Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                        :

                                   :     Chapter 11

6    ENERGY FUTURE HOLDINGS         :

     CORP., et al.,                 :     Case No. 14-10979(CSS)

7                                   :

             Debtors.              :

8    _____:

9

10

11                             United States Bankruptcy Court

12                             824 North Market Street

13                             Wilmington, Delaware

14

15                             September 28, 2015

16                             3:00 PM – 4:17 PM

17

18   B E F O R E :

19   HON CHRISTOPHER S. SONTCHI

20   U.S. BANKRUPTCY JUDGE

21

22

23

24

25   ECR OPERATOR:  AL LUGANO

1    HEARING RE: Special Hearing

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

Page 3

1    A P P E A R A N C E S :

2

3    REED SMITH LLP

4         Attorneys for creditor Bank of New York Mellon

5

6    BY:  KURT GWYNNE (TELEPHONICALLY)

7

8    YOUNG CONAWAY STARGATT & TAYLOR, LLP

9         Attorneys for Ad Hoc Committee of TCEH First Lien

10        Creditors

11

12   BY:  PAULINE K. MORGAN, ESQ. (TELEPHONICALLY)

13

14   OFFICE OF THE UNITED STATES TRUSTEE

15

16   BY:  RICHARD L. SCHEPACARTER, ESQ. (TELEPHONICALLY)

17

18   FRIED FRANK

19        Attorneys for Fidelity

20

21   BY:  GARY KAPLAN (TELEPHONICALLY)

22

23

24

25

```
1    RICHARDS LAYTON & FINGER

2         Co-Counsel to EFHC debtors

3

4    BY:  JASON M MADRON ESQ (TELEPHONICALLY)

5         DANIEL DEFRANCESCHI, ESQ. (TELEPHONICALLY)

6

7    MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

8         Attorneys to Debtors and Debtors in Possession Energy

9         Future Competitive Holidays Company LLC and Texas

10        Competitive Electric Holdings Company LLC

11

12   BY:  DAVID PRIMACK (TELEPHONICALLY)

13

14   CROSS & SIMON LLC

15        Counsel to American Stock Transfer & Trust Co

16

17   BY:  CHRISTOPHER P. SIMON (TELEPHONICALLY)

18

19   O'KELLY ERNST & BIELLI

20        Attorney for EFH

21

22   BY:  DAVID KLAUDER (TELEPHONICALLY)

23

24

25
```

```
 1

 2    WHITE & CASE LLP

 3         Attorney for Ad Hoc Group of TCEH Unsecured Noteholders

 4

 5    BY:  J. CHRISTOPHER SHORE, ESQ. (TELEPHONICALLY)

 6         TOM LAURIA, ESQ. (TELEPHONICALLY)

 7

 8    PAUL WEISS, RIFKIND WHARTON & GARRISON

 9         Attorneys for Ad Hoc Committee of TCEH First

10         Lien Creditors

11

12    BY:  ALAN KORNBERG (TELEPHONICALLY)

13         BRIAN HERMANN (TELEPHONICALLY)

14

15    KIRKLAND & ELLIS LLP

16         Attorney for Debtors

17

18    BY:  MARK KIESELSTEIN (TELEPHONICALLY)

19

20    SULLIVAN & CROMWELL LLP

21         Attorney for E-side Committee

22

23    BY:  ANDREW DIETRICH, ESQ. (TELEPHONICALLY)

24         BRIAN D. GLUCKSTEIN, ESQ. (TELEPHONICALLY)

25
```

```
 1   NIXON PEABODY
 2        Attorney for EFH Indentured Trustee
 3
 4   BY:  RICHARD PEDONE (TELEPHONICALLY)
 5
 6   DRINKER BIDDLE & REATH LLP
 7        Attorney for Citibank, NA, DIP agent
 8
 9   BY:  HOWARD COHEN, ESQ. (TELEPHONICALLY)
10
11   FOLEY & LARDNER LLP.
12        Attorney for UNB Indentured Trustee
13
14   HAROLD KAPLAN (TELEPHONICALLY)
15
16   BROWN RUDNICK
17        Attorneys for WSFS Trustee
18
19   BY: JEFFREY JONAS (TELEPHONICALLY)
20
21   ALSO PRESENT TELEPHONICALLY:
22   SCOTT L. ALBERINO
23   MATTHEW BROD
24   EMILY A BUSSIGEL
25   ADAM M. DENHOFF
```

1   ANDREW DIETDERICH

2   MOSHE FINK

3   MARK FLANNAGAN

4   MATTHEW GREENBERG

5   BRIAN GLUECKSTEIN

6   PAUL HEATH

7   CHAD J. HUSNICK

8   NATASHA HWANGPO

9   KENNETH MAIMAN

10  BRADY C. WILLIAMSON

11  APARNA YENAMANDRA

12  JOSHUA H. APFEL

13  MABEL BROWN

14  MARK A. CODY

15  STACEY DORE

16  DAVID M. DUNN

17  BENJAMIN D. FEDER

18  MOSHE FINK

19  MICHAEL FIRESTEIN

20  MARK FLANNAGAN

21  DAVID M. FOURNIER

22  MARK K. THOMAS

23  AMER TIWANA

24  CARL TULLSON

25  MATTHEW UNDERWOOD

```
 1    MICHAEL J. WALSH

 2    SCOTT L. ALBERINO

 3    ARLENE R. ALVES

 4    CORINNE BALL

 5    ASHLEY F. BARTRAM

 6    L. JOHN BIRD

 7    WILLIAM BOWDEN

 8    JOHN B. BRINGARDNER

 9    PEG A. BRICKLEY

10    CHRISTOPHER L. CARTER

11    STEVEN H. CHURCH

12    KEN COLLIER

13    AMANDA D. DARWIN

14    LAURA DAVIS JONES

15    MICHAEL D. DEBAECKE

16    JUSTIN K. EDELSON

17    JAMIE EDMONSON

18    ANDREW EHRLICH

19    ERIN FAY

20    MICHAEL FIRESTEIN

21    SIMON FRASER

22    MEGGIE GILSTRAP

23    SETH GOLDMAN

24    TODD M. GOREN

25    ISLEY M. GOSLIN
```

1    ANNA E. GRACE

2    MARK F. HEBBEIN

3    BRIAN HERMANN

4    MATTHEW W. KINSKEY

5    EMIL KLEINHAUS

6    CHARLES KOSTER

7    STUART KOVENSKY

8    DANIEL A. LOWENTHAL

9    ANDY MCGAAN

10    R. STEPHEN MCNEILL

11    STEPHEN MILLER

12    PAULINE K. MORGAN

13    BRIAN MORGAN

14    ABID QUERESHI

15    MATTHEW ROOSE

16    JEFFREY S. SABIN

17    NED S. SCHODEK

18    ANDREA B. SCHWARTZ

19    THOMAS WALPER

20    CHRISTOPHER A. WARD

21    EDWARD WEISFELNER

22    SEAN M. BRENNECKE

23    LARRY A. RAPPAPORT

24    ANDREW M. THAU

25

1                    P R O C E E D I N G S

2            THE COURT:  Hi.  Good afternoon, counsel.  This is

3    Sontchi.  We have a lot of people on the phone, of course,

4    as usual.  So I would, again, ask you please to have your

5    phones in mute unless you are speaking to the Court and that

6    you identify yourself for the record every time you do

7    speak.

