## EXHIBIT A

**(Order)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

### ORDER AUTHORIZING DEBTORS TO ENTER INTO
### AND PERFORM UNDER PLAN SUPPORT AGREEMENT

Upon the motion (the "PSA Motion")[2] of the Debtors for entry of an order (this "Order"), authorizing the Debtors (a) to enter into the Plan Support Agreement (the "PSA"), attached hereto as Exhibit A, by and among (i) the Debtors; (ii) the holders of approximately 99.26% of the outstanding equity interests in EFH and its direct and indirect equity holders (the "Consenting Interest Holders"); (iii) certain holders of TCEH First Lien Claims (determined without regard to any claims held by any Debtor) (the "Consenting TCEH First Lien Creditors"); (iv) Wilmington Trust, N.A., as successor administrative agent and collateral agent under the TCEH Credit Agreement (the "TCEH First Lien Agent"), solely in its capacity as such and solely with respect to Section 6.1 and 12.4 of the PSA; (v) certain holders of TCEH Second Lien Note Claims (determined without regard to any claims held by any Debtor) (the "Consenting TCEH Second Lien Noteholders"); (vi) certain holders of TCEH Unsecured Note Claims (determined without regard to any claims held by any Debtor) (the "Consenting TCEH Unsecured

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2]    All capitalized terms used but not otherwise defined in this Order shall have the meanings ascribed to them in the PSA Motion, and if not defined therein, then in the PSA.

Noteholders," and together with the Consenting TCEH First Lien Creditors and the Consenting TCEH Second Lien Noteholders, the "Consenting TCEH Creditor Parties"); (vii) the statutory committee of unsecured creditors of the TCEH Debtors and EFH Corporate Services appointed in the Chapter 11 Cases (the "TCEH Official Committee"); and (viii) certain equity investors that are providing and/or backstopping the equity financing in connection with the plan of reorganization (the "Plan") attached as Exhibit A to the PSA (the "Investor Parties," and together with the Debtors, the Consenting Interest Holders, the Consenting TCEH Creditor Parties, the TCEH First Lien Agent, and the TCEH Official Committee, the "Parties"); and (b) to take any and all actions reasonably necessary to consummate, and to perform any and all obligations contemplated by, the PSA, all as more fully set forth in the PSA Motion; and the Court having found that it has jurisdiction to consider the PSA Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that consideration of the PSA Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b); and the Court having found that venue is proper before this court pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that due and proper notice of the PSA Motion is adequate and appropriate under the particular circumstances; and a hearing having been held to consider the relief requested in the PSA Motion (the "Hearing"); and upon consideration of the record of the Hearing and all proceedings had before the Court; and the Court having found and determined that the relief set forth below is in the best interests of the Debtors' estates, their creditors and other parties in interest; and that the legal and factual bases set forth in the PSA Motion establish just cause for the relief granted herein; and any objections to the requested relief have been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED**:

## Findings and Conclusions Related To the PSA

A.      As a result of negotiations between certain of the Parties, on August 9, 2015, they reached the agreements embodied in the PSA, which include the agreement between certain of the Parties to pursue and support the Plan on the terms set forth in the PSA, and if the Plan is not consummated (and under certain other circumstances), certain of the Parties agree to support an alternative plan of reorganization or other form of restructuring, liquidation, sale, or structured dismissal consistent with and that incorporates the terms of Section 6.1 of the PSA (an "Alternative Restructuring").

B.      Each of the Debtors, including the Disinterested Directors with respect to such matters as they have determined are actual conflicts matters, have determined, in the valid exercise of their business judgment, that entry into the PSA is in the best interests of the Debtors' estates and their creditors.  The Court makes no finding with respect to what matters are or are not actual conflict matters.

C.      The PSA was negotiated at arm's length, has a sound business purpose, is proposed in good faith, does not constitute a solicitation of an acceptance or rejection of a plan, and does not violate section 1125 of the Bankruptcy Code.

D.      Upon entry of this Order, each of the Debtors and each of the other Parties (1) has full power and authority to enter into and perform all of their obligations under the PSA, (2) has full power and authority to take any and all actions necessary to authorize and approve the PSA and has requested and obtained all necessary approvals required to do so, and (3) is legally authorized to enter into and perform under the PSA and to take any and all actions necessary to authorize, approve and implement the PSA.

3

E.      Based on the findings set forth above, as well as the record before this Court, the Court hereby concludes as a matter of law that the Debtors' entry into and performance under the PSA is an appropriate exercise of the Debtors' business judgment, has a sound business purpose, and satisfies the legal requirements for approval in this jurisdiction.

**ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The PSA Motion is **GRANTED** as set forth herein, and any objections to the PSA Motion not previously withdrawn, waived or settled, and all reservations of rights included therein, are hereby overruled with prejudice.

2.      The execution and delivery of the PSA by the Debtors are hereby approved.

3.      The Debtors and each of the Parties are authorized and directed to execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers and to take any and all actions reasonably necessary or appropriate to consummate, complete, execute, and implement the PSA in accordance with the terms and conditions thereof, including amending the PSA in accordance with the terms thereof, provided that any amendment to the PSA that materially and adversely affects the rights, obligations, or property of EFH, EFIH, EFIH Finance Inc., and EECI, Inc. (collectively, the "EFH Debtors") shall require either (a) five (5) business days' notice to the official committee of unsecured creditors of the EFH Debtors and the US Trustee or (b) prior Court approval.

4.      Notwithstanding any other provision herein, the Court makes no finding or ruling in this Order (a) as to the negotiations, reasonableness, business purpose, or good faith of the Settlement Agreement, the Plan, or the terms of the Settlement Agreement or the Plan for any purpose other than the authorization and direction to enter into and perform under the PSA, or (b) as to the standard of review or any factor required for approval of the Settlement Agreement

4

or confirmation of the Plan.  Any rights of (u) the Office of the United States Trustee, (v) the

official committee of unsecured creditors of EFH Corp., EFIH, EFIH Finance Inc., and EECI,

Inc., (w) The Bank of New York Mellon, in its capacity as the PCRB Trustee, (x) The Bank of

New York Mellon Trust Company, in its capacity as the EFCH 2037 Notes Trustee, (y)

American Stock Transfer & Trust Company, LLC, in its capacity as successor trustee for notes

issued by EFH Corp., or (z) UMB Bank, N.A., in its capacity as indenture trustee for the

unsecured 11.25%/12.25% Senior Toggle Notes due 2018 and the 9.75% Senior Notes due 2019,

with respect to the matters stated in clauses (a) and (b) above are hereby reserved and not

waived.

     5.    The Parties' entry into the PSA, any and all negotiations among the Parties

leading to the execution thereof, and the Parties' performance of or actions in further of any

obligations thereunder shall not constitute a solicitation of votes in violation of section 1125(b)

of the Bankruptcy Code.

     6.    Entry of this Order and any termination of the PSA shall not alter or limit the

Court's *Stipulation and Agreed Order Regarding Certain Confirmation Scheduling Matters*

[D.I. 4918] or the Court's *Third Order Extending the Debtors' Exclusive Periods to File a*

*Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy*

*Code* [D.I. 4634] (each as may be amended from time to time) with respect to the Debtors'

exclusive right to propose and solicit votes with respect to a chapter 11 plan.

     7.    All dates contained in the *Stipulation and Agreed Order Regarding a Protocol for*

*Certain Case Matters* [D.I. 2051], as amended by the *Stipulation and Agreed Order Extending Dates*

*in Order Regarding a Protocol for Certain Case Matters* [D.I. 2760], dated November 13, 2014, the

*Stipulation and Agreed Order Extending Dates in Order Regarding a Protocol for Certain Case*

*Matters* [D.I. 4012], dated March 31, 2015, and the *Stipulation and Agreed Order Extending Dates in*

*Order Regarding a Protocol for Certain Case Matters* [D.I. 5057], dated July 21, 2015, regarding the filing of a motion for standing are hereby adjourned without further order or notice.

8.     The PSA and this Order shall bind the Parties, their respective successors, assigns, heirs, executors, administrators, and representatives, including, for the avoidance of doubt, any future transferees of the Consenting TCEH First Lien Creditors, the Consenting TCEH Unsecured Noteholders, and the Consenting TCEH Second Lien Noteholders (subject to the terms and conditions set forth in the Plan Support Agreement), as well as (a) counsel to the Consenting TCEH Unsecured Noteholders, White & Case LLP, (b) counsel to the Consenting TCEH First Lien Creditors, Paul, Weiss, Rifkind, Wharton & Garrison LLP, and (c) counsel to the Consenting TCEH Second Lien Noteholders, Brown Rudnick LLP; and (d) any group presently or later identified in a statement filed under Bankruptcy Rule 2019 as being represented by such counsel identified in clause (a), (b), or (c).

9.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

10.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the construction, performance, enforcement, and implementation of the terms of this Order.

Dated: September 18, 2015

The Honorable Christopher S. Sontchi
United States Bankruptcy Judge

6

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## ORDER AUTHORIZING DEBTORS TO ENTER INTO
## AND PERFORM UNDER PLAN SUPPORT AGREEMENT

Upon the motion (the "PSA Motion")[2] of the Debtors for entry of an order (this "Order"),
authorizing the Debtors (a) to enter into the Plan Support Agreement (the "PSA"), attached
hereto as Exhibit A, by and among (i) the Debtors; (ii) the holders of approximately 99.26% of
the outstanding equity interests in EFH and its direct and indirect equity holders (the
"Consenting Interest Holders"); (iii) certain holders of TCEH First Lien Claims (determined
without regard to any claims held by any Debtor) (the "Consenting TCEH First Lien Creditors");
(iv) Wilmington Trust, N.A., as successor administrative agent and collateral agent under the
TCEH Credit Agreement (the "TCEH First Lien Agent"), solely in its capacity as such and solely
with respect to Section 6.1 and 12.4 of the PSA; (v) certain holders of TCEH Second Lien Note
Claims (determined without regard to any claims held by any Debtor) (the "Consenting TCEH
Second Lien Noteholders"); (vi) certain holders of TCEH Unsecured Note Claims (determined
without regard to any claims held by any Debtor) (the "Consenting TCEH Unsecured

---

[1]   The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the
     debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these
     chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four
     digits of their federal tax identification numbers is not provided herein. A complete list of such information
     may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2]   All capitalized terms used but not otherwise defined in this Order shall have the meanings ascribed to them in
     the PSA Motion, and if not defined therein, then in the PSA.

Case 14-10979-CSS    Doc 6097-1    Filed 09/18/15    Page 4 of 522

### Findings and Conclusions Related To the PSA

A.    As a result of negotiations between certain of the Parties, on August 9, 2015, they reached the agreements embodied in the PSA, which include the agreement between certain of the Parties to pursue and support the Plan on the terms set forth in the PSA, and if the Plan is not consummated (and under certain other circumstances), certain of the Parties agree to support an alternative plan of reorganization or other form of restructuring, liquidation, sale, or structured dismissal consistent with and that incorporates the terms of Section 6.1 of the PSA (an "Alternative Restructuring").

B.    Each of the Debtors, including the Disinterested Directors with respect to such matters as they have determined are actual conflicts matters, have determined, in the valid exercise of their business judgment, that entry into the PSA is in the best interests of the Debtors' estates and their creditors. The Court makes no finding with respect to what matters are or are not actual conflict matters.

C.    The PSA was negotiated at arm's length, has a sound business purpose, is proposed in good faith, does not constitute a solicitation of an acceptance or rejection of a plan, and does not violate section 1125 of the Bankruptcy Code.

D.    Upon entry of this Order, each of the Debtors and each of the other Parties (1) has full power and authority to enter into and perform all of their obligations under the PSA, (2) has full power and authority to take any and all actions necessary to authorize and approve the PSA and has requested and obtained all necessary approvals required to do so, and (3) is legally authorized to enter into and perform under the PSA and to take any and all actions necessary to authorize, approve and implement the PSA.

3

E.     Based on the findings set forth above, as well as the record before this Court, the Court hereby concludes as a matter of law that the Debtors' entry into and performance under the PSA is an appropriate exercise of the Debtors' business judgment, has a sound business purpose, and satisfies the legal requirements for approval in this jurisdiction.

**ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT**:

1.     The PSA Motion is **GRANTED** as set forth herein, and any objections to the PSA Motion not previously withdrawn, waived or settled, and all reservations of rights included therein, are hereby overruled with prejudice.

2.     The execution and delivery of the PSA by the Debtors are hereby approved.

3.     The Debtors and each of the Parties are authorized and directed to execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers and to take any and all actions reasonably necessary or appropriate to consummate, complete, execute, and implement the PSA in accordance with the terms and conditions thereof, including amending the PSA in accordance with the terms thereof, provided that any amendment to the PSA that materially and adversely affects the rights, obligations, or property of EFH, EFIH, EFIH Finance Inc., and EECI, Inc. (collectively, the "EFH Debtors") shall require either (a) five (5) business days' notice to the official committee of unsecured creditors of the EFH Debtors and the US Trustee or (b) prior Court approval.

4.     Notwithstanding any other provision herein, the Court makes no finding or ruling in this Order (a) as to the negotiations, reasonableness, business purpose, or good faith of the Settlement Agreement, the Plan, or the terms of the Settlement Agreement or the Plan for any purpose other than the authorization and direction to enter into and perform under the PSA, or (b) as to the standard of review or any factor required for approval of the Settlement Agreement

4

or confirmation of the Plan. Any rights of (u) the Office of the United States Trustee, (v) the official committee of unsecured creditors of EFH Corp., EFIH, EFIH Finance Inc., and EECI, Inc., (w) The Bank of New York Mellon, in its capacity as the PCRB Trustee, (x) The Bank of New York Mellon Trust Company, in its capacity as the EFCH 2037 Notes Trustee, (y) American Stock Transfer & Trust Company, LLC, in its capacity as successor trustee for notes issued by EFH Corp., or (z) UMB Bank, N.A., in its capacity as indenture trustee for the unsecured 11.25%/12.25% Senior Toggle Notes due 2018 and the 9.75% Senior Notes due 2019, with respect to the matters stated in clauses (a) and (b) above are hereby reserved and not waived.

5.      The Parties' entry into the PSA, any and all negotiations among the Parties leading to the execution thereof, and the Parties' performance of or actions in further of any obligations thereunder shall not constitute a solicitation of votes in violation of section 1125(b) of the Bankruptcy Code.

6.      Entry of this Order and any termination of the PSA shall not alter or limit the Court's *Stipulation and Agreed Order Regarding Certain Confirmation Scheduling Matters* [D.I. 4918] or the Court's *Third Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code* [D.I. 4634] (each as may be amended from time to time) with respect to the Debtors' exclusive right to propose and solicit votes with respect to a chapter 11 plan.

7.      All dates contained in the *Stipulation and Agreed Order Regarding a Protocol for Certain Case Matters* [D.I. 2051], as amended by the *Stipulation and Agreed Order Extending Dates in Order Regarding a Protocol for Certain Case Matters* [D.I. 2760], dated November 13, 2014, the *Stipulation and Agreed Order Extending Dates in Order Regarding a Protocol for Certain Case Matters* [D.I. 4012], dated March 31, 2015, and the *Stipulation and Agreed Order Extending Dates in*

*Order Regarding a Protocol for Certain Case Matters* [D.I. 5057], dated July 21, 2015, regarding the filing of a motion for standing are hereby adjourned without further order or notice.

8.     The PSA and this Order shall bind the Parties, their respective successors, assigns, heirs, executors, administrators, and representatives, including, for the avoidance of doubt, any future transferees of the Consenting TCEH First Lien Creditors, the Consenting TCEH Unsecured Noteholders, and the Consenting TCEH Second Lien Noteholders (subject to the terms and conditions set forth in the Plan Support Agreement), as well as (a) counsel to the Consenting TCEH Unsecured Noteholders, White & Case LLP, (b) counsel to the Consenting TCEH First Lien Creditors, Paul, Weiss, Rifkind, Wharton & Garrison LLP, and (c) counsel to the Consenting TCEH Second Lien Noteholders, Brown Rudnick LLP; and (d) any group presently or later identified in a statement filed under Bankruptcy Rule 2019 as being represented by such counsel identified in clause (a), (b), or (c).

9.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

10.    The Court shall retain jurisdiction to hear and determine all matters arising from or related to the construction, performance, enforcement, and implementation of the terms of this Order.

Dated: September __, 2015

_____
The Honorable Christopher S. Sontchi
United States Bankruptcy Judge

6

Case 14-10979-CSS    Doc 6097-1    Filed 09/18/15    Page 8 of 522

**EXHIBIT A**

**PLAN SUPPORT AGREEMENT**

**THIS PLAN SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

**AMENDED & RESTATED PLAN SUPPORT AGREEMENT**

This PLAN SUPPORT AGREEMENT (this "**Agreement**")[1] is made and entered into as of September 11, 2015 (the "**Agreement Effective Date**"), by and among the following parties:

(a) (i) Energy Future Holdings Corp., a Texas corporation ("**EFH**"); (ii) Energy Future Intermediate Holding Company LLC ("**EFIH**"), a Delaware limited liability company and a direct, wholly-owned subsidiary of EFH; (iii) EFH Corporate Services Company ("**EFH Corporate Services**"), a Delaware corporation and a direct, wholly-owned subsidiary of EFH; (iv) EFIH Finance Inc. ("**EFIH Finance**"), a Delaware corporation and a direct, wholly-owned subsidiary of EFIH; (v) Energy Future Competitive Holdings Company LLC ("**EFCH**"), a Delaware limited liability company and a direct, wholly-owned subsidiary of EFH; (vi) Texas Competitive Electric Holdings Company LLC ("**TCEH**"), a Delaware limited liability company and a direct, wholly-owned subsidiary of EFCH; (vii) each of TCEH's direct and indirect subsidiaries listed on the signature pages hereto (the "**TCEH Subsidiaries**," and together with TCEH and EFCH, the "**TCEH Debtors**"); and (viii) each of EFH's other direct and indirect subsidiaries listed on the signature pages hereto (each of the foregoing entities identified in subclauses (i) through (viii) a "**Debtor**" and, collectively, the "**Debtors**");

(b) (i) Anchorage Capital Master Offshore, Ltd. and PCI Fund LLC, (ii) Arrowgrass Master Fund Ltd., (iii) Arrowgrass Distressed Opportunities Fund Limited, (iv) BlackRock Financial Management, Inc., solely on behalf of the undersigned funds and accounts under management, (v) Centerbridge Partners L.P., solely on behalf of the undersigned funds and accounts it manages or advises, (vi) GSO Capital Partners LP, solely on behalf of the undersigned funds and accounts it manages or advises (collectively, "**GSO**"), (vii) Taconic Capital Advisors L.P., on behalf of funds and accounts under management, (viii) Balyasny Asset Management, L.P., solely on behalf of the undersigned funds and accounts it manages or advises, (ix) BHR Capital LLC, solely on behalf of the undersigned funds and accounts it manages or advises, (x) Cyrus Capital Partners, L.P., solely on behalf of the undersigned funds and accounts it manages or advises, and (xi) Deutsche Bank Securities Inc. (each referred to herein as a "**Creditor-Investor Party**" and collectively referred to herein as the "**Creditor-Investor Parties**");

(c) (i) Hunt Power Holdings, L.L.C. ("**Hunt**"), (ii) Pecos Partners, L.P., (iii) Flourish Investment Corporation, and (iv) Avenue Capital Management II, L.P. ("**Avenue**")

---

[1]  Unless otherwise indicated, capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Plan, as defined below.

(each, including Hunt, referred to herein as a "**Hunt-Investor Party**" and collectively referred to herein as the "**Hunt-Investor Parties**");

(d) (i) Ovation Acquisition I, L.L.C. ("**Parent**") and (ii) Ovation Acquisition II, L.L.C. ("**OV2**," and together with the Creditor-Investor Parties, the Hunt-Investor Parties, and Parent, the "**Investor Parties**");

(e) Texas Energy Future Holdings Limited Partnership ("**Texas Holdings**"), a Texas limited partnership, which holds approximately 99.26% of the outstanding equity interests in EFH;

(f) Texas Energy Future Capital Holdings LLC, a Delaware limited liability company and the general partner of Texas Holdings ("**TEF**");

(g) Kohlberg Kravis Roberts & Co., L.P., TPG Capital, L.P. and Goldman, Sachs & Co. (collectively, the "**Sponsor Managers**") in their capacities as managers and agents for funds holding indirect equity interests in EFH (collectively, in such capacities, the "**Sponsors**" and, together with Texas Holdings and TEF, the "**Consenting Interest Holders**");

(h) the undersigned beneficial holders or investment advisors or managers for such beneficial holders or discretionary accounts of such beneficial holders (collectively, the "**Consenting TCEH First Lien Lenders**") that hold claims[2] (the "**TCEH Credit Agreement Claims**") against the TCEH Debtors under that certain Credit Agreement, dated as of October 10, 2007 (as amended from time to time, the "**TCEH Credit Agreement**"), by and among, *inter alia*, TCEH, as borrower, EFCH and the TCEH Subsidiaries, as guarantors, Wilmington Trust, N.A., as successor administrative agent and collateral agent (the "**TCEH First Lien Agent**"), and the lenders from time to time party thereto;

(i) the TCEH First Lien Agent, solely in its capacity as such and solely with respect to Sections 6.1 and 12.4 hereof;

(j) the undersigned beneficial holders or investment advisors or managers for such beneficial holders or discretionary accounts of such beneficial holders (collectively, the "**Consenting TCEH First Lien Noteholders**") that hold claims (the "**TCEH First Lien Note Claims**") against the TCEH Debtors arising out of the 11.50% fixed senior secured notes due October 1, 2020 (the "**TCEH First Lien Notes**") issued pursuant to that certain Indenture, dated as of April 19, 2011, by and among, *inter alia*, TCEH and TCEH Finance, as issuers, EFCH and the TCEH Subsidiaries, as guarantors, and Delaware Trust Company (f/k/a CSC Trust Company of Delaware), as successor trustee;

---

[2]    As used herein the term "**claim**" has the meaning ascribed to such term as set forth in section 101(5) of the Bankruptcy Code.

(k) the undersigned beneficial holders or investment advisors or managers for such beneficial holders or discretionary accounts of such beneficial holders (collectively, the **"Consenting TCEH First Lien Swap Counterparties"**) that hold claims (the **"TCEH First Lien Swap Claims"**) against the TCEH Debtors arising out of or related to the interest rate swaps entered into by TCEH and secured by a first lien on the same collateral as the TCEH Credit Agreement Claims and TCEH First Lien Note Claims;

(l) the undersigned beneficial holders or investment advisors or managers for such beneficial holders or discretionary accounts of such beneficial holders (collectively, the **"Consenting TCEH First Lien Commodity Hedge Counterparties,"** and together with the Consenting TCEH First Lien Lenders, Consenting TCEH First Lien Noteholders and Consenting TCEH First Lien Swap Counterparties, the **"Consenting TCEH First Lien Creditors"**) that hold claims (the **"TCEH First Lien Commodity Hedge Claims,"** and together with the TCEH Credit Agreement Claims, TCEH First Lien Note Claims and TCEH First Lien Swap Claims, the **"TCEH First Lien Claims"**) against the TCEH Debtors arising out of or related to the commodity hedges entered into by TCEH and secured by a first lien on the same collateral as the TCEH Credit Agreement Claims and TCEH First Lien Note Claims;

(m) the undersigned beneficial holders or investment advisors or managers for such beneficial holders or discretionary accounts of such beneficial holders (collectively, the **"Consenting TCEH Unsecured Noteholders"**) that hold claims (the **"TCEH Unsecured Note Claims"**) against the TCEH Debtors arising out of the 10.25% Fixed Senior Notes due 2015 (including Series B) and 10.50%/11.25% Senior Toggle Notes due 2016 issued pursuant to that certain Indenture dated as of October 31, 2007 by and among, *inter alia*, TCEH and TCEH Finance, as issuers, and EFCH and the TCEH Subsidiaries, as guarantors, and Law Debenture Trust Company of New York, as successor indenture trustee to The Bank of New York Mellon (the **"TCEH Unsecured Notes Indenture Trustee"**);

(n) the undersigned beneficial holders or investment advisors or managers for such beneficial holders or discretionary accounts of such beneficial holders (collectively, the **"Consenting TCEH Second Lien Noteholders,"** and together with the Consenting TCEH First Lien Creditors and the Consenting TCEH Unsecured Noteholders, the **"Consenting TCEH Creditor Parties"**) that hold claims (the **"TCEH Second Lien Note Claims,"** and, together with the TCEH Unsecured Note Claims, the **"TCEH Note Claims"**) against the TCEH Debtors arising out of the 15.0% Fixed Senior Secured Second Lien Notes due 2021 (including Series B) issued pursuant to that certain Indenture dated as of October 6, 2010, by and among, *inter alia*, TCEH and TCEH Finance, as issuers, EFCH and the TCEH Subsidiaries, as guarantors, and Wilmington Savings Fund Society, as successor indenture trustee to The Bank of New York Mellon; and

(o) the statutory committee of unsecured creditors of the TCEH Debtors and EFH Corporate Services appointed in the Chapter 11 Cases pursuant to section 1102 of the

Bankruptcy Code by the U.S. Trustee on May 13, 2014 (the "**TCEH Official Committee**").

Each Debtor, each Investor Party, each Consenting Interest Holder, each Consenting TCEH First Lien Creditor, each Consenting TCEH Unsecured Noteholder, each Consenting TCEH Second Lien Noteholder, the TCEH Official Committee, and, solely with respect to Sections 6.1 and 12.4 of this Agreement, the TCEH First Lien Agent is referred to herein as a "**Party**" and are collectively referred to herein as the "**Parties**."

## RECITALS

**WHEREAS**, on April 29, 2014, the Debtors commenced chapter 11 cases in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), which chapter 11 cases are being jointly administered and are captioned In re Energy Future Holdings Corp., et al., Case No. 14-10979 (CSS) (the "**Chapter 11 Cases**");

**WHEREAS**, on April 13, 2015, the Debtors filed in the Chapter 11 Cases the *Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 4142] and related disclosure statement, and on July 23, 2015, the Debtors filed in the Chapter 11 Cases the *Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 5078] and a related disclosure statement; and on August 3, 2015, the Debtors, with the approval of the Disinterested Directors, filed in the Chapter 11 Cases the *Second Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 5197] (the "**Initial Plan**");

**WHEREAS**, certain of the Parties have been engaged in good faith negotiations with each other regarding the terms of an alternative transaction or transactions (the "**Restructuring Transactions**") to be implemented through a joint plan of reorganization for the Debtors in the form attached hereto as **Exhibit A** (as such plan may be amended from time to time in accordance with this Agreement, the "**Plan**"), which would amend the Initial Plan;

**WHEREAS**, the Plan provides, among other things, that (a) certain distributions to be made thereunder will be funded, in part, from (i) the proceeds of equity investments to be made in Parent and OV2 by the Investor Parties with respect to the indirect acquisition ("**Oncor Acquisition**") by Parent and OV2 of Oncor Electric Delivery Company LLC ("**Oncor**"), a non-Debtor indirect subsidiary of EFH and EFIH, and (ii) proceeds from an offering of rights to purchase a portion of the common equity of Parent (the "**Rights Offering**"), *provided*, that as a condition of participating in the Rights Offering, any person (whether or not a Party to this Agreement) that elects to purchase the common equity of Parent pursuant to the Rights Offering shall affirm that such person is making its own investment decision, which is not being made in conjunction with the investment decision of any other person to acquire a predetermined percentage of Parent or EFH; (b) holders of TCEH First Lien Claims will receive, *inter alia*, 100% of the Reorganized TCEH Common Stock following the Preferred Stock Sale through a tax-free spin-off (the "**Spin-Off**") of Reorganized TCEH (as defined in

4

the Plan); and (c) after the Spin-Off, EFH will merge with and into Parent (the "**Merger**") pursuant to the Purchase Agreement and Agreement and Plan of Merger, substantially in the form attached hereto as **Exhibit B** (the "**Merger Agreement**");

**WHEREAS**, (a) the Investor Parties have agreed in accordance with and subject to the terms and conditions set forth in the Equity Commitment Letter, substantially in the form attached hereto as **Exhibit C** (the "**Equity Commitment Letter**") to provide equity financing, on a several and not joint basis, to fund the Oncor Acquisition, and (b) the Creditor-Investor Parties have further agreed in accordance with and subject to the terms and conditions set forth in the Backstop Agreement, substantially in the form attached hereto as **Exhibit D** (the "**Backstop Agreement**") to backstop the Rights Offering;

**WHEREAS**, on September 16, 2014 the parties executed, and the Bankruptcy Court so-ordered, the *Stipulation and Agreed Order Regarding a Protocol for Certain Case Matters* [D.I. 2051] (the "**Case Matters Protocol**"), as amended by the *Stipulation and Agreed Order Extending Dates in Order Regarding a Protocol for Certain Case Matters* [D.I. 2760], dated November 13, 2014, the *Stipulation and Agreed Order Extending Dates in Order Regarding a Protocol for Certain Case Matters [D.I. 4012], dated March 31, 2015*, and the *Stipulation and Agreed Order Extending Dates in Order Regarding a Protocol for Certain Case Matters* [D.I. 5057], dated July 21, 2015, which impose a process to govern the investigation and filing by parties in interest of motions seeking standing to commence certain claims and causes of action;

**WHEREAS**, on February 19, 2015, the (a) TCEH Official Committee filed the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Exclusive Standing and Authority to Commence, Prosecute, and Settle Certain Claims for Declaratory Judgment, Avoidance and Recovery of Liens, Security Interests, Obligations, Fees, and Interest Payments, and Disallowance of Claims* [D.I. 3593] (the "**TCEH Official Committee Standing Motion**"), (b) ad hoc group of holders of TCEH Unsecured Note Claims filed the *Motion of the Ad Hoc Group of TCEH Unsecured Noteholders for Entry of an Order Granting Standing and Authority to Commence, Prosecute, and Settle Certain Claims for Declaratory Judgment, Avoidance and Recovery of Liens, Security Interests, Obligations, Fees, and Interest Payments, and Disallowance of Claims* [D.I. 3603] (the "**TCEH Ad Hoc Standing Motion**"), and (c) the statutory committee of unsecured creditors of EFH, EFIH, EFIH Finance, and EECI, Inc. appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on October 27, 2014 (the "**EFH Official Committee**") filed the *Motion of the EFH Official Committee for Entry of an Order Granting Derivative Standing and Authority to Prosecute and Settle Claims on Behalf of the Luminant Debtors' Estates* [D.I. 3605] (the "**EFH Official Committee Standing Motion**," and together with the TCEH Official Committee Standing Motion and the TCEH Ad Hoc Standing Motion, the "**TCEH First Lien Standing Motions**");

**WHEREAS**, in accordance with the Case Matters Protocol, on March 31, 2015, and on April 30, 2015, the TCEH Official Committee sent a letter to the Debtors identifying general categories of alleged claims and causes of action, including against other Debtors, the TCEH Debtors' and the other Debtors' directors and officers, and the Sponsors, belonging to the TCEH Debtors' estates that the TCEH Official Committee may seek standing to pursue,

including claims and causes of action for fraudulent transfers under state law and sections 544 and 548 of the Bankruptcy Code, preferential transfers under section 547 of the Bankruptcy Code, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of contract, and/or unjust enrichment (the "**TCEH Committee Litigation Letters**");

WHEREAS, in accordance with the Case Matters Protocol, on April 30, 2015, the TCEH Unsecured Group sent a letter to counsel to the Debtors identifying general categories of alleged inter-Debtor and other claims and causes of action, including against other Debtors, the TCEH Debtors' and the other Debtors' directors and officers, and the Sponsors, belonging to the TCEH Debtors' estates that the TCEH Unsecured Group may seek standing to pursue, including claims and causes of action for fraudulent transfers under state law and sections 544 and 548 of the Bankruptcy Code, preferential transfers under section 547 of the Bankruptcy Code, breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty, breaches of contract, and unjust enrichment (the "**TCEH Unsecured Group Litigation Letter**," and together with the TCEH Committee Litigation Letters, the "**Litigation Letters**");

WHEREAS, certain of the Parties also have been engaged in good faith negotiations with each other regarding the terms of a settlement of, among other things, (a) claims against the Consenting Interest Holders and affiliates thereof, (b) claims against the holders of TCEH First Lien Claims, including those described in the TCEH First Lien Standing Motions, and (c) certain intercompany claims by and between the Debtors, and such Parties have reached agreement with each other with respect to such settlement (the "**Claims Settlement**"), including the releases of such claims, on the terms and conditions set forth in the Settlement Agreement, to which this Agreement is attached as an exhibit (the "**Settlement Agreement**");

WHEREAS, the Parties desire to pursue and support the Plan and Restructuring Transactions and the Claims Settlement in accordance with the terms of this Agreement;

WHEREAS, the Debtors, the Creditor-Investor Parties, the Consenting Interest Holders, the Consenting TCEH Creditor Parties, and the TCEH Official Committee also have been engaged in good faith negotiations with each other regarding certain terms of any alternative restructuring transaction that certain of such Parties would support pursuant to the terms of this Agreement if the Plan is not consummated, which terms are set forth in Section 6.1 hereof (any one or more alternative restructuring transactions, plans of reorganization, sales, liquidations, or structured dismissals containing or otherwise implementing, and not inconsistent with, such terms that are either filed by the Debtors or filed or supported by the Required TCEH First Lien Creditors (as defined below), an "**Alternative Restructuring**");

WHEREAS, the Debtors, the Consenting Interest Holders, the Consenting TCEH Creditor Parties, and the TCEH Official Committee will pursue and/or support an Alternative Restructuring in accordance with the terms of this Agreement; and

WHEREAS, certain of the Parties entered into a plan support agreement, dated as of August 9, 2015, and desire to amend and restate such plan support agreement in accordance with the terms thereof as set forth in this Agreement.

## AGREEMENT

**NOW, THEREFORE,** in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound, agrees as follows:

**Section 1.    Effective Date of Agreement.**

This Agreement shall be immediately effective and binding on each Party, other than the Debtors, upon the execution and delivery by such Party to the other Parties, pursuant to Section 14.8 hereof, of a signature page of this Agreement, whether such execution or delivery occurs before or after the filing of this Agreement with the Bankruptcy Court; *provided, however,* that this Agreement shall become effective and binding with respect to the Debtors upon the date of entry by the Bankruptcy Court of the PSA Approval Order (as defined below).

For the avoidance of doubt, subject to the Parties rights under Section 12, the Parties (other than the Debtors, to the extent set forth in this Section 1) shall be bound to this Agreement on the Agreement Effective Date whether or not the Bankruptcy Court enters the Settlement Order, the Disclosure Statement Order, the Rights Offering Procedures Order, the Alternative APA Order, the Confirmation Order, the Approval Order, the Alternative Plan Disclosure Statement Order, or the Alternative Plan Confirmation Order (all as defined below). Notwithstanding the occurrence of a Plan Support Termination Event, a Party's obligations with respect to an Alternative Restructuring pursuant to, *inter alia,* Section 5 will remain in full force and effect unless and until such Party's obligations under this Agreement are terminated pursuant to Section 12.

**Section 2.    Exhibits Incorporated by Reference.**

Each of the exhibits attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the exhibits hereto. In the event of any inconsistency between this Agreement and the Plan, the Plan shall govern. In the event of any inconsistency between this Agreement (without reference to the exhibits) and the exhibits other than the Plan, this Agreement (without reference to the exhibits) shall govern. In the event of any inconsistency between this Agreement and any Alternative Plan or Alternative APA, the Alternative Plan or Alternative APA, as applicable, shall govern; *provided, however,* for the avoidance of doubt, any Alternative Plan or Alternative APA shall contain or otherwise implement the Required Alternative Terms (as defined below).

**Section 3.    Definitive Documentation.**

3.1    <u>Definitive Documents With Respect to the Restructuring Transactions.</u>

The definitive documents and agreements governing the Plan and Restructuring Transactions (collectively, the "**Definitive Restructuring Documents**") shall include:

(a)    (i) the Settlement Agreement, (ii) the motion to approve the Claims Settlement, the Debtors' entry into the Settlement Agreement, and the Debtors' performance of their

obligations thereunder (the "**Settlement Motion**"), and (iii) the order of the Bankruptcy Court approving the relief requested in the Settlement Motion (the "**Settlement Order**");

(b)    the motion to approve the Debtors' entry into and performance under this Agreement, and the order of the Bankruptcy Court approving the Debtors' entry into and performance under this Agreement (the "**PSA Approval Order**"), which may only be entered following entry of the Amended Cash Collateral Order (as defined in Section 10 of this Agreement) by the Bankruptcy Court, unless otherwise agreed by the Debtors;

(c)    the motion to approve the Backstop Agreement, the Merger Agreement, and related agreements, and the Debtors' performance of their obligations thereunder (the "**Approval Motion**") and the order of the Bankruptcy Court approving the relief requested in the Approval Motion (the "**Approval Order**");

(d)    the Plan and each document or agreement contemplated in connection with consummation of the Plan, including the Backstop Agreement, the Merger Agreement, the Tax Matters Agreement, substantially in the form attached hereto as **Exhibit E**, and all related agreements contemplated by the foregoing;

(e)    the order of the Bankruptcy Court confirming the Plan and authorizing all of the transactions and agreements contemplated by the Plan (the "**Confirmation Order**");

(f)    the disclosure statement relating to the Plan (the "**Disclosure Statement**"), the other solicitation materials in respect of the Plan (the "**Solicitation Materials**," which shall include the Disclosure Statement), and the order entered by the Bankruptcy Court approving the Solicitation Materials as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code (the "**Disclosure Statement Order**");

(g)    the Equity Commitment Letter for each Investor Party listed therein;

(h)    the materials and procedures for solicitation of the Rights Offering (the "**Rights Offering Procedures**"), including the registration statement and related documents and materials to be filed with the Securities and Exchange Commission in connection therewith, the motion to approve the Rights Offering Procedures (the "**Rights Offering Motion**"), and the order of the Bankruptcy Court granting the Rights Offering Motion and approving the Rights Offering Procedures (the "**Rights Offering Procedures Order**");

(i)    the commitment letters with respect to the Reorganized EFIH Debt Facilities (the "**Debt Commitment Letters**") and all Reorganized EFIH Debt Documents;

(j)    the Reorganized TCEH Debt Documents and any commitment letters with respect thereto; and

(k)    all other documents that will comprise supplements to the Plan.

Certain of the Definitive Restructuring Documents remain subject to negotiation and completion and shall, upon completion, contain terms, conditions, representations, warranties,

and covenants consistent with the terms of this Agreement, and shall otherwise be in form and substance reasonably acceptable to the Debtors, the Consenting Interest Holders, the Required Investor Parties, the Required TCEH Creditor Parties, and the TCEH Official Committee; *provided, however*, that if the proposed terms, conditions, representations, warranties, and covenants of such Definitive Restructuring Document would have a material, disproportionate, and adverse effect on any Party (in any capacity) relative to any other Party, then the consent of each such disproportionately affected Party shall also be required to complete such Definitive Restructuring Document. Each Party agrees that it shall act in good faith and use and undertake all commercially reasonable efforts to negotiate and finalize the terms of the Definitive Restructuring Documents.

For the avoidance of doubt, and in addition to any provision in any of the underlying operative documents, once the Definitive Restructuring Documents have been finalized pursuant to this Section 3.1, such documents shall not be further amended, supplemented, or modified in any material respect without the consent (not to be unreasonably withheld) of the Debtors, the Consenting Interest Holders, the Required Investor Parties (as defined below), the Required TCEH Creditor Parties (as defined below), and the TCEH Official Committee; *provided, however,* that if the proposed modification, amendment, or supplement has a material, disproportionate, and adverse effect on any Party (in any capacity) relative to any other Party, then the consent of each such disproportionately affected Party shall also be required to effectuate such modification, amendment, or supplement. Notwithstanding the foregoing, no Party's consent shall be required under this Agreement to amend the Equity Commitment Letter to reflect a reduction or transfer of an Investment Commitment (as defined in the Equity Commitment Letter) in accordance with the Equity Commitment Letter, to amend the Guarantee to reflect a reduction or transfer or assignment thereunder in accordance with the Guarantee or to amend the Backstop Agreement to reflect a reduction or transfer of a Backstop Commitment (as defined in the Backstop Agreement) in accordance with the Backstop Agreement, each of which amendments shall be governed solely by the Equity Commitment Letter, the Guarantee, and the Backstop Agreement, respectively. For purposes of this Agreement, (a) **"Required Investor Parties"** shall mean at least 50.10% in number of unaffiliated Investor Parties holding in the aggregate at least 66.67% in amount of the aggregate amount of (i) "Investment Commitments" (as defined in the Equity Commitment Letter) set forth on Exhibit A to the Equity Commitment Letter (as amended from time to time in accordance therewith and with this Agreement) and (ii) "Backstop Commitments" (as defined in the Backstop Agreement) set forth on Schedule 1 to the Backstop Agreement (as amended from time to time in accordance therewith and with this Agreement), *provided, however,* that on and after the date that the Merger Agreement is executed by the parties thereto, "Required Investor Parties" shall mean Parent; (b) **"Required TCEH Unsecured Noteholders"** shall mean at least three unaffiliated Consenting TCEH Unsecured Noteholders holding in the aggregate at least 50.1% in principal amount of the aggregate principal amount of the TCEH Unsecured Note Claims held by the Consenting TCEH Unsecured Noteholders at such time; (c) **"Required TCEH First Lien Creditors"** shall mean at least five unaffiliated Consenting TCEH First Lien Creditors that are members of the TCEH First Lien Ad Hoc Committee holding in the aggregate at least 50.1% in principal amount of the aggregate principal amount of the TCEH First Lien Claims held by the Consenting TCEH First Lien Creditors that are members of the TCEH First Lien Ad Hoc Committee at such time; (d) **"Required TCEH Second Lien Noteholders"** shall mean at least two unaffiliated Consenting

TCEH Second Lien Noteholders holding in the aggregate at least 50.1% in principal amount of the aggregate principal amount of the TCEH Second Lien Note Claims held by the Consenting TCEH Second Lien Noteholders at such time; and (e) "**Required TCEH Creditor Parties**" shall mean, collectively, the Required TCEH Unsecured Noteholders, the Required TCEH First Lien Creditors, and the Required TCEH Second Lien Noteholders.

3.2     Definitive Documents With Respect to an Alternative Restructuring.

The definitive documents and agreements governing an Alternative Restructuring (collectively, the "**Alternative Restructuring Documents**") shall include:

(a)     a plan of reorganization (an "**Alternative Plan**"), asset purchase agreement or other similar document or agreement that effectuates an Alternative Restructuring (an "**Alternative APA**"), and each other document or agreement contemplated in connection with consummation of an Alternative Restructuring, *provided*, for the avoidance of doubt, that any Alternative Plan may be incorporated into the Plan at any time during the Alternative Restructuring Support Period;

(b)     if an Alternative Restructuring is to be consummated pursuant to an Alternative Plan, the order of the Bankruptcy Court confirming the Alternative Plan and authorizing all of the transactions and agreements contemplated by the Alternative Plan (the "**Alternative Plan Confirmation Order**"), and all pleadings in support of entry of the Alternative Plan Confirmation Order;

(c)     if an Alternative Restructuring is to be consummated pursuant to an Alternative Plan, the disclosure statement relating to the Alternative Plan (the "**Alternative Plan Disclosure Statement**"), the other solicitation materials in respect of Alternative Plan (the "**Alternative Plan Solicitation Materials**," which shall include the Alternative Plan Disclosure Statement), the motion to approve the Alternative Plan Disclosure Statement (if any), and the order entered by the Bankruptcy Court approving the Alternative Plan Solicitation Materials as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code (the "**Alternative Plan Disclosure Statement Order**"); *provided, however*, for the avoidance of doubt, that, at any time during the Alternative Restructuring Support Period, the Alternative Plan Disclosure Statement Order may be incorporated in the Disclosure Statement Order, the Alternative Plan Solicitation Materials may be incorporated in the Plan Solicitation Materials, and the Alternative Plan Confirmation Order may be incorporated in the Confirmation Order;

(d)     if an Alternative Restructuring is to be consummated pursuant to an Alternative APA, the order(s) of the Bankruptcy Court approving such Alternative APA and authorizing all of the transactions, agreements, and relief contemplated by the Alternative APA (the "**Alternative APA Order**"), and all pleadings in support of entry of the Alternative APA Order;

(e)     the Settlement Agreement and Settlement Order; and

(f)     all other documents that will comprise supplements to the Alternative Plan.

Certain of the Alternative Restructuring Documents remain subject to negotiation and completion and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, including the Required Alternative Terms. So long as the Alternative Restructuring Documents contain or otherwise implement and are not inconsistent with the Required Alternative Terms, such Alternative Restructuring Documents shall be deemed to be acceptable for all purposes to the Consenting Interest Holders, the Consenting TCEH Unsecured Noteholders, the Consenting TCEH Second Lien Noteholders, and the TCEH Official Committee. For the avoidance of doubt, and notwithstanding any provision to the contrary in any of the underlying operative documents, once the Alternative Restructuring Documents have been finalized pursuant to this Section 3.2, such documents shall not be further amended, supplemented or modified in any material respect without the consent (not to be unreasonably withheld) of the Debtors and the Required TCEH First Lien Creditors; *provided, however*, that if the proposed modification, amendment, or supplement has a material, disproportionate, and adverse effect on any Party (in any capacity), then the consent of each such disproportionately affected Party shall also be required to effectuate such modification, amendment, or supplement; provided further, however, that if the Debtors did not file or support the Alternative Restructuring to which such Alternative Restructuring Documents pertain, then the Debtors' consent shall not be required to amend, supplement or modify such Alternative Restructuring Documents. Each Consenting Interest Holder, each Consenting TCEH Creditor Party and the TCEH Official Committee agrees that it shall act in good faith and use and undertake all commercially reasonable efforts to take such actions as are reasonably necessary to finalize the terms of the Alternative Restructuring Documents.

**Section 4.** **Commitments Regarding the Plan and Restructuring Transactions**.

4.1    Commitments of the Investor Parties, Consenting Interest Holders, and Consenting TCEH Creditor Parties.

During the period beginning on the Agreement Effective Date and ending on the earlier to occur of the Plan Support Termination Date (as defined in Section 11 hereof) and the Agreement Termination Date (as defined in Section 12 hereof) applicable to the Party (such period, the "**Plan Support Effective Period**"), each Investor Party, Consenting Interest Holder, and Consenting TCEH Creditor Party agrees that:

(a)    subject to receipt of the Disclosure Statement approved by the Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code, and the other Solicitation Materials approved by the Bankruptcy Court, it shall:

(i)    to the extent a class of claims or interests against or in the Debtors (the "**Debtor Claims/Interests**") is permitted to vote to accept or reject the Plan, vote each such claim or interest it holds in such class to accept the Plan by delivering its duly executed and completed ballot(s) accepting the Plan on a timely basis following the commencement of the solicitation;

(ii)    to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, not elect to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iii)    not change or withdraw (or cause to be changed or withdrawn) any such vote or election;

(b)    it shall (i) use commercially reasonable efforts to assist the Debtors in obtaining entry of the Settlement Order, the Scheduling Order Amendments, the PSA Approval Order, the Approval Order, the Disclosure Statement Order, the Rights Offering Procedures Order, and the Confirmation Order and consummation of the Plan as soon as reasonably practicable in accordance with the Bankruptcy Code and on terms consistent with this Agreement, including within the time frames contemplated in this Agreement, and (ii) execute and deliver any other agreements reasonably required to effectuate and consummate the Plan and Restructuring Transactions;

(c)    it shall not directly or indirectly, or encourage any other entity to directly or indirectly, (i) object to, delay, impede, or take any other action or any inaction to interfere with the acceptance, implementation, consummation, or amendment (whether before or after confirmation, *provided* that such amendment is consistent with this Agreement, including Section 13) of the Plan and Restructuring Transactions and the Claims Settlement; (ii) propose, file, support, vote for, or take any other action in furtherance of any restructuring, workout, plan of arrangement, or plan of reorganization for the Debtors other than the Plan, including, for the avoidance of doubt, making or supporting any filings with the Bankruptcy Court or any regulatory agency, including the Public Utility Commission of Texas (the "**PUCT**") and the United States Nuclear Regulatory Commission (the "**NRC**"), or making or supporting any press release, press report or comparable public statement, or filing with respect to any restructuring, workout, plan of arrangement, or plan of reorganization for the Debtors other than the Plan; or (iii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtors or any direct or indirect subsidiaries of the Debtors that are not Debtors other than as expressly permitted by the Plan, the Merger Agreement, and the Settlement Agreement; *provided, however*, that notwithstanding the foregoing, (Y) each Party may file with the Bankruptcy Court all documents necessary to obtain approval of this Agreement and the Claims Settlement and entry of the Scheduling Order Amendments, PSA Approval Order, the Approval Order, and the Settlement Order, and (Z) each Party (subject to Section 4.4 with respect to the Investor Parties) may, during and after the Plan Support Effective Period, (I) solicit from (other than within the meaning of 11 U.S.C. § 1125), and negotiate with the Debtors and/or their other stakeholders, facilitate, and document the other terms of an Alternative Restructuring, (II) solicit from (other than within the meaning of 11 U.S.C. § 1125) and negotiate with the Debtors and/or their other stakeholders, facilitate, and document the terms of another plan or other restructuring transaction that contains the Required Alternative Terms, and (III) solicit from and enter into an agreement or agreements with the Debtors and/or their other stakeholders regarding support for and/or financing of such Alternative Restructuring or other restructuring so long as entering into such agreement or agreements does not violate such Party's commitments and obligations under this Agreement; *provided, however*, that each Party shall use commercially reasonable efforts (x) to keep confidential any solicitation, negotiation, facilitation, and documentation by such Party of an

Alternative Restructuring and (y) to enter into a confidentiality agreement with any counterparty to any agreement regarding support for and/or financing of an Alternative Restructuring, which confidentiality agreement provides that the existence and material terms of such Alternative Restructuring shall be kept confidential and shall not be publicly disclosed, except in each case to the extent required by applicable law or pursuant to such confidentiality agreements (including any "cleansing" provisions set forth in such confidentiality agreements) as determined by such Party in its sole and absolute discretion, and the Parties each waive any right to challenge such a determination made by any other Party;

(d)     it (i) shall refrain from supporting the allowance or payment of any make-whole claim on account of the prepayment, repayment, or other redemption of any debt incurred by EFH or EFIH or their predecessors and (ii) shall not object, encourage others to object, or support any objection to the payment of postpetition interest (if any) at the Federal Judgment Rate to any of the unsecured creditors of EFH, EFIH, or EFIH Finance; *provided, however,* for the avoidance of doubt, nothing in this Agreement shall or shall be deemed to be an agreement by a Party that holds claims or interests in a particular class of claims or interests under the Plan to accept a treatment of such claims or interests under the Plan that is different from or less favorable than the treatment provided to other claims or interests in the same such class under the Plan; *provided further,* that any offer made by a Party (including, for the avoidance of doubt, the Debtors) to holders of any unsecured claims against EFH, EFIH, or EFIH Finance in settlement or compromise of disputes relating to any make-whole claim on account of the prepayment, repayment or other redemption of any debt incurred by EFH or EFIH or payment of postpetition interest at the Federal Judgment Rate with respect to such debt shall also be made, on terms no less favorable (including with respect to the dates between which such holders may consider such offer), to any Investor Party, Consenting Interest Holder, or Consenting TCEH Creditor Party that is a holder of the same type of unsecured claim against EFH, EFIH, or EFIH Finance;

(e)     in the case of the Investor Parties, without limiting the last sentence of Section 9.9(a) of the Merger Agreement, it shall use commercially reasonable efforts to consummate the registration of common equity of Parent in connection with the Rights Offering and the funding of the proceeds of the Rights Offering and the equity financings contemplated by the Backstop Agreement and the Equity Commitment Letter into the Escrow Account (as such term is defined in the Backstop Agreement) as soon as practicable in accordance with the terms and conditions of the Backstop Agreement and the Equity Commitment Letter; and

(f)     it shall not direct any administrative agent, collateral agent, or indenture trustee (as applicable) to take any action inconsistent with such Party's respective obligations under this Agreement, and if any applicable administrative agent, collateral agent, or indenture trustee takes any action inconsistent with a Party's obligations under this Agreement, such Party shall promptly direct such administrative agent, collateral agent, or indenture trustee to cease and refrain from taking any such action; *provided, however,* that GSO and Avenue shall not be required to (i) direct any trustee with respect to their E-Side Claims (as defined below) to take any action that would be materially adverse to such claims, or (ii) affirmatively take any action under Section 4.1(b) above that would be materially adverse to such E-Side Claims, *provided, further, however,* that such Parties shall take no action in opposition of or otherwise

inconsistent with the terms of the Settlement Agreement, whether or not approved by the Bankruptcy Court.

4.2    Commitments of the TCEH Official Committee.

During the Plan Support Effective Period, the TCEH Official Committee, in its capacity as a fiduciary for the unsecured creditors of the TCEH Debtors and EFH Corporate Services, agrees that:

(a)    it shall (i) use commercially reasonable efforts to assist the Debtors in obtaining entry of the Settlement Order, the PSA Approval Order, the Approval Order, the Disclosure Statement Order, the Rights Offering Procedures Order, and the Confirmation Order and consummation of the Plan as soon as reasonably practicable in accordance with the Bankruptcy Code and on terms consistent with this Agreement, including within the timeframes contemplated by this Agreement, and (ii) execute and deliver any other agreements reasonably required to effectuate and consummate the Plan and Restructuring Transactions;

(b)    it shall not directly or indirectly, or encourage any other entity to directly or indirectly, (i) object to, delay, impede, or take any other action or any inaction to interfere with the acceptance, implementation, consummation or amendment (whether before or after confirmation, *provided* that such amendment is consistent with this Agreement, including Section 13) of the Plan and Restructuring Transactions and the Claims Settlement; (ii) propose, file, support, or take any other action in furtherance of any restructuring, workout, plan of arrangement, or plan of reorganization for the Debtors other than the Plan, including, for the avoidance of doubt, making or supporting any filings with the Bankruptcy Court or any regulatory agency, including the PUCT and the NRC, or making or supporting any press release, press report or comparable public statement, or filing with respect to any restructuring, workout, plan of arrangement, or plan of reorganization for the Debtors other than the Plan; or (iii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtors or any direct or indirect subsidiaries of the Debtors that are not Debtors other than as expressly permitted by the Plan and the Settlement Agreement; *provided, however,* that notwithstanding the foregoing, (Y) each Party may file with the Bankruptcy Court all documents necessary to obtain approval of this Agreement and the Claims Settlement and entry of the PSA Approval Order, the Approval Order, and the Settlement Order and (Z) each Party (subject to Section 4.4 with respect to the Investor Parties) may, during and after the Plan Support Effective Period, (I) solicit from (other than within the meaning of 11 U.S.C. § 1125), and negotiate with the Debtors and/or their other stakeholders, facilitate, and document the other terms of an Alternative Restructuring, (II) solicit from (other than within the meaning of 11 U.S.C. § 1125) and negotiate with the Debtors and/or their other stakeholders, facilitate, and document the terms of another plan or other restructuring transaction that contains the Required Alternative Terms, and (III) solicit from and enter into an agreement or agreements with the Debtors and/or their other stakeholders regarding support for and/or financing of such Alternative Restructuring or other restructuring so long as entering into such agreement or agreements does not violate such Party's commitments and obligations under this Agreement; *provided, however,* that each Party shall use commercially reasonable efforts (x) to keep confidential any solicitation, negotiation, facilitation, and documentation by such Party of an Alternative Restructuring and (y) to enter into a confidentiality agreement

with any counterparty to any agreement regarding support for and/or financing of an Alternative Restructuring, which confidentiality agreement provides that the existence and material terms of such Alternative Restructuring shall be kept confidential and shall not be publicly disclosed, except in each case to the extent required by applicable law or pursuant to such confidentiality agreements (including any "cleansing" provisions set forth in such confidentiality agreements) as determined by such Party in its sole and absolute discretion, and the Parties each waive any right to challenge such a determination made by any other Party; *provided, further, however*, that nothing in this Agreement shall affect the obligations of the TCEH Official Committee, if any, to coordinate discovery propounded in connection with confirmation pursuant to the *Order (A) Scheduling Certain Hearing Dates and Deadlines, (B) Establishing Certain Protocols in Connection with the Confirmation of Debtors' Plan of Reorganization, and (C) Revising Certain Dates in the Disclosure Statement Scheduling Order* [D.I. 4916]; and

(c)      it shall (i) refrain from supporting the allowance or payment of any make-whole claim on account of the prepayment, repayment, or other redemption of any debt incurred by EFH or EFIH and (ii) not object, encourage others to object, or support any objection to the payment of postpetition interest (if any) at the Federal Judgment Rate to any of the unsecured creditors of EFH, EFIH, or EFIH Finance.

4.3      Commitments of the Debtors.

(a)      During the Plan Support Effective Period, the Debtors shall use commercially reasonable efforts to: (i) file, as soon as reasonably practicable, the Plan (which shall amend and supersede the Initial Plan), the Disclosure Statement, and the Settlement Motion; (ii) file, as soon as reasonably practicable, the motion seeking approval of the Debtors' entry into and performance under the Backstop Agreement and the Merger Agreement; (iii) file on or before 28 days after the Debtors' execution of this Agreement, the Supplemental Ruling Request pursuant to Section 10(e) hereof; (iv) take all steps reasonably necessary or desirable to obtain orders of the Bankruptcy Court (A) on or before September 30, 2015, approving the Debtors' entry into and performance under this Agreement, (B) on or before October 31, 2015, approving the Disclosure Statement, and (C) on or before December 15, 2015, confirming the Plan, the Settlement Agreement, and the Debtors' entry into and performance under the Settlement Agreement, the Backstop Agreement, and the Merger Agreement; (v) take all steps reasonably necessary to consummate the Rights Offering and the registration of common equity of Parent in connection therewith as soon as practicable, including by providing all assistance and cooperation reasonably requested by Parent in connection therewith in accordance with EFH's and EFIH's obligations pursuant to Section 8.4 of the Backstop Agreement; (vi) support and take all steps reasonably necessary or desirable to consummate as soon as possible, and in any event no later than April 30, 2016 (subject to extension in accordance with Section 11(g)), the Plan and Restructuring Transactions in accordance with this Agreement, including the preparation, execution (where applicable) and filing of the Definitive Restructuring Documents within the dates provided herein and therein; (vii) execute and deliver any other agreements reasonably required to effectuate and consummate the Plan and Restructuring Transactions as soon as reasonably practicable, and in any event no later than April 30, 2016 (subject to extension in accordance with Section 11(g)); (vii) take all steps reasonably necessary to obtain any and all required regulatory and/or third-party approvals for

the Restructuring Transactions as soon as possible, and in any event no later than April 30, 2016 (subject to extension in accordance with Section 11(g)); (ix) take all other steps reasonably necessary to complete the Restructuring Transactions consistent with the dates provided herein; (x) agree to an indefinite adjournment of any litigation or requests for standing to pursue litigation, and any related deadlines, with respect to any claim or cause of action that is proposed to be settled pursuant to the Plan or the Settlement Agreement, and upon entry of the Settlement Order, agree to dismissal or withdrawal, with prejudice, of any such litigation or request; (xi) not object to, delay, impede, or take any other action or any inaction that is inconsistent with or is intended to interfere with acceptance, implementation, consummation, or amendment (whether before or after confirmation, *provided* that such amendment is consistent with this Agreement, including Section 13) of the Plan and Restructuring Transactions and the Claims Settlement; and (xii) not propose, file, support, or take any other action in furtherance of any restructuring, workout, plan of arrangement, or plan of reorganization for the Debtors other than the Plan, including, for the avoidance of doubt, making or supporting any filings with the Bankruptcy Court or any regulatory agency, including the PUCT, or making or supporting any public statements with respect to any restructuring, workout, plan of arrangement, or plan of reorganization for the Debtors other than the Plan; *provided, however*, that notwithstanding the foregoing, (Y) the Debtors may file with the Bankruptcy Court all documents necessary to obtain approval of this Agreement and the Claims Settlement and entry of the PSA Approval Order, the Approval Order, and the Settlement Order, and (Z) the Debtors may, during and after the Plan Support Effective Period, (I) solicit (other than within the meaning of 11 U.S.C. § 1125), negotiate, facilitate, and document the other terms of an Alternative Restructuring, (II) solicit (other than within the meaning of 11 U.S.C. § 1125), negotiate, facilitate, and document the terms of another plan or other restructuring transaction that contains the Required Alternative Terms, and (III) solicit and enter into an agreement or agreements regarding support for and/or financing of such Alternative Restructuring or other restructuring so long as entering into such agreement or agreements does not violate the Debtors' commitments and obligations under this Agreement; *provided, however*, that the Debtors shall use commercially reasonable efforts (x) to keep confidential any solicitation, negotiation, facilitation, and documentation by the Debtors of an Alternative Restructuring and (y) to enter into a confidentiality agreement with any counterparty to any agreement regarding support for and/or financing of an Alternative Restructuring, which confidentiality agreement provides that the existence and material terms of such Alternative Restructuring shall be kept confidential and shall not be publicly disclosed, except in each case to the extent required by applicable law or pursuant to such confidentiality agreements (including any "cleansing" provisions set forth in such confidentiality agreements) as determined by the Debtors in their sole and absolute discretion, and the Parties each waive any right to challenge such a determination made by the Debtors. Additionally, during the Plan Support Effective Period, the Debtors shall use commercially reasonable efforts to substantially complete the process of reconciling claims prior to the Effective Date of the Plan.

(b)    The Debtors, the Investor Parties, Consenting Interest Holders, Consenting TCEH Creditor Parties, and the TCEH Official Committee represent and warrant to each of the other Parties that there are no currently effective agreements (oral or written) or understandings, with respect to any plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business

combination, joint venture, partnership, sale of assets or equity interests or restructuring (other than the Definitive Restructuring Documents, the Alternative Restructuring Documents, and any other proposals, agreements, or understandings relating to the Plan or an Alternative Restructuring) involving the Debtors, or any of their assets, properties or businesses (an "**Alternative Proposal**"). If the Debtors make or receive a written proposal or expression of interest regarding an Alternative Proposal during the Plan Support Effective Period that is reasonably likely to lead to a Superior Proposal (as defined in the Merger Agreement), the Debtors shall promptly notify counsel to the Parties of any such proposal or expression of interest relating to an Alternative Proposal, with such notice to include the material terms thereof, including (unless prohibited by a separate agreement) the identity of the person or group of persons involved. The Debtors shall promptly furnish counsel to the Parties with copies of any written offer or other information that they make or receive relating to an Alternative Proposal and shall keep counsel to the Parties reasonably informed of any material changes to such Alternative Proposal. The Debtors shall not enter into any confidentiality agreement with a party proposing an Alternative Proposal unless such party consents to identifying and providing to counsel to the Parties (under a reasonably acceptable confidentiality agreement) the information contemplated under this Section 4.3(b).

(c)     Notwithstanding anything to the contrary in this Agreement, (i) the board of directors, the board of managers, or any such similar governing body of a Debtor shall be permitted to take (or permitted to refrain from taking) any action with respect to the Restructuring Transactions to the extent such board of directors, board of managers, or such similar governing body determines, in good faith based upon advice of counsel, that taking such action, or refraining from taking such action, as applicable, is reasonably required to comply with applicable law, including its fiduciary duties, and (ii) the officers and employees of the Debtors shall not be required to take any actions inconsistent with applicable law.

4.4     Commitments Between and Among Investor Parties Regarding Alternative Restructurings.

During the Plan Support Effective Period, each Investor Party agrees that: (a) prior to entering into any discussions with any person regarding an Alternative Restructuring, such Investor Party shall provide to each other Investor Party (i) written notice of such proposed discussions and (ii) a reasonable opportunity to participate in any such discussions; and (b) such Investor Party shall not enter into any agreement regarding an Alternative Restructuring absent written consent from the other Investor Parties; *provided, however*, that this Section 4.4 shall not apply to such discussions or agreements with any Investor Party to the extent such discussions or agreements relate solely to such Investor Party's capacity in an Alternative Restructuring as a holder of E-Side Claims.

4.5     Commitments of the TCEH First Lien Creditors.

During the Plan Support Effective Period and the Alternative Restructuring Support Period, each Consenting TCEH First Lien Creditor agrees that it shall: (a) use its commercially reasonable efforts to support an expeditious resolution of the claims and causes of action set forth in the TCEH First Lien Note Intercreditor Action (as defined in the Plan); (b) not directly or indirectly, or encourage any other entity to directly or indirectly, object to,

delay, impede, or otherwise oppose entry of a reasonable scheduling order by the Bankruptcy Court with respect to the TCEH First Lien Note Intercreditor Action that provides for the conclusion of briefing and oral argument, if any, on or prior to November 3, 2015; (c) to the extent it holds any TCEH First Lien Note Claims, use its commercially reasonable efforts to direct the TCEH First Lien Notes Trustee (as defined in the Plan) to amend the complaint in the TCEH First Lien Note Intercreditor Action as soon as reasonably practicable to include any claim or cause of action that the TCEH First Lien Creditor Distributions (as defined in the Plan) should be based on the TCEH First Lien Creditor Postpetition Interest Allocated Claim Amounts (as defined in the Plan) (hereinafter referred to as it relates to distributions under the Plan as the "**TCEH First Lien Creditor Plan Distribution Allocation Dispute**" and as it relates to Adequate Protection Payments (as defined in the Cash Collateral Order) the "**TCEH First Lien Creditor Adequate Protection Payment Allocation Dispute**"); and (d) to the extent it holds any TCEH Credit Agreement Claims, not consent to, and not direct the TCEH First Lien Agent to execute, any amendments, modifications, waivers, or terminations of the TCEH First Lien Intercreditor Agreement (as defined in the Plan) that would, directly or indirectly, adversely affect any of the claims, causes of action, counterclaims, or defenses of the parties to the TCEH First Lien Creditor Plan Distribution Allocation Dispute or the TCEH First Lien Creditor Adequate Protection Payment Allocation Dispute, without the consent of each Consenting TCEH First Lien Creditor; *provided, however*, that nothing herein shall limit the ability to assert any defenses or counterclaims to the complaint or amended complaint or to file any pleading, motion, or other document in the TCEH First Lien Creditor Plan Distribution Allocation Dispute or the TCEH First Lien Creditor Adequate Protection Payment Allocation Dispute; *provided, further, however*, for the avoidance of doubt, nothing in this Section 4.5 shall relieve any Consenting TCEH First Lien Creditor of its obligations under Section 4.1 hereof, and the Parties agree that nothing with respect to the TCEH First Lien Creditor Plan Distribution Allocation Dispute or the TCEH First Lien Creditor Adequate Protection Payment Allocation Dispute is intended to, and no Party shall take any action or inaction that would cause such disputes to, interfere with or delay in any material way the confirmation, implementation, and consummation of the Plan and Restructuring Transactions, including within the time frames contemplated under this Agreement. Further, in connection with the foregoing commitment contained in subsection (d) of this Section 4.5, each Consenting TCEH First Lien Lender represents that it has not previously directed the TCEH First Lien Agent to execute any amendments, modifications, waivers, or terminations of the TCEH First Lien Intercreditor Agreement that would adversely affect any of the claims, causes of action, counterclaims, or defenses of the parties to the TCEH First Lien Creditor Plan Distribution Allocation Dispute or the TCEH First Lien Creditor Adequate Protection Payment Allocation Dispute.

**Section 5.   Commitments Regarding Alternative Restructuring.**

5.1   Commitments of the Consenting Interest Holders, the Consenting TCEH Unsecured Noteholders, and the Consenting TCEH Second Lien Noteholders.

During the period if any, beginning on the Plan Support Termination Date (as defined in Section 11 hereof) and ending on the Agreement Termination Date (as defined in Section 12 hereof) applicable to the Party (such period, the "**Alternative Restructuring Support Period**"), so long as an Alternative Restructuring contains or otherwise implements, and is not

inconsistent with, the Required Alternative Terms, each Consenting Interest Holder, each Consenting TCEH Unsecured Noteholder, and each Consenting TCEH Second Lien Noteholder agrees that:

(a)     if an Alternative Restructuring is to be consummated pursuant to an Alternative Plan, subject to receipt of the Alternative Plan Disclosure Statement approved by the Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code, and the other Alternative Plan Solicitation Materials approved by the Bankruptcy Court;

(i)     to the extent a class of Debtor Claims/Interests is permitted to vote to accept or reject the Alternative Plan, it shall vote each such Debtor Claim/Interest it holds in such class in the same manner as the Required TCEH First Lien Creditors vote on such Alternative Plan by delivering its duly executed and completed ballot(s) on a timely basis following the commencement of solicitation, in a manner to be agreed upon by the Required TCEH First Lien Creditors, the Consenting Interest Holders, the Required TCEH Unsecured Noteholders, and the Required TCEH Second Lien Noteholders;

(ii)    to the extent it is permitted to elect whether to opt out of the releases set forth in the Alternative Plan, it shall not elect to opt out of the releases set forth in the Alternative Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iii)   it shall not change or withdraw (or cause to be changed or withdrawn) any such vote or election;

(b)     it shall not directly or indirectly, or encourage any other entity to directly or indirectly, (i) object to, delay, impede, or take any other action or any inaction to interfere with the acceptance, implementation, consummation, or amendment (whether before or after confirmation, *provided* that such amendment is consistent with this Agreement, including Section 13) of the Alternative Plan or any other Alternative Restructuring; (ii) propose, file, support, vote for, or take any other action in furtherance of any restructuring, workout, plan of arrangement, or plan of reorganization for the Debtors (including the Plan and the Restructuring Transactions) other than an Alternative Restructuring, including, for the avoidance of doubt, making or supporting any filings with the Bankruptcy Court or any regulatory agency, including the PUCT and the NRC, or making or supporting any press release, press report or comparable public statement, or filing with respect to any applicable restructuring, workout, plan of arrangement, or plan of reorganization, (including the Plan and the Restructuring Transactions) other than an Alternative Restructuring; (iii) other than as may be required by the Bankruptcy Court with respect to any fees, expenses, or other reimbursements that are payable from the TCEH Cash Payment, request, or encourage or support any other creditor's request for, a claim against any of the TCEH Debtors for any fees, expenses, or other reimbursements (including professional fees) pursuant to section 503(b)(3)(D) of the Bankruptcy Code; (iv) other than as explicitly permitted or required under Section 5.1(a), support or take any other action in furtherance of any Alternative Restructuring, including, for the avoidance of doubt, making or supporting any filings with the

Bankruptcy Court or any regulatory agency, including the PUCT and the NRC, or making or supporting any press release, press report or comparable public statement, or filing, if both the Debtors and the Required TCEH First Lien Creditors have filed competing Alternative Restructurings; or (v) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtors or any direct or indirect subsidiaries of the Debtors that are not Debtors other than as permitted by the Alternative Plan, any other Alternative Restructuring, and the Settlement Agreement; and

(c)    it shall not direct any administrative agent or indenture trustee (as applicable) to take any action inconsistent with such Party's respective obligations under this Agreement, and if any applicable administrative agent or indenture trustee takes any action inconsistent with a Parties' obligations under this Agreement, such Party shall promptly direct such administrative agent or indenture trustee to cease and refrain from taking any such action.

Notwithstanding anything to the contrary in this Agreement, the Consenting Interest Holders shall have no obligations under this Agreement to support, and reserve all of their rights to object to, any proposed restructuring for the Debtors contemplating a sale or transfer of any or all of the TCEH Debtors' assets, including any Alternative Restructuring, that generates an unpaid cash income tax liability to the Debtors, as determined by the Consenting Interest Holders in their reasonable discretion.

5.2    Commitments of Hunt.

If (A) the Merger Agreement is validly terminated after (i) the joint filing made by Hunt and Oncor with the PUCT relating to the Restructuring Transactions is rejected by the PUCT; (ii) the approval of such filing by the PUCT is not granted because it is conditioned upon the acceptance of conditions and restrictions that are rejected by Parent, the Purchasers or Hunt or (iii) such filing is withdrawn by or with the written consent of Parent, the Purchasers or Hunt because it has not been approved by the PUCT or because Parent, the Purchasers or Hunt are not able to reach agreement with the PUCT regarding any such conditions or restrictions or (B) the Merger Agreement is validly terminated (x) in accordance with Section 8.2 of the Merger Agreement, (y) by either EFH or EFIH in accordance with Section 8.3(a) or 8.3(b) of the Merger Agreement or (z) by either EFH or EFIH in accordance with Section 8.3(g) of the Merger Agreement if such termination pursuant to Section 8.3(g) of the Merger Agreement occurs on or after June 30, 2016, then, in the case of either clause (A) or (B), during the period, if any, beginning on the Plan Support Termination Date (as defined in Section 11 hereof) and ending on the Agreement Termination Date (as defined in Section 12.10 hereof) applicable to Hunt, neither Hunt nor any of its Affiliates shall, directly or indirectly, or encourage any other entity to, directly or indirectly, (a) object to, delay, impede, or take any other action or any inaction to interfere with the acceptance, implementation, consummation or amendment (whether before or after confirmation, *provided* that such amendment was made consistent with this Agreement, including Section 13) of an Alternative Plan or any other Alternative Restructuring; or (b) propose, file, support, or take any other action in furtherance of any restructuring, workout, plan of arrangement, or plan of reorganization for the Debtors (including the Plan and the Restructuring Transactions) other than an Alternative Restructuring, including, for the avoidance of doubt, making or supporting any filings with the Bankruptcy Court or any regulatory agency, including the PUCT, FERC or the NRC, or

making or supporting any public statements with respect to any restructuring, workout, plan of arrangement, or plan of reorganization for the Debtors other than an Alternative Plan or any other Alternative Restructuring.

Notwithstanding anything in this Section 5.2 to the contrary, neither Hunt nor any of its Affiliates shall be prohibited or restricted from taking any actions that they determine in their reasonable discretion are necessary or appropriate, including intervening in any proceedings before or making or supporting any filings with the PUCT, in order (i) to preserve and protect the business, operations, goodwill or assets of any existing electric utility (excluding Oncor Electric Delivery Company LLC) or electric utility property real estate investment trust in the State of Texas for which any of them or their direct or indirect equity owners exercise management control or provide management services or in which any such persons has a direct or indirect equity interest, including InfraREIT, Inc. ("InfraREIT") and Sharyland Utilities, L.P. and their respective subsidiaries or (ii) based on the advice of counsel, to fulfill the contractual, legal or other duties and obligations that any such Person has to or in respect of any such existing electric utility or electric utility investment trust or subsidiary. In addition, the parties hereto expressly acknowledge and agree that Hunt and its Affiliates have no obligation to bind or seek to bind InfraREIT or its subsidiaries to the foregoing provisions of this Section 5.2, it being understood that InfraREIT and its subsidiaries are not parties to this Agreement and have no liabilities or obligations of any kind hereunder.

5.3    Commitments of the TCEH Official Committee.

(a)    During the Alternative Restructuring Support Period, if any, so long as an Alternative Restructuring contains or otherwise implements and is not inconsistent with the Required Alternative Terms, the TCEH Official Committee, in its capacity as a fiduciary for the unsecured creditors of the TCEH Debtors and EFH Corporate Services, agrees that it shall not directly or indirectly, or encourage any other entity to directly or indirectly, (i) object to, delay, impede, or take any other action or any inaction to interfere with the acceptance, implementation, consummation, or amendment (whether before or after confirmation, *provided* that such amendment is consistent with this Agreement, including Section 13) of the Alternative Plan or any other Alternative Restructuring; (ii) propose, file, support, vote for, or take any other action in furtherance of any restructuring, workout, plan of arrangement, or plan of reorganization for the Debtors (including the Plan and the Restructuring Transactions) other than an Alternative Restructuring, including, for the avoidance of doubt, making or supporting any filings with the Bankruptcy Court or any regulatory agency, including the PUCT and the NRC, or making or supporting any press release, press report or comparable public statement, or filing with respect to any restructuring, workout, plan of arrangement, or plan of reorganization (including the Plan but excluding any Alternative Restructuring); (iii) support or take any other action in furtherance of any Alternative Restructuring, including, for the avoidance of doubt, making or supporting any filings with the Bankruptcy Court or any regulatory agency, including the PUCT and the NRC, or making or supporting any press release, press report or comparable public statement, or filing, if both the Debtors and the Required TCEH First Lien Creditors have filed competing Alternative Restructurings; or (iv) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtors or any direct or indirect subsidiaries of the Debtors that are not Debtors

other than as permitted by the Alternative Plan, any other Alternative Restructuring, and the Settlement Agreement.

(b)    Notwithstanding anything contained in this Section 5.3, (i) if the TCEH Official Committee determines in good faith after consultation with its financial advisors and legal counsel and based on the advice of such counsel, that supporting the Alternative Restructuring would be inconsistent with the exercise of its fiduciary duties with respect to the unsecured creditors of EFH Corporate Services, the TCEH Official Committee shall be relieved of its obligations under this Section 5.3 to support such Alternative Restructuring solely with respect to EFH Corporate Services; and (ii) the TCEH Official Committee reserves its right to pursue any good-faith objection with respect to the allowance of any Claim that would materially reduce recoveries to holders of General Unsecured Claims Against the TCEH Debtors Other Than EFCH or EFH Corporate Services during the Alternative Restructuring Support Period.

5.4    Commitments of the Consenting TCEH First Lien Creditors.

During the Alternative Restructuring Support Period, if any, each Consenting TCEH First Lien Creditor agrees:

(a)    that it shall not directly or indirectly, or encourage any other entity to directly or indirectly, propose, file, support, vote for, or take any other action in furtherance of any restructuring, workout, plan of arrangement, or plan of reorganization for the Debtors (including the Plan and the Restructuring Transactions) other than an Alternative Restructuring, including, for the avoidance of doubt, making or supporting any filings with the Bankruptcy Court or any regulatory agency, including the PUCT and the NRC, or making or supporting any press release, press report or comparable public statement, or filing with respect to any restructuring, workout, plan of arrangement, or plan of reorganization for the Debtors (including the Plan and the Restructuring Transactions) other than an Alternative Restructuring;

(b)    if an Alternative Restructuring is to be consummated pursuant to an Alternative Plan, subject to receipt of the Alternative Plan Disclosure Statement approved by the Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code, and the other Alternative Plan Solicitation Materials approved by the Bankruptcy Court, it shall:

(i)    to the extent a class of Debtor Claims/Interests is permitted to vote to accept or reject the Alternative Plan, vote each such claim or interest it holds in such class to accept the Alternative Plan by delivering its duly executed and completed ballot(s) accepting the Alternative Plan on a timely basis following the commencement of the solicitation

(ii)    to the extent a holder of Debtor Claims/Interests is permitted to elect whether to opt out of the releases set forth in the Alternative Plan, elect not to opt out of the releases set forth in the Alternative Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iii)    not change or withdraw (or cause to be changed or withdrawn) any such vote or election;

(c)    it shall (i) use commercially reasonable efforts to assist in obtaining approval of an Alternative Restructuring as soon as reasonably practicable in accordance with the Bankruptcy Code and on terms consistent with this Agreement and (ii) execute and deliver any other agreements reasonably required to obtain confirmation of and consummate an Alternative Restructuring;

(d)    if the Alternative Restructuring is to be consummated pursuant to an asset sale or other similar transaction, it shall take such actions as are commercially reasonable and appropriate to assist in obtaining Bankruptcy Court approval of an Alternative APA and the Alternative APA Order as soon as reasonably practicable;

(e)    it shall not directly or indirectly, or encourage any other entity to directly or indirectly, (i) object to, delay, impede, or take any other action or any inaction to interfere with the acceptance, implementation, consummation, or amendment (whether before or after confirmation, *provided* that such amendment is consistent with this Agreement, including Section 13) of an Alternative Plan or any other Alternative Restructuring; (ii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtors or any direct or indirect subsidiaries of the Debtors that are not Debtors other than as permitted by any Alternative Restructuring and the Settlement Agreement (if approved by the Bankruptcy Court); and

(f)    it shall not direct any administrative agent, collateral agent, or indenture trustee (as applicable) to take any action inconsistent with such Party's respective obligations under this Agreement, and if any applicable administrative agent, collateral agent, or indenture trustee takes any action inconsistent with a Parties' obligations under this agreement, such Party shall promptly direct such administrative agent, collateral agent, or indenture trustee to cease and refrain from taking any such action.

Notwithstanding anything in this Section 5.4 to the contrary, (y) during the Alternative Restructuring Support Period, the Consenting TCEH First Lien Creditors shall have no obligations under this Agreement to support (and may vote their TCEH First Lien Claims to reject), and reserve all of their rights to object to and otherwise litigate in connection with, any disclosure statement, plan of reorganization, or other restructuring transaction for any Debtor that is not filed or supported by the Required TCEH First Lien Creditors (including any proposed amendment to the Plan for the purpose of incorporating an Alternative Plan); *provided, however*, that if the Debtors file or propose any Alternative Restructuring for the EFH Debtors or the EFIH Debtors (i) that is not materially inconsistent with and does not adversely affect any Alternative Restructuring for the TCEH Debtors filed or supported by the Required TCEH First Lien Creditors and (ii) for so long as the Debtors are not continuing to object to or otherwise obstruct such Alternative Restructuring for the TCEH Debtors, the obligations set forth in this Section 5.4 shall apply to the Consenting TCEH First Lien Creditors with respect to such Alternative Restructuring for the EFH Debtors or the EFIH Debtors proposed by the Debtors; and (z) subject to the terms of the Amended Cash Collateral Order (as defined below), the Consenting TCEH First Lien Creditors shall be permitted to take

or direct any action relating to the maintenance, protection, or preservation of the Prepetition Collateral (as defined in the Cash Collateral Order (as defined below)), and reserve all rights and remedies with respect thereto, including in relation to the TCEH Debtors' use of cash collateral, and nothing herein shall be deemed to waive or release any such rights or remedies; *provided*, *however*, that the Consenting TCEH First Lien Creditors shall take no action in opposition of or otherwise inconsistent with Section 6 of this Agreement.

Furthermore, notwithstanding anything in this Section 5.4 or this Agreement to the contrary except Sections 6.1 and 6.2 of this Agreement, no Consenting TCEH First Lien Creditor shall be required to support, or vote in favor of, or otherwise be bound by the requirements of Section 5.4 with respect to, an Alternative Restructuring that does not provide that: (i) the allocation of distributions among the TCEH First Lien Claims is to be made in accordance with the terms of the Plan; and (ii) the ability of the TCEH First Lien Notes Trustee or any Consenting TCEH First Lien Creditor to pursue or defend the TCEH First Lien Creditor Plan Distribution Allocation Dispute and the TCEH First Lien Creditor Adequate Protection Payment Allocation Dispute, to the extent set forth in the Plan, is preserved.

5.5    Commitments of the Debtors and Reservation of Rights.

(a)    During the Alternative Restructuring Support Period, if any, so long as the Alternative Plan or any other Alternative Restructuring contains or otherwise implements and is not inconsistent with the Required Alternative Terms, the Debtors shall make commercially reasonable efforts to (a) support and take all steps reasonably necessary or desirable to consummate an Alternative Plan or any other Alternative Restructuring in accordance with this Agreement, including the preparation, execution (where applicable) and filing of the Alternative Restructuring Documents, (b) take all steps reasonably necessary to obtain Bankruptcy Court approval of the Alternative Restructuring Documents, as applicable, (c) take all steps reasonably necessary to obtain any and all required regulatory and/or third-party approvals of an Alternative Plan or any other Alternative Restructuring as soon as possible, (d) take all other steps reasonably necessary to complete an Alternative Plan or any other Alternative Restructuring, (e) not object to, delay, impede, or take any other action or any inaction that is inconsistent with, or is intended to or is reasonably likely to interfere with the acceptance, implementation, consummation, or amendment (whether before or after confirmation, *provided* that such amendment is consistent with this Agreement, including Section 13) of an Alternative Plan or any other Alternative Restructuring, (f) not propose, file, support, vote for, or take any other action in furtherance of any restructuring, workout, plan of arrangement, or plan of reorganization for the Debtors (including the Plan and the Restructuring Transactions) other than an Alternative Restructuring, including, for the avoidance of doubt, making or supporting any filings with the Bankruptcy Court or any regulatory agency, including the PUCT and the NRC, or making or supporting any press release, press report or comparable public statement, or filing with respect to any restructuring, workout, plan of arrangement, or plan of reorganization for the Debtors (including the Plan and the Restructuring Transactions) other than an Alternative Restructuring, and (g) substantially complete the process of reconciling claims before the Effective Date of an Alternative Plan.

(b)    Notwithstanding anything in this Section 5.5 to the contrary, during the Alternative Restructuring Support Period, the Debtors shall have no obligations under this

Agreement to support, and reserve all of their rights to object to and otherwise litigate in connection with, any disclosure statement, plan of reorganization, or other restructuring transaction for the Debtors that is not filed by the Debtors, including any Alternative Restructuring filed by the TCEH First Lien Creditors.

5.6    Commitments With Respect to Claims Against the EFH Debtors and the EFIH Debtors.

Notwithstanding anything to the contrary in this Agreement, Avenue and GSO, and any Permitted Transferee (defined below) of Avenue or GSO with respect to E-Side Claims, shall be permitted to vote to reject and object to an Alternative Restructuring solely as it relates to Debtor Claims/Interests against the EFH Debtors or the EFIH Debtors ("**E-Side Claims**") held by such Parties (including by beneficial ownership) and exercise its rights and remedies as a holder of such E-Side Claims, and shall not otherwise be bound by or subject to Section 3.2, Section 5 (other than this Section 5.6) or Section 6 with respect to such E-Side Claims; *provided, however,* for the avoidance of doubt, nothing in this Section 5.6 shall waive or diminish such Party's obligations under this Agreement with respect to all other Debtor Claims/Interests; *provided, further, however,* that such Parties shall take no action in opposition of or otherwise inconsistent with the terms of the Settlement Agreement, whether or not approved by the Bankruptcy Court.

**Section 6.    Additional Commitments**.

6.1    Additional Commitments Between and Among the Consenting TCEH Creditor Parties, the TCEH First Lien Agent, and the TCEH Official Committee.

Notwithstanding anything to the contrary in this Agreement (subject to Sections 5.3(b) and 5.6), each Consenting TCEH Creditor Party, the TCEH First Lien Agent, solely in its capacity as such, and the TCEH Official Committee covenants and agrees that, beginning on the Agreement Effective Date, and unless and until such Party's obligations under this Agreement are terminated pursuant to Section 12:

(a)    it will not propose, file, support, vote for, or take any other action in furtherance of, and will vote against (if entitled to vote) any Alternative Restructuring with respect to one or more of the TCEH Debtors (other than any Alternative Restructuring solely with respect to one or more TCEH Debtors whose total assets are less than 2.5% of the consolidated total assets, or whose revenues are less than 2.5% of the consolidated revenues, of all the TCEH Debtors as of the date of such Alternative Restructuring), as applicable, that does not contain or otherwise implement the following terms (the "**Required TCEH Alternative Terms**"):

(i)    upon consummation of such an Alternative Restructuring, holders of Allowed TCEH First Lien Deficiency Claims, Allowed TCEH Unsecured Note Claims, Allowed TCEH Second Lien Note Claims, Allowed PCRB Claims, and Allowed General Unsecured Claims Against the TCEH Debtors Other Than EFCH shall receive, in the aggregate, $550 million in Cash (which shall be subject to reduction only pursuant to Section 11 of this Agreement and Section 2.7 of the Settlement Agreement, and shall not otherwise be subject to dilution or reduction as a consequence of any claim or liability incurred as a result of any act, event or transaction) (the "**TCEH Cash**

Payment"). The TCEH Cash Payment shall be made (i) from the Cash on hand at the TCEH Debtors and, if none (or if Cash on hand is insufficient to make the full amount of the TCEH Cash Payment), the first proceeds of any sale, transfer, or other disposition of, or any financing or similar transaction secured or supported by the Prepetition Collateral (as defined in the Cash Collateral Order) (the "**TCEH Cash Payment Carve Out**") and (ii) before any payment or other distribution (including transfer) is made in connection with such an Alternative Restructuring to the holders of Allowed TCEH First Lien Claims (the "**TCEH First Lien Creditors**"); *provided, however*, that the TCEH Cash Payment Carve Out shall be subordinate in all respects to: (a) the RCT Reclamation Support Carve Out (as defined in the Cash Collateral Order); (b) the Carve Out (as defined in the Cash Collateral Order); and (c) the Permitted Liens (as defined in the Cash Collateral Order). If the Settlement Agreement is not approved and the Plan is not consummated, upon consummation of an Alternative Restructuring, (y) the TCEH Unsecured Group (but not the individual members thereof) and the TCEH Unsecured Notes Indenture Trustee shall be paid from the TCEH Cash Payment the reasonable and documented out-of-pocket fees, expenses, and reimbursements of such Entities (including professional fees) that would not be subject to or covered by the TCEH Unsecured Notes Indenture Trustee's "charging lien," and which have not been paid or otherwise reimbursed by the Debtors, and (z) the TCEH Second Lien Group (but not the individual members thereof) and Wilmington Savings Fund Society, as successor indenture trustee to The Bank of New York Mellon (the "**TCEH Second Lien Notes Indenture Trustee**") shall be paid from the TCEH Cash Payment the reasonable and documented out-of-pocket fees, expenses, and reimbursements of such Entities (including professional fees) that would not be subject to or covered by the TCEH Second Lien Notes Indenture Trustee's "charging lien" and which have not been paid or otherwise reimbursed by the Debtors; in the case of each of clause (y) and (z), unless otherwise ordered by the Bankruptcy Court (or other court of competent jurisdiction). For the avoidance of doubt, any distribution of the TCEH Cash Payment that would otherwise be made to or received by holders of Allowed TCEH First Lien Deficiency Claims pursuant to this Section 6.1(a)(i) shall be subject to Section 6.1(a)(ii) of this Agreement;

(ii)    the TCEH First Lien Creditors will waive, and the TCEH First Lien Agent will not take any action to interfere or that is inconsistent with the waiver of, any recovery or distribution on account of (but not voting rights in respect of) the Allowed TCEH First Lien Deficiency Claims (including any recovery or distribution provided for in Section 6.1(a)(i)) (the "**Limited Waiver**") for the benefit of the holders of Allowed TCEH Unsecured Note Claims, Allowed TCEH Second Lien Note Claims, and Allowed General Unsecured Claims Against the TCEH Debtors Other Than EFCH (collectively, the "**Beneficiary-Claimants**"), such that any payment or other distribution (including transfer) that would otherwise have been made to, or for the benefit of, one or more of the TCEH First Lien Creditors on account of their Allowed TCEH First Lien Deficiency Claims pursuant to an Alternative Restructuring will instead be paid or distributed pro rata to the Beneficiary-Claimants on the basis of the amounts of their respective Allowed Claims; *provided, however*, that, (x) if the Bankruptcy Court (or other court of competent jurisdiction) determines that the Limited Waiver cannot be for the benefit of only the Beneficiary-Claimants or (y) if each of the

Required TCEH Unsecured Noteholders, the Required TCEH Second Lien Noteholders, and the TCEH Official Committee agree, in consultation with the Consenting TCEH First Lien Creditors, then the Limited Waiver shall be for the benefit of the Beneficiary-Claimants and such other holders of Allowed Unsecured Claims against the TCEH Debtors as ordered by such court or agreed by the Required TCEH Unsecured Noteholders, the Required TCEH Second Lien Noteholders, and the TCEH Official Committee, in consultation with the Consenting TCEH First Lien Creditors, but in no event shall include the holders of Allowed TCEH First Lien Deficiency Claims, such that any payment or other distribution (including transfer) that would otherwise have been made to, or for the benefit of, one or more of the TCEH First Lien Creditors on account of their Allowed TCEH First Lien Deficiency Claims pursuant to an Alternative Restructuring will instead be paid or distributed pro rata to the Beneficiary-Claimants and such other holders of Allowed Unsecured Claims against the TCEH Debtors on the basis of the amounts of their respective Allowed Claims. For the avoidance of doubt, (A) under no circumstances will any Holder of a TCEH First Lien Deficiency Claim receive on account of such claim any portion of or distribution from the TCEH Cash Payment, and (B) the Limited Waiver shall not increase the aggregate amount of payments, distributions, or transfers required pursuant to Section 6.1(a)(i) and only relates to the allocation of such payments, distributions and transfers as between the holders of Allowed Unsecured Claims against the TCEH Debtors;

(iii)   upon consummation of any such Alternative Restructuring, (A) the TCEH Debtors' current and former officers, directors, and managers, the Consenting Interest Holders (including affiliates thereof), Holders of TCEH First Lien Claims, Holders of TCEH Unsecured Note Claims, Holders of TCEH Second Lien Claims, Holders of PCRB Claims, Holders of Allowed General Unsecured Claims Against the TCEH Debtors Other Than EFCH, and the TCEH Official Committee and its members, each such Entity's respective current and former affiliates, and each such Entity's and its current and former affiliates' current and former equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and their current and former officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals (each in their capacities as such) shall receive standard exculpation and releases of all of the TCEH Debtors' Estate claims and Causes of Action against such Entities, including all claims and Causes of Action against such Entities proposed to be released under the Plan or the Settlement Agreement (whether or not the Plan is consummated or the Settlement Agreement is approved), and, to the fullest extent permitted by applicable law, releases of all claims and Causes of Action against such Entities held by Holders of Claims against or Interests in the TCEH Debtors approved on or before consummation of any form of Alternative Restructuring with respect to the TCEH Debtors, including any request to modify the automatic stay and foreclose on any of the TCEH Debtors' assets, except that with respect to any releases of claims or Causes of Action by and among the holders of TCEH First Lien Claims as against each other, such releases shall be as agreed to by the Consenting TCEH First Lien Creditors, and (B) the Parties shall be deemed to agree to such exculpation and releases;

(iv)    upon consummation of any such Alternative Restructuring, all Non-TCEH Debtor Intercompany Claims, including any derivative claims, asserted on behalf of the Debtors that any Party would have been legally entitled to assert (whether individually or collectively) shall be released or discharged; *provided*, for the avoidance of doubt, that the Parties shall be deemed to agree to such releases; *provided, further*, that any Alternative Restructuring of the TCEH Debtors shall not be inconsistent with the Settlement Intercompany Claim (as defined below);

(v)    the Reorganized TCEH Debtors shall waive all Causes of Action against creditors of the TCEH Debtors and EFH Corporate Services that arise under sections 544, 547, 548, and 549 of the Bankruptcy Code and state fraudulent conveyance law; and

(vi)    the same terms, treatment, and conditions set forth in the Plan and in this Agreement (including Sections 10(l), 10(m), 10(n), and 10(o) hereof) regarding each of the 2015 Compensation Order, the 2016 Compensation Order (which shall be in form and substance reasonably acceptable to the Required TCEH First Lien Creditors), the Reorganized Debtor Management Incentive Plans, the New Employee Agreements/Arrangements, and the Employment Agreements in existence as of the date of such Alternative Restructuring;

(b)    it will not propose, file, support, vote for, or take any other action in furtherance of, and will vote against (if entitled to vote) any Alternative Restructuring with respect to one or more of the EFH Debtors or the EFIH Debtors, as applicable, that does not contain or otherwise implement the following terms (the "**Required EFH Alternative Terms**," and together with the Required TCEH Alternative Terms, as applicable to a Debtor that is subject to an Alternative Restructuring, the "**Required Alternative Terms**"):[3]

(i)    upon consummation of such an Alternative Restructuring, (A) the EFH and EFIH Debtors' current and former officers, directors, and managers and the Consenting Interest Holders (including affiliates thereof), each such Entity's respective current and former affiliates, and each such Entity's and its current and former affiliates' current and former equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and their current and former officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals (each in their capacity as such) shall receive standard exculpation and releases of all of the EFH and EFIH Debtors' Estate claims and Causes of Action against such Entities, including all claims and Causes of Action against such Entities proposed to be released under the Plan or the Settlement Agreement (whether or not the Plan is consummated or the Settlement Agreement is approved) and, to the fullest extent permitted by applicable

---

[3]    For the avoidance of doubt, in any Alternative Restructuring that only includes the TCEH Debtors, the Required Alternative Terms shall only include the Required TCEH Alternative Terms, and in any Alternative Restructuring that only includes the EFH Debtors and/or the EFIH Debtors, the Required Alternative Terms shall only include the Required EFH Alternative Terms.

law, releases of all claims and Causes of Action against such Entities held by Holders of Claims against or Interests in the EFH and EFIH Debtors approved on or before consummation of any form of Alternative Restructuring with respect to the EFH Debtors and the EFIH Debtors, including any request to modify the automatic stay and foreclose on any of the EFH Debtors' or the EFIH Debtors' assets, and (B) the Parties shall be deemed to agree to such exculpation and releases;

(ii)     all Non-EFH Debtor Intercompany Claims and all Non-EFIH Debtor Intercompany Claims, including any derivative claims, asserted on behalf of the Debtors that any Party would have been legally entitled to assert (whether individually or collectively) shall be released or discharged; *provided*, for the avoidance of doubt, that the Parties shall be deemed to agree to such releases; *provided, further*, that unless otherwise agreed by the Debtors and the Required TCEH First Lien Lenders, TCEH shall have an Allowed, non-priority, unsecured Claim against EFH in the amount of $700 million provided for in any Alternative Restructuring of the EFH Debtors (the "**Settlement Intercompany Claim**"); *provided, further*, that in connection with (A) any such Alternative Plan that includes the TCEH Debtors, TCEH shall be deemed to vote in the same manner as the class of claims that includes the TCEH First Lien Secured Claims (as defined in the Plan), or (B) any Alternative Plan other than as set forth in (A), the Required TCEH First Lien Creditors shall have the sole right to submit a vote to accept or reject such plan of reorganization on account of the Settlement Intercompany Claim on behalf of TCEH; *provided, further, however*, that if EFH at any time ceases to be a Party to this Agreement, this paragraph (ii) shall not be a Required Alternative Term; and

(iii)     the Reorganized EFH Debtors and the Reorganized EFIH Debtors, as applicable, shall waive all Causes of Action against creditors of the TCEH Debtors and EFH Corporate Services that arise under sections 544, 547, 548, and 549 of the Bankruptcy Code and state fraudulent conveyance law.

(c)     it shall (i) adjourn indefinitely or agree to an indefinite adjournment of any litigation or requests for standing to pursue litigation, including the TCEH Ad Hoc Standing Motion and the TCEH Official Committee Standing Motion, and any related deadlines (including the Challenge Period Termination Date (as defined in the Cash Collateral Order)), with respect to any claim or Cause of Action against, or that otherwise relates to or adversely affects, the TCEH First Lien Creditors that is proposed to be settled or released pursuant to the terms of the Settlement Agreement, whether or not approved by the Bankruptcy Court, including the TCEH Official Committee Standing Motion and the TCEH Ad Hoc Standing Motion; (ii) not pursue (but may defend consistent with this Agreement), in any manner, seek standing to pursue, or encourage or support others to pursue or seek standing to pursue, any of the claims or causes of action described in the TCEH Ad Hoc Standing Motion or the TCEH Official Committee Standing Motion; and (iii) use its commercially reasonable efforts to oppose any litigation or requests for standing to pursue litigation with respect to any claim or cause of action that is proposed to be settled pursuant to the Plan or the Settlement Agreement, including the EFH Official Committee Standing Motion;

(d)      any limitations period applicable to any claim or cause of action against, or that otherwise relates to or adversely affects, the TCEH First Lien Creditors that is proposed to be settled or released pursuant to the terms of the Settlement Agreement, whether or not approved by the Bankruptcy Court including the TCEH Official Committee Standing Motion and TCEH Ad Hoc Standing Motion, shall be tolled and suspended, and all claims, arguments or defenses applicable to such claims, or to any defenses thereto that are based upon the passage of time (including all statute of limitations and repose and any claim of waiver, laches, or other time-based claim or defense) shall be tolled and suspended (to the extent the applicable limitations period has not already expired under applicable law as of the Agreement Effective Date);

(e)      promptly following the earliest to occur of (i) the Settlement Agreement Effective Date (as defined in the Settlement Agreement), (ii) the Effective Date of the Plan, and (iii) consummation of an Alternative Restructuring and receipt of the TCEH Cash Payment as set forth in Section 6.1(a)(i)-(ii), it shall dismiss or withdraw with prejudice, or agree to such dismissal or withdrawal of, any litigation or request described in Section 6.1, and any and all related claims and causes of action shall be forever released without further notice or action by any Party or the Bankruptcy Court.

6.2      <u>Additional Commitments Between and Among the Debtors, Consenting Interest Holders, Consenting TCEH Creditor Parties, and the TCEH Official Committee.</u>

(a)      Notwithstanding anything in this Agreement to the contrary, each Debtor and Consenting Interest Holder covenants and agrees that, beginning on the Agreement Effective Date (or, with respect to the Debtors, the date of entry by the Bankruptcy Court of the PSA Approval Order), and unless and until such Party's obligations under this Agreement are terminated pursuant to Section 12:

(i)      it will not propose, file, support, vote for, or take any other action in furtherance of, and will vote against (if entitled to vote) any Alternative Restructuring with respect to all of the Debtors that does not contain or otherwise implement the Required Alternative Terms;

(ii)      it shall adjourn indefinitely or agree to an indefinite adjournment of any deadlines (including under the Case Matters Protocol) related to any litigation or requests for standing to pursue litigation with respect to any claim or cause of action described in Section 6.1(c)(i); and

(iii)      any limitations period applicable to any claim or cause of action described in Section 6.1(c)(i) shall be tolled and suspended, and all claims, arguments or defenses applicable to such claims, or to any defenses thereto that are based upon the passage of time (including all statute of limitations and repose and any claim of waiver, laches, or other time-based claim or defense) shall be tolled and suspended (to the extent the applicable limitations period has not already expired under applicable law as of the Agreement Effective Date).

(b)      Notwithstanding anything in this Agreement to the contrary (subject to Sections 5.3(b) and 5.6), each Party covenants and agrees that, beginning on the Agreement

Effective Date, and unless and until such Party's obligations under this Agreement are terminated pursuant to Section 12:

      (i)     it shall adjourn indefinitely or agree to an indefinite adjournment of any litigation or requests for standing to pursue litigation, and any related deadlines (including under the Case Matters Protocol), and not pursue (but may defend consistent with this Agreement) in any manner, seek standing to pursue, or object to any settlement of any claim or cause of action against a Consenting Interest Holder or the Debtors' officers, directors, or managers, or by one Debtor against another Debtor proposed to be settled or released under the Plan, the Settlement Agreement, or the Required Alternative Terms, or (except with respect to the Consenting TCEH First Lien Creditors) the Alternative Plan or any other Alternative Restructuring, as applicable, including (x) any claims against the Debtors and their affiliates, equity owners, directors, managers, officers, creditors, or any other person or entity, (y) any causes of action of the Debtors against their affiliates, direct or indirect equity owners, directors, managers, officers, creditors, or any other person or entity, or (z) any of the claims or causes of action described in the Litigation Letters, but excluding, for the avoidance of doubt, any good-faith objection by the TCEH Official Committee with respect to the allowance of any Claim that would materially reduce recoveries to holders of General Unsecured Claims Against the TCEH Debtors Other Than EFCH or EFH Corporate Services; *provided* that until the earlier of the entry of the Settlement Order and the consummation of the Plan or an Alternative Restructuring, the Consenting TCEH First Lien Creditors reserve all rights with respect to any claim of a TCEH Debtor against any other Debtor, but, for the avoidance of doubt, are required to support the allowance and amount of any such claims as set forth in the Settlement Agreement and the Required Alternative Terms;

      (ii)    any limitations period applicable to any claim or cause of action described in Section 6.2(b)(i) shall be tolled and suspended, and all claims, arguments or defenses applicable to such claims and causes of action, or to any defenses thereto that are based upon the passage of time (including all statute of limitations and repose and any claim of waiver, laches, or other time-based claim or defense) shall be tolled and suspended (to the extent the applicable limitations period has not already expired under applicable law as of the Agreement Effective Date);

      (iii)   promptly following the earliest to occur of (i) the Settlement Agreement Effective Date (as defined in the Settlement Agreement), (ii) the Effective Date of the Plan, and (iii) consummation of an Alternative Restructuring and receipt of the TCEH Cash Payment as set forth in Section 6.1(a)(i)-(ii), it shall dismiss or withdraw with prejudice, or agree to such dismissal or withdrawal of, any litigation or request described in Section 6.2(b)(i), and any and all related claims and causes of action shall be forever released without further notice or action by any Party or the Bankruptcy Court; and

      (iv)   in the event an Entity that is not a Party pursues and recovers on a claim or cause of action described in Sections 6.1 or 6.2 against the EFH Debtors or the EFIH Debtors, the Holders of EFH Interests, any other Consenting Interest Holders, or the

Debtors' directors, officers, or managers, any such recovery or distribution on account of such claim or cause of action received by a Consenting TCEH Creditor Party shall be deposited in and held in an escrow account and, (i) upon consummation of an Alternative Restructuring and receipt of the TCEH Cash Payment as set forth in Section 6.1(a)(i)-(ii), released to EFH or its designee for the benefit of the EFH Debtors, the EFIH Debtors, the Consenting Interest Holders, and the Debtors' officers, directors, or managers and distributed to them based on any economic losses incurred by each as a result of the litigation of the claims and causes of action described in Sections 6.1 or 6.2, and (ii) in all other events, returned to each Party that deposited such recoveries or distribution into escrow.

6.3    <u>Additional Commitments Between and Among the Consenting Interest Holders and certain of the Consenting TCEH Creditor Parties.</u>

Upon consummation of an Alternative Restructuring for the EFH Debtors, TCEH Debtors, and EFIH Debtors that includes all releases in Section 2.3 of the Settlement Agreement, Texas Holdings agrees that it will pay over and deposit into escrow for the benefit of holders of Allowed TCEH Unsecured Note Claims, Allowed TCEH Second Lien Note Claims, Allowed PCRB Claims, and Allowed General Unsecured Claims Against the TCEH Debtors Other Than EFCH (but, in no event, holders of Allowed TCEH First Lien Deficiency Claims) 100% of the proceeds of any recovery received by Texas Holdings on account of its Interests in EFH (except for the payment of up to $15,000,000.00 referred to in Section 2.7(b) of the Settlement Agreement).

**Section 7.    Transfers of Supporting Claims/Interests.**

(a)    During the period beginning on the Agreement Effective Date and ending on the Agreement Termination Date (as defined in Section 12 hereof) applicable to the Party (such period, the "**Agreement Effective Period**"), neither Consenting Interest Holders, any Investor Party, nor any Consenting TCEH Creditor Party shall sell, use, pledge, assign, transfer, or otherwise dispose of (each, a "**Transfer**") any ownership (including any beneficial ownership)[4] in its respective Debtor Claims/Interests, general partnership interests in Texas Holdings, or interests in TEF (but not including, for the avoidance of doubt, limited partnership interests in Texas Holdings) (the "**Supporting Claims/Interests**"), unless all of the following requirements are satisfied (a transfer that satisfies such requirements, a "**Permitted Transfer**," and such transferee, a "**Permitted Transferee**"):

(i)    the intended transferee executes and delivers to counsel to the other Parties on the terms set forth below an executed joinder agreement in the form attached hereto as **Exhibit F** (a "**Joinder Agreement**") before such Transfer is effective; and

(ii)    the intended transferee, the intended transferee's affiliates, and/or any unaffiliated third-party in which the intended transferee has a direct or indirect

---

[4]    As used herein, the term "**beneficial ownership**" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of voting rights and the disposition of, the Supporting Claims/Interests or the right to acquire such Supporting Claims/Interests.

beneficial ownership, or any group of persons acting pursuant to a plan or arrangement as described in Treasury Regulation Section 1.355-6(c)(4) (*provided, however*, that for the avoidance of doubt, in accordance with Treasury Regulations Section 1.355-6(c)(4)(ii), none of the Investor Parties, Consenting Interest Holders or Consenting TCEH Creditor Parties will be treated as acting pursuant to a plan or arrangement as a result of its being a Party or participating in the Plan and the other Restructuring Transactions, or the Alternative Plan, as applicable), will not, after giving effect to such Transfer, and assuming the Plan and the other Restructuring Transactions were to be consummated immediately upon such Transfer, have beneficial ownership of, in the aggregate, fifty percent (50%) or more of the Reorganized TCEH Common Stock or the Reorganized EFH Common Stock.

Notwithstanding the foregoing, so long as a Transfer by an Investor Party, Consenting Interest Holder, or Consenting TCEH Creditor Party (i) is to an Investor Party, Consenting Interest Holder or Consenting TCEH Creditor Party that is not in breach of its obligations under this Agreement and remains a Party to this Agreement, and (ii) would comply with Section 7(a)(ii), above, then such Transfer shall be a Permitted Transfer, and such transferee a Permitted Transferee, without the requirement of executing and delivering a Joinder Agreement.

(b)     Notwithstanding anything to the contrary herein, (i) the foregoing provisions shall not preclude an Investor Party, Consenting Interest Holder, or Consenting TCEH Creditor Party from settling or delivering securities or bank debt that would otherwise be subject to the terms of this Agreement to settle any confirmed transaction pending as of the date of such Party's entry into this Agreement (subject to compliance with applicable securities laws and it being understood that such securities or bank debt so acquired and held (i.e., not as a part of a short transaction) shall be subject to the terms of this Agreement; (ii) a Qualified Marketmaker[5] that acquires any of the Supporting Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Supporting Claims/Interests, shall not be required to execute and deliver a Joinder Agreement or otherwise agree to be bound by the terms and conditions set forth in this Agreement if such Qualified Marketmaker Transfers such Supporting Claims/Interests (by purchase, sale, assignment, participation, or otherwise) as soon as reasonably practicable, and in no event later than the earlier of (A) one (1) Business Day prior to any voting deadline established by the Bankruptcy Court with respect to the Plan or any Alternative Plan (solely if the Qualified Marketmaker acquires such Supporting Claims/Interests prior to such voting deadline) and (B) twenty (20) Business Days of its acquisition, to a Permitted Transferee and the Transfer otherwise is a Permitted Transfer (including, for the avoidance of doubt, the requirement that such transferee execute a Joinder Agreement in accordance with Section 7(a)); (iii) to the extent any Party is acting solely in its capacity as a Qualified Marketmaker, it may Transfer any ownership interests in the Supporting Claims/Interests that it acquires from a holder of such Supporting Claims/Interests

---

[5]     As used herein, the term "**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Supporting Claims/Interests (or enter with customers into long and short positions in Supporting Claims/Interests), in its capacity as a dealer or market maker in Supporting Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

that is not a Party to a transferee that is not a Party at the time of such Transfer without the requirement that such transferee be or become a signatory to this Agreement or execute a Joinder Agreement; and (iv) a Consenting TCEH Creditor Party may Transfer any Supporting Claims/Interests pursuant to or in connection with any repurchase transaction, reverse repurchase transaction, or any swap or other derivative transaction without satisfying the requirements set forth in this Section 7 only if, in connection with such Transfer, the Consenting TCEH Creditor Party (or a wholly-owned subsidiary controlled by it) retains the contractual right to exercise any voting right or other direction that may be made on account of such Supporting Claims/Interests, and such Consenting TCEH Creditor Party exercises (or causes its wholly-owned subsidiary controlled by it to exercise) such rights so that the Transferred Supporting Claims/Interests are voted in accordance with this Agreement and the transferee thereof does not otherwise take any action inconsistent with such Consenting TCEH Creditor Party's obligations under this Agreement. For purposes of subclause (iv), a Person shall be deemed to "control" another person if such person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract, or otherwise.

(c)     This Agreement shall in no way be construed to preclude any Investor Party, Consenting Interest Holder or Consenting TCEH Creditor Party from acquiring additional Supporting Claims/Interests; *provided, however*, that (i) any Investor Party, Consenting Interest Holder or Consenting TCEH Creditor Party that acquires additional Supporting Claims/Interests, as applicable, during the Agreement Effective Period shall promptly notify the other Parties in accordance with Section 14.8 hereof of such acquisition, including the amount of such acquisition, and (ii) such acquired Supporting Claims/Interests shall automatically and immediately upon acquisition by an Investor Party, Consenting Interest Holder or Consenting TCEH Creditor Party be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to the other Parties); *provided further, however,* that any such acquisition shall not cause such Investor Party, Consenting Interest Holder, or Consenting TCEH Creditor Party to breach Section 7(a)(ii).

(d)     This Section 7 shall not impose any obligation on any Debtor to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Party to Transfer any Supporting Claims/Interests. Notwithstanding anything to the contrary herein, to the extent the Debtors and another Party have entered into a separate agreement with respect to the issuance of a "cleansing letter" or other public disclosure of information in connection with any proposed restructuring transactions (each such executed agreement, a **"Confidentiality Agreement"**), the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms.

(e)     Any Transfer made in violation of this Section 7 shall be void *ab initio*. Upon satisfaction of the requirements set forth in Section 7(a), the applicable Permitted Transferee shall be and shall be deemed to be a Party hereunder solely to the extent of such transferred Supporting Claims/Interests and not, for the avoidance of doubt, with respect to any other Debtor Claims/Interest held by such Permitted Transferee at the time of such Transfer unless already subject to this Agreement. Any Party that effectuates a Permitted Transfer to a Permitted Transferee shall have no liability under this Agreement arising from or related to the failure of the Permitted Transferee to comply with the terms of this Agreement.

(f)    For the avoidance of doubt, this Agreement shall not modify the rights of Parties to transfer their rights and obligations under the Equity Commitment Letter and Backstop Agreement, which shall be governed by the terms of the Equity Commitment Letter and Backstop Agreement, respectively.

**Section 8.    Representations and Warranties.**

8.1    Representations and Warranties of the Debtors.

Each Debtor jointly and severally represents and warrants that:

(a)    it has not filed any IRS Submissions other than (i) the Pre-Submission Memorandum on April 30, 2014, (ii) the Ruling Request on June 10, 2014, (iii) correspondence regarding the no-rule policy on June 20, 2014, (iv) a ruling checklist on June 24, 2014; (v) a transaction slide presentation on August 27, 2014, (vi) the response to Information Request #1 on November 10, 2014, (vii) the Memorandum on Busted 351 Transaction on March 25, 2015, (viii) the supplemental letter on Busted 351 Transaction on May 7, 2015; (ix) the response to Information Request #2 on May 27, 2015; (x) the Memorandum on E&P Allocation on June 5, 2015; (xi) the response to IRS Questions on E&P Allocation on June 15, 2015; (xii) the Memorandum on Determining the E&P Subject to Allocation on June 19, 2015; (xiii) an email from D. Wheat to E. Raineri on E&P Allocation Estimates on June 19, 2015; (xiv) the Memorandum on E&P Allocation re Fair Market Value and Net Worth Cap on July 1, 2015; and (xv) the Memorandum on Section 355(d) Rulings on August 7, 2015; and

(b)    since the internal corporate transactions on April 15, 2013 to eliminate the excess loss account and a deferred intercompany gain, it has not taken any action to change the entity classification for U.S. tax purposes of any Debtor entity, by changing their legal form or otherwise, *provided, however,* that (i) Eagle Mountain Power Company LLC, a Debtor entity that is a disregarded entity for U.S. federal income tax purposes, was formed after April 15, 2013; and (ii) Comanche Peak Nuclear Power Company LLC, a non-Debtor indirect subsidiary of TCEH, became a disregarded entity after April 15, 2013.

(c)    since October 10, 2007, it has not taken any action (and, to its knowledge, none of its direct or indirect owners has taken any action) that result in an ownership change of EFH within the meaning of Section 382(g) of the Internal Revenue Code (including by treating the equity interests of EFH as becoming worthless within the meaning of Section 382(g)(4)(D) of the Internal Revenue Code).

8.2    Representations and Warranties of Investor Parties, Consenting Interest Holders and Consenting TCEH Creditor Parties.

Each Investor Party, Consenting Interest Holder and Consenting TCEH Creditor Party, severally, and not jointly, represents and warrants that, during the Agreement Effective Period (except as otherwise provided below):

(a)    (i) it is, as of the Agreement Effective Date or, if after the Agreement Effective Date, the date upon which it delivers its executed signature page to this Agreement, the beneficial owner (including pursuant to any swap or derivative transaction) of the face amount of the Debtor Claims/Interests, or is the nominee, investment manager, or advisor for beneficial holders of or discretionary accounts holding the Debtor Claims/Interests, and of no other Debtor Claims/Interests, as reflected in such Party's signature block to this Agreement (such Debtor Claims/Interests, the "**Owned Debtor Claims/Interests**"), excluding any Debtor Claims/Interests that are to be sold by such Party through a confirmed transaction pending as of the date of such Party's entry into this Agreement, or (ii) if no amount of Debtor Claims/Interests is reflected in such Party's signature block to this Agreement, it is not the beneficial owner of, or a nominee, investment manager, or advisor for beneficial holders of or discretionary accounts holding, any Debtor Claims/Interests;

(b)    it will not beneficially or legally own, either directly or indirectly through its affiliates, any unaffiliated third parties in which it may hold a direct or indirect beneficial interest, or as part of any group of persons acting pursuant to a plan or arrangement as described in Treasury Regulation Section 1.355-6(c)(4) (*provided, however*, that for the avoidance of doubt, in accordance with Treasury Regulations Section 1.355-6(c)(4)(ii), none of the Investor Parties, Consenting Interest Holders, or Consenting TCEH Creditor Parties will be treated as acting pursuant to a plan or arrangement as a result of its being a Party (or its owning, directly or indirectly, of an interest in a Party) or participating in the Plan and the other Restructuring Transactions, or the Alternative Plan, as applicable), assuming the Plan and the other Restructuring Transactions are consummated, in the aggregate, fifty percent (50%) or more of the Reorganized TCEH Common Stock, the Reorganized EFH Common Stock, or the New EFH Common Stock (as defined in the Plan);

(c)    if it elects to purchase the common equity of Parent pursuant to the Rights Offering, it is making its own investment decision, which is not being made in conjunction with the investment decision of any other person to acquire a predetermined percentage of Parent or Reorganized EFH;

(d)    if it owns any Owned Debtor Claims/Interests, it has the full power and authority to act on behalf of, vote and consent to matters concerning the Owned Debtor Claims/Interests or, with respect to any Owned Debtor Claims/Interests beneficially held through any swap or derivative transaction, it has the right (i) to demand the counterparty thereof retransfer such Owned Debtor Claims/Interests to the applicable Party and/or (ii) to instruct (directly or indirectly) the counterparty thereof with respect to the exercise of any voting right or other direction that may be made on account of such Owned Debtor Claims/Interests;

36

(e)    if it owns any Owned Debtor Claims/Interests, such Owned Debtor Claims/Interests are not subject to any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that could reasonably be expected to adversely affect in any way such Party's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(f)    (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act of 1933, as amended (the "**Securities Act**"), (B) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act), (C) a non-U.S. person under Regulation S of the Securities Act, or (D) the foreign equivalent of (A) or (B) above, and (ii) any securities of any Debtor acquired by the applicable Party in connection with the Plan and Restructuring Transactions, or an Alternative Restructuring, as applicable, will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act; and

(g)    as of the date hereof, it has no actual knowledge of any event that, due to any fiduciary or similar duty to any other person or entity, would prevent it from taking any action required of it under this Agreement.

In addition, Texas Holdings represents and warrants that, during the Agreement Effective Period (except as otherwise provided below):

(a)    since October 10, 2007 through the date hereof, it has not taken any action (and, to its knowledge, none of its direct or indirect owners has taken any action) that resulted in an ownership change of EFH within the meaning of Section 382(g) of the Internal Revenue Code (including by treating the equity interests of EFH as becoming worthless within the meaning of Section 382(g)(4)(D) of the Internal Revenue Code and thereby resulting in an ownership change of EFH within the meaning of Section 382(g) of the Internal Revenue Code);

(b)    to its knowledge, as of the date hereof, no person has owned directly, indirectly, or constructively ( by operation of Section 318 as modified by Section 382(l)(3)(A) of the Internal Revenue Code) 50% or more of the equity interests of EFH during the three-year period ending on the Agreement Effective Date; and

(c)    as of the date hereof, for U.S. federal income tax purposes, its taxable year is the calendar year.

8.3    Mutual Representations and Warranties of All Parties.

Each Party, severally, and not jointly, represents and warrants that:

(a)    it is (other than the TCEH Official Committee) validly existing and in good standing under the laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)    except as expressly provided in this Agreement (including the exhibits hereto) or the Bankruptcy Code (and subject to necessary Bankruptcy Court approval and/or regulatory approvals associated with the Plan and Restructuring Transactions and an Alternative Restructuring, as applicable), no consent or approval is required by any other person or entity for it to effectuate the Plan and Restructuring Transactions and an Alternative Restructuring, as applicable, contemplated by, and perform the respective obligations under, this Agreement;

(c)    except as expressly provided in this Agreement (including the exhibits hereto) or the Bankruptcy Code (and subject to necessary Bankruptcy Court approval and/or regulatory approvals associated with the Plan and Restructuring Transactions and an Alternative Restructuring, as applicable), it has all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Plan and Restructuring Transactions and an Alternative Restructuring, as applicable, contemplated by, and perform its respective obligations under, this Agreement;

(d)    except as expressly provided in this Agreement (including the exhibits hereto) or the Bankruptcy Code and with respect to the Debtors' performance of this Agreement (and subject to necessary Bankruptcy Court approval and/or regulatory approvals associated with the Plan and Restructuring Transactions and an Alternative Restructuring, as applicable), the execution, delivery, and performance by it of this Agreement does not, and shall not, require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state, or other governmental authority or regulatory body; and

(e)    subject to necessary Bankruptcy Court approval and/or regulatory approvals associated with the Plan and Restructuring Transactions and an Alternative Restructuring, as applicable, the execution, delivery, and performance of this Agreement does not and shall not: (i) violate any provision of law, rules, or regulations applicable to it or any of its subsidiaries in any material respect; (ii) violate its certificate of incorporation, bylaws, or other organizational documents or those of any of its subsidiaries; or (iii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any contractual obligation to which it is a party, which conflict, breach, or default, would have a material and adverse effect on the Plan and Restructuring Transactions or an Alternative Restructuring, as applicable.

**Section 9.    Acknowledgement.**

**Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code. The relevant Parties will not solicit acceptances of the Plan, or the Alternative Plan, as applicable, from the relevant Parties in any manner inconsistent with the Bankruptcy Code or applicable non-bankruptcy law.**

**Section 10.    Certain Additional Chapter 11 Matters.**

(a)    During the Plan Support Effective Period, counsel to the Creditor-Investor Parties, counsel to the Hunt-Investor Parties, and counsel to the Consenting TCEH Creditor Parties shall (i) be given the reasonable opportunity to participate in all scheduled substantive communications with the IRS concerning the Supplemental Ruling Request and any other IRS Submission, including all scheduled conference calls and in-person meetings and (ii) be updated promptly regarding any unscheduled communications with the IRS; *provided, however*, that such participation shall be limited to two individuals for each of (x) the Creditor-Investor Parties, (y) the Hunt-Investor Parties, and (z) the Consenting TCEH Creditor Parties. The TCEH Official Committee shall be updated by the Debtors promptly following any such communications or meetings.

(b)    During the Plan Support Effective Period, the Debtors will use commercially reasonable efforts to provide to counsel to the Creditor-Investor Parties, counsel to the Hunt-Investor Parties, counsel to the Consenting Interest Holders, counsel to the Consenting TCEH Creditor Parties, and counsel to the TCEH Official Committee draft copies of all material motions, pleadings and other documents that the Debtors intend to file with any court or regulatory body (including the Bankruptcy Court and the PUCT, but excluding the IRS) relating to the Plan and Restructuring Transactions at least three (3) Business Days before the date on which the Debtors intend to file any such document; *provided, however*, that all Parties acknowledge such three (3) Business Day period, as applicable, may not be reasonably practicable in all cases, and that in such cases the Debtors shall provide as much advance notice as is reasonably practicable. The Debtors will incorporate all reasonably requested comments of the Creditor-Investor Parties, Hunt-Investor Parties, Consenting Interest Holders, Consenting TCEH Creditor Parties, and counsel to TCEH Official Committee in such motions, filings, and orders.

(c)    During the Plan Support Effective Period (and, solely with respect to the Debtors and the Consenting TCEH First Lien Creditors, during an Alternative Restructuring Support Period, if an Alternative Restructuring contemplates a tax-free spin-off of the TCEH Debtors' assets), (i) the Debtors will use commercially reasonable efforts to provide to counsel to the Creditor-Investor Parties, counsel to the Hunt-Investor Parties, counsel to the Consenting Interest Holders, counsel to the Consenting TCEH Creditor Parties, and counsel to the TCEH Official Committee draft copies of all substantive documents (including the Supplemental Ruling Request (as defined below) and any other IRS Submissions) that the Debtors intend to file with the IRS and copies of all correspondence with, and documents received from the IRS, in each case relating to the Plan and Restructuring Transactions, at least five (5) Business Days before the date on which the Debtors intend to submit any such document, or no later than five (5) Business Days after the date on which the Debtors receive such document, as applicable; *provided, however*, that all Parties acknowledge such five (5) Business Day period, as applicable, may not be reasonably practicable in all cases, and that in such cases the Debtors shall provide as much advance notice as is reasonably practicable; and (ii) at the request of the Required TCEH First Lien Creditors, and with the consent of the Debtors and the Required Investor Parties, not to be unreasonably withheld or conditioned, the Debtors shall amend the Plan to provide that Reorganized TCEH shall enter into a tax receivable agreement (under terms and conditions reasonably requested by the Required TCEH First Lien Creditors) under

39

which it agrees to make payments in respect of its (or its subsidiaries') tax items to or for the benefit of the holders of Allowed TCEH First Lien Secured Claims (or their assigns). The Debtors will incorporate all reasonably requested comments of the Creditor-Investor Parties, Hunt-Investor Parties, Consenting Interest Holders, Consenting TCEH Creditor Parties, and counsel to TCEH Official Committee in such documents; *provided, however*, that such rights shall not result in unreasonable delays in submitting the IRS Submissions to the IRS. No additional rulings will be requested pursuant to such rights without the consent of the Parties (such consent not to be unreasonably withheld, delayed, or conditioned).

(d)     EFH will use commercially reasonable efforts to obtain the Private Letter Ruling. The Parties agree to cooperate with, and use their commercially reasonable efforts to assist, EFH in obtaining the Private Letter Ruling. Each Party agrees to (i) use its commercially reasonable efforts to provide any appropriate information and additional representations as the IRS shall require in connection with the Required Rulings; *provided, however*, that providing such information and representations does not restrict the liquidity of equity in Reorganized TCEH on or after the Effective Date of the Plan or the TCEH First Lien Claims against the Debtors prior to the Effective Date of the Plan and (ii) to negotiate in good faith with the other Parties to implement any reasonable changes to the transactions contemplated herein, in each case as reasonably requested by the IRS in order to issue the Private Letter Ruling.

(e)     EFH will use commercially reasonable efforts to file, on or before 28 days after the date the Debtors execute this Agreement, a supplemental written request to the IRS Submissions (the "**Supplemental Ruling Request**"), which shall be in form and substance reasonably acceptable to the Required Investor Parties and the Required TCEH Creditor Parties:

(i)     describing any changes to the Plan and Restructuring Transactions (including the Merger and the REIT Reorganization) since the previously filed IRS Submission;

(ii)     requesting rulings that (A) (i) EFH will be respected as the seller of the Preferred Stock Entity's preferred stock for U.S. federal income tax purposes; (ii) for U.S. federal income tax purposes, (x) upon Reorganized TCEH's conversion to a corporation under Delaware law, EFH will be treated as contributing both the common stock of the Preferred Stock Entity and the other assets subject to the Contribution (other than the assets transferred to the Preferred Stock Entity) to Reorganized TCEH in exchange for all of Reorganized TCEH's stock, and such contribution will be treated as occurring immediately after EFH's sale of the Preferred Stock Entity's preferred stock, and (y) upon the Distribution, EFH will be treated as distributing the stock of Reorganized TCEH to the TCEH First Lien Creditors, and such distribution will be treated as occurring immediately after EFH's contribution to Reorganized TCEH; and (iii) EFH's pre-arranged sale of the Preferred Stock Entity's preferred stock will be taken into account for purposes of the "control immediately after" test under Section 351 of the Internal Revenue Code; (B) Oncor's electrical transmission and distribution system(s) and related regulatory assets (the "**System**") is (exclusive of certain System assets not to comprise more than 12.5% of the total value of the System)

40

a real estate asset within the meaning of Section 856; and (C) neither EFH's and Oncor's activities with respect to the System nor the Transactions will cause amounts received under the lease of the System to be treated as other than "rents from real property" under Section 856; and

(iii)     withdrawing or modifying rulings previously requested in the IRS Submissions as necessary to reflect changes to the Plan and Restructuring Transactions (including the Merger and the REIT Reorganization), including (A) modifying Ruling (17) in the Initial Ruling Request to read as follows:   "(i) persons receiving Reorganized EFH Common Stock pursuant to the Plan will not be aggregated for purposes of applying Section 355(d) to the Spin-Off; and (ii) persons acquiring Parent Common Shares pursuant to or in connection with the Rights Offering, the Equity Commitment Letter, and the Backstop Agreement will not be considered for purposes of applying Section 355(d) to the Spin-Off"; *provided, however,* that clause (ii) of the foregoing may alternatively read as follows:   (1) "the anti-avoidance rule does not apply with respect to the Merger"; or (2) "persons acquiring Parent Common Shares pursuant to or in connection with the Rights Offering, the Equity Commitment Letter, and the Backstop Agreement will not be treated as acquiring Reorganized EFH Common Stock by 'purchase' within the meaning of Section 355(d)"; and (B) modifying Ruling (26) in the Initial Ruling Request to read as follows: "Neither Spinco nor the Preferred Stock Entity will be treated as ever having been a member of the consolidated group of which EFH is the common parent as a result of the Reorganization."; and

(iv)     adding Parent as a taxpayer (within the meaning of Treasury Regulations Section 601.201(l)(1)) to the Supplemental Ruling Request with respect to the Required Rulings described in clauses (l), (m), and (n) of the definition of "Required Rulings" in the Plan.

(f)     During the Plan Support Effective Period, except as otherwise provided in the Plan or in the Private Letter Ruling, the Debtors shall not take any action to change the entity classification for U.S. tax purposes of any Debtor entity, by changing their legal form or otherwise, without the consent of the Required Investor Parties and the Required TCEH First Lien Creditors; *provided, however,* that the consent of the Required TCEH First Lien Creditors shall not be required with respect to any such action with respect to any Debtor entity other than TCEH, the Reorganized EFH Shared Services Debtors, Reorganized TCEH, the Preferred Stock Entity, or any of their respective subsidiaries, if such action does not directly affect the Contribution, the Preferred Stock Sale, the Reorganized TCEH Conversion or the Distribution and does not prevent or delay EFH from obtaining the Private Letter Ruling or adversely affect the Intended Tax Treatment.

(g)     Before the Effective Date, EFH shall take such actions so as to cause all discharge of indebtedness income of the EFH Group attributable to cancellation of indebtedness income of the EFH Group that was previously deferred by the EFH Group under Section 108(i) of the Code to accelerate, pursuant to Section 108(i)(5)(D) of the Code, so that such income shall be taken into account before the Effective Date.

(h)    During the Plan Support Effective Period, the Debtors and the Consenting TCEH First Lien Creditors shall perform their respective commitments, covenants and other obligations with respect to the Preferred Stock Sale as set forth on **Exhibit G** hereto.

(i)    The Parties agree that their obligations under Section 4 shall not be affected, and the Parties will continue to be obligated to support and vote in favor of the Plan, and will not change such vote, solely as a result of the Bankruptcy Court not approving the second paragraph of Article IV.B.15 of the Plan, other than the last sentence thereof.  For the avoidance of doubt, under no circumstance will any Holder of an Allowed TCEH First Lien Deficiency Claim receive any recovery or distribution on account of such Allowed TCEH First Lien Deficiency Claim under the Plan (including on account of any recovery or distribution provided for in Article III.B.29).  Nothing in this Agreement shall or shall be deemed to be an agreement by a Party that holds claims or interests in a particular class of claims or interests under the Plan to accept a treatment of such claims or interests under the Plan that is different from or less favorable than the treatment provided to other claims or interests in the same such class under the Plan.

(j)    The Parties shall enter into and seek as soon as reasonably practicable after the Agreement Effective Date entry of amendments to the (i) *Stipulation and Agreed Order Regarding Certain Confirmation Scheduling Matters* [D.I. 4918] (the "**Scheduling Stipulation**") and (ii) *Order (A) Scheduling Certain Hearing Dates and Deadlines, (B) Establishing Certain Protocols in Connection With the Confirmation of Debtors' Plan of Reorganization, and (C) Revising Certain Dates in the Disclosure Statement Scheduling Order* [D.I. 4916] (the "**Scheduling Order Amendment**"), which Scheduling Stipulation shall include the agreement of the Parties to, and which Scheduling Order Amendment shall provide for, (A) a revised confirmation schedule that will be effective with respect to any plan of reorganization, including any Alternative Plan, after the earlier of the Plan Support Termination Date or any termination of this Agreement and before entry of all of the following: the Confirmation Order, PSA Approval Order, Settlement Order, and Approval Order and (B) a confirmation hearing of reasonable length that concludes on or before 90 days after the filing of such plan of reorganization.

(k)    The Parties shall seek as soon as reasonably practicable after the Agreement Effective Date entry of an order (the "**Amended Cash Collateral Order**") amending that certain *Final Order (A) Authorizing Use of Cash Collateral for Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates, (B) Granting Adequate Protection, and (C) Modifying the Automatic Stay* [D.I. 855] (the "**Cash Collateral Order**"), in form and substance satisfactory to the Debtors and the Required TCEH First Lien Creditors (and reasonably satisfactory to the TCEH Committee as to subparagraph (iv) below), which order shall provide for: (i) the TCEH Debtors' continued use of cash collateral on the terms set forth in the Cash Collateral Order (as may be amended or modified from time to time) through the earliest to occur of (A) the Effective Date of the Plan or consummation of an Alternative Restructuring, (B) the expiration of the Remedies Notice Period (as will be defined in the Amended Cash Collateral Order on terms substantially consistent with the definition of such term in the Cash Collateral Order), or (C) 60 calendar days after the earlier of (1) the Plan Support Termination Date or (2) the Agreement Termination Date as to the Debtors or as to the Consenting TCEH First Lien Creditors; (ii) a waiver of the TCEH Debtors' right to surcharge

42

the Prepetition Collateral (as defined in the Cash Collateral Order) pursuant to section 506(c) of the Bankruptcy Code; (iii) the TCEH Debtors' payment of the reasonable and documented out-of-pocket fees and expenses incurred by the professionals retained by any member of the steering committee of the TCEH First Lien Ad Hoc Committee; and (iv) for payment by TCEH of the reasonable and documented out-of-pocket expenses of the TCEH Official Committee relating to the TCEH Official Committee's investigation and prosecution of the claims set forth in the TCEH Official Committee Standing Motion.

(l)    The Parties agree that, on the Effective Date of the Plan, (i) the Debtors shall assume the Employment Agreements and assign the Employment Agreements to Reorganized TCEH and Reorganized TCEH shall be responsible for any cure costs arising from or related to the assumption of such Employment Agreement, and (ii) Reorganized TCEH shall enter into New Employee Agreements/Arrangements with the 18 individuals of the Debtors' management team who are considered "insiders" but who are not party to an Employment Agreement as of the Petition Date. For the avoidance of doubt, in the event any party to an Employment Agreement and the Reorganized EFH Debtors or Reorganized EFIH Debtors mutually agree that such party's Employment Agreement shall be assumed by Reorganized EFH or Reorganized EFIH and not assigned to Reorganized TCEH, the consent of the Required Investor Parties shall be required with respect to such assumption and the Reorganized EFH Debtors and Reorganized EFIH Debtors, as applicable, shall be responsible for any cure costs arising from or related to the assumption of such Employment Agreements.

(m)    The Parties agree that the occurrence of the Effective Date shall be deemed to constitute a "change in control" under each Employment Agreement to be assigned to Reorganized TCEH (notwithstanding anything to the contrary in the Plan, the Plan Supplement, or any Employment Agreement), and, on the Effective Date, Reorganized TCEH shall execute a written agreement (in a form reasonably acceptable to the Required TCEH First Lien Creditors) with each employee who is party to such Employment Agreement acknowledging that the transactions consummated upon the occurrence of the Effective Date shall constitute a "change in control" under such employee's Employment Agreement.

(n)    The Parties agree that, except as otherwise agreed to by the Debtors, an employee party to a New Employee Agreement/Arrangement, and the Required TCEH First Lien Creditors, the New Employee Agreements/Arrangements shall: (i) provide for the same level of severance and benefits such employee would be entitled to immediately after the Effective Date of the Plan pursuant to the terms of the Energy Future Holdings Corp. Executive Change in Control Policy (effective as of May 20, 2005, as amended on December 23, 2008 and December 20, 2010, and in effect as of the date hereof) (the "**EFH Change in Control Plan**"); (ii) provide that all severance and other benefits set forth in Section 3 of the EFH Change in Control Plan shall be provided on the same terms and conditions set forth in the EFH Change in Control Plan; (iii) acknowledge that the transactions consummated upon the occurrence of the Effective Date of the Plan will constitute a "change in control" under the EFH Change in Control Plan; and (iv) provide that "Good Reason" for purposes of their continued participation in the EFH Change in Control Plan shall have the same definition as that set forth in the EFH Change in Control Plan.

(o)    The material terms of Reorganized Debtor Management Incentive Plan, including potential equity pool available for distribution, shall be set forth in Plan Supplement (and will be in form and substance acceptable to the Required TCEH First Lien Creditors). The Reorganized Debtor Management Incentive Plan shall include an $11 million cash pool to be paid after the Effective Date by Reorganized TCEH (the "**Additional Payment Pool**"). A portion of the Additional Payment Pool shall be allocated to each employee who is eligible to participate in the "Key Leader Plan" or "Supplemental Incentive Award" pursuant to the 2015 Compensation Order in an amount not greater than the difference between (x) the total amount available to be paid to an eligible employee under the "Key Leader Plan" or "Supplemental Incentive Award," as applicable, at target and (y) the total amount an eligible employee actually received under the "Key Leader Plan" or "Supplemental Incentive Award," as applicable, before the Effective Date. The remaining portion of the Additional Payment Pool (if any) that is available after the allocation described in the immediately preceding sentence shall be allocated among the senior management of Reorganized TCEH in amounts, if any, determined in the discretion of the Reorganized TCEH Board (as defined in the Plan). In the event an employee becomes eligible to receive severance within the 12-month period after the Effective Date of the Plan, the amount of such employee's severance shall be reduced dollar-for-dollar for any amounts actually paid by Reorganized TECH to such employee from the Additional Payment Pool. In no event shall amounts to be paid on account of the Additional Payment Pool after the Effective Date of the Plan constitute claims against the Debtors (whether administrative priority or otherwise) or otherwise be due and owing by the Debtors before the occurrence of the Effective Date of the Plan.

(p)    During the Plan Support Effective Period, (i) no Debtor shall take any action that results in an ownership change of EFH within the meaning of Section 382(g) of the Internal Revenue Code (including by treating the equity interests of EFH as becoming worthless within the meaning of Section 382(g)(4)(D) of the Internal Revenue Code); and (ii) Texas Holdings shall not (A) take any action that results in an ownership change of EFH within the meaning of Section 382(g) of the Internal Revenue Code (including by treating the equity interests of EFH as becoming worthless within the meaning of Section 382(g)(4)(D) of the Internal Revenue Code and thereby resulting in an ownership change of EFH within the meaning of Section 382(g) of the Internal Revenue Code); (B) knowingly permit any person (other than Texas Holdings) to own directly, indirectly, or constructively (by operation of Section 318 as modified by Section 382(l)(3)(A) of the Internal Revenue Code) 50% or more of the equity interests of EFH; or (C) change its taxable year to be other than the calendar year.

(q)    The Rights Offering Procedures shall provide, and the parties to the Backstop Agreement shall amend the Backstop Agreement as soon as reasonably practicable to provide, that (i) the Rights issued in respect of the TCEH First Lien Claims (other than any Assigned C5 Rights), and the common equity of Parent issuable with respect to the exercise of such Rights, shall be freely and separately transferable from such TCEH First Lien Claims, provided that (A) all transfers shall be made in compliance with applicable law and (B) no Rights shall be transferable at any time after the date that such Rights are validly exercised (it being understood that, subject to Clause (A), the common equity of Parent issuable with respect to such validly exercised Rights shall be freely transferable on a "when issued" basis) and (ii) no holder of Rights issued in respect of the TCEH First Lien Claims (other than any Assigned C5 Rights), including any transferee of such Rights, shall be required to own any TCEH First Lien

Claims in order to validly exercise such Rights or to receive the common equity of Parent issuable with respect to the exercise of such Rights.

**Section 11.    Termination of Support for Plan and Restructuring Transactions.**

The Parties' commitments and obligations with respect to the Plan and Restructuring Transactions, as set forth in Section 4 hereof (which, for the avoidance of doubt, shall not include any commitments, covenants, or obligations with respect to the Settlement Agreement or an Alternative Restructuring), shall terminate automatically, and without further action by any Party, upon delivery by the Debtors, the Required TCEH First Lien Creditors, or the Required Investor Parties to the other Parties of a written notice (a "**Plan Support Termination Notice**") in accordance with Section 14.8 hereof, setting forth the particular relevant facts and circumstances, upon the occurrence and during the continuation of any of the following (each a "**Plan Support Termination Event**," and the date upon which a Plan Support Termination Event occurs, the "**Plan Support Termination Date**"):

(a)    a condition to the occurrence of the Effective Date, as defined and set forth in the Plan, or to the closing of the transactions contemplated by the Merger Agreement, that either (i) cannot be waived or (ii) can be waived and is not timely waived by the entity or entities entitled to waive it, becomes incapable of being satisfied (which shall include an oral or written statement made by an authorized agent, official, or other representative of the IRS (in the case of an oral statement, witnessed, or verified by counsel to the Investor Parties; *provided*, that such Investor Parties shall direct their counsel to promptly verify any such oral statement, if not already witnessed by such counsel) that one or more of the Required Rulings will not be issued (unless such condition with respect to such Required Ruling can be and is timely waived)).  For the avoidance of doubt, such oral or written statement with respect to a ruling described in clauses (l), (m), or (n) of the definition of "Required Rulings" in the Plan shall not be a Plan Support Termination Event if the Required Investor Parties (or other party authorized by the Required Investor Parties) waive the corresponding condition in respect of any such ruling described in clauses (l), (m), or (n) of the definition of "Required Rulings" in the Plan;

(b)    all conditions to the occurrence of the Effective Date, as defined and set forth in the Plan, have been satisfied or waived but the Plan is not consummated, due to some action or inaction by Parent, OV2, or the Investor Parties, by the date that is thirty (30) days after the date upon which the last condition to the occurrence of the Effective Date has been satisfied or waived;

(c)    termination of the Merger Agreement or a termination of this Agreement by the Required Investor Parties or the Required TCEH Unsecured Noteholders pursuant to Section 12.1(c);

(d)    the Bankruptcy Court shall not have entered the Disclosure Statement Order on or before November 15, 2015 (the "**Disclosure Statement Milestone**"), *provided* that entry of such order shall be deemed to occur upon an oral indication by the Bankruptcy Court that it is approving or will approve the Disclosure Statement; *provided, further*, upon the written request of the Required Investor Parties, with the consent of the TCEH Official Committee (which

45

consent shall not be unreasonably withheld or delayed), which request shall be received by the Debtors and the Consenting TCEH First Lien Creditors by no later than November 15, 2015, the Disclosure Statement Milestone shall be extended through December 15, 2015, whereupon such request, the TCEH Cash Payment shall be immediately and irrevocably reduced by $50 million (whether or not the full thirty day extension is required or proves necessary) (the "**Disclosure Statement Milestone Extension**");

(e)    the Bankruptcy Court shall not have entered the Confirmation Order on or before January 15, 2016 (the "**Confirmation Milestone**"), *provided* that entry of any such order shall be deemed to occur upon an oral indication by the Bankruptcy Court that it is approving or will approve confirmation of the Plan; *provided, further*, (i) if there is a Disclosure Statement Milestone Extension pursuant to Section 11(d), then the Confirmation Milestone shall automatically be extended to and be February 15, 2016; (ii) if there was no Disclosure Statement Milestone Extension, then upon the written request of the Required Investor Parties, with the consent of the TCEH Official Committee (which consent shall not be unreasonably withheld or delayed), which request shall be received by the Debtors and the Consenting TCEH First Lien Creditors by no later than January 15, 2016, the Confirmation Milestone shall be extended through February 15, 2016, whereupon such request pursuant to Section 11(e)(ii), the TCEH Cash Payment shall be immediately and irrevocably reduced by $50 million (whether or not the full thirty-one day extension is required or proves necessary); and (iii) if the Class comprised of Allowed TCEH First Lien Secured Claims is permitted to vote to accept or reject the Plan and fails to accept the Plan, as determined pursuant to section 1126(c) of the Bankruptcy Code, then the Confirmation Milestone will be extended by the lesser of the number of days required to cure such failure to accept the Plan and fifteen (15) Business Days.

(f)    the knowing and willful breach by any of the Investor Parties of any of the representations, warranties, or covenants of such breaching Party as set forth in this Agreement, the Merger Agreement, the Equity Commitment Letter, or the Backstop Agreement that would have a material adverse effect on the Plan and the Restructuring Transactions or that would materially delay the occurrence of the Effective Date of the Plan beyond the applicable Plan Support Outside Date (as defined below); *provided, however*, if such breach is capable of being cured, the Parties shall have fifteen (15) Business Days after receiving such notice to cure any such breach; and

(g)    April 30, 2016 (the "**Plan Support Outside Date**"); *provided, however*, that

(i)    if all approvals required from the PUCT with respect to consummation of the Plan have been obtained before April 30, 2016, and so long as the Investor Parties, and Consenting TCEH Unsecured Noteholders are not in material breach of their obligations under this Agreement, the Merger Agreement, the Equity Commitment Letter, or the Backstop Agreement, then the Plan Support Outside Date automatically shall be extended to and be June 30, 2016;

(ii)    if all approvals required from the PUCT with respect to consummation of the Plan have not been obtained before April 30, 2016, and so long as the Investor Parties and Consenting TCEH Unsecured Noteholders are not in material breach of

46

their obligations under this Agreement, then (A) upon the written request of the Required Investor Parties, with the consent of the TCEH Official Committee (which consent shall not be unreasonably withheld or delayed) and with notice to the Debtors, which request shall be received by the Consenting TCEH First Lien Creditors by no later than April 30, 2016, the Plan Support Outside Date shall be extended to and be May 31, 2016, whereupon such extension, the TCEH Cash Payment shall be immediately and irrevocably reduced by $50 million (whether or not the full thirty-one day extension is required or proves necessary), and (B) following an extension of the Plan Support Outside Date in Section 11(g)(ii)(A), upon the written request of the Required Investor Parties, with the consent of the TCEH Official Committee (which consent shall not be unreasonably withheld or delayed) and with notice to the Debtors, which request shall be received by the Consenting TCEH First Lien Creditors by no later than May 31, 2016, the Plan Support Outside Date shall be extended to and be June 30, 2016, whereupon such extension, the TCEH Cash Payment shall be immediately and irrevocably reduced by an additional $50 million (whether or not the full thirty day extension is required or proves necessary); and

(iii)    so long as all conditions to the occurrence of the Effective Date, other than any condition with respect to the Spin-Off requiring either (A) the termination or expiration of any waiting period applicable under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, or similar law or statute, or (B) any necessary approvals and consents from the Federal Energy Regulatory Commission or the NRC, have been satisfied or waived before an extended Plan Support Outside Date set forth in Section 11(g)(i) or (ii), then the Plan Support Outside Date shall be extended at the request of any Party until a date that is the earlier of (Y) August 31, 2016 (unless the failure of such waiting periods referenced in clause (A) to terminate or expire or such approvals referenced in clause (B) to be obtained by such date is the result of any action or inaction of any Party, other than an Investor Party), and (Z) thirty (30) days after the latest date upon which such waiting periods have terminated or expired or such approvals have been obtained.  For the avoidance of doubt, any extension of the Plan Support Outside Date pursuant to this Section 11(g)(iii) shall not require a reduction of the TCEH Cash Payment amount.

A Plan Support Termination Notice may only be issued by the Debtors, the Required TCEH First Lien Creditors, or the Required Investor Parties, and no such Party may issue a Plan Support Termination Notice if such Party failed to perform or comply in all material respects with the terms and conditions of this Agreement, and such failure to perform or comply caused, or resulted in, the occurrence of the applicable Plan Support Termination Event.

**Section 12.    Agreement Termination Events.**

12.1    Investor Party, Consenting TCEH Unsecured Noteholder, and Consenting TCEH Second Lien Noteholder Termination Events.

This Agreement may be terminated as between the Investor Parties and the other Parties; the Consenting TCEH Unsecured Noteholders and the other Parties; or the Consenting TCEH Second Lien Noteholders and the other Parties, in each case, by the delivery to the other

Parties of a written notice in accordance with Section 14.8 hereof by, as applicable the Required Investor Parties, the Required TCEH Unsecured Noteholders, or the Required TCEH Second Lien Noteholders, in each case, in the exercise of their discretion, upon the occurrence and during the continuation of any of the following events:

        (a)    beneficial holders (or investment advisors or managers for such beneficial holders or discretionary accounts of such beneficial holders) of at least 50.10% of the aggregate outstanding principal amount of the TCEH First Lien Claims (determined without regard to any claims held by Debtors) have not executed and delivered to the other Parties signature pages to this Agreement on or before September 11, 2015, *provided* that this Agreement may only be terminated pursuant to this clause (a) before the earlier to occur of (i) entry of the PSA Approval Order and (ii) entry of the Disclosure Statement Order;

        (b)    the TCEH First Lien Agent has not executed and delivered to the other Parties a signature page to this Agreement on or before September 11, 2015, *provided* that this Agreement may only be terminated pursuant to this clause (b) before the earlier to occur of (i) entry of the PSA Approval Order and (ii) entry of the Disclosure Statement Order;

        (c)    the Oncor Letter Agreement (as defined in the Merger Agreement) shall not have been executed on or before the earlier of (i) the conclusion of the hearing on approval of the Disclosure Statement or (ii) fifteen (15) Business Days after the Agreement Effective Date, *provided* that this Agreement may only be terminated pursuant to this clause (c) before the earlier to occur of (i) entry of the PSA Approval Order and (ii) entry of the Disclosure Statement Order;

        (d)    subject to the occurrence of the Plan Support Termination Date, the knowing and willful breach by a Consenting TCEH First Lien Creditor of any of the representations, warranties, or covenants of such breaching Party as set forth in this Agreement that would prevent and result in a material adverse effect on the consummation of all Alternative Restructurings in accordance with this Agreement, *provided, however*, that the Parties seeking to terminate the Agreement shall include in such notice the details of any such breach, and if such breach is capable of being cured, the Parties shall have fifteen (15) Business Days after receiving such notice to cure any such breach;

        (e)    subject to the occurrence of the Plan Support Termination Date, the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of a Final Order (or other comparable final and non-appealable injunction, judgment, decree, charge, ruling or order issued by a regulatory authority) permanently enjoining or otherwise preventing the consummation of all Alternative Restructurings in accordance with this Agreement; *provided, however*, that the Parties shall have thirty (30) Business Days after issuance of such Final Order or other comparable final and non-appealable injunction, judgment, decree, charge, ruling or order to obtain relief that would allow consummation of an Alternative Restructuring in accordance with this Agreement;

(f)     the Class comprised of Allowed TCEH First Lien Secured Claims is permitted to vote to accept or reject the Plan and fails to accept the Plan, as determined pursuant to section 1126(c) of the Bankruptcy Code, *provided, however,* that the Parties shall have fifteen (15) Business Days after receiving notice of such failure to accept the Plan to cure any such failure; *provided further, however,* that this Agreement may only be terminated pursuant to this clause (f) within fifteen (15) Business Days after the end of this cure period; or

(g)     the PSA Approval Order shall not have been entered on or before September 30, 2015, *provided* that this Agreement may only be terminated pursuant to this clause (g) before the entry of the PSA Approval Order.

In addition to the foregoing, this Agreement may be terminated as between GSO and the other Parties or Avenue and the other Parties, in each case solely with respect to their obligations under this Agreement with respect to their E-Side claims, by the delivery by such Parties to the other Parties of a written notice in accordance with Section 14.8 hereof, upon a modification, amendment, or supplement to the Plan or other Definitive Restructuring Document that materially and adversely affects the treatment of E-Side Claims held by GSO or Avenue, as applicable, without GSO's or Avenue's prior written consent, as applicable; *provided, however,* that the Parties shall have fifteen (15) Business Days after receiving such notice to cure any such breach.

12.2    TCEH Official Committee Termination Events.

This Agreement may be terminated as between the TCEH Official Committee and the other Parties by delivery to the other Parties of a written notice in accordance with Section 14.8 hereof by the TCEH Official Committee, upon the occurrence and during the continuation of any of the following events:

(a)     beneficial holders (or investment advisors or managers for such beneficial holders or discretionary accounts of such beneficial holders) of at least 50.10% of the aggregate outstanding principal amount of the TCEH First Lien Claims (determined without regard to any claims held by Debtors) have not executed and delivered to the other Parties signature pages to this Agreement on or before September 11, 2015, *provided* that this Agreement may only be terminated pursuant to this clause (a) before the earlier to occur of (i) entry of the PSA Approval Order and (ii) entry of the Disclosure Statement Order;

(b)     the TCEH First Lien Agent has not executed and delivered to the other Parties a signature page to this Agreement on or before September 11, 2015, *provided* that this Agreement may only be terminated pursuant to this clause (b) before the earlier to occur of (i) entry of the PSA Approval Order and (ii) entry of the Disclosure Statement Order;

(c)     subject to the occurrence of the Plan Support Termination Date, the knowing and willful breach by a Consenting TCEH First Lien Creditor of any of the representations, warranties, or covenants of such breaching Party as set forth in this

Agreement that would prevent and result in a material adverse effect on the consummation of all Alternative Restructurings in accordance with this Agreement, *provided, however,* that the TCEH Official Committee shall include in such notice the details of any such breach, and if such breach is capable of being cured, the Parties shall have fifteen (15) Business Days after receiving such notice to cure any such breach;

(d)     subject to the occurrence of the Plan Support Termination Date, the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of a Final Order (or other comparable final and non-appealable injunction, judgment, decree, charge, ruling or order issued by a regulatory authority) permanently enjoining or otherwise preventing the consummation of all Alternative Restructurings in accordance with this Agreement; *provided, however,* that the Parties shall have thirty (30) Business Days after issuance of such Final Order or other comparable final and non-appealable injunction, judgment, decree, charge, ruling or order to obtain relief that would allow consummation of an Alternative Restructuring in accordance with this Agreement;

(e)     the Class comprised of Allowed TCEH First Lien Secured Claims is permitted to vote to accept or reject the Plan and fails to accept the Plan, as determined pursuant to section 1126(c) of the Bankruptcy Code, *provided, however,* that the Parties shall have fifteen (15) Business Days after receiving notice of such failure to accept the Plan to cure any such failure; *provided further, however,* that this Agreement may only be terminated pursuant to this clause (e) within fifteen (15) Business Days after the end of this cure period;

(f)     the Required TCEH Unsecured Noteholders terminate this Agreement in accordance with Section 12.1(c); *provided* that this Agreement may only be terminated pursuant to this clause (f) before the earlier to occur of (i) entry of the PSA Approval Order and (ii) entry of the Disclosure Statement Order; or

(g)     the PSA Approval Order shall not have been entered on or before September 30, 2015; *provided* that this Agreement may only be terminated pursuant to this clause (g) before entry of the PSA Approval Order.

12.3     Consenting Interest Holder Termination Events.

This Agreement may be terminated as between the Consenting Interest Holders and the other Parties by delivery to the other Parties of a written notice in accordance with Section 14.8 hereof by all of the undersigned Consenting Interest Holders, upon the occurrence and during the continuation of any of the following events: (a) subject to the occurrence of the Plan Support Termination Date, upon the knowing and willful breach by a Consenting TCEH First Lien Creditor of any of the representations, warranties, or covenants of such breaching Party as set forth in this Agreement that would prevent and result in a material adverse effect on the consummation of all Alternative Restructurings in accordance with this Agreement; *provided, however,* that the Consenting Interest Holders seeking to terminate this Agreement shall include in such notice the details of any such breach, and if such breach is capable of being

cured, the Parties shall have fifteen (15) Business Days after receiving such notice to cure any such breach; (b) subject to the occurrence of the Plan Support Termination Date, the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of a Final Order (or other comparable final and non-appealable injunction, judgment, decree, charge, ruling or order issued by a regulatory authority) permanently enjoining or otherwise preventing the consummation of all Alternative Restructurings in accordance with this Agreement; *provided, however*, that the Parties shall have thirty (30) Business Days after issuance of such Final Order or other comparable final and non-appealable injunction, judgment, decree, charge, ruling or order to obtain relief that would allow consummation of an Alternative Restructuring in accordance with this Agreement; or (c) the PSA Approval Order shall not have been entered on or before September 30, 2015; *provided* that this Agreement may only be terminated pursuant to this clause (c) before entry of the PSA Approval Order.

12.4    Consenting TCEH First Lien Creditor and TCEH First Lien Agent Termination Events.

This Agreement may be terminated as between (i) the Consenting TCEH First Lien Creditors and the other Parties, or (ii) the TCEH First Lien Agent and the other Parties, in each case by the delivery to the other Parties of a written notice in accordance with Section 14.8 hereof by, as applicable: (i) the Required TCEH First Lien Creditors, or (ii) the TCEH First Lien Agent, in each case, in the exercise of their discretion, upon the occurrence and during the continuation of any of the following events:

(a)    subject to the occurrence of the Plan Support Termination Date, the knowing and willful breach by any of the Investor Parties, Consenting TCEH Unsecured Noteholders, Consenting TCEH Second Lien Noteholders, or the TCEH Official Committee of any of the representations, warranties, or covenants of such breaching Party as set forth in this Agreement that would prevent and result in a material adverse effect on the consummation of all Alternative Restructurings in accordance with this Agreement; *provided, however*, that the Parties seeking to terminate this Agreement shall include in such notice the details of any such breach, and if such breach is capable of being cured, the Parties shall have fifteen (15) Business Days after receiving such notice to cure any such breach;

(b)    subject to the occurrence of the Plan Support Termination Date, the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of a Final Order (or other comparable final and non-appealable injunction, judgment, decree, charge, ruling or order issued by a regulatory authority) permanently enjoining or otherwise preventing the consummation of all Alternative Restructurings in accordance with this Agreement; *provided, however*, that the Parties shall have thirty (30) Business Days after issuance of such Final Order or other comparable final and non-appealable injunction, judgment, decree, charge, ruling or order to obtain relief that would allow consummation of an Alternative Restructuring in accordance with this Agreement;

(c)    beneficial holders (or investment advisors or managers for such beneficial holders or discretionary accounts of such beneficial holders) of at least

51

50.10% of the aggregate outstanding principal amount of the TCEH Second Lien Note
Claims (determined without regard to any claims held by Debtors) have not executed
and delivered signature pages to this Agreement on or before September 11, 2015,
*provided* that this Agreement may only be terminated pursuant to this clause (c) before
the earlier to occur of (i) entry of the PSA Approval Order and (ii) entry of the
Disclosure Statement Order;

    (d)    beneficial holders (or investment advisors or managers for such
beneficial holders or discretionary accounts of such beneficial holders) of at least
66.67% of the aggregate outstanding principal amount of the TCEH Unsecured Note
Claims (determined without regard to any claims held by Debtors) have not executed
and delivered signature pages to this Agreement on or before September 11, 2015,
*provided* that this Agreement may only be terminated pursuant to this clause (d) before
the earlier to occur of (i) entry of the PSA Approval Order and (ii) entry of the
Disclosure Statement Order;

    (e)    the Oncor Letter Agreement shall not have been executed on or before
the earlier of (i) the conclusion of the hearing on approval of the Disclosure Statement
or (ii) fifteen (15) Business Days after the Agreement Effective Date, *provided* that this
Agreement may only be terminated pursuant to this clause (e) before the earlier to
occur of (i) entry of the PSA Approval Order and (ii) entry of the Disclosure Statement
Order; or

    (f)    the PSA Approval Order shall not have been entered on or before
September 30, 2015, *provided* that this Agreement may only be terminated pursuant to
this clause (f) before entry of the PSA Approval Order.

12.5    <u>Hunt-Investor Party Termination Events.</u>

This Agreement may be terminated as between any of the Hunt-Investor Parties that do
not hold Debtor Claims/Interests and the other Parties by delivery to the other Parties of a
written notice in accordance with Section 14.8 hereof by such Hunt-Investor Parties upon the
Plan Support Termination Date; *provided* that Hunt's obligations under Section 5.2 shall
survive any such termination as set forth therein.

12.6    <u>Debtors' Termination Events.</u>

A Debtor may terminate this Agreement as to it upon five (5) Business Days' prior
written notice to the other Parties, delivered in accordance with Section 14.8 hereof, upon the
occurrence and during the continuation of any of the following events:

    (a)    beneficial holders (or investment advisors or managers for such
beneficial holders or discretionary accounts of such beneficial holders) of at least
50.10% of the aggregate outstanding principal amount of the TCEH First Lien Claims
(determined without regard to any claims held by Debtors) have not executed and
delivered to the other Parties signature pages to this Agreement on or before
September 11, 2015, *provided* that this Agreement may only be terminated pursuant to

this clause (a) before the earlier to occur of (i) entry of the PSA Approval Order or (ii) entry of the Disclosure Statement Order;

(b)     beneficial holders (or investment advisors or managers for such beneficial holders or discretionary accounts of such beneficial holders) of at least 50.10% of the aggregate outstanding principal amount of the TCEH Second Lien Note Claims (determined without regard to any claims held by Debtors) have not executed and delivered to the other Parties signature pages to this Agreement on or before September 11, 2015, *provided* that this Agreement may only be terminated pursuant to this clause (b) before the earlier to occur of (i) entry of the PSA Approval Order and (ii) entry of the Disclosure Statement Order;

(c)     beneficial holders (or investment advisors or managers for such beneficial holders or discretionary accounts of such beneficial holders) of at least 66.67% of the aggregate outstanding principal amount of the TCEH Unsecured Note Claims (determined without regard to any claims held by Debtors) have not executed and delivered to the other Parties signature pages to this Agreement on or before September 11, 2015, *provided* that this Agreement may only be terminated pursuant to this clause (c) before the earlier to occur of (i) entry of the PSA Approval Order and (ii) entry of the Disclosure Statement Order;

(d)     subject to the occurrence of the Plan Support Termination Date, the knowing and willful breach by any of the Investor Parties, Consenting Interest Holders, or Consenting TCEH Creditor Parties of any of the representations, warranties, or covenants of such breaching Party as set forth in this Agreement that would prevent and result in a material adverse effect on the consummation of all Alternative Restructurings in accordance with this Agreement; *provided, however,* that the Debtors seeking to terminate this Agreement shall include in such notice the details of any such breach, and if such breach is capable of being cured, the Parties shall have fifteen (15) Business Days after receiving such notice to cure any such breach;

(e)     subject to the occurrence of the Plan Support Termination Date, the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of a Final Order (or other comparable final and non-appealable injunction, judgment, decree, charge, ruling or order issued by a regulatory authority) permanently enjoining or otherwise preventing the consummation of all Alternative Restructurings in accordance with this Agreement; *provided, however,* that the Parties shall have thirty (30) Business Days after issuance of such Final Order or other comparable final and non-appealable injunction, judgment, decree, charge, ruling or order to obtain relief that would allow consummation of an Alternative Restructuring in accordance with this Agreement;

(f)     the PSA Approval Order shall not have been entered on or before September 30, 2015, *provided* that this Agreement may only be terminated pursuant to this clause (f) before entry of the PSA Approval Order;

53

(g)     the Oncor Letter Agreement shall not have been executed on or before the earlier of (i) the conclusion hearing on approval of the Disclosure Statement or (ii) fifteen (15) Business Days after the Agreement Effective Date, *provided* that this Agreement may only be terminated pursuant to this clause (g) before the earlier to occur of (i) entry of the PSA Approval Order and (ii) entry of the Disclosure Statement Order; or

(h)     the board of directors, board of managers, or such similar governing body of any Debtor determines in good faith after consultation with its outside financial advisors and outside legal counsel, and based on the advice of such counsel, that proceeding with the Plan and Restructuring Transactions or the Alternative Restructuring would be inconsistent with its applicable fiduciary duties.

12.7    Termination Event for Breach by Debtors or Consenting Interest Holders.

This Agreement may be terminated as between the Debtors and the other non-Debtor Parties (but not, for the avoidance of doubt, as between the non-Debtor Parties) by the delivery to the Debtors of a written notice in accordance with Section 14.8 hereof by the Required Investor Parties and the Required TCEH Creditor Parties, upon the occurrence and during the continuation of any knowing and willful breach by any of the Debtors of any of the representations, warranties, or covenants of such breaching Party as set forth in this Agreement that would prevent and result in a material adverse effect on the consummation of the Plan or, subject to the occurrence of the Plan Support Termination Date, all Alternative Restructurings in accordance with this Agreement; *provided, however*, that the Parties seeking to terminate this Agreement shall include in such notice the details of any such breach, and if such breach is capable of being cured, the Parties shall have fifteen (15) Business Days after receiving such notice to cure any such breach.

This Agreement may be terminated as between the Consenting Interest Holders and the Parties other than Consenting Interest Holders (but not, for the avoidance of doubt, as between the Parties other than the Consenting Interest Holders) by the delivery to the Consenting Interest Holders of a written notice in accordance with Section 14.8 hereof by the Required Investor Parties and the Required TCEH Creditor Parties, upon the occurrence and during the continuation of any knowing and willful breach by any of the Consenting Interest Holders of any of the representations, warranties, or covenants of such breaching Party as set forth in this Agreement that would prevent and result in a material adverse effect on the consummation of the Plan or, subject to the occurrence of the Plan Support Termination Date, all Alternative Restructurings in accordance with this Agreement; *provided, however*, that the Parties seeking to terminate this Agreement shall include in such notice the details of any such breach, and if such breach is capable of being cured, the Parties shall have fifteen (15) Business Days after receiving such notice to cure any such breach.

12.8    Mutual Termination.

This Agreement, and the obligations of all Parties hereunder, may be terminated:

(a)      during the Plan Support Effective Period, by mutual agreement among all of the following: (i) the Debtors; (ii) at least two unaffiliated Creditor-Investor Parties holding in the aggregate at least 50.1% in amount of the (A) "Investment Commitments" (as defined in the Equity Commitment Letter) set forth on Exhibit A to the Equity Commitment Letter (as amended from time to time in accordance therewith and with this Agreement) and (B) "Backstop Commitments" (as defined in the Backstop Agreement) set forth on Schedule 1 to the Backstop Agreement (as amended from time to time in accordance therewith and with this Agreement), made by Creditor-Investor Parties; (iii) the Hunt-Investor Parties; (iv) the Required TCEH Creditor Parties; (v) all of the undersigned Consenting Interest Holders; and (vi) the TCEH Official Committee; or

(b)      during the Alternative Restructuring Support Period, if any, by mutual agreement among all of the following: (i) the Debtors; (ii) the Required TCEH Creditor Parties; (iii) all of the undersigned Consenting Interest Holders; and (iv) the TCEH Official Committee.

12.9    Termination Upon Consummation of the Plan or Alternative Restructuring.

This Agreement shall terminate automatically without any further required action or notice with respect to all Parties on the earlier to occur of the Effective Date of the Plan and the consummation of an Alternative Restructuring.

12.10    Effect of Termination.

No Party may terminate this Agreement, and no Party may be counted among the Required Investor Parties, Investor Parties, Required TCEH Creditor Parties, Consenting TCEH Creditor Parties or Consenting Interest Holders, as applicable, for purposes of terminating this Agreement if such Party failed to perform or comply in all material respects with the terms and conditions of this Agreement, and such failure to perform or comply caused, or resulted in, the occurrence of one or more termination events specified herein. The date on which termination of this Agreement as to a Party is effective in accordance with Section 12 shall be referred to as an "**Agreement Termination Date.**" Upon the occurrence of an Agreement Termination Date as to a Party (but only as to such Party), except as expressly provided in this Agreement, (i) this Agreement shall be of no further force and effect with respect to such Party, (ii) each Party subject to such termination shall be released from its commitments, undertakings, and agreements under this Agreement and shall have the rights that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, and (iii) the remaining Parties to this Agreement, if any, shall be released from any commitments, undertaking, and agreements owed to such terminated Party under this Agreement; *provided, however,* that this Section 12.10, Section 5.2, Section 10(j), Section 14.4, Section 14.6, Section 14.8, Section 14.10, Section 14.12, and Section 14.14 shall survive termination of this Agreement. Notwithstanding anything to the contrary in this Agreement, the foregoing shall not be construed to prohibit any of the Parties from contesting whether any such termination is in accordance with the terms of this Agreement. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right

55

of any Party, or the ability of any Party to protect and preserve its rights, remedies, and interests, including its claims against any Debtor or any other Party. Nothing in this Section 12.8 shall restrict any Debtor's right to terminate this Agreement in accordance with Section 12.6(h).

In addition, and for the avoidance of doubt, the termination rights and effect of termination provided for under this Section 12 apply only to this Agreement (without reference to the exhibits). The applicable termination rights and effect of termination of other agreements between or among any of the Parties, including those attached to this Agreement as exhibits, are governed according to the respective terms and conditions of such agreements.

12.11   No Violation of Automatic Stay.

The automatic stay applicable under section 362 of the Bankruptcy Code shall not prohibit a Party from taking any action necessary to effectuate the termination of this Agreement pursuant to and in accordance with the terms hereof.

**Section 13.    Amendments.**

This Agreement may not be modified, amended, or supplemented in any manner except:

(a)    during the Plan Support Effective Period, in writing signed by (i) the Required Investor Parties; (ii) the Required TCEH Creditor Parties; (iii) all of the undersigned Consenting Interest Holders; (iv) each of the Debtors; and (v) the TCEH Official Committee; *provided, however*, that if the proposed modification, amendment, or supplement has a material, disproportionate, and adverse effect on any Party (in any capacity), then the consent of each such disproportionately affected Party shall also be required to effectuate such modification, amendment, or supplement; and

(b)    during the Alternative Restructuring Support Period, if any, in writing signed by (i) the Debtors; (ii) the Required TCEH Creditor Parties; (iii) all of the undersigned Consenting Interest Holders; and (iv) the TCEH Official Committee; *provided, however*, that if the proposed modification, amendment, or supplement has a material, disproportionate, and adverse effect on any Party (in any capacity), then the consent of each such disproportionately affected Party shall also be required to effectuate such modification, amendment, or supplement.

Any proposed modification, amendment, or supplement that is not approved in accordance with this Section 13 shall be ineffective and void *ab initio*. For the avoidance of doubt, the limitations and requirements for amendment, modification or supplementation provided for in this Section 13 apply only to this Agreement (without reference to the exhibits). Notwithstanding anything to the contrary in this Agreement, the applicable limitations and requirements to modify, amend, supplement, or waive any provision of other agreements between or among any of the Parties, including those attached to this Agreement as exhibits, are governed according to the respective terms and conditions of such agreements and must also comply with Sections 3.1 and 3.2 hereof, as applicable.

**Section 14.    Miscellaneous.**

14.1    Further Assurances.

Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Plan and the Restructuring Transactions, or, after the Plan Support Termination Date, the Alternative Restructuring, as applicable.

14.2    Complete Agreement.

This Agreement, including any exhibits, annexes, and/or schedules hereto and the exhibits, annexes, and/or schedules thereto, and the Settlement Agreement, constitute the entire agreement among the Parties with respect to the subject matter hereof and supersedes and nullifies all prior agreements, oral or written, among the Parties with respect thereto, including any agreements related to Alternative Proposals.

14.3    Headings.

The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

14.4    Governing Law; Jurisdiction; Waiver of Jury Trial.

(a)    This Agreement shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of Delaware, without giving effect to the conflict of laws principles thereof. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in the United States Bankruptcy Court for the District of Delaware (the **"Chosen Court"**), and solely in connection with claims arising under this Agreement: (i) irrevocably submits to the exclusive jurisdiction and the authority of the Chosen Court; (ii) waives any objection to laying venue in any such action or proceeding in the Chosen Court; and (iii) waives any objection that the Chosen Court is an inconvenient forum, does not have jurisdiction over any Party hereto, or lacks the constitutional authority to enter final orders in connection with such action or proceeding.

(b)    Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding arising out of, or relating to, this Agreement or the transactions contemplated hereby (whether based on contract, tort, or any other theory). Each Party (i) certifies that no representative, agent, or attorney of any other Party has represented, expressly or otherwise, that such other Party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other Parties have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 14.4.

57

14.5    Execution of Agreement.

This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of such Party.

14.6    Interpretation and Rules of Construction.

This Agreement is the product of negotiations among the Parties and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Parties were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel. In addition, this Agreement shall be interpreted in accordance with section 102 of the Bankruptcy Code.

14.7    Successors and Assigns.

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.    There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity except as otherwise expressly permitted herein.

14.8    Notices.

All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a)    if to a Creditor-Investor Party or Consenting TCEH Unsecured Noteholder, to:

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Attention:  Gregory Pryor and J. Christopher Shore
E-mail addresses:    gpryor@whitecase.com
                     cshore@whitecase.com

and

White & Case LLP
Southeast Financial Center
200 S. Biscayne Blvd., Suite 4900
Miami, Florida 33131

Attention:  Thomas E Lauria and Matthew C. Brown
E-mail addresses:   tlauria@whitecase.com
mbrown@whitecase.com

(b)     if to a Hunt-Investor Party, to:

Baker Botts L.L.P.
2001 Ross Avenue, Suite 600
Dallas, Texas 75201
Attention: Geoffrey L. Newton, C. Luckey McDowell and Preston Bernhisel
E-mail addresses:   geoffrey.newton@bakerbotts.com
luckey.mcdowell@bakerbotts.com
preston.bernhisel@bakerbotts.com

and

Vinson & Elkins LLP
1001 Fannin Street
Houston, Texas 77002
Attention:  Trina H. Chandler and Paul E. Heath
E-mail addresses:   tchandler@velaw.com
pheath@velaw.com

(c)     if to a Consenting Interest Holder, to:

Wachtell Lipton Rosen & Katz
51 W. 52nd Street
New York, New York 10019
Attention: Richard G. Mason, Emil A. Kleinhaus and Austin T. Witt
E-mail addresses:   rgmason@wlrk.com
eakleinhaus@wlrk.com
awitt@wlrk.com

(d)     if to a Consenting TCEH First Lien Creditor, to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attention: Alan W. Kornberg, Brian S. Hermann, and Jacob A. Adlerstein
E-mail addresses:   akornberg@paulweiss.com
bhermann@paulweiss.com,
jadlerstein@paulweiss.com

(e)     if to a Consenting TCEH Second Lien Noteholder, to:

Brown Rudnick LLP
Seven Times Square

59

New York, NY 10036
Attention: Edward S. Weisfelner
E-mail address:    eweisfelner@brownrudnick.com

(f)    if to the TCEH Official Committee, to:

Morrison & Foerster LLP
250 West 55th Street
New York, New York 10019-9601
Attention: Brett H. Miller, James M. Peck, Lorenzo Marinuzzi, and Todd M.
Goren
E-mail addresses:    brettmiller@mofo.com
jpeck@mofo.com
lmarinuzzi@mofo.com
tgoren@mofo.com

(g)    if to the Debtors, to:

Energy Future Holdings Corp., et al.
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201
Attention: General Counsel
E-mail addresses:    stacey.dore@energyfutureholdings.com
andrew.wright@energyfutureholdings.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention: Edward O. Sassower, P.C., Stephen E. Hessler, and Brian E. Schartz
E-mail addresses:    esassower@kirkland.com
shessler@kirkland.com
bschartz@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:  James H.M. Sprayregen, P.C., Marc Kieselstein, P.C., Chad J.
Husnick and Steven N. Serajeddini
E-mail addresses:    jsprayregen@kirkland.com
marc.kieselstein@kirkland.com
chusnick@kirkland.com
steven.serajeddini@kirkland.com;

and

Proskauer Rose LLP
Three First National Plaza
70 W. Madison Street, Suite 3800
Chicago, IL 60602
Attention:  Mark K. Thomas, Paul V. Possinger
Email addresses:    mthomas@ proskauer.com
                    ppossinger@proskauer.com

and

Cravath, Swaine and Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Attention:  Philip A. Gelston
Email address:     pgelston@cravath.com

and

Jenner & Block LLP
919 Third Avenue
New York, NY 10022
Attention:  Richard Levin
Email address:     rlevin@jenner.com

and

Munger, Tolles & Olson LLP
335 South Grand Avenue, 35th Floor
Los Angeles, CA 90071
Attention:  Thomas B. Walper and Seth Goldman
Email addresses:     thomas.walper@mto.com
                     seth.goldman@mto.com;

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above. Any notice given by delivery, mail, or courier shall be effective when received.

14.9    Independent Due Diligence and Decision Making.

Each Party hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Debtors with the advice of its own counsel and advisors.

14.10    Waiver.

If the Plan or, if applicable, an Alternative Restructuring is not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights, except as otherwise expressly set forth in this Agreement.    Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto, including with respect to the Plan and Restructuring Transactions and an Alternative Restructuring, shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or to pursue the consummation of the Plan and Restructuring Transactions or, if applicable, an Alternative Restructuring.

14.11    Specific Performance.

It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, that such breach would represent irreparable harm, and that each non-breaching Party shall be entitled to specific performance and injunctive relief (without the posting of any bond and without proof of actual damages), but no other form of equitable relief, as the sole and exclusive remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder; *provided, however*, for the avoidance of doubt, notwithstanding anything in this Agreement to the contrary, no Party shall be entitled to seek or obtain specific performance of any obligations of any Investor Party (in its capacity as such) to consummate the Plan or consummate and close the Restructuring Transactions, whether such obligations may arise under this Agreement, the Merger Agreement, the Equity Commitment Letter, the Backstop Agreement, or any other Definitive Restructuring Document; *provided further, however,* for the avoidance of doubt, that the foregoing shall not limit any Party's right to obtain specific performance of another Party's obligations under Section 6 of this Agreement.    For the avoidance of doubt, the remedies provided for in this Section 14.11 apply only to this Agreement (without reference to the exhibits).    The applicable remedies for breaches of other agreements between or among any of the Parties, including those attached to this Agreement as Exhibits, are governed according to the terms of such agreements.

14.12    Several, Not Joint, Claims.

The agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

14.13    No Waiver of Participation and Preservation of Rights.

Except as expressly provided in this Agreement, nothing herein is intended to, does or shall be deemed in any manner to waive, limit, impair, or restrict the ability of each of the

Parties to protect and preserve its rights, remedies, and interests, including its Debtor Claims/Interests and its full participation in the Chapter 11 Cases so long as, in each case, such actions are not inconsistent with the Party's obligations under this Agreement, the Plan, the other Definitive Restructuring Documents, or, if the Plan Support Termination Date occurs, the Alternative Restructuring or the Alternative Restructuring Documents, as applicable. Furthermore, nothing in this Agreement shall be construed to prohibit any Party from appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are consistent with this Agreement and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying, or preventing the timely consummation of the Plan or, if the Plan Support Termination Date occurs, an Alternative Restructuring, as applicable.

14.14   Relationship Among Parties.

Each of the Investor Parties and Consenting TCEH Creditor Parties acknowledge and agree that, notwithstanding any prior history, pattern, or practice of sharing confidences among or between the Investor Parties or Consenting TCEH Creditor Parties, no Investor Party or Consenting TCEH Creditor Party shall have any responsibility for any trading, investment, or voting decision with respect to any security by any other entity by virtue of this Agreement. The Investor Parties and Consenting TCEH Creditor Parties hereby represent and warrant they have no agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Debtors and do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended. No action taken by any Investor Party or Consenting TCEH Creditor Party pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Investor Parties or Consenting TCEH Creditor Parties are in any way acting in concert or as such a "group."

14.15   Severability and Construction.

If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

[Signature Pages Follow]

**Debtor Signature Pages**

ENERGY FUTURE HOLDINGS CORP.
TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC
4CHANGE ENERGY COMPANY
4CHANGE ENERGY HOLDINGS LLC
BIG BROWN 3 POWER COMPANY LLC
BIG BROWN LIGNITE COMPANY LLC
BIG BROWN POWER COMPANY LLC
BRIGHTEN ENERGY LLC
BRIGHTEN HOLDINGS LLC
COLLIN POWER COMPANY LLC
DALLAS POWER AND LIGHT COMPANY, INC.
DECORDOVA POWER COMPANY LLC
DECORDOVA II POWER COMPANY LLC
EAGLE MOUNTAIN POWER COMPANY LLC
EBASCO SERVICES OF CANADA LIMITED
EEC HOLDINGS, INC.
EECI, INC.
EFH AUSTRALIA (NO. 2) HOLDINGS COMPANY
EFH CG HOLDINGS COMPANY LP
EFH CG MANAGEMENT COMPANY LLC
EFH CORPORATE SERVICE COMPANY
EFH FINANCE (NO. 2) HOLDINGS COMPANY
EFH FS HOLDINGS COMPANY
EFH RENEWABLES COMPANY LLC
EFIH FINANCE INC.
ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC
ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC
GENERATION DEVELOPMENT COMPANY LLC
GENERATION MT COMPANY LLC
GENERATION SVC COMPANY
LAKE CREEK 3 POWER COMPANY LLC
LONE STAR ENERGY COMPANY, INC.
LONE START PIPELINE COMPANY, INC.
LSGT GAS COMPANY LLC
LSGT SACROC, INC.
LUMINANT BIG BROWN MINING COMPANY LLC
LUMINANT ENERGY COMPANY LLC
LUMINANT ENERGY TRADING CALIFORNIA COMPANY
LUMINANT ET SERVICES COMPANY
LUMINANT GENERATION COMPANY LLC
LUMINANT HOLDING COMPANY LLC
LUMINANT MINERAL DEVELOPMENT COMPANY LLC
LUMINANT MINING COMPANY LLC
LUMINANT RENEWABLES COMPANY LLC

*[Plan Support Agreement]*

MARTIN LAKE 4 POWER COMPANY LLC
MONTICELLO 4 POWER COMPANY LLC
MORGAN CREEK 7 POWER COMPANY LLC
NCA DEVELOPMENT COMPANY LLC
NCA RESOURCES DEVELOPMENT COMPANY LLC
OAK GROVE MANAGEMENT COMPANY LLC
OAK GROVE MINING COMPANY LLC
OAK GROVE POWER COMPANY LLC
SANDOW POWER COMPANY LLC
SOUTHWESTERN ELECTRIC SERVICE COMPANY, INC.
TCEH FINANCE, INC.
TEXAS ELECTRIC SERVICE COMPANY, INC.
TEXAS ENERGY INDUSTRIES COMPANY, INC.
TEXAS POWER AND LIGHT COMPANY, INC.
TEXAS UTILITIES COMPANY, INC.
TEXAS UTILITIES ELECTRIC COMPANY, INC.
TRADINGHOUSE 3 & 4 POWER COMPANY LLC
TRADINGHOUSE POWER COMPANY LLC
TXU ELECTRIC COMPANY, INC.
TXU ENERGY RECEIVABLES COMPANY LLC
TXU ENERGY RETAIL COMPANY LLC
TXU ENERGY SOLUTIONS COMPANY LLC
TXU RECEIVABLES COMPANY
TXU RETAIL SERVICES COMPANY
TXU SEM COMPANY
VALLEY NG POWER COMPANY LLC
VALLEY POWER COMPANY LLC

By: _____
Name: Anthony R. Horton
Title:  Senior Vice President & Treasurer

[Signature Pages Redacted]

# EXHIBIT A

## PLAN

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

## FOURTH AMENDED JOINT PLAN OF REORGANIZATION
## OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*,
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
--and--
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Counsel to the Debtors and Debtors in Possession

--and--

**PROSKAUER ROSE LLP**
Three First National Plaza
70 W. Madison Street, Suite 3800
Chicago, Illinois 60602
Telephone: (312) 962-3550
Facsimile: (312) 962-3551

Co-Counsel to the Debtor Energy Future Holdings Corp.

--and--

**RICHARDS LAYTON & FINGER**
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

**O'KELLY ERNST & BIELLI, LLC**
901 North Market Street
Wilmington, Delaware 19801
Telephone: (302) 778-4000
Facsimile: (302) 295-2873

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

**CRAVATH, SWAINE AND MOORE LLP**
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1978
Facsimile: (212) 474-3700

**JENNER & BLOCK LLP**
919 Third Avenue
New York, New York 10022
Telephone: (212) 891-1600
Facsimile: (212) 891-1699

Co-Counsel to the Debtor Energy Future Intermediate
Holding Company LLC

--and--

**MUNGER, TOLLES & OLSON LLP**

355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
Telephone: (213) 683-9100
Facsimile: (213) 683-4022

Co-Counsel to the TCEH Debtors

Dated: _____, 2015

**STEVENS & LEE, P.C.**
1105 North Market Street, Suite 700
Wilmington, Delaware  19801
Telephone: (302) 425-3310
Facsimile: (610) 371-7927

**MCELROY, DEUTSCH, MULVANEY
& CARPENTER, LLP**
300 Delaware Avenue, Suite 770
Wilmington, Delaware  19801
Telephone: (302) 300-4515
Facsimile: (302) 654-4031

Error! Unknown document property name.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
      GOVERNING LAW ................................................................................................................4
    A.    Defined Terms. ................................................................................................................4
    B.    Rules of Interpretation. .................................................................................................37
    C.    Computation of Time. ...................................................................................................38
    D.    Governing Law. ............................................................................................................38
    E.    Reference to Monetary Figures. ....................................................................................38

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS ............38
    A.    Administrative Claims. .................................................................................................38
    B.    DIP Claims. ..................................................................................................................40
    C.    Priority Tax Claims. ......................................................................................................42

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...................42
    A.    Classification of Claims and Interests. .........................................................................42
    B.    Treatment of Claims and Interests. ...............................................................................44
    C.    Special Provision Governing Unimpaired Claims. .......................................................58
    D.    Elimination of Vacant Classes. .....................................................................................58
    E.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ...............58
    F.    Controversy Concerning Impairment. ...........................................................................58
    G.    Subordinated Claims and Interests. ..............................................................................58

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN .....................................................59
    A.    General Settlement of Claims and Interests. .................................................................59
    B.    Restructuring Transactions. ...........................................................................................59
    C.    Sources of Consideration for Plan Distributions. .........................................................62
    D.    Intercompany Account Settlement. ...............................................................................64
    E.    Competitive Tax Sharing Agreement. ...........................................................................65
    F.    Oncor Tax Sharing Agreement. ....................................................................................65
    G.    Corporate Existence. .....................................................................................................65
    H.    Vesting of Assets in the Reorganized Debtors. .............................................................65
    I.    Cancelation of Existing Securities and Agreements. .....................................................65
    J.    Corporate Action. .........................................................................................................66
    K.    New Organizational Documents. ..................................................................................66
    L.    Directors and Officers of the Reorganized Debtors. .....................................................67
    M.    Section 1146 Exemption. ..............................................................................................67
    N.    Director, Officer, Manager, and Employee Liability Insurance. ...................................67
    O.    Reorganized Debtor Management Incentive Plan. ........................................................68
    P.    Employee Obligations. .................................................................................................68
    Q.    Preservation of Causes of Action. ................................................................................68
    R.    Payment of Certain Fees. ..............................................................................................69
    S.    Treatment of Certain Claims of the PBGC and Pension Plan. .....................................69
    T.    Tax Receivable Agreement. ..........................................................................................69

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............69
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases. .................69
    B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases. ...................70
    C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ...............70
    D.    Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases. ...........71
    E.    Indemnification Obligations. ........................................................................................71
    F.    Insurance Policies. ........................................................................................................72
    G.    Modifications, Amendments, Supplements, Restatements, or Other Agreements. ........72
    H.    Reservation of Rights. ..................................................................................................72

I.    Nonoccurrence of Effective Date...................................................................72
J.    Contracts and Leases Entered Into After the Petition Date................................72

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...........................................72
A.    Timing and Calculation of Amounts to Be Distributed.......................................72
B.    Disbursing Agent. ......................................................................................73
C.    Rights and Powers of Disbursing Agent. .........................................................73
D.    Delivery of Distributions and Undeliverable or Unclaimed Distributions................74
E.    Manner of Payment.....................................................................................75
F.    SEC Registration/Exemption. .......................................................................75
G.    Compliance with Tax Requirements. ..............................................................76
H.    No Postpetition or Default Interest on Claims. .................................................77
I.    Setoffs and Recoupment. .............................................................................77
J.    No Double Payment of Claims. .....................................................................77
K.    Claims Paid or Payable by Third Parties..........................................................77

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
       DISPUTED CLAIMS...................................................................................78
A.    Allowance of Claims...................................................................................78
B.    Claims Administration Responsibilities............................................................78
C.    Estimation of Claims. .................................................................................78
D.    Adjustment to Claims without Objection. .........................................................79
E.    Time to File Objections to Claims or Interests...................................................79
F.    Disallowance of Claims. ..............................................................................79
G.    Amendments to Proofs of Claim....................................................................79
H.    Reimbursement or Contribution.....................................................................79
I.    No Distributions Pending Allowance. ..............................................................80
J.    Distributions After Allowance. ......................................................................80
K.    Disputed Postpetition Interest Claims. ............................................................80

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS............80
A.    Discharge of Claims and Termination of Interests...............................................80
B.    Release of Liens. .......................................................................................81
C.    Releases by the Debtors. ..............................................................................81
D.    Releases by Holders of Claims and Interests.....................................................82
E.    Exculpation. .............................................................................................82
F.    Injunction.................................................................................................83
G.    Liabilities to, and Rights of, Governmental Units...............................................83
H.    Protections Against Discriminatory Treatment. ..................................................83
I.    Recoupment. ............................................................................................84
J.    Document Retention. ..................................................................................84

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF
       THE PLAN................................................................................................84
A.    Conditions Precedent to Confirmation.............................................................84
B.    Conditions Precedent to the Effective Date. .....................................................85
C.    Waiver of Conditions. .................................................................................87
D.    Effect of Failure of Conditions. ....................................................................87

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ...............87
A.    Modification and Amendments.......................................................................87
B.    Effect of Confirmation on Modifications...........................................................88
C.    Revocation or Withdrawal of Plan. .................................................................88

ARTICLE XI. RETENTION OF JURISDICTION...........................................................88

2

ARTICLE XII. MISCELLANEOUS PROVISIONS ............................................................. 90
    A.    Immediate Binding Effect. .................................................................. 90
    B.    Additional Documents. ....................................................................... 90
    C.    Payment of Statutory Fees. ................................................................. 90
    D.    Statutory Committee and Cessation of Fee and Expense Payment. .... 90
    E.    Reservation of Rights. ........................................................................ 90
    F.    Successors and Assigns. ...................................................................... 91
    G.    Notices. .............................................................................................. 91
    H.    Term of Injunctions or Stays. ............................................................. 93
    I.    Entire Agreement. .............................................................................. 93
    J.    Exhibits. ............................................................................................. 94
    K.    Nonseverability of Plan Provisions. ................................................... 94
    L.    Votes Solicited in Good Faith. ........................................................... 94
    M.    Waiver or Estoppel. ............................................................................ 94
    N.    Conflicts. ............................................................................................ 94

Error! Unknown document property name.

## INTRODUCTION

The Debtors (as defined herein) propose this fourth amended joint plan of reorganization (the "Plan") for the resolution of the outstanding claims against, and interests in, the Debtors pursuant to the Bankruptcy Code. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in Article I.A of the Plan. Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, events during the Chapter 11 Cases, and projections of future operations, as well as a summary and description of the Plan and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

> **THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DRAFT PLAN HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

*A.     Defined Terms.*

As used in the Plan, capitalized terms have the meanings set forth below.

1.      "*2005 Oncor Transfer*" means those certain 2005 transactions pursuant to which the equity of Oncor's predecessor, TXU Electric Delivery Company LLC, was dividended from EFCH's predecessor, TXU US Holdings Company, to EFH Corp.'s predecessor, TXU Corp.

2.      "*2007 Acquisition*" means the transactions that occurred in October 2007 in which TEF and Texas Holdings and their direct and indirect equity holders became the direct and indirect equity holders of each of the Debtors.

3.      "*2011 Amend and Extend Transactions*" means those certain transactions effectuated by TCEH and EFCH in April 2011, including the TCEH Credit Amendment and the issuance of the TCEH First Lien Notes.

4.      "*2013 Revolver Extension*" means those certain transactions effectuated by TCEH and EFCH in January 2013, including the maturity extension of revolving credit commitments due 2013, the Incremental Amendment Agreement, and the incurrence of the TCEH 2012 Incremental Term Loans.

5.      "*2015 Compensation Order*" means the order entered by the Bankruptcy Court on December 17, 2014 [D.I. 3052], authorizing the Debtors to implement the Debtors' 2015 compensation programs.

6.      "*2016 Compensation Order*" means the order, if any, entered by the Bankruptcy Court authorizing the Debtors to implement the Debtors' 2016 compensation programs.

7.      "*503(b)(9) Claim*" means a Claim or any portion thereof entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code.

8.      "*Additional Interest*" means additional interest payable on the EFIH First Lien Notes, the EFIH Second Lien Notes, or the EFIH Unsecured Notes, as applicable, under the registration rights agreements

4

associated with such notes so long as EFIH has not registered such notes in accordance with the Securities Act, on the terms set forth in such registration rights agreements.

9.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Estates under sections 503(b) (including 503(b)(9) Claims), 507(b), or 1114(e)(2) of the Bankruptcy Code, other than DIP Claims, including: (a) the actual and necessary costs and expenses incurred after the Petition Date through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims; (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911–1930; and (d) all Intercompany Claims authorized pursuant to the Cash Management Order.

10.      "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which: (a) with respect to General Administrative Claims, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date.

11.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

12.      "*Allowed*" means with respect to any Claim or Interest, except as otherwise provided herein: (a) a Claim or Interest as to which no objection has been Filed prior to the Claims Objection Deadline and that is evidenced by a Proof of Claim or Interest, as applicable, timely Filed by the applicable Bar Date or that is not required to be evidenced by a Filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated, and as for which no Proof of Claim or Interest, as applicable, has been timely Filed in an unliquidated or a different amount; or (c) a Claim or Interest that is Allowed (i) pursuant to the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.

13.      "*Alternative Plan*" means "Alternative Plan," as such term is defined in the Plan Support Agreement.

14.      "*Alternative Restructuring*" means "Alternative Restructuring," as such term is defined in the Plan Support Agreement.

15.      "*Assigned C5 Equity*" means any Reorganized EFH Common Stock that would have otherwise been distributed to a Holder of an Allowed General Unsecured Claim Against the TCEH Debtors Other Than EFCH, which Reorganized EFH Common Stock shall be issued to Reorganized TCEH pursuant to the Plan; *provided, however,* that, to the extent the issuance of the Assigned C5 Equity to Reorganized TCEH interferes with the preservation of the Intended Tax Treatment, the TCEH Debtors, EFH Corp., the Plan Sponsors, the TCEH Supporting First Lien Creditors, and the TCEH Committee shall reasonably agree to an appropriate modification of the Plan to preserve the Intended Tax Treatment.

16.      "*Assigned C5 Rights*" means any Rights that would have otherwise been distributed to a Holder of an Allowed General Unsecured Claim Against the TCEH Debtors Other Than EFCH, which Rights shall be assigned to Class C3 for the benefit of Holders of Allowed TCEH First Lien Secured Claims upon the exercise by such Holder of an Allowed General Unsecured Claim Against the TCEH Debtors Other Than EFCH of the Cash-Out Election.

17.      "*Assumed Executory Contracts and Unexpired Leases*" means those Executory Contracts and Unexpired Leases to be assumed by the Reorganized Debtors, including as set forth on the Assumed Executory Contract and Unexpired Lease List.

Error! Unknown document property name.

18.    "*Assumed Executory Contract and Unexpired Lease List*" means the list, as determined by the Debtors or the Reorganized Debtors, as applicable, in consultation with the Plan Sponsors and the TCEH Supporting First Lien Creditors, as applicable, of Executory Contracts and Unexpired Leases (with proposed cure amounts) that will be assumed by the Reorganized Debtors, which shall be included in the Plan Supplement.

19.    "*AST&T*" means American Stock Transfer & Trust Company, LLC.

20.    "*Backstop Agreement*" means that certain Backstop Agreement, dated as of August 9, 2015, by and among EFH Corp., EFIH, New EFH, and the Backstop Purchasers, as may be amended, supplemented, or otherwise modified from time to time in accordance therewith, including all exhibits attached thereto.

21.    "*Backstop Purchasers*" means the Entities set forth on Schedule 1 to the Backstop Agreement that will backstop the Rights Offering in the proportions and amounts set forth therein pursuant to the Backstop Agreement.

22.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time.

23.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the United States District Court for the District of Delaware.

24.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

25.    "*Bar Date*" means the applicable date established by the Bankruptcy Court by which respective Proofs of Claims and Interests must be Filed.

26.    "*Basis Step-Up*" means the increase in the federal income tax basis of the assets transferred or deemed transferred to the Preferred Stock Entity pursuant to the Preferred Stock Sale by the excess of: (i) 100% of the aggregate amount of the net losses, net operating losses, and net capital losses (but only to the extent such net capital losses are deductible under applicable tax law against gain recognized on the Preferred Stock Sale) (in each case, including carryovers) available to the EFH Group as of the Effective Date (determined (a) as if the "consolidated year" (within the meaning of Section 1503(e)(2)(B) of the Internal Revenue Code) of the EFH Group ended on the Effective Date, and (b) without regard to any income, gain, loss or deduction generated as a result of the Preferred Stock Sale or transactions occurring outside the ordinary course of business on the Effective Date after the Preferred Stock Sale (other than any Deferred Intercompany and ELA Items (if any) and other transactions expressly contemplated by the Plan and the Definitive Restructuring Documents (as defined in the Plan Support Agreement))), such amount to be mutually agreed on by EFH Corp., the Plan Sponsors and the TCEH Supporting First Lien Creditors in accordance with the Plan Support Agreement, over (ii) $500 million (or, if the TCEH Supporting First Lien Creditors so elect, an amount greater than $500 million).

27.    "*BNY*" means, collectively: (a) BNYM; and (b) BNYMTC.

28.    "*BNYM*" means The Bank of New York Mellon.

29.    "*BNYMTC*" means The Bank of New York Mellon Trust Company, N.A.

30.    "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

31.    "*Cash*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the U.S.

Error! Unknown document property name.

32.    "*Cash Collateral Order*" means the *Final Order (A) Authorizing Use of Cash Collateral for Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates, (B) Granting Adequate Protection, and (C) Modifying the Automatic Stay* [D.I. 855].

33.    "*Cash Management Order*" means the *Final Order (A) Authorizing the Debtors to (I) Continue Using Their Existing Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms, and (III) Continue Using Certain Investment Accounts; (B) Authorizing Continued Intercompany Transactions and Netting of Intercompany Claims; and (C) Granting Postpetition Intercompany Claims Administrative Expense Priority* [D.I. 801].

34.    "*Cash-Out Election*" means the election by a Holder of an Allowed General Unsecured Claim Against the TCEH Debtors Other Than EFCH to receive Cash in lieu of Rights and Reorganized EFH Common Stock pursuant to the terms and conditions set forth in Article III.B.30 of the Plan.

35.    "*Cash-Out Election Pool*" means an amount of Cash up to $42 million that is available for distribution to Holders of Allowed General Unsecured Claims Against the TCEH Debtors Other Than EFCH that exercise the Cash-Out Election.

36.    "*Cash-Out Election Pool Excess Cash*" means any Cash that remains in the Cash-Out Election Pool following distribution to Holders of Allowed General Unsecured Claims Against the TCEH Debtors Other Than EFCH that exercise the Cash-Out Election, which Cash shall be distributed to Class C3 for the benefit of Holders of Allowed TCEH First Lien Secured Claims.

37.    "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

38.    "*Chapter 11 Cases*" means, collectively: (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and (b) when used with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

39.    "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

40.    "*Claims and Noticing Agent*" means Epiq Bankruptcy Solutions, LLC, retained as the Debtors' notice and claims agent pursuant to the *Order Approving the Retention and Appointment of Epiq Bankruptcy Solutions as the Claims and Noticing Agent for the Debtors* [D.I. 321].

41.    "*Claims Objection Deadline*" means the later of: (a) the date that is 180 days after the Effective Date; and (b) such other date as may be fixed by the Bankruptcy Court, after notice and hearing, upon a motion Filed before the expiration of the deadline to object to Claims or Interests.

42.    "*Claims Register*" means the official register of Claims maintained by the Claims and Noticing Agent.

43.    "*Class*" means a category of Claims or Interests as set forth in Article III of the Plan.

Error! Unknown document property name.

44.    *"CM/ECF"* means the Bankruptcy Court's Case Management and Electronic Case Filing system.

45.    *"Collective Professional Fee Claims"* means Professional Fee Claims incurred by a Professional for the collective benefit of two or more of TCEH, EFH Corp., and EFIH.

46.    *"Competitive Tax Sharing Agreement"* means that certain Federal and State Income Tax Allocation Agreement Among the Members of the Energy Future Holdings Corp. Consolidated Group (as amended and restated from time to time), dated May 15, 2012, by and among EFH Corp. and certain of its direct and indirect subsidiaries.

47.    *"Computershare Trust"* means, collectively:  (a) Computershare Trust Company, N.A.; and (b) Computershare Trust Company of Canada.

48.    *"Confirmation"* means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

49.    *"Confirmation Date"* means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

50.    *"Confirmation Hearing"* means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

51.    *"Confirmation Order"* means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance reasonably acceptable to the DIP Agents, the Plan Sponsors, the TCEH Supporting First Lien Creditors, and, subject to and through the Plan Support Termination Date, the TCEH Supporting Second Lien Creditors and the TCEH Committee.

52.    *"Conflict Matters"* means for each of EFH Corp., EFIH, and EFCH/TCEH, as defined in the respective resolutions of the applicable Board of Directors or Board of Managers dated November 7, 2014 and December 9, 2014 including the determination of whether any matter constitutes a "Conflict Matter."

53.    *"Consummation"* means the occurrence of the Effective Date.

54.    *"Contributed TCEH Debtors"* means those one or more TCEH Debtors mutually agreed on by EFH Corp., the Plan Sponsors, and the TCEH Supporting First Lien Creditors whose equity will be contributed by Reorganized TCEH to the Preferred Stock Entity in the Preferred Stock Sale, if any.

55.    *"Contribution"* means, as part of the Spin-Off, immediately following the cancelation of Claims against the TCEH Debtors, the transfer to Reorganized TCEH (a) by TCEH, of all of TCEH's interests in its subsidiaries (excluding the stock of TCEH Finance) and (b) by the EFH Debtors, of (i) the equity interests in the Reorganized EFH Shared Services Debtors (or with the consent of TCEH and the TCEH Supporting First Lien Creditors, the assets and liabilities of the Reorganized EFH Shared Services Debtors related to the TCEH Debtors' operations), (ii) with the consent of TCEH and the TCEH Supporting First Lien Creditors, certain other assets, liabilities, and equity interests related to the TCEH Debtors' operations (including the equity interests of non-Debtor EFH Properties Company or the lease for the Debtors' corporate headquarters at "Energy Plaza" held by EFH Properties Company (but not including any Cash on hand at EFH Properties Company, which shall be transferred to Reorganized EFH)) and (iii) the rights to receive the Assigned C5 Equity pursuant to the Plan, in exchange for the consideration described in Article IV.B.2 of the Plan.

56.    *"Cure Claim"* means a Claim based upon the Debtors' defaults on an Executory Contract or Unexpired Lease at the time such Executory Contract or Unexpired Lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code.

57.    *"Dealer Managers"* means the dealer managers under that certain dealer manager agreement approved under the EFIH First Lien Approval Order.

Error! Unknown document property name.

58.    *"Debtor"* means one of the Debtors, in its individual capacity as a debtor and debtor in possession in its respective Chapter 11 Case.

59.    *"Debtor Intercompany Claim"* means a Claim by any Debtor against any other Debtor.

60.    *"Debtors"* means, collectively:  (a) the TCEH Debtors; (b) the EFIH Debtors; and (c) the EFH Debtors.

61.    *"Deferred Intercompany and ELA Items"* means intercompany items (as such term is defined in Treasury Regulations Section 1.1502-13(b)(2)) or any excess loss account (as such term is defined in Treasury Regulations Section 1.1502-19(a)), in each case, of any subsidiary of TCEH (other than TCEH Finance) that are accelerated into income as a result of the Distribution pursuant to Treasury Regulations Section 1.1502-13(d) or Section 1.1502-19.

62.    *"DIP Agents"* means, collectively:  (a) the TCEH DIP Agent; and (b) the EFIH First Lien DIP Agent.

63.    *"DIP Agreements"* means, collectively:  (a) the TCEH DIP Credit Agreement; and (b) the EFIH First Lien DIP Credit Agreement.

64.    *"DIP Claims"* means, collectively:  (a) the TCEH DIP Claims; and (b) the EFIH First Lien DIP Claims.

65.    *"DIP Facilities"* means, collectively:  (a) the TCEH DIP Facility; and (b) the EFIH First Lien DIP Facility.

66.    *"DIP Lenders"* means the DIP Agents, the TCEH DIP L/C Issuers, the banks, financial institutions, and other lenders party to the DIP Facilities from time to time, and each arranger, bookrunner, syndication agent, manager, and documentation agent under the DIP Facilities.

67.    *"DIP Orders"* means, collectively:  (a) the TCEH Final DIP Order; and (b) the EFIH First Lien Final DIP Order.

68.    *"Direct Professional Fee Claims"* means Professional Fee Claims incurred by a Professional for the benefit of only one of the following: (a) the EFH Debtors; (b) the EFIH Debtors; or (c) the TCEH Debtors.

69.    *"Disallowed Makewhole Claims"* means those Makewhole Claims as to which the Bankruptcy Court has entered an order disallowing the Claim, and such order has not been stayed or reversed or remanded on appeal as of the Effective Date.

70.    *"Disbursing Agent"* means the Reorganized Debtors or the Entity or Entities authorized to make or facilitate distributions under the Plan as selected by the Debtors or the Reorganized Debtors, as applicable, in consultation with the Plan Sponsors and the TCEH Supporting First Lien Creditors.

71.    *"Disclosure Statement"* means the *Disclosure Statement For the Fourth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code*, dated [____], 2015 [D.I. ____], including all exhibits and schedules thereto, as approved pursuant to the Disclosure Statement Order.

72.    *"Disclosure Statement Order"* means the order entered by the Bankruptcy Court in the Chapter 11 Cases: (a) approving the Disclosure Statement as containing adequate information required under section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017; and (b) authorizing the use of the Disclosure Statement for soliciting votes on the Plan [D.I. ____].

9

73.    *"Disinterested Directors and Managers"* means the disinterested directors and managers of EFH Corp., EFIH, and EFCH/TCEH.

74.    *"Disinterested Directors Settlement"* means the settlement negotiated by and among the Disinterested Directors and Managers regarding Debtor Intercompany Claims set forth in the Initial Plan.

75.    *"Disputed"* means with regard to any Claim or Interest, a Claim or Interest that is not yet Allowed.

76.    *"Distribution"* means, as part of the Spin-Off, and following the Contribution and the Reorganized TCEH Conversion, the Pro Rata distribution of the Reorganized TCEH Common Stock and the net Cash proceeds of the New Reorganized TCEH Debt and the Preferred Stock Sale, if any, received in the Contribution to Holders of Allowed TCEH First Lien Secured Claims.

77.    *"Distribution Date"* means the Effective Date and any Periodic Distribution Date thereafter.

78.    *"Distribution Record Date"* means other than with respect to any publicly-held securities, the record date for purposes of making distributions under the Plan on account of Allowed Claims and Allowed Interests (other than DIP Claims), which date shall be the date that is five (5) Business Days after the Confirmation Date or such other date as designated in an order of the Bankruptcy Court.

79.    *"DTC"* means the Depository Trust Company.

80.    *"EFCH"* means Energy Future Competitive Holdings Company LLC, a Delaware limited liability company.

81.    *"EFCH 2037 Note Claim"* means any Claim derived from or based upon the EFCH 2037 Notes.

82.    *"EFCH 2037 Note Indenture"* means that certain Indenture, as amended or supplemented from time to time, dated December 1, 1995, by and between EFCH, successor to TXU US Holdings Company, as issuer, and the EFCH 2037 Notes Trustee.

83.    *"EFCH 2037 Notes"* means, collectively:  (a) the EFCH Fixed 2037 Notes; and (b) the EFCH Floating 2037 Notes.

84.    *"EFCH 2037 Notes Trustee"* means BNYMTC, or any successor thereto, as trustee under the EFCH 2037 Note Indenture.

85.    *"EFCH Fixed 2037 Notes"* means the 8.175% fixed rate notes due January 30, 2037, issued by EFCH pursuant to the EFCH 2037 Note Indenture.

86.    *"EFCH Floating 2037 Notes"* means the 1.245% floating rate notes due January 30, 2037, issued by EFCH pursuant to the EFCH 2037 Note Indenture.

87.    *"Effective Date"* means, with respect to the Plan, the date after the Confirmation Date selected by the Debtors, including the Debtors acting at the direction of the Disinterested Directors and Managers with respect to Conflict Matters, in consultation with the Plan Sponsors and the TCEH Supporting First Lien Creditors, on which:  (a) no stay of the Confirmation Order is in effect; and (b) all conditions precedent specified in Article IX.B have been satisfied or waived (in accordance with Article IX.C).

88.    *"EFH 2019 Note Indenture"* means that certain Indenture, as amended or supplemented from time to time, dated November 16, 2009, by and among EFH Corp., as issuer, and the EFH Notes Trustee.

89.    *"EFH 2019 Notes"* means the 9.75% unsecured notes due October 15, 2019, issued by EFH Corp. pursuant to the EFH 2019 Note Indenture.

90.    *"EFH 2020 Note Indenture"* means that certain Indenture, as amended or supplemented from time to time, dated January 12, 2010, by and among EFH Corp., as issuer, and the EFH Notes Trustee.

91.    *"EFH 2020 Notes"* means the 10.0% unsecured notes due January 15, 2020, issued by EFH Corp. pursuant to the EFH 2020 Note Indenture.

92.    *"EFH Corp."* means Energy Future Holdings Corp., a Texas corporation.

93.    *"EFH Corp. Claims"* means, collectively:  (a) the Allowed EFH Legacy Note Claims; (b) the Allowed EFH Unexchanged Note Claims; (c) the Allowed EFH Swap Claims; (d) the Allowed EFH Non-Qualified Benefit Claims; (e) the Allowed General Unsecured Claims Against EFH Corp; and (f) the Allowed EFH LBO Note Primary Claims.

94.    *"EFH Corporate Services"* means EFH Corporate Services Company, a Texas corporation.

95.    *"EFH Debtor Intercompany Claim"* means any Claim by an EFH Debtor against another EFH Debtor.

96.    *"EFH Debtors"* means, collectively:  (a) EFH Corp.; (b) Brighten Energy LLC; (c) Brighten Holdings LLC; (d) Dallas Power and Light Company, Inc.; (e) Ebasco Services of Canada Limited; (f) EEC Holdings, Inc.; (g) EECI, Inc.; (h) EFH Australia (No. 2) Holdings Company; (i) EFH CG Holdings Company LP; (j) EFH CG Management Company LLC; (k) EFH Corporate Services; (l) EFH Finance (No. 2) Holdings Company; (m) EFH FS Holdings Company; (n) EFH Renewables Company LLC; (o) Generation Development Company LLC; (p) Lone Star Energy Company, Inc.; (q) Lone Star Pipeline Company, Inc.; (r) LSGT Gas Company LLC; (s) LSGT SACROC, Inc.; (t) NCA Development Company LLC; (u) Southwestern Electric Service Company, Inc.; (v) Texas Electric Service Company, Inc.; (w) Texas Energy Industries Company, Inc.; (x) Texas Power and Light Company, Inc.; (y) Texas Utilities Company, Inc.; (z) Texas Utilities Electric Company, Inc.; (aa) TXU Electric Company, Inc.; and (bb) TXU Receivables Company.

97.    *"EFH Group"* means the "affiliated group" (within the meaning of Section 1504(a)(1) of the Internal Revenue Code), and any consolidated, combined, aggregate, or unitary group under state or local law, of which EFH Corp. is the common parent.

98.    *"EFH/EFIH Committee"* means the statutory committee of unsecured creditors of EFH Corp., EFIH, EFIH Finance, and EECI, Inc., appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on October 27, 2014, the membership of which may be reconstituted from time to time.

99.    *"EFH/EFIH Committee Standing Motion"* means the *Motion of the EFH Official Committee for Entry of an Order Granting Derivative Standing and Authority to Prosecute and Settle Claims on Behalf of the Luminant Debtors' Estates* [D.I. 3605].

100.    *"EFH LBO Note Claims"* means, collectively: (a) the EFH LBO Note Primary Claims; and (b) the EFH LBO Note Guaranty Claims.

101.    *"EFH LBO Note Guaranty Claim"* means any Claim against EFIH derived from or based upon the EFH LBO Notes.

102.    *"EFH LBO Note Indenture"* means that certain Indenture, as amended or supplemented from time to time, dated October 31, 2007, by and among EFH Corp., as issuer, EFCH and EFIH as guarantors, and the EFH Notes Trustee.

103.    *"EFH LBO Note Primary Claim"* means any Claim against EFH Corp. derived from or based upon the EFH LBO Notes.

Error! Unknown document property name.

104.    "*EFH LBO Notes*" means, collectively:  (a) the EFH LBO Senior Notes; and (b) the EFH LBO Toggle Notes.

105.    "*EFH LBO Senior Notes* " means the 10.875% senior notes due November 1, 2017, issued by EFH Corp. pursuant to the EFH LBO Note Indenture.

106.    "*EFH LBO Toggle Notes*" means the 11.25%/12.00% toggle notes due November 1, 2017, issued by EFH Corp. pursuant to the EFH LBO Note Indenture.

107.    "*EFH Legacy Note Claim*" means any Claim derived from or based upon the EFH Legacy Notes, excluding any Claims derived from or based upon EFH Legacy Notes held by EFIH.

108.    "*EFH Legacy Note Indentures*" means those certain Indentures, as amended or supplemented from time to time, dated November 1, 2004, by and among EFH Corp., as issuer, and the EFH Notes Trustee.

109.    "*EFH Legacy Notes*" means, collectively:  (a) the 5.55% Series P Senior Notes due November 15, 2014; (b) the 6.50% Series Q Senior Notes due November 15, 2024; and (c) the 6.55% Series R Senior Notes due November 15, 2034, issued by EFH Corp. pursuant to the EFH Legacy Note Indentures and related officers' certificates.

110.    "*EFH Non-Qualified Benefit Claim*" means any Claim against the EFH Debtors derived from or based upon either: (a) a non-contributory, non-qualified pension plan that provides retirement benefits to participants whose tax-qualified pension benefits are limited due to restrictions under the Internal Revenue Code and/or deferrals to other benefit programs; and/or (b) a contributory, non-qualified defined contribution plan that permits participants to voluntarily defer a portion of their base salary and/or annual incentive plan bonuses.

111.    "*EFH Notes Trustee*" means AST&T, in its capacity as successor trustee to BNY.

112.    "*EFH Shared Services Debtors*" means, collectively:  (a) EFH Corporate Services; (b) Dallas Power and Light Company, Inc.; (c) EFH CG Holdings Company LP; (d) EFH CG Management Company LLC; (e) Lone Star Energy Company, Inc.; (f) Lone Star Pipeline Company, Inc.; (g) Southwestern Electric Service Company, Inc.; (h) Texas Electric Service Company, Inc.; (i) Texas Energy Industries Company, Inc.; (j) Texas Power and Light Company, Inc.; (k) Texas Utilities Company, Inc.; (l) Texas Utilities Electric Company, Inc.; and (m) TXU Electric Company, Inc.

113.    "*EFH Series N Note Claim*" means any Claim derived from or based upon the EFH Series N Notes.

114.    "*EFH Series N Note Indenture*" means that certain Indenture, as amended or supplemented from time to time, dated July 3, 2003, by and among EFH Corp., as issuer, and the EFH Series N Trustee.

115.    "*EFH Series N Notes*" means the floating rate convertible notes due 2033 issued by EFH Corp. pursuant to the EFH Series N Note Indenture.

116.    "*EFH Series N Notes Trustee*" means BNYMTC, in its capacity under the EFH Series N Notes.

117.    "*EFH Swap Claim*" means any Claim against EFH Corp. derived from or based upon the EFH Swaps.

118.    "*EFH Swaps*" means those certain swaps entered into by EFH Corp. on an unsecured basis.

119.    "*EFH Unexchanged Note Claim*" means any Claim derived from or based upon the EFH Unexchanged Notes.

Error! Unknown document property name.

120. *"EFH Unexchanged Notes"* means, collectively: (a) the EFH 2019 Notes; and (b) the EFH 2020 Notes.

121. *"EFIH"* means Energy Future Intermediate Holding Company LLC, a Delaware limited liability company.

122. *"EFIH Debtor Intercompany Claim"* means any Claim by an EFIH Debtor against another EFIH Debtor.

123. *"EFIH Debtors"* means, collectively: (a) EFIH; and (b) EFIH Finance.

124. *"EFIH DIP Secured Cash Management Banks"* means the "Secured Cash Management Banks," as defined in the EFIH First Lien Final DIP Order.

125. *"EFIH DIP Secured Cash Management Obligations"* means the "Secured Cash Management Obligations," as defined in the EFIH First Lien Final DIP Order.

126. *"EFIH DIP Secured Hedge Banks"* means the "Secured Hedge Banks," as defined in the EFIH First Lien Final DIP Order.

127. *"EFIH DIP Secured Hedge Obligations"* means the "Secured Hedge Obligations," as defined in the EFIH First Lien Final DIP Order.

128. *"EFIH Finance"* means EFIH Finance Inc., a Delaware corporation.

129. *"EFIH First Lien 2017 Note Indenture"* means that certain Indenture, as amended or supplemented from time to time, dated August 14, 2012, by and among the EFIH Debtors, as issuers, and the EFIH First Lien Notes Trustee.

130. *"EFIH First Lien 2017 Notes"* means the 6.875% senior secured notes due August 15, 2017, issued by the EFIH Debtors pursuant to the EFIH First Lien 2017 Note Indenture.

131. *"EFIH First Lien 2020 Note Indenture"* means that certain Indenture, as amended or supplemented from time to time, dated August 17, 2010, by and among the EFIH Debtors, as issuers, and the EFIH First Lien Notes Trustee.

132. *"EFIH First Lien 2020 Notes"* means the 10.0% senior secured notes due December 1, 2020, issued by the EFIH Debtors pursuant to the EFIH First Lien 2020 Note Indenture.

133. *"EFIH First Lien Approval Order"* means the *Order Approving EFIH First Lien Settlement* [D.I. 858].

134. *"EFIH First Lien DIP Agent"* means Deutsche Bank AG New York Branch, or its duly appointed successor, in its capacity as administrative agent and collateral agent for the EFIH First Lien DIP Facility.

135. *"EFIH First Lien DIP Claim"* means any Claim derived from or based upon the EFIH First Lien DIP Credit Agreement or the EFIH First Lien Final DIP Order, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges.

136. *"EFIH First Lien DIP Collateral"* means the "EFIH DIP Collateral," as defined in the EFIH First Lien Final DIP Order.

137. *"EFIH First Lien DIP Contingent Obligations"* means the "Contingent Obligations," as defined in the EFIH First Lien DIP Credit Agreement, including any and all expense reimbursement obligations of the Debtors that are contingent as of the Effective Date.

13

138. *"EFIH First Lien DIP Credit Agreement"* means that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of June 19, 2014, as amended, supplemented, or modified from time to time, by and among EFIH, EFIH Finance, the banks, financial institutions, and other lenders from time to time party thereto, the EFIH First Lien DIP Agent, and the other agents and entities party thereto, collectively with the "EFIH First Lien DIP Documents," as defined in the EFIH First Lien Final DIP Order.

139. *"EFIH First Lien DIP Facility"* means the EFIH Debtors' $5.4 billion debtor-in-possession financing facility, as approved on a final basis pursuant to the EFIH First Lien Final DIP Order.

140. *"EFIH First Lien Final DIP Order"* means the *Final Order (A) Approving Postpetition Financing For Energy Future Intermediate Holding Company LLC and EFIH Finance Inc., (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Approving the Use of Cash Collateral by Energy Future Intermediate Holding Company LLC and EFIH Finance Inc., (D) Authorizing the EFIH First Lien Repayment, (E) Authorizing Issuance of Roll-Up Debt to the Extent Authorized by the Settlement Orders, and (F) Modifying the Automatic Stay* [D.I. 859], as amended by the *Amended Final Order (A) Approving Postpetition Financing for Energy Future Intermediate Holding Company LLC and EFIH Finance Inc., (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Approving the Use of Cash Collateral by Energy Future Intermediate Holding Company LLC and EFIH Finance Inc., (D) Authorizing the EFIH First Lien Repayment, (E) Authorizing Issuance of Roll-Up Debt to the Extent Authorized by the Settlement Orders, and (F) Modifying the Automatic Stay* [D.I. 3856].

141. *"EFIH First Lien Note Claim"* means any Secured Claim derived from or based upon the EFIH First Lien Notes that was not paid in full in advance of the Effective Date pursuant to a Bankruptcy Court order.

142. *"EFIH First Lien Notes"* means, collectively: (a) the EFIH First Lien 2017 Notes; and (b) the EFIH First Lien 2020 Notes.

143. *"EFIH First Lien Notes Trustee"* means Delaware Trust Company, as successor indenture trustee to BNY.

144. *"EFIH First Lien Settlement"* means that certain settlement approved by the EFIH First Lien Approval Order.

145. *"EFIH Second Lien Note Claim"* means any Secured Claim derived from or based upon the EFIH Second Lien Notes.

146. *"EFIH Second Lien Note Indenture"* means that certain Indenture, as amended or supplemented from time to time, dated April 25, 2011, by and among the EFIH Debtors, as issuers, and the EFIH Second Lien Notes Trustee.

147. *"EFIH Second Lien Notes"* means, collectively: (a) the 11.0% senior secured second lien notes due October 1, 2021; and (b) the 11.75% senior secured second lien notes due March 1, 2022, issued by the EFIH Debtors pursuant to the EFIH Second Lien Note Indenture.

148. *"EFIH Second Lien Notes Trustee"* means Computershare Trust, as successor indenture trustee to BNY.

149. *"EFIH Second Lien Partial Repayment"* means the partial repayment of EFIH Second Lien Notes, in the amount of up to $750 million, effectuated pursuant to the *Order (A) Authorizing Partial Repayment of EFIH Second Lien Notes; (B) Approving EFIH DIP Consent; and (C) Authorizing Consent Fee* [D.I. 3855].

150. *"EFIH Senior Toggle Note Indenture"* means that certain Indenture, as amended or supplemented from time to time, dated December 5, 2012, by and among the EFIH Debtors, as issuers, and the EFIH Unsecured Notes Trustee.

Error! Unknown document property name.

151.    "*EFIH Senior Toggle Notes*" means the 11.25%/12.25% senior unsecured notes due December 1, 2018, issued by the EFIH Debtors pursuant to the EFIH Senior Toggle Note Indenture.

152.    "*EFIH Unexchanged Note Indenture*" means that certain Indenture, as amended or supplemented from time to time, dated November 16, 2009, by and among the EFIH Debtors, as issuers, and the EFIH Unsecured Notes Trustee.

153.    "*EFIH Unexchanged Notes*" means the 9.75% unsecured notes due October 15, 2019, issued by the EFIH Debtors pursuant to the EFIH Unexchanged Note Indenture.

154.    "*EFIH Unsecured Note Claim*" means any Claim derived from or based upon the EFIH Unsecured Notes.

155.    "*EFIH Unsecured Notes*" means, collectively:  (a) the EFIH Senior Toggle Notes; and (b) the EFIH Unexchanged Notes.

156.    "*EFIH Unsecured Notes Trustee*" means UMB Bank, N.A., as successor trustee to BNY.

157.    "*Employment Agreements*" means existing employment agreement by and between certain employees of the Debtors and the Debtors, each of which shall be assumed and assigned to Reorganized TCEH on the Effective Date.

158.    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

159.    "*Equity Commitment Letter*" means that certain letter agreement, dated as of August 9, 2015, by and among the Equity Investors, New EFH, OV2, EFH Corp., and EFIH, pursuant to which, among other things, each Equity Investor has committed, subject to the terms and conditions thereof, to make new money equity investments in one or both of New EFH and OV2 in the proportions and amounts set forth therein in order to fund a portion of the amounts payable by New EFH and OV2 pursuant to the Merger and Purchase Agreement and the Minority Buy-Out.

160.    "*Equity Investment*" means, collectively, the equity investments to be made pursuant to the Rights Offering, the Backstop Agreement, and the Equity Commitment Letter.

161.    "*Equity Investors*" means the Entities set forth on Exhibit A to the Equity Commitment Letter.

162.    "*ERISA*" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 as amended, (2006 V. Supp. 2011), and the regulations promulgated thereunder.

163.    "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

164.    "*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors and Reorganized Debtors; (b) the Plan Sponsors; (c) OV2; (d) Holders of TCEH First Lien Claims; (e) Holders of TCEH Second Lien Note Claims; (f) Holders of TCEH Unsecured Note Claims; (g) Holders of EFH Legacy Note Claims; (h) Holders of EFH Unexchanged Note Claims; (i) Holders of EFH LBO Note Claims; (j) Holders of EFIH First Lien Note Claims; (k) Holders of EFIH Second Lien Note Claims; (l) Holders of EFIH Unsecured Note Claims; (m) the DIP Lenders; (n) the TCEH First Lien Agent; (o) the Indenture Trustees; (p) the Dealer Managers; (q) TEF; (r) Texas Holdings; (s) Oncor; (t) funds and accounts managed or advised by Kohlberg Kravis Roberts & Co., L.P., TPG Capital, L.P. or Goldman, Sachs & Co. that hold direct or indirect interests in Texas Holdings, TEF, or EFH Corp.; (u) the TCEH Committee; (v) any arrangers and lenders under the New Reorganized EFIH Debt; and (w) with respect to each of the foregoing entities in clauses (a) through (v), such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys,

Error! Unknown document property name.

accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

165.   *"Executive Severance Policy"* means the Energy Future Holdings Corp. Executive Change in Control Policy, effective as of May 20, 2005, as amended on December 23, 2008 and December 20, 2010, and in effect as of the date of Filing of the Plan.

166.   *"Executory Contract"* means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

167.   *"FCC"* means the Federal Communications Commission.

168.   *"Federal Judgment Rate"* means the rate of interest calculated pursuant to the provisions of 28 U.S.C. § 1961, which shall be a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, as of the Petition Date, which rate was 0.11%.

169.   *"FERC"* means the Federal Energy Regulatory Commission.

170.   *"File,"* *"Filed,"* or *"Filing"* means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases, including with respect to a Proof of Claim or Proof of Interest, the Claims and Noticing Agent.

171.   *"Final Order"* means an order or judgment of the Bankruptcy Court, as entered on the docket in any Chapter 11 Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided, however,* that the possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court, may be filed relating to such order shall not prevent such order from being a Final Order.

172.   *"General Administrative Claim"* means any Administrative Claim, other than a Professional Fee Claim.

173.   *"General Unsecured Claim Against EFCH"* means any Unsecured Claim against EFCH that is not otherwise paid in full pursuant to an order of the Bankruptcy Court, including the EFCH 2037 Note Claims, but excluding:  (a) Administrative Claims against EFCH; (b) Priority Tax Claims against EFCH; (c) Intercompany Claims against EFCH; (d) Other Priority Claims against EFCH; and (e) DIP Claims.

174.   *"General Unsecured Claim Against EFH Corp."* means any Unsecured Claim against EFH Corp. that is not otherwise paid in full pursuant to an order of the Bankruptcy Court, including the EFH Series N Note Claims, but excluding:  (a) Legacy General Unsecured Claims Against the EFH Debtors; (b) EFH Legacy Note Claims; (c) EFH Unexchanged Note Claims; (d) EFH LBO Note Primary Claims; (e) EFH Swap Claims; (f) EFH Non-Qualified Benefit Claims; (g) the TCEH Settlement Claim; (h) Tex-La Guaranty Claims; (i) Administrative Claims against EFH Corp.; (j) Priority Tax Claims against EFH Corp.; (k) Intercompany Claims against EFH Corp.; (l) Other Priority Claims against EFH Corp.; and (m) DIP Claims.

175.   *"General Unsecured Claim Against the EFH Debtors Other Than EFH Corp."* means any Unsecured Claim against one or more of the EFH Debtors (other than EFH Corp.) that is not otherwise paid in full pursuant to an order of the Bankruptcy Court, excluding:  (a) Legacy General Unsecured Claims Against the EFH Debtors; (b) EFH Non-Qualified Benefit Claims; (c) Administrative Claims against the EFH Debtors other than EFH Corp.; (d) Priority Tax Claims against the EFH Debtors other than EFH Corp.; (e) Intercompany Claims

Error! Unknown document property name.

against the EFH Debtors other than EFH Corp.; (f) Other Priority Claims against the EFH Debtors other than EFH Corp.; and (g) DIP Claims.

176.    *"General Unsecured Claim Against the EFIH Debtors"* means any Unsecured Claim against one or more of the EFIH Debtors that is not otherwise paid in full pursuant to an order of the Bankruptcy Court, including the EFIH Unsecured Note Claims and any Unsecured Claims derived from or based upon the EFIH First Lien Notes or EFIH Second Lien Notes, but excluding: (a) EFH LBO Note Guaranty Claims; (b) Administrative Claims against the EFIH Debtors; (c) Priority Tax Claims against the EFIH Debtors; (d) Intercompany Claims against the EFIH Debtors; (e) Other Priority Claims against the EFIH Debtors; and (f) DIP Claims.

177.    *"General Unsecured Claim Against the TCEH Debtors Other Than EFCH"* means any Unsecured Claim against one or more of the TCEH Debtors other than EFCH that is not otherwise paid in full pursuant to an order of the Bankruptcy Court, including the Legacy General Unsecured Claims Against the TCEH Debtors, but excluding: (a) TCEH Unsecured Debt Claims; (b) Administrative Claims against the TCEH Debtors Other Than EFCH; (c) Priority Tax Claims against the TCEH Debtors Other Than EFCH; (d) Intercompany Claims against the TCEH Debtors Other Than EFCH; (e) Other Priority Claims against the TCEH Debtors Other Than EFCH; and (f) DIP Claims.

178.    *"Governmental Unit"* has the meaning set forth in section 101(27) of the Bankruptcy Code.

179.    *"Holder"* means an Entity holding a Claim or an Interest, as applicable.

180.    *"HSR Act"* means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

181.    *"Hunt"* means Hunt Consolidated, Inc.

182.    *"Impaired"* means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

183.    *"Incremental Amendment Agreement"* means that certain Incremental Amendment No. 1, dated as January 4, 2013, by and among the Incremental 2012 Term Lenders (as defined therein), EFCH, TCEH, the Credit Parties (as defined therein) party thereto, and Citibank, N.A., as administrative and collateral agent.

184.    *"Indemnification Obligations"* means each of the Debtors' indemnification obligations in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, for their current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtors, as applicable.

185.    *"Indenture Trustees"* means, collectively: (a) the EFH Notes Trustee; (b) the EFCH 2037 Notes Trustee; (c) the EFIH First Lien Notes Trustee; (d) the EFIH Second Lien Notes Trustee; (e) the EFIH Unsecured Notes Trustee; (f) the TCEH First Lien Notes Trustee; (g) the TCEH Second Lien Notes Trustee; (h) the TCEH Unsecured Notes Trustee; (i) the PCRB Trustee; (j) the EFH Series N Notes Trustee; and (k) the TCEH Second Lien Notes Collateral Agent.

186.    *"Initial Plan"* means the *Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the United States Bankruptcy Code* [D.I. 4142], dated April 14, 2015.

187.    *"Intended Tax Treatment"* means (a) the qualification of the Contribution, the Reorganized TCEH Conversion, and the Distribution as a "reorganization" within the meaning of sections 368(a)(1)(G), 355, and 356 of the Internal Revenue Code, and (b) the qualification of the contribution described in clause (a) of the definition of the Preferred Stock Sale as a taxable sale of assets to the Preferred Stock Entity pursuant to Section 1001 of the Internal Revenue Code resulting in the Basis Step-Up.

188.    *"Intercompany Claim"* means a Claim by EFH Corp. or any direct or indirect subsidiary of EFH Corp. against EFH Corp. or any direct or indirect subsidiary of EFH Corp.

189.    *"Interest"* means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Entity.

190.    *"Interim Compensation Order"* means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [D.I. 2066].

191.    *"Internal Revenue Code"* means the Internal Revenue Code of 1986, as amended.

192.    *"Investor Rights Agreement"* means that certain Investor Rights Agreement, dated as of November 5, 2008, by and among Oncor, Oncor Electric Delivery Holdings Company LLC, Texas Transmission Investment LLC, EFH Corp., and the other parties thereto.

193.    *"IPO Conversion Plan"* means the plan attached as Exhibit B to the Merger and Purchase Agreement.

194.    *"IRS"* means the Internal Revenue Service.

195.    *"IRS Submissions"* means all submissions to the IRS in connection with requests for the Private Letter Ruling.

196.    *"Judicial Code"* means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

197.    *"Legacy General Unsecured Claim Against the EFH Debtors"* means any Claim against the EFH Debtors derived from or based upon liabilities based on asbestos or qualified post-employment benefits relating to discontinued operations of the EFH Debtors.

198.    *"Legacy General Unsecured Claim Against the TCEH Debtors"* means any Claim against the TCEH Debtors derived from or based upon liabilities based on asbestos or qualified post-employment benefits relating to the TCEH Debtors.

199.    *"Liability Management Program"* means the various transactions, including debt buybacks, new debt issuances, debt exchanges, debt payoffs, intercompany debt forgiveness, dividends, and maturity extensions, by EFH Corp. and its direct and indirect subsidiaries, and restructuring of such Entities' debt obligations completed before the Petition Date, as described in the Debtors' most recent annual SEC filing.

200.    *"Lien"* has the meaning set forth in section 101(37) of the Bankruptcy Code.

201.    *"Litigation Letters"* means, collectively:  (a) the TCEH Committee Litigation Letters; and (b) the TCEH Unsecured Group Litigation Letter.

202.    *"Luminant"* means Luminant Holding Company LLC and its direct and indirect Debtor subsidiaries.

203.    *"Luminant Makewhole Settlement"* means those transactions in settlement of Luminant's obligations to Oncor under the Tax and Interest Makewhole Agreements, by which EFIH purchased Luminant's obligations from Oncor in August 2012, and Luminant paid EFIH the same respective amount in September 2012.

204.    *"Makewhole Claim"* means any Claim derived from or based upon makewhole, applicable premium, redemption premium, or other similar payment provisions provided for by the applicable agreement

Error! Unknown document property name.

calculated as of the Effective Date (or in the case of the EFIH First Lien Notes, the closing date of the EFIH First Lien DIP Facility, and in the case of EFIH Second Lien Notes, the closing date of the EFIH Second Lien Partial Repayment, with respect to the amount repaid at such time) or any other alleged premiums, fees, or claims relating to the repayment of Claims, without respect to an acceleration having occurred on the Petition Date.

205. *"Management Agreement"* means that certain management agreement, dated as of October 10, 2007, by and among EFH Corp., TEF, Kohlberg Kravis Roberts & Co. L.P., TPG Capital, L.P., Goldman, Sachs & Co., and Lehman Brothers Inc.

206. *"Merger"* means that certain merger on the Effective Date of Reorganized EFH with and into New EFH in a transaction intended to qualify as a tax-free reorganization under section 368(a) of the Internal Revenue Code, with New EFH continuing as the surviving corporation.

207. *"Merger and Purchase Agreement"* means that certain Purchase Agreement and Agreement and Plan of Merger, dated as of August 9, 2015, by and among New EFH, OV2, EFH Corp., and EFIH, as may be amended, supplemented, or otherwise modified from time to time in accordance therewith, including all exhibits attached thereto.

208. *"Minority Buy-Out"* means the exercise of the drag-along rights described in the Investor Rights Agreement to acquire Texas Transmission Investment LLC and other minority members' minority interests in Oncor Electric with a portion of the proceeds of the New Reorganized EFIH Debt and/or the Equity Investment.

209. *"New Boards"* means, collectively:   (a) the Reorganized TCEH Board; and (b) the New EFH/EFIH Board.

210. *"New EFH"* means Ovation Acquisition I, L.L.C., a Delaware limited liability company.

211. *"New EFH Common Stock"* means the new shares of common stock, par value $0.01 per share, in New EFH to be issued and distributed under and in accordance with the Plan.

212. *"New EFH/EFIH Board"* means the board of directors or managers of New EFH and Reorganized EFIH on and after the Effective Date to be appointed by the Plan Sponsors.

213. *"New EFH Merger Common Stock"* means the New EFH Common Stock to be issued to holders of Reorganized EFH Common Stock pursuant to the Merger and under and in accordance with the Plan.

214. *"New EFH Shareholders' Agreement"* means that shareholders' agreement that will govern certain matters related to the governance of New EFH, which shall be included in the Plan Supplement.

215. *"New Employee Agreements/Arrangements"* means the agreements or other arrangements entered into by the 18 members of the Debtors' management team who are considered "insiders" but who are not party to an Employment Agreement as of the date of the Plan Support Agreement and Reorganized TCEH on the Effective Date and which shall include the applicable terms set forth in Section 10(o) of the Plan Support Agreement and shall otherwise be substantially in the form included in the Plan Supplement and reasonably acceptable to the TCEH Supporting First Lien Creditors (in consultation with the TCEH Committee).

216. *"New Organizational Documents"* means such certificates or articles of incorporation, by-laws, or other applicable formation documents of each of the Reorganized Debtors, as applicable, the form of which shall be included in the Plan Supplement.

217. *"New Reorganized EFIH Debt"* means, collectively:   (a) the Reorganized EFIH Permanent Financing Facility; and (b) the Reorganized EFIH Interim Financing Facility.

Error! Unknown document property name.

218.    "*New Reorganized EFIH Debt Documents*" means the documents necessary to effectuate the New Reorganized EFIH Debt on terms and conditions as set forth in the Merger and Purchase Agreement, which shall be included in the Plan Supplement.

219.    "*New Reorganized TCEH Debt*" means the new long-term debt of Reorganized TCEH to be issued on the Effective Date prior to the Reorganized TCEH Conversion.

220.    "*New Reorganized TCEH Debt Documents*" means the documents necessary to effectuate the New Reorganized TCEH Debt, which shall be included in the Plan Supplement.

221.    "*Non-EFIH Debtor Intercompany Claim*" means any Claim, other than the TCEH Settlement Claim, by any direct or indirect subsidiary of EFH Corp. (other than an EFH Debtor) against an EFH Debtor, including any Claims derived from or based upon EFH Legacy Notes held by EFIH.

222.    "*Non-EFIH Debtor Intercompany Claim*" means any Claim by EFH Corp. or any direct or indirect subsidiary of EFH Corp. (other than an EFIH Debtor) against an EFIH Debtor.

223.    "*Non-TCEH Debtor Intercompany Claim*" means any Claim by EFH Corp. or any direct or indirect subsidiary of EFH Corp. (other than a TCEH Debtor) against a TCEH Debtor, including any Claim derived from or based upon the TCEH Credit Agreement, the TCEH First Lien Notes, or TCEH Unsecured Notes held by EFH Corp. and EFIH.

224.    "*NRC*" means the United States Nuclear Regulatory Commission.

225.    "*Nuclear Decommissioning Obligations*" means the Debtors' funding obligations related to a nuclear decommissioning trust that will be used to fund the decommissioning of the Comanche Peak nuclear power plant, as required by the Department of Energy.

226.    "*Oak Grove Promissory Note*" means that certain Promissory Note, dated December 22, 2010, by and among Oak Grove Power Company LLC, as issuer, and North American Coal Royalty Company, as holder, and John W. Harris, as trustee, with face amount of $7,472,500 due in annual installments through December 22, 2017, which note is secured by all coal, lignite, and other near-surface minerals on and under certain real property in Robertson County, Texas.

227.    "*Oak Grove Promissory Note Claim*" means any Claim derived from or based upon the Oak Grove Promissory Note.

228.    "*Oncor*" means Oncor Holdings and its direct and indirect subsidiaries.

229.    "*Oncor Electric*" means Oncor Electric Delivery Company LLC.

230.    "*Oncor Holdings*" means Oncor Electric Delivery Holdings Company LLC.

231.    "*Oncor Tax Sharing Agreement*" means that certain Amended and Restated Tax Sharing Agreement, dated as of November 5, 2008, by and among EFH Corp., Oncor Electric Delivery Holdings Company LLC, Oncor Electric, Texas Transmission Investment LLC, and Oncor Management Investment LLC.

232.    "*Ordinary Course Professional Order*" means the *Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* [D.I. 765].

233.    "*Other Priority Claims*" means any Claim, other than an Administrative Claim, a DIP Claim, or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

234.    "*Other Secured Claim Against the EFH Debtors*" means any Secured Claim against any of the EFH Debtors, excluding DIP Claims.

235.   *"Other Secured Claim Against the EFIH Debtors"* means any Secured Claim against any of the EFIH Debtors, excluding:  (a) EFIH First Lien Note Claims, if any; (b) EFIH Second Lien Note Claims; and (c) DIP Claims.

236.   *"Other Secured Claim Against the TCEH Debtors"* means any Secured Claim against any of the TCEH Debtors, including the Oak Grove Promissory Note Claims and Tex-La Obligations, but excluding:  (a) TCEH First Lien Secured Claims; and (b) DIP Claims.

237.   *"OV2"* means Ovation Acquisition II, L.L.C., a Delaware limited liability company.

238.   *"PBGC"* means the Pension Benefit Guaranty Corporation, a wholly-owned United States government corporation, and an agency of the United States created by ERISA.

239.   *"PCRB Claim"* means any Claim derived from or based upon the PCRBs, excluding the Repurchased PCRBs.

240.   *"PCRBs"* means the pollution control revenue refunding bonds and pollution control revenue bonds outstanding from time to time, including: (a) 7.70% Fixed Series 1999C due March 1, 2032; (b) 7.70% Fixed Series 1999A due April 1, 2033; (c) 6.30% Fixed Series 2003B due July 1, 2032; (d) 6.75% Fixed Series 2003C due October 1, 2038; (e) 5.40% Fixed Series 2003D due October 1, 2029; (f) 5.40% Fixed Series 1994A due May 1, 2029; (g) 5.00% Fixed Series 2006 due March 1, 2041; (h) 8.25% Fixed Series 2001A Due October 1, 2030; (i) 8/25% Fixed Series 2001D-1 due May 1, 2033; (k) 6.45% Fixed Series 2000A due June 1, 2021; (l) 5.80% Fixed Series 2003A due July 1, 2022; (m) 6.15% Fixed Series 2003B due August 1, 2022; (n) 5.20% Fixed Series 2001C due May 1, 2028; (o) 6.25% Fixed Series 2000A due May 1, 2028; (p) Series 1994B due May 1, 2029 (variable rate); (q) Series 1995A due April 1, 2030 (variable rate); (r) Series 1995B due June 1, 2030 (variable rate); (s) Series 2001B due May 1, 2029 (variable rate); (t) Series 2001C due May 1, 2036 (15% ceiling); (u) Floating Taxable Series 20011 due December 1, 2036; (v) Floating Series 2002A due May 1, 2037; (w) Series 2003A due April 1, 2038 (15% ceiling); (x) Series 1999B due September 1, 2034 (15% ceiling); (y) Floating Series 2001D-2 due May 1, 2033; (z) Series 2001A due May 1, 2022 (15% ceiling); (aa) Series 2001B due May 1, 2030 (15% ceiling); and (bb) Series 2001A due May 1, 2027 (variable rate), to which, among others, the PCRB Trustee is party.

241.   *"PCRB Trustee"* means BNYM, as indenture trustee for the PCRBs.

242.   *"Pension Plans"* means the two single-employer defined benefit plans insured by the PBGC and covered by Title IV of ERISA, 29 U.S.C. §§ 1301-1461, including (a) the plan sponsored by EFH Corp., and (b) the plan sponsored by Oncor Electric.

243.   *"Periodic Distribution Date"* means, unless otherwise ordered by the Bankruptcy Court, the first Business Day that is 120 days after the Effective Date, and, for the first year thereafter, the first Business Day that is 120 days after the immediately preceding Periodic Distribution Date. After one year following the Effective Date, the Periodic Distribution Date will occur on the first Business Day that is 180 days after the immediately preceding Periodic Distribution Date, unless and until otherwise ordered by the Bankruptcy Court.

244.   *"Petition Date"* means April 29, 2014, the date on which the Debtors commenced the Chapter 11 Cases.

245.   *"Plan"* means this *Fourth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code*, including the Plan Supplement.

246.   *"Plan Sponsors"* means the Equity Investors and the Backstop Purchasers, *provided, however,* that where consent, approval, or waiver of the Plan Sponsors is required under the Plan, the Plan Sponsors shall mean at least 50.10% in number of unaffiliated Equity Investors and Backstop Purchasers holding in the aggregate at least 66.67% in amount of the aggregate amount of (a) "Investment Commitments" (as defined in the Equity Commitment Letter) set forth on Exhibit A to the Equity Commitment Letter (as amended from time to time in

Error! Unknown document property name.

accordance therewith and with this Agreement) and (b) "Backstop Commitments" (as defined in the Backstop Agreement) set forth on Schedule 1 to the Backstop Agreement (as amended from time to time in accordance therewith and with this Agreement), *provided further, however*, that on and after the date that the Merger Agreement is executed by the parties thereto, Plan Sponsors shall mean New EFH.

247.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors no later than 14 days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents Filed with the Bankruptcy Court before the Effective Date as amendments to the Plan Supplement comprised of, among other documents, the following:  (a) New Organizational Documents; (b) the Rejected Executory Contract and Unexpired Lease List; (c) the Assumed Executory Contract and Unexpired Lease List (which shall include the Employment Agreements and provide that such Employment Agreements are assigned to Reorganized TCEH on the Effective Date); (d) a list of retained Causes of Action; (e) the Reorganized Debtor Management Incentive Plan; (f) the New Employee Agreements/Arrangements; (g) the Reorganized TCEH Registration Rights Agreement; (h) the identity of the members of the New Boards and management for the Reorganized Debtors; (i) the New Reorganized TCEH Debt Documents; (j) the New Reorganized EFIH Debt Documents; (k) the Merger and Purchase Agreement; (l) the Backstop Agreement; (m) the Tax Matters Agreement; (n) the Transition Services Agreement; (o) the Reorganized TCEH Shareholders' Agreement; (p) the New EFH Shareholders' Agreement; (q) the Equity Commitment Letter; (r) the Separation Agreement; and (s) the material terms and conditions of the Tax Receivable Agreement (if any).  Any reference to the Plan Supplement in the Plan shall include each of the documents identified above as (a) through (r), as applicable.  Other than with respect to the assumption and assignment of the Employment Agreements as set forth herein, the documents that comprise the Plan Supplement shall be:  (x) subject to any consent or consultation rights provided hereunder and thereunder, including as provided in the definitions of the relevant documents; (y) in form and substance reasonably acceptable to the Plan Sponsors (subject to the terms of the Plan Support Agreement), the TCEH Supporting First Lien Creditors, and the DIP Agents; and (z) subject to the consent or consultation rights provided in the Plan Support Agreement through the Plan Support Termination Date, including any such rights provided to the TCEH Supporting Second Lien Creditors and the TCEH Committee.  The Debtors, subject to any consent or consultation rights provided hereunder, thereunder, and under the Plan Support Agreement through the Plan Support Termination Date, shall have the right to amend the documents contained in the Plan Supplement through and including the Effective Date in accordance with Article IX of the Plan and the applicable document.

248.    "*Plan Support Agreement*" means that certain Plan Support Agreement, dated as of August 9, 2015, by and among the Debtors, the Plan Sponsors, the TCEH Supporting First Lien Creditors, the TCEH Supporting Second Lien Creditors, the TCEH Committee, and certain other Entities, as may be amended, supplemented, or otherwise modified from time to time in accordance therewith, including all exhibits and schedules attached thereto.

249.    "*Plan Support Termination Date*" means the "Plan Support Termination Date" as defined in the Plan Support Agreement.

250.    "*Postpetition Interest Reserve*" means a reserve in the amount of the difference between interest accrued on EFIH Unsecured Note Claims, EFH Legacy Note Claims, EFH LBO Note Claims, and EFH Unexchanged Note Claims from the Petition Date through the Effective Date at the Federal Judgment Rate, and interest accrued on such Claims from the Petition Date through the Effective Date at the applicable non-default contract rate, or such other amount ordered by the Bankruptcy Court.

251.    "*Preferred Stock Entity*" means, under the Preferred Stock Sale, the new Entity in addition to Reorganized TCEH formed prior to the Reorganized TCEH Conversion and treated as a U.S. corporation for federal tax purposes.

252.    "*Preferred Stock Sale*" means, as part of the Spin-Off:  (a) following the Contribution but before the Reorganized TCEH Conversion, the formation of the Preferred Stock Entity by TCEH and the contribution by Reorganized TCEH of the equity in the Contributed TCEH Debtors (or, potentially, certain assets or joint interests in certain assets as agreed upon by EFH Corp., the Plan Sponsors, and the TCEH Supporting First Lien Creditors, in accordance with the Plan Support Agreement, as applicable, to the Preferred Stock Entity (such contribution to

Error! Unknown document property name.

the Preferred Stock Entity of such equity and, potentially such assets, in an amount that is expected to result in the Basis Step-Up) in exchange for the Preferred Stock Entity's (i) common stock and (ii) the Reorganized TCEH Sub Preferred Stock; (b) immediately thereafter, and pursuant to a prearranged and binding agreement, the sale by Reorganized TCEH of all of the Reorganized TCEH Sub Preferred Stock to one or more third party investors in exchange for Cash; *provided, however*, that Holders of TCEH First Lien Claims shall not be permitted to purchase the Reorganized TCEH Sub Preferred Stock; and (c) Reorganized TCEH shall distribute such Cash to TCEH to fund recoveries under the Plan.

253.    *"Priority Tax Claim"* means the Claims of Governmental Units of the type specified in section 507(a)(8) of the Bankruptcy Code.

254.    *"Private Letter Ruling"* means a private letter ruling issued by the IRS addressing the qualification of the Contribution, the Reorganized TCEH Conversion, and the Distribution as a "reorganization" within the meaning of Sections 368(a)(1)(G), 355 and 356 of the Internal Revenue Code and certain other matters.

255.    *"Private Rights Offering"* means the "Private Rights Offering" as defined in the Backstop Agreement.

256.    *"Pro Rata"* means the proportion that the amount of an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of the Allowed Claims or Allowed Interests in that Class, or the proportion of the Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Claim or Interest under the Plan.

257.    *"Professional"* means an Entity, excluding those Entities entitled to compensation pursuant to the Ordinary Course Professional Order:   (a) retained   pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code; *provided, however*, that professionals employed by the DIP Agents shall not be "Professionals" for the purposes of the Plan.

258.    *"Professional Fee Claims"* means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or any other order of the Bankruptcy Court.   To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

259.    *"Professional Fee Escrow Account"* means an interest-bearing account in an amount equal to the Professional Fee Reserve Amount and funded by the Debtors on the Effective Date, pursuant to Article II.A.2(b) of the Plan.

260.    *"Professional Fee Reserve Amount"* means the total amount of Professional Fee Claims estimated in accordance with Article II.A.2(c) of the Plan.

261.    *"Proof of Claim"* means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

262.    *"Proof of Interest"* means a proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

263.    *"PUC"* means the Public Utility Commission of Texas.

264.    *"Reinstate,"* *"Reinstated,"* or *"Reinstatement"* means with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

Error! Unknown document property name.

265. *"REIT"* means a "real estate investment trust," as defined in section 856 of the Internal Revenue Code.

266. *"REIT Reorganization"* means the transactions and commercial arrangements necessary to implement a REIT structure for New EFH.

267. *"Rejected Executory Contract and Unexpired Lease List"* means the list, as determined by the Debtors or the Reorganized Debtors, as applicable, of Executory Contracts and Unexpired Leases that will be rejected by the Reorganized Debtors pursuant to the Plan, which shall be included in the Plan Supplement.

268. *"Released Parties"* means collectively, and in each case in its capacity as such: (a) the Plan Sponsors; (b) OV2; (c) Holders of TCEH First Lien Claims; (d) Holders of TCEH Second Lien Note Claims; (e) Holders of TCEH Unsecured Note Claims; (f) Holders of EFH Legacy Note Claims; (g) Holders of EFH Unexchanged Note Claims; (h) Holders of EFH LBO Note Primary Claims; (i) Holders of EFIH First Lien Note Claims; (j) Holders of EFIH Second Lien Note Claims; (k) Holders of EFIH Unsecured Note Claims; (l) Holders of EFH LBO Note Guaranty Claims; (m) the DIP Lenders; (n) the TCEH First Lien Agent; (o) the Indenture Trustees; (p) the Dealer Managers; (q) TEF; (r) Texas Holdings; (s) Oncor; (t) funds and accounts managed or advised by Kohlberg Kravis Roberts & Co., L.P., TPG Capital, L.P. or Goldman, Sachs & Co. that hold direct or indirect interests in Texas Holdings, TEF, or EFH Corp.; (u) the TCEH Committee; (v) Holders of General Unsecured Claims Against the TCEH Debtors Other Than EFCH; (w) Holders of General Unsecured Claims Against EFCH; (x) Holders of General Unsecured Claims Against the EFIH Debtors; (y) Holders of General Unsecured Claims Against EFH Corp.; (z) Holders of General Unsecured Claims Against the EFH Debtors Other Than EFH Corp.; (aa) any arrangers and lenders under the New Reorganized EFIH Debt; (bb) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (a) through (aa), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and; and (cc) the DTC; *provided, however,* that any Holder of a Claim or Interest that opts out of the releases contained in the Plan shall not be a "Released Party."

269. *"Releasing Parties"* means collectively, and in each case in its capacity as such: (a) the Plan Sponsors; (b) OV2; (c) Holders of TCEH First Lien Claims; (d) Holders of TCEH Second Lien Note Claims; (e) Holders of TCEH Unsecured Note Claims; (f) Holders of EFH Legacy Note Claims; (g) Holders of EFH Unexchanged Note Claims; (h) Holders of EFH LBO Note Primary Claims; (i) Holders of EFIH First Lien Note Claims; (j) Holders of EFIH Second Lien Note Claims; (k) Holders of EFIH Unsecured Note Claims; (l) Holders of EFH LBO Note Guaranty Claims; (m) the DIP Lenders; (n) the TCEH First Lien Agent; (o) the Indenture Trustees; (p) the Dealer Managers; (q) TEF; (r) Texas Holdings; (s) Oncor; (t) funds and accounts managed or advised by Kohlberg Kravis Roberts & Co., L.P., TPG Capital, L.P. or Goldman, Sachs & Co. that hold direct or indirect interests in Texas Holdings, TEF, or EFH Corp.; (u) the TCEH Committee; (v) Holders of General Unsecured Claims Against the TCEH Debtors Other Than EFCH; (w) Holders of General Unsecured Claims Against EFCH; (x) General Unsecured Claims Against the EFIH Debtors; (y) Holders of General Unsecured Claims Against EFH Corp.; (z) Holders of General Unsecured Claims Against the EFH Debtors Other Than EFH Corp.; (aa) all Holders of Claims and Interests that are deemed to accept the Plan; (bb) all Holders of Claims and Interests who vote to accept the Plan; (cc) all Holders in voting Classes who abstain from voting on the Plan and who do not opt out of the releases provided by the Plan; (dd) any arrangers and lenders under the New Reorganized EFIH Debt; (ee) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (a) through (dd), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (ff) all Holders of Claims and Interests, solely with respect to releases of all Holders of Interests in EFH Corp. and their current and former Affiliates, and such Entities' and their Affiliates' current and former equity holders (regardless of whether such interests are held directly or

24

indirectly), predecessors, successors, and assigns, subsidiaries, and their current and former officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

270.    *"Reorganized"* means, as to any Debtor or Debtors, such Debtor(s) as reorganized pursuant to and under the Plan or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

271.    *"Reorganized Debtor Management Incentive Plan"* means the management incentive plan to be implemented with respect to Reorganized TCEH on the Effective Date, the terms of which shall be consistent with the Plan Support Agreement, in form and substance acceptable to Reorganized TCEH and the TCEH Supporting First Lien Creditors, and substantially in the form to be included in the Plan Supplement.

272.    *"Reorganized Debtors"* means collectively, and each in its capacity as such, the Debtors, as reorganized pursuant to and under the Plan or any successor thereto, by merger, consolidation, or otherwise, including New EFH, on or after the Effective Date.

273.    *"Reorganized EFH"* means EFH Corp. on and after the Effective Date, or any successor thereto, including New EFH, by merger, consolidation, or otherwise, unless otherwise indicated in the Plan.

274.    *"Reorganized EFH Common Stock"* means the new shares of common stock in Reorganized EFH to be issued and distributed under and in accordance with the Plan.

275.    *"Reorganized EFH Debtors"* means the EFH Debtors, other than the EFH Shared Services Debtors, as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, including, New EFH, on or after the Effective Date.

276.    *"Reorganized EFH Shared Services Debtors"* means the EFH Shared Services Debtors as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

277.    *"Reorganized EFIH"* means EFIH, or any successor thereto, by merger, consolidation, or otherwise, on and after the Effective Date.

278.    *"Reorganized EFIH Debtors"* means the EFIH Debtors as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

279.    *"Reorganized EFIH Interim Financing Facility"* means a senior unsecured bridge loan facility to be entered into by Reorganized EFIH [and New EFH] on the Effective Date in an aggregate principal amount of up to $[400] million.

280.    *"Reorganized EFIH Membership Interests"* means the new membership interests in Reorganized EFIH to be issued on the Effective Date.

281.    *"Reorganized EFIH Permanent Financing Facility"* means a senior secured term loan facility (or any debt or equity securities (including securities convertible or exchangeable into or exercisable for equity securities, other equity-linked securities or hybrid debt-equity securities or similar transaction), other than equity securities issued pursuant to the Plan and the Equity Investment, of New EFH or Reorganized EFIH) to be entered into by Reorganized EFIH or New EFH on the Effective Date in an aggregate principal amount of up to $5,500 million.

282.    *"Reorganized TCEH"* means the new Entity pursuant to which certain assets and liabilities will be transferred as part of the Contribution and the stock of which will be distributed as part of the Distribution, it being understood that Reorganized TCEH will undertake the Reorganized TCEH Conversion on the Effective Date.

Error! Unknown document property name.

283.    "*Reorganized TCEH Board*" means the board of directors or managers of Reorganized TCEH on and after the Effective Date to be appointed by the TCEH Supporting First Lien Creditors in consultation with TCEH.

284.    "*Reorganized TCEH Common Stock*" means the 450,000,000 shares of common stock in Reorganized TCEH to be issued and distributed in accordance with the Plan.

285.    "*Reorganized TCEH Conversion*" means, as part of the Spin-Off, the conversion of Reorganized TCEH from a Delaware limited liability company into a Delaware corporation on the Effective Date, immediately following the Contribution and immediately prior to the Distribution.

286.    "*Reorganized TCEH Registration Rights Agreement*" means the registration rights agreement that shall provide registration rights to certain Holders of Reorganized TCEH Common Stock, the material terms of which shall be included in the Plan Supplement.

287.    "*Reorganized TCEH Shareholders' Agreement*" means the one or more shareholders' agreements, if any, that will govern certain matters related to the governance of Reorganized TCEH, which shall be included in the Plan Supplement.

288.    "*Reorganized TCEH Sub Preferred Stock*" means the new contingent-voting preferred stock of the Preferred Stock Entity pursuant to the Preferred Stock Sale.

289.    "*Repurchased PCRBs*" means the PCRBs repurchased by TCEH and held in a custody account.

290.    "*Required Opinions*" shall include the following opinions of nationally recognized tax counsel, in substance reasonably acceptable to the Plan Sponsors and the TCEH Supporting First Lien Creditors, at a "should" level:

    (a)    The Contribution, Reorganized TCEH Conversion, and Distribution meet the requirements of Sections 368(a)(1)(G), 355, and 356 of the Internal Revenue Code.

    (b)    EFH[2] should not recognize gain for U.S. federal income tax purposes as a result of the Contribution or the Reorganized TCEH Conversion other than gain recognized pursuant to the transfer of assets to the Preferred Stock Entity and the Preferred Stock Sale.

    (c)    EFH should recognize no gain or loss for U.S. federal income tax purposes upon the Distribution.

291.    "*Required Rulings*" means, collectively, the following rulings by the IRS:

    (a)    The Reorganized TCEH Spin-Off[3] will satisfy the continuity of business enterprise requirement set forth in Treasury Regulations Section 1.368-1(d).

    (b)    The TCEH First Lien Creditors will be treated as holding a proprietary interest in EFH prior to the Reorganization pursuant to Treasury Regulations Section 1.368-1(e), and the continuity of interest requirement of Treasury Regulations Section 1.368-1(e) will

---

[2]    Capitalized terms in this definition that are not defined herein shall have the meanings given such terms in the request submitted to the IRS for the Private Letter Ruling and all other IRS Submissions; *provided, however,* that nothing herein shall require the public disclosure of the IRS Submissions.

[3]    Capitalized terms in this definition that are not defined herein shall have the meanings given such terms in the request submitted to the IRS for the Private Letter Ruling and all other IRS Submissions; *provided, however,* that nothing herein shall require the public disclosure of the IRS Submissions.

Error! Unknown document property name.

be satisfied with respect to the Reorganization.

(c)     The TCEH First Lien Debt will not be treated as assumed by Spinco for purposes of Section 357(c) and (d).

(d)     The TCEH First Lien Debt that is classified as term loans (excluding any term loans issued in 2013) or notes constitutes "securities" of EFH for purposes of Section 355 and Section 368(a)(1)(G).

(e)     Each of the EFH SAG and the Spinco SAG will be engaged in the active conduct of a trade or business (within the meaning of Section 355(b)) immediately after the Reorganized TCEH Spin-Off.

(f)     The Reorganization will satisfy the continuity of business enterprise requirement set forth in Treasury Regulations Section 1.355-1(b).

(g)     The TCEH First Lien Creditors, the unsecured TCEH creditors, the unsecured EFH Creditors and the unsecured EFIH Creditors, to the extent such creditors receive Common Stock in the Issuance, will be treated as "owners of the enterprise" with respect to EFH for purposes of Treasury Regulations Section 1.355-2(c)(1), and the continuity of interest requirement of Treasury Regulations Section 1.355-2(c)(1) will be satisfied, notwithstanding the Merger and the REIT Reorganization.

(h)     (i) persons receiving Reorganized EFH Common Stock pursuant to the Plan will not be aggregated for purposes of applying Section 355(d) to the Reorganized TCEH Spin-Off; and (ii) persons acquiring Parent Common Shares pursuant to or in connection with the Rights Offering, the Equity Commitment Letter, and the Backstop Agreement will not be considered for purposes of applying Section 355(d) to the Reorganized TCEH Spin-Off, provided, however, that with respect to clause (ii) of the foregoing, the ruling may alternatively provide that (1) the anti- avoidance rule does not apply with respect to the Merger or (2) persons acquiring Parent Common Shares pursuant to or in connection with the Rights Offering, the Equity Commitment Letter, and the Backstop Agreement will not be treated as acquiring Reorganized EFH Common Stock by "purchase" within the meaning of Section 355(d).

(i)     Section 355(e) will not apply to (a) the Reorganized TCEH Spin-Off or any post-Distribution transfers of EFH stock or Spinco stock; (b) the issuance of Reorganized EFH stock; (c) the Merger and other steps contemplated by the Plan of Reorganization; or (d) any subsequent registration of the OV1 stock pursuant to registration rights granted to the holders thereof.

(j)     Section 355(g) will not apply to the Reorganized TCEH Spin-Off.

(k)     (i) EFH Corp. will be respected as the seller of the Preferred Stock Entity's preferred stock for U.S. federal income tax purposes; (ii) for U.S. federal income tax purposes, (x) upon Reorganized TCEH's conversion to a corporation under Delaware law, EFH Corp. will be treated as contributing both the common stock of the Preferred Stock Entity and the other assets subject to the Contribution (other than the assets transferred to the Preferred Stock Entity) to Reorganized TCEH in exchange for all of Reorganized TCEH's stock, and such contribution will be treated as occurring immediately after EFH Corp.'s sale of the Preferred Stock Entity's preferred stock, and (y) upon the Distribution, EFH Corp. will be treated as distributing the stock of Reorganized TCEH to the TCEH First Lien Creditors, and such distribution will be treated as occurring immediately after EFH Corp.'s contribution to Reorganized TCEH; and (iii) EFH Corp.'s pre-arranged sale of the Preferred Stock Entity's preferred stock will be taken

27

Error! Unknown document property name.

into account for purposes of the "control immediately after" test under Section 351 of the Internal Revenue Code.

(l) EFH's earnings and profits will be allocated between EFH and Spinco pursuant to Treasury Regulations Section 1.312-10(a) in proportion to the relative fair market values of the business or businesses (and interests in any other properties) retained by EFH and the business or businesses (and interests in any other properties) of Spinco immediately after the Distribution. For purposes of determining their relative fair market values and shares of earnings and profits, the value of Spinco and EFH shall be determined immediately following the Distribution, without regard to any new capital contributed to EFH, but taking into account the value of EFH stock provided to creditors with respect to their claims. For purposes of this determination, the amount of EFH's earnings and profits to be allocated shall include any cancelation of indebtedness income resulting from the satisfaction or cancelation of all Claims against the TCEH Debtors.

(m) Oncor's electrical transmission and distribution system(s) and related regulatory assets (the "System") (exclusive of certain System assets not to comprise more than 12.5% of the total value of the System) is a real estate asset within the meaning of sections 856(c)(4)(A) and (c)(5)(B).

(n) Neither EFH's and Oncor's activities with respect to the System nor the Transactions will cause amounts received under the lease of the System to be treated as other than "rents from real property" under Section 856.

292. "*Restructuring Transactions*" means those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors, the Plan Sponsors and the TCEH Supporting First Lien Creditors reasonably determine to be necessary or desirable to implement the Plan, including the Equity Investment, the transactions described in the Backstop Agreement, the Merger, the incurrence of the New Reorganized EFIH Debt, the Minority Buy-Out, the REIT Reorganization, the Rights Offering, the Spin-Off, and the issuance of Reorganized EFH Common Stock.

293. "*Rights*" means the non-certificated rights that will enable the Holder thereof to purchase shares of New EFH Common Stock at a purchase price of $[___] per share.

294. "*Rights Offering*" means the offering of Rights and shares of New EFH Common Stock that may be purchased upon the exercise thereof to the Rights Offering Participants conducted pursuant to the Rights Offering Procedures and, excluding the Private Rights Offering, registered pursuant to the Rights Registration Statement.

295. "*Rights Offering Allowed Claims*" means Allowed TCEH First Lien Secured Claims, Allowed TCEH Second Lien Note Claims, Allowed TCEH Unsecured Note Claims, Allowed PCRB Claims, and Allowed General Unsecured Claims Against the TCEH Debtors Other Than EFCH; *provided, however*, that the number of Rights offered to Holders of Allowed TCEH Second Lien Note Claims, Allowed TCEH Unsecured Note Claims, and Allowed General Unsecured Claims Against the TCEH Debtors Other Than EFCH, respectively, will be calculated taking into account the waiver or deemed waiver by Holders of Allowed TCEH First Lien Deficiency Claims for the benefit of Holders of Allowed TCEH Second Lien Note Claims, Allowed TCEH Unsecured Note Claims, and Allowed General Unsecured Claims Against the TCEH Debtors Other Than EFCH, as described in Article IV.B.16 hereof; *provided further, however*, that any General Unsecured Claim Against TCEH Debtors Other Than EFCH that has been temporarily allowed for voting purposes pursuant to and in accordance with the Disclosure Statement Order shall constitute a Rights Offering Allowed Claim in the same amount solely for purposes of participation in the Rights Offering, and not for purposes of allowance and distribution.

296. "*Rights Offering Participants*" means Holders of Rights Offering Allowed Claims who are entitled to receive Rights pursuant to the Rights Offering.

Error! Unknown document property name.

297.    *"Rights Offering Procedures"* means the procedures with respect to the Rights Offering approved under the Rights Offering Procedures Order.

298.    *"Rights Offering Procedures Order"* means the order entered by the Bankruptcy Court approving the Rights Offering Procedures [D.I. ___].

299.    *"Rights Offering Proceeds"* means the proceeds, if any, of the Rights Offering.

300.    *"Rights Offering Record Date"* means the date following the Confirmation Date, as determined by New EFH, as of which an Entity must be a record Holder of Rights Offering Allowed Claims in order to be eligible to be a Rights Offering Participant.

301.    *"Rights Registration Effective Date"* means the date and time as of which the Rights Registration Statement, or the most recent post-effective amendment thereto, is declared effective by the SEC.

302.    *"Rights Registration Statement"* means the Registration Statement to be filed with the SEC registering the offering and issuance of the Rights and the New EFH Common Stock to be issued upon the exercise of such Rights, but excluding the Private Rights Offering.

303.    *"Rural Utilities Service"* means the agency of the United States Department of Agriculture tasked with providing public utilities to rural areas in the United States through public-private partnerships.

304.    *"Schedules"* means the schedules of assets and liabilities, schedules of Executory Contracts or Unexpired Leases, and statement of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules.

305.    *"SEC"* means the Securities and Exchange Commission.

306.    *"Secured"* means when referring to a Claim: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan or separate order of the Bankruptcy Court as a secured claim.

307.    *"Securities Act"* means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder.

308.    *"Security"* or *"Securities"* has the meaning set forth in section 2(a)(1) of the Securities Act.

309.    *"Separation Agreement"* means an agreement to effectuate the Spin-Off among TCEH, Reorganized TCEH, EFH Corp. and Reorganized EFH, in form and substance reasonably acceptable to the parties thereto, the Plan Sponsors, and the TCEH Supporting First Lien Creditors, which shall be included in the Plan Supplement.

310.    *"Settlement"* means the compromise and settlement by and among the parties to the Settlement Agreement, including the Debtors and their respective Estates, of (i) all Non-EFH Debtor Intercompany Claims, Non-EFIH Debtor Intercompany Claims, Non-TCEH Debtor Intercompany Claims, and the TCEH Settlement Claim, other than ordinary course Debtor Intercompany Claims incurred pursuant to, and in accordance with, Paragraph 10 of the Cash Management Order (ii) claims and Causes of Action against Holders of TCEH First Lien Claims and the TCEH First Lien Agent, (iii) claims and Causes of Action against the Holders of EFH Interests and certain related Entities, and (iv) claims and Causes of Action against any of the Debtors' directors, managers, officers, and other related Entities, as set forth in the Settlement Agreement.

29

311.    "*Settlement Agreement*" means that certain Settlement Agreement by and among the Debtors and certain Holders of Claims and Interests, as approved in the Settlement Order.

312.    "*Settlement Order*" means the *Order Approving the Settlement and Authorizing the Debtors to Enter Into the Settlement Agreement Pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019* [D.I. ____].

313.    "*Shared Services*" means those shared services provided to EFH Corp. and its direct and indirect subsidiaries, including by or through EFH Corporate Services and/or pursuant to any service-level agreement or shared services agreements.

314.    "*Spin-Off*" means the transactions required to achieve and preserve the Intended Tax Treatment, including the Contribution, the Reorganized TCEH Conversion, and the Distribution.

315.    "*Standing Motions*" means, collectively:  (a) the TCEH Committee Standing Motion; (b) the TCEH Unsecured Group Standing Motion; and (c) the EFH/EFIH Committee Standing Motion.

316.    "*Tax and Interest Makewhole Agreements*" means, collectively:  (a) that certain Tax Make-Whole Agreement, dated as of January 1, 2002, by and among Oncor Electric and TXU Generation Company LP; (b) that certain Interest Make-Whole Agreement, dated as of January 1, 2002, by and among Oncor Electric and TXU Generation Company LP; and (c) that certain Interest Make Whole Agreement, dated as of January 1, 2004, by and among TXU Electric Delivery Company and TXU Generation Company LP.

317.    "*Tax Matters Agreement*" means the tax matters agreement to be entered into on the Effective Date by and among EFH Corp., Reorganized TCEH, and EFIH, effective upon the Distribution, which shall govern the rights and obligations of each party with respect to certain tax matters, in substantially the form attached as Exhibit F to the Plan Support Agreement, which shall be included in the Plan Supplement.

318.    "*Tax Receivable Agreement*" means the tax receivable agreement or similar arrangement, if any, under which Reorganized TCEH shall agree to make payments in respect of its (or its subsidiaries') specified tax items, to be entered into on the Effective Date before the Distribution by Reorganized TCEH, the material terms and conditions of which shall be (i) in form and substance acceptable to the TCEH Supporting First Lien Creditors, subject to the consent of the Debtors, New EFH and OV2 (such consent not to be unreasonably withheld, delayed or conditioned) and (ii) included in the Plan Supplement.

319.    "*Tax Sharing Agreements*" means, collectively:  (a) the Competitive Tax Sharing Agreement; (b) any formal or informal, written or unwritten tax sharing agreement among substantially the same parties that are parties to the Competitive Tax Sharing Agreement; and (c) the Oncor Tax Sharing Agreement.

320.    "*TCEH*" means Texas Competitive Electric Holdings Company LLC, a Delaware limited liability company.

321.    "*TCEH 2012 Incremental Term Loans*" means the TCEH First Lien Claims deemed to have been incurred pursuant to Section 1 of the Incremental Amendment Agreement.

322.    "*TCEH 2015 Note Indenture*" means that certain Indenture, as amended or supplemented from time to time, for the TCEH 2015 Notes, dated as of October 31, 2007, by and among TCEH and TCEH Finance, Inc., as the issuers; EFCH and certain TCEH subsidiaries as guarantors; and the TCEH Unsecured Notes Trustee.

323.    "*TCEH 2015 Notes*" means the 10.25% fixed senior notes due November 1, 2015, issued by TCEH and TCEH Finance pursuant to the TCEH 2015 Note Indenture.

324.    "*TCEH Committee*" means the statutory committee of unsecured creditors of the TCEH Debtors and EFH Corporate Services appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on May 13, 2014, the membership of which may be reconstituted from time to time.

Error! Unknown document property name.

325.     "*TCEH Committee Litigation Letters*" means those certain letters, dated as of March 31, 2015 and April 30, 2015, from the TCEH Committee to the Debtors identifying alleged Claims and Causes of Action that the TCEH Committee may seek standing to pursue.

326.     "*TCEH Committee Standing Motion*" means the *Motion of Official Committee of TCEH Unsecured Creditors for Entry of an Order Granting Exclusive Standing and Authority to Commence, Prosecute, and Settle Certain Claims for Declaratory Judgment, Avoidance and Recovery of Liens, Security Interests, Obligations, Fees, and Interest Payments, and Disallowance of Claims* [D.I. 3593].

327.     "*TCEH Credit Agreement*" means the Credit Agreement, dated as of October 10, 2007, as amended, by and among TCEH, as borrower, EFCH and certain TCEH subsidiaries, as guarantors, the lending institutions party from time to time thereto, the TCEH First Lien Agent, and the other parties thereto.

328.     "*TCEH Credit Agreement Claim*" means any Claims derived from or based upon the TCEH Credit Agreement, including the term loan, revolver, letter of credit, and commodity collateral posting facilities, and guaranty Claims with respect to EFCH.

329.     "*TCEH Credit Amendment*" means that certain Amendment No. 2 to the TCEH Credit Agreement, dated as of April 7, 2011, among TCEH, as borrower, EFCH, the undersigned lenders party to the TCEH Credit Agreement, Citibank, N.A., as administrative and collateral agent, and Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Credit Suisse Securities (USA) LLC, Goldman Sachs Credit Partners L.P., and Morgan Stanley Senior Funding, Inc., as amendment arrangers.

330.     "*TCEH Debtor Intercompany Claim*" means, collectively:  (a) any Claim by a TCEH Debtor against another TCEH Debtor; and (b) any Claim derived from or based upon the Repurchased PCRBs.

331.     "*TCEH Debtors*" means, collectively:  (a) EFCH; (b) TCEH; and (c) TCEH's directly and indirectly owned subsidiaries listed on **Exhibit A** to the Plan.

332.     "*TCEH Deficiency Recipient Claims*" means, collectively: (a) the TCEH Unsecured Note Claims; (b) the TCEH Second Lien Note Claims; and (c) the Allowed General Unsecured Claims Against the TCEH Debtors Other Than EFCH.

333.     "*TCEH Deficiency Recipient*" means a Holder of a TCEH Deficiency Recipient Claim.

334.     "*TCEH DIP Agent*" means Citibank, N.A., or its duly appointed successor, in its capacity as administrative agent and collateral agent for the TCEH DIP Facility.

335.     "*TCEH DIP Claim*" means any Claim derived from or based upon the TCEH DIP Credit Agreement or the TCEH Final DIP Order, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges.

336.     "*TCEH DIP Collateral*" means the "DIP Collateral," as defined in the TCEH Final DIP Order.

337.     "*TCEH DIP Contingent Obligations*" means the "Contingent Obligations," as defined in the TCEH DIP Credit Agreement, including any and all expense reimbursement obligations of the Debtors that are contingent as of the Effective Date.

338.     "*TCEH DIP Credit Agreement*" means the Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of May 5, 2014, as amended, supplemented, or modified from time to time, among EFCH, TCEH, the banks, financial institutions, and other lenders from time to time party thereto, the TCEH DIP Agent, and the other agents and entities party thereto, collectively with the "DIP Documents," as defined in the TCEH Final DIP Order.

Error! Unknown document property name.

339.    *"TCEH DIP Facility"* means the TCEH Debtors' $4.475 billion debtor-in-possession financing facility, as approved on a final basis pursuant to the TCEH Final DIP Order.

340.    *"TCEH DIP L/C"* means any letter of credit issued under the TCEH DIP Credit Agreement.

341.    *"TCEH DIP L/C Issuer"* means the issuer of a TCEH DIP L/C.

342.    *"TCEH DIP Lenders"* means the TCEH DIP Agent, the TCEH DIP L/C Issuers, and the banks, financial institutions, and other lenders party to the TCEH DIP Credit Agreement from time to time.

343.    *"TCEH DIP Secured Cash Management Banks"* means the "Secured Cash Management Banks," as defined in the TCEH Final DIP Order.

344.    *"TCEH DIP Secured Cash Management Obligations"* means the "Secured Cash Management Obligations," as defined in the TCEH Final DIP Order.

345.    *"TCEH DIP Secured Hedge Banks"* means the "Secured Hedge Banks," as defined in the TCEH Final DIP Order.

346.    *"TCEH DIP Secured Hedge Obligations"* means the "Secured Hedge Obligations," as defined in the TCEH Final DIP Order.

347.    *"TCEH Final DIP Order"* means the *Final Order (A) Approving Postpetition Financing For Texas Competitive Electric Holdings Company LLC And Certain Of Its Debtor Affiliates, (B) Granting Liens And Providing Superpriority Administrative Expense Claims, And (C) Modifying The Automatic Stay* [D.I. 856].

348.    *"TCEH Finance"* means TCEH Finance, Inc., a Delaware corporation.

349.    *"TCEH First Lien Ad Hoc Committee"* means the ad hoc committee of certain unaffiliated Holders of TCEH First Lien Claims that is represented by, *inter alia*, Paul, Weiss, Rifkind, Wharton & Garrison LLP and Millstein & Co., L.P.

350.    *"TCEH First Lien Administrative Agent"* means Wilmington Trust, N.A., solely in its capacity as successor administrative agent to Citibank, N.A. under the TCEH Credit Agreement.

351.    *"TCEH First Lien Agent"* means, collectively, the TCEH First Lien Administrative Agent and the TCEH First Lien Collateral Agent and, where applicable, the former administrative agent, the former swingline lender, each former revolving letter of credit issuer, each former and current deposit letter of credit issuer, and the former collateral agent under the TCEH Credit Agreement.

352.    *"TCEH First Lien Claims"* means, collectively:  (a) the TCEH Credit Agreement Claims; (b) the TCEH First Lien Note Claims; (c) the TCEH First Lien Interest Rate Swap Claims; and (d) the TCEH First Lien Commodity Hedge Claims.

353.    *"TCEH First Lien Collateral Agent"* means Wilmington Trust, N.A., solely in its capacity as successor collateral agent to Citibank, N.A. under the TCEH First Lien Intercreditor Agreement.

354.    *"TCEH First Lien Commodity Hedge Claim"* means any Claim derived from or based upon the TCEH First Lien Commodity Hedges.

355.    *"TCEH First Lien Commodity Hedges"* means the commodity hedges entered into by TCEH and secured by a first lien on the same collateral as the TCEH Credit Agreement Claims and the TCEH First Lien Note Claims.

Error! Unknown document property name.

356.     *"TCEH First Lien Creditor Adequate Protection Payment Allocation Dispute"* means the issue raised by the TCEH First Lien Notes Trustee and/or certain Holders of TCEH First Lien Note Claims that, pursuant to section 510(a) of the Bankruptcy Code or otherwise pursuant to applicable law, the Adequate Protection Payments (as defined in the Cash Collateral Order) under the Cash Collateral Order must be allocated among the Holders of TCEH First Lien Claims pursuant to the Postpetition Interest Allocation Calculation (as defined in the Cash Collateral Order); *provided, however,* that nothing in this definition shall limit any claims or defenses to such issue.

357.     *"TCEH First Lien Creditor Adequate Protection Payment Allocation Order"* means a Final Order resolving with prejudice the TCEH First Lien Creditor Adequate Protection Payment Allocation Dispute.

358.     *"TCEH First Lien Creditor Allocation Disputes"* means, collectively: (a) the TCEH First Lien Creditor Adequate Protection Payment Allocation Dispute; and (b) the TCEH First Lien Creditor Plan Distribution Allocation Dispute.

359.     *"TCEH First Lien Creditor Distributions"* means any and all of the distributions set forth in Article III.B.28(c)(i), (ii), and (v) below.

360.     *"TCEH First Lien Creditor Petition Date Allocated Claim Amounts"* means the Allowed amounts of such Claims as of the Petition Date as set forth in the Plan.

361.     *"TCEH First Lien Creditor Plan Distribution Allocation Dispute"* means the issue raised by the TCEH First Lien Notes Trustee and/or certain Holders of TCEH First Lien Note Claims that, pursuant to section 510(a) of the Bankruptcy Code or otherwise pursuant to applicable law, the TCEH First Lien Creditor Distributions should be allocated among the Holders of TCEH First Lien Claims on a basis other than Pro Rata based upon the Allowed amounts of such Claims as of the Petition Date; *provided, however,* that nothing in this definition shall limit any claims or defenses to such issue.

362.     *"TCEH First Lien Creditor Plan Distribution Allocation Order"* means a Final Order resolving with prejudice the TCEH First Lien Creditor Plan Distribution Allocation Dispute, which allocations may be based on the TCEH First Lien Creditor Petition Date Allocated Claim Amounts, the TCEH First Lien Creditor Postpetition Interest Allocated Claim Amounts, or as otherwise provided in such Final Order.

363.     *"TCEH First Lien Creditor Postpetition Interest Allocated Claim Amounts"* means the Allowed amounts of such Claims plus postpetition interest calculated at the rate set forth in each of the applicable governing contracts from the Petition Date until the Effective Date.

364.     *"TCEH First Lien Deficiency Claim"* means any TCEH First Lien Claim that is not a TCEH First Lien Secured Claim.

365.     *"TCEH First Lien Intercreditor Agreement"* means that certain Amended and Restated Collateral Agency and Intercreditor Agreement, dated as of October 10, 2007, as amended and restated from time to time, by and among TCEH, EFCH, the TCEH First Lien Agent, and the other parties thereto.

366.     *"TCEH First Lien Interest Rate Swap Claim"* means any Claim derived from or based upon the TCEH First Lien Interest Rate Swaps.

367.     *"TCEH First Lien Interest Rate Swaps"* means the interest rate swaps entered into by TCEH and secured by a first lien on the same collateral as the TCEH Credit Agreement Claims and the TCEH First Lien Note Claims.

368.     *"TCEH First Lien Note Indenture"* means that certain Indenture, as amended or supplemented from time to time, dated April 19, 2011, among TCEH and TCEH Finance, as issuers, EFCH and certain of TCEH's subsidiaries, as guarantors, and the TCEH First Lien Notes Trustee.

369.    "*TCEH First Lien Note Claim*" means any Claim derived from or based upon the TCEH First Lien Notes, excluding any Claim derived from or based upon the TCEH First Lien Notes held by EFH Corp.

370.    "*TCEH First Lien Note Intercreditor Action*" means the action captioned *Delaware Trust Company* v. *Wilmington Trust, N.A.* (Index No. 650792/2015), that was originally filed by the TCEH First Lien Notes Trustee in New York State Supreme Court on March 13, 2015, and any successor action, adversary proceeding, contested matter, or other litigation proceeding in which any claim or Cause of Action is asserted that property or assets distributed to Holders of TCEH First Lien Claims should be allocated among such Holders taking into account the accrual of postpetition interest on such claims despite the fact that pursuant to section 502(b) of the Bankruptcy Code interest ceased to accrue against the Debtors on the TCEH First Lien Claims as of the Petition Date; *provided, however,* that nothing in this definition shall limit any claims or defenses to such arguments.

371.    "*TCEH First Lien Notes*" means the 11.50% fixed senior secured notes due October 1, 2020, issued by TCEH and TCEH Finance pursuant to the TCEH First Lien Note Indenture.

372.    "*TCEH First Lien Notes Trustee*" means Delaware Trust Company, as successor trustee to BNY.

373.    "*TCEH First Lien Secured Claim*" means any TCEH First Lien Claim that is Secured.

374.    "*TCEH Intercompany Notes*" means, collectively: (a) that certain intercompany promissory note for principal and interest payments, dated as of October 10, 2007, as amended and restated, by and among EFH Corp., as maker, and TCEH, as payee; (b) that certain intercompany promissory note for SG&A, dated as of October 10, 2007, as amended and restated, by and among EFH Corp., as maker, and TCEH, as payee; and (c) that certain intercompany promissory note, dated as of February 22, 2010, as amended and restated, by and among TCEH, as maker, and EFH Corp., as payee.

375.    "*TCEH L/C*" means any letter of credit issued under the TCEH Credit Agreement.

376.    "*TCEH L/C Issuer*" means the issuer of a TCEH L/C.

377.    "*TCEH Second Lien Consortium*" means that certain Ad Hoc Consortium of Holders of TCEH Second Lien Notes.

378.    "*TCEH Second Lien Intercreditor Agreement*" means that certain Second Lien Intercreditor Agreement, dated as of October 6, 2010, as amended and restated from time to time, by and among TCEH, EFCH, the TCEH First Lien Agent, the TCEH Second Lien Notes Trustee, and the other parties thereto.

379.    "*TCEH Second Lien Note Claim*" means any Claim derived from or based upon the TCEH Second Lien Notes.

380.    "*TCEH Second Lien Note Indenture*" means that certain Indenture, as amended or supplemented from time to time, dated October 6, 2010, by and among TCEH and TCEH Finance, as issuers, EFCH and certain of TCEH's subsidiaries, as guarantors, the TCEH Second Lien Notes Trustee, and the TCEH Second Lien Notes Collateral Agent.

381.    "*TCEH Second Lien Notes*" means the 15.0% fixed senior secured second lien notes and the 15.0% fixed senior secured second lien notes, Series B, due April 1, 2021, issued by TCEH and TCEH Finance pursuant to the TCEH Second Lien Note Indenture.

382.    "*TCEH Second Lien Notes Collateral Agent*" means BNYMTC, as collateral agent.

383.    "*TCEH Second Lien Notes Trustee*" means Wilmington Savings Fund Society, as successor trustee to BNY.

384. *"TCEH Senior Toggle Notes"* means the 10.50%/11.25% senior toggle notes due November 1, 2016, issued by TCEH and TCEH Finance pursuant to the TCEH Senior Toggle Note Indenture.

385. *"TCEH Senior Toggle Note Indenture"* means that certain Indenture, as amended or supplemented from time to time, dated December 6, 2007, by and among TCEH and TCEH Finance, Inc., as issuers, EFCH and certain TCEH subsidiaries, as guarantors, and the TCEH Unsecured Notes Trustee.

386. *"TCEH Settlement Claim"* means the Unsecured Claim of TCEH against EFH Corp., Allowed in the amount of $700 million.

387. *"TCEH Supporting First Lien Creditors"* means those Holders of TCEH First Lien Claims that are members of the TCEH First Lien Ad Hoc Committee that agree to support the Restructuring Transactions pursuant to the Plan Support Agreement (which shall not include the TCEH First Lien Agent); *provided* that where consent, waiver, or approval of the TCEH Supporting First Lien Creditors is required under the Plan, the TCEH Supporting First Lien Creditors shall mean at least five unaffiliated TCEH Supporting First Lien Creditors holding in the aggregate at least 50.1% in aggregate principal amount of TCEH First Lien Claims held by all TCEH Supporting First Lien Creditors.

388. *"TCEH Supporting Second Lien Creditors"* means those Holders of TCEH Second Lien Note Claims that agree to support the Restructuring Transactions pursuant to the Plan Support Agreement; *provided* that where consent, waiver, or approval of the TCEH Supporting Second Lien Creditors is required under the Plan, the TCEH Supporting Second Lien Creditors shall mean at least two unaffiliated TCEH Supporting Second Lien Creditors holding in the aggregate at least 50.1% in aggregate principal amount of TCEH Second Lien Note Claims held by all TCEH Supporting Second Lien Creditors.

389. *"TCEH Supporting Unsecured Creditors"* means those Holders of TCEH Unsecured Note Claims that agree to support the Restructuring Transactions pursuant to the Plan Support Agreement; *provided* that where consent, waiver, or approval of the TCEH Supporting Unsecured Creditors is required under the Plan, the TCEH Supporting Unsecured Creditors shall mean at least three unaffiliated TCEH Supporting Unsecured Creditors holding in the aggregate at least 50.1% in aggregate principal amount of TCEH Unsecured Note Claims held by all TCEH Supporting Unsecured Creditors.

390. *"TCEH Unsecured Ad Hoc Group"* means that certain Ad Hoc Group of TCEH Unsecured Noteholders made up of Holders of TCEH Unsecured Notes.

391. *"TCEH Unsecured Debt Claims"* means, collectively: (a) the TCEH First Lien Deficiency Claims; (b) the TCEH Second Lien Note Claims; (c) the TCEH Unsecured Note Claims; and (d) the PCRB Claims.

392. *"TCEH Unsecured Group Litigation Letter"* means that certain letter, dated as of April 30, 2015, from the TCEH Unsecured Ad Hoc Group to the Debtors identifying Claims and Causes of Action that the TCEH Unsecured Ad Hoc Group may seek standing to pursue.

393. *"TCEH Unsecured Group Standing Motion"* means the *Motion of the Ad Hoc Group of TCEH Unsecured Noteholders for Entry of an Order Granting Standing and Authority to Commence, Prosecute, and Settle Certain Claims for Declaratory Judgment, Avoidance and Recovery of Liens, Security Interests, Obligations, Fees, and Interest Payments, and Disallowance of Claims* [D.I. 3603].

394. *"TCEH Unsecured Note Claim"* means any Claim derived from or based upon the TCEH Unsecured Notes, excluding any Claim derived from or based upon the TCEH Unsecured Notes held by EFH Corp. or EFIH.

395. *"TCEH Unsecured Notes"* means, collectively: (a) the TCEH 2015 Notes; and (b) the TCEH Senior Toggle Notes.

Error! Unknown document property name.

396. *"TCEH Unsecured Notes Trustee"* means Law Debenture Trust Company of New York, as successor trustee to BNY.

397. *"TEF"* means Texas Energy Future Capital Holdings LLC, a Delaware limited liability company and the general partner of Texas Holdings.

398. *"Terminated Restructuring Support Agreement"* means that certain Restructuring Support and Lock-Up Agreement, dated as of April 29, 2014, by and among EFH Corp, EFIH, EFH Corporate Services, EFIH Finance, the TCEH Debtors, and certain Holders of Claims and Interests, including all exhibits and schedules attached thereto, and terminated as of July 24, 2014 [D.I. 1697].

399. *"Tex-La"* means the Tex-La Electric Cooperative of Texas, Inc.

400. *"Tex-La 2019 Obligations"* means the payment obligations of EFCH under the terms of the Tex-La Assumption Agreement with respect to the 9.58% fixed notes due 2019 issued by Tex-La in the outstanding principal amount of $35 million.

401. *"Tex-La 2021 Obligations"* means the payment obligations of EFCH under the terms of the Tex-La Assumption Agreement with respect to the 8.254% fixed notes due 2021 issued by Tex-La in the outstanding principal amount of $37 million.

402. *"Tex-La Assumption Agreement"* means that certain Assumption Agreement, dated February 1, 1990 by and among EFCH, Tex-La, and the U.S. acting through the Administrator of the Rural Utilities Service, whereby EFCH agreed to assume certain outstanding indebtedness of Tex-La that is guaranteed by the Rural Utilities Service.

403. *"Tex-La Guaranty Claim"* means any Claim against EFH Corp. derived from or based upon the Tex-La Obligations.

404. *"Tex-La Obligations"* means, collectively: (a) the Tex-La 2019 Obligations; and (b) the Tex-La 2020 Obligations.

405. *"Texas Holdings"* means Texas Energy Future Holdings Limited Partnership, a Texas limited partnership, which holds substantially all of the outstanding Interests in EFH Corp.

406. *"Transaction Agreements"* means, collectively, (a) the Merger and Purchase Agreement; (b) the Backstop Agreement; (c) the Equity Commitment Letter; (d) the New Reorganized TCEH Debt Documents; (e) the New Reorganized EFIH Debt Documents; (f) the Tax Matters Agreement; (g) the Transition Services Agreement; (h) the Separation Agreement; (i) the Tax Receivable Agreement (if any); and (j) related agreements and commitment letters.

407. *"TRA Rights"* means the rights to receive payments under (and otherwise share in the benefits of) the Tax Receivable Agreement (if any), whether such rights are structured as a separate instrument issued by Reorganized TCEH pursuant to the Tax Receivable Agreement, an equity interest in an entity that is a party to the Tax Receivable Agreement, or otherwise.

408. *"Transition Services Agreement"* means the transition services agreement to be entered into between Reorganized TCEH and Reorganized EFH, in form and substance reasonably acceptable to each of the parties thereto, the Plan Sponsors, and the TCEH Supporting First Lien Creditors, as applicable, addressing the Shared Services and any other transition services reasonably necessary to the continued operation of Reorganized EFIH and/or Reorganized EFH (or EFH Corp., as applicable), which shall be included in the Plan Supplement.

409. *"Unexpired Lease"* means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

Error! Unknown document property name.

410.    *"Unimpaired"* means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

411.    *"U.S."* means the United States of America.

412.    *"U.S. Trustee"* means the Office of the U.S. Trustee for the District of Delaware.

413.    *"Unsecured Claim"* means any Claim that is not a Secured Claim.

B.    *Rules of Interpretation.*

For the purposes of the Plan:

(1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions;

(3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented;

(4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns;

(5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto;

(6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement;

(7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan;

(8) subject to the provisions of any contract, certificate of incorporation, or similar formation document or agreement, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules;

(9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan;

(10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply;

(11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be;

(12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system;

Error! Unknown document property name.

(13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated;

(14) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and

(15) except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided, however,* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the U.S., unless otherwise expressly provided.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests.

A.      *Administrative Claims.*

1.      General Administrative Claims.

Except as specified in this Article II, unless the Holder of an Allowed General Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, agree to less favorable treatment, each Holder of an Allowed General Administrative Claim will receive, in full satisfaction of its General Administrative Claim, Cash equal to the amount of such Allowed General Administrative Claim either: (a) on the Effective Date; (b) if the General Administrative Claim is not Allowed as of the Effective Date, 60 days after the date on which an order allowing such General Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable; or (c) if the Allowed General Administrative Claim is based on a liability incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction or agreement giving rise to such Allowed General Administrative Claim, without any further action by the Holders of such

38

Allowed General Administrative Claim, and without any further notice to or action, order, or approval of the Bankruptcy Court.

Except for Claims of Professionals, requests for payment of General Administrative Claims must be Filed and served on the Debtors or the Reorganized Debtors, as applicable, no later than the Administrative Claims Bar Date applicable to the Debtor against whom the General Administrative Claim is asserted pursuant to the procedures specified in the Confirmation Order and the notice of the Effective Date. Holders of General Administrative Claims that are required to File and serve a request for payment of such General Administrative Claims by the Administrative Claims Bar Date that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such General Administrative Claims against the Debtors, the Reorganized Debtors, or their respective property and such General Administrative Claims shall be deemed forever discharged and released as of the Effective Date. Any requests for payment of General Administrative Claims that are not properly Filed and served by the Administrative Claims Bar Date shall not appear on the Claims Register and shall be disallowed automatically without the need for further action by the Debtors or the Reorganized Debtors or further order of the Bankruptcy Court.

    2.    Professional Compensation.

        (a)    Final Fee Applications.

All final requests for payment of Professional Fee Claims, including the Professional Fee Claims incurred during the period from the Petition Date through the Effective Date, must be Filed and served on the Reorganized Debtors no later than 45 days after the Effective Date. All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Cases, including the Interim Compensation Order, and once approved by the Bankruptcy Court, promptly paid from the Professional Fee Escrow Account up to its full Allowed amount. If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims will be allocated among and paid directly by the Reorganized Debtors in the manner prescribed by Article II.A.2(d) of the Plan.

        (b)    Professional Fee Escrow Account.

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount, the funding of which shall be allocated among the Debtors in the manner prescribed by Article II.A.2(d) of the Plan. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by a Final Order. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors in the manner prescribed by the allocation set forth in Article II.A.2(d) of the Plan, without any further action or order of the Bankruptcy Court.

        (c)    Professional Fee Reserve Amount.

Professionals shall estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date and shall deliver such estimate to the Debtors no later than five days before the Effective Date, *provided, however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total amount estimated pursuant to this section shall comprise the Professional Fee Reserve Amount. The Professional Fee Reserve Amount, as well as the return of any excess funds in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid in full, shall be allocated as among the Debtors in the manner prescribed by Article II.A.2(d) of the Plan.

(d)    Allocation of Professional Fee Claims.

Allowed Direct Professional Fee Claims shall be allocated to, and paid by, the applicable Debtor for whose direct benefit such Professional Fees Claims were incurred.  Allowed Collective Professional Fee Claims shall be allocated to, and paid by, each Debtor in the same proportion that the amount of Allowed Direct Professional Fee Claims incurred by such Professional for such Debtor bears to the total amount of Allowed Direct Professional Fee Claims incurred by such Professional for all of the Debtors.

(e)    Post-Effective Date Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors or Reorganized Debtors shall, in the ordinary course of business and without any further notice or application to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred on or after the Effective Date by (i) the Debtors or Reorganized Debtors, in the manner prescribed by the allocation set forth in Article II.A.2(d) of the Plan, (ii) the TCEH Committee, and (iii) the EFH/EFIH Committee.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

*B.*    *DIP Claims.*

1.    TCEH DIP Claims.

The TCEH DIP Claims shall be Allowed in the full amount due and owing under the TCEH DIP Credit Agreement, including all principal, accrued and accruing postpetition interest, costs, fees, and expenses.  On the Effective Date, except to the extent that a Holder of an Allowed TCEH DIP Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, each Allowed TCEH DIP Claim, each such Holder shall receive payment in full in Cash on the Effective Date; *provided* that:

(a)    in respect of any TCEH DIP L/C that is outstanding on the Effective Date, at the option of Reorganized TCEH, (i) such TCEH DIP L/C shall have been canceled (as evidenced by return of the original TCEH DIP L/C to the applicable TCEH DIP L/C Issuer for cancelation or, if no original was issued, written confirmation from the beneficiary of the TCEH DIP L/C to the TCEH DIP L/C Issuer, via swift or in the form of a release letter, that such outstanding TCEH DIP L/C is no longer in effect), (ii) such TCEH DIP L/C shall have been collateralized in Cash in an amount equal to 101% of the undrawn face amount of such TCEH DIP L/C, pursuant to documentation in form and substance satisfactory to the applicable TCEH DIP L/C Issuer, (iii) a back-to-back letter of credit in an amount equal to 101% of the undrawn face amount of such TCEH DIP L/C shall have been provided to the applicable TCEH DIP L/C Issuer on terms and from a financial institution acceptable to such TCEH DIP L/C Issuer, or (iv) such other treatment shall have been provided with respect to such TCEH DIP L/C as Reorganized TCEH and the applicable TCEH DIP L/C Issuer shall agree;

(b)    in respect of any TCEH DIP Secured Hedge Obligation that is outstanding on the Effective Date, at the option of Reorganized TCEH, (i) such TCEH DIP Secured Hedge Obligation shall be secured by a first priority Lien on the TCEH DIP Collateral on terms and conditions as Reorganized TCEH and the applicable TCEH DIP Secured Hedge Bank shall agree, (ii) such TCEH DIP Secured Hedge Obligation shall be repaid in full in Cash on the Effective Date, or (iii) such other treatment shall have been provided with respect to such TCEH DIP Secured Hedge Obligation as Reorganized TCEH and the applicable TCEH DIP Secured Hedge Bank shall agree; and

(c)    in respect of any TCEH DIP Secured Cash Management Obligation that is outstanding

40

on the Effective Date, at the option of Reorganized TCEH, (i) such TCEH DIP Secured
Cash Management Obligation shall be secured by a first priority Lien on the TCEH
DIP Collateral on terms and conditions as Reorganized TCEH and the applicable
TCEH DIP Secured Cash Management Bank shall agree, (ii) such TCEH DIP Secured
Cash Management Obligation shall be repaid in full in Cash on the Effective Date, or
(iii) such other treatment shall have been provided with respect to such TCEH DIP
Secured Cash Management Obligation as Reorganized TCEH and the applicable
TCEH DIP Secured Cash Management Bank shall agree; and

(d)     the TCEH DIP Contingent Obligations (including any and all expense reimbursement
obligations of the TCEH Debtors that are contingent as of the Effective Date) shall
survive the Effective Date on an unsecured basis, shall be paid by the applicable
Reorganized Debtors as and when due under the TCEH DIP Credit Agreement, and
shall not be discharged or released pursuant to the Plan or the Confirmation Order.

Contemporaneously with all amounts owing in respect of principal included in the TCEH DIP Claims
(other than the TCEH DIP Secured Hedge Obligations, the TCEH DIP Secured Cash Management Obligations, and
the TCEH DIP Contingent Obligations), interest accrued thereon to the date of payment, and fees, expenses, and
non-contingent indemnification obligations then due and payable as required by the TCEH DIP Facility and arising
before the Effective Date being paid in full in Cash (or, in the case of any outstanding TCEH DIP L/C, receiving
treatment in accordance with Article II.B.1.(a) of the Plan): (a) the commitments under the TCEH DIP Facility shall
automatically terminate; (b) except with respect to the TCEH DIP Contingent Obligations, the TCEH DIP Facility
shall be deemed canceled; (c) all mortgages, deeds of trust, Liens, pledges, and other security interests against any
property of the Estates arising out of or related to the TCEH DIP Facility shall automatically terminate and be
released, and all TCEH DIP Collateral subject to such mortgages, deeds of trust, Liens, pledges, and other security
interests shall be automatically released, in each case without further action by the TCEH DIP Lenders; and (d) all
guarantees of the Debtors and Reorganized Debtors arising out of or related to the TCEH DIP Claims shall be
automatically discharged and released, in each case without further action by the TCEH DIP Lenders or any other
Entity.

2.    EFIH First Lien DIP Claims.

The EFIH First Lien DIP Claims shall be Allowed in the full amount due and owing under the EFIH First
Lien DIP Credit Agreement, including all principal, accrued and accruing postpetition interest, costs, fees, and
expenses. On the Effective Date, except to the extent that a Holder of an Allowed EFIH First Lien DIP Claim
agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, each Allowed
EFIH First Lien DIP Claim, each such Holder shall receive payment in full in Cash on the Effective Date; *provided
that:*

(a)     in respect of any EFIH DIP Secured Hedge Obligation that is outstanding on the
Effective Date, at the option of Reorganized EFIH, (i) such EFIH DIP Secured Hedge
Obligation shall be secured by a first priority Lien on the EFIH First Lien DIP
Collateral on terms and conditions as Reorganized EFIH and the applicable EFIH DIP
Secured Hedge Bank shall agree, (ii) such EFIH DIP Secured Hedge Obligation shall
be repaid in full in Cash on the Effective Date, or (iii) such other treatment shall have
been provided with respect to such EFIH DIP Secured Hedge Obligation as
Reorganized EFIH and the applicable EFIH DIP Secured Hedge Bank shall agree;

(b)     in respect of any EFIH DIP Secured Cash Management Obligation that is outstanding
on the Effective Date, at the option of Reorganized EFIH, (i) such EFIH DIP Secured
Cash Management Obligation shall be secured by a first priority Lien on the EFIH First
Lien DIP Collateral on terms and conditions as the Debtors and the applicable EFIH
DIP Secured Cash Management Bank shall agree, (ii) such EFIH DIP Secured Cash
Management Obligation shall be repaid in full in Cash on the Effective Date, or (iii)
such other treatment shall have been provided with respect to such EFIH DIP Secured
Cash Management Obligation as Reorganized EFIH and the applicable EFIH DIP

41

Secured Cash Management Bank shall agree; and

(c)    the EFIH First Lien DIP Contingent Obligations (including any and all expense reimbursement obligations of the EFIH Debtors that are contingent as of the Effective Date) shall survive the Effective Date on an unsecured basis, shall be paid by the applicable Reorganized Debtors as and when due under the EFIH First Lien DIP Credit Agreement, and shall not be discharged or released pursuant to the Plan or the Confirmation Order.

C.    *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

# ARTICLE III.
# CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Classification of Claims and Interests.*

Claims and Interests, except for Administrative Claims, DIP Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied before the Effective Date. The Debtors reserve the right to assert that the treatment provided to Holders of Claims and Interests pursuant to Article III.B of the Plan renders such Holders Unimpaired.

1.    Class Identification for the EFH Debtors.

The Plan constitutes a separate chapter 11 plan of reorganization for each EFH Debtor, each of which shall include the classifications set forth below. Subject to Article III.D of the Plan, to the extent that a Class contains Claims or Interests only with respect to one or more particular EFH Debtors, such Class applies solely to such EFH Debtor.

The following chart represents the classification of Claims and Interests for each EFH Debtor pursuant to the Plan.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class A1 | Other Secured Claims Against the EFH Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class A2 | Other Priority Claims Against the EFH Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class A3 | Legacy General Unsecured Claims Against the EFH Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class A4 | EFH Legacy Note Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class A5 | EFH Unexchanged Note Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class A6 | EFH LBO Note Primary Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class A7 | EFH Swap Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

Error! Unknown document property name.

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class A8 | EFH Non-Qualified Benefit Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class A9 | General Unsecured Claims Against EFH Corp. | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class A10 | General Unsecured Claims Against the EFH Debtors Other Than EFH Corp. | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class A11 | Tex-La Guaranty Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class A12 | EFH Debtor Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class A13 | Non-EFH Debtor Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class A14 | Interests in EFH Debtors Other Than EFH Corp. | Unimpaired/Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class A15 | Interests in EFH Corp. | Impaired | Not Entitled to Vote (Deemed to Reject) |

2.    Class Identification for the EFIH Debtors.

The Plan constitutes a separate chapter 11 plan of reorganization for each EFIH Debtor, each of which shall include the classifications set forth below.  Subject to Article III.D of the Plan, to the extent that a Class contains Claims or Interests only with respect to one or more particular EFIH Debtors, such Class applies solely such EFIH Debtor.

The following chart represents the classification of Claims and Interests for each EFIH Debtor pursuant to the Plan.

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class B1 | Other Secured Claims Against the EFIH Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class B2 | Other Priority Claims Against the EFIH Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class B3 | EFIH First Lien Note Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class B4 | EFIH Second Lien Note Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class B5 | EFH LBO Note Guaranty Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class B6 | General Unsecured Claims Against the EFIH Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class B7 | EFIH Debtor Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class B8 | Non-EFIH Debtor Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class B9 | Interests in EFIH | Impaired | Entitled to Vote |
| Class B10 | Interests in EFIH Finance | Impaired | Not Entitled to Vote (Deemed to Reject) |

3.    Class Identification for the TCEH Debtors.

The Plan constitutes a separate chapter 11 plan of reorganization for each TCEH Debtor, each of which shall include the classifications set forth below.  Subject to Article III.D of the Plan, to the extent that a Class contains Claims or Interests only with respect to one or more particular TCEH Debtors, such Class applies solely to such TCEH Debtor.

The following chart represents the classification of Claims and Interests for each TCEH Debtor pursuant to the Plan.

Error! Unknown document property name.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class C1 | Other Secured Claims Against the TCEH Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class C2 | Other Priority Claims Against the TCEH Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class C3 | TCEH First Lien Secured Claims | Impaired | Entitled to Vote |
| Class C4 | TCEH Unsecured Debt Claims | Impaired | Entitled to Vote |
| Class C5 | General Unsecured Claims Against the TCEH Debtors Other Than EFCH | Impaired | Entitled to Vote |
| Class C6 | General Unsecured Claims Against EFCH | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class C7 | TCEH Debtor Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class C8 | Non-TCEH Debtor Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class C9 | Interests in TCEH Debtors Other Than TCEH and EFCH | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class C10 | Interests in TCEH and EFCH | Impaired | Not Entitled to Vote (Deemed to Reject) |

*B.*        *Treatment of Claims and Interests.*

To the extent a Class contains Allowed Claims or Allowed Interests with respect to any Debtor, the classification of Allowed Claims and Allowed Interests is specified below.

1.        Class A1 - Other Secured Claims Against the EFH Debtors.

(a)        *Classification*: Class A1 consists of Other Secured Claims Against the EFH Debtors.

(b)        *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class A1 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class A1, each such Holder shall receive, at the option of the applicable EFH Debtor(s) with the consent of the Plan Sponsors (such consent not to be unreasonably withheld), either:

(i)        payment in full in Cash;

(ii)        delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

(iii)        Reinstatement of such Claim; or

(iv)        other treatment rendering such Claim Unimpaired.

(c)        *Voting:* Class A1 is Unimpaired under the Plan. Holders of Claims in Class A1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.        Class A2 - Other Priority Claims Against the EFH Debtors.

(a)        *Classification*: Class A2 consists of Other Priority Claims Against the EFH Debtors.

44

Error! Unknown document property name.

(b) *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class A2 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class A2, each such Holder shall receive, at the option of the applicable EFH Debtor(s) with the consent of the Plan Sponsors (such consent not to be unreasonably withheld), either:

(i) payment in full in Cash; or

(ii) other treatment rendering such Claim Unimpaired.

(c) *Voting*: Class A2 is Unimpaired under the Plan. Holders of Claims in Class A2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3. Class A3 - Legacy General Unsecured Claims Against the EFH Debtors.

(a) *Classification*: Class A3 consists of Legacy General Unsecured Claims Against the EFH Debtors.

(b) *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class A3 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class A3, each such Holder shall receive, at the option of the applicable EFH Debtor(s) with the consent of the Plan Sponsors (such consent not to be unreasonably withheld), either:

(i) payment in full in Cash;

(ii) Reinstatement of such Claim; or

(iii) other treatment rendering such Claim Unimpaired.

(c) *Voting:* Class A3 is Unimpaired under the Plan. Holders of Claims in Class A3 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

4. Class A4 - EFH Legacy Note Claims.

(a) *Classification*: Class A4 consists of EFH Legacy Note Claims.

(b) *Allowance*: As Class A4 Claims, the EFH Legacy Note Claims are Allowed in an amount equal to the sum of: (i) the principal amount outstanding, plus accrued but unpaid prepetition interest, under the EFH Legacy Note Indentures; and (ii) accrued postpetition interest at the Federal Judgment Rate, but not including, for the avoidance of doubt, any Makewhole Claims.

Error! Unknown document property name.

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed Claim in Class A4 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class A4, each such Holder shall receive, up to the Allowed amount of its Claim, payment in full in Cash or, with the consent of the Debtors, the Plan Sponsors, and the TCEH Supporting First Lien Creditors, other treatment rendering such Claim Unimpaired.

(d)     *Voting:*  Class A4 is Unimpaired under the Plan.  Holders of Claims in Class A4 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

5.     Class A5 - EFH Unexchanged Note Claims.

(a)     *Classification*:  Class A5 consists of EFH Unexchanged Note Claims.

(b)     *Allowance*:  As Class A5 Claims, the EFH Unexchanged Note Claims are Allowed in an amount equal to the sum of:  (i) the principal amount outstanding, plus accrued but unpaid prepetition interest, under the EFH 2019 Note Indenture and EFH 2020 Note Indenture, as applicable; and (ii) accrued postpetition interest at the Federal Judgment Rate, but not including, for the avoidance of doubt, any Makewhole Claims.

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed Claim in Class A5 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class A5, each such Holder shall receive, up to the Allowed amount of its Claim, payment in full in Cash or other treatment rendering such Claim Unimpaired.

(d)     *Voting:*  Class A5 is Unimpaired under the Plan.  Holders of Claims in Class A5 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

6.     Class A6 - EFH LBO Note Primary Claims.

(a)     *Classification*:  Class A6 consists of EFH LBO Note Primary Claims.

(b)     *Allowance*:  As Class A6 Claims, the EFH LBO Note Primary Claims are Allowed in an amount equal to the sum of:  (i) the principal amount outstanding, plus accrued but unpaid prepetition interest, under the EFH LBO Note Indenture; and (ii) accrued postpetition interest at the Federal Judgment Rate, but not including, for the avoidance of doubt, any Makewhole Claims.

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed Claim in Class A6 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class A6, each such Holder shall receive payment in full in Cash or other treatment rendering such Claim Unimpaired; *provided* that in no event shall a Holder of an Allowed Claim in Class A6 receive more than a single satisfaction of such Allowed Claim, including any recovery received on account of an Allowed Claim in Class B5.

(d)     *Voting:*  Class A6 is Unimpaired under the Plan.  Holders of Claims in Class A6 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

Error! Unknown document property name.

7.    Class A7 - EFH Swap Claims.

    (a)    *Classification*: Class A7 consists of EFH Swap Claims.

    (b)    *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class A7 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class A7, each such Holder shall receive, up to the Allowed amount of its Claim, payment in full in Cash or other treatment rendering such Claim Unimpaired.

    (c)    *Voting:* Class A7 is Unimpaired under the Plan. Holders of Claims in Class A7 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

8.    Class A8 - EFH Non-Qualified Benefit Claims.

    (a)    *Classification*: Class A8 consists of EFH Non-Qualified Benefit Claims.

    (b)    *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class A8 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class A8, each such Holder shall receive, up to the Allowed amount of its Claim, payment in full in Cash or other treatment rendering such Claim Unimpaired.

    (c)    *Voting:* Class A8 is Unimpaired under the Plan. Holders of Claims in Class A8 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

9.    Class A9 - General Unsecured Claims Against EFH Corp.

    (a)    *Classification*: Class A9 consists of General Unsecured Claims Against EFH Corp.

    (b)    *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class A9 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class A9, each such Holder shall receive, up to the Allowed amount of its Claim, payment in full in Cash or other treatment rendering such Claim Unimpaired.

    (c)    *Voting:* Class A9 is Unimpaired under the Plan. Holders of Claims in Class A9 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

10.    Class A10 - General Unsecured Claims Against the EFH Debtors Other Than EFH Corp.

    (a)    *Classification*: Class A10 consists of General Unsecured Claims Against the EFH Debtors Other Than EFH Corp.

    (b)    *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class A10 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class A10, each such Holder shall receive, up to the Allowed amount of its Claim, payment in full in Cash or other treatment rendering such Claim Unimpaired.

Error! Unknown document property name.

    (c)     *Voting:* Class A10 is Unimpaired under the Plan. Holders of Claims in Class A10 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

11.   Class A11 - Tex-La Guaranty Claims.

    (a)     *Classification:* Class A11 consists of the Tex-La Guaranty Claims.

    (b)     *Treatment:* Except to the extent that a Holder of an Allowed Claim in Class A11 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class A11, each such Holder shall receive treatment, up to the Allowed amount of its Claim, on account of such Claims under Class C1 as Allowed Other Secured Claims Against the TCEH Debtors.

    (c)     *Voting:* Class A11 is Unimpaired under the Plan. Holders of Claims in Class A11 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

12.   Class A12 - EFH Debtor Intercompany Claims.

    (a)     *Classification:* Class A12 consists of EFH Debtor Intercompany Claims.

    (b)     *Treatment:* EFH Debtor Intercompany Claims shall be, at the option of the EFH Debtors with the consent of the Plan Sponsors (such consent not to be unreasonably withheld), either:

        (i)    Reinstated; or

        (ii)   canceled and released without any distribution on account of such Claims.

    (c)     *Voting:* Holders of Claims in Class A12 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

13.   Class A13 - Non-EFH Debtor Intercompany Claims.

    (a)     *Classification:* Class A13 consists of Non-EFH Debtor Intercompany Claims.

    (b)     *Treatment:* Non-EFH Debtor Intercompany Claims shall be canceled and released without any distribution on account of such Claims.

    (c)     *Voting:* Class A13 is Impaired under the Plan. Holders of Claims in Class A13 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

14.   Class A14 - Interests in the EFH Debtors Other Than EFH Corp.

    (a)     *Classification:* Class A14 consists of Interests in the EFH Debtors Other Than EFH Corp.

Error! Unknown document property name.

    (b)    *Treatment*: Interests in the EFH Debtors Other Than EFH Corp. shall be, at the option of the EFH Debtors with the consent of the Plan Sponsors (such consent not to be unreasonably withheld), either:

        (i)    Reinstated; or

        (ii)    canceled and released without any distribution on account of such Interests.

    (c)    *Voting*: Holders of Interests in Class A14 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

15.    Class A15 - Interests in EFH Corp.

    (a)    *Classification*: Class A15 consists of Interests in EFH Corp.

    (b)    *Treatment*: Interests in EFH Corp. shall be canceled and released without any distribution on account of such Interests.

    (c)    *Voting*: Class A15 is Impaired under the Plan. Holders of Interests in Class A15 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

16.    Class B1 - Other Secured Claims Against the EFIH Debtors.

    (a)    *Classification*: Class B1 consists of Other Secured Claims Against the EFIH Debtors.

    (b)    *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class B1 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class B1, each such Holder shall receive, at the option of the applicable EFIH Debtor(s) with the consent of the Plan Sponsors (such consent not to be unreasonably withheld), either:

        (i)    payment in full in Cash;

        (ii)    delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

        (iii)    Reinstatement of such Claim; or

        (iv)    other treatment rendering such Claim Unimpaired.

    (c)    *Voting:* Class B1 is Unimpaired under the Plan. Holders of Claims in Class B1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

17.    Class B2 - Other Priority Claims Against the EFIH Debtors.

    (a)    *Classification*: Class B2 consists of Other Priority Claims Against the EFIH Debtors.

    (b)    *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class B2 agrees

Error! Unknown document property name.

to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class B2, each such Holder shall receive, at the option of the applicable EFIH Debtor(s) with the consent of the Plan Sponsors (such consent not to be unreasonably withheld), either:

(i)      payment in full in Cash; or

(ii)     other treatment rendering such Claim Unimpaired.

(c)     *Voting*: Class B2 is Unimpaired under the Plan. Holders of Claims in Class B2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

18.   Class B3 - EFIH First Lien Note Claims.

(a)     *Classification:* Class B3 consists of EFIH First Lien Note Claims, if any.

(b)     *Allowance*: As Class B3 Claims, the EFIH First Lien Note Claims are disallowed in their entirety, unless such Claims are otherwise Allowed in any amount by Final Order.

(c)     *Treatment*: Only if such Claims are Allowed in any amount by Final Order, except to the extent that a Holder of an Allowed Claim in Class B3 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class B3, if any, each such Holder shall receive, up to the amount of its Allowed Claim, either payment in full in Cash or other treatment rendering such Claim Unimpaired.

(d)     *Voting*: Class B3 is Unimpaired under the Plan. Holders of Claims in Class B3 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

19.   Class B4 - EFIH Second Lien Note Claims.

(a)     *Classification*: Class B4 consists of EFIH Second Lien Note Claims.

(b)     *Allowance*: As Class B4 Claims, the EFIH Second Lien Note Claims are Allowed in an amount equal to the sum of: (i) the principal amount outstanding, plus accrued but unpaid prepetition interest, under the EFIH Second Lien Note Indenture; and (ii) accrued but unpaid postpetition interest (including any Additional Interest or interest on interest) on such principal at the non-default contract rate set forth in the EFIH Second Lien Note Indenture through the Effective Date, but not including, for the avoidance of doubt, any Makewhole Claims.

(c)     *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class B4 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class B4, each such Holder shall receive, up to the Allowed amount of its Claim, payment in full in Cash or other treatment rendering such Claim Unimpaired.

(d)     *Voting*: Class B4 is Unimpaired under the Plan. Holders of Claims in Class B4 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject

Error! Unknown document property name.

the Plan.

20. Class B5 - EFH LBO Note Guaranty Claims.

    (a)    *Classification*: Class B5 consists of EFH LBO Note Guaranty Claims.

    (b)    *Allowance*: As Class B5 Claims, the EFH LBO Note Guaranty Claims are Allowed in an amount equal to the sum of: (i) the principal amount outstanding, plus accrued but unpaid prepetition interest, under the EFH LBO Note Indenture; and (ii) accrued postpetition interest at the Federal Judgment Rate, but not including, for the avoidance of doubt, any Makewhole Claims.

    (c)    *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class B5 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class B5, each such Holder shall receive, up to the Allowed amount of its Claim, payment in full in Cash or other treatment rendering such Claim Unimpaired; *provided* that in no event shall a Holder of an Allowed Claim in Class B5 receive more than a single satisfaction of such Allowed Claim, including any recovery received on account of an Allowed Claim in Class A6.

    (d)    *Voting*: Class B5 is Unimpaired under the Plan. Holders of Claims in Class B5 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

21. Class B6 - General Unsecured Claims Against the EFIH Debtors.

    (a)    *Classification*: Class B6 consists of General Unsecured Claims Against the EFIH Debtors.

    (b)    *Allowance*: As Class B6 Claims, the EFIH Unsecured Note Claims are Allowed in an amount equal to the sum of: (i) the principal amount outstanding, plus accrued but unpaid prepetition interest, under the respective indentures; and (ii) accrued postpetition interest at the Federal Judgment Rate, but not including, for the avoidance of doubt, any Makewhole Claims.

    (c)    *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class B6 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class B6, each such Holder shall receive, up to the Allowed amount of its Claim, payment in full in Cash or other treatment rendering such Claim Unimpaired.

    (d)    *Voting*: Class B6 is Unimpaired under the Plan. Holders of Claims in Class B6 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

Error! Unknown document property name.

22.    Class B7 - EFIH Debtor Intercompany Claims.

    (a)    *Classification*:  Class B7 consists of EFIH Debtor Intercompany Claims.

    (b)    *Treatment*:  EFIH Debtor Intercompany Claims shall be, at the option of the EFIH Debtors with the consent of the Plan Sponsors (such consent not to be unreasonably withheld), either:

        (i)    Reinstated; or

        (ii)    canceled and released without any distribution on account of such Claims.

    (c)    *Voting*:  Holders of Claims in Class B7 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

23.    Class B8 - Non-EFIH Debtor Intercompany Claims.

    (a)    *Classification*:  Class B8 consists of Non-EFIH Debtor Intercompany Claims.

    (b)    *Treatment*:  Non-EFIH Debtor Intercompany Claims shall be canceled and released without any distribution on account of such Claims.

    (c)    *Voting*:  Class B8 is Impaired under the Plan.  Holders of Claims in Class B8 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

24.    Class B9 - Interests in EFIH.

    (a)    *Classification*:  Class B9 consists of Interests in EFIH.

    (b)    *Treatment*:  Except to the extent that a Holder of an Allowed Interest in Class B9 agrees to a less favorable treatment of its Allowed Interest, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Interest in Class B9, such Holder shall receive its Pro Rata share of 100% of the Reorganized EFIH Membership Interests, subject to dilution by the Reorganized EFIH Membership Interests issued to OV2 in connection with the Equity Investment.

    (c)    *Voting*:  Class B9 is Impaired under the Plan.  Therefore, Holders of Allowed Interests in Class B9 are entitled to vote to accept or reject the Plan.

25.    Class B10 - Interests in EFIH Finance.

    (a)    *Classification*:  Class B10 consists of Interests in EFIH Finance.

    (b)    *Treatment*:  Interests in EFIH Finance shall be canceled and released without any distribution on account of such Interests.

    (c)    *Voting*:  Class B10 is Impaired under the Plan.  Holders of Interests in Class B10 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

Error! Unknown document property name.

26.    Class C1 - Other Secured Claims Against the TCEH Debtors.

    (a)    *Classification*: Class C1 consists of Other Secured Claims Against the TCEH Debtors.

    (b)    *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class C1 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class C1, each such Holder shall receive, at the option of the applicable TCEH Debtor(s) with the consent of the TCEH Supporting First Lien Creditors (such consent not to be unreasonably withheld), either:

        (i)    payment in full in Cash;

        (ii)    delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

        (iii)    Reinstatement of such Claim; or

        (iv)    other treatment rendering such Claim Unimpaired.

    (c)    *Voting:* Class C1 is Unimpaired under the Plan. Holders of Claims in Class C1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

27.    Class C2 - Other Priority Claims Against the TCEH Debtors.

    (a)    *Classification*: Class C2 consists of Other Priority Claims Against the TCEH Debtors.

    (b)    *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class C2 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class C2, each such Holder shall receive, at the option of the applicable TCEH Debtor(s) with the consent of the TCEH Supporting First Lien Creditors (such consent not to be unreasonably withheld), either:

        (i)    payment in full in Cash; or

        (ii)    other treatment rendering such Claim Unimpaired.

    (c)    *Voting:* Class C2 is Unimpaired under the Plan. Holders of Claims in Class C2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

28.    Class C3 - TCEH First Lien Secured Claims.

    (a)    *Classification*: Class C3 consists of TCEH First Lien Secured Claims.

    (b)    *Allowance*: As Class C3 Claims, (i) the TCEH Credit Agreement Claims are Allowed in the amount of $22,863,271,257; (ii) the TCEH First Lien Note Claims are Allowed in the amount of $1,815,965,278; (iii) the TCEH First Lien Swap Claims are Allowed in the amount of $[___]; (iv) TCEH First Lien Commodity Hedge Claims are Allowed in the amount of $[___]; and (v) any Claims of the TCEH First Lien Administrative Agent, the TCEH First Lien Collateral Agent or the TCEH First Lien Notes Trustee for

Error! Unknown document property name.

fees, expenses, or indemnification obligations arising under and pursuant to the TCEH Credit Agreement, the TCEH First Lien Notes Indenture, the TCEH First Lien Interest Rate Swaps, the TCEH First Lien Commodity Hedges, or the TCEH First Lien Intercreditor Agreement, as applicable, are Allowed in an amount to be determined.

(c)     *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class C3 agrees to a less favorable treatment of its Allowed Claim (in a writing executed by such Holder after the Petition Date), in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class C3, subject to Article III.B.28(d), each such Holder thereof shall receive its Pro Rata share (which, for the avoidance of doubt, shall be based on the Allowed amounts of such Claims as of the Petition Date as set forth in the Plan) of:

(i)     100% of the Reorganized TCEH Common Stock (following the Basis Step-Up), subject to dilution after the Distribution only on account of the Reorganized Debtor Management Incentive Plan;

(ii)     100% of the (a) TCEH Debtors' Cash on hand and (b) net Cash proceeds from the issuance of the New Reorganized TCEH Debt and the Preferred Stock Sale, in each case after funding any Cash distributions required to be made by the TCEH Debtors under the Plan, including payment in full of each Allowed TCEH DIP Claim, and providing for adequate post-Effective Date liquidity for TCEH as determined by the TCEH Debtors with the reasonable consent of the TCEH Supporting First Lien Creditors;

(iii)     the Rights to purchase $700 million in the aggregate of New EFH Common Stock pursuant to the Rights Offering and the New EFH Common Stock purchased pursuant to the exercise of the Rights;

(iv)     the Assigned C5 Rights and the Cash-Out Election Pool Excess Cash; and

(v)     the TRA Rights (if any).

In addition, on the Effective Date the TCEH First Lien Agent will be deemed to have delivered, pursuant to Section 5.01 of the TCEH Second Lien Intercreditor Agreement, any notice necessary to cause the automatic release and discharge of any and all Liens on the assets of the TCEH Debtors that secure the repayment of amounts due in respect of the TCEH Second Lien Notes.

(d)     *Allocation:* Unless resolved before Confirmation, the TCEH First Lien Notes Trustee and/or the Holders of TCEH First Lien Claims will seek, as soon as reasonably practicable after Confirmation, entry of the TCEH First Lien Creditor Plan Distribution Allocation Order resolving the TCEH First Lien Creditor Plan Distribution Allocation Dispute through an adjudication of the TCEH First Lien Note Intercreditor Action or otherwise. If a TCEH First Lien Creditor Plan Distribution Allocation Order is entered prior to the Effective Date and such order provides that Holders of Allowed Class C3 Claims shall receive the TCEH First Lien Creditor Distributions on a basis other than Pro Rata, then pursuant to section 510(a) of the Bankruptcy Code, any such TCEH First Lien Creditor Distribution that is subject to such TCEH First Lien Creditor Plan Distribution Allocation Order shall be distributed among the Holders of Allowed Class C3 Claims in accordance with such TCEH First Lien Creditor Plan Distribution Allocation Order; *provided, however,* that if a TCEH First Lien Creditor Plan Distribution Allocation Order has not been entered by the Effective Date, then the TCEH Debtors shall establish a reserve (in an amount to be determined by the TCEH Debtors, with the consent of each of the TCEH First Lien Agent, the TCEH Supporting First Lien Creditors, the TCEH First Lien Notes Trustee, and any other parties to the

54

TCEH First Lien Note Intercreditor Action) solely with respect to any TCEH First Lien Creditor Distributions that remain subject to the TCEH First Lien Creditor Plan Distribution Allocation Dispute, with such reserved amounts to be distributed on a Pro Rata basis after entry of a TCEH First Lien Creditor Plan Distribution Allocation Order, unless and to the extent such order provides that Holders of Allowed Class C3 Claims are entitled to a distribution of any TCEH First Lien Creditor Distributions on a basis other than Pro Rata, in which case, pursuant to section 510(a) of the Bankruptcy Code, any such TCEH First Lien Creditor Distribution that is subject to such TCEH First Lien Creditor Plan Distribution Allocation Order shall be distributed among the Holders of Allowed Class C3 Claims in accordance with such TCEH First Lien Creditor Plan Distribution Allocation Order. Nothing in this Plan shall preclude any party from seeking enforcement of the TCEH First Lien Creditor Adequate Protection Payment Allocation Order or distribution of the Holdback Amount (as defined in the Cash Collateral Order) under the Cash Collateral Order.

(e)     *Voting*: Class C3 is Impaired under the Plan. Therefore, Holders of Allowed Claims in Class C3 are entitled to vote to accept or reject the Plan.

29.    Class C4 - TCEH Unsecured Debt Claims.

(a)     *Classification*: Class C4 consists of TCEH Unsecured Debt Claims.

(b)     *Allowance*: As Class C4 Claims, (i) the TCEH First Lien Deficiency Claims are Allowed in the amount between $[8.1] billion and $[9.5] billion; *provided, however*, that the amount of the Allowed TCEH First Lien Deficiency Claims in connection with the Plan is without prejudice to the amount of the Allowed TCEH First Lien Deficiency Claims in connection with any Alternative Restructuring; (ii) the TCEH Second Lien Note Claims are Allowed in the amount of $[1,648,597,521]; (iii) the TCEH Unsecured Note Claims are Allowed in the amount of $[___]; and (iv) the PCRB Claims are Allowed in the Amount of $[___].

(c)     *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class C4 agrees to a less favorable treatment of its Allowed Claim, and subject to Article IV.B.16 of the Plan, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class C4, each such Holder shall receive its Pro Rata share of:

(i)      the Rights to purchase $[___] in the aggregate of New EFH Common Stock pursuant to the Rights Offering and on and subject to the occurrence of the Effective Date, the New EFH Common Stock purchased pursuant to the exercise of the Rights; and

(ii)     [___]% of the Reorganized EFH Common Stock, which shall be converted to approximately [___]% of New EFH Common Stock (after accounting for dilution by the Merger and Rights Offering).[4]

---

[4]     Subject to ongoing reconciliation and allowance and disallowance of Class C4 Claims, it is anticipated that Holders of Class C4 Claims will receive approximately 97% of the Rights and Reorganized EFH Common Stock. The Debtors, with the consent of the Plan Sponsors and the TCEH Committee, will determine the appropriate allocation of the Rights and Reorganized EFH Common Stock between Class C4 and Class C5 Claims on or before two (2) days before the hearing to approve the Disclosure Statement.

Error! Unknown document property name.

(d) *Voting:* Class C4 is Impaired under the Plan. Therefore, Holders of Allowed Claims in Class C4 are entitled to vote to accept or reject the Plan.

30. Class C5 - General Unsecured Claims Against the TCEH Debtors Other Than EFCH.

(a) *Classification*: Class C5 consists of General Unsecured Claims Against the TCEH Debtors Other Than EFCH.

(b) *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class C5 agrees to a less favorable treatment of its Allowed Claim, and subject to Article IV.B.16 of the Plan, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class C5, each such Holder shall receive its Pro Rata share of:

(i) the Rights to purchase $[___] in the aggregate of New EFH Common Stock pursuant to the Rights Offering and on and subject to the occurrence of the Effective Date, the New EFH Common Stock purchased pursuant to the exercise of the Rights; and

(ii) [___]% of the Reorganized EFH Common Stock, which shall be converted to approximately [___]% of New EFH Common Stock (after accounting for dilution by the Merger and Rights Offering);

*provided, however,* that in lieu of Rights and Reorganized EFH Common Stock set forth above, each Holder of an Allowed Class C5 Claim may elect to receive Cash in an amount equal to its Pro Rata share (calculated based on the aggregate amount of Allowed Class C5 Claims) of the Cash-Out Election Pool; *provided further, however,* that (x) the Assigned C5 Rights shall be assigned to Class C3 for the benefit of Holders of Allowed TCEH First Lien Secured Claims, and (y) the Assigned C5 Equity shall be further assigned to Reorganized TCEH; *provided further, however,* that if a Holder of an Allowed Class C5 Claim makes the Cash-Out Election, such Holder shall receive only a single recovery on account of its Allowed Class C5 Claim, regardless of whether such Holder's Allowed Class C5 Claim is against more than one TCEH Debtor other than EFCH; *provided further, however,* that to the extent the Cash-Out Election interferes with the preservation of the Intended Tax Treatment, the TCEH Debtors, EFH Corp., the Plan Sponsors, the TCEH Supporting First Lien Creditors, and the TCEH Committee shall reasonably agree to an appropriate modification of the Plan to preserve the Intended Tax Treatment.[5]

(c) *Voting:* Class C5 is Impaired under the Plan. Therefore, Holders of Allowed Claims in Class C5 are entitled to vote to accept or reject the Plan; *provided, however,* that a Holder of an Allowed Class C5 Claim shall not be permitted to exercise the Cash-Out Election unless such Holder votes to accept the Plan and does not opt out of the releases provided in the Plan.

---

[5] Subject to ongoing reconciliation and allowance and disallowance of Class C5 Claims, it is anticipated that Holders of Class C5 Claims will receive approximately 3% of the Rights and Reorganized EFH Common Stock, subject to exercise of the Cash-Out Election. The Debtors, with the consent of the Plan Sponsors and the TCEH Committee, will determine the appropriate allocation of the Rights and Reorganized EFH Common Stock between Class C4 and Class C5 Claims on or before two (2) days before the hearing to approve the Disclosure Statement.

Error! Unknown document property name.

31.   Class C6 - General Unsecured Claims Against EFCH.

   (a)   *Classification*: Class C6 consists of General Unsecured Claims Against EFCH.

   (b)   *Treatment*:  General Unsecured Claims Against EFCH shall be canceled and released without any distribution on account of such Claims.

   (c)   *Voting:*  Class C6 is Impaired under the Plan.  Holders of Claims in Class C6 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

32.   Class C7 - TCEH Debtor Intercompany Claims.

   (a)   *Classification*: Class C7 consists of TCEH Debtor Intercompany Claims.

   (b)   *Treatment*:  TCEH Debtor Intercompany Claims shall be, at the option of the applicable TCEH Debtor(s) with the consent of the TCEH Supporting First Lien Creditors (such consent not to be unreasonably withheld), either:

      (i)    Reinstated; or

      (ii)   canceled and released without any distribution on account of such Claims;

         *provided*, *however*, that TCEH Debtor Intercompany Claims against each of EFCH, TCEH, or TCEH Finance and any TCEH Debtor Intercompany Claim derived from or based upon the Repurchased PCRBs shall be canceled and released without any distribution on account of such Claims.

   (c)   *Voting*: Holders of Claims in Class C7 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

33.   Class C8 - Non-TCEH Debtor Intercompany Claims.

   (a)   *Classification*: Class C8 consists of Non-TCEH Debtor Intercompany Claims.

   (b)   *Treatment*:  Non-TCEH Debtor Intercompany Claims shall be canceled and released without any distribution on account of such Claims.

   (c)   *Voting*:  Class C8 is Impaired under the Plan.  Holders of Claims in Class C8 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

34.   Class C9 - Interests in TCEH Debtors Other Than TCEH and EFCH.

   (a)   *Classification*: Class C9 consists of Interests in TCEH Debtors Other Than TCEH and EFCH.

   (b)   *Treatment*:  Interests in TCEH Debtors Other Than TCEH and EFCH shall be with the consent of the TCEH Supporting First Lien Creditors,  either:

      (i)    Reinstated; or

Error! Unknown document property name.

(ii)      canceled and released without any distribution on account of such Interests.

    (c)    *Voting*: Holders of Interests in Class C9 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

35.   Class C10 - Interests in TCEH and EFCH.

    (a)    *Classification*: Class C10 consists of Interests in TCEH and EFCH.

    (b)    *Treatment*: Interests in TCEH and EFCH shall be canceled and released without any distribution on account of such Interests.

    (c)    *Voting*: Class C10 is Impaired under the Plan. Holders of Interests in Class C10 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

D.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes pursuant to the Disclosure Statement Order shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

E.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

F.    *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

G.    *Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors reserve the right to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination relating thereto. Notwithstanding the foregoing, this Plan gives effect to the TCEH First

58

Lien Intercreditor Agreement and no additional changes to the allowance, classification, treatment, or distributions shall be made as a result of the TCEH First Lien Intercreditor Agreement except for any such changes provided for or otherwise consistent with the TCEH First Lien Creditor Plan Distribution Allocation Order as contemplated by Article III.B.28 of the Plan.  Notwithstanding anything to the contrary herein, the TCEH First Lien Agent and the Holders of Allowed TCEH First Lien Claims shall be deemed to have waived any rights under the TCEH Second Lien Intercreditor Agreement to extent such rights would, in any way, impair or diminish the recoveries of the Holders of Allowed TCEH Second Lien Note Claims under this Plan or related documents.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.     *General Settlement of Claims and Interests.*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final.

B.     *Restructuring Transactions.*

1.     Restructuring Transactions.

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, will effectuate the Restructuring Transactions, and will take any actions as may be necessary or advisable to effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Debtors, to the extent provided therein.  The actions to implement the Restructuring Transactions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other organizational documents pursuant to applicable state law; and (d) all other actions that the applicable Entities determine to be necessary or advisable, including making filings or recordings that may be required by law in connection with the Plan.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

2.     Spin-Off.

The TCEH Debtors will undertake the Spin-Off, as follows:

(a)     on or prior to the Effective Date, TCEH will form Reorganized TCEH;

(b)     on the Effective Date, except for liabilities assumed by Reorganized TCEH pursuant to the Plan, all other Claims against the TCEH Debtors will be canceled, and each Holder of an Allowed Claim against a TCEH Debtor will have the right to receive its recovery in accordance with the terms of the Plan; and TCEH shall assume the obligations of its subsidiaries that are TCEH Debtors to make distributions pursuant to and in accordance with the Plan that are to be made after the Effective Date;

Error! Unknown document property name.

(c)     immediately following such cancelation, pursuant to the Separation Agreement, TCEH and the EFH Debtors will make the Contribution to Reorganized TCEH, in exchange for which TCEH shall receive (i) 100% of the Reorganized TCEH membership interests and (ii) the net Cash proceeds of the New Reorganized TCEH Debt, subject to preserving the Intended Tax Treatment;

(d)     immediately following the Contribution, TCEH and Reorganized TCEH shall effectuate the Preferred Stock Sale, including the distribution of the proceeds thereof to TCEH;

(e)     immediately following the Preferred Stock Sale, Reorganized TCEH shall undertake the Reorganized TCEH Conversion; and

(f)     immediately following the Reorganized TCEH Conversion, TCEH will make the Distribution.

3.     TCEH Basis Step-Up.

Pursuant to the Preferred Stock Sale, gain will be triggered in an amount not in excess of, and in order to achieve, the Basis Step-Up.

4.     Transition Services Agreement.

On the Effective Date, Reorganized TCEH and Reorganized EFH or their respective subsidiaries will enter into the Transition Services Agreement.

5.     Reorganized EFH Common Stock.

On the Effective Date, after (a) cancelation of the Interests in EFH Corp. and (b) consummation of the Spin-Off, and concurrently with the incurrence of the debt under the Reorganized EFIH Debt, Reorganized EFH will issue the Reorganized EFH Common Stock to Holders of Claims and Reorganized TCEH as set forth in the Plan. The value of the each share of Reorganized EFH Common Stock at issuance will be the same as the price per share of each share of New EFH Common Stock issued pursuant to the Rights Offering.

6.     Rights Offering.

No later than twenty (20) Business Days following the later of the Confirmation Date and the Rights Registration Effective Date, and prior to the Effective Date, and pursuant to the Rights Offering Procedures, New EFH shall conduct the Rights Offering and distribute the Rights to the Rights Offering Participants as of the Rights Offering Record Date, which Rights Offering will (other than with respect to the Rights issued to Holders of Allowed TCEH First Lien Secured Claims) be fully backstopped by the Backstop Purchasers on the terms and subject to the conditions set forth in the Backstop Agreement.

7.     IPO Conversion Plan and REIT Reorganization.

On the Effective Date, EFH Corp. and EFIH will implement and exercise their rights, if any, as direct or indirect equity holders of Oncor, and take other actions within their reasonable control, to cause Oncor to implement the IPO Conversion Plan, including the REIT Reorganization.

8.     Draw-Down of Funds in Escrow Pursuant to Equity Commitment Letter and Backstop Agreement.

On the Effective Date, the funds held in escrow pursuant to the Equity Commitment Letter and the Backstop Agreement (other than the funds held in escrow pursuant to the Equity Commitment Letter with respect to the purchase by Hunt and certain other Equity Investors of membership interests in OV2) will be released to New EFH. The funds held in escrow pursuant to the Equity Commitment Letter with respect to the purchase by Hunt and

certain other Equity Investors of membership interests in OV2 will be released to OV2 on the first Business Day following the Effective Date.

9.    New Reorganized EFIH Debt.

On the Effective Date, after the consummation of the Spin-Off, and concurrently with the issuance of the Reorganized EFH Common Stock, Reorganized EFIH will enter into the New Reorganized EFIH Debt Documents, as applicable, and incur the debt under the New Reorganized EFIH Debt, the amount of which may be reduced if, and to the extent that, the Rights issued to Holders of Allowed TCEH First Lien Secured Claims are exercised.

10.    Tax Matters Agreement.

On the Effective Date, EFH Corp., Reorganized TCEH, and EFIH shall enter into the Tax Matters Agreement, which agreement shall govern the rights and obligations of each party thereto with respect to certain tax matters, including covenants intended to protect the Intended Tax Treatment of the Spin-Off and indemnity provisions if either party takes any action that causes the Spin-Off to fail to qualify for the Intended Tax Treatment.

11.    Buy-Out of Oncor Minority Equity/Contribution of Oncor Minority Interest.

On or before the Effective Date, New EFH may seek to acquire all or a portion of the Oncor Electric minority interest held by Texas Transmission Investment LLC and/or Oncor Management Investment LLC either (a) pursuant to the drag-along rights set forth in the Investor Rights Agreement or (b) in a privately negotiated transaction with Texas Transmission Investment LLC and/or Oncor Management Investment LLC. If, on the Effective Date, New EFH has acquired all or a portion of the minority interest of Texas Transmission Investment LLC and/or Oncor Management Investment LLC, New EFH shall contribute such acquired minority interest to Reorganized EFIH on the terms and subject to the conditions of the Merger and Purchase Agreement. For the avoidance of doubt, implementation and/or consummation of the Minority Buy-Out shall not be a condition to Confirmation or Consummation.

12.    Merger.

On the Effective Date, after (a) Reorganized EFIH has entered into the New Reorganized EFIH Debt Documents, as applicable, and incurred the debt under the New Reorganized EFIH Debt, (b) the completion of the Rights Offering and the draw-down on the Equity Commitment Letter, (c) the completion of the IPO Conversion Plan, and (d) the issuance of the Reorganized EFH Common Stock, Reorganized EFIH will merge with and into New EFH, with New EFH being the surviving corporation resulting from the Merger, on the terms and subject to the conditions of the Merger and Purchase Agreement and pursuant to the Plan and the applicable provisions of Chapter 10 of the Texas Business Organizations Code and the General Corporate Law of the State of Delaware. Pursuant to the Merger, all shares of Reorganized EFH Common Stock shall be converted into a number of shares of New EFH Merger Common Stock in accordance with the Merger and Purchase Agreement, and all shares of Reorganized EFH Common Stock, when so converted, shall no longer be outstanding and shall automatically be canceled and shall cease to exist.

13.    Dissolution and Liquidation of Certain Subsidiaries of EFH Corp.

EFCH, TCEH, TCEH Finance, EFIH Finance, and such other Debtor entities (other than the TCEH Debtors being transferred in the Spin-Off) as designated by the Debtors, the Plan Sponsors, and the TCEH Supporting First Lien Creditors, will be dissolved and liquidated in accordance with the Plan and applicable law. EFH Corp.'s direct and indirect Interests in each of its subsidiaries (other than EFIH and Oncor) will be either (a) canceled or abandoned pursuant to the Plan or (b) acquired by New EFH pursuant to the Merger with such acquired subsidiaries having been discharged and released, to the fullest extent permitted under applicable law, pursuant to the Plan.

14.    Issuance of Reorganized EFIH Membership Interests.

On the first Business Day following the Effective Date, OV2 will contribute to Reorganized EFIH $[___] in exchange for the issuance by Reorganized EFIH of 3.3% of the Reorganized EFIH Membership Interests. The amount contributed by OV2 to Reorganized EFIH will be used to repay any amounts outstanding under the Reorganized EFIH Interim Financing Facility.

15.    Implementation of the TCEH Settlement.

The TCEH Settlement Claim is in consideration for the terms and conditions embodied in the Plan and the Settlement Agreement, as applicable, including settlement of any prepetition Claim or Cause of Action of the TCEH Debtors against the EFH Debtors, the EFIH Debtors, Oncor, the Holders of Interests in EFH Corp., or their Affiliates, pursuant to Bankruptcy Rule 9019, approved by the Bankruptcy Court. The TCEH Settlement Claim will be deemed satisfied upon Consummation.

In addition, on the Effective Date, and for the purposes of this Plan and the settlements and compromises incorporated herein or contemplated hereby, and unless otherwise ordered by the Bankruptcy Court or agreed by the TCEH Supporting First Lien Creditors, TCEH Supporting Second Lien Creditors, TCEH Supporting Unsecured Creditors, and the TCEH Committee, (a) Holders of Allowed TCEH First Lien Deficiency Claims will waive or be deemed to have waived, and the TCEH First Lien Agent will not take any action to interfere or that is inconsistent with the waiver of, any recovery or distribution on account of (but not voting rights in respect of) such Allowed TCEH First Lien Deficiency Claims (including on account of any recovery or distribution provided for in Article III.B.29) for the benefit of Holders of Allowed TCEH Deficiency Recipient Claims, and (b) all distributions of the Rights, New EFH Common Stock, and Reorganized EFH Common Stock that would otherwise have been distributed to, or for the benefit of, Holders of Allowed First Lien Deficiency Claims pursuant this Plan (including the distributions provided for in Article III.B.29) will instead be distributed Pro Rata to Holders of Allowed TCEH Deficiency Recipient Claims, such that each Holder of an Allowed TCEH Deficiency Recipient Claim receives a proportion thereof equal to the amount its Allowed TCEH Deficiency Recipient Claim bears to the aggregate amount of all Allowed TCEH Deficiency Recipient Claims. For purposes of the Plan only, the Allowed TCEH First Lien Deficiency Claims shall be between $[8.1] billion and $[9.5] billion; *provided, however*, that the amount of the Allowed TCEH First Lien Deficiency Claims in connection with the Plan is without prejudice to the amount of the Allowed TCEH First Lien Deficiency Claims in connection with any Alternative Restructuring. For the avoidance of doubt, under no circumstance will any Holder of an Allowed TCEH First Lien Deficiency Claim receive any recovery or distribution on account of such Allowed TCEH First Lien Deficiency Claims under the Plan (including on account of any recovery or distribution provided for in Article III.B.29).

C.      *Sources of Consideration for Plan Distributions.*

The TCEH Debtors shall fund distributions under the Plan, as applicable, with: (1) Cash on hand at the TCEH Debtors; (2) the Cash proceeds of the New Reorganized TCEH Debt and the Preferred Stock Sale; (3) the Reorganized TCEH Common Stock; (4) the Rights; and (5) the Reorganized EFH Common Stock. The Reorganized EFH Debtors and the Reorganized EFIH Debtors shall fund distributions under the Plan, as applicable, with: (1) Cash on hand at EFH Corp. and EFIH; (2) the Cash proceeds from the New Reorganized EFIH Debt; (3) the Reorganized EFIH Membership Interests; (4) the Cash proceeds of the Equity Investment following the consummation of the Merger, (5) the New EFH Common Stock; and (6) the Reorganized EFH Common Stock. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance of certain securities in connection with the Plan, including the Reorganized TCEH Common Stock and the Reorganized EFH Common Stock, will be exempt from SEC registration to the fullest extent permitted by law.

1.    Cash on Hand at the TCEH Debtors.

TCEH shall use Cash on hand at the TCEH Debtors to fund distributions to certain Holders of Claims against the TCEH Debtors in accordance with the Plan.

62

2.    New Reorganized TCEH Debt.

Before the Reorganized TCEH Conversion, Reorganized TCEH shall enter into the New Reorganized TCEH Debt Documents and incur the New Reorganized TCEH Debt. Confirmation shall constitute approval of the New Reorganized TCEH Debt Documents (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by Reorganized TCEH in connection therewith), and authorization for Reorganized TCEH to enter into and execute the Reorganized TCEH Debt Documents, subject to such modifications as Reorganized TCEH may deem to be reasonably necessary to consummate the Reorganized TCEH Debt Documents.

Reorganized TCEH will distribute the Cash proceeds of the Reorganized TCEH Debt to TCEH, and TCEH shall use such proceeds to fund distributions to certain Holders of Claims against the TCEH Debtors in accordance with the Plan.

3.    Reorganized TCEH Common Stock.

Reorganized TCEH shall be authorized to issue 450,000,000 shares of Reorganized TCEH Common Stock, subject to dilution only by the Reorganized Debtor Management Incentive Plan. Reorganized TCEH shall issue all securities, instruments, certificates, and other documents required to be issued for the Reorganized TCEH Common Stock in respect of Reorganized TCEH or its subsidiaries. All of the shares of Reorganized TCEH Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

Certain Holders of Reorganized TCEH Common Stock will be parties to the Reorganized TCEH Registration Rights Agreement.

4.    Reorganized TCEH Sub Preferred Stock.

Under the Preferred Stock Sale, the Preferred Stock Entity will be authorized to issue a certain number of shares of Reorganized TCEH Sub Preferred Stock, the terms of which shall be consistent with the description of the preferred stock contained in the IRS Submissions previously filed by the Debtors (unless otherwise consented to by the Debtors, the Plan Sponsors and the TCEH Supporting First Lien Creditors (such consent not to be unreasonably withheld, delayed, or conditioned)). The Preferred Stock Entity shall issue all securities, instruments, certificates, and other documents required to be issued for the Reorganized TCEH Sub Preferred Stock in respect of Reorganized TCEH or its subsidiaries. All of the shares of Reorganized TCEH Sub Preferred Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

Reorganized TCEH will distribute the Cash proceeds from the sale of the Reorganized TCEH Sub Preferred Stock to TCEH prior to the Reorganized TCEH Conversion, and TCEH shall use such proceeds to fund distributions to certain Holders of Allowed Claims against the TCEH Debtors in accordance with the Plan.

5.    Rights.

New EFH shall issue the Rights, as set forth in the Plan and the Rights Offering Procedures. Confirmation shall constitute Bankruptcy Court approval of the Rights (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by New EFH in connection therewith).

6.    Reorganized EFH Common Stock.

Reorganized EFH shall be authorized to issue the Reorganized EFH Common Stock, which shall be converted into a number of shares of New EFH Merger Common Stock in accordance with the Merger and Purchase Agreement. Reorganized EFH shall issue all securities, instruments, certificates, and other documents required to be issued with respect to the Reorganized EFH Common Stock in respect of Reorganized EFH or its subsidiaries. All of the shares of Reorganized EFH Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

Error! Unknown document property name.

7.    New EFH Common Stock.

New EFH shall be authorized to issue the New EFH Common Stock.  New EFH shall issue all securities, instruments, certificates, and other documents required to be issued with respect to the New EFH Common Stock in respect of New EFH or its subsidiaries.  All of the shares of New EFH Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

8.    Reorganized EFIH Membership Interests.

Reorganized EFIH shall be authorized to issue the Reorganized EFIH Membership Interests.  Reorganized EFIH shall issue all securities, instruments, certificates, and other documents required to be issued with respect to the Reorganized EFIH Membership Interests.

9.    Cash on Hand at EFH Shared Services Debtors.

Any Cash on hand at the EFH Shared Services Debtors as of the Effective Date shall be used to fund distributions to certain Holders of Allowed Claims against the EFH Shared Services Debtors in accordance with the terms of the Plan.  Any Cash on hand at the EFH Shared Services Debtors as of the Effective Date that remains on hand after payment in full of all Allowed Claims against the EFH Shared Services Debtors pursuant to the Plan shall be transferred to Reorganized TCEH.

10.    Cash on Hand at EFH Corp. and EFIH.

Reorganized EFH and Reorganized EFIH shall use Cash on hand at EFH Corp. and EFIH to fund distributions to certain Holders of Allowed Claims against the EFH Debtors and the EFIH Debtors in accordance with the Plan.

11.    Cash Proceeds of the New Reorganized EFIH Debt.

Reorganized EFIH will enter into the New Reorganized EFIH Debt Documents, as applicable, and incur the New Reorganized EFIH Debt, as set forth in the Plan.  Confirmation shall constitute approval of the New Reorganized EFIH Debt Documents (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by Reorganized EFIH in connection therewith), and authorization for Reorganized EFIH to enter into and execute the New Reorganized EFIH Debt Documents, subject to such modifications as Reorganized EFIH may deem to be reasonably necessary to consummate the New Reorganized EFIH Debt Documents.

Reorganized EFH and Reorganized EFIH will use any Cash proceeds of the New Reorganized EFIH Debt to fund distributions to certain Holders of Claims and Interests of the EFH Debtors and EFIH Debtors in accordance with the Plan.

12.    Cash Proceeds of the Equity Investment.

The EFH Debtors and the EFIH Debtors shall use the Cash proceeds of the Equity Investment to fund distributions to certain Holders of Claims against the EFH Debtors and the EFIH Debtors in accordance with the Plan.

D.    *Intercompany Account Settlement.*

The Debtors (acting at the direction of the Disinterested Directors and Managers with respect to Conflict Matters) and the Reorganized Debtors, as applicable, subject to the consent of the Plan Sponsors and the TCEH Supporting First Lien Creditors, as applicable (such consent not to be unreasonably withheld), shall be entitled to transfer funds between and among themselves as they determine to be necessary or advisable to enable the Reorganized Debtors to satisfy their obligations under the Plan; *provided, however,* that (1) the TCEH Debtors shall not transfer funds to a Debtor that is not a TCEH Debtor, and (2) the EFH Debtors and EFIH Debtors shall not

64

transfer funds to a Debtor that is not an EFH Debtor or an EFIH Debtor, respectively, except as otherwise provided elsewhere in the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Reorganized Debtors' historical intercompany account settlement practices and shall not violate the terms of the Plan.

E.    *Competitive Tax Sharing Agreement.*

On the Effective Date, the Competitive Tax Sharing Agreement shall automatically terminate and all Claims and Causes of Action arising thereunder or in any way related thereto shall be forever fully discharged, canceled, and released.

F.    *Oncor Tax Sharing Agreement.*

On the Effective Date, the Oncor Tax Sharing Agreement will be assumed by Reorganized EFH, as such agreement may be amended or assigned in a manner agreed by Oncor, New EFH, and the Plan Sponsors.

G.    *Corporate Existence.*

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state or federal law). The Reorganized TCEH Debtors will continue to fund the Nuclear Decommissioning Obligations in the ordinary course of business after the Effective Date.

H.    *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Plan, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, Interests, or other encumbrances. Except as otherwise provided in the Plan, on and after the Effective Date, each of the Reorganized Debtors may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

I.    *Cancelation of Existing Securities and Agreements.*

Except as otherwise provided in the Plan, on and after the Effective Date, all notes, instruments, certificates, agreements, indentures, mortgages, security documents, and other documents evidencing Claims or Interests, including Other Secured Claims, TCEH First Lien Secured Claims, EFIH First Lien Note Claims, EFIH Second Lien Note Claims, EFCH 2037 Note Claims, TCEH Second Lien Note Claims, TCEH Unsecured Note Claims, PCRB Claims, EFIH Unsecured Note Claims, EFH Legacy Note Claims, EFH LBO Note Primary Claims, EFH LBO Note Guaranty Claims, EFH Unexchanged Note Claims, EFH Swap Claims, EFH Series N Note Claims, and DIP Claims, shall be deemed canceled, surrendered, and discharged without any need for further action or approval of the Bankruptcy Court or a Holder to take further action with respect to any note(s) or security and the obligations of the Debtors or Reorganized Debtors, as applicable, thereunder or in any way related thereto shall be deemed satisfied in full and discharged, and the Indenture Trustees, the TCEH First Lien Agent, and the DIP Agents shall be released from all duties thereunder; *provided, however,* that notwithstanding Confirmation or Consummation, any such indenture or agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of: (1) allowing Holders to receive distributions under the Plan; (2) allowing the Indenture Trustees, the TCEH First Lien Agent, and the DIP Agents to make the distributions in accordance with the Plan (if

Error! Unknown document property name.

any), as applicable; (3) preserving any rights of the DIP Agents, the TCEH First Lien Agent, or the Indenture Trustees to payment of fees, expenses, and indemnification obligations as against any money or property distributable to the Holders under the relevant indenture, the TCEH Credit Agreement, the TCEH First Lien Intercreditor Agreement, or DIP Agreement, including any rights to priority of payment and/or to exercise charging liens; (4) allowing the Indenture Trustees, TCEH First Lien Agent, and DIP Agents to enforce any obligations owed to each of them under the Plan; and (5) allowing the Indenture Trustees, TCEH First Lien Agent, and DIP Agents to appear in the Chapter 11 Cases or any proceeding in which they are or may become a party; *provided, further, however,* that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable. For the avoidance of doubt, the TCEH First Lien Intercreditor Agreement, the TCEH Credit Agreement, and the TCEH First Lien Note Indenture remain in effect solely to the extent necessary to preserve the TCEH First Lien Creditor Allocation Disputes and any claims or Causes of Action by the TCEH First Lien Notes Trustee, TCEH First Lien Agent, or Holders of TCEH First Lien Claims against other Holders of TCEH First Lien Claims, the TCEH First Lien Agent, or the TCEH First Lien Notes Trustee arising in connection with the TCEH First Lien Creditor Allocation Disputes; *provided, however,* that except as expressly set forth in the Plan, after the Effective Date, the Debtors and the Reorganized Debtors shall not be obligated to pay any fees or expenses under either the TCEH First Lien Intercreditor Agreement, the TCEH First Lien Note Indenture, or the TCEH Credit Agreement arising in connection with the TCEH First Lien Creditor Allocation Disputes, and all related Claims shall be released and discharged consistent with Article VIII.A of the Plan.

J.      *Corporate Action.*

On the Effective Date, all actions contemplated under the Plan with respect to the applicable Debtor or Reorganized Debtor, as applicable, shall be deemed authorized and approved in all respects, including: (1) implementation of the Restructuring Transactions; (2) selection of the directors and officers for the Reorganized Debtors; (3) as applicable, adoption of, entry into, and assumption and/or assignment of the New Employee Agreements/Arrangements and the Employment Agreements; (4) adoption of the Reorganized Debtor Management Incentive Plan; (5) incurrence of the New Reorganized TCEH Debt and distribution of the net proceeds therefrom; (6) incurrence of the New Reorganized EFIH Debt and distribution of the net proceeds therefrom; (7) issuance and distribution of the Reorganized TCEH Common Stock; (8) issuance and distribution of the Reorganized EFH Common Stock (including the New EFH Merger Common Stock); (9) issuance and distribution of the Rights; (10) issuance and distribution of the New EFH Common Stock; (11) the Preferred Stock Sale; (12) issuance and distribution of the common stock of the Preferred Stock Entity; (13) issuance of the Reorganized TCEH Sub Preferred Stock; (14) issuance and distribution of the Reorganized EFIH Membership Interests; and (15) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for herein involving the corporate structure of the Debtors or the Reorganized Debtors, as applicable, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect as of the Effective Date, without any requirement of further action by the Bankruptcy Court, security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors. On or before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, securities, and instruments, and take such actions, contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Reorganized TCEH Debt Documents, the New Reorganized EFIH Debt Documents, the Reorganized TCEH Common Stock, the common stock of the Preferred Stock Entity, the Reorganized TCEH Sub Preferred Stock, the Reorganized EFH Common Stock, the New EFH Common Stock, the New EFH Merger Common Stock, the Reorganized EFIH Membership Interests, as applicable, and any and all other agreements, documents, securities, and instruments relating to the foregoing, and all such documents shall be deemed ratified. The authorizations and approvals contemplated by this Article IV.J shall be effective notwithstanding any requirements under non-bankruptcy law.

K.      *New Organizational Documents.*

The New Organizational Documents for Reorganized TCEH or any of its subsidiaries shall be consistent with the Tax Matters Agreement and in form and substance reasonably acceptable to TCEH and the TCEH Supporting First Lien Creditors.

Error! Unknown document property name.

The New Organizational Documents for New EFH and Reorganized EFIH shall be consistent with the Tax Matters Agreement and in form and substance reasonably acceptable to EFH Corp. and the Plan Sponsors. Governance matters related to New EFH and Reorganized EFIH are described in and shall be consistent with the terms set forth in the New EFH Shareholders' Agreement.

On the Effective Date, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable laws of the respective state of incorporation or formation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective state of incorporation and its respective New Organizational Documents.

*L.    Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the term of the current members of the board of directors of the applicable Debtors shall expire, and the initial boards of directors, including the New Boards, and the officers of each of the Reorganized Debtors shall be appointed in accordance with the respective New Organizational Documents. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement the identity and affiliations of any person proposed to serve on the initial board of directors or be an officer of each of the Reorganized Debtors. To the extent any such director or officer of the Reorganized Debtors is an "insider" under the Bankruptcy Code, the Debtors also will disclose the nature of any compensation to be paid to such director or officer. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents, the New Employee Agreements/Arrangements, the Employment Agreements (assumed and assigned to Reorganized TCEH in accordance with the Plan and the Plan Supplement), and other constituent documents of the Reorganized Debtors.

*M.    Section 1146 Exemption.*

Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant to, in contemplation of, or in connection with, the Plan, including (1) the Restructuring Transactions; (2) the New Reorganized TCEH Debt; (3) the New Reorganized EFIH Debt; (4) the Reorganized TCEH Common Stock; (5) the Reorganized EFIH Common Stock (including the New EFH Merger Common Stock); (6) the common stock of the Preferred Stock Entity; (7) the Reorganized TCEH Sub Preferred Stock; (8) the Rights; (9) the New EFH Common Stock; (10) the Reorganized EFIH Membership Interests; (11) the assignment or surrender of any lease or sublease; and (12) the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer, sale, or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

*N.    Director, Officer, Manager, and Employee Liability Insurance.*

On or before the Effective Date, the Debtors, on behalf of the Reorganized Debtors will obtain sufficient liability insurance policy coverage for the six-year period following the Effective Date for the benefit of the Debtors' current and former directors, managers, officers, and employees on terms no less favorable to the directors, managers, officers, and employees than the Debtors' existing director, officer, manager, and employee coverage and with an available aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing director, officer, manager, and employee coverage upon placement; *provided, however,* that the costs of such policies shall be reasonably allocated in a manner reasonably acceptable to the Debtors, the TCEH Supporting First Lien Creditors, and the Plan Sponsors. After the Effective Date, none of the Debtors or the Reorganized Debtors shall terminate or otherwise reduce the coverage under any director, officer, manager, and employee insurance policies (including the "tail policy") in effect on the Effective Date, with respect to conduct

Error! Unknown document property name.

occurring prior thereto, and all officers, directors, managers, and employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date.

O.       *Reorganized Debtor Management Incentive Plan.*

The Reorganized Debtor Management Incentive Plan is hereby approved in its entirety and shall be implemented on the Effective Date by the applicable Reorganized Debtors without any further action by the New Boards or the Bankruptcy Court.

P.       *Employee Obligations.*

Except as otherwise provided in the Plan or the Plan Supplement, the Reorganized TCEH Debtors shall honor the Debtors' written contracts, agreements, policies, programs and plans for, among other things, compensation, reimbursement, indemnity, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for bonuses and other incentives or compensation for the directors, officers and employees of any of the Debtors who served in such capacity at any time (including the compensation programs approved by the Bankruptcy Court pursuant to the 2015 Compensation Order and the 2016 Compensation Order). To the extent that the above-listed contracts, agreements, policies, programs and plans are executory contracts, pursuant to sections 365 and 1123 of the Bankruptcy Code, each of them will be deemed assumed as of the Effective Date and assigned to the Reorganized TCEH Debtors to the extent a TCEH Debtor is not party to such executory contracts.

Q.       *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action belonging to their Estates, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than: (i) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date; (ii) all Causes of Action that arise under sections 544, 547, 548, and 549 of the Bankruptcy Code and state fraudulent conveyance law; and (iii) the Causes of Action released by the Debtors pursuant to the Settlement Agreement.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled herein or in a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

Error! Unknown document property name.

R.     *Payment of Certain Fees.*

Without any further notice to or action, order, or approval of the Bankruptcy Court, the Reorganized Debtors shall pay on the Effective Date any reasonable and documented unpaid fees and expenses incurred on or before the Effective Date by professionals (a) payable under (1) the TCEH DIP Facility (which fees and expenses shall be paid by Reorganized TCEH), (2) the EFIH First Lien DIP Facility (which fees and expenses shall be paid by Reorganized EFIH), (3) the Merger and Purchase Agreement (which fees and expenses shall be paid by Reorganized EFIH), (4) the Backstop Agreement (which fees and expenses shall be paid by Reorganized EFIH), and (5) the Cash Collateral Order (which fees and expenses shall be paid by TCEH or Reorganized TCEH), including any applicable transaction, success, or similar fees for which the applicable Debtors have agreed to be obligated, and (b) retained by any individual member of the TCEH First Lien Ad Hoc Committee that is a TCEH Supporting First Lien Creditor. Reorganized TCEH shall indemnify the TCEH First Lien Agent for any reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date solely in connection with the implementation of the Plan, including but not limited to, making distributions pursuant to and in accordance with the Plan, and any disputes arising in connection therewith.

The EFH Debtors shall pay in cash in full on the Effective Date, the reasonable and documented fees and expenses (including professional and other advisory fees and expenses) incurred through the Effective Date of the TCEH Unsecured Notes Trustee, the TCEH Second Lien Notes Trustee, the TCEH Second Lien Notes Collateral Agent, the members of the TCEH Unsecured Ad Hoc Group, and the members of the TCEH Second Lien Consortium.

All amounts distributed and paid pursuant to this Article IV.R shall not be subject to disgorgement, setoff, recoupment, reduction, or reallocation of any kind.

S.     *Treatment of Certain Claims of the PBGC and Pension Plan.*

Nothing in the Chapter 11 Cases, the Disclosure Statement, the Plan, the Confirmation Order, or any other document filed in the Chapter 11 Cases shall be construed to discharge, release, limit, or relieve any individual from any claim by the PBGC or the Pension Plans for breach of any fiduciary duty under ERISA, including prohibited transactions, with respect to the Pension Plans, subject to any and all applicable rights and defenses of such parties, which are expressly preserved. The PBGC and the Pension Plans shall not be enjoined or precluded from enforcing such fiduciary duty or related liability by any of the provisions of the Disclosure Statement, Plan, Confirmation Order, Bankruptcy Code, or other document filed in the Chapter 11 Cases. For the avoidance of doubt, the Reorganized Debtors shall not be released from any liability or obligation under ERISA, the Internal Revenue Code, and any other applicable law relating to or arising from the Pension Plans.

T.     *Tax Receivable Agreement.*

At the request of the TCEH Supporting First Lien Creditors, with the consent of the Debtors, New EFH and OV2 (such consent not to be unreasonably withheld, delayed, or conditioned), on the Effective Date and before the Distribution, Reorganized TCEH shall enter into the Tax Receivable Agreement, under which Reorganized TCEH shall agree to make payments in respect of its (or its subsidiaries') specified tax items to or for the benefit of the TCEH First Lien Creditors (or their assigns). In addition, and notwithstanding the foregoing, Reorganized TCEH may enter into one or more tax receivable agreements or other similar arrangements after the Distribution.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.     *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases of the Debtors, not previously assumed or rejected pursuant to an order of the Bankruptcy Court, will be deemed to be Assumed Executory Contracts or Unexpired Leases, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that:

69

(1) previously were assumed or rejected by the Debtors; (2) are identified on the Rejected Executory Contract and Unexpired Lease List; (3) are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date; *provided* that each of (2), (3) and (4) must be in form and substance reasonably acceptable (i) with respect to executory contracts and unexpired leases that will be assumed by Reorganized TCEH or any of its subsidiaries, the TCEH Supporting First Lien Creditors, and (ii) with respect to executory contracts and unexpired leases that will be assumed by Reorganized EFH or Reorganized EFIH, the Plan Sponsors. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assignments and/or assumptions and the rejection of the Executory Contracts or Unexpired Leases listed on the Rejected Executory Contract and Unexpired Lease List pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A or by any order of the Bankruptcy Court, which has not been assigned to a third party before the Confirmation Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Notwithstanding anything this Article V.A. to the contrary, the Employment Agreements and the New Employee Agreements/Arrangements shall be deemed to be entered into or assumed and/or assigned (as applicable) to Reorganized TCEH on the Effective Date, and Reorganized TCEH shall be responsible for any cure costs arising from or related to the assumption of such Employment Agreement; *provided* that, for the avoidance of doubt, in the event any party to an Employment Agreement and the Reorganized EFH Debtors or Reorganized EFIH Debtors mutually agree that such party's Employment Agreement shall be assumed by Reorganized EFH or Reorganized EFIH and not assigned to Reorganized TCEH, the consent of the Plan Sponsors shall be required with respect to such assumption and the Reorganized EFH Debtors and Reorganized EFIH Debtors, as applicable, shall be responsible for any cure costs arising from or related to the assumption of such Employment Agreements. Additionally, notwithstanding anything to the contrary in the Plan, the Plan Supplement, the Executive Severance Policy, or any Employment Agreement, the occurrence of the Effective Date shall be deemed to constitute a "change in control" under the Executive Severance Policy and each Employment Agreement. On the Effective Date, Reorganized TCEH shall execute a written agreement (in a form reasonably acceptable to the TCEH Supporting First Lien Creditors) with each employee who is party to an Employment Agreement acknowledging that the transactions consummated upon the occurrence of the Effective Date shall constitute a "change in control" under such employee's Employment Agreement. The Debtors or the Reorganized Debtors, as applicable, with the reasonable consent of the Plan Sponsors and the TCEH Supporting First Lien Creditors, reserve the right to alter, amend, modify, or supplement the schedules of Executory Contracts and Unexpired Leases with respect to such Debtors and Reorganized Debtors at any time through and including 45 days after the Effective Date.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed within 30 days after the later of: (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; (2) the effective date of such rejection; or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims against the applicable Debtor, and shall be treated in accordance with the Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary defaults under each Assumed Executory Contract or Unexpired Lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective

Error! Unknown document property name.

Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption. At least 14 days before the Confirmation Hearing, the Debtors will provide for notices of proposed assumption and proposed cure amounts to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served, and actually received by the Debtors at least seven (7) days before the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have consented to such assumption or proposed cure amount.

Assumption of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption. **Any Proofs of Claim Filed with respect to an Assumed Executory Contract or Unexpired Lease shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

D.    *Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed by the Executory Contract or Unexpired Lease counterparty or counterparties to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.

E.    *Indemnification Obligations.*

Notwithstanding anything in the Plan to the contrary, each Indemnification Obligation shall be assumed by the applicable Debtor, effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise. Each Indemnification Obligation shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

The TCEH Debtors and Reorganized TCEH shall assume the Indemnification Obligations for the current and former directors, officers, managers, employees, and other professionals of the TCEH Debtors, in their capacities as such, and the EFH Debtors and Reorganized EFH shall assume the Indemnification Obligations for the current and former directors, officers, managers, employees, and other professionals of the EFH Debtors or EFIH Debtors, in their capacities as such; *provided* that the TCEH Debtors and Reorganized TCEH shall not assume, and shall not have any liability for or any obligations in respect of, any Indemnification Obligations for the current and former directors, officers, managers, employees, and other professionals of the EFH Debtors or EFIH Debtors, in their capacities as such, and the EFH Debtors, Reorganized EFH, EFIH Debtors, and Reorganized EFIH shall not assume, and shall not have any liability for or any obligations in respect of, any Indemnification Obligations for the current and former directors, officers, managers, employees, and other professionals of the TCEH Debtors, in their capacities as such.

Notwithstanding the foregoing, nothing shall impair the ability of Reorganized EFH, Reorganized EFIH or Reorganized TCEH, as applicable, to modify indemnification obligations (whether in the bylaws, certificates or incorporate or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) arising after the Effective Date.

71

*F.      Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims.

*G.      Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

*H.      Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List or the Assumed Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease.

*I.      Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur with respect to a Debtor, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases with respect to such Debtor pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

*J.      Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Assumed Executory Contracts or Unexpired Leases, will be performed by the applicable Debtor or the applicable Reorganized Debtor liable thereunder in the ordinary course of their business.  Accordingly, any such contracts and leases (including any Assumed Executory Contracts or Unexpired Leases) that have not been rejected as of the date of the Confirmation Date shall survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

*A.      Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Allowed Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Allowed

72

Interest in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims and Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

With respect to Holders of Class C5 Claims that are Allowed as of the Effective Date, the amount of the Effective Date distribution will be calculated as if each Disputed Class C5 Claim were an Allowed Class C5 Claim equal to the lesser of (a) the asserted amount of such Claim and (b) the amount estimated by the Bankruptcy Court in accordance with Article VII.C of the Plan. On each Periodic Distribution Date, the Disbursing Agent shall make additional Pro Rata distributions to Holders of Allowed Class C5 Claims until such Claims have received the maximum recovery available to Holders of Class C5 Claims under the Plan.

Before the Effective Date, the TCEH Debtors shall create, in consultation with the TCEH Committee, a list of Disputed Class C5 Claims that shall be Allowed Class C5 Claims as of the Effective Date. Following the creation of such list, the TCEH Debtors shall, as soon as reasonably practicable thereafter submit, to the Bankruptcy Court an order, in form and substance reasonably acceptable to the TCEH Committee, allowing such Claims; provided, however, that entry of such order shall not in any way impede, delay, or otherwise interfere with the occurrence of the Effective Date.

B.      *Disbursing Agent.*

All distributions under the Plan shall be made to Holders of Allowed Claims by the Disbursing Agent on the Effective Date, or as soon as reasonably practicable thereafter, in accordance with the Plan. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

C.      *Rights and Powers of Disbursing Agent.*

1.      Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

2.      Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors. Reorganized TCEH shall only be obligated to pay the reasonable fees and expenses incurred by the Disbursing Agent for distributions related to Claims against the TCEH Debtors, and Reorganized EFH and Reorganized EFIH shall only be obligated to pay the reasonable fees and expenses incurred by the Disbursing Agent for distributions related to Claims against the EFH Debtors and EFIH Debtors.

Error! Unknown document property name.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

    1.    Record Date for Distribution.

    On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. The record Holder for the TCEH Credit Agreement Claims solely for purposes of the Record Date shall be the TCEH First Lien Administrative Agent.

    2.    Delivery of Distributions in General.

    Except as otherwise provided herein, the Reorganized Debtors shall make distributions to Holders of Allowed Claims and Allowed Interests as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided, however,* that the Distribution Record Date shall not apply to publicly-traded Securities. The manner of such distributions shall be determined at the discretion of the Reorganized Debtors, and the address for each Holder of an Allowed Claim or Allowed Interest shall be deemed to be the address set forth in any Proof of Claim or Interest Filed by that Holder.

    3.    Delivery of Distributions on DIP Claims.

    All distributions on account of DIP Claims shall be made to the applicable DIP Agent, who shall be deemed to be the Holder of such DIP Claims, as applicable, for purposes of distributions to be made hereunder. As soon as practicable following compliance with the requirements set forth in this Article VI, the applicable DIP Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of DIP Claims in accordance with the terms of the DIP Facilities, as applicable, subject to any modifications to such distributions in accordance with the terms of the Plan; *provided, however,* that the DIP Agents shall retain all rights as administrative agents under the DIP Facilities in connection with the delivery of distributions to DIP Lenders. The DIP Agents shall not have any liability to any person with respect to distributions made or directed to be made by the DIP Agents.

    4.    Delivery of Distributions on TCEH First Lien Claims.

    To the extent that the TCEH First Lien Creditor Plan Distribution Allocation Order provides that any of the TCEH First Lien Creditor Distributions are Collateral (as that term is used in the TCEH First Lien Intercreditor Agreement) or proceeds of Collateral (as that term is used in the TCEH First Lien Intercreditor Agreement), then such distributions shall be made to the TCEH First Lien Collateral Agent for further distribution to the Secured Debt Representatives (as defined in the TCEH First Lien Intercreditor Agreement) pursuant to and in accordance with the Plan and the TCEH First Lien Creditor Plan Distribution Allocation Order, and the Secured Debt Representatives (as defined in the TCEH First Lien Intercreditor Agreement) shall in turn make such distributions to the Holders of Allowed Class C3 Claims pursuant to and in accordance with the Plan and the TCEH First Lien Creditor Plan Distribution Allocation Order. To the extent that the TCEH First Lien Creditor Plan Distribution Allocation Order provides that any of the TCEH First Lien Creditor Distributions are not Collateral (as that term is used in the TCEH First Lien Intercreditor Agreement) or proceeds of Collateral (as that term is used in the TCEH First Lien Intercreditor Agreement), then such distributions shall be made to the Secured Debt Representatives (as defined in the TCEH First Lien Intercreditor Agreement) for further distribution directly to the Holders of Allowed Class C3 Claims pursuant to and in accordance with the Plan. If the TCEH First Lien Creditor Plan Distribution Allocation Order has not been entered as of the Effective Date, a reserve will be established in Article III.B.28. **THE TCEH FIRST LIEN AGENT AND THE TCEH FIRST LIEN NOTES TRUSTEE SHALL NOT HAVE ANY LIABILITY TO ANY PERSON WITH RESPECT TO DISTRIBUTIONS MADE OR DIRECTED TO BE MADE BY SUCH TCEH FIRST LIEN AGENT OR TCEH FIRST LIEN NOTES TRUSTEE PURSUANT TO AND IN ACCORDANCE WITH THE PLAN.**

    5.    No Fractional Distributions.

    No fractional shares of Reorganized TCEH Common Stock, Reorganized EFH Common Stock, or New EFH Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When

74

any distribution pursuant to the Plan on account of an applicable Allowed Claim would otherwise result in the issuance of a number of shares of Reorganized TCEH Common Stock, Reorganized EFH Common Stock, or New EFH Common Stock that is not a whole number, the actual distribution of shares of Reorganized TCEH Common Stock, Reorganized EFH Common Stock, or New EFH Common Stock shall be rounded as follows:  (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of Reorganized TCEH Common Stock, Reorganized EFH Common Stock, or New EFH Common Stock to be distributed to Holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

      6.    Minimum Distribution.

     No Cash payment of less than $50.00 shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.

      7.    Undeliverable Distributions and Unclaimed Property.

     In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided, however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the applicable Distribution Date.  After such date, all unclaimed property or interests in property shall revert to the applicable Reorganized Debtor(s) automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the claim of any Holder to such property shall be fully discharged, released, and forever barred.

*E.*    *Manner of Payment.*

     Unless as otherwise set forth herein, all distributions of Cash, the Reorganized TCEH Common Stock, the Reorganized EFH Common Stock, and the New EFH Common Stock, to the Holders of Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the Reorganized Debtors.  At the option of the Disbursing Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.  All Cash distributions to be made hereunder to the DIP Agents on account of the DIP Claims shall be made by wire transfer.

*F.*    *SEC Registration/Exemption.*

     Each of the Reorganized TCEH Common Stock, New Reorganized TCEH Debt, Reorganized TCEH Sub Preferred Stock, New Reorganized EFIH Debt, Reorganized EFH Common Stock, New EFH Merger Common Stock, Reorganized EFIH Membership Interests, Rights, and New EFH Common Stock are or may be "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

     The New EFH Merger Common Stock issued in exchange for Reorganized EFH Common Stock without registration under the Securities Act may be made in reliance upon the exemption set forth in section 1145(a)(1) of the Bankruptcy Code for the offer or sale under a chapter 11 plan of a security of a successor to the debtor if such securities are offered or sold in exchange for a claim against, or an interest in, such debtor.  The Debtors will seek to obtain a ruling from the Bankruptcy Court in the Confirmation Order that the section 1145(a)(1) exemption applies to the New EFH Merger Common Stock.  In the event the Debtors are unable to obtain a ruling from the Bankruptcy Court that the issuance of the New EFH Merger Common Stock qualifies for the statutory exemption from securities law provided under section 1145 of the Bankruptcy Code, the Debtors will either rely on another exemption from the registration requirements of the Securities Act or will be required to register the New EFH Merger Common Stock under the Securities Act.

     Pursuant to section 1145 of the Bankruptcy Code, the issuance of (1) the Reorganized TCEH Common Stock, (2) the Reorganized EFH Common Stock, (3) the New EFH Merger Common Stock, and (4) the Reorganized

Error! Unknown document property name.

EFIH Membership Interests issued to Holders of Allowed Interests in EFIH are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration before the offering, issuance, distribution, or sale of such securities. Each of the Reorganized TCEH Common Stock, the Reorganized EFH Common Stock, the New EFH Merger Common Stock, and the Reorganized EFIH Membership Interests issued to Holders of Allowed Interests in EFIH, (a) is not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act, and (b) is freely tradable and transferable by any initial recipient thereof that (i) at the time of transfer, is not an "affiliate" of the Reorganized TCEH, Reorganized EFH, Reorganized EFIH, or New EFH, as the case may be, as defined in Rule 144(a)(1) under the Securities Act and has not been such an "affiliate" within 90 days of such transfer, and (ii) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code.

The offering and issuance of the Rights and the New EFH Common Stock issuable upon exercise of the Rights, each pursuant to the Rights Offering (other than any Rights and New EFH Common Stock offered and/or issued under a Private Rights Offering, as applicable), will be registered with the SEC pursuant to an effective registration statement under the Securities Act. As such, the shares of New EFH Common Stock issued upon exercise of the Rights (a) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) will be freely tradable and transferable by any initial recipient thereof that at the time of sale is not, and has not been within the prior 90 days, an "affiliate" of New EFH, as defined in Rule 144(a)(1) under the Securities Act.

The New Reorganized TCEH Debt, the Reorganized TCEH Sub Preferred Stock, the New Reorganized EFIH Debt, the Reorganized EFIH Membership Interests issued to OV2 pursuant to the Equity Commitment Letter, the New EFH Common Stock issued pursuant to the Backstop Agreement and the Equity Commitment Letter, and Rights offered and issued pursuant to the Private Rights Offering (and New EFH Common Stock issued upon the exercise of such Rights) will be issued without registration under the Securities Act in reliance on the exemption from the registration requirements of the Securities Act provided by section 4(a)(2) of the Securities Act (and/or Regulation D promulgated thereunder) and each will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of any of the Reorganized TCEH Common Stock, New Reorganized TCEH Debt, Reorganized TCEH Sub Preferred Stock, New Reorganized EFIH Debt, Reorganized EFH Common Stock, New EFH Merger Common Stock, Reorganized EFIH Membership Interests, and New EFH Common Stock through the facilities of the DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the Reorganized TCEH Common Stock, New Reorganized TCEH Debt, Reorganized TCEH Sub Preferred Stock, New Reorganized EFIH Debt, Reorganized EFH Common Stock, New EFH Merger Common Stock, Reorganized EFIH Membership Interests, and New EFH Common Stock under applicable securities laws.

The DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether any of the Reorganized TCEH Common Stock, New Reorganized TCEH Debt, Reorganized TCEH Sub Preferred Stock, New Reorganized EFIH Debt, Reorganized EFH Common Stock, New EFH Merger Common Stock, Reorganized EFIH Membership Interests, and New EFH Common Stock, as applicable, are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, the DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the Reorganized TCEH Common Stock, New Reorganized TCEH Debt, Reorganized TCEH Sub Preferred Stock, New Reorganized EFIH Debt, Reorganized EFH Common Stock, New EFH Merger Common Stock, Reorganized EFIH Membership Interests, and New EFH Common Stock are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

G.      *Compliance with Tax Requirements.*

In connection with the Plan, the applicable Reorganized Debtor(s) shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit with respect to distributions pursuant to the

Error! Unknown document property name.

Plan. Notwithstanding any provision herein to the contrary, the Reorganized Debtors and the Disbursing Agent, as applicable, shall be authorized to take all actions necessary to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, and establishing any other mechanisms they believe are reasonable and appropriate to comply with such requirements. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

*H.    No Postpetition or Default Interest on Claims.*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, and notwithstanding any documents that govern the Debtors' prepetition funded indebtedness to the contrary, (1) postpetition and/or default interest shall not accrue or be paid on any Claims and (2) no Holder of a Claim shall be entitled to: (a) interest accruing on or after the Petition Date on any such Claim; or (b) interest at the contract default rate, as applicable.

*I.    Setoffs and Recoupment.*

The Debtors and Reorganized Debtors, as applicable, may, but shall not be required to, setoff against or recoup any payments or distributions to be made pursuant to the Plan in respect of any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim it may have against the Holder of such Claim.

*J.    No Double Payment of Claims.*

To the extent that a Claim is Allowed against more than one Debtor's Estate, there shall be only a single recovery on account of that Allowed Claim, but the Holder of an Allowed Claim against more than one Debtor may recover distributions from all co-obligor Debtors' Estates until the Holder has received payment in full on the Allowed Claims. No Holder of an Allowed Claim shall be entitled to receive more than payment in full of its Allowed Claim, and each Claim shall be administered and treated in the manner provided by the Plan only until payment in full on that Allowed Claim.

*K.    Claims Paid or Payable by Third Parties.*

1.    Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a Debtor or a Reorganized Debtor (other than the Disbursing Agent). Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day period specified above until the amount is repaid.

2.    Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or

77

in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

    3.    Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance.

# ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.    *Allowance of Claims.*

Except as otherwise set forth in the Plan, after the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately before the Effective Date.  This Article VII of the Plan shall not apply to the DIP Claims, TCEH First Lien Claims, TCEH Second Lien Note Claims, or TCEH Unsecured Note Claims, which Claims shall be Allowed in full and shall not be subject to any avoidance, reductions, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

B.    *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the applicable Reorganized Debtor(s) shall have the sole authority:  (1) to File, withdraw, or litigate to judgment, objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

Except with respect to Claims and Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII, if one or more Entities have sought and obtained standing to prosecute a Cause of Action on behalf of one or more of the Debtors' Estates and such Entities are prosecuting such Causes of Actions as of the Effective Date, then such Entities will have the sole authority, solely with respect to such Causes of Action, to File, withdraw, litigate to judgment, settle, compromise, or take any other actions in respect of such Causes of Action.

C.    *Estimation of Claims.*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.  Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

Error! Unknown document property name.

If the TCEH Debtors determine, in their reasonable discretion and in consultation with the TCEH Committee, that (1) one or more Disputed Class C5 Claims are capable of estimation by the Bankruptcy Court, (2) estimation will materially improve Effective Date distributions to Holders of Allowed Class C5 Claims, and (3) estimation is otherwise in the best interests of the Estates, the TCEH Debtors shall file one or more motions to estimate such Disputed Class C5 Claims, which motion or motions shall be filed and noticed to be heard (on regular notice to all parties in interest) by the Bankruptcy Court before the Effective Date (or such other date as determined by the Bankruptcy Court).

D.      *Adjustment to Claims without Objection.*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims or Interests.*

Any objections to Claims or Interests shall be Filed on or before the Claims Objection Deadline.

F.      *Disallowance of Claims.*

Any Claims held by Entities from which the Bankruptcy Court has determined that property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer that the Bankruptcy Court has determined is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and the full amount of such obligation to the Debtors has been paid or turned over in full. All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court. All Proofs of Claim Filed on account of an employee benefit shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent the Reorganized Entities elect to honor such employee benefit, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as provided herein or otherwise agreed, any and all Proofs of Claim Filed after the Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.**

G.      *Amendments to Proofs of Claim.*

On or after the Effective Date, a Proof of Claim or Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Proof of Claim or Interest Filed shall be deemed disallowed in full and expunged without any further action.

H.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless before the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim as no longer contingent.

Error! Unknown document property name.

*I.*     *No Distributions Pending Allowance.*

Except as otherwise set forth herein, if an objection to a Claim or portion thereof is Filed as set forth in Article VII.B of the Plan, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

*J.*     *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. Except as otherwise set forth in the Plan, as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under such order or judgment of the Bankruptcy Court.

*K.*     *Disputed Postpetition Interest Claims.*

Claims for postpetition interest with respect to EFIH Unsecured Note Claims, EFH Legacy Note Claims, EFH LBO Note Claims, and EFH Unexchanged Note Claims shall be Allowed under the Plan at the Federal Judgment Rate. Any such Claims for postpetition interest in excess of the Federal Judgment Rate shall be Disputed. If such dispute is not resolved on or before the Effective Date, such Holders shall receive their treatment under the Plan, including payment of postpetition interest at the Federal Judgment Rate, and Reorganized EFH will establish on the Effective Date the Postpetition Interest Reserve.

The Postpetition Interest Reserve shall be used to pay to Holders of such Claims any additional postpetition interest ordered to be paid by the Bankruptcy Court or as agreed by the Plan Sponsors.

The Postpetition Interest Reserve, after payment in full of Allowed Claims against EFH Corp. and the EFIH Debtors, shall be repaid Pro Rata as a purchase price adjustment to the Rights Offering Participants and the Equity Investors, based on the amount of their new money equity investments with respect to Reorganized EFH and/or Reorganized EFIH. In addition, the Postpetition Interest Reserve shall be held and repaid in a manner that does not result in payment of a preferential dividend or otherwise prevent New EFH and Reorganized EFH from qualifying for taxation as a REIT.

**ARTICLE VIII.**
**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

*A.*     *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the

Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

**B.      Release of Liens.**

Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III.B.1, III.B.16, or III.B.26 of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors.

**C.      Releases by the Debtors.**

In addition to any release provided in the Settlement Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Claims and Causes of Action, including Claims and Causes of Action identified, claimed, or released in the Standing Motions, the Litigation Letters, or the Disinterested Directors Settlement, as well as all other Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in--or out-of-court restructuring efforts, intercompany transactions (including dividends paid), transactions pursuant and/or related to the Master Separation Agreement dated December 12, 2001, the TCEH Credit Agreement, the TCEH First Lien Notes, the Cash Collateral Order (and any payments or transfers in connection therewith), the TCEH First Lien Intercreditor Agreement, the Liability Management Program, the Tax Sharing Agreements, the 2007 Acquisition, the Management Agreement, the 2009 amendment to the TCEH Credit Agreement, the 2011 Amend and Extend Transactions, the 2005 Oncor Transfer, the 2013 Revolver Extension, the Luminant Makewhole Settlement, the Tax and Interest Makewhole Agreements, the TCEH Intercompany Notes, the Shared Services, any preference or avoidance claim pursuant to sections 544, 547, 548, and 549 of the Bankruptcy Code, the formulation, preparation, dissemination, negotiation, or Filing of the Terminated Restructuring Support Agreement, the Plan Support Agreement, the EFIH First Lien Settlement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan Support Agreement, the Terminated Restructuring Support Agreement, the Disclosure Statement, the Plan, the Transaction Agreements, the DIP Facilities, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, the Transaction Agreements, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Error! Unknown document property name.

D.      *Releases by Holders of Claims and Interests.*

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Claims and Causes of Action, including Claims and Causes of Action identified, claimed, or released in the Standing Motions, the Litigation Letters, or the Disinterested Directors Settlement, as well as all other Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions (including dividends paid), transactions pursuant and/or related to the Master Separation Agreement dated December 12, 2001, the TCEH Credit Agreement, the TCEH First Lien Notes, the Cash Collateral Order (and any payments or transfers in connection therewith), the TCEH First Lien Intercreditor Agreement, the Liability Management Program, the Tax Sharing Agreements, the 2007 Acquisition, the Management Agreement, the 2009 amendment to the TCEH Credit Agreement, the 2011 Amend and Extend Transactions, the 2005 Oncor Transfer, the 2013 Revolver Extension, the Luminant Makewhole Settlement, the Tax and Interest Makewhole Agreements, the TCEH Intercompany Notes, the Shared Services, any preference or avoidance claim pursuant to sections 544, 547, 548, and 549 of the Bankruptcy Code, the formulation, preparation, dissemination, negotiation, or Filing of the Terminated Restructuring Support Agreement, the Plan Support Agreement, the EFIH First Lien Settlement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan Support Agreement, the Terminated Restructuring Support Agreement, the Disclosure Statement, the Plan, the Transaction Agreements, the DIP Facilities, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, the Transaction Agreements, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any (i) claims or Causes of Action by the Holders of TCEH First Lien Claims, the TCEH First Lien Agent, or the TCEH First Lien Notes Trustee against one or more Holders of TCEH First Lien Claims, the TCEH First Lien Agent, or the TCEH First Lien Notes Trustee arising from or in connection with the TCEH First Lien Creditor Allocation Disputes, (ii) post-Effective Date obligations of any party or Entity under the Plan, (iii) any Restructuring Transaction, or (iv) any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

E.      *Exculpation.*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Terminated Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Support Agreement, the Transaction Agreements, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Plan Support Agreement, the Transaction Agreements, or the DIP Facilities, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan, the Transaction Agreements, or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to

82

their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. For the avoidance of doubt, notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not exculpate any claims or Causes of Action by the Holders of TCEH First Lien Claims, the TCEH First Lien Agent, or the TCEH First Lien Notes Trustee against one or more Holders of TCEH First Lien Claims, the TCEH First Lien Agent, or the TCEH First Lien Notes Trustee arising from or in connection with the TCEH First Lien Creditor Allocation Disputes.

F.    *Injunction.*

In addition to any injunction provided in the Settlement Order, except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests that have been released pursuant to Article VIII.C or Article VIII.D of the Plan, shall be discharged pursuant to Article VIII.A of the Plan, or are subject to exculpation pursuant to Article VIII.E of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan. For the avoidance of doubt, notwithstanding anything to the contrary in the foregoing, the injunction set forth above does not enjoin the TCEH First Lien Creditor Allocation Disputes, or any claims or Causes of Action by the Holders of TCEH First Lien Claims, the TCEH First Lien Agent, or the TCEH First Lien Notes Trustee against one or more Holders of TCEH First Lien Claims, the TCEH First Lien Agent, or the TCEH First Lien Notes Trustee arising from or in connection with the TCEH First Lien Creditor Allocation Disputes.

G.    *Liabilities to, and Rights of, Governmental Units.*

Nothing in the Plan or the Confirmation Order shall release, discharge, or preclude the enforcement of: (i) any liability to a Governmental Unit that is not a Claim; (ii) any Claim of a Governmental Unit arising on or after the Effective Date, other than taxes determined under the prompt determination procedure in section 505 of the Bankruptcy Code, to the extent applicable; (iii) any liability to a Governmental Unit on the part of any Entity other than the Debtors or Reorganized Debtors; or (iv) any valid right of setoff or recoupment by any Governmental Unit.

H.    *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11

Error! Unknown document property name.

Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

*I.        Recoupment.*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Proof of Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

*J.        Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

# ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

*A.        Conditions Precedent to Confirmation.*

It shall be a condition to Confirmation that the following shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

1.   the Bankruptcy Court shall have entered the Disclosure Statement Order, the Confirmation Order, and the Settlement Order in a manner consistent in all material respects with the Plan, the Merger and Purchase Agreement, and the Backstop Agreement, each in form and substance reasonably satisfactory to the Debtors, the Plan Sponsors, the TCEH Supporting First Lien Creditors and, subject to and through the Plan Support Termination Date, the TCEH Supporting Second Lien Creditors and the TCEH Committee; and

2.   the Confirmation Order shall, among other things:

(a)      authorize the Debtors and the Reorganized Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(b)      decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

(c)      authorize the Debtors and Reorganized Debtors, as applicable/necessary, to:  (i) implement the Restructuring Transactions; (ii) issue and distribute the Reorganized EFH Common Stock (including the New EFH Merger Common Stock), the New Reorganized TCEH Debt, the Reorganized TCEH Common Stock, the common stock of the Preferred Stock Entity, the Reorganized TCEH Sub Preferred Stock, the New EFH Common Stock, the Reorganized EFIH Membership Interests, and the New Reorganized EFIH Debt, each pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (iii) make all distributions and issuances as required under the Plan, including Cash, the Reorganized EFH Common Stock, the New Reorganized TCEH Debt, the Reorganized TCEH Common Stock, the common stock of the Preferred Stock Entity, the Reorganized TCEH Sub Preferred Stock, the New Reorganized EFIH Debt, the Reorganized EFIH Membership Interests, and the New EFH Common Stock; and (iv) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement; and

(d)      provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order in furtherance of, or in connection with, any transfers of property pursuant to the Plan, including any deeds, mortgages, security interest filings, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

B.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

1.      the Confirmation Order and the Settlement Order shall have been duly entered in form and substance reasonably acceptable to the Debtors, the Plan Sponsors, the TCEH Supporting First Lien Creditors, and, subject to and through the Plan Support Termination Date, the TCEH Supporting Second Lien Creditors and the TCEH Committee;

2.      any waiting period applicable to the Spin-Off under the HSR Act or similar law or statute shall have been terminated or shall have expired and all governmental and third party approvals and consents that are necessary to implement and effectuate the Spin-Off, including from the FERC, PUC, NRC, and FCC, as applicable, shall have been obtained and shall remain in full force and effect;

3.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, the Equity Investment, the Merger, the REIT Reorganization and the transactions contemplated thereby, including from the FERC, PUC, NRC, and FCC, as applicable, on the terms set forth in the Merger and Purchase Agreement;

4.      the Private Letter Ruling shall have been obtained, which shall remain in full force and effect and shall be reasonably satisfactory to EFH Corp., TCEH, the Plan Sponsors, and the TCEH Supporting First Lien Creditors; *provided, however,* that (x) the failure of the Private Letter Ruling to contain any of the following rulings shall not be grounds for concluding the Private Letter Ruling is not reasonably satisfactory to either EFH Corp., TCEH, the Plan Sponsors, and the TCEH Supporting First Lien Creditors: (i) the Contribution, the Reorganized TCEH Conversion and the Distribution qualify as a "reorganization" within the meaning of Section 368(a)(1)(G) of the Code; (ii) the Distribution constitutes a transaction qualifying under Sections 355 and 356 of the Code; and (iii) the Contribution, the Reorganized TCEH Conversion and the Distribution are not used principally as a device for the distribution of earnings and profits of the Company or Reorganized TCEH and (y) the failure of the Private Letter Ruling to include any one or more of the Required Rulings will be grounds for concluding the Private Letter Ruling is not reasonably satisfactory; *provided, further, however,* that (A) a particular ruling that, in the reasonable determination of EFH Corp., TCEH, the Plan Sponsors, and the TCEH Supporting First Lien Creditors, covers substantially the same subject matter as any one or more of the Required Rulings shall not be grounds for concluding the Private Letter Ruling is not reasonably satisfactory to EFH Corp., TCEH, the Plan Sponsors, and the TCEH Supporting First Lien Creditors due to its failure to include such particular Required Ruling; (B) in the event a specific Required Ruling is not given because the IRS communicates that there is no substantial issue with respect to the requested ruling, the absence of such ruling shall not be grounds for concluding the Private Letter Ruling is not reasonably satisfactory to EFH Corp., TCEH, the Plan Sponsors, and the TCEH Supporting First Lien Creditors provided that EFH Corp. obtains an opinion of nationally recognized tax counsel, in form and substance acceptable to the Plan Sponsors and the TCEH Supporting First Lien Creditors in their reasonable discretion, at a "will" level with respect to the issue that was the subject of the Required Ruling; or (C) a pre-filing agreement (including an agreement in accordance with Revenue Procedure 2009-14) or closing agreement with the IRS shall be acceptable in lieu of any such specific Required Ruling, provided that such agreement is both (i) binding on the

IRS to the same degree as a private letter ruling or is otherwise acceptable to EFH Corp., TCEH, the Plan Sponsors, and the TCEH Supporting First Lien Creditors in their reasonable discretion and (ii) contains, in the reasonable determination of EFH Corp., TCEH, the Plan Sponsors, and the TCEH Supporting First Lien Creditors, conclusions that are substantially similar, and have substantially the same practical effect, to those contained in the Required Rulings *provided further, however*, that the failure of the Private Letter Ruling to contain any of the rulings described in clauses (l), (m), or (n) in the definition of "Required Rulings" shall not be grounds for concluding the Private Letter Ruling is not reasonably satisfactory to EFH Corp., TCEH, or the TCEH Supporting First Lien Creditors; *provided further, however*, that the failure to obtain a ruling that provides that Reorganized TCEH and the Preferred Stock Entity have never been a member of the EFH Group shall not, standing alone, be grounds for concluding the Private Letter Ruling is not reasonably satisfactory;

5. the Debtors shall have obtained the Required Opinions, and such opinions have not been withdrawn, rescinded, or amended;

6. the facts presented and the representations made in the IRS Submissions are true, correct, and complete in all material respects as of the Effective Date;

7. all conditions to the completion of the transactions contemplated by the Transaction Agreements shall have been satisfied or shall have been waived by the party entitled to waive them, and the transactions contemplated by the Transaction Agreements shall be completed substantially simultaneously on the Effective Date;

8. except as otherwise provided in the Plan, the Private Letter Ruling, or the Plan Support Agreement, the Debtors shall not have taken any action to change the entity classification for U.S. tax purposes of any Debtor entity, by changing their legal form or otherwise, without the consent of the Plan Sponsors, TCEH, and the TCEH Supporting First Lien Creditors; *provided, however*, that the consent of TCEH and the TCEH Supporting First Lien Creditors shall not be required with respect to any such action with respect to any Debtor entity other than TCEH, the Reorganized EFH Shared Services Debtors, Reorganized TCEH, the Preferred Stock Entity, or any of their respective subsidiaries, if such action does not directly affect the Contribution, the Preferred Stock Sale, the Reorganized TCEH Conversion, or the Distribution and does not prevent or delay EFH Corp. from obtaining the Private Letter Ruling or adversely affect the Intended Tax Treatment;

9. all Claims against the EFH Debtors and/or the EFIH Debtors with respect to any Makewhole Claim shall be Disallowed Makewhole Claims;

10. the final version of the Plan, the Plan Supplement and all of the schedules, documents, and exhibits contained therein (including the New Employee Agreements/Arrangements and the Employment Agreements) shall have been Filed in a manner consistent in all material respects with the Plan, the Transaction Agreements, the Plan Support Agreement, and the Settlement Order, and shall be in form and substance reasonably acceptable to the Debtors, the Plan Sponsors, the TCEH Supporting First Lien Creditors and, to the extent of any consent or consultation rights provided under the Plan Support Agreement through the Plan Support Termination Date, the TCEH Supporting Second Lien Creditors and the TCEH Committee;

11. all Allowed Professional Fee Claims approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such Allowed Professional Fee Claims after the Effective Date have been placed in the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court;

12. the Debtors and Oncor shall have implemented the Restructuring Transactions, including the Spin-Off, the Merger, and the Equity Investment, in form and manner reasonably acceptable to the Plan Sponsors and the TCEH Supporting First Lien Creditors, and consistent in all material respects with the Plan, the Merger and Purchase Agreement, and the Backstop Agreement; *provided, however*, that implementation or consummation of the Minority Buy-Out shall not be a condition to the Effective Date; and

13. (i) no Debtor shall have taken any action that results in an ownership change of EFH Corp. within the meaning of Section 382(g) of the Internal Revenue Code (including by treating the equity interests of EFH Corp. as becoming worthless within the meaning of Section 382(g)(4)(D) of the Internal Revenue Code); and (ii) Texas Holdings shall not have (A) taken any action that results in an ownership change of EFH Corp. within the meaning of Section 382(g) of the Internal Revenue Code (including by treating the equity interests of EFH Corp. as

86

becoming worthless within the meaning of Section 382(g)(4)(D) of the Internal Revenue Code and thereby resulting in an ownership change of EFH Corp. within the meaning of Section 382(g) of the Internal Revenue Code); (B) knowingly permitted any person (other than Texas Holdings) to own directly, indirectly or constructively (by operation of Section 318 as modified by Section 382(l)(3)(A) of the Internal Revenue Code) 50% or more of the equity interests of EFH Corp. during the three-year period ending on the Effective Date; or (C) changed its taxable year to be other than the calendar year.

C.    *Waiver of Conditions.*

Except with respect to Article IX.B.11, the conditions to Confirmation and Consummation set forth in this Article IX may be waived by the Debtors, including the Debtors acting at the direction of the Disinterested Directors and Managers with respect to Conflict Matters, with the consent of the Plan Sponsors, the TCEH Supporting First Lien Creditors, and, subject to and through the Plan Support Termination Date, the TCEH Supporting Second Lien Creditors and the TCEH Committee (in each case, such consent not to be unreasonably withheld).

D.    *Effect of Failure of Conditions.*

If Confirmation or Consummation with respect to a Debtor does not occur on or before the Plan Support Termination Date, then, as to such Debtor: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity. Notwithstanding the foregoing, for the avoidance of doubt, the Settlement embodied in the Settlement Agreement shall remain in full force and effect and the failure of Confirmation or Consummation to occur with respect to any or all Debtors shall not affect the Settlement or any provisions of the Settlement Agreement.

**ARTICLE X.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

A.    *Modification and Amendments.*

Subject to the Plan Support Agreement, each of the Debtors, including, in the case of any Conflict Matter between any Debtors, each Debtor acting at the direction of its respective Disinterested Director or Manager and without the consent of any other Debtor, reserves the right to modify the Plan, one or more times, before Confirmation, whether such modification is material or immaterial, including any alterations, amendments, or modifications to the Plan to effectuate the Alternative Plan, and to seek Confirmation consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, each of the Debtors, including, in the case of any Conflict Matter between any Debtors, each of the Debtors acting at the direction of its respective Disinterested Director or Manager and without the consent of any other Debtor, expressly reserves its respective rights to alter, amend, or modify the Plan, one or more times, after Confirmation (including any alterations, amendments, or modifications to the Plan to effectuate the Alternative Plan, which shall constitute "modifications" within the meaning of section 1127(b) of the Bankruptcy Code) and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, including with respect to such modifications. Any modification to the Plan shall be in accordance with the Plan Support Agreement and in form and substance reasonably acceptable to the Plan Sponsors, the TCEH Supporting First Lien Creditors, the DIP Agents (and solely with respect to the repayment of the DIP Facilities, acceptable to the DIP Agents), and, subject to and through the Plan Support Termination Date, the TCEH Supporting Second Lien Creditors and the TCEH Committee.

Error! Unknown document property name.

*B.*        *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019, including any modifications or amendments necessary to effectuate the Alternative Plan, as applicable.

*C.*        *Revocation or Withdrawal of Plan.*

Subject to the Plan Support Agreement, each of the Debtors, including, in the case of any Conflict Matter between any Debtors, each Debtor acting at the direction of its respective Disinterested Director or Manager and without the consent of any other Debtor, reserves the right to revoke or withdraw the Plan before the Confirmation Date and to File subsequent plans for any reason, including to the extent the Debtors receive a higher or otherwise better offer than what is provided for in the Plan, or if pursuing Confirmation of the Plan would be inconsistent with any Debtor's fiduciary duties. If any of the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (other than the Settlement embodied in the Settlement Agreement), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code to the extent provided under applicable law, including jurisdiction to:

1.   allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.   hear and determine matters related to the DIP Facilities and the DIP Orders;

3.   decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

4.   resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors' amending, modifying, or supplementing, after the Effective Date, pursuant to Article V of the Plan, any Executory Contracts or Unexpired Leases to the Assumed Executory Contracts and Unexpired Lease List, Rejected Executory Contracts and Unexpired Lease List, or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

5.   adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

Error! Unknown document property name.

6.   adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.   enter and implement such orders as may be necessary to execute, implement, or consummate the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement, including injunctions or other actions as may be necessary to restrain interference by an Entity with Consummation or enforcement of the Plan;

8.   enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.   adjudicate, decide, or resolve any and all matters related to the Restructuring Transactions;

10.  grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

11.  resolve any cases, controversies, suits, disputes, Causes of Action, or any other matters that may arise in connection with the Consummation, interpretation, or enforcement of the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions, or any Entity's obligations incurred in connection with the foregoing, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions;

12.  resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary to implement such releases, injunctions, and other provisions;

13.  resolve any cases, controversies, suits, disputes, or Causes of Action relating to the distribution or the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.K.1 of the Plan;

14.  enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.  enter an order or decree concluding or closing the Chapter 11 Cases;

16.  adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.  consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.  hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code, including any request made under section 505 of the Bankruptcy Code for the expedited determination of any unpaid liability of a Debtor for any tax incurred during the administration of the Chapter 11 Cases, including any tax liability arising from or relating to the Restructuring Transactions, for tax periods ending after the Petition Date and through the closing of the Chapter 11 Cases;

19.  except as otherwise limited herein, recover all assets of the Debtors and property of the Estates, wherever located;

20.  enforce all orders previously entered by the Bankruptcy Court; and

21.  hear any other matter not inconsistent with the Bankruptcy Code.

Error! Unknown document property name.

# ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A.    Immediate Binding Effect.

Subject to Article IX.B of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. Nothing in the Plan or the Confirmation Order affects the DIP Lenders' rights or interests provided under the DIP Facilities, the DIP Agreements, or the DIP Orders, including with respect to (1) any waivers or releases contained therein or (2) the DIP Agents' rights to exercise event of default remedies (including after the Confirmation Date and before the Effective Date), until the DIP Claims are satisfied in full.

### B.    Additional Documents.

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or advisable to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### C.    Payment of Statutory Fees.

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

### D.    Statutory Committee and Cessation of Fee and Expense Payment.

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases (including the EFH/EFIH Committee and the TCEH Committee) shall dissolve; provided, however, that, following the Effective Date, the EFH/EFIH Committee and the TCEH Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (i) Claims and/or applications, and any relief thereto, for compensation by professionals and requests for allowance of Administrative Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; and (ii) appeals of the Confirmation Order as to which the EFH/EFIH Committee or TCEH Committee, as applicable, is a party. Upon dissolution of the EFH/EFIH Committee and TCEH Committee, the members thereof and their respective officers, employees, counsel, advisors, and agents shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date, except to as to the continued limited purposes identified above or as otherwise provided.

### E.    Reservation of Rights.

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or any other Entity with respect to the Holders of Claims or Interests prior to the Effective Date.

F.    *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.    *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.    if to the Debtors, to:

> Energy Future Holdings Corp.
> 1601 Bryan Street,
> Dallas, Texas 75201
> Attention: Stacey Doré, Andrew Wright, and Cecily Gooch
> Email address: stacey.dore@energyfutureholdings.com,
> andrew.wright@energyfutureholdings.com, and cecily.gooch@energyfutureholdings.com

> with copies to:

> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, New York 10022
> Facsimile: (212) 446-4900
> Attention: Edward O. Sassower, P.C., Stephen E. Hessler, and Brian E. Schartz
> E-mail addresses: edward.sassower@kirkland.com, stephen.hessler@kirkland.com, and
> brian.schartz@kirkland.com

> --and--

> Kirkland & Ellis LLP
> 300 North LaSalle
> Chicago, Illinois 60654
> Facsimile: (312) 862-2200
> Attention: James H.M. Sprayregen, P.C., Marc Kieselstein, P.C., Chad J. Husnick, and Steven N.
> Serajeddini
> E-mail addresses: james.sprayregen@kirkland.com, marc.kieselstein@kirkland.com,
> chad.husnick@kirkland.com, and steven.serajeddini@kirkland.com

> --and--

> Proskauer Rose LLP
> Three First National Plaza
> 70 W. Madison Street, Suite 3800
> Chicago, Illinois 60602
> Facsimile: (312) 962-3551
> Attention: Jeff J. Marwil, Mark. K. Thomas, and Peter J. Young
> E-mail addresses: jmarwil@proskauer.com, mthomas@proskauer.com, and
> pyoung@proskauer.com

> --and--

Error! Unknown document property name.

Cravath Swaine and Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Facsimile: (212) 474-3700
Attention: Philip Gelston
E-mail address: pgelston@cravath.com

--and--

Jenner & Block LLP
919 Third Avenue
New York, New York 10022
Facsimile: (212) 891-1699
Attention: Richard Levin
E-mail address: rlevin@jenner.com

--and--

Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
Facsimile: (213) 683-4022
Attention: Thomas B. Walper and Seth Goldman
E-mail addresses: thomas.walper@mto.com and seth.goldman@mto.com

2.    if to the TCEH DIP Agent, to:

Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, New York 10005
Attention: Evan R. Fleck and Karen Gartenberg
E-mail addresses: EFleck@milbank.com and KGartenberg@milbank.com

3.    if to the EFIH First Lien DIP Agent, to:

Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022
Attention: Fredric Sosnick and Ned S. Schodek
E-mail addresses: fsosnick@shearman.com and ned.schodek@shearman.com

4.    if to the Plan Sponsors, to:

White & Case LLP
Southeast Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, Florida 33131
Attention: Thomas E Lauria and Matthew C. Brown
E-mail addresses: tlauria@whitecase.com and mbrown@whitecase.com

--and--

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036

Error! Unknown document property name.

Attention:  J. Christopher Shore and Gregory M. Starner
E-mail addresses: cshore@whitecase.com and gstarner@whitecase.com

–and–

Baker Botts LLP
2001 Ross Avenue
Dallas, Texas 75201
Attention:  C. Luckey McDowell and Geoffrey L. Newton
E-mail addresses:  luckey.mcdowell@bakerbotts.com and geoffrey.newton@bakerbotts.com

5.    if to the TCEH Supporting First Lien Creditors, to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attention:  Alan W. Kornberg, Brian S. Hermann, and Jacob A. Adlerstein
E-mail addresses:  akornberg@paulweiss.com, bhermann@paulweiss.com, and jadlerstein@paulweiss.com

6.    if to the TCEH Committee, to:

Morrison & Foerster LLP
250 West 55th Street
New York, New York 10019
Attention:  Brett H. Miller, James M. Peck, Lorenzo Marinuzzi, and Todd M. Goren
E-mail addresses: brettmiller@mofo.com, jpeck@mofo.com, lmarinuzzi@mofo.com, and tgoren@mofo.com

7.    if to the TCEH Supporting Second Lien Creditors, to:

Brown Rudnick LLP
Seven Times Square
New York, New York 10036
Attention:  Edward S. Weisfelner and Jeffrey L. Jonas
E-mail addresses:  eweisfelner@brownrudnick.com and jjonas@brownrudnick.com

After the Effective Date, the Reorganized Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.    *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.    *Entire Agreement.*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

93

J.     *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at http://www.efhcaseinfo.com or the Bankruptcy Court's website at www.deb.uscourts.gov.

K.     *Nonseverability of Plan Provisions.*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

L.     *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law (including the Securities Act), rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.     *Waiver or Estoppel.*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed before the Confirmation Date.

N.     *Conflicts.*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, the Merger and Purchase Agreement, the Backstop Agreement, or any agreement or order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control; *provided, however,* with respect to any conflict or inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall govern.

*[Remainder of page intentionally left blank.]*

Error! Unknown document property name.

Dated: _____, 2015

Respectfully submitted,

ENERGY FUTURE HOLDINGS CORP.
TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC
4CHANGE ENERGY COMPANY
4CHANGE ENERGY HOLDINGS LLC
BIG BROWN 3 POWER COMPANY LLC
BIG BROWN LIGNITE COMPANY LLC
BIG BROWN POWER COMPANY LLC
BRIGHTEN ENERGY LLC
BRIGHTEN HOLDINGS LLC
COLLIN POWER COMPANY LLC
DALLAS POWER & LIGHT COMPANY, INC.
DECORDOVA II POWER COMPANY LLC
DECORDOVA POWER COMPANY LLC
EAGLE MOUNTAIN POWER COMPANY LLC
EBASCO SERVICES OF CANADA LIMITED
EEC HOLDINGS, INC.
EECI, INC.
EFH AUSTRALIA (NO. 2) HOLDINGS COMPANY
EFH CG HOLDINGS COMPANY LP
EFH CG MANAGEMENT COMPANY LLC
EFH CORPORATE SERVICES COMPANY
EFIH FINANCE (NO. 2) HOLDINGS COMPANY
EFIH FINANCE INC.
EFH FS HOLDINGS COMPANY
ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC
ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC
EFH RENEWABLES COMPANY LLC
GENERATION DEVELOPMENT COMPANY LLC
GENERATION MT COMPANY LLC
GENERATION SVC COMPANY
LAKE CREEK 3 POWER COMPANY LLC
LONE STAR ENERGY COMPANY, INC.
LONE STAR PIPELINE COMPANY, INC.
LSGT GAS COMPANY LLC
LSGT SACROC, INC.
LUMINANT BIG BROWN MINING COMPANY LLC
LUMINANT ENERGY COMPANY LLC
LUMINANT ENERGY TRADING CALIFORNIA COMPANY
LUMINANT ET SERVICES COMPANY
LUMINANT GENERATION COMPANY LLC
LUMINANT HOLDING COMPANY LLC
LUMINANT MINERAL DEVELOPMENT COMPANY LLC
LUMINANT MINING COMPANY LLC
LUMINANT RENEWABLES COMPANY LLC
MARTIN LAKE 4 POWER COMPANY LLC
MONTICELLO 4 POWER COMPANY LLC
MORGAN CREEK 7 POWER COMPANY LLC
NCA DEVELOPMENT COMPANY LLC
NCA RESOURCES DEVELOPMENT COMPANY LLC
OAK GROVE MANAGEMENT COMPANY LLC
OAK GROVE MINING COMPANY LLC
OAK GROVE POWER COMPANY LLC
SANDOW POWER COMPANY LLC

SOUTHWESTERN ELECTRIC SERVICE COMPANY, INC.
TCEH FINANCE, INC.
TEXAS ELECTRIC SERVICE COMPANY, INC.
TEXAS ENERGY INDUSTRIES COMPANY, INC.
TEXAS POWER & LIGHT COMPANY, INC.
TEXAS UTILITIES COMPANY, INC.
TEXAS UTILITIES ELECTRIC COMPANY, INC.
TRADINGHOUSE 3 & 4 POWER COMPANY LLC
TRADINGHOUSE POWER COMPANY LLC
TXU ELECTRIC COMPANY, INC.
TXU ENERGY RECEIVABLES COMPANY LLC
TXU ENERGY RETAIL COMPANY LLC
TXU ENERGY SOLUTIONS COMPANY LLC
TXU RECEIVABLES COMPANY
TXU RETAIL SERVICES COMPANY
TXU SEM COMPANY
VALLEY NG POWER COMPANY LLC
VALLEY POWER COMPANY LLC

By: _____

Name:  Paul M. Keglevic
Title:   Executive Vice President, Chief Financial Officer, and
         Co-Chief Restructuring Officer of EFH Corp., EFIH,
         EFCH, and TCEH

Prepared by:
KIRKLAND & ELLIS LLP
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800 (telephone)

--and--

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
 (312) 862-2000 (telephone)

--and--

RICHARDS LAYTON & FINGER
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700 (telephone)

Counsel to the Debtors and Debtors in Possession

--and--

PROSKAUER ROSE LLP
Jeff J. Marwil (admitted *pro hac vice*)
Mark K. Thomas (admitted *pro hac vice*)
Peter J. Young (admitted *pro hac vice*)
Three First National Plaza
70 W. Madison Street, Suite 3800
Chicago, Illinois 60602
(312) 962-3550 (telephone)

Co-Counsel to the Debtor Energy Future Holdings Corp.

--and--

CRAVATH, SWAINE AND MOORE LLP
Phillip Gelston (admitted *pro hac vice*)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
(212) 474-1978 (telephone)

JENNER & BLOCK LLP
Richard Levin (admitted *pro hac vice*)
919 Third Avenue
New York, New York 10022
(212) 891-1600 (telephone)

Co-Counsel to the Debtor Energy Future Intermediate Holding Company LLC

--and--

MUNGER, TOLLES & OLSON LLP
Thomas B. Walper (admitted *pro hac vice*)
Todd J. Rosen (admitted *pro hac vice*)
Seth Goldman (admitted *pro hac vice*)
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
(213) 683-9100 (telephone)

Co-Counsel to the TCEH Debtors

## EXHIBIT A

### TCEH's Debtor Subsidiaries

4Change Energy Company
4Change Energy Holdings LLC
Big Brown 3 Power Company LLC
Big Brown Lignite Company LLC
Big Brown Power Company LLC
Collin Power Company LLC
DeCordova Power Company LLC
DeCordova II Power Company LLC
Eagle Mountain Power Company LLC
Generation MT Company LLC
Generation SVC Company
Lake Creek 3 Power Company LLC
Luminant Big Brown Mining Company LLC
Luminant Energy Company LLC
Luminant Energy Trading California Company
Luminant ET Services Company
Luminant Generation Company LLC
Luminant Holding Company LLC
Luminant Mineral Development Company LLC
Luminant Mining Company LLC
Luminant Renewables Company LLC
Martin Lake 4 Power Company LLC
Monticello 4 Power Company LLC
Morgan Creek 7 Power Company LLC
NCA Resources Development Company LLC
Oak Grove Management Company LLC
Oak Grove Mining Company LLC
Oak Grove Power Company LLC
Sandow Power Company LLC
TCEH Finance, Inc.
Tradinghouse 3 & 4 Power Company LLC
Tradinghouse Power Company LLC
TXU Energy Receivables Company LLC
TXU Energy Retail Company LLC
TXU Energy Solutions Company LLC
TXU Retail Services Company
TXU SEM Company
Valley NG Power Company LLC
Valley Power Company LLC

Case 14-10979-CSS    Doc 6097-1    Filed 09/16/15    Page 177 of 522

# **EXHIBIT B**

## **MERGER AGREEMENT**

Case 14-10979-CSS    Doc 6097-1    Filed 09/18/15    Page 178 of 522

**EXECUTION VERSION**

**PURCHASE AGREEMENT AND AGREEMENT AND PLAN OF MERGER**

by and among

**OVATION ACQUISITION I, L.L.C.,**

**OVATION ACQUISITION II, L.L.C.,**

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC,**

and

**ENERGY FUTURE HOLDINGS CORP.**

Dated as of August 9, 2015

# TABLE OF CONTENTS

**Page**

**ARTICLE I Issuance; Merger and Other Transactions; Closings** ....................................... 6

| | | |
|---|---|---|
| Section 1.1 | Draw-Down of Equity Commitment; IPO Conversion Plan ...................... 6 |
| Section 1.2 | EFH Issuance............................................................................................. 6 |
| Section 1.3 | Debt Financing ......................................................................................... 6 |
| Section 1.4 | Repayment of Claims ............................................................................... 6 |
| Section 1.5 | Merger ...................................................................................................... 7 |
| Section 1.6 | Contribution of Minority Interest ............................................................ 7 |
| Section 1.7 | EFIH OV2 Issuance ................................................................................. 7 |
| Section 1.8 | Closings .................................................................................................... 8 |
| Section 1.9 | Effective Time .......................................................................................... 9 |
| Section 1.10 | Effects of the Merger ............................................................................... 9 |

**ARTICLE II Certificate of Incorporation and Bylaws of the Surviving Company** ...................... 9

| | | |
|---|---|---|
| Section 2.1 | The Certificate of Incorporation .............................................................. 9 |
| Section 2.2 | Bylaws ...................................................................................................... 9 |

**ARTICLE III Directors and Officers of the Surviving Company** ........................................... 9

| | | |
|---|---|---|
| Section 3.1 | Directors ................................................................................................... 9 |
| Section 3.2 | Officers ................................................................................................... 10 |

**ARTICLE IV Effect of the Merger on Capital Stock; Exchange of Certificates** ........................ 10

| | | |
|---|---|---|
| Section 4.1 | Effect on Capital Stock .......................................................................... 10 |
| Section 4.2 | Exchange of Certificates ........................................................................ 10 |

**ARTICLE V Representations and Warranties** ................................................................. 12

| | | |
|---|---|---|
| Section 5.1 | Representations and Warranties of the Company and EFIH ................... 12 |
| Section 5.2 | Representations and Warranties of the Purchasers ................................. 35 |

**ARTICLE VI Covenants** ................................................................................................ 40

| | | |
|---|---|---|
| Section 6.1 | Interim Operations .................................................................................. 40 |
| Section 6.2 | Alternative Proposals .............................................................................. 44 |
| Section 6.3 | Filings; Other Actions; Notification ....................................................... 46 |
| Section 6.4 | Access and Reports ................................................................................. 51 |
| Section 6.5 | Publicity .................................................................................................. 52 |
| Section 6.6 | Employee Benefits .................................................................................. 52 |
| Section 6.7 | WARN Act ............................................................................................... 54 |
| Section 6.8 | Expenses .................................................................................................. 54 |
| Section 6.9 | Indemnification; Directors' and Officers' Insurance .............................. 54 |
| Section 6.10 | Resignation of Directors and Officers ................................................... 57 |
| Section 6.11 | Takeover Statutes .................................................................................... 57 |
| Section 6.12 | Notice of Current Events ........................................................................ 57 |
| Section 6.13 | Bankruptcy Court Matters ....................................................................... 57 |

i

Section 6.14    Parent and OV2 Waiver.................................................................... 58
Section 6.15    Tax-Free Reorganization Treatment................................................. 59
Section 6.16    Issuance of Equity and Repayment of Indebtedness ....................... 59
Section 6.17    Debt Financing ................................................................................. 59
Section 6.18    Tax Matters....................................................................................... 65
Section 6.19    IPO Conversion Plan; Oncor Restructuring .................................... 66
Section 6.20    Drag-Along Rights ........................................................................... 67
Section 6.21    Transition Services Agreement ........................................................ 68
Section 6.22    Enforcement of Certain Investor Rights........................................... 68
Section 6.23    Oncor Actions................................................................................... 71
Section 6.24    Purchaser Liabilities ........................................................................ 71
Section 6.25    Transaction Expenses ....................................................................... 71
Section 6.26    Rejection of Certain Contracts ......................................................... 72

**ARTICLE VII Conditions**.................................................................................... **73**

Section 7.1    Conditions to All Parties' Obligations .............................................. 73
Section 7.2    Conditions to Obligations of the Purchasers .................................... 75
Section 7.3    Conditions to Obligations of the Company and EFIH ...................... 77

**ARTICLE VIII Termination** ................................................................................. **79**

Section 8.1    Termination by Mutual Consent......................................................... 79
Section 8.2    Termination by Either Parent or the Company/EFIH......................... 79
Section 8.3    Termination by the Company and/or EFIH......................................... 79
Section 8.4    Termination by Parent ....................................................................... 80
Section 8.5    Effect of Termination and Abandonment........................................... 82

**ARTICLE IX Miscellaneous and General**........................................................... **83**

Section 9.1    Survival .............................................................................................. 83
Section 9.2    Modification or Amendment .............................................................. 83
Section 9.3    Waiver of Conditions ........................................................................ 83
Section 9.4    Counterparts....................................................................................... 83
Section 9.5    GOVERNING LAW AND VENUE; WAIVER OF JURY TRIAL ............. 84
Section 9.6    Notices............................................................................................... 85
Section 9.7    Entire Agreement............................................................................... 87
Section 9.8    No Third Party Beneficiaries ............................................................. 88
Section 9.9    Specific Performance......................................................................... 88
Section 9.10   Transfer Taxes ................................................................................... 89
Section 9.11   Definitions......................................................................................... 89
Section 9.12   Severability........................................................................................ 90
Section 9.13   Interpretation; Construction.............................................................. 90
Section 9.14   Assignment ........................................................................................ 91
Section 9.15   Financing Sources Arrangements....................................................... 91

## Exhibits

Exhibit A ................................................................................................Plan of Reorganization
Exhibit B ....................................................................................................IPO Conversion Plan
Exhibit C .................................................................................................................Form of Offer
Exhibit D ............................................................................................... Plan Support Agreement
Exhibit E .................................................................................... Equity Commitment Parties
Exhibit F................................................................................................ Key Regulatory Terms
Exhibit G.............................................................Amended and Restated Split Participant Agreement
Exhibit H....................................................................................................Private Letter Ruling
Exhibit I ................................................................................. Form of Tax Matters Agreement

## Schedules

Schedule 6.4 ................................................................................................. Requests for Information

## Annexes

Annex 1 .............................................................................................. Backstop Purchasers

## TABLE OF DEFINED TERMS

| Term | Provision |
|---|---|
| Acceptable Regulatory Condition | Section 6.3(e) |
| Actions | Section 5.1(g)(i) |
| Advisory Opinion | Section 6.6(c) |
| Affiliate | Section 5.1(a)(i) |
| Agreement | Preamble |
| Alternative Debt Financing | Section 6.17(c) |
| Alternative Proposal | Section 6.2(c) |
| Alternative Transaction Agreement | Section 6.2(a) |
| Amended and Restated Split Participant Agreement | Section 6.6(b) |
| Applicable Date | Section 5.1(e)(i) |
| Applications | Section 6.3(a)(v) |
| Approval Motion | Section 8.4(i)(i) |
| Assumed Plan | Section 5.1(h)(i) |
| Backstop Agreement | Recitals |
| Backstop Purchasers | Recitals |
| Backup Restructuring Proposal | Section 6.2(c) |
| Bankruptcy and Equity Exception | Section 5.1(r) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Benefit Plans | Section 5.1(h)(i) |
| Bond Financing | Recitals |
| Book-Entry Shares | Section 4.1(a) |
| Burdensome Condition(s) | Section 6.3(e) |
| Business Day | Section 1.8 |
| Certificate | Section 4.1(a) |
| Certificates of Merger | Section 1.9 |
| Change of Recommendation | Section 7.2(i) |
| Chapter 11 Cases | Recitals |
| Closing | Section 1.8 |
| Code | Recitals |
| Commitment Documents | Section 5.2(f)(iii) |
| Common Stock | Recitals |
| Company | Preamble |
| Company Approvals | Section 5.1(d)(i) |
| Company Audit Date | Section 5.1(f)(i) |
| Company Board | Section 5.1(c)(ii) |
| Company Disclosure Letter | Section 5.1 |
| Company Material Adverse Effect | Section 5.1(a)(i) |
| Company Material Contract | Section 5.1(r) |
| Company Reports | Section 5.1(e)(i) |
| Company Stock Plan | Section 5.1(b)(i) |
| Competition Law | Section 5.1(d)(i) |
| Compliant | Section 6.17(i) |

## TABLE OF DEFINED TERMS (CONT'D)

| | |
|---|---|
| Confidentiality Agreements | Section 9.7 |
| Confirmation Order | Section 7.1(b) |
| Contract | Section 5.1(d)(ii) |
| Contributed Plan | Section 5.1(h)(i) |
| control | Section 5.1(a)(i) |
| controlling | Section 5.1(a)(i) |
| controlled by | Section 5.1(a)(i) |
| Costs | Section 6.9(a) and Section 6.17(g) |
| Debt Commitment Letter | Section 5.2(f)(i) and Section 6.17(d) |
| Debt Financing | Section 5.2(f)(i) |
| Debt Financing Provisions | Section 9.8 |
| Debtors | Recitals |
| Definitive Agreements | Section 6.17(a) |
| Designated Officer | Section 5.1(h) |
| DGCL | Recitals |
| Disclosure Statement | Section 7.1(b) |
| Disclosure Statement Order | Section 7.1(b) |
| Drag-Along Rights | Recitals |
| Drop-Dead Date | Section 8.2 |
| EFCH | Section 5.1(a)(i) |
| Effective Time | Section 1.9 |
| EFH Contribution | Recitals |
| EFH Corporate Services | Recitals |
| EFH Issuance | Recitals |
| EFH Oncor Consent | Recitals |
| EFH Subject Transactions | Section 1.8 |
| EFIH | Preamble |
| EFIH Board | Section 5.1(c)(ii) |
| EFIH First Lien DIP | Section 1.3 |
| EFIH Issuances | Section 1.7 |
| EFIH OV2 Issuance | Section 1.7 |
| EFIH Parent Issuance | Section 1.6 |
| Eligible Claim | Section 6.9(b) |
| Employees | Section 5.1(h)(i) |
| Enforcement Action | Section 6.22 |
| Environment | Section 5.1(j) |
| Environmental Claim | Section 5.1(j) |
| Environmental Law | Section 5.1(j) |
| Environmental Permits | Section 5.1(j)(ii) |
| Equity Commitment Letter | Recitals |
| Equity Commitment Parties | Recitals |
| Equity Draw-Down | Recitals |
| Equity Financing | Recitals |
| ERCOT | Section 5.1(a)(i)(2) |
| ERCOT Protocols | Section 5.1(o) |
| ERISA | Section 5.1(h)(i) |

**TABLE OF DEFINED TERMS (CONT'D)**

| | |
|---|---|
| ERISA Affiliate | Section 5.1(h)(v) |
| ERISA Plan | Section 5.1(h)(iii) |
| Escrow Closing Date | Section 6.17(f) |
| Exchange Act | Section 5.1(d)(i) |
| Exchange Agent | Section 4.2(a) |
| Excluded Share | Section 4.1(b) |
| Existing Equity Cancellation | Recitals |
| FCC | Section 5.1(d)(i) |
| FCC Approval | Section 5.1(d)(i) |
| FCC/FERC Applications | Section 6.3(a)(v) |
| Federal Power Act | Section 5.1(d)(i) |
| Fee Letter | Section 5.2(f)(i) and Section 6.17(d) |
| FERC | Section 5.1(d)(i) |
| FERC Approval | Section 5.1(d)(i) |
| Filing Subsidiaries | Section 5.1 |
| Financing | Section 5.2(f)(iii) |
| Financing Sources | Section 5.2(f)(i) and Section 6.17(d) |
| First Closing | Section 1.8 |
| First Closing Date | Section 1.8 |
| First Closing Date Transactions | Section 1.2 |
| Franchise Approvals | Section 5.1(d)(i) |
| GAAP | Section 5.1(a)(i)(7) |
| Governmental Entity | Section 5.1(d)(i) |
| Guarantee | Recitals |
| Hazardous Substance | Section 5.1(j) |
| HSR Act | Section 5.1(d)(i) |
| Hunt | Section 5.2(g) |
| Hunt Confidentiality Agreements | Section 9.7 |
| Indemnified Parties | Section 6.9(a) |
| Initial Drop-Dead Date | Section 8.2 |
| Insurance Policies | Section 5.1(n) |
| Insured Retiree Plan | Section 6.6(c) |
| Intellectual Property | Section 5.1(m)(iii) |
| Interim Financing | Section 1.3 |
| Interim Financing Facility | Recitals |
| Investor Rights Agreement | Recitals |
| IPO Conversion Plan | Recitals and Exhibit B |
| IPO Conversion Plan Notice | Section 6.19(a) |
| IRS | Section 5.1(h)(iii) |
| IRS Submissions | Section 6.18(a) |
| IT Assets | Section 5.1(m)(iii) |
| Key Regulatory Terms | Section 6.3(a)(vi) |
| Knowledge | Section 5.1(g) |
| Laws | Section 5.1(i) |
| Lenders | Section 5.2(f)(i) |
| Licenses | Section 5.1(i) |

## TABLE OF DEFINED TERMS (CONT'D)

| | |
|---|---|
| Lien | Section 5.1(b)(iii) |
| Marketing Period | Section 6.17(i) |
| Merger | Recitals |
| MEWA | Section 6.6(c) |
| MGCL | Recitals |
| Minority Interest | Recitals |
| Minority Interest Contribution | Section 1.6 |
| Money Laundering Laws | Section 5.1(t)(ii) |
| NERC | Section 5.1(a)(i)(2) |
| New GP | Exhibit B |
| New Holdco | Recitals |
| Non-Oncor Employee | Section 6.6(a) |
| NRC | Section 5.1(d)(i) |
| NRC Approval | Section 5.1(d)(i) |
| OEDC | Exhibit B |
| Offer | Recitals |
| Oncor | Recitals |
| Oncor AssetCo. | Exhibit B |
| Oncor Employee | Section 6.6(a) |
| Oncor Entities | Section 5.1(a)(i) |
| Oncor Holdings | Section 5.1(a)(i) |
| Oncor Letter Agreement | Recitals |
| Oncor Management | Recitals |
| Oncor Restructuring | Exhibit B |
| Oncor Retiree Welfare Plan | Section 6.6(a) |
| Order | Section 7.1(d) |
| Other Subsidiaries | Section 5.1(b)(iii) |
| OV2 | Preamble |
| OV2 Contribution | Section 1.7 |
| Parent | Preamble |
| Parent Approvals | Section 5.2(d)(i) |
| Parent Common Shares | Recitals |
| Parent Disclosure Letter | Section 5.2 |
| Parent Parties | Section 6.14 |
| Parent Subject Transactions | Section 1.8 |
| Pension Plan | Section 5.1(h)(iii) |
| Per Share Merger Consideration | Section 4.2(a) |
| Permanent Financing | Section 1.3 |
| Permanent Financing Arrangements | Recitals |
| Person | Section 1.8 |
| Plan Effective Date | Section 1.4 |
| Plan of Reorganization | Recitals |
| Plan Support Agreement | Recitals |
| Private Letter Ruling | Section 6.18(a) |
| Preferred Stock Sale | Recitals |
| Proceeding | Section 6.9(a) |

## TABLE OF DEFINED TERMS (CONT'D)

| | |
|---|---|
| PUCT | Section 5.1(d)(i) |
| PUCT Approval | Section 5.1(d)(i) |
| PUCT Filing | Section 6.3(a)(iv) |
| Purchasers | Preamble |
| Purchaser Transaction Parties | Recitals |
| Regulatory Filings | Exhibit F |
| Reimbursement Party | Section 6.25(a) |
| Related Party | Section 9.9(c) |
| Released Claims | Section 6.14 |
| Released Persons | Section 6.14 |
| Release | Section 5.1(j) |
| Remedial Action | Section 5.1(j) |
| Reorganization | Section 7.1(e) |
| Reorganized Company | Recitals |
| Reorganized EFIH | Recitals |
| Reorganized TCEH | Recitals |
| Reorganized TCEH Contributions | Recitals |
| Reorganized TCEH Spin-Off | Recitals |
| Repayment Amount | Section 1.4 |
| Repayment of Claims | Section 1.4 |
| Representatives | Section 6.2(a) |
| Required Financial Information | Section 6.17(e) |
| Required Regulatory Approval | Section 8.2 |
| Required Rulings | Exhibit H |
| Retained Subsidiaries | Section 5.1(g)(ii) |
| Right | Recitals |
| Rights Offering | Recitals |
| Ruling Request | Section 6.18(a) |
| Sarbanes-Oxley Act | Section 5.1(e)(i) |
| SEC | Recitals |
| Second Closing | Section 1.8 |
| Second Closing Date | Section 1.8 |
| Second Closing Date Transactions | Section 1.8 |
| Securities Act | Recitals |
| Share | Section 4.1(a) |
| Shares | Section 4.1(a) |
| Signing Date Agreements | Section 5.1(c)(i) |
| Split Participant Service | Section 6.6(a) |
| Spin-Off Entities | Recitals |
| Spin-Off Date | Recitals |
| Subsidiary | Section 5.1(a)(i) |
| Superior Proposal | Section 6.2(c) |
| Surviving Company | Section 1.5 |
| Tax | Section 5.1(k) |
| Tax Matters Agreement | Section 7.2(d) |
| Tax Return | Section 5.1(k) |

## TABLE OF DEFINED TERMS (CONT'D)

| | |
|---|---|
| Taxes | Section 5.1(k) |
| TBOC | Recitals |
| TCEH | Recitals |
| TCEH Contribution | Recitals |
| TCEH Entities | Section 5.1(s)(iii) |
| Termination Date | Section 8.2 |
| Transaction Agreements | Section 5.1(c)(i) |
| Transaction Expenses | Section 6.25(a) |
| Transactions | Section 1.8 |
| Transition Period | Section 6.6(c) |
| Transition Services Agreement | Section 6.21 |
| under common control with | Section 5.1(a)(i) |
| Unreimbursed Transaction Expenses | Section 6.25(f) |
| TRE | Section 5.1(a)(i)(2) |
| TTI | Recitals |
| WARN Act | Section 5.1(l) |
| wholly owned Subsidiary | Section 5.1(b)(iv) |

## PURCHASE AGREEMENT AND AGREEMENT AND PLAN OF MERGER

This **PURCHASE AGREEMENT AND AGREEMENT AND PLAN OF MERGER** (as hereinafter amended, modified or changed from time to time in accordance with the terms hereof, this "Agreement"), dated as of August 9, 2015, is by and among Energy Future Holdings Corp., a Texas corporation (the "Company"), Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("EFIH"), Ovation Acquisition I, L.L.C., a Delaware limited liability company ("Parent"), and Ovation Acquisition II, L.L.C., a Delaware limited liability company ("OV2" and, together with Parent, the "Purchasers").

### RECITALS

**WHEREAS**, on April 29, 2014, the Company and certain entities in which it, directly or indirectly, holds an equity interest, including TCEH and EFCH (each as defined below) and their respective Subsidiaries (as defined below) (collectively, the "Debtors") commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are currently pending before the Honorable Christopher S. Sontchi and jointly administered for procedural purposes only under Case No. 14-10979 (collectively, with any proceedings relating thereto, the "Chapter 11 Cases");

**WHEREAS**, the Debtors continue to operate their respective businesses as debtors-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, subject to approval of this Agreement by the Bankruptcy Court, the Company, EFIH and the Purchasers have determined to engage in a strategic business combination as more fully set forth below;

**WHEREAS**, the Debtors will submit to the Bankruptcy Court a proposed order confirming a Chapter 11 plan of reorganization (as may be amended, modified or changed from time to time, provided that such amendments, modifications and changes shall not be inconsistent, in any substantive legal or economic respect material to any Purchaser or any Equity Commitment Party (as defined below) (including with respect to the rights and obligations of the Purchasers herein), with this Agreement or the plan of reorganization attached hereto as Exhibit A, the "Plan of Reorganization");

**WHEREAS**, pursuant to the Plan of Reorganization (a) Texas Competitive Electric Holdings Company LLC ("TCEH"), a Delaware limited liability company and a wholly owned, indirect subsidiary of the Company, will form a new subsidiary of TCEH ("Reorganized TCEH") on or before the date (the "Spin-Off Date") for the consummation of the Plan of Reorganization with respect to TCEH and its subsidiaries that are Debtors (it being understood that the Spin-Off Date shall occur on the First Closing Date (as defined below)); (b) on the Spin-Off Date, TCEH will transfer all of the TCEH Assets (as defined in the Plan of Reorganization) in exchange for (i) 100% of the newly-issued equity interests of Reorganized TCEH and (ii) the cash proceeds of new Reorganized TCEH debt (such transfer, the "TCEH Contribution"), as well as the assumption by Reorganized TCEH of the TCEH Liabilities (as defined in the Plan of Reorganization); (c) immediately thereafter, Reorganized TCEH will transfer certain of its assets to a newly formed Delaware entity ("New Holdco"), in exchange for 100% of New Holdco's equity; (d) immediately thereafter, Reorganized TCEH will sell preferred stock of New Holdco to third parties in exchange

for cash consideration and distribute the cash consideration to TCEH (together with the actions described in clause (c), the "Preferred Stock Sale"); and (e) immediately following the TCEH Contribution and the Preferred Stock Sale, Reorganized TCEH will convert into a Delaware corporation pursuant to applicable Law (as defined below);

WHEREAS, pursuant to the Plan of Reorganization and prior to the conversion of Reorganized TCEH to a Delaware corporation, the Company will contribute the equity securities of (a) EFH Corporate Services Company, a Texas corporation ("EFH Corporate Services"), (b) Dallas Power and Light Company, Inc.; (c) EFH CG Holdings Company LP; (d) EFH CG Management Company LLC; (e) Lone Star Energy Company, Inc.; (f) Lone Star Pipeline Company, Inc.; (g) Southwestern Electric Service Company, Inc.; (h) Texas Electric Service Company, Inc.; (i) Texas Energy Industries Company, Inc.; (j) Texas Power and Light Company, Inc.; (k) Texas Utilities Company, Inc.; (l) Texas Utilities Electric Company, Inc.; and (m) TXU Electric Company, Inc., as well as certain other assets, liabilities, and equity interests related to the TCEH Debtors' operations, all as provided in the Plan of Reorganization (together with TCEH and Reorganized TCEH and their respective Subsidiaries, the "Spin-Off Entities"), to Reorganized TCEH (the "EFH Contribution" and, together with the TCEH Contribution, the "Reorganized TCEH Contributions");

WHEREAS, pursuant to the Plan of Reorganization and as a result of the EFH Contribution, the employees of EFH Corporate Services and its Subsidiaries shall become the employees of Reorganized TCEH or one or more of its Subsidiaries;

WHEREAS, pursuant to the Plan of Reorganization, on the First Closing Date, TCEH will distribute, or cause to be distributed, all of the outstanding equity interests in Reorganized TCEH in a manner consistent with the Private Letter Ruling (as defined below) and as set forth in the Plan of Reorganization (the "Reorganized TCEH Spin-Off");

WHEREAS, each of EFCH, TCEH, TCEH Finance, Inc. and each other Subsidiary of EFH (excluding only (i) EFIH and the Oncor Entities (as defined below), (ii) the Spin-Off Entities and (iii) the other entities agreed upon by Parent and the Company) will be dissolved and liquidated or abandoned in accordance with the Plan of Reorganization and applicable Law (as defined below) and the Company's direct and indirect equity interests in each such Subsidiary will be either (as mutually agreed by the Company and Parent, each acting reasonably) cancelled or abandoned pursuant to the Plan of Reorganization;

WHEREAS, it is intended that, for federal income tax purposes, the Reorganized TCEH Spin-Off in conjunction with the Plan of Reorganization qualify as a "reorganization" within the meaning of Sections 368(a)(1)(G), 355 and 356 of the Code (as defined below);

WHEREAS, the respective boards of directors (or similar governing bodies) of each of the Company and EFIH have, by resolutions duly adopted, declared that the EFH Subject Transactions, including the Merger (as defined below), are advisable, and approved and adopted this Agreement;

WHEREAS, the respective boards of directors (or similar governing bodies) of each of the Purchasers have, by resolutions duly adopted, declared that, as applicable to such Purchaser, the Rights Offering (as defined below), the Equity Draw-Down (as defined below) and the other Transactions (as defined below), including the Merger, are advisable, and approved and adopted this Agreement;

WHEREAS, prior to the First Closing Date, Parent shall be converted into a Maryland or Delaware corporation, as determined by the Parent;

WHEREAS, pursuant to the Plan of Reorganization, Parent shall, prior to the First Closing Date, conduct an initial offering of equity rights by distributing to Rights Offering Participants (as defined in the Plan of Reorganization) that number of rights (each, a "Right") that will enable the holders thereof to purchase an aggregate of approximately $5,787,250,000 of common stock, par value $0.01 per share, of Parent ("Parent Common Shares"), all at the same purchase price to be determined by Parent in accordance with the Backstop Agreement, in a transaction pursuant to which the TCEH Unsecured Creditors set forth on Annex 1 or their permitted assignees (the "Backstop Purchasers") will backstop approximately $5,087,250,000 of Rights offered to the Rights Offering Participants (other than holders of Allowed TCEH First Lien Claims, as such term is defined in the Plan of Reorganization), on the terms and subject to the conditions set forth in the backstop agreement, dated as of the date hereof, among the Backstop Purchasers, the Company, EFIH and Parent (the "Backstop Agreement"), all or a portion of which offering of Rights (as set forth in the Backstop Agreement), including the distribution of rights and the issuance of Parent Common Shares pursuant thereto (together with any issuance of Parent Common Shares pursuant to the Backstop Agreement, the "Rights Offering"), will be registered under the Securities Act of 1933, as amended (the "Securities Act"), pursuant to an effective registration statement to be filed with the U.S. Securities and Exchange Commission (the "SEC") in accordance with the Backstop Agreement;

WHEREAS, in connection with, and in furtherance of, the Rights Offering and Merger, each of the Purchasers, the Company and EFIH have formulated the plan attached hereto as Exhibit B, (as may be amended, modified or supplemented from time to time by the Purchasers subject to the prior written consent of the Company and EFIH (such consent not to be unreasonably withheld, conditioned or delayed), in a manner consistent with the terms of the Investor Rights Agreement (as defined below), the "IPO Conversion Plan") to create and implement an IPO Conversion (as such term is defined in the Investor Rights Agreement (as defined below)), pursuant to which the reorganized Company (including any successor in interest thereto, the "Reorganized Company") would serve as the IPO Corporation;

WHEREAS, on the First Closing Date, each of the Purchasers shall obtain funds from the proceeds of the transactions contemplated by the Equity Commitment Letter (as defined below) and the Backstop Agreement (including any proceeds of the Rights Offering) (the "Equity Draw-Down") in at least the minimum amount set forth in Annex 1;

WHEREAS, on the First Closing Date, (i) the IPO Conversion Plan shall be consummated and (ii) Parent may acquire all or a portion of the equity interests (the "Minority Interest") in Oncor Electric Delivery Company LLC, a Delaware limited liability company ("Oncor") held by Texas Transmission Investment LLC, a Delaware limited liability company ("TTI"), and/or Oncor Management Investment LLC, a Delaware limited liability company ("Oncor Management"), either (a) pursuant to the drag-along rights (the "Drag-Along Rights") set forth in Section 3.3 of the Investor Rights Agreement, dated as of November 5, 2008 (the "Investor Rights Agreement"), among Oncor and certain of its direct and indirect equityholders, including the Company and TTI, or (b) in a privately negotiated transaction with TTI and/or Oncor Management;

WHEREAS, contemporaneous with the execution and delivery of this Agreement, Parent delivered to the Company an offer, in the form attached hereto as Exhibit C, to purchase substantially all outstanding IPO Units (as defined in the Investor Rights Agreement) in the IPO Corporation (as

3

defined in the Investor Rights Agreement) and LLC Units (as defined in the Investor Rights Agreement) held by each of TTI and Oncor Management (the "Offer");

WHEREAS, unless Parent has otherwise acquired, or entered into a definitive agreement with TTI and Oncor Management that provides for the acquisition by Parent of all of the Minority Interest prior to or on the First Closing Date, the Company may be required to exercise, or cause to be exercised, the Drag-Along Rights set forth in Section 3.3 of the Investor Rights Agreement in accordance with the terms and subject to the conditions set forth herein and therein;

WHEREAS, on the First Closing Date, immediately after (i) the cancellation and retirement of the outstanding equity interests in the Company to be carried out pursuant to the Plan of Reorganization (the "Existing Equity Cancellation") and (ii) the Reorganized TCEH Spin-Off, the Reorganized Company will issue (the "EFH Issuance") new shares of common stock, no par value, of the Reorganized Company (the "Common Stock") to certain holders of Allowed TCEH Unsecured Debt Claims and Allowed General Unsecured Claims Against the TCEH Debtors Other Than EFCH (each as defined in the Plan of Reorganization) (collectively, the "TCEH Unsecured Creditors") (or to TCEH to the extent of any Assigned C5 Equity (as such term is defined in the Plan of Reorganization)) in consideration of their claims as set forth in, and pursuant to, the Plan of Reorganization, which will result in such TCEH Unsecured Creditors (and/or TCEH to the extent of any Assigned C5 Equity) holding approximately two percent (2%) of the fully diluted shares of common stock of the Surviving Company upon completion of the Merger;

WHEREAS, on the First Closing Date, immediately following the EFH Issuance, and concurrently with the Repayment of Claims and the Merger, (i) reorganized EFIH ("Reorganized EFIH") will borrow an amount up to the amount available under the Overnight Facility (as defined in the Debt Commitment Letter (as defined below)) (the "Interim Financing Facility") and (ii) Reorganized EFIH will borrow or obtain debt financing in the aggregate amount determined pursuant to Section 1.1 of the Parent Disclosure Letter pursuant to one or more facilities or capital markets transactions as contemplated by the Debt Commitment Letter or an Alternative Debt Financing (as defined below) in lieu thereof or any capital markets debt financing undertaken in replacement of, or in lieu of, all or any portion of the debt financing (the "Bond Financing") (such facilities or transactions, the "Permanent Financing Arrangements"), which in each case will be established or arranged on behalf of Reorganized EFIH by the Purchasers;

WHEREAS, upon the terms and subject to the conditions set forth in this Agreement, the Plan of Reorganization and the applicable provisions of Chapter 10 of the Texas Business Organizations Code (the "TBOC") and either the General Corporation Law of the State of Maryland (the "MGCL") or the General Corporation Law of the State of Delaware (the "DGCL"), as the case may be, on the First Closing Date, immediately following the EFH Issuance and the completion of the Rights Offering, and concurrently with the Interim Financing (as defined below), the Permanent Financing (as defined below) and the Repayment of Claims, the Reorganized Company shall merge with and into Parent (the "Merger"), with Parent being the Surviving Company resulting from the Merger;

WHEREAS, it is intended that, for federal income tax purposes, the Merger pursuant to the terms and conditions of this Agreement will qualify as a "reorganization" within the meaning of Sections 368(a)(1), 354, and 356 of the Internal Revenue Code of 1986, as amended (the "Code"), and that this Agreement shall constitute the adoption of a plan of reorganization within the meaning of Section 368 of the Code;

4

**WHEREAS**, on the First Closing Date, immediately after the Merger and borrowing or obtaining financing pursuant to the Interim Financing Facility and Permanent Financing Arrangements, EFIH shall use the proceeds of the Permanent Financing to repay the EFIH First Lien DIP (as defined below) and all expenses related thereto in full in cash in accordance with the Plan of Reorganization;

**WHEREAS**, on the First Closing Date, immediately following the Effective Time (as defined below), if Parent has acquired all or a portion of the Minority Interest from TTI and/or Oncor Management prior to such time, the Surviving Company shall contribute such acquired Minority Interest to Reorganized EFIH in exchange for the EFIH Parent Issuance (as defined below);

**WHEREAS**, on the date hereof, the Purchasers, the Equity Commitment Parties (collectively with any Person that is or becomes a party to the Equity Commitment Letter, Guarantee (as defined below), or the Backstop Agreement, and all successors and permitted assigns of each of the foregoing, the "Purchaser Transaction Parties"), the Company, EFIH and, pursuant to the consent that the parties hereby acknowledge is granted by the Company and EFIH on behalf themselves and their respective Subsidiaries in accordance with the Confidentiality Agreements (as defined below), the creditors of the Debtors named therein, entered into the Plan Support Agreement attached as Exhibit D hereto (the "Plan Support Agreement"), pursuant to which each of the parties thereto has agreed, among other things, to support the Plan of Reorganization;

**WHEREAS**, prior to or concurrently with the execution and delivery of this Agreement, and as a condition to the willingness of the Company and EFIH to enter into this Agreement, each of the entities set forth on Exhibit E (collectively, together with the Backstop Purchasers and any permitted assignees of any such entity, the "Equity Commitment Parties") is entering into (i) a commitment letter in favor of the Company (including the Reorganized Company), EFIH (including Reorganized EFIH) and the Purchasers in a form previously agreed upon by the parties (including all exhibits, schedules, annexes, supplements and amendments thereto, the "Equity Commitment Letter"), pursuant to which, among other things, each Equity Commitment Party is committing, subject to the terms and conditions thereof, to invest in one or both of the Purchasers the amounts set forth therein in order to fund a portion of the amounts payable by the Purchasers pursuant to this Agreement (together with the proceeds of the Rights Offering, the "Equity Financing") and (ii) a Guarantee in favor of the Company (including the Reorganized Company), EFIH (including Reorganized EFIH) and the Purchasers in a form previously agreed upon by the parties (including all exhibits, schedules, annexes, supplements and amendments thereto, the "Guarantee");

**WHEREAS**, the Purchasers, Oncor and Oncor Holdings (as defined below) intend to enter into a letter agreement (the "Oncor Letter Agreement"), pursuant to which, among other things, each of Oncor and Oncor Holdings will agree to take and not to take certain actions in furtherance of the Transactions;

**WHEREAS**, promptly after receiving a request therefor from Oncor Holdings, EFIH will deliver to Oncor Holdings a written consent (the "EFH Oncor Consent") authorizing Oncor Holdings and Oncor to enter into and perform their respective obligations under the Oncor Letter Agreement;

**WHEREAS**, the Company, EFIH and the Purchasers desire to make certain representations, warranties, covenants and agreements in connection with this Agreement; and

**WHEREAS**, the Transactions (i) are subject to the approval by the Bankruptcy Court of this Agreement and the order confirming the Plan of Reorganization and (ii) will be consummated pursuant to the Plan of Reorganization.

**NOW, THEREFORE**, in consideration of the premises, representations, warranties, covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

## ARTICLE I
### Issuance; Merger and Other Transactions; Closings

Section 1.1    Draw-Down of Equity Commitment; IPO Conversion Plan. Upon the terms and subject to the conditions contained in this Agreement, on the First Closing Date, the Purchasers shall carry out the Equity Draw-Down by drawing funds under the Equity Commitment Letter in the aggregate amount set forth in Section 1.1 of the Parent Disclosure Letter. Upon the terms and subject to the conditions contained in this Agreement, on the First Closing Date, following the Reorganized TCEH Spin-Off, each of the Reorganized Company, Reorganized EFIH, Oncor (pursuant to the Oncor Letter Agreement), Parent, OEDC (as defined below) (at the direction of Parent) and an Affiliate (as defined below) of Hunt (at the direction of Parent) shall consummate the steps to be carried out by them pursuant to the IPO Conversion Plan.

Section 1.2    EFH Issuance. Upon the terms and subject to the conditions set forth herein and pursuant to the Plan of Reorganization, on the First Closing Date, immediately after the Existing Equity Cancellation and the consummation of the Reorganized TCEH Spin-Off, the Reorganized Company shall carry out the EFH Issuance by issuing Common Stock to the TCEH Unsecured Creditors as set forth in, and pursuant to, the Plan of Reorganization. The consummation of the IPO Conversion Plan, the Equity Draw-Down, the EFH Issuance, the Interim Financing, the Permanent Financing, the Merger, and, solely to the extent the Minority Interest is acquired, the Minority Interest Contribution (as defined below) and the EFIH Parent Issuance (as defined below) are referred to herein as the "First Closing Date Transactions."

Section 1.3    Debt Financing. Upon the terms and subject to the conditions set forth herein, on the First Closing Date, immediately following the EFH Issuance, and concurrently with the Repayment of Claims and the Merger, Reorganized EFIH will borrow (i) an amount up to the amount available under the Interim Financing Facility (collectively, the "Interim Financing"), and (ii) an aggregate amount under the Permanent Financing Arrangements determined pursuant to Section 1.1 of the Parent Disclosure Letter (the "Permanent Financing"). The parties hereby covenant and agree that, immediately upon receipt of the borrowings pursuant to the Permanent Financing, Reorganized EFIH shall use all or part of the proceeds thereof to repay in full all indebtedness of Reorganized EFIH under the existing first lien debtor-in-possession financing facility of EFIH (the "EFIH First Lien DIP") and all expenses related thereto, in accordance with the Plan of Reorganization.

Section 1.4    Repayment of Claims. Upon the terms and subject to the conditions set forth herein and pursuant to the Plan of Reorganization, on the First Closing Date, concurrently with the Interim Financing, the Permanent Financing and the Merger, the Debtors shall cause the Repayment Amount (as defined below) to be applied in accordance with the Plan of Reorganization, including to the payment of administrative claims (the "Repayment of Claims").

The "Repayment Amount" is equal to the aggregate amount of all Allowed Claims (as defined in the Plan of Reorganization) against the EFH Debtors and EFIH Debtors (as such terms are defined in the Plan of Reorganization) to the extent such Allowed Claims are payable in cash pursuant to the terms of the Plan of Reorganization, which amount shall be funded by (i) cash on hand at the Reorganized Company and its Subsidiaries (other than the Oncor Entities and any Subsidiary (as defined below) of the Company which is not, directly or indirectly, acquired by Parent pursuant to the Merger, including any such Subsidiary which is transferred to Reorganized TCEH or the equity of which is otherwise no longer held, directly or indirectly, by the Reorganized Company immediately prior to the Closing) as of the effective date of the Plan of Reorganization with respect to the Company and EFIH (the "Plan Effective Date"), (ii) the proceeds of the Equity Draw-Down, (iii) the proceeds of the Interim Financing and (iv) the proceeds of the Permanent Financing (net of all unpaid fees and expenses payable in connection with (A) the Debt Financing (as defined below), (B) the Equity Financing or (C) otherwise pursuant to this Agreement or the Transactions). The Repayment of Claims shall be funded from the Repayment Amount and shall be made in accordance with the Plan of Reorganization in full satisfaction of the allowed claims of certain holders of claims and interests in the Debtors.

Section 1.5    Merger. Upon the terms and subject to the conditions set forth herein, in accordance with the applicable provisions of Chapter 10 of the TBOC and the MGCL or the DGCL, as the case may be, and pursuant to the Plan of Reorganization, at the Effective Time, the Reorganized Company shall merge with and into Parent, and the separate corporate existence of the Reorganized Company shall thereupon cease. Parent shall continue as the surviving company (the "Surviving Company"), and the separate corporate existence of Parent, with all of its and the Reorganized Company's rights, privileges, immunities, powers and franchises, shall continue unaffected by the Merger, except as set forth in Article II. Each of the Purchasers hereby covenants and agrees that, on the First Closing Date, immediately following the Merger, and subject to Section 6.25, the Surviving Company shall use the funds then available to it as a result of the Merger (which for the avoidance of doubt shall not include all or any portion of the Repayment Amount) to repay all fees and expenses incurred in connection with the Debt Financing, the Equity Financing or otherwise required to be paid by the Purchasers or the Surviving Company pursuant to this Agreement, the Plan of Reorganization or the Transactions.

Section 1.6    Contribution of Minority Interest. Upon the terms and subject to the conditions set forth herein, on the First Closing Date, immediately following the Effective Time, if Parent has acquired all or a portion of the Minority Interest from TTI and/or Oncor Management prior to the Effective Time, the Surviving Company shall contribute such acquired Minority Interest (the "Minority Interest Contribution") to Reorganized EFIH in exchange for the issuance by Reorganized EFIH of partnership interests in Reorganized EFIH in an aggregate amount equal to the applicable percentage of the outstanding partnership interests in Reorganized EFIH determined pursuant to Section 1.6 of the Parent Disclosure Letter (the "EFIH Parent Issuance"). For the avoidance of doubt, the occurrence of the acquisition of the Minority Interest, the Minority Interest Contribution and the EFIH Parent Issuance are not requirements for, or a condition to, the consummation and closing of the First Closing Date Transactions.

Section 1.7    EFIH OV2 Issuance. Upon the terms and subject to the conditions set forth herein, on the Second Closing Date (as defined below), OV2 shall contribute to Reorganized EFIH the amount determined pursuant to Section 1.1 of the Parent Disclosure Letter, which shall be sufficient to repay the Interim Financing in full (the "OV2 Contribution"), by wire transfer, as directed by Reorganized EFIH, in immediately available funds, in exchange for the

7

issuance by Reorganized EFIH of partnership interests in Reorganized EFIH in an aggregate amount equal to the applicable percentage of the outstanding partnership interests in Reorganized EFIH determined pursuant to <u>Section 1.6</u> of the Parent Disclosure Letter (after giving effect to the EFIH Parent Issuance) (the "<u>EFIH OV2 Issuance</u>" and, together with the EFIH Parent Issuance, the "<u>EFIH Issuances</u>"). Parent hereby covenants and agrees that immediately following the EFIH OV2 Issuance, the Surviving Company and Reorganized EFIH shall use the funds available to them as a result of the OV2 Contribution to repay all remaining portions of the indebtedness outstanding under the Interim Financing Facility.

    Section 1.8   <u>Closings</u>.  On the terms and subject to the conditions set forth in this Agreement, the closing (the "<u>First Closing</u>") of the applicable First Closing Date Transactions, in the order described herein, shall take place at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, at 10:00 a.m. (Eastern Time) on the Plan Effective Date, which shall be (a) the second (2nd) Business Day (as defined below) (or, if such Business Day is not immediately followed by another Business Day, the next subsequent Business Day that is immediately followed by another Business Day) following the day on which the last of the conditions to the obligations of the parties with respect to the First Closing set forth in <u>Article VII</u> is satisfied or waived in accordance with this Agreement (other than those conditions that by their nature or pursuant to the terms of this Agreement are to be satisfied at the First Closing, but subject to the satisfaction or waiver of such conditions at the First Closing) or (b) such other date and time as mutually agreed in writing between the Company, EFIH and Parent; *provided*, that (unless (i) Parent has received the proceeds of the Interim Financing and the Permanent Financing Arrangements as contemplated by the Debt Commitment Letter prior to the commencement of any Marketing Period (as defined below) and (ii) such proceeds shall remain in escrow as of the First Closing, in which case this proviso shall not apply),  if the Marketing Period has not ended at such time, the First Closing shall not occur until the earlier to occur of (x) a date during the Marketing Period specified by Parent on not less than three (3) Business Days' written notice to the Company and (y) the first Business Day following the final day of the Marketing Period, subject in each case to the satisfaction or waiver of all the conditions set forth in <u>Article VII</u>, as of the date determined pursuant to this proviso.  On the terms and subject to the conditions set forth in this Agreement, the closing (the "<u>Second Closing</u>") of the EFIH OV2 Issuance, OV2 Contribution, and the repayment of the Interim Financing in full (the "<u>Second Closing Date Transactions</u>" and, together with the First Closing Date Transactions, the "<u>Parent Subject Transactions</u>") shall take place at the offices of Baker Botts L.L.P., 2001 Ross Avenue, Dallas, Texas 75201, at 10:00 a.m. (Eastern Time) on the Business Day immediately following the First Closing Date.  The date on which the First Closing actually occurs is referred to herein as the "<u>First Closing Date</u>", and the date on which the Second Closing actually occurs is referred to herein as the "<u>Second Closing Date</u>".  For purposes of this Agreement, (A) the term "<u>EFH Subject Transactions</u>" means the Reorganized TCEH Contributions, the Reorganized TCEH Spin-Off and the First Closing Date Transactions (other than the Equity Draw-Down, the Minority Interest Contribution and the EFIH Parent Issuance); (B) the term "<u>Transactions</u>" means the Reorganized TCEH Contributions, the Reorganized TCEH Spin-Off and the Parent Subject Transactions; (C) the term "<u>Business Day</u>" shall mean any day ending at 11:59 p.m. (Eastern Time) other than a Saturday or Sunday or a day on which banks are required or authorized to close in New York, New York and (D) the term "<u>Person</u>" shall mean any individual, corporation (including not-for-profit), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, Governmental Entity (as defined below) or other entity of any kind or nature.  At the First Closing and the Second Closing (each, a "<u>Closing</u>"), Parent and OV2, on the one hand, and Reorganized EFIH and the Reorganized Company, on the other hand, shall execute and deliver all certificates, instruments, and documents required to be executed and/or delivered by such

Person and/or any of its Affiliates under this Agreement in order for the conditions to the other parties' obligations to consummate each such Closing to be satisfied. The Parties acknowledge and agree that none of the First Closing Date Transactions are conditional upon the consummation of any of the Second Closing Date Transactions.

Section 1.9    Effective Time.  On the terms and subject to the conditions set forth in this Agreement, on the First Closing Date, immediately following the consummation of the IPO Conversion Plan, the Equity Draw-Down, the Rights Offering and the EFH Issuance and concurrently with the Repayment of Claims, the Interim Financing, and the Permanent Financing, the Reorganized Company and Parent will cause a certificate of merger to be executed, acknowledged and filed with the Secretary of State of the State of Maryland or the Secretary of State of the State of Delaware, as required by the applicable provisions of the MGCL or the DGCL, as the case may be, and with the Secretary of State of the State of Texas as provided under Section 10.153 of the TBOC (the "Certificates of Merger"), and shall take all such further actions as may be required by applicable Law to make the Merger effective. The Merger shall become effective on the First Closing Date at such time immediately following the consummation of the transactions referred to in the first sentence of this Section 1.9 as is mutually agreed by the parties in writing and specified in each of the Certificates of Merger (such date and time, the "Effective Time").

Section 1.10    Effects of the Merger.  The effects of the Merger shall be as provided in this Agreement, the Plan of Reorganization and in the applicable provisions of the MGCL or the DGCL, as the case may be, the TBOC and other applicable Law. Without limiting the generality of the foregoing, at the Effective Time, all of the property, rights, privileges, powers and franchises of the Reorganized Company and Parent shall vest in the Surviving Company, and all debts, liabilities and duties of the Reorganized Company (to the extent not assumed by Reorganized TCEH or discharged under the Plan of Reorganization) and Parent shall become the debts, liabilities and duties of the Surviving Company.

## ARTICLE II
## Certificate of Incorporation and Bylaws
## of the Surviving Company

Section 2.1    The Certificate of Incorporation.  The certificate of incorporation of Parent as in effect immediately prior to the Effective Time, shall be the certificate of incorporation of the Surviving Company until thereafter changed or amended as provided therein or by the MGCL or the DGCL, as the case may be.

Section 2.2    Bylaws.  The bylaws of Parent, as in effect immediately prior to the Effective Time, shall be the bylaws of the Surviving Company until thereafter changed or amended as provided therein or by the MGCL or the DGCL, as the case may be.

## ARTICLE III
## Directors and Officers of the Surviving Company

Section 3.1    Directors.  The directors of Parent at the Effective Time shall, from and after the Effective Time, be the directors of the Surviving Company until their successors are duly elected or appointed and qualified or until their earlier death, resignation or removal in accordance with the certificate of incorporation and bylaws of Parent.

9

Section 3.2    Officers.  The officers of Parent at the Effective Time shall, from and after the Effective Time, be the officers of the Surviving Company until their successors are duly elected or appointed and qualified or until their earlier death, resignation or removal in accordance with the certificate of incorporation and bylaws of Parent.

## ARTICLE IV
## Effect of the Merger on Capital Stock;
## Exchange of Certificates

Section 4.1    Effect on Capital Stock.  At the Effective Time, by virtue of the Merger and without any action on the part of the Reorganized Company, Parent, the holders of any Common Stock, the holders of any equity interests in Parent or any other Person:

(a)    Merger Consideration.  On the terms set forth in this Agreement and the Plan of Reorganization, each share of Common Stock issued and outstanding immediately prior to the Effective Time (a "Share" or, collectively, the "Shares"), other than Excluded Shares (as defined below), shall be converted into one Parent Common Share (the "Per Share Merger Consideration"), which shares shall be validly issued, fully paid and non-assessable (except to the extent that such non-assessability is limited by the MGCL or the DGCL, as the case may be).  All such Shares (other than Excluded Shares), when so converted, shall no longer be outstanding and shall automatically be cancelled and shall cease to exist, and each holder of a certificate that immediately prior to the Effective Time represented any such Shares (other than Excluded Shares) (each a "Certificate") and each holder of Shares (other than Excluded Shares) held in uncertificated book-entry form (the "Book-Entry Shares") shall cease to have any rights with respect thereto, except the right to receive the Parent Common Shares.

(b)    Cancellation of Excluded Shares.  Each Share owned by Parent, the Company or any direct or indirect wholly owned Subsidiary of the Company (each, an "Excluded Share") shall cease to be outstanding, shall be cancelled and retired without payment of any consideration therefor and shall cease to exist.

(c)    Parent Common Shares.  Each Parent Common Share issued and outstanding immediately prior to the Effective Time shall remain outstanding.

Section 4.2    Exchange of Certificates.

(a)    Exchange Agent and Exchange Procedures.  Prior to the First Closing, Parent shall enter into an exchange agent agreement with an exchange agent (the "Exchange Agent") to act as exchange agent, registrar and transfer agent for the purpose of exchanging Certificates or Book-Entry Shares, other than Excluded Shares, for the Per Share Merger Consideration applicable thereto.  As soon as reasonably practicable after the Effective Time and in any event not later than the fifth (5th) Business Day following the Effective Time, Parent shall issue, or cause to be issued, to each holder of record of a Certificate or Book-Entry Share that immediately prior to the Effective Time represented outstanding Shares (other than Excluded Shares), pursuant to such documentation and procedures as Parent shall determine, that number of Parent Common Shares (which shall be in uncertificated book-entry form through a direct registration system maintained by Parent, except to the extent that a Purchaser Transaction Party requests in writing delivery of a Certificate), that such holder

10

has the right to receive pursuant to the provisions of this <u>Article IV</u>, and each Certificate or Book-Entry Share (other than Excluded Shares) shall be canceled at the Effective Time. In the event of a transfer of ownership of Shares (other than Excluded Shares) that is not registered in the transfer records of the Company, the proper number of Parent Common Shares may be issued to a Person other than the Person in whose name the Certificate or Book-Entry Share so surrendered is registered if such Certificate or Book-Entry Share shall be properly endorsed or otherwise be in proper form for transfer and the Person requesting such issuance shall pay any transfer or other Taxes required by reason of the issuance of Parent Common Shares to a Person other than the registered holder of such Certificate or Book-Entry Share or establish to the reasonable satisfaction of Parent that such Tax has been paid or is not applicable. Until exchanged as contemplated by this <u>Section 4.2(a)</u>, each Certificate and Book-Entry Share (other than Excluded Shares) shall be deemed at any time after the Effective Time to represent only the right to receive upon such exchange the Per Share Merger Consideration, which the holder thereof has the right to receive in respect of such Certificate or Book-Entry Share pursuant to the provisions of this Agreement. No interest shall be paid or will accrue on the Per Share Merger Consideration.

(b)    <u>Transfers</u>. From and after the Effective Time, there shall be no transfers on the stock transfer books of the Reorganized Company or the Surviving Company of the Shares that were outstanding immediately prior to the Effective Time. If, after the Effective Time, any Certificate or Book-Entry Share (other than Excluded Shares) is presented to the Surviving Company or the Exchange Agent for transfer, it shall be cancelled and exchanged for the Per Share Merger Consideration to which the holder thereof is entitled pursuant to and in accordance with this <u>Article IV</u>, together with any unpaid distributions thereon with a record date on or after the Effective Time payable at such time in accordance with <u>Section 4.2(g)</u>.

(c)    <u>Lost, Stolen or Destroyed Certificates</u>. In the event any Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such Certificate to be lost, stolen or destroyed and, if required by the Surviving Company, the posting by such Person of a bond in customary amount and upon such terms as may be required by the Surviving Company as indemnity against any claim that may be made against it with respect to such Certificate, the Exchange Agent will treat such Person as having delivered his, her or its Certificate for purposes of <u>Section 4.2(a)</u>.

(d)    <u>Withholding Rights</u>. The Surviving Company and the Exchange Agent shall be entitled to deduct and withhold from any consideration otherwise payable pursuant to this Agreement such amounts as it is required to deduct and withhold with respect to the making of such payment under the Code, or any other applicable state, local or foreign Tax Law. To the extent that amounts are so withheld by the Surviving Company or the Exchange Agent, as the case may be, such withheld amounts (i) shall be remitted to the applicable Governmental Entity, and (ii) shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made by the Surviving Company or the Exchange Agent, as the case may be.

(e)    <u>No Further Ownership Rights in the Shares</u>.  The Parent Common Shares issued upon the surrender of Certificates or Book-Entry Shares (other than Excluded Shares) shall be deemed to have been issued in full satisfaction of all rights pertaining to such Certificates or Book-Entry Shares.

11

(f)    No Liability. None of Parent, OV2, the Equity Commitment Parties, the Company, EFIH, the Surviving Company or the Exchange Agent or any of their respective directors, officers, employees, representatives and agents shall be liable to any Person in respect of any Parent Common Shares, any unpaid distributions with respect thereto with a record date after the Effective Time, in each case delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law. If any Certificate or Book-Entry Shares shall not have been surrendered prior to such date as the applicable Per Share Merger Consideration or any distributions payable with a record date on or after the Effective Time with respect to any Parent Common Share would escheat to or become the property of any Governmental Entity, any such Per Share Merger Consideration and distributions shall, to the extent permitted by applicable Law, become the property of the Surviving Company, free and clear of all claims or interest of any Person previously entitled thereto.

(g)    Distributions with Respect to Unexchanged Shares. After the Merger, no dividends or other distributions with respect to the Parent Common Shares with a record date on or after the Effective Time shall be paid to the holder of any Certificate or Book-Entry Share that has not been properly exchanged in accordance with the applicable provisions of Section 4.1 and this Section 4.2 until such Certificate or Book-Entry Shares is surrendered for exchange in accordance with this Article IV. Subject to the effect of applicable Law, following exchange of any such Certificate or Book Entry Shares, there shall be paid to the holder of the Parent Common Shares issued in exchange therefor, without interest, at the time of such surrender, any unpaid distributions with a record date on or after the Effective Time theretofore payable with respect to such Parent Common Shares.

## ARTICLE V
### Representations and Warranties

Section 5.1    Representations and Warranties of the Company and EFIH. Except (i) as set forth in any of the Company's or Oncor's, EFIH's and Oncor Electric Delivery Transition Bond Company LLC's (such Subsidiaries collectively, the "Filing Subsidiaries") Annual Report on Form 10-K for the year ended December 31, 2014, the Company's or any of the Filing Subsidiaries' Quarterly Reports on Form 10-Q for the quarter ended June 30, 2015, the Company's or any of the Filing Subsidiaries' Current Reports on Form 8-K filed since December 31, 2014, in each case, filed with the SEC prior to the date hereof (other than disclosures in the "Risk Factors" or "Forward-Looking Statements" sections thereof or any such disclosures included in such filings that are cautionary, predictive or forward-looking in nature), (ii) as set forth in any filing made prior to the date hereof and set forth in Section 5.1 of the Company Disclosure Letter or (iii) as set forth in the corresponding sections or subsections of the disclosure letter delivered to Parent by the Company and EFIH prior to entering into this Agreement (the "Company Disclosure Letter") (it being agreed that disclosure of any item in any section or subsection of the Company Disclosure Letter shall be deemed to have been disclosed with respect to any other section or subsection of the Company Disclosure Letter if the relevance of such item to such other section or subsection is reasonably apparent from the information disclosed, *provided* that no such disclosure shall be deemed to qualify Section 5.1(f), Section 5.1(g) or Section 6.1 unless expressly set forth in Section 5.1(f), Section 5.1(g) or Section 6.1, as applicable, of the Company Disclosure Letter), the Company and EFIH hereby jointly and severally represent and warrant to the Purchasers that:

(a)    Organization, Good Standing and Qualification. Each of the Company and its Subsidiaries (as defined below) is a legal entity duly organized, validly existing and in good

standing under the Laws of its respective jurisdiction of organization and has all requisite corporate or similar power and authority to own, lease, use and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing as a foreign corporation or similar entity in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so qualified or in good standing, has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect (as defined below). The Company has made available to Parent complete and correct copies of the Company's, EFIH's and their respective Subsidiaries' certificates of incorporation or formation and bylaws or operating agreement or comparable governing documents, each as amended through the date hereof.

       (i)      As used in this Agreement, the term "Subsidiary" means, with respect to any Person, any other Person of which at least a majority of the securities or other ownership interests having by their terms ordinary voting power to elect a majority of the board of directors or other persons performing similar functions, is directly or indirectly owned or controlled by such Person and/or by one or more of its Subsidiaries. Notwithstanding the foregoing sentence, the Subsidiaries of the Company and EFIH (A) shall be deemed to include Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings"), and Oncor and their respective Subsidiaries (collectively, the "Oncor Entities") and (B) shall be deemed to exclude (1) Energy Future Competitive Holdings Company LLC ("EFCH"), (2) the Spin-Off Entities and (3) TXU Europe Limited and any entity directly or indirectly owned by TXU Europe Limited. As used in this Agreement, the term "Affiliate" means, with respect to any Person, any other Person, directly or indirectly, controlling, controlled by, or under common control with, such Person; provided that, notwithstanding the foregoing, Affiliates of the Company shall be deemed to include the Oncor Entities and deemed to exclude (A) EFCH and the Spin-Off Entities; (B) TXU Europe Limited and any entity directly or indirectly owned by TXU Europe Limited; (C) Texas Energy Future Capital Holdings LLC, a Delaware limited liability company; and (D) Texas Energy Future Holdings Limited Partnership, a Delaware limited partnership. As used in this Agreement, the term "control" (including the correlative terms "controlling", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. As used in this Agreement, the term "Company Material Adverse Effect" means (A) any fact, event, change, effect, development, circumstance or occurrence that, individually or together with any other fact, event, change, effect, development, circumstance or occurrence, has had or would reasonably be expected to have a material and adverse effect on the financial condition, business, assets, liabilities or results of operations of the Company and its Subsidiaries, taken as a whole, or (B) anything that prevents, materially restricts or materially impairs the Company or any of its Subsidiaries from consummating the EFH Subject Transactions or the transactions contemplated under the Plan of Reorganization; provided, however, that, none of the following that occurs after the date of this Agreement shall, with respect to clause (A), constitute or be taken into account in determining whether there has been or is a Company Material Adverse Effect:

13

(1)    changes in general economic or political conditions or the securities, credit or financial markets globally or outside of or in the U.S. or in the State of Texas or changes that are the result of acts of war or terrorism (other than such acts that cause any physical damage or destruction to or render physically or operationally unusable any facility or property of the Company, EFIH or any of their respective Subsidiaries (other than any facility or property contributed to Reorganized TCEH pursuant to the TCEH Contribution or the EFH Contribution);

(2)    any adoption, implementation, promulgation, repeal, modification, reinterpretation or proposal of any rule, regulation, ordinance, order (other than orders or approvals that give rise to a condition to the First Closing in accordance with the terms of Article VII), protocol or any other Law of or by any national, regional, state or local Governmental Entity (other than the Bankruptcy Court) or by the Electric Reliability Council of Texas, Inc. ("ERCOT"), the North American Electric Reliability Corporation ("NERC") or the Texas Reliability Entity, Inc. ("TRE");

(3)    changes or developments generally affecting electric transmission or distribution systems in the State of Texas (other than changes or developments that cause physical damage or destruction to or render physically or operationally unusable any facility or property of the Company, EFIH or any of their respective Subsidiaries (other than any facility or property contributed to Reorganized TCEH pursuant to the TCEH Contribution or the EFH Contribution));

(4)    changes that are the result of factors generally affecting any industry in which the Company or its Subsidiaries operate;

(5)    any loss or threatened loss of, or adverse change or threatened adverse change in, the relationship of the Company or any of its Subsidiaries with its customers, employees, regulators, financing sources or suppliers to the extent caused by the pendency or the announcement of the Transactions and/or the Plan of Reorganization;

(6)    changes, effects or developments arising from this Agreement, the performance of actions or obligations required to be taken by a party hereunder or consented to in writing by Parent, including any change in the Company's or any of its Subsidiaries' credit ratings to the extent resulting therefrom;

(7)    changes in U.S. generally accepted accounting principles ("GAAP") or interpretation thereof;

(8)    any failure by the Company or any of its Subsidiaries to meet any internal or public projections or forecasts or estimates of revenues or earnings for any period, *provided* that the exception in this clause shall not prevent or otherwise affect a determination that any change, effect or

14

development underlying such failure has resulted in, or contributed to, a Company Material Adverse Effect;

       (9)     changes, effects or developments to the extent such changes, effects or developments solely affect the assets contributed to Reorganized TCEH or its Subsidiaries pursuant to the TCEH Contribution or the EFH Contribution or liabilities for which the Company and its Subsidiaries will be fully and unconditionally discharged as of the First Closing pursuant to the Plan of Reorganization; and

       (10)    the existence of the Chapter 11 Cases.

*provided, further,* that facts, events, changes, effects, developments, circumstances or occurrences set forth in clauses (1) through (4) above may be taken into account in determining whether there has been or is a Company Material Adverse Effect to the extent such facts, events, changes, effects, developments, circumstances or occurrences have a disproportionate and adverse effect on the Company and its Subsidiaries, taken as a whole, as compared to other entities engaged in the relevant business in Texas or other relevant geographic area and are not otherwise excluded by clause (5) through (10) from what may be taken into account in such determination. For the avoidance of doubt, the parties hereto acknowledge and agree that, to the extent any condition or requirement imposed or reimposed on the Company or any of its Subsidiaries by any Governmental Entity (other than the Bankruptcy Court) in connection with any approval sought in connection with this Agreement is an Acceptable Regulatory Condition (as defined below), such condition or requirement shall not be deemed to have had, or contributed to, a Company Material Adverse Effect for purposes of this Agreement.

    (b)    <u>Capital Structure</u>.

       (i)     The authorized capital stock of the Company consists of 2,000,000,000 shares of Common Stock of which 1,669,861,379 shares of Common Stock are outstanding as of the date hereof. Upon the Plan Effective Date and in accordance with the Plan of Reorganization, the authorized capital stock of the Reorganized Company will consist of such number of shares of Common Stock sufficient to effect the EFH Issuance, of which the only outstanding shares will be the shares of Common Stock issued in the EFH Issuance. All of the outstanding shares of Common Stock have been duly authorized and are validly issued, fully paid and non-assessable. Upon the issuance of shares of Common Stock in connection with the EFH Issuance, such shares of Common Stock will be duly authorized, validly issued, fully paid and non-assessable. As of the date hereof, other than up to 34,864,474 shares of Common Stock issuable pursuant to the terms of outstanding awards under the 2007 Stock Incentive Plan for Key Employees of Energy Future Holdings Corp. and its Affiliates (the "<u>Company Stock Plan</u>"), there are no options to purchase shares of Common Stock issued and outstanding. Upon the Plan Effective Date and in accordance with the Plan of Reorganization, there will be no options to purchase shares of Common Stock issued and outstanding. Except as provided in the Plan of Reorganization, upon the issuance of shares of Common Stock in connection with the EFH Issuance, there will be no preemptive or other outstanding rights, options, warrants, conversion rights, stock appreciation rights, performance units,

15

redemption rights, repurchase rights, agreements, arrangements, calls, commitments or rights of any kind that obligate the Reorganized Company to issue or sell any shares of capital stock or other equity securities of the Reorganized Company or any securities or obligations convertible or exchangeable into or exercisable for, or giving any Person a right to subscribe for or acquire, any equity securities of the Reorganized Company, and no securities or obligations evidencing such rights are authorized, issued or outstanding. At the time of issuance of shares of Common Stock in connection with the EFH Issuance, all shares of Common Stock issued pursuant to the Plan of Reorganization will be issued in compliance with the registration requirements under, or an applicable exemption from, the Securities Act, and any applicable "blue sky" laws or will otherwise be exempt from such registration requirements pursuant to Section 1145 of the Bankruptcy Code.

(ii)     As of the date hereof, the Company holds all of the outstanding limited liability company interests in EFIH. All of the outstanding limited liability company interests in EFIH have been duly authorized and are validly issued, fully paid and non-assessable (except to the extent that such non-assessability is limited by the MGCL or the DGCL, as the case may be). Upon the Plan Effective Date, the outstanding limited liability company interests held by the Company as of the date hereof shall constitute all of the outstanding limited liability company interests in Reorganized EFIH, and such limited liability company interests are duly authorized, validly issued, fully paid and non-assessable (except to the extent such non-assessability is limited by the MGCL or the DGCL, as the case may be). As of the date hereof and upon consummation of the First Closing, there are and will be no options to purchase any limited liability company interests in EFIH. As of the Plan Effective Date, there will be no preemptive or other outstanding rights, options, warrants, conversion rights, appreciation rights, redemption rights, repurchase rights, agreements, arrangements, calls, commitments or rights of any kind that obligate EFIH to issue or sell any limited liability company interests or other equity securities of EFIH or any securities or obligations convertible or exchangeable into or exercisable for, or giving any Person a right to subscribe for or acquire, any equity securities of EFIH, and no securities or obligations evidencing such rights are authorized, issued or outstanding.

(iii)     None of the Subsidiaries of the Company own any shares of Common Stock or any limited liability company interests in EFIH. Section 5.1(b)(iii) of the Company Disclosure Letter sets forth a list, as of the date hereof, of the Company's Subsidiaries other than EFIH (the "Other Subsidiaries") and the Company's direct or indirect equity interests therein. Each of the outstanding shares of capital stock or other equity securities of each of the Other Subsidiaries held by the Company or one of its Subsidiaries is duly authorized, validly issued, fully paid and non-assessable (except to the extent that such non-assessability is limited by the MGCL or the DGCL, as the case may be). Except as set forth in Section 5.1(b)(iii) of the Company Disclosure Letter, all of the outstanding shares of capital stock or other equity interests in each Other Subsidiary is owned by the Company or by a direct or indirect wholly owned Subsidiary of the Company, free and clear of any lien, charge, pledge, security interest, claim or other encumbrance (each, a "Lien"), other than Liens granted pursuant to the EFIH First Lien DIP and restrictions on transfer arising under applicable securities laws. There are no preemptive or other outstanding rights,

16

options, warrants, conversion rights, stock appreciation rights, performance units, redemption rights, repurchase rights, agreements, arrangements, calls, commitments or rights of any kind that obligate the Company or any of its Subsidiaries to issue or sell any shares of capital stock or other equity securities of any Other Subsidiary or any securities or obligations convertible or exchangeable into or exercisable for, or giving any Person a right to subscribe for or acquire, any equity securities of any Other Subsidiary, and no securities or obligations evidencing such rights are authorized, issued or outstanding.

(iv)    Neither the Company nor any of its Subsidiaries has entered into any commitment, arrangement or agreement, or are otherwise obligated, to contribute capital, loan money or otherwise provide funds or make additional investments in any other Person, other than any such commitment, arrangement or agreement listed in Section 5.1(b)(iv) of the Company Disclosure Letter that was made or entered into in the ordinary course of business consistent with past practice, with respect to, direct or indirect, wholly owned Subsidiaries of the Company or pursuant to a Contract (as defined below) binding on the Company or any of its Subsidiaries made available to Parent. For purposes of this Agreement, a "wholly owned Subsidiary" of any Person shall include any Subsidiary of such Person of which all of the shares of capital stock or other equity interests are owned by such Person or one or more wholly owned Subsidiaries of such Person, as applicable.

(v)    There are no shareholder agreements, voting trusts or other agreements or understandings to which the Company or any of its Subsidiaries is a party or by which any of the foregoing is bound relating to the voting or registration of any equity securities of the Company or any of its Subsidiaries.

(vi)    Except with respect to the right to vote on a plan of reorganization of the Debtors under the Bankruptcy Code in connection with the Chapter 11 Cases, no bonds, debentures, notes or other indebtedness of the Company or any of its Subsidiaries having the right to vote on any matters on which equity holders may vote, are issued or outstanding.

(c)    Corporate Authority.

(i)    The Company and EFIH have each approved this Agreement and the EFH Subject Transactions and no vote or consent of any equity holder of the Company or EFIH, or any other corporate or limited liability company action, is necessary to approve this Agreement or the EFH Subject Transactions on behalf of the Company and EFIH (other than the requisite votes for approval of the Plan of Reorganization under the Bankruptcy Code). Each of the Company and EFIH has all requisite corporate or limited liability company power and authority and has taken all corporate or limited liability company action necessary in order to execute and deliver each of this Agreement, the Equity Commitment Letter, the Backstop Agreement and the Plan Support Agreement (collectively, with this Agreement, the Backstop Agreement and the Equity Commitment Letter, the "Signing Date Agreements") and, prior to their execution and delivery, which shall occur prior to the First Closing Date, will have taken all corporate or limited liability company action necessary in order to execute and deliver each other agreement contemplated

17

hereby (collectively with the Signing Date Agreements, the "Transaction Agreements") to be executed by the Company and EFIH prior to or at the First Closing, and to perform its obligations under each Transaction Agreement to be executed by the Company and EFIH and to consummate the EFH Subject Transactions. Each of the Signing Date Agreements has been duly executed and delivered by each of the Company and EFIH and, subject to the entry of an order of the Bankruptcy Court that is in form and substance reasonably satisfactory to the Company and Parent (a) approving and authorizing the Company and EFIH to enter into the Signing Date Agreements, and (b) authorizing the Company and EFIH to perform their respective obligations hereunder and thereunder; each constitutes a valid and binding agreement of each of the Company and EFIH and each is enforceable against each of the Company and EFIH in accordance with its terms.

(ii)     The board of directors of the Company (the "Company Board") has declared that the EFH Subject Transactions are advisable and in the best interests of the Company and the stakeholders of the Company, has approved and adopted each Signing Date Agreement which declaration, approval, adoption and consent are in full force and effect and have not been rescinded or modified. In addition, each of (A) the board of managers of EFIH (the "EFIH Board") and (B) a majority of the disinterested managers on the EFIH Board has declared that the EFH Subject Transactions are advisable and in the best interests of EFIH and the stakeholders of EFIH, has approved and adopted each Signing Date Agreement which declaration, approval and adoption are in full force and effect and have not been rescinded or modified.

(iii)    The Company Board has taken all action so that neither Parent nor OV2 nor any Equity Commitment Party will be an "affiliated shareholder" (as such term is defined in Section 21.602 of the TBOC) or prohibited from entering into or consummating a "business combination" (as such term is defined in Section 21.604 of the TBOC) with the Company as a result of the execution of this Agreement or the consummation of any of the Transactions. No other "fair price," "moratorium," "control share acquisition," "business combination" or any other anti-takeover statute or regulation or any anti-takeover provision in the certificate of formation or bylaws of the Company is applicable to the EFH Subject Transactions.

(d)     Governmental Filings; No Violations; Certain Contracts.

(i)      Other than the filings, reports and/or notices to, and consents, registrations, approvals, permits and authorizations required to be made or obtained (A) to or from the Secretary of State of the State of Texas or the Secretary of State of the State of Maryland or Delaware, as the case may be, in connection with the Merger, (B) as a result of facts and circumstances solely attributable to Parent or OV2 or any of their Affiliates, (C) pursuant to the Bankruptcy Code in connection with matters in the Chapter 11 Cases, (D) under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), including the expiration or earlier termination of applicable waiting periods thereunder, or any law that is designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization, restraint of trade or lessening of competition, including the HSR Act ("Competition Law"), (E) under the Securities Exchange Act of 1934 and

18

the rules and regulations promulgated thereunder, as amended (the "Exchange Act"), and the Securities Act, (F) to or from the Federal Energy Regulatory Commission (the "FERC") pursuant to Section 203 of the Federal Power Act (the "Federal Power Act") and the FERC's regulations thereunder, and the approval of the FERC thereunder (the "FERC Approval"), (G) to or from the Public Utility Commission of Texas ("PUCT") pursuant to authority asserted by the PUCT pursuant to the Public Utility Regulatory Act, the PUCT's regulations thereunder and the approval of the PUCT thereunder (the "PUCT Approval") with respect to the matters identified in the PUCT Filing (as defined below) including approval by the PUCT of the Oncor Restructuring (including the transfer of the certificates of convenience and necessity held by Oncor to OEDC), (H) for the issuance of the Private Letter Ruling in accordance with Section 7.1(e), (I) to or from the Federal Communications Commission (the "FCC") for the transfer of radio licenses and point-to-point private microwave licenses held by the Company and its Subsidiaries and the approval of the FCC for such transfer (the "FCC Approval"), (J) with the Nuclear Regulatory Commission (the "NRC") pursuant to Section 184 of the Atomic Energy Act and the NRC's regulations thereunder and the approval of the NRC thereunder (the "NRC Approval"), (K) to or from any municipality or other local Governmental Entity pursuant to any franchise agreement between such municipality or other authority and any Oncor Entity, each such agreement being set forth on Section 5.1(d)(i) of the Company Disclosure Letter (the "Franchise Approvals" and, together with the other items referred to in subsections (C) through (J) of this Section 5.1(d)(i), the "Company Approvals"), (L) to the Pension Benefit Guaranty Corporation with respect to any reportable event filings, and except as set forth in Section 5.1(d)(i) of the Company Disclosure Letter, no notices, reports or other filings are required to be made by the Company or any of its Subsidiaries with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by the Company or any of its Subsidiaries from, any federal, state or local, domestic or foreign governmental or regulatory authority, agency, commission, body, arbitrator, court, regional reliability entity (including the TRE), ERCOT, or any other legislative, executive or judicial governmental entity (each, a "Governmental Entity"), in connection with the execution, delivery and performance by the Company and its Subsidiaries of the Transaction Agreements to which the Company or any of its Subsidiaries is a party and the consummation by the Company and its Subsidiaries of the EFH Subject Transactions, except those which are authorized by the PUCT or ERCOT to be obtained or made after the First Closing Date in the ordinary course of business or the failure to make or obtain has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect.

(ii)     The execution, delivery and performance by the Company and its Subsidiaries of the Transaction Agreements to which the Company or any of its Subsidiaries is a party does not or, if not a Signing Date Agreement, will not, and the consummation of the EFH Subject Transactions will not, constitute or result in (A) a breach or violation of, or a default under, or otherwise contravene or conflict with, the certificate of formation or bylaws of the Company or the comparable governing documents of any of its Subsidiaries, (B) with or without notice, lapse of time or both, a breach or violation of, a termination, cancellation (or right of termination or amendment) or a default under, the creation or acceleration of any obligations under, the requirement to obtain of any consent under, the loss of any benefit under, or the

19

creation of a Lien on any of the assets of the Company or any of its Subsidiaries pursuant to, any agreement, lease, license, franchise, contract, note, mortgage, indenture, credit agreement, arrangement or other obligation (each, a "Contract") binding upon the Company or any of its Subsidiaries or their respective assets or any License (as defined below) held by the Company or any of its Subsidiaries or to which the Company or any of its Subsidiaries, or any of their respective assets, is subject or, (C) assuming that each of the Company Approvals is obtained, a violation of any Law to which the Company or any of its Subsidiaries or their respective assets is subject, except, in the case of clause (B) or (C) above, for any such breach, violation, termination, cancellation, default, creation, acceleration, consent, loss or change that has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect.

(iii)    Without limiting the generality of the foregoing paragraphs (d)(i) and (ii) and except for the issuance by the IRS of the Private Letter Ruling in accordance with Section 6.18 and Section 7.1(e) and the NRC Approval, and except as otherwise set forth on Section 5.1(d)(iii) of the Company Disclosure Letter, no filing, report or notice to, or consent, registration, approval, permit or authorization of, any Governmental Entity is required in connection with the conversion of Reorganized TCEH to a corporation or the consummation by TCEH, Reorganized TCEH, the Company, EFH Corporate Services and their respective Subsidiaries of the Reorganized TCEH Contributions, the Preferred Stock Sale or the Reorganized TCEH Spin-off, except those for which the failure to make or obtain has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect.

(e)    Company Reports; Financial Statements.

(i)    Each of the Company and the Filing Subsidiaries has filed or furnished, as applicable, on a timely basis, all forms, statements, certifications, reports and other documents (including exhibits, financial statements and schedules thereto, and other information incorporated therein) required to be filed or furnished by it with the SEC pursuant to the Exchange Act, the Securities Act or any Contract governing any indebtedness of the Company or such Filing Subsidiary requiring such filings to be made, since December 31, 2012 (the "Applicable Date") (all such forms, statements, certifications, reports and documents filed or furnished since the Applicable Date and those filed or furnished subsequent to the date hereof, including any amendments thereto, the "Company Reports"). Each of the Company Reports, including any financial statements or schedules included therein, at the time of its filing or being furnished complied or, will comply, in all material respects with the requirements of the Securities Act, the Exchange Act and the Sarbanes-Oxley Act of 2002, as amended, and the rules and regulations promulgated thereunder (the "Sarbanes-Oxley Act") applicable to the Company Reports. As of their respective dates (or, if amended prior to or after the date hereof, as of the date of such amendment), the Company Reports filed with or furnished to the SEC prior to the date hereof did not, and any Company Reports filed with or furnished to the SEC subsequent to the date hereof will not, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not

20

misleading. As of the date of this Agreement, there are no material outstanding or unresolved comments received from the SEC staff with respect to the Company Reports. None of the Company Reports is, to the Knowledge (as defined below) of the Company, the subject of ongoing SEC review.

(ii)    Each of the consolidated balance sheets included in, or incorporated by reference into, the Company Reports, as amended prior to the date hereof (including the related notes and schedules thereto) fairly presents in all material respects, or in the case of Company Reports filed after the date hereof, will fairly present in all material respects, the financial position of the applicable entity and its consolidated Subsidiaries as of its date (if amended, as of the date of the last such amendment prior to the date hereof) and each of the statements of consolidated income, comprehensive income, cash flows and shareholders' equity included in or incorporated by reference into the Company Reports (including any related notes and schedules thereto), as finally amended prior to or after the date hereof, fairly presents in all material respects, or in the case of Company Reports filed after the date hereof, will fairly present in all material respects, the financial position, results of operations and cash flows, as the case may be, of the applicable entity and its consolidated Subsidiaries for the periods set forth therein (subject, in the case of unaudited statements, to normal year-end adjustments), in each case in accordance with GAAP (except, in the case of unaudited quarterly financial statements, as permitted by Regulation S-X or the applicable rules or regulations under the Securities Act or the Exchange Act) applied on a consistent basis during the periods and as of the dates involved (except as may be noted therein).

(iii)    The Company maintains internal control over financial reporting (as defined in Rule 13a-15 or 15d-15, as applicable, under the Exchange Act).  Such internal control over financial reporting is effective in providing reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP, in each case, in all material respects. Except as has not had, and would not reasonably be expected to have, individually or in the aggregate, a material effect on the nature or reliability of the information disclosed in the Company's periodic reports filed under the Exchange Act, (A) each of the Company and the Filing Subsidiaries maintains "disclosure controls and procedures" required by Rule 13a-15 or 15d-15 under the Exchange Act that are effective to ensure that information required to be disclosed by it is recorded and reported on a timely basis to the individuals responsible for the preparation of its filings with the SEC and other public disclosure documents (including its chief executive officer and chief financial officer) and (B) neither the Company nor any of the Filing Subsidiaries has disclosed and is not required to disclose, based on its most recent evaluation prior to the date of this Agreement, to its outside auditors and the audit committee of its board of directors (or similar governing body): (1) any significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) that are reasonably likely to adversely affect its ability to record, process, summarize and report financial information and (2) any fraud, known to it, whether or not material, that involves management or other employees who have a significant role in its internal controls over financial reporting.

(iv)    Except as would not have, individually or in the aggregate, a Company Material Adverse Effect, each of the Company and its Subsidiaries is in compliance with the applicable provisions of the Sarbanes-Oxley Act.  Without limiting the generality of the foregoing, neither the Company nor any of its Subsidiaries is a party to, or has a commitment to become a party to, any joint venture, off-balance sheet partnership or any similar Contract or arrangement (including any Contract or arrangement relating to any transaction or relationship between or among the Company or any of its Subsidiaries, on the one hand, and any unconsolidated Affiliate, including any structured finance, special purpose or limited purpose entity or Person, on the other hand) or any "off-balance sheet arrangements" (as defined in Item 303(a) of Regulation S-K of the SEC), where the result, purpose or effect of such Contract or arrangement is to avoid disclosure of any material transaction involving, or material liabilities of, the Company or any of its Subsidiaries in the Company Reports or the financial statements included therein.

(f)    <u>Absence of Certain Changes</u>.

(i)    Since the Company Audit Date (as defined below) until the First Closing Date, except for (a) actions taken after the date hereof in accordance with the Oncor Letter Agreement (including actions required pursuant to <u>Section 6.1</u>), the Oncor Entities have conducted their respective businesses in the ordinary course of business, and (b) actions taken after the date hereof in accordance with this Agreement, the Company and its Subsidiaries (other than the Oncor Entities) have conducted their respective businesses in all material respects in the ordinary course of business and in accordance with the Bankruptcy Code and the orders of the Bankruptcy Court.  The term "<u>Company Audit Date</u>" means the date of the most recent audit of the financial statements of the Company and its consolidated Subsidiaries included in the Company Reports as of the date hereof.

(ii)    Since the Company Audit Date, there has not occurred a Company Material Adverse Effect.

(iii)    Since the Company Audit Date, without limiting the provisions of <u>Section 5.1(f)(i)</u> or <u>Section 5.1(f)(ii)</u> and except for actions taken in accordance with this Agreement (including <u>Section 6.1</u>), there has not been:

(1)    any declaration, setting aside or payment of any dividend or other distribution (whether in cash, stock or property or any combination thereof) with respect to any shares of capital stock of the Company or any of its Subsidiaries (except for (A) dividends or other distributions by any direct or indirect wholly owned Subsidiary to the Company or to any wholly owned Subsidiary of the Company or (B) Oncor's or Oncor Holdings' cash distributions as permitted by their respective limited liability company agreements);

(2)    any material physical damage, destruction to or other casualty loss with respect to any material asset, facility or property owned, leased or otherwise used by the Company, EFIH or any of their respective Subsidiaries (other than any facility or property contributed to Reorganized TCEH

22

pursuant to the TCEH Contribution or the EFH Contribution), whether or not covered by insurance;

(3)     any material change in any financial accounting policies or methods or policies of accounting or accounting practice by the Company or any of its Subsidiaries, other than as required by GAAP;

(4)     any material Tax elections or changes in Tax accounting methods by the Company or any of its Subsidiaries or any settlement or compromise by the Company or any of its Subsidiaries of any material Tax liability or refund; or

(5)     any action taken that, if taken after the date of this Agreement without Parent's consent, would constitute a breach of the covenants set forth in clauses (i) through (xix) of Section 6.1(a).

(g)     Litigation and Liabilities.

(i)     Except for proceedings against the Company or its Subsidiaries set forth in Section 5.1(g) of the Company Disclosure Letter, there are no civil, criminal or administrative actions, suits, complaints, enforcement actions, penalty assessments, claims, hearings, arbitrations, investigations, inquiries, audits or other proceedings (formal or informal, public or non-public) ("Actions") pending or, to the Knowledge of the Company, threatened in writing against the Company or any of its Subsidiaries which has had or would have, individually or in the aggregate, a Company Material Adverse Effect. None of the Company or any of its Subsidiaries is a party to or subject to the provisions of any judgment, settlement, order, writ, injunction, decree or award of any Governmental Entity imposed upon the Company, any of its Subsidiaries or any of their respective businesses, assets or properties which, individually or in the aggregate, has had or would have a Company Material Adverse Effect.

(ii)     Neither the Company nor any of its Subsidiaries has any liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise), other than liabilities and obligations (A) to be expressly assumed pursuant to the Plan of Reorganization, (B) reflected or reserved against in the Company's or any of the Filing Subsidiaries' consolidated balance sheets as of the Company Audit Date, including the notes thereto, (C) incurred in the ordinary course of business since the Company Audit Date, (D) arising as a result of the performance in the ordinary course of the terms of any Company Material Contract (as defined below) or any Transaction Agreement (but not including any liability for breach thereunder), (E) that will not be liabilities of the Company or any of its Subsidiaries after the effectiveness of the Plan of Reorganization, because they are to be discharged or contributed to Reorganized TCEH pursuant to the Plan of Reorganization or (F) that have not had and would not have, individually or in the aggregate, a Company Material Adverse Effect. The Subsidiaries of the Company that are not Spin-Off Entities and are not otherwise canceled or abandoned under the Plan of Reorganization and are not EFIH or a Subsidiary of EFIH, are referred to as "Retained Subsidiaries." None of the Retained Subsidiaries has any liabilities or

23

obligations of any nature (whether accrued, absolute, contingent or otherwise), other than liabilities and obligations (A) that are set forth on Section 5.1(g) of the Company Disclosure Schedule or (B) that will not be liabilities of the Company or any of its Subsidiaries after the effectiveness of the Plan of Reorganization because they are to be discharged or contributed to Reorganized TCEH pursuant to the Plan of Reorganization.

The term "Knowledge" when used in this Agreement with respect to the Company shall mean the actual knowledge of those persons set forth in Section 5.1(g) of the Company Disclosure Letter, after reasonable inquiry.

    (h)    Employee Benefits.

    (i)    All material benefit and compensation plans, programs, policies or arrangements covering current or former employees, officers, consultants, managers, members and directors of the Company and its Subsidiaries (the "Employees"), including "employee benefit plans" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and deferred compensation, change in control, severance, stock option, stock purchase, stock appreciation rights, stock based, incentive and bonus plans, agreements, programs, policies or arrangements sponsored, contributed to, or entered into by the Company or its Subsidiaries and employment agreements (but only such employment agreements that would reasonably be expected to provide for annual compensation of $100,000 or more) (the "Benefit Plans") are listed in Section 5.1(h)(i) of the Company Disclosure Letter. Each Benefit Plan that will (A) remain the responsibility of the Surviving Company or its Subsidiaries following the First Closing is listed in Section 5.1(h)(i)(A) of the Company Disclosure Letter as an "Assumed Plan" and (B) be transferred by the Company or its Subsidiaries as an active or terminated plan to Reorganized TCEH as part of the Reorganized TCEH Contributions is listed in Section 5.1(h)(i)(B) of the Company Disclosure Letter as a "Contributed Plan."

    (ii)    True and complete copies of all Assumed Plans and all amendments thereto have been made available to Parent and to the extent applicable, the following have also been made available to Parent: (A) any trust agreement or other funding instrument related to an Assumed Plan now in effect or required in the future as a result of the transaction contemplated in this Agreement or otherwise; (B) the most recent determination or opinion letter related to an Assumed Plan; (C) any summary plan description; and (D) for the most recent three years or to the extent otherwise prepared during the three-year period preceding the date hereof, (x) the Form 5500 and attached schedules, (y) the audited financial statements, (z) the actuarial valuation reports related to an Assumed Plan; and (z) third-party administration and vendor Contracts related to an Assumed Plan.

    (iii)    All Assumed Plans are in compliance in all material respects with their respective terms and ERISA, the Code and other applicable Laws and there are no claims, actions, suits, proceedings, investigations, arbitrations, audits or hearings (other than for routine claims for benefits) pending or, to the Knowledge of the Company, threatened in writing with respect to any Assumed Plan that would reasonably be expected to result in material liability to the Surviving Company. Each

24

Assumed Plan that is subject to ERISA (an "ERISA Plan") that is an "employee pension benefit plan" within the meaning of Section 3(2) of ERISA (a "Pension Plan") intended to be qualified under Section 401(a) of the Code, has either received a favorable determination or opinion letter that is currently in effect from the Internal Revenue Service (the "IRS") or has properly applied to the IRS for such a letter. To the Knowledge of the Company, there are no circumstances under which it could reasonably expected that any favorable determination or opinion letter that has been received would be revoked by the IRS or that any determination letter that has been applied for would not otherwise be issued by the IRS. Neither the Company nor any of its Subsidiaries has engaged in any transactions with respect to any ERISA Plan that, assuming the taxable period of such transactions expired as of the date hereof, would subject the Company or any Subsidiary to Taxes or penalties imposed by either Section 4975 of the Code or Section 502(i) of ERISA or other breach of fiduciary duty liability that, individually or in the aggregate, would be material.

(iv)    Except as set forth in Section 5.1(h)(iv) of the Company Disclosure Letter, neither the execution of this Agreement, nor the consummation of the Transactions will (A) entitle any Designated Officer (as defined below) to severance pay or any material increase in severance pay upon any termination of employment after the date hereof, (B) accelerate the time of payment or vesting or result in any payment or funding (through a grantor trust or otherwise) of compensation or benefits under, increase the amount payable or result in any other material obligation pursuant to, any of the Assumed Plans, or (C) directly or indirectly cause the Company or its Subsidiaries to transfer or set aside any assets to fund any material benefits under any Assumed Plan due to any directors, officers, employees or consultants of the Company or its Subsidiaries.

(v)    Except as otherwise set forth in Section 5.1(h)(v) of the Company Disclosure Letter, neither the Company nor any of its Subsidiaries has any outstanding liability or is reasonably expected to incur (A) any liability under Subtitle C or D of Title IV of ERISA with respect to any ongoing, frozen or terminated "single employer plan", within the meaning of Section 4001(a)(15) of ERISA, currently or formerly maintained by any of them, or any such single employer plan of any entity which is considered one employer with the Company under Section 4001 of ERISA or Section 414 of the Code (an "ERISA Affiliate") or (B) any withdrawal liability with respect to any "multiemployer plan" within the meaning of Section 3(37) of ERISA under Subtitle E of Title IV of ERISA (regardless of whether based on contributions of an ERISA Affiliate) that has not been satisfied.

The term "Designated Officer" when used in this Agreement shall mean those individuals set forth in Section 5.1(h) of the Company Disclosure Letter.

Except as Section 5.1(k) relates to employee benefits, the representations and warranties set forth in this Section 5.1(h) are the Company's and is Subsidiaries' sole and exclusive representations and warranties regarding employee benefit matters.

(i)    Compliance with Laws; Licenses. The businesses of each of the Company and its Subsidiaries have not been since the Applicable Date, and are not being, conducted in any violation of any federal, state, local or foreign law, statute or ordinance, common law, or

25

any rule, regulation, legally binding standard, judgment, order, writ, injunction, decree, arbitration award, agency requirement or License of any Governmental Entity (collectively, "Laws") except for violations that have not had and would not have, individually or in the aggregate, a Company Material Adverse Effect.  Except with respect to regulatory matters that are the subject of Section 6.3 hereof, no investigation or review by any Governmental Entity with respect to the Company or any of its Subsidiaries is pending or, to the Knowledge of the Company, threatened in writing, nor, to the Knowledge of the Company, has any Governmental Entity indicated in writing an intention to conduct the same or alleged in writing that Company or any of its Subsidiaries is not in compliance with any applicable Law or License held by the Company or any of its Subsidiaries or which challenges or questions the validity of any rights of the holder of any such License, except for such investigations, reviews or allegations, the outcome of which would not, individually or in the aggregate, have a Company Material Adverse Effect. Each of the Company and its Subsidiaries has obtained and possesses and is in compliance with all permits, certifications, approvals, registrations, clearances, consents, authorizations, franchises, variances, exemptions and orders issued or granted by a Governmental Entity ("Licenses") necessary to enable it to own, operate, lease or otherwise hold its properties and assets and to conduct its business as presently conducted, except those the absence of which have not had and would not have, individually or in the aggregate, a Company Material Adverse Effect. Such Licenses are in full force and effect, and no suspension or cancellation of such Licenses is pending or, to the Knowledge of the Company, threatened in writing, except where such failure to be in full force and effect, suspension or cancellation has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect.

(j)      Environmental Matters.  Except for such matters of the type referred to in clauses (i) through (iv) of this Section 5.1(j) that have not had and would not have, individually or in the aggregate, a Company Material Adverse Effect:

(i)      The Company and its Subsidiaries are in compliance with all applicable Environmental Laws (as defined below).

(ii)      Each of the Company and its Subsidiaries has obtained and possesses all Licenses necessary under Environmental Laws for the ownership, operation and maintenance of its facilities and properties in existence as of the date hereof and the conduct of its business as conducted as of the date hereof (the "Environmental Permits"), and all such Environmental Permits are in full force and effect, no suspension or cancellation of such Environmental Permits is pending or, to the Knowledge of the Company, threatened in writing, and each of the Company and its Subsidiaries is in compliance with all terms and conditions of the Environmental Permits granted to it.

(iii)      There is no Environmental Claim (as defined below) (A) pending or, to the Knowledge of the Company, threatened in writing against the Company or any of its Subsidiaries or (B) to the Knowledge of the Company, pending or threatened in writing relating to any real property that the Company or any of its Subsidiaries owns, leases or operates.

(iv)      To the Knowledge of the Company, there has been no Release (as defined below) of any Hazardous Substance (as defined below) at any real property

26

that the Company or any of its Subsidiaries owns or leases that has or would reasonably be expected to result in (A) any Environmental Claim against the Company or any of its Subsidiaries or (B) any requirement on the part of the Company or any of its Subsidiaries to undertake Remedial Action (as defined below).

(v)    To the Knowledge of the Company, the Company and its Subsidiaries have disclosed all current, known conditions relating to the business, operations, properties or assets of the Company or any of its Subsidiaries which, as of the date hereof, are reasonably expected to result in, individually, an obligation of the Company or any of its Subsidiaries to incur costs in excess of $5,000,000 for (A) installing pollution control equipment required under applicable Environmental Laws or (B) conducting environmental remediation required under applicable Environmental Laws.

This Section 5.1(j) contains the sole and exclusive representations and warranties of the Company and its Subsidiaries relating to the Environment, Environmental Laws, Environmental Permits, Environmental Claims, Releases, Remedial Action or Hazardous Substances.

As used herein, the term "Environment" means any and all ambient air, indoor air, surface water and groundwater (including navigable water and wetlands), the land surface or subsurface strata or sediment and flora and fauna.

As used herein, the term "Environmental Claim" means any and all actions, suits, claims, demands, demand letters, directives, liens, written notices of noncompliance or violation by any Person, hearings, arbitrations or other legal or administrative proceedings alleging potential liability under any Environmental Laws (including potential responsibility for or liability for enforcement costs, Remedial Action costs, natural resources damages, property damages, personal injury, fines or penalties) arising out of, based on or resulting from (A) the presence, or Release or threatened Release into the Environment, or alleged presence, Release or threatened Release into the Environment, of any Hazardous Substance; or (B) any violation, or alleged violation, of any Environmental Law.

As used herein, the term "Environmental Law" means any and all Laws, in effect on or prior to the First Closing Date relating to (A) pollution, the protection of the Environment or the protection of human health and safety as it relates to exposure to Hazardous Substances or (B) the use, treatment, storage, transport, handling, release or disposal of any Hazardous Substances.

As used herein, the term "Hazardous Substance" means any chemical, material or substance listed, defined, designated or classified as, or included in the definition of, "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous waste," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants" or "pollutants" or words of similar meaning and regulatory effect under any applicable Environmental Law, including petroleum and any derivative or by-products thereof, asbestos or asbestos-containing materials, polychlorinated biphenyls, and any other substance regulated pursuant thereto, or the presence or Release of, or exposure to which could reasonably be expected to form the basis for liability under any applicable Environmental Law because of its dangerous or deleterious properties or characteristics.

27

As used herein, the term "Release" means any spilling, emitting, leaking, pumping, pouring, emptying, injecting, escaping, dumping, disposing, discharging, migrating or leaching into, onto or through the Environment.

As used herein, the term "Remedial Action" means all actions required by a Governmental Entity or required under any Environmental Law, to (A) clean up, remove, treat, or in any way ameliorate or address any Hazardous Substance in the Environment; (B) prevent the Release or threat of Release, or minimize the further Release of any Hazardous Substance so it does not endanger the public health or welfare or the Environment; (C) perform pre-remedial studies and investigations or post remedial monitoring and care pertaining or relating to a Release; or (D) bring the applicable party into compliance with any Environmental Law.

(k)    Taxes.

(i)    Except as has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect, the Company and each of its Subsidiaries have (A) prepared in good faith and duly and timely filed (taking into account any extension of time within which to file) all Tax Returns (as defined below) required to be filed by any of them, and all such filed Tax Returns are complete and accurate, (B) timely paid all Taxes that are required to be paid (whether or not shown to be due on such Tax Returns), and (C) properly withheld and paid all Taxes that the Company or any of its Subsidiaries were obligated to withhold and pay in connection with amounts owing to any shareholder, employee, creditor or third party, except with respect to matters contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP.

(ii)    There are not pending, or threatened in writing, any audits (or other similar proceedings initiated by a Governmental Entity) in respect of Taxes due from or with respect to the Company or any of its Subsidiaries or Tax matters to which the Company or any Subsidiary is a party, which (if determined adversely to the Company) could have, individually or in the aggregate, a Company Material Adverse Effect.

(iii)    None of the Company or any of its Subsidiaries has participated in any listed transaction under Section 6011, 6111 or 6112 of the Code and the Treasury Regulations promulgated thereunder.

(iv)    None of the Company or any of its Subsidiaries has taken or agreed to take any action that would prevent or impede, or would reasonably be expected to prevent or impede, the Merger from qualifying as a reorganization within the meaning of Section 368(a) of the Code.

(v)    There are no Tax sharing, indemnification or allocation agreements (or similar agreements) to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound (other than (A) agreements between or among the Company and its Subsidiaries or EFCH, TCEH and their Subsidiaries and (B) agreements the primary purpose of which is not the allocation or sharing of any Tax).

28

(vi)    Except as has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect, neither the Company nor any of its Subsidiaries will be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the First Closing Date which taxable income was realized (and reflects economic income arising) prior to the First Closing Date as a result of any: (A) change in method of accounting for a taxable period ending on or prior to the First Closing Date, including by reason of the application of Section 481 of the Code (or any analogous provision of state, local or foreign Law), (B) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign Law) executed on or prior to the First Closing Date, (C) intercompany transaction or excess loss account described in any Treasury Regulation under Section 1502 of the Code (or any corresponding or similar provision of state, local, or foreign income Tax Law) or (D) election under Section 108(i) of the Code.

(vii)    Within the past three (3) years, except pursuant to the Reorganized TCEH Spin-Off, neither the Company nor any of its Subsidiaries has been a "distributing corporation" or a "controlled corporation" in any distribution that was intended to qualify for tax-free treatment under Section 355 of the Code.

(viii)    The amount of net operating losses of the Company for federal income tax purposes as of the First Closing Date that are available to and can be used to offset taxable income and gain (without limitation under Section 382 of the Code and after taking into account any reduction in such net operating losses (x) as a result of the recognition of any income that has previously been deferred under Section 108(i) of the Code and (y) under Sections 108 and 1017 of the Code) exceed the sum of (i) the amount of taxable gain that will result from the Preferred Stock Sale plus (ii) the excess, if any, of (A) the amount of liabilities deemed assumed for tax purposes by Reorganized TCEH over (B) the tax basis of the assets deemed contributed for tax purposes to Reorganized TCEH (after taking into account the Preferred Stock Sale), in each of clause (A) and (B), as a result of the Reorganized TCEH Contributions and the conversion of Reorganized TCEH to a corporation.

(ix)    The facts and statements set forth the IRS Submissions (as defined below) are true, correct, and complete in all material respects; the facts and statements set forth in PLR 201326006 were true, correct and complete in all material respects as of April 15, 2013.

For purposes of this Section 5.1(k), the term "Subsidiary" shall include (in addition to any other entities otherwise included in such term) (A) EFCH, TCEH, Reorganized TCEH and each of their respective Subsidiaries and (B) EFH Corporate Services and its Subsidiaries. As used in this Agreement, (I) the term "Tax" (including, with correlative meaning, the term "Taxes") includes (1) all federal, state, local and foreign income, profits, franchise, gross receipts, environmental, margin, customs duty, capital stock, severances, stamp, payroll, sales, employment, unemployment, disability, use, property, withholding, excise, production, value added, occupancy and other taxes, duties or assessments of any nature whatsoever, together with all interest, penalties and additions imposed with respect to such amounts and any interest in respect of such penalties and additions and (2) any liability in respect of the items described in clause (1) payable by reason of contract,

assumption, transferee or successor liability, operation of Law, Treasury Regulations Section 1.1502-6(a) (or any analogous or similar provision of state, local or foreign Law) and (II) the term "Tax Return" includes all returns and reports (including elections, declarations, disclosures, schedules, estimates and information returns) required to be supplied to a Tax authority relating to Taxes.

Except insofar as Section 5.1(f)(iii)(4) and Section 5.1(h) relate to Taxes, this Section 5.1(k) contains the sole and exclusive representations and warranties of the Company and its Subsidiaries relating to Tax matters.

(l)    Labor and Employment Matters.    Neither the Company nor any of its Subsidiaries (i) has agreed to recognize any labor union or labor organization, nor has any labor union or labor organization been certified, as the exclusive bargaining representative of any employees of the Company or any of its Subsidiaries; (ii) is a party to, otherwise bound by, or currently negotiating any collective bargaining agreement or other Contract with a labor union or labor organization; nor (iii) is the subject of any material proceeding asserting that the Company or any of its Subsidiaries has committed an unfair labor practice, nor, to the Knowledge of the Company as of the date hereof, is any such proceeding threatened in writing.  There is not now, nor has there been since the Applicable Date any labor strike, walk-out, work stoppage, slow-down, lockout, or other material labor dispute involving the Company or any of its Subsidiaries nor, to the Knowledge of the Company, is any such dispute threatened in writing as of the date hereof.  To the Knowledge of the Company, as of the date hereof, there is no campaign being conducted to solicit cards from employees of the Company or any of its Subsidiaries to authorize representation by a labor organization.  Since the Applicable Date, neither the Company nor any of its Subsidiaries have closed any plant or facility or effectuated any layoffs of employees or taken any other action that constitutes a "plant closing" or "mass layoff" as those terms are defined in the United States Worker Adjustment and Retraining Notification Act or any similar Law, or the rules and regulations thereunder (collectively, the "WARN Act"), or that would reasonably be expected to give rise to any material obligation thereunder, except for any such obligation that was fully satisfied on or prior to December 31, 2014 such that the Company and its Subsidiaries have no further obligation or liability in respect thereof.  Except as has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect, the Company and each of its Subsidiaries is, and, for the three years preceding the date of this Agreement, has been, in compliance in all material respects with all applicable Laws and Orders respecting labor, employment, fair employment practices (including equal employment opportunity laws), terms and conditions of employment, classification of employees, workers' compensation, occupational safety and health, immigration, affirmative action, employee and data privacy, plant closings, and wages and hours.

(m)    Intellectual Property.

(i)    The Company and each of its Subsidiaries own, or are licensed or otherwise possess legally enforceable rights to use, all Intellectual Property and IT Assets (as defined below) necessary to conduct their respective businesses, all of which rights shall survive unchanged the execution and delivery of this Agreement and the consummation of the Transactions, except as has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect.

(ii)    To the Knowledge of the Company, (A) the business of the Company and its Subsidiaries, as presently conducted and conducted since the Applicable Date, have not infringed, diluted, misappropriated, or otherwise violated any Intellectual Property (as defined below) of any other Person, and (B) no Person is infringing, diluting, misappropriating, or otherwise violating any Intellectual Property owned by the Company or its Subsidiaries; except as has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect. There is no material Action pending or, to the Knowledge of the Company, threatened in writing by a third party against the Company or any of its Subsidiaries that asserts infringement, misappropriation or violation of such third party's Intellectual Property by the Company or any of its Subsidiaries or seeks to recover any damages or other relief in respect thereof. Except as has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect, each of the Company and its Subsidiaries complies with, and has complied with, all applicable Laws, consents and Contracts, and its own rules, policies and procedures, relating to privacy, data protection, and the collection and use of personal information or other data. There are no investigations or material actions currently pending concerning the data or privacy practices of the Company or any of its Subsidiaries. No material claims have been asserted or, to the Knowledge of the Company, threatened against the Company or any of its Subsidiaries alleging a violation of any of the foregoing, and the consummation of the transactions contemplated by this Agreement will not result in any such violation.

(iii)    For purposes of this Agreement, the term "Intellectual Property" means all intellectual property and industrial property recognized under applicable Law, including trademarks, service marks, Internet domain names, logos, trade dress, trade names and all goodwill associated therewith and symbolized thereby, inventions, discoveries, patents, trade secrets, know-how, copyrights and copyrightable works, software, databases, data (including customer, employee, technical, research and development and manufacturing data) and related items and (if applicable) any registrations, issuances and applications for registration or issuance of any of the foregoing. For purposes of this Agreement, the term "IT Assets" means all computers, computer systems, software, computer code, networks, firmware, middleware, hardware, servers, workstations, hubs, routers, databases and all other information technology equipment and assets.

(n)    Insurance.    All casualty, public liability excess, professional liability, worker's compensation liability, directors and officers liability, property and machinery breakdown and extra expense liability, fiduciary and employee benefits liability and other material insurance policies maintained by the Company or any of its Subsidiaries (other than insurance policies contributed to Reorganized TCEH pursuant to the TCEH Contribution or the EFH Contribution) ("Insurance Policies") are in full force and effect and all premiums due with respect to all Insurance Policies have been paid, with such exceptions that have not had and would not have, individually or in the aggregate, a Company Material Adverse Effect. All Insurance Policies shall in all material respects survive unchanged following the execution and delivery of the Transaction Agreements and the consummation of the EFH Subject Transactions. The coverage provided by such policies is of the kinds, in the amounts and provides protection against the risks required to comply with applicable Law and

obligations under existing Material Contracts, except as has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect.

(o)    Energy Regulatory Matters. The Company is a "holding company" under the Public Utility Holding Company Act of 2005 (including the regulations of the FERC thereunder) with a currently effective waiver of the accounting, record-retention and reporting requirements to the extent set forth in 18 C.F.R. § 366.3(c). Oncor is subject to regulation (i) under Texas Law as a "public utility," an "electric utility" and a "transmission and distribution utility" (as such terms are defined under the Texas Public Utility Regulatory Act, as amended and under the ERCOT Protocols (as defined below) as a "Transmission and/or Distribution Service Provider" (as such term is defined in the ERCOT Protocols), (ii) by FERC under Section 203 of the Federal Power Act, as a "transmitting utility" under Sections 210, 211 and 212 of the Federal Power Act and with respect to records and other requirements relating thereto (but not otherwise as a "public utility" under Section 201 of the Federal Power Act) and its associated contracts, tariffs and other facilities listed in Section 5.1(o) of the Company Disclosure Letter are subject to FERC jurisdiction under FERC orders, (iii) by FERC, NERC and the TRE as a "user, owner and operator of the bulk-power system" under Section 215 of the Federal Power Act. The Company and its Subsidiaries are not currently parties to any ongoing regulatory proceedings (other than routine ordinary course proceedings) at the PUCT or the FERC, and the Company and its Subsidiaries are not parties to any ongoing enforcement actions by the PUCT, the FERC, the TRE or the NERC, in each case, except such regulatory proceedings or enforcement actions as have not had and would not have, individually or in the aggregate, a Company Material Adverse Effect.

As used in this Agreement, the term "ERCOT Protocols" means the documents adopted by ERCOT, including any attachments or exhibits referenced therein, as amended from time to time that contain the scheduling, operating, planning, reliability, and settlement (including customer registration) policies, rules, guidelines, procedures, standards, and criteria of ERCOT including all polices, guidelines, procedures, forms, and applications contained within the "Other Binding Documents" adopted by ERCOT.

(p)    Brokers and Finders. Neither the Company nor any of its Subsidiaries has employed any broker or finder or incurred any liability for any brokerage fees, commissions or finders' fees in connection with the Reorganized TCEH Contributions, the Preferred Stock Sale or the Reorganized TCEH Spin-off or the Transactions, except that the Company or its Subsidiaries have employed, and are solely responsible for the fees and expenses of, the financial advisors identified in Section 5.1(p) of the Company Disclosure Letter (and neither the Reorganized Company nor any of its Subsidiaries shall have any liability or responsibility in respect of any such fees following the First Closing).

(q)    Real Property. Except as has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect, the Company and its Subsidiaries have either good title, in fee or valid leasehold, easement or other rights, to the real property, including land, buildings, wires, pipes, structures and other improvements thereon and fixtures thereto, necessary to permit the Company and its Subsidiaries to conduct their businesses as currently conducted free and clear of any Liens, options, rights of first refusal, conditions, encroachments, easements, rights-of-way, restrictions or other similar encumbrances. In the case of any such real property leased by the Company or any of its Subsidiaries, except as has not had and would not have, individually or in the aggregate, a

32

Company Material Adverse Effect, there exists no uncured breach or default on the part of the Company or any of its Subsidiaries or, to the Knowledge of the Company, the landlord, under the applicable lease. There are no condemnation or eminent domain proceedings pending, or to the Knowledge of the Company threatened in writing, with respect to any real property that the Company or any of its Subsidiaries owns, leases or operates except as has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect.

(r)    Company Material Contracts.    Section 5.1(r) of the Company Disclosure Letter lists any Contract (other than a Contract filed as an exhibit to the Company Reports) (i) that would be required to be filed by the Company or any Filing Subsidiary as a "material contract" (as such term is defined in item 601(b)(10) of Regulation S-K of the Securities Act), except for any such Contract that is a Benefit Plan, (ii) that imposes any material restriction on the right of the Company or any of its Subsidiaries to compete with any other Person or to engage or compete in any line of business or in any geographic area or (iii) that, by its terms, (A) involves potential payments or obligations by or to the Company or any of its Subsidiaries in excess of (x) $10,000,000, in the case of the Company and its Subsidiaries other than the Oncor Entities, or (y) $150,000,000, in the case of the Oncor Entities, or (B) involves the grant to the Company or any of its Subsidiaries of any franchise or right to conduct business in any location or geographic area in which the total number of residential retail customers served by Oncor exceeds 50,000 customers or under which material revenues are generated by the Company or its Subsidiaries (each such Contract, including any Contracts entered into after the date hereof, which, if entered into prior to the date hereof, would have been required to be so listed, a "Company Material Contract"); *provided, however,* that the Company Material Contracts shall not be deemed to include any Contracts (I) if the rights and interests thereunder are to be contributed to Reorganized TCEH pursuant to the Plan of Reorganization and the Company and its Subsidiaries will not have any obligation or liability in respect thereof after the Plan Effective Date or (II) that are to be fully and unconditionally terminated, discharged or rejected pursuant to the Plan of Reorganization. Except as would not have, individually or in the aggregate, a Company Material Adverse Effect, (x) each Company Material Contract is in full force and effect (assuming the due execution, authorization, and delivery by each other party thereto), (y) the Company and its Subsidiaries are not in breach of, or default under, the terms of such Company Material Contract and, to the Knowledge of the Company, no other party to a Company Material Contract is in breach of, or default under, the terms of such Company Material Contract and (z) each Company Material Contract is a valid and binding obligation of the Company or its Subsidiary that is a party thereto and, to the Knowledge of the Company, each other party to such Company Material Contracts in accordance with its terms subject, in the case of clause (x) and (z), to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general equity principles (the "Bankruptcy and Equity Exception").

(s)    Affiliate Transactions.

(i)    Except as disclosed in Section 5.1(s) of the Company Disclosure Letter, and other than those agreements related to ordinary course employment, employee or director compensation, or employee or director incentive arrangements, no officer or director of the TCEH Entities (as defined below) is a party to any agreement, commitment or transaction with the Company or any of its Subsidiaries

33

(excluding the TCEH Entities) or has any material interest in the Company or any of its Subsidiaries (excluding the TCEH Entities).

(ii)     Except for (x) the services to be provided under the Transition Services Agreement and (y) the goods, services and applications described in <u>Section 5.1(s)</u> of the Company Disclosure Letter, since December 31, 2014, no TCEH Entity has directly or indirectly, (A) provided or received material services to or from the Company or any of its Subsidiaries (excluding the TCEH Entities) or (B) billed to, or purchased a material amount of goods or other assets from, the Company or any of its Subsidiaries (excluding the TCEH Entities).

(iii)     Except as otherwise set forth in the Transition Services Agreement and the agreements disclosed in <u>Section 5.1(s)</u> of the Company Disclosure Letter, there are no material written agreements or arrangements whereby (x) any TCEH Entity currently, directly or indirectly, licenses rights to use Intellectual Property to the Company or any of its Subsidiaries (excluding the TCEH Entities), or (y) the Company or any of its Subsidiaries (excluding the TCEH Entities) currently, directly or indirectly, licenses rights to use Intellectual Property to any TCEH Entity. "<u>TCEH Entities</u>" means (A) EFCH, TCEH, Reorganized TCEH and each of their respective Subsidiaries and (B) EFH Corporate Services and its Subsidiaries.

(t)     <u>Anti-Corruption; OFAC</u>.

(i)     Since December 31, 2012, neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any of their respective directors, officers or employees nor any agent or other Person acting on behalf of the Company or any of its Subsidiaries, has:  (a) used any funds of the Company or any of its Subsidiaries for any unlawful contribution, gift, entertainment or other unlawful expense, in each case relating to political activity; (b) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (c) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977; or (d) made any bribe, rebate, payoff, influence payment, kickback or other similar unlawful payment.

(ii)     The operations of the Company and its Subsidiaries are, and since December 31, 2012 have been at all times, conducted in compliance in all material respects with applicable financial recordkeeping and reporting requirements of the Currency and Foreign Transactions Reporting Act of 1970, as amended, the money laundering statutes of all jurisdictions, the rules and regulations thereunder and any related or similar Laws (collectively, the "<u>Money Laundering Laws</u>"), and no action, suit or proceeding by or before any Governmental Entity or any arbitrator involving the Company or any of its Subsidiaries with respect to Money Laundering Laws is pending or, to the Knowledge of the Company, threatened in writing.

(iii)     Neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any of their respective directors, officers or employees nor any agent or other Person acting on behalf of the Company or any of its Subsidiaries, is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department.

Section 5.2    <u>Representations and Warranties of the Purchasers</u>. Except as set forth in reasonable detail in the corresponding sections or subsections of the disclosure letter delivered to the Company by Parent prior to entering into this Agreement (the "<u>Parent Disclosure Letter</u>") (it being agreed that disclosure of any item in any section or subsection of the Parent Disclosure Letter shall be deemed to have been disclosed with respect to any other section or subsection of the Parent Disclosure Letter if the relevance of such item is reasonably apparent based on the information disclosed, *provided* that no such disclosure shall be deemed to qualify <u>Section 5.2(e)</u> unless expressly set forth in <u>Section 5.2(e)</u> of the Parent Disclosure Letter), the Parent and OV2 each hereby severally, and not jointly and severally, represent and warrant as to itself (and not with respect to each other) to the Company and EFIH that:

(a)    <u>Capital Structure.</u>

(i)    Immediately prior to the First Closing Date, the issued and outstanding capital stock of Parent will consist of a number of Parent Common Shares sufficient to consummate the Parent Subject Transactions. All of the outstanding Parent Common Shares will be duly authorized, validly issued, fully paid and non-assessable. There are no options to purchase Parent Common Shares issued and outstanding. Except as may be required to issue Parent Common Shares or other equity interests in connection with the Equity Draw-down, the Rights Offering or the Merger, there are no preemptive or other outstanding rights, options, warrants, conversion rights, stock appreciation rights, performance units, redemption rights, repurchase rights, agreements, arrangements, calls, commitments or rights of any kind that obligate Parent to issue or sell units or other equity securities of Parent or any securities or obligations convertible or exchangeable into or exercisable for, or giving any Person a right to subscribe for or acquire, any equity securities of Parent, and no securities or obligations evidencing such rights are authorized, issued or outstanding.

(ii)    Upon any issuance of Parent Common Shares as a result of the Equity Draw-down, the Rights Offering or the Merger pursuant to this Agreement and the Plan of Reorganization, such Parent Common Shares will be duly authorized, validly issued, fully paid and non-assessable.

(iii)    Neither Parent nor OV2 has any Subsidiary or otherwise owns an equity interest in any Person, except that if the First Closing occurs after March 31, 2016, Parent may own outstanding equity interests of a Person that is a real estate investment trust under Section 856 of the Code, which equity interests are listed on a nationally recognized stock exchange, in such minimal amount as is reasonably necessary to qualify Parent as a real estate investment trust under Section 856 of the Code.

(b)    <u>Organization, Good Standing and Qualification.</u> Each of OV2 and, as of the date hereof, Parent is a limited liability company duly formed, validly existing and in good standing under the Delaware Limited Liability Company Act and has all requisite limited liability company power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted. As of the First Closing Date, Parent will be a corporation duly incorporated, validly existing and in good standing under the MGCL or the DGCL, as the case may be, and will have all requisite corporate power and authority to own,

lease and operate its properties and assets and to carry on its business as presently conducted. Each of Parent and OV2 is qualified to do business and is in good standing as a foreign limited liability company in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so organized, qualified or in such good standing, or to have such power or authority, would not, individually or in the aggregate, reasonably be expected to prevent, materially restrict or materially impair the ability of Parent and OV2 to consummate the Parent Subject Transactions. Parent and OV2 have each made available to the Company a complete and correct copy of the certificate of formation and operating agreement or comparable governing documents of each of Parent and OV2, as in effect on the date of this Agreement.

(c)    Corporate Authority.  Parent and OV2 have each approved this Agreement and the Parent Subject Transactions and no vote or consent of any member, stockholder or other stakeholder of either Purchaser is necessary to approve the Parent Subject Transactions or this Agreement or any of the other Transaction Agreements to be executed by Parent or OV2 on behalf of Parent or OV2.  Each of OV2 and, as of the date hereof, Parent has all requisite limited liability company power and authority and has taken all limited liability company action necessary in order to execute, deliver and perform its obligations under each of this Agreement and the other Transaction Agreements.  As of the First Closing Date, Parent will have all requisite corporate power and authority and will have taken all corporate action necessary in order to execute, deliver and perform its obligations under each of this Agreement and the other Transaction Agreements.  Each of this Agreement and the other Signing Date Agreements has been duly executed and delivered by each of Parent and OV2 and is a valid and binding obligation of Parent and OV2.  Each of this Agreement and the other Signing Date Agreements is enforceable against each of Parent and OV2 in accordance with its terms, subject to the Bankruptcy and Equity Exception.

(d)    Governmental Filings; No Violations; Etc.

(i)    Other than the Confirmation Order (as defined below), the FERC Approval, the PUCT Approval, the FCC Approval, the filings in respect thereof and the filings, notices, consents, registrations, approvals, permits or authorizations to be made or obtained (A) as contemplated by the Backstop Agreement or any other Transaction Agreement, (B) to or from the Secretary of State of the State of Texas the Secretary of State of the State of Maryland or Delaware, as the case may be, in connection with the Merger, (C) required as a result of facts or circumstances solely attributable to the Company or its Subsidiaries, a direct or indirect change of control thereof or the operation of their businesses, (D) under the HSR Act and (E) under the Exchange Act and the Securities Act (other than those items set forth in clauses (B) and (C), all such approvals being collectively the "Parent Approvals"), no notices, reports or other filings are required to be made by Parent or OV2 with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by Parent or OV2 from, any Governmental Entity in connection with the execution, delivery and performance of this Agreement or any of the other Transaction Agreements to which Parent or OV2 are parties by Parent and OV2 and the consummation by Parent and OV2 of the Parent Subject Transactions, except those which are authorized by the FERC, PUCT or ERCOT to be obtained or made after the First Closing Date in the ordinary course of business or those that would not

36

reasonably be expected to prevent, materially restrict or materially impair Parent or OV2 from consummating the Parent Subject Transactions.

(ii)    The execution, delivery and performance of this Agreement by Parent and OV2 do not, and the consummation by Parent and OV2 of the Parent Subject Transactions will not, constitute or result in (A) a breach or violation of, or a default under, the organizational or comparable governing documents of Parent or OV2; (B) with or without notice, lapse of time or both, a breach or violation of, a default under, the creation or acceleration of any obligations or the creation of a Lien on any of the assets of Parent or OV2 pursuant to, any Contracts binding upon Parent or OV2 or any Laws or governmental or non-governmental permit or license to which Parent or OV2 is subject, except for any such breach, violation, default, creation, acceleration, that would not reasonably be expected to prevent, materially delay or materially impair Parent or OV2 from consummating the Parent Subject Transactions.

(e)    <u>Litigation and Liabilities</u>.

(i)    There are no Actions pending or, to the knowledge of Parent or OV2, threatened in writing against the Parent or OV2 that seek to enjoin, or would reasonably be expected to have the effect of preventing, making illegal, or otherwise impeding any of the Transactions, or otherwise to prevent, materially restrict or materially impair the ability of the Purchasers to consummate the Parent Subject Transactions.

(ii)    Neither Parent nor OV2 has any material liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise), other than liabilities and obligations incurred or to be incurred in connection with this Agreement or otherwise relating to the Financing or the Parent Subject Transactions.

(f)    <u>Financing</u>.

(i)    Parent has delivered to the Company a true, complete and correct copy of (A) an executed commitment letter, dated as of the date of this Agreement (as amended, modified, supplemented, replaced or extended from time to time after the date of this Agreement in compliance with <u>Section 6.17</u>, the "<u>Debt Commitment Letter</u>"), from the lenders (including any lenders who become party thereto by joinder or otherwise) party thereto (collectively, the "<u>Lenders</u>"), together with their respective Affiliates, officers, directors, employees, agents, equityholders, advisors and representatives and their respective successors and assigns involved in the Debt Financing (the "<u>Financing Sources</u>"), pursuant to which the Lenders or their respective Affiliates have agreed, subject to the terms and conditions thereof, to provide the debt amounts set forth therein (the debt financing contemplated by the Debt Commitment Letter (including any debt securities to be incurred in connection with the Bond Financing), together with any permitted Alternative Debt Financing (as defined below), is collectively referred to in this Agreement as, the "<u>Debt Financing</u>"), and (B) the fee letter referred to in the Debt Commitment Letter (with solely the fee amounts, pricing caps and other economic "market flex" monetary terms redacted in a customary manner (none of which would adversely affect or

37

reduce the amount or availability of the Debt Financing (other than as may be permitted pursuant to, and in accordance with, Section 1.3 and as set forth on Section 1.1 of the Parent Disclosure Letter)) (as amended, modified, supplemented, replaced or extended from time to time after the date of this Agreement in compliance with Section 6.17, the "Fee Letter").

(ii)     The Purchasers have delivered to the Company true, correct and complete copies of the executed Plan Support Agreement, the executed Backstop Agreement, the Guarantee and the executed Equity Commitment Letter, each dated on or about the date of this Agreement, executed by each of the Purchaser Transaction Parties that is party thereto.

(iii)     Except as expressly set forth in the Debt Commitment Letter, Equity Commitment Letter, the Backstop Agreement and the Guarantee (collectively, the "Commitment Documents") (or in the unredacted portions of the Fee Letter) delivered to the Company, there are no conditions precedent to the obligations of the Lenders or their respective Affiliates or Equity Commitment Parties to provide the financings contemplated thereby (collectively, the "Financing") or any contingencies that would permit the Lenders or their respective Affiliates or Equity Commitment Parties to reduce the total amount of the Debt Financing or Equity Financing, as applicable. There are no other agreements, side letters or arrangements relating to the Financing to which either of the Purchasers is a party as of the date of this Agreement which could impose conditions to the funding of the Financing, other than those set forth in the Commitment Documents (or in the unredacted portions of the Fee Letter) and the payment of fees to applicable Lenders and Purchaser Transaction Parties or their respective Affiliates in connection with the Financing. As of the date of this Agreement, assuming the truth and accuracy of the representations and warranties of the Company and EFIH contained in this Agreement and the Backstop Agreement, neither Purchaser has any reason to believe that it will be unable to satisfy on a timely basis all conditions to be satisfied by it in the Commitment Documents or the Fee Letter at the time it is required to consummate the First Closing hereunder, nor does either Purchaser have knowledge, as of the date of this Agreement, that any of the Lenders or their respective Affiliates or Equity Commitment Parties will not perform their respective funding obligations under the Commitment Documents in accordance with its terms and conditions.

(iv)     The Commitment Documents are a valid, binding obligation of each Purchaser and, to the knowledge of each Purchaser, the other parties thereto, are in full force and effect and, no event has occurred that, with or without notice, lapse of time, or both, would reasonably be expected to constitute a default or breach or a failure to satisfy a condition precedent on the part of either Purchaser, or to the knowledge of either Purchaser, any other party thereto under the terms and conditions of the Commitment Documents and Fee Letter. The Purchasers have paid in full any and all commitment fees or other fees required to be paid on or before the date of this Agreement pursuant to the terms of the Commitment Documents and Fee Letter, and will pay in full any such amounts due on or before the First Closing Date pursuant to such terms and the terms of this Agreement.  Neither the Commitment Documents nor the Fee Letter have been modified, altered or amended on or prior to the date of this Agreement.  None of the commitments under the Commitment Documents have

been withdrawn or rescinded prior to the date of this Agreement, nor, as of the date hereof, is any such amendment, modification, withdrawal or rescission currently contemplated or the subject of current discussions.

(v)  After giving effect to the Equity Draw-Down, and assuming that the First Closing Date occurs on or about March 31, 2016, the Purchasers will hold cash contributed (A) by the Equity Commitment Parties pursuant to the Equity Draw-Down and (B) pursuant to the Rights Offering and Backstop Agreement, which amounts, together with the other funding sources referred to in Section 1.4 and cash to be provided by the OV2 Contribution, shall be sufficient to (x) repay 100% of the Interim Financing, (y) fund the Repayment Amount and (z) pay all other amounts payable at the Closings by any Purchaser or the Surviving Company pursuant to or in connection with any Signing Date Agreement, the Debt Financing, the Equity Financing and/or the Transactions.

(g)  Purchasers.  OV2 was formed solely for the purpose of engaging in the Parent Subject Transactions and activities incidental thereto. All of the outstanding equity securities of Parent and OV2 are owned by a subsidiary of Hunt Consolidated, Inc. ("Hunt"), and at the time of the First Closing will be owned directly or indirectly by the Equity Commitment Parties. Except in connection with its formation, as contemplated by this Agreement or otherwise relating to the Financing or the Transactions, neither Parent nor OV2 has, and prior to the time of the First Closing will not have engaged in any business activities of any type or kind whatsoever or entered into any agreements or arrangements with any Person.

(h)  Brokers.  Neither Purchaser has employed any broker or finder or incurred any liability for any brokerage fees, commissions or finders' fees in connection with the Transactions, except that the Purchasers have employed, and are solely responsible for the fees and expenses of, the financial advisors identified in Section 5.2(h) of the Parent Disclosure Letter.

(i)  Taxes.  As of the date hereof, OV2 is classified and properly treated as a disregarded entity for federal income tax purposes and, after giving effect to the First Closing, OV2 will be classified and properly treated as a partnership for federal income tax purposes. Parent is classified and properly treated as a corporation for federal income tax purposes. Parent and OV2 have not taken or agreed to take any action, and are not aware of any facts or circumstances, in each case, that would prevent or impede, or would reasonably be expected to prevent or impede, the Merger from qualifying as a reorganization within the meaning of Section 368(a) of the Code. This Section 5.2(i) contains the sole and exclusive representations and warranties of Parent and OV2 relating to Taxes.

(j)  Plant Closings and Mass Layoffs.  Neither Parent nor OV2 currently plans or contemplates any plant closings, reductions in force, or terminations of Oncor Employees (as defined below) that would reasonably be expected to give rise to obligations under the WARN Act.

(k)  Financing.  In no event shall the receipt or availability of any funds or financing by either Purchaser or any Affiliate thereof be a condition to either Purchaser's obligations hereunder.

39

(l)     The Offer.    Contemporaneous with the execution and delivery of this Agreement, Parent delivered and made the Offer.

(m)     Disclaimer of Other Representations and Warranties.  EACH PURCHASER (INDIVIDUALLY AND ON BEHALF OF ITS EQUITYHOLDERS) ACKNOWLEDGES AND AGREES THAT NEITHER THE COMPANY NOR ANY OF ITS SUBSIDIARIES MAKES ANY REPRESENTATION OR WARRANTY, WHETHER EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER EXCEPT AS EXPRESSLY SET FORTH IN THE SIGNING DATE AGREEMENTS OR IN ANY CERTIFICATE DELIVERED BY THE COMPANY TO EITHER PURCHASER IN ACCORDANCE WITH THE TERMS THEREOF, AND SPECIFICALLY (BUT WITHOUT LIMITING THE GENERALITY OF THE FOREGOING) THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THE SIGNING DATE AGREEMENTS, NEITHER THE COMPANY NOR ANY OF ITS SUBSIDIARIES MAKES ANY REPRESENTATION OR WARRANTY WITH RESPECT TO (X) ANY PROJECTIONS, ESTIMATES OR BUDGETS OF THE COMPANY OR ANY OF ITS SUBSIDIARIES DELIVERED OR MADE AVAILABLE TO EITHER PURCHASER (OR ANY OF ITS AFFILIATES, OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES OR REPRESENTATIVES) OF FUTURE (I) REVENUES, (II) RESULTS OF OPERATIONS (OR ANY COMPONENT THEREOF), (III) CASH FLOWS OR (IV) FINANCIAL CONDITION (OR ANY COMPONENT THEREOF) OF THE COMPANY AND/OR ANY OF ITS SUBSIDIARIES OR (Y) THE FUTURE BUSINESS AND OPERATIONS OF THE COMPANY AND/OR ANY OF ITS SUBSIDIARIES.

**ARTICLE VI**
**Covenants**

Section 6.1     Interim Operations.

(a)     Each of the Company and EFIH covenants and agrees as to itself and each of its Subsidiaries (other than the Oncor Entities, subject to Section 6.23), and any entities that are to be, and actually are, contributed to Reorganized TCEH pursuant to the Plan of Reorganization) that, except (i) as otherwise specifically permitted by the provisions of this Agreement, (ii) as Parent may approve in writing (such approval, not to be unreasonably withheld, delayed or conditioned), (iii) as is required by any applicable Law or any Order (as defined below) of any Governmental Entity, (iv) as set forth in Section 6.1(a) of the Company Disclosure Letter, (v) as required by the Bankruptcy Court or the Bankruptcy Code, and (vi) as required pursuant to the Plan of Reorganization, in each case after the date hereof and prior to the earlier of the Termination Date (as defined below) and the First Closing Date, (w) the businesses of the Company, EFIH and their respective Subsidiaries (other than the Oncor Entities, subject to Section 6.23) shall be conducted in the ordinary course of business in all material respects and in accordance with the Bankruptcy Code and the Orders of the Bankruptcy Court and (x) each of the Company, EFIH and their respective Subsidiaries (other than the Oncor Entities, subject to Section 6.23) shall use its reasonable best efforts to preserve intact its business organization and relationships with  employees, customers, suppliers and Governmental Entities. Without limiting the generality of the preceding provisions of this Section 6.1(a), and in furtherance thereof, from the date of this Agreement until the earlier of the Termination Date and the First Closing Date, except (A) as otherwise specifically permitted by the provisions of this Agreement, (B) as Parent may

approve in writing (such approval, not to be unreasonably withheld, delayed or conditioned), (C) as is required by any applicable Law or any Order of any Governmental Entity, (D) as set forth in Section 6.1(a) of the Company Disclosure Letter, (E) as required by the Bankruptcy Court or the Bankruptcy Code, or (F) as required pursuant to the Plan of Reorganization, each of the Company and EFIH will not and will not permit any of its respective Subsidiaries (other than the Oncor Entities, subject to Section 6.23, and any entities that are to be, and actually are, contributed to Reorganized TCEH pursuant to the Plan of Reorganization) to:

(i)    adopt any change in its certificate of formation or bylaws or other applicable governing instruments;

(ii)    merge or consolidate with any other Person;

(iii)    adopt a plan of complete or partial liquidation, dissolution, restructuring, recapitalization or other reorganization other than pursuant to the Plan of Reorganization;

(iv)    make any acquisition of any assets or Person for a purchase price in excess of $1,000,000, in the aggregate, unless such acquisition would be permissible under Section 6.1(a)(xi) below;

(v)    issue, sell, pledge, dispose of, grant, transfer, lease, license, guarantee, encumber, or authorize the issuance, sale, pledge, disposition, grant, transfer, lease, license, guarantee or encumbrance of, any shares of its capital stock or other equity interests (other than (A) the issuance of shares of Common Stock upon the settlement of awards outstanding as of the date hereof under the Company Stock Plan (and dividend equivalents thereon, if applicable), or (B) the issuance of equity interests by a wholly owned Subsidiary of the Company to the Company or another wholly owned Subsidiary of the Company), or securities convertible or exchangeable into or exercisable for any shares of such capital stock, or any options, warrants or other rights of any kind to acquire any shares of such capital stock or other equity interests or such convertible or exchangeable securities;

(vi)    make any loans, advances or capital contributions to or investments in any Person in excess of $1,000,000, in the aggregate (other than loans, advances or capital contributions to or investments in the Company or any direct or indirect wholly owned Subsidiary of the Company);

(vii)    declare, set aside, make or pay any dividend or other distribution, payable in cash, stock, property or otherwise, with respect to any of its capital stock or other equity interest (except for dividends paid by any direct or indirect wholly owned Subsidiary to the Company or to any other direct or indirect wholly owned Subsidiary of the Company) or enter into any agreement with respect to the voting of its capital stock;

(viii)    reclassify, split, combine, subdivide or redeem, purchase or otherwise acquire or offer to repurchase, redeem or otherwise acquire, directly or indirectly, any of its capital stock or equity interests or securities convertible or exchangeable into or exercisable for any shares of its capital stock or other equity interests, or any options,

warrants or other rights of any kind to acquire any such capital stock or other equity interests or such convertible or exchangeable securities;

(ix)     repurchase, redeem, defease, cancel, prepay, forgive, issue, sell, incur, or announce, offer, place, or arrange for the incurrence of, or otherwise acquire any indebtedness for borrowed money or any debt securities or rights to acquire debt securities, of the Company or any of its Subsidiaries, or assume, guarantee or otherwise become responsible for such indebtedness of another Person (other than a wholly owned Subsidiary of the Company), except for indebtedness for borrowed money (A) incurred or repaid under the EFIH First Lien DIP (1) in the ordinary course of business or (2) in connection with the refinancing thereof or (B) incurred by drawing under outstanding letters of credit in the ordinary course of business;

(x)     (A) grant to any Employee any increase in compensation or benefits other than increases in the ordinary course of business, (B) grant to any Employee any increase in change in control, severance or termination pay, (C) establish, adopt, enter into, amend in any material respect or terminate any Assumed Plan (or any plan or agreement that would be a Benefit Plan if in existence on the date hereof) in the case of a Contributed Plan, other than in the ordinary course of business, (D) take any action to accelerate the time of vesting, funding or payment of any compensation or benefits under any Assumed Plan, (E) grant any new awards, or any outstanding awards, under any Assumed Plan, or (F) enter into or amend any collective bargaining agreement or other agreement with a labor union, works council or similar organization, except in the case of the foregoing clauses (A) through (F) for actions required pursuant to the terms of any Benefit Plan, or in accordance with the terms and conditions of this Agreement or applicable Law;

(xi)     make or authorize any capital expenditure in an amount in excess of $1,000,000, in the aggregate, during any 12-month period;

(xii)     make any material changes with respect to its financial accounting methods, principles, policies, practices or procedures, except as required by Law or by changes in GAAP;

(xiii)     other than with respect to (1) audits or other Tax proceedings disclosed in Section 6.1(a)(xiii) of the Company Disclosure Letter or (2) any action to accelerate the recognition of cancellation of indebtedness income that previously has been deferred pursuant to Section 108(i) of the Code, in each case, only and to the extent the foregoing would not materially adversely affect Parent, make (excluding any elections made (a) in the ordinary course of business or (b) under Section 168(k) of the Code) or change any material Tax election, change any material method of Tax accounting, settle or compromise any material Tax liability, claim or assessment or agree to an extension or waiver of the limitation period to any material Tax claim or assessment, grant any power of attorney with respect to material Taxes, enter into any closing agreement with respect to any material Tax or refund or amend any material Tax Return, in each case, other than as required by Law;

(xiv)     waive, release, assign, settle or compromise any pending or threatened claim, action, suit or proceeding against the Company or any of its

42

Subsidiaries (A) for an amount in excess of $10,000,000, or (B) that entails the acceptance or imposition of any material restrictions on the business or operations of the Company or its Subsidiaries;

(xv)    transfer, sell, lease, license, mortgage, pledge, surrender, encumber, divest, cancel, abandon or allow to lapse or expire or otherwise dispose of any assets, product lines or businesses of the Company or its Subsidiaries (including capital stock of any of its Subsidiaries) with a fair market value in excess of $1,000,000, in the aggregate, other than sales of obsolete goods or equipment or the licensing or sublicensing of, Intellectual Property in the ordinary course of business consistent with past practice or pursuant to Contracts in effect prior to the date hereof that have been made available to the Purchasers;

(xvi)    other than pursuant to the Plan of Reorganization, (A) enter into, terminate (other than at the end of a term), renew or materially extend or amend any Company Material Contract or Contract that, if in effect on the date hereof, would be a Company Material Contract; or (B) waive any material default under, or release, settle or compromise any material claim against the Company or any of its Subsidiaries or liability or obligation owing to the Company or any of its Subsidiaries under any Company Material Contract;

(xvii)    enter into any Contract that contains a change of control or similar provision that would require a payment to any Person counterparty thereto in connection with the consummation of the Transactions that would not otherwise be due;

(xviii)    fail to maintain in full force and effect material insurance policies covering the Company and its Subsidiaries and their respective properties, assets and businesses in a form and amount consistent with past practice unless the Company determines, in its reasonable commercial judgment, that the form or amount of such insurance should be modified; or

(xix)    agree, authorize or commit to do any of the foregoing.

(b)    Notwithstanding anything in Section 6.1(a) to the contrary, in order to prevent the occurrence of, or mitigate the existence of, an emergency situation involving endangerment of life, human health, safety, the Environment or material property, equipment or other assets, the Company and EFIH may take commercially reasonable actions that would otherwise be prohibited pursuant to Section 6.1(a); *provided, however,* that the Company and EFIH shall provide Parent with notice of such emergency situation as soon as reasonably practicable after obtaining Knowledge thereof.

(c)    Except (i) for actions required under the terms of this Agreement, (ii) for actions expressly permitted under Section 6.2 or (iii) as required by the Bankruptcy Court or the Bankruptcy Code, no party hereto shall intentionally take or permit any of its controlled Affiliates to take any action that is reasonably likely to prevent in any material respect the consummation of any of the Transactions.

43

(d)      Nothing contained in this Agreement is intended to give either Purchaser, directly or indirectly, the right to control or direct the Company's or its Subsidiaries' operations prior to the Effective Time.

Section 6.2          Alternative Proposals.

(a)      Notwithstanding anything to the contrary herein, except as specifically permitted by Section 6.2(d) with respect to a Backup Restructuring Proposal, during the period beginning on the date of this Agreement and ending on the earlier of the First Closing Date or the Termination Date, the Company and its Subsidiaries shall not, and shall use their commercially reasonable efforts to cause their respective directors, officers, employees, investment bankers, attorneys, accountants and other advisors or representatives (collectively, "Representatives") not to, (i) initiate or solicit, propose, or knowingly facilitate, knowingly encourage or knowingly induce, the submission of, any Alternative Proposal, in each case except as permitted by clause (ii) hereof; (ii) enter into, maintain or continue discussions or negotiations with any Person with respect to, any Alternative Proposal, other than, in the case of this clause (ii), if the Company Board (or any board of directors, board of managers or similar governing body of any Debtor), in response to the receipt of an unsolicited, written Alternative Proposal from a third party, determines in good faith after consultation with its outside financial advisors and outside legal counsel that such Alternative Proposal would reasonably be likely to lead to a Superior Proposal (in which case the Company shall notify the Purchasers of such determination in writing promptly after such determination is reached); or (iii) enter into any written letter of intent, agreement in principle or other agreement (whether or not legally binding) that constitutes an Alternative Proposal (an "Alternative Transaction Agreement"). In addition, during the period specified in the first sentence of this Section 6.2(a), if any Debtor makes or receives any written proposal or expression of interest regarding an Alternative Proposal that is reasonably likely to lead to a Superior Proposal, the Company and EFIH shall promptly notify counsel to Parent of any such proposal or expression of interest relating to an Alternative Proposal, with such notice to include unless prohibited by any agreement to which any Debtor is a party or applicable Law, the material terms of such Alternative Proposal and the identity of the Person or group of Persons making the same. Unless prohibited by any agreement to which any Debtor is a party or applicable Law, the Company and EFIH shall promptly furnish counsel to Parent with copies of any written offer or other information that they make or receive relating to an Alternative Proposal and shall keep counsel to Parent reasonably informed of any material changes to such Alternative Proposal; provided, that if such an Alternative Proposal is a Backup Restructuring Proposal, such obligation shall only be applicable if such Backup Restructuring Proposal is reasonably likely to lead to a Superior Proposal. During the period beginning on the date of this Agreement and ending on the earlier of the First Closing Date or the Termination Date, no Debtor shall enter into any agreement with any Person which prohibits the Company or EFIH from providing information to the Purchasers that the Purchasers are expressly entitled to receive in accordance with this Section 6.2(a) and each of the Debtors shall use its commercially reasonable efforts to amend any existing agreement to which it is a party which prohibits it from providing such information to the Purchasers; provided that, for all purposes of this Agreement, the commercially reasonable efforts of the Debtors shall not include any payments to any counterparty of any such existing agreement or the undertaking of, or response to, any action, suit, claim, cause of action or other form of litigation. Notwithstanding anything else in this Agreement to contrary, references in this

44

Section 6.2 to the Company's Subsidiaries do not include the Oncor Entities (subject to Section 6.23).

(b)     On the date hereof, the Company and its Subsidiaries will immediately cease and cause to be terminated any existing activities, discussions or negotiations with any Persons conducted prior to the date hereof with respect to any Alternative Proposal, other than with respect to any Backup Restructuring Proposal.

(c)     For purposes of this Agreement:

"Alternative Proposal" means any bona fide proposal or offer to or from a Person other than the Purchasers or their respective Representatives (or, to the extent that the Purchasers consent in writing to any Affiliate of the Purchasers being treated in the same manner as the Purchasers, any such Affiliate of the Purchasers) with respect to (i) any plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or equity interests or restructuring involving the Debtors or any of their material assets, properties or businesses, (ii) any other direct or indirect acquisition involving the Company and/or one or more of its Subsidiaries or any of their material assets, properties or businesses or (iii) any alternative transaction that would permit the Debtors that are the direct or indirect owners of Oncor Holdings to emerge from the Chapter 11 Cases and does not implement the Restructuring Transactions (as defined in the Plan Support Agreement). For the avoidance of doubt, any proposal by the Company or its Representatives which would otherwise constitute an Alternative Proposal that is not shared by the Company with any third party participant shall not be deemed to be an Alternative Proposal for purposes of this Agreement.

"Backup Restructuring Proposal" means any proposal or offer with respect to any one or more alternative restructuring transactions, plans of reorganization, sales, liquidations, or structured dismissals, either filed or to be filed by the Debtors or filed or to be filed or supported by the Required TCEH First Lien Creditors (other than the Plan of Reorganization) that contains the Required Alternative Terms (as such term is defined in the Plan Support Agreement, including any Alternative Restructuring (as defined in the Plan Support Agreement).

"Superior Proposal" means any bona fide proposal or offer to or from a Person other than the Purchasers or their respective Representatives (or, to the extent that the Purchasers consent in writing to any Affiliate of the Purchasers being treated in the same manner as the Purchasers, any such Affiliate of the Purchasers) with respect to the transactions described in clause (i) through (iii) of the definition of Acquisition Proposal that the Company Board (or the board of directors of EFIH) has determined in good faith, after consultation with its outside financial advisors and outside legal counsel, would, if consummated, result in a transaction superior to the Company (or EFIH, as applicable) than the Transactions, taking into account all terms thereof, including (x) the likelihood and timing of consummation (as compared to the

45

Transactions) and (y) all material legal, financial (including the financing terms of any such proposal), conditionality, regulatory and other aspects of such proposal.

(d)     For the avoidance of doubt and notwithstanding Section 6.2(a), the Company and the other Debtors may, (i) solicit (other than within the meaning of 11 U.S.C. § 1125), negotiate, facilitate, and document the other terms of a Backup Restructuring Proposal, (ii) solicit (other than within the meaning 11 U.S.C. § 1125), negotiate, facilitate, and document the terms of another plan or other restructuring transaction that contains the Required Alternative Terms, and (iii) solicit and enter into an agreement or agreements regarding support for and/or financing of a Backup Restructuring Proposal or other restructuring so long as entering into such agreement or agreements does not violate their commitments and obligations under the Plan Support Agreement; *provided*, *however*, that the Company or the applicable Debtor shall use commercially reasonable efforts (x) to keep confidential any solicitation, negotiation, facilitation, and documentation by the Debtors of a Backup Restructuring Proposal and (y) to enter into confidentiality agreements with any counterparty to any agreement regarding support for and/or financing of a Backup Restructuring Proposal, which confidentiality agreement provides that the existence and terms of such Alternative Restructuring shall be kept confidential and shall not be publicly disclosed, except in each case to the extent required by applicable Law or pursuant to such confidentiality agreements (including any "cleansing" provisions set forth in such confidentiality agreements) as determined by the Company or other Debtor in its sole and absolute discretion, and (iv) during the Alternative Restructuring Support Period (as defined in the Plan Support Agreement), pursue an Backup Restructuring Proposal as set forth in Section 5 of the Plan Support Agreement. Notwithstanding the foregoing, this Section 6.2(d) shall not permit, and the Company and its Subsidiaries shall not, and shall use their reasonable best efforts to cause their respective Representatives not to, make or support any filings with the Bankruptcy Court or any filings with or submissions or inquiries to any other Governmental Entity, including the PUCT, FCC or FERC or make or support any public statements with respect to any Alternative Proposal or Backup Restructuring Proposal, in each case other than in accordance with this Agreement, the Plan Support Agreement, the Plan of Reorganization and the other Transaction Agreements.

(e)     The Company and EFIH shall not, and they shall cause their Subsidiaries (other than the Oncor Entities, subject to Section 6.23) not to, seek to cause or cause the Oncor Entities to take any action that the Company is prohibited from taking pursuant to this Section 6.2.

Section 6.3        Filings; Other Actions; Notification.

(a)     Cooperation.

(i)     Subject to the terms and conditions set forth in this Agreement, the Company and EFIH, on the one hand, and the Purchasers, on the other hand, shall cooperate with each other and cause their respective Subsidiaries (other than the Oncor Entities, subject to Section 6.23) to use their respective reasonable best efforts to take or cause to be taken all actions, and do or cause to be done, and assist and cooperate with the other parties and the Oncor Entities in doing, all things reasonably necessary, proper or advisable on its part under this Agreement and applicable Laws

46

to consummate and make effective the Transactions, as promptly as reasonably practicable, including negotiating, preparing and filing as promptly as reasonably practicable all documentation to effect all necessary notices, reports and other filings and to obtain as promptly as reasonably practicable all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any third party and/or any Governmental Entity in connection with the execution, delivery and performance of this Agreement and the Transactions; *provided* that notwithstanding the foregoing, or anything else in this Agreement to the contrary, the Company's and its Subsidiaries' (other than the Oncor Entities, subject to Section 6.23) sole obligations with respect to (i) the Minority Interest Contribution and/or the EFIH Parent Issuance are set forth in Section 1.6, Section 6.20 and Section 6.22 and (ii) the IPO Conversion Plan are set forth in Section 1.1, Section 6.19 and Section 6.23.

(ii)     The Company and the Purchasers shall use their respective reasonable best efforts to make all filings required of the Company, EFIH, Parent and OV2 under the HSR Act in respect of the applicable Transactions as promptly as reasonably practicable after the date hereof (unless otherwise mutually agreed). The filing fees required under the HSR Act shall be at Parent's sole cost and expense (and shall not be subject to reimbursement pursuant to Section 6.25 or any other Transaction Agreement, including the Plan Support Agreement). The Company agrees that, prior to the termination of this Agreement, it will not withdraw any filing under the HSR Act made in connection with the Transactions without the prior written consent of Parent. The Company and Purchasers shall supply as promptly as reasonably practical any additional information and documentary material that may be requested pursuant to the Competition Laws.

(iii)     Each of (i) the Purchasers shall, pursuant to the Oncor Letter Agreement or otherwise, and (ii) the Company and EFIH shall, pursuant to Section 6.23 or otherwise, use their reasonable best efforts to cause Oncor, to file with the FERC an application for the FERC Approval as promptly as reasonably practicable, but in no event later than 45 days after the date hereof.

(iv)     Each of (i) the Purchasers shall, pursuant to the Oncor Letter Agreement or otherwise, and (ii) the Company and EFIH shall, pursuant to Section 6.23 or otherwise, use their reasonable best efforts to cause Oncor to submit to the PUCT a single, integrated filing (on behalf of the parties) that requests prior approval by the PUCT of the Transactions, including the Oncor Restructuring (the "PUCT Filing"), as promptly as reasonably practicable, but in no event later than 45 days after the date hereof.

(v)     In connection with any PUCT Filing or application submitted to the FCC or FERC with respect to the Transactions (together, the "FCC/FERC Applications" and, together with the PUCT Filing, the "Applications"), the Company shall not be required to endorse, or cause any of its Subsidiaries to endorse, as the Company's or its Subsidiaries' own strategy or take actions to support any modification of the Company's or its Subsidiaries' strategy and business plan that the Company determines in good faith would not be in the best interests of the Company or such Subsidiaries to support if the Transactions were not to be completed;

*provided, however,* that nothing in this Section 6.3(a)(v) shall affect the Company's and its Subsidiaries' obligation to include the Key Regulatory Terms (as defined below) (as applicable) in the Applications. Nothing contained in this Section 6.3(a)(v) is intended to give Parent, directly or indirectly, the right to control or direct the Company's or its Subsidiaries' operations prior to the Effective Time.

(vi)     Each of the Company, EFIH, Parent and OV2 agrees that (A) the Applications shall include the information concerning the Transactions, the Company and its Subsidiaries, and the Purchasers required by applicable Laws of the State of Texas and such other jurisdictions as may be mutually determined by the Company, EFIH and the Purchasers, as the case may be, (B) the Applications and any amendments or supplements thereto shall include the key terms and undertakings set forth in Exhibit F hereto (the "Key Regulatory Terms") to the extent applicable to such Applications and the jurisdictions relevant thereto and such additional agreements or commitments as the Company, EFIH and the Purchasers mutually agree are advisable to obtain the PUCT Approval, FERC Approval or FCC Approval, and (C) neither the Company nor any of its Subsidiaries (other than the Oncor Entities, subject to Section 6.23) shall, or shall be required or permitted to, agree to, or accept any agreements, commitments or conditions in connection with the Transactions pursuant to any settlement or other agreement with any Governmental Entity, which would constitute a Burdensome Condition without the prior written consent of Parent.

(vii)     Subject to Section 6.3(f) and applicable Laws relating to the exchange of information, the Purchasers, on the one hand, and the Company and EFIH, on the other hand, shall use their respective reasonable best efforts to provide the other a reasonable opportunity to review in advance and, to the extent practicable, each will consult with the other on and consider in good faith the views of the other in connection with, all material information relating to either Purchaser or the Company and any of their respective Subsidiaries, as the case may be, that appears in any filing made with, or written materials submitted to, or oral presentations made to any Governmental Entity (other than the NRC) in connection with the Transactions (other than, subject to Section 6.13, in connection with the Chapter 11 Cases). In exercising the foregoing rights, each of the Company and the Purchasers shall act reasonably and as promptly as practicable.

(viii)     The Purchasers, on the one hand, and the Company and EFIH, on the other hand, agree not to schedule, to the extent reasonably practicable, any substantive meetings or substantive communications with the PUCT, FERC or in pursuit of obtaining any necessary clearances pursuant to Competition Laws (but excluding, for the avoidance of doubt, the NRC) regarding the Transactions or the Plan of Reorganization without giving the other party or its Representatives a reasonable opportunity to participate in such meeting or communication to the extent permitted by such Governmental Entity, and in any event the parties shall keep each other reasonably apprised of all material substantive communications with Governmental Entities (other than the NRC) of which it is aware regarding the Transactions (other than, subject to Section 6.13, in connection with the Chapter 11 Cases). Nothing in this Section 6.3(a)(viii) shall prevent, limit or restrict the Company's or any of its Subsidiaries' or other Affiliates from interacting,

48

communicating or making filings or applications with, or resolving any investigation or other inquiry of, any agency or other Governmental Entity (i) in the ordinary course of business consistent with past practice or (ii) in connection with any aspect of the Plan of Reorganization or the Chapter 11 Cases that is not directly related to this Agreement or the Transactions (subject to Section 6.13). The Purchasers, on the one hand, and the Company and EFIH, on the other hand, shall use their reasonable best efforts to obtain the PUCT Approval and the FERC Approval as expeditiously as possible, and notwithstanding anything to the contrary contained herein, expressly agree that receipt of such approval from the PUCT or the FERC shall be sufficient to satisfy all conditions relating to any such approval set forth in Article VII hereof, to the extent that the only conditions or requirements to such approval constitute Acceptable Regulatory Conditions.

(ix)    In the event that the Company and Parent agree in writing upon the use of common counsel or consultants with respect to the negotiation, preparation or filing of any necessary consent, registration, approval, permits and/or authorizations under this Section 6.3(a)(ix), they shall share equally the fees and expenses of such counsel and consultants. In such case any party who does not pay its full share of such fees and expenses shall reimburse the other party for any such shortfall on a monthly basis to the extent such other party paid more than its share of such fees and expenses. The party to whom such reimbursement is owed shall invoice the other party monthly for such reimbursement expenses and such invoices shall be payable in immediately available funds within thirty (30) days after the receipt thereof.

(b)    Information. Subject to Section 6.3(f), the Company and EFIH, on the one hand, and the Purchasers, on the other hand, shall, upon request by the other, furnish the other with all information concerning itself, its Subsidiaries (other than the Oncor Entities, subject to Section 6.23), directors, officers and equityholders and such other matters as may be reasonably necessary or advisable in connection with any statement, filing, notice or application made by or on behalf of any Purchaser, the Company or any of their respective Subsidiaries to or with any third party and/or any Governmental Entity (other than the NRC) in connection with the Transactions.

(c)    Status. Subject to Section 6.3(f) and the instructions of any Governmental Entity, the Company and EFIH, on the one hand, and the Purchasers, on the other hand, shall keep the other reasonably apprised of the status of material matters relating to completion of the Transactions, including, upon reasonable request, promptly furnishing the other with copies of notices or other communications received by Parent or OV2 or the Company or EFIH, as the case may be, or any of their Subsidiaries (other than the Oncor Entities, subject to Section 6.23), from any third party and/or any Governmental Entity (other than the NRC or the Bankruptcy Court) with respect to the Transactions. The Company and EFIH will also keep the Purchasers reasonably and regularly advised of the status and progress of, and provide to the Purchasers any information reasonably requested by them regarding, any other consents of Governmental Entities required in connection with the implementation and consummation of the transactions contemplated by the Plan of Reorganization that are related to or could reasonably be expected to affect the Transactions, including any consents or approvals to be granted by the NRC in connection with the Reorganized TCEH Spin-Off and related transactions. Neither the Company nor EFIH shall take any action with respect to the

49

approvals to be granted by the NRC that would be expected to unreasonably delay the consummation of the Transactions.

(d)     Regulatory Matters; Reasonable Best Efforts.  Subject to the terms and conditions set forth in this Agreement, without limiting the generality of the other undertakings pursuant to this Section 6.3, each of the Company and EFIH and Parent and OV2 shall use its reasonable best efforts to take, or cause to be taken, the following actions:

(i)     the prompt provision to each and every federal, state, local or foreign court or Governmental Entity (including the FCC, the FERC and the PUCT) with jurisdiction over any Company Approvals or Parent Approvals of information and documents reasonably requested by any such Governmental Entity or that are necessary, proper or advisable to permit consummation of the Transactions;

(ii)     with respect to the FCC Approval, the FERC Approval and the PUCT Approval, the expiration or earlier termination of any waiting period under the HSR Act applicable to the Transactions, and any other approval or consent of a Governmental Entity arising due to a change in Law after the date of this Agreement, obtain all such necessary approvals and avoid the entry or enactment of any permanent, preliminary or temporary injunction or other Order, decree, decision, determination, judgment or Law, individually or in the aggregate, that would be reasonably likely to restrain, prevent, enjoin, materially restrict, materially impair or otherwise prohibit the Transactions, including Parent and OV2 taking all actions required by, and accepting all conditions and/or requirements imposed under the terms of any, consent, registration, order, approval or authorization issued by any Governmental Entity in connection with the Transactions to the extent that such conditions or requirements constitute an Acceptable Regulatory Condition; and

(iii)     in the event that any permanent, preliminary or temporary injunction, decision, Order, judgment, determination, decree or Law is entered, issued or enacted, or becomes reasonably foreseeable to be entered, issued or enacted, in any Action, review or inquiry of any kind that would make consummation of the Transactions unlawful or that would restrain, prevent, enjoin, materially restrict, materially impair or otherwise prohibit consummation of the Transactions, reasonable best efforts to resist, vacate, modify, reverse, suspend, prevent, eliminate, avoid, remove or comply with such actual, anticipated or threatened injunction, decision, Order, judgment, determination, decree or enactment so as to permit prompt consummation of the Transactions.

(e)     Notwithstanding the obligations set forth in this Section 6.3, (A) Parent and OV2 shall not be required to, and (B) the Company, EFIH and their Subsidiaries (other than the Oncor Entities, subject to Section 6.23) shall not be permitted to, without the prior written consent of the Purchasers, take any action pursuant to this Section 6.3 in connection with obtaining the FCC Approval, the FERC Approval and the PUCT Approval, the expiration or earlier termination of any waiting period under the HSR Act applicable to the consummation of the Transactions or any approval or consent of a Governmental Entity (other than the Bankruptcy Court or the NRC) in connection with the Transactions (whether arising due to a change in Law after the date of this Agreement or otherwise) if the taking of such efforts or action, individually or in the aggregate, would result in a Burdensome Condition.

50

"Burdensome Condition(s)" means any condition, order, sanction, requirement or term that, individually or in the aggregate, (i) would be reasonably likely to have a material adverse effect on the business, assets, liabilities, condition (financial or otherwise) or results of operations of the Company or the Surviving Company and their respective Subsidiaries, taken as a whole, or the Oncor Entities, taken as a whole, (ii) subjects the operations of the Company or the Surviving Company and their respective Subsidiaries or the Oncor Entities following the First Closing Date to any restriction, limitation, condition or obligation that differs materially and adversely from those currently applicable to the Oncor Entities, (iii) would prevent Oncor from recovering in rates material expenditures recovered by Oncor in its rates consistent with its past practices, or (iv) subjects any Equity Commitment Party or any of their Affiliates (other than the Company or the Surviving Company or their Subsidiaries or the Oncor Entities) to a requirement to take or refrain from taking any action or make or undertake any payment or to any condition, order, sanction, requirement or term; *provided* that (A) the Key Regulatory Terms, and (B) any such condition, order, sanction, requirement or term that primarily relates, as indicated on the face of the order or approval, to the Minority Interest Contribution or the EFIH Parent Issuance shall, in each case, not be deemed to be, or contribute to, a Burdensome Condition, and the failure to receive the approval from any Governmental Entity (including the FERC or the PUCT) of the Minority Interest Contribution or the EFIH Issuances shall not be deemed, or contribute to, a Burdensome Condition. Notwithstanding anything in this Agreement to the contrary, the parties hereto acknowledge and agree that to the extent any condition or requirement imposed or reimposed on the Company or any of its Subsidiaries by any Governmental Entity (other than the Bankruptcy Court) in connection with any approval sought in connection with this Agreement is substantially similar to, or has the same effect as, any condition or requirement imposed on Sharyland Utilities, L.P., Sharyland Distribution and Transmission Services, L.P., or any of their affiliates pursuant to Docket No. 35287 issued by the PUCT on July 21, 2008, such condition or requirement shall not be deemed to be, or contribute to, a Burdensome Condition and, shall be deemed to be an "Acceptable Regulatory Condition."

(f)     Notwithstanding the foregoing, all information disclosed pursuant to this Section 6.3(f) shall be subject to the Confidentiality Agreements and nothing in this Section 6.3(f) shall require any party (i) to violate any of its binding obligations with respect to confidentiality, (ii) to disclose any privileged information or (iii) to violate any applicable Laws or Orders; *provided*, that, as applicable, each of the Company and EFIH, on the one hand, and the Purchasers, on the other hand, shall, to the extent permitted by applicable Law, provide notice to each other that any information is being withheld pursuant to this provision and shall use their respective commercially reasonable efforts to find a mutually agreeable solution to any such confidentiality and/or privilege concerns. Nothing in this Agreement, including this Section 6.3, shall require, or be construed to require, Parent, OV2 or any of their Affiliates or any of the Equity Commitment Parties or their respective Affiliates to agree to the sale, license, divestiture, hold separate or other disposition of any assets, categories of assets or business or other segments of the Company, its Subsidiaries or Affiliates or of either of the Purchasers or any of the Purchaser Transaction Parties or their respective Affiliates.

Section 6.4     Access and Reports.     Subject to applicable Law, upon reasonable notice, each of the Company and EFIH shall, and each shall cause its Subsidiaries (other than the Oncor Entities, subject to Section 6.23) to afford the officers and other Representatives of Parent reasonable access, during normal business hours throughout the period from the date hereof through the earlier of the Termination Date and the First Closing Date, to its employees, properties,

books, contracts and records and, during such period, each of the Company and EFIH shall, and each shall cause its Subsidiaries (other than the Oncor Entities, subject to Section 6.23) to furnish to Parent all such information concerning its business, properties, facilities, operations and personnel as Parent reasonably requests, *provided* that no investigation pursuant to this Section 6.4 shall (i) unreasonably interfere with the ongoing operations of the Company or its Subsidiaries or (ii) affect or be deemed to modify any representation or warranty made by the Company or any condition to the obligations of the Purchasers contained herein, and *provided, further*, that the foregoing shall not require the Company or any of its Subsidiaries to (a) permit any inspection, or to disclose any information, that in the reasonable judgment of the Company or such Subsidiary would result in the disclosure of any trade secrets of third parties or violate any of its or any of its Subsidiaries' obligations with respect to confidentiality if the Company or such Subsidiary shall have used reasonable efforts to furnish such information in a manner that does not result in any such disclosure or violation, including obtaining the consent of such third party to such inspection or disclosure; or (b) disclose any privileged information of the Company or any of its Subsidiaries if the Company or such Subsidiary shall have used reasonable best efforts to furnish such information in a manner that does not result in the loss of such privilege. All requests for information made pursuant to this Section 6.4 shall be directed to Evercore Group L.L.C. or the individuals set forth in Schedule 6.4. All such information shall be governed by the terms of the Confidentiality Agreements, which notwithstanding anything to the contrary therein, shall remain in effect until the First Closing Date (but shall terminate and cease to be of any further force or effect on such date as it relates to information relating to the Company or its Subsidiaries).

Section 6.5    Publicity.   The parties shall consult with each other prior to issuing any press releases or making any public announcements with respect to the Transactions (including any initial press release regarding this Agreement and the Transactions), *provided* that, subject to Section 6.13(b), the Company and its legal counsel, agents, and representatives shall not be required to consult with the Purchasers prior to making filings on the docket of, or statements on the record before, the Bankruptcy Court relating to this Agreement or the Transactions, *provided, further*, that the Company, on the one hand, and each Purchaser on the other hand, and their respective Affiliates, may, without the prior consent of the other, but only following consultation with the other to the extent reasonably practicable, issue such public disclosure as may be required by applicable Law to which the disclosing party is subject. Nothing in this Section 6.5 shall supersede or override the obligations contained in Section 6.2(d).

Section 6.6    Employee Benefits.

(a)    On the First Closing Date, sponsorship (including assumption of all assets and liabilities thereto) of the Contributed Plans (whether terminated or not) will be transferred to TCEH for further contribution to Reorganized TCEH as part of the TCEH Contribution; *provided* that, except as otherwise set forth in the Amended and Restated Split Participant Agreement (as defined below), none of Parent, OV2, any Oncor Entity or any of their Affiliates shall assume or otherwise incur any liability or obligation under any compensatory, severance or similar arrangement in respect of any Non-Oncor Employee (as defined below), it being understood that Reorganized TCEH and Oncor shall enter into the Amended and Restated Split Participant Agreement.

For purposes of Section 6.6(a):

(d)     The provisions of this Section 6.6 are solely for the benefit of the parties to this Agreement, and no current or former Employee or any other individual associated therewith shall be regarded for any purpose as a third party beneficiary of this Agreement, and nothing herein shall be (i) construed as an amendment to any Benefit Plan for any purpose, (ii) give any employee or former employee or any other individual associated therewith or any employee benefit plan or trustee thereof or any other third person any right to enforce the provisions of this Section 6.6 or (iii) obligate Parent, the Surviving Company, OV2, Reorganized TCEH or any of their respective Affiliates to (A) maintain any particular benefit plan, except as provided otherwise in the Amended and Restated Split Participant Agreement or (B) retain the employment of any particular employee.

Section 6.7     WARN Act.  For a period of ninety (90) days immediately following the First Closing Date, neither Parent nor OV2 shall close any facility or lay off any Employees of the Surviving Company or its Subsidiaries, if such closure or layoff would result in any obligations or liabilities for the Company or any of its Subsidiaries under the WARN Act.

Section 6.8     Expenses.  The Surviving Company shall pay all charges and expenses, including those of the Exchange Agent, in connection with the exchange of Shares and other administrative actions contemplated in Article IV.  The Debtors shall pay all administrative expenses incurred in the Chapter 11 Cases.  Except as otherwise provided in the immediately preceding sentences, in Section 6.3(a)(ix), Section 6.17(g), Section 6.19, Section 6.20(c), Section 6.22, Section 6.25, and Section 8.5 hereof, in the Plan Support Agreement, or in the Settlement Agreement, whether or not the Transactions are consummated, all costs and expenses incurred in connection with this Agreement and the Transactions shall be paid by the party incurring such costs and expenses.

Section 6.9     Indemnification; Directors' and Officers' Insurance.

(a)     From and after the First Closing, the Surviving Company agrees that it will indemnify and hold harmless, to the fullest extent permitted under applicable Law (and the Surviving Company shall also advance expenses as incurred to the fullest extent permitted under applicable Law, *provided* that the Person to whom expenses are advanced provides an undertaking to repay such advances if it is ultimately determined that such Person is not entitled to indemnification), each present and former director, manager, member and officer of the Company and each of its Subsidiaries (collectively, the "Indemnified Parties") against any costs or expenses (including reasonable attorneys' fees), judgments, fines, losses, claims, damages or liabilities (collectively, "Costs") incurred in connection with any claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative (a "Proceeding"), arising out of or related to such Indemnified Parties' service as a manager, member, director or officer of the Company or any of its Subsidiaries or services performed by such persons at the request of the Company or any of its Subsidiaries at or prior to or on the First Closing Date, whether asserted or claimed prior to, at or after the First Closing Date, including, without limitation, the Transactions.

(b)     If any Person asserts a claim (an "Eligible Claim") against an Indemnified Party that could reasonably be expected to give rise to a right on the part of the Indemnified Party to indemnification under this Section 6.9, the Indemnified Party shall give notice of such Eligible Claim to the Surviving Company as soon as practicable after receiving written notice of such Eligible Claim or otherwise acquiring actual knowledge of the assertion

54

thereof (but in no event later than ten (10) Business Days after receiving notice of such Eligible Claim or otherwise acquiring actual knowledge of the assertion thereof), and the Surviving Company shall have the right to assume the defense of such Eligible Claim so long as (i) the Eligible Claim involves only money damages and does not seek an injunction or other equitable relief against the Indemnified Party; (ii) the Indemnified Party has not been advised by counsel that an actual or potential conflict exists between the Indemnified Party and the Surviving Company in connection with the defense of the Eligible Claim; (iii) the Eligible Claim does not relate to or otherwise arise in connection with Taxes or any criminal or regulatory enforcement Action; and (iv) the Surviving Company conducts the defense of the Eligible Claim actively and diligently; *provided, however,* that the failure to so notify the Surviving Company will not relieve the Surviving Company from any liability that the Surviving Company may have hereunder with respect to such Eligible Claim, except to the extent that the Surviving Company is actually prejudiced as a result of such failure. If the Surviving Company elects not to assume the defense, is not permitted to assume the defense pursuant to the terms of the Agreement, or fails to diligently pursue or maintain the defense in a timely manner, then the Indemnified Party may employ counsel reasonably satisfactory to the Surviving Company to represent or defend the Indemnified Party against any such Eligible Claim, and the reasonable out of pocket attorney's fees incurred by the Indemnified Party for such counsel will be included in the Indemnified Party's Costs; *provided, however,* that the Indemnified Party's Costs shall not, in connection with any Proceeding or separate but substantially similar Proceedings arising out of the same general allegations, include the fees and expenses of more than one separate firm of attorneys at any time for all Indemnified Parties, except to the extent that local or specialized counsel, in addition to its regular counsel, is required in order to effectively defend against the Eligible Claim and/or the Indemnified Party has been advised by counsel that an actual or potential conflict exists between one or more of the Indemnified Parties in connection with the defense of the Eligible Claim. If the Surviving Company does assume the defense of an Eligible Claim, the Indemnified Party shall have the right to participate in the defense of such Eligible Claim at its own expense. If the Indemnified Party retains its own counsel, the Surviving Company shall reasonably cooperate in providing information to and consulting with the Indemnified Party about the Eligible Claim. The Surviving Company shall not, without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld, conditioned or delayed) consent to the entry of any judgment or order or enter into any settlement with respect to any Eligible Claim unless and until the Surviving Company has agreed in writing to pay all amounts payable pursuant to such settlement, judgment or order and such settlement, judgment or order (i) includes an unconditional and irrevocable release of the Indemnified Party for all liability arising out of such claim (ii) does not result in the finding or admission of any violation of Law on the part of the Indemnified Party and (iii) does not impose any injunctive relief or admit to any wrongdoing by or on behalf of the Indemnified Party. Notwithstanding anything to the contrary contained herein, in no event shall the Indemnified Party consent to the entry of judgment or enter into any settlement with respect to an Eligible Claim for which it is seeking indemnification without the prior written consent of the Surviving Company (such consent not to be unreasonably withheld, conditioned or delayed).

(c)      Prior to the Effective Time, the Company shall be permitted to obtain and fully pay the premium for the extension of (i) the directors' and officers' liability coverage of the Company's and its Subsidiaries' existing directors', managers' and officers' insurance policies, and (ii) the Company's existing fiduciary liability insurance policies, in each case

55

for a claims reporting or discovery period of at least six (6) years from and after the Effective Time with respect to any claim related to any period of time at or prior to the Effective Time from an insurance carrier with the same or better credit rating as the Company's current insurance carrier with respect to directors' and officers' liability insurance and fiduciary liability insurance with terms, conditions, retentions and limits of liability that are, taken as a whole, no less advantageous than the coverage provided under the Company's existing policies with respect to any actual or alleged error, misstatement, misleading statement, act, omission, neglect, breach of duty or any matter claimed against a director or officer of the Company or any of its Subsidiaries by reason of him or her serving in such capacity that existed or occurred at or prior to the Effective Time (including in connection with this Agreement or the transactions or actions contemplated hereby).   Notwithstanding the foregoing, in no event shall the Company be permitted to expend, for the entire tail policy, in excess of 300 percent of the annual premium currently paid by Company for its current policies of directors' and officers' liability insurance (in the aggregate) (which premiums are hereby represented and warranted by the Company to currently be approximately $7.3 million per annum).

(d)     If the Surviving Company or any of its successors or assigns shall (i) consolidate with or merge into any other corporation or entity and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfer all or substantially all of its properties and assets to any individual, corporation or other entity, then, and in each such case, proper provisions shall be made so that the successors and assigns of the Surviving Company shall assume all of the obligations of the Surviving Company set forth in this Section 6.9.

(e)     The rights of the Indemnified Parties under this Section 6.9 shall be in addition to any rights such Indemnified Parties may have under the certificate of incorporation or formation or bylaws, operating agreement or comparable governing documents of the Company or any of its Subsidiaries, or under any applicable Contracts or Laws. All rights to indemnification and exculpation from liabilities for acts or omissions occurring at or prior to the Effective Time and rights to advancement of expenses relating thereto now existing in favor of any Indemnified Party as provided in the certificate of formation, bylaws, operating agreement or comparable governing documents of the Company or of any Subsidiary of the Company or any indemnification agreement between such Indemnified Party and the Company or any of its Subsidiaries shall survive the Merger and be assumed by the Surviving Company and shall not be amended, repealed or otherwise modified in any manner that would adversely affect any right thereunder of any such Indemnified Party.

(f)     The provisions of this Section 6.9 are intended to be for the benefit of, and shall be enforceable by, each of the Indemnified Parties.

(g)     Notwithstanding anything in this Section 6.9 to the contrary, the Purchasers may enter into separate agreements regarding the matters covered by this Section 6.9 with one or more Oncor Entities. If any such separate agreement is entered into, the terms of any such separate agreement shall govern in the case of any inconsistency between Section 6.9 and the terms of such separate agreement, solely with respect to the present and former directors, managers, members and officers of the Oncor Entities.

56

Section 6.10        Resignation of Directors and Officers.

(a)        Pursuant to the Plan of Reorganization, except as otherwise may be agreed by Parent in writing, the Company Board, all officers of the Company and all members of any board of directors or similar governing body and all officers of any Subsidiary of the Company (other than the Oncor Entities, subject to Section 6.23) in each case who are in office immediately prior to the Effective Time, shall be deemed to have resigned from such position(s) effective at the Effective Time.

(b)        As of the First Closing Date, subject to obtaining the PUCT Approval, the designees of the Company serving on the board of directors of each of Oncor and Oncor Holdings shall resign and be replaced by two (2) members appointed by Parent to serve on each respective board of directors until their successors are duly elected or appointed and qualified or until their earlier death, resignation or removal in accordance with the limited liability company agreement of each of Oncor and Oncor Holdings.

Section 6.11        Takeover Statutes.  If any "fair price," "moratorium," "control share acquisition," "business combination" or any other anti-takeover statute or regulation is or may become applicable to the Transactions, (i) the Company and the Company Board and (ii) EFIH and the board of managers of EFIH, in each case shall grant such approvals and take such actions as are necessary so that such transactions shall be consummated as promptly as practicable on the terms contemplated by this Agreement and otherwise act to eliminate or minimize the effects of such statute or regulation on such transactions.

Section 6.12        Notice of Current Events.  From and after the date of this Agreement until the First Closing, the Company and EFIH, on the one hand, and the Purchasers, on the other hand, shall promptly notify each other orally and in writing upon (i) receipt of any written communication from any Person that is a party to a Company Material Contract alleging that the consent of such Person (or another Person) is required in connection with the Transactions; (ii) becoming aware of any occurrence, or non-occurrence, of any event that, individually or in the aggregate, would cause any of the representations or warranties of such party or parties contained in this Agreement to be untrue or inaccurate which, individually or in the aggregate, would reasonably be expected to result in any condition to the obligations of the other party or parties to consummate the Transactions not to be satisfied; (iii) receipt of any material notice or other communication from any Governmental Entity in connection with the Transactions and (iv) the commencement of any Action that, if pending on the date of this Agreement, would have been required to be disclosed pursuant to, in the case of the Company or EFIH, Section 5.1(g) or, in the case of Parent, Section 5.2(e) (provided, however, that the delivery of any notice pursuant to this Section 6.12 shall not cure any breach of any representation or warranty requiring disclosure of such matter prior to the date of this Agreement or otherwise limit or affect the remedies available hereunder to either party, or any of the conditions set forth in Article VII).

Section 6.13        Bankruptcy Court Matters.

(a)        The Debtors shall use commercially reasonable efforts to:  (i) file, as soon as reasonably practicable, the Plan of Reorganization, the Disclosure Statement and the Settlement Motion (each as defined in the Plan Support Agreement), (ii) file, as soon as reasonably practicable, motions seeking approval of the Company's and EFIH's entry into and performance under the Backstop Agreement and this Agreement; (iii) file on or before

57

the day that is twenty-eight (28) days after the Debtors' execution of the Plan Support Agreement, the Supplemental Ruling Request (as defined in the Plan Support Agreement) pursuant to the Plan Support Agreement; and (iv) take all steps reasonably necessary or desirable to obtain orders of the Bankruptcy Court (A) on or before September 30, 2015, approving the Company's and EFIH's entry into and performance under the Plan Support Agreement, (B) on or before October 31, 2015, approving the Disclosure Statement, and (C) on or before December 15, 2015, confirming the Plan of Reorganization and approving the Settlement Agreement (as defined in the Plan Support Agreement) and the Debtors' entry into and performance under the Settlement Agreement, the Backstop Agreement and this Agreement, in each case subject to any extensions to such dates requested in accordance with Section 11 of the Plan Support Agreement.

(b)    The Debtors shall use commercially reasonable efforts to provide to Parent copies of all motions, filings, pleadings, other documents or proposed orders that the Debtors intend to file with the Bankruptcy Court relating to the Transaction Agreements or the Transactions (including the Plan of Reorganization) no less than three (3) Business Days in advance of such filing; *provided, however,* that all Parties acknowledge such three (3) Business Day period, as applicable, may not be reasonably practicable in all cases, and that in such cases the Debtors shall provide as much advance notice as is reasonably practicable. The Company and EFIH shall incorporate all reasonably requested comments of the Purchasers in such motions, filings and orders.

(c)    In the event that any Order reasonably necessary to consummate the Transactions is appealed or a stay pending appeal is sought, subject to the parties' respective rights to terminate this Agreement pursuant to Article VIII hereof, the Company, EFIH, Parent and OV2 shall use their respective reasonable best efforts to oppose the appeal or the stay pending appeal and seek the dismissal of any appeal.

Section 6.14    Parent and OV2 Waiver.    Subject to the receipt by the Purchasers, the Company and EFIH of a reciprocal release from Reorganized TCEH and its Subsidiaries pursuant to the Plan of Reorganization which is substantially consistent with the release contained herein, and except as set forth in Section 6.14 of the Parent Disclosure Letter, each of the Purchasers, the Company and EFIH, acknowledges and agrees that, effective from and after the First Closing, to the fullest extent permitted under applicable Law, any and all rights, Claims and causes of action, Debts, liabilities and obligations, of any nature (other than liabilities or obligations arising under the Plan of Reorganization, including in respect of the indemnification contained in the Plan of Reorganization, the Tax Matters Agreement (as defined below) or any other Transaction Agreement), it or any of its Subsidiaries may have against Reorganized TCEH or any of its Subsidiaries following the First Closing or their respective directors, employees, managers, equityholders, successors and assigns (the "Released Persons") whether arising under, or based upon, any Law or otherwise (including any right, whether arising at law or in equity, to seek indemnification, contribution, cost recovery, damages, or any other recourse or remedy, including as may arise under common Law) are hereby forever fully and irrevocably waived, released and discharged (the "Released Claims") and following the First Closing no claim shall be brought or maintained by, or on behalf of, any of the Purchasers, the Surviving Company, EFIH or any of their respective Subsidiaries (the "Parent Parties") against any Released Person, and no recourse shall be sought or granted against any of them, by virtue of, or based upon any Released Claims. Subject to the receipt by the Purchasers, the Company and EFIH of a reciprocal indemnity from Reorganized TCEH and its Subsidiaries pursuant to the Plan of Reorganization which is substantially consistent with the indemnity contained herein,

58

each of the Purchasers, the Company and EFIH hereby agrees, on behalf of itself and each of the other Parent Parties, effective from and after the First Closing, to indemnify and hold harmless each of the Released Persons from and against, and in respect of, any and all Costs incurred by or on behalf of any Released Person as a result of any violation of this Section 6.14 by any Parent Party.

Section 6.15    Tax-Free Reorganization Treatment. The parties to this Agreement intend that the Merger will qualify as a reorganization under Section 368(a) of the Code, and each shall not, and shall not permit any of its respective controlled Affiliates to take any action, or fail to take any action, that would reasonably be expected to jeopardize the qualification of the Merger as a reorganization under Section 368(a) of the Code. The parties further intend that the Merger will be treated for tax purposes as a transaction that is separate from and occurs after the Reorganized TCEH Spin-Off and that does not adversely impact the qualification of the Reorganized TCEH Contributions and the Reorganized TCEH Spin-Off as a reorganization that meets the requirements of Sections 368(a)(1)(G) and 355 of the Code.

Section 6.16    Issuance of Equity and Repayment of Indebtedness. Notwithstanding anything to the contrary contained herein, except as provided by Section 9.2 or Section 9.9, the Company and its Subsidiaries shall be permitted hereunder to take any action required to consummate the confirmed Plan of Reorganization, including, relating to the issuance of equity in the Company and repayment of indebtedness as set forth therein.

Section 6.17    Debt Financing.

(a)    Parent shall use its reasonable best efforts to obtain the proceeds of the Debt Financing on the terms and conditions described in the Debt Commitment Letter and Fee Letter (or replacement financing obtained in compliance with this Section 6.17), including using its reasonable best efforts to (i) except as otherwise permitted in this Section 6.17, maintain in effect the Debt Commitment Letter and Fee Letter in accordance with their terms, (ii) negotiate definitive agreements with respect to the Debt Financing (the "Definitive Agreements") consistent with the terms and conditions contained in the Debt Commitment Letter and Fee Letter (including, as necessary, the "flex" provisions contained in the Fee Letter) or, if available, on other terms that are acceptable to Parent and would not adversely affect the ability of Parent to consummate the transactions contemplated herein, (iii) satisfy (or obtain the waiver of) on a timely basis all conditions in the Debt Commitment Letter, Fee Letter and the Definitive Agreements within Parent's control (including payment of all fees and expenses) and comply with its obligations thereunder and (iv) enforce its rights under the Debt Commitment Letter, Fee Letter, and/or Definitive Agreements in the event of any breach or purported breach thereof. Parent shall not, and shall cause its Affiliates not to, take or refrain from taking, directly or indirectly, any action that would reasonably be expected to result in a failure of any of the conditions contained in the Debt Commitment Letter or in any Definitive Agreement.

(b)    Parent shall not, without the prior written consent of the Company and EFIH (such consent not to be unreasonably withheld or delayed), permit any amendment or modification to, or any waiver of any provision (including any remedy) under, or voluntarily replace (it being understood that any Alternative Debt Financing or any Bond Financing shall not be deemed a voluntary replacement for purposes of the sentence), the Debt Commitment Letter or Fee Letter or engagement letter with respect thereto if such amendment, modification, waiver or voluntary replacement (i) adds new (or adversely modifies any

59

existing) conditions to the consummation of the Debt Financing as compared to those in the Debt Commitment Letter and Fee Letter, each as in effect on the date of this Agreement, in a manner that would or would reasonably be expected to make any portion of the Debt Financing less likely to be timely obtained, (ii) adversely affects the ability of Parent to enforce its rights against other parties to the Debt Commitment Letter, Fee Letter, or the Definitive Agreements as so amended, replaced, supplemented or otherwise modified, in any material respect, relative to the ability of Parent to enforce its rights against such other parties to the Debt Commitment Letter and Fee Letter, each as in effect on the date hereof or in the Definitive Agreements, (iii) reduces the aggregate amount of the Debt Financing (other than (w) as a result of the decision not to proceed with the acquisition of the Minority Interest and in accordance with Section 1.1 of the Parent Disclosure Letter, (x) if at such time (or prior thereto) there is an equivalent increase in the Equity Commitments, (y) reductions of any amounts thereof constituting increases thereto after the date hereof), or (iv) could otherwise be expected to prevent, impede or delay the consummation of any of the Transactions; *provided*, that for the avoidance of doubt no consent from the Company or EFIH shall be required: (A) for any amendment, replacement, supplement or modification of the Debt Commitment Letter that is limited to adding lenders, lead arrangers, bookrunners, syndication agents or similar entities that have not executed the Debt Commitment Letter as of the date of this Agreement), (B) for implementation or exercise of any "flex" provisions provided in the Fee Letter as in effect as of the date hereof, (C) for any amendment, replacement, supplement or modification to the Debt Commitment Letter or Definitive Agreements so long as such action would not be prohibited by the foregoing clauses (i)-(iv) in this Section 6.17(b) or (D) to add or replace facilities with one or more new facilities or with the Bond Financing.

(c)    In the event that any portion of the Debt Financing becomes unavailable, regardless of the reason therefor, Parent will (i) use its reasonable best efforts to obtain alternative debt financing (the "Alternative Debt Financing") as promptly as reasonably practicable after the occurrence of the event that renders the Debt Financing unavailable but no later than the final day of the Marketing Period (in an amount sufficient, when taken together with any then-available Debt Financing pursuant to any then-existing Debt Commitment Letter, to consummate the Transactions and to pay related fees and expenses earned, due and payable as of the First Closing Date) on terms not less favorable in the aggregate to Parent than those contained in the Debt Commitment Letter and the Fee Letter that the Alternative Debt Financing would replace (taking into account any "flex" provisions) from the same or other sources and which do not include any incremental conditionality to the consummation of such Alternative Debt Financing that are more onerous to Parent or the Company (in the aggregate) than the conditions set forth in the Debt Commitment Letter in effect as of the date of this Agreement or otherwise impede; delay or prevent the Transactions and (ii) promptly notify the Company of such unavailability and the reason therefor.

(d)    For purposes of the Recitals and the foregoing Section 6.17(a) through Section 6.17(c), the term "Debt Commitment Letter" shall be deemed to include any commitment letter (or similar agreement) with respect to any Alternative Debt Financing arranged in compliance herewith (and any Debt Commitment Letters remaining in effect at the time in question), (ii) the term "Fee Letter" shall be deemed to include any fee letter (or similar agreement) with respect to any Alternative Debt Financing arranged in compliance with this Section 6.17(d), and (iii) the term "Financing Sources" shall be deemed to include any financing sources providing the Alternative Debt Financing or Bond Financing arranged

60

in compliance herewith. Parent shall keep the Company reasonably informed on a reasonably current basis of the status of its efforts to consummate the Debt Financing.  Parent shall provide the Company with prompt oral and written notice of any material breach, threatened breach or default by any party to any Debt Commitment Letters or the Definitive Agreements of which Parent gains knowledge and the receipt of any notice or other communication from any Lender, guarantor, or other financing source with respect to any breach, threatened breach or default or, termination or repudiation by any party to any Debt Commitment Letters or the Definitive Agreements or any provision thereof. For the avoidance of doubt, Parent shall, directly or indirectly, make all proceeds of the Debt Financing received by Parent available to OV2 as necessary for OV2 to perform its obligations hereunder.

(e)    Prior to the earlier of the First Closing Date and the Termination Date, the Company agrees to use reasonable best efforts to provide, and to use reasonable best efforts to cause its Subsidiaries (other than Oncor Entities, subject to Section 6.23) and their respective officers and Representatives to provide, reasonable cooperation in connection with the arrangement of the Debt Financing (including, without limitation, any Bond Financing), (provided that the Purchasers shall use reasonable best efforts to provide the Company with notice of any information needed by the Purchasers as soon as reasonably practicable), including reasonable best efforts to undertake the following: (i) active participation by appropriate members of senior management of the Company (or other employees with appropriate seniority or expertise) in meetings, presentations, road shows, due diligence sessions, drafting sessions and sessions with prospective lenders, investors and rating agencies, in each case, at mutually agreeable times and locations and upon reasonable notice, (ii) assisting with the preparation of customary materials for rating agencies and rating agency presentations, offering documents, private placement memoranda, bank information memoranda, prospectuses and similar documents required in connection with the Debt Financing and/or Bond Financing, together with customary authorization letters authorizing the distribution of information to prospective lenders or investors (which customary authorization letters shall be required notwithstanding the reasonable best efforts standard required of the Company above), (iii) executing and delivering any pledge and security documents, currency or interest hedging arrangements, or other definitive financing documents in the form attached to the Debt Commitment Letters or Definitive Agreements or other certificates, or documents as may be reasonably requested by Parent or otherwise reasonably facilitating the pledging of collateral, provided that such documents will not take effect until the Effective Time, (iv) furnishing all (w) financial statements described in paragraph 5 of Exhibit D to the Debt Commitment Letter, as in effect on the date hereof and (x) all information and data reasonably requested by the Purchasers to prepare all pro forma financial statements required in connection with the Debt Financing, and (y) all financial statements and financial data of the type and form required by Regulation S-X and Regulation S-K under the Securities Act for offerings of debt securities on a registration statement on Form S-3 under the Securities Act, including all information required to be incorporated therein (subject to exceptions customary for a private Rule 144A offering involving high-yield debt securities and in no event shall the Company be required to provide financial information otherwise required by Rule 3-10 (other than customary qualitative disclosure with respect thereto) and Rule 3-16 of Regulation S-X (or any Compensation Discussion and Analysis required by Item 402(b) of Regulation S-K) that would not be reasonably necessary for the independent accountants to deliver customary "comfort" (including as to "negative assurance" comfort and change period)), in connection with the Debt Financing (the information required to be delivered pursuant to this clause (iv) being

61

referred to as "Required Financial Information"), (v) assisting Parent and the Lenders or their respective Affiliates in obtaining corporate, facilities and securities ratings, as applicable, in connection with the Debt Financing prior to the launch of general syndication of the Debt Financing, (vi) furnishing Parent and the Lenders or their respective Affiliates promptly, and in any event no later than three (3) Business Days prior to the earlier of the Escrow Closing Date (as defined below) or the First Closing Date, as applicable, with all documentation and other information which any lender providing or arranging Debt Financing has reasonably requested at least ten (10) days prior to the Effective Date; (vii) furnishing Parent and the Lenders or their respective Affiliates promptly, and in any event no later than three (3) Business Days prior to the earlier of the Escrow Closing Date (as defined below) or the First Closing Date, as applicable, with all documentation and other information which any lender has reasonably determined is required by regulatory authorities in connection with such Debt Financing under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the PATRIOT Act (which cooperation shall be required notwithstanding the reasonable best efforts standard required of the Company above); (viii) providing input to certain terms and provisions of one or more credit, note purchase or other agreements in connection with the Debt Financing prior to the Effective Time to the extent direct borrowings or debt incurrences or guarantees thereof by the Company or its Subsidiaries are contemplated by the Debt Commitment Letter, and the preparation of customary schedules and exhibits thereto; (ix) causing the Company's independent auditors to cooperate in connection with the Debt Financing (including providing accountant's comfort letters and consents from the Company's independent auditors to the extent required by the Debt Commitment Letter or the Definitive Agreements), (x) obtaining customary payoff letters, releases of liens and other instruments of termination or discharge reasonably requested by the Purchasers in connection with the repayment of indebtedness of the Company and its Subsidiaries (other than Oncor Entities) as necessary pursuant to this Agreement, the Debt Commitment Letter or the Definitive Agreements or to consummate the Transactions, and (xi) otherwise cooperating with the Parent to satisfy any express conditions precedent to the Debt Financing within the control of the Company, provided in each case (A) such requested cooperation shall not unreasonably interfere with the ongoing operations of the Company and its Subsidiaries, (B) neither the Company nor any of its Subsidiaries shall be required to pay any commitment or other similar fee or incur any other liability or obligation in connection with the Debt Financing prior to the First Closing Date, (C) other than customary authorization letters, none of the Company, its Subsidiaries or their respective officers, directors, or employees shall be required to execute or enter into or perform any agreement with respect to the Debt Financing that is not contingent upon the First Closing or that would be effective prior to the First Closing Date nor prepare any pro forma financial statements, (D) Persons who are on the board of directors or the board of managers (or similar governing body) of the Company and any of its Subsidiaries prior to the First Closing Date in their capacity as such shall not be required to pass resolutions or consents to approve or authorize the execution of the Debt Financing, and (E) none of the Company or its Subsidiaries or their respective officers, directors, or employees shall be required to execute any solvency certificate in connection with the Debt Financing. Nothing contained in this Section 6.17(e) or otherwise shall require the Company or any of its Subsidiaries, prior to the First Closing, to be an issuer or other obligor with respect to the Debt Financing.

(f)      From and after the date hereof until the earlier of the Termination Date and the First Closing Date, it is understood that the Parent may seek to market all or a portion of

the Debt Financing and, in connection therewith, Parent may seek to consummate all or a portion of the Debt Financing prior to the commencement of the Marketing Period hereunder (the date of any such issuance, an "Escrow Closing Date"). In this regard, and for the avoidance of doubt, (i) the Company and EFIH acknowledge that their cooperation obligations set forth in Section 6.17(e) include the obligation to use their reasonable best efforts to cooperate with any such efforts, *provided* such cooperation obligations are limited to those set forth in Section 6.17(e) and (ii) the Purchasers shall not release from escrow the proceeds received in respect of the Interim and Permanent Financing prior to the earlier of the First Closing and the termination of this Agreement in accordance with its terms.

(g)    Prior to the First Closing Date, none of the Company, its Subsidiaries and its and their respective Representatives shall be required to take any action that would subject such Person to actual or potential liability, to bear any cost or expense or to pay any commitment or other similar fee or make any other payment or incur any other liability or provide or agree to provide any indemnity in connection with the Debt Financing or their performance of their respective obligations under this Section 6.17 or any information utilized in connection therewith. Parent shall indemnify and hold harmless the Company, its Subsidiaries and its and their respective Representatives from and against any and all costs or expenses (including reasonable attorneys' fees), judgments, fines, losses, claims, damages or liabilities (collectively, "Costs") suffered or incurred by them in connection with the arrangement of the Debt Financing and the performance of their respective obligations under this Section 6.17 and any information utilized in connection therewith (other than arising from information provided by the Company or its Subsidiaries). Parent shall, promptly upon request of the Company if this Agreement is terminated in accordance with its terms, reimburse the Company and its Subsidiaries for all reasonable and documented out-of-pocket costs and expenses incurred by the Company or its Subsidiaries (including those of its accountants, consultants, legal counsel, agents and other representatives), in connection with the cooperation required by this Section 6.17. The Company hereby consents to the use of the logos of the Company and its Subsidiaries in connection with the Debt Financing; *provided* that such logos are used solely in a manner that is not intended to or reasonably likely to harm or disparage the Company or any of its Subsidiaries or the reputation or goodwill of the Company or any of its Subsidiaries.

(h)    Parent and OV2 acknowledge and agree that the consummation of the Parent Subject Transactions is not conditional upon the consummation of, or the receipt by Parent or OV2 or any of their Affiliates of the proceeds of the Debt Financing.

(i)    As used in this Agreement, the term "Marketing Period" shall mean the first period of fifteen (15) consecutive Business Days, after the date hereof and beginning on the date which Parent shall have received the Required Financial Information from the Company (during which period the consolidated audited, interim and pro forma financial statements of the Company and its Subsidiaries described in Section 6.17(e)(iv) and included in the Required Financial Information shall not require any material change (other than any change to information provided by, or derived from information provided by, Parent or any change caused by any change to information provided by, or derived from information provided by, Parent)) and the other information required to be delivered by Parent pursuant to paragraph 8 of Exhibit D of the Debt Commitment Letter (as in effect on the date hereof); *provided* that (x) each of (I) November 26, 2015 through and including November 29, 2015, (II) July 2, 2016 through and including July 5, 2016 and (III) November 23, 2016 through and including

63

November 27, 2016, shall in each case be disregarded for the purposes of such fifteen (15) consecutive Business Day period, (y) if such period has not ended prior to (I) August 21, 2015, then it will not commence until September 7, 2015, (II) December 22, 2015, then it will not commence until January 4, 2016, (III) August 19, 2016, then it will not commence until September 5, 2016 and (IV) December 22, 2016, then it will not commence until January 2, 2017 and (z) the Marketing Period shall not be deemed to have commenced if, after the date hereof and prior to the completion of the Marketing Period, (A) the independent auditors to the Company shall have withdrawn their audit opinion with respect to any audited financial statements contained in the Required Financial Information, in which case the Marketing Period shall not be deemed to commence unless and until a new unqualified audit opinion is issued with respect to such financial statements by the independent auditors to the Company or another nationally-recognized independent public accounting firm, or (B) the Company or any of its Subsidiaries restates or the Company's board of directors has determined to restate any historical financial statements of the Company or any of its Subsidiaries, in which case the Marketing Period shall not be deemed to commence unless and until such restatement has been completed or the Company's board of directors subsequently concludes that no restatement shall be required in accordance with GAAP, or (C) any of the Required Financial Information would not be Compliant (as defined below) at any time during such fifteen (15) consecutive Business Day period (it being understood that if any Required Financial Information provided to Parent at the commencement of the Marketing Period ceases to be Compliant during any such fifteen (15) consecutive Business Day period, then the Marketing Period shall be deemed to not to have occurred); *provided, further*, that if the Company shall in good faith reasonably believe it has delivered the Required Financial Information, it may deliver to Parent a written notice to that effect (stating when it believes it completed such delivery), in which case the Marketing Period shall be deemed to have commenced on the date specified in that notice unless Parent in good faith reasonably believes the Company has not completed delivery of the Required Financial Information and, within three (3) Business Days of the delivery of such notice by the Company, delivers a written notice to the Company to that effect (stating with specificity which Required Financial Information Parent reasonably believes the Company has not delivered). As used in this Agreement, "Compliant" means, with respect to the Required Financial Information, that such Required Financial Information: (a) does not, taken as a whole, contain any untrue statement of a material fact regarding the Company and its Subsidiaries, or, taken as a whole, omit to state any material fact regarding the Company and its Subsidiaries necessary in order to make such Required Financial Information not materially misleading under the circumstances; and (b) would not be deemed stale or otherwise be unusable under customary practices for offerings and private "for life" placements of high yield debt securities under Rule 144A promulgated under the Securities Act in order to consummate any offering of debt securities on any day during the Marketing Period.

(j)    On the First Closing Date, in accordance with this Agreement and the Plan of Reorganization, the Reorganized Company and Reorganized EFIH shall enter into the Interim Financing Facility. The Reorganized Company and Reorganized EFIH shall cooperate in the preparation of the Interim Financing Facility and shall enter into usual and customary agreements (including usual and customary indemnities) with one or more lenders on terms and conditions reasonably acceptable to the Reorganized Company and Reorganized EFIH. In addition, the Reorganized Company and Reorganized EFIH shall

participate in the preparation and execution of any legal opinions or officer's certificates to be provided in connection with the Interim Financing Facility.

Section 6.18    Tax Matters.

(a)    Private Letter Ruling. The Company, on behalf of the Debtors, has filed with the IRS a written request dated June 10, 2014 (the "Ruling Request," and together with all related materials and supplements thereto filed or to be filed with the IRS, the "IRS Submissions") that the IRS issue a private letter ruling (the "Private Letter Ruling") to the Company addressing the qualification of the Reorganized TCEH Contributions and the Reorganized TCEH Spin-Off as a "reorganization" within the meaning of Sections 368(a)(1)(G), 355 and 356 of the Code and certain other matters. The parties hereto acknowledge and agree that it is anticipated that the IRS will not provide every ruling requested in the Ruling Request and that, subject to, and except as otherwise specified in, the condition set forth in Section 7.1(e), the Transactions are not conditioned on the receipt of any specific ruling from the IRS.

(b)    IRS Submissions. The Company shall be responsible for the preparation and filing of the IRS Submissions which shall be made in a manner that complies with the Plan Support Agreement. The Company shall provide tax counsel of Parent with copies of, and a reasonable opportunity to review and comment on drafts of all IRS Submissions to be filed on or after the date hereof and will incorporate any comments or suggested revisions as are reasonably requested by Parent or its tax counsel with respect thereto; provided, however, that such rights shall not result in unreasonable delays in submitting the IRS Submissions to the IRS. The parties acknowledge and agree that this Agreement and the facts related to the contemplated Reorganized TCEH Contributions, the Reorganized TCEH Spin-Off and the other Transactions will be disclosed to the IRS pursuant to a subsequent IRS Submission. To the extent that the Company, in its good faith judgment, considers any information included in such IRS Submissions (or drafts thereof) to be confidential, the Company may require that any such documents provided to Parent be redacted to exclude such information. Subject to the foregoing, the Company shall provide Parent with copies of each IRS Submission promptly following the filing thereof.

(c)    IRS Communications and Cooperation. Two representatives on behalf of Parent shall be given the opportunity to participate in all substantive scheduled communications after the date hereof with the IRS concerning the IRS Submissions, including all substantive scheduled conference calls and in-person meetings after the date hereof. In addition, the Company (i) shall keep Parent reasonably informed and shall consult in good faith with Parent and its tax counsel with respect to any issue relating to the IRS Submissions and (ii) shall provide Parent with copies of all correspondence, notices, and other written materials received from the IRS after the date hereof and shall otherwise keep Parent and its tax counsel advised of significant developments, and of any substantive communications with the IRS after the date hereof, in each case, regarding the IRS Submissions and the restructuring transactions contemplated hereby and by the Plan of Reorganization. The Company and Parent agree to cooperate and use their reasonable best efforts to assist in obtaining the Private Letter Ruling requested in the Ruling Request (including, for the avoidance of doubt, the requested rulings that are not Required Rulings as set forth on Exhibit H). Notwithstanding the foregoing, the Company and Parent acknowledge that certain of the requested rulings set forth in the Ruling Request address

65

matters for which the IRS does not commonly issue private letter rulings and, as a result, there is substantial uncertainty as to what representations the IRS may require from the Debtors and Parent. Each party agrees to use its reasonable best efforts to provide any appropriate information and additional representations, and to negotiate in good faith with the other parties to implement any changes to the Transactions, in each case as requested by the IRS in order to issue the Private Letter Ruling. No additional rulings will be requested unless mutually agreed by the Company and Parent.

(d)        280G. The Company shall use its reasonable best efforts to provide to Parent, as promptly as reasonably practicable, and in any event within sixty (60) days after the date hereof, a true and correct report specifying whether and to what extent the consummation of the Transactions will result in payment of any amount that could, individually or in combination with any other such payment, constitute an "excess parachute payment" as defined in Section 280G(b)(1) of the Code. Such report, when delivered by the Company, shall be deemed a representation and warranty by the Company as to the information set forth therein, with the same effect as if it were set forth in Section 5(h) hereof.

Section 6.19        IPO Conversion Plan; Oncor Restructuring.

(a)        The Company hereby agrees that it shall (i) reasonably promptly (but in no event later than ten (10) Business days) following the receipt of an Order of the Bankruptcy Court approving the Company's and EFIH's entry into and performance under this Agreement, approve the IPO Conversion Plan, (ii) reasonably promptly following written request of Parent, deliver notice to Oncor of the Company's intent to undertake the IPO Conversion Plan pursuant to the IPO Conversion Plan (the "IPO Conversion Plan Notice") and (iii) on the First Closing Date, consummate the steps of the IPO Conversion Plan to be performed by the Company in accordance with Section 1.1. EFIH hereby agrees that on the First Closing Date, it shall consummate the steps of the IPO Conversion Plan to be performed by EFIH in accordance with Section 1.1.

(b)        Notwithstanding anything in Section 6.25 to the contrary, all reasonable out-of-pocket Costs incurred after the date of this Agreement in connection with (i) this Section 6.19, (ii) the IPO Conversion Plan or (iii) delivery of the IPO Conversion Plan Notice to Oncor, shall be paid by the Purchasers, and the Purchasers shall, upon the request of the Company, reimburse the Company and its Subsidiaries if this Agreement is terminated in accordance with its terms, for all such Costs incurred after the date of this Agreement by the Company or any of its Subsidiaries (including those of its accountants, consultants, legal counsel, agents and other representatives) in immediately available funds within thirty (30) days after the receipt of such request. The Purchasers shall be responsible for their own Costs in connection with (i) this Section 6.19, (ii) the IPO Conversion Plan or (iii) delivery of the IPO Conversion Plan Notice to Oncor. Notwithstanding anything to the contrary contained in any other Transaction Agreement, including the Plan Support Agreement, prior to the First Closing, neither EFH, EFIH nor any of their Affiliates shall be responsible for paying the fees and expenses of the Purchasers or their Affiliates with respect to this Section 6.19 (and the Purchasers and their Affiliates shall track separately all fees and expenses incurred in connection with this Section 6.19).

66

(c)     The Purchasers shall, jointly and severally, indemnify and hold harmless the Company, its Subsidiaries and its and their respective Representatives, if this Agreement is terminated in accordance with its terms, from and against any and all Costs suffered or reasonably incurred by them in connection with (i) this Section 6.19, (ii) the IPO Conversion Plan, or (iii) delivery of the IPO Conversion Plan Notice to Oncor, other than any Costs arising from a breach by the Company or EFIH of its obligations under this Agreement (including under Section 1.1, this Section 6.19 and Section 6.22) with respect to such matters.

Section 6.20     Drag-Along Rights.

(a)     Each of the parties hereto acknowledges and agrees that the Offer (together with this Agreement to the extent referred to therein) constitutes an offer by Parent to purchase (i) substantially all of the IPO Units in the IPO Corporation or, alternatively, substantially all of the LLC Units in Oncor held indirectly by the Company and (ii) all of the LLC Units in Oncor that are owned by TTI and Oncor Management as provided for in Section 3.3(a) of the Investor Rights Agreement.

(b)     So long as Parent has not (x) rescinded the Offer or (y) amended or modified the Offer in a manner that violates the Investor Rights Agreement, at any time following the receipt of a written request from the Parent and prior to the Termination Date, the Company shall (i) prepare a Required Sale Notice (as such term is defined in the Investor Rights Agreement) in form and substance reasonably satisfactory to Parent and the Company and consistent with Section 3.3 of the Investor Rights Agreement and the terms of this Agreement and (ii) promptly deliver such Required Sale Notice to TTI.

(c)     Notwithstanding anything in Section 6.25 to the contrary, all reasonable out-of-pocket Costs incurred by the Company or its Subsidiaries after the date of this Agreement in connection with (i) this Section 6.20, (ii) the Offer or (iii) delivery of the Required Sale Notice to TTI, shall be paid by the Purchasers if this Agreement is terminated in accordance with its terms other than any Costs arising from a breach by the Company or EFIH of its obligations under this Agreement (including under this Section 6.20 and Section 6.22) with respect to such matters. In addition, the Purchasers shall, upon the request of the Company reimburse the Company and its Subsidiaries if this Agreement is terminated in accordance with its terms for all reasonable out-of-pocket Costs incurred after the date of this Agreement by the Company or any of its Subsidiaries (including those of its accountants, consultants, legal counsel, agents and other representatives), in immediately available funds within thirty (30) days after the receipt of such request. The Purchasers shall, jointly and severally, indemnify and hold harmless the Company, its Subsidiaries and its and their respective Representatives in respect of and against any and all Cost suffered or reasonably incurred by them in connection with this Section 6.20, the Offer or the Required Sale Notice. The Purchasers shall be responsible for their own Costs in connection with (i) this Section 6.20, (ii) the Offer or (iii) delivery of the Required Sale Notice to TTI. Notwithstanding anything to the contrary contained in any other Transaction Agreement, including the Plan Support Agreement, prior to the First Closing, neither EFH, EFIH nor any of their Affiliates shall be responsible for paying the fees and expenses of the Purchasers or their Affiliates with respect to this Section 6.20 (and the Purchasers and their Affiliates shall track separately all fees and expenses incurred in connection with this Section 6.20).

Section 6.21    Transition Services Agreement.   At the First Closing, the Company and Reorganized TCEH shall duly execute and deliver a Transition Services Agreement containing such terms as Parent and Reorganized TCEH may reasonably agree (the "Transition Services Agreement"), in accordance with the Plan of Reorganization.

Section 6.22    Enforcement of Certain Investor Rights.

(a)    Following the execution of this Agreement, Parent shall use its reasonable best efforts to negotiate and execute definitive documentation with TTI (or, if applicable, its equityholders) providing for the acquisition of the Minority Interest as of the First Closing Date for consideration in an amount sufficient to satisfy the applicable requirements of Section 3.3 of the Investor Rights Agreement and otherwise on terms to be mutually agreed by Parent and TTI (or, if applicable, its equityholders).  Solely to the extent that, at any time after the date that is thirty (30) days from the date on which the Required Sale Notice is delivered in accordance with Section 6.20, (x) neither Purchaser nor any of its Affiliates has executed definitive documentation with TTI (or, if applicable, its equityholders) providing for the acquisition of the Minority Interest, (y) Parent has complied, in all material respects, with its obligations under this Section 6.22(a) and (z) Parent has neither rescinded the Offer nor amended or modified the Offer in a manner that violates the Investor Rights Agreement, the Purchasers shall be entitled to send a written notice to the Company requesting that the Company commence an Enforcement Action (as defined below).  The parties hereby agree that Parent shall have complied with its obligations under this Section 6.22(a) to the extent Parent has made and not rescinded a good faith offer to TTI consistent with the Offer and otherwise made good faith efforts to propose the basis for negotiations and propose draft definitive documentation providing for the acquisition of the Minority Interest as of the First Closing Date consistent with the terms of the Offer.

(b)    Promptly following, and in no case more than fourteen (14) Business Days after, the delivery of the written notice described in Section 6.22(a), the Company shall file an action (the "Enforcement Action") in the Bankruptcy Court (or, if the Bankruptcy Court issues a final Order confirming that it does not have jurisdiction over the Enforcement Action, another appropriate court mutually agreed in good faith by the Company and Parent) that seeks any or all of the following remedies (as determined by consultation among the parties, but including, at a minimum, the remedies described in clauses (i) and (ii) below): (i) a determination that the Company has the right to enforce the Drag-Along Rights and TTI is accordingly bound to consummate the sale of the Minority Interest at the First Closing, (ii) a determination that TTI is obligated to take such actions as may be reasonably required on its part in connection with consummating the IPO Conversion Plan, (iii) a determination, if applicable, that TTI has failed to comply with its obligations under the Investor Rights Agreement with respect to the Drag-Along Rights contained therein or with respect to the IPO Conversion Plan, (iv) enforcement of any other obligations of TTI arising under the Investor Rights Agreement or the Second Amended and Restated Limited Liability Company Agreement of Oncor, dated as of November 8, 2008, as amended, in each case solely relating to the matters described in clause (i) and/or (ii) above and (v) any other remedy available to the Company at law or in equity in connection with such matters.  For the avoidance of doubt, the Company shall have no obligation to bring any other action (whether in law, equity or otherwise) against TTI pursuant to this Section 6.22; provided, however, that, to the extent that TTI or any of its Affiliates commences any action relating to the matters identified in this Section 6.22 against the Company, EFIH and/or any of its debtor Affiliates, the

68

Company or such other Person shall as promptly as practicable seek to remove any such action to the Bankruptcy Court and, to the extent applicable, seek to enforce the automatic stay against such action pending removal.

(c)    The Enforcement Action shall be conducted by the Company with counsel selected by the Company, in its reasonable discretion, which may include Kirkland & Ellis LLP. To the extent that the Purchasers move to intervene in and otherwise participate in the Enforcement Action, at their own cost and expense and with their own counsel (which may include Baker Botts L.L.P. or White & Case LLP, or both), the Company and EFIH shall not oppose the Purchasers' motion, or knowingly take any action with the intent of preventing, restricting or hindering the Purchasers from intervening and participating in the Enforcement Action, and shall support the Purchasers' right to intervene in the Enforcement Action for any and all purposes related to the Enforcement Action (including related counterclaims) with full rights of participation.

(d)    To the extent that, after the commencement of the Enforcement Action, (i) neither Purchaser nor any of its Affiliates has executed definitive documentation with TTI (or, if applicable, its equityholders) providing for the acquisition of the Minority Interest, (ii) Parent has complied, in all material respects, with its obligations under Section 6.22 and (iii) Parent has neither rescinded the Offer nor amended or modified the Offer in a manner that violates the Investor Rights Agreement, the Company shall prosecute the Enforcement Action diligently until entry of a final order resolving the Enforcement Action in its entirety. Subject to the terms of this Section 6.22, the Company and Parent shall (and shall cause their respective attorneys and advisors to) cooperate with each other and use reasonable best efforts to take all actions, and do, or cause to be done, all things reasonably necessary or advisable to achieve a Successful Outcome (as defined below) of the Enforcement Action, including preparing and filing all documentation reasonably required in connection therewith. A "Successful Outcome" means obtaining the applicable remedies referred to in clauses (i) through (iv) of Section 6.22(b) or entering into a settlement or compromise of the Enforcement Action as set forth in Section 6.22(f).

(e)    In connection with the Enforcement Action, the Company and EFIH shall (i) provide Parent and its designated advisors with a reasonable opportunity to review in advance and provide comments to any material filings made in connection therewith, and consider those comments in good faith, (ii) reasonably consult with, and consider in good faith the views of, Parent and designated counsel in connection with the prosecution, defense and/or settlement of such Enforcement Action and (iii) allow Parent and its designated legal advisors to attend, and, if permitted by applicable Law (and only if appropriate agreements are entered into designed to minimize the risk of waiving, and with the intention of maintaining, any privilege or work product doctrine), participate in, all material meetings, communications and proceedings with respect to such Enforcement Action.    Without limitation to the foregoing sentence, the Company shall consult with, and consider in good faith the views of, Parent regarding all material strategic decisions relating to the conduct of the Enforcement Action, and Parent shall be entitled to set the timing for the filing of any summary judgment or other dispositive motion and for any trial or other significant hearing; *provided, however*, that notwithstanding anything to contrary in this Section 6.22, the Company shall be entitled to refrain from taking any action proposed by Parent that it reasonably determines (based on the advice of its counsel) is (A) likely to have a material and adverse effect on the ability of the Company to effectuate the EFH Subject Transactions or

69

the other transactions contemplated by the Plan of Reorganization or (B) inconsistent with its board of directors' applicable fiduciary duties. Subject to the limitations set forth in the first sentence of Section 6.22(d), the Company shall, and shall direct its counsel to, use reasonable best efforts to take all steps to prosecute the Enforcement Action as promptly as reasonably practicable, including filing motions with the court, as appropriate, to seek a ruling on expedited treatment for the Enforcement Action, and Parent (including designated legal counsel and other advisors) shall use its and their reasonable best efforts to support and assist the Company in fulfilling its obligations with respect to the Enforcement Action.

(f)    Without limiting any other provision of this Section 6.22, the Company shall not settle or compromise any Enforcement Action or consent to the entry of any Order in connection therewith without the prior written consent of Parent (in its sole discretion). Parent shall be entitled to cause the Company to settle or compromise any Enforcement Action or consent to the entry of any Order in connection therewith without the consent of the Company so long as (i) any such settlement or compromise, and any payment obligations in connection therewith, shall be contingent on the occurrence of the First Closing and (ii) Parent provides advance notice of at least five (5) Business Days to the Company of the proposed terms of such settlement or compromise and the Company does not notify Parent in writing within such five (5) Business Day period that the Company has reasonably determined (based on the advice of its counsel) that such settlement or compromise is (A) likely to have a material and adverse effect on the ability of the Company to effectuate the EFH Subject Transactions, or the other transactions contemplated by the Plan of Reorganization or (B) inconsistent with its board of directors' applicable fiduciary duties.

(g)    The Company shall cause its Counsel to track separately all fees and expenses incurred in connection with the Enforcement Action as part of its ongoing fee application process. The Company shall invoice Parent for all reasonable and documented fees and expenses incurred by it and its Affiliates in connection with the Enforcement Action on a monthly basis and such invoices shall be payable by Parent in immediately available funds within fifteen (15) Business Days after the receipt thereof. In addition, the Purchasers hereby agree to, jointly and severally, indemnify and hold harmless the Company, its Affiliates and its and their respective Representatives from and against any and all Costs suffered or reasonably incurred as a result of actions taken pursuant to this Section 6.22, to the extent such actions are taken during the period from the date of this Agreement (other than any Costs arising from a material breach by the Company or EFIH of its obligations under this Section 6.22 or from the gross negligence or willful misconduct of the Company in connection with the Enforcement Action). Notwithstanding anything to the contrary contained in any other Transaction Agreement, including the Plan Support Agreement, prior to the First Closing, neither EFH, EFIH nor any of their Affiliates shall be responsible for paying the fees and expenses of the Purchasers or their Affiliates with respect to the Enforcement Action (and the Purchasers and their Affiliates shall track separately all fees and expenses incurred in connection with the Enforcement Action).

(h)    If requested by Parent, the Company, EFIH and their respective advisors shall promptly consent to, execute and deliver to Parent a mutually agreeable common interest or joint defense or prosecution agreement regarding the defense and/or prosecution of any Enforcement Action that is consistent with the foregoing provisions of this Section 6.22. For purposes of this Agreement, the term "Enforcement Action" shall include any appeals therefrom.

70

Section 6.23    Oncor Actions.  Promptly after receiving a request therefor from Oncor Holdings, EFIH will deliver to Oncor Holdings the EFH Oncor Consent.  Each of the Company and EFIH covenants that it will use its reasonable best efforts to exercise its rights, if any, as a direct or indirect equityholder of the Oncor Entities (including its right to consent and vote), if any, and take other actions within its reasonable control in a manner intended to cause the Oncor Entities to comply with their respective covenants and agreements set forth in the Oncor Letter Agreement, when such agreement has been entered into, and to take or refrain from taking any action that the Company and its Subsidiaries are required to take or refrain from taking pursuant to this Agreement.  Except as expressly set forth herein (including Section 6.22), each Purchaser acknowledges and agrees that neither the Company nor EFIH shall be required, in connection with such party's obligations under this Section 6.23, to (i) pay any amounts to the Oncor Entities or any other Person or incur any liabilities or other obligation, (ii) execute or enter into or perform any new agreement (other than an agreement contemplated hereby or that confirms or makes effective its obligations hereunder) or (iii) breach any Law or commence any Action against any Person, including any of the Oncor Entities or their respective officers and managers.

Section 6.24    Purchaser Liabilities.  During the period from the date hereof through the earlier of the Effective Time and the Termination Date, neither Parent nor OV2 shall incur any material liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise), other than liabilities and obligations incurred or to be incurred in connection with this Agreement or otherwise relating to the Financing or the Transactions.

Section 6.25    Transaction Expenses.

(a)    Except with respect to the express obligations of the Reimbursement Parties (as defined below) to fund certain fees, costs and expenses pursuant to this Agreement (including as described in Section 6.17(g), Section 6.19, Section 6.20(c) and Section 6.22) or any other Transaction Agreement, the Company and EFIH shall, reimburse or pay, as the case may be, the reasonable documented out-of-pocket costs and expenses incurred or accrued, at any time (whether before or after the date of this Agreement) through the earlier of the Termination of this Agreement and the First Closing Date, by the Purchasers, Avenue Capital Management II, L.P., the Equity Commitment Parties that are not Backstop Purchasers, including Hunt, and each Affiliate of such Persons (each a "Reimbursement Party"), on a monthly basis within thirty (30) days after the submission of invoices therefor to the Company (beginning with the reimbursement payment to be made in accordance with Section 6.25(d)), in connection with (w) the exploration and discussion of this Agreement and the Plan of Reorganization and the transactions contemplated hereby and thereby (including any expenses related to obtaining required consents of Governmental Entities and other Persons), (x) any due diligence related to this Agreement, the other Transaction Agreements and the transactions contemplated hereby and thereby, (y) the preparation and negotiation of this Agreement, the other Transaction Agreements, the Plan of Reorganization (and related documents) and the proposed documentation of the transactions contemplated hereby and thereby and (z) the implementation of the transactions contemplated by this Agreement, the other Transaction Agreements and the Plan of Reorganization (including any legal proceedings (A) in connection with the confirmation of the Plan of Reorganization and approval of the Disclosure Statement, and objections thereto, and any other actions in the Proceedings related thereto and (B) to enforce Parent's rights against the Company or EFIH (but not against any other Reimbursement Party) under this Agreement, the other Transaction

71

Agreements and the Plan of Reorganization, *provided* that if the Company or EFIH, as applicable, prevails in such proceeding, Parent shall repay any amounts paid under this clause (B)) and any other judicial and regulatory proceedings in furtherance of this Agreement, the Plan of Reorganization and any Transaction Agreement, including, in each case, the reasonable fees, costs, and expenses of (1) the outside counsel of each Reimbursement Party (including separate regulatory and finance counsel engaged by the Purchasers (whether acting as counsel to the Purchasers prior to the date of this Agreement or as counsel to one or more of the Equity Commitment Parties prior to such date)), and (2) any other professionals reasonably retained by any Reimbursement Party, but specifically excluding any filing fees of any Reimbursement Party incurred or required to be paid in connection with any filings required to be made by such Reimbursement Party or its Affiliates under the HSR Act (collectively, "Transaction Expenses").

(b)    The obligation of the Company and EFIH to pay Transaction Expenses shall not be conditioned or contingent upon the consummation of the transactions contemplated by this Agreement or the Plan of Reorganization.

(c)    Upon the entry of an order of the Bankruptcy Court approving the Company's entry into this Agreement, the provision for the payment of Transaction Expenses is (and the order of the Bankruptcy Court approving this Agreement should so provide, that payment of such expenses is) an integral part of the transactions contemplated by this Agreement and without this provision the Purchasers would not have entered into this Agreement, and the Equity Commitment Parties would not have entered into the Equity Commitment Letter or the Guarantee, and such expenses shall constitute an allowed administrative expense of the Company and EFIH under Sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code.

(d)    Within ten (10) Business Days after the entry of the Order of the Bankruptcy Court approving the Company's and EFIH's entry into and performance under this Agreement, each Reimbursement Party shall submit invoices to the Company with respect to the costs and expenses incurred at any time (whether before or after the date of this Agreement) through the date of such Order for which such Reimbursement Parties are entitled to reimbursement pursuant to this Section 6.25. The Company shall pay such costs and expenses in accordance with this Section 6.25 within ten (10) Business Days of its receipt of each such invoice.

(e)    The Reimbursement Parties are express third party beneficiaries of the agreements contained in this Section 6.25 and shall have the right to enforce the provisions of this Section 6.25.

(f)    Notwithstanding the foregoing, Company and EFIH shall not reimburse or pay Parent for any Transaction Expenses from and after January 1, 2016, regardless of when incurred (such Transaction Expenses for which Parent is not reimbursed pursuant to this sentence being "Unreimbursed Transaction Expenses"); provided, that the Company and EFIH shall reimburse or pay each Equity Commitment Party (but not in any event, and for the avoidance of doubt, Parent) that directly or indirectly incurs or pays any Unreimbursed Transaction Expense as set forth in this Section 6.25.

Section 6.26    Rejection of Certain Contracts. The Company and EFIH agree that they will take all necessary action to seek Bankruptcy Court approval to reject (a) that certain Master

Separation Agreement by and among TXU Electric Delivery Company, TXU Generation Holdings Company LLC, TXU Merger Energy Trading Company LP, TXU SESCO Company, TXU SESCO Energy Services Company, TXU Energy Retail Company LP, and TXU Electric Company, dated as of December 14, 2001 under section 365 of the Bankruptcy Code as a provision of the Plan of Reorganization and (b) that certain Separation Agreement by and between TXU Corp. and Oncor Holdings, dated as of October 10, 2007.

## ARTICLE VII
## Conditions

Section 7.1    Conditions to All Parties' Obligations.  The obligations of each party to effect the First Closing are subject to the satisfaction or mutual waiver (as determined by the Company, and to the extent EFIH would be adversely affected by the Company's actions, by EFIH, on the one hand, and by Parent, on the other hand) of the following conditions:

(a)    Plan of Reorganization    The terms and conditions of the Plan of Reorganization confirmed by the Bankruptcy Court shall not be inconsistent, in any substantive legal or economic respect material to EFH or EFIH or any Purchaser or any Equity Commitment Party (including with respect to the rights and obligations of the Purchasers, EFH or EFIH herein), with the provisions set forth in this Agreement and the Plan of Reorganization.

(b)    Bankruptcy Orders.  (i) The Bankruptcy Court shall have entered an Order or Orders approving the Signing Date Agreements and the Settlement Agreement (as defined in the Plan Support Agreement) and each such Order shall be in form and substance acceptable to Parent in its reasonable discretion and shall be in full force and effect and not be subject to any stay; (ii) the Plan of Reorganization shall have been confirmed by the Bankruptcy Court and the Order entered by the Bankruptcy Court confirming the Plan of Reorganization, shall be in form and substance acceptable to Parent in its reasonable discretion (the "Confirmation Order") and shall be in full force and effect and not be subject to any stay; and (iii) the disclosure statement for the Plan of Reorganization, including all exhibits and schedules, in form and substance acceptable to Parent in its reasonable discretion (the "Disclosure Statement"), shall have been approved by the Bankruptcy Court and the Order approving the Disclosure Statement and related solicitation materials (the "Disclosure Statement Order"), which shall be in form and substance acceptable to Parent in its reasonable discretion, shall be in full force and effect and not be subject to any stay.

(c)    Regulatory Consents.  Any material governmental consent and approval necessary to consummate the Transactions (other than the Minority Interest Contribution or the EFIH Parent Issuance), including the FERC Approval, the FCC Approval, the PUCT Approval, the NRC Approval, shall have been obtained and shall remain in full force and effect, and the applicable waiting period under the HSR Act with respect to each applicable Transaction (other than the Minority Interest Contribution or the EFIH Parent Issuance) shall have expired or been terminated; provided, that, no conditions or requirements attached to any such approvals, or necessary to result in the expiration of any waiting period under the HSR Act, shall constitute a Burdensome Condition.

(d)    Orders.  No court or other Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or order (whether

temporary, preliminary or permanent) (each, an "Order") that is in effect and restrains, enjoins, renders illegal or otherwise prohibits consummation of any Transaction (other than the Minority Interest Contribution or the EFIH Parent Issuance) in accordance with this Agreement.

(e)     Private Letter Ruling. The Private Letter Ruling shall have been obtained by the Company from the IRS and shall be reasonably satisfactory to the Company and Parent; *provided, however,* that the parties acknowledge and agree that (x) the failure of the Private Letter Ruling to contain any of the following rulings shall not be grounds for concluding the Private Letter Ruling is not reasonably satisfactory to either the Company or Parent: (i) the Reorganized TCEH Contributions, the conversion of Reorganized TCEH to a corporation, and the Reorganized TCEH Spin-Off (collectively, the "Reorganization") qualify as a "reorganization" within the meaning of Section 368(a)(1)(G) of the Code; (ii) the Reorganized TCEH Spin-Off constitutes a transaction qualifying under Sections 355 and 356 of the Code; and (iii) the Reorganized TCEH Contributions and the Reorganized TCEH Spin-Off are not used principally as a device for the distribution of earnings and profits of the Company or Reorganized TCEH and (y) the failure of the Private Letter Ruling to include any one or more of the rulings set forth on Exhibit H will be grounds for concluding the Private Letter Ruling is not reasonably satisfactory; *provided further, however,* that (A) a particular ruling that, in the reasonable determination of both the Company and Parent, covers substantially the same subject matter as any one or more of the rulings set forth on Exhibit H shall not be grounds for concluding the Private Letter Ruling is not reasonably satisfactory to either the Company or Parent due to its failure to include such particular ruling set forth on Exhibit H; (B) in the event a specific ruling set forth on Exhibit H is not given because the IRS communicates that there is no substantial issue with respect to the requested ruling, the absence of such ruling shall not be grounds for concluding the Private Letter Ruling is not reasonably satisfactory to either the Company or Parent provided that the Company obtains an opinion of nationally recognized counsel, in form and substance acceptable to Parent in its reasonable discretion, at a "will" level with respect to the issue that was initially requested pursuant to the Ruling Request; or (C) a pre-filing agreement (including an agreement in accordance with Revenue Procedure 2009-14) or closing agreement with the IRS shall be acceptable in lieu of any such specific ruling set forth in Exhibit H, *provided* that such agreement is both (i) binding on the IRS to the same degree as a private letter ruling or is otherwise acceptable to both the Company and Parent in their reasonable discretion and (ii) contains, in the reasonable determination of both the Company and Parent, conclusions that are substantially similar, and have substantially the same practical effect, to those contained in the specific ruling initially requested pursuant to the Ruling Request; *provided further, however,* that Company and Parent acknowledge and agree that the failure of the Private Letter Ruling to contain Required Ruling 12, 13, or 14 shall not be grounds for concluding that the Private Letter Ruling is not reasonably satisfactory to the Company; *provided further, however,* that the failure to obtain a ruling that provides that Reorganized TCEH and New Holdco have never been a member of the consolidated group of which EFH is the common parent shall not, standing alone, be grounds for concluding the Private Letter Ruling is not reasonably satisfactory.

(f)     Opinion of Counsel with respect to the Reorganized TCEH Spin-Off. The Company and Reorganized TCEH shall have obtained an opinion of nationally recognized counsel in form and substance reasonably acceptable to the Company and Parent at a "should" level, to the effect that (i) the Reorganized TCEH Contributions and Reorganized

TCEH Spin-Off meet the requirements of Sections 368(a)(1)(G), 355 and 356 of the Code; (ii) EFH should not recognize gain for U.S. federal income Tax purposes as a result of the Reorganized TCEH Contributions other than gain recognized pursuant to the transfer of assets to New Holdco and the Preferred Stock Sale; and (iii) EFH should recognize no gain or loss for U.S. federal income Tax purposes upon the Reorganized TCEH Spin-Off.

(g)     Reorganized TCEH Spin-Off. The Reorganized TCEH Spin-Off shall have occurred in all material respects in accordance with the Plan of Reorganization and the Private Letter Ruling.

(h)     Conditions to Plan of Reorganization. The conditions to the occurrence of the Plan Effective Date shall have been satisfied or waived in accordance with the Plan of Reorganization.

(i)     Plan Support Agreement, Equity Commitment Letter and Backstop Agreement. None of the following shall have occurred: (i) (A) the occurrence of a Plan Support Termination Event (as defined in the Plan Support Agreement), (B) the termination of the Equity Commitment Parties' obligations pursuant to Section 12.1 of the Plan Support Agreement, (C) the termination of the Consenting TCEH First Lien Creditors' (as defined in the Plan Support Agreement) obligations pursuant to Section 12.4 of the Plan Support Agreement, (D) the termination of the Debtors' obligations pursuant to Section 12.6 of the Plan Support Agreement or (E) the termination of the Plan Support Agreement pursuant to Section 12.8 of the Plan Support Agreement, (ii) the valid termination of the Equity Commitment Letter, or (iii) the valid termination of the Backstop Agreement.

(j)     Consideration. After giving effect to the Equity Draw-Down, the Purchasers will hold cash contributed (A) by the Equity Commitment Parties pursuant to the Equity Commitment Letter in the applicable amount set forth on Section 1.1 of the Parent Disclosure Letter and (B) pursuant to the Rights Offering and Backstop Agreement, which amounts together with the other funding sources referred to in Section 1.4, shall be sufficient to (x) repay 100% of the Interim Financing, (y) fund the Repayment Amount and (z) pay all other amounts payable by any Purchaser or the Surviving Company at the Closing pursuant to or in connection with any Signing Date Agreement, the Debt Financing, the Equity Financing and/or the Transactions.

Section 7.2     Conditions to Obligations of the Purchasers. The obligations of Parent and OV2 to effect the First Closing are also subject to the satisfaction or waiver by Parent of the following conditions:

(a)     Representations and Warranties. (i) The representations and warranties of the Company set forth in this Agreement other than Section 5.1(a), Section 5.1(b), Section 5.1(c), and Section 5.1(f)(ii) (without giving effect to any materiality or Company Material Adverse Effect qualifications set forth therein) shall be true and correct as of the First Closing Date as though made on and as of such date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall, subject to the qualifications below, be true and correct as of such earlier date) except where any failures of any such representations and warranties to be so true and correct have not had and would not have, individually or in the aggregate, a Company Material Adverse Effect; (ii) the representations and warranties set forth in (x) Section 5.1(a), Section

75

5.1(b) and Section 5.1(c) shall be true and correct as of the First Closing Date in all respects without disregarding the Company Material Adverse Effect qualification contained therein and (y) Section 5.1(f)(ii) shall be true and correct as of the First Closing Date in all respects; and (iii) Parent shall have received at the First Closing a certificate signed on behalf of the Company and EFIH (in each case by a senior executive officer of such entity) to the effect that each such officer has read this Section 7.2(a) and the conditions set forth in this Section 7.2(a) have been satisfied.

(b)  Performance of Obligations of the Company and EFIH.  Each of the Company and EFIH shall have performed in all material respects the obligations required to be performed by it under this Agreement at or prior to the First Closing Date, and Parent shall have received a certificate signed on behalf of the Company and EFIH (in each case, by a senior executive officer of such entity) to such effect. In addition, each of Oncor and Oncor Holdings shall have performed in all material respects the obligations required to be performed by it under the Oncor Letter Agreement at or prior to the First Closing Date, and Parent shall have received a certificate signed on behalf of Oncor and Oncor Holdings (in each case, by a senior executive officer of such entity) to such effect.

(c)  Tax Opinion.  Parent and OV2 shall have received an opinion of Baker Botts L.L.P., on the basis of the representations and warranties set forth or referred to in such opinion, dated as of the First Closing Date, to the effect that the Merger will qualify as a reorganization within the meaning of Section 368(a) of the Code. In rendering such opinion, such counsel shall be entitled to rely upon representations of officers of the Company, Parent and OV2 contained in the certificates provided by the Company, Parent and OV2 substantially in the form set forth in Section 7.2(c) of the Company Disclosure Letter (with such changes as are necessary, in the reasonable opinion of such counsel, to reflect any change in applicable Law, regulation or official interpretation thereof occurring between the date hereof and the First Closing Date). In giving such opinion, such counsel shall assume that the Reorganized TCEH Contributions and the Reorganized TCEH Spin-Off meet the requirements of Sections 368(a)(1)(G), 355, and 356 of the Code.

(d)  Tax Matters Agreement.  Parent shall have received a Tax Matters Agreement (the "Tax Matters Agreement"), substantially in the form of Exhibit I, duly executed by the Company, Reorganized TCEH and EFIH.

(e)  Transition Services Agreement.  Parent shall have received a Transition Services Agreement, duly executed by Reorganized TCEH which shall be in form and substance acceptable to Parent in its reasonable discretion.

(f)  No Company Material Adverse Effect.  From the date hereof through the First Closing Date, no Company Material Adverse Effect shall have occurred and be continuing as of the First Closing Date.

(g)  Alternative Proposals.  Neither the Company nor any of its Subsidiaries shall have entered into any Contract or written agreement (whether or not binding) with respect to any Alternative Proposal (or proposed or resolved to do so, which proposal or resolution has not been withdrawn or terminated) except as expressly permitted by Section 6.2.

76

(h)    Change of Recommendation. None of the Company or EFIH or the board of directors or any committee thereof shall have (i) withdrawn, qualified or modified, in a manner adverse to any Purchaser or Equity Commitment Party, its approval or recommendation of this Agreement or the Plan of Reorganization or the transactions contemplated hereby or thereby or (ii) approved or recommended, or resolved to approve or recommend (including by filing any pleading or document with the Bankruptcy Court seeking Bankruptcy Court approval of), any Alternative Proposal (each a "Change of Recommendation").

(i)    Plan Obligations. The Company and each of the other Debtors shall have complied in all material respects with the terms and conditions of the Plan of Reorganization to be performed by such parties prior to the First Closing.

(j)    IPO Conversion Plan. Each of the transactions provided for in the IPO Conversion Plan shall have occurred in accordance with Exhibit B, other than those transactions which are specified to occur at the First Closing, but subject to the substantially contemporaneous completion of such transactions at the First Closing.

(l)    Amended and Restated Split Participant Agreement. Parent shall have received the Amended and Restated Split Participant Agreement, duly executed by Oncor and Reorganized TCEH.

Section 7.3    Conditions to Obligations of the Company and EFIH. The obligation of each of the Company and EFIH to effect the First Closing is also subject to the satisfaction (or waiver by the Company and to the extent EFIH would be adversely affected by the Company's actions, by EFIH) of the following conditions:

(a)    Representations and Warranties. (i) The representations and warranties of the Purchasers set forth in this Agreement other than Section 5.2(b), Section 5.2(c) and Section 5.2(f)(v) shall be true and correct as of the First Closing Date as though made on and as of such date except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date, and where any failures of any such representations and warranties to be so true and correct, individually or in the aggregate, would not reasonably be expected to prevent, materially restrict or materially impair the ability of the Purchasers to consummate the Parent Subject Transactions; (ii) the representations and warranties set forth in Section 5.2(b), Section 5.2(c) and Section 5.2(f)(v) shall be true and correct in all respects; and (iii) the Company shall have received at the First Closing a certificate signed on behalf of Parent by a senior executive officer of Parent to the effect that such officer has read this Section 7.3(a) and the conditions set forth in this Section 7.3(a) have been satisfied.

(b)    Performance of Obligations of the Purchasers and Purchaser Transaction Parties. Each Purchaser shall have performed in all material respects all obligations required to be performed by it under this Agreement and the Plan of Reorganization at or prior to the First Closing Date, and the Company and EFIH shall have received a certificate signed on behalf of Parent and OV2 by a senior executive officer of Parent and OV2, respectively, to such effect. In addition, each Purchaser Transaction Party shall have performed in all material respects the obligations required to be performed by it under the Equity

77

Commitment Letter, the Plan Support Agreement and/or Backstop Agreement, as applicable, at or prior to the First Closing Date.

(c)     Tax Opinion.  The Company shall have received an opinion of Kirkland & Ellis LLP, on the basis of representations and warranties set forth or referred to in such opinion, dated as of the First Closing Date, to the effect that the Merger will qualify as a reorganization within the meaning of Section 368(a) of the Code. In rendering such opinion, such counsel shall be entitled to rely upon representations of officers of the Company, Parent and OV2 contained in the certificates provided by the Company, Parent and OV2 substantially in the form set forth in Section 7.2(c) of the Company Disclosure Letter (with such changes as are necessary, in the reasonable opinion of such counsel, to reflect any change in applicable Law, regulation or official interpretation thereof occurring between the date hereof and the First Closing Date). In giving such opinion, such counsel shall assume that the Reorganized TCEH Contributions and the Reorganized TCEH Spin-Off meet the requirements of Sections 368(a)(1)(G), 355, and 356 of the Code.

(d)     Tax Matters Agreement.  The Company shall have received the Tax Matters Agreement, duly executed by the Company, Reorganized TCEH and EFIH.

(e)     Amended and Restated Split Participant Agreement.  The Company shall have received the Amended and Restated Split Participant Agreement, duly executed by Oncor and Reorganized TCEH.

(f)     Equity Funding.  The Company shall have received evidence of (i) the funding of all of the Investment Commitments (as defined in the Equity Commitment Letter) into the Escrow Account (as defined in the Equity Commitment Letter) in accordance with the Equity Commitment Letter, (ii) the funding of all Backstop Commitments (as defined in the Backstop Agreement) into the Escrow Account (as defined in the Backstop Agreement) in accordance with the Backstop Agreement, (iii) the funding of all amounts subscribed for and payable by the Rights Holders (as defined in the Backstop Agreement) in the Rights Offering, if any, into the Escrow Account (as defined in the Backstop Agreement) in accordance with the Backstop Agreement, (iv) each of the Purchasers having delivered joint written instructions to the Escrow Agent (as defined in the Equity Commitment Letter) stating that (A) the Escrow Agent shall draw the full amount of each Qualifying Letter of Credit (as defined in the Equity Commitment Letter) at the First Closing and (B) the funds held in such Escrow Account (including all such amounts drawn under the Qualifying Letters of Credit), other than funds in an amount equal to the OV2 Investment Commitment (as defined in the Equity Commitment Letter), shall be released to Parent at the First Closing in accordance with this Agreement and (v) Parent having delivered written instructions to the Subscription Agent (as defined in the Backstop Agreement) stating that (A) the Subscription Agent shall draw the full amount of each Qualifying Letter of Credit (as defined in the Backstop Agreement) at the First Closing and (B) the funds held in such Escrow Account (including all such amounts drawn under the Qualifying Letters of Credit) shall be released to Parent at the First Closing in accordance with this Agreement.

## ARTICLE VIII
## Termination

Section 8.1    Termination by Mutual Consent.   This Agreement may be terminated at any time prior to the First Closing, whether before or after the Bankruptcy Court shall have entered the Confirmation Order, by mutual written consent of the Company, EFIH, Parent and OV2 by action of each of their respective boards of directors or managers, as applicable.

Section 8.2    Termination by Either Parent or the Company/EFIH.   This Agreement may be terminated at any time prior to the First Closing by action of either (x) Parent, on the one hand, or (y) the Company and EFIH (acting together), on the other hand, if the First Closing shall not have been consummated by the date that is nine (9) months after the date of this Agreement (as extended pursuant to this Section 8.2, the "Initial Drop-Dead Date"); provided, however, that (i) if any application for the approval of any Governmental Entity that is a condition to the obligations of the parties under Section 7.1(c) (the "Required Regulatory Approvals") has not been received, as of the Initial Drop-Dead Date, Parent shall have the right to extend the Initial Drop-Dead Date for up to 180 days for the purpose of continuing to pursue any such Required Regulatory Approval by delivery of written notice to the Company and EFIH and (ii) so long as all conditions to the occurrence of the First Closing, other than the receipt of the Private Letter Ruling pursuant to Section 7.1(e), have been satisfied before the Initial Drop-Dead Date set forth in this Section 8.2 (or before the termination of any extension to such Initial Drop-Dead Date pursuant to this Section 8.2), then the Company may extend the Initial Drop-Dead Date until August 31, 2016 for the purpose of continuing to pursue the Private Letter Ruling by delivery of written notice to Parent; provided, further, however, that, if the Marketing Period has commenced on or before the Initial Drop-Dead Date, but not ended on or before the Initial Drop-Dead Date, such Initial Drop-Dead Date shall automatically be extended such that the Initial Drop-Dead Date does not occur sooner than three (3) Business Days after the final day of the Marketing Period (the Initial Drop-Dead Date as extended pursuant to this Section 8.2 being the "Drop-Dead Date").   Notwithstanding the foregoing, the right to terminate this Agreement pursuant to this Section 8.2 shall not be available to the Company or EFIH if the willful and intentional failure of the Company or EFIH to fulfill any obligation under this Agreement has been a substantial factor contributing to the failure of the First Closing to occur on or before the Drop-Dead Date.   In addition, this Agreement may be terminated at any time prior to the First Closing by action of either Parent, on the one hand, or the Company and EFIH (acting together), on the other hand, if any Law or Order permanently restraining, enjoining, rendering illegal or otherwise prohibiting consummation of any of the Transactions (other than the Minority Interest Contribution or the EFIH Parent Issuance) shall have become final and non-appealable; provided, that neither the Company nor EFIH shall be permitted to terminate this Agreement pursuant to this sentence unless it shall have used its reasonable best efforts to contest such Law or Order prior to its becoming permanent. For purposes of this Agreement, the "Termination Date" shall mean the date on which this Agreement is validly terminated in accordance with its terms.

Section 8.3    Termination by the Company and/or EFIH.   This Agreement may be terminated at any time prior to the First Closing upon the occurrence of any of the following:

(a)    by the Company and EFIH (acting together) if there has been a breach of any representation, warranty, covenant or agreement made by Parent or OV2 in this Agreement, or any such representation and warranty shall have become untrue after the date of this Agreement, which breach or failure of a representation and warranty to be true (i) would result in a failure of a condition set forth in any provision of Section 7.3(a) or Section 7.3(b)

79

if continuing as of the First Closing and (ii) cannot be, or has not been, cured within thirty (30) days after Parent's receipt of written notice thereof from the Company or EFIH; *provided, however*, that neither the Company nor EFIH is then in breach of this Agreement in a manner that would result or has resulted in any of the conditions set forth in Section 7.2(a) or Section 7.2(b) not being satisfied;

      (b)    by the Company and EFIH (acting together) if Parent and OV2 have failed to consummate the First Closing (other than the Minority Interest Contribution and the EFIH Parent Issuance), notwithstanding the fact that the conditions to the obligation of Parent and OV2 to consummate the First Closing are satisfied, no later than two (2) Business Days after the date required by Section 1.8; *provided, however*, that neither the Company nor EFIH is then in breach of this Agreement in a manner that would result or has resulted in any of the conditions set forth in Section 7.2(a) or Section 7.2(b) not being satisfied;

      (c)    by the Company and EFIH (acting together) if the Confirmation Order confirms a plan of reorganization that is inconsistent, in any substantive legal or economic respect material to the Company or EFIH, with this Agreement or the Plan of Reorganization;

      (d)    by the Company and EFIH (acting together) if the Chapter 11 Cases are dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and such dismissal or conversion does not provide for the Transactions;

      (e)    by the Company if the Company Board determines in good faith after consultation with its outside financial advisors and outside legal counsel, and based on the advice of such counsel, that proceeding with the Transactions would be inconsistent with its applicable fiduciary duties;

      (f)    by EFIH if the board of managers of EFIH determines in good faith after consultation with its outside financial advisors and outside legal counsel, and based on the advice of such counsel, that proceeding with the Transactions would be inconsistent with its applicable fiduciary duties;

      (g)    by the Company and EFIH upon the occurrence of any of the events set forth in Section 7.1(j); or

      (h)    by the Company and EFIH (acting together) if there has been a breach of any representation, warranty, covenant or agreement of any Purchaser Transaction Party under the Equity Commitment Letter, the Plan Support Agreement and/or Backstop Agreement, as applicable, which breach (i) would result in a failure of a condition set forth in Section 7.3(a) or Section 7.3(b) and (ii) cannot be or has not been cured within thirty (30) days after the Purchaser Transaction Party's receipt of written notice thereof from the Company or EFIH; *provided, however*, that neither the Company nor EFIH is then in breach of this Agreement in a manner that would result or has resulted in any of the conditions set forth in Section 7.3(a) or Section 7.3(b) not being satisfied.

      Section 8.4     Termination by Parent. This Agreement may be terminated at any time prior to the First Closing by Parent upon the occurrence of any of the following:

(a)      if there has been a breach of any representation, warranty, covenant or agreement made by the Company and/or EFIH in this Agreement, or any such representation and warranty shall have become untrue after the date of this Agreement, which breach or failure of a representation and warranty to be true (i) would result in a failure of a condition set forth in any provision of Section 7.2(a) or Section 7.2(b) if continuing as of the First Closing and (ii) cannot be, or has not been, cured within thirty (30) days after the Company's or EFIH's receipt of written notice thereof from Parent;

(b)      if the Company and EFIH have failed to consummate the First Closing, notwithstanding the fact that the conditions to the obligation of the Company and EFIH to consummate the First Closing are satisfied, no later than two (2) Business Days after the date required by Section 1.8;

(c)      if any Debtor files with the Bankruptcy Court a plan of reorganization or disclosure statement (including any amendments or modification to such filed plan or disclosure statement) that is inconsistent, in any substantive legal or economic respect material to any Purchaser or any Equity Commitment Party (including with respect to the rights and obligations of the Purchasers herein), with this Agreement or the Plan of Reorganization, and the Debtors have not amended or modified such filed plan of reorganization or disclosure statement so as to cause such plan of reorganization or disclosure statement to be not so inconsistent, in any substantive legal or economic respect material to any Purchaser or any Equity Commitment Party (including with respect to the rights and obligations of the Purchasers herein), within ten (10) Business Days after the Company's or EFIH's receipt of written notice thereof from a Purchaser (which notice must be received by the Company or EFIH within ten (10) Business Days of the filing of such plan of reorganization or disclosure statement);

(d)      if there has been a breach of any covenant or agreement of Oncor or Oncor Holdings under the Oncor Letter Agreement, which breach (i) would result in a failure of a condition set forth in Section 7.1 or Section 7.2 and (ii) cannot be or has not been cured within thirty (30) days after the Company's, EFIH's, Oncor's and Oncor Holdings' receipt of written notice thereof from any Purchaser;

(e)      if the Bankruptcy Court enters an Order approving a plan of reorganization or disclosure statement that is inconsistent, in any substantive legal or economic respect material to Parent or any Equity Commitment Party (including with respect to the rights and obligations of the Purchasers herein), with this Agreement or the Plan of Reorganization;

(f)      if a trustee is appointed in the Chapter 11 Cases pursuant to Section 1104 of the Bankruptcy Code;

(g)      upon the occurrence of any of the events set forth in Section 7.1(i);

(h)      if the Chapter 11 Cases are dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and such dismissal or conversion does not provide for the Transactions (other than the Minority Interest Contribution or the EFIH Parent Issuance);

(i)      if any of the following actions is not completed within the applicable time period specified below:

81

(i)      the Debtors shall not have filed with the IRS, on or before 28 calendar days after their execution of the Plan Support Agreement, the Supplemental Ruling Request (as defined in the Plan Support Agreement);

(ii)      the Bankruptcy Court shall not have entered the Order approving the Company's and EFIH's entry into and performance under the Plan Support Agreement on or before September 30, 2015; *provided* that this Agreement may only be terminated pursuant to this Section 8.4(i)(ii) before the entry of the Order approving the Company's and EFIH's entry into and performance under the Plan Support Agreement;

(iii)      the Bankruptcy Court shall not have entered the Disclosure Statement Order on or before November 15, 2015 (the "Disclosure Statement Milestone"), *provided* that entry of such order shall be deemed to occur upon an oral indication by the Bankruptcy Court that it is approving or will approve the Disclosure Statement; *provided, further,* that the Disclosure Statement Milestone may be extended through December 15, 2015, pursuant to Section 11(d) of the Plan Support Agreement (the "Disclosure Statement Milestone Extension"); or

(iv)      the Bankruptcy Court shall not have entered the Confirmation Order, including the Order approving the Company's and EFIH's entry into and performance under this Agreement, on or before January 15, 2016 (the "Confirmation Milestone"); *provided* that entry of any such order shall be deemed to occur upon an oral indication by the Bankruptcy Court that it is approving or will approve confirmation of the Plan of Reorganization; *provided, further,* (i) if there is a Disclosure Statement Milestone Extension pursuant to Section 11(d) of the Plan Support Agreement, then the Confirmation Milestone shall automatically be extended to and be February 15, 2016; (ii) if there was no Disclosure Statement Milestone Extension, then the Confirmation Milestone may be extended through February 15, 2016, pursuant to Section 11(e)(ii) of the Plan Support Agreement; and (iii) the Confirmation Milestone may otherwise be extended as provided in Section 11(e)(iii) of the Plan Support Agreement;

(j)      if there shall have been a Change of Recommendation or, except as expressly permitted by Section 6.2, the Company or any of its Subsidiaries shall have entered into an Alternative Transaction Agreement; or

(k)      if the Purchasers, Oncor and Oncor Holdings fail to enter into an Oncor Letter Agreement, in form and substance acceptable to Parent in its reasonable discretion, within fifteen (15) Business Days following the date hereof.

Section 8.5      Effect of Termination and Abandonment.

(a)      In the event of a termination of this Agreement pursuant to this Article VIII, this Agreement shall become void and of no further force or effect and no party shall have any liability to any other party hereto (or to any of its Affiliates or their respective Representatives) with respect hereto; *provided, however,* that notwithstanding anything in the foregoing to the contrary, this Section 8.5 and the provisions set forth in the third sentence

82

of <u>Section 9.1</u> shall survive the termination of this Agreement and the parties may have further liability with respect to their obligations thereunder.

(b)    The parties acknowledge and agree that the agreements contained in this <u>Section 8.5</u> are an integral part of the Transactions, and that, without these agreements, the parties would not enter into this Agreement. The Purchasers acknowledge and agree that if the Company or EFIH fails to meet any milestone set forth in <u>Section 8.4(i)</u> within the time period set forth therein, then the right to terminate this Agreement for the failure to meet such milestone shall only exist until ten (10) Business Days after such milestone is met.

**ARTICLE IX**
**Miscellaneous and General**

Section 9.1    <u>Survival</u>.    All covenants, agreements and other terms and provisions contained herein expressly relating to the Second Closing Date Transactions shall survive the First Closing. This <u>Article IX</u> and the agreements of the Company and EFIH, Parent and OV2 that by their terms apply or are to be performed in whole or in part after the First Closing Date or the Second Closing Date, as applicable, including those contained in <u>Section 6.6</u> (*Employee Benefits*), <u>Section 6.8</u> (*Expenses*), <u>Section 6.9</u> (*Directors' and Officers' Insurance*), <u>Section 6.14</u> (*Parent and OV2 Waiver*), <u>Section 6.15</u> (*Tax-Free Reorganization Treatment*), <u>Section 6.17(g)</u> (*Debt Financing*), <u>Section 6.18</u> (*Tax Matters*), <u>Section 6.19</u> (*IPO Conversion Plan; Oncor Restructuring*), <u>Section 6.20(c)</u> (*Drag-Along Rights*), and <u>Section 6.25</u> (*Transaction Expenses*) shall survive the consummation of the Transactions. This <u>Article IX</u> and the agreements of the Company and EFIH, Parent and OV2 contained in the last sentence of <u>Section 6.4</u> (*Access and Reports*), the last sentence of <u>Section 6.8</u> (*Expenses*) (solely to the extent of costs and expenses incurred prior to the termination of this Agreement), <u>Section 6.25</u> (*Transaction Expenses*) (solely to the extent of costs and expenses incurred prior to the termination of this Agreement) and <u>Section 8.5</u> (*Effect of Termination and Abandonment*) and the Confidentiality Agreements shall survive the termination of this Agreement. Subject to the foregoing, all other representations, warranties, covenants and agreements in this Agreement shall not survive the Effective Time or the termination of this Agreement.

Section 9.2    <u>Modification or Amendment</u>.    Subject to the provisions of applicable Laws (including, if applicable, the approval of the Bankruptcy Court), at any time prior to the Effective Time, the parties hereto may modify or amend this Agreement, by written agreement executed and delivered by duly authorized officers of the respective parties. Notwithstanding anything herein to the contrary, no Debt Financing Provision (as defined below) may be amended, supplemented, changed or waived without the consent of the Lenders.

Section 9.3    <u>Waiver of Conditions</u>.    The conditions to each of the parties' obligations to consummate the First Closing Date Transactions (other than the Minority Interest Contribution and the EFIH Parent Issuance) are for the sole benefit of such party and may be waived by such party in whole or in part to the extent permitted by applicable Laws.

Section 9.4    <u>Counterparts</u>.    This Agreement may be executed in any number of counterparts (including by electronic means), each such counterpart being deemed to be an original instrument, and all such counterparts taken together constituting one and the same agreement.

83

Section 9.5      GOVERNING LAW AND VENUE; WAIVER OF JURY TRIAL.

(a)    THIS AGREEMENT, TOGETHER WITH ANY CLAIM, DISPUTE, REMEDY OR LEGAL PROCEEDING ARISING FROM OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS OR ANY RELIEF OR REMEDIES SOUGHT BY ANY PARTY HERETO, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, SHALL BE CONSTRUED, PERFORMED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE (EXCEPT TO THE EXTENT THAT MANDATORY PROVISIONS OF TEXAS LAW ARE APPLICABLE), WITHOUT GIVING EFFECT TO ITS PRINCIPLES OR RULES OF CONFLICT OF LAWS TO THE EXTENT SUCH PRINCIPLES OR RULES WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION; *PROVIDED, HOWEVER*, THAT ALL MATTERS ARISING UNDER THE DEBT COMMITMENT LETTERS, INCLUDING ALL CLAIMS (WHETHER IN CONTRACT, EQUITY, TORT OR OTHERWISE) AGAINST ANY OF THE FINANCING SOURCES OR THE PERFORMANCE OF THE FINANCING SOURCES OR THE PERFORMANCE OF THE DEBT COMMITMENT LETTERS, SHALL BE EXCLUSIVELY CONSTRUED, PERFORMED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. Each of the parties hereto (i) submits to the exclusive jurisdiction of the Bankruptcy Court (or, if the Bankruptcy Court declines to accept jurisdiction over a particular matter, then the Chancery Court of the State of Delaware, and if the Chancery Court of the State of Delaware declines jurisdiction, then any state or federal court sitting in Delaware) in any action or proceeding arising out of or relating to this Agreement, (ii) agrees that all claims in respect of such action or proceeding may be heard and determined in any such court and (iii) agrees not to bring any action or proceeding arising out of or relating to this Agreement (whether on the basis of a claim sounding in contract, equity, tort or otherwise) in any other court. Each of the parties hereto agrees that a final judgment (subject to any appeals therefrom) in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the Transactions in any Delaware or federal court in accordance with the provisions of this Section 9.5(a). Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court. Each of the parties hereto hereby irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 9.6. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by Law.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO (I) THIS AGREEMENT, OR THE TRANSACTIONS AND (II) THE DEBT COMMITMENT LETTERS, THE PERFORMANCE THEREOF OR THE TRANSACTIONS

84

CONTEMPLATED THEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (W) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (X) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (Y) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (Z) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 9.5</u>.

(c)    Notwithstanding the foregoing, each of the parties hereto agrees that it will not bring or support any action, cause of action, claim, cross-claim or third party claim of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against any Financing Source in any way relating to this Agreement or any of the Transactions, including but not limited to any dispute arising out of or relating in any way to the Debt Commitment Letter or the performance thereof, in any forum other than the Supreme Court of the State of New York, County of New York, or, if under applicable law exclusive jurisdiction is vested in the federal courts, the United States District for the Southern District of New York (and any appellate courts thereof).

Section 9.6    <u>Notices</u>. Except as set forth in <u>Section 6.17</u> (*Debt Financing*), <u>Section 6.19</u> (*IPO Conversion Plan; Oncor Restructuring*), and <u>Section 6.20</u> (*Drag-Along Rights*) hereof, any notice, request, instruction or other document to be given hereunder by any party to the others shall be in writing and delivered personally or sent by registered or certified mail, postage prepaid, by email or overnight courier:

<u>If to Parent or OV2</u>:

Ovation Acquisition I, L.L.C.
1900 North Akard Street
Dallas, Texas  75201
Attention: David Hernandez
Email:  DHernandez@huntconsolidated.com

<u>with copies (which shall not constitute notice) to</u>:

Baker Botts L.L.P.
2001 Ross Ave., Suite 600
Dallas, Texas 75201

| Attention: | Geoffrey L. Newton |
| | Luckey McDowell |
| | Preston Bernhisel |
| Email: | geoffrey.newton@bakerbotts.com |
| | luckey.mcdowell@bakerbotts.com |
| | preston.bernhisel@bakerbotts.com |

and

White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131
Attention:              Thomas E. Lauria
Email:                  tlauria@whitecase.com

and

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Attention:              Gregory Pryor
Email:                  gpryor@whitecase.com

If to the Company and/or EFIH:

Energy Future Holdings Corp., et al.
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201
Attention:              General Counsel
Email:                  stacey.dore@energyfutureholdings.com; and
                        awright@energyfutureholdings.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
600 Travis St., Suite 3300
Houston, Texas 77002
Attention:              Andrew Calder
                        Amber Meek
Email:                  andrew.calder@kirkland.com
                        amber.meek@kirkland.com

And

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attention:              James Sprayregen
                        Marc Kieselstein
                        Chad Husnick
                        Steven Serajeddini
Email:                  jsprayregen@kirkland.com
                        mkieselstein@kirkland.com
                        chusnick@kirkland.com
                        steven.serajedinni@kirkland.com

86

And

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022

| Attention: | Edward Sassower |
| | Stephen Hessler |
| | Brian Schartz |
| Email: | edward.sassower@kirkland.com |
| | stephen.hessler@kirkland.com |
| | bschartz@kirkland.com |

or to such other persons or addresses as may be designated in writing by the party to receive such notice as provided above. Any notice, request, instruction or other document given as provided above shall be deemed given to the receiving party upon actual receipt, if delivered personally; three (3) Business Days after deposit in the mail, if sent by registered or certified mail; upon receipt if sent by email and received by 5:00 pm (Eastern Time), on a Business Day (otherwise the next Business Day) (*provided* that if given by email such notice, request, instruction or other document shall be followed up within one (1) Business Day by dispatch pursuant to one of the other methods described herein); or on the next Business Day after deposit with an overnight courier, if sent by an overnight courier.

Section 9.7    Entire Agreement. This Agreement (including any exhibits hereto, including as finally executed agreements), the Company Disclosure Letter, the Parent Disclosure Letter, the confidentiality agreement, dated as of August 28, 2014, among Hunt, the Company, EFIH and, pursuant to a Joinder Agreement, dated as of September 4, 2014, Oncor (the "Hunt Confidentiality Agreement"), the confidentiality agreements, dated as of May 18, 2015, between each Backstop Purchaser and the Company, Energy Future Competitive Holdings Company LLC, TCEH and EFIH (collectively with the Hunt Confidentiality Agreement, the "Confidentiality Agreements"), and the other agreements named herein constitute the entire agreement of the parties hereto with respect to the subject matter hereof, and cancel, merge and supersede all other prior or contemporaneous oral or written agreements, understandings, representations and warranties both written and oral, among the parties, with respect to the subject matter hereof. EACH PARTY HERETO AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT, NEITHER PARENT AND OV2 NOR THE COMPANY AND ITS SUBSIDIARIES MAKES ANY OTHER REPRESENTATIONS OR WARRANTIES, AND EACH HEREBY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, OR AS TO THE ACCURACY OR COMPLETENESS OF ANY OTHER INFORMATION, MADE BY, OR MADE AVAILABLE BY, ITSELF OR ANY OF ITS REPRESENTATIVES, WITH RESPECT TO, OR IN CONNECTION WITH, THE NEGOTIATION, EXECUTION OR DELIVERY OF THIS AGREEMENT OR THE TRANSACTIONS, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO THE OTHER OR THE OTHER'S REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION WITH RESPECT TO ANY ONE OR MORE OF THE FOREGOING. The parties hereby further represent that, in entering into this Agreement  (a) they have been represented and advised by counsel in connection with this Agreement, which they have entered into voluntarily and of their own choice, and not under coercion or duress; (b) they are relying upon their own knowledge and the advice of counsel; (c) they knowingly waive any claim that this Agreement was induced by any misrepresentation or nondisclosure which could have been or was discovered before signing this

87

Agreement; and (d) they knowingly waive any right to rescind or avoid this Agreement based upon presently existing facts, known or unknown.

            Section 9.8        No Third Party Beneficiaries. Except as provided in Section 6.9, Section 6.19, Section 6.20, Section 6.25, Section 9.9 and by the last sentence of this Section 9.8, Parent, OV2, the Company and EFIH hereby agree that their respective representations, warranties and covenants set forth herein are solely for the benefit of the other parties hereto, in accordance with and subject to the terms of this Agreement, and this Agreement is not intended to, and does not, confer upon any Person other than the parties hereto any rights or remedies hereunder, including the right to rely upon the representations and warranties set forth herein. The parties hereto further agree that the rights of third party beneficiaries under Section 6.9 shall not arise unless and until the Effective Time occurs. The representations and warranties in this Agreement are the product of negotiations among the parties hereto and are for the sole benefit of the parties hereto. In some instances, the representations and warranties in this Agreement may represent an allocation among the parties hereto of risks associated with particular matters regardless of the knowledge of any of the parties hereto. Consequently, Persons other than the parties hereto may not rely upon the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date. Each of the Lenders shall be an express third party beneficiary with respect to this Section 9.8 and Section 9.2, Section 9.5, Section 9.9, and Section 9.15 (such provisions, the "Debt Financing Provisions").

            Section 9.9        Specific Performance.

        (a)      The parties hereto acknowledge and agree that irreparable damage would occur in the event that any provision of this Agreement were not performed by the Company or EFIH in accordance with its specific terms or were otherwise breached by the Company or EFIH (including any provision requiring the payment of the Transaction Expenses) and the Purchasers would not have an adequate remedy at law in the form of money damages. Accordingly, the parties hereto acknowledge and agree that the Purchasers shall be entitled, prior to the termination of this Agreement in accordance with its terms or with respect to any provision of this Agreement that survives such termination, to enforce specifically the terms and provisions of this Agreement and to obtain an injunction, injunctions or any form of equitable relief to prevent breaches of this Agreement. Notwithstanding anything in this Agreement or any other Transaction Agreement to the contrary, except with respect to any Purchaser's obligation to pay any amount guaranteed pursuant to the Guarantee, none of the Company, EFIH or any of their Affiliates or stakeholders shall be entitled to seek or obtain specific performance of any Purchaser's obligations under this Agreement, including to consummate the Equity Draw-Down (or to cause it to be consummated) or complete (or cause to be completed) any other action or transaction to be completed at the First Closing.

        (b)      Except with respect to any Purchaser's obligation to pay any amount guaranteed pursuant to the Guarantee, the Company and EFIH hereby (i) waive, on behalf of themselves and their Affiliates, any and all common law, statutory or other remedies (including the remedy of specific performance) under any legal theory that such Person or any of their Affiliates may have against the Purchasers or their respective Affiliates in respect of any claims or causes of action under this Agreement and (ii) agree that, to the extent they or any of their Affiliates incur losses arising from or in connection with a breach by any other party hereto or any of their respective Affiliates of its representations, warranties, covenants

or agreements contained in this Agreement, in no event shall the Company or EFIH or their Affiliates seek to recover any money damages from (or seek any other remedy, including specific performance, based on any legal, contractual or equitable theory against) the Purchasers or any of their respective Affiliates. Notwithstanding anything to the contrary contained in this Agreement, each party hereto acknowledges and agrees under no circumstance shall any other party hereto or their respective Affiliates be liable for any punitive, special, indirect or consequential damages under this Agreement. Notwithstanding the foregoing, nothing in this Section 9.9 shall be deemed to alter or amend any rights or remedies available to any party hereto under any other agreement (including the Plan Support Agreement or any other Transaction Agreement) in accordance with the terms thereof.

(c)    Notwithstanding anything to the contrary contained in this Agreement the Company and EFIH acknowledge and agree that no Person other than the Purchasers, the Company, EFIH and their permitted assignees shall have any obligation under this Agreement. The Company and EFIH further agree that, notwithstanding that the Purchasers or any Equity Commitment Party (or any of their permitted assignees) may be a partnership or limited liability company, no recourse under this Agreement shall be had against any Related Party (as defined below) of the Purchasers or any Equity Commitment Party (or any of their permitted assignees) based upon the relationship of such Related Party to any Purchaser or Equity Commitment Party, whether by or through attempted piercing of the corporate (or limited liability company or limited liability partnership) veil the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable Law, or otherwise, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any such Related Party, as such, for any obligations of the Purchasers or any Equity Commitment Party (or any of their permitted assignees) under this Agreement or for any claim based on, in respect of, or by reason of such obligation or their creation. Notwithstanding the foregoing or anything else in this Agreement to the contrary, nothing in this Agreement shall limit the obligations of any Related Party of the Purchasers, any Purchaser Transaction Party or any other Person under any other Transaction Agreement or Commitment Document to which it is a party. "Related Party" means, with respect to any Person, (x) any former, current or future equity holder, controlling person, director, officer, employee, agent, advisor, representative, Affiliate, member, manager, general or limited partner of such Person and (y) any former, current or future equity holder, controlling person, director, officer, employee, agent, advisor, representative, Affiliate, member, manager, general or limited partner of any of the Related Parties described in clause (x).

(d)    Each Equity Commitment Party, its Affiliates and their respective Related Parties are express third party beneficiaries of the agreements contained in this Section 9.9 and shall have the right to enforce the provisions of this Section 9.9.

Section 9.10    Transfer Taxes. To the extent payable under applicable Law, all transfer, documentary, sales, use, stamp, registration and other similar such Taxes and fees (including penalties and interest) incurred in connection with the Merger shall be paid by the Surviving Company when due.

Section 9.11    Definitions. Each term set forth in the Table of Defined Terms is defined in the section of this Agreement set forth opposite such term.

Section 9.12     Severability.     The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

Section 9.13     Interpretation; Construction.

(a)     The table of contents and headings herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof. Where a reference in this Agreement is made to a section or exhibit, such reference shall be to a section of or exhibit to this Agreement unless otherwise indicated. Such exhibits are an integral part of this Agreement and shall be treated as if fully set forth herein. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The words "hereof," "hereto," "hereby," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not any particular provision of this Agreement. The term "made available" and words of similar import means that the relevant documents, instruments or materials were either (A) posted and made available to the other party or its designated Representatives on the Intralinks due diligence data site maintained by the Company for the purpose of the Transactions, or (B) publicly available by virtue of the relevant party's filing of a publicly available final registration statement, prospectus, report, form, schedule or definitive proxy statement filed with the SEC pursuant to the Securities Act or the Exchange Act, in each case, at least one Business Day prior to the date hereof or such prior date with respect to which such documents, instruments or materials were represented by a party to have been made available to the other party.

(b)     The parties have participated jointly in negotiating and drafting this Agreement. In the event that an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

(c)     Each of the Company, Parent and OV2 has, or may have, set forth information in its respective Disclosure Letter in a section thereof that corresponds to the section of this Agreement to which it relates. The fact that any item of information is disclosed in a Disclosure Letter to this Agreement shall not be construed to mean that such information is required to be disclosed by this Agreement.

(d)     Any reference herein to Parent, the Company or the Reorganized Company after the Effective Time shall be deemed to refer to the Surviving Company, and any reference herein to the Company or EFIH after the Plan Effective Date shall be deemed to refer to the Reorganized Company and Reorganized EFIH, respectively.

90

Section 9.14    <u>Assignment</u>. This Agreement shall not be assignable by operation of law or otherwise without the prior written consent of the non-assigning parties hereto. Any purported assignment in violation of this Agreement is void.

Section 9.15    <u>Financing Sources Arrangements</u>. Notwithstanding anything to the contrary contained in this Agreement, (a) Company, the Debtors and their respective Subsidiaries, Affiliates, directors, officers, employees, agents, partners, managers, members, stockholders or representatives shall not have any rights or claims against any Financing Source, in any way relating to this Agreement or any of the Transactions or the Debt Financing (whether directly or by or through a claim by or on behalf of the Parent against any Financing Source) or in respect of any oral representations made or alleged to have been made in connection herewith or therewith, including any dispute arising out of or relating in any way to the Debt Commitment Letter or the Debt Financing, or the performance thereof or the financings contemplated thereby, whether at law or equity, in contract, in tort or otherwise, (b) no Financing Source shall have any liability (whether in contract, in tort or otherwise) to the Company, the Debtors, and their respective Subsidiaries, Affiliates, directors, officers, employees, agents, partners, managers, members, stockholders or representatives for any obligations or liabilities of any party hereto under this Agreement or the Debt Financing or for any claim (whether directly or by or through a claim by or on behalf of the Parent against any Financing Source) based on, in respect of, or by reason of, the transactions contemplated hereby and thereby or in respect of any oral representations made or alleged to have been made in connection herewith or therewith, including any dispute arising out of or relating in any way to the Debt Commitment Letters or the performance thereof or the financings contemplated thereby, whether at law or equity, in contract, in tort or otherwise and (c) the Company, the Debtors and their respective Subsidiaries, Affiliates, directors, officers, employees, agents partners, managers, members, stockholders and representatives agree not to commence (and if commenced agree to dismiss or otherwise terminate, and not to assist) any Action against any Financing Source in connection with this Agreement, the Debt Financing, the Debt Commitment Letter, or the transactions contemplated hereby or thereby.

*[Remainder of Page Intentionally Left Blank; Signature Page to Follow]*

**IN WITNESS WHEREOF**, this Agreement has been duly executed and delivered by the duly authorized officers of the parties hereto as of the date first written above.

**OVATION ACQUISITION I, L.L.C.**

By: _____

Name:    Hunter L. Hunt
Title:    President

**OVATION ACQUISITION II, L.L.C.**

By: _____

Name:    Hunter L. Hunt
Title:    President

*[Signature Page to Purchase Agreement and*
*Agreement and Plan of Merger]*

**ENERGY FUTURE HOLDINGS CORP.**

By: _____

Name:    Anthony Horton

Title:    Senior Vice President & Treasurer

**ENERGY FUTURE INTERMEDIATE
HOLDING COMPANY LLC**

By: _____

Name:    Anthony Horton

Title:    Senior Vice President & Treasurer

*[Signature Page to Purchase Agreement and
Agreement and Plan of Merger]*

## <u>Exhibit A</u>

### Plan of Reorganization

*(See Attached)*

## Exhibit B

## IPO Conversion Plan

1)     Oncor will be converted from a Delaware limited liability company to a Texas limited liability company.

2)     The Company shall form a new, wholly-owned Delaware limited liability company ("New GP").

3)     EFIH will be converted from a Delaware limited liability company into a Delaware limited partnership, with (A) the general partner being New GP, (B) the limited partner being the Company and (C) the limited partnership agreement providing, among other things, that after completion of the First Day Closing Transactions, the IPO Conversion and the Oncor Restructuring, the equity interests of EFIH will be redeemable for cash or equity interests in the Surviving Company in accordance with provisions typically applicable in an UPREIT.

4)     Oncor and a newly formed Texas limited liability company owned by Hunt and one or more of its Affiliates ("OEDC") will consummate a joint survivor merger under Chapter 10 of the Texas Business Organization Code, as a result of which (A) certain personal property of Oncor, including its certificates of convenience and necessity and franchises, together with its employees and certain other assets and liabilities, but excluding assets and employees of the business that will satisfy the "active trade or business" requirement with respect to the Reorganized TCEH Spin-Off, will be allocated by operation of law to and become property of OEDC, in exchange for an initial cash payment and certain deferred payments from OEDC to Oncor in an aggregate amount equal to the fair market value of such personal property (net of any liabilities assumed), and (B) the real property (and related liabilities) of Oncor will continue to be held by Oncor but such real property (other than assets of the business that will satisfy the "active trade or business" requirement with respect to the Reorganized TCEH Spin-Off) will be leased to and operated by OEDC. After giving effect to this transaction, Oncor (together with its successor) is referred to herein as "Oncor AssetCo."

5)     Oncor AssetCo will be converted back to a Delaware limited liability company.

6)     Oncor AssetCo will enter into a delegation agreement with the Reorganized Company.

7)     An Affiliate of Hunt will enter into a management agreement with the Reorganized Company, Reorganized EFIH and Oncor AssetCo.

8)     Oncor AssetCo and OEDC will enter into arm's-length lease agreements pursuant to which OEDC will lease the transmission and distribution assets from Oncor AssetCo.

9)     Oncor AssetCo will enter into such other agreements with Parent, EFIH or Oncor Holdings as are reasonably requested by Parent pursuant to which Oncor will agree to take such actions as are reasonably necessary to ensure that Parent (and any successor of Parent) will be able to

satisfy (a) the REIT income and asset tests set forth in Sections 856(c)(2)-(4) of the Code (determined as if the assets and income of Parent or its successor consisted solely of its interest in, and income from, Oncor) and (b) any obligations Parent has as a public reporting company, including compliance with the Securities Act, the Exchange Act and the rules and regulations of any national exchange on which Parent's stock is listed.

(collectively steps (4) through (9) above, the "Oncor Restructuring," and together with the other steps, the "IPO Conversion Plan")

**<u>Exhibit C</u>**

**Form of Offer**

*(See Attached)*

Exhibit C

## Exhibit C

### Form of Offer

### Ovation Acquisition I, L.L.C.
1900 North Akard Street
Dallas, Texas 75201

August ___, 2015

Energy Future Holdings Corp.
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201
Attention: Board of Directors

<u>Offer to Purchase IPO Units and LLC Units</u>

Ladies and Gentlemen:

      Reference is made to (i) the Second Amended and Restated Limited Liability Company Agreement of Oncor Electric Delivery Company LLC, dated as of November 5, 2008 (as amended, the "<u>Oncor LLC Agreement</u>"), among Oncor Electric Delivery Holdings Company LLC ("<u>Oncor Holdings</u>"), Oncor Management Investment LLC ("<u>Oncor Management</u>") and Texas Transmission Investment LLC ("<u>TTI</u>") and (ii) the Investor Rights Agreement, dated as of November 5, 2008 (the "<u>Investor Rights Agreement</u>"), among Oncor Electric Delivery Company LLC ("<u>Oncor</u>"), Oncor Holdings, TTI and Energy Future Holdings Corp. ("<u>EFH</u>"). Capitalized terms used herein without definition have the respective meanings set forth in the Investor Rights Agreement.

      As you are aware, as of the date hereof, (i) EFH, Energy Future Intermediate Holding Company LLC ("<u>EFIH</u>"), Ovation Acquisition I, L.L.C. ("<u>OV1</u>") and Ovation Acquisition II, L.L.C. ("<u>OV2</u>") are entering into a Purchase Agreement and Agreement and Plan of Merger, dated as of the date hereof (the "<u>Merger Agreement</u>"), a copy of which is attached as <u>Exhibit A</u> hereto, and (ii) EFH, EFIH and the other debtors in the pending chapter 11 cases jointly administered for procedural purposes only under Case No. 14-10979 (collectively, the "<u>Debtors</u>") are filing an amended Plan of Reorganization (the "<u>Plan of Reorganization</u>") that contemplates certain restructuring transactions that include, among other things, (a) the merger of reorganized EFH with and into OV1 (the "<u>Merger</u>") and (b) an initial public offering by OV1, which will be the successor to reorganized EFH as a result of the Merger, of shares of common stock (collectively, the "<u>Initial Public Offering</u>"). The Plan of Reorganization, which is an integral element of the Merger transaction, is an exhibit to and incorporated as a part of the Merger Agreement. In addition, as of the date hereof, certain investors (the "<u>Investors</u>") are entering into an Equity Commitment Letter and a Backstop Agreement (each as defined in the Merger Agreement) pursuant to which they are committing to purchase substantially all of the outstanding equity interests in OV1 at the closing (the "<u>Closing</u>") of the Merger, the Initial Public Offering and the other transactions contemplated by the Merger Agreement. The Equity Commitment Letter and Backstop Agreement are exhibits to and are incorporated as part of the Merger Agreement.

      OV1 is a Delaware limited liability company that will be converted into a corporation and will be the successor to EFH at the Closing. OV1 has been formed for the express purpose of

carrying out the transactions contemplated by the Merger Agreement, including the Initial Public Offering. In order to facilitate the Initial Public Offering, EFH has developed and will implement an IPO Conversion, which is described in the Merger Agreement. OV1, as the successor to reorganized EFH, is a suitable vehicle for conducting the Initial Public Offering, which will involve the issuance of equity securities of OV1 (and ultimately of the surviving entity in the Merger) to the public pursuant to an effective registration statement under the Securities Act of 1933, as amended, and will result in an active trading market in such securities. For purposes of this offer, OV1 (as successor to reorganized EFH as a result of transactions contemplated by the Merger Agreement and the Plan of Reorganization) is referred to, in relation to the initial public offering of IPO Units to be carried out as described above, as the "IPO Corporation." As set forth in the Plan of Reorganization and the Merger Agreement, all of the existing equity interests in EFH will be cancelled and retired.

This letter constitutes an EFH Sale Proposal and represents an offer to purchase (i) substantially all of the IPO Units in the IPO Corporation or, alternatively, the acquisition of substantially all of the LLC Units in Oncor held indirectly by EFH, which transactions will be implemented through, among other things, the purchase by the Investors of equity interests in the IPO Corporation and the cancellation and retirement of all of the existing equity interests in EFH (which is an integral element of the proposed transactions contemplated by the Merger Agreement and the Plan of Reorganization), and (ii) all of the LLC Units in Oncor that are owned by members of Oncor other than Oncor Holdings. The consummation of the transaction(s) as contemplated by this EFH Sale Proposal will result in a Change of Control.

The form of the purchase agreement to be entered into in order to provide for the purchase and sale of the LLC Units will be provided to TTI and Oncor Management prior to or concurrently with the delivery by EFH of a Required Sale Notice as contemplated by Section 3.3(a) of the Investor Rights Agreement. Such purchase agreement will contain provisions that satisfy the conditions of Section 3.3(d) of the Investor Rights Agreement. Among other things, the form of consideration to be paid to holders of LLC Units other than Oncor Holdings will be cash, and the amount of such consideration will be at least equal to the amount of the purchase price for the LLC Units held by TTI that is required pursuant to Section 3.3 of the Investor Rights Agreement. Such purchase price will, among other things, be sufficient so that TTI will achieve an IRR on its initial investment in the LLC Units which exceeds the IRR Hurdle.

The purchase of IPO Units and LLC Units in accordance with this offer is a part of a merger, recapitalization and sale transaction that, when consummated at the Closing, will result in the Investors (who are a group of Persons acting in concert with respect to the acquisition of EFH and Oncor) owning more of the equity interests in Oncor (or any resulting entity after a merger) than the relevant Related Entity or its Affiliates.

We are available at your earliest convenience to address any questions that you may have about our offer. We look forward to working with you to complete the purchase contemplated hereby.

Respectfully yours,

OVATION ACQUISITION I, L.L.C.


By:    _____

-3-


Name: _____
Title: ___

cc:    Oncor Electric Delivery Holdings Company LLC
       1616 Woodall Rodgers Freeway
       Dallas, Texas  75202
       Attention:  General Counsel

       Texas Energy Future Holdings Limited Partnership
       c/o Energy Future Holdings Corp.
       Energy Plaza
       1601 Bryan Street
       Dallas, Texas  75201

**Exhibit A**

**Merger Agreement**

(See attached)

## Exhibit D

**Plan Support Agreement**

*(See Attached)*

## Exhibit E

### Equity Commitment Parties

Anchorage Capital Master Offshore, Ltd.

Arch Reinsurance Ltd.

Arrowgrass Distressed Opportunities Fund Limited

Arrowgrass Master Fund Ltd.

Atlas Enhanced Master Fund, Ltd.

Atlas Master Fund, Ltd.

Avenue Capital Management, L.P.

Bam Zie Master Fund, Ltd.

BGF Global High Yield Bond Fund

BGF Global Multi-Asset Income Fund, a sub-fund of BlackRock Global Funds

BGF US Dollar High Yield Bond Fund

BHR Capital LLC, as nominee for BHCO Master, Ltd., BHR Master Fund, Ltd. and BHR OC Master Fund, Ltd.

BlackRock Core Bond Trust

BlackRock Corporate High Yield Fund, Inc.

BlackRock Credit Allocation Income Trust IV

BlackRock Credit Alpha Master Fund L.P.

BlackRock Diversified Distribution Fund

BlackRock Dynamic High Income Portfolio of BlackRock Funds II

BlackRock Funds II, BlackRock High Yield Bond Portfolio

BlackRock Funds II, BlackRock Strategic Income Opportunities Portfolio

BlackRock Global Investment Series: Income Strategies Portfolio

BlackRock Global Long/Short Credit Fund Of BlackRock Funds

Exhibit E

BlackRock High Yield Portfolio of the BlackRock Series Fund, Inc.

BlackRock High Yield V.I. Fund of BlackRock Variable Series Funds, Inc.

BlackRock Limited Duration Income Trust

BlackRock Multi-Asset Income Portfolio of BlackRock Funds II

BlackRock Multi-Sector Income Trust

BlackRock Multi-Strategy Master Fund Limited

BlackRock Secured Credit Portfolio of BlackRock Funds II

CA 534 Offshore Fund, Ltd

Centerbridge Credit Partners Master, L.P.

Centerbridge Credit Partners, L.P.

Centerbridge Special Credit Partners II, L.P.

Crescent 1, L.P.

CRS Master Fund, L.P.

Cyrus Opportunities Master Fund II, Ltd.

Cyrus Select Opportunities Master Fund, Ltd.

Deutsche Bank Securities Inc.

Flourish Investment Corporation

GSO Aiguille Des Grands Montets Fund I LP

GSO Aiguille Des Grands Montets Fund II LP

GSO Aiguille Des Grands Montets Fund III LP

GSO Cactus Credit Opportunities Fund LP

GSO Churchill Partners LP

GSO Coastline Credit Partners LP

GSO Credit Alpha Fund LP

GSO Credit-A Partners LP

GSO Palmetto Opportunistic Investment Partners LP

GSO Special Situations Master Fund LP

Exhibit E

Hunt Power Holdings L.L.C.

JNL/BlackRock Global Long Short Credit Fund

MET Investors Series Trust - BlackRock High Yield Portfolio

The Obsidian Master Fund

Pecos Partners, L.P.

PCI Fund LLC

Steamboat Credit Opportunities Master Fund LP

Strategic Income Opportunities Bond Fund

Taconic Master Fund 1.5 L.P.

Taconic Opportunity Master Fund L.P.


The Equity Commitment Parties are entitled to transfer their Investment Commitments (as defined in the Equity Commitment Letter) and, if applicable, their Backstop Commitments (as defined in the Backstop Agreement), in each case in accordance with those agreements.

Exhibit E

## Exhibit F

## Key Regulatory Terms

This Exhibit F sets forth certain key terms and undertakings to be included in the PUCT Filing in connection with the PUCT Approval and, to the extent applicable, filings with other Governmental Entities in connection with the Transactions ("Regulatory Filings").

The specific terms and undertakings to be included in the Regulatory Filings have not yet been determined and will depend on discussions with the rating agencies and the regulatory authorities. In general, however, the Regulatory Filings would contain at least the following proposed commitments:

1. Establishment of a ring fence with appropriate terms and conditions, as reasonably proposed by Parent with the input and advice of Oncor, taking into account the reduced level of debt that Parent and Reorganized EFIH will have following the Transaction, with the goal that Oncor's debt maintains its investment grade rating, including specific commitments to protect Oncor from credit risk from its post-closing Affiliates.

2. Commitments that the Oncor Entities will not incur any debt (including by way of guaranty), or mortgage or pledge its assets as collateral, in respect of any debt incurred to finance the Transactions.

3. Commitments to hold Oncor's customers harmless for any fees or expenses or incremental borrowing costs associated with the Transactions.

4. The conditions and commitments adopted by the PUCT in connection with its approval of the REIT structure in Docket No. 35287 involving Sharyland Utilities, L.P. and SDTS will apply to the Surviving Company, Reorganized EFIH, Oncor and their respective Affiliates such that the substantive effect of the conditions and commitments adopted for each company involved in Docket No. 35287 shall apply to the company in the Surviving Company/Reorganized EFIH/Oncor structure that performs a role or function that corresponds to that company in the Sharyland/SDTS structure to which the condition or commitment applies. These will include conditions relating to the methodology for determining rates, the lessor-lessee relationship under the REIT structure, obligations of the lessor and lessee to fund improvements to Oncor's transmission and distribution system, and recovery of formation and issuance costs associated with the structure.

5. Other commitments related to preserving jobs, maintaining Oncor's headquarters in the Dallas-Fort Worth area, and filing periodic reports with the PUCT or other applicable Governmental Entities regarding compliance with the proposed terms and undertakings.

6. Commitment to make at least the amount of capital expenditures as set forth in Oncor's current long range plan for 3 years following the First Closing Date, subject to the following adjustments to the extent reported to the Commission in Oncor's quarterly earnings monitor report: Oncor may reduce capital spending due to conditions not under Oncor's control, including, without limitation, siting delays, cancellations of projects by third parties, or weaker than expected economic conditions.

**<u>Exhibit G</u>**

**Amended and Restated Split Participant Agreement**

*(See Attached)*

## Exhibit G

### Form of Amended and Restated Split Participant Agreement

AMENDED AND RESTATED SPLIT PARTICIPANT AGREEMENT

This Amended and Restated Split Participant Agreement (the "Agreement"), dated _____, by and between Oncor Electric Delivery Company LLC ("Oncor") and **[REORG TCEH]** ("RTCEH").

WHEREAS, pursuant to the Split Participant Agreement entered into by and between Oncor and Energy Future Holdings Corp. ("EFH"), dated April 28, 2014 (the "Original Agreement"), effective July 1, 2014, welfare benefits for certain current and future retirees of Oncor and EFH whose employment included service with both Oncor (or a predecessor regulated electric business) and a non-regulated business of EFH (such individuals, the "Split Participants") are provided under the Oncor Retiree Welfare Plan (the "Oncor Plan");

WHEREAS, pursuant to the Original Agreement, Oncor is obligated to fund that portion of the welfare benefit costs for the Split Participants with respect to such Split Participants' period of service with Oncor (or a predecessor regulated electric business), and EFH is obligated to fund the remaining welfare benefit costs of the Split Participants, in each case, less the Split Participants' contributions (subject to the rights of Oncor and EFH to amend, modify or terminate such benefits at any time);

WHEREAS, pursuant to the Original Agreement, beginning on January 1, 2015, Oncor began administering the Oncor Plan (which provides certain welfare benefits to eligible Split Participants following retirement), and EFH agreed to pay Oncor for EFH's portion of the costs associated with providing welfare benefits coverage for the Split Participants (including certain administrative costs);

WHEREAS, on April 29, 2014, EFH and certain entities in which it, directly or indirectly, holds an equity interest and their respective subsidiaries, excluding Oncor, its parent, Oncor Electric Delivery Holdings Company LLC, and their direct and indirect subsidiaries (collectively, the "Debtors"), commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. in the United States Bankruptcy Court for the District of Delaware, which cases were jointly administered for procedural purposes only under Case No. 14-10979, *Energy Future Holdings Corp., et al.,* Case No. 14-10979 (CSS) (the "Chapter 11 Cases");

WHEREAS, EFH, Energy Future Intermediate Holding Company LLC and certain purchasers as set forth therein, entered into that certain Purchase Agreement, dated August 9, 2015 (the "Purchase Agreement");

WHEREAS, as contemplated by the Purchase Agreement and pursuant to the plan of reorganization confirmed as part of the Chapter 11 Cases (the "Plan"), EFH and RTCEH have been separated pursuant to a tax-free spin-off of RTCEH (the "Separation");

WHEREAS, pursuant to the terms of the Purchase Agreement and the Plan, certain obligations of EFH (including the obligation to fund its portion of the Oncor Plan) will be transferred to and assumed by RTCEH (the "Transfer");

WHEREAS, the Plan provides that (a) certain distributions to be made thereunder will be funded, in part, from (i) the proceeds of equity investments to be made in one or more investment vehicles (collectively, "MergerCo") by certain investors with respect to the acquisition by MergerCo of Oncor, and (ii) proceeds from an offering of rights to purchase a portion of the common equity of MergerCo, (b) EFH will merge with and into MergerCo pursuant to that certain Purchase Agreement and Agreement and Plan of Merger (the "Merger Agreement"), and (c) certain first lien claim holders of RTCEH will receive, *inter alia*, 100% of the RTCEH Common Stock (as defined in the Plan) through a tax-free spin-off of RTCEH (as defined in the Plan);

WHEREAS, as a result of the Separation and the Transfer, Oncor and RTCEH will not be under "common control" within the meaning of Section 414(c) of the Internal Revenue Code of 1986, as amended, or part of a "control group" within the meaning of Section 3(40)(B)(ii) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA");

WHEREAS, as a result of the lack of common control under ERISA, among other things, the Oncor Plan could be a self-insured multiple employer welfare arrangement (a "MEWA") for purposes of the Texas Insurance Code if both RTCEH and Oncor were to continue to fund the Oncor Plan as described in the Original Agreement beyond the Transition Period (as hereafter defined);

WHEREAS, that certain separation agreement dated October 10, 2007 previously addressed the shared funding of the EFH Retirement Plan and the parties hereto desire and agree to continue such shared funding of the EFH Retirement Plan in accordance with Exhibit B hereunder and that their execution of this Agreement shall evidence their agreement to continue such shared funding thereof;

WHEREAS, the parties hereto desire to amend and restate the Original Agreement (a) to provide for coverage of the Split Participants under the Oncor Plan during the Transition Period and, if the parties obtain a written and binding advisory opinion ("Determination") from the Employee Benefits Security Administration of the U.S. Department of Labor that is issued prior to the close the Transition Period to the effect that the Oncor Plan is not a MEWA, then also during the Extension Period (as hereafter defined); (b) in the event that the parties do not seek or obtain a Determination prior to the close of the Transition Period to the effect that the Oncor Plan is a MEWA, to establish a separate retiree welfare benefit plan for the benefit of the Split Participants (the "Insured Plan") that is a "fully insured" MEWA within the meaning of Section 514(b)(6) of ERISA under Subtitle B of Title I of ERISA effective no later than immediately prior to the close of the Transition Period; and (c) to set forth the funding obligations of RTCEH and Oncor under the Oncor Plan during the Transition Period or Extension Period, as the case may be and under the Insured Plan, if applicable; and

WHEREAS, it is the intention of the parties that RTCEH's and Oncor's obligations with respect to the costs of welfare benefits for the Split Participants under the Oncor Plan during the Transition Period or Extension Period, as the case may be and if applicable, under the Insured Plan shall continue to be allocated in a manner consistent with the past practices of Oncor and EFH prior to the Separation and the Transfer.

2

NOW, THEREFORE, the parties hereby agree as follows:

1.    Coverage of Split Participants for Welfare Benefits.

(a)    Transition Period and Extension Period.  Medical (including prescription drug coverage), vision, dental, life insurance and supplemental life insurance benefits for the Split Participants, to the extent eligible, will be provided under the Oncor Plan, on the same terms and conditions as heretofore provided under the Oncor Plan through the last day of the calendar year following the Separation and the Transfer, or such earlier date as mutually agreed (the "Transition Period"), or for an indefinite period thereafter if the parties obtain a Determination that is issued prior to the close of the Transition Period to the effect that the Oncor Plan is not a MEWA (the "Extension Period").  Any active employees who will be considered Split Participants when they retire will, to the extent eligible, be eligible for these benefits under the Oncor Plan once they retire and will not be eligible for such benefits under any welfare plans maintained by RTCEH after retirement so long as this Agreement is in effect.  Oncor shall for all purposes, including those relating to the Split Participants, be the sponsor of the Oncor Plan and the Insured Plan, and Oncor or its designee shall be the plan administrator for the Oncor Plan and the Insured Plan.  RTCEH and Oncor will each continue to pay its own portion of the costs (including administrative costs) associated with providing welfare benefit coverage for the Split Participants according to the allocations set forth in the letter from Aon Hewitt to EFH dated November 13, 2012, which is attached hereto as Exhibit A (together with any mutually agreed-upon updates to said allocations, the "Aon Hewitt Letter").  The Aon Hewitt Letter describes the current and past practice of allocating the costs associated with providing welfare benefit coverage for the Split Participants between Oncor and EFH consistent with the past practices of Oncor and EFH prior to the Separation and the Transfer, and the parties agree that such practices, including the method of allocating any amount that may be required to be contributed to the Oncor Plan during the Transition Period or Extension Period, as the case may be as well as any amounts that may be required to cover the insurance premiums for the Insured Plan, will be continued by RTCEH and Oncor following the Separation and the Transfer for so long as this Agreement is in effect.

2.    RTCEH Liability for Split Participants under the Oncor Plan and the Insured Plan.  RTCEH will pay Oncor for a portion of the costs of providing retiree welfare benefit coverage for the Split Participants on the following terms and conditions:

(a)    During the Transition Period or Extension Period, as the case may be, Aon Hewitt, or another mutually agreed-upon actuary for the Oncor Plan, will calculate the estimated RTCEH Retiree Welfare Liability for each month during the Transition Period or Extension Period, as the case may be.  For purposes of this Agreement, the term "RTCEH Retiree Welfare Liability" shall mean RTCEH's proportionate share of the aggregate benefits obligation costs as allocated pursuant to the Aon Hewitt Letter with respect to medical, vision, dental, and prescription drug coverage and life insurance costs (including Administrative Costs) for each Split Participant, less each Split Participant's contribution with respect to such RTCEH proportionate share as determined prior to the beginning of each calendar year, in the sole discretion of RTCEH. For purposes of this Agreement, the term "Administrative Costs" shall mean the total amount of administrative costs and expenses incurred by Oncor in sponsoring, maintaining and administering the Oncor Plan, including without limitation, costs associated

3

with communications to participants, third party vendor/benefit provider administrative costs and costs of legal compliance relating to the Oncor Plan (e.g., preparing Form 5500s, summaries of benefits and coverage, summary annual reports and the like), but excluding actuarial, legal, consulting and accounting fees and costs and overhead expenses of Oncor in maintaining and administering the Oncor Plan. The estimated RTCEH Retiree Welfare Liability shall be determined using reasonable actuarial factors, and the actual RTCEH Retiree Welfare Liability shall be determined by Oncor using actual benefit costs.

(b)    Prior to the effective date of this Agreement and prior to the commencement of each subsequent calendar year during the Transition Period or Extension Period, as the case may be, Oncor will provide RTCEH with a calculation of its estimate of the RTCEH Retiree Welfare Liability, including the basis for such calculation in reasonable detail. Oncor will invoice one-twelfth of such amount each month. RTCEH will pay Oncor the full amount provided in the invoice in a single lump sum payment by the first day of the subject month consistent with prior practice.

(c)    Following each calendar quarter, Oncor will perform a true-up calculation of the actual RTCEH Retiree Welfare Liability for the calendar quarter (the "Retiree Welfare Quarterly True-Up"). Oncor will notify RTCEH in writing of the results of these true-up calculations and will, upon request, provide RTCEH with the information relied upon to make its calculations. If the aggregate amount of the Retiree Welfare Quarterly True-Up calculations exceeds the amount that RTCEH paid under paragraph (b) above for the same calendar quarter covered by the Retiree Welfare Quarterly True-Up calculation, RTCEH will pay Oncor the amount of such excess in a single lump-sum payment within sixty (60) days of such notification. If the aggregate amount of the Retiree Welfare Quarterly True-Up calculations is less than the amount that RTCEH paid under paragraph (b) above for the same calendar quarter covered by the Retiree Welfare Quarterly True-Up calculations, Oncor will pay RTCEH the amount of such excess in a single lump-sum payment as soon as administratively practicable but no later than thirty (30) days following such notification.

(d)    Post Transition Period.    If the parties do not seek or obtain a Determination prior to the close of the Transition Period to the effect that the Oncor Plan is not a MEWA, then effective no later than immediately prior to the close of the Transition Period, Oncor shall establish the Insured Plan. Aon Hewitt, or another mutually agreed-upon actuary for the Insured Plan, will calculate the estimated RTCEH Retiree Premium for each year in a manner that is consistent with the Aon Letter and prior practice beginning with the first of the month following the Transition Period. For purposes of this Agreement, the term "RTCEH Retiree Premium" shall mean RTCEH's proportionate share of the monthly insurance premiums as determined by Aon Hewitt or such other actuary, in a manner consistent with the determination of the RTCEH Retiree Welfare Liability under the Aon Hewitt Letter, for each Split Participant with respect to medical, vision, dental, and prescription drug coverage and life insurance costs, less each Split Participant's contribution with respect to such RTCEH proportionate share, as determined prior to the beginning of each calendar year, in the sole discretion of RTCEH.

(e)    By the first day of each month, Oncor will provide RTCEH with an invoice for the estimated RTCEH Retiree Premium for the following month. Such invoice will include the basis for the calculation of the invoiced amount in reasonable detail. RTCEH will

pay Oncor the full amount provided in the invoice in a single lump sum payment by the first day of the subject month consistent with prior practice.

(f)     Following each calendar quarter, Oncor will perform a true-up calculation of the actual RTCEH Retiree Premium for the calendar quarter (the "Retiree Premium Quarterly True-Up"). Oncor will notify RTCEH in writing of the results of these true-up calculations and will, upon request, provide RTCEH with the information relied upon to make its calculations. If the aggregate amount of the Retiree Premium Quarterly True-Up calculations exceeds the amount that RTCEH paid under paragraph (e) above for the same calendar quarter covered by the Retiree Premium Quarterly True-Up calculation, RTCEH will pay Oncor the amount of such excess in a single lump-sum payment within sixty (60) days of such notification. If the aggregate amount of the Retiree Premium Quarterly True-Up calculations is less than the amount that RTCEH paid under paragraph (e) above for the same calendar quarter covered by the Retiree Premium Quarterly True-Up calculations, Oncor will pay RTCEH the amount of such excess in a single lump-sum payment as soon as administratively practicable but no later than thirty (30) days following such notification.

3.     Administration.  Oncor shall in all respects be responsible for administering the provision of retiree welfare benefits for the Split Participants. For the avoidance of doubt, such administration services shall include but are not limited to: benefit distributions; vendor selection, oversight and management; benefits strategy and plan design; participant communications, including but not limited to those required by law; benefit accounting and claims processing; issue resolution; IRS Form W-2 processing for group term life insurance coverage, Retiree Club Communications and inquiries; participant data and records management; selection and rollout of technology and support; and engagement of actuarial, accounting, consulting and legal services related to the Oncor Plan.  Oncor agrees that it will give RTCEH an opportunity to preview all participant communications within the scope of this Agreement prior to the distribution of such communications to the Split Participants.

4.     Cooperation.  RTCEH and Oncor agree to cooperate with each other in any reasonable manner in order to carry out the terms of this Agreement.

5.     Plan Amendments; No Third Party Beneficiary Rights.  Nothing in this Agreement shall be deemed to constitute a provision of, or an amendment to the Oncor Plan or any other benefit plan maintained by either Oncor or RTCEH, nor shall this Agreement be deemed to limit, in any way, the authority of either Oncor or RTCEH to amend or terminate their respective benefit plans from time to time in accordance with the terms of such plans; provided, however, that Oncor agrees it will not amend, modify or terminate the Oncor Plan or the Insured Plan with respect to the benefits available to the Split Participants for a period of eighteen (18) months following the effective date of this Agreement, without the written consent of RTCEH, which consent will not be unreasonably withheld in connection with implementation of the Insured Plan as contemplated herein and in the Merger Agreement, nor shall Oncor amend, modify or terminate the Oncor Plan or the Insured Plan thereafter without the written consent of RTCEH with respect to the benefits available to the Split Participants unless such amendment, modification or termination of the Oncor Plan or the Insured Plan applies to all other current or future retirees receiving post-employment welfare benefits from Oncor or one of its affiliates on a consistent basis.  Nothing in this Agreement shall create any third party beneficiary rights for

5

any individual, including without limitation, any Split Participant or his/her dependents, nor shall this Agreement be deemed to provide any Split Participant or dependent, or any other individual, with any right to continued coverage under the Oncor Plan or any other plan of Oncor or RTCEH. This Agreement relates solely to the Split Participants and does not affect Oncor's welfare benefit obligations related to any participant who is not a Split Participant.

6.    Amendment and Termination. This Agreement may be amended or terminated by either party, provided that: (a) as to EFH, such amendment, modification or termination is effectuated upon at least one hundred fifty (150) days' notice and not effective in the middle of a plan year; and (b) as to Oncor, such amendment, modification or termination (i) is effectuated no earlier than eighteen (18) months following the effective date of this Agreement, (ii) is upon at least one hundred fifty (150) days' notice and not effective in the middle of a plan year and (iii) a comparable amendment, modification or termination applies to all other current or future retirees receiving post-employment welfare benefits from Oncor or any of its affiliates on a consistent basis. This Agreement will automatically terminate in the event that Oncor terminates the Oncor Plan. The termination of this Agreement will not affect the underlying obligations of EFH and Oncor to the Split Participants.

7.    Indemnification. The parties agree to and will defend, protect, indemnify and hold one another harmless from and against all claims, losses, expenses, attorneys' fees, damages, demands, judgments, causes of action, suits, and liability ("Claims") related to the other party's breach of this Agreement, and except as set forth below, any modification of the welfare benefits provided to the Split Participants or material reduction in the rate of contribution by either party under this Agreement.

In the event that an Oncor Entity would, in connection with the maintenance of the Fully Insured Retiree Plan, otherwise be required to maintain the Oncor Retiree Welfare Plan as a fully insured MEWA, the parties to this Agreement agree to work together in good faith, as necessary, to implement an appropriate approach that satisfies any regulatory requirements applicable to the Fully Insured Retiree Plan and the Oncor Retiree Welfare Plan and offsets any material costs that would otherwise be incurred under such circumstances and that are not otherwise recoverable by Oncor through the rate-making process of the PUCT and if such appropriate approach is so implemented, the parties shall have no obligation to defend, protect, indemnify or hold each other harmless from and against Claims directly resulting from such implementation. If after a reasonable period of time the parties to this Agreement are unable to implement an approach that satisfies such regulatory requirements and offsets material costs that would otherwise be incurred and not recoverable by Oncor through such rate-making process, Oncor can amend, modify or terminate the Oncor Plan and the Insured Plan without the written consent of RTCEH such that such amendments, modifications or terminations apply to all current and future retirees receiving post-employment welfare benefits from Oncor or one of its affiliates under such plans on a consistent basis, and the parties shall have no obligation to defend, protect, indemnify and hold each other harmless from and against Claims directly resulting from such amendments, modifications or terminations.

8.    Notices. Any notices or other communications to be provided between the parties hereunder shall be provided in writing (including email or facsimile) to the following addresses:

6

If to Oncor:

Oncor Electric Delivery Company LLC
1616 Woodall Rogers Freeway
Dallas, Texas 75202
Attn: Ms. Kerri Veitch
Email: kerri.veitch@oncor.com

If to RTCEH:

**[REORG TCEH]**
1601 Bryan Street
Dallas, Texas 75201
Attn: Cyndie Ewert
Email: cyndie.ewert@energyfutureholdings.com

9.    Entire Agreement.    Except as otherwise provided herein, this Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes any and all understandings and agreements (whether oral or in writing), relating hereto, including, as of its termination date, the Original Agreement.

10.    Binding Effect.  This Agreement shall bind and inure to the benefit of the parties and their respective successors and permitted assigns.

11.    Severability.  All rights and restrictions contained in this Agreement may be exercised and shall be applicable and binding only to the extent that they do not violate any applicable laws and are intended to be limited to the extent necessary so that they will not render this Agreement illegal, invalid or unenforceable. If any term of this Agreement shall be held to be illegal, invalid or unenforceable by a court of competent jurisdiction, it is the intention of the parties that the remaining terms hereof shall constitute their agreement with respect to the subject matter hereof, and all of such remaining terms shall remain in full force and effect.

12.    Novation.  Except for obligations that are due, but not paid as of the date of this Agreement, RTCEH and Oncor hereby novate EFH's obligations under the Original Agreement.

13.    Amendment.  No change or amendment to this Agreement shall be effective unless in writing and signed on behalf of each of the parties to this Agreement.

14.    Governing Law.  This Agreement shall be governed, construed and enforced in accordance with the laws of the State of Texas.

15.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall be considered one and the same instrument.

[Signatures are located on the next page.]

7

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**ONCOR ELECTRIC DELIVERY COMPANY LLC**

By:_____

Name:_____

Title:_____

**[REORG TCEH]**

By:_____

Name:_____

Title:_____

8

Case 14-10979-CSS    Doc 6097-1    Filed 09/18/15    Page 303 of 522

**EXHIBIT A**

**THE AON HEWITT LETTER**



November 13, 2012

Mr. Robert Moussaid
Energy Future Holdings Corp.
Energy Plaza
1601 Bryan Street
Dallas, TX 75201-3411

Dear Robert,

Subject:  Documentation of Pension Plan Assignment—Revised

This letter documents the process that took effect on January 1, 2005, to (1) assign pension plan
benefits, (2) calculate pension plan liabilities, (3) allocate pension plan assets, and (4) calculate
pension costs for the following business segments that participate in the EFH Retirement Plan:

- Oncor Electric Delivery (Regulated Operations)
- Non-regulated EFH Operations
  - Mining (Luminant Mining Services)
  - Sandow
  - Other Genco (Luminant Power Services)
  - EFH Corp.
  - Retail (TXU Energy Retail)
  - Business Services (EFH Corp. Services)
  - Portfolio Management (Luminant Energy Services)
  - Discontinued Operations

This letter updates our previous letter dated January 3, 2012, to reflect the agreement between EFH
and Oncor related to the allocation of pre-2002 service for certain employees of Business Services
and EFH Corp.

Section 36.065 of the Public Utility Regulating Act provides that benefits attributable to the service of
employees and retirees who were employed by the predecessor integrated electric utility before the
utility's unbundling (as of January 1, 2002) shall be assigned to Oncor Electric Delivery. A copy of this
section of the Act is attached for reference. As described below, the assignment of benefits depends
on the date on which an individual separates from service as well as the business segment for which
he or she works.



Plan benefits for employees who separated from service with EFH prior to January 1, 2002, and did not subsequently transfer after January 1, 2005, are assigned as follows:

- Benefits for most pre-2002 terminations are fully assigned to the business segment based on the company code reported by EFH in the pension census data:
    - Benefits for those reported with company codes for Electric Delivery, Genco (including Mining and Sandow), or Retail are fully assigned to Oncor.
    - Benefits for those reported with company codes for Portfolio Management or Discontinued Operations are fully assigned to the business segment indicated by their reported company code.
- Benefits for pre-2002 terminations with a reported company code for Business Services or EFH Corp. are assigned as follows:
    - 64.43% of the benefit is assigned to Oncor.
    - 35.57% of the benefit is assigned to the business segment indicated by their reported company code.

The 64.43% allocation represents the average aggregate portion of the time that Business Services spent supporting the regulated electric utility as of January 1, 2002, as determined by EFH.

- Some plan participants were reported by EFH with two company codes and two corresponding monthly benefit fields. Benefits for these pre-2002 terminations were assigned directly based on the reported amounts.

Plan benefits for employees who separated from service with EFH on or after January 1, 2002, and did not subsequently transfer after January 1, 2005, are assigned as follows:

- Benefits for post-2001 terminations reported with company codes for Electric Delivery are fully assigned to Oncor.
- Benefits for post-2001 terminations reported with company codes for Portfolio Management or Discontinued Operations are fully assigned to the business segment indicated by their reported company code.
- Benefits for post-2001 terminations reported with company codes for Genco (including Mining and Sandow) or Retail are assigned as follows:
    - A portion of each plan participant's benefit is assigned to Oncor. The applicable portion is calculated as the ratio of (a) service as of December 31, 2001, over (b) total service at separation of employment.
    - The remaining portion of each plan participant's benefit is assigned to the business segment indicated by their reported company code at the time they separated from service. The remaining portion is calculated as the ratio of (a) service beginning January 1, 2002, over (b) total service at separation of employment.
- Benefits for post-2001 terminations with a reported company code for Business Services or EFH Corp. are assigned as follows:



- A portion of each plan participant's benefit is assigned to Oncor. The applicable portion is calculated as the ratio of (a) service as of December 31, 2001, over (b) total service at separation of employment. This ratio is further multiplied by 64.43%.

- The remaining portion of each plan participant's benefit is assigned to the business segment indicated by their reported company code at the time they separated from service. This portion includes 35.57% of the amount attributable to service as of December 31, 2001, plus the full amount attributable to service beginning January 1, 2002.

▪ Company codes as of January 1, 2002, were not available at the time the initial assignment of benefits was performed. Therefore, the assignment of benefits related to pre-2002 service is based on the company code reported as of January 1, 2005 (as a proxy for January 1, 2002). The calculations are generally based on credited service at separation of employment as reported by EFH. For cases where this information was not reported, the service was instead calculated from the vesting service date, if reported, or else from the hire date.

▪ Some plan participants were reported by EFH with two company codes and two corresponding monthly benefit fields. These data elements were not reflected in the assignment of benefits for post-2001 terminations.

Impact of 2012 Plan Changes

When the approach to assign benefits was first adopted in 2005, EFH was not concerned about the assignment of individual benefit amounts since all EFH and Oncor employees were covered by the same pension and retiree welfare plans. That situation changed during 2012 as a separate nonqualified pension plan has now been adopted by Oncor and the formulas for determining participant contributions to the retiree medical plan are scheduled to differ between Oncor and EFH beginning January 1, 2013.

Under the initial assignment, Business Services employees who terminated employment after January 1, 2005, were treated differently than similarly situated Business Services employees who terminated prior to that date. In recognition of the new situation regarding pension and retiree medical plans, EFH and Oncor agreed to assign benefits for all Business Services employees the same way, based on the approach previously used for pre-2005 terminations. EFH and Oncor also agreed to assign benefits for employees of EFH Corp. using the same approach as for employees of Business Services.

In recognition of this change, certain benefits were re-assigned during 2012 from Business Services and EFH Corp. to Oncor. At the same time, plan assets equal to the benefit obligation attributable to these re-assigned benefits were re-allocated from Business Services and EFH Corp. to Oncor. Because the prior assignment method has been communicated to and approved by the Public Utility Commission, Oncor asked that these benefits be separately identified and tracked. As a result, the associated benefit obligations, corresponding plan assets and resulting pension cost will not be included in rate case recovery.



Plan benefits attributable to service prior to January 1, 2002, are assigned to business segments based on an employee's reported company code as of January 1, 2005, as described above. If an employee transfers between business segments after January 1, 2005, benefits attributable to service after January 1, 2002, are assigned to the business segment based on the company code reported as of separation of employment.

Multiple transfers between business segments and transfers prior to January 1, 2005, are not reflected in the assignment of benefits. Rather, benefits attributable to pre-2002 service are assigned based on the company code reported as of January 1, 2005, and benefits attributable to service after January 1, 2002, are assigned based on the company code reported as of separation of employment.

Exhibit 1 of this letter illustrates the process for some sample plan participants. Exhibit 2 graphically illustrates the process.

Once the pension benefit for each plan participant is assigned to each business segment, the relevant actuarial liabilities are calculated at each valuation date based on the assigned portions of the benefit.

Liabilities for ASC 715 (formerly known as FAS 87) accounting are:

- Accumulated benefit obligation ("ABO") is the actuarial present value of benefits, based on current service and pay. An individual's ABO is shared between business segments in the same proportion as the benefit is assigned.

- Projected benefit obligation ("PBO") is the actuarial present value of benefits, based on current service and pay projected to retirement or separation of employment. This measure is the basis for financial and regulatory reporting. An individual's PBO is shared between business segments in the same proportion as the benefit is assigned.

- Total benefit obligation ("TBO") is the actuarial present value of all benefits expected to be paid to an individual from the plan, including projected future service accruals. The difference between an individual's TBO and PBO (i.e. future service accruals) is fully borne by the current business segment.

- Service cost ("SC") is the actuarial present value of benefits earned during the current year calculated on a PBO basis. An individual's SC is fully borne by the current business segment.

Exhibit 3 of this letter shows the progression of the PBO from January 1, 2005, through December 31, 2010, for each business segment.



Liabilities for determination of the minimum funding requirements are allocated as follows:

- Target liability ("TL") is the actuarial present value of benefits, based on current service and pay (similar to ABO). This measure is the basis for statutory calculations under ERISA and the Pension Protection Act of 2006. An individual's TL is shared between business segments in the same proportion as the benefit is assigned.

- Target normal cost ("TNC") is the actuarial present value of benefits earned during the current year calculated on a TL basis. The portion of an individual's TNC associated with additional service accruals is fully borne by the current business segment. The portion of the individual's TNC associated with pay increases on past service benefits is shared between business segments in the same proportion as the benefit is assigned.

Prior to January 1, 2008, the liabilities for plan funding were calculated differently based on the funding methods allowed prior to the Pension Protection Act of 2006. The attribution of accrued liability was similar to the current approach; the attribution of the normal cost was dependent on the specific funding method being used.

Benefit payments made from the pension plan trust are reported by the trustee; however, the trustee does not assign each individual's benefit to the separate business segments. Therefore, the aggregate benefit payment amount is allocated to the business segments each year in proportion to the expected benefit payment amount for the year that is implicit in the actuarial calculation of plan liabilities.

As of January 1, 2005, the fair value of plan assets was allocated to each business segment in proportion to TBO, calculated as described above. Exhibit 4 of this letter shows the initial allocation of the fair value of plan assets as of January 1, 2005.

Each subsequent year, the fair value of plan assets for each business segment is tracked by:

- Adding employer contributions allocated among business segments as determined by EFH.

- Subtracting benefit payments based on the assignment described above.

- Reflecting a proportionate share of investment returns, net of plan expenses.

Exhibit 5 of this letter shows the progression of the fair value of assets from January 1, 2005, through December 31, 2010, for each business segment.

The market-related value of plan assets is determined separately for regulated and non-regulated operations, and then allocated among the non-regulated business segments in proportion to fair value of assets. To determine the separate market-related value of assets for the regulated and non-regulated operations, asset gains/losses and plan expenses are allocated in proportion to a weighted average fair value of assets.



The following procedures were used to allocate the accounting balances among business segments at January 1, 2005:

- The unrecognized net transition obligation and associated amortizations were allocated to each business segment in proportion to PBO.

- The unrecognized prior service cost and associated amortizations were allocated to each business segment in proportion to remaining future service of participants.

- The net amount recognized on the balance sheet was allocated to each business segment in proportion to the funded status (PBO less fair value of plan assets).

- The unrecognized net gain/loss was allocated to each business segment as a balancing item.

The initial accounting balances were established for each business segment at January 1, 2005. Each subsequent year, the balances are tracked based on the amortization amount and newly established bases for the year. New prior service cost bases are calculated for each business segment based on the impact of plan changes on the benefits assigned as described above. New net gains/losses are calculated directly for each business segment based on the differences between expected and actual experience on assigned plan liabilities and tracked assets.

Effective October 10, 2007, Energy Future Holdings Corp. recognized purchase accounting for the non-regulated operations. As a result, all unrecognized accounting balances attributable to non-regulated operations were eliminated at that time.

The pension expense under ASC 715 (formerly known as FAS 87) for each business segment is calculated as follows:

- Service cost is calculated separately for each business segment as described above.

- Interest cost is determined for each business segment based on the PBO calculated separately for each business segment as described above.

- Expected return on plan assets is calculated separately for each business segment based on the assets tracked for each business segment as described above.

- The net transition obligation is amortized for each business segment in accordance with the initial allocation described above.

- Prior service costs are amortized for each business segment in accordance with the initial allocation and treatment of subsequent plan changes as described above.

- The amortization of net (gains)/losses is determined separately for regulated and non-regulated operations, and then allocated proportionally over the non-regulated business segments.



The valuation assumptions used for the plan are determined as follows:

- A single discount rate is determined based on the aggregate plan cash flows.

  – Upon evaluation of the discount rate separately for regulated and non-regulated operations, the rate was found not to be significantly different.

- Since the investment policy has historically been the same for the regulated and non-regulated operations, a single expected rate of return assumption has been used.

  – In the event the investment policies for regulated and non-regulated operations are significantly different, the expected return assumption would be determined separately.

- Other valuation assumptions are generally applied consistently for all business segments, unless future expectations warrant differences.

**Closing**

For your reference, I have also attached the 2008 rate case testimony prepared by Don Shipman which provides additional details of the benefit assignment and cost calculations. I hope this provides you sufficient documentation for your files.

Let us know if you have any questions.

Sincerely,

Aon Hewitt

Alan S. Taper
FSA, EA
Partner

AST:mct 03509L036
cc: Mr. Brian Levine, Aon Hewitt
    Mr. Joe Lopez, Aon Hewitt
    Mr. Brian Walker, Aon Hewitt



Exhibit 1

Assignment of Benefits for Sample Plan Participants

Pre-2002 Terminations

|  | Oncor Electric Delivery | Genco, Retail | EFH Corp., Business Services | Portfolio Mgmt., Discontinued Ops. |
|---|---|---|---|---|
| Eligibility Date | 01/01/1993 | 01/01/1993 | 01/01/1993 | 01/01/1993 |
| Separation Date | 12/31/2000 | 12/31/2000 | 12/31/2000 | 12/31/2000 |
| Regulated Portion | 100.00% | 100.00% | 64.43% | 0.00% |
| Total Benefit | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 |
| Regulated Benefit[1] | 1,000.00 | 1,000.00 | 644.30 | 0.00 |
| Nonregulated Benefit[2] | 0.00 | 0.00 | 355.70 | 1,000.00 |

Post-2001 Terminations

|  | Oncor Electric Delivery | Genco, Retail | EFH Corp., Business Services | Portfolio Mgmt., Discontinued Ops., Business Services |
|---|---|---|---|---|
| Eligibility Date | 01/01/1996 | 01/01/1996 | 01/01/1996 | 01/01/1996 |
| Separation Date | 12/31/2003 | 12/31/2003 | 12/31/2003 | 12/31/2003 |
| Pre-2002 Service | 6.0 years | 6.0 years | 6.0 years | 6.0 years |
| Post-2001 Service | 2.0 years | 2.0 years | 2.0 years | 2.0 years |
| Pre-2002 Ratio | N/A | 75.00% | 75.00% | N/A |
| Regulated Portion of Pre-2002 Benefit | 100.00% | 100.00% | 64.43% | 0.00% |
| Total Benefit | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 |
| Regulated Benefit[1] | 1,000.00 | 750.00 | 483.23 | 0.00 |
| Nonregulated Benefit[2] | 0.00 | 250.00 | 516.77 | 1,000.00 |

---

[1] Assigned to Oncor Electric Delivery.
[2] Assigned to the non-regulated business segment reported at separation.

Exhibit 2





Exhibit 3



| | Mining | Sandow | Other Genco | Total Genco | EFH Corp. | Retail | Business Services | Portfolio Management | Subtotal Non-regulated | Discontinued Operations | Total Non-regulated | Oncor | Total Plan |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Projected Benefit Obligation, January 1, 2005 | $ 21,519,907 | $ 1,363,692 | $ 44,901,437 | $ 87,844,656 | $ 16,985,024 | $ 14,915,350 | $ 14,702,131 | $ 14,792,131 | $ 196,677,715 | $ 505,261,119 | $ 704,838,834 | $ 1,469,136,466 | $ 2,174,060,393 |
| Service Cost | 5,070,631 | 441,084 | 11,846,308 | 17,157,063 | 117,667 | 1,331,977 | 1,293,722 | 730,222 | 20,617,511 | 117,788 | 20,735,269 | 14,692,204 | 35,415,553 |
| Interest Cost | 1,282,546 | 81,865 | 2,694,032 | 4,040,815 | 2,181,700 | 855,457 | 5,017,402 | 970,023 | 12,989,404 | 27,913,861 | 40,903,265 | 85,372,821 | 126,276,026 |
| Plan Amendments | | | | | | | | | | | | | |
| Actuarial (Gain)/Loss | 2,365,991 | 208,177 | 4,628,653 | 7,342,121 | (755,323) | 495,529 | 5,536,647 | 674,763 | 13,479,017 | 34,146,543 | 47,627,560 | 104,618,304 | 152,245,864 |
| Benefits Paid | (382,939) | (7,079) | (730,146) | (1,130,155) | (3,150,465) | (865,834) | (4,139,813) | (360,622) | (9,320,660) | (47,536,970) | (56,857,620) | (67,523,516) | (124,381,170) |
| Projected Benefit Obligation, December 31, 2005 | 29,755,011 | 2,087,453 | 63,349,946 | 95,272,420 | 15,196,069 | 16,827,522 | 53,328,369 | 16,609,544 | 237,442,054 | 518,944,261 | 756,377,265 | 1,606,304,312 | 2,363,681,547 |
| Projected Benefit Obligation, January 1, 2006 | 29,755,011 | 2,087,453 | 63,349,946 | 95,272,420 | 15,196,069 | 16,827,522 | 53,328,369 | 16,609,544 | 237,442,054 | 518,944,261 | 756,377,265 | 1,606,304,312 | 2,363,681,547 |
| Service Cost | 5,957,074 | 469,632 | 13,429,964 | 19,972,172 | 89,659 | 628,865 | 1,654,081 | 1,044,267 | 23,392,451 | 187,658 | 23,590,281 | 1,806,304,317 | 40,261,149 |
| Interest Cost | 1,698,921 | 116,798 | 3,476,157 | 5,291,476 | 773,573 | 597,657 | 5,145,341 | 1,044,421 | 12,761,468 | 29,386,198 | 42,177,666 | 90,154,515 | 132,332,181 |
| Plan Amendments | | | | | | | | | | | | | |
| Actuarial (Gain)/Loss | (659,471) | (100,308) | (4,636,946) | (4,895,727) | (2,228,875) | (6,538,359) | (4,160,342) | (4,150,342) | (15,633,499) | 655,622 | (14,806,967) | (28,871,047) | (43,684,114) |
| Benefits Paid | (470,722) | (21,099) | (2,075,311) | (2,567,526) | (1,518,389) | (409,653) | (3,689,260) | (411,931) | (5,833,269) | (30,141,597) | (35,984,857) | (72,726,477) | (115,529,909) |
| Projected Benefit Obligation, December 31, 2006 | 30,300,513 | 2,552,466 | 74,103,604 | 113,002,803 | 12,111,727 | 11,300,072 | 93,086,483 | 16,735,615 | 246,254,500 | 520,042,835 | 766,307,335 | 1,611,440,001 | 2,340,847,336 |
| Projected Benefit Obligation, January 1, 2007 | 36,308,513 | 2,552,466 | 74,103,604 | 113,002,803 | 12,111,727 | 11,300,072 | 93,086,483 | 16,735,615 | 248,254,560 | 520,042,835 | 768,307,535 | 1,611,540,001 | 2,380,847,536 |
| Service Cost | 6,145,350 | 386,530 | 11,820,004 | 18,382,884 | 61,430 | 352,814 | 1,867,252 | 603,408 | 21,310,359 | 144,614 | 22,055,182 | 16,559,133 | 38,614,315 |
| Interest Cost | 2,193,010 | 136,121 | 4,326,931 | 6,655,362 | 905,263 | 648,842 | 5,561,218 | 1,102,833 | 14,673,435 | 26,980,483 | 44,733,929 | 94,079,743 | 138,813,678 |
| Plan Amendments | | | | | | | | | | | | | |
| Actuarial (Gain)/Loss | (3,309,629) | (569,494) | (8,641,851) | (12,618,609) | 3,373,896 | (723,291) | (2,322,780) | (2,113,609) | (14,034,406) | (32,281,072) | (47,555,481) | (124,245,824) | (171,801,406) |
| Benefits Paid | (1,577,649) | (33,717) | (1,938,968) | (3,419,859) | (1,599,243) | (916,721) | (4,507,654) | (791,042) | (9,924,690) | (34,292,393) | (44,018,919) | (74,970,281) | (118,179,180) |
| Projected Benefit Obligation, December 31, 2007 | 40,632,223 | 2,472,926 | 79,677,265 | 122,982,444 | 14,761,103 | 11,803,076 | 93,826,071 | 16,837,986 | 261,316,953 | 483,004,567 | 744,524,046 | 1,523,771,896 | 2,266,296,544 |
| Projected Benefit Obligation, January 1, 2008 | 40,632,223 | 2,472,926 | 79,877,265 | 122,982,444 | 14,761,103 | 11,650,076 | 83,285,271 | 16,837,985 | 201,316,929 | 483,004,567 | 744,524,046 | 1,523,771,896 | 2,268,255,944 |
| Service Cost | 5,993,497 | 417,800 | 11,992,522 | 18,403,822 | 55,682 | 1,111,537 | 1,285,585 | 807,360 | 20,273,872 | 66,683 | 20,372,255 | 16,157,859 | 36,530,124 |
| Interest Cost | 2,698,512 | 192,200 | 5,311,872 | 8,202,514 | 802,350 | 764,200 | 1,345,949 | 31,633,057 | 85,741,671 | 144,366,789 | | | |
| Plan Amendments | | | | | | | | | | | | | |
| Actuarial (Gain)/Loss | 472,057 | 447,851 | 935,825 | 1,855,843 | (1,136,480) | 46,340 | (10,316,920) | 5,889,643 | (7,863,201) | 2,107 | (6,694,831) | (46,616,844) | (52,514,515) |
| Benefits Paid | (1,123,684) | (46,765) | (2,125,045) | (3,297,495) | (1,513,462) | (666,188) | (4,361,935) | (958,489) | (11,081,702) | (33,273,965) | (44,355,667) | (74,960,710) | (119,627,215) |
| Projected Benefit Obligation, December 31, 2008 | 48,378,605 | 3,482,147 | 94,800,079 | 146,661,831 | 13,016,214 | 12,893,247 | 85,557,606 | 21,833,411 | 270,722,409 | 483,849,245 | 783,371,664 | 1,512,517,018 | 2,275,888,672 |
| Projected Benefit Obligation, January 1, 2009 | 48,378,605 | 3,482,147 | 94,800,079 | 146,661,831 | 13,016,214 | 12,893,247 | 85,557,606 | 21,833,411 | 279,722,409 | 483,849,245 | 783,571,654 | 1,512,517,018 | 2,275,888,672 |
| Service Cost | 5,910,055 | 497,724 | 11,168,663 | 17,553,422 | 45,656 | 1,307,196 | 905,066 | 21,548,021 | 84,684 | 21,117,605 | 15,736,148 | 36,882,753 | |
| Interest Cost | 3,488,215 | 285,284 | 6,025,553 | 10,577,129 | 720,827 | 1,005,530 | 3,014,743 | 1,471,012 | 19,620,247 | 31,301,985 | 50,922,212 | 103,712,784 | 154,634,996 |
| Plan Amendments | | | | | | | | | | | | | |
| Actuarial (Gain)/Loss | 7,896,985 | 693,464 | 19,348,383 | 27,928,142 | (1,262,381) | 3,301,257 | 12,399,387 | 3,014,743 | 45,145,186 | 37,517,080 | 82,663,249 | 223,953,214 | 306,606,472 |
| Transfer* | (1,577,649) | (84,470) | (2,623,045) | (4,460,680) | (870,204) | (4,644,945) | (4,464,945) | (1,100,740) | (12,554,513) | (45,643,432) | (45,643,432) | (81,743,522) | (128,386,955) |
| Benefits Paid | 922,413 | 191,110 | 7,548,961 | 8,660,485 | 279,360 | 2,698,050 | 3,075,590 | 994,339 | 17,223,158 | 355,330 | 17,223,158 | (128,318,055) | (128,318,055) |
| Projected Benefit Obligation, December 31, 2009 | 64,726,334 | 5,029,268 | 136,865,510 | 206,621,112 | 11,584,068 | 20,942,799 | 103,041,256 | 28,551,915 | 370,141,070 | 518,013,364 | 888,154,434 | 1,782,010,064 | 2,671,165,418 |
| Projected Benefit Obligation, January 1, 2010 | 64,726,334 | 5,029,268 | 136,865,510 | 206,621,112 | 11,584,068 | 20,942,799 | 103,041,256 | 28,551,915 | 370,141,070 | 518,013,364 | 888,154,434 | 1,782,010,064 | 2,671,165,418 |
| Service Cost | 6,847,740 | 334,083 | 12,116,790 | 18,567,813 | 52,988 | 1,402,439 | 1,255,671 | 946,317 | 22,550,948 | 81,117 | 22,737,165 | 13,390,927 | 41,177,792 |
| Interest Cost | 4,233,884 | 215,741 | 8,752,928 | 13,212,553 | 672,426 | 1,288,726 | 5,753,765 | 1,657,065 | 22,525,575 | 29,440,365 | 51,974,880 | 103,848,927 | 156,790,795 |
| Plan Amendments | | | | | | | | | | | | | |
| Actuarial (Gain)/Loss | 18,070,804 | (740,308) | 34,040,773 | 52,277,309 | (2,387,431) | 3,792,165 | 4,349,847 | 2,561,667 | 60,912,388 | 162,567 | 60,794,955 | 174,107,399 | 234,902,344 |
| Benefits Paid | (1,768,010) | (85,055) | (3,954,222) | (5,844,987) | (989,014) | (731,247) | (4,109,289) | (4,109,289) | (10,539,223) | (28,545,659) | (41,479,172) | (78,496,283) | (119,940,255) |
| Projected Benefit Obligation, December 31, 2010 | $ 91,093,012 | $ 4,774,226 | $ 186,704,019 | $ 285,264,720 | $ 9,372,657 | $ 26,087,003 | $ 110,291,183 | $ 32,777,066 | $ 463,401,861 | $ 518,760,414 | $ 883,192,275 | $ 2,003,861,347 | $ 2,887,073,022 |

*Transfer related to QSERP amendment.



Exhibit 4

Initial Allocation of Asset Value as of January 1, 2005

EFH Retirement Plan

| Business Segment | Total Benefit Obligation | | Fair Value of Assets | |
|---|---|---|---|---|
| Mining | $ | 71,590,951 | $ | 55,553,391 |
| Sandow | | 5,307,974 | | 4,118,900 |
| Other Genco | | 157,667,263 | | 122,347,182 |
| Total Genco | $ | 234,566,189 | $ | 182,019,473 |
| EFH Corp. | | 17,896,528 | | 13,887,409 |
| Retail | | 32,098,640 | | 24,908,013 |
| Business Services | | 98,605,699 | | 76,516,387 |
| Portfolio Management | | 24,743,162 | | 19,200,284 |
| Subtotal Non-regulated | $ | 407,910,218 | $ | 316,531,566 |
| Discontinued Operations | | 506,082,187 | | 392,711,385 |
| Total Non-regulated | $ | 913,992,405 | $ | 709,242,951 |
| Oncor | | 1,625,957,146 | | 1,261,715,781 |
| Total Plan | $ | 2,539,949,551 | $ | 1,970,958,732 |

Note: Fair value of assets was allocated in proportion to total benefit obligation calculated as of
     January 1, 2005.

Exhibit 5

| | Mining | Sendow | Other Genco | Total Genco | EFH Corp. | Retail | Business Services | Portfolio Management | Subtotal Non-regulated | Discontinued Operations | Total Non-regulated | Oncor | Total Plan |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fair Value of Plan Assets, January 1, 2005 | 56,553,391 | 4,118,800 | 122,347,182 | 182,019,473 | 13,867,408 | 24,908,013 | 76,516,387 | 19,200,284 | 316,531,566 | 392,711,385 | 709,242,951 | 1,261,716,781 | 1,970,959,732 |
| Employer Contributions | (382,936) | (7,076) | (730,144) | (1,120,155) | (3,332,469) | (365,844) | (4,138,011) | (903,602) | (9,320,083) | (47,506,970) | (56,827,053) | (67,503,516) | (124,351,179) |
| Benefits Paid | 3,902,141 | 263,334 | 7,718,438 | 11,176,943 | 773,089 | 1,564,094 | 4,709,449 | 1,233,399 | 109,716,894 | 23,338,914 | 43,055,576 | 77,692,179 | 120,747,752 |
| Actual Return/(Loss) on Plan Assets | (1,470,222) | (21,096) | (2,076,315) | (1,729,105) | (1,616,930) | (403,553) | (3,690,966) | (411,931) | (8,638,226) | (38,633,732) | (38,835,958) | (72,728,477) | (111,676,000) |
| Fair Value of Plan Assets, December 31, 2005 | 7,195,493 | | (1,709,376) | 213,343,720 | 1,265,340 | 1,919,002 | 5,305,752 | 2,442,293 | 38,736,518 | 43,539,731 | 83,255,249 | 198,529,278 | 219,884,927 |
| Fair Value of Plan Assets, January 1, 2006 | 58,672,596 | 4,372,159 | 128,333,506 | 192,378,261 | 11,326,019 | 26,106,263 | 77,067,223 | 20,039,771 | 326,939,537 | 388,344,329 | 695,483,869 | 1,271,871,426 | 1,967,355,265 |
| Employer Contributions | (1,470,222) | (24,096) | (2,076,315) | (2,567,036) | (1,616,930) | (403,553) | (3,690,966) | (411,931) | (8,638,226) | (38,633,732) | (38,835,958) | (72,728,477) | (111,676,000) |
| Benefits Paid | 7,195,493 | 255,219 | 15,736,376 | 23,439,985 | 1,265,340 | 3,180,283 | 6,866,544 | 2,442,293 | 38,736,518 | 43,539,731 | 83,255,249 | 198,529,278 | 219,884,927 |
| Actual Return/(Loss) on Plan Assets | | | | | | | | | | | | | |
| Fair Value of Plan Assets, December 31, 2006 | 65,398,987 | 4,898,196 | 143,056,567 | 213,343,720 | 11,004,423 | 28,666,693 | 82,653,351 | 22,070,343 | 357,967,830 | 381,932,553 | 739,500,383 | 1,335,761,230 | 2,074,661,613 |
| Fair Value of Plan Assets, January 1, 2007 | 65,398,987 | 4,898,196 | 143,056,567 | 213,343,720 | 11,004,423 | 28,666,693 | 82,653,351 | 22,070,343 | 357,967,830 | 381,932,553 | 739,500,383 | 1,335,761,230 | 2,075,661,613 |
| Employer Contributions | (902,326) | (23,717) | (1,502,583) | (2,419,630) | (1,580,243) | (515,721) | (4,507,654) | (791,042) | (9,624,836) | (34,092,363) | (44,016,919) | (74,185,281) | (118,176,180) |
| Benefits Paid | 4,346,668 | 295,261 | 9,517,661 | 14,162,941 | 670,743 | 1,918,002 | 5,370,134 | 1,459,157 | 23,617,980 | 24,412,786 | 48,030,686 | 60,970,785 | 134,941,461 |
| Actual Return/(Loss) on Plan Assets | | | | | | | | | | | | | |
| Fair Value of Plan Assets, December 31, 2007 | 68,945,329 | 5,190,720 | 150,985,076 | 225,116,825 | 9,564,523 | 30,226,277 | 83,024,501 | 22,728,458 | 371,660,674 | 372,253,256 | 743,914,130 | 1,349,848,679 | 2,093,762,808 |
| Fair Value of Plan Assets, January 1, 2008 | 68,945,329 | 5,190,720 | 150,985,076 | 225,116,825 | 9,994,923 | 30,295,277 | 83,024,501 | 22,728,459 | 371,660,674 | 372,253,256 | 743,914,139 | 1,349,848,679 | 2,093,762,808 |
| Employer Contributions | (1,123,864) | (48,768) | (2,135,046) | (3,267,458) | 4,850,000 | (688,190) | 9,600,000 | | 14,650,000 | 69,834,876 | 114,434,879 | 45,946,472 | 160,075,352 |
| Benefits Paid | (13,470,038) | (1,018,009) | (29,541,810) | (44,034,580) | (1,515,462) | (5,901,815) | (4,261,056) | (389,489) | (10,916,702) | (33,270,992) | (44,081,694) | (76,704,299) | (118,821,710) |
| Actual Return/(Loss) on Plan Assets | | | | | (2,098,694) | | (15,697,936) | (459,625) | (73,017,545) | (77,589,882) | (150,607,432) | (252,450,721) | (323,632,153) |
| Fair Value of Plan Assets, December 31, 2008 | 54,346,567 | 4,123,922 | 118,314,021 | 177,784,550 | 11,182,597 | 23,705,156 | 72,365,999 | 17,388,344 | 302,426,627 | 361,227,266 | 663,653,893 | 1,057,709,405 | 1,721,353,298 |
| Fair Value of Plan Assets, January 1, 2009 | 54,346,567 | 4,123,922 | 119,314,021 | 177,784,550 | 11,182,597 | 23,705,156 | 72,365,999 | 17,348,344 | 302,426,627 | 361,227,266 | 663,653,893 | 1,057,709,405 | 1,721,363,298 |
| Employer Contributions | 1,209,027 | 250,055 | 10,109,353 | 11,512,228 | 349,869 | 3,634,619 | 4,098,735 | 3,250,060 | 22,955,414 | 16,062,377 | 41,017,791 | 63,455,212 | 104,473,003 |
| Benefits Paid | (1,577,043) | (60,470) | (2,923,198) | (4,560,665) | (367,095) | (870,283) | (4,644,442) | (1,135,740) | (10,038,020) | (5,128,489) | (15,164,509) | (91,343,556) | (126,386,950) |
| Actual Return/(Loss) on Plan Assets | 9,261,855 | 729,339 | 20,255,908 | 30,162,102 | 1,811,992 | 3,098,049 | 12,011,077 | 2,892,450 | 50,831,649 | 61,506,462 | 112,790,133 | 110,669,425 | 229,821,259 |
| Fair Value of Plan Assets, December 31, 2009 | 63,204,940 | 5,025,817 | 146,657,416 | 215,088,173 | 12,071,203 | 30,467,631 | 83,827,168 | 22,455,002 | 363,709,177 | 407,109,203 | 770,818,382 | 1,218,486,073 | 1,989,306,455 |
| Fair Value of Plan Assets, January 1, 2010 | 63,204,940 | 5,025,817 | 146,657,416 | 215,088,173 | 12,071,203 | 30,467,631 | 83,827,168 | 22,455,002 | 363,709,177 | 407,109,203 | 770,818,382 | 1,218,486,073 | 1,989,306,455 |
| Employer Contributions | (1,798,010) | (55,055) | (3,986,022) | (5,844,587) | (865,014) | (734,147) | (4,138,268) | (829,796) | (12,533,220) | (28,840,958) | (41,479,170) | (76,486,030) | (40,500,000) |
| Benefits Paid | 8,319,718 | 696,760 | 13,344,338 | 16,330,727 | 1,553,627 | 4,019,004 | | | 47,728,733 | 52,429,199 | 100,169,905 | 163,891,045 | (119,686,200) |
| Actual Return/(Loss) on Plan Assets | | | | | | | | | | | | | 260,119,954 |
| Fair Value of Plan Assets, December 31, 2010 | 69,725,646 | 6,827,522 | 162,220,702 | 237,073,923 | 12,754,716 | 33,758,048 | 90,411,426 | 24,426,579 | 368,960,692 | 430,582,436 | 925,486,127 | 1,340,483,083 | 2,193,961,210 |



November 13, 2012

Mr. Robert Moussaid
Energy Future Holdings Corp.
Energy Plaza
1601 Bryan Street
Dallas, TX 75201-3411

Dear Robert,

Subject:  Documentation of Assignment of Postretirement Welfare Benefits—Revised

This letter documents the process that took effect on January 1, 2005, to (1) assign postretirement welfare plan benefits, (2) calculate postretirement welfare plan liabilities, (3) allocate postretirement welfare plan assets, and (4) calculate accounting costs for the following business segments that participate in the EFH Postretirement Welfare Plan:

- Oncor Electric Delivery (Regulated Operations)
- Non-regulated EFH Operations
    - Mining (Luminant Mining Services)
    - Sandow
    - Other Genco (Luminant Power Services)
    - EFH Corp.
    - Retail (TXU Energy Retail)
    - Business Services (EFH Corp. Services)
    - Portfolio Management (Luminant Energy Services)
    - Discontinued Operations

This letter updates our previous letter dated January 26, 2012, to reflect the agreement between EFH and Oncor related to the allocation of pre-2002 service for certain employees of Business Services and EFH Corp.

Assignment of Postretirement Welfare Plan Benefits

Section 36.065 of the Public Utility Regulating Act provides that benefits attributable to the service of employees and retirees who were employed by the predecessor integrated electric utility before the utility's unbundling (as of January 1, 2002) shall be assigned to Oncor Electric Delivery. A copy of this section of the Act is attached for reference. As described below, the assignment of benefits depends on the date on which an individual separates from service as well as the business segment for which he or she works.



**Plan Participants Separating Before January 1, 2002 (Pre-2002 Terminations)**

Plan benefits for employees who separated from service with EFH prior to January 1, 2002, and did not subsequently transfer after January 1, 2005, are assigned as follows:

- Benefits for most pre-2002 terminations are fully assigned to the business segment based on the company code reported by EFH in the census data:
  - Benefits for those reported with company codes for Electric Delivery, Genco (including Mining and Sandow), or Retail are fully assigned to Oncor.
  - Benefits for those reported with company codes for Portfolio Management or Discontinued Operations are fully assigned to the business segment indicated by their reported company code.
- Benefits for pre-2002 terminations with a reported company code for Business Services or EFH Corp. are assigned as follows:
  - 64.43% of the benefit is assigned to Oncor.
  - 35.57% of the benefit is assigned to the business segment indicated by their reported company code.

The 64.43% allocation represents the average aggregate portion of the time that Business Services spent supporting the regulated electric utility as of January 1, 2002, as determined by EFH.

Some pension plan participants were reported by EFH with two company codes and two corresponding monthly pension benefit fields. Pension benefits for these pre-2002 terminations were assigned directly based on the reported pension amounts. For consistency, postretirement welfare benefits for these pre-2002 terminations were assigned in the same proportion as the pension benefits.

**Plan Participants Separating On or After January 1, 2002 (Post-2001 Terminations)**

Plan benefits for employees who separated from service with EFH on or after January 1, 2002, and did not subsequently transfer after January 1, 2005, are assigned as follows:

- Benefits for post-2001 terminations reported with company codes for Electric Delivery are fully assigned to Oncor.
- Benefits for post-2001 terminations reported with company codes for Portfolio Management or Discontinued Operations are fully assigned to the business segment indicated by their reported company code.
- Benefits for post-2001 terminations reported with company codes for Genco (including Mining and Sandow) or Retail are assigned as follows:
  - A portion of each plan participant's benefit is assigned to Oncor. The applicable portion is calculated as the ratio of (a) service as of December 31, 2001, over (b) total service at separation of employment.
  - The remaining portion of each plan participant's benefit is assigned to the business segment indicated by their reported company code at the time they separated from service. The remaining portion is calculated as the ratio of (a) service beginning January 1, 2002, over (b) total service at separation of employment.



- Benefits for post-2001 terminations with a reported company code for Business Services or EFH Corp. are assigned as follows:

  - A portion of each plan participant's benefit is assigned to Oncor. The applicable portion is calculated as the ratio of (a) service as of December 31, 2001, over (b) total service at separation of employment. This ratio is further multiplied by 64.43%

  - The remaining portion of each plan participant's benefit is assigned to the business segment indicated by their reported company code at the time they separated from service. This portion includes 35.57% of the amount attributable to service as of December 31, 2001, plus the full amount attributable to service beginning January 1, 2002.

- Company codes as of January 1, 2002, were not available at the time the initial assignment of benefits was performed. Therefore, the assignment of benefits related to pre-2002 service is based on the company code reported as of January 1, 2005 (as a proxy for January 1, 2002). The calculations are generally based on credited service at separation of employment as reported by EFH. For cases where this information was not reported, the service was instead calculated from the vesting service date, if reported, or else from the hire date.

- Some pension plan participants were reported by EFH with two company codes and two corresponding monthly pension benefit fields. These data elements were not reflected in the assignment of benefits for post-2001 terminations.

## Impact of 2012 Agreement

When the approach to assign benefits was first adopted in 2005, EFH was not concerned about the assignment of individual benefit amounts since all EFH and Oncor employees were covered by the same pension and retiree welfare plans. That situation changed during 2012 as a separate nonqualified pension plan has now been adopted by Oncor and the formulas for determining participant contributions to the retiree medical plan are scheduled to differ between Oncor and EFH beginning January 1, 2013.

Under the initial assignment, Business Services employees who terminated employment after January 1, 2005, were treated differently than similarly situated Business Services employees who terminated prior to that date. In recognition of the new situation regarding pension and retiree medical plans, EFH and Oncor agreed to assign benefits for all Business Services employees the same way, based on the approach previously used for pre-2005 terminations. EFH and Oncor also agreed to assign benefits for employees of EFH Corp. using the same approach as for employees of Business Services.

In recognition of this change, certain benefits were re-assigned during 2012 from Business Services and EFH Corp. to Oncor. At the same time, plan assets equal to the benefit obligation attributable to these re-assigned benefits were re-allocated from Business Services and EFH Corp. to Oncor for the pension plans. The asset transfer related to the OPEB plan will be determined by EFH and Oncor, and will not impact the FAS 106 expense calculation. Because the prior assignment method has been communicated to and approved by the Public Utility Commission, Oncor asked that these benefits be separately identified and tracked. As a result, the associated benefit obligations, corresponding plan assets and resulting pension and post retirement welfare cost will not be included in rate case recovery.



### Transfers Between Business Segments

Plan benefits attributable to service prior to January 1, 2002, are assigned to business segments based on an employee's reported company code as of January 1, 2005, as described above. If an employee transfers between business segments after January 1, 2005, benefits attributable to service after January 1, 2002, are assigned to the business segment based on the company code reported as of separation of employment.

Multiple transfers between business segments and transfers prior to January 1, 2005, are not reflected in the assignment of benefits. Rather, benefits attributable to pre-2002 service are assigned based on the company code reported as of January 1, 2005, and benefits attributable to service after January 1, 2002, are assigned based on the company code reported as of separation of employment.

Exhibit 1 of this letter illustrates the process for some sample plan participants. Exhibit 2 graphically illustrates the process.

### Calculation of Postretirement Welfare Plan Liabilities

Once the health care and life insurance benefits for each plan participant are assigned to each business segment, the relevant actuarial liabilities are calculated at each valuation date based on the assigned portions of the benefits.

### Accounting

Liabilities for ASC 715 (formerly known as FAS 106) accounting are:

- Expected postretirement benefit obligation ("EPBO") is the actuarial present value of the company-subsidized portion of all projected benefits expected to be paid by the plan to the plan participant and any covered dependents.

- Accumulated postretirement benefit obligation ("APBO") is the portion of the EPBO attributed to past service over the total projected service at the date a retiree is fully eligible for retiree benefit coverage. An individual's APBO is shared between business segments in the same proportion as the benefit is assigned. The difference between an individual's EPBO and APBO (i.e. future service accruals) is fully borne by the current business segment.

- Service cost ("SC") is the actuarial present value of benefits attributable to the current year. An individual's SC is fully borne by the current business segment.

Exhibit 3 of this letter shows the progression of the APBO from January 1, 2005, through December 31, 2010. The APBOs for health care benefits and life insurance benefits are shown separately.

### Benefit Payments and Retiree Premiums

Health care benefit payments and retiree premiums within the health care trusts (Union VEBA, Non-Union VEBA and 401(h) account) are reported by the trustee; however, the trustee does not assign each individual's portion to the separate business segments. Therefore, the aggregate benefit payments and retiree premiums are allocated to the business segments each year in proportion to the

Case 14-10979-CSS    Doc 6097-1    Filed 09/18/15    Page 320 of 522



Mr. Robert Moussaid
Page 5
November 13, 2012

expected health care payment amounts for the year that are implicit in the actuarial calculation of plan liabilities.

Likewise, life insurance benefits within the Life Insurance VEBA are reported by the trustee; however, the trustee does not assign each individual's portion to the separate business segments. Therefore, the aggregate benefit payment amount is allocated to the business segments each year in proportion to the expected life insurance payment amount for the year that is implicit in the actuarial calculation of plan liabilities.

### Allocation of Plan Assets

As of January 1, 2005, all health care trust assets in the Union VEBA, Non-Union VEBA and 401(h) account, except those directly attributable to the former TXU Gas Company were assigned to Oncor, as directed by EFH. The rationale for this decision was that all trust fund contributions were made prior to 2002 by the regulated power/generation company pursuant to rate case requirements, so the entire fund balance should be assigned to Oncor.

Life Insurance VEBA assets were also fully assigned to Oncor based on the same rationale. However, the life insurance continuance reserve (ICR) assets as of January 1, 2005, were assigned to the business units (including Oncor) in proportion to the APBO for the life insurance benefits the ICR fund supports. The rationale for this decision was that contributions to the ICR were made by all TXU business units, so the fund balance should be allocated in proportion to the benefit liabilities.

Each subsequent year, the fair value of plan assets for each business segment is tracked by:

- Adding employer contributions allocated among business segments as determined by EFH.
- Subtracting claims payments based on the assignment described above.
- Adding retiree premiums based on the assignment described above.
- Reflecting a proportionate share of investment returns, net of plan expenses.

Exhibit 4 of this letter shows the progression of the fair value of assets from January 1, 2005, through December 31, 2010.

### Calculation of Accounting Costs

### Accounting Balances

The following procedures were used to allocate the accounting balances among business segments at January 1, 2005:

- Prior to January 1, 2005, the unrecognized prior service cost and unrecognized net transition obligation, and associated amortization amounts, were maintained separately for each business segment. These amounts continued to be maintained after January 1, 2005.
- The net amount recognized on the balance sheet was allocated to each business segment in proportion to the funded status (APBO less fair value of plan assets).
- The unrecognized net gain/loss was allocated to each business segment as a balancing item.



The accounting balances were established for each business segment at January 1, 2005. Each subsequent year, the balances are tracked based on the amortization amount and newly established bases for the year. New prior service cost bases are calculated for each business segment based on the impact of plan changes on the benefits assigned as described above. New net gains/losses are calculated directly for each business segment based on the differences between expected and actual experience on assigned plan liabilities and tracked assets.

Effective October 10, 2007, Energy Future Holdings Corp. recognized purchase accounting for the non-regulated operations. As a result, all unrecognized accounting balances attributable to non-regulated operations were eliminated at that time.

The postretirement benefit expense under ASC 715 (formerly known as FAS 106) for each business segment is calculated as follows:

- Service cost is calculated separately for each business segment as described above.

- Interest cost is determined for each business segment based on the APBO calculated separately for each business segment as described above.

- Expected return on plan assets is calculated separately for each business segment based on the assets tracked for each business segment as described above.

- The net transition obligation is amortized for each business segment in accordance with the allocation described above.

- Prior service costs are amortized for each business segment in accordance with the allocation and treatment of subsequent plan changes as described above.

- The amortization of net (gains)/losses is determined separately for regulated and non-regulated operations, and then allocated proportionally over the non-regulated business segments.

The valuation assumptions used for the plan are determined as follows:

- A single discount rate is determined based on the aggregate plan cash flows.
  - Upon evaluation of the discount rate separately for regulated and non-regulated operations, the rate was found not to be significantly different.

- A single expected rate of return assumption is determined based on the weighted average of the plan's trust funds.

- Other valuation assumptions are generally applied consistently for all business segments, unless future expectations warrant differences.

For your reference, I have also attached the 2008 rate case testimony prepared by Pierce Noble which provides additional details of the benefit assignment and cost calculations. I hope this provides you sufficient documentation for your files.



Let us know if you have any questions.

Sincerely,

Aon Hewitt

Alan S. Taper
FSA, EA
Partner

AST:mct 03509L037
cc: Mr. Drew Boswell, Aon Hewitt
    Mr. Brian Levine, Aon Hewitt
    Mr. Brian Walker, Aon Hewitt



Exhibit 1

Assignment of Postretirement Welfare Benefits for Sample
Plan Participants

Pre-2002 Termination

|  | Oncor Electric Delivery | Genco, Retail | EFH Corp., Business Services | Portfolio Mgmt., Discontinued Ops. |
|---|---|---|---|---|
| Eligibility Date | 01/01/1993 | 01/01/1993 | 01/01/1993 | 01/01/1993 |
| Separation Date | 12/31/2000 | 12/31/2000 | 12/31/2000 | 12/31/2000 |
| Regulated Portion of Benefit | 100.00% | 100.00% | 64.43% | 0.00% |
| Nonregulated Portion of Benefit | 0.00% | 0.00% | 35.57% | 100.00% |

Post-2001 Termination

|  | Oncor Electric Delivery | Genco, Retail | EFH Corp., Business Services | Portfolio Mgmt., Discontinued Ops., Business Services |
|---|---|---|---|---|
| Eligibility Date | 01/01/1996 | 01/01/1996 | 01/01/1996 | 01/01/1996 |
| Separation Date | 12/31/2003 | 12/31/2003 | 12/31/2003 | 12/31/2003 |
| Pre-2002 Service | 6.0 years | 6.0 years | 6.0 years | 6.0 years |
| Post-2001 Service | 2.0 years | 2.0 years | 2.0 years | 2.0 years |
| Pre-2002 Ratio | N/A | 75.00% | 75.00% | N/A |
| Regulated Portion of Pre-2002 Benefit | 100.00% | 100.00% | 64.43% | 0.00% |
| Regulated Portion of Total Benefit[1] | 100.00% | 75.00% | 48.32% | 0.00% |
| Non-regulated Portion of Total Benefit[2] | 0.00% | 25.00% | 51.68% | 100.00% |

---

[1] Assigned to Oncor Electric Delivery.
[2] Assigned to the non-regulated business segment reported at separation.

Exhibit 2





1.  Some individuals reported in these business units had specific pension benefit amounts indicated as Electric Delivery; postretirement welfare plan benefits were assigned in proportion to the resulting pension benefit assignments.

Proprietary & Confidential | 10S05L007-Assignment of Benefits.doc/004-K1-0102191



Exhibit 3

Energy Future Holdings Corp.
Historical Progression of Accumulated Postretirement Benefit Obligation from January 1, 2005 through December 31, 2010

| | Health | | | Life | | | Health & Life | | |
|---|---|---|---|---|---|---|---|---|---|
| | Nonregulated | Oncor | Subtotal | Nonregulated | Oncor | Subtotal | Nonregulated | Oncor | Total |
| APBO, January 1, 2005 | $ 170,828,768 | $ 689,154,805 | $ 859,983,573 | $ 15,110,160 | $ 101,658,478 | $ 116,768,638 | $ 185,938,928 | $ 800,813,283 | $ 986,752,211 |
| Service Cost | 7,319,846 | 4,863,072 | 12,182,918 | 414,505 | 339,611 | 754,116 | 7,734,351 | 5,202,683 | 12,937,034 |
| Interest Cost | 9,613,235 | 40,051,133 | 49,664,368 | 869,534 | 5,920,477 | 6,790,011 | 10,482,769 | 45,971,610 | 56,454,379 |
| Participant Contributions[1] | 3,381,143 | 12,291,921 | 15,673,064 | - | - | - | 3,381,143 | 12,291,921 | 15,673,064 |
| Medicare Part D Reimbursement[1] | 2,411,270 | 2,528,842 | 4,940,112 | - | - | - | 2,411,270 | 2,528,842 | 4,940,112 |
| Plan Amendments | - | - | - | - | - | - | - | - | - |
| Actuarial (Gain)/Loss[1] | (3,092,558) | 62,196,969 | 59,104,411 | 174,240 | 2,290,295 | 2,464,445 | (2,918,319) | 64,487,174 | 61,568,858 |
| Benefits Paid[1] | (16,606,086) | (52,025,773) | (68,633,859) | (1,186,343) | (3,909,849) | (5,096,292) | (17,794,429) | (55,935,722) | (73,730,151) |
| APBO, December 31, 2005 | $ 173,853,618 | $ 769,060,969 | $ 942,914,587 | $ 15,382,096 | $ 106,298,822 | $ 121,680,918 | $ 189,235,714 | $ 875,359,791 | $ 1,064,595,505 |
| APBO, January 1, 2006 | $ 173,853,618 | $ 769,060,969 | $ 942,914,587 | $ 15,382,096 | $ 106,298,822 | $ 121,680,918 | $ 189,235,714 | $ 875,359,791 | $ 1,064,595,505 |
| Service Cost | 7,005,503 | 5,314,379 | 12,319,882 | 423,408 | 441,592 | 865,000 | 7,428,911 | 5,755,971 | 13,184,882 |
| Interest Cost | 9,173,871 | 43,827,199 | 53,001,070 | 834,272 | 6,089,740 | 6,924,012 | 10,008,143 | 49,916,939 | 59,925,082 |
| Participant Contributions | 1,128,689 | 13,084,954 | 14,211,643 | - | - | - | 1,128,689 | 13,084,954 | 14,211,643 |
| Medicare Part D Reimbursement | 2,411,270 | 2,528,842 | 4,940,112 | - | - | - | 2,411,270 | 2,528,842 | 4,940,112 |
| Plan Amendments | - | - | - | - | - | - | - | - | - |
| Actuarial (Gain)/Loss | (58,890,517) | (65,345,652) | (124,036,169) | (5,808,715) | (19,872,949) | (25,681,664) | (64,499,232) | (85,218,601) | (149,717,833) |
| Benefits Paid | (12,246,452) | (43,810,076) | (56,056,531) | (534,094) | (3,008,228) | (3,542,322) | (12,780,546) | (46,818,307) | (59,598,853) |
| APBO, December 31, 2006 | $ 122,633,982 | $ 724,660,612 | $ 847,294,594 | $ 10,296,967 | $ 89,948,977 | $ 100,245,944 | $ 132,930,949 | $ 814,609,589 | $ 947,540,538 |
| APBO, January 1, 2007 | $ 122,633,982 | $ 724,660,612 | $ 847,294,594 | $ 10,296,967 | $ 89,948,977 | $ 100,245,944 | $ 132,930,949 | $ 814,609,589 | $ 947,540,538 |
| Service Cost | 8,244,568 | 6,191,972 | 11,436,540 | 287,325 | 280,128 | 567,453 | 6,531,893 | 5,472,100 | 12,003,993 |
| Interest Cost | 7,072,076 | 42,045,667 | 49,117,743 | 587,464 | 5,200,325 | 5,787,789 | 7,659,540 | 47,245,992 | 54,905,532 |
| Participant Contributions | 1,197,676 | 15,723,772 | 16,921,448 | - | - | - | 1,197,676 | 15,723,772 | 16,921,448 |
| Medicare Part D Reimbursement | 4,410,973 | 179,680 | 4,590,653 | - | - | - | 4,410,973 | 179,680 | 4,590,653 |
| Plan Amendments | - | - | - | - | - | - | - | - | - |
| Actuarial (Gain)/Loss | (2,408,829) | (33,979,772) | (36,388,601) | (259,954) | (9,336,542) | (9,596,496) | (2,668,783) | (43,316,314) | (45,985,097) |
| Benefits Paid | (11,422,182) | (45,850,314) | (57,272,496) | (650,469) | (3,970,057) | (4,620,526) | (12,072,652) | (49,820,370) | (61,893,022) |
| APBO, December 31, 2007 | $ 127,728,264 | $ 707,971,617 | $ 835,699,881 | $ 10,261,332 | $ 82,122,832 | $ 92,384,164 | $ 137,989,596 | $ 790,094,449 | $ 928,084,045 |
| APBO, January 1, 2008 | $ 127,728,264 | $ 707,971,617 | $ 835,699,881 | $ 10,261,332 | $ 82,122,832 | $ 92,384,164 | $ 137,989,596 | $ 790,094,449 | $ 928,084,045 |
| Service Cost | 5,705,676 | 4,427,674 | 10,133,250 | 180,636 | 110,453 | 291,089 | 5,886,312 | 4,538,027 | 10,424,339 |
| Interest Cost | 8,247,903 | 44,961,580 | 53,209,483 | 675,236 | 5,168,554 | 5,843,790 | 8,923,139 | 50,130,134 | 59,053,273 |
| Participant Contributions | 3,044,751 | 12,972,002 | 16,016,753 | - | - | - | 3,044,751 | 12,972,002 | 16,016,753 |
| Medicare Part D Reimbursement | 974,176 | 3,363,051 | 4,337,227 | - | - | - | 974,176 | 3,363,061 | 4,337,227 |
| Plan Amendments | - | - | - | - | - | - | - | - | - |
| Actuarial (Gain)/Loss | (7,179,872) | (22,956,716) | (30,136,588) | (648,660) | (4,465,968) | (5,114,057) | (7,828,581) | (27,421,784) | (35,250,645) |
| Revised Methodology Accounting Adjustment | 2,532,914 | (2,532,914) | - | 511,719 | (511,719) | - | 3,044,633 | (3,044,833) | - |
| Benefits Paid | (11,171,612) | (47,659,780) | (58,831,392) | (636,877) | (3,725,119) | (4,364,996) | (11,811,489) | (51,384,899) | (63,196,388) |
| APBO, December 31, 2008 | $ 129,882,200 | $ 700,546,414 | $ 830,428,614 | $ 10,340,057 | $ 78,699,933 | $ 89,039,990 | $ 140,222,257 | $ 779,246,347 | $ 919,468,604 |
| APBO, January 1, 2009 | $ 129,882,200 | $ 700,546,414 | $ 830,428,614 | $ 10,340,057 | $ 78,699,933 | $ 89,039,990 | $ 140,222,257 | $ 779,246,347 | $ 919,468,604 |
| Service Cost | 5,784,780 | 4,391,892 | 10,176,672 | 183,797 | 107,766 | 291,563 | 5,968,577 | 4,499,678 | 10,468,255 |
| Interest Cost | 8,620,846 | 40,757,495 | 55,418,344 | 678,482 | 5,209,075 | 5,887,560 | 9,299,328 | 52,006,576 | 61,305,904 |
| Participant Contributions | 3,039,819 | 13,026,827 | 16,066,640 | 876,821 | 5,499,925 | 6,376,746 | 3,916,640 | 18,526,752 | 22,443,392 |
| Medicare Part D Reimbursement | 1,196,216 | 4,510,220 | 5,706,436 | - | - | - | 1,196,216 | 4,510,220 | 5,706,436 |
| Plan Amendments | - | - | - | - | - | - | - | - | - |
| Actuarial (Gain)/Loss | 14,986,568 | 89,093,448 | 104,080,116 | 397,076 | 3,465,599 | 3,862,675 | 15,383,744 | 92,559,047 | 107,942,791 |
| Benefits Paid | (11,220,108) | (47,466,557) | (58,686,665) | (737,141) | (4,623,757) | (5,360,898) | (11,957,249) | (52,090,314) | (64,047,563) |
| APBO, December 31, 2009 | $ 152,290,421 | $ 810,899,742 | $ 963,190,163 | $ 11,739,092 | $ 88,358,564 | $ 100,097,656 | $ 164,029,513 | $ 899,258,306 | $ 1,063,287,819 |
| APBO, January 1, 2010 | $ 152,290,421 | $ 810,899,742 | $ 963,190,163 | $ 11,739,092 | $ 88,358,564 | $ 100,097,656 | $ 164,029,513 | $ 899,258,306 | $ 1,063,287,819 |
| Service Cost | 6,854,686 | 5,418,105 | 12,272,791 | 243,549 | 137,735 | 381,284 | 7,098,235 | 5,555,840 | 12,654,075 |
| Interest Cost | 8,735,318 | 46,728,794 | 55,464,112 | 686,511 | 5,040,649 | 5,707,160 | 9,401,829 | 51,769,443 | 61,171,272 |
| Participant Contributions | 2,756,245 | 12,087,405 | 14,843,650 | 244,078 | 1,585,765 | 1,829,863 | 3,000,323 | 13,673,190 | 16,673,513 |
| Medicare Part D Reimbursement | 907,080 | 3,420,059 | 4,327,139 | - | - | - | 907,060 | 3,420,059 | 4,327,139 |
| Plan Amendments | - | - | - | - | - | - | - | - | - |
| Actuarial (Gain)/Loss | 13,348,525 | 81,576,038 | 94,924,563 | 880,169 | 2,008,903 | 2,889,072 | 14,228,694 | 83,584,941 | 97,813,635 |
| Benefits Paid | (11,031,100) | (48,939,252) | (59,970,352) | (656,490) | (4,265,245) | (4,921,735) | (11,687,590) | (53,204,497) | (64,892,087) |
| APBO, December 31, 2010 | $ 173,861,175 | $ 911,190,891 | $ 1,085,052,066 | $ 13,116,908 | $ 92,866,391 | $ 105,983,300 | $ 186,978,084 | $ 1,004,057,282 | $ 1,191,035,366 |

[1] We have estimated the allocation of some information for 2005 since this information was not available from the disclosure results provided by Mercer.



Exhibit 4

Energy Future Holdings Corp.
Historical Progression of Postretirement Welfare Plan Assets from January 1, 2005 through December 31, 2010

| | Health | | | Life | | | Health & Life | | |
|---|---|---|---|---|---|---|---|---|---|
| | Nonregulated | Oncor | Subtotal | Nonregulated | Oncor | Subtotal | Nonregulated | Oncor | Total |
| Fair Value of Plan Assets, 1/1/2005 | $ 18,883,956 | $ 160,246,108 | $ 179,130,064 | $ 3,317,454 | $ 46,263,630 | $ 49,581,084 | $ 22,201,410 | $ 206,509,738 | $ 228,711,148 |
| Employer Contributions[1] | 3,709,115 | 47,891,870 | 51,600,985 | - | - | - | 3,709,115 | 47,891,870 | 51,600,985 |
| Participant Contributions[1] | 2,505,330 | 11,814,417 | 14,319,747 | - | - | - | 2,505,330 | 11,814,417 | 14,319,747 |
| Benefits Paid[1] | (10,555,537) | (46,245,270) | (56,800,807) | (1,186,343) | (3,909,949) | (5,096,292) | (11,741,880) | (50,155,219) | (61,897,099) |
| Actual Return on Plan Assets[1] | 1,043,902 | 8,638,843 | 9,683,545 | 133,123 | 2,388,048 | 2,521,171 | 1,177,025 | 11,027,691 | 12,204,716 |
| Fair Value of Plan Assets, 12/31/2005 | $ 15,586,766 | $ 182,346,768 | $ 197,933,534 | $ 2,264,234 | $ 44,741,729 | $ 47,005,963 | $ 17,851,000 | $ 227,088,497 | $ 244,939,497 |
| | | | | | | | | | |
| Fair Value of Plan Assets, 1/1/2006 | $ 15,586,766 | $ 182,346,768 | $ 197,933,534 | $ 2,264,234 | $ 44,741,729 | $ 47,005,963 | $ 17,851,000 | $ 227,088,497 | $ 244,939,497 |
| Employer Contributions | 1,728,093 | 25,839,824 | 27,567,917 | - | - | - | 1,728,093 | 25,839,824 | 27,567,917 |
| Participant Contributions | 1,128,689 | 13,084,954 | 14,211,643 | - | - | - | 1,128,689 | 13,084,954 | 14,211,643 |
| Benefits Paid | (12,248,452) | (43,810,079) | (56,058,531) | (534,094) | (3,008,228) | (3,542,322) | (12,780,546) | (46,818,307) | (59,598,853) |
| Actual Return on Plan Assets | 987,665 | 16,314,941 | 17,302,606 | 268,464 | 5,812,032 | 6,080,496 | 1,256,129 | 22,126,973 | 23,383,102 |
| Fair Value of Plan Assets, 12/31/2006 | $ 7,182,761 | $ 193,776,408 | $ 200,959,169 | $ 1,998,604 | $ 47,545,533 | $ 49,544,137 | $ 9,181,365 | $ 241,321,941 | $ 250,503,306 |
| | | | | | | | | | |
| Fair Value of Plan Assets, 1/1/2007 | $ 7,182,761 | $ 193,776,408 | $ 200,959,169 | $ 1,998,604 | $ 47,545,533 | $ 49,544,137 | $ 9,181,365 | $ 241,321,941 | $ 250,503,306 |
| Employer Contributions | 11,375,282 | 33,322,020 | 44,697,302 | - | - | - | 11,375,282 | 33,322,020 | 44,697,302 |
| Participant Contributions | 1,197,676 | 15,723,772 | 16,921,448 | - | - | - | 1,197,676 | 15,723,772 | 16,921,448 |
| Benefits Paid | (11,422,182) | (45,850,314) | (57,272,495) | (650,469) | (3,970,057) | (4,620,526) | (12,072,651) | (49,820,371) | (61,893,022) |
| Actual Return on Plan Assets | 281,210 | 7,081,721 | 7,362,931 | 103,584 | 2,820,254 | 2,923,838 | 384,794 | 9,901,975 | 10,286,769 |
| Fair Value of Plan Assets, 12/31/2007 | $ 8,614,747 | $ 204,053,607 | $ 212,668,354 | $ 1,451,719 | $ 46,395,730 | $ 47,847,449 | $ 10,066,466 | $ 250,449,337 | $ 260,515,803 |
| | | | | | | | | | |
| Fair Value of Plan Assets, 1/1/2008 | $ 8,614,747 | $ 204,053,607 | $ 212,668,354 | $ 1,451,719 | $ 46,395,730 | $ 47,847,449 | $ 10,066,466 | $ 250,449,337 | $ 260,515,803 |
| Employer Contributions | 8,576,166 | 31,055,581 | 39,631,769 | - | - | - | 8,576,186 | 31,055,581 | 39,631,769 |
| Participant Contributions | 3,044,751 | 12,972,002 | 16,016,753 | - | - | - | 3,044,751 | 12,972,002 | 16,016,753 |
| Benefits Paid | (11,171,612) | (47,669,780) | (58,831,392) | (639,877) | (3,725,119) | (4,364,995) | (11,811,489) | (51,384,898) | (53,196,388) |
| Actual Return on Plan Assets | (1,799,862) | (42,550,854) | (44,350,716) | (243,457) | (10,045,902) | (10,289,359) | (2,043,319) | (52,596,756) | (54,640,075) |
| Revised Methodology Accounting Adjustment | (273,301) | 273,391 | - | (51,301) | 51,301 | - | (324,602) | 324,692 | - |
| Fair Value of Plan Assets, 12/31/2008 | $ 6,990,821 | $ 158,143,947 | $ 165,134,768 | $ 517,084 | $ 32,678,010 | $ 33,193,094 | $ 7,507,905 | $ 190,819,957 | $ 198,327,862 |
| | | | | | | | | | |
| Fair Value of Plan Assets, 1/1/2009 | $ 6,990,821 | $ 158,143,947 | $ 165,134,768 | $ 517,084 | $ 32,678,010 | $ 33,193,094 | $ 7,507,905 | $ 190,819,957 | $ 198,327,862 |
| Employer Contributions | 4,629,436 | 17,816,315 | 22,445,752 | 74,528 | - | 74,528 | 4,703,964 | 17,816,316 | 22,520,280 |
| Participant Contributions | 3,039,819 | 13,026,827 | 16,066,646 | 876,821 | 5,499,925 | 6,376,746 | 3,916,640 | 18,526,752 | 22,443,392 |
| Benefits Paid | (11,220,108) | (47,486,557) | (58,688,665) | (737,141) | (4,623,757) | (5,360,898) | (11,957,249) | (52,090,314) | (64,047,563) |
| Actual Return on Plan Assets | 894,000 | 25,683,585 | 26,577,585 | 24,218 | 4,951,541 | 4,975,759 | 918,218 | 30,635,126 | 31,553,344 |
| Fair Value of Plan Assets, 12/31/2009 | $ 4,333,968 | $ 167,204,118 | $ 171,538,086 | $ 755,510 | $ 38,503,719 | $ 39,259,229 | $ 5,089,478 | $ 205,707,837 | $ 210,797,315 |
| | | | | | | | | | |
| Fair Value of Plan Assets, 1/1/2010 | $ 4,333,968 | $ 167,204,118 | $ 171,538,086 | $ 755,510 | $ 38,503,719 | $ 39,259,229 | $ 5,089,478 | $ 205,707,837 | $ 210,797,315 |
| Employer Contributions | 5,116,715 | 17,918,462 | 23,035,177 | 1,032,303 | 449,046 | 1,481,349 | 6,149,018 | 18,367,508 | 24,516,526 |
| Participant Contributions | 2,758,245 | 12,087,405 | 14,843,650 | 244,078 | 1,585,785 | 1,829,863 | 3,000,323 | 13,673,190 | 16,673,513 |
| Benefits Paid | (11,031,100) | (48,939,252) | (59,970,352) | (656,480) | (4,265,245) | (4,921,735) | (11,687,580) | (53,204,497) | (64,892,087) |
| Actual Return on Plan Assets | 337,143 | 19,303,797 | 19,640,940 | 48,380 | 4,118,346 | 4,166,726 | 385,523 | 23,422,143 | 23,807,666 |
| Fair Value of Plan Assets, 12/31/2010 | $ 1,512,971 | $ 167,574,530 | $ 169,087,501 | $ 1,423,781 | $ 40,391,651 | $ 41,815,432 | $ 2,936,752 | $ 207,966,181 | $ 210,902,933 |

[1] We have estimated the allocation of some information for 2005 since this information was not available from the disclosure results provided by Mercer.

**EXHIBIT B**

The parties hereto acknowledge that RTCEH sponsors, maintains and administers (or if applicable, will sponsor, maintain and administer) the EFH Retirement Plan that covers certain current and future retirees whose employment included service with both Oncor (or a predecessor regulated electric business) and a non-regulated business of EFH (the "Split Participants"). For the avoidance of doubt, Oncor has elected to not participate, nor permit its employees to participate, in the EFH Retirement Plan. RTCEH shall for all purposes be the sponsor of the EFH Retirement Plan and RTCEH or its designee shall be plan administrator for the EFH Retirement Plan. The parties hereto further acknowledge and agree that the methods of allocating liabilities, costs and expenses associated with the EFH Retirement Plan among the participating entities that are in effect on the date hereof, including (i) the method of allocating any amount that may be required to be contributed to, or to an account for the benefit of, any trust established for the purpose of funding benefits under any EFH Retirement Plan and (ii) the method for allocating pension liabilities, costs and expenses (which method is described in the direct 2008 rate case testimony filed with the Public Utilities Commission of Texas by Don Shipman, and more specifically described in the letter from Aon Hewitt to EFH dated November 13, 2012, which is attached hereto as Annex A (together with any mutually-agreed upon updates to said allocations, the "Aon Hewitt Pension Letter")), are fair, appropriate and non-arbitrary, and that each such entity has borne its fair share of such liabilities, costs and expenses. RTCEH shall not alter or otherwise change the method pursuant to which the liabilities, costs and expenses associated with the EFH Retirement Plan have been allocated between RTCEH and Oncor without the prior written consent of Oncor, which consent shall not be unreasonably withheld, except that RTCEH as sponsor of the EFH Retirement Plan may amend the EFH Retirement Plan at any time, as required by federal laws, in order to ensure that the EFH Retirement Plan maintains its qualified plan status and is in compliance with the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). RTCEH further agrees it will not amend, modify or terminate the EFH Retirement Plan for a period of eighteen (18) months following the First Closing Date (as defined in the Merger Agreement) without the consent of Oncor, which consent will not be unreasonably withheld.

Funding the Underfunded Portion of the EFH Retirement Plan. If at any time the EFH Retirement Plan is underfunded and RTCEH delivers to Oncor a written notice requesting that Oncor fund all or a portion of the underfunded amount that is attributable to liabilities for which Oncor is primarily responsible, then Oncor shall promptly fund such amount requested by RTCEH in such notice.

**"Note to Form: The parties acknowledge and agree that they shall negotiate in good faith and cooperate to amend the foregoing paragraph prior to the occurrence of the First Closing under the Merger Agreement to reflect this paragraph's intent, the past practices and relationships of the parties thereto, and the outcome of any arrangements entered into by the parties with the Pension Benefit Guaranty Corporation in respect of the transactions contemplated under the Merger Agreement and any related transactions thereto."**

Case 14-10979-CSS    Doc 6097-1    Filed 09/18/15    Page 328 of 522

# ANNEX A

**Aon Hewitt Pension Letter dated November 13, 2012**



November 13, 2012

Mr. Robert Moussaid
Energy Future Holdings Corp.
Energy Plaza
1601 Bryan Street
Dallas, TX 75201-3411

Dear Robert,

Subject:   Documentation of Pension Plan Assignment—Revised

This letter documents the process that took effect on January 1, 2005, to (1) assign pension plan benefits, (2) calculate pension plan liabilities, (3) allocate pension plan assets, and (4) calculate pension costs for the following business segments that participate in the EFH Retirement Plan:

- Oncor Electric Delivery (Regulated Operations)
- Non-regulated EFH Operations
    - Mining (Luminant Mining Services)
    - Sandow
    - Other Genco (Luminant Power Services)
    - EFH Corp.
    - Retail (TXU Energy Retail)
    - Business Services (EFH Corp. Services)
    - Portfolio Management (Luminant Energy Services)
    - Discontinued Operations

This letter updates our previous letter dated January 3, 2012, to reflect the agreement between EFH and Oncor related to the allocation of pre-2002 service for certain employees of Business Services and EFH Corp.

Assignment of Pension Plan Benefits

Section 36.065 of the Public Utility Regulating Act provides that benefits attributable to the service of employees and retirees who were employed by the predecessor integrated electric utility before the utility's unbundling (as of January 1, 2002) shall be assigned to Oncor Electric Delivery. A copy of this section of the Act is attached for reference. As described below, the assignment of benefits depends on the date on which an individual separates from service as well as the business segment for which he or she works.

2711 North Haskell Avenue | Suite 600 | Dallas, TX 75204
t +1.214.989.0000 | f +1.214.989.2683 | aonhewitt.com
Proprietary & Confidential

Case 14-10979-CSS    Doc 6097-1    Filed 09/18/15    Page 336 of 522



Plan benefits for employees who separated from service with EFH prior to January 1, 2002, and did not subsequently transfer after January 1, 2005, are assigned as follows:

- Benefits for most pre-2002 terminations are fully assigned to the business segment based on the company code reported by EFH in the pension census data:

    - Benefits for those reported with company codes for Electric Delivery, Genco (including Mining and Sandow), or Retail are fully assigned to Oncor.

    - Benefits for those reported with company codes for Portfolio Management or Discontinued Operations are fully assigned to the business segment indicated by their reported company code.

- Benefits for pre-2002 terminations with a reported company code for Business Services or EFH Corp. are assigned as follows:

    - 64.43% of the benefit is assigned to Oncor.

    - 35.57% of the benefit is assigned to the business segment indicated by their reported company code.

The 64.43% allocation represents the average aggregate portion of the time that Business Services spent supporting the regulated electric utility as of January 1, 2002, as determined by EFH.

- Some plan participants were reported by EFH with two company codes and two corresponding monthly benefit fields. Benefits for these pre-2002 terminations were assigned directly based on the reported amounts.

Plan benefits for employees who separated from service with EFH on or after January 1, 2002, and did not subsequently transfer after January 1, 2005, are assigned as follows:

- Benefits for post-2001 terminations reported with company codes for Electric Delivery are fully assigned to Oncor.

- Benefits for post-2001 terminations reported with company codes for Portfolio Management or Discontinued Operations are fully assigned to the business segment indicated by their reported company code.

- Benefits for post-2001 terminations reported with company codes for Genco (including Mining and Sandow) or Retail are assigned as follows:

    - A portion of each plan participant's benefit is assigned to Oncor. The applicable portion is calculated as the ratio of (a) service as of December 31, 2001, over (b) total service at separation of employment.

    - The remaining portion of each plan participant's benefit is assigned to the business segment indicated by their reported company code at the time they separated from service. The remaining portion is calculated as the ratio of (a) service beginning January 1, 2002, over (b) total service at separation of employment.

- Benefits for post-2001 terminations with a reported company code for Business Services or EFH Corp. are assigned as follows:



- A portion of each plan participant's benefit is assigned to Oncor. The applicable portion is calculated as the ratio of (a) service as of December 31, 2001, over (b) total service at separation of employment. This ratio is further multiplied by 64.43%.

- The remaining portion of each plan participant's benefit is assigned to the business segment indicated by their reported company code at the time they separated from service. This portion includes 35.57% of the amount attributable to service as of December 31, 2001, plus the full amount attributable to service beginning January 1, 2002.

▪ Company codes as of January 1, 2002, were not available at the time the initial assignment of benefits was performed. Therefore, the assignment of benefits related to pre-2002 service is based on the company code reported as of January 1, 2005 (as a proxy for January 1, 2002). The calculations are generally based on credited service at separation of employment as reported by EFH. For cases where this information was not reported, the service was instead calculated from the vesting service date, if reported, or else from the hire date.

▪ Some plan participants were reported by EFH with two company codes and two corresponding monthly benefit fields. These data elements were not reflected in the assignment of benefits for post-2001 terminations.

Adoption of OPEB agreement

When the approach to assign benefits was first adopted in 2005, EFH was not concerned about the assignment of individual benefit amounts since all EFH and Oncor employees were covered by the same pension and retiree welfare plans. That situation changed during 2012 as a separate nonqualified pension plan has now been adopted by Oncor and the formulas for determining participant contributions to the retiree medical plan are scheduled to differ between Oncor and EFH beginning January 1, 2013.

Under the initial assignment, Business Services employees who terminated employment after January 1, 2005, were treated differently than similarly situated Business Services employees who terminated prior to that date. In recognition of the new situation regarding pension and retiree medical plans, EFH and Oncor agreed to assign benefits for all Business Services employees the same way, based on the approach previously used for pre-2005 terminations. EFH and Oncor also agreed to assign benefits for employees of EFH Corp. using the same approach as for employees of Business Services.

In recognition of this change, certain benefits were re-assigned during 2012 from Business Services and EFH Corp. to Oncor. At the same time, plan assets equal to the benefit obligation attributable to these re-assigned benefits were re-allocated from Business Services and EFH Corp. to Oncor. Because the prior assignment method has been communicated to and approved by the Public Utility Commission, Oncor asked that these benefits be separately identified and tracked. As a result, the associated benefit obligations, corresponding plan assets and resulting pension cost will not be included in rate case recovery.



### Transfers Between Business Segments

Plan benefits attributable to service prior to January 1, 2002, are assigned to business segments based on an employee's reported company code as of January 1, 2005, as described above. If an employee transfers between business segments after January 1, 2005, benefits attributable to service after January 1, 2002, are assigned to the business segment based on the company code reported as of separation of employment.

Multiple transfers between business segments and transfers prior to January 1, 2005, are not reflected in the assignment of benefits. Rather, benefits attributable to pre-2002 service are assigned based on the company code reported as of January 1, 2005, and benefits attributable to service after January 1, 2002, are assigned based on the company code reported as of separation of employment.

Exhibit 1 of this letter illustrates the process for some sample plan participants. Exhibit 2 graphically illustrates the process.

### Calculation of Pension Plan Liabilities

Once the pension benefit for each plan participant is assigned to each business segment, the relevant actuarial liabilities are calculated at each valuation date based on the assigned portions of the benefit.

### Accounting

Liabilities for ASC 715 (formerly known as FAS 87) accounting are:

- Accumulated benefit obligation ("ABO") is the actuarial present value of benefits, based on current service and pay. An individual's ABO is shared between business segments in the same proportion as the benefit is assigned.

- Projected benefit obligation ("PBO") is the actuarial present value of benefits, based on current service and pay projected to retirement or separation of employment. This measure is the basis for financial and regulatory reporting. An individual's PBO is shared between business segments in the same proportion as the benefit is assigned.

- Total benefit obligation ("TBO") is the actuarial present value of all benefits expected to be paid to an individual from the plan, including projected future service accruals. The difference between an individual's TBO and PBO (i.e. future service accruals) is fully borne by the current business segment.

- Service cost ("SC") is the actuarial present value of benefits earned during the current year calculated on a PBO basis. An individual's SC is fully borne by the current business segment.

Exhibit 3 of this letter shows the progression of the PBO from January 1, 2005, through December 31, 2010, for each business segment.



Liabilities for determination of the minimum funding requirements are allocated as follows:

- Target liability ("TL") is the actuarial present value of benefits, based on current service and pay (similar to ABO). This measure is the basis for statutory calculations under ERISA and the Pension Protection Act of 2006. An individual's TL is shared between business segments in the same proportion as the benefit is assigned.

- Target normal cost ("TNC") is the actuarial present value of benefits earned during the current year calculated on a TL basis. The portion of an individual's TNC associated with additional service accruals is fully borne by the current business segment. The portion of the individual's TNC associated with pay increases on past service benefits is shared between business segments in the same proportion as the benefit is assigned.

Prior to January 1, 2008, the liabilities for plan funding were calculated differently based on the funding methods allowed prior to the Pension Protection Act of 2006. The attribution of accrued liability was similar to the current approach; the attribution of the normal cost was dependent on the specific funding method being used.

Benefit payments made from the pension plan trust are reported by the trustee; however, the trustee does not assign each individual's benefit to the separate business segments. Therefore, the aggregate benefit payment amount is allocated to the business segments each year in proportion to the expected benefit payment amount for the year that is implicit in the actuarial calculation of plan liabilities.

As of January 1, 2005, the fair value of plan assets was allocated to each business segment in proportion to TBO, calculated as described above. Exhibit 4 of this letter shows the initial allocation of the fair value of plan assets as of January 1, 2005.

Each subsequent year, the fair value of plan assets for each business segment is tracked by:

- Adding employer contributions allocated among business segments as determined by EFH.
- Subtracting benefit payments based on the assignment described above.
- Reflecting a proportionate share of investment returns, net of plan expenses.

Exhibit 5 of this letter shows the progression of the fair value of assets from January 1, 2005, through December 31, 2010, for each business segment.

The market-related value of plan assets is determined separately for regulated and non-regulated operations, and then allocated among the non-regulated business segments in proportion to fair value of assets. To determine the separate market-related value of assets for the regulated and non-regulated operations, asset gains/losses and plan expenses are allocated in proportion to a weighted average fair value of assets.



### Allocation of Pension Liability

#### Accounting Balances

The following procedures were used to allocate the accounting balances among business segments at January 1, 2005:

- The unrecognized net transition obligation and associated amortizations were allocated to each business segment in proportion to PBO.

- The unrecognized prior service cost and associated amortizations were allocated to each business segment in proportion to remaining future service of participants.

- The net amount recognized on the balance sheet was allocated to each business segment in proportion to the funded status (PBO less fair value of plan assets).

- The unrecognized net gain/loss was allocated to each business segment as a balancing item.

The initial accounting balances were established for each business segment at January 1, 2005. Each subsequent year, the balances are tracked based on the amortization amount and newly established bases for the year. New prior service cost bases are calculated for each business segment based on the impact of plan changes on the benefits assigned as described above. New net gains/losses are calculated directly for each business segment based on the differences between expected and actual experience on assigned plan liabilities and tracked assets.

Effective October 10, 2007, Energy Future Holdings Corp. recognized purchase accounting for the non-regulated operations. As a result, all unrecognized accounting balances attributable to non-regulated operations were eliminated at that time.

#### Pension Expense

The pension expense under ASC 715 (formerly known as FAS 87) for each business segment is calculated as follows:

- Service cost is calculated separately for each business segment as described above.

- Interest cost is determined for each business segment based on the PBO calculated separately for each business segment as described above.

- Expected return on plan assets is calculated separately for each business segment based on the assets tracked for each business segment as described above.

- The net transition obligation is amortized for each business segment in accordance with the initial allocation described above.

- Prior service costs are amortized for each business segment in accordance with the initial allocation and treatment of subsequent plan changes as described above.

- The amortization of net (gains)/losses is determined separately for regulated and non-regulated operations, and then allocated proportionally over the non-regulated business segments.



The valuation assumptions used for the plan are determined as follows:

- A single discount rate is determined based on the aggregate plan cash flows.
  - Upon evaluation of the discount rate separately for regulated and non-regulated operations, the rate was found not to be significantly different.
- Since the investment policy has historically been the same for the regulated and non-regulated operations, a single expected rate of return assumption has been used.
  - In the event the investment policies for regulated and non-regulated operations are significantly different, the expected return assumption would be determined separately.
- Other valuation assumptions are generally applied consistently for all business segments, unless future expectations warrant differences.

For your reference, I have also attached the 2008 rate case testimony prepared by Don Shipman which provides additional details of the benefit assignment and cost calculations. I hope this provides you sufficient documentation for your files.

Let us know if you have any questions.

Sincerely,

Aon Hewitt

Alan S. Taper
FSA, EA
Partner

AST:mct 03509L036
cc: Mr. Brian Levine, Aon Hewitt
    Mr. Joe Lopez, Aon Hewitt
    Mr. Brian Walker, Aon Hewitt

Case 14-10979-CSS    Doc 6097-1    Filed 09/18/15    Page 336 of 522



Exhibit 1

Assignment of Benefits for Sample Plan Participants

Pre-2002 Formulas

| | Oncor Electric Delivery | Genco, Retail | EFH Corp., Business Services | Portfolio Mgmt., Discontinued Ops. |
|---|---|---|---|---|
| Eligibility Date | 01/01/1993 | 01/01/1993 | 01/01/1993 | 01/01/1993 |
| Separation Date | 12/31/2000 | 12/31/2000 | 12/31/2000 | 12/31/2000 |
| | | | | |
| Regulated Portion | 100.00% | 100.00% | 64.43% | 0.00% |
| | | | | |
| Total Benefit | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 |
| Regulated Benefit[1] | 1,000.00 | 1,000.00 | 644.30 | 0.00 |
| Nonregulated Benefit[2] | 0.00 | 0.00 | 355.70 | 1,000.00 |

Post-2001 Formulas

| | Oncor Electric Delivery | Genco, Retail | EFH Corp., Business Services | Portfolio Mgmt., Discontinued Ops., Business Services |
|---|---|---|---|---|
| Eligibility Date | 01/01/1996 | 01/01/1996 | 01/01/1996 | 01/01/1996 |
| Separation Date | 12/31/2003 | 12/31/2003 | 12/31/2003 | 12/31/2003 |
| | | | | |
| Pre-2002 Service | 6.0 years | 6.0 years | 6.0 years | 6.0 years |
| Post-2001 Service | 2.0 years | 2.0 years | 2.0 years | 2.0 years |
| Pre-2002 Ratio | N/A | 75.00% | 75.00% | N/A |
| | | | | |
| Regulated Portion of Pre-2002 Benefit | 100.00% | 100.00% | 64.43% | 0.00% |
| | | | | |
| Total Benefit | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 |
| Regulated Benefit[1] | 1,000.00 | 750.00 | 483.23 | 0.00 |
| Nonregulated Benefit[2] | 0.00 | 250.00 | 516.77 | 1,000.00 |

---

[1] Assigned to Oncor Electric Delivery.
[2] Assigned to the non-regulated business segment reported at separation.

Exhibit 2





1. Some individuals reported in these business units had specific pension benefit amounts indicated as Electric Delivery; postretirement welfare plan benefits were assigned in proportion to the resulting pension benefit assignments.

Exhibit 3



Projection of Accrued Benefit Obligation by Business Segment

| | Minting | Sandow | Other Genco | Total Genco | EFH Corp. | Retail | Business Services | Portfolio Management | Subtotal Non-regulated | Discontinued Operations | Total Non-regulated | Oncor | Total Plan |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Projected Benefit Obligation, January 1, 2005 | $ 21,519,507 | $ 1,363,652 | 44,951,467 | $ 67,844,656 | 18,563,234 | 14,515,382 | 85,541,911 | 14,792,131 | 199,877,715 | 505,261,119 | 704,938,834 | 1,469,155,459 | $ 2,174,085,933 |
| Service Cost | 5,070,631 | 441,014 | 11,645,339 | 17,157,003 | 117,567 | 1,331,617 | 1,240,722 | 750,222 | 20,617,511 | 117,788 | 20,735,299 | 14,680,204 | 35,415,503 |
| Interest Cost | 1,282,548 | 81,685 | 2,694,602 | 4,048,815 | 2,181,700 | 695,457 | 5,017,462 | 878,630 | 12,986,404 | 27,013,801 | 40,003,205 | 66,372,821 | 129,276,029 |
| Plan Amendments | | | | | | | | | | | | | |
| Actuarial (Gain)/Loss | (382,936) | (7,015) | (730,146) | (1,120,155) | (755,323) | (385,834) | (4,138,613) | (363,692) | (6,320,083) | (47,017,970) | (56,627,656) | (67,523,516) | (124,351,173) |
| Benefits Paid | | | | | | | | | | | | | |
| Projected Benefit Obligation, December 31, 2005 | $ 29,735,011 | $ 2,097,493 | 63,398,946 | 95,272,420 | 15,195,099 | 16,627,522 | 83,258,369 | 16,909,544 | 237,442,954 | 34,148,343 | 757,377,235 | 1,806,304,312 | $ 2,363,681,547 |
| Projected Benefit Obligation, January 1, 2006 | $ 29,735,011 | $ 2,097,493 | 63,398,946 | 95,272,420 | 15,195,099 | 16,627,522 | 83,258,369 | 16,909,544 | 237,442,954 | 34,148,343 | 757,377,235 | 1,806,304,312 | $ 2,363,681,547 |
| Service Cost | 5,982,574 | 436,632 | 13,430,994 | 19,872,170 | 59,969 | 826,805 | 83,264,369 | 1,045,297 | 23,362,932 | 197,659 | 23,560,451 | 16,690,658 | 40,251,148 |
| Interest Cost | 1,689,321 | 115,788 | 3,476,157 | 5,281,476 | 712,573 | 587,667 | 5,145,341 | 1,044,431 | 12,741,468 | 20,386,180 | 42,177,648 | 90,154,515 | 133,332,163 |
| Plan Amendments | | | | | | | | | | | | | |
| Actuarial (Gain)/Loss | (530,471) | (169,308) | (4,066,048) | (4,665,727) | (2,206,975) | (6,536,359) | (3,155,342) | 1,167,514 | (15,503,087) | 655,622 | (14,808,067) | (28,871,047) | (43,838,114) |
| Benefits Paid | (14,600,112) | | | (5,261,476) | (25,276) | (3,150,947) | (5,561,916) | (41,911) | (8,888,729) | (35,141,503)? | (38,650,722)? | (72,209,477)? | (111,119,699)? |
| Projected Benefit Obligation, December 31, 2006 | $ 36,306,513 | $ 2,532,486 | 74,163,804 | 113,002,803 | 12,111,727 | 11,336,072 | 93,098,493 | 19,735,815 | 249,294,900 | 520,042,035 | 769,337,035 | 1,611,549,001 | $ 2,380,947,026 |
| Projected Benefit Obligation, January 1, 2007 | $ 36,306,513 | $ 2,532,486 | 74,163,804 | 113,002,803 | 12,111,727 | 11,336,072 | 93,098,493 | 19,735,815 | 249,294,900 | 520,042,035 | 769,337,035 | 1,611,549,001 | $ 2,380,947,026 |
| Service Cost | 6,148,350 | 395,550 | 11,800,004 | 18,382,904 | 91,450 | 935,314 | 1,667,252 | 869,466 | 21,310,908 | 144,614 | 22,055,192 | 15,565,153 | 38,614,315 |
| Interest Cost | 2,190,310 | 196,121 | 4,326,931 | 6,655,362 | 905,283 | 649,642 | 5,501,216 | 1,102,933 | 14,872,430 | 23,880,403 | 44,733,929 | 64,079,748 | 138,813,076 |
| Plan Amendments | | | | | | | | | | | | | |
| Actuarial (Gain)/Loss | (3,208,504) | (608,494) | (8,841,551) | (12,618,689) | 3,378,866 | (723,231) | (2,522,760) | (2,113,609) | (14,894,405) | (33,951,072) | (47,553,461) | (124,242,924) | (171,901,405) |
| Benefits Paid | (982,325) | (23,717) | (1,093,853) | (2,419,959) | (1,888,243) | (916,721) | (4,381,359) | (731,252) | (9,924,983) | (111,612) | (14,016,319) | (74,181,283) | (118,178,589) |
| Projected Benefit Obligation, December 31, 2007 | $ 40,632,223 | $ 2,472,625 | 76,877,025 | 122,992,444 | 14,763,103 | 11,650,276 | 93,288,271 | 18,837,855 | 281,519,659 | 483,004,587 | 744,524,246 | 1,523,771,896 | $ 2,208,295,944 |
| Projected Benefit Obligation, January 1, 2008 | $ 40,632,223 | $ 2,472,625 | 76,877,025 | 122,992,444 | 14,763,103 | 11,650,276 | 93,288,271 | 18,837,855 | 281,519,659 | 483,004,587 | 744,524,246 | 1,523,771,896 | $ 2,208,295,944 |
| Service Cost | 6,589,457 | 477,951 | 10,900,822 | 18,916,225 | 50,392 | 1,111,537 | 1,298,353 | 907,363 | 20,276,677 | 95,663 | 20,372,335 | 15,161,659 | 35,530,194 |
| Interest Cost | 2,058,312 | 192,256 | 5,311,972 | 8,202,614 | 600,330 | 764,250 | 5,402,178 | 1,345,446 | 16,520,341 | 31,002,007 | 48,257,388 | 96,141,271 | 144,398,758 |
| Plan Amendments | 472,037 | (47,531) | 895,535 | 1,565,845 | (1,136,189) | 48,342 | (10,110,820) | 1,889,020 | (7,992,601) | (1,896,831) | (5,884,831) | (46,818,684) | (92,514,515) |
| Actuarial (Gain)/Loss | (46,798,089) | 217,083 | (2,075,061) | (2,522,165) | (843,966) | (388,159) | (4,861,359) | (658,489) | (14,891,686) | (15,272,100) | (44,307,924) | (13,773,165) | (119,957,110) |
| Benefits Paid | (46,376,505) | 3,462,147 | 64,500,879 | 148,661,531 | 13,016,214 | 12,883,247 | 85,527,690 | 21,803,411 | 279,722,409 | 493,646,261 | 783,371,654 | 1,512,577,018 | $ 2,275,948,672 |
| Projected Benefit Obligation, December 31, 2008 | $ 46,376,505 | $ 3,462,147 | 64,500,879 | 148,661,531 | 13,016,214 | 12,883,247 | 85,527,690 | 21,803,411 | 279,722,409 | 493,646,261 | 783,371,654 | 1,512,577,018 | $ 2,275,948,672 |
| Projected Benefit Obligation, January 1, 2009 | $ 46,378,505 | $ 3,462,147 | 64,500,879 | 148,661,531 | 13,016,214 | 12,883,247 | 85,527,690 | 21,803,411 | 279,722,409 | 493,646,261 | 783,371,654 | 1,510,617,018 | $ 2,275,988,672 |
| Service Cost | 5,919,055 | 467,724 | 11,166,653 | 17,553,432 | 45,695 | 1,337,610 | 2,027,136 | 909,066 | 21,048,621 | 68,664 | 21,117,905 | 15,726,149 | 36,852,753 |
| Interest Cost | 3,498,315 | 285,284 | 6,825,530 | 10,577,129 | 720,827 | 1,006,830 | 5,944,949 | 1,471,512 | 19,820,247 | 31,361,985 | 50,822,217 | 103,712,784 | 154,534,996 |
| Plan Amendments | | | | | | | | | | | | | |
| Actuarial (Gain)/Loss | 7,396,865 | 663,464 | 19,346,683 | 27,426,142 | (1,202,351) | 3,301,257 | 12,380,327 | 3,016,745 | 41,145,168 | 37,517,050 | 82,863,295 | 223,852,314 | 306,026,472 |
| Benefits Paid | (1,577,940) | (50,477) | (2,833,195) | (4,490,085) | (1,272,245) | (870,201) | (4,944,642) | (1,106,740) | (12,554,513) | (34,096,920) | (46,943,433) | (81,743,522) | (128,386,956) |
| Transfer* | 972,415 | 191,119 | 7,559,661 | 8,690,483 | 279,501 | 2,685,066 | 3,076,500 | 2,459,601 | 17,157,938 | 385,556 | 17,506,494 | 7,926,822 | 25,440,460 |
| Projected Benefit Obligation, December 31, 2009 | $ 64,725,334 | $ 5,620,288 | 136,866,010 | 206,624,112 | 11,584,958 | 20,342,789 | 103,041,268 | 28,551,915 | 370,141,070 | 518,018,384 | 880,164,454 | 1,782,010,954 | $ 2,671,165,418 |
| Projected Benefit Obligation, January 1, 2010 | $ 64,725,334 | $ 5,620,288 | 136,885,510 | 206,624,112 | 11,584,958 | 20,342,789 | 103,041,268 | 28,551,915 | 370,141,070 | 518,018,384 | 880,164,454 | 1,782,010,954 | $ 2,671,165,418 |
| Service Cost | 5,847,740 | 504,961 | 72,115,780 | 18,967,813 | 52,696 | 1,430,458 | 1,255,871 | 847,076 | 22,556,048 | 81,117 | 22,237,165 | 18,938,027 | 41,127,762 |
| Interest Cost | 4,233,984 | 215,741 | 8,762,928 | 13,212,653 | 612,425 | 1,269,726 | 5,753,795 | 1,567,095 | 22,535,575 | 29,449,300 | 51,974,960 | 103,845,337 | 154,620,277 |
| Plan Amendments | | | | | | | | | | | | | |
| Actuarial (Gain)/Loss | 18,078,604 | (740,309) | 34,340,773 | 52,277,329 | (2,387,831) | 3,702,166 | 4,348,847 | 2,681,657 | 60,612,328 | 182,567 | 60,794,895 | 178,127,339 | 239,922,244 |
| Benefits Paid | (1,769,010) | (80,055) | (3,890,622) | (5,644,967) | (896,014) | (731,142) | (4,108,266) | (369,756) | (12,553,220) | (28,945,959) | (41,449,179) | (78,456,595) | (119,945,206) |
| Projected Benefit Obligation, December 31, 2010 | $ 91,765,912 | $ 4,779,723 | 168,704,079 | 265,283,730 | 8,972,857 | 26,067,023 | 110,291,193 | 32,777,086 | 482,601,961 | 518,780,414 | 883,182,275 | 2,003,994,347 | $ 2,967,073,022 |

*Transfer related to CSRP amendment.

 Hewitt

Exhibit 4

Initial Allocation of Asset Value as of January 1, 2005

EFH Retirement Plan

| Business Segment | Total Benefit Obligation | | Fair Value of Assets | |
|---|---|---|---|---|
| Mining | $ | 71,590,951 | $ | 55,553,391 |
| Sandow | | 5,307,974 | | 4,118,900 |
| Other Genco | | 157,667,263 | | 122,347,182 |
| Total Genco | $ | 234,566,189 | $ | 182,019,473 |
| EFH Corp. | | 17,896,528 | | 13,887,409 |
| Retail | | 32,098,640 | | 24,908,013 |
| Business Services | | 98,605,699 | | 76,516,387 |
| Portfolio Management | | 24,743,162 | | 19,200,284 |
| Subtotal Non-regulated | $ | 407,910,218 | $ | 316,531,566 |
| Discontinued Operations | | 506,082,187 | | 392,711,385 |
| Total Non-regulated | $ | 913,992,405 | $ | 709,242,951 |
| Oncor | | 1,625,957,146 | | 1,261,715,781 |
| Total Plan | $ | 2,539,949,551 | $ | 1,970,958,732 |

Note: Fair value of assets was allocated in proportion to total benefit obligation calculated as of
January 1, 2005.

Exhibit 5



| | Mining | Sandow | Other Genco | Total Genco | EFH Corp. | Retail | Business Services | Portfolio Management | Subtotal Non-regulated | Discontinued Operations | Total Non-regulated | Oncor | Total Plan |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fair Value of Plan Assets, January 1, 2005 | 55,550,391 | 4,118,000 | 122,347,182 | 182,019,473 | 13,887,409 | 24,908,013 | 75,516,397 | 18,200,264 | 315,531,556 | 382,711,385 | 708,242,851 | 1,261,716,781 | 1,970,958,752 |
| Employer Contributions | | | | | | | | | | | | | |
| Benefits Paid | (382,995) | (7,075) | (720,144) | (1,120,155) | (3,322,489) | (365,834) | (4,138,613) | (363,602) | (9,320,693) | (47,506,970) | (56,827,663) | (67,523,516) | (124,351,179) |
| Actual Return/(Loss) on Plan Assets | 3,592,141 | 260,334 | 7,716,468 | 11,679,663 | 773,098 | 1,664,084 | 4,709,449 | 1,203,089 | 19,720,664 | 23,539,914 | 43,069,578 | 77,670,194 | 120,747,742 |
| Fair Value of Plan Assets, December 31, 2005 | 58,672,596 | 4,372,159 | 128,333,506 | 192,376,261 | 11,328,019 | 26,196,263 | 77,087,723 | 20,038,771 | 326,069,537 | 368,544,229 | 695,463,888 | 1,271,871,429 | 1,967,335,295 |
| Fair Value of Plan Assets, January 1, 2006 | 58,672,596 | 4,372,159 | 128,333,506 | 192,376,261 | 11,328,019 | 26,196,263 | 77,087,723 | 20,038,771 | 326,069,537 | 368,544,229 | 695,463,888 | 1,271,871,429 | 1,967,335,295 |
| Employer Contributions | | | | | | | | | | | | | |
| Benefits Paid | (470,122) | (24,060) | (2,076,315) | (2,567,636) | (1,818,920) | (490,553) | (3,096,290) | (414,931) | (8,698,225) | (30,141,507) | (38,836,752) | (72,738,477) | (111,678,269) |
| Actual Return/(Loss) on Plan Assets | 7,196,493 | 537,126 | 5,799,326 | 23,532,955 | 1,265,342 | 3,190,283 | 9,265,394 | 2,442,055 | 39,726,518 | 43,529,731 | 83,256,249 | 136,529,218 | 219,694,327 |
| Fair Value of Plan Assets, December 31, 2006 | 65,388,967 | 4,886,196 | 143,056,567 | 213,343,720 | 11,004,423 | 28,895,993 | 82,603,351 | 22,070,343 | 357,047,830 | 381,932,553 | 735,000,383 | 1,335,781,230 | 2,075,661,613 |
| Fair Value of Plan Assets, January 1, 2007 | 65,388,967 | 4,886,196 | 143,056,567 | 213,343,720 | 11,004,423 | 28,895,993 | 82,603,351 | 22,070,343 | 357,047,830 | 381,932,553 | 735,000,383 | 1,335,781,230 | 2,075,661,613 |
| Employer Contributions | | | | | | | | | | | | | |
| Benefits Paid | (692,356) | (23,717) | (1,593,862) | (2,418,326) | (1,889,243) | (915,721) | (4,507,854) | (791,442) | (9,824,936) | (24,054,063) | (44,016,915) | (74,161,291) | (118,176,180) |
| Actual Return/(Loss) on Plan Assets | 4,948,688 | 325,051 | 9,517,931 | 14,192,941 | 676,743 | 1,910,005 | 5,379,184 | 1,450,157 | 23,817,985 | 24,412,788 | 48,230,686 | 89,610,785 | 134,341,461 |
| Fair Value of Plan Assets, December 31, 2007 | 69,945,329 | 5,190,720 | 150,980,076 | 226,116,925 | 9,094,523 | 30,295,277 | 83,524,591 | 22,729,458 | 371,693,674 | 372,253,250 | 743,014,130 | 1,349,546,879 | 2,093,762,809 |
| Fair Value of Plan Assets, January 1, 2008 | 68,945,329 | 5,190,720 | 150,980,076 | 226,116,925 | 9,094,523 | 30,295,277 | 83,524,591 | 22,729,458 | 371,693,674 | 372,253,250 | 743,014,130 | 1,349,546,879 | 2,093,762,809 |
| Employer Contributions | | | | | 4,800,000 | | 9,800,000 | | 14,600,000 | 160,076,870 | 160,075,363 | 45,640,473 | 2,033,762,809 |
| Benefits Paid | (1,123,844) | (46,789) | (2,726,048) | (2,297,455) | (1,013,482) | (898,198) | (4,361,256) | (908,488) | (10,016,702) | (33,273,962) | (43,290,664) | (75,794,026) | (119,821,719) |
| Actual Return/(Loss) on Plan Assets | (13,475,938) | (1,018,029) | (28,545,510) | (44,356,568) | (1,888,974) | (5,091,913) | (4,861,959) | (4,384,625) | (70,077,449) | (77,988,887) | (152,007,420) | (262,645,721) | (492,653,349) |
| Fair Value of Plan Assets, December 31, 2008 | 54,346,607 | 4,123,922 | 119,314,021 | 177,784,550 | 11,192,067 | 23,705,168 | 72,365,998 | 17,349,344 | 302,426,627 | 381,277,066 | 663,653,693 | 1,057,709,405 | 1,721,983,296 |
| Fair Value of Plan Assets, January 1, 2009 | 54,346,607 | 4,123,922 | 119,314,021 | 177,784,550 | 11,192,067 | 23,705,168 | 72,365,998 | 17,349,344 | 302,426,627 | 381,277,066 | 663,653,693 | 1,057,709,405 | 1,721,983,296 |
| Employer Contributions | (1,233,507) | 259,026 | 10,109,653 | 11,002,266 | 348,899 | 3,834,616 | 4,088,735 | 3,280,966 | 22,955,414 | 18,692,377 | 41,071,791 | 53,455,212 | 1,721,962,298 |
| Benefits Paid | (1,577,349) | (89,470) | (2,879,195) | (4,460,635) | (1,272,245) | (970,201) | (4,444,442) | (1,106,740) | (12,524,513) | (34,098,920) | (46,623,433) | (81,743,822) | (128,380,965) |
| Actual Return/(Loss) on Plan Assets | 9,291,695 | 703,308 | 20,209,509 | 30,169,162 | 2,071,263 | 3,996,046 | 11,017,077 | 2,692,426 | 50,981,649 | 61,928,462 | 112,750,131 | 179,056,978 | 291,857,128 |
| Fair Value of Plan Assets, December 31, 2009 | 63,204,949 | 5,025,817 | 146,687,416 | 215,098,173 | 12,071,203 | 30,467,631 | 63,627,158 | 22,455,002 | 383,708,177 | 407,108,205 | 770,816,382 | 1,218,490,073 | 1,889,306,455 |
| Fair Value of Plan Assets, January 1, 2010 | 63,204,949 | 5,025,817 | 146,687,416 | 215,098,173 | 12,071,203 | 30,467,631 | 63,627,158 | 22,455,002 | 383,708,177 | 407,108,205 | 770,816,382 | 1,218,490,073 | 1,889,306,455 |
| Employer Contributions | (1,760,010) | (65,056) | (3,895,922) | (5,844,867) | (408,286) | (731,147) | (4,108,240) | (969,796) | (12,533,320) | (28,945,899) | (41,479,179) | (78,466,030) | (119,945,309) |
| Benefits Paid | 8,316,716 | 690,760 | 19,344,259 | 28,330,737 | 1,502,527 | 4,016,584 | 10,892,544 | 2,934,363 | 47,729,735 | 52,429,199 | 100,158,924 | 159,991,940 | 292,119,864 |
| Actual Return/(Loss) on Plan Assets | | | | | | | | | | | | | |
| Fair Value of Plan Assets, December 31, 2010 | 59,753,849 | 5,627,522 | 162,220,752 | 237,573,323 | 12,734,716 | 33,756,046 | 80,411,425 | 24,429,379 | 398,705,692 | 407,108,205 | 825,496,127 | 1,340,483,063 | 2,198,981,210 |

**Exhibit H**

**Private Letter Ruling**

The following are the "Required Rulings":

(1)    The Reorganized TCEH Spin-Off[3] will satisfy the continuity of business enterprise requirement set forth in Treasury Regulations Section 1.368-1(d).

(2)    The TCEH First Lien Creditors will be treated as holding a proprietary interest in EFH prior to the Reorganization pursuant to Treasury Regulations Section 1.368-1(e), and the continuity of interest requirement of Treasury Regulations Section 1.368-1(e) will be satisfied with respect to the Reorganization.

(3)    The TCEH First Lien Debt will not be treated as assumed by Spinco for purposes of Section 357(c) and (d).

(4)    The TCEH First Lien Debt that is classified as term loans (excluding any term loans issued in 2013) or notes constitutes "securities" of EFH for purposes of Section 355 and Section 368(a)(1)(G).

(5)    Each of the EFH SAG and the Spinco SAG will be engaged in the active conduct of a trade or business (within the meaning of Section 355(b)) immediately after the Reorganized TCEH Spin-Off.

(6)    The Reorganization will satisfy the continuity of business enterprise requirement set forth in Treasury Regulations Section 1.355-1(b).

(7)    The TCEH First Lien Creditors, the unsecured TCEH creditors, the unsecured EFH Creditors and the unsecured EFIH Creditors, to the extent such creditors receive Common Stock in the Issuance, will be treated as "owners of the enterprise" with respect to EFH for purposes of Treasury Regulations Section 1.355-2(c)(1), and the continuity of interest requirement of Treasury Regulations Section 1.355-2(c)(1) will be satisfied, notwithstanding the Merger and the Oncor Restructuring.

(8)    (i) Persons receiving Reorganized Company Common Stock pursuant to the Plan of Reorganization will not be aggregated for purposes of applying Section 355(d) to the Reorganized TCEH Spin-Off and (ii) persons acquiring Parent Common Shares pursuant to or in connection with the Rights Offering, the Equity Commitment Letter, and the Backstop Agreement will not be considered for purposes of applying Section 355(d) to the Reorganized TCEH Spin-Off, provided, however, that with respect to clause (ii) of the foregoing, the ruling may alternatively provide that (1) the anti-avoidance rule does not apply with respect to the Merger or (2) persons acquiring Parent Common Shares pursuant to or in connection with the Rights Offering, the Equity Commitment Letter, and the

---

[3]    Capitalized terms in this Exhibit H that are not defined in this Agreement shall have the meanings given such terms in the Ruling Request.

Exhibit H

Backstop Agreement will not be treated as acquiring Reorganized EFH Common Stock by "purchase" within the meaning of Section 355(d).

(9)   Section 355(e) will not apply to (a) the Reorganized TCEH Spin-Off or any post-Distribution transfers of EFH stock or Spinco stock; (b) the issuance of Reorganized EFH stock; (c) the Merger and other steps contemplated by the Plan of Reorganization; or (d) any subsequent registration of the OV1 stock pursuant to registration rights granted to the holders thereof.

(10)  Section 355(g) will not apply to the Reorganized TCEH Spin-Off.

(11)  (i) EFH Corp. will be respected as the seller of the Preferred Stock Entity's preferred stock for U.S. federal income tax purposes; (ii) for U.S. federal income tax purposes, (x) upon Reorganized TCEH's conversion to a corporation under Delaware law, EFH Corp. will be treated as contributing both the Common Stock of the Preferred Stock Entity and the other assets subject to the Contribution (other than the assets transferred to the Preferred Stock Entity) to Reorganized TCEH in exchange for all of Reorganized TCEH's stock, and such contribution will be treated as occurring immediately after EFH Corp.'s sale of the Preferred Stock Entity's preferred stock, and (y) upon the Distribution, EFH Corp. will be treated as distributing the stock of Reorganized TCEH to the TCEH First Lien Creditors, and such distribution will be treated as occurring immediately after EFH Corp.'s contribution to Reorganized TCEH, described above; and (iii) EFH Corp.'s pre-arranged sale of the Preferred Stock Entity's preferred stock will be taken into account for purposes of the "control immediately after" test under Section 351 of the Internal Revenue Code.

(12)  EFH's earnings and profits will be allocated between EFH and Spinco pursuant to Treasury Regulations Section 1.312-10(a) in proportion to the relative fair market values of the business or businesses (and interests in any other properties) retained by EFH and the business or businesses (and interests in any other properties) of Spinco immediately after the Distribution. For purposes of determining their relative fair market values and shares of earnings and profits, the value of Spinco and EFH shall be determined immediately following the Distribution, without regard to any new capital contributed to EFH, but taking into account the value of EFH stock provided to creditors with respect to their claims. For purposes of this determination, the amount of EFH's earnings and profits to be allocated shall include any cancellation of indebtedness income resulting from the satisfaction or cancellation of all claims against any of the TCEH Debtors (as defined in the Plan of Reorganization).

(13)  Oncor's electrical transmission and distribution system(s) and related regulatory assets (the "System") is (exclusive of certain System assets not to comprise more than 12.5% of the total value of the System) is a real estate asset within the meaning of Sections 856(c)(4)(A) and (c)(5)(B).

(14)  Neither EFH's and Oncor's activities with respect to the System nor the Transactions will cause amounts received under the lease of the System to be treated as other than "rents from real property" under Section 856.

Exhibit H

## Exhibit I

**Form of Tax Matters Agreement**

Exhibit I

**Exhibit I**

**Form of Tax Matters Agreement**

FORM OF

TAX MATTERS AGREEMENT

BY AND AMONG

ENERGY FUTURE HOLDINGS CORP.,

ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC

AND

[REORGANIZED TCEH]

DATED AS OF [THE EFFECTIVE DATE]

## Table of Contents

Page

ARTICLE I Definitions .................................................................................................... 3

    Section 1.01    General ............................................................................................ 3
    Section 1.02    Construction ................................................................................... 10
    Section 1.03    References to Time ......................................................................... 11

ARTICLE II Preparation, Filing, and Payment of Taxes Shown Due on Tax Returns ............... 11

    Section 2.01    Tax Returns ................................................................................... 11
    Section 2.02    Tax Return Procedures .................................................................. 11
    Section 2.03    Straddle Period Tax Allocation ..................................................... 13
    Section 2.04    Allocation of Taxes ....................................................................... 13
    Section 2.05    Allocation of Separation-Related Taxes. ...................................... 15
    Section 2.06    Audits/Redeterminations. .............................................................. 15
    Section 2.07    Expenses ....................................................................................... 15
    Section 2.08    Timing of Payments ...................................................................... 16

ARTICLE III Indemnification .......................................................................................... 16

    Section 3.01    Indemnification by the EFH Parties .............................................. 16
    Section 3.02    Indemnification by Reorganized TCEH ........................................ 16
    Section 3.03    Characterization of and Adjustments to Payments ........................ 16
    Section 3.04    Timing of Indemnification Payments ............................................ 16
    Section 3.05    Exclusive Remedy ........................................................................ 17
    Section 3.06    No Duplicative Payment ................................................................ 17

ARTICLE IV Refunds, Timing Differences, and Tax Attributes ......................................... 17

    Section 4.01    Refunds ......................................................................................... 17
    Section 4.02    Timing Differences ....................................................................... 17

ARTICLE V Tax Proceedings .......................................................................................... 18

    Section 5.01    Notification of Tax Proceedings ................................................... 18
    Section 5.02    Tax Proceeding Procedures ........................................................... 18

ARTICLE VI Intended Tax Treatment .............................................................................. 19

    Section 6.01    Restrictions Relating to the Distribution ....................................... 19

ARTICLE VII Cooperation .............................................................................................. 20

    Section 7.01    General Cooperation ..................................................................... 20
    Section 7.02    Retention of Records ..................................................................... 21
    Section 7.03    Failure to Perform ........................................................................ 21

ARTICLE VIII Miscellaneous .......................................................................................... 21

i

Case 14-10979-CSS    Doc 6097-1    Filed 09/18/15    Page 346 of 522

Section 8.01    Governing law.................................................................................. 21
Section 8.02    Dispute Resolution........................................................................... 22
Section 8.03    Tax Sharing Agreements.................................................................. 22
Section 8.04    Interest on Late Payments ............................................................... 22
Section 8.05    Survival of Covenants...................................................................... 22
Section 8.06    Severability ...................................................................................... 22
Section 8.07    Entire Agreement ............................................................................. 23
Section 8.08    Assignment ...................................................................................... 23
Section 8.09    No Third Party Beneficiaries .......................................................... 23
Section 8.10    Affiliates .......................................................................................... 23
Section 8.11    Amendments; Waivers ..................................................................... 23
Section 8.12    Interpretation.................................................................................... 23
Section 8.13    Counterparts..................................................................................... 24
Section 8.14    Confidentiality ................................................................................. 24
Section 8.15    Waiver of Jury Trial......................................................................... 24
Section 8.16    Jurisdiction; Service of Process ...................................................... 24
Section 8.17    Notices ............................................................................................. 25
Section 8.18    Headings .......................................................................................... 28
Section 8.19    Effectiveness.................................................................................... 28
Section 8.20    Further Assurances.......................................................................... 28

# FORM OF
# TAX MATTERS AGREEMENT

This **TAX MATTERS AGREEMENT** (this "Agreement"), dated as of [the Effective Date] (the "Effective Date"), is entered into by and among Energy Future Holdings Corp., a Texas Corporation ("EFH"), Energy Future Intermediate Holding Company LLC, a Delaware Limited Liability Company ("EFIH" and, together with EFH and each other Person that executes a joinder pursuant to Section 8.20, the "EFH Parties") and [Reorganized TCEH], a Delaware limited liability company and an indirect wholly owned Subsidiary of EFH ("Reorganized TCEH" and, together with the EFH Parties, the "Parties").

## RECITALS[1]

**WHEREAS**, on April 29, 2014 EFH and certain entities in which it holds an equity interest (collectively, the "Debtors") commenced chapter 11 cases in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), which chapter 11 cases are being jointly administered and are captioned In re Energy Future Holdings Corp., et al., Case No. 14-10979 (CSS) (the "Chapter 11 Cases");

**WHEREAS**, the Bankruptcy Court has approved the restructuring of the Debtors pursuant to a confirmed Chapter 11 plan of reorganization (the "Plan");

**WHEREAS**, pursuant to the Plan, Texas Competitive Electric Holdings Company LLC ("TCEH"), a Delaware limited liability company and a wholly owned, indirect subsidiary of EFH, (a) has formed Reorganized TCEH as a new subsidiary of TCEH on or before the Effective Date and (b) incorporated [the Preferred Stock Entity], a Delaware corporation (the "Preferred Stock Entity") as a new subsidiary of TCEH immediately after the Contribution (as defined below);

**WHEREAS**, pursuant to the Plan, on the Effective Date, except for liabilities assumed by Reorganized TCEH pursuant to the Plan, all other Claims (as defined in the Plan) against the TCEH Debtors (as defined in the Plan) will be canceled, and each Holder (as defined in the Plan) of an Allowed Claim (as defined in the Plan) against a TCEH Debtor will have the right to receive its recovery in accordance with the terms of the Plan, and TCEH shall assume the obligations of its subsidiaries that are TCEH Debtors to make distributions pursuant to and in accordance with the Plan that are to be made after the Effective Date;

**WHEREAS**, pursuant to the Plan, immediately following such cancelation, pursuant to the Separation Agreement (as defined in the Plan), (a) TCEH will transfer all of TCEH's interests in its subsidiaries (excluding the stock of TCEH Finance, Inc. ("TCEH Finance")) to Reorganized TCEH; and (b) the EFH Debtors will transfer (i) the equity interests in the Reorganized EFH Shared Services Debtors (or with the consent of TCEH and the TCEH

---

[1]  Note to Draft: Recitals and other descriptive provisions to be appropriately revised/conformed to reflect the Plan, as amended.

Supporting First Lien Creditors (as defined in the Plan), the assets and liabilities of the Reorganized EFH Shared Services Debtors related to the TCEH Debtors' operations) and (ii) with the consent of TCEH and the TCEH Supporting First Lien Creditors, certain other assets, liabilities, and equity interests related to the TCEH Debtors' operations (including the equity interests of non-Debtor EFH Properties Company or the lease for the Debtors' corporate headquarters at "Energy Plaza" held by EFH Properties Company (but not including any cash on hand at EFH Properties Company, which shall be transferred to Reorganized EFH)), in exchange for which TCEH shall receive (i) 100% of the Reorganized TCEH membership interests and (ii) the net Cash proceeds of the Reorganized TCEH Debt (as defined in the Plan), subject to preserving the Intended Tax Treatment (as defined below) (together, the "Contribution");

WHEREAS, pursuant to the Plan, immediately following the Contribution but before the Reorganized TCEH Conversion (as defined below), and consistent with the procedures in Exhibit G of the Plan Support Agreement:  (a) Reorganized TCEH will contribute the equity in the Contributed TCEH Debtors (as defined in the Plan), or, potentially, certain assets or joint interests in certain assets, to the Preferred Stock Entity (such contribution to the Preferred Stock Entity of such equity and, potentially such assets, in an amount that is expected to result in the Basis Step-Up (as defined in the Plan)) in exchange for (i) the Preferred Stock Entity's common stock and (ii) the Reorganized TCEH Sub Preferred Stock (as defined in the Plan); (b) immediately thereafter, and pursuant to a prearranged and binding agreement, Reorganized TCEH will sell all of the Reorganized TCEH Sub Preferred Stock to one or more third party investors in exchange for Cash (as defined in the Plan), *provided, however*, that Holders of TCEH First Lien Claims (as defined in the Plan) shall not be permitted to purchase the Reorganized TCEH Sub Preferred Stock; and (c) Reorganized TCEH will distribute such Cash to TCEH to fund recoveries under the Plan (together, the "Preferred Stock Sale")

WHEREAS, pursuant to the Plan, immediately following the Preferred Stock Sale, Reorganized TCEH shall convert from a Delaware limited liability company into a Delaware corporation (the "Reorganized TCEH Conversion");

WHEREAS, pursuant to the Plan, immediately following the Reorganized TCEH Conversion, TCEH will make a Pro Rata (as defined in the Plan) distribution of the Reorganized TCEH Common Stock and the net Cash proceeds of the New Reorganized TCEH Debt and the Preferred Stock Sale, if any, received in the Contribution to Holders of Allowed TCEH First Lien Claims (the "Distribution");

WHEREAS, each of EFCH, TCEH, TCEH Finance, and the Subsidiaries of EFH identified in Annex 1 of the Agreement and Plan of Merger, dated as of August 9, 2015, by and among Hunt Ovation I, L.L.C. ("Parent"), Hunt Ovation II, L.L.C., EFIH, and EFH (the "Merger Agreement") other than the Spin-Off Entities (as defined in the Merger Agreement, will be dissolved and liquidated in accordance with the Plan and applicable law and EFH's direct and indirect equity interests in each of its other Subsidiaries (other than EFIH and the Oncor Entities) will be either (as mutually agreed by EFH and Parent, each acting reasonably) (a) cancelled or abandoned pursuant to the Plan or (b) acquired by Parent with such Subsidiaries being discharged and released, to the fullest extent permitted under applicable law, pursuant to the Plan;

2

WHEREAS, pursuant to the Plan and the Merger Agreement, EFH will merge with and into Parent following the Distribution (and other interim transactions) (the "Merger"), with Parent surviving;

WHEREAS, it is intended that, for U.S. federal income tax purposes, (a) the Contribution, the Reorganized TCEH Conversion and the Distribution will qualify as a "reorganization" within the meaning of Sections 368(a)(1)(G), 355, and 356 of the Code, (b) the contribution described in clause (a) of the definition of the Preferred Stock Sale will be treated as a taxable sale of the assets of the Preferred Stock Entity pursuant to Section 1001 of the Code resulting in the Basis Step-Up (together with clause (a), the "Intended Tax Treatment"), and (c) the Merger will qualify as a reorganization under the provisions of Section 368(a) of the Code;

WHEREAS, the Parties wish to (a) provide for the payment of Tax liabilities and entitlement to refunds thereof, allocate responsibility for, and cooperation in, the filing and defense of Tax Returns, and provide for certain other matters relating to Taxes and (b) set forth certain covenants and indemnities relating to the preservation of the Intended Tax Treatment; and

WHEREAS, this Agreement has been approved by the Bankruptcy Court and will be effective upon the Distribution. In the event of any conflict between this Agreement and the Plan, the Plan shall govern.

NOW, THEREFORE, in consideration of these premises, and of the representations, warranties, covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

ARTICLE I

Definitions

Section 1.01    General. As used in this Agreement, the following terms shall have the following meanings.

"Accounting Firm" has the meaning set forth in Section 8.02.

"Additional Preferred Stock Sale Tax" means an amount (but not less than zero) equal to the regular Income Tax liability (and any corollary state and local Tax liability) (excluding any alternative minimum Tax) of the EFH Group in its taxable year in which the Preferred Stock Sale is consummated and attributable to the Preferred Stock Sale, calculated by determining the excess of (i) the EFH Group tax liability (determined, for the avoidance of doubt, by taking into account the gain on the Preferred Stock Sale as Finally Determined) over (ii) the EFH Group tax liability assuming the Preferred Stock Sale did not occur; provided, that for purposes of such calculation, it shall be assumed that (a) the "consolidated year" (within the meaning of Section 1503(e)(2)(B) of the Code) ended on the Effective Date, (b) the EFH Group recognized no income, gain, loss or deduction as a result of transactions occurring outside the ordinary course of business on the Effective Date after the Preferred Stock Sale (other than Deferred Intercompany and ELA Items (if any) and items directly resulting from other transactions

3

expressly contemplated by the Plan), and (c) the Agreed Tax Attributes shall be as reported on the EFH Group's Tax Returns as originally filed, but adjusted to take into account (i) all Finally Determined adjustments to items of income, loss, credit or other Tax-related attribute attributable to or arising from any business contributed to, or otherwise held on the Effective Date by, any Reorganized TCEH Entity (other than EFH Properties Company) (including, for the avoidance of doubt, any adjustments to (x) any interest expense and discharge of indebtedness income with respect to indebtedness of any such entity, TCEH or any Subsidiary of TCEH (other than TCEH Finance), (y) Deferred Intercompany and ELA Items (if any) and (z) that portion of any Section 108(i) Items which relates to the indebtedness of TCEH or any Subsidiary of TCEH (other than TCEH Finance)) and (ii) all Finally Determined adjustments to items of income, loss, credit or other Tax-related attribute attributable to any business retained by any Reorganized EFH Entity or EFH Properties Company (including, for the avoidance of doubt, any adjustments to (x) any interest expense and discharge of indebtedness income with respect to indebtedness of any such entity and (y) that portion of any Section 108(i) Items which does not relate to the indebtedness of TCEH or any Subsidiary of TCEH (other than TCEH Finance)) (but, in the case of this clause (c)(ii), only to the extent that the aggregate (net) of all adjustments described in this clause (c)(ii) results in an increase to the Agreed Tax Attributes).

"Affiliate" means, with respect to any Person, any other Person, directly or indirectly, controlling, controlled by, or under common control with, such Person; *provided that*, notwithstanding the foregoing, Affiliates of EFH shall be deemed to exclude the Reorganized TCEH Entities following the Distribution.

"Agreed Tax Attributes" means 100% of the aggregate amount of net losses, net operating losses, and net capital losses (but only to the extent such net capital losses are deductible under applicable tax law against gain recognized on the Preferred Stock Sale) (in each case, including carryovers), available to the EFH Group as of the Effective Date (determined (a) as if the "consolidated year" (within the meaning of Section 1503(e)(2)(B) of the Code) of the EFH Group ended on the Effective Date and (b) without regard to any income, gain, loss or deduction generated as a result of the Preferred Stock Sale or transactions occurring outside the ordinary course of business on the Effective Date after the Preferred Stock Sale (other than any Deferred Intercompany and ELA Items (if any) and other transactions expressly contemplated by the Plan and the other Definitive Restructuring Documents (as defined in the Plan Support Agreement)), such amount to be determined in accordance with Exhibit G of the Plan Support Agreement .

"Agreement" has the meaning set forth in the Preamble.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Basis Step-Up" means the increase in the U.S. federal income tax basis in the assets transferred or deemed transferred to the Preferred Stock Entity pursuant to the Preferred Stock Sale.

"Chapter 11 Cases" has the meaning set forth in the Recitals.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contribution" has the meaning set forth in the Recitals.

"Covered Transaction" means the Contribution and Distribution, the Preferred Stock Sale, and any other transaction contemplated by the Plan or the Transaction Agreements.

"Debtors" has the meaning set forth in the Recitals.

"Deferred Intercompany and ELA Items" means intercompany items (as such term is defined in Treasury Regulations Section 1.1502-13(b)(2)) and excess loss account (as such term is defined in Treasury Regulations Section 1.1502-19(a)), in each case, of any Subsidiary of TCEH (other than TCEH Finance) that are accelerated into income as a result of the Distribution pursuant to Treasury Regulations Section 1.1502-13(d) or Section 1.1502-19.

"Distribution" has the meaning set forth in the Recitals.

"Due Date" means (a) with respect to a Tax Return, the date (taking into account all valid extensions) on which such Tax Return is required to be filed under applicable law and (b) with respect to a payment of Taxes, the date on which such payment is required to be made to avoid the incurrence of interest, penalties, and/or additions to Tax.

"Effective Date" has the meaning set forth in the Recitals.

"EFH" has the meaning set forth in the Preamble and, for the avoidance of doubt, all references to EFH shall include Parent following the Merger.

"EFH Breach" means a breach of one or more covenants in Article VI by any Reorganized EFH Entity or any of its Affiliates.

"EFH Group" has the meaning set forth in the Plan.

"EFH Parties" has the meaning set forth in the Preamble.

"EFH Shared Services Debtors" means, collectively:  (a) EFH Corporate Services Company; (b) Dallas Power and Light Company, Inc.; (c) EFH CG Holdings Company LP; (d) EFH CG Management Company LLC; (e) Lone Star Energy Company, Inc.; (f) Lone Star Pipeline Company, Inc.; (g) Southwestern Electric Service Company, Inc.; (h) Texas Electric Service Company, Inc.; (i) Texas Energy Industries Company, Inc.; (j) Texas Power and Light Company, Inc.; (k) Texas Utilities Company, Inc.; (l) Texas Utilities Electric Company, Inc.; and (m) TXU Electric Company, Inc.

"EFH Taxes" means (a) any Taxes of the EFH Group for periods (and portion of a Straddle Period) ending on or before the Effective Date that are not specifically included within the definition of Reorganized TCEH Taxes, including, without duplication, (i) any Taxes attributable to or arising from the ownership or operation of any business retained by any Reorganized EFH Entity or EFH Properties Company (including, for the avoidance of doubt, Taxes arising from any adjustment to interest expense and discharge of indebtedness income

5

with respect to indebtedness of any such entity), in each case, as determined pursuant to Sections 2.03 and 2.04, (ii) Taxes of the EFH Group other than Reorganized TCEH Taxes, (iii) Income Taxes imposed on a Reorganized TCEH Entity attributable to a Tax-Free Transaction Failure and allocated to the EFH Parties pursuant to Sections 2.05(a) or (b), (iv) Taxes attributable to the Preferred Stock Sale other than TCEH Preferred Stock Sale Tax, (v) Transfer Taxes allocated to the EFH Parties pursuant to Section 2.04(d)(i), and (vi) Taxes resulting from any action by any Reorganized EFH Entity outside of the ordinary course of business on the Effective Date after the Distribution, except as a result of any action that is expressly contemplated by the Plan or the Transaction Agreements and (b) any Taxes imposed on any Reorganized EFH Entity for periods (or portion of a Straddle Period) beginning after the Effective Date.

"EFIH" has the meaning set forth in the Preamble.

"Final Determination" means the final resolution of liability for any Tax for any taxable period, by or as a result of (a) a final decision, judgment, decree or other order by any court of competent jurisdiction that can no longer be appealed, (b) a final settlement with the IRS, a closing agreement or accepted offer in compromise under Sections 7121 or 7122 of the Code, or a comparable agreement under the laws of other jurisdictions, (c) any allowance of a Refund in respect of an overpayment of Tax, but only after the expiration of all periods during which such Refund may be recovered by the jurisdiction imposing the Tax or (d) any other final resolution, including by reason of the expiration of the applicable statute of limitations.

"Income Taxes" means any Taxes in whole or in part based upon, measured by, or calculated with respect to net income or profits, net worth or net receipts (including any alternative minimum Tax and the Texas Margin Tax). For the avoidance of doubt, Income Taxes do not include sales, use, real or personal property, or transfer or similar Taxes.

"Indemnified Party" means, with respect to a matter, a Person that is entitled to seek indemnification under this Agreement with respect to such matter.

"Indemnifying Party" means, with respect to a matter, a Person that is obligated to provide indemnification under this Agreement with respect to such matter.

"Intended Tax Treatment" has the meaning set forth in the Recitals.

"IRS" means the U.S. Internal Revenue Service or any successor thereto, including its agents, representatives, and attorneys acting in their official capacity.

"IRS Submissions" means all submissions to the IRS in connection with requests for the Private Letter Ruling.

"Merger" has the meaning set forth in the Recitals.

"Merger Agreement" has the meaning set forth in the Recitals.

"Non-Income Taxes" means any Taxes other than Income Taxes.

"Notified Action" has the meaning set forth in Section 6.01(c).

"Opinion" means an opinion (including an Unqualified Tax Opinion) received by a Party with respect to certain Tax aspects of the Covered Transactions.

"Parent" has the meaning set forth in the Recitals.

"Parties" has the meaning set forth in the Preamble.

"Person" or "person" means a natural person, corporation, company, joint venture, individual business trust, trust association, partnership, limited partnership, limited liability company, association, unincorporated organization or other entity, including a governmental authority.

"Plan" has the meaning set forth in the Recitals.

"Plan Support Agreement" means that certain Plan Support Agreement, dated as of August 9, 2015, by and among the Debtors and the other parties thereto.

"Post-Distribution Period" means any taxable period (or portion thereof) beginning after the Effective Date, including for the avoidance of doubt, the portion of any Straddle Period beginning after the Effective Date.

"Preferred Stock" has the meaning set forth in the Recitals.

"Preferred Stock Entity" has the meaning set forth in the Recitals.

"Preferred Stock Sale" has the meaning set forth in the Recitals.

"Private Letter Ruling" means a private letter ruling issued by the IRS addressing the qualification of the Contribution, the Reorganized TCEH Conversion, and the Distribution as a "reorganization" within the meaning of Sections 368(a)(1)(G), 355 and 356 of the Internal Revenue Code and certain other matters, together with any amendments or supplements thereto (including any supplemental ruling obtained by a Party pursuant to Section 6.01(c)).

"Refund" means any refund (or credit in lieu thereof) of Taxes (including any overpayment of Taxes that can be refunded or, alternatively, applied to other Taxes payable), including any interest paid on or with respect to such refund of Taxes.

"Reorganized EFH Entity" means the EFH Parties and any entity that is a Subsidiary of EFH immediately after the Distribution (including, for the avoidance of doubt, EFCH, TCEH and TCEH Finance).

"Reorganized EFH Shared Services Debtors" means the EFH Shared Services Debtors as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

"Reorganized TCEH" has the meaning set forth in the Preamble and, for the avoidance of doubt, all references to Reorganized TCEH shall include Reorganized TCEH following the Contribution.

"Reorganized TCEH Breach" means a breach of one or more covenants in Article VI by any Reorganized TCEH Entity or any of its Affiliates.

"Reorganized TCEH Debt" has the meaning set forth in Section 8.05.

"Reorganized TCEH Entity" means Reorganized TCEH or any entity that is a Subsidiary of Reorganized TCEH immediately after the Distribution (which shall include, for the avoidance of doubt, the Reorganized EFH Shared Services Debtors and EFH Properties Company, to the extent the equity interests in such entities are transferred pursuant to the Contribution).

"Reorganized TCEH Taxes" means any (a) Income Taxes imposed on EFH and its Subsidiaries attributable to a Tax-Free Transaction Failure and allocated to Reorganized TCEH pursuant to Section 2.05(c), (b) any Taxes for periods (and the portion of any Straddle Period) ending on or before the Effective Date attributable to or arising from the ownership or operation of any business contributed to, or otherwise held on the Effective Date by, any Reorganized TCEH Entity (other than EFH Properties Company) (including, for the avoidance of doubt, any Taxes resulting from any adjustments to interest expense and discharge of indebtedness income with respect to indebtedness of any such entity, TCEH or any Subsidiary of TCEH (other than TCEH Finance)), as determined pursuant to Sections 2.03 and 2.04, in each case, other than any Taxes resulting from (i) a Tax-Free Transaction Failure, (ii) the Preferred Stock Sale or (iii) any Specified Tax Items, (c) Taxes imposed on any Reorganized TCEH Entity for periods (or portion of a Straddle Period) beginning after the Effective Date, (d) Transfer Taxes allocated to Reorganized TCEH pursuant to Section 2.04(d)(i), (e) TCEH Preferred Stock Sale Tax, and (f) Taxes resulting from any action by any Reorganized TCEH Entity outside of the ordinary course of business on the Effective Date after the Distribution, except as a result of any action that is expressly contemplated by the Plan or the Transaction Agreements.

"Restriction Period" has the meaning set forth in Section 6.01(b).

"Section 108(i) Items" means items of income or gain or other Tax items resulting from the acceleration (pursuant to the Plan Support Agreement) of all discharge of indebtedness income of the EFH Group that was previously deferred under Section 108(i) of the Code.

"Specified Tax Items" means Section 108(i) Items and Deferred Intercompany and ELA Items (if any).

"Straddle Period" means any taxable period that begins on or before and ends after the Effective Date.

"Subsidiary" means, with respect to any Person, any other Person of which at least a majority of the securities or other ownership interests having by their terms ordinary voting power to elect a majority of the board of directors or other persons performing similar functions is directly or indirectly owned or controlled by such Person and/or by one or more of its Subsidiaries; provided, that notwithstanding the foregoing, the Subsidiaries of EFH shall be deemed to exclude Reorganized TCEH and all Subsidiaries thereof.

"Tax" or "Taxes" means any and all U.S. federal, state or local, or foreign, income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall

profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever (including any assessment, duty, fee or other charge in the nature of or in lieu of any such tax) and any interest, penalty, or addition thereto, whether disputed or not.

"Tax Attributes" means net operating losses, capital losses, alternative minimum tax credits, investment tax credit carryovers, earnings and profits, foreign tax credit carryovers, overall foreign losses, previously taxed income, separate limitation losses, and any other losses, deductions, credits or other comparable items that could reduce a Tax liability for a past or future taxable period.

"Tax Benefit" means any decrease in Tax payments actually required to be made to a Taxing Authority (or any increase in any Refund otherwise receivable from any Taxing Authority) including any decrease in Tax payments (or increase in any Refund) that actually results from an increase in Tax Attributes (computed on a "with" or "without" basis).

"Tax Cost" means any increase in Tax payments actually required to be made to a Taxing Authority (or any reduction in any Refund otherwise receivable from any Taxing Authority), including any increase in Tax payments (or reduction in any Refund) that actually results from a reduction in Tax Attributes (computed on a "with or without" basis).

"Tax-Free Transaction Failure" means (a) the failure of the Contribution and Distribution to qualify for clause (a) of the definition of the Intended Tax Treatment, and (b) the imposition of any Income Taxes on EFH under Section 355(d) or Section 355(e) of the Code with respect to the Distribution.

"Tax Item" means any item of income, gain, loss, deduction, credit, recapture of credit or any other item which increases, decreases or otherwise impacts Taxes paid or payable.

"Tax Materials" means (a) the Private Letter Ruling, (b) any Opinion, (c) the IRS Submissions, (d) any representation letter from a Party or any Affiliate thereof supporting an Opinion, and (e) any other materials delivered or deliverable by a Party or any Affiliate thereof in connection with the rendering of an Opinion or the issuance by the IRS of the Private Letter Ruling.

"Tax Matter" has the meaning set forth in Section 7.01.

"Tax Proceeding" means any audit, assessment of Taxes, pre-filing agreement, other examination by any Taxing Authority, proceeding, appeal of a proceeding or litigation relating to Taxes, whether administrative or judicial, including proceedings relating to competent authority determinations.

"Tax Return" means any return, report, certificate, form or similar statement or document (including any related or supporting information or schedule attached thereto and any information return or declaration of estimated Tax) supplied to, filed with or required to be supplied to or filed with a Taxing Authority in connection with the payment, determination,

assessment or collection of any Tax or the administration of any laws relating to any Tax, and any amended Tax return or claim for Refund.

"Taxing Authority" means any governmental authority or any subdivision, agency, commission or entity thereof or any quasi-governmental or private body having jurisdiction over the assessment, determination, collection or imposition of any Tax (including the IRS and the Office of the Texas Comptroller of Public Accounts).

"TCEH" has the meaning set forth in the Recitals.

"TCEH Finance" has the meaning set forth in the Recitals.

"TCEH Preferred Stock Sale Tax" means (i) 50% of the alternative minimum Tax (and any corollary state and local Taxes) that results from the limitation on the utilization of the Agreed Tax Attributes to offset the gain attributable to the Preferred Stock Sale under Section 56(d)(1)(A) of the Code and (ii) the Additional Preferred Stock Sale Tax (if any); provided, that in the event of a Tax-Free Transaction Failure (other than as a result of a Reorganized TCEH Breach), the TCEH Preferred Stock Sale Tax shall be zero.

"Texas Margin Tax" means any tax payable pursuant to Section 171.001 et seq. of the Texas Tax Code, as amended.

"Transaction Agreements" has the meaning set forth in the Plan.

"Transfer Taxes" means any transfer, stamp, documentary, sale, use, registration, value-added or other similar Taxes imposed with respect to the Contribution, the Reorganized TCEH Conversion, the Distribution, the Preferred Stock Sale, the Merger or any other transaction contemplated by the Plan.

"Treasury Regulations" means the proposed, final, and temporary income Tax regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"Unqualified Tax Opinion" means a "will" opinion, without substantive qualifications, of a nationally recognized law or accounting firm, which firm is reasonably acceptable to the EFH Parties and Reorganized TCEH, to the effect that a transaction or action will not (i) affect the Intended Tax Treatment and (ii) negate any of the other rulings provided in the Private Letter Ruling. Each of the EFH Parties and Reorganized TCEH acknowledges that Paul, Weiss, Rifkind, Wharton & Garrison LLP, Kirkland & Ellis LLP, Thompson & Knight LLP, and Baker Botts L.L.P. are reasonably acceptable to such entity.

Section 1.02    Construction.  When a reference is made in this Agreement to an Article, a Section, an Exhibit, the Preamble or the Recitals, such reference shall be to an Article, a Section, an Exhibit, the Preamble or the Recitals of this Agreement, respectively, unless otherwise indicated. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The words "hereof," "herein," and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The term

"or" is not exclusive.  Capitalized terms not defined herein have the meaning assigned to them in the Merger Agreement.  All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined herein.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.  Unless otherwise specified, any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes, and including all attachments thereto and instruments incorporated therein.  References to a person are also to its permitted successors and assigns.

Section 1.03   <u>References to Time</u>.  All references in this Agreement to times of the day shall be to New York City time.

ARTICLE II

<u>Preparation, Filing, and Payment of Taxes Shown Due on Tax Returns</u>

Section 2.01   <u>Tax Returns</u>.

(a)     *Tax Returns Required to be Filed by EFH*.  Consistent with Exhibit H to the Plan Support Agreement, EFH shall prepare and file (or cause to be prepared and filed) each Tax Return required to be filed by a Reorganized EFH Entity (including, for the avoidance of doubt, the U.S. federal income Tax Return of the EFH Group and all state income and franchise Tax Returns including members of the EFH Group for all periods ending on or before the Effective Date) and shall pay, or cause such Reorganized EFH Entity to pay, all Taxes shown to be due and payable on each such Tax Return; *provided that* Reorganized TCEH shall reimburse EFH for any such Taxes that are Reorganized TCEH Taxes.

(b)     *Reorganized TCEH Entity Tax Returns*.  Reorganized TCEH shall prepare and file (or cause to be prepared and filed) each Tax Return required to be filed by a Reorganized TCEH Entity after the Effective Date and shall pay, or cause be paid, all Taxes shown to be due and payable on such Tax Return; *provided that*, the EFH Parties shall jointly and severally reimburse Reorganized TCEH for any such Taxes that are EFH Taxes.

Section 2.02   <u>Tax Return Procedures</u>.

(a)     *Manner of Tax Return Preparation*.  Unless otherwise required by a Taxing Authority or by applicable law, the Parties shall prepare and file all Tax Returns, and take all other actions, in a manner consistent with this Agreement, the Tax Materials, and past practice.  All Tax Returns shall be filed on a timely basis (taking into account applicable extensions) by the Party responsible for filing such Tax Returns under this Agreement.

(b)     *Right to Review Certain Returns Prepared by EFH*.  In the case of any Tax Return described in <u>Section 2.01(a)</u>, (i) the portion (if any) of such Tax Return that relates to Reorganized TCEH Taxes or would reasonably be expected to adversely affect the Tax position

11

of any Reorganized TCEH Entity shall (to the extent permitted by law) be prepared in a manner consistent with past practice and the Tax Materials and (ii) EFH shall provide a draft of such Tax Return to Reorganized TCEH for its review and comment at least thirty (30) days prior to the Due Date for such Tax Return or, in the case of any such Tax Return filed on a monthly basis or property Tax Return, ten (10) days. EFH shall consider in good faith any reasonable comment received from Reorganized TCEH at least three (3) days prior to the Due Date for such Tax Return. In the event that neither past practice nor the Tax Materials are applicable to a particular item or matter, EFH shall determine the reporting of such item or matter in good faith in consultation with Reorganized TCEH. The Parties shall negotiate in good faith to resolve all disputed issues. Any disputes that the Parties are unable to resolve shall be resolved by the Accounting Firm pursuant to Section 8.02. In the event that any dispute is not resolved (whether pursuant to good faith negotiations among the Parties or by the Accounting Firm) prior to the Due Date for the filing of any Tax Return, such Tax Return shall be timely filed as prepared by EFH and such Tax Return shall be amended as necessary to reflect the resolution of such dispute in a manner consistent with such resolution. For the avoidance of doubt, the EFH Parties shall be jointly and severally responsible for any interest, penalties or additions to Tax resulting from the late filing of any Tax Return described in Section 2.01(a), except to the extent that such late filing is primarily caused by the failure of any Reorganized TCEH Entity to provide relevant information necessary for the preparation and filing of such Tax Return.

(c) *Right to Review Certain Returns Prepared by Reorganized TCEH.* In the case of any Tax Return described in Section 2.01(b) that would reasonably be expected to adversely affect the Tax position of any Reorganized EFH Entity, (i) such Tax Return shall (to the extent permitted by law) be prepared in a manner consistent with past practice and the Tax Materials and (ii) Reorganized TCEH shall provide a draft of such Tax Return to EFH for its review and comment at least thirty (30) days prior to the Due Date for such Tax Return, or in the case of any such Tax Return filed on a monthly basis or property Tax Return, ten (10) days. Reorganized TCEH shall consider in good faith any reasonable comment received from EFH at least three (3) days prior to the Due Date for such Tax Return. In the event that neither past practice nor the Tax Materials are applicable to a particular item or matter, Reorganized TCEH shall determine the reporting of such item or matter in good faith in consultation with EFH. The Parties shall negotiate in good faith to resolve all disputed issues. Any disputes that the Parties are unable to resolve shall be resolved by the Accounting Firm pursuant to Section 8.02. In the event that any dispute is not resolved (whether pursuant to good faith negotiations among the Parties or by the Accounting Firm) prior to the Due Date for the filing of any Tax Return, such Tax Return shall be timely filed as prepared by Reorganized TCEH and such Tax Return shall be amended as necessary to reflect the resolution of such dispute in a manner consistent with such resolution. For the avoidance of doubt, Reorganized TCEH shall be responsible for any interest, penalties or additions to Tax resulting from the late filing of any Tax Return described in Section 2.01(b) except to the extent that such late filing is primarily caused by the failure of any Reorganized EFH Entity to provide relevant information necessary for the preparation and filing of such Tax Return.

(d) *Tax Reporting.* Unless otherwise required by law, the EFH Parties and Reorganized TCEH, as applicable, shall file the appropriate information and statements, as required by Treasury Regulations Sections 1.355-5(a) and 1.368-3, with the IRS, and shall retain

the appropriate information relating to the Contribution and the Distribution as described in Treasury Regulations Sections 1.355-5(d) and 1.368-3(d).

(e)    *Amendments.* Any amendment of any Tax Return described in <u>Section 2.01</u> of any Reorganized TCEH Entity shall be subject to the same procedures required for the preparation of such type of Tax Return of such Reorganized TCEH Entity pursuant to this <u>Section 2.02</u>. Any amendment of any Tax Return described in <u>Section 2.01</u> of any Reorganized EFH Entity shall be subject to the same procedures required for the preparation of such type of Tax Return of such Reorganized EFH Entity pursuant to this <u>Section 2.02</u>.

Section 2.03    <u>Straddle Period Tax Allocation</u>.  To the extent permitted by law, the EFH Parties and Reorganized TCEH shall elect to close the taxable year of each Reorganized TCEH Entity as of the close of the Effective Date. In the case of any Straddle Period, the amount of any Income Taxes attributable to the portion of the Straddle Period ending on, or beginning after, the Effective Date shall be made by means of a closing of the books and records of such Reorganized TCEH Entity as of the close of the Effective Date; *provided that* in the case of Non-Income Taxes that are periodic Taxes (e.g., property Taxes) and exemptions, allowances, and deductions that are calculated on an annual basis (such as depreciation deductions), such Taxes, exemptions, allowances, and deductions shall be allocated between the portion of the Straddle Period ending at the end of the Effective Date and the portion beginning after the Effective Date based upon the ratio of (a) the number of days in the relevant portion of the Straddle Period to (b) the number of days in the entire Straddle Period; *provided, however,* that in allocating any such exemptions, allowances, or deductions (or increase in such amounts) between the two periods that comprise a Straddle Period, any such items that relate to an asset or property that was sold, acquired or improved during the Straddle Period shall be allocated on a daily basis solely among the days in the Straddle Period during which such asset was owned or such improvement existed; *provided further,* that Taxes that are properly allocable (based on, among other relevant factors, factors set forth in Treasury Regulations Section 1.1502-76(b)(1)(ii)(B)) to the portion of the Effective Date after the Distribution, shall be allocable to the portion of the Straddle Period beginning after the Effective Date.

Section 2.04    <u>Allocation of Taxes</u>.

(a)    *Income Taxes.* Subject to Section 2.04(b), Income Taxes (other than Taxes resulting from (x) a Tax-Free Transaction Failure, (y) the Preferred Stock Sale or (z) except in cases where there has been a Tax-Free Transaction Failure, any Specified Tax Items) shall be allocated in accordance with past practices and as follows:

(i)    In the case of U.S. federal regular Income Taxes, in proportion to the separate taxable income (calculated in accordance with Treasury Regulations Section 1.1552-1(a)(1) and determined without regard to any gain attributable to the Preferred Stock Sale) attributable to any business retained by any Reorganized EFH Entity or EFH Properties Company (including, for the avoidance of doubt, any interest expense and discharge of indebtedness income with respect to indebtedness of any such entity), on the one hand, and any business contributed to (or otherwise held on the Effective Date by) any Reorganized TCEH Entity (other than EFH Properties Company) (including, for the avoidance of doubt, any interest expense and discharge of indebtedness income with

13

respect to indebtedness of any such entity, TCEH or any Subsidiary of TCEH (other than TCEH Finance)), on the other hand; and

(ii)    In the case of Texas Margin Tax, in proportion to the separate taxable margins (calculated in a manner consistent with Treasury Regulations Section 1.1552-1(a)(1) and determined without regard to any gain attributable to the Preferred Stock Sale) attributable to any business retained by, any Reorganized EFH Entity or EFH Properties Company (including, for the avoidance of doubt, any interest expense and discharge of indebtedness income with respect to indebtedness of any such entity), on the one hand, and any business contributed to (or otherwise held on the Effective Date by) any Reorganized TCEH Entity (other than EFH Properties Company) (including, for the avoidance of doubt, any interest expense and discharge of indebtedness income with respect to indebtedness of any such entity, TCEH or any Subsidiary of TCEH (other than TCEH Finance)), on the other hand.

(b)    *Alternative Minimum Taxes.* Alternative minimum Taxes (other than Taxes resulting from (x) a Tax-Free Transaction Failure, (y) the Preferred Stock Sale or (z) except in cases where there has been a Tax-Free Transaction Failure, any Specified Tax Items) shall be allocated between the EFH Parties, on the one hand, and Reorganized TCEH, on the other hand, in proportion to the respective separate amounts of alternative minimum tax each of the Reorganized EFH Entities and EFH Properties Company, on the one hand, and the Reorganized TCEH Entities (other than EFH Properties Company), on the other hand, would have if each such group separately determined its alternative minimum tax based on items attributable to any business retained by any Reorganized EFH Entity or EFH Properties Company, on the one hand, and any business contributed to (or otherwise held on the Effective Date by) any Reorganized TCEH Entity (other than EFH Properties Company), on the other hand.

(c)    *Non-Income Taxes.* Non-Income Taxes shall be allocated between the EFH Parties, on the one hand, and Reorganized TCEH, on the other hand, based on the applicable items attributable to or arising from any business retained by any Reorganized EFH Entity or EFH Properties Company, on the one hand, and any business contributed to (or otherwise held on the Effective Date by) any Reorganized TCEH Entity (other than EFH Properties Company), on the other hand, that contribute to such Taxes (e.g., sales Taxes and value added Taxes shall be allocated to the EFH Parties to the extent arising from taxable sales made by any business retained by any Reorganized EFH Entity or EFH Properties Company). In the event that any Non-Income Tax is not attributable to (and does not arise from) any items relating to any business (e.g., capital Taxes imposed based on the authorized stock), such Non-Income Taxes shall be allocated between the EFH Parties, on the one hand, and Reorganized TCEH, on the other hand, in proportion to the net taxable income of any business retained by any Reorganized EFH Entity or EFH Properties Company, on the one hand, and any business contributed to (or otherwise held on the Effective Date by) any Reorganized TCEH Entity (other than EFH Properties Company), on the other hand.

(d)    *Other Taxes.*

(i)     Transfer Taxes, if any, shall be allocated fifty percent (50%) to the EFH Parties and fifty percent (50%) to Reorganized TCEH.

(ii)    Income Taxes attributable to a Tax-Free Transaction Failure shall be allocated as set forth in Section 2.05.

(iii)   TCEH Preferred Stock Sale Tax shall be allocated to Reorganized TCEH.

(iv)    Except in cases where there has been a Tax-Free Transaction Failure, Taxes resulting from any Specified Tax Items shall be allocated to the EFH Parties.

(e)     *Allocation of Tax Attributes.* Tax Attributes, if any, remaining after the Distribution (other than net operating losses) shall be allocated in accordance with the Private Letter Ruling or, if not addressed in the Private Letter Ruling, between the Reorganized EFH Entities, on the one hand, and the Reorganized TCEH Entities, on the other hand, in accordance with the Code and Treasury Regulations, including Treasury Regulations Section 1.1502-76 (and any applicable state, local and foreign Laws). The allocation of such Tax Attributes shall be determined by treating the Reorganized TCEH Entities as one consolidated group and the Reorganized EFH Entities as a separate and distinct consolidated group. Any disputes shall be resolved by the Accounting Firm in accordance with Section 8.02. The EFH Parties and Reorganized TCEH hereby agree to compute all Taxes consistently with the determination of the allocation of Tax Attributes pursuant to this Section 2.04(e) unless otherwise required by a Final Determination.

Section 2.05    Allocation of Separation-Related Taxes.

(a)     *No-Fault.* Income Taxes attributable to a Tax-Free Transaction Failure, to the extent not allocated pursuant to Sections 2.05(b) or (c), shall be allocated to the EFH Parties.

(b)     *EFH Breach.* Income Taxes attributable solely to a Tax-Free Transaction Failure as a result of an EFH Breach shall be allocated to the EFH Parties.

(c)     *Reorganized TCEH Breach.* Incomes Taxes attributable solely to a Tax-Free Transaction Failure as a result of Reorganized TCEH Breach shall be allocated to Reorganized TCEH.

Section 2.06    Audits/Redeterminations.    Any redetermined Taxes or Tax Attributes resulting from an audit shall be allocated between the EFH Parties, on the one hand, and Reorganized TCEH, on the other hand, in the same manner as they would have been allocated had the redetermined amounts been known at the time the original Tax liability was computed.

Section 2.07    Expenses.    Except as provided in Section 8.02 in respect of the Accounting Firm, each Party shall bear its own expenses incurred in connection with this Article II.

Section 2.08    Timing of Payments.  Any reimbursement of Taxes under Section 2.01 shall be made upon the later of (a) two (2) business days before the Due Date of such payment of such Taxes and (b) ten (10) business days after the party required to make such reimbursement has received notice from the party entitled to such reimbursement. For the avoidance of doubt, a party may provide notice of reimbursement of Taxes prior to the time such Taxes were paid, and such notice may represent a reasonable estimate (provided that the amount of reimbursement shall be based on the actual Tax liability and not on such reasonable estimate).

ARTICLE III

Indemnification

Section 3.01    Indemnification by the EFH Parties.  The EFH Parties, on a joint and several basis, shall pay (or cause to be paid), and shall indemnify and hold each Reorganized TCEH Entity harmless from and against, without duplication, all EFH Taxes and all losses or damages arising out of, resulting from or relating to any breach by any Reorganized EFH Entity of any EFH Party representation, warranty, covenant or agreement in this Agreement.

Section 3.02    Indemnification by Reorganized TCEH.  Reorganized TCEH shall pay (or cause to be paid), and shall indemnify and hold each Reorganized EFH Entity harmless from and against, without duplication, all Reorganized TCEH Taxes and all losses or damages arising out of, resulting from or relating to any breach by any Reorganized TCEH Entity of any Reorganized TCEH representation, warranty, covenant or agreement in this Agreement.

Section 3.03    Characterization of and Adjustments to Payments.

(a)    In the absence of a Final Determination to the contrary, for all Tax purposes, the EFH Parties and Reorganized TCEH shall treat or cause to be treated any payment required by this Agreement (other than any payment treated for Tax purposes as interest) as either a contribution by EFH to Reorganized TCEH or a distribution by Reorganized TCEH to EFH, as the case may be, occurring immediately prior to the Effective Date.

(b)    Any indemnity payment pursuant to this Agreement shall be (A) increased to include (i) all reasonable accounting, legal, and other professional fees and court costs and damages incurred by the Indemnified Party in connection with such indemnity payment and (ii) any Tax Cost resulting from the receipt of (or entitlement to) such indemnity payment and (B) decreased to account for any Tax Benefit that the Indemnified Party actually realizes by way of a Refund or a decrease in Taxes reported on a filed Tax Return (in or with respect to a taxable year that ends on or before December 31, 2021) in connection with the incurrence or the payment by the Indemnified Party of such fees or costs or indemnifiable amounts determined using a "with and without" methodology (treating any deductions attributable to such fees or costs or indemnifiable amounts as the last items claimed for any taxable year, including after the utilization of any available net operating loss carryovers).

Section 3.04    Timing of Indemnification Payments.  Indemnification payments in respect of any liabilities for which an Indemnified Party is entitled to indemnification pursuant to this Article III shall be paid by the Indemnifying Party to the Indemnified Party within ten (10)

16

days after written notification thereof by the Indemnified Party, including reasonably satisfactory documentation setting forth the basis for, and calculation of, the amount of such indemnification payment.

Section 3.05    Exclusive Remedy.    Anything to the contrary in this Agreement notwithstanding, the EFH Parties and Reorganized TCEH hereby agree that the sole and exclusive monetary remedy of a party for any breach or inaccuracy of any representation, warranty, covenant or agreement contained in Section 6.01 shall be the indemnification rights set forth in this Article III.

Section 3.06    No Duplicative Payment.    Notwithstanding anything to the contrary in this Agreement, it is intended that the provisions of this Agreement will not result in a duplicative payment of any amount required to be paid under any other Transaction Agreement, and this Agreement shall be construed accordingly.

ARTICLE IV

Refunds, Timing Differences, and Tax Attributes

Section 4.01    Refunds.

(a)    Except as provided in Section 4.02, the EFH Parties shall be entitled to all Refunds of Taxes for which an EFH Party is responsible pursuant to Article III, and Reorganized TCEH shall be entitled to all Refunds of Taxes for which Reorganized TCEH is responsible pursuant to Article III. A Party receiving a Refund to which the other Party is entitled pursuant to this Agreement shall pay the amount to which such other Party is entitled (less any Tax or other reasonable out-of-pocket costs incurred by the first Party in receiving such Refund) within ten (10) days after the receipt of the Refund.

(b)    To the extent that the amount of any Refund under this Section 4.01 is later reduced by a Taxing Authority or in a Tax Proceeding, such reduction shall be allocated to the Party to which such Refund was allocated pursuant to this Section 4.01 and an appropriate adjusting payment shall be made.

Section 4.02    Timing Differences.    If pursuant to a Final Determination any Tax Attribute (including those allocated pursuant to Section 2.04(e)) is made allowable to a Reorganized TCEH Entity as a result of an adjustment to any Taxes for which an EFH Party is responsible hereunder (other than Taxes attributable to a Tax-Free Transaction Failure) and such Tax Attribute would not have arisen or been allowable but for such adjustment, or if pursuant to a Final Determination any Tax Attribute is made allowable to a Reorganized EFH Entity as a result of an adjustment to any Taxes for which Reorganized TCEH is responsible hereunder and such Tax Attribute would not have arisen or been allowable but for such adjustment, Reorganized TCEH or the EFH Parties (on a joint a several basis), as the case may be, shall make a payment to either the applicable EFH Party or Reorganized TCEH, as appropriate, within thirty (30) days after such Party (or its Affiliates) actually realizes a Tax benefit by way of a Refund or a decrease in Taxes reported on a filed Tax Return (in or with respect to a taxable year that ends on or before December 31, 2021) that is attributable to such Tax Attribute, determined

17

using a "with and without" methodology (treating any deductions or amortization attributable to such Tax Attributes as the last items claimed for any taxable year, including after the utilization of any available net operating loss carryovers), *provided that* no payment shall be made under this Section unless Reorganized TCEH or the applicable EFH Party, as the case may be, has previously paid the Tax adjustment or indemnified the other Party for such Tax adjustment. In the event of any overlap between Section 3.03 and this Section 4.02, this Section 4.02 shall apply and Section 3.03 shall not apply.

ARTICLE V

Tax Proceedings

Section 5.01   Notification of Tax Proceedings.   Within ten (10) days after an Indemnified Party becomes aware of the commencement of a Tax Proceeding that may give rise to an indemnity payment pursuant to Article III, such Indemnified Party shall notify the Indemnifying Party in writing of such Tax Proceeding, and thereafter shall promptly forward or make available to the Indemnifying Party copies of notices and communications relating to such Tax Proceeding. The failure of the Indemnified Party to notify the Indemnifying Party in writing of the commencement of any such Tax Proceeding within such ten (10) day period or promptly forward any further notices or communications shall not relieve the Indemnifying Party of any obligation which it may have to the Indemnified Party under this Agreement except to the extent (and only to the extent) that the Indemnifying Party is actually materially prejudiced by such failure.

Section 5.02   Tax Proceeding Procedures.

(a)   EFH.   EFH shall be entitled to contest, compromise, and settle any adjustment that is proposed, asserted or assessed pursuant to any Tax Proceeding with respect to any Tax Return it is responsible for preparing pursuant to Article II; *provided that* to the extent that such Tax Proceeding relates to Reorganized TCEH Taxes or would reasonably be expected to materially adversely affect the Tax position of any Reorganized TCEH Entity for any Post-Distribution Period, EFH shall (i) keep Reorganized TCEH informed in a timely manner of the material actions proposed to be taken by EFH with respect to such Tax Proceeding, (ii) permit Reorganized TCEH at its own expense to participate in the aspects of such Tax Proceeding that relate to Reorganized TCEH Taxes, and (iii) not settle any aspect of such Tax Proceeding that relates to Reorganized TCEH Taxes without the prior written consent of Reorganized TCEH, which shall not be unreasonably withheld, delayed or conditioned. Notwithstanding the foregoing, Reorganized TCEH shall have the right to control any Tax Proceeding that relates primarily to Taxes for which Reorganized TCEH has an indemnification obligation pursuant to Section 3.02.

(b)   Reorganized TCEH.   Except as otherwise provided in Section 5.02(a), Reorganized TCEH shall be entitled to contest, compromise, and settle any adjustment that is proposed, asserted or assessed pursuant to any Tax Proceeding with respect to any Tax Return it is responsible for preparing pursuant to Article II; *provided that* to the extent that such Tax Proceeding relates to EFH Taxes or would reasonably be expected to materially adversely affect the Tax position of any Reorganized EFH Entity, Reorganized TCEH shall (i) keep EFH

informed in a timely manner of the material actions proposed to be taken by Reorganized TCEH with respect to such Tax Proceeding, (ii) permit EFH at its own expense to participate in the aspects of such Tax Proceeding that relate to EFH Taxes, and (iii) not settle any aspect of such Tax Proceeding that relates to EFH Taxes without the prior written consent of EFH, which shall not be unreasonably withheld, delayed or conditioned. Notwithstanding the foregoing, EFH shall have the right to control any Tax Proceeding that relates primarily to Taxes for which EFH has an indemnification obligation pursuant to Section 3.01.

ARTICLE VI

Intended Tax Treatment

Section 6.01    Restrictions Relating to the Distribution.

(a)    *General.*  Following the Distribution, (i) the EFH Parties will not (and will cause each other Reorganized EFH Entity not to) take any action (or refrain from taking any action) which is inconsistent with the facts presented and the representations made prior to the Effective Date in the Tax Materials and (ii) Reorganized TCEH will not (and will cause each other Reorganized TCEH Entity not to) take any action (or refrain from taking any action) which is inconsistent with the facts presented and the representations made prior to the Effective Date in the Tax Materials. Each of the EFH Parties and Reorganized TCEH covenants and agrees that it will not take, and will cause its respective Affiliates to refrain from taking, any position on any Tax Return that is inconsistent with the Intended Tax Treatment, except as required by a Final Determination.

(b)    *Restrictions.*  Without derogating from the generality of Section 6.01(a), following the Distribution and prior to the first day following the second anniversary of the Effective Date (the "Restriction Period"), each EFH Party and Reorganized TCEH shall, and except with respect to clause (iii) of this Section 6.01(b), shall cause each of its respective Subsidiaries set forth on Exhibit A to:

(i)    continue the active conduct of each trade or business (for purposes of Section 355(b) of the Code and the Treasury Regulations thereunder) (A) that it was engaged in immediately prior to the Distribution (taking into account Section 355(b)(3) of the Code), (B) that was being relied upon for purposes of satisfying the requirements of Section 355(b) of the Code and the Treasury Regulations thereunder and (C) the substantial assets of which are identified on Exhibit B;

(ii)    continue to hold certain assets identified on Exhibit B and held at the time of the Distribution;

(iii)    not dissolve or liquidate or take any action that is a liquidation for U.S. federal income tax purposes;

(iv)    not merge or consolidate with any other Person with such other Person surviving the merger or consolidation in a transaction that does not qualify as a reorganization under Section 368(a) of the Code;

19

(v)     not redeem or otherwise repurchase (directly or indirectly through an Affiliate) any of its equity other than pursuant to open market stock repurchase programs meeting the requirements of Section 4.05(1)(b) of Rev. Proc. 96-30, 1996-1 C.B. 696; and

(vi)    not directly or indirectly acquire any of the Preferred Stock.

(c)     *Certain Exceptions.*  Notwithstanding the restrictions imposed by Section 6.01(b), during the Restriction Period, the EFH Parties and Reorganized TCEH may proceed with any of the actions or transactions described therein, if:

(i)     such action or transaction is described in (or is otherwise consistent with) the facts in the Private Letter Ruling;

(ii)    a supplemental private letter ruling is received from the IRS in form and substance reasonably satisfactory to EFH and Reorganized TCEH to the effect that such action or transaction will not affect the Intended Tax Treatment of any applicable transaction;

(iii)   EFH or Reorganized TCEH, as the case may be, obtains an Unqualified Tax Opinion with respect to such action or transaction at least thirty (30) days prior to effecting such action or transaction;

(iv)    such action is the issuing of stock or options to employees under a compensation plan adopted after the Distribution; or

(v)     such action by the EFH Parties and/or their Affiliates is approved in writing by Reorganized TCEH and such action by Reorganized TCEH and/or its Affiliates is approved in writing by EFH.

If the EFH Parties, on the one hand, or Reorganized TCEH, on the other, notifies the other Party that it desires to take one of the actions described in Section 6.01(b) (a "Notified Action"), the EFH Parties and Reorganized TCEH shall cooperate in obtaining a supplemental private letter ruling from the IRS or an Unqualified Tax Opinion for the purpose of permitting the EFH Parties or Reorganized TCEH to take the Notified Action.

ARTICLE VII

Cooperation

Section 7.01    General Cooperation.  The Parties shall each cooperate fully (and each shall cause its respective Subsidiaries to cooperate fully) with all reasonable requests in writing or via e-mail from another Party, or from an agent, representative or advisor to such Party, in connection with the preparation and filing of Tax Returns, claims for Refunds, Tax Proceedings, Tax ruling requests, and calculations of amounts required to be paid pursuant to this Agreement, in each case, related or attributable to or arising in connection with Taxes of any of the Parties or their respective Subsidiaries covered by this Agreement and the establishment of any reserve required in connection with any financial reporting (a "Tax Matter").  Such cooperation shall

include the provision of any information reasonably necessary or helpful in connection with a Tax Matter and shall include at each Party's own cost:

        (i)     the provision, in hard copy and electronic forms, of any Tax Returns of the Parties and their respective Subsidiaries, books, records (including information regarding ownership and Tax basis of property), documentation, and other information relating to such Tax Returns, including accompanying schedules, related work papers, and documents relating to rulings or other determinations by Taxing Authorities;

        (ii)    the execution of any document (including any power of attorney) reasonably requested by another Party in connection with any Tax Proceedings of any of the Parties or their respective Subsidiaries, or the filing of a Tax Return or a Refund claim of the Parties or any of their respective Subsidiaries; and

        (iii)   the use of the Party's reasonable best efforts to obtain any documentation in connection with a Tax Matter.

Each Party shall make its employees, advisors, and facilities available, without charge, on a reasonable and mutually convenient basis in connection with the foregoing matters in a manner that does not interfere with the ordinary business operations of such Party.

Section 7.02   Retention of Records.   The EFH Parties and Reorganized TCEH shall retain or cause to be retained all Tax Returns, schedules, and work papers, and all material records or other documents relating thereto in their possession, including all such electronic records, and shall maintain all hardware necessary to retrieve such electronic records, in all cases until sixty (60) days after the expiration of the applicable statute of limitations (including any waivers or extensions thereof) of the taxable periods to which such Tax Returns and other documents relate or until the expiration of any additional period that any Party reasonably requests, in writing, with respect to specific material records and documents. A Party intending to destroy any material records or documents shall provide the other Party with reasonable advance notice and the opportunity to copy or take possession of such records and documents. The Parties will notify each other in writing of any waivers or extensions of the applicable statute of limitations that may affect the period for which the foregoing records or other documents must be retained.

Section 7.03   Failure to Perform.   If a Party materially fails to comply with any of its obligations set forth in Section 7.01 or Section 7.02 upon reasonable request and notice by the other Party, and such failure results in the imposition of additional Taxes, the non-performing Party shall be liable in full for such additional Taxes notwithstanding anything to the contrary in this Agreement.

ARTICLE VIII

Miscellaneous

Section 8.01   Governing law.   This Agreement and all issues and questions concerning the construction, validity, enforcement, and interpretation of this Agreement (and all Schedules

and Exhibits) shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware. In furtherance of the foregoing, the internal laws of the State of Delaware shall control the interpretation and construction of this Agreement (and all Schedules and Exhibits), even though under that jurisdiction's choice of law or conflict of law analysis, the substantive law of some other jurisdiction would ordinarily apply.

Section 8.02  Dispute Resolution. In the event of any dispute among the Parties as to any matter covered by Section 2.02 and Section 2.04, the Parties shall appoint a nationally recognized independent public accounting firm (the "Accounting Firm") to resolve such dispute. In this regard, the Accounting Firm shall make determinations with respect to the disputed items based solely on representations made by the EFH Parties and Reorganized TCEH and their respective representatives, and not by independent review, and shall function only as an expert and not as an arbitrator and shall be required to make a determination in favor of one Party only. The Parties shall require the Accounting Firm to resolve all disputes no later than thirty (30) days after the submission of such dispute to the Accounting Firm and agree that all decisions by the Accounting Firm with respect thereto shall be final and conclusive and binding on the Parties. The Accounting Firm shall resolve all disputes in a manner consistent with this Agreement. The Parties shall require the Accounting Firm to render all determinations in writing and to set forth, in reasonable detail, the basis for such determination. The fees and expenses of the Accounting Firm shall be borne equally by the Parties. For the avoidance of doubt, any dispute among the Parties as to any matter not covered by Section 2.02 or Section 2.04 shall be governed by the provisions set forth in Section 8.16.

Section 8.03  Tax Sharing Agreements. All Tax sharing, indemnification, and similar agreements, written or unwritten, as between a Reorganized EFH Entity, on the one hand, and a Reorganized TCEH Entity, on the other (other than this Agreement and any other agreement for which Taxes is not the principal subject matter), shall be or shall have been terminated (and, to the extent provided under the Plan, settled) no later than the Effective Date and, after the Effective Date, no Reorganized EFH Entity or Reorganized TCEH Entity shall have any further rights or obligations under any such Tax sharing, indemnification or similar agreement, except as provided in the Plan.

Section 8.04  Interest on Late Payments. With respect to any payment among the Parties pursuant to this Agreement not made by the due date set forth in this Agreement for such payment, the outstanding amount will accrue interest at a rate per annum equal to the rate in effect for underpayments under Section 6621 of the Code from such due date to and including the payment date.

Section 8.05  Survival of Covenants. Except as otherwise contemplated by this Agreement, the covenants and agreements contained herein to be performed following the Distribution shall survive the Distribution in accordance with their respective terms.

Section 8.06  Severability. If any provision of this Agreement or the application of any such provision to any Person or circumstance shall be declared judicially to be invalid, unenforceable or void, such decision shall not have the effect of invalidating or voiding the

Case 14-10979-CSS    Doc 6097-1    Filed 09/18/15    Page 369 of 522

remainder of this Agreement, it being the intent and agreement of the Parties that this Agreement shall be deemed amended by modifying such provision to the extent necessary to render it valid, legal, and enforceable to the maximum extent permitted while preserving its intent or, if such modification is not possible, by substituting therefor another provision that is valid, legal, and enforceable and that achieves the original intent of the Parties.

Section 8.07    Entire Agreement.    This Agreement, the Exhibits, the other Transaction Agreements, the Plan and the other documents referred to herein shall constitute the entire agreement among the Parties with respect to the subject matter hereof and shall supersede all previous negotiations, commitments, and writings with respect to such subject matter.  Except as otherwise expressly provided herein, in the case of any conflict between the terms of this Agreement and the terms of any other agreement, the terms of this Agreement shall control.

Section 8.08    Assignment.    Neither this Agreement nor any of the rights, benefits or obligations hereunder may be assigned by any of the Parties (whether by operation of law or otherwise) without the prior written consent of the other Parties, and any purported assignment without such consent shall be null and void.  Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by the Parties and their respective successors and permitted assigns.

Section 8.09    No Third Party Beneficiaries.    Nothing in this Agreement, express or implied, is intended to or shall confer upon any Person (other than the Parties and their respective successors and permitted assigns) any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, and, except as provided in Article III relating to certain indemnitees, no Person shall be deemed a third party beneficiary under or by reason of this Agreement.

Section 8.10    Affiliates.    Each EFH Party shall cause to be performed, and hereby guarantees the performance of, all actions, agreements, and obligations set forth herein to be performed by an Affiliate of such EFH Party, and Reorganized TCEH shall cause to be performed, and hereby guarantees the performance of, all actions, agreements, and obligations set forth herein to be performed by an Affiliate of Reorganized TCEH.

Section 8.11    Amendments; Waivers.    This Agreement may not be amended except by an instrument in writing signed by each of the Parties.  No failure or delay by any Party in exercising any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right hereunder.  Any agreement on the part of any Party to any such waiver shall be valid only if set forth in an instrument in writing signed on behalf of such Party.

Section 8.12    Interpretation.    The Parties have participated jointly in the negotiation and drafting of this Agreement, and in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provisions of this Agreement.

Section 8.13  <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or portable document format (PDF) shall be as effective as delivery of a manually executed counterpart of any such Agreement.

Section 8.14  <u>Confidentiality</u>.  Each Party shall hold and cause its directors, officers, employees, advisors, and consultants to hold in strict confidence, unless compelled to disclose by judicial or administrative process or, in the opinion of its counsel, by other requirements of law, all information (other than any such information relating solely to the business or affairs of such party) concerning the other Party furnished it by such other Party or its representatives pursuant to this Agreement (except to the extent that such information can be shown to have been (a) in the public domain through no fault of such Party or (b) later lawfully acquired from other sources not under a duty of confidentiality by the party to which it was furnished), and no Party shall release or disclose such information to any other Person, except its directors, officers, employees, auditors, attorneys, financial advisors, bankers or other consultants who shall be advised of and agree to be bound by the provisions of this <u>Section 8.14</u>.  Each Party shall be deemed to have satisfied its obligation to hold confidential information concerning or supplied by the other Party if it exercises the same care as it takes to preserve confidentiality for its own similar information.  Except as required by law or with the prior written consent of the other Party, all Tax Returns, documents, schedules, work papers and similar items and all information contained therein, and any other information that is obtained by a Party or any of its Affiliates pursuant to this Agreement, shall be kept confidential by such Party and its Affiliates and representatives, shall not be disclosed to any other Person, and shall be used only for the purposes provided herein.  If a Party or any of its Affiliates is required by law to disclose any such information, such Party shall give written notice to the other Party prior to making such disclosure.

Section 8.15  <u>Waiver of Jury Trial</u>.  AS A SPECIFICALLY BARGAINED INDUCEMENT FOR EACH PARTY TO ENTER INTO THIS AGREEMENT (WITH EACH PARTY HAVING HAD OPPORTUNITY TO CONSULT COUNSEL), EACH PARTY EXPRESSLY AND IRREVOCABLY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING UNDER THIS AGREEMENT OR ANY ACTION OR PROCEEDING ARISING OUT OF THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY OTHER TRANSACTION AGREEMENT, REGARDLESS OF WHICH PARTY INITIATES SUCH ACTION OR PROCEEDING, AND ANY ACTION OR PROCEEDING UNDER THIS AGREEMENT OR ANY ACTION OR PROCEEDING ARISING OUT OF THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY OTHER TRANSACTION AGREEMENT SHALL BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

Section 8.16  <u>Jurisdiction; Service of Process</u>.  Any action with respect to this Agreement and the rights and obligations arising hereunder, or for recognition and enforcement of any judgment in respect of this Agreement and the rights and obligations arising hereunder brought by a Party or its successors or assigns, in each case, shall be brought and determined exclusively in the Bankruptcy Court (or, if the Bankruptcy Court declines to accept jurisdiction over a particular matter, then the Chancery Court of the State of Delaware, and if the Chancery

Court of the State of Delaware declines jurisdiction, then any state or federal court sitting in Delaware). Each Party hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any Action with respect to this Agreement (a) any claim that is not personally subject to the jurisdiction of the above named courts for any reason other than the failure to serve in accordance with this Section 8.16, (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and (c) to the fullest extent permitted by applicable law, any claim that (i) the Action in such court is brought in an inconvenient forum, (ii) the venue of such Action is improper or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts. Each Party further agrees that no Party to this Agreement shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 8.16 and each Party waives any objection to the imposition of such relief or any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument. The Parties hereby agree that mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 8.17, or in such other manner as may be permitted by law, shall be valid and sufficient service thereof and hereby waive any objections to service accomplished in the manner herein provided. NOTWITHSTANDING THIS Section 8.16, ANY DISPUTE REGARDING SECTION 2.02 OR SECTION 2.04 SHALL BE RESOLVED IN ACCORDANCE WITH SECTION 8.02; PROVIDED THAT THE TERMS OF SECTION 8.02 MAY BE ENFORCED BY EITHER PARTY IN ACCORDANCE WITH THE TERMS OF THIS SECTION 8.16.

Section 8.17   Notices.    All notices, requests, claims, demands, and other communications to be given or delivered under or by the provisions of this Agreement shall be in writing and shall be deemed given only (a) when delivered personally to the recipient, (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), *provided that* confirmation of delivery is received, (c) upon machine-generated acknowledgment of receipt after transmittal by facsimile or (d) five (5) days after being mailed to the recipient by certified or registered mail (return receipt requested and postage prepaid). Such notices, demands, and other communications shall be sent to the Parties at the following addresses (or at such address for a Party as will be specified by like notice):

If to any EFH Party:

Energy Future Holdings Corp., et al.
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201
Attention:    General Counsel
E-mail:        stacey.dore@energyfutureholdings.com
                 awright@energyfutureholdings.com

with a copy (which shall not constitute notice) to, until the Merger becomes effective:

Kirkland & Ellis LLP
600 Travis St., Suite 3300
Houston, Texas 77002
Attention:     Andrew Calder
               Amber Meek
E-mail:        andrew.calder@kirkland.com
               amber.meek@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attention:     James Sprayregen
               Marc Kieselstein
               Chad Husnick
               Steven Serajeddini
E-mail:        jsprayregen@kirkland.com
               mkieselstein@kirkland.com
               chusnick@kirkland.com
               steven.serajedinni@kirkland.com

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:     Edward Sassower
               Stephen Hessler
               Brian Schartz
E-mail:        edward.sassower@kirkland.com
               stephen.hessler@kirkland.com
               bschartz@kirkland.com

<u>with a copy (which shall not constitute notice) to, when and after the Merger
becomes effective:</u>

Hunt Consolidated, Inc.
1900 North Akard Street
Dallas, Texas 75201
Attention:     David Hernandez
E-mail:        DHernandez@huntconsolidated.com

and

Baker Botts L.L.P.
2001 Ross Avenue, Suite 600

Dallas, Texas 75201
Attention:    Geoffrey L. Newton
              Luckey McDowell
              Preston Bernheisel
E-mail:    geoffrey.newton@bakerbotts.com
              luckey.mcdowell@bakerbotts.com
              preston.bernhisel@bakerbotts.com

and

White & Case LLP
Wachovia Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Attention:    Thomas E. Lauria
E-mail:    tlauria@whitecase.com

and

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Attention:    Gregory Pryor
E-mail:    gpryor@whitecase.com

<u>If to Reorganized TCEH, after the Distribution</u>:

[Reorganized TCEH]
[Energy Plaza
1601 Bryan Street
Dallas, Texas 75201]

<u>with a copy (which shall not constitute notice) to</u>:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attention:    Alan W. Kornberg
              Brian S. Hermann
              Jacob A. Adlerstein
E-mail:    akornberg@paulweiss.com
              bhermann@paulweiss.com
              jadlerstein@paulweiss.com

Any Party to this Agreement may notify any other Party of any changes to the address or any of the other details specified in this paragraph; *provided that* such notification shall only be effective on the date specified in such notice or five (5) Business Days after the notice is given,

whichever is later. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver. Any notice to any EFH Party will be deemed notice to all the Reorganized EFH Entities, and any notice to Reorganized TCEH will be deemed notice to all the Reorganized TCEH Entities.

Section 8.18    Headings.    The headings and captions of the Articles and Sections used in this Agreement and the table of contents to this Agreement are for reference and convenience purposes of the Parties only, and will be given no substantive or interpretive effect whatsoever.

Section 8.19    Effectiveness.    This Agreement shall become effective upon the Distribution.

Section 8.20    Further Assurances.    The EFH Parties shall cause each other Person that is or becomes a Subsidiary of EFH that is not "ring-fenced" to execute a joinder to this Agreement (a) to become an EFH Party (effective as of the date such Person becomes a Subsidiary of EFH or ceases to be "ring-fenced") and (b) to be bound by the obligations of the EFH Parties under this Agreement on a joint and several basis.


*[The remainder of this page is intentionally left blank.]*

Case 14-10979-CSS    Doc 6097-1    Filed 09/18/15    Page 375 of 522

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the day and year first above written.

ENERGY FUTURE HOLDINGS CORP.


By:_____


ENERGY FUTURE INTERMEDIATE
HOLDING COMPANY LLC


By:_____


[REORGANIZED TCEH]


By:_____

Case 14-10979-CSS    Doc 6097-1    Filed 09/18/15    Page 376 of 522

Exhibit A[2]

---

[2]  Note to Draft:  List of Subsidiaries to be provided by mutual agreement of the Parties through good faith negotiation.

Case 14-10979-CSS   Doc 6097-1   Filed 09/16/15   Page 377 of 522

<u>Exhibit B</u>[3]

---

[3] <u>Note to Draft</u>:  List of assets to be provided by mutual agreement of the Parties through good faith negotiation and shall be consistent with the IRS Submissions.

2

## SCHEDULE 6.4

### REQUESTS FOR INFORMATION

Michael Carter (with a copy to Patrick Williams and Greg Santos)

# Annex 1

## Backstop Purchasers

Anchorage Capital Master Offshore, Ltd.

Arch Reinsurance Ltd.

Arrowgrass Distressed Opportunities Fund Limited

Arrowgrass Master Fund Ltd.

Atlas Enhanced Master Fund, Ltd.

Atlas Master Fund, Ltd.

Avenue Capital Management II, L.P.

Bam Zie Master Fund, Ltd.

BGF Global High Yield Bond Fund

BGF Global Multi-Asset Income Fund, a sub-fund of BlackRock Global Funds

BGF US Dollar High Yield Bond Fund

BHR Capital LLC, as nominee for BHCO Master, Ltd., BHR Master Fund, Ltd. and BHR OC Master Fund, Ltd.

BlackRock Core Bond Trust

BlackRock Corporate High Yield Fund, Inc.

BlackRock Credit Allocation Income Trust IV

BlackRock Credit Alpha Master Fund L.P.

BlackRock Diversified Distribution Fund

BlackRock Dynamic High Income Portfolio of BlackRock Funds II

BlackRock Funds II, BlackRock High Yield Bond Portfolio

BlackRock Funds II, BlackRock Strategic Income Opportunities Portfolio

BlackRock Global Investment Series: Income Strategies Portfolio

BlackRock Global Long/Short Credit Fund Of BlackRock Funds

BlackRock High Yield Portfolio of the BlackRock Series Fund, Inc.

BlackRock High Yield V.I. Fund of BlackRock Variable Series Funds, Inc.

BlackRock Limited Duration Income Trust

BlackRock Multi-Asset Income Portfolio of BlackRock Funds II

BlackRock Multi-Sector Income Trust

BlackRock Multi-Strategy Master Fund Limited

BlackRock Secured Credit Portfolio of BlackRock Funds II

CA 534 Offshore Fund, Ltd

Centerbridge Credit Partners Master, L.P.

Centerbridge Credit Partners, L.P.

Centerbridge Special Credit Partners II, L.P.

Crescent 1, L.P.

CRS Master Fund, L.P.

Cyrus Opportunities Master Fund II, Ltd.

Cyrus Select Opportunities Master Fund, Ltd.

Deutsche Bank Securities Inc.

GSO Aiguille Des Grands Montets Fund I LP

GSO Aiguille Des Grands Montets Fund II LP

GSO Aiguille Des Grands Montets Fund III LP

GSO Cactus Credit Opportunities Fund LP

GSO Churchill Partners LP

GSO Coastline Credit Partners LP

GSO Credit Alpha Fund LP

GSO Credit-A Partners LP

GSO Palmetto Opportunistic Investment Partners LP

GSO Special Situations Master Fund LP

JNL/BlackRock Global Long Short Credit Fund

MET Investors Series Trust - BlackRock High Yield Portfolio

The Obsidian Master Fund

PCI Fund LLC

Steamboat Credit Opportunities Master Fund LP

Strategic Income Opportunities Bond Fund

Taconic Master Fund 1.5 L.P.

Taconic Opportunity Master Fund L.P.

## EXHIBIT C

### EQUITY COMMITMENT LETTER

**EXECUTION VERSION**

August 9, 2015

Ovation Acquisition I, L.L.C.
Ovation Acquisition II, L.L.C.
1900 North Akard Street
Dallas, Texas 75201
Attention: Interim Operations Committee

Energy Future Holdings Corp.
Energy Future Intermediate Holding Company LLC
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201
Attention: Boards of Directors

<u>Equity Commitment with respect to Merger Agreement</u>

Ladies and Gentlemen:

Reference is made to the Purchase Agreement and Agreement and Plan of Merger, dated as of the date hereof (as amended or modified in accordance with the terms thereof, the "<u>Merger Agreement</u>"), by and among Ovation Acquisition I, L.L.C., a Delaware limited liability company ("<u>Parent</u>"), Ovation Acquisition II, L.L.C., a Delaware limited liability company ("<u>OV2</u>" and, together with Parent, the "<u>Purchasers</u>"), Energy Future Holdings Corp., a Texas corporation (the "<u>Company</u>"), and Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("<u>EFIH</u>"), upon the terms and subject to the conditions of which, among other things, the reorganized Company will be merged with and into Parent. This letter agreement is being delivered to Parent, OV2, the Company and EFIH (collectively, the "<u>Commitment Beneficiaries</u>") in order to induce the Commitment Beneficiaries to enter into the Merger Agreement. Capitalized terms used but not defined herein have the meanings ascribed to them in the Merger Agreement.

      1.    <u>Commitment.</u>

Each of the parties listed on the signature pages hereto other than the Commitment Beneficiaries (each, an "<u>Initial Commitment Party</u>") hereby commits solely on its own behalf, severally and not jointly, upon the terms and subject to the conditions set forth in this letter agreement, that such Initial Commitment Party shall, directly or indirectly, purchase (A) such Initial Commitment Party's Allotted Portion (as defined below) of shares of common stock of Parent (the "<u>Shares</u>") in exchange for cash (which will be funded in accordance with <u>Section 2</u>), in the aggregate amount, if any, set forth opposite the name of such Initial Commitment Party (under the column entitled "Parent Investment") on <u>Exhibit A</u> hereto (such Person's "<u>Parent Investment Commitment</u>") and (B) such Initial Commitment Party's Allotted Portion (as defined below) of equity interests in OV2 (which equity interests shall be exchangeable, in

Ovation Acquisition I, L.L.C., Ovation Acquisition II, L.L.C.,
Energy Future Holdings Corp. and Energy
Future Intermediate Holding Company LLC      -2-                        August 9, 2015

accordance with the governing documents of the Purchasers, into the same number of Shares as the amount of the OV2 Investment would purchase if it were a Parent Investment) in exchange for cash in the aggregate amount, if any, set forth opposite the name of such Initial Commitment Party (under the column entitled "OV2 Investment") on Exhibit A hereto (such Person's "OV2 Investment Commitment"), in each case, to be used by the Purchasers, together with the proceeds of the Debt Financing (including any Alternative Debt Financing that has been obtained in accordance with, and satisfies the terms and conditions of Section 6.17 of the Merger Agreement), the proceeds of the Rights Offering and/or the equity financing provided by the Backstop Agreement and cash on hand of the Company and its Subsidiaries (other than the Oncor Entities), solely for the purpose of funding the Repayment of Claims (or repaying any Debt Financing used for such purpose) and any other amounts required to be paid or funded by the Purchasers or the Surviving Company pursuant to the Merger Agreement.   For the purposes of this letter agreement, the term "Investment Commitment" means, with respect to any Commitment Party (as defined below), the Parent Investment Commitment and the OV2 Investment Commitment of such Commitment Party. The price paid by each Commitment Party for each Share (or equity interest in OV2 exchangeable for a Share) shall be the same as the price per Share required to exercise Rights in the Rights Offering and the Purchase Price paid under the Backstop Agreement.   The amount of the Investment Commitment of each Commitment Party may only be reduced as follows: (i) in proportion to the Pro Rata Shares (as defined below) of the Commitment Parties with respect to a reduction to the aggregate amount of the Equity Financing, as contemplated by Section 1.1 of the Parent Disclosure Letter or (ii) as otherwise determined by the Commitment Parties, except that any reduction pursuant to this clause (ii) shall require the prior written consent of the Company and EFIH (in their sole discretion). Exhibit A shall be revised in order to reflect any reduction of the Investment Commitments pursuant to the previous sentence.

"Allotted Portion" means, with respect to any Commitment Party, the allotted portion of the Shares of Parent or equity interests in OV2 (based on the election of such Commitment Party as to whether to invest in Shares of Parent or equity interests in OV2 as set forth in the appropriate column on Exhibit A) that reflects such Commitment Party's Pro Rata Share of the aggregate Investment Commitments.

Parent or OV2, as the case may be, shall issue or cause to be issued such Shares or OV2 equity interests, as the case may be to each relevant Commitment Party, upon the occurrence of the First Closing, in the case of Shares, and the Second Closing, in the case of OV2 equity interests, and payment of such Commitment Party's Investment Commitment in accordance with this letter agreement, pursuant to a customary subscription agreement to be entered into among Parent or OV2, as the case may be, on the one hand, and the Commitment Parties, on the other hand, which agreement shall include, among other things, representations and warranties substantially similar to those contained in Sections 6.1(a) through 6.1(f) of the Backstop Agreement.  All Shares and equity interests in OV2 will be issued with all issue, stamp, transfer, sales and use, or similar Taxes or duties that are due and payable (if any,

Ovation Acquisition I, L.L.C., Ovation Acquisition II, L.L.C.,
Energy Future Holdings Corp. and Energy
Future Intermediate Holding Company LLC        -3-                          August 9, 2015

including pursuant to Section 1146 of the Bankruptcy Code) in connection with such delivery and shall be duly paid by the Surviving Company out of the proceeds of the Equity Financing. Upon issuance, such Shares and equity interests will be duly authorized, validly issued, fully paid and non- assessable (or, in the case of the equity interests in OV2, not subject to capital call obligations under the governing documents of OV2), and free and clear of all Liens.

Each Commitment Party may cause the funding of its Investment Commitment, directly or indirectly, to be made through one or more direct or indirect Subsidiaries of such Commitment Party or any investment fund or funds advised or managed by an Affiliate of such Commitment Party or any other investor or investors that is a limited partner of any such investment fund; *provided,* that none of the foregoing shall eliminate or modify in any manner the Commitment Party's obligation to fund its Investment Commitment in the event that such direct or indirect Subsidiaries of such Commitment Party or any investment fund or funds advised or managed by an Affiliate of such Commitment Party or any other investor or investors that is a limited partner of any such investment fund fails to fund any portion of the Investment Commitment as and when required by this letter agreement or otherwise relieve such Commitment Party of its other obligations under this letter agreement. A Commitment Party shall not be under any obligation under any circumstances to contribute more than its Investment Commitment pursuant to the terms of this letter agreement or otherwise in connection with the Transactions.

All cash contributions or cash payments in respect of the Investment Commitment hereunder, if any, shall be made in lawful money of the United States, in immediately available funds and paid strictly in accordance with the timing and the terms and conditions set forth in this letter agreement and the Merger Agreement.

Notwithstanding anything to the contrary herein, the Purchasers and any Commitment Parties that are registered investment companies pursuant to the Investment Company Act of 1940 as amended, (the "Investment Company Act") may mutually agree to the issuance by either Purchaser to such Commitment Parties of equity interests or promissory notes or any appropriate arrangements agreed to by such Purchaser and such Commitment Parties that enable such Commitment Parties to fulfil their obligations under this letter agreement and comply with the applicable restrictions and limitations imposed on them under the Investment Company Act.

2.      Funding the Investment Commitment; Conditions to the Investment Commitment.

(a)      On the Backstop Funding Date (as such term is defined under the Backstop Agreement attached hereto as Exhibit D) (the "Funding Date"), subject to the prior funding of the proceeds, if any, of the Rights Offering into escrow pursuant to the Backstop Agreement and the substantially concurrent funding of the aggregate Backstop Commitment (as such term is defined under the Backstop Agreement) into escrow pursuant to the Backstop Agreement, each Commitment Party shall pay an amount equal to its Investment Commitment

Ovation Acquisition I, L.L.C., Ovation Acquisition II, L.L.C.,
Energy Future Holdings Corp. and Energy
Future Intermediate Holding Company LLC    -4-    August 9, 2015

into an escrow account (the "Escrow Account") established by the Commitment Beneficiaries
with an escrow agent (the "Escrow Agent") reasonably acceptable to each of the Commitment
Beneficiaries, by any combination of (i) a wire transfer of cash in immediately available funds
or (ii) delivering to the Escrow Agent an irrevocable standby letter of credit (a "Qualifying
Letter of Credit") issued by an Eligible Financial Institution (as defined below) which names
the Escrow Agent as the sole beneficiary thereof. The escrow agreement (the "Escrow
Agreement") by and among the Commitment Beneficiaries and the Escrow Agent establishing
the Escrow Account shall be on terms reasonably acceptable to each of the Commitment
Beneficiaries and shall provide, among other things, that: (i) any funds in the escrow account
shall be released and the Escrow Agent shall be permitted to draw on the Qualifying Letters
of Credit only with the express written instruction of each of the Purchasers in accordance
with Section 2(b), and (ii) all fees and expenses of the Escrow Agent in connection therewith
shall be paid by the Purchasers. Nothing in this letter agreement shall prevent a Commitment
Party that has funded all or a portion of its Investment Commitment by way of a Qualifying
Letter of Credit from funding into the Escrow Account an amount of cash equal to all or a
portion of the Qualifying Letter of Credit in order to reduce the amount funded by way of a
Qualifying Letter of Credit. An "Eligible Financial Institution" means a financial institution
having a long-term senior unsecured indebtedness rating of at least "A-" by Standard &
Poor's Ratings Services or Fitch Ratings Inc. or at least "A3" by Moody's Investors Service,
Inc.

      (b)    The Escrow Agreement shall provide that (i) the Escrow Agent shall draw the
full amount of each Qualifying Letter of Credit upon the delivery of a joint written instruction
signed by each of the Purchasers and (ii) the funds held in the Escrow Account (including all
such amounts drawn in accordance with the Escrow Agreement under the Qualifying Letters
of Credit), other than funds in an amount equal to the OV2 Investment Commitment, shall be
released to Parent in accordance with the terms of the Escrow Agreement only upon the
delivery of a joint written instruction signed by each of the Purchasers and only if all
Qualifying Letters of Credit held by the Escrow Agent have been fully funded in accordance
with their terms. The Purchasers shall provide such joint written instruction to the Escrow
Agent to draw the full amount of each Qualifying Letter of Credit and release of the funds
held in the Escrow Account only upon: (i) the satisfaction, or waiver by the Purchasers (if
permissible), of each of the conditions to the obligations of the Purchasers set forth in Section
7.1 and Section 7.2 of the Merger Agreement, (ii) the prior or substantially concurrent funding
of the Debt Financing (including any Alternative Debt Financing that has been obtained in
accordance with, and satisfies the conditions of, Section 6.17 of the Merger Agreement), (iii)
the funding of all of the Investment Commitments into the Escrow Account in accordance
with Section 2(a), (iv) the prior or substantially concurrent release of the funds held in escrow
pursuant to the Backstop Agreement and (v) the substantially concurrent consummation of the
First Closing and the Plan Effective Date in accordance with the terms of the Merger
Agreement and the Plan of Reorganization.

Ovation Acquisition I, L.L.C., Ovation Acquisition II, L.L.C.,
Energy Future Holdings Corp. and Energy
Future Intermediate Holding Company LLC      -5-                                    August 9, 2015

(c)    After the release of the funds held in the Escrow Account pursuant to Section 2(b), the remaining funds held in the Escrow Account (including all amounts drawn in accordance with the Escrow Agreement under the Qualifying Letters of Credit on the First Closing Date) shall be released to OV2 only upon the written instruction signed by OV2 upon the substantially concurrent consummation of the Second Closing in accordance with the terms of the Merger Agreement.

(d)    If the amount of the Investment Commitment of each Commitment Party is validly reduced in accordance with Section 1 after the Funding Date, then the Purchasers shall promptly deliver to each Commitment Party, the Debtor Commitment Beneficiaries and the Escrow Agent a written notice of such reduction (a "Reduction Notice"), together with a revised Exhibit A to reflect such reduction of the Investment Commitments of each Commitment Party and (i) each applicable Commitment Party shall cause any Qualifying Letter of Credit issued on its behalf, and that does not, by its terms, provide for the automatic reduction of the amount of such Qualifying Letter of Credit in accordance with Section 1 hereto, to be promptly replaced (and in any event, within two (2) Business Days of receipt of the Reduction Notice) with a new Qualifying Letter of Credit for such Commitment Party's reduced Investment Commitment in Exhibit A, and (ii) the Purchasers shall promptly give joint written notice to the Escrow Agent to release to each applicable Commitment Party from the Escrow Account each Qualifying Letter of Credit that has been so replaced or, to the extent any Commitment Party has funded its Investment Commitment with cash, an appropriate amount of cash to reflect the valid reduction to such Commitment Party's Investment Commitment in accordance with Section 1.

(e)    If this letter agreement is terminated in accordance with its terms, the Purchasers shall provide a written termination notice to the Escrow Agent, as promptly as practicable following such termination. The Escrow Agreement shall provide that, upon the Escrow Agent's receipt of such termination notice, the Escrow Agent shall promptly return all letters of credit and all funds (and any interest or other income earned thereon) held in the Escrow Account by wire transfer of immediately available funds to the applicable Commitment Parties.

3.    Transfers of Investment Commitments.

Any Commitment Party (as defined below) (a "Transferor Commitment Party") may, from time to time during the period from the date hereof until the First Closing, (a) freely transfer all or any portion of its rights and obligations in connection with its Investment Commitment to (i) one or more of its Affiliates or funds or accounts that are managed or controlled by such Transferor Commitment Party or its Affiliates (other than a portfolio company) or (ii) another Commitment Party or one or more of its Affiliates or (b) with the prior written consent of the Company and EFIH (together, the "Debtor Commitment Beneficiaries"), on the one hand, and Parent, on the other hand (which consent, in each case, shall not be unreasonably withheld, conditioned or delayed) transfer all or any portion of its Investment Commitment to one or more other entities (with respect to any transfer by a