## Schedule 1

| Investor | Backstop Commitment | Pro Rata Share | Percentage of Backstop Premium |
|---|---|---|---|
| Anchorage Total | $ 1,700,000,000.00 | 33.42% | 32.79% |
| Arrowgrass Total | $ 334,900,000.00 | 6.58% | 6.46% |
| Avenue Total | $ 212,500,000.00 | 4.18% | 4.10% |
| BlackRock Total | $ 955,400,000.00 | 18.78% | 20.07% |
| Balyasny Total | $ 286,450,000.00 | 5.63% | 5.52% |
| BHR Total | $ 119,850,000.00 | 2.36% | 2.31% |
| Centerbridge Total | $ 336,600,000.00 | 6.62% | 6.49% |
| Cyrus Total | $ 191,250,000.00 | 3.76% | 3.93% |
| Deutsche Bank Total | $ 286,450,000.00 | 5.63% | 5.52% |
| GSO Total | $ 425,000,000.00 | 8.35% | 8.20% |
| Taconic Total | $ 238,850,000.00 | 4.70% | 4.61% |
| Total Investors | $ 5,087,250,000.00 | 100.00% | 100.00% |

**COMPANY DISCLOSURE LETTER**

TO

**BACKSTOP AGREEMENT**

by and among

**OVATION ACQUISITION I, L.L.C.,**

**ENERGY FUTURE HOLDINGS CORP.,**

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC,**

and

**THE INVESTORS SET FORTH THEREIN**

Dated as of August 9, 2015

This Disclosure Letter (this "<u>Letter</u>") is delivered pursuant to that certain Backstop Agreement (as hereinafter amended, modified or changed from time to time in accordance with the terms hereof, the "<u>Agreement</u>"), dated as of August 9, 2015, by and among Ovation Acquisition I, L.L.C., a Delaware limited liability company ("<u>Company</u>"), Energy Future Holdings Corp., a Texas corporation ("<u>EFH</u>"), Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("<u>EFIH</u>"), and the Investors set forth therein.  Capitalized terms used but not otherwise defined herein will have the meanings ascribed to them in the Agreement.

The information provided in this Letter is being provided solely for the purpose of making disclosures to EFH and EFIH under the Agreement.  In disclosing this information, the Company does not expressly waive any attorney-client privilege associated with such information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed herein.

The disclosures in this Letter are arranged by sections corresponding to the sections in the Agreement.  It is agreed, however, that disclosure of any item in any section or subsection of this Letter shall be deemed to have been disclosed with respect to any other section or subsection of this Letter if the relevance of such item is reasonably apparent from the information disclosed.

The specification of any dollar amount or the inclusion of any item in the disclosures contained in this Letter is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the ordinary course of business, and no party shall use the fact of the setting of the amounts or the fact of the inclusion of any item in this Letter in any dispute or controversy between the parties as to whether any obligation, item or matter not described or included in this Letter is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or is within or outside of the ordinary course of business. The information contained in this Letter is disclosed solely for purposes of the Agreement, and no information contained herein shall be deemed to be an admission by any party hereto to any third party of any matter whatsoever (including any violation of Law, breach of contract or other obligations of any kind).

This Letter and the information and disclosures contained herein are intended only to qualify and limit the representations or warranties of the Company contained in the Agreement and shall not be deemed to expand in any way the scope or effect of any of such representations, warranties or covenants.

## TABLE OF CONTENTS

**Section 2.1  Rights Offering Reductions**..........................................................................................1

**Section 5.1  Registered and Beneficial Owners**...............................................................................2

## Section 2.1

## Rights Offering Reductions

| Reduction Scenarios | Aggregate Backstop Commitment[1] | Aggregate Rights Offering Size |
|---|---|---|
| Minority Interest is Not Acquired | $4,071 | $4,771 |
| Minority Interest Acquired Solely from TTI | 5,076 | 5,776 |
| Minority Interest Acquired Solely from Oncor Management | 4,083 | 4,783 |
| Minority Interest Acquired from TTI and Oncor Management (no reductions) | 5,087 | 5,787 |

*(1) The Backstop Commitment of each Investor shall be reduced in the same proportion as the reductions set forth herein*

## Section 5.1

## Registered and Beneficial Owners

**1.**   Hunt Transmission Services, L.L.C. owns 100% of the membership interests in the Company.

**Exhibit A**

**Commitment Joinder Agreement**

_____, 201__

Ovation Acquisition I, L.L.C.
1900 North Akard Street
Dallas, Texas  75201
Attention: Management Committee

Energy Future Holdings Corp.
Energy Future Intermediate Holding Company LLC
Energy Plaza
1601 Bryan Street
Dallas, Texas  75201
Attention: Boards of Directors

Ladies and Gentlemen:

Reference is made to that certain Backstop Agreement, dated as of August 9, 2015 (the "Backstop Agreement"), among Ovation Acquisition I, L.L.C., Energy Future Holdings Corp. and Energy Future Intermediate Holding Company LLC and the Investors (as defined in the Backstop Agreement). Capitalized terms used but not defined herein have the meanings ascribed to them in the Backstop Agreement.

The undersigned hereby (i) acknowledges that it has received and reviewed a copy of the Backstop Agreement, and (ii) represents and warrants that, from and after the Certification Date, it will hold at least $1,000,000 in aggregate principal amount of Rights Offering Allowed Claims and (iii) agrees to assume and be bound by the obligations of [_____] in respect of the Transferred Backstop Commitment set forth on the signature page hereof, and to observe and comply with, all of the terms and provisions of the Backstop Agreement that are applicable with respect to such Transferred Backstop Commitment as if an original party hereto.

The undersigned also represents and warrants that, without limiting the generality of any representations and warranties made by the undersigned in any subscription agreement executed by it as a condition to its admission to the Company, the undersigned is a qualified institutional "accredited investor" as defined in Rule 501(a)(1), (2), (3) and (7) of Regulation D under the Securities Act of 1933, as amended, or a qualified "accredited investor" as defined in Rule 501(a)(8) of Regulation D, but only to the extent all of the equity owners thereof are investors which are qualified institutional "accredited investors" as defined in Rule 501(a)(1), (2), (3) and (7) of Regulation D.

*[Signature page follows]*

IN WITNESS WHEREOF, the undersigned has caused this Joinder to be executed as of the date first written above.

[_____]

By: _____

Name:_____

Title: _____

Transferred Commitment:

| Investor | Backstop Commitment | Pro Rata Share | Percentage of Backstop Premium |
|---|---|---|---|
| [●] | $[●] | [●]% | [●]% |

**<u>Exhibit B</u>**

**Guarantee**

(See attached.)

**EXECUTION VERSION**

# GUARANTEE

GUARANTEE, dated as of August 9, 2015 (this "<u>Guarantee</u>"), by each of the parties listed on the signature pages hereto (each, a "<u>Guarantor</u>"), in favor of Energy Future Holdings Corp., a Texas corporation (the "<u>Company</u>"), and Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("<u>EFIH</u>"). Capitalized terms used but not defined herein shall have the meanings given to such terms in either: (i) the Purchase Agreement and Agreement and Plan of Merger, dated as of the date hereof (as amended or modified in accordance with the terms thereof, the "<u>Merger Agreement</u>"), by and among Ovation Acquisition I, L.L.C., a Delaware limited liability company ("<u>Parent</u>"), Ovation Acquisition II, L.L.C., a Delaware limited liability company ("<u>OV2</u>" and, together with Parent, the "<u>Purchasers</u>"), the Company and EFIH, (ii) that certain letter agreement, dated as of the date hereof, by and among the Company, EFIH, the Purchasers and each Guarantor (the "<u>Equity Commitment Letter</u>") providing for certain commitments by the Guarantors to invest in the Purchasers, as applicable, or (iii) that certain Backstop Agreement, dated as of the date hereof, by and among the Company, EFIH, Parent and certain Guarantors (the "<u>Backstop Agreement</u>") providing for, among other things, certain commitments by the Guarantors that are party thereto to backstop the Rights Offering.

1.    <u>Guarantee</u>.   To induce the Company and EFIH to enter into the Merger Agreement, each Guarantor, intending to be legally bound, hereby absolutely, irrevocably and unconditionally guarantees to the Company and EFIH, severally and not jointly, upon the terms and subject to the conditions set forth in this Guarantee, the due and punctual payment and discharge of its Pro Rata Share (as defined below) of the obligation of the Purchasers to pay all fees, costs and expenses  (including the payment of indemnities) payable by either Purchaser under the Merger Agreement or the Plan of Reorganization, not to exceed $35 million in the aggregate (the "<u>Guaranteed Obligations</u>"); *provided*, that in no event shall any Guarantor's several and not joint liability in respect of the Guaranteed Obligations exceed such Guarantor's Pro Rata Share of the Guaranteed Obligations as set forth opposite the name of such Guarantor on <u>Annex 1</u> hereto, as such amount is adjusted to reflect any increase or decrease in the amount of any Guarantor's (i) Investment Commitment in accordance with <u>Section 1</u>, <u>Section 3</u> or <u>Section 4</u> of the Equity Commitment Letter and/or (ii) Backstop Commitment in accordance with <u>Section 2.1</u>, <u>Section 2.2(i)</u>, <u>Section 3.2(c)</u>, <u>Section 3.3(a)</u> or <u>Section 3.5(a)</u> of the Backstop Agreement (each such Guarantor's Pro Rata Share of the Guaranteed Obligations being referred to as the "<u>Cap</u>"). This Guarantee may not be enforced against any Guarantor without giving effect to the Cap (and to the provisions of <u>Sections 6</u>, <u>7</u> and <u>8</u> hereof). This Guarantee may be enforced only for the payment of money by Guarantor up to the Cap. All payments hereunder shall be made in lawful money of the United States, in immediately available funds. If any Purchaser fails to discharge any portion of the Guaranteed Obligations when due, each Guarantor's liability to the Company and EFIH hereunder in respect of its Pro Rata Share of the Guaranteed Obligations (up to the Cap) shall become immediately due and payable, and the Company and EFIH may at any time and from time to time, at the Company's and EFIH's option, and so long as any Purchaser has failed to discharge any portion of the Guaranteed Obligations, take any and all actions available hereunder or otherwise at law or in equity to

collect each Guarantor's Pro Rata Share of the Guaranteed Obligations (subject to the Cap). As used in this letter agreement, "Pro Rata Share" means, with respect to a Guarantor, the ratio of the aggregate Investment Commitment and, if applicable, Backstop Commitment of such Guarantor to the aggregate Investment Commitments and Backstop Commitments of all of the Guarantors, in each case as set forth on Annex 1 hereto, as such amount is adjusted to reflect any increase or decrease in the amount of any Guarantor's Investment Commitment in accordance with Section 1, Section 3 or Section 4 of the Equity Commitment Letter and/or Backstop Commitment in accordance with Section 2.1, Section 2.2(i), Section 3.2(c), Section 3.3(a) or Section 3.5(a) of the Backstop Agreement; *provided, however*, that whenever such term is used in a provision that refers to a Guarantor as a member of a group that represents a subset of all Guarantors, such ratio shall be calculated on the basis of the aggregate Investment Commitments and, if applicable, Backstop Commitments of all of the Guarantors who are members of such group (rather than all of the Guarantors).

In furtherance of the foregoing, each Guarantor acknowledges that this Guarantee is one of payment, not collection, and if any Purchaser fails to discharge any portion of the Guaranteed Obligations when due, the Company and EFIH may, in their sole discretion, bring and prosecute a separate action or actions against each Guarantor for the full amount of such Guarantor's Pro Rata Share of the Guaranteed Obligations (subject to the Cap), regardless of whether any such action is brought against any Purchaser or whether any Purchaser is joined in any such action or actions.

2.    Nature of Guarantee; Changes in Obligations; Certain Waivers.

(a)    Except as otherwise provided herein, the liability of each Guarantor in respect of the Guaranteed Obligations shall, to the fullest extent permitted under applicable Law, be absolute, irrevocable and unconditional irrespective of:

      i.    the value, genuineness, regularity, illegality or enforceability of the Merger Agreement, the Backstop Agreement, or any other Transaction Agreement, other than in the case of (A) fraud, (B) defenses to the payment of the Guaranteed Obligations that are available to the Purchasers under the Merger Agreement (including with respect to the value, genuineness, regularity, illegality or enforceability of the Merger Agreement), or (C) any attempt by the Company and/or EFIH or any Person acting on its behalf to seek to impose liability upon the Guarantors in violation of the provisions set forth in Section 6 or Section 7;

      ii.    any change in the corporate existence, structure or ownership of Parent or OV2, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting Parent or OV2 or any of their respective assets;

      iii.    any waiver, amendment or modification of the Merger Agreement in accordance with its terms, or change in the time, manner, place or terms

of payment or performance, or any change or extension of the time of payment or performance of, renewal or alteration of, any Guaranteed Obligation, any liability incurred directly or indirectly in respect thereof, or any agreement entered into by the Company and/or EFIH, on the one hand, and Purchasers, on the other hand, in connection therewith (so long as any such changes do not have the effect of increasing the Cap or changing the several nature of this Guarantee);

iv.    the existence of any claim, set-off or other right that the Guarantor may have at any time against Parent, OV2, the Company or EFIH, whether in connection with any Guaranteed Obligation or otherwise;

v.    the failure or delay on the part of the Company and/or EFIH to assert any claim or demand or to enforce any right or remedy against Parent, OV2 or any other Guarantor;

vi.    the adequacy of any other means the Company and/or EFIH may have of obtaining payment related to the Guaranteed Obligations; or

vii.    any other act or omission that may or might in any manner or to any extent vary the risk of the Guarantor or otherwise operate as a discharge of the Guarantor as a matter of law or equity, other than payment of the Guaranteed Obligations or any claim, defense or other matter referred to in clauses (A) through (C) of Section 2(a)(i) and in Section 2(f).

(b)    Each Guarantor waives promptness, diligence, notice of the acceptance of this Guarantee and of the Guaranteed Obligations, presentment, demand for payment, notice of non-performance, default, dishonor and protest, notice of any Guaranteed Obligation incurred and all other notices of any kind (other than notices to Parent, with a copy to its counsel, with respect to the Guaranteed Obligations pursuant to the Merger Agreement), all defenses which may be available by virtue of any stay, moratorium or other similar Law now or hereafter in effect or any right to require the marshaling of assets of Parent, OV2 or any other Person now or hereafter liable with respect to the Guaranteed Obligations.

(c)    To the fullest extent permitted by applicable Law, each Guarantor hereby waives any and all notice of the creation, renewal, extension or accrual of any of the Guaranteed Obligations (subject to the Cap) and notice of or proof of reliance by the Company and/or EFIH in respect of this Guarantee. The Guaranteed Obligations shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all other arrangements between Parent, OV2 or the Guarantors, on the one hand, and the Company and/or EFIH, on the other, provided for in the Merger Agreement shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. When pursuing its rights and remedies hereunder against any Guarantor, the Company and EFIH shall be under no obligation to pursue such rights and remedies it may have against Parent or OV2 or any other Person for the Guaranteed Obligations or any right of offset with respect thereto, and any failure by the

- 3 -

Company or EFIH to pursue such other rights or remedies, or to collect any payments from Parent or OV2 or any such other Person or to realize upon or to exercise any such right of offset, shall not relieve any Guarantor of any liability hereunder, and shall not impair the rights and remedies, whether express, implied or available as a matter of Law, of the Guarantors.

(d)     Neither the Company nor EFIH shall be obligated to file any claim relating to the Guaranteed Obligations if Parent or OV2 becomes subject to a bankruptcy, reorganization or similar proceeding, and the failure of the Company or EFIH to so file shall not affect the Guarantors' obligations hereunder (subject to the Cap).  If any payment made by a Guarantor to the Company and EFIH or in respect of the Guaranteed Obligations is rescinded or must otherwise be returned for any reason whatsoever, such Guarantor shall remain liable hereunder with respect to the Guaranteed Obligations as if such payment had not been made (subject to the Cap).

(e)     The Guarantors will not exercise any rights of subrogation or contribution against Parent or OV2, whether arising by contract or operation of Law (including, without limitation, any such right arising under bankruptcy or insolvency Laws) or otherwise, by reason of any payment by any of them pursuant to the provisions of this Guarantee unless and until the Guaranteed Obligations have been paid in full.

(f)     Notwithstanding anything to the contrary contained in this Guarantee or otherwise, the Company and EFIH each hereby agrees that each Guarantor shall have all defenses to the payment of its obligations under this Guarantee that would be available to Purchasers in respect of the Merger Agreement with respect to the Guaranteed Obligations.

(g)     Unless and until the Guaranteed Obligations have been paid in full, no Guarantor shall exercise against Parent, OV2 or any other Person now or hereafter liable with respect to the Guaranteed Obligations (including any other Guarantor) any rights of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Company or EFIH against Parent, OV2 or any other Person now or hereafter liable with respect to the Guaranteed Obligations (including any other Guarantor), whether arising by contract or operation of Law (including, without limitation, any such right arising under bankruptcy or insolvency Laws) or otherwise, including the right to take or receive from Parent, OV2 or any other Person now or hereafter liable with respect to the Guaranteed Obligations (including any other Guarantor), directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, by reason of any payment by it pursuant to the provisions of Section 1 hereof. If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the payment in full in immediately available funds of all amounts payable under this Guarantee, such amount shall be received and held in trust for the benefit of the Company and EFIH, shall be segregated from other property and funds of such Guarantor and shall forthwith be promptly paid or delivered to the Company and EFIH in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to all amounts payable by such Guarantor under this Guarantee.

3.      Representations and Warranties.

(a)      Each Guarantor hereby represents and warrants, severally as to itself only and not jointly, to the Purchasers, the other Guarantors, the Company and EFIH that (a) it has all requisite corporate, limited liability company or partnership (as the case may be) power and authority to execute, deliver and perform this Guarantee, (b) the execution, delivery and performance of this Guarantee by such Guarantor has been duly and validly authorized and approved by all necessary organizational action by it, (c) this Guarantee has been duly and validly executed and delivered by it and constitutes a legal, valid and binding obligation of such Guarantor, enforceable against such Guarantor in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting creditors' rights generally, and (ii) general equitable principles (whether considered in a proceeding in equity or at law) and (d) such Guarantor has the financial capacity to pay and perform its obligations under this Guarantee, and all funds necessary for such Guarantor to fulfill its obligations under this Guarantee shall be available to such Guarantor for so long as this Guarantee shall remain in effect in accordance with the provisions herein.

(b)      Each Purchaser hereby represents and warrants, severally as to itself only and not jointly, to the Guarantors, the Company and EFIH that (a) it has all requisite limited liability company power and authority to execute, deliver and perform this Guarantee, (b) the execution, delivery and performance of this Guarantee by such Purchaser has been duly and validly authorized and approved by all necessary organizational action by it and (c) this Guarantee has been duly and validly executed and delivered by it and constitutes a legal, valid and binding obligation of such Purchaser, enforceable against such Purchaser in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting creditors' rights generally, and (ii) general equitable principles (whether considered in a proceeding in equity or at law).

(c)      The Company and EFIH hereby jointly and severally represent and warrant to the Purchasers and the Guarantors that (a) each of the Company and EFIH has all requisite corporate or limited liability company (as the case may be) power and authority to execute, deliver and perform this Guarantee, (b) the execution, delivery and performance of this Guarantee by the Company and EFIH has been duly and validly authorized and approved by all necessary organizational action by each of the Company and EFIH (other than the requisite votes for approval of the Plan of Reorganization under the Bankruptcy Code) and (c) this Guarantee has been duly and validly executed and delivered by the Company and EFIH and, subject to the approval of the Bankruptcy Court, constitutes a legal, valid and binding obligation of the Company and EFIH, enforceable against each of the Company and EFIH in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting creditors' rights generally, and (ii) general equitable principles (whether considered in a proceeding in equity or at law).

4.    <u>No Assignment</u>.  The Company and EFIH may not assign, transfer or delegate their rights, interests or obligations under or in connection with this Guarantee, in whole or in part, to any other Person (except by operation of Law) without the prior written consent of each of the Guarantors, and any purported assignment, transfer or delegation without such consent shall be null and void.  No Guarantor may assign, transfer or delegate all or part of its rights, interests and obligations hereunder, without the prior written consent of the Company, EFIH and Parent, except to any other Person to which it may transfer all or a portion of its Investment Commitment in accordance with <u>Section 3</u> of the Equity Commitment Letter or its Backstop Commitment in accordance with <u>Section 3.5</u> of the Backstop Agreement without such consent, and subject to the execution of a joinder to this Guarantee in the form attached hereto as <u>Exhibit A</u> confirming its agreement to assume and be bound by the obligations of the applicable Guarantor; *provided,* that no such transfer will eliminate or modify in any manner the transferring Guarantor's obligations under this Guarantee (such that both the transferring Guarantor and the transferee of the Guarantee remain liable for the Guaranteed Obligations), unless otherwise consented to in writing by the Company, EFIH and Parent (in each case, such consent not to be unreasonably withheld, conditioned or delayed).   Notwithstanding the foregoing, following the Funding Date, the consent of the Company, EFIH and Parent shall not be required for a Guarantor to assign, transfer or delegate all or part of its rights, interests and obligations hereunder if such transferring Guarantor has fully funded its Investment Commitment in accordance with <u>Section 3</u> of the Equity Commitment Letter or its Backstop Commitment in accordance with <u>Section 3.5</u> of the Backstop Agreement and provides prior written notice of such transfer to each of the Company, EFIH and Parent; *provided,* that no such transfer will eliminate or modify in any manner the transferring Guarantor's obligations under this Guarantee (such that both the transferring Guarantor and the transferee of the Guarantee remain liable for the Guaranteed Obligations), unless otherwise consented to in writing by the Company, EFIH and Parent (in each case, such consent not to be unreasonably withheld, conditioned or delayed).  If a Guarantor transfers all or any portion of its rights, interests and obligations hereunder with the prior written consent of the Company, EFIH and Parent (such consent not to be unreasonably withheld, conditioned or delayed) in accordance with this <u>Section 4</u>, then upon such transfer, the transferring Guarantor shall have no further obligations hereunder in respect of such transferred rights, interests and obligations.  Following any assignment or transfer in accordance with this Guarantee, <u>Annex 1</u> hereto shall be revised and updated to reflect any changes in the identity of the Guarantors and their Pro Rata Shares and related Caps.

5.    <u>Notices</u>.   Any notice, request, instruction or other document to be given hereunder by any party to the others shall be in writing and delivered personally or sent by registered or certified mail, postage prepaid, by email or overnight courier:

<u>If to a Guarantor</u>:

To the notice information
set forth on such Guarantor's
signature page hereto.

<u>with copies (which shall not constitute notice) to:</u>

Baker Botts L.L.P.
2001 Ross Ave., Suite 600
Dallas, Texas 75201
Attention:     Geoffrey L. Newton
              Luckey McDowell
              Preston Bernhisel
Email:         geoffrey.newton@bakerbotts.com
              luckey.mcdowell@bakerbotts.com
              preston.bernhisel@bakerbotts.com

and

White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131
Attention:     Thomas E. Lauria
Email: tlauria@whitecase.com

and

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Attention:     Gregory Pryor
Email: gpryor@whitecase.com

<u>If to the Company and/or EFIH:</u>

Energy Future Holdings Corp., et al.
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201
Attention:     General Counsel
Email:         stacey.dore@energyfutureholdings.com; and
              awright@energyfutureholdings.com

<u>with copies (which shall not constitute notice) to:</u>

Kirkland & Ellis LLP
600 Travis St., Suite 3300

Houston, Texas 77002
Attention:    Andrew Calder
                Amber Meek
Email:        andrew.calder@kirkland.com
                amber.meek@kirkland.com

And

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attention:    James Sprayregen
                Marc Kieselstein
                Chad Husnick
                Steven Serajeddini
Email:        jsprayregen@kirkland.com
                mkieselstein@kirkland.com
                chusnick@kirkland.com
                steven.serajedinni@kirkland.com

And

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:    Edward Sassower
                Stephen Hessler
                Brian Schartz
Email:        edward.sassower@kirkland.com
                stephen.hessler@kirkland.com
                bschartz@kirkland.com

6.    <u>Termination</u>.  This Guarantee shall terminate in its entirety and each Guarantor shall have no further obligations or liabilities under or in connection with this Guarantee upon the earliest to occur of: (a) the First Closing, if the First Closing occurs, (b) the date which is forty-five (45) Business Days following the termination of the Merger Agreement if, on such date, neither the Company nor EFIH shall have made any valid claim for payment hereunder and (c) the date on which payment of the Guaranteed Obligations has been fully resolved pursuant to an agreement in writing executed by the Company and EFIH or indefeasibly paid in full if the Company or EFIH shall have made a valid claim for payment under this Guarantee within the time period specified in clause (b).

7.    <u>No Recourse</u>.  Notwithstanding anything to the contrary contained in this Guarantee, each of the Company and EFIH, by its acceptance of the benefits of this Guarantee,

hereby covenants, acknowledges and agrees, that no Person other than the Guarantors and their permitted assignees shall have any obligation under this Guarantee, and that, notwithstanding that the Guarantors (or any of their permitted assignees) may be a partnership or limited liability company, no recourse or right of recovery (whether at law, in equity, in contract, in tort or otherwise) under this Guarantee, shall be had against any Related Party of the Guarantors based upon the relationship of such Related Party to any Guarantors or, whether by or through attempted piercing of the corporate (or limited liability company or limited liability partnership) veil, or by invoking any alter ego theory, by or through any claim against or on behalf of the Purchasers, whether by the enforcement of any assessment or by or through any legal or equitable proceeding, or by virtue of any applicable Law, or otherwise, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any such Related Party, as such, for any obligations of the Guarantors under this Guarantee, or for any claim based on, in respect of, or by reason of such obligation. Notwithstanding the foregoing or anything else in this Guarantee to the contrary, nothing in this Guarantee shall limit the obligations of any Related Party of the Guarantors, any Purchaser or any other Person under any other Transaction Agreement to which it is a party for the benefit of the other parties thereto in accordance with the terms and subject to the limitations set forth therein and nothing in this <u>Section 7</u> shall limit the obligations of any Guarantor under this Guarantee (including any Guarantor that is a Related Party of another Guarantor, but only in its capacity as a Guarantor). "<u>Related Party</u>" means, with respect to any Person, (i) any former, current or future equity holder, controlling person, director, officer, employee, agent, advisor, representative, Affiliate, member, manager, general or limited partner of such Person and (ii) any former, current or future equity holder, controlling person, director, officer, employee, agent, advisor, representative, Affiliate, member, manager, general or limited partner of the foregoing; *provided*, that for the avoidance of doubt the Purchasers shall not be considered Related Parties of any Guarantor.

8.    <u>Remedies</u>.  The Company and EFIH agree that (A) none of the Guarantors are a party to the Merger Agreement, and nothing herein shall cause any of the Guarantors to become, or be deemed to have become, party to the Merger Agreement, and (B) the Company and EFIH shall in no event seek to recover any amount pursuant to this Guarantee from any Guarantor under this Guarantee in excess of the amount expressly payable by such Guarantor under this Guarantee.

9.    <u>Governing Law; Jurisdiction</u>.

(a)    THIS GUARANTEE, TOGETHER WITH ANY CLAIM, DISPUTE, REMEDY OR LEGAL PROCEEDING ARISING FROM OR RELATING TO THIS GUARANTEE OR THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY RELIEF OR REMEDIES SOUGHT BY ANY PARTY HERETO, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, SHALL BE CONSTRUED, PERFORMED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO ITS PRINCIPLES OR RULES OF CONFLICT OF LAWS TO THE EXTENT SUCH PRINCIPLES OR RULES WOULD

REQUIRE OR PERMIT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION. Each of the parties hereto (i) submits to the exclusive jurisdiction of the Bankruptcy Court (or, if the Bankruptcy Court declines to accept jurisdiction over a particular matter, then the Chancery Court of the State of Delaware, and if the Chancery Court of the State of Delaware declines jurisdiction, then any state or federal court sitting in Delaware) in any action or proceeding arising out of or relating to this Guarantee, (ii) agrees that all claims in respect of such action or proceeding may be heard and determined in any such court and (iii) agrees not to bring any action or proceeding arising out of or relating to this Guarantee (whether on the basis of a claim sounding in contract, equity, tort or otherwise) in any other court. Each of the parties hereto agrees that a final judgment (subject to any appeals therefrom) in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Guarantee or the transactions contemplated hereby in the Bankruptcy Court or any Delaware or federal court in accordance with the provisions of this Section 9. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court. Each of the parties hereto hereby irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 5. Nothing in this Guarantee will affect the right of any party to this Guarantee to serve process in any other manner permitted by Law.

(b) EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS GUARANTEE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS GUARANTEE, OR THE TRANSACTIONS CONTEMPLATED BY THIS GUARANTEE. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (W) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (X) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (Y) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (Z) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS GUARANTEE BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.

10.    Counterparts. This Guarantee may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Guarantee may be delivered by facsimile, electronic mail or otherwise, each of which shall be deemed to be an original for the purposes of this paragraph.

11.    <u>Third Party Beneficiaries</u>.  Subject to <u>Section 7</u>, this Guarantee is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any Person other than the parties hereto; except that as a material aspect of this Guarantee, the parties intend that all Related Parties shall be, and such Related Parties are, intended third party beneficiaries of this Guarantee who may rely on and enforce the provisions of this Guarantee that bar the liability, or otherwise protect the interests, of such Related Parties.

12.    <u>Confidentiality</u>.  This Guarantee shall be treated by the parties hereto as strictly confidential and is being provided to the parties hereto solely in connection with the Merger Agreement and the transactions contemplated thereby.  This Guarantee may not be used, circulated, quoted or otherwise referred to in any document (other than the Merger Agreement), except with the written consent of each of the parties hereto; *provided*, that the parties hereto may disclose such information to the extent necessary to comply with and prevent violation of applicable Law, the applicable rules of any national securities exchange or in connection with any U.S. Securities and Exchange Commission filings relating to the transactions contemplated by the Merger  Agreement.  Notwithstanding the foregoing, this Guarantee may be provided by the parties hereto to their respective Affiliates, partners, directors, officers, employees, investors or potential investors, agents and legal, financial, accounting or other advisors or representatives who have been directed to treat this Guarantee as confidential, with the understanding that such Affiliates, partners, directors, officers, employees, investors or potential investors, agents, advisors and representatives shall be informed of the confidential nature of this Guarantee and their need to so treat this Guarantee as confidential, and each party shall be liable for any breach by such Affiliates, agents, advisors and representatives of the provisions of this Section 12.

13.    <u>Specific Performance</u>.    The parties hereto acknowledge and agree that irreparable damage would occur in the event that any provision of this Guarantee is not performed by a party hereto in accordance with its specific terms or is otherwise breached by a party hereto and the parties would not have an adequate remedy at law in the form of money damages.  Accordingly, the parties acknowledge and agree that the parties hereto shall be entitled, prior to the termination of this Guarantee in accordance with its terms, to enforce specifically the terms and provisions, and subject to the conditions and limitations (including the Cap), of this Guarantee and to obtain an injunction, injunctions or any form of equitable relief to prevent breaches of this Guarantee, in addition to any other remedy to enforce this Guarantee to which they are entitled at Law or in equity.  In addition, each Guarantor hereby covenants and agrees that it shall not directly or indirectly institute any proceeding asserting or assert as a defense in any proceeding, and shall cause its respective Affiliates not to directly or indirectly institute any proceeding asserting or assert as a defense in any proceeding, (i) that (x) the Company has an adequate remedy at law or (y) an award of specific performance is not an appropriate remedy for any reason at law or equity or (ii) the illegality, invalidity or unenforceability in accordance with its terms of this Guarantee.  Each Guarantor agrees to pay on demand all reasonable out-of-pocket expenses (including reasonable fees of counsel)

incurred by the Company in connection with the enforcement of its rights hereunder if the Company prevails in such litigation or proceeding.

14.    Miscellaneous.

(a)    This Guarantee, together with the provisions of and definitions contained in the Merger Agreement and the other Transaction Agreements, constitutes the entire understanding among the parties hereto with respect to the subject matter hereof and replaces and supersedes all prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof.

(b)    No single or partial exercise by the Company of any right, remedy or power hereunder shall preclude any other or future exercise of any right, remedy or power hereunder. Each and every right, remedy and power hereby granted to the Company or allowed it by Law or other agreement shall be cumulative and not exclusive of any other, and may be exercised by the Company at any time or from time to time.

(c)    This Guarantee may not be amended or waived except in a writing signed by each of the parties hereto.

(d)    The provisions of this Guarantee shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Guarantee, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (i) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (ii) the remainder of this Guarantee and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction. Notwithstanding the foregoing, this Guarantee may not be enforced without giving effect to the limitation of the amount payable by each Guarantor hereunder to the Cap and to the provisions of Sections 6, 7 or 8 hereof.  Each party hereto covenants and agrees that it shall not assert, and shall cause its respective Affiliates and representatives not to assert, that this Guarantee or any provisions hereof (including any limitations on any Guarantor's liability herein) are invalid, illegal or unenforceable.

(e)    The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Guarantee.

(f)    All parties acknowledge that each party and its counsel have reviewed this Guarantee and that any rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Guarantee.

(g)      Notwithstanding anything contained herein, each party acknowledged that its decision to enter into this Guarantee has been made by such party independent of any other party.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, each of the Guarantors and the Guarantee parties have caused this Guarantee to be executed and delivered as of the date first written above by its officer or representative thereunto duly authorized.

