**<u>EXHIBIT A</u>**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN RE: ANC RENTAL CORPORATION, et al.

        Debtors

_____

ANC RENTAL CORPORATION, et al.

        Appellant                 Civil Action No. 04-1430

v.

DALLAS COUNTY, ET AL.

        Appellees            Bankruptcy Case No. 01-11200

_____

### APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE
### HONORABLE MARY F. WALRATH

_____

### BRIEF OF APPELLANT ANC RENTAL CORPORATION, ET AL.

_____

Joseph Grey (No. 2358)
Thomas G. Whalen, Jr. (No. 4034)
STEVENS & LEE, P.C.
1105 North Market Street, Seventh Floor
Wilmington, DE 19801
Telephone:  (302) 654-5180
Telecopier:  (302) 654-5181

Joseph M. Harrison IV
J.M. HARRISON & ASSOCIATES
1009 C Street, Suite 200
Floresville, Texas 78114-2223
Telephone:  (830) 393-0500
Telecopier:  (830) 393-4941

ATTORNEYS FOR APPELLANTS

DATED: August 12, 2005

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... iii

A.    STATEMENT OF THE BASIS OF APPELLATE JURISDICTION .....................1

B.    STATEMENT OF THE ISSUES PRESENTED ......................................................1

C.    STATEMENT OF THE FACTS ..............................................................................2

D.    ARGUMENT ...........................................................................................................3

      1.    The Bankruptcy Court erred in granting DCAD's Motion to Abstain as to ANC's  claim for determination of the amount of <u>unpaid</u> tax year 2001 taxes .................................................................................................................3

      2.    The Bankruptcy Court erred in holding that determination of the market value of the Unpaid Account Presented a Complex Tax Issue for Purposes of Abstention Analysis.................................................................................................4

      3.    The Bankruptcy Court erred in concluding that a trial of the market value of  a single ANC rental car fleet at one airport location for a single tax year could be lengthy...............................................................................................4

      4.    The Bankruptcy Court erred in concluding that the trial of the market value of  a single ANC rental car fleet at one airport location for a single tax year would be lengthy and involve complex debtor asset and liability structures ............................................................................................................

      5.    The Bankruptcy Court erred in concluding that abstention from hearing ANC's request to determine the 2001 unpaid taxes left the Debtors with an alternative remedy..........................................................................................6

      6.    The Bankruptcy Court Erred in Finding That Valuing the Unpaid Account under the Same Market Value Standard Applied to Other Business Assets under Texas Law, Would Somehow Jeopardize Uniformity of Assessment7

E.    CONCLUSION....................................................................................................21

## TABLE OF AUTHORITIES

### Cases

City of Perth Amboy v. Custom Distributing Services, (In Re: Custom Distributing
Services, 224 F.3d 235 (3rd Cir. 2000)..............................................8-10, 13-15, 17, 18, 20

City Vending of Muskogee Inc. v. West Oklahoma Tax Commission, 898 F. 2d 122, 124-
25 (10th Cir. 1990), cert. den'd. 498 U.S. 823 (111 S.Ct. 75), 112 L. Ed. 2d 48 (1990)....17

Connecticut National Bank v. Germain, 503 U.S. 249, 252 (1992) .................................22

Ernst & Young v. Motsumoto (In re United Ins. Managerial, Inc.), 14 F.3d 1380, 1383
(9th Cir. 1994)....................................................................................................................1

Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A., 530 U.S. 1 (2000) .22

In Re Cumberland Farms, Inc., 175 B.R. 138 (Bankruptcy D. Mass., 1995)....................16

In Re St. Johns Nursing Home, Inc., 154 B.R. 117, 125 (Bankr. D. Mass. 1993), aff'd,
169 B.R. 795 (D. Mass. 1994) ...........................................................................................9

In Re: Penking Trust, 196 B.R. 389 (Bankruptcy Court E.D. Tenn. 1996)................13, 16

In re AWB Assocs., G.P., 144 B.R. 270, 277 (Bankr. E.D. Pa. 1992) ........................11, 17

In re Fiedel Country Day School, 55 B.R. 229, 231 (Bankr. E.D.N.Y. 1985) ............11, 17

In re Galvano, 116 B.R. 367, 372 (Bankr. E.D.N.Y. 1990)........................................11, 17

In re Piper Aircraft Corp., 171 B.R. 415, 418 (Bankr. S.D. Fla. 1994)......................11, 17

Midland Asphalt Corp. v. United States, 489 U.S. 794, 798, 103 L. Ed. 2d 879, 109 S. Ct.
1494 (1989)........................................................................................................................1

New Orleans Public Service Co., Inc. v. Council of New Orleans, 491 U.S. 350, 358
(1989)................................................................................................................................3

### Statutes

11 U.S.C. § 505 ........................................................................... 2, 12-18, 20, 21

SL1 564115v1/011002.00003

11 U.S.C. § 505 (a)(2)(A) ...................................................................................... 7, 10-12

11 U.S.C. § 505(a)(1) ...................................................................................................9

