Control Number: 45188



Item Number: 81

Addendum StartPage: 0

PUC DOCKET NO. 45188

| | |
|---|---|
| JOINT REPORT AND APPLICATION OF ONCOR ELECTRIC DELIVERY COMPANY LLC, OVATION ACQUISITION I, LLC, OVATION ACQUISITION II, LLC AND SHARY HOLDINGS, LLC FOR REGULATORY APPROVALS PURSUANT TO PURA §§ 14.101, 37.154, 39.262(l)-(m), and 39.915 § § § § § § § § § | PUBLIC UTILITY COMMISSION OF TEXAS |

## PRELIMINARY ORDER

On September 29, 2015, Oncor Electric Delivery Company LLC (Oncor),[1] Ovation Acquisition I, LLC, Ovation Acquisition II, LLC, and Shary Holdings, LLC (collectively, applicants) jointly filed an application for Commission approval of a transaction that would transfer control of Oncor and would restructure Oncor. The applicants request that the Commission approve the transaction under PURA §§ 14.101, 39.262(m), and 39.915(b). In addition, the applicants request that the Commission approve the transfer of Oncor's certificates of convenience and necessity.

On August 9, 2015, the Ovation entities, Energy Future Holdings, Corp. (EFH), and Energy Future Intermediate Holding Company LLC (EFIH) entered into a merger agreement and plan of merger by which Ovation I would acquire EFH's indirect, 80% ownership interest in Oncor, and Oncor would be reorganized such that, ultimately, Oncor will be separated into two companies, with one company (Oncor AssetCo) holding legal title to all of Oncor's current transmission and distribution assets, and one company (Oncor OpCo) operating the assets, holding Oncor's certificates of convenience and necessity (CCNs) and other personal property. Shary Holdings, LLC, wholly-owned by Hunter Hunt and members of his family, will have operational control of Oncor OpCo.

---

[1] This means Oncor Electric Delivery Company LLC as it exists on the date of this order, and does not refer



At the conclusion of these transactions, Ovation I would be an indirect owner of Oncor AssetCo, and would qualify to elect to be taxed as a real estate investment trust (REIT) under Internal Revenue Code[2] §§ 856-860. According to the application, prior to the closing of the transactions, Ovation I would be converted into a Delaware corporation, and would elect to be taxed as a REIT commencing with the taxable year ending December 31, 2016.[3]

These transactions are a portion of a greater plan for Oncor's current, indirect parent company, Energy Future Holdings, to emerge from chapter 11 bankruptcy.[4] The transactions at issue in this docket are a portion of the fifth amended joint plan to reorganize Energy Future Holdings Corp. and some of its affiliates that was filed in the bankruptcy court on September 21, 2015. The hearing for consideration of the fifth amended plan, based on ballots and a solicitation package sent to creditors regarding the plan, is scheduled to commence at the bankruptcy court on November 3, 2015. Commission approval of the proposed transaction at issue in this docket is a prerequisite to completion of this plan.

The fifth amended plan contemplates that approximately $5.5 billion or more of debt will be incurred by Ovation I or its post-closing subsidiary, a reorganized EFIH. If the transactions contemplated by the application are consummated, Ovation I will be the proposed indirect parent of Oncor, and ultimately Oncor AssetCo. While technically this debt is being raised as part of the capitalization of Ovation I, functionally this debt constitutes a refinancing of the debt incurred by EFH and EFIH either to finance the original 2007 buyout of TXU Corp. or subsequently to restructure or refinance portions of the original acquisition debt. In this preliminary order, any reference to "2007 Buyout Debt" means (1) existing EFH or EFIH debt obligations described in this paragraph and (2) any debt or other obligation now or hereafter incurred by Ovation I or a reorganized EFIH. The term "2007 Buyout Debt" does not include debt obligations of Oncor that exist within the ring fence established in the final order in Docket No. 34077, *Joint Report*

---

to the contemplated entities Oncor AssetCo and Oncor OpCo (defined below).

[2] Internal Revenue Code of 1986, as amended.

[3] Application at 3, footnote 5.

