IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ENERGY FUTURE HOLDINGS CORP., *et. al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 14-10979 (CSS)<br><br>(Jointly Administered) |
| ENERGY FUTURE HOLDINGS CORP.,<br><br>Plaintiff,<br><br>v.<br><br>TEXAS TRANSMISSION INVESTMENT LLC,<br><br>Defendant. | Adv. Pro. No. _____ |

## ADVERSARY COMPLAINT

Plaintiff Energy Future Holdings Corp. ("EFH") brings this Adversary Complaint for breach of contract and specific performance against Defendant Texas Transmission Investment LLC ("TTI").

## INTRODUCTION

1. TTI has breached its contractual obligations to sell all of its minority interest in Oncor Electric Delivery Company LLC ("Oncor") to Ovation Acquisition I, L.L.C. ("OV1") and Ovation Acquisition II, L.L.C. (together with OV1, "Buyers").

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered on a final basis, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at www.efbcaseinfo.com. In this Adversary Complaint, the debtors in these chapter 11 cases are referred to as "Debtors."

2.   In November 2008, EFH arranged for TTI to acquire a 19.75% equity stake in Oncor through Oncor's issuance of new membership interests to TTI. At that time, both EFH and TTI knew EFH's 80.03% indirect interest in Oncor might be sold to a third party directly, indirectly or through an entity established for purposes of an initial public offering ("IPO"). They also knew that if TTI could refuse to sell its minority interest in Oncor at the same time, interested buyers would likely offer a discounted price for EFH's controlling interest due to the presence of a minority member with corporate governance rights.

3.   Planning for this eventuality, TTI and EFH agreed in an Investor Rights Agreement ("IRA") that if an offer was made to purchase EFH's interest in Oncor—directly, indirectly or through an entity established for purposes of an IPO—EFH could "drag-along" TTI and compel TTI to sell its interest to the same buyer or buyers at a proportionate price (the "Drag-Along Rights"). The parties also agreed that EFH could compel TTI to take all actions that EFH deems necessary or advisable to prepare for and consummate an IPO (the "IPO Conversion Rights").

4.   In exchange, EFH agreed that it would be able to exercise its Drag-Along Rights only if TTI achieved an internal rate of return (the "IRR," as defined in the IRA) on its investment of 10% or higher.

5.   EFH and its wholly owned subsidiary, Energy Future Intermediate Holding Company LLC ("EFIH"), are now Debtors in the above-captioned chapter 11 cases (the "Chapter 11 Cases"). A key element of Debtors' proposed plan of reorganization is the sale of their indirect interest in Oncor.

6.   On August 9, 2015, Buyers, EFH, and EFIH executed a Purchase Agreement and Agreement and Plan of Merger (the "Merger Agreement") in which, among other things, EFH

agreed to sell its indirect interest in Oncor to Buyers (the "Sale"). The Merger Agreement is contingent upon the conversion of Oncor to a real estate investment trust ("REIT") for the express purpose of an initial offering of securities of reorganized EFH's successor pursuant to a rights offering that will be registered under the Securities Act of 1933, as amended (the "IPO Conversion Plan").

7.  Buyers also have offered to purchase TTI's 19.75% interest in Oncor at the same price (on a pro-rata basis) provided in the Merger Agreement for the purchase of EFH's 80.03% indirect interest in Oncor. Under Buyers' offer, TTI will be paid an amount that represents an IRR in excess of 10%, which is a favorable return on investment over a period of significant decline in the wholesale electricity market in Texas.

8.  Consistent with EFH's Drag-Along Rights and IPO Conversion Rights, on September 4, 2015, EFH sent a notice to TTI notifying it that (a) EFH intended to exercise its Drag-Along Rights if necessary to consummate the Sale, and (b) EFH intended to effectuate the REIT conversion contemplated in the Merger Agreement as part of the IPO Conversion Plan (the "Required Sale Notice"). This Required Sale Notice also requested TTI's assurances that it will comply with its obligations under the IRA, including those obligations related to EFH's Drag-Along Rights and the IPO Conversion Rights.

