**FINAL**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SS Body Armor I, Inc., *et al.*,[1] | ) | Case No. 10-11255 (CSS) |
| | ) | |
| Debtors. | ) | Jointly Administered |

**DECLARATION IN SUPPORT OF CLAIMS
OF D. DAVID COHEN AND IN RESPONSE
TO  DEBTORS OBJECTIONS TO CLAIMS**

D. David Cohen, Esq. swears and affirms as follows:

Preliminary Statement

This is the bankruptcy of a publicly owned entity which, with its public shareholders, were undemocratically ruled, cheated, abused with the entity ransacked in now proven criminal schemes (2003-2006).  Then, the entity was horn swaggled into a consolidated Class Action/Derivative Action Federal Court Settlement in which the wrongdoers would have been forgiven, released, and indemnified without requiring them to make any payment whatsoever to the Victims. (2006-2008).  The Settlement left the principal wrongdoer in voting control of the publicly-owned entity,

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax Identification numbers are: SS Body Armor I, Inc. ((9361) f/k/a Point Blank Solutions, Inc., SS Body Armor II, Inc. (4044) f/k/a Point Blank Body Armor, Inc.; SS Body Armor III, Inc. (9051) f/k/a Protective Apparel Corporation of America; and PBSS LLC (8203).

and he soon created a scheme for the replacement of an independent Board of Directors by representatives of a New York Hedge Fund.  The Hedge Fund has since 2009 also ruled undemocratically, without elections, and filed for bankruptcy of the entity, <u>without any assertion of the claims against the principal wrongdoer</u>.  The Debtor now proposes a Plan (preliminarily approved) in which there would be zero current payment to unsecured creditors, zero current payment to victims of the prior crimes, and zero current payment to the share owners of the entity; while there is to be an approximately $30 Million distribution to the bankruptcy lawyers and the Class Action lawyers.

This Plan has been opposed by D. David Cohen ("Cohen"), a former (2002) executive of the publicly-owned entity who has been a long term advocate for the Debtor, the Victims, and the public shareholders, and against the crimes and other shenanigans which have taxed the public and publicly-owned Debtor.  This is a Memorandum by Cohen in support of his own claim in Bankruptcy in the amount of One Million Eight Hundred Eighty Six Thousand Eight Hundred Fifty Dollars ($1,886,850).  Cohen's claim is based on compensation denied to him when he became an advocate against the original criminality on specific claims of

breach of contract, fraud, intentional and tort oppression and <u>Quantum Meruit</u>.

<u>Introduction</u>

1.    Point Blank Solutions, Inc., now SS Body Armor I, Inc., and subsidiaries (the "Debtors") object to the claims of D. David Cohen, Esq. ("Cohen").  In this Declaration and accompanying Memorandum, Cohen submits his response to Debtors Objections.

2.    For a long time prior to this bankruptcy, Debtor was known as DHB Industries, Inc. ("DHB").  David H. Brooks ("Brooks") was the President, Chairman, Chief Executive Officer and largest single shareholder of DHB, a publicly-owned Company. Cohen was an attorney for, and then briefly an executive employee of DHB, in periods prior to June of 2002.  The Petition in Bankruptcy was filed on <u>April 14, 2010</u>, eight years later.  The current Settlement and Plan proposes to resolve the Bankruptcy by using Thirty Million Dollars[2] ($30,000,000) of litigation assets that Cohen and his counsel, Carter Ledyard Milburn ("CLM") saved for the Debtor, during the years prior to the filing and seeks to do so without paying CLM the fees due to it under the long

---

[2] The Original Settlement was funded with $35,200,000 deposited by the Debtor.  More than $20,000,000 are in an escrow account.  Close to $10,000,000 was conditionally paid to Class Counsel.

established    securities    laws/principles,    rules    and procedures, and without any credit to Cohen.

3.    Cohen    asserts    that    he    acted    professionally, properly and promptly <u>for the Debtors</u>, when the <u>Debtors themselves</u> and all of the attorneys, were making repeated efforts to <u>forgive, release and indemnify</u> Brooks.    One would imagine that any successor counsel for the Debtors concerned with Debtors best interests and financial solvency would have been appreciative of, and cooperative with,    Cohen    and    CLM.    Instead,    from    the    inception, Bankruptcy Counsel has been aggressively anti-Cohen and anti-CLM.    The Original Settlement Agreement was thrown out by the Second Circuit on September 30, 2010, during the pendency    of    this    Bankruptcy.[3]    Debtors    Counsel    have nonetheless failed and refused to pursue the Class Action litigation against Brooks <u>et al</u>.  They expended millions of dollars of attorney time on alternate routes belatedly adopted to reject the Original Settlement and seek a turnover of the escrow assets.    But, when those efforts never reached a final conclusion, they relied upon Cohen's and CLM's victory in the Court of Appeals, <u>Cohen v. Viray</u>,

---

[3] After explaining for years that the Class Action and derivative action were intrinsically tied to one another, the Debtors assert that the only derivative action was reversed, and chooses to proceed with the Class Action Settlement.  In the Plan, Debtors abandon all of the individual Defendants for zero consideration.

