**EXHIBIT H**

**Disclosures Regarding New Boards of New EFH**

In accordance with Section L of Article IV of the Plan, set forth below is a summary of (a) the composition of the Board of Directors (the "Board") of New EFH following the Merger (as a result of which New EFH will be the successor to Reorganized EFH) and the process by which the Equity Investors propose or expect to designate additional members of the Board and (b) the management of New EFH following the Merger.

**Board of New EFH**

*Board Composition*

The business and affairs of New EFH will be managed under the direction of the Board. Pursuant to New EFH's Certificate of Incorporation (the "Charter") and Bylaws (the "Bylaws"), forms of which are attached to the Plan Supplement as Exhibit A(i) and Exhibit A(ii), respectively, and the Interest Holders Agreement to be entered into among New EFH, OV2, Reorganized EFIH (which will be converted into a Delaware limited partnership (the "Operating Partnership")), Hunt Power Holdings, L.L.C., a Delaware limited liability company and an affiliate of Hunt, and the Equity Investors at the closing of the transactions contemplated by the Merger and Purchase Agreement (the "Closing"), the proposed form of which is attached to the Plan Supplement as Exhibit A(iii) (the "Interest Holders Agreement"), the Board will initially and for the first year following the Closing consist of thirteen directors, of which (a) two directors will be appointed by Hunt, (b) one director will be appointed by Pecos Partners, L.P., Flourish Investment Corporation and Avenue Capital Management II, L.P. (collectively, the "Hunt Consortium Investors") and (c) ten directors will be appointed by the Backstop Purchasers (excluding Avenue Capital Management II, L.P.).

Each of the directors appointed by the Backstop Purchasers (a) will not be an officer or employee of New EFH or any of its subsidiaries or the Manager, Hunt or any of their affiliates and (b) will otherwise be "independent" in accordance with the Charter and Bylaws, the rules of the New York Stock Exchange (whether or not the shares of common stock of New EFH ("Common Shares") are listed on such exchange) and the requirements of the Securities Exchange Act of 1934, as amended, applicable to members of the audit committee of the Board.

In addition, at least one of the directors will qualify as an "audit committee financial expert" as defined by the Securities and Exchange Commission.

From and after the first year following the Closing, two members of the Board will be nominated by Hunt and the remaining members of the Board will be nominated by the Board or a committee thereof (which committee may not include either director designated by Hunt), and all directors will be elected by the New EFH stockholders. Pursuant to the Interest Holders Agreement, New EFH will agree to take all reasonable steps within its control that are necessary or appropriate to maintain the directors designated by Hunt and the Hunt Consortium Investors, including calling a meeting of its stockholders or requesting the written consent of the stockholders in lieu of a meeting in order to approve the relevant action or other matter.

The rights of Hunt and the Hunt Consortium Investors to designate or nominate directors will terminate, and any directors designated or nominated by Hunt or the Hunt Consortium Investors may be removed, (a) in the case of Hunt and the Hunt Consortium Investors, (i) if Hunt Utility Services, LLC, a Delaware limited liability company and an affiliate of Hunt that will act as manager of the Ovation Entities (as defined below) pursuant to the Management Agreement (as defined below) (the "Manager"), resigns or is removed or terminated from service in such capacity under the Management Agreement and is not succeeded in such capacity under the Management Agreement by another entity controlled by Hunt or any of its affiliates, (ii) the Manager ceases to be controlled by Hunt or any of its affiliates or (iii) there is a change of control of the entity owned by the Hunt family that, upon the REIT Reorganization, will hold the certificates of convenience and necessity and certain other assets currently held by Oncor, or (b) in the case of the Hunt Consortium Investors, any event specified in clause (a) above occurs or such investors, together with their permitted transferees, cease to own in the aggregate at least a majority of the Common Shares owned by the Hunt Consortium Investors as of the Closing.

*Selection of Directors*

Hunt proposes to nominate W. Kirk Baker and David A. Campbell to serve as members of the Board.

The Hunt Consortium Investors also will nominate an individual to serve as a member of the Board.

The Backstop Purchasers have engaged Russell Reynolds Associates to identify and assist in the selection of the ten independent directors of the Board and the director to be nominated by the Hunt Consortium Investors. The Backstop Purchasers will work with Russell Reynolds Associates to identify potential candidates, conduct interviews and undertake a vetting process so that the directors to be nominated by the Backstop Purchasers will be identified and prepared to take office on the Effective Date.

None of the initial directors of New EFH will be an "insider" of the Debtors under the Bankruptcy Code.

**Management of New EFH**

*Management Agreement*

Subject to the oversight and delegation rights of the Board, the Manager will manage the day-to-day operations of New EFH pursuant to a Management Agreement to be entered into among the Manager, New EFH, the Operating Partnership, Oncor Electric Delivery Holdings Company LLC, a Delaware limited liability company ("Oncor Holdings"), Oncor, which will be reorganized pursuant to the REIT Reorganization as the company holding the assets of Oncor that are considered real property and certain of the personal property assets ("Oncor AssetCo" and, together with New EFH, the Operating Partnership and Oncor Holdings, the "Ovation Entities"), at the Closing, a copy of which is attached to attached to the Plan Supplement as Exhibit W. Under the Management Agreement, the services and activities to be performed by the Manager will include: (a) performing day-to-day business administrative functions necessary for the management of the Ovation Entities; (b) collecting revenues and paying obligations of the Ovation Entities; (c) providing executive and administrative personnel, office space and office services required for the management and operation

of the Ovation Entities; (d) performing financial management and reporting and treasury functions; (e) performing investor relations functions; (f) managing tax matters and (g) negotiating the leases, amendments, supplements and renewals in accordance with leasing and approval standards promulgated by the boards of directors of New EFH and Oncor AssetCo.

