## EXHIBIT K

**New Reorganized EFIH Debt Documents—Amended and Restated Commitment Letter**

EXECUTION VERSION

**MORGAN STANLEY SENIOR FUNDING INC.**
1585 Broadway
New York, New York
10036

**JPMORGAN CHASE BANK, N.A.**
**J.P. MORGAN SECURITIES LLC**
383 Madison Avenue
New York, New York
10179

**BANK OF AMERICA, N.A.**
**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED**
One Bryant Park
New York, New York
10036

**BARCLAYS BANK PLC**
745 Seventh Avenue
New York, New York
10019

**DEUTSCHE BANK AG NEW YORK BRANCH**
**DEUTSCHE BANK SECURITIES INC.**
60 Wall Street
New York, New York
10005

**MUFG UNION BANK, N.A.**
445 South Figueroa Street,
15th Floor
Los Angeles, California
90071

**WELLS FARGO BANK, NATIONAL ASSOCIATION**
**WELLS FARGO SECURITIES, LLC**
550 South Tryon Street
Charlotte, North Carolina
28202

CONFIDENTIAL

August 26, 2015

Project Ovation
$5,500 million Senior Secured Term Loan Facility
$250 million Overnight Facility
Amended and Restated Commitment Letter

Ovation Acquisition I, L.L.C.
Ovation Acquisition II, L.L.C.
c/o Hunt Consolidated, Inc.
1900 North Akard Street
Dallas, Texas 75201
Attention:  David Hernandez

Ladies and Gentlemen:

Reference is made to the commitment letter (including the annexes and exhibits attached thereto, the "Original Commitment Letter") dated August 9, 2015 (the "Original Commitment Date") among you and Morgan Stanley Senior Funding, Inc. ("MSSF").  The parties hereto agree that this amended and restated commitment letter (including the attached Exhibits A through D, including the annexes thereto,

the "<u>Term Sheets</u>" and together with this letter, collectively, this "<u>Commitment Letter</u>") amends, restates, supersedes and replaces in its entirety the Original Commitment Letter.

Ovation Acquisition I, L.L.C., a Delaware limited liability company ("<u>Parent</u>") and Ovation Acquisition II, L.L.C., a Delaware limited liability company ("<u>OV2</u>", and together with Parent, "<u>you</u>" or the "<u>Purchasers</u>"), have advised MSSF, JPMorgan Chase Bank, N.A. ("<u>JPMCB</u>"), J.P. Morgan Securities LLC ("<u>JPM Securities</u>"), Bank of America, N.A. ("<u>BOA</u>"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("<u>MLPFS</u>"), Barclays Bank PLC ("<u>BBPLC</u>"), Deutsche Bank AG New York Branch ("<u>DBNY</u>"), Deutsche Bank Securities Inc. ("<u>DBSI</u>"), MUFG Union Bank, N.A. ("<u>MUFG</u>"), Wells Fargo Bank, National Association ("<u>WFB</u>") and Wells Fargo Securities, LLC ("<u>WFS</u>" and, collectively with MSSF, JPMCB, JPM Securities, BOA, MLPFS, BBPLC, DBNY, DBSI, MUFG and WFB, the "<u>Commitment Parties</u>," "<u>us</u>" or "<u>we</u>") that you intend to acquire certain equity interests of the Target Entities (as defined in <u>Exhibit A</u>) in connection with the bankruptcy cases commenced by Energy Future Holdings Corp. ("<u>EFH</u>") and certain of its subsidiaries and affiliates, et al. (collectively, the "<u>Debtors</u>"), jointly administered under Case No. 14-10979 (CSS) and any proceeding relating thereto (the "<u>Bankruptcy Cases</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), and to consummate the other transactions described on <u>Exhibit A</u> hereto.  The Acquisition is expected to be consummated in accordance with a plan of reorganization to be filed by the Debtors with the Bankruptcy Court (as amended, modified or supplemented in accordance with the terms herein, the "<u>Plan of Reorganization</u>").  Capitalized terms used but not otherwise defined herein are used with the meanings assigned to such terms in the Exhibits hereto.

     1.    <u>Commitments</u>.

In connection with the Transactions contemplated hereby, (a) each of MSSF, JPMCB, BOA, BBPLC, DBNY, MUFG and WFB (each, an "<u>Initial Lender</u>" and, collectively the "<u>Initial Lenders</u>") hereby commits to provide the percentage of the entire principal amount of the Term Loan Facility (the "<u>Term Loan Facility Commitments</u>"), upon the terms set forth in <u>Exhibit B</u> hereto and in accordance with the percentages set forth on <u>Schedule 1</u> hereto for such Initial Lender (as such schedule may be amended or supplemented in accordance with the terms of this Commitment Letter) and (b) each of MSSF, JPMCB, BOA, BBPLC, DBNY, MUFG and WFB (each an "<u>Initial Overnight Lender</u>" and, collectively the "<u>Initial Overnight Lenders</u>") hereby commits to provide the percentage of the entire principal amount of the Overnight Facility (the "<u>Overnight Facility Commitments</u>"), upon the terms set forth in <u>Exhibit C</u> hereto and in accordance with the percentages set forth on <u>Schedule 1</u> hereto for such Initial Overnight Lender (as such schedule may be amended or supplemented in accordance with the terms of this Commitment Letter), in the case of each of clauses <u>(a)</u> and <u>(b)</u>, (i) upon the terms set forth or referred to in this letter and the Transaction Summary attached as <u>Exhibit A</u> hereto and (ii) the initial funding of which is subject only to the conditions set forth on <u>Exhibit D</u> hereto.

     2.    <u>Titles and Roles</u>.

It is agreed that (i) MSSF, JPM Securities, MLPFS, BBPLC, DBSI, MUFG and WFS will act as joint lead arrangers and joint bookrunners for the Term Loan Facility (as defined in <u>Exhibit B</u>) (acting in such capacities, the "<u>Term Loan Lead Arrangers</u>") and (ii) MSSF, JPM Securities, MLPFS, BBPLC, DBSI, MUFG and WFS will act as joint lead arrangers and joint bookrunners for the Overnight Facility (as defined in <u>Exhibit C</u>) (acting in such capacities, the "<u>Overnight Facility Arrangers</u>", and together with the Term Loan Lead Arrangers, the "<u>Lead Arrangers</u>").

It is understood and agreed that (a) MSSF will have "left" placement in any marketing materials or other documentation used in connection with the Facilities (as defined in <u>Exhibit B</u>), and in each case having the roles and responsibilities customarily associated with such name placement, (b) JPM

Securities shall appear immediately to the right of MSSF in any marketing materials or other documentation used in connection with the Facilities, (c) each of the other Lead Arrangers (or their affiliates) shall appear to the right of JPM Securities in any marketing materials or other documentation used in connection with the Facilities in accordance with their economics (or in the event such parties' economics are identical, then in alphabetical order), (d) MSSF will act, and MSSF hereby agrees to act, as sole administrative agent and collateral agent, for the Term Loan Facility and (e) MSSF will act, and MSSF hereby agrees to act, as sole administrative agent for the Overnight Facility, in each case upon the terms and subject to the conditions set forth or referred to in this Commitment Letter.

You agree that no other agents, co-agents or arrangers will be appointed, no other titles will be awarded and no compensation (other than that expressly contemplated in this Commitment Letter and the Amended and Restated Fee Letter dated the date hereof and delivered in connection herewith (the "Fee Letter")) will be paid to any Lender (as defined below) in order to obtain its commitment to participate in the Term Loan Facility or the Overnight Facility unless you and we shall so reasonably agree.

3.    Syndication.

We intend (or, in the case of the Overnight Facility, reserve the right) to syndicate the Facilities to a group of lenders identified by us in consultation with you and reasonably acceptable to you (such consent not to be unreasonably withheld or delayed) (together with the Initial Lenders and the Initial Overnight Lenders, the "Lenders"); provided that we will not syndicate the Facilities to (a) any company engaged principally in the business of energy or power generation and/or transmission, as identified in writing by the Purchasers to the Lead Arrangers (and after the Acquisition Funding Date, by the Borrower to the Administrative Agents (as defined in Exhibit C)) from time to time; or, (b) any company whose principal business is that of an energy or power merchant as identified in writing by the Purchasers to the Lead Arrangers (and after the Acquisition Funding Date, by the Borrower to the Administrative Agents) from time to time; provided that, in the case of each of clause (a) or (b), the foregoing shall not apply retroactively to disqualify any parties that have previously acquired an assignment or participation interest in the loans under the Facilities to the extent that any such party was not a Disqualified Institution at the time of the applicable assignment or participation, as the case may be; or (c) any financial institution identified in writing by the Purchasers to the Lead Arrangers on or prior to the date of the Commitment Letter (such persons described in clauses (a) through (c), together with their affiliates that are reasonably identifiable by name or otherwise identified in writing by the Purchasers or the Borrower, as applicable, collectively, the "Disqualified Institutions"). Notwithstanding the Lead Arrangers' right to syndicate the Facilities and receive commitments with respect thereto (i) the Commitment Parties, Initial Lenders and Initial Overnight Lenders will not be relieved, released or novated from their respective obligations hereunder, including their respective obligation to fund all or any portion of their commitments hereunder until the Acquisition Funding Date has occurred and (ii) unless you otherwise agree in writing, each Lead Arranger shall retain exclusive control over all rights and obligations with respect to its (or its affiliates) commitments in respect of the Facilities, including all rights with respect to consents, modifications, supplements, waivers and amendments, until the Acquisition Funding Date has occurred. Without limiting your obligations to assist with syndication efforts as set forth herein, the Commitment Parties agree that completion of syndication of the Facilities is not a condition precedent to the availability and initial funding of the Facilities.

The Lead Arrangers intend to commence syndication efforts with respect to the Term Loan Facility promptly and from the date of your acceptance of the Original Commitment Letter until the earlier to occur of (x) a Successful Syndication (as defined in the Fee Letter) and (y) the date that is 60 days after the Acquisition Funding Date (such period, the "Syndication Period") and you agree to assist the Lead Arrangers in completing a syndication of the Term Loan Facility reasonably satisfactory to the Lead Arrangers and you. Such assistance shall, during the Syndication Period, include (a) using your

commercially reasonable efforts to ensure that the syndication efforts benefit from your existing banking relationships, (b) facilitating direct contact between appropriate members of your senior management, on the one hand, and the proposed Lenders, on the other hand (and, pursuant to your rights under the Acquisition Agreement (as defined in Exhibit A hereto), your using commercially reasonable efforts to ensure such contact between appropriate members of senior management of EFH and the Target Entities, on the one hand, and the proposed Lenders, on the other hand), in all cases at times and locations to be mutually agreed upon, (c) your assistance (and using your commercially reasonable efforts to cause EFH and the Target Entities to assist, pursuant to your rights under the Acquisition Agreement) in the preparation of a customary confidential information memorandum (the "Confidential Information Memorandum") and other customary marketing materials to be used in connection with the syndication of the Term Loan Facility, subject, in the case of information relating to the Target Entities, to the limitations on your rights as set forth in the Acquisition Agreement and it being understood that the only financial statements which you shall be required to provide to the Lead Arrangers are the financial statements specifically provided for in Exhibit D hereto and no third-party consultant reports shall be required to be delivered to the Lead Arrangers, (d) the hosting, with the Lead Arrangers and appropriate members of your senior management, of meetings (or, if you and we shall agree, conference calls in lieu of any such meeting) of prospective Lenders (limited to one "bank meeting," unless otherwise deemed reasonably necessary by the Lead Arrangers and you) at times and locations to be mutually agreed, (e) your ensuring that there is no competing issuance or incurrence of syndicated bank facilities or debt securities by or on behalf of the Purchasers or their respective subsidiaries and your using commercially reasonable efforts to ensure that there are no competing issuances of syndicated bank facilities or debt securities by and on behalf of the Target Entities, announced, offered, placed or arranged (other than the Facilities, Permitted Surviving Debt and such other indebtedness as agreed between you and us), in each case that would reasonably be expected to materially impair the primary syndication of the Term Loan Facility and (f) using your commercially reasonable efforts to obtain public corporate or corporate family ratings (but not a specific rating) (or updates to the existing public corporate credit rating and public corporate family rating), as applicable, of the Borrower (as defined in Exhibit B) and public ratings (but not a specific rating) (or updates to existing ratings) for the Term Loan Facility from each of Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's Financial Services LLC, a subsidiary of The McGraw Hill Corporation ("S&P"), prior to the launch of general syndication of the Term Loan Facility. Notwithstanding anything contained in this Commitment Letter, the Fee Letter, the Facilities Documentation (as defined in Exhibit C attached hereto) or any other letter agreement or other undertaking concerning the financing of the transactions contemplated hereby to the contrary neither the commencement nor the completion of the syndication of the Facilities, nor the obtaining of the ratings (or updates to ratings) referred to above, nor the compliance with any of the provisions of this Commitment Letter (other than Exhibit D), shall constitute a condition precedent to the availability and initial funding of the Facilities.

