# **EXHIBIT R**

**New EFH Shareholders' Agreement**

_____

# INTEREST HOLDERS AGREEMENT

_____

[●], 2016

Americas 90856911 (2K)

ARTICLE I DEFINED TERMS ................................................................................................1
    Section 1.1.   Definitions .............................................................................................1
    Section 1.2.   Interpretation; Terms Generally ...........................................................4

ARTICLE II BOARD AND GOVERNANCE .........................................................................5
    Section 2.1.   Company Actions ..................................................................................5
    Section 2.2.   Board .....................................................................................................5
    Section 2.3.   Voting Requirements. ...........................................................................7
    Section 2.4.   Company Organizational Documents ..................................................8

ARTICLE III HUNT TRANSFERS; OTHER AGREEMENTS ..........................................9
    Section 3.1.   Hunt Transfer Restrictions ...................................................................9
    Section 3.2.   Additional Company Agreements .......................................................9

ARTICLE IV MISCELLANEOUS ..........................................................................................9
    Section 4.1.   Remedies ...............................................................................................9
    Section 4.2.   Termination .........................................................................................10
    Section 4.3.   Notices ................................................................................................10
    Section 4.4.   Successors and Assigns ......................................................................11
    Section 4.5.   Amendment and Waiver ....................................................................11
    Section 4.6.   Severability ........................................................................................11
    Section 4.7.   Governing Law and Venue; Waiver of Jury Trial. ..........................11
    Section 4.8.   Waiver ................................................................................................12
    Section 4.9.   No Presumption Against Drafter ......................................................12
    Section 4.10.  Entire Agreement ...............................................................................13
    Section 4.11.  Counterparts .......................................................................................13

SCHEDULES

Schedule A    Investors
Schedule B    Initial Board Members

**OVATION
INTEREST HOLDERS AGREEMENT**

This INTEREST HOLDERS AGREEMENT (this "Agreement"), dated [●], 2016, is among [OVATION ACQUISITION I, INC.][1], a Delaware corporation (the "Company"), OVATION ACQUISITION II, L.L.C., a Delaware limited liability company ("Ovation II"), [OVATION PARTNERS, L.P.], a Delaware limited partnership (the "Operating Partnership"), HUNT POWER HOLDINGS, L.L.C., a Delaware limited liability company (the "Hunt Limited Partner"), and each of the Persons identified on Schedule A.

**RECITALS**

As of the date hereof, each Investor other than Ovation II is a Common Shareholder (as defined below) of the Company;

As of the Operating Partnership Effective Date (as defined below), the Company will be the general partner and Ovation II and the Hunt Limited Partner will be limited partners of the Operating Partnership; and

The parties desire to enter into this Agreement in order to provide for certain rights and obligations relating to the governance of the Company and the Operating Partnership and related matters.

NOW, THEREFORE, in consideration of the premises, the terms and provisions set forth herein, the mutual benefits to be gained by the performance thereof and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**ARTICLE I
DEFINED TERMS**

Section 1.1.    Definitions.

1.1.1    As used in this Agreement, the terms set forth below have the following respective meanings:

"Board" means the Board of Directors of the Company.

"Class A Unit" means a means a partnership unit in the Operating Partnership with the preferences, conversion or other rights, voting powers or rights, restrictions, limitations as to distribution, qualifications or other terms or conditions provided for Class A Units under the Partnership Agreement.

"Common Interest" means a Common Share or Class A Unit.

"Common Share" means a share of Common Stock of the Company.

---

[1] Note to Draft: Entity names for the Company and the Operating Partnership to be updated.

"Common Stock" means the common stock, par value $0.01 per share, of the Company.

"Common Shareholder" means a Person who is the record owner of any Common Shares.

"Company Bylaws" means the Bylaws of the Company, as in effect as of the date hereof and as the same may be amended from time to time hereafter in accordance with the terms hereof and thereof.

"Company Charter" means the Certificate of Incorporation of the Company, as in effect as of the date hereof and as the same may be amended from time to time hereafter in accordance with the terms hereof and thereof.

"Company Corporate Governance Guidelines" means the corporate governance guidelines or any other principles or guidelines adopted by the Board with respect to matters related to the governance of the Company, including the nomination and election of Directors.

