**<u>EXHIBIT U</u>**

**New EFH Management Agreement**

———————————————————————————————

**MANAGEMENT AGREEMENT**

———————————————————————————————

[●], 2016

## **TABLE OF CONTENTS**

**Page**

Section 1.........Definitions............................................................................................1
Section 2.........Appointment of the Manager; Performance Standard ................................8
Section 3.........Services to be Provided...............................................................................11
Section 4.........OAC Restrictions.......................................................................................16
Section 5.........Manager Personnel; Outside Activities ......................................................16
Section 6.........Agency .......................................................................................................18
Section 7.........Bank Accounts ...........................................................................................19
Section 8.........Records; Confidentiality .............................................................................19
Section 9.........Obligations of Manager; Restrictions ........................................................20
Section 10.......Compensation ............................................................................................22
Section 11.......Expenses of the Company...........................................................................26
Section 12.......Attribution of Expenses; Expense Budget; Reimbursement of Expenses ................28
Section 13.......Insurance ...................................................................................................30
Section 14.......Limits of Manager Responsibility; Indemnification....................................31
Section 15.......Intellectual Property; License ....................................................................34
Section 16.......No Joint Venture ........................................................................................34
Section 17.......Term; Termination .....................................................................................34
Section 18.......Termination for Good Reason ....................................................................36
Section 19.......Termination for Cause ...............................................................................37
Section 20.......Action Upon Termination ...........................................................................37
Section 21.......Assignment ...............................................................................................37
Section 22.......Notices .......................................................................................................38
Section 23.......Binding Nature of Agreement; Third Party Beneficiaries; Successors and Assigns .39
Section 24.......Complete Agreement; Amendments............................................................39
Section 25.......Governing Law ..........................................................................................39
Section 26.......Arbitration..................................................................................................39
Section 27.......No Waiver; Cumulative Remedies ..............................................................41
Section 28.......Headings ....................................................................................................41
Section 29.......Cure of Invalid Provisions .........................................................................41
Section 30.......Construction of Agreement........................................................................42
Section 31.......Multiple Counterparts ................................................................................42

## MANAGEMENT AGREEMENT

This MANAGEMENT AGREEMENT (this "Agreement") is dated [●], 2016 (the "Effective Date"), and is between Hunt Utility Services, LLC, a Delaware limited liability company (the "Manager"), [Ovation] Partners, LP, a Delaware limited partnership (the "Operating Partnership"), [Ovation Acquisition I], Inc., a Delaware corporation and the general partner of the Operating Partnership (the "Company"), [Oncor AssetCo] Holdings Company LLC, a Delaware limited liability company ("Oncor Holdings"), and [Oncor AssetCo], a Delaware limited liability company ("OAC"). The Manager, the Operating Partnership, the Company, Oncor Holdings, and OAC are sometimes referred to in this Agreement individually as a "Party" and collectively as the "Parties."

RECITALS:

The Company is a corporation that intends to elect to be taxed as a real estate investment trust ("REIT") and intends to continue to qualify to be taxed as a REIT for federal income tax purposes.

The Manager is an indirect subsidiary of Hunt Consolidated, Inc. ("Hunt").

The Company, the Operating Partnership, Oncor Holdings and OAC desire to retain the Manager to provide management and advisory services on the terms and conditions set forth herein, and the Manager wishes to be retained to provide such services.

The Parties hereby agree as follows:

Section 1.        Definitions. In this Agreement the following terms have the meanings indicated.

"Additional Services" has the meaning set forth in Section 3(b).

"Affiliate" means, with regard to a Person, a Person that Controls, is Controlled by, or is under common Control with such original Person. The term "Affiliated" has the correlative meaning. By way of example, and not limitation, Affiliates of the Manager include, and are not limited to, Hunt, Hunt Investment Company, L.P., Hunt Power Holdings, L.L.C., Ovation Acquisition II, L.L.C., Hunt Transmission Services, LLC, and Hunt Power, L.P. Notwithstanding the foregoing, no Company Entity will be deemed to be an Affiliate of the Manager, Hunt or any member of the Hunt Group.

"Affiliate Transaction" has the meaning set forth in Section 2(e)(12).

"Aggregate Management Costs" has the meaning set forth in Section 10(e)(4).

"Agreement" has the meaning set forth in the Preamble.

"Approval" means (together with the correlated terms "Approve" or "Approved"), with respect to a Company Entity and any matter, the approvals required with respect to such matter under the Governing Instruments of such Company Entity or, if no approval is specified, the

approval of the board of directors or other governing body of such Company Entity or, if applicable, a committee of such board of directors or other governing body to which such board of directors or other governing body has delegated approval authority with respect to such matter; *provided, however*, if any board of directors, governing body or committee delegates authority to the Manager or to officers of the applicable Company Entity, then the approval of the Manager or any such officer will be deemed the Approval of the delegating board of directors, governing body or committee.

"Arbitration Panel" has the meaning set forth in Section 26(a).

"Assets" means the assets of the Company Entities.

"Audit Committee" means the audit committee of the Company Board.

"Bankruptcy" means, with respect to any Person, (a) the filing by such Person of a voluntary petition seeking liquidation, reorganization, arrangement or readjustment, in any form, of its debts under Title 11 of the United States Code or any other federal, state or foreign insolvency law, or such Person's filing an answer consenting to or acquiescing in any such petition, (b) the making by such Person of any assignment for the benefit of its creditors, (c) the expiration of sixty (60) days after the filing of an involuntary petition under Title 11 of the United States Code, an application for the appointment of a receiver for a material portion of the assets of such Person, or an involuntary petition seeking liquidation, reorganization, arrangement or readjustment of its debts under any other federal, state or foreign insolvency law, *provided*, that the same shall not have been vacated, set aside or stayed within such 60-day period or (d) the entry against such Person of a final and non-appealable order for relief under any bankruptcy, insolvency or similar law now or hereinafter in effect.

"Board of Directors" means either the Company Board or, as the context requires, the OAC Board and "Boards of Directors" means, together, the Company Board and the OAC Board.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning set forth in the Preamble.

"Company Account" has the meaning set forth in Section 7.

"Company Assets" means all Assets other than the OAC Assets.

"Company Board" means the board of directors of the Company. Upon the request of the Company Board, the term "Company Board" may be deemed, for all purposes hereof or for specified purposes only, to refer to a committee or designee of the Company Board.

"Company Entity" means the Company, the Operating Partnership, Oncor Holdings, OAC or any of their respective Subsidiaries.

"Company Expenses" has the meaning set forth in Section 12(a).

2

"Company Indemnified Party" has the meaning set forth in Section 14(e).

"Company IP" has the meaning set forth in Section 15.

"Company Management Costs" has the meaning set forth in Section 10(c).

"Company Panel Member" has the meaning set forth in Section 26(b).

"Control" when used with respect to any Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled" have meanings correlative to the foregoing.

"CPI-Adjusted" has the meaning given to such term in Section 10(f).

"Damages" has the meaning set forth in Section 14(d).

"Dedicated Management Team" means members of the Management Team designated by the Manager from time to time as being assigned to devote substantially all of their business time to acting as officers of Company Entities or carrying out the Manager's obligations under this Agreement (disregarding time spent on professional associations, charitable activities, corporate boards other than boards of Company Entities, and the management of personal and family investments).

"Discretionary Expenses" has the meaning set forth in Section 12(b).

"Effective Date" has the meaning set forth in the Preamble.

"Entity" means any partnership, limited partnership, proprietorship, corporation, joint venture, joint stock company, limited liability company, limited liability partnership, business trust, estate, governmental entity, cooperative, association or other foreign or domestic enterprise, including accounts or funds managed by an investor or any of its Subsidiaries.

"Equity Interests" means any shares of capital stock, membership interests, partnership interests or other equity interests and options or warrants to acquire, or securities convertible or exchangeable into, capital stock, membership interests, partnership interests or other equity securities of an Entity.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Expenses" has the meaning set forth in Section 11(a).

"Fiscal Year" means the twelve-month period beginning on January 1st and ending on December 31st each year.

"Good Utility Practice" has the meaning as defined from time to time by the Public Utility Commission of Texas and, as of the date hereof, means any of the practices, methods, and acts engaged in or approved by a significant portion of the electric utility industry during the

3

relevant time period, or any of the practices, methods, and acts that, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety, and expedition. Good Utility Practice is not intended to be limited to the optimum practice, method, or act, to the exclusion of all others, but rather is intended to include acceptable practices, methods, and acts generally accepted in the region.

"Governing Instruments" means, with regard to any Entity, the articles or certificate of incorporation and bylaws in the case of a corporation, certificate of limited partnership (if applicable) and the partnership agreement in the case of a general or limited partnership, the articles or certificate of formation and the operating agreement in the case of a limited liability company, or similar governing documents, in each case as amended from time to time.

"Governmental Authority" means any nation or government, any state, city, municipality or political subdivision thereof, any federal or state court or any other agency, body, authority or entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Hunt" has the meaning set forth in the Recitals.

"Hunt Group" means (a) Ray L. Hunt and Hunter L. Hunt; (b) any lineal descendent of the foregoing (including by adoption); (c) any spouse of the foregoing; (d) any trust established primarily for the benefit of any one or more of the foregoing; and (e) any Entity Controlled, individually or collectively, by any of the foregoing Persons identified in the preceding clauses (a) through (d) (including Hunt and its Subsidiaries). Notwithstanding the foregoing, no Company Entity will be deemed to be a member of the Hunt Group.

"Indemnitee" has the meaning set forth in Section 14(e).

"Indemnitor" has the meaning set forth in Section 14(f).

"Independent Directors" means the members of the Company Board who the Company Board determines are not officers, directors, employees, Affiliates or other representatives of OEDC, the Manager, any member of the Hunt Group or any of their respective Affiliates, and who are otherwise "independent" in accordance with the Company's Governing Instruments and policies and, if applicable, the rules of the New York Stock Exchange or any other securities exchange on which the Company's common stock is listed.

"Initial Term" means a period commencing on the date hereof and ending on the earlier of (i) December 31, 2021 and (ii) a Successful Challenge.

"Intellectual Property" means the worldwide right, title, and interest in all intellectual property rights, including all copyrights, copyright registrations, applications for registration, and all renewals or reversions thereof; domain names, trademarks, service marks, brand names, certification marks, trade names, trade dress and other indicia of origin, together with the goodwill associated with the foregoing and registrations and applications for registration of the foregoing; inventions (whether or not patentable), priority rights, patent rights, patents, and patent applications, and all divisions, continuations, continued prosecution applications, reissues,

4

extensions and renewals thereof, together with the right to sue and collect damages for past, present and future infringement thereof; trade secrets, confidential information and know-how; work product, documents, code, works of authorship, programs, manuals, developments, processes, formulae, data, databases, specifications, fixtures, tooling, equipment, supplies, processes, discoveries, improvements, and similar rights.

"Investment Company Act" means the Investment Company Act of 1940, as amended.

"Joint Panel Member" has the meaning set forth in Section 26(c).

"Management Costs" has the meaning set forth in Section 10(b).

"Management Costs Budget" has the meaning set forth in Section 10(c).

"Management Fee" has the meaning set forth in Section 10(a).

"Management Team" means all individuals that the Manager makes available to serve as officers of the Company Entities or to provide services to the Company Entities in accordance with this Agreement.

"Manager" has the meaning set forth in the Preamble.

"Manager Change of Control" has the meaning set forth in Section 19.

"Manager Indemnified Party" has the meaning set forth in Section 14(d).

"Manager Panel Member" has the meaning set forth in Section 26(b).

"OAC" has the meaning set forth in the Preamble.

"OAC Assets" means the Assets owned by OAC and its Subsidiaries.

"OAC Board" means the board of directors of OAC provided for in the OAC LLC Agreement. Upon the request of the OAC Board, the term "OAC Board" may be deemed, for all purposes hereof or for specified purposes only, to refer to a committee or designee of the OAC Board.

"OAC Expansion Activities" means the performance of the following activities in connection with the design, supervision and construction of new transmission lines, switching stations and distribution stations:

> (i)     acquiring property, easements, construction permits and fee title necessary for expansion and development;

> (ii)    planning, organizing, and managing the development of the engineering design of the expansion;

> (iii)   developing and maintaining engineering and project software applications;

5

   (iv)  requisitioning components and materials for expansion;

   (v)  organizing and managing the construction of transmission lines, switching stations, and distribution substation facilities, which includes (A) coordinating and conducting on-site monitoring and inspection of contractor activities, (B) determining the technical land requirements for construction, (C) creating and maintaining engineering drawings and documentation for construction, and (D) requesting planned outages and switching required for construction activities; and

   (vi)  maintaining all land records.

