# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| MARATHON ASSET MANAGEMENT, LP, | **COMPLAINT** |
| Plaintiff, | |
| -against- | Index No.: _____/2015 |
| WILMINGTON TRUST, N.A., as Administrative Agent and Collateral Agent | |
| Defendant. | |

## COMPLAINT

Plaintiff Marathon Asset Management, LP, on behalf of one or more managed funds and/or accounts ("Marathon"), through its undersigned counsel, alleges as follows based upon its knowledge, information and belief:

## NATURE OF ACTION

1.      This action seeks a declaration affirming Marathon's contractual rights to payment pursuant to a $1.25 billion subfacility within a $24.5 billion credit facility.

2.      The defendant, Wilmington Trust, N.A., as Administrative Agent and Collateral Agent ("Wilmington"), serves as the agent for Marathon and all other lenders under the subfacility and the larger credit facility.  The borrower under the credit facilities is Texas Competitive Electric Holdings Company LLC ("TCEH" or the "Borrower").

3.      This action is brought to ensure that Wilmington, when performing its role of distributing value from TCEH or others to the lenders under these credit facilities, will respect the contractual rights to which Marathon, and other subfacility lenders similarly-situated with Marathon, are entitled.  The rights at issue, in brief, are rights to be paid first—on a priority

basis—from certain cash specifically attributable to letters of credit issued under the $1.25 billion subfacility, before that cash is made available to all lenders under the larger $24.5 billion facility of which the subfacility is a part.

4.      Marathon has raised its priority contractual rights with Wilmington and with other lenders under the credit facilities, but they have not agreed to honor those priority contractual rights, which could have hundreds of millions of dollars in value.  Therefore, Marathon is compelled to seek a declaration of its rights from this Court.

5.      More specifically, Marathon and other lenders under the applicable $1.25 billion subfacility (the "<u>Deposit L/C Loan Facility</u>" and  the "<u>Deposit L/C Loan Facility Lenders</u>") have a priority secured interest in, and rights to, cash attributable to letters of credit issued under the Deposit L/C Loan Facility.  Marathon seeks a declaration of the rights of the Deposit L/C Lenders with respect to that cash, because absent such a declaration, Marathon's bargained-for rights will be infringed by the actions and omissions of Wilmington and of other lenders who do not share in Marathon's priority secured interest.  Once value is further distributed under these credit facilities, it will be difficult to get it back—so Marathon seeks a declaration, prior to any further distribution, making clear that its priority rights will be respected when further distributions are made.

## **GENERAL BACKGROUND**

6.      The rights of the parties to the credit facilities are governed by, and this action will require the interpretation of, primarily two documents, both of which are expressly governed by New York law.

- First, the Credit Agreement dated as of October 10, 2007, by and among TCEH, Energy Future Competitive Holdings Company ("<u>EFCH</u>"), and the Administrative Agent, Collateral Agent, Deposit Letter of Credit Issuer, and

certain Lenders (as such terms are defined therein) who are parties thereto, among others (as amended from time to time and including all related documents, schedules, and agreements the "Credit Agreement"). The Credit Agreement contains provisions for loans made and repaid, and letters of credit issued, under the credit facilities at issue.

- Second, the Amended and Restated Collateral Agency and Intercreditor Agreement, dated as of October 10, 2007, and as amended and restated as of August 7, 2009 (the "Intercreditor Agreement"). The Intercreditor Agreement contains provisions for allocation of value among the lenders under the credit facilities at issue, and specifically as between the Deposit L/C Loan Facility Lenders and other lenders.

7.     The proceeds of the Deposit L/C Loan Facility that were advanced by the Deposit L/C Loan Facility Lenders, including Marathon's predecessors in interest, were deposited into a segregated account established by the Borrower as security for the Deposit L/C Loan Facility ("Deposit L/C Loan Collateral Account"), such that the account initially contained $1.25 billion in cash. Under the Credit Agreement and a related security agreement, the Borrower granted a security interest in the Deposit L/C Loan Collateral Account and its cash and proceeds to all of the Deposit L/C Loan Facility Lenders and all of the other lenders and agent parties to the Credit Agreement (the "Secured Parties") to secure the Borrower's obligations to the Secured Parties. However, Marathon and the other Deposit L/C Loan Facility Lenders were granted a priority right in the Deposit L/C Loan Collateral Account, above the rights of the lenders who made other types of loans under the Credit Agreement but who did not make loans under the Deposit L/C Loan Facility and whose cash was not used to fund the Deposit L/C Loan Collateral Account.

8.    In the Intercreditor Agreement, the Secured Parties agreed among themselves and with the Borrower that the funds in the Deposit L/C Loan Collateral Account would, following an exercise of remedies against the Collateral, be distributed essentially as follows:

- *first*, to satisfy all obligations to the issuer of the Deposit Letters of Credit (the "<u>Deposit Letter of Credit Issuer</u>") in respect of the Deposit L/C Loan Facility;

- ***next,* to satisfy obligations to the Deposit L/C Loan Facility Lenders like Marathon under the Deposit L/C Loan Facility**; and

- *finally,* to all of the Secured Parties (whether a Deposit L/C Loan Facility Lender like Marathon or not) ratably for the remaining obligations under the Credit Agreement.

This priority "waterfall" guarantees Marathon and the other Deposit L/C Loan Facility Lenders not just a lien on the Deposit L/C Loan Collateral Account and its cash and proceeds, but a priority right to specific cash in and proceeds of that account.  The Secured Parties that are *not* Deposit L/C Loan Facility Lenders do not share in that priority right.

9.    Despite this clear delineation of rights, certain other Secured Parties, in particular non- Deposit L/C Loan Facility Lenders, have shown an inflexible opposition to Marathon's rights, and will not recognize those rights.

10.    Wilmington is the Administrative Agent and the Collateral Agent (both as defined in the Credit Agreement) of the credit facility, including the Deposit L/C Loan Facility.  As such, it is responsible for the administration of all funds in connection with the credit facilities at issue, including the ultimate allocation and distribution of those funds among Marathon and the other Deposit L/C Loan Facility Lenders, on the one hand, and all credit facility lenders, on the other

hand. Wilmington is stuck between a rock and a hard place. While it has no independent stake in the value at issue, it also lacks clear direction as to which lenders should receive the value to which the Deposit L/C Loan Facility Lenders claim priority.

11.     The dispute regarding the priority rights of the Deposit L/C Loan Facility Lenders has come to a head since TCEH and certain of its affiliates filed chapter 11 bankruptcy proceedings last year. At the outset of the bankruptcy proceedings, the rights of the Deposit L/C Loan Facility Lenders were reserved in orders of the bankruptcy court. But those rights were not adjudicated or otherwise determined, and they remain in dispute. Wilmington and the other lenders have not recognized Marathon's rights, which puts those rights at risk following any distributions from TCEH's chapter 11 case and more generally. The parties to the Credit Agreement and the Intercreditor Agreement, including Marathon and Wilmington, have submitted to the jurisdiction of this Court for resolution of any legal action or proceeding relating to those agreements. This declaratory judgment action is brought so that the Court can resolve the present dispute over the scope and terms of Marathon's rights under those agreements, which will in turn facilitate the resolution of the credit facilities

12.     Accordingly, Marathon brings this action to determine and preserve its priority rights in the Deposit L/C Loan Collateral Account. Without a declaration affirming Marathon's rights, such rights are likely to be violated due to the failure of the other lenders and Wilmington to recognize them.[1]

---

[1]     Wilmington and the other lenders are contractually bound to recognize the priority rights of Marathon and the other Deposit L/C Loan Facility Lenders without regard to whether TCEH recognizes those rights, and without regard to whether those rights are reflected in any chapter 11 plan confirmed in TCEH's bankruptcy case. That said, Marathon notes that the chapter 11 plan most recently proposed by TCEH and its affiliated bankruptcy debtors, on April 14, 2015 [Bankr. D. Del. Case No. 14-10979-CSS, Doc. No. 4142], does not appear to reflect the priority rights of Marathon or the other Deposit L/C Loan Facility Lenders, but rather proposes that distributions under the plan be made to all lenders under the Credit Agreement on a *pro rata* basis. If that plan or a similar plan were confirmed by the U.S. Bankruptcy Court and upheld on any appeal, such a plan would not affect the enforceability of the rights of Marathon as against Wilmington (and/or other lenders), including the ability to seek redress for the

## PARTIES

13.     Plaintiff Marathon is a limited partnership duly organized and existing under the laws of the State of Delaware and having its principal corporate office at One Bryant Park, 38th Floor, New York, NY 10036.

14.     Defendant Wilmington, upon information and belief, is a national banking association duly organized and existing under the laws of the State of Delaware. Wilmington is named as defendant in this Complaint solely in its capacity as Collateral Agent[2] and as Administrative Agent[3] under the Credit Agreement and the Intercreditor Agreement, as applicable.

## JURISDICTION AND VENUE

15.     Defendant Wilmington, as a party to the Credit Agreement and the Intercreditor Agreement, has consented to New York jurisdiction and venue in this Court. Section 13.13 of the Creditor Agreement provides, in relevant part:

> 13.13. Submission to Jurisdiction; Waivers. Each party hereto irrevocably and unconditionally:
>
> (a) submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Credit Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York and appellate courts from any thereof;
>
> (b) consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same; . . . .

---

breach of its contractual rights as alleged in this Complaint, for example, if any distributions under that plan were made in a manner contrary to the contractual priority provisions of the documents referenced herein.

[2]      Wilmington succeeded Citibank, N.A. as Collateral Agent, effective May 1, 2014.

[3]      Wilmington succeeded Citibank, N.A. as Administrative Agent, effective May 1, 2014.

- 6 -

Case 1:15-cv-09492-SAT    Document 1-1   Filed 06/17/15    Page 9 of 277

Similarly, Section 9.6 of the Intercreditor Agreement provides, in relevant part:

> 9.6 <u>Submission to Jurisdiction; Waivers</u>.  Each party hereto irrevocably and unconditionally:
>
> (a) submits for itself and its property in any legal action or proceeding relating to this Agreement, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York and appellate courts from any thereof;
>
> (b) consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same; . . . .

16.    Accordingly, this Court has jurisdiction over Wilmington pursuant to General Obligations Law § 5-1402, because Wilmington, in its capacities as Collateral Agent and Administrative Agent, has submitted to the jurisdiction of the courts of this state.

17.    Likewise, venue is proper in this county pursuant to New York CPLR § 501 because Wilmington, in its capacities as Collateral Agent and Administrative Agent, has agreed that venue is appropriate in any court in this state.

## APPLICABLE LAW

18.    Section 13.12 of the Credit Agreement expressly provides that it shall be governed by, and construed in accordance with, the laws of the State of New York.  Section 9.10 of the Intercreditor Agreement expressly provides for the same governing law.

## STATEMENT OF FACTS SUPPORTING RELIEF

### A.    The $24.5 Billion Credit Facility

*The Credit Agreement*

19.    On or about October 10, 2007, the Borrower entered into the Credit Agreement with the other parties thereto.  A copy of the Credit Agreement (together with its amendments to date) is attached as <u>Exhibit A</u> hereto.

20.     Under the Credit Agreement, the lenders party thereto (the "Lenders")
collectively provided three separate credit facilities to the Borrower:  (i) $20.55 billion in term
loans, (ii) a $2.7 billion revolving line of credit, and (iii) the $1.25 billion Deposit L/C Loan
Facility (the three facilities are referred to collectively as the "Loans").
Each of the Loans was funded by different (though overlapping) subgroups of the Lenders that
committed to participate in one or more of the Loans.  *See* Ex. A, Credit Agreement § 2.

21.     Lenders funded their individual "commitment amount" for the particular Loan or
Loans in which they participated, as specified in the Credit Agreement, and the proceeds of the
different Loans were deployed for distinct purposes.  *See* Ex. A, Credit Agreement § 2.

22.     While the Credit Agreement is a "master agreement" that governs all of the Loans
and provides the Lenders with certain collective rights applicable to all Loans, each Loan is a
separate and independent obligation of the Borrower.  For example:  (1) the Borrower issued
separate promissory notes for each Loan; (2) each Loan has an individual maturity date under the
Credit Agreement, *see* Ex. A, Credit Agreement § 2.5; (3) each Loan had the possibility of
accruing interest at a different rate, *see* Ex. A, Credit Agreement § 2.6, 2.8; and (4) the Borrower
could designate that any voluntary prepayments would apply to a particular Loan or Loans, *see*
Ex. A, Credit Agreement § 5.1.

### *The Deposit L/C Loan Facility and Deposit Letters of Credit*

23.     The Deposit L/C Loan Facility was intended to permit the Borrower to obtain
letters of credit (as defined in the Credit Agreement, the "Deposit Letters of Credit") for general
corporate purposes, including in connection with environmental matters and commodity hedging
agreements, as to which the Borrower would have contingent liabilities but not necessarily any
present (or perhaps any future) obligation to make payment.  As stated in the Credit Agreement,
in relevant part:

> Subject to and upon the terms and conditions herein set forth, each Lender having a Deposit L/C Loan Commitment severally, but not jointly, agrees to make a loan or loans (each, a "**Deposit L/C Loan**" and, collectively, the "**Deposit L/C Loans**") in Dollars on the Closing Date to the Borrower, which Deposit L/C Loans (i) shall not exceed, for any such Lender, the Deposit L/C Loan Commitment of such Lender, (ii) shall not exceed, in the aggregate, the Total Deposit L/C Loan Commitment, . . . .

*See* Ex. A, Credit Agreement § 2.1(b).

24.     On the closing date under the Credit Agreement, the proceeds of the Deposit L/C Loan Facility advanced by the Deposit L/C Loan Facility Lenders, including Marathon's predecessors in interest, were deposited in the segregated Deposit L/C Loan Collateral Account. As stated in the Credit Agreement, in relevant part:

> On the Closing Date, the Borrower shall establish the Deposit L/C Loan Collateral Account for the purpose of cash collateralizing the Borrower's obligations to the Deposit Letter of Credit Issuer in respect of the Deposit Letters of Credit. On the Closing Date, the proceeds of the Deposit L/C Loans, together with other funds (if any) provided by the Borrower, shall be deposited into the Deposit L/C Loan Collateral Account such that, and the Borrower agrees that at all times thereafter, and shall immediately cause additional funds to be deposited and held in the Deposit L/C Loan Collateral Account from time to time in order that, the Deposit L/C Loan Collateral Account Balance shall at least equal the Deposit Letters of Credit Outstanding.

*See* Credit Agreement § 3.9.

25.     In return, the Borrower granted a security interest in the Deposit L/C Loan Collateral Account (and its cash and proceeds) to secure the Borrower's obligations under the Credit Agreement and related documents.  As stated in the Credit Agreement, in relevant part:

> The Borrower hereby grants to the Collateral Agent, for the benefit of the Deposit Letter of Credit Issuer, a security interest in the Deposit L/C Loan Collateral Account and all cash and balances therein and all proceeds of the foregoing, as security for the Deposit L/C Obligations (and, in addition, grants a security interest therein, for the benefit of the Secured Parties as collateral security for the Obligations; provided that amounts on deposit in the Deposit L/C Loan Collateral Account shall be applied, first, to repay the Deposit L/C Obligations and, then, all other Obligations).

*See* Credit Agreement § 3.9.  These provisions clearly trace the cash loaned by the Deposit L/C Loan Facility Lenders to the Deposit L/C Loan Collateral Account.

26.     The Deposit Letter of Credit Issuer under the Credit Agreement agreed to issue, upon the request of the Borrower and subject to the conditions in the Credit Agreement, Deposit Letters of Credit for the account of the Borrower and certain of its subsidiaries, to beneficiaries identified by the Borrower.  One such condition was that the balance of the Deposit L/C Loan Collateral Account must at all times equal at least the amount of Deposit Letters of Credit outstanding (as defined in the Credit Agreement, the "Deposit Letters of Credit Outstanding")— such that the Deposit L/C Loan Facility was always secured by at least 100% cash collateralization in the segregated Deposit L/C Loan Collateral Account.  *See* Ex. A, Credit Agreement §§ 3.1(b), 3.9.  For example, as stated in the Credit Agreement, in relevant part:  "no Deposit Letter of Credit shall be issued the Stated Amount of which, when added to the Deposit Letters of Credit Outstanding at such time, would exceed the Deposit L/C Loan Collateral Account Balance."  *See* Ex. A, Credit Agreement § 3.1(b)(ii).  These provisions ensure that the aggregate amounts that could ever be paid to beneficiaries of Deposit Letters of Credit would never exceed the amount of funds loaned by the Deposit L/C Loan Facility Lenders.

27.     The security interest in the Deposit L/C Loan Collateral Account was also granted, in a duplicative manner for additional clarity, pursuant to the Security Agreement executed contemporaneously with the Credit Agreement (as amended from time to time and including all related documents, schedules, and agreements, the "Security Agreement," a copy of which is attached as Exhibit B hereto).  The Deposit L/C Loan Facility Lenders' security interest in the Collateral (as defined in the Security Agreement) applies to the Deposit L/C Loan Collateral Account and its cash and proceeds. *See* Ex. B, Security Agreement § 2(a)(xii).

### *Deposit Letter of Credit Mechanics*

28. The mechanics for the funding, issuance, and drawing upon the Deposit Letters of Credit under the Credit Agreement were structured to protect the Deposit Letter of Credit Issuer and the Deposit L/C Loan Facility Lenders independently from the other Secured Parties not involved in the Deposit L/C Loan Facility.

29. Upon the initial closing of the Credit Agreement, the Deposit L/C Loan Facility Lenders, including Marathon's predecessors in interest, funded the $1.25 billion Deposit L/C Loan Facility amount into the Deposit L/C Loan Collateral Account, establishing the maximum amount of Deposit Letters of Credit that could be issued by the Deposit Letter of Credit Issuer at the request of the Borrower. The Borrower then requested that the Deposit Letter of Credit Issuer issue Deposit Letters of Credit to third parties to whom the Borrower or its subsidiaries owed or might owe obligations (the "Letter of Credit Beneficiaries"), effectively to ensure such Letter of Credit Beneficiaries would be paid for those obligations up to the amounts of the applicable Deposit Letters of Credit.

30. The Deposit Letter of Credit Issuer granted the Borrower's requests, and issued, in the aggregate, hundreds of millions of dollars in Deposit Letters of Credit that remained outstanding as of the date of TCEH's bankruptcy filing (the "Petition Date"). For Letter of Credit Beneficiaries to recover amounts owing to them by the Borrower or its subsidiaries, the Letter of Credit Beneficiaries would present their applicable Deposit Letters of Credit to the Deposit Letter of Credit Issuer for payment.

31. Then, the Deposit Letter of Credit Issuer would pay the Letter of Credit Beneficiaries the amounts of the applicable draws, and seek reimbursement from the Borrower for those amounts. If the Borrower did not reimburse the Deposit Letter of Credit Issuer, the

Deposit Letter of Credit Issuer had the first right to withdraw the unpaid reimbursement amount from the Deposit L/C Loan Collateral Account and reimburse itself.

### *Deposit Letter of Credit Priority Funds: The Undrawn Overage Amount*

32.     Because the amount of Deposit Letters of Credit issued was at all times less than the amount in the Deposit L/C Loan Collateral Account, and because not all Letter of Credit Beneficiaries would necessarily be owed by the Borrower or its subsidiaries the full amount of the applicable Deposit Letters of Credit, there was, and remains, the possibility for two categories of excess amounts in, or otherwise attributable to, the Deposit L/C Loan Collateral Account.  These amounts are over and above the maximum amount that would be required to reimburse the Deposit Letter of Credit Issuer for all amounts owed to it in respect of all Deposit Letters of Credit.

33.     First, there may be an amount equal to the difference between the amount in the Deposit L/C Loan Collateral Account and the amount of issued Deposit Letters of Credit[4]—an amount that never corresponded to any issued Deposit Letter of Credit (the "Unissued Overage Amount").

34.     Second, there may be an amount of any positive difference between the amount of Deposit Letters of Credit Outstanding and the amount that the Letter of Credit Beneficiaries are ultimately owed by the Borrower and its subsidiaries (the "Undrawn Overage Amount").

35.     The Undrawn Overage Amount may arise in one of three ways:

- First, a Letter of Credit Beneficiary *may not draw on its applicable Deposit Letter of Credit at all*, because it turns out that the contingent obligations of

---

[4]      This amount would be augmented by fees and other incidental amounts owing to the Deposit Letter of Credit Issuer.

the Borrower or its subsidiaries never materialize.

- Second, a Letter of Credit Beneficiary *may draw less than the full amount of its applicable Deposit Letter of Credit*, because it knows at the time of the draw that the Borrower or its applicable subsidiaries owe, or will owe, the Letter of Credit Beneficiary less than the full amount of the Deposit Letter of Credit.

- Third, a Letter of Credit Beneficiary *may draw the full amount of its applicable Deposit Letter of Credit*, because it does not know at the time of the draw if the Borrower or its applicable subsidiaries owe the Letter of Credit Beneficiary less or more than the full amount of its Deposit Letter of Credit.  In this third scenario, the Letter of Credit Beneficiary *would be required to refund to the Borrower any amount in excess of what it was ultimately owed*.

36.    In this declaratory judgment action, Marathon seeks the preservation of its priority secured claim to any Undrawn Overage Amount, however it may have arisen or may arise. Marathon does not claim any priority rights in any Unissued Overage Amount.

37.    Despite requests for information from TCEH, Marathon is unable to determine with any certainty the actual Undrawn Overage Amount as of the Petition Date or as of the date of this Complaint, and the amount could change over time.  However, on information and belief, as ascertained from public filings of TCEH and its affiliates, such an amount exists and could be in the range of several hundred million dollars.

*Application of Any Undrawn Overage Amount*

38.     Under the Credit Agreement, the Collateral Agent is primarily responsible for all Collateral securing the obligations of the Borrower to the various Secured Parties.  To define the respective rights of the Secured Parties to the Collateral upon the Collateral Agent's exercise of remedies following a default by the Borrower under the Credit Agreement and related documents, the Collateral Agent and Lenders entered into the Intercreditor Agreement.  A copy of the Intercreditor Agreement is attached as Exhibit C hereto.  The Intercreditor Agreement divides the Collateral into two categories for the purpose of establishing priorities among the Secured Parties:  (1) the Deposit L/C Loan Collateral Account, and (2) all other Collateral.  *See* Ex. C, Intercreditor Agreement §§ 4.1(a), (b).

39.     Section 4.1 of the Intercreditor Agreement establishes specific priority mechanisms or "waterfalls" for the distribution of proceeds from each of these two categories of Collateral.  *Id.*  Effectively, cash and other proceeds of the Deposit L/C Loan Collateral Account first flows down the waterfall specific to that Collateral only (the "Deposit L/C Loan Collateral Waterfall").

40.     The Deposit L/C Loan Collateral Waterfall provides that proceeds of the Deposit L/C Loan Collateral Account are to be distributed as follows:

- first, on a pro rata basis, to the payment of all amounts due to the Deposit Letter of Credit Issuer under any of the Financing Documents, excluding amounts payable in connection with any unreimbursed amount under any Letter of Credit;

- second, on a pro rata basis, to the payment of all amounts due to the Deposit Letter of Credit Issuer in an amount equal to 100% of the Unpaid Drawings

under any Deposit Letter of Credit;

- <u>third</u>, on a <u>pro rata</u> basis, to any Secured Party which has theretofore advanced or paid any fees to the Deposit Letter of Credit Issuer, other than any amounts covered by priority <u>second</u>, an amount equal to the amount thereof so advanced or paid by such Secured Party and for which such Secured Party has not been previously reimbursed;

- **<u>fourth</u>, on a pro rata basis, to the payment of all other Deposit L/C Obligations**; and

- <u>last</u>, the balance, if any, after all of the Deposit L/C Obligations have been indefeasibly paid in full in cash, as set forth above in [the section addressing all Collateral other than Deposit L/C Collateral].

*See* Ex. C, Intercreditor Agreement Section 4.1(b) (underlined emphasis in original; bold emphasis added).

41.     The "fourth" and "last" clauses of this waterfall clearly allocate value to satisfaction of the Deposit L/C Obligations specifically, before value is allocated to obligations under the Credit Agreement more generally.  Under these "fourth" and "last", after the Deposit Letter of Credit Issuer has been reimbursed for Unpaid Drawings and all other amounts owing to it as set forth in the first three clauses of that section, proceeds of the Deposit L/C Loan Collateral Account—including the Undrawn Overage Amount, if any—are applied "on a <u>pro rata</u> basis, to the payment of all other Deposit L/C Obligations."[5]

---

[5]     Excess cash and other proceeds of the Deposit L/C Loan Collateral Account after application of the Deposit L/C Loan Collateral Waterfall, if any, plus any other Collateral and proceeds thereof, then flows down the waterfall generally applicable to all Collateral and proceeds thereof (the "<u>General Collateral Waterfall</u>"), as provided in Section 4.1(a) of the Intercreditor Agreement.

42.     The term "<u>Deposit L/C Obligations</u>" is defined in the Credit Agreement to include the amount of "all outstanding Deposit Letters of Credit <u>plus</u> the aggregate principal amount of all Unpaid Drawings under all Deposit Letters of Credit . . ."—effectively, the total amount corresponding to all issued Deposit Letters of Credit, whether undrawn or drawn and not yet reimbursed, and whether owing on account of the Borrower's obligations to the Deposit Letter of Credit Issuer or otherwise on account of the Deposit L/C Loan Facility.  *See* Ex. A, Credit Agreement § 1.1 at 23 (emphasis in original).

43.     All reimbursements and other amounts owing to the Deposit Letter of Credit Issuer are distributed to the Deposit Letter of Credit Issuer under the first three clauses of the Deposit L/C Loan Collateral Waterfall.  Therefore, the only Deposit L/C Obligations remaining unpaid by the time that the "fourth" clause of the Deposit L/C Loan Collateral Waterfall becomes operative would be obligations owing to the Deposit L/C Loan Facility Lenders on account of the Deposit L/C Loan Facility.  This is unsurprising—as a matter of common sense, "Deposit L/C Obligations" means obligations in respect of issued Deposit Letters of Credit, including the amounts loaned by the Deposit L/C Loan Facility Lenders to fund those Deposit Letters of Credit.  Accordingly, any Undrawn Overage Amount must be paid to the Deposit L/C Loan Facility Lenders pursuant to that "fourth" clause.[6]

44.     As would be expected, the Deposit L/C Loan Collateral Waterfall accords priority to those most closely related to the Deposit Letters of Credit and the Deposit L/C Loan Facility:

---

[6]     Even after payment of all amounts owing to the Deposit Letter of Credit Issuer under the first three clauses of the Deposit L/C Loan Collateral Waterfall, and even after payment of any **Undrawn** Overage Amount to the Deposit L/C Loan Facility Lenders under the "fourth" clause of the Deposit L/C Loan Collateral Waterfall, any **Unissued** Overage Amount would remain in the Deposit L/C Loan Collateral Account.  Any such Unissued Overage Amount would, pursuant to the fifth and "last" clause of the Deposit L/C Loan Collateral Waterfall, flow into the General Collateral Waterfall, where it would ultimately be distributed to all Lenders (including the Deposit L/C Loan Facility Lenders) ratably.  *See* Intercreditor Agreement § 4.1(a).  Marathon therefore asserts no right in the Unissued Overage Amount that is different or greater than the rights of other Secured Parties therein.

the Deposit Letter of Credit Issuer and the Deposit L/C Loan Facility Lenders.  Accordingly, the

Intercreditor Agreement specifies that amounts in the Deposit L/C Loan Collateral Account must

be applied first to repay the Deposit Letter of Credit Issuer for the sum of all amounts that have

been drawn by Letter of Credit Beneficiaries, and for which the Deposit Letter of Credit Issuer

has not yet been reimbursed by the Borrower (as defined in the Credit Agreement, the "Unpaid

Drawings"), plus certain other fees and incidental amounts owing to the Deposit Letter of Credit

Issuer under the relevant financing documents.  *See* Ex. C, Intercreditor Agreement § 4.1(b),

*first*, *second*.

45.     For example, assume $1 billion in Deposit Letters of Credit were issued under the

Deposit L/C Loan Facility, leaving a $250 million Unissued Overage Amount.[7]  If the entire $1

billion in Deposit Letters of Credit was drawn and retained by the applicable Letter of Credit

Beneficiaries from the Deposit Letter of Credit Issuer, then the Deposit Letter of Credit Issuer

would be entitled to be reimbursed that full $1 billion on a first-priority basis from the Deposit

L/C Loan Collateral Account, and there would be no Undrawn Overage Amount.  If, on the other

hand, only $800 million of the $1 billion were drawn by the applicable Letter of Credit

Beneficiaries from the Deposit Letter of Credit Issuer on their Deposit Letters of Credit, then,

after first-priority payments to the Deposit Letter of Credit Issuer, there would remain an

Undrawn Overage Amount of approximately $200 million (less any fees and other incidental

amounts owing to the Deposit Letter of Credit Issuer).[8]  In this example, there would exist no

priority right to the $250 million Unissued Overage Amount.

---

[7]     The amounts used herein are by way of example only and do not necessarily reflect the actual amounts of issued, drawn, or refunded Deposit Letters of Credit.  Such information is not readily ascertainable from publicly-available documents, and Marathon intends to seek such information, including in connection with any discovery in this action.

[8]     Or, if the entire $1 billion were drawn, the Deposit Letter of Credit Issuer would be reimbursed in the amount of $1 billion, and if certain Letter of Credit Beneficiaries later refunded $300 million of the drawn amounts

46.     In sum, Marathon and the other Deposit L/C Loan Facility Lenders have two distinct interests in the Collateral:  (1) a priority right to payment of the Undrawn Overage Amount, if any, before any amounts are paid to the pre-petition Lenders ratably, under the Deposit L/C Loan Collateral Waterfall or otherwise, and (2) the right to share ratably with all pre-Petition Lenders in any distribution of other Collateral (including the Unissued Overage Amount and any portion of the Undrawn Overage Amount that rolls over after giving effect to the Deposit L/C Loan Collateral Waterfall.  Mechanically, this creates a two-step process for distribution of value by Wilmington. First, Wilmington is required to distribute value on account of any Undrawn Overage Amount to the Deposit L/C Loan Facility Lenders, ratably.  This will not likely pay all of those Deposit L/C Loan Facility Lenders in full, because any Undrawn Overage Amount will, by necessity, be less than the total amount of the Deposit L/C Loan Facility.  Therefore, second, Wilmington is required to distribute all other value flowing through the Credit Agreement to all Lenders ratably (taking into account the reduction, through the first step in the distribution, of the claims of the Deposit L/C Loan Facility Lenders).

**B.     The Dispute is Ripe for Adjudication by this Court**

47.     For over a year, Marathon has asserted the priority rights described above, and has been patient in awaiting their resolution.  However, Marathon is concerned that as the bankruptcy proceedings of TCEH run their course, the time will soon come for Wilmington to allocate and distribute value under the Credit Agreement.  Marathon has pressed the other Lenders for recognition of the priority rights it and the Deposit L/C Loan Facility Lenders hold, and has engaged Wilmington in those discussions.  But those other Lenders and Wilmington have not recognized those rights.

---

to the Borrower, there would remain an Undrawn Overage Amount of approximately $300 million (again, less any fees and other incidental amounts owing to the Deposit Letter of Credit Issuer).

48.     Marathon has attempted to initiate discussions with Wilmington and the other Lenders toward a consensual resolution of these issues, but those attempts have not resulted in any meaningful progress towards such a resolution.

49.     Therefore, Marathon's priority rights to payment of any Undrawn Overage Amount are at risk and are likely to be infringed absent timely adjudication by a court of competent jurisdiction.

## CAUSE OF ACTION

### Declaratory Judgment

50.     Plaintiff Marathon repeats and incorporates by reference each and every allegation set forth above as though fully set forth herein.

51.     The Credit Agreement and the Intercreditor Agreement, and the ancillary agreements related thereto, are valid and binding contracts entered into by the parties thereto for good and valuable consideration.  Marathon is a party to the Credit Agreement as a Deposit L/C Loan Facility Lender (and as a Lender) and to the Intercreditor Agreement as a Secured Party. Marathon has performed all of its obligations under both the Credit Agreement and the Intercreditor Agreement.

52.     Pursuant to Section 3.9 of the Credit Agreement and the Security Agreement, the Borrower in return for access to Deposit Letters of Credit, granted Marathon, through Wilmington as Collateral Agent, a security interest in the Deposit L/C Loan Collateral Account (and its cash and proceeds) to secure the Borrower's obligations under the Credit Agreement and related documents.  That security interest secures Marathon's priority right to any Undrawn Overage Amount, however it may arise.

53.     Pursuant to Section § 4.1(b) of the Intercreditor Agreement, the Deposit L/C Loan Collateral Waterfall provides that, after satisfaction of the first three parts of that waterfall, cash

- 19 -

and other proceeds of the Deposit L/C Loan Collateral Account, including any Undrawn Overage Amount, must next be distributed to the Letter of Credit Issuer and the Deposit L/C Loan Facility Lenders (in accordance with their respective priority under the Deposit L/C Loan Collateral Waterfall). Only after all of the debts of the Deposit Letter of Credit Issuer and the Deposit L/C Loan Facility Lenders, including payment to the Deposit L/C Loan Facility Lenders of any Undrawn Overage Amount, have been satisfied would all other Lenders have a right to repayment under the General Collateral Waterfall. Marathon maintains the right to share ratably in any distributions to Lenders under the General Collateral Waterfall.

54. As noted, however, both Wilmington, as Collateral Agent and Administrative Agent, and other Secured Parties have not recognized Marathon's priority rights to any Undrawn Overage Amount as a Deposit L/C Loan Facility Lender. Thus, a "justiciable controversy" exists concerning those rights.

55. Accordingly, pursuant to CPLR 3001, Plaintiff Marathon requests a declaratory judgment that it has the secured priority interest described herein in respect of any Undrawn Overage Amount.

56. Marathon also requests a declaration that Wilmington must preserve any cash or other value corresponding to any Undrawn Overage Amount that it may now or hereafter hold until the appropriate distributions to Marathon (and any other Deposit L/C Loan Facility Lenders) have been made in accordance with the declaration requested in the immediately preceding paragraph.

### PRAYER FOR RELIEF

WHEREFORE, Marathon, respectfully requests the entry of judgment against Wilmington as follows:

      **A.**      Awarding Marathon a declaratory judgment as set forth in Paragraphs 54 and 55 above;

      **B.**      Directing Wilmington to take all steps necessary to comply with the Court's declaratory judgment.

      **C.**      Awarding costs; and

      **D.**      Awarding such other relief available under the law that may be considered appropriate under the circumstances.

Dated:  New York, New York
       May 14, 2015

                                Respectfully submitted,

                                WILMER CUTLER PICKERING
                                HALE AND DORR LLP

Of Counsel:                     <u>s/ George W. Shuster, Jr.</u>
                                George W. Shuster, Jr.
WILMER CUTLER PICKERING      Christopher J. Bouchoux
HALE AND DORR LLP              7 World Trade Center
Benjamin W. Loveland            250 Greenwich Street
60 State Street                    New York, NY 10007
Boston, MA 02109              Telephone: (212) 230-8000
(617) 526-6000                 Facsimile: (212) 230-8888

*Attorneys for Plaintiff Marathon Asset*     *Attorneys for Plaintiff Marathon Asset*
*Management, LP*                 *Management, LP*