# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | Chapter 11 |
| In re | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | ) | Case No. 14-10979 (CSS) |
| *Debtors*. | ) | (Jointly Administered) |
| | ) | Related to D.I. 6122 |

## OBJECTION OF DELAWARE TRUST COMPANY,
## AS TRUSTEE FOR THE EFIH FIRST LIEN NOTES,
## TO CONFIRMATION OF FIFTH AMENDED PLAN OF REORGANIZATION

WILMER CUTLER PICKERING HALE AND DORR LLP

Philip D. Anker
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: 212-230-8800
Facsimile: 212-230-8888
Philip.Anker@wilmerhale.com

Joel Millar
David Gringer
Isley Gostin
1875 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: 202-663-6000
Facsimile: 202-663-6363
Joel.Millar@wilmerhale.com
David.Gringer@wilmerhale.com
Isley.Gostin@wilmerhale.com

ROPES & GRAY LLP

Keith H. Wofford
Mark Somerstein
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: 212-596-9000
Facsimile: 212-596-9090
Keith.Wofford@ropesgray.com
Mark.Somerstein@ropesgray.com

D. Ross Martin
Andrew Devore
800 Boylston Street, Prudential Tower
Boston, MA 02199-3600
Telephone: 617-951-7000
Facsimile: 617-951-7050
Ross.Martin@ropesgray.com
Andrew.Devore@ropesgray.com

DRINKER BIDDLE & REATH LLP

James H. Millar
1177 Avenue of the Americas
41st Floor
New York, NY 10036-2714
Telephone: 212-248-3264
Facsimile: 212-248-3141
James.Millar@dbr.com

COLE SCHOTZ P.C.

Norman L. Pernick (Bar No. 2290)
J. Kate Stickles (Bar No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: 302-652-3131
Facsimile: 302-652-3117
npernick@coleschotz.com
kstickles@coleschotz.com

Warren A. Usatine
Court Plaza North
25 Main Street
Hackensack, NJ 07602
Telephone: 201-489-3000
Facsimile: 201-489-1536
wusatine@coleschotz.com

*Counsel for Delaware Trust Company*          Dated: October 23, 2015

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT ..................................................................................................................2

I.    UNLESS THE PLAN IS MODIFIED TO "UNIMPAIR" THE EFIH
FIRST LIEN NOTES CLAIMS, THE PLAN CANNOT BE
CONFIRMED UNDER BANKRUPTCY CODE SECTIONS 1129(a)(2)
AND 1129(a)(10)...................................................................................................3

    A.    The Plan Impairs The Noteholders' Rights With Respect to Their
Make-Whole. ...............................................................................................5

    B.    The Plan Impairs The Noteholders' Claims For Reimbursement Of
Fees And Expenses And Indemnification...................................................18

    C.    The Plan Impairs The Noteholders' Claims For Interest. ..........................21

    D.    The Plan Impairs The Noteholders' Liens. ...............................................25

    E.    The Plan Impairs The Noteholders' Rights And Claims Against
Non-Debtor Third Parties, Including The EFIH Second-Lien
Trustee And Noteholders In The Pending Inter-Creditor Action. .............30

    F.    The Plan Impairs The Noteholders' Contractual Rights Prohibiting
EFIH From Paying The Second-Lien Noteholders Before the First-
Lien Noteholders Have Been Paid In Full. ................................................33

    G.    The Plan Impairs The Noteholders' Contractual Rights Under The
Indenture And Related Security Agreements. ...........................................35

    H.    The Plan Impairs The Noteholders' Rights In Their Pending Third
Circuit Appeal Of The EFIH First-Lien Settlement. .................................37

II.    UNLESS THE PLAN IS MODIFIED TO "UNIMPAIR" THE EFIH
FIRST LIEN NOTES CLAIMS, THE PLAN CANNOT BE
CONFIRMED UNDER BANKRUPTCY CODE SECTION 1129(b)..................38

III.    THE PLAN CAN BE MODIFIED TO UNIMPAIR THE EFIH FIRST
LIEN NOTES CLAIMS ......................................................................................40

RESERVATION OF RIGHTS ........................................................................................44

CONCLUSION..............................................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Berg Chilling Sys., Inc. v. Hull Corp.*,
  435 F.3d 455 (3d Cir. 2006) .................................................................................6

*Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co.*,
  2015 WL 4191419 (S.D.N.Y. July 10, 2015) .........................................................5

*In re Anderson*,
  51 B.R. 397 (Bankr. D. Haw.), *amended*, 56 B.R. 443 (Bankr. D.
  Haw. 1985) ..........................................................................................................23

*In re Best Prods. Co.*,
  168 B.R. 35 (Bankr. S.D.N.Y. 1994) ....................................................................31

*In re Chassix Holdings, Inc.*,
  533 B.R. 64 (Bankr. S.D.N.Y. 2015) ....................................................................33

*In re Continental Airlines*,
  203 F.3d 203 (3d Cir. 2000) .................................................................................33

*In re Dynamic Brokers, Inc.*,
  293 B.R. 489 (B.A.P. 9th Cir. 2003) .....................................................................21

*In re Envirodyne Indus.*,
  1993 Bankr. Lexis 2224 (Bankr. N.D. Ill. Dec. 13, 1993) ....................................31

*In re Greenwood Point, LP*,
  445 B.R. 885 (Bankr. S.D. Ind. 2011) ..................................................................28

*In re Highway Truck Drivers & Helpers, Teamsters Local No. 107*,
  100 B.R. 209 (Bankr. E.D. Pa. 1989) ....................................................................9

*In re Hoopai*,
  581 F.3d 1090 (9th Cir. 2009) ......................................................................19, 23

*In re JER/Jameson Mezz Borrower II, LLC*,
  461 B.R. 293 (Bankr. D. Del. 2011) ......................................................................4

*In re L & J Anaheim Assocs.*,
  995 F.2d 940 (9th Cir. 1993) ...............................................................................4

*In re Mangia Pizza Investments, LP*,
  480 B.R. 669 (Bankr. W.D. Tex. 2012) ................................................................29

*In re PPI Enterprises (U.S.), Inc.*,
    324 F.3d 197 (3d Cir. 2003)..................................................................4, 17, 18

*In re Philadelphia Newspapers, LLC*,
    690 F.3d 161 (3d Cir. 2012).................................................... 17-18, 44

*In re TCI 2 Holdings LLC*,
    428 B.R. 117 (Bankr. D.N.J. 2010) ........................................................31

*In re Texas Rangers Baseball Partners*,
    434 B.R. 393 (Bankr. N.D. Tex. 2010).................................... 20, 34-35

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del. 2011) ........................................................4

*In re Tribune Media Co.*,
    799 F.3d 272 (3d Cir. 2015)...........................................................31, 32

*In re Yates Dev., Inc.*,
    258 B.R. 36 (Bankr. M.D. Fla. 2000) ......................................................9

*Merrill Lynch Interfunding Inc. v. Argenti*,
    2000 WL 490739 (S.D.N.Y. Apr. 26, 2000), *aff'd*, 2 F. App'x 98
    (2d Cir. 2001)........................................................................................27

*Pinson v. Thacker*,
    2009 WL 5124996 (Ky. Ct. App. Dec. 30, 2009)................................28

*United Artists Theatre Co. v. Walton*,
    315 F.3d 217 (3d Cir. 2003)................................................................33

*United States v. Pound*,
    2010 WL 2330240 (E.D. Ok. June 8, 2010) .......................................28

## STATUTES, RULES, AND REGULATIONS

11 U.S.C. § 502..............................................................................6, 17, 21

11 U.S.C. § 506................................................................................19, 23

11 U.S.C. § 1124............................................................................4, 9, 28

11 U.S.C. § 1126..................................................................................2, 3

11 U.S.C. § 1129 ............................................................................ *passim*

Del. Code Ann. tit. 8, §§ 259(a), 264(e) ...................................................6

Fed. R. Bankr. P. 3007 ............................................................................21

Delaware Trust Company, as indenture and collateral trustee ("Trustee") for the first-lien notes ("Notes") issued by Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. (together, "EFIH" or the "EFIH Debtors"), submits this Objection to Confirmation of the Fifth Amended Plan of Reorganization of Energy Future Holdings Corp., *Et Al.* (D.I. 6122) (the "Plan").[1]  In support thereof, the Trustee states as follows:

## PRELIMINARY STATEMENT

As this Court knows, the Debtors have repeatedly championed the Plan as one that purportedly "unimpairs" all E-side creditors, including the Trustee and the holders of the Notes (the "Noteholders").  The Debtors have not solicited acceptances of the Plan from the Noteholders, let alone sought to meet the demanding standards for cram-down if the Noteholders voted to reject the Plan.  Accordingly, this Court has recognized that "the crux of the confirmation hearing, other than the settlement, is going to be whether the E side creditors are truly unimpaired," and that "[i]f the E side creditors are impaired the plan as it exists today is almost certainly going to fail."  8/18/2015 Hr'g Tr. at 40:13-20; *see also* 8/25/2015 Hr'g Tr. at 70:22-25 (statement by Court that if the Plan impairs E side creditors, it is "DOA").  Indeed, "given the significance of the issue and the adverse consequences to the plan if the E side creditors are in fact impaired," the Court has "urge[d] the debtors and the plan proponents not to be too cute on the impairment issue." 8/18/2015 Hr'g Tr. at 41:1-4.

While the Trustee has no desire to impede the Debtors' emergence from bankruptcy, the Trustee is compelled to file this Objection to confirmation because the Debtors and the other proponents of the Plan (the "Plan Proponents") have chosen to

---

[1]    Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Plan.

disregard this Court's admonition not to be "too cute."  As currently drafted, the Plan

does not remotely "unimpair" the Trustee's and the Noteholders' claims (the "<u>EFIH First</u>

<u>Lien Notes Claims</u>").  Instead, the Plan would seek to:

- Deny all recovery on the Trustee's and Noteholders' make-whole claim, even if allowed on appeal.

- Deny all recovery on certain interest, fees and expenses owed to them.

- Release all of their liens on the Effective Date, without payment in full.

- Release their claims against non-debtors, including against the EFIH second-lien trustee and noteholders in pending inter-creditor litigation.

- Cancel the indenture and security agreements and all of EFIH's obligations thereunder on the Effective Date.

- Release their pending appeal of the EFIH First Lien Settlement.

However, these impediments to confirmation could be removed with modest

changes to the Plan that would preserve the Trustee's and the Noteholders' rights and

leave them truly "unimpaired"—exactly what the Debtors claim they intend the Plan to

do.  To that end, set out below are proposed modifications to the Plan that would do that.

*See infra* p.40.  In the event the Plan were so modified, the Trustee would be prepared to

withdraw this Objection.

## ARGUMENT

The Plan cannot be confirmed in its current form because the Plan impairs the

EFIH First Lien Notes Claims.  Unless the Plan is modified to "unimpair" those claims,

the Plan cannot meet at least three requirements for confirmation of a plan under section

1129 of the Bankruptcy Code:

*First*, the Plan cannot meet the requirement under sections 1129(a)(2) and 1126(a)

that a plan proponent must solicit acceptances or rejections from each impaired class of

creditors, because there has been no solicitation of the Noteholders.

*Second*, the Plan cannot meet the requirement under section 1129(a)(10) that at least one impaired class of claims has accepted the Plan, because there is no class of impaired claims at EFIH that has accepted the Plan.

*Third*, the Plan cannot meet the requirement under section 1129(b) that a "cram-down" plan be "fair and equitable" with respect to each class of claims that is impaired under, and has not accepted, the plan, because the Plan, which the Noteholders have not voted to accept, is not fair and equitable with respect to the EFIH First Lien Notes Claims and violates the absolute priority rule.

## I.    UNLESS THE PLAN IS MODIFIED TO "UNIMPAIR" THE EFIH FIRST LIEN NOTES CLAIMS, THE PLAN CANNOT BE CONFIRMED UNDER BANKRUPTCY CODE SECTIONS 1129(a)(2) AND 1129(a)(10).

Section 1129(a)(2) provides that "[t]he court shall confirm a plan only if all of the following requirements are met: … (2) The proponent of the plan complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(2). Those "applicable provisions" include the requirement under § 1126 that holders of impaired claims be allowed to vote to accept or reject the plan. *See id.* § 1126(a), (f). Furthermore, § 1129(a)(10) provides another requirement for confirmation: "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." *See id.* § 1129(a)(10).

These requirements cannot be met if the Trustee and the Noteholders are impaired because the Noteholders' votes have not been solicited and they have not accepted the

Plan, and there is no class of impaired claims against EFIH that has voted to accept the Plan.[2]

The Bankruptcy Code defines what impairment means.  It makes clear that a class of claims is impaired unless all rights of the holders of the claims are fully preserved:

> "[A] class of claims … is impaired under a plan unless, with respect to each claim … of such class, the plan … leaves unaltered the legal, equitable, and contractual rights to which such claim … entitles the holder of such claim."

11 U.S.C. § 1124(1).  As the Third Circuit has put it, "[i]f the … plan does not leave the creditor's rights **entirely 'unaltered**,' the creditor's claim will be labeled as impaired under § 1124(1) of the Bankruptcy Code."  *In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 202 (3d Cir. 2003) (emphasis added); *In re L & J Anaheim Assocs.*, 995 F.2d 940, 942 (9th Cir. 1993) ("Congress define[d] impairment in the broadest possible terms.").  Furthermore, "[t]he Bankruptcy Code creates a presumption of impairment."  *PPI*, 324 F.3d at 203.  Thus, "[t]he burden is placed on the debtor to demonstrate the plan leaves the creditor's rights unaltered."  *Id.*

EFIH cannot meet that burden here.  As detailed below, the EFIH First Lien Notes Claims are impaired because the Debtors' "[P]lan does not leave the [Trustee's and the Noteholders'] rights entirely 'unaltered.'"  *Id.* at 202.

---

[2]    EFIH cannot satisfy § 1129(a)(10) by pointing to an accepting, impaired class of "T-side" creditors because EFIH has not been substantively consolidated with the T-side Debtors.  *See In re Tribune Co.*, 464 B.R. 126, 183 (Bankr. D. Del. 2011) ("I find nothing ambiguous in the language of § 1129(a)(10), which, absent substantive consolidation or consent, must be satisfied by each debtor in a joint plan.  Neither plan here satisfies § 1129(a)(10)."); *accord In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 302 (Bankr. D. Del. 2011) (dismissing chapter 11 case where confirmation of a plan would not be possible absent substantive consolidation because of the debtors' inability to satisfy § 1129(a)(10)).

### A.    The Plan Impairs The Noteholders' Rights With Respect to Their Make-Whole.

As the Court is aware, the Trustee asserts that EFIH owes the Noteholders a contractual "make-whole" payment of approximately $431 million (plus interest) as a result of EFIH's repayment of all principal on the Notes in June 2014.  The Court, of course, has held to the contrary, determining that EFIH does not owe the make-whole. However, the Trustee and the Noteholders have the right to appeal that ruling and have done so.[3]  And, if they prevail in that appeal and an appellate court holds that the make-whole claim must be allowed, the Trustee and the Noteholders will have the right to have that claim allowed and paid by the EFIH Debtors, their successors or other appropriate parties.

That is true both as a matter of state law and under the Bankruptcy Code.  Under state law, the Noteholders are entitled to payment of the make-whole if the denial of that claim is reversed on appeal—precisely as the Southern District of New York recently held in another make-whole litigation.[4]  In such event, the Noteholders would be entitled under their contracts and applicable state law to payment of the make-whole from EFIH,

---

[3]    *Delaware Trust Company v. Energy Future Intermediate Holding Company LLC*, No. 15-cv-620-RGA (D. Del.).

[4]    *See Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co.*, 2015 WL 4191419, at *1 (S.D.N.Y. July 10, 2015) (holding, after Second Circuit reversed district court's prior decision denying make-whole, that "the Noteholders were entitled to be paid the 'Make-Whole' Price which, under the Supplemental Indenture as construed by the Second Circuit, was due upon redemption of the notes"; "[a]ccordingly, Chesapeake must pay the Noteholders … the Make-Whole").

or from any successor to EFIH.[5]  And under the Bankruptcy Code, if an appellate court were to hold that the Noteholders have a valid claim for the make-whole under the indenture and state law that is allowable under section 502 of the Bankruptcy Code, they would be entitled to have that claim paid in accordance with the Bankruptcy Code's provisions governing the treatment of allowed claims.

If the appeal were decided in the Noteholders' favor before the Plan's "Effective Date," there is no question that the make-whole would have to be allowed and paid under any confirmable plan of reorganization.  11 U.S.C. §§ 502(b)(1), 1129(a)(1), 1129(b)(2).  The Debtors and the Plan Proponents have recognized as much.  They have drafted the Plan to provide that if the Trustee and the Noteholders prevail on appeal prior to the Effective Date, a condition precedent to the Plan's effectiveness will not be met.  *See* Plan Art. IX.B.9.  They have *not* drafted the Plan to provide that, if the Trustee and the Noteholders prevail on appeal before the Effective Date, the Plan will still go effective but the make-whole claim will still not be allowed and paid, because they know that the

---

[5]     *See* Indenture § 5.01 (attached as <u>Exhibit C</u> to the supporting Declaration of Philip D. Anker filed contemporaneously herewith [hereinafter "<u>Anker Decl.</u>"]) ("EFIH shall not consolidate or merge with or into … or … dispose of all or substantially all of its properties or assets … to any Person unless … the Successor Company, if other than EFIH … expressly assumes all the obligations of EFIH under the Notes, this Indenture and the Security Documents, … [including] in the case of a merger of EFIH with and into EFH Corp …."); *id.* § 13.12 ("All agreements of the Issuer in this Indenture and the Notes shall bind its successors."); Collateral Trust Agreement § 7.20 (attached as <u>Exhibit A</u> to Anker Decl.) ("EFIH will cause each Person that becomes a Successor Company … to become a party to this Agreement … whereupon such Person will be bound by the terms hereof to the same extent as if it had executed and delivered this Agreement as of the date hereof."); Del. Code Ann. tit. 8, §§ 259(a), 264(e) (providing that surviving corporation or limited liability company in merger is liable for all debts and liens of merged corporation or limited liability company); *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 464 (3d Cir. 2006) (noting that acquirer of assets is liable for transferor's liabilities under state-law successor-liability rules where the acquisition results in a de facto merger or mere continuation of the transferor's business).

Plan could not lawfully so provide.  There is no basis for the Plan to provide for that unlawful result if, simply because of happenstance, the Trustee and the Noteholders prevail on appeal after, rather than before, the Effective Date.

Put simply, the Noteholders have the right, if they prevail on appeal, whether before or after the Effective Date, to have their make-whole claim allowed and paid.  But as written, the Plan would impair that right.  It purports to deny the make-whole payment *even if* that claim is allowed on appeal.

Specifically, the Plan provides that the Noteholders' secured claims will be allowed only as to specified interest and fees, but not the make-whole:

> *Allowance*: As Class B3 Claims, ***the EFIH First Lien Note Claims are Allowed in an amount equal to the sum of***: (i) any accrued but ***unpaid prepetition interest*** under the EFIH First Lien Note Indenture; (ii) accrued but ***unpaid postpetition interest*** (including any Additional Interest or interest on interest) on such principal at the non-default contract rate set forth in the EFIH First Lien Note Indenture through the closing date of the EFIH First Lien DIP Facility (excluding interest on interest, which shall be through the Effective Date); ***and*** (iii) all reasonable and documented ***fees and expenses*** owed under the EFIH First Lien Note Indenture, ***but not including, for the avoidance of doubt, any Makewhole Claims***.

Plan § III.B.18 (p.52) (Class B3 – EFIH First Lien Note Claims) (emphasis added).  The Plan further provides that only those specified allowed claims will be paid:

> *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class B3 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class B3, ***each such Holder shall receive, up to the Allowed amount of its Claim, payment in full in Cash***.

*Id.* (emphasis added).  The Plan's treatment of any unsecured claims of the Noteholders likewise provides that no make-whole will be allowed or paid.[6]

If there were any doubt on the question, the Plan's definition of "Allowed" puts that doubt to rest.  It excludes the make-whole, even if an appellate court holds that it must be allowed.  The Plan defines "Allowed" to include, in relevant part, only those claims that are allowed "(i) pursuant to the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith."  *Id.* § I.A.13.  Nothing in that definition includes a claim disputed by the Debtors and initially disallowed by this Court but that is later allowed on appeal.

Moreover, because the Plan does not provide for allowance or payment of the make-whole, the Plan's release and discharge provisions would appear to release and discharge the Debtors, as of the Effective Date, from any liability for the make-whole— and even enjoin the Trustee and the Noteholders from continuing the make-whole appeal after the Effective Date.  *See* Plan § VIII.A ("[E]xcept as otherwise specifically provided in the Plan … the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims … [and] Liens on … the Debtors or any of their assets or properties"); *id.* § VIII.D ("As of the Effective Date, each Releasing Party [defined to include the Trustee and Noteholders, *see infra* p.30 is deemed to have released and discharged each Debtor [and] Reorganized Debtor … from any and all Claims."); *id.* § VIII.F ("[E]xcept as

---

[6]      *See* Plan § III.B.21 (p.53) (Class B6 – General Unsecured Claims Against the EFIH Debtors) (providing that allowed unsecured claims do "not includ[e], for the avoidance of doubt, any Makewhole Claims").

otherwise expressly provided in the Plan or for obligations … required to be paid

pursuant to the Plan … all Entities that … hold claims … that have been released

pursuant to … Article VIII.D … [or] discharged pursuant to Article VIII.A … are

permanently enjoined, from and after the Effective Date, from … continuing … any

action or other proceeding of any kind … with respect to any such [released] claims …

[or] recovering … any judgment, award, decree or order against such [the Debtors or

Reorganized Debtors] … with respect to any such [released] claims").[7]

Accordingly, the Plan impairs the Noteholders because it alters their right to

prosecute their appeal and be paid the make-whole if they prevail on appeal.  Denying a

creditor its legal right to appeal an adverse judgment, and permanently disallowing a

claim that an appellate court may otherwise determine should be allowed, unquestionably

"alter" the Noteholders' "legal, equitable, and contractual rights."  11 U.S.C. §1124(1);

*see In re Highway Truck Drivers & Helpers, Teamsters Local No. 107*, 100 B.R. 209,

214 (Bankr. E.D. Pa. 1989) (holding that creditor was impaired under § 1124 where plan

altered creditor's rights with respect to pending appeal concerning its claim); *In re Yates

Dev., Inc.*, 258 B.R. 36, 42 (Bankr. M.D. Fla. 2000) (same).

---

[7]       The Plan also impairs the Noteholders to the extent the documents filed in the
Plan Supplement purport to prevent Reorganized EFIH or New EFH from paying the
make-whole (or securing payment) by prohibiting Reorganized EFIH or New EFH from
raising new debt or equity capital to fund such payment (and from maintaining the liens
securing the EFIH First Lien Notes Claims).  *See, e.g.*, Plan § XII.J ("All exhibits and
documents included in the Plan Supplement are incorporated into and are a part of the
Plan …."); Plan Supplement, D.I. 6544-40, Ex. K ("New Reorganized EFIH Debt
Documents—Amended and Restated Commitment Letter") at Ex. B-8 & B-10 (term
sheet for $5.5 billion secured term loan facility providing that "negative covenants" will
"Limit[] … liens," "debt," "loans and other investments" and that "events of default" will
include "breach of covenants" and "material judgment defaults").

Nor is the Trustee mistaken in its reading of the Plan.  The Debtors have confirmed that the Plan means what it says, notwithstanding any contrary impression the Debtors may have sought to convey to the Court in the statement that their counsel, Mr. Husnick, read into the record at the hearing on September 21, 2015.  As the Court will recall, at an earlier hearing, the Court asked the Debtors "[i]f the third circuit reverses and says [the Noteholders] have a make whole claim of $400 million, what's the debtor's position on whether or not the claim will be paid under this plan?"  9/18/2015 Hr'g Tr. at 27:20-23.  Debtors' counsel initially said that he needed to check with his co-counsel.  *Id.* at 27:24-28:2.  After considering the issue for a few days, the Debtors decided to be "cute."  Reading from what he admitted was a prepared statement, Mr. Husnick noted that the Plan does not contemplate the payment of any make-whole claim and that the Debtors reserved all of their appellate rights, "including the right to assert equitable mootness."  9/21/2015 Hr'g Tr. at 16:3-17.  But he then added that if, nevertheless, any "make-whole claims are subsequently determined by an appellate court to be allowed claims that must be paid by either reorganized EFIH or new EFH, then such allowed claims will become obligations of reorganized EFIH or new EFH, as applicable."  *Id.* 16:17-21.

That statement might be read to suggest that the Plan provides for the make-whole to be paid if it is allowed on appeal.  But that would be wrong.  In fact, EFIH's statement merely acknowledges the truism that if—notwithstanding the contrary terms of the Plan—a court of competent jurisdiction holds Reorganized EFIH or New EFH liable pursuant to a final and non-appealable order, then Reorganized EFIH or New EFH will

be so liable.  As EFIH's co-CRO, General Counsel, and Rule 30(b)(6) witness, Ms. Doré,

testified:

> "Q. I take it that the statement Mr. Husnick read into the record you are
> telling me accurately reflects the debtor's position?
> **A. It does.**
> …
> Q. He said -- well, let me try to translate it in my words, and tell me why I
> have it wrong. If an appellate court says that it's an obligation of
> reorganized EFIH, then it's an obligation of reorganized EFIH. Isn't that
> what he said?
> **A. That is what he said.**
> Q. How is that not a tautology?
> **A. It may or may not be a tautology, but it's the truth. If the appellate
> court says that it's an obligation of the reorganized companies, then it
> is.**
> **…**
> Q. So it tells us that the debtors recognize the power of the Court of
> Appeals to issue orders that would be binding on the reorganized
> company?
> MR. McGAAN: Object. Mischaracterizes the testimony.
> MR. HOROWITZ: I really want to know what the testimony is.
> Q. Is that what it means?
> **A. Yes.**"

9/28/2015 Doré Dep. Tr. at 73:5-9, 76:12-77:3, 126:24-127:9 (attached as <u>Exhibit F</u> to

Anker Decl.).

Thus, although the Court urged the Debtors not to be "too cute" with respect to

impairment, the Debtors are in fact trying to have it both ways.  They are trying to avoid

admitting to this Court that the Plan denies the make-whole even if it is allowed on

appeal.  No doubt, the Debtors recognize that denying that right would undermine their

argument that the Plan "unimpairs" the Noteholders.  Yet, at the same time, the Debtors

are trying to position themselves to argue just the opposite in the appeal of this Court's

separate order denying the make-whole:  that is, they are trying to position themselves to

be able to claim, after the Plan goes effective, that the make-whole appeal should be

dismissed as equitably moot because allowing and paying the make-whole would be *contrary* to the Plan's terms.

Indeed, EFIH stated in a recent submission to the District Court in the make-whole appeal that "[t]he treatment of the Noteholders' make-whole claim" under "the proposed plan has always provided that the claim would be disallowed and not paid," and that the Trustee should not be "surprise[d] that equitable mootness might affect its appeal" under this "well-settled defense[] … available to debtors in bankruptcy appeals."[8] And when pressed, EFIH has acknowledged that the Plan does, in fact, deny the make-whole, even if it is allowed on appeal.

Thus, Ms. Doré testified:

> "Q: And so there is no provision for payment of any EFIH first lien make-whole claim, right? Whether allowed—whether deemed allowed on appeal or not, right?
> **A. That is correct."**
> …
> Q. OK. So, to be clear, nothing in the plan as it currently exists provides that new EFH or new EFIH might be liable for make-whole claims that are allowed on appeal after the effective date?
> **A. That's correct.**
> …
> Q. So the issue that Judge Sontchi is going to be addressing is a plan that does not provide for any recovery for make-whole claims that are allowed after the effective date, on appeal after the effective date, right?
> **A. It just doesn't speak to the issue of the -- it doesn't allow for make-whole claims, period, before or after the effective date. There are no make-whole claims allowed in the plan.**
> …
> Q. The debtors have no plan -- no intention to amend the plan to make it clear that claim -- make-whole claims allowed on appeal after the effective date would become obligations of the reorganized entities, correct?
> **A. We do not have a current intention to do that amendment, that is correct."**

---

[8]     Appellees' Opp., D.I. 36, at 2, *Delaware Trust Company v. Energy Future Intermediate Holding Company LLC*, No. 15-cv-620-RGA (D. Del. Sept. 25, 2015).

9/28/2015 Doré Dep. Tr. at 27:17-:21, 116:15-:20, 123:21-124:7, 124:15-:23.[9]

Ms. Doré further confirmed that the Debtors are reserving their right to argue that the appeal should be dismissed as equitably moot on grounds that, even if the make-whole is allowed on appeal, paying that claim would be contrary to the terms of the Plan:

> Q. The debtors are reserving the right to argue that confirmation of the plan and the effectiveness of the plan will render the appeal by the EFIH first liens of the denial of their make-whole claim equitably moot, right?
> **A. Yes.**
> …
> Q. So I take it the debtors are reserving the right to argue, following confirmation of a plan in an appeal, that the appellate court should not allow the make-whole claim and require reorganized EFH or reorganized EFIH to pay it because doing so would be contrary to the terms of a confirmed plan.
> **A. We are reserving the right to argue that.**

*Id.* at 75:25-76:7, 82:13-:22, 118:3-10.[10]

Moreover, the Debtors also are "reserving the right to argue" that neither Reorganized EFIH nor New EFH will have liability to pay the make-whole even if an appellate court reverses this Court's judgment denying the make-whole claim. As noted, the Noteholders currently have the right under state law to hold any successor of EFIH

---

[9]     *See also* 9/28/2015 Doré Dep. Tr. at 26:20-:24 ("Q: So the plan does not provide for the allowance of any EFIH first-lien make-whole claims, right? **A: Correct.**"); *id.* at 28:3-29:2 ("Q. … [T]here is no provision in the definition of allowed, for a claim to be allowed over the objection of the debtors because an appellate court concludes that the claim is valid, right? **A. … I believe you are correct.**"); *id.* at 40:10-13 ("The plan provides for no payment of the EFIH first lien make-whole claim, no ifs, no ands, no buts, right? **A. That's true.**"); *id.* at 52:24-53:4 ("Q. Does the fifth amended plan provide for the allowance of the EFIH first lien make-whole claims if 'otherwise allowed in any amount by final order'? **A. No.**"); *id.* at 110:11-14 ("Q. [N]othing in the plan itself provides for any recovery for make-whole claims that are allowed after the effective date, correct? **A. That's correct.**").

[10]     *See also* Disclosure Statement, D.I. 6124, at 16 ("The Debtors, such Holders of Makewhole Claims, and all other applicable parties in interest reserve all rights with respect to arguments that may be raised in connection with any such appeals [of 'the Confirmation Order or any other order of the Bankruptcy Court'], including any arguments as to whether such appeals are equitably moot.").

13

liable for any make-whole that is allowed on appeal.  And EFIH has admitted that

Reorganized EFIH and/or New EFH will be the successor to EFIH,[11] and that

Reorganized EFIH and New EFH will have the financial ability to pay the Noteholders'

make-whole claim if—notwithstanding all of their arguments for why no appellate court

should allow the claim—it (together with all other make-whole claims, and interest on all

such claims) is allowed on appeal.[12]

---

[11]     Different witnesses for the Debtors have testified inconsistently as to whether, if the Plan is confirmed and consummated, there will remain a separate "Reorganized EFIH" owned by New EFH or the two companies will be merged, with New EFH the surviving entity.  *Compare* 10/1/2015 Keglevic Dep. Tr. at 14:5-24 (merged) (attached as Exhibit G to Anker Decl.); *with* 10/19/2015 Ying Dep. Tr. at 16:23-17:22 (remain separate) (attached as Exhibit H to Anker Decl.).  But there is no dispute that any surviving entity will be a successor to EFIH.  *See* 10/1/2015 Keglevic Dep. Tr. at 14:5-:24 ("Q. Assuming the plan is confirmed and gets consummated, will there continue to be a separate EFIH as a legal entity from EFH? MR. McKANE: Objection, form. **A. I don't believe so.** Q. So they will be merged together? **A. Yes.** Q. And the surviving entity I believe in the plan is referred to as 'new EFH'? **A. Yes. Or 'reorganized EFH,' yes.** Q. And it will be the successor to both what is now EFIH and what is also EFH? MR. McKANE: Calls for a legal conclusion. Objection to form. MR. SHORE: Form. Q. To the best of your understanding? **A. Generally speaking, yes.**"); Plan Supplement, D.I. 6544-4, Ex. A(iii) at 1 ("Reorganized EFIH Partnership Agreement" providing that EFIH will be converted into a Delaware limited partnership and that "[t]he Partnership is the successor to Energy Future Intermediate Holding Company LLC").

[12]     *See* 10/1/2015 Keglevic Dep. Tr. at 18:8-17 ("Q. Do the debtors expect that new EFH will be able to pay the full amount of the make-whole claim of the EFIH first liens if an appellate court following the effective date determines that that claim is valid and reverses the bankruptcy court? **A. Yes.** Q. Any material doubts that the debtors have about that? **A. None.**"); *id.* at 61:12-62:14 ("Q. Assume that after the effective date, the EFIH first liens win on appeal their make-whole and interest thereon. The EFIH second liens win their make-whole and interest thereon. The EFH PIKs win their make-whole and interest thereon. The EFH bonds win their make-whole and interest thereon. And after the effective date, there is a determination that the EFIH PIKs are entitled to interest at their contract rate, rather than at the federal judgment rate. Does it remain the debtors' belief -- MR. McKANE: With no risk probability discounting for the amounts? Q. With no risk probability discounting for the amounts. I will adopt your counsel's qualification. Does it remain the debtors' belief that reorganized EFH would be able to satisfy all of those liabilities after the effective date? MR. SHORE: Objection to form. **A. It does.**"); *id.* at 20:3-15, 41:16-46:7, 49:21-50:12 (same); 10/19/2015 Ying Dep. Tr. at 21:5-22 ("Q. Your opinion is that, am I correct, that if, after confirmation, the EFIH first liens win their

Yet, in deposition, Ms. Doré made it clear that the Debtors reserve the right to argue that neither Reorganized EFIH nor New EFH will have any liability under the Plan for the make-whole, even if an appellate court sustains the claim:

> Q. And I think what you just told me is that there are two conditions [in Mr. Husnick's statement].  First, the appellate court must decide that the -- must determine that the make-whole claim is an allowed claim, right?
> **A. Yes.**
> Q. And, second, it must decide that it must be paid by either reorganized EFIH or new EFH.  If both of those conditions are met, then the allowed claim will become an obligation of reorganized EFIH or new EFH, right?
> **A. Correct.**
> Q. What happens if an appellate court simply says the first of those two. Judge Sontchi erred. The claim was a valid claim. In that circumstance, does the plan -- what treatment does the plan provide for the EFIH first lien make-whole claim?
> **A. Again, I can't -- you know, typically an appellate court in particular is going to issue a very lengthy analysis and opinion and, without knowing exactly what that opinion is, I can't tell you what would happen exactly because my -- my guess is, if, in your hypothetical, the Court just said it is an allowed claim and didn't go to the next step of saying and it must be paid by either reorganized EFIH or new EFH, the parties at that point would argue about, you know, what that means in the opinion. Your clients would argue that was implied and perhaps the reorganized EFIH would argue something different, and I don't know what the answer would be.**
> Q. And certainly, under the plan, the debtors reserve the right in that circumstance to argue that the make-whole claim need not be paid by reorganized EFIH or reorganized EFH, right?
> MR. McGAAN: Object to the form.
> **A. The debtors have reserved all of our appellate rights.**

---

appeal and are entitled to both the full amount of the make-whole they seek and all the interest they seek, and the EFIH second liens prevail and also are entitled to the full amount of the make-whole and interest they seek, and the EFIH PIKs are entitled to the full amount of the make-whole and interest they seek, and all post-petition interest at the contract rate they seek, and the various EFH notes also prevail and are entitled to the full amount of both make-whole and post-petition interest that they seek, even if all of that happens, reorganized EFH should be able to raise the capital to pay all of those liabilities in full, right? **A. That's correct.**"); *id.* at 75:23-76:6 ("Q. And so the bottom line, Mr. Ying, is it is your opinion that if everything -- with all the conservative assumptions you made on value and if every liability that is in dispute has to be paid in full by New EFH, New EFH will be able to pay those liabilities and should not have to go back into bankruptcy, right? **A. That's correct.**").

Q. Including the appellate -- the right to argue that confirmation of the plan renders the appeal by the EFH first liens equitably moot, right?
**A. Yes.**

9/28/15 Doré Dep. Tr. at 73:18-75:20, 77:19-78:3.  In short, the Plan impairs the Noteholders because it denies them the right they have today to be paid by EFIH or any successor the make-whole if that claim is allowed on appeal.

Nevertheless, EFIH has argued that the Noteholders' rights are not being altered because a "debtor need not pay [a] disallowed claim when the plan becomes effective," and the Noteholders "do not have an existing right to have the Plan or the Court preemptively fashion an appellate remedy."[13]  Those contentions miss the point.  No one is arguing that EFIH must pay the make-whole on the Effective Date if, at that time, the make-whole remains disallowed under this Court's order, but subject to a pending appeal.  Nor is anyone arguing that the Court must fashion an appellate remedy in the Plan like requiring EFIH to "bond that appeal."  But the Noteholders do have the right to hold EFIH (or any successor) liable for the make-whole if they prevail in the appeal—whenever that may happen.  Because the Plan purports to extinguish that right, it impairs them.

Alternatively, EFIH and the other Plan Proponents have intimated that it is not the *Plan* that is altering their rights, but rather the bankruptcy-law doctrine of equitable mootness.  Any such argument is without merit.  Equitable mootness does not require that all appeals be dismissed after a plan goes effective; it applies, if it all (and the Trustee and the Noteholders submit it would not apply here in any event), only where the *plan* has altered the creditor's right to obtain the relief it seeks if it prevails on appeal.

---

[13]     Debtors' Reply to Objections to Disclosure Statement, D.I. 6061, at 10-11.

16

In *PPI*, the Third Circuit held that a landlord was not impaired by a plan provision that capped its lease-termination damages in accordance with § 502(b)(6).  In reaching that conclusion, it distinguished between "plan impairment, under which the debtor alters" the creditor's rights, and "statutory impairment, under which the operation of a provision of the Code alters the amount that the creditor is entitled to under nonbankruptcy law."  *PPI*, 324 F.3d at 203.  The Court of Appeals determined that the landlord's claim was not impaired because "the Bankruptcy Code, not the Plan, [was] the only source of limitation on [the landlord's] rights":  "the limitation on [the landlord's] potential recovery was dictated by § 502(b)(6), which was *independent* of the Plan." *Id.* at 203-205 (emphasis added).  This was true because even if no plan had been confirmed, § 502(b)(6) would have still required that the landlord's damages claim be capped, whether in chapter 11 or in chapter 7.  The Third Circuit, thus, stressed that "the limitation on damages under § 502(b)(6) is 'absolute,'" and that "[the debtor] *could not* offer a plan that departed from the § 502(b)(6) limitation."  *Id.* at 204 (emphasis added).

Here, by contrast, there is no independent requirement of bankruptcy law dictating that the Plan must deny the Noteholders payment of their make-whole claim if it is allowed on appeal.  To the contrary, the Debtors could write the Plan to say that the make-whole claim *will* be allowed and paid if it is allowed on appeal after the Plan goes effective, just as many other plans provide for the payment of claims allowed after those plans go effective.[14]  And if the Plan so provided, its confirmation could *not* conceivably render the Trustee's and Noteholders' appeal equitably moot.  *In re Phila. Newspapers,*

---

[14]    The Debtors' own witnesses have admitted that New EFH and/or Reorganized EFIH could easily raise the necessary funds to pay the make-whole (and all other disputed claims against EFIH and EFH) and that paying such claims would not require either to re-file for bankruptcy.  *See supra* note 12.  This Court can and should so find.

*LLC*, 690 F.3d 161, 170 (3d Cir. 2012).  This is true because equitable-mootness is a limitation that is entirely *dependent* on the terms of the plan at issue, not *independent* of it.  It applies (if at all) only where "a successful appeal would be fatal to a plan" and "unravel[]" it.  *Id.* at 168.  Accordingly, if a plan "provide[s] that … claims will be paid on the later of the [p]lan's effective date or the date on which the claims become allowed," then "they may be paid under the [p]lan without upsetting it" and any appeal from the disallowance of the claims cannot be equitably moot.  *Id.* at 170.

Thus, unlike in *PPI*, the Debtors here *could* propose a plan that would leave the Noteholders' right to be paid the make-whole if they prevail on appeal "entirely 'unaltered.'"  324 F.3d at 202, 204.  Because the Plan does not do so, in an apparent effort to set up an equitable-mootness defense that would have no basis in the absence of that Plan, the Noteholders' rights with respect to the make-whole are impaired.

### B.    The Plan Impairs The Noteholders' Claims For Reimbursement Of Fees And Expenses And Indemnification.

The Trustee and Noteholders are also impaired because the Plan does not provide for the reimbursement of any reasonable fees and expenses or other indemnification claims that the Trustee may incur after the Effective Date.  The Debtors acknowledge that the Trustee has the right under the indenture governing the Notes (the "Indenture") to reimbursement of its reasonable fees and expenses.  *See* Plan § III.B.18 (allowing "all reasonable and documented fees and expenses owed under the EFIH First Lien Note Indenture").  But the Plan also purports to "cancel" and "discharge" the Indenture (and the related Collateral Trust Agreement) as of the Effective Date, and provides that "the obligations of the Debtors or Reorganized Debtors, as applicable, thereunder or in any way related thereto shall be deemed satisfied in full and discharged."  *Id.* § IV.I.  As a

result, the Debtors are apparently taking the position that EFIH's obligation to reimburse the Trustee's fees and expenses ends on the Effective Date, and that the Trustee is therefore not entitled to reimbursement of its fees and expenses incurred after the Effective Date. *See* Disclosure Statement, D.I. 6124, at 54 (setting deadline to submit "final invoices … for any reasonable and documented fees and expenses incurred by the … Indenture Trustee incurred … through the Effective Date").

In this respect as well, the Plan attempts to alter the Trustee's and the Noteholders' rights. The Trustee will almost surely incur fees and expenses after the Effective Date, including in the make-whole appeal, the inter-creditor action with the second-lien noteholders, the appeal of the EFIH First Lien Settlement and/or any appeal from confirmation of the Plan. But for the Plan, the Trustee and Noteholders would have the right to be reimbursed for those amounts. Following the effective date of a plan, a creditor's right to reimbursement of fees and expenses is governed entirely by state law; section 506(b) is inapplicable. *In re Hoopai*, 581 F.3d 1090, 1099-1101 (9th Cir. 2009). The Indenture and the Collateral Trust Agreement each obligate EFIH (and any successor) to pay all reasonable fees and expenses and other indemnification claims incurred by the Trustee in connection with the performance of its duties under the

Indenture, including "the costs and expenses of enforcing the Indenture."[15]  Moreover, the Indenture expressly provides that EFIH's reimbursement obligations "shall survive the satisfaction and discharge of this Indenture."  Indenture § 7.07; *see also* Collateral Trust Agreement § 7.10 (providing that EFIH's reimbursement obligations survive repayment of all other Secured Debt Obligations").  Thus, even if the Indenture were cancelled and discharged on the Effective Date—as the Plan provides (but which itself impairs the EFIH First Lien Note Claims)—the Trustee still would have the contractual and legal right to be reimbursed for reasonable fees and expenses incurred after the Effective Date.

Accordingly, to the extent the Plan does not provide for the payment of reasonable fees and expenses and other indemnification liabilities incurred after the Effective Date, the Trustee and the Noteholders are impaired under the Plan.  *See In re Tex. Rangers Baseball Partners*, 434 B.R. 393, 410 (Bankr. N.D. Tex. 2010) ("in order for the Plan to be confirmed without the acceptance of the Lenders or satisfaction of

---

[15]     *See* Indenture § 7.07 ("The Issuer and the Guarantors, jointly and severally, shall reimburse the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it," "includ[ing] the reasonable compensation, disbursements and expenses of the Trustee's agents and counsel.  The Issuer and the Guarantors, jointly and severally, shall indemnify the Trustee for, and hold the Trustee harmless against, any and all loss, damage, claims, liability or expense (including attorneys' fees) incurred by it in connection with the acceptance or administration of this trust and the performance of its duties hereunder (including the costs and expenses of enforcing this Indenture against the Issuer or any of the Guarantors (including this Section 7.07) or defending itself against any claim whether asserted by any Holder, the Issuer or any Guarantor, or liability in connective with the acceptance, exercise or performance of any of its powers or duties hereunder)."); Collateral Trust Agreement § 7.10 (obligating EFIH to pay "all reasonable fees, expenses and disbursements of legal counsel and any auditors, accountants, consultants or appraisers or other professional advisors and agents engaged by the Collateral Trustee incurred in connection with the negotiation, preparation, closing, administration, performance or enforcement of this Agreement and the other Security Documents").

Code § 1129(b)(1), the treatment of the Lenders must be modified to allow them to

exercise their rights under their loan documents following the effective date").

### C.     The Plan Impairs The Noteholders' Claims For Interest.

The Noteholders are also impaired because the Plan does not provide for the

payment of all interest owed to them.  Rather, it provides for the allowance of interest

only to the following extent:

> (i) any accrued but unpaid prepetition interest under the EFIH First Lien
> Note Indenture; [and]

> (ii) accrued but unpaid postpetition interest (including any Additional
> Interest or interest on interest) on such principal at the non-default contract
> rate set forth in the EFIH First Lien Note Indenture through the closing
> date of the EFIH First Lien DIP Facility (excluding interest on interest,
> which shall be through the Effective Date);

Plan § III.B.18(b).[16]  That treatment does not leave the Noteholders unimpaired because

the Noteholders also have the right to receive interest on several other obligations.

1.     *Interest on the make-whole*.  The Plan does not appear to allow any

interest on the make-whole (if allowed on appeal).  Rather, it allows only post-petition

---

[16]      In addition, the Plan provides that "[e]xcept as otherwise specified in the Plan or
any Final Order, the amount of an Allowed Claim shall not include interest or other
charges on such Claim from and after the Petition Date."  Plan § 1.A.13.  Moreover, the
Plan provides that "[e]xcept as specifically provided as Allowed Claims pursuant to
Article III.B of the Plan or otherwise objected to by the Debtors in the Chapter 11 Cases,
the Plan shall serve as the Debtors' objection to all other EFIH First Lien Note Claims."
*Id.* § VII.A.  That purported blanket objection to all claims of the Trustee and the
Noteholders not otherwise allowed under the Plan—which provides no grounds or basis
therefor—violates the Bankruptcy Code and the Bankruptcy Rules.  *See* 11 U.S.C. §
502(a) (a claim is deemed allowed unless a party in interest objects); Fed. R. Bankr. P.
3007 (limiting joinder of claims objections and providing requirements for omnibus
claims objections, including that such objections "state the grounds of the objection to
each claim"); *In re Dynamic Brokers, Inc.*, 293 B.R. 489, 496 (B.A.P. 9th Cir. 2003)
("[T]here is no rule that authorizes an objection to claim to be litigated in chapter 11 plan
confirmation proceedings without complying with Rule 3007.").

interest on "principal."  Plan § III.B.18(b).[17] That impairs the Noteholders by altering

their contractual right to receive interest on the make-whole.  The Notes require EFIH to

"pay interest (including post-petition interest in any proceeding under Bankruptcy Law)

on overdue principal *and premium* … at the interest rate on the Notes."  Supplemental

Indenture (Jan. 29, 2013) Ex. A, Notes § 1 (emphasis added) (attached as <u>Exhibit E</u> to

Anker Decl.).  The Noteholders are therefore entitled to interest, at the contractual rate of

10% or more, on the $431 million make-whole (if allowed on appeal) from the date it

was due—June 19, 2014, when EFIH paid all outstanding principal on the Notes—until

the date the make-whole amount is paid.  Even without compounding (that is, interest on

interest), that could amount to $43.1 million or more per year.  Because the Plan does not

provide for such interest, it impairs the Noteholders.

        2.     *Interest on Fees and Expenses*.  The Plan also impairs the Noteholders

because it does not allow any interest on amounts due to the Trustee for reimbursement

of reasonable fees and expenses.  As noted, the Plan allows post-petition interest only on

"principal."  That alters the Noteholders' rights because they have a contractual right to

receive interest, not merely on any unpaid principal balance of the Notes, but also on any

outstanding fees and expenses (as well as on the outstanding make-whole and all other

obligations).  *See* Indenture §10.04 (providing that the payment of "*interest on* the

overdue principal, premium, if any, and interest (to the extent permitted by law), on the

---

[17]     *See also* 9/28/2015 Doré Dep. Tr. at 95 at 95:11-96:2 ("Q. [I]s there any provision in the plan, with respect to the treatment of the EFIH first liens, for payment of that [interest on the make-whole]?  MR. McGAAN: Object to the assumed premise of the question; not your math if you are asking her to do the math. But answer if you know. **A. You have now raised in my mind the question of whether make-whole is considered principal or not, and I guess that would determine the answer to your question. I don't think that it is, but somebody could tell me I'm wrong about that.**").

Notes and the performance of *all other Obligations* of EFIH to the Holders of Notes or

the Trustee under this Indenture and the Notes" are secured obligations (emphasis

added)); *id.* § 1.01 ("'Obligations' means … fees, indemnifications [and] reimbursements

….").  The agreements of the parties control with respect to fees and interest thereon,

whether incurred before or after the Effective Date.  *See In re Anderson*, 51 B.R. 397,

399 (Bankr. D. Haw.), *amended*, 56 B.R. 443 (Bankr. D. Haw. 1985) (looking to the

parties' agreement to determine whether interest on fees was allowed under § 506(b));

*Hoopai*, 581 F.3d at 1099-1101 (holding that after plan's effective date, state law, rather

than § 506(b), governs allowance of fees).

      3.      *"Additional Interest" and Interest Thereon*.  The Plan further impairs the

Noteholders because it also does not appear to allow "Additional Interest" that accrued

*pre-petition*, or interest on that interest.  "Additional Interest" is the extra interest owed

by EFIH as a result of the agreed "bump-up" in the interest rate following EFIH's failure

to register certain of the Notes under the securities laws.[18]  As the Debtors explained in

the Disclosure Statement, EFIH agreed when it issued the Notes (pursuant to a

"Registration Rights Agreement") to seek to register certain of them under the securities

laws and, if it was unable to do so, to increase the interest rate payable on the Notes.  As

the Debtors also concede, the Notes were not registered, and as a result, "the interest rate"

on the Notes "increased."  Disclosure Statement, D.I. 6124, at 53, nn.49 & 50.

      The Plan does expressly allow "Additional Interest or interest on interest" to the

extent such interest accrued during the *post-petition* period.  As set out above,

---

[18]     *See* Plan § 1.A.9 (defining "Additional Interest" to "mean[] additional interest payable on the EFIH First Lien Notes … under the registration rights agreements associated with such notes so long as EFIH has not registered such notes in accordance with the Securities Act, on the terms set forth in such registration rights agreements").

"Additional Interest" is expressly allowed in clause (ii) for "postpetition interest."  But in

contrast, in clause (i) for "prepetition interest," there is no such provision expressly

allowing "Additional Interest or interest on interest."  The absence of such a provision in

clause (i) creates the negative inference that *prepetition* Additional Interest (and interest

on such interest) is not allowed under the Plan.

That would impair the Noteholders because they have a contractual right to

receive Additional Interest (and interest thereon) that began accruing *prepetition*, in

January 2014.  The Debtors have so admitted.  *See* Disclosure Statement at n.50 ("Under

the terms of the agreement, the registration was supposed to occur by January 29, 2014.

The exchange offer was not completed, and under the terms of the registration rights

agreement, the interest rate on the applicable EFIH First Lien 2020 Notes increased by

0.25% on January 30, 2014, and by another 0.25% on April 30, 2014.").  EFIH has not

paid any of that Additional Interest.  The Noteholders are also entitled to the payment of

interest on such Additional Interest (that is, interest on interest).  *See* Indenture § 4.01

(providing that EFIH "shall pay interest (including post-petition interest in any

proceeding under any Bankruptcy Law) on overdue installments of interest").  Because

the Plan seemingly does not provide for the payment of this prepetition Additional

Interest and interest thereon, the Trustee and Noteholders are impaired under the Plan.

4.      *Interest accruing after the Effective Date*.  Finally, the Plan impairs the

Noteholders because it does not appear to allow any interest that may accrue after the

Effective Date on any outstanding obligations.  Rather, it allows only (i) "prepetition

interest" and (ii) "postpetition interest … through the Effective Date."  *See* Plan §

III.B.18.  And, elsewhere, the Plan provides that "[e]xcept as otherwise provided in the

Plan, Holders of Claims and Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date." Plan § VI.A.

That impairs the Noteholders because it alters their contractual right under the Indenture and the Notes to continue receiving interest on any overdue payments (including the make-whole if allowed on appeal) until such obligations are paid; the Indenture contains no expiration date cutting off the accrual of interest after the effective date of any plan. *See* Indenture § 4.01 (providing that EFIH "shall pay interest … on overdue installments of interest"); *id.* § 10.04 (providing for "interest on … overdue … Obligations"); Supplemental Indenture (Jan. 29, 2013) Ex. A, Notes § 1 (providing that EFIH "will pay interest … on overdue … premium").

### D.    The Plan Impairs The Noteholders' Liens.

The Notes are currently secured by liens on substantially all of EFIH's assets, including its interest in Oncor.[19]  Those liens secure all of EFIH's obligations with respect to the Notes, including the make-whole, interest, fees, indemnification claims, and any other damages or liabilities.[20]  The Trustee and the Noteholders are entitled to retain those liens until all such obligations have been paid in full.[21]

---

[19]    *See* 9/28/2015 Doré Dep. Tr. at 85:23-86:5 ("Q. Today the EFIH first liens have a lien on all substantially all of EFIH's assets, right? **A. Yes.** Q. And those assets include the 80 percent interest in Oncor, right? **A. Yes.**"); *accord* 10/1/2015 Keglevic Dep. Tr. at 16:21-17:3; Collateral Trust Agreement (dated as of Nov. 16, 2009) § 2.1; Pledge Agreement (dated as of Nov. 16, 2009) § 1; Indenture § 10.04.

[20]    *See* Collateral Trust Agreement (dated as of Nov. 16, 2009) § 1.1 (definitions of "Parity Lien Obligations" and "Obligations") and § 2.1 (granting security interest to secure, among other things, "any principal, interest (including all interest accrued thereon after the commencement of any Insolvency or Liquidation Proceeding at the rate, including any applicable post-default rate, specified in the Secured Debt Documents, even if such interest is not enforceable, allowable or allowed as a claim in such

The Plan impairs these rights.  It provides that "on the Effective Date," the

Trustee's and the Noteholders' liens will be "fully released and discharged,"

"concurrently with … satisfaction in full of the portion of the Secured Claim that is

Allowed as of the Effective Date."  Plan § VIII.B; *see also id.* § IV.H (providing that "on

the Effective Date, all property in each Estate … shall vest in each applicable

Reorganized Debtor, free and clear of all Liens").[22]  Thus, the Plan would release the

---

proceeding), premium, penalties, fees, indemnifications, reimbursements, damages and other liabilities"); Pledge Agreement (dated as of Nov. 16, 2009) § 2 (attached as <u>Exhibit B</u> to Anker Decl.) (granting security interest to secure "the payment of all Obligations … under the Parity Lien Documents, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, fees, premiums, penalties, indemnifications, contract causes of action, costs, expenses or otherwise"); Indenture § 10.04 ("[T]he principal, premium, if any, and interest on the Notes … and interest on the overdue principal, premium, if any, and interest (to the extent permitted by law), on the Notes and performance of all other Obligations of EFIH to the Holders of the Notes or the Trustee under this Indenture and the Notes, according to the terms hereunder or thereunder, are secured as provided in the Pledge Agreement and the Collateral Trust Agreement").

[21]    *See* Collateral Trust Agreement §§ 3.2, 4.1(a) (providing that the "Trustee's Liens upon the Collateral will be released" only upon "payment in full of all outstanding Secured Debt Obligations"); *accord* Pledge Agreement § 19(b); Indenture § 10.04.

[22]    *See also* 9/28/2015 Doré Dep. Tr. at 88:4-14 ("Q. With respect to treatment under the plan, does the plan provide for the liens of the EFIH first liens to remain in place? Yes or no? **A. Well, I don't know for sure, but you pointed me to a provision that said all the claims are discharged at the effective date, so I would assume, whether it is Op Co, Prop Co or anybody else, there is no more liens after the effective date. But I'm not positive about that.**").

26

Trustee's and the Noteholders' liens as of the Effective Date, even though their claims will not have been paid in full, contrary to their state-law rights.[23]

As discussed above, the Plan apparently would not pay the Noteholders' outstanding claims for "Additional Interest" and interest thereon, and any interest accruing after the Effective Date on any outstanding obligations. Moreover, the Plan would not allow or pay the make-whole (or the related interest and litigation fees and expenses incurred, before and after the Effective Date, with respect thereto). This Court's orders denying the make-whole are on appeal, and the Court has entered no order (let alone a final, non-appealable order) disallowing any claim for fees and expenses, or interest, asserted by the Trustee and the Noteholders. Accordingly, the Trustee and the Noteholders are entitled to retain their liens pending resolution of the make-whole appeal and a final determination of whether EFIH owes the make-whole (and hence whether it has paid all of its secured obligations, including the make-whole, in full). *See, e.g.*, *Merrill Lynch Interfunding Inc. v. Argenti*, 2000 WL 490739, at *4 (S.D.N.Y. Apr. 26, 2000) (holding that, where state law required secured creditor to release lien upon satisfaction of the debt, the creditor was not required to release its lien following trial court's determination that debtor's payment satisfied the debt, because the creditor had appealed and sought a ruling that it was owed additional amounts), *aff'd*, 2 F. App'x 98

---

[23]     The Plan also impairs the Noteholders to the extent the documents filed in the Plan Supplement purport to release the Trustee's and Noteholders' liens. *See, e.g.*, Plan § XII.J ("All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan …."); Plan Supplement, D.I. 6544-40, Ex. K ("New Reorganized EFIH Debt Documents—Amended and Restated Commitment Letter") at Ex. B-3 (term sheet for $5.5 billion secured term loan facility providing that "none of the Collateral shall be subject to any pledges, security interests or mortgages, customary exceptions and other exceptions to be agreed upon").

(2d Cir. 2001).[24]  And they are entitled to retain their liens securing their claims for fees, expenses and interest that have not been disallowed by this Court.

Because the Plan would, instead, cut off the Noteholders' liens as of the Effective Date, the Plan impairs the Noteholders.  *See, e.g.*, *In re Greenwood Point, LP*, 445 B.R. 885, 907 (Bankr. S.D. Ind. 2011) ("Here, the Plan proposes that the real estate will vest in the reorganized debtor free and clear of liens, including the lien of the [creditor].  The proposed loss of the [creditor's] valid lien rights prior to payment in full of its claim under the Plan is additional, and significant, impairment under Section 1124.").

To be sure, the Trustee's and the Noteholders' existing liens are subordinate to the lien securing the EFIH DIP loan.  And they recognize that the new exit financing, which would replace the DIP loan and which is contemplated to be roughly the same dollar amount as the DIP loan or less, could prime the Trustee's and the Noteholders' liens as well.  But the Plan would go much further and extinguish the Noteholders' liens altogether.

Accordingly, in order to "unimpair" the Trustee and the Noteholders, the Plan must be modified to preserve their liens, with the same priority, on all the same collateral securing their claims—including EFIH's ownership interest in Oncor—until all of their claims have either been disallowed by final, non-appealable order or have been allowed

---

[24]      *See also, e.g.*, *United States v. Pound*, 2010 WL 2330240, at *1 (E.D. Ok. June 8, 2010) ("[P]laintiff is under no obligation to release the tax liens pending appeal. … [S]uch release could result in severe prejudice to plaintiff if assets were dissipated. Should the Tenth Circuit agree with plaintiff's position on the merits, the parties should as a matter of equity return to the status quo ante.  Release of the tax liens might render that impossible."); *Pinson v. Thacker*, 2009 WL 5124996, at *3 (Ky. Ct. App. Dec. 30, 2009) (holding that secured creditor was entitled to retain its lien because fees to which it was entitled were continuing to accrue pending appeal; hence "[the creditor] had a good cause for declining to release the lien while the appeal was pending").

and paid in full.  *Cf. In re Mangia Pizza Invs., LP*, 480 B.R. 669, 690 (Bankr. W.D. Tex.

2012) (holding that creditor was not impaired where plan provided that the creditor

would retain its lien on collateral until paid in full).

Indeed, even if the Debtors and the Plan Proponents had acknowledged that the

Plan impaired the EFIH First Lien Notes Claims, solicited acceptances of the Plan by the

Noteholders, and sought to cram-down the Noteholders if they rejected the Plan, the

Noteholders would have had the right to retain their liens or receive the "indubitable

equivalent" of those liens.  *See* 11 U.S.C. § 1129(b)(2)(a)(iii).  For the liens to be

released, the "indubitable equivalent" standard would have required EFIH to establish a

reserve or escrow funded with cash in an amount sufficient to pay all of EFIH's potential

obligations to the Noteholders, including the make-whole (and all related interest and

fees), interest and fees.  The result has to be at least the same where, as here, the Plan

purports to "unimpair" the Noteholders.

To be clear, the Noteholders are not arguing that they have the right today to

require that EFIH establish a reserve securing their make-whole claim while the appeal is

pending.  But, as discussed above, they do have the right to retain their liens pending

resolution of that appeal (and the payment in full of all their other claims).  And if the

Plan is going to take that right away, then it needs, at a minimum, to provide them with a

substitute of "indubitable equivalence."  Short of a replacement lien on the same

collateral with the same priority, a cash escrow is the only practical alternative.  The

Debtors have recognized as much.  Earlier this year, their Co-CROs floated a proposed

plan term "[w]ith respect to EFIH first lien noteholders … [providing that] to the extent

the Court does not rule on the [make-whole] claims or they are under appeal as of the

Effective Date, the Debtors will escrow the disputed amounts to obtain a lien release."[25]

By neither funding an escrow nor maintaining the liens, the Plan impairs the Trustee's

and the Noteholders' rights.

     **E.**     **The Plan Impairs The Noteholders' Rights And Claims Against Non-Debtor Third Parties, Including The EFIH Second-Lien Trustee And Noteholders In The Pending Inter-Creditor Action.**

The Plan's third-party release provision provides that the Trustee and the

Noteholders are each a "Releasing Party" (Plan § I.A.285(i), (o)) that will forced to

release the "Released Parties":

> "As of the Effective Date, each Releasing Party is deemed to have released and discharged each … Released Party from any and all Claims and Causes of Action … relating to, or in any manner arising from … the Debtors … or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing."

Plan § VIII.D (emphasis added).  The Plan's injunction provision then enjoins the

Releasing Parties from asserting any released claim against a Released Party:

> "[A]ll Entities that … hold claims … that have been released pursuant to … Article VIII.D of the Plan …are permanently enjoined, from and after the Effective Date, from taking any of the following actions against … the Released Parties: (i) … continuing in any manner any action … with respect to any such claims … (ii) … collecting … against such Entities … with respect to such claims … (iii) … enforcing any lien … against such Entities … with respect to any such claims …."

Plan § VIII.F.

Those Released Parties include the indenture trustee for the EFIH second-lien

notes and the holders of those notes.  *Id.* § I.A.284(j), (o).  As such, the Plan would

---

[25]    *See* Presentation to the Boards of Directors and Managers of Energy Future Holdings Corp. et al., Overview of Proposed Global Term Sheet and Creditor Plan Proposals (Jan. 30, 2015), at 11 (bates number EFH05546965) (attached as <u>Exhibit I</u> to Anker Decl.).

seemingly release the pending claims of the first-lien Trustee and Noteholders against the second-lien trustee and noteholders under their inter-creditor agreement to turn over any proceeds of collateral that the second-lien trustee and noteholders receive, until the first-lien noteholders have been paid in full.  *See* Collateral Trust Agreement (Nov. 16, 2009) §§ 2.4(c)-(d), 3.4, 7.21.  It would also apparently enjoin the first-lien Trustee and Noteholders from continuing their pending action against the second-lien trustee to enforce that agreement (as well as from prosecuting any appeal therefrom).  *See* Adv. Pro. No. 14-50410 (Bankr. D. Del.).  *See* 9/28/2015 Doré Dep. Tr. 61:3-:10 ("Q. Under the plan, without the consent of the EFIH first lien noteholders or the EFIH first-lien trustee, the plan provides for the release of their claims against the EFIH second lien trustee and the EFIH second lien noteholders, right? **A. I believe that's correct.**").[26]

The "Released Parties" also include junior E-side and T-side creditors—including the EFIH unsecured "PIK" noteholders, the EFH noteholders, and the T-side creditors holding the first-lien, second-lien and unsecured notes of TCEH.  *Id.* § I.A.284(c)-(h), (k)-(*l*).  The Plan's release and injunction provisions would thus appear to release, among other things, any rights the EFIH first-lien Noteholders may have, including for example if they prevail in their make-whole appeal, to require those junior creditors to disgorge any distributions they receive from the proceeds of the first-lien Noteholders' collateral, to the extent the first-lien Noteholders are otherwise not paid in full.  *Cf. In re Tribune*

---

[26]     The Plan's impairment of the Noteholders' rights against the second-lien noteholders also violates §§ 1129(a)(1) and 510(a).  *See In re TCI 2 Holdings LLC*, 428 B.R. 117, 141 (Bankr. D.N.J. 2010) ("Section 1129(a)(1) requires a plan to conform to the provisions of Title 11, including § 510(a), which makes subordination agreements enforceable in bankruptcy to the same extent such agreements are enforceable outside of bankruptcy."); *accord In re Best Prods. Co.*, 168 B.R. 35, 62 (Bankr. S.D.N.Y. 1994); *In re Envirodyne Indus.*, 1993 Bankr. Lexis 2224, at *8 (Bankr. N.D. Ill. Dec. 13, 1993).

*Media Co.*, 799 F.3d 272, 280, 283-284 (3d Cir. 2015) (holding that appeal was not

equitably moot because the court could order junior creditors to disgorge plan

distributions to senior creditors if plan's distribution scheme was held unlawful on

appeal); *see also* Disclosure Statement at 58 ("Accordingly, the EFIH First Lien Notes

Trustee submits that, in addition or as an alternative to requiring New EFH and any other

successor to the EFIH Debtors under the Plan to pay all EFIH First Lien Note Claims that

are held to be valid or otherwise Allowed, a court could order Holders of other Claims

against any of the Debtors receiving distributions under the Plan, including, without

limitation, Holders of TCEH Unsecured Debt Claims and/or General Unsecured Claims

Against the TCEH Debtors Other Than EFCH, to disgorge distributions they receive

under the Plan or otherwise make payment to the EFIH First Lien Notes Trustee and

Holders of the EFIH First Lien Notes sufficient to satisfy in full all EFIH First Lien Note

Claims that are held to be valid or otherwise Allowed.").[27]

---

[27]     The significance of this issue is evident from several other cases. The Third
Circuit has stressed that, rather than dismiss an appeal as equitably moot following
confirmation of a plan, an appellate court should consider if any relief could be fashioned
for the appellant and that dismissal on equitable mootness grounds is particularly
inappropriate where the appellant is arguing that value it should have received went to a
different group of creditors under the plan. *See Tribune*, 799 F.3d at 278, 280, 283-284
(explaining that "a court may fashion whatever relief is practicable instead of declining
review simply because full relief is not available" and that "the remedy of taking from
one class of stakeholders the amount given to them in excess of what the law allows is
not apt to be inequitable"; if appellant's "argument on the merits is correct," "the [junior
creditors] were never entitled to that money in the first place," and "requiring them to
forgo a windfall they never should have gotten" "is not unfair" or "inequitable"). That is
essentially the Trustee's and Noteholders' argument with respect to the make-whole—
that they are not only entitled to payment of the make-whole, but also that, as senior
EFIH creditors with a priority lien on EFIH's assets, they are entitled to be paid out of the
value of EFIH ahead of all other creditors, including the Plan Proponents. Yet, in another
pending appeal involving confirmation of a plan in which a debtor's senior creditors
suggested that similar relief could be fashioned, the reorganized debtor responded that the
plan released any claims against the debtor's junior creditors who received distributions

These release provisions cannot be approved under the demanding standard in this Circuit for non-consensual, non-debtor releases. *See, e.g.*, *United Artists Theatre Co. v. Walton*, 315 F.3d 217, 227 (3d Cir. 2003); *In re Continental Airlines*, 203 F.3d 203, 214-217 (3d Cir. 2000). Releasing the EFIH second-lien trustee and noteholders is not "necessary" to the reorganization (indeed they *objecting* to the Plan), nor are they contributing any consideration toward the released inter-creditor claims. And while T-side creditors are providing funding, they are doing so to acquire billions of dollars in equity in Oncor in order to make a handsome profit, not to "buy" releases.

In any event, even if these non-consensual releases had any lawful basis, there can be no question that they alter the Trustee's and Noteholders' rights. *In re Chassix Holdings, Inc.*, 533 B.R. 64, 81 (Bankr. S.D.N.Y. 2015) ("If a creditor must release a claim against a third party under a plan … it is difficult to understand how such a creditor could properly be considered to be 'unimpaired' by the Plan …."). They thus impair the Trustee and the Noteholders.

> **F.**   **The Plan Impairs The Noteholders' Contractual Rights Prohibiting EFIH From Paying The Second-Lien Noteholders Before the First-Lien Noteholders Have Been Paid In Full.**

The Plan not only impairs the Noteholders' rights against the second-lien trustee and noteholders for turnover, but it also impairs the Noteholders' rights against EFIH to bar it from paying the second-lien noteholders in the first place.

---

under the plan. *See* Reply of Reorganized Debtors in Support of Motion to Dismiss Appeals as Equitably Moot, at 7, D.I. 126, *In re MPM Silicones, LLC*, No. 15-1682 (2d Cir. Sept. 28, 2015) (arguing that court "cannot force disgorgement of recoveries from the Plan Support Parties" because "the Plan effectuated a broad release of any claims held against the Plan Support Parties").

Under the Collateral Trust Agreement, EFIH is prohibited from making any distributions to the second-lien trustee and noteholders from the parties' common collateral until the first-lien Noteholders' claims have been paid in full.  *See* Collateral Trust Agreement § 2.4(c).[28]  Yet, under the Plan, EFIH will make distributions to the second-lien trustee and noteholders on the Effective Date, even though it has not paid the first-lien Noteholders in full.  *See* Plan § III.B.19.

Furthermore, the Plan would cancel and discharge the Collateral Trust Agreement as of the Effective Date (as discussed below), and would not otherwise provide the first-lien Noteholders compensation for breach of their right to require that EFIH not make distributions to the second-lien trustee and noteholders until the first-lien Noteholders are fully paid.  *See, e.g.*, *Texas Rangers Baseball Partners*, 434 B.R. at 407-408 (holding

---

[28]    Section 2.4(c) provides:  "At any time prior to the Discharge of Parity Lien Obligations and after (1) the commencement of any Insolvency or Liquidation Proceeding in respect of EFIH or (2) the Collateral Trustee and each Junior Lien Representative have received written notice from any Parity Lien Representative stating that (A) such Series of Parity Lien Debt has become due and payable in full (whether at maturity, upon acceleration or otherwise) or (B) the holders of Parity Liens securing such Series of Parity Lien Debt have become entitled under any Parity Lien Document to and desire to enforce any or all of such Parity Liens by reason of a default under such Parity Lien Documents, no payment of money (or the equivalent of money) shall be made from the proceeds of Collateral by EFIH to the Collateral Trustee (other than distributions to the Collateral Trustee in respect of its fees under this Agreement and for the benefit of the holders of Parity Lien Obligations), any Junior Lien Representative or any holder of Junior Lien Obligations with respect to Junior Lien Obligations (including, without limitation, payments and prepayments made for application to Junior Lien Obligations). In addition, at any time prior to the Discharge of Parity Lien Obligations, no payment shall be made to the Collateral Trustee (other than distributions to the Collateral Trustee in respect of its fees under this Agreement and for the benefit of the holders of Parity Lien Obligations), any Junior Lien Representative or any holder of Junior Lien Obligations with respect to Junior Lien Obligations (including, without limitation, payments and prepayments made for application to Junior Lien Obligations) (i) from the proceeds resulting from a Sale of Collateral, (ii) from any proceeds resulting from any enforcement action taken by any holder of Secured Debt Obligations in respect of all or any of the Collateral or (iii) from the proceeds of Collateral in violation of the Parity Lien Documents."

that, to "unimpair" lenders that had contractual right barring debtor from selling assets without the lenders' consent, the plan cannot alter lenders' right to obtain damages for breach of that right).[29]

Thus, in order to "unimpair" the Noteholders, the Plan must either provide that distributions to the second-lien trustee and noteholders will be held in escrow, in an amount sufficient to pay all of EFIH's obligations to the first-lien Noteholders, including the make-whole (if allowed on appeal), interest and fees, pending final resolution of the EFIH First Lien Notes Claims, or leave unaltered all claims of the first-lien Trustee and the Noteholders under the Collateral Trust Agreement against EFIH and its successors, including Reorganized EFIH and New EFH, for breach of EFIH's obligations under that agreement.

G.    **The Plan Impairs The Noteholders' Contractual Rights Under The Indenture And Related Security Agreements.**

The Plan further impairs the Noteholders by canceling the first-lien agreements— including the Notes, the Indenture, the Collateral Trust Agreement, the Pledge Agreement, and the Registration Rights Agreement—and discharging the Debtors' obligations thereunder.  The Plan provides that:

> "Except as otherwise provided in the Plan, on and after the Effective Date, all notes, instruments, certificates, agreements, indentures, mortgages, security documents and other documents evidencing Claims …, including … EFIH First Lien Note Claims … shall be deemed canceled, surrendered, and discharged … and the obligations of the Debtors or Reorganized Debtors, as applicable, thereunder or in any way related thereto shall be deemed satisfied in full and discharged."

---

[29]    The Plan also impairs the Trustee's and Noteholders' rights to the extent the Plan's distribution mechanics do not comply with the Indenture and the Collateral Trust Agreement (which, for example, require that distributions to the Noteholders go through the Trustee).  *See* Plan §§ I.A.71, VI.B.

Plan § IV.I.  The Plan carves out a handful of narrow exceptions permitting the Indenture to continue in effect for limited purposes (e.g., allowing the Trustee to make distributions and assert charging liens against funds to reimburse their fees), but provides that such continuance does not affect the discharge of Claims or result in any expense or liability of the Reorganized Debtors.  *See id.*  Otherwise, the Plan terminates all of EFIH's obligations under the Indenture and all the related agreements, as of the Effective Date.

That impairs the Trustee and the Noteholders because it alters their contractual rights.  The requirements for the satisfaction and discharge of the Indenture have not been met.  Among other things, as discussed above, the Plan does not provide for payment in full of all obligations owed to the Noteholders, including  the make-whole (if allowed on appeal), interest and reasonable fees and expenses.  *See* Indenture § 12.01 (requiring EFIH to deposit funds with the Trustee "sufficient … to pay and discharge the entire indebtedness on the Notes," including "premium" and "accrued and unpaid interest").

Moreover, because the Plan does not allow fees and expenses incurred by the Trustee after the Effective Date in the make-whole appeal (or otherwise), the Trustee cannot and will not pay over all distributions to the Noteholders on the Effective Date; rather, some of those distributions will be held back to cover post-Effective Date fees and expenses relating to the ongoing make-whole appeal, the inter-creditor action with the second-lien noteholders, the EFIH First Lien Settlement appeal, any appeal from confirmation of the Plan, and any other matters.  As such, the Indenture, by its terms, cannot be satisfied and discharged.  *See id.* § 12.02 (providing that, even if the satisfaction and discharge requirements were otherwise met, "[i]f the Trustee … is unable to apply any money … in accordance with Section 12.01 hereof by reason of any legal

proceeding …, [EFIH's] … obligations under this Indenture and the Notes shall be revived and reinstated").

Furthermore, the Indenture and other first-lien agreements give the Trustee and the Noteholders rights that, absent the Plan, would continue to exist after the Effective Date.  For example, as discussed above, the Indenture gives the Trustee the right to be reimbursed by EFIH for its reasonable fees and expenses, including those incurred after the Effective Date.  *See supra* p.18.  Also, the Collateral Trust Agreement gives the Trustee and the Noteholders the right to require the second-lien noteholders to turn over the proceeds of collateral until the first-lien Noteholders are paid in full and provides that any such funds will be held in trust for the benefit of the first-lien Noteholders until they are turned over.  *See supra* pp.30-31 (citing Collateral Trust Agreement (Nov. 16, 2009) §§ 2.4(c)-(d), 3.4, 7.21).  In addition, the agreements give the Trustee the right to be indemnified by EFIH against any "loss, damage, claims, liability or expense … incurred by it in connection with the … performance of its duties" under the Indenture.  *See* Indenture § 7.07; Collateral Trust Agreement § 7.11; Pledge Agreement § 15.

Under the Plan, these and all other contractual rights would apparently be canceled and discharged as of the Effective Date.  For this reason as well, the Trustee and the Noteholders are impaired.

**H.    The Plan Impairs The Noteholders' Rights In Their Pending Third Circuit Appeal Of The EFIH First-Lien Settlement.**

The Plan impairs the Noteholders by seemingly extinguishing their pending appeal in the Third Circuit of the Court's approval of the EFIH First-Lien Settlement (the "First-Lien Settlement Appeal").  The Plan's release provision provides that the Trustee and the Noteholders, as "Releasing Part[ies]," must "release[]" "each Debtor," each

"Reorganized Debtor," and each "Released Party"—including the settling EFIH First-Lien noteholders (*see* Plan § I.A.284(i))—from "any and all Claims and Causes of Action … relating to, or in any manner arising from …the EFIH First Lien Settlement."  Plan § VIII.D.  The Plan would further enjoin the Trustee and Noteholders from "continuing in any manner any action or other proceeding" with respect to such released claims.  *Id.* § VIII.F.  These provisions thus appear to require the Trustee and the Noteholders to dismiss their pending First-Lien Settlement Appeal—an appeal that is fully briefed.

This too impairs the Trustee and the Noteholders.  The Plan must preserve the First-Lien Settlement Appeal as well as the Trustee's and the Noteholders' rights to any relief that may be awarded by the Third Circuit (or this or any other Court on remand).

## II.    UNLESS THE PLAN IS MODIFIED TO "UNIMPAIR" THE EFIH FIRST LIEN NOTES CLAIMS, THE PLAN CANNOT BE CONFIRMED UNDER BANKRUPTCY CODE SECTION 1129(b).

Even if the votes of the Noteholders were solicited, unless they voted to accept the Plan, the Plan still could not be confirmed because it does not comply with the "cram down" requirements of section 1129(b) for a dissenting, impaired class of creditors.  For a class of over-secured creditors like the Noteholders, section 1129(b) requires that their secured claims be paid *in full*.  *See* 11 U.S.C. § 1129(b)(2)(A).  To the extent any of the Noteholders' claims are unsecured, section 1129(b) similarly requires that their claims be paid in full, or else no junior class of creditors or shareholders may receive or retain any property under the Plan.  *See id.* § 1129(b)(2)(B).

The Plan cannot meet those requirements here.  As discussed above, the Plan does not pay the Noteholders' claims in full.  And several junior classes (the EFIH second liens, the EFIH PIKs, the EFH noteholders, and various TCEH creditors) are being paid value under the Plan, including from the Noteholders' collateral—EFIH's interest in

Oncor—in which the Noteholders have senior liens.  The Plan thus violates the absolute priority rule.

To be sure, section 1129(b)'s full-payment requirement applies to "allowed" claims, and the make-whole is not currently allowed.  But if the Trustee and Noteholders prevail on appeal, the make-whole will become an "allowed" claim.  Nothing in the statute says that a debtor may pay only those claims that have been allowed "prior to the effective date," but not those claims that are "allowed" thereafter.  Rather, it says that the plan must pay *all* "allowed" claims (11 U.S.C. §§ 1129(b)(2)(A), 1129(b)(2)(B)), and hence the Plan here must provide for the payment of all claims that become allowed, whether before, or after, the Effective Date.

Indeed, the Bankruptcy Code permits debtors to confirm a plan of reorganization before the claims-allowance process is complete—while preserving creditors' rights in that process—precisely so that the company need not spend years finishing all such litigation before it can reorganize and emerge from bankruptcy.  Thus, Chapter 11 plans routinely provide for much of the claims-allowance process to take place after confirmation—as does this Plan with respect to other claims.  *See* Plan § VII.E, I & J. But the Plan provides that the Noteholders' claim for the make-whole, as well as the claims for interest and fees discussed above, will not be paid, even if ultimately allowed. The Plan thus violates the Bankruptcy Code's requirement of full-payment of secured claims as well as the absolute priority rule.  Unless modified to "unimpair" the Noteholders' claims, the Plan cannot be confirmed.

### III.  THE PLAN CAN BE MODIFIED TO UNIMPAIR THE EFIH FIRST LIEN NOTES CLAIMS

Although the Plan cannot be confirmed in its current form, there are modest changes that could be made that would leave the Noteholders unimpaired.  Set forth below is proposed language to do so; proposed additions are shown in bold font and deletions are shown with strikethrough effects.

1.      Plan § I.A.13 (Definition of "Allowed"):

"Allowed" means with respect to any Claim or Interest, except as otherwise provided herein: (a) a Claim or Interest as to which no objection has been Filed prior to the Claims Objection Deadline and that is evidenced by a Proof of Claim or Interest, as applicable, timely Filed by the applicable Bar Date or that is not required to be evidenced by a Filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated, and as for which no Proof of Claim or Interest, as applicable, has been timely Filed in an unliquidated or a different amount; or (c) a Claim or Interest that is Allowed (i) pursuant to the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court, ~~or~~ (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; **or (iv) by Final Order (including any such Claim to which the Debtors had objected or which the Bankruptcy Court had disallowed prior to such Final Order)**. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.

2.      Plan § I.A.186 (Definition of "Final Order"):

"Final Order" means an order or judgment of the Bankruptcy Court, as entered on the docket in any Chapter 11 Case **(or any related adversary proceeding or contested matter)** or the docket of any other court of competent jurisdiction**, or an order or judgment of any other court having jurisdiction over any appeal from any order or judgment entered in the Chapter 11 Case (or in any related adversary proceeding or contested matter),** that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired

according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; provided, however, that the possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court, may be filed relating to such order shall not prevent such order from being a Final Order.

3.      Plan § III.B.18 ("EFIH First Lien Note Claims"), subsection (b) ("Allowance"):

*Allowance*: As Class B3 Claims, the EFIH First Lien Note Claims are Allowed in an amount equal to the sum of: (i) any accrued but unpaid prepetition interest ~~under the EFIH First Lien Note Indenture~~ **(including any Additional Interest and interest on interest) at the applicable rate set forth in, and calculated in accordance with, the EFIH First Lien Notes, the EFIH First Lien 2017 Note Indenture, the EFIH First Lien 2020 Note Indenture and/or any related agreement, as applicable**; (ii) **any** accrued but unpaid postpetition interest (including any Additional Interest ~~or~~ **and** interest on interest) ~~on such principal~~ at the ~~non-default contract~~ **applicable** rate set forth in, **and calculated in accordance with,** the ~~EFIH First Lien Note Indenture~~ **EFIH First Lien Notes, the EFIH First Lien 2017 Note Indenture, the EFIH First Lien 2020 Note Indenture, and/or any related agreement, as applicable,** through the closing date of the EFIH First Lien DIP Facility (excluding interest on interest, which shall be through the Effective Date); ~~and~~ (iii) all reasonable and documented fees and expenses **and indemnification claims, and interest thereon,** owed under **and as calculated in accordance with** ~~the EFIH First Lien Note Indenture~~ **the EFIH First Lien Notes, the EFIH First Lien 2017 Note Indenture, the EFIH First Lien 2020 Note Indenture, and/or any related agreement, as applicable, whether incurred or accruing before, on or after the Effective Date,** but (**except as provided in clause (iv) below**) not including, for the avoidance of doubt, any Makewhole Claims**; and (iv) the amount of any other Claims (including any Makewhole Claims), and interest thereon (whether accruing before, on or after the Effective Date, as calculated in accordance with the EFIH First Lien Notes, the EFIH First Lien 2017 Note Indenture, the EFIH First Lien 2020 Note Indenture and/or any related agreement, as applicable, or otherwise as determined by Final Order), of the EFIH First Lien Notes Trustee or Holders of EFIH First Lien Notes, if and to the extent such Claims are Allowed, whether Allowed before, on or after the Effective Date.**

41

4.      Plan § III.B.18 ("EFIH First Lien Note Claims"), subsection (c) ("Treatment"):

*Treatment*: Except to the extent that a Holder of an Allowed Claim in Class B3 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class B3, each such Holder shall receive, up to the Allowed amount of its Claim, payment in full in Cash **from Reorganized EFIH and/or New EFH.  Notwithstanding anything to the contrary contained in this Plan, all legal, equitable and contractual rights of the Holders of EFIH First Lien Note Claims to which such Claims entitle such Holders shall not be, and are not, altered by any provision of this Plan, and all such rights shall remain intact from and after the Effective Date unaltered by consummation of the Plan and shall be deemed to be assumed by each of Reorganized EFIH, New EFH and any other successor to the EFIH Debtors or Reorganized EFIH Debtors.  Without limiting the foregoing, and notwithstanding anything to the contrary contained in this Plan, from and after the Effective Date, (i) the Holders of the Class B3 Claims shall retain all Liens on all collateral securing such Claims (including the EFIH Debtors' ownership interests in Oncor) until all Class B3 Claims have been either (a) Allowed (whether before, on or after the Effective Date) and paid in full in Cash, or (b) disallowed by a Final Order, with such Liens to have priority over all other Liens other than the Liens securing the Reorganized EFIH Permanent Financing Facility, the principal amount of which shall at no time exceed $5,500 million; (ii) notwithstanding anything to the contrary in the definition of "Releasing Party" in Article I.A.285 of this Plan, the EFIH First Lien Notes Trustee and the Holders of EFIH First Lien Note Claims shall not be deemed a "Releasing Party" under any provision of this Plan (including Articles I.A.285, VIII.D and VIII.F of this Plan); (iii) all notes, instruments, certificates, agreements, indentures, mortgages, security documents, and other documents evidencing the EFIH First Lien Note Claims (including the EFIH First Lien Notes; the EFIH First Lien 2017 Note Indenture; the EFIH First Lien 2020 Note Indenture; the Collateral Trust Agreement, as amended or supplemented from time to time, dated November 16, 2009, by and among EFIH and the EFIH First Lien Notes Trustee; the Pledge Agreement, as amended and supplemented from time to time, dated November 16, 2009, by and among EFIH and the EFIH First Lien Notes Trustee; and any registration rights agreement relating to the EFIH First Lien Notes) shall remain intact unaltered by consummation of the Plan, and all obligations of the EFIH Debtors or the Reorganized EFIH Debtors, as applicable, thereunder shall be deemed to be assumed by, and become obligations of, each of Reorganized EFIH, New EFH and any other successor to the EFIH Debtors or Reorganized EFIH Debtors; and (iv) the legal, equitable**

**and contractual rights of the Holders of the EFIH First Lien Note Claims and the EFIH First Lien Notes Trustee with respect to any action or proceeding and any relief that may be sought or granted therein (including the pending appeal by the EFIH First Lien Notes Trustee and such Holders regarding the denial of their Makewhole Claims,** *Delaware Trust Company v. Energy Future Intermediate Holding Company LLC***, No. 15-cv-620-RGA (D. Del.); the pending adversary proceeding commenced by the EFIH First Lien Notes Trustee against the EFIH Second Lien Notes Trustee for turnover and other relief,** *Delaware Trust Company, as Indenture Trustee v. Computershare Share Trust Company, N.A., et al.***, Adv. Pro. No. 14-50410-CSS (Bankr. D. Del.); and the pending appeal regarding the EFIH First Lien Settlement,** *In re Energy Future Holdings Corp.***, No. 15-1591 (3d Cir.)) shall remain intact and shall be unaltered by consummation of the Plan.**

5.      Plan § III.B.21 ("General Unsecured Claims Against the EFIH Debtors"), subsection (b) ("Allowance"):

*Allowance*: As Class B6 Claims, the EFIH Unsecured Note Claims are Allowed in an amount equal to the sum of: (i) the principal amount outstanding in the amount of $1,568,249,000; (ii) accrued but unpaid prepetition interest in the amount of $81,115,347; and (iii) accrued postpetition interest on the principal amount outstanding as of the Petition Date at the Federal Judgment Rate or such other rate as determined by Final Order, but not including, for the avoidance of doubt, any Makewhole Claims.  **Notwithstanding anything to the contrary in the preceding sentence, any Class B6 Claim derived from or based upon the EFIH First Lien Notes (including any Makewhole Claims) shall be Allowed if and to the extent such Claim would be an Allowed Class B3 Claim under Article III.B.18 of the Plan if the term EFIH First Lien Note Claims were defined to include Unsecured Claims derived from or based upon the EFIH First Lien Notes.**

6.      Plan § III.B.21 ("General Unsecured Claims Against the EFIH Debtors"), subsection (c) ("Treatment"):

*Treatment*: Except to the extent that a Holder of an Allowed Claim in Class B6 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class B6, each such Holder shall receive, up to the Allowed amount of its Claim, payment in full in Cash. **Notwithstanding anything to the contrary in the preceding sentence, each Holder of an Allowed Class B6 Claim derived from or based upon the EFIH First Lien Notes (including any Makewhole Claims) shall receive the same Treatment such Holder would have received under Article III.B.18 if the term EFIH First Lien Note Claims were**

**defined to include Unsecured Claims derived from or based upon the EFIH First Lien Notes.**

Similar provisions have been included in other plans.  As noted, where a creditor had appealed the disallowance of its claim, plans confirmed in this Circuit have provided that the claim would be "paid [after] the Plan's effective date [on] the date on which the claims become allowed."  *Phila. Newspapers*, 690 F.3d at 170.  And in connection with the make-whole litigation in *AMR*, the debtor agreed, in response to an objection that the plan did not truly "unimpair" the noteholders, that "[i]f the Debtors refinance the obligations and it is determined by an appellate court that the make-whole amounts are payable, the Debtors or New AAG shall pay such amount in Cash."[30]  If the Debtors and the other Plan Proponents truly want to "unimpair" the EFIH First Lien Notes Claims, there is no reason they cannot agree to similar modifications to the Plan.

## RESERVATION OF RIGHTS

The Trustee reserves the right to supplement this Objection to the extent the Plan Supplement (filed less than three days before this Objection was due), or any further supplement or change to the Plan, affects the rights of the Trustee and the Noteholders.

## CONCLUSION

The Court should deny confirmation of the Plan unless it is modified to "unimpair" the EFIH First Lien Notes Claims, as set forth above.

---

[30]    *See* Debtors' Mem. of Law In Supp. of Confirmation Of Debtors' Second Am. Joint Chapter 11 Plan And In Resp. to Objs. to Plan, Ex. A at 3, *In re AMR Corp.*, No. 11-15463, D.I. 9516 (Bankr. S.D.N.Y. Aug. 8, 2013).

Dated:  October 23, 2015

COLE SCHOTZ P.C.

/s/ J. Kate Stickles
Norman L. Pernick (Bar No. 2290)
J. Kate Stickles (Bar No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone: 302-652-3131
Facsimile:  302-652-3117
npernick@coleschotz.com
kstickles@coleschotz.com

Warren A. Usatine
Court Plaza North
25 Main Street
Hackensack, NJ 07602
Telephone: 201-489-3000
Facsimile:  201-489-1536
wusatine@coleschotz.com

WILMER CUTLER PICKERING HALE AND DORR LLP

Philip D. Anker
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: 212-230-8800
Facsimile:  212-230-8888
Philip.Anker@wilmerhale.com

Joel Millar
David Gringer
Isley Gostin
1875 Pennsylvania Avenue, NW
Washington, DC 2006
Telephone:  202-663-6000
Facsimile: 202-663-6363
Joel.Millar@wilmerhale.com
David.Gringer@wilmerhale.com
Isley.Gostin@wilmerhale.com

ROPES & GRAY LLP

Keith H. Wofford
Mark Somerstein
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: 212-596-9000
Facsimile: 212-596-9090
Keith.Wofford@ropesgray.com
Mark.Somerstein@ropesgray.com

D. Ross Martin
Andrew Devore
800 Boylston Street, Prudential Tower
Boston, MA  02199-3600
Telephone: 617-951-7000
Facsimile: 617-951-7050
Ross.Martin@ropesgray.com
Andrew.Devore@ropesgray.com

DRINKER BIDDLE & REATH LLP

James H. Millar
1177 Avenue of the Americas
41st Floor
New York, NY 10036-2714
Telephone:  212-248-3264
Facsimile:  212-248-3141
James.Millar@dbr.com

*Counsel for Delaware Trust Company*