**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | ) | Case No. 14-10979 (CSS) |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Hearing Date: November 3, 2015**<br>**Objection Deadline: October 23, 2015** |

**OBJECTION OF THE UNITED STATES TO DEBTORS' MOTION TO APPROVE A SETTLEMENT OF LITIGATION CLAIMS AND AUTHORIZE THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE SETTLEMENT AGREEMENT (D.I. 5249) AND DEBTORS' FIFTH AMENDED PLAN OF REORGANIZATION (D.I. 6122)**

The United States of America, on behalf of the Environmental Protection Agency ("EPA"), hereby files this objection to the *Motion of Energy Future Holdings Corp., et al., to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter into and Perform under the Settlement Agreemen*t [D.I. 5249] (the "Settlement Motion") and the Debtors' *Fifth Amended Plan of Reorganization* [D.I. 6122] (the "Plan").

The Settlement Agreement, attached as Exhibit A to the Debtors' Settlement Motion, should not be approved because its terms are unreasonable and inequitable and do not meet the requirements of Federal Rule of Bankruptcy Procedure 9019. The Plan should not be approved because it deviates from the priority scheme without specific and credible grounds, in violation of 11 U.S.C. § 507, and because the Plan's overly broad discharge provisions violate 11 U.S.C. § 1129(a)(1) and (3) because they are inconsistent with the requirements of the Code and are forbidden by law. The Plan also should not be approved because it allows reorganized debtors and New EFH to discharge liabilities non-debtors and to distribute the assets of non-debtor

affiliates but does not expressly require these entities to provide funds adequate to meet environmental obligations of the dissolved entities, presenting a danger to public health and safety and the environment.

In support of its Objection, the United States avers four principal reasons why the Settlement Agreement and Plan should not be approved. *First*, both the Settlement Agreement and the Plan arbitrarily exclude general unsecured creditors of Energy Future Competitive Holdings Company LLC ("EFCH") from Class C5 (which includes unsecured creditors of TCEH and TCEH's subsidiaries, *but excludes unsecured creditors of* EFCH) and thus deny the benefits of the Settlement Agreement to creditors of EFCH. The Debtors have not provided specific and credible grounds for the lower-priority treatment of EFCH creditors in comparison with similarly situated creditors of the debtor subsidiaries of TCEH in Class C5. This does not comport with the Third Circuit's requirement that debtors provide specific and credible grounds to justify a deviation from the priority scheme of 11 U.S.C. § 507. *See In re Jevic Holding Corp.*, 787 F.3d 173, 184 (3d Cir. 2015).

*Second*, by denying general unsecured creditors of EFCH any benefit of a settlement of claims pursued on its behalf, the Settlement Agreement's inequitable terms severely impair the interests of a creditor group that was inadequately represented during settlement negotiations. The detriment to creditors who were not afforded meaningful participation in the negotiations outweighs any benefit the Settlement Agreement provides to the bankruptcy estate. The Settlement Agreement is thus unfair and inequitable and should not be approved. *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 838 (Bankr. D. Del. 2008).

*Third*, the Debtors propose that upon Plan confirmation, claims of general unsecured creditors of EFCH will be "cancelled and released." Because this language could be construed to

limit or prohibit the United States from exercising its police and regulatory authority to protect human health and the environment, and because it potentially interferes with the United States' pursuit of claims against co-liable non-debtor entities responsible for pollution hazards, such language violates 11 U.S.C. § 1129 (a)(1) and (3) because it is inconsistent with the requirements of the Code and is forbidden by law.

*Fourth*, the Plan allows New EFH to acquire EFH Corp.'s interests in its subsidiaries, including non-debtor EFH Properties Company, "with such acquired subsidiaries having been discharged and released, to the fullest extent permitted under applicable law." Plan, Article IV.B.13. The Plan thus incorrectly proposes that this Court has jurisdiction to release and discharge the environmental liabilities of non-debtors. The Plan also specifically allows assets of certain non-debtor entities, including EFH Properties, to be distributed. To the extent the Debtors ask this Court to countenance the distribution of a corporation's assets without providing sufficient funds to meet environmental obligations, the proposed Plan is not in good faith, in violation of Section 1129(a)(3) of the Bankruptcy Code, and should not be approved.

**Introduction**

1. This Court has jurisdiction to hear the Motion and this Objection under 28 U.S.C. § 157(a) and 1334.

2. The United States is charged with the police and regulatory responsibility to protect human health and the environment under several environmental statutes, including the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 *et seq.*, and the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq*. These statutes are designed, *inter alia*, to ensure that owners, operators of hazardous waste disposal facilities, and the generators of hazardous waste, take

necessary steps to protect the public from serious environmental dangers and are responsible for cleaning up hazardous waste sites and compensating the public for injury to, destruction of, or loss of natural resources.

3. On May 1, 2015, the United States filed Amended Proof of Claim Number 10059 ("Proof of Claim 10059" or the "Claim"), and is a party in interest with respect to that Claim.[1]

**Factual Background**

4. The Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on April 29, 2014.

EPA's Proof of Claim 10059

5. In accordance with this Court's Order, on May 1, 2015, the United States filed Proof of Claim 10059, alleging that the Debtor, EFCH, is jointly and severally liable for response costs incurred and to be incurred by the United States under CERCLA at four abandoned, contaminated uranium mines in McKinley County, New Mexico (the "EFH Legacy Mine Sites"). The United States incorporates Proof of Claim 10059 by reference as if it is fully set forth herein.

6. The Claim is classified as a general unsecured claim against EFCH.

7. Texas Utilities Fuel Company, later known as TXU Fuel Company ("TUFCO"), a Texas corporation and a wholly-owned subsidiary of EFCH, and TUFCO's subsidiary, Chaco Energy Company ("Chaco"), a New Mexico corporation, were owners and/or operators of the EFH Legacy Mine Sites at various times. TUFCO and Chaco explored for, and produced, uranium at the EFH Legacy Mine Sites at various times during the 1970s and 1980s.

[1] The United States also filed Proofs of Claim Numbers 7904 and 7905, which are not relevant to this Objection.

8. EPA conducted a preliminary investigation of the EFH Legacy Mine Sites. Based on this investigation, EPA concluded that uranium had been disposed of at the Sites and that response actions to protect human health and the environment are necessary. TUFCO and Chaco were owners and/or operators of the EFH Legacy Mine Sites at the time of disposal of uranium, a hazardous substance, and are thus liable for EPA's past and future costs of cleanup at the sites under Section 107 of CERCLA, 42 U.S.C. § 9607. *See* United States Proof of Claim 10059. EPA's past costs are approximately $20,000. *Id.* EPA estimates that its future cleanup costs to address the contamination at the EFH Legacy Mine Sites will be approximately $23 million. *Id.*

9. According to documents provided by the Debtors, TUFCO dissolved on or about October 8, 2007, and its assets and liabilities were assigned to and assumed by EFCH. Also according to documents provided by the Debtors, Chaco dissolved in or about 2004. At the time Chaco dissolved, it was a wholly-owned subsidiary of non-debtor, EFH Properties. Upon dissolution, Chaco's assets, valued at $100 million, were distributed to EFH Properties.

10. Under Section 53-16-24 of the New Mexico Business Corporation Act, the dissolution of a corporation does not take away or impair any remedy available against that corporation for any liability incurred prior to the dissolution. N.M. Stat. Ann. 1978, § 53-16-24 (Survival of remedy after dissolution). Further, "New Mexico places no express time limits on survival or remedies by or against domestic corporations after dissolution." *Mountain Woodworks, Inc. v. James VOSS*, 180 P.3d 735, 742 (Or. App. 2008) (citing *Smith v. Halliburton Co.*, 879 P.2d 1198, 1202 (N.M. Ct. App. 1994). Thus, based on information provided by the Debtors, the United States has informed Debtors and EFH Properties that it believes EFH Properties, a non-debtor subsidiary of EFH Corp., is also liable, as the distributee of the assets of

Chaco, for response costs incurred and to be incurred by the United States at the EFH Legacy Mine Sites.

The TCEH Committee's Motion for Standing to Prosecute and Settle Fraudulent Transfer Claims on Behalf of T-side Debtors

11. The United States Trustee created the Official Committee for General Unsecured Creditors of TCEH Debtors (the "TCEH Committee") on May 13, 2014 [D.I. 420]. The TCEH Committee was created to represent the interests of general unsecured creditors of EFCH, TCEH, and TCEH's direct and indirect subsidiaries. Of the seven members on the TCEH Committee, three were identified as general unsecured creditors of EFCH in EFCH's original Schedule F, filed on June 30, 2014 [D.I. 1273]: (1) the Bank of New York Mellon Trust; (2) the Pension Benefit Guarantee Corporation; and (3) the Law Debenture Trust. But these committee members also have filed claims against TCEH and thus, no member of the TCEH Committee solely represents the interests of general unsecured creditors of EFCH.

12. On February 19, 2015, the TCEH Committee sought standing to prosecute and settle fraudulent conveyance claims on behalf of all of the TCEH Debtors, including EFCH (hereinafter the "Standing Motion").[2]

13. In the proposed complaint attached to the Standing Motion, the TCEH Committee includes claims for actual and constructive fraudulent conveyance pursuant to the Delaware fraudulent conveyance statute, Del. Code Ann. tit. 6, §§ 1304, 1305 and 1307, and Sections 502, 510, 544, 547, 548, 550 and 551 of the Bankruptcy Code. Standing Motion, Exhibit C (the "TCEH Committee's Complaint"). These claims arise from the 2007 leveraged buyout through

[2] *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Exclusive Standing and Authority to Commence, Prosecute, and Settle Certain Claims for Declaratory Judgment, Avoidance and Recovery of Liens, Security Interests, Obligations, Fees, and Interest Payments, and Disallowance of Claims* [D.I. 3593]. The EFH Committee and TCEH Unsecured Group also sought standing for related claims. Settlement Motion, ¶ 34.

which a group of private investors acquired EFH Corp. (the "2007 LBO"), and the $24 billion credit agreement (the "Credit Agreement") that funded the 2007 LBO, as well as the 2011 amendments and extensions and the 2013 revolver extension to the Credit Agreement (the "Amendments and Extensions"). *See generally* Standing Motion, Exhibit C.

14. Briefly stated, the TCEH Committee's Complaint alleges that the Credit Agreement and Amendments and Extensions rendered the companies insolvent and were not in exchange for reasonably equivalent value. Complaint, ¶¶ 23-107. Among other relief, the TCEH Committee seeks the avoidance of the liens, security interests and other obligations associated with the Credit Agreement, and the avoidance and recovery of the fees, interest payments, and other transaction costs associated with the Credit Agreement and Amendments and Extensions. Complaint ¶¶ 108-322. The relief is sought on behalf of the TCEH Debtors, including EFCH, TCEH and TCEH's subsidiaries. The Credit Agreement and the Amendments and Extensions name TCEH as the obligor to the debt, interest payments, fees, and other transaction costs. TCEH is the only entity obligated to make the payments sought to be avoided or recovered by Counts 2 through 22 of the TCEH Committee's Complaint. *See* Standing Motion, Exhibit A (*Declaration of Christopher A. Ward*, containing true and correct copies of the Credit Agreement and the Amendments and Extensions) [D.I. 3593-2]. Under the Credit Agreement, the $24 billion of debt incurred by TCEH is guaranteed by EFCH and the subsidiaries of TCEH with security interests in the subsidiaries of TCEH. *Id*.

Treatment of General Unsecured Creditors of EFCH under the Plan and Settlement Agreement

15. The Debtors assert that the terms of the Settlement Agreement are in consideration for "the classification, distributions, releases, and other benefits provided under the Plan." Plan, Article IV.A; *see also* Settlement Motion, ¶ 48 ("[t]he Settlement Parties' resolution

of claims under the Settlement Agreement is in consideration of… the opportunity to receive the economic benefits of the transactions contemplated by the Plan….").

16. Under the Plan, claims of creditors in Class C6, General Unsecured Claims against EFCH, "shall be cancelled and released without any distribution on account of such claims." Plan, Article III.B., ¶ 31.

17. In contrast, creditors in Class C5, which includes the general unsecured creditors of TCEH and TCEH's subsidiaries, but excludes general unsecured creditors of EFCH, will receive: (1) the rights to their pro rata share of $5,087,250,000 in the aggregate of New EFH Common Stock and the Reorganized EFH Common Stock, *or* (2) their pro rata share of a cash-out election, valued at $42 million. *Id.* ¶ 30.

18. In addition, under the Settlement Agreement, if the Plan is not consummated, and in the event an alternative restructuring is effectuated, various creditors of TCEH Debtors, including general unsecured creditors of TCEH and its subsidiaries, but excluding general unsecured creditors of EFCH, will receive their pro rata share of $550,000,000. In short, despite the fact that they are similarly situated with respect to general unsecured creditors in Class C5, general unsecured creditors of EFCH receive no economic benefit under either the Plan or the Settlement Agreement.

19. The Debtors have not provided sufficient grounds for disparate treatment of like creditors. The United States objected to the Disclosure Statement for the Third Amended Plan on the basis that the Debtors did not sufficiently justify or explain the disparate treatment of Class C5 and Class C6. *United States' Objection to the Disclosure Statement for the Third Amended Plan* [D.I. 5357], ¶ 7. The provided only a single relevant sentence in the Disclosure Statement for the Fifth Amended Plan: "Holders of Claims against TCEH are not being paid in

full under the Plan, so EFCH's ownership interest in TCEH has no value." Disclosure Statement at 132. This does not adequately explain why EFCH is in Class C6 and the subsidiaries of TCEH are in Class C5 when both are similarly situated with respect to their obligations under the Credit Agreement.

20. Finally, the Plan allows New EFH to acquire EFH Corp.'s interests in its subsidiaries, including EFH Properties, "with such acquired subsidiaries having been discharged and released, to the fullest extent permitted under applicable law." Plan, Article IV.B.13. In addition, the equity interests of EFH Properties may be transferred to Reorganized TCEH and any cash on hand at EFH Properties may be transferred to Reorganized EFH. Fifth Amended Plan at 8; Disclosure Statement at 12 and 223. The Debtors provide no support for the principle that this Court has the authority to discharge and release nonbankruptcy-related liabilities, such as environmental liabilities, of non-debtors. The Debtors provide no information concerning whether and to what extent EFH Properties, after Plan confirmation and restructuring transactions associated with the Merger, will be sufficiently capitalized to meet its environmental obligations to protect human health and the environment at the EFH Legacy Mine Sites.

## Discussion

### I. The Settlement Agreement and the Plan deviate from the priority scheme under Section 507 of the Bankruptcy Code without specific and credible grounds.

21. Federal Rule of Bankruptcy Procedure 9019 authorizes the bankruptcy court to approve settlements "as long as they are 'fair and equitable.'" *In re Jevic Holding Corp.*, 787 F.3d 173, 180 (3d Cir. 2015) (approving settlement agreement that provided for structured dismissal) (citation omitted). The burden of persuasion rests squarely on the plan supporters seeking approval of a global settlement. *In re Washington Mutual, Inc.*, 442 B.R. 314, 328 (Bankr. D. Del. 2011). The decision to approve or disapprove a settlement agreement is within

the discretion of the bankruptcy court. *In re Jevic Holding Corp.*, 787 F.3d at 180. To approve a settlement agreement, a bankruptcy judge need only conclude that the settlement "falls within the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness." *In re Nortel Networks, Inc.* 522 B.R. 491, 510 (Bankr. D. Del. 2014). Bankruptcy courts may approve settlements that deviate from the priority scheme of Section 507 of the Bankruptcy Code only if the debtors demonstrate specific and credible grounds to justify the deviation. *In re Jevic Holding Corp.*, 787 F.3d at 184.

22. In the proposed Plan, the Debtors seek this Court's approval to treat general unsecured creditors of EFCH differently from the creditors of direct and indirect subsidiaries of TCEH despite the fact that these creditor groups are similarly situated with respect to the economic benefit they should receive from the Settlement Agreement. This different treatment of similarly situated creditors deviates from the priority scheme under Section 507 of the Bankruptcy Code and the Debtors have not provided specific and credible grounds for the deviation. Without such justification, the Plan should not be approved. *In re Jevic Holding Corp.*, 787 F.3d at 184.

23. Under the Plan, Class C5 is comprised of general unsecured creditors of all TCEH Debtors, including the direct and indirect subsidiaries of TCEH, but *excluding* creditors of EFCH. Class C6 is comprised of general unsecured creditors of EFCH. The Debtors have proposed radically different treatment of creditors of Classes C5 and C6. Creditors of Class C5 receive their pro rata share of more than $5 billion in New EFH Common Stock and Reorganized EFH Common Stock, or their pro rata share of a cash payout of $42 million. The Debtors estimated rate of recovery for creditors in Class C5 is 6.8 percent to 49.9 percent. In stark contrast to creditors in Class C5, creditors of Class C6 receive zero distribution and their claims

are cancelled and released under the Plan. But, as explained more fully below, despite the fact that EFCH and the subsidiaries of TCEH are similarly situated with respect to their obligations under the Credit Agreement and Amendments and Extensions, and thus arguably should receive similar remedies from a successful litigation of the fraudulent conveyance claims, general unsecured creditors of EFCH do not "receive the economic benefits of the transactions contemplated by the Plan." Settlement Motion, ¶ 48.

24. In the Disclosure Statement filed with the Third Amended Plan, the Debtors did not set forth a justification for the disparate treatment of creditors in Classes C5 and C6. The United States objected to the Disclosure Statement to the Third Amended Plan on the basis that it did not adequately explain the disparate treatment of similarly situated creditors. United States' Disclosure Statement Objection, ¶ 7. The Debtors did not respond to the United States' objection, nor did the Debtors respond to the United States' requests for further information concerning the disparate treatment.

25. In the hundreds of pages of pleadings and additional materials filed in support of the Plan and Settlement Agreement, the Debtors provide only one sentence on the deviation from the priority scheme: "Holders of Claims against TCEH are not being paid in full under the Plan, so EFCH's ownership interest in TCEH has no value." Disclosure Statement at 132. The Debtors do not explain why creditors of subsidiaries of TCEH benefit from the settlement despite the lack of assets to pay holders of TCEH claims in full, but creditors of EFCH receive no such benefit. The Debtors' single sentence in its Disclosure Statement is neither specific nor credible grounds to justify the deviation from the priority scheme, nor does it adequately explain why EFCH is in Class C6 and the subsidiaries of TCEH are in Class C5 when both are similarly situated with respect to their obligations under the Credit Agreement.

26. The Debtors thus propose to arbitrarily deviate from the priority scheme – without grounds – by treating one group of general unsecured creditors of TCEH Debtors as if they were in a lower priority class than all other general unsecured creditors of TCEH Debtors. Therefore, the Plan should not be approved unless the Plan is modified to provide the same treatment for creditors of Class C5 and Class C6.

27. The Settlement Agreement, the terms of which are in consideration for distribution provisions in the Plan, does not provide grounds for the deviation. The TCEH Committee's Complaint seeks the avoidance of $24 billion in debt and the recovery of fees, interest payments and other transaction costs related to the Credit Agreement and Amendments and Extensions. To be sure, under the Credit Agreement and Amendments and Extensions, only TCEH was obligated to make payments of the fees, interest, and other transaction costs related to the Credit Agreement and Amendments and Extensions. A settlement of claims would reasonably recover such payments on behalf of TCEH alone. However, the creditors of direct and indirect subsidiaries of TCEH receive the economic benefit of the settlement of these claims even though these Debtors made no payments. This is so despite the fact that if these payments were recovered through a successful prosecution of the fraudulent conveyance claims, such recovery would flow only to the obligor-debtor, TCEH, who made the payments. Excluding EFCH from the benefit of settling these claims, while bestowing that benefit to TCEH's debtor-subsidiaries, is arbitrary and has no specific or credible basis.

28. For these reasons, the distribution under the Plan of the consideration provided by the Settlement Agreement deviates from the priority scheme without specific or credible grounds, and is thus unfair and inequitable and should not be approved.

**II. The proposed distribution of settlement proceeds severely and unfairly impairs creditors of EFCH, outweighing the benefit to the bankruptcy estate provided by the Settlement Agreement.**

28. Four factors guide bankruptcy courts in determining whether a settlement is fair and reasonable: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *In re Jevic Holding Corp*, 787 F.3d at 180 (quoting *In re Martin*, 91 F.3d 389 (3d Cir. 1996)).

29. The Debtors have not met their burden to establish that the Settlement Agreement is fair and reasonable and in the best interests of creditors. The United States does not contend that there is no business justification for the Settlement Agreement, or that avoiding costly litigation would not benefit the bankruptcy estate. Nor does the United States dispute that some of the *Martin* factors weigh in favor of approval of settlement. *In re Capmark Financial Group Inc.*, 438 B.R. 471, 519 (Bankr. D. Del. 2010) (Sontchi J.) (holding "debtor may seek approval of a settlement over major creditor objections as long as it carries its burden of establishing that the balance of the Martin factors, including the paramount interests of creditors, weighs in favor of settlement."). But here, the fourth *Martin* factor, the paramount interests of creditors, outweighs the other factors.

30. The fourth *Martin* factor concerns the paramount interest not of creditor-parties to the settlement, but of creditors that did not settle. *In re Nortel Networks, Inc.*, 522 B.R. at 512-513 (courts are to look to the "fairness [of the settlement] to other persons, i.e., the parties who did not settle.") (internal citation and quotation omitted). To be sure, "views of objecting parties cannot be permitted to predominate over the best interests of the estate as a whole." *Id*. But where a party is denied meaningful participation in negotiations, any benefits to the bankruptcy

estate provided by a settlement are outweighed by severe detriment to the non-settling party. *In re Nutritional Sourcing Corp.*, 398 B.R. at 838 (finding that negotiated definition of "trade creditor" resulted in distribution unfair to non-settling creditors and denying debtors' motion to approve settlement agreement). And the Bankruptcy Court has "a duty to ensure [such non-settling parties] are not injured to the benefit of other creditors." *Id.*

31. Because the Settlement Agreement severely impairs and results in zero distribution to a single creditor group, the Debtors' emphasis on the benefits the Settlement Agreement bestows on the bankruptcy estate is misplaced. Settlement Motion, ¶ 238. Here, the unfairness to the non-settling party is extreme. In addition, the Settlement Agreement and the Plan clearly skip over objecting general unsecured creditors of EFCH. *See In re Jevic*, 787 F.3d at 184 (noting that settlement agreements and plans that skip over objecting creditors raise a concern that the settlement agreement is the result of "collusion among debtors, creditors, and their attorneys and other professionals"). No member of the TCEH Committee represented solely the interests of general unsecured creditors of EFCH, suggesting that the interests of this creditor group were inadequately represented at settlement negotiations. And the Settlement Agreement results in a severe detriment to that the non-settling party. To be sure, the Settlement Agreement resolves complex, costly litigation preserving resources in the estate. But the severe unfairness to a non-settling party greatly outweighs any benefit to the bankruptcy estate. *In re Nutritional Sourcing Corp.*, 398 B.R. at 838.

32. In *In re Nutritional Sourcing*, this Court considered a settlement agreement that provided 100 percent recovery to parties that engaged in settlement negotiations and 13.2 percent recovery to similarly situated creditors who were not afforded meaningful participation in settlement negotiations. *In re Nutritional Sourcing*, 398 B.R. at 836-837. The Court found that

the reduction in the recovery rate, from 100 percent for settling parties to 13.2 percent, for non-settling creditors, was severely unfair. Acknowledging the Bankruptcy Court's duty to ensure that parties excluded from settlement negotiations are not injured to the benefit of other creditors, the Court found that the detriment to non-settling creditors was so unfair, it outweighed any benefit to the bankruptcy estate provided by the settlement, and thus the settlement agreement could not be approved. *Id.* at 838.

33. Here, general unsecured creditors that participated in the settlement negotiations receive between 6.8 percent and 49.9 percent of the allowed amount of their claims, or, in the event the Plan is not consummated, they will receive their pro rata share of $550 million. In contrast, general unsecured creditors of EFCH, a party inadequately represented in the settlement negotiations, receive zero distribution under the Plan and no economic benefit from the Settlement Agreement. Further, this denial of a fair and equitable distribution to general unsecured creditors of EFCH will increase the pro rata share of each of the general unsecured creditors of TCEH Debtors at the expense of non-setting parties. This is precisely the kind of unfairness the Court in *Nutritional Sourcing* acknowledged it must ensure against. *In re Nutritional Sourcing*, 398 B.R. at 838.

34. While it is true that this Court has approved a settlement agreement over the official committee's objection when the committee had been excluded from negotiations, in *In re Capmark* the committee contended that the settling parties settled too cheaply and did not benefit the estate enough. 438 B.R. at 475 (approving settlement agreement and noting that including official committee in settlement negotiations, while preferable, is not required). The official committee's unfairness argument rested on its exclusion from negotiations and the inadequacy of the settlement amount, not on any unfair distribution resulting from the negotiations. *See id*. at

519 (citing *In re Sea Containers, Ltd.*, No. 06-11156, 2008 WL 4296562, at *11 (Bankr. D. Del. Sept. 19, 2008) and noting court's approval of settlement "over objection of creditors most impacted by settlement where creditors failed to convince court 'the settlement so affects their position as to be unfair.'"). Here, the United States does not contest the amount of settlement, but rather contends that the zero distribution – and specifically the lack of any distribution of settlement benefits – to general unsecured creditors of EFCH in Class C6 is so unfair that the settlement should not be approved.

35. Finally, public policy supports a finding that the Debtor's proposed distribution of the settlement proceeds is unfair to the non-settling parties and that such unfairness outweighs the other *Martin* factors. By denying creditors in Class C6 any distribution under the Plan, the unfairness injures not merely a private creditor hoping to collect a debt. Rather, by denying EPA any recovery of its costs of cleaning up the EFH Legacy Mine Sites, the Debtors' unfair proposal places the burden of protecting public health and the environment – specifically, from pollution hazards caused by EFCH's predecessor in interest – on the public. Such a result is squarely at odds with the strict liability principles of CERCLA.

## III. The Plan provision stating that claims of creditors in Class C6 will be "cancelled and released" violates Section 1129(a)(1) and (3) of the Bankruptcy Code.

36. Section 1129(a)(1) requires that the Plan comply with the provisions of the Bankruptcy Code. Section 1141(d)(1) of the Code provides that "the confirmation of a plan… discharges the debtor from any debt that arose before the date of such confirmation." The United States has submitted a proof of "claim," a term specifically defined as a "right to payment." 11 U.S.C. §101(5). The discharge of a "claim" under the Bankruptcy Code, however, does not cancel and release the "claim," but rather, merely "discharges the debtor from any debt" related to a claim. 11 U.S.C. § 1141(d)(A); *In re Dabrowski*, 257 B.R. 394 (S.D.N.Y. 2001). Because

the term "debt" is defined as "liability on a claim," 11 U.S.C. § 101(12), and because Debtors' CERCLA and other environmental obligations are not "claims," these obligations are not dischargeable. Many environmental compliance obligations are not monetary claims or equitable remedies within this definition because the breach of these obligations does not "give[] rise to a right to payment[.]" 11 U.S.C. § 101(5)(B). Such compliance obligations are thus ongoing police and regulatory obligations that are not dischargeable under the Code.[3]

37. Further, the difference between a mere discharge from the payment of debt, as compared to the full release or cancellation of a claim, is an important distinction where others might also be liable, such as co-obligors, joint tortfeasors, guarantors, or insurance companies, and where a government has police or regulatory powers beyond the mere right to payment of a debt that is discharged under a plan or reorganization.[4]

38. Article III.B ¶ 31 of the Plan – cancelling and releasing claims against EFCH – thus violates Sections 1141(d)(1) and 1129(a)(1) of the Code because it purports to discharge more than is allowed by the Code. Such language could be construed to limit or prohibit the United States from exercising its police or regulatory authority to protect human health and the environment. Language purporting to cancel and release claims also affects the United States' authority to seek economic recoveries against others, such as other potentially responsible parties

---

[3] *See, e.g.*, *United States v. Apex Oil Co.*, 579 F.3d 734 (7th Cir. 2009) (Request for injunction requiring groundwater cleanup not dischargeable because discharge of equitable remedies limited to where breach gives rise to right to payment.); *In re Torwico Elec., Inc.*, 8 F.3d 146 (3d Cir. 1993) (Injunctive obligation to remedy pollution not a claim where there is an ongoing threat.); *In re Chateaugay Corp.*, 944 F.2d 997, 1008 (2d Cir. 1991) ("[A] cleanup order that accomplishes the dual objectives of removing accumulated wastes and stopping or ameliorating ongoing pollution emanating from such wastes is not a dischargeable claim.").

[4] According to documents provided by the Debtors, insurance policies held by various affiliates of EFH Corp. may have covered TUFCO and Chaco's environmental liability at the EFH Legacy Mine Sites. By seeking to "cancel and release" claims, the Debtors limit the rights of the United States to receive proceeds from these insurance policies. Such a limitation is unfair and inconsistent with the Bankruptcy Code.

responsible for the cost of cleaning up hazardous waste at the EFH Legacy Mine Sites. As a result, such language violates Section 1129(a)(1) and (3) of the Bankruptcy Code and should not be approved.

**IV. To the extent the Plan allows claims against non-debtors to be discharged and to allow non-debtors to be insufficiently capitalized to meet environmental obligations, the Plan is not in good faith and should not be approved.**

39. The proposed Plan provides that certain subsidiaries of EFH Corp., and any other Debtor entities designated by the Debtors, the Plan Sponsors, and the TCEH Supporting First Lien Creditors, may be dissolved and liquidated in accordance with applicable law. Plan, Article IV.B. ¶ 13. Under the Plan, EFH Corp. may cancel or abandon its interests in its subsidiaries, including non-debtor affiliates such as EFH Properties, or these interests may be acquired by New EFH "with such acquired subsidiaries having been discharged and released, to the fullest extent permitted under applicable law…." *Id.* It is not clear how the Debtors propose that this Court has authority to discharge and release the liabilities of non-debtor corporations, for example environmental liabilities of non-debtor that are unrelated to the bankruptcy, including the environmental liability of EFH Properties relating to hazardous waste at the EFH Legacy Mine Sites

40. The Plan also provides that the equity interests held by non-debtor EFH Properties Company may be distributed to Reorganized TCEH and any cash on hand at EFH Properties may be distributed to New EFH. Plan, Article I, ¶ 56 ("Contribution"); *see also* Disclosure Statement at 12 and 223. The proposed distribution described in the Plan could render EFH Properties insufficiently capitalized to meet its environmental obligations to protect public health and the environment, and specifically to pay the costs of cleaning up the hazardous waste at the EFH Legacy Mine Sites.

41. To the extent the Debtors ask this Court to countenance the dissolution of non-debtor affiliates or the distribution of non-debtor affiliates' assets, without providing sufficient funds to meet environmental obligations after such dissolution or distribution, the proposed Plan is not in good faith, in violation of Section 1129(a)(3) of the Bankruptcy Code, and should not be approved. *See* 11 U.S.C. § 1129(a)(3) (the court cannot confirm a plan that is not in good faith or proposed by any means "forbidden by law").

**Conclusion**

For the foregoing reasons, the United States respectfully requests that the Court deny the Debtors' Motion to Approve a Settlement Agreement. The United States also respectfully requests that the Court not approve the Debtors' Fifth Amended Plan of Reorganization or order the Debtors to modify the Plan consistent with the Bankruptcy Code and applicable law.

*[Signatures follow.]*

DATED: October 23, 2015

JOHN C. CRUDEN
Assistant Attorney General

/s/ Anna Grace
ANNA GRACE
BRANDON ROBERS
Trial Attorneys
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Washington DC 20044-7611
Phone: (202) 514-4091
Email: Anna.E.Grace@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that before 4:00 p.m. (Eastern Daylight Time) on October 23, 2015, the foregoing ***UNITED STATES' OBJECTION TO DEBTORS' MOTION TO APPROVE A SETTLEMENT OF LITIGATION CLAIMS AND AUTHORIZE THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE SETTLEMENT AGREEMENT (D.I. 5249) AND DEBTORS' FIFTH AMENDED PLAN OF REORGANIZATION (D.I. 6122)*** was filed and served using the Court's electronic case filing (CM/ECF) system.

/s/ Anna Grace