# Exhibit H

## Transcript of October 19, 2015 Deposition of David Ying excerpts

Page 1

1                    DAVID YING
2   UNITED STATES BANKRUPTCY COURT
3   FOR THE DISTRICT OF DELAWARE
    ---------------------------------------------x
4   In Re:
5   Energy Future Holdings Corporation, et al.,
6                    Debtors.
7   Chapter 11
8   Case No. 14-10979
9   Jointly Administered
10  ---------------------------------------------x
11              DEPOSITION OF DAVID YING
12                 New York, New York
13                 October 19, 2015
14
15
16
17
18
19
20
21
22
23  Reported by:
24  KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25  JOB NO. 99137

Page 14

1  DAVID YING
2  BY MR. ANKER:
3  Q. Mr. Ying, you're obviously free to
4  look at it, but my first question is can you
5  identify the document that I have handed you?
6  A. This is the expert --
7  MR. PEDONE: Can I suggest we call it
8  Ying Confirmation 1 since he's been deposed?
9  MR. ANKER: Sure. Let me correct what
10  I said earlier. The document that I have
11  handed to Mr. Ying, which is a deck entitled
12  David Ying's Expert Report, October 12,
13  2015, Evercore, will be described for
14  purposes of this deposition and marked as
15  Ying Confirmation Exhibit No. 1.
16  (Ying Confirmation Exhibit 1, David
17  Ying's Expert Report, October 12, 2015,
18  marked for identification, as of this date.)
19  BY MR. ANKER:
20  Q. Can you identify the document that has
21  been marked as Ying Confirmation Exhibit No. 1?
22  A. This is an expert report that I have
23  prepared and filed in connection with issues
24  raised with the confirmation of the plan.
25  Q. And am I correct that this report

Page 15

1  DAVID YING
2  addresses a number of different opinions that
3  you propose to provide at the confirmation
4  hearing?
5  A. Yes, that's correct.
6  Q. I want to focus you in my questioning
7  on what I think is your third opinion C. EFIH
8  Feasibility Analysis.
9  Mr. Ying, it appears to me to begin
10  right after the numbered page 32, although I
11  don't think it is itself the first page
12  numbered.
13  A. No, it begins on C. EFIH Feasibility
14  Analysis, which follows page 32.
15  Q. Immediately follows page 32?
16  A. Yes.
17  Q. I will do my best not to do what I
18  just did, which is to talk over you, and my
19  apologies, and if you could do the same, I would
20  appreciate it.
21  Mr. Ying, can you describe in your
22  words the assignment you were given with respect
23  to the opinion that you are rendering as to the
24  EFIH feasibility analysis?
25  A. The report was prepared in response to

Page 16

1  DAVID YING
2  a question that has been raised, and the
3  question that was raised is if,
4  post-confirmation, through appeal, various
5  creditors of EFIH and EFH were to succeed on all
6  of the alleged payment disputes -- and the
7  alleged payment disputes include make-whole
8  payment disputes and disputes with respect to
9  the payment of post-petition interest at full
10  contract rate -- that if all of those appeals
11  were to be finally determined in favor of the
12  various plaintiffs, what would be the liability
13  and could the restructured post-confirmation
14  EFH, as contemplated in the plan, have the
15  financial wherewithal to make all of those
16  payments.
17  Q. Mr. Ying, I think when I asked the
18  question, I may have misspoken. I described it
19  as the EFIH Feasibility Analysis. In fact, the
20  report is entitled EFH Feasibility Analysis; is
21  that right, sir?
22  A. That's correct.
23  Q. And is that because the restructuring,
24  as you understand it, contemplates that what is
25  now EFIH and EFH, what is now EFH, will be

Page 17

1  DAVID YING
2  merged into a single restructured entity termed
3  "new EFH" or "reorganized EFH"?
4  A. Well, I don't know if EFIH and EFH
5  will -- I believe EFIH and EFH will still exist.
6  My understanding is that they will both have
7  debt outs or they will both be still
8  consolidated with one another, and therefore,
9  when we address feasibility, we're addressing
10  feasibility of both.
11  Q. You say they will still be
12  consolidated with each other. You understand,
13  do you not, that EFIH is a separate company
14  today from EFH?
15  A. Well, EFH owns 100 percent of EFIH
16  and, I believe, post-reorganization will
17  continue to do so.
18  Q. And so your understanding is that,
19  post-reorganization, Oncor will be owned by EFIH
20  and EFIH in turn will be owned by EFH?
21  A. I believe that's the economic
22  substance of the transaction, yes.
23  Q. You describe the assignment you were
24  given. Who gave you that assignment?
25  A. I was told that was the question by

Page 18

DAVID YING

1  company counsel, Kirkland & Ellis.
2  Q. Did company counsel give you any
3  assumptions to make for purposes of your
4  analysis?
5  A. No; we made them ourselves.
6  Q. And the "we" in that sentence is
7  Evercore?
8  A. Evercore and the colleagues who work
9  for me on this assignment.
10  Q. At Evercore?
11  A. At Evercore.
12  Q. And can you briefly describe in your
13  own words the opinion or opinions that you
14  reached with respect to the assignment you have
15  described, period?
16  A. Well, not to restate the opinion
17  itself, because it's several pages, but we think
18  that EFH should be able to raise enough capital
19  to address an adverse judgment on every and all
20  of the alleged claims.
21  Q. And by "address," if we were to use
22  simple English, is it fair to say your opinion
23  is that if every single disputed claim is
24  allowed in full with interest post-emergence,

Page 19

DAVID YING

1  EFH will be able to raise debt and/or equity
2  capital to pay those liabilities in full,
3  correct?
4  A. That's correct.
5  Q. And therefore, it is your opinion, is
6  it not, sir, that reorganized EFH is not likely
7  to have to refile for bankruptcy in the event
8  that all of the liabilities are deemed valid in
9  the full amount sought, right?
10  A. That's correct.
11  Q. Can you briefly describe the work you
12  did to reach that conclusion or conclusions?
13  A. We looked at the pro forma financial
14  statements for EFH as we understand them; we
15  calculated, to the best of our ability, the
16  maximum amount of the alleged claims; and we
17  looked at both the debt capacity of
18  post-confirmation EFH -- and when I say EFH, I'm
19  referring to both EFH and EFIH as a consolidated
20  entity -- we looked at the debt capacity of EFH
21  and we also looked at EFH from the perspective
22  of the equity capital markets and looked at its
23  standing in the capital markets and whether it
24  would have the ability to raise additional

Page 20

DAVID YING

1  equity capital.
2  Q. What documents did you review in doing
3  your analysis?
4  A. We used, obviously, the plan of
5  reorganization and we used what pro forma
6  financial information we had with respect to
7  what EFH might look like as of an assumed
8  confirmation date of June 30, 2016.
9  Q. Mr. Ying, you just stated that you
10  used what pro forma financial information you
11  had with respect to what EFH might look like as
12  an assumed confirmation date of June 30, 2016.
13  Do you believe you had adequate
14  information to render the opinions you were
15  rendering?
16  A. I believe we do, yes.
17  Q. Mr. Ying, I don't want to -- obviously
18  you're not a lawyer, and I don't mean to use
19  lawyer-speak, but have you heard the term "a
20  fortiori"?
21  A. Actually, I have not.
22  Q. I think -- I'm not a Latin scholar,
23  but I think "a fortiori" means if A is true,
24  then B follows like day follows night. If A is

Page 21

DAVID YING

1  true, B absolutely must be true. Let me try to
2  not use Latin and I'll try to ask the question
3  differently.
4  Your opinion is that, am I correct,
5  that if, after confirmation, the EFIH first
6  liens win their appeal and are entitled to both
7  the full amount of the make-whole they seek and
8  all the interest they seek, and the EFIH second
9  liens prevail and also are entitled to the full
10  amount of the make-whole and interest they seek,
11  and the EFIH PIKs are entitled to the full
12  amount of the make-whole and interest they seek,
13  and all post-petition interest at the contract
14  rate they seek, and the various EFH notes also
15  prevail and are entitled to the full amount of
16  both make-whole and post-petition interest that
17  they seek, even if all of that happens,
18  reorganized EFH should be able to raise the
19  capital to pay all of those liabilities in full,
20  right?
21  A. That's correct.
22  Q. Okay. I want to change the
23  hypothetical.
24  Assume for a minute that there are

Page 74

1  DAVID YING
2  "With no risk probability discounting for the
3  amounts?"
4      And I responded, "With no risk probability
5  discounting for the amounts. I will adopt you
6  counsel's qualification.
7      "Does it remain the debtors' belief that
8  reorganized EFH would be able to satisfy all of
9  those liabilities after the effective date?"
10     Mr. Shore objected to form.
11     "A  It does."
12     You agree with Mr. Keglevic, what he
13 stated on those lines?
14     A.  Yes.
15     Q.  And I went on to ask him, starting on
16 line 15 on page 62:
17     "Q  And for the reasons that you
18 previously provided?
19     Mr. Shore -- he doesn't seem to like
20 my questions -- again objected to form.
21     And Mr. Keglevic responded:
22     "A  The primary basis for my conclusion
23 is the, as we calculated it, the substantial
24 amount of equity that reorganized EFH would
25 be -- that would exist at reorganized EFH.  An

Page 75

1  DAVID YING
2  I think we had calculated that amount at $8.5
3  billion, which should be substantial coverage
4  even under a worst-case scenario for all the
5  disputed contingent, unliquidated amounts
6  associated with the make-whole and
7  post-petition interest."
8      Did I read that accurately?
9      A.  Yes.
10     Q.  And do you agree with what Mr.
11 Keglevic stated at those lines?
12     A.  I don't understand his reference to
13 $8.5 billion, but I agree with his conclusion.
14     Q.  I think we did some math and came up
15 with a slightly higher number using $20
16 billion --
17     A.  Okay.
18     Q.  -- as the assumed value rather than
19 19, but the transcript will speak for itself.
20     Bottom line is you agree with his
21 conclusion?
22     A.  I agree with his conclusion.
23     Q.  And so the bottom line, Mr. Ying, is
24 it is your opinion that if everything -- with
25 all the conservative assumptions you made on

Page 76

1  DAVID YING
2  value and if every liability that is in dispute
3  has to be paid in full by New EFH, New EFH will
4  be able to pay those liabilities and should not
5  have to go back into bankruptcy, right?
6      A.  That's correct.
7      MR. ANKER:  I'll pass the witness.
8      MR. ROGERS:  Can we take a break --
9      MR. ANKER:  Yes.
10     MR. ROGERS:  -- while we're switching?
11     MR. ANKER:  Yes.
12     (Recess; Time Noted:  9:35 a.m.)
13     (Time Noted:  9:42 a.m.)
14 EXAMINATION BY
15 MR. HARDIMAN:
16     Q.  Mr. Ying, John Hardiman again for the
17 EFH Official Committee of Unsecured Creditors.
18     I want to return to something that you
19 discussed with Mr. Anker.  You might recall you
20 gave some testimony that both the Hunt Group and
21 the investors who make up the T-unsecured
22 creditors are sophisticated financial players;
23 do you recall that testimony?
24     A.  Yes.
25     Q.  And I think you testified that you

Page 77

1  DAVID YING
2  would not expect those sophisticated financial
3  players to invest $7 billion of equity in the
4  New EFH unless they believed it was worth more
5  than $7 billion?
6      A.  I recall saying that it's quite
7  possible, but I don't know their investment
8  hurdle rates; so it's more speculation than it
9  is based in fact.
10     Q.  Would you expect sophisticated
11 investors such as the T-unsecureds and the Hunts
12 to invest $7 billion of equity into the
13 reemerged Oncor if they believe it is worth less
14 than $7 billion?
15     A.  No.
16     Q.  Does your feasibility analysis of EFH
17 address that scenario, a scenario where the
18 equity of the reemerged entity will be less than
19 the amount that is currently expected to be
20 funded?
21     A.  No, it does not.
22     Q.  Am I correct you also do not, in your
23 opinion, provide an independent valuation of
24 Oncor post-emergence; is that correct?
25     A.  Yes.