**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., et al., | Case No. 14-10979 (CSS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos.: 5249** |

**OBJECTION OF THE BANK OF NEW YORK MELLON, AS
INDENTURE TRUSTEE FOR THE PCRB CLAIMS, TO THE MOTION
OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, TO APPROVE A
SETTLEMENT OF LITIGATION CLAIMS AND AUTHORIZE THE
DEBTORS TO ENTER INTO AND PERFORM UNDER THE
<u>SETTLEMENT AGREEMENT AND HEARING THEREON</u>**

The Bank of New York Mellon ("<u>BNYM</u>"), in its capacity as the PCRB Trustee,[1] by

undersigned counsel, objects to the *Motion of Energy Future Holdings Corp., et al., to Approve a*

*Settlement of Litigation Claims and Authorize the Debtors to Enter Into and Perform Under the*

*Settlement Agreement and Hearing Thereon* (D.I. 5249) (the "<u>Motion</u>").  In support of the

objection, BNYM respectfully states as follows:

## I.    PRELIMINARY STATEMENT

1.      The holders of the PCRB Claims are creditors of the TCEH estate.  The TCEH

estate holds in excess of $2 billion in claims against the holders of the TCEH First Lien Claims.

The TCEH estate's claims would be released under the Settlement Agreement in exchange for a

limited "waiver" of the TCEH First Lien Deficiency Claims.  In effect, the limited "waiver"

transfers the distribution on account of the TCEH First Lien Deficiency Claims to a group of

Beneficiary-Claimants (as defined in the Settlement Agreement), which excludes only holders of

the PCRB Claims.  The disparate treatment of the PCRB Claims, which is to be incorporated into

the Plan, violates section 1123(a)(4) of the Bankruptcy Code, which requires the "same

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to such terms in the *Fifth Amended Joint
Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code.*

treatment" for all creditors in Class C4 TCEH Unsecured Debt Claims.  The Debtors offer no specific and justifiable grounds to justify departure from the Bankruptcy Code's distribution scheme and approve the Settlement Agreement.

2.      The Settlement Agreement also is not fair and equitable as to the PCRB Claims. Although the Debtors favored *pari passu* treatment of the PCRB Claims, the TCEH Unsecured Ad Hoc Group demanded the disparate treatment of the PCRB Claims in an effort to increase the distribution on account of the TCEH Unsecured Note Claims at the expense of the holders of the PCRB Claims.

3.      The exclusion of the PCRB Claims from the distribution on account of the "waiver" of the TCEH First Lien Deficiency Claims results in a 50% to 55% discount in the distribution on account of the PCRB Claims.  The discount is not based upon any analysis of the TCEH estate's causes of action compared to the TCEH subsidiaries' causes of action against the holders of the TCEH First Lien Claims or any principled analysis whatsoever.  Indeed, none of the Debtors, Hugh Sawyer (the TCEH Disinterested Manager), Eric Mendelsohn (the TCEH Disinterested Manager's financial advisor), David Ying (the Debtors' financial advisor), or Eric Siegert (the TCEH Unsecured Ad Hoc Group's financial advisor) conducted *any* analysis of the appropriateness of the 50% to 55% discount on the distribution to holders of PCRB Claims.

4.      The Debtors wisely ensured that the Settlement Agreement contain a provision that permits this Court to require *pari passu* treatment of the PCRB Claims and approve the Settlement Agreement.  *See* Settlement Agreement at § 2.2(b).  In other words, the Court can sustain this objection to the disparate treatment of the PCRB Claims, require *pari* passu treatment of the PCRB Claims, approve the Settlement Agreement, and confirm the Plan.

## II.    FACTUAL BACKGROUND

### A.    The Debtors' Bankruptcy Cases

5.    On April 29, 2014, each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code.  These chapter 11 cases are jointly administered.

### B.    The PCRB Claims

6.    BNYM serves as the PCRB Trustee with respect to multiple series of pollution control revenue bonds or pollution control bonds.  As of the Petition Date, the PCRB Claims totaled in excess of $881 million (excluding "company-owned" PCRB Claims).

7.    The PCRB Trustee timely filed unsecured proofs of claim against TCEH relating to the PCRB Claims in the aggregate amount of $1.087 billion (excluding company-owned PCRB Claims), including principal, plus interest and fees.

8.    The PCRB Claims are unsecured obligations of TCEH.

### C.    TCEH's Claims Against EFH and the Holders of the TCEH First Lien Claims

#### 1.    TCEH's Proposed $700 Million Inter-Debtor Claim Against EFH

9.    The TCEH estate holds inter-Debtor claims in excess of $3 billion against EFH. *See* Transcript of Deposition of Hugh E. Sawyer (Sept. 24, 2015) ("Sawyer Tr.") at 544:5-24.

10.    The TCEH estate's inter-Debtor claims against EFH are resolved pursuant to the Settlement Agreement.

11.    The terms of the settlement of the inter-Debtor claims in the Settlement Agreement largely track the terms of the Disinterested Director Settlement.  Motion at p. 21, ¶ 51.  Specifically, on March 16, 2015, Hugh Sawyer, the TCEH Disinterested Manager, made a demand on the EFH entities for a $1.2 billion inter-Debtor claim.  *See* Sawyer Tr. at 600:9-21. After negotiation, the TCEH estate's claims against EFH were resolved pursuant to the

Disinterested Director Settlement.  Under the terms of the Disinterested Director Settlement, EFH, EFIH, and the TCEH Debtors agreed to release inter-Debtor claims in exchange for, among other things, an allowed $700 million general unsecured claim by TCEH against EFH. Motion at p. 18, ¶ 44.

12.     Under the Settlement Agreement, TCEH (not its subsidiaries) will have an allowed $700 million claim against EFH (the "TCEH Settlement Claim").  *See* Settlement Agreement at § 2.1(b); Motion at pp. 18-19, ¶ 44; p. 21 n.15; p. 93, ¶ 225.  The TCEH subsidiaries will not have any claim against EFH under the Settlement Agreement.

13.     Without explanation, the Settlement Agreement treats the proceeds of the TCEH Settlement Claim as the prepetition collateral of the holders of the TCEH First Lien Claims, notwithstanding that the settled claims include avoidance actions and commercial tort claims. *See* Settlement Agreement at § 2.1(c).  At his deposition, Hugh Sawyer was unable to explain why the proceeds of the TCEH Settlement Claim are treated as the prepetition collateral of holders of the TCEH First Lien Claims.  *See* Sawyer Tr. at 643:16-23 and 644:3-9.

## 2.     TCEH's Claims Against the Holders of the TCEH First Lien Claims

14.     The TCEH estate also holds claims in excess of $2 billion against the holders of the TCEH First Lien Claims.  *See* Sawyer Tr. at 660:16-21, 663:24-664:11, and 664:12-665:6.

15.     The TCEH estate's claims against holders of the TCEH First Lien Claims also were resolved pursuant to the Settlement Agreement.  *See* Motion at p. 21, ¶ 52; Sawyer Tr. at 656:10-15.

16.     Specifically, the Settlement Agreement provides for the release of the TCEH estate's $2 billion "2011 amend and extend" claim and its $340 million 2013 "revolver extension" claim against the holders of the TCEH First Lien Claims in exchange for the "fixing"

of the First Lien Deficiency Claims at $8 billion to $9.5 billion. *See* Sawyer Tr. at 660:16-21, 663:24-664:11, and 664:12-665:6.

> ### D.    Initial Plans Provide *Pari Passu* Treatment for the PCRB Claims

17.    On April 14, 2015, the *Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* (D.I. 4142) (the "<u>Original Plan</u>"). On July 23, 2015, the Debtors filed the *Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* (D.I. 5078) (the "<u>First Amended Plan</u>"). On August 3, 2015, the Debtors filed the *Second Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* (D.I. 5197) (the "<u>Second Amended Plan</u>").

18.    The Original Plan, the First Amended Plan, and the Second Amended Plan treated the PCRB Claims *pari passu* with the holders of the TCEH Second Lien Note Claims, the TCEH Unsecured Note Claims, and General Unsecured Claim Against the TCEH Debtors Other Than EFCH, with a full (not "limited") waiver of the TCEH First Lien Deficiency Claims. *See* Original Plan, Art. III.B.28 and 29 (regarding treatment of Classes C4 and C5); First Amended Plan, Art. III.B.30 and 31 (regarding treatment of Classes C4 and C5) Second Amended Plan, Art. III.B.30 and 31 (regarding treatment of Classes C4 and C5).

> ### E.    The TCEH Unsecured Ad Hoc Group Demands the Disparate Treatment of the PCRB Claims in the Settlement Agreement and the Subsequent Amended Plans

19.    On August 9, 2015, the Debtors and the various other parties thereto, including the TCEH Official Committee and the TCEH Unsecured Ad Hoc Group, entered into the Settlement Agreement.

20.    As part of the Settlement Agreement, the TCEH Unsecured Ad Hoc Group insisted on the disparate treatment of the PCRB Claims. *See* Disclosure Statement, Art. V.E.29,

p. 131 ("The TCEH Unsecured Ad Hoc Group was not willing to treat the PCRB Claims *pari passu*"); Sawyer Tr. at 678:25-679:19; Transcript of Deposition of David Ying (Oct. 19, 2015) ("Ying Tr.") at 155:19-22, 155:24-156:2.

21.     The Debtors initially maintained their position that the PCRB Claims should be treated *pari passu* with other unsecured creditors of TCEH.  *See* Sawyer Tr. at 678:5-21 (stating that "[m]y recollection is that the debtors took the position that the unsecured creditors at the TCEH level should be treated *pari passu* with the other unsecured creditors").

22.



23.

24.     Consistent with the TCEH Unsecured Ad Hoc Group's demands, the Settlement Agreement provides that the holders of the TCEH First Lien Deficiency Claims will "waive" any recovery thereon for the benefit of the holders of Allowed TCEH Unsecured Note Claims, Allowed TCEH Second Lien Note Claims, and Allowed General Unsecured Claims Against the TCEH Debtors Other Than EFCH (collectively, the "Beneficiary-Claimants"), not for the benefit of the PCRB Claims. *See* Settlement Agreement at § 2.2(b).

25.     The Beneficiary-Claimants alone (which do not include the PCRB Claims) also will receive additional distributions of Rights and Reorganized EFH Common Stock on account of the waiver of the TCEH First Lien Deficiency Claims. *See* Settlement Agreement at § 2.2(b).

26.     As a result of being excluded from the Beneficiary-Claimants, the PCRB Claims will receive a 50% to 55% discount in the distribution that they would otherwise receive if treated *pari passu*.

27.     On August 10, 2015, the Debtors filed the *Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* (D.I. 5244) (the "Third Amended Plan"), which embodies the disparate treatment of the PCRB Claims set forth in the Settlement Agreement, and the *Disclosure Statement for the Third Amended Plan* (D.I. 5246).

28.     The subsequent chapter 11 plans filed by the Debtors also contain the disparate treatment of the PCRB Claims that was reflected first in the Third Amended Plan.[2]

29.     On September 21, 2015, the Debtors filed the *Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the*

---

[2] On September 18, 2015, the Debtors filed the *Fourth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* (D.I. 6017) and the *Disclosure Statement for the Fourth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* (D.I. 6110).

*Bankruptcy Code* (D.I. 6122) (the "Plan"), which is the latest chapter 11 plan filed by the

Debtors, and the *Disclosure Statement for the Plan* (D.I. 6124) (the "Disclosure Statement").

30.    The Plan classifies the PCRB Claims in Class C4 among the "TCEH Unsecured

Debt Claims," which consists of (a) the PCRB Claims, (b) the TCEH First Lien Deficiency

Claims, (b) the TCEH Second Lien Note Claims, and (c) the TCEH Unsecured Note Claims.

Plan, Art. I.A.404, p. 36.

31.    With respect to the Class C4 TCEH Unsecured Debt Claims, the Plan provides, in

full and final satisfaction, settlement, release, and discharge of and in exchange for such claims,

each holder of a Class C4 TCEH Unsecured Debt Claim shall receive a pro rata share of:

- the Rights to purchase $5,087,250,000 . . . in the aggregate of New EFH Common Stock pursuant to the Rights Offering and on and subject to the occurrence of the Effective Date, the New EFH Common Stock purchased pursuant to the exercise of the Rights; and

- the Reorganized EFH Common Stock, which shall be converted to approximately 2% of New EFH Common Stock.

*See* Plan, Art. III.B.29, pp. 57-58; Disclosure Statement, Art. V.E.29, p. 129.

32.    As with the Third Amended Plan, the Plan incorporates the disparate treatment of

the PCRB Claims set forth in the Settlement Agreement, thereby discounting by 50% to 55% the

distribution on account of the PCRB Claims.  *See* Plan, Art. III.B.29, pp. 57-58, Art. IV.B.15, p.

64; Disclosure Statement, Art. I.F, p. 24 n.14.

**F.    The Proposed 50% to 55% Discount Imposed on the PCRB Claims Is Arbitrary and Untethered to A Principled Analysis of the Claims Against the Holders of the TCEH First Lien Claims.**

33.    Assuming (a) a range of Reorganized EFH enterprise values from $19 billion to

$24 billion and (b) a TCEH First Lien Deficiency Claims of $8.1 billion to $9.5 billion, the

Debtors' most recent Disclosure Statement provides a range of potential distributions on account

of PCRB Claims from 2.9% to 20.7%.  *See* Disclosure Statement, Art. I.F, p. 23.  The potential

distributions set forth in the Disclosure Statement (for the holders of the PCRB Claims and for other TCEH unsecured creditors) are summarized as follows:

| Range of Illustrative Estimated Recoveries | | | | | | |
|---|---|---|---|---|---|---|
| **Illustrative Reorganized EFH Enterprise Value:** | **$19.0bn** | **$20.0bn** | **$21.0bn** | **$22.0bn** | **$23.0bn** | **$24.0bn** |
| $9.5bn Allowed TCEH First Lien Deficiency Claims | | | | | | |
| Allowed Class C4/C5 Claims other than PCRB Claims | 6.8% | 14.4% | 22.1% | 29.7% | 37.3% | 44.9% |
| Allowed PCRB Claims | 2.9% | 6.1% | 9.3% | 12.5% | 15.8% | 19.0% |
| $8.1bn Allowed TCEH First Lien Deficiency Claims | | | | | | |
| Allowed Class C4/C5 Claims other than PCRB Claims | 6.8% | 14.4% | 22.0% | 29.5% | 37.1% | 44.7% |
| Allowed PCRB Claims | 3.1% | 6.6% | 10.1% | 13.6% | 17.1% | 20.7% |

34.    A 2.9% recovery on $881.496 million in outstanding non-company owned PCRB Claims would total $25.56 million.  If the PCRB Claims received a *pari passu* distribution with the other T-side unsecured creditors, the distribution on account of the PCRB Claims could be approximately 6.4% or $56.42 million.  Thus, the holders of PCRB Claims would receive approximately an additional $30 million in value if the PCRB Claims shared *pari passu* in the distribution on account of the TCEH First Lien Deficiency Claims.  The effect of the disparate treatment of the PCRB Claims increases dramatically to approximately $200 million as the Reorganized EFH enterprise value increases from $19 billion to $24 billion.

35.    The proposed 50% to 55% discount in the distribution to holders of PCRB Claims is arbitrary.  It is not based on a principled analysis of the TCEH's claims against the holders of the TCEH First Lien Claims as compared to the TCEH subsidiaries' claims against the holders of

the TCEH First Lien Claims.  The proposed 50% to 55% discount is simply a function of the amount of the TCEH First Lien Deficiency Claims.  In other words, the 50% to 55% discount is determined solely by the amount of distributions on account of the TCEH First Lien Deficiency Claims ($8.1 billion or $9.5 billion).

36.    The Debtors presented Hugh Sawyer, the TCEH Disinterested Manager, as their Rule 30(b)(6) designee with respect to the deposition notice served by BNYM (D.I. 5828). Sawyer did not perform an analysis to support the 50% to 55% discount in the distribution on account of the PCRB Claims.  *See* Sawyer Tr. at, *e.g.*, 682:24-683:8.  In fact, Sawyer did not even analyze the financial impact on the holders of PCRB Claims resulting from the proposed exclusion of the PCRB Claims from participation in the "waiver" of the TCEH First Lien Deficiency Claims.  *See* Sawyer Tr. at 681:8-682:13.

37.    Searching for an explanation, Sawyer generally asserted that the TCEH subsidiaries' ownership of the operating assets provided a basis for the disparate treatment of the PCRB Claims.  Sawyer, however, did not explain (nor could he) how the value of the TCEH subsidiaries' operating assets was relevant when addressing the waiver of a *deficiency* claim, which by definition assumes that all of the TCEH subsidiaries' assets are fully-encumbered and of no value to unsecured creditors.[3]   In any event, Sawyer did not analyze the distribution to the TCEH creditors compared to the distribution to the TCEH subsidiaries' creditors.  *See* Sawyer Tr. at 688:9-13.

38.    In short, Sawyer admitted that he did not do any analysis to determine whether the distribution discount on the PCRB Claims was appropriate:

---

[3] The TCEH subsidiaries' operating assets were not part of the negotiations relating to the $700 million intercompany claim in favor of TCEH.  *See* Sawyer Tr. at 651:24-652:3, 652:6-8; 653:18-20, 653:22-25, and 654:15-20.

> **Q.**   **Did you ever do any analysis to determine whether the discount on the distribution that the PCRB claims are receiving was appropriate?**
>
> **A.**   **No.**

*See* Sawyer Tr. at 688:9-13; *see also* Sawyer Tr. at 681:8-682:13.

39.     Notwithstanding that he was the Debtors' Rule 30(b)(6) designee, Sawyer's lack of analysis was matched by his lack of understanding of the relevant facts.   TCEH's claims against the holders of the TCEH First Lien Claims were settled for the "waiver" of the TCEH First Lien Deficiency Claims and the alleged fixing of that claim at $8 billion.   *See* Sawyer Tr. at 657:2-21.   However, Sawyer did not know the amount of TCEH's claims that were to be released in the Settlement Agreement.   *See* Sawyer Tr. at 656:10-657:15.

40.     Sawyer also did not analyze whether trade creditors of TCEH alone should be entitled to share in the "waiver" while the PCRB Claims were excluded from sharing in the "waiver" as creditors of TCEH alone.   *See* Sawyer Tr. at 675:5-13; *see also* Sawyer Tr. at 676:8-15.

41.     Eric Mendelsohn of Greenhill, the TCEH Disinterested Manager's financial advisor, also did not recall preparing any analysis regarding the proposed 50% to 55% discount in the distribution on account of the PCRB Claims or the appropriateness thereof.   *See* Transcript of Deposition of Eric R. Mendelsohn (Oct. 21, 2015) ("Mendelsohn Tr.") at 251:5-8, 251:15-22, 252:3-6, 252:8-12, 252:14-20, 252:24-25, 253:19-254:2, 254:7, 254:8-11, 254:13-17, 254:22.

42.     David Ying of Evercore, the Debtors' financial advisor also did not recall preparing any such analysis.   *See* Ying Tr. at 155:6818, 156:23-157:5, 157:12-25, 158:2-7.

43.    Eric Siegert of Houlihan Lokey, the TCEH Unsecured Ad Hoc Group's financial advisor, also did not recall preparing any such analysis. *See* Transcript of Deposition of Eric Siegert (Oct. 7, 2015) ("<u>Siegert Tr.</u>") at 143:24-144:9, 144:11.

**G.    The Settlement Agreement and the Plan Expressly Contain Provisions Allowing the Court to Order *Pari Passu* Treatment of the PCRB Claims While Approving the Settlement Agreement and the Plan.**

44.    The Debtors, implicitly acknowledging that this Court would not countenance the disparate treatment of the PCRB Claims, wisely included provision that would allow Court approval of the Settlement Agreement (and the Plan) to proceed upon the Court's ruling that the PCRB Claims are entitled to share *pari passu* in the waiver of the TCEH First Lien Deficiency Claims. *See* Settlement Agreement at § 2.2(b) ("if the Bankruptcy Court . . . determines that the Limited Waiver cannot be for the benefit of only the Beneficiary-Claimants, . . . then the Limited Waiver shall be for the benefit of the Beneficiary-Claimants *and such other holders of Allowed Unsecured Claims* against the TCEH Debtors *as ordered by such court*") (emphasis added).

45.



46.    Similar to Section 2.2(b) of the Settlement Agreement, the Plan allows for the Court to confirm the Plan while requiring that the holders of the PCRB Claims share *pari passu* in the "waiver" of the First Lien Deficiency Claims. *See* Plan, Art. IV.B.15, p. 64 ("for the purposes of this Plan and the settlements and compromises incorporated herein or contemplated hereby, and *unless otherwise ordered by the Bankruptcy Court* . . . (a) Holders of Allowed TCEH First Lien Deficiency Claims will waive or deemed to have waived . . . any recovery or

distribution on account of . . . such Allowed TCEH First Lien Deficiency . . . for the benefit of Holders of Allowed TCEH Deficiency Recipient Claims").

47.     Therefore, the Court can require that the PCRB Claims share *pari passu* in the distribution on account of the waiver of the TCEH First Lien Deficiency Claims and then approve the Settlement Agreement and confirm the Plan thereby insuring a successful reorganization that is fair to all creditors, including the holders of the PCRB Claims.

## III.    OBJECTIONS

### A.    The Disparate Treatment of the PCRB Claims as Compared to Other Class C4 Creditors Violates Section 1123(a)(4) of the Bankruptcy Code. Therefore, the Settlement Agreement Cannot be Approved.

48.     "'Equality of distribution among creditors is a central policy of the Bankruptcy Code.'" *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 239 (3d Cir. 2004) (quoting *Begier v. IRS*, 496 U.S. 53, 58 (1990)); *see also In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) (stating that "equality of distribution among creditors is a central policy of the Bankruptcy Code that is furthered by several different Code provisions"). Several provisions of the Bankruptcy Code "are designed to ensure equality of distribution from the time the bankruptcy petition is filed." *Combustion Eng'g*, 391 F.3d at 239.

49.     In furtherance of this central policy of equality of distribution, section 1122 of the Bankruptcy Code provides that a debtor can only put "substantially similar" claims in the same class. *See* 11 U.S.C. § 1122(a). Likewise, section 1123(a)(4) of the Bankruptcy Code provides that a "plan must 'provide the **same treatment** for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.'" *Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.)*, 407 B.R. 576, 592 (D. Del. 2009) (quoting 11 U.S.C. § 1123(a)(4)) (emphasis added).

50.     Courts must enforce section 1123(a)(4) of the Bankruptcy Code according to its

plain language. *Id.* (citing *Hartford Underwriters Ins. Co. v. Union Planters*, 530 U.S. 1, 6

(2000)).

51.     "Although neither the Code nor the legislative history precisely defines the

standards of equal treatment, courts have interpreted the same treatment requirement to mean

that all claimants in a class must have the **same opportunity** for recovery." *W.R. Grace & Co.*,

729 F.3d at 327 (internal citations and quotations omitted) (emphasis added); *see also Del. Trust*

*Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future Holding Corp.)*, 527

B.R. 157, 168 (D. Del. 2015) (quoting *W.R. Grace*).

52.     In short, "if claims within the same class are not receiving the same treatment, and

the holders of those claims being treated less favorably have not consented to the discrimination,

the plan is not confirmable." *Schroeder*, 407 B.R. at 592.

53.     The Settlement Agreement unabashedly treats the PCRB Claims in a dramatically

less favorable manner than the other Class C4 TCEH Unsecured Debt Claims in violation of

section 1123(a)(4) of the Bankruptcy Code.  As provided in Art. III.B.29 of the Plan, the Class

C4 TCEH Unsecured Debt Claims will receive a pro rata share of (i) the Rights to purchase New

EFH Common Stock pursuant to the Rights Offering and (ii) the Reorganized EFH Common

Stock. *See* Art. III.B.29, pp. 57-58.

54.     In addition to the treatment set forth in Art. III.B.29, the Beneficiary-Claimants

(which do not include the PCRB Claims) also will receive on account of their Class C4 TCEH

Unsecured Debt Claims the benefit of the waiver of the TCEH First Lien Deficiency Claims.

*See* Settlement Agreement at § 2.2(b); Disclosure Statement, Art. V.E.29, pp. 129-30; Plan, Art.

IV.B.15, p. 64.

55.     The Debtors acknowledge that holders of the PCRB Claims are not receiving *pari passu* treatment with respect to the distribution on account of the waiver of the TCEH First Lien Deficiency Claims.  *See* Disclosure Statement, Art. V.E.29, p. 131 ("Holders of PCRB Claims do not receive any share of the recoveries on the TCEH First Lien Deficiency Claim."); Art. I.C.2(c), p. 13 ("if the Court finds that the PCRBs must share *pari passu* with other Holders of TCEH Unsecured Debt Claims" and "[i]n the event the PCRBs were to receive *pari passu* treatment under the Plan").

56.     Although the TCEH estate holds billions of dollars in causes of action against the holders of the TCEH First Lien Claims, the Plan proposes to deny the holders of the PCRB Claims *any* share in the proceeds (*i.e.*, the distribution on account of the deficiency "waiver") of the release of such causes of action while all other Class C4 creditors are entitle to share in those proceeds.  The net effect of that disparate treatment – to which the holders of the PCRB Claims have not consented – is a distribution that is approximately $30 million to $200 million less than the distribution on account of the PCRB Claims if treated *pari passu* with the other Class C4 claims.

57.     As a result of Settlement Agreement and Art. IV.B.15 of the Plan, the PCRB Claims do not recover *pari passu* with the other Class C4 TCEH Unsecured Debt Claims, *unless* this Court orders otherwise.  Thus, the Settlement Agreement and Plan violate section 1123(a)(4) of the Bankruptcy Code, unless this Court accepts the invitation in the Settlement Agreement and Plan to order that the PCRB Claims be treated *pari passu* with respect to distributions on account of the TCEH First Lien Deficiency Claims.  *See Schroeder*, 407 B.R. at 592 (section 1123(a)(4) violated where plan provided a 100% distribution to some claims in a given class and 130% to

other claims in that same class, because the holders of the claims proposed to receive 130% had relinquished claims in an entirely different class).

58.     In summary, the Settlement Agreement and Plan violate section 1123(a)(4) of the Bankruptcy Code by failing to provide the "same treatment" for holders of the PCRB Claims – and cannot be approved.

**B.     There are No Specific and Justifiable Grounds to Justify Departure from the Bankruptcy Code's Distribution Scheme.**

59.     In *Jevic Holdings Corp.*, the Third Court held that "bankruptcy courts may approve settlements that deviate from the priority scheme of § 507 of the Bankruptcy Code only if they have *specific and credible grounds* to justify [the] deviation." *Jevic Holdings Corp.*, 787 F.3d at 184 (emphasis added) (quoting *Iridium*, 468 F.3d at 466) (internal quotation marks omitted).[4]  The Debtors have offered no "specific and credible" grounds to justify a departure from the Bankruptcy Code's distribution scheme and approve the Settlement Agreement.

---

[4] This is not a case where a secured lender is distributing its own property, which it may do without regard for the Bankruptcy Code's distribution priorities.  *See In re ICL Holding Co.*, No. 14-2709, 2015 WL 5315604 (3d Cir. Sept. 14, 2015).  This case involves the holders of TCEH First Lien Claims purporting to "gift" the distribution on account of the TCEH First Lien Deficiency Claims to (i) Class C4 unsecured creditors other than the holders of the PCRB Claims and (ii) Class C5 unsecured creditors.  The District Court has "flatly rejected" the proposition that creditors are free to do whatever they wish with their bankruptcy dividends, which are property of the estate.  *See In re Armstrong World Indus., Inc.*, 320 B.R. 523, 540 (D. Del. Feb. 23, 2005), *aff'd*, 432 F.3d 507, 514 (3d Cir. 2005) (declaring that cases allowing secured creditors to gift "do not stand for the unconditional proposition that creditors are generally free to do whatever they wish with the bankruptcy proceeds they receive"); *see generally* Kenneth N. Klee, Adjusting Chapter 11: Fine Tuning the Plan Process, 69 AM. BANKR. L.J. 551, 570-71 (1995) ("Although the argument can be and has been made that senior creditors should be entitled to do what they want with their property, the lessons of history should suffice to impose a *per se* rule that precludes senior creditors from collaborating with junior creditors or equity owners at the expense of intervening classes.") (footnotes omitted); *see also Rahman v. Oncology Assoc., P.C.*, 269 B.R. 139 (D. Md. 2001) (stating that "a settlement cannot uphold an impairment of rights accomplished in violation of applicable legal rules"); *see also Findley v. Blinken (In re Johns-Manville)*, 982 F.2d 721, 750 (2d Cir. 1992) (In declining to approve a settlement relating to asbestos litigation, the Second Circuit stated, "we cannot uphold as sensible' or 'useful' or 'fair' or 'even achieving the most good for the most people' an impairment of rights accomplished in violation of applicable legal rules.").

1. **The Settlement Agreement Can Be Approved and the Plan Can Be Confirmed if the Court Orders *Pari Passu* Treatment of the PCRB Claims.**

60.     In a "close-call," the Court in *Jevic Holdings Corp.* approved a settlement that did not comply with the distribution provisions of the Bankruptcy Code because it "remained the least bad alternative since there was 'no prospect' of a plan being confirmed and conversion to Chapter 7 would have resulted in the secured creditors taking all that remained of the estate in 'short order.'" *Id.* Here, the opposite is true.

61.     The Settlement Agreement *can* be approved and the Plan *can* be confirmed if the Court orders that holders of the PCRB Claims must share *pari passu* in the distribution on account of the waiver of the TCEH First Lien Deficiency Claims. The Debtors wisely included provisions that would allow the Settlement Agreement and Plan to proceed if the Court rules that the PCRB Claims are entitled to share *pari passu* in the distribution on account of the TCEH First Lien Deficiency Claims waiver. *See* Settlement Agreement at § 2.2(b) ("if the Bankruptcy Court . . . determines that the Limited Waiver cannot be for the benefit of only the Beneficiary-Claimants, . . . then the Limited Waiver shall be for the benefit of the Beneficiary-Claimants *and such other holders of Allowed Unsecured Claims* against the TCEH Debtors *as ordered by such court*") (emphasis added); Plan, Art. IV.B.15, p. 64 ("for the purposes of this Plan and the settlements and compromises incorporated herein or contemplated hereby, and *unless otherwise ordered by the Bankruptcy Court* . . . (a) Holders of Allowed TCEH First Lien Deficiency Claims will waive or be deemed to have waived . . . any recovery or distribution on account of . . . such Allowed TCEH First Lien Deficiency Claims . . . for the benefit of Holders of Allowed TCEH Deficiency Recipient Claims") (emphasis added).

62.     Thus, the Court should (i) deny the Motion as filed or (ii) approve it on the condition that the PCRB Claims share *pari passu* in the distribution on account of the TCEH First Lien Deficiency Claims waiver.

### 2. Withdrawal of the Standing Motions Does Not Justify the Unequal Treatment of the PCRB Claims.

63.     The Debtors have asserted that the preferential treatment of the Beneficiary-Claimants is justifiable on the grounds that the TCEH Official Committee and the TCEH Unsecured Ad Hoc Group are withdrawing the Standing Motions with respect to claims against the holders of the TCEH First Lien Claims.[5]   *See* Motion at p. 110, ¶ 243.  In so arguing, the Debtors insinuate that TCEH Official Committee and the TCEH Unsecured Ad Hoc Group should be entitled to a greater distribution on account of the settlement of causes of action that are – and always have been – property of TCEH's bankruptcy estate.  That argument is baseless.

64.     There is no dispute that the claims against the holders of TCEH First Lien Claims belong to the TCEH Debtors, not the TCEH Unsecured Ad Hoc Group or the TCEH Official Committee.  *See generally In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014) (causes of action are property of the bankruptcy estate); *Jevic Holding Corp. v. CIT Group/Business Credit Inc. (In re Jevic Holding Corp.)*, 787 F.3d 173, 188 (3d Cir. 2015) (Scirica, J., dissenting) (cause of action is property of the estate); TCEH Unsecured Ad Hoc Group Standing Motion, pp. 1-2 (TCEH Unsecured Ad Hoc Group "brings this Motion for entry of an order granting standing and authority to commence, prosecute, and settle certain causes of action *on behalf of the TCEH Debtors* relating to the First Lien Debt") (emphasis added); *see also* TCEH Committee Standing Motion, p. 36.

---

[5] The Standing Motions were not granted.  They are pending.  *See* Disclosure Statement, Art. IV.J, p. 91.

65. Proceeds of TCEH's causes of action also are property of TCEH's estate. *See Jevic Holding Corp.*, 787 F.3d at 188 (Scirica, J., dissenting) (citing *Bd of Trs. Of Teamsters Local 863 v. Foodtown, Inc.*, 296 F.3d 164, 169 (3d Cir. 2002); 11 U.S.C. § 541(a)(6)). Thus, the distributions on account of the TCEH First Lien Deficiency Claims are property of the TCEH estate because its claims are settled in exchange for those distributions.

66. Holders of the PCRB Claims are entitled to share *pari passu* in the distribution on account of the waiver of the TCEH First Lien Deficiency Claims. *See In re Nationwide Sports Distributors*, *Inc.*, 227 B.R. 455, 465 (E.D. Pa. 1998) (rejecting a proposed settlement of estate causes of action for the disproportionate benefit of the creditors that negotiated the settlement agreement); *Young v. Higbee Co.*, 324 U.S. 204 (1945) (shareholders who withdrew their appeal from a confirmation order in return for compensation — paid from non-estate property by insiders of the debtor —larger than the plan provided to other shareholders breached their duty of good faith to other shareholders).

67. Contending that the TCEH Official Committee and the TCEH Unsecured Ad Hoc Group's filing of a Standing Motion is a basis for the disparate treatment of the PCRB Claims also is belied by the facts. None of the indenture trustee for the holders of the TCEH Second Lien Note Claims, the holders of the TCEH Second Lien Note Claims, or the Class C5 General Unsecured Claims Against the TCEH Debtors Other Than EFCH filed a motion for derivative standing to assert claims on behalf of the estates of TCEH and its subsidiaries. Yet, each of those creditor groups will share in the distribution on account of the waiver of the TCEH First Lien Deficiency Claims.

68.     Withdrawal of the Standing Motions does not constitute "specific and credible" grounds to justify a departure from the Bankruptcy Code's distribution scheme and approve the Settlement Agreement.

**3.      The Existence of Claims against Other Debtors is Irrelevant to the Treatment of the PCRB Claims in Class C4.**

69.     Outside of the Motion, the Debtors have attempted to justify the disparate treatment of the PCRB Claims under the Settlement Agreement and the Plan on the grounds that the PCRB Claims only have claims against TCEH, while other Class C4 creditors also have claims against TCEH's subsidiaries. *See* Disclosure Statement, Art. V.E.29, p. 131. This alleged justification lacks merit. First of all, the fact that the subsidiaries hold the operating assets is irrelevant because the disparity in distribution is based upon the TCEH First Lien Deficiency Claims. *By definition*, the assertion of a deficiency claims means that there is *no equity* for Class C4 creditors in TCEH subsidiaries' operating assets.

70.     Secondly, none of the Debtors, Sawyer, Mendelsohn, Ying, or Siegert conducted an analysis to determine the value of the claims against the holders of the TCEH First Lien Claims held by TCEH as compared to such claims held by TCEH's subsidiaries. *See* Sawyer Tr. at 682:24-683:8; Mendelsohn Tr. at 254:8-11, 254:13; Ying Tr. at 157:20-158:7; Siegert Tr. at 143:24-144:9, 144:11. Indeed, there is no analysis supporting any discount on the distribution to holders of PCRB Claims, let alone a 50% to 55% discount.

71.     Thirdly, Class C5 General Unsecured Claims Against the TCEH Debtors Other Than EFCH includes creditors with trade claims against TCEH alone. Those creditors (unlike holders of the PCRB Claims) are entitled to share in the distribution on account of the waiver of the First Lien Deficiency Claims even though holders of the PCRB Claims, which also have

claims against TCEH alone, are precluded from sharing in such distribution.  *See* Plan, Art. I.A.346, p. 32.  Thus, this alleged justification is pretextual at best.

72.     Fourthly, that certain holders of Beneficiary-Claimants may hold claims against other Debtors does not constitute consent on behalf of the holders of PCRB Claims to disparate treatment of their Class C4 TCEH Unsecured Debt Claims.  The district court's decision in *Schroeder*, 407 B.R. 576, is on point.  The question raised on appeal was whether the plan provided unequal treatment to holders of claims in class HC3b by providing a 100% distribution on some claims in class HC3b (the "100% claims") and a 130% distribution on other claims in class HC3b whose holders had relinquished their claims in class HC10b (the "130% claims"). *Id.* at 592.  The bankruptcy court concluded that the plan discriminated with consent, reasoning that the holders of the 130% claims, instead of insisting on receiving 100% of the determined distribution for their HC3b claims and 100% of the determined distribution for their HC10b claims (a total distribution of 200%), consented to a less favorable treatment in the form of receiving 0% on their HC10b claims and 130% on their HC3b claims (a total distribution of 130%).  *Id.*

73.     The district court *reversed* the bankruptcy court's conclusion.  *Id.*  The consent to less favorable treatment of claims in class HC10b only excused the disparate treatment of claims in that class.  *Id.*  Such consent was irrelevant to the disparate treatment of claims in class HC3b. *Id.*  The treatment of claims in class HC3b was an entirely separate matter, and it was clear that the plan treated the 100% claims in that class less favorably than the 130% claims without the holders of the 100% claims' consent.  *Id.*  Thus, the bankruptcy court erred in finding that the plan was in compliance with section 1123(a)(4) of the Bankruptcy Code.  *Id.*  The district

court cautioned that while it "appreciates the complexity of dealing with the tangle of debtor entities, . . . there are limits to what equity alone can accomplish." *Id.* at 592 n.34.

74.    The instant case is similar.  The Settlement Agreement and Plan provides a distribution on account of PCRB Claims that is significantly less than the distribution on account of other Class C4 Claims.  The fact that the Beneficiary-Claimants consent to such treatment is irrelevant.  The holders of PCRB Claims do not consent.  Regardless of the alleged reason (and there is no valid one), the Settlement Agreement and Plan indisputably fail to provide the "same treatment" or "same opportunity" for recovery to creditors in Class C4.

75.    Fifthly, the Plan supporters argue that holders of PCRB Claims benefit from the Settlement Agreement because the deficiency claim against TCEH would be much larger if TCEH's assets alone were considered.  This argument, however, is both inconsistent with the Plan as filed and applicable law.

76.    *All* TCEH Unsecured Debt Claims are classified *together* in Class C4.  Thus, the TCEH First Lien Deficiency Claims must be determined based upon all of the TCEH Debtors' assets.

77.    In addition, although (absent state law to the contrary) a secured creditor may assert the full amount of its claim against each estate, whether a creditor is oversecured or undersecured is determined based on all of the debtors' assets.  *See In re Residential Capital, LLC*, 501 B.R. 549, 598 (Bankr. S.D.N.Y. 2013) ("There is a surprising dearth of case law explicitly addressing the issue of valuing the extent of a creditor's security in multi-debtor cases. The statute likewise does not provide much guidance. The Court agrees with the JSNs that they are entitled to aggregate their collateral across debtor entities.  Any other reading of the statute would lead to inequitable and illogical results."); *Id.* at 600 ("It is not surprising that the [d]ebtors

cite no case authority in support of their argument.  The argument is clearly inconsistent with the code and cannot withstand modest scrutiny.") (citing Hearing Transcript at 12:19-13:3, *In re Revolution Dairy, LLC*, No. 13-20770 (Bankr. D. Utah, Apr. 23, 2013), ECF No. 206)).

78.      That certain Beneficiary-Claimants' may hold claims against other Debtors does not constitute "specific and credible" grounds to justify a departure from the Bankruptcy Code's distribution scheme and approve the Settlement Agreement.

> **C.      The Settlement Agreement Is Not Fair and Equitable to the Holders of the PCRB Claims.**

79.      Bankruptcy Rule 9019 authorizes settlements that are "fair and equitable." *Jevic Holding Corp.*, 787 F.3d at 180 (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson (TMT Trailer Ferry)*, 390 U.S. 414, 424 (1968)).  While settlements "are a 'normal part of the process of reorganization,'" like every "important determination in reorganization proceedings, [settlements must] receive the 'informed, independent judgment' of the bankruptcy court." *TMT Trailer Ferry*, 390 U.S. at 424.  "[T]he unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them" to ensure that they are fair and equitable.  *In re Nutraquest*, 434 F.3d 639, 644 (3d Cir. 2005).  The Settlement Agreement is not fair and equitable as to holders of PCRB Claims and cannot be approved under Bankruptcy Rule 9019.

> **1.      The Settlement Agreement Does Not Comply with the Bankruptcy Code's Priorities**

80.      It has long been true that "[t]he great object of the Bankrupt Act, so far as creditors are concerned, is to secure equality of distribution among them of the property of the bankrupt." *Mayer v. Hellman*, 91 U.S. 496, 501 (1875); *see also Begier,* 496 U.S. at 58 ("Equality of distribution among creditors is a central policy of the Bankruptcy Code.").

81.     In the context of a "pre-plan" settlement, "whether a particular settlement's distribution scheme complies with the [Bankruptcy] Code's priority scheme must be the most important factor for the bankruptcy court to consider" when approving a settlement. *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 463 (2d Cir. 2007). In fact, "**compliance with the [Bankruptcy] Code priorities will usually be dispositive of whether a proposed settlement is fair and equitable**." *Official Comm. of Unsecured Creditors v. CIT Grp./Bus. Credit Inc. (In re Jevic Holding Corp.)*, 787 F.3d 173, 184 (3d Cir. 2015) (emphasis added) (citing *Iridium Operating*, 478 F.3d at 455).

82.     As discussed above, the Settlement Agreement does not comply with the Bankruptcy Code priorities. The Settlement Agreement effectively "skips" holders of the PCRB Claims by entitling the holders of <u>all</u> other Class C4 TCEH Unsecured Debt Claims and the holders of <u>all</u> Class C5 General Unsecured Claim Against the TCEH Debtors Other Than EFCH to share in the "waiver" of the TCEH First Lien Deficiency Claims. The Settlement Agreement's lack of compliance with the Bankruptcy Code priorities demonstrates that the Settlement Agreement is not fair and equitable. *Jevic Holding Corp.*, 787 F.3d at 184.

### 2.     The Settlement Agreement Raises Justifiable Concerns About Collusion

83.     Although the Bankruptcy Code and the Bankruptcy Rules do not extend the absolute priority rules to settlements in bankruptcy, "the policy underlying the rule—ensuring the evenhanded and predictable treatment of creditors—applies in the settlement context." *Jevic Holdings Corp.*, 787 F.3d at 184; *cf. Iridium*, 478 F.3d at 455 (stating that in the Second Circuit, "a long-standing creditor protection – the Bankruptcy Code's priority scheme for reorganization plan distributions – applies to bankruptcy court approval of a settlement under Rule 9019"). In fact, "**[s]ettlements that skip objecting creditors in distributing estate assets raise justifiable**

**concerns about collusion among debtors, creditors, and their attorneys and other professionals**." *Jevic Holdings Corp.*, 787 F.3d at 184 (emphasis added) (citing *Iridium*, 478 F.3d at 464).

84.    In this case, the mistreatment of holders of the PCRB Claims under the Settlement Agreement "raise[s] justifiable concerns about collusion among debtors, creditors, and their attorneys and other professionals." *See Jevic Holdings Corp.*, 787 F.3d at 184 (emphasis added) (citing *Iridium*, 478 F.3d at 464).  Indeed the circumstances surrounding the negotiation of the Settlement Agreement evidence such collusion.

85.    As detailed above, the Debtors took the position that the PCRB Claims should be treated *pari passu* with other unsecured creditors of TCEH.  *See* Sawyer Tr. at 678:5-21. Indeed, the earlier versions of a chapter 11 plan provided that the PCRB Claims would receive treatment *pari passu* with the other holders of C4 TCEH Unsecured Debt Claims with a full (not "limited") waiver of the TCEH First Lien Deficiency Claims.

86.    The TCEH Unsecured Ad Hoc Group was unwilling to treat the PCRB Claims *pari passu* with other unsecured creditors of TCEH. Disclosure Statement, Art. V.E.29, p. 131;

███████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

87.    In order to control the vote of Class C4 TCEH Unsecured Debt Claims, the Plan funders needed the consent of the TCEH Second Lien Note Claims.  Accordingly, the TCEH Unsecured Ad Hoc Group proposed that holders of TCEH Second Lien Note Claims be entitled to share in the waiver of the First Lien Deficiency Claims with the TCEH Unsecured Note Claims.  As the PCRB Claims are a minority of the Class C4 Claims, the TCEH Unsecured Ad

Hoc Group did not need the votes of the PCRB Claims. Therefore, the TCEH Unsecured Ad Hoc Group excluded the PCRB Claims from sharing in the distribution on account of the waiver of the First Lien Deficiency Claims while increasing their distribution on account of the TCEH Unsecured Note Claims.

88.      In short, the TCEH Unsecured Ad Hoc Group provided a greater distribution for holders of the TCEH Unsecured Note Claims and the TCEH Second Lien Note Claims to garner the votes of such holders.

89.      The TCEH Unsecured Ad Hoc Group also needed to secure the vote of unsecured creditors in Class C5 General Unsecured Claims Against the TCEH Debtors Other than EFCH. Accordingly, the TCEH Unsecured Ad Hoc Group ultimately proposed that holders of General Unsecured Claims Against the TCEH Debtors Other Than EFCH be entitled to share in the distribution on account of deficiency waiver.  Thus, all Class C4 creditors (other than holders of PCRB Claims) and all Class C5 creditors (even trade creditors with claims *solely* against TCEH) are entitled to share in the waiver of the First Lien Deficiency Claim – while the PCRB Claims alone are excluded from sharing in the deficiency waiver.

90.      The evidence of collusion surrounding the negotiation of the Settlement Agreement evidence demonstrates that the Settlement Agreement is not fair and equitable.  *Jevic Holdings Corp.*, 787 F.3d at 184

### 3.      The Settlement Agreement Is Not Fair to the Non-Settling Parties

91.      Of particular relevance, "[u]nder the 'fair and equitable' standard, [courts must] look to the fairness of the settlement to other persons, *i.e.*, the parties who did not settle."  *Id.* The fact that the holders of the PCRB Claims are not parties to the Settlement Agreement is not a basis to deny the holders of the PCRB Claims the distribution to which they are entitled. Nothing in the Bankruptcy Code or the Bankruptcy Rules "obligates a creditor to cut a deal in

order to receive a distribution of estate assets to which he is entitled." *Jevic Holding Corp.*, 787

F.3d at 184.

92.    Thus, "bankruptcy courts **cannot approve settlements . . . devised by certain**

**creditors in order to increase their shares of the estate at the expense of other creditors**."

*Jevic Holdings Corp.*, 787 F.3d at 184 (emphasis added).  Indeed, the Bankruptcy Code's

guarantee of equal treatment "protect[s] the creditors from one another." *Young v. Higbee*, 324

U.S. 204, 210 (1945).

93.    This Court should not approve the Settlement Agreement because it constitutes

the TCEH Unsecured Ad Hoc Group's attempt to increase their distribution at the expense of

holders of the PCRB Claims.  *See Jevic Holdings Corp.*, 787 F.3d at 184.  The TCEH Unsecured

Ad Hoc Group imposed the disparate treatment of the holders of PCRB Claims.  No other party

in interest required the disparate treatment of holders of PCRB Claims.  In order to reach a global

compromise, the other parties in interest succumbed to the TCEH Unsecured Ad Hoc Group's

demands.  The net effect of that disparate treatment – to which the holders of the PCRB Claims

have not consented – is a distribution that is approximately $30 million to $200 million less than

the distribution on account of the PCRB Claims if treated *pari passu* with the other Class C4

claims.

94.    There is no principled basis to exclude holders of the PCRB Claims from *any*

share in the distribution on account of the TCEH First Lien Deficiency Claims.  Again, none of

the Debtors, Sawyer, Mendelsohn, Ying, or Siegert conducted an analysis to determine the value

of the claims against the holders of the TCEH First Lien Claims held by TCEH as compared to

such claims held by TCEH's subsidiaries.  *See* Sawyer Tr. at 682:24-683:8; Mendelsohn Tr. at

254:8-11, 254:13; Ying Tr. at 157:20-158:7; Siegert Tr. at 143:24-144:9, 144:11.  Indeed, there

is no analysis supporting any discount on the distribution to holders of PCRB Claims, let alone a 50% to 55% discount.  Instead, the discount is simply the result of the size of the TCEH First Lien Deficiency Claims.

95.     The TCEH Unsecured Ad Hoc Group's attempt to exclude the holders of PCRB Claims from sharing in the "waiver" of the TCEH First Lien Deficiency Claims is patently unfair because TCEH's estate, which is liable on the PCRB Claims, owns many of the claims against the holders of the TCEH First Lien Claims which are being settled under the Settlement Agreement.  *See generally Emoral*, 740 F.3d at 879 (causes of action are property of the bankruptcy estate); *Jevic Holding Corp.*, 787 F.3d at 188 (Scirica, J., dissenting) (cause of action is property of the estate).

96.     In summary, the "waiver" of such recovery or, more accurately, the "gifting" of the distribution on account of the TCEH First Lien Deficiency Claims, for the benefit of only *certain* creditors of TCEH demonstrates that the Settlement Agreement is not fair and equitable as to the holders of PCRB Claims.

97.     "If the 'fair and equitable' standard is to have any teeth, it must mean that bankruptcy courts cannot approve settlements . . . devised by certain creditors in order to increase their shares of the estate at the expense of other creditors."  *Jevic Holding Corp.*, 787 F.3d at 184.

98.     This Court should reject the Settlement Agreement as submitted and require that the holders of PCRB Claims share *pari passu* with the Beneficiary-Claimants in the distributions on account of the waiver of the TCEH First Lien Deficiency Claims.

**D.     No Stay Pending Appeal Should Be Waived.**

99.     The Debtors' request to waive the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) must be denied.  Bankruptcy Rule

provides, "An order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." The purpose of this rule is to "'provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.'" *In re Filene's Basement*, No. 11-13511, 2014 Bankr. LEXIS 2000, *43-44 (Bankr. D. Del. Apr. 29, 2014) (quoting 10 Collier on Bankruptcy ¶ 6004.11, ¶ 6006.04 (16th ed. 2014)).

100.    A short period of time is often needed and essential to an objecting party intending to appeal because, if the transaction is closed in the absence of a stay, any appeal by an objecting party may well be moot. *Id.* "[I]f an objection has been filed and is being overruled, the court should eliminate or reduce the 14-day stay period only upon a showing that there is a sufficient business need to close the transaction within the 14-day period and that the interests of the objecting party, taking into account the likelihood of success on appeal, are sufficiently protected." *Id.* Furthermore, "[i]f the objecting party informs the court that it intends to appeal and seek a stay, then the stay period should not be reduced to less than an amount of time sufficient to allow the objecting party to seek a stay, unless the court determines that the need to proceed sooner outweighs the objecting party's interests." *Id.*

101.    BNYM intends to appeal any order approving the Settlement Agreement and seek a stay.  The fourteen-day stay of Bankruptcy Rule 6004(h), to the extent applicable, is necessary to preserve the right of BNYM to seek a stay of any order approving the Settlement Agreement pending appeal.  The Debtors can make no showing whatsoever that there is a need to close the transaction within the 14-day period nor have the Debtors made a showing that the interests of BNYM are sufficiently protected.  The brief stay under Bankruptcy Rule 6004(h) would allow BNYM to seek a stay of an order approving the Settlement Agreement pending appeal.

## IV.    RESERVATION OF RIGHTS

102.    BNYM reserves its rights to supplement the objections set forth herein and to support objections asserted by other parties in interest.

## V.    CONCLUSION

For the foregoing reasons, BNYM respectfully requests that the Court enter an Order (a)(i) denying the Motion or (ii) approving the Motion *only if* the holders of PCRB Claims share *pari passu* with the Beneficiary-Claimants in the distributions on account of the waiver of the TCEH First Lien Deficiency Claims, and (b) granting such further relief to BNYM as is appropriate.

Dated:  October 23, 2015                              Respectfully submitted,
Wilmington, Delaware

                                                     REED SMITH LLP

                                          By:    /s/ *Kurt F. Gwynne*
                                                 Kurt F. Gwynne (No. 3951)
                                                 1201 Market Street, Suite 1500
                                                 Wilmington, DE 19801
                                                 Telephone: (302) 778-7500
                                                 Facsimile: (302) 778-7575
                                                 Email:  kgwynne@reedsmith.com

                                                 Sarah K. Kam (*pro hac vice*)
                                                 599 Lexington Avenue
                                                 New York, NY 10022
                                                 Telephone: (212) 549-0284
                                                 Facsimile: (212) 521-5450
                                                 Email: skam@reedsmith.com

                                                 Counsel to The Bank of New York Mellon,
                                                 in its capacity as the PCRB Trustee