# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Re: D.I. 5249, 6085, 6122 |

**TRIAL BRIEF AND OMNIBUS OBJECTION OF THE EFH OFFICIAL COMMITTEE TO (I) MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, TO APPROVE A SETTLEMENT OF LITIGATION CLAIMS AND AUTHORIZE THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE SETTLEMENT AGREEMENT AND (II) CONFIRMATION OF THE FIFTH AMENDED JOINT PLAN OF REORGANIZATION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1]  The last four digits of Energy Future Holdings Corp.'s taxpayer identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ..................................................................................................... 5

    A.    Concern in the Board Room. ................................................................... 5

    B.    Payments to Insiders. .............................................................................. 7

    C.    The "Guiding Light" of Global Settlement. ............................................ 8

    D.    The Initial Attempt at a Quick Global Settlement. ................................ 10

    E.    Sale Process in Pursuit of Global Settlement. ....................................... 10

    F.    Tax Memorandum in Pursuit of Global Settlement. .............................. 12

    G.    The EFH Committee. ............................................................................. 13

    H.    The Auction is Conditioned on TCEH Approval, Then Cancelled. ............ 13

    I.    The Improper Sale Process with the Controlling Owners. ..................... 15

    J.    The Purchase Option. ............................................................................ 18

    K.    The CRO Term Sheet: Global Releases for Price $TBD. ...................... 22

    L.    The Minimal Role of the Disinterested Directors. ................................. 24

    M.    The March Intercompany Claims Settlement. ........................................ 25

    N.    The Settlement Agreement. ................................................................... 28

    O.    Disarmament. ........................................................................................ 31

THE INTERSILO SETTLEMENT CANNOT BE APPROVED. ............................................... 34

    I.    THE INTERSILO SETTLEMENT HAS NO MERIT. ...................................... 34

    A.    The Bid and the Ask:  March 16 to March 26, 2015. ............................ 34

    B.    Ten Dispositive Considerations. ............................................................ 36

        1.    The Fair Market Value of TCEH is Less Than Basis and Available NOLs. ............ 36

        2.    The Tax Allocation Agreement Excludes AMT Claims. .......................... 38

3.    EFCH, Not EFH, Was the Tax Parent of TCEH........................................ 40

4.    A Four-Year Look-Back Period Applies to the Intercompany Notes....................... 45

5.    The Interest Rate on the TCEH Demand Notes Was Reasonably
Equivalent Value to TCEH. ..................................................................... 46

6.    TCEH Received Reasonably Equivalent Value for the Ordinary Course
Intercompany Payments............................................................................ 49

7.    The Intersilo Settlement Compromises Valuable Claims by EFH
Against TCEH and Luminant. ................................................................. 53

8.    The Intersilo Settlement Compromises Valuable Claims Against
Directors, Officers and Insurers. ............................................................ 57

9.    The Intersilo Settlement Compromises Valuable Claims Against
the Controlling Owners............................................................................ 59

10.    The LBO is Not Seriously in Dispute. ..................................................... 59

II.    THE INTERSILO SETTLEMENT IS A VIOLATION OF THE
FIDUCIARY DUTIES OF THE E-SIDE DEBTORS, IS NOT FAIR
AND CANNOT BE APPROVED. ..................................................................... 59

A.    Section 1107 of the Bankruptcy Code Imposes Duties on the Debtors
That Are Analogous to State Law Fiduciary Duties.................................... 59

B.    State Law Fiduciary Duties Also Apply. ..................................................... 60

C.    The EFH Directors and Officers Breached Their Fiduciary Duties,
and Accordingly, the Intersilo Settlement is Subject to Entire
Fairness Review........................................................................................... 61

D.    At a Minimum, Because the Intersilo Settlement is a Part of and
Justified Solely by a Change-of-Control Transaction, it is Subject
to Enhanced Scrutiny................................................................................... 67

E.    The Intersilo Settlement Cannot Survive Either Entire Fairness
Review or Enhanced Scrutiny. .................................................................... 69

III.    THE INTERSILO SETTLEMENT WAS NOT THE RESULT OF ARM'S-LENGTH
BARGAINING. .................................................................................................. 72

IV.    THE INTERSILO SETTLEMENT IS NOT FAIR, EQUITABLE,
REASONABLE OR IN THE INTERESTS OF THE E-SIDE ESTATES....................... 75

-ii-

A.    *TMT Trailer* Mandates Independent Review to Protect E-Side Creditors.................... 75

B.    The Intersilo Settlement Requires Heightened Scrutiny................................................ 76

C.    The Intersilo Settlement Fails a *Martin* Assessment. ................................................... 78

1.    Likelihood of Success on the Merits......................................................................... 78

2.    Collectability............................................................................................................ 79

3.    Complexity, Expense, Inconvenience and Delay. ................................................... 79

4.    The Paramount Interests of Creditors. .................................................................... 81

D.    The Intersilo Settlement Fails *Zenith*.......................................................................... 87

E.    The Debtors Have No Evidence of Fairness to Individual E-Side Debtors................. 93

V.    THE INTERSILO SETTLEMENT VIOLATES THE ABSOLUTE
PRIORITY RULE............................................................................................................ 94

A.    The Intersilo Settlement Must Comply with the Absolute Priority Rule..................... 94

B.    The Controlling Owner Releases Constitute Distributions of Value
on Account of Equity Interests in the Debtor. ............................................................. 97

THE PLAN IS NOT CONFIRMABLE. .................................................................................... 100

I.    THERE IS NO EVIDENCE OF FEASIBILITY. .......................................................... 101

A.    The E-side Debtors Have Impermissibly Prioritized Disarmament
Over Feasibility. ....................................................................................................... 101

B.    The Plan Lacks a Firm Commitment for the Necessary Funding.............................. 103

C.    Without an Enforceable Contract, the Likelihood of Closing
Depends on the Value of Oncor in the Future. .......................................................... 106

D.    The Plan is Premised on the Unusual and Unreasonable Contingencies
Necessary to Fundamentally Alter the Business of Oncor. ....................................... 111

E.    The Plan Lacks a Critical Indicator of Feasibility: Creditor Support. ....................... 113

II.    THE UNCERTAIN EFFECTIVE DATE PRECLUDES ANY RECORD
SUFFICIENT TO CONFIRM THE PLAN NOW.......................................................... 114

III.    THERE IS NO ADEQUATE MEANS TO IMPLEMENT THE PLAN........................ 115

SC1:3961318.8

IV.  THE PLAN FAILS TO SATISFY SECTIONS 1129(A)(1), (2), (3), (8) AND (10) OF THE BANKRUPTCY CODE. ................................................................ 116

    A.  The E-side Debtors Are Proposing the Plan for an Improper Purpose. ...................... 117

    B.  The Plan Violates the Fiduciary Duties of the E-side Debtors. .................................. 118

    C.  The Plan is Blatant Gerrymandering of Impaired Creditors. ..................................... 120

    D.  The Proposed Transactions Create "Synthetic Exclusivity." ..................................... 126

    E.  The Plan Violates Section 1103 of the Bankruptcy Code .......................................... 129

CONCLUSION .................................................................................................................... 131

SC1:3961318.8

# TABLE OF AUTHORITIES

## CASES

*A. Copeland Enters., Inc.* v. *Guste*,
    706 F. Supp. 1283 (W.D. Tex. 1989)........................................................................ 68

*Aronson* v. *Lewis*,
    473 A.2d 805 (Del. 1984)....................................................................................... 63

*Aurelius Capital Master Ltd.* v. *Acosta*,
    No. 13-CV-091173, 2014 WL 10505127 (N.D. Tex. Jan. 28, 2014).................................. 7, 58

*Bank of Am. Nat. Trust & Sav. Ass'n* v. *203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999)......................................................................................... 97, 125

*Capital Concepts Prop. 85-1* v. *Mut. First, Inc.*,
    35 F.3d 170 (5th Cir. 1994)..................................................................................... 54

*Case* v. *Los Angeles Lumber Products Co.*,
    308 U.S. 106 (1939) .............................................................................................. 94

*Cede & Co.* v. *Technicolor, Inc.*,
    634 A.2d 345 (Del. 1993).................................................................................. 62, 63

*Cinerama, Inc.* v. *Technicolor, Inc.*,
    663 A.2d 1156 (Del. 1995)...................................................................................... 66

*Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.* v. *Anderson*,
    390 U.S. 414 (1968)........................................................................................ passim

*Crescent/Mach I Partners, L.P.* v. *Turner*,
    846 A.2d 963 (Del. Ch. 2000).................................................................................. 66

*Geron* v. *Schulman (In re Manshul Constr. Corp.)*,
    No. 97–CV–8851, 2000 WL 1228866 (S.D.N.Y. Aug. 30, 2000) .................................... 54

*In re Abbotts Dairies of Pennsylvania, Inc.*,
    788 F.2d 143 (3d Cir. 1986)................................................................................... 126

*In re Adelphia Commc'n Corp.*,
    336 B.R. 610 (Bankr. S.D.N.Y. 2006)........................................................................ 74

*In re Advanced Telecomm. Network, Inc.*,
    490 F.3d 1325 (11th Cir. 2007) ............................................................................... 55

-i-

*In re Aguilar*,
  344 S.W.3d 41 (Tex. App. 2011) ........................................................................ 62

*In re All Land Investments, LLC*,
  468 B.R. 676 (Bankr. D. Del. 2012) ................................................................ 123

*In re Allegheny Int'l Inc.*,
  954 F.2d 167 (3d Cir. 1992) .............................................................................. 39

*In re Armstrong World Indus., Inc.*,
  432 F.3d 507 (3d Cir. 2005) .............................................................................. 94

*In re Armstrong World Indus., Inc.*,
  320 B.R. 523 (D. Del. 2005) ............................................................................ 101

*In re Armstrong World Indus., Inc.*,
  348 B.R. 136 (D. Del. 2006) ............................................................................ 130

*In re ARN LTD. Ltd. P'ship*,
  140 B.R. 5 (Bankr. D.D.C. 1992) .................................................................... 112

*In re Beyond.com Corp.*,
  289 B.R. 138 (Bankr. N.D. Cal. 2003) ............................................................ 102

*In re BH S & B Holdings LLC*,
  420 B.R. 112 (Bankr. S.D.N.Y. 2009) .............................................................. 66

*In re Broadstripe, LLC*,
  444 B.R. 51 (Bankr. D. Del. 2010) .............................................................. 63, 69

*In re Bush Indus., Inc.*,
  315 B.R. 292 (Bankr. W.D.N.Y. 2004) ........................................................... 118

*In re C.P. Del Caribe, Inc.*,
  140 B.R. 320 (Bankr. D.P.R. 1992) .................................................................. 81

*In re Capmark Fin. Grp. Inc.*,
  438 B.R. 471 (Bankr. D. Del. 2010) ......................................................... passim

*In re Cent. European Indus. Dev. Co. LLC*,
  288 B.R. 572 (Bankr. N.D. Cal. 2003) ............................................................ 114

*In re Chassix Holdings, Inc.*,
  533 B.R. 64 (Bankr. S.D.N.Y. 2015) ................................................................ 76

*In re Clarkson*,
  767 F.2d 417 (8th Cir. 1985) ................................................................... 110, 111

-ii-

*In re Combustion Eng'g, Inc.*,
   391 F.3d 190 (3d Cir. 2004)................................................................. 122, 124, 126

*In re Conex Holdings, LLC*,
   518 B.R. 792 (Bankr. D. Del. 2014) ................................................................. 39, 42

*In re Coram Healthcare Corp.*,
   271 B.R. 228 (Bankr. D. Del. 2001) ...................................................... 60, 118, 119

*In re Coram Healthcare Corp.*,
   315 B.R. 321 (Bankr. D. Del. 2004) ............................................................... 81, 87

*In re Delaware & Hudson Railway Co.*,
   124 B.R. 169 (D. Del. 1991)................................................................................. 67

*In re Dharmasuriya*,
   No. 2:09-BK-28606-PC, 2014 WL 845991 (Bankr. C.D. Cal. Mar. 4, 2014)......................... 77

*In re DN Assoc.*,
   144 B.R. 195 (Bankr. D. Me. 1992)...................................................................... 129

*In re Dollar Thrifty S'holder Litig.*,
   14 A.3d 573 (Del. Ch. 2010)................................................................. 68, 70, 122

*In re Drexel Burnham Lambert Grp., Inc.*,
   134 B.R. 493 (Bankr. S.D.N.Y. 1991)................................................................... 77

*In re Exaeris, Inc.*,
   380 B.R. 741 (Bankr. D. Del. 2008) ................................................... 67, 76, 91, 92

*In re Family Dollar Stores, Inc. Shareholder Litig.*,
   No. CV 9985-CB, 2014 WL 7246436 (Del. Ch. Dec. 19, 2014).......................................... 122

*In re Global Ocean Carriers Ltd.*,
   251 B.R. 31 (Bankr. D. Del. 2000) ...................................................................... 125

*In re Granite Broad. Corp.*,
   369 B.R. 120 (Bankr. S.D.N.Y. 2007)................................................................. 113

*In re Grossinger's Assoc.*,
   116 B.R. 34 (Bankr. S.D.N.Y. 1990)................................................................... 129

*In re Haardt*,
   65 B.R. 697 (Bankr. E.D. Pa. 1986) ................................................................... 114

*In re Hoffman*,
   52 B.R. 212 (Bankr. D.N.D. 1985) ...................................................................... 102

-iii-

*In re Indianapolis Downs, LLC*,
  486 B.R. 286 (Bankr. D. Del. 2013) ..................................................................... 103, 112, 113

*In re Innkeepers USA Trust*,
  442 B.R. 227 (Bankr. S.D.N.Y. 2010) .............................................................................. 67, 76

*In re Jevic Holding Corp.*,
  787 F.3d 173 (3d Cir. 2015)...................................................................................... 81, 95, 96

*In re Jones*,
  32 B.R. 951 (Bankr. D. Utah 1983) ........................................................................................ 114

*In re Kasual Kreation, Inc.*,
  54 B.R. 915 (Bankr. S.D. Fla. 1985)......................................................................................... 89

*In re KB Toys Inc.*,
  736 F.3d 247 (3d Cir. 2013)...................................................................................................... 55

*In re Krueger*,
  66 B.R. 463 (Bankr. S.D. Fla. 1986)....................................................................................... 114

*In re Lernout & Hauspie Speech Prods., N.V.*,
  301 B.R. 651 (Bankr. D. Del. 2003) ....................................................................................... 100

*In re Loudoun Heights, LLC*,
  No. 13-15588-BFK, 2014 WL 2928110 (Bankr. E.D. Va. June 27, 2014) ............................. 76

*In re Marvel Entm't Grp., Inc.*,
  222 B.R. 243 (D. Del. 1998)...................................................................................................... 73

*In re Master Mortg. Inv. Fund, Inc.*,
  168 B.R. 930 (Bankr. W.D. Mo. 1994).............................................................................. 88, 92

*In re Mavrode*,
  205 B.R. 716 (Bankr. D.N.J. 1997) .......................................................................................... 84

*In re McLean Indus., Inc.*,
  70 B.R. 852 (Bankr. S.D.N.Y. 1987) ...................................................................................... 130

*In re Miller Parking Co., LLC*,
  510 B.R. 123 (E.D. Mich. 2014)................................................................................................ 94

*In re Montgomery Ward Holding Corp.*,
  242 B.R. 147 (D. Del. 1999)...................................................................................................... 67

*In re Moultonborough Hotel Grp., LLC*,
  No. BR 10-14214-JMD, 2012 WL 5464630 (Bankr. D.N.H. Nov. 8, 2012) ........................... 76

*In re Nat. Century Fin. Enterprises, Inc.*,
  341 B.R. 198 (Bankr. S.D. Ohio 2006) .................................................................................. 56

*In re Nortel Networks, Inc.*,
  522 B.R. 491 (Bankr. D. Del. 2014) ...................................................................................... 92

*In re Nutraquest, Inc.*,
  34 F.3d 639 (3d Cir. 2006) .................................................................................................... 81

*In re Nutritional Sourcing Corp.*,
  398 B.R. 816 (Bankr. D. Del. 2008) ...................................................................................... 73

*In re Olde Prairie Block Owner, LLC*,
  467 B.R. 165 (Bankr. N.D. Ill. 2012) .................................................................................. 105

*In re Opus E., LLC*,
  528 B.R. 30, 109 (Bankr. D. Del. 2015) ................................................................................ 46

*In re Penn Cent. Transp. Co.*,
  596 F.2d 1127 (3d Cir. 1979)................................................................................................. 75

*In re Potomac Iron Works, Inc.*,
  217 B.R. 170 (Bankr. D. Md. 1997) .................................................................................... 114

*In re PPI Enters. (U.S.), Inc.*,
  324 F.3d 197 (3d Cir. 2003)................................................................................................. 123

*In re Premier Int'l Holdings, Inc.*,
  No. 09-12019(CSS), 2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010) ..................... 100, 117

*In re Pullman Const. Indus. Inc.*,
  107 B.R. 909 (Bankr. N.D. Ill. 1989) .................................................................................... 97

*In re PWS Holding Corp*,
  228 F.3d 224 (3d Cir. 2000)............................................................................... 97, 98, 99, 130

*In re Quigley Co. Inc.*,
  37 B.R. 102 (Bankr. S.D.N.Y. 2010) .................................................................................. 126

*In re R.M.L., Inc.*,
  92 F.3d 139, 152 (3d Cir. 1996)............................................................................................. 55

*In re Ralph C. Tyler, P.E., P.S., Inc.*,
  156 B.R. 995 (Bankr. N.D. Ohio 1993) ............................................................................... 103

*In re Rural Metro Corp.*,
  88 A.3d 54 (Del. Ch. 2014).............................................................................................. 68, 69

*In re S. Canaan Cellular Investments, Inc.*,
   427 B.R. 44 (Bankr. E.D. Pa. 2010) ............................................................... 102, 106

*In re Stratford Associates Ltd. P'ship*,
   145 B.R. 689 (Bankr. D. Kan. 1992) ..................................................................... 103

*In re Structurlite Plastics Corp.*,
   91 B.R. 813 (Bankr. S.D. Ohio 1988)..................................................................... 130

*In re Sugarhouse Realty, Inc.*,
   192 B.R. 355 (E.D. Pa. 1996) ...................................................................... 103, 106

*In re Summit Global Logistics, Inc.*,
   No. 08-11566, 2008 WL 819934 (Bankr. D.N.J. Mar. 26, 2008)........................... 60

*In re Sunflower Racing, Inc.*,
   226 B.R. 673 (D. Kan. 1998).................................................................................. 112

*In re TCI 2 Holdings, LLC*,
   428 B.R. 117 (Bankr. D.N.J. 2010) ....................................................................... 119

*In re Thurmon*,
   87 B.R. 190 (Bankr. M.D. Fla. 1988) .................................................................... 107

*In re Tribune Co.*,
   464 B.R. 126 (Bankr. D. Del. 2011) ............................................... 72, 89, 102, 112

*In re United Shipping Co.*,
   No. 4-88-533, 1989 WL 12723 (Bankr. D. Minn. Feb. 17, 1989)........................... 76

*In re W.T. Grant Co.*,
   699 F.2d 599 (2d Cir. 1983)..................................................................................... 76

*In re Washington Mut., Inc.*,
   442 B.R. 314 (Bankr. D. Del. 2011) ........................................................................ 75

*In re Washington Mut., Inc.*,
   461 B.R. 200 (Bankr. D. Del. 2011) ...................................................................... 102

*In re Windsor on the River Assoc., Ltd.*,
   7 F.3d 127 (8th Cir. 1993) ..................................................................................... 124

*In re World Health Alternatives, Inc.*,
   344 B.R. 291 (Bankr. D. Del. 2006) ........................................................................ 94

*In re WR Grace & Co.*,
   729 F.3d 332 (3d Cir. 2013).................................................................................... 126

*In re Yates Develop., Inc.*,
   258 B.R. 36 (Bankr. M.D. Fla. 2000) .................................................................. 115

*In re Zenith Elecs. Corp.*,
   241 B.R. 92 (Bankr. D. Del. 1999) ................................................................. passim

*Int'l Bankers Life Ins. Co.* v. *Holloway*,
   368 S.W.2d 567 (Tex. 1963) ............................................................................... 62

*John Hancock Mut. Life Ins. Co.* v. *Route 37 Business Park Assoc.*,
   987 F.2d 154 (3d Cir. 1993) ....................................................................... 123, 124

*JPMorgan Chase Bank, N.A.* v. *Charter Commc'ns Operating, LLC
   (In re Charter Commc'ns)*,
   419 B.R. 221 (Bankr. S.D.N.Y. 2009) ......................................................... 67, 77

*Landon* v. *S & H Mktg. Grp., Inc.*,
   82 S.W.3d 666 (Tex. App. 2002) ........................................................................ 69

*LaSalle Nat. Bank* v. *Perelman*,
   82 F. Supp. 2d 279 (D. Del. 2000) ...................................................................... 60

*Lyons* v. *Montgomery*,
   701 S.W.2d 641 (Tex. 1985) ............................................................................... 43

*Matter of Bergman*,
   585 F.2d 1171 (2d Cir. 1978) ........................................................................... 102

*Matter of Foster Mortg. Corp.*,
   68 F.3d 914 (5th Cir. 1995) ............................................................................... 77

*Matter of Sound Radio, Inc.*,
   93 B.R. 849 (Bankr. D.N.J. 1988) ............................................................ 101, 110

*Matter of T-H New Orleans Ltd. P'ship*,
   116 F.3d 790 (5th Cir. 1997) ........................................................................... 106

*Meyers* v. *Moody*,
   693 F.2d 1196 (5th Cir. 1982) ............................................................................ 63

*Michelson* v. *Duncan*,
   407 A.2d 211 (Del. 1979) ................................................................................. 119

*Mills Acquisition Co.* v. *Macmillan, Inc.*,
   559 A.2d 1261 (Del. 1989) ................................................................................. 66

-vii-

*Motorola, Inc.* v. *Official Comm. of Unsecured Creditors*
  *(In re Iridium Operating LLC)*,
  478 F.3d 452 (2d Cir.2007) ........................................................................... 72, 95, 96

*Myers* v. *Martin (In re Martin)*,
  91 F.3d 389 (3d Cir. 1996) ................................................................................. 74, 78

*N. Am. Catholic Educ. Programming Found., Inc.* v. *Gheewalla*,
  930 A.2d 92 (Del. 2007) ................................................................................. 62, 119

*Neurobehavorial Associates, P.A.* v. *Cypress Creek Hospital, Inc.*,
  995 S.W.2d 326 (Tex. App. 1999) ............................................................................ 62

*Northview Motors, Inc.* v. *Chrysler Motors Corp.*,
  186 F.3d 346 (3d Cir. 1999) .............................................................................. 60, 97

*Oberly* v. *Kirby*,
  592 A.2d 445 (Del. 1991) .................................................................................... 119

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel.*
  *Cybergenics Corp.* v. *Chinery*,
  330 F.3d 548 ........................................................................................................ 60

*Pace* v. *Jordan*,
  999 S.W.2d 615 (Tex. App. 1999) ............................................................................ 63

*Paramount Commc'ns Inc.* v. *QVC Network Inc.*,
  637 A.2d 34 (Del. 1993) ....................................................................................... 61

*Pension Benefit Guar. Corp.* v. *Braniff Airways, Inc. (In re Braniff Airways, Inc.)*,
  700 F.2d 935 (5th Cir. 1983) ................................................................................. 92

*Prod. Res. Grp., L.L.C.* v. *NCT Grp., Inc.*,
  863 A.2d 772 (Del. Ch. 2004) ............................................................................... 62

*Rales* v. *Blasband*,
  634 A.2d 927 (Del. 1993) ..................................................................................... 65

*Revlon, Inc.* v. *MacAndrews & Forbes Holdings, Inc.*,
  506 A.2d 173 (Del. 1986) ..................................................................................... 68

*The Majestic Star Casino, LLC* v. *Barden Development, Inc.*,
  716 F.3d 736 (3d Cir. 2013) .................................................................................. 37

*Travelers Indem. Co.* v. *Lake*,
  594 A.2d 38 (Del. 1991) ....................................................................................... 45

*Weaver* v. *Kellogg*,
  216 B.R. 563 (S.D. Tex. 1997) ............................................................ 62

*Weinberger* v. *UOP, Inc.*,
  457 A.2d 701 (Del. 1983) ............................................................ 66, 69

## STATUTES

11 U.S.C. § 1121 ............................................................................. 127

11 U.S.C. § 1129 ........................................................................... passim

11 U.S.C. § 507 ................................................................................. 97

11 U.S.C. § 553 ................................................................................. 54

26 C.F.R. 1.1502-1 ............................................................................ 42

DEL. CODE ANN. tit. 6, § 1304 (West) ...................................... 46, 53

DEL. CODE ANN. tit. 6, § 1309 (West) ............................................ 46

DEL. CODE ANN. tit. 8, § 141(a) (West) .......................................... 62

N.Y. DEBT. & CRED. LAW § 151 (McKinney) ............................... 54

TEX. BUS. & COM. CODE ANN. § 24.010 (West) ...................... 45, 46

TEX. BUS. ORGS. CODE ANN. § 21.401 (West) .............................. 62

## OTHER AUTHORITIES

H.R. Rep. No. 595, 95th Cong., 1st Sess. 401 (1978) ..................... 130

Richard B. Levin, J.R. Lederer, Leslie J. Tchaikovsky and Victor A. Vilaplana, *Bankruptcy Practice after the Bankruptcy Act of 2005*, SM048 ALI-ABA 1, American Law Institute - American Bar Association Continuing Legal Education (2006) ........................................... 127

S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978) ........................ 115

The official committee of unsecured creditors (the "EFH Committee") of Energy Future Holdings Corp. ("EFH"), Energy Future Intermediate Holding Company LLC ("EFIH"), EFIH Finance Inc., and EECI, Inc. ("EECI") hereby submits this trial brief and omnibus objection (this "Objection") to (a) the motion (the "Settlement Motion") of EFH and its affiliated debtors and debtors in possession (collectively, the "Debtors") for an order approving the amended and restated settlement agreement (as may be further modified, amended or supplemented from time to time, the "Settlement Agreement"), dated as of September 10, 2015, by and among the Debtors and the other parties thereto and (b) confirmation of the *Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 6122] (as may be further modified, amended or supplemented from time to time, the "Plan"),[1] and respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      EFH, EFIH, EFIH Finance Inc. and EECI (the "E-side Debtors") have no operations.  They own 80% of Oncor, a ring-fenced utility they cannot manage.  Yet this 80% interest has been stuck in bankruptcy for 18 months.

2.      The interest in Oncor should have been—and still can be—sold or reorganized in the best interests of the E-side creditors.  However, the bankruptcy cases of the E-side Debtors are controlled by conflicted fiduciaries who used exclusivity to prevent reorganization unless two groups of adverse parties consented:  the deeply impaired T-side creditors and EFH's controlling insiders.

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the Settlement Agreement, as applicable.

3.     The story of the last year of these cases is that the E-side creditors have not approved these consent payments.  The price has increased over the course of the cases.  Initially, the Debtors—in their conflicted plural form—proposed that EFH give up its NOLs, claims against insiders and claims against the E-side Debtors.  When the value of Oncor began to rise, the Debtors added a $700 million general unsecured claim against EFH.  When even that was not enough, the Debtors cancelled the Oncor auction and awarded the T-side creditors (who were working with the controlling owners) the exclusive option to buy Oncor set forth in the current Plan.

4.     At each step, the Debtors have blamed the E-side creditors for not coming up with their own plan to which the T-side creditors and controlling insiders consent.  The Debtors have waved the club of exclusivity and case expense to force the E-side creditors to do so.  However, the Debtors simultaneously made that consent impossible (or prohibitively expensive) by refusing to consider actual litigation of claims.  Instead, the Debtors communicated to the T-side creditors and controlling insiders that the "guiding light" of the Debtors' case strategy was to obtain their agreement.  The evidence at trial will show that the mere possibility of litigation with the TCEH junior creditors (who would sue controlling insiders) or litigation by an estate trust against controlling insiders was incompatible with the mandate of the E-side Debtors' supposed trustee.

5.     With exclusivity set to expire and approval of the E-side creditors still elusive, the Debtors replaced the recalcitrant E-side creditors with more flexible E-side "Disinterested Directors" and now propose to manufacture approval and take by force of law what the T-side creditors and the controlling insiders demand.  The Debtors do so by arguing— as the centerpiece to their business case—that the transactions described may be unusual, risky

-2-

and objected to by the E-side creditors, but are the only options currently available for the E-side Debtors to which the T-side creditors and controlling insiders consent.

6.      From EFH's perspective, the Debtors' global compromise with the T-side creditors reflected in the Settlement Agreement and the Plan before the Court upends the corporate governance fundamentals of bankruptcy.  The proposed transactions are a violation of the duty of care and the duty of loyalty, an impermissible outsourcing of responsibilities, a failure to marshal E-side Debtor property for the exclusive benefit of the applicable estates, and, as an essential condition to success, the virtually complete disenfranchisement of E-side creditors.

7.      The harm caused to the E-side creditors from the lack of stewardship of their estates increases with time.  The E-side Debtors could have been reorganized yesterday without the T-side Debtors.  They should be tomorrow, in a real plan with remedies, transparency, good faith, and the involvement of the E-side creditors who are at financial risk.

8.      With respect to the Settlement Agreement, the EFH Committee has no objection to the settlement among the T-side Debtors and the various T-side creditors.  This Objection is limited to the elements of the Settlement Agreement binding on the E-side Debtors, which consist of a settlement of inbound and outbound intercompany claims and related insider releases, and is referred to as the "Intersilo Settlement."  The Intersilo Settlement cannot be approved by this Court for five independent reasons, each of which is fatal.  First, there are ten dispositive issues relating to the merits of the claims proposed to be settled that, when canvassed, clearly establish that there is no justification for a net $700 million claim by EFH in favor of TCEH.  Without sufficiently valid claims, any material settlement must fail.

-3-

9.      Second, entry into the Intersilo Settlement is a violation of the fiduciary duties of the E-side Debtors and cannot be approved.  Third, the Disinterested Director process manufactured by the Debtors did not create a required arm's-length negotiation because none of the negotiating parties had an economic stake in the outcome.  Fourth, in the event the Court reaches a conventional analysis under Bankruptcy Rule 9019, the evidence will establish that the Intersilo Settlement is not fair, reasonable or in the interests of the E-side Debtors' estates.  Fifth, the Intersilo Settlement fails to comply with the absolute priority rule by providing value to the controlling equity owners ahead of the E-side creditors.

10.      As do the Debtors, the EFH Committee regards the two components of the Intersilo Settlement—the resolution of claims among the T-side and E-side estates and the resolution of claims among the E-side estates and their insiders—as inextricably linked.  In the Intersilo Settlement, EFH buys releases for the controlling insiders, current and former directors and officers, participating creditors, and their affiliates "from the beginning of the world" from all claims, including claims previously alleged by the TCEH Unsecured Ad Hoc Group and other T-side creditors against the released parties.  If the insider releases are not included, EFH has overpaid on the Debtors' own analysis.

11.      The Plan fares no better.  Its terms were negotiated between the purchasers and the controlling owners, and then virtually ignored by the Debtors who prioritized long-term settlement *and bargained away every conceivable incentive that could have been put in the Plan to motivate its closure*.  As a result, the EFH Board of Directors agreed to a nine month commitment where the estate has no enforceable rights.  This Plan is not confirmable because the Debtors cannot satisfy their burden of establishing that the Plan is in the best interests of the E-side Debtors or feasible under section 1129(a)(11) of the Bankruptcy Code or that it has

-4-

adequate means of implementation under section 1123(a)(5).  Moreover, the Plan as it relates to

the E-side Debtors intentionally violates cardinal bankruptcy policies and suffers from numerous

other infirmities under section 1129(a) that redundantly preclude confirmation.

## STATEMENT OF FACTS

      A.    <u>Concern in the Board Room.</u>

      12.    These chapter 11 cases are the culmination of the largest failed leveraged

buyout in history.  At all times since the 2007 buyout, 100% of EFH has been owned by Texas

Energy Future Holdings Limited Partnership, a limited partnership controlled by certain

investment funds affiliated with (i) Kohlberg Kravis Roberts & Co. L.P., (ii) TPG Global LLC

and (iii) GS Capital Partners (collectively, the "<u>Controlling Owners</u>").  (EFH, Annual Report

(Form 10-K), at iv-v (March 31, 2015).)  At all times since the buyout, the Controlling Owners'

representatives have comprised a majority of the EFH Board of Directors.

      13.    Although EFH has only three owners and no listed public stock, as of the

Petition Date in these cases, EFH had over $41 billion of funded debt outstanding on a

consolidated basis.  Its indebtedness was publicly traded and registered with the Securities and

Exchange Commission.  In the years prior to the commencement of these cases, EFH funded

debt was actively traded and highly liquid.

      14.    Energy prices declined dramatically after the buyout.  As a result, EFH has

███████████████████████████████████████████████████████

██.  (*See* Glueckstein Decl., Ex. 23, Expert Report of Mark F. Rule at 5.)  EFH's funded debt

continued to actively trade while EFH was insolvent.

      15.    As its financial situation worsened in 2012, EFH and its Debtor

subsidiaries undertook a series of liability management transactions beginning in 2010.  The

liability management transactions generally were led by Mr. Keglevic, with the close involvement of sponsor directors.  (Glueckstein Decl., Ex. 8 (Keglevic II Depo. Tr.) at 268:23-269:12; Ex. 11 (Smidt Depo. Tr.) at 157:2-10.)  At the time of these liability management transactions, EFH was insolvent, as it essentially admitted publicly.  (*See* EFH, Annual Report (Form 10-K), at 41, 121 (March 3, 2009).)

16.    The Debtors ██████████████████████████████████████

███████████████████████████████.  (Glueckstein Decl., Ex. 8 (Keglevic II Depo. Tr.) at 220:23-222:6; Ex. 25 at KERTN00000026-36.)

17.    Faced with uncertainty and mounting risk that their liability management transactions would be unsuccessful, the Debtors were ████████████████████████████

███████████████ ("<u>D&O Insurance</u>").  ████████████████████████████

███████████████████████████████████████.  (Glueckstein Decl., Ex. 26 at EFH03509294.)  At the time, the EFH Board of Directors was informed that the "███

███████████████████████████████."  (*Id.*)  At an October 25, 2012 Board of Directors meeting, Mr. Keglevic and others discussed "████████████████████████

████████████████████████████████████████████████████

███████████████" (Glueckstein Decl., Ex. 27 at EFH-SP00070456.)

18.    With respect to the events of this period, the Debtors received letters from the creditors of TCEH, including the TCEH Committee, asserting numerous fiduciary duty and avoidance claims against directors, officers and the Controlling Owners.  (Glueckstein Decl., Ex. 74 at EFH05850377-382; Ex. 75 at EFCH00007456-61.)



-6-

19.     In 2013, creditors sued Mr. Keglevic and other executives for breach of fiduciary duties.  (*See Aurelius Capital Master Ltd.* v. *Acosta*, No. 13-cv-091173, 2014 WL 10505127 (N.D. Tex. Jan. 28, 2014).)  That suit was dismissed on standing grounds.

B.      Payments to Insiders.

20.     Since the buyout, EFH and its Debtor subsidiaries have paid in excess of $███████ to the Controlling Owners in the form of management, transaction, advisory and monitoring fees under the 2007 Management Agreement.

21.     The EFH directors and officers also were well paid during the years preceding the Petition Date.  Three individuals at the center of the events described in this Objection were among the top six earners at EFH in the last few years.  In 2013, EFH's Chief Financial Officer, Mr. Paul Keglevic, received approximately $3.35 million in aggregate compensation.  (EFH, Annual Report (Form 10-K), at 191 (March 31, 2015).)  EFH's General Counsel, Ms. Stacey Doré, received approximately $2.84 million in aggregate compensation. (*Id.*)  Compensation in prior years was commensurate, as was compensation in 2014, the year of the chapter 11 filing.  Mr. Keglevic and Ms. Doré were chosen as "co-"Chief Restructuring Officers (each, a "CRO") of the Debtors.  They have no professional restructuring experience in chapter 11.  (Glueckstein Decl., Ex. 8 (Keglevic II Depo. Tr.) at 278:18-279:4; Ex. 5 (Doré Depo. Tr.) at 31:8-10.)

22.     Donald J. Evans, the Chairman of the EFH Board of Directors, has been paid over $17.6 million in aggregate compensation in the years since the buyout, including $2.6 million in 2014, $2.6 million in 2013 and $3.34 million in 2012.  Mr. Evans is an independent director and one of two "Disinterested Directors" of EFH.  (*See* EFH, Annual Report (Form 10-K), at 271 (March 3, 2009); EFH, Annual Report (Form 10-K), at 258 (February 19, 2010); EFH,

-7-

Annual Report (Form 10-K), at 251 (February 18, 2011); EFH, Annual Report (Form 10-K), at 223 (February 21, 2012); EFH, Annual Report (Form 10-K), at 212 (February 19, 2013); (EFH, Annual Report (Form 10-K), at 224 (April 30, 2014); EFH, Annual Report (Form 10-K), at 206 (March 31, 2015).)

C.    The "Guiding Light" of Global Settlement.

23.    From the outset of the Debtors' restructuring efforts, and at every point since, the key actors for the Debtors have been driven by a desire for "global settlement" and releases of all litigation claims against insiders. The Debtors have pursued this objective at all costs to creditors, prioritizing their desire for peace over maximizing distributable value. The Debtors' Co-Chief Restructuring Officer admits that "



" (Glueckstein Decl., Ex. 5 (Doré Depo. Tr.) at 282:5-22.) The other co-CRO, Mr. Keglevic, testified that dating back to the first discussions about a potential restructuring in December 2012, he "

." (Glueckstein Decl., Ex. 8 (Keglevic II Depo. Tr.) at 238:15-25.) This view is consistent with the desires of the Controlling Owners,

. (Glueckstein Decl., Ex. 28 at EFH03479793-95.)

. (Glueckstein Decl., Ex. 11 (Smidt Depo. Tr.) at 103:9-18.)

24.    This focus on global settlement

████████████████████████████████████████████████████

███████████████████████████████████████ (Glueckstein Decl., Ex. 14

(Ying Depo. Tr.) at 98:11-16.)  The decision-makers for EFH, the CROs and the Board of

Directors, each emphasize ████████████████████████████████

████████████████████████████████████████████.  Mr. Keglevic

testified that "████████████████████████████████████████

████████████████████████████████████████████."

(Glueckstein Decl., Ex. 7 (Keglevic I Depo. Tr.) at 36:24-37:8.)  Mr. Ying summed up the

Debtors' desire for a global settlement succinctly as "█████████████████" of the

restructuring effort.  (Glueckstein Decl., Ex. 14 (Ying Depo. Tr.) at 112:13-19.)

     25.    The so-called Disinterested Directors at EFH ████████████.  Each

stated that ████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████.  (Glueckstein Decl., Ex. 13 (Williamson II Depo. Tr.) at 94:8-19;

Ex. 6 (Evans Depo. Tr.) at 148:7-149:7.)  This "guiding light" yielded an unwillingness to

commence litigation or pursue a plan of reorganization unless it delivers a global settlement.

(Glueckstein Decl., Ex. 5 (Doré Depo. Tr.) at 249:19-250:2; Ex. 12 (Williamson I Depo. Tr.) at

46:11-20.)  In fact, Ms. Williamson expressed ████████████████████████████

██████, testifying that "█████████████████████████████████████

█████████████████████████."  (Glueckstein Decl., Ex. 13 (Williamson II Depo. Tr.) at

96:14-97:2.)

     26.    Over $22 billion dollars of claims against the T-side Debtors cannot be

satisfied from the businesses they own.  In the absence of the Settlement Agreement, or another

-9-

similar transaction, the only source of recovery for these claims is likely litigation, chiefly against non-Debtors.

27.    In describing the currently proposed set of transactions to counsel for the Controlling Owners, counsel for the TCEH Unsecured Ad Hoc Group opined that the

███████████████████████████████████████████████████

(Glueckstein Decl., Ex. 29 at CONF_TUA-00001785.)

D.    The Initial Attempt at a Quick Global Settlement.

28.    Immediately before the Petition Date, the Debtors entered into the Restructuring Support and Lock-Up Agreement (the "RSA") with certain stakeholders.  ([D.I. 98], Ex. D.)  The RSA would have severely impaired both EFH and TCEH unsecured creditors.  The RSA, however, would have locked in full releases to officers, directors and Controlling Owners.  (Glueckstein Decl., Ex. 5 (Doré Depo. Tr.) at 277:2-20, 392:20-393:20.)

29.    In the summer of 2014, it became clear that the Debtors and the Controlling Owners would not "get everything they could have dreamed of" yet.  The RSA, while providing releases, did little else, and certainly did not maximize the value of EFH for either EFH or TCEH unsecured creditors.  In the face of creditor objections, the RSA was terminated by the Debtors on July 24, 2014.  ([D.I. 1697].)  Instead, the Debtors embarked on a sale process to maximize the value of the 80% ownership interest in Oncor held by EFIH and, indirectly, by EFH.

E.    Sale Process in Pursuit of Global Settlement.

30.    Even though the Oncor interest belongs solely to the E-side Debtors, all the Debtors moved jointly for approval of bidding procedures to sell Oncor.  ([D.I. 2087].)  The only explanation offered for the decision to include the T-side Debtors as movants on a motion to

-10-

sell property of EFH and EFIH is (i) that TCEH has identified potential claims against EFH that, if allowed, would make TCEH a creditor of EFH; and (ii) the TCEH estate might argue it should be participating.  (Glueckstein Decl., Ex. 5 (Doré Depo. Tr.) at 354:22-355:13; Ex. 8 (Keglevic II Depo. Tr.) at 152:9-23.)

31.     In October 2014, the Court rebuked the Debtors' lack of appropriate corporate governance in pursuing the bidding procedures motion.  (Glueckstein Decl., Ex. 15 (Nov. 3, 2014 Hr'g Tr.) at 18:1-4.)  The Court recognized that the nature of the Debtors' decision-making could require the Court to apply principles "of state law governing the exercise of fiduciary duties such as requiring a debtor to demonstrate the entire fairness of a proposed transaction."  (*Id.* at 17:13-18.)

32.     The Debtors sought to address their corporate governance deficiencies by retaining, at the direction of their Disinterested Directors, separate teams of legal counsel and financial advisors.  The ostensible role of these advisors was to represent the respective estates' interests with respect to issues on which there is an actual conflict of interest, chiefly among the E-side Debtors, on the one hand, and the T-side Debtors, on the other hand.

33.     Yet little changed.  The Debtors remained focused on ensuring that all the Disinterested Directors approve any Oncor sale transaction.  (Glueckstein Decl., Ex. 14 (Ying Depo. Tr.) at 25:20-26:4.)  In doing so, the Debtors provided TCEH a veto over the Oncor sale process, even though TCEH's estate was insolvent by billions of dollars and, accordingly, TCEH's interests diverged from those of the E-side Debtors.  On January 10, 2015, counsel for the TCEH Committee reported to TCEH's independent counsel that they had been assured by the Debtors' joint counsel at Kirkland & Ellis LLP that Hugh Sawyer, the TCEH Disinterested Director, " will be able to stop [the] sale process if needed."  (Glueckstein Decl., Ex. 31 at

EFCH00016061.)  TCEH's independent counsel did not dispute that understanding.  Mr. Sawyer

confirmed ███████████████████████████████████████████████████

████████████████████████████████████████████████████████.

(Glueckstein Decl., Ex. 10 (Sawyer Depo. Tr.) at 700:18-701:6.)  No other EFH creditor

(potential or actual) was given a veto.

       F.    <u>Tax Memorandum in Pursuit of Global Settlement.</u>

      34.    From the outset, the Debtors' central excuse as to why the E-side Debtors

must purchase the T-side creditor consent rested on federal tax law.  On October 1, 2014, the

Debtors had filed an Omnibus Tax Memorandum with the Court designed to support its assertion

that EFH could not be reorganized without the consent of TCEH and, in particular, the holders of

the TCEH First Lien Claims (the "<u>TCEH First Lien Creditors</u>").  ([D.I. 2296].)  The Omnibus

Tax Memorandum was prepared by the Debtors' Joint Counsel.  The Debtors stated that a

taxable disposition of the T-side Debtors (disregarded entities) by EFH (their corporate parent)

"likely would result in EFH being left with a potential tax liability of ***$7 billion* or more**."  (*Id.* at

4 (emphasis in original).)  The Debtors' analysis was based on mischaracterization of federal tax

law and an "illustrative" assumption that the fair market value of TCEH was $18 billion. (*Id.* at

8-9.)

      35.    The Debtors waited to disclose the current value of TCEH until they were

required to do so in connection with the challenge to reinstatement of the EFH legacy bond.  The

value of TCEH, calculated as of ███████████, is between $██ and $███ billion.  (Glueckstein

Decl., Ex. 24, Expert Report of David Ying at 3.)  The sum of existing basis and net operating

losses at EFH is $██ billion today.  (Glueckstein Decl., Ex. 22, Expert Report of Michael Henkin

-12-

at 48.)  Accordingly, on the real numbers, zero taxes will be payable in the event of a taxable

deconsolidation of TCEH, not *$7 billion or more*.

G.    The EFH Committee.

36.    After having no official committee for the first six months of these cases,

the EFH Committee was appointed by the United States Trustee on October 27, 2014, pursuant

to section 1102(a)(1) of the Bankruptcy Code.  ([D.I. 2570].)  The EFH Committee represents

the collective interests of the unsecured creditors of EFH, EFIH, EFIH Finance Inc., and EECI,

Inc.  (*Id.*)  Once the EFH Committee and its advisors began their investigation, they quickly

concluded that the absence of fiduciary loyalty to the E-side Debtors had created a false narrative

about tax matters and the balance of litigation claims.

37.    At the first appearance in Court for the EFH Committee, counsel noted

that "we are not convinced that there is a foreseeable chain of events at Luminant that would

result in stranded tax liability at EFH in any realistic set of circumstances," and that the narrative

on "intercompany claims is more complicated in our view than it may first appear."

(Glueckstein Decl., Ex. 16 (Nov. 20, 2014 Hr'g Tr.) at 19:21-23, 20:5-8.)  On December 11,

2014, the EFH Committee identified to the Debtors specific additional intercompany claims

requiring attention and expressed the view that claims against the Controlling Owners and other

insiders should not be settled outside of a plan because such a settlement could prove harmful to

creditors.  (Glueckstein Decl., Ex. 30 at EFH_DD00004946-47.)

H.    The Auction is Conditioned on TCEH Approval, Then Cancelled.

38.    When the EFH Committee was formed, the Court delayed approval of

modified bidding procedures to permit the EFH Committee to retain advisors and comment on

those bidding procedures.  (Glueckstein Decl., Ex. 15 (Nov. 3, 2014 Hr'g Tr.) at 22:20-22.)  The

-13-

EFH Committee was involved in the negotiation of the bidding procedures, which ensured that the EFH Committee, as fiduciary for the E-side unsecured creditors, would see bid information, be kept informed of the progress of negotiations and be in a position to form a recommendation for or against a sale transaction.  ([D.I. 3284-1] at Ex. 1. to Ex. A 3-4, 8.)

39.    However, it became clear that the involvement of TCEH on the sell-side would complicate the execution path for any Oncor sale.  Not only did the TCEH Committee understand that the TCEH Disinterested Director would be able to stop the Oncor sale process, but the TCEH Unsecured Ad Hoc Group used the insertion of TCEH to argue for delay of the bidding process and the postponement of the Debtors' selection of a stalking horse buyer, with the publicly-announced intention of advancing their own proposed Oncor transaction instead. (*See* Glueckstein Decl., Ex. 31 at EFCH00016061; Ex. 39 at EFH05794837; Ex. 76 at EFH05794239; Ex. 37 at EFH05794119-21.)  Any purchaser watching was on notice that it was competing with TCEH creditors who could influence TCEH's approval of the winning bid.

40.    The Debtors ultimately received ██████ bids at the second round bidding deadline on April 13, 2015: ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████.

41.    On the Round 2 Bid Deadline,[2] ████████████████████████████ ████████████████████████████████████████████████. (Glueckstein Decl., Ex. 32 at EFH05806958.) ████████████████████ ████████████████████████████████████████████

---

[2]    As defined in the Transaction Bidding Procedures [D.I. 3284-1] at 9.

██████████████████████████████████ (*Id.* at EFH05807044-45), ███████████████

███████████████████████████. (*Id.* at EFH05807050-51.)

42.    The documents submitted by ███████ on the Round 2 Bid Deadline

contained a ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███. (*Id.* at EFH05806352-53.)  In addition, ██████████████████████████

███████████████████████████ (*Id.* at EFH05806633), ████████████████

████████████████████████████████████████████████████████████████████

███████ (Glueckstein Decl., Ex. 32 at EFH05806565, 628.)

43.    The Debtors ultimately concluded that the auction process "████████████

████████████████████████" and cancelled the auction.  (Glueckstein Decl., Ex. 5 (Doré

Depo. Tr.) at 361:11-14; Ex. 14 (Ying Depo. Tr.) at 38:19-39:20.) ███████████████

███████████████████████████. (Glueckstein Decl., Ex. 13 (Williamson II Depo. Tr.)

at 150:11-15.)

I.    The Improper Sale Process with the Controlling Owners.

44.    A ███ "bid," however, was *not* submitted.  During the competitive

auction process, the TCEH Unsecured Ad Hoc Group—██████████████████████████

█████—reached out to ██████████████████ to discuss a new proposal.  The premise of

this transaction was a simple *quid pro quo*: ████████████████████████████████████.

(Glueckstein Decl., Ex. 33 at EFH05796176-80.)

45.    The Debtors initially were not involved.  ████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████. (Glueckstein

-15-

Decl., Ex. 34 at EFH05795328-29.)  This was the first in a string of Debtor complaints about

being "████████" with the real negotiations between the TCEH Unsecured Ad Hoc Group, as

bidders, and ████████████, and "████████████████." (Glueckstein

Decl., Ex. 35 at EFH05793136-37.)

      46.    While the Debtors were providing the EFH Committee with the weekly

updates and draft documents about ████████████████ required by the Court-

approved bidding procedures, confidential negotiations continued between the TCEH Unsecured

Ad Hoc Group and ████████████.  Eventually, the Debtors' counsel was invited to join

and provided due diligence materials similar to those made available to auction bidders.

(Glueckstein Decl., Ex. 36 at EFH05796786-88; Ex. 37 at EFH05794119-23; Ex. 38 at

EFCH00005275-77.)  The Debtors were informed that ████████████████████

███████████████████████████████████████████████████

███████████████████████.  (Glueckstein Decl., Ex. 5 (Doré Depo. Tr.) at

356:23-357:10.)  The TCEH Unsecured Ad Hoc Group was clear in its correspondence with the

Debtors of the main advantage of their proposal: ████████████████████

████████████  (Glueckstein Decl., Ex. 39 at EFH05794839.)

      47.    In accordance with ████████████████, the Debtors

shifted to the primary pursuit of the TCEH Unsecured Ad Hoc Group's proposal at the expense

of the Court-approved auction.  First, the Debtors helped the TCEH Unsecured Ad Hoc Group

find an operator:  the Hunt Group ████████████████████████

████████████.  Mr. Kieselstein ████████████████████████

███████████████████████████.  (Glueckstein Decl., Ex. 40 at

EFH05795075-77.)  This was ████████████████████████████

-16-

███████████████████████████████████████████████.  (*Id.*)

Astonishingly, this ███████████████████████████, but not known by the

Debtors' co-CRO and General Counsel, Ms. Doré, who was ████████████████

████████████████████████████████████████████████

████████.  (*See* Glueckstein Decl., Ex. 41 at EFIH_DD00023417-18.)

       48.    As their proposed transaction developed, the TCEH Unsecured Ad Hoc

Group began requesting that the Debtors postpone the Round 2 Bid Deadline, the filing of a

stalking horse motion under the bidding procedures, and the planned filing of their chapter 11

plan.  To increase leverage, in early April, the TCEH Unsecured Ad Hoc Group stressed that

their proposal needed more time, but would eliminate or substantially reduce the litigation that

would otherwise "plague" the Debtors.  (*See* Glueckstein Decl., Ex. 39 at EFH05794837.)

Accordingly, the Debtors should ████████████████████████████████████

████████████████████████████████  (*See* Glueckstein Decl.,

Ex. 76 at EFH05794239.)  While initially resistant, the Debtors soon began negotiating a

stipulation with the TCEH Unsecured Ad Hoc Group, the TCEH Committee and TCEH

Disinterested Director, whereby the Debtors agreed not to commence their stalking horse hearing

before June 15, 2015—in exchange for an adjournment of the TCEH Unsecured Ad Hoc Group's

and TCEH Committee's motions seeking standing to litigate avoidance and other actions.  (*See*

Glueckstein Decl., Ex. 77 at EFCH00001692-94.)[3]

---

[3]    In response to the EFH Committee's inquiry regarding the postponement of the stalking horse hearing, counsel to the EFH Disinterested Directors stated that the stipulation regarding the standing motion and Oncor stalking horse hearing was not a Conflict Matter.  (*See* Glueckstein Decl., Ex. 78 at EFH_DD00023428.)

49.     On June 8, 2015, the new transaction arranged by the Controlling Owners, the TCEH Unsecured Ad Hoc Group and the Hunt Group was publicly announced.  (Glueckstein Decl., Ex. 42 at EFH HUNT 0000589-602.)  Just days before, the press release had been sent to White & Case LLP, counsel to the TCEH Unsecured Ad Hoc Group, for review prior to filing on Form 8-K.  A comparison of the draft press release and Form 8-K with the final version indicates that the word "██" in the draft had been replaced by counsel with the word "proposal." (*Compare id. with* InfraREIT, Inc., Current Report (Form 8-K), at Ex. 99.1 (June 8, 2015).)

50.     On June 25, 2015, the Debtors announced in Court that they would not be proceeding with a stalking horse bidder and effectively cancelled the Court-approved competitive auction process.  (Glueckstein Decl., Ex. 19 (June 25, 2015 Hr'g Tr.) at 14:25-15:4.) Shortly before that announcement, the Debtors' Board of Directors was informed that ████

████████████████████████████████████████████████

██████████████████████.  (*See* Glueckstein Decl., Ex. 79 at EFH05551779.)

J.      The Purchase Option.

51.     The Debtors assert that, both at the time the Plan was filed and today, there is no other available plan of reorganization that provides an opportunity for the E-side creditors to be paid in full.  (Glueckstein Decl., Ex. 8 (Keglevic II Depo. Tr.) at 122:12-21; Ex. 12 (Williamson I Depo. Tr.) at 22:2-6; Ex. 5 (Doré Depo Tr.) at 308:20-25; Ex. 14 (Ying Depo Tr.) at 52:11-15; Ex. 6 (Evans Depo. Tr.) at 146:19-147:3.)  That belief, however, cannot explain nor justify the illusory nature of the proposed transaction.

52.     The Plan contemplates a potential merger transaction by which the Hunt Group and certain T-side creditors (collectively with the Hunt Group, the "Purchasers") have a free option to purchase EFIH's interest in Oncor.  As with typical option contracts, the Purchase

-18-

Agreement and Agreement and Plan of Merger by and among Ovation Acquisition I, L.L.C., Ovation Acquisition II, L.L.C., EFIH, and EFH (the "Merger Agreement") grants the Purchasers the right, but not the obligation, to acquire Oncor.

53.    The non-binding nature of the Purchasers' option to purchase Oncor is undisputed.  (Glueckstein Decl., Ex. 7 (Keglevic I Depo. Tr.) at 58:25-59:4.)  The proposed merger was presented to the Boards of Directors on numerous occasions as a non-binding purchase contract:  the Boards of Directors were advised that the " ██████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████ ."  (Glueckstein Decl., Ex. 53 at EFH06002849 (emphasis in original); Ex. 51 at EFH06002903.)  As the Debtors' CROs and the EFH Disinterested Directors acknowledged, this means that the Purchasers may elect not to close the transaction for any reason, whether it be based on their personal financial interests, the value of Oncor, or the economic conditions at the time of closing.  (Glueckstein Decl., Ex. 8 (Keglevic II Depo. Tr.) at 169:22-170:3; Ex. 5 (Doré Depo. Tr.) at 314:11-16, 315:8-13; Ex. 6 (Evans Depo. Tr.) at 268:12-23, 269:18-24; Ex. 13 (Williamson II Depo. Tr.) at 140:9-141:2.)  The Debtors' joint financial advisor, Mr. Ying, testified that ████████████████████ ███████████████████████████████████████████████████████████████ ███████████████ (Glueckstein Decl., Ex. 14 (Ying Depo. Tr.) at 64:14-65:7.)  The Debtors, however, did ██████████████████████████████████████████████ ████████████████████████████████████████████. (Glueckstein Decl., Ex. 7 (Keglevic I Depo. Tr.) at 61:8-19.)

54.    The Merger Agreement provides no remedies to the Debtors in the event that the Purchasers choose not to close the transaction, even if all regulatory and other conditions

are met.  (Glueckstein Decl., Ex. 2 (Baker Depo. Tr.) at 150:3-20; Ex. 14 (Ying Depo. Tr.) at

67:9-14; Ex. 5 (Doré Depo. Tr.) at 317:21-25.)  Perhaps even more significantly, the Merger

Agreement contains an express waiver of all remedies against the Purchasers.  (*See* Merger

Agreement § 9.9(b).)  The Purchasers can choose to walk away from the deal without the usual

concern of parties in their situation that they could face damages for breaching their

commitments.

       55.     Over the course of negotiations, the Debtors expressed concern about the

"███████████████████████████" associated with the transaction.  (Glueckstein Decl., Ex.

57 at EFH05954744; Ex. 2 (Baker Depo. Tr.) at 115:10-13.)  Likewise, presentations to the

Board of Directors highlighted ███████████████████████████

███████████.  (Glueckstein Decl., Ex. 58 at EFH05552008; Ex. 53 EFH06002849; Ex. 51

at EFH06002936, 939.)  The Board of Directors were told:



(Glueckstein Decl., Ex. 53 at EFH06002855.)

       56.     Without contractual remedies, the likelihood that the Purchasers will

desire to close on the expected terms takes on paramount importance.  Ms. Doré, the Debtors'

co-CRO, testified that ███████████████████████████████

███████████.  (Glueckstein Decl., Ex. 5 (Doré Depo. Tr.) at 312:15-313:14.)  In fact, both CROs

testified that ███████████████████████████████████

███████████.  (*Id.* at 316:6-10; Ex. 8 (Keglevic II Depo. Tr.) at 165:5-12.)  Their views

consist only of ███████████████████████████████████

████████████████████████████████████. (*See id.* at 165:22-169:13.)  The EFH Disinterested Directors similarly expressed their █████████████████████████████████████ ████████████████████████████████. (Glueckstein Decl., Ex. 6 (Evans Depo. Tr.) at 263:25-264:6; Ex. 13 (Williamson II Depo. Tr.) at 138:18-140:8.)

57.    Mr. Ying, a professional with M&A advisory experience, was more succinct.  He testified that in evaluating the proposed transaction, he simply ████████████ ██████████████████████████████████████████████████████████████ ████. (Glueckstein Decl., Ex. 14 (Ying Depo. Tr.) at 48:10-49:6.)

58.    The Debtors had little involvement in the development of the financial terms of the proposed transaction.  The Debtors' joint financial advisor explained that ███ ██████████████████████████████████████████████████████████████ ██████. (*Id.* at 15:8-16:11.)  The price was merely the price investors had to pay to satisfy claims of E-side creditors that must be paid to emerge from bankruptcy, not a penny more or less. (*Id.* at 84:24-85:22.)  ███████████████████████████████████████ ████████████████████████████████████████████ ████████. (Glueckstein Decl., Ex. 39 at EFH05794837-39; Ex. 35 at EFH05793136.)  Mr. Ying testified that █████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████. (Glueckstein Decl., Ex. 14 (Ying Depo. Tr.) at 14:7-23; 15:8-18.)

59.    Plan negotiations also excluded E-side creditors and the EFH Committee, despite their rights under the bidding procedures.  (Glueckstein Decl., Ex. 13 (Williamson II Depo. Tr.) at 17:19-18:8; Ex. 6 (Evans Depo. Tr.) at 194:22-195:4; Ex. 3 (Cremens I Depo. Tr.) at 119:25-120:11.)

-21-

60.    The Debtors did ███████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████. (Glueckstein Decl., Ex. 54 at

EFH06192803-07.)  While the Hunt Group apparently was ███████████████ (*see* Glueckstein

Decl., Ex. 55 at EFH Hunt 005216-21), the Debtors were not only unsuccessful in obtaining

either specific performance or a reverse break fee, but they also ended up disclaiming even their

common law remedies.  In fact, the Debtors bargained away all remedies in the Merger

Agreement in exchange for support for the Settlement Agreement.  (Glueckstein Decl., Ex. 5

(Doré Depo. Tr.) at 335:13-336:6.)  The Debtors prioritized lasting consensus with T-side

creditors over contract remedies for the seller.  (*Id.*; Ex. 13 (Williamson II Depo. Tr.)

at 96:14-24.)

61.    The Debtors acknowledge that the contract is an option, but argue that it is

not "free."  The Debtors assert that "[t]he disarmament concept can be thought of like a non-

refundable deposit.  Instead of cash, however, the currency is the permanent waiver of any and

all alleged causes of action . . . . With that context we think it's difficult for any party to

characterize the rights of the ad hoc [TCEH] unsecured creditors in the proposed transactions as

something that was obtained free of cost."  (Glueckstein Decl., Ex. 21 (Aug. 25, 2015 Hr'g Tr.)

at 20:2-5.)  In other words, the exchange of EFH's remedies for everyone's releases was an

express, intentional bargain.

K.    The CRO Term Sheet: Global Releases for Price $TBD.

62.    In January 2015—after the Disinterested Directors were instructed to hire

separate counsel to address conflict matters—the Debtors' CROs, with their Joint Counsel,

developed a plan term sheet in an effort to "████████████████████████" among parties

in interest.  (Glueckstein Decl., Ex. 8 (Keglevic II Depo. Tr.) at 80:7-18.)  The CROs presented

the framework for the term sheet at the joint Board of Directors meeting on January 30, 2015.  In

connection with that the meeting, the joint Boards of Directors were presented materials detailing

the key provisions of the CRO term sheet, which included ██████████████████████████

████████████████████████████████████████████████████████████████████████.

(Glueckstein Decl., Ex. 43 at EFH05546954-99.)  Importantly, the CROs (not the Disinterested

Directors) informed the Boards of Directors that █████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████ (*Id.* at EFH05546971.) ███████████████████████████████

████████████████████████████████████████████████████████████████████████

(Glueckstein Decl., Ex. 44 at EFH05547239-44.)

      63.    Mr. Keglevic testified that ████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████.  (Glueckstein Decl., Ex. 8 (Keglevic II

Depo. Tr.) at 82:15-84:5.)  Ms. Doré further explained that she and Mr. Keglevic had ██████████

████████████████████████████████████████████████████████████████████████

████████████████████████████.  (Glueckstein Decl., Ex. 5 (Doré Depo. Tr.) at 269:14-

25.)  At the time, Ms. Doré and the Debtors' Joint Counsel were involved with providing

information to the Disinterested Directors and their counsel about the ████████████████████

████.  (*Id.* at 257:13-22.)  It was against this backdrop of ██████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████.

-23-

L.      The Minimal Role of the Disinterested Directors.

64.     The evidence establishes that while the role of the Disinterested Directors has been trumpeted by the Debtors, in reality, the Disinterested Directors performed a minor role with respect to the E-side Debtors' approval of the Settlement Agreement and Plan compared to the Controlling Owners, CROs and their respective counsel (the "Conflicted Insiders").  On December 9, 2014, the EFH Board of Directors authorized the Disinterested Directors █

███████████████████████████████████████████████████████████████████████████████.  (Glueckstein Decl., Ex. 45 at EFH_DD00015416-18.)  Yet, the Disinterested Directors of EFH

██████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████.  (Glueckstein Decl., Ex. 13 (Williamson II Depo. Tr.) at 34:21-35:7.)

65.     Conflicted Insiders were the primary negotiators and final decision makers for all other matters.  The Disinterested Directors at EFH, for instance, were █████████████

██████████████████████████████████████████████████████████████████████████

███████████████████████████████████.  (Id. at 16:11-17:13; Ex. 6 (Evans Depo. Tr.) at 130:12-133:18.)  Instead, ███████████████████████████████████████████████████████████████████

███████████.  (Glueckstein Decl., Ex. 13 (Williamson II Depo. Tr.) at 16:18-17:13; Ex. 6 (Evans Depo. Tr.) at 132:4-133:6.)  The joint negotiations occurred despite the myriad of tax, claims allowance and merger consideration issues raised by the Settlement Agreement and the Plan that pose unique conflicts for EFH.

66.     The Disinterested Directors at EFH ███████████████████████████████████

██████████████████████████████████████████████████████████████████████████████.  (Glueckstein Decl., Ex. 12 (Williamson I Depo. Tr.) at 39:4-8; Ex. 6 (Evans Depo. Tr.) at

-24-

144:22-146:4.)  This is a stunning conclusion given that EFH is paying for insider releases for all of the Debtors' estates and the Controlling Owners through the provision of a $700 million allowed claim.  The EFH Disinterested Directors understood ██████████████████████, ██████████████████████████.  (Glueckstein Decl., Ex. 13 (Williamson II Depo. Tr.) at 121:3-14.)

67.    The EFH Disinterested Directors did not regard the other parts of the Settlement Agreement or the Plan Support Agreement ██████████████████████ ████████████████████████████████████████████████ ██████.  (Glueckstein Decl., Ex. 6 (Evans Depo. Tr.) at 145:23-146:4; Ex. 12 (Williamson I Depo. Tr.) at 37:13-19; Ex. 3 (Cremens I Depo. Tr.) at 34:24-15.) ██████████████ ████████████████████████████████████████████████ ██████████████████████████████████ ██████████████████████.  (Glueckstein Decl., Ex. 6 (Evans Depo. Tr.) at 141:22-23.) ██████████ ████████████████████████████████████████████ ██████

M.    The March Intercompany Claims Settlement.

68.    With respect to their limited role in settling intercompany claims, the EFH Disinterested Directors prepared only for settlement.  At the EFH Board of Directors meeting on February 26, 2015, EFH's independent counsel reviewed a ██████████████████████ ██████████████████████████████, and noted that "██████████████████ ██████████████████" (Glueckstein Decl., Ex. 46 at EFH05551547.) ██████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████████

-25-

████████████████████████████████████████████████████████

████████████████████████████████████████. (Glueckstein Decl.,

Ex. 13 (Williamson II Depo. Tr.) at 48:2-49:10, 282:2-5; Ex. 6 (Evans Depo. Tr.) 182:16-183:5.)

69.    ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

████████. (Glueckstein Decl., Ex. 13 (Williamson II Depo Tr.) at 54:6-19; Ex. 6 (Evans Depo.

Tr.) at 194:13-21.)  It is clear that the ████████████████████████████

████████████████████████████████████████████████████████

████ (Glueckstein Decl., Ex. 13 (Williamson II Depo Tr.) at 78:22-79:4.)  The EFH

Disinterested Directors acknowledged that the ████████████████████████

████████████████████████████████████████. (*Id.* at 69:21-

70:15; Ex. 6 (Evans Depo. Tr.) at 221:25-222:6.)  But EFH Disinterested Director Billie

Williamson ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████. (Glueckstein Decl., Ex. 47 at

EFH_DD000035133-34; Ex. 13 (Williamson II Depo. Tr.) at 77:14-79:4.)

70.    The record establishes that the March Settlement (as defined below) was

negotiated in a very short period of time.  On March 16, 2015, the Disinterested Director at

TCEH made an initial proposal of a $1.2 billion allowed claim plus significant additional

consideration.  (Glueckstein Decl., Ex. 48 at EFH_DD00004567-69.)  Tellingly, TCEH

referenced only eight claims, only three of which had an asserted par value in excess of $150

million:  (i) a $754 million claim relating to intercompany tax sharing; (ii) a $620 million claim

-26-

relating to underpayment of interest by EFH on TCEH intercompany notes; and (iii) $700

million as the amount to paid in return for consenting to a tax-free deconsolidation of TCEH and

reduced step-up in tax basis of TCEH assets (the "Basis Step-up Claim").  (*Id.*)  The next day, on

March 17, 2015, EFH Disinterested Directors countered with a net $100 million allowed claim in

favor of TCEH.  (Glueckstein Decl., Ex. 49 at EFH_DD00004570-71.)  Both proposals

contained releases for all directors, officers and Controlling Owners in return for no

consideration at all.

71.    The $1.1 billion gap in the proposals was quickly closed and an agreement

reached (roughly at the mid-point) on March 26, 2015, after meetings held from March 24-26,

2015 at EFH's headquarters in Dallas, Texas.  (*See* [D.I. 4147-1] at Ex. 1; Glueckstein Decl., Ex.

13 (Williamson II Depo. Tr.) at 85:20-24.)  The result, as choreographed, was a settlement of all

intersilo claims and releases for all directors, officers and Controlling Owners (the "March

Settlement").  The Disinterested Directors testified that the March Settlement included broad

releases for all directors, officers and Controlling Owners because ███████████████████

████████████████████████████████████████████████.  (Glueckstein

Decl., Ex. 13 (Williamson II Depo. Tr.) at 89:9-90:10.)  Among other things, the March

Settlement filled in the "$TBD" from the CRO term sheet and provided a $700 million allowed

claim against EFH in favor of TCEH, which could be increased up to $805 million depending on

distributable value available to EFH.  (*See* [D.I. 4147-2] at Sched. D to Ex. 1.)

72.    Significantly, the March Settlement was designed to exist only in a plan of

reorganization that provided full (or very close to full) recoveries to EFH unsecured creditors.

(*Id.* ("The Settlement is subject to Bankruptcy Court approval . . . as part of a joint plan of

reorganization.").)  Ms. Williamson explained that the EFH Disinterested Directors reviewed

-27-

waterfall scenarios prepared by EFH's independent financial advisor.  (Glueckstein Decl., Ex. 13 (Williamson II Depo. Tr.) at 62:3-21.)  That analysis assumed a total enterprise value of Oncor ranging from $18.0 billion to $19.25 billion.  ([D.I. 4147-2] at Sched. C to Ex. 1.)

73.    In announcing the March Settlement, EFH's independent counsel represented to the Court on April 14, 2015 that there was consensus "that a tax-free reorganization must be accomplished."  (Glueckstein Decl., Ex. 17 (Apr. 14, 2015 Hr'g Tr.) at 43:19-44:6.)

74.    The EFH Disinterested Directors did not discuss—or even preview—with creditors or the EFH Committee the fact they were going to allow a $700 million claim in favor of TCEH prior to agreeing to the March Settlement.  (Glueckstein Decl., Ex. 13 (Williamson II Depo. Tr.) at 25:17-26:2.)  Upon learning of the agreement on Friday, April 3, counsel for the EFH Committee expressed its shock to EFH's independent counsel and requested an explanation for both the timing and the substance of the proposal, which was not promptly provided.  To the contrary, counsel was told that "we are shutting down for the weekend."  (Glueckstein Decl., Ex. 50 at EFH_DD00006393-94.)  When pressed during the following week, the EFH Disinterested Directors' independent counsel relied on the fact that the March Settlement only existed in the Plan and that the Disinterested Directors retained a fiduciary out.  (*See*, *e.g*., Glueckstein Decl., Ex. 17 (Apr. 14, 2015 Hr'g Tr.) at 45:7-14.)  Moreover, the Debtors argued to this Court that "the inter-debtor settlement as a whole needs to be considered in the context of the plan." (Glueckstein Decl., Ex. 18 (May 13, 2015 Hr'g Tr.) at 25:6-9; 25:22-26:5.)

N.    The Settlement Agreement.

75.    The March Settlement (with minor changes) now forms two of the three parts of the broader Settlement Agreement.  (Glueckstein Decl., Ex. 13 (Williamson II Depo. Tr.)

-28-

at 102:14-103:2.)  The Settlement Agreement consists of three independent settlements: (i) the intersilo claims settlement embodied in the March Settlement; (ii) a release of claims against the Controlling Owners and the Debtors' directors and officers, also embedded in the March Settlement; and (iii) a T-side intercreditor settlement of claims against the TCEH First Lien Creditors for $550 million.  (*Id.* at 102:21-103:11; Ex. 6 (Evans Depo. Tr.) at 154:2-20.) Only the third part is new, resulting from the T-side mediation—limited to T-side issues— approved by the Court (the "T-side Mediation Settlement").

76.  ████████████████████████████████████████████ ████████████████████████████████████████████████████. (Glueckstein Decl., Ex. 51 at EFH06002917.) ██████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████ (*Id.*) ████████████████████████████████, counsel for the TCEH Unsecured Ad Hoc Group █████████████████ ████████████████████████████████, informing counsel for ███████████ ████████████████████████████████████████████████ ████████████████████████████ (Glueckstein Decl., Ex. 52 at EFCH00028830.)

77.  Nevertheless, the Conflicted Insiders stayed true to their "guiding light," prevailed in negotiation, and ultimately proposed the fully-negotiated Settlement Agreement and accompanying Plan to the EFH Disinterested Directors in August 2015 for approval.  The Settlement Agreement included a modified version of the initial March Settlement, already agreed by the Conflicted Insiders and the T-side creditors.  The EFH Disinterested Directors

-29-

testified that ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████. (Glueckstein Decl., Ex. 13 (Williamson II Depo. Tr.) at 105:2-24.)  Yet,

the EFH Disinterested Directors lacked the most important information to inform even this

limited decision.

      ██  *First*, Mr. Evans testified that ██████████████████████████

████████████████████████████████████████████████████████████████

██████████████████. (Glueckstein Decl., Ex. 6 (Evans Depo. Tr.) at 252:21-253:10.)  ██████████

████████████████████████ the March Settlement was changed to give the TCEH First Lien

Creditors the right to file an alternative plan that includes a taxable disposition of TCEH.  (Plan

Support Agreement § 5.4.)  *Second*, the EFH Disinterested Directors ██████████████████

██████████████████████████████████████████████████████████████.

(Glueckstein Decl., Ex. 13 (Williamson II Depo. Tr.) at 78:2-11.)  Indeed, the materials

presented to the Disinterested Directors (and the entire EFH Board of Directors) when they

approved the Settlement Agreement on August 9, 2015, still reflect an inflated enterprise value

of $12.80 billion to $15.60 billion for TCEH rather than the projection of approximately $██

billion applicable today.  (*Compare* Disclosure Statement Ex. H at 12, Ex. G at 3; *with*

Glueckstein Decl., Ex. 22, Expert Report of Michael Henkin at 45.)

      79.   *Third*, the EFH Disinterested Directors ██████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████. (Glueckstein Decl., Ex. 13 (Williamson II Depo. Tr.) at 112:7-19.)  Ms. Doré

acknowledged that ██████████████████████████████████████████

-30-

█████████████████████████████████████████████████████

(Glueckstein Decl., Ex. 5 (Doré Depo. Tr.) at 305:20-306:13.)

        O.     <u>Disarmament.</u>

        80.     Today, the Debtors and the purchasers propose the Plan, the Settlement Agreement and the proposed merger transaction as a single package.  (Glueckstein Decl., Ex. 2 (Baker Depo. Tr.) at 138:16-19.)  Ms. Doré testified that ████████████████" and "████████ ████████████" (Glueckstein Decl., Ex. 5 (Doré Depo. Tr.) at 294:24-295:19 (emphasis added).)  The mechanism to accomplish this is the Plan Support Agreement, and the express condition that the Settlement Agreement be approved by the Court prior to or at confirmation. (Plan § IX.A.1.)

        81.     Once again, it was the Conflicted Insiders, not the EFH Disinterested Directors, who are responsible for this architecture.  In lieu of pursuing remedies against the Purchasers in the Merger Agreement, the Conflicted Insiders bargained for the T-side creditors to support their request for "disarmament" through the Settlement Agreement and the Plan Support Agreement.  The concept of "disarmament," among other things, required the TCEH Unsecured Ad Hoc Group to forgo their litigation rights against the Controlling Owners and others, consent to the Settlement Agreement, and, in the event the Plan fails, support a plan that contains certain alternative restructuring provisions enumerated in the Plan Support Agreement.  (Glueckstein Decl., Ex. 7 (Keglevic I Depo. Tr.) at 20:12-18, 21:20-22:9; Ex. 12 (Williamson I Depo. Tr.) at 48:11-20.)

        82.     The Debtors determined the support for "disarmament" was sufficient merger consideration for the substantial conditionality contained in the proposed transaction. (Glueckstein Decl., Ex. 53 at EFH06002855; Ex. 51 at EFH06002903.)  Mr. Keglevic testified

that "███████████" the Debtors ████████████████████████████████████

████████████████████████████████████ (Glueckstein Decl., Ex. 8

(Keglevic II Depo. Tr.) at 145:9-14.)  Indeed, ████████████████████████

████████████████████████████████████ (*See* Glueckstein Decl., Ex.

56 at EFH05793162-63.)

83.    However, unlike merger consideration typically paid to the seller,

disarmament benefits numerous parties beyond the E-side Debtors.  Materials provided to the

EFH Board of Directors explained that ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████.  (Glueckstein Decl., Ex. 51 at EFH06002911.)  The E-side Debtors

Disinterested Directors acknowledge that ████████████████.  (Glueckstein Decl., Ex. 13

(Williamson II Depo. Tr.) at 136:4-137:6; Ex. 3 (Cremens I Depo. Tr.) at 44:18-25.)

84.    The EFH Disinterested Directors testified that ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ (Glueckstein

Decl., Ex. 12 (Williamson I Depo. Tr.) at 49:18-20, 50:22-51:23; Ex. 6 (Evans Depo. Tr.) at

260:2-5.)  The Debtors never ████████████████████████████████████████

████████████.  (Glueckstein Decl., Ex. 5 (Doré Depo. Tr.) at 336:7-13; Ex. 8 (Keglevic II Depo.

Tr.) at 143:15-24.)  They simply felt there was never ████████████████████████

████████████████████ (Glueckstein Decl., Ex. 8 (Keglevic II Depo. Tr.) at

145:22-25.)

85.    Disarmament applies to future plan negotiations.  If approved by the

Court, the Settlement Agreement remains in place even if the current Plan is never

-32-

consummated.  (Settlement Agreement § 3.1.)  The Settlement Agreement was designed that way to ensure that any necessary potential alternative restructuring achieved disarmament of creditors, even at the cost of creditor recoveries.  (Glueckstein Decl., Ex. 5 (Doré Depo. Tr.) at 300:14-19; Ex. 6 (Evans Depo. Tr.) at 148:2-149:7); Ex. 13 (Williamson II Depo. Tr.) at 94:8-19, 96:14-97:9.)  The EFH Disinterested Directors expressed a view that, ███████████████

████████████████████████████████████████████████████████████████

(Glueckstein Decl., Ex. 6 (Evans Depo. Tr.) at 247:3-13.)

86.    Despite the supposed benefits to EFH, the Settlement Agreement was removed from the Plan for the purpose of preventing the E-side creditors from voting on its terms.  In the months leading up to filing the Plan, the Debtors had been negotiating with the Purchasers a potential "'toggle' feature that would allow for a backup plan in the event the TCEH Unsecured Creditors' proposal was unsuccessful."  (Glueckstein Decl., Ex. 59 at EFH06004360-61.)  E-side creditors would have been entitled to vote on a "toggle" plan because they were impaired.  (*See* [D.I. 4142] at 34.)  The TCEH Unsecured Ad Hoc Group, however, insisted that there be no toggle in any plan filed by the Debtors.  A central problem with including such an alternative in the Plan would be that E-side creditors would be entitled to vote on it.  (Glueckstein Decl., Ex. 60 at CONF_FLC_00000473-78.)  Counsel for the TCEH Unsecured Ad Hoc Group made clear that ████████████████████████████ ████████████████ (Glueckstein Decl., Ex. 61 at CONF_FLC_00000468-72.)

87.    Disarmament has another purpose and effect.  The lengthy delay between confirmation and the contemplated effective date of this Plan provides the Debtors what counsel to the TCEH Unsecured Ad Hoc Group calls ██████████████████████████

███████████████████████████████████████████████████████

-33-

██████████████████████████████████████ (Glueckstein Decl., Ex. 62 at

EFH05960167-69.)


## THE INTERSILO SETTLEMENT CANNOT BE APPROVED.

## I.        THE INTERSILO SETTLEMENT HAS NO MERIT.

88.        Although the breadth of legacy discovery created a long potential claims

list, the number of claims actually the subject of negotiations among the Disinterested Directors

is manageable.  No claim has been litigated and no merits pleading filed, except for the EFH

Committee's unanswered objection to the claim asserted by TCEH under the Tax Allocation

Agreement.  To the extent the merits of the claims were considered during negotiations, the

scope of the issues between TCEH and EFH was clearly laid out before negotiations began in

earnest.  There are only ten dispositive issues that the Court needs to canvass to assess the merits

of the Intersilo Settlement.  Upon review, the evidence will establish that there is no reasonable

basis for EFH to agree to a $700 million settlement in favor of TCEH.[4]

A.        The Bid and the Ask:  March 16 to March 26, 2015.

89.        As stated above, the negotiations that produced the March Settlement

involved only the limited set of claims that were in fact asserted by TCEH against EFH

following the diligence process conducted by TCEH Disinterested Director Hugh Sawyer and his

advisors.

---

[4]        In reviewing the Intersilo Settlement, the EFH Committee takes as a premise that all EFIH creditors will be paid
in full in priority to EFH creditors.  Accordingly, this Objection is concerned only with value to the E-side
Debtors collectively, measured by return to EFH unsecured creditors as the likely fulcrum class in the
circumstances when the settlement would be relevant.

-34-

90.     TCEH informed EFH on March 16, 2015 that it was asserting claims with an aggregate face amount in the range of $1.8 billion to $2.5 billion, assuming a par recovery for EFH creditors and without regard to litigation risk.  TCEH allocated value to the following individual claims:

- Payment to TCEH for forgoing a taxable disposition of the T-side Debtors' estates, which would permit TCEH creditors a basis 'step-up' to fair market value and cause cash taxes to be payable by EFH:  $700 million;

- The full claim sought by TCEH under the Tax Allocation Agreement, without netting:  $754 million;

- A constructive fraudulent transfer claim that the interest paid by EFH to TCEH on intercompany notes was less than reasonably equivalent value:  $620 million;

- A constructive fraudulent transfer claim that TCEH overpaid for shared services:  $125 million;

- A constructive fraudulent transfer claim that TCEH overpaid for Controlling Owner management fees:  $140 million;

- Preference and constructive fraudulent transfer claims relating to payments by TCEH in connection with an IRS settlement:  $84 million;

- Claims for breach of fiduciary duty by EFH (as a corporation) in connection with TCEH's 2011 "amend and extend" financing transactions:  $80 million; and

- Constructive fraudulent transfer claims relating to the 2007 LBO:  $0.

(Glueckstein Decl., Ex. 48 at EFH_DD00004567-69.)  These are the only relevant claims for purposes of analyzing the reasonableness of the Intersilo Settlement.

91.     TCEH offered to settle all of these claims in return for:  (a) a $1.2 billion claim against EFH, (b) use of EFH's NOLs, (c) 100% of any excess value from the sale of Oncor after payment of the E-side creditors in full and (d) $10 million paid to the Controlling Owners

-35-

to satisfy the 'continuity of interest' requirement for the tax-free spin of TCEH.[5]  In addition,

TCEH's offer was premised on the forfeiture by EFH of all its claims against the T-side Debtors.

92.    EFH responded the next day, on March 17.  EFH agreed to forfeit its

claims against the T-side Debtors and offered TCEH:  (a) a $100 million claim against EFH,

(b) use of EFH's NOLs and (c) a sharing of excess value of Oncor after payment of the E-side

creditors in full.  (Glueckstein Decl., Ex. 49 at EFH_DD00004571.)

93.    Negotiations ensued, and on March 26, the March Settlement was agreed

for purposes of the then-filed plan.  The Controlling Owners, director and officer releases were

included in the TCEH proposal, EFH counterproposal and the March Settlement with no

attributed monetary value.  (Glueckstein Decl., Ex. 13 (Williamson II Depo. Tr.) at 89:9-25.)

B.    Ten Dispositive Considerations.

1.    *The Fair Market Value of TCEH is Less Than Basis and Available NOLs.*

94.    The Debtors' position today is that TCEH and its consolidated subsidiaries

are worth between $███ billion and $███ billion. (Glueckstein Decl., Ex. 24, Expert Report of

David Ying at 3.)  This "weighted average" value as determined by the Debtors' joint financial

advisors is consistent with recent trading values of TCEH debt securities.  (*See* Glueckstein

Decl., Ex. 22, Expert Report of Michael Henkin at 48 (noting TCEH implied market value of

$███ billion as of ███████████).)

95.    This valuation is a sea-change.  In the Disclosure Statement approved by

the Court on September 22, the Debtors stated that TCEH and its consolidated subsidiaries were

---

[5]    This is one of a number of Debtor tax positions that have been proven incorrect and are no longer being asserted.

worth between $12.80 billion and $15.60 billion on a going concern basis.  (Disclosure

Statement Ex. H at 12, Ex. G at 3.)  These valuations were based on stale and misleading

projections.  The Debtors' current projections—first provided in discovery seven days before the

Disclosure Statement hearing—were not provided to the Court or the public, or included in the

Disclosure Statement.  Those projections show a ███████████████ from previous

projections as of March 2015, including a ██████████ in projected terminal EBITDA.  (*See*

Glueckstein Decl., Ex. 22, Expert Report of Michael Henkin at 48-49; Ex. 63 at EFH06212151.)

96.    The real valuations show that EFH is not at risk from a taxable disposition

of the T-side Debtors.  The tax basis in TCEH and its consolidated subsidiaries is estimated to be

$██ billion as of █████████.  (Glueckstein Decl., Ex. 84, TCEH Partial Tax Basis Step-

up Transaction Presentation, March 17, 2015, at 3.)  EFH is projected to have $██ billion of

available NOLs as of ██████.  (*See id.* at 5; Disclosure Statement at 222 (projecting $4.9

billion in NOLs for the EFH group as of December 31, 2015, with $100-150 million in additional

NOLs generated each month after January 1, 2016).)

97.    Based on the facts today, with $██ billion of tax basis and available

NOLs, there is no foreseeable circumstance in which EFH is at risk for cash taxes from a basis

step-up at the T-side Debtors.  EFH has nothing to lose but some of its NOLs.  The T-side coal

business is in secular decline, has gradually fallen in value throughout these cases and shows no

sign of reversing its inexorable course such that a taxable sale could exhaust NOLs.  If that

unlikely change were to occur, EFH would "check the box" to revoke the disregarded-entity

status of Luminant or other operating subsidiaries, and available cash at these entities would be

applied first to pay any tax liability associated with a taxable disposition of property of the

applicable T-side estates. *See The Majestic Star Casino, LLC* v. *Barden Development, Inc.*, 716

-37-

F.3d 736, 757 (3d Cir. 2013) (holding that a debtor's pass-through tax status can be revoked by its parent without violating the automatic stay imposed by the Bankruptcy Code).[6]  There is thus no reason to pay the T-side any value for the Basis Step-Up Claim.  (*See* Glueckstein Decl., Ex. 13 (Williamson II Depo. Tr.) at 69:21-70:15.)

### 2.  *The Tax Allocation Agreement Excludes AMT Claims.*

98.    The largest intercompany claim by the TCEH Debtors against the EFH Debtors is the general unsecured tax claim of TCEH against EFH under the Tax Allocation Agreement, in the amount of approximately $754 million.  (Settlement Motion ¶ 195.)  This results from a book-keeping error in preparing the Debtors' schedules of assets and liabilities.  ([D.I. 1237].)  The Senior Director of EFH's Corporate Tax Group stated that the dispute about the Tax Allocation Agreement payables ███████████████████████████████████ ██████████, and that ████████████████████████████████████████████ ████████████████████████████████████.  (Glueckstein Decl., Ex. 1 (Ashby Depo. Tr.) at 119:11-15.)  The Court should give no weight to the Debtors' failure to correct this mistake once it left the purview of the Debtors' tax professionals and became caught up in the Disinterested Director process.[7]  The law is clear that once the *prima facie* validity of a scheduled claim is negated, the "burden reverts to the claimant to prove the validity of the claim

---

[6]    The liability of Luminant or other operating subsidiaries for the taxable sale of property of their estates would have administrative priority under section 503(b) of the Bankruptcy Code with respect to a claim by the IRS.  Since the Luminant or other T-side estates would receive the proceeds of the sale of their property, if EFH chose to pay the tax liability for which it is jointly and severally liable, EFH would have a contribution or other administrative priority claim against those estates.

[7]    On February 18, 2015, the EFH Disinterested Directors tried to amend the EFH schedule of assets and liabilities to correct this mistake.  ([D.I. 3586].)  However, on February 23, 2015, this amendment was withdrawn for failure to comply with certain agreed upon notice protocols.  ([D.I. 3624].)  After the March Settlement was announced, the mistake has been left uncorrected.

by a preponderance of the evidence." *In re Allegheny Int'l Inc.*, 954 F.2d 167, 174 (3d Cir.

1992).

99.    TCEH has no tax attributes.  It is and for all relevant times has been a

"disregarded entity" for federal income tax purposes, any of its "assets, liabilities, income items,

and deduction items will be treated as owned, owed, received, and incurred directly by its

owner" parent taxpayer.  *In re Conex Holdings, LLC*, 518 B.R. 792, 802 (Bankr. D. Del. 2014).

Thus, TCEH's intercompany tax claims against EFH must arise under the terms of a contract.  In

this case, the only contract is the Tax Allocation Agreement.

100.    According to information provided by the Debtors and reflected in the

EFH Tax Methods Report prepared by Grant Thornton, approximately $395 million of the $754

million claim under the Tax Allocation Agreement purportedly arises from the elimination of

alternative minimum tax ("AMT") credits on TCEH's books and other adjustments for taxable

year 2006 (the "AMT Claim").  (Glueckstein Decl., Ex. 64 at EFH05524581-656 ("Grant

Thornton Report"), ¶¶ 185-86, 210-211.)  The Tax Allocation Agreement on its face plainly

provides no justification for the AMT Claim.  When pushed to explain why it might, TCEH

states that the AMT Claim arises as a result of a May 2013 settlement with the Internal Revenue

Service (the "IRS") in which the Tax Group agreed to eliminate AMT tax credits in 2006

corresponding to excluded cancellation of debt income from a subsidiary insolvency that same

year.

101.    The AMT Claim cannot arise under the Tax Allocation Agreement for

three obvious reasons.  *First*, the claim relates to the taxable year 2006, and the Tax Allocation

Agreement by its terms only applies beginning in January 2010.  (Tax Allocation Agreement,

Preamble.)  *Second*, there is no evidence that the lost AMT credits belonged to TCEH in the first

-39-

place, or even related to its activities.  TCEH generally had interest expense well in excess of

income.  *Third*, the Tax Allocation Agreement does not compensate any party for AMT credits

relating to excluded cancellation of indebtedness income.  Parties to the Tax Allocation

Agreement are compensated only for tax attributes that actually offset another entity's *taxable*

*income*,[8] and cancellation of debt income is excluded from income when (as was the case here,

prior to its liquidation) the relevant debtor is insolvent.  *See* IRC § 108(a).  In other words, the

elimination of the AMT credits had no effect on anyone's tax liability.  (Grant Thornton Report

¶ 173 ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████  The $395.4 million AMT Claim thus cannot survive even superficial scrutiny and would

plainly be disallowed.[9]

### 3.  EFCH, Not EFH, Was the Tax Parent of TCEH.

102.    The remaining $358.7 million claim asserted by TCEH under the Tax

Allocation Agreement (the "NOL Claim") requires only slightly more analysis to conclude there

is no likelihood of success.  The NOL Claim is described in detail in the EFH Committee's

---

[8]    Section 1.2 of the Tax Allocation Agreement provides the method of allocation of intercompany payments
within the consolidated Tax Group.  At Step 1, each member of the group is allocated its share of the
consolidated tax liability the consolidated tax group actually pays to the Department of the Treasury.  At Step 2,
an additional amount of liability is allocated to any such member whose payment under Step 1 was less than it
would have paid if it had filed its own separate tax return.  And at Step 3, *if* a member was assigned an
additional amount of liability under Step 2, that amount is then allocated as a payable owed to the entity whose
tax attributes were used to offset that member's taxable income.  Conversely, an entity with tax attributes that
were not used to offset any member's taxable income—thus not giving rise to an "additional amount" allocated
under Step 2—obtains no right under the Tax Allocation Agreement to receive any compensation under Step 3.
That is precisely the case with the AMT credits that are the subject of the AMT claim.

[9]    In fact, the Debtors have recently reduced the $395.4 million claim to $240 million because it had been
miscalculated.  (Settlement Motion ¶ 208.)  The Debtors note that they have "uncovered complicated and
inconsistent tax accounting practices at the legal entity level" and are "hampered by lack of institutional
memory regarding certain accounting decisions."  (*Id.* at n. 52.)  If the Debtors remain confused, after millions
of pages of legacy discovery, then there is no evidence for this Court to consider on the issue.

-40-

Objection to the claims under the Tax Allocation Agreement.  ([D.I. 4801].)  There has been no response to that objection on its merits, only the speculative listing in the Settlement Motion of points that TCEH "could argue."  (Settlement Motion ¶¶ 199-200.)

103.    The NOL Claim arises out of a March 2013 settlement with the IRS that is still pending final approval.  That settlement required the Tax Group to recognize nearly $4.5 billion of additional taxable income generated by Luminant for tax years 2006-2012, resulting in an additional $1.29 billion of tax liability on the part of EFCH (which, prior to 2013, was a taxable corporation like EFH and parent of a number of disregarded entity subsidiaries, including TCEH and Luminant).  EFCH used the benefit of its NOLs arising out of interest expense at its disregarded entity subsidiary TCEH to offset $358.7 million of that additional tax liability generated by its disregarded entity subsidiary Luminant.  EFH—the other member in the consolidated tax group in 2006-2012—then used its own NOLs (or those generated by EFH's own subsidiaries) to offset the remaining $931 million, so that cash taxes were never paid.

104.    As a threshold matter, again, the Tax Allocation Agreement by its terms is effective only beginning in January 2010.  The amount of the NOL Claim based on tax years 2006-2009 would thus plainly be disallowed even without the following analysis.

105.    The remainder of the NOL Claim would fail for the simple reason that EFCH was a corporation from 2006-2012.  During these taxable years, EFCH was the parent of TCEH and Luminant and a "member" of the Tax Group.  The Tax Allocation Agreement follows federal tax law.  Each draws a fundamental distinction between "members" of the Tax Group on the one hand (EFH and EFCH during the relevant time period), and "entities that are, for federal income tax purposes, disregarded" on the other hand (TCEH and Luminant).  (Tax Allocation Agreement Recitals ¶ 1; *see also* Tax Allocation Agreement §§ 1.2, 1.7(b), 3, 4.1, 5.1, 5.2.)  The

-41-

distinction derives directly from federal tax law, with which the Tax Allocation Agreement expressly provides that it is "intended to be consistent."  (Tax Allocation Agreement § 1.2 (citing 26 C.F.R. § 1.1552-1(a)(1), 1.1502-33(d)(3)); *see* 26 C.F.R. § 1.1502-1(b) (defining "member" to mean "a corporation (including the corporate parent)"); Glueckstein Decl., Ex. 8 (Keglevic II Depo. Tr.) at 377:9-13.)

106.    Under both the Tax Allocation Agreement and federal tax law, only taxable corporations (during the relevant times here, EFH and EFCH) are "members" of a tax group, and their disregarded entity subsidiaries are, of course, disregarded.  And under both the Tax Allocation Agreement and federal income tax law, only the taxable corporations can owe tax liability or own tax attributes, and a taxable corporation always does so based on an *aggregation* of the tax liabilities and attributes of all their disregarded entity subsidiaries.  *In re Conex Holdings*, 518 B.R. at 803 (dismissing a disregarded entity's turnover claim against its parent tax group member because the "tax benefits derived from the Defendants use of the [disregarded entity's] [net operating losses] inured solely to the benefit of the Defendant").

107.    Since EFCH was a corporation from 2006-2012, all of the tax liabilities and attributes of TCEH and Luminant are necessarily aggregated at EFCH.  They have no independent existence under the Internal Revenue Code.  This is not contractual netting as between parties, but the order of operations in calculating the underlying tax liability in the first place.  This is reflected in section 1.2 of the Tax Allocation Agreement and the order of operations under the Internal Revenue Code, as more fully set forth in the EFH Committee's Objection.  This straightforward allocation methodology demonstrates that the NOL Claim is meritless.  Any compensation due to TCEH for the use of its NOLs to offset income of TCEH's subsidiary Luminant first would settle within and among the TCEH Debtors, not with EFH.

-42-

(Glueckstein Decl., Ex 1 (Ashby Depo. Tr.) at 131:16-17; 129:19-20.)  Accordingly, there is no

basis under the Tax Allocation Agreement for a claim that EFH owes TCEH because *EFCH* used

NOLs arising from (disregarded) TCEH's interest expense to shield *EFCH's* tax liability arising

from the operations of (disregarded) Luminant.

108.    To establish a contrary reading of the Tax Allocation Agreement, TCEH

first would have to demonstrate that the specific text of section 1.2 of the Tax Allocation

Agreement was "ambiguous," despite its incorporation of corresponding provisions of Federal

tax law.  *See Lyons* v. *Montgomery*, 701 S.W.2d 641, 643 (Tex. 1985) (an unambiguous Texas

contract is construed in accordance with its plain terms).  There is little chance of TCEH doing

so.

109.    Moreover and not surprisingly, the historical practice of the Debtors is

also consistent with the Tax Allocation Agreement and federal tax law.  EFH's Senior Director

of EFH's Corporate Tax Group has already acknowledged at his deposition that ███████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

(Glueckstein Decl., Ex. 1 (Ashby Depo. Tr.) at 109:20-23 (agreeing that ███████████████

████████████████████████████████████████████████████

███████).)  ████████████████████████████████████████

███████████  (Glueckstein Decl., Ex. 65 at EFH06071049 ("█████████████████

█████████████████████████████████████████████████████

████████").)  Indeed, as the Grant Thornton Report notes, "███████

████████████████████████████████████████████████████

████████████████████████████████"  (Grant Thornton Report ¶

-43-

212.)  In other words, for purposes of determining the intercompany payables and receivables, the same result would follow whether the Tax Allocation Agreement applied or not.  (*See* Glueckstein Decl., Ex. 1 (Ashby Depo. Tr.) at 95:9-96:23.)[10]

110.    It seems clear that this claim was contrived for litigation purposes and bears no resemblance to how anyone involved with applying the Tax Allocation Agreement interpreted it.  The Chief Financial Officer of EFH—the person ultimately charged with interpreting and applying the Tax Allocation Agreement—███████████.  (Glueckstein Decl., Ex. 8 (Keglevic II Depo. Tr.) at 377:8-378:24 (explaining that the intent at the time the Agreement was drafted ████████████████████████████████████████ █████████████████████████).  Indeed, prior to Mr. Keglevic's deposition, EFH had submitted a document stating:  "EFH believes that at least one current key officer of the Debtor entities, the CFO, who was a signatory to [an internal summary of allocation matters prepared before the Tax Allocation Agreement was signed] and who has the authority to determine any matters that are not expressly addressed by the [Tax Allocation Agreement], would testify that the separate TCEH claim is not valid and a 'net' of the payables between EFH and entities on the T-side is the proper result."  (Settlement Motion ¶ 201.)

---

[10]    Accordingly, even if payables totaling $754 million were incorrectly booked on certain stand-alone company internal tax records as being owed by EFH to TCEH, relevant company employees ignored them until the $754 million payable mistakenly ended up on the Debtors' schedules of assets and liabilities.  Instead, consistent with established company practice, those employees rolled the relevant payables up to represent net liabilities between the T-side Debtors and the E-side Debtors.  Indeed, EFH's Senior Director of its Corporate Tax Group confirmed that, █████████████████████████████████████████████████████████ ████████████████████████████  (Glueckstein Decl., Ex. 1 (Ashby Depo. Tr.) at 104:6-18 (stating that the ██████████████████████████████████████████████████████████ █████████████).)

111.    Finally, the order of operations under the Tax Allocation Agreement and federal tax law also is the only reading consistent with commercial reality.  TCEH is the parent of Luminant.  It benefitted when NOLs belonging to EFCH, but attributable to TCEH, were used by EFCH to reduce Luminant's taxable income.  It would be completely illogical for TCEH to benefit from the use of these NOLs through its 100% ownership of Luminant and then claim compensation for loss of the very same NOLs from EFCH or, even more bizarrely, EFH.

112.    For these reasons, the NOL Claim would be disallowed in full if contested.

### 4. A Four-Year Look-Back Period Applies to the Intercompany Notes.

113.    A four-year look-back period applies to any avoidance action relating to TCEH's intercompany demand notes (the "TCEH Demand Notes").  Delaware courts generally apply the "most significant relationship" test in determining which state's law applies to a fraudulent transfer claim, considering (1) the place where the relevant injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (4) the place where the relationship, if any, between the parties is centered.  *Travelers Indem. Co.* v. *Lake*, 594 A.2d 38, 47 (Del. 1991).  EFH, EFCH, EFIH and TCEH are all incorporated in either Texas or Delaware.  Because each of the parties operated in Texas, their relationship was centered in Texas, and any conduct causing injury would have occurred in Texas.  Under the most significant relationship test, either Delaware or Texas law applies.  Both states have adopted the four-year look-back period for avoidance actions under the Uniform Fraudulent Transfer Act.  *See* TEX. BUS. & COM. CODE ANN. § 24.010 (West); DEL. CODE ANN. tit. 6, § 1309 (West).

114.    Only a portion of the advances under the TCEH Demand Notes were made after April 29, 2010, and these advances were repaid relatively promptly.  If TCEH's claim for

-45-

underpayment of interest on the TCEH Demand Notes is limited to advances made after April 29, 2010 for periods when these incremental advances were outstanding, its claim for underpayment of interest is reduced from the $425 million-to-$834 million range asserted by TCEH's independent financial advisor, to approximately $162 million, excluding prejudgment interest. *See also* TEX. BUS. & COM. CODE ANN. § 24.010 (West); DEL. CODE ANN. tit. 6, §§ 1304, 1309 (West) (requiring a "transfer" from the debtor during the look-back period). Additionally, TCEH erroneously applies the New York 9% prejudgment rate. Under controlling law, prejudgment interest on a fraudulent transfer claim is discretionary and would, in all events, be at a lower rate. *See In re Opus E., LLC*, 528 B.R. 30, 109 (Bankr. D. Del. 2015) ("For the fraudulent transfer claims, the federal judgment interest rate between February 1, 2009, and June 30, 2009, varied from .47% to .60%."). Applying the maximum possible Delaware or Texas judgment rate of 5%, the maximum underpayment of interest totals only $187.2 million, even if TCEH were correct in its argument regarding "fair" interest rates (which it patently is not, as discussed below). A detailed calculation of the $162 million and $187.2 million totals is attached hereto as Annex A.

### 5. *The Interest Rate on the TCEH Demand Notes Was Reasonably Equivalent Value to TCEH*.

115. The interest rate on the TCEH Demand Notes was fair to TCEH and constituted reasonably equivalent value. Central to the "reasonably equivalent value" of the TCEH Demand Notes to TCEH was their nature as a cash management product: an equivalent to a bank account, but one earning interest at LIBOR + 5.0% rather than the pennies otherwise available from third-party cash management products. The flexibility of this product for TCEH is evidenced by the ▮ different advances and repayments on the facility during the four-year look-back period. (Glueckstein Decl., Ex. 83, EFH Borrowings 2013, June 13, 2014.)

-46-

116.    TCEH's Board of Managers is on record at its contemporaneous April 26, 2012 meeting with at least three good reasons why TCEH chose to keep reasonably large amounts of its cash on demand at EFH during at least some of this period.  *First*, TCEH believed the combined credit of EFH and EFIH—which fully guaranteed the TCEH Demand Notes but not any of the 'benchmark' EFH securities cited by the Debtors—was sufficient to support repayment given the demand feature.  *Second*, ██████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████ (Glueckstein Decl., Ex. 66 at EFH03509037_R.)  The term "negative arbitrage" means, in this context, that TCEH would be unable to invest its cash anywhere other than EFH without earning at least as much as its cost of debt—*i.e.*, the TCEH Demand Notes were more profitable than any alternative available to TCEH.  *Third*, TCEH concluded that ██████████████████████████████

███████████████████████████████████████████████████████

████████ (*Id.*)  In other words, if TCEH could not keep its cash at EFH on demand under the TCEH Demand Notes, its financial covenants would require it to repay long-term funded debt and lose access to the corresponding liquidity altogether.

117.    TCEH's claim for underpayment of interest rests entirely on a specious comparison of the TCEH Demand Notes with the trading prices of long-term funded debt securities of EFH due 2017 and 2014.  There is no basis for this comparison.  The demand feature of the TCEH Demand Notes was the *essence* of its value to TCEH as a cash management product, and is critical to the credit risk and pricing of the advances.  (*See* Glueckstein Decl., Ex. 22, Expert Report of Michael Henkin at 37 (noting that a put feature mitigates long-term credit risk and enhances liquidity).)

118.    Importantly, because the TCEH Demand Notes were payable on demand by their terms, the notes were in the nature of short-term instruments. (*Id.* at 37-39.) ████████ ███████████████████████████████████████████, a note payable on demand can be treated as having a very short maturity for purposes of credit analysis—and a demand feature is a valid reason for a lower yield. (Glueckstein Decl., Ex. 9 (Mendelsohn Depo. Tr.) at 80:17-83:25; 237:7-19.) TCEH's proposed expert's only response to this was to insist that the demand feature was somehow "████████████" and thus may be disregarded despite the clear terms of the TCEH Demand Notes and the historical fact that they were repaid in full well prior to the Petition Date. (*Id.* at 124:20-126:13; 236:19-237:4.) The allegation that the demand feature is "████████" is irreconcilable with the ████ separate repayment and advances within the four year period to the Petition Date.

119.    The complete irrelevance of long-term spreads to demand instruments is illustrated by comparing demand and long-term notes issued by other corporate borrowers. The yield differential between the TCEH Demand Notes and EFH's publicly traded debt securities is consistent with the differential between the publicly traded unsecured notes of other large, non-investment grade corporate issuers, and demand notes of those same issuers with features similar to those of the TCEH Demand Notes (non-publicly traded, variable-rate demand notes with no fixed maturity). (Glueckstein Decl., Ex. 22, Expert Report of Michael Henkin at 44.) For example, the chart below shows the yield on demand notes issued by Ford Motor Company, LLC ("Ford") as compared with much higher yield on Ford's public notes.

-48-



120.    Investors advanced credit to Ford in the form of demand notes at a much lower yield than on Ford's public unsecured notes.  That public investors similarly required higher yields on EFH's longer term debt, as compared to the lower and more stable yields for notes repayable on demand, is commonplace.  (*Id.* at 42.)

### 6. *TCEH Received Reasonably Equivalent Value for the Ordinary Course Intercompany Payments.*

121.    The previous five considerations eliminate $2.071 billion of the maximum $2.5 billion face amount of claims asserted by TCEH.  The remainder consists of $349 million of constructive fraudulent transfer challenges to ordinary course cost allocation matters between the E-side Debtors and the T-side Debtors, and an $80 million assertion that EFH as a corporation is liable for breach of fiduciary duty or for aiding and abetting a fiduciary breach by control persons of TCEH.  With respect to the challenge to ordinary course cost allocations, the $349 million consists of:  (a) $125 million of alleged overpayments to EFH Corporate Services Company ("EFH Corporate Services"), (b) $140 million of alleged overpayment of management and other fees to the Controlling Owners and (c) $84 million related to TCEH's contribution to

-49-

an IRS settlement.  These remaining claims alone certainly cannot serve as the basis for a $700 million claim in favor of TCEH, and in any event impose immaterial litigation risk on EFH.

a)  EFH Corporate Services.

122.    There is no evidence that TCEH received less than reasonably equivalent value from EFH Corporate Services during the applicable four-year look-back period.  As a preliminary matter, TCEH has targeted the wrong party with this purported fraudulent transfer claim, as the transferee in these contested transactions was EFH Corporate Services, not EFH.  As noted in the Debtors' First Day Declaration, EFH Corporate Services provided shared services "at cost" to TCEH under a separate shared service agreement between EFH Corporate Services and TCEH.  ([D.I. 98] at 22.)  EFH was thus not the recipient of any payment from TCEH under this agreement. TCEH's only conceivable fraudulent transfer claim related to shared services must be brought against EFH Corporate Services—an entity that will merge with TCEH under the Plan.  (*See* Plan § I.A.56.)

123.    Even assuming that EFH was the proper target of a fraudulent transfer action, TCEH has not put forth any facts establishing that TCEH in fact overpaid for corporate services during this period.  Indeed, the idea of overpaying for services provided "at cost" is itself rather absurd.  There is certainly no evidence in the discovery record that TCEH could have procured similar services for less cost from any third-party provider.

124.    The Debtors are left with an assertion that EFH should pay TCEH because EFH itself received corporate services for less than reasonably equivalent value and EFH received a better below-market deal than TCEH.  No legal precedent is cited for this theory of fraudulent transfer.  Moreover, the claim is inconsistent with the basic facts.  The corporate services arrangements were not designed to strip money from either EFH or TCEH, but were the

-50-

result of an evaluation of the Debtors' corporate and shared services arrangements by Huron

Consulting Group in 2009.  (Glueckstein Decl., Ex. 67 at EFCH00019308-74 (the "Huron

Report").) ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ (Glueckstein

Decl., Ex. 23, Expert Report of Mark F. Rule at 26.)[11]  TCEH cannot show prejudice from these

arrangements given its cost savings, and cannot rebut the Huron Report, which is strong and

contemporaneous evidence that TCEH received reasonably equivalent value under the

allocations recommended therein.

> b)  Controlling Owner Fees.

125.    The Huron Report also reallocated responsibility among EFH and TCEH

for the payment of Controlling Owner management fees.  As with other ordinary course cost

sharing, there is no indication why the Huron Report is not highly probative of reasonably

equivalent value.  TCEH's position appears to be grounded in skepticism as to why 100% of the

Controlling Owner management fees over this period should be paid by TCEH, rather than

allocated among the companies in some unspecified percentage.  TCEH ignores the fact that

EFH paid all of the Controlling Owner management fees in 2008 and 2009, suggesting that

TCEH's payment of the Controlling Owner fees over the relevant period was a simple *quid pro*

*quo*.  (*Id.* at 25.)

126.    TCEH's Disinterested Director Hugh Sawyer should respect the work of

---

[11]    In 2008 and 2009, ████████████████████████████████████████

████████████████████████████████████████ (*Id.* at 25, 26.)

Huron Consulting Group validating the intercompany allocations TCEH wishes to attack.  He has been a Managing Director there since 2010.

127.    More fundamentally, TCEH's $140 million asserted claim requires the conclusion that TCEH received no value from the Controlling Owner management fees paid during this period, and that any value from the Controlling Owner management fees was received by EFH.  This is preposterous given that TCEH is a much larger company, with more debt, business and financing activities.  TCEH paid, on average, ██% of total SG&A from ████. (*Id.* at 24, Figure 7.)  If total Controlling Owner fees for this period are allocated in the same manner as SG&A, the amount of TCEH's claim falls to less than $12 million.

c)  Contribution to IRS Settlement.

128.    TCEH has asserted an $84 million "insider preference" claim under section 547 of the Bankruptcy Code based on a September 2013 payment by TCEH to EFH under the Tax Allocation Agreement to cover back taxes incurred by its subsidiaries (the "September 2013 Payment").  Ample evidence demonstrates that tax sharing payments like the September 2013 Payment were common between EFH and TCEH, and that the September 2013 Payment, like all such payments, is "ordinary course" for purposes of section 547(c)(2) of the Bankruptcy Code and thus cannot constitute an avoidable preference.

129.    The Grant Thornton Report notes that the September 2013 Payment "appears consistent with other settlement payments made in the normal course of business between TCEH and EFH Corp in the settlement of quarterly estimate payments."  (Grant Thornton Report ¶ 197.)  ████████████████████████████

████████████████████████████████

████████████████████████████ (*See* Glueckstein Decl., Ex. 68 at

-52-

EFH_DD00015432.)  Kevin Ashby, senior tax director of EFH, characterizes intercompany tax payments under the Tax Allocation Agreement as "█████████████████████ ███████" (Glueckstein Decl., Ex. 1 (Ashby Depo. Tr.) at 68:10-69:2.)

130.    TCEH's alternative fraudulent transfer claim under state law is equally meritless.  A constructive fraudulent transfer claim under Delaware law requires a finding that TCEH did not receive reasonably equivalent value for the September 2013 Payment. *See* DEL. CODE ANN. tit. 6, § 1304 (West).  Such a finding cannot be made because the September 2013 Payment satisfied an antecedent debt of TCEH to EFH.  The September 2013 Payment arose out of an $84 million tax liability owed by EFH to the IRS under the 1997 IRS Appeals Settlement. This tax liability had been accrued by TCEH and its subsidiaries and resulted in a contractual obligation by TCEH to reimburse EFH under the Tax Allocation Agreement.  (*See* Grant Thornton Report ¶¶ 186-88.)  The discharge of this contractual antecedent debt by TCEH through the September 2013 Payment precludes any conclusion that TCEH did not receive reasonably equivalent value.

### 7.    *The Intersilo Settlement Compromises Valuable Claims by EFH Against TCEH and Luminant.*

131.    While TCEH's claims against EFH cannot succeed for the reasons described above, EFH has valuable claims against TCEH and Luminant, both as affirmative claims, and, if ever needed, setoff and section 502(d) allowance defenses.

a)    Undisputed Claims.

132.    EFH and EFIH have at least $1.3 billion of undisputed claims against TCEH and Luminant.  These include $284 million of TCEH Unsecured Notes and $19 million of TCEH Credit Agreement Claims held by EFH, $79 million of TCEH Unsecured Notes held by EFIH and a claim of at least $924 million by EFH against Luminant under the Tax Allocation

Agreement (TCEH asserts that this claim is larger). All of these claims are forfeited in the

Intersilo Settlement, despite having—at a minimum—a market value in the claims trading

market.

133.    The Debtors do not dispute these conclusions, but instead argue that the

E-side Debtors cannot use these funded debt holdings to set off intercompany claims by the

T-side Debtors against the E-side Debtors. (Settlement Motion ¶¶ 164-167.) The EFH

Committee agrees with the Debtors that these prepetition claims could not be set off against the

TCEH avoidance actions discussed above, if they were otherwise allowable, because mutuality is

lacking. *Geron* v. *Schulman (In re Manshul Constr. Corp.)*, 2000 WL 1228866, *56-57, 2000

U.S. Dist. LEXIS 12576, 97-CV-8851, at *161 (S.D.N.Y. Aug. 30, 2000) ("[W]hen a party is

being sued for fraudulent transfers there is no mutuality of obligations and thus no right to any

set-off."). However, the $284 million prepetition claim by EFH arising under its TCEH

Unsecured Notes can be set off against any claim by TCEH under the Tax Allocation

Agreement, providing an additional defense if necessary to TCEH's claims thereunder. *See* 11

U.S.C. § 553; N.Y. DEBT. & CRED. LAW § 151; *Capital Concepts Prop. 85-1* v. *Mut. First, Inc.*,

35 F.3d 170, 174-75 (5th Cir. 1994). Moreover, the EFH Committee believes that TCEH has no

allowable claim against EFH and, accordingly, EFH's outbound claims against TCEH and

Luminant are available to be monetized as a source of recovery to EFH creditors.

b)    Avoidance Actions.

134.    EFH also has avoidance actions against TCEH. These avoidance actions

are not mentioned in the Settlement Motion or the record of negotiations by EFH concerning the

Intersilo Settlement. However, the simple fact is that during the four-year look-back period

under Delaware and Texas law, net transfers from EFH and EFIH to TCEH were in the billions

-54-

in favor of the E-side.  Even without opening up for review ordinary course transfers, there are three material avoidance actions relating to extraordinary transactions that will have to be taken into account if, as suggested by Mark F. Rule, EFH was insolvent during the four-year period prior to the Petition Date.  (*See* Glueckstein Decl., Ex. 23, Expert Report of Mark F. Rule at 20.)  These three avoidance actions are relevant on their own merits as assets of EFH.  They also are relevant as redundant defenses to the allowance of any claims against EFH by TCEH under section 502(d) of the Bankruptcy Code, which requires TCEH to return avoidance proceeds to EFH *prior* to allowing a claim by TCEH against EFH's bankruptcy estate.  *In re KB Toys Inc.*, 736 F.3d 247, 252 (3d Cir. 2013) (section 502(d) renders disallowable any claims that belonged to an entity that has received an avoidable transfer).[12]

### 1)  Advances to the T-side Debtors.

135.    EFH advanced $107.6 million in cash to EFCH and/or TCEH between March 29, 2010 and the Petition Date.  These advances were documented as a loan but there was no credit support and no prospects of being repaid.  Unlike all other temporary funding arrangements between the E-side Debtors and T-side Debtors, these advances in fact were never repaid.  (Glueckstein Decl., Ex. 82, EFCH and TCEH Borrowings 2014.)  The full amount of these advances is forfeited without compensation under the Intersilo Settlement.  Yet, these advances were classic fraudulent transfers.  *See In re R.M.L.*, Inc., 92 F.3d 139, 152 (3d Cir. 1996) (the prospect of a future return can confer value only if there is "some chance" of return.); *In re Advanced Telecomm. Network, Inc.*, 490 F.3d 1325, 1334-37 (11th Cir. 2007) (finding

---

[12]    In this respect, section 502(d) and EFH's avoidance claims will prevent any residual avoidance actions by TCEH, as TCEH will not be willing or able to return funds to EFH simply to make its own avoidance claims. This operation of section 502(d) in joint debtor cases is one reason why interdebtor constructive fraudulent transfer claims, in particular, are often zeroed out when creditors are not paid in full.

fraudulent transfer where Debtor received promise to repay cash transfers from shareholder who "had no ability to repay the loans."); *In re Nat. Century Fin. Enters, Inc.*, 341 B.R. 198, 218 (Bankr. S.D. Ohio 2006) (finding fraudulent transfer when promise to pay from hospital was "worthless due to [hospital's] own insolvency at the time" and "did not offer a legitimate and reasonable chance of return."). TCEH is liable to return the amount advanced, plus potential interest on the amount advanced at the prejudgment rate applicable under Texas law.

*2) Funding of TCEH Debt Repurchases.*

136.    EFH paid at least $█ million to repurchase TCEH Unsecured Notes on the market when TCEH required deleveraging. (Glueckstein Decl., Ex. 23, Expert Report of Mark F. Rule at 29.) This contribution by EFH to TCEH is also a fraudulent transfer for which EFH received no reasonably equivalent value. EFH is not in the business of repurchasing TCEH notes, the notes received were never intended to be a source of value, and the notes are proposed by EFH to be forfeited without compensation in the Intersilo Settlement.

137.    The underlying notes are the same notes described in paragraph 132 above, currently held by EFH and EFIH and enforceable against TCEH as general unsecured prepetition claims. In future litigation, EFH may take the position that it is in its interest to seek to recover the amount it lost as a fraudulent transfer, perhaps because of the defense provided by section 502(d). Alternatively, EFH may forgo its fraudulent transfer claim and either assert the full general unsecured prepetition claim, sell the notes on the market, or set the notes off as a mutual debt against any portion of a claim under the Tax Allocation Agreement that is allowed.

*3) The EFH Demand Note.*

138.    The Settlement Motion also ignores an intercompany demand note entered into in February 2010, pursuant to which EFH lent TCEH $770 million (the "EFH Demand

-56-

Note"). The EFH Demand Note is nearly identical to the TCEH Demand Notes about which the

TCEH Debtor complains—but worse for the funding party. The EFH Demand Note is an

obligation of TCEH, which at the time of incurrence was a poorer credit than EFH by any

measure. In addition, while EFH's obligations under the TCEH Demand Notes were guaranteed

by the solvent EFIH, TCEH's obligations under the EFH Demand Note were not guaranteed by

any other Debtor. Surprisingly, the EFH Demand Note also paid interest at a *lower* rate, LIBOR

+ 3.50%.

139.    For the EFH Committee, the primary relevance of the EFH Demand Note

is to underscore the lack of merit in TCEH's assertion that the TCEH Demand Notes were issued

on unreasonable terms. However, if TCEH has a claim against EFH for underpaid interest, then

EFH has its own claim against TCEH for underpaid interest as well. The EFH Demand Note

balance was at times as high as $770 million. Even if TCEH could prevail in future litigation on

the substance of an avoidance claim based on underpayment of interest on the TCEH Demand

Notes (it cannot), the allowance of any such claim against EFH would require TCEH to first

disgorge, in cash and in full, the amount it underpaid itself.

### 8.    *The Intersilo Settlement Compromises Valuable Claims Against Directors, Officers and Insurers.*

140.    One striking thing about certain of the claims alleged by TCEH against

EFH is that the underlying facts, if true, would give rise to claims against directors and officers

of various Debtors for breach of fiduciary duties, including the duty of loyalty. For example,

TCEH's $80 million "aiding and abetting" claim against EFH alleges that EFH is responsible to

TCEH for assisting directors of both companies in pursuing a debt refinancing that cost TCEH

$80 million in fees. As another example, any of TCEH's constructive fraudulent transfer actions

can be restated as a claim against directors for breach of the duty of loyalty. In fact, the

-57-

dismissed Aurelius creditor derivative suit from 2013 cited by the Debtors in the Settlement

Motion (Settlement Motion ¶¶ 147-149) was not a constructive fraudulent transfer action at all,

but a claim against *Mr. Keglevic and the other directors for breach of their duty of loyalty* to

EFCH. (*Aurelius*, 2014 WL 10505127, at *2.)

141.    The EFH estate likely has its own claims against EFH directors and

officers for breach of their fiduciary duty, including the duty of loyalty.  Some of these claims

related to the same facts and circumstances that give rise to EFH's avoidance actions:  in each

case, value was transferred from EFH to TCEH in circumstances where certain directors and

officers benefitted on both sides of the transaction.  Other claims relate to the decisions made at

EFH in the years immediately preceding the Petition Date and the manner in which these

bankruptcy cases have been planned and conducted, as discussed in more detail below and in the

Conflicts Counsel Supplement (as defined below).

142.    These directors and officers are insured.  The Debtors have director and

officer liability insurance coverage of ██████████████████████████████,[13] and

the ███████████████████████████████████████████████████████████████

██████  (Glueckstein Decl., Ex. 69 at EFH05590323.)  These insurance assets should be

available as a potential source of EFH creditor recoveries, but are forfeited by the Intersilo

Settlement's pre-effective date releases of directors and officers—and, incidentally and

wastefully, their insurers—"from the beginning of the world." (Settlement Agreement § 2.4(a).)

---

[13]    *See* Energy Future Holdings Corp., Quarterly Report (Form 10-Q) Ex. 3(a) RESTATED CERTIFICATE OF
FORMATION OF ENERGY FUTURE HOLDINGS CORP. Art. VIII, IX (undated) (May 2, 2013) (indemnifying "each
person who was or is made a party or is threatened to be made a party to or is involved in any threatened,
pending or completed action or other proceeding . . . by reason of the fact" that the party "is or was a director or
officer of [EFH] . . . to the fullest extent permitted by the [Texas Business Organizations Code]."

### 9. *The Intersilo Settlement Compromises Valuable Claims Against the Controlling Owners.*

143.    Conflicts counsel for the EFH Committee has filed a supplemental

statement (the "Conflicts Counsel Supplement") setting forth the view of the EFH Committee

that the EFH estate has valuable claims against the Controlling Owners that are compromised by

the Intersilo Settlement.  The Court is referred to the Conflicts Counsel Supplement as to the

merits of these claims.[14]

### 10. *The LBO is Not Seriously in Dispute.*

144.    A central premise of the Intersilo Settlement is that the 2007 LBO is not

being challenged.  The EFH Committee agrees there is no colorable basis to do so.  TCEH

attributed a value of $0 to all LBO-related claims in its negotiations with EFH.  (Glueckstein

Decl., Ex. 48 at EFH_DD00004568.)  More fundamentally, the core structure of the Intersilo

Settlement permits no payment of value from EFH to TCEH premised on the insolvency of EFH

in 2007 and the avoidance of LBO transfers.  It would be impossible for EFH to pay TCEH

material value on such theories and release the Controlling Owners.

## II.    THE INTERSILO SETTLEMENT IS A VIOLATION OF THE FIDUCIARY DUTIES OF THE E-SIDE DEBTORS, IS NOT FAIR AND CANNOT BE APPROVED.

### A.    Section 1107 of the Bankruptcy Code Imposes Duties on the Debtors That Are Analogous to State Law Fiduciary Duties.

145.    Section 1107 of the Bankruptcy Code requires the Debtors and their

directors and officers to comply with fiduciary duties "comparable to the duties that the officers

and directors of a solvent corporation owe their shareholders," including the duties of care and

---

[14]    Sullivan & Cromwell LLP has not been involved in the assessment of claims against the Controlling Owners and will not be involved in the prosecution of such claims.

SC1:3961318.8

loyalty.  *LaSalle Nat. Bank* v. *Perelman*, 82 F. Supp. 2d 279, 292 (D. Del. 2000); *In re Coram*

*Healthcare Corp.*, 271 B.R. 228, 235 (Bankr. D. Del. 2001) ("A debtor in possession is bound by

a duty of loyalty that includes an obligation to refrain from self dealing, to avoid conflicts of

interests and the appearance of impropriety.  The duty of loyalty owed by a debtor in possession

is also owed by its senior officers."); *see also Official Comm. of Unsecured Creditors of*

*Cybergenics Corp. ex rel. Cybergenics Corp.* v. *Chinery*, 330 F.3d 548, 573 (3d Cir. 2003)

(debtors have a "fiduciary duty to maximize the value of the bankruptcy estate").

        B.      <u>State Law Fiduciary Duties Also Apply.</u>

        146.    Similar to the duties imposed by section 1107 of the Bankruptcy Code, the

Debtors and their directors and officers are also required to comply with applicable state law

fiduciary duties.  *First*, the release of the Controlling Owners and the directors and officers

outside a plan constitutes a disposition of estate property, and thus requires the Debtors and

directors and officers to comply with section 363(b) of the Bankruptcy Code.  *Northview Motors,*

*Inc.* v. *Chrysler Motors Corp.*, 186 F.3d 346 (3rd Cir. 1999) (holding that claims held by the

debtor constitute property of the estate and that settling such claims constitutes a sale of the

claims).[15]  Section 363(b) requires compliance with state law fiduciary duties.  *In re Summit*

*Global Logistics, Inc.*, No. 08-11566, 2008 WL 819934, at *11 (Bankr. D.N.J. Mar. 26, 2008)

(holding that Delaware debtors "were required to meet the requirements of applicable Delaware

non-bankruptcy law" in proposing sale under section 363).

---

[15]    The Intersilo Settlement is also subject to section 363 for the additional reason that the disarmament contained in the Settlement constituted a key part of the consideration for the merger transaction.  (*See* Glueckstein Decl., Ex. 12 (Williamson I Depo. Tr.) at 60:20-61:2; Ex. 8 (Keglevic II Depo. Tr.) at 140:11-18.)

147.     *Second*, the Debtors assert that the Intersilo Settlement is merger consideration for the disposition of Oncor.  (Glueckstein Decl., Ex. 12 (Williamson I Depo. Tr.) at 60:20-61:2; Ex. 8 (Keglevic II Depo. Tr.) at 140:12-18.)  The Purchasers are receiving an exclusive option to acquire Oncor in a remedy-free transaction, and in exchange, (i) the TCEH unsecured creditors agree to disarm; and (ii) the Controlling Owners and the directors and officers are released from all claims.  The Debtors are clear that disarmament and releases are

███████████████████████████████████████████████████████

███████████   (Glueckstein Decl., Ex. 5 (Doré Depo. Tr.) at 294:24-295:19.)  Accordingly, the Debtors must comply with state law fiduciary duties applicable to change-of-control transactions. *Paramount Commc'ns Inc.* v. *QVC Network Inc.*, 637 A.2d 34, 43 (Del. 1993) (noting that in sale of control transactions, "the directors must act in accordance with their fundamental duties of care and loyalty").

148.     *Third*, as consideration and a supposedly essential condition to the Plan, the Intersilo Settlement must comply with section 1129(a)(3) of the Bankruptcy Code, which incorporates applicable state corporate law.  *In re Zenith Elecs. Corp.*, 241 B.R. 92, 108 (Bankr. D. Del. 1999) (noting that a plan "must meet the standards for approval of such a transaction under [applicable state] corporate law" and reviewing a transaction with a controlling shareholder under the Delaware "entire fairness" standard).

C.     The EFH Directors and Officers Breached Their Fiduciary Duties, and Accordingly, the Intersilo Settlement is Subject to Entire Fairness Review.

149.     Because the Debtors' directors and officers were inadequately informed and impermissibly interested in the Intersilo Settlement, they are not entitled to the protection of the business judgment rule, and instead must show that the transaction was entirely fair to stakeholders:  they must demonstrate fair dealing and fair price.  Under state law, as a

-61-

fundamental principle of corporate law, control of a corporation is entrusted to its board of directors.  DEL. CODE ANN. tit. 8, § 141(a) (West); TEX. BUS. ORGS. CODE ANN. § 21.401 (West). With that power of control comes corporate directors' "unyielding fiduciary duty to protect the interests of the corporation and to act in the best interests of its shareholders." *Cede & Co.* v. *Technicolor, Inc.*, 634 A.2d 345, 360 (Del. 1993) (citations omitted); *accord Int'l Bankers Life Ins. Co.* v. *Holloway*, 368 S.W.2d 567, 577 (Tex. 1963) ("The responsibility of the corporate fiduciary includes the dedication of his uncorrupted business judgment for the sole benefit of the corporation.").[16]

150.    Those same state law fiduciary duties remain in place when a corporation becomes insolvent.  But the "corporation's insolvency 'makes the creditors the principal constituency injured by any fiduciary breaches that damage the firm's value.'" *N. Am. Catholic Educ. Programming Found., Inc.* v. *Gheewalla*, 930 A.2d 92, 102 (Del. 2007) (quoting *Prod. Res. Grp., L.L.C.* v. *NCT Grp., Inc.*, 863 A.2d 772, 794 (Del. Ch. 2004)); *see also Weaver* v. *Kellogg*, 216 B.R. 563, 583-84 (S.D. Tex. 1997) (holding that, under Texas and Delaware law, directors may owe fiduciary duties to the corporation's creditors if the corporation is in "the vicinity of insolvency").  That is because, during insolvency, "creditors, as residual claimants to a definitionally-inadequate pool of assets, become exposed to substantial risk as the entity goes forward; poor decisions by management may erode the value of the remaining assets, leaving the

---

[16]    Texas courts, like other state courts nationwide, look to Delaware corporate law to inform and supplement their own.  *See, e.g.*, *In re Aguilar*, 344 S.W.3d 41, 46-47 (Tex. App. 2011) (examining Delaware law when no Texas cases addressed the particular issue, and noting that "[c]ourts throughout the country look to Delaware for guidance on matters of corporate law"); *Neurobehavorial Assoc., P.A.* v. *Cypress Creek Hosp., Inc.*, 995 S.W.2d 326, 332 n.12 (Tex. App. 1999).  This Court has indicated that it also may consult Delaware law "where the directors and/or management are self-interested."  (Glueckstein Decl., Ex. 15 (Nov. 3, 2014 Hr'g Tr.) at 17:13-18.)

SC1:3961318.8

corporation with even less capital to satisfy its debts in an ultimate dissolution." *Prod. Res. Grp.*, 863 A.2d at 791.

151.    The EFH directors and officers breached their duty of care in approving the Intersilo Settlement.  "The duty of the directors of a company to act on an informed basis . . . forms the duty of care element of the business judgment rule." *Cede & Co.*, 634 A.2d at 367; *accord Meyers* v. *Moody*, 693 F.2d 1196, 1209 (5th Cir. 1982).  Directors "have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them.  Having become so informed, they must then act with requisite care in the discharge of their duties." *Aronson* v. *Lewis*, 473 A.2d 805, 812 (Del. 1984); *accord Pace* v. *Jordan*, 999 S.W.2d 615, 624 (Tex. App. 1999).  "The more significant the subject matter of the decision, the greater is the requirement to probe and consider alternatives." *In re Broadstripe, LLC*, 444 B.R. 51, 104-05 (Bankr. D. Del. 2010).

152.    The EFH directors and officers failed to adequately inform themselves of the material aspects of the Intersilo Settlement both in March, when the March Settlement was initially approved, and again in August, when the Intersilo Settlement was approved in its current form.  A diligent director determining whether to settle a number of claims on behalf of the company and for how much would take steps to understand not only the general nature of each of those claims and the amount of damages asserted, but would also seek to understand the relative *merits* of each of those claims before determining a reasonable price to pay to settle them. *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 514 (Bankr. D. Del. 2010) (listing "an intelligent and objective opinion of the probabilities of ultimate success should the claims be litigated" as the first factor relevant to a "full and fair assessment" of litigation claims").

███████████████████████████████████████████████ (Glueckstein

Decl. Ex. 6 (Evans Depo. Tr.) at 182:16-183:5.)  In fact, early on in that process the CROs

prepared a term sheet presented to the Board of Directors in January 2015 reflecting their

conclusion that ████████████████████████████████████████████████████████

(Glueckstein Decl., Ex. 5 (Doré Depo. Tr.) at 269:9-25.)  The job of the Disinterested Directors

was to fill in the blank.

153.    Moreover, although the Disinterested Directors routinely stated ██████



(*See* Glueckstein Decl.,

Ex. 6 (Evans Depo. Tr.) at 207:12-21; Ex. 10 (Sawyer Depo. Tr.) at 542:20-23; Ex. 13

(Williamson II Depo. Tr.) at 66:2-67:5.)  ████████████████████████████████

████████████████████████████████████████  (*Id.* at 48:17-49:14.)

154.    The EFH directors and officers also failed to adequately inform

themselves of the material changes between the agreement they reached in March and the

Intersilo Settlement approved in August.  The Disinterested Directors were not involved in

negotiating those changes.  (*See* Glueckstein Decl., Ex. 10 (Sawyer Depo. Tr.) at 748:8-12; Ex.

13 (Williamson II Depo. Tr.) at 109:24-110:8.)  Nor did they adequately understand those

changes or their consequences.  For example, ████████████████████████████

████████████████████████  (Glueckstein Decl., Ex. 13 (Williams Depo. II

Tr.) at 110:9-16.)  Yet while the terms of the March Settlement eliminated the threat of a taxable

plan, the Intersilo Settlement and the Plan Support Agreement contain no such restriction, ████

████████████████████████████  (Glueckstein Decl., Ex. 6 (Evans Depo. Tr.) at

252:21-253:19; Ex. 13 (Williamson II Depo. Tr.) at 108:15-20.)

-64-

155.    The EFH directors and officers also breached their duty of loyalty in approving the Intersilo Settlement because they were *interested*.  *See Rales* v. *Blasband*, 634 A.2d 927, 936 (Del. 1993) ("A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders."). While the directors and officers had no stake in the outcome of any intercompany settlement—or in creditor recoveries from these chapter 11 cases generally—they had one significant *personal* stake:  securing releases of all prepetition and postpetition acts for themselves and their colleagues.  As Ms. Billie Williamson, one of the EFH Disinterested Directors, noted, ███

████████████████████████████████████████████████████████████████

███  (Glueckstein Decl., Ex. 13 (Williamson II Depo. Tr.) at 116:22-117:3.)

156.    These releases were extremely meaningful.  Numerous creditors, both of the T-side Debtors and of the E-side Debtors, threatened litigation in connection with prepetition activities prior to and during these chapter 11 cases.  The EFH and EFIH Disinterested Directors were aware that the EFH creditors disapproved of the March Settlement—and generally any intercompany settlement that included a payment by any of the E-side Debtors to any of the T-side Debtors—and had raised concerns about violations of fiduciary duties in connection with the EFH and EFIH Disinterested Directors' decision to settle.

157.    The releases are particularly material to the directors in light of the Debtors' limited director and officer liability insurance coverage—████████████████

████████████████████████████████████████████████  The EFH directors and officers were fully aware of this deficient coverage.  They were told, at an October 25, 2012 Board of Directors meeting, that "████████████████████████

████████████████████████████████████████████████████████████████

-65-

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████" (Glueckstein Decl., Ex. 27 at EFH-SP00070456.)  The

Directors were also informed that "████████████████████████████████████

████████████████████████████." (Glueckstein Decl., Ex. 70 at

EFH01452862.)

      158.    Unsurprisingly, as a result, the EFH directors and officers ████████

████████████████████████████ (*See* Glueckstein Decl., Ex. 13

(Williamson II Depo. Tr.) at 116:21-117:3; 198:3-24; 266:16-267:13; Ex. 4 (Cremens II Depo.

Tr.) at 42:15-24; Ex. 6 (Evans Depo. Tr.) at 147:7-22.)

      159.    These breaches of fiduciary duties have significant consequences for this

Court's review of the Intersilo Settlement.  While decisions by a board of directors are generally

protected by the business judgment rule, directors lose that protection if they breach their

fiduciary duties to the company.  *See Crescent/Mach I Partners, L.P.* v. *Turner*, 846 A.2d 963,

984 (Del. Ch. 2000).  When the presumption of the business judgment rule is rebutted, "the

board of directors' action is examined under the entire fairness standard." *Cinerama, Inc.* v.

*Technicolor, Inc.*, 663 A.2d 1156, 1162 (Del. 1995).  The burden then falls on the directors to

show the entire fairness of the challenged transaction, *In re BH S & B Holdings LLC*, 420 B.R.

112, 146-47 (Bankr. S.D.N.Y. 2009) (citing *Mills Acquisition Co.* v. *Macmillan, Inc.*, 559 A.2d

1261, 1280 (Del. 1989)), which requires the directors to demonstrate both a fair process of

dealing and the substantive fairness of the price.  *Weinberger* v. *UOP, Inc.*, 457 A.2d 701, 711

(Del. 1983).

160.    The same result is required by the Bankruptcy Code.  Generally, in proposing a sale under section 363(b) of the Bankruptcy Code, a debtor must establish a "sound business purpose" for the sale, which essentially requires the Court to conduct its own business judgment analysis.  *In re Exaeris, Inc.*, 380 B.R. 741, 744-45 (Bankr. D. Del. 2008) (citing *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991)); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999).  Where, however, a proposed transaction involves interested directors or a breach of fiduciary duties, courts will subject the transaction to heightened scrutiny, *JPMorgan Chase Bank, N.A.* v. *Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 240-41 (Bankr. S.D.N.Y. 2009), under which "courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration."  *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010).

D.    At a Minimum, Because the Intersilo Settlement is a Part of and Justified Solely by a Change-of-Control Transaction, it is Subject to Enhanced Scrutiny.

161.    Even if the entire fairness standard did not apply to the Intersilo Settlement due to the conflicts of the EFH Board of Directors in the exercise of their fiduciary duties, the Intersilo Settlement would still be subject to enhanced scrutiny because it is part of a change-of-control transaction:  the sale of Oncor contemplated by the Plan.

162.    A particular application of directors' fiduciary duties arises once directors determine to enter into a transaction that will transfer control of the company.  Once a board makes the decision to sell the company or otherwise engineer a "change of control," its fiduciary duties take on "increased importance.  The [directors] are no longer 'defenders of the corporate

-67-

bastion'; they have become 'auctioneers charged with getting the best price for the stockholders at a sale of the company.'" *A. Copeland Enters., Inc.* v. *Guste*, 706 F. Supp. 1283, 1292 (W.D. Tex. 1989) (quoting *Revlon, Inc.* v. *MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182 (Del. 1986)).  In other words, the "duty of the board [changes] from the preservation of . . . the corporate entity to the maximization of the company's value at a sale for the stockholder's benefit." *Revlon*, 506 A.2d at 182.

163.    Courts apply an intermediate standard of review, termed "enhanced scrutiny," to change-of-control transactions.  *In re Rural Metro Corp.*, 88 A.3d 54, 82 (Del. Ch. 2014) (citing *Revlon*, 506 A.2d at 182-84).  Enhanced scrutiny applies to "situations involving potential conflicts of interest where the realities of the decisionmaking context can subtly undermine the decisions of even independent and disinterested directors." *Id.* (internal quotation marks omitted).  By applying enhanced scrutiny, "the court seeks to assure itself that the board acted reasonably, in the sense of taking a logical and reasoned approach for the purpose of advancing a proper objective, and to thereby smoke out mere pretextual justifications for improperly motivated decisions." *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010).

164.    Although the Debtors nominally separated the Intersilo Settlement from the Plan, that Intersilo Settlement is properly viewed as merger consideration in a change-of-control transaction.  As the Disinterested Directors each noted, the Intersilo Settlement was part of the bargain to sell Oncor to the Purchasers:  EFH was provided a potential sale transaction in exchange for a $700 million allowed claim, releases of all claims against the T-side Debtors, the Controlling Owners, and the directors and officers, and other consideration.  (Glueckstein Decl., Ex. 12 (Williamson I Depo. Tr.) at 60:20-61:2; Ex. 8 (Keglevic II Depo. Tr.) at 140:12-18.)

-68-

Accordingly, the Intersilo Settlement triggered *Revlon* duties to maximize the Debtors' value and must receive enhanced scrutiny from this Court.

> E.   The Intersilo Settlement Cannot Survive Either Entire Fairness Review or <u>Enhanced Scrutiny.</u>

165.   As noted, once it is established that directors breached their fiduciary duties in approving a transaction, those directors have the burden of establishing the "entire fairness" of the transaction, "sufficient to pass the test of careful scrutiny by the courts." *Weinberger*, 457 A.2d at 711; *Landon* v. *S & H Mktg. Grp., Inc.*, 82 S.W.3d 666, 673 (Tex. App. 2002). The entire fairness burden requires the directors to "demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain." *Weinberger*, 457 A.2d at 711. The showing necessary to establish entire fairness "has two basic aspects: fair dealing and fair price." *Id.* The fair dealing prong concerns aspects of process and timing regarding the transaction, such as "when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and stockholders were obtained." *Id.*; *In re Broadstripe*, 444 B.R. at 106 (citations omitted). The fair price prong "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Id.* These prongs should not be considered in isolation, but rather "[a]ll aspects of the issue must be examined as a whole since the question is one of entire fairness." *Weinberger*, 457 A.2d at 711.

166.   To satisfy enhanced scrutiny in the merger or sale-of-control context, "directors must establish both (i) the reasonableness of the decision making process employed by the directors, including the information on which the directors based their decision, and (ii) the reasonableness of the directors' action in light of the circumstances then existing." *In re Rural*

-69-

*Metro Corp.*, 88 A.3d at 83 (internal quotation marks omitted).  "In a situation where heightened scrutiny applies, the predicate question of what the board's true motivation was comes into play."  *In re Dollar Thrifty*, 14 A.3d at 598.  In applying enhanced scrutiny, "the court seeks to assure itself that the board acted reasonably, in the sense of taking a logical and reasoned approach for the purpose of advancing a proper objective, and to thereby smoke out mere pretextual justifications for improperly motivated decisions.  *Id.*

167.    Accordingly, under either the entire fairness standard or the intermediate level of enhanced scrutiny, the Court must consider both the *process* that led to the proposed Intersilo Settlement and the *result* of that process—*i.e.*, the substance of the Intersilo Settlement itself.

168.    The Intersilo Settlement cannot be upheld under either standard.  The process by which the Intersilo Settlement was negotiated and approved by the EFH directors amounts to a rushed process designed to achieve a global settlement at all costs, not a full and fair evaluation of whether it is in EFH's interest to agree to the Intersilo Settlement in exchange for the *possibility* of selling Oncor.  As discussed above, the Debtors and the Disinterested Directors prepared only for settlement from the beginning.  The Disinterested Directors and their advisors ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████ (Glueckstein Decl. Ex. 13 (Williamson II Depo. Tr.) at 48:2-49:10, 282:2-5; Ex. 6 (Evans Depo. Tr.) at 182:16-183:5.) Early on, the EFH's independent counsel acknowledged that "███████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████ (Glueckstein Decl., Ex. 46 at EFH05551547.).

169.    The Disinterested Directors, while independent in the sense of not standing on both sides of the acquisition transaction, had no economic stake whatsoever in what came out of the negotiation of the March Settlement—other than obtaining their own releases—which is perhaps why they never realistically considered the notion that it might be in the best interests to litigate (and perhaps even win) its claims against TCEH.  Indeed, the EFH Committee and the EFH creditors, whose creditor claims will be significantly diluted, were never involved or able to help shape the settlement of TCEH's claims despite numerous requests to do so.  (Glueckstein Decl., Ex. 13 (Williamson II Depo. Tr.) at 25:17-26:2 (████████████████████████████████████████████████████████████).)

170.    The Disinterested Directors were even less involved in the ███████████
███████████████████████████████████████ (*Id.* at 16:11-17:8.)  Of course, when the sole objectives are global releases and the avoidance of litigation, there is little need to revisit the underlying merits of the Intersilo Settlement.

171.    Moreover, for the reasons explained above, the Intersilo Settlement does not entail a fair or reasonable price.  The Intersilo Settlement requires EFH to pay $700 million and release its valuable claims against the T-side Debtors and insiders.  In exchange, the E-side Debtors receive releases of claims that are worth *far* less than that amount regardless of whether the transaction is effected, and a mere *opportunity* for the E-side creditors to be compensated *if* a myriad of conditions are satisfied and the Purchasers ultimately choose to close the transaction.  The E-side Debtors receive no additional payment for that free option to acquire Oncor; to the contrary, the *T-side Debtors* get paid even if the Purchasers decide not to close the transaction.  Given the relative merits of the intercompany claims between the silos, and the complete conditionality of the contemplated Oncor transaction (with downside *only* for the E-side

-71-

unsecured creditors), the Intersilo Settlement can in no way be characterized as a "fair price" for an exclusive right to purchase Oncor.

## III.     THE INTERSILO SETTLEMENT WAS NOT THE RESULT OF ARM'S-LENGTH BARGAINING.

172.     Arm's-length negotiation is a component of the Bankruptcy Rule 9019 analysis in the Second Circuit, *Motorola, Inc.* v. *Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007), and a factor considered by courts in the Third Circuit as a matter of course.  *See*, *e.g.*, *In re Tribune Co.*, 464 B.R. 126, 155 (Bankr. D. Del.), *on reconsideration*, 464 B.R. 208 (Bankr. D. Del. 2011) (considering "the extent that the settlement is truly the product of arm's-length bargaining, and not fraud or collusion"); *In re Capmark*, 438 B.R. at 520 (concluding "the Debtors engaged in arm's length good-faith negotiation with the secured lenders" with whom they settled).  The controlling cases establishing the architecture for Bankruptcy Rule 9019 review strike a balance between independent review and 'range of reasonable' analysis that depends on parties at arm's length reaching a real agreement on the merits before the merits are presented to the Court.

173.     Compared to the arm's-length negotiations in the cases cited by the Debtors in support of their motion, the negotiation of the March Settlement on which the Intersilo Settlement is premised stands in stark contrast:  *none of the negotiating parties had any economic stake in the outcome.*  The EFH Disinterested Directors have no claims and no economic interest in the success of the negotiation.  Their only economic interest was in obtaining releases for themselves and related persons—an interest in direct conflict with the interests of the estate.  The Disinterested Directors may have tried hard in such circumstances to be objective and to put themselves in the place of the creditors whose interests were at stake.  But this could never replicate the reality of private actors negotiating in their own self-interest.

-72-

174.     Perhaps for this reason, virtually all of the Bankruptcy Rule 9019 settlements cited by the Debtors involve the support of the statutory committee and other representative arm's-length creditors.  No creditor has a veto, as the Court in *Capmark* correctly made clear.  *In re Capmark*, 438 B.R. at 195.  However, the courts in the Third Circuit also have made clear that "all [ ]factors relevant to a full and fair assessment of the wisdom of the proposed compromise" should be considered in connection with a Bankruptcy Rule 9019 motion.  *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 833 (Bankr. D. Del. 2008) (citing *Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.* v. *Anderson*, 390 U.S. 414, 424 (1968)); *see also In re Marvel Entm't Grp., Inc.*, 222 B.R. 243, 249 (D. Del. 1998) (same).  Evidence of arm's-length negotiation involving creditors is clearly a relevant factor.

175.     The EFH Committee respectfully submits that, absent extraordinary circumstances, Bankruptcy Rule 9019 review should not apply to a settlement negotiated entirely without creditor involvement by an independent director who (i) has no interest aligned with the interests of the estate's creditors and (ii) a conflicting interest in the outcome that is material to the director.  Attached as Annex B is a list of every Rule 9019 case cited by the Debtors in support of their Motion.  There is no case that involves the fatal combination of insider releases and an objection by the statutory committee.  While there could be appropriate circumstances where such a settlement could be approved, approval should involve, at a minimum, the ratification of the settlement by creditor parties with an economic interest in order to recreate the essential dynamics of parties acting at arm's length.

176.     The fact that the Disinterested Directors have no personal financial interest is especially problematic in light of the absence of a litigation record (or even a litigation plan) with respect to the few main claims underlying the Intersilo Settlement, and the Debtors' dogged

-73-

insistence that "global peace" was priceless.  Arm's-length creditors at EFH certainly might

agree to "global peace," deciding to release dozens of potential defendants simultaneously.  But

real creditors would not do so at any price.  Real creditors would have weighed the pros and cons

of litigation alternatives and made a determination that mirrors the factors that the Court must

take into account in the *TMT Trailer* analysis.  Their analysis and negotiation would be an

essential input to the Court's review—one that is missing here.

177.    Nor does the fact that some of the compromised claims are between two

Debtors excuse the disenfranchisement of creditors.  The intersilo claims may belong to EFH and

TCEH as a corporate matter, but in a case where value must be divided between the E-side and

the T-side creditors, these intercompany claims are really intercreditor claims.  As Judge Gerber

noted in similar circumstances:

> In one sense, these disputes are, as the Arahova Noteholders
> Committee puts it, "intradebtor" disputes.  In another sense—more
> consistent with the real world and the usual practice in chapter
> 11—these disputes are "intercreditor" disputes, as it is the creditors
> of the respective individual debtors who are directly affected by
> those debtors' asset-liability mix, and who normally negotiate out
> (or, in some cases, litigate) the controversies that affect their
> particular recoveries.

> *In re Adelphia Commc'n Corp.*, 336 B.R. 610, 617 n.3 (Bankr.
> S.D.N.Y. 2006), *aff'd* 342 B.R. 122 (S.D.N.Y. 2006).

178.    The EFH Committee respectfully submits that there is no justification in

law for the proposition that "[c]ompromises are favored in bankruptcy," *Myers* v. *Martin* (*In re*

*Martin*), 91 F.3d 389, 393 (3d Cir. 1996), unless those compromises are the result of arm's-

length negotiation.  Approving the Intersilo Settlement with these Disinterested Directors as a

replacement for the involvement of arm's-length creditors would announce to potential debtors

everywhere that there is a new path to achieving compromises—one far more convenient than dealing with creditors, especially when insiders are implicated.

## IV.    THE INTERSILO SETTLEMENT IS NOT FAIR, EQUITABLE, REASONABLE OR IN THE INTERESTS OF THE E-SIDE ESTATES.

### A.    *TMT Trailer* Mandates Independent Review to Protect E-Side Creditors.

179.    The Debtors have moved for approval of the Intersilo Settlement under Bankruptcy Rule 9019.  In the event the Court gets that far, to approve a settlement under Rule 9019, the Court must "apprise[] itself of all facts necessary to form an intelligent and objective opinion of the probabilities of ultimate success should the claims be litigated, estimate [ ] the complexity, expense and likely duration of such litigation, and other factors relevant to a full and fair assessment of the [claims]." *In re Capmark*, 438 B.R. at 514 (citing *In re Penn Cent. Transp. Co.*, 596 F.2d 1127, 1146 (3d Cir. 1979)).  After doing so, the Court has an active role. In contrast to business judgment review under general corporate law, the Court cannot merely defer to the Debtors' conclusions and justifications but instead must make an "informed and independent" judgment.  *TMT Trailer*, 390 U.S. at 424.  To make an informed and independent judgment, the Court "needs facts, not allegations." *Id.* at 437.

180.    The Debtors bear the burden of proof by a preponderance of the evidence. *In re Capmark*, 438 at 509.  In reviewing a settlement with different parts, the Court's mandate is unchanged.  The Court cannot simply take a "holistic" view, but instead must examine "each part of the settlement . . . to determine whether the settlement as a whole is reasonable." *In re Washington Mut., Inc.*, 442 B.R. 314, 329 (Bankr. D. Del. 2011).  A failure by the Debtors to present sufficient evidence to carry their burden of proof with respect to the component parts of the Settlement Agreement must result in denial of its approval.

-75-

181.    In reviewing a settlement with respect to multiple debtors, the Debtors

must establish that the settlement is fair, equitable, reasonable and in the best interests of the

creditors of *each* Debtor individually.  *In re Innkeepers*, 442 B.R. at 235 ("[I]n a case with

multiple debtors, the debtors, as fiduciaries, have duties to refrain from favoring or appearing to

favor one or another of their estates and its creditors over another."); *In re United Shipping Co.*,

No. 4-88-533, 1989 WL 12723, at *5 (Bankr. D. Minn. Feb. 17, 1989) ("The focus of Rule 9019

is to protect other creditors against bad deals made between one creditor and the debtor.")

B.    The Intersilo Settlement Requires Heightened Scrutiny.

182.    In conducting independent review, Courts require arm's-length settlements

that do not involve insiders to fall "above the lowest point in the range of reasonableness."  *In re*

*Capmark*, 438 B.R. at 515 (citing *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)).

Courts take a different approach and apply heightened scrutiny when settlements are negotiated

by insiders or contain releases or other financial advantages for insiders.  *See In re Chassix*

*Holdings, Inc.*, 533 B.R. 64, 70 (Bankr. S.D.N.Y. 2015) ("Ordinarily a settlement is reviewed

under a 'business judgment' standard, and is approved so long as it does not fall below the

lowest point of range of reasonableness. . . .  However, since the settlement here is with the

Debtors' parent . . . the Court agrees that it is proper to apply heightened scrutiny . . . ."); *In re*

*Exaeris*, 380 B.R. at 746-47 (stating that a "stricter standard" may be appropriate "when

evaluating settlements negotiated by insiders of a debtor."); *In re Loudoun Heights, LLC*, No. 13-

15588-BFK, 2014 WL 2928110, at *13 (Bankr. E.D. Va. June 27, 2014) (holding that "[a]ny

settlement benefitting an insider must be heavily scrutinized by the Court"); *In re*

*Moultonborough Hotel Grp., LLC*, No. BR 10-14214-JMD, 2012 WL 5464630, at *9 (Bankr.

D.N.H. Nov. 8, 2012) (noting that a settlement that included a release of an insider claim

-76-

required "stricter scrutiny"); *In re Dharmasuriya*, No. 2:09-BK-28606-PC, 2014 WL 845991, at

*3 (Bankr. C.D. Cal. Mar. 4, 2014) ("[insider] dealings are subject to a higher level of

scrutiny."); *see also Matter of Foster Mortg. Corp.*, 68 F.3d 914, 919 (5th Cir. 1995) ("The

court's scrutiny must be great when the settlement is between insiders and an overwhelming

majority of creditors in interest oppose such settlement of claims."); *In re Charter Commc'ns*,

419 B.R. at 240 (subjecting plan settlement with controlling shareholder to "heightened

scrutiny"); *In re Drexel Burnham Lambert Grp. Inc.*, 134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991)

("We subjected the agreement to closer scrutiny because it was negotiated with an insider, and

hold that closer scrutiny of insider agreements should be added to the cook book list of factors

that Courts use to determine whether a settlement is fair and reasonable.").

      183.    The Intersilo Settlement falls squarely within the types of transactions

subject to heightened scrutiny.  *First*, the initial March Settlement was negotiated by

Disinterested Directors who were *disinterested* in the outcome of any intercompany settlement—

or these chapter 11 cases generally—but *extremely interested* in obtaining releases of all

prepetition and postpetition acts for themselves and their colleagues.  As Ms. Billie Williamson,

one of the EFH Disinterested Directors, noted, ████████████████████████████

████████████████████████████████████  (Glueckstein Decl., Ex. 13

(Williamson II Depo. Tr.) at 116:22-117:3.)  The subsequent Intersilo Settlement included in the

Settlement Agreement was negotiated in July and August by parties adverse to EFH, including

the Controlling Owners and officers and advisors with duties to the T-side Debtors.  The Intersilo

Settlement was then merely presented for approval to the EFH Disinterested Directors and the

full Board of Directors, who approved it without change.

184.    *Second*, the Intersilo Settlement contains releases of all directors and officers, former and current, including those involved in the negotiation of the Intersilo Settlement itself, "from the beginning of the world through the Settlement Effective Date." (Settlement Agreement § 2.4(a).)  Accordingly, the Court should apply heightened scrutiny to its independent review of the Intersilo Settlement.

C.    The Intersilo Settlement Fails a *Martin* Assessment.

185.    In reviewing a settlement under Bankruptcy Rule 9019, courts in this jurisdiction "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal."  *In re Martin*, 91 F.3d at 393. Striking this balance requires a review of four factors:  "(1) the probability of success of litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."  *Id.* (citing *TMT Trailer*, 390 U.S. at 424-25).  Despite months and millions of dollars being spent to justify it, the Intersilo Settlement will fail *Martin* review on the facts that will be established at trial.

*1.  Likelihood of Success on the Merits.*

186.    The facts and evidence will show that no claim asserted by TCEH against EFH has any likelihood of success on its individual merits.  As discussed in depth in section I.B. above, none of the litigation claims to which TCEH ascribed any value during negotiation of the March Settlement have merit.  In any event, the ten considerations discussed establish that there is no material likelihood of success on the merits that could remotely support a $700 million allowed claim against EFH in favor of TCEH.

187.    On the other side of the ledger, EFH has at least $1.3 billion of claims against EFH and Luminant with respect to which the likelihood of success on the merits is 100%. In addition, EFH has its own avoidance actions against the T-side Debtors with respect to which the likelihood of success on the merits is considerably higher than it is for any of the avoidance claims by TCEH. Finally, EFH has claims against Controlling Owners, directors and officers, and access to at least ███████ of D&O Insurance.

### 2.    *Collectability.*

188.    TCEH's claims against EFH are not collectible even if those claims have merit (they do not) because of EFH's setoff rights under section 553 of the Bankruptcy Code and rights under section 502(d) of the Bankruptcy Code. EFH's claims against TCEH are collectible to the extent of value available at TCEH, which is low but not negligible. EFH's claims against the Controlling Owners are collectible. EFH's claims against directors and officers are collectible at least to the extent of indemnities by the Controlling Owners and/or ███████ of D&O Insurance.

### 3.    *Complexity, Expense, Inconvenience and Delay.*

189.    The issues underlying the Intersilo Settlement are not nearly as complicated as the Debtors suggest. There is only one TCEH Debtor making meaningful claims against the E-side Debtors: TCEH. There has been no colorable assertion that any other TCEH Debtor or individual creditor has any significant claims against any E-side Debtor. Nor has TCEH claimed a right in property or any administrative priority. The only claims asserted are prepetition general unsecured claims.

190.    TCEH's claims are against only one estate: EFH. At various points in the past, counsel to TCEH and its creditors have hinted at claims against EFIH or even Oncor.

-79-

These claims were empty speculation.  They have fallen away and the record presents no

evidence of any such claim.  The material relationship between the credit silos is *bilateral*:

claims between EFH and TCEH.

191.    Under no circumstances would the need to resolve whether TCEH has an

allowable claim against EFH prevent the successful reorganization of EFH.  There is no reason

why EFH cannot pursue and confirm whatever plan of reorganization is in the best interests of all

of its stakeholders subject to an unsecured prepetition claim dispute.  There is no reason why

litigation and/or arm's-length settlement efforts (involving EFH creditors) could not resolve the

dispute quickly and efficiently.  If those efforts do not, there is no reason why a plan of

reorganization for EFH could not be confirmed and even become effective with an appropriate

reserve established.  The question is merely one of whether it is, or is not, in the best interests of

the EFH creditors to settle—and when settlement should occur.

192.    With respect to the dynamics of claims litigation, the TCEH claims against

EFH raise dispositive legal issues that would be resolved in the early stages of litigation,

including the inability to meet federal pleading standards, the application of the parol evidence

rule, the application of the statute of limitations, setoff, and section 502(d) of the Bankruptcy

Code.

193.    Claims litigation may of course be expensive, but it will not cost $700

million or anything of that magnitude.  █████████████████████

████████████████  (Glueckstein Decl. Ex. 13 (Williamson II Depo. Tr.) at 48:2-49:10.)

The record for the legacy claims is already produced and no further document discovery is

required.  Indeed, the EFH estate has invested heavily in discovery and should be ready to

-80-

litigate with the fruits of its efforts.  There is certainly no basis to justify the staggering cost of the Intersilo Settlement as a litigation cost settlement.

194.    Moreover, EFH will pay only its own expenses.  In order to pursue a claim against EFH, TCEH (on behalf of its creditors) will need to pay its own way with its own cash. This will be a painful endeavor for TCEH creditors and their fiduciaries.  If TCEH were to prevail on any claim after litigation, TCEH would bear, in addition to 100% of its own costs, the dilution of their "successful" general unsecured claim by a percentage of the amount spent by EFH defending against it.  The concept of "litigation cost" will thus always be tilted in EFH's favor and is another reason why an otherwise unfavorable settlement to EFH cannot possibly be justified.

### 4.  *The Paramount Interests of Creditors.*

195.    The fourth, and most significant, *Martin* factor is the paramount interest of the E-side creditors.  Under Bankruptcy Rule 9019, fairness of the settlement is analyzed from the perspective of "the parties who did not settle" and whether the settlement "serves the interests of the estate, not one particular group of creditors."  *In re Nutraquest*, 434 F.3d 639, 645 (3d Cir. 2006); *In re Jevic Holding Corp.*, 787 F.3d 173, 185 (3d Cir. 2015), *as amended* (Aug. 18, 2015); *see also In re Coram Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004) (noting that the fact that the settlement is reasonable as to the settling creditors does not mean that it is reasonable to the Debtors and the other creditors).  The Court should "emphasize" this factor and "give proper deference to their reasonable objections."  *In re C.P. Del Caribe, Inc.*, 140 B.R. 320, 325 (Bankr. D.P.R. 1992).

SC1:3961318.8

a)  All E-Side Creditors Object.

196.    A significant indication that the Intersilo Settlement is not fair and equitable for the E-side Debtors is that *no* E-side creditor supports it.[17]  The support for the Intersilo Settlement comes only from parties that are adverse to the E-side creditors on the subject matter of the Intersilo Settlement, including the E-side directors and officers. The EFH Committee has objected to the Intersilo Settlement (and the preceding March Settlement) consistently and with clear reasons since it was announced.  The EFH Committee's objection is not dispositive but should carry weight with the Court given the EFH Committee's role as statutory fiduciary for all E-side unsecured creditors and the representative claims held by its members for their own account.   The EFH Committee's objection as to the fairness of the settlement is even more credible in light of the vocal support for the Intersilo Settlement among the T-side creditors.

b)  The Intersilo Settlement May Waste Claims Against Insiders.

197.    The Intersilo Settlement is intended to prevent the E-side Debtors from monetizing litigation assets against insiders by forfeiting those litigation assets definitively today, before they may become relevant in the future.  This is prejudicial to the E-side creditors in two ways.  First, these outbound litigation claims against insiders are being compromised on an "all or nothing" basis without (i) individual review of their merits or (ii) creditor involvement in a decision to forego them.  Second, the E-side creditors are prevented from challenging the compromise of these claims except on a Bankruptcy Rule 9019 settlement basis, which does not involve a trial on the merits of the individual claims.  In the case of a compelling reason to

---

[17]    The three exceptions are creditors that hold unsecured claims at EFIH and are participating in the Purchasers' bidding consortium in the Plan.

compromise claims against insiders, this prejudice might be overcome.  However, these claims are simply litigation assets.  The targets of such litigation have not threatened to harm the E-side Debtors or quit work if the releases are not obtained, nor could they consistent with their position and/or duties.

           c)  Material Facts Will Only Be Known Later.

        198.     The Intersilo Settlement applies only with respect to an unknown plan at an unknown date at least six and perhaps more months in the future.  The value of Oncor is volatile and there is no way to know at this time how much value at EFH will be distributable to creditors.  Permanently compromising all of EFH's litigation assets, unnecessarily, without a sense of distributable value at EFH is overwhelmingly prejudicial to EFH creditors.  For example, the EFH Disinterested Directors ████████████████████████████████ ████████████████████████████ (*see* Glueckstein Decl., Ex. 13 (Williamson II Depo. Tr.) at 62:3-21), and ████████████████████████████ Impairment of EFH unsecured creditors completely changes the outlook for EFH with respect to the pricing of the compromise of claims.  Certain litigation claims against insiders and their insurers that will not need to be pursued if EFH creditors are paid in full, but will be diligently pursued if EFH creditors are otherwise impaired.  Certain litigation claims against insiders (and their insurers) will not be pursued if EFH creditors are paid in full, but will be diligently pursued if EFH creditors are otherwise impaired.  Prepetition indemnification contracts become less important.  Claims by EFH against TCEH become relatively more valuable.  The dynamics of both setoff and section 502(d) defenses as between EFH and TCEH are modified.  None of this can be predicted at this time.

-83-

d)  Favoritism.

199.    Viewed from the perspective of E-side creditors, the Intersilo Settlement plainly and impermissibly favors one affiliated creditor—TCEH—over all other creditors.  *See In re Mavrode*, 205 B.R. 716, 721 (Bankr. D.N.J. 1997) ("A proposed settlement will necessarily fail where one creditor benefits at the other creditors' expense.").  Vis-à-vis EFH, TCEH is nothing more than an affiliate and an alleged general unsecured creditor.  Because of its status as an affiliate, it has received better treatment than all other creditors.  TCEH had access and the ability to negotiate with the EFH Disinterested Directors regarding their claim, while virtually none of the other EFH creditors ever had such access.  In addition, the evidence at trial will show that EFH gave TCEH an effective consent right over matters such as the disposition of Oncor while no similar consent right was given to any other EFH creditor.

200.    Similarly, TCEH received the unique benefit of negotiating with EFH in secret.  The other disputed claims against the E-side Debtors—make-whole and postpetition interest claims—have been resolved by open processes involving litigation with a right to intervene.  However, the largest and most dubious claim against EFH was resolved by stealth and announced to other EFH stakeholders as a *fait accompli*.  This is not equal treatment of creditors by EFH.

e)  Lack of Creditor Input in Negotiation.

201.    The $700 million claim by TCEH against EFH is the single largest disputed claim against EFH.  Yet, the EFH Committee and the EFH creditors were not involved or able to help shape the settlement, despite numerous requests to do so.  The EFH Committee has been generally involved in the Debtors' claims resolution process with respect to other claims, but was deliberately excluded from discussions about TCEH's claim.  The Debtors and

-84-

the EFH and EFIH Disinterested Directors' advisors were aware of the EFH Committee's

contrary views as to the merits of the intercompany claims.  Contrary views are the very reason

why the EFH Committee should have been included.

202.    Approval of the Intersilo Settlement would prejudice EFH creditors by

judicially sanctioning this exclusion of creditor input.  Denial of the Intersilo Settlement, on the

other hand, would permit an opportunity for EFH creditor input into the resolution of the

underlying claims at arm's length by the stakeholders with an economic interest in the outcome.

Denial of the Intersilo Settlement also permits the EFH Committee to seek standing to pursue the

claims being forfeited in the Intersilo Settlement.  The Court may grant or deny a future standing

motion, but E-side creditors are prejudiced by their inability to plead one if the Intersilo

Settlement is approved and the claims are lost forever.

f)    Prejudice to E-Side Creditors in Future Plan Negotiations.

203.    The Intersilo Settlement expressly contemplates negotiations about a

future plan of reorganization.  In fact, the Debtors' Co-CRO acknowledged that ███████████

███████████████████████████████████████████████████ (Glueckstein

Decl., Ex. 5 (Doré Depo. Tr.) at 300:14-19.)  The Intersilo Settlement and the related provisions

of the Plan Support Agreement were structured by all other necessary participants to those future

plan negotiations other than the E-side creditors.  Not surprisingly, the other participants

negotiated to handicap the negotiation position of the excluded E-side creditors.  The E-side

creditors are deprived of their right to prevent releases of the Controlling Owners, directors and

officers, who continue to control the Debtors.  These releases are ensured with respect to all past

acts and omissions, including with respect to the current Plan (regardless of whether it succeeds),

by the Intersilo Settlement itself.  And these releases are all but ensured with respect to yet

unknown future plans by the corresponding provisions of the Plan Support Agreement, which becomes effectively permanent upon approval by the Court of the Intersilo Settlement.  In short, the E-side creditors lose now any right to hold Controlling Owners and estate fiduciaries responsible for the remainder of these cases.

204.    The Intersilo Settlement also is intended to—and does—prejudice the E-side creditors vis-à-vis another adverse party, the TCEH First Lien Creditors.  Pursuant to the terms of the Intersilo Settlement, the TCEH First Lien Creditors are the economic beneficial owners of the $700 million TCEH settlement claim.  (Settlement Agreement § 2.1(c).)  The treatment of this claim in applicable documents is illustrative of its role, not as a claim on the merits, but as a bargaining chip to prejudice the E-side creditors in future plan negotiations.  First, the $700 million claim is deemed satisfied if the *current* Plan closes even though all that the TCEH First Lien Creditors receive in that case is an opportunity to invest $700 million in reorganized EFH at plan value.  (Plan § IV.B.15.)  It is highly suspicious that this supposedly valuable claim is given up without an actual recovery if the Plan closes, but springs to life if the E-side creditors are potentially impaired and have plan approval and other rights.  Second, the language of the Settlement Agreement expressly contemplates subordination of the entire $700 million claim if the TCEH First Lien Creditors agree.  There would be little reason to expressly mention the right to voluntarily subordinate a bona fide claim.

205.    The terms of the Settlement Agreement belong in a plan of reorganization.  There are a number of issues that will need to be resolved between EFH creditors and EFH insiders in a future plan, and a number of issues to be resolved between EFH creditors and the TCEH First Lien Creditors seeking to use EFH NOLs.  It is inappropriate for one group of

-86-

stakeholders to use the Bankruptcy Rule 9019 process to prejudice the others so far in advance in such future plan discussions.

206.    The "paramount interest of creditors" prong of the *Martin* test is violated by creditor objection and creditor prejudice.  Accordingly, the EFH Committee submits that the Court should deny approval of the Intersilo Settlement.

D.    The Intersilo Settlement Fails *Zenith.*

207.    The releases in the Intersilo Settlement cannot be approved because they violate Third Circuit law relating to non-debtor releases.  Any releases that are otherwise inappropriate in a plan of reorganization are equally inappropriate outside of a plan of reorganization.  *In re Coram Healthcare*, 315 B.R. at 334 (stating that the requirements for approving releases under Bankruptcy Rule 9019 are generally the same as those under section 1123 of the Bankruptcy Code).  Under Third Circuit law, notwithstanding section 524(e) of the Bankruptcy Code, releases by the debtor against third parties are allowed only under "certain limited circumstances."  *In re Zenith Elecs.*, 241 B.R. at 110.  Courts apply a non-exclusive five-factor test to determine the appropriateness of a debtor's release of non-debtor third parties:

- An identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;

- Substantial contribution by the non-debtor of assets to the reorganization;

- The essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success;

- An agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes 'overwhelmingly' votes to accept the plan; and

- Provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.

-87-

*Id.* (citing *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994)).  The

insider releases in the Intersilo Settlement clearly do not satisfy any of these five factors.[18]

208.    *First*, contrary to the Debtors' allegations, there is no identity of interest

between the E-side Debtors and the Controlling Owners or the directors and officers merely by

virtue of the E-side Debtors' indemnification obligations.  (Settlement Motion ¶ 255.)

Avoidance actions against the Controlling Owners and actions against the directors and officers

for breach of the duty of loyalty are explicitly excluded from the E-side Debtors' indemnification

obligations.[19]  Additionally, these indemnification obligations are *prepetition* obligations of the

Debtors' and give rise to *prepetition* general unsecured claims.  Accordingly, the Controlling

Owners, directors and officers will only recover fully from the E-side Debtors—if these claims

are otherwise relevant—if the E-side Debtors are solvent—and there is no indication the E-side

Debtors will be in the circumstance where the Intersilo Settlement applies.  Furthermore, to the

extent that the E-side Debtors do indemnify the directors and officers, the Debtors have access to

███████████ of director and officer liability insurance.  A suit against insured directors and

officers will *not* "result in severe and irreparable harm to the [Debtors'] estate[s]" and is *not* the

---

[18]    The EFH Committee also objects to the releases as applied to other non-debtor third parties for which the Debtors have provided no basis to grant the relief.

[19]    *See, e.g.*, Energy Future Holdings Corp., Quarterly Report (Form 10-Q) Ex. 3(a) RESTATED CERTIFICATE OF FORMATION OF ENERGY FUTURE HOLDINGS CORP. Art. IX (undated) (May 2, 2013) (carve-out for "breach of the director's duty of loyalty to the Corporation or its shareholders"); SECOND AMENDED RESTATED ARTICLES OF INCORPORATION OF ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY A-1 Art X (undated) (Sept. 17, 2008) (same); Energy Future Intermediate Holding Co., Annual Report (Form 10-K) Ex. 3(b) SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC §§ 5.2, 6.1 (Sept. 15, 2011) (Feb. 21, 2012) (carve-out for "fraud"); Texas Competitive Electric Holdings Co., Post-Effective Amendment (Form S-1/A) Ex. 3(e) FOURTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC §§ 12.02, 13.01 (Aug. 29, 2011) (March 27, 2012) (carve-out for "fraud").

SC1:3961318.8

same as a suit against the Debtors.  *See In re Kasual Kreation, Inc.*, 54 B.R. 915, 917 (Bankr. S.D. Fla. 1985).

209.    *Second*, the Controlling Owners and directors and officers have not contributed substantial assets to these chapter 11 cases.  Their indemnification claims against the Debtors alone cannot justify such broad sweeping releases.  With respect to the Controlling Owners, the Debtors' argument that the Controlling Owners are receiving the releases because they are agreeing to "forego future recoveries on their equity and consenting to TCEH's $700 million claim against EFH in the event of an Alternative Plan" is misleading.  (Settlement Motion ¶ 256.)  If approved, the releases in the Settlement Agreement are effective *immediately* upon court approval, *independent* of the outcome of the current Plan.  (Settlement Agreement §3.1.)  The terms of any future alternative plan are uncertain, although potentially resulting in deep impairment of the EFH creditors.  In such a scenario, absent payment in full to all EFH creditors, the Controlling Owners would not be entitled to *any* recovery on their equity, and their consent to any claim is wholly unnecessary.  With respect to the directors and officers, the Debtors rely on their "massive investments of time and effort to, and continued support for, the Debtors' reorganization" as justification for the releases.  (Settlement Motion ¶ 259.)  While the EFH Committee does not dispute the current directors' and officers' enormous investments of time and effort, that alone cannot justify non-plan releases, especially from claims that the directors and officers breached their fiduciary duties to the estates and the stakeholders whose best interests they are required to pursue.  Moreover, this justification does not apply to former directors and officers.  Their past investments of time and efforts were not towards the Debtors' reorganization, and accordingly, cannot validate releases of claims.  *In re Tribune Co.*, 464 B.R. at 188 (releases of former directors and officers are unfair because "there [was] no basis in the

-89-

record to support any finding that 'substantial contribution' ha[d] been made . . . or that a release [was] necessary to the reorganization").

210.    *Third*, the releases are not essential to the Debtors' reorganization.  The Debtors can reorganize without the estates ceding, now, potentially valuable actions against the Controlling Owners and directors and officers.  These actions can be settled in connection with a future plan if the facts so warrant or can be preserved and addressed by a litigation trust. Additionally, to the extent that releases are important to the *current* Plan, there are releases of the Controlling Owners and directors and officers contained in the current Plan that will become effective if and when the Plan becomes effective.  The Debtors have provided no justification as to why the Controlling Owners, directors and officers need to be released today with respect to future alternative plans.

211.    *Fourth*, no creditor of the E-side Debtors is in favor of the Intersilo Settlement.  The Debtors conveniently note that the Settlement Agreement "ha[s] substantial support of all T-side creditors and interest holders" but neglect to mention any of the creditors of the other half of the Debtors' capital structure.  (Settlement Motion ¶ 262.)  Additionally, the Debtors remark that the "T-Side creditors were the only creditors to identify any potential claims against the Controlling Owners, directors, or officers."  (*Id.*)  This statement is flatly inaccurate. On December 11, 2014, shortly after its formation, counsel to the EFH Committee sent the Debtors' joint counsel and EFH and EFIH's independent counsel "additions to the list of intercompany claims that merit attention," and expressed the view that claims against insiders should not be immediately settled because such a settlement could be harmful to E-side creditors. (Glueckstein Decl., Ex. 30 at EFH_DD00004946-47.)

212.    *Fifth*, the releases in the Settlement Agreement are not tied to the current

Plan or *any* plan.  It is true that "the Plan calls for payment of all allowed E-side creditor claims

in full in cash"—if it is ever consummated.  (Settlement Agreement ¶ 263.)  This ignores the fact

that the releases in the Intersilo Settlement exist *independent* of the Plan—and are effective even

if the current Plan is not confirmed or is confirmed and never goes effective.  If approved, the

releases would shield the Controlling Owners and directors and officers under *any* future plan,

irrespective of treatment of E-side claims in that plan.  Even counsel for the Purchasers

recognized during negotiations that ██████████████████████████████████

██████████████    (*See* Glueckstein Decl., Ex. 52 at EFCH00028830.)

213.    The final *Zenith* factor is especially critical in light of the intentional

decision to seek approval of the releases outside of a plan.  The released claims are valuable and

are being distributed to the Controlling Owners on account of their controlling equity position as

discussed in paragraphs 220-230 below.  No court has addressed the question of whether a debtor

can use a settlement for the primary purpose of making a distribution to controlling equity prior

to the confirmation of a plan of reorganization, especially when unsecured creditors may be

deeply impaired.[20]  Generally speaking, cases approving preplan distributions pursuant to

settlements over a "*sub rosa plan*" or similar objection have approved those payments in respect

of claims only when the court has been assured of payment under a future plan in accordance

with the priority scheme of the Bankruptcy Code.  *See, e.g.*, *In re Capmark*, 438 B.R. at 512-3

---

[20]    Pre-effective date distributions to equity holders and other insiders can also be made under 363(b), but the Debtors have not pled for such relief.  Even if the Debtors had properly requested authority to provide pre-effective date releases to the Controlling Owners and other insiders of EFH, the Court would be required to closely scrutinize that request, especially over committee dissent.  *See In re Exaeris*, 380 B.R. at 745-46.

-91-

(approving proposed payments to oversecured senior secured creditors); *In re Nortel Networks, Inc.*, 522 B.R. 491, 508 (Bankr. D. Del. 2014).

214.    The form is novel, but at its core, the Intersilo Settlement is a distribution to equity holders on account of their interests (and to other insiders on account of their so-called contributions), fully resolving their role in these chapter 11 cases.  The law regarding such distributions, including in the form of releases, is clear:  (i) only at effectiveness, (ii) only in limited circumstances, and (iii) subject to stringent review by the court.  *See*, *e.g.*, *In re Master Mortg.*, 168 B.R. at 937; *In re Zenith Elecs.*, 241 B.R. at 110.  The Intersilo Settlement would release insiders (i) at approval of the Settlement Motion, (ii) without any evidence of why circumstances justify making such an extraordinary distribution and (iii) without satisfying the requirements of *Zenith*, *203 North LaSalle*, other cases that skeptically examine distributions to insiders, and sections 1129(a)(7), (8) and (10) of the Bankruptcy Code.[21]

215.    Accordingly, the Debtors cannot satisfy their burden with respect to any of the *Zenith* factors, and the releases of non-Debtors insiders in the Intersilo Settlement cannot be approved.  As the Intersilo Settlement is a single, integrated transaction designed to purchase such releases (by the EFH and T-side Debtors) using the E-side Debtors' assets, the entire Intersilo Settlement cannot be approved.

---

[21]    The legal proposition violated by the Intersilo Settlement as applied to the Controlling Owners also can be phrased in a number of alternate ways:  a *sub rosa*  plan that dictates distributions to a controlling stakeholder (*see Pension Benefit Guar. Corp*. v. *Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983)); a distribution of property estate without authority under section 363(b) of the Bankruptcy Code (*see In re Exaeris*, 380 B.R. at 745-46); and a threat to critical protections for creditors under the plan confirmation process (*see In re Capmark*, 438 B.R. at 590).  But semantics obscure the basic principle:  the Intersilo Settlement is a collusive distribution to insiders that violates core provisions of the Bankruptcy Code and cannot be approved.

-92-

E.    The Debtors Have No Evidence of Fairness to Individual E-Side Debtors.

216.    The Settlement Agreement releases claims by over 70 Debtors (against what may be hundreds of released parties) without evidence that the Intersilo Settlement is fair and equitable with respect to the individual estates of each Debtor.  With respect to the E-side Debtors and their direct and indirect Debtor subsidiaries, the Intersilo Settlement necessarily fails in the absence of such evidence.

217.    EECI and Ebasco Services of Canada Limited ("Ebasco") are two examples.  EECI and Ebasco were in the business (and/or successors to entities that had been in the business) of building "power plants across the United States and in other counties where asbestos was present.  Workers at these power plants (and family members and others who came into contact with these workers) may have been exposed to asbestos."  ([D.I. 5171], Ex. 3 at 4.)  EECI and Ebasco have been involved in asbestos litigation for years.  They have no material assets *other* than intercompany claims, litigation claims against non-Debtors and potential insurance assets.  In light of the nexus of intercompany claims between EECI, Ebasco and other Debtors, the Debtors always have paid legacy asbestos liabilities from general corporate resources.  The Debtors propose to assume or pay legacy asbestos liabilities in the Plan, as they have in all previously proposed plans of reorganization for the E-side Debtors.

218.    There has been no assertion that any party to the Settlement Agreement has a claim *against* EECI and Ebasco.  Yet, in the Settlement Agreement, EECI and Ebasco release all claims "from the beginning of the world" against the other Debtors and all other parties in the Settlement Agreement, leaving EECI and Ebasco without recourse to other Debtors for the legacy asbestos liabilities previously paid in the ordinary course.

-93-

219.    The inclusion of EECI and Ebasco has corporate governance implications. (Glueckstein Decl., Ex. 13 (Williamson II Depo. Tr.) at 217:4-19 ("███████████ ██████████████████████").)  However, it also indicates a substantive defect.  The Settlement Agreement cannot be approved as to EECI, Ebasco or any other E-side Debtor— outside of a plan of reorganization that resolves all claims against such E-side Debtors—unless there is specific identification and evidence of the claims by and against the applicable entity being released and a showing that the Settlement Agreement is fair and equitable.  The Debtors have not made such a showing with respect to any individual E-side Debtor.

## V.    THE INTERSILO SETTLEMENT VIOLATES THE ABSOLUTE PRIORITY RULE.

### A.    The Intersilo Settlement Must Comply with the Absolute Priority Rule.

220.    A "fair and equitable" settlement must comply with the doctrine of absolute priority.  *TMT Trailer*, 390 U.S. at 441 (stating that "[the 'fair and equitable'] standard incorporates the absolute priority doctrine under which creditors and stockholders may participate only in accordance with their respective priorities"); *Case* v. *Los Angeles Lumber Products Co.*, 308 U.S. 106, 115-16 (1939) (concluding that in "equity reorganization law the term 'fair and equitable' included . . . the precedence to be accorded creditors over stockholders").  Although not always labelled as the absolute priority rule, contemporary courts also analyze priority when determining whether to approve settlements.  *See In re World Health Alternatives, Inc.*, 344 B.R. 291, 297 (Bankr. D. Del. 2006) (analyzing the priority of distribution under the proposed settlement); *In re Armstrong World Indus., Inc.*, 432 F.3d 507, 518 (3d Cir. 2005) (concluding that the absolute priority rule applied where the equity holder proposed to settle its intercompany claim in exchange for warrants to the reorganized debtor); *In re Miller Parking Co., LLC*, 510 B.R. 123, 130 (E.D. Mich. 2014) (noting that the absolute priority rule

-94-

"bars a settlement where claims of a junior class are paid while claims of a senior class have not been fully satisfied").

221.    The Third Circuit has held that the policy behind the absolute priority rule applies to settlements, even if the strict priority scheme of section 507 applicable to plan distributions does not. *In re Jevic*, 787 F.3d at 180 (holding that "bankruptcy courts may, in rare instances like this one, approve structured dismissals that do not strictly adhere to the Bankruptcy Code's priority scheme"). The court in *Jevic* was clear to stress the importance of absolute priority doctrine and that compliance with absolute priority is the norm, not the exception. *Id.* at 184 (stating that "compliance with the Code priorities will usually be dispositive of whether a proposed settlement is fair and equitable"). Other circuits have taken a similar position. *In re Iridium*, 478 F.3d at 465 (allowing deviation from the absolute priority rule in a liquidating case "in some minor respects," while stating that compliance with "the Bankruptcy Code's priority scheme will be the most important factor for a bankruptcy court to consider in approving a settlement under Bankruptcy Rule 9019. In most cases, it will be dispositive.").

222.    Although the *Jevic* court did not provide specific factors to be considered to determine whether there are "specific and credible grounds" to depart from the absolute priority rule, it is clear from the court's discussion that deviation requires extraordinary circumstances. In *Jevic*, the debtor had ceased operations and terminated all employees prior to the petition, and the court made explicit findings that there was "no prospect" for reorganization, questioning even whether the debtor would even be able to convert its case to a Chapter 7 liquidation. *See In re Jevic*, 787 F.3d at 175-76, 178. *Iridium* too, concerned a defunct debtor, not a debtor with a viable business needing to restructure its capital structure. *In re Iridium*, 478

-95-

F.3d at 456-57 (noting that there was no demand for the debtor's service and that the debtor had

far fewer customers that needed to be viable).  The court in *Jevic* explained that part of the

reason it decided a departure from section 507 priorities was appropriate was that, like *Iridium*,

the proposed non-compliant distributions would ensure some creditors are paid rather than

subject the whole estate to litigation which would quickly drain the liquidating estate.  *In re*

*Jevic*, 787 F.3d at 185.

223.    Departure from the absolute priority rule is not justified in this case.  This

case does not involve operationally defunct businesses seeking orderly resolution as in *Jevic* and

*Iridium*.  The Debtors are planning to sell a viable operating business to a buyer for value.

(Disclosure Statement at 41.)  The Debtors do not assert that they lack alternative means out of

bankruptcy as in *Jevic*.  To the contrary, the Debtors assert they will pursue an alternate plan if

the proposed Plan is not consummated.  (Disclosure Statement § VIII.B (explaining that if the

proposed Plan is not confirmed or consummated, the Debtors may seek to confirm and

consummate a new plan).)  This case does not involve litigation that will drain the estate if the

proposed distribution is not made; there is no evidence the Debtors will run out of money if a

settlement is not approved now.  And this is not a case where uncertainty of creditor's status as

to priority makes it difficult or impracticable to apply priorities; nobody is questioning the fact

that E-side creditors are in fact creditors.  Instead, this is a case where priority rules should be

respected as "the most important factor" and "dispositive."  *See In re Iridium*, 478 F.3d at 455; *In*

*re Jevic*, 787 F.3d at 183.

224.    The Court should be especially wary in this case to depart from the

Bankruptcy Code priorities because the challenged distribution is made to controlling owners.

The court in both *Jevic* and *Iridium* dealt with section 507 priorities and distributions to junior

-96-

creditors before senior creditors.   In *Jevic*, the debtors reached a settlement with all

constituencies, including the official committee of unsecured creditors, except for one creditor

group that was senior to certain parties to the settlement.   In *Iridium*, the settlement agreement

contemplated distribution of assets of the estate to the unsecured creditors ahead of an insider

who was also potentially an administrative creditor, thereby skipping over the administrative

claim.   In contrast, the Intersilo Settlement strikes at the historical heart of the absolute priority

rule by envisioning distributions to controlling owners while unsecured creditors are potentially

impaired.  *See Bank of Am. Nat. Trust & Sav. Ass'n* v. *203 N. LaSalle St. P'ship*, 526 U.S. 434,

444 (1999) (stating that "[t]he reason for [the 'fair and equitable' requirement] was the danger

inherent in any reorganization plan proposed by a debtor, then and now, that the plan will simply

turn out to be too good a deal for the debtor's owners").

      B.     The Controlling Owner Releases Constitute Distributions of Value on
<u>Account of Equity Interests in the Debtor.</u>

     225.     The Intersilo Settlement violates the absolute priority rule by distributing

value to equity holders while unsecured creditors may be impaired.   Courts have long recognized

that releases are valuable.  *See*, *e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 238 (3d Cir. 2000)

(discussing the absolute priority rule, stating that "[t]here can be little doubt that a legal claim is

property within the meaning of the Bankruptcy Code"); *Northview Motors*, 186 F.3d at 350

(stating that legal claims are "property" under the Bankruptcy Code); *In re Pullman Const.*

*Indus. Inc.*, 107 B.R. 909, 950-51 (Bankr. N.D. Ill. 1989) (noting that a "release from a cause of

action constitutes property of value[, for] if a release did not have value, nobody would ever

request one").   Releases, as with anything of value from the estate, can only be distributed to

stakeholders according to priorities of the Code.   11 U.S.C. § 507; *see also In re Pullman*, 107

-97-

B.R. at 950-51 (finding that the release of subordinated debenture holders while unsecured creditors senior to the debenture holders were impaired violated the absolute priority rule).

226.    The Third Circuit has held that releases of equity owners may be granted while creditors are impaired without violating the absolute priority rule *only* in limited circumstances.  In *PWS Holdings*, the court held that a plan providing sponsor releases while leaving creditors impaired did not violate the absolute priority rule where the releases were not given "on account of" equity interests, but for other valid reasons.  *In re PWS*, 228 F.3d at 238.  The court in *PWS Holdings* determined that the two reasons for the releases were (i) the lack of value of the underlying litigation claims and (ii) the cost of pursuing them, each as verified by a court appointed independent examination.  Accordingly, the court found that there was no "causal relationship" between the distribution of value via releases and the recipients' equity interests in the Debtors.  *Id.* at 242.  The court's holding was narrow: "without direct evidence of causation, releasing potential claims against junior equity does not violate the absolute priority rule in the particular circumstance in which the estate's claim are only of marginal viability and could be costly to pursue."  *Id.*

227.    The proposed releases of the Controlling Owners in these cases stand in stark contrast to the limited exceptions to the absolute priority rule cited above.  The Debtors themselves justify the releases as a *quid pro quo* in exchange for a foregone equity contribution and other rights deriving from the Controlling Owners' interests.  (Settlement Motion ¶ 256.)  In fact, the Controlling Owners went so far as to bargain for releases in their capacity as owners, to sign the Plan Support Agreement in their capacity as owners, and ███████████████████

█████████████████████████████████████████████████

██████████████████    (*See* Glueckstein Decl., Ex. 71 at EFCH00015880.)  A

-98-

contemporaneous contractual exchange of consideration is irrefutable evidence of the "causal relationship" contemplated by *PWS*.

228.    The releases also are contemplated to be distributed "because of" interests in the Debtors, given the exclusive nature of the negotiations about the releases and absence of a market test.  The court in *PWS* found the releases there were not given "because of" the sponsor's interest in the debtor since the sponsor did not enjoy exclusivity with respect to the negotiation of the releases and the court-appointed examiner served as "an appropriate surrogate for a market test and an acceptable safeguard."  *In re PWS*, 228 F.3d at 239, 242.  Of note, the statutory creditors' committee in *PWS* had investigated the claims and consented to the proposed settlement, which provided further reassurance that the releases were not circumventing the protections of the absolute priority rule.  *Id*. at 232.

229.    The Debtors in these cases do not assert that the releases are of negative value to the estate.  They cannot make that assertion because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Glueckstein Decl., Ex. 5 (Doré Depo. Tr.) at 410:6-14.)  Nor has there been any court-appointed independent analysis ensuring the fairness of the releases.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Glueckstein Decl., Ex. 6 (Evans Depo. Tr.) at 229:18-25.)  Yet they also were valuable enough to warrant years of focused negotiation by the Controlling Owners and their counsel.  In a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████████████████████

███████████ (*See* Glueckstein Decl., Ex. 71 at EFCH00015880.)

230.    It may be proper for the Controlling Owners to receive "███████████

███████████" "in exchange" for their alleged "upside" in a future alternative plan, even one

that impairs EFH creditors, if the requirements of section 1129 are satisfied and the Bankruptcy

Code priorities respected.  However, the Controlling Owners cannot do so today outside of a

plan on account of their controlling equity interests.  The Intersilo Settlement, for this reason as

well, cannot be approved.


## THE PLAN IS NOT CONFIRMABLE.

231.    A Court's role in the confirmation process is its primary gatekeeping

function under the Bankruptcy Code.  A plan proponent bears the burden of demonstrating the

plan's compliance with each requirement of section 1129(a) by a preponderance of the evidence.

*See In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *4 (Bankr. D.

Del. Apr. 29, 2010).  Independent of the plan proponent's burden, "[t]he Code imposes an

independent duty upon the court to determine whether a plan satisfies each element of § 1129."

*In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 656 (Bankr. D. Del. 2003), *aff'd*

308 B.R. 672 (D. Del. 2004).

232.    As discussed below, the proposed Plan is not the pivotal event of these

chapter 11 cases that it must be to be confirmed.  The record is clear that the Plan is not justified

by the E-side Debtors on its own merits, but exists primarily as a partial settlement payment to

incent a subset of the Purchasers to forgo future litigation.  At its heart, the purpose of the

Merger Agreement, for the E-side Debtors, is not to sell Oncor, but to buy a settlement.

(Glueckstein Decl., Ex. 12 (Williamson I Depo. Tr.) at 60:20-61:5; *see also* Ex. 13 (Williamson II Depo. Tr.) at 141:6-142:10.)  In a case such as this, where the plan proponent has not justified—and cannot justify—the Plan on its own merits, the gatekeeping role of the Court and its independent evaluation is of paramount significance.  The Plan must be evaluated on its merits—rather than approved on the basis of its mere existence—under the clear rubric established by section 1129(a), with the confirmation test satisfied as to each E-side Debtor and without regard to the interests of the T-side Debtors, the Controlling Owners or other insiders.  *In re Armstrong World Indus., Inc.*, 320 B.R. 523, 532 (D. Del. 2005) ("Given the substantial consequences these rearrangements will have on the debtor, the creditors, and other parties in interest, Congress—not surprisingly—has provided explicit requirements that a proposed plan must meet for confirmation.").

I.      **THERE IS NO EVIDENCE OF FEASIBILITY.**

        A.      The E-side Debtors Have Impermissibly Prioritized Disarmament Over
                Feasibility.

        233.    The feasibility determination is recognized as being "the focal point of any inquiry into the confirmability of a plan."  *Matter of Sound Radio, Inc.*, 93 B.R. 849, 855 (Bankr. D.N.J. 1988).  The plain text of section 1129(a)(11) requires a determination that "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

        234.    To confirm the Plan, the Court must have evidence as to both the probability of plan effectiveness *and* the probability of avoiding a subsequent financial reorganization after effectiveness.  The majority of feasibility case law focuses on the second risk.  The first risk is the focus of this Objection.  It is equally, if not more, central to the

-101-

gatekeeper function of 1129(a)(11).  *See, e.g., In re S. Canaan Cellular Investments, Inc.*, 427

B.R. 44, 61 (Bankr. E.D. Pa. 2010) (feasibility standard requires an examination of "the

probability of actual performance of the provisions of the plan") (quoting *In re Hoffman*, 52 B.R.

212, 215 (Bankr. D.N.D. 1985)) (quoting *Matter of Bergman*, 585 F.2d 1171, 1179 (2d Cir.

1978)); *In re Tribune,* 464 B.R. at 185 (feasibility standard requires "a reasonable assurance of

compliance with plan terms") (quoting *In re Washington Mut., Inc.*, 461 B.R. 200, 252 (Bankr.

D. Del. 2011)); *In re Beyond.com Corp.*, 289 B.R. 138, 146 (Bankr. N.D. Cal. 2003) ("[T]he

proposed plan expressly anticipates modification and implements procedures for modification.

Plan modification necessarily requires further financial reorganization.").

235.    The E-side Debtors have impermissibly prioritized disarmament as to

*future* plans over the feasibility of *this* Plan.  The Debtors view the confirmation of the Plan as

little more than a vehicle for achieving their actual goal of locking in full releases and "global

peace" for the purposes of all future plans.  (Glueckstein Decl., Ex. 5 (Doré Depo. Tr.) at 282:5-

11.)  EFH has indicated ███████████████████████████████████████████

████████████████████████████████████████████

(Glueckstein Decl., Ex. 13 (Williamson II Depo. Tr.) at 115:12-20; *see also* Ex. 2 (Baker Depo.

Tr.) at 138:7-19.)  Rather than working diligently to strengthen this Plan, the Debtors instead

spent valuable energy and negotiating capital resolving issues and ████████████████

██████████████████████████████████████████

███████.  (Glueckstein Decl., Ex. 5 (Doré Depo. Tr.) at 293:7-23 (█████████████████

██████████████████████████████████████████).)

Although the Debtors clearly contemplate subsequent plans or restructuring arrangements, these

alternatives are not included in the Plan as required by section 1129(a)(11).  Thus, the Plan is

likely to be followed by the need for further financial reorganization "not proposed in the plan," and does not meet the clear statutory requirements for confirmation.

      B.      <u>The Plan Lacks a Firm Commitment for the Necessary Funding.</u>

      236.    Courts have recognized that evidence of a firm commitment of financing "goes directly to [the] feasibility" of a plan, *In re Ralph C. Tyler, P.E., P.S., Inc.*, 156 B.R. 995, 997 (Bankr. N.D. Ohio 1993), and that "[g]enerally, without proper funding in place or a firm commitment of such funding, the Court cannot find [a] plan feasible." *In re Stratford Assoc. Ltd. P'ship*, 145 B.R. 689, 699 (Bankr. D. Kan. 1992). Having a workable plan that is binding on all parties is at the heart of the lengthy and expensive confirmation process. *See, e.g., In re Sugarhouse Realty, Inc.*, 192 B.R. 355, 368 (E.D. Pa. 1996) ("Permitting withdrawal after confirmation would be in conflict . . . with the Bankruptcy Code generally."). Committed financing can even help ameliorate feasibility concerns in cases where there is significant contingency or conditionality. *See, e.g., In re Indianapolis Downs, LLC*, 486 B.R. 286, 299 (Bankr. D. Del. 2013) (finding plan feasible notwithstanding regulatory risk where purchaser had "committed half a billion dollars" to deal).[22]

      237.    Under the Merger Agreement, the Debtors have expressly waived any remedies against the Purchasers for non-performance. The Merger Agreement states that the E-side Debtors:

---

[22] Although not specifically noted in the court's opinion, the Asset Purchase Agreement in *Indianapolis Downs* provided for a deposit which would serve as liquidated damages under certain circumstances. *See In re Indianapolis Downs, et al.* Motion of the Debtors for Entry of an Order: (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (II) Approving Asset Purchase Agreement; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief [D.I. 1414] ¶ 23(k); Asset Purchase Agreement [D.I. 1546].

-103-

(i) waive, on behalf of themselves and their Affiliates, any and all common law, statutory or other remedies (including the remedy of specific performance) under any legal theory that such Person or any of their Affiliates may have against the Purchasers or their respective Affiliates in respect of any claims or causes of action under this Agreement and (ii) agree that, to the extent they or any of their Affiliates incur losses arising from or in connection with a breach by any other party hereto or any of their respective Affiliates of its representations, warranties, covenants or agreements contained in this Agreement, in no event shall the Company or EFIH or their Affiliates seek to recover any money damages from (or seek any other remedy, including specific performance, based on any legal, contractual or equitable theory against) the Purchasers or any of their respective Affiliates.

(Merger Agreement § 9.9(b).)

238.    It would be charitable to call this provision unusual.  In his survey of all power and utility deals at or above $1 billion announced in the last five years, Mr. Henkin concludes that *no deal has been announced in the industry on the basis of a contract without any remedy*.  (Glueckstein Decl., Ex. 22, Expert Report of Michael Henkin at 18.)  The reason is simple:  contracts without remedies are illusory.

239.    The Debtors understood this at the time.  ███████████████

████████████████.  When the Debtors' joint counsel first reviewed the merger documentation they wrote to the Purchasers' counsel:  "█████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████"

(Glueckstein Decl., Ex. 80 at EFH06192362.)

-104-

240.    Rather than require a binding contract to address the euphemistic "substantial conditionality" associated with a remedy-less contract, the Debtors bargained for disarmament according to July 10 board materials. "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████." (Glueckstein Decl., Ex. 58 at EFH05552008.)  The materials provided to the Debtors' Board of Directors at their August 9 meeting to approve the Plan also are ████████████████████████████████████████████████████ (Glueckstein Decl., Ex. 53 at EFH06002849, EFH06002855.)

241.    Courts have found that a plan is infeasible where the necessary financing is optional.  *See*, *e.g.*, *In re Olde Prairie Block Owner, LLC*, 467 B.R. 165, 171 (Bankr. N.D. Ill. 2012).  In assessing feasibility, courts have examined the underlying financing documentation to determine whether would-be plan investors are "legally obligate[d]" to provide the funding necessary for the plan's success.  *Id.* (finding plan not feasible when plan investor was not "legally obligate[d]" to provide necessary amount of funding and refusing to rely on "vague statements as to a possible funding increase").  A clear legal obligation for the Purchasers to provide the necessary funding must exist for this Plan to be feasible.  Here, the Merger Agreement instead "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" (Glueckstein Decl., Ex. 22, Expert Report of Michael Henkin at 22.)  The Purchasers have given little more

-105-

than vague statements in reference to their contractual obligations to follow through with the Merger.  (Glueckstein Decl., Ex. 2 (Baker Depo. Tr.) at 153:17-154:22.)[23]

242.    Not surprisingly, in his survey of bankruptcy exits at or above $1 billion announced in the last five years, Mr. Henkin found no plan sale transaction without remedies in the contract.  (Glueckstein Decl., Ex. 22, Expert Report of Michael Henkin at 18.)  Confirmation of a plan that provides an "out" for the necessary counterparties cuts directly against the fundamental purpose and the key importance of confirmation as the "pivotal event in a reorganization proceeding." *See In re Sugarhouse Realty, Inc.*, 192 B.R. at 368.  Confirmation fixes the parties' rights and ties all parties to an agreed path forward, out of bankruptcy. Confirmation of an illusory plan which allows one party to abandon its role at any time, without penalty, is anathema to the purpose of confirmation and the goals of the Bankruptcy Code. *See, e.g.*, *id.* at 368-69 ("This court finds implausible the implication that the bankruptcy court would proceed with confirmation only to allow a party to withdraw at a later date.").

> C.    **Without an Enforceable Contract, the Likelihood of Closing Depends on the Value of Oncor in the Future.**

243.    Whether the Purchasers close, the transaction will depend on the value of

---

[23]    Courts have occasionally, but rarely, found plans feasible in the absence of a binding contract for necessary equity financing by hearing evidence on the value of the assets to be sold and the availability of a disposition process that was certain to result in proceeds sufficient to make contemplated plan payments in full.  *See, e.g.*, *In re S. Canaan Cellular Investments, Inc.*, 427 B.R. at 65 (finding proposed plan premised on sale of limited partnership feasible based on evidence that there was "a strong likelihood that a buyer could be found that would pay an amount sufficient for the debtor to meet its plan funding obligation" especially in light of fallback contractual put right "that would also yield adequate funds to repay creditors of the debtors in full").  These are rare cases, where the proposed plans often include alternate means for paying creditors in case of plan failure or where such a hypothetical sale is merely one alternative.  *See id.*; *see also Matter of T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997) (finding plan premised on creditor repayment out of revenues feasible where plan "included several alternatives which could reasonably result in the full payment" including sale of asset to third party).  Theoretically, this line of reasoning would permit a plan sale without a financial commitment—but only on a showing that the commitments are readily available in the market or as part of a broader plan that includes other feasible alternative means to repay creditors.

Oncor at the time of the proposed closing, which may be as late as August 2016 under the Plan

Support Agreement and the Merger Agreement.  (*Accord* Glueckstein Decl., Ex. 22, Expert

Report of Michael Henkin at 22 ("[T]he final decision by the [Purchasers] as to whether or not to

acquire Oncor has not taken place and will not occur until the transaction needs to be funded.").)

This is not disputed by the Debtors or their financial advisors.  (Glueckstein Decl., Ex. 14 (Ying

Depo. Tr.) at 117:5-8.; Ex. 5 (Doré Depo. Tr.) at 314:11-315:13.)  Courts recognize that would-

be plan funders are likely to act rationally, not altruistically, in determining whether to provide

the financing necessary for a debtor's plan.  *See*, *e.g.*, *In re Thurmon*, 87 B.R. 190, 192 (Bankr.

M.D. Fla. 1988) (recognizing plan funder unlikely to provide necessary funding unless funder

himself could obtain favorable financing).  Rational economic decision-making would suggest

that if the value of Oncor is higher than the contractual purchase price, the Purchasers will have

an incentive to close (although there is nothing that requires it), while if the value of Oncor is

lower than the contractual price, they likely will exercise their cost-free option to abandon the

Plan.  The Debtors' CROs and financial advisor recognize that ████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████  (Glueckstein Decl., Ex. 5 (Doré

Depo. Tr.) at 314:12-315:7; Ex. 14 (Ying Depo. Tr.) at 64:14-65:7.)  This is because there are no

adverse consequences for failing to perform under the Merger Agreement.

   244. Absent any consequences for failing to perform under the Merger

Agreement, the Purchasers' decision will be a rational, economic one based on whether it makes

sense to proceed given the value of Oncor at the time of closing.  If the transaction is not a

"winner" for the Purchasers, then there is no reason to think they will close.

245.    The fact that the Purchasers may be expending money in pursuit of the merger (including in furtherance of required regulatory approvals) is not evidence of a likelihood of closing the merger in the future.  Any such deal expenses are classic "sunk costs"—*i.e.*, costs which have been incurred and cannot be recovered.  Any sunk costs incurred by the Purchasers (or the Debtors) between the signing of the Merger Agreement and the effective "option exercise" date will not factor into a rational, economic decision on whether the Purchasers should proceed with the merger.  That calculus will remain exactly the same on the day that the Purchasers are ultimately forced to decide whether to "exercise their option" to purchase Oncor, as the Debtors recognize.  (Glueckstein Decl., Ex. 5 (Doré Depo. Tr.) at 315:8-13.)  If the value of Oncor on the effective date is lower than its cost, the fact that the parties have expended money in preparation for the potential merger will not make a money-losing acquisition any more appealing to the Purchasers.  More fundamentally, options have value even if *not* exercised and it makes complete sense for the Purchasers to spend money despite considerable uncertainty as to whether closing will occur (especially when, as here, the cost is peanuts compared the option strike price and many of the expenses will be reimbursed by the estate anyway).  Indeed, an option to acquire Oncor is worth *more* than a contract to acquire Oncor at the same price because a contract carries downside risk and a rational party will spend more and work longer to preserve the option than the contract.

246.    The Debtors and the Purchasers also have, at times, claimed that the agreement by the T-side creditor Purchasers to the Settlement Agreement (in which the junior classes at TCEH receive $550 million in cash) is a substitute for the lack of remedies in the Merger Agreement.  (*Id.* at 316:18-317:6; *see also* [D.I. 5978] ¶¶ 6-7 ("Instead of the typical remedies for a financial buyer—a reverse breakup fee or liquidated damages clause—the PSA

-108-

mandates a complete disarmament through implementation of the Alternative Restructuring. . . . [D]isarmament is both *more punitive* than a reverse breakup fee and, from the Debtors' perspective, *superior* to one.") (emphasis in original).)

247.    This is demonstrably false.  Settling with TCEH junior creditors may be a substitute for contract damages in the sense that the Debtors bargained away contractual remedies to obtain a global settlement.  Irrespective of whether that settlement is valuable or a good idea (it is not), the Settlement Agreement certainly cannot increase the likelihood of closing the purchaser transaction.  It is not a "remedy" for the very reason cited by the Debtors in support of the exchange of which they are so proud:  disarmament "always applies, and not just in the case of the purchasers' breach."  (*Id.* ¶ 6.)[24]

248.    In fact, combining the sale of Oncor in a non-binding contract with the Settlement Agreement works to chill and *decrease* the likelihood of the option being exercised.  Without a binding contract, the Purchasers—consisting of dozens of different funds—will make an economic decision at the relevant time.  The first decision they will need to make, for those who continue to hold TCEH junior claims, is whether they would like to give up their share of a $550 million cash distribution from the TCEH estate.  In other words, they may purchase Oncor only after forfeiting that cash.  From the standpoint of likelihood of closing, the proposed disposition of Oncor is an option with up to a $550 million penalty payable in cash upon

---

[24]    The Debtors also are wrong when they imply that the only remedy available in the market was liquidated damages.  The Henkin report demonstrates that specific performance *and* some form of remedies (*i.e.*, either liquidated damages, a reverse termination fee or deposit forfeiture) were available in over 72% of the precedent transactions.  (Glueckstein Decl., Ex. 22, Expert Report of Michael Henkin at 18.)  When general (unliquidated) damages are included, "100% of the transactions ... contained both specific performance and at least one form of financial remedy for the benefit of the seller." *Id.*

-109-

exercise.[25]  (*See* Glueckstein Decl., Ex. 22, Expert Report of Michael Henkin at 23 ("The

Debtors' position [that disarmament is superior to typical remedies] is not supported by the

financial incentives created by the parties' agreements.").)

249.    The $550 million penalty represents a significant amount in comparison

with the $7.1 billion investment that may be necessary from the Purchasers and other investors.

(Settlement Motion ¶ 2.)  The variance in the necessary check size is an unusual fact.  The exact

price of the transaction in the future was ███████████████████████████████

████████████████████████████████████████████████████████

██████████████████████  (Glueckstein Decl., Ex. 14 (Ying Depo. Tr.) at 85:18-86:10.)  The

"price" in this sense is arbitrary:  it cannot be a dollar less or more than the fluctuating amount of

claims.  That price is no indication of the value of Oncor now (or in the future), it is merely an

indication that an option has value even with great uncertainty concerning its strike price and the

volatility of the underlying asset.

250.    The Court's feasibility determination must be "firmly rooted in predictions

based on objective fact."  *In re Clarkson*, 767 F.2d 417, 420 (8th Cir. 1985).  At the core of the

feasibility analysis is the presentation by the Debtors of objective facts and information relevant

to the determination of whether a plan's assumptions and projections are realistic.  *See*, *e.g.*,

*Matter of Sound Radio*, 93 B.R. at 856 ("The Code . . . requires the debtor to provide sufficient

documentation and to answer appropriate questions.").  A debtor's failure to provide this crucial

information can "make[] informed expectations about the plan's success virtually impossible."

---

[25]    The penalty may be larger or smaller, in reality, because creditors are a subset of the purchasers, and purchasers are a subset of the creditors.  If 50% of the creditors with the option to purchase Oncor are entitled to 80% of the $550 million, as an example, the effective penalty upon exercise—for the purpose of assessing whether a rational buyer will close—is $550 x .80 / .50, or $880 million.

*In re Clarkson*, 767 F.2d at 420.  In the present case, the lack of objective information about the value of Oncor renders it impossible to assess whether it is reasonably likely that the Purchasers will decide to proceed with the merger at the price contemplated by the Plan, which, in turn, renders it impossible to conclude that the Plan is feasible.

> D.    The Plan is Premised on the Unusual and Unreasonable Contingencies Necessary to Fundamentally Alter the Business of Oncor.

251.    The EFH Committee agrees with the Debtors that, in a non-binding contract, a detailed discussion of conditions is irrelevant.  (*See* [D.I. 5978] ¶ 5.)  This explains why the conditions in the Merger Agreement are drafted so broadly in the first place:  only a seller that did not consider them relevant could have agreed.  The conditions appear to be nothing more than a way to reinforce the nature of the Merger Agreement as "█████████ ███████████████████████████████████████████" by permitting the Purchasers to point to a condition as it walks away rather than be accused, even without a remedy, of "breach."  (Glueckstein Decl., Ex. 51 at EFH06002903.)

252.    However, what is potentially relevant to the Court's analysis are the premises behind the Purchasers' attribution of value to their option to purchase Oncor and whether those bases can be achieved.  Here, the Court is again asked to venture into unchartered waters.  The Purchasers propose not a mere regulatory change-of-control condition, but a complex set of approvals necessary to change the business of Oncor to a REIT.  While the Purchasers may have some experience with a significantly smaller REIT, the transformation at the heart of the Plan contemplates the creation of a REIT which is "unprecedented in its size and complexity."  (Glueckstein Decl., Ex. 22, Expert Report of Michael Henkin at 15.)  The Purchasers are only interested in buying a business that does not yet exist, and may never exist.

-111-

253.     Where a plan requires the occurrence of "too many uncertain events" before the plan can be successful, it is infeasible. *See, e.g., In re Sunflower Racing, Inc.*, 226 B.R. 673, 690 (D. Kan. 1998). Regulatory approval risk is not *per se* fatal to a plan's feasibility, but "the plan proponent bears the burden of demonstrating that achieving the necessary approvals is not subject to 'material hurdles' or readily anticipated, significant obstacles." *In re Indianapolis Downs*, 486 B.R. at 298 (quoting *In re Tribune*, 464 B.R. at 185). The Debtors, themselves, recognize that the necessary regulatory approvals and rulings cannot reasonably be expected as a matter of course. Rather, the Board of Directors have been notified that ███

██████████████████████████████████████████████████████████

████████████████████████████████████████████ (Glueckstein Decl., Ex. 72 at EFH05552045 ; Ex. 53 at  EFH06002855.) The Disclosure Statement also specifically notes that the REIT reorganization and related regulatory, IRS and other approvals are "subject to *significant* contingency and risk," but the Debtors have not adduced any evidence to demonstrate that the necessary conditions are likely to be satisfied. (Disclosure Statement at 207-08 (emphasis added).) Given the significant uncertainty surrounding Oncor's REIT conversion and the attendant regulatory and tax risks, the proposed Plan, which is conditioned on the favorable resolution of this extraordinary transformation, is not feasible and cannot be confirmed.

254.     It is worth highlighting that a highly contingent or open-ended plan does not become feasible merely because a debtor believes it to be the only deal available, even if the plan counterparty is "obviously attempting" to meet the conditions and is "relatively confident" that they will be met. *See In re ARN LTD. Ltd. P'ship*, 140 B.R. 5, 14 (Bankr. D.D.C. 1992) (finding open-ended and conditional plan not feasible notwithstanding the fact that it was the

only plan to emerge out of extensive marketing period, because satisfaction of conditions was "entirely uncertain"). Even if the Debtors believe the REIT reorganization and merger is the only possible arrangement that is currently available for the sale of Oncor and an exit from bankruptcy in the near future, this cannot justify the level of contingency in the proposed Plan. Desperation or fear of delay are not substitutes for feasibility. *See also In re Granite Broad. Corp.*, 369 B.R. 120, 146 (Bankr. S.D.N.Y. 2007) ("The feasibility requirement of § 1129(a)(11) of the Bankruptcy Code is not optional."). Unless and until the Court is presented with a plan that presents a reasonable assurance of compliance with its terms, confirmation is not appropriate.

E.     The Plan Lacks a Critical Indicator of Feasibility: Creditor Support.

255.     Importantly, neither the EFH Committee nor any significant E-side creditor acting at arm's length supports the Plan. Courts have regularly recognized the key role that creditor support—or lack thereof—plays in assessing the feasibility of a plan under section 1129(a)(11). In *In re Indianapolis Downs*, the court highlighted the position of the creditors as the "first, best indicator of feasibility" noting that "[t]he support or opposition of creditors with skin in the game and an opportunity to study a debtor's proposals is more illuminating to the Court than any expert report or accountant's projections." 486 B.R. 286, 298-99 (Bankr. D. Del. 2013). The EFH Committee and creditors are clearly voicing their objections to the highly-contingent option granted to the Purchasers as a stand-alone Plan for the Debtors' exit from bankruptcy, as well as to an unknown universe of future plans whose parameters will be established through the Settlement Agreement and the Plan Support Agreement. As parties with the real economic interest, the E-side creditors' opposition to the current Plan should be given due weight in the Court's analysis.

-113-

II.    **THE UNCERTAIN EFFECTIVE DATE PRECLUDES ANY RECORD SUFFICIENT TO CONFIRM THE PLAN NOW.**

256.    Courts have recognized that a plan's effective date is "expressly designated as the critical point for the major financial standards for confirmation." *In re Jones*, 32 B.R. 951, 959 n. 13 (Bankr. D. Utah 1983); *see also In re Potomac Iron Works, Inc.*, 217 B.R. 170, 173 (Bankr. D. Md. 1997) ("The effective date plays an important role in valuation and should therefore be set forth in the plan with specificity.").  Accordingly, although the Bankruptcy Code does not define "effective date," courts have held that the term "effective date" cannot be defined as a contingent date, or some date that is unreasonably distant from the confirmation date. *See, e.g., In re Potomac Iron Works*, 217 B.R. at 174; *see also In re Haardt*, 65 B.R. 697, 701 (Bankr. E.D. Pa. 1986) ("The effective date of the plan is the date of confirmation or, at a minimum, as close as possible to the confirmation date.").

257.    The effective date in the proposed Plan fails both those tests—not only is it subject to numerous conditions which may never be satisfied, but, with the extensions provided for in the Plan Support Agreement, could occur up to *nine* months after confirmation.  These are significant deficiencies and render the Plan unconfirmable.

258.    As a general rule, "the effective date of the plan should be reasonably close to the date of the confirmation hearing." *In re Jones*, 32 B.R. at 959; *see also In re Cent. European Indus. Dev. Co. LLC*, 288 B.R. 572, 577 (Bankr. N.D. Cal. 2003) (noting the court could not confirm a plan with a "substantial and indefinite delay between any confirmation hearing and the effective date"); *In re Krueger*, 66 B.R. 463, 465 (Bankr. S.D. Fla. 1986) (finding four month delay between confirmation and effective date unreasonable).  The greater the time between confirmation and effectiveness, the greater the risk of market or other changes, which prevents a plan proponent from presenting meaningful information about valuation and,

-114-

relatedly, creditor recoveries.  A distant effective date renders the necessary assumptions about the state of the world at effectiveness less reliable than an effective date which occurs promptly following confirmation.  Courts recognize that in such situations, creditors are "forced to bear all the risk of delay."  *In re Yates Develop., Inc.*, 258 B.R. 36, 43 (Bankr. M.D. Fla. 2000).  For not only are a plan's assumptions less certain under a plan with a delayed or conditional effective date, but a confirmed plan (even if not yet effective) forecloses all other plan opportunities for the length of the delay.  A court's imprimatur of confirmation on a plan is exclusive;  a court can only confirm a single plan.  This exclusivity, if bestowed improperly or prematurely, operates to the detriment of creditors as it precludes the pursuit of other, potentially more favorable or expedient deals and plans.

259.    The lack of clarity about if and when the effective date of the Plan will occur makes the confirmation-related evaluations required under the Bankruptcy Code impossible and impermissibly shifts risks of Plan failure to creditors.  If confirmed, the Plan could stymie deal-making for the next nine months.  Especially in light of the serious feasibility deficiencies noted above, the Plan should not be confirmed now with such a delayed and conditional effective date.

## III.    THERE IS NO ADEQUATE MEANS TO IMPLEMENT THE PLAN.

260.    For the same reasons as cited above, the Plan violates section 1129(a)(1) which requires the Plan to contain "adequate means for the plan's implementation"  under section 1123(a)(5).[26]  The complete lack of remedies in the Merger Agreement shifts all control

---

[26]    Section 1129(a)(1) requires compliance with "applicable provisions of this title," which includes section 1123(a).  *See* S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978) ("Subsection (a) [of section 1130 (enacted as section 1129)] enumerates the requirement governing confirmation of a plan. . . . Paragraph (1) requires that the

over the Plan's implementation to the Purchasers.  The Debtors retain no ability to control the

Plan's realization and must depend completely on the Purchasers to voluntarily perform all pre-

effectiveness undertakings, as well as fund and close at the expected price.  An option contract,

unenforceable on the part of the Debtors, is not "adequate" for implementing a plan, especially in

a complicated transaction where the Debtors will be spending time and money and forgoing

other opportunities to comply with the contract because it *is* binding on the Debtors.  (Merger

Agreement § 9.9(a).)  Because the Debtors have expressly abdicated all power to hold the

Purchasers to the bargain on which the Plan depends, the Plan manifestly lacks the "adequate

means for implementation" as required under section 1123(a)(5) and thus cannot be confirmed

under section 1129(a)(1).

## IV.  THE PLAN FAILS TO SATISFY SECTIONS 1129(A)(1), (2), (3), (8) AND (10) OF THE BANKRUPTCY CODE.

261.    In addition to not being feasible, the Plan cannot be confirmed because it

is inconsistent with the text, objectives and purposes of the Bankruptcy Code as it relates to the

E-side Debtors.  The Plan is proposed for an improper purpose (to achieve a Bankruptcy Rule

9019 settlement that is not included in the Plan), violates the fiduciary duties of the E-side

Debtors, gerrymanders, creates 'synthetic exclusivity,' evades the bankruptcy priority scheme

and was formed without regard to the checks and balances Congress dictated must apply in

chapter 11.  As a result, the Plan fails to satisfy section 1129(a)(1), (2), (3), (7), (8) and (10) of

the Bankruptcy Code.

---

plan comply with the applicable provisions of chapter 11, such as sections 1122 and 1123, governing
classification and contents of plan.").

A.    The E-side Debtors Are Proposing the Plan for an Improper Purpose.

262.    The Debtors' "guiding light" in the negotiation of the Plan was achieving the Settlement Agreement. The Plan has never been—and cannot be—justified on its own as a business decision for the E-side Debtors. There has been no showing that the Plan is in the best interests of the E-side Debtors *without* the Intersilo Settlement, nor have the E-side Debtors shown any interest in making such a showing. Rather, the Debtors openly admit that without the approval of the Settlement Agreement, they "████████████," even if the Plan is confirmed. (*See* Glueckstein Decl., Ex. 13 (Williamson II Depo. Tr.) at 115:12-19.)

263.    The E-side Debtors went so far as to sign a contract—the Plan Support Agreement—that documents this purpose. On the one hand, the E-side Debtors receive the Settlement Agreement, consisting of (i) the cessation of all litigation by and against them and (ii) a number of concessions designed to help implement a *future* plan. On the other hand, the E-side Debtors give to the Purchasers the option to purchase Oncor in the current Plan.

264.    Even if granting an option in exchange for the Settlement Agreement were in the best interests of the E-side Debtors (which it is not), the E-side Debtors cannot justify the Plan with the Settlement Agreement. The Settlement Agreement is a condition to the Plan, not a business purpose for it. To be proposed in good faith for purposes of section 1129(a)(3), a plan of reorganization requires its own legitimate business purpose and a relationship to the reasons for plans in the first place: to successfully reorganize and maximize the value of each of the Debtors and value available to creditors. *In re Premier Int'l Holdings, Inc.*, 2010 WL 2745964, at *11. A plan proposed for the express purpose of achieving a Bankruptcy Rule 9019 settlement is facially deficient under law. The Debtors—having separated the Intersilo Settlement from the Plan to defeat the application of section 1129(a) of the Bankruptcy Code cannot now borrow

-117-

from the Intersilo Settlement to establish a business purpose for the Plan.  Either the Intersilo

Settlement is in the Plan—and creditors can vote—or it is not.

B.      The Plan Violates the Fiduciary Duties of the E-side Debtors.

265.    As part of the same transaction, the Plan is as defective as the Intersilo

Settlement because of the failure of the E-side Debtors to comply with their fiduciary duties

under the Bankruptcy Code and organic state law.  The Debtors have therefore failed to satisfy

sections 1129(a)(1) and 1129(a)(2) of the Bankruptcy Code, which requires compliance with the

fiduciary duties of the E-side Debtors as chapter 11 trustee, and section 1129(a)(3), which

mandates that the Court can only confirm the Plan if the Debtors establish that the Plan and the

Intersilo Settlement was "proposed in good faith and not by any means forbidden by law."

11 U.S.C. § 1129(a)(3).

266.    Section 1129(a)(3) incorporates Delaware and other applicable non-

bankruptcy law and requires that a plan "must not only comply with the provisions of the Code,

but must meet the standards for approval of such a transaction under [applicable state] corporate

law."  *In re Zenith Elecs. Corp.*, 241 B.R. at 108 (reviewing a transaction with a controlling

shareholder under the Delaware "entire fairness" standard); *see also In re Coram Healthcare*,

271 B.R. at 239-40 (distinguishing *Zenith* since the transaction before the court involved

conflicts of interest that were so pervasive as to taint the debtors' entire operation in bankruptcy).

Here, the Debtors' decision to propose a plan that is expressly conditioned on approval of the

Intersilo Settlement[27] must comply with the Debtors' organic corporate law duties.  *See In re*

*Bush Indus., Inc.*, 315 B.R. 292, 306 (Bankr. W.D.N.Y. 2004) (finding that a plan was not

---

[27]   *See* Plan § IX.A.1 (stating that entry of an order approving the Settlement Agreement is a condition precedent to confirmation of the Plan).

proposed in good faith where the terms of the plan were negotiated prepetition in violation of fiduciary duties by a director who received a new employment contract under the plan and by other directors who received releases); *In re Coram Healthcare*, 271 B.R. at 237 (denying confirmation for lack of good faith because the CEO breached the duty of loyalty due to conflict of interest); *see also In re TCI 2 Holdings, LLC*, 428 B.R. 117, 143-44 (Bankr. D.N.J. 2010) (noting that "a demonstration of a breach of fiduciary duty by officers or directors of a debtor may certainly defeat the confirmability of the debtors' plan on lack of good faith grounds" but finding no breach of fiduciary duty).  Therefore, the propriety of agreeing to the entirety of the Intersilo Settlement—negotiated by insiders and approved by uninformed directors and officers—must be analyzed under the law governing the internal affairs of the Debtors.

267.    Some courts have shown hesitancy in applying state law entire fairness review to transactions under a plan of reorganization, such as Judge Shannon's comments from the bench in *In re Seegrid.  In re Seegrid Corp.*, No. 14-12391 (BLS), Dec. 18, 2014 Hr'g Tr. 6:20-25 (Bankr. D. Del.).  The EFH Committee respectfully suggests that the cases discussing entire fairness and section 1129(a)(3) do not address one important consideration that may be dispositive.  Under state law, the fairness of a transaction involving a breach of the duty of loyalty or the duty of care can be ratified by appropriate shareholder action.  *Oberly* v. *Kirby*, 592 A.2d 445, 467 (Del. 1991) ("The key to upholding an interested transaction is the approval of some neutral decision-making body."); *Michelson* v. *Duncan*, 407 A.2d 211, 218 (Del. 1979) (noting that "voidable acts [by directors] are susceptible to cure by shareholder approval").  In an insolvent Delaware corporation, where the law shifts to creditors the right to pursue derivative actions, ratification by analogy may be provided by the approval of a requisite number of creditors with the right to bring the underlying derivative claims.  *See Gheewalla*, 930 A.2d at

-119-

101 ("[T]he creditors of an insolvent corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties."). Congress included an analogous provision in the Bankruptcy Code: section 1129(a)(10), requiring the approval of a class of impaired creditors not including insiders. Section 1129(a)(10) can be seen to work as ratification of breaches of the duty of loyalty in the vast majority of bankruptcy cases where impaired creditors have received a disclosure statement and approved the plan of reorganization, fully describing such matters as insider releases. In *In re Seegrid* before Judge Shannon, the fulcrum class of impaired creditors voted overwhelmingly to accept the plan.[28] Not here. Perhaps the most troubling of all the consequences of the Debtors' attempt to treat their obvious fulcrum class of unsecured creditors as 'unimpaired' is that there can be no ratification of fiduciary violations by the constituency to whom the fiduciaries owe duties. Entire fairness can and should apply.

268. The Plan, as a part of a "package deal" with the Intersilo Settlement, chasing the "guiding light" of releases, fails entire fairness review as certainly as the Settlement Agreement for the reasons discussed at paragraphs 165-171 above.

C.    The Plan is Blatant Gerrymandering of Impaired Creditors.

269. The Oncor transactions are designed to unimpair the E-side creditors regardless of the true value of Oncor. From the beginning, the Purchasers' proposals required unimpairment of all E-side creditors, even before due diligence on Oncor was completed. An email sent by ███████ to ██████████ on ███████████████████

---

[28]    Declaration of Kathleen M. Logan Certifying Voting on, and Tabulation of, Ballots Accepting and Rejecting Prepackaged Plan of Reorganization for Seegrid Corporation, *In re Seegrid Corp.*, No. 14-12391 (BLS) (Bankr. D. Del. Oct. 21, 2014); *In re Seegrid Corp.*, No. 14-12391 (BLS), Dec. 18, 2014 Hr'g Tr. 7:23-25 (Bankr. D. Del.).

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████ (Glueckstein Decl., Ex. 39 at EFH05794839 ███████████████████████

███████████████████████████████████████████████

████████████.)  Later, comprehensive term sheets described the Oncor transactions as "premised" in part on E-side unimpairment, even while terms like purchase price, the amount of equity to be contributed, the amount of new debt to be borrowed and the remedies against the Purchasers remained unspecified.  (Glueckstein Decl., Ex. 73 at EFH05551642.)  The Purchasers made clear to other parties that "██████████████████████████████" for the express purpose of avoiding a vote, and that the ████████████████████████████████████████

████████████████████████████. (Glueckstein Decl., Ex. 61 at CONF_FLC_00000468-72.)

270.    The Debtors eventually agreed to the Purchasers' proposed approach and, as negotiations progressed, agreed to increasing conditionality and modifications to other non-price deal terms in order to preserve "unimpairment" and avoid a vote.  Ultimately, the Debtors agreed to pursue a transaction that was "effectively structured as an option" in exchange for a purchase price equal to the exact amount that unimpaired the E-side creditors.  Both the Debtors and the Purchasers have testified that the final purchase price in the Oncor transactions was based entirely on the amount needed to pay E-side claims in full; *i.e.*, if tomorrow, the amount of allowed claims against EFH decreased by $1 billion, then the purchase price for Oncor would decrease by the same amount, even though the value of the underlying assets would not change. (Glueckstein Decl., Ex. 2 (Baker Depo. Tr.) at 190:18-191:4; Ex. 14 (Ying Depo. Tr.) at 85:18-86:10.)

271.    Generally, price and risk are both key components of consideration under a merger agreement. A responsible board cannot ignore closing certainty when considering the merits of an offer. *See*, *e.g.*, *In re Family Dollar Stores, Inc. Stockholder Litig.*, No. CV9985-CB, 2014 WL 7246436, at *16 (Del. Ch. Dec. 19, 2014) ("[A] financially superior offer on paper does not equate to a financially superior transaction in the real world if there is a meaningful risk that the transaction will not close.").  As the Delaware Chancery Court has observed:

> The stockholders of several corporations in recent years have enjoyed . . . psychic, but not financial rewards, as premium-generating deals were papered and not consummated.  In the wake of such failed deals, the formerly desired targets have often suffered, both in terms of operating performance and market valuation.  *To pretend that contractual provisions designed to ensure that the buyer actually pays have no relation to the value of the deal ignores economic reality and common sense.*

> *In re Dollar Thrifty*, 14 A.3d at 616 (emphasis added).

272.    The Debtors and the Purchasers certainly are not "totally oblivious to the economic reality that value will not be value unless it is ultimately paid." *Id.*  Rather, by adjusting the conditionality in the Oncor transactions, the Debtors and the Purchasers have manipulated the "headline price" of the proposed deal—by agreeing to add conditions to the contract in order to ensure the purchase price hit a desired number—payment in full of the E-side creditors.  It should be disturbing that it took a complete option—not just a weak contract—to get there.

273.    Numerous courts in this jurisdiction have found it "troubling" when a debtor "manipulate[s] the Chapter 11 confirmation process by engineering literal compliance with the Code while avoiding opposition to reorganization by truly impaired creditors." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 243 (3d Cir. 2004).  In past cases, this manipulation has come in the form of "[a]rtificial impairment . . . an insignificant or de minimis impairment under

-122-

. . . § 1124." *Id.*  The debtor's motivation for artificial impairment was generally "to obtain the requisite vote to permit confirmation by cram down."  *In re All Land Investments, LLC*, 468 B.R. 676, 691-92 (Bankr. D. Del. 2012).  Put differently, if artificial impairment was permitted, "[t]he critical confirmation requirements set out in Section 1129(a)(8) (acceptance by all impaired classes) and Section 1129(a)(10) (acceptance by at least one impaired class in the event of a "cram down") would be seriously undermined."  *John Hancock Mut. Life Ins. Co.* v. *Route 37 Business Park Assoc.*, 987 F.2d 154, 158 (3d Cir. 1993).

274.    "The Bankruptcy Code creates a presumption of impairment so as to enable a creditor to vote on acceptance of the plan."  *In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 203 (3d Cir. 2003).  In this case, the Debtors' artificial *un*impairment of the E-side creditors raises the same concerns—and is motivated by the same illegitimate goals—as artificial impairment.  To the knowledge of the EFH Committee, creditors holding the vast majority of claims against the E-side Debtors would have voted to reject the Plan, if provided the opportunity to vote on the Plan.[29]  Accordingly, if the Debtors had classified EFH unsecured creditors appropriately as "impaired" under the Plan (or if the Debtors had negotiated Oncor transactions with greater certainty but a lower headline value that did not pay EFH unsecured creditors in full), the Debtors would have been unable to satisfy section 1129(a)(10) of the Bankruptcy Code, which requires that at least one non-insider class of impaired claims vote to accept the plan.[30]

---

[29]    The Debtors' refusal to provide provisional ballots to the E-side creditors, as requested by the EFH Committee, speaks to the Debtors' view of the likely outcome of such a vote.

[30]    The EFH Committee believes that the classification of claims against EFH may be improper (and crafted to lay the groundwork for manufacturing consent of an impaired consenting class under potential future plans where EFH unsecured creditors may be deeply impaired), but in light of the alleged unimpairment of all E-side creditors under this Plan, the classification of claims against EFH has not been put at issue.

-123-

275.    The intentional circumvention of section 1129(a)(10) is no mere technical matter. As the *Combustion Engineering* court noted:

> The purpose of [§ 1129(a)(10)] is to provide some indicia of support for a plan of reorganization by affected creditors and prevent confirmation where such support is lacking.  As such, § 1129(a)(10) requires that a plan of reorganization pass muster in the opinion of creditors whose rights to repayment from the debtor are implicated by the reorganization. By providing impaired creditors the right to vote on confirmation, the Bankruptcy Code ensures the terms of the reorganization are monitored by those who have a financial stake in its outcome. *Combustion Eng'g*, 391 F.3d at 243-44 (internal citations and quotations omitted).

276.    Here, as discussed above, the creditors of EFH with the direct financial stake in the viability of the Oncor transactions—the EFH unsecured creditors—have been intentionally disenfranchised by the Debtors, because the Debtors are fully aware that providing such creditors with a vote would have required constructing a plan that arm's-length creditors perceive to be fair and worthy of support.  It is no secret that the Debtors have had difficulty in these cases earning support from the E-side creditors, and particularly EFH unsecured creditors. Those creditors are the stakeholders in the cases with the most to gain or lose as a result of a successful disposition of Oncor.   With their recoveries at stake, they are appropriately the Debtors' toughest critics.  *See*, *e.g.*, *In re Windsor on the River Assoc., Ltd.*, 7 F.3d 127, 132 (8th Cir. 1993) (holding that artificial impairment was contrary to public policy and contravened the congressional intent that section 1129(a)(10) of the Bankruptcy Code ensured creditor support for a plan); *John Hancock*, 987 F.2d at 158 (noting that permitting manipulation of the voting requirements "would lead to abuse of creditors and would foster reorganizations that do not serve any broader public interest").

277.    Similarly, the Debtors' circumvention of section 1129(a)(8) of the Bankruptcy Code can be seen on the special facts of these cases to deprive EFH unsecured

-124-

creditors of other essential protections.  Specifically, even if the Debtors manufactured an impaired consenting class at EFH, thus satisfying the requirement of section 1129(a)(10), dissenting classes of EFH unsecured creditors would be protected by the requirements of section 1129(b) of the Bankruptcy Code, including the absolute priority rule.  The EFH Committee is aware of no case holding that the allocation of closing risk violates the absolute priority rule in 1129(b).  However, the facts of these cases are extraordinary:  with an unprecedented risk before effectiveness allocated by an "insurance policy" that protects the Controlling Owners but not E-side creditors.  (*Compare* Glueckstein Decl., Ex. 20 (Aug. 11, 2015 Hr'g Tr.) at 33:24-34:2 *with* Ex. 81 at EFH05792237.)

278.    Applying more than a "technical perspective" in light of the importance of absolute priority raises the question of how far those in control can go in allocating closing risk to creditors as a fruit of their control status.  As discussed above, according to the Debtors, ███

████████████████████████████████████████████████████████

██████████████████████████ (Glueckstein Decl., Ex. 5 (Doré Depo. Tr.) at 282:5-22.) In other words, the Controlling Owners, by granting or withholding their support, could control which plans were, in the eyes of the Debtors, acceptable.  This "exclusive right to determine who will be the owner" of the reorganized Debtors is a right the Controlling Owners held "on account of [their] current position as controlling shareholder[s]" of the Debtors.  *See In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 49 (Bankr. D. Del. 2000).  Accordingly, if creditors are impaired or deemed impaired by the allocation of closing risk, this right is subject to a market test—a test the Debtors have not satisfied.  *See 203 N. LaSalle*, 526 U.S. at 458.

279.    Another way to phrase the problem with the Debtors' artificial unimpairment of EFH unsecured creditors is that it violates the good faith requirement of section

-125-

1129(a)(3) of the Bankruptcy Code.  *See, e.g., Combustion Eng'g*, 391 F.3d at 246 ("the good

faith requirement provides an additional check on a debtor's intentional impairment of claims").

With respect to unimpairment, sections 1129(a)(3), 1129(a)(8) and 1129(a)(10) work in concert

to ensure that creditors are not improperly disenfranchised or stripped of their protections against

debtor misconduct in connection with the confirmation of a plan.  *See In re Abbotts Dairies of*

*Pennsylvania, Inc.*, 788 F.2d 143, 150 (3d Cir. 1986) (the purpose of requiring a good faith

finding is to "prevent[] a debtor-in-possession or trustee from effectively abrogating the creditor

protections of Chapter 11").   Indeed, a plan in technical compliance with other provisions of the

Bankruptcy Code, but not "consistent with the objectives and purposes of the Bankruptcy Code",

may still fail to satisfy the requirements of 1129(a)(3).  *In re WR Grace & Co.*, 729 F.2d 332,

346 (3d Cir. 2013); *see also Combustion Eng'g*, 391 F.3d at 246; *In re Quigley Co. Inc.*, 437

B.R. 102, 125-29 (finding that a plan "was proposed in bad faith since it was designed to achieve

acceptance through a tainted vote").  Here, as discussed above, the Debtors structured the Oncor

transactions with the improper motive of creating illusory unimpairment of EFH unsecured

creditors in order to take advantage of a technical right to expedite the confirmation process to

the detriment of the EFH Committee and EFH unsecured creditors, while providing an

"insurance policy" to  insiders and everyone else against the heightened risks created.  These

actions are diametrically opposed to the "objectives and purposes of the Bankruptcy Code"—

they are quintessential bad faith.  *Combustion Eng'g*, 391 F.3d at 247.

        D.     The Proposed Transactions Create "Synthetic Exclusivity."

        280.     The Proposed Transactions are equally express attempts to circumvent

another central protection for E-side creditors in the Bankruptcy Code:  the limits on the duration

of exclusivity imposed by Congress in the 2005 Bankruptcy Abuse Prevention and Consumer

Protection Act.  Specifically, section 1121(d)(2) of the Bankruptcy Code expressly prohibits the extension of the period in which the debtor holds the exclusive right to file a plan past 18 months after the petition date, and limits the period for confirmation of a timely-filed plan to up to 20 months after the petition date.  11 U.S.C. § 1121(d)(2).  Prior to the 2005 amendments, bankruptcy courts had discretion to extend exclusivity indefinitely—and frequently did so.  This practice was highly criticized, was perceived to give debtors disproportionate control and negotiating leverage in large chapter 11 cases, and led to "indignation" in Congress—thus the 2005 amendments prohibited this previously widespread practice.[31]

281.    Here, faced with the imminent loss of exclusivity,[32] the Debtors and the Purchasers have intentionally created a means to preserve the Debtors' exclusive control of these Debtors' chapter 11 cases long after the statutory limits have passed.  Specifically, section 1129(c) of the Bankruptcy Code provides that "the court may confirm only one plan."  11 U.S.C. § 1129(c).  In other words, if the Plan, however contingent, is confirmed by the Court prior to the termination of exclusivity, the existence of the confirmed Plan will preclude the confirmation of alternative plans until "the order of confirmation . . .  has been revoked."  *Id*.

282.    As discussed above, the Debtors acknowledge the Plan is "highly conditional."  But even a highly speculative plan, once confirmed, precludes the confirmation of alternative plans.  Accordingly, with the Plan in place, the Debtors will continue to control plan negotiations until such Plan is terminated, long past the expiration of exclusivity and regardless

---

[31]    Richard B. Levin, J.R. Lederer, Leslie J. Tchaikovsky and Victor A. Vilaplana, *Bankruptcy Practice after the Bankruptcy Act of 2005*, SM048 ALI-ABA 1, American Law Institute - American Bar Association Continuing Legal Education (2006).

[32]    The 18-month period to propose a plan terminates on October 29, 2015, and the 20-month period to confirm a timely-filed plan terminates on December 29, 2015.

-127-

of whether the current Plan becomes effective.  Specifically, EFH and EFIH are entitled to

terminate the Merger Agreement and Plan Support Agreement in accordance with their terms

(including for certain alternative, ostensibly "superior" proposals developed by the Debtors), and

the Debtors will have access to constantly-updated information about the status of regulatory

approvals and will be able to negotiate fallback plans in advance of Plan termination.  (Merger

Agreement Art. VIII.)

283.    The negotiations between the Debtors, Controlling Owners and the

Purchasers acknowledged this improper benefit of the Plan for the Debtors.  

(Emphasis added).  (Glueckstein Decl., Ex. 62 at

EFH05960167.)  In an email to

(Glueckstein Decl., Ex. 29 at CONF_TUA-

00001785 (emphasis added).)  In other words, this Plan permits the Debtors to have an extended

exclusivity period in which to develop the future plan of reorganization for the E-side Debtors,

the one they expect to apply when the "highly contingent" current Plan is withdrawn.

284.    The prejudice to E-side creditors, including the EFH Committee, from the

deprivation of this Congressionally-mandated right to propose a plan is especially significant

given the cost and expense of these chapter 11 cases, the negotiation of this exclusivity extension

by the same insiders who have kept the E-side Debtors from independently reorganizing, the

SC1:3961318.8

skepticism expressed by the EFH Committee as to the need for a joint plan in the future, and the unanimous opposition of the E-side creditors to the Plan.

285.    While the BAPCPA amendments to section 1121(d) are relatively recent, "gaming" exclusivity by proposing a placeholder plan on the eve of termination of exclusivity is not a new technique.  The Debtors have proposed speculative or sham plans on the eve of the expiration of the "first" exclusive period—the period for filing a plan—to buy 60 days of additional exclusivity during the period where the Debtors can seek to confirm that plan.  *See In re Grossinger's Assoc.*, 116 B.R. 34, 36 (Bankr. S.D.N.Y. 1990) (finding that the debtor's proposal of a plan that did "not offer any serious reorganizational possibilities" prior to the expiration of the exclusive period for filing a plan was insufficient to extend exclusivity for the period of time provided under the Bankruptcy Code to confirm such plan, and terminating exclusivity); *see also In re DN Assoc.*, 144 B.R. 195, 197 (Bankr. D. Me. 1992) (terminating exclusivity prior to the deadline for soliciting acceptances to a timely filed plan because, among other things, such plan had "questionable prospects" for confirmation).

286.    This also cannot be supported by the Court.  The proposal of a speculative plan to extend exclusivity past Congress's expressly-set limits is illegitimate, violates section 1121(d) of the Bankruptcy Code  and is contrary to the purposes of the Bankruptcy Code and public policy.  Accordingly, the Plan does not satisfy sections 1129(a)(1) and 1129(a)(3) of the Bankruptcy Code and cannot be confirmed.

E.    The Plan Violates Section 1103 of the Bankruptcy Code.

287.    Finally, the Plan violates section 1103 of the Bankruptcy Code.  The primary function of the creditors' committee and other statutory committees in a chapter 11 proceeding is to participate in the formulation of the debtor's plan of reorganization.  *In re*

-129-

*Structurlite Plastics Corp.*, 91 B.R. 813, 819 (Bankr. S.D. Ohio 1988).  Committee participation, which is expressly permitted by section 1103(c) of the Bankruptcy Code, is central to the chapter 11 framework.  *See*, *e.g.*, *In re McLean Indus., Inc.*, 70 B.R. 852, 860 (Bankr. S.D.N.Y. 1987) ("Negotiation of a plan of reorganization is expected to take place among the debtor and the unsecured creditors committee and each additional committee, if any."); *see also In re Structurlite Plastics*, 91 B.R. at 818-19, *citing* H.R. Rep. No. 595, 95th Cong., 1st Sess. 401, 1978 U.S. Code Cong. & Admin. News 5787, 5963, 6357 ("The drafters of the Bankruptcy Code clearly envisioned a prominent role for creditors' committees in the reorganization process," including "supervision of the debtor in possession.").

288.    Every chapter 11 debtor must comply with that framework as it is reflected in the provisions of the Bankruptcy Code.  Sections 1129(a)(1) and 1129(a)(2) implicate those provisions of the Bankruptcy Code "applicable to reorganization," such as the requirement to provide adequate information to creditors.  *See In re PWS Holding Corp.*, 228 F.3d at 248 (finding that section 1125 is among the "applicable provisions" of the Bankruptcy Code referenced in section 1129(a)(2)); *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 163-64 (D. Del. 2006) (debtor had satisfied section 109, section 1107 and other applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and applicable orders of the bankruptcy court, and was accordingly in compliance with section 1129(a)(2)).

289.    The Debtors and Purchasers make no effort to deny their exclusion of the EFH Committee from the formulation of the Settlement Agreement, Plan or Plan Support Agreement.  It was not a mistake.  The EFH Committee is a fiduciary with a different "guiding light":  risk-adjusted creditor recoveries.  In light of the conflict of interest issues raised by the Disinterested Directors' process itself, the involvement of the EFH Committee would have

-130-

complicated the resolution of "Conflict Matters" (and the other conflict matters not so defined).

Certainly, the EFH Committee would have advocated for less risk to E-side creditors.  Whether

successful or not, committee involvement would have been useful on the facts of these cases.

Instead, the Debtors elevated two of EFH's own directors to serve as a *de facto* creditors'

committee, without economic interest in the outcome of these cases, without claims that are

representative of diverse creditor interests, and without the special duties of a statutory

committee.

290.    The Debtors (including the Disinterested Directors) have justified their

refusal to meaningfully discuss or negotiate the Settlement Agreement and Plan with the EFH

Committee by ██████████████████████████████████████████████████

████████████████████████████████████  (*See* Glueckstein Decl., Ex. 12 (Williamson I

Depo. Tr.) at 28:10-17.)  However, there is no more an impairment test in section 1103 than

there is in sections 1129(a)(1), 1129(a)(2) or 1129(a)(3).


## CONCLUSION

291.    As Justice White noted in closing in *TMT Trailer*, "[o]ne can easily

sympathize with the desire of a court to terminate bankruptcy reorganization proceedings, for

they are frequently protracted.  The need for expedition, however, is not a justification for

abandoning proper standards."  *TMT Trailer*, 390 U.S. at 450.

292.    The EFH Committee respectfully requests that the Court deny approval of

the Settlement Motion and confirmation of the Plan and grant such other and further relief as is

just and proper.  The EFH Committee reserves its right to amend this Objection or interpose

additional objections to respond to further amendments to the Settlement Agreement or the Plan.

-131-

Dated:  Wilmington, Delaware
         October 23, 2015

**MONTGOMERY McCRACKEN WALKER & RHOADS, LLP**

*/s/ Mark A. Fink*_____
Natalie D. Ramsey (DE Bar No. 5378)
Davis Lee Wright (DE Bar No. 4324)
Mark A. Fink (DE Bar No. 3946)
1105 North Market Street, 15th Floor
Wilmington, DE  19801
Telephone: (302) 504-7800
Facsimile: (302) 504 -7820
E-mail:      nramsey@mmwr.com
             dwright@mmwr.com
             mfink@mmwr.com

– and –

**SULLIVAN & CROMWELL LLP**

Andrew G. Dietderich
Brian D. Glueckstein
John L. Hardiman
Alexa J. Kranzley
125 Broad Street
New York, New York  10004
Telephone:    (212) 558-4000
Facsimile:    (212) 558-3588
E-mail:       dietdericha@sullcrom.com
              gluecksteinb@sullcrom.com
              hardimanj@sullcrom.com
              kranzleya@sullcrom.com

*Counsel for The Official Committee of Unsecured Creditors of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, EFIH Finance Inc., and EECI, Inc.*

-132-

**ANNEX A**



| Incremental Borrowing above 04/28/2010 Balance | |
|---|---|
| Maximum P&I Balance | $914.5 |
| Maximum SG&A Balance | 86.8 |
| **Total Additional Borrowing** | **$1,001.3** |

| Incremental Interest since April 29, 2010 | |
|---|---|
| Additional P&I Interest | $155.9 |
| Additional SG&A Interest | 5.8 |
| **Total Additional Interest** | **$161.6** |
| *Including 5% Pre-judgement Rate* | *187.2* |

Source: EFH Schedule of Intercompany Notes, Greenhill provided Advantage Data yields.
  (1)   P&I Balance $466.2mm as of 04/28/2010.
  (2)   SG&A Balance $943.7mm as of 04/28/2010.

# ANNEX B

## CASES CITED BY DEBTORS IN SUPPORT OF 9019 SETTLEMENT APPROVAL MOTION

| Case | Debtors' Citation | Insider Releases | Standalone Settlement | UCC Objection |
|------|------------------|------------------|-----------------------|---------------|
| *Myers* v. *Martin*, 91 F.3d 389 (3d Cir. 1996). | pp. 30, 93, 94, 101, 103 | No | No | No |
| *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471 (Bankr. D. Del. 2010). | pp. 30, 31 | No | **Yes** | **Yes** |
| *In re World Health Alternatives, Inc.*, 344 B.R. 291 (Bankr. D. Del. 2006). | p. 30 | No | **Yes** | No |
| *In re Adelphia Commc'n Corp.*, 368 B.R. 337 (Bankr. D. Del. 2007). | pp. 31, 89, 98 | No | No | No |
| *In re Charter Commc'ns*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009). | pp. 31, 105 | **Yes** | No | No |
| *In re Key3Media Grp., Inc.*, 336 B.R. 87 (Bankr. D. Del. 2005), *aff'd*, 2006 WL 2842462 (D. Del. Oct. 2, 2006). | pp. 31, 103, 108 | No | No | No |
| *In re Washington Mut. Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011). | pp. 32, 93, 96, 98, 101, 104, 108 | **Yes** | No | No |
| *In re Kaiser Aluminum Corp.*, 339 B.R. 91 (D. Del. 2006). | pp. 35, 36, 99, 100 | No | **Yes** | No |

| Case | Debtors' Citation | Insider Releases | Standalone Settlement | UCC Objection |
|---|---|---|---|---|
| *In re Tribune Co.*, 464 B.R. 126 (Bankr. D. Del. 2011). | pp. 41, 95 | No | No | No |
| *In re WCI Cable, Inc.*, 282 B.R. 457 (Bankr. D. Or. 2002). | p. 89 | No | No | No |
| *In re Drexel Burnham Lambert Grp.*, 138 B.R. 723 (Bankr. S.D.N.Y. 1992). | p. 95 | **<u>Yes</u>** | No | No |
| *In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004). | p. 96 | No | No | No |
| *In re Satcon Tech. Corp.*, No. 12-12869 KG, 2012 WL 6091160 (Bankr. D. Del. Dec. 7, 2012). | p. 99 | No | **<u>Yes</u>** | No |
| *In re W.R. Grace & Co.*, 475 B.R. 34 (D. Del. 2012). | pp. 99, 103 | No | No | No |
| *In re Blitz U.S.A., Inc.*, No. 11-13603, 2014 WL 2582976 (Bankr. D. Del. Jan. 30, 2014). | p. 106 | No | No | No |

SC1:3961318.8