# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | Case No. 14-10979 (CSS) |
| Debtors. | (Jointly Administered) |
| | Re: D.I. 5249, 6085, 6122 |

## DECLARATION OF BRIAN D. GLUECKSTEIN IN SUPPORT OF TRIAL BRIEF AND OMNIBUS OBJECTION OF THE EFH OFFICIAL COMMITTEE TO (I) MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, TO APPROVE A SETTLEMENT OF LITIGATION CLAIMS AND AUTHORIZE THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE SETTLEMENT AGREEMENT AND (II) CONFIRMATION OF THE FIFTH AMENDED JOINT PLAN OF REORGANIZATION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

[1] The last four digits of Energy Future Holdings Corp.'s taxpayer identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

## DECLARATION OF BRIAN D. GLUECKSTEIN

BRIAN D. GLUECKSTEIN declares:

1.  I am a member of the Bar of the State of New York and a member of Sullivan & Cromwell LLP ("S&C"), counsel for the EFH Official Committee in the above-captioned action.  I am admitted *pro hac vice* to the United States District Court for the District of Delaware.

2.  I make this declaration to place before the Court certain materials referenced in the *Trial Brief and Omnibus Objection of The EFH Official Committee to (I) Motion of Energy Future Holdings Corp.,* et al*., to Approve A Settlement of Litigation Claims And Authorize The Debtors to Enter Into And Perform Under The Settlement Agreement And (II) Confirmation of The Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp.,* et al*., Pursuant to Chapter 11 of The Bankruptcy Code*, filed on October 23, 2015, in the above-referenced cases.

3.  Attached as Exhibit 1 is an excerpt from a copy of the transcript of the deposition of Kevin Michael Ashby, taken October 2, 2015.

4.  Attached as Exhibit 2 is an excerpt from a copy of the transcript of the deposition of Kirk Baker, taken October 5, 2015.

5.  Attached as Exhibit 3 is an excerpt from a copy of the transcript of the deposition of Charles Cremens, taken September 15, 2015.

6.  Attached as Exhibit 4 is an excerpt from a copy of the transcript of the deposition of Charles Cremens, taken October 1, 2015.

7.  Attached as Exhibit 5 is a copy of the transcript of the deposition of Stacey Doré, taken September 28, 2015.

-2-

8.      Attached as <u>Exhibit 6</u> is a copy of the transcript of the deposition of Donald L. Evans, taken September 25, 2015.

9.      Attached as <u>Exhibit 7</u> is a copy of the transcript of the deposition of Paul Keglevic, taken September 10, 2015.

10.      Attached as <u>Exhibit 8</u> is a copy of the transcript of the deposition of Paul Keglevic, taken October 1, 2015.

11.      Attached as <u>Exhibit 9</u> is an excerpt from a copy of the transcript of the deposition of Eric R. Mendelsohn, taken October 21, 2015.

12.      Attached as <u>Exhibit 10</u> is an excerpt from a copy of the transcript of the deposition of Hugh E. Sawyer, taken September 24, 2015.

13.      Attached as <u>Exhibit 11</u> is a copy of the transcript of the deposition of Jonathan Smidt, taken September 25, 2015.

14.      Attached as <u>Exhibit 12</u> is a copy of the transcript of the deposition of Billie Ida Williamson, taken September 15, 2015.

15.      Attached as <u>Exhibit 13</u> is a copy of the transcript of the deposition of Billie Ida Williamson, taken September 30, 2015.

16.      Attached as <u>Exhibit 14</u> is a copy of the transcript of the deposition of David Ying, taken September 23, 2015.

17.      Attached as <u>Exhibit 15</u> is an excerpt from a copy of the transcript of the hearing held on November 3, 2014, in *In re Energy Future Holdings Corp.*, No. 14-10979 (Bankr. D. Del.).

18.     Attached as <u>Exhibit 16</u> is an excerpt from a copy of the transcript of the hearing held on November 20, 2014, in *In re Energy Future Holdings Corp.*, No. 14-10979 (Bankr. D. Del.).

19.     Attached as <u>Exhibit 17</u> is an excerpt from a copy of the transcript of the hearing held on April 14, 2015, in *In re Energy Future Holdings Corp.*, No. 14-10979 (Bankr. D. Del.).

20.     Attached as <u>Exhibit 18</u> is an excerpt from a copy of the transcript of the hearing held on May 13, 2015, in *In re Energy Future Holdings Corp.*, No. 14-10979 (Bankr. D. Del.).

21.     Attached as <u>Exhibit 19</u> is an excerpt from a copy of the transcript of the hearing held on June 25, 2015, in *In re Energy Future Holdings Corp.*, No. 14-10979 (Bankr. D. Del.).

22.     Attached as <u>Exhibit 20</u> is an excerpt from a copy of the transcript of a hearing held on August 11, 2015, in *In re Energy Future Holdings Corp.*, No. 14-10979 (Bankr. D. Del.).

23.     Attached as <u>Exhibit 21</u> is an excerpt from a copy of the transcript of the hearing held on August 25, 2015, in *In re Energy Future Holdings Corp.*, No. 14-10979 (Bankr. D. Del.).

24.     Attached as <u>Exhibit 22</u> is a copy of the Expert Report of Michael Henkin, dated October 12, 2015.

25.     Attached as <u>Exhibit 23</u> is a copy of the Expert Report of Mark F. Rule, CFA, dated October 12, 2015.

-4-

26.     Attached as <u>Exhibit 24</u> is a copy of the Expert Report of David Ying, dated October 12, 2015.

27.     Attached as <u>Exhibit 25</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

28.     Attached as <u>Exhibit 26</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

29.     Attached as <u>Exhibit 27</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

30.     Attached as <u>Exhibit 28</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

31.     Attached as <u>Exhibit 29</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

32.     Attached as <u>Exhibit 30</u> is a copy of an e-mail from Alexa Kranzley of S&C to Edward Sassower, Marc Kieselstein and James Sprayregen of K&E, Jeff Marwil and Mark Thomas of Proskauer Rose LLP ("<u>Proskauer</u>"), Richard Levin of Cravath, Swaine & Moore LLP and others, dated December 11, 2014, attaching a document entitled "Additions to Proposed Claims for Comprehensive Settlement", bearing production numbers EFH_DD00004946 to EFH_DD00004947.

33.     Attached as <u>Exhibit 31</u> is a copy of an e-mail from James Peck of Morrison & Foerster LLP ("<u>MOFO</u>") to Thomas Walper of Munger, Tolles & Olson LLP ("<u>MTO</u>"), dated January 10, 2015, bearing production numbers EFCH00016061 to EFCH00016062.

-5-

34.     Attached as <u>Exhibit 32</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

35.     Attached as <u>Exhibit 33</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

36.     Attached as <u>Exhibit 34</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

37.     Attached as <u>Exhibit 35</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

38.     Attached as <u>Exhibit 36</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

39.     Attached as <u>Exhibit 37</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

40.     Attached as <u>Exhibit 38</u> is a copy of an e-mail from Richard Mason of WLRK to Thomas Lauria of White & Case, James Sprayregen, Marc Kieselstein and Edward Sassower of K&E and others, dated April 10, 2015, bearing production numbers EFCH00005275 to EFCH00005277.

41.     Attached as <u>Exhibit 39</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

42.     Attached as <u>Exhibit 40</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

43.     Attached as <u>Exhibit 41</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

44.     Attached as <u>Exhibit 42</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

45.     Attached as <u>Exhibit 43</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

46.     Attached as <u>Exhibit 44</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

47.     Attached as <u>Exhibit 45</u> is a copy of an e-mail from Ashley Burton of EFH to Jeff Marwil of Proskauer, dated December 11, 2014, attaching a document entitled "Energy Future Holdings Corp. ("EFH") Board of Directors Resolutions", bearing production numbers EFH_DD00015415 to EFH_DD00015418.

48.     Attached as <u>Exhibit 46</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

49.     Attached as <u>Exhibit 47</u> is a copy of an e-mail from Paul Keglevic of EFH to Billie Williamson of Mack O. Forrester & Co., PLLC, dated February 20, 2015, attaching a slide entitled "Value to TCEH of Partial Tax Basis Step Up", as of November 30, 2014, bearing production numbers EFH_DD000035133 to EFH_DD000035134.

50.     Attached as <u>Exhibit 48</u> is a copy of the minutes of a March 16, 2015 meeting of the  Disinterested Directors of EFH, bearing production numbers EFH_DD00004567 to EFH_DD00004569.

51.     Attached as <u>Exhibit 49</u> is a copy of the minutes of a March 17, 2015 meeting of the Disinterested Directors of EFH, bearing production numbers EFH_DD00004570 to EFH_DD00004571.

SC1:3974781.2

52.    Attached as Exhibit 50 is a copy of an e-mail from Andrew Dietderich of S&C to Mark Thomas of Proskauer, dated April 3, 2015, bearing production numbers EFH_DD00006393 to EFH_DD00006394.

53.    Attached as Exhibit 51 is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

54.    Attached as Exhibit 52 is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

55.    Attached as Exhibit 53 is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

56.    Attached as Exhibit 54 is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

57.    Attached as Exhibit 55 is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

58.    Attached as Exhibit 56 is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

59.    Attached as Exhibit 57 is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

60.    Attached as Exhibit 58 is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

61.    Attached as Exhibit 59 is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

62.    Attached as Exhibit 60 is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

SC1:3974781.2

63.     Attached as Exhibit 61 is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

64.     Attached as Exhibit 62 is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

65.     Attached as Exhibit 63 is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

66.     Attached as Exhibit 64 is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

67.     Attached as Exhibit 65 is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

68.     Attached as Exhibit 66 is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

69.     Attached as Exhibit 67 is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

70.     Attached as Exhibit 68 is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

71.     Attached as Exhibit 69 is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

72.     Attached as Exhibit 70 is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

73.     Attached as Exhibit 71 is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

SC1:3974781.2

74.    Attached as <u>Exhibit 72</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

75.    Attached as <u>Exhibit 73</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

76.    Attached as <u>Exhibit 74</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

77.    Attached as <u>Exhibit 75</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

78.    Attached as <u>Exhibit 76</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

79.    Attached as <u>Exhibit 77</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

80.    Attached as <u>Exhibit 78</u> is a copy of an email from Mark Thomas of Proskauer to Andrew Dietderich of S&C, dated May 18, 2015, bearing production numbers EFH_DD00023428 to EFH_DD00023430.

81.    Attached as <u>Exhibit 79</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

82.    Attached as <u>Exhibit 80</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

83.    Attached as <u>Exhibit 81</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

84.    Attached as <u>Exhibit 82</u> is a copy of FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER.

-10-

85.     Attached as <u>Exhibit 83</u> is a copy of FILED UNDER SEAL – SUBJECT

TO PROTECTIVE ORDER.

86.     Attached as <u>Exhibit 84</u> is a copy of FILED UNDER SEAL – SUBJECT

TO PROTECTIVE ORDER.

I declare under penalty of perjury under the laws of the United States that the

foregoing is true and correct.

Executed on October 23, 2015

/s/ Brian D. Glueckstein
Brian D. Glueckstein

-11-

## Exhibit 1

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

**Exhibit 2**

1                    KIRK BAKER

2         UNITED STATES BANKRUPTCY COURT

3         FOR THE DISTRICT OF DELAWARE

4    -------------------------------------------x

5    In Re:

6    Energy Future Holdings Corporation,

7    et al.,

8                        Debtors.

9    Chapter 11

10   Case No. 14-10979

11   Jointly Administered

12   -------------------------------------------x

13

14           DEPOSITION OF KIRK BAKER

15              New York, New York

16               October 5, 2015

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 98601

1                       KIRK BAKER

2        A.     Experience.

3        Q.     Anything else?

4        A.     Thirty years of experience.

5               We asked -- I am the person who is in

6    charge of the original request for a private

7    letter ruling to place transmission and

8    distribution assets into a lessee/lessor

9    structure and facilitate a REIT, so I have

10   received in my career private letter rulings

11   from the IRS in the past, including one that

12   would be very close to this one that's being

13   sought.

14       Q.     Going back to the time period before

15   the plan of reorganization was signed up when

16   you were in the process of putting together the

17   joint proposal with the T-unsecureds, were you

18   concerned or, should I say, the Hunts concerned

19   that the level of conditionality might cause the

20   debtors not to agree to the transaction?

21             MR. SHORE:  Objection to form.

22             MS. TERTERYAN:  Object to the form.

23       A.     I'm sorry, the stereo --

24             MR. BECKWITH:  That's all right.

25       He'll rephrase.

1                         KIRK BAKER

2        A.    Could you ask it again?  I'm sorry.

3        Q.    Yes.  Sure.

4              And again, since we had moved up to

5    beyond the plan, I'm going back to the time

6    period --

7        A.    Before the plan.

8        Q.    -- before the plan is signed up.  So

9    that was the first part of my question.

10       A.    All right.

11       Q.    And my question is were the Hunts

12   concerned that the level of conditionality might

13   be a problem for the debtors in accepting the

14   transaction?

15             MR. SHORE:  Objection to form.

16       A.    Generally -- I'm not going to recall

17   specifics as to any particular condition

18   precedent to closing.  In general, Hunt would be

19   concerned that there needs to be a balanced

20   approach where all parties gain something to

21   help facilitate the transaction closing.

22       Q.    And would that balanced approach be

23   willing to make certain concessions to

24   ameliorate any concerns that the debtors may

25   have had about the conditionality?

1                        KIRK BAKER

2            MR. SHORE:  Objection to form.

3            MS. TERTERYAN:  Objection to form.

4            MR. BECKWITH:  Calls for speculation.

5       A.    Yeah, I'm not sure -- I'm not trying

6    to be difficult.  I think --

7       Q.    Neither am I.

8       A.     It's a negotiated transaction, and so

9    all parties had things that were maybe of most

10   importance to them, and I think that that

11   transaction was able to facilitate most parties

12   getting what was most important to them to allow

13   the execution of the contract and to move

14   forward and hopefully get out of bankruptcy as

15   expeditiously as possible.

16      Q.    Did the debtors express concerns about

17   the level of conditionality in the deal?

18            MS. TERTERYAN:  Objection to form.

19      A.    You know, beyond negotiating tactics

20   and describing what they needed, I don't recall,

21   you know, specifics about I don't like this or

22   this or this.

23      Q.    When you say beyond negotiating

24   tactics, as a part of negotiation, did they

25   express in negotiations any concerns about the

1                        KIRK BAKER

2   conditionality of the deal?

3              MS. TERTERYAN:   Objection.   Form.

4        A.    As I recall, generally, in the give

5   and take of negotiation around a plan support

6   agreement, each party -- each party would have

7   griped about what the other party wanted and how

8   it wouldn't help the one that was doing the

9   griping.

10       Q.    Was conditionality one of the things

11  that the debtors griped about?

12       A.    I believe conditionality was

13  discussed, yes.

14       Q.    Did the Hunts propose anything to

15  address the gripes that EFH had about

16  conditionality?

17             MS. TERTERYAN:   Object to form.

18       A.    Did Hunt propose anything -- did Hunt

19  propose anything to address the concerns that

20  the debtor would have raised around

21  conditionality?  No, I don't recall any

22  specifics.

23       Q.    Generally, on this question of

24  conditionality, do you recall that being a topic

25  of negotiations with the debtors?

1                    KIRK BAKER

2          MR. SHORE:  Objection to form.

3          MR. BECKWITH:  Objection.  Asked and

4     answered.

5     A.    Yes, generally, it was discussed.

6     Q.    Was it also something that you

7     discussed with the folks representing the

8     T-unsecureds?

9          MR. SHORE:  Objection to form.

10    A.    I believe at that point we would have

11    already been a group, so I'm not sure how I can

12    answer that.

13    Q.    Well, in the course of putting

14    together the proposal, were there negotiations

15    between the Hunts and the T-unsecureds?

16    A.    We collectively determined -- I recall

17    generally we collectively determined how to put

18    what we -- to put forward what we thought would

19    be the best proposal that would allow EFH, the

20    debtor, to achieve its goals, which we thought

21    was exit from bankruptcy as soon as possible.

22    Q.    Okay.  And in the course of doing

23    that, there was some give and take of

24    negotiation with the EFH side?

25    A.    Give and take with negotiation.  The

1                    KIRK BAKER

2  plan support agreement was a negotiated

3  document, yes.

4      Q.   Okay.  And to the extent the debtors

5  suggested changes to what had been proposed by

6  the consortium, did the consortium then amongst

7  themselves discuss those proposed changes?

8          MS. TERTERYAN:  Objection.  Vague.

9      A.   Yes, parties would have discussed what

10 was being discussed in negotiations.

11     Q.   Was there any disagreement -- I

12 shouldn't say "disagreement."

13         Was there any issues that were

14 controversial between the Hunts and their other

15 consortium members as to what should and

16 shouldn't be in the deal?

17         MR. SHORE:  Objection to form.

18     A.   We reached a consensus view as to how

19 we would respond to and negotiate with the

20 debtor to achieve the plan support agreement.

21     Q.   Did the debtors propose anything be

22 included in the deal to ameliorate its

23 conditionality?

24         MR. SHORE:  Object to the form.

25         MS. TERTERYAN:  Object to the form.

1                    KIRK BAKER

2    A.    Yes, I just don't recall specifics.

3          MR. HARDIMAN:  Let me mark as Baker

4    Exhibit 9 an e-mail dated June 11, 2015,

5    from Geoffrey Newton to a group of other

6    people, EFH Bates number HUNT 726.

7          (Baker Exhibit 9, an e-mail chain

8    bearing Bates Nos. EFH HUNT 0000726 through

9    728, marked for identification, as of this

10    date.)

11   BY MR. HARDIMAN:

12    Q.    Mr. Baker, you will note that you are

13   CC'd on this e-mail.  Do you recall seeing this

14   e-mail before?

15    A.    I don't recall specifically.

16    Q.    Who is Geoffrey Newton?

17    A.    He's a senior attorney at Baker Botts,

18   representing us.

19    Q.    Representing the Hunts?

20    A.    Yes.

21    Q.    Are Messrs. Koster, Lauria, Siegert

22   and Mazzucchi representatives of the

23   T-unsecureds?

24    A.    Yes.  I believe the first two are

25   attorneys, and Siegert and Mazzucchi are both

1                       KIRK BAKER

2     advisors from Houlihan Lokey.

3          Q.    And at around this time, were the

4     Hunts discussing with the T-unsecured the nature

5     of the potential joint proposal?

6          A.    June 11, yes.

7          Q.    And the first paragraph of the e-mail

8     indicates there's going to be a telephone

9     conference, and the subject of the e-mail is an

10    issues list for that conference.

11              Do you see that?

12         A.    Yes.

13         Q.    Now, you will note in bullet 1, which

14    is titled Presentation to Debtors, Mr. Newton

15    says, "Under the current setup, our impression

16    is that the debtors are likely to see some

17    advantages, but also conclude that a great deal

18    of conditionality is being added to the deal, as

19    noted in several items below."

20              Do you see that?

21         A.    I see the sentence, yes.

22         Q.    Did you agree with that observation by

23    Mr. Newton?

24         A.    Did I agree with the observation of

25    Mr. Newton?

1                    KIRK BAKER

2          We didn't specifically discuss his

3    observation.  There is conditionality in the bid

4    proposal.

5          Q.    Let me ask you, do you disagree with

6    this observation now that you read it?

7          A.    I wouldn't agree with the words.

8          Q.    Which words wouldn't you agree with?

9          A.    "Great deal."

10         Q.    So you think there was conditionality,

11   but not a great deal of conditionality?

12         A.    Right.

13         Q.    If you take a look at bullet 11, you

14   see it talks about regulatory conditions, see

15   that?

16         A.    Yes.

17         Q.    And I'm just reading from the

18   document:  "We think the idea of stating that

19   any conditions attached to the PUCT order must

20   be acceptable to Hunt and the G-7 will be

21   difficult for the debtors to accept."

22         Do you see that sentence?

23         A.    Yes.

24         Q.    "The debtors will view this as

25   excessive conditionality, especially as we know

<sup></sup>1                          KIRK BAKER

2    that certain regulatory conditions are likely to

3    be imposed."

4              See that?

5    A.    Yes.

6    Q.    "The prior proposal made by the Hunts

7    to the debtors included a concept that the

8    purchaser is willing to accept certain specific

9    regulatory conditions."

10              Do you see that?

11    A.    Uh-huh.

12    Q.    Is that correct; that in a prior

13    proposal that the Hunts had made to the

14    T-unsecureds, it included a concept that the

15    purchaser would be willing to accept --

16              MS. TERTERYAN:  Objection to form.

17    Q.    -- certain specified regulatory

18    conditions?

19              MS. TERTERYAN:  Objection.  Form.

20    A.    In the bids that -- the two bids that

21    we described before that we submitted, yes, we

22    did have certain specified regulatory

23    conditions.

24    Q.    And is it correct that, in connection

25    with the joint proposal, the Hunts were also

1                         KIRK BAKER

2  prepared to make a similar term included in the

3  proposal?

4          MR. SHORE:   Object to the form.

5      A.    You're asking for speculation as to

6  what we would have done in a subsequent

7  transaction with new parties.

8      Q.    No, I'm not asking about -- this is

9  your lawyer sending something over to the other

10  side, and so I'm -- and "the other side" meaning

11  the T-unsecureds?

12      A.    Yes.

13      Q.    And he is stating that in the prior

14  proposal the Hunts had included a concept of

15  specified regulatory conditions, and what he

16  says at the end is, "We should discuss this and

17  other points that increase the conditionality in

18  our deal."

19          Do you see that?

20      A.    I do.

21      Q.    So is it correct that the Hunts were

22  willing to discuss, at least with the

23  T-unsecureds, the concept of putting specified

24  regulatory conditions that you were willing to

25  accept in the transaction?

1                    KIRK BAKER

2          MR. SHORE:  Object to the form.

3          MR. BECKWITH:  I think you see the

4      line here between attorney-client and not,

5      but you are free to describe the

6      conversations with the T-uns or what you

7      were expecting of that communication, but

8      you should not reveal any internal

9      communications with Baker Botts or internal

10     to Hunt, as attorney-client privileged.

11     A.    Hunt had submitted a bid with

12 specified regulatory conditions based upon

13 burdensome conditions, and it would appear that

14 we were at that point discussing how to -- how,

15 and if, those types of provisions should in some

16 way apply.

17     Q.    And were the Hunts comfortable

18 including such provisions in the joint proposal?

19          MR. SHORE:  Objection to form.

20          MR. BECKWITH:  Same instructions.

21     A.    The Hunts had made a bid that

22 contained burdensome conditions.  I don't -- I

23 can't speak as to our existing -- our state of

24 mind on what we would or would not have done on

25 June 11.

1                      KIRK BAKER

2      Q.    Do you have any reason to believe that

3  what Mr. Newton is saying in this e-mail is

4  incorrect?

5           MR. SHORE:  Objection to form.

6           MS. TERTERYAN:  Objection to form.

7      A.    Generally, I find Geoff to be very

8  careful and thorough.

9      Q.    You said in your previous answer to

10  that one, "The Hunts had made a bid that

11  contained" -- what was typed is "burdensome

12  conditions."

13           Had you intended to say specific

14  regulatory conditions?

15           MR. SHORE:  Objection to form.

16      A.    We had made a bid that had certain

17  specified regulatory conditions that I believed

18  had to be defined as burdensome conditions in

19  the bid, but I don't recall that specifically.

20      Q.    Do you recall what the unsecured

21  creditor group's response was to the notion of

22  putting some specified regulatory conditions in

23  the joint proposal?

24           MR. SHORE:  Objection to the form.

25      A.    I believe that we have some regulatory

1                          KIRK BAKER

2    conditions.

3         Q.    No, I know that, but I mean specific

4    regulatory conditions that the purchaser is

5    willing to accept; that's what this is talking

6    about.

7              MR. SHORE:  Objection to form.

8              MR. BECKWITH:  Objection.  Vague.

9         Lack of foundation.

10        Q.    Again --

11        A.    And I'm --

12             MR. BECKWITH:  Hang on.  Let him

13        answer.

14             MR. HARDIMAN:  Okay.

15        A.    I'm feeling like you're going to have

16   to -- I'm not trying to -- I'm not trying to be

17   hard or difficult.

18             I -- I feel like what you're asking is

19   would the debtor and the consortium members and

20   Hunt have agreed to a different deal than the

21   plan support agreement, and I don't know.

22        Q.    I'm not intending to ask that.  What

23   I'm intending to ask is, simply with respect to

24   this point in paragraph 11, what was the

25   response of the T-unsecured creditor group?

KIRK BAKER

1

2      A.      I believe that we generally have a --

3 there are some regulatory conditions that are

4 acceptable if they're placed upon us by the PUCT

5 that that satisfies the conditions precedent.

6           So, based upon that, I would say that

7 their conclusion was that we collectively as a

8 consortium agree to put in reasonable conditions

9 that the debtors agree to in connection with

10 signing a fully negotiated transaction.

11     Q.      The next paragraph has to do with a

12 breakup fee?

13     A.      Uh-huh.

14     Q.      It talks about the rationale for

15 seeking an increase in the EFH breakup fee from

16 175 to 225 in addition to an expense

17 reimbursement.  Do you see that?

18     A.      I do.

19     Q.      Was this a breakup fee that would have

20 been payable by the purchaser group to EFH in

21 the event that the transaction did not close?

22           MR. SHORE:  Objection to the form.

23     A.      I believe so.

24     Q.      Do you recall what the unsecured

25 creditors' response was to the notion of

1                        KIRK BAKER

2    including a breakup fee that would be payable

3    under certain circumstances by the purchaser

4    group to EFH?

5         A.    I'm sorry, do I remember who --

6               MR. SHORE:  Objection to form.

7         Q.    The unsecured creditors group?

8         A.    I don't know.

9         Q.    The final agreement does not have any

10   sort of breakup fee payable --

11        A.    That's true.

12        Q.    -- by the purchaser?

13              How is it that that was not included

14   in the transaction?

15              MS. TERTERYAN:  Objection to form.

16              MR. SHORE:  Objection to form.

17        A.    It was included in the transaction I'm

18   going to say generally.  What was included in

19   the ultimate plan support agreement was a -- I

20   think it's sometimes referred to as disarmament.

21   The T-side unsecureds agree to give up claims

22   and litigation in exchange for other things in

23   the transaction.

24              So when you're asking me about a

25   breakup fee, I didn't own those -- I don't own

1                    KIRK BAKER

2    those claims.  Hunt didn't own or control those

3    claims.  That's what our partners controlled and

4    that's what they gave up.

5        Q.    And in return for giving them up, the

6    EFH debtor agreed not to pursue any -- not to

7    seek any sort of breakup fee against the

8    purchaser group in the agreement?

9             MS. TERTERYAN:  Objection to form.

10            MR. SHORE:  Objection to form.

11       A.    I can't specifically state why the

12   debtors agreed to or didn't agree to any

13   particular provision in the plan support

14   agreement.  It was very important for them to be

15   able to, as I recall, achieve some certainty of

16   exit from bankruptcy without protracted

17   litigation, and the parties that could have the

18   ability to protract that litigation were the

19   T-unsecureds.  And so the compromise of those

20   specific claims, it was very important to the

21   debtor.

22       Q.    Do you have a recollection of

23   negotiations with the debtor about a potential

24   breakup fee payable from the purchaser group to

25   the debtor in the event of closing not

1                      KIRK BAKER

2    occurring?

3              MS. TERTERYAN:  Objection to form.

4         A.    Not around the purchase and sale

5    agreement.  I do recall conversations about that

6    around our second bid.

7         Q.    The second --

8         A.    Yes.

9         Q.    What of the conversations do you

10   remember with respect to the second bid?

11        A.    They clearly wanted a breakup fee

12   around our second bid.

13        Q.    And the Hunts were willing to pursue

14   the bid with a breakup fee in it?

15             MR. BECKWITH:  Asked and answered.

16             MS. TERTERYAN:  Objection.

17        A.    We made a bid with a breakup fee

18   included.

19        Q.    The next paragraph, paragraph 13 here

20   in this document, talks about specific

21   performance?

22        A.    Uh-huh.

23        Q.    What was the T-unsecured creditors'

24   response to this point made in this agreement by

25   Mr. Newton discussing specific performance?

1                     KIRK BAKER

2          MR. SHORE:  Object to the form.

3      A.    I don't recall specific -- I don't

4  recall specific responses.  Our -- the purchase

5  and sale agreement does not have specific

6  performance.  It has conditions precedent that

7  must be satisfied.

8      Q.    And when you say conditions precedent,

9  are you referring to the regulatory conditions

10  and whatever other conditions precedent are in

11  the agreement?

12     A.    Yes, the conditions that you -- that

13  we turned to in the last exhibit.

14     Q.    Are you saying that the -- a specific

15  performance remedied by EFH, the debtor, against

16  the purchaser in the event of non-closing was

17  traded for conditions precedent?

18          MS. TERTERYAN:  Objection.  Form.

19          MR. SHORE:  Objection.  Form.

20          MR. BECKWITH:  Asked and answered.

21  Misstates prior testimony.

22     A.    It seems like there was a number of

23  people who disagree with that question.

24     Q.    Well, it was only a question.  Anybody

25  can disagree with it.  I guess -- I get an

1                      KIRK BAKER

2    impression of what they want you to answer.

3        A.    Could you ask it again?

4             MR. SHORE:   My objection was to the

5    form.

6        A.    I'm confused.

7        Q.    My question is -- I'm just following

8    up on your previous answer in which I asked

9    about specific performance, and you said there

10   was conditionality that came out of the

11   transaction.

12            I'm saying are you saying that the EFH

13   debtors traded specific performance for

14   conditions precedent?

15            MS. TERTERYAN:   Object to the form.

16            MR. SHORE:   Object to the form.

17       A.    I'm not sure exactly what they traded

18   for.  I would make an observation when you say

19   specific performance, "specific performance" can

20   mean a very certain thing, but I do believe what

21   the debtors received from the T-unsecureds is a

22   very specific settlement and release of a claim

23   and disarmament provision that the T-unsecureds

24   were the only parties who could give.  And

25   that's what the debtors received, and that gives

1                        KIRK BAKER

2       them certainty.

3              If this transaction doesn't close,

4       which I certainly wouldn't be sitting here and

5       putting a lot of effort into it if we didn't

6       believe that it will, they have certainty that

7       they won't have litigation for years.

8          Q.    But they have no remedy against the

9       purchaser group if the purchaser group chooses

10      not to go forward with the merger transaction;

11      is that right?

12              MS. TERTERYAN:   Objection to form.

13              MR. BECKWITH:   Objection.  No

14          foundation.

15              MR. SHORE:   Objection to form.

16          A.    I'm not sure how you're using the word

17      "remedy."  To me, if you have agreed to not

18      continue to pursue certain rights if an event

19      occurs, I think I have a remedy, but I don't --

20      beyond that, that's a common definition of

21      "remedy."  I know most people in this room are

22      litigators.  I think that's probably a term of

23      art.

24          Q.    Right.  So you're saying that the

25      settlement agreement between the EFH and the

KIRK BAKER

1  T-side, in your view, is the remedy if the

2  transaction does not close?

3   

4    MR. SHORE:  Objection to form.

5    MS. TERTERYAN:  Objection to form.

6   A.  In my view, that was a very important,

7  valuable thing, right, to both be given up and

8  obtained.

9   Q.  Was it an important right to the Hunts

10  or important rights between the debtor and the

11  T-unsecured?

12    MR. SHORE:  Object to the form.

13    MS. TERTERYAN:  Objection to the form.

14   A.  It's only important to the Hunts to

15  the extent that it helps us achieve our

16  objective of getting out of bankruptcy faster

17  and closing.  It did seem to give more certainty

18  to the ability to close and get out of

19  bankruptcy.

20   Q.  In Mr. Newton's e-mail in this

21  paragraph 13, he says, "Transactions with 'true

22  option' termination provisions (i.e., reverse

23  breakup fees as liquidated damages for breaches

24  of any kind) have been very rare since 2007."

25    You see that sentence?

1                          KIRK BAKER

2        A.    I do.

3        Q.    Do you have any reason to disagree

4   with that statement by Mr. Newton?

5        A.    I have no information or belief about

6   it, so I have no reason to agree nor disagree.

7        Q.    You know, based on your experience in

8   the M&A world, do you have any reason to

9   disagree with that?

10            MR. SHORE:  Object to the form.

11       A.    Each transaction stands on its own.

12  Some transactions have breakups and reverse

13  breakups.  Some have specific performance.  Some

14  have conditionality.

15       Q.    I think what he's saying here is that

16  a transaction with provisions that only have

17  reverse breakup fees and no specific performance

18  have been very rare since 2007.  So, with

19  respect to that specific question, do you have

20  any reason to disagree with that?

21            MR. SHORE:  Objection to form.

22            MR. BECKWITH:  Objection.

23       Speculation.

24            MS. TERTERYAN:  Objection to form.

25            MR. BECKWITH:  And you shouldn't

1                    KIRK BAKER

2      reveal any attorney-client communications.

3           THE WITNESS:  The only basis that I

4      would have for an opinion on that particular

5      paragraph or that particular sentence

6      drafted by Geoff would be based upon advice

7      received by Geoff.  So I probably ought to

8      let that one go.

9  BY MR. HARDIMAN:

10      Q.   You don't have any basis just based on

11  your own experience, which I think you said was

12  your basis for some other things?

13           MR. BECKWITH:  Objection to form.  He

14      just answered that question.  Do not answer

15      that question.

16           MR. SHORE:  Object to form.

17           MR. HARDIMAN:  What's the basis for

18      you telling him not to answer that question?

19           MR. BECKWITH:  Did you hear his

20      answer?

21           MR. HARDIMAN:  I know.  That's why I

22      didn't ask for legal advice.  I asked again

23      whether or not he had any basis on his own

24      personal experience.

25           MR. BECKWITH:  Well, no, but it was in

1                        KIRK BAKER

2        the context of attorney advice.

3                MR. HARDIMAN:   I'm not asking the

4        attorney advice.

5                MR. BECKWITH:   I'm giving you a lot of

6        room.

7        BY MR. HARDIMAN:

8        Q.    I'm not asking your attorney advice.

9        I'm simply asking you whether or not your

10       experience provides you any basis to come up

11       with a view on this statement from Mr. Newton?

12               MR. SHORE:   Object to the form.

13       A.    As I recall, and I do not have the

14       purchase and sale agreement in front of me, but

15       the one T&D transaction that we -- that Hunt did

16       in 2009 or '10, I believe, where we acquired

17       Caprock had a breakup fee as the sole remedy if

18       we didn't close.

19       Q.    You have referred to this a couple of

20       times.  Let me just talk about it specifically.

21               Approval of the settlement agreement

22       between the T-side and EFH is a condition to the

23       plan going forward; isn't that correct?

24       A.    Approval of the settlement agreement.

25               MR. SHORE:   Object to the form.

1          KIRK BAKER

2     A.    Which settlement agreement?  I'm

3 sorry.

4     Q.    The settlement agreement -- there's a

5 couple settlement agreements, but there's a

6 settlement agreement between TCEH and EFH.

7 There's also a settlement agreement between the

8 T first liens and the T-unsecured.

9          I have this wrong.  My understanding

10 is there's one settlement agreement that

11 includes all the settlements.  Is it your

12 understanding that that -- approval of that is a

13 precondition to the plan going forward?

14     A.    Generally, it is my understanding that

15 there is settlement of intercompany claims on

16 the T-side or intercreditor claims on the

17 T-side, and then certainly there is settlements

18 contained in the purchase -- I mean the plan

19 support agreement that those have to be

20 fulfilled for it to go forward.

21     Q.    Are you aware that there is a

22 settlement agreement being put before the

23 Bankruptcy Court for approval at the same time

24 that the plan is being put forward for approval?

25     A.    Oh, yes.  Yes, I am.

1                   KIRK BAKER

2      Q.    How did it come about that the

3 approval of the settlement agreement became a

4 precondition to the plan going forward?

5           MS. TERTERYAN:  Object to form.

6      A.    I -- I don't recall.

7      Q.    Do you recall any consideration of the

8 settlement agreement being incorporated as part

9 of the overall plan?

10          MR. BECKWITH:  Objection.  Form.

11     A.    I don't recall the specifics of what

12 went into one agreement or another agreement.

13 They're all a package, and so it was all -- they

14 were all important to bring all the parties to

15 the table.

16     Q.    All right.  So you viewed the

17 settlement agreement and the plan and the merger

18 agreement all as one package?

19     A.    Yes.

20     Q.    Do you recall if anybody resisted the

21 idea in the negotiations of the settlement

22 approval being a precondition of the plan going

23 forward?

24     A.    I don't recall.

25          MS. TERTERYAN:  Object to form.

1          KIRK BAKER

2          MR. SHORE:  Object to form.

3     A.    I don't recall.

4     Q.    Has the Hunt side had any discussions

5 with the plan sponsors regarding this

6 precondition of the settlement agreement being

7 approved?

8          MR. SHORE:  Object to the form.

9     A.    Are we a plan sponsor?  We're a

10 signatory to the plan support agreement.

11    Q.    You're right.  You're right.  I don't

12 mean the plan -- I mean the sponsors of the

13 entity, KKR and the other two sponsors?

14    A.    No.

15    Q.    Have there been any discussions that

16 you're aware of about potentially waiving the

17 settlement approval condition as a precondition

18 to the plan?

19          MS. TERTERYAN:  Object to form.

20          MR. BECKWITH:  So you should not

21     reveal any common interest communications or

22     attorney-client communications as part of

23     the answer to that.  Before the common

24     interest arose, you can reveal that.

25    A.    Could you ask that again?  I'm sorry.

1                        KIRK BAKER

2      Q.    Sure.  Have there been any discussions

3   that you're aware of about a potential waiver of

4   this settlement approval precondition to the

5   plan going forward?

6      A.    I'm not -- not that I recall

7   specifically, no.

8      Q.    I think you mentioned the disarmament

9   concept as part of your answers, and my

10  question --

11     A.    Sometimes referred to as that, yes.

12     Q.    What do you understand that term to

13  be?

14     A.    I forget which of the agreements it's

15  contained in so I'll -- without looking at it

16  specifically, I'll just have to say in general.

17  In general, it is the agreement by the T-side

18  unsecured or undersecured creditors' agreement

19  to not continue to pursue certain claims that

20  they may have against -- I think against the

21  debtor, against the debtors' owners, against the

22  directors, against the officers, against the

23  E-side companies, maybe E-side creditors -- I

24  don't recall specifically -- in exchange for and

25  in agreement with the first lienholders that the

1                        KIRK BAKER

2    T-side settlement of any claims that they have

3    to.

4              So it's basically, you know, they

5    disarm -- that's why it was called that -- they

6    disarm any future litigation on pursuing the

7    claims that they would have against all the

8    parties to the purchase and sale agreement --

9         Q.    Were you --

10        A.    I'm sorry, plan support agreement.

11        Q.    I'm sorry.  I thought you were

12   finished.

13              Were you or any of the Hunt

14   representatives involved in the negotiation of

15   the disarmament part of this?

16        A.    No.

17        Q.    How did the concept get introduced to

18   the discussions?  Who first raised it?

19              MS. TERTERYAN:  Object to form.

20        A.    I don't recall who -- who brought it

21   up first.  It's a very valuable right that our

22   partners, the T-uns, have or had, and they were

23   able to give that -- compromise that valuable

24   right as part of the plan support agreement.

25              So I don't recall who was the first

1                          KIRK BAKER

2    one to talk about the concept.

3         Q.    Do you know if anybody on the Hunt

4    side has done anything to analyze the strength

5    of the claims that are being settled as part of

6    disarmament?

7              MR. BECKWITH:  Objection to the extent

8         it calls for attorney-client privileged

9         communications.  Otherwise, you can answer.

10        A.    I don't believe so.

11        Q.    So when you say this is a very

12   valuable agreement, is that based on what you've

13   been told by the people from the T-unsecured

14   side?

15             MS. TERTERYAN:  Object to form.

16        A.    I would have been told that by an

17   attorney.  I am not sure which attorney.

18        Q.    Do you recall if it was a Baker &

19   Botts attorney?

20        A.    I've had numerous conversations with

21   Baker Botts attorneys, who I would be surprised

22   if they were not part of the conversations.

23             MR. BECKWITH:  Then you shouldn't

24        reveal it.

25        Q.    Were you told that by a White & Case

KIRK BAKER

1    attorney?

3    A.    I don't recall.

4    Q.    Do you recall having any discussions

5    or anybody on the Hunt side having discussions

6    of any detail with representatives of the

7    T-unsecured creditors as to what their claims

8    were?

9    A.    You know, I don't recall specifics,

10   specific discussions of the various claims that

11   the T-unsecureds had against all of the parties.

12   There were general conversations of the litany

13   of claims and rights they had that they were

14   compromising.

15   Q.    Did you have any discussions with the

16   debtor regarding the claims it might have

17   against the T-side that were part of the

18   settlement?

19        MR. SHORE:  Objection to form.

20   A.    Not that I recall.

21   Q.    Same question before:  I'm not asking

22   for attorney advice.  I'm just asking whether or

23   not the Hunt side engaged in any analysis of the

24   strength of the claims that the debtor may have

25   had against the T-side entities?

1                    KIRK BAKER

2          MR. SHORE:  Object to the form.

3          MS. TERTERYAN:  Object to the form.

4          MR. BECKWITH:  I think it's the same

5     question.

6          MR. HARDIMAN:  I thought I asked it

7     the other way around.

8          MR. BECKWITH:  You may have.  Just

9     make sure you protect the attorney-client

10    privilege.

11         THE WITNESS:  Yes.

12         You're asking if, outside of something

13    that might be covered by an attorney-client

14    privilege, am I aware of any analysis done

15    for Hunt or by Hunt of the -- of the value

16    or the -- how good the claims from EFH

17    against TCEH would have been?  If that's the

18    question, the answer is no.

19 BY MR. HARDIMAN:

20    Q.    Okay, but I am not asking for what the

21 advice was.

22    A.    Right.

23    Q.    But I would like you to include in

24 that answer, if your attorneys have done an

25 analysis for you, I would like you to tell me

1                    KIRK BAKER

2   yes or no.  I'm not asking what the analysis

3   was.

4        A.    I'm not aware of any.

5        Q.    Do you know who led the negotiations

6   on behalf of the debtors regarding the

7   disarmament proposal?

8             MS. TERTERYAN:  Objection.

9   Foundation.

10       A.    On behalf of the debtors?

11       Q.    Yes.

12       A.    Kirkland & Ellis and Stacey.

13       Q.    Do you know if the disinterested

14   directors were involved in the negotiation of

15   the disarmament concept?

16       A.    I, you know, I don't know.

17       Q.    Other than potentially facilitating

18   the merger agreement, does the disarmament

19   provide any other benefits to Hunt?

20             MS. TERTERYAN:  Objection to form.

21       Q.    To the Hunt Group?

22       A.    Other than facilitating the

23   transaction and allowing us to achieve our

24   business objective, no.

25       Q.    So if you were told that you could

1                         KIRK BAKER

2   achieve your business objective without

3   disarmament, the Hunts would have no dog in that

4   Hunt?

5              MR. SHORE:   Objection to form.

6        A.    So to speak.

7              MR. BECKWITH:   Speculation.

8        A.    Yeah, I have no idea.

9        Q.    To your knowledge, did the debtors ask

10  for disarmament as a trade-off against the

11  conditionality of your transaction?

12             MS. TERTERYAN:   Object to form.

13             MR. SHORE:   Object to form.

14             MR. BECKWITH:   That's been asked and

15        answered.

16             MR. HARDIMAN:   I don't think so.

17             THE WITNESS:   And I don't remember the

18        specifics of what was -- what was -- what

19        the gives and takes in the negotiation were.

20             MR. HARDIMAN:   Let me mark as Baker

21        Exhibit 10 an e-mail dated June 29, 2015

22        from an attorney at Kirkland & Ellis to a

23        number of people, including attorneys at

24        Baker Botts.   It's marked EFH6192803.

25             (Baker Exhibit 10, an e-mail dated

1                    KIRK BAKER

2        June 29, 2015 from Kirkland & Ellis to a

3        number of people, including attorneys at

4        Baker Botts, bearing Bates Nos. EFH6192803

5        through 6192807, marked for identification,

6        as of this date.)

7    BY MR. HARDIMAN:

8        Q.    Mr. Baker, I don't see you as a CC of

9    this document, although your lawyers are CC'd on

10   it, and my first question is do you remember

11   seeing this document?

12       A.    You know, I don't -- I don't

13   specifically recall this document.

14       Q.    Do you recall documents like this that

15   came from the -- this is from the debtors'

16   counsel laying out the disarmament mechanics?

17       A.    Yes.  Yes.  Generally.

18       Q.    Do you recall that in their initial

19   proposals regarding disarmament that the debtors

20   proposed a termination fee and specific

21   performance as remedies?

22            MS. TERTERYAN:  Objection.  Vague.

23       Q.    And I would refer you to paragraph 5

24   and paragraph 14 of the attachment.

25            MS. TERTERYAN:  Objection.  He said he

KIRK BAKER

1

2    doesn't remember the document.

3        A.    I don't recall the specifics.

4        Q.    Do you recall that in the initial

5    discussions of the disarmament proposal that the

6    debtors were proposing a breakup fee and

7    specific performance as remedies against the

8    purchaser?

9        A.    I really don't recall the specifics

10   because I would not have been involved in the

11   detailed discussions and negotiations of the

12   disarmament provision simply because it was not

13   our rights to give and compromise, so it would

14   have been somewhat presumptuous of us to have

15   weighed in heavily on someone else's rights.  So

16   we just didn't get involved in the specifics of

17   that part of the negotiation.

18       Q.    Is it fair to say that your

19   recollection is the extent to which the specific

20   performance and breakup fee provisions were

21   discussed in connection with disarmament, that

22   was a discussion that occurred between the

23   T-unsecureds and the debtors?

24            MR. SHORE:  Objection to form.

25       A.    Baker Botts could very well have been

1                        KIRK BAKER

2    involved.  There could have been people on the

3    Hunt team that were involved in the discussions

4    or leading the discussions.  I'm just not aware

5    of the specifics because, as I said, those were

6    not our rights to compromise, and we didn't do

7    an analysis of how much faster we could get out

8    of bankruptcy.  It was just this will help us.

9         Q.    We talked about the regulatory

10   conditions before.  If the Hunts choose not to

11   go forward with this transaction, what remedies

12   do the debtors have against the Hunts?

13              MS. TERTERYAN:  Objection.  Vague.

14              MR. SHORE:  Objection to the form.

15              MR. BECKWITH:  Same.

16        A.    They would be specified in the

17   contract or not limited by the contract.  I do

18   not -- if you're positing that we -- that Hunt

19   not go forward because a condition precedent has

20   not been satisfied, then I'm not sure -- if

21   you're positing that we breached the contract, I

22   don't know what claims they would have against

23   us.

24              I'm sorry.  I feel like I'm being

25   difficult, and I don't understand what you're

1                        KIRK BAKER

2    asking.

3         Q.    That is what I'm positing.  If, at the

4    end of the day, the conditions are satisfied but

5    the Hunts decide not to go forward and breach

6    the contract, what remedies do the debtors have

7    against the Hunts?

8              MS. TERTERYAN:  Object to form.

9              MR. BECKWITH:  Calls for a legal

10        conclusion.

11        A.    I don't recall that there's any

12   specific provisions in the document to remedies

13   against Hunt.  If the -- if the transaction does

14   not close and -- and I don't recall the

15   specifics of when -- when the provision comes

16   into play.

17             If the transaction does not close and

18   we have been given our full time to try to close

19   it and then the debtors go with an alternative

20   transaction, we have agreed not to oppose it.

21        Q.    Is that what's sometimes referred to

22   as the "sore loser" provision?

23        A.    Some people have referred to it as the

24   "sore loser" provision, yes.

25        Q.    Everybody in these depositions does,

1                         KIRK BAKER

2    so do you mind if I use that as the term going

3    forward?

4        A.    As long as we stipulate that I find it

5    to be somewhat offensive, go ahead.

6        Q.    No, neither one of us likes it.  We'll

7    agree.  Neither one of us likes it.

8              How did that first come up, that

9    provision?

10             MS. TERTERYAN:  Objection to form.

11       Q.    In the negotiations?

12       A.    How did the "sore loser" --

13       Q.    Sore loser --

14       A.    -- inappropriately named "sore loser"

15   provision first become described or discussed?

16       Q.    Yes, how did it first come up in the

17   negotiations?  Who first raised it?

18       A.    Stacey Doré asked me for it.

19       Q.    What did she say?

20       A.    I don't recall the specific words, but

21   she was interested in making sure that they

22   could reach closure and that if this

23   transaction, for whatever reason, didn't happen,

24   she wanted to make sure that we, Hunt, were not

25   going to try to stop another transaction if they

1                          KIRK BAKER

2    chose another strategic to partner with, that we

3    wouldn't try to stop that.

4        Q.    And you have agreed to that as part of

5    the deal?

6        A.    In general, without looking at the

7    specific cite, I would be very careful about

8    specifically what we agreed to, but in general,

9    yes.

10       Q.    What was the initial reaction to that

11   request?  Did you --

12             MR. SHORE:  Objection to form.

13       Q.    -- resist it?

14       A.    Yes.

15       Q.    Did you get anything in return for

16   agreeing to it in the negotiations?

17             MS. TERTERYAN:  Objection.  Form.

18       A.    It was the last provision agreed to by

19   all parties to the purchase -- to the plan

20   support agreement, so the entire deal had to be

21   done before we would agree to it.

22       Q.    And when you say -- I think you said

23   that Ms. Doré said she raised it in the context

24   of wanting closure.  I take it that's closure of

25   whatever alternative plan might be presented in

                          KIRK BAKER

1   case your plan falls through?

2       A.    Yeah.

3       MR. BECKWITH:  Objection.

4       A.    That might be a --

5       MR. BECKWITH:  Lack of foundation.

6       A.    Yeah, as I recall, what was being

7   sought was the ability, if our transaction was

8   unsuccessful and did not close, she did not want

9   the parties to our transaction to come back and

10  gripe about whatever alternative transaction

11  needed to be proposed to get out of bankruptcy.

12       That is why you would have had the --

13  be very important for the T-unsecureds to agree

14  to disarmament and for us to agree to the

15  inappropriately named "sore loser."

16       Q.    Coming back to the actual transaction

17  that's on the books, assuming the conditions are

18  satisfied, are the Hunts committed to going

19  through with the transaction even if they view

20  at the time of closing that it's not in their

21  best economic interests?

22       MR. SHORE:  Objection to form.

23       A.    Wow.

24       MR. BECKWITH:  Same.

KIRK BAKER

1

2    A.    Are the Hunts committed -- I believe

3 we signed documents that would say if the

4 conditions precedent have been satisfied, we

5 fund.

6    Q.    And are you prepared to do that even

7 if it's against your economic interests at the

8 time?

9         MR. BECKWITH:  Objection.  Form.

10    A.    Typically, we would be prepared to --

11 I can't think of a time in which the Hunts would

12 say we are not inclined to fulfill our

13 contractual obligations, so yes.

14    Q.    Why haven't you agreed then for there

15 to be any remedy that the EFH debtors would have

16 against you in the -- in the circumstance that

17 you choose not to close?

18         MS. TERTERYAN:  Objection to form.

19         MR. BECKWITH:  Objection.

20    Speculation.

21         MR. SHORE:  Objection to form.

22    A.    I don't know.

23    Q.    Are you stating definitively now that

24 you will close the transaction even if, in your

25 view, the asset has lost value?

1                    KIRK BAKER

2          MR. BECKWITH:  Objection.  Asked and

3     answered.

4          MR. SHORE:  Objection to form.

5     A.    I think, to the extent that we have a

6  contractual obligation, we would anticipate that

7  we would be expected to fulfill that contractual

8  obligation or be sued.

9     Q.    And if you are sued, who can sue you

10 and what are your --

11    A.    I don't know all the --

12         MR. BECKWITH:  Objection.

13    Speculation.  Calls for a legal conclusion.

14    Q.    Do the debtors have any legal recourse

15 against you?

16         MR. BECKWITH:  Same objection.

17         MS. TERTERYAN:  Objection to form.

18         MR. SHORE:  Objection to form.

19    A.    I'm not a litigator so I don't know.

20    Q.    If in fact -- hypothetical, we're

21 speaking for the moment -- the debtors have no

22 recourse against you and you determine -- and

23 therefore you would have no liability to the

24 debtors, and you determine that the transaction

25 is no longer in the Hunt's best economic

1                     KIRK BAKER

2   interests, would you still close it?

3              MR. SHORE:  Object to the form.

4              MR. BECKWITH:  Objection.

5   Speculation.

6        A.    I don't know.  I would say we've been

7   pursuing the purchase and acquisition of Oncor

8   and other T&D assets for a decade.  If we didn't

9   believe that we were going to close on this

10  transaction and fulfill all the conditions

11  precedent, we wouldn't be here.

12       Q.    I think you said before that there is

13  a financial -- strike that -- that there are

14  certain investors on your side of the bid?

15       A.    There are --

16             MR. BECKWITH:  I don't think there's a

17  question.

18             THE WITNESS:  Okay.

19       Q.    Am I correct?

20       A.    There are certain members of the

21  consortium that are sometimes thought of more as

22  Hunts.

23       Q.    Okay.  Do you have certain obligations

24  to those investors' contractual obligations?

25             MR. BECKWITH:  Objection.  Calls for

                        KIRK BAKER

1
2    legal conclusion.

3        A.    They're parties to the purchase and

4    sale agreement.  They have signed commitment

5    papers.  They will be parties to the investor

6    rights agreement that we have discussed.  Beyond

7    that, I'm not aware of any specifics.

8        Q.    And I'm coming near the end here.

9              Just with respect to the Hunt Group,

10   who do you report to?

11       A.    I report to Hunter and Ray Hunt.

12       Q.    Do you have fiduciary obligations to

13   them?

14             MR. BECKWITH:  Objection.  Calls for a

15       legal conclusion.  It's also outside the

16       scope of this corporate rep notice by a

17       mile.

18       A.    You know, I don't know.  It's a very

19   interesting question, but I certainly feel a

20   moral obligation to the people I have worked

21   with for 18 or 19 years.

22       Q.    And I just don't know the answer to

23   this, and I should, but I mean, who owns the

24   Captra Group that you work for?

25       A.    Captra?

1                           KIRK BAKER

2        Q.    Yes.

3        A.    It's a partnership.  I own the general

4   partner and the Hunts own the limited partner.

5   So I guess, collectively, me and Ray and Hunter.

6        Q.    Are there other investors in the

7   general partner besides the Hunts?

8        A.    I own the general partner and the

9   Hunts own the limited partner.

10       Q.    Oh, I'm sorry.

11             Are there other investors in the

12   limited partner other than the Hunts?

13       A.    Not currently.

14       Q.    Are there any investors in the general

15   partner?

16       A.    Other than me?

17       Q.    Yes.

18       A.    No.

19       Q.    To the best of your knowledge, do the

20   debtors have any litigation claims or other

21   claims against Hunt in the event of termination?

22             MS. TERTERYAN:  Object to form.

23             MR. SHORE:  Object to the form.

24             MR. BECKWITH:  Objection.

25   Speculation.  Asked and answered.

1                         KIRK BAKER

2       A.     I don't know.

3              MR. HARDIMAN:  Take a break.

4              MR. BECKWITH:  Okay.

5              (Recess; Time Noted:  4:54 p.m.)

6              (Time Noted: 5:05 p.m.)

7  BY MR. HARDIMAN:

8       Q.     Getting back to the question of what

9  remedies the debtor may have against the Ovation

10 consortium in the event of lack of closing,

11 again, I'm not asking for legal advice, but did

12 you ask your advisors to look into that issue,

13 period?

14             MR. BECKWITH:  Objection.  Attorney --

15      Q.     Don't tell me what they said.

16             MR. BECKWITH:  Attorney-client

17 privileged.  I'll let you answer that yes or

18 no.

19      A.     No.

20      Q.     If the T-unsecured creditors' side of

21 the consortium resists closing, do the Hunts

22 have any remedies against them?

23             MR. SHORE:  Objection to form.

24             MR. BECKWITH:  Same objections.

25      A.     You know, I don't -- I don't remember

1                        KIRK BAKER

2   specifically if we have remedies.  If you

3   would -- if you want to guide me to the specific

4   provisions in a document, I believe that if the

5   conditions precedent are basically satisfied and

6   they don't want to fund, we would have some

7   period of time to find additional equity.

8        Q.    And if you could not find additional

9   equity, would you have any recourse against the

10  members of the consortium who do not fund?

11             MR. SHORE:  Objection to form.

12       A.    I don't recall.  I don't believe so.

13       Q.    You don't believe so; is that what you

14  said?

15       A.    Right.

16       Q.    Is there some threshold number of

17  members of the unsecured creditors side of the

18  consortium who need to say they don't want to

19  fund before there is no remedy against them?

20             MR. SHORE:  Objection to form.

21             MR. BECKWITH:  Same objection.

22       Q.    I mean, what I'm getting at, to make

23  it easier, can one person, one member of their

24  group say we don't want to fund, and that ends

25  everything?

1                    KIRK BAKER

2      A.    I don't recall specifically what the

3   percentage threshold is.  I recall generally

4   that there would be a round-robin filling of any

5   vacancy that would be caused by somebody not

6   filling an equity hole.

7      Q.    Again, I'm sort of talking at the

8   remedy, not the cure more or less.  I understand

9   what you're saying is that there are provisions

10  as to how you would go about replacing that

11  particular member, but are there provisions to

12  require that member to go forward with the

13  funding?

14     A.    I just don't recall specifically.

15          MR. SHORE:  Objection to form.

16     Q.    Let me ask one last question about the

17  "sore loser" provision.  Do you consider that

18  provision -- again, which we're both calling the

19  "sore loser" provision -- do you consider that

20  provision to be the equivalent of a contractual

21  requirement to close on the consortium's part?

22          MR. SHORE:  Objection to form.

23          MS. TERTERYAN:  Objection to form.

24     A.    On the part of the consortium.

25          I -- once again, let's stipulate the

1                        KIRK BAKER

2   inappropriately named "sore loser" provision, I

3   believe there's only one party to the purchase

4   and sale agreement other than the debtor that's

5   either detrimented or benefited by that

6   provision, so I don't think that that would

7   apply to any of the other consortium members one

8   way or the other.

9            It certainly would to Hunt, and I

10  don't know that -- that would not necessarily be

11  viewed as a requirement to close, but it was not

12  given lightly.

13       Q.    Let me just -- the way that came out,

14  I have to ask you to repeat that again.

15       A.    Okay.

16       Q.    With respect to the Hunts, do you

17  consider the "sore loser" provision to be the

18  equivalent to a contractual requirement to close

19  the transaction?

20       A.    No.

21            MR. HARDIMAN:  I'm going to pass the

22       witness at this time.  I guess I have to say

23       for the record two things:  I reserve on

24       whether or not this was the appropriate

25       30(b)(6) preparation and also reserve on

1                      KIRK BAKER

2       some of the privilege issues that have

3       been -- privilege objections that have been

4       raised.

5            MR. BECKWITH:  We certainly are

6       prepared to discuss the four topics you

7       agreed to ask him about.  I don't think you

8       asked him many questions about those four

9       topics, but as we explained, he was the

10      leader of this deal.

11           So any insinuations in your

12      questioning or now to the contrary is

13      rejected, and we'll obviously preserve our

14      privilege.

15           MR. HARDIMAN:  Okay.

16   EXAMINATION BY

17   MR. SHEPPARD:

18      Q.    Good afternoon, Mr. Baker.

19      A.    Good afternoon.

20      Q.    My name is Mark Sheppard.  I am

21   co-counsel for the Official EFH Committee,

22   particularly in connection with the potential

23   conflicts involving the sponsors.

24           And when I mention the word

25   "sponsors," I'm talking about the equity

1                    KIRK BAKER

2    sponsors of EFH, not the plan sponsors, okay?

3    Can we agree on that?

4        A.    Okay.

5        Q.    And you understand who those equity

6    sponsors are, correct?  KKR --

7        A.    KKR, TPG, Goldman Sachs.

8        Q.    Those are the three that I know of,

9    so...

10       A.    Okay.

11       Q.    Now, Mr. Hardiman covered a lot of

12   what I would have asked you, so I'm going to try

13   to minimize any of the duplication of questions,

14   but some of it, it may be necessary for me to go

15   back to your prior testimony.  I'm not trying to

16   characterize your testimony.  I'm simply trying

17   to orient you.  Okay?  If I misstate your

18   testimony, please let me know.  It's not my

19   intention to try to do that.  All right?

20       A.    Okay.

21       Q.    Now, in connection with your

22   preparation as a 30(b)(6) witness, did you

23   review any documents in connection particularly

24   with regard to the releases of the equity

25   sponsors in this plan and settlement agreement?

1                     KIRK BAKER

2      A.    Did I review any specific documents

3  around those releases, no.

4      Q.    Okay.  And other than the preparation

5  that you talked about earlier, was there any

6  preparation that you undertook specifically with

7  regard to -- I believe it's number 7 on the

8  notice, which is the negotiations involving the

9  releases of the sponsors?

10     A.    No.

11          MR. BECKWITH:  So I understand, your

12     position is that that falls under which of

13     the four categories that you took to the

14     judge?

15          MR. SHEPPARD:  I believe it was --

16          MR. BECKWITH:  Communications among

17     T-side parties concerning the settlement

18     agreement?  Documents and communications

19     concerning disarmament and drag?  Documents

20     and communications concerning likelihood of

21     close?  Documents and communications

22     concerning Hunt and the T-side

23     creditor-investor consortium joining forces?

24          MR. SHEPPARD:  I believe it would be

25     related to the disarmament.

1                          KIRK BAKER

2              THE WITNESS:   Okay.   I didn't review

3         any of the specific provisions.   As I

4         indicated, I've been in charge of this

5         process and the negotiations for Hunt for a

6         long time, so I've read all of the documents

7         in connection with those negotiations at

8         least once, if not twice, but I didn't do

9         any specific reading of that provision.

10   BY MR. SHEPPARD:

11        Q.    Did you have any negotiations yourself

12   with any of the equity sponsors in connection

13   with the current plan and settlement agreement?

14              MR. SHORE:   Object to form.

15        A.    I had one conversation with one person

16   from one of the sponsors.

17        Q.    And who was that?

18        A.    Jonathan Smidt.

19        Q.    And what was the nature of that

20   conversation?

21        A.    The inappropriately named "sore loser"

22   provision.

23        Q.    Did you have any discussions with any

24   of the equity sponsors concerning their being

25   released by any settlement agreement or plan of

1                    KIRK BAKER

2   reorganization?

3       A.    I don't recall any specific

4   conversations.  The only conversation I had with

5   a sponsor was with Jonathan that -- since the

6   bankruptcy has been filed.  I -- as we said

7   earlier, certainly I've stayed in contact with

8   the sponsors over the years.

9       Q.    And I'm really focusing on the period

10  of from the Sunday of The Masters up until the

11  present.

12      A.    Got it.

13      Q.    Okay.  Which, as I understood your

14  testimony, was when this deal really started to

15  take shape; is that fair?

16      A.    As I recall, that is the timeframe,

17  yes.

18      Q.    Did any of your advisors have any

19  negotiations with any of the equity sponsors, to

20  your knowledge?

21      A.    I'm not aware of anybody having

22  conversations with the sponsors, other than that

23  one conversation I had with Jonathan.

24      Q.    Now, you testified that you were

25  familiar with the definitive documents here and

1                         KIRK BAKER

2    that you reviewed those in anticipation of your

3    testimony today, correct?

4        A.    No.  What I said is, in connection

5    with me being in charge of the negotiation of

6    the transaction, I have read the definitive

7    documents at least once, if not twice, over the

8    course of their being drafted and signed.  I did

9    not read them in anticipation of my testimony

10   today.

11       Q.    And I apologize, I didn't mean to

12   misstate your testimony.

13       A.    Okay.  No.  No.

14       Q.    So you're generally familiar with the

15   settlement agreement?

16       A.    Generally, yes.

17       Q.    And you're aware that the settlement

18   agreement releases the equity sponsors; are you

19   aware of that?

20            MS. TERTERYAN:  Objection.  Vague.

21       A.    I am generally aware of that, yes.

22       Q.    Did you have any role in negotiating

23   that particular provision of the settlement

24   agreement?

25       A.    Did I specifically have a role in

1                    KIRK BAKER

2  negotiating the disarmament and settlement

3  provisions with the sponsors?

4      Q.    With regard to the releases of the

5  sponsors --

6      A.    No.

7      Q.    -- in particular?

8          MS. TERTERYAN:  Objection to form.

9      A.    No.  I know generally that they exist.

10 I know that that was some of the give and take,

11 but no.

12     Q.    Did you or the persons or entities

13 that you were negotiating on behalf of -- which

14 I think we've been referring to generally as the

15 Hunts; is that fair?

16     A.    Yes.

17     Q.    Did they have a position in connection

18 with the release of the sponsors?

19          MR. SHORE:  Object to the form.

20     A.    Yes.  Generally, our position was

21 before we would agree to any inappropriately

22 named "sore loser" provision, all the parties

23 had to agree on the other elements of the plan

24 support agreement.  So, to the extent that that

25 release or part of the disarmament was some of

1                          KIRK BAKER

2    the negotiation that was necessary, we were

3    interested in those reaching closure so that we

4    could talk about the disarmament and get on with

5    the execution of the transaction.

6         Q.    Were you involved personally in

7    connection with those negotiations --

8         A.    No.

9         Q.    -- relating to the plan sponsors?

10        A.    No.

11              MR. BECKWITH:  Let him get his

12   question out.

13              THE WITNESS:  Sorry.

14        Q.    I'm talking as fast as I can.

15              Did the Hunts care one way or the

16   other whether the sponsors were released

17   ultimately?

18              MR. SHORE:  Object to the form.

19              MS. TERTERYAN:  Object to the form.

20        A.    We cared, in achieving our business

21   objective of acquiring Oncor, being able to help

22   EFH exit bankruptcy.  To the extent that a

23   sponsor's release was important to help achieve

24   those objectives, it was important to us.

25        Q.    How would the sponsor's releases help

1                       KIRK BAKER

2    EFH exit from bankruptcy?

3              MS. TERTERYAN:  Object to form.

4              MR. SHORE:  Object to form.

5       A.    From our perspective, generally, to

6    the extent that those releases' disarmament, all

7    releases were part of a negotiated plan support

8    agreement that allowed people to ask us for a

9    provision where we would agree to stand down if

10   we were not ultimately successful in closing the

11   transaction, that helps facilitate people

12   signing a plan support agreement and moving

13   forward with executing the transaction.  That's

14   why it would be important to us.

15      Q.    And I guess my question, more

16   specifically, was how does the release of the

17   sponsors directly impact that?

18             MS. TERTERYAN:  Object to form.

19             MR. BECKWITH:  Asked and answered.

20      A.    I don't know how it specifically

21   affects the efficacy other than it was part of

22   the package that's completely negotiated.

23      Q.    You testified earlier about releases

24   of the T-side claims.  Do you recall that?

25      A.    I recall generally being asked some

1                        KIRK BAKER

2    questions about that, yeah.

3         Q.    And that there were releases of the

4    T-side claims against the debtors and others as

5    well as a release intercreditor on the T-side.

6              Do you recall that, two different

7    settlements?

8              MR. SHORE:  Object to the form.

9         A.    That's my understanding.

10        Q.    What is your understanding of the

11   claims that may have gone between the E-side and

12   the T-side?

13             MR. SHORE:  Object to form.

14             MS. TERTERYAN:  Object to form.

15        A.    You know, generally, there were

16   intercompany claims.  We did not spend much time

17   thinking about those claims.

18        Q.    So if I were to ask you, could you

19   tell me any of those claims as you sit here

20   today, the E-side claims against the T-side?

21             MS. TERTERYAN:  Object to form.

22             MR. SHORE:  Objection.

23        A.    I couldn't say with any specificity.

24   I think some of them may have -- I think I

25   recall people suggesting some may have come up

KIRK BAKER

1
2   under the Tax Sharing Agreement, but I'm not
3   sure.   That might not even be the right
4   agreement.
5       Q.    And how about any claims that the
6   T-side may have against the E-side?
7            MS. TERTERYAN:   Object to form.
8       A.    I'm aware that there were some
9   intercompany claims made.   They may also be
10  under that tax allocation or sharing agreement.
11  I'm not sure which one it is.   And I would
12  recall generally that I thought the -- the only
13  time I've ever really heard much about the
14  independent directors, I thought the independent
15  directors of each side got together and agreed
16  on a number.
17      Q.    Okay.   If that's your understanding.
18      A.    Yeah, I don't know if it's right,
19  but...
20      Q.    Do you recall the first time that you
21  remember anyone talking about the release of the
22  sponsors?
23           MR. BECKWITH:   So I'm going to object
24      to the extent that requires you to reveal an
25      attorney-client communication.   I don't

1                          KIRK BAKER

2       think counsel is seeking to invade that

3       privilege.

4               MR. SHEPPARD:  I am not.

5               MR. BECKWITH:  But to the extent it's

6       somebody else, you can reveal that.

7       A.      You know, I don't recall with

8   specificity the first time it ever came up that

9   there would need to be a release of the

10  sponsors.  As I indicated before, I have had

11  conversations with the sponsors' advisors, and

12  it would have been discussed then.  It would

13  have been something important to him.

14      Q.      And important to who?

15      A.      Steve Zellen.

16      Q.      And did Mr. Zellen tell you why it was

17  important to him and/or the sponsors?

18      A.      I think, as I recall, it gives closure

19  to the case.

20      Q.      And do you recall approximately when

21  that conversation with Mr. Zellen was?

22      A.      I first had conversations with Steve

23  after -- at about the same time, but I believe

24  after my initial conversation with Tom Lauria.

25      Q.      So approximately when was that?

1                       KIRK BAKER

2       A.      Somebody said before when The Masters

3    was.

4       Q.      April.

5       A.      Okay.   Sometime in April.

6       Q.      And when is the first time that you

7    recall any discussion regarding the releases of

8    the current and former directors and officers of

9    EFH?

10      A.      The first time there was a discussion

11   of that?   That would have been in connection

12   with our first round bid.

13      Q.      And how was it in connection with your

14   first round bid?

15      A.      I believe it was a requirement that

16   there would be releases to the extent that a

17   party bidding could give a release and

18   indemnification of the directors and officers on

19   a go-forward basis.

20      Q.      So it's your recollection that it was

21   part of the bidding procedures?

22      A.      Yes.

23      Q.      Did the Hunt bid include those

24   releases?

25      A.      To the extent that we could give

1                          KIRK BAKER

2   release, it would have included releases, but

3   the requirement was more that the -- if Hunt had

4   acquired under the first or second bid, that we

5   would have continued to indemnify the directors

6   and officers.

7       Q.    Do you still have Baker 6 there --

8       A.    Somewhere.

9       Q.    -- Mr. Baker, which is the e-mail

10  6/6/2015?

11      A.    Got it.

12      Q.    Okay.  Let me direct your attention to

13  the second page or, I guess, back page of that.

14            Are you there?

15      A.    I'm here.

16      Q.    Okay.  So if you go back -- and just

17  to orient us, this is an e-mail from Preston

18  Bernhisel at Baker Botts, right?  And he's your

19  counsel?

20      A.    He is.

21      Q.    And this appears to be an e-mail

22  laying out open issues in connection with the

23  negotiations; is that fair?

24      A.    Yes.

25      Q.    Okay.  If you turn then to the second

1                        KIRK BAKER

2    page, sub (c), do you see that?

3        A.    Uh-huh.

4        Q.    "Indemnification for D&Os with respect

5    to violations of antifraud statutes."

6              What is your understanding of what's

7    being sought there?

8              MR. SHORE:  Object to the form.

9        A.    What's being sought?  You mean -- if

10   you're asking what was the open issue in our

11   discussions that Preston was pointing to, as I

12   recall, it was whether or not if we -- if a Hunt

13   consortium acquired Oncor pursuant to one of the

14   bids, whether or not that continuing entity

15   would provide indemnification for directors and

16   officers for claims against them relating to

17   fraud.

18       Q.    And to your knowledge, were the Hunt

19   consortium, were they willing to do that?

20       A.    It was an open issue in both of the

21   bids that we submitted, as I recall.

22       Q.    Do you recall who in the negotiations

23   requested that indemnification?

24       A.    I don't recall specifically.

25             K&E.

1                      KIRK BAKER

2      Q.    I don't think your attorney wants you

3  to speculate.

4      A.    Okay.

5          MR. BECKWITH:  Well, no, he just

6      answered.

7          MR. SHEPPARD:  To the best of your

8      recollection.

9          MR. BECKWITH:  He can do whatever he

10     wants.  He said K&E.  If you want to follow

11     up, follow up.

12     Q.    Do you know who at K&E?

13     A.    No.

14     Q.    And how is it that you would know it

15  was K&E?

16     A.    I don't know that it was K&E.  I

17  voluntarily said probably K&E.  I could not

18  recall specifically.

19     Q.    Okay.

20     A.    My mistake.

21     Q.    Now, can we turn to Baker 9, please.

22  This is an e-mail dated 6/11/2015 from Geoffrey

23  Newton, who I believe you testified again is one

24  of your attorneys at Baker Botts; is that

25  correct?

                         KIRK BAKER

1

2    A.    That is correct.

3    Q.    And you're CC'd there, right?

4    A.    Yes.

5    Q.    Again, this is another e-mail laying

6    out a list of issues for a telephone conference

7    at 1 o'clock regarding the negotiations relating

8    to what became the plan, right?

9    A.    Yes.

10   Q.    All right.  Turn to the third page of

11   the e-mail, if you would, number 22.

12   A.    Uh-huh.

13   Q.    Okay.  It says, "Post-Closing

14   Indemnification.  We should discuss to what

15   extent we are willing to provide post-closing

16   indemnification to former directors and officers

17   of EFH, EFIH and the sponsors."

18         Do you see that?

19   A.    I do.

20   Q.    Okay.  First off, who is the "we" in

21   that paragraph?

22   A.    I'm assuming it's the parties who took

23   place in the 1 o'clock telephone conference and

24   that might have included all -- Geoff and all

25   the people in the "to" line.

KIRK BAKER

1

2    Q.    Do you recall any particular

3  negotiations regarding this provision in number

4  22?

5    A.    No, I don't recall any specifics about

6  number 22.

7    Q.    Do you know who proposed to include

8  this as part of the agreement?

9        MS. TERTERYAN:  Object to form.

10   A.    The -- we would have generally known

11 at the time, because of our discussions around

12 the bid procedures, that indemnification was

13 important to the directors and officers.

14   Q.    Was it important to anyone else in the

15 negotiations?

16       MS. TERTERYAN:  Object to form.

17   A.    It was important to us to the extent

18 that it was important to other parties to the

19 transaction.  So I don't know to whom else it

20 would be.

21   Q.    So you don't know to whom else it

22 would have been important?

23   A.    Other than us, because it would help

24 facilitate the transaction, I don't know.

25   Q.    And how does providing a post-closing

1                      KIRK BAKER

2    indemnification to former directors and officers

3    of EFH, EFIH and the sponsors help the Hunts get

4    to closing?

5              MS. TERTERYAN:  Object to form.

6         A.    Okay.  I'm going to have to step back

7    and say, generally, it's been in my experience

8    in an acquisition transaction that former

9    officers and directors continue to be

10   indemnified for actions that they took prior to

11   the time of the acquisition.  There's not a

12   tailed cut-off.

13        Q.    That's for the former officers and

14   directors.  How about specifically for the

15   equity sponsors.  How does that help the Hunts

16   emerge from bankruptcy?

17             MS. TERTERYAN:  Objection to form.

18             MR. BECKWITH:  Objection.  You need to

19        rephrase that.

20        Q.    I'll try to rephrase it.

21             MR. BECKWITH:  The Hunts aren't in

22        bankruptcy.

23        Q.    How does that assist EFH in emerging

24   from bankruptcy?

25             MS. TERTERYAN:  Object to form.

1                        KIRK BAKER

2              MR. BECKWITH:  Asked and answered.

3        A.    You know, I didn't ask specifically

4  how any one party was or was not released would

5  help us achieve our goal of acquiring Oncor as

6  efficiently as possible.  In connection with a

7  number of conversations and negotiations, this

8  provision was -- we were told was important.

9        Q.    And you were told it was important by

10  whom?

11        A.    I believe initially by -- in the

12  conversations I think it was K&E.  It may have

13  been people at EFH, and the releases and

14  indemnification was important to Mr. Zellen as

15  well.

16        Q.    And was that communicated to you in

17  that same conversation that you mentioned about

18  Mr. Zellen before?

19              MS. TERTERYAN:  Object to form.

20        Q.    Or was it a different conversation?

21              MS. TERTERYAN:  Object to form.

22        A.    I don't recall the specific

23  conversation.  We have spoken more than once.

24        Q.    Okay.  Did the Hunts consider carving

25  out the claims against the sponsors?

1                       KIRK BAKER

2        A.     No.

3        Q.     And not releasing those claims?

4        A.     No.

5        Q.     Did anyone in the negotiations

6    consider carving out the releases against the

7    sponsors, to your knowledge?

8        A.     To my knowledge, no.

9             MR. SHEPPARD:  Let's -- I don't know

10        if this was marked as an exhibit or not.

11             MR. BECKWITH:  What is it?  I can

12        maybe help you.

13             MR. SHEPPARD:  June 29, 2015.

14             MR. HARDIMAN:  The one from K&E?

15             MR. BECKWITH:  Baker 10.  This one?

16             I'll hand you mine.

17             MR. SHEPPARD:  I'm just wondering if

18        it's part of the same e-mail chain.

19             No, it's not.  It's different.  So why

20        don't we mark this as Baker 11.

21             (Baker Exhibit 11, an e-mail from

22        Thomas Lauria to Luckey McDowell and

23        Geoffrey Newton, dated 6/29/15, bearing

24        Bates Nos. EFH HUNT 0004663 through 664,

25        marked for identification, as of this date.)

KIRK BAKER

1

2  BY MR. SHEPPARD:

3      Q.    I have handed you what has been marked

4  as Baker Exhibit 11, Mr. Baker.  Do you see

5  that?

6      A.    I see it.

7      Q.    Okay.  And you are not on this, at

8  least according to the header here, but

9  McDowell, Luckey; Newton, Geoffrey; those two

10  gentlemen are your attorneys, are they not?

11     A.    They are.

12     Q.    And Mr. Lauria was representing the

13  T-uns, correct?

14     A.    He still does, yes.

15     Q.    At the time of this e-mail?

16     A.    Yes.  The best of my knowledge, yes.

17     Q.    Why don't you skip down then to

18  paragraph 4.

19     A.    The one numbered 4?

20     Q.    Yes.  I'm sorry, paragraph numbered 4

21  there, not the fourth paragraph.  Just take a

22  minute to read that and then I'll just have a

23  couple of questions.

24           (Document review.)

25     A.    Okay.

1                       KIRK BAKER

2      Q.    Okay.  Why don't we start with,

3   generally, what is it that Mr. Lauria here is

4   talking about in this paragraph 4?

5            MR. SHORE:  Objection to form.

6      A.    I believe this paragraph generally

7   describes the most of the provisions of the

8   disarmament provision, as I recall the

9   negotiations.

10     Q.    And "if we don't get the PLR re:

11  spin," what does that mean?

12     A.    Means get a private letter ruling from

13  the Internal Revenue Service that allows for a

14  spinoff of the -- the T-side assets in a

15  tax-free manner.

16     Q.    And then if you jump ahead, it says

17  the tax management agreement terminates, the PSA

18  terminates.

19            Is that the plan support agreement?

20            MR. SHORE:  Objection to form.

21     Q.    PSA?

22     A.    I believe that's what Tom would be

23  referring to.

24     Q.    Okay.  And is it your understanding

25  that the PSA does terminate if you don't get the

1                         KIRK BAKER

2    private letter ruling?

3              MR. SHORE:  Objection to form.

4        A.    It's a condition precedent.

5        Q.    And then just skipping down a little

6    bit further, you see where it says about the

7    9019 order?

8        A.    Uh-huh.

9        Q.    Separate 9019 order?  Do you see that?

10       A.    I see it.

11       Q.    What is your understanding of what the

12   separate 9019 order would include?

13             MR. SHORE:  Objection to form.

14       A.    I don't know what a 9019 order is.

15   What follows that is what I have heard to and I

16   too have referred to generally as the

17   disarmament provisions.

18       Q.    And it says there the T-uns get a $500

19   million senior unsecured claim versus T and the

20   $700 million claim versus E in exchange for the

21   release of the T-firsts, the sponsors and

22   EFH/EFIH, do you see that?

23       A.    I do.

24       Q.    Is that your understanding of what the

25   settlement agreement does?

Page 187

1                         KIRK BAKER

2              MR. SHORE:  Objection to form.

3              MS. TERTERYAN:  Object to form.

4         A.    You know, I don't recall with

5    specificity if these are the exact provisions

6    that are in the settlement agreement.  We could

7    look at the settlement agreement and find those

8    provisions and see if they track it.

9              Generally, that is -- generally,

10   that's my understanding of what it would do.

11             MR. SHEPPARD:  Why don't we just go

12        off the record for a second and I think that

13        may be all I have.  Just give me a minute.

14             (Discussion off the record.)

15             (Pause in the proceedings.)

16             MR. SHEPPARD:  Just one last question,

17        Mr. Baker.

18   BY MR. SHEPPARD:

19        Q.    Going back to the bid procedures that

20   you talked earlier, do you have any

21   understanding of why those bid procedures

22   included a release of the sponsors?

23             MS. TERTERYAN:  Object to form.

24             MR. BECKWITH:  I did not hear the end.

25        I'm sorry.

1                    KIRK BAKER

2      Q.    Why those bid procedures included a

3   release of the sponsors?

4           MS. TERTERYAN:  Object to form.

5      A.    I don't know.

6           MR. SHEPPARD:  Thank you.

7           MR. PEDONE:  Short break while we

8      switch seats.

9           (Pause; Time Noted: 5:40 p.m.)

10          (Time Noted:  5:41 p.m.)

11   EXAMINATION BY

12   MR. PEDONE:

13     Q.    Mr. Baker, I'm Richard Pedone, counsel

14   for American Stock Transfer, which is the

15   Indenture Trustee for the bond debt at EFH Corp.

16          How is the apportionment of equity

17   between Hunt and the other investors arrived at?

18     A.    Just negotiation.

19     Q.    Who participated in the negotiation?

20     A.    All of the equity participants.

21     Q.    How were the interests of the various

22   parties valued?

23          MR. SHORE:  Objection to the form.

24     A.    I'm sorry, I don't understand.

25     Q.    Sure.  Was the -- I'll come back to

KIRK BAKER

1

2    it.

3        A.    I'm sorry, I'm not trying to be

4    difficult.  Let me -- everyone's putting in

5    cash, so that's why I didn't understand the

6    value of each person's interest.

7        Q.    Sure.  How was the amount of cash or

8    the percentages of equity that each side could

9    put in arrived at?

10        A.    Oh, pure negotiation.

11            MS. TERTERYAN:  Object to form.

12        Q.    And were, aside from the cash that the

13    parties are bringing to the table for the

14    investment, was it considered that anyone was

15    bringing any other consideration to the

16    transaction?

17        A.    Yes, the T-uns are valuable.  They

18    were valuable partners because they had the

19    ability to agree to the very -- the exact

20    disarmament provision that we've been

21    discussing, but there is no valuation of it.

22    That's just they're valuable parties because of

23    that.

24        Q.    So you're not aware of any valuation

25    that has been done of that contribution, so to

KIRK BAKER

1  speak, that the T-uns are bringing to the table?

2          MS. TERTERYAN:   Object to the form.

3          MR. SHORE:   Object to the form.

4     A.    I'm not aware of any valuation of the

5  claims released or received one way or the other

6  under the disarmament provisions.

7     Q.    And what's the value of the interest

8  that will be purchased?

9          MR. SHORE:   Objection to the form.

10    A.    The value of the interest will be

11 purchased.  Everybody just gets a -- they buy a

12 unit for every dollar contributed.  I'm not --

13    Q.    They're buying a unit into a new

14 company, correct?

15    A.    Sure.  Each share is valued at the

16 purchase price.

17    Q.    And what is the purchase price?

18         MR. SHORE:  Objection to form.

19    A.    That's a significantly more difficult

20 question than you might have anticipated.  I

21 think the purchase price depends on how much you

22 have to pay to the creditors on the E-side under

23 claims that they're continuing to pursue.

24    Q.    And aside from payments on claims, is

1                        KIRK BAKER

2    there any other component to the purchase price?

3            MR. SHORE:  Object to the form.

4    A.    No.

5    Q.    So you don't consider whatever

6    intangible value you referred to that the T-uns

7    are bringing to the table to be the equivalent

8    of any monetary consideration that would go into

9    the purchase price or other consideration that

10   should be considered in the purchase price?

11           MS. TERTERYAN:  Object to form.

12   A.    I've never seen a valuation of it.  No

13   one received credit, equity credit for it, so...

14   Q.    What do you know about the merits of

15   the claims that will be resolved in the

16   settlement?

17           MR. SHORE:  Object to the form.

18           MS. TERTERYAN:  Object to the form.

19           MR. BECKWITH:  Objection.  Asked and

20       answered.

21   A.    I've never --

22           MR. BECKWITH:  Vague.

23   A.    Generally, I have not done any

24   analysis of the claims.

25   Q.    Did you have any discussions with

1                    KIRK BAKER

2   Stacey Doré about the value of those claims?

3        A.    Specifically about the value of the

4   claims?  No.

5        Q.    Did you ever have any discussions with

6   anyone else at EFH Corp. about the value of the

7   claims?

8        A.    Specifically about the value of the

9   claims, no.

10       Q.    Did you ever discuss the claims with

11   Stacey Doré?

12       A.    Sure.

13       Q.    And what did she say to you?

14       A.    They were very important to her and

15   they were important to the debtor as part of the

16   negotiation of the ultimate plan support

17   agreement.

18       Q.    And why were they important?

19            MS. TERTERYAN:  Objection.  I would

20       just like to caution the witness that to the

21       extent he's answering after August 9, to

22       preserve the common interest privilege.

23            MR. BECKWITH:  That's fair.

24            THE WITNESS:  Okay.  Thank you.  I'll

25       be careful.

**<u>Exhibit 3</u>**

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 4

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

**Exhibit 5**

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

**Exhibit 6**

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

**Exhibit 7**

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 8

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

**Exhibit 9**

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

SC1:3974781.2

**Exhibit 10**

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

**Exhibit 11**

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 12

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 13

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

**Exhibit 14**

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

**<u>Exhibit 15</u>**

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                        :

                                   :    Chapter 11

6    ENERGY FUTURE HOLDINGS        :

     CORP.,  et al.,               :    Case No. 14-10979(CSS)

7                                  :

             Debtors.              :    (Jointly Administered)

8    _____

9

10

11

12                                 United States Bankruptcy Court

13                                 824 North Market Street

14                                 Wilmington, Delaware

15

16

17                                 November 3, 2014

18                                 1:06 PM - 1:34 PM

19

20

21    B E F O R E :

22    HON CHRISTOPHER S. SONTECHI

23    U.S. BANKRUPTCY JUDGE

24

25    ECR OPERATOR:  LESLIE MURIN

1           I will start with the legal standard, but first I

2     want to address the specific objection relating to what is

3     it that the debtors are seeking here.

4           Several of the objectors have argued that the

5     debtors are seeking to sell the equity in reorganized EFH

6     Corp. which is an asset that doesn't currently exist and

7     that the debtors do not and will never own.  That is an

8     inaccurate description of what is going on here.

9           The debtors are seeking competitive bids to enter

10    into a transaction of any type with regard to Oncor.  They

11    have made it clear however that they favor their preferred

12    tax plan, so it is fair to view the motion as seeking a

13    transaction that would serve as the basis for a

14    reorganization plan.  In that instance they are not

15    specifically selling an asset, but Section 363(b) is not

16    limited to the sale of assets.  It states that a debtor may

17    use, sell, or lease property.

18           Here the debtors are auctioning off the right to

19    enter into a contract that will serve as the basis for a

20    proposed plan of reorganization.  That is clearly within the

21    ambit of Section 363.  Excuse me.

22              Moving on.  The bidding procedures motion and

23    the proposed bidding procedures are clearly outside the

24    debtors' ordinary course of business and require Court

25    approval after notice and a hearing.

1              Let me pause here and address the point that the

2      debtors are seeking something they normally would not.

3      Advance approval of bidding procedures to select a stalking

4      horse bidder.

5              Implicit in that argument is that the Court could

6      provide greater deference to the debtors' proposed action.

7      The Court disagrees.  Even were the debtors not to have

8      sought prior Court approval of bidding procedures for

9      selection of a stalking horse that decision, i.e., the

10     selection of the stalking horse, would require Court

11     approval and would be integral to the Court's decision as to

12     whether to approve the stalking horse.

13             The question then would be how did we get here?

14     In other words, the stalking horse bidding procedure would

15     be subject to Court scrutiny either ahead of time as here or

16     afterwards as is normally done.

17             Moreover, the evidence here strongly suggests that

18     all of the bidding action is likely to occur prior to the

19     selection of a stalking horse bidder.  Thus Court and

20     creditor involvement at this stage is important.

21             To approve the motion the Court must find that the

22     debtors have satisfied the business judgment standard under

23     363(b)(1), i.e., is the proposed action supported by a sound

24     business reason and based on a sound exercise of business

25     judgment?

1            The business judgment test here differs from the

2    general corporate law business judgment rule which protects

3    corporate directors are liability when they have exercised

4    due care and are not self-interested in the transaction.

5            Here by contrast the Bankruptcy Court reviews the

6    debtors' business judgment to determine independently

7    whether the judgment is a reasonable one.

8            The Court should not substitute its judgment for

9    the debtors; however, but should determine only whether the

10   debtors' judgment was reasonable and whether a sound

11   business justification exists supporting the transaction and

12   its terms.

13           That said, in making the Court's determination it

14   might import where appropriate principals of state law

15   governing the exercise of fiduciary duties such as requiring

16   a debtor to demonstrate the entire fairness of a proposed

17   transaction where the directors and/or management are self-

18   interested.

19           The Court does not find however that the debtors

20   need satisfy the entire fairness standard in connection with

21   the bidding procedures motion, rather the Court finds that

22   the debtors have satisfied the business judgment standard

23   under Section 363(b) and will grant the bidding procedures

24   motion subject to several significant and important

25   conditions.

1           The Court finds that the business decision to

2    market the Oncor business and prosecute the bidding

3    procedures motion was the result of flawed and insufficient

4    corporate governance.

5           The implied authority given to the co-chief

6    restructuring officers was insufficient in the context of a

7    transaction of this magnitude and with such -- excuse me --

8    and with such a significant impact on the bankruptcy.

9    Chairman Evans' informal polling of the members of the

10   various boards was insufficient as well.

11          In order for the Court to approve the bidding

12   procedures as modified in this ruling the debtors must go

13   back to the boards of EFH Corp., EFCH, TCEH, and EFIH and

14   receive each boards' approval through a formal vote

15   assenting to the bid procedures as modified.

16          Based upon the conflicts involved at the TCEH and

17   EFIH levels that vote must be by that boards' independent

18   directors, which the Court understands to be Mr. Sawyer and

19   Mr. Cremens, respectively.

20          The assent of the boards of directors must be

21   communicated to the Court in a mechanism to be determined

22   before the Court's approval of the bidding procedures motion

23   and the modified bidding procedures will be effective.

24          Each boards' approval by vote, and in the case of

25   TCEH and EFIH, an independent vote will also have to be

1    obtained to approve the stalking horse and the ultimate

2    winning bidder.

3           The record is murky as to the details of the

4    various meetings of the various boards with regard to the

5    marketing and sale of the Oncor business.  We certainly know

6    that the various boards met several times and that these

7    issues were discussed at many, if not all, the meetings.

8    The testimony of Mr. Keglevic, Sawyer, and Cremens

9    establishes that at the EFH Corp. level, the directors in

10   all likelihood have satisfied their fiduciary duty of care.

11          The record is insufficient for the Court to make

12   such an observation at the TCEH and EFIH level.

13          Mr. Sawyer and Mr. Cremens occupy important

14   positions in this bankruptcy case as the independent

15   directors of TCEH and EFIH respectively.  It is incumbent

16   upon them to act vigorously in those roles.

17          Next, the Court finds that the bidding procedures

18   are not transparent and are inappropriate in a bankruptcy

19   case.  The procedures must allow for the substantive

20   involvement of some creditors on a real-time basis with the

21   ability for those creditors to communicate directly with

22   potential bidders.

23          The Court however is very sensitive to the

24   potential pitfalls associated with having two many cooks in

25   the kitchen, and especially when dealing with bidders that

Page 20

1    may be publicly held companies.

2             Thus the Court will limit the creditors'

3    participation to the two official committees of unsecured

4    creditors.  The longstanding TCEH committee and the newly

5    formed EFIH committee.  That participation will be limited

6    to a professional eyes only basis, and the number of

7    professionals under the tent, so to speak, will be limited

8    to a small number of legal and factual -- excuse me -- legal

9    and financial advisors, i.e., no more than five total

10   persons per committee.

11            Also the debtors' proposed cart blanche authority

12   to modify the bid procedures is unacceptable.  Any material

13   modification of the bid procedures will require either

14   consent of the official committees for Court approval which

15   can be sought on an in camera basis.

16            Finally, the proposed timelines must be stretched

17   somewhat to allow for sufficient time for any interested

18   party to develop an alternative transaction to the debtors'

19   preferred tax structure and the EFIH committee to select

20   advisors and at least start to get up to speed.

21            The Court notes that it does not consider its

22   review of the proposed bidding procedures as opposed to the

23   decision to pursue a proposed transaction as meriting

24   deference under the business judgment standard.

25            When the Court's authority is requested to

1    establish bid procedures the Court has an independent duty

2    to review those procedures on their merits with special

3    attention to questions of fairness and due process.  The

4    Court exercises its independent judgment in reviewing bid

5    procedures while keeping in mind that the Court is in no way

6    an expert at marketing or selling anything.

7              We are not reinventing the wheel here.  We all

8    know how to market and sell an asset in a bankruptcy.  The

9    immense size of this case in an $18 billion is certainly

10   unusual, and the involvement of public companies as bidders

11   is a complicating factor, but there is no reason to depart

12   with well-established practices that have been developed to

13   address the unique context of selling an asset in

14   bankruptcy.

15             Creditor and Court oversight of the debtors'

16   action outside the ordinary course of business, including

17   asset marketing and sales, is not only appropriate, but is

18   required by the law.

19             To that end I find the debtors' proposed provision

20   in the bid procedures and order to give them unfettered

21   discretion to amend the bid procedures to be frankly

22   offensive.  I cannot imagine a set of circumstances in which

23   I would knowingly approve such a transaction -- or provision

24   -- excuse me.

25             I'm not going to rule on the specifics of the bid

1    procedures on an item by item basis, my ruling is that the

2    official committees must be substantive involved on a real-

3    time basis, have the ability to speak directly with

4    potential bidders, and have consent rights to changes in the

5    procedures.

6            As to timing, in order for the debtors' statement

7    that they are open to any transaction to be anything more

8    than lip service more time must be provided to allow any

9    such transaction to be formulated.  I believe that Mr. Hiltz

10   is probably correct that such an alternative transaction is

11   unlikely, but the debtors have made a point of being open to

12   such transactions and I'm going to hold them to it.

13           Also, I believe that the time periods between

14   rounds one, round two, and the entering into a stalking

15   horse agreement are too tight in a bankruptcy context.

16   While I'm sure they are probably appropriate in a normal M&A

17   transaction, more time is needed to deal with the

18   complexities involved in bankruptcy, including the

19   involvement of the creditors.

20           Finally some limited amount of time is required to

21   allow the EFIH official committee to be in a position to

22   participate meaningfully in the process.

23           I am looking to the TCEH official committee and

24   the debtors to work out the details as to the bid procedures

25   based on my rulings.

1              The EFIH committee should participate to the

2      extent it is sufficiently organized to do so in a timely

3      manner.

4              At the same time I want to make it clear that I am

5      not overruling or altering any accommodations that the

6      debtors have already made to resolve objections.

7              Also, I am not allowing the objectors, other than

8      the official committees, under the tent.  I understand their

9      passion on this issue and their significant financial stake,

10     but that is outweighed by my concern over confidentiality.

11     The risk of leaking of confidential information expands

12     exponentially as parties are added to the process, and the

13     risk of that exposure might lead an otherwise interested

14     bidder from participating, which would be harmful to the

15     process.

16              That said, my ruling with regard to limiting

17     involvement in the process to the debtors and the official

18     committees is limited to the period relating to selection of

19     a stalking horse.

20              Access to information, involvement, et cetera,

21     during the open marketing process should be more robust.

22     That can be addressed either at this point, which would

23     require the input of all the objectors, or at the stalking

24     horse hearing.

25              Circling back to the corporate governance issue.

1            I am also reluctant to specify the exact manner in

2    which the debtors are to inform the Court and the parties

3    regarding whether the various boards have voted to approve

4    the bids procedures as modified.  I think that either board

5    merits or certifications specifying the action taken in the

6    manner in which the issue is determined, i.e., who was

7    present, were presentations made, et cetera, should be

8    sufficient.  I look to the debtors and the objectors to work

9    out a reasonable procedure.  If you cannot work it out I

10   will get involved in the process.

11           It probably makes sense to codify that procedure

12   in a court order, and it may make sense to have a bidding

13   procedures order that contains as a condition to its

14   effectiveness submission of that information.  Again, the

15   Court will look to the objectors and the debtors on this.

16           Just to be clear, however, we are not going to

17   have another hearing on the merits of the decision.  If the

18   Court is unsatisfied with the submission of the results of

19   the boards' deliberations either in form or substance the

20   Court will inform the parties.

21           Similar submissions will need to be made in

22   connection with approval of stalking horse agreement and the

23   ultimate winning bidder.

24           There was a tremendous amount of evidence elicited

25   by the objectors in an attempt to challenge not just the

1    process by which the debtors made their decision to pursue

2    marketing the Oncor business, which I previously addressed,

3    but the substance of that decision as well.

4              The objectors argue that the debtors are making a

5    critical error in pursuing their preferred tax transaction

6    at all, marketing Oncor prior to even beginning negotiations

7    over a plan with the creditors, freezing out creditors in

8    the process, and several other arguments.

9              Moreover, the objectors assert that the filing and

10   pursuit of this motion drastically undercuts the progress

11   that had been made over the summer in establishing the

12   protocols regarding investigations of claims, et cetera.

13             At heart the objectors take issue with the

14   debtors' entire reorganization strategy.

15             In making its ruling the Court is specifically not

16   opining on the merits of the debtors' -- the merits of the

17   debtors' proposed course of action nor its preferred tax

18   structure.  The business judgment standard correctly

19   requires deference to a debtor's business and reorganization

20   strategy, especially during exclusivity.  There is no where

21   near a sufficient record before the Court for it to take the

22   extraordinary step of overruling the debtors' proposed

23   decision to market its assets or to pursue a specific

24   negotiation strategy in developing its proposed plan of

25   reorganization.

**<u>Exhibit 16</u>**

```
                                              Page 1
 1   UNITED STATES BANKRUPTCY COURT
 2   DISTRICT OF DELAWARE
 3
 4
 5   In re:                    :
                               :  Chapter 11
 6   ENERGY FUTURE HOLDINGS     :
     CORP.,  et al.,            :  Case No. 14-10979(CSS)
 7                             :
             Debtors.          :  (Jointly Administered)
 8   _____:
     AVENUE CAPITAL MANAGEMENT II, :
 9   LP, on behalf of certain   :
     investment funds it advises, :
10   GSO CAPITAL PARTNERS LP, on :
     behalf of certain funds and :
11   accounts it manages, P.    :
     SCHOENFELD ASSET MANAGEMENT :
12   LP, and investment manager on :  Adversary Proceeding
     behalf of certain of its   :  No. 14-50797 (CSS)
13   affiliated investment funds, :
     THIRD AVENUE MANAGEMENT LLC, :
14   on behalf of certain funds it :
     manages, and NEW YORK CAPITAL :
15   MANAGEMENT GLOBAL ADVISORS,  :
     LLS, on behalf of certain   :
16   funds and/or accounts managed :
     or advised by it and/or its :
17   affiliates,                :
                               :
18            Plaintiffs,       :
                               :
19       v.                     :
                               :
20   FIDELITY INVESTMENTS,       :
     FIDELITY ADVISOR SERIES II: :
21   FIDELITY ADVISOR STRATEGIC   :
     INCOME FUND, FIDELITY SCHOOL :
22   STREET TRUST: FIDELITY       :
     STRATEGIC INCOME, FIDELITY   :
23   SUMMER STREET TRUST: FIDELITY :
     CAPITAL & INCOME FUND,       :
24   PYRAMIS GLOBAL ADVISORS TRUST :
     COMPANY, as Investment       :
25   Manager Under Power of       :
```

1            THE COURT:  Okay.

2            MR. SASSOWER:  Since they've been hired we've had

3    a number of meetings and calls with Sullivan to get them as

4    fully up to speed as possible.

5            Your Honor, I'd also like to introduce to you

6    several other professionals.  As Your Honor may have seen on

7    November 7th the debtors filed a notice with the Court that

8    each of EFH, EFIH, and EFCH and TCEH were in the process of

9    retaining independent advisors to advise on actual

10   conflicts.  That notice is docket entry 2570.

11           The decision of who to hire was left entirely in

12   the hands of the disinterested directors at each estate.

13   Hugh Sawyer for TCEH, Chuck Cremens at EFIH, and Don Evans

14   and Billi (ph) Williamson at EFH.

15           Consistent with the retention protocol prior to

16   interviewing any candidates these disinterested directors

17   consulted with the unsecured creditors at their estates.

18           Specifically, Mr. Sawyer consulted with

19   representatives of the ad hoc group of unsecured bond

20   holders at TCEH, the TCEH second lien indenture trustee, and

21   the TECH official committee, as well as the ad hoc group of

22   TECH first lien holders.

23           Similarly, Mr. Cremens consulted with

24   representatives of the ad hoc group of the EFIH PIC

25   noteholders and the newly formed EFH/EFIH official

1    committee.

2         Finally, Mr. Evans and Ms. Williamson consulted

3    with representatives of Fidelity, the ad hoc group of what

4    we'll call non-Fidelity noteholders at EFH, and the new

5    EFH/EFIH committee.

6         After consulting with their respective

7    constituents the disinterested directors interviewed

8    multiple firms in person.

9         Mr. Sawyer selected Munger, Tolles as TCEH's

10   independent counsel, and Greenhill (ph) as TCEH's

11   independent investment banker.  Mr. Tom Walper of Munger,

12   Tolles is on the phone today, he has a live speaking line if

13   Your Honor would like to address him.

14        Mr. Cremens selected Cravath as EFIH's independent

15   counsel, and Mr. Rich Levin from Cravath is in the courtroom

16   today.

17        And Mr. Evans and Ms. Williamson selected

18   Proskauer Rose as EFH's independent counsel, and Messieurs

19   Jeff Marlow and Mark Thomas from Proskauer are in the

20   courtroom today.

21        We've also been working to get these new advisors

22   up to speed as quickly as possible, and in the cases of

23   Messieurs Walper and Levin they have already had in person

24   meetings with the primary creditor representatives at their

25   respective estates.

1            Each of the debtors will be filing retention

2    motions for the independent advisors in the coming days.

3            Switching topics, Your Honor.  In your bidding

4    procedures opinion you strongly encouraged the debtors and

5    their stakeholders to commence plan negotiations as soon as

6    possible.  To this end the debtors conducted an all-hands

7    settlement conference yesterday.  Every major creditor

8    representative was there, over 60 people in attendance.

9    Technically there was a TCEH settlement conference and then

10   an EFH/EFIH settlement conference.  And we hope to hold more

11   of these meetings on a regular basis.

12           I will not disclose anything that was said at the

13   meeting or even try to characterize the meetings however as

14   the meetings were subject to 408 and confidentiality.  In

15   order for the settlement conferences to be productive people

16   need to speak freely, and they won't do that if they're

17   afraid that what they say in a conference will be used

18   against them in a courtroom.

19           Lastly, the parties are continuing to discuss the

20   bidding procedures, and the new advisors at each of the

21   estates are playing a key role in those discussions.

22           The debtors and some of their creditors may be

23   interpreting your opinion differently, but we hope that we

24   can work out those differences amongst ourselves, if not

25   we'll be back to you for additional guidance.

1          THE COURT:  No matter how hard you try to be

2     clear.

3          MR. SASSOWER:  With that, Your Honor, we have two

4     items on the agenda.  Both of them are uncontested.  The

5     debtors' motion to withdraw MHI from the Comanche Peak Joint

6     Venture, which reflects consensus with the TCEH creditors

7     and the newly formed EFH/EFIH committee, and the debtors'

8     non-proprietary hedging and trading motion with respect the

9     debtors have filed a certificate of counsel early this

10    morning.

11         My partner, Brian Schartz will be handling both

12    those matters after Mr. Dietderich's comments, and my

13    understanding is that Mr. Miller, as you know counsel to the

14    official T side committee, would also like to address Your

15    Honor this morning.

16         THE COURT:  Okay.  Very good.

17         MR. SASSOWER:  So with that I will yield the

18    podium to Mr. Dietderich.

19         THE COURT:  Very good.  Thank you.

20         MR. SASSOWER:  Thank you, Your Honor.

21         MR. DIETDERICH:  Thank you, Mr. Sassower.

22         Good afternoon, Your Honor.

23         THE COURT:  Good afternoon.

24         MR. DIETDERICH:  Andy Dietderich at Sullivan &

25    Cromwell for what I'll refer to as the EFH committee in

1    shorthand.  With me in the courtroom, my colleagues, Michael

2    Torkin and Brian Gl  uckstein, and our co-counsel, Natalie

3    Ramsey at Montgomery McCracken.

4         Your Honor, the committee is late to work, but

5    starting full throttle.  The committee was formed on the

6    27th, it has retained advisors, it has met as Mr. Sassower

7    suggested with virtually all the major groups in the case,

8    with the exception of the ad hoc committees and the

9    individual creditors for the T subsidiaries.

10        The constituency of the committee is important to

11   understand.  EFH and EFIH both has unsecured bondholders,

12   but EFH also has a diverse collection of other creditors.

13   It has trade creditors, it has employees and retirees, it

14   has important contingent creditors such as asbestos victims,

15   and it has, to the extent there are allowed claims,

16   potentially creditors in the form of its own subsidiaries,

17   particularly on the competitive side.

18        The committee is aware of this, and the committee

19   is approaching at least for the time being its work as if we

20   were fiduciaries directly or indirectly for all of the

21   creditors of the entire group.

22        The committee does not include despite their

23   presence as large holders in our constituency any of the

24   institutional investors who are sponsors for the

25   restructuring support agreement.  That is important, because

1    I think it allows us to take a view on the major issues of

2    this case that is fresh, that is independent of the history.

3    We've done a lot of work getting up to speed of that

4    history, we have no substantive view yet of the merits of

5    that transaction, but we're taking a fresh look and an

6    independent perspective on it.

7            We are hesitant to give any substantive view on

8    any issue in the case, but I think it is important for the

9    Court to understand that there are elements of the narrative

10   so far of which we are skeptical, and I would group those in

11   five areas.

12           First, there are not two silos.  There's a single

13   parent company, EFH, that owns three different groups of

14   companies.  EFIH and the Oncor business, EFCH and the

15   competitive subsidiaries, and a group of business service

16   companies that have positive book value, seem to have

17   interesting employee systems and contracts, and are wholly

18   owned by EFH, and EFH as the parent company is entitled to

19   marshal the residual value of all three groups of companies

20   and distribute it to its creditors.

21           Second, (indiscernible - 12:28:43) intercompany

22   claims is more complicated in our view than it may first

23   appear.  There are alleged intercompany claims from the

24   competitive subsidiaries against EFH.  There also appear to

25   be a list of claims by the parent company against those same

1    competitive subsidiaries.  We've yet to form a view on the

2    merits of any of those claims except to note that they are

3    claims and they will be resolved in an orderly process at

4    the right time in the case.

5              Three, we are not convinced that there is a

6    foreseeable chain of events at Luminant that would result in

7    stranded tax liability at EFH in any realistic set of

8    circumstances.  Our tax work is -- has been prioritized and

9    we're proceeding full throttle with that.  It benefits both

10   from all of the great tax work other professionals have

11   done, and people have been very forthcoming and willing to

12   share, but it also benefits my fresh look, and we would note

13   as a preliminary observation that EFH is a substantial

14   creditor of Luminant, which is the business that generates

15   the tax revenue and potentially the tax losses under the tax

16   sharing agreement and potentially other theories, and that

17   that claim by the parent company against Luminant sits side

18   by side with the OBO debt, and the priority of that claim

19   versus the OBO debt, unsecured or even secured, is something

20   that requires review.

21             Fourth, we are appreciative of being involved in

22   the Oncor process, but hopefully dubious of the views we've

23   heard so far.  We do not know what the right answer is for

24   Oncor, we encourage and will continue to encourage the

25   debtor to promptly explore all alternatives.

1          Fifth, we also are skeptical of what we've heard

2     from many stakeholders, that this case because of its

3     complexity is doomed to years of litigation before the

4     proceeds are finally distributed to creditors.  We do not

5     accept that fate.  There's certainly precedent for it, but

6     there's precedent for the alternative as well, and the

7     committee being entitled to the marginal dollar at the

8     parent is very focused on trying to put this puzzle together

9     in a way that's constructive and a way that allows value to

10    be distributed to creditors reasonably promptly.

11          In the very short term we greatly appreciate Your

12    Honor involving us even before we were here in the process

13    for the disposition of Oncor.

14          We have a few other housekeeping matters.  We're

15    working with the debtor on a stipulation to give us the

16    benefit of case protocols on discovery and on other matters.

17    We have an interpretive question we may need some guidance

18    on on what committee means now that the committee has split.

19    We are in discussions with the first lien lenders with

20    respect to having an appropriate challenge period for the --

21    for the first -- in the cash collateral order for the

22    stipulations in that arrangement, including the stipulation

23    for the liens.  And we're reviewing the EFIH make-whole

24    settlement to form a view on it.

25          We -- I should close, Your Honor, by noting that

1   we are deeply respectful of all of the work that has been

2   done before.  We do not need to invent the wheel if we don't

3   need to, and we hope to piggyback, for lack of a better

4   work, on all of the work product that has been done in the

5   case so far.  And people have been very forthcoming and very

6   cooperative in working with us to make sure that we can form

7   our own independent review with the minimum possibility of

8   delay.

9           THE COURT:  Very good.

10          MR. DIETDERICH:  So with that I will answer of the

11  Court, but thank you.

12          THE COURT:  I don't have any, but thank you very

13  much for your presentation.

14          MR. DIETDERICH:  Of course.  Thank you.

15          THE COURT:  Mr. Miller?

16          MR. MILLER:  Good afternoon, Your honor.  Brett

17  Miller, Morrison & Forrester for the T side committee as I

18  assume we will be known as going forward, even though we

19  have a debtor in our chain with an E to start off with we'll

20  go by T side.

21          We welcome Sullivan & Cromwell and Guggenheim to

22  the case.  We've been speaking and we will endeavor to

23  continue to work with them to get them up to speed.  It's

24  nice after six months not to be the new guy in the case, and

25  they bring some fresh ideas and we will continue to work

**Exhibit 17**

SC1:3974781.2

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4

5   In re:                          :
                                    :   Chapter 11
6   ENERGY FUTURE HOLDINGS          :
    CORP., et al.,                  :   Case No. 14-10979(CSS)
7                                   :
            Debtors.                :   (Jointly Administered)
8   _____    :
    ENERGY FUTURE INTERMEDIATE      :
9   HOLDING COMPANY LLC and EFIH    :
    FINANCE INC.,                   :
10                                  :
            Plaintiffs,             :
11                                  :   Adversary Proceeding
        v.                          :   No. 14-51002(CSS)
12                                  :
    UMB BANK, N.A., as INDENTURE    :
13  TRUSTEE,                        :
                                    :
14          Defendant.              :
    _____:

15

16

17

                            United States Bankruptcy Court
18
                            824 North Market Street
19
                            Wilmington, Delaware
20

21

22                          April 14, 2015
23                          10:39 AM
24

25

1    plan that the DDAs filed this morning.

2           Also on April 3rd the debtors circulated an

3    updated version of the plan documents that incorporated the

4    DDA settlement and DD settlement.  On April -- the April 3rd

5    distribution was important because under the case matters

6    protocol that Your Honor approved on September 16th the

7    debtors were required to give ten-days notice to certain

8    creditor constituencies of any plan and disclosure statement

9    that they intended to file.

10          We also shared the distribution not only with the

11   people who were intended or who are obligated to see the

12   stuff under the protocol, but also a variety of other

13   stakeholders on a professional eyes only basis, and all of

14   that was subject to FRE correlate and confidentiality.

15          As the debtors had hoped would happen the

16   April 3rd distribution of the plan documents kicked off the

17   flurry of activity between the debtors and the creditors and

18   amongst the creditor groups themselves.  Although the

19   creditors have not yet signed onto the plan we've listened

20   to creditor feedback and where possible incorporated those

21   views in the plan documents.

22          As I've said many times, the debtors ultimate goal

23   is to file a fully consensual plan of reorganization.  We're

24   not there yet, but we're going to keep trying and we hope to

25   be there one day soon.

1          The plan currently provides for a tax-free spin of

2    TCEH with a partial step up in tax basis and a tax-free

3    reorganization of EFH and EFIH through one of three possible

4    scenarios.  A backstop recapitalization by existing

5    shareholders -- stakeholders, a sale to a third party, or a

6    stand-alone reorganization.

7          It's important to note that that optionality of

8    the plan is designed to work hand and hand with the auction

9    process while allowing flexibility to accommodate any other

10   restructuring alternative that maximizes value.

11         Importantly the plan contains an unconditional

12   fiduciary out that'll allow the debtors to explore any and

13   all other restructuring alternatives that have been the

14   potential to better maximize the value of the debtors'

15   estates.  And the debtors are fully prepared to amend,

16   supplement, or even replace the plan and related documents

17   altogether, as needed.

18         To that end there's recently been a significant

19   interest level regarding the potential use of a real estate

20   investment trust or a REIT structure for EFIH's interest in

21   Oncor.  In particular the possibility of a restructure has

22   been the focus of discussions amongst certain potential

23   bidders, the debtors, various major creditor constituencies,

24   and in particular the ad hoc group of TCEH unsecured

25   noteholders and the TCEH official committee.

```
 1              To allow parties to explore such an alternative
 2    the plan provides that an EFH or EFIH restructuring may be
 3    executed through a REIT.  Moreover, the debtors are working
 4    closely with these parties to facilitate their diligence
 5    efforts around a potential restructuring, again, whether EFH
 6    is recapitalized through a third-party sale or REIT, a
 7    creditor back proposal, or some combination of these, the
 8    debtors' sole interest is in maximizing the value for all
 9    stakeholders, and the debtors have designed a plan to
10    accommodate any of these options and are prepared to revise
11    the plan if it's further -- if it's needed to further
12    accommodate any of these options.
13              The April 3rd distribution also kicked off
14    negotiations that resulted in the stipulation filed this
15    morning.  Both the stipulation that's not up for today and
16    won't be heard until May 4th or some other day.
17              I do think it's helpful to quickly cover the main
18    points in order to provide the Court with additional
19    context.
20              First perhaps most significantly the stipulation
21    reflects broad base support amongst the TCEH creditor
22    constituencies, the first liens, as well as the junior
23    creditors.
24              One issue that the stipulation covers is the
25    treatment of plan distributions.  The April 3rd draft of a
```

1    plan included the (indiscernible) base settlement which

2    provides up to $105 million of value from EFH to TCEH, but

3    it also included a partial allocation of the $105 million as

4    between the TCEH first lien holders and the TCEH junior

5    creditors.

6            Following the April 3rd distribution these parties

7    request that the debtors not include that allocation in the

8    plan that was filed this morning in order to further

9    facilitate their negotiations.  The plan -- as a result the

10   plan filed this morning does not yet allocate between the

11   TCEH first lien creditors and the TCEH junior creditors the

12   value flowing from EFH to TCEH.

13           The plan also provides for a guaranteed

14   distribution from the TCEH first lien creditors to the TCEH

15   junior creditors.  The April 3rd stipulation of the plan

16   included an amount for the guaranteed distribution.

17           Following the April 3rd circulation the TCEH first

18   lien creditors and the TCEH junior creditors requested that

19   debtors not yet provide the amount of the guaranteed

20   distribution.

21           As a result the plan filed this morning preserves

22   a construct of the guaranteed distribution from the TCEH

23   first lien creditors to the TCEH junior creditors, but does

24   not specify the amount of the guaranteed distribution.

25           Per the terms of the stipulation the debtors will

1    fill in those two numbers that they took out of the plan no

2    later than five days before the disclosure statement

3    hearing.  We're hopeful that by the time we do so we'll have

4    consensus around those two numbers, but if we don't in order

5    to move forward with the disclosure statement hearing the

6    debtors will fill the numbers back in themselves.

7            The stipulation also modifies certain dates that

8    were included in the March 27th circulation of the

9    scheduling motion.

10           As modified by the stipulation the scheduling

11   motion proposes many of the critical dates designed to

12   achieve plan confirmation before the end of this year,

13   including starting the confirmation hearing on

14   November 18th, subject of course to the Court's availability

15   on that day.  We believe that this dynamic is vital to the

16   plan process because it will focus all parties, the debtors

17   included, on the negotiations.

18           The stipulation provides that the ad hoc committee

19   of TCEH first lien lenders supports the dates set forth in

20   the scheduling motion as revised by the stipulation, it

21   further provides that the TCEH official committee has agreed

22   not to object to the relief sought in the scheduling motion.

23           Wilmington Savings Fund Society and the TCEH

24   unsecured ad hoc committee have reserved their rights to

25   object to the scheduling motion.

1                   As this Court has noted on numerous occasions

2      these Chapter 11 cases are enormously complex and large;

3      however, the debtors believe that the time is right to begin

4      a determined march towards confirmation that will serve the

5      interest of all stakeholders, creditors, customers, vendors,

6      employees, and regulators alike.

7                   The stipulation further provides that the

8      scheduling motion will -- or the proposed order approving

9      the scheduling motion will be revised to contemplate plan

10     mediation.

11                  Specifically if the scheduling motion is approved

12     the parties will either consensually appoint a plan mediator

13     or submit a list of proposed mediators to Your Honor in

14     advance of the May 4th hearing and ask Your Honor to appoint

15     a mediator.

16                  Importantly the debtors would not have agreed to

17     participate in plan mediation in the absence of defined

18     confirmation timeline as reflected in the filed scheduling

19     motion.

20                  As I noted at the beginning of the hearing the

21     proposed scheduling order is still in flux, there's still

22     some dates that need to be agreed to and we still need to

23     layer in the mediation concept, so we'll be filing a revised

24     proposed scheduling order in the coming days.  We also may

25     be filing a revised stipulation in the coming days per your

1   comments this morning.

2          With respect to the standing motions the

3   stipulation extends the challenge deadline to seek standing

4   under the TCEH cash collateral order which spurred the

5   filing of the standing motions as Your Honor noted to

6   June 30th, and the standing motions will be adjourned to a

7   hearing in June to be scheduled, but again, that provision

8   of the certification is in flux per your comments this

9   morning.

10          Last the stipulation contains certain confidential

11   information regarding the auction process, and this

12   information has been filed under seal to preserve the

13   integrity of the auction process.  We'll take up the motion

14   for seal at the May 4th hearing or whenever Your Honor is

15   prepared to hear such a motion.

16          Ultimately, Your Honor, the stipulation balances

17   the competing considerations that have driven these

18   Chapter 11 cases for nine months.  The stipulation allows

19   the debtors and their stakeholders to continue to pursue

20   value maximizing restructuring objections while driving

21   these Chapter 11 cases towards a conclusion.

22          With that, Your Honor, I'm happy to answer any

23   questions you may have or I'm prepared to yield the podium

24   to the DDAs.  I think Mark Thomas of Proskauer is going to

25   go first.

Page 43

1          THE COURT:  All right.

2          MR. SASSOWER:  Thank you, Your Honor.

3          MR. THOMAS:  Good morning, Your Honor, Mark Thomas

4    of Proskauer Rose.

5          Your Honor, we are counsel to EFH Corp., the

6    ultimate parent debtor and debtor in possession reporting to

7    and acting at the direction of the disinterested directors.

8    Those disinterested directors are Don L. Evans and Billy

9    Williamson.

10          Your Honor, as noted by Mr. Sassower very, very

11    early this morning while I was sound asleep we filed docket

12    number 4147, and docket number 4147 is the statement of the

13    disinterested directors regarding the proposed settlement of

14    conflict matters as part of a plan of reorganization.  That

15    statement, Your Honor, attaches as Exhibit 1 the April 1st

16    minutes of the meetings of the disinterested directors that

17    approved the settlement.  It attaches as Schedule A to

18    Exhibit 1 the list of settled conflict matters.

19          And, Your Honor, I'm not going to repeat the

20    entirety of this statement that was filed this morning, I'll

21    summarize a few high point, but the settled matters that are

22    listed on Schedule A to Exhibit 1 are an extensive list of

23    factually intensive, incredibly and complicated intercompany

24    claims and causes of action that could be asserted against

25    the various debtors' estates against each other.  And one of

1    the settled matters also is the tax basis step up issue

2    which has been front and center of this case for a very long

3    time, Your Honor, and since we've been involved in this case

4    the consensus of all the parties in interest, especially on

5    the EFH side of the case, is that a tax-free reorganization

6    must be accomplished.

7           Your Honor, Schedule B to the minutes is a non-

8    exhaustive list of the diligence meetings and negotiations

9    that were concluded and done by the disinterested directors

10   and their advisors.

11          We, Proskauer, have been engaged since November of

12   2014, and the disinterested directors engaged Sola Capital

13   (ph) as financial advisors in December of 2014, and our

14   diligence included numerous extensive formal and informal

15   meetings with parties in interest, creditors, the debtors,

16   professional advisors, and other constituents who were

17   organized at least on the E side in terms of our diligence.

18          Your Honor, Schedule C to the minutes is an

19   illustrative waterfall that was used during the

20   negotiations.

21          And finally Exhibit 2 to the minutes -- I'm sorry

22   -- to the statement, Your Honor, is the joint statement that

23   was issued on April 3rd by all three groups of disinterested

24   directors and their advisors that sets forth the principal

25   terms of the settlement.

1          As discussed by Mr. Sassower the headline of the

2    settlement is that the TCEH estate will be granted an

3    allowed non-priority general unsecured claim in the amount

4    of $700 million against the EFH estate, and that claim will

5    be subject to certain sharing percentages under a waterfall.

6          Your Honor, however, again, as Mr. Sassower noted,

7    this settlement is part of and embodied in the plan of

8    reorganization that was filed today, and the settlement is

9    subject to confirmation of the plan.  And likewise the

10   disinterested directors have maintained a fiduciary out that

11   if they determine that there is a transaction or a plan that

12   is in furtherance of their fiduciary duties as the

13   disinterested directors of the EFH estate the settlement

14   will not go forward and they can exercise a fiduciary out.

15              THE COURT:  Thank you.

16              MR. THOMAS:  Thank you, Your Honor.

17              MR. WALPER:  Good morning, Your Honor, Thomas

18   Walper, Munger, Tolles & Olson on behalf of the EFCH and

19   TCEH estates for the purposes of representing the

20   disinterested manager at his direction.

21          On November 7th and then on December 9th of last

22   year the EFC and TCEH boards of managers delegated the

23   authority to the disinterested manager, Mr. Huge Sawyer

24   (ph)m to identify and act on matters in which there existed

25   an actual conflict between the TCEH debtors on the one hand

1    and the other debtors.  Mr. Sawyer then retained my Munger,

2    Tolles & Olson, as well as Greenhill as a financial advisor.

3            After the resolutions were approved by the board

4    and the advisors were retained at Mr. Sawyer's direction

5    there was immediate and significant work to determine and

6    identify the conflict matters and to investigate those

7    matters.  That included, and you will be able to confirm by

8    the time records, significant review of materials prepared

9    by the debtors advisors, including K&E, Sidley, Evercore,

10   Ensolfo Cooper (ph), had many meetings with those advisors.

11   It included reviewing the documents in the debtors' data

12   room, the legacy database as relevant to conflict matters.

13   It involved a meeting with the debtors' employees and

14   interview of them with respect to their knowledge of the

15   conflict matters.  There was extensive research done on the

16   analysis of tax issues, including the tax structuring and

17   tax sharing issues.

18           Mr. Sawyer and his advisors also sought input from

19   TCEH creditor groups, including the TCEH official committee,

20   the TCEH first liens, the TCEH second liens, as well as the

21   ad hoc group of TCEH unsecured creditors.

22           You know, essentially Mr. Sawyer has met with his

23   professionals nearly every day since their retention for the

24   purpose of analyzing and understanding the conflict issues

25   and in working through the process of the independent

1    managers.

2            On February 25th of this year Mr. Sawyer met with

3    the TCEH board and outlined a number of what he had

4    concluded a non-exhaustive list of conflict matters.  That

5    list after that date was shared with the various T side

6    creditor constituents.

7            During March there was an approximate 30-day

8    period during which all of the disinterested advisors along

9    side of their disinterested managers and directors set out

10   to negotiate matters which were actual conflicts.  Many of

11   those meetings, as Mr. Sassower and Mr. Thomas referenced,

12   were in person and discussions at times became tempered and

13   I think to describe them arduous would be an understatement.

14           THE COURT:  I'm sorry, I'm going to interrupt.

15   Somebody on the telephone I can hear your typing.  Mute your

16   phones or hang up.  Go ahead.

17           MR. WALPER:  Thank you, Your Honor.

18           These negotiations culminated in a meeting that

19   Mr. Sawyer had on April 1st in which he concerned whether or

20   not it would be appropriate to enter into a settlement that

21   would compromise all of the conflict matters that he had

22   determined and to incorporate those in a plan of

23   reorganization.

24           Importantly the terms of that settlement, as the

25   others have noted, would provide for a tax-free spin of TCEH

1    and for a partial step up in basis.

2            A key to the interest of a lot of the T side

3    constituents, the tax-free reorganization of EFH and EFIH

4    could be executed through a number of scenarios, including

5    in particular a real estate investment trust, a REIT

6    structure, but through that sale to a third party, maxed out

7    recap, and a stand-alone reorganization.

8            Again, this was very, very key to Mr. Sawyer when

9    he was considering whether or not a settlement would be

10   appropriate of the conflicts.

11           Unlike in the RSA, and importantly, this provided

12   for a very significant payment by the E side to the T side

13   by allowing a $700 million unsecured claim, and as have been

14   described, an additional $105 million as to recoveries on

15   the E side over $1.41 billion.

16           Last night -- the pause was I think a lack of

17   sleep, so I apologize, Your Honor -- but last night

18   Mr. Sawyer had prepared and directed our filing of a

19   statement much like the statement that was referenced by

20   Mr. Thomas which very specifically outlines in a very

21   transparent way details of the process that were undergone

22   in order to reach that settlement.  It includes his minutes,

23   it includes presentations that were made to him in

24   connection with his disinterested manager meeting when he

25   made that determination, and it has been filed at docket

**Exhibit 18**

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                      :

                                  :    Chapter 11

6    ENERGY FUTURE HOLDINGS       :

     CORP., et al.,               :    Case No. 14-10979(CSS)

7                                 :

           Debtors.              :    (Jointly Administered)

8    _____ :

9

10                        United States Bankruptcy Court

11                        824 North Market Street

12                        Wilmington, Delaware

13

14                        May 13, 2015

15                        2:05 PM

16

17

18

19

20   B E F O R E :

21   HON CHRISTOPHER S. SONTCHI

22   U.S. BANKRUPTCY JUDGE

23   ECR OPERATOR:  LESLIE MURIN

24

25

1    settlement was proposed that this piecemeal claim objection

2    was filed.

3            We would respectfully request the Court to not have

4    any interim hearing with respect to this claim objection

5    that's been filed but put it off until such time as the

6    settlement can be heard in connection with the plan or is

7    withdrawn by -- or denied -- withdrawn by the parties or

8    denied by the Court or at some -- such other time in the

9    future -- and I know that there was a time that was

10   suggested by the T-side unsecured committee with the Court

11   and reconsider what the timing might be in light of

12   developments in the case.

13           Thank you, Your Honor.

14           THE COURT:   Thank you.

15           MR. MILLER:   Your Honor, Brett Miller and Todd

16   Goren from Morrison & Foerster on behalf of the T-side

17   creditors' committee.  As Your Honor has seen in our letter,

18   we are very much in line with the TCEH independent in our

19   view that this should not go forward on the proposed

20   schedule.  I will hand it over to my partner, Todd Goren, if

21   that's okay, to cover the specifics as Mr. Glueckstein has

22   raised the issue of -- that this would not be an evidentiary

23   hearing and this would not -- this would be a very simple

24   argument and simple thing to decide.  We greatly disagree

25   with that and Mr. Goren can add some color on that, if

Page 22

1    that's okay, Your Honor.

2            THE COURT:  That's fine.  Thank you.

3            MR. GOREN:  Thank you, Your Honor.  Todd Goren,

4    Morrison & Foerster.

5            As Mr. Miller noted, we strenuously disagree with

6    the fact that this could be resolved without any discovery.

7    I'm sure it won't surprise you that we have the exact

8    opposite reading of the so-called unambiguous contract that

9    the E committee proposes in their objection.  We think that

10   there is a host of parol evidence that supports our reading

11   of the contract that would need to be explored and likely

12   submitted to the Court as well as supplemented with

13   additional documentary discovery and depositions.  And I

14   think it's also important to note that the E committee

15   argues in their objection that the agreement that they

16   believe you could rule in the four corners of the document

17   does not govern tax years before 2010 which is when most of

18   these agreements took place.  And I think it's quite

19   obviously a factual question about if that agreement does

20   not govern then what agreement, if any, does.  And there's

21   evidence in the record that would again need to be

22   supplemented as to -- to answer that question.  So I think

23   on the face of what they filed, this simply cannot be

24   resolved on the four corners of the document.

25           As to scheduling, we propose that you wait until

1    after the hearing on the disclosure statement which is

2    currently scheduled for July to determine whether this

3    should move forward and, if so, on what schedule.  We think

4    that makes sense for a few reasons.  First, as Mr. Walper

5    noted, we agree that this claim is intertwined with numerous

6    other claims including several other tax claims and/or GSA

7    related claims.  And it would be highly inefficient to try

8    and litigate one of those claims without the others and

9    potentially prejudicial as well to the T-side.

10          We are obligated at this point under the case

11   matters protocol to bring those claims 15 days after the

12   disclosure statement.  Possible that date gets extended but,

13   for now, there is an impending deadline for 15 days after

14   approval of the disclosure statement.

15          Second, we also believe that trying to litigate

16   this now could very well be disruptive to the ongoing claim

17   negotiation.  You know, there's a proposed intercompany

18   settlement on the table.

19          And more importantly, the third reason is that,

20   you know, there is ongoing negotiations for a potential

21   alternative plan that you've heard a lot about recently, and

22   that plan, if successful, would completely root out this

23   objection so there would be a lot of wasted time, energy,

24   and effort on a claim objection that might very well become

25   completely irrelevant.

1           So for that reason, we think it makes sense for

2     you to defer setting any kind of schedule on this until

3     after the disclosure statement hearing.  At that point, we

4     can pick back up the question, we'll know whether their

5     disclosure statement that contains the plan settlement has

6     been approved at that point, we'll know whether our deadline

7     to file the claims has been extended, and if so, until when,

8     and whether or not we would be seeking standing to pursue

9     those claims shortly thereafter.  So we think that, you

10    know, within a couple months you'll have significantly more

11    information that would allow you to set an appropriate

12    schedule in this, if it even makes sense to set a schedule

13    at that point.

14           Thank you, Your Honor.

15           THE COURT:  Thank you.

16           MR. MCKANE:  Your Honor, this is Mark McKane of

17    Kirkland & Ellis on behalf of the debtors.  May I proceed?

18           THE COURT:  Yes.

19           MR. MCKANE:  Thank you, Your Honor.

20           Your Honor, we absolutely recognize -- we at

21    Kirkland recognize that this is a -- the actual claim itself

22    is a conflicts matter and then that is why Mr. Walper, on

23    behalf of Munger Tolles, submitted the submission on behalf

24    of TCEH.

25           Nonetheless on behalf -- in recognition of kind of

1     how this claim or any claim -- single claim objection

2     impacts the overall case and the scheduling of those types

3     of claims, vis-à-vis, the plan, we ask to be heard.  And

4     specifically, Your Honor, we want to put this claim

5     objection in context, in the context of when we filed the

6     plan, the overall effort and the comprehensive nature of the

7     proposed settlement within that plan, and in context of the

8     scheduling order and the scheduling hearing you just heard

9     less than ten days ago.

10          Specifically, Your Honor, on May 4th you heard

11    objections to the proposed schedule that was put forward by

12    the EFH official committee and the EFH notes indenture

13    trustee that in two separate instances tried to interject a

14    specific issue:  one, enterprise valuation; and two, the

15    overall consideration of the inter-debtor proposed

16    settlement in advance of confirmation issues.  And in both

17    circumstances, you rejected that objection and said that you

18    viewed both of those issues as confirmation issues and

19    should be considered and as part of a comprehensive

20    resolution of a plan.

21          That is exactly what we believe is appropriate

22    here.  For the same reasons that we believe the inter-debtor

23    settlement as a whole needs to be considered in the context

24    of the plan, we believe that any of the components of that

25    settlement, specifically the tax claim, which was undeniably

1    a large factor that, you know, both sides that people

2    focused on given the potential amounts in that issue -- at

3    issue there, they both -- that also should be considered in

4    the context of the overall settlement in the context of the

5    overall plan.

6            So for the same reasons that the Court rejected

7    their efforts to try to schedule sub-issues as part of a

8    plan less than ten days ago on May 10th, we believe that

9    same analysis should apply here.

10           As to Mr. Glueckstein's concerns about clarity I

11   would like to note a few things.  Since the schedules were

12   filed there has been intense scrutiny by creditors as it

13   relates to the scheduling of that tax claim -- this is a

14   TCEH to EFH tax claim -- as well as the corresponding EFH to

15   Luminant Generation 1.29 billion dollar tax claim.

16           Through the Legacy discovery process and

17   additional informal discovery efforts with tax professionals

18   there have been intense review on the tax sharing agreement,

19   on the schedules, and on the debtors' intercompany tax

20   practices.

21           So, to the extent that there is a question about

22   whether there is an ability to gain clarity there should be

23   significant clarity already on these issues.

24           Nonetheless, in addition to that, going forward

25   with a plan confirmation process, there'll be an opportunity

1    to take additional discovery and evaluation of the inter

2    inter-silo settlement, a component of which is this claim.

3    And there will be an opportunity to evaluate the

4    disinterested directors and to -- and how, you know, this

5    tax claim factors into their overall thinking.  So

6    additional clarity will be gained, but that clarity is best

7    viewed in the context of an overall settlement as part of an

8    overall plan.

9            It is for that reason that we absolutely believe

10   that this claim objection should not be scheduled or heard

11   until the overall proposed settlement is considered as part

12   of a plan, or as noted by Mr. Walper in his papers and said

13   today that proposed settlement is withdrawn or by another

14   order of the Court.

15           Thank you, Your Honor.

16           THE COURT:  Thank you.

17           MR. SHORE:  Your Honor, Chris Shore from White &

18   Case.  May I be heard?

19           THE COURT:  Of course.

20           MR. SHORE:  Okay.  Well this telephonic hearing is

21   going to make some strange bedfellows because I'm going to

22   come out on the same side as the debtors and Mr. Sawyer,

23   along with the committee.

24           We're going ask that you at least not schedule the

25   motion until after the disclosure statement to keep a level

1    playing field.

2              Effectively, what happened last week, as we

3    understood it, is the Court put on hold the litigative

4    process to see if more plan consensus could take hold.  I

5    think you heard that nobody has still come out in front of

6    the -- in favor of the debtors' plan, but we've made

7    significant efforts in advancing the alternative

8    transaction.  Since we were there last week I think we've

9    completed the negotiation with the NDA with the companies,

10   and either today or first thing tomorrow our small group of

11   backstop parties will be restricted.

12              They are currently holding an aggregate of 4

13   billion dollars of claims in the capital structure.  They

14   have allocated out, at least on an initial basis, the

15   primary backstop commitments of up to 6 billion dollar of

16   equity financing.  There may be an additional upsize of a

17   billion dollars on that plan.  The term sheet is in heavy

18   negotiations with the REIT sponsor.  We have drafts of the

19   backstop commitments plan term sheet, plan support

20   agreement.  Due diligence is full speed ahead and we've got

21   continued meetings with Oncor and the debtors.

22              We may not get there.  It looks like we will get

23   to the point where we have a fully executable plan supported

24   throughout the capital structure.

25              The problem with the claim objection right now is

**<u>Exhibit 19</u>**

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4

5   In re:                              :

                                        :    Chapter 11

6   ENERGY FUTURE HOLDINGS              :

    CORP., et al.,                      :    Case No. 14-10979(CSS)

7                                       :

            Debtors.                    :    (Jointly Administered)

8   _____  :

9

10

11

12                            United States Bankruptcy Court

13                            824 North Market Street

14                            Wilmington, Delaware

15

16

17                            June 25, 2015

18                            10:41 AM

19

20  B E F O R E :

21  HON CHRISTOPHER S. SONTCHI

22  U.S. BANKRUPTCY JUDGE

23

24

25  ECR OPERATOR:  LESLIE MURIN

1                    P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.  Good morning.

4              MR. KIESELSTEIN:  Good morning, Your Honor.  Mark

5    Kieselstein, Kirkland & Ellis, on behalf of the debtors.

6              First, Your Honor, we apologize for testing your

7    patience this morning, but we were hopefully getting

8    productive work done.

9              THE COURT:  This isn't even close to testing my

10   patience.

11        (Laughter)

12             MR. KIESELSTEIN:  That's good to know.  I'm sure

13   you'll tell me when I have, Your Honor.

14             THE COURT:  I certainly will.

15        (Laughter)

16             MR. KIESELSTEIN:  Your Honor, we're here today for

17   a scheduling conference on confirmation of the debtors'

18   proposed plan or reorganization.

19             And by way of background Your Honor will recall we

20   first filed the motion seeking approval of the disclosure

21   statement and a plan confirmation schedule on April 14th,

22   and at the May 4th hearing Your Honor entered a schedule

23   through the time of the disclosure statement hearing and

24   continued the scheduling conference to this date with regard

25   to a confirmation schedule.

1           On June 18th, Your Honor, we filed a proposed

2   confirmation schedule that contemplated starting the hearing

3   on November 18th, which Your Honor had reserved, that

4   sparked a great deal of conversation, some of it heated, and

5   Your Honor we have been working round the clock since that

6   date, and I'm pleased to report that we have an agreement

7   just finalized late this morning with virtually all, but not

8   all, of the parties for a definitive confirmation schedule,

9   and this is an agreement, Your Honor, that as typical leaves

10  everyone unsatisfied to one degree or another.

11          Just to give the headline, Your Honor, the

12  schedule operates such that if we stay on the path we are

13  now embarking on, one that has the support of the ad hoc

14  first lien notes, the E side second lien ad hoc group, and

15  the Fidelity -- and Fidelity, and that's a path that would

16  equitize the E side in large part and envisions cashing out

17  the PIKs and potentially cramming down the unsecureds on the

18  T side, if we stay on that path which we are currently on

19  the confirmation hearing would start in the latter part of

20  January, subject of course to Your Honor's schedule.

21          Your Honor, that schedule also holds out the

22  possibility and reserves dates for the circumstance that the

23  T unsecured plan of which you've heard a bunch, and which I

24  will speak more about in a few minutes, if that comes

25  together, and that will require a great deal of work, and

1    such a plan would cash out the E side completely that there

2    could be an October confirmation, and it's an integral part

3    of the deal that we've struck that the Court reserve dates

4    in October for that possibility.

5             Now, Your Honor, again, much would have to happen

6    for those dates to be available, but it is essential that we

7    get that in order to keep the rest of our deal in tact.

8             Your Honor, I want to elaborate a little bit on

9    what I said a minute ago about how this deal leaves everyone

10   a little bit dissatisfied or maybe more than a little, I

11   think it puts everything in the proper context in this case.

12            Your Honor, for the debtors it's a bitter pill to

13   swallow to move off of a November schedule that we believed

14   was fully achievable because of the inordinate toll this

15   case is taking both financially in terms of opportunity cost

16   et cetera on the company, and I'll speak a little bit more

17   to that shortly, but we decided that it was worth the trade

18   in terms of locking in, and I mean triple locking in, the

19   backend of the process on an uncontested basis, or a largely

20   uncontested basis, and again, we deem that worth the candle.

21            And as I'll explain there are important agreements

22   in a stipulation that's going to accompany the scheduling

23   order that helped us reach that decision.

24            Your Honor, for the T firsts they can speak for

25   themselves of course and Mr. Herman is in the courtroom, but

1    no party has borne a greater burden from the length of these

2    cases given the well-documented administrative costs of

3    these cases as well as some of the macro economic events

4    that have occurred with respect to gas prices and power

5    prices.  Nevertheless, Your Honor, they were willing to give

6    up a shot at November for this certainty, and again, I mean

7    airtight certainty of starting the confirmation trial in

8    January.

9          For the T unsecured creditors and the T committee,

10   and again, they can speak for themselves better than I, I

11   know they were of the view that November was incredibly

12   tight, and that even January what they're agreeing to is

13   burdensome, and they could have asked for additional time or

14   no schedule at all, but they traded that for this agreement,

15   which as I say, also contemplates the possibility that the T

16   side deal comes together, and I would view that as not

17   likely, I would view that as more unlikely than not on this

18   time frame, and I'll talk at that in a minute why we feel

19   that way, but we've locked in a possible October

20   confirmation should all that come together.

21          And, Your Honor, for the E side, and they're

22   hardly monolithic on that, I think their view is they would

23   like this case to come to a close, and we all agree with

24   that, and they were ready to support November, but I think

25   in large part are willing to support January.

1           So, Your Honor, this Chapter 11 everyone is up

2    happy to one degree or another and that's the nature of the

3    compromise we're putting before Your Honor today.

4           Your Honor, I want to take a moment to acknowledge

5    the efforts of Mr. Barowitz (ph), the mediator, who played

6    an instrumental role in both crafting and forging this

7    compromise.  He has a bully pulpit and he used it quite

8    effectively, and like Teddy Roosevelt who coined that

9    phrase, he speaks softly but metaphorically he carries a big

10   stick.  We would not have gotten here today without his

11   efforts.

12          Your Honor, with that I want to talk a little bit

13   about how we got here since we filed our plan on April 14th,

14   and Your Honor, you will recall that our plan was forlorn

15   and quite unloved when we filed it and creditors beat a path

16   to this podium to talk about just how much they disliked,

17   even hated, our plan, and we've come a long way since that

18   date and that work has accelerated, we think it vindicates

19   the need for a debtor to stick its head up above the fox

20   hole even when nobody necessarily wants it to.

21          So we filed that plan on April 14th, as Your Honor

22   will recall we were in the throws of the bid procedure

23   process and trying to identify a stalking horse, we had even

24   reserved dates for that.

25          Despite the debtors' efforts for the past several

1    weeks or months we were not able to reach a sufficiently

2    attractive bid to justify moving forward with the stalking

3    horse, and as Your Honor knows there will not be a stalking

4    horse hearing on July 13th.

5           That being said, the stalking horse process has

6    yielded very significant benefits to the debtors, along with

7    the plan filing in our view it acted as a catalyst for plan

8    discussions with all of the creditors and key stakeholders.

9           And as that stalking horse process unfolded, as

10   Your Honor knows, we engaged in parallel active discussions

11   with creditor --

12          THE COURT:  Right, back up.

13          MR. KIESELSTEIN:  Sure.

14          THE COURT:  What do I know isn't happening on

15   July 13th?

16          MR. KIESELSTEIN:  The stalking horse hearing, Your

17   Honor.

18          THE COURT:  And I know that why?

19          MR. KIESELSTEIN:  I thought we informed Your Honor

20   that it had come off the calendar.

21          THE COURT:  Nope.

22          MR. KIESELSTEIN:  Okay.  Well -- oh, we left a

23   message yesterday, Your Honor, and --

24       (Laughter)

25          MR. KIESELSTEIN:  -- I'm afraid it either wasn't

1    detailed or it didn't get to you, Your Honor, so I apologize

2    for that.

3              THE COURT:  All right.  So the whole week comes

4    off?

5              MR. KIESELSTEIN:  I believe that it was the

6    13th --

7              UNIDENTIFIED SPEAKER:  There's an omnibus date on

8    the 16th.

9              MR. KIESELSTEIN:  There's still an omnibus on the

10   16th, Your Honor, but this is also a very late-breaking

11   development, something --

12             THE COURT:  Okay.

13             MR. KIESELSTEIN:  -- we were in discussions with

14   our board as late as the last couple of days.

15             THE COURT:  Okay.  Just give me a second.

16        (Pause)

17             THE COURT:  Okay, go ahead.  You might want to

18   back up a minute, I stopped listening a little bit when you

19   told me what I already knew.

20        (Laughter)

21             MR. KIESELSTEIN:  I apologize, Judge.

22             THE COURT:  No worries.

23             MR. KIESELSTEIN:  Let me try again.

24             I was -- the point I was trying to make while my

25   revelation was ringing in your ears, Your Honor, was that

1    the stalking horse process has yielded significant benefits

2    even though it has not produced an actionable bid at this

3    time and that was it was a catalyst to other groups with

4    other plan alternatives to move ahead with expedition, and

5    it I think played a large role in getting us to where we are

6    today.  That and the filing of the plan itself we think both

7    have that catalytic effect on the process.

8              And so, Your Honor, what we can identify now is

9    that we have obtained the support in principal for a stand-

10   alone equitization plan from the ad hoc group of E seconds,

11   from Fidelity, and from the T firsts that embraces the core

12   elements of our plan, the DD settlement, that is the

13   disinterested director settlement of the intercompany

14   claims, as well as the make-whole settlements that are

15   embedded in the plan, and that's about $30 billion at the

16   capital structure that again has now largely embraced our

17   plan.

18             And what that would involve, Your Honor, is an

19   equitization on the E side at a value of approximately

20   $19 billion, there would be -- the plan envisions that the

21   PIKs would be paid out in cash or equitized, and Your Honor,

22   there would be again an honoring of the DD settlement so

23   there would be an allowed claim for TCEH of $700 million

24   against the EFH estate.  So those are some of the key

25   elements of that plan.

1            To be clear there is work to be done on that plan.

2    In particular, Your Honor, the terms under which the new

3    money would come in to pay off the PIKs is still under

4    discussion, and to the extent that the mediation process,

5    which Your Honor will recall was meant to fill in two blank

6    ins the plan, how the disinterested director settlement

7    claim is allocated between the T firsts and the T juniors,

8    as well as what we refer to as the guaranteed distribution

9    to the T juniors, those blanks have not been filled in and

10   if the mediation process is unsuccessful, as Your Honor will

11   recall, the debtor would fill in those numbers no earlier

12   than five days before the disclosure statement hearing.

13           If people are unsatisfied with how those numbers

14   are filled in they reserve all their rights and that could

15   obviously have an impact on our ability to go forward on the

16   plan I'm talking to Your Honor about.

17           But nevertheless, we think this is sufficiently

18   actionable and developed to move forward on setting the

19   schedule, and that's what the January schedule revolves

20   around.

21           I want to highlight three important points with

22   respect to that plan.

23           First, Your Honor, that approach, that plan

24   contemplates, but does not require, conversion of EFIH into

25   a REIT.  That is to say the confirmation would proceed

1    regardless and the consummation whether a REIT was completed

2    or can be completed.  So REIT or non-REIT the plan still

3    goes forward.

4            Second, Your Honor, again, this approach envisions

5    a new money equity investment from significant stakeholders,

6    including the second lien noteholders and Fidelity that

7    again would be used to satisfy the claims of certain

8    creditors in cash or a combination of cash and reorganized

9    equity.

10           And third, and very importantly, this approach

11   allows the debtor to continue to pursue alternative

12   proposals seeking to maximize the value of the debtors'

13   estates.

14           And, Your Honor, I want to talk in that regard

15   about the T side unsecured REIT plan that you've heard much

16   about, and Your Honor, we are obviously continuing to work

17   very hard on that plan, we continue to see its unique

18   attributes in terms of the possibility of global closure, we

19   remain committed to facilitating that transaction.

20           But, Your Honor, candor compels me to report to

21   the Court that despite the passage of several months that

22   plan is nowhere near being actionable.

23           And putting aside the very important issue of REIT

24   conditionality we've received documents of late that add new

25   dimensions of conditionality, and there are other issues

1    besides just contractual issues on which we remain far

2    apart.

3            These are all solvable issues, but in our opinion

4    they will take many weeks unless there's a much different

5    approach to getting this done.

6            So in our view we're not nearly there yet with

7    that deal, but we're going to continue to work on that deal.

8    And for it to happen in the very near term we think a galaxy

9    of stars would have to align.

10           If I were to use a baseball analogy, Your Honor, I

11   would say --

12           THE COURT:  I think you've beaten this dead horse,

13   I got it.

14           MR. KIESELSTEIN:  Okay.  Your Honor, I just wanted

15   to add we don't doubt for a minute the good faith of

16   Mr. Lauria, Mr. Shore, or their clients, we don't doubt

17   their wherewithal or their desire to get that done, but

18   deploying $7 billion of equity capital doesn't happen

19   overnight, and again, we're going to work with them to try

20   and make it happen if it can happen at all.

21           Your Honor, I did want to talk about the

22   stipulation -- actually one other point I wanted to make,

23   Your Honor.  I think it's important for the Court to be

24   aware in a little more concrete way of the impact of the

25   case on the business.  We've talked about it at a high

**Exhibit 20**

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3   In re:                          :

                                    :   Chapter 11

4   ENERGY FUTURE HOLDINGS          :

    CORP., et al.,                  :   Case No. 14-10979(CSS)

5                                   :

            debtors.                :   (Joint Administration

6   _____:   Requested)

7

8

9                                   United States Bankruptcy Court

10                                  824 North Market Street

11                                  Wilmington, Delaware

12

13                                  August 11, 2015

14                                  9:45 AM – 1:23 PM

15  B E F O R E :

16  HON CHRISTOPHER S. SONTCHI

17  U.S. BANKRUPTCY JUDGE

18

19

20

21

22

23

24

25  ECR OPERATOR:  DANA MOORE

1   there are two items up for today.  The first item is the

2   Liberda motion to appoint a representative for the interest

3   of certain asbestos claimants.  My partner Chad Husnick will

4   address that motion.  And the second item is a scheduling

5   issue related to the debtor's objection to the EFIH take

6   note holders post-petition interest claim.  My partner Andy

7   McGann is here to address that issue.  So with that, Your

8   Honor, unless you have any questions, I will yield the

9   podium.

10          THE COURT:  Just you mentioned three milestones.

11  First of all, really strange to see a lot of people on the

12  other side of the room, but certainly welcome and my nirvana

13  to have would be to have no one over at this table.  But

14  maybe we'll get there.  And I want to thank you for the

15  heads up through local counsel that there were developments,

16  which allowed me to be prepared to address those

17  developments or at least to understand them as best as

18  possible and I want to thank you for sending over the

19  materials yesterday morning.

20          I certainly didn't read two three-inch notebooks

21  last night but I did read both the PSA and settlement

22  motions which provided me with a lot of backdrop and

23  informed me as to what the current status is.  So I do

24  appreciate that.  You mentioned milestones and there is a

25  PSA disclosure stating the confirmation milestones.  Is

1    there a settlement agreement milestone as well or is that

2    identical to the confirmation?

3         MR. SASSOWER:  I don't believe there's a separate

4    settlement milestone but the confirmation is conditioned on

5    the settlement agreement.  So the settlement agreement has

6    to be approved on or before confirmation.

7         THE COURT:  Okay.  All right.  I would certainly -

8    - oh, and I did receive and read the letters that were

9    presented to the court.  I guess they were filed -- yeah,

10   they were written yesterday but I received them and read

11   them this morning, so I'm up to date on that.  Certainly

12   open the podium to anyone who wants to be heard in

13   connection with Mr. Sassower's update.

14        MR. SASSOWER:  Thank you, Your Honor.

15        THE COURT:  Mr. Lauria, good morning.

16        MR. LAURIA:  Good morning, Your Honor.  Tom Lauria

17   with White & Case.  We represent the ad hoc group of TCH

18   unsecured note holders.

19        The first thing I want to do is thank the Court

20   for making an expedited confirmation schedule available.

21   This deal is premised on ability to move quickly to

22   confirmation and without that schedule we never would have

23   gotten to the point we are at today.  And we will not get to

24   the finish line if we're not able to maintain that pace.

25        I think the speed and pace is really important to

1    the transaction that we've negotiated.  With that

2    opportunity at hand and with the able and steady assistance

3    of the Court appointed mediator of Mr. Peter Borowitz, we

4    have succeeded in building a broad consensus around a value

5    maximizing transaction that we believe will pave the way for

6    the debtors to exit Chapter 11 in the first half of 2016 if

7    all requisite approvals are obtained.  And that also

8    includes an insurance policy if we don't get there.

9            After over a year of contentious litigation -- and

10   I have to say it sure seems longer than that -- regarding

11   how the business of the EFH debtors would be reorganized and

12   how value would be allocated among the company's

13   approximately $42 billion of debt, we've forged an agreement

14   with the company and all of the other TCEH creditor groups

15   that have been active in the case regarding the terms of the

16   plan which was filed with the Court early yesterday morning.

17           The plan embraces three fundamental principles of

18   Chapter 11 reorganization: consensus, unimpairment and put

19   your money where your mouth is.  The merchant generation

20   business owned by TCEH will be transferred to its first lien

21   creditors in satisfaction of their approximately $25 billion

22   in debt.  This reflects near complete consensus of all T-

23   side stakeholder groups.

24           At the same time, all of the allowed claims

25   against EFH and EFIH will be paid in cash in full.  By

1    unimpairing them, we have taken the ballot out of their

2    hands in the hope of achieving a quick and efficient march

3    to confirmation.  This outcome is being sponsored by a group

4    of investors who, as promised, are providing $12.1 billion

5    of new debt and equity capital, $7.1 billion in equity and

6    $5.5 billion of debt availability.  We expect only to use $5

7    billion in connection with closing the transaction.

8            The group is comprised of members of the ad hoc

9    group including Anchorage, BlackRock, Arrowgrass, Balyasny,

10   Deutsche Bank, Cyrus and BHR.  TCEH unsecured notes

11   including Centerbridge, GSO and Taconic and Hunt

12   Consolidated and certain of its investors including Avenue

13   and the Texas Teachers' Pension.  These are the folks who

14   are putting their money where their mouth is.

15           We're not here to argue about valuation.  We're

16   here to pay the price to get out of jail.  To use my

17   partner, Mr. Shore's metaphor about the airplane with two

18   classes, one fighting over lobster and caviar and the other

19   hoping for chips, the folks in coach have gotten together

20   and agreed to buy the first class meal at full price.

21           The plan reflects a truly remarkable turn in these

22   cases.  When they were commenced the May 2014, it looked

23   like everyone would be impaired in some way and that

24   fighting between and within the two silos would be endless

25   and that billions of dollars of T-side unsecured claims were

1    at risk of a take-not in recovery.  Now we have a plan that

2    pays the E-side in full, gives the T-first their collateral

3    and provides a meaningful recovery to T-unsecureds.  To that

4    point, the T-unsecureds will receive outright 2% of the

5    equity and reorganized EFH and the rights to purchase

6    approximately $5.1 billion of new EFH common equity and the

7    rights are fully backstopped by members of the investor

8    group.  I think the Court knows -- I know sometimes people

9    say that and it isn't what the Court knows.

10            THE COURT:  Or what it remembers is more

11   difficult.

12            MR. LAURIA:  The road to this juncture has been

13   long and bumpy and anything but predictable.  We urged from

14   the beginning that the states mandated that no stone go

15   unturned.  And in truth, we never knew this particular stone

16   existed, much less what we would find under it.

17            In addition to speed, the deal is premised on the

18   ability to use the value that the parties believe will be

19   unlocked by converting EFH into a real estate investment

20   trust and transferring the T-side assets to TCH firsts in a

21   tax-free transaction.  These elements add materially to the

22   complexity of the exit but they also provide the currency

23   that makes the deal work.

24            Importantly, because of that complexity, the

25   parties have also negotiated a settlement agreement that

1    acts as an insurance policy, one that we all hope never to

2    use in the event that the deal doesn't consummate.

3            This was a tough, hard-fought deal made between

4    significantly impaired constituencies with conflicting

5    interests.  It was made and broken and remade multiple times

6    before bringing it to the court.  As we go forward, we need

7    to guard it from further breakage, particularly from those

8    stakeholders who this deal will pay in full.

9            We support completely the schedule that debtor's

10   counsel described on the record.  We think it's very

11   important to use the 18th as a checkpoint to see where we

12   are.  The 18th -- what we have before the court, the first

13   milestone is a disclosure statement hearing.  And just out

14   of curiosity, we had our office pull out of the new

15   disclosure statement all of the amended, new language, all

16   of the new language and it's 15 pages.  It's 15 pages that

17   are going to be reviewed and commented on and presumably

18   objected to by people who don't vote on a plan.

19           In fact, there's precedent for those people not

20   even getting a disclosure statement, just a summary.  But I

21   expect that when we get back to court on the 18th, the

22   objections that we're going to have are going to be

23   principally filed by those parties who already, from the

24   letter that was submitted, seemed dead set on doing nothing

25   but achieving delay, which will put them at risk more than

1    anybody else in this courtroom because at some point, at

2    some point if the peace isn't kept, if the deal isn't

3    maintained, you're going to have a foreclosure on the T-

4    side.

5            And when that happens, you have billions of

6    dollars of taxes being realized by those folks that will

7    diminish, if not eliminate, their potential recovery.  This

8    deal insulates them and protects them from that outcome.

9    Thank you, Your Honor.

10           THE COURT:  You're welcome.

11           MR. KORNBERG:  Good morning, Your Honor.  Alan

12   Kornberg of Paul Weiss, Rifkind Wharton & Garrison.  We're

13   the ad hoc committee of TCEH first lien creditors.  Your

14   Honor, it is a red letter day when you have significant

15   creditor support at all levels of the T-side capital

16   structure for a plan and related settlement and you have us

17   all, as the Court observes, sitting on the debtor's side of

18   the aisle.  If approved, the plan that's before the Court

19   will maximize creditor recoveries.

20           You've already heard how it will pay in full in

21   cash all allowed E-side claims and there is the related

22   settlement.  We described it as durable.  Mr. Sassower

23   described it as disarmament.  Mr. Laurie described it as an

24   insurance policy.  It is all of the above.  That settlement

25   would resolve for all time contentious, complicated issues

1    that would likely impede confirmation of not only the

2    proposed plan but any plan that might be proposed in these

3    cases.   Your Honor, we heard you loud and clear when several

4    hearings ago you admonished us all to posture in the

5    negotiating room and not in the courtroom.

6            With the able assistance of the mediator, Mr.

7    Borowitz, we got beyond posturing very quickly and focused

8    on putting together a very creative, complicated and

9    multifaceted deal.  It's a deal that our steering committee

10   believes is the value maximizing and most readily achievable

11   result in these very complex cases.  While it is tempting to

12   celebrate a milestone which we have today, at best this is

13   merely the beginning of the end.

14           From our perspective, we need to go out and garner

15   creditor support for this deal.  Many of the first lien

16   creditors only heard about the proposed plan and settlement

17   yesterday when they read it in the various bankruptcy news

18   services.  As you've heard, we have significant regulatory

19   and Internal Revenue Service processes that have to be

20   undertaken and successfully completed.  We have a myriad of

21   details to be worked out to implement the complicated

22   agreements that we've reached and, not the least, we have a

23   multifaceted bankruptcy process to complete.  One of the

24   reasons our steering committee fully supports this plan and

25   the related settlement is because we believe they can be

1    achieved relatively quickly.

2            Let me say that we are highly focused on having a

3    confirmation hearing as soon as possible.  I know we've been

4    a broken record with Your Honor on this point but, as we've

5    said many, many times, getting our collateral back sooner

6    rather than later is a principal goal of the TCEH first lien

7    creditors.  Therefore, we are fully supportive of the

8    proposed schedule that Mr. Sassower described and we urge

9    the Court to approve it and to overrule objections that

10   would delay or impede the path that has finally emerged to

11   resolve these cases.  Thank you, Your Honor.

12           THE COURT:  Thank you.  Mr. Miller.

13           MR. MILLER:  Thank you, Your Honor.  Brett Miller

14   of Morrison and Foerster on behalf of the T-side committee.

15   The T-side committee is comprised of a diverse group of

16   creditors with various types of claim at different debtor

17   entities.

18           On top of congratulating the debtors and the

19   mediator and the other T-side creditor groups who we've

20   worked with tirelessly over the last several weeks to get

21   this done, I really want to compliment the seven members of

22   the T-side committee who proudly display their fiduciary

23   duties over this period and during many emails and calls and

24   many versions of documents.  And not all their issues were

25   resolved in this merger plan.

**Exhibit 21**

```
                                                    Page 1

 1    UNITED STATES BANKRUPTCY COURT

 2    DISTRICT OF DELAWARE

 3

 4

 5    In re:                        :

                                    :    Chapter 11

 6    ENERGY FUTURE HOLDINGS         :

      CORP., et al.,                :    Case No. 14-10979(CSS)

 7                                  :

              Debtors.             :    (Jointly Administered)

 8    _____ :

 9

10

11

12                            United States Bankruptcy Court

13                            824 North Market Street

14                            Wilmington, Delaware

15

16

17                            August 25, 2015

18                            9:58 AM

19

20    B E F O R E :

21    HON CHRISTOPHER S. SONTCHI

22    U.S. BANKRUPTCY JUDGE

23

24

25    ECR OPERATOR:  BRANDON MCCARTHY
```

1    we've said in the past we believe court-approved deadlines

2    are key drivers to progress in a case this large and this

3    complex.  Virtually all of the real progress in this case

4    has occurred when people are bucking up against a court-

5    ordered deadline.  Without dates that parties are working

6    towards, stakeholders tend to lose focus and negotiations

7    tend to meander.  We think we've made a lot of progress to

8    date, but the best way to keep making progress is to keep

9    people on a tight schedule.

10          Your Honor, now I'll turn to the three

11   misconceptions that I would like to address this morning.

12          The first point is probably the most germane to

13   the scheduling motion.  Parties have tried to characterize

14   the plan, the settlement, the merger transaction as some

15   great surprise.  But the basic structure of the deal has

16   actually been part of the public record for quite some time

17   now.

18          As we explain in detail in our reply brief, the

19   debtors filed an initial plan that contemplated a merger

20   transaction and the DBA settlement on April 14th of this

21   year and supplemented that with extensive discussion on the

22   record at the hearings on May 4th, June 1st, June 25th and

23   July 23rd.

24          In addition, as I'll discuss in more detail in a

25   minute, for the duration of the merger negotiations the

1  debtors were simultaneously negotiating a parallel

2  transaction with various E Side stakeholders, and these

3  parallel negotiations were no secret to most, if not all

4  creditors.

5          In fact, not only would E Side credit advisors and

6  T Side credit advisors sometimes pass each other on the 50th

7  floor conference center at Kirkland's New York office, but

8  there were at least a couple of meetings attended by

9  advisors for key constituents to both sides, not to mention

10 numerous one on one calls to keep parties apprised of the

11 general state of play.

12         The DD settlement, which is incorporated in large

13 part in the settlement agreement has a similar history.  The

14 underlying facts that give rise to the alleged claims

15 resolved under the DD settlement are well known to all major

16 stakeholders in this case.  To that end, the debtors have

17 produced over 800,000 totaling more than 5.6 million pages

18 in an eight-month discovery process.

19         In connection with the filing of the DD settlement

20 last April, the DBAs themselves filed extensive materials

21 detailing the settlement and the bases for the settlement.

22         Your Honor, I should note after I yield the

23 podium, each of the DBAs are here and would like to address

24 the Court.

25         Since April, the DBAs have provided additional

1    information about their negotiations in the disclosure

2    statement and have produced additional documents further

3    evidencing their negotiations.  Five months later the

4    debtors' third amended plan and settlement agreement

5    incorporate the DD settlement in substantially similar form.

6          All this is to say, Your Honor, is that the path

7    to this deal has been long and it has been transparent to

8    the various creditor groups and the official committees in

9    this case.  Some stakeholders are seeing some of the details

10   for the first time, but as core components the merger, the

11   tax-free spinoff of reorganized TCH, the DD settlement have

12   been the subject of documentation, discussion and due

13   diligence for at least five months.  And the issues they

14   resolved in this deal have been the subject of eight months

15   of discovery.

16         Moreover, the deal that we've struck substantially

17   narrows the confirmation issues despite some of the

18   objectors trying to argue the contrary.  The deal resolves

19   what would have been a valuation and equity allocation fight

20   on the E Side, a cram-down on the T Side, litigation from

21   both sides around the DD settlement and litigation on the T

22   Side regarding the allocation of value.

23         Moreover, the deal resolves the T Side's standing

24   litigation and provides an agreed cash collateral extension

25   avoiding a fight on those fronts as well.

1          Of course the parties have raised potential

2     confirmation issues that are present and still outstanding.

3     And it's our goal to resolve as many, if not all of those

4     issues by the time we get to confirmation.

5          And to that end the debtors are in connect -- are

6     in conversations with the objecting stakeholders.  But to

7     the extent that we're not able to get there, to the extent

8     we're not able to resolve all of those objections, we think

9     the confirmation hearing will nevertheless be far simpler

10    than it would have been absent this deal.

11         Your Honor, let me pause here for a moment as it

12    relates to the objecting stakeholders.  In paragraph 30 of

13    the reply brief that we filed the debtors noted that a

14    number of the E Side creditors, including Fidelity, have not

15    filed objections with this Court.  Fidelity was upset by

16    this comment, and so the debtors have agreed to correct the

17    record with the following statement which has been

18    coordinated with Fidelity.  That statement is as follows:

19         "While this observation is factual, neither the

20    Court nor the constituents should interpret the debtors'

21    observation as commentary about or by Fidelity.  The debtors

22    did not intend to characterize why Fidelity did not file

23    written objections, ascribe any motivation as to why

24    Fidelity did not file written objections, or profess any

25    specific insights into Fidelity's decision-making on why it

1    did not file written objections."

2          Moving on, Your Honor, to the second

3    misconception.  It's also important to consider the

4    available alternatives to the merger transaction.  Parties

5    have alleged that we've ignored the E Side and the

6    implication is that there would have been some better

7    alternative had we not done that.  Yet the fact is we tried

8    incredibly hard to pull something together on the E Side and

9    it ultimately didn't happen.

10          These negotiations advanced to the point that the

11   debtors announced at the June 25th hearing, but the E Side

12   equitization -- that the E Side equitization combined with a

13   new money investment was the tentative path forward.   But

14   we noted at that hearing that the equity financing still had

15   a ways to go and, in the end, it did not come to fruition.

16          Despite these setbacks, we have every intention of

17   continuing to negotiate an alternative plan in case the

18   proposed plan is not consummated.  The PSA allows us to do

19   this which, again, was a key sacrifice made by the investor

20   group.  And as I stated just a minute ago, the debtors are

21   engaged in ongoing negotiations with the non-consenting

22   stakeholders and are hopeful that we'll be able to generate

23   consensus around the primary plan.

24          As to the free option point, Your Honor, we will

25   provide a full briefing on this issue in connection with

1    confirmation and we can introduce evidence to the extent

2    it's necessary.  But before this concept starts to snowball,

3    and given that Your Honor mentioned it at the last hearing,

4    I wanted to briefly touch on it this morning.

5            I think the free option narrative started at the

6    hearing a couple of weeks ago when we first announced a

7    deal.  After I provided an update at that hearing, Mr.

8    Diederich (ph) got up and said that a "free option"  is "how

9    the debtors' counsel described the deal" to him.

10           And then later Mr. Kireshi (ph) of Akin Gump on

11   behalf of the PIC trustee said the deal is "a free option as

12   characterized by the debtors."  I do love that.  Mr.

13   Diederich says the debtors says something and then Mr.

14   Kireshi says, as the debtors have conceded, Your Honor.

15           We're here to tell you today that we have -- we

16   have not conceded that point.  At that hearing two weeks ago

17   we had already yielded the podium and we didn't think those

18   comments rose to the level that needed to be corrected at

19   that hearing.  But to be clear from the debtors' perspective

20   this is not a free option.

21           The free option argument is based primarily on the

22   conditionality and lack of remedies if the deal doesn't

23   close.  But every agreement governing complex mergers like

24   this one has a measure of conditionality for the purchaser

25   because of the extensive conditions to closing.

1           This merger agreement in particular has a

2    significant degree of conditionality as made clear on the

3    record at the various hearings leading up to signing and

4    later in the disclosure statement and other filings.  But

5    this conditionality did not come free to the investor group.

6           Instead, the proposed new equity owners of

7    reorganized EFH made a key concession in exchange for the

8    deal's conditionality, which is disarmament.  Disarmament is

9    a key sacrifice on the part of the TCH junior creditors that

10   signed up to this deal and makes the transaction anything

11   but free.

12          Disarmament is first and foremost an agreement of

13   the TCH creditors to support a comprehensive settlement of

14   any and all alleged causes of action, including the DBA

15   settlement come what may.  The disarmament concept is

16   embodied primarily in the settlement agreement.  However,

17   the PSA also requires that the parties support an

18   alternative restructuring under certain circumstances, which

19   is what we call the drag.

20          Under the drag the TCH junior creditors have

21   agreed to refrain from objecting to an alternative plan that

22   provides them at least $550 million in cash recovery, paid

23   from the TCH estate as a carve-out from TCH's first lien

24   collateral.  Together, disarmament and the drag provide

25   assurance that the time spent pursuing the merger

Page 20

```
1    transaction will not be lost time.
2              The disarmament concept can be thought of like a
3    non-refundable deposit.  Instead of cash, however, the
4    currency is the permanent waiver of any and all alleged
5    causes of action.  These claims have the significant
6    potential to involve significant litigation costs and
7    massive delay, and the TCH unsecured creditors have alleged
8    that these causes of action, alleged causes of action have
9    significant value.
10             With that context we think it's difficult for any
11   party to characterize the rights of the ad hoc TCH unsecured
12   creditors in the proposed transactions as something that was
13   obtained free of cost.
14             With that, Your Honor, unless you have any
15   questions I will yield the podium to the DBAs.
16             THE COURT:  No questions.  Thank you.
17             MR. SASSOWER:  Thank you, Your Honor.  I think
18   we're going to start with Mark Thomas of Proskauer on behalf
19   of the EFH DBs.
20             MR. THOMAS:  Morning, Your Honor.
21             THE COURT:  Morning.
22             MR. THOMAS:  Mark Thomas of Proskauer representing
23   EFH and acting on behalf of and at the direction of Billy
24   Williamson and Don Evans, the disinterested directors of
25   EFH.
```

1          And, Your Honor, we have been retained and

2     resolutions were passed so that the disinterested directors

3     of EFH would resolve inter-debtor conflict matters.  And

4     notwithstanding ad hominem attacks and disparaging remarks

5     regarding the good faith of the work of the disinterested

6     directors and their advisors, we are here.  We have been

7     here since November and we have been actively involved in

8     all aspects of these cases.

9          Since our retention in November on behalf of the

10    disinterested directors of EFH we have reviewed, analyzed

11    and considered many things, including all the legacy

12    discovery.  And that legacy discovery, in addition to the

13    interlinks database, has been available to all the objectors

14    and they have had full and unfettered access to that trough

15    of documents and factual information.

16          And those documents and factual information gave

17    rise in February to the filing of standing motions and

18    litigation letters by various parties in interest, including

19    the official EFH committee.

20          Your Honor, we have also reviewed and considered

21    financial information and valuation information.  We, along

22    with the EFH committee, were intimately involved in the

23    bidding procedures and the bid process that Your Honor

24    approved with respect to the potential sale of Encore.  And

25    we, like the professionals as the EFH committee who were

1   aware of that process, know why no stalking horse bid was

2   presented to Your Honor for approval.

3          Your Honor, we have reviewed and considered all

4   proposals and all term sheets put forth by E Side

5   constituents and stakeholders with respect to alternative

6   plans of reorganization.  Those included proposals from the

7   EFIH PICs, the EFIH second liens, and the EFH creditors,

8   principally Fidelity.  We have not received any proposals or

9   any term sheets at any time from the EFH official committee.

10          We have considered the inertia that presently

11   exists with the E Side creditors.  That inertia is

12   unfortunate.  They're having a difficult time coming to

13   consensus on an E Side restructuring.  We believe that

14   difficult time is driven by the fact that they all want to

15   recover par plus accrued, and when everyone wants much

16   greater than 100 cents on the dollar for their claims in

17   Chapter 11 it's difficult to come to consensus.

18          We have considered the merits of the various

19   inter-debtor claims which gave rise to the DD settlement

20   that was announced in April.  And the gist of those claims

21   are avoidance actions that would be very complex, very time-

22   consuming and extremely expensive to litigate.  And most of

23   those types of claims were set forth in the standing

24   motions.  They were also discussed at length in the proposed

25   -- in the submissions of the disinterested directors in

1    April.

2           We've also considered the merits of the inter-

3    creditor claims that were also set forth in those standing

4    motions.

5           And at the appropriate time, Your Honor, we will

6    support the re-plan sponsored by the T unsecured that is

7    presently on file and the plan support agreement and the

8    9019 settlement agreement.  Now is not the time, but we will

9    be here at -- when those matters are up for hearing.

10   Today, we support the scheduling motion.

11          Your Honor, we've considered carefully the

12   regulatory risks and issues involved in the plan.  And these

13   regulatory risks will exist in any plan.  These are

14   regulated businesses.  Any change of control will require

15   consent and approval from the nuclear regulatory commission,

16   from FERK (ph), from the Public Utility Commission of Texas,

17   and we are also seeking rulings from the Internal Revenue

18   Service and that is a fact of life in these cases.

19          Your Honor, we've carefully considered the

20   disarmament provisions and the drag-along provisions that

21   Mr. Sassower mentioned, and the extraordinary benefits that

22   will occur to this estate in the event that the effective

23   date of the plan, assuming the plan is confirmed, does not

24   occur.  And we've considered the costs and the savings and

25   the time that will be paired off of the case based upon

Page 24

1   disarmament and drag.

2          Your Honor, we have met with and discussed the

3   disinterested directors' settlement as modified by the 9019

4   motion.  We have discussed the various proposals from the E

5   Side with E Side constituents and stakeholders.

6          Your Honor, if I may?

7          THE COURT:  Yes.  OF course.  Sorry.

8          MR. THOMAS:  Just briefly --

9          THE COURT:  Taking some notes.

10         MR. THOMAS:  That's -- thank you.

11         Briefly, with respect to the 9019 settlement, it's

12  extraordinarily complex and it's incredibly easy.  The gist

13  of the settlement is each of the three major debtors, EFIH,

14  EFH who I represent, and TCEH grant each other releases of

15  all claims and all causes of action except that the TCEH

16  estate, for the benefit of its creditors, will receive an

17  allowed unsecured claim of $700 million against EFH.  That

18  allowed claim is not a gift.  It was carefully considered an

19  analyzed.

20         And one of the things that the 9019 settlement

21  does is there is an agreement between the T first liens,

22  first lien creditors, and the T unsecured creditors that

23  provides that that $700 million allowed claim constitute

24  prepetition collateral of the T first lien creditors.

25         And in the absence of that kind of settlement, and

## Exhibit 22

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## <u>Exhibit 23</u>

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 24

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 25

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 26

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 27

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 28

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 29

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

**Exhibit 30**

| | |
|---|---|
| **Sender:** | Kranzley, Alexa J. <kranzleya@sullcrom.com> |
| **Sent:** | Thursday, December 11, 2014 11:51:16 PM |
| **Recipient:** | Sassower, Edward O (esassower@kirkland.com) <esassower@kirkland.com>;marc.kieselstein@kirkland.com;james.sprayregen@kirkland.com;st Jeff J. <jmarwil@proskauer.com>;Thomas, Mark K. <mthomas@proskauer.com>;rlevin@cravat |
| **Cc:** | Dietderich, Andrew G. <dietdericha@sullcrom.com>;Glueckstein, Brian D. <gluecksteinb@sullc (Ronen.Bojmel@guggenheimpartners.com) <Ronen.Bojmel@guggenheimpartners.com>;Henkir (Michael.Henkin@guggenheimpartners.com) <Michael.Henkin@guggenheimpartners.com>;Hol <AHoltz@alixpartners.com> |
| **Subject:** | EFH Settlement - Additional Claims [Confidential / Subject to FRE 408] |
| **Attachments:** | SC1-#3764249-v1-EFH_-_Additional_Claims.docx |

<u>**CONFIDENTIAL/SUBJECT TO FRE 408**</u>

Attached are some additions to the list of intercompany claims that merit attention.  As discussed, this is prepared now at your request based on only preliminary work, and we reserve the right to amend or supplement.  In particular, we are not in a position at this time to enumerate specific claims against sponsors and their affiliates (or Ds, Os or other insiders for prepetition acts or omissions.)  Our preliminary view is that including settlement of such matters at this time is not necessary to create a confirmable plan and adds risk and complexity that could prove with time to be harmful to creditors.

**Alexa J. Kranzley**
Sullivan & Cromwell LLP | 125 Broad Street | New York, NY 10004-2498
T: (212) 558-7893 | F: (212) 291-9373 | C: (917) 587-0849
kranzleya@sullcrom.com | http://www.sullcrom.com

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

EFH_DD00004946

**Additions to Proposed Claims for Comprehensive Settlement**

K.  Any use of EFH NOLs by EFH, EFIH or new Oncor owners

L.  Claim by EFH versus GenCo and other T subsidiaries with respect to tax and other liabilities, including $567 million tax liability for 'mark to market' settlement

M.  Claims to avoid dividends or distributions from GenCo to TCEH, EFCH, etc. while GenCo was insolvent

N.  Claims to judicially determine the contractual limit on the upstream guarantees of LBO and post-LBO debt by GenCo and its subsidiaries ('savings clause')

    1.  Determination of GenCo and subsidiary solvency net of taxes (fair saleable value, adequate capitalization, etc.)

        A.  2007

        B.  Date of each subsequent incurrence of an upstream guarantee

    2.  Clawback to GenCo of debt service paid to TCEII firsts, seconds and unsecureds with respect to missing portion of upstream guarantees

O.  Claims that TCEH first liens are subject to pre-existing gains tax liability in 2007

P.  Claims for employee pension, OBEP, SERP, insurance and  other costs not charged to GenCo in business services arrangements in the past

Q.  Claims for fair value payment from GenCo to EFH for assumption of business services arrangements

R.  Preference claims

    1.  Against E and T funded debt holders

    2.  Between business services and other companies

S.  Other claims against sponsors, sponsor affiliates and designees, belonging to EFH and EFIH, including affirmative claims and grounds for disallowance or subordination, to the extent such claims are included in a "Comprehensive Settlement"

EFH_DD00004947

**Exhibit 31**

| | |
|---|---|
| **Sender:** | Peck, James M. <JPeck@mofo.com> |
| **Sent:** | Saturday, January 10, 2015 8:07:40 PM |
| **Recipient:** | Walper, Thomas <thomas.walper@mto.com> |
| **Cc:** | Miller, Brett H. <BrettMiller@mofo.com> |
| **Subject:** | Re: Can we follow up around 4 eastern? |

---

Heads up: We should have had greater visibility into your client's decision process and timing. Jamie tells us that Hugh's earlier than expected decision to green light procedures was the factor that lead to fast track scheduling of the board meeting.
Sent from my iPhone
> On Jan 10, 2015, at 2:48 PM, Walper, Thomas <thomas.walper@mto.com> wrote:>
> Speak to you then. Thank you.>
> Thomas B. Walper> Cell: 626.893.4642
> thomas.walper@mto.com>
>> On Jan 10, 2015, at 11:47 AM, Peck, James M. <JPeck@mofo.com> wrote:>>
>> I'm available as well. Let's use the same dial in. Bottom line: proceeding with meeting tomorrow; understands the negative energy caused by precipitous decision to approve procedures; asserts Hugh will be able to stop sale process if needed; is open to better communication and damage control.>>
>> Sent from my iPhone>>
>>> On Jan 10, 2015, at 2:29 PM, Miller, Brett H. <BrettMiller@mofo.com> wrote:>>>
>>> I am available. We just spent an hour on the phone with Jamie.>>>
>>> Brett H. Miller | Managing Partner - NY>>> Morrison & Foerster LLP | www.mofo.com
>>> 250 West 55th Street | New York, NY 10019-9601>>> T: 212-468-8051| F: 212-468-7900
>>> E: bmiller@mofo.com>>>
>>> Please note our new address>>>
>>> Original Message>>> From: Walper, Thomas
>>> Sent: Saturday, January 10, 2015 2:23 PM>>> To: Miller, Brett H.; Peck, James M.
>>> Subject: Can we follow up around 4 eastern?>>>
>>>>>> Thomas B. Walper
>>> Cell: 626.893.4642>>> thomas.walper@mto.com
>>>>

====================================================================
>>>> This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail JPeck@mofo.com, and delete the message.
>
====================================================================
This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail JPeck@mofo.com, and delete the

message.

EFCH00016062

## Exhibit 32

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 33

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

**<u>Exhibit 34</u>**

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 35

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 36

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## <u>Exhibit 37</u>

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

**Exhibit 38**

| **Sender:** | Mason, Richard G. <RGMason@WLRK.com> |
|---|---|
| **Sent:** | Friday, April 10, 2015 12:42:50 AM |
| **Recipient:** | Lauria, Thomas E. (White & Case LLP) <tlauria@whitecase.com>;Sprayregen, James H. M. (Kirkland & Ellis LLP) <james.sprayregen@kirkland.com>;'mkieselstein@kirkland.com' <mkieselstein@kirkland.com>;Sassower, Edward O. (Kirkland & Ellis LLP) <esassower@kirkland.com>;Zelin, Steven M. (The Blackstone Group) <zelin@blackstone.com>;Walper, Thomas <thomas.walper@mto.com>;Thomas, Mark K. (Proskauer Rose LLP) <mthomas@proskauer.com> |
| **Cc:** | Shore, J. Christopher (White & Case LLP) <cshore@whitecase.com>;Pryor, Gregory (White & Case LLP) <gpryor@whitecase.com>;Siegert, P. Eric (Houlihan Lokey) <esiegert@hl.com>;'MMazzucchi@HL.com' <MMazzucchi@HL.com> |
| **Subject:** | RE: EFH |

Thanks Tom. We have shared this with our clients.
Ricky
Richard G. Mason
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
212-403-1252 (phone)
212-403-2000 (fax)
rgmason@wlrk.com (email)
-----Original Message-----
From: Lauria, Thomas E [mailto:tlauria@whitecase.com]
Sent: Thursday, April 09, 2015 6:39 PM
To: Sprayregen, James H. M. (Kirkland & Ellis LLP); 'mkieselstein@kirkland.com'; Sassower, Edward O. (Kirkland & Ellis LLP); Mason, Richard G.; Zelin, Steven M. (The Blackstone Group); Walper, Thomas B. (Munger, Tolles & Olson LLP); Thomas, Mark K. (Proskauer Rose LLP)
Cc: Shore, J. Christopher (White & Case LLP); Pryor, Gregory (White & Case LLP); Siegert, P. Eric (Houlihan Lokey); 'MMazzucchi@HL.com'
Subject: Re: EFH
By the way, I would ask that you share my email with your clients and all relevant deciders and their advisors.


--------------------------
Sent from my BlackBerry Wireless Handheld
----- Original Message -----
From: Lauria, Thomas E
Sent: Thursday, April 09, 2015 06:32 PM
To: 'James.sprayregen@kirkland.com' <James.sprayregen@kirkland.com>; 'mkieselstein@kirkland.com' <mkieselstein@kirkland.com>; 'esassower@kirkland.com' <esassower@kirkland.com>; 'RGMason@WLRK.com' <RGMason@WLRK.com>; 'zelin@blackstone.com' <zelin@blackstone.com>; 'thomas.walper@mto.com' <thomas.walper@mto.com>; 'mthomas@proskauer.com' <mthomas@proskauer.com>
Cc: Shore, Christopher; Pryor, Gregory; 'ESiegert@HL.com' <ESiegert@HL.com>; 'MMazzucchi@HL.com' <MMazzucchi@HL.com>
Subject: EFH
Jamie, Edward and Marc,

As you know, several months ago, the Ad Hoc Group of TCEH Unsecured Noteholders (the "TCEH group") commenced discussions with the Debtors and the Sponsors regarding an alternative plan that would increase distributable value through the use of a REIT structure and that would moot concerns about a potentially

EFCH00005275

massive trapped tax at EFH by having EFH retain its ownership of TCEH. To achieve this result, among other things, we would have had be able to confirm the plan by cramdown on the TCEH First Lien Creditors, who would likely vote to reject. Over time, as a consequence of input from the Sponsors, the Debtors and the various estate fiduciaries, and based on our performance of additional diligence and investigation, the proposal has evolved into one that has far fewer moving parts, entails less execution risk and that could eliminate much of the litigation that might otherwise plague these estates for years to come. At this point, the proposal has three primary elements:

(1) The merchant generation business would be spun-off to the TCEH First Lien Creditors in a way that gives them the benefit of a partial step-up in basis; the TCEH Firsts would waive (or assign for the benefit of the TCEH unsecureds) their deficiency claims and their right to recover on interdebtor claims; and the TCEH Firsts would be released from all estate claims and causes of action;

(2) The TCEH unsecureds (including the TCEH Second Lien Creditors and PCRBs) would receive equity and the right to buy the rest of the equity in EFH, which would be converted into a REIT; and

(3) The proceeds of the above-noted equity raise, together with new EFIH debt and cash on the EFIH balance sheet, would be used to pay in cash in full all allowed secured and unsecured claims against EFH and EFIH.

I think all parties now recognize and agree that the conversion of EFH into a REIT substantially increases the value of the ownership interests in Oncor and that such a transaction, for which there is precedent in Texas, is reasonably executable, particularly if the right strategic partner is involved. In that regard, the true benefit of the transaction we are proposing is that, rather than allowing that accretive value to be acquired by a third party purchaser or EFIH creditors who otherwise stand to get paid in full through the Debtors' auction process, it instead captures that value and uses it to pay all E-side creditors in full and to provide currency to pay T-side claims that would otherwise receive little or no recovery, absent the litigation of intra- and inter-estate claims.

The proposed transaction requires only the agreement of the Sponsors (who are giving up their right to the upside in exchange for a quick peace and a release), the TCEH Firsts (who are giving up their right to try to recover on their deficiency claims in exchange for getting their collateral quickly, without dispute and on terms that allow them to enjoy the benefit of a partial step up in basis), and the TCEH Unsecureds (who are forgoing litigation rights for the opportunity to own the upside surplus value of EFH, converted into a REIT).

All other creditors are unimpaired.

It also requires the TCEH Group to provide commitments to backstop the purchase of approximately $5 billion of EFH/REIT equity and to raise about $6 billion of new EFIH debt. Efforts to satisfy these requirements are under way and now going at full steam. However, getting to definitive arrangements regarding that amount of capital and establishing and formalizing relationships with the right partners for the successful implementation of the transaction are not over-night exercises. Realistically, we think it will take well into May or early June for this value-maximizing, peace-creating transaction to be substantially and definitively documented and that it will likely take at least six months to get (a) a plan implementing the deal confirmed, (b) the necessary Texas PUC approval and (c) the required IRS private letter rulings.

So, what we need is an appropriate runway to focus our efforts on finalizing our transaction and to give the Debtors the opportunity to determine if it should serve as the basis for their exit from chapter 11. To do this, we would propose that the Debtors build some time into the front end of their contemplated timelines for the auction and plan processes, such that without materially diminishing the ability to pursue an exit based on the auction of Oncor and the plan structure that the Debtors are currently pursuing, we can offer what we think is a superior exit and the Debtors can pivot to our approach in an efficient fashion if they agree.

To do this, we make the following requests:

(1) While we believe it would be best if the Debtors would delay the filing of their plan until early May, if the Debtors feel that they must file on Monday, April 13, we believe the damage to our effort and the level of distraction can be mitigated if--

(a) the plan leaves blank (i) the amount of first-dollar value from the E-side that will go to the TCEH First Lien Creditors, and (ii) the amount of the minimum distribution to the TCEH Unsecureds,

(b) the Debtors agree not to schedule the hearing on approval of the Disclosure Statement for any earlier than July, and

(c) the Debtors agree not to schedule the hearing on their plan for any earlier than December (unless peace breaks out);

(2) Likewise, while we believe the best thing would be to push the deadline for second round bids for Oncor until early May, the damage to our effort can be mitigated if the Debtors agree (a) to accept as a qualified bid one that does not include fully committed financing, and (b) not to determine who the stalking horse bidder is until June 15(this will allow discussions between our group and at least one potential strategic partner to continue hopefully to fruition); and

(3) To avoid any potential change in negotiating dynamics while we are pursuing our transaction, (a) the hearing on the motions for standing to commence litigation against the TCEH First Lien Creditors should be adjourned until the June omnibus hearing date, and (b) the statement filed yesterday by Hugh Sawyer should be withdrawn.

We ask that these matters be taken up and considered by all relevant parties and hope that they will all see the benefit of modifying the timelines slightly to accommodate our effort to formalize our proposal for a value-maximizing plan.

Thanks

Tom

--------------------------
Sent from my BlackBerry Wireless Handheld
===================================================================================
This email communication is confidential and is intended only for the individual(s) or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose the contents of this communication to others. Please notify the sender that you have received this email in error by replying to the email or by telephoning +1 212 819 8200. Please then delete the email and any copies of it. Thank you.
===================================================================================


===================================================
Please be advised that this transmittal may be a confidential attorney-client communication or may otherwise be privileged or confidential. If you are not the intended recipient, please do not read, copy or re-transmit this communication. If you have received this communication in error, please notify us by e-mail (helpdesk@wlrk.com) or by telephone (call us collect at 212-403-4357) and delete this message and any attachments.
Thank you in advance for your cooperation and assistance.

www.wlrk.com
===================================================

## <u>Exhibit 39</u>

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

**<u>Exhibit 40</u>**

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 41

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 42

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 43

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 44

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

**Exhibit 45**

| **Sender:** | Burton, Ashley <Ashley.Burton@energyfutureholdings.com> |
|---|---|
| **Sent:** | Thursday, December 11, 2014 5:35:37 PM |
| **Recipient:** | Marwil, Jeff J. <jmarwil@proskauer.com> |
| **Cc:** | Walker, Jeff (Legal) <Jeff.Walker@energyfutureholdings.com>;Dore, Stacey <Stacey.Dore@energyfutureholdings.com> |
| **Subject:** | Resolutions |
| **Attachments:** | EFH Resolutions.docx |

Attached is a copy of the final resolutions adopted by the EFH Board on December 9.  Please let me know if you have any questions.

Thank you,
Ashley

**Ashley Burton**
Manager, Corporate Governance
**Energy Future Holdings | 1601 Bryan Street | 43-064 | Dallas, Texas  75201**
Office: 214.812.0017| Email: ashley.burton@energyfutureholdings.com

Confidentiality Notice: This email message, including any attachments, contains or may contain confidential information intended only for the addressee. If you are not an intended recipient of this message, be advised that any reading, dissemination, forwarding, printing, copying or other use of this message or its attachments is strictly prohibited. If you have received this message in error, please notify the sender immediately by reply message and delete this email message and any attachments from your system.

**ENERGY FUTURE HOLDINGS CORP. ("EFH")**
**BOARD OF DIRECTORS RESOLUTIONS**
**DECEMBER 9, 2014**

The following recitals and resolutions supplement the Board of Directors Resolutions dated as of November 7, 2014 ("November 7th Resolutions") and, in the event of any inconsistency, these resolutions shall supersede and control.

WHEREAS, EFH and certain of its direct and indirect subsidiaries (excluding Oncor Electric Delivery Holdings Company LLC and its subsidiaries), including TCEH (the "Debtors") on April 29, 2014, filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code ("Chapter 11 Case") in the Bankruptcy Court for the District of Delaware ("Bankruptcy Court");

WHEREAS, the members of the Board of Directors of EFH ("Board") having relationships or interests with other affiliated or related companies and their direct or indirect equity holders and other material relationships have disclosed certain facts that they believe to be material to the Board;

WHEREAS, as described in the material presented and reviewed by the Board and based on a review of the known facts and circumstances, the Board has determined and confirmed by the November 7th Resolutions that Donald L. Evans and Billie I. Williamson are the only current members of the Board that are disinterested with respect to any matter pertaining to the Chapter 11 Case on which an actual conflict exists between EFH, on the one hand, and any other Debtor, on the other hand ("Conflict Matters"), and were designated the Disinterested Directors ("Disinterested Directors") as set forth in *Stipulation and Agreed Order Regarding a Protocol for Certain Case Matters*, approved by the Bankruptcy Court on September 16, 2014 ("Stipulation");

WHEREAS, the members of the Board considered the Stipulation related to, among other things, the authority of the Disinterested Directors to retain independent legal counsel and other advisors under certain circumstances;

WHEREAS, the Board resolved by the November 7th Resolutions to delegate the authority to the Disinterested Directors to seek and retain, at EFH's sole expense, independent legal counsel and such other advisors ("Independent Advisors") as the Disinterested Directors deem necessary to represent and advise EFH, reporting to the Disinterested Directors, on the Conflict Matters;

WHEREAS, the Disinterested Directors interviewed and engaged certain Independent Advisors effective as of November 19, 2014 to represent and advise EFH, and reporting solely to the Disinterested Directors, as set forth herein; and

WHEREAS, pursuant to the Stipulation and Section 21.416 of the Texas Business Organizations Code, the members of the Board desire to delegate to the Disinterested Directors certain rights, authority, and powers in connection with Conflict Matters, among other matters set forth herein;

NOW, THEREFORE, BE IT,

RESOLVED that, to the fullest extent permitted by applicable law, the Board hereby delegates to the Disinterested Directors the authority to review and act upon (as set forth herein) any Conflict Matters; and further

RESOLVED that, to the fullest extent permitted by applicable law, the Board hereby delegates to the Disinterested Directors the authority to investigate and determine whether any matter constitutes a Conflict Matter, in the exercise of their business judgment and with the advice of the Independent Advisors, and any such determination shall be binding on EFH and EFH's subsidiaries (other than Energy Future Intermediate Holding Company LLC and its direct and indirect subsidiaries and Energy

Future Competitive Holdings Company LLC and its direct and indirect subsidiaries (the "Excluded Subsidiaries")); and further

RESOLVED that, to the fullest extent permitted by applicable law, the Board hereby delegates to the Disinterested Directors the authority to make all decisions, and to implement or direct the implementation of all such decisions, in each case on EFH's behalf, with respect to Conflict Matters as the Disinterested Directors deem appropriate, in the exercise of their business judgment and with the advice of the Independent Advisors or others with whom the Disinterested Directors determine it is appropriate or necessary to consult, and to act on behalf of and bind EFH in connection therewith, including taking action on EFH's behalf, as the direct and indirect holder of 100% of the equity interests in its subsidiaries, causing such subsidiaries (other than the Excluded Subsidiaries) to abide by and implement the decisions and actions of the Disinterested Directors with respect to Conflict Matters and the Disinterested Directors' determination of whether a matter constitutes a Conflict Matter; and further

RESOLVED that the Disinterested Directors will update the Board at board meetings on the status of their (i) review of and decisions on whether any matter constitutes a Conflict Matter, and (ii) review of and decisions on Conflict Matters, in each case in the manner that the Disinterested Directors determine is appropriate and necessary to fulfill their duties and obligations as the Disinterested Directors, taking into account the confidentiality or privilege of the Disinterested Directors' work and the advice of the Independent Advisors; and further

RESOLVED that EFH shall, as the direct and indirect holder of 100% of the equity interests in its subsidiaries, direct and cause each of such subsidiaries (other than the Excluded Subsidiaries) to abide by and comply with these resolutions; and further

RESOLVED that the officers, employees, advisors and agents of EFH (collectively, the "Authorized Persons"), acting alone or with one or more other Authorized Persons, be, and hereby are, directed to furnish to the Disinterested Directors and the Independent Advisors all information as the Disinterested Directors or the Independent Advisors may request, in a manner that shall not effect a waiver of any applicable privilege, and to cooperate with the Disinterested Directors and the Independent Advisors in all respects; and further

RESOLVED that any Authorized Person, acting alone or with one or more other Authorized Persons be, and hereby are, authorized, empowered and directed to implement any decision made by the Disinterested Directors in respect of a Conflict Matter on behalf of EFH as directed by the Disinterested Directors; provided that the Disinterested Directors retain the right to implement any such decision on behalf of EFH and its subsidiaries (other than the Excluded Subsidiaries) themselves or through the Independent Advisors; and further

RESOLVED that any Authorized Person, acting alone or with one or more other Authorized Persons be, and they hereby are, authorized, empowered and directed to take any and all action that they deem necessary or proper to assist the Disinterested Directors in carrying out the foregoing, in each case as requested by and under the direction of the Disinterested Directors; and further

RESOLVED that the Disinterested Directors shall control any attorney-client, work product, or other privilege belonging to EFH in connection with the Independent Advisors or their work or privileged communications on the Conflict Matters and on whether any matter constitutes a Conflict Matter; and further

RESOLVED that each member of the Board has agreed and hereby agrees that he or she shall not have access to, and shall not seek access to, and hereby directs that each Authorized Person shall not have access to and shall not seek access to, the work or privileged material of the Independent Advisors on the Conflict Matters or on whether any matter constitutes a Conflict Matter, except as permitted by the Disinterested Directors; and further

EFH_DD00015417

RESOLVED that the Disinterested Directors be, and hereby are, authorized to take all such further action, at EFH's expense, as the Disinterested Directors shall deem necessary, proper or advisable consistent with these resolutions or in order to carry out fully the intent and purposes of these resolutions; and further

RESOLVED that all actions previously done or approved, or caused to be done or approved, by the Disinterested Directors or the Authorized Persons, including the retention of Independent Advisors, in each case only to the extent consistent with these resolutions, or to otherwise carry out the intent of these resolutions, be and hereby are approved, adopted, confirmed and ratified in all respects.

EFH_DD00015418

## Exhibit 46

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

**Exhibit 47**

| **Sender:** | Keglevic, Paul <Paul.Keglevic@energyfutureholdings.com> |
|---|---|
| **Sent:** | Friday, February 20, 2015 6:36:40 PM |
| **Recipient:** | Billie Williamson <billie.williamson@forresterco.com> |
| **Subject:** | Fwd: Tax Gain and Partial Step Up.pptx |
| **Attachments:** | Tax Gain and Partial Step Up.pdf;ATT00001.htm |

I used $19 since that was value of TCEH first lien debt at filing so this was the amount of potential value they gave up in RSA
$13,250 is what we are using for Goodwill based on Duff and Phelps work

Sensitivity outlined on bottom of slide

Paul Keglevic
O-214-812-4032
C-214-422-5422
C-213-509-3173

Begin forwarded message:

> **From:** "Carter, Michael" <Michael.Carter@energyfutureholdings.com>
> **Date:** February 20, 2015 at 12:25:44 PM CST
> **To:** "Keglevic, Paul" <Paul.Keglevic@energyfutureholdings.com>
> **Subject: Tax Gain and Partial Step Up.pptx**
>
> See attached

Confidentiality Notice: This email message, including any attachments, contains or may contain confidential information intended only for the addressee. If you are not an intended recipient of this message, be advised that any reading, dissemination, forwarding, printing, copying or other use of this message or its attachments is strictly prohibited. If you have received this message in error, please notify the sender immediately by reply message and delete this email message and any attachments from your system.

---

**Total Control Panel**                                                                 Login

To: billie.williamson@forresterco.com    Remove this sender from my allow list
From:
paul.keglevic@energyfutureholdings.com

*You received this message because the sender is on your allow list.*

EFH_DD00035133

# Value to TCEH of Partial Tax Basis Step Up

**As of 11/30/2014; $ millions**

| | Fair Value at Filing Based on 1st Lien Debt Price | Current Fair Value |
|---|---|---|
| **Fair Value** | 19,500 | 13,250 |
| **Tax Basis** | (7,000) | (6,800) |
| | 12,500 | 6,450 |
| **NOL's[1]** | (2,000) | (4,900) |
| **Gain after NOL's** | 10,500 | 1,550 |
| **x Tax Rate** | 35% | 35% |
| **Tax Payment** | 3,675 | 550 |
| | | |
| **Value to TCEH (PV at 9%)** | 1,775 | 275 |

*Each $1bn change in EV in results in additional tax of ($1bn * 35%) $350mm and NPV impact of $175mm*

[1] Current fair value reflects NOLs assuming 12/31/15 emergence.

0

**Exhibit 48**

**MINUTES OF A MEETING OF THE**
**DISINTERESTED DIRECTORS**
**OF ENERGY FUTURE HOLDINGS CORP.**

**MARCH 16, 2015**

A meeting of the Disinterested Directors of the Board of Directors (the "Board") of Energy

Future Holdings Corp., a Texas corporation ("EFH" or the "Company"), was held on March 16,

2015, at 5:00 p.m. (Eastern).

**Disinterested Directors Present:**

> Donald L. Evans
> Billie I. Williamson

**Others Present:**

> Julie M. Allen, Esq., Proskauer Rose LLP
> Michael A. Firestein, Esq., Proskauer Rose LLP
> Jeff J. Marwil, Esq., Proskauer Rose LLP
> Mark K. Thomas, Esq., Proskauer Rose LLP
> Neil Luria, SOLIC Capital
> Raoul Nowitz, SOLIC Capital

Ms. Allen acted as Secretary of the meeting. ██████████ the purpose of the meeting

was to report to the Disinterested Directors on the demand made by Munger Tolles & Olson LLP

("MTO"), as independent legal advisor to the disinterested manager of Energy Future Competitive

Holdings Company LLC ("EFCH") and Texas Competitive Electric Holdings Company LLC

("TCEH"), Mr. Hugh Sawyer, to Proskauer Rose LLP, as independent legal advisor to the

Disinterested Directors, with respect to intercompany claims of TCEH against the other debtors in the

Chapter 11 proceedings.

1

EFH_DD00004567

███████████████ MTO indicated that they valued their claims against EFH at "par" (i.e., without regard to any litigation risk and assuming a 100% recovery on all claims in their favor without regard to the law or facts) in the range of $1.8 billion to $2.5 billion, excluding LBO claims.  The "par" amounts are comprised of the following:

1. Intercompay tax claim=$754 million;

2. Insider preference=$84 million;

3. SG&A/P&I notes (interest rate delta) claim=$620 million;

4. Amend and extend claim=$80 million;

5. Over-allocation of shared services=$125 million;

6. Over-allocation of sponsor fees=$140 million;

7. LBO claims=zero; and

8. Basis step-up=$700 million

MTO indicated that there was some overlap between the intercompany tax claim and the basis step-up claim, which accounts for the $700 million difference in the low and high end of the range of their "par" number.  MTO offered to settle their claims against EFH for (i) $1.2 billion plus (ii) the NOLs, which would be transferred by EFH to TCEH in connection with the tax-free spin-off of TCEH, and (iii) 100% of any excess value from the sale of Oncor after payment in full to all E-side creditors and the approximately $10 million payment to the sponsors to satisfy the continuity of interest requirement for the tax-free spin.  MTO further alleged that of the $1.2 billion amount, EFIH was jointly and severally liable for $200 million of such amount.  MTO further stated that their offer included releases to all directors, officers and sponsors.

2

5249/26969-005 current/48166523v1                          03/29/2015 7:20 pm

EFH_DD00004568

After extensive discussion ███████████████████ ███████████████████████████████████████ it was determined to table a decision on a counter-offer until the following day.

There being no further business to come before the meeting, the meeting was adjourned at approximately 6:00 p.m. (Eastern).

Julie M. Allen, Secretary of the Meeting

3

EFH_DD00004569

**Exhibit 49**

## MINUTES OF A MEETING OF THE
## DISINTERESTED DIRECTORS
## OF ENERGY FUTURE HOLDINGS CORP.

### MARCH 17, 2015

A meeting of the Disinterested Directors of the Board of Directors (the "Board") of Energy

Future Holdings Corp., a Texas corporation ("EFH" or the "Company"), was held on March 17, 2015,

at 5:00 p.m. (Eastern).

**Disinterested Directors Present:**

> Donald L. Evans
> Billie I. Williamson

**Others Present:**

> Michael A. Firestein, Esq., Proskauer Rose LLP
> Jeff J. Marwil, Esq., Proskauer Rose LLP
> Neil Luria, SOLIC Capital
> Raoul Nowitz, SOLIC Capital

Mr. Marwil acted as Secretary of the meeting. ███████████ that the purpose of the meeting

was to discuss the counter-offer to be made to the demand made by Munger Tolles & Olson LLP

("MTO"), as independent legal advisor to the disinterested manager of Energy Future Competitive

Holdings Company LLC ("EFCH") and Texas Competitive Electric Holdings Company LLC

("TCEH"), Mr. Hugh Sawyer, with respect to intercompany claims of TCEH against the other debtors in

the Chapter 11 proceedings.

After discussion, noting that the value at "par" (i.e., without regard to litigation risk and assuming

a 100% recovery) of the EFH claims against TCEH is $1.3 billion (comprised of $930 million in tax

1.

EFH_DD00004570

claims and $380 million of notes) and that the NOLs (with a present value of approximately $1 billion) are the property of EFH, the Disinterested Directors authorized Proskauer to make the following counter-offer to MTO:

1. Waive the tax claim=$930 million;

2. Waive the notes claim−$380 million;

3. Provide for a $100 million TCEH claim against EFH;

4. Contribute the NOLs (present value of $1 billion) to TCEH;

5. Provide for sharing of excess consideration from the sale of Oncor after payment in full to all E-side creditors in a manner consistent with the Co-CRO term sheet; and

6. Provide for releases to all directors, officers and sponsors.

There being no further business to come before the meeting, the meeting was adjourned at approximately 6:00 p.m. (Eastern).

Jeff J. Marwil, Secretary of the Meeting

2.

5249/26969-005 current/47511586v2                                       02/17/2015 5:34 pm

**Exhibit 50**

| | |
|---|---|
| **Sender:** | Dietderich, Andrew G. <dietdericha@sullcrom.com> |
| **Sent:** | Friday, April 03, 2015 9:54:24 PM |
| **Recipient:** | Thomas, Mark K. <mthomas@proskauer.com> |
| **Cc:** | Marwil, Jeff J. <jmarwil@proskauer.com>;Glueckstein, Brian D. <gluecksteinb@sullcrom.com>;zzExt-Ronen.Bojmel@guggenheimpartners.com <Ronen.Bojmel@guggenheimpartners.com>;zzExt-Michael.Henkin@guggenheimpartners.com <Michael.Henkin@guggenheimpartners.com> |
| **Subject:** | RE: EFH |

I left a voicemail for Jeff. We need a time this weekend where Proskauer can walk us through the claims and the fiduciary considerations that led to this result. It is critical that it happen as promptly as possible.

I can assure you that dozens of people will now be working over the holidays. It would aid us greatly if you would spend an hour on the phone.

-----Original Message-----
**From:** Thomas, Mark K. [mthomas@proskauer.com]
**Sent:** Friday, April 03, 2015 04:25 PM Eastern Standard Time
**To:** Dietderich, Andrew G.
**Cc:** Marwil, Jeff J.
**Subject:** Re: EFH

  Andy, we are shutting down for the weekend. Happy to discuss with you next week.
  Mark

Sent from my iPhone

On Apr 3, 2015, at 1:41 PM, Dietderich, Andrew G. <dietdericha@sullcrom.com> wrote:

  This requires an explanation as quickly as possible, so we can put it in context for stakeholders.  I left a voicemail.  When can we speak?

  **From:** Possinger, Paul V. [mailto:ppossinger@proskauer.com]
  **Sent:** Friday, April 03, 2015 1:03 PM
  **To:** Dietderich, Andrew G.
  **Subject:** FW: EFH - Please see attached

  Apologies, misspelled your email address the first time.

  **From:** Possinger, Paul V.
  **Sent:** Friday, April 03, 2015 12:00 PM
  **To:** 'dietricha@sullcrom.com'; 'torkinm@sullcrom.com'; 'aglenn@kasowitz.com'; 'dfliman@kasowitz.com'; 'drosner@kasowitz.com'; 'rpedone@nixonpeabody.com'; 'gary.kaplan@friedfrank.com'; 'brad.scheler@friedfrank.com'; 'matthew.roose@friedfrank.com'; 'awitt@wlrk.com'; 'rgmason@wlrk.com'
  **Cc:** Thomas, Mark K.; Marwil, Jeff J.; Allen, Julie M.
  **Subject:** EFH - Please see attached

EFH_DD00006393

**Paul V. Possinger**
**Partner**

Proskauer
Three First National Plaza
70 West Madison, Suite 3800
Chicago, IL 60602-4342
d 312.962.3570
m 312.953.2909
f  312.962.3551
ppossinger@proskauer.com

greenspaces
Please consider the environment before printing this email.

*********************************************************************************************
This message and its attachments are sent from a law firm and may contain information that is
confidential and protected by privilege from disclosure.
If you are not the intended recipient, you are prohibited from printing, copying, forwarding or
saving them.
Please delete the message and attachments without printing, copying, forwarding or saving them,
and notify the sender immediately.
*********************************************************************************************

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

<Final Joint Statement.pdf>

EFH_DD00006394

## Exhibit 51

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 52

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 53

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 54

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 55

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## <u>Exhibit 56</u>

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

**Exhibit 57**

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 58

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## **Exhibit 59**

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

**Exhibit 60**

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## **Exhibit 61**

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## __Exhibit 62__

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 63

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

**Exhibit 64**

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

SC1:3974781.2

**<u>Exhibit 65</u>**

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## <u>Exhibit 66</u>

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## <u>Exhibit 67</u>

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 68

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## **Exhibit 69**

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 70

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 71

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

**Exhibit 72**

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## __Exhibit 73__

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 74

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 75

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 76

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

<u>**Exhibit 77**</u>

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

**Exhibit 78**

| | |
|---|---|
| **Sender:** | Thomas, Mark K. </O=PROSKAUER/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=MTHOMAS> |
| **Sent:** | Monday, May 18, 2015 5:45:19 PM |
| **Recipient:** | 'Dietderich, Andrew G.' <dietdericha@sullcrom.com> |
| **Cc:** | Marwil, Jeff J. <jmarwil@proskauer.com>;Glueckstein, Brian D. <gluecksteinb@sullcrom.com>;Kranzley, Alexa J. <kranzleya@sullcrom.com>;Korry, Alexandra D. <KorryA@sullcrom.com>;Zylberberg, David R. <zylberbergd@sullcrom.com>;Richard Levin <RLevin@cravath.com>;Gelston Philip A. <pgelston@cravath.com> |
| **Subject:** | RE: Scheduling order |

Andy, the Scheduling Order and Stipulation have been entered by the Court.  Your parade of hypotheticals and unfounded assumptions and suspicions are utterly divorced from the facts of the Chapter 11 proceedings and the case calendar.  The bidders are fully aware of the bid process and schedule.  As previously stated, the Scheduling Motion and the Stipulation that arose therefrom are not Conflict Matters.  You are free to forward this message to your client.

Thanks, Mark

Mark K. Thomas
Partner

Proskauer
Three First National Plaza
70 West Madison, Suite 3800
Chicago, IL 60602-4342
d 312.962.3560
f  312.962.3551
mthomas@proskauer.com


greenspaces
Please consider the environment before printing this email.


-----Original Message-----
From: Dietderich, Andrew G. [mailto:dietdericha@sullcrom.com]
Sent: Monday, May 18, 2015 11:16 AM
To: Thomas, Mark K.
Cc: Marwil, Jeff J.; Glueckstein, Brian D.; Kranzley, Alexa J.; Korry, Alexandra D.; Zylberberg, David R.; Richard Levin; Gelston Philip A.
Subject: RE: Scheduling order

Mark,

My client is still interested in hearing your explanation when you are ready for the distraction.  Most relevant for them is the factual question whether your clients approved EFH entering into the stipulation.  Remember that they have no Oncor bidding information, unlike your clients.

Andy

-----Original Message-----
From: Thomas, Mark K. [mailto:mthomas@proskauer.com]
Sent: Friday, May 15, 2015 11:23 AM
To: Dietderich, Andrew G.
Cc: Marwil, Jeff J.; Glueckstein, Brian D.; Kranzley, Alexa J.; Korry, Alexandra D.; Zylberberg, David R.; Richard Levin; Gelston Philip A.
Subject: Re: Scheduling order

Rich and Phil, see Andy's email below.  I disagree with him on everything and will provide a detailed response later, but I thought you should be added to the discussion since EFIH is the Oncor majority owner.  Sorry to burden you with this distraction.  Mark

EFH_DD00023428

Mark K. Thomas
Partner
Proskauer
70 W. Madison Street
Chicago, Il 60602
312-962-3560

> On May 15, 2015, at 8:31 AM, Dietderich, Andrew G. <dietdericha@sullcrom.com> wrote:
>
> Well, that's a practical reason why it may not matter at the end of the day, but it misses our point.  This is not a scheduling order by the Court about litigation.  It's a CONTRACTUAL promise to the T-side not to hold a sale hearing before July 13 -- which is 58 days from today.  Oncor is being marketed right now and the delay could well be prejudicial to the M&A process (putting aside the incremental case burn for EFH).  It all sounds hunky-dory for EFH to delay the auction in hopes for a T side bid to save the day and pay all E creditors in full.  But these 'bidders' are the exact same group playing for delay since the beginning of the case.  If this is intended to facilitate a T side bid, have you seen any bona fides on that bid?  Has your client?  We have seen nothing.
>
> I understand why officers/directors/K&E/Evercore may want to cater to the T side in hopes this unsubstantiated bid solves their immense and growing problem.  But why would EFH itself contractually agree to this?  What if the T side bid - tomorrow - becomes not credible and/or dies and a buyer wants to proceed right away?  What if that buyer, understandably, does not want to be strung out so long?  The Court would of course reconsider schedule if the estates needed him to -- but now it cannot because EFH has contractually agreed with TCEH and its creditors -- including the T ad hoc committee (who has no fiduciary duties) -- not to grant bidding protection to any Oncor buyer prior to that date.
>
> I take it from your failure to answer my question that your clients did not review or approve.  I must disagree with your conclusion that this is not a conflict matter (although I will not parse the meaning of your capitalizing the term).  This stipulation is a contract between affiliates.  EFH and EFIH alone have the power to dispose of the property of their estates.  Now we effectively have the T side bidding for Oncor (owned by EFH and EFIH) and the conflicted debtor advisors (with fiduciary duties to the T side) facilitating that bid to the possible detriment of the Oncor sales process.  If that isn't a conflict matter, I don't know what is.
>
> -----Original Message-----
> From: Thomas, Mark K. [mailto:mthomas@proskauer.com]
> Sent: Friday, May 15, 2015 8:38 AM
> To: Dietderich, Andrew G.
> Cc: Marwil, Jeff J.; Glueckstein, Brian D.; Kranzley, Alexa J.
> Subject: Re: Scheduling order
>
>     Andy:
>     Everybody always knew, and the Scheduling Motion, which is not a Conflict Matter, acknowledged, that all dates would be dictated by Judge Sontchi's availability, not by the Debtors or the Disinterested Directors.
>     Mark
>
> Mark K. Thomas
> Partner
> Proskauer
> 70 W. Madison Street
> Chicago, Il 60602
> 312-962-3560
>
>> On May 14, 2015, at 8:10 PM, Dietderich, Andrew G. <dietdericha@sullcrom.com> wrote:
>>
>> Mark and Jeff, we were surprised to see the revised scheduling order now has the debtor committing not to have a stalking horse hearing before July 13.  Did your clients review and approve that change?  Please let us know promptly.  Andy.
>>
>>
>>
>>
>>
>> This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.
>
>
>
> *********************************************************************
> *********************************************************************
> ********** This message and its attachments are sent from a law firm

EFH_DD00023429

> and may contain information that is confidential and protected by privilege from disclosure.
> If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them.
> Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately.
> *******************************************************************
> *******************************************************************
> **********
>

EFH_DD00023430

## **Exhibit 79**

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 80

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 81

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

<u>**Exhibit 82**</u>

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## **Exhibit 83**

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**

## Exhibit 84

**FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER**