**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
|  | ) Case No. 14-10979 (CSS) |
|  | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | ) (Jointly Administered) |
|  | ) |
| Debtors. | ) **Re: D.I. 6122** |
|  | ) <u>**Hearing Date**</u>**: November 3, 2015 at 11:00 a.m. (ET)** |
|  | ) <u>**Objection Deadline**</u>**: October 23, 2015 at 4:00 p.m. (ET)** |
|  | ) |

**OBJECTION OF UMB BANK, N.A. TO CONFIRMATION OF FIFTH AMENDED
JOINT PLAN OF REORGANIZATION OF ENERGY FUTURE HOLDINGS
<u>CORP., *ET AL.*, PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND .....................................................................................................................4

I.  DESCRIPTION OF CLAIMS AND OBLIGATIONS UNDER INDENTURES ..............5

    A.  Contractual Interest (Rate, Additional Interest and Compounding Interest) Under the Indentures .......................................................................................7

    B.  Trustee Fees, Expenses and Indemnification Under the Indentures .......................8

II.  DESCRIPTION OF ALLOWANCE AND TREATMENT UNDER THE PLAN ..............9

    A.  Allowance Provisions Relating to the EFIH Unsecured Note Claims ....................9

    B.  Disallowance Provisions Relating to the EFIH Unsecured Note Claims ..............10

    C.  Postpetition Interest Reserve ...............................................................................10

OBJECTION .........................................................................................................................11

I.  THE PLAN IMPROPERLY ALTERS THE LEGAL, EQUITABLE AND CONTRACTUAL RIGHTS OF THE EFIH UNSECURED NOTE PARTIES IN VIOLATION OF SECTION 1124(1) ...............................................................................11

    A.  The Plan Alters the Indentures by Failing to Provide for the Payment of Postpetition Interest at the Rate and Method Prescribed Therein .........................14

        1.  Case Law and Legislative History Support the Conclusion that the Plain Language of Section 1124(1) Requires Payment of the Contractual Interest ...............................................................................15

        2.  Section 502(b)(2) Does Not Limit or Determine the Legal, Equitable and Contractual Entitlement of the EFIH Unsecured Noteholders to Postpetition Interest .........................................................20

    B.  The Plan Alters the Indentures by Failing to Provide for the Payment of the Trustee Fees and Expenses ............................................................................22

    C.  The Plan Alters the Indentures by Absolving Reorganized EFIH of All Post-Effective Date Obligations Under the Indentures .........................................24

    D.  The Debtors and Plan Sponsors Should be Enjoined from Seeking to Dismiss Any Appeals Concerning Disputed EFIH Unsecured Note Claims .........26

i

II.     THE DEBTORS IMPROPERLY USE THE PLAN TO OBJECT TO PORTIONS
        OF THE EFIH UNSECURED NOTE CLAIMS AND TRUSTEE FEES AND
        EXPENSES IN VIOLATION OF SECTION 1129(A)(1) .................................................28

        A.      The Debtors Have Offered No Basis or Explanation for the "Objection" in
                Violation of Bankruptcy Rule 3007 .......................................................................29

        B.      The Debtors Discriminate Against the Trustee Insofar as the Plan Provides
                for the Payment of the Fees and Expenses of the EFIH First and Second
                Lien Trustees and Trustees for the TCEH Unsecured and Second Lien
                Noteholders ............................................................................................................32

III.    THE PLAN FAILS TO PROVIDE ADEQUATE MEANS FOR
        IMPLEMENTATION IN VIOLATION OF SECTION 1123(A)(5) .................................33

IV.     THE PLAN PROVIDES FOR DISPARATE TREATMENT OF THE EFIH
        UNSECURED NOTEHOLDERS IN VIOLATION OF SECTION 1123(A)(4) ..............36

V.      THE PLAN WAS NOT PROPOSED IN GOOD FAITH IN VIOLATION OF
        SECTION 1129(A)(3) BECAUSE IT IS INEXTRICABLY TIED TO APPROVAL
        OF THE SETTLEMENT AGREEMENT ........................................................................38

RESERVATION OF RIGHTS ..................................................................................................40

CONCLUSION ...........................................................................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Ace-Texas, Inc.*,
217 B.R. 719 (Bankr. D. Del. 1998) ...............................................................12, 17

*In re AMR Corp.*,
No. 11-15463 (SHL) (Bankr. S.D.N.Y. June 5, 2013) ...........................................16

*In re Armstrong World Indus., Inc.*,
348 B.R. 111 (D. Del. 2006) .................................................................................33

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. Lasalle St. P'ship*,
526 U.S. 434 (1999) ............................................................................................17

*Bustop Shelters of Louisville, Inc. v. Classic Homes, Inc.*,
914 F.2d 810 (6th Cir. 1990) ...............................................................................25

*In re Calpine Corp.*,
No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 19, 2007) .........................................16

*In re Catholic Diocese of Wilmington, Inc.*,
513 B.R. 639 (Bankr. D. Del. 2014) .....................................................................31

*In re Chemtura Corp.*,
No. 09-11233 (REG) (Bankr. S.D.N.Y. Nov. 3, 2010) ..........................................16

*In re Coastal Broad. Sys.*,
2012 Bankr. LEXIS 3098 (Bankr. D.N.J. 2012).....................................................23

*In re Combustion Eng'g, Inc.*,
391 F.3d 190 (3d Cir. 2004)...........................................................................33, 36

*In re Coram Healthcare Corp.*,
315 B.R. 321 (Bankr. D. Del. 2004) .....................................................................12

*In re Delta Mills, Inc.*,
404 B.R. 95 (Bankr. D. Del. 2009) .......................................................................22

*In re Dow Corning Corp., ("Dow II")*
244 B.R. 678 (Bankr. E.D. Mich. 1999) ...............................................................16

*In re Dynamic Brokers, Inc.*,
293 B.R. 489 (B.A.P. 9th Cir. 2003).....................................................................30

*In re Energy Future Holdings Corp.*,
  513 B.R. 651 (Bankr. D. Del. 2014) ................................................................................17

*Energy Future Holdings Corp.*,
  No. 14-10979 (CSS) (Bankr. D. Del. 2014 Dec. 10, 2014) [D.I. 2963] ..................................32

*In re Gatzke*,
  365 B.R. 138 (Bankr. D. Mont. 2007) ...............................................................................30

*In re Gen. Growth Props., Inc.*,
  No. 09-11977 (ALG) (Bankr. S.D.N.Y. Oct. 21, 2010) .......................................................16

*In re Genesis Health Ventures, Inc.*,
  266 B.R. 591 (Bankr. D. Del. 2001) ..................................................................................33

*In re Glob. Ocean Carriers, Ltd.*,
  251 B.R. 31 (Bankr. D. Del. 2000) ...................................................................................23

*In re Hobdy*,
  130 B.R. 318 (B.A.P. 9th Cir. 1991) .................................................................................30

*In re Holden*,
  491 B.R. 728 (Bankr. E.D.N.C. 2013) ..............................................................................30

*In re Holt*,
  153 B.R. 215 (Bankr. N.D. Ill. 1993) ...........................................................................30, 31

*In re Insilco Techs., Inc.*,
  480 F.3d 212 (3d Cir. 2007)............................................................................................23

*In re Jankins*,
  184 B.R. 488 (Bankr. E.D. Va. 1995) ...............................................................................30

*In re Kincaid*,
  388 B.R. 610 (Bankr. E.D. Pa. 2008) ...............................................................................31

*In re Leslie Fay Cos., Inc.*,
  207 B.R. 764 (Bankr. S.D.N.Y. 1997)...............................................................................38

*In re Motors Liquidation Co.*,
  447 B.R. 198 (Bankr. S.D.N.Y. 2011)...............................................................................35

*In re New Century TRS Holdings, Inc.*,
  407 B.R. 576 (D. Del. 2009)............................................................................................36

*In re New Power Co.*,
  313 B.R. 496 (Bankr. N.D. Ga. 2004) ..............................................................................30

*In re New Valley Corp.*,
  168 B.R. 73 (Bankr. D.N.J. 1994) .................................................................17, 18

*In re Northwestern Corp.*,
  362 B.R. 131 (D. Del. 2007).........................................................................35

*In re Oakwood Homes Corp.*,
  394 B.R. 352 (Bankr. D. Del. 2008) ...............................................................22

*Ogle v. Fidelity & Deposit Co. of Md.*,
  586 F.3d 143 (2d Cir. 2009)..........................................................................30

*In re One2One Commc'ns, LLC*,
  No. 13-3410, 2015 WL 4430302 (3d. Cir. July 21, 2015)......................................28

*In re Overseas Shipholding Grp., Inc.*,
  No. 12-20000 (PJW) (Bankr. D. Del. July 16, 2014) ...........................................16

*Platinum Capital, Inc., v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*,
  314 F.3d 1070 (9th Cir. 2002) ......................................................................27

*In re PPI Enters. (U.S.), Inc.*
  ("*PPI*"), 324 F.3d 197 (3d Cir. 2003) ..................................................... passim

*In re PPI Enters. (U.S.), Inc.*,
  228 B.R. 339 (Bankr. D. Del. 1998) ...........................................................19, 20

*In re Premier Int'l Holdings, Inc.*,
  No. 09-12019 (CSS) (Bankr. D. Del. Apr. 1, 2010) [D.I. 1928] .............................16

*In re PWS Holdings Corp.*,
  228 F.3d 224 (3d Cir. 2000).........................................................................38

*In re Qmect, Inc.*,
  368 B.R. 882 (Bankr. N.D. Ca. 2007)..............................................................29

*Security Mortgage Co. v. Powers*,
  278 U.S. 149 (1928)...................................................................................29

*In re SNTL Corp.*,
  571 F.3d 826 (9th Cir. 2009) ........................................................................29

*In re Texas Rangers Baseball Partners*,
  434 B.R. 393 (Bankr. N.D. Tex. 2010)............................................................25

*Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co. ("Travelers")*,
  549 U.S. 443 (2007)...........................................................................22, 29, 30

*In re Valley View Shopping Ctr.*,
   260 B.R. 10 (Bankr. D. Kan. 2001) ..................................................................25

*In re Washington Mutual, Inc.*,
   260 B.R. 10 (Bankr. D. Kan. 2001) ..................................................................28

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012) .......................................................................12, 38

*In re W.R. Grace & Co.*,
   729 F.3d 311 (3d Cir. 2013).....................................................................36, 37

**STATUTES**

11 U.S.C.
   § 101(5)(A) ...........................................................................................29
   § 502(b)...............................................................17, 20, 21, 22, 29, 30
   § 1123(a)(5) ................................................................................. passim
   § 1123(a)(5) ...........................................................3, 11, 36, 37, 38
   §§ 1124(1), (2) .......................................................................... passim
   § 1124(3) ..........................................................................................17, 19
   § 1129(a)(3) ...............................................................................4, 11, 38
   § 1129(a)(3) ...........................................................................................19

Federal Judgeship Act of 1984 ..................................................................19

**OTHER AUTHORITIES**

Bankruptcy Rule 3007 .............................................................................3, 29
Disclosure Statement VIII.E.1 ......................................................................27
Fed. R. Bankr. P. 3001(f)..............................................................................31
Fed. R. Bankr. P. 3007(a) .............................................................................32
H.R. Rep. No. 103-835 (1994)................................................................19, 20
Rule 3001 ........................................................................................................31

UMB Bank, N.A., as Indenture Trustee (the "Trustee") for the unsecured 11.25%/12.25% Senior Toggle Notes Due 2018 (the "PIK Notes" and such holders, the "PIK Noteholders") and the 9.75% Senior Notes due 2019 (the "Unexchanged Senior Notes, and such holders, the "Unexchanged Senior Noteholders" and, together with the PIK Notes, the "EFIH Unsecured Notes"),[1] by and through its undersigned counsel, files this objection (the "Objection") to the *Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp.,* et al., *Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 6122] (the "Plan").  In support of this Objection, the Trustee respectfully submits as follows:

## PRELIMINARY STATEMENT[2]

1.      If the Plan, in its present form, actually did what it purports to do—unimpair and pay in full the Trustee and the EFIH Unsecured Noteholders—this Objection would be much more limited.  Instead, the Debtors are seeking through the Plan to abrogate the legal and contractual rights of the Trustee and the EFIH Unsecured Noteholders in order to reduce the purchase price the Plan Sponsors are required to pay to acquire EFIH's economic interests in Oncor Electric—the crown jewel of the Debtors' estates.[3]  While the Trustee has well-founded concerns regarding whether this Plan can be confirmed and whether this complex transaction will ever be consummated—concerns which it understands will be voiced by other objecting parties in these proceedings—the Trustee's objection to confirmation of the Plan is focused on elements which affect the allowance and treatment of claims held by the Trustee and the EFIH

---

[1] The Unexchanged Senior Noteholders, together with the PIK Noteholders, the "EFIH Unsecured Noteholders" and, together with the Trustee, the "EFIH Unsecured Note Parties."

[2] Capitalized terms used but not defined in the Preliminary Statement shall have the meanings ascribed to such terms below.  Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan (as defined herein), as applicable.

[3] If the Plan is consummated and the REIT Reorganization is accomplished, the Plan Sponsors expect billions of dollars of equity value to be created.  In fact, the Debtors' financial advisor believes that the enterprise value of Oncor may increase from approximately $19 billion (the price at which the Plan Sponsors are investing) to up to $24 billion.

Unsecured Noteholders.  As described below, the Plan does not satisfy Section 1129 for multiple reasons.

2.      First, as this Court is aware, the Debtors and the Plan Sponsors have advertised the Plan as a full unimpairment plan for all E-Side Creditors, who will be paid in full and in cash.  Like most advertisements, however, one needs to read the fine print.  Here, the Plan contains the fine print, and, upon closer inspection, it demonstrates that the Plan, among other things, alters the legal, contractual and equitable rights of the Trustee and the EFIH Unsecured Noteholders in violation of Section 1124(1).  The Plan fails, among other things, to (i) provide for the payment in full, and in cash, of all contractual entitlements due to the EFIH Unsecured Note Parties under the Indentures, including the payment of postpetition interest at the contractual rate and method set forth in the Indentures, (ii) provide for Reorganized EFIH to assume any liabilities for disputed claims of the Trustee and EFIH Unsecured Noteholders (should such claims be Allowed by entry of a Final Order), and (iii) provide for the payment of the fees and expenses of the Trustee and its advisors as required by the express terms of the Indentures.  Moreover, the legal and contractual rights of the Trustee and the EFIH Unsecured Noteholders are further altered by the Debtors' and Plan Sponsors' failure to preserve remedies upon appeal, including their refusal to waive the ability to seek dismissal of any appeals on equitable mootness grounds, assuming the Debtors prevail in this Court on their various claim objections and the Plan is consummated.

3.      Second, the Plan seeks impermissibly to disallow the Trustee's claims under the Indentures for unpaid fees and compensation as well as reimbursement of fees and expenses incurred by its advisors.  Despite the Plan's purported unimpairment of all creditors of EFIH (which include the claims of the Trustee), the Debtors inexplicably take the position that the

2

Plan functions as a "claim objection," seeking to disallow all EFIH Unsecured Note Claims, except as specifically Allowed pursuant to the Plan or otherwise objected to by the Debtors in these chapter 11 cases. This renders the Plan an objection to the Trustee Fees and Expenses, in violation of Bankruptcy Rule 3007. Furthermore, such objection is clearly discriminatory and inconsistent with favorable treatment of the TCEH unsecured trustees.[4]

4.     Third, the Plan violates Section 1123(a)(5) by not providing adequate means for the Plan's implementation because the Postpetition Interest Reserve will not be sufficiently funded. Even if the Court requires the Debtors to pay postpetition interest at the contract rate, the Debtors and the Plan Sponsors do not intend to pay such amounts on the Effective Date, but rather will place such funds in a Postpetition Interest Reserve for the duration of the appellate process. Furthermore, the Debtors seek authority through the Plan to simply cut off fee reimbursement obligations, as well as the accrual of post-Effective Date interest, while appeals drag on. By doing so, they have provided no assurance that Reorganized EFH or EFIH will be able to pay the postpetition interest claims at the contract rate if ultimately Allowed by Final Order in these cases. Neither the Trustee nor the EFIH Unsecured Noteholders should bear any risk of nonpayment under a Plan that purports to pay them in full and in cash.

5.     Fourth, the Plan violates Section 1123(a)(4) because it provides for disparate treatment among the EFIH Unsecured Noteholders. Holders of the same types of claims do not need to receive the exact same recovery, but a plan proponent is required to offer them the same opportunity. Here, the Plan impermissibly affords select EFIH Unsecured Noteholders the *opportunity* to invest and receive associated fees in connection with the Backstop Agreement without offering the same opportunity to all EFIH Unsecured Noteholders. As a party to the

---

[4] The Debtors also intend to pay the fees and expenses of the EFIH First and Second Lien Trustees (subject to a customary review process for reasonableness) and the advisor fees to the non-statutory TCEH unsecured creditor advisors.

Backstop Agreement, EFIH was required to make this opportunity available to all EFIH Unsecured Noteholders.

6.      Finally, the Plan was not proposed in good faith in violation of Section 1129(a)(3) to the extent confirmation is conditioned upon approval of the Settlement Agreement.

## BACKGROUND

7.      On April 29, 2014, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

8.      On April 14, 2015, the Debtors filed the *Joint Plan of Reorganization of Energy Future Holdings Corp., et al.*, *Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 4142] (the "Original Plan") and the disclosure statement related thereto [D.I. 4143].  On July 23, 2015, after the Debtors found that they were unable to effectuate the Original Plan, they filed the *Debtors' Amended Joint Chapter 11 Plan of Reorganization* [D.I. 5078] and the *Amended Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization* [D.I. 5080]. The Debtors have since filed a series of amended plans and disclosure statements.

9.      On August 10, 2015, the Debtors filed a number of agreements related to the implementation of the Plan (collectively, the "Plan Documents"), including the *Motion of Energy Future Holdings Corp., et al., to Authorize the Debtors to Enter Into and Perform Under the Plan Support Agreement* [D.I. 5248] (the "PSA Motion," and such plan support agreement, the "PSA") and the *Motion of Energy Future Holdings Corp., et al., to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter Into and Perform Under the Settlement Agreement* (the "Settlement Motion" and such settlement, the "Settlement Agreement") [D.I. 5249].  On September 18, 2015, the Court entered an Order approving the PSA Motion [D.I.

6097].   The Court will consider approval of the Settlement Agreement in connection with confirmation of the Plan.

10.    On September 21, 2015, the Debtors filed the most recent iteration of the Plan, as well as the *Disclosure Statement for the Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 6124] (the "Disclosure Statement").   Also on September 21, 2015, the Court held a hearing to consider approval of the Disclosure Statement and, on September 22, 2015, the Court entered the *Order (A) Approving the Disclosure Statement, (B) Establishing the Voting Date, Voting Deadline, and Other Dates, (C) Approving Procedures for Soliciting, Receiving, and Tabulating Votes on the Plan and for Filing Objections to the Plan, and (D) Approving the Manner and Forms of Notice and Other Related Documents* [D.I. 6131].

## I.    DESCRIPTION OF CLAIMS AND OBLIGATIONS UNDER INDENTURES

11.    Pursuant to an indenture dated December 5, 2012 (as amended and supplemented, the "PIK Indenture"), between December 5, 2012 and January 30, 2013, Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. (together, the "EFIH Debtors") issued $1,392,445,000 in aggregate principal amount of PIK Notes due 2018.   *See* PIK Indenture at 1.   Pursuant to an indenture dated November 16, 2009 (as amended, modified or supplemented, the "Unexchanged Senior Notes Indenture"), the EFIH Debtors issued the Unexchanged Senior Notes.   The Trustee was appointed as successor trustee immediately before the filing of the Debtors' chapter 11 cases.   The PIK Indenture and the Unexchanged Senior Notes Indenture (collectively, the "Indentures") are governed by New York law.   PIK Indenture § 12.08; Unexchanged Senior Notes Indenture § 13.08.

12.     On October 23, 2014, the Trustee filed proofs of claim on behalf of (i) itself and the PIK Noteholders (Claim No. 6347, the "<u>PIK Claim</u>")[5] and (ii) itself and the EFIH Unexchanged Noteholders (Claim No. 6348, the "<u>Unexchanged Senior Notes Claim</u>" and, together with the PIK Claim, the "<u>Unsecured Note Claims</u>").[6]  The Unsecured Note Claims assert claims for (i) principal and (ii) prepetition accrued interest and accrued fees and expenses, and reserve the right to seek, *inter alia*, postpetition "fees, indemnities, costs and expenses," including the "fees and expenses of the Indenture Trustee's counsel and other professionals" (collectively, the "<u>Trustee Fees and Expenses</u>").  *See* PIK Claim; Unexchanged Senior Notes Claim.

13.     On July 9, 2015, the EFIH Debtors filed the *EFIH Debtors' Partial Objection to Proof of Claim No. 6347 Filed by the Indenture Trustee for the EFIH Unsecured Notes* [D.I. 4964] (the "<u>Claim Objection</u>").  In the Claim Objection, the EFIH Debtors argue that while courts award postpetition interest to unsecured creditors of a solvent debtor, postpetition interest should be limited to the "legal rate," which they interpret as the federal judgment rate of interest (the "<u>Federal Judgment Rate</u>").[7]  Claim Objection ¶ 3.  On September 4, 2015, the Trustee filed a partial response to the EFIH Debtors' argument that the PIK Noteholders are not entitled to postpetition interest above the Federal Judgment Rate [D.I. 5874] (the "<u>PPI Response</u>").  The EFIH Debtors filed a reply to the PPI Response [D.I. 6109] (the "<u>EFIH Debtor PPI Response</u>"),

---

[5] Specifically, the PIK Claim seeks $1,566,234,000.00 in principal, $81,030,856.25 in prepetition accrued interest and $109,431.96 in prepetition accrued fees and expenses.  *See* PIK Claim.  In addition, the PIK Claim asserts a claim for "make-whole" amounts.

[6] Specifically, the Unexchanged Senior Notes Claim seeks $2,015,000.00 in principal, $106,243.92 in prepetition accrued interest and $140.79 in prepetition accrued fees and expenses.

[7] The EFIH Debtors also argue that the PIK Indenture does not provide for the payment of a "call premium" to the PIK Noteholders.  Claim Objection ¶ 33.  On August 28, 2015, the Trustee filed a partial response to the EFIH Debtors' argument that the EFIH Unsecured Note Claims are not entitled to a call premium pursuant to the PIK Indenture [D.I. 5788] and the EFIH Debtors filed a response on September 11, 2015 [D.I. 5962].  A hearing on this issue was held on October 20, 2015.

and, on October 2, 2015, the Trustee filed a sur-reply [D.I. 6303] (the "Sur-Reply).  On October 16, 2015, the EFIH Debtors filed a response to the Sur-Reply [D.I. 6488].  A hearing on this issue is scheduled for October 28, 2015.

**A.  Contractual Interest (Rate, Additional Interest and Compounding Interest) Under the Indentures**

14.    The Indentures contain several provisions requiring, among other things, the payment of postpetition interest on overdue principal (including Additional Interest, as defined in the Indentures) and postposition interest in a chapter 11 case at the contract rate (such contractually entitled interest and methodology under the Indentures, the "Contractual Interest"):

- Right to Postpetition Interest and Interest on Overdue Interest:

  o Section 4.01:  "The issuer shall pay interest (***including post-petition interest in any proceeding under any Bankruptcy Law***) ***on overdue principal*** at the rate equal to the then applicable interest rate on the Notes to the extent lawful; it shall pay interest (***including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest*** (including Additional Interest, if any) (without regard to any applicable grace period) at the same rate to the extent lawful."  (emphasis added); *see also* Indentures, Exhibit A (Form of Note).

- Interest Rates:

  o PIK Indenture:  Providing that cash interest will accrue on the principal at a rate of 11.25% per annum and the PIK Interest (which is currently in effect) will accrue at a rate of 12.25% per annum; in each case plus Additional Interest).[8]  *See* PIK Indenture, Exhibit A (Form of Note).

  o Unexchanged Senior Notes Indenture:  Providing that cash interest will accrue on the principal at a rate of 9.75% per annum).  *See* Unexchanged Senior Notes Indenture, Exhibit A (Form of Note).

---

[8] Section 2(c) of that certain Registration Rights Agreement concerning the PIK Notes, dated as of December 5, 2012, sets forth when the Additional Interest will be owed.  The Additional Interest currently is a per annum rate of 0.50%.  Registration Rights Agt. § 2(c).

**B.    Trustee Fees, Expenses and Indemnification Under the Indentures**

15.    The Indentures contain explicit language (i) obligating the EFIH Debtors and certain of their subsidiaries to pay the Trustee's fees and expenses incurred thereunder (including the fees and expenses of the Trustee's professionals and advisors) and (ii) providing that such obligations shall be treated as costs of administration in a bankruptcy case and shall survive discharge.  In particular, Section 7.07 of the Indentures set out the following obligations and rights related thereto:

- Trustee Fees and Expenses:

  o PIK Indenture:    "The Issuer and the Guarantors, jointly and severally, shall [(i)] pay to the Trustee . . . such compensation for its acceptance of this Indenture and services hereunder as the parties shall agree in writing from time to time . . . [and, (ii)] reimburse the Trustee . . . for all reasonable disbursements, advances and expenses incurred or made by it in addition to the compensation for its services.  Such expenses shall include the reasonable compensation, disbursement and expenses of the Trustee's agents and counsel."  PIK Indenture § 7.07.

  o Unexchanged Senior Notes Indenture:    "The Issuer and the Guarantors, jointly and severally, shall [(i)] pay to the Trustee from time to time such compensation for its acceptance of this Indenture and services hereunder as the parties shall agree in writing from time to time . . . [and, (ii)] reimburse the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it in addition to the compensation for its services.  Such expenses shall include the reasonable compensation, disbursements and expenses of the Trustee's agents and counsel."  Unexchanged Senior Notes Indenture § 7.07.

- Indemnification:    "Issuer and Guarantors, jointly and severally, shall indemnify the Trustee for, and hold the Trustee harmless against, any and all loss, damage, claims, liability or expense (including attorney's fees) incurred by it in connection with the acceptance or administration of this trust and the performance of its duties hereunder . . ."    (the "Indemnification Obligations").  Indentures § 7.07.

- Charging Lien: "T[]o secure the payment obligations of the Issuer and the Guarantors . . . the Trustee shall have a Lien prior to the Notes on all money or property held or collected by the Trustee, except that held in

trust to pay principal and interest on particular Notes.  Such Lien shall survive the satisfaction and discharge of this Indenture." (the "Charging Lien"). [9]  Indentures § 7.07.

- Costs of Administration:  "When the Trustee incurs expenses or renders services after an Event of Default . . . the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any Bankruptcy Law."  Indentures § 7.07.

- Obligations of the Issuer Shall Survive Discharge:  "The obligations of the Issuer under this Section 7.07 shall survive the satisfaction and discharge of [the Indentures] . . . ."  Indentures § 7.07.

## II.    DESCRIPTION OF ALLOWANCE AND TREATMENT UNDER THE PLAN

### A.    Allowance Provisions Relating to the EFIH Unsecured Note Claims

16.    The Plan classifies the EFIH Unsecured Note Claims as Class B6 (General Unsecured Claim Against the EFIH Debtors) and treats Class B6 as unimpaired.   Article III.B.21 provides:

(b) *Allowance:*  As Class B6 Claims, the EFIH Unsecured Note Claims are Allowed in an amount equal to the sum of:  (i) the principal amount outstanding in the amount of $1,568,249,000; (ii) accrued but unpaid prepetition interest in the amount of $81,115,347; and (iii) accrued postpetition interest on the principal amount outstanding as of the Petition Date at the Federal Judgment Rate or such other rate as determined by Final Order, but not including, for the avoidance of doubt, any Makewhole Claims.

(c) *Treatment:*  Except to the extent that a Holder of an Allowed Claim in Class B6 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class B6, each such Holder shall receive, up to the Allowed amount of its Claim, payment in full in Cash.

Plan Art. III.21(b), (c).

---

[9] In addition, Section 6.13 of the Indentures provide that any distributions that the Trustee receives under the Indentures shall be used first to pay any amounts due under Section 7.07 of the Indentures, including the Trustee Fees and Expenses and the Indemnification Obligations.  *See* Indentures § 6.13.

**B.    Disallowance Provisions Relating to the EFIH Unsecured Note Claims**

17.    Pursuant to the Plan, the Makewhole Claims are expressly disallowed and all other portions of the EFIH Unsecured Note Claims (i.e., the Trustee Fees and Expenses and the Indemnification Obligations) are not Allowed in Article III.21 of the Plan and therefore are deemed objected to.    *See* Plan Art. VII.A.    In addition, the Plan purports to cut off these liabilities post-Effective Date.    *See id.* Art. IV.I (providing that the EFIH Unsecured Note Claims and the Indentures will be deemed "cancelled, surrendered, and discharged. . . and the obligations of the Debtors or Reorganized Debtors. . . shall be deemed satisfied in full and discharged. . . .").[10]

**C.    Postpetition Interest Reserve**

18.    The Plan provides for a Postpetition Interest Reserve in the amount of the difference between interest accrued on the EFIH Unsecured Note Claims, EFH Legacy Note Claims, EFH LBO Note Claims, and EFH Unexchanged Note Claims as calculated at the Federal Judgment Rate, and as calculated at "the applicable non-default contract rate, but not including interest-on-interest, or such other amount ordered by the Bankruptcy Court."    Plan Art. I.A(266).    The Postpetition Interest Reserve *will not* be established if the Court disallows Contractual Interest.    Rather, the express purpose of the Postpetition Interest Reserve is to satisfy "any Disputed Postpetition Interest Claims that are Allowed by Final Order after the Effective Date, or as otherwise agreed by [the Reorganized Debtors]."    *Id.* Art. VII.K.    In other words, the Postpetition Interest Reserve will be funded only if this Court *Allows* Contractual Interest; this permits the Debtors (and Plan Sponsors) to appeal such order without paying these Allowed amounts to the Trustee for distribution to the EFIH Unsecured Noteholders.    Further,

---

[10] The Plan does provide that such Indentures will continue for limited purposes, such as the Trustee's ability to exercise its Charging Lien; however, this does nothing to alter the fact that the Plan cuts off the Debtors' post-Effective Date liabilities for which they are liable under the Indenture.

the Plan is explicit that the Postpetition Interest Reserve will not be augmented or provide for post-Effective Date interest-on-interest.

## OBJECTION

19.     Bankruptcy Code section ("Section") 1129(a)(1) requires that, as a condition to confirmation, the Plan must "comply with the applicable provisions of this title."  The Plan does not satisfy Section 1129(a)(1) because it:  (i) violates Section 1124(1) by classifying the EFIH Unsecured Note Parties as "unimpaired"; (ii) serves as an improper "claim objection" to the Trustee Fees and Expenses; (iii) fails to provide an adequate means of implementation under Section 1123(a)(5); and (iv) violates Section 1123(a)(4) because the PIK Noteholders are receiving disparate treatment.  In addition, the Plan fails to meet the "good faith" requirements under Section 1129(a)(3).

I.     **THE PLAN IMPROPERLY ALTERS THE LEGAL, EQUITABLE AND CONTRACTUAL RIGHTS OF THE EFIH UNSECURED NOTE PARTIES IN VIOLATION OF SECTION 1124(1)**

20.     The Debtors cannot meet their burden to demonstrate that the EFIH Unsecured Note Parties are unimpaired and, therefore, confirmation must be denied.  Section 1124 provides that a class of claims or interests is impaired under a chapter 11 plan unless the plan either:  (i) "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest;" or (ii) notwithstanding any contractual right to accelerated payment, reinstates the original maturity date of the obligation, cures outstanding defaults (with certain exceptions), compensates the claimant or interest holder for damages suffered in reasonably relying on the default provision, and otherwise leaves unaltered the legal, equitable, or contractual rights of the claimant or interest holder.  11 U.S.C. §§ 1124(1), (2).  Since the Plan does not seek to reinstate the PIK Notes pursuant to Section 1124(2), Section 1124(1) requires the Debtors to demonstrate that the Plan leaves the EFIH Unsecured

Noteholders' "***legal, equitable, and contractual*** rights" unaltered.    11 U.S.C. § 1124(1) (emphasis added); *see In re PPI Enters. (U.S.), Inc.* ("*PPI*"), 324 F.3d 197, 203 (3d Cir. 2003).

21.    "If the debtor's Chapter 11 reorganization plan does not leave the creditor's rights ***entirely unaltered***, the creditor's claim will be labeled as impaired as [a matter of law] under [Section] 1124(1). . . ." *Id.* (emphasis added); *In re W.R. Grace & Co.*, 475 B.R. 34, 150-51 (D. Del. 2012) ("[T]he Bankruptcy Code creates a presumption of impairment in favor of creditors, which can only be overcome if the reorganization plans leaves the creditor's nonbankruptcy rights completely unaltered."); *Coram Healthcare Corp.*, 315 B.R. 321, 351 (Bankr. D. Del. 2004) ("[I]f the proposed plan of reorganization does not leave the creditor's rights entirely unaltered, the creditor's claim is impaired."); *In re Ace-Texas, Inc.*, 217 B.R. 719, 727 (Bankr. D. Del. 1998) (any treatment other than what is required under the contract would alter the creditor's rights, thus "impairing" such creditors).

22.    The Third Circuit presumes impairment under a plan.    *PPI*, 324 F.3d at 203. Here, the Debtors have the burden to demonstrate unimpairment by showing that the EFIH Unsecured Note Parties' legal, equitable and contractual rights are unaltered.    *Id.*    The Debtors have not, and cannot, meet this burden.    The analysis of whether the EFIH Unsecured Note Parties are impaired under Section 1124(1) should begin, and end, with the following question: what treatment "leaves unaltered the legal, equitable, and contractual rights" to which the EFIH Unsecured Note Parties are entitled?    11 U.S.C. § 1124(1).    If the Plan does not leave "unaltered the . . . contractual rights" (which it does not), then the EFIH Unsecured Note Parties are impaired.

23.    Under the Indentures, an Event of Default occurred due to the chapter 11 filing. *See* Indentures § 6.01(a)(6).    As a result, "all principal of and premium, if any, ***interest*** . . . and

*any other monetary obligations* on the outstanding Notes" became immediately due and payable without further action or notice. *See* Indentures § 6.02 (emphasis added). The PIK Indenture provides for the payment of Cash Interest at a rate of 11.25% per annum (and PIK Interest at a rate of 12.25% per annum), as well as Additional Interest, if any. *See* PIK Indenture, <u>Exhibit A</u> (Form of Note). Similarly, the Unexchanged Senior Notes Indenture provides for the payment of interest at a rate of 9.75%. *See* Unexchanged Senior Notes Indenture, <u>Exhibit A</u> (Form of Note). Interest-on-interest at the applicable contract rate is also required under the Indentures. *See id.* (providing that the EFIH Debtors will pay interest (including post-petition interest) on overdue installments of interest). Further, the Issuer and Guarantors are obligated under the Indentures to pay and/or reimburse the Trustee Fees and Expenses. *See* Indentures § 7.07.[11]

24.     Despite these unambiguous contractual provisions, the Plan does not provide for payment and/or assumption, as applicable, of *any* of these bargained-for rights: not Contractual Interest (including interest-on-interest post-Effective Date), not the Trustee Fees and Expenses

---

[11] The Trustee believes that the Event of Default provisions in the Indentures requiring the payment of postpetition interest and "any other monetary obligations" are the applicable provisions that determine the EFIH Unsecured Note Parties' legal and contractual rights in these cases. However, under any other scenario, whether "Legal Defeasance and Covenant Defeasance" under Article 8 of the Indentures or the "Satisfaction and Discharge" provisions under Article 11, the Issuer and Guarantors would still be contractually obligated to satisfy all obligations related to interest payments and the Trustee Fees and Expenses. *See, e.g.,* PIK Indenture §§ 8.02, 8.04 (providing that the Issuer's obligations as to the rights of the Trustee (i.e., fees, expenses, indemnification) will continue until otherwise terminated or discharged; requiring the Issuer to deposit cash in amounts due, including principal and any interest and Additional Interest, if any); § 11.01 (requiring the Issuer to have paid or caused to be paid all sums payable by it under the PIK Indenture, which include interest and any outstanding Trustee Fees and Expenses).

and not Indemnification Obligations.[12]    The difference between the EFIH Unsecured

Noteholders' contractual entitlements to receive the Contractual Interest versus the Federal

Judgment Rate that the Debtors have proposed to pay the EFIH Unsecured Noteholders is

hundreds of millions of dollars.[13]    Nevertheless, the Plan purports to classify the EFIH

Unsecured Noteholders as *un*impaired.    The treatment of the EFIH Unsecured Noteholders

under the Plan, in disregard of the clear language in the Indentures, impairs the EFIH Unsecured

Noteholders under the plain meaning of Section 1124(1).    As such, the Plan must either be

modified to truly *un*impair the EFIH Unsecured Note Parties or Plan confirmation must be

denied.[14]

### A.    The Plan Alters the Indentures by Failing to Provide for the Payment of Postpetition Interest at the Rate and Method Prescribed Therein

25.    The EFIH Debtors have argued that a solvent debtor's plan must, ***at most***, provide

for postpetition interest at the Federal Judgment Rate and "[w]here the plan so provides, a

creditor can point to no right of which it has been deprived by the plan and is therefore

***unimpaired***."    *See* EFIH Debtor PPI Response ¶ 23 (emphasis added).    As an initial matter,

---

[12] The PIK Indenture also requires the payment of certain "make-whole" payments and/or "applicable premiums," including the optional redemption premium being litigated before the Court.  The Trustee reserves the right to argue, and brief, that the PIK Noteholders are impaired due to the Plan's failure to provide for such payments.  Furthermore, Article VI.B of the Plan provides that distributions will be made by the Disbursing Agent, defined as the "Reorganized Debtors or the Entity or Entities authorized to make or facilitate distributions under the Plan as selected by the Debtors or the Reorganized Debtors, as applicable, in consultation with the Plan Sponsors and the TCEH Supporting First Lien Creditors."  Plan Art. I.A(71).  Under the Indentures, the Trustee is the proper "disbursing agent" and the Plan must be modified to so provide.  Failure to make this modification alters the legal and contractual rights under the Indentures.

[13] Assuming an April 2016 emergence, the postpetition interest due to the EFIH Unsecured Noteholders under the terms of the Indentures will be approximately $463 million.  The Debtors assert that the Federal Judgment Rate for purposes of calculating postpetition interest is .11%, which equates to a difference of approximately $460 million. Assuming a June 30, 2016 emergence, the Contractual Interest owed to the EFIH Unsecured Noteholders will be approximately $508 million, as compared to $3 million if interest allowance is calculated using the Federal Judgment Rate.

[14] Because the Plan characterized Class B6 as unimpaired, the EFIH Unsecured Note Parties were not entitled to vote on the Plan.  As such, if this Court finds that the Plan renders the EFIH Unsecured Note Parties impaired under section 1124(1) and the Plan is not modified to unimpair the EFIH Unsecured Note Parties, the Plan cannot be confirmed in its present form because the Debtors have failed to satisfy Section 1129(a)(8) and Section 1129(b). The Trustee reserves all rights to brief this issue further, if necessary.

Third Circuit precedent is clear that, where a debtor is solvent, unsecured creditors are required to receive postpetition interest in addition to the "allowed" prepetition amount of its claims in order to render such creditors *un*impaired.  *See PPI*, 324 F.3d at 206; *see also*, PPI Response ¶¶ 24-25, 42.  The EFIH Debtors do not dispute this longstanding principle and concede the existence of a "solvent debtor" exception.  *See* EFIH Debtor PPI Response ¶ 3.  The remaining question, therefore, is the ***rate*** of postposition interest that the EFIH Unsecured Noteholders must receive, and the method by which such postpetition interest shall be calculated, in order to render them unimpaired under Section 1124(1).

1.    <u>Case Law and Legislative History Support the Conclusion that the Plain Language of Section 1124(1) Requires Payment of the Contractual Interest</u>

26.    As discussed *supra*, the presumption of impairment is overcome only if a plan "leaves unaltered the [creditor's] legal, equitable, and contractual rights" *PPI*, 324 F.3d at 203 (quoting Section 1124(1)).  In viewing the EFIH Unsecured Noteholders' entitlement to Contractual Interest, including at what rate, under the rubric of "unimpairment"—as it properly should be viewed—the plain language of Section 1124(1) applies on its face.  That analysis is simple—does the Plan "leave unaltered the legal, equitable, and contractual rights" to which the EFIH Unsecured Noteholders are entitled?   11 U.S.C § 1124(1).  If the Plan does not leave "unaltered the . . . contractual rights"—***as is the case here***—then the EFIH Unsecured Noteholders are impaired.  No further analysis is necessary.

27.    The Plan provides that each holder of General Unsecured Claims Against the EFIH Debtors (which includes the EFIH Unsecured Noteholders) will receive "up to the Allowed amount of its Claim, payment in full in Cash or other treatment rendering such Claim Unimpaired" while taking the position that such Allowed Claims should be limited to payment of "accrued postpetition interest . . . at the Federal Judgment Rate."  *See* Plan Art. III.B(21).

While the EFIH Debtors attempt to "unimpair" the EFIH Unsecured Noteholders by paying them postpetition interest at the Federal Judgment Rate, this position is inconsistent with Section 1124(1)'s clear requirement that a creditor must receive its full "legal, equitable, and contractual rights" to be deemed unimpaired. Unless the EFIH Debtors provide the EFIH Unsecured Noteholders with payment of the Contractual Interest, they cannot, under the plain language of Section 1124(1), treat the EFIH Unsecured Noteholders as unimpaired.

28.     This logical outcome is illustrated by the treatment provided to unimpaired, unsecured creditors in other large chapter 11 solvent debtor cases. *See, e.g., In re Overseas Shipholding Grp., Inc.*, No. 12-20000 (PJW) (Bankr. D. Del. July 16, 2014) [D.I. 3663] (unsecured claims were paid postpetition interest at contract rate, including any default interest (if applicable); deemed unimpaired); *In re Gen. Growth Props., Inc.,* No. 09-11977 (ALG) (Bankr. S.D.N.Y. Oct. 21, 2010) [D.I. 6232] (general unsecured creditors received postpetition interest at applicable contract interest rate, unless no contract interest rate, then received FJR; deemed unimpaired). [15] Case law and legislative history further support that the EFIH Unsecured Noteholders must receive Contractual Interest to be unimpaired. As this Court, and other courts, have recognized: "[w]hile solvent debtor cases are somewhat of a rarity, the available precedent consistently defers to previously contracted bargains and provisions when dealing with solvent debtors in varying situations." *In re Energy Future Holdings Corp.*, 513

---

[15] Even in other large solvent debtor chapter 11 cases, in which unsecured creditors were treated as "impaired" because they were receiving payment in a mix of stock and cash, these unsecured creditors were being paid in full plus their postpetition interest at the contract rate. *See In re Dow Corning Corp., ("Dow II")*, 244 B.R. 678, 696 (Bankr. E.D. Mich. 1999); *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. June 5, 2013) [D.I. 8590] (unsecured creditors received postpetition interest at contract rate); *In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS) (Bankr. D. Del. Apr. 1, 2010) [D.I. 1928] (plan provided for postpetition interest at contract rate for holders of unsecured claims); *In re Chemtura Corp.*, No. 09-11233 (REG) (Bankr. S.D.N.Y. Nov. 3, 2010) [D.I. 4409-1] (unsecured claims received postpetition interest at contract rate); *In re Calpine Corp.*, No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 19, 2007) [D.I. 7237] (senior note claims, general note claims, subordinated note claims (all unsecured issuances) received postpetition interest at contract rate as determined by bankruptcy court). These cases substantiate that unsecured creditors in solvent debtor reorganizations are entitled to postpetition interest at the contract rate regardless of impairment status.

B.R. 651, 660 (Bankr. D. Del. 2014).  This general principal follows Supreme Court and Third Circuit precedent.  *See, e.g.*, *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. Lasalle St. P'ship*, 526 U.S. 434, 441 n.14 (1999) (noting that "[c]laims are unimpaired if they retain all of their prepetition. . . contractual rights against the debtor"); *PPI*, 324 F.3d at 202 ("[I]f the debtor's Chapter 11 reorganization plan does not leave the creditor's rights entirely 'unaltered,' the creditor's claim will be labeled as impaired under [Section] 1124(1) . . . ."); *see also In re Ace-Texas, Inc.*, 217 B.R. 719, 727 (Bankr. D. Del. 1998) ("[I]mpairment can be avoided only if the plan proposes cash payment in the full amount of the claim in accordance with the parties' agreement. . . .  Any other treatment would alter the creditor's rights.").

29.    In 1994, Congress reaffirmed this principle specifically with respect to postpetition interest when it revised Section 1124 to repeal what was then Section 1124(3) (the "1994 Amendments").  Prior to the 1994 Amendments, Section 1124(3) specified that a creditor receiving full payment of an "allowed claim" was not impaired.  Interpreting this statute in 1994, one bankruptcy court held that Section 1124(3) allowed a solvent debtor to pay the "allowed" claims of unsecured creditors in full, excluding post-petition interest, without risking impairment.  *See In re New Valley Corp.*, 168 B.R. 73, 77-80 (Bankr. D.N.J. 1994).

30.    In recognition of the unfairness of the *New Valley* decision, Congress repealed Section 1124(3), specifically in order to prevent solvent debtors from "unimpairing" creditors by paying them merely the "allowed" amount of their claims in cash without postposition interest (which was not "allowed" under Section 502(b)(2)).  The legislative history of the 1994 Amendments makes clear that the deletion of subsection (3) was designed to fix the *New Valley* problem under which solvent debtors could unimpair creditors by paying them only the "allowed" claim amount:

The principal change in this section is set forth in subsection (d) and relates to the award of postpetition interest. In a recent Bankruptcy Court decision in *In re New Valley Corp.*, 168 B.R. 73 (Bankr. D.N.J. 1994), unsecured creditors were denied the right to receive postpetition interest on their allowed claims even though the debtor was liquidation and reorganization solvent. The *New Valley* decision applied section 1124(3) of the Bankruptcy Code literally by asserting, in a decision granting a declaratory judgment, that a class that is paid the allowed amount of its claims in cash on the effective date of a plan is unimpaired under section 1124(3), therefore is not entitled to vote, and is not entitled to receive postpetition interest. . . . In order to preclude this unfair result in the future, the Committee finds it appropriate to delete section 1124(3) from the Bankruptcy Code.

As a result of this change, if a plan proposed to pay a class of claims in cash in the full allowed amount of the claims, the class would be impaired entitling creditors to vote for or against the plan of reorganization. If creditors vote for the plan of reorganization, it can be confirmed over the vote of a dissenting class of creditors only if it complies with the "fair and equitable" test under section 1129(b)(2) of the Bankruptcy code and it can be confirmed over the vote of dissenting individual creditors only if it complies with the "best interests of creditors'" test under section 1129(a)(7) of the Bankruptcy Code. ***The words "fair and equitable" are terms of art that have a well established meaning under the case law of the Bankruptcy Act as well as under the Bankruptcy Code. Specifically, courts have held that where an estate is solvent, in order for a plan to be fair and equitable, unsecured and undersecured creditors' claims must be paid in full, including postpetition interest, before equity holders may participate in any recovery.*** *See, e.g., Consolidated Rock Products Co. v. Dubois*, 312 U.S. 510, 527, 61 S.Ct. 675, 685 (1941); *Debentureholders Protective Committee of Continental Inv. Corp.*, 679 F.2d 264 (1st Cir.), cert. denied, 459 U.S. 894 (1982) and cases cited therein.

H.R. Rep. No. 103-835, at 47-48, n.15 (1994) (emphasis added).

31.     In the bankruptcy court decision in the *PPI* line of cases, Judge Walsh examined this legislative history and highlighted the perverse outcome Congress sought to avoid through the 1994 Amendments:

The result in *New Valley* stood in contrast with a line of cases holding that where a debtor is solvent, unsecured creditors must be paid in full, including postpetition interest, pursuant to the "fair and equitable" test of § 1129(b)(2) when the debtor is cramming down that creditor's claim. Thus, solvent debtors could avoid paying "unimpaired" unsecured creditors postpetition interest by paying them in full in cash, yet the same solvent debtor would be required to pay postpetition interest to an "impaired" dissenting class of unsecured creditors . . . [Congress] intended that to be unimpaired, the claim must receive postpetition interest. This result puts the

creditor in the same position it would be in if no bankruptcy occurred and a fully solvent debtor satisfied the obligation by cash payment in full with interest to the date of payment.

*In re PPI Enters. (U.S.), Inc.,* 228 B.R. 339, 351-52 (Bankr. D. Del. 1998) , *aff'd*, 324 F.3d 197

(3d Cir. 2003).

32.    Furthermore, when Congress deleted Section 1124(3) to ensure that unsecured creditors of solvent debtors would not lose their right to receive postpetition interest as it existed under both pre- and post-Code practices under Section 1129(b)'s "fair and equitable test" (the "Fair and Equitable Test"), it considered whether the repeal would come into conflict with the amendment to the 1984 Code limiting application of the "best interests test" of Section 1129(a)(7) to impaired classes.  Congress concluded that no conflict existed:

> With respect to section 1124(1) and (2), [the deletion of section 1124(3)] would not change the beneficial 1984 amendment to section 1129(a)(7) of the Bankruptcy code, which excluded from application of the best interests of creditors test classes that are unimpaired under section 1124.

H.R. Rep. No. 103-835, at 48 (1994).[16] That Congress made the considered decision to decline to apply Section 1129(a)(7), and by extension, Section 726(a)(5), to unimpaired classes evidences its intent to determine the appropriate unimpairment interest rate by reference to *Consolidated Rock* and its progeny.

33.    Accordingly, the excising of Section 1124(3) reinforces the notion that while a debtor still has the option of paying a creditor in full to "unimpair" such creditor, a solvent debtor can do so under Section 1124(1) only if all contractual rights—including payment of postpetition interest at the contract rate—are satisfied.  *See PPI*, 324 F.3d at 207 (recognizing that a cash payment equal to the allowed amount of the claim but without postpetition interest

---

[16] When the Bankruptcy Code was originally enacted, the best interest of creditors test applied to all classes of claims irrespective of whether the class was impaired or unimpaired.  Bankruptcy Amendment & Federal Judgeship Act of 1984, PL 98–353 (HR 5174), July 10, 1984.  In 1984, Section 1129(a)(7) was amended to limit application of the best interest of creditors test impaired classes of claims and interests.  *Id.*

***could not qualify for nonimpairment under Section 1124(1) because the failure to pay***

***postpetition interest does not leave unaltered the contractual or legal rights of the claim***)

(citing *PPI*, 228 B.R. at 352) (emphasis added).

34.    Only when a creditor's full contractual entitlements are left in place or satisfied in

full is that creditor's claim unimpaired.  This is significant because an unsecured creditor who is

unimpaired and is deemed to accept a plan is not entitled to vote on a plan and is not afforded

the protections under, among other provisions, the Fair and Equitable Test.  The EFIH Debtors'

statutory interpretation would lead to the absurd situation where an unimpaired unsecured

creditor would have less protection against alteration of its contractual rights in the chapter 11

case than an impaired unsecured creditor.[17]  Congress could not have intended such a result.

35.    Accordingly, because the Plan does not provide for payment of the Contractual

Interest for the EFIH Unsecured Noteholders, the EFIH Unsecured Noteholders are impaired.

2.    Section 502(b)(2) Does Not Limit or Determine the Legal, Equitable and
Contractual Entitlement of the EFIH Unsecured Noteholders to
Postpetition Interest

36.    The Third Circuit has held that a claim is impaired under Section 1124(1) only if

the plan itself, as opposed to some provision of the Bankruptcy Code, alters the creditor's rights.

*PPI*, 324 F.3d at 205.  Section 502(b)(2) disallows claims, as of the petition date, for unmatured

interest on unsecured debt.  The EFIH Debtors argue, based on *PPI*, that it is ***Bankruptcy Code***

Section 502(b)(2), and not the ***Plan***, that alters the EFIH Unsecured Noteholders' contractual

rights by limiting the availability of postpetition interest and, therefore, the EFIH Unsecured

---

[17] As discussed in detail in the PPI Response (¶¶ 28-66) and the Sur-Reply (¶¶ 7, 8-10), the Fair and Equitable Test of Section 1129(b) is a basis under which impaired unsecured creditors may be entitled to postpetition interest at the contract rate.  To the extent that the Court determines that the EFIH Unsecured Noteholders are impaired under the Plan but nevertheless proceeds with Plan confirmation, the Trustee reserves all rights to fully brief the issue of what rate of postpetition interest the EFIH Unsecured Noteholders, as "impaired" creditors, are entitled to under all applicable provisions of Section 1129.

Noteholders are not impaired.  *See* EFIH Debtor PPI Response ¶¶ 22-23.  As a result, the EFIH

Debtors conclude, "a solvent debtor's plan must, ***at most***, provide for postpetition interest to

unsecured creditors at the federal judgment rate."  *See id.* at ¶ 23.  This argument is meritless.

37.      As an initial matter, the EFIH Debtors take inconsistent positions on this issue.

On the one hand, they argue that Section 502(b)(2) disallows postpetition interest and therefore

failure to provide for payment of the Contractual Interest constitutes statutory impairment rather

than "plan" impairment under Section 1124(1).  On the other hand, they recognize that at least

some form of postpetition interest is nevertheless required in order for the EFIH Unsecured

Noteholders to be rendered unimpaired.  *See* EFIH Debtor PPI Response ¶ 23.  This right to

postpetition interest arises under Section 1124(1).  As such, any purported limitation on the right

to postpetition interest by operation of Section 502(b)(2)—which may be the general rule—is

inapplicable in solvent debtor cases in which the unsecured creditors are being treated as

unimpaired under Section 1124(1).  Rather, the right to postpetition interest arises under Section

1124(1) alone.

38.      Further, the EFIH Debtors' reliance on *PPI* in support of this "statutory argument"

is misguided.  *Id.  PPI* addressed whether a plan properly classified a landlord's allowed claim

as "unimpaired" where the plan proposed to pay the full amount of the "allowed" claim, as

reduced by Section 502(b)(6), plus postpetition interest on the allowed claim.  The landlord

contended that its claim was impaired by operation of Section 502(b)(6).  *PPI*, 324 F.3d at 203-

04.  The Third Circuit held that this "statutory impairment" of the landlord's allowed claim

under Section 502(b)(6) was not impairment for purposes of Section 1124(1).  *Id*. at 205.  The

EFIH Debtors argue, by analogy, that the EFIH Unsecured Noteholders' claims are similarly

limited by Section 502(b)(2) and thus the failure to pay postpetition interest at the contract rate

does not constitute impairment by the Plan.  *See* EFIH Debtors PPI Response at ¶ 22.  The analogy fails.  The Third Circuit held that a creditor was impaired if a chapter 11 plan failed to pay the creditor postpetition interest **in addition to** the "allowed" prepetition amount of its claim.  *PPI*, 324 F.3d at 207.

39.     Thus, under *PPI*, in addition to the "allowed" amount of the EFIH Unsecured Noteholders' claim under Section 502(b)(2), the EFIH Unsecured Noteholders must also receive postpetition interest in order to be unimpaired under Section 1124(1).  That means the EFIH Unsecured Noteholders are entitled to receive interest at the rate provided for in the Indentures so as not to alter the EFIH Unsecured Noteholders' "contractual rights."

**B.  The Plan Alters the Indentures by Failing to Provide for the Payment of the Trustee Fees and Expenses**

40.     Courts have recognized that contractual provisions providing for the payment and/or reimbursement of attorney's fees and expenses are enforceable rights that must be upheld under state law.[18]  The Indentures expressly provide that the Issuer and Guarantors, jointly and severally, will pay the Trustee Fees and Expenses.  *See* Indentures § 7.07.  As a result, the Trustee has claims against the EFIH Debtors under the Indentures for payment of the Trustee Fees and Expenses that must be paid in full in cash.

41.     The Plan's failure to provide for the payment of the Trustee Fees and Expenses alters the contractual rights of not just the Trustee, but also of the EFIH Unsecured Noteholders.

---

[18] *See, e.g., In re Delta Mills, Inc.*, 404 B.R. 95, 116 (Bankr. D. Del. 2009) (citing *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co. ("Travelers")*, 549 U.S. 443, 448 (2007)) (stating that, even though the default "American Rule" does not entitle the prevailing litigant to collect attorneys' fees, "this default rule may be overcome by a statute authorizing payment of fees, or by an enforceable contract, allocating payment of fees").  Courts within the Third Circuit have also determined that when attorneys' fees are expressly provided for pursuant to a contract governed by New York law (such as the Indentures), such attorneys' fees should be allowed.  *See, e.g., In re Oakwood Homes Corp.*, 394 B.R. 352, 356 (Bankr. D. Del. 2008) (citing *Travelers*, 549 U.S. 443 (2007)) ("When it is clear from the language of the agreement and the surrounding circumstances that indemnity was intended, New York courts have awarded attorneys' fees pursuant to the express terms of the indemnity agreement in a variety of circumstances . . . [a]lso, in the bankruptcy context, the Supreme Court has held that attorneys' fees authorized by prepetition contracts may be awarded even if they are incurred in postpetition litigation.").

Under the terms of the Indentures, the Issuer and Guarantors are contractually obligated to pay the Trustee Fees and Expenses. Failure to honor this obligation alters the EFIH Unsecured Noteholders' contractual rights and expectations under the Indentures and renders the Plan's premise that the EFIH Unsecured Noteholders will receive the "Allowed" amounts false. Plan Art. III.21. If the EFIH Debtors refuse to fulfill their contractual obligations and pay the Trustee Fees and Expenses, the Trustee likely will have to exercise the Charging Lien. [19] *See* Indentures § 7.07. The Charging Lien, once exercised, ensures that the Trustee Fees and Expenses are paid as a matter of first priority out of the EFIH Unsecured Noteholders' recoveries. *Id.* If the Trustee is required to utilize the Charging Lien, the EFIH Unsecured Noteholders will not be paid in full on account of their Allowed Claims.

42. Anything less than a full recovery in cash, along with the costs, expenses, and interest that a claimant is entitled to, and any non-monetary rights, impairs that claimant and triggers a right to vote to accept or reject a plan of reorganization. 11 U.S.C. § 1124(1); *see, e.g.*, *In re Insilco Techs., Inc.*, 480 F.3d 212, 215 n.5 (3d Cir. 2007) ("Under the Bankruptcy Code, creditors' claims are 'impaired' if the plan of reorganization does not provide those creditors with full recovery."); *In re Coastal Broad. Sys.*, No. 11-10596 (GMB) 2012 Bankr. LEXIS 3098, at *14-15 (Bankr. D.N.J. July 6, 2012) (holding that a class of creditors was impaired, even when paid in full, where the plan extinguished creditors' rights, pursuant to a prepetition subordination agreement, to bring legal proceedings against the Debtor or a guarantor); *In re Glob. Ocean Carriers, Ltd.*, 251 B.R. 31, 40-41 (Bankr. D. Del. 2000) (finding

---

[19] The Trustee reserves all rights to assert that the Trustee Fees and Expenses should be paid as administrative expense or substantial contribution claims under Section 503. *See* PIK Indenture § 7.07 ("When the Trustee incurs expenses or renders services after an Event of Default . . . the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any Bankruptcy Law."); Unexchanged Senior Notes Indenture § 7.07 (same).

that the rights of a creditor, who was otherwise to be paid in full, were negatively impacted by a plan that gave Debtors immediate access to secured creditors' restricted cash).

43.     As such, and consistent with Congressional intent that Section 1124 be read "in the broadest possible terms," a reduction of the EFIH Unsecured Noteholders' recoveries due to the use of the Charging Lien constitutes impairment such that the EFIH Unsecured Noteholders should be entitled to vote on the Plan.  In order to *un*impair the EFIH Unsecured Noteholders, the Plan must be modified to pay for the Trustee Fees and Expenses in accordance with the Indentures (either as an Allowed General Unsecured Claim Against the EFIH Debtors or as an independent Plan provision).

**C.  The Plan Alters the Indentures by Absolving Reorganized EFIH of All Post-Effective Date Obligations Under the Indentures**

44.     The EFIH Unsecured Note Parties are impaired under the Plan because the Plan does not provide that Reorganized EFIH will assume the liabilities that the EFIH Debtors agreed to under the Indentures, including the Contractual Interest and pre- and post-Effective Date Indemnification Obligations and Trustee Fees and Expenses (collectively, the "Contractual Entitlements").  With no assurance that the pre-Effective Date liabilities will be assumed, and an insufficient (or no) reserve set aside to satisfy these claims (discussed *infra*, at ¶¶ 58-63), the EFIH Unsecured Note Parties are impaired.

45.     In addition, the Plan expressly cancels and discharges any post-Effective Date Contractual Entitlements:

> [O]n and after the Effective Date, all notes, instruments, certificates, agreements, indentures. . . evidencing Claims or Interests, . . . including EFIH Unsecured Note Claims. . . shall be deemed canceled, surrendered, and discharged without any need for further action or approval of the Bankruptcy Court . . . .

Plan Art. IV.I.  **By this single provision, the Plan improperly cuts off post-Effective Date**

**contractual entitlements, including the accrual of post-Effective Date interest on distributions,**

**payment of post-Effective Date Trustee Fees and Expenses, and Indemnification Obligations**.

Unless this Court Allows the Contractual Interest and orders the Trustee Fees and Expenses paid

in full in cash, and the Debtors do not appeal these orders, it is very likely that, due to the

magnitude of these issues, the Trustee will be engaged in post-Effective Date litigation while

these appeals are being pursued.

46.    The Plan's arbitrary cut-off of the EFIH Unsecured Noteholders' state law

contractual rights represents a material alteration of the Indentures and an independent reason

why the Plan impairs the EFIH Unsecured Note Parties as a matter of law.  *See In re Texas*

*Rangers Baseball Partners*, 434 B.R. 393, 406-10 (Bankr. N.D. Tex. 2010) (holding that, for

lenders to be unimpaired under Section 1124(1), the plan has to grant the lenders "their right

under their loan documents prospectively," including payment of principal plus postpetition

interest and also the ability for the lenders, post-effective date, to "exercise all rights under a

loan document not otherwise in conflict with the Code, plan, or bankruptcy court order"); *see*

*also Bustop Shelters of Louisville, Inc. v. Classic Homes, Inc.*, 914 F.2d 810, 814-15 (6th Cir.

1990) (acknowledging that if contractual rights provided for under a loan were altered such that

creditor's rights to proceed against loan counterparty would be limited, such creditor would

have to be treated as impaired); *In re Valley View Shopping Ctr.*, 260 B.R. 10, 32 (Bankr. D.

Kan. 2001) (when unsecured claims were to be paid in full 90 days post-confirmation, without

postconfirmation interest, the court held that the deferral "undisputedly impairs these unsecured

claims").  This result is especially egregious in a situation in which this Court Allows the

Contractual Interest, but, under the terms of the Plan, the Debtors (or Reorganized Debtors) and

the Plan Sponsors could pursue appeals while holding distributions to the EFIH Unsecured

Noteholders on account of the Allowed Contractual Interest ransom.

47.    As such, unless these pre- and post-Effective Date Contractual Entitlements are

assumed by the Reorganized Debtors (if Allowed by Final Order), the EFIH Unsecured Note

Parties are not assured "payment in full, in cash."[20]  In order for the Plan to properly treat the

EFIH Unsecured Note Parties as "unimpaired," the Plan must be amended to expressly provide

that Reorganized EFIH will assume the Contractual Entitlements, including the Indemnification

Obligations, and pay the Contractual Interest and Trustee Fees and Expenses if Allowed by

Final Order.[21]

**D. The Debtors and Plan Sponsors Should be Enjoined from Seeking to Dismiss Any Appeals Concerning Disputed EFIH Unsecured Note Claims**

48.    Should the Court find that the Contractual Interest and/or the Trustee Fees and

Expenses are disallowed, the Debtors have reserved the right to argue that any appeals

---

[20] The Debtors have represented to the Trustee that the Contractual Interest, if ultimately Allowed, will be assumed by Reorganized EFIH, consistent with similar statements made by the Debtors on the record with respect to the disputed make-whole claims.  Hr'g Tr. At 16: 14-21, Energy Future Holdings Corp., No. 14-10979 (CSS) (Bankr D. Del. Sept. 21, 2015)  (Debtors stating that if "any of those make-whole claims are subsequently determined by an appellate court to be allowed claims that must be paid by either reorganized EFIH or new EFH, then such allowed claims will become obligations of reorganized EFIH or new EFH, as applicable").  The Trustee assumes that a similar concession will be made for the Trustee Fees and Expenses. However, the Debtors have not amended the Plan to provide that the Reorganized Debtors will assume these liabilities; nor do they intend to.  *See, e.g.,* Doré Dep. Tr. at 124:21-23 ("We do not have a current intention to do that amendment [to amend the plan to make it clear that make-whole claims allowed on appeal after the effective date would become obligations of the reorganized entities], that is correct.").  Rather, the Plan provides for the discharge of claims (*see* Plan Art. VIII.A) and that the Indentures will be cancelled on the Effective Date, except for limited purposes. *See* Plan Art. IV.I.

[21] This should not be a burden to the Debtors.  Deponents have unequivocally testified that the Reorganized Debtors would be able to raise adequate money to satisfy the Makewhole Claims and Contractual Interest, if allowed.  *See* Ying Dep. Tr. at 62:12-17 ("Q: And while you believe that if all of these liabilities [make-wholes and PPI]  in full have to come due, a portion would have to be financed with new equity, you believe that New EFH should be able to raise that new equity, right?  A: Yes."); Keglevic Dep. Tr. at 61:11-25, 62:1-15, Oct. 1, 2015 ("Q: I want you to make the worst-case assumption.  Assume that after the effective date, the EFIH first liens win on appeal their make-whole and interest thereon.  The EFIH second liens win their make-whole and interest thereon.  The EFH PIKs win their make-whole and interest thereon.  The EFH bonds win their make-whole and interest thereon.  And after the effective date, there is a determination that the EFIH PIKs are entitled to interest at their contract rate, rather than at the federal judgment rate.  Does it remain the debtors' belief -. . . that reorganized EFH would be able to satisfy all of those liabilities after the effective date?  A: It does.").  Similarly, there should be no reason that the Contractual Entitlements could not be satisfied by Reorganized EFIH.

concerning such issues (among others) (the "Appeals") are equitably moot.[22] *See* Disclosure Statement V.E.21 (stating that the Debtors "reserve all rights with respect to arguments that may be raised . . . in connection with any such appeals [of the Confirmation Order or other order of the Court], including any arguments as to whether such appeals are equitably moot"). Essentially, creditors of EFIH are being required to give up their claims and contractual rights against the Issuer—the EFIH Debtors—while Reorganized EFIH and the Plan Sponsors retain their rights to seek dismissal of any appeals related to the Trustee claims and the EFIH Unsecured Note Claims. If this truly is an "unimpairment" Plan, then the Debtors and Plan Sponsors should not be given the opportunity to cut off the EFIH Unsecured Note Parties' appellate rights in an attempt to avoid paying any EFIH Unsecured Note Claims and Trustee claims that may ultimately be Allowed by Final Order.

49.    Moreover, as the case for equitable mootness is weak based on the facts of these cases, the Debtors and Plan Sponsors would not be prejudiced. Appeals solely seeking monetary damages against solvent debtors should not be deemed equitably moot. *See Platinum Capital, Inc., v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1074 (9th Cir. 2002) (court holding that an appeal was not moot because the creditor's "claim is only for monetary damages against solvent debtors, this is not a case in which it would be impossible to fashion effective relief. Nor has there been such a comprehensive change in circumstances as to render it inequitable for the court to consider the merits of the appeal."). Further, the Third Circuit has recently held that application of equitable mootness should be "limited in scope" and

---

[22] It is unclear on what basis the Debtors will argue that any Appeals are equitably moot. However, for example, it is entirely possible that the PUCT will place limitations on the incurrence of additional debt. The Debtors have conceded as much in the Disclosure Statement: in their discussion of the potential risks of a REIT Reorganization, the Debtors note that "[e]ven if regulatory approval from the PUCT ultimately is obtained, the PUCT may impose certain conditions that could significantly affect Oncor Electric's value." Disclosure Statement VIII.E.1. The Debtors potentially could rely on such restrictions to support an argument that the Appeals are equitably moot.

"cautiously applied." *In re One2One Commc'ns, LLC*, No. 13-3410, 2015 WL 4430302, at *4 (3d. Cir. July 21, 2015) (quoting *In re Phila. Newspapers, LLC*, 690 F.3d 161, 170 (3d Cir. 2012), *cert. dismissed*, 133 S. Ct. 1001 (2013)). Substantial consummation of a plan of reorganization does not compel *per se* dismissal of an appeal as equitably moot. *See, e.g.*, *One2One*, 2015 WL 4430302, at *5-6 (finding that, although plan was substantially consummated, public policy, among other factors, weighed in favor of providing the appellant with appellate review of its bankruptcy appeal).

50.     If the Trustee prevails in any Appeal and a Final Order is entered, the Contractual Interest and/or Trustee Fees and Expenses become Allowed Claims entitled to distributions under the Plan. The Debtors should not be permitted to mount an end-run around its Plan obligations by claiming that the Plan, or the Effective Date of the Plan, has made such a decision equitably moot. By preserving the right to argue equitable mootness as a way to avoid payment of the Contractual Interest and the Trustee Fees and Expenses, under a Plan that purports to *un*impair the EFIH Unsecured Note Parties, the EFIH Unsecured Note Parties' legal and contractual rights are altered.

## II.   THE DEBTORS IMPROPERLY USE THE PLAN TO OBJECT TO PORTIONS OF THE EFIH UNSECURED NOTE CLAIMS AND TRUSTEE FEES AND EXPENSES IN VIOLATION OF SECTION 1129(A)(1)

51.     The Debtors purport to use the Plan as a "claim objection," seeking to disallow *all* EFIH Unsecured Note Claims, except as specifically Allowed pursuant to the Plan or otherwise objected to by the Debtors in these chapter 11 cases. *See* Plan Art. VII.A. Thus, the Plan presumably constitutes an "objection" to all other portions of the EFIH Unsecured Note Claims, including the Trustee Fees and Expenses and the Indemnification Obligations.

A. **The Debtors Have Offered No Basis or Explanation for the "Objection" in Violation of Bankruptcy Rule 3007**

52.      The Debtors are improperly attempting to use the Plan as an "objection" to the Trustee Fees and Expenses, among other claims.   There should be no dispute by any party, including the Debtors, that the Trustee Fees and Expenses constitute allowable general unsecured claims under the Bankruptcy Code.   Section 502(b) governs the allowance of claims and provides that a "court, after notice and a hearing, shall determine the *amount* of [a] claim . . . as of the date of the filing of the petition, and shall allow such claim in such amount." 11 U.S.C. § 502(b).   The Bankruptcy Code broadly defines "claim" to include the "right to payment, whether or not such right is . . . liquidated, ***unliquidated***, fixed, ***contingent***, matured, ***unmatured***, disputed, . . . or ***unsecured***."   11 U.S.C. § 101(5)(A) (emphasis added).   A "right to payment," in turn, "usually refer[s] to a right to payment recognized under state law."   *See Travelers*, 549 U.S. 443, 451 (2007).   As discussed above (*infra* at ¶ 40), the Trustee Fees and Expenses are valid claims under the Indentures and thus constitute a "right to payment recognized under state law" even if such right was contingent on the Petition Date.[23]   The

---

[23] *See, e.g., Security Mortgage Co. v. Powers*, 278 U.S. 149, 155-56 (1928) (holding that, notwithstanding their contingent nature, postpetition attorneys' fees are allowed because, among other reasons, the "contingent obligation to pay attorneys' fees was a part of the original transaction"); *In re SNTL Corp.*, 571 F.3d 826, 844 (9th Cir. 2009) ("Pospetition fees can be fairly contemplated when the parties have provided for them in their contracts and thus are contingent claims as of the petition date [which] cannot be disallowed merely because they are contingent."(internal citations omitted)); *In re Qmect, Inc.*, 368 B.R. 882, 884 (Bankr. N.D. Ca. 2007) (determining that postpetition attorneys' fees fall under the category of "contingent" claims because, *inter alia*, "the definition of 'claim' is very broad and includes 'contingent' claims," and case law under the Bankruptcy Act authorized post-petition attorneys' fees in a creditor's unsecured claim, which Congress, in enacting the Bankruptcy Code would have clarified and corrected if such reading were incorrect).

Supreme Court decision in *Travelers* requires the allowance of contractually-mandated unsecured creditors' postpetition attorneys' fees pursuant to Section 502(b). [24]

53.    Having established that the Trustee Fees and Expenses are allowable General Unsecured Claims Against the EFIH Debtors in accordance with the Indentures, the Trustee questions whether a plan of reorganization should ***ever*** properly be used as a claim objection. *See, e.g.*, *In re Dynamic Brokers, Inc.*, 293 B.R. 489, 496 (B.A.P. 9th Cir. 2003) ("Not only is it more difficult for a creditor to litigate against the entire collective body of other creditors and owners in a plan confirmation proceeding, but the evidence relevant to a plan confirmation is so different from the evidence relevant to a claim objection that the two proceedings simply do not form a convenient trial unit."); *In re Hobdy*, 130 B.R. 318, 321 (B.A.P. 9th Cir. 1991) ("The Bankruptcy Rules, which set forth the procedural mechanism for implementing the Code, do not permit such indirect attacks on the viability of claims."); *In re Jankins*, 184 B.R. 488, 493 (Bankr. E.D. Va. 1995) ("A creditor familiar with the Federal Rules of Bankruptcy Procedure and the Local Rules of this Court would have no reason to anticipate or expect that a plan of reorganization would (or could) impose additional requirements with respect to allowance of claims beyond those imposed by the applicable rules"); *In re Holt*, 153 B.R. 215, 216 (Bankr.

---

[24] In *Travelers*, the Supreme Court was asked to consider "whether federal bankruptcy law precludes an unsecured creditor from recovering attorney's fees authorized by a prepetition contract and incurred in post-petition litigation." 549 U.S. at 445.   The Court held that, because the Bankruptcy Code contains no express disallowance of an unsecured creditor's contractually provided-for postpetition attorneys' fees, and there is no applicable state law prohibition, an unsecured creditor's postpetition attorneys' fees are allowable as unsecured claims. *Id.* Circuit and other courts have followed *Travelers* to similarly find that unsecured creditor's fees and expenses are allowable claims under Section 502(b). *See, e.g., Ogle v. Fidelity & Deposit Co. of Md.*, 586 F.3d 143 (2d Cir. 2009) (holding that "an unsecured claim for post-petition fees, authorized by a valid pre-petition contract, is allowable under section 502(b)"); *In re STNL Corp.*, 571 F.3d at 842 (finding unsecured creditor entitled to postpetition attorneys' fees because such fees were provided for pursuant to a prepetition contract, Section 506(b) only limits secured claims, and Section 502(b) does not "specifically disallow attorneys' fees of creditors"); *In re Holden*, 491 B.R. 728 (Bankr. E.D.N.C. 2013) (determining that, post-*Travelers*, claims are only disallowed to the extent unenforceable against the debtor, and allowing postpetition attorneys' fees because there was no evidence to suggest the underlying contract was unenforceable); *In re New Power Co.*, 313 B.R. 496, 507 (Bankr. N.D. Ga. 2004) (finding that nothing in Section 502 requires the disallowance of an unmatured claim for attorneys' fees). *See generally In re Gatzke*, 365 B.R. 138 (Bankr. D. Mont. 2007) (determining that, post-*Travelers*, an unsecured creditor is entitled to postpetition attorney's fees pursuant to a contract when not prohibited by applicable statute).

N.D. Ill. 1993) (concluding in a Memorandum Opinion that "[t]he terms of a plan cannot be used to deviate from established proof of claim procedures to determine the amount of a claim").

54.     Even if a plan of reorganization can serve as a claim objection in certain circumstances, it is not proper here.   The Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") set forth specific procedural requirements for objections to claims that have not been met here.   *See* Fed. R. Bankr. P. 3001(f); 3007(a); 9014(a).   A proof of claim executed and filed in accordance with Bankruptcy Rule 3001 (as were the EFIH Unsecured Note Claims) constitutes prima facie evidence of the validity and amount of the claim.   *See* Fed. R. Bankr. P. 3001(f).   A claim objection must set forth a good faith basis for disputing the claim and "produce evidence equal in force to the prima facie case [for establishing the claim]."   *In re Catholic Diocese of Wilmington, Inc.*, 513 B.R. 639, 643 (Bankr. D. Del. 2014) ("In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency . . . [The burden reverts to the claimant only if] the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of the claim.") (*citing In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173–74 (3d Cir. 1992) (internal citations omitted)); *see also In re Kincaid*, 388 B.R. 610, 615 (Bankr. E.D. Pa. 2008) (holding that a good faith basis is a prerequisite to a debtor making a claim objection sufficient to force a claimant to provide additional evidence to revalidate its claim).

55.     The filed EFIH Unsecured Note Claims, and the underlying Indentures, establish a prima facie case for the payment of the Trustee Fees and Expenses.   The Debtors have articulated ***no basis*** as to why the Trustee Fees and Expenses should be disallowed.   Rather, the Plan merely contains a generic statement:   "[e]xcept as specifically provided . . . the Plan shall

serve as the Debtors' objection to all . . . EFIH Unsecured Note Claims . . . ."  Plan Art. VII.A.

No reference is made to the Trustee Fees and Expenses, the Indemnification Obligations nor to

any of the Bankruptcy Rules that govern claim objections.[25]   This "objection" is also contrary

to the Debtors' own claims procedures and the order approving them, which require that the

Debtors provide the basis for any objection to a proof of claim.  *See* Claim Objection Procedure

Order, Energy Future Holdings Corp., No. 14-10979 (CSS) (Bankr D. Del.  Dec. 10, 2014) [D.I.

2963].  No such information is contained in the Plan.

56.    Accordingly, the Plan is an improper claim objection and should not serve as a

basis for disallowing any portion of the EFIH Unsecured Note Claims, including the Trustee

Fees and Expenses and Indemnification Obligations.

**B.    The Debtors Discriminate Against the Trustee Insofar as the Plan Provides for the Payment of the Fees and Expenses of the EFIH First and Second Lien Trustees and Trustees for the TCEH Unsecured and Second Lien Noteholders**

57.    The Debtors have chosen to pay the fees and expenses of almost every agent and

trustee in these cases except for the EFH and EFIH unsecured note trustees.  The Plan provides

that the EFIH First Lien and Second Lien Notes Claims will be Allowed in an amount that

***includes*** "all reasonable and documented fees and expenses" owed under the applicable

indenture.  *See* Plan Art. III.B(18), (19).  Similarly, the Plan provides for the payment in cash in

full on the Effective Date of the "reasonable and documented fees and expenses (including

professional and other advisory fees and expenses) incurred through the Effective Date of the

TCEH Unsecured Notes Trustee, the TCEH Second Lien Notes Trustee, the TCEH Second Lien

Notes Collateral Agent, the members of the TCEH Unsecured Ad Hoc Group, and the members

---

[25] Although the Disclosure Statement more clearly states that the Plan will serve as an objection to the Trustee Fees and Expenses, it too fails to provide any basis for objecting to Allowance of the Trustee Fees and Expenses.  *See* Disclosure Statement, V.E(21)  ("The filing and notice of filing of the Plan, in accordance with Fed. R. Bankr. P. 3007(a), shall serve as the Debtors' objection to the Alleged Unsecured Trustee Fees and Claims . . . .").

of the TCEH Second Lien Consortium."   Plan Art. IV.R.   The Trustee submits that it is particularly indefensible for the Plan to pay all trustee and agent fees and expenses on the insolvent "T-side," but deny the validity and reimbursement of the Trustee Fees and Expenses against the solvent EFIH estate.   Additionally, the Debtors' agreement to pay the fees and expenses of certain unsecured creditors, but not others, results in disparate treatment among classes of similarly situated creditors in violation of Section 1129(b) and cannot be countenanced.   *See, e.g.*, *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 238 (3d Cir. 2004) ("The Bankruptcy Code furthers the policy of 'equality of distribution among creditors' by requiring that a plan of reorganization provide similar treatment to similarly situated creditors"); *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006) (holding that compliance with Section 1129 requires a Plan to not unfairly treat two similarly situated classes of creditors differently) (*citing In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986)); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 611 (Bankr. D. Del. 2001) (same).

## III.   THE PLAN FAILS TO PROVIDE ADEQUATE MEANS FOR IMPLEMENTATION IN VIOLATION OF SECTION 1123(A)(5)

58.   Section 1123(a)(5) mandates that, "[n]otwithstanding any otherwise applicable nonbankrutpcy law, a plan shall. . . provide adequate means for the plan's implementation."   11 U.S.C. § 1123(a)(5).   The Plan fails to provide adequate means for implementation because, as discussed herein, the Postpetition Interest Reserve is inadequate.

59.   The Plan provides for the establishment of a Postpetition Interest Reserve on the Effective Date that will include the amount of the "difference between interest accrued on EFIH Unsecured Note Claims, EFH Legacy Note Claims, EFH LBO Note Claims, and EFH Unexchanged Note Claims from the Petition Date through the Effective Date at the Federal Judgment Rate, and interest accrued on such Claims from the Petition Date through the

33

Effective Date at the applicable non-default contract rate, but not including interest-on-interest, or such other amount ordered by the Bankruptcy Court." Plan Art. I.A(266). This reserve, however, is inadequate for the following reasons:

- The reserve does not provide for the accrual of interest-on-interest post-Effective Date;

- The reserve does not account for interest-on-interest or Additional Interest that is owed under the Indentures; and

- The reserve will only be established if this Court Allows the Contractual Interest or does not decide this issue prior to the Effective Date.

Each of these deficiencies open up the possibility that the EFIH Unsecured Noteholders will not receive payment in full, in cash on account of such Allowed Contractual Interest.

60. First, the Postpetition Interest Reserve will be underfunded. Although the Plan provides that EFIH Unsecured Noteholders will be entitled to postpetition interest that is due and owing as of the Effective Date, the Postpetition Interest Reserve does **not** reserve any amounts on account of Additional Interest or interest-on-interest. *See id.* This is contrary to the specific language of the Indentures, which provides for Additional Interest and interest-on-interest at the contract rate. *See* Indentures § 4.01, Exhibit A (Form of Note). The Debtors have already implicitly acknowledged the EFIH Unsecured Noteholders' right to interest-on-interest by including this concept in the calculation of the "Federal Judgment Rate." *See* Plan Art. I.A(266) (providing that the "Federal Judgment Rate" will be compounded annually). In addition, the Plan specifically provides that the "unimpaired" holders of EFIH Second Lien Notes, who have virtually identical language in their indentures, will receive interest-on-interest and Additional Interest.

61. Second, the Debtors do not propose to augment the reserve with compounding interest, even if the Trustee prevails on its claim for interest-on-interest. Instead, they purport to use the Plan to extinguish any rights under the Indentures to accrue post-Effective Date

Contractual Interest. *See id.* Art. IV.I (providing that the EFIH Unsecured Note Claims and the Indentures will be deemed "canceled, surrendered, and discharged . . . and the obligations of the Debtors or Reorganized Debtors . . . shall be deemed satisfied in full and discharged . . . .).

62.     Third, the Postpetition Interest Reserve is designed to protect the Plan Sponsors, not the creditors.  The Postpetition Interest Reserve will only be established in certain *limited* circumstances—that is, (i) if this Court allows the Contractual Interest on or before the Effective Date and such order is not a Final Order or (ii) if this Court has not yet decided, as of the Effective Date, whether the Contractual Interest claim should be Allowed or disallowed.  *See* Plan Art. VII.K; *see also* Keglevic Dep. Tr. at 51:2-16, Oct. 1, 2015 ("[T]he obligation to fund [the Postpetition Interest Reserve] will have ended at the effective date.").  In contrast, if this Court *disallows* the Contractual Interest claim on or before the Effective Date, the Postpetition Interest Reserve will not be established, even if such order is not a Final Order and is subject to appeal.  Under this scenario, the EFIH Unsecured Noteholders have no assurance that there will be funds to pay the Contractual Interest claim if ultimately Allowed by Final Order; rather, the Debtors presumably have reserved the right to argue that any Appeal should be dismissed as equitably moot.

63.     In order for a debtor's plan to be confirmable, the debtor has a duty to establish in its plan "reserves with assets sufficient to pay disputed claim in full to allow creditors full *pro rata* recovery on their claims."  *In re Motors Liquidation Co.*, 447 B.R. 198, 215 (Bankr. S.D.N.Y. 2011); *In re Northwestern Corp.*, 362 B.R. 131, 134-35 (D. Del. 2007) (remanding to bankruptcy court to determine whether claims reserve contained sufficient assets to allow creditor to recovery fully on their claims and ensure equal treatment for similarly situated creditors).  Here, contrary to established case law, the Debtors have failed to create a sufficient

Postpetition Interest Reserve and to establish any reserve for the Trustee Fees and Expenses. The failure to ensure that the Contractual Interest will be paid if a Court ultimately enters a Final Order does not provide an adequate means for implementation of the Plan in violation of Section 1123(a)(5) (and is a another reason the EFIH Unsecured Note Parties are impaired).  To remedy this deficiency, the Postpetition Interest Reserve (i) must be established regardless of whether this Court Allows or disallows the Contractual Interest if such issue is on appeal, (ii) must provide for post-Effective Date interest in accordance with the Indentures, and (iii) must be properly funded in accordance with the Debtors' contractual obligations (for example, should include interest-on-interest at the rate provided for under the Indentures accrued as of the Effective Date (including Additional Interest, as applicable) and be augmented for replenishment, as necessary).

## IV.    THE PLAN PROVIDES FOR DISPARATE TREATMENT OF THE EFIH UNSECURED NOTEHOLDERS IN VIOLATION OF SECTION 1123(A)(4)

64.    The Plan should not be confirmed in its present form because it fails to offer all EFIH Unsecured Noteholders the same opportunities to recover on their claims.   Section 1123(a)(4) requires that a plan of reorganization "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment . . . ."  11 U.S.C. § 1123(a)(4); *see also In re New Century TRS Holdings, Inc.*, 407 B.R. 576, 592 (D. Del. 2009).  The Third Circuit has acknowledged that "'[e]quality of distribution among creditors is a central policy of the Bankruptcy Code.'"  *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 238 (3d Cir. 2004) (quoting *Begier v. IRS*, 496 U.S. 53, 58 (1990)). Furthermore, the Third Circuit has recognized that "courts have interpreted the 'same treatment' requirement to mean that all claimants in a class must have 'the same opportunity' for recovery."  *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) (citing *In re Dana Corp.*,

412 B.R. 53, 62 (S.D.N.Y. 2008) ("The key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity.")). Accordingly, "what matters . . . is not that claimants recover the same amount but that they have equal opportunity to recover on their claims." *W.R. Grace & Co.*, 729 F.3d at 327.

65. Here, the Debtors have offered to certain of the EFIH Unsecured Noteholders (the "Participating Holders") the ability to participate in the Equity Investment (which includes equity investments to be made pursuant to the Rights Offering, the Backstop Agreement, and the Equity Commitment Letter), but this opportunity was not made to *all* of the EFIH Unsecured Noteholders.  The Participating Holders are signatories to the PSA, the Backstop Agreement and the Equity Commitment Letter and as a result will be able to invest in New EFH and/or OV2 and to backstop the Rights Offering, for which they will receive a premium in the form of New EFH Common Stock and various "fees" in connection with their participation.[26] *See* Equity Commitment Letter, Exhibit A; Backstop Agt. § 4.1 and Schedule 1.  In order to comply with the requirements of Section 1123(a)(4), these investment opportunities should have been offered to all EFIH Unsecured Noteholders.  Instead, the Trustee understands that the Debtors made these opportunities available only to the Participating Holders, in direct contravention of the Bankruptcy Code.

66. Courts in this district have held that investment opportunities must be offered to all members of the class to comply with the requirements of Section 1123(a)(4).  For example, in *In re Washington Mutual, Inc.*, the debtors' proposed plan offered members of a certain class of creditors the opportunity to participate in a rights offering to purchase stock in the

---

[26] The Backstop Agreement states that the Investors (which term includes the Participating Holders) will be paid a Backstop Premium of $305,000,000 in shares of New EFH to "compensate the Investors for their Backstop Commitment."  Backstop Agt. § 4.1.  All EFIH Unsecured Noteholders, however, have not been offered the opportunity to participate in these fees and premiums that were selectively offered to the Participating Holders.

reorganized debtor, but the plan only made that opportunity available to those claimants whose claim exceeded a $2 million threshold.  442 B.R. 314, 360 (Bankr. D. Del. 2011).  The Bankruptcy Court for the District of Delaware held that excluding smaller claimants within the same class from participation in the rights offering constituted disparate treatment, such that the debtors would have to modify the plan so that all claimants in the class would have the same opportunity to participate in order to comply with Section 1123(a)(4).  *Id.* at 361.  Similarly, the Debtors' failure to offer the opportunity to participate in the Equity Investment to all EFIH Unsecured Noteholders is disparate treatment, which may be remedied only by opening up participation in the Equity Investment to all of the EFIH Unsecured Noteholders.

## V.    THE PLAN WAS NOT PROPOSED IN GOOD FAITH IN VIOLATION OF SECTION 1129(A)(3) BECAUSE IT IS INEXTRICABLY TIED TO APPROVAL OF THE SETTLEMENT AGREEMENT

67.    Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  This generally means that there is a reasonable likelihood that the plan will fairly achieve a result consistent with the Bankruptcy Code, in light of the particular facts and circumstances.  *See In re PWS Holdings Corp.*, 228 F.3d 224, 242 (3d Cir. 2000); *In re Leslie Fay Cos., Inc.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997).[27]

68.    Here, as detailed in the Settlement Objection[28] filed contemporaneously herewith, the Plan is premised upon approval of the Settlement Agreement that contains releases from EFIH that become effective upon approval of the settlement rather than the Effective Date of the

---

[27] The factors the Court considers when evaluating good faith include whether the proposed plan "(1) fosters a result consistent with the [Bankruptcy] Code's objectives; (2) has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected; and (3) [exhibited] a fundamental fairness in dealing with the creditors."  *In re W.R. Grace & Co.*, 475 B.R. 34, 87-88 (D. Del. 2012) (citations omitted).

[28] The "Settlement Objection" means the *Objection of UMB Bank, N.A. to the Motion of Energy Future Holdings Corp., et al., to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter into and Perform Under the Settlement Agreement*.  The Settlement Objection is hereby incorporated by reference.

Plan.  The Trustee objects to the EFIH Inter-Debtor Releases (as defined in the Settlement Objection), which includes EFIH's release of nearly $1.3 billion in undisputed Legacy Note Claims (as defined in the Settlement Objection) against EFH.  As set forth in the Settlement Objection, the EFIH Debtors' agreement to the terms of the Disinterested Director Settlement (as defined in the Settlement Objection) was premised on EFIH's releases being provided in accordance with a plan of reorganization that provided for payment in full to EFIH creditors and a "fiduciary out" if a future plan of reorganization would not provide for payment in full to EFIH creditors.  *See* Settlement Obj. ¶¶ 11-18.  These benefits to EFIH creditors were a primary reason that the independent director of the EFIH Debtors approved the Disinterested Director Settlement.  *See Energy Future Intermediate Company LLC's Statement in Support of Intercompany Settlement in the Plan* [D.I. 4146]; *see also* Cremens Dep. Tr. 127:13-14, Sept. 15, 2015 (describing the treatment of creditors of EFIH as "a hundred percent cash payout").

69.    Although the Debtors contend that the Disinterested Director Settlement was incorporated into the Settlement Agreement, that settlement has been materially altered to the detriment of EFIH and its creditors as a result of the timing of the proposed releases.  *See* Settlement Obj. ¶¶ 19-30.  The Settlement Agreement provides for releases immediately upon its approval and independent of the consummation of any plan of reorganization, and thus improperly strips away EFIH's negotiated protections, and is not in the best interests of EFIH's estate.  *See* Settlement Obj. ¶¶ 34-40.

## **RESERVATION OF RIGHTS**

70.    This Objection is submitted without prejudice to, and with a full reservation of, the Trustee's right to supplement this Objection in advance of or in connection with confirmation of the Plan.  Nothing herein shall be deemed to waive the Trustee's right to assert any additional arguments in connection with the Court's consideration of the Plan and Settlement Motion.

*[Remainder of page intentionally left blank.]*

## CONCLUSION

**WHEREFORE**, for the reasons set forth in this Objection, the Trustee respectfully requests that the Court deny confirmation of the Plan unless the Plan is modified to address the concerns set forth in this Objection.

Dated:  October 23, 2015
Wilmington, Delaware

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Ira S. Dizengoff (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036
Telephone:    (212) 872-1000
Facsimile:    (212) 872-1002
Email:        idizengoff@akingump.com
              aqureshi@akingump.com

Scott L. Alberino (admitted *pro hac vice*)
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone:    (202) 887-4000
Facsimile:    (202) 887-4288
Email:        salberino@akingump.com

By:   */s/ Raymond H. Lemisch*
**KLEHR HARRISON HARVEY BRANZBURG LLP**
Raymond H. Lemisch (No. 4204)919 Market Street, Suite 1000
Wilmington, DE 19801
Telephone: (302) 426-1189
Facsimile: (302) 426-9193
E-mail: rlemisch@klehr.com

**FOLEY & LARDNER LLP**
Harold L. Kaplan (admitted *pro hac vice*)
Mark F. Hebbeln (admitted *pro hac vice*)
Lars A. Peterson (admitted *pro hac vice*)
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Telephone: (312) 832-4500
Facsimile: (312) 832-4700
Email: hkaplan@foley.com
mhebbeln@foley.com
lapeterson@foley.com

Barry G. Felder (admitted *pro hac vice*)
Jonathan H. Friedman (admitted *pro hac vice*)
90 Park Avenue
New York, NY 10016
Telephone: (212) 682-7474
Facsimile: (212) 687-2329
E-mail: bgfelder@foley.com
jfriedman@foley.com

*Co-Counsel for UMB BANK, N.A., as Trustee*