**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF**
**CONFIRMATION OF JOINT PLAN OF REORGANIZATION**

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

i

**Table of Contents**

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ......................................................................................................................3

I.      Restructuring Transactions. ......................................................................................3

II.     Tax Considerations. ................................................................................................5

      A.    Taxable Sale of TCEH's Assets Involves Unacceptable Risk for Each Estate and All Stakeholders. ..............................................................................6

      B.    A Taxable Sale of TCEH's Assets Will Make a REIT Transaction Impossible. ...............................................................................................7

III.    Global Settlement. ................................................................................................9

IV.   Confirmation Solicitation and Notification Process. ...................................................14

      A.    Unimpaired and Deemed to Accept. .........................................................14

      B.    Fully Impaired and Deemed to Reject. .......................................................15

      C.    Subject to Reinstatement or Discharge and Deemed to Accept or Reject. ............16

      D.    Voting Classes. ................................................................................16

ARGUMENT .......................................................................................................................17

I.      The Plan Satisfies Each Requirement for Confirmation. ...........................................17

      A.    The Plan Complies Fully with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)). ...............................................................17

            ii.    The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code. ...............................................................18

            iii.   The Plan Satisfies the Seven Mandatory Plan Requirements of Sections 1123(a) of the Bankruptcy Code. ...............................................19

      B.    The Debtors Have Complied Fully with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)). ...............................................................25

      C.    The Debtors Proposed the Plan in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)). ...............................................................26

      D.    The Plan Provides for Bankruptcy Court Approval of Certain Administrative Payments (Section 1129(a)(4)). ...............................................................28

E.      The Debtors Have Complied with the Bankruptcy Code's Governance Disclosure Requirement (Section 1129(a)(5)). .......................................................30

F.      The Plan Does Not Provide for Any Rate Changes Requiring Governmental Approval (Section 1129(a)(6)). .......................................................31

G.      The Plan Is in the Best Interests of Holders of Claims and Interests (Section 1129(a)(7)). ...............................................................................................32

H.      The Plan Satisfies the Voting Requirements (Section 1129(a)(8)). ......................33

         i.      Allowed Claims and Interests Subject to Reinstatement Are Unimpaired. ...................................................................................34

         ii.     The Potential Reinstatement of the EFH Legacy Notes Is Permissible. ...................................................................................34

I.      The Plan Complies With Statutorily Mandated Treatment of Administrative and Priority Tax Claims (Section 1129(a)(9)). .............................36

J.      At Least One Impaired Class of Claims has Accepted the Plan, Excluding the Acceptances of Insiders (Section 1129(a)(10)). .................................................37

K.      The Plan Is Feasible (Section 1129(a)(11)). .........................................................37

         i.      Regulatory Applications Have Been Submitted That the Debtors Believe Satisfy All of the Requirements for Approval. ...........................38

         ii.     The Merger Is Reasonably Likely to Close. ................................................40

         iii.    Reorganized TCEH and New EFH Will Be Financially-Sound. ...............42

L.      The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)). ...........................................................................................44

M.     The Plan Complies with Section 1129(a)(13) of the Bankruptcy Code. ..............44

N.      Sections 1129(a)(14) Through Sections 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan. ...........................................................................45

O.     The Plan Satisfies the Cramdown Requirements (Section 1129(b)). ...................45

P.      The Plan Does Not Unfairly Discriminate Against the Deemed Rejecting Classes. ................................................................................................................47

Q.     The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code: (Section 1129(c)-(e)). ............................................................49

ii

II.    The Discretionary Contents of the Plan Are Appropriate....................................................49

    A.    The Plan Appropriately Incorporates the Global Settlement of Inter-Debtor and Legacy Claims and Causes of Action. ...........................................................50

        i.    The Settlement of Certain Inter-Debtor Claims Is Reasonable and In the Best Interest of the Debtors' Estates.................................................51

        ii.    The Settlement of Claims Against TCEH First Lien Creditors Is Reasonable and in the Best Interest of the Debtors' Estates.....................53

        iii.    The Debtor Releases in the Plan Are Appropriate.....................................54

        iv.    The Third Party Releases in the Plan are Appropriate..............................56

    B.    The Plan's Exculpation Provisions Are Appropriate.............................................58

    C.    The Injunction Sought Is Necessary to Enforce the Releases and Exculpations Contained in the Plan. ....................................................................60

CONCLUSION.............................................................................................................................61

RLF1 13187742v.1

## Table of Authorities

**Page(s)**

**Cases**

*B.D. Int'l Disc. Corp. v. Chase Manhattan Bank,*
701 F.2d 1071 (2d Cir. 1983) ...................................................................................26

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,*
526 U.S. 434 (1999) ...............................................................................28, 32, 47

*Electric Machinery Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.,*
549 U.S. 443 (2007) ...................................................................................36

*Gillman v. Cont'l Airlines (In re Cont'l Airlines),*
203 F.3d 203 (3d Cir. 2000) .................................................................58, 59

*In re 203 N. LaSalle St. Ltd. P'ship,*
190 B.R. 567 (Bankr. N.D. Ill. 1995) ...................................................................48

*In re 300 Washington St. LLC,*
528 B.R. 534 (Bankr. E.D.N.Y. 2015) ...................................................................50

*In re Adelphia Commc'ns. Corp.,*
368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...............................................................32, 53

*In re Adelphia Commnc's Corp.,*
Case No. 02-41729 (REG) (Bankr. S.D.N.Y., Jan. 5, 2007) ...................................40

*In re Ahead Commc'ns Sys., Inc.,*
395 B.R. 512 (D. Conn. 2008) ...................................................................22

*In re Am. Solar King Corp.,*
90 B.R. 808 (Bankr. W.D. Tex. 1988) ...............................................................25, 31

*In re Ambanc La Mesa Ltd. P'ship,*
115 F.3d 650 (9th Cir. 1997) ...................................................................49

*In re AMR Corp.,*
Case No. 11-15463 (SHL) (Bankr. S.D.N.Y., Oct. 22, 2013) .................................40

*In re Armstrong World Indus.,*
432 F.3d 507 (3d Cir. 2005) ...................................................................21

*In re Armstrong World Indus., Inc.,*
348 B.R. 111 (D. Del. 2006) ...................................................................17

iv

*In re Arrowmill Dev. Corp.*,
    211 B.R. 497 (Bankr. D.N.J. 1997) ...................................................................58

*In re Aztec Co.*,
    107 B.R. 585 (Bankr. M.D. Tenn. 1989) ...........................................................49

*In re Blitz U.S.A., Inc.*,
    2014 WL 2582976 (Bankr. D. Del. Jan. 30, 2014) ...........................................56

*In re Bonded Mailings, Inc.*,
    20 B.R. 781 (Bankr. E.D.N.Y. 1982) ................................................................26

*In re Bowles*,
    48 B.R. 502 (Bankr. E.D. Va. 1985) .................................................................48

*In re Brice Rd. Devs., L.L.C.*,
    392 B.R. 274 (B.A.P. 6th Cir. 2008) ................................................................39

*In re Cajun Elec. Power Coop., Inc.*,
    150 F.3d 503 (5th Cir. 1998) ............................................................................28

*In re Century Glove, Inc.*,
    1993 WL 239489 (D. Del. Feb. 10, 1993) ........................................................32

*In re Charter Commc'ns*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) ..................................................25, 30, 56

*In re Citadel Broad. Corp.*,
    Case No. 09-17442 (BRL) (Bankr. S.D.N.Y., May 19, 2010) ...........................40

*In re Coastal Broad. Sys., Inc.*,
    570 F. App'x 188 (3d Cir. 2014) ......................................................................18

*In re Congoleum Corp.*,
    2010 WL 1850182 (D.N.J. May 7, 2010) ..........................................................28

*In re Coram Healthcare Corp.*,
    315 B.R. 321 (Bank. D. Del. 2004) .............................................................18, 51

*In re DBSD N. Am.*,
    Case No. 09-13061 (REG) (Bankr. S.D.N.Y., July 5, 2011) .............................40

*In re Distributed Energy Sys. Corp.*,
    2009 WL 1458175 (Bankr. D. Del. May 18, 2009) ..........................................21

*In re Drexel Burnham Lambert Grp.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992) ..............................................................52

v

*In re Drexel Burnham Lambert Grp., Inc.*,
    960 F.2d 285 (2d Cir. 1992)...................................................................62

*In re Edison Mission Energy*,
    Case No. 12-49219 (JPC) (Bankr. N.D. Ill., Mar. 11, 2014) ....................40

*In re Elec. Mach. Enters., Inc.*,
    371 B.R. 549 (Bankr. M.D. Fla. 2007) ...................................................36

*In re Electroglas, Inc.*,
    2009 WL 8189056 (Bankr. D. Del. July 9, 2009)....................................21

*In re Enron Corp.*,
    326 B.R. 497 (S.D.N.Y. 2005)................................................................62

*In re Exide Techs.*,
    303 B.R. 48 (Bankr. D. Del. 2003) ...........................................18, 47, 57

*In re Freymiller Trucking, Inc.*,
    190 B.R. 913 (Bankr. W.D. Okla. 1996) ................................................48

*In re Garcia*,
    276 B.R. 627 (Bankr. D. Ariz. 2002)......................................................37

*In re Genco Shipping & Trading Ltd.*,
    509 B.R. 455 (Bankr. S.D.N.Y. 2014).....................................................28

*In re Genesis Health Ventures, Inc.*,
    266 B.R. 591 (Bankr. D. Del. 2001) .......................................................17

*In re Global Crossings, Ltd.*,
    Case No. 02-40188 (REG) (Bankr. S.D.N.Y., Dec. 26, 2002) ................40

*In re Hawaiian Telecom Commcn's, Inc.*,
    Case No. 08-02005 (Bankr. D. Haw., Dec. 30, 2009) ............................40

*In re Indianapolis Downs, LLC*,
    486 B.R. 286 (Bankr. D. Del. 2013) ...................................28, 40, 44, 58

*In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986),
    *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987) .......................................................49

*In re Journal Register Co.*,
    407 B.R. 520 (Bankr. S.D.N.Y. 2009)....................................................28

*In re Kaiser Aluminum Corp.*,
    2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006), *aff'd*, 343 B.R. 88 (D. Del.
    2006) ......................................................................................................18

*In re Kaiser Aluminum Corp.*,
    339 B.R. 91 (D. Del. 2006) .................................................................................53

*In re Key3Media Group, Inc.*,
    336 B.R. (Bankr. D. Del. 2005) .........................................................................57

*In re Landing Assoc., Ltd.*,
    157 B.R. 791 (Bankr. W.D. Tex. 1993) ............................................................39

*In re Lapworth*,
    1998 WL 767456 (Bankr. E.D. Pa. Nov. 3, 1998) ...........................................25

*In re Laramie Assocs., Ltd.*,
    1996 WL 549984 (Bankr. E.D. Pa. June 20, 1996) ..........................................33

*In re Lightsquared Inc.*,
    Case No. 12-12080 (SCC) (Bankr. S.D.N.Y., Mar. 27, 2015) .........................40

*In re Madison Hotel Assocs.*,
    749 F.2d 410 (7th Cir. 1984) .............................................................................26

*In re Majestic Star Casino, LLC*,
    Case No. 09-14136 (KG) (Bankr. D. Del., Mar 10, 2011) ...............................40

*In re Martin*,
    91 F.3d 389 (3d Cir. 1996) ...........................................................................27, 51

*In re Master Mortg. Inv. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994) .............................................................56

*In re Maxcom Telecommunicaciones, S.A.B. DE C.V.*,
    Case No. 13-11839 (PJW) (Bankr. D. Del., Sept. 10, 2013) ...........................40

*In re Mirant Corp.*,
    2005 WL 6440372 (Bankr. N.D. Tex. May 24, 2005) ......................................37

*In re Mirant Corp.*,
    2007 WL 1258932 (Bankr. N.D. Tex. Apr. 27, 2007) ......................................18

*In re Onco Inv. Co.*,
    316 B.R. 163 (Bankr. D. Del. 2004) .................................................................37

*In re PPI Enters., Inc.*,
    324 F.3d 197 (3d Cir. 2003) .........................................................................33, 34

*In re Premier Int'l Holdings, Inc.*,
    2010 WL 2745964 (Bankr. D. Del. Apr. 30, 2010) ..........................................61

vii

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000)......................................................................25, 61, 62

*In re Quigley Co., Inc.*,
   377 B.R. 110 (Bankr. S.D.N.Y. 2007) ..................................................................20

*In re Rath Packing Co.*,
   55 B.R. 528 (Bankr. N.D. Iowa 1985) ..................................................................50

*In re Satcon Tech. Corp.*,
   2012 WL 6091160 (Bankr. D. Del. Dec. 7, 2012)................................................53

*In re Seda France, Inc.*,
   2011 WL 3022563 (Bankr. W.D. Tex. July 22, 2011) .........................................36

*In re Sorenson Commc'ns, Inc.*,
   Case No. 14-10454 (BLS) (Bankr. D. Del., Apr. 10, 2014) ..................................40

*In re Sound Radio, Inc.*,
   93 B.R. 849 (Bankr. D.N.J. 1988) ........................................................................26

*In re Spansion, Inc.*,
   2010 WL 2905001 (Bankr. D. Del. Apr. 16, 2010) .............................................61

*In re Spansion, Inc.*,
   426 B.R. 114 (Bankr. D. Del. 2010) ...............................................................58, 60

*In re Specialty Equip. Cos.*,
   3 F.3d 1043 (7th Cir. 1993) ..................................................................................58

*In re T-H New Orleans Ltd. P'ship*,
   116 F.3d 790 (5th Cir. 1997) ................................................................................39

*In re Taddeo*,
   685 F.2d 24 (2d Cir. 1982)....................................................................................37

*In re Trenton Ridge Investors, LLC*,
   461 B.R. 440 (Bankr. S.D. Ohio 2011)................................................................39

*In re Tribune Co.*, 464 B.R. 126 (Bankr. D. Del. 2011),
   *on reconsideration*, 464 B.R. 208 (Bankr. D. Del. 2011)...............................40, 52

*In re Tribune Co.*,
   476 B.R. 843 (Bankr. D. Del. 2012) .....................................................................18

*In re Vaughan Co.*,
   498 B.R. 297 (Bankr. D.N.M. 2013) ....................................................................54

*In re W. Coast Video Enters., Inc.*,
    174 B.R. 906 (Bankr. E.D. Pa. 1994) ...................................................................58

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012) ...................................................................... *passim*

*In re W.R. Grace & Co.*,
    729 F.3d 311 (3d Cir. 2013)..............................................................................20, 39

*In re Wash. Mut., Inc.*,
    461 B.R. 200 (Bankr. D. Del. 2011) ...................................................................39

*In re Wash. Mut., Inc.*,
    2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012) .............................................18

*In re Wash. Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ..................................................55, 56, 57, 61

*In re World Health Alts., Inc.*,
    344 B.R. 291 (Bankr. D. Del. 2006) ...................................................................21

*In re WorldCom, Inc.*,
    2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ........................................25

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
    987 F.2d 154 (3d Cir. 1993)................................................................................18

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988)...............................................................................49

*NLRB v. Bildisco & Bildisco*,
    465 U.S. 513 (1984)............................................................................................26

*United States v. Reorganized CF & I Fabricators of Utah, Inc.*,
    518 U.S. 213 (1996)............................................................................................32

**Statutes**

11 U.S.C. § 502(b)(2) .................................................................................................35

11 U.S.C. § 506(b) ......................................................................................................36

11 U.S.C. § 726(a)(5)...................................................................................................35

11 U.S.C. § 1114(e) .....................................................................................................45

11 U.S.C. § 1122(a) .....................................................................................................18

RLF1 13187742v.1

11 U.S.C. § 1123(a)(1)-(3)...................................................................................................19

11 U.S.C. § 1123(a)(4)........................................................................................................19

11 U.S.C. § 1123(a)(5)....................................................................................................21, 22

11 U.S.C. § 1123(a)(6)....................................................................................................22, 23

11 U.S.C. § 1123(a)(7)........................................................................................................23

11 U.S.C. § 1123(b)(1)–(6)..................................................................................................50

11 U.S.C. § 1123(b)(3)(A)...................................................................................................51

11 U.S.C. § 1124...............................................................................................................33

11 U.S.C. § 1125(b)............................................................................................................25

11 U.S.C. § 1126(c)............................................................................................................33

11 U.S.C. § 1126(f)............................................................................................................33

11 U.S.C. § 1126(g)...........................................................................................................33

11 U.S.C. § 1129(a)(3)..............................................................................................26, 28, 61

11 U.S.C. § 1129(a)(4)....................................................................................................28, 30

11 U.S.C. § 1129(a)(5)(A)(i) .............................................................................................30

11 U.S.C. § 1129(a)(5)(A)(ii) ............................................................................................30

11 U.S.C. § 1129(a)(5)(B) .................................................................................................30

11 U.S.C. § 1129(a)(6)....................................................................................................31, 32

11 U.S.C. § 1129(a)(7)........................................................................................................32

11 U.S.C. § 1129(a)(8)....................................................................................................33, 34

11 U.S.C. § 1129(a)(9)........................................................................................................38

11 U.S.C. § 1129(a)(11)..............................................................................................39, 43, 44

11 U.S.C. § 1129(a)(12)......................................................................................................45

11 U.S.C. § 1129(b) ...............................................................................................33, 46, 49

11 U.S.C. § 1129(b)(1) .......................................................................................................46

11 U.S.C. § 1129(b)(2)(B)(ii) ................................................................................................47

11 U.S.C. § 1129(b)(7)(A)(ii) ...............................................................................................35

11 U.S.C. § 1129(c) ...............................................................................................................50

26 U.S.C. § 857(a)(2)(B) .........................................................................................................8

28 U.S.C. § 1930....................................................................................................................45

**Rules**

Bankruptcy Rule 9019 ...........................................................................................................51

**Regulations**

Treas. Reg. § 1.312-10(a) ........................................................................................................9

Treas. Reg. § 20.2031-2(b)(1)..................................................................................................6

RLF1 13187742v.1

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this memorandum of law in support of confirmation of the *Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp.,* et al*., Pursuant to Chapter 11 of the Bankruptcy Code* (D.I. 6122) (as modified, amended, or supplemented from time to time, the "Plan").[2]  In support of confirmation of the Plan, the Debtors respectfully state as follows.[3]

## Preliminary Statement

1.      The Court should confirm the Plan.  The Debtors have spent the past several years navigating a variety of complex and often times contentious issues.  As the legal and economic landscape shifted over time, so did the form and focus of the restructuring:  from the aptly-named "Project Olympus," a consolidation transaction that would have equitized the E-side and T-side creditors at reorganized EFH; to a tax-free spin-off of TCEH, first memorialized in the pre-filing restructuring support agreement; to the Oncor marketing process, an effort to capitalize on the boom in interest in the Debtors' ownership interests in Oncor; to the value-maximizing Plan currently before the Court.  The one constant has been the unwavering good-faith engagement by the Debtors, their directors, officers, employees, and many of their stakeholders to reach a positive outcome.  These efforts paid off in a big way.

2.      For a long time, the biggest roadblock in these cases was the looming threat of legacy litigation that would have brought great cost and delay to the estates.  To begin to address these issues, the parties embarked on an eight-month discovery process that resulted in the production of over 5 million pages and over 900,000 documents related to a host of prepetition

---

[2]    Capitalized terms used but not defined in this memorandum have the meanings ascribed to them in the Plan.

[3]    The exhibits referenced herein are included as exhibits to the *Declaration of Brenton A. Rogers, Esq. in Support of the Debtors' Memorandum of Law in Support of Confirmation of Joint Plan of Reorganization*, filed contemporaneously herewith.

transactions.  This process led to several standing motions filed by junior stakeholders against the TCEH first lien creditors, and ultimately set the stage for mediation among TCEH creditors. At the same time, as the specter of conflicts threatened to paralyze the chapter 11 cases, the Debtors developed and implemented a rigorous conflict-matters protocol with their disinterested directors and advisors at each of EFH, EFIH, and TCEH.  These directors and advisors each underwent their own exhaustive diligence and negotiation process around inter-Debtor claims.

3.    Several breakthroughs followed.  *First*, the Debtors' disinterested directors came to terms on a settlement of intercompany claims and issues that was reflected in the Debtors' first plan of reorganization.  *Second*, the TCEH creditors agreed through mediation upon a settlement construct that would serve as the linchpin for a transaction sponsored by the TCEH unsecured creditors.  Together, these compromises, as embodied in the Settlement Agreement, represent a complete solution to the Debtors' legacy litigation and the cornerstone for the Debtors' reorganization.

4.    Given the history, the Plan is a remarkable result.  At the outset of the restructuring, EFH and even EFIH unsecured creditors were facing the possibility of significant impairment, whether resulting from a massive deconsolidation tax or depressed Oncor asset values.  Unsecured creditors of TCEH, with claims to only a limited pool of unencumbered assets, were in an even worse position.  Yet these TCEH unsecured creditors were undeterred and undertook great efforts to create value by offering value, as only they themselves could do. This work began in late 2014, when the Debtors and the TCEH unsecured creditors first began discussing transaction alternatives, but began to make meaningful headway toward the end of the first quarter of 2015, when the TCEH unsecureds began to appreciate the added value in Oncor that could be unlocked through a real estate investment trust structure.  It was through these

2

efforts, which continued into the summer of 2015, coupled with the massive breakthrough of the Settlement Agreement, the Plan took its current form: a comprehensive transaction that provides for consensus with nearly the entire "T-side" constituency and a 100% recovery for the "E-side" constituencies, a paragon of a successful restructuring.

5.      Not surprisingly, the Plan satisfies each of the requirements of the Bankruptcy Code, as laid out more fully in this Confirmation Brief. The Debtors therefore respectfully request that the Court enter the Confirmation Order.[4]

## **Background**

## I.      **Restructuring Transactions.**

6.      As described above, the Plan is premised on two transactions involving the largest competitive utility company in Texas—TCEH—and the largest rate-regulated utility company in Texas—Oncor. ***First***, the Plan contemplates a tax-free spin-off of TCEH to its first lien creditors (the "TCEH Spin-Off") that will be structured to obtain a significant, and carefully controlled, step-up in tax basis in certain of TCEH's assets. Under the TCEH Spin-Off, TCEH will transfer substantially all of its assets to newly-formed Reorganized TCEH in exchange for the cash proceeds of a Reorganized TCEH exit facility (or take-back debt, to the extent applicable), the Cash proceeds from the sale of the preferred stock of a newly-formed subsidiary of Reorganized TCEH (the "Preferred Stock Entity"), the right to receive payments under a tax receivable agreement (if any), and 100% of the Reorganized TCEH equity.[5]  TCEH will distribute that

---

[4]   In accordance with the *Amended Order (A) Revising Certain Hearing Dates and Deadlines, and (B) Establishing Certain Protocols in Connection with the Confirmation of Debtors' Plan of Reorganization* [D.I. 5771], the Debtors anticipate filing a reply addressing Plan objections on October 30, 2015 (the "Confirmation Reply").

[5]   EFH will also contribute certain assets to Reorganized TCEH to facilitate the reorganization. As a technical matter, the respective parties will receive the stock in Reorganized EFH and New EFH immediately before the Merger occurs.

3

consideration to the TCEH first lien creditors, who will then own Reorganized TCEH. **Second**, the Plan contemplates an acquisition of EFH Corp., which indirectly owns approximately 80% of Oncor, for up to $12.6 billion and by way of the Merger with Hunt Ovation I, LLC ("OV1"). The Merger will be funded by Hunt Consolidated, Inc. ("Hunt") and a consortium of prepetition creditors, including a number of major TCEH unsecured creditors (collectively with Hunt and as defined in the Plan, the "Plan Sponsors") with the proceeds of up to $5.5 billion of new debt financing, and $7.1 billion of equity financing, composed of approximately $1.763 billion in the form of a direct investment and $5.087 billion in funds raised in a rights offering to TCEH unsecured creditors and TCEH first lien creditors. Collectively, these sources of distribution allow the Debtors to (a) render Claims against the "E-side" (i.e., Claims against the EFH Debtors and the EFIH Debtors) Unimpaired (i.e., payment in full in Cash or Reinstatement) and (b) provide Holders of Allowed TCEH unsecured claims (i.e., Class C4 and Class C5) with their *pro rata* share of $150 million of Reorganized EFH Common Stock and rights to purchase up to $5.1 billion of New EFH equity.

7.      The Restructuring Transactions are the product of a negotiation and transaction development process that began in mid-2012. After the Debtors' filed their chapter 11 petitions, the Debtors and their stakeholders focused their restructuring discussions on four key issues: (a) executing a TCEH spin-off in a manner that minimizes adverse tax consequences; (b) the increasing value of EFH Corp's economic interest in Oncor; (c) the potential of utilizing a real estate investment trust (a "REIT") to restructure the "E-side," which had long been identified as a possible way to unlock significant value for the "E-side" but which requires certain regulatory and tax rulings; and (d) a fair and comprehensive resolution of inter-Debtor and intra-"T-side" legacy and other related claims.

8.      With these considerations in mind, and with the goal of identifying the transaction likely to generate the most significant value for EFH Corp.'s interest in Oncor, the Debtors embarked on an extensive and in some ways unprecedented third-party marketing process for EFH Corp.'s economic interests in Oncor.[6]  In parallel with that process, the Debtors engaged in extensive ongoing negotiations with the major economic stakeholders on both sides of their capital structures.   After reviewing the multiple Round 2 bids, and in light of simultaneous discussions with various creditor constituencies, the Debtors determined that they had not received a sufficiently attractive stalking horse bid.   Nevertheless, the negotiations related to the marketing process in many ways set the stage for the watershed Restructuring Transactions reflected in the Plan, which attracted greater support across the Debtors' capital structure than any party initially thought possible, put the Debtors on a smoother path to emergence than any party initially thought likely, and ultimately return greater value to the Debtors' estates than any party initially anticipated.[7]

## II.      Tax Considerations.

9.      The need to structure the Restructuring Transactions in a way that mitigates an otherwise substantial tax liability while allowing the Debtors to maximize the value of their assets served as one of the most significant drivers in negotiations around the Plan.  Based on a number of considerations, the Debtors ultimately determined that a tax-free transaction would maximize the value of their estates.   Specifically, a taxable sale of TCEH's assets (a) could expose EFH's creditors and stakeholders to a potential significant tax liability and (b)

---

[6]    *See Order (A) Approving Revised Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C) Approving the Form and Manner of Notice Thereof* [D.I. 3295].

[7]    *See* Ex. 1, 9/23/2015 Ying Dep. Tr. at 45:13-22 ("From a financial point of view, it's the only offer or it's an offer that has by far the highest value associated with it. It's the offer that has the most distributable value associated with it, and it's the only proposal that seems to have a vast majority of the stakeholders' support.").

would significantly reduce the value of EFH by making it effectively impossible for EFH to become a REIT, which all parties agree is the most likely transaction to maximize value if successfully executed.

**A.    A Taxable Sale of TCEH's Assets Involves Unacceptable Risk for Each Estate and All Stakeholders.**

10.    Since the beginning of these chapter 11 cases, there have been significant changes in the market's perception of the value of the TCEH assets.  Based on the current value of TCEH's assets, certain creditors may seek to assert that TCEH could now be disposed of in a taxable transaction without the Debtors triggering a cash liability.  This possibility, however, would be premised on two important and uncertain assumptions:  (a) that the decline in value will persist until TCEH emerges from chapter 11; and (b) that when TCEH emerges from chapter 11, the market will not value TCEH higher than the parties' current expectations.[8]  If either assumption proves not to be true, a taxable disposition could generate a significant tax liability.

11.    The rules and regulations of the IRS do not permit this Court or any expert to decide on the value of TCEH at emergence for tax purposes.  Rather, TCEH's value will be determined for tax purposes by the trading that will occur in the stock of TCEH immediately after emergence (or the actual proceeds received in a sale of TCEH).[9]  To the extent that TCEH trading value is higher than expected, resulting in taxable gain that exceeds the amount of the Debtors' available net operating losses ("NOLs") and TCEH's basis in its assets, (neither of

---

[8]    Additionally, this possibility assumes that 100% of the Debtors' NOLs would be available solely to offset a disposition of TCEH's assets and that a taxable disposition of TCEH's assets would not be accompanied by a taxable disposition of EFH's other assets, including its indirect interests in Oncor.

[9]    *See, e.g.*, Treas. Reg. § 20.2031-2(b)(1) ("In general, if there is a market for stocks or bonds, on a stock exchange, in an over-the-counter market, or otherwise, the mean between the highest and lowest quoted selling prices on the valuation date is the fair market value per share or bond.").  Although this regulation specifically relates to the estate planning area, it is a principle that is widely applicable to determinations of the value of stock.

which can be determined with precise accuracy until after the emergence transactions occur), the

Debtors will have triggered a potentially significant tax liability with no cash set aside to pay for

that tax.  As a result, the Debtors have determined that separating TCEH from EFH in a taxable

disposition is not in the best interests of the Debtors or their stakeholders.[10]

> **B.** **A Taxable Sale of TCEH's Assets Will Make a REIT Transaction Impossible.**

12.    The two linchpins that have brought this extraordinarily complicated case to the

brink of confirmation are the ability to (a) effect a tax-free spin-off of TCEH with a partial

step-up in the tax basis of certain TCEH's assets[11] and (b) convert EFH into a REIT.  The

conversion of Reorganized EFH into a REIT potentially creates substantial incremental value,

resulting in the Plan Sponsors willingness to invest up to $7.1 billion to acquire Reorganized

EFH through the Merger (and provide an additional $5.5 billion of debt financing), thereby

facilitating 100% recoveries for all "E-side" creditors.  Indeed, no one disputes that converting

EFH into a REIT is the most likely way to maximize recovery for the creditors of EFIH and

EFH.

---

[10]    *See*, *e.g.*, Ex. 2, 9/25/2015 Evans Dep. Tr. at 210:15-24 (noting a taxable sale runs the risk of a very large tax liability at EFH); Ex. 3, 5/28/2014 Keglevic Dep. Tr. at 273:19-25, 274:1-3 (explaining a primary reason for not agreeing to the sale of assets is a substantial tax would be created); Ex. 4, 9/30/2015 Williamson Dep. Tr. at 71:4-22 (explaining tax liability in a taxable transaction is determined in part by the basis of the assets); Ex. 5, 10/19/2015 Ying Dep. Tr. at 111:5-25, 112:2 (noting that if TCEH were to separate from EFH in a taxable fashion EFH would no longer have the ability to convert to a REIT).  The EFH Official Committee's own expert admitted that in a taxable transaction of TCEH, there would be a tax liability owed by EFH in the absence of tax attributes that would reduce the potential gain.  *See* Ex. 6, 10/21/2015 Henkin Dep. Tr. at 265:18-24.

[11]    The basis step-up transaction involves a transaction that will be treated as an asset sale for tax purposes. However, the basis step-up transaction contemplates numerous contractual provisions and protections described, in part, in Exhibit G to the PSA, to ensure that no taxable gain in excess of available NOLs is triggered.  If those provisions fail, the parties have agreed to a predetermined allocation of risk in the highly-negotiated tax matters agreement.  These protections would not be available in a taxable disposition of all of TCEH's assets.

13.     Against this backdrop, it is important to understand that a taxable disposition of TCEH would render the REIT conversion effectively impossible.  Understanding how and why this is so requires a brief explanation of certain tax rules related to REIT eligibility and the allocation of earnings and profits ("E&P") in tax-free spin-offs.

14.     E&P is a specialized tax concept that is generally used to measure the amount a corporation has available to pay taxable dividends to its shareholders.  When a previously-existing corporation converts to a REIT, it is required to "purge" the E&P that accumulated before the conversion by paying a taxable dividend to its shareholders equal to the accumulated E&P from non-REIT years.[12]  This purging dividend is frequently paid 20% in cash and 80% in stock (but generally may not be paid 100% in stock).

15.     There is no dispute that EFH's total E&P at emergence will be enormous.  Specifically, the Debtors currently estimate that overall E&P will be in the range of $25-$30 billion.[13]  If EFH were required to purge this full amount, it would be required to pay a $5-$6 billion dividend in cash, and its new shareholders would receive a taxable dividend of $25-$30 billion.  This outcome would effectively eliminate the parties' ability to acquire EFH through the Merger because EFH will not have $5-$6 billion in cash available to pay a purging dividend.[14]  Absent the ability to pay the requisite purging dividend, EFH could not convert to a REIT, and the value-enhancing economics of the REIT structure would be lost.

---

[12]  *See* 26 U.S.C. § 857(a)(2)(B) (an entity does not qualify to be taxed as a REIT unless "as of the close of the taxable year, the real estate investment trust has no earnings and profits accumulated in any non-REIT year.").

[13]  The vast majority of this E&P will be attributable to the cancellation of TCEH's debt and the basis step-up transaction, rather than historical operations.

[14]  Any effort by EFH's new owners to contribute cash to EFH to enable EFH to pay the cash portion of the purging dividend would also be subject to substantial risk and implementation problems.

8

16.     The TCEH Spin-Off, if accomplished on a tax-free basis, will avoid this horrendous result because the vast majority of EFH's E&P at the time of the spin-off will be allocated to TCEH in the spin-off, not to EFH.[15]  And, since TCEH is not converting to a REIT, TCEH does not need to make a purging dividend.  Consequently, the tax-free spin-off of TCEH makes possible the REIT conversion for EFH.  A taxable disposition of TCEH would have the exact opposite outcome, because a taxable transaction would create approximately the same amount of E&P, but all of that E&P would remain at EFH under applicable tax rules.

### III.    Global Settlement.

17.     In addition to the tax and REIT structuring considerations described above, the Debtors' negotiations with their stakeholders were also informed by the potential for settling value-destructive inter-Debtor and intra-"T-side" litigation.  On April 14, 2015, the Debtors filed an initial plan of reorganization setting forth the framework for the current Plan:  the TCEH Spin-Off coupled with the highest or otherwise best restructuring transaction at EFH Corp.[16]  A critical component of that initial plan was the settlement entered into between the disinterested directors and managers of EFH Corp., EFIH, and EFCH and TCEH (the "Disinterested Director Settlement").[17]  The Disinterested Director Settlement resolved all alleged prepetition inter-

---

[15]    *See* Treas. Reg. § 1.312-10(a) (providing for the allocation of E&P in tax-free spin-off transactions).  While this regulation solely references "D" reorganizations, rather than "G" reorganizations like the TCEH Spin-Off, no party has expressed any serious doubt that the IRS will issue a ruling that confirms that this regulation applies to the TCEH Spin-Off.  Additionally, one of the rulings that the Debtors are required to receive from the IRS will ensure that the EFH tax group's E&P will be predominantly allocated to TCEH.

[16]    *Joint Plan of Reorganization of Energy Future Holdings Corp.,* et al., *Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 4142].

[17]    *See Energy Future Competitive Holdings Company LLC and Texas Competitive Electric Holdings Company LLC's Statement in Support of Intercompany Settlement in the Plan* [D.I. 4145]; *Energy Future Intermediate Holdings Company LLC's Statement in Support of Intercompany Settlement in the Plan* [D.I. 4146]; *Statement of the Disinterested Directors of Debtor Energy Future Holdings Corp. Regarding Proposed Settlement of Conflict Matters as Part of Proposed Plan of Reorganization* [D.I. 4147].

9

Debtor claims among the EFH, EFIH, and the TCEH silos, including the alleged claims arising out of the 2007 leveraged buyout and certain predecessor and successor transactions.[18]

18.    The Disinterested Director Settlement was the product of an intensive process through which the disinterested directors and managers and the Debtors' conflicts matters advisors reviewed and analyzed the applicable legacy transactions and potential inter-Debtor causes of action.[19]  After extensive diligence, these disinterested fiduciaries engaged in arm's-length negotiations to reach a comprehensive settlement of the inter-Debtor Claims.  At the same time these disinterested fiduciaries were evaluating such claims, all of the Debtors' most significant stakeholders were doing the same through the Court-approved legacy discovery process that ultimately resulted in the production of over 900,000 documents, many of which related to the alleged legacy claims.

19.    Effective August 10, 2015—the same day the Debtors filed the first version of the Plan embodying the Merger—the Debtors entered into a settlement (the "Settlement Agreement")[20] and the Plan Support Agreement ("PSA").[21]  The parties to both agreements (the "Supporting Parties") include substantial majorities of the TCEH first lien creditors, the TCEH

---

[18]    *See* Disclosure Statement, Art. I.C.

[19]    *See Energy Future Competitive Holdings Company LLC and Texas Competitive Electric Holdings Company LLC's Statement in Support of Intercompany Settlement in the Plan* [D.I. 4145]; *Energy Future Intermediate Holdings Company LLC's Statement in Support of Intercompany Settlement in the Plan* [D.I. 4146]; *Statement of the Disinterested Directors of Debtor Energy Future Holdings Corp. Regarding Proposed Settlement of Conflict Matters as Part of Proposed Plan of Reorganization* [D.I. 4147].

[20]    *See Motion of Energy Future Holdings Corp.,* et al.*, to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter into and Perform Under the Settlement Agreement* [D.I. 5249].  Given that the Settlement is subject to Court-approval on a standalone basis and incorporated in the Plan with only minor modifications, the Debtors believe the Court need not reevaluate the Settlement in the context of Plan confirmation but can rather largely rely on its findings in connection with the motion to approve the Settlement, which will be heard contemporaneously with Plan confirmation.

[21]    *See Motion of Energy Future Holdings Corp.,* et al.*, to Authorize the Debtors to Enter into and Perform Under the Plan Support Agreement* [D.I. 5248].  The Court approved the Debtors' entry into the PSA on September 18, 2015.  *See Order Authorizing Debtors to Enter into and Perform Under Plan Support Agreement* [D.I. 6097].

10

second lien noteholders, and the TCEH unsecured noteholders, as well as the official committee of TCEH unsecured creditors (the "TCEH Creditors' Committee") and the holders of approximately 99.26% of the outstanding equity interests in EFH Corp. (the "Prepetition Sponsors")—in short, the vast majority of constituents who are most severely impaired under the Plan.

20.     The Debtors' disinterested directors and managers separately reviewed and approved the Settlement Agreement and PSA insofar as they related to Conflicts Matters (as defined in the resolutions approving the Settlement Agreement and PSA and as attached hereto) and in consultation with their respective conflicts matters advisors.[22]  The agreements were then reviewed and approved by the Debtors' full boards in consultation with the Debtors' advisors.[23] The net result of the inter-Debtor settlement embodied in the Settlement Agreement and the Plan is a $700 million Allowed unsecured Claim by TCEH against EFH Corp. (the "TCEH Settlement Claim"), which will be deemed satisfied upon consummation of the Merger.[24]  On August 10, 2015, the Debtors filed a separate motion for approval of the Settlement Agreement, which provides extensive substantive argument in support of its approval (the "Settlement Motion").[25]

21.     Taken together, the PSA and the Settlement Agreement safeguard the consensus forged by the hard-fought Disinterested Director Settlement, against the possibility that the Merger does not close—a concept colloquially referred to as "disarmament."  Disarmament

---

[22]  *See* Ex. 7, Minutes of Joint Meeting of Disinterested Manager of the Boards of EFCH and TCEH (Aug. 9, 2015) [EFCH00034820]; Ex. 8, Minutes of a Meeting of the Disinterested Directors of EFH Corp. (Aug. 9, 2015) [EFH_DD00035222]; Ex. 9, Minutes of the Meeting of the Independent Manager of the Board of Directors (Aug. 9, 2015) [EFIH_DD0028055]

[23]  Ex. 10, Presentation to Joint Boards re Approval of Am. Plan and Merger Transaction Documents (Aug. 9, 2015) [EFH06002898]; Ex. 11, Minutes of a Joint Board Meeting (Aug. 9, 2015) [EFH06004432].

[24]  Plan Art. IV.B.15.

[25]  The Court will hear the Settlement Motion concurrently with Plan Confirmation.

11

eliminates the cost, delay, and loss of negotiating momentum caused by litigating legacy claims two years into these chapter 11 cases.  The Settlement Agreement resolves virtually all inter-Debtor Claims and all claims by one Debtor against another and by the Debtors and the Supporting Parties against the TCEH first lien creditors, the Prepetition Sponsors, and the Debtors' directors and officers.  Entry of the order approving the Settlement Agreement (the "Settlement Order") will release any claims in these categories that have arisen **as of the effective date of the Settlement Agreement** (the "Settlement Order Releases").[26]

22.    The Plan will also release claims in these same categories that have arisen **as of the effective date of the Plan** (the "Plan Effective Date").  In addition to claims held by the Debtors and the Supporting Parties, the Plan will release claims held by the Releasing Parties, as defined in the Plan, including all Holders of Claims and Interests (the "Plan Releases").[27]

23.    The Plan Releases of course only take effect if the Effective Date occurs.  Thus, to ensure that the Disinterested Director Settlement and disarmament would survive in the absence of the Effective Date, the parties turned to the PSA.  Should the Plan Effective Date not occur, the PSA provides that the Supporting Parties other than the TCEH Supporting First Lien Creditors will refrain from objecting to an Alternative Restructuring that includes certain required alternative terms.  The required alternative terms for a TCEH Alternative Restructuring include a $550 million agreed cash recovery to the TCEH unsecured creditors—sourced entirely from the TCEH first lien collateral.[28]  The required alternative terms for an EFH Alternative Restructuring include the TCEH Settlement Claim.[29]  The required alternative terms for all

---

[26]    Settlement Agreement, ¶ 2.1.

[27]    Plan, Art. VIII.C-D.

[28]    PSA, § 6.1(a)(i), (vi).

[29]    *Id.* § 6.1(b)(ii).

Debtors include the full settlement of inter-Debtor and other legacy claims and causes of action, as embodied in the Plan Releases.[30]    Additionally, the TCEH junior creditor parties to the PSA must vote in the same manner as the TCEH Supporting First Lien Parties on any plan that includes the Required Alternative Terms.[31]    Importantly, the parties to the PSA across the "E-side" and "T-side" are required to support an efficient Plan confirmation process (including if the Plan ultimately reflects an Alternative Plan), subject to certain conditions.[32]

24.    At their core, the REIT structure and the disarmament structure are two sides of the same coin—the REIT structure has the potential to unlock significant value for creditors across the capital structure (as evidenced by the funding contributions associated with the Merger) but requires certain regulatory and tax rulings, the absence of which may prevent the Merger from closing.  Disarmament, as embodied in the provisions of the Plan, the Settlement Agreement, and the PSA described above, ensures that if the Merger does not close, the Debtors and their stakeholders have nevertheless eliminated a very significant hurdle to confirming an alternative chapter 11 plan—extended and value-destructive litigation regarding legacy claims. Importantly, locking in the Settlement and disarmament *now* was a key component of incentivizing the Supporting Parties to support the Plan.

---

[30]    *Id.* § 6.1(a)(iii)-(v), (b).  Although the TCEH Supporting First Lien Parties generally retain their right to object to an alternative plan filed by the Debtors that includes the Required Alternative Terms, they must refrain from objecting to an Alternative Restructuring proposed by EFH and EFIH that does not adversely affect a TCEH Alternative Restructuring.  *Id.* § 5.4.

[31]    *Id.* § 5.1(a)(i).

[32]    *Id.* § 10(j) (requiring the Parties to support a Plan confirmation process that concludes on or before 90 days after the filing of a Plan (including an Alternative Plan), with respect to a Plan that is filed after the earlier of the Plan Support Termination Date or any termination of the PSA and before entry of all of the following orders: the Confirmation Order, the order approving the PSA (which has been entered), the Settlement Order, and the order approving the Backstop Agreement, the Merger Agreement, and related agreements (which motion has not been filed as of the date hereof).

13

IV.    **Confirmation Solicitation and Notification Process.**

25.    On September 22, 2015, the Court entered the order approving the Disclosure Statement and establishing procedures for solicitation of votes on the Plan (the "Disclosure Statement Order").[33]   As required by section 1126 of the Bankruptcy Code, the Debtors solicited votes from the Holders of Claims or Interests in Impaired Classes receiving a recovery under the Plan, with all other Classes deemed to accept or reject the Plan as applicable.

A.    **Unimpaired and Deemed to Accept.**

26.    Holders of Claims in the following Classes are Unimpaired under the Plan and therefore were deemed to accept the Plan. While the Debtors did not solicit votes from Holders of Claims in such Classes, the Debtors mailed them a notice regarding the Confirmation hearing as required under the Disclosure Statement Order.[34]

| Class | Claims and Interests | Status |
|---|---|---|
| Class A1 | Other Secured Claims Against the EFH Debtors | Unimpaired |
| Class A2 | Other Priority Claims Against the EFH Debtors | Unimpaired |
| Class A3 | Legacy General Unsecured Claims Against the EFH Debtors | Unimpaired |
| Class A4 | EFH Legacy Note Claims | Unimpaired |
| Class A5 | EFH Unexchanged Note Claims | Unimpaired |
| Class A6 | EFH LBO Note Primary Claims | Unimpaired |
| Class A7 | EFH Swap Claims | Unimpaired |
| Class A8 | EFH Non-Qualified Benefit Claims | Unimpaired |
| Class A9 | General Unsecured Claims Against EFH Corp. | Unimpaired |

---

[33]    *See Order (A) Approving the Disclosure Statement, (B) Establishing the Voting Record Date, Voting Deadline, and Other Dates, (C) Approving Procedures for Soliciting, Receiving, and Tabulating Votes on the Plan and for Filing Objections to the Plan, and (D) Approving the Manner and Forms of Notice and Other Related Documents* [D.I. 6131].

[34]    *See id.* at ¶ E; *Affidavit of Service of Solicitation Materials* [D.I. 6552].

14

| Class | Claims and Interests | Status |
|---|---|---|
| Class A10 | General Unsecured Claims Against the EFH Debtors Other Than EFH Corp. | Unimpaired |
| Class A11 | Tex-La Guaranty Claims | Unimpaired |
| Class B1 | Other Secured Claims Against the EFIH Debtors | Unimpaired |
| Class B2 | Other Priority Claims Against the EFIH Debtors | Unimpaired |
| Class B3 | EFIH First Lien Note Claims | Unimpaired |
| Class B4 | EFIH Second Lien Note Claims | Unimpaired |
| Class B5 | EFH LBO Note Guaranty Claims | Unimpaired |
| Class B6 | General Unsecured Claims Against the EFIH Debtors | Unimpaired |
| Class C1 | Other Secured Claims Against the TCEH Debtors | Unimpaired |
| Class C2 | Other Priority Claims Against the TCEH Debtors | Unimpaired |

### B.    Fully Impaired and Deemed to Reject.

27.    Holders of Claims or Interests in the following Classes did not receive any recovery under the Plan and therefore were deemed to reject the Plan. While the Debtors did not solicit votes from these stakeholders, the Debtors mailed them a notice regarding the Confirmation hearing as required under the Disclosure Statement Order.[35]

| Class | Claims and Interests | Status |
|---|---|---|
| Class A13 | Non-EFH Debtor Intercompany Claims | Impaired |
| Class A15 | Interests in EFH Corp. | Impaired |
| Class B8 | Non-EFIH Debtor Intercompany Claims | Impaired |
| Class B10 | Interests in EFIH Finance | Impaired |
| Class C6 | General Unsecured Claims Against EFCH | Impaired |
| Class C8 | Non-TCEH Debtor Intercompany Claims | Impaired |
| Class C10 | Interests in TCEH and EFCH | Impaired |

---

[35]  *Id.*.

15

**C.      Subject to Reinstatement or Discharge and Deemed to Accept or Reject.**

28.      With respect to inter-Debtor Claims and Interests between Debtors in the same "debt silo" (for example, Claims between one EFH Debtor and another EFH Debtor), the Debtors retained the ability to either reinstate or cancel and release such Claims on the Plan Effective Date to facilitate ordinary operations or the maintenance of existing organizational structures.  The Debtors holding these Claims and Interests are deemed to have accepted or rejected the Plan.  The Debtors were not required to solicit votes from the Debtors holding these Claims and Interests or serve such Debtors with any other type of notice in connection with solicitation.[36]

| Class | Claims and Interests | Status |
|---|---|---|
| Class A12 | EFH Debtor Intercompany Claims | Unimpaired/ Impaired |
| Class A14 | Interests in EFH Debtors Other Than EFH Corp. | Unimpaired/ Impaired |
| Class B7 | EFIH Debtor Intercompany Claims | Unimpaired/ Impaired |
| Class C7 | TCEH Debtor Intercompany Claims | Unimpaired/ Impaired |
| Class C9 | Interests in TCEH Debtors Other Than TCEH and EFCH | Unimpaired/ Impaired |

**D.      Voting Classes.**

29.      The Voting Deadline is October 23, 2015, at 4:00 p.m. (prevailing Eastern Time). Contemporaneously with the filing of this memorandum of law, the Debtors are tabulating the

---

[36]    *Id.*

votes received from Holders of Claims and Interests in Classes entitled to vote on the Plan and cannot provide the final voting results at this time.

30.     Suffice to say, the Debtors expect that they will have the necessary votes to accept from the Classes entitled to vote to support Confirmation of the Plan. The Debtors will address the voting results in more detail in the Confirmation Reply.

## <u>Argument</u>

31.     To confirm the Plan, the Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[37]   As described in detail below, the Plan complies with all relevant provisions of the Bankruptcy Code and all other applicable law. The Debtors will produce evidence to support this conclusion at the Confirmation hearing. The Debtors thus respectfully request that the Court confirm the Plan.

**I.     The Plan Satisfies Each Requirement for Confirmation.**

   **A.     The Plan Complies Fully with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).**

32.     Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of the Bankruptcy Code.[38]   The principal aim of this provision is to ensure compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a plan of reorganization.[39]   Accordingly, the determination of

---

[37]   *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 & n.15 (D. Del. 2006); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 616 n.23 (Bankr. D. Del. 2001).

[38]   11 U.S.C. § 1129(a)(1).

[39]   *See* S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5936, 6368; *see also Genesis Health*, 266 B.R. at 599 ("The legislative history reflects that the applicable provisions of chapter 11 includes sections such as section 1122 and 1123, governing classification and contents of plan." (internal quotation marks and alterations omitted)).

whether the Plan complies with section 1129(a)(1) of the Bankruptcy Code requires an analysis of sections 1122 and 1123 of the Bankruptcy Code.

> ### ii.    The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

33.    Section 1122 of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[40]  Because claims only need to be "substantially" similar to be placed in the same class, plan proponents have broad discretion in determining to classify claims together.[41]  Likewise, the Third Circuit has recognized that plan proponents may place similar claims into *different* classes so long as there is a reasonable basis to do so[42]—for example, where members of a class have different legal rights.[43]

34.    Here, each of the Claims or Interests in a particular Class is substantially similar to the other Claims or Interests in such Class, and there is a reasonable basis for the separate classification of Claims.  In general, the Plan's classification scheme follows the Debtors' capital

---

[40]   11 U.S.C. § 1122(a).

[41]   *See In re Tribune Co.*, 476 B.R. 843, 855 (Bankr. D. Del. 2012) (recognizing that plan proponents have "discretion" in classifying claims under a plan of reorganization); *In re W.R. Grace & Co.*, 475 B.R. 34, 109-10 (D. Del. 2012) ("Plan proponents and bankruptcy courts have considerably broad discretion in deciding how to classify claims.")

[42]   *In re Coastal Broad. Sys., Inc.*, 570 F. App'x 188, 193 (3d Cir. 2014) ("[A] corollary to that rule is that the 'grouping of similar claims in different classes' is permitted so long as the classification is 'reasonable.'") (quoting *In re Jersey Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987)); *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 159 (3d Cir. 1993) (stating that "each class must represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed"); *In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004) (stating that similar claims may be placed in separate classes so long as such classification is reasonable).

[43]   *See, e.g.*, *In re Wash. Mut., Inc.*, 2012 WL 1563880, at *12 (Bankr. D. Del. Feb. 24, 2012) (permitting separate classification of notes issued by same issuer where each debenture had "slightly different legal rights"); *In re Kaiser Aluminum Corp.*, 2006 WL 616243, at *5-6 (Bankr. D. Del. Feb. 6, 2006) (permitting classification scheme after consideration of creditors' legal rights), *aff'd*, 343 B.R. 88 (D. Del. 2006); *In re Exide Techs.*, 303 B.R. 48, 79-80 (Bankr. D. Del. 2003) (stating that there may be a basis for separately classifying creditors of the same priority level); *see also In re Mirant Corp.*, 2007 WL 1258932, at *7 (Bankr. N.D. Tex. Apr. 27, 2007) (permitting separate classification because holders of claims had different legal interests in the debtor's estate).

18

structure.  The Plan first classifies Claims and Interests into subcategories based on the Debtors'

three primary "debt silos":  subcategory A for the EFH Debtors, subcategory B for the EFIH

Debtors, and subcategory C for the TCEH Debtors.  From there, Claims are generally

categorized by priority, by Secured versus Unsecured status, by type, or based on unique factors

associated with particular series of debt.[44]  Because the Plan classifies Claims and Interests based

upon their different rights and attributes, the Plan satisfies section 1122 of the Bankruptcy Code.

### iii.    The Plan Satisfies the Seven Mandatory Plan Requirements of Sections 1123(a) of the Bankruptcy Code.

35.    The seven applicable requirements of section 1123(a) of the Bankruptcy Code

generally relate to the specification of claims treatment and classification, the equal treatment of

claims within classes, and the mechanics of implementing the plan.  The Plan satisfies each of

these requirements.

36.    ***Specification of Classes, Impairment, and Treatment.***  The first three

requirements of section 1123(a) are that the plan specify (a) the classification of claims and

interests, (b) whether such claims and interests are impaired or unimpaired, and (c) the precise

nature of their treatment under the Plan.[45]  The Plan, in particular Article III, satisfies these three

requirements by setting forth these specifications in detail.[46]

37.    ***Equal Treatment.***  The fourth requirement of section 1123(a) is that the plan must

"provide the same treatment for each claim or interest of a particular class."[47]  Courts in

Delaware construe this provision to require "only approximate equality," not "precise

---

[44]    Plan, Art. III.A.

[45]    11 U.S.C. § 1123(a)(1)-(3).

[46]    Plan, Art. III.B1-B35.

[47]    11 U.S.C. § 1123(a)(4).

equality."[48]   Importantly, in analyzing equal treatment, courts examine whether particular class members "give up the same degree of consideration for their distribution under the plan."[49]

38.    Here, the Plan satisfies these requirements.   In general, the Plan provides for identical treatment within each Class.   The TCEH Unsecured Debt Claims (Class C4), which include the TCEH First Lien Deficiency Claim, the TCEH Second Lien Note Claims, the TCEH Unsecured Note Claims, and the PCRB Claims, will all receive their *pro rata* share of $150 million of Reorganized EFH Stock and approximately $5.1 billion of Rights to participate in the Merger.   In the first instance, this will result in an identical recovery to all class members on account of them giving up their debt claims *against TCEH*.

39.    As a critical component of the settlement of litigation to avoid the liens securing the TCEH First Lien Secured Claims, the Plan provides that the Holders of TCEH First Lien Secured Claims, whose Claims are secured by the asset-holding TCEH subsidiaries like Luminant and TXU Energy, will waive their recovery under the TCEH First Lien Deficiency Claim for the benefit of holders of TCEH Unsecured Debt Claims that *also hold guarantees against the asset-holding TCEH subsidiaries* (i.e., the TCEH Second Lien Note Claims and the TCEH Unsecured Note Claims but excluding the PCRB Claims, which are only obligations of TCEH).

40.    In the absence of the waiver of the TCEH First Lien Deficiency Claim, TCEH would bear the brunt of nearly $20 billion of additional funded debt receiving Rights in TCEH. In addition, the waiver of the TCEH First Lien Deficiency Claim, as a critical component of a global settlement of intercreditor litigation, has the support of both the TCEH first lien creditors

---

[48]   *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) (quoting *In re Quigley Co., Inc.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007)).

[49]   *W.R. Grace & Co.*, 475 B.R. at 121.

20

(who are giving up their recovery on account of the deficiency claim), the TCEH Unsecured Ad Hoc Group (whose constituencies are the beneficiaries of the waiver), and the TCEH Creditors' Committee (who is a fiduciary of all "T-side" creditor constituencies). This settlement is a reasonable means of ensuring that Holders of these subsidiary guarantees do not give up disproportionate consideration under the Plan. In addition, courts in the Third Circuit have recognized the permissibility of secured creditors providing a portion of their recovery to junior creditors in certain circumstances, including as part of a larger restructuring transaction.[50]

41.    ***Adequate Means for Implementation.***  The fifth requirement of section 1123(a) is that the plan provide adequate means for its implementation.[51]  The Plan, together with the documents and forms of agreement included in the Plan Supplement, provides a detailed blueprint for the transactions that underlie the Plan.

42.    Article IV of the Plan, in particular, sets forth the means for implementation of the two critical going-concern transactions underlying the Plan:  the TCEH Spin-Off and the Merger. It also describes the means for cancelation of existing securities and implementation of the key capital markets transactions underlying the Plan, including the issuance of the New Reorganized TCEH Debt, the Reorganized TCEH Common Stock, the Rights, the Reorganized EFH Common Stock, and the New EFH Common Stock.  In addition to these core transactions, the Plan sets

---

[50]    *See In re Armstrong World Indus.*, 432 F.3d 507, 514 (3d Cir. 2005) (denying confirmation where the plan of reorganization contemplated unsecured creditors providing a portion of their recovery to former equity holders but noting that distributions from secured creditors are tantamount to permissible carve-outs from lien proceeds); *In re Electroglas, Inc.*, 2009 WL 8189056 (Bankr. D. Del. July 9, 2009) (permitting a stalking horse bidder to contribute a portion of its bid to certain creditors not receiving payment in full under the Plan); *In re Distributed Energy Sys. Corp.*, 2009 WL 1458175 (Bankr. D. Del. May 18, 2009) (same); *In re World Health Alts., Inc.*, 344 B.R. 291, 297 (Bankr. D. Del. 2006) (finding that secured creditors may share their recovery with unsecured creditors post-*Armstrong*).

[51]    11 U.S.C. § 1123(a)(5).  Section 1123(a)(5) specifies that adequate means for implementation of a plan may include:  retention by the debtor of all or part of its property; the transfer of property of the estate to one or more entities; cancelation or modification of any indenture; curing or waiving of any default; amendment of the debtor's charter; or issuance of securities for cash, for property, for existing securities, in exchange for claims or interests or for any other appropriate purpose. *Id.*

21

forth the other critical mechanics of the Debtors' emergence, like the dissolution of certain subsidiaries, the establishment and termination of certain agreements, and the settlement of intercompany accounts.

43.    The precise terms governing the execution of these transactions are set forth in greater detail in the applicable definitive documents or forms of agreements included in the Plan Supplement.  This includes, for example, the mechanics of the Merger, which are described in customary provisions of the Merger Agreement.  Likewise, the Plan Supplement includes definitive agreements, forms of agreement, or term sheets for the Plan's new-money debt and equity financing, including the potential reinstatement of the EFH Legacy Notes.  Thus, the Plan satisfies section 1123(a)(5).

44.    ***Non-Voting Stock.***  The sixth requirement of section 1123(a) is that a plan must contemplate a provision in the reorganized debtor's corporate charter that prohibits the issuance of non-voting equity securities or, with respect to preferred stock, adequate provisions for the election of directors upon an event of default.[52]  As one court explained, this subsection "prevents the issuance of a class of stock without the *possibility* of exercising *any* vote."[53]  Its legislative history indicates that it is primarily meant to protect the interests of a debtor's prepetition creditors and stockholders receiving equity under the plan.[54]

45.    Here, the Plan provides that the New Organizational Documents of Reorganized TCEH and New EFH will prohibit the issuance of non-voting stock.  Additionally, as a critical component of the required tax treatment of the TCEH Spin-Off and the related basis step-up

---

[52]  *See* 11 U.S.C. § 1123(a)(6).

[53]  *In re Ahead Commc'ns Sys., Inc.*, 395 B.R. 512, 518 (D. Conn. 2008) (emphases added).

[54]  S. Rep. No. 95-989, at 11 (1978) ("As public investors are likely to be junior or subordinated creditors or stockholders, it is essential for them to have legislative assurance that their interests will be protected.").

transaction, TCEH or one of its subsidiaries will form a new business entity that will issue contingent-voting preferred stock to third-party investors for approximately $50 million in cash. The terms of the preferred stock will provide voting rights in the event of certain sustained dividend arrearages.  Thus, the Plan complies with the requirements of section 1123(a)(6).

46.     ***Selection of Officers and Directors.***  Finally, section 1123(a)(7) requires that the Plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan."[55]  The Plan provides that, on the Plan Effective Date, the terms of the existing boards of the Debtors will expire and the initial boards of directors, including the New Boards, and the officers of each of the Reorganized Debtors will be selected in accordance with the New Organization Documents.[56]

47.     In connection with the Plan Supplement filed on October 20, 2015,[57] the Debtors filed additional disclosures regarding the New Organization Documents.  Specifically, with respect to Reorganized TCEH, the Debtors disclosed that the initial Reorganized TCEH Board will consist of seven members, three of whom were named in the Plan Supplement.[58]  The TCEH Supporting First Lien Creditors will engage an executive search firm to assist in the identification and interview process to identify the remaining four directors.[59]  The current directors and officers of the TCEH Debtors will serve after the Confirmation Date until the Effective Date, with the remaining officers to be identified by a notice to be filed by the

---

[55]   11 U.S.C. § 1123(a)(7).

[56]   Plan, Art. IV.L.

[57]   *See Plan Supplement for the Joint Plan of Reorganization of Energy Future Holdings Corp.,* et al.*, Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 6544].

[58]   *Id.* at Ex. I.

[59]   *Id.*

Debtors.[60]   Reorganized TCEH will be managed in accordance with the Reorganized TCEH

Certificate of Incorporation, Reorganized TCEH Bylaws, and the LLC Agreements governing

the Reorganized TCEH Subsidiaries, drafts of which were filed with the Plan Supplement.[61]

48.     With respect to New EFH, the Debtors disclosed the names of two directors,

chosen by Hunt, who will serve on the New EFH Board after the Effective Date.[62]   Another

member of the Hunt Consortium will nominate a third individual and the remaining ten directors

will be independent and appointed by the Backstop Purchasers.[63]   The Backstop Purchasers and

the Hunt Consortium have engaged an executive search firm to identify and interview directors

for the remaining eleven positions.[64]   With respect to officers, the Manager (an affiliate of Hunt

that will act as manager to the Hunt entities) expects to recommend individuals to serve as

officers before December 31, 2015, and the New EFH Board will retain the sole authority to

appoint and remove certain enumerated officers.[65]   The New EFH Board will manage the

business and affairs of New EFH pursuant to New EFH's Certificate of Incorporation, New

EFH's Bylaws, and an operating partnership agreement between Reorganized EFIH and the

acquisition vehicles owned by the purchasers, drafts of which were included with the Plan

Supplement.[66]   Consistent with applicable law, the Debtors identified those post-Effective Date

---

[60]   *Id.*

[61]   *Id.* at Ex. B(i), Ex. B(ii), and Ex. B(iii).

[62]   *Id.* at Ex. H.

[63]   *Id.*

[64]   *Id.*

[65]   *Id.*

[66]   *Id.* at Ex. A(i), Ex. A(ii), and Ex. A(iii).

24

directors whose identifies were known as of the Plan Supplement filing date.[67]    Therefore, the

Plan satisfies the requirements of section 1123(a)(1)–(7) of the Bankruptcy Code.

### B.    The Debtors Have Complied Fully with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).

49.    Section 1129(a)(2) requires that the plan *proponents* comply with applicable

provisions of the Bankruptcy Code.  Case law and legislative history indicate that this section

principally reflects the disclosure and solicitation requirements of section 1125 of the

Bankruptcy Code,[68] which prohibits the solicitation of plan votes without a court-approved

disclosure statement.[69]

50.    Here, the Debtors have satisfied section 1125 of the Bankruptcy Code.  The Court

approved the Disclosure Statement as containing adequate information, and the Debtors solicited

and are tabulating votes on the Plan in accordance with the solicitation procedures approved by

the Court.  The Debtors also timely mailed the notices to non-voting creditors as described in the

solicitation procedures.[70]    Accordingly, the Debtors have satisfied the requirements of

section 1125 of the Bankruptcy Code and therefore have satisfied the requirements of section

1129(a)(2) of the Bankruptcy Code.

---

[67]    *In re Charter Commc'ns*, 419 B.R. 221, 260 n.30 (Bankr. S.D.N.Y. 2009) ("Although section 1129(a)(5) requires the plan to identify all directors of the reorganized entity, that provision is satisfied by the Debtors' disclosure at this time of the identities of the *known* directors."); *In re Am. Solar King Corp.*, 90 B.R. 808, 815 (Bankr. W.D. Tex. 1988) ("The subsection does not (and cannot) compel the debtor to do the impossible, however.  If there is no proposed slate of directors as yet, there is simply nothing further for the debtor to disclose under subsection (a)(5)(A)(i).")

[68]    *See In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000); *In re WorldCom, Inc.*, 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) ("The legislative history to section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code."); *In re Lapworth*, 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 3, 1998) ("The legislative history of [section] 1129(a)(2) specifically identifies compliance with the disclosure requirements of [section] 1125 as a requirement of [section] 1129(a)(2)."); S. Rep. No. 95-989, at 126; H.R. Rep. No. 95-595at 412.

[69]    11 U.S.C. § 1125(b).

[70]    *See Affidavit of Service of Solicitation Materials* [D.I. 6552].

C.    **The Debtors Proposed the Plan in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)).**

51.    The Bankruptcy Code requires that the proponent of a plan of reorganization propose the plan "in good faith and not by any means forbidden by law."[71]  In assessing the good faith standard, courts consider whether the plan:  (1) fosters a result consistent with the objectives of the Bankruptcy Code; (2) has been proposed with honesty, good intentions, and a basis for expecting that the reorganization can be effectuated; and (3) exhibits a fundamental fairness in dealing with creditors.[72]

52.    Courts look to the reorganization plan itself to determine whether the plan seeks relief consistent with the Bankruptcy Code.[73]    To that end, the fundamental purpose of chapter 11 is to enable a company in financial distress to restructure its balance sheet, reorganize its business operations, and avoid the adverse economic effects associated with disposing of assets at their liquidation value.[74]  Minimizing litigation through compromise is likewise favored in bankruptcy.[75]

---

[71]    11 U.S.C. § 1129(a)(3).

[72]    *W.R. Grace & Co.*, 475 B.R. at 87-88.

[73]    *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984); *see also In re Sound Radio, Inc.*, 93 B.R. 849, 854 (Bankr. D.N.J. 1988).

[74]    *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984); *see also B.D. Int'l Disc. Corp. v. Chase Manhattan Bank (In re B.D. Int'l Disc. Corp.)*, 701 F.2d 1071, 1075 n.8 (2d Cir. 1983) (stating "the two major purposes of bankruptcy [are] achieving equality among creditors and giving the debtor a fresh start"); *In re Bonded Mailings, Inc.*, 20 B.R. 781, 785 (Bankr. E.D.N.Y. 1982) (holding Bankruptcy Code's policy of equitable distribution amongst creditors should not be thwarted by actions of a single creditor).

[75]    *See In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) ("To minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy." (internal quotation marks and alterations omitted)); *see also* Ex. 1, 9/23/2015 Ying Dep. Tr. at 45:7-22 (stating the Plan is "the only proposal that seems to have a vast majority of the stakeholders' support"); Ex. 12, 9/10/15 Keglevic Dep. Tr. at 26:11-28:16 ("[T]his plan gave us the most consensus and as we've said consensus we believe is very valuable and important in this case."); Ex. 13, 10/1/15 Keglevic Dep. Tr. at 121:15- 122:15 ("I think in the scheme of the time I've been associated with this case, this was the easiest decision I have made, because we had a plan that had consensus of the T-side, which is very valuable in this case").

53.     Here, the Plan will shed over $30 billion of debt through a merger with respect to the regulated utility and the spin-off of the largest competitive utility company in Texas.  It will also settle the billions of dollars of alleged claims arising out of the Debtors' 2007 leveraged buyout and its predecessor and successor transactions, a result born of a virtually-unprecedented conflicts matters protocol, involving four sets of Debtors' advisors and an eight-month discovery process that produced millions of pages of documents.  Effectuating these landmark transactions and settlements is the good-faith purpose of the Plan.

54.     In designing those transactions, the Debtors have left no stone unturned, and, indeed, have considered numerous alternatives, including consolidated transaction structures, equitization transactions, third-party strategic acquisitions, and everything in between.  The end result comes after years of negotiations between the Debtors and their highly-organized stakeholders, dating back to early 2013, and a six-month, Court-approved third-party marketing process in which over 50 potential third-party bidders were contacted.  The Debtors have thoroughly analyzed the resulting Restructuring Transactions and believe that the Plan will be consummated.[76]  At bottom, the Plan unimpairs all "E-side" creditors (through payment in full in cash or through Reinstatement) and has the support of nearly all of the key "T-side" creditors.  This level of consensus amongst impaired creditors and the potential for full recoveries for all non-voting parties is *prima facie* evidence of good faith.[77]  Accordingly, the Debtors respectfully submit that the Plan satisfies section 1129(a)(3) of the Bankruptcy Code.

---

[76] *See* Ex. 14, 9/28/2015 Doré Dep. Tr. at 199:15-20 ("[W]e believe and I think the plan sponsors parties believe that it is allowed under the law [and] that there is a reasonable basis for setting it up this way . . . .").

[77] *See, e.g.*, *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 435 (1999) ("[T]he two recognized policies underlying Chapter 11 [are] preserving going concerns and maximizing property available to satisfy creditors . . . ."); *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 468 (Bankr. S.D.N.Y. 2014) ("[A] key goal of a bankruptcy in a mega Chapter 11 such as this is for creditors to negotiate to reach a

**D.     The Plan Provides for Bankruptcy Court Approval of Certain Administrative Payments (Section 1129(a)(4)).**

55.     The Bankruptcy Code requires that professional fees and expenses related to the case and paid under the plan be approved by the court as reasonable or subject to approval of the court as reasonable.[78]  Whether a payment is reasonable is a case-by-case inquiry that turns on who makes the payment, who receives it, and the effect of such payments on the estate.[79]  As one court explained, as to routine legal fees and expenses that have been approved as reasonable in the first instance, "the court will ordinarily have little reason to inquire further with respect to the amount charged."[80]

56.     Here, all of the Plan's fee and expense provisions are subject to the Court's approval as reasonable at the confirmation hearing, and the Debtors have exhaustively described the fee and expense provisions of the Plan in the Disclosure Statement, including the identity of all those constituencies whose advisors are entitled to payment under the Plan.  A significant portion of these fees and expenses are already authorized by the Court to be paid under the EFIH First Lien DIP Facility, the TCEH DIP Facility, and the Cash Collateral Order, which are subject to pre-existing review procedures.[81]  All of the fees and expenses payable under the Plan must be

---

consensus. . . ."); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 294-95 (Bankr. D. Del. 2013) (noting "a clear legislative policy encouraging negotiations among creditors and stakeholders in Chapter 11 cases").

[78]    11 U.S.C. § 1129(a)(4).

[79]    *In re Cajun Elec. Power Coop., Inc.*, 150 F.3d 503, 517 (5th Cir. 1998) ("What constitutes a reasonable payment will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate."); *see also In re Congoleum Corp.*, 2010 WL 1850182, at *5 (D.N.J. May 7, 2010) (quoting same); *In re Journal Register Co.*, 407 B.R. 520, 537 (Bankr. S.D.N.Y. 2009) ("The determination whether a payment is reasonable under § 1129(a)(4) requires an analysis of the issue of reasonableness based on the facts and circumstances of the payments.").

[80]    *Cajun Elec.*, 150 F.3d at 517.

[81]    *See* Cash Collateral Order, ¶ 5(c); TCEH DIP Order, ¶ 22; EFIH First Lien DIP Order, ¶ 27.

reasonable and documented, and, to the extent they are not, the Debtors will file an objection to such fees and expenses with the Court.[82]

57.     Moreover, the cost for payment of the vast majority of incremental fees payable under the Plan—in particular those payable to the Supporting Parties—will effectively be paid by the Plan Sponsors.[83]  At that point, all of the creditors of the EFH Debtors will be repaid in full in cash or otherwise have received a full recovery.[84]

58.     As to TCEH, the only incremental fees payable by Reorganized TCEH are those to reimburse *individual members* of the TCEH First Lien Ad Hoc Committee that are TCEH Supporting First Lien Creditors—who are themselves among the future owners of Reorganized TCEH.  The fees of the TCEH First Lien Ad Hoc Committee itself, as opposed to the individual members, are already payable and subject to a review process under the Cash Collateral Order.[85]  Under the circumstances, given the significant level of consensus among "T-side" creditors and considering that "E-side" creditors are left Unimpaired under the Plan, the Court should approve the provisions of the Plan that provide for payment of fees and expenses under the Plan as reasonable and find that the Plan satisfies section 1129(a)(4) of the Bankruptcy Code.

---

[82]  *See* Ex. 14, 9/28/2015 Doré Dep. Tr. at 185:2-9 (emphasizing the Debtors' "vigilance" in reviewing professional fees).

[83]  *See id.* at 191:20:196-19 (discussing various fee-payment provisions).

[84]  In addition, the Confirmation Order would authorize the monthly payment by EFH and EFIH of fees payable to the Plan Sponsors under the Merger Agreement and Backstop Agreement that are related to the Merger.  Fees and expenses payable under the Settlement Agreement are described in the Settlement Agreement and the motion to approve the Settlement Agreement.  The Debtors will address all objections to the Settlement Agreement in the reply that will be filed on October 30, 2015.

[85]  Under paragraph 5(c) of the Cash Collateral Order, the TCEH Debtors are required to provide copies of invoices submitted by the professionals for the TCEH First Lien Ad Hoc Committee to the U.S. Trustee and the Creditors' Committees and such parties have ten calendar days to raise an objection, which will be heard by the Court if not resolved amongst the parties.

29

**E.    The Debtors Have Complied with the Bankruptcy Code's Governance Disclosure Requirement (Section 1129(a)(5)).**

59.    The Bankruptcy Code requires the proponent of a plan to disclose the identity and affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan.[86]   It further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[87]   Lastly, it requires that the plan proponent have disclosed the identity of insiders to be retained by the reorganized debtor and the nature of their compensation.[88]   In construing section 1129(a)(5), courts have long made clear that, to the extent the debtor is unable to identify these individuals by name at the time of confirmation, the debtor nonetheless satisfies this requirement so long as directors will be appointed consistent with the company's organizational documents and applicable state and federal law.[89]

60.    As described in detail in Section I.A.(ii) above, the Debtors have supplied all available information with respect to the identity of the directors and officers to serve on the New EFH Board and the Reorganized TCEH Board in the Plan Supplement filed on October 20, 2015.  In particular, (a) with respect to Reorganized TCEH, the current directors and officers will serve on the Reorganized TCEH Board following entry of the Confirmation Order until the Effective Date, and (b) with respect to New EFH, a Hunt affiliate (defined as the Manager) will recommend officers to be appointed to New EFH before December 31, 2015.  Additionally, the

---

[86]   11 U.S.C. § 1129(a)(5)(A)(i).

[87]   *Id.* § 1129(a)(5)(A)(ii).

[88]   *Id.* § 1129(a)(5)(B).

[89]   *Charter Commc'ns*, 419 B.R. at 260 n.30 ("Although section 1129(a)(5) requires the plan to identify all directors of the reorganized entity, that provision is satisfied by the Debtors' disclosure at this time of the identities of the *known* directors."); *Am. Solar King*, 90 B.R. at 815  ("The subsection does not (and cannot) compel the debtor to do the impossible, however.  If there is no proposed slate of directors as yet, there is simply nothing further for the debtor to disclose under subsection (a)(5)(A)(i).").

Debtors have identified three of the seven directors of the Reorganized TCEH Board and two of thirteen directors of the New EFH Board, with the remaining directors to be identified following a robust effort by one or more executive search firms.

61.    Under the Plan, the Debtors will adopt, enter into, assume, and/or assign the New Employee Agreements/Arrangements and the Employee Arrangements on the Effective Date, as well as adopt the Reorganized Debtor Management Incentive Plan.[90]  In the Plan Supplement filed on October 20, 2015, the Debtors filed a term sheet reflecting the material terms of the Reorganized Debtor Management Incentive Plan (subject to the approval of the New Boards). Additionally, the Debtors filed employee letter agreements for members of their executive leadership team.[91]  Consistent with the provisions of the Plan, the PSA requires the Debtors to assume the Employment Agreements and assign the Employment Agreements to Reorganized TCEH, and requires Reorganized TCEH to enter into New Employee Agreements/Arrangements with a limited number of individuals who may be considered insiders.[92]  Accordingly, the Debtors have satisfied the requirements of section 1129(a)(5).

**F.    The Plan Does Not Provide for Any Rate Changes Requiring Governmental Approval (Section 1129(a)(6)).**

62.    The Bankruptcy Code requires that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."[93]  The Plan is expressly conditioned on a number of regulatory approvals, including

---

[90]    Plan, Art. IV.J.

[91]    Plan Supplement, Ex. F, Ex. F(i), and Ex. F(ii).

[92]    PSA, ¶ 10(l).

[93]    11 U.S.C. § 1129(a)(6).

FERC, PUC, NRC, and FCC approvals, which are generally associated with the changes of control that will occur under the Plan. The Plan does not, however, provide for any rate changes that require the approval of these regulatory agencies. Thus, this provision of the Bankruptcy Code is inapplicable to the Plan.

### G.     The Plan Is in the Best Interests of Holders of Claims and Interests (Section 1129(a)(7)).

63.      The best interests of creditors test requires that, "[w]ith respect to each impaired class of claims or interests," members of such class that have not accepted the plan will receive at least as much as they would in a hypothetical chapter 7 liquidation.[94]  Where the plan provides for less than full recoveries on claims, a debtor generally satisfies the test by comparing recoveries in a hypothetical liquidation with the estimated recoveries under the plan of reorganization.[95]

64.      Here, all Allowed Claims against the EFH Debtors and EFIH Debtors are Unimpaired. Thus, by the express terms of section 1129(a)(7), which only applies to impaired claims or interests, the Plan need not satisfy the best interests test with respect to these Claims.[96] As to the TCEH Debtors, the Disclosure Statement includes a customary liquidation analysis.[97] The liquidation analysis demonstrates that each Class of Claims against the TCEH Debtors will

---

[94]   *Id.* § 1129(a)(7).

[95]   *See 203 N. LaSalle St. P'ship*, 526 U.S. at 442 n.13; *see also United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 228 (1996); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation"); *In re Century Glove, Inc.*, 1993 WL 239489, at *7 (D. Del. Feb. 10, 1993).

[96]   The few "E-side" Interests that are deemed to reject the Plan or that are deemed to accept or reject the Plan based on the Debtors' ultimate treatment of such Claims are either interdebtor Interests or Interests held by the Prepetition Sponsors who are party to the PSA (specifically, Class A12, Class A13, Class A14, Class B7, Class B8, and Class B10).

[97]   Disclosure Statement, Ex. H.

receive more under the Plan than it would in a hypothetical liquidation.  The Plan thus satisfies the best interests of creditors test.

### H.    The Plan Satisfies the Voting Requirements (Section 1129(a)(8)).

65.    The Bankruptcy Code generally requires that each class of claims or interests must either accept the plan or be unimpaired under the plan.[98]  If not, the plan must satisfy the "cramdown" requirements with respect to the claims or interests in that class.[99]

66.    The Debtors expect that the Plan will satisfy these requirements with respect to every Class of Claims and Interests against the Debtors because all Classes either will have voted to accept the Plan, are conclusively presumed to have accepted the Plan, or will receive treatment consistent with the Bankruptcy Code's cramdown requirements.  The Debtors will address the cramdown requirements with respect to Classes voting to reject the Plan, if any, in the Confirmation Reply.

67.    A claim is unimpaired if the plan either "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest" or cures defaults and reinstates the maturity of the claim.[100]  As an alternative to reinstatement, repayment in full in cash of the allowed amount of such claims results in unimpairment.[101]  The

---

[98]   11 U.S.C. § 1129(a)(8). A class of impaired claims accepts a plan if holders of at least two-thirds in dollar amount and more than half in number of the claims in that class actually vote to accept the plan.  *Id.* § 1126(c). A class that is not impaired under a plan, and the creditors in that class, are conclusively presumed to have accepted the plan.  *Id.* § 1126(f).  A class is deemed to have rejected a plan if the plan provides that the holders of claims or interests in that class do not receive or retain any property under the plan on account of such claims or interests.  *Id.* § 1126(g).

[99]   *Id.* § 1129(b).

[100]   *Id.* § 1124.

[101]   *In re PPI Enters., Inc.*, 324 F.3d 197, 205-07 (3d Cir. 2003) (overruling argument that Congress intended to eliminate unimpairment by cash repayment); *see also In re Laramie Assocs., Ltd.*, 1996 WL 549984, at *6 (Bankr. E.D. Pa. June 20, 1996) ("Class 1 Claims are not impaired.  Each holder of a Class 1 Claim shall be paid in Cash the full amount of its Allowed Claim . . . .").

33

Third Circuit has held that, if the Bankruptcy Code partially disallows or caps a claim, the claim is nonetheless unimpaired so long as the allowed amount is repaid in full in cash.[102]

68.     Here, the Plan generally provides for repayment in full in Cash of all Allowed Claims against the EFH Debtors and the EFIH Debtors.  The exception is the option under the Plan to reinstate two series of EFH Legacy Notes and various non-debt Claims against the EFH Debtors and the EFIH Debtors.  In each case, this treatment renders such Claims Unimpaired and thus the Holders are conclusively deemed to have accepted the Plan.  The Plan therefore satisfies the requirements of section 1129(a)(8) of the Bankruptcy Code with respect to these Classes.

### i.     Allowed Claims and Interests Subject to Reinstatement Are Unimpaired.

69.     Although the vast majority of unimpaired Claims or Interests will be repaid in full in cash, the Plan provides that two series of EFH Legacy Notes may be reinstated (Class A4) and certain non-debt claims may receive other treatment rendering them unimpaired (Classes A1-A3, A8-A10, B1-B2, and C1-B2).  In all circumstances, this would involve reinstatement under section 1124(2) of the Bankruptcy Code or a close analog leaving such Claims unaltered under section 1124(1).  This, of course, is the statutory definition of unimpairment, and thus Claims subject to this treatment are Unimpaired.

### ii.     The Potential Reinstatement of the EFH Legacy Notes Is Permissible.

70.     The potential reinstatement of Series Q and R EFH Legacy Notes, which would be assumed by Reorganized TCEH if the Debtors elect to reinstate them on the Plan Effective

---

[102]  *Id.* at 204 ("[A] creditor's claim outside of bankruptcy is not the relevant barometer for impairment; we must examine whether the plan itself is a source of limitation on a creditor's legal, equitable, or contractual rights."); *see also W.R. Grace*, 475 B.R. at 161 (confirming that the *PPI Enterprises* holding also applies to section 502(b)(2)'s prohibition on allowance of unmatured interest on unsecured debt).

Date, is permissible.  Section 1124(2) of the Bankruptcy Code provides that a debt claim is unimpaired if the plan (a) cures prepetition and postpetition defaults (other than *ipso facto* defaults), (b) reinstates the maturity, (c) compensates the holder for reasonable reliance damages, and (d) does not otherwise alter the holder's legal, equitable, or contractual rights.[103]  As the Second Circuit explained, "[a] default is an event in the debtor-creditor relationship which triggers certain consequences."[104]  As to cure, nonmonetary defaults, if any, are generally curable by cash payment.[105]  Moreover, a change in rights that is not a defined event of default under the indenture generally need not be cured.[106]

71.    The Plan satisfies these requirements with respect to the Series Q and R EFH Legacy Notes.  The Debtors are unaware of any material events of default on the EFH Legacy Notes other than the nonpayment of accrued postpetition contract interest, which the Debtors would repay in full in cash on the Plan Effective Date if the EFH Legacy Notes were reinstated.  Moreover, the indentures governing the Series Q and Series R EFH Legacy Notes do not contain an event of default for covenant breaches, as such nonmonetary breaches do not result in events of default by the terms of the indentures.[107]

72.    The language of the debt documents also mandates that Reorganized TCEH assume the EFH Legacy Notes if they are Reinstated.  The indentures require that, if certain

---

[103]  11 U.S.C. § 1124(2).

[104]  *In re Taddeo*, 685 F.2d 24, 26-27 (2d Cir. 1982); *see also In re Onco Inv. Co.*, 316 B.R. 163, 167 (Bankr. D. Del. 2004) (quoting this definition from *Taddeo* in the chapter 11 context).

[105]  *See In re Garcia*, 276 B.R. 627, 642 (Bankr. D. Ariz. 2002) (stating in the chapter 13 context that "[t]he Code also suggests that most, if not all, cures may be made in monetary terms").

[106]  *See In re Mirant Corp.*, 2005 WL 6440372, at *3 (Bankr. N.D. Tex. May 24, 2005) (looking to the language of the "Event of Default" provision of the indenture to determine what defaults existed and needed cure).

[107]  Ex. 15, EFH Legacy Series Q First Supplemental Indenture § 5.01(a) [EFH04470477]; Ex. 16, EFH Legacy Series R First Supplemental Indenture § 5.01(a) [EFH02438512].

going-concern transactions are undertaken, the successor must assume the EFH Legacy Notes.[108]

The supplemental indentures specified that a spin-off of TCEH or a successor would qualify as a

going-concern transaction subject to that provision, such that the spun-off entity would assume

the notes.[109]

73.    If the Debtors elect to reinstate the Series Q and R EFH Legacy Notes, this going-

concern provision will be triggered by the TCEH Spin-Off.  After payment arrearages are cured,

Reorganized TCEH, as required by the indentures, will assume the applicable EFH Legacy Notes

by supplemental indentures that reinstate their maturities and otherwise leave their prepetition

terms unaltered.  Thus, reinstatement of the Series Q and R EFH Legacy Notes, and assumption

by Reorganized TCEH, is permissible under section 1124(2) of the Bankruptcy Code if the

Debtors elect to do so on the Plan Effective Date.

## I.    The Plan Complies With Statutorily Mandated Treatment of Administrative and Priority Tax Claims (Section 1129(a)(9)).

74.    The Bankruptcy Code generally requires that claims entitled to administrative

priority must be repaid in full in cash or receive certain other specified treatment.[110]  Here, the

Plan generally provides that Allowed Administrative Claims will be repaid in full in cash or

receive other treatment rendering them Unimpaired.  Therefore, the Debtors submit that the Plan

complies with section 1129(a)(9) of the Bankruptcy Code.

---

[108] Ex. 17, EFH Legacy Notes Indenture § 1101 [EFH00626501]; Ex. 18, EFH Legacy Notes Indenture § 1101 [EFH00626577]

[109] Ex. 15, EFH Legacy Series Q First Supplemental Indenture § 6.01(b) [EFH04470477]; Ex. 16, EFH Legacy Series R First Supplemental Indenture § 6.01(b) [EFH02438512].

[110] 11 U.S.C. § 1129(a)(9).

36

J.      **At Least One Impaired Class of Claims has Accepted the Plan, Excluding the Acceptances of Insiders (Section 1129(a)(10)).**

75.      The Bankruptcy Code  requires that, "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."[111]  Here, the Debtors expect that at least one impaired accepting Class of Claims (without counting insiders) will vote to accept the Plan at each of the TCEH Debtors and the only Impaired Claims against the EFH Debtors and EFIH Debtors are inter-Debtor Claims held by insiders (Classes A12, A13, B7, and B8), which should be ignored for the purposes of this requirement.  The Debtors will address this requirement further in the Confirmation Reply to the extent necessary after completion of the Voting Report.  Therefore, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

K.      **The Plan Is Feasible (Section 1129(a)(11)).**[112]

76.      Feasibility refers to the Bankruptcy Code's requirement that plan confirmation must not be "likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . ., unless such liquidation or reorganization is proposed in the plan."[113]  Under this standard, it is well established that the success of the plan need only be

---

[111] *Id.* § 1129(a)(10); *see also* Ex. 13, 10/1/2015 Keglevic Dep. Tr. at 165:11- 171:4.

[112] *See generally* Ex. 19, 10/5/2015 Baker Dep. Tr. at 155:20-156:11, 111:17-112:13, 109:6-22; Ex. 20, 10/7/2015 Siegert Dep. Tr. at 126:14-127:25.

[113] 11 U.S.C. § 1129(a)(11).

37

"reasonably likely," not "guaranteed."[114]   Indeed, "a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility."[115]

> ### i. Regulatory Applications Have Been Submitted That the Debtors Believe Satisfy All of the Requirements for Approval.

77.    The fact that a plan depends on regulatory and tax approvals does not change the statutory feasibility standard.  It is not clear that the requirements of section 1129(a)(11) applies to conditions precedent to the consummation of a Plan as opposed to the ability of the reorganized debtor to satisfy its obligations under the plan after consummation of the plan. Nevertheless, to the extent pre-consummation requirements are to be considered in connection with the feasibility analysis, "[i]t is not at all unusual for consummation of a Chapter 11 plan to be conditioned upon the expectation of approval by regulatory authorities, and courts have not typically held up confirmation of a plan to wait for issuance of such approvals."[116]  Numerous courts have approved chapter 11 plans that are conditioned on regulatory approvals, including state public utility commission approvals, FCC approvals, and FERC approvals.[117]   In the

---

[114] *W.R. Grace*, 729 F.3d at 348; *see also In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997) ("All the bankruptcy court must find is that the plan offer 'a reasonable probability of success.'" (quoting *In re Landing Assoc., Ltd.*, 157 B.R. 791, 820 (Bankr. W.D. Tex. 1993))).

[115] *In re Brice Rd. Devs., L.L.C.*, 392 B.R. 274, 283 (B.A.P. 6th Cir. 2008) (internal quotation marks omitted); *see also In re Wash. Mut., Inc.*, 461 B.R. 200, 252 (Bankr. D. Del. 2011) (quoting "low threshold of proof" standard); *In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 479 (Bankr. S.D. Ohio 2011) (same).

[116]  *Indianapolis Downs*, 486 B.R. at 298.

[117] *See, e.g.*, *In re Lightsquared Inc.*, Case No. 12-12080 (SCC) (Bankr. S.D.N.Y. Mar. 27, 2015) [D.I. 2276] (Federal Communications Commission); *In re Sorenson Commc'ns, Inc.*, Case No. 14-10454 (BLS) (Bankr. D. Del. Apr. 10, 2014) [D.I. 180] (Federal Communications Commission); *In re Edison Mission Energy*, Case No. 12-49219 (JPC) (Bankr. N.D. Ill. Mar. 11, 2014) [D.I. 2206] (Federal Energy Regulatory Commission); *In re AMR Corp.*, Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. Oct. 22, 2013) [D.I. 10367] (Federal Aviation Administration and Department of Transportation); *In re DBSD N. Am.*, Case No. 09-13061 (REG) (Bankr. S.D.N.Y. July 5, 2011) [D.I. 1159] (Federal Communications Commission); *In re Majestic Star Casino, LLC*, Case No. 09-14136 (KG) (Bankr. D. Del. Mar 10, 2011) [D.I. 1059] (State gaming regulators); *In re Citadel Broad. Corp.*, Case No. 09-17442 (BRL) (Bankr. S.D.N.Y. May 19, 2010) [D.I. 369] (Federal Communications Commission); *In re Hawaiian Telecom Commcn's, Inc.*, Case No. 08-02005 (Bankr. D. Haw. Dec. 30, 2009) [D.I. 1570] (Hawaii Public Utilities Commission and the Federal Communications Commission); *In re Maxcom Telecommunicaciones, S.A.B. de C.V.*, Case No. 13-11839 (PJW) (Bankr. D. Del. Sept. 10, 2013) [D.I. 148] (the

regulatory context, Delaware bankruptcy courts emphasize that the likelihood of success need only be "reasonable" to show feasibility and have found plans feasible despite significant post-confirmation regulatory conditions.[118]

78.    Here, the Plan is expressly conditioned on FERC, PUC, NRC, IRS, and FCC approvals and/or rulings.[119]  These regulatory processes are characteristic of the Debtors' highly-regulated businesses and would be necessary in one form or another under virtually any plan of reorganization.[120]  The Debtors' management and regulatory advisors—and where applicable the management and regulatory advisors of Oncor and Hunt—collectively have many decades of experience in each of the applicable regulatory processes.[121]  In each case, an application has been submitted (or is in the process of being developed and submitted) that the Debtors believe satisfies or will satisfy the applicable regulatory requirements, the terms and conditions of the Plan, and the applicable definitive documents.[122]  Thus, obtaining all necessary regulatory approvals is feasible.

---

Mexican Government under Mexican telecommunications law); *In re Adelphia Commc'ns Corp.*, Case No. 02-41729 (REG) (Bankr. S.D.N.Y. Jan. 5, 2007) (Federal Trade Commission); *In re Global Crossings, Ltd.*, Case No. 02-40188 (REG) (Bankr. S.D.N.Y. Dec. 26, 2002) [D.I. 2586] (Federal Communications Commission).

[118] *See Indianapolis Downs*, 486 B.R. at 299; *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *on reconsideration*, 464 B.R. 208 (Bankr. D. Del. 2011).

[119] The importance of the tax structure to Consummation of the Plan is discussed in greater detail in the Background section.

[120] *See* Ex. 1, 9/23/2015 Ying Dep. Tr. at 150:12-151:3 (answering "No," when asked "Do you have any reason to believe as you sit here today that the transaction will not close on its terms?"); Ex. 13, 10/1/2015 Keglevic Dep. Tr. at 165:11- 171:4 ("And when you look at the situation that the company is currently in, I would think the PUCT is motivated to get this company out of bankruptcy, and as we stated, this company will be an investment grade, above an investment grade.  We haven't been there since 2007 in our corporate structure.  So it gives a lot of, I think, confidence to the PUCT."); Ex. 14, 9/28/2015 Doré Dep. Tr. at 311:6- 314:8 (discussing reasons for confidence in management team's ability to consummate deal).

[121] *See* Ex. 19, 10/05/2015 Baker Dep. Tr. at 111:22- 112:13 (basing confidence in ability to obtain regulatory approval on thirty years' experience).

[122] *See id.* at 107:20- 109:15 ("[I]t is my view that we will receive regulatory approval from the FERC and the Public Utility Commission of Texas; otherwise, we wouldn't be sitting here today.").

ii.        **The Merger Is Reasonably Likely to Close.**[123]

79.      The Reorganized Debtors will use the proceeds of funds received in the Merger to pay all Allowed Claims asserted against the EFH Debtors and the EFIH Debtors in full in cash (except for Claims that may be Reinstated under the Plan).  The Plan Sponsors are obligated to use reasonable best efforts to consummate the Merger.[124]   Indeed, the Plan Sponsors are committed to working with the Debtors to consummate the Merger.  Certain parties may assert that the Merger may not close, but have yet to provide evidence of such assertions other than speculative fears regarding changes in market conditions.  All transactions are subject to market conditions and the potential for the market to adversely affect the likelihood of consummating the Merger is not evidence that the Merger will not close.

80.      If, however, the Merger does not close, the Debtors have mitigated the downside risk of such an outcome through an unprecedented remedies package.  In place of traditional remedies, the Debtors negotiated for two things.  *First*, disarmament, which requires the parties to the PSA and Settlement Agreement to release their claims for all time.  *Second*, the drag provisions, which require such parties to support an expedited alternative plan, including certain terms in the event that the Plan cannot be consummated.

81.      The disarmament and drag provisions provide a strong incentive for the purchasers to close the Merger—stronger than a reverse breakup fee or similar remedies that

---

[123]  *See id.* at 155:20-156:11 ("If we didn't believe that we were going to close on this transaction and fulfill all the conditions precedent, we wouldn't be here."); Ex. 20, 10/7/2015 Siegert Dep. Tr. at 126:14-127:25 ("But certainly, with the $1.5 billion and the $7.1 million, we have adequate funds to close the transaction."); Ex. 13, 10/1/2015 Keglevic Dep. Tr. at 165:5-169:21 (explaining reasons for view that merger "has a more likely than not chance of closing," including the counterparties' sophistication and that Oncor would be a "cornerstone of" Hunt's progress "going forward").

[124]  Merger Agreement § 6.1(a) [D.I. 6097-1]

40

could have been reasonably obtained under the circumstances.[125]  The TCEH unsecured parties have asserted billions of dollars in derivative claims on behalf of TCEH against the TCEH first liens, EFH Corp., and EFIH, and before entering into the PSA, asserted numerous objections to the Debtors' restructuring efforts.  These claims and objections are their "crown jewel" in these cases and their only likely avenue for meaningful recovery.  Yet the Required Alternative Terms of the PSA, as well as the Settlement Agreement, provide a permanent resolution of the litigation and objections asserted by the TCEH unsecured creditors, whether or not the Merger closes, for a maximum $550 million, less the professional fees of the TCEH unsecured parties.[126]

82.    This is not the result that the TCEH unsecured creditor constituency spent years fighting for in this restructuring.  From the perspective of the TCEH unsecured creditors, the PSA and the Settlement Agreement sacrifice recoveries they believed should have been far greater in amount than a standard reverse breakup fee.[127]  From the Debtors' perspective, regardless of the merits of the claims, the disarmament and the drag provisions eliminate the significant cost and risk of legacy litigation with the TCEH unsecured creditors.  Given the dollar amount of claims at issue, this is far more valuable than a modest reverse breakup fee that would otherwise have put these parties back at square one.

---

[125] *See* Ex. 13, 10/1/2015 Keglevic Dep. Tr. at 140:3-143:14 (stating, in part, "I would much rather have the value associated with the remedies I have as a result of the alternative restructuring terms, the settlement agreement, et cetera, than 200 million bucks. I think that is more valuable to all the estates"); Ex. 1, 9/23/2015 Ying Dep. Tr. at 68:13-24 (["T]here are significant agreements and obligations that the junior TCEH creditors are agreeing to that are significant -- that have significant economic consequences to them and that I believe significantly streamline the ability of the company to reach a consensual deal with the E-side in a manner which heretofore has not been possible to reach.  And to be specific, the T junior creditors are obligated to agree to whatever plan is reached with the E-side creditors and the T-firsts.").

[126] *See* Settlement Agreement § 2.2(a) [D.I. 6085-1]

[127] *See* Ex. 1, 9/23/2015 Ying Dep. Tr. at 95:12-97:17 (stating that breakup fees in the auction process could have been "a couple hundred million dollars" and that breakup fees are "customary" and a "function of negotiation with a buyer along with other dimensions").

41

83.     Lastly, the sophisticated institutions that are the Plan Sponsors have the motivation and financial wherewithal to close.[128]  Hunt, a highly-reputable Texas institution, has been seeking to acquire Oncor for "close to a decade."[129]  Like the other Plan Sponsors, the Debtors required Hunt to sign the PSA, where it gave up the right to lobby against or pursue any alternative Oncor transaction should the Merger not close.[130]  Moreover, even if Hunt were to seek to walk away from the Merger, the Plan Sponsors can compel Hunt to close by specific performance under the Equity Commitment Letter.[131]

84.     Given this comprehensive remedies package that is uniquely tailored to provide a strong incentive under the circumstances, the Debtors submit that the Merger is reasonably likely to close.  There is risk that the Merger does not close, but, in evaluating the Plan's feasibility, the Court may also take into account the "drag" safeguards that the Debtors have put in place should the Merger not close.  In that event, the "drag" provisions that the Debtors negotiated will spring into place, and allow these chapter 11 cases to progress toward a consensual resolution.  In any case, with or without taking into account the "drag" provisions of the PSA, the Plan satisfies the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code.

### iii.     Reorganized TCEH and New EFH Will Be Financially-Sound.

85.     When assessing the feasibility of a reorganized company as a going concern, courts may assess various factors with respect to the commercial viability of the new entity,

---

[128]  *See id.* at 36:10-15 ("I know that the Hunts are well advised.").

[129]  *See* James Osborne, *Hunt's Play for Oncor Gets New Life in Energy Future Bankruptcy*, The Dallas Morning News (July 23, 2015), http://bizbeatblog.dallasnews.com/2015/07/hunts-play-for-oncor-gets-new-life.html/; *see also* Ex. 19, 10/5/2015 Baker Dep. Tr. at 13:11-14:7 (describing Hunt's interest in Oncor before and after the LBO); Ex. 1, 9/23/2015 Ying Dep. Tr. at 36:10-15 ("I know that the Hunt Group had been talking to all the various creditor constituencies in the case for quite some time.").

[130]  *See* PSA § 5.2.

[131]  *See* Equity Commitment Letter § 7(c) [D.I. 5248-2].

42

including capital structure, earning capacity, economic conditions, and management strength—although earning capacity is generally the most important metric.[132]

86.    The Plan is feasible as to the Reorganized TCEH Debtors. The net debt of Reorganized TCEH at emergence will be no greater than 5.5 times projected 2017 adjusted EBITDA, inclusive of the Series Q and R EFH Legacy Notes if reinstated.[133]  The Reorganized TCEH Debtors' projections further demonstrate that the Debtors will be able to continue as a going concern and satisfy all of their obligations under the Plan.[134]  Moreover, after emerging with an incredibly streamlined balance sheet, Reorganized TCEH expects to maintain its strong operational performance as compared to peer companies.  Despite sustained declines in wholesale electricity prices following the Debtors' 2007 LBO, when benchmarked to its competitors, TCEH has maintained top-tier operational performance.  The Debtors have every expectation that this performance will persist.

87.    As to the EFH Debtors, the Plan and Merger documents contemplate a reorganized company that has up to $5.5 billion of debt.[135]  Aside from the fact that the Plan Sponsors have agreed to invest $7.1 billion of new money into the Reorganized EFH Debtors, the Debtors have included projections that demonstrate the ability of the Reorganized EFH

---

[132] *W.R. Grace.*, 475 B.R. at 115  ("The bankruptcy court can consider a wide array of factors in determining a plan's feasibility, including assessment of the debtor's capital structure, the earning power of the business, economic conditions, and the ability of the corporation's management.  Most importantly, the debtor must provide the bankruptcy court with an estimate of its future earning capacity."  (citation omitted)); *see also Indianapolis Downs*, 486 B.R. at 298 (listing similar factors).

[133] *See* Plan Supplement, Ex. K; Ex. 13, 10/1/2015 Keglevic Dep. Tr. at 27:6-11.

[134] *See* Disclosure Statement, Ex. E.

[135] *See*  Ex. 13, 10/1/2015 Keglevic Dep. Tr. at 27:9-11 (stating the debt financing commitments contemplated under the Merger and Purchase Agreement).

43

Debtors to honor all of their obligations under the Plan.[136]    Accordingly, the Plan satisfies the feasibility requirements of section 1129(a)(11).[137]

**L.    The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)).**

88.    The Bankruptcy Code requires the payment of all fees payable under 28 U.S.C. § 1930.[138]  The Plan includes an express provision requiring payment of all fees under 28 U.S.C. § 1930.[139]  The Plan, therefore, complies with section 1129(a)(12) of the Bankruptcy Code.

**M.    The Plan Complies with Section 1129(a)(13) of the Bankruptcy Code.**

89.    The Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.[140]  Retiree benefits is defined under section 1114(a) of the Bankruptcy Code as medical benefits.[141]  Article IV.P of the Plan provides that on or after the Plan Effective Date, the payment of all retiree benefits, as defined in section 1114 of the Bankruptcy Code, will continue in accordance with applicable law.   In addition, as disclosed in the Plan Supplement, the Debtors anticipate terminating their two non-qualified benefit programs:  (a) the non-contributory, non-qualified pension plan known as the Second Supplemental Retirement Plan, and (b) the contributory, non-

---

[136]  *See* Ex. 13, 10/1/2015 Keglevic Dep. Tr. at 44:11-46:7 (expressing confidence in Plan's feasibility even if all make-whole claims are allowed); *id.* at 49:21-51:24 (expressing confidence in Plan's feasibility even if disputed post-petition interest claims are allowed).

[137]  The Debtors will produce evidence at the Confirmation hearing with respect to the feasibility of the Plan as it relates to the Reorganized TCEH Debtors and the EFH Debtors to the extent necessary.

[138]  11 U.S.C. § 1129(a)(12).

[139]  Plan, Art. XII.C.

[140]  11 U.S.C. § 1129(a)(13).

[141]  Section 1114(a) defines "retiree benefits" as: " . . . payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title." 11 U.S.C. § 1114(e) (emphasis added).

qualified, deferred contribution plan known as the Salary Deferral Program (collectively, the "EFH Non-Qualified Benefit Plans").  Allowed Claims arising in connection with the EFH Non-Qualified Benefit Plans are classified as Class A8 Claims and are Unimpaired under the Plan. Because the EFH Non-Qualified Plans provide income-based payments (i.e., not medical benefits of the type considered to be "retiree benefits" in the parlance of section 1129(a)(13)) and, in any event, beneficiaries under the EFH Non-Qualified Benefit Plans will be paid in full on the Effective Date for amounts due under the EFH Non-Qualified Benefit Plans, both the termination of the EFH Non-Qualified Plans and the Plan as a whole comply with section 1129(a)(13) of the Bankruptcy Code.

**N.    Sections 1129(a)(14) Through Sections 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan.**

90.    A number of the Bankruptcy Code's confirmation requirements are inapplicable to the Plan.  Section 1129(a)(14) of the Bankruptcy Code is inapplicable to the Plan because the Debtors are not subject to any domestic support obligations.[142]    Section 1129(a)(15) is inapplicable because no Debtor is an "individual" as defined in the Bankruptcy Code.[143] Section 1129(a)(16) is inapplicable because the Plan does not provide for any property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.[144]

**O.    The Plan Satisfies the Cramdown Requirements (Section 1129(b)).**

91.    If an impaired class has not voted to accept the plan, the plan must be "fair and equitable" and not "unfairly discriminate" with respect to that class.[145]  The Debtors will address the cramdown requirements for any Classes that vote to reject the Plan in the Confirmation

---

[142]  *See* 11 U.S.C. § 1129(a)(14).

[143]  *See id.* § 1129(a)(15).

[144]  *See id.* § 1129(a)(16).

[145]  *See id.*  § 1129(b)(1).

45

Reply.  Nevertheless, as described below, the Plan satisfies both of these cramdown requirements with respect to the Impaired Classes that have been deemed to reject the Plan.

> **a.        The Plan Is Fair and Equitable with Respect to the Rejecting Classes.**

92.       The Plan complies with the absolute priority rule with respect to all deemed rejecting Classes.  Specifically, the "fair and equitable" requirement mandates that a junior class of claims cannot receive a distribution under the plan unless senior classes (a) are rendered unimpaired or (b) give their consent.[146]  This requirement is known as the "absolute priority rule."  The corollary of the absolute priority rule is that senior classes cannot receive more than a 100% recovery for their claims or interests.[147]

93.       ***Class C6: EFCH General Unsecured Claims.***  The Class consisting of General unsecured Claims against EFCH (Class C6) is Impaired and deemed to reject.  The more junior class, consisting of Interests in TCEH and EFCH (Class C10), will receive no recovery under the Plan, and the more senior classes will receive no more than a 100% recovery.  Thus, the Plan satisfies the absolute priority rule with respect to Class C6.

94.       ***Class A15: EFH Corp. Equity Interests.***  The Class consisting of the equity Interests in EFH Corp. held by Texas Holdings (Class A15) is Impaired and deemed to reject. There are no Claims or Interests junior to the Interests in Class A15, and no more senior class is receiving more than a 100% recovery.  Thus, the Plan satisfies the absolute priority rule with respect to Class A15.

95.       ***Inter-Silo Claims and Interests.***  A number of the remaining Impaired Classes deemed to reject the Plan consist entirely of Claims between and among the EFH Debtors, the

---

[146]  *See id.* § 1129(b)(2)(B)(ii), (C)(ii); *see also 203 N. LaSalle St. P'ship*, 526 U.S. at 441.

[147]  *See Exide Techs.*, 303 B.R. at 61.

46

EFIH Debtors, and the TCEH Debtors (Classes A12, A13, B7, B8, C7, and C8) and Interests

held by EFH in EFCH and Interests held by EFCH in TCEH (Class C10) that are receiving the

treatment agreed to in the Settlement Agreement and Plan Support Agreement.  This treatment

was agreed to, in exchange for mutual releases and other consideration, by each of EFH Corp.,

EFIH, and TCEH at the direction of their respective disinterested directors and managers.  Thus,

the treatment is consensual, and these Classes are deemed to reject only by virtue of section

1126(g) of the Plan.

96.    ***Intra-Silo Claims and Interests***.  Claims between TCEH and its subsidiaries and

Interests held by one TCEH Debtor in another TCEH Debtor (other than EFCH's Interests in

TCEH) (Class C7 and C9) may be canceled or reinstated with the consent of the TCEH

Supporting First Lien Creditors to allow Reorganized TCEH to maintain the existing

organizational and operational structure where optimal.  Likewise, the Claims by and among the

EFH Debtors and Interests held by one EFH Debtor in another EFH Debtor (other than Interests

in EFH and EFIH) may be canceled or reinstated with the consent of the Plan Sponsors to

maintain the existing organizational and operational structure where optimal.[148]  Thus, the Plan

satisfies the absolute priority rule.

**P.    The Plan Does Not Unfairly Discriminate Against the Deemed Rejecting Classes.**

97.    The Plan does not unfairly discriminate against the deemed rejecting Classes.

The Bankruptcy Code does not provide a standard for determining when "unfair discrimination"

---

[148] For example, the EFH Debtors will be reinstating the Claims and Interests by and among EFH Corp., LSGT Gas Company LLC, EECI, Inc., EEC Holdings, Inc., and LSGT SACROC, Inc. to facilitate payment of the Legacy General Unsecured Claims Against the EFH Debtors.  *See* Ex. 13, 10/1/2015 Keglevic Dep. Tr. at 328:2-330:17.

exists.[149]   Rather, courts typically examine the facts and circumstances of the particular case to

determine whether unfair discrimination exists.[150]    At a minimum, however, the unfair

discrimination standard prevents creditors and interest holders with similar legal rights from

receiving materially different treatment under a proposed plan without compelling justifications

for doing so.[151]   The unfair discrimination requirement, which involves a comparison of classes,

is distinct from the equal treatment requirement of section 1123(a)(4), which involves a

comparison of the treatment of claims within a particular class.

98.    ***Class C6: EFCH General Unsecured Claims.***   The Class consisting of general

unsecured Claims against EFCH (Class C6) will receive no recovery under the Plan.  This is the

only Class of Claims against EFCH that does not consist of Secured, Administrative, or Priority

Claims, and the Interests in TCEH and EFCH (Class C10) will likewise receive no recovery.

Thus, there is no unfair discrimination against Class C6.

99.    ***Other Classes.***   Otherwise, the rejecting classes consist entirely of inter-Debtor

Claims and Interests and the interests in EFH Corp. held by Texas Holdings.   Moreover, the

treatment of each such Class is entirely consensual:  the Holder of each applicable Claim or

Interest in such Classes is either a Debtor or, as to Texas Holdings, a party to the Plan Support

Agreement that is supporting the Plan.   Thus, the Plan does not unfairly discriminate against

Classes that are subject to the cramdown requirements of section 1129(b).

---

[149]  *See In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established").

[150]  *See In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or not a particular plan does [unfairly] discriminate is to be determined on a case-by-case basis …"); *see also In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[151]  *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 654 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

48

**Q.    The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code: (Section 1129(c)-(e)).**

100.    The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code.    Section 1129(c), prohibiting confirmation of multiple plans, is not implicated because there is only one proposed plan of reorganization.[152]

101.    The Plan also complies with section 1129(d) because the primary purpose of the Plan is not to avoid taxes or securities laws.    The primary purpose of the Plan is to restructure the Debtors' balance sheets by shedding tens of billions of dollars of funded debt, and certain tax-efficient structures, expressly provided for under the Internal Revenue Code, are utilized to that end, which is entirely permissible.[153]

102.    Lastly, section 1129(e) of the Bankruptcy Code is inapplicable because none of the Debtors' chapter 11 cases is a "small business case."[154]    Thus, the Plan satisfies the Bankruptcy Code's mandatory confirmation requirements.

**II.    The Discretionary Contents of the Plan Are Appropriate.**

103.    The Bankruptcy Code identifies various additional provisions that may be incorporated into a chapter 11 plan, including "any appropriate provision not inconsistent with the applicable provisions of this title."[155]    Among other discretionary provisions, the Plan gives effect to a global settlement of inter-Debtor and legacy claims and causes of action.    The Court

---

[152]  11 U.S.C. § 1129(c).

[153]  *See, e.g.*, *In re 300 Washington St. LLC*, 528 B.R. 534, 554 (Bankr. E.D.N.Y. 2015) ("A debtor may still benefit from avoidance of tax liabilities through its plan, provided that this is not the plan's primary purpose."); *In re Rath Packing Co.*, 55 B.R. 528, 536 (Bankr. N.D. Iowa 1985) ("[T]he Court holds 'the principal purpose' should be strictly construed and essentially means 'most important.'").

[154]  11 U.S.C. § 1129(e).  A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $2,490,925[]" (excluding debt owed to 1 or more affiliates or insiders)."  *Id.* § 101(51D)(B).

[155]  *Id.* § 1123(b)(1)-(6); *see* Ex. 14, 9/28/2015 Doré Dep. Tr. at 294:24-297:20 (explaining why the Plan is conditioned on Settlement approval).

should approve this settlement, the corresponding Plan Releases, and the other discretionary provisions of the Plan.

### A. The Plan Appropriately Incorporates the Global Settlement of Inter-Debtor and Legacy Claims and Causes of Action.

104.    The Bankruptcy Code states that a plan may "provide for . . . the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[156]  Settlements under a plan are generally subject to the same standard applied to settlements under Bankruptcy Rule 9019.[157]  In particular, the Third Circuit applies the four-factor *Martin* test for considering motions to approve settlements under Bankruptcy Rule 9019, weighing:  (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interests of the creditors.[158]

105.    Here, under the Settlement Motion, the Court will have separately reviewed and determined whether to approve the global settlement of inter-Debtor and legacy claims.  The Court of course need not entirely repeat this analysis under Bankruptcy Rule 9019 in the context of confirmation.  Instead, as set forth below, the Court can largely rely on its findings of fact and conclusions of law in connection with the Settlement Motion.

106.    The Plan's global settlement is given effect primarily through the Plan Releases. The Plan Releases are coextensive with the Settlement Order Releases except in two respects: first, the Plan Releases apply to claims arising as of the Plan Effective Date rather than the earlier effective date of the Settlement Agreement, and second, the Plan Releases apply to a customarily

---

[156]  *Id.* § 1123(b)(3)(A).

[157]  *See Coram Healthcare Corp.*, 315 B.R. at 334-35.

[158]  *See Martin*, 91 F.3d at 393.

broader set of releasing parties. These narrow distinctions do not require a reexamination of the factual or legal predicates of the Settlement Agreement. Thus, this memorandum only briefly reviews these factors.

> i.    **The Settlement of Certain Inter-Debtor Claims Is Reasonable and In the Best Interest of the Debtors' Estates.**

107.    As set forth in the Settlement Motion, the four-factor *Martin* test strongly favors the resolution of substantially all inter-Debtors claims, to be replaced by the $700 million TCEH Settlement Claim.

- *First*, the inter-Debtor settlement resolves a broad range of complex claims among the Debtors—the strengths, weaknesses, and uncertainties of which are described at length in the Settlement Motion.[159] In negotiating the Disinterested Director Settlement, the respective disinterested fiduciaries expressed considerable disagreement as to the merits of many of these claims. But, after testing their positions against one another, it became clear to the TCEH Debtors and EFH Corp. that they generally agreed that TCEH's claims against EFH Corp. were more valuable than the EFH Corp. claims against the TCEH Debtors. Moreover, claims between EFH Corp. and EFIH generally run in favor of EFIH, making them largely circular. Thus, the parties eventually arrived at a compromise that values the TCEH Debtors' inter-Debtor claims at roughly $700 million more than the inter-Debtor claims against them—not based on a mechanical allocation of value, but based on an assessment of each individual claim, and taking into account the significant benefits of global resolution.[160]

- *Second*, if any one of the Debtors were to obtain a large net judgment (accounting for setoff) on the inter-Debtor claims against another Debtor, it likely would face considerable difficulty in collecting on that judgment. This collectability issue is particularly acute with respect to inter-Debtor claims against the TCEH Debtors, the insolvency of which is undisputed. Material additional claims against EFH Corp., too, would significantly threaten its ability to provide a full recovery on all unsecured claims.

---

[159]  Settlement Motion § I.B.

[160]  *See, e.g.*, *Tribune Co.*, 464 B.R. at 173-74  (concluding that outcome of claims was uncertain but ultimately determining that settlement fell above the lowest point in the range of reasonableness); *In re Drexel Burnham Lambert Grp.*, 138 B.R. 723, 747 (Bankr. S.D.N.Y. 1992) (approving settlement that was "not derived from a precise mathematical formula" but "represent[ed] the product of the agreed resolution of a large number of uncertain issues in the context of a comprehensive settlement of issues regarding the treatment of all Claims against the Debtors").

- **Third**, litigation of these claims would be a massive undertaking of indefinite duration and expense, involving protracted discovery and expert work, incredibly fact-intensive questions for judicial resolution, complicated and unresolved legal issues, and the likelihood of extensive appeals.[161]  In addition to these direct litigation costs, the Debtors would incur substantial indirect costs from litigation of inter-Debtor claims, including incremental administrative costs of delay and distraction of management and advisors.

- **Fourth**, settlement of all inter-Debtor Claims is in the best interests of creditors. It avoids draining resources that can otherwise fund creditor Claims.[162] Moreover, it provides certainty that hastens emergence and avoids delay that could affect customer and employee retention, contracting with hedge counterparties, investment in assets, and use of managerial time on litigation-related matters rather than for business operations.[163]  Further, a delay in resolution of the inter-Debtor claims could have a material impact on the Debtors' value and could change the market environment for Oncor.[164]  The settlement thus has the substantial support of creditors entitled to vote on the Plan and facilitates the Debtors' ability to repay all Claims against the EFH Debtors and EFIH Debtors in full in cash or otherwise provide them a full recovery.[165]

108.    In sum, the terms of the inter-Debtor settlement were negotiated at arm's length and are manifestly reasonable.  The settlement is based upon the Disinterested Director Settlement, reached after more than a month of intense negotiations and supported by months of research and investigation by the Debtors, the disinterested directors and managers, and their

---

[161] *See Adelphia*, 368 B.R. at 242-43; *accord In re Energy Future Holdings Corp.*, May 13, 2015 Hr'g Tr. (Sontchi, J.) ("I have every expectation with a claim of this size and the importance it may hold in connection with the capital structure and how this case might go forward that we wouldn't even have clarity were I to make a decision . . . because people would want to pursue their appellate rights.").

[162] *See In re Kaiser Aluminum Corp.*, 339 B.R. 91, 96 (D. Del. 2006) (approving a settlement that "serves the best interest of the estate and the creditors by arranging for a global settlement which will facilitate a plan of reorganization that will ultimately benefit all creditors and reduce the fees, costs and expenses that the estate would have had to bear in order to litigate the extensive, complex and uncertain issues raised by [the] claim").

[163] *See In re Satcon Tech. Corp.*, 2012 WL 6091160, at *5 (Bankr. D. Del. Dec. 7, 2012) (settlement was in the paramount interest of creditors because it was the "only way the Debtors can have confidence that the relationship" with their supplier "will remain stable in the future").

[164] *See W.R. Grace*, 475 B.R. at 79 (settlement is in the paramount interest of creditors because it involved an "infusion of tangible and abstract value into Grace's bankruptcy estate" that "enlarges the pool of funds available to *all* creditors and ensures greater guaranteed recovery").

[165] *See In re Kaiser Aluminum Corp.*, 339 B.R. at 96 ("[P]roposed settlement serves the best interest of the estate and the creditors by arranging for a global settlement which will facilitate a plan of reorganization that will ultimately benefit all creditors[.]").

52

respective advisors.   Thus, for the reasons set forth above and in the Settlement Motion, the

Court should approve the Plan's global settlement of inter-Debtor claims.

### ii.    The Settlement of Claims Against TCEH First Lien Creditors Is Reasonable and in the Best Interest of the Debtors' Estates.

109.    As set forth in the Settlement Motion, the four-factor *Martin* test also supports the

resolution of all of the TCEH Debtors' claims against the TCEH first lien creditors, including

those alleged in the standing motions.   The expensive and time-consuming litigation in pursuit of

claims against the TCEH first lien creditors would not be in the Debtors' best interests.   For one,

claims seeking to avoid liens, security interests, and obligations arising out of the 2007 LBO may

be time-barred.[166]   Moreover, there are strong arguments that the Debtors were not rendered

insolvent by the LBO, that they received reasonably equivalent value for the transaction, and that

the transaction would be protected by the section 546(e) safe harbor.   Likewise, there are

arguments that the constructive fraudulent transfer claims concerning the 2011 Amend and

Extend Transactions and 2013 Revolver Extension should fail because the Debtors received

reasonably equivalent value for these transactions.

110.    The other *Martin* factors likewise support the TCEH first lien settlement.   As with

the inter-Debtor settlement, the outcome of the claims against the TCEH first lien creditors

would turn on complex factual and legal issues, which would be the subject of extensive

discovery and expert testimony.   And the time necessary to obtain final judgments on the TCEH

first lien claims is uncertain, would require expenditure of time and resources of *both* the Debtors

and the TCEH creditors, and would delay any recovery by the Debtors and, ultimately, the

TCEH unsecured creditors.   Lastly, the TCEH first lien settlement is in the best interest of the

---

[166]  In particular, the TCEH first lien creditors have argued that a private plaintiff should not be permitted to use a government agency's immunity from state law statutes of limitation to pursue private claims.  *See, e.g.*, *In re Vaughan Co.*, 498 B.R. 297 (Bankr. D.N.M. 2013).

creditors.  After all, the TCEH Supporting First Lien Creditors and the other Supporting Parties negotiated and agreed to this aspect of the settlement after considering their interests and options. The Court should therefore approve the TCEH first lien settlement as incorporated in the Plan.

### iii.    The Debtor Releases in the Plan Are Appropriate.

111.    Courts in Delaware and elsewhere generally analyze five factors when determining whether a debtor's release of non-debtors is appropriate, commonly known as the *Zenith* or *Master Mortgage* factors.  The analysis includes an inquiry into whether there is: "(1) an identity of interest between the debtor and the non-debtor such that a suit against the non-debtor will deplete the estate's resources; (2) a substantial contribution to the plan by the non-debtor; (3) the necessity of the release to the reorganization; (4) the overwhelming acceptance of the plan and release by creditors and interest holders; and (5) the payment of all or substantially all of the claims of the creditors and interest holders under the plan."[167]  These factors are "neither exclusive nor conjunctive requirements" but rather serve as guidance to courts in determining fairness of a debtor's releases.[168]

112.    Here, again, the Court can rely entirely on its findings in connection with the Settlement Order Releases.  All of the alleged legacy litigation claims arose prepetition, in connection with the Debtors' 2007 LBO, as well as its predecessor and successor transactions, including various Liability Management Program transactions.  The temporal scope of the postpetition claims that are covered by the releases—up to the Plan Effective Date rather than up to the earlier Settlement Agreement effective date—is therefore immaterial.

---

[167] *In re Washington Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) and *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994)).

[168] *Id.* (citing *Master Mortg.*, 168 B.R. at 935).

113.    As set forth in the Settlement Motion, an analysis of the *Master Mortgage* factors

demonstrates that the releases of the Prepetition Sponsors and the Debtors' directors and officers

should be approved.

- *First*, an identity of interest exists between the Debtors and the Prepetition Sponsors as well as the Debtors and the Debtors' directors and officers because the Debtors are required to indemnify each of the Sponsors and the directors and officers for any liability they incur as a result of any claims brought against the Prepetition Sponsors.[169]

- *Second*, the Prepetition Sponsors and directors and officers have made substantial contributions to the Plan.    The Prepetition Sponsors consented to the allowance of the $700 million TCEH Settlement Claim, which primes their equity interests, and they transferred their residual equity interests to the TCEH unsecured creditors in the event of any topping bid.[170]    The Prepetition Sponsors have also waived their clams for unpaid management fees and expenses (totaling approximately $69 million). And the Prepetition Sponsor vehicle that owns EFH Corp. has agreed that it will not take any "worthless stock deduction" with respect to its EFH equity prior to consummation of the Plan if doing so would give rise to an ownership change for tax purposes, which could adversely affect the partial basis step-up contemplated by the Plan.    Beyond all this, the Prepetition Sponsors and the directors and officers have also made significant non-monetary contributions to this restructuring, including their participation in 75 joint board and committee meetings in 2015 alone.[171]

- *Third*, the releases are essential to the Plan because they allow the Debtors to move forward with the restructuring without first tackling lengthy and complex

---

[169] *See id.* at 347 (holding that an identity of interest existed between the directors/officers and the debtors where the debtors had to indemnify directors/officers for claims asserted against them); *Charter Commc'ns*, 419 B.R. at 259 (holding that "[t]he indemnification obligations between the Debtors and their directors, officers, agents, and professionals produce an identity of interest"); *Master Mortg.*, 168 B.R. at 935 (noting that the identity of interest is "usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor").

[170] Even if the excess value at EFH Corp. is not ultimately realized, forgoing the *right* to this potential recovery was critical to enabling the global settlement that is integral to the Plan.  *See In re Blitz U.S.A., Inc.*, 2014 WL 2582976, at *4 (Bankr. D. Del. Jan. 30, 2014) (holding that consideration provided by Wal-Mart constitutes a substantial contribution where part of the consideration included agreement to relinquish valuable insurance rights).

[171] *See In re Exide Techs.*, 303 B.R. 48, 74 n.37 (Bankr. D. Del. 2003) (declining to hold that "the price of a release of officers, directors and others must always involve the contribution of tangible 'assets' or that efforts alone of officers and directors are never sufficient to warrant such a release.").

55

litigation against the Prepetition Sponsors or the Debtors' directors and officers.[172]

- **Fourth**, the Plan Releases have substantial support of the creditors entitled to vote on the Plan.  Indeed, the Supporting Parties were the only creditors to identify any potential claims against the Prepetition Sponsors, directors, or officers.[173]

- **Fifth**, the Plan calls for payment of all Allowed Claims against the EFH Debtors and EFIH Debtors in full in cash or other treatment providing a full recovery.  This factor therefore weighs in favor of approving the releases.[174]

114.    Moreover, as discussed at length in the Settlement Motion, to the extent fraudulent-transfer claims might be pursued against the Sponsors in connection with the 2007 LBO, those claims would face substantial hurdles.[175]  Claims to recover payments of fees to the Sponsors under the Management Agreement likewise would have to overcome numerous substantial defenses, as discussed above.[176]  To the extent the Debtors might pursue claims against their directors and officers, those claims also would be unlikely to succeed.[177]  For the reasons set forth above and in greater detail in the Settlement Motion, the Court should approve the Debtor releases in the Plan.

### iv.    The Third Party Releases in the Plan are Appropriate.

---

[172] *See In re Key3Media Grp., Inc.*, 336 B.R. at 97 (Bankr. D. Del. 2005); *see Washington Mut.,* 442 B.R. at 348 (holding the releases were reasonable because in light "of the complex and interrelated claims that the Debtors, JPMC and the FDIC have to virtually every asset in the Debtors' estates, it is hard to imagine what plan the Debtors could propose without the resolution of those claims first").

[173] After a number of witnesses made this point in confirmation depositions, conflicts counsel to the EFH Creditors' Committee sent a letter to the board of directors of EFH Corp. stating that the Committee "intends to/may" assert such claims.  It did not, however, identify substantive bases for such claims beyond vague references to the 2007 LBO and certain predecessor transactions.

[174] *See Washington Mut.*, 442 B.R. at 348 (holding the releases were reasonable in part because "all creditors, except the lowest subordinated class, will receive payment in full plus post-petition interest from the proceeds of the assets released by the Global Settlement.").

[175] *See* Settlement Motion § I.B.b.

[176] *See id.* § I.B.c.

[177] *See id.* ¶¶ 265-68.

115.    The Third Circuit has identified the factors necessary to approve nonconsensual third-party releases.   Specifically, the Third Circuit has explained that the "hallmarks" of permissible nonconsensual third-party releases would be "fairness, necessity to the reorganization, and specific factual findings to support these conclusions."[178]   In so holding, the Third Circuit recognized that there was a split in the Circuits regarding the permissibility of nonconsensual third-party releases and that given such a divide, the Third Circuit would review nonconsensual third-party releases on a case-by-case basis.[179]   Delaware Courts that have subsequently ruled on this issue have looked at, among other things, whether (a) the releasee has provided critical contribution to the debtor's plan and (b) whether the release is fair to the nonconsenting creditors (i.e., whether the nonconsenting creditor was compensated for their contributions).[180]   Further, interested parties have received sufficient notice of the releases.[181] These releases are consensual within the meaning of the law and therefore appropriately included in the Plan.

116.    Here, the factors identified by the Third Circuit counsel in favor of the nonconsensual third-party releases in the Plan.   The non-consenting parties releasing claims consist only of the limited number of impaired creditors of the TCEH Debtors that voted to reject or were deemed to reject the Plan.   As to fairness, the Debtors are not aware of any alleged

---

[178]   *In re Cont'l Airlines*, 203 F.3d 203, 214 (3d Cir. 2000).

[179]   *Id.* at 212.

[180]   *See In re Spansion, Inc.*, 426 B.R. 114, 145 (Bankr. D. Del. 2010) (citing *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607-08 (Bankr. D. Del. 2001) (describing the factual conclusions that may support nonconsensual third-party releases).

[181]   In both the Plan and Disclosure Statement, the releases (as well as the injunction enforcing the releases) were conspicuously set off in **bold** font.  Moreover, in soliciting votes on the Plan, the Debtors sent ballots to all impaired stakeholders unambiguously providing in **bold** or all capital letters that stakeholders could vote for or against the Plan or abstain from voting and opt out of the third-party releases contained in the Plan.

claims held by these third parties that are related to the Debtors or these chapter 11 cases, and thus these releases impose little to no costs on these parties.

117.    On the other hand, these releases are part and parcel of the Settlement Agreement, which is one of the cornerstones of the Debtors' restructuring efforts.  The releases contemplated under the Settlement Agreement were a critical component in incentivizing the Supporting Parties to support the Plan, and, ultimately, obtaining the support of nearly all significant "T-side" creditors, including those constituencies that remain substantially Impaired under the Plan. Similarly, the releases contemplated by the Plan and Settlement Agreement were a core negotiation point in connection with the Merger and in the absence of such releases, the Debtors may not have been positioned to render all "E-side" creditors Unimpaired. Indeed, in the absence of such releases, the Debtors very well could have found themselves mired in legacy litigation for the foreseeable future, a process that would delay emergence and likely generate significant costs.

### B.    The Plan's Exculpation Provisions Are Appropriate.

118.    Exculpation provisions that apply only to estate fiduciaries, and are limited to claims not involving actual fraud, willful misconduct, or gross negligence, are customary and generally approved in this district under appropriate circumstances.[182]   Unlike third-party releases, exculpation provisions do not affect the liability of third parties *per se*, but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the Debtors' restructuring.[183]

---

[182]  *See Washington Mut.*, 442 B.R. at 350-51 (holding that an exculpation clause that encompassed "the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers" was appropriate).

[183]  *See PWS Holding*, 228 F.3d at 245 (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of

58

119.    Here, the Plan's definition of Exculpated Parties includes the following estate fiduciaries:

> (a) the Debtors and Reorganized Debtors; (b) the Committees; and (c) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.[184]

120.    The Exculpated Parties have participated in good faith in formulating and negotiating the Plan, and they should be entitled to protection from exposure to any lawsuits filed by disgruntled creditors or other unsatisfied parties.   Indeed, the exculpation provision and the liability standard it sets represents a conclusion of law that flows logically from certain findings of fact that the Court must reach in confirming the Plan.

121.    *First*, as discussed above, the Court must find, under section 1129(a)(2), that the Debtors have complied with the applicable provisions of the Bankruptcy Code.  Additionally, the Court must find, under section 1129(a)(3), that the Plan has been proposed in good faith and not by any means forbidden by law.  These findings apply to the Debtors and, by extension, to the Debtors' officers, directors, employees, and professionals.  Further, these findings imply that the Plan was negotiated at arm's length and in good faith.  Here, as discussed above, the Debtors and their officers, directors, and professionals actively negotiated with holders of claims and interests across the Debtors' capital structure throughout these chapter 11 cases.  Accordingly, the Court's

---

liability under the Code"); *see also In re Premier Int'l Holdings, Inc.*, 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 30, 2010) (approving a similar exculpation provision as that provided for under the Plan); *In re Spansion, Inc.*, 2010 WL 2905001, at *16 (Bankr. D. Del. Apr. 16, 2010) (same).

[184]   Plan, Art. I.A.179.

59

findings of good faith vis-à-vis the Debtors' chapter 11 cases should also extend to the Exculpated Parties.

122.    **Second**, the promise of exculpation played a significant role in facilitating Plan negotiations.  All of the Exculpated Parties played a key role in developing the Plan that has paved the way for a successful reorganization of the Debtors, and likely would not have been so inclined to participate in the plan process without the promise of exculpation.  Exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability.[185]  In addition, it is well established that the liability of statutory committees and their professionals under section 1103 of the Bankruptcy Code is limited to acts of gross negligence and willful misconduct, making their inclusion as Exculpated Parties entirely appropriate.[186]

123.    The Debtors therefore request that the Court approve the Plan's exculpation provisions and adopt the appropriate standard of liability for the Exculpated Parties with respect to the Debtors' chapter 11 cases.

**C.    The Injunction Sought Is Necessary to Enforce the Releases and Exculpations Contained in the Plan.**

124.    The Plan's injunction provision simply provides the enforcement mechanism for the releases and exculpation provisions of the Plan.  This injunction generally provides that all entities are permanently enjoined from prosecuting or otherwise pursuing claims released or

---

[185] *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

[186] *See PWS Holding*, 228 F.3d at 246-47 (holding that the appropriate standard of liability under section 1103 is "willful misconduct or *ultra vires* acts," and approving an exculpation of the creditors committee and its professionals subject only to liability for willful misconduct or gross negligence).

exculpated under the Plan.[187]    The Plan's release and exculpation provisions would be substantially weakened without the injunction provision.  Moreover, the injunction provided in the Plan is consistent with other injunctions approved in this District.

## Conclusion

125.    For the reasons set forth herein, the Debtors respectfully request that the Court confirm the Plan and enter the Confirmation Order.

*[Remainder of page intentionally left blank.]*

---

[187] The Plan's injunction provision applies to the discharge of claims against and interests in the Debtors.  *See* Plan, Art. VII.F.

RLF1 13187742v.1

Dated: October 23, 2015
      Wilmington, Delaware    */s/ Joseph C. Barsalona II*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
Joseph C. Barsalona II (No. 6102
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:        collins@rlf.com
            defranceschi@rlf.com
            madron@rlf.com
            barsalona@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        edward.sassower@kirkland.com
            stephen.hessler@kirkland.com
            brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        james.sprayregen@kirkland.com
            marc.kieselstein@kirkland.com
            chad.husnick@kirkland.com
            steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession

RLF1 13187742v.1

Dated: October 23, 2015
   Wilmington, Delaware   */s/ Mark S. Thomas*
           **BIELLI & KLAUDER, LLC**
           David M. Klauder (No. 5769)
           1201 N. King Street
           Wilmington, DE 19801
           Telephone: (302) 803-4600
           Facsimile: (302) 397-2557
           Email:  dklauder@bklegal.com


           -and-


           **PROSKAUER ROSE LLP**
           Jeff J. Marwil (admitted *pro hac vice*)
           Mark K. Thomas (admitted *pro hac vice*)
           Peter J. Young (admitted *pro hac vice*)
           Three First National Plaza
           70 W. Madison Street, Suite 3800
           Chicago, IL 60602
           Telephone: (312) 962-3550
           Facsimile: (312) 962-3551
           Email:  jmarwil@proskauer.com
              mthomas@proskauer.com
              pyoung@proskauer.com


           Co-Counsel to the Debtor Energy Future Holdings Corp.

Dated: October 23, 2015
        Wilmington, Delaware         */s/ Richard Levin*
_____

**STEVENS & LEE, P.C.**
Joseph H. Huston, Jr. (No. 4035)
919 North Market Street, Suite 1300
Wilmington, Delaware 19801
Telephone:    (302) 425-3310
Facsimile:    (610) 371-7927
Email:        jhh@stevenslee.com

-and-

**CRAVATH, SWAINE AND MOORE LLP**
Michael A. Paskin, Esq.
Trevor M. Broad, Esq.
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Telephone:    (212) 474-1760
Facsimile:    (212) 474-3700
Email:        mpaskin@cravath.com
              tbroad@cravath.com

-and-

**JENNER & BLOCK**
Richard Levin, Esq. (*admitted pro hac vice*)
Vincent Lazar, Esq. (*admitted pro hac vice*)
919 Third Avenue
New York, NY 10022-3908
Telephone:    (212) 891-1601
Facsimile:    (212) 891-1699
Email:        rlevin@jenner.com

Co-Counsel to Energy Future Intermediate Holding
Company LLC

64

Dated: October 23, 2015
    Wilmington, Delaware      */s/ Thomas B. Walper*

**MCELROY, DEUTSCH, MULVANEY
& CARPENTER, LLP**
David P. Primack (No. 4449)
300 Delaware Avenue, Suite 770
Wilmington, DE  19801
Telephone:     (302) 300-4515
Facsimile:      (302) 654-4031
Email:             dprimack@mdmc-law.com

-and-

**MUNGER, TOLLES & OLSON LLP**
Thomas B. Walper
Seth Goldman
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071
Telephone:     (213) 683-9100
Facsimile:      (213) 683-4022
Email:             Thomas.Walper@mto.com
                   Seth.Goldman@mto.com

Co-Counsel to the TCEH Debtors

RLF1 13187742v.1