# EXHIBIT 1

# Excerpts from 9/23/15 Ying Dep. Tr.

1

1               DAVID YING

2    UNITED STATES BANKRUPTCY COURT

3    FOR THE DISTRICT OF DELAWARE
     ----------------------------------------x
4    In Re:

5    Energy Future Holdings Corporation, et al.,

6                Debtors.

7    Chapter 11

8    Case No. 14-10979

9    Jointly Administered

10   ----------------------------------------x

11   * * *PARTIALLY CONFIDENTIAL (PAGES 76-77)* * *

12          DEPOSITION OF DAVID YING

13               New York, New York

14               September 23, 2015

24   Reported by: KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 98065

1          DAVID YING

2          MR. ROGERS:  Objection to form.

3     A.   It's supposition, but I don't think it

4  would result in a better result.

5     Q.   Sir, are you aware that, at some point

6  in the process, the Hunts began working directly

7  with the T-unsecured creditors on a REIT

8  transaction?

9     A.   Yes.

10    Q.   Do you know how the pairing of the

11 Hunts and the T-unsecured creditors came to be?

12    A.   I know that the Hunts are well

13 advised.  I know that the Hunt Group had been

14 talking to all the various creditor

15 constituencies in the case for quite some time.

16         I suspect that multiple people will

17 claim credit that they are the ones who created

18 the marriage of the Hunts with the T-uns, but I

19 don't know exactly what the sequence of phone

20 calls and meetings and events were.

21    Q.   From the perspective of running the

22 sale process, was it a concern to you that the

23 Hunts were talking to all creditor

24 constituencies?

25         MR. SHORE:  Object to the form.

45

1            DAVID YING
2    we would have entertained any offer of any
3    structure, and I think the market has spoken in
4    that we never received any offer with any other
5    structure other than a transaction that doesn't
6    trigger any de-consolidation tax.
7        Q.   Mr. Ying, I would like to turn to the
8    current plan that's on file and that's in front
9    of you as Exhibit 1.
10           Did you recommend this plan as being
11   in the best interests of EFH and EFIH?
12       A.   Yes.
13       Q.   Why did you provide that -- let me
14   rephrase.  Why did you conclude that the current
15   plan is in the best interests of EFH?
16       A.   From a financial point of view, it's
17   the only offer or it's an offer that has by far
18   the highest value associated with it.  It's the
19   offer that has the most distributable value
20   associated with it, and it's the only proposal
21   that seems to have a vast majority of the
22   stakeholders' support.
23       Q.   And your view with respect to the
24   plan, that's informed by an understanding of the
25   terms of the settlement agreement that are

1                    DAVID YING

2     contract?

3          MR. ROGERS:  Objection to form.

4     A.   Again, just to be clear, what do you

5     mean by "remedies"?

6     Q.   If the transaction does not close, are

7     there enforceable remedies in the purchase

8     contract that are enforceable by EFH?

9     A.   Okay.  So, again, I think it's

10    important just to highlight that in the

11    traditional M&A context, there are no penalties

12    for the buyer group, but embedded in the

13    settlement agreement, there are significant

14    agreements and obligations that the junior TCH

15    creditors are agreeing to that are

16    significant -- that have significant economic

17    consequences to them and that I believe

18    significantly streamline the ability of the

19    company to reach a consensual deal with the

20    E-side in a manner which heretofore has not been

21    possible to reach.  And to be specific, the T

22    junior creditors are obligated to agree to

23    whatever plan is reached with the E-side

24    creditors and the T-firsts.

25          So, by eliminating another class of

```
 1                   DAVID YING
 2      A.   I don't recall exactly who the
 3   settling interest holders are, but I think all
 4   the signatories to the PSA are part of the
 5   released parties.
 6      Q.   Okay.  Do the released parties include
 7   who we have been referring to here as the
 8   sponsors?
 9           MR. ROGERS:  Objection.  Foundation.
10      A.   I believe, yes.
11      Q.   Do you know who the sponsors are, sir?
12      A.   I think they're primarily identified
13   as the three private equity firms that own a
14   majority of the equity of the parent.
15      Q.   Okay.  And that would be Goldman Sachs
16   & Company, TPG and KKR; is that correct?
17      A.   Yes.
18      Q.   And in your capacity as the financial
19   advisor for the Debtors, did you have any
20   dealings in particular with any of the board
21   members who represented the sponsors at EFH?
22      A.   Over the last three years of this
23   assignment, I've had plenty of interaction with
24   them.
25      Q.   And who are those board members that
```

96

1                      DAVID YING
2    you consider to be representatives of the
3    sponsors on the board?
4        A.   Well, both Michael MacDougall and
5    David Bonderman are directors, and they are
6    partners at TPG.  Jonathan Schmidt has been the
7    primary partner at KKR who has been at the board
8    meetings.  There have been other KKR partners
9    who have come and gone.  And the two partners at
10   Goldman Sachs' PIA group are Ken Pontarelli and
11   Scott Lebovitz.
12       Q.   Did you deal with any one of those
13   more than the others in connection with your
14   duties at EFH?
15       A.   No.
16       Q.   You had a discussion with Mr.
17   Glueckstein about the bid procedures.  Do you
18   recall that?
19       A.   Yes.
20       Q.   Did you have any conversations
21   specifically with any of the persons you just
22   named as the sponsor directors in connection
23   with the bid procedures?
24       A.   I don't recall a specific conversation
25   with them, no.

97

1                    DAVID YING
2       Q.    In connection with the bid procedures,
3    did you give presentations to various potential
4    bidders?
5       A.    As part of the bid procedures, I
6    believe Oncor made management presentations to
7    all of the serious bidders who signed a confi
8    and wanted to meet Oncor management, yes.
9       Q.    And were you personally involved in
10   this management?
11      A.    I did not attend those meetings.
12      Q.    Did you have any direct conversations
13   with any of the bidders that ultimately bid
14   here?
15      A.    I believe I did speak to all of the
16   serious bidders about the initial form of their
17   bid.
18      Q.    Were you aware of any particular
19   restrictions that were being placed on these
20   bidders as to -- specifically as to whether
21   there would be a requirement that they release
22   the sponsors of any part of their bid?
23      A.    That particular provision was -- I
24   don't believe was ever raised as part of a bid.
25   In fact, we were, as I had said earlier, we

150

1                    DAVID YING

2    right now, who do you understand to be the

3    fulcrum stakeholder on the E-side?

4         A.   Well, since all of the E-side

5    creditors are paying -- being paid in full, I

6    think, in part, it could have been the T-claim,

7    but that's being compromised, so that's a

8    potential fulcrum.  And then once all the

9    creditors have been paid in full, it actually

10   becomes the equity who have agreed to the plan

11   and agreed to hand over their economic interest.

12        Q.   Do you have any reason to believe that

13   the purchase commitments made by the investor

14   group are not legitimate?

15        A.   No.

16        Q.   Do you have any reason to believe that

17   the commitments were made in anything other than

18   good faith?

19        A.   No.

20        Q.   Do you have any reason to believe that

21   the commitments that have been made are not

22   fully executable?

23        A.   No.

24        Q.   Do you have any reason to believe as

25   you sit here today that the transaction will not

151

                    DAVID YING

1                      DAVID YING

2  close on its terms?

3      A.    No.

4      Q.    If the equity is in the fulcrum and

5  you believe that the transaction is going to

6  close, is there any legitimate reason in your

7  view to run an auction to establish the value of

8  the equity holders' equity interest?

9      A.    If the equity holders have agreed,

10 there is absolutely no reason to run another

11 auction.

12         MR. SHORE:  I think that's it for me.

13         Thank you very much.

14         MR. GLUECKSTEIN:  I think we're done.

15         Thank you, Mr. Ying.  Appreciate your

16     time.

17         (Whereupon, the deposition concluded

18     at 2:17 p.m.)

19                       _____
                        DAVID YING

20

21   Subscribed and sworn to
   before me this    day
22   of          2015.

23

    _____
24

25