**EXHIBIT 13**

**Excerpts from 10/1/15 Keglevic Dep. Tr.**

Page 1

1    UNITED STATES BANKRUPTCY COURT
2      FOR THE DISTRICT OF DELAWARE
3    ------------------------------------x
4    In Re:
5    Energy Future Holdings Corporation,
6    et al.,
7                    Debtors.
8
9    Chapter 11
10   Case No. 14-10979
11   Jointly Administered
12   ------------------------------------x
13
14
15        DEPOSITION OF PAUL KEGLEVIC
16          New York, New York
17           October 1, 2015
18
19   ***This transcript contains a portion that
20     has been designated Highly Confidential***
21
22
23   Reported by: MARY F. BOWMAN, RPR, CRR
24   JOB NO: 98276
25

Page 2

1
2
3
4
5
6           October 1, 2015
7             9:04 a.m.
8
9        Deposition of PAUL KEGLEVIC
10   , held at the offices of Kirkland
11   Ellis, LLP, 601 Lexington Avenue, New
12   York, New York, before Mary F. Bowman, a
13   Registered Professional Reporter, Certified
14   Realtime Reporter, and Notary Public of the
15   State of New Jersey.
16
17
18
19
20
21
22
23
24
25

Page 3

1
2           APPEARANCES:
3    KIRKLAND & ELLIS
4    Attorneys for the Debtors
5       555 California Street
6       San Francisco, CA 94104
7    BY:  MARK McKANE, ESQ.
8        CHAD HUSNICK, ESQ.
9        HOWARD KAPLAN, ESQ.
10       NICK LAIRD, ESQ.
11
12
13   SULLIVAN & CROMWELL
14   Attorneys for E-side Official Creditors
15      125 Broad Street
16      New York, NY 10004
17   BY:  BRIAN GLUECKSTEIN, ESQ.
18       JOHN LIOLOS, ESQ.
19
20
21
22
23
24
25

Page 4

1
2           APPEARANCES:
3    MONTGOMERY McCRACKEN
4    Attorneys for EFH Committee
5       123 South Broad Street
6       Philadelphia, PA 19109
7    BY:  MARK SHEPPARD, ESQ.
8        DAVID DORMONT, ESQ.
9
10   SHEARMAN & STERLING
11   Attorneys for EFIH, First Lien DIP Agent
12      599 Lexington Avenue
13      New York, NY 10022
14   BY:  FAY TELONI, ESQ.
15
16
17
18
19
20
21
22
23
24
25

1              Keglevic
2    I'm giving you would be interest accruing
3    through June 30.
4        Q.   Of two thousand --
5        A.   '16.
6        Q.   I will do my best not to talk
7    over you, and if you would do the same.  I
8    think I actually talked over you there, so
9    I'm the one apologizing.
10       A.   You're forgiven.
11       Q.   Thank you.
12            MR. WALPER:  Can you speak up,
13   Mr. Anker?
14            MR. McKANE:  Yes.  And slow down.
15            MR. ANKER:  Can we go off the
16   record one second.
17            MR. McKANE:  Sure.
18            (Discussion off the record)
19   BY MR. ANKER:
20       Q.   I asked you, Mr. Keglevic, about
21   the outstanding projected amount of EFIH
22   second lien debt, and you gave me an answer
23   as of June 30, 2016.  What is the projected
24   EFIH PIK debt as of June 30, 2016?
25       A.   The numbers I'm giving you are

1              Keglevic
2    the principal and undisputed interest.  So
3    when I give you the PIK number, because
4    there is disputed interest, this would be
5    just the principal amount.
6        Roughly it's about a billion
7    eight as well.
8        Q.   So if you take the DIP of 5.4
9    plus a billion eight of second lien EFIH
10   debt, and the billion eight of PIK debt, I
11   think you get to about 9 billion?
12            MR. SHORE:  Object to the form.
13       A.   That's correct, 3.6 billion plus
14   5.4 is 9 billion dollars.
15       Q.   I'm not great at math, but good
16   enough to do that.
17       There is also today at the EFH
18   level legacy debt, right?
19       A.   Yes, roughly 600 million dollars.
20       Q.   Projected as of June 30, 2016?
21       A.   Yes, with the same caveat with
22   respect to the make-whole and
23   post-petition.
24       Q.   So if you add the 9 billion at
25   EFH to the 600 million at -- I am sorry, if

1              Keglevic
2    you add the 9 billion at EFIH to the
3    600 million at EFH, you get to
4    approximately 9.6 billion, correct?
5        A.   That's close, yes.
6        Q.   And the projected debt on
7    emergence at new EFH is how much again,
8    sir?
9        A.   The new debt is projected to be
10   somewhere between 5 to 5.5.  I believe we
11   have debt commitments up to 5.5 billion.
12       Q.   Am I also right that the way the
13   plan works is, if the rights offering is
14   oversubscribed, that will, in fact, reduce
15   the amount of debt at emergence?
16            MR. SHORE:  Objection to form.
17       A.   Those numbers could be reduced,
18   yes.
19       Q.   And so the 5 to 5.5 assumes no
20   oversubscription, correct?
21       A.   That's correct.
22            MR. SHORE:  Objection to form.
23       Q.   And so the combined EFH/EFIH will
24   be delevered by 4 to 4 and a half billion
25   at a minimum, right?

1              Keglevic
2            MR. McKANE:  Objection, form.
3        Q.   Dollars, right?
4        A.   Yes, somewhere in that range.
5        Q.   The pennies is not what I'm
6    concerned about.
7        The restructuring also
8    contemplates, I think you testified a
9    minute ago, that the reorganized EFH will
10   become a REIT; is that correct?
11       A.   That is the plan, correct.
12       Q.   And I understand you're not here
13   as an expert, but a REIT stands for real
14   estate investment trust?
15       A.   It does.
16       Q.   Are there tax advantages from a
17   financial standpoint for the debtors, as
18   you understand it, to being a REIT?
19            MR. SHORE:  Object to the form.
20       A.   Well, there won't be tax
21   advantages to the debtors.  There will be
22   tax advantages to the new investors.
23       Q.   My mistake.  Right.
24       Can you briefly explain your
25   understanding of those advantages?

Keglevic

1
2 approximately of that date?
3   A.   I don't.  That's why I didn't
4 want to answer to a specific date.
5   Q.   Let me represent to you that it
6 was June 19, 2014.
7       MR. HOROWITZ:  Don't look at me.
8   Q.   I think I'm right.
9   A.   Maybe I can -- I think
10 430 million dollar is the, quote/unquote,
11 frozen amount as of when we paid off the
12 first lien.  That sounds like a reasonable
13 approximation of what the potential
14 liability is, if overturned by the appeal
15 courts.
16   Q.   Assume for a moment that my
17 clients would also claim that they are
18 entitled to interest on that sum running
19 from the date of the repayment of the
20 principal of the notes through whatever
21 date that is.  Assume that the second liens
22 would make the same claim, assume the PIKs
23 would make the same claim.
24       Does that assumption change in
25 any way the debtors' view that if an

Keglevic

1
2 appellate court following the effective
3 date reverses the bankruptcy court and
4 holds that all the make-whole claims,
5 principal plus interest thereon, are due,
6 that the -- that reorganized EFH will be
7 able to pay that sum?
8       MR. SHORE:  Objection.
9       MR. McKANE:  Object to the form.
10   A.   Can you tell me what interest
11 rate they are going to claim?
12   Q.   Our notes are at 10 percent, and
13 I think there is a little tranche of
14 bump-up because of the failure to register
15 them.  So as to part of it, 10 and a half,
16 and as to part of it, 10 percent.
17       Assume that the second liens
18 would claim whatever interest rate is
19 accruing on their notes as provided in the
20 notes, and assume the same for the PIKs.
21   A.   The -- no, those --
22       MR. SHORE:  Objection to form.
23   A.   I would not think the additional
24 accrued interest would fundamentally change
25 the reality that there is still a very --

Keglevic

1
2 it is a very small amount in relation to
3 the amount of the 8 and a half billion
4 dollars equity that this entity would be
5 worth.
6   Q.   I just want to get a clear
7 record.  When you say, "It is a very small
8 amount in relation to the amount of the 8
9 and a half billion dollars of equity that
10 this entity would be worth," what is the
11 "it" in that sentence?
12   A.   The -- your hypothetical was we
13 lose 100 percent of all the make-whole
14 cases, and the finding is also that there
15 would be interest on top of those amounts.
16 Rough numbers, in my mind, those
17 make-wholes are about a billion dollars in
18 total, and adding interest for a period of
19 time, I can do the math, on a billion
20 dollars at 10 percent, that's 100 million a
21 year, so say a billion two.
22       If I was the chief financial
23 officer, which I will not be, by the way,
24 of reorganized EFH, and I had a company
25 worth 8 and a half billion dollars, and I

Keglevic

1
2 had a claim for 1.2 billion dollars, I
3 would not -- if my alternative being pay it
4 or file for bankruptcy, I would find a way
5 for my 8 and a half billion dollars to pay
6 the amount and not flush the remaining
7 7.3 billion dollars of equity value in the
8 estate.
9       That's why the debtor is not
10 concerned with the proposition.
11   Q.   I think this may just be a way of
12 changing the language, and I don't mean to
13 prolong this.  Is it fair to say that the
14 debtors believe that even if all of the
15 make-wholes are allowed, including
16 interest, that the plan of reorganization
17 is feasible?
18       MR. SHORE:  Objection to form.
19       MR. McKANE:  Objection to form.
20   A.   I do feel on the record, since
21 I've been I think very cooperative in
22 taking all the hypotheticals, that number
23 one, the debtors don't think it is likely
24 that that scenario will take place.
25   Q.   I understand that.

Keglevic

2    A.    That being said, if the
3   worst-case scenario were to happen, as you
4   have described it, we still believe that
5   those amounts have sufficient equity
6   coverage to assure their payment.
7    Q.    And you took -- I don't mean this
8   in a critical way -- I will use the word
9   "umbrage," when I referred to "reorganized
10  debtors."  I take it, it is the expectation
11  of the debtors that if this plan is
12  confirmed and goes effective, new EFH will
13  not have to refile for bankruptcy?
14   A.    That is absolutely our
15  assumption.
16   Q.    Well, it is more than an
17  assumption.  It is the belief based on
18  analysis, right?
19   A.    Based on the preponderance of the
20  evidence, we believe it is highly unlikely
21  that they would have to file for
22  bankruptcy.
23   Q.    And is that also your belief,
24  that it would be highly unlikely that
25  reorganized EFH would have to file for

Keglevic

2   bankruptcy, does that remain the debtors'
3   belief if the make-whole claims, the
4   make-whole rulings are all reversed on
5   appeal?
6    MR. SHORE:  Objection to form.
7    A.    Yes.
8    Q.    Mr. Keglevic, I think I have only
9   one other set of questions.  Are you
10  familiar with -- and I'll give it to you in
11  a moment -- Exhibit F to the disclosure
12  statement, which are the Oncor projections?
13   A.    I am.
14   Q.    OK.  Let me hand you -- I'm not
15  going to give you the entirety of the
16  disclosure statement.
17   MR. McKANE:  That's fine.
18   MR. ANKER:  We will mark this as
19  Keglevic Exhibit 1.
20   MR. McKANE:  Since this is his
21  tenth deposition, can we mark it as
22  Keglevic Confirmation Exhibit 1?
23   MR. ANKER:  Yes.  Mark it as
24  Keglevic Confirmation Deposition
25  Exhibit 1.

1   Keglevic
2    (Exhibit 1, document entitled
3   "EFH/EFIH Financial Projections" marked
4   for identification, as of this date.)
5    Q.    Mr. Keglevic, my first question
6   is going to be, can you identify for the
7   record Keglevic Plan Confirmation
8   Deposition Exhibit 1?
9    A.    Yes.  These are the financial
10  projections that were derived by Oncor's
11  long-range plan going from 2015 to 2022, as
12  well as a pro forma REIT summary of the
13  same period, allocating the numbers that
14  were in their base projection into the
15  propco and opco, but not changing the --
16  generally the total numbers, except to
17  pro forma in the efficiency of the
18  structure for tax purposes.
19   Q.    OK.  Let me start by directing
20  you to the very first paragraph -- the
21  document isn't numbered, but on page 2,
22  which has at the top, one, "Development of
23  EFH/EFIH Financial Projections."
24    Do you see the page I'm referring
25  to?

1   Keglevic
2    MR. McKANE:  It is actually
3   numbered page 3.
4    MR. HOROWITZ:  We have a problem.
5    MR. McKANE:  Copy problem?
6    MR. HOROWITZ:  Copy problem, I
7   think.
8    MR. ANKER:  The version I had
9   doesn't have the page number on the
10  bottom, for reasons that I don't
11  understand.
12   MR. McKANE:  Can we pause for a
13  second.
14   MR. HOROWITZ:  Let's go off the
15  record for a second.
16    (Recess)
17  EXAMINATION BY
18  MR. HOROWITZ:
19   Q.    Good morning.  Just stepping in
20  to fill a little time here, Mr. Keglevic.
21  Greg Horowitz from Kramer Levin on behalf
22  of the EFIH second lien indenture trustee.
23  I have just a very small number of
24  questions to clean up.
25    First, there was testimony about

Page 49

Keglevic

1              Keglevic
2 the debtors' assumption or expectation that
3 the new company will be a REIT. Just to
4 clarify, that's actually a condition
5 precedent to the plan going effective,
6 isn't it?
7     A.   It is.
8     Q.   So under any scenario where we
9 are talking about the current plan being
10 effective, we will be talking about a REIT,
11 right?
12     A.   That's correct.
13     Q.   My second question, Mr. Anker
14 asked you questions about your assumptions
15 that -- withdrawn.
16          Asked you a number of questions
17 about a hypothetical scenario where
18 post-effective-date make-whole claims are
19 allowed on appeal, right?
20     A.   Correct, he did.
21     Q.   And you testified, just to keep
22 it as simple as possible, that the debtors
23 have done an analysis and are confident
24 that the new company will be able to pay
25 any liabilities that are allowed on appeal

Page 50

1              Keglevic
2 after the effective date; is that accurate?
3 Is that fair to say?
4      MR. SHORE: Objection to form.
5      MR. McKANE: Objection to form.
6      Go ahead.
7     A.   Certainly with respect to the
8 make-wholes, including potential accrued
9 interest, given the equity capitalization,
10 we believe that the reorganized EFH would
11 have the financial ability to make those
12 payments.
13     Q.   Fine.
14          There was no discussion about the
15 dispute over the interest rate that would
16 accrue on the PIK notes, but that's an
17 issue the debtors are also very much aware
18 of, right?
19     A.   Correct. There is post-petition
20 interest at both EFIH -- and we haven't
21 talked about it, but there is also a
22 make-whole at EFH, and there's also a
23 post-petition interest claim at EFH. So
24 there are those potential liabilities as
25 well.

Page 51

Keglevic

1              Keglevic
2          The difference on post-petition
3 interest is that if it was adjudicated that
4 there was an obligation of EFIH to pay the
5 PIK post-petition interest, which is far
6 and away the biggest amount of
7 post-petition interest, that the investors
8 have agreed to stand in and reserve those
9 amounts, effectively fund those amounts.
10          If after the effective date that
11 were to be the case, we have to go through
12 the same analysis and see if there was
13 enough equity and financial wherewithal to
14 pay those amounts, because the obligation
15 to fund will have ended at the effective
16 date.
17          So my answer would then lean on
18 the same type analysis that I did for the
19 make-wholes, given that the post-petition
20 interest numbers -- it is 300-and-some-odd
21 million dollars -- we would think there
22 would be plenty of equity and financial
23 ability for the reorganized EFH to pay that
24 amount.
25     Q.   You just answered about five of

Page 52

1              Keglevic
2 my questions.
3          To summarize, there will be an
4 escrow or a reserve for the disputed
5 interest rate on the PIK notes; is that
6 right? But that --
7     A.   If adjudicated before the
8 emergence date.
9     Q.   And if it is not adjudicated or
10 if it has been decided by the bankruptcy
11 court but still potentially pending appeal
12 as of the effective date, any amount in
13 that reserve would be distributed to the
14 funding -- to the new money investors; is
15 that right?
16      MR. McKANE: Objection to form.
17      MR. SHORE: Objection to form.
18     A.   My understanding, if there is not
19 a, you know, final adjudicated -- if there
20 is an adjudicated amount, it will be
21 effectively escrowed. If there is none or
22 if, you know -- or if we were to win that
23 case, and after the effective date it was
24 overturned, there would not be an escrow
25 because it didn't meet the conditions for

1           Keglevic
2      (Recess)
3           MR. GLUECKSTEIN:  Back on the
4      record.
5      Q.    Mr. Keglevic, the -- you
6  recommended as co-CRO that boards approve
7  pursuit of the current plan of
8  reorganization, correct?
9      A.    Correct.
10     Q.    The plan, the plan that's before
11  the Court was approved by the boards in
12  August of this year, correct?
13     A.    Correct.
14     Q.    At the time the plan was approved
15  and filed, do you believe there were
16  alternative plans available to EFH or EFIH
17  at that time?
18     A.    No.  I think in the scheme of the
19  time I've been associated with this case,
20  this was the easiest decision I have made,
21  because we had a plan that had consensus of
22  the T-side, which is very valuable in this
23  case, and an opportunity through that plan
24  to pay the E-side at par, and there wasn't
25  any bid that I had or an E-side plan that

1           Keglevic
2  would have gotten me close to those results
3  and conclusions.
4           So I, you know -- and then in
5  addition, I think the uniqueness of the
6  alternative restructuring part of the
7  program, that even if the transaction did
8  not consummate, as we discussed, we would
9  still eliminate litigation and be able to
10  fast-track an alternative, to me was highly
11  desirable.
12          But there were literally no
13  alternatives that were executable or would
14  have produced anywhere near the result that
15  this plan produces.
16     Q.    At the time you approved or
17  recommended approval of the plan in August,
18  you were unaware then of any plan, other
19  plan that would pay EFH creditors in full,
20  correct?
21     A.    Correct.
22     Q.    In your previous answer,
23  Mr. Keglevic, you talked about paying
24  E-side creditors at par; is that right?
25          MR. McKANE:  Objection, form.

1           Keglevic
2      Go ahead.
3      A.    The current plan assumes that
4  E-side creditors will be paid at par for
5  the undisputed claims.
6      Q.    At the time you recommended to
7  the board to proceed with this plan, was it
8  your understanding that those E-side
9  undisputed claims would be paid in cash?
10     A.    Well, or --
11          MR. SHORE:  Object to the form.
12     A.    -- there was an alternative.
13     Q.    "Or there was an alternative."
14     A.    Or otherwise --
15     Q.    What do you mean by that?
16     A.    There was language in there that
17  probably -- well, ultimately needed to be
18  cleaned up and more specific, but I think
19  it was like "or otherwise unimpaired," and
20  while I, you know, if I had read that
21  document cold, couldn't tell you what those
22  words meant either, I certainly was aware
23  that we had the opportunity in the EFH
24  indenture to reinstate the EFH unsecured
25  debt beneath TCEH if we chose to do so.

1           Keglevic
2          So that had been an option that
3  we had discussed for a while, and that the
4  T-side creditors were aware of, and, you
5  know, in our mind and -- I'm not a lawyer,
6  but my understanding is reinstatement is
7  consistent with payment at par, that I was
8  focused on payment at par, and cash versus
9  reinstatement were the two options to pay
10  in par -- pay at par, excuse me.
11     Q.    What involvement, what
12  involvement did you have as co-chief
13  restructuring officer in informing the
14  boards of directors of the various debtors
15  with respect to the terms of the plan of
16  reorganization?
17     A.    I don't think there -- it is
18  specified, my duties, what -- you know, we
19  do our best to make the board aware of
20  material conditions in the plan.  I -- you
21  know, best we can.  Obviously, there is a
22  lot of agreements and a lot of pages and a
23  lot of provisions.
24     Q.    What, if anything, did you do to
25  inform the boards with respect to the terms

Keglevic

1
2  room, I believe, and available for anybody
3  who is restricted in or an advisor to the
4  case.
5      Q.  To the extent you can, just as
6  a -- as you sit here, without looking at
7  the numbers in front of you, do you have an
8  understanding as to what the revised EBITDA
9  numbers reflect compared to -- in relation
10  to the material that was submitted in
11  connection with the disclosure statement?
12      A.  Yes.  The EBITDA for 2016 is
13  basically flat.  But as you get into the
14  out-years, the impact -- the power prices
15  are down 9 to 10 dollars kind of per year.
16  So in all of those out-years, there is a
17  reduced EBITDA as a result of the power
18  price, offset somewhat by a reduction in
19  capital expenditures, because in a lower
20  power price environment, you don't run all
21  the plants at the same production levels,
22  which means you don't have to do the same
23  capital expenditure to keep them available
24  that you otherwise would, since even if
25  they are available, they are not going to

Keglevic

1
2  run in those environments.
3          And like I said, we also put some
4  additional O&M reductions across the
5  company that were not insubstantial to
6  offset some of those declines.
7          So the big story is lower EBITDA
8  driven more than 100 percent by the power
9  price declines but offset somewhat by cost
10  reductions.
11      Q.  And in light of those
12  conclusions, are you intending to update
13  the projections that have been filed with
14  the Court in connection with the disclosure
15  statement, publicly?
16          MR. McKANE:  To the extent you
17      can answer the question without
18      disclosing attorney/client
19      communications, please do so.
20      A.  We have not made that conclusion.
21  I go to the fact that, as I said, even if
22  there is a diminution in value, which there
23  is likely to be with reduced EBITDA, given
24  the tenets that we put in the case around
25  credit rating and equity at a 50/50 capital

Keglevic

1
2  structure, I don't think the conclusion of
3  the ability to support the new debt levels
4  is going to be any different than it was in
5  the prior case.
6          It's kind of a self-fulfilling
7  prophecy.  If you reduce the top number,
8  you reduce the amount of equity and debt to
9  match those cash flows to provide the same
10  outcome in terms of creditworthiness.
11          So the question or the issue is,
12  will the new entity be creditworthy.  I
13  think it is fairly easy to get to that
14  conclusion without new numbers, but that's
15  one man's point of view, and we have not
16  concluded as to whether we will update
17  those.
18          We certainly have provided the
19  updated information into the data room for
20  all to see.  The question of whether it
21  needs to go in the disclosure statement,
22  et cetera, I think our team is still
23  contemplating.
24          More than you wanted to hear.
25      Q.  Very helpful.  Thank you very

Keglevic

1
2  much.
3          Mr. Keglevic, with respect to the
4  merger transaction contemplated by the plan
5  of reorganization, am I correct that the
6  debtors do not have any remedies in the
7  purchase agreement itself should the
8  purchasers choose not to close at a later
9  date?
10          MR. McKANE:  Objection to form.
11      A.  Well, I think it depends on your
12  definition of "remedies."  If the
13  transaction does not close, the
14  consideration we receive is substantial.
15  We get disarmament, we get a drag right, we
16  get an accelerated alternative schedule.
17  We maintain T-side consensus moving into
18  the next case.
19          There is various elements that,
20  you know, effectively, when you think of
21  remedies, the remedies might be that you
22  got a payment, a break fee.  As we, I
23  think, discussed at the PSA deposition, I
24  believe that the remedies that we are
25  getting in this case if the transaction

Page 141

```
1              Keglevic
2   doesn't close have substantially more value
3   than if we just got a dollar amount, which
4   in the -- you know, the bids we got from
5   outsiders, none of them were -- as I can
6   recall, exceeded 200 million dollars.
7          I would much rather have the
8   value associated with the remedies I have
9   as a result of the alternative
10  restructuring terms, the settlement
11  agreement, et cetera, than 200 million
12  bucks. I think that is more valuable to
13  all the estates.
14         So we don't have traditional
15  remedies, but we effectively have remedies
16  if it will not close, and I'm sure, if you
17  look at the 550 million dollar settlement
18  that the T junior securities will receive,
19  and knowing that they started with
20  150 million dollars of unencumbered cash,
21  and that they have to pay their fees out of
22  that 550 million dollars, they commonly
23  refer to not closing as the booby prize,
24  and substantially less than the value they
25  thought they could have got through the
```

Page 142

```
1              Keglevic
2   alternative, but they traded that value to
3   get what they believe is the upside
4   associated with the majority ownership of
5   the new entity.
6          And we concur with them, and in
7   fact, that was the difficult part of the
8   negotiation, to give us the kind of
9   remedies that we thought were applicable,
10  and obviously they would have much rather
11  have gotten a different set of remedies,
12  but that's what a negotiation is all about,
13  each side gives.
14     Q.    Did you, Mr. Keglevic, explore in
15  your negotiations with the purchasers
16  including what you referred to as
17  traditional remedies as part of this
18  transaction?
19     A.    Yeah, I think at some point we --
20  you know, typically in a negotiation, you
21  try to get specific performance plus, so
22  yeah, I think at different times we were
23  trying to get as much as we possibly could.
24  Specific performance, break fees, I think
25  at different times those were all
```

Page 143

```
1              Keglevic
2   discussed.
3          And very difficult to get
4   specific performance in today's deal
5   environment, and frankly, as I said, the
6   break fee, as we looked at it, would always
7   be in addition to the other things we got,
8   because we viewed those as more valuable,
9   but that was -- given it was a tradeoff
10  between those two, we ended up in that
11  position, and like I said, the other side
12  was clearly not interested in giving us any
13  of the kind of remedies that they got, but
14  I think it ended up being a balanced deal.
15     Q.    In reaching your conclusion that
16  the disarmament terms that you received for
17  pursuing this transaction were valuable,
18  did you actually undertake to quantify that
19  in any way?
20     A.    I did not do a quantification,
21  but we received the debt conclusion from --
22  and it was articulated to the board, in
23  their minds, the value from all the DDAs,
24  and from our counsel. You know, so I
25  relied heavily -- and Ms. Doré -- you know,
```

Page 144

```
1              Keglevic
2   the legal experts in this case, in terms of
3   the probability of loss of any of the
4   claims, the cost to defend, and the time
5   and delay associated with litigating some
6   matters that go all the way back to 2007
7   that would be tremendously fact-intensive
8   and long trials.
9          So I think the -- I know at least
10  that if any of those groups were to say you
11  could take a couple hundred million dollar
12  break fund or get those other elements,
13  that they would share my conclusion. And
14  that was articulated at the board, I think
15  probably by me, with concurrence by the
16  others.
17     Q.    And in your answer, when you
18  referenced "those groups," you are
19  referring to counsel and Ms. Doré; is that
20  fair?
21     A.    What I meant to -- who I meant to
22  include was the disinterested director
23  advisors for EFIH, disinterested director
24  advisors for EFH, and disinterested
25  director advisors for TCEH, in addition to
```

Page 165

```
1              Keglevic
2   that would satisfy either their objectives
3   or ours.  So they moved on to this other
4   transaction.
5       Q.   With respect to the current
6   transaction, did you reach a view with
7   respect to the likelihood that this
8   transaction would close?
9       A.   Yes.
10      Q.   And what is your view?
11      A.   My view is that it has a more
12  likely than not chance of closing.
13      Q.   And you have chosen the term
14  "more likely than not."  What -- how did
15  you --
16      A.   That is a layman's term.
17      Q.   I understand it, but it is a
18  term, and so I'm just trying to understand.
19          How did you conclude that it's
20  more likely than not, in your mind, that
21  this transaction will close?
22      A.   Look, I considered a lot of
23  factors.  One is the financial
24  sophistication, the reputation of the
25  counterparties, the investors to the deal.
```

Page 166

```
1              Keglevic
2   Obviously, the Hunts have been very
3   interested in acquiring Oncor for a long
4   period of time.  They have a big stake in
5   Texas.  They are -- strategically believe
6   this is a cornerstone of the, you know,
7   progress of the Hunt consolidated group
8   going forward.
9          These assets of this size in a
10  regulated company don't come up for
11  marketing very often, and if you had to buy
12  a currency in the United States associated
13  with a regulated company, Texas would
14  absolutely be the best currency, given the
15  business climate, economic climate and
16  regulatory climate.  So I find them to be
17  highly motivated and people that close more
18  deals than they, you know, don't close.
19          Also, money talks, and the equity
20  commitments and the size of the commitments
21  across the group of the initial investors
22  and backstop parties, there are some very
23  serious names associated with those
24  commitments.
25          So I think when you consider the
```

Page 167

```
1              Keglevic
2   Hunts and the other investors -- and I'm
3   sure you know their names.  I don't have to
4   go through them with you.  Obviously,
5   having their money committed to a potential
6   deal, and the time and expense and
7   reputational risk of not executing this
8   deal is pretty high.
9          So I think we got a tremendously
10  motivated group of partners, and by the
11  way, both groups had to believe -- the
12  Hunts did their due diligence on the other
13  investors, and the other investors did
14  their due diligence on the Hunts, in terms
15  of their ability to make this happen.
16          Then you get into the IRS issues
17  and whether we will get the treatment we
18  expect from the IRS.  I will tell you I
19  relied -- while I have a general business
20  judgment, certainly we have a situation
21  where in Texas, for assets like this, we
22  have a REIT treatment, you know, InfraREIT.
23  That goes not only to the PUCT, which I
24  will get to in a minute, but to the IRS
25  approval.
```

Page 168

```
1              Keglevic
2          And I rely heavily on my tax and
3   my external tax team, as well as the tax
4   teams of all these sophisticated financial
5   investors, and I think collectively we all
6   believe we will get the IRS to give us what
7   we need to move forward.
8          And then kind of the third leg of
9   the stool is the -- you know, as I think
10  about it, is the PUCT, and at the end of
11  the day, you always have to consider
12  options, and if the PUCT doesn't approve
13  this change of control -- first, I think it
14  is going to be very difficult under their
15  stringent rules not to do so, because they
16  just have to get past -- I think the way to
17  summarize the application which we just
18  filed very simply is that they are not
19  taking on any unusual risks that are not
20  compensated for, or there is benefits to
21  the ratepayers, or at least no harm to the
22  ratepayers.
23          And when you look at the
24  situation that the company is in currently,
25  I would think the PUCT is motivated to get
```

Keglevic

1
2  this company out of bankruptcy, and as we
3  stated, this company will be an investment
4  grade, above an investment grade.  We
5  haven't been there since 2007 in our
6  corporate structure.  So it gives a lot of,
7  I think, confidence to the PUCT.
8       And as I said, they have -- they
9  are used to REITs.  And I think the -- just
10 having another REIT in Texas, I think we
11 believe it is -- excuse me for using it
12 again -- more likely than not we can get
13 the PUCT over the hurdle.
14      So looking at all of those
15 things, I think we have a very good chance
16 of coming to closure.  But as I stated
17 earlier, we also recognize that this isn't
18 the simplest transaction, and therefore, we
19 made sure we had the right kind of remedies
20 and received the right kind of benefits in
21 case my evaluation is incorrect.
22    Q.   Would you agree, Mr. Keglevic,
23 that ultimately the investors will make a
24 decision at the time of closing as to
25 whether it is in their financial interest

Keglevic

1
2  to close?
3    A.   Yes.  And I think in -- and that
4  equation is twofold, not just one.  It is
5  the returns they're likely to receive if
6  they close for their new investment, and
7  you heard from at least Mr. Ying's
8  testimony that Mr. Anker repeated to me,
9  that there is some fairly sizeable upside
10 in this structure.
11      But they also have to consider
12 ultimately where they go with the booby
13 prize.  I guarantee you that that is not --
14 they do not want to opt back to a
15 550 million dollar settlement net of their
16 fees when the -- I can't remember what we
17 called -- what Mr. Shore called it, but we
18 weren't even giving them potato chips, but
19 he -- you know, they were kind of starting
20 with 150 million dollars.
21      So the fact that he ends up net
22 after going through and developing this
23 list of claims that he settles for that
24 amount also provides high motivation to
25 close the transaction.  And I think there

Keglevic

1
2  is enough upside that even if some of the
3  upside is trimmed, it still might be a
4  better alternative than the booby prize.
5       MR. GLUECKSTEIN:  Should we maybe
6  break for lunch and we coordinate the
7  rest of the afternoon?
8       MR. McKANE:  That would be great.
9       (Recess)
10      MR. GLUECKSTEIN:  Let's go on the
11 record.
12      Mr. Keglevic, thank you for your
13 time.
14      Mr. McKane, we know objectors
15 have been working hard to split the
16 time at these depositions to fit within
17 the time period.  What I propose to do,
18 if it is OK, I am going to pass the
19 witness to other folks who would like
20 to ask questions.  If we have some
21 remaining time, I would like to reserve
22 to ask a few additional questions at
23 the end of the day, and we can talk
24 about that.  But I think it is
25 reasonable under the circumstances.

Keglevic

1
2       MR. McKANE:  When is Mr. Kazan
3  dialing in?
4       MR. GLUECKSTEIN:  Towards the end
5  of the day.  We can talk about that.
6       MR. McKANE:  You want to go after
7  him?
8       MR. GLUECKSTEIN:  With that
9  reservation, I am going to let
10 Mr. Sheppard ask some questions.
11      MR. McKANE:  All right.
12      MR. SHEPPARD:  We are on the
13 record.
14 EXAMINATION
15 BY MR. SHEPPARD:
16    Q.   Mr. Keglevic, good afternoon.
17 I'm Mark Sheppard.  We met a couple of
18 weeks ago when we convened for your
19 deposition in connection with the plan
20 support agreement.  Do you recall that?
21    A.   I do.
22    Q.   At that time, people went over
23 the ground rules with you.  I am not going
24 to go over them again.  You heard a couple
25 of them this morning.  The most important

Keglevic

1
2  monthly.
3      Q.   OK.  And do you know who has the
4  records of those computations and balances?
5      A.   We record them each month in our
6  general ledger of the corporation.  We have
7  a controller, Terry Nutt, and you know, if
8  there is any supplemental information, my
9  treasurer, Mr. Horton may have it.
10      But either of those gentleman has
11  access to that information and the ability
12  to provide you with how interest has
13  accrued monthly from whatever time frame
14  you need.
15      Q.   And if that's something that we
16  would like to see, is that doable?
17      MR. McKANE:  We will take it
18      under advisement.
19      MR. KAZAN:  I will await the
20      memo.
21      MR. McKANE:  And we may be able
22      to direct you to other information that
23      has already been made available to all
24      creditors from which you can find the
25      information.

Keglevic

1
2  that Jacobs Construction announced that it
3  bought the company in 1993.  Do you know
4  who would have records at your end with
5  respect to that transaction?
6      A.   I would -- I would say our
7  controller is the best source of historical
8  records of accounting transactions.
9      Q.   In your opinion -- and I don't
10  know if this is something you're entitled
11  or allowed to have an opinion about -- but
12  is EECI insolvent?
13      MR. McKANE:  I will object to the
14      form of the question, but allow him to
15      answer.
16      A.   I think that the question turns
17  on the recoverability of the intercompany
18  receivables, and as it is our intention in
19  this case to have reorganized E -- to have
20  the liabilities travel with reorganized E
21  and the -- I would say no, they are not
22  insolvent.
23      Q.   And the same would be true of EEC
24  Holdings and LSGT Sacroc, is that correct?
25      A.   That's correct.

Keglevic

1
2      MR. KAZAN:  That would be very
3      useful because we haven't been able to
4      find it yet.
5      Q.   Is there anything in the SOFAs
6  that reflect the sale of the assets of
7  Humphries & Glasgow?
8      MR. McKANE:  Objection to form,
9      overbroad.
10      A.   I don't think -- well, I know the
11  SOFAs did not include Humphries & Glasgow
12  as an entity because it is not a debtor.
13  As you mentioned, there may be still a
14  receivable on somebody else's books, so --
15  I would think not, but I'm not perfectly
16  sure, sir.
17      Q.   OK.  You said you think you still
18  own the stock in Humphries & Glasgow which
19  is in dissolution or administration in
20  England.  Do you know when the assets of
21  that company were sold?
22      A.   I don't.  It was -- I believe --
23  well, I'm almost positive it was before my
24  time with the company.
25      Q.   Well, there are published reports

Keglevic

1
2      Q.   And in your proposed
3  reorganization, what happens to this
4  approximately billion dollars in account
5  receivables that these three companies
6  hold?
7      A.   Well, what has happened to date
8  is the parent has funded all of the cash
9  needs of those entities in satisfaction of
10  any liabilities they have.  Once those cash
11  needs are satisfied, if -- you know, and
12  there are no longer any liabilities
13  associated with those entities, I would
14  assume the receivable would be canceled and
15  eliminated in consolidation with the
16  reorganized E.
17      But as I said, those claims
18  against those entities have not been
19  resolved or released as part of our
20  proposed bankruptcy.  So effectively, the
21  ability to pay to recover those receivables
22  to the extent needed will be assumed by the
23  new entity, reorganized EFH, which will
24  begin with a substantial amount of equity,
25  billions -- I think today we calculated 8

Keglevic

1
2  and a half billion dollars in my first
3  round of questioning and also would expect
4  that entity to be an investment grade
5  company.
6        So I think the amount of credit
7  support for the asbestos or other claims of
8  that, of those entities is well secured.
9      Q.   What liabilities does EECI have
10 other than for asbestos and these other
11 post -- other benefits that you mentioned
12 that you calculated around 50 million?
13       MR. McKANE:  Objection to form.
14     A.   I don't have the schedules in
15 front of me, but my understanding is of the
16 group of companies we talked about, that
17 is, those are the total liabilities.  There
18 aren't any additional ones.
19     Q.   Would the same be true of EEC
20 Holdings?
21     A.   Yes, sir.
22     Q.   And the Sacroc as well?
23     A.   Yes, sir.
24     Q.   You do not view these companies
25 as creditors in this bankruptcy, but rather

Keglevic

1
2  as sources of the elimination of these
3  receivables as part of the resolution of
4  the bankruptcy, is that correct?
5        MR. McKANE:  Objection to form.
6        Go ahead.
7      A.   I think I generally agree with
8  you, but can I say it another way, that the
9  claims that those entities have against EFH
10 are not released as part of any part of the
11 bankruptcy, and therefore, will continue,
12 will travel, as I like to call it, with the
13 reorganized EFH.  And, therefore, that will
14 be the source of any required funding of
15 the 50 million dollars or whatever that
16 liability -- those liabilities turn out to
17 be.
18     Q.   No matter how large those
19 liabilities turn out to be?
20     A.   No matter how large those
21 liabilities turn out to be.
22     Q.   When we are told that the plan
23 will pay all E-side creditors in full, you
24 are not including these three subsidiaries
25 collecting their accounts receivables in

Keglevic

1
2  those calculations, are you?
3      A.   I am not.
4        MR. KAZAN:  Is anybody keeping
5  time?
6        (Discussion held off the record)
7      Q.   Now, can you tell me what role,
8  if any, you played in the decision to seek
9  the asbestos bar date and unmanifested
10 claimants?
11     A.   I played a very small
12 insignificant role from a finance
13 standpoint and there was a benefit in
14 seeking a bar date simply because of the
15 bid process that we were running and the
16 fact that the potential bidders were asking
17 us for the best possible estimate we had
18 with respect to what the asbestos claims
19 would be, and without a bar date, it is
20 very difficult to give them a tangible
21 estimate for asbestos.
22       But the legal aspects of it, I
23 unfortunately, will have to kick that
24 decision and how it was done to my co-CRO
25 Ms. Doré after consultation with our legal

Keglevic

1
2  counsel.
3      Q.   Were you able to make a
4  calculation of an estimate of asbestos
5  liabilities for these unmanifested
6  claimants on the assumption that you got
7  the bar date?
8        MR. McKANE:  Objection to form.
9      A.   I don't recall if we have updated
10 our assessment of the liability, in the
11 liability we have on the books, there is a
12 portion of it for asserted claims, and
13 there is a portion for unasserted claims,
14 and I think we are still evaluating the
15 information we have gotten as part of the
16 bar date, and I'm not aware that we have
17 updated our estimate and I'm sure you will
18 agree with me that that is a difficult
19 estimate to produce.
20     Q.   Do you recall what value you put
21 in whatever estimate you did complete on
22 unmanifested claimants?
23     A.   In -- I apologize, I don't have
24 the information in front of me, but I
25 think, my recollection was there was about