# EXHIBIT 14

# Excerpts from 9/28/15 Doré Dep. Tr.

Page 1

```
 1
 2         UNITED STATES BANKRUPTCY COURT
 3          FOR THE DISTRICT OF DELAWARE
 4  -------------------------------------x
 5  In Re:
 6  Energy Future Holdings Corporation,
 7  et al.,
 8                 Debtors.
 9
10  Chapter 11
11  Case No. 14-10979
12  Jointly Administered
13  -------------------------------------x
14
15         DEPOSITION OF STACEY DORÉ
16             New York, New York
17            September 28, 2015
18
19
20  Reported by:
21  MARY F. BOWMAN, RPR, CRR
22  JOB NO. 98268
23
24
25
```

Page 2

```
 1
 2
 3
 4
 5            September 28, 2015
 6               9:00 a.m.
 7
 8
 9       Deposition of STACEY DORÉ held, at
10  the offices of Kirkland & Ellis, LLP, 601
11  Lexington Avenue, New York, New York,
12  before Mary F. Bowman, a Registered
13  Professional Reporter, Certified Realtime
14  Reporter, and Notary Public of the State of
15  New Jersey.
```

Page 3

```
 1
 2            APPEARANCES:
 3  WILMERHALE
 4  Attorneys for Delaware Trust Co. as Indenture
 5  Trustee
 6      7 World Trade Center
 7      New York, NY  10007
 8  by: PHILIP ANKER, ESQ.
 9      DAVID GRINGER, ESQ.
10
11  KIRKLAND & ELLIS
12  Attorneys for the Debtors
13      300 North LaSalle Street
14      Chicago, IL  60654
15  BY: ANDREW McGAAN, ESQ.
16      HOWARD KAPLAN, ESQ
17      MARC KIESELSTEIN, ESQ.
18
19
20  SULLIVAN & CROMWELL
21  Attorneys for E-side Official Creditors
22  125 Broad Street
23  New York, NY 10004
24  BY: BRIAN GLUECKSTEIN, ESQ.
25      VERONICA IP, ESQ.
```

Page 4

```
 1
 2           APPEARANCES:
 3  KRAMER LEVIN NAFTALIS & FRANKEL
 4  Attorneys for EFIH 2nd Lien Note Trustee
 5      1177 Avenue of the Americas
 6      New York, NY 10036
 7  BY: GREGORY HOROWITZ, ESQ.
 8
 9  MONTGOMERY McCRACKEN
10  Attorneys for EFH Committee
11      123 South Broad Street
12      Philadelphia, PA 19109
13  BY: MARK SHEPPARD, ESQ.
14      KATHERINE FIX, ESQ.
15
16  SHEARMAN & STERLING
17  Attorneys for EFIH, First Lien DIP Agent
18      599 Lexington Avenue
19      New York, NY 10022
20  BY: FAY TELONI, ESQ.
```

Page 185

1     S. Doré
2     A.   Will I don't, I don't really know
3  that I have a view on that.  I mean I'm
4  just -- I'm not sure that, to me
5  personally, that it matters whether the
6  rest of the world knows what the fees are.
7  I think what I take responsibility for is
8  that the company knows and is vigilant as
9  vigilant as we can be about the fees.
10    Q.   OK.  Now, let's talk specifically
11 about paragraph R on page 71.  Under the
12 plan -- are you familiar with this
13 provision, Ms. Doré?
14    A.   I am.
15    Q.   Would you say you are very
16 familiar with this provision?
17    A.   I'm pretty familiar with it, yes.
18    Q.   OK.  You see at the beginning it
19 says without any further notice to or
20 action order other approval of the
21 bankruptcy court, the reorganized debtor
22 shall pay on the effective date, the
23 reasonable and documented unpaid fees and
24 expenses incurred on or before the
25 effective date.

Page 186

1     S. Doré
2       So let's stop right there.
3  That's what it says, right?
4     A.   Yes.
5     Q.   Let's stop there for a moment and
6  it is your understanding that those are all
7  fees that were incurred post bankruptcy, is
8  that right?
9     A.   Yes.
10    Q.   And it is -- they are not going
11 to be any fees paid pursuant to this
12 provision that occur after the exit from
13 bankruptcy, correct?  The effective date?
14    A.   On or before the effective date.
15 That's correct.
16    Q.   Now, this provision as opposed
17 to -- and I know, I'm trying to also be
18 efficient here, I know you know who is
19 getting paid under these provisions and I
20 can read it and I know who is getting paid
21 under here.
22       Specifically I would like to know
23 were you involved in the negotiation of
24 this provision?
25    A.   Yes, in the sense that this is

Page 187

1     S. Doré
2  one of the examples we talked about earlier
3  where I did not personally have discussions
4  with anyone associated with the plan
5  sponsors about the provision but I had a
6  lot of discussions with Kirkland about it
7  and provided my views which they then
8  relayed to the parties.
9     Q.   And I have no desire here to ask
10 you about anything that your counsel
11 provided to you, but independently of your
12 counsel, you are an attorney also?
13    A.   Yes.
14    Q.   And I know you're not a
15 bankruptcy attorney but you are a very
16 experienced attorney, are you not?
17    A.   I think so.
18    Q.   You have spent how many years in
19 private practice?
20    A.   11 years.
21    Q.   Where did you work?
22    A.   Vinson & Elkins.
23    Q.   What department were you in?
24    A.   Litigation.
25    Q.   Were you a partner?

Page 188

1     S. Doré
2     A.   Actually, I was not.
3     Q.   Well, that's OK, you are now the
4  general counsel of a huge company.
5       Why is it, from a business
6  perspective, Ms. Doré, why is it that the
7  company is willing to agree to pay these
8  fees without any notice, et cetera?  Tell
9  me what the reasoning is behind that?
10    A.   Well, again, this was a point of
11 negotiation.  This certainly the way it is
12 drafted now is not, it wasn't that -- this
13 wasn't the original language and it stayed
14 that way for ever, there was a lot of back
15 and forth about it.  And I think we viewed
16 at the end of the day the folks who are the
17 plan sponsors and the other parties under
18 this provision believed that if the plan
19 goes effective, because this is only
20 triggered on the effective date, this
21 particular provision, if the plan goes
22 effective, the fees should be paid for a
23 successful transaction and a plan.
24      And we ultimately agreed as part
25 of a package of a lots of gives and takes,

Page 189

S. Doré

2 that we would agree to that and you know,
3 the new owners of both companies are
4 ultimately the ones who are bearing that
5 responsibility because the money is coming
6 out of the companies before they take those
7 companies over. So they are taking them
8 over less than cash and that was in our
9 view kind of their decision to make.
10   Q.   So let me see if I understanding
11 is. So it is your understanding that when
12 they, when the new -- when you say the plan
13 sponsors, in this particular scenario, you
14 are talking about the purchasers, is that
15 right?
16   A.   I am. I am sorry, I have been
17 imprecise with that term because I think
18 under the plan, the plan sponsors are a
19 defined term that mean the E-side investors
20 which is the consortium that consists of
21 Hunt plus some of the unsecured creditors
22 on the T-side.
23       The prospective owners of TCEH,
24 in my mind, I'm including with plan
25 sponsors but that's not technically how it

Page 190

S. Doré

2 is defined under the plan.
3       What I mean is the plan
4 supporters for lack of a better word. So
5 everybody who kind of signed on to the PSA.
6   Q.   So it would be --
7   A.   Maybe PSA parties is a better
8 way.
9   Q.   First lien owner group plus the
10 investor group?
11   A.   Yes.
12   Q.   Is that what you are thinking?
13   A.   Yes and also I think we are
14 agreeing in here to pay the other settling
15 or PSA parties maybe is a bet are way to
16 say it. So that includes for example the
17 TCEH second lien parties who are not -- and
18 my understanding at least, are not part of
19 the investor group but they are part of the
20 PSA support group. It is basically, the
21 way we think about it, basically the
22 parties who agreed to help us bring this
23 plan home.
24   Q.   So you see it more as a success,
25 like a success fee type of a payment?

Page 191

S. Doré

2   A.   Well, it is not a success fee in
3 the strict sense of the word. But because
4 these, because this provision is paying the
5 fees on the effective date, it is presuming
6 a successful reorganization, because by
7 that time, you have gotten plan
8 confirmation, you have gotten regulatory
9 approvals, all the other conditions to the
10 plan have occurred and we now have the
11 ability to exit bankruptcy. So in my view,
12 exiting bankruptcy is success.
13   Q.   Now, a little bit ago, you were
14 saying that, you were viewing that the new
15 purchasers, the new owners are actually
16 going to be taking the companies less the
17 amount of these fees, is that right?
18   A.   That's right.
19   Q.   So would it be correct then
20 what's really happening is that these fees
21 are getting paid by the company as it is
22 now, that by the time it goes into
23 reorganization, that's a new company is
24 going to have -- it's going to be -- the
25 value of that company is going to be less

Page 192

S. Doré

2 than the amount of these fees?
3       MR. McGAAN:   Object to form. You
4 can answer.
5   A.   Well, the provision states that
6 it is the reorganized debtors that shall
7 pay on the effective date.
8       So as a technical matter I think
9 it is the reorganized debtors that pay.
10 But I don't know that that's really
11 relevant, my point is whether you say it is
12 the debtors or reorganized debtors who are
13 actually cutting the check, people who are
14 going to own these companies are taking
15 those companies out of bankruptcy less that
16 cash. And that's their money to spend in
17 my view at that point.
18   Q.   And just for clarification,
19 Ms. Doré, although the prefatory language
20 says the reorganized debtors shall pay,
21 there are different parts of this provision
22 that say, paid for by, for example,
23 different debtors, the reorganize the EFIH,
24 it also says, for example, with respect to
25 under the cash collateral order which fees

Page 193

S. Doré

1  
2  and expenses shall be paid by TCEH or
3  reorganized TCEH, do you see that?
4      A.   Yeah and I think that particular
5  one which I think is the only one --
6      Q.   There is two?
7      A.   That is not reorganized -- OK.
8  Well that one is in recognition of the fact
9  that TCEH is already paying the expenses of
10 the, under the cash collateral order.
11     Q.   Right, well and then let's look
12 at the second paragraph under letter R?
13     A.   Yes.
14     Q.   It provides that with respect to
15 the fees of the TCEH unsecured notes
16 trustee, the TCEH second lien notes
17 trustee, the TCEH second lien notes
18 collateral agent, the members of the TCEH
19 unsecured ad hoc group and the members of
20 the TCEH second lien consortium, that's
21 being paid by the EFH debtors, isn't that
22 what it says?
23     A.   Yes.  That's correct.
24     Q.   Can you explain that to me?
25     A.   So I think that shall did-you

Page 194

S. Doré

1  
2  have to really understand all three
3  documents that are -- there is really four
4  documents that contain fee provisions to
5  kind of understand how this all works
6  together.  And so this is the plan, of
7  course, but if you start with there is a
8  settlement agreement in which -- and I
9  think you're aware of this in which there
10 is a provision that says upon approval of
11 the settlement agreement, that TCEH will
12 pay fees of essentially the junior
13 creditors at TCEH.
14     Q.   Which is pretty much that group
15 that I just read to you?
16     A.   Yes.  So they will pay up to 50
17 million, it is not exactly 50, I don't know
18 how people came up with this number but it
19 is like 49,750 or something.  But up to
20 close to 50 million, they will pay fees
21 that were incurred through June 30 of 2015.
22 So that gets paid under the settlement
23 order.  Then there are provisions in both
24 the back stop agreement and the merger
25 agreement which we think of as more sort of

Page 195

S. Doré

1  
2  transactional related fees.
3      Q.   I think you called them the
4  transactional fees, right?
5      A.   Yes and those are fees of --
6  those are sort of the plan sponsor, the
7  technical plan sponsor under the plan
8  parties' fees that get paid under the
9  merger and back stop agreement upon
10 approval of those agreements, those get
11 paid on a go forward basis.  And then I --
12 so in my view, this plan provision is
13 intended to kind of fill the gap, such that
14 if there are fees of these groups you read
15 that are not paid by the end of the case,
16 and the plan goes effective, so again, it
17 is the reorganized EFIH debtors and their
18 owners who are these parties, some of them,
19 they have made a decision that they would
20 pay those fees at the end and again, our
21 view was that's their money to spend.
22     Q.   And there is also this
23 reimbursement mechanism that happens?
24     A.   Yes.
25     Q.   Could you explain that please?

Page 196

S. Doré

1  
2      A.   So under the settlement
3  agreement, the 50 million that gets pay by
4  the TCEH estate under the settlement
5  agreement would be reimbursed by the
6  reorganized EFH upon the effective date of
7  this plan.  If this plan never goes
8  effective and there is an alternative plan
9  many that gets confirmed with the required
10 alternative terms from the PSA, that
11 contain the 550 million dollars settlement
12 amount to the junior creditors at TCEH,
13 then the fees that TCEH paid under the
14 settlement agreement get deducted from that
15 550 million that goes to the junior
16 creditors.
17     So in effect, TCEH is made whole
18 either way for the fees that it would pay
19 upon approval of the settlement agreement.
20     Q.   You said, with respect to the
21 dollar amount, the 49,750, whatever the
22 exact numbers are, how did the debtors
23 arrive at that number?
24     A.   The number was requested by the
25 parties who were getting paid that amount

Page 197

1    S. Doré
2  and they represented that to be a
3  reasonable estimate of what they thought
4  they had incurred up through that June 30
5  dates that not -- they have not been
6  getting paid to date as you know. So I
7  think they tried to estimate what they
8  thought the fees would be and agreed to cap
9  themselves at that amount. So if it turns
10 out that they were wrong and their fees are
11 more, which is very possible, then there
12 will be some of their fees that don't get
13 paid under that provision.
14    Q.   Did you see any invoices or bills
15 relating to that amount?
16    A.   I have not. But we do have the
17 ability and the obligation when those
18 amounts get paid or when those amounts are
19 sent to us essentially to be paid upon
20 approval of the settlement agreement, they
21 have to be reasonable and documented fees.
22 So it is not like we just have to cut a
23 check for the 49,750. We will have the
24 opportunity at that time to a review the
25 bills and make sure that the fees they are

Page 198

1    S. Doré
2  requesting up to that amount are reasonable
3  and documented and the company will have
4  that obligation. TCEH specifically because
5  it is paying the fees.
6    Q.   Do you know why the payment of
7  the fees and this reimbursement mechanism
8  were put in place?
9       MR. McGAAN: Object to form. Go
10   ahead if you understand.
11   Q.   Do you understand my question?
12   A.   Yeah, I do. Yes, because
13 originally there was a discussion about EFH
14 paying those fees since they were going to
15 the parties who sort of brought this plan
16 to fruition, but I think there was a
17 recognition among all the parties that if
18 the plan was not confirmed, that should not
19 be EFH's obligation.
20      So there was this mechanism set
21 up where TCEH would pay the fees and get
22 reimbursed only upon success by EFH, and if
23 there isn't success, then essentially the
24 fees are coming out of their own pocket.
25   Q.   Right. Now, Ms. Doré, are you

Page 199

1    S. Doré
2  aware that there is at least one -- the
3  U.S. trustee, for example, and possibly
4  other parties that are of the view that
5  these fees cannot be paid in this manner?
6    A.   I am aware of that argument.
7    Q.   OK. And what is your
8  understanding of that?
9       MR. McGAAN: Object to form. You
10   can answer if you understand the
11   question.
12   A.   My understanding like many legal
13 issues in this case apparently, there is a
14 difference of opinion about what the law
15 ==provides and we believe, we believe and I==
16 ==think the plan sponsors parties believe==
17 ==that it is allowed under the law, that==
18 ==there is a reasonable basis for setting it==
19 ==up this way and that's what we plan to==
20 ==argue and we understand that others, in==
21 objecting to the plan or settlement
22 agreement might argue to the contrary and
23 ultimately that will be up to the judge to
24 decide.
25   Q.   And let's say, for example, that

Page 200

1    S. Doré
2  the judge decides that this is not the
3  proper way, and that an application is
4  required to be filed. What happens to the
5  deal?
6    A.   I can't speak for the other
7  parties to the deal. I can only tell you
8  that the agreement is conditioned on the
9  fees being paid.
10      So as a technical matter, at that
11 point, we may have a problem with the deal.
12   Q.   And what is your, what is the
13 debtor's position?
14   A.   The debtor's position is that the
15 fees should be approved as part of plan
16 confirmation and approval of the settlement
17 agreement, the merger and the back stop
18 exactly as they have been put forward.
19   Q.   I should have finished my
20 question.
21   A.   I am sorry.
22   Q.   What is the debtor's position if
23 the court says sorry, we believe that those
24 specific fees, the ones that are being
25 proposed to be paid, and it says here

Page 293

1            S. Doré
2  was primarily really a legal drafting
3  exercise.
4         So I would say in this particular
5  case, yes, I was probably more involved
6  than Paul was.
7    Q.    I think you talked a little bit
8  ago in your answers conveying what you were
9  trying to accomplish with respect to the
10 settlement agreement.  What in your mind is
11 the purpose of this settlement agreement?
12   A.    The purpose of this settlement
13 agreement is to resolve virtually every
14 issue in this case, all intercreditor,
15 interdebtor claims, claims against Ds and
16 Os, claims against sponsors, every claim
17 that can be resolved we've tried to resolve
18 in this settlement agreement.
19        And so the objective of it is to
20 bring full closure and consensus to any
21 plan of reorganization, whether it be the
22 primary plan that we are trying to confirm
23 or an alternative plan.
24   Q.    To your knowledge, what is being
25 settled through the settlement agreement?

Page 294

1            S. Doré
2    A.    Well, again, I think I just
3  stated, certainly all the legacy -- what we
4  call the legacy claims that had been
5  asserted.  If you recall, there were two or
6  three letters that had been sent stating on
7  behalf of the TCEH unsecured creditors
8  committee and TCEH uncured ad hoc committee
9  certain claims that had been asserted in
10 the standing motion.  So certainly those
11 are being settled here.  Any potential
12 claims that any estate might have against
13 Ds and Os and sponsors were being settled,
14 and intercreditor claims, for example,
15 between creditors at the T-side estate are
16 also being settled.
17        So it is a broad settlement of
18 claims in the case and all intercompany
19 claims.
20   Q.    And you as co-CRO recommended the
21 approval of this settlement agreement to
22 the boards of directors, right?
23   A.    Yes.
24   Q.    And Ms. Doré, do you have an
25 understanding that the plan of

Page 295

1            S. Doré
2  reorganization is conditioned on approval
3  of this settlement?
4    A.    Yes.
5    Q.    Do you have an understanding as
6  to why that's the case?
7    A.    Because, again, that was part of
8  the essential package that was agreed to
9  was that for this plan to be confirmed,
10 there needed to be full releases of all of
11 the participating parties, and that
12 included all the debtors, intercompany
13 debtors and claims against debtors.  It is
14 a package deal.  I think there is a lot of
15 attempt to separate things and parse things
16 out because certain parties like certain
17 things and certain parties don't like
18 certain things, but it all rises or falls
19 together.
20   Q.    And you say it rises or falls
21 together.  With respect to the settlement
22 agreement though, that rises or falls
23 because the debtors sought to have this
24 condition, correct?
25   A.    We certainly wanted that.  But it

Page 296

1            S. Doré
2  wasn't just the debtors.  The TCEH first
3  liens very much wanted the settlement
4  releases, all the releases to happen in
5  order for this deal to take effect.
6    Q.    And that's because as you alluded
7  to earlier, part of the settlement
8  agreement relates to intercompany T-side
9  claims?
10   A.    That's right.
11   Q.    From your perspective as the
12 debtors, why did you view it as important
13 to have the plan conditioned on the
14 approval to settle?
15   A.    Well, from our perspective, what
16 was important was to have the settlement
17 agreement approved.  That was the most
18 important thing, because that -- if the
19 settlement agreement is approved, then we
20 have the benefit of the settlement
21 agreement, even if the plan ultimately
22 isn't confirmed, for whatever reason.  And
23 the settlement agreement stands alone.  We
24 had considered, you know, way back last
25 spring, embodying the disinterested

Page 297

1           S. Doré
2  director settlement in a 9019 and getting
3  separate approval.  We had discussions
4  about that.
5       So that was something that we had
6  always contemplated having approval of on a
7  stand-alone basis was to settle the
8  intercompany claims.
9       So having the plan be conditioned
10 on the settlement agreement, I actually
11 think while we agree with it, I think that
12 was more of a request of some of the
13 supporting parties.  Because if the
14 settle -- just to be clear, if the
15 settlement agreement is approved but the
16 plan is not confirmed, we still have the
17 benefit of the settlement agreement, and we
18 can still use that to our benefit in an
19 alternative plan to avoid litigation.
20    Q.   Based on that, would the debtors
21 be comfortable pursuing this settlement
22 agreement in the absence of the plan of
23 reorganization that's on the table right
24 now?
25    A.   Well, that's not the deal that we

Page 298

1           S. Doré
2  struck.  I mean, I don't know.  In some
3  hypothetical scenario would we -- if we
4  couldn't have gotten to agreement on the
5  plan itself, would we have pursued the
6  settlement agreement anyway?  Maybe.  But I
7  don't think that -- I don't think that the
8  investor group, the TCEH unsecureds would
9  have -- they would have never entered into
10 the settlement agreement without us
11 agreeing to pursue the plan that has them
12 acquiring the company.  That's the benefit
13 of their bargain.  That's the deal we
14 struck.
15    Q.   You talked about that you
16 considered as far back as the spring
17 proceeding with the disinterested director
18 intercompany claim settlement, outside of a
19 plan.
20    A.   We talked about it.  Not -- that
21 didn't rise to the level of the board, but
22 there were discussions with the
23 disinterested director advisors and some of
24 the creditor advisors about whether that
25 would be something to pursue, and

Page 299

1           S. Doré
2  ultimately we decided having the settlement
3  in a plan at the time was sufficient,
4  because we still had a long way to go in
5  terms of trying to figure out, you know,
6  what was going to happen in auction, who
7  was going to ultimately acquire the EFH
8  side.  So it didn't seem necessary to push
9  forward with it separately, but it was
10 something we did talk about and discussed.
11    Q.   In connection with the current
12 plan, did you consider embodying the
13 intercompany claim settlement in the plan
14 as opposed to a separate settlement?
15    A.   I'm sure we did at some point.
16 We talked about so many different
17 permutations of how we were going to do
18 this.  There was probably some point we
19 talked about doing that, but it is not
20 ultimately the way we agreed to do it.
21    Q.   From your perspective, as co-CRO,
22 was there a business reason, in your mind,
23 as to why this time the settlement is
24 outside of the plan?
25    A.   Yeah, it is what I said.  I think

Page 300

1           S. Doré
2  we viewed it as valuable to have the
3  settlement agreement approved outside of
4  the plan because if it is approved,
5  hopefully the plan gets confirmed and we
6  have both.  But if for some reason the plan
7  isn't confirmed or the plan is confirmed
8  and doesn't go effective, we still have the
9  benefit -- all the estates still have the
10 benefit of the settlement agreement, and we
11 have essentially avoided costly, lengthy
12 and contentious litigation for the rest of
13 the case.
14    Q.   Is it fair then from the debtor's
15 perspective, if you need to pursue an
16 alternative plan, that you viewed the
17 settlement agreement as helping to
18 facilitate that?
19    A.   Yes.
20    Q.   Is that the main purpose of
21 having the settlement agreement outside of
22 the plan and structuring it that way for
23 the purposes of this transaction?
24    A.   It is one purpose.  I don't know
25 if it is the main purpose.  The main

Page 309

         S. Doré
1
2    Q.   And has your view changed on that
3   between August and today?
4    A.   It has not.
5    Q.   I don't intend for this to be a
6   memory test, but as you sit here, the
7   current plan of reorganization that's
8   before the court, what conditions do you
9   recall being discussed in agreeing to --
10  agreeing to pursue this plan?
11   A.   Are you talking about conditions
12  to effectiveness of the plan itself?
13   Q.   Correct. Again, understanding
14  that there are conditions in the plan, I
15  just want your understanding of the
16  conditions, as you see them, that were
17  discussed in agreeing to pursue this plan?
18   A.   I want to make sure I understand
19  what you're asking, because there are
20  listed conditions precedent to the
21  effectiveness in the plan, which I'm happy
22  to walk through. There is a handy dandy
23  list in the plan itself. But if you are
24  saying are there other conditions that we
25  tried to assert in negotiations -- I'm not

Page 310

         S. Doré
1
2   sure I understand your question.
3    Q.   Let's start with, of the list
4   that exists in the plan, that are the
5   conditions that exist in the currently
6   filed plan, what -- which of those
7   conditions did you recall specifically
8   discussing as an area of concern prior to
9   filing the plan?
10   A.   As an area of concern? Can you
11  be more specific about that?
12   Q.   Conditions that the debtors were
13  concerned about being in this plan -- that
14  you ultimately got comfortable with -- in
15  agreeing to this plan?
16   A.   Conditions that we initially
17  didn't want in the plan and then agreed to?
18  I'm sorry, I'm just -- I want to make sure
19  I'm answering the right question.
20   Q.   Let's start with whether it is
21  conditions you wanted or didn't want but
22  conditions that were of concern to you. So
23  if that's because you didn't want them,
24  that's fine.
25   A.   I mean, all the conditions are of

Page 311

         S. Doré
1
2   concern to me because I want to make sure
3   we meet them. So I, if you could rephrase
4   your question, I'm having a hard time
5   understanding you.
6    Q.   Are there conditions in the plan
7   currently that you are concerned will not
8   be met?
9    A.   No.
10   Q.   How is it that you got
11  comfortable in agreeing to pursue this plan
12  that, in your view, the conditions will, in
13  fact, be met?
14   A.   Through a lot of conversations
15  with counterparties, with advisors, through
16  my own independent evaluation, through
17  conversations with external parties, a lot
18  of thought and diligence has gone into
19  making sure that this plan is achievable.
20  And to the extent that the conditions are
21  within the company's control, our team
22  is -- I have every confidence that our team
23  will execute on what we are required to
24  execute on, because we have one of the most
25  talented and dedicated and committed teams

Page 312

         S. Doré
1
2   around, and everybody is laser focused on
3   getting this plan done. You could not have
4   a more motivated management team to make
5   sure that every condition in this plan is
6   met, to the extent that it is within our
7   control.
8    Q.   Who was tasked with assessing the
9   ultimate risk of whether or not this plan
10  will close?
11   A.   Well, close or will be confirmed?
12   Q.   Will close.
13   A.   Assuming confirmation?
14   Q.   Assuming confirmation?
15   A.   I don't know that anybody was
16  given the task specifically of assessing
17  the risk of closing. It was something that
18  we considered, of course, in our
19  negotiations, and it was the motivation
20  behind many of the provisions that we
21  negotiated was to do everything we could to
22  increase the likelihood of the plan
23  closing, and we spent a lot of time
24  thinking about and talking to our board,
25  both Paul and I did and the advisors, as

Page 313

S. Doré

well as people on my team and people on Paul's team, and everyone who is looking at this tried to think through every risk that there was and do everything we could to mitigate those risks.

So I don't think there was a particular person tasked with it. It was an essential part of the negotiation in the entire process.

Q. And that assessment of risk was done, was that done by you and Paul?

A. I think I just said it was done by the entire team who was working on this.

Q. What factors did the team consider in assessing the likelihood of the transaction to close?

A. We considered the incentives of the counterparties to close. We considered the relationships of the various parties that they had with regulators. We considered the legal merits and risks of certain positions that parties were taking. We considered the financial wherewithal of the parties who were making investments.

Page 314

S. Doré

We considered the disincentives that they would have not to close. We considered our own relationships. We considered the timeline. We considered interest rates and value of, you know, Oncor and a lot of different factors. That's not an exhaustive list.

Q. Couple of follow up on a few of these points.

You included there the value of Oncor. You considered in your analysis of risk of closing, the fact -- the value of Oncor at the time of closing would be relevant to whether the deal closes?

A. Sure.

Q. And you considered a potential change in market conditions. Did you consider that from the perspective of whether -- how that will influence the investors and their decision to close?

A. We did consider that they -- we assume that they will take the market conditions into account as any party who is being asked -- who has agreed to invest 12

Page 315

S. Doré

billion dollars would do. What we can't predict is what those market conditions would be. But we have every reason to believe and to be confident that the market conditions will be such that they will close.

Q. You would agree as rational actors, the investors will make a decision on that based on the economic conditions at the time?

A. Absolutely, and anyone purchasing a company would make that same evaluation.

MR. McGAAN: When you get to a good point for a break, whenever.

MR. GLUECKSTEIN: This is an OK point for a break. Why don't we take a short break.

THE VIDEOGRAPHER: The time is 4:25 p.m. We are going off the record.

(Recess)

THE VIDEOGRAPHER: The time is 4:46 p.m. We are back on the record with video number 6.

Q. Ms. Doré, before the break, we

Page 316

S. Doré

were talking about the risk of closing on this transaction, do you recall that discussion?

A. I do.

Q. What did you ultimately conclude with respect to the likelihood of closing on this transaction if you reached one?

A. We concluded that it was likely to close.

Q. Did you, in your mind, quantify that likelihood in any way?

A. No.

Q. And the basis for that was just a consideration of the multiple factors we talked about before the break?

A. Correct.

Q. What remedies do the debtors have if the conditions to closing are met but the purchaser chooses not to close the transaction?

A. Well, we have the settlement agreement, we will have full resolution of all of the issues in the case that could have been contested, and we have agreement