# EXHIBIT 19

# Excerpts from 10/5/15 Baker Dep. Tr.

Page 1

```
 1              KIRK BAKER
 2       UNITED STATES BANKRUPTCY COURT
 3       FOR THE DISTRICT OF DELAWARE
 4 ---------------------------------------x
 5 In Re:
 6 Energy Future Holdings Corporation,
 7 et al.,
 8           Debtors.
 9 Chapter 11
10 Case No. 14-10979
11 Jointly Administered
12 ---------------------------------------x
13
14        DEPOSITION OF KIRK BAKER
15           New York, New York
16           October 5, 2015
17
18
19
20
21
22
23 Reported by:
24 KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25 JOB NO. 98601
```

Page 2

```
 1              KIRK BAKER
 2           October 5, 2015
 3
 4      Deposition of KIRK BAKER, held
 5 at Kirkland & Ellis LLP, 601 Lexington
 6 Avenue, New York, New York, before Kathy
 7 S. Klepfer, a Registered Professional
 8 Reporter, Registered Merit Reporter,
 9 Certified Realtime Reporter, Certified
10 Livenote Reporter, and Notary Public of
11 the State of New York.
```

Page 3

```
 1              KIRK BAKER
 2       A P P E A R A N C E S:
 3 KIRKLAND & ELLIS
 4 Attorneys for the Debtors
 5    555 California Street
 6    San Francisco, California  94014
 7 BY:  ANNA TERTERYAN, ESQ.
 8      BRENTON ROGERS, ESQ. (Telephonic)
 9
10 SULLIVAN & CROMWELL
11 Attorneys for E-side Official Creditors
12    125 Broad Street
13    New York, New York  10004
14 BY:  JOHN HARDIMAN, ESQ.
15      DAVID ZYLBERBERG, ESQ.
16
17 MONTGOMERY McCRACKEN WALKER & RHOADS
18 Attorneys for EFH Committee
19    123 South Broad Street
20    Avenue of the Arts
21    Philadelphia, Pennsylvania  19109
22 BY:  MARK SHEPPARD, ESQ.
```

Page 4

```
 1              KIRK BAKER
 2       A P P E A R A N C E S:  (Cont'd.)
 3
 4 NIXON PEABODY
 5 Attorneys for American Stock Transfer as Indenture
 6 Trustee at EFH
 7    100 Summer Street
 8    Boston, Massachusetts  02110-2131
 9 BY:  RICHARD PEDONE, ESQ.
10
11 AKIN GUMP STRAUSS HAUER & FELD
12 Attorneys for UMB Bank, As Indenture Trustee for the
13 Unsecured 11.25 Percent/12.25 Percent Senior Toggle
14 Notes Due 2018
15    One Bryant Park
16    New York, New York  10036
17 BY:  CHRISTOPHER CARTY, ESQ.
18
19 MORRISON & FOERSTER
20 Attorneys for Official Committee of Unsecured
21 Creditors for TCEH
22    250 West 55th Street
23    New York, New York  10019-9601
24 BY:  SAMANTHA MARTIN, ESQ.
```

Page 13

1         KIRK BAKER
2  Hunt Group and the debtor about potentially
3  purchasing Oncor?
4     A.   Yes.
5     Q.   When did those occur?
6     A.   I don't remember dates.  Generally, we
7  would have been in communication with EFH
8  management about wanting to be participants in
9  the process to help facilitate an acquisition of
10 Oncor.
11    Q.   Prior to the bankruptcy, had there
12 been any communications between the Hunts and
13 either management of Oncor or EFH about the
14 Hunts having an interest in purchasing Oncor?
15    A.   Yes.
16    Q.   When did those first occur?
17    A.   First occurred prior to the original
18 LBO of EFH, and then continued in connection
19 with the LBO and following.
20    Q.   And who were those communications
21 with, specifically, if you remember?
22    A.   I won't remember specifics.  We spoke
23 with John Wilder; we spoke with other management
24 at EFH, I don't remember specifically whom; and
25 I would have spoken with KKR.

Page 14

1         KIRK BAKER
2     Q.   Did any of those discussions advance
3  to the stage of the Hunts making a proposal to
4  acquire Oncor?  And this is the pre-bankruptcy
5  discussions.
6     A.   Are we talking pre-bankruptcy?
7     Q.   Pre-bankruptcy.  In this question
8  pre-bankruptcy.
9     A.   And pre-LBO?
10    Q.   Just pre-bankruptcy, so as far as back
11 as possible.
12    A.   Yes, Hunt -- in connection with the
13 original LBO, Hunt made a -- a consortium made
14 an offer to acquire Oncor.
15    Q.   And what happened with that bid?
16    A.   We were told no, they weren't
17 interested.
18    Q.   Other than that proposal, are there
19 any other proposals made by the Hunts for Oncor?
20    A.   No.
21    Q.   Once the bankruptcy was announced, and
22 I think you testified that there were
23 communications before the bidding process began
24 that the Hunts would like to be involved, who
25 did you have those communications with?

Page 15

1         KIRK BAKER
2     A.   Tony Horton, Paul Keglevic, John
3  Young.
4     Q.   And these were all executives of EFH?
5     A.   Uh-huh.
6     Q.   Did you have discussions with any
7  other parties other than the EFH representatives
8  you just stated?
9          And I should say not internal Hunt
10 people or advisors, but people from the EFH
11 side.
12         MR. BECKWITH:  So could you rephrase?
13 I lost that.
14         MR. HARDIMAN:  Sure.  Sure.
15    Q.   Other than the three people you just
16 stated -- and this is the period prior to making
17 your bid, the Hunt bid in the process -- other
18 than those three people, did you have
19 communications with anybody else from the EFH
20 side.
21    A.   Okay, that's from EFH, right?
22    Q.   Yes.
23         What I'm trying to exclude is I assume
24 that within the Hunt Group you had discussions
25 with people at the Hunt Group and you had

Page 16

1         KIRK BAKER
2  discussions with your own advisors.  I'm talking
3  about the people who would have been on the
4  other side of any kind of transaction.
5     A.   Yes, there had been conversations with
6  EFH management over the course of, I think, the
7  ownership of EFH since the LBO.  Those three
8  parties come to mind, but there would have been
9  other parties involved too, Tax Department,
10 Accounting Department, Legal Department.  I
11 don't remember specifically.
12    Q.   I'm focusing right now only on the
13 time period after the bankruptcy was announced
14 before you put your bid in.
15    A.   Okay.
16    Q.   Were there any other parties you spoke
17 to in that period?
18         MR. BECKWITH:  Let me just object.
19 Vague.  Because when you say "any other
20 parties," you lost me on that.
21    Q.   Anybody else from the EFH side?
22         MR. BECKWITH:  That's what I thought
23 you meant.  Okay.
24    A.   After bankruptcy, before bidding?
25    Q.   Right.

Page 105

KIRK BAKER

2      MR. BECKWITH: Same objection.
3   A.   I don't want to try to remake the
4  contract, and I'm surprised that you don't have
5  the contract. It stands --
6   Q.   We do have the contract. I'm sorry.
7        If you could --
8   A.   The contract would stand on its own.
9  I don't recall that there -- I just don't recall
10 that.
11     MR. BECKWITH: Why don't we take our
12 hour break now and let you find the
13 contract.
14     MR. HARDIMAN: Okay. You want to take
15 a break? It's up to you.
16     MR. BECKWITH: We've been going an
17 hour. Let's take a break.
18     THE WITNESS: Okay. We'll take a
19 break.
20     (Recess; Time Noted: 3:41 p.m.)
21     (Time Noted: 3:52 p.m.)
22 BY MR. HARDIMAN:
23  Q.   Am I correct that the acquisition
24 vehicle for the contemplated transaction are
25 entities called Ovation?

Page 106

KIRK BAKER

2   A.   Yes.
3   Q.   Are there underlying contracts among
4  the members of the consortium behind Ovation?
5   A.   Underlying contracts?
6   Q.   Yes. Are there contracts among the
7  group that make up the consortium that is behind
8  Ovation?
9   A.   I believe there is an interim
10 investors agreement or term sheet, yeah.
11  Q.   Are there corporate governance
12 documents regarding Ovation?
13  A.   Ovation -- no, Ovation is presently
14 owned by Hunt, and those -- the charter and
15 documents are presently being drafted.
16  Q.   Okay.
17  A.   That would be facilitated and become
18 the amended charter.
19  Q.   Okay. Does the interim investors
20 agreement or term sheet lay out whatever
21 remedies there are amongst the consortium
22 members against each other if they don't perform
23 their obligations?
24     MR. SHORE: Object to the form.
25  A.   I don't recall the specifics, but I

Page 107

KIRK BAKER

2  don't -- I don't -- I recall that -- defining
3  the parties roles and obligations, but I don't
4  remember a remedies section. I could -- if you
5  have one, I could look at it.
6   Q.   You don't remember one way or the
7  other if there's --
8   A.   No.
9   Q.   Do you think generally there is one in
10 there?
11     MR. SHORE: Objection to form.
12  A.   I just don't recall.
13  Q.   Who has been in charge of drafting
14 those documents?
15  A.   Baker Botts and White & Case.
16  Q.   In preparation for this deposition, I
17 take it you didn't review any of those
18 documents?
19  A.   No.
20  Q.   Let's go back to the approvals. Let's
21 talk about the FERC approval process.
22       Who is spearheading that?
23  A.   In both the PUCT filing and the FERC
24 filing, you have to have a lead filer who is
25 seeking the approval of the regulatory agency.

Page 108

KIRK BAKER

2  In both those cases, basically it's the Ovation
3  entity, with Hunt leading the efforts.
4   Q.   And who at Hunt --
5   A.   Involved --
6   Q.   I'm sorry.
7   A.   Involved would also be Oncor and EFH.
8   Q.   Who at Hunt is leading those efforts?
9   A.   Ralph Goodlet.
10  Q.   And what stage is that approval
11 process in?
12  A.   The FERC approval?
13  Q.   Yes.
14  A.   I believe the FERC filing occurred
15 last week.
16  Q.   What is the timeframe of the FERC
17 approval process?
18  A.   I'm not trying to be difficult. As I
19 recall, and I've been through one FERC approval
20 process in connection with our acquisition --
21 "our" being not Oncor, but when we acquired a
22 regulated utility named Caprock and closed into
23 a lessee/lessor structure, we had to get PUCT
24 approval then and FERC approval.
25       I do not recall a specific timeline

Page 109

KIRK BAKER

2 for the FERC to grant or deny approval of the
3 particular transaction. As I recall, it was
4 shorter than the Public Utility Commission of
5 Texas.
6   Q. Do you have any view on the likelihood
7 of the transaction receiving FERC approval?
8      MR. SHORE: Object to the form.
9   A. I'm not a regulatory expert, but yes,
10 it is my view that we will receive regulatory
11 approval from the FERC and the Public Utility
12 Commission of Texas; otherwise, we wouldn't be
13 sitting here today.
14   Q. And I take it that's based on -- based
15 on what, I should say, both of those --
16   A. Experience. We've had the opportunity
17 to acquire transmission and distribution assets.
18 We received a private letter ruling approving
19 them as being owned by real estate. We have
20 received regulatory approval from the PUCT and
21 FERC for lessee/lessor. InfraREIT is now a
22 publicly traded REIT, so that's experience.
23   Q. How about the IRS private ruling
24 that's also a condition to the closing, what
25 stage is that process in?

Page 110

KIRK BAKER

2   A. There's been an original submission,
3 and within the last three weeks, maybe -- maybe
4 30 days -- I'm going to get those dates wrong.
5 Generally, within the last month, there's been a
6 supplemental filing for that private letter
7 ruling to request to pick up the specifics of
8 this transaction.
9   Q. And who is spearheading that process?
10   A. Kirkland & Ellis will spearhead that
11 along with Thompson & Knight.
12   Q. Just with respect to the PUC, have you
13 received any analyses from anybody as to the
14 likelihood of obtaining the PUC approval?
15      MR. BECKWITH: I assume you're not
16   asking for attorney analysis.
17   Q. I'm not asking what the analyses is.
18 I'm just asking right now whether he's gotten it
19 from anybody. You don't have to tell me what's
20 in it.
21      MR. BECKWITH: Don't reveal any
22   attorney-client communications by answering
23   that question, but you can answer whether or
24   not they exist.
25   A. I'm not aware of any specific analysis

Page 111

KIRK BAKER

2 being done as to the likelihood of approval.
3     We have the same legal team and
4 business execution team that facilitated the
5 transactions that I described before for the
6 Public Utility Commission of Texas.
7   Q. Have you seen any analysis of the
8 likelihood of obtaining FERC approval?
9      MR. BECKWITH: Same objection and
10   instruction.
11   A. And no, same answer.
12   Q. How about the IRS private ruling, have
13 you seen any analysis of the likelihood of
14 obtaining that?
15      MR. BECKWITH: Same.
16   A. No, no specific analysis.
17   Q. Do you have a view as to the
18 likelihood of obtaining that?
19   A. Yes, I believe --
20      MR. BECKWITH: Asked and answered.
21   A. I believe we will receive it.
22   Q. Are you as confident in that as you
23 are with respect to the FERC and the PUCT?
24   A. Yes.
25   Q. And what's that based on?

Page 112

KIRK BAKER

2   A. Experience.
3   Q. Anything else?
4   A. Thirty years of experience.
5     We asked -- I am the person who is in
6 charge of the original request for a private
7 letter ruling to place transmission and
8 distribution assets into a lessee/lessor
9 structure and facilitate a REIT, so I have
10 received in my career private letter rulings
11 from the IRS in the past, including one that
12 would be very close to this one that's being
13 sought.
14   Q. Going back to the time period before
15 the plan of reorganization was signed up when
16 you were in the process of putting together the
17 joint proposal with the T-unsecureds, were you
18 concerned or, should I say, the Hunts concerned
19 that the level of conditionality might cause the
20 debtors not to agree to the transaction?
21      MR. SHORE: Objection to form.
22      MS. TERTERYAN: Object to the form.
23   A. I'm sorry, the stereo --
24      MR. BECKWITH: That's all right.
25   He'll rephrase.

Page 153

1         KIRK BAKER
2 case your plan falls through?
3   A.  Yeah.
4       MR. BECKWITH: Objection.
5   A.  That might be a --
6       MR. BECKWITH: Lack of foundation.
7   A.  Yeah, as I recall, what was being
8 sought was the ability, if our transaction was
9 unsuccessful and did not close, she did not want
10 the parties to our transaction to come back and
11 gripe about whatever alternative transaction
12 needed to be proposed to get out of bankruptcy.
13     That is why you would have had the --
14 be very important for the T-unsecureds to agree
15 to disarmament and for us to agree to the
16 inappropriately named "sore loser."
17   Q.  Coming back to the actual transaction
18 that's on the books, assuming the conditions are
19 satisfied, are the Hunts committed to going
20 through with the transaction even if they view
21 at the time of closing that it's not in their
22 best economic interests?
23       MR. SHORE: Objection to form.
24   A.  Wow.
25       MR. BECKWITH: Same.

Page 154

1         KIRK BAKER
2   A.  Are the Hunts committed -- I believe
3 we signed documents that would say if the
4 conditions precedent have been satisfied, we
5 fund.
6   Q.  And are you prepared to do that even
7 if it's against your economic interests at the
8 time?
9       MR. BECKWITH: Objection. Form.
10   A.  Typically, we would be prepared to --
11 I can't think of a time in which the Hunts would
12 say we are not inclined to fulfill our
13 contractual obligations, so yes.
14   Q.  Why haven't you agreed then for there
15 to be any remedy that the EFH debtors would have
16 against you in the -- in the circumstance that
17 you choose not to close?
18       MS. TERTERYAN: Objection to form.
19       MR. BECKWITH: Objection.
20 Speculation.
21       MR. SHORE: Objection to form.
22   A.  I don't know.
23   Q.  Are you stating definitively now that
24 you will close the transaction even if, in your
25 view, the asset has lost value?

Page 155

1         KIRK BAKER
2       MR. BECKWITH: Objection. Asked and
3 answered.
4       MR. SHORE: Objection to form.
5   A.  I think, to the extent that we have a
6 contractual obligation, we would anticipate that
7 we would be expected to fulfill that contractual
8 obligation or be sued.
9   Q.  And if you are sued, who can sue you
10 and what are your --
11   A.  I don't know all the --
12       MR. BECKWITH: Objection.
13 Speculation. Calls for a legal conclusion.
14   Q.  Do the debtors have any legal recourse
15 against you?
16       MR. BECKWITH: Same objection.
17       MS. TERTERYAN: Objection to form.
18       MR. SHORE: Objection to form.
19   A.  I'm not a litigator so I don't know.
20   Q.  If in fact -- hypothetical, we're
21 speaking for the moment -- the debtors have no
22 recourse against you and you determine -- and
23 therefore you would have no liability to the
24 debtors, and you determine that the transaction
25 is no longer in the Hunt's best economic

Page 156

1         KIRK BAKER
2 interests, would you still close it?
3       MR. SHORE: Object to the form.
4       MR. BECKWITH: Objection.
5 Speculation.
6   A.  I don't know. I would say we've been
7 pursuing the purchase and acquisition of Oncor
8 and other T&D assets for a decade. If we didn't
9 believe that we were going to close on this
10 transaction and fulfill all the conditions
11 precedent, we wouldn't be here.
12   Q.  I think you said before that there is
13 a financial -- strike that -- that there are
14 certain investors on your side of the bid?
15   A.  There are --
16       MR. BECKWITH: I don't think there's a
17 question.
18       THE WITNESS: Okay.
19   Q.  Am I correct?
20   A.  There are certain members of the
21 consortium that are sometimes thought of more as
22 Hunts.
23   Q.  Okay. Do you have certain obligations
24 to those investors' contractual obligations?
25       MR. BECKWITH: Objection. Calls for