55. The Debtors acknowledge that holders of the PCRB Claims are not receiving *pari passu* treatment with respect to the distribution on account of the waiver of the TCEH First Lien Deficiency Claims. *See* Disclosure Statement, Art. V.E.29, p. 131 ("Holders of PCRB Claims do not receive any share of the recoveries on the TCEH First Lien Deficiency Claim."); Art. I.C.2(c), p. 13 ("if the Court finds that the PCRBs must share *pari passu* with other Holders of TCEH Unsecured Debt Claims" and "[i]n the event the PCRBs were to receive *pari passu* treatment under the Plan").

56. Although the TCEH estate holds billions of dollars in causes of action against the holders of the TCEH First Lien Claims, the Plan proposes to deny the holders of the PCRB Claims *any* share in the proceeds (*i.e.*, the distribution on account of the deficiency "waiver") of the release of such causes of action while all other Class C4 creditors are entitle to share in those proceeds. The net effect of that disparate treatment – to which the holders of the PCRB Claims have not consented – is a distribution that is approximately $30 million to $200 million less than the distribution on account of the PCRB Claims if treated *pari passu* with the other Class C4 claims.

57. As a result of Settlement Agreement and Art. IV.B.15 of the Plan, the PCRB Claims do not recover *pari passu* with the other Class C4 TCEH Unsecured Debt Claims, *unless* this Court orders otherwise. Thus, the Settlement Agreement and Plan violate section 1123(a)(4) of the Bankruptcy Code, unless this Court accepts the invitation in the Settlement Agreement and Plan to order that the PCRB Claims be treated *pari passu* with respect to distributions on account of the TCEH First Lien Deficiency Claims. *See Schroeder*, 407 B.R. at 592 (section 1123(a)(4) violated where plan provided a 100% distribution to some claims in a given class and 130% to

other claims in that same class, because the holders of the claims proposed to receive 130% had relinquished claims in an entirely different class).

58. In summary, the Settlement Agreement and Plan violate section 1123(a)(4) of the Bankruptcy Code by failing to provide the "same treatment" for holders of the PCRB Claims – and cannot be approved.

### B. There are No Specific and Justifiable Grounds to Justify Departure from the Bankruptcy Code's Distribution Scheme.

59. In *Jevic Holdings Corp.*, the Third Court held that "bankruptcy courts may approve settlements that deviate from the priority scheme of § 507 of the Bankruptcy Code only if they have *specific and credible grounds* to justify [the] deviation." *Jevic Holdings Corp.*, 787 F.3d at 184 (emphasis added) (quoting *Iridium*, 468 F.3d at 466) (internal quotation marks omitted).[4] The Debtors have offered no "specific and credible" grounds to justify a departure from the Bankruptcy Code's distribution scheme and approve the Settlement Agreement.

---

[4] This is not a case where a secured lender is distributing its own property, which it may do without regard for the Bankruptcy Code's distribution priorities. *See In re ICL Holding Co.*, No. 14-2709, 2015 WL 5315604 (3d Cir. Sept. 14, 2015). This case involves the holders of TCEH First Lien Claims purporting to "gift" the distribution on account of the TCEH First Lien Deficiency Claims to (i) Class C4 unsecured creditors other than the holders of the PCRB Claims and (ii) Class C5 unsecured creditors. The District Court has "flatly rejected" the proposition that creditors are free to do whatever they wish with their bankruptcy dividends, which are property of the estate. *See In re Armstrong World Indus., Inc.*, 320 B.R. 523, 540 (D. Del. Feb. 23, 2005), *aff'd*, 432 F.3d 507, 514 (3d Cir. 2005) (declaring that cases allowing secured creditors to gift "do not stand for the unconditional proposition that creditors are generally free to do whatever they wish with the bankruptcy proceeds they receive"); *see generally* Kenneth N. Klee, Adjusting Chapter 11: Fine Tuning the Plan Process, 69 AM. BANKR. L.J. 551, 570-71 (1995) ("Although the argument can be and has been made that senior creditors should be entitled to do what they want with their property, the lessons of history should suffice to impose a *per se* rule that precludes senior creditors from collaborating with junior creditors or equity owners at the expense of intervening classes.") (footnotes omitted); *see also Rahman v. Oncology Assoc., P.C.*, 269 B.R. 139 (D. Md. 2001) (stating that "a settlement cannot uphold an impairment of rights accomplished in violation of applicable legal rules"); *see also Findley v. Blinken (In re Johns-Manville)*, 982 F.2d 721, 750 (2d Cir. 1992) (In declining to approve a settlement relating to asbestos litigation, the Second Circuit stated, "we cannot uphold as sensible' or 'useful' or 'fair' or 'even achieving the most good for the most people' an impairment of rights accomplished in violation of applicable legal rules.").

### 1. The Settlement Agreement Can Be Approved and the Plan Can Be Confirmed if the Court Orders *Pari Passu* Treatment of the PCRB Claims.

60. In a "close-call," the Court in *Jevic Holdings Corp.* approved a settlement that did not comply with the distribution provisions of the Bankruptcy Code because it "remained the least bad alternative since there was 'no prospect' of a plan being confirmed and conversion to Chapter 7 would have resulted in the secured creditors taking all that remained of the estate in 'short order.'" *Id.* Here, the opposite is true.

61. The Settlement Agreement *can* be approved and the Plan *can* be confirmed if the Court orders that holders of the PCRB Claims must share *pari passu* in the distribution on account of the waiver of the TCEH First Lien Deficiency Claims. The Debtors wisely included provisions that would allow the Settlement Agreement and Plan to proceed if the Court rules that the PCRB Claims are entitled to share *pari passu* in the distribution on account of the TCEH First Lien Deficiency Claims waiver. *See* Settlement Agreement at § 2.2(b) ("if the Bankruptcy Court . . . determines that the Limited Waiver cannot be for the benefit of only the Beneficiary-Claimants, . . . then the Limited Waiver shall be for the benefit of the Beneficiary-Claimants *and such other holders of Allowed Unsecured Claims* against the TCEH Debtors *as ordered by such court*") (emphasis added); Plan, Art. IV.B.15, p. 64 ("for the purposes of this Plan and the settlements and compromises incorporated herein or contemplated hereby, and *unless otherwise ordered by the Bankruptcy Court* . . . (a) Holders of Allowed TCEH First Lien Deficiency Claims will waive or be deemed to have waived . . . any recovery or distribution on account of . . . such Allowed TCEH First Lien Deficiency Claims . . . for the benefit of Holders of Allowed TCEH Deficiency Recipient Claims") (emphasis added).

62.     Thus, the Court should (i) deny the Motion as filed or (ii) approve it on the condition that the PCRB Claims share *pari passu* in the distribution on account of the TCEH First Lien Deficiency Claims waiver.

### 2.   Withdrawal of the Standing Motions Does Not Justify the Unequal Treatment of the PCRB Claims.

63.     The Debtors have asserted that the preferential treatment of the Beneficiary-Claimants is justifiable on the grounds that the TCEH Official Committee and the TCEH Unsecured Ad Hoc Group are withdrawing the Standing Motions with respect to claims against the holders of the TCEH First Lien Claims.[5]  *See* Motion at p. 110, ¶ 243. In so arguing, the Debtors insinuate that TCEH Official Committee and the TCEH Unsecured Ad Hoc Group should be entitled to a greater distribution on account of the settlement of causes of action that are – and always have been – property of TCEH's bankruptcy estate. That argument is baseless.

64.     There is no dispute that the claims against the holders of TCEH First Lien Claims belong to the TCEH Debtors, not the TCEH Unsecured Ad Hoc Group or the TCEH Official Committee. *See generally In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014) (causes of action are property of the bankruptcy estate); *Jevic Holding Corp. v. CIT Group/Business Credit Inc. (In re Jevic Holding Corp.)*, 787 F.3d 173, 188 (3d Cir. 2015) (Scirica, J., dissenting) (cause of action is property of the estate); TCEH Unsecured Ad Hoc Group Standing Motion, pp. 1-2 (TCEH Unsecured Ad Hoc Group "brings this Motion for entry of an order granting standing and authority to commence, prosecute, and settle certain causes of action *on behalf of the TCEH Debtors* relating to the First Lien Debt") (emphasis added); *see also* TCEH Committee Standing Motion, p. 36.

---

[5] The Standing Motions were not granted. They are pending. *See* Disclosure Statement, Art. IV.J, p. 91.

65.     Proceeds of TCEH's causes of action also are property of TCEH's estate. *See Jevic Holding Corp.*, 787 F.3d at 188 (Scirica, J., dissenting) (citing *Bd of Trs. Of Teamsters Local 863 v. Foodtown, Inc.*, 296 F.3d 164, 169 (3d Cir. 2002); 11 U.S.C. § 541(a)(6)). Thus, the distributions on account of the TCEH First Lien Deficiency Claims are property of the TCEH estate because its claims are settled in exchange for those distributions.

66.     Holders of the PCRB Claims are entitled to share *pari passu* in the distribution on account of the waiver of the TCEH First Lien Deficiency Claims. *See In re Nationwide Sports Distributors, Inc.*, 227 B.R. 455, 465 (E.D. Pa. 1998) (rejecting a proposed settlement of estate causes of action for the disproportionate benefit of the creditors that negotiated the settlement agreement); *Young v. Higbee Co.*, 324 U.S. 204 (1945) (shareholders who withdrew their appeal from a confirmation order in return for compensation — paid from non-estate property by insiders of the debtor —larger than the plan provided to other shareholders breached their duty of good faith to other shareholders).

67.     Contending that the TCEH Official Committee and the TCEH Unsecured Ad Hoc Group's filing of a Standing Motion is a basis for the disparate treatment of the PCRB Claims also is belied by the facts. None of the indenture trustee for the holders of the TCEH Second Lien Note Claims, the holders of the TCEH Second Lien Note Claims, or the Class C5 General Unsecured Claims Against the TCEH Debtors Other Than EFCH filed a motion for derivative standing to assert claims on behalf of the estates of TCEH and its subsidiaries. Yet, each of those creditor groups will share in the distribution on account of the waiver of the TCEH First Lien Deficiency Claims.

68. Withdrawal of the Standing Motions does not constitute "specific and credible" grounds to justify a departure from the Bankruptcy Code's distribution scheme and approve the Settlement Agreement.

### 3. The Existence of Claims against Other Debtors is Irrelevant to the Treatment of the PCRB Claims in Class C4.

69. Outside of the Motion, the Debtors have attempted to justify the disparate treatment of the PCRB Claims under the Settlement Agreement and the Plan on the grounds that the PCRB Claims only have claims against TCEH, while other Class C4 creditors also have claims against TCEH's subsidiaries. *See* Disclosure Statement, Art. V.E.29, p. 131. This alleged justification lacks merit. First of all, the fact that the subsidiaries hold the operating assets is irrelevant because the disparity in distribution is based upon the TCEH First Lien Deficiency Claims. *By definition*, the assertion of a deficiency claims means that there is *no equity* for Class C4 creditors in TCEH subsidiaries' operating assets.

70. Secondly, none of the Debtors, Sawyer, Mendelsohn, Ying, or Siegert conducted an analysis to determine the value of the claims against the holders of the TCEH First Lien Claims held by TCEH as compared to such claims held by TCEH's subsidiaries. *See* Sawyer Tr. at 682:24-683:8; Mendelsohn Tr. at 254:8-11, 254:13; Ying Tr. at 157:20-158:7; Siegert Tr. at 143:24-144:9, 144:11. Indeed, there is no analysis supporting any discount on the distribution to holders of PCRB Claims, let alone a 50% to 55% discount.

71. Thirdly, Class C5 General Unsecured Claims Against the TCEH Debtors Other Than EFCH includes creditors with trade claims against TCEH alone. Those creditors (unlike holders of the PCRB Claims) are entitled to share in the distribution on account of the waiver of the First Lien Deficiency Claims even though holders of the PCRB Claims, which also have

claims against TCEH alone, are precluded from sharing in such distribution. *See* Plan, Art. I.A.346, p. 32. Thus, this alleged justification is pretextual at best.

72. Fourthly, that certain holders of Beneficiary-Claimants may hold claims against other Debtors does not constitute consent on behalf of the holders of PCRB Claims to disparate treatment of their Class C4 TCEH Unsecured Debt Claims. The district court's decision in *Schroeder*, 407 B.R. 576, is on point. The question raised on appeal was whether the plan provided unequal treatment to holders of claims in class HC3b by providing a 100% distribution on some claims in class HC3b (the "100% claims") and a 130% distribution on other claims in class HC3b whose holders had relinquished their claims in class HC10b (the "130% claims"). *Id.* at 592. The bankruptcy court concluded that the plan discriminated with consent, reasoning that the holders of the 130% claims, instead of insisting on receiving 100% of the determined distribution for their HC3b claims and 100% of the determined distribution for their HC10b claims (a total distribution of 200%), consented to a less favorable treatment in the form of receiving 0% on their HC10b claims and 130% on their HC3b claims (a total distribution of 130%). *Id.*

73. The district court *reversed* the bankruptcy court's conclusion. *Id.* The consent to less favorable treatment of claims in class HC10b only excused the disparate treatment of claims in that class. *Id.* Such consent was irrelevant to the disparate treatment of claims in class HC3b. *Id.* The treatment of claims in class HC3b was an entirely separate matter, and it was clear that the plan treated the 100% claims in that class less favorably than the 130% claims without the holders of the 100% claims' consent. *Id.* Thus, the bankruptcy court erred in finding that the plan was in compliance with section 1123(a)(4) of the Bankruptcy Code. *Id.* The district

court cautioned that while it "appreciates the complexity of dealing with the tangle of debtor entities, . . . there are limits to what equity alone can accomplish." *Id.* at 592 n.34.

74. The instant case is similar. The Settlement Agreement and Plan provides a distribution on account of PCRB Claims that is significantly less than the distribution on account of other Class C4 Claims. The fact that the Beneficiary-Claimants consent to such treatment is irrelevant. The holders of PCRB Claims do not consent. Regardless of the alleged reason (and there is no valid one), the Settlement Agreement and Plan indisputably fail to provide the "same treatment" or "same opportunity" for recovery to creditors in Class C4.

75. Fifthly, the Plan supporters argue that holders of PCRB Claims benefit from the Settlement Agreement because the deficiency claim against TCEH would be much larger if TCEH's assets alone were considered. This argument, however, is both inconsistent with the Plan as filed and applicable law.

76. *All* TCEH Unsecured Debt Claims are classified *together* in Class C4. Thus, the TCEH First Lien Deficiency Claims must be determined based upon all of the TCEH Debtors' assets.

77. In addition, although (absent state law to the contrary) a secured creditor may assert the full amount of its claim against each estate, whether a creditor is oversecured or undersecured is determined based on all of the debtors' assets. *See In re Residential Capital, LLC*, 501 B.R. 549, 598 (Bankr. S.D.N.Y. 2013) ("There is a surprising dearth of case law explicitly addressing the issue of valuing the extent of a creditor's security in multi-debtor cases. The statute likewise does not provide much guidance. The Court agrees with the JSNs that they are entitled to aggregate their collateral across debtor entities. Any other reading of the statute would lead to inequitable and illogical results."); *Id.* at 600 ("It is not surprising that the [d]ebtors

cite no case authority in support of their argument. The argument is clearly inconsistent with the code and cannot withstand modest scrutiny.") (citing Hearing Transcript at 12:19-13:3, *In re Revolution Dairy, LLC*, No. 13-20770 (Bankr. D. Utah, Apr. 23, 2013), ECF No. 206)).

78. That certain Beneficiary-Claimants' may hold claims against other Debtors does not constitute "specific and credible" grounds to justify a departure from the Bankruptcy Code's distribution scheme and approve the Settlement Agreement.

### C. The Settlement Agreement Is Not Fair and Equitable to the Holders of the PCRB Claims.

79. Bankruptcy Rule 9019 authorizes settlements that are "fair and equitable." *Jevic Holding Corp.*, 787 F.3d at 180 (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson (TMT Trailer Ferry)*, 390 U.S. 414, 424 (1968)). While settlements "are a 'normal part of the process of reorganization,'" like every "important determination in reorganization proceedings, [settlements must] receive the 'informed, independent judgment' of the bankruptcy court." *TMT Trailer Ferry*, 390 U.S. at 424. "[T]he unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them" to ensure that they are fair and equitable. *In re Nutraquest*, 434 F.3d 639, 644 (3d Cir. 2005). The Settlement Agreement is not fair and equitable as to holders of PCRB Claims and cannot be approved under Bankruptcy Rule 9019.

#### 1. The Settlement Agreement Does Not Comply with the Bankruptcy Code's Priorities

80. It has long been true that "[t]he great object of the Bankrupt Act, so far as creditors are concerned, is to secure equality of distribution among them of the property of the bankrupt." *Mayer v. Hellman*, 91 U.S. 496, 501 (1875); *see also Begier*, 496 U.S. at 58 ("Equality of distribution among creditors is a central policy of the Bankruptcy Code.").

81. In the context of a "pre-plan" settlement, "whether a particular settlement's distribution scheme complies with the [Bankruptcy] Code's priority scheme must be the most important factor for the bankruptcy court to consider" when approving a settlement. *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 463 (2d Cir. 2007). In fact, "**compliance with the [Bankruptcy] Code priorities will usually be dispositive of whether a proposed settlement is fair and equitable.**" *Official Comm. of Unsecured Creditors v. CIT Grp./Bus. Credit Inc. (In re Jevic Holding Corp.)*, 787 F.3d 173, 184 (3d Cir. 2015) (emphasis added) (citing *Iridium Operating*, 478 F.3d at 455).

82. As discussed above, the Settlement Agreement does not comply with the Bankruptcy Code priorities. The Settlement Agreement effectively "skips" holders of the PCRB Claims by entitling the holders of all other Class C4 TCEH Unsecured Debt Claims and the holders of all Class C5 General Unsecured Claim Against the TCEH Debtors Other Than EFCH to share in the "waiver" of the TCEH First Lien Deficiency Claims. The Settlement Agreement's lack of compliance with the Bankruptcy Code priorities demonstrates that the Settlement Agreement is not fair and equitable. *Jevic Holding Corp.*, 787 F.3d at 184.

### 2. The Settlement Agreement Raises Justifiable Concerns About Collusion

83. Although the Bankruptcy Code and the Bankruptcy Rules do not extend the absolute priority rules to settlements in bankruptcy, "the policy underlying the rule—ensuring the evenhanded and predictable treatment of creditors—applies in the settlement context." *Jevic Holdings Corp.*, 787 F.3d at 184; *cf. Iridium*, 478 F.3d at 455 (stating that in the Second Circuit, "a long-standing creditor protection – the Bankruptcy Code's priority scheme for reorganization plan distributions – applies to bankruptcy court approval of a settlement under Rule 9019"). In fact, "**[s]ettlements that skip objecting creditors in distributing estate assets raise justifiable**

**concerns about collusion among debtors, creditors, and their attorneys and other professionals.**" *Jevic Holdings Corp.*, 787 F.3d at 184 (emphasis added) (citing *Iridium*, 478 F.3d at 464).

84.  In this case, the mistreatment of holders of the PCRB Claims under the Settlement Agreement "raise[s] justifiable concerns about collusion among debtors, creditors, and their attorneys and other professionals." *See Jevic Holdings Corp.*, 787 F.3d at 184 (emphasis added) (citing *Iridium*, 478 F.3d at 464). Indeed the circumstances surrounding the negotiation of the Settlement Agreement evidence such collusion.

85.  As detailed above, the Debtors took the position that the PCRB Claims should be treated *pari passu* with other unsecured creditors of TCEH. *See* Sawyer Tr. at 678:5-21. Indeed, the earlier versions of a chapter 11 plan provided that the PCRB Claims would receive treatment *pari passu* with the other holders of C4 TCEH Unsecured Debt Claims with a full (not "limited") waiver of the TCEH First Lien Deficiency Claims.

86.  The TCEH Unsecured Ad Hoc Group was unwilling to treat the PCRB Claims *pari passu* with other unsecured creditors of TCEH. Disclosure Statement, Art. V.E.29, p. 131;

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████

87.  In order to control the vote of Class C4 TCEH Unsecured Debt Claims, the Plan funders needed the consent of the TCEH Second Lien Note Claims. Accordingly, the TCEH Unsecured Ad Hoc Group proposed that holders of TCEH Second Lien Note Claims be entitled to share in the waiver of the First Lien Deficiency Claims with the TCEH Unsecured Note Claims. As the PCRB Claims are a minority of the Class C4 Claims, the TCEH Unsecured Ad

Hoc Group did not need the votes of the PCRB Claims. Therefore, the TCEH Unsecured Ad Hoc Group excluded the PCRB Claims from sharing in the distribution on account of the waiver of the First Lien Deficiency Claims while increasing their distribution on account of the TCEH Unsecured Note Claims.

88.  In short, the TCEH Unsecured Ad Hoc Group provided a greater distribution for holders of the TCEH Unsecured Note Claims and the TCEH Second Lien Note Claims to garner the votes of such holders.

89.  The TCEH Unsecured Ad Hoc Group also needed to secure the vote of unsecured creditors in Class C5 General Unsecured Claims Against the TCEH Debtors Other than EFCH. Accordingly, the TCEH Unsecured Ad Hoc Group ultimately proposed that holders of General Unsecured Claims Against the TCEH Debtors Other Than EFCH be entitled to share in the distribution on account of deficiency waiver. Thus, all Class C4 creditors (other than holders of PCRB Claims) and all Class C5 creditors (even trade creditors with claims *solely* against TCEH) are entitled to share in the waiver of the First Lien Deficiency Claim – while the PCRB Claims alone are excluded from sharing in the deficiency waiver.

90.  The evidence of collusion surrounding the negotiation of the Settlement Agreement evidence demonstrates that the Settlement Agreement is not fair and equitable. *Jevic Holdings Corp.*, 787 F.3d at 184

### 3.  The Settlement Agreement Is Not Fair to the Non-Settling Parties

91.  Of particular relevance, "[u]nder the 'fair and equitable' standard, [courts must] look to the fairness of the settlement to other persons, *i.e.*, the parties who did not settle." *Id.* The fact that the holders of the PCRB Claims are not parties to the Settlement Agreement is not a basis to deny the holders of the PCRB Claims the distribution to which they are entitled. Nothing in the Bankruptcy Code or the Bankruptcy Rules "obligates a creditor to cut a deal in

order to receive a distribution of estate assets to which he is entitled." *Jevic Holding Corp.*, 787 F.3d at 184.

92. Thus, "bankruptcy courts **cannot approve settlements . . . devised by certain creditors in order to increase their shares of the estate at the expense of other creditors**." *Jevic Holdings Corp.*, 787 F.3d at 184 (emphasis added). Indeed, the Bankruptcy Code's guarantee of equal treatment "protect[s] the creditors from one another." *Young v. Higbee*, 324 U.S. 204, 210 (1945).

93. This Court should not approve the Settlement Agreement because it constitutes the TCEH Unsecured Ad Hoc Group's attempt to increase their distribution at the expense of holders of the PCRB Claims. *See Jevic Holdings Corp.*, 787 F.3d at 184. The TCEH Unsecured Ad Hoc Group imposed the disparate treatment of the holders of PCRB Claims. No other party in interest required the disparate treatment of holders of PCRB Claims. In order to reach a global compromise, the other parties in interest succumbed to the TCEH Unsecured Ad Hoc Group's demands. The net effect of that disparate treatment – to which the holders of the PCRB Claims have not consented – is a distribution that is approximately $30 million to $200 million less than the distribution on account of the PCRB Claims if treated *pari passu* with the other Class C4 claims.

94. There is no principled basis to exclude holders of the PCRB Claims from *any* share in the distribution on account of the TCEH First Lien Deficiency Claims. Again, none of the Debtors, Sawyer, Mendelsohn, Ying, or Siegert conducted an analysis to determine the value of the claims against the holders of the TCEH First Lien Claims held by TCEH as compared to such claims held by TCEH's subsidiaries. *See* Sawyer Tr. at 682:24-683:8; Mendelsohn Tr. at 254:8-11, 254:13; Ying Tr. at 157:20-158:7; Siegert Tr. at 143:24-144:9, 144:11. Indeed, there

is no analysis supporting any discount on the distribution to holders of PCRB Claims, let alone a 50% to 55% discount. Instead, the discount is simply the result of the size of the TCEH First Lien Deficiency Claims.

95.     The TCEH Unsecured Ad Hoc Group's attempt to exclude the holders of PCRB Claims from sharing in the "waiver" of the TCEH First Lien Deficiency Claims is patently unfair because TCEH's estate, which is liable on the PCRB Claims, owns many of the claims against the holders of the TCEH First Lien Claims which are being settled under the Settlement Agreement. *See generally Emoral*, 740 F.3d at 879 (causes of action are property of the bankruptcy estate); *Jevic Holding Corp.*, 787 F.3d at 188 (Scirica, J., dissenting) (cause of action is property of the estate).

96.     In summary, the "waiver" of such recovery or, more accurately, the "gifting" of the distribution on account of the TCEH First Lien Deficiency Claims, for the benefit of only *certain* creditors of TCEH demonstrates that the Settlement Agreement is not fair and equitable as to the holders of PCRB Claims.

97.     "If the 'fair and equitable' standard is to have any teeth, it must mean that bankruptcy courts cannot approve settlements . . . devised by certain creditors in order to increase their shares of the estate at the expense of other creditors." *Jevic Holding Corp.*, 787 F.3d at 184.

98.     This Court should reject the Settlement Agreement as submitted and require that the holders of PCRB Claims share *pari passu* with the Beneficiary-Claimants in the distributions on account of the waiver of the TCEH First Lien Deficiency Claims.

**D.     No Stay Pending Appeal Should Be Waived.**

99.     The Debtors' request to waive the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) must be denied. Bankruptcy Rule

provides, "An order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." The purpose of this rule is to "'provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.'" *In re Filene's Basement*, No. 11-13511, 2014 Bankr. LEXIS 2000, *43-44 (Bankr. D. Del. Apr. 29, 2014) (quoting 10 Collier on Bankruptcy ¶ 6004.11, ¶ 6006.04 (16th ed. 2014)).

100.    A short period of time is often needed and essential to an objecting party intending to appeal because, if the transaction is closed in the absence of a stay, any appeal by an objecting party may well be moot. *Id.* "[I]f an objection has been filed and is being overruled, the court should eliminate or reduce the 14-day stay period only upon a showing that there is a sufficient business need to close the transaction within the 14-day period and that the interests of the objecting party, taking into account the likelihood of success on appeal, are sufficiently protected." *Id.* Furthermore, "[i]f the objecting party informs the court that it intends to appeal and seek a stay, then the stay period should not be reduced to less than an amount of time sufficient to allow the objecting party to seek a stay, unless the court determines that the need to proceed sooner outweighs the objecting party's interests." *Id.*

101.    BNYM intends to appeal any order approving the Settlement Agreement and seek a stay. The fourteen-day stay of Bankruptcy Rule 6004(h), to the extent applicable, is necessary to preserve the right of BNYM to seek a stay of any order approving the Settlement Agreement pending appeal. The Debtors can make no showing whatsoever that there is a need to close the transaction within the 14-day period nor have the Debtors made a showing that the interests of BNYM are sufficiently protected. The brief stay under Bankruptcy Rule 6004(h) would allow BNYM to seek a stay of an order approving the Settlement Agreement pending appeal.

## IV. RESERVATION OF RIGHTS

102. BNYM reserves its rights to supplement the objections set forth herein and to support objections asserted by other parties in interest.

## V. CONCLUSION

For the foregoing reasons, BNYM respectfully requests that the Court enter an Order (a)(i) denying the Motion or (ii) approving the Motion *only if* the holders of PCRB Claims share *pari passu* with the Beneficiary-Claimants in the distributions on account of the waiver of the TCEH First Lien Deficiency Claims, and (b) granting such further relief to BNYM as is appropriate.

Dated: October 23, 2015
Wilmington, Delaware

Respectfully submitted,

REED SMITH LLP

By: /s/ *Kurt F. Gwynne*
Kurt F. Gwynne (No. 3951)
1201 Market Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 778-7500
Facsimile: (302) 778-7575
Email: kgwynne@reedsmith.com

Sarah K. Kam (*pro hac vice*)
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 549-0284
Facsimile: (212) 521-5450
Email: skam@reedsmith.com

Counsel to The Bank of New York Mellon, in its capacity as the PCRB Trustee