IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| | : | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | : | Case No. 14-10979 (CSS) |
| | : | |
| | : | Jointly Administered |
| | : | |
| Debtors. | : | **Hearing Date: November 3, 2015 at 11:00 a.m.** |
| | : | **Objections Due: October 23, 2015 by 4:00 p.m. Extended for the U.S. Trustee to October 28, 2015 by 12:00 p.m. (noon)** |

**UNITED STATES TRUSTEE'S OBJECTION TO THE
FIFTH AMENDED JOINT PLAN OF REORGANIZATION OF ENERGY FUTURE
HOLDINGS CORP.,** ***ET AL****,* **PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY
CODE AND THE MOTION OF ENERGY FUTURE HOLDINGS CORP., ET AL, TO
APPROVE A SETTLEMENT OF LITIGATION CLAIMS AND AUTHORIZE THE
DEBTORS TO ENTER INTO AND PERFORM UNDER THE
SETTLEMENT AGREEMENT (D.I. 5249, 6085, 6122)**

Andrew R. Vara, the Acting United States Trustee for Region 3 (the "U.S. Trustee"), hereby objects to the *Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan") and the *Motion of Energy Future Holdings Corp., et al, to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter into and Perform under the Settlement Agreement* (the "Settlement Agreement") (D.I. 5249, 6085, 6122).[1]

**PRELIMINARY STATEMENT**

The Plan and the Settlement Agreement cannot be approved for at least three reasons. First, both documents may grant inappropriate third-party releases in favor of numerous non-debtor parties. As proposed, these provisions may contravene the Bankruptcy Code and applicable Third Circuit standards. Second, the Plan unlawfully extends exculpation to non-

---

[1] Unless otherwise defined herein, capitalized terms shall have the same meaning and context as those capitalized terms included in the referenced or cited document or pleading.

estate fiduciaries, including non-debtor affiliates and shareholders. Third, both the Plan and the Settlement Agreement approve the payment of approximately $49.75 million to several non-estate retained professionals without adequate disclosure or legal justification.

Absent additional evidence or amendments consistent with these concerns,[2] the Court should deny confirmation of the Plan and reject the Settlement Agreement.

## JURISDICTION

1. Under (i) 28 U.S.C. § 1334, (ii) applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a), and (iii) 28 U.S.C. § 157(b)(2), this Court has jurisdiction to hear and determine this objection.

2. Pursuant to 28 U.S.C. § 586(a)(3), the "U.S. Trustee is charged with administrative oversight of the bankruptcy system in this District. Such oversight is part of the "U.S. Trustee's overarching responsibility to enforce the laws as written by Congress and interpreted by the courts. *See United States Trustee v. Columbia Gas Systems, Inc. (In re Columbia Gas Systems, Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that the "U.S. Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest).

3. Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on the issues raised in this objection.

---

[2] In addition to these defects, the U.S. Trustee notes that Plan, Article IV, section O provides that "The Reorganized Debtor Management Incentive Plan is hereby approved in its entirety and shall be implemented on the Effective Date by the applicable Reorganized Debtors *without any further action by the New Boards* or the Bankruptcy Court." (*emphasis added*). This language may be construed as inconsistent with the *Term Sheet Regarding Reorganized TCEH Management Incentive Plan* (D.I. 6544-30) (the "Term Sheet"). As written, the Term Sheet does not fix any rights to compensation by individual managers of Reorganized TCEH because the post-emergence board of directors will ultimately determine awards "in its sole discretion at the time of the grant". *See* Term Sheet. To the extent that this interpretation of the Term Sheet is incorrect and the Plan *does* fix rights to compensation by selected management at the time of confirmation, the Management Incentive Plan does not comport with 11 U.S.C. § 503(c).

## FACTUAL BACKGROUND

4. On April 29, 2014, the Debtors commenced these Chapter 11 cases.

5. On April 14, 2015, the Debtors filed their initial plan of reorganization and disclosure statement (collectively, the "Initial Documents"). (D.I. 4142 & 4143). On September 21, 2015, and after several amendments to the Initial Documents, the Debtors filed the current Plan. (D.I. 6122).

### Third-Party Releases

6. The Plan provides for third-party releases as follows:

> As of the Effective Date, each Releasing Party[3] is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Claims and Causes of Action, including Claims and Causes of Action identified, claimed, or released in the Standing Motions, the Litigation Letters, or the Disinterested Directors Settlement, as well as all other Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively) […]

Plan, Article VIII, Section D (the "Subject Releases").

7. The Subject Releases are given not only by claims and interests who vote to accept the Plan, but by all Holders of Claims and Interests that are deemed to accept the Plan, and all Holders in voting Classes who abstain from voting on the Plan and did not opt out of the releases provided by the Plan.

### Exculpation Provision

8. The Plan also provides for exculpation for certain parties as follows:

---

[3] The full list of "Releasing Parties" can be found in the Plan at Article I, Section A, Paragraph 248.

3

Except as otherwise specifically provided in the Plan, no Exculpated Party[4] shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Terminated Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Support Agreement, the Transaction Agreements, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Plan Support Agreement, the Transaction Agreements, or the DIP Facilities, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan, the Transaction Agreements, or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence[...]

Plan, Article VIII, Section E (the "Exculpation Provision").

### The Payment of Certain Fees of Non-Estate Retained Professionals

9.    The Plan further provides for the payment of certain fees as follows:

Without any further notice to or action, order, or approval of the Bankruptcy Court, the Reorganized Debtors shall pay on the Effective Date any reasonable and documented unpaid fees and expenses incurred on or before the Effective Date by professionals (a) payable under (1) the TCEH DIP Facility (which fees and expenses shall be paid by Reorganized TCEH), (2) the EFIH First Lien DIP Facility (which fees and expenses shall be paid by Reorganized EFIH), (3) the Merger and Purchase Agreement (which fees and expenses shall be paid by Reorganized EFIH), (4) the Backstop Agreement (which fees and expenses shall be paid by Reorganized EFIH), and (5) the Cash Collateral Order (which fees and expenses shall be paid by TCEH or Reorganized TCEH), including any applicable transaction, success, or similar fees for which the applicable Debtors have agreed to be obligated, and (b) retained by any individual member of the TCEH First Lien Ad Hoc Committee that

---

[4]    The full list of "Exculpated Parties" can be found in the Plan at Article I, Section A, Paragraph 179.

> is a TCEH Supporting First Lien Creditor. Reorganized TCEH shall indemnify the TCEH First Lien Agent for any reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date solely in connection with the implementation of the Plan, including but not limited to, making distributions pursuant to and in accordance with the Plan, and any disputes arising in connection therewith.
>
> The EFH Debtors shall pay in cash in full on the Effective Date, the reasonable and documented fees and expenses (including professional and other advisory fees and expenses) incurred through the Effective Date of the TCEH Unsecured Notes Trustee, the TCEH Second Lien Notes Trustee, the TCEH Second Lien Notes Collateral Agent, the members of the TCEH Unsecured Ad Hoc Group, and the members of the TCEH Second Lien Consortium.
>
> All amounts distributed and paid pursuant to this Article IV.R shall not be subject to disgorgement, setoff, recoupment, reduction, or reallocation of any kind.

Plan, Article IV, Section R.

10. In particular, the second paragraph of Article IV. R. of the Plan provides for the payment of the fees, expenses, and reimbursements, including professional fees, of the TCEH Unsecured Notes Trustee, the TCEH Second Lien Notes Trustee, the TCEH Second Lien Notes Collateral Agent, members of the TCEH Unsecured Ad Hoc Group, and the members of the TCEH Second Lien Consortium all without any further notice to or action, order, or approval of the Bankruptcy Court.[5]

11. Section 2.7(a) of the Settlement Agreement provides for the "Payment of Certain Fees and Expenses" as follows:

---

[5] Likewise, the Settlement Agreement provides that TCEH shall pay the reasonable and documented out-of-pocket fees, expenses, and reimbursements of (i) the members of the ad hoc committee of TCEH First Lien Creditors and (ii)(A) the TCEH Unsecured Group (but not the individual members thereof), (B) the TCEH Unsecured Notes Trustee, (C) the TCEH Second Lien Group (but not the individual members thereof), (D) the TCEH Second Lien Trustee, and (E) The Bank of New York Mellon Trust Company, N.A., as collateral agent under the TCEH Second Lien Notes Indenture which aggregate fees, expenses, and reimbursements for the period from the Petition Date through June 30, 2015, shall not exceed $49,750,000.00. Settlement Agreement § 2.7 (D.I. 5249).

(a) In exchange for the applicable Parties' agreements contained in the Plan Support Agreement, as well as their agreement to the settlements and releases set forth herein, TCEH shall, not later than the first Business Day following the Settlement Effective Date, pay the reasonable and documented out-of-pocket fees, expenses, and reimbursements of (i) the members of the ad hoc committee of TCEH First Lien Creditors and (ii)(A) the TCEH Unsecured Group (but not the individual members thereof), (B) the TCEH Unsecured Notes Trustee, (C) the TCEH Second Lien Group (but not the individual members thereof), (D) the TCEH Second Lien Trustee, and (E) The Bank of New York Mellon Trust Company, N.A., as collateral agent under the TCEH Second Lien Notes Indenture (the foregoing fees, expenses, and reimbursements in clause (ii), collectively, the "Professional Fees"); provided, however, that the aggregate fees, expenses, and reimbursements payable to the foregoing Parties under this Section 2.7(a)(ii) for the period before and including June 30, 2015, shall not exceed $49,750,000.00. Upon the Effective Date of the Plan, EFH shall reimburse TCEH in cash for the Professional Fees paid pursuant to this Section 2.7, provided, however, that EFH shall have no obligation to reimburse TCEH for the Professional Fees paid pursuant to this Section 2.7 in the event that the Effective Date of the Plan does not occur. If the Effective Date of the Plan does not occur, under any Alternative Restructuring, the TCEH Cash Payment shall be reduced by the amount of the Professional Fees actually paid pursuant to this Section 2.7. The Settling TCEH Unsecured Noteholders, Settling TCEH Second Lien Noteholders and TCEH Official Committee agree that, solely for purposes of allocating the TCEH Cash Payment among the holders of Allowed TCEH Unsecured Note Claims, Allowed TCEH Second Lien Claim, Allowed PCRB Claims, and Allowed General Unsecured Claims Against the TCEH Debtors Other Than EFCH: (x) the Professional Fees of the TCEH Unsecured Group and TCEH Second Lien Group that (1) are actually paid pursuant to this Section 2.7, and (2) are not subject to or covered by the TCEH Unsecured Notes Trustee's and TCEH Second Lien Notes Trustee's "charging liens," respectively, shall reduce pro rata the distributions to all holders of Allowed TCEH Unsecured Note Claims, Allowed TCEH Second Lien Claim, Allowed PCRB Claims, and Allowed General Unsecured Claims Against the TCEH Debtors Other Than EFCH based on the amounts of the respective distributions such holders would otherwise have received but for such reduction and taking into account the effect of the Limited Waiver; (y) the Professional Fees of the TCEH Unsecured Group and TCEH Unsecured Notes Trustee that (1) are actually paid pursuant to this Section 2.7 and (2) are subject to or covered by the TCEH Unsecured Notes Trustee's "charging lien" shall reduce pro rata the distributions to holders of Allowed TCEH Unsecured Notes Claims based on the amounts of their Allowed Claims; and (z) the Professional Fees of the TCEH Second Lien Group and TCEH Second Lien Notes Trustee that (1) are actually paid pursuant to this Section 2.7

  and (2) are subject to or covered by the TCEH Second Lien Notes Trustee's "charging lien," shall reduce pro rata the distributions to holders of Allowed TCEH Second Lien Note Claims based on the amounts of their Allowed Claims.

Settlement Agreement, Section 2.7(a)

## LAW AND ANALYSIS

### A. General Standards

  12. In order to obtain confirmation, a plan proponent has the burden to establish compliance with all the requirements of section 1129(a) of the Bankruptcy Code (the "Code"). *See* 11 U.S.C. § 1129(a). The plan proponent bears the burden of proof with respect to each and every element of section 1129(a). *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001).

### B. The Subject Releases May Be Overbroad and Contrary to Applicable Law

 *i.* *The Debtors Must Justify the Release of the Debtors' Claims*

  13. The Subject Releases appear to release the Debtors' claims only, including claims derivative of the Debtors' that others may assert (collectively, the "Debtor Claims"). *See* Plan, Article VIII, Section D (Provision releases liability "from any and all *Claims and Causes of Action*, including Claims and Causes of Action identified, claimed, or released in the Standing Motions, the Litigation Letters, or the Disinterested Directors Settlement, as well as all other Claims and Causes of Action, whether known or unknown, including any derivative claims, *asserted on behalf of the Debtors*, that such Entity would have been legally entitled to assert …") (*emphasis added*). To be clear, the U.S. Trustee's arguments made in Paragraphs 15 to 24 below only apply if the Subject Releases extend beyond the Debtor Claims.

14. Under any circumstances, the Debtors must justify the release of the Debtor Claims as to each and every recipient. In *In re Zenith Electronics Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999), the court approved releases by the debtor against third parties, but only after finding that five factors were met: (i) the release was necessary to the success of the reorganization, (ii) the releasees have provided a critical financial contribution to the debtor's plan, (iii) the releasees' financial contribution was necessary to make the plan feasible, and (iv) the release was fair to the non-consenting creditors, *i.e.,* whether the non-consenting creditors received reasonable compensation in exchange for the release. *Id.* at 110-111 (*citing Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930 (Bankr.W.D.Mo.1994)).

ii.  *If the Subject Releases Extend Beyond Debtor Claims, The Court Should Only Approve Consensual and Limited Releases*

15. Releases given by non-debtors to other non-debtors in a plan are permissible only in rare and exceptional circumstances in which certain key factors are present. *See In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000) (rejecting arguments that a permissive view of releases confers "unfettered discretion" and citing *Master Mortgage*, 168 B.R. at 937 with approval).[6]

16. Courts in this District have routinely determined that releases given by non-debtors to other non-debtors should be allowed only if they are consensual. *See In re Washington Mutual, Inc.*, 442 B.R. 314, 352 (Bankr. D. Del. 2011) (citations omitted); *see also*

---

[6] In *Continental Airlines*, the Third Circuit surveyed cases from various circuits as to when, if ever, a non-consensual third party release is permissible. The Third Circuit acknowledged that a number of Circuits do not allow such non-consensual releases under any circumstances. *See id.* at 212. Other Circuits, the Court found, "have adopted a more flexible approach, albeit in the context of extraordinary cases," such as mass tort cases. *See id.* at 212 (citations omitted).

8

*In re Indianapolis Downs,* 486 B.R. 286, 306 (Bankr. D. Del. 2013) (finding releases consensual when consideration was provided and detailed instructions on opting out where provided to impaired creditors).

       17.      But virtually all of the Subject Releases are non-consensual. Although the Plan purports to have some opt-out provision to cure the consent problems, this one offers no cure. Rather, the opt-out provisions are ambiguous at best, and at worst, entirely illusory. The definition of "Releasing Parties" does not expressly state that the enumerated individuals in Article I(A)(285) have a right to opt-out at all. *See* Plan, Article I(A)(285)(a) through (z). And even if all parties could theoretically opt-out, the Plan ballot specifies that the opt-out provision is only valid "if the Court determines that [the voter has] the right to opt-out".[7]

       18.      Absent actual, affirmative consent or a real opportunity to opt-out, the Subject Releases are non-consensual and should not be approved.[8]

   iii.   *Alternatively, Any Non-Consensual Releases Should Be Subjected to Rigorous Standards and Narrowly Tailored; These Are Not*

       19.      If, however, the Court does consider approving non-consensual third-party releases, they must be reviewed under the rigorous standards of *Continental Airlines* and well-established case law within the District of Delaware: the "hallmarks of permissible non-consensual releases" are "fairness, necessity to the reorganization, and special factual findings to support these conclusions." *Continental Airlines*, 203 F.3d at 214.

---

[7]   *See*, *e.g*., D.I. 6552, pp. 43 of 419.

[8]   Even when truly consensual, it is nonetheless unclear whether a plan can provide for a release of non-debtor directors and officers by other non-debtors. *See Washington Mutual*, 442 B.R. at 349-50 (disapproving consensual third-party releases proposed for the debtors' directors, officers, and professionals given lack of evidence of a substantial contribution to the reorganization). As noted by the court in *Washington Mutual*, directors and officers already receive exculpation under the plan. *See id.*

9

20. In *Genesis Health*, the Court evaluated whether a non-consensual release fit the "hallmarks" discussed in *Continental Airlines*, by considering whether: (i) the non-consensual release is necessary to the success of the reorganization, (ii) the releasees will provide a critical financial contribution to the debtor's plan, (iii) the releasees' financial contribution is necessary to make the plan feasible, and (iv) the release is fair to the non-consenting creditors, *i.e.*, whether the non-consenting creditors will receive reasonable compensation in exchange for the release. *Id.*, 266 B.R. at 607-08 (*citing Zenith Electronics Corp.*, 241 B.R. at 110 and *Master Mortgage*, 168 B.R. at 935); *see also In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del 2010) (same).

21. Nothing in the record establishes that the Subject Releases satisfy *Continental Airlines* or the factors set forth in *Genesis Health* with respect to each of the released parties, particularly the directors and officers, who have not made a financial contribution to the Plan.

22. The courts in *Continental Airlines, Genesis Health, and Washington Mutual* rejected third-party releases for directors and officers. *See Continental Airlines*, 203 F.3d at 215 ("[W]e have found no evidence that the non-debtor D&Os provided a critical financial contribution to the Continental Debtors' plan that was necessary to make the plan feasible in exchange for receiving a release of liability"); *Genesis Health*, 266 B.R. at 606–07 ("[T]he officers, directors and employees have been otherwise compensated for their contributions, and the management functions they performed do not constitute contributions of 'assets' to the reorganization."); *Washington Mutual*, 442 B.R. at 349-50 (disapproving third-party releases proposed for the debtors' directors, officers, and professionals because no evidence of a substantial contribution to the reorganization).

23. Beyond directors and officers, other released parties have not made a substantial financial contribution to the Plan either. For example, the definition of "Released Parties" includes multiple general unsecured creditor groups. *See* Plan, Article I(A)(284)(v)-(w).

24. The Debtors have the burden of justifying the validity of the third-party releases for each and every party to be released. Because an evidentiary predicate is necessary to approve these releases, the U.S. Trustee reserves post-trial argument on this issue after the record at the confirmation hearing is closed.

C. **The Exculpation Provision is Overbroad and Contrary to Applicable Law**

25. Article VIII, Section E of the Plan exculpates:

(a) the Debtors and Reorganized Debtors;

(b) the Committees; and

(c) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

*See* Plan, Article I(A)(179) and Article VIII(E).

26. As stated by the Court in *In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) an "exculpation clause must be limited to the *fiduciaries* who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors' directors and officers." *Id.* at 350-51 (emphasis added). Other courts within this District, including this one, have agreed. *See ASHINC Corporation, et al. (f/k/a Allied Systems*

11

*Holdings, Inc.)*, Case No. 12-11564-CSS; *see also In re Tribune Company,* 464 B.R. 126 (Bankr. D. Del. 2011) (Carey, J.).

27. These conclusions are consistent with *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000). The issue in *PWS* was whether an official committee of unsecured creditors could receive exculpation. As described by Judge Shannon in *In re PTL Holdings LLC*, 2011 Bankr. LEXIS 4436 (Bankr. D. Del. Nov. 10, 2011)*:*

> In reaching its conclusion, the *PWS* court examined § 1103(c) and noted that the section "has been interpreted to imply both a fiduciary duty to committee constituents and a limited grant of immunity to committee members." "This immunity," the court found, "covers committee members for actions within the scope of their duties." The *PWS* court's reasoning thus implies that a party's exculpation is based upon its role or status as a fiduciary. That is why, as the *Washington Mutual* court pointed out, courts have permitted exculpation clauses insofar as they "merely state[] the standard to which ... estate fiduciaries [a]re held in a chapter 11 case." That fiduciary standard, however, applies only to estate fiduciaries, "no one else."

*PTL Holdings* at * 37-38 (citations omitted)*.*

28. Here, the definition of Exculpated Parties includes a wide range of non-estate fiduciaries. First, it is unclear whether "the Committees" refers to the official committees entitled to protections under section 1103(c) or whether non-fiduciary ad hoc groups are also included. Second, the broad inclusion of current and former affiliates may include various non-debtor parties. Third, current and former equity holders of the debtor are not considered estate fiduciaries based upon ownership status alone. Fourth, rank-and-file employees are not bound as estate fiduciaries in the same way as corporate management. Fifth and finally, many of the covered parties in clause (c) of the definition (reprinted in ¶ 25 above) are not fiduciaries if their connection to the estate is through any source other than the Debtors or the official creditor committees.

29. Unless the Exculpation Provision is amended to remove all non-estate fiduciaries, the Plan should not be confirmed.

**D.    The Plan Provides for the Payment of Non-Estate Retained Professionals Without Adequate Disclosure or Legal Justification**

30. Together, Article IV.R of the Plan and section 2.7(a) of the Settlement Agreement obligate the Debtors to pay an undisclosed amount of fees, "[w]ithout further notice to or action, order, or approval of the Bankruptcy Court," to undisclosed professionals retained by multiple parties in connection with the bankruptcy cases. Plan, Article IV.R, Settlement Agreement, Section 2.7(a). These fee payments are presumably to be made with no opportunity to object, with no disclosure of the amounts and recipients, and with no legal basis proffered or established for the payments. The Court should not, and cannot, abdicate its oversight of professional fees as the Debtors request.

31. The Debtors fail to provide sufficient information to allow anyone, including the U.S. Trustee, the Court, or other interested parties, to evaluate the propriety of any particular payment authorized under the Plan or Settlement Agreement. The lack of information is itself reason to deny their approval. And to the extent that the vague payment provisions seek to evade the procedural and substantive requirements imposed by the Bankruptcy Code, the U.S. Trustee objects.

32. In particular, at least some of the proposed third-party professional fee payments relate to professionals whose compensation is specifically governed by sections 503(b)(3)(D) and (4) of the Code, including the professionals of indenture trustees, of unofficial

committees, and of individual creditors.[9] *See* 11 U.S.C. § 503(b)(3)(D).  Although such professionals might be eligible to be compensated from the bankruptcy estate, section 503 imposes detailed requirements that must be met before approval and payment, including the timely filing of a request for payment by the professional, *see* 11 U.S.C. § 503(a); notice and a hearing before the court, *see* 11 U.S.C. § 503(b); a showing that such expenses were "actual" and "necessary," *see* 11 U.S.C. § 503(b)(3); a showing that the creditor, unofficial committee, or indenture trustee has made a "substantial contribution" to the bankruptcy case, *see* 11 U.S.C. § 503(b)(3)(D); and a finding by the court that any compensation paid to an attorney or accountant is "reasonable."  *See* 11 U.S.C. § 503(b)(4).  Moreover, a party's right to payment under section 503(b) is not automatic but "depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."  *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir.1999).  It is unclear whether the payment provisions of the Plan and Settlement Agreement will limit payment to professionals who can and will satisfy section 503(b).  Likewise, those provisions also do not provide parties in interest with any effective opportunity to review or contest whether those requirements have been met.

33.     The fact that these payments of professional fees are proposed as part of a chapter 11 plan and settlement agreement does not relieve the third-party professionals of their obligation to comply with the requirements of section 503, which is the "sole source" of authority to pay post-petition professional fees on an administrative basis.  *Davis v. Elliot*

---

[9] For example, in addition to the professionals payable under various transactional documents (but who are not further specified in the Plan), the Plan expressly provides for payment of the professionals of, among others, the TCEH Unsecured Notes Trustee and members of the TCEH Unsecured Ad Hoc Group, each of whom are among the types of parties whose right to compensation for professional fees is specifically addressed by 11 U.S.C. § 503(b)(3)(D).  Plan, Article IV.R.  Similarly, the Settlement Agreement provides for payment to professionals of, among others, the TCEH Unsecured Group and the TCEH Unsecured Notes Trustee.  Settlement Agreement, Section 2.7(a).

*Management Corp. (In re Lehman Bros. Holdings Inc.)*, 508 B.R. 283, 290 (S.D.N.Y. 2014). In *Lehman*, the court roundly rejected an attempt by certain committee members to circumvent section 503(b)(4) by seeking payment under a "permissive" plan provision which purported to pay third-party professional fees without regard to whether they could be authorized under section 503. As the court explained, plans pay only claims and administrative expenses:

> Although the Bankruptcy Code does not explicitly forbid payments [of] professional fees that are not administrative expenses, no such explicit prohibition is necessary. Reorganization plans exist to pay claims and expenses . . . Therefore, the Individual Members' professional fee expenses are either administrative expenses or not, and if the latter, they cannot be paid under a plan.

*Id.* at 293. Indeed, the court recognized that any contrary result "could lead to serious mischief," since it would allow plan proponents to distribute the estate's assets without regard to the Bankruptcy Code's priority scheme. *Id.*

34. The *Lehman* court's reasoning applies with equal force here. Like the fees at issue in *Lehman*, the third-party professional fees "are either administrative expenses or not." *Id.* Because the third-party professionals seek to enjoy the benefits of administrative priority under section 503—the sole possible source of statutory authorization permitting them to be paid by the Debtors in full on the Effective Date—they must also comply with the disclosure obligations and substantive limitations imposed by that section.[10]

---

[10] Even if the third-party fee provisions of the Settlement Agreement were considered in isolation from the Plan, the result would be no different. Nothing in the Bankruptcy Rule 9019 authorizes courts to create categories of administrative expenses not subject to section 503, and section 105(a) cannot be used to override the prohibitions of another section of the Code. *See In re Combustion Engineering, Inc.,* 391 F.3d 190, 236 (3rd Cir. 2004) ("The general grant of equitable power contained in § 105(a) cannot trump specific provisions of the Bankruptcy Code, and must be exercised within the parameters of the Code itself"); *see also Law v. Siegel*, 134 S. Ct. 1188, 1194 (2014) ("We have long held that 'whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of' the Bankruptcy Code.") (citations omitted).

35. Even apart from section 503(b), Article IV.R of the Plan cannot be approved because it also violates section 1129(a)(4) of the Code.[11] That section provides that a court may approve a chapter 11 plan only if, among other things, the court finds that any payment made by the debtor "for services or for costs and expenses" in connection with the case has either "been approved by, or is subject to the approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4). Article IV.R violates this requirements because it purports to give the reorganized Debtors (and not the Court) sole discretion to determine whether a particular fee is reasonable, it provides no disclosure whatsoever of the actual fees to be paid, and there is consequently no basis on which this Court can make the reasonableness finding required by section 1129(a)(4).

36. Accordingly, the U.S. Trustee submits that the Court should deny confirmation of the Plan and approval of the Settlement Agreement unless Article VI.R of the Plan and section 2.7(a) of the Settlement Agreement are amended to: (i) require disclosure to the Court, the U.S. Trustee, and other parties in interest of the identities of any professionals receiving payments under that section, the amount of the proposed payment, and the legal and factual basis for the reasonableness of such payment; (ii) clarify that professionals subject to section 503(b), including without limitation professionals of creditors and professionals of indenture trustees, shall be compensated only to the extent compensation is authorized and actually approved and awarded under that section; and (iii) provide a reasonable opportunity for the United States Trustee and other parties in interest to object to such fees on any grounds, including without limitation the professionals' failure to satisfy any part of section 503(b).

---

[11] To be clear, the U.S. Trustee does not suggest that section 1129(a)(4) may be used as a substitute for review under section 503(b). *See Lehman*, 508 B.R. at 294 n.9 (rejecting argument that section 1129(a)(4) could be used to authorize fees prohibited by section 503(b)). But even assuming that any of the proposed fees did fall outside the scope of section 503(b), they would nevertheless remain subject to the more general disclosure and court approval requirements of section 1129(a)(4).

**CONCLUSION**

37. As detailed above, the Plan is not confirmable because it seeks approval of certain relief that is contrary to applicable law and controlling precedent. The R. 9019 Motion should be denied as it seeks approval of relief that is contrary to specific statutory authority.

38. The U.S. Trustee leaves the Debtors to their burden and reserves any and all rights, remedies and obligations to, *inter alia*, complement, supplement, augment, alter and/or modify this objection, file an appropriate Motion and/or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery and cross-examine any and all witnesses in support of the Plan, the R. 9019 Motion and the Settlement Agreement.

**WHEREFORE,** the U.S. Trustee respectfully requests that this Court issue an order denying confirmation of the Plan and approval of the Settlement Agreement consistent with this objection, and/or granting such other relief as this Court deems appropriate, fair and just.

Dated: October 27, 2015
      Wilmington, Delaware

Respectfully submitted,

**ANDREW R. VARA**
**ACTING UNITED STATES TRUSTEE**

By: */s/ Richard L. Schepacarter*
    Richard L. Schepacarter
    Andrea B. Schwartz
    Timothy J. Fox, Jr.
    Trial Attorneys
    United States Department of Justice
    Office of the United States Trustee
    J. Caleb Boggs Federal Building
    844 King Street, Room 2207, Lockbox 35
    Wilmington, DE 19801
    (302) 573-6491
    (302) 573-6497 (Fax)