# Exhibit B

Page 1

1
2  UNITED STATES BANKRUPTCY COURT
3  FOR THE DISTRICT OF DELAWARE
   --------------------------------------------x
4  In Re:
5  Energy Future Holdings Corporation, et al.,
6            Debtors.
7  Chapter 11
8  Case No. 14-10979
9  Jointly Administered
10 --------------------------------------------x
11        DEPOSITION OF MARK RULE
12          New York, New York
13           October 22, 2015
14
15
16
17
18
19
20
21
22
23 Reported by:
24 KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25 JOB NO. 99140

Page 2

1
2            October 22, 2015
3
4       Deposition of MARK RULE, held
5  at Kirkland & Ellis LLP, 601 Lexington
6  Avenue, New York, New York, before Kathy
7  S. Klepfer, a Registered Professional
8  Reporter, Registered Merit Reporter,
9  Certified Realtime Reporter, Certified
10 Livenote Reporter, and Notary Public of
11 the State of New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2         A P P E A R A N C E S:
3  SULLIVAN & CROMWELL
4  Attorneys for E-side Official Creditors
5       125 Broad Street
6       New York, New York  10004
7  BY:  ADAM BREBNER, ESQ.
8
9  KIRKLAND & ELLIS
10 Attorneys for the Debtors
11      300 North LaSalle
12      Chicago, Illinois  60654
13 BY:  BRENTON ROGERS, ESQ.
14      555 California Street
15      San Francisco, California  94104
16      KEVIN CHANG, ESQ.
17
18 MONTGOMERY McCRACKEN WALKER & RHOADS
19 Attorneys for EFH Committee and the Witness
20      123 South Broad Street
21      Avenue of the Arts
22      Philadelphia, Pennsylvania  19109
23 BY:  LATHROP NELSON, ESQ.
24
25

Page 4

1
2         A P P E A R A N C E S:  (Cont'd.)
3
4  MUNGER TOLLES & OLSON
5  Attorneys for the TCH Debtors
6      355 South Grand Avenue
7      Los Angeles, California  90071
8  BY:  BRADLEY SCHNEIDER, ESQ.
9
10 PAUL, WEISS, RIFKIND, WHARTON & GARRISON
11 Attorneys for Ad Hoc Committee of TCEH First Lien
12 Creditors
13      1285 Avenue of the Americas
14      New York, New York  10019
15 BY:  KIMBERLY FRANCIS, ESQ.
16
17 NIXON PEABODY
18 Attorneys for American Stock Transfer as Indenture
19 Trustee at EFH
20      100 Summer Street
21      Boston, Massachusetts  02110
22 BY:  MORGAN NIGHAN, ESQ.
23      GEORGE SKELLY, ESQ. (Telephonic)
24
25

**Page 5**

```
 1
 2    A P P E A R A N C E S:  (Cont'd.)
 3
 4 AKIN GUMP STRAUSS HAUER & FELD
 5 Attorneys for UMB Bank, As Indenture Trustee for the
 6 Unsecured 11.25 Percent/12.25 Percent Senior Toggle
 7 Notes Due 2018
 8    One Bryant Park
 9    New York, New York  10036
10 BY: RICHARD WILLIAMS, ESQ.
11
12 MORRISON & FOERSTER
13 Attorneys for Official Committee of Unsecured
14 Creditors for TCEH
15    250 West 55th Street
16    New York, New York  10019
17 BY: SAMANTHA MARTIN, ESQ.
18
19 WHITE & CASE
20 Attorneys for the Ad Hoc Group of
21 TCEH Unsecured Notes
22    1155 Avenue of the Americas
23    New York, New York  10036
24 BY: DANIELLE AUDETTE, ESQ.
25
```

**Page 6**

```
 1
 2
 3    A P P E A R A N C E S:  (Cont'd.)
 4
 5 FRIED, FRANK, HARRIS, SHRIVER & JACOBSON
 6 Attorneys for Fidelity
 7    One New York Plaza
 8    New York, New York  10004
 9 BY: ALYSA AIN, ESQ.
10
11 PATTERSON BELKNAP WEBB & TYLER
12 Attorneys for the Law Debenture
13    1133 Avenue of the Americas
14    New York, New York  10036
15 BY: BRIAN GUINEY, ESQ. (Telephonic)
16
17 PROSKAUER ROSE
18 Attorneys for EFH at the direction of the
19 Disinterested Directors
20    70 West Madison
21    Chicago, Illinois  60602
22 BY: MARK THOMAS, ESQ.
23
24
25
```

**Page 7**

```
 1
 2    A P P E A R A N C E S:  (Cont'd.)
 3
 4 BROWN RUDNICK
 5 Attorneys for Wilmington Savings Fund
 6 Society as Successor Trustee
 7    One Financial Center
 8    Boston, Massachusetts  02111
 9 BY: JONATHAN MARSHALL, ESQ. (Telephonic)
10
11 VENABLE
12 Attorneys for Pimco
13    Rockefeller Center
14    1270 Avenue of the Americas
15    New York, New York  10020
16 BY: JEFFREY SABIN, ESQ.
17
18 WACHTELL, LIPTON, ROSEN & KATZ
19 Attorneys for EFH Equity Owners
20    51 West 52nd Street
21    New York, New York  10019
22 BY: EMIL KLEINHAUS, ESQ.
23    NATASHA FERNANDEZ-SILBER, ESQ.
24
25
```

**Page 8**

```
 1
 2    A P P E A R A N C E S:  (Cont'd.)
 3
 4 SHEARMAN & STERLING
 5 Attorneys for EFIH, First Lien DIP Agent
 6    599 Lexington Avenue
 7    New York, New York  10022
 8 BY: FOTEINI TELONI, ESQ.
 9
10 KRAMER LEVIN NAFTALIS & FRANKEL
11 Attorneys for EFIH 2nd Lien Note Trustee
12    1177 Avenue of the Americas
13    New York, New York  10036
14 BY: GREGORY HOROWITZ, ESQ. (Telephonic)
15
16 SEWARD & KISSEL
17 Attorneys for TCEH First Lien Agent
18    One Battery Park Plaza
19    New York, New York  10004
20 BY: THOMAS ROSS HOOPER, ESQ. (Telephonic)
21
22
23
24
25
```

MARK RULE

1  MARK RULE, called as a
2  witness, having been duly sworn by a Notary
3  Public, was examined and testified as
4  follows:
5
6  EXAMINATION BY
7  MR. ROGERS:
8      Q.   Good morning, Mr. Rule.  We met off
9  the record.  My name is Brent Rogers and I
10 represent the debtors in this matter.
11         Have you been deposed before?
12     A.   I have not.
13     Q.   Please let me know if you don't
14 understand a question that I ask and I'll
15 rephrase it for you.  Is that fair?
16     A.   Yes.
17     Q.   And if you do answer a question that I
18 ask, I'll assume you understood it.  Is that
19 fair?
20     A.   Yes.
21     Q.   What did you do to prepare for this
22 deposition?
23     A.   Well, I independently reviewed my
24 report and source documents as well as I met
25 with counsel.

MARK RULE

1
2      Q.   When you say you reviewed source
3  documents, do you mean the documents that are
4  cited in your report?
5      A.   Yes.
6      Q.   Did you review any documents that are
7  not cited in your report?
8      A.   I did.
9      Q.   What documents?
10     A.   I reviewed some documents from the
11 data site that related to SG&A allocations.
12     Q.   Do you recall generally what those
13 documents were?
14     A.   They looked like annual presentations
15 put together by EFH Corp. that was an annual
16 review of the allocations of SG&A between the
17 various entities.
18     Q.   Had you seen those documents before
19 you reviewed them in preparation for the
20 deposition?
21     A.   I hadn't seen them, but they confirmed
22 other documents that I had reviewed.
23     Q.   Besides the documents that you found
24 on the data site, are there any other documents
25 you reviewed in preparation for the deposition

MARK RULE

1
2  that you did not cite in your report?
3      A.   Not that I can recall, no.
4      Q.   You say you met with counsel to
5  prepare for the deposition?
6      A.   Yes.
7      Q.   Did you meet with anyone else?
8      A.   No.
9      Q.   Did you listen in on the testimony of
10 David Ying on Monday?
11     A.   Yes.
12     Q.   Did you listen to the whole thing?
13     A.   Yes, but I was focused on the sections
14 that related to my report.
15     Q.   Did you read the transcript of Mr.
16 Ying's testimony?
17     A.   I read the relevant sections.
18     Q.   Have you listened in on any of the
19 other expert depositions that have taken place
20 this week?
21     A.   No, I have not.
22     Q.   In the course of discovery in this
23 case, have you listened to any fact witness
24 depositions?
25     A.   No, I have not.

MARK RULE

1
2      Q.   Have you read any transcripts other
3  than Mr. Ying's?
4      A.   No, I have not.
5      Q.   Have you ever served as an expert
6  witness in litigation before?
7      A.   I have not.
8      Q.   Have you ever testified in court in
9  any capacity before?
10     A.   No.
11     Q.   Who retained you in this matter?
12     A.   AlixPartners has been retained by the
13 E-side Unsecured Creditors Committee as
14 financial advisors.
15     Q.   Is there a law firm that you've been
16 working with in particular?
17     A.   AlixPartners or myself?
18     Q.   Well, let me be a little more clear.
19         Who retained you to provide expert
20 testimony in this matter?
21     A.   I'm not sure I can answer the
22 question.  I was asked, as part of our role as
23 financial advisors, by counsel to prepare a
24 report, so I can't speak to retention because we
25 were retained previously and I was not involved

Page 13

MARK RULE

1           MARK RULE
2 in the retention.
3    Q.  Okay. Who asked you to prepare the
4 report?
5    A.  It was Montgomery McCracken.
6    Q.  When did Montgomery McCracken ask you
7 to prepare an expert report?
8    A.  A little over three weeks ago.
9 Probably closer to four.
10   Q.  And when you were first approached to
11 prepare a report in this matter, what was your
12 task? What opinions were you asked to develop?
13   A.  Well, prior to being asked to submit
14 an expert report, I was working on helping
15 counsel review issues of valuation and solvency,
16 and so it was after that initial review that I
17 was asked to provide a report.
18   Q.  So you had been helping counsel review
19 issues of valuation and solvency, and then they
20 approached you and asked you to submit a report
21 on those topics?
22   A.  Yes.
23   Q.  Do you know if anyone else has been
24 looking at solvency issues for the E-side
25 Unsecured Creditors Committee besides

Page 14

1           MARK RULE
2 AlixPartners?
3    A.  I'm not aware.
4    Q.  Have you talked to Guggenheim, anyone
5 from Guggenheim at all, about your opinions in
6 this case?
7    A.  I've had a discussion with Guggenheim
8 related to the plan of reorganization and the
9 proposed bid that underlies the plan.
10   Q.  Was that in connection with the
11 opinions that you are rendering here today?
12   A.  Yes.
13   Q.  What was the substance of those
14 discussions?
15   A.  It was understanding the transaction,
16 understanding the bid.
17   Q.  And when you say understanding the
18 transaction or the bid, you mean the current,
19 sometimes referred to as the Hunt Group bid?
20   A.  That's correct.
21   Q.  And what was it about the Hunt Group
22 bid that you needed to understand to render your
23 opinions in the case?
24     MR. BREBNER: Just to be clear, you're
25 asking about his expert opinions in his

Page 15

1           MARK RULE
2 report that he's offering as testimony at
3 trial, correct?
4     MR. ROGERS: Correct.
5     THE WITNESS: I wanted to understand
6 the bid so I can understand if the nature of
7 the offer by the Hunts could be potentially
8 used to value the pre-petition assets, and
9 as I say in my report, I do not believe that
10 the current bid can be used to value the
11 pre-petition assets.
12 BY MR. ROGERS:
13   Q.  Did you learn anything else from
14 Guggenheim about the Hunt bid that was relevant
15 to the opinions that you are rendering in your
16 report?
17   A.  No.
18   Q.  About how many hours have you put into
19 developing the opinions that you are rendering
20 in your report, if you can ballpark it for me?
21   A.  Personally, several hundred. The work
22 really dates back to August, but there would be
23 additional hours, obviously, incurred by members
24 of my team.
25   Q.  Now, you provided an expert report in

Page 16

1           MARK RULE
2 this matter, correct?
3    A.  Yes.
4     MR. ROGERS: We will mark that expert
5 report as Exhibit 1.
6     (Rule Exhibit 1, Expert Report of Mark
7 F. Rule, CFA, October 12, 2015, marked for
8 identification, as of this date.)
9     MR. NELSON: Rule 1?
10    MR. ROGERS: Sure.
11 BY MR. ROGERS:
12   Q.  Do you have Rule Exhibit 1 in front of
13 you, Mr. Rule?
14   A.  Yes.
15   Q.  Is this a copy of the report that you
16 have submitted in this case?
17   A.  Yes, it appears to be a copy.
18   Q.  Who helped you draft this report?
19     MR. BREBNER: Objection to form.
20   A.  The report was drafted by myself and
21 members of the AlixPartners team.
22   Q.  And you understood that it was
23 important for your report to contain all of the
24 opinions you plan to offer in this case,
25 correct?

MARK RULE

1
2  A.  I'm not sure I understand your
3  question.  I understand that there were certain
4  opinions that I was asked to provide opinions
5  on, and those are reflected in my report.
6  Q.  Are all of the opinions that you were
7  asked to render in this case reflected in your
8  report?
9  A.  Yes.
10  Q.  You understood that it was important
11  for your report to contain all of the bases for
12  the opinions that you are rendering in this
13  case, correct?
14  A.  I believe my report does reflect the
15  bases for or the support for my opinions, yes.
16  Q.  And all of the bases for your opinions
17  are contained within the report, correct?
18  A.  I believe so, yes.
19  Q.  And if you turn to page 5 of your
20  report, there is a section of your report titled
21  Summary of Opinions, right?
22  A.  Yes.
23  Q.  And these are the opinions that you
24  were asked to render in this case, correct?
25  A.  Yes.

MARK RULE

1
2  Q.  Did you have an opportunity to review
3  your report before it was served on the debtors?
4  A.  Yes.
5  Q.  Is your report complete and accurate?
6  A.  Yes.
7  Q.  Is there anything in the report that
8  as you sit here today you would want to change?
9  A.  Not that I can recall, no.
10  Q.  When you listened in on Mr. Ying's
11  testimony, you heard him make certain comments
12  about your report, correct?
13  A.  Yes.
14  Q.  Did any of those comments cause you to
15  reevaluate the opinions that you have in your
16  report?
17  MR. BREBNER: Objection. Form.
18  A.  Well, one comment he made is inability
19  to review and analyze Figure 5, and so I went
20  back and had my team go back to the source
21  documents and double-check that the citations in
22  the source documents were sufficient such that
23  one could go back to the SEC filings and
24  recreate the analysis.
25  Q.  And were you satisfied at the end of

MARK RULE

1
2  that evaluation that the citations are
3  sufficient to find the numbers in your report?
4  A.  Yes.
5  Q.  Is there anything else about Mr.
6  Ying's comments that caused you to reevaluate
7  any of your opinions?
8  A.  No.
9  Q.  There is Exhibit 1 to your report is
10  your résumé, right?
11  A.  Yes, Exhibit 1 is a version of my
12  résumé, yes.
13  Q.  Is it accurate and up to date as of
14  today?
15  A.  Yes.
16  Q.  You are qualified to do valuations,
17  right?
18  A.  Yes.
19  Q.  And you valued a wide range of assets
20  in your career, correct?
21  A.  Yes.
22  Q.  And you valued a wide range of
23  businesses, right?
24  A.  Yes.
25  Q.  You valued electric utility generation

MARK RULE

1
2  and transmission -- you valued at least one
3  electric utility generation and transmission
4  cooperative, right?
5  A.  Yes.
6  Q.  You have not done any work in this
7  case to value independently EFH Corp. or any of
8  its subsidiaries, correct?
9  MR. NELSON: Objection to form.
10  MR. BREBNER: Objection to form.
11  A.  What I have done is what I summarize
12  in my report.  I have relied upon the
13  contemporaneous valuations done by Duff & Phelps
14  after I analyzed them and became comfortable
15  that they were a reasonable starting point for
16  my solvency analysis.
17  Q.  But you haven't done a ground-up
18  valuation of any of the debtors, right?
19  MR. BREBNER: Object to form.
20  A.  I have not done a full valuation,
21  independent valuation myself, no.
22  Q.  Were you asked to do a full,
23  independent valuation of any of the debtors?
24  A.  Well, number one, as I say in my
25  report, I don't think, based on the information

Page 21

1          MARK RULE
2 that's been made available to the committee,
3 that a full valuation can be done. That being
4 said, that's the reason why I relied in part on
5 Duff & Phelps.
6    Q.   Were you asked to do a full valuation
7 of any of the debtors?
8    A.   I would have done a full valuation if
9 the information would have been available.
10   Q.   But my question is just a little bit
11 different. Did anyone ask you to do a full
12 valuation of any of the debtors?
13   A.   I don't recall specifically being
14 asked one way or the other. I do recall being
15 asked to evaluate the solvency, and under that
16 construct, I normally would like to do a full,
17 independent valuation.
18   Q.   And what information would you have
19 needed to do a full, independent valuation?
20   A.   Well, it starts with one of the key
21 drivers, the projections, and so while I have
22 summary-level projections contained in Duff &
23 Phelps, what I don't have, and which would be
24 critical, would be full projections, the backup
25 behind the projections, the assumptions for each

Page 22

1          MARK RULE
2 of the inputs and the context of those
3 assumptions and projections, namely, discussions
4 with management or testimony by management or
5 contemporaneous documentations that spell out
6 the rationale behind those. And so the
7 information that I had, that was not available.
8 So that's probably the key thing because that
9 informs other aspects of the valuation.
10   Q.   Okay. So that's the key thing, but
11 there may be other things that you would want as
12 well to do a full, independent valuation of the
13 debtors, right?
14   A.   That's the primary thing, yes.
15   Q.   Another thing that's apparent from
16 your résumé is that you are qualified to do an
17 analysis of fraudulent conveyance in preference
18 actions, right?
19   A.   That's correct.
20   Q.   And you have done that before in
21 high-profile cases, correct?
22   A.   I have.
23   Q.   So you've done that before for
24 unsecured creditors committees?
25   A.   I have advised unsecured creditors

Page 23

1          MARK RULE
2 committees on issues of valuation and solvency.
3    Q.   Have you done a fraudulent conveyance
4 analysis for an unsecured creditors committee
5 before?
6    A.   What do you mean by fraudulent
7 conveyance analysis?
8    Q.   Well, let's look at page 2 of your
9 résumé.
10   A.   Okay.
11   Q.   Are you with me?
12   A.   I am.
13   Q.   See the top bullet there relates to
14 work you did as a financial advisor to the
15 unsecured creditors committee in a
16 multi-billion-dollar bankruptcy of a newspaper
17 and television company?
18   A.   Okay.
19   Q.   And you did a fraudulent conveyance --
20 you advised that unsecured creditors committee
21 on fraudulent conveyance issues, correct?
22   A.   Yes, namely, valuation and solvency
23 issues that would be the bases for the committee
24 arguing fraudulent conveyance.
25   Q.   Given your experience, you understand

Page 24

1          MARK RULE
2 that whether a transaction is a fraudulent
3 conveyance is often a contested issue in
4 bankruptcies, right?
5    A.   I understand there could be different
6 views by different parties as far as issues of
7 solvency.
8    Q.   And you understand that issues of
9 fraudulent conveyance are factually-intensive,
10 right?
11        MR. BREBNER:  Objection to form.
12        MR. NELSON:  Objection to form.
13   A.   What do you mean by
14 factually-intensive?
15   Q.   Well, to understand whether a
16 transaction was a fraudulent conveyance, you
17 need to have a lot of information and facts,
18 right?
19   A.   I would say it's a case-by-case basis.
20 So each one could be more complex than the
21 other. So, I mean, it just depends on the
22 individual facts and circumstances surrounding
23 the case.
24   Q.   And you worked on fraudulent
25 conveyance matters that were

Page 25

MARK RULE

1
2 factually-intensive, correct?
3    A.   I have worked on complex matters, yes.
4    Q.   Have you ever been involved in a
5 fraudulent conveyance analysis that has gone to
6 trial?
7    A.   Yes.
8    Q.   And I think you said before you
9 haven't provided any testimony before, but was
10 there testimony in the trial over whether
11 transactions were fraudulent conveyances?
12   A.   Yes.
13   Q.   And did it take a long time between
14 the filing of a complaint and the litigation of
15 the issues at trial in that case?
16        MR. NELSON:  Objection to form.
17   A.   In that particular case, there was a
18 period of time between, you know, filing of the
19 complaint and ultimate trial, but I think that's
20 typical for a lot of cases in the court system.
21   Q.   You think it's typical for a long
22 period of time between the filing of the case
23 and the litigation of the matter at trial,
24 right?
25        MR. BREBNER:  Objection to form.

Page 26

MARK RULE

1
2    A.   Again, I think that's a function of
3 the legal system, not necessarily a function of
4 being able to do the analysis.
5    Q.   Sure.  And I'm not suggesting that
6 it's a function of the time necessary to do the
7 analysis.  All I'm asking is, in your
8 experience, you understand it can be a long time
9 between the filing of a complaint and the
10 litigation of a fraudulent conveyance matter at
11 trial, right?
12   A.   I've been involved in cases that had
13 varying lengths between filing of a complaint
14 and actual trial, and some obviously don't get
15 to trial, so...
16   Q.   And you understand that it can be
17 expensive to litigate fraudulent conveyance
18 actions, right?
19        MR. NELSON:  Objection to form.
20   A.   I can't -- I can't speak to costs from
21 a legal side of what it costs to litigate one
22 because, again, that can vary.
23   Q.   You understand that fraudulent
24 conveyance litigation often involves experts on
25 both sides of the issue, right?

Page 27

MARK RULE

1
2    A.   It can, yes.
3    Q.   One of the tests for determining
4 insolvency in a fraudulent conveyance action is
5 the debtor's ability to pay its debts as they
6 come due.  Are you aware of that?
7    A.   I am.
8    Q.   And in the past, you have done
9 analyses of companies' ability to pay their
10 debts before they -- as they come due?
11   A.   I have done analyses in conjunction
12 with the balance sheet test.
13   Q.   Have you ever done an analysis of a
14 debtor's ability to pay debts as they come due?
15   A.   In the context of a solvency analysis?
16   Q.   Correct.
17   A.   I have.
18   Q.   And you're qualified to make that
19 assessment, right?
20   A.   Yes.
21   Q.   And you're qualified to do damages
22 analyses, right?
23   A.   In what context?
24   Q.   Well, you've done damages analyses in
25 the past?

Page 28

MARK RULE

1
2    A.   I have.
3    Q.   Okay.  And is it your understanding
4 from your experience that damages are often
5 contested issues in litigation?
6    A.   Oftentimes, you will have different
7 views; different parties will have different
8 views on the issue, sure.
9    Q.   And oftentimes different parties will
10 hire experts on either side of the damages
11 issue, right?
12   A.   They can.
13   Q.   You've done analyses of post-merger
14 solvency of a combined company, correct?
15   A.   I have done analyses on a pro forma
16 basis that were geared towards answering the
17 question if two companies are combined on a pro
18 forma post-merger basis, will they be solvent;
19 yes, I have.
20   Q.   And you've done work to determine the
21 appropriateness of valuation inputs such as
22 projections and discount rates, correct?
23   A.   In the context of the cases we were
24 just talking about?
25   Q.   In the context of your career.

Page 29
1                    MARK RULE
2      A.   Can you repeat the question?
3      Q.   Sure.  You've done work to determine
4  the appropriateness of valuation inputs such as
5  projections and discount rates?
6      A.   Yes.
7      Q.   You've assessed the reasonableness of
8  financial projections in the past, right?
9      A.   Yes.
10     Q.   Would you agree with me that the
11 appropriateness of valuation inputs are often
12 disputed issues in litigation?
13     A.   Again, different parties can have
14 different views on valuation inputs.
15     Q.   And oftentimes in litigation you will
16 see experts on either side disputing the
17 appropriateness of various valuation inputs,
18 correct?
19          MR. BREBNER:  Objection to form.
20     A.   Again, experts can have different
21 opinions as to inputs in valuations, yes.
22     Q.   You're not an expert in the oil and
23 gas industry, are you?
24     A.   I am -- I have familiarity with the
25 oil and gas industry based on my case

Page 30
1                    MARK RULE
2  experience, but do I not hold myself out as an
3  expert in oil and gas.
4      Q.   And you're not offering any opinions
5  in this case on the oil and gas industry,
6  correct?
7          MR. BREBNER:  Objection to form.
8      A.   I'm offering opinions as those
9  contained in my report.
10     Q.   And there's no opinions in your report
11 about the oil and gas industry, right?
12     A.   No.
13     Q.   You're not an expert in energy
14 regulatory agencies, are you?
15     A.   No.
16     Q.   Or, put another way, you're not an
17 expert in energy regulations, right?
18     A.   Again, I'm familiar, but again, I do
19 not hold myself out as an expert.
20     Q.   Okay.  I want to turn to page 5 of
21 your report, Mr. Rule.  At the very top of page
22 5, the first full sentence reads, "I also
23 reserve the right to respond or reply to any
24 opinions offered by Debtor's experts relating to
25 the opinions herein or my areas of expertise."

Page 31
1                    MARK RULE
2      Do you see that?
3      A.   Yes.
4      Q.   Why did you include that reservation
5  of rights?
6      A.   Well, to the extent that the debtors
7  had experts that disagreed or had different
8  opinions than mine, I would like the chance to
9  respond to them.
10     Q.   Okay.  Any other reason?
11     A.   No.  I mean, that would be the reason.
12     Q.   Have you been asked to review the
13 expert reports of any of the debtors' experts?
14     A.   I have reviewed some of the expert
15 reports, yes.  I've reviewed some of the expert
16 reports, yes.
17     Q.   Which ones have you reviewed?
18     A.   I've reviewed Mendelsohn.  I think
19 that's the only expert report, debtors expert
20 report, that I have reviewed.
21     Q.   Do you intend to offer any opinions in
22 this case on Mr. Mendelsohn's expert report?
23     A.   I do not.
24     Q.   Do you intend to respond or reply to
25 any opinions offered by the debtors' experts in

Page 32
1                    MARK RULE
2  this case?
3      A.   To the extent that they submit
4  rebuttal reports and relate to my report, I
5  would imagine that I would review and respond
6  where appropriate.
7      Q.   As you sit here today, there have been
8  no rebuttal reports issued by the debtors;
9  you're aware of that, correct?
10     A.   I am aware that, at this stage, there
11 have been no rebuttal reports.
12     Q.   Okay.  So, as you sit here today,
13 there are no opinions or -- there are no
14 opinions offered by the debtors that you intend
15 to respond to; is that fair?
16          MR. NELSON:  Objection to form.
17          MR. BREBNER:  Objection.
18     A.   There are no formal opinions.  I'm
19 aware of some critiques that Mr. Ying brought up
20 in his deposition that, you know, I would
21 respond to if asked about, but as far as formal
22 opinions, I'm not aware of any formal opinions
23 that relate to solvency or SG&A costs or debt
24 repurchases that the debtors have offered.
25     Q.   You're not offering any opinion on the

1          MARK RULE
2 solvency of any debtor prior to December 31,
3 2008 in this case, correct?
4    A.   That's correct.
5    Q.   Your solvency opinions are related to
6 particular dates that start at year-end 2008,
7 right?
8    A.   That's correct.
9    Q.   You're not offering any opinion on the
10 solvency of EFH or its subsidiaries at the time
11 of the 2007 LBO, correct?
12   A.   That's correct.
13   Q.   You're not offering any opinion as to
14 whether the LBO left EFH or any of its
15 subsidiaries insolvent, correct?
16   A.   I did not perform that analysis.
17   Q.   Were you asked to do any analysis of
18 the solvency of EFH or any of its subsidiaries
19 at the time of the LBO?
20   A.   I was not.
21   Q.   Were you asked to do any analysis of
22 the solvency of any debtor at any time other
23 than those laid out in your report?
24   A.   I was asked to review the solvency
25 from 2008 through the petition date, and that

1          MARK RULE
2 was laid out in my report.
3        MR. ROGERS:  We'll mark this as Rule
4    2.
5        (Rule Exhibit 2, TXU Corp. Solvency
6    Analysis Presentation October 10, 2007,
7    marked for identification, as of this date.)
8 BY MR. ROGERS:
9    Q.   Mr. Rule, you recognize this as a Duff
10 & Phelps report dated October 10, 2007?
11   A.   Yes.
12   Q.   And this is a report that you cited in
13 your reliance materials and in your report,
14 correct?
15   A.   Yes, it appears to be the same report.
16   Q.   Have you reviewed this Duff & Phelps
17 report, Exhibit 2?
18   A.   I have.
19   Q.   Have you done -- well, this report is
20 an analysis of whether EFH and its subsidiaries
21 would be solvent after the LBO, correct?
22   A.   Yes; that's what it purports to be,
23 yes.
24   Q.   I want to direct you to a statement
25 that's on page 2 of the Duff & Phelps report,

1          MARK RULE
2 Exhibit 2.  Do you see there's four bullet
3 points on page 2?
4    A.   Yes.
5    Q.   In the second bullet point, the third
6 sentence reads, "Any estimates and projections
7 contained herein involve numerous and
8 significant subjective determinations, which may
9 or may not prove to be correct."
10       Do you see that?
11   A.   I see that statement.
12   Q.   Do you agree that a solvency analysis
13 inherently involves significant subjective
14 determinations?
15   A.   I don't know -- I don't think I agree
16 with "significant," but I would agree that
17 valuation and solvency analyses do have a
18 subjective component to the analysis.
19   Q.   And those subjective components can
20 be -- or, that subjective component can be the
21 subject of professional judgment, right?
22   A.   Well, not only professional judgment,
23 but judgment by the company itself when you're
24 looking at projections and their estimate of
25 what they think is going to happen in the

1          MARK RULE
2 future.  So it's judgment by the company, it can
3 be judgment by professionals, but as I said,
4 there is an element of judgment in valuation and
5 solvency analyses.
6    Q.   And you agree that reasonable minds
7 can differ on elements of judgment, correct?
8        MR. BREBNER:  Objection to form.
9    A.   I think, by definition, if it's an
10 opinion and a judgment opinion, that people can
11 have different opinions.
12   Q.   Have you done a solvency opinion
13 before?
14   A.   I have -- what do you mean by solvency
15 opinion?
16   Q.   Have you offered an opinion to any
17 company about whether or not it was solvent at a
18 particular point in time?
19   A.   Are you referring to a formal opinion,
20 such as what's contained here in the Duff &
21 Phelps report, or are you referring to advice
22 given to a client?
23   Q.   Let's start with a formal opinion.
24 Have you ever rendered a formal solvency opinion
25 before?

Page 37

1        MARK RULE
2    A.   No; AlixPartners does not render
3 formal solvency opinions.
4    Q.   Is that a policy of AlixPartners, that
5 it doesn't render formal solvency opinions?
6    A.   It's a policy of AlixPartners, but
7 that being said, we do advise clients on issues
8 of solvency, and we have done in the past, and I
9 would imagine we would continue to do so in the
10 future.
11   Q.   You're not offering any opinions in
12 this case on the Duff & Phelps 2007, October 10
13 solvency opinion, correct?
14   A.   I'm not offering any opinions on the
15 solvency opinion itself.  I do note that certain
16 aspects of Duff & Phelps' opinion are consistent
17 with my analysis, namely, the manner in which
18 they did their consolidated analysis and the use
19 of face value of debt.
20   Q.   You're not critiquing the methodology
21 that Duff & Phelps used in the October 10, 2007
22 solvency opinion, correct?
23   A.   I have not formed any opinions on
24 their analysis as it relates to the 2007
25 solvency analysis.

Page 38

1        MARK RULE
2    Q.   And you're aware that the Duff &
3 Phelps solvency analysis in 2007 concluded that
4 EFH, which was then, at the time, called TXU,
5 had a net asset value of approximately $4
6 billion?
7    A.   If you direct me to the page, but I
8 don't recall off the top of my head the specific
9 number.
10   Q.   Sure.  It's page 21 of the Exhibit 2,
11 October 10, 2007 Duff & Phelps report.
12        And you see there the net asset value
13 is about $3.9 billion?
14   A.   Yes, according to this page, Duff &
15 Phelps concluded that, as of -- I don't see the
16 date on this page, but according to this
17 analysis, the net asset value for a consolidated
18 TXU, which would include Oncor and TCEH, was
19 approximately $3.9 billion.
20   Q.   And that was as of the date of the
21 proposed transaction and immediately following
22 the consummation of the proposed transaction,
23 which was the LBO, correct?
24   A.   That's what it says, the proposed
25 transaction, but based on this page, I don't

Page 39

1        MARK RULE
2 know what the exact date is.
3    Q.   And you don't take issue with this
4 conclusion on page 21, do you?
5    A.   I haven't fully evaluated the
6 conclusion.
7    Q.   So you have no basis to challenge it?
8    A.   I haven't evaluated it.
9    Q.   And if you look at the page
10 immediately before page 21, so page 20, you see
11 there is an analysis of TCEH solvency under the
12 balance sheet test, correct?
13   A.   That's what it purports to be, yes.
14   Q.   And just to step back, on page 21,
15 that was an analysis of EFH solvency under the
16 balance sheet test, correct?
17   A.   That's what it purports to be.
18   Q.   And you don't take issue with any of
19 the conclusions on page 20 of the Duff & Phelps
20 analysis, correct?
21        MR. BREBNER:  Objection to form.
22   A.   Again, I haven't fully analyzed and
23 formed any opinions as it relates to this
24 specific analysis.
25   Q.   You're not offering any opinion that

Page 40

1        MARK RULE
2 the LBO was a fraudulent transfer, right?
3    A.   Again, I haven't evaluated the issue
4 and formed any opinions.
5    Q.   And you're not offering any opinion
6 that the LBO, or any transaction it included,
7 should be avoided, right?
8    A.   Again, I haven't evaluated the issue
9 or formed any opinions.
10   Q.   You're not offering any opinion that
11 any pre-petition transaction was a fraudulent
12 transfer, correct?
13   A.   Could you repeat that question,
14 please?
15   Q.   Sure.  You are not offering any
16 opinion in this case that any pre-petition
17 transaction was a fraudulent transfer?
18   A.   I have not evaluated any specific
19 transactions that occurred pre-petition.  I was
20 tasked or asked to provide solvency opinions
21 related to 2008 to the petition date.
22   Q.   You haven't evaluated any pre-petition
23 transactions?  You have no opinion as to whether
24 any of those transactions were fraudulent
25 transfers, fair?

MARK RULE

1
2    MR. NELSON: Objection to form.
3    A.    I haven't evaluated any of the actual
4    transactions. I do have an opinion that would
5    relate to solvency, which would be the basis for
6    arguing potential fraudulent conveyances.
7    Q.    There are other elements to a
8    fraudulent conveyance claim, you're aware of
9    that, besides solvency?
10   A.    Specifically, you're referring to
11   what?
12   Q.    So, for instance, whether the transfer
13   was for reasonably equivalent value.
14   A.    I'm aware that there is a reasonably
15   equivalent value aspect to a fraudulent
16   conveyance, correct.
17   Q.    And you haven't done any analysis of
18   whether any particular transaction involved
19   reasonably equivalent value, correct?
20   A.    I haven't formed any opinions related
21   to reasonably equivalent value in any
22   transactions.
23   Q.    Were you asked to do any analysis of
24   transactions as potential fraudulent conveyances
25   other than the solvency analysis that you have

MARK RULE

1
2    done?
3        MR. BREBNER: For purposes of his
4    report? Opinions at trial?
5        MR. ROGERS: Yes.
6        THE WITNESS: I have not evaluated any
7    transactions in the context of a fraudulent
8    conveyance. I have evaluated certain
9    transactions related to SG&A and debt
10   repurchases.
11   BY MR. ROGERS:
12   Q.    Okay. But have you been asked to
13   determine whether those transactions were
14   fraudulent conveyances?
15   A.    No.
16   Q.    Have you been asked to determine
17   whether any of those transactions were done for
18   reasonably equivalent value?
19   A.    No.
20   Q.    You're not offering any opinion in
21   this case that any particular pre-petition
22   transaction should be avoided on any basis,
23   correct?
24   A.    My opinions are, again, those
25   contained in my report.

MARK RULE

1
2    Q.    And none of those opinions relate to
3    whether -- strike that.
4        None of those opinions are that a
5    particular transaction should be avoided on any
6    basis, right?
7    A.    That's correct.
8    Q.    Have you been asked to do an
9    assessment in connection with your expert
10   opinions in this case as to whether any
11   transactions should be avoided on any basis?
12   A.    I have not been asked to do that.
13   Q.    You're not offering any opinion in
14   this case on the merits of any legal claims,
15   litigation claims, right?
16       MR. NELSON: Objection. Form.
17   A.    I'm not a lawyer, so I wouldn't be
18   opining on any legal theories.
19   Q.    In the context of the expert work you
20   have done in this case, have any litigation
21   claims been identified to you?
22   A.    My analysis has been focused on the
23   solvency aspects as well as the SG&A and debt
24   repurchases.
25   Q.    So my question was a little bit

MARK RULE

1
2    different. Have any litigation claims been
3    identified to you?
4    A.    I have not had any discussion related
5    to specific claims.
6    Q.    And you're not offering any opinion in
7    this case as to potential damages associated
8    with any litigation claims, correct?
9    A.    I am not.
10   Q.    Are you familiar with the settlement
11   agreement that's been filed with the court in
12   this case?
13   A.    I'm generally familiar with it.
14   Q.    You're not offering any opinion as to
15   the value of any of the claims that were settled
16   in the settlement agreement, correct?
17   A.    I am not.
18   Q.    And you're not offering any opinion as
19   to the merits of the settlement agreement, are
20   you?
21       MR. BREBNER: Objection to form.
22   A.    I was not asked to evaluate the
23   merits.
24   Q.    And you're not offering any opinion on
25   that?

MARK RULE

2  A.  I am not.

3  Q.  How did you get access to the

4  materials that you relied on to develop your

5  opinions?

6  A.  Well, the materials came from two

7  primary sources.  They were provided to me by

8  counsel as well as publicly available

9  information.

10  Q.  Did you ask your team to collect

11  publicly available information that might be

12  relevant to your analysis?

13  A.  Yes.

14  Q.  And did you ask counsel to provide you

15  with materials that might be relevant to your

16  analysis?

17  A.  Yes.

18  Q.  And did you rely on counsel to provide

19  you with the materials that you needed to

20  conduct your analysis?

21  A.  I had a discussion with counsel of

22  relevant materials, and so their review and

23  gathering of the materials are the materials

24  they gave me, so yes.

25  Q.  What did you ask counsel to provide

MARK RULE

2  you?

3  A.  I asked them to provide me information

4  that would be relevant for making a

5  determination of valuation and solvency.  So,

6  you know, for example, projections, details

7  behind the projections, any related

8  contemporaneous documentation that would speak

9  to projections or internal valuations that were

10  done, as just examples.

11  Q.  Were there any materials that counsel

12  provided you that you considered but eventually

13  did not rely on in your report?

14      MR. BREBNER:  Objection to form.

15  A.  I don't recall.  I don't recall.

16  Q.  As you sit here today, you can't think

17  of any materials that you received from counsel

18  and considered in developing your opinion but

19  did not rely on?

20  A.  I think I have identified all the

21  information that I considered.  I can't recall

22  if there was other information provided by

23  counsel that ultimately, you know, I didn't

24  consider in my analysis.

25  Q.  One of the things you said you asked

MARK RULE

2  counsel for was internal valuations.

3      Are you talking there about internal

4  valuations at the company?

5  A.  Internal valuations that the company

6  did or the equity sponsors may have did -- or,

7  done at the time.

8  Q.  So you asked counsel for internal

9  valuations that the company or the sponsors may

10  have done contemporaneously, correct?

11  A.  Yes.

12  Q.  Were you given everything that you

13  asked for by counsel?

14  A.  It's my understanding that certain

15  information that I requested was unavailable.

16  Q.  Was there anything that you asked for

17  that you didn't get?

18  A.  As an example, full, detailed

19  projections in native form that were developed

20  by the company and underlied Duff & Phelps'

21  analyses so the projections that I had were

22  those contained in Duff & Phelps.  So backup to

23  those projections contained in Duff & Phelps I

24  asked for, and it's my understanding those are

25  unavailable or were not made available to the

MARK RULE

2  committee.

3  Q.  Was there anything else you asked for

4  that you didn't get?

5  A.  That would be the largest thing.  You

6  know, I did receive certain contemporaneous

7  valuations.  I don't know if there were other

8  ones out there that I did not receive, so it's

9  hard for me to say I didn't receive something if

10  I don't know it exists.

11  Q.  If there were other contemporaneous

12  valuations out there that you did not receive

13  and that contradicted your opinion in this case,

14  would you want to know about that?

15  A.  I would.  I would want to review them

16  and try to determine the bases for the

17  valuations and try to reconcile those valuations

18  with my opinions to understand why they may

19  differ and to see how they may impact, if at

20  all, my opinions.

21  Q.  Did you rely on your counsel to bring

22  to your attention other materials that might be

23  relevant to your analysis in the case?

24      MR. BREBNER:  Objection to form.

25  A.  Well, again, I had a discussion with

MARK RULE

1    counsel about what I believe was relevant, so I
2    think they had an understanding of what I was
3    looking for. So, you know, I cannot speak for
4    counsel, but I believe they were giving me what
5    was available and what was relevant.
6    Q. One of the things you have already
7    mentioned today is that you relied on several
8    reports that were prepared by Duff & Phelps to
9    develop your opinions on solvency, correct?
10   A. I have used them as an input to my
11   solvency analysis, yes.
12   Q. And the manner in which you used them
13   as an input is that you have used their
14   valuations of the debtors, correct?
15   A. I used -- I relied upon their
16   enterprise valuation of the -- of TCEH and
17   Oncor.
18   Q. The Duff & Phelps reports that you
19   relied on in developing your opinion are listed
20   on pages 7 through 9 of your report; is that
21   right?
22   A. They're contained in that listing, but
23   there are also additional Duff & Phelps reports
24   that, you know, are as of different dates that,
25

MARK RULE

1    you know, did not provide a bases for my
2    analyses.
3    Q. So the Duff & Phelps report that did
4    provide a bases for your analyses are
5    contained -- are listed on pages 7 to 9; is that
6    right?
7    A. Yes.
8    Q. And apart from the solvency analysis
9    on page 7 of your report, none of the rest of
10   the Duff & Phelps report you cited was a
11   solvency analysis, correct?
12   A. No, they were not solvency analyses.
13   Q. And they didn't purport to be solvency
14   analyses, did they?
15   A. Duff & Phelps did not describe them as
16   solvency analyses.
17   Q. The Duff & Phelps reports that you
18   relied on in developing your opinions were the
19   reports that were dated as of December 2008,
20   2009, 2010, 2011 and 2012, right?
21   A. They weren't dated as of December.
22   The analysis was done as of December that year.
23   The actual reports were submitted sometime in a
24   month or two, generally, after the date of the
25

MARK RULE

1    report.
2    Q. Understood. So the Duff & Phelps
3    reports that you relied on were conducted as of
4    December of the years 2008 and 2012, correct?
5    A. Yes, the valuation analyses were as of
6    December of those years.
7    Q. Those Duff & Phelps reports that we
8    just discussed that were analyses as of December
9    of those years are the only things that you
10   relied on to determine the enterprise value of
11   Oncor and TCEH; is that correct?
12       MR. NELSON: Objection to form.
13   A. Well, as I say in my report, I did
14   analyses around the Duff & Phelps valuations to
15   determine if they would be a reasonable basis,
16   but from the standpoint of my report, the
17   beginning of my solvency analysis, the starting
18   point is the Duff & Phelps enterprise
19   valuations.
20   Q. You haven't done an analysis to
21   confirm or replace the Duff & Phelps valuation
22   analysis, right?
23       MR. BREBNER: Objection to form.
24   A. Well, as I said in my report, I
25

MARK RULE

1    reserve the right to do so, provided that
2    sufficient information to be able to do that
3    analysis is made available.
4    Q. But as you sit here today, you haven't
5    done that analysis?
6    A. As I say --
7        MR. BREBNER: Objection to form.
8    A. As I say in my report, the information
9    is not available, so I have not done a full,
10   independent analysis.
11       MR. ROGERS: Mark this as Exhibit 3.
12       (Rule Exhibit 3, a report from Duff &
13   Phelps dated February 2013 entitled "Energy
14   Future Holdings, Corp. Equity Valuation
15   Analysis as of December 1, 2012," marked for
16   identification, as of this date.)
17   BY MR. ROGERS:
18   Q. Exhibit 3 is a Duff & Phelps report
19   dated February 2013, and it's an equity
20   valuation analysis as of December 1, 2012. Do
21   you see that?
22   A. That's what it's titled, yes.
23   Q. And do you recognize this as one of
24   the reports that you relied on in developing
25

MARK RULE

1
2 your opinions in the case?
3    A.   Yes, it appears to be a copy of one of
4 the -- of the Duff & Phelps report that I used.
5    Q.   If you look at page 5 of Exhibit 3,
6 there is an Executive Summary.  Do you see that?
7    A.   Yes.
8    Q.   And the fifth bullet down on page 5 of
9 Exhibit 3, the first sentence reads, "By its
10 very nature, valuation work cannot be regarded
11 as an exact science and the conclusions arrived
12 at in many cases will be of necessity -- will of
13 necessity be subjective and dependent on the
14 exercise of individual judgment."
15       Do you see that?
16    A.   That's what the statement says, yes.
17    Q.   Do you agree with that statement?
18    A.   I think, consistent with what I have
19 previously said, that valuation work does have a
20 subjective component to it.
21    Q.   Do you agree that it cannot be
22 regarded as an exact science?
23    A.   Because there is a subjective
24 component, yes, it cannot be considered exact.
25    Q.   And do you agree that valuation work

MARK RULE

1
2 is dependent on the exercise of individual
3 judgment?
4    A.   Yes, individual judgment, valuation
5 judgment is a component of valuation work.
6    Q.   Page 6 of Exhibit 3 continues the
7 Executive Summary and it contains a Summary of
8 Procedures & Scope of Analysis.  Do you see
9 that?
10    A.   Yes, it identifies a listing of
11 procedures that Duff undertook.
12    Q.   And if you would just take a moment to
13 review those procedures, can you confirm for me
14 that you have not performed any of those
15 procedures in rendering your opinions in this
16 case.
17       (Document review.)
18    A.   I have performed some of these
19 procedures where I've been able to.  Other ones
20 such as, you know, discussions with management
21 have not had the ability to do.  So some of
22 these, yes, I have done.  Others where the
23 information or access to management is not
24 available, I have not been able to do those.
25    Q.   Which of these procedures have you

MARK RULE

1
2 performed in this case?
3    A.   Well, if I just go down the list,
4 we've reviewed bullet or sub-bullet point number
5 2, "Analysis of general market data, including
6 economic, regulatory and environmental forces,"
7 we have reviewed some information on that.
8       The next bullet point down, number 3,
9 we've analyzed -- we've definitely looked at
10 historical performance by Oncor and TCEH.  You
11 know, we haven't been able to do the second part
12 of that sentence, have discussions, you know,
13 understanding with management the changes
14 between the expectations.
15       The next bullet point, haven't been
16 able to do that.  So the fifth one down,
17 "Analysis of trading multiples," we have done
18 some work related to trading multiples.  We
19 haven't been able to do detailed analysis of
20 financial projections.  We've been unable to
21 review the summary-level projections in the Duff
22 & Phelps report.  We have done some work around
23 analysis of discounts at premiums.  That's the
24 third bullet point from the bottom.
25       So that, you know, just at a high

MARK RULE

1
2 level, that's an example of some of the work
3 we've been able to do and some that, you know,
4 we haven't been able to do because of either
5 access to management or, you know, full
6 information hasn't been available.
7    Q.   In your expert report, is there any
8 discussion of general market data, including
9 economic, regulatory and environmental forces?
10    A.   No, there's not an explicit
11 discussion.
12    Q.   In your report is there any discussion
13 of an analysis of trading multiples of
14 comparable power and utility companies and other
15 market factors as of the valuation dates?
16    A.   There is some reference to trading
17 multiples, particularly as it relates to 2013,
18 but again, that was an analysis, just an
19 observation of multiples 2013 versus 2012 based
20 on the comparables that Duff identified.  So
21 there is some discussion on that.
22    Q.   Other than the discussion of the
23 trading multiple changes between 2012 and 2013,
24 is there any other discussion of trading
25 multiples or comparable power and utility

1          MARK RULE
2 companies in your report?
3    A.   No, there is no explicit discussion.
4    Q.   Is there any analysis of discounts and
5 premiums appropriate for each of the uses of the
6 value of the share price as determined by Duff &
7 Phelps in your report?
8    A.   Well, there is a discussion of a
9 control premium, so I would say yes, but as it
10 relates to discounts that Duff considered that
11 they discuss, discounts for lack of
12 marketability and minority interest, there is no
13 explicit discussion related to those two
14 discounts.
15    Q.   Are the procedures on page 6 that you
16 have not performed because you say you were
17 unable to perform them, are those things that
18 you would want to do if you were going to do a
19 ground-up solvency analysis of EFH?
20    A.   Generally speaking, these are steps
21 that we generally would take.  There could be
22 additional ones, but based on what I'm reviewing
23 here, these are general steps we would probably
24 take.
25    Q.   Page 7 of Exhibit 3 is a summary of

1          MARK RULE
2 key assumption changes since the last valuation
3 update.  Do you see that?
4    A.   That's what it purports to be, yes.
5    Q.   And you're not offering any opinion in
6 this case on any of the assumption changes since
7 the last valuation update in any of the Duff &
8 Phelps reports, correct?
9    A.   No, I haven't been able to analyze
10 that because I don't have the full information.
11    Q.   Do you agree that the assumptions
12 reflected on page 7 of Exhibit 3 are subjective?
13    A.   Can you be more specific?  Which
14 assumptions are you talking about?
15    Q.   Sure.  Let me just ask you generally.
16       Are there any assumptions on page 7 of
17 Exhibit 3 that you would agree have a subjective
18 element; just yes or no?
19    A.   I mean, I'd have to look at each
20 individual assumption, but I mean -- I mean,
21 there are assumptions on this page that would
22 have a subjective component.  There's also
23 assumptions listed on this page that would not.
24       For example, their value of debt based
25 on market price.  That's based on data from the

1          MARK RULE
2 market, so that wouldn't be subjective.  But
3 some of the other assumptions listed on this
4 page could have a subjective component.
5    Q.   And you haven't done any analysis of
6 the reasonableness of the subjective components
7 of these assumptions, correct?
8       MR. BREBNER:  Object to the form.
9    A.   We have done some analyses to try to
10 put Duff & Phelps -- certain Duff & Phelps
11 assumptions in proper context, but not have --
12 have not formed full opinions, in part because
13 all the information that I believe I would need
14 to form those opinions has not been made
15 available.
16       But we have done analyses around
17 assumptions, for example, related to discount
18 rate, but haven't been able to fully form
19 opinions because all information necessary or
20 that I would want has not been made available.
21    Q.   Can you turn to page 11 of Exhibit 3,
22 and page 11 contains a summary of the valuation
23 conclusions that Duff & Phelps reached in this
24 report, correct?
25    A.   That's what the page says, Summary of

1          MARK RULE
2 Valuation Conclusions.
3    Q.   Is it fair to say that the methodology
4 that Duff & Phelps employed here was to
5 determine the impact of TCEH and Oncor
6 separately on the equity value of EFH and then
7 to add those together?
8    A.   Can you repeat the question?
9    Q.   Sure.  I'm just trying to understand
10 what Duff & Phelps did here.
11       Am I right that they determined the
12 impact of TCEH and Oncor separately on the
13 equity value of EFH and then added those
14 together?
15    A.   Well, as reflected on page 11, they
16 determined that TCEH had zero equity and Oncor
17 had positive equity, and they added it together,
18 yes, but based on this report, this methodology
19 is a deviation from methodologies that they
20 employed in past reports, including their
21 solvency opinion from 2007.
22    Q.   Sure.  I'm just trying to understand
23 what they did in this report.
24       So for TCEH, for instance, Duff &
25 Phelps determined --

Page 61

1        MARK RULE
2        And I know you take issue with the
3 method that they used to calculate the value of
4 the debt, right?
5    A.   Well, I don't -- I take -- they're not
6 purporting this to be a solvency opinion, and
7 one of the reasons I don't believe it is a
8 solvency opinion is because it uses fair market
9 value for debt, which is not, in my opinion, the
10 appropriate standard in performing a solvency
11 analysis.
12        So, from that perspective, it appears,
13 based on the label Fair Value of Debt, that
14 they're using fair value, not face value.
15    Q.   Using the face value of debt, Duff &
16 Phelps -- strike that.  Using the fair value of
17 debt, Duff & Phelps determined that the
18 liabilities of TCEH exceeded its enterprise
19 value, correct?
20    A.   On a standalone basis, yes.
21    Q.   And TCEH, on a standalone basis, had
22 negative equity value, right?
23    A.   Well, I mean, this page says it had
24 zero equity value.
25    Q.   If you simply subtract the market

Page 62

1        MARK RULE
2 value of the debt from the enterprise value of
3 TCEH, you come up with a negative number, right?
4    A.   The market value of the debt is
5 greater than the estimated enterprise value.
6    Q.   And Duff & Phelps did not subtract
7 equity value from EFH as a result of that
8 calculation; is that right?
9    A.   Can you repeat the question, please?
10    Q.   Sure.  Notwithstanding the fact that
11 the debt at TCEH exceeded its enterprise value,
12 Duff & Phelps gave it a zero impact on the
13 equity value of EFH, right?
14    A.   In this particular analysis, they did,
15 and as I said, this analysis is a deviation from
16 prior analyses.
17    Q.   In your view, is that the appropriate
18 way to treat TCEH in determining the equity
19 value of EFH Corp.?
20    A.   Are you asking on a consolidated
21 basis?
22    Q.   What I'm asking is if I'm trying to
23 determine the equity value of EFH Corp., is it
24 appropriate to treat the equity value of TCEH as
25 zero in this analysis?

Page 63

1        MARK RULE
2        MR. BREBNER:  Objection to form.
3        MR. NELSON:  Same.
4    A.   Well, if I'm understanding your
5 question, if you're asking me on a consolidated
6 basis, I would not assume a zero equity value
7 for TCEH.  I would include all assets and
8 liabilities in the analysis consistent with how
9 Duff & Phelps did it in their 2007 solvency
10 analysis.
11    Q.   Do you understand that a solvency
12 analysis for purposes of fraudulent transfer
13 needs to be done specifically to the entity that
14 was engaged in the transfer?
15        MR. NELSON:  Objection to form.
16    A.   Can you repeat the question?
17    Q.   Do you understand that a solvency
18 analysis for purposes of a fraudulent transfer
19 needs to be done specifically to the entity that
20 was engaged in the transfer?
21        MR. NELSON:  Same objection.
22    A.   Generally speaking, the entity that
23 made the transfer would be the focus of the
24 analysis.
25    Q.   If I want to know if EFH Corp. was

Page 64

1        MARK RULE
2 solvent, do you agree that the methodology
3 employed by Duff & Phelps in treating TCEH as a
4 zero impact is appropriate?
5    A.   Can you repeat the question, please?
6    Q.   Sure.  If I want to know if EFH Corp.
7 was solvent as of year-end 2012, and I know that
8 TCEH is insolvent, are you -- do you have any
9 basis to disagree with the -- with treating TCEH
10 as a zero impact on EFH Corp.?
11        MR. NELSON:  Objection to form.
12    A.   You're asking specifically about EFH,
13 the legal entity?
14    Q.   Correct.
15    A.   I mean, as I said in my report, you
16 know, I think if you're looking at the
17 consolidated enterprise or solvency of EFH, I
18 think you should include all assets and
19 liabilities.  You know, I can't necessarily
20 speak on the appropriateness of the analysis as
21 contained on page 11 because it's not a solvency
22 analysis.
23    Q.   Are you aware of any guarantees by EFH
24 Corp. of TCEH debt?
25    A.   As I sit here today, I can't recall.

MARK RULE

1

2    Q.   As you sit here today, you're not
3 aware of any guarantees by EFH Corp. to TCEH
4 debt?
5    A.   There may or may not have been
6 guarantees.  I just can't recall one way or the
7 other.
8    Q.   Are you aware of any other obligation
9 of EFH Corp. to pay TCEH's debt?
10       MR. NELSON:  Objection to form.
11    A.   What do you mean by obligation?  Are
12 you speaking about a legal obligation?
13    Q.   Correct.
14    A.   I can't speak legally, but there may
15 be reasons from a financial standpoint that they
16 would be -- that they would pay their debt.
17    Q.   So, as you sit here today, you have no
18 idea whether there is a legal obligation on the
19 part of EFH Corp. to pay TCEH debt?
20    A.   As I said before, I don't recall one
21 way or the other if there was any legal
22 guarantees.
23    Q.   In assessing the solvency of EFH
24 Corp., do you think it's relevant whether EFH
25 Corp. has guaranteed TCEH debt?

1       MARK RULE
2    A.   It could be relevant.
3    Q.   And you haven't considered that in
4 rendering your opinion in this case, right?
5    A.   What I considered was the consolidated
6 assets and liabilities of EFH Corp.
7    Q.   I want to get away from a consolidated
8 assets and liabilities.  I understand you have
9 done that analysis.
10    A.   Okay.
11    Q.   What I want to know is the solvency of
12 the legal entity EFH Corp.  Are you with me?
13    A.   Uh-huh.
14    Q.   In assessing the solvency of the legal
15 entity EFH Corp., would you agree with me that
16 if there is no guarantee by EFH Corp. of TCEH
17 debt, then TCEH's insolvency means that it has
18 no impact on EFH Corp.'s equity value?
19       MR. NELSON:  Objection.
20    A.   I have not done that explicit
21 analysis, but, you know, it would depend on, you
22 know, my understanding of, again, any guarantees
23 that may exist at the time.  So I haven't done
24 the analysis, and I don't think as I sit here
25 today I can answer that question.

1       MARK RULE
2    Q.   I want you to assume with me that EFH
3 Corp. has not guaranteed any TCEH debt.  Under
4 that assumption, would you agree that the equity
5 value of TCEH held by EFH cannot go below zero?
6    A.   Implicit in that assumption is that
7 EFH Corp. would not be willing to pay on behalf
8 of TCEH debt, and I can't speak as I sit here
9 today that they would make that decision that
10 they wouldn't be willing to pay.  Because under
11 your -- under your scenario, you're asking me to
12 assume that there is no legal obligation, but
13 there might be reasons from a financial and
14 economic situation where they would pay on
15 TCEH's debt.
16    Q.   I want to assume that EFH Corp. is
17 in bankruptcy.
18    A.   It's in bankruptcy?
19    Q.   Yes.
20    A.   Okay.
21    Q.   And there is no legal obligation for
22 EFH Corp. to pay TCEH debt.
23    A.   Okay.
24    Q.   Would you agree with me that, under
25 those circumstances, the value of TCEH in the

1       MARK RULE
2 hands of EFH Corp. cannot go below zero?
3    A.   That would be true for any of their
4 subsidiaries.  So if you're analyzing the value
5 of EFH Corp. in a bankruptcy, you would look to
6 the value of the subsidiaries, both TCEH and
7 EFIH.
8    Q.   And the value of TCEH in EFH Corp.'s
9 hands cannot go below zero, correct?
10    A.   That would be true for EFIH as well.
11    Q.   And it's true for TCEH?
12    A.   It would be true for any of their
13 subsidiaries in the context of the scenario you
14 proposed.
15    Q.   If you look on page 16 of Exhibit No.
16 3, there is -- or, 16 and 17 both contain
17 projected income statements for TCEH and Oncor,
18 right?
19    A.   That's how they're labeled, yes.
20    Q.   And you don't offer any opinion in
21 this case about the reasonableness of the
22 projected income statements in any of the Duff &
23 Phelps reports, right?
24    A.   As I said before, I haven't had
25 sufficient information to put these in proper

MARK RULE

1  context.
2
3      Q.    Sure. And I'm just asking a simple
4  yes-or-no question, which is: You are not
5  offering any opinion in this case as to the
6  reasonableness of the projected income
7  statements in any of the Duff & Phelps reports,
8  true?
9          MR. BREBNER: Objection to form.
10     A.    I'm not offering an opinion because I
11  haven't been able to form one.
12     Q.    You don't have any basis to confirm
13  the reasonableness, or lack thereof, of these
14  projections, right?
15     A.    To confirm or reject.
16     Q.    Is that something you would want to do
17  if you were asked to do your own independent
18  valuation of EFH or any of its subsidiaries?
19     A.    Consistent with my prior testimony,
20  yes, given the fact that the projections are a
21  significant input to the Duff & Phelps analysis
22  or any valuation insolvency analysis, it would
23  be important to analyze the projections and come
24  to a determination regarding their
25  reasonableness.

MARK RULE

1
2      Q.    When you say that they're significant
3  input to the Duff & Phelps analysis, is that
4  another way of saying that the valuations that
5  Duff & Phelps arrived at are sensitive to
6  changes in these projections?
7      A.    Well, as an input to the valuation,
8  yes. If you were to change the projections up
9  or down, the resulting value would change up or
10  down.
11     Q.    If you look on page 19 of the Duff &
12  Phelps 2012 report, page 19 contains some power
13  curves, heat rate scenarios and gas price
14  curves, do you see that?
15     A.    I do.
16     Q.    And you're not offering any opinion on
17  the reasonableness of the power curves provided
18  by the company to Duff & Phelps?
19     A.    I have not been able to form any
20  opinions on this page, no.
21     Q.    Are the power curves something that
22  you might want to assess if you were to do your
23  own valuation of the debtors?
24     A.    I know that they're a driver of
25  revenue, so yes, it would be something that I

MARK RULE

1  would want to assess.
2
3      Q.    If you look on page 27 of the Duff &
4  Phelps 2012 report, you see there some key
5  assumptions for Oncor in the discounted cash
6  flow analysis; do you see that?
7      A.    Yes.
8      Q.    You are not offering any opinion in
9  this case on the EBITDA assumptions for Oncor,
10  are you?
11     A.    Consistent with my past testimony, I
12  haven't been able to fully evaluate the
13  derivation of the EBITDA and the reasonableness,
14  so I haven't been able to form an opinion at
15  this point.
16     Q.    And you're not offering any opinions
17  on the reasonableness of the depreciation
18  assumptions for Oncor employed by Duff & Phelps,
19  right?
20     A.    Consistent with my last answer, I
21  haven't been able to fully form opinions.
22     Q.    And you're not offering any opinions
23  on the reasonableness of the cash taxes
24  assumptions for Oncor, correct?
25     A.    Again, consistent with my prior two

MARK RULE

1
2  answers, I haven't been able to form opinions,
3  given the lack of information.
4      Q.    And you're not offering any opinions
5  in this case on the working capital assumptions
6  for Oncor employed by Duff & Phelps, correct?
7      A.    Consistent with my last three answers,
8  given the lack of information, I haven't been
9  able to fully form opinions.
10     Q.    Did you ask your counsel to submit
11  document requests to the debtors relating to the
12  issues raised in your report?
13     A.    I asked for information. I do not
14  know if counsel -- what counsel did with that
15  information, if it was limited to searching
16  information that's been produced, and I
17  understand there's been a substantial production
18  in this case, or if they explicitly went back to
19  the debtors and asked specifically for
20  information. I don't know what they did with my
21  information requests.
22     Q.    What did you first ask counsel for
23  information relating to the opinions you are
24  rendering in your report?
25     A.    I don't recall specifically, but it

MARK RULE

2 would have been in the earlier stages of the
3 analyses.
4    Q.   So about four weeks ago?
5    A.   No, it would have dated back beyond
6 that to the initial analyses that we were asked
7 to consider by counsel and the committee that
8 relate to these issues. So it would have
9 predated the request to issue a report.
10   Q.   Well, for example, when did you first
11 ask counsel for the backup to the company's
12 projections that were used by Duff & Phelps?
13      MR. NELSON: Objection to form.
14   A.   It relates -- it would be before we
15 looked at these individual issues, so there was
16 other financial analyses that predate work on
17 this specific analyses that I would have
18 requested backup that related to Duff & Phelps.
19 So, you know, it pre-dates it by several months.
20   Q.   Can you ballpark for me when you first
21 asked for the backup to the projections that the
22 company provided to Duff & Phelps?
23      MR. NELSON: Objection to form.
24   A.   Ballpark, probably -- probably
25 sometime during the first quarter of this year.

MARK RULE

2    Q.   Are the assumptions on page 27 of the
3 Duff & Phelps report assumptions that you would
4 want to form opinions on if you were doing your
5 own analysis of solvency of EFH or the debtors?
6    A.   Yes, I would want to evaluate the
7 overall reasonableness of the assumptions
8 because, as I said, projections are a key input
9 to the valuation analyses.
10   Q.   Would you turn to page 28, the next
11 page of Exhibit 3. You haven't formed any
12 opinion on the reasonableness of the capital
13 expenditures assumptions for Oncor in the Duff &
14 Phelps reports, correct?
15   A.   Again, consistent with my answers to
16 the previous page, you know, just because of
17 insufficient information, I haven't been able to
18 fully form opinions on CAPEX.
19   Q.   And you haven't formed any opinions on
20 terminal year cash flow assumptions for Oncor in
21 the Duff & Phelps reports, correct?
22   A.   Well, we've done some work around
23 long-term growth rates but haven't been able to
24 put them in proper context because we haven't
25 been able to fully understand the projections,

MARK RULE

2 particularly the projections that precede the
3 terminal year.
4    Q.   And there is no discussion of
5 long-term growth rates in your report, correct?
6    A.   There is no explicit discussion, no.
7    Q.   And there is no discussion of -- well,
8 you haven't formed any opinions on the terminal
9 value calculations that Duff & Phelps used in
10 their reports, correct?
11   A.   I have not formalized any opinions,
12 no.
13   Q.   You're not offering any opinion on the
14 discount rates that Duff & Phelps used in their
15 reports, correct?
16   A.   Again, we've done some work around the
17 discount rate but have not formed opinions
18 because certain pieces of information, such as
19 the projections themselves and understanding
20 those, have not been made available or I do not
21 have.
22   Q.   If you were going to do your own
23 independent valuation of the debtors, would you
24 want to form an opinion on the reasonableness of
25 the discount rates that are used?

MARK RULE

2    A.   Yes.
3    Q.   You would agree that valuations are
4 sensitive to the discount rates that are used
5 for discounted cash flow analysis, correct?
6    A.   It depends on the individual valuation
7 and the underlying cash flows, but they can be
8 sensitive. In other situations -- it's
9 relative. They can be sensitive, they might not
10 be sensitive. It just depends on the individual
11 projections.
12   Q.   Have you formed any opinion in this
13 case as to whether the Duff & Phelps valuations
14 of EFH and its subsidiaries are sensitive to the
15 discounted -- to the discount rate that Duff &
16 Phelps used?
17   A.   Can you repeat that question one more
18 time?
19   Q.   Yes, it was garbled.
20      You have not done any sensitivity
21 analysis around the discount rates that Duff &
22 Phelps used in its reports, have you?
23   A.   We've done sensitivity analysis. I'm
24 generally aware of the magnitude of the
25 sensitivity as it relates to the discount rates

1          MARK RULE
2 and the projections used by Duff & Phelps.
3     Q.   You're not offering any opinions in
4 this case on the sensitivity of those valuations
5 to discount rates, correct?
6     A.   There is no formal opinion in my
7 report that relates to the sensitivity of the
8 discount rates.
9     Q.   Duff & Phelps employed several methods
10 of valuing EFH and its subsidiaries, right?
11 They used discounted cash flow; they used the
12 market comparable companies multiples test;
13 right?  They used more than one?
14    A.   Generally across their reports dating
15 back to the solvency analysis in 2007 through
16 the 2012 report, yes, they generally would use
17 an income and market approach.
18    Q.   If you look on page 33 of the 2012
19 Duff & Phelps report, for instance, you see --
20 this is the first page of a selected company
21 analysis that Duff & Phelps performed as of
22 year-end 2012, correct?
23    A.   For TCEH, that's correct.
24    Q.   Right.  And you have not looked at
25 comparable companies for TCEH and Oncor

1          MARK RULE
2 yourself, right?
3     A.   We've reviewed the comparable
4 companies, so we've definitely looked at them in
5 conjunction with our analysis of Duff & Phelps.
6     Q.   You're not offering any opinion in
7 this case on the reasonableness of the
8 comparable companies that were selected by Duff
9 & Phelps in their reports, correct?
10         MR. BREBNER:  Objection to form.
11    A.   There is no explicit opinion in my
12 report commenting on Duff & Phelps comparable
13 companies.
14    Q.   Would you agree with me that a
15 valuation based on comparable companies is
16 sensitive to the universe of comparable
17 companies that are selected for the purpose?
18         MR. NELSON:  Objection to form.
19    A.   Again, it depends on the facts and
20 circumstances.  You could have a situation where
21 the range of multiples on the comparable
22 companies could be larger in one case than
23 others.  So, in a circumstance like that where
24 you have a larger range in comparable companies,
25 it's a little bit more sensitive versus where

1          MARK RULE
2 you have a tighter range, because generally, at
3 the end of the day, you use some kind of summary
4 statistic, whether it be a median, a mean, a
5 quartile.
6         So those efforts try to take out some
7 of the subjectiveness or the sensitivity, but
8 again, it depends on facts and circumstances
9 related to the company that you're trying to
10 value.
11    Q.   And if you turn to the next page --
12 and I'll try to wrap up this line of questioning
13 so we can take a break.  If you turn to the next
14 page of Exhibit 3, you see the list of
15 comparable companies that Duff & Phelps selected
16 for TCEH?
17    A.   Yes.
18    Q.   You're not offering any opinion in
19 this case as to the reasonableness of those
20 comparable companies that Duff & Phelps
21 selected, right?
22    A.   Again, we have done some work looking
23 at who they selected and who they excluded, but
24 there is no explicit or formal opinion in my
25 report related to their comp companies for TCEH.

1          MARK RULE
2     Q.   There is a disclaimer at the bottom of
3 page 34 that says, "None of the companies
4 utilized for comparative purposes in the
5 following analysis are, of course, identical to
6 TCEH."
7         Do you see that?
8     A.   Yes.
9     Q.   And do you agree with that?
10    A.   Well, I would say, by definition, no
11 two companies are identical.  So I would agree
12 that, you know, these companies listed are not
13 identical to TCEH.
14    Q.   Do you agree that a complete valuation
15 analysis cannot be limited to a quantitative
16 review of selected comps?
17    A.   I'm sorry.  Are you quoting something
18 from Duff & Phelps?
19    Q.   Yes.  I'm sorry.  I should read
20 straight out of the Duff & Phelps report.
21         So on page 34, the disclaimer at the
22 bottom says, in the second sentence,
23 "Accordingly, a complete valuation analysis
24 cannot be limited to a quantitative review of
25 the selected companies," and then it goes on.

MARK RULE

1

2      Do you agree with that part of the

3 statement?

4      A.   I would -- I would agree that

5 identifying comparable companies does include an

6 element or can include an element of judgment.

7      Q.   And would you agree that a complete

8 valuation analysis cannot be limited to a

9 quantitative review of selected companies?

10      A.   Well, a complete valuation analysis

11 would also include an income approach, so this

12 would be a piece of what you would consider in a

13 complete valuation analysis.

14      Q.   Do you agree that a complete valuation

15 analysis involves complex considerations and

16 judgments concerning differences in financial

17 and operating characteristics of the comparable

18 companies?

19      A.   I don't know if I agree with the

20 complex considerations.  As I said before, it

21 can include an element of judgment when

22 identifying the appropriate comparable

23 companies.

24      Q.   If you turn to page 41 of Exhibit 3,

25 the 2012 Duff & Phelps report, you see there is

1      MARK RULE

2 the list of comparable companies that Duff &

3 Phelps selected for its analysis of Oncor?

4      A.   Yes, it says this is a list of their

5 comparable companies for Oncor.

6      Q.   And you're not offering any opinions

7 in this case as to the reasonableness of the

8 comparable companies that Duff & Phelps selected

9 for Oncor, correct?

10      A.   Well, we've done some work analyzing

11 the ones that it included -- it excluded, but I

12 have no formal opinion on the comp companies

13 they selected.

14      Q.   Last questions on this document.  If

15 you turn to page 47 of Exhibit 3, the 2012 Duff

16 & Phelps report, you see there are the selected

17 multiples -- an analysis of the selected

18 multiples that Duff & Phelps used for Oncor?

19      A.   That's what the page says.

20      Q.   You're not offering any opinion on the

21 reasonableness of the selected multiples that

22 Duff & Phelps used for Oncor, correct?

23      A.   Again, we did some independent

24 analysis analyzing calculations and multiples

25 they selected, but there are no formal opinions

1      MARK RULE

2 in my report related to the selected multiples.

3      Q.   You said a couple of times today that

4 you have done some independent analyses on

5 things like the selection of multiples.

6      Is that something that you have

7 disclosed in your report?

8      MR. BREBNER:  Objection to form.

9      A.   It's not explicitly disclosed, in part

10 because it's part of trying to do a full

11 valuation analyses, as which I've said I've been

12 unable to do because pieces of information are

13 missing.  And so, for example, while we've

14 looked at comparable companies in trying to

15 evaluate the multiples selected by Duff &

16 Phelps, one of the pieces of information I would

17 want and understand because Duff & Phelps uses

18 four multiples is the projections by the

19 company.

20      So while we have done some work, we

21 haven't been able -- or, I haven't been able to

22 fully form opinions, so that's why it's not

23 explicitly in my report.

24      MR. ROGERS:  Okay.  You want to take a

25 break?

1      MARK RULE

2      MR. NELSON:  Yes, please.

3      THE WITNESS:  Sure.

4      (Recess; Time Noted:  10:25 a.m.)

5      (Time Noted:  10:34a.m.)

6 BY MR. ROGERS:

7      Q.   Mr. Rule, have you been asked to

8 assess the solvency of the debtors as of the

9 date of any particular transaction?

10      A.   No, my solvency analyses were focused

11 on year-end of each year from 2008 through 2012.

12      Q.   For the purposes of the solvency

13 analysis in your report, you have limited

14 yourself to the balance sheet test of solvency,

15 correct?

16      MR. NELSON:  Objection to form.

17      A.   Well, as I said, the opinions relate

18 to the balance sheet test.  The ability to do a

19 cash flow test because, again, full projections

20 weren't available limits my ability to do that,

21 but yes, my opinions are focused on the balance

22 sheet test.

23      Q.   You're not offering any opinion in

24 this case as to whether EFH or its subsidiaries

25 had unreasonably small capital for the operation

1          MARK RULE
2  of their business as of any particular date,
3  correct?
4      A.   I have not formed an opinion on that
5  issue.
6      Q.   And you're not offering any opinion as
7  to whether EFH could pay its debts as they
8  became due as of any particular date, correct?
9      A.   Again, I haven't formed an opinion
10 based on the information I have.
11     Q.   One of the things that you did in your
12 opinion was you adjusted the Duff & Phelps
13 analysis to remove the control premium for
14 Oncor, right?
15     A.   That's correct.  I made an adjustment
16 at the bottom of my analysis to the effects of
17 removing that for the Oncor valuation.
18     Q.   Do you have Exhibit 3, the Duff &
19 Phelps 2012 report, in front of you?
20     A.   I do.
21     Q.   Can you turn to page 9, please.  There
22 is a discussion on page 9 of the 2012 Duff &
23 Phelps report of consideration of a minority
24 interest discount.  Do you see that?
25     A.   Yes.

1          MARK RULE
2      Q.   And is that another way of talking
3  about a control premium?
4      A.   Well, this minority interest relates
5  to the valuation of individual shares of EFH.
6  It doesn't relate to the enterprise valuation.
7      Q.   Okay.  The last bullet on slide 9
8  says, "Based on the terms of the EFH Management
9  Stockholder Agreement dated February 1, 2008, we
10 have not applied a minority interest discount in
11 our conclusion of the Value of the Share Price
12 of EFH."
13        Do you see that?
14     A.   Yes.
15     Q.   Do you know what the EFH Management
16 Stockholder Agreement is?
17     A.   I do not.
18     Q.   That's not something you considered in
19 developing your opinion as to whether a control
20 premium was appropriate in this case?
21     A.   Well, number one, I don't recall
22 reviewing it, and you know, this is discussing a
23 bases for not applying a minority interest to
24 the share price as calculated in Duff & Phelps.
25     Q.   Sure.  And my question was just a

1          MARK RULE
2  little bit different.
3        You did not consider the terms of the
4  EFH Management Stockholder Agreement in
5  determining whether a control premium was
6  appropriate or not, correct?
7      A.   What I considered -- I haven't
8  considered this specific document.  What I did
9  consider is management's disclosures in its SEC
10 filings about its ability to control.
11     Q.   We'll talk about that in a second.
12        The EFH Management Stockholder
13 Agreement is not something you relied on in
14 rendering your opinions in this case, correct?
15     A.   I don't recall reviewing it.
16     Q.   Do you know if EFH has the power to
17 force the minority holders of Oncor to sell
18 their interest in Oncor?
19     A.   Can you repeat that, please?
20     Q.   Do you know if EFH has the power to
21 force the minority holders of Oncor to sell
22 their interest in Oncor?
23        MR. NELSON:  Objection to form.
24     A.   I don't -- I don't recall one way or
25 the other.

1          MARK RULE
2      Q.   What is the basis for your opinion
3  that the control premium for Oncor embedded in
4  the Duff & Phelps analysis is inappropriate?
5      A.   Well, my bases is explained on -- it
6  begins on page 11 and it continues on page 12,
7  and at the end of the day, it's based on
8  disclosures that Duff & Phelps -- that EFH has
9  made to -- in its public filings that it does
10 not have the ability to control key aspects of
11 Oncor, and so, as a result, given that lack of
12 control, I do not believe that someone would pay
13 a premium, a control premium, for an asset that
14 they can't control.
15     Q.   Let me break that down a little bit.
16        Your opinion that a control premium is
17 inappropriate is based on the fact that EFH
18 Corp. does not have control of Oncor today,
19 correct?
20     A.   Today or, you know, back in time over
21 the course of my analysis.
22     Q.   Why doesn't EFH have -- EFH Corp. have
23 control of Oncor today?
24     A.   As we sit here today?
25     Q.   Yes.

MARK RULE

2   A.   I haven't done any analysis
3  post-petition, but my analysis is focused on
4  2008 to the petition date.
5   Q.   Fair enough.  My question was
6  inaccurate.  Let me try to rephrase.
7        Why didn't EFH Corp. have control of
8  Oncor as of year-end 2012?
9   A.   Well, based on their disclosures, and
10  this is an example of their disclosure in 2010,
11  you know, they concluded that they don't have
12  the power to control the activities deemed most
13  significant to Oncor Holdings and Oncor's
14  economic performance, and furthermore, they
15  state that they couldn't amend the ringfencing
16  measures or control the ability to pay
17  dividends.
18   Q.   So the reason that EFH Corp. did not
19  have the power to control Oncor was because of
20  what we call the ringfence, right?
21   A.   That's my understanding, yes.
22   Q.   And why was the ringfence in place?
23   A.   My understanding is the ringfence was
24  put in place to -- in an effort to
25  effectively -- my general understanding is the

MARK RULE

2  ringfence was put into place to put in
3  significant controls or measures between EFH
4  Corp. and its subsidiaries and Oncor such that
5  Oncor, its debt rating and things like that, of
6  that nature, would not be affected by the LBO
7  debt that was at the parent companies.
8   Q.   Was EFH Corp. required to put the
9  ringfence in place?
10        MR. NELSON:  Objection to form.
11   A.   I can't speak as I sit here today.
12  That being said, I believe -- I believe there
13  are disclosures within the SEC filings that some
14  of the regulatory bodies may have requested it;
15  but again, I can't speak definitively on that
16  issue.
17        MR. ROGERS:  We'll mark this as
18     Exhibit 4.
19        (Rule Exhibit 4, Form 10-K for Energy
20     Future Holdings Corp. for the Fiscal Year
21     Ended December 31, 2013, marked for
22     identification, as of this date.)
23  BY MR. ROGERS:
24   Q.   Exhibit 4 is a copy of the Form 10-K
25  for the fiscal year ended December 31, 2013 for

MARK RULE

2  EFH Corp.  Do you see that?
3   A.   Yes.
4   Q.   And this is one of the documents that
5  you relied on in rendering your opinions in this
6  case, correct?
7   A.   I believe so, yes.
8   Q.   If you turn to page 30 -- the
9  numbering is strange because the pages don't
10  print out correctly, but it's page 30 of the
11  2013 10-K.
12        Are you with me?
13   A.   I believe so.  I'm on the page after
14  page 29, so...
15   Q.   Do you see there, about two-thirds of
16  the way down on page 30, there is a section
17  titled, "Oncor's Ringfencing measures may not
18  work as planned," and it goes on from there?
19        Are you with me there?
20   A.   There is a bold header that begins
21  with that, yes.
22   Q.   If you look at the first sentence
23  under that bold header, it says, "In 2007, EFH
24  Corp. and Oncor implemented certain structural
25  and operational ringfencing measures, including

MARK RULE

2  certain measures required by the PUCT's Order on
3  Rehearing in Docket No. 34077," and then it goes
4  on from there.
5        Do you see that sentence?
6   A.   Yes.
7   Q.   Have you looked at PUCT's Order on
8  Rehearing in Docket No. 34077 to understand the
9  ringfencing measures?
10   A.   I have not explicitly looked at that
11  document.  I understand the ringfencing measure
12  is based on the disclosures made by EFH
13  management in its SEC filings.
14   Q.   So your understanding of the
15  ringfencing measures comes entirely from the SEC
16  disclosures, correct?
17   A.   Yes.
18        MR. NELSON:  Objection.
19   Q.   And I think you said this:  You didn't
20  read the PUCT's Order on Rehearing in Docket No.
21  34077, right?
22   A.   As I said previously, I did not read
23  that specific document related to ringfencing.
24  I relied upon the disclosures made by
25  management.

MARK RULE

2  Q.  Based on the disclosures made by
3  management, do you understand that some of the
4  ringfencing measures were ordered to be put in
5  place by the regulators?
6  A.  Based on this disclosure that we're
7  reviewing right now, yes, but I don't think
8  that -- that doesn't change my opinion.
9  Q.  And based on the disclosures by
10  management, it's your understanding that the
11  purpose of the ringfence was to mitigate Oncor's
12  credit exposure to its parent companies,
13  correct?
14  A.  That's what this statement says.
15  Q.  You're not a regulatory expert, right?
16  A.  No.
17  Q.  You're not offering an opinion in this
18  case that the regulators would require
19  ringfencing for an investment grade purchaser of
20  Oncor, are you?
21      MR. BREBNER:  Objection to form.
22  A.  I'm sorry, can you repeat that
23  question?
24  Q.  Sure.  You're not offering any opinion
25  in this case that the regulators would require

MARK RULE

2  ringfencing for an investment grade purchaser of
3  Oncor?
4  A.  I'm not commenting on or have opinions
5  on regulatory requirements.
6  Q.  And you're not commenting on and you
7  don't have any opinion on whether a regulator
8  would require ringfencing of Oncor if it is
9  purchased by an investment grade purchaser,
10  right?
11  A.  I'm sorry, can you repeat that one
12  more time?
13  Q.  Sure.  You're not offering any opinion
14  in this case as to whether a regulator would
15  require ringfencing of Oncor if it is purchased
16  by an investment grade purchaser, correct?
17  A.  Are you asking about the current --
18  are you asking about the current bid and the
19  current structure as underlined in the plan, or
20  are you discussing a potential buyer in the
21  period that I was looking at?
22  Q.  You're not offering any opinion in
23  this case as to whether a regulator would have
24  required ringfencing of Oncor if it was
25  purchased by an investment grade purchaser in

MARK RULE

2  2012, right?
3      MR. BREBNER:  Objection to form.
4  A.  I have not formed any opinions on what
5  a regulator would require.
6  Q.  And you're not offering any opinion
7  that mitigating Oncor's credit exposure to an
8  investment grade purchaser would have been
9  necessary in 2012, correct?
10  A.  Can you repeat that, please?
11      (Record read.)
12  A.  I'm not offering an opinion, but it's
13  my understanding that the ringfence measures are
14  contemplated to be still in place under the
15  current bid, so it was my understanding that --
16  so, said differently, it's my understanding that
17  even if Oncor was purchased, that it would --
18  the ringfencing measures wouldn't be eliminated.
19  That's my understanding, so...
20  Q.  What is your understanding that if
21  Oncor was purchased in 2012, the ringfencing
22  would have stayed in place based on?
23  A.  I believe it's based on my review of
24  the measures themselves in the SEC filings.
25  Q.  What is it about the ringfencing

MARK RULE

2  measures in the SEC filings that leads you to
3  conclude that if Oncor had been purchased by an
4  investment grade purchaser in 2012, the
5  ringfence would have stayed in place?
6  A.  I don't recall specifically where I
7  read that, but that is my recollection, and I
8  believe it was from the SEC filings, but
9  that's -- that's my recollection.  I don't
10  specifically recall where I got that, where I
11  read that.
12  Q.  The fact is, as you sit here today,
13  you can't tell me whether the ringfence would
14  have stayed in place if Oncor was purchased by
15  an investment grade purchaser in 2012; isn't
16  that right?
17  A.  As I sit here today, no.
18  Q.  Would you agree with me that if an
19  investment grade purchaser was able to purchase
20  Oncor without the ringfencing measures, it would
21  pay a control premium?
22      MR. BREBNER:  Objection to form.
23      MR. NELSON:  Objection.
24  A.  Assuming that it had control over
25  Oncor, it could pay a premium for said control.

1           MARK RULE
2    Q.    And if the ringfencing measures
3 weren't in place, the purchaser would have
4 control over Oncor, true?
5       MR. BREBNER:  Objection to form.
6    A.    Assuming the ringfencing measures were
7 not in place, and no other actions were taken by
8 any regulators and they purchased a control
9 stake, in theory, they would have control over
10 Oncor.
11   Q.    And your opinion in this case is based
12 on the assumption that the ringfence would have
13 to stay in place even if an investment grade
14 purchaser purchased Oncor, correct?
15   A.    The basis for my opinion for adjusting
16 the control premium is based on the company's
17 disclosures that the ringfencing prevented them
18 from operating Oncor on a day-to-day basis, but
19 that being said, I believe also as part of the
20 ringfencing there were requirements by the New
21 York Stock Exchange for a majority independent
22 board, so that would have to be eliminated as
23 well.
24   Q.    Let me restate my question.
25       Your opinion in this case is based on

1           MARK RULE
2 an assumption that the ringfence would have to
3 stay in place even if an investment grade
4 purchaser purchased Oncor, right?
5       MR. BREBNER:  Objection to form.
6    A.    My analysis is based on the assumption
7 that the ringfencing prevents the owner of Oncor
8 from controlling day-to-day operations.
9    Q.    Would you agree with me that the best
10 evidence of what buyers are willing to pay is to
11 market the asset?
12      MR. NELSON:  Objection.
13   A.    Well, I think an offer to pay could be
14 indicative, but I would put more weight on what
15 an investor actually paid in a closed
16 transaction.
17   Q.    Are you aware that the debtors held an
18 auction for the equity of Oncor?
19      MR. BREBNER:  Objection to form.
20   A.    I'm generally aware that, in the
21 process of the bankruptcy, an auction was held
22 for Oncor.
23   Q.    Have you looked at the bids that the
24 debtors received in the course of that auction?
25   A.    I -- I haven't looked at explicit

1           MARK RULE
2 bids.  I've had conversations with Guggenheim
3 regarding them.
4    Q.    What was substance of those
5 conversations?
6    A.    Generally, what the bids were, and I
7 believe we discussed, you know, why the bids did
8 not go forward.
9    Q.    Did any of the bids that were made in
10 the course of the auction for Oncor include a
11 control premium?
12   A.    I'm not aware of any of the bids
13 breaking out a portion of the bid explicitly for
14 control.
15   Q.    And you haven't done any analysis to
16 determine whether those bids included a control
17 premium, right?
18   A.    Well, without the bidder indicating
19 that a certain portion of the bid was related to
20 control, I don't think an analysis can be done.
21 Because, typically, how you quantify a control
22 premium is based on publicly traded companies.
23 So you have a -- an analysis -- you have a share
24 price before control based on minority discount,
25 and then you know what someone acquiring control

1           MARK RULE
2 is willing to pay, and the difference is the
3 control premium.
4       So I haven't seen in this case any
5 indication or any statements made by bidders
6 that X percentage of the bid relates to a
7 control premium, and I don't believe that you
8 can actually quantify, because it's a privately
9 held company, what the control premium would be
10 that's embedded in any bid.
11   Q.    Have you done any analysis of the
12 implied equity value of Oncor associated with
13 any of the bids in the auction?
14   A.    I haven't specifically been asked to
15 do that, no.
16   Q.    And so you haven't done it?
17   A.    No.
18   Q.    And you haven't done any analysis of
19 whether the -- what we call the Hunt bid
20 includes a control premium, correct?
21   A.    I haven't done any analysis, but
22 again, without the Hunts identifying what their
23 control premium is, I don't know how you could
24 definitively quantify a control premium in this
25 case because it's a private company.

Page 101

MARK RULE

1
2    Q.   Have you done any analysis of the
3  implied equity value of Oncor in the Hunt bid?
4    A.   I have not done any analysis.
5    Q.   Apart from your opinion that a control
6  premium should not be included in the valuation
7  of Oncor, you're not offering any opinions in
8  this case about the methodology that Duff &
9  Phelps used to calculate the control premium; is
10 that true?
11   A.   I've reviewed their methodology.  I
12 have not -- I do not have any formal opinions
13 contained in my report.
14   Q.   You spoke earlier about how you had
15 asked your counsel for valuations of the
16 company, the debtors, that have been done by the
17 company or the sponsors, right?
18   A.   That's correct.
19   Q.   Are you aware of any valuations of the
20 debtors that were performed by the company as of
21 December 2012 other than the Duff & Phelps
22 report that you have cited in your report?
23   A.   No, the latest valuation that I've
24 seen done by the debtors was 2011 where they --
25 in a board presentation where they stated they

Page 102

MARK RULE

2  were insolvent and thought they would be
3  insolvent through 2017.
4        (Rule Exhibit 5, an e-mail from Paul
5     Keglevic dated 2/8/2013 bearing Bates Nos.
6     EFH-SP00010480, marked for identification,
7     as of this date.)
8  BY MR. ROGERS:
9    Q.   In front of you you have what we have
10 marked as Exhibit 5.  It's an e-mail from Paul
11 Keglevic sent on February 8, 2013.  Do you see
12 that?
13   A.   Yes.
14   Q.   Have you seen this e-mail before?
15   A.   I don't believe so.
16   Q.   The first line of the e-mail says,
17 "Attached please find draft equity valuations
18 from Duff & Phelps and a calculation of EFH net
19 value."  Do you see that?
20   A.   Yes.
21   Q.   And if you look in the third
22 paragraph, it says, "The document entitled EFH
23 Net Value uses a $17 billion EV for EFIH less
24 the par value of outstanding debt and arrives at
25 $800 million of net value."

Page 103

MARK RULE

1
2        Do you see that?
3    A.   Yes.
4    Q.   Were you aware of this analysis in
5  which Duff & Phelps arrived at a $800 million
6  net value for EFH when you formed your opinions
7  in this case?
8    A.   I wasn't aware of it, but it wouldn't
9  change my opinions.
10   Q.   Why is that?
11   A.   Well, based on what they're disclosing
12 here, this document would indicate that only
13 $800 million -- $800 million -- let me
14 re-read this.
15       Actually, I'm not sure what -- who
16 they're referring to when they refer to the
17 statement, "The document entitled EFH net value
18 uses a $17 billion enterprise value for
19 EFIH less" --
20       Actually, based on the statement, it
21 wouldn't change my opinion because what it's
22 saying here, as I read it, is $800 million of
23 value is available to EFH Corp., so when you
24 factor in $800 million less the debt that was
25 outstanding at Corp., EFH Corp. would be

Page 104

MARK RULE

2  insolvent.
3    Q.   Okay.  And you haven't seen the EFH
4  net value analysis that Duff & Phelps did that's
5  referred to in Mr. Keglevic's e-mail, correct?
6    A.   No, I haven't seen any documentation
7  that purports to be attached, it looks like, to
8  this e-mail.
9        MR. ROGERS:  We'll mark as Exhibit 6.
10       (Rule Exhibit 6, a document entitled
11    "EFH Net Value February 8, 2013,
12    Confidential Draft for Discussion," marked
13    for identification, as of this date.)
14 BY MR. ROGERS:
15   Q.   And I'll represent to you, Mr. Rule,
16 that Exhibit 6 is the attachment to the e-mail
17 that we just looked at as Exhibit 5 and that
18 Exhibit 6 is titled EFH Net Value.  Okay?
19   A.   Okay.
20   Q.   Have you seen this document Exhibit 6
21 before?
22   A.   I do not believe so.
23   Q.   If you turn to page 2 of the document,
24 you see there's a calculation of net equity
25 value to EFH?

MARK RULE

2  A.  Yes.
3  Q.  And you see that in the calculation of
4  that net equity value, there is an accounting
5  for both EFH debt and EFIH debt?
6  A.  Okay.
7  Q.  Well, let me ask it this way:  You
8  don't have any idea how the number -- the
9  numbers for net equity value to EFH were arrived
10  at, is that fair, because you have never seen
11  this document before?
12  A.  I don't have a basis to evaluate the
13  individual numbers on this page and to make an
14  assessment whether or not they're correct and
15  complete.
16  Q.  Is understanding the numbers on this
17  page something you would like to do?
18      MR. BREBNER:  Objection to form.
19  A.  It would be something that I would
20  take into consideration to evaluate, again, the
21  accuracy and completeness of the numbers.
22  Q.  Do you know if EFIH held EFH debt as
23  of year-end 2012?
24  A.  I believe they held both debt of EFH
25  Corp. and TCEH.

MARK RULE

2  Q.  Do you know what the magnitude of EFH
3  debt held by EFIH was as of year-end 2012?
4  A.  I don't recall the specific number,
5  but I'm sure it's contained in the SEC filings.
6  Q.  You have two solvency analyses in your
7  report.  One is on a consolidated basis and one
8  is looking at only what we consider the E-side
9  of the house, right?
10  A.  Uh-huh.
11  Q.  In your E-side analysis, how did you
12  account for EFH debt that was held by EFIH?
13  A.  Well, as a general matter, the
14  methodology I took in Figure 5 was starting with
15  the Oncor valuation by Duff & Phelps, adjusting
16  for its disclosed debt and cash in its SEC
17  filings as well as nonoperating liabilities, and
18  so that would be the value to Oncor Holdings,
19  and then from there I adjusted Oncor Holdings,
20  EFIH and EFH Corp., the residual value in Oncor
21  based on the disclosed additional assets and
22  liabilities for each entity as disclosed in
23  their SEC filings.
24      So, for example, if there was a tax
25  payable between Oncor Holdings and EFH Corp.,

MARK RULE

2  the asset would be on Corp.'s balance sheet and
3  the liability would be on Oncor Holdings'
4  balance sheet.
5  Q.  So if EFIH held EFH Corp. debt, is it
6  fair to say that it would show up as an asset on
7  EFIH's balance sheet and a liability on EFH's
8  balance sheet under your analysis?
9  A.  Yes.
10  Q.  And it would be carried as an asset on
11  EFIH's balance sheet at fair value, right?
12  A.  It should be, yes.
13  Q.  And it would be carried as a liability
14  on EFH's balance sheet at par value, correct?
15  A.  At the stated obligation, yes.
16  Q.  So, to the extent that EFIH held EFH
17  debt, if that debt was trading below par, that
18  had a negative impact on the equity value of EFH
19  Corp. under your analysis, correct?
20  A.  Well, I would say if it's trading
21  below par, that would be indicative of the
22  market indicating that they thought EFH Corp.
23  was insolvent.  So if there is a difference, and
24  I don't believe there was a material difference,
25  particularly as it related to certain issuances

MARK RULE

2  such as the Q, R and P issuances, where the fair
3  market value on EFIH's books was based on the
4  market value, which was trading in the 40s and
5  50s.  So I think, from that standpoint, that
6  would be to me indicative that the market
7  believed that EFH Corp. would not pay fully on
8  that debt.
9  Q.  Okay.  I'm not asking about what the
10  market believes.  Let's look at page 21 of your
11  report, Figure 5.
12  A.  Uh-huh.
13  Q.  There is a line item on Figure 5 for
14  EFIH Other Assets, correct?
15  A.  That's correct.
16  Q.  And in December 2012, the EFIH Other
17  Assets line item was approximately $5.4 billion?
18  A.  That's -- yes, that's what Figure 5
19  represents.
20  Q.  And does that include EFH debt held by
21  EFIH?
22  A.  That would, yes.
23  Q.  How much?
24  A.  As I sit here today, I don't know the
25  approximate amount.

MARK RULE

1
2    Q.   You cite in Figure 5 for that number
3  the EFIH Form 10-K for year-end 2013, right?
4    A.   Yes.
5         (Rule Exhibit 7, Form 10-K for Energy
6    Future Intermediate Holding Company LLC for
7    the Fiscal Year Ended December 31, 2013,
8    marked for identification, as of this date.)
9  BY MR. ROGERS:
10   Q.   We have placed in front of you what
11 has been marked as Exhibit 7, which is EFIH's
12 Form 10-K for the year-end 2013.
13        Do you see that?
14   A.   Yes.
15   Q.   If you would turn to page 48 of the
16 EFIH 10-K.
17   A.   Okay.
18   Q.   Are you there?
19   A.   Yes.
20   Q.   And page 48 is the page that you cite
21 in Note 7 to your report, correct?  To Figure 5,
22 I should say, correct?
23   A.   Just let me verify.
24        Yes, that looks correct.
25   Q.   And I'll represent to you that if you

MARK RULE

1
2  add up Income Taxes Receivable from EFH Corp.,
3  Other Non-Current Assets Principally on
4  Amortized Debt Premium/Discount and, further
5  down, Affiliate Debt Held by EFIH, you arrive at
6  the number $5.465 billion.  Okay?
7    A.   Okay.
8    Q.   Is that how you calculated the EFIH
9  Other Assets?
10   A.   That appears to be so.
11   Q.   And so approximately $5.388 billion of
12 the number cited in your report is on account of
13 affiliate debt that EFIH held, correct?
14   A.   That's what it says, yes.
15   Q.   So if you look at Note 8, which is on
16 page 70 of the EFIH 10-K, do you see there is a
17 chart there of the Principal Amounts, Coupon
18 Rates, Maturities and Carrying Value of Holdings
19 of Debt of Affiliates by EFIH?
20   A.   Yes.
21   Q.   And you see the vast majority of the
22 $5.388 billion in holdings was holdings of EFH
23 Corp. debt, right?
24   A.   Yes.  Well, it relates -- five out of
25 six securities relate to EFH Corp.

MARK RULE

1
2    Q.   And in amount, the carrying value, the
3  vast majority of the $5.388 billion is EFH Corp.
4  debt, correct?
5    A.   Yes.
6    Q.   And that's a carrying value, right?
7    A.   That would be the fair market value.
8    Q.   Fair market value, right.  And so
9  that's the number -- the amount of EFIH debt
10 held by EFH -- sorry.  Strike that.
11        The amount of EFH debt held by EFIH as
12 reflected on -- in Note 8 at fair market value
13 is baked into your EFIH Other Assets number on
14 Figure 5, correct?
15   A.   That's the amount of the asset that
16 EFIH has on its balance sheet, correct.
17   Q.   And the amount of -- do you know what
18 the -- well, we can just look.
19        If you look in Note 8 of the EFIH
20 10-K, you can see that the principal amount of
21 all of the debt held by EFIH was approximately
22 $1.15 billion higher than the carrying value,
23 correct?
24   A.   I haven't done the math right here,
25 but it looks approximately right.  And as I said

MARK RULE

1
2  before, it's a function of, you know,
3  significant discounts, particularly in the P, Q
4  and R securities.
5    Q.   And if you look on Figure 5, there is
6  a line for EFH corporate debt a little bit below
7  the EFIH Other Assets?
8    A.   Yes.
9    Q.   And in 2012, at year-end, the amount
10 of EFH corporate debt was approximately $7.895
11 billion?
12   A.   That's correct.
13   Q.   And that includes EFH debt that was
14 held by EFIH, correct?
15   A.   It would include all debt issuances
16 regardless of if it's held by EFIH or public
17 market participants.
18   Q.   I'm just trying to understand if the
19 EFH Corporate Debt number at year-end 2012
20 includes the approximately $6.4 billion in
21 principal amount of EFH debt held by EFIH; is
22 that right?
23   A.   Well, that number, the 7.895, there is
24 no additional disclosures on it, so you can't
25 tell the specific makeup of it, but I believe

1          MARK RULE
2 that it would include the stated obligation of
3 EFH Corp.
4     Q.   To the extent that EFH debt held by
5 EFIH appears on both the EFIH Other Assets line
6 and the EFH Corporate Debt line, there is going
7 to be a difference on those two lines as to the
8 valuation of that debt, correct?
9     A.   The difference being that implicit in
10 the difference is the market's assessment that
11 EFH Corp. won't be able to pay its stated
12 obligation.
13    Q.   Right.  I understand what the market
14 is saying.  We'll talk about that.  All I'm
15 trying to understand is that there is going to
16 be a difference in the value of the EFH debt
17 that is baked into the EFIH Other Assets line as
18 compared to the EFH Corporate Debt line,
19 correct?
20    A.   I would say that the value of the
21 assets at EFHI are at a fair market value,
22 whereas the value of the debt at EFH Corp. is at
23 the stated obligation.  So, again, to the extent
24 that there's a difference, there is a reason for
25 that difference.

1          MARK RULE
2     Q.   And the impact of that difference on
3 the adjusted equity value of EFH Corp. under
4 your Figure 5 is approximately a billion
5 dollars, correct?
6     A.   The difference between the fair market
7 value and the face value, approximately, is
8 about a billion.
9     Q.   And so under your analysis in Figure
10 5, the fact that EFIH holds EFH debt is
11 impacting the equity value of EFH Corp. by
12 approximately negative $1 billion, correct?
13    A.   I'm not sure what you mean by
14 impacting.  Again, what's reflected here is the
15 fair market value of the assets less the stated
16 value of the liabilities.  So, to the extent
17 that there is a difference, as I said, there is
18 a reason for that difference, but from a mass
19 standpoint, if you wanted to make an adjustment
20 to suggest that either the asset needs to be
21 marked up or the liability needs to be marked
22 down, the difference is about a billion dollars,
23 and so that would impact my analysis from a
24 mathematical standpoint.  I don't think that
25 would change my opinion.

1          MARK RULE
2     Q.   Did you consider eliminating the EFH
3 debt held by EFIH in the analysis that you did
4 on Figure 5?
5     A.   What do you mean by eliminate it?
6     Q.   Sure.  Did you consider looking only
7 at third-party debt of EFH Corp. in your EFH
8 Corp. Debt line?
9     A.   Well, again, it's -- EFIH has a
10 separate asset that's different from the
11 liability of EFH Corp.  These are two different
12 entities.  So I thought it was appropriate to
13 give credit to EFIH for the assets they hold and
14 have the debt that EFH owes be at the face
15 amount of what they owe.
16    Q.   Well, what you could have done is you
17 could have calculated EFIH other assets without
18 consideration of EFH debt held by EFIH and done
19 the same thing for your calculation of EFH
20 corporate debt, right?
21    A.   Well, that assumes a hypothetical, and
22 it's not reflective of what actually was the
23 assets and liabilities of the entities at the
24 time.
25    Q.   EFIH has at all times been 100 percent

1          MARK RULE
2 owned by EFH, correct?
3     A.   That's my understanding.
4     Q.   And EFIH has at all times, under your
5 own analysis, been solvent, correct?
6     A.   Yes.
7     Q.   EFH Corp. could have at any time
8 forced EFIH to dividend the EFH debt that EFIH
9 held to EFH for cancellation, correct?
10         MR. BREBNER:  Objection to form.
11    A.   It's my understanding that if there
12 weren't any restrictions on dividends at the
13 EFIH level, and the EFIH board approved a
14 dividend, they could have made a dividend.
15         That being said, in the -- in the
16 years that I'm looking at where EFIH had
17 affiliate debt, 2010, '11 and '12, they did not
18 do that.  A decision could have been made to
19 sell the debt, which they didn't do either.
20         So you're asking me to assume
21 something for my analysis which I don't agree
22 with, and as I said, you know, I reflected the
23 assets and liabilities as they were stated on
24 their SEC filings.
25    Q.   And the EFH debt held by EFIH in 2012

Page 117

```
 1           MARK RULE
 2  had an impact of approximately negative $1
 3  billion on your calculation of equity value of
 4  EFH Corp., fair?
 5           MR. NELSON:  Object to form.
 6      A.   Again, I'll say two things.  There is
 7  a reason why there is a difference in the value.
 8  The fair market value of the asset is based on
 9  what the market thought was going to be paid on
10  that asset.
11           From a mathematical standpoint, the
12  difference would have an impact on my adjusted
13  equity value, but again, it would not change my
14  opinion because you would have to factor in what
15  the exact impact was, how large it was, and
16  number two, you would have to reconcile what
17  that showed you with other facts in the case and
18  other indicia, such as bond trading prices.
19           So, from a mathematical standpoint, it
20  could have an impact, but I don't agree with
21  that adjustment.
22           MR. ROGERS:  I'll move to strike the
23    answer as nonresponsive.
24  BY MR. ROGERS:
25      Q.   My question is very simple, Mr. Rule:
```

Page 118

```
 1              MARK RULE
 2  In 2012, the EFH debt held by EFIH had an impact
 3  of approximately negative $1 billion on the
 4  equity value of EFH Corp. by your calculations,
 5  correct?  It's a yes-or-no question.
 6           MR. NELSON:  You can answer the
 7    question.
 8      A.   Well, I don't think -- if you make the
 9  assumption that either the asset should have
10  been marked up or the liability marked down such
11  that they would completely eliminate each other,
12  then, yes, mathematically, it would impact the
13  numbers in Figure 5.
14      Q.   I'm not asking you to make any
15  assumptions.  All I'm asking you is that the
16  debt that EFIH held of EFH at year-end 2012 has
17  a negative $1 billion impact on your calculation
18  of equity value, yes or no?
19           MR. NELSON:  Object to form.
20      A.   Well, I think an assumption is
21  implicit in your question.  The fact that the
22  fair market value and the face don't cancel each
23  other, if you made those equal such that they
24  did cancel each other, there would be an impact
25  on my adjusted equity value.
```

Page 119

```
 1              MARK RULE
 2      Q.   Or if that -- if EFIH didn't -- if
 3  that debt didn't exist, the equity value of EFH
 4  Corp. would be a billion higher under your
 5  calculation, correct?
 6      A.   What do you mean by didn't exist?
 7      Q.   Well, strike it.
 8           You haven't done any calculation of
 9  the impact of debt, EFH debt, held by EFIH in
10  any year from 2008 to 2012, correct?
11      A.   Can you repeat that one more time,
12  please?
13      Q.   Sure.  You haven't done any
14  calculations to determine what the impact of EFH
15  debt held by EFIH is for any year from 2008 to
16  2012?
17           MR. NELSON:  Object to form.
18      A.   If I understand your question
19  correctly, assuming that the asset and the
20  liability was equal and they were eliminated,
21  have you done a calculation under that scenario
22  that's reflected in my report?  No, I have not.
23      Q.   Do you know what happened to the debt
24  that EFIH held of EFH after year-end 2012?
25      A.   Happened in what context?  From a
```

Page 120

```
 1              MARK RULE
 2  trading value?  From a --
 3      Q.   Do you know if EFIH ever dividended
 4  that debt up to EFH for cancellation?
 5      A.   Beyond 2012, I don't believe I've
 6  analyzed any subsequent periods as far as what
 7  they did with the affiliate debt.
 8      Q.   So you don't know what happened to
 9  that debt in terms of whether it was dividended
10  up to EFH for cancellation?
11      A.   As I sit here right now, no.
12      Q.   Would you agree with me that if EFH
13  forced EFIH to dividend the EFH debt up to EFH
14  for cancellation, that could have a material
15  positive impact on the equity value of EFH
16  Corp.?
17      A.   In what period?
18      Q.   After 2012.
19           MR. BREBNER:  Objection to form.
20      A.   Well, that would impact the analysis
21  of 2013, which, as I stated, I haven't done.
22      Q.   So you haven't looked to see if such a
23  dividend was ever declared?
24      A.   I don't recall as I sit here if such a
25  dividend was declared.  It may have been.  I
```

MARK RULE

1
2 don't know.  But as I said, you would have to
3 take that into consideration when doing an
4 analysis of 2013 as well as a consideration of
5 valuations and other changes in assets and
6 liabilities.
7     Q.    Do you have the EFIH 10-K in front of
8 you?
9     A.    Which exhibit, I'm sorry, is that?
10        MR. NELSON:  Rule 7.
11    A.    I have Rule 7.
12    Q.    I want to go back to the Note 8 that
13 we looked at before on page 70.
14        Are you there?
15    A.    Hold on a second here.  There's two
16 different sets of numbering.
17        Yes, I'm there.
18    Q.    By the way, did you look at Note 8 of
19 the EFIH 10-K when you were developing your
20 opinions in this case?
21    A.    I generally reviewed the SEC filings.
22 I may have looked at this.  I don't recall.  I
23 know that my citation relates to another page,
24 so I don't know as I sit here today because I
25 reviewed a lot of information.

MARK RULE

1
2     Q.    There is a section titled Affiliate
3 Debt Held by EFH.  That's the section we were
4 talking about earlier.  Do you see that?
5     A.    Uh-huh.
6     Q.    And the third paragraph down says, "In
7 the first quarter of 2013, EFIH distributed to
8 EFH Corp. $6.36 billion principal amount, $5.778
9 billion carrying amount of the EFH Corp. debt
10 that it previously received in debt exchanges,
11 leaving $1.361 billion principal amount of
12 affiliate debt still held by EFIH."
13        Do you see that?
14    A.    Yes.
15    Q.    And then EFH Corp. canceled those
16 notes, do you see that?
17    A.    That's what it says.
18    Q.    Of the notes that were dividended, if
19 you continue reading that paragraph, $5.12
20 billion of that in principal amount was held as
21 of December 31, 2012, right?
22    A.    Yes, that's what it says.
23    Q.    What was the impact on the equity
24 value of EFH Corp. of that dividend and
25 cancellation in the first quarter of 2013?

MARK RULE

1
2        MR. NELSON:  Object to form.
3     A.    I would have to look at the balance
4 sheet.  But, I mean, it depends on, obviously,
5 changes in other assets and liabilities, but all
6 else equal, I would have to look at the balance
7 sheet.
8     Q.    Well, the debt was trading below par,
9 right?
10    A.    Yes, the market thought it was
11 impaired.
12    Q.    So, to the extent that EFIH
13 distributed that debt to EFH Corp. for
14 cancellation, that had a positive impact on EFH
15 Corp.'s equity value, right?
16    A.    Yes, all else equal, that would have a
17 positive effect in 2013.
18    Q.    And you haven't done any analysis to
19 quantify the magnitude of that positive effect,
20 correct?
21    A.    As I said in my report, I haven't done
22 a full valuation analysis in 2013.
23    Q.    Right.  That wasn't my question,
24 though.
25        My question was:  You haven't done any

MARK RULE

1
2 analysis to quantify the magnitude of the
3 positive effect due to the dividend and
4 cancellation in the first quarter of 2013,
5 right?
6     A.    I have not because I have not analyzed
7 2013.
8     Q.    But you do have opinions in your
9 report about solvency after year-end 2012,
10 right?
11    A.    I have opinions related to indicia of
12 solvency.
13    Q.    And you didn't consider in rendering
14 that opinion the dividend and cancellation of
15 EFH debt, correct?
16    A.    Well, that would only be part of the
17 answer.  You would still have to look at
18 valuation and changes in other assets and
19 liabilities.  So one change in a liability in
20 itself doesn't necessarily suggest that the
21 entity would be solvent.
22    Q.    Okay.  My question was a little bit
23 different.  You didn't consider, in rendering
24 your opinion in this case, the dividend and
25 cancellation of EFH debt in the first quarter of

1          MARK RULE
2 2013, correct?
3    A.   It would be part of a consideration in
4 a full valuation analysis, but there's other
5 considerations, as I said, such as changes in
6 asset values and other liabilities.
7          MR. ROGERS:  I'll move to strike as
8    nonresponsive.
9          MR. NELSON:  He's answering your
10    question.
11          MR. ROGERS:  No, he's not.
12 BY MR. ROGERS:
13    Q.   My question is very simple:  In
14 considering the solvency of EFH Corp. after
15 2012, you did not look at the dividend and
16 cancellation of EFH Corp. debt, correct?
17    A.   It would be a consideration of many.
18    Q.   I'm not asking if it would be a
19 consideration.  I'm asking if you considered it.
20    A.   I did not do a full valuation analysis
21 in 2013.
22    Q.   You're still not answering my
23 question, Mr. Rule.
24          As part of the solvency opinion that
25 you render about the solvency of EFH Corp. after

1          MARK RULE
2 2012 -- there is an opinion in here about the
3 solvency of EFH Corp. after 2012, correct?
4    A.   There is an opinion related to indicia
5 of solvency, yes.
6    Q.   And as an indicia of solvency, you did
7 not consider the dividend and cancellation of
8 EFH Corp. debt?
9    A.   It would be a consideration, again, if
10 I had done a full analysis.  So, in forming my
11 opinions, because I didn't do a full analysis,
12 since it's not explicitly considered.  My basis
13 for my opinions is largely focused on the bond
14 trading prices.
15          MR. ROGERS:  You want to take another
16    break?  We can keep going until lunch if you
17    guys are okay.
18          THE WITNESS:  Maybe a quick one.
19    Maybe a few minutes.
20          MR. ROGERS:  Sure.
21          (Recess; Time Noted:  11:29 a.m.)
22          (Time Noted: 11:36 a.m.)
23 BY MR. ROGERS:
24    Q.   Let's turn to page 5 of your report,
25 the summary of your opinions.

1          MARK RULE
2    A.   Okay.
3    Q.   And is it fair to say the first two
4 opinions that you highlight here have to do with
5 what you call Consolidated EFH Corp. and the
6 second two opinions have to do with EFH Corp.,
7 the legal entity, and the E-side; is that right?
8    A.   Yes.
9    Q.   Why did you do it those two different
10 ways?
11    A.   I'm not sure I understand your
12 question.
13    Q.   Sure.  Why did you do an analysis of
14 both Consolidated EFH Corp. and EFH Corp. and
15 the E-side?
16    A.   I was asked by counsel to do a
17 consolidated analysis, consistent with the
18 manner that both the company and Duff & Phelps
19 had done, as well as doing an analysis of Corp.
20 and the E-side, excluding TCEH.
21    Q.   Do you know why you were asked to do
22 an analysis of Corp. and the E-side excluding
23 TCEH?
24    A.   Specifically, how counsel might use
25 it, no.  It was the analysis that I was asked to

1          MARK RULE
2 do.
3    Q.   Were you ever asked to do an analysis
4 of the solvency of TCEH as a standalone?
5    A.   I was not asked to do an explicit
6 analysis of the solvency of TCEH.  That being
7 said, I think implicit in my analysis is an
8 evaluation of TCEH's solvency, and what I mean
9 by that is the consolidated solvency of EFH
10 Corp. is greater than the E-side insolvency.
11 So, as a result, that must mean that TCEH is
12 contributing the difference.
13    Q.   When you do the consolidated analysis,
14 the debt at TCEH has a material negative impact
15 on Consolidated EFH Corp., right?
16    A.   The debt relative to the asset values.
17    Q.   And to the extent that the debt at
18 TCEH exceeds asset values at TCEH, the
19 difference is a -- has a negative impact on
20 Consolidated EFH Corp., correct?
21    A.   It would contribute to the overall
22 negative value of EFH Corp., as would the
23 negative value of EFIH.  So it would be
24 comprised of those two.
25    Q.   And we know that, from your own

MARK RULE

1 analysis, that EFIH was always solvent from 2008
2 to 2012, right?
3
4    A.   The EFIH, the legal entity, yes.
5    Q.   So, to the extent that Consolidated
6 EFH Corp. has a negative equity value, that's
7 all because of the value of TCEH, correct?
8    A.   No.
9       MR. NELSON: Object to form.
10   A.   It would in part because of the value
11 of TCEH, but it also would have to factor in the
12 assets and liabilities at EFH Corp., including
13 their debt.
14   Q.   When you look at the contribution of
15 the subsidiaries to the value of Consolidated
16 EFH Corp., is it fair to say that EFIH's
17 contribution was always positive?
18   A.   Based on the figures in Figure 5, yes,
19 EFIH's contribution was positive.
20   Q.   And you understand from the work that
21 you have done that the contribution of TCEH,
22 especially in later years, has been negative?
23   A.   Based on my work and as well as the
24 disclosures by the company in their SEC filings
25 beginning in 2010 when they disclosed that TCEH

MARK RULE

1
2 was balance-sheet insolvent.
3    Q.   So when you exclude TCEH from the
4 analysis, as you did in your E-side analysis,
5 that has a positive impact on the equity value
6 of EFH Corp., correct?
7    A.   Positive in the standpoint it's less
8 negative.
9    Q.   Right. The equity value of EFH Corp.
10 is less negative when you exclude TCEH from the
11 analysis, right?
12   A.   It's still negative, but yes, less
13 negative.
14   Q.   I have a quick question about the
15 control premium calculations in your Figure 5 on
16 page 21.
17   A.   Sure.
18   Q.   What was the methodology that you
19 applied to determine the adjustment eliminating
20 the Oncor control premium in your Figure 5?
21   A.   So, effectively, if the enterprise
22 value at the top of the chart includes a control
23 premium, Duff & Phelps disclosed in their market
24 approach for Oncor what the valuation was
25 without a control premium. So if you take that

MARK RULE

1
2 value and you weight it along with the DCF, you
3 will get a difference in concluded enterprise
4 value, and so the difference of their original
5 conclusion with the control premium versus a
6 recalculation without the control premium is
7 what's reflected in the adjustment eliminating
8 Oncor control premium.
9    Q.   Looking at the adjustment for December
10 of 2012, can you explain why the adjustment
11 eliminating the Oncor control premium for the
12 midpoint case doesn't fall between the
13 adjustment for the low and the high cases?
14   A.   Yes, because Duff & Phelps was
15 rounding their conclusions more on the midpoint
16 than they were on the high and the low.
17   Q.   And when you look at control premiums
18 for, say, December 2008, your adjustment shows
19 that the adjustment for the low case is a
20 greater adjustment than the adjustment for the
21 high case, right?
22   A.   Yes.
23   Q.   And then December 2009, the adjustment
24 for the low case is less than the adjustment for
25 the high case, right?

MARK RULE

1
2    A.   Yes.
3    Q.   What accounts for that difference?
4    A.   Again, it's the relative valuation,
5 high versus low, but it's also the rounding that
6 was employed by Duff & Phelps. In some cases,
7 they rounded up. Some cases they rounded down.
8 Some cases they rounded up by more than they
9 rounded down. So it really is those two factors
10 that impact the difference between a mid, high
11 and low.
12   Q.   I think this is just a matter of pure
13 math, but would you agree with me that if you
14 had not made an adjustment for the control
15 premium for the high case in 2012 in Figure 5,
16 that the conclusion would be that EFH Corp. is
17 solvent?
18       MR. BREBNER: Objection to form.
19   A.   Again, mathematically, if you assume
20 that there is no control premium adjustment, and
21 under the high scenario, which I believe a
22 midpoint is more appropriate, but yes, in that
23 case, under a high scenario, no control premium,
24 you would have a positive equity value. But
25 again, I don't know if that -- I don't think

1        MARK RULE
2  that would change my opinion.
3    Q.   Is it fair to say that the
4  calculations you did in Figure 5 are the primary
5  basis of your opinion the E-side was
6  insolvent from 2008 to 2012?
7    A.   It's the primary basis, but it's also
8  supported by other indicia.
9    Q.   And the other indicia that you cite in
10 the section of your report dealing with E-side
11 insolvency are a March 2010 JPMorgan
12 presentation and an e-mail from Jonathan Smidt
13 at KKR, correct?
14   A.   As well as the trading prices of the
15 debt.
16   Q.   Well, you don't cite trading prices of
17 the debt in your discussion of E-side insolvency
18 from 2008 through 2012, right?
19   A.   Yes, I do.
20   Q.   Where is that?
21   A.   It's the top of page 22.
22   Q.   Oh, I see.  Okay.  We'll talk about
23 trading value of debt later.
24   A.   Okay.
25   Q.   Let's talk about the two materials

1        MARK RULE
2  that you cite.  So the 2010 JPMorgan
3  presentation, let's mark that as Exhibit 8.
4        (Rule Exhibit 8, JPMorgan presentation
5        entitled "Discussion Materials March 2010,
6        Energy Future Holdings," marked for
7        identification, as of this date.)
8  BY MR. ROGERS:
9    Q.   You see Exhibit 8 is the JPMorgan
10 presentation that you cite in Note 40 on your
11 report, correct?
12   A.   That's correct.
13   Q.   This was provided to you by counsel?
14   A.   This was one of the documents
15 identified by counsel pursuant to my request for
16 other contemporaneous valuations.
17   Q.   You haven't had any discussions with
18 anyone from JPMorgan about the contents of this
19 document, right?
20   A.   I have not.
21   Q.   And you see it's marked as a draft at
22 the top right-hand corner of the document?
23   A.   That's what it says.
24   Q.   Do you know if this report was ever
25 finalized?

1        MARK RULE
2    A.   I do not know if it was finalized or
3  if the nature of it being a draft would impact
4  the conclusions in it, so no, I don't.
5    Q.   Do you know what the purpose of this
6  analysis that JPMorgan is doing was?
7    A.   It appears, based on the statement in
8  their Executive Summary, that they were
9  considering various recapitalization options for
10 EFH.
11   Q.   It's not a solvency analysis, right?
12   A.   No.
13   Q.   Do you know if JPMorgan had any
14 particular agenda in presenting this document to
15 EFH?
16   A.   I don't know the context of JPMorgan
17 presenting this document to EFH.
18   Q.   You haven't talked to anyone who
19 received this document at EFH, right?
20   A.   I haven't talked to anybody at EFH,
21 no.
22   Q.   And you're not aware of any testimony
23 on this document in the course of this case,
24 right?
25   A.   Not that I'm aware.

1        MARK RULE
2    Q.   Did you ask your counsel to submit
3  questions in any depositions in the case?
4    A.   I don't believe so, no.
5    Q.   You're not rendering any opinions in
6  this case on the reasonableness of the valuation
7  underlying JPMorgan's report, Exhibit 7, right?
8    A.   No, I'm not offering opinions on the
9  reasonableness of their analysis.  I'm simply
10 saying that their conclusions regarding Oncor
11 are supportive of my analysis as well as, you
12 know, other indicia such as bond price.
13   Q.   Did you know that the sponsors KKR and
14 TPG prepared quarterly valuation reports
15 relating to EFH?
16   A.   Internally?
17   Q.   Yes.
18   A.   I'm not specifically aware of them
19 because I haven't seen them.
20   Q.   You haven't reviewed any quarterly
21 valuation reports prepared by KKR or TPG in the
22 course of rendering your opinion in this case,
23 right?
24   A.   I have not seen said reports.
25   Q.   If such reports existed, would those

1           MARK RULE
2  be something you would want to see?
3      A.   It would be something I would want to
4  consider, and to the extent that it differed
5  from information and analyses I've already
6  performed, I would want to analyze the
7  differences.
8      Q.   And you have spoken a couple times
9  about trading value of debt.  I want to ask some
10 questions about that.
11     A.   Okay.
12     Q.   Do you agree that market interest
13 rates impact the trading price of corporate
14 bonds?
15     A.   Market factors can affect the price of
16 bonds as well as company-specific factors.
17     Q.   If market rates of interest increase,
18 the trading price of corporate bonds decreases,
19 fair; all other things being equal?
20     A.   All else equal, an increase in the
21 discount rate reduces the overall value of bonds
22 or any other assets.
23     Q.   Are there other reasons besides --
24 well, strike that.
25          And increasing interest rates, market

1           MARK RULE
2  interest rates, can cause corporate bonds to
3  trade below par, all other things being equal?
4      A.   All else equal, below par, yes.  This
5  severe, unlikely.
6      Q.   Are there other factors besides
7  possible insolvency that can cause debt to trade
8  below par?
9      A.   As I said, there would be
10 company-specific factors such as concerns about
11 solvency, as well as there could be market
12 factors, as you said, you know, an increase in
13 overall rates.
14          But based on what I've seen here, the
15 severity and the consistency of the severity of
16 the bond trading prices would indicate to me
17 that it's more than just market factors that are
18 impacting the prices of the bonds.
19     Q.   What other market factors besides
20 interest rates can impact the trading price of
21 corporate bonds?
22     A.   The duration to maturity can impact
23 the price of bonds, as an example.  Probably the
24 largest factor is what we said:  The discount
25 rate.

1           MARK RULE
2      Q.   Any others you can think of as you sit
3  here today?
4      A.   Those are probably two primary
5  factors.  There could be others.
6      Q.   How did the interest rates on EFH's
7  legacy notes, by which I mean the notes that
8  were in existence before the LBO, compare to
9  market interest rates in the period 2008 to
10 2012, if you know?
11     A.   Are you referring to the coupon rates?
12     Q.   Yes, I'm talking -- yes, I'm talking
13 about --
14          Let's look at your chart on page --
15 you have the chart twice.
16     A.   23?
17     Q.   Sure.  So page 23 of your report,
18 there is a Figure 6, right?
19     A.   Uh-huh.
20     Q.   And what I'm asking about is the
21 stated interest rate for the legacy bonds.  So,
22 for instance, you know 5.5 percent Fixed Series
23 P Senior Notes due November 15, 2014.  How did
24 that compare to market interest rates from 2008
25 to 2013?

1           MARK RULE
2      A.   I don't know as I sit here today.
3  What was relevant to my analysis was the trading
4  prices themselves as well as the implied yield
5  based on the trading prices, and in most
6  instances, that yield was over the typical
7  threshold for distressed debt over a thousand
8  basis points off the relevant Treasury, so
9  that's what I was focused on.  I wasn't really
10 focused on the stated rate versus market rates
11 at the time.
12     Q.   Do you know what the legacy bonds
13 traded at immediately after the LBO?
14     A.   Which, again, which ones do you mean
15 by "legacy"?  The ones on Figure 6.  I just
16 haven't used that terminology.
17     Q.   Okay.  So let's just take an example.
18 Let's use the 6.55 percent Fixed Series R Senior
19 Notes.
20     A.   Okay.
21     Q.   Do you know what those traded at
22 immediately after the LBO?
23     A.   I don't, I don't recall as I sit here
24 what the exact trading prices were.
25     Q.   Did you look?

1           MARK RULE
2     A.   It would have been -- when we received
3  our download from Bloomberg, it would have been
4  part of that download, and it would have been
5  something we probably would have looked at, but
6  it also would have been something that really
7  wasn't relevant to my analysis given the overall
8  decline in the valuations between '07 and 2008.
9  So...
10    Q.   On page 22 of your report, the last
11 sentence that starts on the last line of page 22
12 reads, "In performing a comprehensive valuation
13 and solvency analysis, it would be important for
14 a solvency professional to compare the solvency
15 conclusion derived from these trading prices
16 with the solvency conclusion derived from
17 generally accepted valuation approaches."
18        Do you see that?
19    A.   Yes.
20    Q.   And I take it from that statement that
21 you haven't done the comparison of the solvency
22 conclusion from these trading prices to the
23 solvency conclusion derived from a generally
24 accepted valuation approach, right?
25    A.   In 2013, that's correct.  In 2008 to

1           MARK RULE
2  '12, the bond prices were supportive of my
3  analysis, so they were consistent, but that
4  statement would be -- if you got some
5  inconsistency between where the bond prices were
6  trading and the results from your valuation
7  analysis, you would need to do additional
8  analyses to determine the more accurate
9  determinant of solvency.
10    Q.   In some circumstances, bond prices can
11 be an inaccurate determinant of solvency; is
12 that true?
13    A.   Well, I think that's a relative
14 question.  I think the levels of impairment or
15 trading prices and the implied yield on some of
16 these instruments to me indicate insolvency.
17        At higher prices and lower implied
18 yields, it's possible.  It's not a precise
19 measurement, but issuances trading in the 30
20 cents on the dollar to me indicates there's much
21 more involved in market factors.  There are
22 assessments being made about the underlying
23 assets and the investor's ability or expectation
24 of receiving principal and interest payments.
25    Q.   Is there a threshold below which, in

1           MARK RULE
2  your opinion, if a bond is trading below that
3  threshold, then that is an indicator of
4  insolvency?
5     A.   I don't think there is a defined
6  threshold.  I think it's -- I think you have to
7  look at the facts and circumstances, and so when
8  you compare the bond prices with other analyses,
9  I think you can make that conclusion where the
10 bond prices are.
11    Q.   You don't disclose in your report any
12 analysis of implied yields on these bonds,
13 right?
14    A.   No, the implied yields, you're right,
15 it's not disclosed explicitly, but it's part of
16 the pricing information that Bloomberg reports.
17 So it would be in the source document.
18    Q.   I want to ask about some other
19 materials that you cited in your report.
20    A.   Okay.
21    Q.   And I want to start with an October
22 27, 2011 document entitled "Board Strategy
23 Session," which we will mark as Exhibit 9.
24        (Rule Exhibit 9, a document entitled
25 "Board Strategy Session," dated October 27,

1           MARK RULE
2  2011, marked for identification, as of this
3  date.)
4  BY MR. ROGERS:
5     Q.   And this is cited at Note 32 of your
6  report, right?
7     A.   Yes.
8     Q.   Obviously you weren't at the meeting
9  at which this was presented, correct?
10    A.   I was not.
11    Q.   And you haven't spoken to anyone who
12 was at that meeting, right?
13    A.   I have not.
14    Q.   Have you looked at the minutes of the
15 meeting at which this was presented?
16    A.   I don't believe I have, no.
17    Q.   So you don't know what was said at the
18 meeting about the contents of this report, true?
19    A.   The dialogue that accompanied the
20 report or the board presentation, no.  I know
21 what's contained in the report itself.
22    Q.   And you haven't spoken to anybody who
23 prepared the deck, correct?
24    A.   No.
25    Q.   If you turn to page 109, which is the

MARK RULE

1
2 start of the section that you cite in your
3 report.
4    A.   Okay.
5    Q.   Do you see there's an agenda there?
6    A.   Yes.
7    Q.   And you see that this section of the
8 report that follows page 109, the agenda, the
9 person responsible was Mr. Keglevic?
10    A.   Yes.
11    Q.   And you know who that is, right?
12    A.   I believe he's the CFO.
13    Q.   Did you ask your counsel to ask Mr.
14 Keglevic any questions about this deck in his
15 deposition?
16    A.   I believe he was deposed before this
17 document was identified.
18    Q.   Okay.  And it's fair to say that the
19 analysis that you cite in your report, which is
20 on page 110 of the deck, right?
21    A.   That would be the first of two screen
22 shots that are contained on page 16 and 17 of my
23 report.
24    Q.   So the chart on page 110, it's fair to
25 say that this is an analysis of the enterprise

MARK RULE

1
2 value of what you call Consolidated EFH Corp.,
3 correct?
4    A.   Yes, this would be consistent with my
5 Figure 2.
6    Q.   And the analysis of Consolidated EFH
7 Corp., as we've discussed, to the extent that
8 TCEH was insolvent, that had a negative impact
9 on the value of Consolidated EFH Corp., correct?
10    A.   To the extent that they were
11 insolvent, it would have a negative impact, yes.
12    Q.   And fair to say that, to the extent
13 that the court wants to know if EFH Corp., the
14 legal entity, was insolvent, the Consolidated
15 EFH Corp. analysis won't answer that question,
16 right?
17    A.   I think the combination of both my
18 analyses answers that question.  As I mentioned
19 earlier, because the consolidated analysis is
20 more insolvent than the E-side, that implies the
21 T-side's insolvent.
22    So, as a result, the analysis that you
23 would look at, and should still look at, is the
24 E-side analysis, and that shows that Corp. is
25 insolvent.

MARK RULE

1
2    Q.   You're not offering any opinion on the
3 basis of the estimated total enterprise value as
4 stated on page 110 of Exhibit 9, correct?
5    A.   You're referring to the column that
6 says Estimated TEV at 2011?
7    Q.   Correct.
8    A.   I am not offering an opinion on the
9 accuracy of that number.
10    Q.   Another document you cite in your
11 report at page 16, Note 30 is an e-mail from
12 Paul Keglevic dated March 17, 2009, correct?
13    A.   Yes.
14    MR. ROGERS:  We'll mark that as
15 Exhibit 10.
16    (Rule Exhibit 10, an e-mail from Paul
17 Keglevic dated 3/17/2009, bearing Bates Nos.
18 EFH-SP00040957, marked for identification,
19 as of this date.)
20 BY MR. ROGERS:
21    Q.   And Exhibit 10 is the e-mail that you
22 cited in your report, right?
23    A.   Yes.
24    Q.   In this e-mail, Mr. Keglevic is
25 talking about an opportunity to potentially pay

MARK RULE

1
2 the sponsors a dividend, right?
3    A.   That's what the first line says, yes.
4    Q.   And he says this would be an EFH
5 dividend in the next line, right?
6    A.   Which I assume would be an EFH Corp.
7 dividend, yes.
8    Q.   Correct.  That was going to be my next
9 question.
10    So you say in your report -- and I'll
11 point you to the line.  It's on page 15.  In the
12 second full paragraph, the second sentence, you
13 say, "For Example, on March 17, 2009, Paul
14 Keglevic, in an e-mail to equity sponsors,
15 Goldman Sachs, KKR and TPG, stated that
16 Consolidated EFH Corp. was insolvent if the face
17 value of debt was used instead of the fair
18 market value of debt."
19    Right?
20    A.   Yes.
21    Q.   Can you just point me to the language
22 in the e-mail where Mr. Keglevic says that
23 Consolidated EFH is insolvent if you use face
24 value of debt instead of fair market value?
25    A.   It says, with the paragraph beginning,

Page 149

1            MARK RULE
2 "The Texas law regarding solvency seems to give
3 some latitude regarding using FV of debt -- if
4 face value of debt is required, we would not be
5 solvent..."
6    Q.   Okay.  And you also say that, on page
7 16 of your report -- well, strike that.
8        You haven't spoken to Mr. Keglevic
9 about this e-mail, correct?
10   A.   I have not.  Just what his words are
11 on the page.
12   Q.   And do you understand that Mr.
13 Keglevic's conclusion about solvency is based on
14 conversations that he had with Duff & Phelps; do
15 you understand that from the e-mail?
16   A.   Can you repeat that, please?
17   Q.   Sure.  Do you understand from the
18 context of this e-mail that Mr. Keglevic's
19 statements about the solvency of EFH are based
20 on conversations he had with Duff & Phelps?
21   A.   I don't know if he's making that
22 determination based on discussions with Duff &
23 Phelps or if it's based on an internal analysis
24 or both.
25   Q.   You don't know what the basis of Mr.

Page 150

1            MARK RULE
2 Keglevic's conclusion was, right?
3    A.   I don't.  I know he's requesting a
4 valuation report similar to the one that was
5 done as of 12/31/08 from Duff & Phelps.
6        So, again, I don't know if he's basing
7 it on a Duff & Phelps analysis or their own
8 internal analysis.  I do note in my report that
9 in a subsequent document that Duff & Phelps
10 indicated that they would be insolvent.
11   Q.   In the statement that you pointed me
12 to where Mr. Keglevic says "if face value of
13 debt is required, we would not be solvent for
14 dividend purposes," what did he mean by "for
15 dividend purposes"?
16   A.   Based on this statement, it indicates
17 that, in order to pay a dividend, they couldn't
18 pay one because they would be insolvent.
19   Q.   Do you know if he meant they would be
20 insolvent before or after payment of the
21 dividend?
22        MR. NELSON:  Object to form.
23        MR. ROGERS:  What's the objection?
24        MR. NELSON:  Well, I'll withdraw the
25 objection.

Page 151

1            MARK RULE
2        THE WITNESS:  Can you repeat the
3    question?  Sorry.
4 BY MR. ROGERS:
5    Q.   Do you know when he made the statement
6 that "if face value of debt is required, we
7 would not be solvent for dividend purposes," he
8 meant before or after the dividend?
9    A.   It's unclear in this e-mail.
10   Q.   And you haven't spoken with anyone
11 from Duff & Phelps about the substance of this
12 e-mail either, right?
13   A.   No, just their -- just the document
14 that I cite next that indicates that their
15 analysis would indicate insolvency.
16   Q.   Was the dividend, the potential
17 dividend that Mr. Keglevic discusses in this
18 e-mail, ever declared?
19   A.   I don't know.
20   Q.   Was the solvency analysis that Mr.
21 Keglevic refers to as a potential analysis that
22 Duff & Phelps could do, was that analysis ever
23 actually done?
24   A.   It's unclear to me, because in the
25 next paragraph on page 16, it indicates that

Page 152

1            MARK RULE
2 Duff & Phelps thought they would fail that test,
3 so I don't know if it was ultimately done and on
4 what basis they would have done it, but...
5    Q.   You're talking about the statement on
6 page 16 of your report?
7    A.   Yes, the one that's footnoted,
8 footnote 31.
9    Q.   Do you agree with me that book value
10 of equity can change for many reasons unrelated
11 to the company's financial health?
12   A.   That's a fairly broad statement.  I
13 mean, typically, book value is driven by the
14 operating performance of the company.
15   Q.   Are there other factors that can cause
16 changes in book value besides the financial
17 health of the company?
18   A.   What do you mean by financial health?
19 The financial position or the financial
20 operations?
21   Q.   Let's look at your Figure 3 on page
22 15.  You --
23   A.   You said page 15?
24   Q.   Yes, page 15, Figure 3.
25   A.   Okay.

1         MARK RULE
2     Q.   And this is a chart of Consolidated
3  EFH Corp.'s book value from December 2007 to
4  December 2012, right?
5     A.   Yes.
6     Q.   And there was a big drop in
7  Consolidated EFH Corp. book value from December
8  2007 to December of 2008, right?
9     A.   Yes.
10    Q.   What accounts for that?
11    A.   My recollection is there was an asset
12 impairment.
13    Q.   What was that a result of?
14    A.   Valuation analysis of the assets of
15 EFH Corp.
16        MR. ROGERS:  We can either break for
17    lunch now, or if we take a short break, I
18    may be able to wrap up.
19        Why don't we break for lunch because I
20    know other people are going to have
21    questions.
22        MR. NELSON:  Okay.
23        MR. ROGERS:  Is that all right with
24    you, Mr. Rule?
25        THE WITNESS:  Yes, that's fine.

1         MARK RULE
2        AFTERNOON SESSION
3        (Time Noted:  12:46 p.m.)
4  MARK RULE, resumed and
5     testified further as follows:
6  EXAMINATION BY (Cont'd.)
7  MR. ROGERS:
8     Q.   Mr. Rule, have you done a solvency
9  analysis of any company in connection with the
10 issuance of a dividend?
11    A.   You're asking me the reason for the
12 solvency opinion would be because the company
13 wanted to issue a dividend?
14    Q.   Yes.
15    A.   In those specific circumstances, no.
16    Q.   I want to talk about your opinion that
17 there is no indication that the E-side and EFH
18 Corp. became solvent during the period from
19 December 31, 2012 through the petition date,
20 okay?
21    A.   Okay.
22    Q.   And specifically, that opinion -- or
23 the basis for that opinion starts on page 22 of
24 your report, right?
25    A.   Yes.

1         MARK RULE
2     Q.   And I want to ask, first, in the
3  second paragraph in that section on page 22, you
4  say, "It is my understanding there may be
5  significant off-balance sheet liabilities to
6  consider," and then it goes on from there, do
7  you see that?
8     A.   Yes.
9     Q.   Where did you gain that understanding
10 from?
11    A.   That would be a combination of
12 discussions with members of my team as well as
13 discussions with counsel.
14    Q.   One of the potential off-balance sheet
15 liabilities that you mentioned is potential
16 E-side liabilities related to the make-whole
17 payments, right?
18    A.   Yes.
19    Q.   Well, first, before we get to that,
20 I'm sorry, let me step back.  What is the
21 standard for including contingent liabilities in
22 a solvency analysis?
23    A.   Generally, the standard is that you
24 can estimate -- reasonably estimate the
25 liabilities and reasonably estimate their

1         MARK RULE
2  probability of occurrence such that it's
3  reasonable to include a solvency analysis.
4     Q.   Okay.  So now getting to the
5  make-whole payments, what triggered, if you
6  know, the claim that make-whole payments were
7  due on E-side debt?
8     A.   I don't recall as I sit here.
9     Q.   Did you consider, in the course of
10 rendering your opinion, what it was that
11 triggered the claim for make-whole payments on
12 the E-side?
13    A.   What I considered was discussions
14 with, again, team members and counsel that these
15 could be potentially something that should be
16 factored in.  It's an indication that these are
17 possible things you would want to factor in, not
18 necessarily something I'm saying you should
19 definitively factor in.
20    Q.   Okay.  Let's break that down a little.
21        Did your team tell you what it was
22 that triggered the claims for make-whole
23 payments that exist in the bankruptcy?
24    A.   I just don't recall that specific
25 issue as I sit here.

Page 157

MARK RULE

2    Q.   And so the other thing you said was
3 that these are possible things you would want to
4 factor in, but not necessarily volunteering you
5 should definitively factor in, correct?
6    A.   Yes, this paragraph is identifying
7 things that potentially should be factored in.
8    Q.   The other thing -- well, strike that.
9         Do you know if claims for make-whole
10 payments on the E-side would have been triggered
11 if EFH was sold to a willing buyer in December
12 of 2012?
13    A.   I don't know.
14    Q.   Did you look at any of the indentures
15 relating to the debt on which make-whole claims
16 are being made?
17    A.   I believe some of my team members did,
18 but I don't recall specifically looking at that
19 myself.
20    Q.   Do you know what they say about
21 changes in control and whether a make-whole
22 payment is triggered under those circumstances?
23    A.   As I sit here, I can't recall.
24    Q.   You don't offer an opinion on the
25 magnitude of the potential make-whole payments,

Page 158

MARK RULE

2 do you?
3    A.   I don't.  It's simply to say that they
4 should be potentially considered.
5    Q.   And you don't offer any opinion on the
6 likelihood that creditors will prevail on those
7 make-whole claims, right?
8    A.   No, it's my understanding that that is
9 being contested.
10    Q.   The other potential off-balance sheet
11 liability you refer to in this paragraph on page
12 22 of your report is payments that would be made
13 under the settlement agreement that's been
14 filed?
15    A.   That's correct.
16    Q.   Do you know when the settlement
17 agreement was signed?
18    A.   In 2015.
19    Q.   So it didn't exist in the period that
20 you were looking at from 2008 through the
21 petition date, correct?
22    A.   My understanding is some of the
23 intercompanies that are being settled in that
24 settlement agreement are potentially applicable
25 to periods prior to 2012.  So, again, this is a

Page 159

MARK RULE

2 possible off-balance sheet liability to factor
3 in.
4    Q.   And you don't have any opinion on
5 which claims might have existed in the 2008
6 through pre-petition period?
7    A.   No, I haven't done that analysis.
8    Q.   And you haven't done any analysis of
9 the magnitude of any claims that might have
10 existed before the bankruptcy, correct?
11    A.   No, I haven't done that analysis.
12    Q.   And you haven't done any analysis of
13 the likelihood that those claims would have been
14 successful in the pre-petition period, correct?
15    A.   Can you repeat that question, please?
16    Q.   Sure.  Let me put it this way:  You
17 don't have an opinion on the likelihood that a
18 pre-petition litigation on the claims that were
19 settled in the settlement agreement would have
20 been successful?
21    A.   I know it's subject to a dispute, but
22 I have not evaluated the merits of the argument.
23    Q.   So you haven't assessed the likelihood
24 that EFH Corp. would succeed in any of the
25 claims that are settled in the settlement

Page 160

MARK RULE

2 agreement if it had brought those claims before
3 filing bankruptcy?
4    A.   I have not performed that analysis.
5    Q.   My last line of questions has to do
6 with your opinion -- the last opinion that you
7 state in your report, which is that, as of the
8 petition date, EFH Corp. and EFIH held TCEH debt
9 acquired for at least $242 million?
10    A.   Yes.
11    Q.   Okay.  As I understand it, correct me
12 if I'm wrong, the basis of your opinion here was
13 that you pulled publicly available market data
14 on the value of debt that EFH Corp. acquired to
15 determine what it paid for that debt when it
16 acquired it?
17    A.   What I did is we went back to the
18 public filings that, number one, identified
19 transactions identified by EFH Corp. of
20 purchases of debt, and we identified when those
21 happened, normally during a time period, a
22 quarter; and then based on that, we observed
23 market prices based on Bloomberg during that
24 time period and applied the lowest price for
25 that time period to the principal amount that

Page 161

MARK RULE

2 they acquired to determine potentially what they
3 acquired it for.
4    Q.    You're not offering any opinion in
5 this case that any of the acquisitions of debt
6 by EFH Corp. or EFIH were fraudulent transfers,
7 are you?
8    A.    I'm not offering an opinion.
9    Q.    And you're not offering any opinion
10 that the purchases that EFH and EFIH made of
11 TCEH debt were not made for reasonably
12 equivalent value, are you?
13    A.    I have not done that analysis.
14    Q.    In fact, your assumption is that the
15 purchases were made at market prices, correct?
16    A.    Yes, because I applied market prices.
17       MR. ROGERS: I think I'll pass the
18    witness. Thank you.
19       THE WITNESS: Okay.
20 EXAMINATION BY
21 MR. KLEINHAUS:
22    Q.    Good afternoon.
23    A.    Good afternoon.
24    Q.    For the record, my name a Emil
25 Kleinhaus. I'm from Wachtell Lipton Rosen &

Page 162

MARK RULE

2 Katz. My firm is counsel to Kohlberg Kravis
3 Roberts & Co., LP, TPG Capital, LP, and Goldman
4 Sachs & Co., which I'll call "KKR," "TPG" and
5 "Goldman Sachs" for short. I might also call
6 them "the sponsors."
7       I'm also counsel to the affiliated
8 funds that hold equity interests in EFH and
9 counsel to Texas Energy Future Holdings Limited
10 Partnership, which holds direct equity interests
11 in EFH.
12       So if I call KKR, TPG and Goldman "the
13 sponsors," you'll know what I'm referring to?
14    A.    Yes.
15    Q.    Okay. Thankfully, Mr. Rogers covered
16 a lot of the ground that I would have covered,
17 so I'm going to try to cut through my questions
18 and not repeat all that much.
19       Have you published any articles ever?
20    A.    I have not.
21    Q.    Have you published anything?
22    A.    Only internally.
23    Q.    Are you an expert on the market for
24 natural gas?
25    A.    I am not.

Page 163

MARK RULE

2    Q.    Are you an expert in forecasting the
3 price of natural gas?
4    A.    I am not.
5    Q.    Are you an expert on heat rates?
6    A.    I am not.
7    Q.    Expert on the utility industry?
8    A.    I am not.
9    Q.    Expert in the Texas power market?
10    A.    No.
11    Q.    Are you aware that KKR, TPG and
12 Goldman Sachs received certain fees from the
13 debtors between the time of the LBO and the time
14 of the bankruptcy filing?
15    A.    I am generally aware that they were
16 paid sponsor fees.
17    Q.    Are you expressing any opinion on
18 whether KKR, TPG or Goldman Sachs provided value
19 in exchange for those fees?
20    A.    I have not analyzed the fees or the
21 value provided or not provided, so I haven't
22 done that analysis.
23    Q.    Okay. So you're not expressing any
24 opinion --
25    A.    No.

Page 164

MARK RULE

2    Q.    -- on those fees?
3       Are you expressing any opinion on
4 whether KKR, TPG or Goldman Sachs provided fair
5 consideration for those fees?
6    A.    I have not analyzed that issue, so I
7 have no opinion on it.
8    Q.    Can you look at page 25 of your expert
9 opinion, please, which is Exhibit 1.
10    A.    Sure.
11    Q.    The second full paragraph begins with
12 a sentence saying, "As a result of the increased
13 centralization of costs in EFH Corporate
14 Services starting in 2010, the incurrence of
15 direct costs by both TCEH and EFH Corp./EFIH
16 declined significantly."
17       Do you see that sentence?
18    A.    You said the second full paragraph, or
19 the first?
20    Q.    The second full paragraph. The
21 sentence beginning "as a result of."
22    A.    That's -- yes, I see that.
23    Q.    What is EFH Corporate Services?
24    A.    The centralized entity that handles
25 many of the shared corporate services.

Page 165

MARK RULE

2  Q.  And do you understand that it's a
3  separate corporate entity than EFH Corp.?
4  A.  My understanding is in the
5  organizational chart, yes, it's a separate
6  corporate entity.
7  Q.  Are you offering any opinion on the
8  solvency of EFH Corporate Services on its own at
9  any point in time?
10  A.  No.
11  Q.  Are you offering any opinion on the
12  financial condition of EFH Corporate Services on
13  its own at any point in time?
14  A.  No.
15  Q.  Did you conduct an analysis to
16  determine which particular debtor entities made
17  payments to KKR, TPG or Goldman Sachs?
18  A.  I have not undertaken that analysis.
19  Q.  Are you offering any opinion on which
20  of the debtor entities made payments to KKR,
21  Goldman Sachs and TPG?
22  A.  No.
23  Q.  I'm going to jump ahead a bit and
24  introduce a new exhibit.
25      This will be Rule 11.

Page 166

MARK RULE

2      (Rule Exhibit 11, Duff & Phelps Final
3  Report entitled "Energy Future Holdings,
4  Corp. Quarterly Equity Valuation Analysis
5  as of December 31, 2008," dated February 12,
6  2009, marked for identification, as of this
7  date.)
8  BY MR. KLEINHAUS:
9  Q.  I've put in front of you an exhibit
10  beginning with the Bates stamp CITIBANK0007404,
11  and this is a Duff & Phelps Quarterly Equity
12  Valuation Analysis as of December 31, 2008.
13      Is this one of the exhibits that
14  you -- one of the documents that you relied on
15  in your expert report?
16  A.  Yes, it appears to be.
17  Q.  Please go to page 23 of this exhibit.
18  Do you see in the middle of the page where it
19  says Terminal Valuation?
20  A.  Yes.
21  Q.  And it says the terminal valuation was
22  done using the Gordon Growth Model?
23  A.  Yes.
24  Q.  And do you know what terminal growth
25  rate was used by Duff & Phelps?

Page 167

MARK RULE

2  A.  I believe it's disclosed upfront.  I
3  believe at this point in time they used 2.5
4  percent, but let me just verify that.
5  Q.  I think on page 23 that might -- I see
6  that number.
7  A.  I'm sorry, I don't see it.
8  Q.  Right under Terminal Year Cash Flow.
9  A.  Oh, there it is.  Yes.
10  Q.  Is the Gordon Growth Model the only
11  way to calculate terminal value?
12  A.  No.
13  Q.  Is an alternative way to calculate
14  terminal value to use a multiple of an EBITDA
15  projection?
16  A.  In some instances, valuations are done
17  using a multiple.
18  Q.  And a multiple of what?
19  A.  Typically, it could be EBITDA.
20  Q.  And do you agree that both the
21  perpetual growth model approach and the multiple
22  approach are widely accepted ways to calculate
23  terminal value?
24  A.  They're both used.  In using the
25  multiple approach, one of the things that I'll

Page 168

MARK RULE

2  do is to calculate what the implicit growth rate
3  is in there.
4      So assuming that it, again, is a
5  reasonable growth rate, given the projections
6  and the long-term expectations for the company,
7  that's a way you can get comfortable with the
8  multiple, because at the end of the day, you
9  want to really assess what the long-term growth
10  rate is.
11  Q.  If you use the Gordon Growth Model,
12  you will look at the implicit multiple as well,
13  right?
14  A.  Sometimes you will look at multiples
15  as a potential reasonableness check.
16  Q.  So does your expert report state any
17  opinion as to whether Duff & Phelps used the
18  best approach in calculating terminal value in
19  this report?
20  A.  No.  As I stated earlier, in an effort
21  to fully evaluate the assumptions they made, I
22  would have wanted to -- or, I would need to
23  fully evaluate the projections that would inform
24  the long-term assumption regarding growth.
25  Q.  Do you have an opinion as to whether

1          MARK RULE
2  using a multiple-based approach for terminal
3  value would be unreasonable as applied to EFH?
4      A.    Again, I would qualify it with it
5  wouldn't be unreasonable assuming the implied
6  growth rate was reasonable.
7      Q.    But are you stating an opinion that
8  using a multiples approach would be unreasonable
9  as applied to EFH?
10     A.    I have no formal opinion as it relates
11  to this case that relates to a terminal
12  multiple.
13     Q.    Can you look at page 21 of Exhibit 1,
14  please.
15         MR. NELSON:  Exhibit 11?
16     Q.    Exhibit 11.  I'm sorry.  Exhibit 11,
17  yes.
18         Do you see in the second-to-last
19  bullet on page 21 of Exhibit 11 the WACC, the
20  weighted average cost of capital, that was used
21  for TCEH?
22     A.    Yes.
23     Q.    And what was that by Duff & Phelps?
24     A.    It says 12.5 percent.
25     Q.    And if you look at page 27 -- and just

1          MARK RULE
2  to back up, the multiple on page 21 -- excuse
3  me, the WACC on page 21 is for TCEH, right, as
4  opposed to Oncor?
5      A.    That's correct.
6      Q.    And on page 27, there is a WACC, a
7  weighted average cost of capital, for Oncor.
8  And what is that?
9      A.    It says 6.75 percent.
10     Q.    Does your report state an opinion as
11  to whether Duff & Phelps used the correct WACC
12  in this or any other of its reports?
13     A.    I believe it's consistent with my
14  prior testimony.  I have not fully developed an
15  opinion upon the appropriateness of the WACC, in
16  part because the WACC needs to be viewed in the
17  context of projections being used.
18     Q.    Go to page 25, please.  Do you see
19  that in the Assumptions and Sources section, the
20  top left-hand corner?
21     A.    Yes.
22     Q.    There is an assumption of debt 60
23  percent and equity 40 percent?
24     A.    Yes.
25     Q.    Do you agree that the cost of equity

1          MARK RULE
2  capital is generally higher than the cost of
3  debt capital?
4      A.    Generally speaking, yes.
5      Q.    And is that true for TCEH, if you look
6  at the bottom right-hand corner?
7      A.    Yes, based on this analysis, equity --
8  the required rate of return for equity is higher
9  than the required rate of return for debt.
10     Q.    Do you know how the assumption of 60
11  percent debt versus 40 percent equity, do you
12  know how that compares to TCEH's actual
13  debt-to-equity ratio at the end of 2008?
14     A.    I haven't done the analysis, but -- I
15  mean, I haven't done the analysis.  The 60/40 is
16  based on an industry average, and I know that
17  TCEH was part of an LBO, so I'd have to do the
18  math; but I would assume that 60 percent debt is
19  less than what TCEH had.
20     Q.    Does your report state an opinion on
21  whether it was reasonable for Duff & Phelps to
22  use a 60/40 debt-to-equity breakdown?
23     A.    No.
24     Q.    If you can go to page 24, please.  Do
25  you see here the second-to-bottom bullet, there

1          MARK RULE
2  is a reference to a composite market risk
3  premium of 6 percent?
4      A.    Yes.
5      Q.    If you go to page 25, please, do you
6  see a reference to alpha in the derivation of
7  discount rate?
8      A.    Yes.
9      Q.    And what's that alpha?  What's the
10  percent?
11     A.    5 percent.
12     Q.    And is it your understanding that Duff
13  & Phelps applied both a 6 percent market risk
14  premium and an alpha of 5 percent on top of that
15  in conducting its DCF?
16     A.    Well, the 6 percent market risk
17  premium and the alpha were factored into the
18  discount rate.  So, as a result, that would be
19  factored into the DCF analysis.
20     Q.    And so there's both a market risk
21  premium of 6 percent and this alpha of 5 percent
22  were factored in, right?
23     A.    Yes, they added a 5 percent company
24  risk factor.
25     Q.    Do you know why Duff & Phelps added in

MARK RULE

2 the 5 percent company risk factor?
3    A.    The only documentation that I've seen
4 is a reference to company characteristics.  What
5 those specific characteristics in Duff's view
6 were, I don't know.  I haven't seen any other
7 contemporaneous documents that discuss that.
8    Q.    Does your report state an opinion as
9 to whether Duff & Phelps was correct to add a 5
10 percent company-specific premium on top of the 6
11 percent market risk premium?
12    A.    It doesn't have a formal opinion, in
13 part because I haven't been able to formalize an
14 opinion, because part of that -- part of the
15 alpha could be associated with a projection
16 risk.  So, again, there's other factors that you
17 would need to consider in coming up with an
18 alpha.
19    Q.    Is it standard practice in valuation
20 to add a company-specific premium on top of a
21 market premium?
22    A.    It depends on the facts and
23 circumstances of the valuation.  It's -- it's
24 not uncommon.
25    Q.    Have you in your valuation practice

MARK RULE

2 ever added a 5 percent company-specific premium
3 on top of a 6 percent market risk premium?
4    A.    I've definitely used alphas.  Can I
5 recall specifically a 5 percent?  I can't recall
6 at this point, but I've used material alphas in
7 the past.
8    Q.    But you can't recall a specific
9 instance of 5 percent?
10    A.    As I sit here now, given the number of
11 valuations I've done, I can't specifically
12 recall 5 percent.
13    Q.    Can you recall a specific instance of
14 higher than 5 percent for an alpha?
15    A.    Again, same answer.  I just don't
16 recall specifically 5 percent or higher.
17    Q.    Do you recall specifically lower
18 alphas that you have used?
19    A.    Again, specific alphas and specific
20 cases, I don't recall, but generally speaking,
21 an alpha between, you know, zero and 5 percent
22 can be a reasonable range, again, depending on
23 the facts and circumstances of the valuation
24 project.
25    Q.    Do you know if Duff & Phelps used an

MARK RULE

2 alpha in the 2007 solvency report that it did?
3    A.    I'd have to look at that report.  I
4 just don't recall.
5    Q.    Are you familiar with natural gas
6 hedges that TCEH put in place in 2007?
7    A.    Generally speaking, I'm familiar with
8 their hedging program.
9    Q.    How do the hedges work?
10    A.    They were trying to protect themselves
11 from a financial standpoint from changes in
12 natural gas prices, so they were trying to lock
13 in specific prices.
14    Q.    Were they successful in doing that?
15    A.    I don't recall specifically.  That
16 would be something I would have to go back and
17 look at.
18    Q.    So sitting here today you don't know
19 whether the company succeeded in putting in
20 place hedges in 2007?
21    A.    I know that there were hedges.  Did I
22 consider them successful?  I don't know.
23    Q.    Did you take into account the hedges
24 in rendering your opinion?
25    A.    Well, the hedges would be taken into

MARK RULE

2 account in the valuation analyses themselves.
3 So, from my perspective, since Duff considered
4 them, they should be in the cash flows that they
5 would be considered in the analysis.
6    Q.    Look at page 26, please, of Exhibit
7 11.  This is TCEH discounted cash flow analysis.
8 Do you know whether the cash flow projections on
9 this page are hedged or unhedged?
10    A.    It appears they're unhedged because
11 they're making an adjustment for the fair market
12 value of the hedges.
13    Q.    Okay.  And their adjustment to the
14 fair market value of the hedges in this
15 valuation -- in this document was to reduce
16 enterprise value of $824 million, right?
17    A.    That's what this says, yes.
18    Q.    Are you offering an opinion as to
19 whether it was reasonable for Duff & Phelps to,
20 in this document, reduce the company's valuation
21 by $824 million as a result of hedges?
22    A.    I'm not offering that opinion, no.
23    Q.    Are you offering any opinion more
24 generally about whether Duff & Phelps correctly
25 addressed the hedges in the documents that you