1        MARK RULE
2 have cited?
3     A.   No, I do not have a formal opinion
4 related to that.
5     Q.   Do you know if Duff & Phelps took into
6 account the hedges in identifying comparable
7 companies?
8     A.   Based on the information I have,
9 it's -- I believe it's -- I don't have enough
10 information to know how they adjusted comparable
11 companies, if at all, for comparable company
12 hedges.
13    Q.   Do you know if Duff & Phelps took into
14 account the hedges when they added the 5 percent
15 company-specific premium?
16    A.   Again, I don't know what the basis for
17 their 5 percent alpha was.
18    Q.   As a valuation expert, would hedges be
19 something that should be taken into account in
20 determining an alpha?
21    A.   I think the more appropriate way to
22 take them into account is to take them in
23 account on the cash flow side.  So if you can
24 reasonably forecast the hedges, you should
25 incorporate those in your cash flows.

1        MARK RULE
2     Q.   You had some discussion with Mr.
3 Rogers, which I won't go back over, about market
4 pricing of debt, and that was discussion that
5 was about the implications of bonds trading
6 below par.
7        Do you remember that discussion?
8     A.   Yes.
9     Q.   So I'm going to ask the other -- a
10 different question, which is if a bond is
11 trading at par, in your view, does that mean
12 investors believe they will receive payment in
13 full?
14        MR. BREBNER:  Objection to form.
15    A.   Well, if it's trading at par, they
16 obviously can sell them in the market to get the
17 full value of the instrument, but I would say if
18 it's trading at par, it's an indication that
19 they expect to receive principal and interest
20 payments.
21    Q.   In full?
22    A.   In full.
23    Q.   Are you familiar with the current
24 trading prices of EFH Corp. debt?
25    A.   I haven't analyzed the debt

1        MARK RULE
2 post-petition.
3     Q.   How much of that debt is currently
4 trading above par?
5     A.   Again, I haven't analyzed the debt
6 post-petition or evaluated reasons why it could
7 be trading where it is.
8     Q.   I'm sorry.  I think I misheard you.
9        You said you have or you haven't
10 valued --
11    A.   I have not.
12    Q.   I apologize.
13        Did anyone bring to your attention any
14 sales of EFH equity at any time?
15    A.   So sales of equity --
16    Q.   I'll be more specific.  Sales of
17 equity after the LBO, either sales of direct
18 equity or sales of LP interest, that were
19 indirect holdings of the equity?
20    A.   As sit here, I can't recall any such
21 transactions.
22    Q.   Did anyone bring those -- any of those
23 transactions to your attention?
24    A.   Not that I recall.
25    Q.   Do you think that would be a relevant

1        MARK RULE
2 data point in conducting a valuation?
3     A.   Well, it's something that I would want
4 to consider and the facts and circumstances
5 surrounding that sale, but it would be something
6 that would be factored into the analysis.
7     Q.   Are you familiar with the private
8 equity industry?
9     A.   Generally.
10    Q.   Do you have any private equity
11 clients?
12    A.   The firm does, yes.
13    Q.   And is it your understanding that
14 private equity firms conduct valuations of their
15 investments?
16    A.   As a general matter, I know that they
17 will perform internal valuations, yes.
18    Q.   And do you know whether KKR is a
19 public company?
20    A.   I believe they're public.
21    Q.   And as a public company, they have SEC
22 filings, right?
23    A.   Yes.
24    Q.   Did you look at their SEC filings to
25 see whether a valuation of EFH was disclosed?

Page 181

1          MARK RULE
2     A.   I didn't personally. I believe
3  members of the team did, but personally, I don't
4  recall looking at those.
5     Q.   Did you take that into account at all
6  in your opinion?
7     A.   It's currently not factored in my
8  opinion, no.
9     Q.   Do you know whether KKR, TPG or
10  Goldman conducted internal valuations of their
11  investments?
12    A.   I don't know.
13    Q.   So you're not stating any opinion on
14  the reasonableness of any valuations that they
15  conducted, right?
16    A.   I haven't reviewed that valuation, so
17  I haven't formed an opinion.
18         MR. KLEINHAUS: This is going to be
19  Exhibit 12.
20         (Rule Exhibit 12, KKR report entitled
21     "EFH Discussion Materials," marked for
22     identification, as of this date.)
23  BY MR. KLEINHAUS:
24    Q.   Rule Exhibit 12 is a document that
25  begins with the Bates stamp LEG_SP_00315318, and

Page 182

1          MARK RULE
2  the cover of this document says "EFH Discussion
3  Materials, February 2012, KKR."
4         This is one of the documents that you
5  discuss in your expert report, right?
6     A.   It appears to be so, yes.
7     Q.   If you look at page 17 of your expert
8  report, please, Exhibit 1. You say here, "In
9  February 2012, in a KKR presentation, KKR
10  acknowledged a Consolidated EFH Corp.'s face
11  value of net debt was $40.193 billion while the
12  fair market value was only $27.481 billion, (a
13  31.6 percent discount to par), again indicating
14  that Consolidated EFH Corp. was insolvent."
15  Then you cite two pages, 319 and 333.
16         Can you look at page 319, please?
17    A.   Okay.
18    Q.   So, first of all, when you say "while
19  the fair market value was only $27.481 billion,"
20  you're referring to fair market value of debt,
21  right?
22    A.   Yes, on an aggregate basis.
23    Q.   And page 315319 deals with debt
24  prices, right?
25    A.   Yes.

Page 183

1          MARK RULE
2     Q.   Does this deck include KKR's
3  enterprise valuation of Consolidated EFH at this
4  time?
5     A.   I don't see a consolidated enterprise
6  value analysis.
7     Q.   Do you see a valuation of KKR's equity
8  holdings in this deck?
9     A.   What page are you looking at?
10    Q.   I'm not looking at any. I'm just
11  asking.
12         You reviewed this deck for your
13  report, is there an enterprise valuation or a
14  valuation of KKR's equity holdings in this deck?
15    A.   I see analyses of TCEH and the E-side,
16  but I don't believe I see a consolidated
17  analysis, if I'm reading this correctly.
18    Q.   Do you know whether KKR attached a
19  positive value to its EFH equity as of February
20  2012?
21    A.   I do not.
22    Q.   Do you know whether KKR's estimate of
23  Consolidated EFH's enterprise value at that time
24  exceeded the face amount of Consolidated EFH's
25  debt?

Page 184

1          MARK RULE
2     A.   I haven't seen any of their analyses,
3  so I don't know.
4     Q.   Did you look at KKR's SEC filings to
5  determine that?
6     A.   Again, I believe we did, but I don't
7  recall specifically myself looking at them.
8     Q.   Can you look at 315333, please. This
9  is the other page that you cite in your report.
10         So the title is "EFH (Excluding TCEH)
11  Implied Lender Capital Recovery." Do you see
12  that?
13    A.   Yes.
14    Q.   And this page discusses potential
15  creditor recoveries between 2012 and 2016,
16  correct?
17    A.   Yes.
18    Q.   So in 2012 -- well, strike that. Let
19  me back up. It discusses potential recoveries
20  at both an 8.5 times multiple and a 9.5 times
21  multiple, right?
22    A.   That's what it purports to say, yes.
23    Q.   And in 2012, at a 9.35 times multiple,
24  it shows a 100 percent recovery on EFH and EFIH
25  debt, right?

1          MARK RULE
2    A.    At 9.5, it says 100 percent recovery,
3 but at 8.5, it says it's impaired.
4    Q.    Well, to be clear, some of it -- some
5 of the EFH debt shows 100 percent recovery,
6 other debt is less than 100 percent at 8.5
7 times, right?
8    A.    That's correct.
9    Q.    And then at the top, this document
10 takes management EBITDA, excluding
11 securitization, and puts an 8.5 times multiple
12 on that, right?  In other words --
13    A.    I mean, it's unclear on whose EBITDA
14 it is.
15    Q.    Okay.
16    A.    Because it says at the top excluding
17 TCEH.
18    Q.    All right.  So it takes management --
19 it says at the top "excluding TCEH," then it
20 says management EBITDA, and for 2013, for
21 example, it says 1,749, and then puts -- it
22 multiplies that by 8.5 times, right?
23    A.    You said in 2013?
24    Q.    Correct.
25    A.    Yes, it multiplies management EBITDA

1          MARK RULE
2 by 8 and a half times.
3    Q.    And on this document, based on that
4 calculation, there is an implied enterprise
5 value in 2013 of $14,867,000,000, right?
6    A.    Again, for -- it appears to exclude
7 TCEH, but yes.
8    Q.    How does that implied enterprise value
9 compare to the enterprise value that Duff &
10 Phelps put on Oncor at the end of 2012?
11    A.    I believe it's lower.
12    Q.    What enterprise value does Duff &
13 Phelps put on Oncor at the end of 2012?
14    A.    Between $15.5 billion and $18 billion.
15    Q.    Was there a midpoint valuation?
16    A.    $17 billion.
17    Q.    Can you look back at page 17 of your
18 expert report, Exhibit 1 to the deposition.  In
19 the second paragraph of that report, you express
20 an opinion on what the equity sponsors
21 understood regarding Consolidated EFH Corp.'s
22 solvency between 2009 and 2012, right?
23    A.    Yes.
24    Q.    Let's take it entity-by-entity.
25          What due diligence did you perform to

1          MARK RULE
2 make yourself comfortable that you could express
3 an expert opinion on KKR's understanding of
4 EFH's solvency over a four-year period?
5          MR. BREBNER:  Objection to form.
6    A.    Can you repeat that question?
7    Q.    Yes.  What due diligence did you
8 perform to get comfortable that you could state
9 an expert opinion on KKR's understanding of
10 EFH's solvency over a four-year period?
11          MR. BREBNER:  Objection to form.
12          MR. NELSON:  Objection.
13    A.    That statement is based on the prior
14 paragraph, where I observe in KKR's own
15 documentations that the debt, in aggregate, is
16 trading 30 -- almost 32 percent discount to par
17 and specific issuances are severely below that.
18 So that was the basis for my statement.
19    Q.    So you, as an expert, are drawing an
20 inference as to KKR's knowledge -- strike that.
21          You, as an expert, are drawing an
22 inference as to KKR's understanding over a
23 four-year period based on that February 2012
24 document?
25    A.    Based on my interpretation of that

1          MARK RULE
2 document, yes.
3    Q.    So, based on that one document, you
4 are expressing an expert opinion about KKR's
5 understanding over four years?
6    A.    Based on my interpretation of that
7 specific document.
8    Q.    Okay.  Did you review any KKR internal
9 valuations before opining on KKR's
10 understanding?
11    A.    I did not have access to any of them.
12    Q.    We'll come back to that.
13          Did you review any depositions of KKR
14 witnesses before opining on KKR's understanding
15 over a four-year period?
16    A.    I did not.
17    Q.    Did you speak to anybody at KKR before
18 opining about KKR's understanding over a
19 four-year period?
20    A.    I did not.
21    Q.    Do you stand by your opinion as to
22 what KKR understood over a four year period?
23    A.    Again, my statement was based on the
24 documents that I was able to review and my
25 interpretation of them.

Page 189

MARK RULE

1
2    Q.   So you stand by that opinion, about
3 KKR's understanding over a four-year period?
4    A.   Based on the information I have at
5 this point in time and my interpretation of that
6 document.
7    Q.   What due diligence did you conduct to
8 satisfy yourself that TPG over a four-year
9 period understood that Consolidated EFH Corp.
10 was insolvent?
11   A.   The statement in that last paragraph,
12 "equity sponsors" relates to KKR.
13   Q.   So you want to correct your report
14 that you're only talking about KKR?
15   A.   I think that the transcript will
16 reflect that I'm talking about KKR when I say
17 "equity sponsors" in that paragraph.
18   Q.   So you're stating an opinion about
19 KKR's understanding of Consolidated EFH Corp.'s
20 solvency without any documentary basis relating
21 to KKR's valuation of the assets of EFH, right?
22   A.   Again, my statement is based off of
23 the information that I have reviewed to date.
24   Q.   Are you aware that the sponsors have
25 produced over a million pages of documents in

Page 190

MARK RULE

1
2 this case?
3    A.   I know there's been productions. I
4 can't tell you who's produced what.
5    Q.   Do you know that the sponsors produced
6 significant documents?
7    A.   I know they have produced documents.
8    Q.   Do you know that there have been
9 depositions of sponsor witnesses in this case?
10   A.   I'm generally aware.
11   Q.   So, before you opined on KKR's
12 understanding of EFH's insolvency, did you think
13 it was necessary to conduct further due
14 diligence beyond the documents you reviewed?
15   A.   The documents that I reviewed are the
16 ones that I had access to, and my basis for that
17 statement is my interpretation of the documents
18 I reviewed.
19   Q.   So is it your testimony you didn't
20 have access to other KKR documents that would
21 reflect on its understanding of EFH's solvency?
22   A.   These are the documents that I had
23 access to.
24   Q.   Okay. For the period after 2012, are
25 you expressing a full-fledged opinion that the

Page 191

MARK RULE

1
2 E-side was insolvent?
3    A.   No. As I say in my report, I have not
4 done a full analysis of it, but I do note that,
5 based on market trading prices, I believe there
6 was a basis to suggest that the E-side remained
7 insolvent.
8    Q.   You say on page 22 of your report, at
9 the end of the first paragraph in Section X, "I
10 do not believe there is an indication of
11 solvency during this period." Do you see that?
12   A.   Yes.
13   Q.   Before you stated that opinion, did
14 you review any internal company valuations of
15 Oncor from the post-2012 period?
16   A.   I reviewed the documents that I had,
17 and I don't believe there were any internal
18 valuations.
19   Q.   Did you review any sponsor valuations
20 of Oncor from the post-2012 period?
21   A.   Again, I haven't -- I don't have
22 access to or I haven't been given access to the
23 sponsor valuations.
24       MR. KLEINHAUS: This is going to be
25 Rule Exhibit 13.

Page 192

MARK RULE

1
2       (Rule Exhibit 13, a letter on Thompson
3 & Knight letterhead dated September 24,
4 2012, bearing Bates Nos. EFH02367162 through
5 2367211, marked for identification, as of
6 this date.)
7 BY MR. KLEINHAUS:
8    Q.   This is a document begins with the
9 Bates stamp EFH02367162, and it's a letter on
10 the letterhead of the law firm of Thompson &
11 Knight, LLP, dated December 24, 2012.
12       My first question, after you have a
13 chance to peruse the document, is whether you
14 have ever seen this document before?
15   A.   No, I do not believe I have seen this.
16   Q.   If you look at page 02367195, the
17 signature page, do you see that this document --
18 this letter is signed by David Wheat of Thompson
19 & Knight, LLP?
20   A.   Yes.
21   Q.   And do you see the next page, Bates
22 stamp 2367196, is a declaration signed by Carla
23 Howard of Energy Future Holdings Corp.?
24   A.   Yes, I see that.
25   Q.   And the declaration says, among other

Page 193

1    MARK RULE
2  things, that the request contains all the
3  relevant facts relating to the request, and such
4  facts are true, correct and complete?
5    A.   That's what it says.
6    Q.   Can you go to page 7, please, of the
7  letter.
8    A.   Okay.
9    Q.   Do you see right above where it says
10 Reasons for Proposed Transaction?
11   A.   Uh-huh.
12   Q.   There is a sentence that says, "EFH,
13 on the other hand, is not a guarantor of the
14 TCEH Debt and the fair market value of its
15 assets exceeds its liabilities."
16   A.   I see that.
17   Q.   Did you consider this statement on
18 behalf of EFH at the time you rendered your
19 opinion?
20   A.   I haven't seen this document, so it's
21 not factored into my opinion.
22   Q.   This document wasn't brought to your
23 attention before you signed your expert report?
24   A.   As I've said, I haven't seen this
25 document.

Page 194

1    MARK RULE
2    Q.   On page 23 of your expert report, you
3  say, after the chart, "I note that the current
4  bid to purchase the 80.03 percent interest in
5  Oncor by the TCEH Unsecured Ad Hoc Group and
6  Hunt Consolidated, Inc. (the 'Hunt Bid') is not
7  a reliable basis upon which to evaluate the
8  pre-petition solvency of the E-side."
9         Do you see that?
10   A.   Yes.
11   Q.   Are you stating an opinion as to
12 whether the current bid referenced here is a
13 reliable basis to evaluate the post-petition
14 solvency of the E-side?
15   A.   I have not evaluated the post-petition
16 E-side.
17   Q.   So you're expressing no opinion as to
18 whether this bid is a reliable basis on which to
19 evaluate post-petition solvency, right?
20   A.   My analysis is limited to
21 pre-petition.
22   Q.   Do you have any knowledge about
23 whether the idea of converting Oncor to a REIT
24 was examined pre-petition?
25   A.   I don't have -- I know in the

Page 195

1    MARK RULE
2  disclosure statement they discussed that it was
3  something they were considering.  I don't know
4  if it was something that extends back to before
5  the petition date.
6    Q.   Were you shown any documents relating
7  to converting to a REIT prior to the petition
8  date?
9    A.   I don't recall seeing any.
10   Q.   Just follow quickly on one line of
11 questioning from earlier.  I just want to make
12 sure I have this clear.
13        Do you know one way or the other
14 whether EFH Corp. has guaranteed the debt of
15 TCEH?
16   A.   As I said earlier, as I sit here
17 today, I can't recall.
18   Q.   So, in rendering your expert opinion,
19 did you take into account whether EFH Corp. has
20 guaranteed the debt of TCEH?
21   A.   I think, as I stated earlier, that if
22 you look at both my consolidated analysis and my
23 E-side analysis, if your statement is true that
24 they have not guaranteed the T-side debt, that
25 my analysis would still show that EFH Corp. is

Page 196

1    MARK RULE
2  insolvent.  So, while not explicitly, implicitly
3  in my analysis I believe I have.
4    Q.   Do you remember earlier today in one
5  of your answers you referenced the possibility
6  of EFH Corp. being willing to pay TCEH debt even
7  if it's not obligated to do so?
8    A.   Yes.
9    Q.   You represent the EFH Official
10 Committee of Unsecured Creditors?
11        MR. BREBNER:  Objection to form.
12   Q.   Excuse me.  You're the financial
13 advisor to them?
14   A.   My firm is the financial advisor.
15   Q.   In the context of your work in that
16 capacity, has the EFH Committee ever had
17 discussion of voluntarily paying TCEH debts?
18   A.   I can't -- I'm not -- I have not had
19 such discussions with the committee, so I
20 can't -- I can't speak to that.
21   Q.   Do you have any factual basis to say
22 that EFH Corp. would gratuitously pay TCEH debts
23 without an obligation to do so?
24        MR. BREBNER:  Objection to form.
25   A.   I mean, it would depend on the facts

MARK RULE
2 and circumstances.  Could there be a basis, you
3 know, outside of bankruptcy?  Perhaps, but I
4 haven't evaluated that.
5    Q.  Do you know whether EFH Corp. has ever
6 paid TCEH's debts?
7    A.  I don't know.
8       MR. KLEINHAUS:  Okay.  That's all I
9 have.  Thank you very much.
10 EXAMINATION BY
11 MR. THOMAS:
12    Q.  Mr. Rule, Mark Thomas from Proskauer
13 representing EFH.
14       During your deposition you referred
15 to, quote, counsel at various times, counsel
16 obtaining information, materials for you.
17       Who are you referring to when you say
18 "counsel"?
19    A.  It would be both Sullivan & Cromwell
20 and Montgomery McCracken.
21    Q.  Who drafted your report?
22       MR. BREBNER:  Objection.  Asked and
23    answered.
24    A.  I drafted the majority of the report
25 with assistance from team members on other

MARK RULE
2 aspects of it.
3    Q.  Did your counsel review your report?
4    A.  Yes.
5    Q.  Did they revise your report?
6       MR. BREBNER:  Objection to form.
7    A.  We had discussions regarding edits.
8    Q.  And did you make edits to your report
9 based on your discussions with counsel?
10       MR. BREBNER:  I'm going to instruct
11    the witness not to answer based on Rule 26
12    that's incorporated in the court's order.
13    You're not allowed to get into the drafting
14    process.
15       MR. THOMAS:  I'm asking a question of
16    fact.  I'm not getting into the drafting
17    process.
18       MR. BREBNER:  I think you are.  You
19    are getting into what one draft said versus
20    what a later draft said, and that you're not
21    entitled to do under the rule.
22       MR. THOMAS:  I'm not asking one draft
23    versus the other.  I'm just asking if he
24    made edits to his report based on his
25    discussions with his counsel.  It's a

MARK RULE
2 yes-or-no question.
3       MR. BREBNER:  You can answer yes or
4    no.
5       THE WITNESS:  Some of the edits I made
6    were based on discussions with counsel.
7 BY MR. THOMAS:
8    Q.  You were not asked to evaluate the
9 solvency of EFH as of the closing of the LBO,
10 correct?
11    A.  That's correct.
12    Q.  Why?
13       MR. BREBNER:  Objection to form.
14    A.  I was asked to evaluate it from 2008
15 to the petition date.  That was the dates I was
16 asked to do it.
17    Q.  Do you know why you were not asked to
18 evaluate it as of the closing of the LBO?
19    A.  I cannot speak to that.
20    Q.  Did you ask why?
21       MR. BREBNER:  You're really getting
22    into discussions with counsel here.  He's
23    not offering an opinion on it.
24       MR. THOMAS:  I'm asking a factual
25    question did he ask why.  It's a yes-or-no

MARK RULE
2 question.
3       MR. BREBNER:  Even if it's a yes-or-no
4    question, it's a question about his
5    discussion with counsel.  So we're not
6    getting into that.  I instruct the witness
7    not to answer.
8 BY MR. THOMAS:
9    Q.  Are you going to follow that
10 instruction?
11    A.  Yes.
12    Q.  Did you wonder why?
13    A.  Did I wonder what why?
14    Q.  Why you were not asked to evaluate the
15 solvency of EFH at the time of the closing of
16 the LBO?
17    A.  I was -- I performed the analysis I
18 was asked to do.  I mean...
19    Q.  You testified earlier about a control
20 premium?
21    A.  Yes.
22    Q.  Is it your testimony that EFH cannot
23 sell its interest in Oncor?
24    A.  That's not my testimony at all.
25    Q.  We talked about the Oncor sale

MARK RULE

1
2 process, and you said you had discussions with
3 Guggenheim regarding what the bids were and why
4 the bids did not go forward.
5        Do you recall that?
6    A.   Yes.
7    Q.   Did Guggenheim tell you the reason the
8 bids did not go forward was that the high bid
9 would not have paid the EFIH creditors in full?
10   A.   I remember that generally they -- they
11 didn't think the bids were sufficient, so I
12 think you could interpret that as -- as a reason
13 why.
14   Q.   On page 23 of your report, you state
15 that "the Hunt bid is not a reliable basis to
16 evaluate the pre-petition solvency of the
17 E-side," correct?
18   A.   Correct.
19   Q.   You also say that "the value of Oncor
20 implied by the Hunt bid is not applicable to
21 valuing the pre-petition assets of Oncor or its
22 solvency," correct?
23   A.   That's correct.
24   Q.   Isn't it true that, therefore, that
25 the -- that the Hunt bid is not applicable to

MARK RULE

1
2 valuing the current assets of Oncor or its
3 current solvency?
4    A.   I haven't done the analysis, but
5 assuming that Oncor is not a REIT, then I would
6 agree with that.  My issue is the bid involves
7 or is premised on conversion to a REIT, which
8 has additional tax benefits.  So if Oncor is not
9 a REIT, I would agree with that statement.
10   Q.   Let me go to page 4 of your report.
11        You represented the Unsecured
12 Creditors Committee of Tribune as an expert on
13 issues of valuation and solvency, correct?
14   A.   I advised them on issues of valuation
15 and solvency.  I was designated as an expert,
16 but I did not tender a report.
17   Q.   Okay.  And was that in connection with
18 fraudulent conveyance litigation in the Tribune
19 bankruptcy case?
20   A.   No, it was part of the -- it was part
21 of the actual restructuring.  Were they
22 evaluating potential claims?  Yes, but the
23 actual -- it was during the actual bankruptcy
24 that I was advising them, if I --
25   Q.   So you were advising them regarding

MARK RULE

1
2 restructuring and plans of reorganization as
3 opposed to fraudulent conveyance relating to the
4 LBO?
5    A.   Maybe I misunderstood your connection
6 [sic].  We were advising them in connection with
7 the bankruptcy, and I personally was advising
8 them on issues of valuation and solvency to
9 evaluate if there is potentially fraudulent
10 conveyance claims.
11   Q.   Okay.  And were fraudulent conveyance
12 claims commenced based on your evaluation?
13   A.   I don't -- I don't know.
14   Q.   On page 5 of your report has your
15 summary of opinions, and the first four of which
16 relate to solvency of Consolidated EFH Corp. and
17 EFH Corp. and the E-side at various times,
18 correct?
19   A.   Correct.
20   Q.   In reaching your opinions regarding
21 solvency, did you apply the income approach to
22 value EFH Corp.?
23   A.   Well, Duff & Phelps did.
24   Q.   I said did you?
25   A.   I did not individually.  For reasons

MARK RULE

1
2 previously stated, I did not perform a full
3 income approach.
4    Q.   Did you apply the market approach?
5    A.   Again, similar answer.  I did not
6 personally, but I relied on Duff & Phelps.
7    Q.   And did you apply the cost approach?
8    A.   I did not nor did Duff.
9    Q.   So when your report says you have not
10 performed a full valuation and solvency analysis
11 of the E-side, that's true at all times,
12 correct?  You have not at any time?
13   A.   Where specifically are you reading
14 from my report?
15   Q.   Page 22.
16   A.   Could you repeat the question, please?
17   Q.   Yes.  Strike the question.
18        At no time have you performed a full
19 valuation and solvency analysis of the E-side,
20 correct?
21   A.   I have not performed an independent
22 valuation between 2008 and 2012, no.
23   Q.   You haven't performed a full valuation
24 between 2012 and today, have you?
25   A.   I have not.

Page 205

1          MARK RULE
2    Q.   If you refer to page 23, there is a
3 chart of the EFH Corp. debt?
4    A.   Yes.
5    Q.   Did you look to see whether the EFIH
6 Corp. debt was trading at or below par?
7    A.   I believe we reviewed it.  I don't
8 recall specifically as I sit here where it was
9 trading at various points in time.
10   Q.   The EFH debt reflected in Figure 6, in
11 the time period from 2010 to 2011, every one of
12 these issuances increased, correct?
13   A.   As of that date and time, year over
14 year, that would be an accurate statement.
15   Q.   Do you know why that occurred?
16   A.   I don't.
17   Q.   Comparing 2011 to 2012, again, every
18 issuance of EFH Corp. debt increased, correct?
19   A.   From 2011 to 2012, that's correct.
20   Q.   And do you know why that occurred?
21   A.   I don't.
22   Q.   And in 2012, two issuances of EFH debt
23 were trading at 94.5 percent of par; do you see
24 that?
25   A.   Yes.

Page 206

1          MARK RULE
2    Q.   Do you know why those issuances were
3 trading at 94.5 percent of par?
4    A.   I don't, just like I don't know the
5 specific factors of why they all declined in
6 2013.
7    Q.   Page 3 of your report, the second
8 paragraph states that your report was prepared
9 for the limited purpose of permitting an
10 evaluation of the existence of potential claims.
11 Do you see that?
12   A.   Yes.
13   Q.   When you were considering EFH
14 solvency, did you value any claims or causes of
15 action owned by EFH?
16   A.   As I believe I stated earlier, no, I
17 have not evaluated individual potential claims
18 or transactions.
19   Q.   Did you investigate whether EFH owned
20 any claims or causes of action?
21   A.   That was not part of the scope of my
22 assignment, no.
23   Q.   Do you know whether EFH owns any
24 claims or causes of action?
25       MR. BREBNER:  Exclude from your answer

Page 207

1          MARK RULE
2 discussions with counsel that are not part
3 of the opinions you are offering.
4    A.   Again, it wasn't part of the scope of
5 my assignment.
6    Q.   So your firm is a financial advisor to
7 the EFH Official -- strike that.
8        Your firm is financial advisor to the
9 Official EFIH and EFH Committee, correct?
10   A.   Yes.
11   Q.   Are you the lead person on the
12 engagement at your firm?
13   A.   No.
14   Q.   Who is the lead at your firm?
15   A.   Alan Holtz.
16   Q.   Have you been involved in this
17 engagement from the inception?
18   A.   Not from the inception, I have not,
19 no.
20   Q.   When did you begin getting involved in
21 this engagement?
22   A.   I would say at some point -- I think I
23 was involved with some maybe initial meetings,
24 but I think materially involved, probably around
25 some point in the first quarter, towards the end

Page 208

1          MARK RULE
2 of the first quarter of this year.
3    Q.   The EFH Committee is a fiduciary,
4 correct?
5    A.   I don't know if I can answer that
6 question.  I'm not a -- I'm not a lawyer.
7    Q.   But you've represented committees in
8 the past, right, official committees?
9    A.   Sure.
10   Q.   And you don't know whether official
11 committees owe fiduciary duties to the estate as
12 a whole?
13   A.   Again, my roles in representing
14 committees have not been focused on their
15 fiduciary duties.  It's been focused on specific
16 financial analyses that were important to
17 committees.
18   Q.   You consider yourself a valuation
19 expert, correct?
20   A.   Yes.
21   Q.   The plan that's currently on the table
22 that will be set for confirmation at November 3
23 proposes to pay all E-side creditors in full,
24 correct?
25   A.   That's my understanding.

Page 209

1          MARK RULE
2     Q.   Have you advised the committee of
3  alternatives to that plan?
4          MR. BREBNER:  Objection.  I'm going to
5     instruct the witness not to answer.  It's
6     outside the scope of his opinion.  His
7     advice to the committee is privileged and
8     work product.
9     Q.   Have you prepared a valuation of EFH
10 or EFIH so that the committee could consider the
11 current valuation of EFH and EFIH before it
12 decides whether to object to the plan that
13 provides payment in full?
14    A.   My analysis is limited to the opinions
15 set forth in my report.
16    Q.   So that's a no?
17    A.   I have not personally done anything,
18 no.
19         MR. THOMAS:  I have no further
20    questions.
21 EXAMINATION BY
22 MR. SCHNEIDER:
23    Q.   Good afternoon, Mr. Rule.  I'm Brad
24 Schneider.  I'm with Munger Tolles & Olson,
25 counsel to the TCEH debtors.

Page 210

1          MARK RULE
2     How are you?
3     A.   Good.  Yourself?
4     Q.   I'm hanging in there.
5          Can you turn to the Exhibit 2 to your
6  report.  I have a clarifying question I would
7  like to ask you.
8     A.   You say Exhibit 2?
9     Q.   Exhibit 2.
10    A.   Okay.
11    Q.   This is titled "Documents and
12 information relied upon are cited throughout the
13 report and/or listed below."
14         Are you using the term "relied upon"
15 there in a way that is different than
16 "considered"?
17         My question is are there documents
18 that you considered but did not rely upon that
19 are not listed here or cited in the report that
20 were considered in forming your opinions?
21    A.   No, I would think this is both a
22 relied upon and considered list, except for the
23 few documents that I mentioned at the beginning
24 of my testimony.
25    Q.   And the few documents that you

Page 211

1          MARK RULE
2  considered, as I recall, concerned your opinion
3  concerning shared services and the allocation of
4  shared services; is that correct?
5     A.   Yes, and there were some annual
6  evaluations of the allocation that were
7  contained on the shared side.
8     Q.   Were they -- were they in the form of
9  PowerPoint presentations?
10    A.   I believe they were PowerPoints, yes.
11    Q.   Were they titled Service Level
12 Agreements?
13    A.   I don't, as I sit here, specifically
14 remember the names of the documents.
15    Q.   How many documents were there?
16    A.   Somewhere probably between five and
17 ten.
18    Q.   And when did you review these
19 documents?
20    A.   They would have been sometime between
21 the time I submitted my report and today, so
22 probably sometime this past week.
23    Q.   Was it yesterday?
24    A.   No.
25    Q.   Was it more than a day ago?

Page 212

1          MARK RULE
2     A.   Yes, it was either over the weekend or
3  earlier in the week.
4     Q.   Did you consider those reports or have
5  you now considered those reports in connection
6  with any of the opinions that you have rendered
7  in your report?
8     A.   I believe those reports confirmed the
9  opinions in my report that the -- essentially,
10 that the SG&A allocation was an annual process
11 that involved the various parties of EFH.
12    Q.   So you were looking at those documents
13 to confirm any conclusion that you had reached
14 in your report?
15    A.   No, it confirmed the conclusion I
16 reached based on other information already.
17    Q.   Did you ask for those reports?
18    A.   They were provided as additional
19 confirmation to documents I already had seen
20 related to the SG&A allocations.
21    Q.   Did you ask for additional
22 confirmation?
23    A.   No, they were provided to me.
24    Q.   They were provided without your
25 request?

MARK RULE

2   A.   Yes.
3   Q.   Was any factual information conveyed
4 to you regarding those reports when they were
5 provided?
6   A.   I'm not sure I understand your
7 question.  What do you mean by --
8   Q.   Who provided them to you?
9   A.   Internally, they were provided by --
10 they were sent by one of the team members.
11   Q.   And what did the team members say
12 about the reports, if anything?
13   A.   That these related to the SG&A
14 allocations.
15   Q.   Have you discussed them with -- those
16 reports with your counsel?
17     MR. BREBNER:  I'm going to instruct
18   the witness not to answer.
19   Q.   You can answer yes or no.
20     MR. SCHNEIDER:  Can he answer yes or
21 no?
22     MR. BREBNER:  No.  I'm instructing him
23   not to answer.  You're not allowed to get
24   into discussions with counsel.
25     MR. ROGERS:  Oh, sure he is.  Facts

MARK RULE

2 provided and assumptions provided.
3     MR. BREBNER:  Sure, you can ask him if
4   he had any discussions with counsel that
5   provided him with facts or assumptions
6   concerning these documents.  Go ahead.
7 BY MR. SCHNEIDER:
8   Q.   Did counsel provide you with any facts
9 concerning those reports?
10   A.   Counsel didn't provide me the reports,
11 so...
12     MR. SCHNEIDER:  Okay.  I'm going to
13   make a request on the record that you either
14   identify by Bates number or send us copies
15   of those reports.
16     MR. BREBNER:  We will take that under
17   advisement.
18     MR. SCHNEIDER:  And I frankly think it
19   was improper not to provide them before the
20   deposition.  We reserve the right to keep
21   this deposition open upon reviewing those
22   documents.
23 BY MR. SCHNEIDER:
24   Q.   Do you intend to review any other
25 documents -- let me strike that.

MARK RULE

2     Let's go to Section XI of your report.
3 I'm going to be asking you mostly about the
4 opinions in this part of your report.
5     This is Section XI, SG&A Costs,
6 Corporate Services and Allocations.
7     Are you there?
8   A.   Yes.
9   Q.   Do you intend to review any additional
10 information concerning the opinions you have
11 offered in this part of your report between now
12 and the confirmation hearing?
13   A.   As I sit here today, I don't intend
14 to, but obviously if something comes to my
15 attention that's relevant, I would consider it.
16   Q.   Someone might send you another set of
17 documents out of the blue, right?
18   A.   Again, I can't speak to that.  If
19 additional information becomes available, it's
20 something I would consider.
21   Q.   Have you requested any additional
22 information from anyone concerning the opinions
23 set forth in Section XI of your report?
24   A.   I have not requested any additional
25 information.

MARK RULE

2   Q.   So you're satisfied that you have all
3 the additional -- all the information that you
4 need to offer the opinions set forth in Section
5 XI of your report?
6   A.   I believe, as I sit here today, that I
7 have the sufficient information to provide a
8 reasonable basis for my opinions.
9   Q.   You believe you have a reasonable
10 basis for the opinions set forth in Section XI
11 of your report?
12   A.   Yes.
13   Q.   Now, you mentioned earlier you spent
14 hundreds of hours working on the opinions in
15 your report as a whole, correct?
16   A.   I spent hundreds of hours working on
17 this case.  Obviously, the actual working on the
18 report was a shorter timeframe.
19   Q.   What about Section XI of your report,
20 how much time did you spend working on that part
21 of your report?
22   A.   I can't specifically tell you right
23 now.  I can tell you that members of my team
24 spent significant time working on this section
25 of the report.

MARK RULE

1
2    Q.   About how many members of your team
3  worked on this section of your report?
4    A.   At least two or three, if not more.
5    Q.   Do you monitor the hours they spend on
6  particular work that they conduct, including in
7  connection with this report?
8    A.   I don't monitor the hours.  I monitor
9  their work product.
10   Q.   Do you have a general awareness of how
11 many hours they spent on this section of the
12 report?
13   A.   I haven't reviewed the invoices.
14   Q.   Would it surprise you if it's more
15 than a hundred hours?
16   A.   I can't speak one way or the other
17 about how many hours were put into this section.
18   Q.   Based on your experience, do you have
19 any expectation of how many hours would have
20 been put in preparing the information upon which
21 you relied in Section XI of your report?
22   A.   I haven't had discussions with
23 individual numbers of the team as far as how
24 much time they put into the individual analyses.
25 What I've had discussions with them are the

MARK RULE

1
2  analyses themselves.
3    Q.   How much time did you spend discussing
4  the analyses with them?
5    A.   Again, I can't pinpoint how much time
6  I spent on this section of the report versus
7  other sections of the report.  It was a
8  comprehensive, you know, effort.
9    Q.   Was it more than an hour?
10   A.   Yes, it was more than an hour.
11   Q.   Substantially more?
12   A.   I don't know what you mean by
13 "substantially."
14   Q.   Was it more than ten hours?
15   A.   I would say it was probably more than
16 ten hours, yes.
17   Q.   Was it more than 50 hours?
18   A.   Again, I don't know.
19   Q.   Don't know.
20       Did you write this section of your
21 report?
22   A.   I did not write the initial draft.
23   Q.   Who wrote the initial draft?
24   A.   I believe Alan Holtz was one of the
25 authors.

MARK RULE

1
2    Q.   And he's with AlixPartners?
3    A.   Yes, he's the managing director.
4    Q.   Did counsel, either Sullivan &
5  Cromwell or Montgomery McCracken, provide you
6  with any facts that you considered in forming
7  the opinions expressed in this section of your
8  report?
9    A.   I believe the facts that underlie
10 these analyses were provided by the debtors
11 themselves.
12   Q.   So the answer is no?
13   A.   Yeah, the basis for these analyses
14 were information we received from the debtors.
15   Q.   Did Sullivan & Cromwell or Montgomery
16 McCracken identify any assumptions that you
17 relied upon in forming the opinions that you
18 expressed in this part of your report?
19   A.   No.  I mean, this was an AlixPartners
20 analysis based on the data that we reviewed.
21   Q.   So any assumptions in here are
22 AlixPartners' assumptions, correct?
23   A.   Either AlixPartners' assumptions or an
24 actual data from the debtors.
25   Q.   Do you know if this includes any

MARK RULE

1
2  assumptions?
3        MR. BREBNER:  Objection to form.
4    A.   I'm not sure I understand the
5  question.
6    Q.   Do you know if the opinions that you
7  offer in Section XI of the report are based on
8  any assumptions?
9        MR. BREBNER:  Objection to form.
10   A.   I mean, there are some assumptions
11 baked into this analysis, but the root of the
12 analyses are based on actual data.
13   Q.   What are the key assumptions?
14       MR. BREBNER:  Objection to form.
15   A.   There's multiple analyses in here.
16       Which one are you talking about?
17   Q.   I'm asking you to identify the key
18 assumptions underlying the opinions that you set
19 forth in Section XI of your report.
20       MR. BREBNER:  Objection to form.
21   Q.   We'll walk through the individual --
22 that's -- that may not be a fair question, so
23 let's --
24       Let me ask you this:  The service
25 level agreements that you reviewed, the five to

Page 221

1        MARK RULE
2 ten reports that you reviewed at some point in
3 the last week, did you read them cover-to-cover?
4    A.   I reviewed them. I don't know if I
5 did a detailed review, but based on my review,
6 they were consistent with other documents I've
7 seen that basically allowed me the basis that
8 supported the conclusion that the SG&A
9 allocations were reviewed each year and that
10 they were reviewed by the entities of EFH.
11       MR. SCHNEIDER: Move to strike
12    everything after "I reviewed them."
13       MR. NELSON: He's answering your
14    questions.
15 BY MR. SCHNEIDER:
16    Q.   Did you understand everything you saw
17 in those reports?
18       MR. BREBNER: Objection to form.
19    A.   I understood the reports, at least for
20 purposes of my analysis.
21    Q.   Was there any part of the reports that
22 you did not understand, whether or not it was
23 related to your analysis?
24    A.   I would have to go back and look at
25 the reports. As I sit here, I don't recall

Page 222

1        MARK RULE
2 specific things that I may or may not have
3 understood.
4    Q.   Do you believe sitting here today that
5 you are familiar with the process by which those
6 reports were generated?
7    A.   Are you asking how the specific
8 documents -- how the specific documents were
9 generated, if I'm familiar with the process of
10 who did them and -- I'm not sure I understand
11 your question.
12    Q.   What is your understanding of the
13 purpose of those reports?
14    A.   Those reports documented the annual
15 rereview of the SG&A allocations.
16    Q.   Among?
17    A.   The parties that were -- that
18 participated in those discussions.
19    Q.   What parties?
20    A.   My understanding it included EFH,
21 TCEH, among others.
22    Q.   Did it include EFIH?
23    A.   As I sit here today, I can't recall if
24 EFIH was specifically involved.
25    Q.   Was Oncor involved?

Page 223

1        MARK RULE
2    A.   Again, I can't recall.
3    Q.   Was Oncor involved in the discussions
4 of those allocations? Oncor representatives,
5 were Oncor representatives involved in
6 discussions that led to the preparation of those
7 SLAs?
8    A.   I don't recall.
9    Q.   Do you think you ever knew the answer
10 to that question?
11    A.   As I sit here, again, I can't recall.
12 I don't know if I knew it at one point and just
13 can't remember.
14    Q.   Why did you review Eric Mendelsohn's
15 expert report?
16    A.   It was provided to me by counsel, so I
17 thought it was something I should review.
18    Q.   Are you going to offer -- I think you
19 may have answered, but let me confirm. You're
20 not going to offer any opinion concerning any of
21 the matters -- strike that.
22       You're not going to offer an opinion
23 at the confirmation hearing on any of the
24 opinions that are set forth in Mr. Mendelsohn's
25 report, correct?

Page 224

1        MARK RULE
2    A.   I'm not planning to offer any rebuttal
3 opinions as they relate to Mr. Mendelsohn's
4 report.
5    Q.   Let's go to page 24 of your report, if
6 we're not already there. Let me ask you about
7 Figure 7 on that page.
8    A.   Okay.
9    Q.   And if I'm understanding this
10 correctly, this is a chart of SG&A expenses from
11 2008 to 2004 among the EFH corporate family; is
12 that correct?
13    A.   To 2014, that's correct.
14    Q.   I apologize. 2014.
15       How did you prepare this chart?
16    A.   This chart was based on information
17 provided by the debtors in the data room where
18 we compiled the chart based on that information.
19    Q.   And is that the information that's
20 cited in the Sources & Notes at the bottom of
21 the chart?
22    A.   That would be correct.
23    Q.   Did you make any adjustments to the
24 information in the Sources & Notes in compiling
25 this chart?

Page 225

MARK RULE

2  A.  I did not adjust any of the source
3  data.
4  Q.  Why did you combine EFH and EFIH in
5  the second section of the chart?
6  A.  I believe, at least for most of the
7  years, that's how the source data provided it.
8  Q.  And in the third section under EFH
9  Consolidated, do you see where it reads in the
10  second line on the left, "Consolidated Allocated
11  (excluding Oncor)."  Do you see that?
12  A.  Yes.
13  Q.  And do you have an understanding as to
14  why Oncor is excluded from that entry?
15  A.  This was trying to analyze the direct
16  versus allocated between TCEH and EFH, so in
17  totaling the total between the two, Oncor was
18  excluded.
19  Q.  So you excluded Oncor from this; it
20  was not excluded from the underlying data,
21  source data upon which you compiled this chart?
22  A.  Well, this is -- this is a build-up
23  from the source data.  So when we're focused on
24  TCEH and the E-side, we excluded Oncor such that
25  we could have a comparison between TCEH and the

Page 226

MARK RULE

2  E-side.
3  Q.  You did not believe that Oncor was
4  part of the E-side as part of your analysis?
5  A.  I mean, for presentation purposes,
6  could we put another bucket in here to include
7  Oncor?  Yes, we could have.
8  Q.  I'm not trying to argue with you.  I'm
9  just trying to get a better understanding of why
10  you excluded Oncor from this part of the chart,
11  and in my understanding is what you were trying
12  to do was simply compare direct and allocated
13  costs to TCEH, EFH and EFIH without including
14  Oncor?
15  A.  Yes.
16  Q.  Okay.  Do you know if Oncor is
17  excluded from the second section, EFH Corp./EFIH
18  and the EFH Corp./EFIH Direct Cost, the line
19  entries there?
20  A.  I'm sorry, what figure are you --
21  Q.  I apologize.  The second part of this
22  chart, the middle part.
23  A.  Okay.  Yes.
24  Q.  Do you know if Oncor is excluded
25  there?

Page 227

MARK RULE

2  A.  Oncor is not in there.
3  Q.  If you turn to page 25 of your report,
4  please, take a look at the first full paragraph
5  which begins, "Beginning in late 2009, in an
6  effort to reduce overall SG&A costs for the
7  Consolidated EFH Corp. and to better match SG&A
8  costs," et cetera, do you see that?
9  A.  I see the paragraph, yes.
10  Q.  And this is a -- your account of a
11  change in the manner in which EFH Corp.
12  allocated certain shared services costs
13  beginning in 2010, is that fair?
14  A.  Yes, based on review of things,
15  including the Huron Consulting Report, but yes.
16  Q.  You mentioned the Huron Consulting
17  Report.  Is there -- are there any other
18  documents upon which you relied for the
19  statements made in this paragraph?
20  A.  Well, it would be the Huron Report, it
21  would also be the debtors' -- I believe I have
22  them cited in here -- the debtors' Motion to
23  Approve the Settlement Agreement.  Those would
24  be the two primary documents.
25  Q.  Okay.  Now, the Huron study was

Page 228

MARK RULE

2  prepared in 2009, is that accurate?
3  A.  My recollection it was prepared at
4  some point in 2009, yes.
5  Q.  So there is nothing in that study that
6  will -- that describes what EFH Corp. actually
7  did beginning in 2010, is that fair?
8  A.  I think there was a recommendation in
9  there that a necessity and benefits test should
10  be applied, and based on their work, they
11  thought at the time EFH Corp. was bearing a
12  significant burden of the overall costs, so they
13  thought a necessity and benefits test should be
14  applied such that the costs were reallocated to
15  all of the entities or the entities that the
16  company felt was appropriate based on the
17  necessity and benefits test.
18  Q.  And it's your understanding that EFH
19  followed that recommendation?
20  A.  It's my understanding they followed
21  the recommendation, yes.
22  Q.  Do you know if the company deviated
23  from Huron's recommendations in any respect?
24  A.  I haven't done that analysis.  What
25  I've been focused on was the recommendation to

MARK RULE

1
2 undertake a necessities and benefits test to
3 reallocate the corporate SG&A.
4    Q.   What does a necessity and benefits
5 test in this context mean?
6    A.   My understanding in this context, it's
7 looking at what the costs are and who at the end
8 of the day or what entity at the end of the day
9 was the benefactor for incurring those costs.
10    Q.   Have you personally ever applied a
11 necessities and benefit test in the context of
12 an allocation of shared services costs?
13    A.   I have not.
14    Q.   Do you hold yourself out as an expert
15 in the application of the necessity and benefit
16 test in the allocation of shared services costs?
17    A.   I do not.
18    Q.   Have you conducted an analysis to
19 determine whether EFH Corp. applied the
20 necessity and benefits test in allocating shared
21 services costs in a manner consistent with
22 Huron's recommendation?
23    A.   I haven't done an independent
24 analysis.  That being said, I reviewed documents
25 that indicate that it was an annual thing they

1              MARK RULE
2 did, that being a necessities and benefits test,
3 and it was an annual thing for EFH and TCH --
4 TCEH to participate in.  So, while I'm not
5 making the assessment, the company did.
6    Q.   So you read documents from the
7 company --
8    A.   Yes.
9    Q.   -- that stated that the company was
10 applying a necessities and benefits test?
11    A.   That's my interpretation of those
12 documents, yes.
13    Q.   And is that an expert opinion, your
14 interpretation of those documents?
15    A.   I'm not sure I understand your
16 question.
17    Q.   What expertise are you bringing to
18 bear in interpreting those documents?
19    A.   My expertise is, in this section, I'm
20 analyzing the actual cash flows, the actual
21 expenses, and quantifying what actually
22 happened.
23    Q.   You're quantifying what actually
24 happened, but the source documents that you were
25 provided from the company already contain that

1              MARK RULE
2 quantitation, don't they?
3    A.   Not all the quantification.  There's
4 quantification on page 26 that was an analysis
5 that AlixPartners performed that was not
6 contained in the source documents.
7    Q.   So where does your expert analysis
8 begin, starting on -- in Section XI, where does
9 your expert analysis begin?
10         MR. BREBNER:  Objection to form.
11    A.   I would say on page 25, the bottom
12 paragraph at least.
13    Q.   Okay.  So the bottom paragraph is
14 where you believe your expert analysis begins?
15    A.   Yes.
16    Q.   That's where you're bringing your
17 expertise to bear?
18    A.   Yes.
19    Q.   Because before that, you're
20 summarizing company documents, right?
21    A.   Before that is our interpretation of
22 the company documents, yes.
23    Q.   And that's not an expert opinion,
24 correct?
25    A.   Well, it informs the expert opinion

1              MARK RULE
2 that we came to in the section.
3    Q.   Whether or not it informs it is not
4 itself an expert opinion, correct?
5    A.   I mean, it's commentary on our
6 interpretation of data and documents that were,
7 again, relevant to the opinion in this section.
8    Q.   Is that commentary expert commentary?
9    A.   It informs -- all I can say is that it
10 informs the expert opinion.
11    Q.   You can't say one way or the other
12 whether it's expert commentary?
13         MR. BREBNER:  Objection to form.
14    A.   Again, it's part factual in nature.
15 So, from that standpoint, it wouldn't be an
16 expert opinion, but again, it informs the
17 opinion that comes afterwards.
18    Q.   Let's go to the second full paragraph
19 on page 25.  Take a moment to look at that.
20    A.   Yes.
21    Q.   I'm going to ask you about the third
22 sentence.  You write, "This increase in
23 allocated costs" --
24         And there you are referring to the
25 increase in allocated costs to TCEH, correct?

1        MARK RULE
2    A.   That's correct.
3    Q.   -- "was primarily related to the
4 decrease in directly paid costs."
5        Do you see that?
6    A.   Yes.
7    Q.   What's the basis for that statement?
8    A.   The basis is that the direct costs
9 went down significantly, more so than the
10 allocated costs went up.  So I think it's a
11 conclusion you can draw that a portion of why
12 the allocated costs went up is because they were
13 no longer paying them directly.
14   Q.   It's an inference you are drawing from
15 the --
16   A.   The data.
17   Q.   -- company's data?
18   A.   Yes.
19   Q.   Let's try not to talk over each other.
20   A.   Sorry.
21   Q.   It's for the benefit of the court
22 reporter.
23       So that's an inference you have drawn
24 from the company's data, correct?
25   A.   Yes, I think it's a reasonable

1        MARK RULE
2 inference.
3    Q.   Have you taken any steps to confirm
4 that inference -- additional steps apart from
5 reviewing the data?
6    A.   Well, I think the data speaks for
7 itself.  I think the paragraph that direct costs
8 decrease significantly, more so than allocated
9 costs increase is a basis for helping to explain
10 why allocated costs increased.
11   Q.   But you're positing there is a
12 relationship between the two, correct?
13   A.   Well, it's my understanding that
14 because of the corporate services and more costs
15 being incurred by corporate services, as a
16 result, there are fewer direct costs being
17 incurred.
18   Q.   Let's go to the last sentence.  You
19 write, "As a result, TCEH's directly paid SG&A
20 costs decreased by $119.7 million more than
21 allocated costs were increased from 2009 to
22 2014."
23       Do you see that?
24   A.   Yes.
25   Q.   How did you calculate that?

1        MARK RULE
2    A.   That is --
3    Q.   I apologize.  How did you calculate
4 the $119.7 million?
5    A.   That's the difference between the
6 261.7 and the 142.0 in the same paragraph.
7    Q.   I see.  And those numbers were drawn,
8 is that fair to say, from Figure 7 on page 24?
9    A.   Those were based on Figure 7, yes.
10   Q.   Why did you start with 2009?
11   A.   Because it's the year before the
12 change in the allocation.
13   Q.   But let's go to your Figure 7.  That
14 starts at 2008, correct?
15   A.   Yes.
16   Q.   Let's go back to page 26.  This is
17 part of your expert analysis?
18   A.   Yes.
19   Q.   Correct?
20   A.   Yes.
21   Q.   You start in 2008.  You include 2008
22 in that analysis, correct?
23   A.   Well, the point of this analysis is to
24 illustrate that if the allocation was in place
25 in 2008 and 2009, that TCEH would have been

1        MARK RULE
2 worse off.
3    Q.   Right.  Now, let me ask you this:  If
4 you had performed this -- if we go back to the
5 second full paragraph on page 25, if you had
6 performed that calculation starting in 2008
7 rather than 2009, that number would not have
8 been $119.7 million, would it?
9    A.   No, it would be -- it would be
10 something less, but again, the reason for us
11 doing that is -- is the allocation changed
12 between 2009 and 2010.  So that's the
13 appropriate period to evaluate the changes in
14 the direct versus the allocated costs.
15   Q.   Did it change between 2008 and 2010?
16   A.   Did what change?
17   Q.   The allocation.
18       MR. BREBNER:  Objection to form.
19   A.   I don't know if I understand your
20 question.  Did the numbers themselves change?
21   Q.   No, the allocation methodology, did it
22 change between the year 2008 and 2010?
23   A.   Did it change between 2008 and 2010?
24   Q.   Yes.
25   A.   Yes, it's a different -- yes, because

MARK RULE

1
2 the methodology changed between 2009 and 2010.
3 Therefore, between 2008 and 2010, the statement
4 is still true.
5    Q.   And so if you had used 2008 rather
6 than 2009, that would have given you a larger
7 time period with which to assess the effect of
8 the allocation change in 2010, correct?
9    A.   Well, I think the most relevant period
10 to assess the change in the allocation is the
11 last period, being the last part of the
12 allocation, which is 2009.  That's why it was
13 done that way.
14    Q.   What was done that way?
15    A.   Well, that's why the observation is
16 based on 2009 versus 2008.  The change happened
17 from '09 to 2010.
18       MR. SCHNEIDER:  I'm going to mark Rule
19 Exhibit No. 14.
20       (Rule Exhibit 14, Document showing
21    calculations for the periods 2008 to 2014
22    using the data in Figure 7, marked for
23    identification, as of this date.)
24 BY MR. SCHNEIDER:
25    Q.   Now, this is an exhibit that I had

MARK RULE

1
2 prepared, and this is my attempt to reproduce
3 the same calculation for the periods 2008 to
4 2014 using the data in Figure 7.
5       I'm going to ask you if you think that
6 my calculation is correct, and I even have a
7 calculator if you need it.
8       MR. BREBNER:  Object to the form of
9    the question.
10    A.   I mean, the numbers look like they
11 were pulled correctly from Figure 7.  Generally,
12 the calculation of the difference looks correct.
13       Again, I think what this shows is
14 there was a -- net benefit and decrease of
15 direct costs versus allocated costs.  So, while
16 the numbers might change depending on
17 measurement date, and I still think the
18 appropriate date is to measure it from '09, you
19 still have a $60 million net positive here.
20    Q.   That's half of $119 million that you
21 get if you start with 2009, correct?
22    A.   But again, the conclusion is still the
23 same.  They benefited by the direct costs going
24 down more than their allocated costs in a
25 material way.

MARK RULE

1
2    Q.   So it's a less powerful rhetorical
3 point if you use $60 million than $119 million,
4 isn't it, sir?
5    A.   It's a difference in numbers, but
6 again, as I've said, I think the appropriate
7 period to measure the change is from the last
8 period before the change happened, which is
9 2009.
10    Q.   Can you tell me why there's a
11 difference if you start with 2008 rather than
12 2009, other than the numbers are different,
13 obviously?  Do you know why the numbers are
14 different?
15    A.   I would assume that there is
16 slightly -- either it could be a function -- I,
17 actually, I don't know.  It could be a function
18 of just total costs.
19    Q.   Go back to Figure 7.  This shows that
20 Figure 7 that the EFH/EFIH direct costs declined
21 from 2008 to 2014 from approximately $899.3
22 million to $52.1 million, correct?
23    A.   That's what the numbers show.
24    Q.   And their allocated costs also
25 declined, correct?

MARK RULE

1
2    A.   That's what it shows.
3    Q.   And it was only TCEH whose allocated
4 costs increased, correct?
5    A.   Yes.  And again, I believe that's a
6 result of the change in allocation methodology
7 and which was based on a necessity and benefits
8 test.
9    Q.   So it is correct that it was only
10 TCEH's allocated costs that decreased?
11       MR. BREBNER:  Objection to form.
12       MR. NELSON:  Objection.
13    A.   Can you repeat the question, please?
14    Q.   It is correct that it was only TCEH's
15 allocated costs that increased over this period?
16       And I used "decrease" my last
17 question.  I apologize.
18    A.   Relative to 2009, yes, that's an
19 accurate statement.
20    Q.   And when you say that, "I believe
21 that's a result of the change in allocation
22 methodology which was based on a necessity and
23 benefits test," that's based on your reading of
24 EFH documents, correct?
25    A.   Yes.

Page 241

1                MARK RULE
2      Q.   Now, SG&A expenses can decline for any
3  number of reasons, correct?
4      A.   As a general matter, yes, SG&A
5  expenses can go down.
6      Q.   Reduced employee benefits?
7      A.   Sure.
8      Q.   Lower bad debt expenses?
9      A.   Sure.
10     Q.   Spending less on marketing?
11     A.   All factors.
12     Q.   Have you investigated all the factors
13  that led to the decline in SG&A expenses that is
14  reflected in Figure 4 over the 2008 to 2014
15  period?
16     A.   I have not done an individual analysis
17  on a component-by-component bucket to determine
18  specifically if one bucket or all of the buckets
19  was responsible for the decline.
20     Q.   Can you testify with a reasonable
21  degree of professional certainty as to the
22  causes of these declines in SG&A expenses?
23     A.   Again, my -- the statements -- are
24  discussions of them inaccurate?  I'm not opining
25  on individual buckets that may or may not have

Page 242

1                MARK RULE
2  declined here.
3      Q.   So the answer is no?
4           MR. BREBNER:  Objection to form.
5      A.   Can you repeat the original question
6  then?
7      Q.   Can you testify with a reasonable
8  degree of professional certainty as to the
9  causes of these declines in SG&A expenses?
10     A.   I have not formed that opinion.
11          MR. SCHNEIDER:  I'm going to mark as
12  Rule Exhibit 15.
13          (Rule Exhibit 15, Huron Consulting
14     Group report entitled "Energy Future
15     Holdings Corp. Shared Services Review,"
16     marked for identification, as of this date.)
17  BY MR. SCHNEIDER:
18     Q.   A document which has the Bates numbers
19  EFCH19308 to 19374.  This is titled "Energy
20  Future Holdings Corp. Shared Services Review."
21          Do you recognize this document?
22     A.   Yes, this the appears to be the Huron
23  Report.
24     Q.   This is the Huron study that you
25  discuss and cite in your report, correct?

Page 243

1                MARK RULE
2      A.   Yes.
3      Q.   And we've already discussed certain
4  parts of this.  Let's go to page 8, which is
5  EFCH19315, and do you see there is a summary of
6  recommendations on this page?
7      A.   Yes.
8      Q.   And there's seven recommendations?
9      A.   Yes.
10     Q.   And item 3 is the necessity and
11  benefit test recommendation that we've
12  discussed?
13     A.   That appears to be so, yes.
14     Q.   Now, item 4 states, "Adopt a general
15  'proxy' allocation method for residual costs or
16  other costs that cannot be allocated using
17  cost-causative direct or indirect factors."
18          Do you see that?
19     A.   Yes.
20     Q.   What's a proxy allocation?
21     A.   I cannot speak to what Huron meant by
22  that.
23     Q.   Do you have any experience applying
24  proxy allocation methods in the context of
25  shared services?

Page 244

1                MARK RULE
2      A.   No.
3      Q.   Do you know what costs over the 2010
4  to 2014 period EFH allocated using proxy
5  allocation methods, if any?
6      A.   I cannot speak to that, no.
7      Q.   Do you know, assuming EFH used a proxy
8  allocation method, what proxy allocation method
9  EFH utilized to allocate costs?
10     A.   I'm sorry.  Can you repeat it?
11     Q.   Assuming EFH utilized a proxy
12  allocation method to allocate shared services
13  costs, do you know what that method was?
14     A.   Again, I can't speak to the specific
15  methods.  What I can speak to is they applied a
16  necessity and benefits test between EFH and
17  TCEH.  Both parties were involved in determining
18  the resulting allocation.
19          So, as far as the method goes, I can't
20  speak to -- I know there is various methods,
21  depending on the cost buckets, but I can't speak
22  to the specific methods themselves.
23     Q.   Is it ever not possible to apply the
24  necessity and benefit test to a particular cost
25  category?

Page 245

MARK RULE

2 A. Can you repeat that one more time?
3 Q. Is it ever not possible to apply the
4 necessity and benefit test to allocate a
5 particular cost?
6      MR. BREBNER: Object to form.
7 A. I'm maybe stuck on "not possible," but
8 are you asking me is it possible that one of the
9 cost categories was not based on a necessity and
10 benefit test?
11 Q. Do you know whether or not EFH, in
12 allocating SG&A costs, ever concluded over the
13 2010 to 2014 period that certain costs were not
14 susceptible to allocation using a necessity and
15 benefit test?
16 A. As I sit here today, I can't -- I
17 can't recall one way or the other.
18 Q. Do you know what factors would go into
19 such a determination.
20 A. Consistent with my prior answer, I
21 don't recall, so I can't discuss the factors.
22 Q. Does the Huron study contain any
23 recommendation that EFH not allocate any shared
24 services costs to EFIH?
25 A. I don't -- my recollection is Huron

Page 246

MARK RULE

2 doesn't specifically recommend specific
3 allocations other than an overall method of
4 applying a necessities and benefits test. So
5 from that -- from that method, it was up to the
6 company and the parties involved to apply the
7 test, where applicable, and come to an overall
8 allocation that the parties agree to.
9 Q. So it's your understanding that it
10 wasn't Huron -- Huron did not state allocate no
11 shared services costs to EFIH; instead, EFIH
12 and -- strike that.
13     Huron did not recommend any specific
14 allocation percentages among the EFH corporate
15 family with respect to shared services costs, is
16 that your understanding?
17 A. My understanding is the specific
18 allocation was determined by the parties
19 involved in the negotiation of said allocation.
20 Q. Your understanding is that the
21 allocations were the product of negotiation?
22 A. My understanding is that EFH and TCEH
23 were involved in determining the allocation,
24 yes.
25 Q. Go to page 25 of your report.

Page 247

MARK RULE

2      THE WITNESS: Can we actually take a
3 quick break?
4      MR. SCHNEIDER: Sure.
5      (Recess; Time Noted: 2:48 p.m.)
6      (Time Noted: 2:54 p.m.)
7 BY MR. SCHNEIDER:
8 Q. Mr. Rule, I want to go back to page 25
9 of your report, please.
10 A. Okay.
11 Q. Start with the final paragraph on that
12 page. We'll take a look at the final paragraph
13 on that page. The first sentence you refer to
14 the change in cost allocation methodologies.
15 Then in the second sentence, you refer to
16 certain corporate costs that prior to 2010 were
17 borne -- the majority of which were borne
18 directly by EFH Corp. Do you see that?
19 A. Yes.
20 Q. And you write, "EFH Corp. determined
21 that TCEH received the primary benefit of the
22 majority of these services, and as such,
23 allocated a substantial portion of the costs
24 associated to such services to TCEH beginning in
25 2010."

Page 248

MARK RULE

2      Do you see that?
3 A. Yes.
4 Q. What's the basis for that statement?
5 A. The basis for the statement would be
6 documents that I have read, the motion I read,
7 the debtors' motion for the approval of the
8 settlement agreement, as well as the underlying
9 data that underlies Figure 7.
10 Q. Did you do any independent
11 investigation of whether in fact TCEH received
12 the primary benefit of the majority of the
13 services that are discussed in this paragraph?
14 A. No. I took the debtors at their word.
15 Q. Did you bring any expertise to bear in
16 making the assertions set forth in this
17 paragraph?
18      MR. BREBNER: Object to form.
19 Q. Strike that. That was a bad question.
20      So you haven't conducted any expert
21 analysis to assess whether TCEH in fact received
22 the primary benefit of the majority of the
23 services that are referenced in this paragraph,
24 correct?
25 A. The statement I make in that paragraph

Page 249

MARK RULE

1 is based largely on statements made by the
2 debtors themselves.
3
4    Q.   You say largely.  Is there anything
5 else?
6    A.   I mean, other than the fact that I
7 know Huron recommended a necessities and
8 benefits test and that was a methodology adopted
9 by the company, but it was the company's own
10 words that indicated that a substantial portion
11 of the benefit related to TCEH.
12   Q.   So you had the Huron report and you
13 had the settlement motion.  That's the essential
14 basis for that statement, correct?
15   A.   Corroborated by documents that I have
16 since seen, but yes.
17   Q.   What documents?
18   A.   The documents I referred to earlier.
19   Q.   Okay.  Which have not been provided to
20 us.
21       You then write, "Additionally, TCEH
22 benefited by not receiving a larger allocation
23 of these costs prior to 2010."
24       Do you see that?
25   A.   Yes.

Page 250

MARK RULE

1
2    Q.   How did it benefit?
3    A.   Well, if the allocation in 2010 was
4 the appropriate allocation that's based on a
5 necessities and benefits test, if that
6 allocation was applied retroactively to 2008 and
7 2009, on a net basis, they paid less in 2008 and
8 2009.  Said differently, EFH paid more.
9    Q.   You said if the allocation in 2010 was
10 the appropriate allocation that's based on the
11 necessities and benefits test.
12       If the allocation was not appropriate,
13 would it still be your opinion that TCEH
14 benefited by not receiving a larger allocation
15 of these costs prior to 2010?
16   A.   I have no reason to believe the
17 allocation was not appropriate considering that
18 EFH and TCEH were the parties involved in
19 establishing the allocation.  The company did it
20 itself.
21   Q.   If the allocation was not appropriate
22 under the necessities and benefits test, would
23 you still be of the opinion that TCEH benefited
24 by not receiving a larger allocation prior to
25 2010?

Page 251

MARK RULE

1
2    A.   It would depend on what the allocation
3 was.
4    Q.   It would depend on what allocation?
5    A.   Well, if you're asking me a
6 hypothetical that the actual allocation in 2010
7 applied to 2008 and 2009 is not the appropriate
8 allocation, I can't answer the question unless
9 you tell me what the appropriate allocation is
10 and then be able to do the math to see if they
11 benefited.
12   Q.   Let's say the appropriate allocation
13 was the allocation that was in place prior to
14 2010, hypothetically, and then they changed the
15 allocation in 2010 to an inappropriate
16 allocation.
17       Under that hypothetical, would you
18 still be of the opinion that TCEH benefited by
19 not receiving a larger allocation of those costs
20 prior to 2010?
21       MR. BREBNER:  Objection to form.
22   A.   Well, under that hypothetical, which I
23 don't agree with, the actual allocation in 2008
24 and 2009 would be the same.  So they would be
25 neither better or worse off.

Page 252

MARK RULE

1
2    Q.   When you say "under that hypothetical,
3 which I don't agree with," what don't you agree
4 with?
5    A.   I don't agree with the hypothetical
6 that the 2010 allocation forward is a wrong
7 allocation when it was developed and agreed to
8 by the parties that were party to the allocation
9 itself.  By definition, I don't know how it
10 could be wrong if the two parties that are part
11 of it have agreed to it.
12   Q.   You can't conceive of how it could be
13 wrong if the two parties have agreed to it?
14   A.   If two parties that are party to it
15 have agreed to it, by definition, it -- by
16 definition, it can't be wrong because it's what
17 they agreed to.
18   Q.   Can the parties agree to an allocation
19 that is inconsistent with the necessities and
20 benefits test, yes or no?
21   A.   Can you repeat the question?
22   Q.   Can the parties -- let me put it to
23 you another way.
24       EFH allocated certain costs to --
25 shared services costs to TCEH, correct?

MARK RULE

2  A.  That's correct.

3  Q.  Now, is it possible, in your expert
4  opinion, for EFH and TCEH to agree on an
5  allocation of a particular cost that results in
6  a greater cost to TCEH than the benefit that
7  TCEH receives for the related service?

8  A.  So if I understand your question, are
9  you asking me is it possible that the allocation
10  to TCEH was greater than the underlying benefits
11  and -- or necessity and benefits analysis?

12  Q.  Yes.

13  A.  I presume it's possible, but it would
14  have to be something that would be agreed on --
15  agreed upon by the parties.

16  Q.  Can parties agree to a fraudulent
17  transfer?

18  A.  I'm not sure I understand your
19  question.

20  Q.  Do you understand that there is a
21  dispute in this case between TCEH and EFH as to
22  whether TCEH received reasonably equivalent
23  value for the shared services costs that were
24  allocated to it over the 2010 to 2014 period?

25  A.  As a general matter, yes.

MARK RULE

2  Q.  Are you offering any opinion on that
3  dispute?

4  A.  As to the reasonableness?

5  Q.  Yes.

6  A.  No.

7  Q.  Are you offering an opinion that TCEH
8  in fact received reasonably equivalent value for
9  every cost that was allocated to it by EFH over
10  the 2010 to 2014 period?

11  A.  As I said, no.

12  Q.  Let's go to page 26, Figure 8.

13      Now, if I understand this chart
14  correctly, you took the EFH's approach to
15  allocating correct -- well, strike that.

16      Why don't you tell me how you prepared
17  this chart.

18  A.  The chart is based on actual SG&A in
19  2008 and 2009, and the premise of this chart is
20  if the actual allocation that was in place from
21  2010 to 2013 was in place in 2008 and 2009, how
22  would have TCEH's overall costs changed?  As a
23  result, the direct costs would have gone down,
24  but the allocated costs would have gone up such
25  that there is a net difference between the two

MARK RULE

2  of $132 million.

3  Q.  And the percentages that you have in
4  your chart for TCEH Direct, which is 59 percent,
5  and so on, how did you derive those percentages?

6  A.  Those are based on the actual
7  allocation from 2010 to 2013.

8  Q.  And is that a blended average or
9  weighted average of the percentages over that
10  period?

11  A.  That would be a total, so --

12  Q.  Oh, I see.

13  A.  So it would be the full period.  So,
14  said differently, could it be a weighted
15  average?  Yes, but it -- I analyzed the full
16  period.

17  Q.  And does the total SG&A, does that
18  include Oncor?

19  A.  Yes.  Yes, it does.

20  Q.  Again, let's be careful not to talk
21  over each other.

22      Let's turn to the next section of your
23  report.  This is "Analysis of the SG&A
24  Allocation to EFIH."  Do you see that?

25  A.  Yes.

MARK RULE

2  Q.  Now, you quote a portion of the motion
3  to approve the settlement here, which is the
4  Docket No. 5249, do you see that?

5  A.  Yes.

6  Q.  And you quote the portion that states,
7  "No shared services costs were allocated to EFIH
8  before 2014."  Do you see that?

9  A.  Where are you?

10  Q.  I'm on page 26, first --

11  A.  You're on page 26?

12  Q.  The first paragraph under subsection
13  B.

14  A.  Yes.

15  Q.  And in conducting your review of the
16  company's data, did you find that statement to
17  be accurate?

18  A.  Based on the data that the company
19  gave, yes.

20  Q.  And the next quoted portion is, "The
21  TCEH Debtors contend that EFIH should have been
22  allocated at least a portion of these expenses."

23      Do you see that?

24  A.  Yes.

25  Q.  Do you agree with that statement?

Page 257

1           MARK RULE
2    A.    Based on my review of that motion,
3 yes.
4    Q.    Well, do you personally agree that
5 EFIH should have been allocated a portion of the
6 shared services costs prior to 2014?
7           MR. BREBNER: Objection to the form of
8    the question.
9    A.    No, I don't. The portion of the costs
10 that were allocated from 2010 to 2013 and,
11 again, after 2013 were based on a methodology
12 where it was determined amongst the parties what
13 the appropriate allocations were. So, again, it
14 gets back to the parties were the ones that were
15 determining what was appropriate.
16    Q.    Your opinion is that it was
17 appropriate not to allocate any cost to EFIH
18 before 2014 is based on your understanding that
19 that allocation or the absence of such an
20 allocation was pursuant to an agreement among
21 the entities?
22    A.    That and the fact that I understand
23 EFIH is effectively a holding company.
24    Q.    And why is that relevant, in your
25 opinion?

Page 258

1           MARK RULE
2    A.    It doesn't have much in operations.
3 There was an allocation to Oncor itself and
4 TCEH. Those were the major operating
5 subsidiaries.
6    Q.    So you've conducted an independent
7 analysis?
8    A.    No, I have not.
9    Q.    What expertise do you have to opine
10 that the absence of any allocation of shared
11 services costs to EFIH before 2014 was
12 appropriate?
13           MR. BREBNER: Objection. Form.
14    A.    Can you repeat the question, please?
15    Q.    What expertise do you have to opine
16 that the absence of any allocation of shared
17 services costs at EFIH before 2014 was
18 appropriate?
19    A.    I don't have an expert opinion here as
20 to the appropriateness of the allocation itself.
21 What this section relates to is an observation
22 that when an allocation was actually made, that
23 it was something different than the range that
24 was used in the Munger Tolles Report. That's
25 the opinion here.

Page 259

1           MARK RULE
2    Q.    That's an expert opinion?
3    A.    Based on our analysis of the -- the
4 relevant data, yes.
5    Q.    Well, you understand that -- well,
6 strike that.
7           Let's go to Figure 9. You refer to a
8 Munger Tolles presentation, and that's the
9 Exhibit D to the pleading that's referenced in
10 footnote 47 of your report?
11    A.    Yes.
12    Q.    And that's what you have derived
13 Figure 9 from?
14    A.    Yes, it's a replication of their
15 report.
16    Q.    It's not an exact replication, is it?
17    A.    It's a numbers replication.
18    Q.    You think it's a fair representation?
19    A.    I'm not sure I understand the question
20 about fair. I mean, it concludes 69 to 138,
21 which were the numbers contained in Munger
22 Tolles.
23    Q.    You think it fairly characterizes the
24 Munger Tolles presentation?
25    A.    I'm not sure, again, what you mean by

Page 260

1           MARK RULE
2 fair. I think the numbers here themselves are
3 consistent with the numbers in the Munger Tolles
4 presentation, and the citation that I have there
5 is citation number 47.
6           MR. SCHNEIDER: I'm going to mark this
7    as Rule Exhibit No. 16.
8           (Rule Exhibit 16, Munger Tolles
9    Presentation, marked for identification, as
10    of this date.)
11 BY MR. SCHNEIDER:
12    Q.    Now, Rule 16 is the Munger Tolles
13 presentation that you are citing here, correct?
14    A.    It appears to be so, yes.
15    Q.    Let's go to page 6 of this
16 presentation. Now, this is the chart that you
17 excerpt in your report, correct?
18    A.    It's the chart that we -- a portion of
19 it, yes, that we excerpted, yes.
20    Q.    You didn't include all the columns,
21 did you?
22    A.    I include the columns to calculate the
23 alleged underallocation of 69 to 138.
24    Q.    You don't show the columns reflecting
25 the actual allocations, correct?

Page 261

MARK RULE

2  A.  No, I don't.
3  Q.  Why not?
4  A.  I don't think it's relevant for me to
5  show them when the point of the analysis, as I
6  understand it, is that using a 20 to 40 percent
7  reallocation, that you get an underallocation of
8  69 and 138.  I think that my Figure 9 accurately
9  depicts that.
10  Q.  And what is the analysis that you
11  conducted in connection with the --
12  A.  The analysis is an observation that
13  the 20 to 40 percent, which there doesn't appear
14  to be any basis, as I can see it, in the Munger
15  Tolles analysis, does not seem to be supported
16  by the actual allocation that was occurring in
17  the first nine months of 2014.
18  Q.  What's your understanding of the
19  purpose of the Munger Tolles Report?
20  A.  My understanding of this particular
21  page, which is the one I was focused on, is that
22  Munger Tolles believes there was an
23  underallocation to EFIH.
24  Q.  And an overallocation to TCEH,
25  correct?

Page 262

MARK RULE

2  A.  I mean, this particular page doesn't
3  come to that conclusion.  This page comes to the
4  conclusion that EFH should have been allocated,
5  at minimum, its proportional share of certain
6  corporate overhead expenses up to 2010.
7  Q.  Let's go to page 4 of this report.  Do
8  you see the second main bullet, "Overallocation
9  of shared services costs"?
10  A.  Yes.
11  Q.  The next item below that, "Since at
12  least 2010, shared services costs have been
13  substantially overallocated to the T-side."
14  A.  Yes.
15  Q.  Is it a fair reading of this document
16  that Munger Tolles was asserting that shared
17  services costs were overallocated to the T-side?
18  A.  That's not the focus of my analysis.
19  My analysis is simply to indicate that there's
20  an inconsistency between what actually was
21  allocated to EFIH in 2014, it's inconsistent
22  with the 20 to 40 percent that's being
23  illustrated on page 6.
24  Q.  If someone is arguing that TCEH was
25  overallocated costs and EFIH was underallocated

Page 263

MARK RULE

2  costs, that their proposed reallocation of costs
3  would be inconsistent with what the company
4  actually did?
5  A.  Can you repeat that one more time?
6  I'm sorry.  That was a long question.
7  Q.  You're making the observation that the
8  potential reallocation that Munger Tolles sets
9  forth in this report is inconsistent with what
10  the company actually did, correct?
11  A.  Yes.
12  Q.  Isn't that obvious?
13  A.  Well, I think it starts with the
14  assumption that you're suggesting that the
15  actual allocation was incorrect.
16  Q.  And that's what Munger Tolles is
17  advocating here, correct?
18  A.  Okay.
19  Q.  And you haven't conducted any expert
20  analysis to confirm that the allocations were in
21  fact correct other than to observe that that's
22  what the parties agreed?
23  A.  That is what the parties agree.
24  Q.  And you haven't done any expert
25  analysis to confirm that that agreement was

Page 264

MARK RULE

2  reasonable?
3  A.  We have not done an independent
4  analysis that confirmed or rejected the
5  company's own agreed-upon allocation to EFIH.
6  Q.  And so what's the significance of your
7  observation that Munger Tolles' proposed
8  reallocation is inconsistent with what the
9  company actually did?
10  A.  Can you say that one more time?
11  Q.  What's the significance of your
12  observation that Munger Tolles' proposed
13  reallocation of shared services costs is
14  inconsistent with what the company actually did?
15  A.  It's based on the fact that, again,
16  the actual is what was agreed upon.
17  Q.  Is it your intention to testify to the
18  court that the parties agreed to the shared
19  services allocations that are reflected in their
20  records?
21  A.  That would be a basis of my opinion,
22  yes.
23  Q.  And what other opinion are you
24  offering in this section of your report?
25  A.  In this particular section that

Page 265

MARK RULE

1
2 relates to Munger Tolles?
3   Q.   Subsection B of your report.
4   A.   Can you repeat the question one more
5 time?
6   Q.   What other expert opinion are you
7 offering in this portion of your report?
8       MR. BREBNER:  Objection to form.
9   A.   I think I say it there at the bottom
10 of page 27; that the analysis of the actual
11 is -- is inconsistent with the proposed
12 reallocation.
13   Q.   And what expertise are you bringing to
14 bear in making that observation?
15   A.   An analysis of the actual data.
16   Q.   What analysis did you undertake?
17   A.   We went back through.  We recreated
18 Munger Tolles to understand the buckets that
19 they were looking at.  We then went to the
20 actual data in 2014 and compiled what the actual
21 allocation was by bucket.
22   Q.   You said you recreated Munger Tolles.
23 What do you mean you recreated Munger Tolles?
24 It's right here in the document.
25   A.   I wanted to understand the accuracy of

Page 266

MARK RULE

1
2 the numbers and the components of the numbers.
3 The source data for this is -- is quite
4 detailed.  So, in order to understand exactly
5 how Munger Tolles was getting to their numbers,
6 it was important for us to recreate it.
7   Q.   What did you recreate?
8   A.   The actual quantification of 69 to
9 138.
10   Q.   How did you recreate that?  It looks
11 like you just cut and pasted that from your
12 report into this report.
13   A.   We went back to the actual information
14 from 2010 to 2013 and verified that the total
15 that is contained in 2010 to 2013 totaled to
16 make sure that when we looked at the actual,
17 that we were doing an apples to apples
18 comparison.  We just didn't accept the first
19 column on page 6 that told us the 354.
20   Q.   Now I understand.  So you confirmed
21 the underlying numbers to which these
22 percentages were applied?
23   A.   Yes.
24   Q.   Okay.  Did you find any inaccuracies?
25   A.   I believe, at the end of the day, it

Page 267

MARK RULE

1
2 was -- we got the same numbers, or roughly the
3 same numbers.
4   Q.   And so what you observed is, in your
5 report, is that you don't see any support for
6 the proposed 20 to 40 percent reallocation?
7   A.   Yes.
8   Q.   Is that the sum and substance of your
9 opinion regarding this portion of the Munger
10 Tolles presentation?
11   A.   Yes.
12   Q.   Did you conduct any investigation in
13 an attempt to understand the source of the 20 to
14 40 percent allocation?
15   A.   I mean, we analyzed the Munger Tolles
16 Report, and so within the report we didn't see
17 any basis for the 20 to 40 percent and I have
18 seen no other documents that would corroborate
19 it.  So, as I sit here today, I don't know where
20 the 20 to 40 percent assumption came from.
21   Q.   Did you ask your counsel to contact
22 Munger Tolles to ask Munger Tolles?
23   A.   I can't -- I don't believe so, no.
24   Q.   Did that ever occur to you?
25   A.   I don't know if I thought about that

Page 268

MARK RULE

1
2 or not.
3   Q.   Let's go to Figure 10 on page 28 of
4 your report.  Now, this is a reflection of the
5 allocation of certain shared services costs to
6 EFIH through September of 2014, correct?
7   A.   It's the actual allocation to EFIH for
8 the first nine months of 2014, which reconcile
9 to the same categories as contained in the
10 Munger Tolles Report.
11   Q.   And you'll see, as you observed,
12 there's some of these costs are now -- strike
13 that.  As reflected in this Figure 10, beginning
14 in 2014, EFIH began allocating a certain
15 percentage of at least some of these costs to
16 EFIH, correct?
17   A.   Yes, some of the costs were allocated
18 and others were not.
19   Q.   Including costs that were not
20 previously allocated to EFIH, correct?
21   A.   I'm not sure I understand your
22 question.
23   Q.   Well, let's take sponsor fees.
24 Starting in 2014, 19.5 percent of those fees
25 were allocated to EFIH, correct?

MARK RULE

1
2      A.   That's correct.
3      Q.   And before 2014, zero percent of those
4  fees were allocated to EFIH, correct?
5      A.   There was not an allocation to EFIH
6  before 2014.
7      Q.   And do you have an understanding of
8  what changed between 2013 and 2014 with respect
9  to the allocation of sponsor fees?
10     A.   I understand that the parties agreed
11 to a different allocation.
12     Q.   Do you understand why they agreed to a
13 different allocation?
14     A.   I do not know why the parties agreed
15 to a different allocation.
16     Q.   Do you have a view on whether that
17 change was appropriate?
18     A.   I do not have a view of whether or not
19 the agreed-upon change is appropriate.
20     Q.   Would the answer be the same with
21 respect to the other categories in Figure 10 for
22 which costs were -- a percentage of costs were
23 allocated to EFIH?
24     A.   It would be -- the answers would be
25 the same for what we just spoke about for

MARK RULE

1
2  sponsor fees.
3      Q.   Was TCEH a party to a written shared
4  services agreement?
5      A.   Yes.
6      Q.   Have you reviewed that agreement?
7      A.   I have reviewed it.
8      Q.   Did you consider it in forming your
9  opinion?
10     A.   Yes, it was part of forming my
11 opinions.
12     Q.   Is that disclosed in your report as
13 part of the materials that you considered?
14     A.   You know, I don't see it actually
15 listed on Exhibit 2, but I know it's something
16 that I reviewed.
17     Q.   Is EFIH a party to a written shared
18 services agreement?
19     A.   They are as well, yes.
20     Q.   Are they a party to the same shared
21 services agreement as TCEH?
22     A.   I know they are two different
23 documents.
24     Q.   Did you review the EFIH shared
25 services agreement?

MARK RULE

1
2      A.   I would have reviewed it at the same
3  time I reviewed the TCEH one.
4      Q.   That's not disclosed in your report
5  either?
6      A.   Yeah, it seems like the two of those
7  did not make Exhibit 2.
8      Q.   Have you ever participated in drafting
9  a shared services agreement within a corporate
10 group?
11     A.   I have not.
12     Q.   Do you consider yourself an expert on
13 shared services agreements?
14     A.   I do not.
15     Q.   Go to page 18 of your report, Figure
16 4.
17     A.   Yes.
18     Q.   It's a summary of EFH Corp.'s -- the
19 trading prices of their public debt, correct?
20     A.   That's correct.
21     Q.   And you derived that from Bloomberg?
22     A.   That's correct.
23     Q.   What's Bloomberg?
24     A.   It's a, effectively, a financial
25 database, if you will, that tracks a variety of

MARK RULE

1
2  financial market information, including debt and
3  equity prices.
4      Q.   Are there any other sources of debt
5  trading prices that people in your field rely
6  upon?
7      A.   We primarily rely on Bloomberg.  I
8  know Bloomberg oftentimes will have prices from
9  other third parties that they incorporate into
10 their pricing information, but Bloomberg is
11 primarily the one that I rely upon.
12     Q.   Can you think of any others that
13 professionals in your field rely upon?
14     A.   Not off the top of my head.
15     Q.   Is AdvantageData an example?
16          (Continued on the next page to include
17     the jurat.)
18
19
20
21
22
23
24
25

Page 273

1          MARK RULE
2    A.   I don't recall using them recently, so
3  I can't say one way or the other.
4          MR. SCHNEIDER:  I have no further
5  questions.  Thank you.
6          MR. NELSON:  All set?  All right.
7          (Whereupon, the deposition concluded
8  at 3:30 p.m.)
9              oOo
10
11
12        _____
          MARK RULE
13
14   Subscribed and sworn to
     before me this    day
15   of      2015.
16
     _____
17
18
19
20
21
22
23
24
25

Page 274

1
2
3          CERTIFICATE
4  STATE OF NEW YORK )
           :  ss
5  COUNTY OF NEW YORK)
6      I, Kathy S. Klepfer, a Registered
7  Merit Reporter and Notary Public within and
8  for the State of New York, do hereby
9  certify:
10     That MARK RULE, the witness whose
11  deposition is herein before set forth, was
12  duly sworn by me and that such deposition is
13  a true record of the testimony given by such
14  witness.
15     I further certify that I am not
16  related to any of the parties to this action
17  by blood or marriage and that I am in no way
18  interested in the outcome of this matter.
19     In witness whereof, I have hereunto
20  set my hand this 22nd day of October 2015.
21
22    -------------------------------
        KATHY S. KLEPFER, RPR, RMR, CRR, CLR
23
24
25

Page 275

1
2          INDEX
3  TESTIMONY OF M. RULE:            PAGE
4  Examination by Mr. Rogers         9
5  Examination by Mr. Kleinhaus     161
6  Examination by Mr. Thomas        197
7  Examination by Mr. Schneider     209
8
9  RULE EXHIBITS:                   PAGE
10  Exhibit 1, Expert Report of Mark F. Rule, CFA,   16
11  October 12, 2015
12  Exhibit 2, TXU Corp. Solvency Analysis        34
13  Presentation October 10, 2007
14  Exhibit 3, a report from Duff & Phelps dated   52
15  February 2013 entitled "Energy Future Holdings,
16  Corp. Equity Valuation Analysis as of December 1,
17  2012"
18  Exhibit 4, Form 10-K for Energy Future Holdings  90
19  Corp. for the Fiscal Year Ended December 31,
20  2013
21  Exhibit 5, an e-mail from Paul Keglevic dated   102
22  2/8/2013 bearing Bates Nos. EFH-SP00101480
23  Exhibit 6, a document entitled "EFH Net Value   104
24  February 8, 2013, Confidential Draft for
25  Discussion"

Page 276

1
2          INDEX (Cont'd.)
3  RULE EXHIBITS:                   PAGE
4  Exhibit 7, Form 10-K for Energy Future        109
5  Intermediate Holding Company LLC for the Fiscal
6  Year Ended December 31, 2013
7  Exhibit 8, JPMorgan presentation entitled    134
8  "Discussion Materials March 2010, Energy
9  Future Holdings"
10  Exhibit 9, a document entitled "Board        143
11  Strategy Session," dated October 27, 2011
12  Exhibit 10, an e-mail from Paul Keglevic dated  147
13  3/17/2009, bearing Bates Nos. EFH-SP00040957
14  Exhibit 11, Duff & Phelps Final Report       166
15  entitled "Energy Future Holdings, Corp.
16  Quarterly Equity Valuation Analysis as of
17  December 31, 2008," dated February 12, 2009
18  Exhibit 12, KKR report entitled EFH          181
19  Discussion Materials
20  Exhibit 13, a letter on Thompson & Knight     192
21  letterhead dated September 24, 2012, bearing
22  Bates Nos. EFH02367162 through 2367211
23  Exhibit 14, Document showing calculations for  237
24  the periods 2008 to 2014 using the data in
25  Figure 7

Page 277

```
 1
 2          INDEX (Cont'd.)
 3  RULE EXHIBITS:                    PAGE
 4  Exhibit 15, Huron Consulting Group report    242
 5  entitled "Energy Future Holdings Corp.
 6  Shared Services Review"
 7  Exhibit 16, Munger Tolles Presentation    260
 8
 9  DIRECTIONS NOT TO ANSWER:
10  Page 200, Line 6
11  Page 209, Line 4
12  Page 213, Line 17
13
14  REQUESTS FOR PRODUCTION:
15  Page 214, Line 12
16
17
18
19
20
21
22
23
24
25
```

Page 278

```
 1
 2  NAME OF CASE:  In re EFHI
 3  DATE OF DEPOSITION:  10/22/15
 4  NAME OF WITNESS:  Mark Rule
 5        Reason Codes:
 6    1.  To clarify the record.
      2.  To conform to the facts.
 7    3.  To correct transcription errors.
 8  Page _____ Line _____ Reason _____
    From _____ to _____
 9
    Page _____ Line _____ Reason _____
10  From _____ to _____
11  Page _____ Line _____ Reason _____
    From _____ to _____
12
    Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
    From _____ to _____
15
    Page _____ Line _____ Reason _____
16  From _____ to _____
17  Page _____ Line _____ Reason _____
    From _____ to _____
18
    Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
    From _____ to _____
21
    Page _____ Line _____ Reason _____
22  From _____ to _____
23  Page _____ Line _____ Reason _____
    From _____ to _____
24
25        _____
```

# Transcript Word Index

**[& - 2008]**

## &

**&**
2:5 3:3,9,18 4:4,10 5:4,12
5:19 6:5,11 7:18 8:4,10,16
20:13 21:5,22 34:10,16,25
36:20 37:12,16,21 38:2,11
38:14 39:19 47:20,22,23
49:9,19,24 50:4,11,16,18
51:3,8,15,19,22 52:13,19
53:4 54:8 55:22 57:6 58:7
59:10,10,23 60:4,10,24
61:15,17 62:6,12 63:9 64:3
68:22 69:7,21 70:3,5,11,18
71:3,18 72:6 73:12,18,22
74:3,13,21 75:9,14 76:13
76:15,21 77:2,9,19,21 78:5
78:9,12 79:15,20 80:18,20
81:25 82:2,8,16,18,22
83:15,17 85:12,18,22 86:24
88:4,8 101:8,21 102:18
103:5 104:4 106:15 127:18
130:23 131:14 132:6
149:14,20,22 150:5,7,9
151:11,22 152:2 161:25
162:3,4 166:2,11,25 168:17
169:23 170:11 171:21
172:13,25 173:9 174:25
176:19,24 177:5,13 186:9
186:12 192:3,10,19 197:19
203:23 204:6 209:24 219:4
219:15 224:20,24 275:14
276:14,20

## 0

**00315318**
181:25
**02110**
4:21
**02111**
7:8
**02367195**
192:16
**07**
141:8
**09**
237:17 238:18

## 1

**1**
16:5,6,9,12 19:9,11 52:16
52:21 86:9 114:12 117:2
118:3,17 164:9 169:13
182:8 186:18 275:10,16
278:6
**1,749**
185:21

**1.15**
111:22
**1.361**
122:11
**10**
34:6,10 37:12,21 38:11
90:19,24 91:11 109:3,5,12
109:16 110:16 111:20
121:7,19 147:15,16,21
268:3,13 269:21 275:13,18
276:4,12
**10/22/15**
278:3
**10:25**
84:4
**10:34a.m.**
84:5
**100**
4:20 115:25 184:24 185:2,5
185:6
**10004**
3:6 6:8 8:19
**10019**
4:14 5:16 7:21
**10020**
7:15
**10022**
8:7
**10036**
5:9,23 6:14 8:13
**102**
275:21
**104**
275:23
**109**
144:25 145:8 276:4
**11**
1:7 59:21,22 60:15 64:21
88:6 116:17 165:25 166:2
169:15,16,16,19 176:7
276:14
**11.25**
5:6
**11:29**
126:21
**11:36**
126:22
**110**
145:20,24 147:4
**1133**
6:13
**1155**
5:22
**1177**
8:12

**119**
238:20 239:3
**119.7**
234:20 235:4 236:8
**12**
16:7 88:6 116:17 142:2
166:5 181:19,20,24 275:11
276:17,18 277:15
**12.25**
5:6
**12.5**
169:24
**12/31/08**
150:5
**12:46**
154:3
**123**
3:20
**125**
3:5
**1270**
7:14
**1285**
4:13
**13**
191:25 192:2 276:20
**132**
255:2
**134**
276:7
**138**
259:20 260:23 261:8 266:9
**14**
237:19,20 276:23
**14,867,000,000**
186:5
**14-10979**
1:8
**142.0**
235:6
**143**
276:10
**147**
276:12
**15**
139:23 148:11 152:22,23
152:24 242:12,13 277:4
**15.5**
186:14
**16**
68:15,16 145:22 147:11
149:7 151:25 152:6 260:7,8
260:12 275:10 277:7
**161**
275:5

**166**
276:14
**17**
68:16 102:23 103:18
145:22 147:12 148:13
182:7 186:16,17 277:12
**18**
186:14 271:15
**181**
276:18
**19**
70:11,12
**19.5**
268:24
**19109**
3:22
**192**
276:20
**19374**
242:19
**197**
275:6

## 2

**2**
23:8 34:4,5,17,25 35:2,3
38:10 55:5 104:23 146:5
210:5,8,9 270:15 271:7
275:12 278:6
**2.5**
167:3
**2/8/2013**
102:5 275:22
**2:48**
247:5
**2:54**
247:6
**20**
39:10,19 261:6,13 262:22
267:6,13,17,20
**200**
277:10
**2004**
224:11
**2007**
33:11 34:6,10 37:12,21,24
38:3,11 60:21 63:9 77:15
91:23 153:3,8 175:2,6,20
275:13
**2008**
33:3,6,25 40:21 50:20 51:5
84:11 86:9 89:4 119:10,15
129:2 131:18 133:6,18
139:9,24 141:8,25 153:8
158:20 159:5 166:5,12
171:13 199:14 204:22
224:11 235:14,21,21,25

**[2008 - 52]**

**2008 (cont.)**
236:6,15,22,23 237:3,5,16
237:21 238:3 239:11,21
241:14 250:6,7 251:7,23
254:19,21 276:17,24
**2009**
50:21 131:23 147:12
148:13 166:6 186:22 227:5
228:2,4 234:21 235:10,25
236:7,12 237:2,6,12,16
238:21 239:9,12 240:18
250:7,8 251:7,24 254:19,21
276:17
**2010**
50:21 89:10 116:17 129:25
133:11 134:2,5 164:14
205:11 227:13 228:7
236:12,15,22,23 237:2,3,8
237:17 244:3 245:13
247:16,25 249:23 250:3,9
250:15,25 251:6,14,15,20
252:6 253:24 254:10,21
255:7 257:10 262:6,12
266:14,15 276:8
**2011**
50:21 101:24 143:22 144:2
147:6 205:11,17,19 276:11
**2012**
50:21 51:5 52:16,21 56:19
56:23 64:7 70:12 71:4
77:16,18,22 81:25 82:15
84:11 85:19,22 89:8 95:2,9
95:21 96:4,15 101:21
105:23 106:3 108:16 112:9
112:19 116:25 118:2,16
119:10,16,24 120:5,18
122:21 124:9 125:15 126:2
126:3 129:3 131:10 132:15
133:6,18 139:10 153:4
154:19 157:12 158:25
182:3,9 183:20 184:15,18
184:23 186:10,13,22
187:23 190:24 191:15,20
192:4,11 204:22,24 205:17
205:19,22 275:17 276:21
**2013**
52:14,20 56:17,19,23 90:21
90:25 91:11 102:11 104:11
109:3,7,12 120:21 121:4
122:7,25 123:17,22 124:4,7
125:2,21 139:25 141:25
185:20,23 186:5 206:6
254:21 255:7 257:10,11
266:14,15 269:8 275:15,20
275:24 276:6

**2014**
139:23 224:13,14 234:22
237:21 238:4 239:21
241:14 244:4 245:13
253:24 254:10 256:8 257:6
257:18 258:11,17 261:17
262:21 265:20 268:6,8,14
268:24 269:3,6,8 276:24
**2015**
1:13 2:2 16:7 158:18
273:15 274:20 275:11
**2016**
184:15
**2017**
102:3
**2018**
5:7
**209**
275:7 277:11
**21**
38:10 39:4,10,14 108:10
130:16 169:13,19 170:2,3
**213**
277:12
**214**
277:15
**22**
1:13 2:2 133:21 141:10,11
154:23 155:3 158:12 191:8
204:15
**22nd**
274:20
**23**
139:16,17 166:17 167:5
194:2 201:14 205:2
**2367196**
192:22
**2367211**
192:5 276:22
**237**
276:23
**24**
171:24 192:3,11 224:5
235:8 276:21
**242**
160:9 277:4
**25**
164:8 170:18 172:5 227:3
231:11 232:19 236:5
246:25 247:8
**250**
5:15
**26**
176:6 198:11 231:4 235:16
254:12 256:10,11

**260**
277:7
**261.7**
235:6
**27**
71:3 74:2 143:22,25 169:25
170:6 265:10 276:11
**27.481**
182:12,19
**28**
74:10 268:3
**29**
91:14
**2nd**
8:11

**3**

**3**
52:12,13,19 53:5,9 54:6
55:8 57:25 58:12,17 59:21
68:16 74:11 79:14 81:24
82:15 85:18 152:21,24
206:7 208:22 243:10
275:14 278:7
**3.9**
38:13,19
**3/17/2009**
147:17 276:13
**3:30**
273:8
**30**
91:8,10,16 142:19 147:11
187:16
**300**
3:11
**31**
33:2 90:21,25 109:7 122:21
152:8 154:19 166:5,12
275:19 276:6,17
**31.6**
182:13
**315319**
182:23
**315333**
184:8
**319**
182:15,16
**32**
144:5 187:16
**33**
77:18
**333**
182:15
**34**
80:3,21 275:12
**34077**
92:3,8,21

**354**
266:19
**355**
4:6

**4**

**4**
38:5 90:18,19,24 202:10
241:14 243:14 262:7
271:16 275:18 277:11
**40**
134:10 170:23 171:11
261:6,13 262:22 267:6,14
267:17,20
**40.193**
182:11
**40s**
108:4
**41**
81:24
**47**
82:15 259:10 260:5
**48**
109:15,20

**5**

**5**
17:19 18:19 30:20,22 53:5
53:8 102:4,10 104:17
106:14 108:11,13,18 109:2
109:21 111:14 112:5 114:4
114:10 115:4 118:13
126:24 129:18 130:15,20
132:15 133:4 172:11,14,21
172:23 173:2,9 174:2,5,9
174:12,14,16,21 177:14,17
203:14 275:21
**5.12**
122:19
**5.388**
110:11,22 111:3
**5.4**
108:17
**5.465**
110:6
**5.5**
139:22
**5.778**
122:8
**50**
218:17
**50s**
108:5
**51**
7:20
**52**
275:14

**[52.1 - agencies]**

**52.1**
239:22
**5249**
256:4
**52nd**
7:20
**555**
3:14
**55th**
5:15
**59**
255:4
**599**
8:6

**6**

**6**
54:6 57:15 104:9,10,16,18
104:20 139:18 140:15
172:3,13,16,21 173:10
174:3 205:10 260:15
262:23 266:19 275:23
277:10
**6.36**
122:8
**6.4**
112:20
**6.55**
140:18
**6.75**
170:9
**60**
170:22 171:10,18 238:19
239:3
**60/40**
171:15,22
**601**
2:5
**60602**
6:21
**60654**
3:12
**69**
259:20 260:23 261:8 266:8

**7**

**7**
49:21 50:6,10 57:25 58:12
58:16 109:5,11,21 121:10
121:11 136:7 193:6 224:7
235:8,9,13 237:22 238:4,11
239:19,20 248:9 276:4,25
**7.895**
112:10,23
**70**
6:20 110:16 121:13

**8**

**8**
102:11 104:11 110:15
111:12,19 121:12,18 134:3
134:4,9 186:2 243:4 254:12
275:24 276:7
**8.5**
184:20 185:3,6,11,22
**80.03**
194:4
**800**
102:25 103:5,13,13,22,24
**824**
176:16,21
**899.3**
239:21

**9**

**9**
49:21 50:6 85:21,22 86:7
143:23,24 147:4 259:7,13
261:8 275:4 276:10
**9.35**
184:23
**9.5**
184:20 185:2
**90**
275:18
**90071**
4:7
**94.5**
205:23 206:3
**94104**
3:15
**99140**
1:25

**a**

**a.m.**
84:4 126:21,22
**ability**
27:5,9,14 54:21 84:18,20
87:10 88:10 89:16 142:23
**able**
26:4 52:3 54:19,24 55:11
55:16,19 56:3,4 58:9 59:18
69:11 70:19 71:12,14,21
72:2,9 74:17,23,25 83:21
83:21 96:19 113:11 153:18
173:13 188:24 251:10
**absence**
257:19 258:10,16
**accept**
266:18
**accepted**
141:17,24 167:22

**access**
45:3 54:23 56:5 188:11
190:16,20,23 191:22,22
**accompanied**
144:19
**account**
106:12 110:12 175:23
176:2 177:6,14,19,22,23
181:5 195:19 227:10
**accounting**
105:4
**accounts**
132:3 153:10
**accuracy**
105:21 147:9 265:25
**accurate**
18:5 19:13 142:8 205:14
228:2 240:19 256:17
**accurately**
261:8
**acknowledged**
182:10
**acquired**
160:9,14,16 161:2,3
**acquiring**
99:25
**acquisitions**
161:5
**action**
27:4 206:15,20,24 274:16
**actions**
22:18 26:18 97:7
**activities**
89:12
**actual**
26:14 41:3 50:24 171:12
202:21,23,23 216:17
219:24 220:12 230:20,20
251:6,23 254:18,20 255:6
260:25 261:16 263:15
264:16 265:10,15,20,20
266:8,13,16 268:7
**ad**
4:11 5:20 194:5
**adam**
3:7
**add**
60:7 110:2 173:9,20
**added**
60:13,17 172:23,25 174:2
177:14
**additional**
15:23 49:24 57:22 106:21
112:24 142:7 202:8 212:18
212:21 215:9,19,21,24
216:3 234:4

**additionally**
249:21
**addressed**
176:25
**adjust**
225:2
**adjusted**
85:12 106:19 114:3 117:12
118:25 177:10
**adjusting**
97:15 106:15
**adjustment**
85:15 114:19 117:21
130:19 131:7,9,10,13,18,19
131:20,20,23,24 132:14,20
176:11,13
**adjustments**
224:23
**administered**
1:9
**adopt**
243:14
**adopted**
249:8
**advantagedata**
272:15
**advice**
36:21 209:7
**advise**
37:7
**advised**
22:25 23:20 202:14 209:2
**advisement**
214:17
**advising**
202:24,25 203:6,7
**advisor**
23:14 196:13,14 207:6,8
**advisors**
12:14,23
**advocating**
263:17
**affect**
137:15
**affiliate**
110:5,13 116:17 120:7
122:2,12
**affiliated**
162:7
**affiliates**
110:19
**afternoon**
154:2 161:22,23 209:23
**agencies**
30:14

**[agenda - applied]**

**agenda**
135:14 145:5,8
**agent**
8:5,17
**aggregate**
182:22 187:15
**ago**
13:8 73:4 211:25
**agree**
29:10 35:12,15,16 36:6
53:17,21,25 58:11,17 64:2
66:15 67:4,24 76:3 78:14
80:9,11,14 81:2,4,7,14,19
96:18 98:9 116:21 117:20
120:12 132:13 137:12
152:9 167:20 170:25 202:6
202:9 246:8 251:23 252:3,3
252:5,18 253:4,16 256:25
257:4 263:23
**agreed**
252:7,11,13,15,17 253:14
253:15 263:22 264:5,16,18
269:10,12,14,19
**agreement**
44:11,16,19 86:9,16 87:4
87:13 158:13,17,24 159:19
160:2 227:23 248:8 257:20
263:25 270:4,6,18,21,25
271:9
**agreements**
211:12 220:25 271:13
**ahead**
165:23 214:6
**ain**
6:9
**akin**
5:4
**al**
1:5
**alan**
207:15 218:24
**alixpartners**
12:12,17 14:2 16:21 37:2,4
37:6 219:2,19,22,23 231:5
**alleged**
260:23
**allocate**
244:9,12 245:4,23 246:10
257:17
**allocated**
225:10,16 226:12 227:12
232:23,25 233:10,12 234:8
234:10,21 236:14 238:15
238:24 239:24 240:3,10,15
243:16 244:4 247:23
252:24 253:24 254:9,24

**allocated (cont.)**
256:7,22 257:5,10 262:4,21
268:17,20,25 269:4,23
**allocating**
229:20 245:12 254:15
268:14
**allocation**
211:3,6 212:10 229:12,16
235:12,24 236:11,17,21
237:8,10,12 240:6,21
243:15,20,24 244:5,8,8,12
244:18 245:14 246:8,14,18
246:19,23 247:14 249:22
250:3,4,6,9,10,12,14,17,19
250:21,24 251:2,4,6,8,9,12
251:13,15,16,19,23 252:6,7
252:8,18 253:5,9 254:20
255:7,24 257:19,20 258:3
258:10,16,20,22 261:16
263:15 264:5 265:21
267:14 268:5,7 269:5,9,11
269:13,15
**allocations**
10:11,16 212:20 213:14
215:6 221:9 222:15 223:4
246:3,21 257:13 260:25
263:20 264:19
**allowed**
198:13 213:23 221:7
**alpha**
172:6,9,14,17,21 173:15,18
174:14,21 175:2 177:17,20
**alphas**
174:4,6,18,19
**alternative**
167:13
**alternatives**
209:3
**alysa**
6:9
**amend**
89:15
**american**
4:18
**americas**
4:13 5:22 6:13 7:14 8:12
**amortized**
110:4
**amount**
108:25 111:2,9,11,15,17,20
112:9,21 115:15 122:8,9,11
122:20 160:25 183:24
**amounts**
110:17
**analyses**
27:9,11,22,24 28:13,15

**analyses (cont.)**
35:17 36:5 47:21 50:3,5,13
50:15,17 51:6,9,15 59:9,16
62:16 73:3,6,16,17 74:9
83:4,11 84:10 106:6 137:5
142:8 143:8 146:18 176:2
183:15 184:2 208:16
217:24 218:2,4 219:10,13
220:12,15
**analysis**
18:24 20:16 22:17 23:4,7
25:5 26:4,7 27:13,15 33:16
33:17,21 34:6,20 35:12,18
37:17,18,24,25 38:3,17
39:11,15,20,24 41:17,23,25
43:22 45:12,16,20 46:24
48:23 49:12 50:9,12,23
51:18,21,23 52:4,6,11,16
52:21 54:8 55:5,17,19,23
56:13,18 57:4,19 59:5
61:11 62:14,15,25 63:8,10
63:12,18,24 64:20,22 66:9
66:21,24 69:21,22 70:3
71:6 74:5 76:5,21,23 77:15
77:21 78:5 80:5,15,23 81:8
81:10,13,15 82:3,17,24
84:13 85:13,16 88:4,21
89:2,3 98:6 99:15,20,23
100:11,18,21 101:2,4 103:4
104:4 106:11 107:8,19
114:9,23 115:3 116:5,21
120:20 121:4 123:18,22
124:2 125:4,20 126:10,11
127:13,17,19,22,25 128:3,6
128:7,13 129:2 130:4,4,11
135:6,11 136:9,11 140:3
141:7,13 142:3,7 143:12
145:19,25 146:6,15,19,22
146:24 149:23 150:7,8
151:15,20,21,22 153:14
154:9 155:22 156:3 159:7,8
159:11,12 160:4 161:13
163:22 165:15,18 166:4,12
171:7,14,15 172:19 176:5,7
180:6 183:6,17 191:4
194:20 195:22,23,25 196:3
200:17 202:4 204:10,19
209:14 219:20 220:11
221:20,23 226:4 228:24
229:18,24 231:4,7,9,14
235:17,22,23 241:16
248:21 253:11 255:23
258:7 259:3 261:5,10,12,15
262:18,19 263:20,25 264:4
265:10,15,16 275:12,16
276:16

**analyze**
18:19 58:9 69:23 137:6
225:15
**analyzed**
20:14 39:22 55:9 120:6
124:6 163:20 164:6 178:25
179:5 255:15 267:15
**analyzing**
68:4 82:10,24 230:20
**angeles**
4:7
**annual**
10:14,15 211:5 212:10
222:14 229:25 230:3
**answer**
9:17 12:21 66:25 71:20
117:23 118:6 124:17
146:15 174:15 198:11
199:3 200:7 204:5 206:25
208:5 209:5 213:18,19,20
213:23 219:12 223:9 242:3
245:20 251:8 269:20 277:9
**answered**
197:23 223:19
**answering**
28:16 125:9,22 221:13
**answers**
72:2,7 74:15 146:18 196:5
269:24
**anybody**
135:20 144:22 188:17
**apart**
50:9 101:5 234:4
**apologize**
179:12 224:14 226:21
235:3 240:17
**apparent**
22:15
**appear**
261:13
**appears**
16:17 34:15 53:3 61:12
110:10 113:5 135:7 166:16
176:10 182:6 186:6 242:22
243:13 260:14
**apples**
266:17,17
**applicable**
158:24 201:20,25 246:7
**application**
229:15
**applied**
86:10 130:19 160:24
161:16 169:3,9 172:13
228:10,14 229:10,19
244:15 250:6 251:7 266:22

**[apply - based]**

**apply**
203:21 204:4,7 244:23
245:3 246:6
**applying**
86:23 230:10 243:23 246:4
**approach**
77:17 81:11 130:24 141:24
167:21,22,25 168:18 169:2
169:8 203:21 204:3,4,7
254:14
**approached**
13:10,20
**approaches**
141:17
**appropriate**
32:6 57:5 61:10 62:17,24
64:4 81:22 86:20 87:6
115:12 132:22 177:21
228:16 236:13 238:18
239:6 250:4,10,12,17,21
251:7,9,12 257:13,15,17
258:12,18 269:17,19
**appropriateness**
28:21 29:4,11,17 64:20
170:15 258:20
**approval**
248:7
**approve**
227:23 256:3
**approved**
116:13
**approximate**
108:25
**approximately**
38:5,19 108:17 110:11
111:21,25 112:10,20 114:4
114:7,12 117:2 118:3
239:21
**areas**
30:25
**argue**
226:8
**arguing**
23:24 41:6 262:24
**argument**
159:22
**arrive**
110:5
**arrived**
53:11 70:5 103:5 105:9
**arrives**
102:24
**articles**
162:19
**arts**
3:21

**asked**
12:22 13:3,12,13,17,20
17:4,7,24 20:22 21:6,14,15
31:12 32:21 33:17,21,24
40:20 41:23 42:12,16 43:8
43:12 44:22 46:3,25 47:8
47:13,16,24 48:3 69:17
72:13,19 73:6,21 84:7
100:14 101:15 127:16,21
127:25 128:3,5 197:22
199:8,14,16,17 200:14,18
**asking**
14:25 26:7 62:20,22 63:5
64:12 67:11 69:3 94:17,18
108:9 116:20 118:14,15
125:18,19 139:20 154:11
183:11 198:15,22,23
199:24 215:3 220:17 222:7
245:8 251:5 253:9
**aspect**
41:15
**aspects**
22:9 37:16 43:23 88:10
198:2
**asserting**
262:16
**assertions**
248:16
**assess**
70:22 71:2 84:8 168:9
237:7,10 248:21
**assessed**
29:7 159:23
**assessing**
65:23 66:14
**assessment**
27:19 43:9 105:14 113:10
230:5
**assessments**
142:22
**asset**
38:5,12,17 88:13 98:11
107:2,6,10 111:15 114:20
115:10 117:8,10 118:9
119:19 125:6 128:16,18
153:11
**assets**
15:8,11 19:19 63:7 64:18
66:6,8 106:21 108:14,17
110:3,9 111:13 112:7 113:5
113:17,21 114:15 115:13
115:17,23 116:23 121:5
123:5 124:18 129:12
137:22 142:23 153:14
189:21 193:15 201:21
202:2

**assignment**
206:22 207:5
**assistance**
197:25
**associated**
44:7 100:12 173:15 247:24
**assume**
9:18 63:6 67:2,12,16
116:20 132:19 148:6
171:18 239:15
**assumes**
115:21
**assuming**
96:24 97:6 119:19 168:4
169:5 202:5 244:7,11
**assumption**
58:2,6,20 67:4,6 97:12 98:2
98:6 118:9,20 161:14
168:24 170:22 171:10
263:14 267:20
**assumptions**
21:25 22:3 58:11,14,16,21
58:23 59:3,7,11,17 71:5,9
71:18,24 72:5 74:2,3,7,13
74:20 118:15 168:21
170:19 214:2,5 219:16,21
219:22,23 220:2,8,10,13,18
**attached**
102:17 104:7 183:18
**attachment**
104:16
**attempt**
238:2 267:13
**attention**
48:22 179:13,23 193:23
215:15
**attorneys**
3:4,10,19 4:5,11,18 5:5,13
5:20 6:6,12,18 7:5,12,19
8:5,11,17
**auction**
98:18,21,24 99:10 100:13
**audette**
5:24
**august**
15:22
**authors**
218:25
**available**
21:2,9 22:7 45:8,11 47:25
49:6 52:4,10 54:24 56:6
59:15,20 75:20 84:20
103:23 160:13 215:19
**avenue**
2:6 3:21 4:6,13 5:22 6:13
7:14 8:6,12

**average**
169:20 170:7 171:16 255:8
255:9,15
**avoided**
40:7 42:22 43:5,11
**aware**
14:3 27:6 32:9,10,19,22
38:2 41:8,14 64:23 65:3,8
76:24 98:17,20 99:12
101:19 103:4,8 135:22,25
136:18 163:11,15 189:24
190:10
**awareness**
217:10

**b**

**back**
15:22 18:20,20,23 39:14
72:18 73:5 77:15 88:20
121:12 155:20 160:17
170:2 175:16 178:3 184:19
186:17 188:12 195:4
221:24 235:16 236:4
239:19 247:8 257:14
265:17 266:13
**backup**
21:24 47:22 73:11,18,21
**bad**
241:8 248:19
**baked**
111:13 113:17 220:11
**balance**
27:12 39:12,16 84:14,18,21
107:2,4,7,8,11,14 111:16
123:3,6 130:2 155:5,14
158:10 159:2
**ballpark**
15:20 73:20,24
**bank**
5:5
**bankruptcies**
24:4
**bankruptcy**
1:2 23:16 67:17,18 68:5
98:21 156:23 159:10 160:3
163:14 197:3 202:19,23
203:7
**based**
20:25 29:25 38:25 56:19
57:22 58:24,25 60:18 61:13
78:15 85:10 86:8 88:7,17
89:9 92:12 93:2,6,9 95:22
95:23 97:11,16,25 98:6
99:22,24 103:11,20 106:21
108:3 117:8 129:18,23
135:7 138:14 140:5 149:13
149:19,22,23 150:16

**[based - business]**

based (cont.)
160:22,23 169:2 171:7,16
177:8 186:3 187:13,23,25
188:3,6,23 189:4,22 191:5
198:9,11,24 199:6 203:12
212:16 217:18 219:20
220:7,12 221:5 224:16,18
227:14 228:10,16 235:9
237:16 240:7,22,23 245:9
249:2 250:4,10 254:18
255:6 256:18 257:2,11,18
259:3 264:15
bases
17:11,15,16 23:23 48:16
50:2,5 86:23 88:5
basically
221:7
basing
150:6
basis
24:19 28:16,18 39:7 41:5
42:22 43:6,11 51:16 61:20
61:21 62:21 63:6 64:9
69:12 88:2 97:15,18 105:12
106:7 126:12 133:5,7 140:8
147:3 149:25 152:4 154:23
160:12 177:16 182:22
187:18 189:20 190:16
191:6 194:7,13,18 196:21
197:2 201:15 216:8,10
219:13 221:7 233:7,8 234:9
248:4,5 249:14 250:7
261:14 264:21 267:17
bates
102:5 147:17 166:10
181:25 192:4,9,21 214:14
242:18 275:22 276:13,22
battery
8:18
bear
230:18 231:17 248:15
265:14
bearing
102:5 147:17 192:4 228:11
275:22 276:13,21
began
268:14
beginning
51:18 129:25 148:25
164:21 166:10 210:23
227:5,13 228:7 247:24
268:13
begins
88:6 91:20 164:11 181:25
192:8 227:5 231:14

behalf
67:7 193:18
believe
15:9 17:14,18 49:2,5 59:13
61:7 88:12 90:12,12 91:7
91:13 95:23 96:8 97:19
99:7 100:7 102:15 104:22
105:24 107:24 112:25
120:5 132:21 136:4 144:16
145:12,16 157:17 167:2,3
170:13 177:9 178:12
180:20 181:2 183:16 184:6
186:11 191:5,10,17 192:15
196:3 205:7 206:16 211:10
212:8 216:6,9 218:24 219:9
222:4 225:6 226:3 227:21
231:14 240:5,20 250:16
266:25 267:23
believed
108:7
believes
108:10 261:22
belknap
6:11
benefactor
229:9
benefit
229:11,15 233:21 238:14
243:11 244:24 245:4,10,15
247:21 248:12,22 249:11
250:2 253:6
benefited
238:23 249:22 250:14,23
251:11,18
benefits
202:8 228:9,13,17 229:2,4
229:20 230:2,10 240:7,23
241:6 244:16 246:4 249:8
250:5,11,22 252:20 253:10
253:11
best
98:9 168:18
better
226:9 227:7 251:25
beyond
73:5 120:5 190:14
bid
14:9,16,18,19,22 15:6,10
15:14 94:18 95:15 99:13,19
100:6,10,19 101:3 194:4,6
194:12,18 201:8,15,20,25
202:6
bidder
99:18
bidders
100:5

bids
98:23 99:2,6,7,9,12,16
100:13 201:3,4,8,11
big
153:6
billion
23:16 38:6,13,19 102:23
103:18 108:17 110:6,11,22
111:3,22 112:11,20 114:4,8
114:12,22 117:3 118:3,17
119:4 122:8,9,11,20 182:11
182:12,19 186:14,14,16
bit
21:10 43:25 78:25 87:2
88:15 112:6 124:22 165:23
blended
255:8
blood
274:17
bloomberg
141:3 143:16 160:23
271:21,23 272:7,8,10
blue
215:17
board
97:22 101:25 116:13
143:22,25 144:20 276:10
bodies
90:14
bold
91:20,23
bond
117:18 126:13 136:12
138:16 142:2,5,10 143:2,8
143:10 178:10
bonds
137:14,16,18,21 138:2,18
138:21,23 139:21 140:12
143:12 178:5
book
152:9,13,16 153:3,7
books
108:3
borne
247:17,17
boston
4:21 7:8
bottom
55:24 80:2,22 85:16 171:6
171:25 224:20 231:11,13
265:9
brad
209:23
bradley
4:8

break
79:13 83:25 88:15 126:16
153:16,17,19 156:20 247:3
breakdown
171:22
breaking
99:13
brebner
3:7 14:24 16:19 18:17
20:10,19 24:11 25:25 29:19
30:7 32:17 36:8 39:21 42:3
44:21 46:14 48:24 51:24
52:8 59:8 63:2 69:9 78:10
83:8 93:21 95:3 96:22 97:5
98:5,19 105:18 116:10
120:19 132:18 178:14
187:5,11 196:11,24 197:22
198:6,10,18 199:3,13,21
213:22 214:3,16 220:3,9,14
220:20 221:18 231:10
232:13 236:18 238:8
240:11 242:4 245:6 248:18
251:21 257:7 258:13 265:8
brent
9:9
brenton
3:13
brian
6:15
bring
48:21 179:13,22 248:15
bringing
230:17 231:16 265:13
broad
3:5,20 152:12
brought
32:19 160:2 193:22
brown
7:4
bryant
5:8
bucket
226:6 241:17,18 265:21
buckets
241:18,25 244:21 265:18
build
225:22
bullet
23:13 35:2,5 53:8 55:4,4,8
55:15,24 86:7 169:19
171:25 262:8
burden
228:12
business
85:2

**[businesses - columns]**

**businesses**
19:23
**buyer**
94:20 157:11
**buyers**
98:10

**c**

**calculate**
61:3 101:9 167:11,13,22
168:2 234:25 235:3 260:22
**calculated**
86:24 110:8 115:17
**calculating**
168:18
**calculation**
62:8 102:18 104:24 105:3
115:19 117:3 118:17 119:5
119:8,21 186:4 236:6 238:3
238:6,12
**calculations**
75:9 82:24 118:4 119:14
130:15 133:4 237:21
276:23
**calculator**
238:7
**california**
3:14,15 4:7
**call**
89:20 100:19 127:5 146:2
162:4,5,12
**called**
9:2 38:4
**cancel**
118:22,24
**canceled**
122:15
**cancellation**
116:9 120:4,10,14 122:25
123:14 124:4,14,25 125:16
126:7
**capacity**
12:9 196:16
**capex**
74:18
**capital**
72:5 74:12 84:25 162:3
169:20 170:7 171:2,3
184:11
**career**
19:20 28:25
**careful**
255:20
**carla**
192:22
**carried**
107:10,13

**carrying**
110:18 111:2,6,22 122:9
**case**
1:8 5:19 11:23 14:6,23
16:16,24 17:7,13,24 20:7
24:19,19,23 25:15,17,22
29:25 30:5 31:22 32:2 33:3
37:12 40:16 42:21 43:10,14
43:20 44:7,12 48:13,23
53:2 54:16 55:2 58:6 66:4
68:21 69:5 71:9 72:5,18
76:13 77:4 78:7,22 79:19
82:7 84:24 86:20 87:14
91:6 93:18,25 94:14,23
97:11,25 100:4,25 101:8
103:7 117:17 121:20
124:24 131:12,19,21,24,25
132:15,23 135:23 136:3,6
136:22 161:5 169:11 190:2
190:9 202:19 216:17
253:21 278:2
**cases**
22:21 25:20 26:12 28:23
53:12 131:13 132:6,7,8
174:20
**cash**
71:5,23 74:20 76:5,7 77:11
84:19 106:16 167:8 176:4,7
176:8 177:23,25 230:20
**categories**
245:9 268:9 269:21
**category**
244:25
**causative**
243:17
**cause**
18:14 138:2,7 152:15
**caused**
19:6
**causes**
206:14,20,24 241:22 242:9
**center**
7:7,13
**centralization**
164:13
**centralized**
164:24
**cents**
142:20
**certain**
17:3 18:11 37:15 42:8
47:14 48:6 59:10 75:18
91:24 92:2 99:19 107:25
163:12 227:12 243:3
245:13 247:16 252:24
262:5 268:5,14

**certainty**
241:21 242:8
**certificate**
274:3
**certified**
2:9,9
**certify**
274:9,15
**cetera**
227:8
**cfa**
16:7 275:10
**cfo**
145:12
**challenge**
39:7
**chance**
31:8 192:13
**chang**
3:16
**change**
18:8 70:8,9 93:8 103:9,21
114:25 117:13 124:19
133:2 152:10 227:11
235:12 236:15,16,20,22,23
237:8,10,16 238:16 239:7,8
240:6,21 247:14 269:17,19
**changed**
236:11 237:2 251:14
254:22 269:8
**changes**
55:13 56:23 58:2,6 70:6
121:5 123:5 124:18 125:5
152:16 157:21 175:11
236:13
**chapter**
1:7
**characteristics**
81:17 173:4,5
**characterizes**
259:23
**chart**
110:17 130:22 139:14,15
145:24 153:2 165:5 194:3
205:3 224:10,15,16,18,21
224:25 225:5,21 226:10,22
254:13,17,18,19 255:4
260:16,18
**check**
18:21 168:15
**chicago**
3:12 6:21
**circumstance**
78:23
**circumstances**
24:22 67:25 78:20 79:8

**circumstances (cont.)**
142:10 143:7 154:15
157:22 173:23 174:23
180:4 197:2
**citation**
121:23 260:4,5
**citations**
18:21 19:2
**cite**
11:2 109:2,20 133:9,16
134:2,10 145:2,19 147:10
151:14 182:15 184:9
242:25
**cited**
10:4,7 34:12 50:11 101:22
110:12 143:19 144:5
147:22 177:2 210:12,19
224:20 227:22
**citibank0007404**
166:10
**citing**
260:13
**claim**
41:8 156:6,11
**claims**
43:14,15,21 44:2,5,8,15
156:22 157:9,15 158:7
159:5,9,13,18,25 160:2
202:22 203:10,12 206:10
206:14,17,20,24
**clarify**
278:6
**clarifying**
210:6
**clear**
12:18 14:24 185:4 195:12
**client**
36:22
**clients**
37:7 180:11
**closed**
98:15
**closer**
13:9
**closing**
199:9,18 200:15
**clr**
1:24 274:22
**codes**
278:5
**collect**
45:10
**column**
147:5 266:19
**columns**
260:20,22,24

**[combination - contemplated]**

combination
146:17 155:11
combine
225:4
combined
28:14,17
comfortable
20:14 168.7 187:2,8
coming
173:17
commenced
203:12
comment
18:18
commentary
232:5,8,8,12
commenting
78:12 94:4,6
comments
18:11,14 19:6
committee
3:19 4:11 5:13 12:13 13:25
21:2 23:4,15,20,23 48:2
73:7 196:10,16,19 202:12
207:9 208:3 209:2,7,10
committees
22:24 23:2 208:7,8,11,14
208:17
comp
79:25 82:12
companies
27:9 28:17 56:14 57:2
77:12,25 78:4,8,13,15,17
78:22,24 79:15,20,25 80:3
80:11,12,25 81:5,9,18,23
82:2,5,8,12 83:14 90:7
93:12 99:22 177:7,11
company
23:17 28:14 35:23 36:2,17
47:4,5,9,20 70:18 73:22
77:20 79:9 83:19 100:9,25
101:16,17,20 109:6 127:18
129:24 137:16 138:10
152:14,17 154:9,12 168:6
172:23 173:2,4,10,20 174:2
175:19 177:11,15 180:19
180:21 191:14 228:16,22
230:5,7,9,25 231:20,22
246:6 249:9 250:19 256:18
257:23 263:3,10 264:9,14
276:5
company's
73:11 97:16 152:11 176:20
233:17,24 249:9 256:16
264:5

comparable
56:14,25 77:12,25 78:3,8
78:12,15,16,21,24 79:15,20
81:5,17,22 82:2,5,8 83:14
177:6,10,11
comparables
56:20
comparative
80:4
compare
139:8,24 141:14 143:8
186:9 226:12
compared
113:18
compares
171:12
comparing
205:17
comparison
141:21 225:25 266:18
compiled
224:18 225:21 265:20
compiling
224:24
complaint
25:14,19 26:9,13
complete
18:5 80:14,23 81:7,10,13
81:14 105:15 193:4
completely
118:11
completeness
105:21
complex
24:20 25:3 81:15,20
component
35:18,20 53:20,24 54:5
58:22 59:4 241:17,17
components
35:19 59:6 266:2
composite
172:2
comprehensive
141:12 218:8
comprised
128:24
comps
80:16
conceive
252:12
concerned
211:2
concerning
81:16 211:3 214:6,9 215:10
215:22 223:20

concerns
138:10
conclude
96:3
concluded
38:3,15 89:11 131:3 245:12
273:7
concludes
259:20
conclusion
39:4,6 86:11 131:5 132:16
141:15,16,22,23 143:9
149:13 150:2 212:13,15
221:8 233:11 238:22 262:3
262:4
conclusions
39:19 53:11 59:23 60:2
131:15 135:4 136:10
condition
165:12
conduct
45:20 165:15 180:14 189:7
190:13 217:6 267:12
conducted
51:4 181:10,15 229:18
248:20 258:6 261:11
263:19
conducting
172:15 180:2 256:15
confidential
104:12 275:24
confirm
51:22 54:13 69:12,15
212:13 223:19 234:3
263:20,25
confirmation
208:22 212:19,22 215:12
223:23
confirmed
10:21 212:8,15 264:4
266:20
conform
278:6
conjunction
27:11 78:5
connection
14:10 43:9 154:9 202:17
203:5,6 212:5 217:7 261:11
consider
46:24 73:7 81:12 87:3,9
106:8 115:2,6 124:13,23
126:7 137:4 155:6 156:9
173:17 175:22 180:4
193:17 208:18 209:10
212:4 215:15,20 270:8
271:12

consideration
85:23 105:20 115:18 121:3
121:4 125:3,17,19 126:9
164:5
considerations
81:15,20 125:5
considered
46:12,18,21 53:24 57:10
66:3,5 86:18 87:7,8 125:19
126:12 156:13 158:4 176:3
176:5 210:16,18,20,22
211:2 212:5 219:6 270:13
considering
125:14 135:9 195:3 206:13
250:17
consistency
138:15
consistent
37:16 53:18 63:8 69:19
71:11,20,25 72:7 74:15
127:17 142:3 146:4 170:13
221:6 229:21 245:20 260:3
consolidated
37:18 38:17 62:20 63:5
64:17 66:5,7 106:7 127:5
127:14,17 128:9,13,15,20
129:5,15 146:2,6,9,14,19
148:16,23 153:2,7 182:10
182:14 183:3,5,16,23,24
186:21 189:9,19 194:6
195:22 203:16 225:9,10
227:7
construct
21:16
consulting
227:15,16 242:13 277:4
consummation
38:22
contact
267:21
contain
16:23 17:11 68:16 230:25
245:22
contained
17:17 21:22 30:9 35:7
36:20 42:25 47:22,23 49:23
50:6 64:21 101:13 106:5
144:21 145:22 211:7 231:6
259:21 266:15 268:9
contains
54:7 59:22 70:12 193:2
cont'd
4:2 5:2 6:3 7:2 8:2 154:6
276:2 277:2
contemplated
95:14

[contemporaneous - creditor]

**contemporaneous**
20:13 22:5 46:8 48:6,11
134:16 173:7
**contemporaneously**
47:10
**contend**
256:21
**contents**
134:18 144:18
**contested**
24:3 28:5 158:9
**context**
22:2 27:15,23 28:23,25
42:7 43:19 59:11 68:13
69:2 74:24 119:25 135:16
149:18 170:17 196:15
229:5,6,11 243:24
**contingent**
155:21
**continue**
37:9 122:19
**continued**
272:16
**continues**
54:6 88:6
**contradicted**
48:13
**contribute**
128:21
**contributing**
128:12
**contribution**
129:14,17,19,21
**control**
57:9 85:13 86:3,19 87:5,10
88:3,10,12,13,14,16,18,23
89:7,12,16,19 96:21,24,25
97:4,8,9,16 99:11,14,16,20
99:21,24,25 100:3,7,9,20
100:23,24 101:5,9 130:15
130:20,22,25 131:5,6,8,11
131:17 132:14,20,23
157:21 200:19
**controlling**
98:8
**controls**
90:3
**conversations**
99:2,5 149:14,20
**conversion**
202:7
**converting**
194:23 195:7
**conveyance**
22:17 23:3,7,19,21,24 24:3
24:9,16,25 25:5 26:10,17

**conveyance (cont.)**
26:24 27:4 41:8,16 42:8
202:18 203:3,10,11
**conveyances**
25:11 41:6,24 42:14
**conveyed**
213:3
**cooperative**
20:4
**copies**
214:14
**copy**
16:15,17 53:3 90:24
**corner**
134:22 170:20 171:6
**corp**
10:15 20:7 34:5 52:15
62:19,23 63:25 64:6,10,24
65:3,9,19,24,25 66:6,12,15
66:16 67:3,7,16,22 68:2,5
88:18,22 89:7,18 90:4,8,20
91:2,24 103:23,25,25
105:25 106:20,25 107:5,19
107:22 108:7 110:2,23,25
111:3 113:3,11,22 114:3,11
115:7,8,11 116:7 117:4
118:4 119:4 120:16 122:8,9
122:15,24 123:13 125:14
125:16,25 126:3,8 127:5,6
127:14,14,19,22 128:10,15
128:20,22 129:6,12,16
130:6,9 132:16 146:2,7,9
146:13,15,24 148:6,16
153:7,15 154:18 159:24
160:8,14,19 161:6 164:15
165:3 166:4 178:24 182:14
189:9 192:23 195:14,19,25
196:6,22 197:5 203:16,17
203:22 205:3,6,18 226:17
226:18 227:7,11 228:6,11
229:19 242:15,20 247:18
247:20 275:12,16,19
276:15 277:5
**corp.'s**
66:18 68:8 107:2 123:15
153:3 182:10 186:21
189:19 271:18
**corporate**
112:6,10,19 113:6,18
115:20 137:13,18 138:2,21
164:13,23,25 165:3,6,8,12
215:6 224:11 229:3 234:14
234:15 246:14 247:16
262:6 271:9
**corporation**
1:5

**correct**
14:20 15:3,4 16:2,25 17:13
17:17,24 18:12 19:20 20:8
22:19,21 23:21 25:2 27:16
28:14,22 29:18 30:6 32:9
33:3,4,8,11,12,15 34:14,21
35:9 36:7 37:13,22 38:23
39:12,16,20 40:12 41:16,19
42:23 43:7 44:8,16 47:10
49:10,15 50:12 51:5,12
58:8 59:7,24 61:19 64:14
65:13 68:9 71:24 72:6
74:14,21 75:5,10,15 76:5
77:5,22,23 78:9 82:9,22
84:15 85:3,8,15 87:6,14
88:19 91:6 92:16 93:13
94:16 95:9 97:14 100:20
101:18 104:5 105:14
107:14,19 108:14,15
109:21,22,24 110:13 111:4
111:14,16,23 112:12,14
113:8,19 114:5,12 116:2,5
116:9 118:5 119:5,10
123:20 124:15 125:2,16
126:3 128:20 129:7 130:6
133:13 134:11,12 141:25
144:9,23 146:3,9 147:4,7
147:12 148:8 149:9 157:5
158:15,21 159:10,14
160:1 161:15 170:5,11
173:9 184:16 185:8,24
189:13 193:4 199:10,11
201:17,18,22,23 202:13
203:18,19 204:12,20
205:12,18,19 207:9 208:4
208:19,24 211:4 216:15
219:22 223:25 224:12,13
224:22 231:24 232:4,25
233:2,24 234:12 235:14,19
235:22 237:8 238:6,12,21
239:22,25 240:4,9,14,24
241:3 242:25 248:24
249:14 252:25 253:2
254:15 260:13,17,25
261:25 263:10,17,21 268:6
268:16,20,25 269:2,4
271:19,20,22 278:7
**correctly**
91:10 119:19 176:24
183:17 224:10 238:11
254:14
**corroborate**
267:18
**corroborated**
249:15

**cost**
169:20 170:7,25 171:2
204:7 226:18 243:17
244:21,24 245:5,9 247:14
253:5,6 254:9 257:17
**costs**
26:20,21 32:23 164:13,15
215:5 226:13 227:6,8,12
228:12,14 229:7,9,12,16,21
232:23,25 233:4,8,10,12
234:7,9,10,14,16,20,21
236:14 238:15,15,23,24
239:18,20,24 240:4,10,15
243:15,16 244:3,9,13
245:12,13,24 246:11,15
247:16,23 249:23 250:15
251:19 252:24,25 253:23
254:22,23,24 256:7 257:6,9
258:11,17 262:9,12,17,25
263:2,2 264:13 268:5,12,15
268:17,19 269:22,22
**counsel**
9:25 11:4 12:23 13:15,18
45:8,14,18,21,25 46:11,17
46:23 47:2,8,13 48:21 49:2
49:5 72:10,14,14,22 73:7
73:11 101:15 127:16,24
134:13,15 136:2 145:13
155:13 156:14 162:2,7,9
197:15,15,18 198:3,9,25
199:6,22 200:5 207:2
209:25 213:16,24 214:4,8
214:10 219:4 223:16
267:21
**county**
274:5
**couple**
83:3 137:8
**coupon**
110:17 139:11
**course**
11:22 80:5 88:21 98:24
99:10 135:23 136:22 156:9
**court**
1:2 12:8 25:20 44:11
146:13 233:21 264:18
**court's**
198:12
**cover**
182:2 221:3,3
**covered**
162:15,16
**credit**
93:12 95:7 115:13
**creditor**
184:15

**creditors**
3:4 4:12 5:14 12:13 13:25
22:24,25 23:4,15,20 158:6
196:10 201:9 202:12
208:23
**critical**
21:24
**critiques**
32:19
**critiquing**
37:20
**cromwell**
3:3 197:19 219:5,15
**crr**
1:24 274:22
**current**
14:18 15:10 94:17,18,19
95:15 110:3 178:23 194:3
194:12 202:2,3 209:11
**currently**
179:3 181:7 208:21
**curves**
70:13,14,17,21
**cut**
162:17 266:11

**d**

**damages**
27:21,24 28:4,10 44:7
**danielle**
5:24
**data**
10:11,24 55:5 56:8 58:25
160:13 180:2 219:20,24
220:12 224:17 225:3,7,20
225:21,23 232:6 233:16,17
233:24 234:5,6 237:22
238:4 248:9 256:16,18
259:4 265:15,20 266:3
276:24
**database**
271:25
**date**
16:8 19:13 33:25 34:7
38:16,20 39:2 40:21 50:25
52:17 84:9 85:2,8 89:4
90:22 102:7 104:13 109:8
134:7 144:3 147:19 154:19
158:21 160:8 166:7 181:22
189:23 192:6 195:5,8
199:15 205:13 237:23
238:17,18 242:16 260:10
278:3
**dated**
34:10 50:20,22 52:14,20
73:5 86:9 102:5 143:25
147:12,17 166:5 192:3,11

**dated (cont.)**
275:14,21 276:11,12,17,21
**dates**
15:22 33:6 49:25 56:15
73:19 199:15
**dating**
77:14
**david**
11:10 192:18
**day**
79:3 88:7 97:18,18 98:8,8
168:8 211:25 229:8,8
266:25 273:14 274:20
**dcf**
131:2 172:15,19
**dealing**
133:10
**deals**
182:23
**debenture**
6:12
**debt**
32:23 37:19 42:9 43:23
58:24 61:4,9,13,15,17 62:2
62:4,11 64:24 65:4,9,16,19
65:25 66:17 67:3,8,15,22
90:5,7 102:24 103:24 105:5
105:5,22,24 106:3,12,16
107:5,17,17 108:8,20 110:4
110:5,13,19,23 111:4,9,11
111:21 112:6,10,13,15,19
112:21 113:4,6,8,16,18,22
114:10 115:3,7,8,14,18,20
116:8,17,19,25 118:2,16
119:3,9,9,15,23 120:4,7,9
120:13 122:3,9,10,12 123:8
123:13 124:15,25 125:16
126:8 128:14,16,17 129:13
133:15,17,23 137:9 138:7
140:7 148:17,18,24 149:3,4
150:13 151:6 156:7 157:15
160:8,14,15,20 161:5,11
170:22 171:3,9,11,13,18,22
178:4,24,25 179:3,5 182:11
182:20,23 183:25 184:25
185:5,6 187:15 193:14
195:14,20,24 196:6 205:3,6
205:10,18,22 241:8 271:19
272:2,4
**debtor**
33:2,22 165:16,20
**debtors**
1:6 3:10 4:5 9:10 18:3
20:18,23 21:7,12 22:13
31:6,13,19,25 32:8,14,24
49:15 70:23 72:11,19 74:5

**debtors (cont.)**
75:23 84:8 98:17,24 101:16
101:20,24 163:13 209:25
219:10,14,24 224:17
227:21,22 248:7,14 249:3
256:21
**debtor's**
27:5,14 30:24
**debts**
27:5,10,14 85:7 196:17,22
197:6
**december**
33:2 50:20,22,23 51:5,7,9
52:16,21 90:21,25 101:21
108:16 109:7 122:21 131:9
131:18,23 153:3,4,7,8
154:19 157:11 166:5,12
192:11 275:16,19 276:6,17
**decides**
209:12
**decision**
67:9 116:18
**deck**
144:23 145:14,20 183:2,8
183:12,14
**declaration**
192:22,25
**declared**
120:23,25 151:18
**decline**
141:8 241:2,13,19
**declined**
164:16 206:5 239:20,25
242:2
**declines**
241:22 242:9
**decrease**
233:4 234:8 238:14 240:16
**decreased**
234:20 240:10
**decreases**
137:18
**deemed**
89:12
**defined**
143:5
**definitely**
55:9 78:4 174:4
**definition**
36:9 80:10 252:9,15,16
**definitively**
90:15 100:24 156:19 157:5
**degree**
241:21 242:8
**delaware**
1:3

**depend**
66:21 196:25 251:2,4
**dependent**
53:13 54:2
**depending**
174:22 238:16 244:21
**depends**
24:21 76:6,10 78:19 79:8
123:4 173:22
**depicts**
261:9
**deposed**
9:11 145:16
**deposition**
1:11 2:4 9:22 10:20,25 11:5
32:20 145:15 186:18
197:14 214:20,21 273:7
274:11,12 278:3
**depositions**
11:19,24 136:3 188:13
190:9
**depreciation**
71:17
**derivation**
71:13 172:6
**derive**
255:5
**derived**
141:15,16,23 259:12
271:21
**describe**
50:16
**describes**
228:6
**designated**
202:15
**detailed**
47:18 55:19 221:5 266:4
**details**
46:6
**determinant**
142:9,11
**determination**
46:5 69:24 149:22 245:19
**determinations**
35:8,14
**determine**
28:20 29:3 42:13,16 48:16
51:11,16 60:5 62:23 99:16
119:14 130:19 142:8
160:15 161:2 165:16 184:5
229:19 241:17
**determined**
57:6 60:11,16,25 61:17
246:18 247:20 257:12

**[determining - duff]**

**determining**
27:3 62:18 87:5 177:20
244:17 246:23 257:15
**develop**
13:12 45:4 49:10
**developed**
47:19 170:14 252:7
**developing**
15:19 46:18 49:20 50:19
52:25 86:19 121:19
**deviated**
228:22
**deviation**
60:19 62:15
**dialogue**
144:19
**differ**
36:7 48:19
**differed**
137:4
**difference**
100:2 107:23,24 113:7,9,10
113:16,24,25 114:2,6,17,18
114:22 117:7,12 128:12,19
131:3,4 132:3,10 235:5
238:12 239:5,11 254:25
**differences**
81:16 137:7
**different**
21:11 24:5,6 28:6,7,7,9
29:13,14,20 31:7 36:11
44:2 49:25 87:2 115:10,11
121:16 124:23 127:9
178:10 210:15 236:25
239:12,14 258:23 269:11
269:13,15 270:22
**differently**
95:16 250:8 255:14
**diligence**
186:25 187:7 189:7 190:14
**dip**
8:5
**direct**
34:24 38:7 162:10 164:15
179:17 225:15 226:12,18
233:8 234:7,16 236:14
238:15,23 239:20 243:17
254:23 255:4
**direction**
6:18
**directions**
277:9
**directly**
233:4,13 234:19 247:18
**director**
219:3

**directors**
6:19
**disagree**
64:9
**disagreed**
31:7
**disclaimer**
80:2,21
**disclose**
143:11
**disclosed**
83:7,9 106:16,21,22 129:25
130:23 143:15 167:2
180:25 270:12 271:4
**disclosing**
103:11
**disclosure**
89:10 93:6 195:2
**disclosures**
87:9 88:8 89:9 90:13 92:12
92:16,24 93:2,9 97:17
112:24 129:24
**discount**
28:22 29:5 59:17 75:14,17
75:25 76:4,15,21,25 77:5,8
85:24 86:10 99:24 110:4
137:21 138:24 172:7,18
182:13 187:16
**discounted**
71:5 76:5,15 77:11 176:7
**discounts**
55:23 57:4,10,11,14 112:3
**discovery**
11:22
**discuss**
57:11 173:7 182:5 242:25
245:21
**discussed**
51:9 99:7 146:7 195:2
213:15 243:3,12 248:13
**discusses**
151:17 184:14,19
**discussing**
86:22 94:20 218:3
**discussion**
14:7 44:4 45:21 48:25 56:8
56:11,12,21,22,24 57:3,8
57:13 75:4,6,7 85:22
104:12 133:17 134:5 178:2
178:4,7 181:21 182:2
196:17 200:5 275:25 276:8
276:19
**discussions**
14:14 22:3 54:20 55:12
134:17 149:22 155:12,13
156:13 196:19 198:7,9,25

**discussions (cont.)**
199:6,22 201:2 207:2
213:24 214:4 217:22,25
222:18 223:3,6 241:24
**disinterested**
6:19
**dispute**
159:21 253:21 254:3
**disputed**
29:12
**disputing**
29:16
**distressed**
140:7
**distributed**
122:7 123:13
**district**
1:3
**dividend**
116:8,14,14 120:13,23,25
122:24 124:3,14,24 125:15
126:7 148:2,5,7 150:14,15
150:17,21 151:7,8,16,17
154:10,13
**dividended**
120:3,9 122:18
**dividends**
89:17 116:12
**docket**
92:3,8,20 256:4
**document**
54:17 72:11 82:14 87:8
92:11,23 102:22 103:12,17
104:10,20,23 105:11
134:19,22 135:14,17,19,23
143:17,22,24 145:17
147:10 150:9 151:13
176:15,20 181:24 182:2
185:9 186:3 187:24 188:2,3
188:7 189:6 192:8,13,14,17
193:20,22,25 237:20
242:18,21 262:15 265:24
275:23 276:10,23
**documentary**
189:20
**documentation**
46:8 104:6 173:3
**documentations**
22:5 187:15
**documented**
222:14
**documents**
9:24 10:3,3,6,9,10,13,18,22
10:23,24 18:21,22 91:4
134:14 166:14 173:7
176:25 182:4 188:24

**documents (cont.)**
189:25 190:6,7,14,15,17,20
190:22 191:16 195:6
210:11,17,23,25 211:14,15
211:19 212:12,19 214:6,22
214:25 215:17 221:6 222:8
222:8 227:18,24 229:24
230:6,12,14,18,24 231:6,20
231:22 232:6 240:24 248:6
249:15,17,18 267:18
270:23
**doing**
74:4 121:3 127:19 135:6
175:14 236:11 266:17
**dollar**
23:16 142:20
**dollars**
114:5,22
**double**
18:21
**download**
141:3,4
**draft**
16:18 102:17 104:12
134:21 135:3 198:19,20,22
218:22,23 275:24
**drafted**
16:20 197:21,24
**drafting**
198:13,16 271:8
**draw**
233:11
**drawing**
187:19,21 233:14
**drawn**
233:23 235:7
**driven**
152:13
**driver**
70:24
**drivers**
21:21
**drop**
153:6
**due**
5:7 27:6,10,14 85:8 124:3
139:23 156:7 186:25 187:7
189:7 190:13
**duff**
20:13 21:5,22 34:9,16,25
36:20 37:12,16,21 38:2,11
38:14 39:19 47:20,22,23
49:9,19,24 50:4,11,16,18
51:3,8,15,19,22 52:13,19
53:4 54:11 55:21 56:20
57:6,10 58:7 59:10,10,23

**[duff - equity]**

**duff (cont.)**
60:4,10,24 61:15,17 62:6
62:12 63:9 64:3 68:22 69:7
69:21 70:3,5,11,18 71:3,18
72:6 73:12,18,22 74:3,13
74:21 75:9,14 76:13,15,21
77:2,9,19,21 78:5,8,12
79:15,20 80:18,20 81:25
82:2,8,15,18,22 83:15,17
85:12,18,22 86:24 88:4,8
101:8,21 102:18 103:5
104:4 106:15 127:18
130:23 131:14 132:6
149:14,20,22 150:5,7,9
151:11,22 152:2 166:2,11
166:25 168:17 169:23
170:11 171:21 172:12,25
173:9 174:25 176:3,19,24
177:5,13 186:9,12 203:23
204:6,8 275:14 276:14
**duff's**
173:5
**duly**
9:3 274:12
**duration**
138:22
**duties**
208:11,15

**e**

**earlier**
73:2 101:14 122:4 146:19
168:20 195:11,16,21 196:4
200:19 206:16 212:3
216:13 249:18
**ebitda**
71:9,13 167:14,19 185:10
185:13,20,25
**economic**
55:6 56:9 67:14 89:14
**edits**
198:7,8,24 199:5
**efch19308**
242:19
**efch19315**
243:5
**effect**
123:17,19 124:3 237:7
**effectively**
89:25 130:21 257:23
271:24
**effects**
85:16
**effort**
89:24 168:20 218:8 227:6
**efforts**
79:6

**efh**
3:19 4:19 6:18 7:19 10:15
20:7 33:10,14,18 34:20
38:4 39:15 57:19 60:6,13
62:7,13,19,23 63:25 64:6
64:10,12,17,23 65:3,9,19
65:23,24 66:6,12,15,16,18
67:2,5,7,16,22 68:2,5,8
69:18 74:5 76:14 77:10
84:24 85:7 86:5,8,12,15
87:4,12,16,20 88:8,17,22
88:22 89:7,18 90:3,8 91:2
91:23 92:12 102:6,18,22
103:6,17,23,25 104:3,11,18
104:25 105:5,9,22,24 106:2
106:12,20,25 107:5,16,18
107:22 108:7,20 110:2,22
110:25 111:3,10,11 112:6
112:10,13,19,21 113:3,4,6
113:11,16,18,22 114:3,15
114:11 115:2,7,7,11,14,18
115:19 116:2,7,8,9,25
117:4 118:2,4,16 119:3,9
119:14,24 120:4,10,12,13
120:13,15 122:3,8,9,15,24
123:13,14 124:15,25
125:14,16,25 126:3,8 127:5
127:6,14,14 128:9,15,20,22
129:6,12,16 130:6,9 132:16
135:10,15,17,19,20 136:15
146:2,6,9,13,15 147:18
148:4,6,16,23 149:19 153:3
153:7,15 154:17 157:11
159:24 160:8,14,19 161:6
161:10 162:8,11 164:13,15
164:23 165:3,8,12 169:3,9
178:24 179:14 180:25
181:21 182:2,10,14 183:3
183:19 184:10,24 185:5
186:21 189:9,19,21 193:12
193:18 195:14,19,25 196:6
196:9,16,22 197:5,13 199:9
200:15,22 203:16,17,22
205:3,10,18,22 206:13,15
206:19,23 207:7,9 208:3
209:9,11 212:11 221:10
222:20 224:11 225:4,8,16
226:13,17,18 227:7,11
228:6,11,18 229:19 230:3
239:20 240:24 244:4,7,9,11
244:16 245:11,23 246:14
246:22 247:18,20 250:8,18
252:24 253:4,21 254:9
262:4 271:18 275:22,23
276:13,18

**efh02367162**
192:4,9 276:22
**efhi**
113:21 278:2
**efh's**
107:7,14 108:3 139:6
183:23,24 187:4,10 190:12
190:21 254:14
**efih**
8:5,11 68:7,10 102:23
103:19 105:5,22 106:3,12
106:20 107:5,16 108:14,16
108:21 109:3,16 110:5,8,13
110:16,19 111:9,11,13,16
111:19,21 112:7,14,16,21
113:5,5,17 114:10 115:3,9
115:13,17,18,25 116:4,8,8
116:13,13,16,25 118:2,16
119:2,9,15,24 120:3,13
121:7,19 122:7,12 123:12
128:23 129:2,4 160:8 161:6
161:10 164:15 184:24
201:9 205:5 207:9 209:10
209:11 222:22,24 225:4
226:13,17,18 239:20
245:24 246:11,11 255:24
256:7,21 257:5,17,23
258:11,17 261:23 262:21
262:25 264:5 268:6,7,14,16
268:20,25 269:4,5,23
270:17,24

**efih's**
107:7,11 109:11 129:16,19
**either**
28:10 29:16 56:4 114:20
116:19 118:9 151:12
153:16 179:17 212:2
214:13 219:4,23 239:16
271:5
**electric**
19:25 20:3
**element**
36:4 58:18 81:6,6,21
**elements**
36:7 41:7
**eliminate**
115:5 118:11
**eliminated**
95:18 97:22 119:20
**eliminating**
115:2 130:19 131:7,11
**ellis**
2:5 3:9
**embedded**
88:3 100:10

**emil**
7:22 161:24
**employed**
60:4,20 64:3 71:18 72:6
77:9 132:6
**employee**
241:6
**ended**
90:21,25 109:7 275:19
276:6
**energy**
1:5 30:13,17 52:14 90:19
109:5 134:6 162:9 166:3
192:23 242:14,19 275:15
275:18 276:4,8,15 277:5
**engaged**
63:14,20
**engagement**
207:12,17,21
**enterprise**
49:17 51:11,19 61:18 62:2
62:5,11 64:17 86:6 103:18
130:21 131:3 145:25 147:3
176:16 183:3,5,13,23 186:4
186:8,9,12
**entirely**
92:15
**entities**
10:17 115:12,23 165:16,20
221:10 228:15,15 257:21
**entitled**
52:14 102:22 103:17
104:10 134:5 143:22,24
166:3 181:20 198:21
242:14 275:15,23 276:7,10
276:15,18 277:5
**entity**
63:13,19,22 64:13 66:12,15
106:22 124:21 127:7 129:4
146:14 164:24 165:3,6
186:24,24 229:8
**entries**
226:19
**entry**
225:14
**environmental**
55:6 56:9
**equal**
118:23 119:20 123:6,16
137:19,20 138:3,4
**equity**
7:19 47:6 52:15,20 60:6,13
60:16,17 61:22,24 62:7,13
62:18,23,24 63:6 66:18
67:4 98:18 100:12 101:3
102:17 104:24 105:4,9

**[equity - factors]**

**equity (cont.)**
107:18 114:3,11 117:3,13
118:4,18,25 119:3 120:15
122:23 123:15 129:6 130:5
130:9 132:24 148:14
152:10 162:8,10 166:4,11
170:23,25 171:7,8,11,13,22
179:14,15,17,18,19 180:8
180:10,14 183:7,14,19
186:20 189:12,17 272:3
275:16 276:16
**equivalent**
41:13,15,19,21 42:18
161:12 253:22 254:8
**eric**
223:14
**errors**
278:7
**especially**
129:22
**esq**
3:7,13,16,23 4:8,15,22,23
5:10,17,24 6:9,15,22 7:9,16
7:22,23 8:8,14,20
**essential**
249:13
**essentially**
212:9
**establishing**
250:19
**estate**
208:11
**estimate**
35:24 155:24,24,25 183:22
**estimated**
62:5 147:3,6
**estimates**
35:6
**et**
1:5 227:8
**ev**
102:23
**evaluate**
21:15 44:22 71:12 74:6
83:15 105:12,20 168:21,23
194:7,13,19 199:8,14,18
200:14 201:16 203:9
236:13
**evaluated**
39:5,8 40:3,8,18,22 41:3
42:6,8 159:22 179:6 194:15
197:4 206:17
**evaluating**
202:22
**evaluation**
19:2 128:8 203:12 206:10

**evaluations**
211:6
**eventually**
46:12
**evidence**
98:10
**exact**
39:2 53:11,22,24 117:15
140:24 259:16
**exactly**
266:4
**examination**
9:6 154:6 161:20 197:10
209:21 275:4,5,6,7
**examined**
9:4 194:24
**example**
46:6 47:18 56:2 58:24
59:17 73:10 83:13 89:10
106:24 138:23 140:17
148:13 185:21 272:15
**examples**
46:10
**exceeded**
61:18 62:11 183:24
**exceeds**
128:18 193:15
**excerpt**
260:17
**excerpted**
260:19
**exchange**
97:21 163:19
**exchanges**
122:10
**exclude**
130:3,10 186:6 206:25
**excluded**
79:23 82:11 225:14,18,19
225:20,24 226:10,17,24
**excluding**
127:20,22 184:10 185:10
185:16,19 225:11
**excuse**
170:2 196:12
**executive**
53:6 54:7 135:8
**exercise**
53:14 54:2
**exhibit**
16:5,6,12 19:9,11 34:5,17
35:2 38:10 52:12,13,19
53:5,9 54:6 57:25 58:12,17
59:21 68:15 74:11 79:14
81:24 82:15 85:18 90:18,19
90:24 102:4,10 104:9,10,16

**exhibit (cont.)**
104:17,18,20 109:5,11
121:9 134:3,4,9 136:7
143:23,24 147:4,15,16,21
164:9 165:24 166:2,9,17
169:13,15,16,16,19 176:6
181:19,20,24 182:8 186:18
191:25 192:2 210:5,8,9
237:19,20,25 242:12,13
259:9 260:7,8 270:15 271:7
275:10,12,14,18,21,23
276:4,7,10,12,14,18,20,23
277:4,7
**exhibits**
166:13 275:9 276:3 277:3
**exist**
66:23 119:3,6 156:23
158:19
**existed**
136:25 159:5,10
**existence**
139:8 206:10
**exists**
48:10
**expect**
178:19
**expectation**
142:23 217:19
**expectations**
55:14 168:6
**expenditures**
74:13
**expenses**
224:10 230:21 241:2,5,8,13
241:22 242:9 256:22 262:6
**expensive**
26:17
**experience**
23:25 26:8 28:4 30:2
217:18 243:23
**expert**
11:19 12:5,19 13:7,14
14:25 15:25 16:4,6 29:22
30:3,13,17,19 31:13,14,15
31:19,19,22 43:9,19 56:7
93:15 162:23 163:2,5,7,9
164:8 166:15 168:16
177:18 182:5,7 186:18
187:3,9,19,21 188:4 193:23
194:2 195:18 202:12,15
208:19 223:15 229:14
230:13 231:7,9,14,23,25
232:4,8,10,12,16 235:17
248:20 253:3 258:19 259:2
263:19,24 265:6 271:12
275:10

**expertise**
30:25 230:17,19 231:17
248:15 258:9,15 265:13
**experts**
26:24 28:10 29:16,20 30:24
31:7,13,25
**explain**
131:10 234.9
**explained**
88:5
**explicit**
56:10 57:3,13 66:20 75:6
78:11 79:24 98:25 128:5
**explicitly**
72:18 83:9,23 92:10 99:13
126:12 143:15 196:2
**exposure**
93:12 95:7
**express**
186:19 187:2
**expressed**
219:7,18
**expressing**
163:17,23 164:3 188:4
190:25 194:17
**extends**
195:4
**extent**
31:6 32:3 107:16 113:4,23
114:16 123:12 128:17
129:5 137:4 146:7,10,12

**f**

**face**
37:19 61:14,15 114:7
115:14 118:22 148:16,23
149:4 150:12 151:6 182:10
183:24
**fact**
11:23 62:10 69:20 88:17
96:12 114:10 118:21
161:14 198:16 248:11,21
249:6 254:8 257:22 263:21
264:15
**factor**
103:24 117:14 129:11
138:24 156:17,19 157:4,5
159:2 172:24 173:2
**factored**
156:16 157:7 172:17,19,22
180:6 181:7 193:21
**factors**
56:15 132:9 137:15,16
138:6,10,12,17,19 139:5
142:21 152:15 173:16
206:5 241:11,12 243:17
245:18,21

**[facts - francisco]**

**facts**
24:17,22 78:19 79:8 117:17
143:7 173:22 174:23 180:4
193:3,4 196:25 213:25
214:5,8 219:6,9 278:6
**factual**
196:21 199:24 213:3
232:14
**factually**
24:9,14 25:2
**fail**
152:2
**fair**
9:15,19 32:15 40:25 60:3
61:8,13,14,16 89:5 105:10
107:6,11 108:2 111:7,8,12
113:21 114:6,15 117:4,8
118:22 127:3 129:16 133:3
137:19 145:18,24 146:12
148:17,24 164:4 176:11,14
182:12,19,20 193:14
220:22 227:13 228:7 235:8
259:18,20 260:2 262:15
**fairly**
152:12 259:23
**fall**
131:12
**familiar**
30:18 44:10,13 175:5,7
178:23 180:7 222:5,9
**familiarity**
29:24
**family**
224:11 246:15
**far**
24:6 32:21 120:6 217:23
244:19
**february**
52:14,20 86:9 102:11
104:11 166:5 182:3,9
183:19 187:23 275:15,24
276:17
**fees**
163:12,16,19,20 164:2,5
268:23,24 269:4,9 270:2
**feld**
5:4
**felt**
228:16
**fernandez**
7:23
**fewer**
234:16
**fidelity**
6:6

**fiduciary**
208:3,11,15
**field**
272:5,13
**fifth**
53:8 55:16
**figure**
18:19 106:14 108:11,13,18
109:2,21 111:14 112:5
114:4,9 115:4 118:13
129:18 130:15,20 132:15
133:4 139:18 140:15 146:5
152:21,24 205:10 224:7
226:20 235:8,9,13 237:22
238:4,11 239:19,20 241:14
248:9 254:12 259:7,13
261:8 268:3,13 269:21
271:15 276:25
**figures**
129:18
**filed**
44:11 158:14
**filing**
25:14,18,22 26:9,13 160:3
163:14
**filings**
18:23 87:10 88:9 90:13
92:13 95:24 96:2,8 106:5
106:17,23 116:24 121:21
129:24 160:18 180:22,24
184:4
**final**
166:2 247:11,12 276:14
**finalized**
134:25 135:2
**financial**
7:7 12:14,23 23:14 29:8
55:20 65:15 67:13 73:16
81:16 152:11,16,18,19,19
165:12 175:11 196:12,14
207:6,8 208:16 271:24
272:2
**find**
19:3 102:17 256:16 266:24
**fine**
153:25
**firm**
12:15 162:2 180:12 192:10
196:14 207:6,8,12,14
**firms**
180:14
**first**
4:11 8:5,17 13:10 30:22
53:9 72:22 73:10,20,25
77:20 91:22 102:16 122:7
122:25 124:4,25 127:3

**first (cont.)**
145:21 148:3 155:2,19
164:19 182:18 191:9
192:12 203:15 207:25
208:2 227:4 247:13 256:10
256:12 261:17 266:18
268:8
**fiscal**
90:20,25 109:7 275:19
276:5
**five**
110:24 211:16 220:25
**fixed**
139:22 140:18
**fledged**
190:25
**flow**
71:6 74:20 76:5 77:11
84:19 167:8 176:7,8 177:23
**flows**
76:7 176:4 177:25 230:20
**focus**
63:23 262:18
**focused**
11:13 43:22 84:10,21 89:3
126:13 140:9,10 208:14,15
225:23 228:25 261:21
**foerster**
5:12
**follow**
195:10 200:9
**followed**
228:19,20
**following**
38:21 80:5
**follows**
9:5 145:8 154:5
**footnote**
152:8 259:10
**footnoted**
152:7
**force**
87:17,21
**forced**
116:8 120:13
**forces**
55:6 56:9
**forecast**
177:24
**forecasting**
163:2
**form**
16:19 18:17 20:9,10,19
24:11,12 25:16,25 26:19
29:19 30:7 32:16 36:8
39:21 41:2 43:16 44:21

**form (cont.)**
46:14 47:19 48:24 51:13,24
52:8 59:8,14,18 63:2,15
64:11 65:10 69:9,11 70:19
71:14,21 72:2,9 73:13,23
74:4,18 75:24 78:10,18
83:8,22 84:16 87:23 90:10
90:19,24 93:21 95:3 96:22
97:5 98:5,19 105:18 109:3
109:5,12 116:10 117:5
118:19 119:17 120:19
123:2 129:9 132:18 150:22
178:14 187:5,11 196:11,24
198:6 199:13 211:8 220:3,9
220:14,20 221:18 231:10
232:13 236:18 238:8
240:11 242:4 245:6 248:18
251:21 257:7 258:13 265:8
275:18 276:4
**forma**
28:15,18
**formal**
32:18,21,22 36:19,23,24
37:3,5 77:6 79:24 82:12,25
101:12 169:10 173:12
177:3
**formalize**
173:13
**formalized**
75:11
**formed**
37:23 39:23 40:4,9 41:20
59:12 74:11,19 75:8,17
76:12 85:4,9 95:4 103:6
181:17 242:10
**forming**
126:10 210:20 219:6,17
270:8,10
**forth**
209:15 215:23 216:4,10
220:19 223:24 248:16
263:9 274:11
**forward**
99:8 201:4,8 252:6
**foteini**
8:8
**found**
10:23
**four**
13:9 35:2 73:4 83:18 187:4
187:10,23 188:5,15,19,22
189:3,8 203:15
**francis**
4:15
**francisco**
3:15

**[frank - high]**

**frank**
6:5
**frankel**
8:10
**frankly**
214:18
**fraudulent**
22:17 23:3,6,19,21,24 24:2
24:9,16,24 25:5,11 26:10
26:17,23 27:4 40:2,11,17
40:24 41:6,8,15,24 42:7,14
63:12,18 161:6 202:18
203:3,9,11 253:16
**fried**
6:5
**front**
16:12 85:19 102:9 109:10
121:7 166:9
**full**
20:20,22 21:3,6,8,11,16,19
21:24 22:12 30:22 47:18
52:10 56:5 58:10 59:12
83:10 84:19 123:22 125:4
125:20 126:10,11 148:12
164:11,18,20 178:13,17,21
178:22 190:25 191:4 201:9
204:2,10,18,23 208:23
209:13 227:4 232:18 236:5
255:13,15
**fully**
39:5,22 59:18 71:12,21
72:9 74:18,25 83:22 108:7
168:21,23 170:14
**function**
26:2,3,6 112:2 239:16,17
**fund**
7:5
**funds**
162:8
**further**
110:4 154:5 190:13 209:19
273:4 274:15
**furthermore**
89:14
**future**
1:5 36:2 37:10 52:15 90:20
109:6 134:6 162:9 166:3
192:23 242:14,20 275:15
275:18 276:4,9,15 277:5
**fv**
149:3

**g**

**gain**
155:9
**garbled**
76:19

**garrison**
4:10
**gas**
29:23,25 30:3,5,11 70:13
162:24 163:3 175:5,12
**gathering**
45:23
**geared**
28:16
**general**
55:5 56:8 57:23 89:25
106:13 180:16 217:10
241:4 243:14 253:25
**generally**
10:12 44:13 50:25 57:20,21
58:15 63:22 76:24 77:14,16
79:2 98:20 99:6 121:21
141:17,23 155:23 163:15
171:2,4 174:20 175:7
176:24 180:9 190:10
201:10 238:11
**generated**
222:6,9
**generation**
19:25 20:3
**george**
4:23
**getting**
156:4 198:16,19 199:21
200:6 207:20 266:5
**give**
115:13 149:2
**given**
23:25 36:22 47:12 69:20
72:3,8 88:11 141:7 168:5
174:10 191:22 237:6
274:13
**giving**
49:5
**go**
18:20,23 55:3 67:5 68:2,9
99:8 121:12 166:17 170:18
171:24 172:5 175:16 178:3
193:6 201:4,8 202:10 214:6
215:2 221:24 224:5 232:18
234:18 235:13,16 236:4
239:19 241:5 243:4 245:18
246:25 247:8 254:12 259:7
260:15 262:7 268:3 271:15
**goes**
80:25 91:18 92:3 155:6
244:19
**going**
35:25 57:18 75:22 113:6,15
117:9 126:16 148:8 153:20
162:17 165:23 178:9

**going (cont.)**
181:18 191:24 198:10
200:9 209:4 213:17 214:12
215:3 223:18,20,22 232:21
237:18 238:5,23 242:11
260:6
**goldman**
148:15 162:3,5,12 163:12
163:18 164:4 165:17,21
181:10
**good**
9:8 161:22,23 209:23 210:3
**gordon**
166:22 167:10 168:11
**grade**
93:19 94:2,9,16,25 95:8
96:4,15,19 97:13 98:3
**grand**
4:6
**gratuitously**
196:22
**greater**
62:5 128:10 131:20 253:6
253:10
**gregory**
8:14
**ground**
20:17 57:19 162:16
**group**
5:20 14:19,21 194:5 242:14
271:10 277:4
**growth**
74:23 75:5 166:22,24
167:10,21 168:2,5,9,11,24
169:6
**guarantee**
66:16
**guaranteed**
65:25 67:3 195:14,20,24
**guarantees**
64:23 65:3,6,22 66:22
**guarantor**
193:13
**guggenheim**
14:4,5,7 15:14 99:2 201:3,7
**guiney**
6:15
**gump**
5:4
**guys**
126:17

**h**

**half**
186:2 238:20
**hand**
134:22 170:20 171:6

**hand (cont.)**
193:13 274:20
**handles**
164:24
**hands**
68:2,9
**hanging**
210:4
**happen**
35:25
**happened**
119:23,25 120:8 160:21
230:22,24 237:16 239:8
**hard**
48:9
**harris**
6:5
**hauer**
5:4
**head**
38:8 272:14
**header**
91:20,23
**health**
152:11,17,18
**heard**
18:11
**hearing**
215:12 223:23
**heat**
70:13 163:5
**hedged**
176:9
**hedges**
175:6,9,20,21,23,25 176:12
176:14,21,25 177:6,12,14
177:18,24
**hedging**
175:8
**held**
2:4 67:5 98:17,21 100:9
105:22,24 106:3,12 107:5
107:16 108:20 110:5,13
111:10,11,21 112:14,16,21
113:4 115:3,18 116:9,25
118:2,16 119:9,15,24 122:3
122:12,20 160:8
**helped**
16:18
**helping**
13:14,18 234:9
**hereunto**
274:19
**high**
22:21 55:25 131:13,16,21
131:25 132:5,10,15,21,23

**high (cont.)**
201:8
**higher**
111:22 119:4 142:17 171:2
171:8 174:14,16
**highlight**
127:4
**hire**
28:10
**historical**
55:10
**hoc**
4:11 5:20 194:5
**hold**
30:2,19 115:13 121:15
162:8 229:14
**holders**
87:17,21
**holding**
109:6 257:23 276:5
**holdings**
1:5 52:15 89:13 90:20
106:18,19,25 107:3 110:18
110:22,22 134:6 162:9
166:3 179:19 183:8,14
192:23 242:15,20 275:15
275:18 276:9,15 277:5
**holds**
114:10 162:10
**holtz**
207:15 218:24
**hooper**
8:20
**horowitz**
8:14
**hour**
218:9,10
**hours**
15:18,23 216:14,16 217:5,8
217:11,15,17,19 218:14,16
218:17
**house**
106:9
**howard**
192:23
**huh**
66:13 106:10 108:12 122:5
139:19 193:11
**hundred**
15:21 217:15
**hundreds**
216:14,16
**hunt**
14:19,21 15:14 100:19
101:3 194:6,6 201:15,20,25

**hunts**
15:7 100:22
**huron**
227:15,16,20,25 242:13,22
242:24 243:21 245:22,25
246:10,10,13 249:7,12
277:4
**huron's**
228:23 229:22
**hypothetical**
115:21 251:6,17,22 252:2,5
**hypothetically**
251:14

**i**

**idea**
65:18 105:8 194:23
**identical**
80:5,11,13
**identification**
16:8 34:7 52:17 90:22
102:6 104:13 109:8 134:7
144:2 147:18 166:6 181:22
192:5 237:23 242:16 260:9
**identified**
43:21 44:3 46:20 56:20
134:15 145:17 160:18,19
160:20
**identifies**
54:10
**identify**
214:14 219:16 220:17
**identifying**
81:5,22 100:22 157:6 177:6
**illinois**
3:12 6:21
**illustrate**
235:24
**illustrated**
262:23
**imagine**
32:5 37:9
**immediately**
38:21 39:10 140:13,22
**impact**
48:19 60:5,12 62:12 64:4
64:10 66:18 107:18 114:2
114:23 117:2,12,15,20
118:2,12,17,24 119:9,14
120:15,20 122:23 123:14
128:14,19 130:5 132:10
135:3 137:13 138:20,22
146:8,11
**impacting**
114:11,14 138:18
**impaired**
123:11 185:3

**impairment**
142:14 153:12
**implemented**
91:24
**implications**
178:5
**implicit**
67:6 113:9 118:21 128:7
168:2,12
**implicitly**
196:2
**implied**
100:12 101:3 140:4 142:15
142:17 143:12,14 169:5
184:11 186:4,8 201:20
**implies**
146:20
**important**
16:23 17:10 69:23 141:13
208:16 266:6
**improper**
214:19
**inability**
18:18
**inaccuracies**
266:24
**inaccurate**
89:6 142:11 241:24
**inappropriate**
88:4,17 251:15
**inception**
207:17,18
**include**
31:4 38:18 63:7 64:18 81:5
81:6,11,21 99:10 108:20
112:15 113:2 156:3 183:2
222:22 226:6 235:21
255:18 260:20,22 272:16
**included**
40:6 82:11 99:16 101:6
222:20
**includes**
100:20 112:13,20 130:22
219:25
**including**
55:5 56:8 60:20 91:25
129:12 155:21 217:6
226:13 227:15 268:19
272:2
**income**
68:17,22 69:6 77:17 81:11
110:2 203:21 204:3
**inconsistency**
142:5 262:20
**inconsistent**
252:19 262:21 263:3,9

**inconsistent (cont.)**
264:8,14 265:11
**incorporate**
177:25 272:9
**incorporated**
198:12
**incorrect**
263:15
**increase**
137:17,20 138:12 232:22
232:25 234:9
**increased**
164:12 205:12,18 234:10
234:21 240:4,15
**increasing**
137:25
**incurred**
15:23 234:15,17
**incurrence**
164:14
**incurring**
229:9
**indenture**
4:18 5:5
**indentures**
157:14
**independent**
20:21,23 21:17,19 22:12
52:11 69:17 75:23 82:23
83:4 97:21 204:21 229:23
248:10 258:6 264:3
**independently**
9:23 20:7
**index**
275:2 276:2 277:2
**indicate**
103:12 138:16 142:16
151:15 229:25 262:19
**indicated**
150:10 249:10
**indicates**
142:20 150:16 151:14,25
**indicating**
99:18 107:22 182:13
**indication**
100:5 154:17 156:16
178:18 191:10
**indicative**
98:14 107:21 108:6
**indicator**
143:3
**indicia**
117:18 124:11 126:4,6
133:8,9 136:12
**indirect**
179:19 243:17