8            We are here at the request of Sullivan & Cromwell

9    for a conference call, so unless there is an objection

10   otherwise, I think I would turn it over to, I assume it's

11   Mr. Dietderich but it might Mr. Glueckstein, so I don't

12   know.  Whoever would like to speak on their behalf.

13           MR. DIETDERICH:  Thank you, Your Honor.  It's Andy

14   Dietderich with Sullivan & Cromwell.  Good afternoon.  Your

15   Honor, I think that the letters received set this up nicely

16   from our perspective.  It is a sea change.

17           The schedule that we've been on was based on a

18   premise of a deal and the deal was pretty straightforward --

19   we would proceed at breakneck pace on a cash transaction

20   because the cash transaction is the one thing that

21   simplifies an otherwise very complicated case.

22           We've kept our side of the bargain.  We are

23   proceeding to breakneck pace.  We've added additional

24   staffing.  We're conducting depositions.  We've 11

25   depositions in 10 days.  Our experts are going to be

1    identified next Monday, export reports the following Monday.

2          The plan, even a cash -- even with a cash plan

3    involves a number of really difficult legal issues and it's

4    all for a plan that was launched at us in which we were not

5    involved in the formation of, which puts us at a

6    disadvantage, at least in terms of the other parties, in

7    preparing for trial in the first place.

8          But it worked and we're proceeding as quickly as

9    we can and being as diligent as we can to put ourselves in

10   the position to be ready for trial on November 3rd.  But

11   again, we were in this situation because of the bargain and

12   the bargain was a cash plan.

13         And, you know, I think that what's happening is

14   people are taking advantage of that situation and changing

15   the strategy and it is a big change.  If it had been

16   reinstatement at Oncor, maybe it's something we could get

17   our mind around more quickly.  Oncor we understand.

18         But this is reinstatement at TCEH, which is an

19   entirely different company, a different issuer and we have

20   not conducted diligence expecting to receive securities of

21   TCEH in connection with the plan.

22         We need to reassess what it means.  We have a

23   bunch of information, basic information they haven't even

24   yet provided.  How much debt at TCEH?  What does the pro

25   forma balance sheet look like?  How does this change the T-

1    side transactions?  What projections, cash flow projections,

2    will they actually be relying on?

3            Our financial advisors requested this information.

4    They're waiting.  From their perspective, they would be our

5    expert, this I like an underwriting, an underwriting of a

6    bond deal for a new issuer.  We need full cash flow

7    diligence.

8            They say this will take them about a month.  We

9    will push them as much as we possibly can to shorten that

10   but we need some reasonable period of time to look at this

11   new issuer (indiscernible) and to conclude it's feasible and

12   it works.

13           The timing is further complicated by the fact that

14   the debtors themselves aren't ready.  They really should go

15   first, but they're board, Your Honor, has not even approved

16   the transaction with reinstatement.

17           The August 9th minutes and all the materials that

18   were so carefully prepared, hundreds and hundreds of pages

19   served up just at the beginning of discovery on which we

20   have based our entire discovery effort, that -- did not

21   mention reinstatement once in any of those materials.  It is

22   a cash deal as presented to their own board of directors.

23           In addition, we don't think they have financial

24   projections that are credible in the face of the contested,

25   you know, feasibility trial or even any real attention to

1    the question of feasibility.  The financial information in

2    the disclosure statement all is based on 2014 numbers for

3    TCEH, 2014 prices and Evercore and expert -- other expert

4    determinations that are based on the facts and circumstances

5    back at the time, they all have a qualification in those

6    reports, in the disclosure statements that there's been no

7    material change since the date of the reports and the

8    effectiveness of the plan and we are, as anybody who is

9    looking at the energy industry, are people who say it's

10   crystal clear there has already been a material change.

11           But that information, the only information that

12   we've seen, and we've only started looking at it over the

13   last few days because nobody knew it was relevant, that even

14   that information stale and will have to be changed prior to

15   confirmation and I would imagine, which is why they haven't

16   come back to the board to get approval, has to be changed

17   before it's again presented to the board of directors so the

18   board of directors can make an informed decision.

19           The legal situation is also not simple.  This

20   ability to move the bonds from EFH over to TCEH is highly

21   unusual in the markets.  It was put in place as part of the

22   course of exchange offer in 2012.  We need to look and think

23   about, you know, whether or not that legally is a kosher

24   amendment to the indenture.

25           Keep in mind that these are retail bonds, so the

1    provisions of the TIA apply.  So it's not simply a question

2    of the language of the indenture, but it raises, you know,

3    implications, especially given recent case law developments

4    on whether or not you really can strand a retail bond

5    investor with this kind of coercive result.

6              So there's a lot of work to do.  You know, when we

7    think about it, we certainly need to know what the debtor's

8    business case for feasibility is.  We need to know and see

9    updated projections and financial information behind TCEH.

10             We asked over the weekend for the debtors to

11   confirm that their experts are actually ready to testify to

12   feasibility based on the information that we have, we heard

13   crickets.  We assume the answer is no and they're going to

14   need to, you know, give us new financial information as

15   well.

16             So we think that the most -- the earliest we could

17   do this, if reinstatement does stay on the table and

18   assuming the debtors are able to provide us financial

19   information promptly, are able to go back to their boards

20   promptly, are able to get their own experts on the same page

21   promptly, we think a four-week schedule is, you know, the

22   most aggressive we could possibly do.

23             When we think about it in the context of all the

24   other work that's being done, that other work is difficult

25   and there still is a lot of heavy lifting just to get ready

1    for trial on a cash basis.

2            When you think about it in terms of first

3    principles, again, as the committee, there are a lot of

4    alarm bells here that go off for this plan from the

5    perspective of EFH.  We're dealing with a cancellation of a

6    court-approved auction.  We have insiders at the M&A

7    bargaining table.  The official committee was excluded from

8    the plan formation discussions.

9            I don't mean to keep harping on that in a self-

10   centered way, Your Honor, but the committee is the check and

11   balance on the behavior of the debtor in possession.

12           We have pre-effectiveness releases of insiders.

13   We have the use of those releases as payment for M&A

14   transactions.  We have the broadest 9019 supplement anyone

15   has ever seen.  We have an unusual amount of time, maybe an

16   unprecedented amount of time and risk between confirmation

17   and effectiveness.

18           We have no solicitation or vote to the fulcrum

19   class and we have this done over the objection of not one,

20   not two, not three, but every single EFH creditor who, with

21   respect, we will work as hard as we can.  But if there was a

22   case to rush, this ain't it.

23           THE COURT:  Thank you, Mr. Dietderich.  Mr.

24   Pedone, do you wish to be heard?

25           MR. PEDONE:  Yes, I do, Your Honor.  Richard

1   Padone on behalf of the EFH indentured trustee America Stock

2   Transfer.

3          Your Honor, what is proposed here is a material

4   difference from paying cash.  Reinstatement at TCEH is

5   reorganized, it's not reinstatement at all but will add an

6   obligor.  It's unusual and it will create legal issues.

7          The debtor's assertion that this is all we've been

8   contemplating, that is that moving the debt to reorganize

9   TCEH was always a considered option that the world should

10  have known about and that my client should have known about,

11  rings hollow.

12         First, there was all the talk of all cash that we

13  heard repeatedly and we cited and the Court is aware of.

14  But more importantly, the disclosure statement itself does

15  not contain any projections showing the impact of the

16  potential reinstatement of this debt.  There's not even a

17  footnote saying we will adjust these if, in fact, we

18  reinstate this debt and TCEH reorganized.  There's no

19  details on the capital structure of reorganized TCEH that

20  include this debt.

21         So when they say that they expected the world to

22  know based upon some standard language that this could

23  occur, we find that it rings hollow and we were not put on

24  alert that the debt could be put down to reorganized TCEH.

25         Your Honor, Mr. Dietderich noted that the board

1    itself, there appears to be no evidence at all through

2    depositions and other discovery so far, that the board was

3    aware that reinstatement and reorganize TCEH could occur.

4    There may have been discussions about it at the board level

5    about a potential for reinstatement, but nothing about this

6    extraordinary step that opens up these broad areas analyzed.

7            Your Honor, what is relevant today is not the

8    legality of the transaction could this occur outside of

9    bankruptcy.  We'll deal with that and what would be

10   required, the two steps, so to speak, assuming the debt by

11   EFH and then reinstating it and moving it to a different

12   company.  That double-step transaction is not going back to

13   the obligor.  That's unusual and this is potentially a TIA

14   issue.  But that's all for another day.

15           What we have today are two questions that we need

16   to prepare for trial on, but first analyze do we even need

17   to try or could we agree with it, what's there to analyze?

18   And those are issues related to feasibility and then does

19   this transaction somehow result in the form of impairment

20   equitable or legal.

21           And as we outlined in our letter, the debtors are

22   $10 to $20 million ahead of us in analyzing what the

23   reorganized TCEH would look like.  We stepped back and we

24   said, okay, we realize that this case is a freight train

25   moving as quickly as humanly possible towards trial.  What

1    would be required to get through this?

2              What our expert said to us is we could go into the

3    million-plus page database and begin to dig for documents

4    and assemble out own base case.  That's quite crazy.

5              The way to proceed is have the debtors put in a

6    really succinct form their expert reports for feasibility on

7    the table.  Let them lay out what they will rely on.  Ask

8    them to be very specific about the documents they're relying

9    on.  Don't give us generalities that require a week of

10   digging to pull the documents out.  Put the debtor's case

11   package for feasibility on the table, new loan documents for

12   the new entity, what the corporate governance at the new

13   entity will look like, what the projections are, fuel price

14   projections that are not 11 months old by the time we get to

15   the time of confirmation, et cetera, et cetera.  Package it

16   out so, as Mr. Dietderich said, he can do the underwriting

17   on this as you would with a new loan and then our experts

18   can analyze that.

19             And our experts have said that the normal process

20   to begin to analyze something like this would be two to

21   three months to start from scratch and go forward.  They

22   said that here, if they receive this information, they

23   thought that to get to the point that they could put a

24   rebuttal case on was 45 days, that is, rebut what the debtor

25   said.  They said it would take two months to actually put

1    our own case together to controvert the debtor's case.

2          And that led us to say the practical solution here

3    is to require the debtors to put their case together as fast

4    as they can from the moment the debtors put that neat, tidy

5    package, their expert report on the table, start the clock

6    and we will get ready to go to a confirmation trial in 45

7    days.  That's compromise on both sides' parts, but it's what

8    I think any expert analyzing what would be needed would make

9    sense here and we're prepared to proceed on that basis.

10          Your Honor, at the end of our letter we laid out a

11   very concrete proposal that the Court extend the

12   confirmation hearing date by 45 days and that the parties go

13   back and consult on the details of what would actually be

14   required from the discovery and ask that the Court consider

15   that.  Thank you.

16          THE COURT:  All right.  Is there anyone else that

17   wishes to be heard in favor of the positions espoused by Mr.

18   Dietderich and Mr. Pedone?  All right.  I will at this point

19   turn it over initially to the debtors.

20          MR. KEISELSTEIN:  Good afternoon, Your Honor.

21   It's Mark Keiseltein, Kirkland & Ellis on behalf of the

22   debtors.  Thank you for hearing us this afternoon.

23          Your Honor, I'm not going to belabor the points

24   that we made in the letter, but there are I think several

25   points of emphasis and elaboration in rebuttal to what you

1    just heard.

2            Your Honor, first and foremost, you know, these

3    very sophisticated parties and advisors have been aware of

4    the possibility of reinstatement throughout the entire

5    course of this restructuring.  But I will note that in April

6    when we filed our original plan, we believed, based on how

7    the auction process was going, that the EFH's state was

8    actually going to be impaired and not for lease elements.

9            And the question of unimpairment was actually put

10   to the side.  So contrary to the insinuations of some that

11   the otherwise unimpaired language is meaningless boilerplate

12   that's put in every plan and to which no attention should be

13   paid, in fact, that was not in the April 14th plan.

14           What happened thereafter?  Your Honor, it was

15   indeed only when the dual path plan was filed in late July

16   that the otherwise unimpaired language was incorporated and

17   that was no accident.  It was a deliberate conscious choice

18   of language that was triggered by a new set of facts,

19   specifically that a transaction was under serious

20   consideration that would leave E-side creditors unimpaired.

21   That, of course, is a retransaction that's the centerpiece

22   of our plan today.

23           And as the replan developed, unimpairment in all

24   of its forms became a live issue and we put that language in

25   the plan, again, not as a matter of wrote exercise, but

1    because that was how things were playing out.

2              And we did more than just put in the language

3    otherwise unimpaired.  We actually defined that term, it's

4    one of the definitions under the plan by an explicit

5    reference to Section 1124 of the code, which of course,

6    encompasses reinstatement for an unsecured creditor other

7    than payment in cash in full on the effective date, it's the

8    single most prominent, if not only, matter to otherwise

9    unimpair a party.

10             And so it's simply not credible for these very

11   smart and experienced advisors to say that we saw the

12   language change made by the debtor, we understood the

13   reference to 1124 but we had no idea that the debtor might

14   actually pursue this alternative treatment.

15             And it also rings hollow, Your Honor, the notion

16   that they don't know their own indenture which lays out

17   quite plainly, the indenture combined with the supplemental

18   indentures, what happens if the legacy notes are reinstated

19   in the context of a spinoff of TCEH, which of course is

20   exactly what the plan provides.  And what that provides for

21   is that the liability travels from EFH to TCEH.  Again, it's

22   in their own indenture and although, I think for the first

23   time we're hearing that those transaction by which, you

24   know, that mechanic was set up are somehow suspect, we

25   obviously went through a very long legacy liability process

1   with all the major stakeholders where they examined in great

2   pain and at great expense all the pre-petition transactions

3   and asserted where they thought they might have avoidance

4   actions or standing to try to avoid transactions and to my

5   knowledge, these were never on the list so they were well

6   aware exactly how their own indentures worked and what

7   reinstatement would mean in this case.

8            And obviously if we reinstate then we have to live

9   with its terms and the terms say in the context of the

10  spinoff of TCEH the liability travels.

11           Now, and indeed, as the letter of the first liens

12  indicated, when Mr. Pedone's client objected to the

13  disclosure statement on August 17th, they noted that they --

14  that unimpairments was not clearly enough defined for them

15  and that it encompassed possibly the concept of

16  reinstatement.

17           So and Mr. Padone says in his letter that it was

18  unforeseeable that the debtor might make this change prior

19  to September 18th, it was not only foreseeable, it was

20  foreseen.

21           And so we very much dispute the notion that this

22  is a sea change under the plan.  It is not.  It's consistent

23  with every plan since the first amended plan that was filed

24  in late July.

25           Now, they may not have focused on the possibility

1    of reinstatement at TCEH but that really can't be laid at

2    the debtor's doorstep.  It was as plain as day in the plan

3    itself.

4              And second, Your Honor, I want to illustrate the

5    interaction between the EFH make whole issue and

6    reinstatement.  And, as we said in our letter and as the

7    plan very plainly states and no one could argue confusion on

8    this point, the allowance of an EFH make whole claim prior

9    to emergence would cause a failure of a condition to the

10   replan and in that case, payment in full in cash to all the

11   E-side creditors would be thrown into severe doubt.

12             The option of reinstatement would be a means,

13   perhaps the only means, to avoid that very bad outcome and

14   would permit the full cash payments to the balance of the E-

15   side creditors while giving the EFH noteholders the benefit

16   of their bargain.

17             Thus I want to be really clear that reinstatement

18   does not break faith with the plan.  It actually keeps faith

19   with the plan.  And this is important because there's,

20   again, this insinuation that reinstatement -- and, again,

21   we're only talking about the EFH legacy notes -- is somehow

22   contrary to the spirit of the plan.

23             And, again, to the extent the parties' view of the

24   spirit of the plan, it matters when it contradicts the very

25   clear, expressed words on the page, I want to be, again,

1    clear, that it does not contradict it.  It's entirely

2    consistent with the spirit of the plan and the letter of a

3    plan to have a make whole situation dealt with to be able to

4    obviate that outcome.  And, again, we think that's highly

5    unlikely as an outcome because we think the make whole

6    claims are weak.  But obviously that's not today's issue.

7            I just want to take a minute on governance because

8    we've heard a fair amount about how the board did not

9    specifically authorize this alleged change.  I think it goes

10   to the question of whether it's a sea change or whether it's

11   preservation of the status quo, i.e. the potential ability

12   to pursue reinstatement if the circumstances warrant.  And

13   clearly it's the latter and not the former.  The board has

14   not been asked to actually approve the implementation of a

15   reinstatement strategy and are unlikely to ever do so unless

16   the make whole scenario that I laid out comes to pass.

17           So the board was not asked to authorize all the

18   clarifications and changes made in the context of resolving

19   a dozen or more disclosure statement objections and recall

20   that the request for more clarity was one that was prompted

21   by Mr. Padone's objection.

22           I want to talk briefly about discovery itself.

23   Again, we start with the proposition of the E-side

24   stakeholders were on notice fully of the possibility of

25   reinstatement.  It's also true that they've had access to a

1   ton of financial information for months necessary to assess

2   feasibility and it's also true that they had the full

3   opportunity since July when confirmation discovery commenced

4   to seek additional information.  Again, they chose to focus

5   on other issues.

6           But fortunately, the factual issues around

7   reinstatement are actually quite narrow and the primary

8   factual issue I agree relates to feasibility.  Can

9   reorganized TCEH handle the additional debt?  And as we set

10  out in the letter, Your Honor, the debt service on these

11  notes, if reinstated, would be around $35 million a year.

12  The projected EBITDA, the forecast for reorganized TCEH

13  reflects EBITDA in excess of $1 billion a year.

14          I'm not a financial year but it doesn't take one

15  to see that the reinstated notes will not make a material

16  dent in the operational cash flows of the company.  And, of

17  course, the E-side parties are entitled to do some about of

18  diligence to vouch safe the projections to make sure they're

19  not off by a factor of 90% or more and they were entitled to

20  do that in July and August and chose not to.

21          But it is, frankly, ludicrous for the E-side

22  parties to claim that they need to do an exhaustive bottoms-

23  up plant-by-plant analysis of the accuracy of the

24  projections.  And to delay this extraordinarily expensive

25  and painful process so it can do so and potentially endanger

1     the retransaction itself, as was laid out by the unsecured

2     ad hoc letter is, again, not appropriate.

3            Given the relative size of the reinstated debt and

4     the projected cash flows that would constitute massive

5     overkill.  Again, given the limited nature of the

6     feasibility inquiries and the relative sizes of the debt and

7     the cash flows, the E-side creditors still have ample

8     opportunity to scrutinize feasibility through the upcoming

9     depositions of Mr. Keglevic, Mr. Filsinger, the debtor's

10    energy expert, Mr. Millstein, the financial advisor for the

11    TCEH first lien creditors who, after all, represents the

12    future owners of substantially all the equity of reorganized

13    TCEH and who would be hurt most of all by a future

14    insolvency.

15           And we also agree to provide a second bite of the

16    apple with Mr. (indiscernible), the debtor's financial

17    advisor.  And as we point out in the letter, to the extent

18    that reinstatements were pursued, there would be a cash

19    payment, and as we understand it, roughly equal to the

20    amount of the reinstated debt that would come from the

21    investors over to TCEH to fully compensate it for taking on

22    that liability not presently on its balance sheet.

23           Again, when you couple that with the financial

24    information that's already readily available, including an

25    updated high level forecast that per the scheduling order

1    was put in the data room on or around September 10th, it's

2    clear that there is enough information and enough time for

3    this issue to be fully vetted.

4           So notwithstanding they're not having paid

5    attention to this issue until July, August or the first half

6    of September, there is still plenty of time for the

7    necessary diligence to be done prior to trial, and I would

8    add, the trial, as you know, Your Honor, is going to start

9    with the settlement agreement and other issues and staging

10   the trial could be managed so that this is one of the last

11   issues, if not the last issue, dealt with.

12          And to that end, Your Honor, we offered a series

13   of accommodations that we laid out in the letter and that I

14   won't repeat and, Your Honor, in sum, I think the adage is

15   that old adage.  You know, failure to plan on their part is

16   not an emergency on our part and we would as the Court to

17   deny the request for delay of the trial.

18          THE COURT:  Okay.  Thank you.  Mr. Kornberg?

19          MR. HERMANN:  Good afternoon, Your Honor.  It's

20   Brian Hermann from Paul Weiss on behalf of the TCEH first

21   lien ad hoc committee.  I'll be very brief because I think

22   Mr. Kieselstein touched on the points I was going to make

23   for the most part.

24          First, I agree with him.  I think this can come as

25   no surprise to the EFH Committee or to the EFH note

1    indenture trustee.  The plan was pretty clear in my view

2    that it would pale out claims in full, in cash or other

3    treatment rendering the claim unimpaired.  I don't know what

4    that could have meant if not reinstatement.  I don't know

5    what else you can do with a claim to unimpair it over that

6    pay it in full or in cash or reinstate it.

7              As far as the debt traveling to TCEH, that's

8    exactly what the indenture provides.  Nobody's playing any

9    games with that.  As Mr. Dietderich correctly said, that

10   indenture's been in place since 2012.  Those are the

11   provisions.  We're just agreeing under the plan to abide by

12   them in the event that reinstatement is elected.

13             In terms of the request for the delay, I think

14   it's important to put the current dispute in perspective

15   because I think it helps to view it with some commonsense

16   practicality.

17             From our client's point of view, Your Honor, we're

18   projected under the plan to get $0.59 recovery on account of

19   secured debt, which means that billions of dollars of value

20   is being wiped out from our clients.  On the other hand, the

21   parties complaining about the rush, either stand to get paid

22   in full in cash or to be reinstated.  Either way, they're

23   getting paid in full.  So I just don't understand the

24   constant resistance to moving forward with a plan that would

25   otherwise satisfy those claims in full.

1           And in terms of feasibility, I think that's a red

2   herring for a couple reasons.  One, as the debtors pointed

3   out in their letter, to the extent that they elect to

4   reinstate the date and the debt were to travel to

5   reorganized TCEH, reorganized TCEH would be fully

6   compensated by the EFH estate for taking on that debt.  So I

7   think from a feasibility perspective, the estate should be

8   net neutral.

9           In addition, the midpoint valuation of reorganized

10   TCEH in the debtor's disclosure statement, which nobody's

11   really taken issue with, is $14.2 billion.  We're talking

12   about $500 million approximately worth of debt.  So it's

13   really de minimis in the grand scheme of things in terms of

14   the company's ability to service it and in view of the

15   enterprise value.

16           And the last point I would make is nobody is more

17   focused on the feasibility of this plan than my clients who

18   are converting a bunch of debt into equity.  They would not

19   do that, I assure you and I think you know this -- I'm sure

20   you know this -- if they thought that the plan was not

21   feasible.  They would not be subordinating their current

22   secured debt to any debt, let alone $500 million of

23   unsecured debt that may travel over from the EFH estate in

24   the event that the debt is reinstated.

25           So I think when you view this dispute in

1    perspective, it's sort of incredible to me that creditors

2    who stand to be paid in full are looking to further burden

3    an estate where creditors are being asked to wipe out, and

4    agreeing to wipe out billions of dollars of debt.  I don't

5    think there's any part that's more appropriately situated to

6    assess the feasibility of the plan than we are.  If they'd

7    like to, they're more than welcome to, but they don't need

8    more time to do it.  I think it's been fully vetted by a lot

9    of people who have a far greater interest in the TCEH estate

10   than they might.

11           And so for those reasons, we would ask that you

12   deny the request to extend the confirmation hearing.

13           THE COURT:  I don't know if you realize it, Mr.

14   Hermann, but you made their case several times because you

15   reiterated on several times that you didn't understand why

16   creditors who were being paid in full would be objecting.

17   The entire point is that everybody's been saying that,

18   including to me, repeatedly.  But that's not the issue.

19           You're not paying them in full.  You're reserving

20   the right not to pay them in full.  You're reserving the

21   right to reinstate them at the T-side of the capital

22   structure.

23           So to complain about them complaining about them

24   being paid in full is to miss the entire point of this

25   telephone conference.  Mr. Shore?

1        MR. LAURIA:  Your Honor, this is Tim Lauria with

2    White & Case.  Mr. Shore, unfortunately, is stuck in a

3    hearing in Chicago today, so I'm appearing on his stead.

4        THE COURT:  Happy to have you.

5        MR. LAURIA:  I represent the -- thank you, Your

6    Honor.  I represent the TCEH ad hoc unsecured group and the

7    creditor investor consortium.  I'd like to address four

8    points.  Number, on the issue of surprise or the sea change

9    as it was referred to by counsel today; number two, the

10   substantive impact of potential reinstatement; number three,

11   the impact of delay on negotiations that are going on behind

12   the scenes; and number four, importantly, the impact of

13   delay on the ability to get this transaction consummated.

14       With respect to the first point, I just want to

15   elaborate a little bit on a couple of points that have

16   already been made.  Not only did the EFH note trustee laid

17   the issue of what otherwise unimpaired meant in his

18   disclosure statement objection, but so did the EFH second

19   lien trustee.

20       And indeed, at the scheduling hearing on the 25th,

21   counsel to the second lien trustee specifically raised the

22   issue on the record and I'm just going to quote from the

23   transcript Page 108.  Mr. Bowden said, "The other issue I

24   just want to raise, which we raised in our pleading and it

25   partially goes to the question of impairment, it somehow

1    goes to the scheduling and it's not a big issue, but I just

2    want to make sure that people understand.

3              We've heard today -- debtors have said in their

4    pleading that the cornerstone of their plan with respect

5    with EFIH's creditors is to pay in full, in cash.  That

6    would be great but that's not what the plan actually says.

7    It says "paid in full in cash or such other treatment that

8    has rendered them unimpaired".  Without knowing what that

9    is, it's kind of hard to know whether or not on October 28th

10   confirmation hearing and all the things that go along with

11   it leading up to that are really feasible.

12             "We've raised this with the debtors.  They haven't

13   really told us they're going to take that language out until

14   we know really what we're talking about as far as what our

15   plan treatment is going to be.  It's a little bit hard for

16   me to stand here and say the schedule is okay or is not

17   okay.  Thank you."

18             Now, the interesting thing is that, in fact, in

19   consideration of that, the Court did, in fact, address it in

20   its ruling.  In the transcript at Page 148, the Court said

21   truncating the schedule was specifically contemplated by a

22   new order of the Court entered in July as presented and I

23   know there's going to be a fight about whether it's true or

24   not.  But it's presented with an unimpaired E-side and

25   consent on the T-side except for Mr. Gwynne's client.

1            I believe that we are materially in compliance

2     with the proviso under the order that was entered previously

3     by the Court where we would shorten the process.  And,

4     indeed, I think we had initially contemplated early October,

5     October 5th or so, within the hearing.  We're already

6     pushing that out another month.

7            The issues have been sufficiently narrowed from

8     what was initially contemplated to be sort of the mother of

9     all confirmation hearings starting in January of 2016.

10    They've been narrowed by the unimpairment of the E-side and

11    the balance sheet.

12           So Your Honor, it seems to me that it's fair to

13    say that the issue that today is being raised is something

14    brand new that nobody was aware of or has thought about, in

15    fact, has been on the table and people have thought about it

16    on the record and otherwise.  And so this is little more

17    than a regurgitation in a further effort to continue

18    delaying the timeline that is so important to the completion

19    of this transaction.

20           In that regard, I just want to say something here

21    that seems to skip past the statements of counsel from time

22    to time.

23           There is not a lawyer on this phone call who

24    doesn't know that the words 'otherwise unimpaired' includes

25    within it -- in fact, I really think there are two choices

1    here, paying in cash in full or you're reinstating.  So the

2    fact that those lawyers chose not to focus on that language

3    but to ignore it, is not something that they can now rely on

4    as purported surprise.  And, indeed, the idea that EFH

5    noteholders and the EFH trustee are somehow unaware of this

6    possible, they are charged with knowledge of what their

7    indenture says.

8              And I want to be really clear about this.  It's

9    unfortunate that nobody attached the EFH indenture to the

10   letters that were filed today.  But the EFH indenture

11   specifically provides for the move of this debt to the T-

12   side in the event of a separation.  In other words, if you

13   want to unimpair the EFH notes, you have to move it to the

14   T-side.  You couldn't move it to Oncor, as Mr. Dietderich

15   referred to.

16             And importantly, this is not an underwriting

17   analysis, as Mr. Pedone suggested he'd like to do.  In fact,

18   a majority of the EFH noteholders consented in 2012 to the

19   amendment of the indenture which was signed by the trustee,

20   which specifically provides this treatment.

21             Now, what's interesting about that, moving on to

22   my second point, in 2012 when the consenting noteholders

23   agreed and the indenture was amended to provide for this,

24   they were agreeing to be moved behind $27 billion of secured

25   debt and they were agreeing to be pari passu with over $5

1   billion of unsecured debt.  Today, under the plan, they

2   would be moved behind approximately $6 billion of new

3   secured debt and they would be pari passu with $2.25 billion

4   of unsecured debt.

5          So they have materially improved the substance of

6   their position in the event of a reinstatement from what

7   they negotiated for in 2012.

8          Now, as counsel for the first lien T-side debt

9   pointed out, we're talking about $492 million of debt moving

10  into a capital structure of over $14 billion with over $1

11  billion of EBITDA.  I think that it's fair to say that this

12  is much ado about nothing.

13         Now, they get their discovery and they certainly

14  get to make their arguments.  But the fact of the matter is

15  that first lien lenders who are owed over $24 billion are

16  subordinating a substantial amount of their recovery to this

17  debt if in fact it's reinstated and moved over to the T-

18  side.  So while the plan certainly has to be feasible from

19  the technical perspective, let's not lose sight of the

20  practical considerations here.

21         On to the impact on settlement discussions, we

22  have always required from an investment standpoint that the

23  make wholes have to be disallowed or not paid and we

24  recognize that there's a risk around that issue from an

25  appellate perspective.  And so we've been trying to work

1   deals with the E-side creditors that resolve the issue of

2   the make whole.  And we have been making significant

3   progress at the EFH level in particular.  And I can't

4   promise that a deal will be achieved but I can tell you that

5   one is within reach.

6          But as in past situations, we have to get the

7   agreement of other constituencies to deliver that appeal.

8   The important thing is that the issue of the make whole

9   could be rendered moved simply be reinstatement.  So if we

10  can't get to a deal, it's an important tool for us to move

11  forward with this plan to have the right to reinstatement.

12         And, in fact, we have always told the holders of

13  the debt who we have negotiated with on and off for months

14  that failure to reach a deal would result in the need to

15  resort to reinstatement.  This has been no secret in the

16  Courtroom and it's been less of a secret in the negotiating

17  room.

18         On the other side of the coin, though, the ability

19  to delay the timeline shifts leverage against us and

20  empowers those who don't want to make a deal.  And in that

21  regard, I think it's noteworthy that counsel to the

22  statutory fiduciary for the EFH creditors has not

23  participated voluntarily in any of the settlement

24  negotiations that we've had.

25         Counsel has instead been focused not on how to

1    make this deal work to the unquestioned benefit of every

2    stakeholder in this case, but only how to blow it up.  And

3    they argue issues that are of no concern to the stakeholders

4    who they purport to represent.

5              Final point I'd like to address, the importance on

6    timing.  This deal is incredibly complex.  We're separating

7    two very large companies.  We've got regulatory hurdles to

8    cover that the Court has been informed of from time to time.

9    We're raising $12 billion of new capital through a rights

10   offering to literally thousands of creditors.  We're raising

11   $5 billion of new debt.  We're transferring generating

12   assets which are subject to regulation by a number of

13   different agencies to a new ownership group and we're

14   changing ownership of a public utility.

15             These things are going to be difficult to achieve.

16   They are achievable but they are going to be difficult to

17   achieve in the timeframe provided.  And so we have pushed

18   and pushed hard because we understand that financial

19   investors cannot be asked to wait an indefinite amount of

20   time to get their recovery and they understand that new

21   money can't be committed for an indefinite period of time

22   when we're talking about $12 billion of new capital.

23             So timing is everything here and pushing

24   confirmation back a month, as requested, or more in the case

25   of the EFH noteholder trustee, puts that at risk.  Indeed,

1    every day we lose creates more risk around this transaction.

2    We can get it done but we can't lose time and we shouldn't

3    be taking our eye off the ball.

4            The possibility here is that we get to a

5    resolution with the EFH noteholders and we never have to go

6    to reinstatement.  We waive the right to reinstate.  I can't

7    promise to Your Honor today that we're going to get there.

8    We're trying very hard to get there.  But I can tell you

9    that if we're forced to take the opportunity of

10   reinstatement off the table or if the process is delayed,

11   the prospect of getting to a deal is going to go down, not

12   up.  So we would ask that the request to delay the process

13   be denied.

14           THE COURT:  Thank you.  Would anyone else like to

15   be heard before I turn it back over to Mr. Dietderich?

16           MR. JONAS:  Your Honor, Jeff Jonas on behalf of

17   the T-side second liens.  I won't belabor the point.  We're

18   in support in the same fashion as all the other T-side

19   creditors that have spoken.

20           THE COURT:  Thank you, Mr. Jonas.

21           MR. JONAS:  Thank you.

22           THE COURT:  All right.  Mr. Dietderich, yeah, if

23   you'd like to reply.

24           MR. DIETERICH:  I'll be brief.  Let me first,

25   because I guess I need to now respond to Mr. Lauria's

1    statements.  The committee was excluded from discussions

2    about the formulation of this plan.  The committee asked to

3    be involved and we were excluded.  At no point during this

4    proceeding has Mr. Lauria bothered to call me and discuss

5    his bid for Oncor -- at no point, despite my role for the

6    statutory committee.

7              I have requested to contact him and I've gotten

8    nothing in return.  In fact, the conversation I remember

9    most was the email saying let's talk and his asking me back

10   send me wire instructions, which I think is directly

11   material to the nature of the conversation and the basis on

12   which they believe it was fair to exclude us.

13             But this conversation has nothing to do with

14   anybody's legal rights.  It doesn't even have anything to do

15   with the plan.  It's about scheduling and if it's so

16   important to have the toggle as a technique for dealing with

17   the make whole problem on the EFH notes, then you'd think

18   they would have done their homework and they wouldn't have

19   put this in on September 21st because there is nothing in

20   the disclosure statement other than that one reference.

21             There's no conditions about when the toggle

22   applies.  There's no conversation with the board about the

23   importance of it.  There's no adjustment to the financial

24   statements or anything else.  We know how to write toggle

25   plans.  And if this was really important, they would have

1    done it and they would have done it correctly but they

2    didn't.

3         This is only about scheduling.  And regardless of

4    the nature of the plan, I can tell you this.  We had a cash

5    schedule.  In all scheduling conversations of which I've

6    been a part, cash had been the reason for speed.  If we now

7    have a non-cash plan, we need a non-cash schedule and we,

8    the committee, despite not being involved, despite not being

9    consulted, despite not talking to the debtor are going to

10   bend over backwards to get it done as quickly as humanly

11   possible.  But as quickly as humanly possible is four weeks.

12   Thank you, Your Honor.

13         THE COURT:  Thank you.  Mr. Pedone?

14         MR. PEDONE:  Your Honor, I just join Mr.

15   Dietderich's comments and emphasize the absence of

16   information concerning this.  Reinstatement transaction and,

17   in particular, concerning the deal that apparently exists

18   but has never been disclosed until the letters today where

19   cash will flow from the REIT entity over to the reorganized

20   TCEH to compensate for this reinstatement.

21         We were trying to figure out the economics of the

22   transaction and, apparently, there's a deal that's not in

23   the disclosure statement, not anywhere else.  It was

24   disclosed today and I think that emphasizes the fact that

25   the world really didn't know what was going on here.  Thank

1    you.

2              THE COURT:  Thank you.  All right.  I think it's

3    somewhat disingenuous for the debtors and their supporters

4    to argue today that everybody knew this was something that

5    was entirely possible if not probable and they were clearly

6    asleep at the switch and it's not our fault and we need to

7    be able to press forward on the timeframe that's already

8    been set by the Court.

9              While it certainly is true that the language has

10   been in there since at least the plan was filed in August,

11   repeatedly, as I pointed out with Mr. Hermann, repeatedly

12   the mantra has been, Judge, push forward.  Don't worry about

13   what the E-side has to say.  They're going to get paid in

14   full in cash.  It doesn't get any better than that.  Let's

15   go to confirmation.  And every 5th or 6th time perhaps

16   someone would throw in the footnote, or otherwise impaired.

17             I have been operating under the assumption that

18   the default was cash and that sort of the out might be some

19   other treatment.  But I certainly haven't been focused on

20   that other treatment in putting the schedule together that

21   we have today.

22             I do believe that there has been a substantial

23   change in how certain of the E-side creditors view the world

24   based on what happened at the disclosure statement hearing.

25   However, I don't want to overstate the impact that has on

1    the case in general.

2              We are talking about one piece of a much larger

3    deal and a much larger settlement and confirmation hearing.

4    We're talking about specific treatment of one specific set

5    of debt on the E-side, the EFH legacy notes.  And we're

6    talking about a specific change reinstating them on the T-

7    side of the debt structure.

8              I believe that it is appropriate and really

9    required that Mr. Pedone's client, Mr. Dietderich's client

10   be given the opportunity to take discovery related to the

11   issues that come out, the narrow issues, but the issues that

12   come out of the reinstatement at the T-side of the debt

13   structure.  Certainly that would include feasibility on the

14   T-side.

15             Now, I heard a lot today from the plan supporters

16   to the effect of we're talking about a billion dollar EBITDA

17   post reorganization company.  What are they complaining

18   about?  Well, they need an opportunity and are entitled to

19   an opportunity to test that and that includes document

20   discovery and supplemental deposition discovery.

21             I don't think it's fair or feasible to provide an

22   opportunity for that discovery in the current schedule.  So

23   what do we do?  We're going to bifurcate in somewhat the

24   hearing and the preparation.  Confirmation will go forward

25   on November 3rd.  The discovery schedule in place will

1   continue to go forward and be adhered to.  However, in

2   connection solely with issues related to the reinstatement

3   of the EFH legacy notes on the T-side of the capital

4   structure, the Court will allow separate track discovery

5   document and deposition on those narrow issues and also an

6   extension of time for the submission of expert reports by

7   the objectors.  The debtors don't need extra time, but by

8   the objectors related to those issues.  And really we're

9   talking about, again, T-side feasibility.

10          Conformation will start on November 3rd.  The

11  issues related to the feasibility of reorganized TCEH and

12  any other specific issues related to the reinstatement of

13  the legacy notes won't be considered in trial until the week

14  of November 30th.

15          I have currently scheduled and ask the debtors not

16  to send out the notice until after today but of course they

17  can as soon as we get off the phone, a confirmation trial on

18  the 3rd, 4th, 5th, 6th, 12th, 13th, 19th, 20th and I just

19  added the 23rd, 24th and 25th.  That's 11 trial dates.  Not

20  all of those are full days.

21          I don't think that we will be done by then.  I

22  hope we will be substantially done.  But we certainly won't

23  be done because we'll at least preserve this issue for the

24  week, which hopefully will be the last week, but the week of

25  November 30th.

1           This will require even more super human activities

2     by the lawyers and professionals to dual track a

3     confirmation hearing with discovery on these issues but

4     there just isn't time in the current schedule to fairly give

5     Mr. Dietderich and Mr. Pedone's clients the opportunity that

6     they need and deserve to take discovery, issue an expert

7     report and file an objection to confirmation and be prepared

8     to go to a contested hearing.

9           So I am, in effect, granting Mr. Dietderich's

10    request for what is almost a 30-day, I guess it's four-week,

11    extension out of the confirmation as a whole but on this

12    specific issue and you'll need to work out a schedule

13    amongst yourself and submit it to the Court to supplement

14    the schedule already in place that gives an opportunity for

15    discovery and submission of expert reports and an objection

16    deadline that's extended to deal with these specific issues.

17          I just think that's really the only fair way to

18    proceed.  I am very cognoscente of the need to keep this

19    thing going on a schedule but I always have to balance that

20    with basic due process rights.  I'm doing my best to

21    accomplish that.  I think it's fair to bifurcate the trial.

22    I think as Mr. Kieselstein said, we've got a lot to do.

23    We're going to start with settlement.  That may take some

24    time.  That will take some time.  There are a lot of other

25    issues involved, a lot of different debt as various places,

1    a lot of different evidence that might have to come into

2    place, certainly more than one or two objectors, so I don't

3    think it's going to disrupt the trial overly much to do what

4    the debtors in effect suggested, which was sort of push

5    these issues back towards the backend of the confirmation

6    hearing.  And we're just going to do that on a formal basis

7    as opposed to a more ad hoc informal basis by just seeing

8    how the case proceeds.

9              So I'd ask the plan proponents, sponsors,

10   supporters to work with Mr. Dietderich and Mr. Pedone to

11   come up with an agreed schedule that will supplement what's

12   already in place, consistent with my comments today and to

13   submit it to the Court under certification of counsel.

14             I hope and pray you're able to work that out

15   without further court intervention.  But if you can't,

16   contact the Court and we'll either -- I'll either have you

17   submit the orders under dueling certifications or maybe

18   write letters and have yet another call because I always

19   miss spending time with you guys when I'm not able to do so.

20   No, being facetious of course.  Absolutely will make myself

21   available at any moment to deal with the very serious issues

22   that are contemplated by this case and I don't take it

23   lightly at all.

24             All right?  So I hope that's sufficiently clear

25   but I would now ask if anybody has any questions.

1           MR. DIETDERICH:  Your Honor, this is Mr.

2    Dietderich.  I think it is sufficiently clear but just so I

3    get it myself, we should assume cash for the purposes of the

4    initial phase of the confirmation hearing.

5           THE COURT:  Yes.  I think that's fair.

6           MR. DIETDERICH:  Okay.

7           THE COURT:  Again, and I think this only affects

8    this one debt issuance, at least that's my understanding.

9           MR. KIESELSTEIN:  That's correct, Your Honor.

10          MR. LAURIA:  Your Honor, this is Tom Lauria, if I

11   may ask one question of clarification.

12          As I mentioned, we are, in fact, in discussions

13   with the EFH noteholders and if those discussions get to

14   fruition, we have a deal with them, we will not need to

15   retain the right to seek reinstatement.  And so as part of

16   that deal, we would agree, obviously, you know, with the

17   debtors, to waive the reinstatement right.  And I just

18   wanted to make sure that, or ask the Court that if we're

19   able to bring that to the Court and that deal's on the table

20   and we're waiving the reinstatement right, presumably at

21   that point we would stop the supplemental discovery and

22   wouldn't need to have this bifurcated hearing on

23   reinstatement related issues.

24          THE COURT:  Well, right.  As I've ruled

25   previously, discovery is for a purpose.  And if the purpose,

1    i.e. the reinstatement option, is off the table, there's no

2    purpose for discovery.  So were that to no longer be an

3    option under the plan, obviously that would mute the issue

4    and focus it back on what everyone has known the issue, at

5    least primary issue, to have been which is whether they

6    truly are impaired, if you pay in full in cash, et cetera,

7    et cetera, all the issues we all know about.

8             MR. LAURIA:  Right, right.  Thank you, Your Honor.

9             THE COURT:  You're welcome.  Anything further for

10   today?

11            MR. PEDONE:  Nothing from the debtor, Your Honor.

12   Thank you so much for your time.

13            THE COURT:  You're welcome.  Have a good day.

14   We're adjourned.

15

16                         * * * *

17

18

19

20

21

22

23

24

25

Page 48

1                    C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4      transcript is a true and accurate record of the proceedings.

5      Sonya

6      Ledanski Hyde        Digitally signed by Sonya Ledanski Hyde
                            DN: cn=Sonya Ledanski Hyde, o=Veritext,
7                           ou, email=digital@veritext.com, c=US
                            Date: 2015.09.29 11:27:06 -04'00'

8      Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  September 29, 2015