**ENERGY FUTURE HOLDINGS CORP.**

By: _____
Name: Anthony Horton
Title:  Senior Vice President & Treasurer

**ENERGY FUTURE INTERMEDIATE
HOLDING COMPANY LLC**

By: _____
Name: Anthony Horton
Title: Senior Vice President & Treasurer

*[Signature Page to the Guarantee]*

**HUNT POWER HOLDINGS, L.L.C.**

By: _____

Name: Hunter L. Hunt
Title:   President


Hunt Power Holdings, L.L.C.
1900 N. Akard Street
Dallas, Texas 75201
Attention: David Hernandez
Email: DHernandez@huntconsolidated.com

*[Signature Page to Guarantee]*

**ATLAS MASTER FUND, LTD.**

By: _____
Name:
Title:      **Adam Finger**
            Authorized Signatory

Atlas Master Fund, Ltd.
c/o Balyasny Asset Management
181 West Madison Street
Chicago, IL 60602
Attention: Taylor O'Malley & Scott Schroeder
Email:      Tomalley@bamfunds.com; Sschroeder@bamfunds.com

**ATLAS ENHANCED MASTER FUND, LTD.**

By: _____

Name:          **Adam Finger**

Title:          **Authorized Signatory**


Atlas Enhanced Master Fund, Ltd.
c/o Balyasny Asset Management
181 West Madison Street
Chicago, IL 60602
Attention: Taylor O'Malley & Scott Schroeder
Email:       Tomalley@bamfunds.com; Sschroeder@bamfunds.com

**BAM ZIE MASTER FUND, LTD.**

By: _____

Name:

Title:     **Adam Finger**

          **Authorized Signator**

BAM Zie Master Fund, Ltd.
c/o Balyasny Asset Management
181 West Madison Street
Chicago, IL 60602
Attention: Taylor O'Malley & Scott Schroeder
Email:     Tomalley@bamfunds.com; Sschroeder@bamfunds.com

*[Signature Page to Guarantee]*

**BHR CAPITAL LLC as nominee for:**
**BHCO Master, Ltd.**
**BHR Master Fund, Ltd.**
**BHR OC Master Fund, Ltd., which funds shall be jointly**
**and severally liable for their obligations hereunder**

By: _____

Name:  William Brown

Title:  Partner, President & COO

BHR Capital LLC
545 Madison Avenue
10th Floor
New York, NY 10022
Attention: Michael N. Thompson
            William J. Brown
            Stephen Harris
Email:    Mthompson@bhrcap.com
          Wbrown@bhrcap.com
          Sharris@bhrcap.com

*[Signature Page to Guarantee]*

**CENTERBRIDGE CREDIT PARTNERS, L.P.**

By: _Susanne V. Clark_
Name:      Susanne V. Clark
Title:      **Authorized Signatory**


Centerbridge Credit Partners, L.P.
375 Park Avenue
12th Floor
New York, NY 10152
Attention: The Office of the General Counsel
Email:      legalnotices@centerbridge.com

*[Signature Page to Guarantee]*

**CENTERBRIDGE CREDIT PARTNERS MASTER, L.P.**

By: _Susanne V. Clark_
Name:     **Susanne V. Clark**
Title:     **Authorized Signatory**


Centerbridge Credit Partners Master, L.P.
375 Park Avenue
12th Floor
New York, NY 10152
Attention: The Office of the General Counsel
Email:     legalnotices@centerbridge.com

*[Signature Page to Guarantee]*

**CENTERBRIDGE SPECIAL CREDIT PARTNERS II, L.P.**

By: _Susanne V. Clark_

Name:

Title:

                Susanne V. Clark

                Authorized Signatory


Centerbridge Special Credit Partners II, L.P.
375 Park Avenue
12th Floor
New York, NY 10152
Attention: The Office of the General Counsel
Email:     legalnotices@centerbridge.com

**CYRUS OPPORTUNITIES MASTER FUND II, LTD.**

By: Cyrus Capital Partners, L.P.,
    its Investment Manager

By: _____
Name: Thomas Stamatelos
Title:   Authorized Signatory

Cyrus Opportunities Master Fund II, Ltd.
c/o Cyrus Capital Partners, L.P.
399 Park Avenue
39th Floor
New York, NY 10022
Attention: Sumaer Grewal
Email:      sgrewal@cyruscapital.com

With copies to:

Cyrus Capital Operations Department
Email:      ops@cyruscapital.com

*[Signature Page to Guarantee]*

**CYRUS SELECT OPPORTUNITIES MASTER FUND, LTD.**

By: Cyrus Capital Partners, L.P.,
     its Investment Manager

By: _____
Name: Thomas Stamatelos
Title:   Authorized Signatory




Cyrus Select Opportunities Master Fund, Ltd.
c/o Cyrus Capital Partners, L.P.
399 Park Avenue
39th Floor
New York, NY 10022
Attention: Sumaer Grewal
Email:      sgrewal@cyruscapital.com


With copies to:


Cyrus Capital Operations Department
Email:      ops@cyruscapital.com


*[Signature Page to Guarantee]*

**CRS MASTER FUND, L.P.**

By: Cyrus Capital Partners, L.P.,
      its Investment Manager

By: _____
Name: Thomas Stamatelos
Title:   Authorized Signatory



CRS Master Fund, L.P.
c/o Cyrus Capital Partners, L.P.
399 Park Avenue
39th Floor
New York, NY 10022
Attention: Sumaer Grewal
Email:      sgrewal@cyruscapital.com


With copies to:


Cyrus Capital Operations Department
Email:      ops@cyruscapital.com

**CRESCENT 1, L.P.**

By: Cyrus Capital Partners, L.P.,
    its Investment Manager

By: _____
Name: Thomas Stamatelos
Title:  Authorized Signatory

Crescent 1, L.P.
c/o Cyrus Capital Partners, L.P.
399 Park Avenue
39th Floor
New York, NY 10022
Attention: Sumaer Grewal
Email:     sgrewal@cyruscapital.com

With copies to:

Cyrus Capital Operations Department
Email:     ops@cyruscapital.com

*[Signature Page to Guarantee]*

**DEUTSCHE BANK SECURITIES INC.,**
**solely with respect to the Distressed Products Group**


By: _____

Name: Mike Curreri
Title:

By: _____

Name: Shawn Faurot
Title:


Deutsche Bank Securities Inc.
60 Wall Street
3rd Floor
New York, NY 10005
Attention: Mike Curreri & Shawn Faurot
Email:      Mikel.curreri@db.com; Shawn.faurot@db.com

*[Signature Page to Guarantee]*

GSO CHURCHILL PARTNERS LP,
GSO COASTLINE CREDIT PARTNERS LP,
GSO CREDIT-A PARTNERS LP,
GSO CREDIT ALPHA FUND LP,
GSO PALMETTO OPPORTUNISTIC INVESTMENT PARTNERS LP, and
STEAMBOAT CREDIT OPPORTUNITIES MASTER FUND LP

By: GSO Capital Partners LP, its Investment Manager

By:_____
Name: Marisa Beeney
Title: Authorized Person

345 Park Avenue
31st Floor
New York, NY 10154
Attention: Patrick Fleury
          Marisa Beeney
Email:    Patrick.Fleury@gsocap.com
          Marisa.Beeney@gsocap.com

*[Signature Page to Guarantee]*

GSO SPECIAL SITUATIONS MASTER FUND LP

By: GSO Capital Partners LP, its Investment Advisor

By:_____
Name: Marisa Beeney
Title:  Authorized Person


345 Park Avenue
31st Floor
New York, NY 10154
Attention: Patrick Fleury
          Marisa Beeney
Email:    Patrick.Fleury@gsocap.com
          Marisa.Beeney@gsocap.com

[*Signature Page to Guarantee*]

GSO AIGUILLE DES GRANDS MONTETS FUND I LP,
GSO AIGUILLE DES GRANDS MONTETS FUND II LP and
GSO AIGUILLE DES GRANDS MONTETS FUND III LP

By: GSO Capital Partners LP, its attorney-in-fact

By:_____
Name: Marisa Beeney
Title:  Authorized Person


345 Park Avenue
31st Floor
New York, NY 10154
Attention: Patrick Fleury
          Marisa Beeney
Email:    Patrick.Fleury@gsocap.com
          Marisa.Beeney@gsocap.com

GSO CACTUS CREDIT OPPORTUNITIES FUND LP

By: GSO Cactus Credit Opportunities Associates LLC,
its general partner

By:_____
Name: Marisa Beeney
Title:  Authorized Person


345 Park Avenue
31st Floor
New York, NY 10154
Attention: Patrick Fleury
          Marisa Beeney
Email:    Patrick.Fleury@gsocap.com
          Marisa.Beeney@gsocap.com

**ANCHORAGE CAPITAL MASTER OFFSHORE, LTD.**

By: Anchorage Capital Group, L.L.C.,
      its Investment Manager

By: _____
Name:          Daniel Allen
Title:      Senior Portfolio Manager

Anchorage Capital Master Offshore, Ltd.
c/o Anchorage Capital Group, L.L.C.
610 Broadway, 6th Floor
New York, NY 10012
Attn: General Counsel
Fax: +1-212-432-4651
Email: legal@anchoragecap.com

[*Signature Page to Guarantee*]

**PCI FUND LLC**

By: Anchorage Capital Group, L.L.C.,
    its Investment Manager

By: _____
Name:          Daniel Allen
Title:       Senior Portfolio Manager


PCI Fund LLC
c/o Anchorage Capital Group, L.L.C.
610 Broadway, 6th Floor
New York, NY 10012
Attn: General Counsel
Fax: +1-212-432-4651
Email: legal@anchoragecap.com

**TACONIC OPPORTUNITY MASTER FUND L.P.**

By: Taconic Capital Advisors L.P.,
    its Investment Manager

By: _____
Name: Marc Schwartz
Title: Principal

Taconic Opportunity Master Fund L.P.
280 Park Avenue
5th Floor
New York, NY 10017
Attention: Marc Schwartz
Email:    maschwartz@taconiccap.com

*[Signature Page to Guarantee]*

**TACONIC MASTER FUND 1.5 L.P.**

By: Taconic Capital Advisors L.P.,
    its Investment Manager

By: _____
Name: Marc Schwartz
Title: Principal

Taconic Master Fund 1.5 L.P.
280 Park Avenue
5th Floor
New York, NY 10017
Attention: Marc Schwartz
Email:      maschwartz@taconiccap.com

*[Signature Page to Guarantee]*

**ARROWGRASS MASTER FUND LTD.**

By:
Name:    Sean Flynn
Title:   Director


Arrowgrass Master Fund Ltd.
c/o Arrowgrass Capital Partners (US) LP
1330 Avenue of the Americas
32nd Floor
New York, NY 10019
Attention: Josh Hertz & David Dunn
Email:      Joshua.hertz@arrowgrass.com; David.dunn@arrowgrass.com


and


Arrowgrass Capital Partners LLP
3rd Floor
10 Portman Square
London, England
W1H 6AZ
Attention: General Counsel
Email:      legal@arrowgrass.com


*[Signature Page to Guarantee]*

**ARROWGRASS DISTRESSED OPPORTUNITIES FUND LIMITED**

By:

Name:

Title:   Director


Arrowgrass Distressed Opportunities Fund Limited
c/o Arrowgrass Capital Partners (US) LP
1330 Avenue of the Americas
32nd Floor
New York, NY 10019
Attention: Josh Hertz & David Dunn
Email:       Joshua.hertz@arrowgrass.com; David.dunn@arrowgrass.com


and


Arrowgrass Capital Partners LLP
3rd Floor
10 Portman Square
London, England
W1H 6AZ
Attention: General Counsel
Email:       legal@arrowgrass.com


*[Signature Page to Guarantee]*

**BLACKROCK CORE BOND TRUST**

By: BlackRock Financial Management, Inc.,
     its Sub-Advisor

By: _____
Name:    AnnMarie Smith
Title:    Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK MULTI-SECTOR INCOME TRUST**

By: BlackRock Advisors, LLC,
    its Investment Advisor

By:  _____
Name:
Title:    **AnnMarie Smith**
          **Authorized Signatory**


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK DIVERSIFIED DISTRIBUTION FUND**

By: BlackRock Financial Management, Inc.
      its Sub-Advisor

By: _____
Name:
Title:          AnnMarie Smith
                   Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:        David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK LIMITED DURATION INCOME TRUST**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By:
Name:
Title:

              Marie Smith
            Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

**BLACKROCK FUNDS II, BLACKROCK HIGH YIELD BOND PORTFOLIO**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By:
Name:
Title:
    AnnMarie Smith
    Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK SECURED CREDIT PORTFOLIO OF**
**BLACKROCK FUNDS II**

By: BlackRock Financial Management, Inc.,
     its Sub-Advisor

By: _____
Name:
Title:

       **AnnMarie Smith**
       **Authorized Signatory**


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

**BLACKROCK CREDIT ALLOCATION INCOME
TRUST IV**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:
Title:

       **AnnMarie Smith**
       **Authorized Signatory**

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

**BLACKROCK HIGH YIELD PORTFOLIO OF THE
BLACKROCK SERIES FUND, INC.**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:
Title:    AnnMarie **Smith**
     **Authorized Signatory**


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK HIGH YIELD V.I. FUND OF
BLACKROCK VARIABLE SERIES FUNDS, INC.**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By:
Name:
Title:
    AnnMarie Smith
    Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BGF GLOBAL HIGH YIELD BOND FUND**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:   AnnMarie Smith
Title:    Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK GLOBAL INVESTMENT SERIES:**
**INCOME STRATEGIES PORTFOLIO**

By: BlackRock Financial Management, Inc.,
   its Sub-Advisor

By: _____
Name:
Title:
        **AnnMarie Smith**
        **Authorized Signatory**

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK CORPORATE HIGH YIELD FUND, INC.**

By: BlackRock Advisors, LLC,
    its Investment Advisor

By: _____
Name:    AnnMarie Smith
Title:    Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**MET INVESTORS SERIES TRUST - BLACKROCK
HIGH YIELD PORTFOLIO**

By: BlackRock Financial Management, Inc.,
    its Investment Advisor

By: _____
Name:
Title:
       AnnMarie Smith
       Authorized Signatory



BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

**BGF US DOLLAR HIGH YIELD BOND FUND**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By:
Name:
Title:
      **AnnMarie Smith**
      **Authorized Signatory**


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

**THE OBSIDIAN MASTER FUND**

By: BlackRock Financial Management, Inc.,
    its Investment Advisor

By: _____
Name:
Title:

    AnnMarie Smith
    Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**CA 534 OFFSHORE FUND, LTD**

By: BlackRock Financial Management, Inc.,
    its Investment Advisor

By: _____
Name:    AnnMarie Smith
Title:    Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

[*Signature Page to Guarantee*]

**BLACKROCK CREDIT ALPHA MASTER FUND L.P.**

By: BlackRock Financial Management, Inc.,
    its Investment Advisor

By: _____
Name:
Title: AnnMarie Smith
      Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**JNL/BLACKROCK GLOBAL LONG SHORT CREDIT FUND**

By: BlackRock Financial Management, Inc.,
     its Sub-Advisor

By: _____

Name:

Title:    AnnMarie Smith
          Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

[*Signature Page to Guarantee*]

**BLACKROCK GLOBAL LONG/SHORT CREDIT FUND**
**OF BLACKROCK FUNDS**

By: BlackRock Financial Management, Inc.,
     its Sub-Advisor

By: _____
Name:
Title:

AnnMarie Smith
Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK MULTI-STRATEGY MASTER FUND LIMITED**

By: BlackRock Institutional Trust Company, N.A.,
    its Investment Manager

By: _____
Name:
Title:              ...arie Smith
              Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**ARCH REINSURANCE LTD.**

By: BlackRock Financial Management, Inc.,
    its Investment Advisor

By: _____
Name:
Title:


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK FUNDS II, BLACKROCK STRATEGIC
INCOME OPPORTUNITIES PORTFOLIO**

By: BlackRock Financial Management, Inc.,
    its Registered Sub-Advisor

By: _____
Name:
Title:

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**STRATEGIC INCOME OPPORTUNITIES BOND FUND**

By: BlackRock Institutional Trust Company, N.A.,
    not in its individual capacity but as Trustee of the Strategic
    Opportunities Bond Fund

By:
Name:
Title:

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK DYNAMIC HIGH INCOME PORTFOLIO
OF BLACKROCK FUNDS II**

By: BlackRock Advisors, LLC,
    its Investment Advisor

By: _____
Name: ALEX SHINGLER
Title: MANAGING DIRECTOR

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

[*Signature Page to Guarantee*]

**BLACKROCK MULTI-ASSET INCOME PORTFOLIO OF BLACKROCK FUNDS II**

By: BlackRock Advisors, LLC,
    its Investment Advisor

By: _____
Name: ALEX SHINGLER
Title: MANAGING DIRECTOR


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BGF GLOBAL MULTI-ASSET INCOME FUND, A SUB-FUND OF BLACKROCK GLOBAL FUNDS**

By: BlackRock Financial Management, Inc.,
    its Advisor

By: _____
Name: ALEX SHINGLER
Title: MANAGING DIRECTOR


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**PECOS PARTNERS, L.P.**

By:  Pecos Strategic Partners, LLC,
      its General Partner

By:  GL Pecos Strategic Partners, LLC,
      its sole member

By:  _____
Name: Sonia Gardner
Title:  Member


Pecos Partners, L.P.
399 Park Avenue, 6th Floor
New York, NY 10022
Attention:  Sonia Gardner
            Todd Greenbarg
Email:      sgardner@avenuecapital.com
            tgreenbarg@avenuecapital.com

*[Signature Page to Guarantee]*

**FLOURISH INVESTMENT CORPORATION**

By: _____
Name: Keping Li
Title:   President and Executive Director


Flourish Investment Corporation
c/o China Investment Corporation
25/F New Poly Plaza, No.1 Chaoyangmen Beidajie Dongcheng District, Beijing, China. 100010
Attention: Yuan Tian
             Haipeng Liang
             Jia Chen
             Jie Yuan
Email:    tianyuan@china-inv.cn
             lianghp@china-inv.cn
             chenjia@china-inv.cn
             yuanjie@china-inv.cn

*[Signature Page to Guarantee]*

## Annex 1

## Pro Rata Share



| Guarantor | Pro Rata Share |
|---|---|
| Anchorage Total | 28.17% |
| Arrowgrass Total | 5.55% |
| Avenue Total | 7.04% |
| BlackRock Total | 17.24% |
| Balyasny Total | 4.75% |
| BHR Total | 1.99% |
| Centerbridge Total | 5.58% |
| Cyrus Total | 3.38% |
| Deutsche Bank Total | 4.75% |
| GSO Total | 7.04% |
| Taconic Total | 3.96% |
| Hunt Power Holdings Total | 3.52% |
| Pecos Partners Total | 3.52% |
| Flourish Investment Total | 3.52% |
| Total Investors | 100.00% |

**Exhibit A**

**Joinder to Guarantee**

_____, 201__

Energy Future Holdings Corp.
Energy Future Intermediate Holding Company LLC
Energy Plaza
1601 Bryan Street
Dallas, Texas  75201
Attention: Boards of Directors

Ladies and Gentlemen:

Reference is made to the Guarantee, dated as of August 9, 2015 (the "Guarantee"), among the Guarantors (as defined in the Guarantee), Energy Future Holdings Corp. and Energy Future Intermediate Holding Company LLC.  Capitalized terms used but not defined herein have the meanings ascribed to them in the Guarantee.

The undersigned hereby (i) acknowledges that it has received and reviewed a copy of the Guarantee and (ii) agrees to assume and be bound by the obligations of [_____] in respect of the portion of the Guaranteed Obligations transferred to the undersigned, as reflected on the updated Annex 1 to the Guarantee, and to observe and comply with all of the terms and provisions of the Guarantee that are applicable to the Guarantors as if an original party hereto.

_[Signature page follows]_

IN WITNESS WHEREOF, the undersigned has caused this Joinder to be executed as of the date first written above.

[_____]

By: _____
Name: _____
Title: _____

# EXHIBIT D

## BACKSTOP AGREEMENT

**EXECUTION VERSION**

**BACKSTOP AGREEMENT**

THIS BACKSTOP AGREEMENT (this "Agreement"), dated as of August 9, 2015, is made by and among Ovation Acquisition I, L.L.C., a Delaware limited liability company (the "Company"), Energy Future Holdings Corp., a Texas corporation ("EFH"), Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("EFIH"),  and the Investors set forth on Schedule 1 hereto, as it may be amended from time to time in accordance with this Agreement (each referred to herein individually as an "Investor" and collectively as the "Investors").  The Company, EFH, EFIH and each Investor are each referred to herein as a "Party" and collectively, the "Parties".

RECITALS

WHEREAS, on April 29, 2014, EFH and certain entities in which it, directly or indirectly, holds an equity interest (collectively, the "Debtors") commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are currently pending before the Honorable Christopher S. Sontchi and jointly administered for procedural purposes only under Case No. 14-10979 (collectively, together with any proceedings relating thereto, the "Chapter 11 Cases");

WHEREAS, the Debtors continue to operate their respective businesses as debtors-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, subject to approval of this Agreement, the Merger Agreement (as defined below) and certain related agreements by the Bankruptcy Court, EFH, EFIH and the Company have determined to engage in a strategic business combination as more fully set forth in the Merger Agreement;

WHEREAS, prior to the First Closing Date, the Company will be converted into a corporation incorporated in either Delaware or Maryland as determined by the Company (the "Conversion");

WHEREAS, simultaneously with the execution and delivery of this Agreement by the parties hereto, the Company, Ovation Acquisition II, L.L.C., a Delaware limited liability company ("OV2"), EFH and EFIH are entering into a Purchase Agreement and Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which EFH will merge (the "Merger") with and into the Company, on the terms and subject to the conditions contained in the Merger Agreement with the Company surviving such Merger (the "Surviving Company"); and

WHEREAS, pursuant to the Plan of Reorganization (as defined in the Merger Agreement), the Company will obtain a portion of the equity funding required to consummate the transactions contemplated by the Merger Agreement and the Plan of Reorganization through an equity rights offering on the terms and subject to the conditions set forth in this Agreement and the Plan of Reorganization which will involve the distribution of Rights (as defined below) to Rights Offering Participants (as defined below);

NOW, THEREFORE, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, each of the Parties hereby agrees as follows:

# ARTICLE I

## DEFINITIONS

Section 1.1    <u>Definitions</u>.  Except as otherwise expressly provided in this Agreement, or unless the context otherwise requires, whenever used in this Agreement (including any Exhibits and Schedules hereto), the following terms shall have the respective meanings specified therefor below.  All capitalized terms used but not defined herein have the meanings ascribed to them in the Merger Agreement.

"<u>Allotted Portion</u>" means, with respect to any Investor, the percentage equal to (i) (A) the Backstop Commitment of such Investor less (B) the aggregate Purchase Price paid or funded in accordance with this Agreement, as of the relevant time of determination, for the exercise of Rights by such Investor (excluding Rights issued in connection with any Allowed TCEH First Lien Secured Claims held by such Investor), divided by (ii) (A) the aggregate Backstop Commitments of all Investors, less (B) the aggregate Purchase Price paid or funded in accordance with this Agreement for the exercise of Rights by all Investors (excluding Rights issued in connection with any Allowed TCEH First Lien Secured Claims held by Investors), as of the relevant time of determination.

"<u>Allowed TCEH First Lien Secured Claims</u>" has the meaning ascribed to such term in the Plan of Reorganization.

"<u>Backstop Commitment</u>" means (i) with respect to each Investor, the aggregate funding commitment of each Investor pursuant to this Agreement as set forth opposite such Investor's name on <u>Schedule 1</u> (as it may be amended from time to time in accordance with this Agreement) and (ii) with respect to all Investors, the aggregate Backstop Commitments of all Investors in an amount equal to $5,087,250,000.  For greater certainty, the Unsubscribed Shares Commitment shall be treated as a portion of the Backstop Commitment.

"<u>Commitment Joinder Agreement</u>" means a joinder agreement substantially in the form attached as <u>Exhibit A</u> hereto.

"<u>Common Stock</u>" means common stock, par value $0.01 per share, of the Company.

"<u>Company Disclosure Letter</u>" means the disclosure letter delivered to EFH, EFIH and the Investors by the Company prior to entering into this Agreement.

"<u>Eligible Financial Institution</u>" means a financial institution having a long-term senior unsecured indebtedness rating of at least "A-" by Standard & Poor's Ratings Services or Fitch Ratings Inc. or at least "A3" by Moody's Investors Service, Inc.

"<u>Exercising Holder</u>" means each Rights Holder that has validly exercised and not withdrawn its exercise of Rights in accordance with the terms and conditions hereof.

"<u>Expiration Time</u>" means the date that is twenty (20) days after the Rights Distribution Date, or any later date and time as the Company shall specify in a notice provided to the Investors and EFH no later than 9:00 a.m., Eastern time, on the Business Day immediately preceding the then scheduled Expiration Time; <u>provided</u>, that if the Expiration Time is later than the date that is sixty (60) days after the Rights Distribution Date, such date shall be determined with the prior written consent of EFH and EFIH, acting together, such consent not to be unreasonably withheld.

"<u>Investment Company Act</u>" means the Investment Company Act of 1940, as amended.

"Private Rights Offering" means the offering of Rights and the shares of Common Stock that may be purchased upon the exercise thereof to the Investors and the applicable holders of Allowed TCEH First Lien Secured Claims that initially elect in accordance with Section 2.2(c) to fund the Purchase Price of the Rights by providing a Qualifying Letter of Credit to the Company.

"Prospectus" means the final prospectus contained in the Registration Statement at the Securities Act Effective Date (including information, if any, omitted pursuant to Rule 430A and subsequently provided pursuant to Rule 424(b) under the Securities Act), and any amended form of such prospectus provided under Rule 424(b) under the Securities Act or contained in a post-effective amendment to the Registration Statement.

"Public Rights Offering" means the offering, conducted pursuant to the Registration Statement, of Rights and the shares of Common Stock that may be purchased upon the exercise thereof to Rights Offering Participants, other than the Investors and the applicable holders of Allowed TCEH First Lien Secured Claims that elect to fund the Purchase Price of the Rights by providing a Qualifying Letter of Credit to the Company, subject to Section 2.2(c).

"Qualifying Letter of Credit" means an irrevocable standby letter of credit (without contingency or conditions) issued by an Eligible Financial Institution which names the Subscription Agent as the sole beneficiary thereof.

"Registration Statement" means the Registration Statement to be filed with the SEC relating to the Public Rights Offering and all Common Stock to be issued pursuant thereto.

"Rights Holder" means a Rights Offering Participant that is the holder of a Right.

"Rights Offering" means the Public Rights Offering and the Private Rights Offering.

"Rights Offering Allowed Claims" has the meaning ascribed to such term in the Plan of Reorganization.

"Rights Offering Participants" has the meaning ascribed to such term in the Plan of Reorganization.

"Rights Offering Record Date" means the date following the date of the Confirmation Order as determined by the Company as of which a Person must be a Rights Offering Participant of record in order to be eligible to receive Rights.

"Securities Act Effective Date" means the date and time as of which the Registration Statement, or the most recent post-effective amendment thereto, is declared effective by the SEC.

"Shares" means shares of Common Stock.

"Subscription Agent" means a subscription agent selected by the Company.

"Transfer" means to sell, transfer, assign, pledge, hypothecate, participate, donate or otherwise encumber or dispose of.

"Unsubscribed Shares" means the total number of Shares issuable to Rights Holders (other than Rights Holders that are holders of Allowed TCEH First Lien Secured Claims, subject to Section 2.1) pursuant to Rights offered in the Rights Offering as to which (i) such Rights Holders have not exercised their Rights during the Rights Exercise Period or (ii) such Rights Holders have validly withdrawn a previous exercise of Rights in accordance with Section 2.2(h).

Section 1.2    <u>Additional Defined Terms</u>.    In addition to the terms defined in <u>Section 1.1</u>, additional defined terms used herein shall have the respective meanings assigned thereto in the Sections indicated in the table below.

| Defined Term | Section |
|---|---|
| Affiliated Transferee | Section 3.5(a) |
| Agreement | Preamble |
| Alternative Financing | Section 3.3(a) |
| Backstop Commitment Beneficiaries | Section 3.5(a) |
| Backstop Commitment Party | Section 3.5(a) |
| Backstop Funding Date | Section 3.2(a) |
| Backstop Premium | Section 4.1(a) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Certification Date | Section 3.5(a) |
| Chapter 11 Cases | Recitals |
| Company | Preamble |
| Conversion | Recitals |
| Cure Period | Section 3.3(a) |
| Debtors | Recitals |
| Default Amount | Section 3.3(a) |
| Defaulting Investor | Section 3.3(a) |
| Determination Date | Section 2.2(e) |
| EFH | Preamble |
| EFIH | Preamble |
| Escrow Account | Section 2.2(h) |
| Escrow Agreement | Section 2.2(h) |
| Excess Shares | Section 2.2(j) |
| Exercising Certification | Section 2.2(d) |
| Expense Reserve | Section 2.2(k) |
| Forfeited Fee | Section 3.3(b) |
| Investor | Preamble |
| Investor Default | Section 3.3(a) |
| Investor Shares | Section 6.1(e) |
| Issuing Certification | Section 2.2(f) |
| Merger | Recitals |
| Merger Agreement | Recitals |
| Non-Defaulting Investors | Section 3.3(a) |
| OV2 | Recitals |
| Overfunding Party | Section 3.3(a) |
| Party | Preamble |
| Pro Rata Share | Section 3.3(a) |
| Purchase Notice | Section 2.2(e) |
| Purchase Price | Section 2.1 |
| Reduction Notice | Section 3.2(d) |
| Related Party | Section 11.9 |
| Right | Section 2.1 |
| Rights Distribution Date | Section 2.2(b) |
| Rights Exercise Period | Section 2.2(d) |
| Specific Performance Right | Section 11.8 |
| Surviving Company | Recitals |

4

| Defined Term | Section |
|---|---|
| Transaction Fees ................................................... | Section 2.2(k) |
| Transferee Investor .............................................. | Section 3.5(a) |
| Transferred Backstop Commitment...................... | Section 3.5(a) |
| Unsubscribed Shares Commitment....................... | Section 3.1 |

Section 1.3    Construction.  In this Agreement, unless the context otherwise requires:

(a)    references to Articles, Sections, Exhibits and Schedules are references to the articles and sections or subsections of, and the exhibits and schedules attached to, this Agreement;

(b)    the descriptive headings of the Articles and Sections of this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement;

(c)    references in this Agreement to "writing" or comparable expressions include a reference to a written document transmitted by means of electronic mail in portable document format (.pdf), facsimile transmission or comparable means of communication;

(d)    words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa;

(e)    the words "hereof", "herein", "hereto" and "hereunder", and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole, including all Exhibits and Schedules attached to this Agreement, and not to any provision of this Agreement;

(f)    the term this "Agreement" shall be construed as a reference to this Agreement as the same may have been, or may from time to time be, amended, modified, varied, novated or supplemented;

(g)    "include", "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words;

(h)    references to "day" or "days" are to calendar days;

(i)    references to "the date hereof" means as of the date of this Agreement;

(j)    unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder in effect as of the applicable date; and

(k)    references to "dollars" or "$" are to United States of America dollars.

## ARTICLE II

## RIGHTS OFFERING

Section 2.1    The Rights Offering.  Pursuant to the Rights Offering, the Company will distribute, in accordance with this Agreement and the Plan of Reorganization, to each Rights Offering Participant (including each Investor that is a Rights Offering Participant) that number of rights (each, a "Right") that will enable (i) such Rights Holder that is a Rights Offering Participant (excluding holders of Allowed TCEH First Lien Secured Claims) to purchase its pro rata portion (as specified in Section 2.2(b)(i)) of the Shares to be issued in the Rights Offering, at a purchase price per Share, which will be the same for all Rights Holders (and all Equity Commitment Parties (as defined in the Equity Commitment Letter) with respect to shares of Common Stock purchased pursuant to the Equity

Commitment Letter), and shall be determined by the Company prior to the Rights Distribution Date (such per Share purchase price, the "Purchase Price"), which would result (if fully subscribed) in the receipt of aggregate gross proceeds to the Company of $5,087,250,000 and (ii) such Rights Holder that is a holder of an Allowed TCEH First Lien Secured Claim to purchase its pro rata portion (as specified in Section 2.2(b)(ii)) of the Shares to be issued in the Rights Offering, at the Purchase Price, which would result (if fully subscribed) in the receipt of aggregate gross proceeds to the Company of $700,000,000. Notwithstanding anything to the contrary herein, if any Rights issuable pursuant to Section 2.1(i) become Assigned C5 Rights (as defined in the Plan of Reorganization), the Shares issuable upon exercise of such Rights shall not be excluded from the calculation of an Investor's Allocated Portion or the number of Unsubscribed Shares and the Backstop Commitments shall not be altered or reduced as a result of such assignment.  The Company will conduct the Rights Offering in accordance with this Agreement and the Plan of Reorganization.  Notwithstanding the foregoing, the aggregate gross proceeds to be raised from Rights offered to Rights Offering Participants (excluding holders of Allowed TCEH First Lien Secured Claims) may be reduced in accordance with Section 2.1 of the Company Disclosure Letter at any time prior to or following the Plan Effective Date, and the number of Shares to be offered in, or sold pursuant to, such Rights Offering to Rights Offering Participants (excluding holders of Allowed TCEH First Lien Secured Claims) shall be reduced accordingly on a pro rata basis.  Notwithstanding anything to the contrary herein, to the extent a Rights Offering Participant is the holder of both Allowed TCEH First Lien Secured Claims and other Rights Offering Allowed Claims, such Rights Offering Participant shall be entitled to receive Rights pursuant to both Section 2.1(ii) in respect of its Allowed TCEH First Lien Secured Claims and Section 2.1(i) in respect of its other Rights Offering Allowed Claims, and such Rights Offering Participant shall not be excluded from any group of Rights Holders or, if applicable, Investors, solely by virtue of its holding both Allowed TCEH First Lien Secured Claims and other Rights Offering Allowed Claims,

Section 2.2    Procedure of Rights Offering.  The Rights Offering will be conducted as follows:

(a)    On the terms and subject to the conditions of this Agreement and pursuant to the Plan of Reorganization, the Company shall offer the Shares for subscription by Rights Holders pursuant to the Rights Offering.

(b)    The Company shall, no later than twenty (20) Business Days after the later of the date the Bankruptcy Court has entered the Confirmation Order and the Securities Act Effective Date, issue to (i) each Rights Offering Participant (other than in respect of Allowed TCEH First Lien Secured Claims) as of the Rights Offering Record Date (the date of such issuance, the "Rights Distribution Date") sufficient Rights to purchase its pro rata portion of the aggregate number of Shares offered to the Rights Offering Participants in the Rights Offering (pursuant to Section 2.1(i)), based on the Rights Offering Allowed Claims held by such Rights Offering Participant (other than in respect of an Allowed TCEH First Lien Secured Claim) in relation to the aggregate amount of Rights Offering Allowed Claims held by all Rights Offering Participants (other than in respect of Allowed TCEH First Lien Secured Claims), and (ii) each holder of an Allowed TCEH First Lien Secured Claim as of the Rights Offering Record Date sufficient Rights to purchase its pro rata portion of the aggregate number of Shares offered to holders of Allowed TCEH First Lien Secured Claims in the Rights Offering pursuant to Section 2.1(ii), based on the Allowed TCEH First Lien Secured Claims held by such holder of Allowed TCEH First Lien Secured Claims in relation to the aggregate amount of Allowed TCEH First Lien Secured Claims held by all holders of Allowed TCEH First Lien Secured Claims.

(c)    Except to the extent otherwise determined by the Company, the Rights Offering will be conducted as a Private Rights Offering and as a Public Rights Offering as follows:  (i) the Private Rights Offering shall be made to each holder of Allowed TCEH First Lien Secured Claims that is party to the Plan Support Agreement which would be entitled to Rights to purchase (together with any other

holder of Allowed First Lien Secured Claims that is a direct or indirect Subsidiary or Affiliate of, or investment fund, fund or account that is advised, managed or controlled by, such holder or its Affiliates) such number of Shares in the Rights Offering having an aggregate Purchase Price of at least $50 million and each Investor that, in each case, elects to fund the Purchase Price of any portion of its Rights by providing a Qualifying Letter of Credit to the Company, with each such holder of Allowed TCEH First Lien Secured Claims or Investor receiving such Rights and being entitled to purchase the Shares underlying such Rights in a private placement pursuant to an exemption from the registration requirements under the Securities Act provided by Section 4(a)(2) under the Securities Act, provided that such holder of Allowed TCEH First Lien Secured Claims or Investor is an "accredited investor" within the meaning of Rule 501 under the Securities Act; and (ii) the Public Rights Offering will be made to all other Rights Offering Participants and holders of Allowed TCEH First Lien Secured Claims as of the Rights Offering Record Date pursuant to the Registration Statement.  The Company and EFH shall distribute the Prospectus and any related materials to each Rights Offering Participant in the Public Rights Offering.  Each of the Registration Statement and Prospectus shall be in form and substance reasonably acceptable to the Company, EFH and EFIH.  Subject to applicable securities laws, (A) Investors shall have the ability to elect to participate in the Public Rights Offering or the Private Rights Offering, in each case with respect to all or a portion of such Investor's Rights and at any time until the date that is ten (10) Business Days prior to the initial filing of the Registration Statement or such later date as may be determined by the Company and (B) the Company may, in its sole discretion, permit Investors to participate in both the Public Rights Offering and the Private Rights Offering by funding a portion of the Purchase Price of the Rights that it exercises in cash and a portion of such amount by way of a Qualifying Letter of Credit.  For the avoidance of doubt, the Company may decide in its sole discretion to conduct the Rights Offering solely as a Public Rights Offering, permitting the Investors to fund all or a portion of the aggregate Purchase Price of such Rights exercised by the Investors by way of a Qualifying Letter of Credit, if, after consultation with the U.S. Securities and Exchange Commission, the Company determines that it is possible to conduct the Rights Offering as a public offering while retaining the possibility of allowing funding through Qualifying Letters of Credit to certain Investors and/or holders of Allowed TCEH First Lien Secured Claims in compliance with applicable securities laws.

(d)     The Rights may be exercised during a period (the "<u>Rights Exercise Period</u>") commencing on the Rights Distribution Date and ending at the Expiration Time.  In order to validly exercise a Right, a Rights Holder must deliver to the Subscription Agent a written certification (the "<u>Exercising Certification</u>") that such Rights Holder holds Rights Offering Allowed Claims or Allowed TCEH First Lien Secured Claims (with respect to each exercising Rights Holder, its "<u>Reported Claim</u>").  In addition, the Plan of Reorganization shall provide that to validly exercise a Right, a Rights Holder shall, during the Rights Exercise Period, (i) return a duly executed subscription document to the Subscription Agent electing to exercise all or a portion of the Rights held by such Rights Holder and (ii) pay an amount equal to the aggregate Purchase Price for the number of Shares that such Rights Holder validly elects to purchase pursuant to its Right in accordance with <u>Section 2.2(h)</u>.  In the Public Rights Offering, the payment of the aggregate Purchase Price for the exercise of Rights shall be made by wire transfer of cash in immediately available funds into the Escrow Account (as defined below) in accordance with <u>Section 2.2(h)</u>.  In the Private Rights Offering, the payment of the aggregate Purchase Price for the exercise of Rights shall be made by delivery to the Subscription Agent of a Qualifying Letter of Credit. Nothing in this Agreement shall prevent an Investor that has funded its Purchase Price for the exercise of Rights by way of a Qualifying Letter of Credit from funding into the Escrow Account an amount of cash equal to all or a portion of the Qualifying Letter of Credit in order to reduce the amount funded by way of a Qualifying Letter of Credit, provided that the Shares underlying such Rights shall remain a part of the Private Rights Offering.  The Rights are not separately transferable from the Rights Offering Allowed Claims or Allowed TCEH First Lien Secured Claims held by the applicable Rights Holder.

(e)     No later than the fifth (5th) Business Day following the date on which the Expiration Time occurs (the "Determination Date"), the Subscription Agent shall deliver to each Investor, the Company, EFH and EFIH a written certification of (i) the number of Shares validly elected to be purchased by Rights Holders pursuant to the Rights, (ii) the aggregate Purchase Price therefor paid by Rights Holders in the Rights Offering, and (iii) the number of Unsubscribed Shares, if any, and the aggregate Purchase Price therefor (a "Purchase Notice").

(f)     At least twenty (20) Business Days prior to the First Closing Date or such shorter period as the Company and the Subscription Agent agree, the Company shall instruct the Subscription Agent to deliver to each Exercising Holder a written notice instructing such Exercising Holder to deliver to the Subscription Agent a written certification (the "Issuing Certification"), no later than a date determined by the Company and included in such notice, that such Rights Holder holds an aggregate principal amount of Rights Offering Allowed Claims or Allowed TCEH First Lien Secured Claims equal to the lesser of (i) $1,000,000 and (ii) its Reported Claim.  If an Exercising Holder does not deliver the Issuing Certification by the date set out in the notice specified in the previous sentence, (A) it shall forfeit its Rights and any amounts paid by it or on its behalf in connection with the exercise of its Rights, and (B) the Company shall have the right to offer and sell the Shares represented by such Exercising Holder's Rights on its behalf to any Person or Persons in the Company's sole discretion.

(g)     On the First Closing Date, in accordance with the terms of the Merger Agreement, the Company will issue, solely in book-entry form (except to the extent that an Investor requests in writing delivery of a physical Share certificate), to each Rights Holder that validly exercised Rights and delivered the Purchase Price in respect thereof in accordance with this Agreement, the number of Shares to which such Rights Holder is entitled based on such exercise.  All such Shares will be issued with all issue, stamp, transfer, sales and use, or similar Taxes or duties that are due and payable (if any, including pursuant to Section 1146 of the Bankruptcy Code) in connection with such delivery duly paid by the Surviving Company out of the proceeds of the Equity Financing.

(h)     All amounts paid by the Rights Holders in the Rights Offering in connection with the exercise of their Rights shall be held for the benefit of the Company in a non-interest-bearing escrow account (the "Escrow Account") established by the Company with the Subscription Agent.  The Escrow Agreement (the "Escrow Agreement") by and among the Company, EFH, EFIH and the Subscription Agent establishing such Escrow Account shall be on terms reasonably acceptable to EFH, EFIH and the Company and shall provide, among other things, that: (i) any funds in the Escrow Account shall be released to the Company and the Subscription Agent shall be able to draw on the Qualifying Letters of Credit only upon the express written instruction of the Company in accordance with Section 3.2(b) and (ii) all fees and expenses of the Subscription Agent in connection therewith shall be paid by the Company.  The funds held in such Escrow Account shall only be released to the Company, the Investors and the Rights Holders, in each case in the circumstances expressly permitted in this Agreement.

(i)     Each Rights Holder that validly exercised its Rights shall be entitled, upon written notice to the Company, to irrevocably withdraw a previous exercise of Rights after the withdrawal deadline established in the Registration Statement if (i) there are changes to the Plan of Reorganization after the withdrawal deadline that the Bankruptcy Court determines are materially adverse to the Rights Holders and (ii) the Bankruptcy Court requires resolicitation of votes under Section 1126 of the Bankruptcy Code or an opportunity to change previously cast acceptances or rejections of the Plan of Reorganization. If any Rights Holder validly exercises a withdrawal right, the Subscription Agent shall promptly, and in any event within two (2) Business Days after such withdrawal, deliver to each Investor, the Company, EFH and EFIH a written update to the Purchase Notice certifying (i) the number of Shares validly elected to be purchased by Rights Holders pursuant to the Rights, taking such withdrawals into account and (ii) the aggregate Purchase Price therefor paid by Rights Holders in the Rights Offering, taking such withdrawals into account and (iii) the number of Unsubscribed Shares, if any, and the

aggregate Purchase Price therefor, taking such withdrawals into account. Promptly following receipt of such update, (i) each Rights Holder in the Private Rights Offering that has validly withdrawn all or a portion of a previous exercise of Rights and had funded all or a portion of the payment of its Purchase Price with a Qualifying Letter of Credit, shall cause any Qualifying Letter of Credit issued on its behalf, and that does not, by its terms, provide for the automatic reduction of the amount of such Qualifying Letter of Credit in accordance with this Section 2.2(i), to be promptly replaced with a new Qualifying Letter of Credit in an amount equal to such Exercising Holder's reduced aggregate Purchase Price, if any, (after taking into account such withdrawal and the amount of any cash which will remain in the Escrow Account in respect of such reduced aggregate Purchase Price, if any) and the Company shall promptly give written instruction to the Subscription Agent to release to each such Rights Holder from the Escrow Account each Qualifying Letter of Credit that has been so replaced and (ii) with respect to each Rights Holder that has validly withdrawn all or a portion of a previous exercise of Rights and had funded all or a portion of the payment of its Purchase Price in cash into the Escrow Account, the Company shall deliver written instructions to the Subscription Agent to release from the Escrow Account any cash in excess of such Rights Holder's reduced aggregate Purchase Price, if any, (after taking into account such withdrawal and the amount of any Qualifying Letter of Credit that will remain in the Escrow Account in respect of such reduced aggregate Purchase Price).

(j)     If the number of Shares to be offered or sold in the Rights Offering is reduced in accordance with Section 2.1 after the Expiration Time, then no adjustment to the per Share Purchase Price shall be made, but the Subscription Agent shall make appropriate adjustment to reduce the number of Shares (the number of reduced Shares referred to as "Excess Shares") to be purchased by, and issued to, each applicable Exercising Holder on a pro rata basis to reflect the Excess Shares (and the aggregate Purchase Price payable by each Exercising Holder shall be proportionately reduced). In such event, the Company shall, or shall cause the Subscription Agent to, promptly deliver to each Exercising Holder, EFH and EFIH a written notice of such reduction. Promptly following receipt of such notice, (i) each Exercising Holder in the Private Rights Offering that has funded the payment of its Purchase Price with a Qualifying Letter of Credit, shall cause any Qualifying Letter of Credit issued on its behalf, and that does not, by its terms, provide for the automatic reduction of the amount of such Qualifying Letter of Credit in accordance with this Section 2.2(j), to be promptly replaced with a new Qualifying Letter of Credit in an amount equal to such Exercising Holder's reduced aggregate Purchase Price (after taking into account any cash which will remain in the Escrow Account in respect of such reduced aggregate Purchase Price), and the Company shall promptly give written instruction to the Subscription Agent to release to each such Exercising Holder from the Escrow Account each Qualifying Letter of Credit that has been so replaced and (ii) with respect to each Exercising Holder that funded all or a portion of the payment of its Purchase Price in cash into the Escrow Account, the Company shall deliver written instructions to the Subscription Agent to release from the Escrow Account any cash in excess of such Exercising Holder's reduced aggregate Purchase Price (after taking into account the amount of any Qualifying Letter of Credit that will remain in the Escrow Account in respect of such reduced aggregate Purchase Price).

(k)     It is understood and agreed that the Company may become obligated under the Merger Agreement or other Transaction Agreements to pay certain fees and expenses in connection with the transactions contemplated under the Merger Agreement (including approximately $27,500,000 to the Lenders under the Fee Letter) prior to First Closing (collectively "Transaction Fees") and that such Transaction Fees are for the benefit of the Investors and the Exercising Holders. For the purpose of ensuring that each Exercising Holder pays its proportionate share of any Transaction Fees, the Escrow Agreement shall provide that the Subscription Agent shall establish from the amount funded into the Escrow Account a reserve in the amount of $44,800,000 (the "Expense Reserve"), from which any Transaction Fees shall be paid in accordance with this Section 2.2(k). Consequently, if any of the Transaction Fees become due and payable, Exercising Holders and each Investor shall be responsible for their respective proportionate shares of such Transaction Fees and the Company may give written

instruction to the Subscription Agent to release such proportionate share of the Transaction Fees from the Expense Reserve for the purpose of paying the Exercising Holders' proportionate shares of such Transaction Fees.  In connection with any amount to be released under this Section 2.2(k), the Company shall instruct the Subscription Agent to draw an appropriate amount from each Qualifying Letter of Credit delivered to the Subscription Agent pursuant to Section 2.2(d) and to allocate such amount to the Expense Reserve in order to give effect to the foregoing.  For the purpose of this Section 2.2(k), the proportionate share of each Exercising Holder shall be calculated by dividing (i) the total Purchase Price paid by such Exercising Holder by (ii) the amount of the Equity Financing.  If the First Closing occurs, the funds in the Expense Reserve shall be released to the Company at the First Closing.  If the First Closing does not occur, the funds in the Expense Reserve shall be released to Exercising Holders if this Agreement is terminated only when all claims for payment of any Transaction Fees that may be payable by the Company have been fully resolved.

(l)    The Company may with the prior written consent of EFH and EFIH (such consent not to be unreasonably withheld, conditioned or delayed) modify the procedures set forth in this Section 2.2 or adopt such additional detailed procedures consistent with the provisions of this Section 2.2 to more efficiently administer the exercise of the Rights (including such modifications as may be deemed advisable in connection with the Private Letter Ruling).

## ARTICLE III

## THE UNSUBSCRIBED SHARES COMMITMENT

Section 3.1    The Unsubscribed Shares Commitment. On the terms and subject to the conditions set forth in this Agreement, each Investor agrees, severally and not jointly, to purchase, and the Company agrees to sell to such Investor, on the First Closing Date for the Purchase Price per Share, such Investor's Allotted Portion of the Unsubscribed Shares (taking into account any adjustments thereto in accordance with Article II), rounded down to the nearest whole number to avoid fractional shares (such obligation to purchase the Unsubscribed Shares, the "Unsubscribed Shares Commitment"), provided that the aggregate Unsubscribed Shares Commitment shall not exceed $5,087,250,000.

Section 3.2    Funding the Unsubscribed Shares Commitment.

(a)    On the fifth (5th) Business Day following the delivery of the Purchase Notice (the "Backstop Funding Date"), subject to the prior funding into the Escrow Account pursuant to Article II of the proceeds, if any, of the exercise of the Rights and the substantially concurrent funding of the aggregate Investment Commitments (as such term is defined under the Equity Commitment Letter) into escrow pursuant to the Equity Commitment Letter, each Investor shall pay an amount equal to its Unsubscribed Shares Commitment into the Escrow Account by any combination of (i) wire transfer of cash in immediately available funds, or (ii) delivering to the Subscription Agent a Qualifying Letter of Credit in an amount equal to such amount.  Additionally, if the Subscription Agent delivers an updated Purchase Notice to reflect withdrawals in accordance with Section 2.2(i), no later than the earlier of (i) the fifth (5th) Business Day following the delivery of such updated Purchase Notice and (ii) the First Closing Date, each Investor shall pay into the Escrow Account, an amount equal to its Allotted Portion of the funds and Qualifying Letters of Credit released from the Escrow Account pursuant to Section 2.2(i) relating to such withdrawals, by any combination of (i) wire transfer of cash in immediately available funds or (ii) delivering to the Subscription Agent a Qualifying Letter of Credit in an amount equal to such amount.

(b)    The Escrow Agreement shall provide that (i) the Subscription Agent shall draw the full amount of each Qualifying Letter of Credit at the First Closing, in accordance with the terms of the Escrow Agreement only upon written instruction signed by the Company, and (ii) the funds held in

the Escrow Account (including all amounts (A) funded pursuant to the Rights Offering, and (B) drawn in accordance with the Escrow Agreement under the Qualifying Letters of Credit) shall be released to the Company in accordance with the terms of the Escrow Agreement only upon written instruction signed by the Company and only if all Qualifying Letters of Credit held by the Subscription Agent have been fully funded in accordance with their terms. The Company shall provide such written instruction upon the satisfaction of each of the conditions set forth in Section 9.1 and Section 9.2.

(c)    The proceeds of each Investor's Backstop Commitment shall be used by the Purchasers, together with the proceeds of the Debt Financing (including any Alternative Debt Financing that has been obtained in accordance with, and satisfies the conditions of, Section 6.17 of the Merger Agreement), the proceeds of the Rights Offering, the contributions pursuant to the Equity Commitment Letter and cash on hand of EFH and its Subsidiaries (other than the Oncor Entities), solely for the purpose of funding the Repayment of Claims and the payment of fees and expenses for which the Company or the Surviving Company is responsible pursuant to the Merger Agreement. Notwithstanding anything to the contrary in this Agreement, the aggregate Backstop Commitments may be reduced in accordance with Section 2.1 of the Company Disclosure Letter, and the Backstop Commitment and, if applicable, the corresponding Unsubscribed Shares Commitment of each Investor shall be reduced accordingly on a pro rata basis.

(d)    If the amount of the Unsubscribed Shares Commitment of each Investor is reduced in accordance with Section 2.1 or Section 3.2(c) after the Backstop Funding Date, then the Company shall promptly deliver to each Investor, EFH, EFIH and the Subscription Agent a written notice of such reduction (a "Reduction Notice"), if applicable, attaching a revised Schedule 1 to reflect the reduction of the Unsubscribed Shares Commitment of each Investor and (i) each applicable Investor shall cause any Qualifying Letter of Credit issued on its behalf, and that does not, by its terms, provide for the automatic reduction of the amount of such Qualifying Letter of Credit in accordance with Section 2.1 or Section 3.2(c) hereof, to be promptly replaced (and in any event, within two (2) Business Days of receipt of the Reduction Notice) with a new Qualifying Letter of Credit in an amount equal to such Investor's reduced Unsubscribed Shares Commitment in Schedule 1 (taking into account any cash which will remain in the Escrow Account in respect of such reduced Unsubscribed Shares Commitment and the reduction in such amount in accordance with Section 2.2(i)), and (ii) the Company shall promptly give written notice to the Subscription Agent to release to each applicable Investor from the Escrow Account each Qualifying Letter of Credit that has been so replaced or, to the extent any Investor has funded its Unsubscribed Shares Commitment with cash, an appropriate amount of cash to reflect the reduction of such Investor's Unsubscribed Shares Commitment set forth in the Reduction Notice (after taking into account the amount of any Qualifying Letter of Credit that will remain in the Escrow Account in respect of such reduced Unsubscribed Shares Commitment).

(e)    Each Investor may effect the funding of its Unsubscribed Shares Commitment directly or indirectly through one or more direct or indirect Subsidiaries of such Investor or any investment fund or funds advised or managed by an Affiliate of such Investor or any other investor or investors that is a limited partner of any such investment fund in accordance with Section 3.5(a).  An Investor shall not be under any obligation under any circumstances to contribute more than its Backstop Commitment pursuant to the terms of this Agreement.

(f)    If this Agreement is terminated in accordance with its terms, the Company shall provide a written termination notice to the Subscription Agent, as promptly as practicable following such termination.  The Escrow Agreement shall provide that, upon the Subscription Agent's receipt of such termination notice, the Subscription Agent shall promptly return all letters of credit and all funds held in the Escrow Account by wire transfer of immediately available funds to the applicable Rights Holders and Investors.

(g)        Notwithstanding anything to the contrary herein, the Company and any Investors that are registered investment companies pursuant to the Investment Company Act may mutually agree to the issuance by the Company to such Investor of equity interests or promissory notes or any appropriate arrangements agreed to by the Company and such Investors that enable such Investors to fulfil their obligations under the Backstop Agreement and comply with the applicable restrictions and limitations imposed on them under the Investment Company Act.

(h)        All cash contributions or cash payments in respect of the Unsubscribed Shares Commitment hereunder shall be made in lawful money of the United States, in immediately available funds and paid strictly in accordance with the timing and the terms and conditions set forth in this Agreement and the Merger Agreement.

Section 3.3        Alternative Financing.

(a)        If and to the extent that one or more Investors fails to fund all or any portion of its Unsubscribed Shares Commitment (such amount, the "<u>Default Amount</u>") as and when required under this Agreement (each such Investor, a "<u>Defaulting Investor</u>" and each such default, an "<u>Investor Default</u>"), then each Investor that is not a Defaulting Investor (the "<u>Non-Defaulting Investors</u>"), shall have the right, but not the obligation, within twenty (20) Business Days (the "<u>Cure Period</u>") following receipt of the first written notice from the Company, EFH or EFIH of an Investor Default, to fund any portion of the Default Amount, on the terms and subject to the conditions set forth in this Agreement. If the Non-Defaulting Investors desire to assume all or any portion of any Default Amount that, in the aggregate, exceeds the Default Amount (each such party, an "<u>Overfunding Party</u>"), then such Default Amount shall be allocated among the Overfunding Parties as determined by agreement among the Overfunding Parties, or in the absence of agreement, among the Overfunding Parties based on their respective Pro Rata Shares (as defined below). As used in this Agreement, "<u>Pro Rata Share</u>" means, with respect to an Investor, the ratio of the Backstop Commitment of such Investor to the Backstop Commitments of all of the Investors; <u>provided</u>, that whenever such term is used in a provision that refers to an Investor as a member of a group that represents a subset of all Investors (such as the Non-Defaulting Investors or the Overfunding Parties), such ratio shall be calculated on the basis of the aggregate Backstop Commitments of all of the Investors who are members of such group (rather than all of the Investors). If all or any portion of the Default Amount is not assumed and funded by the Non-Defaulting Investors during the Cure Period, the Company has the right, within 30 Business Days following expiration of the Cure Period, to assign to one or more Transferee Investors the remaining portion of the Unsubscribed Shares Commitment of the Defaulting Investor without the consent of EFH or EFIH; <u>provided</u>, that any such Transferee Investor assumes and funds the applicable amount within such 30 Business Day period. The arrangements pursuant to which any Default Amount is cured pursuant to this <u>Section 3.3(a)</u> is referred to as an "<u>Alternative Financing</u>". Following any assumption of a Default Amount in accordance with this Agreement, the Company and the Investors shall revise and update <u>Schedule 1</u> hereto to reflect any changes in the identity of the Investors and their Unsubscribed Shares Commitments.

(b)        Any Defaulting Investor shall immediately and without any further action of any party, forfeit any right to its Backstop Premium pursuant to <u>Section 4.1</u> (a "<u>Forfeited Fee</u>"). Any such Forfeited Fee shall be allocated instead to the Non-Defaulting Investors and Transferee Investors that assume the obligation to fund the Default Amount in accordance with the provisions of this <u>Section 3.3</u>.

(c)        If an Investor Default occurs, EFH, EFIH and the Company agree that the First Closing Date shall be delayed only to the extent necessary to allow for an Alternative Financing to be completed within the time frame established in <u>Section 3.3(a)</u>; <u>provided</u>, that in no event shall the First Closing Date be delayed more than fifty (50) Business Days without the prior written consent of EFH, EFIH and the Company.

(d)    Notwithstanding anything to the contrary contained herein, nothing in this Section 3.3 shall relieve any Defaulting Investor of any of its obligations hereunder.

Section 3.4    Issuance and Delivery of Unsubscribed Shares.

(a)    Issuance of the Unsubscribed Shares will be made by the Company to the account of each applicable Investor (in accordance with its Allotted Portion) on the First Closing Date, contemporaneously upon the release of funds deposited by such Investor and held in the Escrow Account pursuant to Section 3.2(b) to the Company on the First Closing Date equal to the aggregate Purchase Price for such Investor's Allotted Portion of the Unsubscribed Shares, and such Unsubscribed Shares shall be delivered on the First Closing Date or as promptly as reasonably practicable thereafter.

(b)    All Unsubscribed Shares will be issued with all issue, stamp, transfer, sales and use, or similar Taxes or duties that are due and payable (if any, including pursuant to Section 1146 of the Bankruptcy Code) in connection with such delivery duly paid by the Surviving Company out of the proceeds of the Equity Financing.

(c)    Unless an Investor requests in writing delivery of a physical Share certificate, the entry of any Shares to be delivered pursuant to this Agreement into the account of an Investor pursuant to the Company's book entry procedures shall be deemed delivery of such Shares for purposes of this Agreement.

Section 3.5    Transfer, Designation and Assignment Rights.

(a)    Any Investor may, from time to time during the period from the date hereof until the First Closing, (a) freely Transfer all or any portion of its rights and obligations in connection with its Backstop Commitment to (i) one or more of its direct or indirect Subsidiaries, Affiliates or investment funds, funds or accounts that are advised, managed or controlled by such Investor or its Affiliates (other than a portfolio company) (an "Affiliated Transferee") or (ii) to another Investor or one or more of its Affiliates or (b) with the prior written consent of EFH and EFIH, on the one hand, and the Company (together with EFH and EFIH, the "Backstop Commitment Beneficiaries"), on the other hand, which consent, in each case, shall not be unreasonably withheld, conditioned or delayed, transfer all or any portion of its Backstop Commitment to one or more other entities (each such Affiliated Transferee, Investor or other entity, a "Transferee Investor"); provided, that, in the case of any Transfer of a Backstop Commitment pursuant to this Section 3.5 (each, a "Transferred Backstop Commitment"), it shall be a condition to any such Transfer that the applicable Transferee Investor (i) shall execute (A) a Commitment Joinder Agreement confirming its agreement to assume and be bound by the obligations of the applicable transferring Investor in respect of the Transferred Backstop Commitment and any other obligations of the Investors hereunder relating thereto, and (B) a joinder to the Guarantee attached hereto as Exhibit B, confirming its agreement to assume and be bound by the rights and obligations of the applicable transferring Investor under the Guarantee that are attributable to the Transferred Backstop Commitment, and (ii) if such Transfer occurs after the Backstop Funding Date and the transferring Investor has paid its Backstop Commitment by way of a Qualifying Letter of Credit, shall deliver to the Subscription Agent either cash or a Qualifying Letter of Credit in the amount of the Transferred Backstop Commitment, and (iii) is a holder of, or has committed to hold by no later than two (2) Business Days after the date that the Bankruptcy Court has entered the Confirmation Order (the "Certification Date"), at least $1,000,000 in aggregate principal amount of Rights Offering Allowed Claims, unless otherwise waived by the Company; provided, further, that, in each case, except as otherwise explicitly provided in this Section 3.5(a) (x) no such Transfer will eliminate or modify in any manner the transferring Investor's obligations hereunder, unless otherwise agreed in writing by the Backstop Commitment Beneficiaries (in each case, in each such party's sole discretion) and (y) if the transferring Investor has paid its Backstop Commitment by way of a cash deposit in the Escrow Account, such cash deposit shall either remain in the Escrow

Account for the account of the Transferee Investor or be concurrently replaced by the Transferee Investor. Notwithstanding the foregoing, following the Backstop Funding Date, the consent of neither the Company nor EFH and EFIH shall be required for an Investor to Transfer all or any portion of a Transferred Backstop Commitment if the transferring Investor has fully funded such transferring Investor's Backstop Commitment in accordance with Section 3.2(a) of this Agreement (and such amount shall either remain in the Escrow Account for the account of the Transferee Investor or be concurrently replaced by the Transferee Investor) and provides prior written notice of such Transfer to each other Investor and otherwise complies with the requirements of this Section 3.5(a) applicable to such Transfers. If a transferring Investor is permitted to Transfer all or any portion of its Backstop Commitment without the prior written consent of the Company, EFH or EFIH in accordance with this Section 3.5(a), then upon duly completing such Transfer in accordance with this Section 3.5(a), the transferring Investor shall have no further obligations hereunder with respect to the Transferred Backstop Commitment. Following any Transfer of a Transferred Backstop Commitment in accordance with this Agreement, the Company and the Investors shall revise and update Schedule 1 hereto to reflect any changes in the identity of the Investors and their Backstop Commitments.

(b)    Each Investor, severally and not jointly, agrees that it will not, directly or indirectly, assign, at any time prior to the First Closing Date or earlier termination of this Agreement in accordance with its terms, its rights and obligations under this Agreement or to Unsubscribed Shares or any interest or participation therein to any Person other than in accordance with this Section 3.5.

(c)    Upon a valid Transfer of a Transferred Backstop Commitment in accordance with this Section 3.5, each transferring Investor shall cause any Qualifying Letter of Credit issued on its behalf to be promptly replaced with a new Qualifying Letter of Credit in the amount of such Investor's reduced Unsubscribed Shares Commitment; provided, that if the Transferred Backstop Commitment is equal to the transferring Investor's entire Backstop Commitment, the Company shall promptly send written notice to the Subscription Agent authorizing the return of the Qualifying Letter of Credit issued on behalf of the transferring Investor.

## ARTICLE IV

## BACKSTOP PREMIUM

Section 4.1    Backstop Premium.    The Company shall pay to the Investors an aggregate number of shares of Common Stock having an aggregate value of $305,000,000, which shares shall be issued by the Company in accordance with Section 4.2, to the Investors in the proportions set forth in Schedule 1 to compensate the Investors for their Backstop Commitment (the "Backstop Premium").

Section 4.2    Payment of Backstop Premium.    Subject to Section 4 of the Equity Commitment Letter and Section 3.3(b) of this Agreement, the Backstop Premium shall be earned by the Investors on the date hereof and shall be paid by the Company to the Investors in the proportions set forth on Schedule 1 (as amended from time to time pursuant to Section 3.5) simultaneously with the issuance of the Unsubscribed Shares purchased pursuant to the Unsubscribed Shares Commitment, if any, on the First Closing Date.  The Backstop Premium will be nonrefundable and non-avoidable when paid.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to, and agrees with, each of the Investors as set forth below.

(a)    <u>Capital Structure; Issuance</u>.

(i)    As of the date hereof, the membership interests of the Company consist of limited liability company interests owned exclusively by a subsidiary of Hunt Consolidated, Inc.  As of the date of issuance of shares of Common Stock as a result of the transactions contemplated pursuant to this Agreement, the issued and outstanding capital stock of the Company will consist of a number of shares of Common Stock sufficient to consummate the transactions contemplated herein.  All of the outstanding membership interests in the Company have been duly authorized, validly issued, fully paid and non-assessable (except to the extent that such non-assessability is limited, prior to the Conversion, by the Delaware LLC Act).  There are no options to purchase shares of Common Stock issued and outstanding.  Except as set forth in this Agreement, the Merger Agreement and the Equity Commitment Letter, there are no preemptive or other outstanding rights, options, warrants, conversion rights, stock appreciation rights, performance units, redemption rights, repurchase rights, agreements, arrangements, calls, commitments or rights of any kind that obligate the Company or any other Person to issue, deliver, sell or transfer, or repurchase, redeem or otherwise acquire or cause to be issued, delivered, sold or transferred, or repurchased, redeemed or otherwise acquired equity securities of or voting securities of the Company or any securities or obligations convertible or exchangeable into or exercisable for, or giving any Person a right to subscribe for or acquire, any such securities of the Company, and no securities or obligations evidencing such rights are authorized, issued or outstanding.

(ii)    Each Person set forth in <u>Section 5.1</u> of the Company Disclosure Letter is the registered and beneficial owner of the applicable membership interests in the Company set forth beside such Person's name in <u>Section 5.1</u> of the Company Disclosure Letter, with good title thereto, free and clear of all Liens**.**

(iii)    Upon the issuance of shares of Common Stock as a result of the transactions contemplated pursuant to this Agreement, such shares of Common Stock will be duly authorized, validly issued, fully paid and non-assessable, free and clear of all Liens.

(iv)    The Company does not have any Subsidiary or otherwise own any equity interest in any Person, except that if the First Closing occurs after March 31, 2016, the Company may own outstanding equity interests of a Person that is a real estate investment trust under Section 856 of the Code, which equity interests are listed on a recognized stock exchange, in such minimal amount as is reasonably necessary to qualify the Company as a real estate investment trust under Section 856 of the Code.

(b)    <u>Organization, Good Standing and Qualification</u>. As of the date hereof, the Company is a limited liability company duly formed, validly existing and in good standing under the Delaware LLC Act and has all requisite limited liability company power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted.  As of the date of issuance of shares of Common Stock as a result of the transactions contemplated pursuant to this Agreement, the Company will be a corporation duly incorporated, validly existing and in good standing under the Delaware General Corporation Law or Maryland General Corporation Law, as the case may be, and will have all requisite corporate power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted.  The Company is qualified to do business and is in good standing as a foreign limited liability company in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so organized, qualified or in such good standing, or to have such power or authority,

would not, individually or in the aggregate, reasonably be expected to prevent, materially restrict or materially impair the ability of the Company to consummate the transactions contemplated hereby. The Company has made available to the Investors a complete and correct copy of the organizational or comparable governing documents of the Company, as in effect on the date of this Agreement.

(c)     Authority.  The Company has approved this Agreement and the transactions contemplated hereunder and no vote or consent of any equity holder or other stakeholder of the Company is necessary to approve the transactions contemplated hereunder or this Agreement on behalf of the Company.  As of the date hereof, the Company has all requisite limited liability company power and authority and has taken all limited liability company action necessary in order to execute, deliver and perform its obligations under this Agreement including the issuance of the Rights and the Shares pursuant to the Rights Offering and this Agreement.  As of the date of issuance of shares of Common Stock as a result of the transactions contemplated pursuant to this Agreement, the Company will have all requisite corporate power and authority and will have taken all corporate action necessary in order to execute, deliver and perform its obligations under this Agreement including the issuance of the Rights and the Shares pursuant to the Rights Offering and this Agreement.  This Agreement has been duly executed and delivered by the Company and is a valid and binding obligation of the Company.  This Agreement is enforceable against the Company in accordance with its terms subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(d)     Governmental Filings; No Violations; Etc.

(i)     Other than (A) the Confirmation Order, (B) the filings and/or notices to, and consents, registrations, approvals, permits and authorizations required to be made or obtained under the Exchange Act and the Securities Act and under state or foreign securities or Blue Sky Laws, (C) the Parent Approvals set forth in the Merger Agreement in connection with the Transactions, (D) the filings and/or notices to, and consents, registrations, approvals, permits and authorizations required under the rules and regulations of the New York Stock Exchange or the Nasdaq Stock Exchange, as applicable, to consummate the transactions contemplated herein and (E) the filings to be made to effect the Conversion under the Delaware LLC Act and the Delaware General Corporation Law or Maryland General Corporation Law, as the case may be, no notices, reports or other filings are required to be made by the Company with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by the Company from, any Governmental Entity in connection with the execution, delivery and performance of this Agreement by the Company and the consummation by the Company of the transactions contemplated hereunder, including the issuance of the Rights and the Shares pursuant to the Rights Offering and this Agreement.

(ii)     The execution, delivery and performance of this Agreement by the Company does not, and the consummation by the Company of the transactions contemplated hereunder will not, constitute or result in (A) a breach or violation of, or a default under, the organizational or comparable governing documents of the Company or (B) with or without notice, lapse of time or both, a breach or violation of, a default under, the creation or acceleration of any obligations or the creation of a Lien on any of the assets of the Company pursuant to, any Contracts binding upon the Company or any Laws or governmental or non-governmental permit or license to which the Company is subject, except, in the case of clause (B), for any such breach, violation, default, creation, acceleration, that would not reasonably be expected to prevent, materially delay or materially impair the ability of the Company to consummate the transactions contemplated hereby.

(e)    <u>Issuance</u>. The Shares to be issued and sold by the Company to the Investors hereunder, when such Shares are issued and delivered against payment therefor by the Rights Holders and the Investors, as applicable, shall have been duly and validly authorized, issued and delivered and shall be fully paid and non-assessable, and free and clear of all Taxes, liens, preemptive rights, rights of first refusal, subscription and similar rights, other than any rights contained in the organizational or other governing documents of the Company or any shareholders agreement to which one or more of the Investors shall be a party.

(f)    <u>No Assets or Liabilities</u>.  Other than the rights and obligations of the Company pursuant to this Agreement, the Merger Agreement, the Equity Commitment Letter and the other Transaction Agreements to which the Company is a party, the Company has never had nor has, directly or indirectly, any material liabilities of any nature (whether absolute, accrued, contingent or otherwise), nor has the Company ever held or owned and does not hold or own any material assets.

(g)    <u>Registration Statement and Prospectus</u>.  The Registration Statement and any post-effective amendment thereto, as of the Securities Act Effective Date, will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading; and as of the applicable filing date of the Prospectus and any amendment or supplement thereto and as of the First Closing Date, the Prospectus will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF THE INVESTORS

Each Investor represents and warrants as to itself only, and agrees with the Company, severally and not jointly, as set forth below.

(a)    <u>Organization</u>.  Such Investor is a legal entity duly organized, validly existing and, if applicable, in good standing (or the equivalent thereof) under the laws of its jurisdiction of incorporation or organization.

(b)    <u>Power and Authority</u>. Such Investor has the requisite corporate, limited partnership or limited liability company power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary corporate, limited partnership or limited liability company action required for the due authorization, execution, delivery and performance by it of this Agreement.

(c)    <u>Execution and Delivery</u>.  This Agreement (a) has been duly and validly executed and delivered by such Investor and (b) upon the entry of the Approval Order and the expiration, or waiver by the Bankruptcy Court of the fourteen (14)-day period set forth in Bankruptcy Rule 6004(h), will constitute the valid and binding obligations of such Investor, enforceable against such Investor in accordance with its terms.

(d)    <u>Governmental Filings; No Violations; Etc</u>.

(i)    No filings, reports, notices, consents, registrations, approvals, permits or authorizations are required to be made by such Investor with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by such Investor from, any Governmental Entity in connection with the execution, delivery and performance of this Agreement by such Investor and the consummation by such Investor

17

of the transactions contemplated hereunder, other than as may be required by Section 13 and Section 16 of the Exchange Act.

(ii)    The execution, delivery and performance of this Agreement by such Investor does not, and the consummation by such Investor of the transactions contemplated hereunder will not, constitute or result in (A) a breach or violation of, or a default under, the organizational or comparable governing documents of such Investor; or (B) with or without notice, lapse of time or both, a breach or violation of, a default under, the creation or acceleration of any obligations or the creation of a Lien on any of the assets of such Investor pursuant to, any Contracts binding upon such Investor or any Laws or governmental or non-governmental permit or license to which such Investor is subject, except, in the case of clause (B), for any such breach, violation, default, creation, acceleration, that would not reasonably be expected to prevent, materially delay or materially impair the ability of the Investor to consummate the transactions contemplated hereby.

(e)    Claims. Such Investor will, from and after the Certification Date, hold at least $1,000,000 in aggregate principal amount of Rights Offering Allowed Claims.

(f)    No Registration. Such Investor understands that the Shares to be sold to it pursuant to the Private Rights Offering and the Unsubscribed Shares Commitment, including through any Alternative Financing and the Backstop Premium (collectively, the "Investor Shares"), will not be registered under the Securities Act and are being sold to such Investor by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of such Investor's representations as expressed herein or otherwise made pursuant hereto.

(g)    Investment Intent. Such Investor is acquiring the Investor Shares for investment for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof not in compliance with applicable securities Laws, and such Investor has no present intention of selling, granting any participation in, or otherwise distributing the same, except in compliance with applicable securities Laws.

(h)    Securities Laws Compliance. The Investor Shares will not be offered for sale, sold or otherwise transferred by such Investor except pursuant to a registration statement or in a transaction exempt from, or not subject to, registration under the Securities Act.

(i)    Sophistication. Such Investor has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its investment in the Investor Shares to be acquired hereunder. The Investor is an "accredited investor" as defined in Rule 501(a) under the Securities Act. The Investor understands and is able to bear any economic risks associated with such investment (including, without limitation, the necessity of holding the Investor Shares for an indefinite period of time), and such Investor can afford to suffer the complete loss of the Investor Shares and its investment in the Company. The Investor has sought independent legal, investment and tax advice in connection with its decision to acquire the Investor Shares to be purchased by it to the extent that such Investor has deemed such advice to be necessary or appropriate.

(j)    Independent Investment Decision. Such Investor is making its own investment decision, which is not being made in conjunction with the investment decision of any other person to acquire a predetermined percentage of the shares of the Company or EFH.

## ARTICLE VII

## REPRESENTATIONS AND WARRANTIES OF EFH AND EFIH

EFH and EFIH jointly and severally represent and warrant, and agree with the Company and the Investors, as set forth below.

(a)    <u>Organization, Good Standing and Qualification</u>.  Each of EFH and EFIH is a legal entity duly organized, validly existing and in good standing under the Laws of its respective jurisdiction of organization and has all requisite corporate, limited liability company or similar power and authority to own, lease, use and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing as a foreign corporation, limited liability company or similar entity in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so qualified or in good standing has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect (as defined in the Merger Agreement).

(b)    <u>Authority</u>.  EFH and EFIH have each approved this Agreement and the transactions contemplated hereunder and no vote or consent of any equity holder of EFH or EFIH, or any other corporate or limited liability company action, is necessary to approve this Agreement or the transactions contemplated hereunder on behalf of EFH and EFIH (other than the requisite votes for approval of the Plan of Reorganization).  Each of EFH and EFIH has all requisite corporate or limited liability company power and authority and has taken all corporate or limited liability company action necessary in order to execute and deliver this Agreement, and to perform its obligations hereunder and the consummation of the transactions contemplated hereunder.

(c)    <u>Execution and Delivery</u>.  This Agreement (a) has been duly executed and delivered by each of EFH and EFIH and subject to the entry of the Approval Order and the expiration, or waiver by the Bankruptcy Court of the fourteen (14)-day period set forth in Bankruptcy Rule 6004(h), will constitute the valid and binding obligations of such entity, enforceable against such entity in accordance with its terms.

## ARTICLE VIII

## ADDITIONAL COVENANTS

Section 8.1    <u>Notification</u>.  The Company shall notify, or cause the Subscription Agent to notify the Investors, on each Friday during the Rights Exercise Period and on each Business Day during the five (5) Business Days prior to the Expiration Time (and any extensions thereto), or more frequently if reasonably requested by any of the Investors, of the aggregate number of Rights known by the Company to have been exercised pursuant to the Rights Offering as of the close of business on the preceding Business Day or the most recent practicable time before such request, as the case may be.

Section 8.2    <u>Use of Proceeds</u>.  The Company will apply the net proceeds from the exercise of the Rights and the sale of the Unsubscribed Shares in accordance with the Merger Agreement.

Section 8.3    <u>Securities Laws; Registration Statement</u>.  The Company shall take all action as may be necessary or advisable so that the Rights Offering and the issuance and sale of the Shares and the other transactions contemplated by this Agreement will be effected in accordance with the Securities Act and the Exchange Act and any state or foreign securities or Blue Sky laws.  The Company shall: (i) provide the Investors with a reasonable opportunity to review the Registration Statement, and

19

any amendment or supplement thereto, before any filing with the SEC and shall duly consider in good faith any comments consistent with this Agreement, and any other reasonable comments of the Investors and their respective counsel; (ii) advise the Investors, promptly after it receives notice thereof, of the time when the Registration Statement has been filed or has become effective or any Prospectus or Prospectus supplement has been filed and shall furnish the Investors with copies thereof; (iii) advise the Investors promptly after it receives notice of any comments or inquiries by the SEC (and furnish the Investors with copies of any correspondence related thereto), of the issuance by the SEC of any stop order or of any order preventing or suspending the use of the Prospectus, of the initiation or threatening of any proceeding for any such purpose, or of any request by the SEC for the amending or supplementing of the Registration Statement or a Prospectus or for additional information, and in each such case, provide the Investors with a reasonable opportunity to review any such comments, inquiries, request or other communication from the SEC and to review any amendment or supplement to the Registration Statement or the Prospectus before any filing with the SEC, and to duly consider in good faith any comments consistent with this Agreement, and any other reasonable comments of the Investors and their respective counsel; and (iv) in the event of the issuance of any stop order or of any order preventing or suspending the use of a Prospectus or suspending any such qualification, to use promptly its reasonable best efforts to obtain its withdrawal.

Section 8.4    EFH and EFIH Cooperation.  Prior to the First Closing, each of EFH and EFIH shall, and shall cause each of its Subsidiaries (other than the Oncor Entities, subject to Section 6.23 of the Merger Agreement) to provide commercially reasonable assistance and cooperation as reasonably requested by the Company in connection with the preparation of the Registration Statement and the Prospectus and to use their respective commercially reasonable efforts (a) to cause appropriate officers, agents and employees of EFH and EFIH and their respective Subsidiaries (other than the Oncor Entities, subject to Section 6.23 of the Merger Agreement) (i) to assist with the preparation of the Registration Statement, the Prospectus and other offering documents, projections and similar documents in connection therewith, (ii) to furnish the Company with, and authorize the inclusion  in the Registration Statement and the Prospectus of, financial statements and financial and other pertinent information regarding EFH and its Subsidiaries as may be reasonably requested by the Company to consummate the Rights Offering and the registration of the Common Stock pursuant to this Agreement, which information shall not contain any untrue statement of a material fact relating to EFH or EFIH or omit to state a material fact relating to EFH or EFIH, (iii) execute and deliver customary certificates and other documents (excluding, in each case, an opinion or similar instrument) as may be reasonably requested by the Company in connection with the Rights Offering and the registration of the Common Stock pursuant to this Agreement, (iv) to participate in a reasonable number of customary due diligence and drafting sessions with the Company, the Investors and their respective Representatives and (v) to take actions necessary for the consummation of the Rights Offering and the registration of the Common Stock pursuant to this Agreement, and (b) to cause the independent certified public accountants of EFH and EFIH and their Subsidiaries (other than the Oncor Entities, subject to Section 6.23 of the Merger Agreement) to provide assistance to the Company, including providing consent, on a customary basis, to the Company to use their audit reports relating to EFH and EFIH and their Subsidiaries and to provide any necessary "comfort letters" and to prepare and deliver other customary documents and instruments.

Section 8.5    Rule 158. The Company will generally make available to the Company's security holders as soon as practicable an earnings statement of the Company or statements of the Company which shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 under the Securities Act.

Section 8.6    No Stabilization. The Company will not take, directly or indirectly, any action designed to or that would reasonably be expected to cause or result in any stabilization or manipulation of the price of the Shares.

Section 8.7    Listing. The Company shall use its commercially reasonable efforts to list and maintain the listing of the Common Stock on the New York Stock Exchange or the Nasdaq Global Select Market.

Section 8.8    Claims.  On the Certification Date, each Investor and Transferee Investor shall deliver to the Company a written certification that such Investor or Transferee Investor holds at least $1,000,000 in aggregate principal amount of Rights Offering Allowed Claims.  From and after the Certification Date, each Investor and Transferee Investor shall continue to hold at least $1,000,000 in aggregate principal amount of Rights Offering Allowed Claims.

Section 8.9    Transaction Expenses.

(a)    Except with respect to the express obligations of the Investors to fund certain fees, costs and expenses pursuant to the Guarantee, EFH and EFIH shall, reimburse or pay, as the case may be, the reasonable documented out-of-pocket costs and expenses (including any Unreimbursed Transaction Expenses (as defined in the Merger Agreement) incurred or accrued by an Investor) incurred or accrued, from and after June 1, 2015 through the earlier of the Termination of this Agreement and the First Closing Date, by the Investors on a monthly basis within ten (10) Business Days of the submission of invoices therefor to EFH, in connection with (w) the exploration and discussion of this Agreement, the Merger Agreement and the Plan of Reorganization and the transactions contemplated hereby and thereby (including any expenses related to obtaining required consents of Governmental Entities and other Persons), (x) any due diligence related to this Agreement, the Merger Agreement, the other Transaction Agreements and the transactions contemplated hereby and thereby, (y) the preparation and negotiation of this Agreement, the Merger Agreement, the other Transaction Agreements, the Plan of Reorganization (and related documents) and the proposed documentation of the transactions contemplated hereby and thereby and (z) the implementation of the transactions contemplated by this Agreement, the Merger Agreement, the other Transaction Agreements and the Plan of Reorganization (including any legal proceedings (A) in connection with the confirmation of the Plan of Reorganization and approval of the Disclosure Statement, and objections thereto, and any other actions in the Proceedings related thereto and (B) to enforce the Company's rights against EFH or EFIH (but not against any other Investor) under this Agreement, the Merger Agreement, the other Transaction Agreements and the Plan of Reorganization) and any other judicial and regulatory proceedings in furtherance of this Agreement, the Merger Agreement, the Plan of Reorganization and any Transaction Agreement, including, in each case, the reasonable fees, costs, and expenses of (1) any outside counsel of the Investors, and (2) any other professionals or counsel reasonably retained by any Investor, but specifically excluding any filing fees of any Investor incurred or required to be paid in connection with any filings required to be made by such Investor or its Affiliates under the HSR Act (collectively, "Transaction Expenses").

(b)    The obligation of EFH and EFIH to pay Transaction Expenses shall not be conditioned or contingent upon the consummation of the transactions contemplated by this Agreement, the Merger Agreement or the Plan of Reorganization.

(c)    The provision for the payment of Transaction Expenses is (and the order of the Bankruptcy Court approving this Agreement should so provide, that payment of such expenses is) an integral part of the transactions contemplated by this Agreement and without this provision the Investors would not have entered into this Agreement and such expenses shall constitute an allowed administrative expense of EFH under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code.

(d)    Within ten (10) Business Days of the entry of the Order of the Bankruptcy Court approving EFH's entry into this Agreement, each Investor shall submit invoices to EFH with respect to the costs and expenses incurred at any time (whether before or after the date of this Agreement) through the date of such Order for which such Reimbursement Parties are entitled to reimbursement pursuant to this Section 8.9.  The Company shall pay such costs and expenses in accordance with this Section 8.9 within ten (10) Business Days of its receipt of each such invoice.

(e)    For the purposes of this Section 8.9, the term "Investor" shall not include Avenue Capital Management II, L.P.

## ARTICLE IX

## CONDITIONS TO THE OBLIGATIONS OF THE PARTIES

Section 9.1    Conditions to the Release of Escrowed Funds.  The obligations of the Company hereunder to provide the written instructions to the Subscription Agent in accordance with Section 3.2(b) shall be subject to the satisfaction on or prior to the Plan Effective Date of each of the following conditions, in addition to those set out in Section 9.2: (a) the satisfaction, or waiver by the Company and OV2 (if permissible), of each of the conditions to the obligations of the Company and OV2 set forth in Section 7.1 and Section 7.2 of the Merger Agreement, (b) the prior or substantially concurrent funding of the Debt Financing (including any Alternative Debt Financing that has been obtained in accordance with, and satisfies the conditions of, Section 6.17 of the Merger Agreement), (c) the prior funding of the aggregate Unsubscribed Shares Commitment into the Escrow Account in accordance with Section 3.2(a), (d) the prior or substantially concurrent release of the funds held in escrow pursuant to the Equity Commitment Letter, (e) the substantially concurrent consummation of the First Closing and Plan Effective Date in accordance with the terms of the Merger Agreement and the Plan of Reorganization, and (f) the Registration Statement being effective not later than the Rights Distribution Date and continuing to be effective and there being no stop order having been entered by the SEC with respect thereto.

Section 9.2    Additional Conditions to Release of Escrowed Funds.  The obligations of the Company hereunder to provide the written instructions to the Subscription Agent in accordance with Section 3.2(b) shall be subject to (unless waived by the Company in accordance with this Agreement) the satisfaction on or prior to the Plan Effective Date of each of the following conditions, in addition to those set out in Section 9.1:

(a)    Representations and Warranties.  The representations and warranties of each of (i) the Investors contained in Article VI and (ii) EFH and EFIH contained in Article VII, shall in each case be true and correct as of the date hereof and at and as of the First Closing Date with the same effect as if made on and as of the First Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(b)    Covenants.  Each of EFH and EFIH shall have performed and complied with, in all material respects, all of their respective covenants and agreements contained in this Agreement that contemplate, by their terms, performance or compliance prior to the First Closing Date.  In addition, each of the Oncor Entities shall have performed and complied with, in all material respects, all of their respective covenants and agreements contained in the Oncor Letter Agreement that contemplate, by their terms, performance or compliance prior to the First Closing Date.

Section 9.3    Survival of Representations and Warranties.    All representations, warranties, covenants and agreements in this Agreement shall not survive the Effective Time or the termination of this Agreement.

## ARTICLE X

## TERMINATION

Section 10.1    Termination Rights.    This Agreement, and the obligations of the Parties, including without limitation any and all obligations that the Investors may have with respect to the Backstop Commitment, shall terminate, automatically and without the necessity of any action by or on the part of any Party or other Person, immediately upon the earliest to occur of (a) the termination of the Merger Agreement in accordance with its terms, (b) the First Closing Date; provided that, in case of this clause (b), the proceeds of the Rights Offering and the Unsubscribed Shares Commitment shall have been funded in accordance with Section 2.2(d) and Section 3.2(a), respectively, and the funds held in the Escrow Account shall have been released to the Company as contemplated by Section 3.2(b) prior to such termination, (c) the termination of the Investors' obligations hereunder pursuant to Section 11.10 or (d) upon the written notice of the Company to EFH and EFIH, if the Company so elects, following the commencement of any Proceeding by either EFH or EFIH or any of their respective Affiliates against any Investor or any of their respective Related Parties under this Agreement, the Merger Agreement or any other Transaction Agreement or in connection with the transactions contemplated thereby other than to enforce the obligations of such Investor (i) under the Guarantee, (ii) any confidentiality agreement entered into by such Investor with either EFH or EFIH, (iii) as expressly permitted by the terms of any such agreement or (iv) any objection to the Claim (or any part of the Claim) of an Investor against EFH or EFIH.

Section 10.2    Effect of Termination.    Upon termination under this Article X, all rights and obligations of the Parties shall terminate without any liability of any Party to any other Party except that the provisions of the covenants and agreements made by the Parties herein under Section 8.9, this Article X and Article XI will survive indefinitely in accordance with their terms.

Section 10.3    Failure to Fulfill Obligations.    The right to terminate this Agreement pursuant to Section 10.1 shall not be available to EFH or EFIH if failure of either of them to fulfill any obligation under this Agreement has been a substantial factor contributing to the failure of the First Closing to occur on or before the Termination Date; provided that no such restriction shall limit the ability of EFH or EFIH to terminate any other Transaction Agreement in accordance with its terms.

## ARTICLE XI

## GENERAL PROVISIONS

Section 11.1    Notices.    Any notice, request, instruction or other document to be given hereunder by any party to the others shall be in writing and delivered personally or sent by registered or certified mail, postage prepaid, by email or overnight courier:

If to the Company:

Ovation Acquisition I, L.L.C.
1900 North Akard Street
Dallas, Texas  75201
Attention: David Hernandez
Email:  DHernandez@huntconsolidated.com

with copies (which shall not constitute notice) to:

Baker Botts L.L.P.
2001 Ross Ave., Suite 600
Dallas, Texas 75201

| Attention: | Geoffrey L. Newton |
| | Luckey McDowell |
| | Preston Bernhisel |
| Email: | geoffrey.newton@bakerbotts.com |
| | luckey.mcdowell@bakerbotts.com |
| | preston.bernhisel@bakerbotts.com |

and

White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131

| Attention: | Thomas E. Lauria |
| Email: | tlauria@whitecase.com |

and

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036

| Attention: | Gregory Pryor |
| Email: | gpryor@whitecase.com |

If to EFH and/or EFIH:

Energy Future Holdings Corp., et al.
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201

| Attention: | General Counsel |
| Email: | stacey.dore@energyfutureholdings.com; and |
| | awright@energyfutureholdings.com |

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
600 Travis St., Suite 3300
Houston, Texas 77002

| Attention: | Andrew Calder |
| | Amber Meek |
| Email: | andrew.calder@kirkland.com |
| | amber.meek@kirkland.com |

And

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attention:                          James Sprayregen
                                    Marc Kieselstein
                                    Chad Husnick
                                    Steven Serajeddini
Email:                              jsprayregen@kirkland.com
                                    mkieselstein@kirkland.com
                                    chusnick@kirkland.com
                                    steven.serajedinni@kirkland.com

And

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:                          Edward Sassower
                                    Stephen Hessler
                                    Brian Schartz
Email:                              edward.sassower@kirkland.com
                                    stephen.hessler@kirkland.com
                                    bschartz@kirkland.com


If to any Investor:

To the address set forth on such Investor's signature page hereto

with copies (which shall not constitute notice) to:

White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131
Attention:                          Thomas E. Lauria
Email:                              tlauria@whitecase.com

and

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Attention:                          Gregory Pryor
Email:                              gpryor@whitecase.com

or to such other persons or addresses as may be designated in writing by the party to receive such notice as provided above. Any notice, request, instruction or other document given as provided above shall be deemed given to the receiving party upon actual receipt, if delivered personally; three (3) Business Days after deposit in the mail, if sent by registered or certified mail; upon receipt if sent by email and received by 5:00 pm (Eastern Time), on a Business Day (otherwise the next Business Day) (*provided* that if given by email such notice, request, instruction or other document shall be followed up within one (1) Business Day by dispatch pursuant to one of the other methods described herein); or on the next Business Day after deposit with an overnight courier, if sent by an overnight courier

Section 11.2    <u>Assignment; Third Party Beneficiaries</u>.    This Agreement is not assignable (a) by either EFH or EFIH, without the prior written consent of the Company (and any purported assignment without such consent shall be null and void *ab initio*), (b) by any of the Investors, except in accordance with the terms and conditions contained herein (and any other purported assignment shall be null and void *ab initio*) or (c) by the Company without the prior written consent of EFH and EFIH (and any purported assignment without such consent shall be null and void *ab initio*).    This Agreement is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any Person other than the parties hereto and their successors (including the corporation that will be the successor to Parent as provided in the Merger Agreement); except that as a material aspect of this Agreement the parties intend that all Related Parties shall be, and such Related Parties are, intended third party beneficiaries of this Agreement who may rely on and enforce the provisions of this Agreement that bar the liability, or otherwise protect the interests, of such Related Parties.

Section 11.3    <u>Prior Negotiations; Entire Agreement</u>.    This Agreement (including the agreements attached as Exhibits, Annexes or Schedules to and the documents and instruments referred to in this Agreement) and the other Transaction Agreements constitute the entire agreement of the Parties and supersede all prior agreements, arrangements or understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement, except that the Parties hereto acknowledge that any confidentiality agreements heretofore executed among the Parties will continue in full force and effect.

Section 11.4    <u>GOVERNING LAW AND VENUE; WAIVER OF JURY TRIAL.</u>

(a)    THIS AGREEMENT, TOGETHER WITH ANY CLAIM, DISPUTE, REMEDY OR LEGAL PROCEEDING ARISING FROM OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS OR ANY RELIEF OR REMEDIES SOUGHT BY ANY PARTY HERETO, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, SHALL BE CONSTRUED, PERFORMED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO ITS PRINCIPLES OR RULES OF CONFLICT OF LAWS TO THE EXTENT SUCH PRINCIPLES OR RULES WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION. Each of the parties hereto (i) submits to the exclusive jurisdiction of the Bankruptcy Court (or, if the Bankruptcy Court declines to accept jurisdiction over a particular matter, then the Chancery Court of the State of Delaware, and if the Chancery Court of the State of Delaware declines jurisdiction, then any state or federal court sitting in Delaware) in any action or proceeding arising out of or relating to this Agreement, (ii) agrees that all claims in respect of such action or proceeding may be heard and determined in any such court and (iii) agrees not to bring any action or proceeding arising out of or relating to this Agreement (whether on the basis of a claim sounding in contract, equity, tort or otherwise) in any other court. Each of the parties hereto agrees that a final judgment (subject to any appeals therefrom) in any such

action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the Transactions in any Delaware or federal court in accordance with the provisions of this <u>Section 11.4(a)</u>. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.  Each of the Parties hereto hereby irrevocably and unconditionally consents to service of process in the manner provided for notices in <u>Section 11.1</u>.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by Law.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS HEREUNDER.    EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (W) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (X) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (Y) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (Z) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 11.4</u>.

Section 11.5    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the Parties and delivered to each other Party (including via facsimile or other electronic transmission), it being understood that each Party need not sign the same counterpart.

Section 11.6    <u>Modification, Waiver or Amendments</u>.  Except as expressly provided herein, subject to the provisions of applicable Laws (including, if applicable, the approval of the Bankruptcy Court), at any time prior to the Effective Time, this Agreement (including <u>Section 2.1</u> of the Company Disclosure Letter) may not be modified, waived or amended except by written agreement executed and delivered by duly authorized officers of the Company, EFH and EFIH; provided that, except as expressly provided herein, any amendment, waiver or modification to (i) the manner, timing or terms or conditions applicable to the funding of or release from escrow of the Backstop Commitment contemplated by any Investor (including <u>Section 3.2(a)</u>, <u>Section 3.2(b)</u>, and <u>Section 9.1</u>, but excluding any reduction to the aggregate amount of the Rights Offering, as contemplated by <u>Section 2.1</u> of the Company Disclosure Letter), (ii) the requirement that the per Share purchase price be the same under this Agreement and the Equity Commitment Letter, (iii) the definition of "Pro Rata Share" or (iv) this <u>Section 11.6</u> may not be made without each affected Investor executing a written instrument expressly authorizing such amendment or waiver prior thereto.

Section 11.7    <u>Remedies</u>.  The sole obligations of the Investors in connection with this Agreement shall be their obligations expressly provided for in this Agreement in accordance with the terms and subject to the conditions hereof.  Accordingly, EFH and EFIH agree that (i) EFH and EFIH do

Case 14-10979-CSS    Doc 6258-4    Filed 10/02/15    Page 106 of 271


not have the right to enforce the Backstop Commitment and (ii) EFH and EFIH shall in no event seek to recover any amount from any Investor under this Agreement.

Section 11.8    <u>Enforceability</u>.

(a)    This Agreement may only be enforced by the Company. No creditor of, or holder of a claim against or interest in, any of the Company, EFH or EFIH shall have any right to enforce this Agreement or to cause any of the Company, EFH or EFIH to enforce this Agreement, other than pursuant to any agreement among the Investors and the Company. Notwithstanding anything to the contrary in this Agreement, EFH and EFIH shall not be entitled to the benefit of the Backstop Commitments or to take any action or commence any Proceeding to enforce the same. Each Investor acknowledges and agrees, as to itself only, that, if on or prior to the Backstop Funding Date, the conditions to fund into the Escrow Account set forth in <u>Section 3.2(a)</u> have been satisfied and this Agreement has not been terminated in accordance with its terms, then the Company may seek specific performance of each Investor's obligation to fund its Unsubscribed Shares Commitment in accordance with <u>Section 3.2(a)</u> (the "<u>Specific Performance Right</u>"). Each of the Investors agrees, severally as to itself and not jointly, not to oppose the granting of an injunction, specific performance or other equitable relief hereunder in the circumstances under which the Specific Performance Right is applicable, on the basis that the Company has an adequate remedy at law or an award of specific performance is not an appropriate remedy for any reason at law or equity. EFH and EFIH agree that, notwithstanding anything to the contrary contained in this Agreement, none of EFH or EFIH or their Affiliates shall be entitled to seek or obtain specific performance of any Investor's obligations under this Agreement.

(b)    The parties hereto acknowledge and agree that irreparable damage would occur in the event that any provision of this Agreement were not performed by EFH or EFIH in accordance with its specific terms or were otherwise breached by EFH or EFIH (including any provision requiring the payment of Transaction Expenses) and the Investors and the Company would not have an adequate remedy at law in the form of money damages. Accordingly, the parties acknowledge and agree that each Investor and the Company shall be entitled, prior to the valid termination of this Agreement in accordance with its terms or with respect to any provision of this Agreement that survives such termination, to enforce specifically the terms and provisions of this Agreement and to obtain an injunction, injunctions or any form of equitable relief to prevent breaches of this Agreement against EFH and EFIH. EFH and EFIH hereby agree that, to the extent they or any of their Affiliates incur losses arising from or in connection with a breach by any Investor of its representations, warranties, covenants or agreements contained in this letter agreement, in no event shall EFH or EFIH or their Affiliates seek to recover any money damages from (or seek any other remedy, including specific performance, based on any legal, contractual or equitable theory against) such Investor or any of its Related Parties.

Section 11.9    <u>No Recourse</u>. Notwithstanding anything to the contrary contained in this Agreement each of the Company, EFH and EFIH, by its acceptance of the benefits of this Agreement, hereby covenants, acknowledges and agrees that no Person other than the Parties and their permitted assignees shall have any obligation under this Agreement. The Company, EFH and EFIH further agree that, notwithstanding that the Investors (or any of their permitted assignees) may be a partnership or limited liability company, no recourse or right of recovery (whether at law, in equity, in contract, in tort or otherwise) under this Agreement shall be had against any Related Party (as defined below) of the Investors (or any of their permitted assignees) based upon the relationship of such Related Party to any Investor, or whether by or through attempted piercing of the corporate (or limited liability company or limited liability partnership) veil, or by invoking any alter ego theory, by or through any claim against or on behalf of the Purchasers, whether by the enforcement of any assessment or by or through any legal or equitable proceeding, or by virtue of any applicable Law, or otherwise, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any such Related Party, as such, for any obligations of the Investor under this Agreement or

for any claim based on, in respect of, or by reason of such obligation or their creation. Notwithstanding the foregoing or anything else in this Agreement to the contrary, nothing in this Agreement shall limit the obligations of any Related Party of the Investors, any Purchaser or any other Person under any other Transaction Agreement or Commitment Document (as defined in the Merger Agreement) to which it is a party for the benefit of the other parties thereto in accordance with the terms and subject to the limitations set forth therein and nothing in this Section 11.9 shall restrict the obligations of any Investor under this Agreement. "Related Party" means, with respect to any Investor, (x) any former, current or future equity holder, controlling person, director, officer, employee, agent, advisor, representative, Affiliate, member, manager, general or limited partner of such Investor and (y) any former, current or future equity holder, controlling person, director, officer, employee, agent, advisor, representative, Affiliate, member, manager, general or limited partner of the foregoing; *provided* that for the avoidance of doubt the Purchasers shall not be considered Related Parties of any Investor.

Section 11.10    Certain Claims.    In addition to the foregoing, if EFH or EFIH or any of their respective Affiliates (i) asserts any claim or commences any Proceeding in which an allegation is made that any of the limitations on any Investor's liability herein are illegal, invalid or unenforceable in whole or in part, (ii) asserts, in writing, any theory of liability against any Investor or its Affiliates with respect to the transactions contemplated by the Merger Agreement or hereunder, other than to enforce any Investor's obligation under the express terms of the Guarantee or (iii) otherwise seeks, in writing, as a remedy (excluding disallowance of the claim (or any part of the claim) of an Investor against EFH or EFIH) anything other than enforcing any Investor's obligation under the express terms of the Limited Guarantee, then, upon the written notice of the Company if it so elects, (A) the Investors' obligations under this Agreement shall terminate *ab initio* and be null and void, (B) if any Investor has previously made any payments or funded its Backstop Commitment under this Agreement, such Investor shall be entitled to recover such payments and the Company shall return or cause to be returned (by the Subscription Agent or otherwise) to such Investor any such payments received by the Company or any of their respective designees, or the Subscription Agent, in the event of such assertion or requirement from EFH or EFIH or any of their respective Affiliates and (C) no Investor or its Affiliates shall have any liability to any Person in connection with the Merger Agreement, the Equity Commitment Letter, any other Transaction Agreement, the Plan of Reorganization or this Agreement, whether based upon contract, tort or any other claim or legal theory and whether at law or equity. The foregoing sentence shall survive any termination of this Agreement.

Section 11.11    Headings.    The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

Section 11.12    No Reliance.    No Investor or any of its Related Parties shall have any duties or obligations to the other Investors in respect of this Agreement or the transactions contemplated hereby, except those expressly set forth herein or in another written agreement to which such Investor or its Related Parties are parties. Without limiting the generality of the foregoing, (a) no Investor or any of its Related Parties shall be subject to any fiduciary or other implied duties to the other Investors, (b) no Investor or any of its Related Parties shall have any duty to take any discretionary action or exercise any discretionary powers on behalf of any other Investor, (c) (i) no Investor or any of its Related Parties shall have any duty to the other Investors to obtain, through the exercise of diligence or otherwise, to investigate, confirm, or disclose to the other Investors any information relating to the Company, either Backstop Commitment Beneficiary or any of their respective Subsidiaries that may have been communicated to or obtained by such Investor or any of its Affiliates in any capacity and (ii) no Investor may rely, and confirms that it has not relied, on any due diligence investigation that any other Investor or any Person acting on behalf of such other Investor may have conducted with respect to the Company or any of its Affiliates or any of their respective securities and (d) each Investor acknowledges that no other Investor is acting as a placement agent, initial purchaser, underwriter, broker or finder with respect to its Unsubscribed Shares or its Backstop Commitment.

29

Section 11.13   <u>Confidentiality</u>.   This Agreement shall be treated by EFH and EFIH as strictly confidential and is being provided to EFH and EFIH solely in connection with the Merger Agreement and the transactions contemplated thereby. This Agreement may not be used, circulated, quoted or otherwise referred to in any document (other than the Merger Agreement) by EFH and EFIH, except with the written consent of each of the Investors; *provided, however*, that EFH and EFIH may disclose such information to the extent necessary to comply with and prevent violation of applicable Law, the applicable rules of any national securities exchange or in connection with any SEC filings or filings with the Bankruptcy Court, in each case relating to the transactions contemplated by the Merger Agreement or hereunder. Notwithstanding the foregoing, this Agreement may be provided by EFH and EFIH to their agents and legal, financial, accounting or other advisors or representatives who have been directed to treat this Agreement as confidential, with the understanding that EFH and EFIH shall inform such agents and advisors of the confidential nature of this Agreement and their need to so treat this Agreement as confidential.

Section 11.14   <u>Severability</u>.   The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first above written.

**OVATION ACQUISITION I, L.L.C.**

By: _____

Name:   Hunter L. Hunt

Title:    President

**ENERGY FUTURE HOLDINGS CORP.**

By: _____
Name:   Anthony Horton
Title:    Senior Vice President &
         Treasurer

**ENERGY FUTURE INTERMEDIATE
HOLDING COMPANY LLC**

By: _____
Name:   Anthony Horton
Title:    Senior Vice President &
         Treasurer

**ATLAS MASTER FUND, LTD.**

By: _____

Name:
Title:    **Adam Finger**
          **Authorized Signatory**


Atlas Master Fund, Ltd.
c/o Balyasny Asset Management
181 West Madison Street
Chicago, IL 60602
Attention: Taylor O'Malley & Scott Schroeder
Email:      Tomalley@bamfunds.com; Sschroeder@bamfunds.com

**ATLAS ENHANCED MASTER FUND, LTD.**

By: _____
Name:
Title:        **Adam Finger**
            **Authorized Signatory**


Atlas Enhanced Master Fund, Ltd.
c/o Balyasny Asset Management
181 West Madison Street
Chicago, IL 60602
Attention: Taylor O'Malley & Scott Schroeder
Email:      Tomalley@bamfunds.com; Sschroeder@bamfunds.com

**BAM ZIE MASTER FUND, LTD.**

By: _____
Name:
Title:     **Adam Finger**
           **Authorized Signatory**


BAM Zie Master Fund, Ltd.
c/o Balyasny Asset Management
181 West Madison Street
Chicago, IL 60602
Attention: Taylor O'Malley & Scott Schroeder
Email:     Tomalley@bamfunds.com; Sschroeder@bamfunds.com

**BHR CAPITAL LLC as nominee for:**
**BHCO Master, Ltd.**
**BHR Master Fund, Ltd.**
**BHR OC Master Fund, Ltd., which funds shall be jointly**
**and severally liable for their obligations hereunder**

By: _____
Name: William Brown
Title: Partner, President & COO


BHR Capital LLC
545 Madison Avenue
10th Floor
New York, NY 10022
Attention: Michael N. Thompson
            William J. Brown
            Stephen Harris
Email:      Mthompson@bhrcap.com
            Wbrown@bhrcap.com
            Sharris@bhrcap.com

**CENTERBRIDGE CREDIT PARTNERS, L.P.**

By: _____
Name:        Susanne V. Clark
Title:        Authorized Signatory


Centerbridge Credit Partners, L.P.
375 Park Avenue
12th Floor
New York, NY 10152
Attention: The Office of the General Counsel
Email:      legalnotices@centerbridge.com

**CENTERBRIDGE CREDIT PARTNERS MASTER, L.P.**

By: _____
Name:        Susanne V. Clark
Title:        **Authorized Signatory**


Centerbridge Credit Partners Master, L.P.
375 Park Avenue
12th Floor
New York, NY 10152
Attention: The Office of the General Counsel
Email:        legalnotices@centerbridge.com

**CENTERBRIDGE SPECIAL CREDIT PARTNERS II, L.P.**

By: _____

Name:    **Susanne V. Clark**

Title:    **Authorized Signatory**

Centerbridge Special Credit Partners II, L.P.
375 Park Avenue
12th Floor
New York, NY 10152
Attention: The Office of the General Counsel
Email:    legalnotices@centerbridge.com

**CYRUS OPPORTUNITIES MASTER FUND II, LTD.**

By: Cyrus Capital Partners, L.P.,
    its Investment Manager

By: _____
Name: Thomas Stamatelos
Title:   Authorized Signatory




Cyrus Opportunities Master Fund II, Ltd.
c/o Cyrus Capital Partners, L.P.
399 Park Avenue
39th Floor
New York, NY 10022
Attention: Sumaer Grewal
Email:      sgrewal@cyruscapital.com


With copies to:


Cyrus Capital Operations Department
Email:      ops@cyruscapital.com

*[Signature Page to Backstop Agreement]*

**CYRUS SELECT OPPORTUNITIES MASTER FUND, LTD.**

By: Cyrus Capital Partners, L.P.,
    its Investment Manager

By: _____
Name: Thomas Stamatelos
Title:   Authorized Signatory




Cyrus Select Opportunities Master Fund, Ltd.
c/o Cyrus Capital Partners, L.P.
399 Park Avenue
39th Floor
New York, NY 10022
Attention: Sumaer Grewal
Email:     sgrewal@cyruscapital.com


With copies to:


Cyrus Capital Operations Department
Email:     ops@cyruscapital.com

*[Signature Page to Backstop Agreement]*

**CRS MASTER FUND, L.P.**

By: Cyrus Capital Partners, L.P.,
    its Investment Manager

By: _____
Name: Thomas Stamatelos
Title:   Authorized Signatory


CRS Master Fund, L.P.
c/o Cyrus Capital Partners, L.P.
399 Park Avenue
39th Floor
New York, NY 10022
Attention: Sumaer Grewal
Email:     sgrewal@cyruscapital.com


With copies to:


Cyrus Capital Operations Department
Email:     ops@cyruscapital.com

**CRESCENT 1, L.P.**

By: Cyrus Capital Partners, L.P.,
    its Investment Manager

By: _____
Name: Thomas Stamatelos
Title:   Authorized Signatory




Crescent 1, L.P.
c/o Cyrus Capital Partners, L.P.
399 Park Avenue
39th Floor
New York, NY 10022
Attention: Sumaer Grewal
Email:        sgrewal@cyruscapital.com


With copies to:


Cyrus Capital Operations Department
Email:        ops@cyruscapital.com

*[Signature Page to Backstop Agreement]*

**DEUTSCHE BANK SECURITIES INC.,**
**solely with respect to the Distressed Products Group**


By: _____

Name: Mike Curreri
Title:

By: _____

Name: Shawn Faurot
Title:


Deutsche Bank Securities Inc.
60 Wall Street
3rd Floor
New York, NY 10005
Attention: Mike Curreri & Shawn Faurot
Email:       Mikel.curreri@db.com; Shawn.faurot@db.com

[*Signature Page to Backstop Agreement*]

GSO CHURCHILL PARTNERS LP,
GSO COASTLINE CREDIT PARTNERS LP,
GSO CREDIT-A PARTNERS LP,
GSO CREDIT ALPHA FUND LP,
GSO PALMETTO OPPORTUNISTIC INVESTMENT PARTNERS LP, and
STEAMBOAT CREDIT OPPORTUNITIES MASTER FUND LP

By: GSO Capital Partners LP, its Investment Manager


By:_____
Name: Marisa Beeney
Title:  Authorized Person


345 Park Avenue
31st Floor
New York, NY 10154
Attention: Patrick Fleury
          Marisa Beeney
Email:    Patrick.Fleury@gsocap.com
          Marisa.Beeney@gsocap.com

GSO SPECIAL SITUATIONS MASTER FUND LP

By: GSO Capital Partners LP, its Investment Advisor

By:_____
Name: Marisa Beeney
Title:  Authorized Person


345 Park Avenue
31st Floor
New York, NY 10154
Attention: Patrick Fleury
           Marisa Beeney
Email:     Patrick.Fleury@gsocap.com
           Marisa.Beeney@gsocap.com

GSO AIGUILLE DES GRANDS MONTETS FUND I LP,
GSO AIGUILLE DES GRANDS MONTETS FUND II LP and
GSO AIGUILLE DES GRANDS MONTETS FUND III LP

By: GSO Capital Partners LP, its attorney-in-fact

By:_____

Name: Marisa Beeney
Title:  Authorized Person


345 Park Avenue
31st Floor
New York, NY 10154
Attention: Patrick Fleury
            Marisa Beeney
Email:      Patrick.Fleury@gsocap.com
            Marisa.Beeney@gsocap.com

GSO CACTUS CREDIT OPPORTUNITIES FUND LP

By: GSO Cactus Credit Opportunities Associates LLC,
its general partner

By:_____
Name: Marisa Beeney
Title:  Authorized Person


345 Park Avenue
31st Floor
New York, NY 10154
Attention: Patrick Fleury
           Marisa Beeney
Email:     Patrick.Fleury@gsocap.com
           Marisa.Beeney@gsocap.com

**ANCHORAGE CAPITAL MASTER OFFSHORE, LTD.**

By: Anchorage Capital Group, L.L.C.,
    its Investment Manager

By: _____
Name:
Title:       **Daniel Allen**
      **Senior Portfolio Manager**

Anchorage Capital Master Offshore, Ltd.
c/o Anchorage Capital Group, L.L.C.
610 Broadway, 6th Floor
New York, NY 10012
Attn: General Counsel
Fax: +1-212-432-4651
Email: legal@anchoragecap.com

**PCI FUND LLC**

By: Anchorage Capital Group, L.L.C.,
    its Investment Manager

By: _____
Name:
Title:          Daniel Allen
             Senior Portfolio Manager


PCI Fund LLC
c/o Anchorage Capital Group, L.L.C.
610 Broadway, 6th Floor
New York, NY 10012
Attn: General Counsel
Fax: +1-212-432-4651
Email: legal@anchoragecap.com

[*Signature Page to Backstop Agreement*]

**TACONIC OPPORTUNITY MASTER FUND L.P.**

By: Taconic Capital Advisors L.P.,
    its Investment Manager

By: _____
Name: Marc Schwartz
Title: Principal

Taconic Opportunity Master Fund L.P.
280 Park Avenue
5th Floor
New York, NY 10017
Attention: Marc Schwartz
Email:      maschwartz@taconiccap.com

*[Signature Page to Backstop Agreement]*

**TACONIC MASTER FUND 1.5 L.P.**

By: Taconic Capital Advisors L.P.,
    its Investment Manager

By: _____
Name: Marc Schwartz
Title: Principal




Taconic Master Fund 1.5 L.P.
280 Park Avenue
5th Floor
New York, NY 10017
Attention: Marc Schwartz
Email:      maschwartz@taconiccap.com

*[Signature Page to Backstop Agreement]*

**ARROWGRASS MASTER FUND LTD.**

By:
Name:     Sean Flynn
Title:   Director




Arrowgrass Master Fund Ltd.
c/o Arrowgrass Capital Partners (US) LP
1330 Avenue of the Americas
32nd Floor
New York, NY 10019
Attention: Josh Hertz & David Dunn
Email:      Joshua.hertz@arrowgrass.com; David.dunn@arrowgrass.com


and


Arrowgrass Capital Partners LLP
3rd Floor
10 Portman Square
London, England
W1H 6AZ
Attention: General Counsel
Email:      legal@arrowgrass.com




*[Signature Page to Backstop Agreement]*

**ARROWGRASS DISTRESSED OPPORTUNITIES FUND LIMITED**

By:
Name:  Sean Flynn
Title:  Director


Arrowgrass Distressed Opportunities Fund Limited
c/o Arrowgrass Capital Partners (US) LP
1330 Avenue of the Americas
32nd Floor
New York, NY 10019
Attention: Josh Hertz & David Dunn
Email:      Joshua.hertz@arrowgrass.com; David.dunn@arrowgrass.com


and


Arrowgrass Capital Partners LLP
3rd Floor
10 Portman Square
London, England
W1H 6AZ
Attention: General Counsel
Email:      legal@arrowgrass.com

*[Signature Page to Backstop Agreement]*

**BLACKROCK CORE BOND TRUST**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:
Title:
    AnnMarie Smith
    Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BLACKROCK MULTI-SECTOR INCOME TRUST**

By: BlackRock Advisors, LLC,
    its Investment Advisor

By:
Name:
Title:
    **AnnMarie Smith**
    **Authorized Signatory**

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

[*Signature Page to Backstop Agreement*]

**BLACKROCK DIVERSIFIED DISTRIBUTION FUND**

By: BlackRock Financial Management, Inc.
    its Sub-Advisor

By:
Name:     AnnMarie Smith
Title:     Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BLACKROCK LIMITED DURATION INCOME TRUST**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By:
Name:   AnnMarie Smith
Title:    Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BLACKROCK FUNDS II, BLACKROCK HIGH YIELD BOND PORTFOLIO**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By:
Name:
Title:

      AnnMarie Smith
      Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

**BLACKROCK SECURED CREDIT PORTFOLIO OF**
**BLACKROCK FUNDS II**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:
Title:
    **AnnMarie Smith**
    **Authorized Signatory**

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BLACKROCK CREDIT ALLOCATION INCOME TRUST IV**

By: BlackRock Financial Management, Inc.,
     its Sub-Advisor

By: _____
Name:
Title:      AnnMarie Smith
          Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BLACKROCK HIGH YIELD PORTFOLIO OF THE BLACKROCK SERIES FUND, INC.**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By:
Name:
Title:
    AnnMarie Smith
    Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BLACKROCK HIGH YIELD V.I. FUND OF**
**BLACKROCK VARIABLE SERIES FUNDS, INC.**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:
Title:

AnnMarie Smith
Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:        David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BGF GLOBAL HIGH YIELD BOND FUND**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:
Title:

        AnnMarie Smith
        Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

[*Signature Page to Backstop Agreement*]

**BLACKROCK GLOBAL INVESTMENT SERIES:**
**INCOME STRATEGIES PORTFOLIO**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:
Title:

       AnnMarie Smith
       Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BLACKROCK CORPORATE HIGH YIELD FUND, INC.**

By: BlackRock Advisors, LLC,
    its Investment Advisor

By: _____
Name:
Title:
      **AnnMarie Smith**
      **Authorized Signatory**


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

**MET INVESTORS SERIES TRUST - BLACKROCK
HIGH YIELD PORTFOLIO**

By: BlackRock Financial Management, Inc.,
     its Investment Advisor

By: _____
Name:
Title:
          AnnMarie Smith
          Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BGF US DOLLAR HIGH YIELD BOND FUND**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By:
Name:
Title:

      AnnMarie Smith
      Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

**THE OBSIDIAN MASTER FUND**

By: BlackRock Financial Management, Inc.,
      its Investment Advisor

By: _____
Name:
Title:      AnnMarie Smith
              Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**CA 534 OFFSHORE FUND, LTD**

By: BlackRock Financial Management, Inc.,
    its Investment Advisor

By: _____
Name:
Title:

      AnnMarie Smith
      Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

**BLACKROCK CREDIT ALPHA MASTER FUND L.P.**

By: BlackRock Financial Management, Inc.,
    its Investment Advisor

By:
Name:
Title:

    **AnnMarie Smith**
    **Authorized Signatory**


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

**JNL/BLACKROCK GLOBAL LONG SHORT CREDIT
FUND**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:
Title:
        AnnMarie Smith
        Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BLACKROCK GLOBAL LONG/SHORT CREDIT FUND
OF BLACKROCK FUNDS**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:
Title:
        Annemarie Smith
        Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BLACKROCK MULTI-STRATEGY MASTER FUND
LIMITED**

By: BlackRock Institutional Trust Company, N.A.,
      its Investment Manager

By: _____
Name: _____
Title: _____

        **AnnMarie Smith**
        **Authorized Signatory**


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**ARCH REINSURANCE LTD.**

By: BlackRock Financial Management, Inc.,
    its Investment Advisor

By: _____
Name:
Title:


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**STRATEGIC INCOME OPPORTUNITIES BOND FUND**

By: BlackRock Institutional Trust Company, N.A.,
    not in its individual capacity but as Trustee of the Strategic
    Opportunities Bond Fund

By: _____
Name:
Title:


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BLACKROCK FUNDS II, BLACKROCK STRATEGIC INCOME OPPORTUNITIES PORTFOLIO**

By: BlackRock Financial Management, Inc.,
    its Registered Sub-Advisor

By: _____
Name:
Title:

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BLACKROCK DYNAMIC HIGH INCOME PORTFOLIO OF BLACKROCK FUNDS II**

By: BlackRock Advisors, LLC,
    its Investment Advisor

By: _____
Name: ALEX SHINGLER
Title: MANAGING DIRECTOR

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

[*Signature Page to Backstop Agreement*]

**BLACKROCK MULTI-ASSET INCOME PORTFOLIO
OF BLACKROCK FUNDS II**

By: BlackRock Advisors, LLC,
    its Investment Advisor

By: _____
Name: ALEX SHINGLER
Title: MANAGING DIRECTOR


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BGF GLOBAL MULTI-ASSET INCOME FUND, A SUB-FUND OF BLACKROCK GLOBAL FUNDS**

By: BlackRock Financial Management, Inc.,
     its Advisor

By: _____
Name: ALEX    SHINGLER
Title: MANAGING    DIRECTOR


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**AVENUE CAPITAL MANAGEMENT II, L.P.**
*on behalf of certain funds it advises*

By: Avenue Capital Management II GenPar, LLC,
    its General Partner

By: _____
Name: Sonia Gardner
Title:   Managing Member




Avenue Capital Management II, L.P.
399 Park Avenue, 6th Floor
New York, NY 10022
Attention:  Sonia Gardner
            Todd Greenbarg
Email:      sgardner@avenuecapital.com
            tgreenbarg@avenuecapital.com

*[Signature Page to Backstop Agreement]*

## Schedule 1

| Investor | Backstop Commitment | Pro Rata Share | Percentage of Backstop Premium |
|---|---|---|---|
| Anchorage Total | $ 1,700,000,000.00 | 33.42% | 32.79% |
| Arrowgrass Total | $ 334,900,000.00 | 6.58% | 6.46% |
| Avenue Total | $ 212,500,000.00 | 4.18% | 4.10% |
| BlackRock Total | $ 955,400,000.00 | 18.78% | 20.07% |
| Balyasny Total | $ 286,450,000.00 | 5.63% | 5.52% |
| BHR Total | $ 119,850,000.00 | 2.36% | 2.31% |
| Centerbridge Total | $ 336,600,000.00 | 6.62% | 6.49% |
| Cyrus Total | $ 191,250,000.00 | 3.76% | 3.93% |
| Deutsche Bank Total | $ 286,450,000.00 | 5.63% | 5.52% |
| GSO Total | $ 425,000,000.00 | 8.35% | 8.20% |
| Taconic Total | $ 238,850,000.00 | 4.70% | 4.61% |
| Total Investors | $ 5,087,250,000.00 | 100.00% | 100.00% |



**Exhibit A**

**Commitment Joinder Agreement**

_____, 201__

Ovation Acquisition I, L.L.C.
1900 North Akard Street
Dallas, Texas  75201
Attention: Management Committee

Energy Future Holdings Corp.
Energy Future Intermediate Holding Company LLC
Energy Plaza
1601 Bryan Street
Dallas, Texas  75201
Attention: Boards of Directors

Ladies and Gentlemen:

Reference is made to that certain Backstop Agreement, dated as of August 9, 2015 (the "Backstop Agreement"), among Ovation Acquisition I, L.L.C., Energy Future Holdings Corp. and Energy Future Intermediate Holding Company LLC and the Investors (as defined in the Backstop Agreement). Capitalized terms used but not defined herein have the meanings ascribed to them in the Backstop Agreement.

The undersigned hereby (i) acknowledges that it has received and reviewed a copy of the Backstop Agreement, and (ii) represents and warrants that, from and after the Certification Date, it will hold at least $1,000,000 in aggregate principal amount of Rights Offering Allowed Claims and (iii) agrees to assume and be bound by the obligations of [_____] in respect of the Transferred Backstop Commitment set forth on the signature page hereof, and to observe and comply with, all of the terms and provisions of the Backstop Agreement that are applicable with respect to such Transferred Backstop Commitment as if an original party hereto.

The undersigned also represents and warrants that, without limiting the generality of any representations and warranties made by the undersigned in any subscription agreement executed by it as a condition to its admission to the Company, the undersigned is a qualified institutional "accredited investor" as defined in Rule 501(a)(1), (2), (3) and (7) of Regulation D under the Securities Act of 1933, as amended, or a qualified "accredited investor" as defined in Rule 501(a)(8) of Regulation D, but only to the extent all of the equity owners thereof are investors which are qualified institutional "accredited investors" as defined in Rule 501(a)(1), (2), (3) and (7) of Regulation D.

*[Signature page follows]*

IN WITNESS WHEREOF, the undersigned has caused this Joinder to be executed as of the date first written above.

[_____]

By: _____

Name:_____

Title: _____

Transferred Commitment:

| Investor | Backstop Commitment | Pro Rata Share | Percentage of Backstop Premium |
|---|---|---|---|
| [●] | $[●] | [●]% | [●]% |

**<u>Exhibit B</u>**

**Guarantee**

(See attached.)

**EXECUTION VERSION**

# GUARANTEE

GUARANTEE, dated as of August 9, 2015 (this "Guarantee"), by each of the parties listed on the signature pages hereto (each, a "Guarantor"), in favor of Energy Future Holdings Corp., a Texas corporation (the "Company"), and Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("EFIH").  Capitalized terms used but not defined herein shall have the meanings given to such terms in either: (i) the Purchase Agreement and Agreement and Plan of Merger, dated as of the date hereof (as amended or modified in accordance with the terms thereof, the "Merger Agreement"), by and among Ovation Acquisition I, L.L.C., a Delaware limited liability company ("Parent"), Ovation Acquisition II, L.L.C., a Delaware limited liability company ("OV2" and, together with Parent, the "Purchasers"), the Company and EFIH, (ii) that certain letter agreement, dated as of the date hereof, by and among the Company, EFIH, the Purchasers and each Guarantor (the "Equity Commitment Letter") providing for certain commitments by the Guarantors to invest in the Purchasers, as applicable, or (iii) that certain Backstop Agreement, dated as of the date hereof, by and among the Company, EFIH, Parent and certain Guarantors (the "Backstop Agreement") providing for, among other things, certain commitments by the Guarantors that are party thereto to backstop the Rights Offering.

1.      Guarantee.   To induce the Company and EFIH to enter into the Merger Agreement, each Guarantor, intending to be legally bound, hereby absolutely, irrevocably and unconditionally guarantees to the Company and EFIH, severally and not jointly, upon the terms and subject to the conditions set forth in this Guarantee, the due and punctual payment and discharge of its Pro Rata Share (as defined below) of the obligation of the Purchasers to pay all fees, costs and expenses  (including the payment of indemnities) payable by either Purchaser under the Merger Agreement or the Plan of Reorganization, not to exceed $35 million in the aggregate (the "Guaranteed Obligations"); *provided*, that in no event shall any Guarantor's several and not joint liability in respect of the Guaranteed Obligations exceed such Guarantor's Pro Rata Share of the Guaranteed Obligations as set forth opposite the name of such Guarantor on Annex 1 hereto, as such amount is adjusted to reflect any increase or decrease in the amount of any Guarantor's (i) Investment Commitment in accordance with Section 1, Section 3 or Section 4 of the Equity Commitment Letter and/or (ii) Backstop Commitment in accordance with Section 2.1, Section 2.2(i), Section 3.2(c), Section 3.3(a) or Section 3.5(a) of the Backstop Agreement (each such Guarantor's Pro Rata Share of the Guaranteed Obligations being referred to as the "Cap").  This Guarantee may not be enforced against any Guarantor without giving effect to the Cap (and to the provisions of Sections 6, 7 and 8 hereof).  This Guarantee may be enforced only for the payment of money by Guarantor up to the Cap.  All payments hereunder shall be made in lawful money of the United States, in immediately available funds. If any Purchaser fails to discharge any portion of the Guaranteed Obligations when due, each Guarantor's liability to the Company and EFIH hereunder in respect of its Pro Rata Share of the Guaranteed Obligations (up to the Cap) shall become immediately due and payable, and the Company and EFIH may at any time and from time to time, at the Company's and EFIH's option, and so long as any Purchaser has failed to discharge any portion of the Guaranteed Obligations, take any and all actions available hereunder or otherwise at law or in equity to

collect each Guarantor's Pro Rata Share of the Guaranteed Obligations (subject to the Cap). As used in this letter agreement, "Pro Rata Share" means, with respect to a Guarantor, the ratio of the aggregate Investment Commitment and, if applicable, Backstop Commitment of such Guarantor to the aggregate Investment Commitments and Backstop Commitments of all of the Guarantors, in each case as set forth on Annex 1 hereto, as such amount is adjusted to reflect any increase or decrease in the amount of any Guarantor's Investment Commitment in accordance with Section 1, Section 3 or Section 4 of the Equity Commitment Letter and/or Backstop Commitment in accordance with Section 2.1, Section 2.2(i), Section 3.2(c), Section 3.3(a) or Section 3.5(a) of the Backstop Agreement; *provided, however*, that whenever such term is used in a provision that refers to a Guarantor as a member of a group that represents a subset of all Guarantors, such ratio shall be calculated on the basis of the aggregate Investment Commitments and, if applicable, Backstop Commitments of all of the Guarantors who are members of such group (rather than all of the Guarantors).

In furtherance of the foregoing, each Guarantor acknowledges that this Guarantee is one of payment, not collection, and if any Purchaser fails to discharge any portion of the Guaranteed Obligations when due, the Company and EFIH may, in their sole discretion, bring and prosecute a separate action or actions against each Guarantor for the full amount of such Guarantor's Pro Rata Share of the Guaranteed Obligations (subject to the Cap), regardless of whether any such action is brought against any Purchaser or whether any Purchaser is joined in any such action or actions.

2.    Nature of Guarantee; Changes in Obligations; Certain Waivers.

(a)    Except as otherwise provided herein, the liability of each Guarantor in respect of the Guaranteed Obligations shall, to the fullest extent permitted under applicable Law, be absolute, irrevocable and unconditional irrespective of:

      i.    the value, genuineness, regularity, illegality or enforceability of the Merger Agreement, the Backstop Agreement, or any other Transaction Agreement, other than in the case of (A) fraud, (B) defenses to the payment of the Guaranteed Obligations that are available to the Purchasers under the Merger Agreement (including with respect to the value, genuineness, regularity, illegality or enforceability of the Merger Agreement), or (C) any attempt by the Company and/or EFIH or any Person acting on its behalf to seek to impose liability upon the Guarantors in violation of the provisions set forth in Section 6 or Section 7;

      ii.    any change in the corporate existence, structure or ownership of Parent or OV2, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting Parent or OV2 or any of their respective assets;

      iii.    any waiver, amendment or modification of the Merger Agreement in accordance with its terms, or change in the time, manner, place or terms

of payment or performance, or any change or extension of the time of payment or performance of, renewal or alteration of, any Guaranteed Obligation, any liability incurred directly or indirectly in respect thereof, or any agreement entered into by the Company and/or EFIH, on the one hand, and Purchasers, on the other hand, in connection therewith (so long as any such changes do not have the effect of increasing the Cap or changing the several nature of this Guarantee);

iv.    the existence of any claim, set-off or other right that the Guarantor may have at any time against Parent, OV2, the Company or EFIH, whether in connection with any Guaranteed Obligation or otherwise;

v.    the failure or delay on the part of the Company and/or EFIH to assert any claim or demand or to enforce any right or remedy against Parent, OV2 or any other Guarantor;

vi.    the adequacy of any other means the Company and/or EFIH may have of obtaining payment related to the Guaranteed Obligations; or

vii.    any other act or omission that may or might in any manner or to any extent vary the risk of the Guarantor or otherwise operate as a discharge of the Guarantor as a matter of law or equity, other than payment of the Guaranteed Obligations or any claim, defense or other matter referred to in clauses (A) through (C) of Section 2(a)(i) and in Section 2(f).

(b)    Each Guarantor waives promptness, diligence, notice of the acceptance of this Guarantee and of the Guaranteed Obligations, presentment, demand for payment, notice of non-performance, default, dishonor and protest, notice of any Guaranteed Obligation incurred and all other notices of any kind (other than notices to Parent, with a copy to its counsel, with respect to the Guaranteed Obligations pursuant to the Merger Agreement), all defenses which may be available by virtue of any stay, moratorium or other similar Law now or hereafter in effect or any right to require the marshaling of assets of Parent, OV2 or any other Person now or hereafter liable with respect to the Guaranteed Obligations.

(c)    To the fullest extent permitted by applicable Law, each Guarantor hereby waives any and all notice of the creation, renewal, extension or accrual of any of the Guaranteed Obligations (subject to the Cap) and notice of or proof of reliance by the Company and/or EFIH in respect of this Guarantee. The Guaranteed Obligations shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all other arrangements between Parent, OV2 or the Guarantors, on the one hand, and the Company and/or EFIH, on the other, provided for in the Merger Agreement shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. When pursuing its rights and remedies hereunder against any Guarantor, the Company and EFIH shall be under no obligation to pursue such rights and remedies it may have against Parent or OV2 or any other Person for the Guaranteed Obligations or any right of offset with respect thereto, and any failure by the

Company or EFIH to pursue such other rights or remedies, or to collect any payments from Parent or OV2 or any such other Person or to realize upon or to exercise any such right of offset, shall not relieve any Guarantor of any liability hereunder, and shall not impair the rights and remedies, whether express, implied or available as a matter of Law, of the Guarantors.

(d)     Neither the Company nor EFIH shall be obligated to file any claim relating to the Guaranteed Obligations if Parent or OV2 becomes subject to a bankruptcy, reorganization or similar proceeding, and the failure of the Company or EFIH to so file shall not affect the Guarantors' obligations hereunder (subject to the Cap).  If any payment made by a Guarantor to the Company and EFIH or in respect of the Guaranteed Obligations is rescinded or must otherwise be returned for any reason whatsoever, such Guarantor shall remain liable hereunder with respect to the Guaranteed Obligations as if such payment had not been made (subject to the Cap).

(e)     The Guarantors will not exercise any rights of subrogation or contribution against Parent or OV2, whether arising by contract or operation of Law (including, without limitation, any such right arising under bankruptcy or insolvency Laws) or otherwise, by reason of any payment by any of them pursuant to the provisions of this Guarantee unless and until the Guaranteed Obligations have been paid in full.

(f)     Notwithstanding anything to the contrary contained in this Guarantee or otherwise, the Company and EFIH each hereby agrees that each Guarantor shall have all defenses to the payment of its obligations under this Guarantee that would be available to Purchasers in respect of the Merger Agreement with respect to the Guaranteed Obligations.

(g)     Unless and until the Guaranteed Obligations have been paid in full, no Guarantor shall exercise against Parent, OV2 or any other Person now or hereafter liable with respect to the Guaranteed Obligations (including any other Guarantor) any rights of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Company or EFIH against Parent, OV2 or any other Person now or hereafter liable with respect to the Guaranteed Obligations (including any other Guarantor), whether arising by contract or operation of Law (including, without limitation, any such right arising under bankruptcy or insolvency Laws) or otherwise, including the right to take or receive from Parent, OV2 or any other Person now or hereafter liable with respect to the Guaranteed Obligations (including any other Guarantor), directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, by reason of any payment by it pursuant to the provisions of Section 1 hereof. If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the payment in full in immediately available funds of all amounts payable under this Guarantee, such amount shall be received and held in trust for the benefit of the Company and EFIH, shall be segregated from other property and funds of such Guarantor and shall forthwith be promptly paid or delivered to the Company and EFIH in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to all amounts payable by such Guarantor under this Guarantee.

3.       <u>Representations and Warranties</u>.

(a)      Each Guarantor hereby represents and warrants, severally as to itself only and not jointly, to the Purchasers, the other Guarantors, the Company and EFIH that (a) it has all requisite corporate, limited liability company or partnership (as the case may be) power and authority to execute, deliver and perform this Guarantee, (b) the execution, delivery and performance of this Guarantee by such Guarantor has been duly and validly authorized and approved by all necessary organizational action by it, (c) this Guarantee has been duly and validly executed and delivered by it and constitutes a legal, valid and binding obligation of such Guarantor, enforceable against such Guarantor in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting creditors' rights generally, and (ii) general equitable principles (whether considered in a proceeding in equity or at law) and (d) such Guarantor has the financial capacity to pay and perform its obligations under this Guarantee, and all funds necessary for such Guarantor to fulfill its obligations under this Guarantee shall be available to such Guarantor for so long as this Guarantee shall remain in effect in accordance with the provisions herein.

(b)      Each Purchaser hereby represents and warrants, severally as to itself only and not jointly, to the Guarantors, the Company and EFIH that (a) it has all requisite limited liability company power and authority to execute, deliver and perform this Guarantee, (b) the execution, delivery and performance of this Guarantee by such Purchaser has been duly and validly authorized and approved by all necessary organizational action by it and (c) this Guarantee has been duly and validly executed and delivered by it and constitutes a legal, valid and binding obligation of such Purchaser, enforceable against such Purchaser in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting creditors' rights generally, and (ii) general equitable principles (whether considered in a proceeding in equity or at law).

(c)      The Company and EFIH hereby jointly and severally represent and warrant to the Purchasers and the Guarantors that (a) each of the Company and EFIH has all requisite corporate or limited liability company (as the case may be) power and authority to execute, deliver and perform this Guarantee, (b) the execution, delivery and performance of this Guarantee by the Company and EFIH has been duly and validly authorized and approved by all necessary organizational action by each of the Company and EFIH (other than the requisite votes for approval of the Plan of Reorganization under the Bankruptcy Code) and (c) this Guarantee has been duly and validly executed and delivered by the Company and EFIH and, subject to the approval of the Bankruptcy Court, constitutes a legal, valid and binding obligation of the Company and EFIH, enforceable against each of the Company and EFIH in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting creditors' rights generally, and (ii) general equitable principles (whether considered in a proceeding in equity or at law).

4.    <u>No Assignment</u>.  The Company and EFIH may not assign, transfer or delegate their rights, interests or obligations under or in connection with this Guarantee, in whole or in part, to any other Person (except by operation of Law) without the prior written consent of each of the Guarantors, and any purported assignment, transfer or delegation without such consent shall be null and void.  No Guarantor may assign, transfer or delegate all or part of its rights, interests and obligations hereunder, without the prior written consent of the Company, EFIH and Parent, except to any other Person to which it may transfer all or a portion of its Investment Commitment in accordance with <u>Section 3</u> of the Equity Commitment Letter or its Backstop Commitment in accordance with <u>Section 3.5</u> of the Backstop Agreement without such consent, and subject to the execution of a joinder to this Guarantee in the form attached hereto as <u>Exhibit A</u> confirming its agreement to assume and be bound by the obligations of the applicable Guarantor; *provided,* that no such transfer will eliminate or modify in any manner the transferring Guarantor's obligations under this Guarantee (such that both the transferring Guarantor and the transferee of the Guarantee remain liable for the Guaranteed Obligations), unless otherwise consented to in writing by the Company, EFIH and Parent (in each case, such consent not to be unreasonably withheld, conditioned or delayed).  Notwithstanding the foregoing, following the Funding Date, the consent of the Company, EFIH and Parent shall not be required for a Guarantor to assign, transfer or delegate all or part of its rights, interests and obligations hereunder if such transferring Guarantor has fully funded its Investment Commitment in accordance with <u>Section 3</u> of the Equity Commitment Letter or its Backstop Commitment in accordance with <u>Section 3.5</u> of the Backstop Agreement and provides prior written notice of such transfer to each of the Company, EFIH and Parent; *provided,* that no such transfer will eliminate or modify in any manner the transferring Guarantor's obligations under this Guarantee (such that both the transferring Guarantor and the transferee of the Guarantee remain liable for the Guaranteed Obligations), unless otherwise consented to in writing by the Company, EFIH and Parent (in each case, such consent not to be unreasonably withheld, conditioned or delayed).  If a Guarantor transfers all or any portion of its rights, interests and obligations hereunder with the prior written consent of the Company, EFIH and Parent (such consent not to be unreasonably withheld, conditioned or delayed) in accordance with this <u>Section 4</u>, then upon such transfer, the transferring Guarantor shall have no further obligations hereunder in respect of such transferred rights, interests and obligations.  Following any assignment or transfer in accordance with this Guarantee, <u>Annex 1</u> hereto shall be revised and updated to reflect any changes in the identity of the Guarantors and their Pro Rata Shares and related Caps.

5.    <u>Notices</u>.  Any notice, request, instruction or other document to be given hereunder by any party to the others shall be in writing and delivered personally or sent by registered or certified mail, postage prepaid, by email or overnight courier:

<u>If to a Guarantor</u>:

To the notice information
set forth on such Guarantor's
signature page hereto.

<u>with copies (which shall not constitute notice) to:</u>

Baker Botts L.L.P.
2001 Ross Ave., Suite 600
Dallas, Texas 75201
Attention:      Geoffrey L. Newton
                Luckey McDowell
                Preston Bernhisel
Email:          geoffrey.newton@bakerbotts.com
                luckey.mcdowell@bakerbotts.com
                preston.bernhisel@bakerbotts.com

and

White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131
Attention:      Thomas E. Lauria
Email: tlauria@whitecase.com

and

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Attention:      Gregory Pryor
Email: gpryor@whitecase.com

<u>If to the Company and/or EFIH:</u>

Energy Future Holdings Corp., et al.
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201
Attention:      General Counsel
Email:          stacey.dore@energyfutureholdings.com; and
                awright@energyfutureholdings.com

<u>with copies (which shall not constitute notice) to:</u>

Kirkland & Ellis LLP
600 Travis St., Suite 3300

Houston, Texas 77002
Attention:        Andrew Calder
                  Amber Meek
Email:            andrew.calder@kirkland.com
                  amber.meek@kirkland.com

And

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attention:        James Sprayregen
                  Marc Kieselstein
                  Chad Husnick
                  Steven Serajeddini
Email:            jsprayregen@kirkland.com
                  mkieselstein@kirkland.com
                  chusnick@kirkland.com
                  steven.serajedinni@kirkland.com

And

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:        Edward Sassower
                  Stephen Hessler
                  Brian Schartz
Email:            edward.sassower@kirkland.com
                  stephen.hessler@kirkland.com
                  bschartz@kirkland.com

6.    Termination.  This Guarantee shall terminate in its entirety and each Guarantor shall have no further obligations or liabilities under or in connection with this Guarantee upon the earliest to occur of: (a) the First Closing, if the First Closing occurs, (b) the date which is forty-five (45) Business Days following the termination of the Merger Agreement if, on such date, neither the Company nor EFIH shall have made any valid claim for payment hereunder and (c) the date on which payment of the Guaranteed Obligations has been fully resolved pursuant to an agreement in writing executed by the Company and EFIH or indefeasibly paid in full if the Company or EFIH shall have made a valid claim for payment under this Guarantee within the time period specified in clause (b).

7.    No Recourse.  Notwithstanding anything to the contrary contained in this Guarantee, each of the Company and EFIH, by its acceptance of the benefits of this Guarantee,

- 8 -

hereby covenants, acknowledges and agrees, that no Person other than the Guarantors and their permitted assignees shall have any obligation under this Guarantee, and that, notwithstanding that the Guarantors (or any of their permitted assignees) may be a partnership or limited liability company, no recourse or right of recovery (whether at law, in equity, in contract, in tort or otherwise) under this Guarantee, shall be had against any Related Party of the Guarantors based upon the relationship of such Related Party to any Guarantors or, whether by or through attempted piercing of the corporate (or limited liability company or limited liability partnership) veil, or by invoking any alter ego theory, by or through any claim against or on behalf of the Purchasers, whether by the enforcement of any assessment or by or through any legal or equitable proceeding, or by virtue of any applicable Law, or otherwise, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any such Related Party, as such, for any obligations of the Guarantors under this Guarantee, or for any claim based on, in respect of, or by reason of such obligation.  Notwithstanding the foregoing or anything else in this Guarantee to the contrary, nothing in this Guarantee shall limit the obligations of any Related Party of the Guarantors, any Purchaser or any other Person under any other Transaction Agreement to which it is a party for the benefit of the other parties thereto in accordance with the terms and subject to the limitations set forth therein and nothing in this Section 7 shall limit the obligations of any Guarantor under this Guarantee (including any Guarantor that is a Related Party of another Guarantor, but only in its capacity as a Guarantor).  "Related Party" means, with respect to any Person, (i) any former, current or future equity holder, controlling person, director, officer, employee, agent, advisor, representative, Affiliate, member, manager, general or limited partner of such Person and (ii) any former, current or future equity holder, controlling person, director, officer, employee, agent, advisor, representative, Affiliate, member, manager, general or limited partner of the foregoing; *provided*, that for the avoidance of doubt the Purchasers shall not be considered Related Parties of any Guarantor.

8.    Remedies.  The Company and EFIH agree that (A) none of the Guarantors are a party to the Merger Agreement, and nothing herein shall cause any of the Guarantors to become, or be deemed to have become, party to the Merger Agreement, and (B) the Company and EFIH shall in no event seek to recover any amount pursuant to this Guarantee from any Guarantor under this Guarantee in excess of the amount expressly payable by such Guarantor under this Guarantee.

9.    Governing Law; Jurisdiction.

(a)    THIS GUARANTEE, TOGETHER WITH ANY CLAIM, DISPUTE, REMEDY OR LEGAL PROCEEDING ARISING FROM OR RELATING TO THIS GUARANTEE OR THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY RELIEF OR REMEDIES SOUGHT BY ANY PARTY HERETO, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, SHALL BE CONSTRUED, PERFORMED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO ITS PRINCIPLES OR RULES OF CONFLICT OF LAWS TO THE EXTENT SUCH PRINCIPLES OR RULES WOULD

REQUIRE OR PERMIT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION. Each of the parties hereto (i) submits to the exclusive jurisdiction of the Bankruptcy Court (or, if the Bankruptcy Court declines to accept jurisdiction over a particular matter, then the Chancery Court of the State of Delaware, and if the Chancery Court of the State of Delaware declines jurisdiction, then any state or federal court sitting in Delaware) in any action or proceeding arising out of or relating to this Guarantee, (ii) agrees that all claims in respect of such action or proceeding may be heard and determined in any such court and (iii) agrees not to bring any action or proceeding arising out of or relating to this Guarantee (whether on the basis of a claim sounding in contract, equity, tort or otherwise) in any other court. Each of the parties hereto agrees that a final judgment (subject to any appeals therefrom) in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Guarantee or the transactions contemplated hereby in the Bankruptcy Court or any Delaware or federal court in accordance with the provisions of this <u>Section 9</u>. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court. Each of the parties hereto hereby irrevocably and unconditionally consents to service of process in the manner provided for notices in <u>Section 5</u>. Nothing in this Guarantee will affect the right of any party to this Guarantee to serve process in any other manner permitted by Law.

(b) EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS GUARANTEE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS GUARANTEE, OR THE TRANSACTIONS CONTEMPLATED BY THIS GUARANTEE. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (W) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (X) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (Y) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (Z) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS GUARANTEE BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 9</u>.

10.    <u>Counterparts</u>. This Guarantee may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Guarantee may be delivered by facsimile, electronic mail or otherwise, each of which shall be deemed to be an original for the purposes of this paragraph.

11.    <u>Third Party Beneficiaries</u>.  Subject to <u>Section 7</u>, this Guarantee is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any Person other than the parties hereto; except that as a material aspect of this Guarantee, the parties intend that all Related Parties shall be, and such Related Parties are, intended third party beneficiaries of this Guarantee who may rely on and enforce the provisions of this Guarantee that bar the liability, or otherwise protect the interests, of such Related Parties.

12.    <u>Confidentiality</u>.  This Guarantee shall be treated by the parties hereto as strictly confidential and is being provided to the parties hereto solely in connection with the Merger Agreement and the transactions contemplated thereby.  This Guarantee may not be used, circulated, quoted or otherwise referred to in any document (other than the Merger Agreement), except with the written consent of each of the parties hereto; *provided*, that the parties hereto may disclose such information to the extent necessary to comply with and prevent violation of applicable Law, the applicable rules of any national securities exchange or in connection with any U.S. Securities and Exchange Commission filings relating to the transactions contemplated by the Merger  Agreement.  Notwithstanding the foregoing, this Guarantee may be provided by the parties hereto to their respective Affiliates, partners, directors, officers, employees, investors or potential investors, agents and legal, financial, accounting or other advisors or representatives who have been directed to treat this Guarantee as confidential, with the understanding that such Affiliates, partners, directors, officers, employees, investors or potential investors, agents, advisors and representatives shall be informed of the confidential nature of this Guarantee and their need to so treat this Guarantee as confidential, and each party shall be liable for any breach by such Affiliates, agents, advisors and representatives of the provisions of this Section 12.

13.    <u>Specific Performance</u>.    The parties hereto acknowledge and agree that irreparable damage would occur in the event that any provision of this Guarantee is not performed by a party hereto in accordance with its specific terms or is otherwise breached by a party hereto and the parties would not have an adequate remedy at law in the form of money damages.  Accordingly, the parties acknowledge and agree that the parties hereto shall be entitled, prior to the termination of this Guarantee in accordance with its terms, to enforce specifically the terms and provisions, and subject to the conditions and limitations (including the Cap), of this Guarantee and to obtain an injunction, injunctions or any form of equitable relief to prevent breaches of this Guarantee, in addition to any other remedy to enforce this Guarantee to which they are entitled at Law or in equity.  In addition, each Guarantor hereby covenants and agrees that it shall not directly or indirectly institute any proceeding asserting or assert as a defense in any proceeding, and shall cause its respective Affiliates not to directly or indirectly institute any proceeding asserting or assert as a defense in any proceeding, (i) that (x) the Company has an adequate remedy at law or (y) an award of specific performance is not an appropriate remedy for any reason at law or equity or (ii) the illegality, invalidity or unenforceability in accordance with its terms of this Guarantee.  Each Guarantor agrees to pay on demand all reasonable out-of-pocket expenses (including reasonable fees of counsel)

incurred by the Company in connection with the enforcement of its rights hereunder if the Company prevails in such litigation or proceeding.

14.    Miscellaneous.

(a)    This Guarantee, together with the provisions of and definitions contained in the Merger Agreement and the other Transaction Agreements, constitutes the entire understanding among the parties hereto with respect to the subject matter hereof and replaces and supersedes all prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof.

(b)    No single or partial exercise by the Company of any right, remedy or power hereunder shall preclude any other or future exercise of any right, remedy or power hereunder. Each and every right, remedy and power hereby granted to the Company or allowed it by Law or other agreement shall be cumulative and not exclusive of any other, and may be exercised by the Company at any time or from time to time.

(c)    This Guarantee may not be amended or waived except in a writing signed by each of the parties hereto.

(d)    The provisions of this Guarantee shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Guarantee, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (i) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (ii) the remainder of this Guarantee and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction. Notwithstanding the foregoing, this Guarantee may not be enforced without giving effect to the limitation of the amount payable by each Guarantor hereunder to the Cap and to the provisions of Sections 6, 7 or 8 hereof.  Each party hereto covenants and agrees that it shall not assert, and shall cause its respective Affiliates and representatives not to assert, that this Guarantee or any provisions hereof (including any limitations on any Guarantor's liability herein) are invalid, illegal or unenforceable.

(e)    The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Guarantee.

(f)    All parties acknowledge that each party and its counsel have reviewed this Guarantee and that any rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Guarantee.

(g)     Notwithstanding anything contained herein, each party acknowledged that its decision to enter into this Guarantee has been made by such party independent of any other party.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, each of the Guarantors and the Guarantee parties have caused this Guarantee to be executed and delivered as of the date first written above by its officer or representative thereunto duly authorized.

**ENERGY FUTURE HOLDINGS CORP.**

By: _____
Name: Anthony Horton
Title:  Senior Vice President & Treasurer

**ENERGY FUTURE INTERMEDIATE
HOLDING COMPANY LLC**

By: _____
Name: Anthony Horton
Title: Senior Vice President & Treasurer

*[Signature Page to the Guarantee]*

**HUNT POWER HOLDINGS, L.L.C.**

By: _____

Name: Hunter L. Hunt
Title:   President


Hunt Power Holdings, L.L.C.
1900 N. Akard Street
Dallas, Texas 75201
Attention: David Hernandez
Email: DHernandez@huntconsolidated.com

*[Signature Page to Guarantee]*

**ATLAS MASTER FUND, LTD.**

By: _____

Name:

Title: **Adam Finger**
      Authorized Signatory


Atlas Master Fund, Ltd.
c/o Balyasny Asset Management
181 West Madison Street
Chicago, IL 60602
Attention: Taylor O'Malley & Scott Schroeder
Email:      Tomalley@bamfunds.com; Sschroeder@bamfunds.com

**ATLAS ENHANCED MASTER FUND, LTD.**

By:

Name:    **Adam Finger**
Title:    **Authorized Signatory**


Atlas Enhanced Master Fund, Ltd.
c/o Balyasny Asset Management
181 West Madison Street
Chicago, IL 60602
Attention: Taylor O'Malley & Scott Schroeder
Email:    Tomalley@bamfunds.com; Sschroeder@bamfunds.com

**BAM ZIE MASTER FUND, LTD.**

By: _____

Name:

Title:     **Adam Finger**
           Authorized Signator

BAM Zie Master Fund, Ltd.
c/o Balyasny Asset Management
181 West Madison Street
Chicago, IL 60602
Attention: Taylor O'Malley & Scott Schroeder
Email:      Tomalley@bamfunds.com; Sschroeder@bamfunds.com

**BHR CAPITAL LLC as nominee for:**
**BHCO Master, Ltd.**
**BHR Master Fund, Ltd.**
**BHR OC Master Fund, Ltd., which funds shall be jointly**
**and severally liable for their obligations hereunder**

By: _____
Name:  William Brown
Title:  Partner, President & COO

BHR Capital LLC
545 Madison Avenue
10th Floor
New York, NY 10022
Attention: Michael N. Thompson
              William J. Brown
              Stephen Harris
Email:     Mthompson@bhrcap.com
              Wbrown@bhrcap.com
              Sharris@bhrcap.com

**CENTERBRIDGE CREDIT PARTNERS, L.P.**

By: _Susanne V. Clark_
Name:    **Susanne V. Clark**
Title:    **Authorized Signatory**


Centerbridge Credit Partners, L.P.
375 Park Avenue
12th Floor
New York, NY 10152
Attention: The Office of the General Counsel
Email:    legalnotices@centerbridge.com

*[Signature Page to Guarantee]*

**CENTERBRIDGE CREDIT PARTNERS MASTER, L.P.**

By: _____
Name:     **Susanne V. Clark**
Title:     **Authorized Signatory**


Centerbridge Credit Partners Master, L.P.
375 Park Avenue
12th Floor
New York, NY 10152
Attention: The Office of the General Counsel
Email:      legalnotices@centerbridge.com

*[Signature Page to Guarantee]*

**CENTERBRIDGE SPECIAL CREDIT PARTNERS II, L.P.**

By: _Susanne V. Clark_
Name:    Susanne V. Clark
Title:    Authorized Signatory


Centerbridge Special Credit Partners II, L.P.
375 Park Avenue
12th Floor
New York, NY 10152
Attention: The Office of the General Counsel
Email:    legalnotices@centerbridge.com

*[Signature Page to Guarantee]*

**CYRUS OPPORTUNITIES MASTER FUND II, LTD.**

By: Cyrus Capital Partners, L.P.,
    its Investment Manager

By: _____
Name: Thomas Stamatelos
Title:   Authorized Signatory


Cyrus Opportunities Master Fund II, Ltd.
c/o Cyrus Capital Partners, L.P.
399 Park Avenue
39th Floor
New York, NY 10022
Attention: Sumaer Grewal
Email:        sgrewal@cyruscapital.com


With copies to:


Cyrus Capital Operations Department
Email:        ops@cyruscapital.com

*[Signature Page to Guarantee]*

**CYRUS SELECT OPPORTUNITIES MASTER FUND, LTD.**

By: Cyrus Capital Partners, L.P.,
    its Investment Manager

By: _____
Name: Thomas Stamatelos
Title:   Authorized Signatory

Cyrus Select Opportunities Master Fund, Ltd.
c/o Cyrus Capital Partners, L.P.
399 Park Avenue
39th Floor
New York, NY 10022
Attention: Sumaer Grewal
Email:    sgrewal@cyruscapital.com

With copies to:

Cyrus Capital Operations Department
Email:    ops@cyruscapital.com

*[Signature Page to Guarantee]*

**CRS MASTER FUND, L.P.**

By: Cyrus Capital Partners, L.P.,
    its Investment Manager

By: _____
Name: Thomas Stamatelos
Title:   Authorized Signatory




CRS Master Fund, L.P.
c/o Cyrus Capital Partners, L.P.
399 Park Avenue
39th Floor
New York, NY 10022
Attention: Sumaer Grewal
Email:      sgrewal@cyruscapital.com


With copies to:


Cyrus Capital Operations Department
Email:      ops@cyruscapital.com

*[Signature Page to Guarantee]*

**CRESCENT 1, L.P.**

By: Cyrus Capital Partners, L.P.,
    its Investment Manager

By: _____
Name: Thomas Stamatelos
Title:   Authorized Signatory




Crescent 1, L.P.
c/o Cyrus Capital Partners, L.P.
399 Park Avenue
39th Floor
New York, NY 10022
Attention: Sumaer Grewal
Email:      sgrewal@cyruscapital.com


With copies to:


Cyrus Capital Operations Department
Email:      ops@cyruscapital.com

*[Signature Page to Guarantee]*

**DEUTSCHE BANK SECURITIES INC.,**
**solely with respect to the Distressed Products Group**


By: _____

Name: Mike Curreri
      R Mikel Curreri
Title:    Managing Director


By: _____

Name: Shawn Faurot
       Shawn Faurot
Title:    Managing Director


Deutsche Bank Securities Inc.
60 Wall Street
3rd Floor
New York, NY 10005
Attention: Mike Curreri & Shawn Faurot
Email:    Mikel.curreri@db.com; Shawn.faurot@db.com


*[Signature Page to Guarantee]*

GSO CHURCHILL PARTNERS LP,
GSO COASTLINE CREDIT PARTNERS LP,
GSO CREDIT-A PARTNERS LP,
GSO CREDIT ALPHA FUND LP,
GSO PALMETTO OPPORTUNISTIC INVESTMENT PARTNERS LP, and
STEAMBOAT CREDIT OPPORTUNITIES MASTER FUND LP

By: GSO Capital Partners LP, its Investment Manager

By:_____
Name: Marisa Beeney
Title:  Authorized Person


345 Park Avenue
31st Floor
New York, NY 10154
Attention: Patrick Fleury
           Marisa Beeney
Email:     Patrick.Fleury@gsocap.com
           Marisa.Beeney@gsocap.com

GSO SPECIAL SITUATIONS MASTER FUND LP

By: GSO Capital Partners LP, its Investment Advisor

By: _____
Name: Marisa Beeney
Title:  Authorized Person


345 Park Avenue
31st Floor
New York, NY 10154
Attention: Patrick Fleury
          Marisa Beeney
Email:    Patrick.Fleury@gsocap.com
          Marisa.Beeney@gsocap.com

GSO AIGUILLE DES GRANDS MONTETS FUND I LP,
GSO AIGUILLE DES GRANDS MONTETS FUND II LP and
GSO AIGUILLE DES GRANDS MONTETS FUND III LP

By: GSO Capital Partners LP, its attorney-in-fact

By:_____
Name: Marisa Beeney
Title:  Authorized Person


345 Park Avenue
31st Floor
New York, NY 10154
Attention: Patrick Fleury
            Marisa Beeney
Email:     Patrick.Fleury@gsocap.com
            Marisa.Beeney@gsocap.com

GSO CACTUS CREDIT OPPORTUNITIES FUND LP

By: GSO Cactus Credit Opportunities Associates LLC,
its general partner

By:_____
Name: Marisa Beeney
Title:  Authorized Person


345 Park Avenue
31st Floor
New York, NY 10154
Attention: Patrick Fleury
           Marisa Beeney
Email:    Patrick.Fleury@gsocap.com
          Marisa.Beeney@gsocap.com

**ANCHORAGE CAPITAL MASTER OFFSHORE, LTD.**

By: Anchorage Capital Group, L.L.C.,
    its Investment Manager

By: _____
Name:         Daniel Allen
Title:        Senior Portfolio Manager


Anchorage Capital Master Offshore, Ltd.
c/o Anchorage Capital Group, L.L.C.
610 Broadway, 6th Floor
New York, NY 10012
Attn: General Counsel
Fax: +1-212-432-4651
Email: legal@anchoragecap.com

[*Signature Page to Guarantee*]

**PCI FUND LLC**

By: Anchorage Capital Group, L.L.C.,
    its Investment Manager

By: _____
Name:        Daniel Allen
Title:      Senior Portfolio Manager


PCI Fund LLC
c/o Anchorage Capital Group, L.L.C.
610 Broadway, 6th Floor
New York, NY 10012
Attn: General Counsel
Fax: +1-212-432-4651
Email: legal@anchoragecap.com

*[Signature Page to Guarantee]*

**TACONIC OPPORTUNITY MASTER FUND L.P.**

By: Taconic Capital Advisors L.P.,
    its Investment Manager

By: _____
Name: Marc Schwartz
Title: Principal

Taconic Opportunity Master Fund L.P.
280 Park Avenue
5th Floor
New York, NY 10017
Attention: Marc Schwartz
Email:    maschwartz@taconiccap.com

[*Signature Page to Guarantee*]

**TACONIC MASTER FUND 1.5 L.P.**

By: Taconic Capital Advisors L.P.,
    its Investment Manager

By: _____
Name: Marc Schwartz
Title: Principal

Taconic Master Fund 1.5 L.P.
280 Park Avenue
5th Floor
New York, NY 10017
Attention: Marc Schwartz
Email:     maschwartz@taconiccap.com

*[Signature Page to Guarantee]*

**ARROWGRASS MASTER FUND LTD.**

By:
Name:    Sean Flynn
Title:   Director


Arrowgrass Master Fund Ltd.
c/o Arrowgrass Capital Partners (US) LP
1330 Avenue of the Americas
32nd Floor
New York, NY 10019
Attention: Josh Hertz & David Dunn
Email:      Joshua.hertz@arrowgrass.com; David.dunn@arrowgrass.com


and


Arrowgrass Capital Partners LLP
3rd Floor
10 Portman Square
London, England
W1H 6AZ
Attention: General Counsel
Email:      legal@arrowgrass.com


*[Signature Page to Guarantee]*

**ARROWGRASS DISTRESSED OPPORTUNITIES FUND
LIMITED**

By:
Name:
Title:   Director


Arrowgrass Distressed Opportunities Fund Limited
c/o Arrowgrass Capital Partners (US) LP
1330 Avenue of the Americas
32nd Floor
New York, NY 10019
Attention: Josh Hertz & David Dunn
Email:      Joshua.hertz@arrowgrass.com; David.dunn@arrowgrass.com


and


Arrowgrass Capital Partners LLP
3rd Floor
10 Portman Square
London, England
W1H 6AZ
Attention: General Counsel
Email:      legal@arrowgrass.com

*[Signature Page to Guarantee]*

**BLACKROCK CORE BOND TRUST**

By: BlackRock Financial Management, Inc.,
     its Sub-Advisor

By: _____
Name:    AnnMarie Smith
Title:    Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK MULTI-SECTOR INCOME TRUST**

By: BlackRock Advisors, LLC,
    its Investment Advisor

By: _____
Name:
Title:     AnnMarie Smith
           Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK DIVERSIFIED DISTRIBUTION FUND**

By: BlackRock Financial Management, Inc.
    its Sub-Advisor

By:
Name:       AnnMarie Smith
Title:       Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:       David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK LIMITED DURATION INCOME TRUST**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By:
Name:
Title:
          AnnMarie Smith
        Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

**BLACKROCK FUNDS II, BLACKROCK HIGH YIELD BOND PORTFOLIO**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By:
Name:
Title:    AnnMarie Smith
          Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK SECURED CREDIT PORTFOLIO OF BLACKROCK FUNDS II**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:
Title:

       **AnnMarie Smith**
       **Authorized Signatory**


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

**BLACKROCK CREDIT ALLOCATION INCOME
TRUST IV**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:
Title:

      **AnnMarie Smith**
      **Authorized Signatory**


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK HIGH YIELD PORTFOLIO OF THE
BLACKROCK SERIES FUND, INC.**

By: BlackRock Financial Management, Inc.,
　　its Sub-Advisor

By: _____
Name:
Title:　　AnnMarie **Smith**
　　　　**Authorized Signatory**

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:　　David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK HIGH YIELD V.I. FUND OF**
**BLACKROCK VARIABLE SERIES FUNDS, INC.**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By:
Name:
Title:

AnnMarie Smith
Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BGF GLOBAL HIGH YIELD BOND FUND**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:   AnnMarie Smith
Title:    Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

[*Signature Page to Guarantee*]

**BLACKROCK GLOBAL INVESTMENT SERIES:**
**INCOME STRATEGIES PORTFOLIO**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:
Title:       AnnMarie Smith
             Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK CORPORATE HIGH YIELD FUND, INC.**

By: BlackRock Advisors, LLC,
    its Investment Advisor

By: _____
Name:    AnnMarie Smith
Title:    Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

**MET INVESTORS SERIES TRUST - BLACKROCK
HIGH YIELD PORTFOLIO**

By: BlackRock Financial Management, Inc.,
     its Investment Advisor

By:
Name:
Title:        AnnMarie Smith
              Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:        David.trucano@blackrock.com

**BGF US DOLLAR HIGH YIELD BOND FUND**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:
Title:
     **AnnMarie Smith**
     **Authorized Signatory**


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**THE OBSIDIAN MASTER FUND**

By: BlackRock Financial Management, Inc.,
    its Investment Advisor

By: _____
Name:
Title:

     AnnMarie Smith
     Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**CA 534 OFFSHORE FUND, LTD**

By: BlackRock Financial Management, Inc.,
    its Investment Advisor

By: _____
Name:    AnnMarie Smith
Title:    Authorized Signatory



BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK CREDIT ALPHA MASTER FUND L.P.**

By: BlackRock Financial Management, Inc.,
    its Investment Advisor

By: _____
Name:
Title: AnnMarie Smith
    Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**JNL/BLACKROCK GLOBAL LONG SHORT CREDIT FUND**

By: BlackRock Financial Management, Inc.,
　　its Sub-Advisor

By: _____
Name:
Title:　　AnnMarie Smith
　　　　Authorized Signatory



BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:　　David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK GLOBAL LONG/SHORT CREDIT FUND
OF BLACKROCK FUNDS**

By: BlackRock Financial Management, Inc.,
      its Sub-Advisor

By: _____
Name:
Title:

        AnnMarie Smith
        Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:       David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK MULTI-STRATEGY MASTER FUND
LIMITED**

By: BlackRock Institutional Trust Company, N.A.,
      its Investment Manager

By: _____
Name:
Title:           ...arie Smith
           Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

**ARCH REINSURANCE LTD.**

By: BlackRock Financial Management, Inc.,
    its Investment Advisor

By: _____
Name:
Title:

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

[*Signature Page to Guarantee*]

**BLACKROCK FUNDS II, BLACKROCK STRATEGIC
INCOME OPPORTUNITIES PORTFOLIO**

By: BlackRock Financial Management, Inc.,
    its Registered Sub-Advisor

By: _____
Name:
Title:

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**STRATEGIC INCOME OPPORTUNITIES BOND FUND**

By: BlackRock Institutional Trust Company, N.A.,
    not in its individual capacity but as Trustee of the Strategic
    Opportunities Bond Fund

By:
Name:
Title:


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK DYNAMIC HIGH INCOME PORTFOLIO
OF BLACKROCK FUNDS II**

By: BlackRock Advisors, LLC,
    its Investment Advisor

By: _____
Name: ALEX SHINGLER
Title: MANAGING DIRECTOR

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

[*Signature Page to Guarantee*]

**BLACKROCK MULTI-ASSET INCOME PORTFOLIO OF BLACKROCK FUNDS II**

By: BlackRock Advisors, LLC,
    its Investment Advisor

By: _____
Name: ALEX SHINGLER
Title: MANAGING DIRECTOR


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

[*Signature Page to Guarantee*]

**BGF GLOBAL MULTI-ASSET INCOME FUND, A SUB-FUND OF BLACKROCK GLOBAL FUNDS**

By: BlackRock Financial Management, Inc.,
    its Advisor

By: _____
Name: ALEX SHINGLER
Title: MANAGING DIRECTOR


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**AVENUE CAPITAL MANAGEMENT II, L.P.**
*on behalf of certain funds it advises*

By:  Avenue Capital Management II GenPar, LLC,
     its General Partner


By:  _____
Name: Sonia Gardner
Title:  Managing Member



Avenue Capital Management II, L.P.
399 Park Avenue, 6th Floor
New York, NY 10022
Attention:  Sonia Gardner
            Todd Greenbarg
Email:      sgardner@avenuecapital.com
            tgreenbarg@avenuecapital.com

*[Signature Page to Guarantee]*

**AVENUE CAPITAL MANAGEMENT II, L.P.**
*on behalf of certain funds it advises*

By: Avenue Capital Management II GenPar, LLC,
    its General Partner

By: _____
Name: Sonia Gardner
Title:  Managing Member


Avenue Capital Management II, L.P.
399 Park Avenue, 6th Floor
New York, NY 10022
Attention:  Sonia Gardner
            Todd Greenbarg
Email:      sgardner@avenuecapital.com
            tgreenbarg@avenuecapital.com

**PECOS PARTNERS, L.P.**

By:  Pecos Strategic Partners, LLC,
     its General Partner

By:  GL Pecos Strategic Partners, LLC,
     its sole member

By: _____
Name: Sonia Gardner
Title:  Member

Pecos Partners, L.P.
399 Park Avenue, 6th Floor
New York, NY 10022
Attention:  Sonia Gardner
            Todd Greenbarg
Email:      sgardner@avenuecapital.com
            tgreenbarg@avenuecapital.com

**FLOURISH INVESTMENT CORPORATION**

By: _____
Name: Keping Li
Title: President and Executive Director

Flourish Investment Corporation
c/o China Investment Corporation
25/F New Poly Plaza, No.1 Chaoyangmen Beidajie Dongcheng District, Beijing, China. 100010
Attention: Yuan Tian
          Haipeng Liang
          Jia Chen
          Jie Yuan
Email:    tianyuan@china-inv.cn
          lianghp@china-inv.cn
          chenjia@china-inv.cn
          yuanjie@china-inv.cn

*[Signature Page to Guarantee]*

# Annex 1

## Pro Rata Share



| Guarantor | Pro Rata Share |
|---|---|
| Anchorage Total | 28.17% |
| Arrowgrass Total | 5.55% |
| Avenue Total | 7.04% |
| BlackRock Total | 17.24% |
| Balyasny Total | 4.75% |
| BHR Total | 1.99% |
| Centerbridge Total | 5.58% |
| Cyrus Total | 3.38% |
| Deutsche Bank Total | 4.75% |
| GSO Total | 7.04% |
| Taconic Total | 3.96% |
| Hunt Power Holdings Total | 3.52% |
| Pecos Partners Total | 3.52% |
| Flourish Investment Total | 3.52% |
| Total Investors | 100.00% |

## Exhibit A

**Joinder to Guarantee**

_____, 201__

Energy Future Holdings Corp.
Energy Future Intermediate Holding Company LLC
Energy Plaza
1601 Bryan Street
Dallas, Texas  75201
Attention: Boards of Directors

Ladies and Gentlemen:

Reference is made to the Guarantee, dated as of August 9, 2015 (the "Guarantee"), among the Guarantors (as defined in the Guarantee), Energy Future Holdings Corp. and Energy Future Intermediate Holding Company LLC.  Capitalized terms used but not defined herein have the meanings ascribed to them in the Guarantee.

The undersigned hereby (i) acknowledges that it has received and reviewed a copy of the Guarantee and (ii) agrees to assume and be bound by the obligations of [_____] in respect of the portion of the Guaranteed Obligations transferred to the undersigned, as reflected on the updated Annex 1 to the Guarantee, and to observe and comply with all of the terms and provisions of the Guarantee that are applicable to the Guarantors as if an original party hereto.

*[Signature page follows]*

IN WITNESS WHEREOF, the undersigned has caused this Joinder to be executed as of the date first written above.

[_____]

By: _____

Name: _____

Title: _____

## **EXHIBIT E**

**FORM OF TAX MATTERS AGREEMENT**

FORM OF

TAX MATTERS AGREEMENT

BY AND AMONG

ENERGY FUTURE HOLDINGS CORP.,

ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC

AND

[REORGANIZED TCEH]

DATED AS OF [THE EFFECTIVE DATE]

Table of Contents

Page

ARTICLE I Definitions ................................................................................................ 3
     Section 1.01   General ................................................................................ 3
     Section 1.02   Construction...................................................................... 10
     Section 1.03   References to Time ........................................................... 11

ARTICLE II Preparation, Filing, and Payment of Taxes Shown Due on Tax Returns ............... 11
     Section 2.01   Tax Returns...................................................................... 11
     Section 2.02   Tax Return Procedures..................................................... 11
     Section 2.03   Straddle Period Tax Allocation........................................ 13
     Section 2.04   Allocation of Taxes ......................................................... 13
     Section 2.05   Allocation of Separation-Related Taxes. ......................... 15
     Section 2.06   Audits/Redeterminations.................................................. 15
     Section 2.07   Expenses ......................................................................... 15
     Section 2.08   Timing of Payments ........................................................ 16

ARTICLE III Indemnification ...................................................................................... 16
     Section 3.01   Indemnification by the EFH Parties................................ 16
     Section 3.02   Indemnification by Reorganized TCEH ......................... 16
     Section 3.03   Characterization of and Adjustments to Payments ................. 16
     Section 3.04   Timing of Indemnification Payments .............................. 16
     Section 3.05   Exclusive Remedy ........................................................... 17
     Section 3.06   No Duplicative Payment .................................................. 17

ARTICLE IV Refunds, Timing Differences, and Tax Attributes.................................. 17
     Section 4.01   Refunds ........................................................................... 17
     Section 4.02   Timing Differences ......................................................... 17

ARTICLE V Tax Proceedings ...................................................................................... 18
     Section 5.01   Notification of Tax Proceedings ..................................... 18
     Section 5.02   Tax Proceeding Procedures.............................................. 18

ARTICLE VI Intended Tax Treatment......................................................................... 19
     Section 6.01   Restrictions Relating to the Distribution.......................... 19

ARTICLE VII Cooperation .......................................................................................... 20
     Section 7.01   General Cooperation ....................................................... 20
     Section 7.02   Retention of Records....................................................... 21
     Section 7.03   Failure to Perform ........................................................... 21

ARTICLE VIII Miscellaneous...................................................................................... 21

i

Section 8.01    Governing law.................................................................................................21
Section 8.02    Dispute Resolution...........................................................................................22
Section 8.03    Tax Sharing Agreements...................................................................................22
Section 8.04    Interest on Late Payments................................................................................22
Section 8.05    Survival of Covenants.......................................................................................22
Section 8.06    Severability ......................................................................................................22
Section 8.07    Entire Agreement..............................................................................................23
Section 8.08    Assignment ......................................................................................................23
Section 8.09    No Third Party Beneficiaries ...........................................................................23
Section 8.10    Affiliates ..........................................................................................................23
Section 8.11    Amendments; Waivers......................................................................................23
Section 8.12    Interpretation....................................................................................................23
Section 8.13    Counterparts.....................................................................................................24
Section 8.14    Confidentiality .................................................................................................24
Section 8.15    Waiver of Jury Trial.........................................................................................24
Section 8.16    Jurisdiction; Service of Process .......................................................................24
Section 8.17    Notices .............................................................................................................25
Section 8.18    Headings ..........................................................................................................28
Section 8.19    Effectiveness....................................................................................................28
Section 8.20    Further Assurances...........................................................................................28

FORM OF
TAX MATTERS AGREEMENT

This **TAX MATTERS AGREEMENT** (this "Agreement"), dated as of [the Effective Date] (the "Effective Date"), is entered into by and among Energy Future Holdings Corp., a Texas Corporation ("EFH"), Energy Future Intermediate Holding Company LLC, a Delaware Limited Liability Company ("EFIH" and, together with EFH and each other Person that executes a joinder pursuant to Section 8.20, the "EFH Parties") and [Reorganized TCEH], a Delaware limited liability company and an indirect wholly owned Subsidiary of EFH ("Reorganized TCEH" and, together with the EFH Parties, the "Parties").

RECITALS[1]

**WHEREAS**, on April 29, 2014 EFH and certain entities in which it holds an equity interest (collectively, the "Debtors") commenced chapter 11 cases in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), which chapter 11 cases are being jointly administered and are captioned In re Energy Future Holdings Corp., et al., Case No. 14-10979 (CSS) (the "Chapter 11 Cases");

**WHEREAS**, the Bankruptcy Court has approved the restructuring of the Debtors pursuant to a confirmed Chapter 11 plan of reorganization (the "Plan");

**WHEREAS**, pursuant to the Plan, Texas Competitive Electric Holdings Company LLC ("TCEH"), a Delaware limited liability company and a wholly owned, indirect subsidiary of EFH, (a) has formed Reorganized TCEH as a new subsidiary of TCEH on or before the Effective Date and (b) incorporated [the Preferred Stock Entity], a Delaware corporation (the "Preferred Stock Entity") as a new subsidiary of TCEH immediately after the Contribution (as defined below);

**WHEREAS**, pursuant to the Plan, on the Effective Date, except for liabilities assumed by Reorganized TCEH pursuant to the Plan, all other Claims (as defined in the Plan) against the TCEH Debtors (as defined in the Plan) will be canceled, and each Holder (as defined in the Plan) of an Allowed Claim (as defined in the Plan) against a TCEH Debtor will have the right to receive its recovery in accordance with the terms of the Plan, and TCEH shall assume the obligations of its subsidiaries that are TCEH Debtors to make distributions pursuant to and in accordance with the Plan that are to be made after the Effective Date;

**WHEREAS**, pursuant to the Plan, immediately following such cancelation, pursuant to the Separation Agreement (as defined in the Plan), (a) TCEH will transfer all of TCEH's interests in its subsidiaries (excluding the stock of TCEH Finance, Inc. ("TCEH Finance")) to Reorganized TCEH; and (b) the EFH Debtors will transfer (i) the equity interests in the Reorganized EFH Shared Services Debtors (or with the consent of TCEH and the TCEH

---

[1]    Note to Draft: Recitals and other descriptive provisions to be appropriately revised/conformed to reflect the Plan, as amended.

Supporting First Lien Creditors (as defined in the Plan), the assets and liabilities of the Reorganized EFH Shared Services Debtors related to the TCEH Debtors' operations) and (ii) with the consent of TCEH and the TCEH Supporting First Lien Creditors, certain other assets, liabilities, and equity interests related to the TCEH Debtors' operations (including the equity interests of non-Debtor EFH Properties Company or the lease for the Debtors' corporate headquarters at "Energy Plaza" held by EFH Properties Company (but not including any cash on hand at EFH Properties Company, which shall be transferred to Reorganized EFH)), in exchange for which TCEH shall receive (i) 100% of the Reorganized TCEH membership interests and (ii) the net Cash proceeds of the Reorganized TCEH Debt (as defined in the Plan), subject to preserving the Intended Tax Treatment (as defined below) (together, the "Contribution");

WHEREAS, pursuant to the Plan, immediately following the Contribution but before the Reorganized TCEH Conversion (as defined below), and consistent with the procedures in Exhibit G of the Plan Support Agreement:  (a) Reorganized TCEH will contribute the equity in the Contributed TCEH Debtors (as defined in the Plan), or, potentially, certain assets or joint interests in certain assets, to the Preferred Stock Entity (such contribution to the Preferred Stock Entity of such equity and, potentially such assets, in an amount that is expected to result in the Basis Step-Up (as defined in the Plan)) in exchange for (i) the Preferred Stock Entity's common stock and (ii) the Reorganized TCEH Sub Preferred Stock (as defined in the Plan); (b) immediately thereafter, and pursuant to a prearranged and binding agreement, Reorganized TCEH will sell all of the Reorganized TCEH Sub Preferred Stock to one or more third party investors in exchange for Cash (as defined in the Plan), *provided, however*, that Holders of TCEH First Lien Claims (as defined in the Plan) shall not be permitted to purchase the Reorganized TCEH Sub Preferred Stock; and (c) Reorganized TCEH will distribute such Cash to TCEH to fund recoveries under the Plan (together, the "Preferred Stock Sale")

WHEREAS, pursuant to the Plan, immediately following the Preferred Stock Sale, Reorganized TCEH shall convert from a Delaware limited liability company into a Delaware corporation (the "Reorganized TCEH Conversion");

WHEREAS, pursuant to the Plan, immediately following the Reorganized TCEH Conversion, TCEH will make a Pro Rata (as defined in the Plan) distribution of the Reorganized TCEH Common Stock and the net Cash proceeds of the New Reorganized TCEH Debt and the Preferred Stock Sale, if any, received in the Contribution to Holders of Allowed TCEH First Lien Claims (the "Distribution");

WHEREAS, each of EFCH, TCEH, TCEH Finance, and the Subsidiaries of EFH identified in Annex 1 of the Agreement and Plan of Merger, dated as of [•], by and among Hunt Ovation I, L.L.C. ("Parent"), Hunt Ovation II, L.L.C., EFIH, and EFH (the "Merger Agreement") other than the Spin-Off Entities (as defined in the Merger Agreement, will be dissolved and liquidated in accordance with the Plan and applicable law and EFH's direct and indirect equity interests in each of its other Subsidiaries (other than EFIH and the Oncor Entities) will be either (as mutually agreed by EFH and Parent, each acting reasonably) (a) cancelled or abandoned pursuant to the Plan or (b) acquired by Parent with such Subsidiaries being discharged and released, to the fullest extent permitted under applicable law, pursuant to the Plan;

**WHEREAS**, pursuant to the Plan and the Merger Agreement, EFH will merge with and into Parent following the Distribution (and other interim transactions) (the "Merger"), with Parent surviving;

**WHEREAS**, it is intended that, for U.S. federal income tax purposes, (a) the Contribution, the Reorganized TCEH Conversion and the Distribution will qualify as a "reorganization" within the meaning of Sections 368(a)(1)(G), 355, and 356 of the Code, (b) the contribution described in clause (a) of the definition of the Preferred Stock Sale will be treated as a taxable sale of the assets of the Preferred Stock Entity pursuant to Section 1001 of the Code resulting in the Basis Step-Up (together with clause (a), the "Intended Tax Treatment"), and (c) the Merger will qualify as a reorganization under the provisions of Section 368(a) of the Code;

**WHEREAS**, the Parties wish to (a) provide for the payment of Tax liabilities and entitlement to refunds thereof, allocate responsibility for, and cooperation in, the filing and defense of Tax Returns, and provide for certain other matters relating to Taxes and (b) set forth certain covenants and indemnities relating to the preservation of the Intended Tax Treatment; and

**WHEREAS**, this Agreement has been approved by the Bankruptcy Court and will be effective upon the Distribution.  In the event of any conflict between this Agreement and the Plan, the Plan shall govern.

**NOW, THEREFORE**, in consideration of these premises, and of the representations, warranties, covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

ARTICLE I

Definitions

Section 1.01   General.  As used in this Agreement, the following terms shall have the following meanings.

"Accounting Firm" has the meaning set forth in Section 8.02.

"Additional Preferred Stock Sale Tax" means an amount (but not less than zero) equal to the regular Income Tax liability (and any corollary state and local Tax liability) (excluding any alternative minimum Tax) of the EFH Group in its taxable year in which the Preferred Stock Sale is consummated and attributable to the Preferred Stock Sale, calculated by determining the excess of (i) the EFH Group tax liability (determined, for the avoidance of doubt, by taking into account the gain on the Preferred Stock Sale as Finally Determined) over (ii) the EFH Group tax liability assuming the Preferred Stock Sale did not occur; provided, that for purposes of such calculation, it shall be assumed that (a) the "consolidated year" (within the meaning of Section 1503(e)(2)(B) of the Code) ended on the Effective Date, (b) the EFH Group recognized no income, gain, loss or deduction as a result of transactions occurring outside the ordinary course of business on the Effective Date after the Preferred Stock Sale (other than Deferred Intercompany and ELA Items (if any) and items directly resulting from other transactions

3

expressly contemplated by the Plan), and (c) the Agreed Tax Attributes shall be as reported on the EFH Group's Tax Returns as originally filed, but adjusted to take into account (i) all Finally Determined adjustments to items of income, loss, credit or other Tax-related attribute attributable to or arising from any business contributed to, or otherwise held on the Effective Date by, any Reorganized TCEH Entity (other than EFH Properties Company) (including, for the avoidance of doubt, any adjustments to (x) any interest expense and discharge of indebtedness income with respect to indebtedness of any such entity, TCEH or any Subsidiary of TCEH (other than TCEH Finance), (y) Deferred Intercompany and ELA Items (if any) and (z) that portion of any Section 108(i) Items which relates to the indebtedness of TCEH or any Subsidiary of TCEH (other than TCEH Finance)) and (ii) all Finally Determined adjustments to items of income, loss, credit or other Tax-related attribute attributable to any business retained by any Reorganized EFH Entity or EFH Properties Company (including, for the avoidance of doubt, any adjustments to (x) any interest expense and discharge of indebtedness income with respect to indebtedness of any such entity and (y) that portion of any Section 108(i) Items which does not relate to the indebtedness of TCEH or any Subsidiary of TCEH (other than TCEH Finance)) (but, in the case of this clause (c)(ii), only to the extent that the aggregate (net) of all adjustments described in this clause (c)(ii) results in an increase to the Agreed Tax Attributes).

"Affiliate" means, with respect to any Person, any other Person, directly or indirectly, controlling, controlled by, or under common control with, such Person; *provided that*, notwithstanding the foregoing, Affiliates of EFH shall be deemed to exclude the Reorganized TCEH Entities following the Distribution.

"Agreed Tax Attributes" means 100% of the aggregate amount of net losses, net operating losses, and net capital losses (but only to the extent such net capital losses are deductible under applicable tax law against gain recognized on the Preferred Stock Sale) (in each case, including carryovers), available to the EFH Group as of the Effective Date (determined (a) as if the "consolidated year" (within the meaning of Section 1503(e)(2)(B) of the Code) of the EFH Group ended on the Effective Date and (b) without regard to any income, gain, loss or deduction generated as a result of the Preferred Stock Sale or transactions occurring outside the ordinary course of business on the Effective Date after the Preferred Stock Sale (other than any Deferred Intercompany and ELA Items (if any) and other transactions expressly contemplated by the Plan and the other Definitive Restructuring Documents (as defined in the Plan Support Agreement)), such amount to be determined in accordance with Exhibit G of the Plan Support Agreement .

"Agreement" has the meaning set forth in the Preamble.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Basis Step-Up" means the increase in the U.S. federal income tax basis in the assets transferred or deemed transferred to the Preferred Stock Entity pursuant to the Preferred Stock Sale.

"Chapter 11 Cases" has the meaning set forth in the Recitals.

4

"Code" means the Internal Revenue Code of 1986, as amended.

"Contribution" has the meaning set forth in the Recitals.

"Covered Transaction" means the Contribution and Distribution, the Preferred Stock Sale, and any other transaction contemplated by the Plan or the Transaction Agreements.

"Debtors" has the meaning set forth in the Recitals.

"Deferred Intercompany and ELA Items" means intercompany items (as such term is defined in Treasury Regulations Section 1.1502-13(b)(2)) and excess loss account (as such term is defined in Treasury Regulations Section 1.1502-19(a)), in each case, of any Subsidiary of TCEH (other than TCEH Finance) that are accelerated into income as a result of the Distribution pursuant to Treasury Regulations Section 1.1502-13(d) or Section 1.1502-19.

"Distribution" has the meaning set forth in the Recitals.

"Due Date" means (a) with respect to a Tax Return, the date (taking into account all valid extensions) on which such Tax Return is required to be filed under applicable law and (b) with respect to a payment of Taxes, the date on which such payment is required to be made to avoid the incurrence of interest, penalties, and/or additions to Tax.

"Effective Date" has the meaning set forth in the Recitals.

"EFH" has the meaning set forth in the Preamble and, for the avoidance of doubt, all references to EFH shall include Parent following the Merger.

"EFH Breach" means a breach of one or more covenants in Article VI by any Reorganized EFH Entity or any of its Affiliates.

"EFH Group" has the meaning set forth in the Plan.

"EFH Parties" has the meaning set forth in the Preamble.

"EFH Shared Services Debtors" means, collectively:  (a) EFH Corporate Services Company; (b) Dallas Power and Light Company, Inc.; (c) EFH CG Holdings Company LP; (d) EFH CG Management Company LLC; (e) Lone Star Energy Company, Inc.; (f) Lone Star Pipeline Company, Inc.; (g) Southwestern Electric Service Company, Inc.; (h) Texas Electric Service Company, Inc.; (i) Texas Energy Industries Company, Inc.; (j) Texas Power and Light Company, Inc.; (k) Texas Utilities Company, Inc.; (l) Texas Utilities Electric Company, Inc.; and (m) TXU Electric Company, Inc.

"EFH Taxes" means (a) any Taxes of the EFH Group for periods (and portion of a Straddle Period) ending on or before the Effective Date that are not specifically included within the definition of Reorganized TCEH Taxes, including, without duplication, (i) any Taxes attributable to or arising from the ownership or operation of any business retained by any Reorganized EFH Entity or EFH Properties Company (including, for the avoidance of doubt, Taxes arising from any adjustment to interest expense and discharge of indebtedness income

with respect to indebtedness of any such entity), in each case, as determined pursuant to <u>Sections 2.03</u> and <u>2.04</u>, (ii) Taxes of the EFH Group other than Reorganized TCEH Taxes, (iii) Income Taxes imposed on a Reorganized TCEH Entity attributable to a Tax-Free Transaction Failure and allocated to the EFH Parties pursuant to <u>Sections 2.05(a)</u> or <u>(b)</u>, (iv) Taxes attributable to the Preferred Stock Sale other than TCEH Preferred Stock Sale Tax, (v) Transfer Taxes allocated to the EFH Parties pursuant to <u>Section 2.04(d)(i)</u>, and (vi) Taxes resulting from any action by any Reorganized EFH Entity outside of the ordinary course of business on the Effective Date after the Distribution, except as a result of any action that is expressly contemplated by the Plan or the Transaction Agreements and (b) any Taxes imposed on any Reorganized EFH Entity for periods (or portion of a Straddle Period) beginning after the Effective Date.

"<u>EFIH</u>" has the meaning set forth in the Preamble.

"<u>Final Determination</u>" means the final resolution of liability for any Tax for any taxable period, by or as a result of (a) a final decision, judgment, decree or other order by any court of competent jurisdiction that can no longer be appealed, (b) a final settlement with the IRS, a closing agreement or accepted offer in compromise under Sections 7121 or 7122 of the Code, or a comparable agreement under the laws of other jurisdictions, (c) any allowance of a Refund in respect of an overpayment of Tax, but only after the expiration of all periods during which such Refund may be recovered by the jurisdiction imposing the Tax or (d) any other final resolution, including by reason of the expiration of the applicable statute of limitations.

"<u>Income Taxes</u>" means any Taxes in whole or in part based upon, measured by, or calculated with respect to net income or profits, net worth or net receipts (including any alternative minimum Tax and the Texas Margin Tax). For the avoidance of doubt, Income Taxes do not include sales, use, real or personal property, or transfer or similar Taxes.

"<u>Indemnified Party</u>" means, with respect to a matter, a Person that is entitled to seek indemnification under this Agreement with respect to such matter.

"<u>Indemnifying Party</u>" means, with respect to a matter, a Person that is obligated to provide indemnification under this Agreement with respect to such matter.

"<u>Intended Tax Treatment</u>" has the meaning set forth in the Recitals.

"<u>IRS</u>" means the U.S. Internal Revenue Service or any successor thereto, including its agents, representatives, and attorneys acting in their official capacity.

"<u>IRS Submissions</u>" means all submissions to the IRS in connection with requests for the Private Letter Ruling.

"<u>Merger</u>" has the meaning set forth in the Recitals.

"<u>Merger Agreement</u>" has the meaning set forth in the Recitals.

"<u>Non-Income Taxes</u>" means any Taxes other than Income Taxes.

"<u>Notified Action</u>" has the meaning set forth in <u>Section 6.01(c)</u>.

6

"Opinion" means an opinion (including an Unqualified Tax Opinion) received by a Party with respect to certain Tax aspects of the Covered Transactions.

"Parent" has the meaning set forth in the Recitals.

"Parties" has the meaning set forth in the Preamble.

"Person" or "person" means a natural person, corporation, company, joint venture, individual business trust, trust association, partnership, limited partnership, limited liability company, association, unincorporated organization or other entity, including a governmental authority.

"Plan" has the meaning set forth in the Recitals.

"Plan Support Agreement" means that certain Plan Support Agreement, dated as of August 9, 2015, by and among the Debtors and the other parties thereto.

"Post-Distribution Period" means any taxable period (or portion thereof) beginning after the Effective Date, including for the avoidance of doubt, the portion of any Straddle Period beginning after the Effective Date.

"Preferred Stock" has the meaning set forth in the Recitals.

"Preferred Stock Entity" has the meaning set forth in the Recitals.

"Preferred Stock Sale" has the meaning set forth in the Recitals.

"Private Letter Ruling" means a private letter ruling issued by the IRS addressing the qualification of the Contribution, the Reorganized TCEH Conversion, and the Distribution as a "reorganization" within the meaning of Sections 368(a)(1)(G), 355 and 356 of the Internal Revenue Code and certain other matters, together with any amendments or supplements thereto (including any supplemental ruling obtained by a Party pursuant to Section 6.01(c)).

"Refund" means any refund (or credit in lieu thereof) of Taxes (including any overpayment of Taxes that can be refunded or, alternatively, applied to other Taxes payable), including any interest paid on or with respect to such refund of Taxes.

"Reorganized EFH Entity" means the EFH Parties and any entity that is a Subsidiary of EFH immediately after the Distribution (including, for the avoidance of doubt, EFCH, TCEH and TCEH Finance).

"Reorganized EFH Shared Services Debtors" means the EFH Shared Services Debtors as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

"Reorganized TCEH" has the meaning set forth in the Preamble and, for the avoidance of doubt, all references to Reorganized TCEH shall include Reorganized TCEH following the Contribution.

"Reorganized TCEH Breach" means a breach of one or more covenants in Article VI by any Reorganized TCEH Entity or any of its Affiliates.

"Reorganized TCEH Debt" has the meaning set forth in Section 8.05.

"Reorganized TCEH Entity" means Reorganized TCEH or any entity that is a Subsidiary of Reorganized TCEH immediately after the Distribution (which shall include, for the avoidance of doubt, the Reorganized EFH Shared Services Debtors and EFH Properties Company, to the extent the equity interests in such entities are transferred pursuant to the Contribution).

"Reorganized TCEH Taxes" means any (a) Income Taxes imposed on EFH and its Subsidiaries attributable to a Tax-Free Transaction Failure and allocated to Reorganized TCEH pursuant to Section 2.05(c), (b) any Taxes for periods (and the portion of any Straddle Period) ending on or before the Effective Date attributable to or arising from the ownership or operation of any business contributed to, or otherwise held on the Effective Date by, any Reorganized TCEH Entity (other than EFH Properties Company) (including, for the avoidance of doubt, any Taxes resulting from any adjustments to interest expense and discharge of indebtedness income with respect to indebtedness of any such entity, TCEH or any Subsidiary of TCEH (other than TCEH Finance)), as determined pursuant to Sections 2.03 and 2.04, in each case, other than any Taxes resulting from (i) a Tax-Free Transaction Failure, (ii) the Preferred Stock Sale or (iii) any Specified Tax Items, (c) Taxes imposed on any Reorganized TCEH Entity for periods (or portion of a Straddle Period) beginning after the Effective Date, (d) Transfer Taxes allocated to Reorganized TCEH pursuant to Section 2.04(d)(i), (e) TCEH Preferred Stock Sale Tax, and (f) Taxes resulting from any action by any Reorganized TCEH Entity outside of the ordinary course of business on the Effective Date after the Distribution, except as a result of any action that is expressly contemplated by the Plan or the Transaction Agreements.

"Restriction Period" has the meaning set forth in Section 6.01(b).

"Section 108(i) Items" means items of income or gain or other Tax items resulting from the acceleration (pursuant to the Plan Support Agreement) of all discharge of indebtedness income of the EFH Group that was previously deferred under Section 108(i) of the Code.

"Specified Tax Items" means Section 108(i) Items and Deferred Intercompany and ELA Items (if any).

"Straddle Period" means any taxable period that begins on or before and ends after the Effective Date.

"Subsidiary" means, with respect to any Person, any other Person of which at least a majority of the securities or other ownership interests having by their terms ordinary voting power to elect a majority of the board of directors or other persons performing similar functions is directly or indirectly owned or controlled by such Person and/or by one or more of its Subsidiaries; provided, that notwithstanding the foregoing, the Subsidiaries of EFH shall be deemed to exclude Reorganized TCEH and all Subsidiaries thereof.

"Tax" or "Taxes" means any and all U.S. federal, state or local, or foreign, income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall

profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever (including any assessment, duty, fee or other charge in the nature of or in lieu of any such tax) and any interest, penalty, or addition thereto, whether disputed or not.

"Tax Attributes" means net operating losses, capital losses, alternative minimum tax credits, investment tax credit carryovers, earnings and profits, foreign tax credit carryovers, overall foreign losses, previously taxed income, separate limitation losses, and any other losses, deductions, credits or other comparable items that could reduce a Tax liability for a past or future taxable period.

"Tax Benefit" means any decrease in Tax payments actually required to be made to a Taxing Authority (or any increase in any Refund otherwise receivable from any Taxing Authority) including any decrease in Tax payments (or increase in any Refund) that actually results from an increase in Tax Attributes (computed on a "with" or "without" basis).

"Tax Cost" means any increase in Tax payments actually required to be made to a Taxing Authority (or any reduction in any Refund otherwise receivable from any Taxing Authority), including any increase in Tax payments (or reduction in any Refund) that actually results from a reduction in Tax Attributes (computed on a "with or without" basis).

"Tax-Free Transaction Failure" means (a) the failure of the Contribution and Distribution to qualify for clause (a) of the definition of the Intended Tax Treatment, and (b) the imposition of any Income Taxes on EFH under Section 355(d) or Section 355(e) of the Code with respect to the Distribution.

"Tax Item" means any item of income, gain, loss, deduction, credit, recapture of credit or any other item which increases, decreases or otherwise impacts Taxes paid or payable.

"Tax Materials" means (a) the Private Letter Ruling, (b) any Opinion, (c) the IRS Submissions, (d) any representation letter from a Party or any Affiliate thereof supporting an Opinion, and (e) any other materials delivered or deliverable by a Party or any Affiliate thereof in connection with the rendering of an Opinion or the issuance by the IRS of the Private Letter Ruling.

"Tax Matter" has the meaning set forth in Section 7.01.

"Tax Proceeding" means any audit, assessment of Taxes, pre-filing agreement, other examination by any Taxing Authority, proceeding, appeal of a proceeding or litigation relating to Taxes, whether administrative or judicial, including proceedings relating to competent authority determinations.

"Tax Return" means any return, report, certificate, form or similar statement or document (including any related or supporting information or schedule attached thereto and any information return or declaration of estimated Tax) supplied to, filed with or required to be supplied to or filed with a Taxing Authority in connection with the payment, determination,

assessment or collection of any Tax or the administration of any laws relating to any Tax, and any amended Tax return or claim for Refund.

"Taxing Authority" means any governmental authority or any subdivision, agency, commission or entity thereof or any quasi-governmental or private body having jurisdiction over the assessment, determination, collection or imposition of any Tax (including the IRS and the Office of the Texas Comptroller of Public Accounts).

"TCEH" has the meaning set forth in the Recitals.

"TCEH Finance" has the meaning set forth in the Recitals.

"TCEH Preferred Stock Sale Tax" means (i) 50% of the alternative minimum Tax (and any corollary state and local Taxes) that results from the limitation on the utilization of the Agreed Tax Attributes to offset the gain attributable to the Preferred Stock Sale under Section 56(d)(1)(A) of the Code and (ii) the Additional Preferred Stock Sale Tax (if any); provided, that in the event of a Tax-Free Transaction Failure (other than as a result of a Reorganized TCEH Breach), the TCEH Preferred Stock Sale Tax shall be zero.

"Texas Margin Tax" means any tax payable pursuant to Section 171.001 et seq. of the Texas Tax Code, as amended.

"Transaction Agreements" has the meaning set forth in the Plan.

"Transfer Taxes" means any transfer, stamp, documentary, sale, use, registration, value-added or other similar Taxes imposed with respect to the Contribution, the Reorganized TCEH Conversion, the Distribution, the Preferred Stock Sale, the Merger or any other transaction contemplated by the Plan.

"Treasury Regulations" means the proposed, final, and temporary income Tax regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"Unqualified Tax Opinion" means a "will" opinion, without substantive qualifications, of a nationally recognized law or accounting firm, which firm is reasonably acceptable to the EFH Parties and Reorganized TCEH, to the effect that a transaction or action will not (i) affect the Intended Tax Treatment and (ii) negate any of the other rulings provided in the Private Letter Ruling. Each of the EFH Parties and Reorganized TCEH acknowledges that Paul, Weiss, Rifkind, Wharton & Garrison LLP, Kirkland & Ellis LLP, Thompson & Knight LLP, and Baker Botts L.L.P. are reasonably acceptable to such entity.

Section 1.02    Construction.  When a reference is made in this Agreement to an Article, a Section, an Exhibit, the Preamble or the Recitals, such reference shall be to an Article, a Section, an Exhibit, the Preamble or the Recitals of this Agreement, respectively, unless otherwise indicated.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  The words "hereof," "herein," and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The term

"or" is not exclusive.  Capitalized terms not defined herein have the meaning assigned to them in the Merger Agreement. All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined herein.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.  Unless otherwise specified, any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes, and including all attachments thereto and instruments incorporated therein.  References to a person are also to its permitted successors and assigns.

Section 1.03   <u>References to Time</u>.  All references in this Agreement to times of the day shall be to New York City time.

ARTICLE II

<u>Preparation, Filing, and Payment of Taxes Shown Due on Tax Returns</u>

Section 2.01   <u>Tax Returns</u>.

(a)   *Tax Returns Required to be Filed by EFH*.  Consistent with Exhibit H to the Plan Support Agreement, EFH shall prepare and file (or cause to be prepared and filed) each Tax Return required to be filed by a Reorganized EFH Entity (including, for the avoidance of doubt, the U.S. federal income Tax Return of the EFH Group and all state income and franchise Tax Returns including members of the EFH Group for all periods ending on or before the Effective Date) and shall pay, or cause such Reorganized EFH Entity to pay, all Taxes shown to be due and payable on each such Tax Return; *provided that* Reorganized TCEH shall reimburse EFH for any such Taxes that are Reorganized TCEH Taxes.

(b)   *Reorganized TCEH Entity Tax Returns*.  Reorganized TCEH shall prepare and file (or cause to be prepared and filed) each Tax Return required to be filed by a Reorganized TCEH Entity after the Effective Date and shall pay, or cause be paid, all Taxes shown to be due and payable on such Tax Return; *provided that*, the EFH Parties shall jointly and severally reimburse Reorganized TCEH for any such Taxes that are EFH Taxes.

Section 2.02   <u>Tax Return Procedures</u>.

(a)   *Manner of Tax Return Preparation*.  Unless otherwise required by a Taxing Authority or by applicable law, the Parties shall prepare and file all Tax Returns, and take all other actions, in a manner consistent with this Agreement, the Tax Materials, and past practice.  All Tax Returns shall be filed on a timely basis (taking into account applicable extensions) by the Party responsible for filing such Tax Returns under this Agreement.

(b)   *Right to Review Certain Returns Prepared by EFH*.  In the case of any Tax Return described in <u>Section 2.01(a)</u>, (i) the portion (if any) of such Tax Return that relates to Reorganized TCEH Taxes or would reasonably be expected to adversely affect the Tax position

11

of any Reorganized TCEH Entity shall (to the extent permitted by law) be prepared in a manner consistent with past practice and the Tax Materials and (ii) EFH shall provide a draft of such Tax Return to Reorganized TCEH for its review and comment at least thirty (30) days prior to the Due Date for such Tax Return or, in the case of any such Tax Return filed on a monthly basis or property Tax Return, ten (10) days.  EFH shall consider in good faith any reasonable comment received from Reorganized TCEH at least three (3) days prior to the Due Date for such Tax Return.  In the event that neither past practice nor the Tax Materials are applicable to a particular item or matter, EFH shall determine the reporting of such item or matter in good faith in consultation with Reorganized TCEH.  The Parties shall negotiate in good faith to resolve all disputed issues.  Any disputes that the Parties are unable to resolve shall be resolved by the Accounting Firm pursuant to Section 8.02.  In the event that any dispute is not resolved (whether pursuant to good faith negotiations among the Parties or by the Accounting Firm) prior to the Due Date for the filing of any Tax Return, such Tax Return shall be timely filed as prepared by EFH and such Tax Return shall be amended as necessary to reflect the resolution of such dispute in a manner consistent with such resolution. For the avoidance of doubt, the EFH Parties shall be jointly and severally responsible for any interest, penalties or additions to Tax resulting from the late filing of any Tax Return described in Section 2.01(a), except to the extent that such late filing is primarily caused by the failure of any Reorganized TCEH Entity to provide relevant information necessary for the preparation and filing of such Tax Return.

(c)  *Right to Review Certain Returns Prepared by Reorganized TCEH*.  In the case of any Tax Return described in Section 2.01(b) that would reasonably be expected to adversely affect the Tax position of any Reorganized EFH Entity, (i) such Tax Return shall (to the extent permitted by law) be prepared in a manner consistent with past practice and the Tax Materials and (ii) Reorganized TCEH shall provide a draft of such Tax Return to EFH for its review and comment at least thirty (30) days prior to the Due Date for such Tax Return, or in the case of any such Tax Return filed on a monthly basis or property Tax Return, ten (10) days. Reorganized TCEH shall consider in good faith any reasonable comment received from EFH at least three (3) days prior to the Due Date for such Tax Return.  In the event that neither past practice nor the Tax Materials are applicable to a particular item or matter, Reorganized TCEH shall determine the reporting of such item or matter in good faith in consultation with EFH.  The Parties shall negotiate in good faith to resolve all disputed issues. Any disputes that the Parties are unable to resolve shall be resolved by the Accounting Firm pursuant to Section 8.02.  In the event that any dispute is not resolved (whether pursuant to good faith negotiations among the Parties or by the Accounting Firm) prior to the Due Date for the filing of any Tax Return, such Tax Return shall be timely filed as prepared by Reorganized TCEH and such Tax Return shall be amended as necessary to reflect the resolution of such dispute in a manner consistent with such resolution. For the avoidance of doubt, Reorganized TCEH shall be responsible for any interest, penalties or additions to Tax resulting from the late filing of any Tax Return described in Section 2.01(b) except to the extent that such late filing is primarily caused by the failure of any Reorganized EFH Entity to provide relevant information necessary for the preparation and filing of such Tax Return.

(d)  *Tax Reporting*. Unless otherwise required by law, the EFH Parties and Reorganized TCEH, as applicable, shall file the appropriate information and statements, as required by Treasury Regulations Sections 1.355-5(a) and 1.368-3, with the IRS, and shall retain

the appropriate information relating to the Contribution and the Distribution as described in Treasury Regulations Sections 1.355-5(d) and 1.368-3(d).

(e)    *Amendments*.  Any amendment of any Tax Return described in <u>Section 2.01</u> of any Reorganized TCEH Entity shall be subject to the same procedures required for the preparation of such type of Tax Return of such Reorganized TCEH Entity pursuant to this <u>Section 2.02</u>.  Any amendment of any Tax Return described in <u>Section 2.01</u> of any Reorganized EFH Entity shall be subject to the same procedures required for the preparation of such type of Tax Return of such Reorganized EFH Entity pursuant to this <u>Section 2.02</u>.

Section 2.03    <u>Straddle Period Tax Allocation</u>.  To the extent permitted by law, the EFH Parties and Reorganized TCEH shall elect to close the taxable year of each Reorganized TCEH Entity as of the close of the Effective Date.  In the case of any Straddle Period, the amount of any Income Taxes attributable to the portion of the Straddle Period ending on, or beginning after, the Effective Date shall be made by means of a closing of the books and records of such Reorganized TCEH Entity as of the close of the Effective Date; *provided that* in the case of Non-Income Taxes that are periodic Taxes (e.g., property Taxes) and exemptions, allowances, and deductions that are calculated on an annual basis (such as depreciation deductions), such Taxes, exemptions, allowances, and deductions shall be allocated between the portion of the Straddle Period ending at the end of the Effective Date and the portion beginning after the Effective Date based upon the ratio of (a) the number of days in the relevant portion of the Straddle Period to (b) the number of days in the entire Straddle Period; *provided, however*, that in allocating any such exemptions, allowances, or deductions (or increase in such amounts) between the two periods that comprise a Straddle Period, any such items that relate to an asset or property that was sold, acquired or improved during the Straddle Period shall be allocated on a daily basis solely among the days in the Straddle Period during which such asset was owned or such improvement existed; *provided further*, that Taxes that are properly allocable (based on, among other relevant factors, factors set forth in Treasury Regulations Section 1.1502-76(b)(1)(ii)(B)) to the portion of the Effective Date after the Distribution, shall be allocable to the portion of the Straddle Period beginning after the Effective Date.

Section 2.04    <u>Allocation of Taxes</u>.

(a)    *Income Taxes*.  Subject to Section 2.04(b), Income Taxes (other than Taxes resulting from (x) a Tax-Free Transaction Failure, (y) the Preferred Stock Sale or (z) except in cases where there has been a Tax-Free Transaction Failure, any Specified Tax Items) shall be allocated in accordance with past practices and as follows:

(i)    In the case of U.S. federal regular Income Taxes, in proportion to the separate taxable income (calculated in accordance with Treasury Regulations Section 1.1552-1(a)(1) and determined without regard to any gain attributable to the Preferred Stock Sale) attributable to any business retained by any Reorganized EFH Entity or EFH Properties Company (including, for the avoidance of doubt, any interest expense and discharge of indebtedness income with respect to indebtedness of any such entity), on the one hand, and any business contributed to (or otherwise held on the Effective Date by) any Reorganized TCEH Entity (other than EFH Properties Company) (including, for the avoidance of doubt, any interest expense and discharge of indebtedness income with

respect to indebtedness of any such entity, TCEH or any Subsidiary of TCEH (other than TCEH Finance)), on the other hand; and

(ii)    In the case of Texas Margin Tax, in proportion to the separate taxable margins (calculated in a manner consistent with Treasury Regulations Section 1.1552-1(a)(1) and determined without regard to any gain attributable to the Preferred Stock Sale) attributable to any business retained by, any Reorganized EFH Entity or EFH Properties Company (including, for the avoidance of doubt, any interest expense and discharge of indebtedness income with respect to indebtedness of any such entity), on the one hand, and any business contributed to (or otherwise held on the Effective Date by) any Reorganized TCEH Entity (other than EFH Properties Company) (including, for the avoidance of doubt, any interest expense and discharge of indebtedness income with respect to indebtedness of any such entity, TCEH or any Subsidiary of TCEH (other than TCEH Finance)), on the other hand.

(b)    *Alternative Minimum Taxes*. Alternative minimum Taxes (other than Taxes resulting from (x) a Tax-Free Transaction Failure, (y) the Preferred Stock Sale or (z) except in cases where there has been a Tax-Free Transaction Failure, any Specified Tax Items) shall be allocated between the EFH Parties, on the one hand, and Reorganized TCEH, on the other hand, in proportion to the respective separate amounts of alternative minimum tax each of the Reorganized EFH Entities and EFH Properties Company, on the one hand, and the Reorganized TCEH Entities (other than EFH Properties Company), on the other hand, would have if each such group separately determined its alternative minimum tax based on items attributable to any business retained by any Reorganized EFH Entity or EFH Properties Company, on the one hand, and any business contributed to (or otherwise held on the Effective Date by) any Reorganized TCEH Entity (other than EFH Properties Company), on the other hand.

(c)    *Non-Income Taxes*. Non-Income Taxes shall be allocated between the EFH Parties, on the one hand, and Reorganized TCEH, on the other hand, based on the applicable items attributable to or arising from any business retained by any Reorganized EFH Entity or EFH Properties Company, on the one hand, and any business contributed to (or otherwise held on the Effective Date by) any Reorganized TCEH Entity (other than EFH Properties Company), on the other hand, that contribute to such Taxes (e.g., sales Taxes and value added Taxes shall be allocated to the EFH Parties to the extent arising from taxable sales made by any business retained by any Reorganized EFH Entity or EFH Properties Company). In the event that any Non-Income Tax is not attributable to (and does not arise from) any items relating to any business (e.g., capital Taxes imposed based on the authorized stock), such Non-Income Taxes shall be allocated between the EFH Parties, on the one hand, and Reorganized TCEH, on the other hand, in proportion to the net taxable income of any business retained by any Reorganized EFH Entity or EFH Properties Company, on the one hand, and any business contributed to (or otherwise held on the Effective Date by) any Reorganized TCEH Entity (other than EFH Properties Company), on the other hand.

(d)    *Other Taxes*.

14

(i)    Transfer Taxes, if any, shall be allocated fifty percent (50%) to the EFH Parties and fifty percent (50%) to Reorganized TCEH.

(ii)    Income Taxes attributable to a Tax-Free Transaction Failure shall be allocated as set forth in Section 2.05.

(iii)    TCEH Preferred Stock Sale Tax shall be allocated to Reorganized TCEH.

(iv)    Except in cases where there has been a Tax-Free Transaction Failure, Taxes resulting from any Specified Tax Items shall be allocated to the EFH Parties.

(e)    *Allocation of Tax Attributes*. Tax Attributes, if any, remaining after the Distribution (other than net operating losses) shall be allocated in accordance with the Private Letter Ruling or, if not addressed in the Private Letter Ruling, between the Reorganized EFH Entities, on the one hand, and the Reorganized TCEH Entities, on the other hand, in accordance with the Code and Treasury Regulations, including Treasury Regulations Section 1.1502-76 (and any applicable state, local and foreign Laws). The allocation of such Tax Attributes shall be determined by treating the Reorganized TCEH Entities as one consolidated group and the Reorganized EFH Entities as a separate and distinct consolidated group. Any disputes shall be resolved by the Accounting Firm in accordance with Section 8.02. The EFH Parties and Reorganized TCEH hereby agree to compute all Taxes consistently with the determination of the allocation of Tax Attributes pursuant to this Section 2.04(e) unless otherwise required by a Final Determination.

Section 2.05    Allocation of Separation-Related Taxes.

(a)    *No-Fault*. Income Taxes attributable to a Tax-Free Transaction Failure, to the extent not allocated pursuant to Sections 2.05(b) or (c), shall be allocated to the EFH Parties.

(b)    *EFH Breach*. Income Taxes attributable solely to a Tax-Free Transaction Failure as a result of an EFH Breach shall be allocated to the EFH Parties.

(c)    *Reorganized TCEH Breach*. Incomes Taxes attributable solely to a Tax-Free Transaction Failure as a result of Reorganized TCEH Breach shall be allocated to Reorganized TCEH.

Section 2.06    Audits/Redeterminations.    Any redetermined Taxes or Tax Attributes resulting from an audit shall be allocated between the EFH Parties, on the one hand, and Reorganized TCEH, on the other hand, in the same manner as they would have been allocated had the redetermined amounts been known at the time the original Tax liability was computed.

Section 2.07    Expenses.    Except as provided in Section 8.02 in respect of the Accounting Firm, each Party shall bear its own expenses incurred in connection with this Article II.

Section 2.08   Timing of Payments.   Any reimbursement of Taxes under Section 2.01 shall be made upon the later of (a) two (2) business days before the Due Date of such payment of such Taxes and (b) ten (10) business days after the party required to make such reimbursement has received notice from the party entitled to such reimbursement. For the avoidance of doubt, a party may provide notice of reimbursement of Taxes prior to the time such Taxes were paid, and such notice may represent a reasonable estimate (provided that the amount of reimbursement shall be based on the actual Tax liability and not on such reasonable estimate).

ARTICLE III

Indemnification

Section 3.01   Indemnification by the EFH Parties.   The EFH Parties, on a joint and several basis, shall pay (or cause to be paid), and shall indemnify and hold each Reorganized TCEH Entity harmless from and against, without duplication, all EFH Taxes and all losses or damages arising out of, resulting from or relating to any breach by any Reorganized EFH Entity of any EFH Party representation, warranty, covenant or agreement in this Agreement.

Section 3.02   Indemnification by Reorganized TCEH.   Reorganized TCEH shall pay (or cause to be paid), and shall indemnify and hold each Reorganized EFH Entity harmless from and against, without duplication, all Reorganized TCEH Taxes and all losses or damages arising out of, resulting from or relating to any breach by any Reorganized TCEH Entity of any Reorganized TCEH representation, warranty, covenant or agreement in this Agreement.

Section 3.03   Characterization of and Adjustments to Payments.

(a)   In the absence of a Final Determination to the contrary, for all Tax purposes, the EFH Parties and Reorganized TCEH shall treat or cause to be treated any payment required by this Agreement (other than any payment treated for Tax purposes as interest) as either a contribution by EFH to Reorganized TCEH or a distribution by Reorganized TCEH to EFH, as the case may be, occurring immediately prior to the Effective Date.

(b)   Any indemnity payment pursuant to this Agreement shall be (A) increased to include (i) all reasonable accounting, legal, and other professional fees and court costs and damages incurred by the Indemnified Party in connection with such indemnity payment and (ii) any Tax Cost resulting from the receipt of (or entitlement to) such indemnity payment and (B) decreased to account for any Tax Benefit that the Indemnified Party actually realizes by way of a Refund or a decrease in Taxes reported on a filed Tax Return (in or with respect to a taxable year that ends on or before December 31, 2021) in connection with the incurrence or the payment by the Indemnified Party of such fees or costs or indemnifiable amounts determined using a "with and without" methodology (treating any deductions attributable to such fees or costs or indemnifiable amounts as the last items claimed for any taxable year, including after the utilization of any available net operating loss carryovers).

Section 3.04   Timing of Indemnification Payments.   Indemnification payments in respect of any liabilities for which an Indemnified Party is entitled to indemnification pursuant to this Article III shall be paid by the Indemnifying Party to the Indemnified Party within ten (10)

16

days after written notification thereof by the Indemnified Party, including reasonably satisfactory documentation setting forth the basis for, and calculation of, the amount of such indemnification payment.

Section 3.05    Exclusive Remedy.    Anything to the contrary in this Agreement notwithstanding, the EFH Parties and Reorganized TCEH hereby agree that the sole and exclusive monetary remedy of a party for any breach or inaccuracy of any representation, warranty, covenant or agreement contained in Section 6.01 shall be the indemnification rights set forth in this Article III.

Section 3.06    No Duplicative Payment.    Notwithstanding anything to the contrary in this Agreement, it is intended that the provisions of this Agreement will not result in a duplicative payment of any amount required to be paid under any other Transaction Agreement, and this Agreement shall be construed accordingly.

ARTICLE IV

Refunds, Timing Differences, and Tax Attributes

Section 4.01    Refunds.

(a)    Except as provided in Section 4.02, the EFH Parties shall be entitled to all Refunds of Taxes for which an EFH Party is responsible pursuant to Article III, and Reorganized TCEH shall be entitled to all Refunds of Taxes for which Reorganized TCEH is responsible pursuant to Article III.    A Party receiving a Refund to which the other Party is entitled pursuant to this Agreement shall pay the amount to which such other Party is entitled (less any Tax or other reasonable out-of-pocket costs incurred by the first Party in receiving such Refund) within ten (10) days after the receipt of the Refund.

(b)    To the extent that the amount of any Refund under this Section 4.01 is later reduced by a Taxing Authority or in a Tax Proceeding, such reduction shall be allocated to the Party to which such Refund was allocated pursuant to this Section 4.01 and an appropriate adjusting payment shall be made.

Section 4.02    Timing Differences.    If pursuant to a Final Determination any Tax Attribute (including those allocated pursuant to Section 2.04(e)) is made allowable to a Reorganized TCEH Entity as a result of an adjustment to any Taxes for which an EFH Party is responsible hereunder (other than Taxes attributable to a Tax-Free Transaction Failure) and such Tax Attribute would not have arisen or been allowable but for such adjustment, or if pursuant to a Final Determination any Tax Attribute is made allowable to a Reorganized EFH Entity as a result of an adjustment to any Taxes for which Reorganized TCEH is responsible hereunder and such Tax Attribute would not have arisen or been allowable but for such adjustment, Reorganized TCEH or the EFH Parties (on a joint a several basis), as the case may be, shall make a payment to either the applicable EFH Party or Reorganized TCEH, as appropriate, within thirty (30) days after such Party (or its Affiliates) actually realizes a Tax benefit by way of a Refund or a decrease in Taxes reported on a filed Tax Return (in or with respect to a taxable year that ends on or before December 31, 2021) that is attributable to such Tax Attribute, determined

17

using a "with and without" methodology (treating any deductions or amortization attributable to such Tax Attributes as the last items claimed for any taxable year, including after the utilization of any available net operating loss carryovers), *provided that* no payment shall be made under this Section unless Reorganized TCEH or the applicable EFH Party, as the case may be, has previously paid the Tax adjustment or indemnified the other Party for such Tax adjustment.  In the event of any overlap between Section 3.03 and this Section 4.02, this Section 4.02 shall apply and Section 3.03 shall not apply.

ARTICLE V

Tax Proceedings

Section 5.01    Notification of Tax Proceedings.    Within ten (10) days after an Indemnified Party becomes aware of the commencement of a Tax Proceeding that may give rise to an indemnity payment pursuant to Article III, such Indemnified Party shall notify the Indemnifying Party in writing of such Tax Proceeding, and thereafter shall promptly forward or make available to the Indemnifying Party copies of notices and communications relating to such Tax Proceeding.  The failure of the Indemnified Party to notify the Indemnifying Party in writing of the commencement of any such Tax Proceeding within such ten (10) day period or promptly forward any further notices or communications shall not relieve the Indemnifying Party of any obligation which it may have to the Indemnified Party under this Agreement except to the extent (and only to the extent) that the Indemnifying Party is actually materially prejudiced by such failure.

Section 5.02    Tax Proceeding Procedures.

(a)    EFH.    EFH shall be entitled to contest, compromise, and settle any adjustment that is proposed, asserted or assessed pursuant to any Tax Proceeding with respect to any Tax Return it is responsible for preparing pursuant to Article II; *provided that* to the extent that such Tax Proceeding relates to Reorganized TCEH Taxes or would reasonably be expected to materially adversely affect the Tax position of any Reorganized TCEH Entity for any Post-Distribution Period, EFH shall (i) keep Reorganized TCEH informed in a timely manner of the material actions proposed to be taken by EFH with respect to such Tax Proceeding, (ii) permit Reorganized TCEH at its own expense to participate in the aspects of such Tax Proceeding that relate to Reorganized TCEH Taxes, and (iii) not settle any aspect of such Tax Proceeding that relates to Reorganized TCEH Taxes without the prior written consent of Reorganized TCEH, which shall not be unreasonably withheld, delayed or conditioned. Notwithstanding the foregoing, Reorganized TCEH shall have the right to control any Tax Proceeding that relates primarily to Taxes for which Reorganized TCEH has an indemnification obligation pursuant to Section 3.02.

(b)    Reorganized TCEH.    Except as otherwise provided in Section 5.02(a), Reorganized TCEH shall be entitled to contest, compromise, and settle any adjustment that is proposed, asserted or assessed pursuant to any Tax Proceeding with respect to any Tax Return it is responsible for preparing pursuant to Article II; *provided that* to the extent that such Tax Proceeding relates to EFH Taxes or would reasonably be expected to materially adversely affect the Tax position of any Reorganized EFH Entity, Reorganized TCEH shall (i) keep EFH

18

informed in a timely manner of the material actions proposed to be taken by Reorganized TCEH with respect to such Tax Proceeding, (ii) permit EFH at its own expense to participate in the aspects of such Tax Proceeding that relate to EFH Taxes, and (iii) not settle any aspect of such Tax Proceeding that relates to EFH Taxes without the prior written consent of EFH, which shall not be unreasonably withheld, delayed or conditioned. Notwithstanding the foregoing, EFH shall have the right to control any Tax Proceeding that relates primarily to Taxes for which EFH has an indemnification obligation pursuant to Section 3.01.

ARTICLE VI

Intended Tax Treatment

Section 6.01    Restrictions Relating to the Distribution.

(a)    *General*.  Following the Distribution, (i) the EFH Parties will not (and will cause each other Reorganized EFH Entity not to) take any action (or refrain from taking any action) which is inconsistent with the facts presented and the representations made prior to the Effective Date in the Tax Materials and (ii) Reorganized TCEH will not (and will cause each other Reorganized TCEH Entity not to) take any action (or refrain from taking any action) which is inconsistent with the facts presented and the representations made prior to the Effective Date in the Tax Materials. Each of the EFH Parties and Reorganized TCEH covenants and agrees that it will not take, and will cause its respective Affiliates to refrain from taking, any position on any Tax Return that is inconsistent with the Intended Tax Treatment, except as required by a Final Determination.

(b)    *Restrictions*.  Without derogating from the generality of Section 6.01(a), following the Distribution and prior to the first day following the second anniversary of the Effective Date (the "Restriction Period"), each EFH Party and Reorganized TCEH shall, and except with respect to clause (iii) of this Section 6.01(b), shall cause each of its respective Subsidiaries set forth on Exhibit A to:

(i)    continue the active conduct of each trade or business (for purposes of Section 355(b) of the Code and the Treasury Regulations thereunder) (A) that it was engaged in immediately prior to the Distribution (taking into account Section 355(b)(3) of the Code), (B) that was being relied upon for purposes of satisfying the requirements of Section 355(b) of the Code and the Treasury Regulations thereunder and (C) the substantial assets of which are identified on Exhibit B;

(ii)    continue to hold certain assets identified on Exhibit B and held at the time of the Distribution;

(iii)    not dissolve or liquidate or take any action that is a liquidation for U.S. federal income tax purposes;

(iv)    not merge or consolidate with any other Person with such other Person surviving the merger or consolidation in a transaction that does not qualify as a reorganization under Section 368(a) of the Code;

(v)    not redeem or otherwise repurchase (directly or indirectly through an Affiliate) any of its equity other than pursuant to open market stock repurchase programs meeting the requirements of Section 4.05(1)(b) of Rev. Proc. 96-30, 1996-1 C.B. 696; and

(vi)    not directly or indirectly acquire any of the Preferred Stock.

(c)    *Certain Exceptions*.  Notwithstanding the restrictions imposed by Section 6.01(b), during the Restriction Period, the EFH Parties and Reorganized TCEH may proceed with any of the actions or transactions described therein, if:

(i)    such action or transaction is described in (or is otherwise consistent with) the facts in the Private Letter Ruling;

(ii)    a supplemental private letter ruling is received from the IRS in form and substance reasonably satisfactory to EFH and Reorganized TCEH to the effect that such action or transaction will not affect the Intended Tax Treatment of any applicable transaction;

(iii)    EFH or Reorganized TCEH, as the case may be, obtains an Unqualified Tax Opinion with respect to such action or transaction at least thirty (30) days prior to effecting such action or transaction;

(iv)    such action is the issuing of stock or options to employees under a compensation plan adopted after the Distribution; or

(v)    such action by the EFH Parties and/or their Affiliates is approved in writing by Reorganized TCEH and such action by Reorganized TCEH and/or its Affiliates is approved in writing by EFH.

If the EFH Parties, on the one hand, or Reorganized TCEH, on the other, notifies the other Party that it desires to take one of the actions described in Section 6.01(b) (a "Notified Action"), the EFH Parties and Reorganized TCEH shall cooperate in obtaining a supplemental private letter ruling from the IRS or an Unqualified Tax Opinion for the purpose of permitting the EFH Parties or Reorganized TCEH to take the Notified Action.

ARTICLE VII

Cooperation

Section 7.01    General Cooperation.  The Parties shall each cooperate fully (and each shall cause its respective Subsidiaries to cooperate fully) with all reasonable requests in writing or via e-mail from another Party, or from an agent, representative or advisor to such Party, in connection with the preparation and filing of Tax Returns, claims for Refunds, Tax Proceedings, Tax ruling requests, and calculations of amounts required to be paid pursuant to this Agreement, in each case, related or attributable to or arising in connection with Taxes of any of the Parties or their respective Subsidiaries covered by this Agreement and the establishment of any reserve required in connection with any financial reporting (a "Tax Matter").  Such cooperation shall

include the provision of any information reasonably necessary or helpful in connection with a Tax Matter and shall include at each Party's own cost:

> (i)    the provision, in hard copy and electronic forms, of any Tax Returns of the Parties and their respective Subsidiaries, books, records (including information regarding ownership and Tax basis of property), documentation, and other information relating to such Tax Returns, including accompanying schedules, related work papers, and documents relating to rulings or other determinations by Taxing Authorities;

> (ii)    the execution of any document (including any power of attorney) reasonably requested by another Party in connection with any Tax Proceedings of any of the Parties or their respective Subsidiaries, or the filing of a Tax Return or a Refund claim of the Parties or any of their respective Subsidiaries; and

> (iii)    the use of the Party's reasonable best efforts to obtain any documentation in connection with a Tax Matter.

Each Party shall make its employees, advisors, and facilities available, without charge, on a reasonable and mutually convenient basis in connection with the foregoing matters in a manner that does not interfere with the ordinary business operations of such Party.

Section 7.02    <u>Retention of Records</u>.    The EFH Parties and Reorganized TCEH shall retain or cause to be retained all Tax Returns, schedules, and work papers, and all material records or other documents relating thereto in their possession, including all such electronic records, and shall maintain all hardware necessary to retrieve such electronic records, in all cases until sixty (60) days after the expiration of the applicable statute of limitations (including any waivers or extensions thereof) of the taxable periods to which such Tax Returns and other documents relate or until the expiration of any additional period that any Party reasonably requests, in writing, with respect to specific material records and documents.    A Party intending to destroy any material records or documents shall provide the other Party with reasonable advance notice and the opportunity to copy or take possession of such records and documents. The Parties will notify each other in writing of any waivers or extensions of the applicable statute of limitations that may affect the period for which the foregoing records or other documents must be retained.

Section 7.03    <u>Failure to Perform</u>.    If a Party materially fails to comply with any of its obligations set forth in <u>Section 7.01</u> or <u>Section 7.02</u> upon reasonable request and notice by the other Party, and such failure results in the imposition of additional Taxes, the non-performing Party shall be liable in full for such additional Taxes notwithstanding anything to the contrary in this Agreement.

ARTICLE VIII

Miscellaneous

Section 8.01    <u>Governing law</u>.    This Agreement and all issues and questions concerning the construction, validity, enforcement, and interpretation of this Agreement (and all Schedules

and Exhibits) shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.  In furtherance of the foregoing, the internal laws of the State of Delaware shall control the interpretation and construction of this Agreement (and all Schedules and Exhibits), even though under that jurisdiction's choice of law or conflict of law analysis, the substantive law of some other jurisdiction would ordinarily apply.

Section 8.02    Dispute Resolution.  In the event of any dispute among the Parties as to any matter covered by Section 2.02 and Section 2.04, the Parties shall appoint a nationally recognized independent public accounting firm (the "Accounting Firm") to resolve such dispute. In this regard, the Accounting Firm shall make determinations with respect to the disputed items based solely on representations made by the EFH Parties and Reorganized TCEH and their respective representatives, and not by independent review, and shall function only as an expert and not as an arbitrator and shall be required to make a determination in favor of one Party only. The Parties shall require the Accounting Firm to resolve all disputes no later than thirty (30) days after the submission of such dispute to the Accounting Firm and agree that all decisions by the Accounting Firm with respect thereto shall be final and conclusive and binding on the Parties. The Accounting Firm shall resolve all disputes in a manner consistent with this Agreement. The Parties shall require the Accounting Firm to render all determinations in writing and to set forth, in reasonable detail, the basis for such determination.  The fees and expenses of the Accounting Firm shall be borne equally by the Parties.  For the avoidance of doubt, any dispute among the Parties as to any matter not covered by Section 2.02 or Section 2.04 shall be governed by the provisions set forth in Section 8.16.

Section 8.03    Tax Sharing Agreements.  All Tax sharing, indemnification, and similar agreements, written or unwritten, as between a Reorganized EFH Entity, on the one hand, and a Reorganized TCEH Entity, on the other (other than this Agreement and any other agreement for which Taxes is not the principal subject matter), shall be or shall have been terminated (and, to the extent provided under the Plan, settled) no later than the Effective Date and, after the Effective Date, no Reorganized EFH Entity or Reorganized TCEH Entity shall have any further rights or obligations under any such Tax sharing, indemnification or similar agreement, except as provided in the Plan.

Section 8.04    Interest on Late Payments.  With respect to any payment among the Parties pursuant to this Agreement not made by the due date set forth in this Agreement for such payment, the outstanding amount will accrue interest at a rate per annum equal to the rate in effect for underpayments under Section 6621 of the Code from such due date to and including the payment date.

Section 8.05    Survival of Covenants.  Except as otherwise contemplated by this Agreement, the covenants and agreements contained herein to be performed following the Distribution shall survive the Distribution in accordance with their respective terms.

Section 8.06    Severability.  If any provision of this Agreement or the application of any such provision to any Person or circumstance shall be declared judicially to be invalid, unenforceable or void, such decision shall not have the effect of invalidating or voiding the

remainder of this Agreement, it being the intent and agreement of the Parties that this Agreement shall be deemed amended by modifying such provision to the extent necessary to render it valid, legal, and enforceable to the maximum extent permitted while preserving its intent or, if such modification is not possible, by substituting therefor another provision that is valid, legal, and enforceable and that achieves the original intent of the Parties.

Section 8.07    Entire Agreement.    This Agreement, the Exhibits, the other Transaction Agreements, the Plan and the other documents referred to herein shall constitute the entire agreement among the Parties with respect to the subject matter hereof and shall supersede all previous negotiations, commitments, and writings with respect to such subject matter.  Except as otherwise expressly provided herein, in the case of any conflict between the terms of this Agreement and the terms of any other agreement, the terms of this Agreement shall control.

Section 8.08    Assignment.    Neither this Agreement nor any of the rights, benefits or obligations hereunder may be assigned by any of the Parties (whether by operation of law or otherwise) without the prior written consent of the other Parties, and any purported assignment without such consent shall be null and void.  Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by the Parties and their respective successors and permitted assigns.

Section 8.09    No Third Party Beneficiaries.    Nothing in this Agreement, express or implied, is intended to or shall confer upon any Person (other than the Parties and their respective successors and permitted assigns) any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, and, except as provided in Article III relating to certain indemnitees, no Person shall be deemed a third party beneficiary under or by reason of this Agreement.

Section 8.10    Affiliates.    Each EFH Party shall cause to be performed, and hereby guarantees the performance of, all actions, agreements, and obligations set forth herein to be performed by an Affiliate of such EFH Party, and Reorganized TCEH shall cause to be performed, and hereby guarantees the performance of, all actions, agreements, and obligations set forth herein to be performed by an Affiliate of Reorganized TCEH.

Section 8.11    Amendments; Waivers.    This Agreement may not be amended except by an instrument in writing signed by each of the Parties.  No failure or delay by any Party in exercising any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right hereunder.  Any agreement on the part of any Party to any such waiver shall be valid only if set forth in an instrument in writing signed on behalf of such Party.

Section 8.12    Interpretation.    The Parties have participated jointly in the negotiation and drafting of this Agreement, and in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provisions of this Agreement.

Section 8.13    Counterparts.    This Agreement may be executed in one or more counterparts each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or portable document format (PDF) shall be as effective as delivery of a manually executed counterpart of any such Agreement.

Section 8.14    Confidentiality.    Each Party shall hold and cause its directors, officers, employees, advisors, and consultants to hold in strict confidence, unless compelled to disclose by judicial or administrative process or, in the opinion of its counsel, by other requirements of law, all information (other than any such information relating solely to the business or affairs of such party) concerning the other Party furnished it by such other Party or its representatives pursuant to this Agreement (except to the extent that such information can be shown to have been (a) in the public domain through no fault of such Party or (b) later lawfully acquired from other sources not under a duty of confidentiality by the party to which it was furnished), and no Party shall release or disclose such information to any other Person, except its directors, officers, employees, auditors, attorneys, financial advisors, bankers or other consultants who shall be advised of and agree to be bound by the provisions of this Section 8.14.  Each Party shall be deemed to have satisfied its obligation to hold confidential information concerning or supplied by the other Party if it exercises the same care as it takes to preserve confidentiality for its own similar information.  Except as required by law or with the prior written consent of the other Party, all Tax Returns, documents, schedules, work papers and similar items and all information contained therein, and any other information that is obtained by a Party or any of its Affiliates pursuant to this Agreement, shall be kept confidential by such Party and its Affiliates and representatives, shall not be disclosed to any other Person, and shall be used only for the purposes provided herein.  If a Party or any of its Affiliates is required by law to disclose any such information, such Party shall give written notice to the other Party prior to making such disclosure.

Section 8.15    Waiver of Jury Trial.    AS A SPECIFICALLY BARGAINED INDUCEMENT FOR EACH PARTY TO ENTER INTO THIS AGREEMENT (WITH EACH PARTY HAVING HAD OPPORTUNITY TO CONSULT COUNSEL), EACH PARTY EXPRESSLY AND IRREVOCABLY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING UNDER THIS AGREEMENT OR ANY ACTION OR PROCEEDING ARISING OUT OF THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY OTHER TRANSACTION AGREEMENT, REGARDLESS OF WHICH PARTY INITIATES SUCH ACTION OR PROCEEDING, AND ANY ACTION OR PROCEEDING UNDER THIS AGREEMENT OR ANY ACTION OR PROCEEDING ARISING OUT OF THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY OTHER TRANSACTION AGREEMENT SHALL BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

Section 8.16    Jurisdiction; Service of Process.    Any action with respect to this Agreement and the rights and obligations arising hereunder, or for recognition and enforcement of any judgment in respect of this Agreement and the rights and obligations arising hereunder brought by a Party or its successors or assigns, in each case, shall be brought and determined exclusively in the Bankruptcy Court (or, if the Bankruptcy Court declines to accept jurisdiction over a particular matter, then the Chancery Court of the State of Delaware, and if the Chancery

Court of the State of Delaware declines jurisdiction, then any state or federal court sitting in Delaware). Each Party hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any Action with respect to this Agreement (a) any claim that is not personally subject to the jurisdiction of the above named courts for any reason other than the failure to serve in accordance with this Section 8.16, (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and (c) to the fullest extent permitted by applicable law, any claim that (i) the Action in such court is brought in an inconvenient forum, (ii) the venue of such Action is improper or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts. Each Party further agrees that no Party to this Agreement shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 8.16 and each Party waives any objection to the imposition of such relief or any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument. The Parties hereby agree that mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 8.17, or in such other manner as may be permitted by law, shall be valid and sufficient service thereof and hereby waive any objections to service accomplished in the manner herein provided. NOTWITHSTANDING THIS Section 8.16, ANY DISPUTE REGARDING SECTION 2.02 OR SECTION 2.04 SHALL BE RESOLVED IN ACCORDANCE WITH SECTION 8.02; PROVIDED THAT THE TERMS OF SECTION 8.02 MAY BE ENFORCED BY EITHER PARTY IN ACCORDANCE WITH THE TERMS OF THIS SECTION 8.16.

Section 8.17 Notices. All notices, requests, claims, demands, and other communications to be given or delivered under or by the provisions of this Agreement shall be in writing and shall be deemed given only (a) when delivered personally to the recipient, (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), *provided that* confirmation of delivery is received, (c) upon machine-generated acknowledgment of receipt after transmittal by facsimile or (d) five (5) days after being mailed to the recipient by certified or registered mail (return receipt requested and postage prepaid). Such notices, demands, and other communications shall be sent to the Parties at the following addresses (or at such address for a Party as will be specified by like notice):

> If to any EFH Party:
>
> Energy Future Holdings Corp., et al.
> Energy Plaza
> 1601 Bryan Street
> Dallas, Texas 75201
> Attention:      General Counsel
> E-mail:         stacey.dore@energyfutureholdings.com
>                 awright@energyfutureholdings.com
>
> with a copy (which shall not constitute notice) to, until the Merger becomes effective:

Kirkland & Ellis LLP
600 Travis St., Suite 3300
Houston, Texas 77002
Attention:      Andrew Calder
                Amber Meek
E-mail:         andrew.calder@kirkland.com
                amber.meek@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attention:      James Sprayregen
                Marc Kieselstein
                Chad Husnick
                Steven Serajeddini
E-mail:         jsprayregen@kirkland.com
                mkieselstein@kirkland.com
                chusnick@kirkland.com
                steven.serajedinni@kirkland.com

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:      Edward Sassower
                Stephen Hessler
                Brian Schartz
E-mail:         edward.sassower@kirkland.com
                stephen.hessler@kirkland.com
                bschartz@kirkland.com

with a copy (which shall not constitute notice) to, when and after the Merger
becomes effective:

Hunt Consolidated, Inc.
1900 North Akard Street
Dallas, Texas 75201
Attention:      David Hernandez
E-mail:         DHernandez@huntconsolidated.com

and

Baker Botts L.L.P.
2001 Ross Avenue, Suite 600

Dallas, Texas 75201
Attention:      Geoffrey L. Newton
                 Luckey McDowell
                 Preston Bernheisel
E-mail:          geoffrey.newton@bakerbotts.com
                 luckey.mcdowell@bakerbotts.com
                 preston.bernhisel@bakerbotts.com

and

White & Case LLP
Wachovia Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Attention:      Thomas E. Lauria
E-mail:          tlauria@whitecase.com

and

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Attention:      Gregory Pryor
E-mail:          gpryor@whitecase.com

<u>If to Reorganized TCEH, after the Distribution</u>:

[Reorganized TCEH]
[Energy Plaza
1601 Bryan Street
Dallas, Texas 75201]

<u>with a copy (which shall not constitute notice) to</u>:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attention:      Alan W. Kornberg
                 Brian S. Hermann
                 Jacob A. Adlerstein
E-mail:          akornberg@paulweiss.com
                 bhermann@paulweiss.com
                 jadlerstein@paulweiss.com

Any Party to this Agreement may notify any other Party of any changes to the address or any of the other details specified in this paragraph; *provided that* such notification shall only be effective on the date specified in such notice or five (5) Business Days after the notice is given,

whichever is later. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver. Any notice to any EFH Party will be deemed notice to all the Reorganized EFH Entities, and any notice to Reorganized TCEH will be deemed notice to all the Reorganized TCEH Entities.

Section 8.18    <u>Headings</u>.    The headings and captions of the Articles and Sections used in this Agreement and the table of contents to this Agreement are for reference and convenience purposes of the Parties only, and will be given no substantive or interpretive effect whatsoever.

Section 8.19    <u>Effectiveness</u>.    This Agreement shall become effective upon the Distribution.

Section 8.20    <u>Further Assurances</u>.    The EFH Parties shall cause each other Person that is or becomes a Subsidiary of EFH that is not "ring-fenced" to execute a joinder to this Agreement (a) to become an EFH Party (effective as of the date such Person becomes a Subsidiary of EFH or ceases to be "ring-fenced") and (b) to be bound by the obligations of the EFH Parties under this Agreement on a joint and several basis.


*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the day and year first above written.

ENERGY FUTURE HOLDINGS CORP.


By:_____


ENERGY FUTURE INTERMEDIATE
HOLDING COMPANY LLC


By:_____


[REORGANIZED TCEH]


By:_____

## <u>EXHIBIT F</u>

### FORM OF JOINDER AGREEMENT

This Joinder Agreement to the Plan Support Agreement, dated as of [_____], 2015 (as amended, supplemented, or otherwise modified from time to time, the "**Agreement**"), by and among the Parties is executed and delivered by _____ (the "**Joining Party**") as of _____, 2015.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.    <u>Agreement To Be Bound</u>.  The Joining Party hereby agrees to be bound by (a) all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as <u>Annex I</u> (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof), and (b) the vote with respect to the Plan or an Alternative Restructuring, as applicable, of the transferor of the Supporting Claims/Interests to be acquired in connection with the execution of this Joinder Agreement, if such vote was cast before the effectiveness of the transfer of such Supporting Claims/Interests.  The Joining Party shall hereafter be deemed to be a "Party" under the Agreement solely with respect to any Supporting Claims/Interests transferred to such Joining Party in connection with this Joinder Agreement and not, for the avoidance of doubt, with respect to any other Debtor Claims/Interests held by such Joining Party at the time of such Transfer, unless already subject to the Agreement.

2.    <u>Representations and Warranties</u>.  The Joining Party hereby makes the representations and warranties of the Investor Parties, Consenting Interest Holders and Consenting TCEH Creditor Parties set forth in the Agreement to each other Party to the Agreement.

3.    <u>Governing Law</u>.  This Joinder Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

\*      \*      \*

IN WITNESS WHEREOF, the Joining Party has caused this Joinder Agreement to be executed as of the date first written above.

[JOINING PARTY]

By:_____
    Name:
    Title:

Notice information:

_____
_____
_____

Owned Debtor Claims/Interests:

_____
_____
_____

## EXHIBIT G

## MECHANICS RELATING TO THE PREFERRED STOCK SALE

Identification of Potential Preferred Stock Sale Assets.  As promptly as is reasonably practicable after the Agreement Effective Date,[1] the Consenting TCEH First Lien Creditors, the Investor Parties, and the Debtors shall attempt to identify assets that could potentially be contributed in the Preferred Stock Sale and shall appoint a mutually acceptable valuation expert to provide a valuation report for each such identified asset.  Such Parties shall attempt to obtain updated valuation reports for each asset that is proposed to be included in the Preferred Stock Sale no more than thirty (30) days prior to the Effective Date. Furthermore, the Debtors shall provide to the Consenting TCEH First Lien Creditors and the Investor Parties for their review an estimate of the tax basis of each such asset and a projection of such tax basis on the Effective Date, which projection shall be periodically updated.

Estimated Tax Attributes.  At least one hundred and twenty (120) days prior to the Effective Date, the Debtors shall provide to the Consenting TCEH First Lien Creditors and the Investor Parties for their review an estimate of the Agreed Tax Attributes (as defined below), as well as all documents (including all schedules and worksheets) used by the Debtors to determine such estimate. The Consenting TCEH First Lien Creditors, the Investor Parties, and EFH shall negotiate in good faith to determine a reasonable estimate of the Agreed Tax Attributes (the "**Agreed Estimated Tax Attributes**").  If such Parties cannot agree, any disputes shall be resolved by the Accounting Firm pursuant to the Dispute Resolution provisions described below.

Determination of Expected Gain and Selection of Assets for Preferred Stock Sale.  As promptly as is reasonably practicable after the date when the Consenting TCEH First Lien Creditors, the Investor Parties, and the Debtors determine the Agreed Estimated Tax Attributes, the Consenting TCEH First Lien Creditors shall determine the amount of gain that is intended to be recognized, which amount shall not be greater than the excess of (i) the Agreed Estimated Tax Attributes over (ii) $500,000,000 (such excess, the "**Maximum Gain**"). Following such determination by the Consenting TCEH First Lien Creditors, the Debtors shall provide the Consenting TCEH First Lien Creditors and the Investor Parties for their review a proposed list of assets to include in the Preferred Stock Sale, such list to be comprised only of assets for which a valuation was obtained as described above. The Consenting TCEH First Lien Creditors and the Investor Parties shall select the assets to be included in the Preferred Stock Sale from the assets on the list, to be selected so as to not generate gain in excess of the Maximum Gain (based on the valuation and tax basis figures with respect to such assets determined in accordance with this Exhibit G).

Formula Clause Approach.  The Debtors, the Investor Parties, and the Consenting TCEH First Lien Creditors shall, in good faith, discuss the implementation of a formula-based approach to setting the amount of taxable gain realized in connection with the Preferred Stock Sale (the "Formula Clause Approach").  Under such an approach, the Debtors would propose that the precise percentage of certain assets to be transferred in connection with the Preferred Stock Sale

---

[1]    Capitalized terms used but not otherwise defined in this Exhibit G have the meaning ascribed to such terms in (a) the Plan, which is attached to the Plan Support Agreement as Exhibit A, or (b) if not defined in the Plan, then the Plan Support Agreement to which this Exhibit G is attached.

would be based on a formula. Such formula would be designed to ensure that the aggregate fair market value of all of the assets transferred equals the sum of the tax basis of such assets plus the Agreed Tax Attributes (adjusted for the Maximum Gain), all as further agreed upon with the IRS as part of a pre-filing agreement or determined by the bankruptcy court or the IRS under the prompt determination of taxes procedure; *provided, however*, that if no agreement with the IRS is reached pursuant to such procedures and the bankruptcy court does not make a determination, the assets transferred in connection with the Preferred Stock Sale would be adjusted at such future time as ultimately determined pursuant to IRS audit and review procedures. For the avoidance of doubt, the Formula Clause Approach will be utilized only upon the agreement of the Debtors, the Investor Parties, and the Consenting TCEH First Lien Creditors.

Dispute Resolution. In the event of any dispute between the Debtors, the Investor Parties, and the Consenting TCEH First Lien Creditors as to any matter covered by the foregoing provisions of this Exhibit G, except for the Formula Clause Approach as discussed above (if applicable), the Consenting TCEH First Lien Creditors, the Investor Parties, and the Debtors shall appoint a nationally recognized independent public accounting firm (the "**Accounting Firm**") to resolve such dispute. In this regard, the Accounting Firm shall make determinations with respect to the disputed items based solely on representations made by such Parties and their respective representatives, and not by independent review, and shall function only as an expert and not as an arbitrator and shall be required to make a determination in favor of one Party only. Such Parties shall require the Accounting Firm to resolve all disputes no later than thirty (30) days after the submission of such dispute to the Accounting Firm and agree that all decisions by the Accounting Firm with respect thereto shall be final and conclusive and binding on the Parties. The Accounting Firm shall resolve all disputes in a manner consistent with this Agreement. Such Parties shall require the Accounting Firm to render all determinations in writing and to set forth, in reasonable detail, the basis for such determination. The fees and expenses of the Accounting Firm shall be borne equally by TCEH, on the one hand, and EFH, on the other hand.

Certain Definitions. For purposes of this Exhibit G,

(a) "**Agreed Tax Attributes**" means 100% of the aggregate amount of net losses, net operating losses, and net capital losses (but only to the extent such net capital losses are deductible under applicable tax law against gain recognized on the Preferred Stock Sale) (in each case, including carryovers), available to the EFH Group as of the Effective Date (determined (a) as if the "consolidated year" (within the meaning of Section 1503(e)(2)(B) of the Code) of the EFH Group ended on the Effective Date and (b) without regard to any income, gain, loss or deduction generated as a result of the Preferred Stock Sale or transactions occurring outside the ordinary course of business on the Effective Date after the Preferred Stock Sale (other than any Deferred Intercompany and ELA Items (if any) and other transactions expressly contemplated by the Plan and the other Definitive Restructuring Documents)), such amount to be mutually agreed on by EFH, the Investor Parties, and the Consenting TCEH First Lien Creditors; and

(b) "**Deferred Intercompany and ELA Items**" means intercompany items (as such term is defined in Treasury Regulations Section 1.1502-13(b)(2)) and excess loss accounts (as such term is defined in Treasury Regulations Section 1.1502-19(a)), in each case, of any subsidiary of TCEH (other than TCEH Finance) that are accelerated into income as a

result of the Distribution pursuant to Treasury Regulations Section 1.1502-13(d) or Section 1.1502-19.