11 U.S.C. § 505(a)(1)(A) ...........................................................................................13

11 U.S.C. § 505(a)(2)(B) ........................................................ 8-10, 14, 16, 17, 19

11 U.S.C. § 505(a)(2)(B)(i) .......................................................................................14

11 U.S.C. §§ 1101 et. seq...........................................................................................2

28 U.S.C. § 158(a) ......................................................................................................1

Federal Rule of Bankruptcy Procedure 8001 ...........................................................1

Tex. Tax Code Ann. § 1.04(7) (Vernon, 2001) ..................................................3, 4

Tex. Tax Code Ann. § 41.44 (Vernon, 2001) .........................................................11

Tex. Tax Code Ann. § 42.25 (Vernon 2001) .............................................................6

Tex. Tax Code Ann. § 42.26 (Vernon 2001) .............................................................6

A.      STATEMENT OF THE BASIS OF APPELLATE JURISDICTION

The United States District Court for the District of Delaware (the "District Court")

has appellate jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a) and Federal Rule of

Bankruptcy Procedure 8001.  The Order issued by the Bankruptcy Court constituted a final

order for purposes of appellate jurisdiction because it disposed of all claims for relief raised

in ANC's adversary complaint.  See *Midland Asphalt Corp. v. United States*, 489 U.S. 794,

798, 103 L. Ed. 2d 879, 109 S. Ct. 1494 (1989); *Ernst & Young v. Motsumoto (In re United*

*Ins. Managerial, Inc.)*, 14 F.3d 1380, 1383 (9th Cir. 1994).

B.      STATEMENT OF THE ISSUES PRESENTED

1.      Did the Bankruptcy Court err in granting DCAD's Motion to Abstain as to

ANC's claim for determination of the amount of unpaid tax year 2001 taxes?

2.      Did the Bankruptcy Court err in holding that determination of the market

value of a single ANC rental car fleet at one airport location for a single tax year presented a

complex tax issue for purposes of abstention analysis?

3.      Did the Bankruptcy Court err in concluding that a trial of the market value of

a single ANC rental car fleet at one airport location for a single tax year could be lengthy?

4.      Did the Bankruptcy Court err in concluding that a trial of the market value of

a single ANC rental car fleet at one airport location for a single tax year involved several

debtors with complex asset and liability structures?

5.      Did the Bankruptcy Court err in concluding that abstention from hearing

ANC's request to determine the 2001 unpaid taxes left the Debtors with an alternative

remedy?

1

6.     Did the Bankruptcy Court err in concluding that trial of the market value of a single ANC rental car fleet at one airport location for a single tax year, which would involve determining the correct value of that single rental car fleet under the same market value standard applied to other business assets under Texas law, would somehow jeopardize uniformity of assessment regarding other taxpayers?

C.     STATEMENT OF THE FACTS

ANC RENTAL CORPORATION, ("ANC") the Debtor and Appellant herein, filed for protection under Chapter 11 of the U.S. Bankruptcy Code, 11 U.S.C.§§ 1101 et. seq. in the U.S. Bankruptcy Court for the District of Delaware.  Thereafter, on January 13, 2004, ANC filed adversary complaints against Defendants Dallas County[1], City of Dallas, Dallas Independent School District, (collectively the "Tax Authorities") and Dallas Central Appraisal District, ("DCAD"), Appellees, asking the Bankruptcy Court to determine the correct amounts of ANC's tax liability to Appellees in accordance with 11 U.S.C. § 505 for ANC's airport rental car fleet for tax years 1999, 2000 and 2001.  ANC sought partial refunds of previously paid 1999 and 2000 taxes, and a reduction of amounts due in unpaid 2001 taxes (hereafter, the "Unpaid Taxes").[2]

Appellee DCAD filed a Motion to Dismiss, Abstain or Transfer, and the Tax Authorities filed a Joint Motion for Partial Summary Judgment.  The court granted in part and denied in part DCAD's Motion, denying their dismissal as a party while granting

---

[1]  Including Dallas County Community College District and Parkland Hospital, for whom the County collects taxes

[2] The 2001 taxes were recently paid under protest and with reservation of rights under the

2

abstention as to the 2001 Unpaid Taxes. The court also granted both motions as to tax years 1999 and 2000.

D.    ARGUMENT

**1.    The Bankruptcy Court erred in granting DCAD's Motion to Abstain as to ANC's claim for determination of the amount of <u>unpaid</u> tax year 2001 taxes**

The bankruptcy court clearly erred in abstaining from hearing ANC's challenge concerning the appropriate amount of Unpaid Taxes concerning tax year 2001. As the court recognized, abstention should be exercised sparingly, *New Orleans Public Service Co., Inc. v. Council of New Orleans*, 491 U.S. 350, 358 (1989), and only in exceptional circumstances. Contrary to the court's assertions in its memorandum opinion, none of the recognized considerations support abstention on this issue.

Taking these factors in order, beginning with complexity of the issue, the Unpaid Taxes involve appropriate tax amounts for a single ANC business personal property account, consisting of an airport rental car fleet, for a single tax year, 2001.[3]

Thus, the question on which the court refused to accept jurisdiction boils down to the proper valuation of a single fleet of ANC's rental vehicles at one location for one tax year. Texas central appraisal districts located in the larger Texas cities, including Dallas and Fort Worth, each carry out hundreds of thousands of such valuation exercises annually.

---

instant appeal, and ANC has initiated refund request procedures on the associated excess.

[3] Non-vehicle furniture, fixtures, and equipment form a tiny part of this total, but are generally not in dispute.

3

The valuation standard to be applied is neither complex, nor novel, being "market value," which is defined, consistent with classic appraisal theory, in Texas Property Tax Code § 1.04(7) as follows:

> (7) "Market value" means the price at which a property would transfer for cash or its equivalent under prevailing market conditions if:
>
>> (A) exposed for sale in the open market with a reasonable time for the seller to find a purchaser;
>>
>> (B) both the seller and the purchaser know of all the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions on its use; and
>>
>> (C) both the seller and purchaser seek to maximize their gains and neither is in a position to take advantage of the exigencies of the other.

Tex. Prop. Tax Code Ann. § 1.04(7) (Vernon, 2002).

**2.     The Bankruptcy Court erred in holding that determination of the market value of the Unpaid Account Presented a Complex Tax Issue for Purposes of Abstention Analysis**

Accordingly, as to the first traditional abstention consideration, complexity of the issue, the Bankruptcy Court is simply incorrect. This tax issue is by no means complex, nor would a burdensome "fact intensive review," as described in the opinion, be required. This issue is a simple matter of expert testimony for presentation by appraisal witnesses on behalf of appellants and appellees.

**3.     The Bankruptcy Court erred in concluding that a trial of the market value of a single ANC rental car fleet at one airport location for a single tax year could be lengthy**

Given the nature of the issue for determination, presentation of each expert's basic analytical process, reasoning and conclusions followed by a cross-examination of each could not conceivably require more than two to three hours of time, and would likely take much

4

less.  The valuation standard is straight forward, the items being valued are the subject of considerable available empirical market sales and other supporting data, and a competent fleet appraiser would have little trouble summarizing his or her reasoning and conclusions in a matter of minutes.  There is simply no complexity here.

As to consideration two, the need to administer the bankruptcy case in an orderly and efficient manner, the court acknowledged that the status of the case, post-confirmation, weighed against abstention since there would be no disruption to bankruptcy case administration resulting from exercising jurisdiction.  As for consideration three, the burden on the Bankruptcy Court's docket, ANC by no means questions, discounts or underestimates the substantial docket burden being carried by many bankruptcy courts nationally, and the U.S. Bankruptcy Court for the District of Delaware in particular.

That said, for the same reasons set forth above, the subject single-account, single tax year fleet valuation issue would consume little of that court's precious time, attention and resources to thoroughly address.  Thus, the burden on the court's docket would be very limited.

**4.      The Bankruptcy Court erred in concluding that the trial of the market value of a single ANC rental car fleet at one airport location for a single tax year would be lengthy and involve complex debtor asset and liability structures**

As earlier explained, the question at issue is that of the correct valuation of ANC's airport rental car fleet for a single tax year under the "market value" definition set out above. Dispute over proper methodology may be a part of the testimony, but no more so than in any other valuation matter.  The ultimate legal standard for valuation, market value, is not in dispute, and that constant results in a fairly straightforward value question for determination.

The resulting determination of correct tax amounts due flows arithmetically and inevitably from that valuation. How the alleged complexity of the debtors' asset and liability structure plays into this single issue dispute is unclear. This would be a short trial (hearing would be more appropriate) on a single valuation issue.

As to the related abstention consideration of perceived prejudice to the debtor and/or taxing authorities, the court concludes, with no explanation, that the Tax Authorities would be significantly prejudiced. How is utterly unexplained. In fact, ANC would submit that the relief requested would <u>avoid</u>, rather than create, prejudice, by avoiding prejudicial treatment of ANC on valuation matters as compared to other Texas taxpayers within the same industry. ANC's contention, as set forth in its adversary pleadings, is that the subject appraisal and tax authorities valued ANC's rental car fleet at levels well above the actual market value of those vehicles pursuant to substantive Texas law, and that taxes were, as a result, assessed at excessive levels because based on such excessive values.

Substantive Texas law unequivocally entitles taxpayers to appraisal of their assets for local ad valorem tax purposes and not more than the market value of those assets, and additionally to have such appraised values determined in an equal and uniform manner with the level of appraisal and assessment applied to other comparable or similar taxable properties. See, e.g., Tex. Tax Code Ann. §§ 42.25, 42.26 (Vernon 2002). ANC's adversary filing sought accurate application of that state law valuation standard to the 2001 airport vehicle fleet, which ANC strenuously asserts (with ample supporting appraisal evidence) was excessively and unequally valued for the tax years in question. Thus, the relief sought here would <u>avoid</u> prejudice, not <u>create</u> it.

6

**5.      The Bankruptcy Court err in concluding that abstention from hearing ANC's request to determine the 2001 unpaid taxes left the Debtors with an alternative remedy**

The bankruptcy court also concluded, again without support, that its decision to abstain "does not leave the Debtors without an alternative remedy." With all respect to the bankruptcy court, ANC is mystified as to what remedy the court had in mind. Deadlines for filing administrative protests with local county authorities have long-since expired, and in fact expired, as to the 2001 taxes at issue, prior to ANC's bankruptcy filing. Thorough exercise of those rights prior to the petition date would actually have stripped bankruptcy court jurisdiction over determination of taxes pursuant to the operation of § 505 (a)(2)(A). ANC simply has no other remedy for the gross excesses in assessed values for 2001.

**6.      The Bankruptcy Court Erred in Finding That Valuing the Unpaid Account under the Same "Market Value" Standard Applied to Other Business Assets under Texas Law, Would Somehow Jeopardize Uniformity of Assessment**

Given the basic simplicity of the tax issue and objective valuation standard to be applied, the Taxing Authorities' argument, (which the court apparently found persuasive) that accepting jurisdiction would somehow disturb uniformity of assessment, is specious. As explained, ANC seeks only the accurate valuation and assessment of its assets consistent with substantive state law, namely the "market value" standard set forth above.

Were ANC advancing some sort of novel, controversial, or otherwise non-conforming theory of valuation by which it sought to have its taxable assets appraised in a manner inconsistent with underlying Texas law, Appellees' argument in this area might have merit. However, ANC's assertion and request is just the opposite, that in fact

7

Appellees, in particular DCAD, have failed to adhere to their own state substantive legal standard in the appraising ANC's assets.

Although the uniformity argument is, in practice, over-used and seemingly invoked in defense of nearly any property tax issue brought before federal bankruptcy courts, ANC does not dispute the importance of uniformity of assessment as a consideration. However, while some fact patterns may legitimately raise a question of uniformity, here, without question, ANC seeks only determination of its fleet value and corresponding taxes according to Texas' "market value" standard. Uniformity is, by no means, at issue.

**The Bankruptcy Court Mis-Applied *Custom Distributing* to <u>Unpaid</u> Taxes**

Not only was abstention unwarranted, but the bankruptcy court here unquestionably mis-applied the Third Circuit's reasoning in *City of Perth Amboy v. Custom Distributing Services, (In Re: Custom Distributing Services)*, 224 F.3d 235 (3rd Cir. 2000). In a concluding section of this brief, ANC will outline the logical inconsistencies inherent in the expansive reading applied to the two-word phrase "properly request" by the  Court of Appeals in the *Custom Distributing* case with respect to the scope of bankruptcy court authority to order tax refunds under Code § 505.

First, however, and recognizing that *Custom*, flawed or not, reflects current Third Circuit law on the issue of refund authority, ANC begins with a more fundamental and, it believes, virtually irrefutable point:  The bankruptcy court unquestionably mis-applied *Custom* and its reasoning in the instant appeal to situations not involving refund claims, but, rather, <u>unpaid</u> taxes.

8

A methodical review of *Custom* confirms that the Third Circuit's reasoning and holdings, tied inexorably as they are to interpretation of the term "properly requests" as it appears in Code § 505(a)(2)(B), can **only** be applied to refund situations, not to requests for determination of unpaid taxes . Here, the Bankruptcy Court dismissed ANC's § 505 action even as to what were, as of the dismissal date, challenges to the correct amount of **unpaid** taxes (hereafter, "the unpaid accounts").

This conclusion is virtually inescapable, in that §§ 505(a)(2)(B) only addresses bankruptcy court authority to order refunds, and does not otherwise address or restrict the court's general authority to reduce excessive taxes under § 505.  Indeed, the Third Circuit recognized as much in *Custom*, noting that it was undisputed by either party that the bankruptcy court had jurisdiction, pursuant to § 505(a)(1), to reduce Custom's property tax assessments for the 1992 through 1997 tax years.  Id., 224 F. 3d, at 240.

In *Custom*, taxes for years 1992 through 1994 had been previously paid in full, 1995 partially paid, while 1996 and 1997 remained completely unpaid.  Ultimately, these last three years, involving partly paid and unpaid taxes, were remanded to the district court for further proceedings.  Id., at 247.

In discussing the appropriate interpretive scope of the phrase "properly request," the Third Circuit cited *In Re St. Johns Nursing Home, Inc.*, 154 B.R. 117, 125 (Bankr. D. Mass. 1993), aff'd, 169 B.R. 795 (D. Mass. 1994) for the proposition that the term "properly" connotes correctness and dictates conformity with the governmental unit's procedures, and that "if the statute did not have this meaning, the word properly would be superfluous."  Id., 154 B.R., at 125.

If *St Johns*' reasoning is correct, consider the impact that the bankruptcy court's findings in the instant case with respect to the unpaid accounts on the integrity and internal consistency of Code § 505 as a whole.

In *St. Johns*, the court worried about the impact of the single term "properly." In the instant case, the bankruptcy court's unfounded extension of the "properly request" concept beyond § 505(a)(2)(B) to situations involving <u>unpaid</u> taxes would render not just one word, but rather the entire preceding §§ 505(a)(2)(A), largely superfluous. The basis for this conclusion is simple. The bankruptcy court found, as to the unpaid accounts, that the court lacked jurisdiction to grant relief because ANC had not properly protested such amounts at the time. Yet in *Custom*, as noted, the bankruptcy court's general § 505 authority to reduce assessments was unchallenged, only refund authority being at issue.

Moreover, while the *Custom* court did find that Custom Distributing's failure to timely challenge assessed valuations under New Jersey law left them unable to "properly request" a tax refund consistent with the requirements of state law, this finding, too, arose <u>specifically in the context of interpreting the court's authority to order refunds</u> under the "properly request" standard of § 505(a)(2)(B).

Absent a refund situation, none of the reasoning of *Custom* ever comes into play. That distinction lies at the heart of the fundamental logical disconnect in the court's reasoning here. Not only has the bankruptcy court misapplied interpretative statutory language from Code § 505(a)(2)(B) to a non-refund situation to which, by definition, it has no applicability, but adopting this bizarre "rewrite" of § 505 to extend the "properly request"

10

requirement to non-refund scenarios would largely emasculate an entire subsection of § 505, if not most applications of § 505 generally.

In *Custom*, the Court concluded that § 505(a)(2)(B) was "unclear," and thus found it appropriate to "proceed to its legislative history for guidance." *Custom Distributing*, 224 F. 3d, at 241. A part of that legislative history is the well-recognized purpose behind the remedial mechanisms created by § 505 and its predecessors: protecting creditors from the dissipation of an estate's assets which could result if creditors were bound by a tax judgment which a debtor, due to its ailing financial condition, failed to contest. See *In re Piper Aircraft Corp.*, 171 B.R. 415, 418 (Bankr. S.D. Fla. 1994); *In re AWB Assocs., G.P.,* 144 B.R. 270, 277 (Bankr. E.D. Pa. 1992); *In re Galvano*, 116 B.R. 367, 372 (Bankr. E.D.N.Y. 1990); *In re Fiedel Country Day School*, 55 B.R. 229, 231 (Bankr. E.D.N.Y. 1985).

This purpose, as originally envisioned, is reflected both in the breadth of broad general remedial authority with which § 505 begins, and also, conversely, by limitations such as э§ 505(a)(2)(A), which prevents a proverbial "second bite at the apple" by debtors who in fact proved themselves capable of acting timely and thoroughly to preserve and vindicate their available remedies under state law.

Consider this underlying  intent, not to mention the express wording of limiting provision § 505(a)(2)(A), in the context of the bankruptcy court's ruling here. The court found, in essence, that ANC would have to have timely protested the unpaid 2001 accounts (citing the failure to "properly protest") in order to have been entitled to court relief under § 505 as to even unpaid taxes.

However, Texas, like many state tax appeal systems, requires that assessment challenges (which Texas calls "protests") be filed relatively early in the tax calendar in order to facilitate finalizing of tax rolls and issuance of bills. In Texas, protests are generally due by May 31 or within 30 days after issuance of a notice of appraised value, Tex. Tax Code Ann. § 41.44 (Vernon, 2001), and most unresolved protests are heard and adjudicated by local appraisal review boards by late July. This time frame is particularly applicable with respect to moderate to larger size commercial accounts, since appraisal review boards are generally required to certify their local appraisal rolls by July 20 and include not less than 95 percent of the county-wide appraised value in that certification. Id.,e.g. § 26.01.

As a result, had ANC timely protested the subject unpaid 2001 accounts, as this court held it must, the protest would have almost certainly been adjudicated by Appellees' appraisal review well before ANC's November 13, 2001 bankruptcy filing, with said adjudication barring any right to relief under § 505 pursuant to the restriction imposed by § § 505(a)(2)(A). Conversely, failing to protest these accounts in the Spring of 2001 would, per the bankruptcy court's reasoning, bar § 505 relief due to the taxpayer's failure to "properly protest," a phrase <u>nowhere</u> found in § 505.

For debtors like ANC, filing for bankruptcy relatively late in the tax year,[4] the implications of the bankruptcy court's reasoning are both clear and ominous: Although Congress took the time to craft, debate and enact § 505 and its statutory predecessors to protect debtors and case creditors against pre-filing administrative appeals oversight and/or

---

[4]By this time, most protests or other administrative appeals, if filed at all by a financially-buckling entity, would already have been adjudicated for that year

tax collector overreaching, debtors and creditors will be, in most cases, barred from invoking the section's remedial purposes.

Fail to protest value during the original tax year (the very scenario prompting enactment of § 505's predecessor), and this court will analogize that to a failure to properly request refunds, despite no support for that analogy either in § 505's wording, or interpretive case law. Protest timely, and provided the protest is heard in reasonably prompt fashion (thus prior to the bankruptcy filing, §§ 505(a)(1)(A) bars further relief. Put more simply: "Heads, the tax office wins, tails you lose."

*In Re: Penking Trust*, 196 B.R. 389 (Bankruptcy Court E.D. Tenn. 1996) another in a line of cases preceding *Custom Distributing* and on which *Custom's* reasoning relies, also reiterates the clear and sharp distinction between restrictions on what it asserts as bankruptcy court authority to order refunds, versus the acknowledged general authority of bankruptcy courts to determine tax liability under § 505 in a non-refund situation.

In fact, in responding to case arguments therein by the trustee in support of the court's refund authority, the *Penking* court went out of its way to generally endorse the cited cases, while distinguishing them on the grounds that they involved not refunds, but simply the court's general authority to determine taxes under § 505. Id., at 396.

This general authority, when invoked in connection with determination of unpaid taxes, appears beyond serious question, and in fact, as noted in *Penking*, has long been a part of the law, extending back prior to passage of the 1978 Bankruptcy Code. Courts have argued whether or not that 1978 Code was intended to alter pre-existing law to extend court

13

authority in the area of refunds.  Never in question, however, was the long-standing authority

of these courts to make determinations with respect to unpaid taxes.  See, Id.

### *Custom's* Own Wording and Reasoning Refutes Applicability to Unpaid Taxes

Repeated references throughout the *Custom* opinion confirm its focus solely on the

issue of tax <u>refunds</u>.  For example, after acknowledging the undisputed question of the

court's general jurisdiction "to reduce Custom's property tax assessment" the court notes

that " [t]he more difficult task lies in defining the precise contours of the jurisdictional grant

embodied in Section 505 with regard to refunds and offsets of taxes already paid by

Custom."  Id., 224 F. 3d, at 240.

The court next defines the appellate task as one of "evaluating the City's claim that

the 'properly request' requirement of § 505(a)(2)(B)(i) requires the debtor to file a claim for

refund in accordance with the procedures set out by the taxing authority."  Id.  Following

that is a lengthy analysis of the perceived meaning of the "properly request" language found

in § 505(a)(2)(B).  The subject of the "request" referred to by this term is, obviously, refund

requests, not any other form of requests conceivably dealing with unpaid taxes.

Further on, the court specifically refers to "policy considerations that compel us to

read the 'properly request' language of  §  505(a)(2)(B)(i) as creating a jurisdictional bar

against adjudicating <u>refund claims</u> that are raised for the first time in a bankruptcy

proceeding."  Id., at 243 (emphasis added).  Ultimately, the Third Circuit concluded that "the

bankruptcy court did not have jurisdiction to order the City to refund excess payments for

those years in which Custom paid the taxes but did not contest them in accordance with

14

N.J.S.A. 54:3-21. Accordingly, the overpayments made by Custom for the 1992, 1993 and 1994 tax years cannot be refunded." Id., at 243-4.

Stating the obvious, all of the Third Circuit's reasoning and conclusions as cited hereinabove refer specifically, and solely, to bankruptcy court authority to order **refunds** of **paid** taxes, an interpretation of the "properly request" language contained squarely in the refund limitations provision of Code § 505. Nowhere in the court's opinion does it state (or even infer) that the "properly request" concept can, or should, be applied to situations involving unpaid taxes.

In fact there is, of course, no basis in the express statutory language of § 505 for doing so, and the balance of the Third Circuit' opinion, if anything, strongly implies just the opposite. In *Custom*, the bankruptcy court, as cited above, first addressed and disposed of tax years 1992 through 1994, which had previously been paid in full and as to which Custom sought partial refunds.

However, there were also three other years, 1995, which had been partially paid, and unpaid tax years 1996 to 1997. After addressing an alternative argument that refunds could be sought in the form of offsets (briefly discussed hereinbelow) and spending some time on analysis of pertinent expert testimony and related evidentiary issues, the court remanded tax years 1995 through 1997 to the district court for further proceedings.

None of these tax years had been the subject of previous protests or appeals at the state level. Obviously, then, had it been proper to engraft the "properly request" concept onto situations involving unpaid taxes (as the bankruptcy court did in the instant case), the Third Circuit would presumably have done so in *Custom* with respect to years 1995 to 1997,

15

and in so doing disposed of the entire case on appeal without need for remand. However, the court, instead, expressly (and rightly) chose not to do so, as, indeed, no logical extrapolation from the express language of § 505 would support its use to dismiss claims for determination of unpaid taxes absent pre-bankruptcy appeal and adjudication.

***Cumberland Farms*, Relied on by Appellees, In Fact Supports the Same Conclusion**

Further indication that the Third Circuit would have considered this bankruptcy court's artificial analogy inappropriate can be found in *In Re Cumberland Farms, Inc.*, 175 B.R. 138 (Bankruptcy D. Mass., 1995), an opinion cited by the Third Circuit in *Custom* as the very foundation for their conclusions. (See detailed discussion of *Cumberland Farms* holding and Third Circuit characterization as the "first case in which there was analysis of § 505 in its legislative history." *Custom*, 224 F.3d, at 242.) The *Custom* opinion leaves little doubt as to the court's heavy reliance upon the analysis in *Cumberland Farms*.

Significantly, *Cumberland Farms* involved refund requests concerning multiple tax years for which taxes had previously been paid (and which the court found that bankruptcy courts had no authority to order) and a single unpaid tax year, 1992. Although the court ultimately chose to abstain from substantive relief,[5] on the underlying question of jurisdiction to grant relief, Cumberland court express no doubt that it had jurisdiction, stating,

> "The court's jurisdiction is quite different with respect to the
> unpaid 1992 taxes. <u>Unlike its provision concerning tax</u>

---

[5] Abstention in that case was based on specific aspects of the plan of reorganization and the perceived impact on the estate and estate creditors. Those factors are not pertinent here

<u>refund claims, Section 505 contains no language showing
deference to state procedure on unpaid taxes</u>."

*In Re Cumberland Farms, Inc.*, 175 B.R. 138, at 142-3 (emphasis added).

Bankruptcy courts have recognized the simple purpose behind the 120 day refund request provision of Code § 505(a)(2)(B), namely to "afford the taxing authority a reasonable opportunity to review any refund claim under its normal administrative procedures." See, e.g. *In Re Penking Trust,* 196 B.R. 389 (Bankruptcy Court E.D. Tenn. 1996), at 393. Equally undisputed is the fundamental remedial purpose underlying § 505, that of providing a ready forum for "prompt resolution of a debtor's tax liability," and affording protection against "dissipation of the estate's assets which could result if the debtor failed to challenge a pre-petition assessment." Id., citing *City Vending of Muskogee Inc. v. West Oklahoma Tax Commission*, 898 F. 2d 122, 124-25 (10th Cir. 1990), cert. den'd. 498 U.S. 823 (111 S.Ct. 75), 112 L. Ed. 2d 48 (1990).

Other cases have similarly held that § 505 was enacted primarily to protect creditors from the dissipation of an estate's assets which could result if creditors were bound by a tax judgment which a debtor, due to its ailing financial condition, failed to contest. See, e.g., I*n re Piper Aircraft Corp*.; *In re AWB Assocs., G.P.*, *In re Galvano*, 116 B.R. 367, 372 (Bankr. E.D.N.Y. 1990); and *In re Fiedel Country Day School*, cited *supra*.

The "proper request" requirements of §§ 505(a)(2)(B) is clearly an exhaustion of remedies provision intended, as many of the cases applying it confirm, simply to provide constituent taxing units with a full opportunity to consider refund requests on their merits before the matter is presented to the Bankruptcy Court for determination of the merits.

17

Given that reality, a more logical (and arguably less punitive to debtors and non-tax office creditors) approach by Bankruptcy Courts confronted with refund requests first presented to a taxing unit by formal § 505 pleadings would be either to stay relief until the 120 days has passed.

Another option would be to accept and rule on the request for relief, provided the Debtor reimburse the taxing unit for costs for failure to first present the refund request by letter. These and other practical alternatives geared to effectuating § 505 and safeguarding rights of Debtors and other case creditors (rather than simple procedural rejection of the request) exist, as more equitable alternatives to the holding in *Custom Distributing*.

*Custom* also expressly cited, discussed and appears to have relied upon language contained in the then-proposed Bankruptcy Reform Act of 1999, limiting the scope of § 505 refund authority to state level procedural and time frames. That provision, was eventually enacted in April of 2005 as part of the Bankruptcy Reform Act, and when it takes effect October 17, 2005 to new bankruptcy cases filed on or after that date, will, for the first time, create express bankruptcy code language limiting § 505 relief according to state level time and procedural requirements. These provisions obviously have no application to ANC's Chapter 11 proceedings.

Inclusion of such specific restrictions in the recently enacted reform legislation are compelling evidence that they were not a part of existing bankruptcy law, and renders the Third Circuit's reliance on contemplated "future law" anomalous and inappropriate. Notwithstanding *Custom's* exhaustive court discussion of legislative history in an effort to

18

justify an opposite conclusion, the version of § 505 applicable here simply does not limit § 505 relief to the time frames and procedural requirements found under state law.

**The Flawed Reasoning of *Custom Distributing* as Applied to Refund Claims**

Even local taxing units and other proponents of the *Custom Distributing* holding would be hard pressed to deny that the court went out of its way to construct a foundation (based on its interpretation of the legislative history of § 505 and its progeny) for an expansive definition of the term "properly requests" which goes far beyond the meaning one would naturally ascribe to these two words at first glance.

In order to delve into a lengthy, subjective discussion of legislative history, the court had to first find, as it did, that the § 505 was ambiguous. Yet it need not have so held. One obvious intent of §§ 505(a)(2)(B) recognized by numerous cases (including some generally supportive of the custom rationale) is that the requirement that the trustee or debtor in possession "properly request" refunds from the affected taxing unit first, and allow up to 120 days for response, was enacted simply to ensure that tax units had an adequate opportunity to intelligently evaluate and respond to refund requests before a busy court was drawn into the dispute.

Even in this context, § 505(a)(2)(B) makes perfect sense as a simple "exhaustion of remedies" provision not unlike many such provisions found throughout state and federal tax law. Not surprisingly, most, if not all, such provisions require that the prior administrative action, either at the time of initial filing or upon presentation to the particular administrative body, be carried out with sufficient detail and information so as to allow that administrative body to intelligently consider and decide the dispute on its merit.

19

A bald allegation of overassessment and/or request for refund, without supporting facts or analysis, does nothing to facilitate early, administrative-level resolution of disputes.

Viewed in this context, a simpler and far more logical interpretation of the term "properly request" in § 505(a)(2)(B) is that the legislature simply meant to require that the taxpayer not only present the request first to local taxing authorities and allow them up to 120 days to respond, but also submit a "proper" request, in the sense of furnishing sufficient explanation, analysis and, as applicable, data to allow the taxing unit to meaningfully consider the subject request on its merits. Most of us would agree that a refund request lacking any explanation of its supporting analysis and rationale and thus frustrating any tax unit's attempt to consider it on its merits, would not be a "proper" request. The simple words "properly request" readily imply such a requirement, and the court could, and should, have gone no further than this obvious meaning.

Given the level of detailed explanation of various procedural requirements contained not only throughout other code sections generally, but even specific § 505 (consider, for example, the mechanisms laid out in § 505(b), had Congress intended the meaning of "properly request" ascribed by custom and its progeny, it could have easily set out detailed requirements for preparing and presenting refund requests in strict conformance with all state and local procedural details and time frames, as well as all state law administrative conditions preceding, as an absolute pre-condition to refund relief under §505.

*Custom* cited various provisions in earlier draft bankruptcy legislation which discussed or hinted at such express requirements, yet none of that language became a part of the final, enacted bill. Nonetheless, courts have chosen to "read in" such unenacted language

and, as a result, create absolute threshold jurisdictional bars to taxpayer relief even in situations of unquestionably excessive valuation and assessment.

One inherent and fundamental problem with the reasoning of *Custom* and its progeny is that it utterly destroys, at least in this procedural context, the traditional separate treatment of <u>substantive</u> and <u>procedural</u> state laws in federal court proceedings. Numerous decisions throughout the years have recognized this fundamental distinction.

For example, federal actions properly brought in federal court not by reason of a federal law cause of action, but rather, diversity jurisdiction, contemplate application of forum state substantive law, yet remain governed by federal procedure. More specific to the current situation, various bankruptcy courts have recognized the propriety of applying substantive state law (for example, the applicable state valuation standard) to disputes arising under Bankruptcy Code § 505.

All of these decisions, historically, have held that federal bankruptcy courts addressing such disputes should apply, and be controlled by, state and local procedural provisions in the handling of a § 505 matter. If such adherence to state and local procedures were required of bankruptcy courts here, why not elsewhere, throughout the bankruptcy code and reorganization proceedings generally. Such was obviously not the intent of Congress.

ANC recognizes that the recently-enacted Bankruptcy Reform Act (and which applies only to bankruptcy proceedings initiated on or after October 17, 2005) does, for the first time, add a provision specifically restricting the availability of relief (including court "determination" of taxes under § 505), to the time periods during which such relief would be available under non-bankruptcy law. However, since, obviously, these restrictions are not

SL1 564115v1/011002.00003

yet law, and have no relevance to the instant case, the fact that Reform Act proponents felt it necessary to specifically add them further evidences the fact that they have not, historically, been part of § 505. Accordingly, "legislation by implication" in this area, and the resulting denial of subsequent consideration of otherwise-valid partial refund claims, is inequitable and inappropriate.

### E. CONCLUSION

*Custom Distributing* warps Bankruptcy Code § 505 out of resemblance to its original remedial purposes and carefully crafted scope and limitations. As a result, a Code section expressly enacted to prevent tax offices profiting from the neglect of distressed companies, at the expense of debtors and other creditors, has been stripped of most of its vitality, making the express restrictions imposed on new bankruptcies by the 2005 Bankruptcy Reform Act very much an anti-climax, at least as to § 505.

More than once, the United States Supreme Court has cautioned lower federal courts to enforce federal code and statutory provisions, including the United States Bankruptcy Code, according to the express statutory language. See, e.g., *Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000), citing *Connecticut National Bank v. Germain*, 503 U.S. 249, 252 (1992). Regrettably, the Third Circuit chose otherwise, in crafting its decision in *Custom*.

The one remaining area, however, where jurisdiction unquestionably remains, is as to unpaid taxes, including the Unpaid Taxes involved herein. Moreover, abstention was without basis given the nature of the issue, and its grant was an abuse of discretion. Accordingly, while ANC prays for relief from the flawed reasoning and application of

22

Custom with respect to refund requests concerning paid taxes, it strenuously urges relief in the form of reversal and remand of the claims concerning Unpaid Taxes on the single location of ANC's airport rental car fleet for tax year 2001.

Dated: August 12, 2005.

<div style="margin-left:40%">

Respectfully submitted,


 /s/ Joseph Grey
Joseph Grey (No. 2358)
Thomas G. Whalen, Jr. (No. 4034)
STEVENS & LEE, P.C.
1105 North Market Street, Seventh Floor
Wilmington, DE 19801
Telephone:  (302) 654-5180
Telecopier:  (302) 654-5181

Joseph M. Harrison IV
J.M. HARRISON & ASSOCIATES
1009 C Street, Suite 200
Floresville, Texas 78114-2223
Telephone:  (830) 393-0500
Telecopier:  (830) 393-4941
ATTORNEYS FOR APPELLANTS

</div>

SL1 564115v1/011002.00003