[4] *In re Energy Future Holdings Corp., et al*, No 14-10979 (CSS) (Bankr. D. Del.) (petition filed Apr. 29, 2014).

*and Application of Oncor Electric Delivery Company and Texas Energy Future Holdings Limited Partnership Pursuant to PURA § 14.101.*

The Commission is required to make a determination on the transaction at issue in this docket not later than March 27, 2016.[5] The Commission currently intends to take final action of this matter at the open meeting currently scheduled for March 24, 2016, although it is likely it will deliberate on this matter at an earlier open meeting. By taking final action by a vote in the March 24 open meeting the Commission will satisfy this statutory deadline. In any event, at this time, the Commission intends to issue its order on this matter on Friday, March 25, 2016, although that date could slip.

### I. Issues to be Addressed

After reviewing the pleadings submitted by the parties, the Commission identifies the following issues that must be addressed in this docket:

### A. GENERAL ISSUES

1. Is the application sufficient for the Commission's consideration? If not, what action should the Commission take?

2. Have the applicants complied with reporting requirements under PURA §§ 14.101, 39.262(l), 39.915(b), and 16 Texas Administrative Code (TAC) § 25.74?

3. Is the transaction consistent with the public interest, considering the following factors as identified in PURA § 14.101(b)?

    a. What is the reasonable value of the property, facilities, or securities to be acquired, disposed of, merged, transferred, or consolidated?

    b. Will the transaction adversely affect the health or safety of customers or employees?

---

[5] PURA §§ 39.262(m), 39.915(b).

    c. Will the transaction result in the transfer of jobs of citizens of this state to workers domiciled outside this state?

    d. Will the transaction result in a decline in service?

    e. Will Oncor receive consideration equal to the reasonable value of the assets when it sells, leases, or transfers assets?

4. Is the transaction consistent with the public interest, considering the following factors as identified in PURA §§ 39.262(m) and 39.915(b)?

    a. Will the transaction adversely affect the reliability of service?

    b. Will the transaction adversely affect the availability of service?

    c. Will the transaction adversely affect the cost of service?

5. If this transaction is found not to be in the public interest, how will the financial implications of the transaction be addressed to eliminate unreasonable costs in future ratemaking proceedings?

6. Are both Oncor AssetCo and Oncor OpCo electric utilities, as defined by PURA § 31.002? Are both Oncor AssetCo and Oncor OpCo transmission and distribution utilities as defined in PURA § 31.002?

7. Do Oncor AssetCo and Oncor OpCo have separate statutory obligations to provide safe and reliable service?

8. Does PURA require Oncor AssetCo to obtain a CCN? Should Oncor AssetCo be permitted to exercise rights under the CCNs to be held by Oncor OpCo?

9. Should the CCN rights associated with the transaction be transferred pursuant to PURA § 37.154?

    a. Will the assignees of the CCN rights provide adequate service?

    b. Should the Commission prescribe any conditions to the transfer of the CCN rights?

10. Does PURA allow the Commission to treat Oncor AssetCo and Oncor OpCo on a consolidated basis? Should the Commission decide this issue in this docket or in a future docket?

11. Does the Commission have the authority to prohibit Oncor AssetCo from owning any transmission and distribution assets outside of ERCOT because of jurisdictional considerations relating to the Federal Energy Regulatory Commission? If the Commission does have such authority, should it exercise that authority?

12. If Oncor AssetCo is permitted to own transmission and distribution assets outside of ERCOT, should Oncor AssetCo be required to hold any such assets in a separate entity?

13. What entities would be Oncor OpCo's unregulated affiliates? What entities would be Oncor AssetCo's unregulated affiliates?

## B. REIT-RELATED ISSUES

14. Will the transaction result in net tangible and quantifiable benefits to Texas customers on a timely basis?

    a. What is a reasonable estimate of the amount of the benefit?

    b. What are the tangible and quantifiable benefits specific to this transaction?

    c. Do the tangible and quantifiable benefits of the transaction to Texas ratepayers exceed its corresponding costs and risks to those same ratepayers?

    d. What are methods through which ratepayers could receive the tangible and quantifiable benefits of this transaction?

15. Should the companies that result from the transaction be required to provide customers with a guaranteed minimum amount of savings due to the transaction?

16. Does the transaction impede or increase competition?

17. What is the intended composition of the board of directors of each ultimate entity, and what are the benefits of such a board composition?

18. Is a private letter ruling from the Internal Revenue Service regarding the REIT qualification of Ovation I or Oncor AssetCo a precondition to the closing of the transaction? Please address recent guidance issued by the Internal Revenue Service in Notice 2015-59 and Rev. Proc. 2015-43. What will be the result if such a private letter ruling is not obtained?

19. What would be the result if Ovation I or Oncor AssetCo failed to qualify as a REIT at any time?

    a. Would ratepayers encounter any increased costs or decreases in service quality?

    b. How can the Commission ensure that ratepayers will not be harmed in such a disqualification?

20. Will the proposed structure of the resulting entities, including the existence of a REIT, result in a lower weighted average cost of capital?

21. Does the requirement for a REIT to "distribute annually at least 90 percent of its taxable ordinary income to shareholders," allow Oncor to retain sufficient capital to make new capital investments in assets used and useful in providing service to its ratepayers?

22. How will Oncor OpCo meet lease payment obligations to Oncor AssetCo and also maintain its obligation to provide safe and reliable service?

23. Will Oncor OpCo make the ultimate decision on transmission and distribution investments? Will Oncor AssetCo have any oversight or authority over Oncor OpCo regarding investments?

24. Will there be additional costs incurred due to the REIT structure that would not otherwise be incurred? If so, what is the amount of those additional costs?

25. Why must Oncor AssetCo conduct the street lighting and transmission engineering and construction management business? Will this aspect of the transaction have any impact on REIT qualification?

26. Is it reasonable for Oncor OpCo to be allocated the $2.4 billion pension obligations related to Oncor retirees and legacy EFH retirees?[6] Should pension expense liability obligations be shared between Oncor AssetCo and Oncor OpCo? If so, in what manner?

27. What rights do minority or majority equity owners have to replace the REIT's management team? What risks does this create? What is the Commission's authority over such changes?

28. What are Oncor AssetCo management entity's statutory and common law duties to Oncor AssetCo and its direct and indirect owners? Do these duties conflict with obligations imposed on Oncor AssetCo under PURA or obligations under any lease or other agreement between Oncor OpCo and Oncor AssetCo?

29. What ensures that the Oncor OpCo management team employed at Oncor OpCo, rather than Oncor OpCo's owners, will control operations at Oncor OpCo?

30. Under the laws of the state of its organization, what rights and under what conditions can minority or majority equity owners in Oncor AssetCo replace the management team? What risks does this create? What is the Commission's authority over such changes?

31. After the separation of Oncor into Oncor AssetCo and Oncor OpCo, which of the entities will assume the current debt of Oncor? Does the separation preserve the financial integrity of Oncor? Are the rights of the holders of such debt impaired in any material respect? What rights will the holders of that debt have to control the assets of Oncor AssetCo?

---

[6] Shapard Direct at 18.

32. Should certain legal actions regarding the REIT-related entities be brought in Texas courts? If so, for what types of actions?

33. What mechanisms will Oncor AssetCo and Oncor OpCo use to protect the utility's financial viability if a major storm requires significant restoration to the transmission and distribution system? Assuming Oncor OpCo will be responsible for the continued maintenance, operation, and restoration of the transmission and distribution system, which entity or other parties will be responsible for securing adequate funds to finance the restoration?

34. How will Oncor OpCo meet payment obligations to Oncor AssetCo if a major storm impacts Oncor OpCo's revenue stream?

35. Which entity will own and maintain the self-insurance reserve account permitted under 16 TAC § 25.231(b)(1)(G)? If that account is entirely depleted because of a storm, then what methods will Oncor AssetCo or Oncor OpCo use to repair and restore damage to the transmission and distribution system?

36. Would Oncor AssetCo or Oncor OpCo be eligible to use the securitization provisions of PURA §§ 36.401-36.406? If so, which entity would be the recipient of the proceeds?

### C. LEASE AGREEMENT

37. Does the Commission have the authority to require that it approve any lease agreements between Oncor AssetCo and Oncor OpCo and any modifications or supplements to them? If so, do the lease agreements provide sufficient protection to ratepayers such that their terms cannot be changed or terminated without the prior approval of the Commission?

38. Do the payments made from Oncor OpCo to Oncor AssetCo in accordance with the lease constitute rates, as defined in PURA § 11.003? Does Oncor AssetCo's lease to Oncor OpCo fall within the definition of service, as defined in PURA § 11.003?

39. Will Oncor AssetCo and Oncor OpCo be affiliates as defined in Chapter 11 of PURA?[7] If so, will the terms of the lease agreement (along with any amendments or modifications thereto) and any other arrangement between Oncor OpCo and Oncor AssetCo require Commission approval under the standards set forth in PURA § 36.058?

40. If Oncor OpCo is unable to satisfy a lease payment obligation, what rights, if any, will the owners of Oncor AssetCo have to control the assets of Oncor AssetCo?

41. If Oncor OpCo is unable to satisfy a lease payment obligation, what rights, if any, will the owners of Oncor AssetCo have to remove the Oncor AssetCo management entity?

42. What happens upon termination or expiration of the lease? What would be the result if a lease between Oncor AssetCo and Oncor OpCo could not be negotiated?

43. Under what other circumstances could Oncor OpCo be replaced as the lessee under the lease?

### D. 2007 BUYOUT DEBT ISSUES

44. Should a ring fence be required for one or more of the resulting entities? If so, should the ring fences proposed by the applicants be approved? Should other ring fence provisions be required?

45. Have the applicants laid out any path for the eventual retirement of the 2007 buyout debt? Should such a plan be required?

46. What impact would a major storm have on any plan to retire the 2007 buyout debt?

47. What will be the impact of the proposed transaction on Oncor AssetCo's and Oncor OpCo's bond rating and cost of debt? What guarantees or commitments should be required to ensure that regulated entities' debt ratings have no negative impact on ratepayers?

---

[7] PURA §§ 11.003(2) and 11.006.

48. Should a specific minimum investment grade be required to be maintained? If so, at what level?

49. Do the instruments creating the 2007 buyout debt, such as loan agreements, notes, trust indentures, security agreements and other collateral documents contain adequate acknowledgement that neither Oncor, Oncor AssetCo, nor Oncor OpCo are liable, directly or indirectly, for any such debt and provide that the creditors may not attempt to exercise any control over Oncor AssetCo or Oncor OpCo without the prior approval of the Commission?

50. Should any instruments creating a newly incurred debt obligation for the REIT entities require the Commission's prior approval? If so, should that approval include any restriction on creditor attempts to exercise control over Oncor AssetCo or Oncor Opco?

51. If Oncor OpCo is unable to satisfy a payment obligation to Oncor AssetCo or if Oncor AssetCo is unable to satisfy a payment obligation to the REIT, will such failure to satisfy such obligation constitute a default by the REIT parent of Oncor AssetCo? Would such default allow the creditors to gain control over Oncor AssetCo assets without prior approval of the Commission? Would such default constitute a change of control requiring Commission approval under PURA §§ 14.101, 39.262, or 39.915?

52. Under what circumstances, if any, can the creditors of the 2007 buyout debt remove the Oncor AssetCo management entity?

53. Are there any circumstances under which Oncor AssetCo, its direct or indirect owners or its creditors can remove the Oncor AssetCo management entity without the prior approval of the Commission?

54. What are appropriate consequences that would result from a violation of the ring fence provisions or other failures to comply with the Commission's final order in this proceeding?

## E. PURCHASERS' REGULATORY COMMITMENTS

55. Are the commitments identified by the purchasers allowed under PURA and otherwise legally enforceable? Should any of the regulatory commitments proposed by the purchasers be modified?

56. What is an appropriate level of independence for the boards of Oncor AssetCo and Oncor Holdings?

    a. Will a single, disinterested director as proposed by the purchasers constitute sufficient independence?

    b. What would constitute a "material relationship" within the context of the purchasers' regulatory commitments?

57. Is the dividend commitment made by the purchasers sufficient to prevent excess dividends?

58. Is a single, disinterested director of Oncor AssetCo and Oncor Holdings, out of a total of three directors, sufficient safeguard against the material actions defined in the purchasers' regulatory commitments, and the special approval rights commitment?

59. What would constitute a "material agreement or transaction" within the scope of the purchasers' regulatory commitments?

60. What would constitute "material assets or facilities" for purposes of the affiliate asset transfer commitments in the purchasers' regulatory commitments?

61. Is a single, disinterested independent party with a non-economic interest in Oncor OpCo sufficient safeguard against the filing of a petition of Oncor OpCo, or any person acting on behalf of Oncor OpCo, to commence any voluntary bankruptcy, liquidation, receivership, or similar proceeding?

62. How will the disinterested, independent party with a non-economic interest in Oncor OpCo be compensated?

63. What will be the basis for calculating the "historical working capital needs of the business?"

64. What is an appropriate amount for the additional cash reserve for contingencies to be held by Oncor OpCo?

65. Are the restrictive covenants in the leases between Oncor AssetCo and Oncor OpCo restricting Oncor OpCo from incurring debt, effecting asset sales, creating or incurring liens, engaging in certain business activities, and undergoing change of control transactions, without consent from Oncor AssetCo, sufficient safeguard on activities of Oncor OpCo?

    a. Would these restrictive covenants interfere with Oncor OpCo's obligation to fund improvements to the electrical system, in accordance with item 12 of the Docket No. 35287 commitments, if Oncor AssetCo fails to meet its obligation to fund improvements?

66. What is the scope of the applicants' commitment to hold ratepayers harmless for any fees or expenses or incremental borrowing costs associated with the transaction? Is the payment to Oncor OpCo for the CCN included in within this commitment?

67. Is the purchasers' jobs preservation commitment for two years after closing of sufficient duration?

68. Which entity in the post-closing structure will assume the Oncor Entities' employment, severance, retention, termination, and change in control arrangements? Will that entity have sufficient funds to do so?

69. Is the applicants' commitment to make at least the amount of capital expenditures as set forth in Oncor's current long-range plan for three years following the date of the closing, subject to certain adjustments a reasonable commitment?

70. What other regulatory commitments should the Commission require, if any, to ensure that the transaction is in the public interest?

### F. TEXAS TRANSMISSION INVESTMENT

71. Should approval of the transactions described in the application be conditioned on the successful acquisition of the minority share of Oncor held by Texas Transmission Investment, LLC?

72. What is the status of the minority interest acquisition?

73. Because of the special rights possessed by the Texas Transmission Investment group, would the removal of their minority stake in Oncor constitute a change in control for purposes of PURA §§ 14.101, 39.262(l) or 39.915(a)?

74. Would it be in the public interest for Texas Transmission Investment, LLC (or some other independent party) to maintain a minority interest in Oncor AssetCo or Oncor Opco?

### G. OTHER ISSUES

75. What conditions, if any, should the Commission place on an approval of the proposed transaction?

76. What reporting requirements or reviews, if any, should be required?

This list of issues is not intended to be exhaustive. The parties are free to raise and address any issues relevant in this docket that they deem necessary, subject to any limitations imposed by the Commission in future orders issued in this docket. The Commission reserves the right to identify any additional issues or areas that must be addressed.

## II. Effect of Preliminary Order

This Order is preliminary in nature and is entered without prejudice to any party expressing views contrary to this Order before the Commission at hearing. The Commission, upon its own motion or upon the motion of any party, may deviate from this Order when circumstances dictate that it is reasonable to do so. The Commission will not address whether this Order should be modified except upon its own motion. Furthermore, this Order is not subject to motions for rehearing or reconsideration.

SIGNED AT AUSTIN, TEXAS the 15th day of October 2015.

PUBLIC UTILITY COMMISSION OF TEXAS

_____
DONNA L. NELSON, CHAIRMAN

_____
KENNETH W. ANDERSON, JR., COMMISSIONER

_____
BRANDY MARTY MARQUEZ, COMMISSIONER

q:\cadm\orders\prelim\45000\45188dpo2.docx