9.  Notwithstanding the express provisions of the IRA, on September 11, 2015, TTI notified EFH that it would not comply with its obligations under the IRA or otherwise honor EFH's Drag-Along Rights and IPO Conversion Rights. Instead, TTI argued that the Sale and the Required Sale Notice did not trigger EFH's Drag-Along Rights or IPO Conversion Rights under the IRA.

3

10. In breach of its contractual obligations under the IRA, TTI is refusing to deliver its Oncor interest unless it is paid even more than it is entitled to under the terms of the IRA (*i.e.*, more than its pro-rata share of the Oncor purchase price). TTI hopes that the threat of delaying EFH's restructuring and Buyers' acquisition of complete ownership of Oncor will force Buyers to offer an even higher price. TTI has even sought to insert itself in Debtors' bankruptcy proceeding, by submitting a Reservation of Rights [D.I. 5973] asking this Court to insulate TTI from necessary rulings in connection with Debtors' *Third Amended Joint Plan of Reorganization* [D.I. 5244] (as amended, modified, or supplemented from time to time, including through Debtors' filing of the Fifth Amended Plan on September 21, 2015, the "Plan").

11. TTI does not and cannot dispute that it has an express obligation under the IRA to sell its interest in Oncor when EFH's Drag-Along Rights have been triggered and exercised. But TTI maintains that the Drag-Along Rights have not been triggered by the Sale, the terms and conditions of the Merger Agreement or the Required Sale Notice.

12. TTI is wrong. It is in breach of the IRA because it has not agreed to sell its Oncor interests to Buyers notwithstanding its express obligation to do so in light of EFH's election to exercise its Drag-Along Rights.

13. TTI agreed in the IRA that a breach of any obligation in Sections 3.3 and 3.7 of the IRA is material, and TTI further agreed that there is no adequate remedy at law for TTI's breach of Article III of the IRA. Indeed, in recognition of the importance of EFH's Drag-Along Rights and IPO Conversion Rights and the special nature of an ownership interest in Oncor, the IRA expressly provides for enforcement of those rights through the remedy of specific performance.

14. Accordingly, EFH is entitled to a judgment ordering TTI to specifically perform all of its obligations under Article III of the IRA, including, but not limited to, (a) its obligation to sell its interests in Oncor on the terms and conditions offered by Buyers under the Merger Agreement and the Required Sale Notice, and (b) its obligation to cooperate with Oncor and EFH in implementing the IPO Conversion Plan.

## JURISDICTION AND VENUE

15. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012, because this adversary proceeding arises in and relates to the Chapter 11 Cases.

16. This is a core proceeding under 28 U.S.C. § 157(b) because it relates to the administration and property of the bankruptcy estate in the Chapter 11 Cases, including in connection with the Plan. EFH consents to this Court's entry of final orders with regard to any claim in this action.

17. Venue is proper pursuant to 28 U.S.C. § 1409 because this adversary proceeding arises in and relates to the Chapter 11 Cases, which are pending in this Court.

## PARTIES

18. Plaintiff EFH is a Texas corporation with its principal place of business in Dallas, Texas. It indirectly owns an 80.03% interest in Oncor. On April 29, 2014, EFH, together with the other Debtors, filed in this Court voluntary petitions for protection under chapter 11 of the United States Bankruptcy Code.

19. Defendant TTI is a Delaware limited liability company. It owns a 19.75% minority interest in Oncor and is a party in interest in the Chapter 11 Cases.

## FACTUAL ALLEGATIONS

20. When TTI invested in Oncor, TTI agreed that it could be compelled to sell its interest in Oncor under certain circumstances. Those circumstances now exist, but TTI refuses to sell its interest in Oncor in accordance with the Required Sale Notice.

### I. EFH seeks out a minority member in Oncor primarily to maintain Oncor's investment-grade credit rating.

21. Oncor is an electric utility that operates the largest transmission and distribution system in Texas. The system covers more than 91 counties and over 400 municipalities and delivers electricity to more than 3.2 million homes and businesses. Oncor operates more than 120,000 miles of transmission and distribution lines.

22. Oncor is a monopoly regulated by, among others, the Public Utility Commission of the State of Texas, which oversees Oncor's operations and approves the rates Oncor charges its ratepayers.

23. In October 2007, all of the outstanding shares of common stock of then-TXU Corp. were sold to private investors, creating EFH (the "2007 Transaction"). At that time and until November 2008, EFH wholly owned Oncor indirectly through its subsidiary EFIH.

24. At the time of the 2007 Transaction, Oncor—as a regulated utility with a regulated rate base—enjoyed an investment-grade credit rating, which allowed Oncor to borrow money and obtain credit at lower rates than non-investment grade companies. One of EFH's objectives after the 2007 Transaction was to maintain Oncor's investment-grade credit rating to avoid additional costs and credit-posting requirements.

25. To achieve this objective, EFH agreed to implement certain "ring-fencing" measures with respect to its investment in Oncor. One of these measures was to sell approximately 20% of its interest in Oncor to an independent third party.

## II. EFH sells 19.75% of Oncor to TTI, provided that TTI agrees to sell such interest in the event of a change of control of Oncor.

26. To identify potential purchasers of a minority stake in Oncor, EFH conducted a typical sales process. Through that process, EFH identified TTI as a potential buyer.

27. TTI held itself out to EFH as majority owned by two investment funds, Borealis Infrastructure Corporation and GIC Special Investments Pte Ltd, both of which invest in stable assets that often have regulatory barriers to entry. TTI is owned by sophisticated investors and was advised by respected financial and legal advisors in connection with the sales process.

28. After negotiating definitive agreements, on November 5, 2008, EFH sold a 19.75% interest in Oncor to TTI, which was (and continues to be) an unaffiliated third party. At or around the same time, EFH sold an approximately 0.22% interest in Oncor to Oncor's management.

29. EFH retained an approximately 80.03% indirect interest in Oncor. Today, EFH owns that interest through two of its subsidiaries, EFIH and Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings"). EFH wholly owns EFIH, which wholly owns Oncor Holdings, which owns approximately 80.03% of Oncor.

30. From the outset, TTI and EFH knew EFH's interest in Oncor might be sold to a third party or taken public, and they negotiated contractual rights in favor of EFH accordingly. EFH needed to ensure that if such a sale or IPO occurred, the purchaser or purchasers would be able to purchase 100% of Oncor, including TTI's interest. This was particularly important because the continued presence of a minority member with corporate governance rights could impair the amount that a future potential purchaser might be willing to pay for EFH's interest in Oncor.

31. TTI understood and accepted EFH's need to be able to force TTI to sell its interests in Oncor in certain circumstances. To effectuate this intent, TTI agreed in the IRA to grant EFH the Drag-Along Rights and IPO Conversion Rights. Both provisions were material terms of the bargain, and EFH would not have sold its interest to TTI without these provisions.

32. Under the IRA, EFH's Drag-Along Rights permit it to compel the sale of TTI's stake in Oncor for the same proportionate purchase price agreed to by EFH. Under the IRA, the parties recognized EFH's need to be able to force a sale, as well as TTI's desire to have an acceptable rate of return on its investment in Oncor. To balance these goals, the parties agreed that EFH could not invoke its Drag-Along Rights unless TTI achieved a certain rate of return on its Oncor investment. The parties actively negotiated the specific level of return required, and ultimately agreed that an IRR threshold of 10% was appropriate.

**III.    EFH and TTI enter into the Investor Rights Agreement.**

33. EFH and TTI memorialized these and other agreements in the IRA, dated November 5, 2008. Ex. A (IRA). The IRA and the Second Amended and Restated Limited Liability Company Agreement of Oncor, also dated as of November 5, 2008 (as amended, the "LLC Agreement"), control the governance of Oncor and the relationship between EFH and TTI concerning Oncor. In the event of a conflict between the two agreements, the IRA controls. IRA § 2.5. The IRA is governed by New York law. IRA § 5.6(a).

34. In general, the IRA sets forth agreements between EFH and TTI governing (a) the transferability of their respective membership interests in Oncor (including restrictions on transferability, rights of first refusal, and "drag" and "tag" along provisions), (b) pre-emptive rights with respect to new issuances of membership interests in Oncor, and (c) preparations for an IPO.

8

35. Several provisions of the IRA are material to this dispute. The first material provision concerns the Drag-Along Rights in Article III, Section 3.3 of the IRA, which ensure that if EFH receives an offer to sell or transfer its indirect majority interest in Oncor to a third-party buyer or buyers, it can compel TTI (as a minority member of Oncor) to sell its membership interests to the same buyer or buyers. In other words, EFH can effectuate the sale of the entirety of Oncor to a third-party buyer or buyers rather than just EFH's majority stake.

36. More specifically, EFH may enforce its Drag-Along Rights as to TTI if the following conditions are met: (a) EFH receives an offer to purchase its indirect interest in Oncor as part of a transaction that would result in a "Change of Control" of Oncor, IRA § 3.3(a)[2]; (b) TTI receives "terms and conditions no less favorable in the aggregate than those offered to the other [Oncor] Members," IRA § 3.3(d)(i); (c) TTI achieves "an [internal rate of return] on its initial investment in [Oncor] . . . of no less than 10.0%" as a result of the transaction, IRA § 3.3(d); (d) with certain exceptions, TTI is paid in cash for its Oncor interest, IRA §3.3(d)(ii); and (e) EFH delivers to TTI a written notice, at least 20 business days before the anticipated closing date, that contains the "material terms and conditions of the [transaction]," IRA § 3.3(a)-(b) (collectively, the "Conditions Precedent to EFH's Drag-Along Rights").

37. Upon receipt of a Required Sale Notice, the IRA requires TTI to sell or otherwise transfer the interest specified in the Notice and "to take or cause to be taken all other actions as may be reasonably necessary to consummate the Required Sale,"[3] including, without limitation,

---

[2] Under the IRA, a "Change of Control" includes a "sale by [Oncor] ... to a Person (or group of Persons acting in concert) of equity interests that results in any Person (or group of Persons acting in concert) owning more of the equity interests of [Oncor] ... than [certain affiliates of EFH]." *See* IRA, Definitions.

[3] Under the IRA, a "Required Sale" is defined as a transaction in involving the sale of interests (including the interests to be sold pursuant to the Drag-Along Rights) sufficient to result in a Change of Control. *See* IRA § 3.3(a).

9

(a) voting in favor of the Required Sale, if its vote is required, (b) consenting in writing to the Required Sale, and (c) using reasonable efforts to cause any individuals it designated or nominated to the Oncor Board to vote in favor of the Required Sale. IRA §3.3(c).

38. The second IRA provision material to this dispute is Article III, Section 3.7, which, among other things, allows EFH to request that the Oncor Board take any and all measures that EFH "deems necessary, advisable or convenient to create a suitable vehicle for an [IPO]." IRA § 3.7(a). Such measures may include (a) "amendment of the LLC Agreement," (b) "the merger, conversion or consolidation of [Oncor]," (c) "the formation of Subsidiaries and the distribution to Members of equity or other interests in such Subsidiaries," (d) "moving [Oncor] to another jurisdiction," and (e) "preparing an existing Affiliate of [Oncor] . . . to be a publicly traded entity." *Id.* The IRA defines all such actions that are taken "for the express purpose of an initial offering of the securities of [Oncor] for sale to the public in an IPO" as an "IPO Conversion." *Id.*

39. Section 3.7(a) of the IRA requires TTI "to cooperate . . . in good faith in order to effectuate the IPO Conversion," while Section 3.7(b) obligates TTI to take "all actions reasonably required by [Oncor] in connection with consummating the IPO Conversion." IRA § 3.7(a)-(b). Such actions include "the voting of any [membership interests in Oncor] in connection with any matters relating to the IPO Conversion . . . and using its reasonable efforts to cause any individuals designated or nominated by [it] to the Board to vote in favor of the IPO Conversion . . . [if] called to vote . . . and/or to consent in writing to the IPO Conversion." IRA §3.7(b). The IRA also recognizes that this agreement "authorizes [Oncor] to create and implement the IPO Conversion without the need for any . . . consent" on the part of TTI, subject to one limited condition. *Id.*

10

40.     The third IRA provision material to this dispute is Article III, Section 3.8, which expressly provides for the remedy of specific performance of TTI's obligations under Article III of the IRA, including Sections 3.3 and 3.7, in the event of TTI's breach of contract. Indeed, in Section 3.8 of the IRA, TTI "consent[ed] to . . . the issuance of an injunction or the enforcement of other equitable remedies against it at the suit of an aggrieved party . . . to compel specific performance of all of the terms of this Article III [including Sections 3.3 (Drag-Along Rights) and 3.7 (IPO Conversion Rights)]." IRA § 3.8.

41.     In Section 3.8 of the IRA, TTI further "acknowledge[d] that it shall be impossible to measure in money damages to [Oncor] or the Member(s) if [it] . . . fails to comply with any of the restrictions or obligations imposed by this Article III." IRA § 3.8. In that same section, TTI also "waive[d] any defenses" to specific performance or other equitable remedies, "including the defenses of: (i) failure of consideration; (ii) breach of any other provision of this Agreement; and (iii) availability of relief in damages." *Id.*

**IV.    Buyers offer to buy EFH's and TTI's interests in Oncor.**

42.     On August 9, 2015, EFH, EFIH, and Buyers entered into the Merger Agreement for Buyers to acquire all of EFH's indirect equity ownership in Oncor. Ex. B (Merger Agreement). Under the Merger Agreement and related documents, OV1 will be converted into a corporation and its equity securities will be sold to the public in an IPO pursuant to an effective registration statement under the Securities Act of 1933, as amended. Reorganized EFH will also merge at the same closing with and into OV1. At the closing of the transactions contemplated by the Merger Agreement and related documents, OV1 will be the successor to reorganized EFH and will indirectly own EFH's current interest in Oncor.

43.     As EFH and TTI foresaw when they negotiated the IRA, third parties—in this case, Buyers—want to purchase all of Oncor in a Change of Control transaction. To that end, on

11

RLF1 13168299v.1

August 9, 2015, EFH received from Buyers an offer to acquire all of EFH's and TTI's equity interest in Oncor ("Offer Letter"). Ex. C (Offer Letter).

44. Buyers' purchase of EFH's and TTI's interests in Oncor is a part of a merger or sale transaction that will result in Buyers owning a majority of the equity interests in Oncor. Accordingly, the transactions contemplated by Buyers' offer would constitute a Change of Control within the meaning of the IRA.

45. Buyers' obligation to consummate the Sale contemplated by the Merger Agreement is subject to and conditioned upon a number of events, including, without limitation, implementation of the IPO Conversion Plan. Merger Agreement § 7.2(j). Consistent with its decision to enter into the Merger Agreement, EFH intends to take all necessary steps to satisfy those conditions within its control, including, without limitation, taking all steps necessary to implement the IPO Conversion Plan.

46. TTI may attempt to frustrate the sale of Oncor to Buyers by refusing to cooperate with the IPO Conversion Plan, which is a condition precedent to Buyers' obligation to consummate the Sale reflected in the Merger Agreement. EFH has sought to eliminate this risk by invoking its Drag-Along Rights in connection with the Offer, thus allowing Buyers to acquire TTI's interest in Oncor and ensuring that TTI cannot prevent the IPO Conversion Plan.

**V.    EFH proposes a reorganization based on a change of control of Oncor.**

47. Debtors filed voluntary chapter 11 petitions with this Court on April 29, 2014. Since that time, Debtors have tried to reach a consensual restructuring agreement with their constituents. From the start, EFH recognized that the sale of its indirect interest in Oncor would be integral to any plan of reorganization.

48. On August 10, 2015, the day after EFH, EFIH, and Buyers entered into the Merger Agreement, Debtors filed the Plan. The Sale is the centerpiece of the Plan on the "E"-

side of Debtors' business, and, as noted above, that aspect of the Plan depends on the effectuation and implementation of the IPO Conversion Plan.

49. All creditors of EFH and EFIH would be unimpaired under the Plan based on the significant proceeds to be realized from EFH's sale of its indirect interest in Oncor.

## VI. EFH delivers the Required Sale Notice to TTI.

50. On or about September 4, 2015, EFH sent to TTI a Required Sale Notice describing the terms and conditions of the Buyers' Offer Letter and the Merger Agreement. Ex. D (Required Sale Notice). The Required Sale Notice and the transactions described therein satisfy all Conditions Precedent to EFH's Drag-Along Rights.

51. The Required Sale Notice makes clear that the IPO Conversion Plan described in the Offer Letter and the Merger Agreement is specifically intended to effectuate an IPO Conversion, as that term is defined in the IRA, which EFH intends to support in order to conclude the Sale to Buyers.

52. In addition, the Required Sale Notice requested from TTI adequate assurances, in writing, that TTI intended to honor and perform its obligations under the IRA, including its obligations under Article III of the IRA to sell to Buyers on the terms and conditions in the Required Sale Notice and to support the IPO Conversion Plan.

53. The Required Sale Notice stated that "[b]ased on certain assumptions made by [Buyers], the aggregate purchase price being offered by [Buyers] for the [Oncor] LLC Units held by TTI is expected to be $2,190,867,500.00." In the sale, TTI will receive an amount that represents an IRR in excess of 10%. As a result, the IRR hurdle required to invoke EFH's Drag-Along Rights in the IRA will be satisfied.

### VII. TTI breaches the IRA.

54. Despite Buyers' offer to purchase TTI's interest in Oncor for an amount in excess of that required by the IRA and notwithstanding TTI's obligations to sell that interest under the IRA, TTI refuses, in breach of the IRA, to participate in the Sale.

55. TTI disputes that EFH's Drag-Along Rights and IPO Conversion Rights have been validly triggered as a result of the Merger Agreement and the Required Sale Notice. Indeed, TTI has renounced EFH's Drag-Along Rights and IPO Conversion Rights by asserting that (a) TTI has no current obligation under the IRA to sell its minority interest in Oncor and does not intend to do so, and (b) TTI has no current obligation under the IRA to assist and cooperate with the IPO Conversion Plan and does not intend to do so.

56. Specifically, on September 11, 2015, TTI sent a letter to EFH, stating that it "does not agree . . . that the Required Sale Notice and [Buyers'] Offer trigger the drag-along requirements of Section 3.3 of the Investor Rights Agreement or TTI's IPO Conversion Cooperation obligations in Section 3.7 of that agreement." Ex. E (9/11/15 Letter).

57. Three days later, on September 14, 2015, TTI filed a Reservation of Rights with this Court purporting to reserve its rights to object to the Plan, Debtors' disclosure statement, the Required Sale Notice, the Merger Agreement, and any matter in which the value or amount of claims against Debtors is determined on the theory that it could affect the price offered to TTI. D.I. 5973. In this filing, TTI objected to the adequacy of the Required Sale Notice and reiterated its erroneous contention that the Required Sale Notice did not trigger EFH's Drag-Along Rights under the IRA. TTI stated, among other things, that the "Offer described in the Required Sale Notice does not satisfy the conditions needed to effectuate the drag," and that the "defects in the Required Sale Notice and Offer . . . can be litigated at an appropriate time." *Id.*

14

58. On September 21, 2015, TTI wrote to EFH again asserting that "TTI does not agree that [EFH's] Required Sale Notice and appended Offer [Letter] trigger the drag-along requirements of Section 3.3 of the [IRA] or TTI's IPO Conversion cooperation obligations in Section 3.7." Ex. F (9/21/15 Letter).

59. TTI's objection to the Required Sale Notice has no merit. Instead, it is a strategic tactic by TTI intended to obtain a higher purchase price by threatening to, among other things, block the Sale and scuttle Debtors' Plan.

## CAUSE OF ACTION

### (Breach of Contract and Specific Performance)

60. EFH re-alleges and incorporates each of the above allegations as if set forth in this cause of action.

61. EFH and TTI executed and are parties to the IRA, which is a valid, binding, and enforceable contract.

62. EFH has performed its obligations under the IRA, except those excused by TTI's prior breaches of the IRA.

63. TTI has breached the IRA and violated EFH's Drag-Along Rights under Section 3.3 by failing to agree to sell its membership interest in Oncor to Buyers on the terms and conditions set forth in the Required Sale Notice and the Offer Letter.

64. Given the special nature of an ownership interest in Oncor, its critical importance to Debtors' Plan, and the express terms of Section 3.8 of the IRA, EFH has no adequate remedy at law for TTI's breach of the IRA.

65. EFH is entitled to a judgment directing TTI to specifically perform all of its obligations under Article III of the IRA, including, but not limited to its obligations to: (a) sell its membership interest in Oncor to Buyers on the terms, conditions, and price set forth in the

15

Required Sale Notice and the Offer Letter; (b) vote, if its vote is required by the IRA, the LLC Agreement or otherwise, its Oncor LLC units in favor of the Sale of Oncor to Buyers at any meeting of Oncor members called to vote on or approve the Sale and/or to consent in writing to the Sale; (c) use its reasonable efforts to cause any individuals designated or nominated by it to the Oncor Board to vote in favor of the Sale in a vote of the Board called to vote on or approve the Sale and/or consent in writing to the Sale, if their vote is required by the IRA, the LLC Agreement or otherwise; (d) enter into agreements relating to the Sale and to agree (as to itself) to make to Buyers the representations, warranties, covenants, indemnities, and agreements as any affiliates of EFH agree to make in connection with the Sale; (e) take or cause to be taken all other actions as may be reasonably necessary to consummate the Sale; and (f) take all actions required of it to implement the IPO Conversion Plan in order to consummate the IPO Conversion.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff EFH respectfully requests that the Court enter judgment in its favor and award relief as follows:

> A. an order of specific performance directing TTI to: (1) sell its membership interest in Oncor to Buyers on the terms, conditions, and price set forth in the Required Sale Notice and the Offer Letter; (2) vote, if its vote is required by the IRA, the LLC Agreement, or otherwise, its Oncor LLC units in favor of the Sale of Oncor to Buyers at any meeting of Oncor members called to vote on or approve the Sale and/or to consent in writing to the Sale; (3) use its reasonable efforts to cause any individuals designated or nominated by TTI to the Oncor Board to vote in favor of the Sale in a vote of the Board called to vote on or approve the Sale and/or consent in writing to the Sale, if their vote is required by the IRA, the LLC

17

Agreement or otherwise; (4) enter into agreements relating to the Sale and to agree (as to itself) to make to Buyers the representations, warranties, covenants, indemnities and agreements as any affiliates of EFH agree to make in connection with the Sale; (5) take or cause to be taken all other actions as may be reasonably necessary to consummate the Sale; and (6) take all actions required of it to implement the IPO Conversion Plan in order to consummate the IPO Conversion;

B.    an award of costs, expenses and reasonable attorneys' fees, both at trial and on appeal, in addition to all other sums allowed by law; and

C.    such other relief that this Court deems just and equitable.

*[Remainder of page intentionally left blank.]*

Dated: October 19, 2015
Wilmington, Delaware

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:   (302) 651-7700
Facsimile:   (302) 651-7701
Email:       collins@rlf.com
             defranceschi@rlf.com
             madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:       edward.sassower@kirkland.com
             stephen.hessler@kirkland.com
             brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:       james.sprayregen@kirkland.com
             marc.kieselstein@kirkland.com
             chad.husnick@kirkland.com
             steven.serajeddini@kirkland.com

*Co-Counsel to Energy Futures Holding Corp.*