622 F.3d 188 (2d Cir. 2010) to construct a new Settlement, without, as stated, any credit to Cohen or CLM.

4.    In the new Settlement, the losing parties before the Second Circuit propose to again release Brooks from his civil liability in order for them to receive up to thirty (30) Million Dollars out of the escrow to pay themselves, while paying CLM zero, and ignoring entirely the indebtedness and other stated obligations to Cohen. In the objections to Cohen's claim and CLM's claim, the alleged primary sin is that Cohen and CLM did not join in the chorus praising the Plan solution.  Cohen's objections to their Plan, they claim, are only a mask for Cohen seeking fees for himself (though Cohen does not now, or previously, seek any fees for himself)[4].

5.    This new Settlement came about only after Debtors failed and refused for more than four years to proceed with the Class Action claims against Brooks et al.  In late 2014, the lawyers for Debtors and Class Counsel/derivative Counsel decided to give away all of the Class claims against Brooks and all of the other wrongdoers.  Brooks is not a party to the Settlement.  The $35,200,000 originally

---

[4] Cohen fully supports the fee claims of CLM (see ¶11 infra and CLM will owe Cohen $139,000 (advanced by him to CLM) if CLM collects a fraction of its fee claim.

put into escrow (by the Debtor for the Class Action Victims) is allocated for use as follows:

(a)  $9,925,000 to be retained by Class Action Counsel (and $300,000 to be retained by derivative counsel) even though there is <u>zero</u> recovery by the Class in the Class Action and there never will be any such recovery);

(b)  $20,000,000 is to be "borrowed" by Debtors, which will immediately pay all, or substantially all of such sum, to the Debtors lawyers and other administrators, including ($1,500,000) to Bankruptcy Counsel to Class Counsel, all as claimed priority expenses of the Bankruptcy.

Under the New Settlement, not one penny of new money is being invested in the Debtors; and

Not one penny of the Escrow Money will be currently paid to unsecured creditors of the Debtors;

Not one penny of the Escrow Money will be currently paid to members of the Class or other Victims of the civil wrongs; and

Not one penny of the Escrow Money will be currently paid to existing public shareholders of the Debtors.

6.    Cohen asserts he forthrightly disputed the New Settlement. Cohen does not agree that the New Settlement is a "good deal" for the Debtors or any other interest group, <u>except for the lawyers</u>.  For that reason, Cohen opposed the

New Settlement, but Cohen acknowledges that as the Debtors Plan has been the "only" Plan presented, and it is a Plan which sets forth "possibilities" of future recoveries for the creditors, the Class and the shareholders of the Debtor, including by relying inter alia on the possible SEC enforcement of Sarbanes Oxley §304 ("SOX 304") claims against Brooks for $186,000,000, that this Court could reasonably determine that it was left with no practical other alternative to end the Bankruptcy case.

The Debtors Objections to the Cohen Claims

7.    The Debtors objections to Cohen's claims are stridently stated and include these allegations:

Paragraph 11 asserts "Cohen has repeatedly tried to hinder Debtors' efforts to obtain approval of the Settlement Agreement, in the hopes of improving Cohen's positions in his claims – related negotiations with the Debtors and allowing Cohen to extract payment of substantial attorneys' fees from the Debtors in exchange for going away – in other words withdrawing his Opposition to a Settlement Agreement" supported by all the other interest groups. **This is totally false.  There is not an iota of evidence of Cohen was seeking, or ever sought, to extract attorneys fees or other consideration for himself as a condition for "going away".  Cohen was the whistle**

blower for the public Company from before the crimes were committed. He was verbally attacked and financially punished for that by the Debtor prior to Bankruptcy, and now the Bankruptcy lawyers double down with their unprofessional name calling and zealous overreaching retaliation against the only person whose personal conduct saved the $33 Million in escrow for the Debtor and made any Settlement, including this Settlement, possible in the first instance.

Paragraph 12 – Alleged example of "frivolous lengths" which Cohen has gone to try to disrupt the Settlement. . ." Nothing Cohen did in this matter was ever done frivolously. Cohen recently appeared before Judge Sontchi, as a witness and as a lawyer.  The Court heard the arguments made, and no one ever suggested during the proceedings in which Cohen participated that Cohen was acting frivolously.

Paragraph 13 – Cohen sought to "re-try" the issues (decided in this Court) in the EDNY proceedings.  In fact, dual Court approval was contemplated by the Debtors from the outset of their filing of the Plan, and CLM acted accordingly.

Paragraph 14 – Cohen made "meritless" arguments in the EDNY.  Cohen made no arguments in the EDNY.  CLM did, and in Cohen's opinion, none of such arguments can fairly be

called meritless despite the fact that the Order, drafted

<u>entirely by Debtors Counsel</u>, includes the word meritless.

Paragraph 15 – Cohen has "gone so far as to form an alliance with David Brooks and the Brooks family . . . even supported the Brooks family's efforts to build a consensus to replace the Debtor's <u>Independent</u> Board of Directors with a Brooks-sponsored Board." **Another monstrous lie. Steel Partners LP gained control of the Board of the Debtor <u>by its alliance</u> with Brooks in 2008-2009 (after Brooks' arrest on October 25, 2007). Though Steel sold all of its Shares in the Debtor promptly after the filing in April, 2010, Steal has ruled the Debtors autocratically for the last almost six years without a single shareholder meeting or shareholder vote on any matter. Cohen favored return of the EDNY Court approved truly independent Board of General Ellis and others, as I told the Court, and freely disclosed to the Court.**[5]

Paragraph 16 – "In sum" (<u>Debtors charge</u>) "Cohen's litigation strategy – in essence challenging an <u>undeniably</u> (emphasis added) 'good deal' for the Debtors by forcing the Debtors to respond to an almost endless series of often-

---

[5] Cohen had seven meetings with David H. Brooks in early 2015. The subject of the meetings was getting Brooks <u>to currently</u> authorize payment of Restitution to the Victims and to the Debtor. Brooks offered <u>$115 Million</u> in currently payable Restitution, a fact he permitted Cohen to disclose to Counsel for the Equity Committee. Cohen requested Debtor Counsel and other Counsel to cooperate in such discussions. Debtors Counsel would not do so leaving all the parties still with a Settlement in which Brooks is contesting 100% of the Restitution and paying nothing currently.

baseless arguments in the hopes of extracting a payment from the Debtors – has provided no benefit to the Debtors and their estates." **Again, a string of completely unprofessional total falsehoods, which should embarrass any meritorious counsel making such assertions. Those accusing Cohen of blackmail are the only ones making unwarranted multi-million dollar extractions from the Debtors' Estate.**

8.    The Debtors Bankruptcy Counsel's conduct is not new. Similar allegations were previously made by others representing the Debtor when Debtor was solely controlled by Brooks, before his personal criminal crookedness was exposed. Debtors' Bankruptcy counsel go further seeking to paint Cohen as a blackmailer seeking legal fees for himself as the price for "going along" with a transaction they dubiously call an "undeniably good deal". In response, Cohen asserts under oath that the allegations are not merely false, they are fraudulent, and part and parcel of a malicious, unethical campaign in order for the lawyers to walk off with close to Thirty Million Dollars ($30,000,000) for themselves, forcing all other interests "to wait" for other events which may, or may not, happen, before those legitimate creditors can get paid anything. Only lawyers who are egomaniacs could possibly describe such a Plan as an "undeniably good deal."

9.    <u>The  Truth</u>.    This  is  the  undisclosed  and
unvarnished truth about the history of these matters:

A.    DHB and its two operating subsidiaries were
manufacturers  of  body  armor  clothing  for  the  Defense
Department and for the U.S. Troops.  When 9/11 happened,
Cohen, a lawyer for DHB, was charged with responsibility
for securing a listing of the Common Stock of DHB on the
American    Stock    Exchange.    Cohen    undertook    that
responsibility  promptly,  successfully  securing  such  a
listing  (effective  February  1,  2002),  by  dealing
forthrightly  with  the  facts  that  DHB's  main  principal,
Brooks,  had  a  checkered  history  with  the  Securities  and
Exchange  Commission  and  that  NASDAQ  had  delisted  DHB's
Common Stock at the end of 1999.  The events of 9/11 thus
opened a significant financial opportunity for DHB, while
imposing  significant  obligations  on  DHB  to  the  Defense
Department and the Country.  The listing was obtained <u>inter
alia</u> through promises by DHB organized and vouchsafed for
by Cohen of good and proper corporate governance at DHB.

B.    Effective January 1, 2002, Cohen became a Senior
Vice President of DHB with responsibilities for mergers and
acquisitions  and  all  matters  of  corporate  governance.
Within months, Cohen was embroiled in disputes with Brooks
relating  to  corporate  governance.  Cohen  recognized  that

Brooks was "overreaching" and putting the publicly-owned entity at risk. Near the end of June 2002, Cohen's employment and engagement by DHB were summarily terminated. In accordance with his ethical obligations to DHB, and then to the provisions of the Sarbanes Oxley Act ("SOX"), adopted June 30, 2002, Cohen delivered a proper warning to the Audit Committee of DHB on <u>July 11, 2002</u> (more than 10 months before the Criminal Period began). The detailed report concluded that unless proper precautions were taken to supervise Brooks, it would lead to a disaster for DHB. The Debtor responded to Cohen's Audit Committee Report in part by permitting Brooks and/or Schlegel to convert a valuable 100,000 Share Warrant owned by Cohen. Cohen continued in 2003 and 2004 to be an advocate for the return of his own Warrant, and for the derivative interests of the publicly-owned Company.

C.    At the end of 2004, Brooks, DHB's Chief Operating Officer (Sandra Hatfield), DHB's Chief Financial Officer (Dawn Schlegel) and all of its directors (minus the newly elected General Ellis) engaged in a systematic cashless warrant raid on the publicly owned entity. In the last 33 days of 2004, they exchanged their Warrants (similar to the 100,000 Share Warrant which had been wrongfully withheld from Cohen) for publicly transferable Shares and

immediately sold the Shares partly to the public Company and mostly into the public market. The group, as a whole, received more than $210 Million; Brooks' share alone was $186 Million.

D.    After the "cashless raid" of December, 2004 occurred, Cohen accepted 40,000 DHB Common Shares as compensation for the wrongful conversion of his 100,000 Share DHB Warrant. The Debtors specifically valued the consideration at $588,800 and gave Cohen a 1099 in that amount. Debtors also stipulated that keeping the Shares registered was of the essence of the Settlement Agreement, then breached the agreement, making it impossible for Cohen to sell the Shares or to receive any significant part of represented capital sum. Under the Agreement, Debtor immediately owed Cohen Two Hundred Two Thousand ($202,000) for that violation. The sum is part of the claim.

E.    The Class Action law suits began in late summer of 2005. Consistent with his prior whistle blower activities, Cohen contacted Class Counsel early on in 2006 offering to "help" with his factual knowledge of the background "gratis" (for free) if only Class Counsel agreed to exercise its best efforts to get its recovery from Brooks and the other individual wrongdoers, before taking anything from the Debtor. Cohen shared some of his pre-

June, knowledge of the situation with Tom Wilhelm, Esq., an associate of Class Counsel. Mr. Wilhelm thanked Cohen for his offer of cooperation, but said Class Counsel could not accept Cohen's offer.

F.    In mid-2006, still during the later proven criminal period, Class Action Counsel, Derivative Counsel, the Debtors and Brooks all agreed to the Original Settlement of the Consolidated Class Action and Derivative Action (the "Original Settlement") which did the opposite and took the entire $35.2 Million recovery from the entity, without any contribution from the actual wrongdoers, though Brooks was permitted to make additional equity investments (about $22 Million) in DHB, solidifying his voting control of the entity.

10.    Against the odds, Cohen derivatively on behalf of the Debtor, commenced a fight against what he saw as the corrupt and abusive Original Settlement. But for Cohen's conduct, and the Second Circuit Court of Appeals decision secured by CLM's advocacy on September 30, 2010, the Settlement as now proposed would be unavailable and impossible of construction. If the Original Settlement had been allowed to conclude, there would be no money in escrow; no multi-million dollar claims against Brooks; and effectively no $186 Million in SOX 304 claims.

11. Cohen's Counsel, in the EDNY and before the Second Circuit Court of Appeals, was and is CLM. As Counsel for the successful appellant, CLM is clearly entitled to an award of fees and expenses for CLM's extensive work with respect to the successful appeal prosecuted before the Second Circuit, and determined on September 30, 2010, and for the additional work that has been required in connection with the protracted proceeding, which has taken more than five (5) years so far. Although Cohen has appeared pro se in these Bankruptcy proceedings, Cohen wholeheartedly supports CLM's application for fees and expenses in the amount of $1,860,000 as filed on September 25, 2015. Cohen seeks no attorneys fees for himself, not for his work in the EDNY Case, not even for his continuing pro se appearances throughout these Bankruptcy proceedings. Cohen did not keep his time, or even keep an accounting for his many thousands of dollars of out-of-pocket costs incurred throughout the Bankruptcy. Cohen's claims are not as a lawyer but as a principal, acting derivatively for the Debtor, in all of the events and proceedings, including being the successful derivative litigant in the Second Circuit, and as a Victim of Debtors many breaches of contract, torts designed to punish him and retaliate against him as a whistle blower.

12.  Under the New Settlement Plan, there is no new money being infused in the Debtor; the only money changing hands in the Settlement is the $20 Million to be "borrowed" by the Debtors from the escrow and then paid to lawyers. The escrow only still exists because of the actions taken by Cohen, _acting derivatively_ on behalf of the Debtor in the EDNY District Court, in the Second Circuit, and in this Court.  The escrow money is available to fund a Settlement because of Cohen's conduct, including the successful Appeal prosecuted by CLM.  Cohen acted derivatively for the Debtor.  Cohen put up One Hundred Thousand Dollars ($100,000) of his own money to make the appeal possible. No one else did that.

The Unraveling of DHB

13.  Within weeks after the end of 2004, the stock market price for the DHB Shares began to drop to lower and lower prices.  In August, 2005, DHB made a negative public announcement about its use of a fabric ("Xylon") from a Japanese supplier, which had failed in certain instances to effectively stop bullet penetration.  It was an industry wide problem, and DHB had _not_ used Xylon with its body armor clothing for the Defense Department, so the impact on DHB's business and financial affairs should have been modest, but DHB announced a $40 Million reserve.  The DHB

stock price took another large step down.    A number of class action/derivative action law suits were initiated against the Debtor, Brooks and the other officers and directors.

14.    Before long, the Class Counsel for a Consolidated Class Action was named, and a Derivative Counsel was appointed.    Class Counsel and Derivative Counsel ordinarily are at odds; in this case, they were not, they were two affiliated (brother) law firms.    Thomas Amon, Esq., the husband of a EDNY sitting Judge, was selected as co-counsel to the derivative Counsel.    The symbiotic relationship between Class and Derivative Counsel presented an unbalanced situation.    William Lerach, Esq.[6] in San Diego was the principal lawyer for Class Counsel on this matter. Sam Rudman, Esq. in New York was, and has been, his New York counterpart.

V.    The Original Settlement is reached

15.    The Original Settlement happened within the Criminal Period (May 1, 2003 to August 18/19, 2006) when Brooks controlled the Board of DHB and got his way on

---

[6] Mr. Lerach was later charged, arrested, and pled guilty to other Securities law offenses, paying cash bribes to Class Plaintiffs, and he was, on information and belief, disbarred.  The unlawful cash bribes to named plaintiffs were not dissimilar to the procedures which enabled Lerach to secure the appointment of derivative Counsel which was in Class Counsel's pocket.

everything.    As Judge Seybert observed in the District Court's Memorandum of Opinion of March 27, 2015:

> **"In 2003, Defendants began a number of schemes to reap millions in personal profit at the expense of the Company and its shareholders.   The sheer number and diversity of these fraudulent schemes strains belief.   It is no stretch to say that Defendants ransacked that Company for their own gain, and their conduct was devastating to both the Company and its shareholders."**

16.    Any suggestion that the Original Settlement was a worthwhile "achievement" <u>for</u> the Class or for the publicly-owned entity was, and is, a sad joke on the administration of justice.  Messrs. Lerach and Brooks reached an accommodation with Brooks in June, 2006 without any depositions or other discovery.   It was not modified for the August 19, 2006 indictment of Ms. Schlegel and Ms. Hatfield.    Nor, was it modified for the Board's substantially simultaneous acknowledgement that the DHB 2003, 2004 and 2005 financial statements were not reliable.

17.  Subsequent to the Settlement, Schlegel pled guilty to her participation in the crimes; Brooks was arrested and at least temporarily jailed; then Brooks and Hatfield were convicted of criminal fraud; and the SEC brought an administrative proceeding against three of the

DHB former directors (a majority of the persons who made the Settlement) charging them all of being Brooks' cronies who failed to adhere to their fiduciary duties to the Debtors; and the SEC brought separate SOX 304 proceedings (which are stayed) against Brooks and Schlegel.

18.  Cohen was an aggressive opponent to the Original Settlement.  Cohen initiated applications to the Department of Justice seeking and securing the DOJ's support opposing confirmation of the 2006 Settlement, and Cohen retained CLM to serve as his counsel to derivatively challenge the Original Settlement.[7]  No one else did that.

19.  Cohen did not oppose the Original Settlement because of some technicality.  Cohen opposed it because the Original Settlement violated, as he saw it, all of the standards of fundamental fairness and fair play for the publicly-owned Company.  By late 2007-2008, the DOJ, for itself, and for the SEC, agreed.  The District Court did not agree.  Brooks, then a Billionaire, was to be completely let off the hook of financial responsibility for his wrongdoing.  Brooks, and all the other individuals who had profited in their participation in the Cashless Warrant raid and other schemes, were asked to pay zero to the Class

---

[7] Debtors make much of the fact that Cohen elected not to be a member of the Class.  Cohen did that because it was necessary to derivatively appeal the Original Settlement, not for any personal advantage.

Plaintiffs and zero to the Debtor. They were to be released, forgiven and in Mr. Brooks' (and Ms. Schlegel's) case, also indemnified. The unlawful Indemnification stuck out like a sore thumb. Brooks estimated liability to the Debtor under SOX 304, exceeded $186 Million. His liability for the $186 Million was a virtual certainty. His capacity to pay (at that time) unquestioned. In the Settlement, Brooks was purportedly "pushed" out of management, but he was left with the single largest stock position, effective voting control of the entity, and no restrictions on his exercise of that power.

20. The release, forgiveness of and Indemnification in the Original Settlement was an abusive "sweetheart" deal preposterously wrong-headedly imposed on the Debtor by multiple lawyers (Brooks' lawyers, the Company's lawyers, the other Defendants lawyers, the Class Counsel and Derivative Counsel). The total attorneys fee cost to the Company of the Original Settlement was apparently in excess of $25 Million (mostly paid with the proceeds of D&O insurance). The terms of Settlement provided for the publicly-owned Company to pay $35,200,000 to the Class Action Plaintiffs (of which sum Class Counsel received a provisional pendente lite allowance of $9,925,000).

VI.  The Road to Bankruptcy

21.   Leaving Brooks as the largest vote holder in the Debtor soon had negative consequences. When the ink on the confirmation of the Settlement was barely dry, Brooks used his votes to change administration of the continuing entity from the true independent, Court approved, leadership of General Larry Ellis to a separate control group from Steel Partners, LP, a New York Hedge Fund, with whom Brooks had held private discussions.   There is no record of what Brooks and the Steel Partners people "decided" which motivated Brooks to vote for them.   But, this is known for certain:   Steel changed the Debtor's lawyers to Steel's counsel without going through the Board, causing the only two Independent Directors to quit with filed 8-Ks.   By the very beginning of 2010, the Steel Board of the Debtor advised by Steel's Counsel, was planning a Chapter XI filing for the Debtor, and engaged Debtor's Bankruptcy Counsel in this case.

22.   On January 15, 2010, at the very eve of bankruptcy, the Debtor sent lawyers to the Second Circuit Court of Appeals to argue still for the release, forgiveness and Indemnification of Brooks.   If these people had gotten their way, there would be no Class or Debtor claims against Brooks which would still be viable, and the SEC's 304 Action would be completely nullified.   If Cohen

was not involved, and they had their way, there would be no money in escrow. The Bankruptcy Petition was filed on April 14, 2010. There are <u>no claims against Brooks</u> listed as an asset. There are <u>no contingencies</u> with Brooks listed. There is no discussion of the Second Circuit Court of Appeals case in the First Day Report. Yet, Debtors counsel's immediate reaction to Cohen speaking up about those assets of the Debtors was antagonism and adversity.

23. The Debtors did not change their "release, forgiveness and Indemnification" posture with respect to Brooks in April, May, June or July of 2010 either. Cohen, via CLM and Delaware Counsel, sought leave to require the Class Action litigation to proceed. Debtors opposed. Debtors succeeded. In September, Debtor finally <u>relented</u>, but instead moved in Bankruptcy Court to reject the Original Settlement and to seek a turnover of funds. Cohen spoke for the Debtors. Now, Debtors have done a 180° turn again, and seek to forego the Class Action entirely, proceeding anew with zero recovery from Brooks (for the Civil wrongs), and all the other defendants. The Debtors lawyers say that they are taking their "chances" that collection from Brooks on Restitution, possible Remission and the SEC's 304 case, will pay Debtors interest holders more than enough to make up for allowing the Class Action

to die without a recovery. Cohen's problem with that equation is simple: the lawyers who "decided" to take their chances don't intend to take any such chances themselves. In the Plan they have presented, they are paying themselves first and in full out of the Class Action Escrow Money, leaving all the other parties entitled to recovery to take their chances.

24.    Cohen did not ever stand idly by in the Bankruptcy case.   Cohen successfully lobbied and argued for the creation of an Equity Committee, when the Debtors opposed the creation of the Equity Committee.   Cohen spoke at length with Eric Green of Prescott Group Capital Management, LLC, the largest independent (of Brooks) holder of PBSO Shares, convincing Prescott to remain involved with Debtor.   Cohen met with a number of other equity holders as well stressing to each his view that the key to returning value to the publicly-owned Debtor entity was the prompt pursuit of the Civil Action litigation.   Cohen had numerous contacts with initial Equity Committee Counsel and other Equity Committee members, all relating to the retention of Class Action litigation assets and other remedies against Brooks et al.

25.    During the Bankruptcy, an effort was made by Debtors Counsel for a possible reorganization with Lone

Star, a financial group from San Francisco. Cohen initially supported the transaction with Lone Star, and then withdrew his support when it became clear that the Lone Star transaction would "eliminate" the equity interest of virtually all (but not all) of the existing public holders of Debtor. Cohen believed that the benefit of the litigation belonged to the stock market Victims of Brooks' misconduct, including all of the Debtor's equity owners. There was a change of Equity Committee composition, and a new Equity Committee Counsel appointed. Debtors Counsel contends in pleadings it had secret negotiations in 2011 with Brooks, and claims to have reached a $200 Million Settlement Term Sheet which Brooks did not reject until 2013. Debtors never publicly announced those discussions or publicly disclosed the Term Sheet.

26. Debtors Counsel also chose to deregister the Common Stock (making Debtor into a non-reporting Company). It is well understood that a non-reporting company is less valuable than a reporting company. Debtor asserted that the expense of maintaining a reporting company outweighed any increased value of being a reporting entity. Cohen expressed objections that the drop of reporting company status would weigh against the SEC pressing the 304 litigation against Brooks. But, the SEC representative

attached to the case testified, and the Court allowed
Debtor to become a non-reporting entity.    It is a non-
reporting Company now, another reason no one is likely to
present a competing Plan.

VII. <u>The Status of the Debtor</u>

27.    The situation with this publicly-known Debtor is
already a national disgrace, commencing with Brooks'
criminality, of course, but multiplied by the many failures
of others, including Cohen's inability to succeed to change
the course of events.    Though the promise of an ultimate
litigation windfall of many millions has been ever present
since at least September of 2010, this Debtor never
identified any party willing to join with it in any
transaction to successfully reorganize the publicly-owned
entity. The Debtor – the principal provider of body armor
for our troops in Iraq and Afghanistan, was not bankrupted
immediately following the outright frauds and terrible
misdeeds by Brooks <u>et al</u>; nor was it bankrupted by the
Class Action chicanery and the Original Settlement. It was
Steel Partners which took the entity into bankruptcy, sold
the operations privately, terminated all of its employees,
and which witnessed the public shareholders of Debtor being
fleeced again, without even the due process opportunity to
vote for a leadership of their own choosing. Approximately,

or more than, $2 Billion was paid by the Department of Defense to Debtor for body armor vests from 2002 to 2011. Almost none of the money reached the pockets of the public owners of the Company (excluding Brooks and his gang of insiders).

28. After the collapse of Enron in 1970, Congress and the American public were up in arms about the failures of corporate governance at every level which had plagued that former industrial giant. SOX was directly responsive to the Enron situation. Cohen heard the fuss and carefully read the provisions of the new SOX law, including the entirely new focus on attorney responsibility in corporate governance, 15 U.S.C. §7245 and later SEC Release 2003-13 dated January 23, 2003. Cohen complied with his heightened responsibilities to the publicly-owned Debtor and its public shareholders. At DHB, Cohen acting for the entity, put himself directly in the eye of the storm that Brooks and others were creating by their unlawful conduct. Brooks did not act alone. His crimes were also committed by the COO and CFO. His actions were validated, or at least sanctioned and ignored by a majority of the Board of Directors. Brooks had no trouble in finding replacement counsel for DHB, who served while the crimes were ongoing,

and then replacement counsel to "go along" with the Original Settlement.

29. The Debtor's Motion seeking to avoid Debtor's legal obligations to Cohen is not simply a product of the differences between this Debtors Counsel and Cohen. It is a product of the differences between all those who think "everything is okay" as long as "all the legal fees are being paid," and those in the bar who dare to stand up for the public interests, in accordance with the law and rules.

30. After thirteen (13) plus years, including the last five (5) years in this Bankruptcy proceeding:

(i) Cohen contends he has been on the side of the publicly owned Debtors, the Victims, and the shareholders throughout the controversies;

(ii) Cohen's stubborn insistence that the Original Settlement was, and is, a preposterous abuse of the publicly-owned Company was the single catalyst which kept the Debtor's litigation options open by the successful appeal to the DOJ and the Second Circuit;

(iii) But for Cohen's Appeal, and the successful prosecution of that Appeal by CLM, there would be NO money (zero) available for the proposed Settlement and Plan that is presently on the table;

(iv) Cohen, and his counsel CLM, are entitled to credit for saving one hundred percent (100%) of the escrow money that is available, plus one hundred percent (100%) of any money, if any, which may later be received by the SEC's possible prosecution and resolution of the SOX 304 cases against Defendants Brooks and Schlegel; and

(v) Counsel for the Debtors, including Bankruptcy Counsel and Class Counsel and Derivative Counsel, all at critical points in the past, sought the total release, forgiveness and indemnification of Brooks. Now they seek maximum recoveries from Brooks (without the Class Action); But, they seek to do so, without any credit to Cohen of any payment to him for what's owed to him.

31.  Benefit to the Estate.  Cohen asserts that he has consistently exercised his best efforts to fulfill his professional responsibilities to the Debtors and to "benefit" the Debtors estate to the extent that it is entitled to lawfully benefit.

Prayer for Relief

**WHEREFORE,** Cohen respectfully requests that the Court find as follows:

(i)  Cohen was an executive officer of, and counsel to the Debtors prior to June of 2002.

(ii) Cohen was promised and issued certain securities compensation (a Warrant to purchase 100,000 Shares at $5.00 per Share) for his services prior to June of 2002.

(iii) On July 11, 2002 and thereafter, Cohen promptly acted in accordance with the newly enacted Sarbanes Oxley Act, 15 U.S.C. §7245, Law requiring an attorney to report evidence of a material violation of securities law or breach of fiduciary duty by the Company or any agent thereof to the Audit Committee of the Debtor.

(iv) Following Cohen's initial report to the Audit Committee, the Debtor withheld Cohen's Warrant from him, and that withholding lasted until February of 2003.

(v) The publicly traded Shares of the Debtor were very valuable and the withholding of the Warrant individually damaged Cohen.

(vi) On February 23, 2003, Cohen entered into a Settlement Agreement with the Debtor providing for the issuance of 40,000 Shares of DHB Common Stock to Cohen and certain others with the provision that "It is of the essence of this Agreement" that Cohen and the Distributees timely receive the Shares and secure an unimpeded opportunity to sell or otherwise transfer such Shares, and to effect same requiring the Debtor to file all reports required to be filed by a publicly-owned Company with a

class of securities registered under the Securities and Exchange Act.

(vii)  It is uncontested that Debtor failed to timely make the filings required by the Settlement Agreement on a timely basis for the last quarter and full year of 2005, and for each of the quarters of, and the full year of 2006.

(viii)  It is further uncontested that during the course of this Bankruptcy, Debtor failed to make all such filings for the full year 2010, and for all quarterly reports and full year reports in 2011, 2012, et seq., and that Debtor, of its own volition, has deregistered the Common Stock so that it is no longer required to make such Exchange Act filings.

(ix) In 2006, Debtor entered into a Consolidated Class Action/Derivative Action Settlement of certain litigation with the persons in an identified Class, and that such Consolidated Settlement would have forgiven, released and indemnified David H. Brooks from his liabilities to the Corporation and to the Class, and that Cohen filed objections to the Settlement and thereafter actively and successfully sought the support of the Department of Justice on behalf of itself and the Securities & Exchange Commission, for Cohen's Objections to the Original Settlement.

(x)   After the Original Settlement was approved by the District Court in 2008, Cohen promised and then paid the law firm of Carter Ledyard & Milburn and additional One Hundred Thousand Dollars ($100,000) (above approximately $39,000 previously paid to CLM) to pursue Cohen's derivative objections on behalf of Debtor.

(xi) Cohen's appeal to the Second Circuit, by CLM, was successful; the entirety of the Original Settlement was stopped, and the Debtor's deposit payment for the Settlement in the amount of Thirty Five Thousand Two Hundred Dollars ($35,200) became at least theoretically, available to the Debtor, and the release and indemnity to Brooks was voided.

(xii)   Cohen has filed a claim as a creditor seeking One Million Eight Hundred Thirteen Thousand Two Hundred Ten Dollars ($1,813,218) for himself plus Forty Three Thousand Six Hundred Thirty Two Dollars ($43,632) as representative of certain employee Distributees of the Common Stock, with determinations that:

FIRST, Fundamental fairness requires allowance of the Cohen claims in full; without Cohen's multiple prior efforts, Cohen's cash advance to CLM; and the successful appeal to the Second Circuit, the Debtors would not have had access to the Thirty Two Thousand Five Hundred Thousand

Dollar ($32,500,000) escrow monies on deposit in the EDNY, and the SEC would not be able to pursue its 304 claims against criminal Defendants Brooks and Schlegel for the benefit of the Debtor, and potentially to recover up to an additional One Hundred Eighty Six Million Dollars ($186,000,000) from Defendant Brooks alone; and

SECOND, rejecting subordination of the Cohen claims to the claims of the Unsecured Creditors would do a disservice to the process of subordination in a case in which there would be no money to pay to the Unsecured Creditors but for the actions and efforts of Cohen, as described in the findings.

Respectfully submitted,

D. David Cohen

Sworn to before me this 18th
Day of October, 2015

Notary

ELVIRA AUGITA
Notary Public, State of New York
No. 01AU6176710
Qualified in Nassau County
Commission Expires June 6, 20__