In consideration of the services provided by it, the Manager will receive an annual management fee payable in equal quarterly installments. The annual management fee will be established prior to each year and will reflect the actual cost of dedicated personnel of the Manager, an agreed allocation of certain overhead costs and reasonable out-of-pocket expenses incurred by the Manager related to its duties. The management fee will be subject to a true-up at the end of each year pursuant to which, if the actual costs that are properly allocable to the performance of the services by the Manager under the Management Agreement are less than the aggregate fees paid during such year, the difference will be refunded to the Ovation Entities. On the other hand, if the actual costs that are properly allocable to the performance of the services by the Manager under the Management Agreement are greater than the aggregate fees paid during such year, the difference will be paid to the Manager, subject to an aggregate cap in the amount of 110% of the budgeted amount. In addition, the Ovation Entities will reimburse the Manager for certain expenses incurred in the conduct of the business of the Ovation Entities, other than costs included within the annual management fee.

The initial term of the Management Agreement will expire on December 31, 2021. The Management Agreement will automatically extend for additional two-year terms, unless (a) a majority of New EFH's independent directors or the board of directors of Oncor AssetCo, as applicable, decides not to renew the agreement and provides notice of its intent not to renew to the Manager at least 365 days prior to expiration of the then-current term or (b) the Manager decides not to renew the agreement and provides notice of its intent not to renew to the Ovation Entities at least 365 days prior to the expiration of the then-current term. In addition, during any renewal term, (x) either New EFH or Oncor AssetCo may terminate the Management Agreement at any time upon 365 days' prior notice to the Manager or (y) the Manager may terminate the Management Agreement at any time upon 365 days' prior notice to the Ovation Entities. Further, subject to applicable notice requirements, (A) New EFH or Oncor AssetCo will also have the right to terminate the Management Agreement at any time for Cause (as defined below), and (B) the Manager will have the right to terminate the Management Agreement at any time for Good Reason (as defined below).

"Cause" is defined in the Management Agreement to include (i) the Manager's material breach of the agreement that, if curable, continues without cure for a period of 30 days following notice of such breach, (ii) any act of fraud, misappropriation of funds, or embezzlement by the Manager against any Ovation Entity or any of its respective subsidiaries, other than an immaterial misapplication of funds that is promptly corrected, (iii) an act of bad faith, willful misconduct or gross negligence by the Manager in the performance of its duties under the Management Agreement that results in material harm to any Ovation Entity or any of its subsidiaries, (iv) the commencement of any voluntary proceeding relating to the Manager's bankruptcy, insolvency or similar events or the issuance of an order for relief in an involuntary proceeding regarding the bankruptcy or insolvency of the Manager, (v) any dissolution of the Manager, (vi) the Manager's conviction of a felony (including a plea of *nolo contendere*), (vii) a change of control of the Manager or (viii) a determination by the Manager not to pursue or develop a business opportunity that the Board directs the Manager to pursue or develop to the extent that the Manager is not prohibited from pursuing such opportunity on behalf of any Ovation Entity by an existing contractual obligation. In these circumstances, the termination fee described below would not be owed.

"Good Reason" is defined in the Management Agreement to include the following: (1) the Ovation Entities collectively seek to set the management fee payable to the Manager for any fiscal year at an amount that is more than 25% less than the management fee payable for the preceding fiscal year (subject to certain limitations), (2) an Ovation Entity requests or directs that the Manager take any action in violation of any law or to refrain from taking any action necessary to comply with any law, (3) the Ovation Entities materially breach any provision of the Management Agreement or (4) except as expressly permitted by the Management Agreement, the Ovation Entities materially reduce the scope of the Manager's responsibilities or the services being provided by the Manager under the Management Agreement.

If New EFH exercises its right not to renew the Management Agreement at the end of the then-current term, the Operating Partnership will be required to pay the Manager a termination fee in an amount equal to the actual out-of-pocket costs incurred by the Manager and its affiliates in terminating or reallocating personnel or resources solely as a result of a termination of the Management Agreement, which fee shall in no event exceed $20,000,000. If Oncor AssetCo exercises its right not to renew the Management Agreement at the end of the then-current term, Oncor AssetCo will be required to pay the Manager such termination fee. If the Manager terminates the Management Agreement for Good Reason, then New EFH and Oncor AssetCo will each pay its proportionate share of such termination fee.

### *Officers of New EFH*

The Manager will make available to the Ovation Entities personnel to serve as the management team, including a Chief Executive Officer and Chief Financial Officer of New EFH, along with appropriate support personnel, to provide management services.

The Manager will recommend persons to serve as the Chief Executive Officer and Chief Financial Officer of New EFH and to hold other offices with New EFH. The Board has the sole authority to appoint and remove the Chief Executive Officer and Chief Financial Officer of New EFH, and the Board (or an officer designated by the Board) has the sole authority to appoint and remove, as applicable, other officers in accordance with the governing agreements of New EFH.

The Manager expects to recommend individuals to serve as officers of New EFH prior to December 31, 2015. Such individuals will be considered by the Board for appointment prior to the Closing. It is not proposed that any "insider" of the Debtors under the Bankruptcy Code be appointed as an officer of New EFH.