The Lead Arrangers, in their capacity as such, will manage, in consultation with you (and subject to your consent rights set forth in the first paragraph of this Section 3), all aspects of the syndication of the Facilities, including decisions as to the selection of prospective Lenders to be approached and when they will be approached, when the Lenders' commitments will be accepted, which Lenders will participate, the allocation of the commitments among the Lenders and the amount and distribution of fees among the Lenders.

You acknowledge that (a) the Lead Arrangers will make available an information package and presentation to the proposed syndicate of Lenders by posting the information package and presentation on IntraLinks, SyndTrak or another similar electronic system, in each case subject to a standard "click through" or similar confidentiality arrangements substantially consistent with the second paragraph set forth in Section 9 hereof, and (b) certain of the prospective Lenders may be "public side" Lenders (i.e., Lenders that have personnel that do not wish to receive material non-public information within the

4

meaning of the United States federal and state securities laws ("MNPI") with respect to you, the Target Entities, your or their respective subsidiaries, or the respective securities of any of the foregoing (each, a "Public Lender" and, collectively, the "Public Lenders")).  At the request of the Lead Arrangers, you agree to (and, pursuant to your rights under the Acquisition Agreement, to use commercially reasonable efforts to cause EFH and the Target Entities to) assist us in preparing an additional version of the information package and presentation consisting exclusively of information and documentation with respect to you, the Target Entities, your or its respective subsidiaries, the respective securities of any of the foregoing that is either publicly available or not material with respect to you, the Target Entities, your or its respective subsidiaries or the securities of any of the foregoing or the Acquisition for purposes of United States federal securities laws (the "Public Package").  It is understood that in connection with your assistance described above, customary authorization letters will be included in the Confidential Information Memorandum that authorize the distribution of the Confidential Information Memorandum to prospective Lenders, confirm that the Public Package does not include MNPI about you, the Target Entities, any of your or its respective subsidiaries, the securities of any of the foregoing and includes a representation substantially consistent with the representation referred to in Section 4 hereof, and the Public Package will contain customary language exculpating you (without limitation of your indemnification obligations under Section 7 hereof), EFH, the Target Entities, any of your or its respective subsidiaries and affiliates and the Commitment Parties and their respective affiliates, with respect to any liability related to the use of the contents of the Public Package.  You acknowledge and agree that, in addition to the Public Package, the following documents may be distributed to all prospective Lenders, including prospective Public Lenders (except to the extent you notify us to the contrary and provided that you have been given a reasonable opportunity to review such documents and comply with United States Securities and Exchange Commission disclosure obligations): (i) the Term Sheets, (ii) drafts and final definitive documentation with respect to the Facilities, (iii) administrative materials prepared by the Lead Arrangers for prospective Lenders (such as Lender meeting invitations, allocations and funding and closing memoranda) and (iv) notifications of changes in the terms of the Facilities.  You also agree, at our request, to identify (or, in the case of information relating to the Target Entities, use commercially reasonable efforts to identify) information to be distributed to the Public Lenders by clearly and conspicuously marking the same as "PUBLIC."  All information that is not specifically identified as "PUBLIC" (including the Projections) shall be treated as being suitable only for posting to private Lenders.  By marking such materials "PUBLIC" you shall be deemed to have authorized the Commitment Parties and the potential Lenders to treat such materials as not containing MNPI.

       4.      <u>Information</u>.

You hereby represent that (with respect to information relating to the Target Entities and their subsidiaries, to your knowledge) (a) all written information concerning you and your subsidiaries and the Target Entities and their subsidiaries, other than any estimates, forecasts, projections and other forward looking information with respect to the Purchasers and the Target Entities delivered pursuant to the Commitment Letter in connection with the Acquisition and the preparation of the Confidential Information Memorandum (the "Projections") and information of a general economic or industry-specific nature, that has been or will be made available to any of us by you, or any of your representatives on your behalf in connection with the transactions contemplated hereby (the "Information"), when taken as a whole, does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to all supplements and updates thereto from time to time) and (b) the Projections have been or will be prepared in good faith based upon assumptions believed by the preparer thereof to be reasonable at the time furnished (it being recognized by the Commitment Parties that such Projections are as to future events and are not to be viewed as facts and are subject to significant uncertainties and contingencies many of which are beyond

5

your control, that no assurance can be given that any particular financial projections will be realized, that actual results may differ from projected results and that such differences may be material). You agree that if, at any time prior to the later of the expiration of the Syndication Period and the Acquisition Funding Date, you become aware that any of the representations in the preceding sentence would be incorrect in any material respect if the Information or the Projections were being furnished and such representations were being made at such time, you will (or prior to the Acquisition Funding Date with respect to Information and Projections concerning the Target Entities, you will, subject to any applicable limitations on your rights as set forth in the Acquisition Agreement, use commercially reasonable efforts to) supplement the Information and the Projections so that the representations in the preceding sentence remain true (to your knowledge with respect to information relating to the Target Entities and their subsidiaries) in all material respects; provided, that any such supplementation shall cure any breach of such representations. You understand that in arranging and syndicating the Term Loan Facility we may use and rely on the Information and the Projections without independent verification thereof, and we do not assume responsibilities for the accuracy or completeness of the Information or the Projections. Notwithstanding anything to the contrary in this Commitment Letter, you will not be obligated to supplement such Information or the Projections to reflect changes in commodity prices, market heat rates, interest rates, regulatory issues of general applicability, general market conditions or similar assumptions relating to, or impacting, the Target Entities' businesses.

5.      Fee Letter.

As consideration for the commitments and agreements of the Commitment Parties hereunder, you agree to pay or cause to be paid the fees described in the Fee Letter on the terms and subject to the conditions set forth therein.

6.      Limited Conditionality Provision.

Notwithstanding anything in this Commitment Letter, the Fee Letter, the Facilities Documentation or any other letter agreement or other undertaking concerning the financing of the transactions contemplated hereby to the contrary, (a) the terms of the Facilities Documentation shall be in a form such that they do not impair the availability of the Facilities on the Acquisition Funding Date if the conditions set forth on Exhibit D hereto are satisfied or waived by the applicable Lead Arrangers, it being understood that to the extent any Collateral (including the creation or perfection of any security interest) is not or cannot be provided on the Acquisition Funding Date (other than, (i) a lien on Collateral that may be perfected by the filing of a financing statements under the UCC and (ii) a pledge of the equity interests in the Borrower, its subsidiaries and the Target Entities directly acquired by the Borrower on the Acquisition Funding Date and constituting Collateral (and only to the extent required to be pledged in connection with the Term Loan Facility) with respect to which a lien may be perfected by the delivery of a stock (or equivalent) certificate and such stock certificates have been delivered to you) after your use of commercially reasonable efforts to do so without undue burden or expense, then the provision and/or perfection of such Collateral shall not constitute a condition precedent to the availability and initial funding of the Term Loan Facility on the Acquisition Funding Date but may instead be delivered and/or perfected within 60 days (or, with respect to any mortgage, 90 days) (or, in each case, such longer period as the Term Loan Administrative Agent may agree in its reasonable discretion) after the Acquisition Funding Date pursuant to arrangements reasonably satisfactory to the Term Loan Administrative Agent, (b) the only conditions (express or implied) to the availability of the Facilities on the Acquisition Funding Date are those expressly set forth on Exhibit D hereto, and such conditions shall be subject in all respects to the provisions of this paragraph and (c) the only representations and warranties the making and accuracy of which shall be a condition to the availability of any of the Facilities on the Acquisition Funding Date shall be (x) such of the representations made by EFH in the Acquisition Agreement with respect to the Target Entities as are material to the interests of the Lenders, but only to the extent that you

6

or your applicable affiliate has the right to terminate your (or its) obligations under the Acquisition Agreement or refuse to consummate the Acquisition (as defined in <u>Exhibit A</u>) as a result of a breach of such representations in the Acquisition Agreement (the "<u>Acquisition Agreement Representations</u>") and (y) the Specified Representations (as defined below) made by the Borrower and Guarantors in the Facilities Documentation.  As used herein, the "<u>Specified Representations</u>" shall mean the representations and warranties set forth in the Facilities Documentation made with respect to the Borrower and the Guarantors relating to: organizational existence; organizational power and authority (as it relates to due authorization, execution and delivery of the Facilities Documentation); due authorization, execution and delivery of the Facilities Documentation, and enforceability, in each case, as it relates to entering into and performance under the Facilities Documentation; no conflicts of the Facilities Documentation with charter documents; Federal Reserve margin regulations; the Investment Company Act; compliance with the PATRIOT Act; use of proceeds of the Facilities not in violation of OFAC and the FCPA; and, subject to the Limited Conditionality Provision and liens permitted under the Facilities Documentation, the creation, validity and perfection of security interests in the Collateral.  This paragraph, and the provisions contained herein, are referred to in this Commitment Letter as the "<u>Limited Conditionality Provision</u>."

       7.     <u>Indemnification; Expenses</u>.

You agree (a) to indemnify and hold harmless each of the Commitment Parties, their respective affiliates and controlling persons and the respective directors, officers, employees, partners, agents, advisors and other representatives of each of the foregoing (each, an "<u>indemnified person</u>") from and against any and all losses, claims, damages and liabilities to which any such indemnified person may become subject resulting from or in connection with this Commitment Letter, the Fee Letter, the Facilities, the use of the proceeds thereof, the Acquisition and the Transactions or any claim, litigation, investigation or proceeding, actual or threatened, relating to any of the foregoing (a "<u>Proceeding</u>"), regardless of whether any indemnified person is a party thereto or whether such Proceeding is brought by you, any of your affiliates or any third party, and to reimburse each indemnified person within 30 days following written demand therefor for any reasonable and documented legal or other out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing (but limited, in the case of legal fees and expenses, to one counsel to such indemnified persons, taken as a whole and, solely in the case of an actual or potential conflict of interest where the indemnified person informs you of such conflict, one additional counsel to all affected indemnified persons, taken as a whole (and, if reasonably necessary, of one local counsel in any relevant material jurisdiction to all such persons, taken as a whole)); <u>provided</u>, that the foregoing indemnity will not, as to any indemnified person, apply to losses, claims, damages, liabilities or related expenses to the extent they result from (i) the willful misconduct, bad faith or gross negligence of, such indemnified person (or any of its Related Parties (as defined below)) or a material breach by such indemnified person (or any of its Related Parties) of its obligations under this Commitment Letter or the Fee Letter, in each case as determined by a final, non-appealable judgment of a court of competent jurisdiction or (ii) any disputes solely among indemnified persons and not resulting from any act or omission of you or the Target Entities or any of your or the Target Entities' subsidiaries (other than any Proceeding against any Commitment Party solely in its capacity or in fulfilling its role as an administrative agent or Lead Arranger or similar role under the Facilities), and (b) if the Acquisition Funding Date occurs, to reimburse each Commitment Party from time to time within 30 days after receipt of an invoice thereafter, for all reasonable and documented out-of-pocket expenses (including due diligence expenses, applicable syndication expenses and travel expenses, but limited, in the case of legal fees and expenses, to the reasonable fees, charges and disbursements of one counsel to the Commitment Parties, taken as a whole (and, if reasonably necessary, of one local counsel in any relevant material jurisdiction to all such persons, taken as a whole)), incurred in connection with each of the Facilities and any related documentation (including this Commitment Letter, the Fee Letter and the Facilities Documentation).  No indemnified person or any other party hereto shall be liable for any damages arising from the use by any person (other than such indemnified person (or its Related Parties))

of Information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent any such damages arise from the gross negligence, bad faith or willful misconduct of, or material breach of this Commitment Letter, the Fee Letter or the Facilities Documentation by, such indemnified person (or any of its Related Parties) or any other party hereto, as applicable, in each case as determined by a final, non-appealable judgment of a court of competent jurisdiction.  None of the indemnified persons, you and the Target Entities, or any of your or their respective affiliates or the respective directors, officers, employees, agents, advisors or other representatives of any of the foregoing shall be liable for any special, indirect, consequential or punitive damages in connection with this Commitment Letter, the Fee Letter or the Facilities (including the use or intended use of the proceeds of the Facilities) or the transactions contemplated hereby; provided, that nothing contained in this sentence shall limit your indemnification obligations to the extent set forth hereinabove to the extent such special, indirect, consequential or punitive damages are included in any third party claim in connection with which such indemnified person is entitled to indemnification hereunder.  You shall not be liable for any settlement of any Proceeding effected without your consent (which consent shall not be unreasonably withheld or delayed), but if settled with your written consent, or if there is a final judgment against an indemnified person in any such Proceeding, you agree to indemnify and hold harmless such indemnified person in the manner set forth above.  You shall not, without the prior written consent of the affected indemnified person (which consent shall not be unreasonably withheld or delayed), effect any settlement of any pending or threatened Proceeding against such indemnified person in respect of which indemnity could have been sought hereunder by such indemnified person unless such settlement (a) includes an unconditional release of such indemnified person from all liability or claims that are the subject matter of such Proceeding and (b) does not include any statement as to any admission of fault or culpability.  For purposes hereof, "Related Party" and "Related Parties" of an indemnified person mean any (or all, as the context may require) of such indemnified persons and its (or their) respective affiliates and controlling persons and its or their respective directors, officers, employees, partners, agents, advisors and other representatives thereof.

       8.    <u>Sharing of Information, Absence of Fiduciary Relationship</u>.

       Each Commitment Party, together with its respective affiliates (the "Banks"), is a full service financial firm and as such from time to time may effect transactions for its own account or the account of customers, and hold long or short positions in debt or equity securities or loans of companies that may be the subject of the transactions contemplated hereby.  The Banks may have economic interests that conflict with those of you and the Target Entities.  You acknowledge and agree that (a)(i) the arranging and other services described herein regarding the Facilities are arm's-length commercial transactions between you and your affiliates, on the one hand, and the Banks, on the other hand, (ii) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate and you are not relying on the Commitment Parties for such advice and (iii) you are capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated hereby; and (b) in connection with the transactions contemplated hereby, (i) each Bank has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you or any of your affiliates and (ii) no Bank has any obligation to you or your affiliates except those obligations expressly set forth in this Commitment Letter and any other agreement with you or any of your affiliates.  You further acknowledge and agree that you are responsible for making your own independent judgment with respect to such transactions and the process leading thereto.  Please note that the Commitment Parties and their affiliates have not provided any legal, accounting, regulatory or tax advice.  You agree that you will not claim that the Commitment Parties or their applicable affiliates, as the case may be, have rendered advisory services of any nature or respect, or owe a fiduciary or similar duty to you or your affiliates, in connection with the transactions contemplated by this Commitment Letter.  In particular, each of the parties hereto acknowledge that Morgan Stanley & Co. LLC ("MS&Co.") is acting as a buy-side financial advisor to

Hunt Consolidated, Inc. in connection with the Transactions.  Each of the parties hereto agree not to assert or allege any claim based on actual or potential conflict of interest arising or resulting from, on the one hand, the engagement of MS&Co. in such capacity and our obligations hereunder, on the other hand.  In addition, please note that Barclays Capital Inc. has been retained by Oncor Electric Delivery Company, LLC ("Oncor") as financial advisor (in such capacity, the "Advisor") to Oncor in connection with a transaction involving Oncor and its affiliates.  You agree to such retention, and further agree not to assert any claim you might allege based on any actual or potential conflicts of interest that might be asserted to arise or result from, on the one hand, the engagement of the Advisor and, on the other hand, the relationships of Barclays Capital Inc. or its affiliates with you as described and referred to herein.  You acknowledge that, in such capacity, the Advisor may make recommendations that Oncor does not pursue or accept your offer or proposal for the Acquisition or advise in other manners adverse to your interests.  You further acknowledge that Barclays Bank PLC shall not be imputed to have knowledge of confidential information provided to or obtained by Barclays Capital Inc. in its capacity as Advisor.

You acknowledge that the Commitment Parties and their affiliates may be providing debt financing, equity capital or other services (including, without limitation, financial advisory services) to other persons in respect of which you, the Target Entities and your and their respective affiliates may have conflicting interests regarding the transactions described herein and otherwise.  None of the Commitment Parties or their affiliates will use confidential information obtained from you by virtue of the transactions contemplated by this Commitment Letter or their other relationships with you in connection with the performance by them or their affiliates of services for such other persons, and none of the Commitment Parties or their affiliates will furnish any such information to other persons, except to the extent permitted under Section 9 below.  You also acknowledge that none of the Commitment Parties or their affiliates has any obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained by them from other persons.

9.    Confidentiality.

This Commitment Letter is entered into on the understanding that neither this Commitment Letter nor the Fee Letter nor any of their terms or substance shall be disclosed by you, directly or indirectly, to any other person or entity except (a) your subsidiaries, EFH, the Target Entities and to your and their respective directors, officers, employees, affiliates, members, partners, prospective (solely with respect to you) and actual investors, attorneys, accountants, independent auditors, agents and other advisors on a confidential basis in writing and such parties agree to keep such information confidential (provided, that any disclosure of the Fee Letter or its contents to EFH or the Target Entities directors, officers, employees, affiliates, members, partners, stockholders, attorneys, accountants, independent auditors, agents or other advisors shall be redacted in a manner reasonably satisfactory to the Commitment Parties and you in respect of the amounts of fees (but not the aggregate amount of fees, which may be disclosed to EFH) and the "Flex Provisions" described in the Fee Letter (unless the Commitment Parties otherwise consent, which consent shall not be unreasonably withheld or delayed)), (b) in any legal, judicial or administrative proceeding (including, without limitation, as may be required to obtain Bankruptcy Court approval of the Acquisition (in which case you agree to inform each of us in writing promptly thereof)), (c) to the extent reasonably necessary or advisable in connection with the exercise of any remedy or enforcement of any right under this Commitment Letter and/or the Fee Letter, (d) this Commitment Letter, including the existence and contents of this Commitment Letter (but not the contents of the Fee Letter, other than the existence thereof and the contents thereof as part of projections, pro forma information and a generic disclosure of aggregate sources and uses in marketing materials and other disclosures) may be disclosed (i) in any syndication or other marketing materials in connection with the Facilities and (ii) in connection with any public filing requirement, (e) the Term Sheets, including the existence and contents thereof (but not the Fee Letter or the contents thereof, other than the existence thereof and the aggregate amount of fees payable thereunder, as part of projections, pro forma

information and a generic disclosure of aggregate sources and uses), may be disclosed to any rating agency and (f) after your acceptance hereof, the Term Sheets, including the existence and contents thereof (but not the Fee Letter) may be disclosed to any Lenders or participants or prospective Lenders or prospective participants and, in each case, their directors (or equivalent managers), officers, employees, affiliates, independent auditors or other experts and advisors.  Notwithstanding anything to the contrary in the foregoing, you may, after consulting with the Commitment Parties, disclose to the Bankruptcy Court, the United States Trustee, the Committee Representatives and the Reviewing Parties the fees and expenses payable under the Fee Letter on an aggregate basis with the other fees and expenses payable by you in connection with the Transactions (including legal, professional and advisory and other out of pocket fees and expenses).  The foregoing restrictions shall cease to apply in respect of the existence and contents of this Commitment Letter (but not in respect of the Fee Letter and its contents) on the date that is one year following the termination of this Commitment Letter in accordance with its terms unless earlier superseded by the Facilities Documentation.  As used herein, "Committee Representatives" and "Reviewing Parties" shall have the meanings assigned to such terms in Exhibit 1 to the Order (A) Approving Revised Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C) Approving the form and Manner of Notice Thereof, dated January 14, 2015 (ECF No. 3295) of the Bankruptcy Court.

The Commitment Parties shall use all information received by them in connection with the Acquisition and the related transactions (including any information obtained by them based on a review of the books and records relating to you, the Target Entities and your or their subsidiaries or affiliates) solely for the purposes of providing the services that are the subject of this Commitment Letter and shall treat confidentially all such information and the terms and contents of this Commitment Letter, the Fee Letter and the Facilities Documentation and shall not publish, disclose or otherwise divulge such information; provided, however, that nothing herein shall prevent any Commitment Party from disclosing any such information (a) subject to the final proviso of this sentence, to any Lenders or participants or prospective Lenders or participants, (b) to the extent compelled by legal process in, or reasonably necessary to, the defense of such legal, judicial or administrative proceeding, in any legal, judicial or administrative proceeding or otherwise as required by applicable law, rule or regulation (in which case such Commitment Party shall (i) to the extent permitted by law, inform you promptly in advance thereof and (ii) use commercially reasonable efforts to ensure that any such information so disclosed is accorded confidential treatment), (c) upon the request or demand of any regulatory authority having jurisdiction over such Commitment Party or its affiliates (in which case such Commitment Party shall (i) except with respect to any audit or examination conducted by bank accountants or any governmental bank authority exercising examination or regulatory authority, to the extent permitted by law, notify you promptly in advance thereof and (ii) use commercially reasonable efforts to ensure that any such information so disclosed is accorded confidential treatment), (d) to the directors (or equivalent managers), officers, employees, independent auditors or other experts and advisors of such Commitment Party (collectively, the "Representatives") on a "need to know" basis solely in connection with the transactions contemplated hereby and who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential, (e) to any of its affiliates and their Representatives on a "need to know" basis solely in connection with the transactions contemplated hereby and who are informed of the confidential nature of such information and are or have been advised of their obligation to keep such information confidential; provided, such Commitment Party shall be responsible for its affiliates' and their Representatives' compliance with this paragraph, (f) to the extent any such information becomes publicly available other than by reason of disclosure by such Commitment Party, its affiliates or its or their respective Representatives in breach of this Commitment Letter, (g) to the extent applicable and necessary to establish a due diligence defense, (h) subject to the final proviso of this sentence, to any direct or indirect contractual counterparty to any credit default swap or similar derivative product, and (i) to Moody's or S&P in connection with obtaining a rating required pursuant to this Commitment Letter and/or the Facilities Documentation, as applicable; provided, further, that the

disclosure of any such information pursuant to <u>clauses (a)</u>, <u>(h)</u> and <u>(i)</u> above shall be made subject to the acknowledgment and acceptance by such recipient that such information is being disseminated on a confidential basis (on substantially the terms set forth in this paragraph or as is otherwise reasonably acceptable to you and each Commitment Party, including, without limitation, as set forth in the Confidential Information Memorandum or other marketing materials) in accordance with the standard syndication processes of the Commitment Parties or market standards for dissemination of such type of information, which shall in any event require "click through" or other affirmative action on the part of the recipient to access such confidential information and acknowledge its confidentiality obligations in respect thereof.  The provisions of this paragraph shall automatically terminate on the date that is two years following the date of this Commitment Letter unless earlier superseded by the Facilities Documentation.  Notwithstanding anything to the contrary in this Commitment Letter, under no circumstance will we or our affiliates knowingly disclose any confidential information to a Disqualified Institution (except pursuant to <u>clauses (b)</u> and <u>(f)</u> above).

      10.    <u>Miscellaneous</u>.

In connection with your acceptance of the Term Loan Facility Commitments, you agree to engage one or more investment banks reasonably acceptable to the Initial Lenders (collectively, the "<u>Investment Banks</u>") to place, in one or more transactions, debt or equity securities (including securities convertible or exchangeable into or exercisable for equity securities, other equity-linked securities or hybrid debt-equity securities or similar transaction) of the Parent or Reorganized EFIH yielding aggregate gross cash proceeds of up to $5,500 million of debt or equity securities (including securities convertible or exchangeable into or exercisable for equity securities, other equity-linked securities or hybrid debt-equity securities or similar transaction) the gross cash proceeds of which will be used to provide funds for the Transactions if such sale or placement is completed on or prior to the Acquisition Funding Date or, to the extent such sale or placement occurs subsequent to the Acquisition Funding Date, to refinance the Term Loan Facility, in each case, other than the Rights Offering (as defined in the Acquisition Agreement) (any such debt or equity placement, a "<u>Securities Offering</u>").

This Commitment Letter shall not be assignable by any party hereto (except (i) by you, at your option, to (A) another newly formed domestic shell entity, which will, directly or indirectly, or through a wholly-owned domestic subsidiary, control the Target Entities after giving effect to the Transactions or (B) Reorganized EFH (as defined in <u>Exhibit A</u>) or Reorganized EFIH (as defined in <u>Exhibit A</u>) in connection with the Transactions and, upon such assignment and delegation, shall assume all of your obligations and liabilities hereunder upon the effectiveness of such assignment and (ii) by us as expressly contemplated, and subject to the limitations set forth, under <u>Section 2</u> above) without the prior written consent of each other party hereto, not to be unreasonably withheld or delayed (and any purported assignment without such consent shall be null and void).

This Commitment Letter is intended to be solely for the benefit of the parties hereto and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and, to the extent expressly set forth herein, the indemnified persons.  Notwithstanding the foregoing, but subject to the limitations otherwise set forth herein, each Commitment Party reserves the right to employ the services of its respective affiliates or branches in providing services contemplated hereby and to allocate, in whole or in part, to their affiliates or branches certain fees payable to such Commitment Party in such manner as such Commitment Party and its respective affiliates or branches may agree in their sole discretion and, to the extent so employed, such affiliates and branches shall be entitled to the benefits and protections afforded to, and subject to the provisions governing the conduct of, such Commitment Party hereunder; <u>provided</u> that with respect to the commitments of each Commitment Party, any assignments thereof to an affiliate or branch thereof will not relieve any such Commitment Party from any of its obligations hereunder unless and until, such affiliate or branch shall have funded the

portion of the commitment so assigned (and then only to the extent of the amount so funded).  This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and each Commitment Party.  This Commitment Letter may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which, when taken together, shall constitute one agreement.  Delivery of an executed signature page of this Commitment Letter by facsimile or other electronic transmission (including "pdf", "tif" or similar format) shall be effective as delivery of a manually executed counterpart hereof.  Section headings used herein are for convenience of reference only, are not part of this Commitment Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter.  This Commitment Letter and the Fee Letter are the only agreements that have been entered into among us and you with respect to the subject matter hereof and set forth the entire understanding of the parties with respect hereto and thereto, and supersede all prior agreements and understandings related to the subject matter hereof.

This Commitment Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York; provided that (a) the interpretation of the definition of Company Material Adverse Effect (as defined in the Acquisition Agreement) and whether there shall have occurred a Company Material Adverse Effect (as defined in the Acquisition Agreement), (b) whether the Acquisition has been consummated as contemplated by the Acquisition Agreement and (c) whether the Acquisition Agreement Representations are accurate and whether as a result of any inaccuracy thereof you have the right to terminate your obligations under the Acquisition Agreement, shall be determined in accordance with the laws of the State of Delaware (except to the extent the mandatory provisions of Texas law are applicable) without regard to conflict of laws principles that would result in the application of the laws of another jurisdiction.  Each of the parties hereto irrevocably agrees to waive all right to trial by jury in any suit, action, proceeding or counterclaim (whether based upon contract, tort or otherwise) related to or arising out of the Acquisition, this Commitment Letter, the Fee Letter or the performance by us or any of our affiliates of the services contemplated hereby.

Each of the parties hereto irrevocably and unconditionally (a) submits to the exclusive jurisdiction of the Bankruptcy Court, or, if the Bankruptcy Court does not have exclusive jurisdiction or does not exercise jurisdiction, then to the exclusive jurisdiction of any state or federal court sitting in the Borough of Manhattan in the City of New York (or any appellate court therefrom) over any suit, action or proceeding arising out of or relating to this Commitment Letter, the Fee Letter, the transactions contemplated hereby or the performance of services hereunder and agrees that all claims in respect of any such suit, action or proceeding shall be heard and determined only in the Bankruptcy Court or in such New York state, or to the extent permitted by, federal court and (b) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit or the judgment or in any other matter provided by law.  You and we agree that service of any process, summons, notice or document by registered mail addressed to such person shall be effective service of process against such person for any suit, action or proceeding brought in any such court.  Each of the parties hereto hereby irrevocably and unconditionally waives any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum.

Each of the parties hereto agrees that (i) this Commitment Letter is a binding and enforceable agreement with respect to the subject matter herein (including an obligation to negotiate in good faith) notwithstanding that the funding of the Facilities is subject to the conditions specified herein, including the execution and delivery of the Facilities Documentation by the parties hereto in a manner consistent with this Commitment Letter (including the Documentation Principles (as defined in Exhibit C attached hereto)); it being acknowledged and agreed that the commitments provided hereunder are subject only to those conditions set forth on Exhibit D hereto and (ii) the Fee Letter is a binding and enforceable agreement with respect to the subject matter therein.

Each of the Commitment Parties hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001), as amended (the "PATRIOT Act"), it is required to obtain, verify and record information that identifies each of the Borrower and each Guarantor, which information includes names, addresses, tax identification numbers and other information that will allow each Lender to identify the Borrower and each Guarantor in accordance with the PATRIOT Act.  This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Commitment Parties and each Lender.

The Fee Letter and the indemnification, confidentiality (subject to the last sentence in the first paragraph of Section 9 hereof), jurisdiction, governing law, no agency or fiduciary duty, conflict waiver, waiver of jury trial, service of process, venue submission, survival, information and syndication provisions contained herein (including the Flex Provisions) shall remain in full force and effect regardless of whether the Facilities Documentation shall be executed and delivered and notwithstanding the termination or expiration of this Commitment Letter or the commitments hereunder; provided, that your obligations under this Commitment Letter (other than (a) your obligations with respect to syndication and information, which shall survive only until the expiration of the Syndication Period, at which time such obligations shall terminate and be of no further force and effect, and (b) confidentiality of this Commitment Letter, the Fee Letter and the contents hereof and thereof) shall automatically terminate and be of no further force and effect to the extent superseded by the Facilities Documentation on the Acquisition Funding Date and you shall automatically be released from all liability hereunder in connection therewith at such time.  Subject to the preceding sentence, you may (upon written notice to the Initial Lenders at any time), at your option, terminate this Commitment Letter and the commitments hereunder in whole or in part.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of our offer as set forth in this Commitment Letter and the Fee Letter by returning to us executed counterparts of this Commitment Letter and of the Fee Letter not later than 11:59 p.m., New York City time, on August 26, 2015.  Such offer will remain available for acceptance until such time, but will automatically expire at such time if we have not received such executed counterparts in accordance with the preceding sentence. In the event that the Acquisition Funding Date does not occur on or before 11:59 p.m., New York City time, on the earliest of (a) five (5) business days after the nine-month anniversary of the Original Commitment Date if the Acquisition shall not have occurred on or prior to such date; provided, that (i) so long as all conditions (as provided in the Acquisition Agreement) to the occurrence of the First Closing (as defined in the Acquisition Agreement), other than the receipt of the Private Letter Ruling (as defined in the Acquisition Agreement), have been satisfied before such nine-month anniversary, the date for purposes of clause (a) may, to the extent the Company (as defined in the Acquisition Agreement), exercises its option to extend the Initial Drop-Dead Date (as defined in the Acquisition Agreement) pursuant to Section 8.2 of the Acquisition Agreement, be extended to five (5) business days after August 31, 2016 and/or (ii) if the Required Regulatory Approvals (as defined in the Acquisition Agreement) have not been received by the Initial Drop-Dead Date, the date for purposes of clause (a) may, to the extent Parent exercises its option to extend the Initial Drop-Dead Date pursuant to Section 8.2 of the Acquisition Agreement, be extended for up to 180 days for the purpose of continuing to pursue such Required Regulatory Approvals, (b) the date of the termination of the Acquisition Agreement by you or with your written consent, in each case prior to the closing of the Acquisition or (c) the date of the closing of the Acquisition without the use of the Facilities, then this Commitment Letter and the commitments hereunder shall automatically terminate unless, in each case, we shall, in our sole discretion, agree to an extension.  In addition, each Commitment Party's commitments hereunder to provide and arrange the Term Loan Facility will be reduced on a dollar-for-dollar basis in an aggregate principal amount of up to $5,500 million by any issuance under a Securities Offering (including the issuance of securities the proceeds of which are deposited into escrow) prior to the Acquisition Funding Date; provided, that the

Term Loan Facility shall not be reduced by more than $2,000 million as a result of the issuance of equity securities in connection with a Securities Offering.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

We are pleased to have been given the opportunity to assist you in connection with this important financing.

**MORGAN STANLEY SENIOR FUNDING, INC.**

By: _____
    Name: William Graham
    Title: Managing Director

[Signature Page to Amended and Restated Commitment Letter]

**JPMORGAN CHASE BANK, N.A.**

By: _____

Name: *Peter Christensen*

Title: *Vice President*

**J.P. MORGAN SECURITIES LLC**

By: _____

Name:

Title: **Daniel Pombo**
**Managing Director**

[Signature Page to Amended and Restated Commitment Letter]

BANK OF AMERICA, N.A.

By: _____

    Name:  William Merritt
    Title:  Vice President


MERRILL LYNCH, PIERCE, FENNER
& SMITH INCORPORATED

By: _____

    Name: _____
    Title:         **Sanjay Rijhwani**
                    **Director**


[Signature Page to Amended and Restated Commitment Letter]

**BARCLAYS BANK PLC**

By: _____
     Name: Paul Cugno
     Title: Managing Director

[Signature Page to Amended and Restated Commitment Letter]

**DEUTSCHE BANK AG NEW YORK BRANCH**

By: _____
Name: Craig Molson
Title: Managing Director

By: _____
Name: **Sandeep Desai**
Title: Managing Director

**DEUTSCHE BANK SECURITIES INC.**

By: _____
Name: Craig Molson
Title: Managing Director

By: _____
Name: **Sandeep Desai**
Title: Managing Director

[Signature Page to Amended and Restated Commitment Letter]

MUFG UNION BANK, N.A.

By: _____

Name:    Jeffrey Fesenmaier
Title:    Managing Director

[Signature Page to Amended and Restated Commitment Letter]

**WELLS FARGO BANK, NATIONAL ASSOCIATION**

By: _____

    Name:  Scott Bjelde
    Title:  Managing Director

**WELLS FARGO SECURITIES, LLC**

By: _____

    Name:
    Title:

[Signature Page to Amended and Restated Commitment Letter]

WELLS FARGO BANK, NATIONAL
ASSOCIATION

By: _____
     Name:
     Title:


WELLS FARGO SECURITIES, LLC

By: _____
     Name:    Kevin J. Scotto
     Title:     Director

[Signature Page to Amended and Restated Commitment Letter]

Accepted and agreed to as of
the date first above written:

**OVATION ACQUISITION I, L.L.C.**

By: _____

    Name: David C. Hernandez
    Title: Senior Vice President


**OVATION ACQUISITION II, L.L.C.**

By: _____

    Name: David C. Hernandez
    Title: Senior Vice President


[Signature Page to Amended and Restated Commitment Letter]

**<u>SCHEDULE 1</u>**

**COMMITMENTS**

| Commitment Party | Term Loan Facility | Overnight Facility |
|---|---|---|
| Morgan Stanley Senior Funding, Inc. | 50.0% | 50.0% |
| JPMorgan Chase Bank, N.A. | 15.0% | 15.0% |
| Bank of America, N.A. | 7.0% | 7.0% |
| Barclays Bank PLC | 7.0% | 7.0% |
| Deutsche Bank AG New York Branch | 7.0% | 7.0% |
| MUFG Union Bank, N.A. | 7.0% | 7.0% |
| Wells Fargo Bank, National Association | 7.0% | 7.0% |
| **TOTAL** | **100%** | **100%** |

Project Ovation
Transaction Summary

   Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Commitment Letter to which this <u>Exhibit A</u> is attached or in <u>Exhibit B</u>, <u>C</u>, or <u>D</u> (including the Annexes thereto) attached thereto.  In the case of any such capitalized term that is subject to multiple and differing definitions, the appropriate meaning thereof in this <u>Exhibit A</u> shall be determined by reference to the context in which it is used.

   The Purchasers intend to acquire (the "<u>Acquisition</u>") equity interests of reorganized Energy Future Holdings Corp. ("<u>Reorganized EFH</u>") and Energy Future Intermediate Holding Company LLC ("<u>Reorganized EFIH</u>") in connection with the pending bankruptcy cases filed by Energy Future Holdings Corp. (the "<u>EFH</u>") and certain of its subsidiaries and affiliates, et al. (collectively, the "<u>Debtors</u>"), jointly administered under Case No. 14-10979 (CSS) (the "<u>Bankruptcy Cases</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") and, in particular, intend to (i) merge Reorganized EFH with and into Parent (the "<u>Merger</u>") and (ii) consummate certain related transactions pursuant to which OV2 will acquire equity interests in Reorganized EFIH (and, together with Reorganized EFH and the subsidiaries of Reorganized EFH and Reorganized EFIH (other than Energy Future Competitive Holdings Company LLC, Texas Energy Competitive Electric Holdings Company LLC, TXU Europe Limited, EFH Corporate Services Company and their respective subsidiaries, including any subsidiaries to be formed prior to the Acquisition Funding Date), the "<u>Target Entities</u>") pursuant to the Plan of Reorganization, and as more particularly described in that certain Purchase Agreement and Agreement and Plan of Merger dated as of August 9, 2015 among the Purchasers, Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("<u>EFIH</u>"), and EFH (as amended from time to time in a manner that would not result in a failure of the condition precedent set forth in paragraph 1 of <u>Exhibit D</u>, the "<u>Acquisition Agreement</u>").  In connection therewith:

   (a)  On the Acquisition Funding Date:

    (i)  A consortium of investors led by Hunt (as defined below) and members of an ad hoc group of TCEH unsecured creditors (collectively, the "<u>Equity Investors</u>"), will make cash investments to Parent as common stock or equity contributions (collectively with the OV2 Contribution (as defined below), the "<u>Equity Contribution</u>"). The Equity Contribution will not be less than an amount equal to 50% (the "<u>Minimum Equity Contribution</u>") of the (i) aggregate gross proceeds of the Term Loan Facility and/or any proceeds from a Securities Offering funded on the Acquisition Funding Date, (ii) aggregate amount of Permitted Surviving Debt (as defined below, but excluding for the purposes of this clause (ii) any indebtedness for borrowed money of the Oncor Entities (as defined in <u>Exhibit B</u>)) and (iii) all cash investments made by the Equity Investors to Parent as common stock or common equity contributions made in connection with the Transactions;

    (ii)  if applicable, Parent will acquire the equity interests in Oncor Electric Delivery Company LLC (if any) currently held by Texas Transmission Investment LLC and Oncor Management Investment LLC (the "<u>Minority Interests</u>");

    (iii)  Reorganized EFH will issue new shares of common stock to TCEH Unsecured Creditors as set forth in the Acquisition Agreement equal to 100% of the issued and outstanding common stock of Reorganized EFH;

(iv)    Reorganized EFH and/or Reorganized EFIH will borrow secured bridge loans (the "Overnight Loans") under the Overnight Facility in an aggregate principal amount of up to $250 million, as described in Exhibit C;

(v)    the Borrower (as defined in Exhibit B) will (x) borrow senior secured term loans (the "Term Loans") under the Term Loan Facility in an aggregate principal amount of up to $5,500 million, as described in Exhibit B less the aggregate principal amount of any and all debt and equity securities issued pursuant to a Securities Offering and/or (y) if and to the extent that the Borrower does not borrow the Term Loans in such aggregate principal amount on or prior to the Acquisition Funding Date, the Borrower will issue or cause to be issued concurrently or prior to the Acquisition Funding Date up to $5,500 million of debt or equity securities pursuant to a Securities Offering on terms and conditions reasonably acceptable to the Commitment Parties;

(vi)    all existing third party debt for borrowed money of the Target Entities will be repaid, redeemed, defeased, discharged, refinanced or terminated (or irrevocable notice for the repayment or redemption thereof will be given) and all security and guarantees in respect thereof released and discharged (the "Refinancing") other than indebtedness, security and guarantees permitted to remain outstanding under the Facilities Documentation after the Acquisition Funding Date, which shall include all third party indebtedness for borrowed money of the Oncor Entities in existence as of the Acquisition Funding Date, any securities issued pursuant to any Securities Offering and any debt permitted to remain outstanding under the Acquisition Agreement (the "Permitted Surviving Debt");

(vii)    Reorganized EFH and Parent will consummate the Merger, upon which Parent, as the surviving company (the "Surviving Company") will cause a portion of the Overnight Facility to be repaid;

(viii)    The Surviving Company will contribute the Minority Interests (if acquired by it) to Reorganized EFIH in exchange for the issuance by Reorganized EFIH of partnership interests;

(ix)    the fees, premiums, expenses and other transaction costs incurred in connection with the Transactions, including to fund any original issue discount and upfront fees (the "Transaction Costs") then due and payable will be paid; and

(x)    the proceeds of the Term Loan Facility and the Overnight Facility will be used to pay the consideration and other amounts owing in connection with the Acquisition under the Acquisition Documents, to effect the Refinancing and to pay all or a portion of the Transaction Costs.

(b)    On the Second Closing Date (as defined in the Acquisition Agreement), to be held at least one business day after the Acquisition Funding Date:

(i)    Hunt Consolidated Inc. ("Hunt") will make cash investments to OV2 as common stock or equity contributions (the "OV2 Contribution").

(ii)    OV2 will contribute to Reorganized EFIH an amount in cash specified in the Acquisition Agreement from the Equity Contribution in exchange for new partnership interests in Reorganized EFIH (the "OV2 Equity Contribution"); and

Exhibit A-2

        (iii)      Reorganized EFIH and the Surviving Company will repay in full all remaining indebtedness outstanding under the Overnight Facility.

The transactions described above in <u>clauses (a)</u> and <u>(b)</u>, together with the transactions contemplated to occur on the Acquisition Funding Date by the Acquisition Agreement are collectively referred to as the "<u>Transactions</u>." For purposes of the Commitment Letter and the Fee Letter "<u>Acquisition Funding Date</u>" shall mean the date of the consummation of the Merger and the satisfaction or waiver of the relevant conditions set forth on <u>Exhibit D</u> and the funding of the Facilities.

Project Ovation
$5,500 million Senior Secured Term Loan Facility

<u>Summary of Principal Terms</u>

Set forth below is a summary of the principal terms for the Term Loan Facility Commitments to be provided pursuant to the Commitment Letter to which this <u>Exhibit B</u> is attached (the "<u>Term Loan Facility</u>", together with the Overnight Facility (as defined in <u>Exhibit C</u>), the "<u>Facilities</u>").  Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Commitment Letter to which this <u>Exhibit B</u> is attached or in <u>Exhibit A</u>, <u>C</u>, or <u>D</u> (including the Annexes hereto and thereto) attached thereto.  In the case of any such capitalized term that is subject to multiple and differing definitions, the appropriate meaning thereof in this <u>Exhibit B</u> shall be determined by reference to the context in which it is used.

| | |
|---|---|
| <u>Borrower</u>: | Parent or Reorganized EFIH or, upon the prior written consent of the Term Loan Lead Arrangers, another entity reasonably acceptable to the Term Loan Lead Arrangers (the "<u>Borrower</u>"). |
| <u>Agent</u>: | MSSF will act as sole administrative agent and collateral agent, (in such capacity, the "<u>Term Loan Administrative Agent</u>") and MSSF will act as syndication agent for a syndicate of banks, financial institutions and other lenders (other than Disqualified Institutions) (together with MSSF, JPMCB, BOA, BBPLC, DBNY, MUFG and WFB, the "<u>Term Loan Lenders</u>"), and will perform the duties customarily associated with such role. |
| <u>Term Loan Lead Arrangers and Bookrunners</u>: | MSSF, JPM Securities, MLPFS, BBPLC, DBSI, MUFG and WFS, will act as joint lead arrangers and joint bookrunners for the Term Loan Facility (the "<u>Term Loan Lead Arrangers</u>"), and will perform the duties customarily associated with such role. |
| <u>Term Loan Facility</u>: | Senior secured term loans in an aggregate principal amount of up to $5,500 million (the "<u>Term Loans</u>"), less the aggregate principal amount of any Securities Offering on or prior to the Acquisition Funding Date; <u>provided</u> that the Term Loan Facility shall not be reduced by more than $2,000 million as a result of the issuance of equity securities in connection with a Securities Offering. |
| <u>Purpose</u>: | The proceeds of the Term Loans will be used by the Borrower on the Acquisition Funding Date, together with the proceeds of (i) any Securities Offering (if any) on or prior to the Acquisition Funding Date, (ii) the proceeds of the Equity Contribution and (iii) borrowings under the Overnight Facility, to finance a portion of the Transactions (including working capital and/or purchase price adjustments, the payment of Transaction Costs and to acquire the Minority Interests (which may, for the avoidance of doubt, occur after the Acquisition Funding Date |

using proceeds of the Term Loans borrowed on the Acquisition Funding Date)).

Availability:

The Term Loans shall be made in a single drawing on the Acquisition Funding Date. Repayments and prepayments of the Term Loans may not be reborrowed.

Maturity and Amortization:

The Term Loan Facility shall mature on the seventh anniversary of the Acquisition Funding Date (the "Term Loan Maturity Date"). The Term Loans will amortize in equal quarterly installments in aggregate annual amounts equal to 1.00% of the original principal amount of the Term Loan Facility during each year of the Term Loan Facility, with a final balloon payment equal to the balance of the original principal amount of the Term Loan Facility payable at maturity.

Guarantees:

Parent, which is a direct parent company of the Borrower and the Borrower's current and future wholly-owned domestic subsidiaries, other than (i) any domestic subsidiary of a foreign subsidiary that is a "controlled foreign corporation" within the meaning of Section 957 of the Internal Revenue Code of 1986, as amended (a "CFC"), (ii) any domestic subsidiary that has no material assets other than equity interests in and/or debt of one or more foreign subsidiaries that are CFCs (a "CFC Holdco"), (iii) any domestic subsidiary that is prohibited by applicable law, rule, regulation or contract from guaranteeing the Term Loan Facility or which would require governmental (including regulatory) consent, approval, license or authorization to provide a Guarantee (unless such consent, approval, license or authorization has been received) and (iv) the Oncor Entities (as defined below) (collectively, the "Guarantors" and together with the Borrower, the "Credit Parties").

For the avoidance of doubt, Oncor Electric Delivery Holdings Company LLC and its subsidiaries (the "Oncor Entities") (i) will not be Guarantors under the Term Loan Facility and (ii) will not be directly or indirectly restricted (or be "restricted subsidiaries") in the conduct of their respective businesses by the Term Loan Facility Documentation (whether by application of mandatory repayments, representations and warranties, affirmative covenants, negative covenants, events of default or otherwise) (other than through customary covenants restricting transaction with affiliates, intercompany investments and intercompany loans).

Ranking:

The Term Loans will constitute senior secured indebtedness of the Borrower, and will rank pari passu in right of payment with all senior debt of the Borrower and senior in right of payment to all subordinated indebtedness of the Borrower.

Exhibit B-2

Security:    All cash management, interest rate protection and other hedging arrangements entered into with the Term Loan Administrative Agent, any Term Loan Lender, or any affiliates of the foregoing at the time of the entering into of such arrangements will be secured by a valid and perfected first priority lien and security interest in all of the following, whether owned on the Acquisition Funding Date or thereafter acquired (collectively, the "Collateral"):

(a)    all equity interests of (or other ownership interests in), and intercompany debt of, the Borrower, each Guarantor and each other direct subsidiary owned by a Credit Party (which, for the avoidance of doubt, shall include a pledge of the equity interests in Oncor Electric Delivery Holdings Company LLC), except, in the case of any equity interest of any CFC or CFC Holdco, such pledge shall be limited to 65% of the voting capital stock (and, for the avoidance of doubt, 100% of the non-voting capital stock) of such CFC or CFC Holdco;

(b)    substantially all present and future tangible and intangible assets of the Borrower and the Guarantors including but not limited to, machinery and equipment, inventory and other goods, accounts receivable, owned real property, fixtures, as-extracted collateral, general intangibles, intercompany debt, license rights, intellectual property, chattel paper, insurance policies, contract rights, hedge agreements, documents, instruments, indemnification rights, tax refunds and investment property, wherever located; and

(c)    all proceeds and products of the property and assets described in clauses (a) and (b) above.

All the above-described pledges, security interests and mortgages shall be created on terms and pursuant to documentation reasonably satisfactory to the Term Loan Administrative Agent, and none of the Collateral shall be subject to any other pledges, security interests or mortgages, customary exceptions and other exceptions to be agreed upon.  Assets will be excluded from the Collateral in circumstances to be mutually agreed and in circumstances where the Term Loan Administrative Agent determines in writing, in consultation with the Borrower, that the cost of obtaining a security interest in such assets is excessive in relation to the value afforded thereby. Notwithstanding the foregoing (x) the Collateral shall not include any of the assets of the Oncor Entities and any of the equity interests issued by any of the Oncor Entities not held by a Credit Party and (y) in no event shall control agreements or control, lockbox or similar arrangements be required.

Exhibit B-3

| | |
|---|---|
| Interest Rates: | At the Borrower's option, the Term Loans will bear interest based on the Base Rate or LIBOR (in each case, as defined below): |

A. <u>Base Rate Option</u>

Interest will be at the Base Rate plus 1.75% per annum, calculated on the basis of the actual number of days elapsed in a year of 365 days and payable quarterly in arrears. "<u>Base Rate</u>" shall mean, for any day, a fluctuating rate per annum equal to the highest of (i) the Federal Funds Rate, as published by the Federal Reserve Bank of New York, plus 1/2 of 1%, (ii) the rate that the Term Loan Administrative Agent announces from time to time as its prime or base commercial lending rate, as in effect from time to time and (iii) LIBOR for an interest period of one-month beginning on such day plus 1%.

Base Rate borrowings will be in minimum amounts to be agreed upon and will require one business day's prior notice.

B. <u>LIBOR Option</u>

Interest will be determined for periods to be selected by the Borrower ("<u>Interest Periods</u>") of one, two, three or six months or (subject to the prior consent of all Term Loan Lenders) 12 months and will be at an annual rate equal to the London Interbank Offered Rate ("<u>LIBOR</u>") for the corresponding deposits of U.S. dollars, plus 2.75% per annum; <u>provided</u> that LIBOR shall be deemed to be not less than 0.75% per annum; <u>provided</u>, that if LIBOR is less than zero, it will be deemed to be zero. LIBOR will be determined by reference to the rate appearing on Reuters Screen Libor 01 for the applicable interest period (or on any successor or substitute page of such screen, or any successor to or substitute for such screen, providing rate quotations comparable to those currently provided on such page of such screen, as determined by the Term Loan Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market). Interest will be paid at the end of each Interest Period or, in the case of Interest Periods longer than three months, quarterly, and will be calculated on the basis of the actual number of days elapsed in a year of 360 days. LIBOR will be adjusted for statutory reserve requirements (if any).

LIBOR borrowings will require three business days' prior notice and will be in minimum amounts to be agreed upon.

| | |
|---|---|
| Default Rate: | In the case of a payment default, the applicable interest rate on overdue amounts shall be increased by 2.00% *per annum*. |

Exhibit B-4

| | |
|---|---|
| Mandatory Prepayments: | The Borrower will prepay the Term Loans, without premium or penalty, together with accrued interest, with any of the following: (i) the net cash proceeds from the issuance of any public equity securities of the Borrower (excluding any net cash proceeds from any Rights Offering (as defined in the Acquisition Agreement)); provided that the Term Loan Facility shall not be subject to a mandatory prepayment of more than $2,000 million as a result of the issuance of such public equity securities; (ii) the net cash proceeds from certain other indebtedness to be agreed incurred by the Borrower or any of the Borrower's restricted subsidiaries (including any refinancing facility but excluding any other indebtedness permitted by the Term Loan Facility Documentation); and (iii) the net cash proceeds from non-ordinary course asset sales by the Borrower or any of the Borrower's restricted subsidiaries other than amounts reinvested in assets to be used in the Borrower's or any of its subsidiaries' business within 12 months and other exceptions to be agreed. Any such prepayments pursuant to the foregoing clauses (i) and (ii) above shall be subject to customary and appropriate exceptions (including in respect of the issuances of equity securities issued pursuant to equity compensation arrangements) and baskets to be no more restrictive than the Precedent Credit Agreement (as defined below). |
| Voluntary Prepayments: | The Term Loans may be prepaid at any time, without premium or penalty (other than any breakage or redeployment costs and except as set forth below), in whole or in part, at the option of the Borrower, together with accrued and unpaid interest, including from the proceeds of a Securities Offering. |
| Application of Prepayments: | Prepayments of the Term Loan Facility will be applied (i) in the case of optional prepayments, to the remaining scheduled amortization payments thereof as directed by the Borrower and (ii) in the case of mandatory prepayments, first, to accrued interest and fees due on the amount of the prepayment and second, in the direct order of maturity to the remaining installments under the Term Loan Facility. |
| Prepayment Premium: | In the event that, within six months of the Acquisition Funding Date, the Term Loan Facility is refinanced with the proceeds of any senior secured term loans with a lower applicable margin or yield than that applicable to the Term Loan Facility, such prepayment shall be made at 101% of the principal amount prepaid. Repricings of a Term Loan Facility through an amendment will be deemed a prepayment. For the avoidance of doubt (x) a repayment with the proceeds of a debt or equity securities offering (whether by initial public offering or otherwise) and (y) a repayment arising in connection with a "change of control" or "transformative transaction" (each such term to be defined in in the Term Loan Facility Documentation), shall, in either case, not give rise to a prepayment premium. |

Exhibit B-5

Assignments and Participations:

Each Term Loan Lender may assign all or, subject to minimum amounts to be agreed, a portion of its Term Loans and commitments under the Term Loan Facility (other than to any Disqualified Institution) with the consent of (a) the Borrower, unless a payment event of default has occurred and is continuing or if such assignment is to an existing Term Loan Lender, an affiliate of an existing Term Loan Lender or an approved fund of a Term Loan Lender; provided that the consent of the Borrower shall have been deemed to have been given if the Borrower has not responded within ten business days of written request for such consent and (b) the Term Loan Administrative Agent.

The Term Loan Lenders will have the right to participate their Term Loans and commitments under the Term Loan Facility to other financial institutions (other than to any Disqualified Institution); provided that voting rights of participants shall be limited to matters in respect of (a) increase in commitments participated to such participants, (b) reductions of principal, interest or fees, (c) extensions of final maturity or the due date of any interest or fee payment, (d) release of all or substantially all of the value of the guarantees of the Guarantors and (e) changes in voting threshold.

No assignment or participation may be made to Disqualified Institutions; provided that the list of Disqualified Institutions shall be made available to the Term Loan Lenders upon request thereof.

Assignments of Term Loans to the Borrower and its affiliates shall be permitted through open market purchases and/or Dutch auctions in accordance with customary procedures to be mutually agreed upon and subject to customary terms and conditions.

Term Loan Facility Documentation:

The definitive credit documentation for the Term Loan Facility (the "Term Loan Facility Documentation") shall be in the form of a customary senior secured term loan credit facility agreement, shall contain the terms set forth in the Commitment Letter and the Exhibits thereto and such other terms as the Borrower and the Commitment Parties shall agree, which will be negotiated in good faith (giving effect to the Limited Conditionality Provision); it being understood and agreed that the Term Loan Facility Documentation shall (a) give due regard to the operational and strategic requirements of the Borrower and its restricted subsidiaries in light of their consolidated size, industries, practices and proposed business plan (including, without limitation, to obtain and maintain REIT status), in each case, after giving effect to the transactions contemplated herein, (b) be based on the credit agreement, dated as of July 23, 2014 among TerraForm Power Operating, LLC, Goldman Sachs Bank USA, as administrative agent and collateral agent and the other

Exhibit B-6

parties from time to time party thereto (the "Precedent Credit Agreement"), which shall be modified in a customary manner to reflect the incorporation of a term loan facility as contemplated hereby (as opposed to a revolving credit facility) and (c) give due regard to the Borrower's financial model, delivered by the Lead Arrangers to the Borrower on July 21, 2015, (clauses (a), (b) and (c), the "Term Loan Documentation Principles"). Notwithstanding the foregoing, the Term Loan Facility Documentation will contain only those conditions to borrowing expressly set forth in Exhibit D to the Commitment Letter.

Conditions Precedent to Borrowing:

The availability of the Term Loan Facility on the Acquisition Funding Date will be subject solely to the conditions in Exhibit D to the Commitment Letter and shall be subject in all respects to the Limited Conditionality Provision.

Representations and Warranties:

Representations and warranties applicable to the Borrower and its restricted subsidiaries, consistent with the Term Loan Documentation Principles and limited to: corporate existence; corporate power and authority; non-contravention and enforceability of the Term Loan Facility Documentation; no conflicts of the Term Loan Facility Documentation with applicable law or material contracts; accuracy and completeness of financial and other information (including pro forma financial information); compliance with applicable laws and regulations, including ERISA, environmental laws and Federal Reserve regulations; accuracy and completeness of disclosure; absence of undisclosed liabilities; consents; ownership of property; intellectual property; PATRIOT Act and anti-terrorism law compliance; anti-money laundering; FCPA; OFAC; subsidiaries; status as senior debt; no material litigation; inapplicability of the Investment Company Act of 1940; solvency of the Borrower and its restricted subsidiaries on a consolidated basis as of the Acquisition Funding Date; payment of taxes; and validity, priority and perfection of the liens on and security interest in the Collateral.

Affirmative Covenants:

Affirmative covenants applicable to the Borrower and its restricted subsidiaries, consistent with the Term Loan Documentation Principles, and limited to: delivery of certified quarterly (for the first three quarters of each fiscal year) and audited annual financial statements, accountants' letters, notices of defaults, litigation and other material events, annual budgets, compliance certificates and other information customarily supplied and reasonably requested in transactions of this type; compliance with applicable laws and regulations, including ERISA, environmental laws, Federal Reserve regulations, PATRIOT Act, OFAC, anti-money laundering laws and the FCPA; payment of taxes; maintenance of appropriate and adequate insurance; use of proceeds; preservation of corporate

existence, rights (charter and statutory), permits, licenses and approvals; visitation and inspection rights; keeping of proper books and records; maintenance of properties; agreement to hold annual meetings (or, at the discretion of the Borrower, conference calls) with Term Loan Lenders; covenant to guarantee obligations and provide security; further assurances (including, without limitation, with respect to security interests in after acquired property); ability to designate and re-designate unrestricted subsidiaries on terms to be mutually agreed; and commercially reasonable efforts to maintain public corporate credit/family ratings of the Borrower and ratings of the Term Loan Facility from Moody's and S&P (but not to maintain a specific rating). For the avoidance of doubt, the affirmative covenants shall not include a requirement to provide updates to schedules or requirements to maintain cash management systems on terms acceptable to the Term Loan Administrative Agent.

Negative Covenants:                      Negative covenants applicable to the Borrower and its restricted subsidiaries, consistent with the Term Documentation Principles and limited to:

1. Limitations on liens and further negative pledges; provided, that the Borrower shall be permitted to secure loans and commitments under the Revolving Facility (as defined below) on a *pari passu* basis with the Term Loan Facility pursuant to intercreditor arrangements reasonably satisfactory to the Term Loan Administrative Agent and the Borrower.

2. Limitations on sale-leaseback transactions.

3. Limitations on debt (including, without limitation, guaranties and other contingent obligations, and including the subordination of all intercompany indebtedness owed by a Credit Party on terms reasonably satisfactory to the Term Loan Administrative Agent) and "disqualified" preferred stock; provided that the Borrower shall be permitted to establish commitments for, and incur loans under, a revolving credit facility for working capital and other general corporate purposes in an aggregate principal amount not to exceed $350 million on terms and conditions to be agreed (the "Revolving Facility").

4. Limitations on mergers, consolidations and acquisitions.

5. Limitations on sales, transfers and other dispositions of assets.

6. Limitations on loans and other investments.

7. Limitations on dividends and other distributions, stock repurchases and redemptions and other restricted payments.

8. Limitations on transactions with affiliates.

Exhibit B-8

9. No change in (i) the nature of their business (with carve-outs for similar ancillary and reasonably related businesses), or (ii) fiscal year.

10. No modification or waiver of subordinated debt and the charter documents of the Borrower and its restricted subsidiaries in a manner materially adverse to the Term Loan Lenders.

For the avoidance of doubt, upon the delivery of an opinion (addressed to the Term Loan Lenders) of Baker Botts LLP providing for the REIT Opinions (as defined below), the Term Loan Facility Documentation will permit unlimited restricted payments to the extent necessary to permit the Borrower (or its direct or indirect parent companies) to maintain its status as a real estate investment trust for U.S. federal income tax purposes (a "REIT") under the Internal Revenue Code of 1986, as amended (the "Code") and to avoid the imposition of income or excise taxes on the Borrower or its direct or indirect parent companies, notwithstanding that any default or event of default may have occurred and be continuing. As used herein, the "REIT Opinions" shall mean, assuming the Borrower (or its direct or indirect parent) will make a timely election to be treated as a REIT under the Code: (1) that, commencing with the Borrower's (or its direct or indirect parent) first year of intended status as a REIT, that it has been organized in conformity with the requirements for qualification and taxation as a REIT under the Code, and, based on the Borrower's (or its direct or indirect parent's) actual operations through the date of emergence from the Bankruptcy Cases and proposed method of operation thereafter, it will qualify as a REIT under the Code, (2) to the extent the Borrower (or its direct or indirect parent) is an "UPREIT" (i.e. all the properties are acquired or owned directly or indirectly by an umbrella partnership), that the umbrella partnership entity has been since its formation or emergence from the Bankruptcy Cases, is and, based on its proposed method of operation thereafter, will be treated as a partnership or disregarded entity for U.S. federal income tax purposes (and not as a publicly traded partnership taxable as a corporation) and (3) to the extent Borrower (or its direct or indirect parent) owns any assets as part of a joint venture (other than assets held through a "taxable REIT subsidiary" (within the meaning of Section 856(l) of the Code)), that each subsidiary partnership has been since its formation or emergence from the Bankruptcy Cases, is and, based on its proposed method of operation thereafter, will be treated as a partnership for U.S. federal income tax purposes (and not as a publicly traded partnership taxable as a corporation). Notwithstanding the foregoing, the Borrower (or its direct or indirect parent) shall be permitted to make any purging dividends necessary to qualify and elect to be treated as a REIT under the Code prior to making the actual

Exhibit B-9

election to be a REIT; <u>provided</u> that a timely REIT election is ultimately made in due course.

| | |
|---|---|
| <u>Financial Covenant</u>: | None. |

<u>Events of Default</u>:    Events of default applicable to the Borrower and its restricted subsidiaries, consistent with the Term Loan Documentation Principles and limited to: failure to pay principal when due or interest or other amounts within a specified grace period of 10 days with respect to any default in the failure to pay interest; breach of representations and warranties; breach of covenants (subject, in the case of affirmative covenants (other than notices of default and the covenant to maintain the existence of the Borrower) to a grace period of 30 days); cross-default and cross-acceleration to material indebtedness (other than as a result of a financial covenant contained in any revolving credit facility); bankruptcy and insolvency of the Borrower or its restricted subsidiaries; material judgment defaults with respect to the Borrower and its restricted subsidiaries; actual or asserted invalidity by the Credit Parties or impairment of Term Loan Facility Documentation; change of control; and customary ERISA defaults.

<u>Voting</u>:    Amendments and waivers with respect to the Term Loan Facility Documentation will require the approval of Term Loan Lenders holding a majority of the aggregate principal amount of the Term Loans, except that (i) the consent of each Term Loan Lender directly and adversely affected thereby shall be required with respect to (a) reductions in the principal amount or extensions of the final maturity or reductions of scheduled amortization of any Term Loan, (b) reductions in the rate of interest (other than a waiver of default interest), or the amount of any fee owed to such Term Loan Lender or (c) modifications to the assignment provisions of the Term Loan Facility Documentation that further restrict assignments thereunder and (ii) the consent of 100% of the Term Loan Lenders shall be required with respect to (a) reductions of any of the voting percentages and (b) releases of all or substantially all of the value of the guarantees of the Guarantors.

Notwithstanding the foregoing, modifications to customary provisions in connection with the "amend and extend" transactions shall be permitted on customary terms and shall only require approval of the affected and consenting Term Loan Lenders; <u>provided</u> that it is understood that no existing Term Loan Lenders will have any obligation to commit to any such extension.  The Term Loan Facility Documentation will permit amendments thereof without the approval or consent of the Term Loan Lenders to effect a permitted "repricing transaction" (i.e., a transaction in which any tranche of Term Loans is refinanced

with a replacement tranche of term loans, or is modified with the effect of, bearing a lower rate of interest) other than any Term Loan Lender holding Term Loans subject to such "repricing transaction" that will continue as a Term Loan Lender in respect of the repriced tranche of Term Loans or modified Term Loans.

Non-Consenting Term Loan Lenders:

The Term Loan Facility Documentation shall contain customary and appropriate provisions for transactions of this type, consistent with the Term Loan Documentation Principles, for replacing non-consenting Term Loan Lenders in connection with amendments and waivers requiring the consent of all Term Loan Lenders or of all Term Loan Lenders affected thereby so long as Term Loan Lenders holding more than 50% of the aggregate amount of the loans and commitments under the Term Loan Facility shall have consented thereto.

Cost and Yield Protection:

Customary and appropriate for financings of this type, it being agreed that the documentation will provide customary provisions regarding withholding and other tax liabilities; *provided* that the Term Loan Facility Documentation shall contain provisions requiring Term Lenders to assert a claim in respect of yield protection with a specified period of time.  The Term Loan Facility Documentation shall contain customary provisions protecting the Term Loan Lenders against increased costs or loss of yield resulting from changes in reserve, capital adequacy and other requirements of law and from the imposition of or changes in certain withholding or other taxes (it being understood that the Dodd Frank Wall Street Reform and Consumer Protection Act and Basel III and all regulations, interpretations and directives thereunder shall be deemed to be a change in law if, and only if, it is the Term Loan Lender's general policy or practice to demand compensation in similar circumstances under comparable provisions of other financing agreements).

Expenses and Indemnification:

To reimburse each Commitment Party from time to time within 30 days after receipt of an invoice, for all reasonable and documented out-of-pocket expenses (including due diligence expenses, applicable syndication expenses and travel expenses, but limited, in the case of legal fees and expenses, to the reasonable fees, charges and disbursements of one counsel to the Commitment Parties, taken as a whole (and, if reasonably necessary, of one local counsel in any relevant material jurisdiction to all such persons, taken as a whole)), incurred in connection with each of the Term Loan Facility and any related documentation (including this Commitment Letter, the Fee Letter and the Term Loan Facility Documentation).  The Borrower agrees to pay all costs and expenses of the Term Loan Administrative Agent and its affiliates (including, without limitation, reasonable fees and disbursements of counsel) incurred in connection with the administration, amendment, waiver or modification (including proposed amendments,

waivers or modifications) of, and enforcement of any of its rights and remedies under, the Term Loan Facility Documentation.

The Borrower will indemnify the Term Loan Lenders, the Commitment Parties, the Term Loan Lead Arrangers, the Term Loan Administrative Agent and their respective affiliates, and hold them harmless from and against all reasonable and documented out-of-pocket costs, expenses (including but not limited to reasonable legal fees and expenses of one counsel to such indemnified persons, taken as a whole) and liabilities arising out of or relating to the Transactions and any actual or proposed use of the proceeds of any loans made under the Term Loan Facility; provided, however, that no such person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred resulted from (i) the gross negligence, bad faith or willful misconduct of such person or any of its controlled affiliates, (ii) any material breach of the Term Loan Facility Documentation by such person or any of its affiliates and (iii) any dispute between or among indemnified persons (other than any Proceeding against any Commitment Party solely in its capacity or in fulfilling its role as an administrative agent or Lead Arranger or similar role under the Facilities).

The expense reimbursement and indemnification provisions will be, in each case, consistent with the Term Loan Documentation Principles.

Governing Law and Forum;
Submission to Exclusive
Jurisdiction:                                 New York.

Counsel to the Term Loan
Administrative Agent and the
Lead Term Loan Lead Arrangers:                Cahill Gordon & Reindel LLP.

<u>EXHIBIT C</u>

Project Ovation
$250 million Overnight Facility

<u>Summary of Principal Terms</u>

Set forth below is a summary of the principal terms for the Overnight Facility Commitments to be provided pursuant to the Commitment Letter to which this <u>Exhibit C</u> is attached (the "<u>Overnight Facility</u>").  Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Commitment Letter to which this <u>Exhibit C</u> is attached or in <u>Exhibit A</u>, <u>B</u>, or <u>D</u> (including the Annexes thereto) attached thereto.  In the case of any such capitalized term that is subject to multiple and differing definitions, the appropriate meaning thereof in this <u>Exhibit C</u> shall be determined by reference to the context in which it is used.

| | |
|---|---|
| <u>Co-Borrowers</u>: | Reorganized EFH and/or Reorganized EFIH or, upon the prior written consent of the Overnight Facility Arrangers, another entity reasonably acceptable to the Overnight Facility Arrangers (collectively the "<u>Co-Borrowers</u>"). |
| <u>Agent</u>: | MSSF will act as sole administrative agent (in such capacity, the "<u>Overnight Administrative Agent</u>" and, together with the Term Loan Administrative Agent, the "<u>Administrative Agents</u>") for the lenders under the Overnight Facility (other than Disqualified Institutions) (together with MSSF, JPMCB, BOA, BBPLC, DBNY, MUFG and WFB, the "<u>Overnight Lenders</u>"), and will perform the duties customarily associated with such role. |
| <u>Overnight Lead Arranger and Bookrunner</u>: | MSSF, JPM Securities, MLPFS, BBPLC, DBSI, MUFG and WFS will act as lead arrangers and bookrunners for the Overnight Facility (the "<u>Overnight Facility Arrangers</u>"), and will perform the duties customarily associated with such role. |
| <u>Overnight Facility</u>: | Senior secured bridge loans in an aggregate principal amount of up to $250 million (the "<u>Overnight Loans</u>"). |
| <u>Purpose</u>: | A portion of the proceeds of the Overnight Loans will be included in the Repayment Amount (as defined in the Acquisition Agreement) and utilized to satisfy the allowed claims of the Stakeholders (as defined in the Acquisition Agreement). |
| <u>Availability</u>: | The Overnight Loans shall be made in a single drawing on the Acquisition Funding Date.  Repayments and prepayments of the Overnight Loans may not be reborrowed. |
| <u>Amortization</u>: | None. |
| <u>Guarantees</u>: | Same as the Term Loan Facility. |

Exhibit C-1

Security:

OV2 shall pledge and deposit with or deliver to the Overnight Administrative Agent, for the benefit of the Overnight Lenders as collateral for the Overnight Loans, cash or deposit account balances (up to the aggregate principal amount of the Overnight Facility) or, if the Overnight Administrative Agent or Overnight Lenders shall agree in their sole discretion, other credit support, in each case pursuant to documentation in form and substance reasonably satisfactory to the Overnight Administrative Agent and Overnight Lenders.

Interest Rates:

The Overnight Loans will bear interest based on the rate *per annum* determined by the Overnight Administrative Agent to be the rate at which deposits in dollars for delivery on the date of determination in same day funds in the approximate amount of the Overnight Loan being made or maintained and with a term equal to one month would be offered to the Overnight Administrative Agent at its request as of the Acquisition Funding Date.  Such interest will be calculated on the basis of the actual number of days elapsed in a 365-day year (or a 366-day year in a leap year) and payable on the Overnight Loan Maturity Date.

Interest Payments:

Calculation of interest shall be on the basis of actual days elapsed in a year of 360 days.  Interest on the Overnight Loans will be payable in cash on the Overnight Loan Maturity Date.

Default Rate:

In the case of a payment default, the applicable interest rate on overdue amounts shall be increased by 2.00% *per annum*.

Maturity:

The Overnight Loans will mature on the third business day after the date of funding the Overnight Loans (the "Overnight Loan Maturity Date")

Voluntary Prepayments:

The Overnight Loans may be prepaid at any time, without premium or penalty, in whole or in part, at the option of the Co-Borrowers, together with accrued but unpaid interest.

Assignments and Participations:

Any Overnight Lender may assign all or, subject to minimum amounts to be agreed, a portion of its Overnight Loans (other than to any Disqualified Institution) with the consent of the Co-Borrowers unless a payment event of default has occurred and is continuing or if such assignment is to an existing Overnight Lender, an affiliate of an existing Overnight Lender or an approved fund of an Overnight Lender, underlined provided that the consent of the Co-Borrowers shall have been deemed to have been given if the Co-Borrowers have not responded within ten business days of written request for such consent and (b) the Overnight Administrative Agent.

Each Overnight Lender will have the right to participate its Overnight Loans to other financial institutions (other than to any Disqualified Institution); provided that voting rights of

Exhibit C-2

participants shall be limited to matters in respect of (a) increase in commitments participated to such participants, (b) reductions of principal, interest or fees, (c) extensions of final maturity or the due date of any interest or fee payment, (d) release of all or substantially all of the value of the guarantees of the Guarantors and (e) changes in voting threshold.

No assignment or participation may be made to Disqualified Institutions; provided, that the list of Disqualified Institutions shall be made available to any Overnight Lender upon request thereof.

| | |
|---|---|
| Overnight Facility Documentation: | The definitive credit documentation for the Overnight Facility (the "Overnight Facility Documentation", and together with the Term Loan Facility Documentation, the "Facilities Documentation") shall be substantially in the form of the Term Loan Facility Documentation, modified to reflect the terms of this Exhibit C (the "Overnight Facility Documentation Principles", and together with the Term Loan Documentation Principles, the "Documentation Principles"). Notwithstanding the foregoing, the Overnight Facility Documentation will contain only those conditions to borrowing expressly set forth in Exhibit D to the Commitment Letter. |
| Conditions Precedent to Borrowing: | The availability of the Overnight Facility on the Acquisition Funding Date will be subject solely to the conditions in Exhibit D to the Commitment Letter and shall be subject in all respects to the Limited Conditionality Provision. |
| Representations and Warranties: | Representations and warranties applicable to the Co-Borrowers and their respective restricted subsidiaries consistent with the Term Loan Facility Documentation (revised as necessary to reflect the nature of the Overnight Facility). |
| Covenants and Events of Default: | The Overnight Loans will contain such affirmative covenants, negative covenants and events of default consistent with the Term Loan Facility with respect to the Co-Borrowers (revised as necessary to reflect the nature of the Overnight Facility). |
| Voting, Cost and Yield Protection, Expenses and Indemnification: | Substantially consistent with the Term Loan Facility. |
| Governing Law and Forum; Submission to Exclusive Jurisdiction: | New York. |
| Counsel to the Overnight Administrative Agent: | Cahill Gordon & Reindel LLP. |

Exhibit C-3

CONDITIONS

The availability and initial funding of the Facilities shall be subject only to the satisfaction (or waiver by each Lead Arranger) of the following conditions.  Capitalized terms used but not otherwise defined herein have the meanings assigned to such terms in the Commitment Letter to which this Exhibit D is attached or in Exhibits A, B, or C attached thereto.  In the case of any such capitalized term that is subject to multiple and differing definitions, the appropriate meaning thereof in this Exhibit D shall be determined by reference to the context in which it is used.

1.      The Transactions shall be consummated concurrently with the initial funding of the Facilities in accordance with the Acquisition Agreement and the applicable documentation relating to the Acquisition referred to therein, without waiver or amendment thereof or any consent thereunder (including any change in the purchase price) that is materially adverse to the Lenders unless consented to by the Lead Arrangers (such consent not to be unreasonably withheld, conditioned or delayed) (it being agreed that (i) any increase in the purchase price shall not be materially adverse to the Lenders in their respective capacities as such so long as such increase is funded by an increase in the Equity Contribution (including any increase funded by additional equity investors not part of the Equity Investors), (ii) any decrease in the purchase price shall not be materially adverse to the Lenders so long as any reduction is (x) first, applied to reduce the Equity Contribution to the Minimum Equity Contribution and (y) second, allocated pro rata to the Equity Contribution and the Term Loan Facility (it being understood and agreed that no purchase price or similar adjustment provisions set forth in the Acquisition Agreement shall constitute an increase or decrease in the purchase price) and (iii) any decrease in the amount of the Facilities as a result of the failure to acquire the Minority Interests prior to the Acquisition Funding Date shall not be materially adverse to the Lenders.  Immediately following the Transactions, the Refinancing shall have occurred.  The Purchasers shall have received the Equity Contribution.

2.      The Administrative Agents and the Lenders under the Facilities shall have received customary opinions of counsel for the Borrower, the Co-Borrowers and the Guarantors (which shall include, to the extent applicable, customary opinions of Delaware law) and of local counsel in Maryland, to the extent applicable, and Texas, as the case may be, and corporate resolutions, certificates and customary closing certificates.

3.      The Acquisition Agreement Representations and Specified Representations shall be true and correct in all material respects.

4.      Since the date of the Acquisition Agreement until the Acquisition Funding Date, no Acquisition Funding Date Material Adverse Effect shall have occurred and be continuing as of the Acquisition Funding Date.  "Acquisition Funding Date Material Adverse Effect" means a "Company Material Adverse Effect" (as defined in the Acquisition Agreement).

5.      The Lead Arrangers shall have received (a) the audited financial statements, including combined balance sheets, statements of operations, statements of cash flows, statements of stockholders equity of the Target Entities, as of and for the years ended December 31, 2012, December 31, 2013 and December 31, 2014, (b) within 45 days after the end of each subsequent interim fiscal quarter, unaudited financial statements, including consolidated balance sheets, statements of operations and statements of cash flows of the Target Entities for such fiscal quarter and for the comparable periods of the preceding fiscal year; and (c) a pro forma consolidated balance sheet and related pro forma statement of income of the Borrower on a consolidated basis as of the last day of and for the most recently completed four fiscal quarter period ending prior to the Acquisition Funding Date for which financial statements were required

to be delivered pursuant to the preceding clause (b), prepared after giving effect to the Transactions as if the Transactions had occurred as of such date (in the case of such balance sheet) or at the beginning of such period (in the case of the statement of income). Each Lead Arranger hereby acknowledges that EFH's public filing with the Securities and Exchange Commission of any required audited financial statements on Form 10-K or required unaudited financial statements on Form 10-Q, in each case, will satisfy the requirements under clauses (a) and (b) as applicable, of this paragraph and that as of the Original Commitment Date clause (a) has been satisfied.

6.      All fees required to be paid on the Acquisition Funding Date pursuant to the Fee Letter and all expenses required to be paid on the Acquisition Funding Date pursuant to the Commitment Letter, in the case of expenses to the extent invoiced at least two business days prior to the Acquisition Funding Date, shall have been paid.  All other accrued costs, fees and compensation earned, due and payable to the Administrative Agents, the Term Loan Lead Arrangers, the Overnight Facility Arrangers and the Lenders shall have been paid.

7.      The Administrative Agents and the Lenders shall have received at least three business days prior to the Acquisition Funding Date all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act, that has been reasonably requested by the Initial Lenders at least ten days in advance of the Acquisition Funding Date.

8.      The Term Loan Lead Arrangers shall have been afforded a period of not less than 10 consecutive business days prior to the Acquisition Funding Date, after receipt of the information required under paragraph 5 above to syndicate the Term Loan Facility; provided that (x) each of (i) November 26, 2015 through and including November 29, 2015, (ii) July 2, 2016 through and including July 5, 2016 and (iii) November 23, 2016 through and including November 27, 2016 shall be disregarded for the purposes of such 10 consecutive business day period and (y) if such period has not ended prior to (i) August 21, 2015, then it will not commence until September 7, 2015, (ii) December 22, 2015, then it will not commence until January 4, 2016, (iii) August 19, 2016, then it will not commence until September 5, 2016, and (iv) December 22, 2016, then it will not commence until January 2, 2017. If the Borrower in good faith reasonably believes that it has delivered such materials required under paragraph 5 to syndicate the Term Loan Facility, it may deliver to the Term Loan Lead Arrangers written notice to that effect (stating when it believes it completed any such delivery), in which case the Borrower shall be deemed to have delivered the financial information on the date specified in such notice and the 10 consecutive business day period described above shall be deemed to have commenced on the date specified in such notice, in each case unless the Term Loan Lead Arrangers in good faith reasonably believe that the Borrower has not completed such delivery and, within two business days after its receipt of such notice from the Borrower, the Term Loan Lead Arrangers deliver a written notice to the Borrower to that effect (stating with specificity which information is required).

9.      The Bankruptcy Court shall have entered an order or orders (i) approving the Signing Date Agreements (as defined in the Acquisition Agreement on the Original Commitment Date)  and (ii) authorizing the parties thereto to enter into the Transactions pursuant to the Signing Date Agreements and such order or orders shall be in full force and effect and not subject to any stay (such order or orders, collectively, the "Approval Order") and without any modification, supplement or waiver in any manner materially adverse to the Lenders, unless consented to in writing thereby (such consent not to be unreasonably withheld, conditioned or delayed).

10.      The Confirmation Order (as defined in the Acquisition Agreement), shall be substantially consistent with the Plan of Reorganization and (i) shall have been entered by the Bankruptcy Court and be in full force and effect, and not subject to any stay, and shall provide that (a) the Acquisition is free and

clear of all liens, claims and encumbrances, except those contemplated to remain outstanding after the Closing Date under the Acquisition Agreement, (b) the Acquisition does not constitute a fraudulent conveyance or transfer and otherwise provides reasonable equivalent value and fair and adequate consideration, (c) the Purchasers consummated the Acquisition in good faith for purposes of Section 363(m) of the Bankruptcy Code and (d) the purchase price paid by the Purchasers was not controlled by an agreement among potential bidders for purposes of Section 363(n) of the Bankruptcy Code or otherwise, (ii) shall not be modified, supplemented, or amended from such form in any manner materially adverse to the Commitment Parties, unless consented to in writing thereby (such consent not to be unreasonably withheld, conditioned or delayed), and (iii) shall not in any way modify the terms of the Approval Order in any manner materially adverse to the Commitment Parties, unless consented to in writing thereby (such consent not to be unreasonably withheld, conditioned or delayed).