"Company Organizational Documents" means the Company Charter, the Company Bylaws and the Company Corporate Governance Guidelines.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of Equity Interests, by contract or otherwise. "Controlling" and "Controlled" shall have correlative meanings. Without limiting the generality of the foregoing, a Person shall be deemed to Control any other Person in which it owns, directly or indirectly, a majority of the Equity Interests.

"Director" means an individual who is a member of the Board.

"Entity" means any partnership (whether general or limited), limited liability company, trust (including a common law trust, statutory trust, voting trust or any other form of trust), estate, association (including any group, organization, co-tenancy, plan, board, council or committee), corporation, governmental authority or any other entity.

"Equity Interests" means (i) with respect to any corporation, all shares, interests, participations or other equivalents of capital stock of such corporation, however designated, and any warrants, options or other rights to purchase or acquire any such capital stock and any securities convertible into or exchangeable or exercisable for any such capital stock, (ii) with respect to any partnership, all partnership interests, participations or other equivalents of partnership interests of such partnership, however designated, and any warrants, options or other rights to purchase or acquire any such partnership interests and any securities convertible into or exchangeable or exercisable for any such partnership interests, (iii) with respect to any limited liability company, all units, interests, participations or other equivalents of membership interests of such limited liability company, however designated, and any warrants, options or other rights to purchase or acquire any such membership interests and any securities convertible into or exchangeable or exercisable for any such

membership interests and (iv) with respect to any other Entity, all equity interests in such Entity that are equivalent to the equity interests described in clauses (i) through (iii) above.

"Hunt" means Hunt Consolidated, Inc., a Delaware corporation.

"Hunt Consortium Investor" means an Investor designated as such on Schedule A.

"Hunt Group" means (i) Hunt; (ii) Ray L. Hunt, Hunter L. Hunt, their respective spouses, any trust established primarily for the benefit of any of the foregoing and any lineal descendent of the foregoing (including by adoption); (iii) Sharyland Utilities, L.P., and (iv) all Entities Controlled, individually or collectively, or directly or indirectly, by any of the Persons identified in the preceding clause (i), (ii) or (iii).

"Hunt Limited Partner" has the meaning ascribed to such term in the Partnership Agreement.

"Independent Director" means a Director who (a) is not an officer or employee of (i) the Company or any of its Subsidiaries or (ii) the Manager, any member of the Hunt Group or any of their respective Affiliates, (b) has no current or prior material relationships with the Manager, any member of the Hunt Group or any of their respective Affiliates (it being understood and agreed that this clause (b) shall not be deemed to preclude an individual from being an Independent Director solely by virtue of the fact that such individual is a current or former member of the board of directors of InfraREIT, Inc.) and (c) is otherwise "independent" in accordance with the Company Organizational Documents, the rules of the New York Stock Exchange (whether or not the Common Units or any other Equity Interests of the Company are listed on such exchange) and the requirements of the Securities Exchange Act of 1934, as amended, applicable to members of the audit committee of the Board. The determination as to whether or not a Director, or a nominee for Director, is "Independent" for this purpose, shall be made by a majority of the then-current Independent Directors of the Board.

"Investor" means a Common Shareholder or a Limited Partner holding Class A Units, in each case identified on Schedule A.

"Management Agreement" means the Management Agreement, dated as of the date hereof, among Hunt Utility Services, LLC, the Company, the Operating Partnership, [Oncor AssetCo] Holdings Company LLC and [Oncor AssetCo] LLC.

"Manager" means the manager under the Management Agreement.

"OEDC" means Oncor Electric Delivery Company LLC, a Texas limited liability company.

"OEDC Change of Control" means members of the Hunt Group ceasing to Control OEDC.

"Operating Partnership Effective Date" has the meaning ascribed to the term "Effective Date" in the Partnership Agreement.

"Partnership Agreement" means the Amended and Restated Agreement of Limited Partnership of the Operating Partnership, dated as of the Operating Partnership Effective Date, as it is in effect on such date and as it may be amended from time to time thereafter.

"Party" means each Person that is party to this Agreement.

"Person" means any individual or Entity.

"Qualified Person" means an individual that meets the qualifications to serve as a Director as set forth in the Company Bylaws and the Corporate Governance Guidelines of the Company.

"Required Hunt Consortium Investors" means Hunt Consortium Investors who in the aggregate own at least a majority of the total number of Shares owned by the Hunt Consortium Investors.

"Transfer" means, with respect to a Common Interest, a transfer, assignment, mortgage, encumbrance, grant of a security interest in, or any other disposition or hypothecation of such Common Interest, direct or indirect, voluntary, involuntary or by operation of law, and the term "Transfer" used as a verb has a correlative meaning.

1.1.2   Each of the terms set forth in the table below has the meaning assigned to such term in provision listed opposite such term:

| Term | Provision |
|---|---|
| Agreement | Preamble |
| Company | Preamble |
| Hunt Consortium Director | Section 2.2.4(a) |
| Hunt Director | Section 2.2.3(a) |
| Hunt Limited Partner | Preamble |
| Hunt Termination Event | Section 2.2.3(c) |
| Investor | Preamble |
| Operating Partnership | Preamble |
| Ovation II | Preamble |
| Relative | Section 2.4(d) |

1.1.3   Capitalized terms used and not otherwise defined in this Agreement have the respective meanings given to them in the Partnership Agreement.

Section 1.2.   Interpretation; Terms Generally.

1.2.1   The headings in this Agreement are inserted for convenience and identification only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof. Except where specified otherwise, all references to Articles, Sections or Schedules refer to articles and sections of and schedules to this Agreement.

1.2.2   Wherever from the context it appears appropriate, each term stated in either the singular or the plural includes the singular and the plural, and pronouns stated in any gender include the masculine, the feminine, and the neuter genders.  The words "include", "includes", and "including" are deemed to be followed by the phrase "without limitation." Unless the context otherwise requires, the words "hereof", "herein", and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement.

1.2.3   Unless otherwise specified, any references to any agreement or other instrument or any statute or regulation are to such agreement or instrument or such statute or regulation as amended and supplemented from time to time (and, in the case of a statute or regulation, to any corresponding provisions of successor statutes or regulations).

1.2.4   Except where otherwise specified, the provisions of this Agreement relative to number of days refer to calendar days. When the date for performance of any monetary obligation falls on a non-Business Day, such obligation need not be performed until the next-following Business Day.

1.2.5   All sums and amounts payable or to be payable pursuant to the provisions of this Agreement are payable only in coin or currency of the United States of America that, at the time of payment, is legal tender for the payment of public and private debts in the United States of America.

## ARTICLE II
## BOARD AND GOVERNANCE

Section 2.1.   Company Actions. The Company shall take all reasonable steps within its control that are necessary or appropriate to effectuate the purposes of this Agreement, including calling a meeting of the Common Shareholders or requesting the written consent of the Common Shareholders in lieu of a meeting in order to approve the relevant action or other matter.  Each of the Investors ratifies, confirms and approves the performance by the Company of its obligations under this Agreement and agrees that it shall not take any action that could reasonably be expected to prevent, hinder or restrict the Company from performing such obligations; *provided, however*, that no Investor shall have any obligation to vote or execute a consent with respect to any Common Shares held by it in order to comply with its obligations under this Agreement, and nothing contained in this Agreement shall be deemed an agreement by any Investor to acquire, hold, dispose of, vote or agree not to vote any securities.

Section 2.2.   Board.

2.2.1   Composition of Board.  As provided in the Company Charter and applicable law, the Company is to be managed by the Board.  As of the date hereof, the Board consists of 13 Directors divided into three categories: (i) Hunt Directors, (ii) Hunt Consortium Directors, and (iii) Independent Directors.  The initial Directors and the category to which each initial Director belongs are set forth on Schedule B.

2.2.2    Company Actions; Director Designations. The Company shall take all reasonable steps within its control that are necessary or appropriate so that that all Directors are nominated as provided in this Section 2.2.3, 2.2.4 and 2.2.5, including calling a meeting of the Common Shareholders or requesting the written consent of the Common Shareholders in lieu of a meeting in order to approve the relevant action or other matter.

2.2.3    Hunt Directors.

(a)    For as long as no Hunt Termination Event has occurred, in connection with any meeting of Common Shareholders, or action by written consent of the Common Shareholders, at or pursuant to which Directors are to be elected, a sufficient number of Qualified Persons designated by Hunt (the "Hunt Directors") shall be nominated in accordance with the Company Organizational Documents and applicable law, so as to ensure that there are two Hunt Directors on the Board.  The then-Chief Executive Officer of the Company (to the extent the services of such officer are being provided by the Manager pursuant to the Management Agreement) shall be one of the Hunt Directors and the second Hunt Director may, if Hunt so determines in its sole discretion, be an officer or employee of Hunt or of the Manager or any of their respective Affiliates.

(b)    For as long as no Hunt Termination Event has occurred, if at any time there are fewer than two Hunt Directors for any reason (including as a result of the death or resignation of any individual who previously served in such capacity), the Company shall request that Hunt designate an individual or individuals that are Qualified Persons consistent with Section 2.2.3(a) and, upon the designation of such individual or individuals, shall arrange for each such individual to be appointed as a Director by the Board or be nominated for election as a Director as promptly as practicable after his, her or their designation.

(c)    If (i) the Manager resigns or is removed or terminated from service in such capacity under the Management Agreement and is not succeeded in such capacity under the Management Agreement by another member of the Hunt Group, (ii) the Manager at any time ceases to be a member of the Hunt Group or (iii) there is an OEDC Change of Control (each, a "Hunt Termination Event"), then this Agreement shall automatically terminate in accordance with Section 4.2, and neither the Company nor any other Party shall be prohibited or restricted from taking any lawful action it determines is necessary or appropriate to remove any Hunt Director from the Board.

2.2.4    Hunt Consortium Directors.

(a)    For as long as (i) no Hunt Termination Event has occurred and (ii) the Hunt Consortium Investors, together with their respective Affiliates, continue to own in the aggregate at least a majority of the Common Shares owned by the Hunt Consortium Investors as of the date hereof, in connection with any meeting of Common Shareholders, or action by written consent of the Common Shareholders, pursuant to which Directors are to be elected, one Qualified Person designated by the Required Hunt Consortium Investors (the "Hunt Consortium Director") shall be

nominated in accordance with the Company Organizational Documents and applicable law. If the Required Hunt Consortium Investors so determine in their sole discretion, the Hunt Consortium Director may be an officer or employee of any Hunt Consortium Investor or any of its Affiliates.

(b) For as long as the conditions set forth in clause (i) and (ii) of Section 2.2.4(a) are satisfied, if at any time there is no Hunt Consortium Director for any reason (including as a result of the death or resignation of any individual who previously served in such capacity), the Company shall request that the Required Hunt Consortium Investors designate an individual that is a Qualified Person consistent with Section 2.2.4(a) and, upon the designation of such individual, shall arrange for such individual to be appointed as a Director by the Board or be nominated for election as a Director as promptly as practicable after his or her designation.

(c) If (i) any of the conditions for the removal of the Hunt Directors set forth in Section 2.2.3(c) above are satisfied or (ii) the Hunt Consortium Investors, together with their respective Affiliates, cease to own in the aggregate at least a majority of the Common Shares owned by the Hunt Consortium Investors as of the date hereof, then this Section 2.2.4 shall automatically terminate and neither the Company nor any other Party shall be prohibited or restricted from taking any lawful action it determines is necessary or appropriate to remove the Hunt Consortium Director from the Board.

2.2.5   Other Directors.  All individuals nominated or elected to serve as Directors, other than the Hunt Directors and the Hunt Consortium Director, shall be Independent Directors.  Hunt shall be entitled to interview any such individuals prior to the time they are nominated or elected to serve as Directors.

Section 2.3.   Voting Requirements.

2.3.1   For as long as Hunt is entitled to designate the Hunt Directors pursuant to Section 2.2.3(a) and two Hunt Directors are actually serving as members of the Board, in the case of any election of an individual to serve as a Director, other than a Hunt Director or a Hunt Consortium Director, the Hunt Limited Partner shall cause each Common Shareholder that is a member of the Hunt Group to vote or execute a consent with respect to any Common Shares held by it in the same proportion as the Common Shareholders that are not members of the Hunt Group or Hunt Consortium Investors.

2.3.2   For as long as the Hunt Consortium Investors are entitled to designate the Hunt Consortium Director pursuant to Section 2.2.4(a) and a Hunt Consortium Director is actually serving as a member of the Board, in the case of any election of an individual to serve as a Director, other than a Hunt Director or a Hunt Consortium Director, each Hunt Consortium Investor shall vote or execute a consent with respect to all Common Shares held by it in the same proportion as the Common Shareholders that are not members of the Hunt Group or Hunt Consortium Investors.

Section 2.4.    Company Organizational Documents.

2.4.1    The Company shall take all reasonable steps within its control that are necessary or appropriate to ensure that the appropriate Company Organizational Documents provide for the following:

(a)    The Chairman of the Board will be chosen by the affirmative vote of a majority of the total number of Directors who are not members of the management of the Company; provided that the Chairman of the Board shall not be a member of the Company's management team.

(b)    Subject to Section 2.4.1(c) and (d), any action by the Board to approve or take action to authorize or effect any transactions or other matters will require the affirmative vote of a majority of the total number of Directors.

(c)    Any action by the Board to approve or take action to authorize or effect any of the following transactions or other matters will require the approval of 66⅔% of the total number of Directors:

(i)    any consolidation of the Company or the Operating Partnership with another Entity or any merger of the Company or the Operating Partnership with or into another Entity;

(ii)    any issuance of Equity Interests in the Company or the Operating Partnership to any Person (or group of Persons) that owns more than 5% of the total outstanding Equity Interests of the applicable class of Equity Interests of the Company or the Operating Partnership;

(iii)    any change (whether by conversion, recapitalization or otherwise) in the legal form of the Company or the Operating Partnership from a Delaware corporation (in the case of the Company) or a Delaware limited partnership (in the case of the Operating Partnership) to any other type of Entity;

(iv)    any modification of or amendment to this Agreement;

(v)    any modification of or amendment to the Partnership Agreement that requires the approval of the Company;

(vi)    any consent by the Company to any Transfer by the Hunt Limited Partner of any Common Units received by it upon conversion of Class A Units pursuant to Section 3.9 of the Partnership Agreement other than to members of the Hunt Group; or

(vii)    the voluntary filing of a petition in bankruptcy for the Company or the Operating Partnership, the making of an assignment for the benefit of creditors of the Company or the Operating Partnership, the filing of a petition or answer seeking, consenting to or acquiescing in any

reorganization, arrangement, readjustment, liquidation, dissolution or similar relief with respect to the Company or the Operating Partnership under any statute, law or regulation or the taking of any action seeking, consenting to or acquiescing in the appointment of a trustee, receiver or liquidator of the Company or the Operating Partnership or any substantial part of the properties and assets of the Company or the Operating Partnership.

(d)    Except for (i) the services to be performed by the Manager and the compensation to be paid to the Manager therefor in accordance with the Management Agreement and (ii) transactions expressly contemplated by the Company Organizational Documents or the Partnership Agreement, any transactions between the Company, on the one hand, and its Affiliates (other than wholly-owned subsidiaries of the Company), its current or former Directors, the Manager, any member of the Hunt Group or any Relative of the foregoing, on the other hand, shall be approved by a majority of the Independent Directors on the Board who have no interest in such transaction. For the purpose of this Section 2.4(d), "Relative" means with respect to any individual, such individual's spouse, former spouse, child, stepchild, parent, parent of spouse, sibling or grandchild or a trust, family limited partnership or other similar legal entity for the benefit of such individual or any of the foregoing.

## ARTICLE III
## HUNT TRANSFERS; OTHER AGREEMENTS

Section 3.1.    Hunt Transfer Restrictions.  Prior to the first anniversary of the date hereof, the Hunt Limited Partner shall not, and shall cause its Affiliates not to, Transfer any Common Shares received by any of them in redemption or other exchange of Common Units issued to the Hunt Limited Partner upon conversion of Class A Units (as provided in Section 3.9 of the Partnership Agreement), except to one or more members of the Hunt Group or with the prior written consent of the Company.  The restrictions set forth in this Section 3.1 shall terminate, and this Section 3.1 shall be of no further force or effect, upon the earlier of (i) the termination of the Management Agreement or (ii) the occurrence of any event or circumstance that causes or results in the individuals designated by Hunt in accordance with Section 2.2.3(a) not being nominated or elected for any reason to serve as members of the Board or any other actions contemplated to be taken by the Company under this Agreement (including the actions described in Section 2.4 and 3.2) not being taken (whether or not such actions are within the control of the Company).

Section 3.2.    Additional Company Agreements.  The Company shall take all reasonable steps within its control that are necessary or appropriate to ensure that the Company (a) maintains its classification as a corporation for United States federal income tax purposes and (b) complies with all of the terms and provisions of the Partnership Agreement.

## ARTICLE IV
## MISCELLANEOUS

Section 4.1.    Remedies; Enforceability. The Parties agree that irreparable damage would occur and that the Parties would not have any adequate remedy at law in the event that

any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, this being in addition to any other remedy to which they are entitled at law or in equity.  This Agreement may only be enforced by the Parties hereto.  Notwithstanding anything to the contrary contained in this Agreement, the Parties acknowledge and agree that under no circumstance shall any Party hereto be liable to any other Party or any of its Affiliates for any punitive, special, indirect or consequential damages.

Section 4.2.    Termination.  This Agreement shall terminate upon the occurrence of a Hunt Termination Event whereupon none of the Parties will have any further rights or obligations hereunder.

Section 4.3.    Notices.

4.3.1    In order to be deemed effective, all documents to be delivered and all notices, approvals, authorizations, demands, requests, reports and/or consents to be given or obtained by any Party shall be deemed received, unless earlier received, (i) if sent by certified or registered mail, return receipt requested, when actually delivered as aforesaid, except that such delivery shall be prior to 5:00 p.m., recipient's time, on any Business Day and if a notice is not delivered on a Business Day or is delivered after 5:00 p.m., recipient's time, such notice shall be deemed to have been received by such recipient at the commencement of such recipient's first Business Day next following the time of delivery, (ii) if sent by overnight mail or international courier, when actually delivered as aforesaid, except that such delivery shall be prior to 5:00 p.m., recipient's time, on any Business Day and if a notice is not delivered on a Business Day or is delivered after 5:00 p.m., recipient's time, such notice shall be deemed to have been received by such recipient at the commencement of such recipient's first Business Day next following the time of delivery, (iii) if sent by email or facsimile transmission, prior to 5:00 p.m., recipient's time, on any Business Day and if a notice is not transmitted on a Business Day or is transmitted after 5:00 p.m., recipient's time, such notice shall be deemed to have been received by such recipient at the commencement of such recipient's first Business Day next following transmission of such notice, provided that confirmatory notice is sent promptly thereafter by first-class mail, postage prepaid, and (iv) if delivered by hand, on the date of receipt, at the address set forth below:

(a)    if to the Company or the Operating Partnership:

1900 North Akard Street
Dallas, Texas 75201
Attention: David Hernandez
Email Address: DHernandez@huntconsolidated.com

(b)    if to any other Party, to the address of such Party as it appears in the books and records of the Company or the Partner Registry, as applicable.

The above addresses may be changed for future communications or delivery of notice hereunder by giving notice of such change to the others listed above in the manner prescribed by this Section 4.3. All notices shall be deemed effective when received by all applicable Parties at the addresses set forth above (as such addresses may be changed by the Parties in accordance herewith). Notwithstanding the foregoing, no notice shall be deemed ineffective because of any Party's refusal to accept delivery at the address specified for the giving of such notice in accordance herewith.

Section 4.4. <u>Successors and Assigns</u>. Except as otherwise expressly provided herein, this Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of the Company and the Operating Partnership, as applicable, and each of the Investors. Except as otherwise permitted by this Agreement, none of the Parties hereto may assign any of its rights or obligations under this Agreement.

Section 4.5. <u>Amendment and Waiver</u>. This Agreement and any provision hereof may be amended or waived only with the consent of the Company, the Operating Partnership, the Hunt Limited Partner, OV2 and the holders of a majority of the Common Shares then held by all Investors, except that no amendment to this Agreement (i) that would have an adverse effect on any Investor that is disproportionate to the effect of the amendment on Investors generally, including any amendment to a provision requiring the approval of, or providing any right to, a particular Investor or group of Investors, (ii) that would provide any right to any Investor that is not shared proportionately by all Investors or (iii) that would require any Investor to acquire, hold, dispose of, vote or agree not to vote any securities, in each case shall be effective against such affected Investor or group of Investors, as applicable, without its consent.

Section 4.6. <u>Severability</u>. The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

Section 4.7. <u>Governing Law and Venue; Waiver of Jury Trial</u>.

(a) THIS AGREEMENT, TOGETHER WITH ANY CLAIM, DISPUTE, REMEDY OR LEGAL PROCEEDING ARISING FROM OR RELATING TO THIS AGREEMENT OR ANY RELIEF OR REMEDIES SOUGHT BY ANY PARTY HERETO, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, SHALL BE CONSTRUED, PERFORMED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO ITS PRINCIPLES OR RULES OF CONFLICT OF LAWS TO THE EXTENT SUCH PRINCIPLES OR RULES WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION. Each of the Parties hereto (i) submits to the exclusive jurisdiction of the Chancery Court of the State of Delaware, and if the Chancery Court of the State of Delaware declines jurisdiction, then any state or federal court sitting in Delaware, in

any action or proceeding arising out of or relating to this Agreement, (ii) agrees that all claims in respect of such action or proceeding may be heard and determined in any such court and (iii) agrees not to bring any action or proceeding arising out of or relating to this Agreement (whether on the basis of a claim sounding in contract, equity, tort or otherwise) in any other court.  Each of the Parties hereto agrees that a final judgment (subject to any appeals therefrom) in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Each of the Parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any Delaware or federal court in accordance with the provisions of this Section 4.7(a).  Each of the Parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court. Each of the Parties hereto hereby irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 4.3.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

(b)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT.  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (W) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (X) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (Y) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (Z) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 4.7.

Section 4.8.    Waiver. Neither the failure nor any delay on the part of a Party to exercise any right, remedy, power or privilege or insist on strict performance under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the Party asserted to have granted such waiver.

Section 4.9.    No Presumption Against Drafter. The Parties hereto have jointly participated in the negotiation and drafting of this Agreement. In the event of any ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by each of the Parties hereto and no presumptions or burdens of proof shall arise favoring any Party by virtue of the authorship of the provision of this Agreement.

Section 4.10.  <u>Entire Agreement</u>. This Agreement contains the entire understanding and agreement among the parties with respect to the subject matter hereof and supersedes any prior written or oral understandings or agreements among them with respect thereto.

Section 4.11.  <u>Counterparts</u>. This Agreement may be executed and delivered in one or more counterparts (including by means of facsimile or electronic mail transmission), each of which when so executed and delivered shall be deemed an original, none of which need contain the signatures of each of the parties hereto and all of which together shall constitute one and the same instrument binding on all the parties hereto. Each Party shall become bound by this Agreement immediately upon affixing its signature hereto.

[*Remainder of Page Intentionally Left Blank*]

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

**COMPANY:**

[OVATION ACQUISITION I], INC.


By: _____
    Name:
    Title:

**OPERATING PARTNERSHIP:**

[OVATION PARTNERS], L.P.

By:  [Ovation Acquisition I], Inc., its
      general partner


By: _____
    Name:
    Title:

**OVATION II:**

OVATION ACQUISITION II, L.L.C.


By: _____
    Name:
    Title:

**HUNT LIMITED PARTNER:**

HUNT POWER HOLDINGS, L.L.C.


By: _____
    Name:
    Title:

**INVESTORS:**

[Investor signature pages to come.]

Americas 90856911 (2K)

**SCHEDULE A**

**<u>Investors:</u>**

| Name of Investor | Investor Category |
|---|---|
| Hunt Power Holdings, L.L.C. | Hunt Investor |
| Avenue Capital Management II, L.P. | Hunt Consortium Investor |
| Flourish Investment Corporation | Hunt Consortium Investor |
| Pecos Partners, L.P. | Hunt Consortium Investor |
| [Other Investors to Come] | |

**SCHEDULE B**

## Board Composition

| Hunt Directors | 1. W. Kirk Baker |
| | 2. David A. Campbell |
| Hunt Consortium Director | [●] |
| Independent Directors | 1. [●] |
| | 2. [●] |
| | 3. [●] |
| | 4. [●] |
| | 5. [●] |
| | 6. [●] |
| | 7. [●] |
| | 8. [●] |
| | 9. [●] |
| | 10. [●] |