"OAC Expenses" has the meaning set forth in Section 12(a).

"OAC LLC Agreement" means the third amended and restated limited liability company agreement of OAC, as amended, restated or supplemented or otherwise modified from time to time.

"OAC Management Costs" has the meaning set forth in Section 10(c).

"OAC Officer" means an officer of OAC in his or her capacity as an officer of OAC. Subject to Section 4(b), such officer of OAC may also serve as an officer of the Manager or another Company Entity.

"OAC Streetlight Services Business" means the business of on-going installation, replacement and/or maintenance of streetlights, along with the provision of electricity services, operated by OAC, consisting of the following activities:

   (i)  maintaining the poles, overhead and underground conductors, circuits, and conduits dedicated solely to streetlight electricity delivery;

   (ii)  ensuring that each streetlight (and the components thereof, including poles, conductors and conduits) is connected to the grid and properly coordinated and compatible with the rest of the electricity delivery system;

   (iii)  developing and generate ad hoc reports regarding streetlight outages and maintenance;

   (iv)  coordinating with, and supervise, third parties to install, maintain, repair and replace streetlights;

   (v)  providing field support services and governance to third parties making streetlight repairs; and

   (vi)  exercising financial oversight over the operating expenses and capital expenditures associated with the installation, electricity delivery and maintenance.

"OEDC" means Oncor Electric Delivery Company LLC, a Texas limited liability company.

"Oncor Holdings" has the meaning given to such term in the Preamble.

"Oncor Holdings Board" means the board of directors of Oncor Holdings provided for under the Oncor Holdings LLC Agreement. Upon the request of the Oncor Holdings Board, the term "Oncor Holdings Board" may be deemed, for all purposes hereof or for specified purposes only, to refer to a committee or designee of the Oncor Holdings Board.

"Oncor Holdings LLC Agreement" means the amended and restated limited liability company agreement of Oncor Holdings, as amended, restated or supplemented or otherwise modified from time to time.

"Operating Partnership" has the meaning set forth in the Preamble.

"Other Potential Acquirer" has the meaning set forth in Section 9(i).

"Over-Budget Payment Limit" has the meaning set forth in Section 10(e)(4).

"Party" or "Parties" has the meaning set forth in the Preamble.

"Person" means any individual, corporation, proprietorship, firm, partnership, limited partnership, limited liability company, trust, association or other Entity.

"Prior-Year Company Management Costs" has the meaning set forth in Section 10(f).

"Prior-Year OAC Management Costs" has the meaning set forth in Section 10(f).

"PUCT" means the Public Utility Commission of the State of Texas.

"Reconciliation Report Date" has the meaning set forth in Section 10(e)(1).

"REIT" has the meaning set forth in the Recitals.

"Renewal Term" means a period commencing on the expiration of the Initial Term or any Renewal Term and ending on the earlier of (i) the date that is two (2) years after the commencement of such Renewal Term and (ii) a Successful Challenge.

"Reorganized TCEH" has the meaning set forth in Section 2(b).

"Ring-Fenced Entities" means Oncor Holdings, OAC and their respective Subsidiaries.

"SEC" means the United States Securities and Exchange Commission.

"Separateness Undertakings" means, collectively, the Separateness Undertakings as defined in the OAC LLC Agreement and the Oncor Holdings LLC Agreement.

"Severance Costs" means the actual out-of-pocket costs incurred by the Manager and its Affiliates in terminating or reallocating personnel or resources solely as a result of a termination of this Agreement; *provided*, *however*, that in no event shall Severance Costs for purposes of this Agreement exceed $20,000,000.

"Significant Stockholder" means any Person that beneficially owns more than 10% of the equity normally entitled to vote at any meeting of the Company's stockholders (with "beneficial ownership" calculated in accordance with Rule 13d-3 promulgated pursuant to the Exchange Act).

"Standard of Care" has the meaning set forth in Section 14(a).

"Streetlight Assets" means the Assets used in connection with the operation of the OAC Streetlight Services Business, which include streetlight poles, luminaires, mast arms, photocells, the streetlight outage tracking software, and the overhead and underground conductors and conduits dedicated solely to the streetlight electricity delivery.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, trust, partnership, joint venture, or other Entity of which a majority of (i) the voting power of the voting equity securities or (ii) the outstanding Equity Interests is owned, directly or indirectly, by such Person.

"Successful Challenge" means the date a court of competent jurisdiction has determined in a final, non-appealable order that this Agreement, or any term or provision hereof, after giving effect to Section 26, caused a termination of the Company's REIT election under Section 856(g) of the Code.

"Target" has the meaning set forth in Section 9(i).

"Third Panel Member" has the meaning set forth in Section 23(b).

Section 2.    Appointment of the Manager; Performance Standard

(a)    The Company, the Operating Partnership, Oncor Holdings and OAC (in each case, on its own behalf and on behalf of its Subsidiaries) hereby appoint the Manager to manage the Assets (exclusive of the Streetlight Assets) and the day-to-day operations of the Company Entities (exclusive of the OAC Expansion Activities and the OAC Streetlight Services Business) subject to the conditions and in accordance with the terms of this Agreement, and the Manager hereby agrees to use its reasonable best efforts to perform each of the duties set forth herein in accordance with the Standard of Care except where a higher standard of care is specified in this Agreement.

(b)    The Parties shall not, and shall not permit any Company Entity to, appoint any Person other than the Manager to provide the Company Entities with the services to be provided by the Manager under this Agreement, except (i) as provided below in this Section 2(b), (ii) for the provision of services by [Texas Competitive Electric Holdings Company Inc.], a Delaware corporation ("Reorganized TCEH"), to the Company and other Company Entities as provided in the Transition Services Agreement, dated [___],

8

between Reorganized TCEH  and the Company, (iii) the Company may, at its sole expense, retain a consultant or advisor to advise on acquisition, joint venture, development or disposition opportunities, (iv) to the extent that the Manager otherwise agrees, in its sole and absolute discretion or (v) to the extent that the Manager elects, pursuant to the terms of this Agreement, to cause the duties of the Manager hereunder to be provided by third parties. Notwithstanding the foregoing, each Company Entity has the right, at its sole expense, to retain or consult with any Person that its applicable Board of Directors deems necessary to supplement, review or verify any of the services performed or that may be performed by the Manager under this Agreement from time to time. If a Company Entity believes that the Manager is not satisfactorily providing services that the Manager is required to provide under this Agreement, then such Company Entity may give notice to the Manager describing such services and providing a reasonably detailed explanation of the basis for its belief that the Manager is not satisfactorily providing such services. Following delivery of such notice, the applicable Board of Directors (or its designee) and the Manager shall consult in good faith to attempt to resolve the situation.  If, within fifteen (15) days after delivery of the Company Entity's notice to the Manager provided for above, the Manager has not commenced providing the services in question, or established that it will do so, to the reasonable satisfaction of the applicable Board of Directors (or its designee), then the Company Entity that delivered the notice may obtain such services from a third party service provider. In such case, to the extent the Manager could have provided such services pursuant to a then-approved Management Costs Budget, the reasonable costs of obtaining the services from such third party shall be deducted from the Management Fee otherwise payable to the Manager in respect of the provision of such services. Notwithstanding the foregoing, if the Manager disputes that it is unable or failed to satisfactorily provide the services in question, or that such services are required to be provided under this Agreement, then the Manager may initiate an arbitration as provided in Section 26. If such arbitration determines that the Manager has not failed to provide any services that it is required to provide under this Agreement in accordance with the terms of this Agreement (including the Standard of Care), then no deduction shall be made from the Management Fee payable to the Manager on account of services provided by the third party service provider, and the applicable Company Entity must terminate the engagement of the third party service provider, with such Company Entity (and not the Manager) bearing the costs of such termination.  The non-prevailing party in any such arbitration shall bear all costs and expenses associated with such arbitration.

(c)      The Parties acknowledge that (i) the Manager is an Affiliate of Hunt and (ii) the Manager may perform its services for the Company Entities in part through the personnel and facilities of Hunt and Affiliates of Hunt; provided, that nothing in this Section 2(c) shall relieve the Manager of its obligations under this Agreement.

(d)      The Manager (i) in its capacity as manager of the Company Entities (other than the Ring-Fenced Entities) and the Company Assets (exclusive of the Streetlight Assets), at all times will be subject to the supervision and oversight of the Company Board, (ii) in its capacity as manager of OAC and the OAC Assets (exclusive of the Streetlight Assets, the OAC Expansion Activities and the OAC Streetlight Services Business), at all times will be subject to the supervision and oversight of the OAC Board

9

and, to the extent provided in <u>Section 4(a)</u>, an OAC Officer, and (iii) in its capacity as manager of Oncor Holdings at all times will be subject to the supervision and oversight of the Oncor Holdings Board. The Manager will have only such functions and authority as the Company Entities may delegate to it, including the functions and authority identified in, and delegated to the Manager under, this Agreement.

(e)     Without limiting or modifying the powers of oversight and supervision of the Boards of Directors as set forth herein or in the applicable Governing Instruments, the Manager shall not effect, commit to or authorize any of the following acts, expenditures, decisions and obligations with respect to (i) any Company Entity (other than Ring-Fenced Entities) without the prior Approval of the Company Board, (ii) OAC or any of its Subsidiaries without the prior Approval of the OAC Board or (iii) Oncor Holdings without the prior approval of the Oncor Holdings Board:

(1)     any material acquisition of any Person (whether by consolidation, merger or similar combination of such Company Entity with or into such Person or otherwise);

(2)     any sale, conveyance, transfer or other disposition of any type, in one transaction or in a series of related transactions, of material assets or property other than in the ordinary course of business;

(3)     entering into any partnership or joint venture with any Person other than another Company Entity;

(4)     the execution of any lease of transmission and distribution Assets to an operator thereof, and any material amendments thereto;

(5)     the incurrence of material indebtedness or the material modification of any agreement governing any material indebtedness;

(6)     the appointment or termination of the Chief Executive Officer and the Chief Financial Officer of the Company, the Operating Partnership, Oncor Holdings or OAC, as the case may be, in their capacity as such officer of such entity (provided that, for clarity, this Section 2(e)(6) does not require the Manager to maintain or terminate the employment of any employee of the Manager in such individual's capacity as an employee of the Manager);

(7)     any winding up, dissolution or liquidation of such Company Entity;

(8)     the commencement of a voluntary case concerning such Company Entity under Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto;

(9)     the sale of any equity securities or any option, warrant or right to purchase or instrument convertible into any equity securities, by such Company Entity other than (i) equity securities or options issued under any stock option

10

plan or other equity incentive plan Approved by the requisite Board of Directors, or (ii) equity securities issued or sold to another Company Entity;

(10)    the guarantee by such Company Entity of any obligations (including indebtedness) of any other Person, other than another Company Entity, subject to any applicable Separateness Undertakings;

(11)    changing the material accounting policies applicable to such Company Entity;

(12)    adopting an annual budget for such Company Entity; or

(13)    the consummation of any transaction between any Company Entity, on the one hand, and a Significant Stockholder of the Company, any Affiliate of any Significant Stockholder of the Company, the Manager, any Affiliate of the Manager, OEDC or any Affiliate of OEDC, on the other hand (any such transaction, an "Affiliate Transaction"), other than the transactions expressly contemplated by this Agreement, the Governing Instruments of the Company, the Joint Survivor Merger Agreement between a Subsidiary of OAC and OEDC, or any lease (in each case, as in effect on the Effective Date as subsequently amended or extended with the approval of the Boards of Directors) between OAC or a Subsidiary thereof and OEDC or a Subsidiary thereof.

Section 3.    Services to be Provided

(a)    Subject to Section 2(e), Section 3(b), Section 4, and Section 5, and subject to the supervision and oversight provided for under Section 2(d) and Section 4(a) and the budget limitations set forth in any Management Costs Budget or as provided in Section 12, the Manager shall (i) manage the day-to-day operations of the Company Entities and (ii) perform (or cause to be performed), in accordance the Standard of Care and with any guidelines that may be adopted from time to time by the applicable Boards of Directors (including any annual budgets), the following services and activities:

(1)    performing day-to-day administrative functions necessary or appropriate for the Company Entities' management;

(2)    collecting revenues and paying debts and obligations for the Company Entities;

(3)    providing executive and administrative personnel, office space and office services required in rendering services for the Company Entities' management and operation;

(4)    engaging, retaining and supervising, on behalf of each Company Entity, such services of accountants, legal counsel, appraisers, insurers, brokers, transfer agents, registrars, investment banks, valuation firms, financial advisors, due diligence firms, underwriting review firms and banks as the Manager deems

11

necessary or advisable in connection with the management and operations of such Company Entity;

(5)      communicating with the holders of any of the securities of each Company Entity as required to satisfy the reporting and other rules or requirements under the Governing Instruments of such Company Entity or of any governmental bodies or agencies or trading markets having jurisdiction over such Company Entity (including the rules of the New York Stock Exchange or any other exchange on which the securities of a Company Entity are listed) and to maintain effective relations with such holders, including website maintenance, logo design, analyst presentations, investor conferences and annual meeting arrangements;

(6)      preparing for the review and Approval and filing on behalf of each Company Entity that is subject to the periodic reporting requirements of the Exchange Act, current reports on Form 8-K, quarterly reports on Form 10-Q, annual reports on Form 10-K, proxy statements and other reports required to be filed by the Exchange Act with the SEC and otherwise satisfying reporting and compliance obligations under applicable securities laws or the rules of the New York Stock Exchange or any other exchange on which securities of a Company Entity are listed;

(7)      arranging marketing materials, advertising, industry group activities (such as conference participation and industry organization memberships) and other promotional efforts designed to promote the business of Company Entities;

(8)      communicating with analysts and the investment community generally and administering community and public relations activities;

(9)      sourcing, evaluating, submitting for Approval, and, subject to obtaining such Approval, directing the issuance of any common or preferred stock issuances or other equity issuances;

(10)      subject to any necessary Approvals, drawing on existing lines of credit at such times as the Manager deems appropriate to support the business of the Company Entities and sourcing, facilitating, evaluating and submitting for Approval any other loan, indebtedness, guaranty or other financing arrangements necessary or appropriate in connection with the business of the Company Entities and managing the Company Entities' relationships with existing or potential lenders;

(11)      evaluating and recommending to the Boards of Directors hedging strategies and engaging in hedging activities, consistent with such strategies that have received Approval as modified from time to time, while maintaining the Company's qualification as a REIT;

12

(12)    opening and managing Company Accounts and conducting treasury/cash management activities on behalf of the Company Entities;

(13)    investing and reinvesting money and securities in short-term investments pending investment in other investments, and paying related fees, costs and expenses;

(14)    monitoring compliance by the Ring-Fenced Entities with the Separateness Undertakings and, if requested by a Board of Directors, providing reports thereon to the Boards of Directors, to OEDC, to the PUCT or any other applicable Governmental Authority or to any rating agency;

(15)    managing the relationship of the Company Entities with rating agencies;

(16)    advising the Boards of Directors on capital structure and capital raising;

(17)    subject to Section 2(e)(4), negotiating with tenants any new leases, lease amendments, lease supplements or lease renewals, all in accordance with leasing standards established by the Boards of Directors from time to time, and causing the applicable Company Entity to perform its obligations under any such agreements and enforcing any related rights;

(18)    evaluating, negotiating, submitting for Approval, and, subject to receipt of such Approval, entering into any project acquisitions;

(19)    working with tenants or other third parties to construct transmission and distribution projects, including causing a Company Entity to negotiate, enter into and perform its obligations under any related construction contracts, engineering, procurement and construction (EPC) contracts or other contracts related to such construction activities;

(20)    preparing annual operating and capital expenditure budgets, and any related amendments, for Approval and causing the Company Entities to perform and implement then-effective annual budgets that have received such Approval;

(21)    preparing financial statements for Approval in all cases in a manner intended to ensure compliance with applicable laws and regulations;

(22)    coordinating the relationship with external auditors subject to approval of such auditors, subject to oversight from the Audit Committee or the relevant Board of Directors, as applicable, or other appropriate governing body when appropriate;

(23)    administering bookkeeping and accounting functions as are required for the management and operation of the Company Entities;

(24)    evaluating and recommending and, subject to obtaining Approval, making any accounting policy changes;

(25)    designing, preparing, updating and monitoring internal control over financial reporting and disclosure controls and procedures, subject to oversight from the Audit Committee or the relevant Board of Directors, as applicable, or other appropriate governing body when applicable, and in all cases in a manner intended to ensure compliance with applicable laws and regulations;

(26)    managing any internal audit function required by securities laws, exchange rules or a Board of Directors, including, if appropriate, engaging a third party firm on behalf of a Company Entity to provide such function, and managing the relationship with that firm, subject to oversight from the Audit Committee or the relevant Board of Directors, as applicable, or other appropriate governing body when appropriate, and in all cases in a manner intended to ensure compliance with applicable laws and regulations;

(27)    subject to Section 9(i), sourcing, evaluating and submitting for applicable Board of Director Approval, and, subject to receipt of such Board of Director Approval, causing a Company Entity to agree to and execute, potential merger, acquisition, joint venture, development or disposition opportunities;

(28)    administering and managing all policy matters related to environmental issues, and as requested by the Company or any Company Entity, on matters related to the administration of existing or new permits on behalf of the Company and all Company Entities;

(29)    coordinating and managing the business of any joint venture or co-investment interests a Company Entity holds directly or indirectly and conducting all matters with the joint venture or co-investment partners;

(30)    monitoring the insurance required under Company Entity leases and sourcing and evaluating any insurance coverage, such as director and officer insurance, and, subject to obtaining Approvals when applicable, causing Company Entities to obtain any such insurance;

(31)    enforcing the rights of Company Entities under any applicable insurance policies and other contracts when and as appropriate, subject to oversight and direction from the applicable Board of Directors or a committee thereof, when appropriate;

(32)    assisting the Company regarding the maintenance of its qualification as a REIT and monitoring compliance with the various REIT qualification tests and other tax laws and regulations, and, in accordance with Section 9(c)(ii), causing the Company to qualify as a REIT for U.S. federal income tax purposes;

(33)    managing all tax matters, including making necessary tax filings and causing each Company Entity to make any related payments that are owed to taxing authorities, managing and coordinating audits and filing appropriate tax appeals, and in all cases in a manner intended to ensure compliance with applicable laws and regulations;

(34)    scheduling, managing and preparing materials for all meetings of each Board of Directors or committees thereof;

(35)    if requested by the relevant Board of Directors, counseling each Board of Directors in connection with any policy decisions;

(36)    subject to obtaining Board of Director or other appropriate Approvals, handling and resolving all claims, disputes or controversies between Company Entities and third parties;

(37)    furnishing the Boards of Directors with reports and statistical and economic research regarding activities and services performed by the Manager on behalf of a Company Entity, as appropriate;

(38)    assisting the Company Entities in complying with all regulatory requirements applicable to the Company Entities with respect to the Company Entities' business;

(39)    keeping each Board of Directors apprised of material information relevant to the Company Entities including by attending meetings of the Board of Directors and making reports to the applicable Board of Directors, including reports of its performance of the services set forth herein; and

(40)    performing such other services as may be required from time to time for the management of, and other activities relating to, the Assets (exclusive of the Streetlight Assets) and the business and operations of the Company Entities (exclusive of the OAC Expansion Activities and the OAC Streetlight Services Business) as may be required under the Governing Instruments of any Company Entity, as a Board of Directors reasonably requests or as the Manager deems appropriate under the particular circumstances.

(b)    The Manager shall promptly inform the relevant Company Entity if it identifies additional services that the Manager should, in its opinion, perform for such Company Entity, specifying that such services are not in its opinion within its obligations under Section 3(a), and any Company Entity from time to time may request that the Manager provide additional services to such Company Entity that are not otherwise provided for under Section 3(a). If a Company Entity and the Manager agree to the Manager providing any additional services ("Additional Services") to such Company Entity, the Manager shall provide such Additional Services in accordance with this Agreement and be reimbursed for all costs and expenses related to such Additional Services and compensated for all such Additional Services as agreed in advance and in writing by such Company Entity and the Manager. The provision of any Additional

15

Services shall be subject to the terms of this Agreement. The Manager is not obligated to provide any Additional Services except to the extent it agrees to do so or as set forth in Section 9(i), unless such Additional Services are required in order for OAC or a Subsidiary thereof to comply with its regulatory obligations to the PUCT and the OAC Board has agreed to reimburse the Manager for its costs associated with such Additional Services.

(c)    For the avoidance of doubt, in performing its obligations under this Agreement, the Manager shall not act, be required to act, or recommend that any of the Company Entities act in a manner that is inconsistent with OAC's rights and obligations under the Public Utility Regulatory Act of Texas or any lease of any transmission and distribution Assets between OAC or one of its Subsidiaries, on the one hand, and OEDC or one of its Subsidiaries, on the other hand.

Section 4.    OAC Restrictions.

(a)    In providing services to OAC and its Subsidiaries under this Agreement, including the services described in Section 3(a) and the Additional Services provided for in Section 3(b), the Manager and any other service provider retained by the Manager on behalf of OAC or its Subsidiaries shall be subject to the supervision, oversight and monitoring of an OAC Officer whenever such services involve the negotiation of financing for expansion activities, negotiation of any lease, collection of rent or maintenance of financial or accounting records.

(b)    Neither the Manager nor any member of the Management Team shall perform or provide (or cause to be performed or provided) any services or activities constituting the OAC Streetlight Services Business or the OAC Expansion Activities. The OAC Streetlight Services Business and the OAC Expansion Activities are to be undertaken exclusively by officers and employees of OAC that are not employees of the Manager or of any member of the Hunt Group (other than OEDC or a Subsidiary thereof) and are to be overseen and supervised by OAC Officers that are not employees or officers of the Manager or any member of the Hunt Group (other than OEDC or a Subsidiary thereof). Such OAC Officers will report to the OAC Board. Notwithstanding anything to the contrary contained in this Agreement, neither the Manager nor any member of the Management Team has any authority or responsibility with respect to the Streetlight Assets, the conduct of the OAC Streetlight Services Business or the performance of the OAC Expansion Activities.

Section 5.    Manager Personnel; Outside Activities.

(a)    The Manager and its Affiliates will make available to each Company Entity personnel to serve as the Management Team of such Company Entity and to serve as officers of such Company Entity as may be necessary or advisable to provide the management services to be provided by the Manager to Company Entities under this Agreement, as required by the Governing Instruments of such Company Entity and as otherwise reasonably requested by a Board of Directors. The Manager shall make available other support personnel as are necessary or advisable to provide the

management services to be provided by the Manager to Company Entities under this Agreement. Subject to <u>Section 4(b)</u>, the same personnel may serve as officers of, and otherwise provide services to, the Manager, the Company, Oncor Holdings, OAC and any other Company Entity.

(b)       The Manager shall, upon request of the applicable Board of Directors, discuss the composition of the Management Team with the applicable Board of Directors and consider such Boards of Directors' recommendations in good faith. Furthermore, the Manager will consult and advise with the OAC Board and the Company Board (i) before the Manager or another member of the Hunt Group terminates the employment (as an employee of the Manager or another member of the Hunt Group) of any individual then serving as the CFO or CEO of any Company Entity and (ii) before recommending any person to serve as the CEO or the CFO of the Company. Subject to the foregoing, no provision of this Agreement will be deemed to give any Company Entity or Board of Directors the authority to require Hunt or the Manager to retain or terminate any employee of the Manager or another member of the Hunt Group in such individual's capacity as an employee of the Manager or member of the Hunt Group. Notwithstanding the foregoing, no provision of this Agreement will be deemed to give the Manager or any member of the Hunt Group the authority to retain or terminate (or require any Company Entity to retain or terminate) any individual in his or her capacity as an officer of any Company Entity.

(c)       The Manager shall recommend persons to serve as the CEO and CFO of each Company Entity and to hold other offices of OAC. The applicable Board of Directors shall have the sole authority to appoint and remove the CEO and CFO of each Company Entity, and the applicable Board of Directors or an officer designated by the applicable Board of Directors shall have the sole authority to appoint and remove other officers in accordance with the Governing Instruments of the Company Entity.

(d)       The Manager shall require the members of the Management Team to devote such portion of their time to the management of the Company Entities as is necessary and appropriate to operate the businesses of the Company Entities as contemplated by this Agreement and the Governing Instruments of each Company Entity. The Manager is not obligated to dedicate itself exclusively to the management of the Company Entities, or to require members of the Management Team to dedicate any specific portion of their time to the Company Entities, but the Manager must devote sufficient resources to the business of the Company Entities, commensurate with their level of activity, to discharge the Manager's obligations under this Agreement. The Manager shall dedicate sufficient time and shall engage and make available sufficient personnel (including personnel of the Manager's Affiliates) to perform the tasks and activities that typically would be performed internally (and not outsourced to third parties) by a manager rendering management and advisory services similar to those to be rendered by the Manager hereunder, and the Manager shall only engage third parties to perform such tasks and activities in accordance with the budget limitations set forth in <u>Section 12</u>.

(e)     Nothing in this Section 5, Section 3, Section 14(a) or any other provision of this Agreement requires, or is to be read to require, the Manager or any Affiliate of the Manager to bear or incur any unreimbursed Expenses. The Manager shall not have any liability under this Agreement for any consequences of, or any failure of the Manager to provide services contemplated hereby that is attributable to, the Company Entities' failure to fund Expenses that are incurred in accordance with this Agreement or any applicable approved budget. In any Fiscal Year, the Manager is not obligated to make resources or personnel available to the Company Entities in excess of those contemplated by the Management Costs Budget for such Fiscal Year, unless the Company or OAC, or both, as applicable, approve an increase in the Management Costs Budget for such Fiscal Year.

(f)     Subject to the provisions of Section 5(a), this Agreement does not and nothing in this Agreement is to be read to (i) prevent the Manager, Hunt or any of their Affiliates, officers, directors, employees or personnel, from engaging in other businesses or from rendering services of any kind (including the services to be provided to the Company Entities hereunder) to any other Person, including investing in, or rendering management, administrative or other services to others in connection with, any type of business (including acquisitions of assets that meet the principal investment objectives of the Company), whether or not the investment objectives or policies of any such other Person or Entity are similar to those of the Company or (ii) subject to any applicable blackout or other trading policies adopted by the Company, OAC or the Boards of Directors, in any way bind or restrict the Manager, Hunt or any of their Affiliates, officers, directors, employees or personnel from buying, selling or trading any securities or investments for their own accounts or for the account of others for whom Hunt or any of its Affiliates (other than the Manager), officers, directors, employees or personnel may be acting. If the Manager makes a recommendation to a Board of Directors with respect to any matter with respect to which it is reasonably likely that the Manager could have an actual conflict of interest, then the Manager will disclose any such conflict of interest prior to or concurrently with making such recommendation.

(g)     Subject to Section 4, managers, partners, officers, employees, personnel and agents of the Manager or Affiliates of the Manager may serve as directors, officers, employees, personnel, agents, nominees or signatories for the Company Entities, to the extent permitted by their Governing Instruments or by any resolutions duly adopted by the applicable governing entities pursuant to the Company Entities' Governing Instruments. When executing documents or otherwise acting in such capacities for the Company Entities, such persons shall use their respective titles in the applicable Company Entity.

Section 6.     Agency. Without expanding in any way the Manager's powers or authorities provided for in Section 3, subject to Section 4, the Manager may act as agent of any Company Entity or any combination of Company Entities in acquiring, financing, leasing, managing and disposing of Assets, disbursing and collecting the funds of the Company Entities, paying the debts and fulfilling the obligations of the Company Entities, supervising the performance of professionals engaged by or on behalf of the Company Entities and handling, prosecuting and settling any claims of or against the Company Entities, the Boards of Directors,

18

holders of the Company Entities' securities or representatives or properties of the Company Entities.

Section 7.    <u>Bank Accounts</u>. The Manager may establish and maintain one or more bank accounts in the name and on behalf of any Company Entity (any such account, a "<u>Company Account</u>"), and may collect and deposit funds into any such Company Account or Company Accounts, and disburse funds from any such Company Account or Company Accounts in accordance herewith; and the Manager shall, on a quarterly basis or upon request of a Board of Directors or a committee thereof from time to time, render appropriate accountings of such collections and payments to each Board of Directors and, upon request, to the auditors of the Company Entities. The Manager shall deposit all funds collected by the Manager on behalf of Company Entities in Company Accounts. The Manager shall maintain separate Company Accounts for the Ring-Fenced Entities to the extent required under their Governing Instruments.

Section 8.    <u>Records; Confidentiality</u>.

(a)    The Manager shall (i) maintain the Company and Company Entities' books and records in accordance with the applicable Governing Instruments and in a manner intended to ensure compliance with internal financial controls and disclosure controls and procedures established to ensure compliance with applicable laws and regulations, (ii) maintain complete and accurate accounting records in accordance with generally accepted accounting principles, and (iii) maintain complete and accurate tax records in accordance with federal, state, local and foreign revenue and tax laws, regulations and other applicable authorities. During the term of this Agreement and thereafter, each Company Entity shall be entitled, upon the reasonable prior written request of any Company Entity and at such Company Entity's sole cost and expense, to examine, audit and make copies of the books, records and other documents and information of such Company Entity or its Subsidiaries, its properties or assets and the ownership and operation thereof, which books, records, documents and information shall be available to the representatives of the Company Entities at all reasonable times at the principal office of the Manager, or at such other location where such information is maintained. The Manager shall, upon reasonable prior written notice, discuss the business, financial condition and results of operations of each Company Entity with any member of a Board of Directors or of the board of Oncor Holdings.

(b)    The Manager shall keep confidential any and all information obtained in connection with the services rendered under this Agreement and shall not disclose any such information (or use the same except in furtherance of its duties under this Agreement) to unaffiliated third parties except (i) with the prior written consent of the Boards of Directors; (ii) to legal counsel, accountants and other professional advisors to any of the Company Entities; (iii) to appraisers, financing sources and others in the ordinary course of any Company Entity's business, subject to customary non-disclosure undertakings; (iv) pursuant to the order of any Governmental Authority having jurisdiction over any Company Entity; (v) in connection with any governmental or regulatory filings of any Company Entity or disclosure or presentations to investors or prospective investors in, or lenders or prospective lenders to, a Company Entity; (vi) as required by law or legal process to which the Manager or any Person to whom disclosure

19

is permitted hereunder is a party; or (vii) to the extent reasonably required to perform the services under this Agreement. The foregoing shall not apply to information that becomes publicly available through the actions of a Person other than the Manager and not from the Manager's violation of this Section 8. The provisions of this Section 8 shall survive the termination of this Agreement. The Manager shall cause its Affiliates, agents, representatives and subcontractors to keep confidential any such information to the same degree set forth in this Section 8.

Section 9.    Obligations of Manager; Restrictions.

(a)    The Manager shall require each seller or transferor of assets to any Company Entity to make such representations and warranties regarding such assets as may, in the commercially reasonable judgment of the Manager, be necessary and appropriate. In addition, the Manager shall take such other action as it deems necessary or appropriate in accordance with Good Utility Practice (in its commercially reasonable discretion observing the Standard of Care) with regard to the protection of the Assets.

(b)    The Manager shall use its reasonable best efforts to monitor relationships among the Company Entities, any tenant that leases the assets of the Company Entities, the Manager and its Affiliates and holders of Equity Interests in the Company to ensure compliance with REIT rules and regulations related to related party rents.

(c)    The Manager shall, in a manner consistent with the Standard of Care, refrain from causing the Company Entities to take any action that (i) is not in compliance with the guidelines and policies of a Board of Directors, (ii) would adversely affect the Company's qualification as a REIT under the Code or would otherwise cause the Company to be subject to U.S. federal income or excise taxes, (iii) would adversely affect any Company Entity's status as an entity intended to be exempted from registration or excluded from investment company status under the Investment Company Act or (iv) would violate any law, rule or regulation of any Governmental Authority having jurisdiction over any Company Entity or that would otherwise not be permitted by a Company Entity's Governing Instruments, code of conduct or other compliance policies. In addition, the Manager shall take such affirmative steps which, in its judgment made in good faith, or in the judgment of the Company Board as transmitted to the Manager in writing, would prevent or cure any action described in clauses (i)-(iv) of this Section 9(c). If the Manager is directed to cause a Company Entity to take any such action described in clauses (i)-(iv) of this Section 9(c) by a Board of Directors, the Manager shall promptly notify such Board of Directors if, in the Manager's reasonable good faith judgment, such action would adversely affect such status or violate any such law, rule or regulation or the Governing Instruments. The Manager shall not be in breach of this Section 9(c) for any Company Entity action taken at the direction of a Board of Directors as long as the Manager complies with its obligations under the preceding sentence.

(d)    Subject to Section 9(e), in carrying out its obligations under this Agreement, the Manager shall cause, in a manner consistent with the Standard of Care, the Company Entities (i) to comply with their respective Governing Instruments and (ii)

20

to refrain from any action that would violate the Governing Instruments of any Company Entity.

(e)     In carrying out its obligations under this Agreement, the Manager shall cause, in a manner consistent with the Standard of Care, the Ring-Fenced Entities to comply with the Separateness Undertakings and to refrain from any action that would cause the Ring-Fenced Entities to violate the Separateness Undertakings. In the event of any conflict between the provisions of the Governing Instruments of the Company or any other Company Entity or a directive of the Company Board, on the one hand, and the Separateness Undertakings or any directive of the OAC Board given in accordance with the Separateness Undertakings, on the other hand, the provisions of the Separateness Undertakings or directive of the OAC Board, as applicable, shall control. The Manager shall promptly notify each Board of Directors of any such conflict. The Manager shall not be in breach of this Agreement or of any obligation to a Company Entity that results from its good faith reliance on a provision of the OAC LLC Agreement or a directive of the OAC Board relating to OAC that is consistent with the Separateness Undertakings.

(f)     The Manager shall keep records of its services and expenses in a level of detail appropriate for the shared services industry. The Manager shall cooperate with the Company Entities and OEDC, and document its activities and the incurrence of Expenses and Management Costs, so as to facilitate the recovery of OAC Expenses and OAC Management Costs in the PUCT-approved recoverable rates charged by OEDC to its customers.

(g)     The Manager and subcontractors, as applicable, shall, in a manner consistent with the Standard of Care, perform the services contemplated by this agreement in accordance with: (i) all applicable laws, regulations, orders, licenses and permits, including applicable governmental approvals, (ii) all applicable agreements of the Company and Company Entities relating to their businesses of which the Manager is aware and (iii) absent the instruction of the Boards of Directors to the contrary, the annual budgets as provided in Section 12.

(h)     The Manager is not required to provide any services to any Company Entity with respect to the identification, pursuit or development of electricity transmission facility development projects outside of the distribution service territory of OEDC and its Affiliates, and neither the Manager nor any Affiliate of Manager has any exclusivity or other obligation to offer transmission or development projects or opportunities to any Company Entity, other than the obligations that OEDC and its Subsidiaries owe pursuant to any lease between OAC or one of its Subsidiaries, on the one hand, and OEDC or one of its Subsidiaries, on the other hand.  Notwithstanding the forgoing or anything in this Agreement to the contrary, if a Board of Directors learns of a business opportunity that such Board of Directors determines is appropriate for the relevant Company Entity to pursue, whether independently or from an officer of such Company Entity, and, in either case, directs the Manager to pursue or develop such project, then, subject to any contractual obligations or other commitments the Manager has (which the Manager shall disclose to such Board of Directors), the Manager shall pursue such opportunity as part of the services provided pursuant to this Agreement.

21

(i)      If an opportunity arises for the Company or any other Company Entity to pursue the acquisition of, or a merger or other combination with, a third party utility, transmission or distribution asset owner or electricity transmission project or assets that, in each case, Manager believes is in the best interests of the Company Entities and its stakeholders (a "Target"), the Manager will, unless a Board of Directors requests otherwise, provide advice and assistance to the Company in evaluating and pursuing the possible acquisition of or other combination with the Target. At the same time the Manager may provide similar assistance and advice with respect to the same opportunity to other Persons in which the Manager or a member of the Hunt Group owns an interest or to which Manager or another member of the Hunt Group provides management services (an "Other Potential Acquirer"). In such circumstances, the Manager will make presentations to the Company Board and the governing body of the Other Potential Acquirer regarding the Target. If both the Company and the Other Potential Acquirer wish to pursue a possible transaction involving a Target, then, if the Company and the Other Potential Acquirer do not determine to pursue the Target jointly, the Manager and its Affiliates will establish separate, segregated deal teams (through the engagement of advisors) to work with each of the companies in considering, evaluating and pursuing such a transaction. In such circumstance, any employee, officer or representative of the Manager or any member of the Hunt Group serving as an officer or director of either a Company Entity or the Other Potential Acquirer will be recused from participating in discussions involving presentations by the Manager or its Affiliates to either company. If both companies elect to pursue the acquisition of a Target in competition with each other, then any employee, officer or representative of the Manager or of any member of the Hunt Group that has been actively involved in providing management services to both the Company Entities and the Other Potential Acquirer shall be excluded from participating in either company's pursuit of the Target, unless both the Company and the Other Potential Acquirer (i) consent to such participation by such individual and (ii) separately and specifically agree, at such time, to indemnify and hold harmless (in a manner consistent with Section 14) the individual, the Manager, all Affiliates of the Manager, and the officers, employees, agents and representatives of the Manager and its Affiliates, from any claims arising from or related to the participation of such individual in the activities to which the companies have consented.

Section 10.      Compensation.

(a)      During the Initial Term and any Renewal Term, the Operating Partnership and OAC will collectively pay the Manager an aggregate annual fee (the "Management Fee") in an amount equal to the Management Costs incurred during such Fiscal Year, subject to the limitations provided in in this Section 10.

(b)      The Management Fee to be paid in any Fiscal Year will initially be proposed by the Manager as part of the annual budget process for such Fiscal Year established by the Boards of Directors, with the amount of the Management Fee for the Fiscal Year to be equal to the Management Costs expected to be incurred during such Fiscal Year as set forth in the Management Costs Budget for such Fiscal Year. "Management Costs" means the following costs, without duplication, as incurred by the Manager and its Affiliates in providing services under this Agreement:

22

(1)     all salaries, bonuses, hiring and severance costs, employer payroll taxes, insurance costs, pension costs, employee benefit plan costs, incentive plan costs, worker's compensation and similar expenses, car allowances, and other benefits of or for the Dedicated Management Team (excluding costs of the equity incentive plan referred to in Section 10(i));

(2)     all reasonable and documented travel and entertainment expenses incurred by the Dedicated Management Team in connection with the business of the Company Entities;

(3)     costs associated with professional service organizations, publications, professional development or related matters for the Dedicated Management Team;

(4)     all rental expense and other occupancy costs and other expenses for the rental, lease or operation of office space for the Dedicated Management Team, including costs and expenses relating to acquiring or leasing furniture, fixtures and equipment, office materials and supplies, electronic communication devices, delivery charges, and costs and expenses related to telephone and telecommunication services and other utilities, and repair and maintenance (or a fair and reasonable allocation of such expenses to the extent such resources are used not only by the Dedicated Management Team but also by Persons other than the Dedicated Management Team); and

(5)     a fair and reasonable allocation (consistent with standards applicable to the shared services industry) of the expenses of the type described in clauses (1) through (4) of this Section 10(b) incurred with respect to members of the Management Team who are not members of the Dedicated Management Team.

(c)     The Manager, the Company and OAC shall endeavor in good faith to agree on the budgeted Management Costs (the "Management Costs Budget") for each pending Fiscal Year prior to the commencement thereof as part of the Company's and OAC's annual budget process, taking into account the Manager's good faith estimate of expected costs in obtaining and providing the Management Team and the other resources included in Management Costs and the scope of activity contemplated for the Company Entities during such Fiscal Year, as set forth in the Company's and OAC's annual plans. The Management Costs Budget shall include an allocation of all Management Costs to either the portion of Management Costs that is attributable to services to be provided to or for the benefit of the Ring-Fenced Entities and OAC Assets ("OAC Management Costs") and the portion that is not ("Company Management Costs"), with a fair allocation method as reasonably determined by the Manager (subject to Section 10(d)) being used to apportion any shared costs. OAC shall pay the budgeted OAC Management Costs, and the Operating Partnership shall pay the budgeted Company Management Costs, in cash, in four equal quarterly installments in arrears on the last day of each calendar quarter (or the first business day that follows such day, if the last day of the calendar quarter is not a business day).

23

(d)    The Company Entities and their representatives may (subject to confidentiality agreements governing such information) review and audit costs and expenditures actually incurred to verify that such costs and expenditures have been properly charged to the Company Entities and are properly stated in the correct amount, may review the allocation of costs as among the Company Entities and any other recipient of the Manager's services and may otherwise examine such records and supporting information as are typically reviewed in the course of sound auditing practices. If the Company or OAC disagrees with the methods used by the Manager to allocate costs between OAC Management Costs and Company Management Costs, between Company Entities or between Company Entities and other parties, the Manager, the Company and OAC shall discuss such disagreement in good faith and endeavor to resolve such disagreement and, if applicable, establish a mutually agreeable allocation method. If the parties are unable to resolve any such disagreement within thirty (30) days after written notice thereof from the Company or OAC to the Manager, then the Manager may (and will, at the request of OAC or the Company) submit such dispute to arbitration as provided in Section 26.

(e)    The Manager shall maintain a record and appropriate documentation of all Management Costs actually incurred, during each Fiscal Year, with appropriate detail regarding the actual OAC Management Costs and the actual Company Management Costs. Following each Fiscal Year budgeted Management Costs will be reconciled with actual Management Costs as follows:

(1)    No later than forty-five (45) days after the completion of such Fiscal Year (the "Reconciliation Report Date"), the Manager shall prepare and present to the OAC Board a reconciliation of the OAC Management Costs actually incurred during such Fiscal Year to the OAC Management Costs provided for in the Management Costs Budget for such Fiscal Year and prepare and present to the Company Board a reconciliation of the Company Management Costs actually incurred during such Fiscal Year to the Company Management Costs provided for in the Management Costs Budget for such Fiscal Year. Each such presentation will include reasonably detailed related data and supporting materials, and the Manager will promptly respond to any follow-up questions and inquiries that the OAC Board or Company Board, as applicable, has related to such presentation.

(2)    If the actual OAC Management Costs incurred for a Fiscal Year were less than the budgeted OAC Management Costs for such Fiscal Year (as finally determined pursuant to Section 10(g)), then the Manager shall pay the difference to OAC no later than three (3) business days following the final determination of such difference pursuant to Section 10(g). If the actual OAC Management Costs for a Fiscal Year were greater than the budgeted OAC Management Costs for such Fiscal Year, then, subject to clause (4) of this Section 10(e), OAC shall pay the amount of the over-budget OAC Management Costs for such Fiscal Year to the Manager no later than five (5) business days following the final determination of such difference pursuant to Section 10(g).

24

(3)      If the actual Company Management Costs incurred for a Fiscal Year were less than the budgeted Company Management Costs for such Fiscal Year (as finally determined pursuant to Section 10(g)), then the Manager shall pay the difference to the Operating Partnership no later than five (5) business days following the final determination of such difference pursuant to Section 10(g). If the actual Company Management Costs for a Fiscal Year were greater than the budgeted Company Management Costs, then, subject to clause (4) of this Section 10(e), the Operating Partnership shall pay the amount of the over-budget Company Management Costs for such Fiscal Year to the Manager no later than five (5) business days following the final determination of such difference pursuant to Section 10(g).

(4)      If the total actual Management Costs for a Fiscal Year (the "Aggregate Management Costs") exceed 110% of the total Management Costs Budget for such Fiscal Year, then the aggregate amount of over-budget payments to the Manager for such Fiscal Year will be limited to an amount equal to 10% of the Management Costs Budget for such Fiscal Year (the "Over-Budget Payment Limit"). If the Aggregate Management Costs exceed 110% of the total Management Costs Budget for a Fiscal Year, and both OAC Management Costs and Company Management Costs are over their respective budgets, then OAC and the Operating Partnership shall each pay its proportionate share of the Over-Budget Payment Limit, based on its relative share of the Aggregate Management Costs, to the Manager. If either OAC Management Costs or Company Management Costs, but not both, are over the amount budgeted therefor in the Management Costs Budget, and such over-budget amount is more than the Over-Budget Payment Limit, then OAC or the Operating Partnership, as applicable, shall pay the Over-Budget Payment Limit, but not more, to the Manager.

(f)      If the OAC Board and the Manager do not agree on the amount of OAC Management Cost to be included in the Management Costs Budget for a Fiscal Year prior to the commencement of that Fiscal Year, then, until such new OAC Management Cost amount is agreed, the Management Cost Budget for such Fiscal Year will be deemed to include all OAC Management Costs applicable to the just-concluded Fiscal Year (the "Prior-Year OAC Management Costs"), except that each line item of Prior-Year OAC Management Costs will be adjusted ("CPI-Adjusted") by any increase or decrease between the Consumer Price Index for the United States (All Items) (base year 1982 84=100) published by the United States Department of Labor, Bureau of Labor Statistics for the just-concluded Fiscal Year to the CPI for the year immediately preceding the just-concluded Fiscal Year. If the Company Board and the Manager do not agree on the amount of Company Management Cost to be included in the Management Costs Budget for a Fiscal Year prior to the commencement of that Fiscal Year, then, until such new Company Management Cost amount is agreed, the Management Cost Budget for such Fiscal Year will be deemed to include all Company Management Costs applicable to the

just-concluded Fiscal Year (the "Prior-Year Company Management Costs"), except that each line item of Prior-Year Company Management Costs will be CPI-Adjusted.[1]

(g)     If the Company Board does not agree with the Manager's calculation of actual Company Management Costs for a Fiscal Year, then the Manager and the Company Board will cooperate to resolve any such differences in a timely manner. If the Manager and the Company Board do not resolve such differences prior to the date that is thirty (30) days following the Reconciliation Report Date, the Manager may (and will, at the Company Board's request) submit such dispute to arbitration as provided in Section 26. If the OAC Board does not agree with the Manager's calculation of actual OAC Management Costs for a Fiscal Year, then the Manager and the OAC Board will cooperate to resolve any such differences in a timely manner. If the Manager and the OAC Board do not resolve such differences prior to the date that is thirty (30) days following the Reconciliation Report Date, the Manager may (and will, at the OAC Board's request) submit such dispute to arbitration as provided in Section 26.

(h)     The Management Fee for the period beginning on the Effective Date and ending on December 31, 2016 is $[_____][2], subject to adjustment after December 31, 2016, as provided in Section 10(e).

(i)     Promptly following the Effective Date, the Company shall establish and implement a management incentive plan to provide equity incentive compensation, by action of its Board of Directors or a compensation committee thereof, to members of the Management Team and OEDC personnel as determined by the Company. The costs of this plan, and awards granted under it, will not be deemed Management Costs or be borne by the Manager or affect the payment of the Management Fee to the Manager. The Company, the Manager and OEDC will cooperate in designing the plan, identifying the personnel to be included in the plan, and establishing awards under the plan.

Section 11.     Expenses of the Company.

(a)     The Company Entities shall bear and be responsible for all Expenses, including any Expenses initially incurred by the Manager on their behalf. "Expenses" means all expenses incurred in the conduct of the business of the Company Entities other than Management Costs. Expenses include, but are not limited to, the following:

(1)     any and all expenses and costs incurred in connection with (i) the operation of the OAC Streetlight Services Business, (ii) the acquisition, ownership, disposition and financing of any Streetlight Asset and (iii) the performance of the OAC Expansion Activities;

---

[1] Note to Draft: When agreement date is known, this provision will be adjusted to annualize the first-year management fee for purposes of determining Prior-Year OAC Management Costs and Prior-Year Company Management Costs with respect to determining the 2017 Management Fee.

[2] Note to Draft: Amount to be filled in once a determination of increased Manager costs is finalized. Target amount is $20 million, but in setting this amount the parties will cooperate to ensure that the Manager does not suffer a working capital shortfall during the first year of this Agreement.

(2)      out-of-pocket expenses in connection with the acquisition, disposition and financing of other entities and Assets on behalf of a Company Entity;

(3)      out-of-pocket costs of legal, tax, accounting, administrators for the establishment and maintenance of the books and records, consulting, auditing, administrative, and other similar services rendered for the Company Entities by third parties retained by a Company Entity or by the Manager on behalf of a Company Entity;

(4)      the compensation and expenses of the members of the Boards of Directors and of any officers or employees of any Company Entity that are not also members of the Management Team;

(5)      the cost of liability insurance related to the officers, directors, consultants or agents of any Company Entity and any obligations to indemnify any such persons;

(6)      out-of-pocket costs associated with the establishment and maintenance of any of the Company Entities' secured and unsecured forms of borrowings (including commitment fees, accounting fees, legal fees, closing and other similar costs) or any of the Company Entities' securities offerings;

(7)      out-of-pocket expenses for services provided by third parties connected with communications to holders of any of the Company Entities' securities and other bookkeeping and clerical work necessary in maintaining relations with holders of such securities;

(8)      out-of-pocket costs incurred in complying with the reporting and other requirements of any Governmental Authority, including all out-of-pocket costs of preparing and filing required reports with the SEC, the out-of-pocket costs payable by a Company Entity to any third party transfer agent or registrar in connection with the listing and/or trading of the Company Entity's stock on any exchange, the fees payable by a Company Entity to any such exchange in connection with its listing, and costs of preparing, printing and mailing any annual report to stockholders and proxy materials with respect to any stockholder meetings;

(9)      out-of-pocket costs associated with any computer software or hardware, electronic equipment or purchased information technology services from third party vendors that is used for the Company Entities; *provided*, that if such software, hardware, equipment or services also benefit the businesses of Affiliates of the Manager or activities of the Manager that are unrelated to those of the Company Entities, the Expenses shall only include an amount reasonably allocated to the Company Entities by the Manager;

(10)      out-of-pocket costs and expenses incurred with respect to market information systems and publications, pricing and valuation services, research

27

publications and materials, including financial analytics and market data, and settlement, clearing and custodial fees and expenses, relevant to the business of a Company Entity;

(11)    out-of-pocket compensation and expenses for services provided by each Company Entity's custodian, transfer agent and registrar, if any;

(12)    out-of-pocket costs of maintaining each Company Entity's compliance with all federal, state and local rules and regulations or any other regulatory agency;

(13)    taxes and license fees payable by any Company Entity;

(14)    insurance premiums payable by any Company Entity to any third party insurance provider;

(15)    all other out-of-pocket costs and expenses payable to third parties by any Company Entity relating to the business and investment operations of the Company Entities, including the costs and expenses of acquiring, owning, protecting, maintaining, developing and disposing of Assets, including appraisal, valuation, reporting, audit and legal fees;

(16)    out-of-pocket expenses relating to any office(s) or office facilities used for the operation of the businesses of the Company Entities, including disaster backup recovery sites and facilities, maintained for the Company Entities or Assets separate from the office or offices of the Manager;

(17)    expenses connected with the payments of interest, dividends or distributions in cash or any other form authorized or caused to be made by a Board of Directors to or on account of holders of a Company Entities' securities, including in connection with any dividend reinvestment plan;

(18)    any judgment or settlement of pending or threatened proceedings (whether civil, criminal or otherwise) against any Company Entity, or against any trustee, director or officer of any Company Entity in his capacity as such for which any Company Entity is required to indemnify such trustee, director or officer by any court or governmental agency; and

(19)    all out-of-pocket costs and expenses payable to third party service providers relating to the development and management of the Company's website.

(b)    The provisions of this Section 11 shall survive the termination of this Agreement with respect to any Expenses incurred prior to or in connection with such termination.

Section 12.    Attribution of Expenses; Expense Budget; Reimbursement of Expenses.

(a)    OAC shall pay or reimburse all Expenses that relate to the business of the Ring-Fenced Entities or to the OAC Assets (collectively, "OAC Expenses"). The Operating Partnership shall pay or reimburse all Expenses that are not OAC Expenses (collectively, "Company Expenses"). The Manager shall establish procedures for designating and documenting the designation of Expenses as OAC Expenses or Company Expenses, which shall in all cases be consistent with the Separateness Undertakings. On request, the Manager will review such procedures with each Board of Directors.

(b)    The Manager shall manage the Company Entities (exclusive of the OAC Expansion Activities, OAC Streetlight Services Business and the Streetlight Assets) in accordance with Fiscal Year capital expenditure budgets and operating expense budgets adopted by the Company Entities in their annual budgeting process. The Manager will submit Fiscal Year budgets comprised of at least four different categories: (i) Management Costs for such Fiscal year, which are addressed in more detail in Section 10; (ii) estimated capital expenditures for such Fiscal Year; (iii) estimated non-discretionary Expenses (other than capital expenditures) such as interest and obligations under multi-year agreements to which a Company Entity is a Party; and (iv) all other estimated Expenses for such Fiscal Year (the expenses referred to in clause (iv) being "Discretionary Expenses").

(c)    In no event may Manager cause or permit OAC and its Subsidiaries (on a consolidated basis) to exceed their Fiscal Year capital expenditure budget by more than 10% without the Approval of the OAC Board and the Company Board. In no event may the Company, the Operating Partnership and their Subsidiaries (on a consolidated basis) exceed their Fiscal Year capital expenditure budget by more than 10% without the Approval of the Company Board.

(d)    The Manager shall use reasonable best efforts, observing the Standard of Care, to cause Discretionary Expenses for a Fiscal Year not to exceed the estimates submitted to the Boards of Directors by more than 10% of such estimates, and the Manager shall promptly notify each Board of Directors of any expected deviations in excess of 10% of the estimates and the reasons for such deviations. Upon receipt of such notice of expected deviations from the budget, a Board of Directors may instruct the Manager that any or all additional Discretionary Expenses in excess of the budget for Discretionary Expenses require the approval of such Board of Directors.

(e)    The Manager may prepare and deliver to the Company and/or OAC, as applicable, a statement documenting any unreimbursed Expenses incurred by the Manager on behalf of a Company Entity in accordance with this Agreement. The Operating Partnership shall reimburse the Manager for all Company Expenses and OAC shall reimburse the Manager for all OAC Expenses on or before the 30th day following the date of delivery of such statement. The Manager shall not be obligated to pay any Expenses from its own funds. The provisions of this Section 12 shall survive the termination of this Agreement with respect to Expenses incurred prior to or in connection with such termination. The Operating Partnership shall pay all obligations of

the Company under this Agreement to pay any fees, reimbursements, indemnities or other amounts to the Manager.

Section 13.    Insurance.[3]

(a)    Each of the Company and OAC will provide customary director and officer liability insurance coverage for (i) the members of the Dedicated Management Team, (ii) members of the Management Team serving as officers or directors of the Company, OAC, the Manager or any Company Entity, and (iii) members of the Management Team who spend a significant portion of their working time providing services to Company Entities under this Agreement, including professional liability coverage with limits no less than $[_____]. The Manager may also request that additional professional liability insurance be purchased and added to the Company policy or the OAC policy, and the Company and/or OAC, as applicable, shall obtain such additional insurance, provided that the Manager bears any premium costs related to persons other than the Designated Management Team and premium costs over and above the premium costs of the insurance with coverage limits of $[_____]. The Manager, the Company and OAC shall review all such policies annually and shall mutually agree upon the terms and conditions of such policies.

(b)    The Manager (or an Affiliate of the Manager, on the Manager's behalf), shall maintain, at its expense and at all times during the term of this Agreement, insurance as follows:

(1)    Commercial General Liability Insurance including Umbrella Liability Insurance, written on an occurrence basis, with limits of not less than $[_____] combined for bodily injury and property damage liability.

(2)    Workers Compensation Insurance, as required by the law of the State where the Assets are located, covering all of the Manager's employees, and Employer's Liability Insurance with limits of not less than $[_____] for bodily injury by accident and $[_____] for bodily injury by disease.

(3)    Commercial Crime and/or Employee Dishonesty Insurance, covering the activities of all of its employees who may handle or be responsible for monies or other property of Company, with limits of not less than $[_____].

(c)    Upon request by the Company or OAC, the Manager shall furnish to the Company or OAC, as applicable, certificates of insurance evidencing the insurance coverage required hereunder. The Manager shall arrange for the Company Entities to be included as additional insureds on the Manager's insurance policies.

(d)    Notwithstanding any other provision in this Agreement to the contrary, each of the Company, the Operating Partnership, OAC and the Manager hereby waives any and all rights of recovery, claim, action or cause of action, and release all claims

---

[3] Note to Draft: Parties to agree on appropriate insurance coverage amounts.

against the other party, and the other party's Affiliates, agents, employees, officers, partners, servants and shareholders, for any loss or damage to such party's property by reason of any casualty which is covered by insurance, regardless of the cause or origin thereof, including the negligence, gross negligence or willful misconduct of the other party or the other party's Affiliates, agents, employees, officers, partners, servants or shareholders. Each party also covenants that all property insurance policies carried by such party shall contain provisions under which such party's insurer waives its right of subrogation against the other party (and such policies shall be so endorsed), unless such waiver is illegal or against public policy or such waiver renders such policy void or voidable, or is not available at a reasonable cost.

Section 14.    Limits of Manager Responsibility; Indemnification.

(a)    The Manager will owe an obligation to provide the services to be provided by it under this Agreement with the same duty of care that an officer of a Delaware corporation would owe to that corporation (the "Standard of Care"). For avoidance of doubt, Manager and the Management Team are entitled to rely reasonably on qualified experts and professionals (including accountants, legal counsel and other service providers) retained in accordance with this Agreement. Notwithstanding the foregoing, observing the Standard of Care will in no circumstances (i) require the Manager or its Affiliates to allocate personnel or resources to the provision of services hereunder if Manager has requested that the reasonable costs of such personnel or resources be included in the Management Costs Budget and OAC or the Company has failed to agree to such inclusion or (ii) vary the Manager's standard of liability or indemnification rights or obligations set forth in this Section 14.

(b)    The Manager shall not be responsible for any action (or failure to take action) of any Board of Directors in following or declining to follow any advice or recommendations of the Manager, including as set forth in Section 9(b).

(c)    The Manager, its Affiliates, their respective officers, directors, stockholders and employees, and any Person providing services to the Manager, will not be liable to the Company Entities, the Company Board, the Company's stockholders, the Operating Partnership's partners or the OAC Board for any acts or omissions by any such Person in the performance of its duties or provision of its services to or on behalf of the Company Entities, except by reason of acts or omissions constituting gross negligence, willful misconduct, bad faith or reckless disregard of their duties under this Agreement, as determined by a final non-appealable order of a court of competent jurisdiction.

(d)    To the maximum extent permitted by applicable law, the Operating Partnership and OAC shall indemnify and hold the Manager, its Affiliates, their respective officers, directors, stockholders and employees and any Person providing services to the Manager (each a "Manager Indemnified Party") harmless from any and all expenses, losses, damages, liabilities, demands, charges and claims of any nature whatsoever (including reasonable attorneys' fees) ("Damages") in respect of or arising from any acts or omissions of such Manager Indemnified Party, unless it has been determined judicially or by arbitration that such Damages resulted from such Manager

31

Indemnified Party's gross negligence, willful misconduct, bad faith or reckless disregard of duties under this Agreement.

(e)     To the maximum extent permitted by applicable law, the Manager shall indemnify and hold the Company Entities and their respective officers, directors, employees and agents (each, a "Company Indemnified Party" and together with a Manager Indemnified Party, the "Indemnitee"), harmless from any and all Damages in respect of or arising from (i) acts or omissions of the Manager constituting gross negligence, willful misconduct, bad faith or reckless disregard of its duties under this Agreement, as determined judicially or by arbitration, or (ii) any claims by or relating to the Manager's or its Affiliates' employees relating to the terms and conditions of their employment by the Manager or such Affiliate (including, without limitation, any liability with respect to severance or withdrawal liability).

(f)     The Indemnitee will promptly notify the party against whom indemnity is claimed (the "Indemnitor") of any claim for which it seeks indemnification; *provided*, *however*, that the failure to so notify the Indemnitor will not relieve the Indemnitor from any liability which it may have hereunder, except to the extent such failure actually prejudices the Indemnitor. The Indemnitor shall have the right to assume the defense and settlement of such claim; *provided*, that the Indemnitor notifies the Indemnitee of its election to assume such defense and settlement within thirty (30) days after the Indemnitee gives the Indemnitor notice of the claim. In such case, the Indemnitor will not settle or compromise such claim, and the Indemnitee will not be liable for any such settlement made by Indemnitor, without Indemnitee's prior written consent. If the Indemnitor is entitled to, and does, assume such defense by delivering the aforementioned notice to the Indemnitee, the Indemnitee will (i) have the right to approve the Indemnitor's counsel (which approval will not be unreasonably withheld, delayed or conditioned), (ii) be obligated to cooperate in furnishing evidence and testimony and in any other manner in which the Indemnitor may reasonably request and (iii) be entitled to participate in (but not control) the defense of any such action, with its own counsel and at its own expense.

(g)     The Operating Partnership and OAC shall advance funds to a Manager Indemnified Party for legal expenses and other costs incurred as a result of any legal action or proceeding if a claim in respect thereof is to be made pursuant hereto and if requested by such Manager Indemnified Party if (i) such suit, action or proceeding relates to or arises out of, or is alleged to relate to or arise out of or has been caused or alleged to have been caused in whole or in part by, any action or inaction on the part of the Manager Indemnified Party in the performance of its duties or provision of its services on behalf of the Company Entities; and (ii) the Manager Indemnified Party affirms in writing that such person in good faith believes that it has met the standard of conduct necessary for indemnification under this Section 14 and undertakes to promptly repay any funds advanced pursuant to this Section 14(g) in cases where a final non-appealable order of a court of competent jurisdiction is entered that such Manager Indemnified Party would not be entitled to indemnification under Section 14(d). If advances are required under this Section 14(g), the Manager Indemnified Party shall furnish the Operating Partnership and OAC with an affirmation and undertaking as set forth in clause (ii) of the preceding

32

sentence and shall thereafter have the right to bill the Operating Partnership and OAC for, or otherwise require the Operating Partnership and OAC to pay, at any time and from time to time after such Manager Indemnified Party shall become obligated to make payment therefor, any and all reasonable amounts for which such Manager Indemnified Party is entitled to indemnification under this Section 14, and the Operating Partnership and OAC shall pay the same within thirty (30) days after request for payment. In the event that a determination is made by a final non-appealable decision pursuant to Section 26 or non-appealable order of a court of competent jurisdiction that the Operating Partnership and OAC are not so obligated in respect of any amount paid by it to a particular Manager Indemnified Party, such Manager Indemnified Party will refund such amount within thirty (30) days of such determination, and in the event that a determination is made by a final non-appealable decision pursuant to Section 26 or non-appealable order of a court of competent jurisdiction that the Operating Partnership and OAC are so obligated in respect to any amount not paid by the Operating Partnership or OAC to a particular Manager Indemnified Party, the Operating Partnership or OAC will pay such amount to such Manager Indemnified Party within thirty (30) days of such final determination, in either case together with interest at the current prime rate plus two percent (2%) from the date paid until repaid or the date it was obligated to be paid until the date actually paid.  The Manager will not be entitled to advancement under this Section 14(g) with respect to any legal action or proceeding arising from or related to this Agreement by any Company Entity against the Manager or by the Manager against any Company Entity.

(h)    Without limiting the Manager Indemnified Parties' entitlement to indemnification hereunder, any Manager Indemnified Party entitled to indemnification under this Agreement must seek recovery under any insurance policies by which such Manager Indemnified Party is covered, must obtain the Company's written consent prior to entering into any compromise or settlement which would result in the Operating Partnership having an obligation to indemnify such Manager Indemnified Party, and must obtain OAC's written consent prior to entering into any compromise or settlement which would result in OAC having an obligation to indemnify such Manager Indemnified Party. Any amounts actually recovered under any applicable Company-funded or OAC-funded insurance policies will offset any amounts that the Operating Partnership or OAC, as applicable, owes pursuant to the indemnification obligations under this Agreement.

(i)    The Operating Partnership and OAC are severally (and not jointly and severally) liable for their obligations to indemnify and advance expenses to the Manager Indemnified Parties as provided in this Section 14. The Operating Partnership and OAC shall make any indemnification payment or advance of expenses required to be made by them hereunder in such proportions as they may agree. In the absence of such agreement, if the Operating Partnership makes any indemnification payment or advances any expenses in respect of any claim for indemnification under this Agreement, then it shall be entitled to contribution from OAC to the extent such claim relates to the business of OAC or to the OAC Assets, and if OAC makes any indemnification payment or advances any expenses in respect of any claim for indemnification under this Agreement, then it shall be entitled to contribution from the Operating Partnership to the extent such claim

33

relates to the business or assets of Company Entities other than OAC and the OAC Assets.

Section 15.    Intellectual Property; License.  All Intellectual Property created or developed by the Manager, the Company, the Operating Partnership, Oncor Holdings or OAC primarily in connection with the Manager's provision of services pursuant to this Agreement (the "Company IP") shall, subject to the remainder of this Section 15, be the sole and exclusive property of the Company. The Manager (on behalf of itself and all of its Subsidiaries) shall assign and does hereby assign to the Company all Company IP. The Company hereby grants to the Manager and its Affiliates a non-exclusive, perpetual, worldwide, fully paid up, royalty-free, non-transferable, irrevocable license and right to use the Company IP for their respective business purposes, including the provision by Manager and its Affiliates of services substantially the same as or similar to those provided under this Agreement to other Persons whose business is substantially the same as or similar to the business of the Company Entities, and, in connection with providing such services, to sublicense Company IP to such other Persons. The Parties will, or will cause their respective Affiliates, Subsidiaries, directors, officers, employees agents and other personnel to, upon request of another Party, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may be requested by a Party to carry out the intent of this Section 15 or to otherwise perfect, record, confirm, or enforce the Company's rights in and to the Company IP, as the owner thereof, and the Manager's and its Affiliates' rights in and to the Company IP, as licensee thereof.

Section 16.    No Joint Venture. Nothing in this Agreement shall be construed to make any Party a partner or joint venturer with respect to any other Party or impose any liability as such on any Party.

Section 17.    Term; Termination.

(a)    Unless this Agreement is terminated as provided in this Section 17, this Agreement shall remain in effect during the Initial Term and, subject to Section 17(b) and Section 17(c), shall automatically renew for a Renewal Term upon the expiration of the Initial Term and upon the expiration of each Renewal Term.

(b)    During any Renewal Term (but not during the Initial Term):

(1)    the Company (at the direction of a majority of the Independent Directors) may terminate this Agreement as it relates to the Company, the Operating Partnership and the Company Assets at any time upon 365 days' prior written notice to the Manager and OAC, in which case this Agreement shall terminate as it relates to the Company, the Operating Partnership and the Company Assets on the 365th day after the Company's termination notice is given;

(2)    OAC (at the direction of the OAC Board) may terminate this Agreement as it relates to OAC, Oncor Holdings and the OAC Assets at any time upon 365 days' prior written notice to the Manager and the Company, in

34

which case this Agreement shall terminate as it relates to OAC, Oncor Holdings and the OAC Assets on the 365th day after OAC's termination notice is given; and

(3)    Manager may terminate this Agreement as it relates to all Company Entities at any time upon 365 days' prior written notice to the other Parties, in which case this Agreement shall terminate as to all Parties on the 365th day after the Manager's termination notice is given.

(c)    The Company (at the direction of a majority of the Independent Directors) may elect not to renew this Agreement as it relates to the Company, the Operating Partnership and the Company Assets by delivering notice of such election to the Manager and OAC at least 365 days prior to the end of the Initial Term or any Renewal Term, in which case this Agreement shall terminate as it relates to the Company, the Operating Partnership and the Company Assets on the last day of the Initial Term or such Renewal Term, as applicable.

(d)    OAC (at the direction of the OAC Board) may elect not to renew this Agreement as it relates to OAC, Oncor Holdings and the OAC Assets by delivering notice of such election to the Manager and the Company at least 365 days prior to the end of the Initial Term or any Renewal Term, in which case this Agreement shall terminate as it relates to OAC, Oncor Holdings and the OAC Assets on the last day of the Initial Term or such Renewal Term, as applicable.

(e)    If the Company terminates or elects not to renew this Agreement as provided in Section 17(b) or (c), then on the last day of the Initial Term or Renewal Term, as applicable, the Operating Partnership shall pay Severance Costs to the Manager. If OAC elects not to renew this Agreement as provided in Section 17(b) or (d), then, on the last day of the Initial Term or Renewal Term, as applicable, OAC shall pay Severance Costs to the Manager. If the Manager terminates this Agreement as provided in Section 18, then the Company and OAC shall each pay its proportionate share of the Severance Costs upon receipt of an invoice therefor from the Manager. The Manager shall provide reasonable documentation of the Severance Costs and the policies and contractual obligations that underlie them.

(f)    The Manager may elect not to renew this Agreement as it relates to all Company Entities by delivering written notice of such election to the Company and OAC at least 365 days prior to the end of the Initial Term or any Renewal Term, in which case this Agreement shall terminate as to all Parties on the last day of the Initial Term or Renewal Term, as applicable.

(g)    No termination or rejection of this Agreement by the Company (either pursuant to this Section 17 or pursuant to any Bankruptcy proceeding) will affect the Manager's obligations and rights under this Agreement with respect to OAC and the Ring-Fenced Entities unless OAC also terminates this Agreement. If the Company terminates this Agreement and OAC does not, this Agreement will continue without the Company or the Operating Partnership as a Party hereto. Except as otherwise set forth

35

herein, neither the Company nor the Operating Partnership will not have any rights or obligations hereunder following the termination of this Agreement by the Company.

(h)      No termination or rejection of this Agreement by OAC (either pursuant to this Section 17 or pursuant to any Bankruptcy proceeding) will affect the Manager's obligations and rights under this Agreement with respect to the Company and the Operating Partnership unless the Company also terminates this Agreement. If OAC terminates this Agreement and the Company does not, this Agreement will continue without OAC as a Party hereto. Except as otherwise set forth herein, OAC will not have any rights or obligations hereunder following the termination of this Agreement by OAC.

(i)      Upon the termination of this Agreement for any reason, the Manager shall (i) immediately pay over to the Company Entities as to which it has been terminated any and all monies collected and held by the Manager for the account or on behalf of such Company Entities, without deduction or offset; (ii) promptly turn over to such Company Entities all books, papers, leases, agreements, documents, records, keys and other items relating to the management and operation of such Company Entities and their assets (other than, if applicable, assets held through Company Entities as to which this Agreement has not been terminated); and (iii) within thirty (30) days thereafter, render to such Company Entities a final accounting with respect to the management and operation of such assets through the date of termination. In connection with any termination of this Agreement for any reason, the Manager shall, prior to and following such termination, cooperate with the Company Entities as to which it has been terminated and provide reasonable assistance (with commensurate cost reimbursement) to support a transition of the management duties to such Company Entities or their designee.

(j)      If this Agreement is terminated pursuant to this Section 17 or Section 19, such termination shall be without any further liability or obligation of any Party as to which the Agreement has been terminated to any other Party, except that Sections 7, 14, 15, 20, and 22 through 31 will survive any such termination.

Section 18.      Termination for Good Reason. The Manager may terminate this Agreement as to all Company Entities at any time upon written notice to the Company and OAC if (a) the Company and OAC collectively seek to set the Management Fee payable to the Manager for any Fiscal Year at an amount that is more than 25% less than the Management Fee payable for the preceding Fiscal Year, unless such reduction is required by a Governmental Authority having regulatory authority over the OAC Assets or pemitted pursuant to Section 2(b), (b) a Company Entity requests or directs that the Manager take any action in violation of any law or to refrain from taking any action necessary to comply with any law, (c) the Company, Oncor Holdings, OAC or the Operating Partnership materially breaches any provision of this Agreement, or (d) except as may be permitted by Section 2(b), the Company or OAC materially reduces the scope of the Manager's responsibilities or the services being provided by the Manager under the Agreement, and, in any such case identified in clauses (a)-(d) of this Section 18, such action or failure is not corrected within thirty (30) days after notice thereof from the Manager to the Company and OAC.

36

Section 19.    <u>Termination for Cause</u>. Notwithstanding anything to the contrary contained in Section 17, the Company, with the approval of a majority of the Independent Directors, or OAC, with the approval of a majority of the OAC Board, may terminate this Agreement effective immediately upon written notice of termination from the Company or OAC, as applicable, to the Manager and the other Parties, if (i) the Manager materially breaches any provision of this Agreement and, if such breach is capable of being cured, such breach continues for a period of thirty (30) days after written notice thereof specifying such breach and requesting that the same be remedied in such 30-day period, (ii) the Manager engages in any act of fraud, misappropriation of funds, or embezzlement against any Company Entity, other than a non-recurrent immaterial misapplication of funds that is promptly corrected, (iii) there is an event of any bad faith, willful misconduct or gross negligence on the part of the Manager in the performance of its duties under this Agreement that results in material harm to any Company Entity, (iv) there is a commencement of any voluntary proceeding relating to the Manager's Bankruptcy or insolvency or an order for relief in an involuntary Bankruptcy case, (v) there is a dissolution of the Manager, (vi) the Manager is convicted of a felony (including a plea of nolo contendere), (vii) there is a Manager Change of Control (provided, that, in the case of (vii), any termination under this Section 19 must occur within ninety (90) days after the date the Independent Directors and the OAC Board receive written notice from the Manager of such Manager Change of Control, which Manager agrees to provide promptly) or (viii) the Manager determines not to pursue or develop a business opportunity that a Board of Directors directs the Manager to pursue or develop in accordance with Section 9(h) to the extent that the Manager is not prohibited from pursuing such opportunity on behalf of any Company Entity by a contractual obligation to which the Manager or any Affiliate of the Manager is subject as of the Effective Date and that was disclosed to the Board of Directors on or before the Effective Date (provided, that a termination pursuant to this clause (viii) shall not be deemed termination for "cause" for purposes of, or have any adverse effect on, any incentive compensation of any member of the Management Team under any incentive compensation plan of any Company Entity or on the "carried interest" or other interest of any Affiliate of the Manager in any Company Entity under the terms of the Governing Instruments of such Company Entity). For purposes of this Agreement, "Manager Change of Control" shall be deemed to have occurred if members of the Hunt Group cease to Control Manager or its successor hereunder. If a Party terminates this Agreement pursuant to this Section 19, then the Agreement will terminate as to all Parties; provided that a Party or Company Entity that did not give the notice of termination may elect to have this Agreement continue as to it and its Assets by giving written notice to such effect to the Manager and the other Parties within thirty (30) days of such termination notice.

Section 20.    <u>Action Upon Termination</u>. From and after the effective date of termination of this Agreement, pursuant to <u>Sections 17</u>, <u>18</u> or <u>19</u>, the Manager shall not be entitled to compensation under this Agreement for periods after such termination from the Party or Parties as to which this Agreement has been terminated, but shall be paid (i) if terminated pursuant to <u>Section 17</u>, all compensation accruing to the date of termination (including any payment due pursuant to <u>Section 17(e)</u>) and (ii) as provided in <u>Section 11</u> and <u>Section 12</u>.

Section 21.    <u>Assignment</u>. The Manager shall not assign any of its rights or obligations hereunder (including by operation of law) unless such assignment is consented to in writing by the Company after the approval of a majority of the Company Board (including a majority of the Independent Directors) and by OAC after the approval of a majority of the

OAC Board; *provided, however,* that neither the Company nor OAC shall unreasonably withhold consent to an assignment of this Agreement by the Company Manager to an Affiliate of Hunt. Any such permitted assignment shall bind the assignee under this Agreement in the same manner as the Manager is bound, and the Manager shall be liable to the Company, the Operating Partnership and OAC for all errors or omissions of the assignee under any such assignment. In addition, each permitted assignee shall execute and deliver to the Company, the Operating Partnership and OAC a counterpart of this Agreement naming such assignee as Manager. This Agreement shall not be assigned by the Company, the Operating Partnership or OAC without the prior written consent of the Manager, except in the case of assignment by the Company, Operating Partnership or OAC to another organization which is a successor (by merger, consolidation, purchase of assets, or other transaction) to the Company, the Operating Partnership or OAC, in which case such successor organization shall be bound under this Agreement and by the terms of such assignment in the same manner as the Company, the Operating Partnership and OAC are bound under this Agreement.

Section 22.    <u>Notices</u>. All notices, offers or other communications required or permitted to be given pursuant to this Agreement shall be in writing and may be personally served, sent via facsimile, sent via electronic mail or sent by United States mail or by commercial courier and shall be deemed to have been given when received at the address set forth below:

If to the Manager:

Hunt Utility Services, LLC
Attn: Hunter L. Hunt, President
1900 North Akard Street
Dallas, TX 75201
Facsimile: 214-978-8989
E-mail:HHunt@huntoil.com

If to the Company or the Operating Partnership:

[Ovation Acquisition I], Inc.
Attn: Chief Executive Officer
1807 Ross Avenue, 4th Floor
Dallas, TX 75201
E-mail: [ ]

With a copy to:

[Ovation Acquisition I], Inc.
Attn: General Counsel
1807 Ross Avenue, 4th Floor
Dallas, TX 75201
E-mail: legal@huntutility.com

If to Oncor Holdings or OAC:

[Oncor AssetCo]
Attn: [ ]
1807 Ross Avenue, 4th Floor
Dallas, TX 75201
E-mail: [        ]

The address of any party hereto may be changed by a notice in writing given in accordance with the provisions of this Section 22.

Section 23.    Binding Nature of Agreement; Third Party Beneficiaries; Successors and Assigns. This Agreement shall be binding upon and inure solely to the benefit of each Party hereto and, with respect to Section 14, the Indemnitees, and nothing in this Agreement, express or implied, is intended to or shall confer upon any Person other than the Parties and their respective successors and permitted assigns any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 24.    Complete Agreement; Amendments. This Agreement contains the entire understanding of the parties with respect to the transactions contemplated hereby and supersedes all prior arrangements or understandings with respect thereto. This Agreement shall not be modified or amended except in a writing signed by all Parties. No purported modifications or amendments, including any oral agreement (even if supported by new consideration), course of conduct or absence of a response to a unilateral communication, shall be binding on any Party.

Section 25.    Governing Law. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF DELAWARE WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES TO THE CONTRARY.

Section 26.    Arbitration.

(a)    Subject to Section 26(h), any dispute under or relating to this Agreement shall, if not resolved by the Parties involved in the dispute within sixty (60) days after notice of such dispute is served by one Party to the other (or, if different, the period provided for resolution by the Parties in the provision of this Agreement under which such dispute is brought), be submitted to an "Arbitration Panel" comprised of three members. No more than one panel member may be with the same firm (which shall not

be deemed to prohibit the panel members from being members of the same organization such as the American Arbitration Association or Judicial Arbitration and Mediations Services), and no panel member may have an economic interest in the outcome of the arbitration.

(b)    The Arbitration Panel shall be selected as follows: Within five (5) business days after the expiration of the period referenced above, the Manager shall select a panel member meeting the criteria of the above paragraph (the "Manager Panel Member") and the other Party to the dispute, shall select its panel member meeting the criteria of the above paragraph (the "Company Panel Member"). If a Party fails to timely select its respective panel member, the other Party may notify such Party in writing of such failure, and if such Party fails to select its respective panel member within three (3) business days from such notice, then the other Party may select such panel member on such Party's behalf. Within five (5) business days after the selection of the Manager Panel Member and the Company Panel Member, the Manager Panel Member and the Company Panel Member shall jointly select a third panel member meeting the criteria of the above paragraph (the "Third Panel Member"). If the Manager Panel Member and the Company Panel Member fail to timely select the Third Panel Member and such failure continues for more than three (3) business days after written notice of such failure is delivered to the Manager Panel Member and Company Panel Member by either the Manager or the other Party to the dispute, either the Manager or such other Party may request the managing officer of the American Arbitration Association to appoint the Third Panel Member.

(c)    If the Manager is involved in a dispute submitted to arbitration under this Agreement that involves both the Company and the Operating Partnership, on the one hand, and OAC, on the other hand, then the Arbitration Panel shall be selected as follows: within five (5) business days after the expiration of the period referenced in Section 26(a), the Company and OAC shall jointly select a mutually acceptable panel member meeting the criteria set forth in Section 26(a) (the "Joint Panel Member") and the Manager Panel Member shall be selected in accordance with Section 26(b). If a Party fails to timely select its respective panel member, the other Party may notify such Party in writing of such failure, and if such Party fails to select its respective panel member within three (3) business days from such notice, then the other Party may select such panel member on such Party's behalf. Within five (5) business days after the selection of the Manager Panel Member and the Joint Panel Member, the Manager Panel Member and the Joint Panel Member shall jointly select the Third Panel Member. If the Manager Panel Member and the Joint Panel Member fail to timely select the Third Panel Member and such failure continues for more than three (3) business days after written notice of such failure is delivered to the Manager Panel Member and Joint Panel Member by either the Manager or the Company, either the Manager or the Company may request the managing officer of the American Arbitration Association to appoint the Third Panel Member. Notwithstanding the foregoing, in the event that the Company and OAC are unable to agree upon the Joint Panel Member in accordance with the first sentence of this Section 26(c), then the managing officer of the American Arbitration Association shall appoint all three members of the Arbitration Panel.

(d)    Within ten (10) business days after the selection of the Arbitration Panel, each Party involved in the dispute shall submit to the Arbitration Panel a written statement identifying its summary of the issues and claims. Any Party may also request an evidentiary hearing on the merits in addition to the submission of written statements. The Arbitration Panel shall make its decision within twenty (20) days after the later of (i) the submission of such written statements of particulars, and (ii) the conclusion of any evidentiary hearing on the merits, and shall take into consideration the relative risks and rewards undertaken and capital invested by each Party. The Arbitration Panel shall reach its decision by majority vote and shall communicate its decision by written notice to the Parties.

(e)    The decision by the Arbitration Panel shall be final, binding and conclusive and shall be non-appealable and enforceable in any court having jurisdiction. All hearings and proceedings held by the Arbitration Panel shall take place in Dallas, Texas.

(f)    The resolution procedure described herein shall be governed by the Commercial Rules of the American Arbitration Association and the Procedures for Large, Complex Commercial Disputes in effect as of the date hereof and subject to the Texas General Arbitration Act to the extent such act is applicable hereto.

(g)    Subject to the last sentence of Section 2(b), the Parties involved in a dispute shall bear equally the fees, costs and expenses of the Arbitration Panel in conducting the arbitration.

(h)    For purposes of this Section 26, the Company and the Operating Partnership are considered a single Party, all decisions to be made by either of them under this Section 26 with respect to a dispute in which the Company and the Operating Partnership are involved are to be made by the Company, on its own behalf and in its capacity as general partner of the Operating partnership, and all costs to be paid by either of them under this Section 26 are to be paid by the Operating Partnership.

Section 27.    No Waiver; Cumulative Remedies. No failure to exercise and no delay in exercising, on the part of any party hereto, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law. No waiver of any provision hereunder shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

Section 28.    Headings. The headings of the sections of this Agreement have been inserted for convenience of reference only and shall not be deemed part of this Agreement.

Section 29.    Cure of Invalid Provisions. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable, and this Agreement shall be construed and enforced as if such illegal, invalid or

41

unenforceable provision had never comprised a part hereof, and the remaining provisions hereof shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement; *provided*, *however*, that if such illegal, invalid or unenforceable provision may be made legal, valid and enforceable by limitation thereof, then the provision shall be revised and reformed to make it legal, valid and enforceable to the maximum extent permitted by law. Without limiting the foregoing, if, due to an amendment to any provision of the Code or the Treasury Regulations, the issuance of a court opinion in any tax litigation, or the issuance of an IRS revenue ruling or revenue procedure, it is determined by tax counsel for the Company, or if a court of competent jurisdiction determines with respect to the Company, that one or more provisions of this Agreement cause or will cause the Company to fail to meet one or more of the requirements that are required to be met in order for the Company to continue to qualify as a REIT, then the provision or provisions that caused or will cause such failure shall be fully severable, and this Agreement shall be construed and enforced as if such provision or provisions that caused such failure had never comprised a part hereof.

Section 30.    Construction of Agreement. The headings, captions, titles and subtitles herein are inserted for convenience of reference only and are to be ignored in any construction of the provisions hereof. Except as otherwise specified herein, all section, schedule and exhibit references in this Agreement refer to the sections, schedules and exhibits of and to this Agreement, and the terms "herein", "hereof", "hereto", "hereunder" and similar terms refer to this Agreement generally rather than to the particular provision in which such term is used. Whenever the words "including", "include" or "includes" are used in this Agreement, they are to be interpreted in a non-exclusive manner as though the words "but [is] not limited to" or "without limitation" immediately followed the same. Time is of the essence for this Agreement. The language in all parts of this Agreement is in all cases to be construed simply according to the fair meaning thereof and not strictly against the party that drafted such language. Except as otherwise provided herein, references in this Agreement to any agreement, articles, bylaws, instrument or other document are to such agreement, articles, bylaws, instrument or other document as amended, modified or supplemented from time to time.

Section 31.    Multiple Counterparts. This Agreement may be executed in multiple counterparts, each of which shall constitute an original hereof and all of which taken together shall constitute one and the same agreement. If any signature is delivered by facsimile transmission or by PDF, such signature shall create a valid and binding obligation of the party executing (or on whose behalf the signature is executed) with the same force and effect as if such facsimile or PDF signature were an original thereof.

\* \* \*

[*Signature page follows.*]

42

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the Effective Date.

HUNT UTILITY SERVICES, LLC


By: _____
　　　　Name:
　　　　Title:


[OVATION ACQUISITION I], INC.


By: _____
　　　　Name:
　　　　Title:


[OVATION] PARTNERS, LP

　By:　[Ovation Acquisition I], Inc., its general
　　　　partner


　By: _____
　　　　　Name:
　　　　　Title:


[ONCOR ASSETCO] HOLDINGS COMPANY LLC


By: _____
　　　　Name:
　　　　Title:


[ONCOR ASSETCO,] LLC


By: _____
　　　　Name:
　　　　Title: