# Exhibit D

Page 1

1           DAVID YING
2 UNITED STATES BANKRUPTCY COURT
3 FOR THE DISTRICT OF DELAWARE
---------------------------------------------x
4 In Re:
5 Energy Future Holdings Corporation, et al.,
6           Debtors.
7 Chapter 11
8 Case No. 14-10979
9 Jointly Administered
10 ---------------------------------------------x
11        DEPOSITION OF DAVID YING
12          New York, New York
13            October 19, 2015
14
15
16
17
18
19
20
21
22
23 Reported by:
24 KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25 JOB NO. 99137

Page 2

1           DAVID YING
2          October 19, 2015
3
4       Deposition of DAVID YING, held
5 at Kirkland & Ellis LLP, 601 Lexington
6 Avenue, New York, New York, before Kathy
7 S. Klepfer, a Registered Professional
8 Reporter, Registered Merit Reporter,
9 Certified Realtime Reporter, Certified
10 Livenote Reporter, and Notary Public of
11 the State of New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1           DAVID YING
2         A P P E A R A N C E S:
3
4 SULLIVAN & CROMWELL
5 Attorneys for E-side Official Creditors
6      125 Broad Street
7      New York, New York  10004
8 BY:  JOHN HARDIMAN, ESQ.
9      JOHN LIOLOS, ESQ.
10
11 KIRKLAND & ELLIS
12 Attorneys for the Debtors
13     300 North LaSalle
14     Chicago, Illinois  60654
15 BY:  BRENTON ROGERS, ESQ.
16     601 Lexington Avenue
17     New York, New York  10022
18 BY:  JUSTIN SOWA, ESQ.
19
20
21
22
23
24
25

Page 4

1           DAVID YING
2       A P P E A R A N C E S:  (Cont'd.)
3
4 KRAMER LEVIN NAFTALIS & FRANKEL
5 Attorneys for EFIH 2nd Lien Note Trustee
6     1177 Avenue of the Americas
7     New York, New York  10036
8 BY:  P. BRADLEY O'NEILL, ESQ.
9
10 MONTGOMERY McCRACKEN WALKER & RHOADS
11 Attorneys for EFH Committee
12     123 South Broad Street
13     Philadelphia, Pennsylvania  19109
14 BY:  LATHROP NELSON, III, ESQ.
15
16
17 SHEARMAN & STERLING
18 Attorneys for EFIH, First Lien DIP Agent
19     599 Lexington Avenue
20     New York, New York  10022
21 BY:  FOTEINI TELONI, ESQ.
22
23
24
25

Page 5

1          DAVID YING
2       A P P E A R A N C E S:  (Cont'd.)
3
4  PAUL, WEISS, RIFKIND, WHARTON & GARRISON
5  Attorneys for Ad Hoc Committee of First Lien Lenders
6      1285 Avenue of the Americas
7      New York, New York  10019
8  BY:  NOAH MAMIS, ESQ.
9
10 NIXON PEABODY
11 Attorneys for American Stock Transfer as Indenture
12 Trustee at EFH
13     100 Summer Street
14     Boston, Massachusetts 02110
15 BY:  RICHARD PEDONE, ESQ.
16
17 AKIN GUMP STRAUSS HAUER & FELD
18 Attorneys for UMB Bank, As Indenture Trustee for the
19 Unsecured 11.25 Percent/12.25 Percent Senior Toggle
20 Notes Due 2018
21     One Bryant Park
22     New York, New York  10036
23 BY:  CHRISTOPHER CARTY, ESQ.
24
25

Page 6

1          DAVID YING
2
3       A P P E A R A N C E S:  (Cont'd.)
4
5  MORRISON & FOERSTER
6  Attorneys for Official Committee of Unsecured
7  Creditors for TCEH
8      250 West 55th Street
9      New York, New York  10019
10 BY:  ERICA RICHARDS, ESQ.
11
12 MUNGER TOLLES & OLSON
13 Attorneys for the TCH Debtors
14     355 South Grand Avenue
15     Los Angeles, California  90071
16 BY:  EMILY BUSSIGEL, ESQ. (Telephonic)
17
18 WACHTELL, LIPTON, ROSEN & KATZ
19 Attorneys for EFH Equity Owners
20     51 West 52nd Street
21     New York, New York  10019
22 BY:  ALEXANDER LEES, ESQ.
23
24
25

Page 7

1          DAVID YING
2       A P P E A R A N C E S:  (Cont'd.)
3
4  WHITE & CASE
5  Attorneys for the Ad Hoc Group of
6  TCEH Unsecured Notes
7      1155 Avenue of the Americas
8      New York, New York  10036
9  BY:  DANIELLE AUDETTE, ESQ.
10
11 FRIED, FRANK, HARRIS, SHRIVER & JACOBSON
12 Attorneys for Fidelity
13     One New York Plaza
14     New York, New York  10004
15 BY:  JOCELYN RYAN, ESQ.
16     ALYSA AIN
17
18 WILMERHALE
19 Attorneys for Delaware Trust Co. as Indenture
20 Trustee
21     7 World Trade Center
22     New York, New York  10007
23 BY:  PHILIP ANKER, ESQ.
24     DAVID GRINGER, ESQ.
25

Page 8

1          DAVID YING
2       A P P E A R A N C E S:  (Cont'd.)
3
4  REED SMITH
5  Attorneys for The Bank of New York Mellon, as
6  PCRB Trustee, and The Bank of New York Mellon
7  Trust Company, as EFCH 2037 Notes Trustee
8      599 Lexington Avenue
9      New York, New York  10022
10 BY:  SARAH KAM, ESQ.
11
12 PATTERSON BELKNAP WEBB & TYLER
13 Attorneys for the Law Debenture
14     1133 Avenue of the Americas
15     New York, New York  10036
16 BY:  BRIAN GUINEY, ESQ. (Telephonic)
17
18 PROSKAUER ROSE
19 Attorneys for EFH at the direction of the
20 Disinterested Directors
21     Three First National Plaza
22     Chicago, Illinois 60602
23 BY:  PAUL POSSINGER, ESQ. (Telephonic)
24
25

Page 9

1         DAVID YING
2
3     A P P E A R A N C E S:  (Cont'd.)
4
5  BROWN RUDNICK
6  Attorneys for Wilmington Savings Fund
7  Society as Successor Trustee
8     One Financial Center
9     Boston, Massachusetts 62111
10 BY: JONATHAN MARSHALL, ESQ. (Telephonic)
11
12 VENABLE
13 Attorneys for Pimco
14    Rockefeller Center
15    1270 Avenue of the Americas
16    New York, New York 10020
17 BY: JEFFREY SABIN, ESQ.
18
19
20 ALSO PRESENT:
21    MARK RULE, AlixPartners
22
23
24
25

Page 10

1              DAVID YING
2  DAVID YING, called as a
3     witness, having been duly sworn by a Notary
4     Public, was examined and testified as
5     follows:
6  EXAMINATION BY
7  MR. ANKER:
8     Q.   Good morning, Mr. Ying.  My name is
9  Philip Anker.  I'm with Wilmer Cutler Pickering
10 Hale & Dorr.  We are counsel to Delaware Trust
11 Company as Indenture Trustee for the EFIH First
12 Lien Bonds.
13          Before I begin questioning you, I
14 believe counsel for the EFH Official Committee
15 wanted to make a statement on the record.
16          MR. HARDIMAN:  I just want to state on
17 the record that, on behalf of the EFH
18 Official Committee, we reserve the right to
19 recall Mr. Ying in the reinstatement phase
20 of discovery, and to the extent he is being
21 offered today only once, we object to that;
22 we don't think that is consistent with the
23 court's ruling.
24          MR. ROGERS:  Obviously, we disagree
25 with the EFH Committee's position and

Page 11

1              DAVID YING
2  believe you should ask your questions about
3  feasibility today.
4          MR. PEDONE:  And on behalf of American
5  Stock Transfer, as Indenture Trustee, we
6  join in the Committee's comments, and we
7  note that the documents requested have not
8  yet been produced.  We can deal with this
9  later.
10          MR. ROGERS:  All documents responsive
11 to the requests have been produced.
12 EXAMINATION BY
13 MR. ANKER:
14    Q.   Mr. Ying, with that, let me begin.
15 You have been deposed a number of times, so I
16 don't propose to waste your time or the time of
17 any other counsel around the room by going over
18 the ground rules, but obviously if at any time
19 any question I ask you you don't understand,
20 please just let me know and I'll rephrase it.
21          If at any time you want to take a
22 break, just let me know.  If there's a pending
23 question, I will ask you to answer it before the
24 break, but otherwise, happy to accommodate you.
25          Mr. Ying, I'm just going to spend a

Page 12

1              DAVID YING
2  couple of minutes on background.  By whom are
3  you employed, sir?
4     A.   Evercore.
5     Q.   What has Evercore's role been in
6  this -- these Chapter 11 cases?
7     A.   We're the financial advisor to the
8  debtors.
9     Q.   And how long has Evercore been
10 involved in these restructuring efforts?
11    A.   We were retained by EFH back in the
12 middle of 2012.
13    Q.   You say you were retained by EFH.  I
14 take it you have done work as a financial
15 advisor with respect to the restructuring of not
16 only EFH, the parent, but also of its myriad
17 subsidiaries, including EFIH; is that right,
18 sir?
19    A.   Yes.
20    Q.   And I take it given the amount of time
21 you have been, that is, Evercore has been
22 involved with these restructuring efforts, it
23 has become familiar with the financial condition
24 of each of the debtors?
25    A.   Yes.

Page 13

DAVID YING

1
2  Q.   What role have you, Mr. Ying,
3  personally had in these efforts?
4  A.   I'm the senior partner at Evercore who
5  is responsible for this project, and I have at
6  any point in time, you know, half a dozen
7  bankers reporting to me, analyzing and working
8  on various aspects of the assignment.
9  Q.   So it's fair to say that you
10 personally are -- have become familiar with the
11 financial condition of each of the debtors,
12 correct?
13 A.   Yes.
14 Q.   Mr. Ying, you are here to testify
15 today, am I right, regarding an expert report
16 that you have furnished in connection with plan
17 confirmation proceedings?
18 A.   Yes.
19      MR. ANKER:  I'm going to mark as an
20 exhibit that report.  I think we've been
21 marking exhibits, at least in the
22 depositions I've been at, with reference to
23 the witness.  So this is marked as Ying 1.
24      Let me hand a copy to the court
25 reporter and to Mr. Ying and his counsel.

Page 14

DAVID YING

1
2  BY MR. ANKER:
3  Q.   Mr. Ying, you're obviously free to
4  look at it, but my first question is can you
5  identify the document that I have handed you?
6  A.   This is the expert --
7      MR. PEDONE:  Can I suggest we call it
8  Ying Confirmation 1 since he's been deposed?
9      MR. ANKER:  Sure.  Let me correct what
10 I said earlier.  The document that I have
11 handed to Mr. Ying, which is a deck entitled
12 David Ying's Expert Report, October 12,
13 2015, Evercore, will be described for
14 purposes of this deposition and marked as
15 Ying Confirmation Exhibit No. 1.
16      (Ying Confirmation Exhibit 1, David
17 Ying's Expert Report, October 12, 2015,
18 marked for identification, as of this date.)
19 BY MR. ANKER:
20 Q.   Can you identify the document that has
21 been marked as Ying Confirmation Exhibit No. 1?
22 A.   This is an expert report that I have
23 prepared and filed in connection with issues
24 raised with the confirmation of the plan.
25 Q.   And am I correct that this report

Page 15

DAVID YING

1
2  addresses a number of different opinions that
3  you propose to provide at the confirmation
4  hearing?
5  A.   Yes, that's correct.
6  Q.   I want to focus you in my questioning
7  on what I think is your third opinion C. EFIH
8  Feasibility Analysis.
9      Mr. Ying, it appears to me to begin
10 right after the numbered page 32, although I
11 don't think it is itself the first page
12 numbered.
13 A.   No, it begins on C. EFIH Feasibility
14 Analysis, which follows page 32.
15 Q.   Immediately follows page 32?
16 A.   Yes.
17 Q.   I will do my best not to do what I
18 just did, which is to talk over you, and my
19 apologies, and if you could do the same, I would
20 appreciate it.
21      Mr. Ying, can you describe in your
22 words the assignment you were given with respect
23 to the opinion that you are rendering as to the
24 EFIH feasibility analysis?
25 A.   The report was prepared in response to

Page 16

DAVID YING

1
2  a question that has been raised, and the
3  question that was raised is if,
4  post-confirmation, through appeal, various
5  creditors of EFIH and EFH were to succeed on all
6  of the alleged payment disputes -- and the
7  alleged payment disputes include make-whole
8  payment disputes and disputes with respect to
9  the payment of post-petition interest at full
10 contract rate -- that if all of those appeals
11 were to be finally determined in favor of the
12 various plaintiffs, what would be the liability
13 and could the restructured post-confirmation
14 EFH, as contemplated in the plan, have the
15 financial wherewithal to make all of those
16 payments.
17 Q.   Mr. Ying, I think when I asked the
18 question, I may have misspoken.  I described it
19 as the EFIH Feasibility Analysis.  In fact, the
20 report is entitled EFH Feasibility Analysis; is
21 that right, sir?
22 A.   That's correct.
23 Q.   And is that because the restructuring,
24 as you understand it, contemplates that what is
25 now EFIH and EFH, what is now EFH, will be

DAVID YING

2 merged into a single restructured entity termed
3 "new EFH" or "reorganized EFH"?
4    A.    Well, I don't know if EFIH and EFH
5 will -- I believe EFIH and EFH will still exist.
6 My understanding is that they will both have
7 debt outs or they will both be still
8 consolidated with one another, and therefore,
9 when we address feasibility, we're addressing
10 feasibility of both.
11    Q.    You say they will still be
12 consolidated with each other.  You understand,
13 do you not, that EFIH is a separate company
14 today from EFH?
15    A.    Well, EFH owns 100 percent of EFIH
16 and, I believe, post-reorganization will
17 continue to do so.
18    Q.    And so your understanding is that,
19 post-reorganization, Oncor will be owned by EFIH
20 and EFIH in turn will be owned by EFH?
21    A.    I believe that's the economic
22 substance of the transaction, yes.
23    Q.    You describe the assignment you were
24 given.  Who gave you that assignment?
25    A.    I was told that was the question by

DAVID YING

2 company counsel, Kirkland & Ellis.
3    Q.    Did company counsel give you any
4 assumptions to make for purposes of your
5 analysis?
6    A.    No; we made them ourselves.
7    Q.    And the "we" in that sentence is
8 Evercore?
9    A.    Evercore and the colleagues who work
10 for me on this assignment.
11    Q.    At Evercore?
12    A.    At Evercore.
13    Q.    And can you briefly describe in your
14 own words the opinion or opinions that you
15 reached with respect to the assignment you have
16 described, period?
17    A.    Well, not to restate the opinion
18 itself, because it's several pages, but we think
19 that EFH should be able to raise enough capital
20 to address an adverse judgment on every and all
21 of the alleged claims.
22    Q.    And by "address," if we were to use
23 simple English, is it fair to say your opinion
24 is that if every single disputed claim is
25 allowed in full with interest post-emergence,

DAVID YING

2 EFH will be able to raise debt and/or equity
3 capital to pay those liabilities in full,
4 correct?
5    A.    That's correct.
6    Q.    And therefore, it is your opinion, is
7 it not, sir, that reorganized EFH is not likely
8 to have to refile for bankruptcy in the event
9 that all of the liabilities are deemed valid in
10 the full amount sought, right?
11    A.    That's correct.
12    Q.    Can you briefly describe the work you
13 did to reach that conclusion or conclusions?
14    A.    We looked at the pro forma financial
15 statements for EFH as we understand them; we
16 calculated, to the best of our ability, the
17 maximum amount of the alleged claims; and we
18 looked at both the debt capacity of
19 post-confirmation EFH -- and when I say EFH, I'm
20 referring to both EFH and EFIH as a consolidated
21 entity -- we looked at the debt capacity of EFH
22 and we also looked at EFH from the perspective
23 of the equity capital markets and looked at its
24 standing in the capital markets and whether it
25 would have the ability to raise additional

DAVID YING

2 equity capital.
3    Q.    What documents did you review in doing
4 your analysis?
5    A.    We used, obviously, the plan of
6 reorganization and we used what pro forma
7 financial information we had with respect to
8 what EFH might look like as of an assumed
9 confirmation date of June 30, 2016.
10    Q.    Mr. Ying, you just stated that you
11 used what pro forma financial information you
12 had with respect to what EFH might look like as
13 an assumed confirmation date of June 30, 2016.
14        Do you believe you had adequate
15 information to render the opinions you were
16 rendering?
17    A.    I believe we do, yes.
18    Q.    Mr. Ying, I don't want to -- obviously
19 you're not a lawyer, and I don't mean to use
20 lawyer-speak, but have you heard the term "a
21 fortiori"?
22    A.    Actually, I have not.
23    Q.    I think -- I'm not a Latin scholar,
24 but I think "a fortiori" means if A is true,
25 then B follows like day follows night.  If A is

Page 21

1          DAVID YING
2 true, B absolutely must be true. Let me try to
3 not use Latin and I'll try to ask the question
4 differently.
5          Your opinion is that, am I correct,
6 that if, after confirmation, the EFIH first
7 liens win their appeal and are entitled to both
8 the full amount of the make-whole they seek and
9 all the interest they seek, and the EFIH second
10 liens prevail and also are entitled to the full
11 amount of the make-whole and interest they seek,
12 and the EFIH PIKs are entitled to the full
13 amount of the make-whole and interest they seek,
14 and all post-petition interest at the contract
15 rate they seek, and the various EFH notes also
16 prevail and are entitled to the full amount of
17 both make-whole and post-petition interest that
18 they seek, even if all of that happens,
19 reorganized EFH should be able to raise the
20 capital to pay all of those liabilities in full,
21 right?
22     A.    That's correct.
23     Q.    Okay. I want to change the
24 hypothetical.
25          Assume for a minute that there are

Page 22

1          DAVID YING
2 settlements with everyone junior in the capital
3 structure to the EFIH first liens and, as a
4 result, reorganized EFH does not have to pay the
5 full amount of the make-wholes and the full
6 amount of the post-petition interest being
7 sought, but only a portion thereof.
8          Is it fair to say your opinion would
9 remain the same in those circumstances, that new
10 EFH should be able to pay the full amount of the
11 make-whole sought by the EFIH first liens and
12 interest thereon?
13          MR. ROGERS: Objection to the form.
14     A.    Well, to fully answer your question, I
15 would like to know a little bit more about the
16 exact timing of the settlements. I would like
17 to know exactly how those settlements are being
18 assumed to be met.
19          But based on your general question, I
20 think it's fair to say that if settlements are
21 reached with the junior constituencies in the
22 EFH/EFIH capital structure, post-reorganization,
23 EFH should still have the financial wherewithal
24 to access the capital markets to fund a
25 settlement with the EFIH first liens on their

Page 23

1          DAVID YING
2 specific make-whole claims.
3     Q.    Let me ask a slightly different
4 question. Imagine that post-emergence from
5 bankruptcy, on or about June 13, 2017, there is
6 a final judgment requiring payment of the full
7 make-whole and interest thereon sought by the
8 EFIH first liens, but also assume that courts
9 hold that the EFIH second liens are not entitled
10 to any make-whole and the EFIH PIKs are not
11 entitled to make-whole or contract rate of
12 interest, and the EFH notes are not entitled to
13 their make-whole or interest.
14          I take it your opinion is that the
15 EFIH -- that reorganized EFH will have the
16 financial capacity to raise capital to pay the
17 EFIH first lien debt itself?
18     A.    That's correct.
19     Q.    That is an even easier opinion to
20 reach than if you assume the worst case
21 scenario, that all of the liabilities of all of
22 the creditors are allowed in full, right?
23     A.    That's correct.
24     Q.    That's the notion of "a fortiori" that
25 I was trying to get to.

Page 24

1          DAVID YING
2          Now, let's turn to page 33, if you
3 would, of your report, sir. And if at any point
4 I'm asking you questions you want to look at
5 your report, just please do so.
6          Page 33 sets forth various
7 assumptions, am I right, that you have made in
8 rendering your opinion?
9     A.    Yes.
10     Q.    Okay. You assume, first, an emergence
11 date of June 30, 2016; is that right?
12     A.    Yes.
13     Q.    Why did you assume that the debtors
14 would emerge from Chapter 11, that is, the plan
15 would go effective on June 30 of next year?
16     A.    It's the current best guess that the
17 company and we and K&E have established to
18 estimate all the financial impacts of the plan
19 of reorganization.
20     Q.    Is it the best guess that the company
21 and we and K&E have as to when the debtors will
22 emerge from Chapter 11?
23     A.    Yes.
24     Q.    You second -- not second. You also
25 assumed that, and I'm reading from your report,

Page 25

DAVID YING

2 "The pro forma equity value at emergence is
3 assumed to equal the total equity commitments
4 issued in accordance with the plan of
5 reorganization."
6    I read that correctly, did I not?
7  A.  Yes.
8  Q.  So let me see if I understand that.
9 Under the plan of reorganization, various T-side
10 unsecured creditors as well as the Hunts are
11 making an equity contribution, right?
12  A.  Yes.
13  Q.  And that is approximately, plus or
14 minus, $7 billion?
15  A.  Yes.
16  Q.  What you are assuming for these
17 purposes is that the value of the equity that
18 they are acquiring on the effective date will be
19 precisely the amount of cash they put in, that
20 is, given or take $7 billion, right?
21  A.  Yes.
22  Q.  Now, you would agree with me, would
23 you not, that the Hunts are financially
24 sophisticated actors?
25  A.  Yes.

Page 26

DAVID YING

2  Q.  And the TCEH unsecured creditors -- a
3 court may some day look at this -- we're not
4 talking about trade creditors here who are doing
5 this financing, are we?
6  A.  No.
7  Q.  We're not talking about employees,
8 right?
9  A.  No.
10  Q.  We're not talking about mom and pops,
11 if we can use the generic term, right?
12  A.  No.
13  Q.  We're talking about hedge funds,
14 private equity firms, and other sophisticated,
15 highly sophisticated financial actors, right?
16  A.  Yes.
17  Q.  Some of the nation's largest hedge
18 funds, in fact, right?
19  A.  Yes.
20  Q.  Okay.  And it's fair to say they are
21 financially sophisticated, right?
22  A.  Yes.
23  Q.  And it's fair to assume they are not
24 paying $7 billion if they really think what
25 they're acquiring is equity worth no more than

Page 27

DAVID YING

2 $7 billion, right?
3  A.  Yes.
4  Q.  And so let's assume that in fact the
5 equity they are acquiring is worth more than $7
6 billion.  Would that change your ultimate
7 opinion?
8  A.  No.
9  Q.  In fact, it would make the ultimate
10 opinion easier to reach, right?
11  A.  Yes.
12  Q.  Okay.  Have you ever heard the term,
13 when used in relation to a hedge fund or a
14 private equity firm, that they have a "hurdle
15 rate"?
16  A.  Yes.
17  Q.  Can you describe what a hurdle rate
18 is?
19  A.  Well, typically, when hedge funds or
20 private equity firms raise a limited partnership
21 pool of capital from institutional investors,
22 they enter into a fee agreement with respect to
23 those monies, and it's very often that, to
24 manage those monies and earn a rate of return,
25 the manager will get a management fee of an

Page 28

DAVID YING

2 annual amount -- usually it's, you know, 1 or 2
3 percent per year -- and they will get a carried
4 interest on the appreciation in those
5 investments above a hurdle rate.  And so,
6 typically, the hurdle rate is set at a 7 or 8
7 percent hurdle rate, but above 7 or 8 percent
8 annual return on the investment, the manager
9 gets an override of, you know, it would depend
10 on the manager, anywhere between 15 and 30
11 percent of the profits above the hurdle rate.
12  Q.  So the hurdle rate is a target, if you
13 will, of an internal -- of a rate of return on
14 an annualized basis, right?
15  A.  Well, it's more than a target.  It's a
16 threshold above which the manager gets his
17 carried interest, and below that threshold, the
18 manager doesn't get a carried interest.
19  Q.  Have you also heard of the term an
20 "internal rate of return"?
21  A.  I certainly have.
22  Q.  What is that, sir?
23  A.  Internal rate of return is a
24 calculation one makes when you look at a set of
25 future cash flows and you calculate what is the

Page 29

1          DAVID YING
2 implied rate of return associated with those
3 future cash flows as they relate to a particular
4 investment.
5     Q.   Now, I know, Mr. Ying, that you don't
6 work for the various hedge funds that are T-side
7 creditors and are helping to fund this plan, but
8 do you have a general understanding of what
9 their hurdle rates are?
10    A.   Well, there are so many different
11 funds here, I don't know what their hurdle rates
12 are.
13    Q.   You have no approximate ballpark
14 figure you can give me?
15    A.   I wouldn't want to guess. Some of the
16 investors -- a firm called BlackRock. They run
17 mutual funds. I have no idea what their hurdle
18 rates are.
19    Q.   Okay. Do you have any idea what their
20 or any of the other T-side internal creditor's
21 internal rate of returns are?
22    A.   No, I don't.
23    Q.   Okay. Now, you also state on page 33
24 that you have made the assumption that the
25 equity value at emergence grows at an assumed

Page 30

1          DAVID YING
2 cost of equity of 8.5 percent; is that right,
3 sir?
4     A.   That's correct.
5     Q.   And is that 8.5 percent annually?
6     A.   Yes.
7     Q.   Why did you make that assumption?
8     A.   Well, the presumption -- not just an
9 presumption, pardon me. The plan of
10 reorganization is conditioned on converting
11 Oncor or EFH to a C -- from a C Corp. to a REIT,
12 and we've looked at comparable entities to try
13 to calculate a weighted average cost -- or, a
14 cost of equity cost of capital for EFH as a REIT, and
15 based on those calculations, using the capital
16 asset pricing model, we've derived at an
17 expected equity cost of capital of 8.5 percent.
18    Q.   Do I understand correctly that you
19 have looked at other REITs and that those REITs,
20 on average, the cost to them of raising equity
21 capital has been 8.5 percent per annum?
22    A.   We have looked at other comparable
23 entities. Some of them are not REITs. Some of
24 them are actually UPREITs or C corps. They all
25 have different forms, but we have looked for a

Page 31

1          DAVID YING
2 universe of companies that are publicly traded;
3 that are, from a business standpoint and a
4 structural standpoint, are as similar as
5 possible to what people had planned to convert
6 EFH to; and using typical investment banker
7 valuation technology, which is looking at betas
8 for the comps, we have come up with an equity
9 cost of capital.
10    Q.   Of 8.5 percent per annum?
11    A.   Yes, sir.
12    Q.   And that would suggest, as translated
13 to New EFH, that the investors expect to make at
14 least 8.5 percent per annum, right?
15    A.   That's correct.
16    Q.   So, in the first year on their $7
17 billion in equity, they're assuming that that
18 equity will increase by some $600 million?
19    A.   I believe there's a number in the
20 charts here, but yes, I think that's the right
21 number.
22    Q.   I'm doing the math in my head and I
23 won't hold you to it to the penny.
24         Mr. Ying, the assumption that
25 reorganized EFH, that its equity will be worth

Page 32

1          DAVID YING
2 exactly what the investors are willing to
3 invest, can you translate that into an assumed
4 total enterprise value, or TEV, for EFH?
5     A.   Yes.
6     Q.   I'm happy to direct you to where I
7 think it appears in your report. I think it
8 appears page 35.
9     A.   I would place it at page 37, but if
10 you want to look at page 35, I'm happy to.
11    Q.   No, let's do where you're comfortable.
12 You're right, 37.
13         Can you answer my question, what is
14 the implied total enterprise value for
15 reorganized EFH assuming that the equity is
16 worth no more at emergence than what the
17 investors are paying for it?
18    A.   The number on page 37 is $19.139
19 billion.
20    Q.   Now, you were deposed a few weeks ago?
21    A.   Yes.
22    Q.   And I'm happy to show you your
23 testimony, but I believe you testified that you
24 had done an analysis where you looked at the
25 time at what the T-side unsecured debt was

Page 33

1          DAVID YING
2 trading at and what that might imply the TEV, or
3 total enterprise value, of Oncor is on a pro
4 forma basis assuming the reorganization goes
5 forward, correct?
6          MR. ROGERS: Objection to form.
7    A.   I recall making that statement, yes.
8    Q.   Okay. And do you recall what that
9 analysis showed?
10   A.   You would have to refresh my memory as
11 to the number I used.
12   Q.   Okay.
13          MR. ANKER: We'll be marking as Ying
14 Confirmation Deposition Exhibit No. 2 a
15 transcript of Mr. Ying's deposition that
16 occurred on September 23, 2015.
17          (Ying Confirmation Exhibit 2,
18 Deposition of David Ying dated September 25,
19 2015, marked for identification, as of this
20 date.)
21 BY MR. ANKER:
22   Q.   Mr. Ying, first, can you identify what
23 has been marked as Ying Confirmation Exhibit No.
24 2?
25   A.   This is a transcript of my deposition

Page 34

1          DAVID YING
2 on September 23, 2015.
3    Q.   And I don't mean this at all
4 pejoratively: You testified truthfully, to the
5 best of your ability, right?
6    A.   Yes.
7    Q.   Okay. Can I direct your attention to
8 page 88, sir.
9    A.   Yes.
10   Q.   And Mr. Ying, let me direct you
11 particularly to lines 4 through 14 on page 88.
12   A.   Yes.
13   Q.   And I'm happy to do the talking, but
14 tell me whether I'm reading it correctly.
15       "Q   Have you offered any views on that
16 valuation to the debtors at any point?
17       "A   We have looked at the trading prices
18 for the claims that the T-unsecureds have as
19 well as the T second liens, and based on that
20 trading price and the terms of the merger
21 agreement, we have imputed a valuation for
22 Oncor as a REIT pro forma for the closing of
23 the merger. That number currently, I think,
24 the last time we looked, was a little north of
25 $20 billion."

Page 35

1          DAVID YING
2       Did I read that correctly?
3    A.   Yes.
4    Q.   And you testified truthfully and
5 accurately when you gave that testimony, did you
6 not, sir?
7    A.   Yes.
8    Q.   And so if instead you did your
9 analysis for purposes of your expert report that
10 has been marked as Exhibit 1 using a $20 billion
11 rather than a 19 -- slightly more than $19
12 billion total enterprise value assumed for
13 Oncor, it would even be easier, would it not,
14 for New EFH to finance the payment of all the
15 disputed claims?
16   A.   Yes.
17   Q.   Mr. Ying, are you familiar, generally,
18 with the disclosure statement? Let me rephrase
19 that.
20       You're probably not familiar with the
21 entirety of the disclosure statement. No one
22 probably is.
23       Are you familiar, generally, with the
24 financial parts of the disclosure statement for
25 the debtors here?

Page 36

1          DAVID YING
2          MR. ROGERS: Objection to form.
3    A.   Yes.
4    Q.   Okay.
5    A.   I believe so, yes.
6    Q.   Did you understand my last question?
7    A.   Yes.
8    Q.   Are you aware -- and I'm happy to show
9 it to you -- that there are charts in the
10 disclosure statement that project the recovery
11 to T-side unsecured creditors based on a range
12 of enterprise values for Oncor?
13   A.   I believe I recall those charts, yes.
14   Q.   I don't want this to be a memory test.
15       This will be Ying Confirmation Exhibit
16 No. 3.
17          (Ying Confirmation Exhibit 3,
18 Disclosure Statement for the Fifth Amended
19 Joint Plan of Reorganization of Energy
20 Future Holdings Corp., et al., Pursuant to
21 Chapter 11 of the Bankruptcy Code, marked
22 for identification, as of this date.)
23 BY MR. ANKER:
24   Q.   Mr. Ying, my first question is can you
25 identify Ying Confirmation Exhibit No. 3?

DAVID YING

2  A.   This is the disclosure statement for
3  the plan of reorganization.
4     Q.   Okay.  And can I ask you to turn to
5  what is on the bottom page 23.  On the top it's
6  page 32 of 253.
7     A.   Yes, I'm looking at it.
8     Q.   Okay.  First, Mr. Ying, were you and
9  your colleagues involved in the preparation of
10 the chart that appears on the bottom of page 23
11 entitled Range of Illustrative Estimated
12 Recoveries?
13    A.   I believe some of the people that work
14 for me were involved with this, but I did not
15 have any direct involvement.
16    Q.   Was Evercore involved in the decision
17 for purposes of this chart to assume a range of
18 enterprise value of between 19 and 24 billion?
19    A.   I assume that we were, but I don't
20 have any direct knowledge of the decisions with
21 respect to selection of this range.
22    Q.   Mr. Ying, at the top it says
23 Illustrative Reorganized EFH Enterprise Value.
24       Do you understand the 19 to 24 billion
25 to be EFH TEV or Oncor projected TEV?

DAVID YING

2  A.   Well, pursuant to the plan of
3  reorganization, EFH will, at confirmation, own
4  100 percent of Oncor.  So this is a consolidated
5  enterprise value for EFH and all of its
6  subsidiaries.
7     Q.   But it's not calculated after
8  deducting the Oncor debt, right?
9     A.   It's a total enterprise value, so it's
10 the total value of only the left-hand side of
11 the balance sheet in its totality.
12    Q.   Okay.  Do you know how it came about
13 that a range of $19-24 billion for the
14 enterprise value was chosen for purposes of the
15 disclosure statement?
16    A.   I don't have a specific recollection
17 of my having a discussion about this particular
18 range.  It's a nice, big, broad range.
19    Q.   You certainly never expressed the view
20 that that's deceptive, right?
21    A.   I think it's just being fully
22 disclosive of the possibilities.
23    Q.   Okay.  And so the possibilities, as
24 disclosed in the disclosure statement, range
25 from a low of $19 billion to a high of $24

DAVID YING

2  billion, right?
3     A.   That is correct.
4     Q.   Okay.  And for purposes of your
5  analysis in the expert report that's Exhibit 1,
6  you applied the low end of that range, $19
7  billion, right?
8     A.   That's correct.
9     Q.   Which is a conservative assumption for
10 purposes of your opinion, right?
11    A.   That is correct.
12    Q.   A less conservative assumption would
13 be to choose the opposite end of the range, $24
14 billion, right?
15    A.   That is correct.
16    Q.   And if you chose $24 billion, not only
17 would the total enterprise value be
18 approximately $5 billion higher, but so, too,
19 would the equity value, right?
20    A.   That's correct.
21    Q.   Because the liabilities are fixed,
22 right?
23    A.   That's correct.
24    Q.   So for every dollar in increased
25 enterprise value, there is a dollar-for-dollar

DAVID YING

2  corresponding increase in equity value, right?
3     A.   That's correct.
4     Q.   Mr. Ying, let me take you back to your
5  report, which I believe was marked as Exhibit
6  No. 1, and could I turn you to page 30 -- I'm
7  sorry, page 33, which is the assumptions.
8        Are you there, sir?
9     A.   Yes.
10    Q.   Mr. Ying, were you by any chance in
11 court or listening telephonically to the hearing
12 that occurred in these Chapter 11 cases on this
13 past Friday?
14    A.   I was not.
15    Q.   Are you familiar with an individual
16 named Christopher Shore?
17    A.   Yes.
18    Q.   Mr. Shore is at White & Case, which is
19 counsel for the T-unsecureds and the investors
20 who are on the T-side investing in this
21 transaction?
22    A.   Yes, he is.
23    Q.   Are you aware that he announced that a
24 tentative settlement has been reached with 40
25 percent in dollar amount of the EFIH PIKs?

DAVID YING

2  A.   I read an excerpt of the hearing in
3  one of the various news services that reports on
4  bankruptcy proceedings, and I do recall reading
5  that he made such an announcement in court.
6  Q.   And are you aware that he announced
7  that that settlement would provide for the
8  payment of no make-whole to the settling EFIH
9  PIK holders?
10  A.   I don't recall any specifics that he
11  gave with respect to the terms of the
12  settlement.
13  Q.   Assume that there is a settlement with
14  40 percent or more of the EFIH PIKs that
15  provides for no payment of any make-whole to
16  them and a payment of less than 100 percent of
17  the contract rate of post-petition interest they
18  are seeking.
19       With me so far?
20  A.   Yes.
21  Q.   Those assumptions are less
22  conservative than the assumptions you made in
23  issuing your report, right?
24  A.   I'm not sure about the word "less
25  conservative," but if Mr. Shore's settlement

DAVID YING

2  becomes part of the plan, the financial
3  wherewithal of EFH to make all of the other
4  unsettled payments become easier.
5  Q.   Much more articulately stated than my
6  inarticulate question.  Thank you.
7  A.   You're welcome.
8  Q.   Let's turn now to page 34 of your
9  expert report, which is Exhibit No. 1, and I
10  want to ask you about a couple of the bullet
11  points on this page, which is entitled Overview;
12  correct, sir?
13  A.   Yes.
14  Q.   Okay.  Now, if you look to the second
15  full bullet and then indenting, there is a
16  sub-bullet that says, "$0.5 billion related to
17  PPI litigation reserve which is assumed to be
18  refunded to the investors at emergence."
19       Did I read that correctly?
20  A.   Yes.
21  Q.   Can you explain what you are trying to
22  state there in the report?
23  A.   Yes.  One of the provisions of the
24  merger agreement with the investor group is that
25  they will overfund the merger at confirmation by

DAVID YING

2  investing an additional, approximately, $500
3  million, the use of proceeds of which is
4  earmarked for the payment of post-petition
5  interest, at full contract rate, to all of the
6  unsecured creditors who are alleging that
7  they're entitled to those payments.
8       Under the assumptions that we used for
9  this feasibility analysis, we assumed the most
10  conservative possible position, which would be
11  that, at confirmation, those post-petition
12  interest obligations had been denied, that the
13  post-litigation claims were being appealed
14  outside the Bankruptcy Court, and that pursuant
15  to the terms of the merger agreement, those
16  funds would be returned to the investors, and
17  therefore, EFH, post-confirmation, would not
18  have access to them, but would still have to
19  have the financial wherewithal to make those
20  payments if they suddenly, at some point in the
21  future, it was determined that EFH was obligated
22  to make those payments.
23       Again, it was a conservative
24  assumption.
25  Q.   And even with that conservative

DAVID YING

2  assumption, you reached the opinion that
3  reorganized EFH would be able to pay all of the
4  liabilities that are in dispute, right?
5  A.   That's correct.
6  Q.   Now, you said that one of the
7  provisions of the merger agreement with the
8  investor group is that they will overfund the
9  merger by investing an additional approximately
10  $500 million, right?
11  A.   Yes.
12  Q.   And that additional investment would
13  be in the form of equity, not debt, right?
14  A.   That's correct.
15  Q.   And it wouldn't buy them any
16  additional shares beyond what they would
17  otherwise receive, right?
18  A.   That's correct.
19  Q.   Doesn't that suggest to you, Mr. Ying,
20  that the investors believe that the equity they
21  are receiving at confirmation is worth at least
22  $500 million more than the $7 billion you are
23  assuming?
24  A.   It's possible.  I really don't want to
25  speculate.  I don't know what their mind-set is.

1          DAVID YING
2    Q.    It is fair to say that -- you are an
3 investment banker, right?
4    A.    Yes, I am.
5    Q.    And it is fair to say that investment
6 bankers in doing valuation analyses look to
7 market indicia of value, right?
8    A.    Yes.
9    Q.    And one market indicia of value is
10 what sophisticated investors will pay for a
11 particular asset, right?
12    A.    That is correct.
13    Q.    And so it's fair to say for this
14 particular asset highly sophisticated investors
15 are willing to pay at least $500 million more
16 than the $7 billion you are assuming at
17 emergence is the equity value of New EFH, right?
18    A.    I think that's correct.
19    Q.    You also note on page 34, "$0.2
20 billion allocated to TCEH junior creditors on
21 account of their pre-petition claims."
22        Do you see that, sir?
23    A.    Yes.
24    Q.    Can you explain what you mean by that
25 statement?

1          DAVID YING
2    A.    As part of the plan of reorganization,
3 the T-side is being given a claim against EFH in
4 settlement of their alleged causes of action and
5 they are being allocated $0.2 billion of equity
6 in the reorganized EFH as a result of that.
7    Q.    So let me see if I can put it in my
8 words, but obviously I want to make sure I'm
9 right, so tell me if I'm right or wrong.
10        T-side creditors are both receiving
11 some stock directly without putting in any
12 equity investment at all and, in addition,
13 receiving the right to invest and acquire
14 additional equity in New EFH, right?
15    A.    That's correct.
16    Q.    And as to the first part, the equity
17 that T-side creditors are receiving without
18 putting in any equity investment, that's
19 approximately $200 million in value, right?
20    A.    That's correct.
21    Q.    Using your very conservative
22 assumptions on value, right?
23    A.    That's the amount that they're being
24 allocated relative to the new money being
25 invested.  Whether that allocation is worth more

1          DAVID YING
2 or less in the marketplace, that's subject to
3 opinion.
4    Q.    Well, they're receiving 2 percent of
5 the equity, right?
6    A.    Well, it's $200 million out of $7
7 billion, so it's -- I can't do that math in my
8 head.
9    Q.    1.6, 1.5 billion, right?  1.5 percent?
10    A.    It's -- well, actually, it's really
11 $152 million.  I think, actually, the exact
12 number should be on page 35.
13    Q.    You show it there as $151 million.
14    A.    $151 million out of $7 billion, so
15 it's about 2 percent.
16    Q.    Okay.
17    A.    Thank you.  Your math was correct.
18    Q.    Okay.  And just to be clear, they're
19 not receiving $151 million in cash, right?
20    A.    No, they're receiving $151 million of
21 equity based on the $7 billion equity account
22 that's being created.
23    Q.    So if in fact what you, for purposes
24 of your conservative analysis, have assumed is
25 $7 billion of equity is really worth 10 or 11 or

1          DAVID YING
2 12 billion, then what the T-side unsecureds are
3 receiving at confirmation, without putting a
4 penny in, is worth more than $151 million,
5 right?
6    A.    That's correct.
7    Q.    Mr. Ying, one other question on page
8 34.  You say, "If 12 months after emerging from
9 bankruptcy, all of Reorganized EFH's arguments
10 are rejected, and a final order and judgment are
11 entered requiring full amounts of PPI and MW to
12 be paid, Reorganized EFH will need to raise
13 additional capital to pay such obligations."
14        Did I read that correctly?
15    A.    Yes, you did.
16    Q.    And just so we have a clear record,
17 "PPI" is post-petition interest?
18    A.    That's correct.
19    Q.    And "MW" is make-whole?
20    A.    That's correct.
21    Q.    Two sets of questions on that bullet.
22        First, I understand you had to make an
23 assumption of a date as to which the payment
24 obligations would have to be made, and
25 therefore, you assumed 12 months after

Page 49

DAVID YING

1
2  emergence, or June 30, 2017, right?
3     A.    That's correct.
4     Q.    But if it turns out that all of your
5  assumptions are right except the payment has to
6  be made or payments have to be made July 15,
7  2017, 15 days later, are you still comfortable
8  with your opinion?
9     A.    Yes.
10    Q.    Are you still comfortable with your
11 opinion if it's six months later?
12    A.    I believe I would be.  I would have to
13 run the numbers to take a look at them
14 specifically, but my -- my general sense, given
15 the fact that the value of the equity account
16 should be rising because that's the basic
17 definition of the valuation of the company, that
18 there's a positive rate of return on the equity,
19 as the size of the company grows, even though
20 the size of the claim would grow, that they
21 would be growing proportionally.
22    Q.    And I said six months.  I take it we
23 can generalize that.  I understand you haven't
24 run the numbers, but it's not as if you are
25 trying to offer an opinion that is specific to

Page 50

DAVID YING

1
2  one day, right?
3     A.    That's correct.
4     Q.    Because the debtors can't today
5  represent to Judge Sontchi that if they lose all
6  of these appeals, the loss is going to be
7  realized on June 30, 2017, right?
8     A.    That's correct.
9     Q.    And so what you are offering is a more
10 general opinion that whenever it turns out that
11 all of these losses occur, if they occur in this
12 litigation, reorganized EFH will be able to pay
13 all those liabilities, right?
14    A.    That's correct.
15    Q.    Okay.  The other question I had to you
16 about the last point is you say, if after
17 emerging EFH loses all of these appeals,
18 reorganized EFH will need to raise additional
19 capital to pay such obligations, right?
20    A.    Yes.
21    Q.    Now, you're an investment banker and
22 you have looked at lots of companies over your
23 career, right?
24    A.    Yes.
25    Q.    And you have advised lots of

Page 51

DAVID YING

1
2  companies, right?
3     A.    Yes.
4     Q.    And there are many, many healthy
5  companies, Fortune 100 companies, that don't
6  have a billion or $2 billion in cash just
7  sitting around liquid to pay liabilities, right?
8     A.    That's correct.
9     Q.    So the fact that reorganized EFH would
10 need to raise capital to pay these liabilities
11 is not at all suggestive that its financial
12 condition would be anything less than healthy,
13 right?
14    A.    That's correct.
15    Q.    Because it has assets; it just doesn't
16 have liquidity to pay that amount of liability
17 as you project it, right?
18    A.    That's correct.
19    Q.    Okay.  And you say it will need to
20 raise capital.  I take it you believe it could
21 raise debt capital, right?
22    A.    Yes.
23    Q.    And it could raise equity capital,
24 right?
25    A.    Yes.

Page 52

DAVID YING

1
2     Q.    Or a combination thereof, right?
3     A.    Yes.
4     Q.    Okay.  Let's turn to -- we're going to
5  skip 35 -- page 36.  And Mr. Ying, really all I
6  want to do on 36 is make sure I understand this
7  chart.
8        At the top of the page -- I use the
9  term "column" to use what's on the top and
10 "rows" to refer to what's on the left.  Is that
11 the way you refer to it as well?
12    A.    Yes.
13    Q.    Okay.  The first column is 6/30/16, so
14 that's the projected emergence date, right?
15    A.    Yes.
16    Q.    The second column is six months later,
17 December 31, 2016, right?
18    A.    Yes.
19    Q.    And the right-hand column is June 30,
20 '17, which is the one year after the projected
21 emergence, right?
22    A.    Yes.
23    Q.    And let me make sure I understand it.
24 The first set of rows is my client's claim,
25 which you project, as of June 30, as a

DAVID YING

1
2 make-whole of $426 million and accrued interest
3 on the make-whole of $95 million, right?
4    A.   Yes.
5    Q.   Mr. Ying, you're not -- this isn't --
6 hopefully, some day we'll have this discussion
7 because we will have prevailed on appeal, but my
8 clients think their make-whole as of -- the
9 principal amount of the make-whole is not $426
10 million, but $431 million.
11        Assume we're right.  Would that $5
12 million difference, plus interest thereon, cause
13 you to change your opinions?
14   A.   No.
15   Q.   It's trivial in the bigger picture of
16 things in terms of reorganized EFH's ability to
17 raise the necessary capital to pay the
18 liabilities, right?
19   A.   Yes.
20   Q.   Okay.  And so if you now look over at
21 the next two columns, the make-whole amount, the
22 principal stays constant, but the interest is
23 increasing at a rate of approximately 10 percent
24 compounded, right, annually?
25   A.   That's correct.

DAVID YING

1
2    Q.   And then you have below it the EFIH
3 second lien notes, right?
4    A.   That's correct.
5    Q.   And so there, as well as on the EFH
6 first lien notes, you are making the worst case
7 scenario, which is that the company loses on
8 appeal the make-whole and it also owes all
9 accrued interest, right?
10   A.   Correct.
11   Q.   And there as well the make-whole
12 remains constant over time, but the accrued
13 interest increases, right?
14   A.   That's correct.
15   Q.   And then the third set of creditor
16 bodies with disputed claims is the EFIH
17 unsecured notes, which we often refer to as the
18 PIKs, right?
19   A.   Yes.
20   Q.   For "payment in kind," right?
21   A.   Yes.
22   Q.   And there you show both a make-whole
23 called a call premium, right?
24   A.   Yes.
25   Q.   And interest thereon increasing over

DAVID YING

1
2 time, right?
3    A.   That's correct.
4    Q.   As well as post-petition accrued
5 interest, right?
6    A.   Yes.
7    Q.   And by "incremental," you mean the
8 delta between the contract rate of interest on
9 the one hand and the federal judgment rate on
10 the other hand, right?
11   A.   Yes.
12   Q.   And that's increasing over time,
13 right?
14   A.   Yes.
15   Q.   Okay.  And then the fourth set of
16 creditor bodies is the EFH LBO notes, right?
17   A.   Yes.
18   Q.   And there their claim is just
19 post-petition interest, and you're showing the
20 incremental amount at the contract rate as
21 compared to the federal judgment rate, right?
22   A.   Yes.
23   Q.   And that increases over time, right?
24   A.   Yes.
25   Q.   And then the EFH unsecured notes is

DAVID YING

1
2 the third category, and they have both the
3 make-whole and a claim for post-petition accrued
4 interest, right?
5    A.   Yes.
6    Q.   And the post-petition accrued interest
7 increases over time, right?
8    A.   Yes.
9    Q.   And while the principal amount of the
10 make-whole doesn't, the accrued interest --
11 there's interest that builds up on the
12 make-whole, right?
13   A.   That's correct.
14   Q.   And then if you assume every one of
15 those losses occurs, there is an additional
16 $2,229,000,000 in liabilities to be paid on June
17 30, 2017, right?
18   A.   Yes.
19   Q.   But if you then turn to page 37, the
20 equity value assumed as of that time, using all
21 your very conservative assumptions on equity
22 value, is far greater than $2,229,000,000,
23 right?
24   A.   Yes.
25   Q.   It's 5,350 -- I'm sorry, it's

DAVID YING

1
2 $7,608,000,000 before taking account of that
3 liability, those liabilities, right?
4    A.    That's correct.
5    Q.    And so those liabilities, even if the
6 company had to pay every penny of it, there
7 would still be $5,358,000,000 in equity value,
8 right?
9    A.    Yes.
10    Q.    Let's go to page 38.  Tell me when
11 you're there.
12    A.    I'm there.
13    Q.    Now, you have a box up at the top, and
14 I'll again, just to make it easier on you, I
15 will end up stopping speaking in a few minutes,
16 you will have to go longer today, so let me be
17 courteous to you.
18        It says, "In the event of an adverse
19 judgment, EFH's strong ratings and credit
20 profile should position EFH to finance a
21 significant portion of the Obligations with
22 newly issued debt at EFH/EFIH.  If an adverse
23 judgment requires payment of all disputed PPI
24 and MW, a portion of such Obligations will
25 likely require funding with new equity."

DAVID YING

1
2        Did I read that correctly?
3    A.    Yes.
4    Q.    Okay.  What do you mean by "EFH's
5 strong ratings and credit profile"?
6    A.    Well, we know right now that EFIH has
7 a -- pardon me.  Excuse me.  We start with the
8 fact we know that Oncor has an investment grade
9 credit rating, and we think that,
10 post-confirmation, the credit rating at EFIH,
11 with the pro forma capital structure that we
12 think EFIH and EFH will emerge with, will have a
13 very strong BB credit rating.
14    Q.    Which would be investment grade,
15 right?
16    A.    "Strong BB" means just below
17 investment grade, but nonetheless, it's a very
18 strong credit rating and means that they would
19 have ample access to the debt capital markets if
20 they needed to raise incremental debt.
21    Q.    Okay.  Today, before the
22 restructuring, EFH and EFIH are not investment
23 grade, right?
24    A.    No, they're in bankruptcy.  They have
25 defaulted.

DAVID YING

1
2    Q.    Okay.  Bad question on my part.
3        The companies filed for bankruptcy on
4 April 29, 2014, right?
5    A.    Correct.
6    Q.    Okay.  On April 28, 2014, the day
7 before they filed for bankruptcy, they were not
8 investment grade issuers, were they?
9    A.    Absolutely not.
10    Q.    And the result of this restructuring
11 is a material deleveraging of the balance sheet
12 for EFIH and EFH, right?
13    A.    Yes.
14    Q.    A material improvement in their credit
15 rating, in all likelihood, right?
16    A.    Yes.
17    Q.    Okay.  Now, at the bottom of page 38,
18 you have various -- strike that.  Let me go back
19 and ask a different question.
20        The second sentence in the box at the
21 top of the page says, "If an adverse judgment
22 requires payment of all disputed PPI and
23 make-whole, a portion of such obligations will
24 likely require funding with new equity," right?
25    A.    Yes.

DAVID YING

1
2    Q.    Imagine, again, that the only --
3 strike that.
4        Do you believe that New EFH would be
5 able to fund the liability just owed to my
6 client, potentially, the 426 to 431 million of
7 make-whole and accrued interest which you
8 calculate is another 150 to June 30, 2017,
9 entirely with debt?
10    A.    Yes.
11    Q.    Okay.  Let's now go to the bottom of
12 the page where I was going to take you a minute
13 ago.
14        You see it says PF Credit Metrics?
15    A.    Yes.
16    Q.    "PF" stands for pro forma?
17    A.    Yes.
18    Q.    There's a couple of other
19 abbreviations.  You have "CY."  That's calendar
20 year?
21    A.    Calendar year, yes.
22    Q.    And we all know what EBITDA is, and we
23 have already gone over TEV, so I'm not going to
24 take you back through it.
25        How does the projected various ratios,

1          DAVID YING
2 debt to calendar year 2017 EBITDA or debt to
3 calendar year 2018 EBITDA or debt to Oncor TEV,
4 before any of these liabilities -- so the first
5 column on the left -- compare to comparable
6 companies?
7    A.    Well, there aren't a lot of comparable
8 companies to how EFH is structured, but from a
9 credit metrics standpoint, those are some of the
10 metrics we look at to say that EFH and IH would
11 probably emerge with a very strong BB credit
12 rating, and from that we derive that it would
13 have very significant access to incremental debt
14 capital if it chose to raise capital by issuing
15 new debt at EFH and IH.
16    Q.    There are a lot of financially healthy
17 companies that have far greater -- far higher
18 debt to EBITDA or debt to enterprise value
19 ratios than what you show here before judgment,
20 right?
21    A.    Well, again, this is a regulated
22 utility as the underlying asset, so these credit
23 metrics are a little unusual for a regulated
24 utility, but nonetheless, we know the capital
25 markets would look at these ratios and look at

1          DAVID YING
2 the enterprise value of the business and say
3 they would be delighted to lend to the company
4 with this credit -- these credit metrics.
5    Q.    Okay.  And I take it the capital
6 markets would also be delighted to lend or
7 provide equity financing if all the judgments
8 occurred, and let's look at the third column
9 from the left, the $1.125 billion equity and
10 $1.125 billion debt, right?
11    A.    That's correct, yes.
12    Q.    And while you believe that if all of
13 these liabilities in full have to come due, a
14 portion would have to be financed with new
15 equity, you believe that New EFH should be able
16 to raise that new equity, right?
17    A.    Yes.
18    Q.    The equity markets would be delighted
19 to lend -- not delighted to lend -- delighted to
20 invest, right?
21    A.    That's correct.
22    Q.    Okay.  I'm trying to move this along,
23 Mr. Ying, in both fairness to you and other
24 people.
25          This is an open-ended question.  Page

1          DAVID YING
2 39, as I read it, was simply a different way of
3 stating what you have already stated on page 38
4 and earlier.
5          Is there anything -- and again, I
6 don't mean that critically.  Is there anything
7 I'm missing, anything new or different on this
8 page?
9    A.    On page 39?
10    Q.    Yes.
11    A.    No, other than we tried to estimate
12 how much equity would or could the company
13 reasonably expect to issue relative to a
14 starting point of about $5 billion of equity.
15    Q.    And what was your conclusion?
16    A.    The conclusion was that the company
17 should be able to raise, you know, at least a
18 billion, billion and a half of incremental
19 equity; that that size of public offering would
20 not be unusual or would certainly be acceptable
21 and well-absorbed by the equity capital markets.
22    Q.    Okay.  And let's then turn to page 40,
23 the last page of this portion of your expert
24 report, right?
25    A.    Yes.

1          DAVID YING
2    Q.    Okay.  Now, why don't you explain to
3 me page 40.  I think I understand it, but I
4 would like to hear it out of your words.
5    A.    Sure.  Again, we were trying to look
6 at what's precedent for a company -- a public
7 company doing a public offering to raise
8 incremental equity capital and how big an
9 offering could they do and how big an offering
10 does that represent as a percentage of its
11 pre-offering public equity market
12 capitalization.
13          So you see, based on this chart, that
14 there are many public offerings in this general
15 size category; that you see offerings that do
16 range as high as about 35 percent of the
17 pre-offering capitalization, and that gives us
18 an indication that, yes, the equity capital
19 markets should be willing to raise at least 35
20 percent of the pre-offering capitalization of
21 this company, which is a little over $5 billion,
22 in a big public offering.
23    Q.    Okay.  So let me make sure I
24 understand the chart fully.  You have got a left
25 axis -- you have a vertical axis and a

Page 65

1          DAVID YING
2 horizontal axis, right?
3    A.   Correct.
4    Q.   In the vertical axis, it says Pre-Deal
5 Market Capitalization, right?
6    A.   Correct.
7    Q.   So what you're representing there is
8 the equity value of the company before the
9 secondary equity raise, right?
10   A.   That's correct.
11   Q.   And so the low end is $5 billion, and
12 it ranges from 5 to 35; just the numbers you
13 show there, right?
14   A.   Correct.
15   Q.   Okay.  And then in the horizontal
16 axis, you range there from 0 percent, the
17 numbers you showed, to 40 percent, right?
18   A.   That's correct.
19   Q.   And what that means is the deal size,
20 that is, the amount of new equity that's raised
21 as a percentage of the pre-deal capitalization,
22 right?
23   A.   That's correct.
24   Q.   So if you had a company whose pre-deal
25 capitalization was $5 billion, by way of

Page 66

1          DAVID YING
2 example, and a billion in new equity was raised,
3 that would be 20 percent, right?
4    A.   That's correct.
5    Q.   And if I understand it correctly here,
6 you're saying on the prior page that,
7 comfortably, New EFH should be able to raise
8 north a billion to a billion and a half of
9 equity with a preexisting about $7 billion,
10 right, in equity value?
11   A.   Well, we reduced the size of the
12 equity count to 5 because we have to deduct from
13 equity value the fact that they have to raise --
14 that there's been a judgment of $2 billion.  If
15 the company announced tomorrow that they owed an
16 extra 2 and a half or 2 and a quarter billion --
17   Q.   Got it.
18   A.   -- to the world, you would infer that
19 the value of the presettlement stock would go
20 down by that amount, and the decision would be
21 does the company fund that 2 and a quarter with
22 debt, equity, and what combination thereof.
23   Q.   Okay.  And so you've got, assuming the
24 loss of all the litigation in full, about 5.3 to
25 5.4 in equity value as of 6/30/17, right, using

Page 67

1          DAVID YING
2 your conservative assumptions, right?
3    A.   That's correct.
4    Q.   Okay.  And the company, you're saying,
5 would be able to be then raise a billion or more in
6 debt and a billion to a billion and a half in
7 equity, right?
8    A.   That's correct.
9    Q.   Okay.  And you show here on page 40
10 that a whole bunch of companies were able to
11 raise between -- a new -- let me start again.
12 Talking too quickly.
13        A whole bunch of companies were able
14 to raise, in secondary equity offerings, around
15 as much as $5 billion -- I'm sorry.  I'm being
16 inarticulate again.
17        A whole bunch of companies were able
18 to do secondary offerings in which they raised
19 20 to 30 percent or more of their pre-deal
20 market capitalization, right?
21   A.   That's correct.
22   Q.   And they were able to do so where that
23 pre-deal market capitalization was also in the
24 range of $5 billion, right?
25   A.   That's correct.

Page 68

1          DAVID YING
2    Q.   And they were able to do that in the
3 last three years, right?
4    A.   That's correct.
5    Q.   Okay.  Mr. Ying, let me ask you -- I
6 think I know where it is.  Let's mark as Exhibit
7 No. 4.  I'm just taking page 40 of your report,
8 and what I would ask you to do is just circle
9 for me the balls that represent the companies
10 that were able to raise 20 to 30 percent of
11 their pre-deal market capitalization in a
12 secondary offering where that pre-deal market
13 capitalization was, ballpark, $5 billion?
14        MR. ANKER:  Let's mark this as Ying
15   Confirmation Deposition Exhibit No. 4.
16        (Ying Confirmation Exhibit 4, a chart
17   labeled EFH Feasibility Analysis, marked for
18   identification, as of this date.)
19        THE WITNESS:  Does someone have a
20   writing implement?
21 BY MR. ANKER:
22   Q.   A blue pen is probably not the
23 greatest.
24        Yes, it's fine.  Use blue.
25   A.   Sure.  So this is 20 to 30 percent in

1            DAVID YING
2 the $5 billion equity market cap range.
3    Q.   Right.
4    A.   (Witness complies.)
5    Q.   Mr. Ying, just so we have a clear
6 record, you have marked in a rectangular box the
7 balls that represent actual offerings that got
8 done, capital raises that got done that meet the
9 criteria I just mentioned, correct, sir?
10   A.   Yes.
11   Q.   And just to be clear, the reason I
12 asked 20 to 30 billion -- can we turn back to
13 page 39 of your report, Exhibit No. 1.
14   A.   Yes.
15   Q.   If you look at the top, Total PPI and
16 Make-Whole?
17   A.   Yes.
18   Q.   You see that box?  So that assumes a
19 loss on everything, right, sir?
20   A.   Yes.
21   Q.   And if you look at the second line,
22 New Equity Financing As a Percentage of
23 Prefinancing Equity Market Capitalization?
24   A.   Yes.
25   Q.   If in fact the company raised the

1            DAVID YING
2 necessary $2.5 billion, $2.25 billion, $1.125
3 equity, $1.125 debt, the equity raise as a
4 percentage of the capitalization would be 21
5 percent, right?
6    A.   Yes.
7    Q.   That's your calculation, right?
8    A.   Yes.
9    Q.   Okay.  Mr. Ying, I just have a couple
10 of more questions.
11        Are you familiar with the deposition
12 that Mr. Keglevic gave in -- a week or two ago
13 in connection with the plan confirmation
14 proceedings?
15   A.   I have not seen it or read it.
16   Q.   Okay.  Why don't we mark then as
17 Exhibit Ying Confirmation Deposition Exhibit No.
18 5 a copy of Mr. Keglevic's deposition, which
19 occurred on October 1, 2015.
20        (Ying Confirmation Exhibit 5,
21    Deposition of Paul Keglevic dated October 1,
22    2015, marked for identification, as of this
23    date.)
24 BY MR. ANKER:
25   Q.   Mr. Ying, I'm not going to ask you to

1            DAVID YING
2 identify the document.  I will represent to you
3 it is what I just told you it is, but you can
4 see on the first page it so indicates.
5        Let me ask you to turn specifically to
6 two places.  First is page 20, that is, by "page
7 20," I mean deposition transcript page 20.
8        You will see there's four pages per
9 page.
10   A.   Yes.
11   Q.   Okay.  And if you're on page 20, I was
12 questioning Mr. Keglevic, and look at starting
13 on line 3, sir.
14   A.   Of which of these sub-pages?
15   Q.   Page 20 of the transcript.
16   A.   Yes.
17   Q.   At the bottom it says page 6, but on
18 the transcript it says page 20.  There's four
19 pages reprinted per page of paper.
20        Tell me when you're there then.
21   A.   So is it page 6, pages 18 to 21?
22   Q.   Correct, sir.
23   A.   Thank you.  Sorry.
24   Q.   So on deposition transcript page 20,
25 line 3, I asked the following:

1            DAVID YING
2    "Q   Assume that after the effective date,
3 an appellate court enters an order allowing the
4 claim of the EFIH first liens to the
5 make-whole, the EFIH second liens to the
6 make-whole, and the EFIH PIKs to the
7 make-whole.  Do the debtors believe that
8 reorganized EFH will be able to satisfy all of
9 those claims in full?
10   "A   Yes."
11        Mr. Shore then objected to form.
12   "Q   Is there any material doubt that the
13 debtors have about that?
14   "A   No."
15        Did I read that accurately?
16   A.   Yes.
17   Q.   You agree with Mr. Keglevic in that
18 respect?
19   A.   Yes, I do.
20   Q.   Okay.  Now turn to -- again, I'm
21 referring to the deposition page, so there's
22 four pages per page -- page 61, lines -- let's
23 first go to page 61.  Just to make it easier for
24 you in terms of the numbered page on the bottom
25 of the page, it's page 16.

DAVID YING

2  A.  I have it.

3  Q.  Okay.  I don't want to -- well, I'll

4 read it in the record.  Starting with line 6,

5 and again, I'm questioning just to give you

6 context.

7  "Q  I just want to make sure -- no

8 criticism on Mr. Horowitz on my left, it's

9 really a criticism of myself for not asking the

10 question earlier.  I just want to make sure.

11 It is a clean-up question.

12  "I want you to make the worst-case

13 assumption.  Assume that after the effective

14 date, the EFIH first liens win on appeal their

15 make-whole and interest thereon.  The EFIH

16 second liens win their make-whole and interest

17 thereon, the EFH PIKs win their make-whole and

18 interest thereon, the EFH bonds win their

19 make-whole and interest thereon.  And after the

20 effective date, there is a determination that

21 the EFIH PIKs are entitled to interest at their

22 contract rate, rather than at the federal judgment

23 rate.

24  Does it remain the debtors' belief" --

25  And Mr. McKane from Kirkland interrupte

DAVID YING

2 "With no risk probability discounting for the

3 amounts?"

4  And I responded, "With no risk probability

5 discounting for the amounts.  I will adopt you

6 counsel's qualification.

7  "Does it remain the debtors' belief that

8 reorganized EFH would be able to satisfy all of

9 those liabilities after the effective date?"

10  Mr. Shore objected to form.

11 "A  It does."

12  You agree with Mr. Keglevic, what he

13 stated on those lines?

14  A.  Yes.

15  Q.  And I went on to ask him, starting on

16 line 15 on page 62:

17  "Q  And for the reasons that you

18 previously provided?

19  Mr. Shore -- he doesn't seem to like

20 my questions -- again objected to form.

21  And Mr. Keglevic responded:

22  "A  The primary basis for my conclusion

23 is the, as we calculated it, the substantial

24 amount of equity that reorganized EFH would

25 be -- that would exist at reorganized EFH.  An

DAVID YING

2 I think we had calculated that amount at $8.5

3 billion, which should be substantial coverage

4 even under a worst-case scenario for all the

5 disputed contingent, unliquidated amounts

6 associated with the make-whole and

7 post-petition interest."

8  Did I read that accurately?

9  A.  Yes.

10  Q.  And do you agree with what Mr.

11 Keglevic stated at those lines?

12  A.  I don't understand his reference to

13 $8.5 billion, but I agree with his conclusion.

14  Q.  I think we did some math and came up

15 with a slightly higher number using $20

16 billion --

17  A.  Okay.

18  Q.  -- as the assumed value rather than

19 19, but the transcript will speak for itself.

20  Bottom line is you agree with his

21 conclusion?

22  A.  I agree with his conclusion.

23  Q.  And so the bottom line, Mr. Ying, is

24 it is your opinion that if everything -- with

25 all the conservative assumptions you made on

DAVID YING

2 value and if every liability that is in dispute

3 has to be paid in full by New EFH, New EFH will

4 be able to pay those liabilities and should not

5 have to go back into bankruptcy, right?

6  A.  That's correct.

7  MR. ANKER:  I'll pass the witness.

8  MR. ROGERS:  Can we take a break --

9  MR. ANKER:  Yes.

10  MR. ROGERS:  -- while we're switching?

11  MR. ANKER:  Yes.

12  (Recess; Time Noted:  9:35 a.m.)

13  (Time Noted:  9:42 a.m.)

14 EXAMINATION BY

15 MR. HARDIMAN:

16  Q.  Mr. Ying, John Hardiman again for the

17 EFH Official Committee of Unsecured Creditors.

18  I want to return to something that you

19 discussed with Mr. Anker.  You might recall you

20 gave some testimony that both the Hunt Group and

21 the investors who make up the T-unsecured

22 creditors are sophisticated financial players;

23 do you recall that testimony?

24  A.  Yes.

25  Q.  And I think you testified that you

DAVID YING

1 would not expect those sophisticated financial
2 players to invest $7 billion of equity in the
3 New EFH unless they believed it was worth more
4 than $7 billion?
5     A.   I recall saying that it's quite
6 possible, but I don't know their investment
7 hurdle rates; so it's more speculation than it
8 is based in fact.
9     Q.   Would you expect sophisticated
10 investors such as the T-unsecureds and the Hunts
11 to invest $7 billion of equity into the
12 reemerged Oncor if they believe it is worth less
13 than $7 billion?
14    A.   No.
15    Q.   Does your feasibility analysis of EFH
16 address that scenario, a scenario where the
17 equity of the reemerged entity will be less than
18 the amount that is currently expected to be
19 funded?
20    A.   No, it does not.
21    Q.   Am I correct you also do not, in your
22 opinion, provide an independent valuation of
23 Oncor post-emergence; is that correct?
24    A.   Yes.

DAVID YING

1     Q.   Why didn't you provide a valuation of
2 the -- of Oncor post-emergence or address a
3 situation where the equity was worth less than
4 the contemplated funded amount in your report?
5          MR. ROGERS:   Objection to form.
6     A.   Well, in response to the second half
7 of your question, if Oncor is worth less than
8 the purchase price, the odds of the investors
9 closing the merger are low; and in response to
10 the first half of your question, I don't have
11 access to the projections that the investor
12 group and the Hunts are using and so it's very
13 difficult for me to assess valuation without
14 their projections.
15    Q.   With respect to the first part of the
16 question -- I'm not going to ask you anything
17 about your TCEH feasibility analysis which is in
18 the first part of your report.  However, there
19 is a valuation there of TCEH, am I correct?
20    A.   Yes.
21    Q.   And am I correct that Evercore, in
22 performing that valuation, had access to certain
23 raw material that was necessary to perform that
24 valuation?

DAVID YING

1     A.   That's correct.
2     Q.   And that included projections from the
3 company, correct?
4     A.   Projections of TCEH, yes, that's
5 correct.
6     Q.   Anything else, any other raw material
7 you were provided by the company to perform that
8 valuation?
9     A.   Only access to management and
10 significant due diligence around those numbers.
11    Q.   Did you have access to the same type
12 of raw material in order to perform an
13 evaluation of Oncor post-emergence?
14    A.   We have projections from Oncor.  We
15 have had access to Oncor and EFH management
16 regarding those projections, and we have even
17 spent a great deal of time with Oncor management
18 and, in particular, EFH management discussing
19 how would you transform Oncor and EFH and EFIH
20 into a REIT?
21    Q.   So you had the raw material to perform
22 a valuation of Oncor, had you chosen to do so?
23    A.   But to finish my comments --
24    Q.   Oh, I'm sorry.

DAVID YING

1     A.   That's all right.
2     Q.   I thought you had finished since you
3 paused there.
4     A.   I was pausing.
5          Again, we have had extensive
6 discussion and analysis of what it would take to
7 convert EFH, EFIH and Oncor into a REIT.  There
8 are many decisions that have to be made as to
9 how that would actually look economically, and
10 we have done some analysis around what that
11 might look like, and we have done a fair amount
12 of analysis and shared it with the company in
13 terms of what a valuation might be, but we do
14 not have the projections that the Hunts and the
15 investor group are using.
16         They, in all likelihood, have made
17 different assumptions from what we have made, so
18 it's very difficult for us to value what they
19 are thinking without being privy to their
20 analysis of all of the myriad of decisions that
21 have to be made in terms of what Oncor would
22 look like as a REIT.
23    Q.   Just turning to what you have, at your
24 previous deposition -- I'm happy to turn you to

1              DAVID YING
2 the page if you want to, I think it's on page
3 87 -- you were asked whether or not you had been
4 asked by the company as of the date of your
5 deposition to do a valuation of Oncor at the
6 time of emergence, and you answered no; do you
7 recall that testimony?
8    A.    I do.
9    Q.    Subsequent to that deposition, which
10 was --
11   A.    I believe it was September 23.
12   Q.    September 23.
13        Have you been asked by the company to
14 do a valuation of Oncor at the time of
15 emergence?
16   A.    No.
17   Q.    And therefore, I take it you have not
18 done a valuation of Oncor at the time of
19 emergence?
20   A.    We have not.
21   Q.    And you are not planning to offer an
22 opinion at the hearing in this proceeding as to
23 the value of Oncor at the time of emergence?
24   A.    We are not.
25   Q.    Do you not believe that that is

1              DAVID YING
2 relevant to your conclusions regarding
3 feasibility of EFH?
4         MR. ROGERS:  Objection to form.
5    A.    I think the feasibility report that we
6 submitted at the very beginning of it says that
7 the feasibility report is designed to address a
8 very specific question, which is, as it states,
9 if all the alleged post-petition interest and
10 make-whole claims are finally determined to be
11 valid claims, would the post-reorganized EFH be
12 able to reasonably expect it to make all those
13 payments.
14   Q.    And that's the only issue you are
15 addressing with respect to EFH feasibility in
16 your opinion?
17   A.    That is correct.
18   Q.    And just so the record is clear, you
19 are referring to the question, I believe, that
20 is in the highlighted box on page 33 of your
21 report, "your report" being Ying Confirmation
22 Exhibit 1?
23   A.    That's correct.
24   Q.    And for purposes of that opinion, you
25 have assumed that the funding will take place as

1              DAVID YING
2 contemplated by the plan?
3    A.    That is correct.
4    Q.    Yet there are no assurances that that
5 will in fact happen, correct?
6    A.    I'm certainly not making those
7 assurances, no.
8    Q.    Well, in fact, in your report you
9 state specifically that there is no assurance
10 that that funding will occur or that the merger
11 transaction will be completed; isn't that
12 correct?
13   A.    I don't recall that particular
14 reference, but I think that's a fair
15 representation.
16   Q.    Okay.  Just to make the record clear,
17 if you go to the beginning of your section in
18 your report, it's unnumbered but it comes after
19 the page that says C. EFH Feasibility Analysis.
20 There is then a page that says Disclaimer?
21   A.    I see it.
22   Q.    Okay.  And if you go to the second
23 page of the Disclaimer, the very first
24 paragraph, and I'm looking now one, two,
25 three -- six lines down in that paragraph, am I

1              DAVID YING
2 reading correctly there is a sentence that
3 reads, "No assurance is or can be provided that
4 any transaction can be successfully concluded or
5 successfully concluded at levels indicated
6 herein, that a market will develop for any
7 security or other asset discussed herein, or
8 that any such security or other asset will
9 perform in accordance with its terms."
10        Am I correct; that sentence says?
11   A.    Yes.
12   Q.    And you stand by that sentence?
13   A.    Yes, I do.
14   Q.    Stepping back for a second, Mr. Ying,
15 what did you do to prepare for today's
16 deposition?
17   A.    I met with counsel at K&E.  We
18 discussed the contents of my expert report.  I
19 don't recall much else that was discussed.
20   Q.    About how long did you meet?
21   A.    Under two hours.
22   Q.    Did you review any documents during
23 that meeting?
24   A.    The only documents I recall reviewing
25 is the Rule Report.

DAVID YING

1
2    Q.    Did you review a report put in by
3  Michael Henkin from Guggenheim?
4    A.    I recall reading Mr. Henkin's report
5  after the report was filed.
6    Q.    But you did not review it in the
7  preparation session?
8    A.    No.  Not for this, no.
9    Q.    Did you, when you did your review, did
10  you review it in preparation for today's
11  deposition?
12    A.    No, I just read it because I thought I
13  should read it.
14    Q.    Okay.  Are you intending to offer in
15  this proceeding any opinions that are not
16  contained in Ying Confirmation Exhibit 1?
17    A.    I'm certainly prepared to speak to
18  everything that I've prepared.  If asked
19  opinions on other reports, I'm certainly
20  prepared to respond if I think I can be additive
21  or have a point of view.
22    Q.    Okay.  Have you been asked to prepare
23  a rebuttal report to any of the expert reports
24  submitted by any of the other parties in this
25  proceeding?

DAVID YING

1
2    A.    No, I have not.
3    Q.    Is it possible that you will submit a
4  rebuttal report in response to any of the other
5  reports submitted by other experts in this
6  proceeding?
7         MR. ROGERS:  Objection to form.
8    A.    That all depends on whether counsel
9  asks that I do so.
10    Q.    So it is possible that you may do so?
11         MR. ROGERS:  Objection to form.
12    A.    At this point, I'm not planning to
13  make any rebuttal reports.
14    Q.    I'm asking something slightly
15  different.  Is it possible that you could put in
16  a rebuttal report with respect to any of the
17  other expert reports?
18         MR. ROGERS:  Objection to form.
19    A.    I think almost anything is possible.
20    Q.    So you have not definitively ruled out
21  submitting a rebuttal report in response to any
22  of the other expert reports?
23    A.    That's true.
24    Q.    And do you intend to respond at the
25  hearing to any of the opinions contained in any

DAVID YING

1
2  of the other expert reports?
3    A.    I don't know because counsel hasn't
4  asked me those questions and we haven't
5  discussed it.
6    Q.    So, again, it's possible that you
7  might at the hearing respond to the points made
8  in the other expert reports?
9         MR. ROGERS:  Objection to form.
10    A.    It's possible.
11         MR. ROGERS:  Objection to form.
12    Q.    Is there anything you would like to
13  change in your expert report that you have
14  submitted, Ying Confirmation Exhibit 1?
15    A.    No.
16    Q.    Something else you said in response to
17  Mr. Anker -- and I apologize if I got this
18  wrong.  I was scribbling it down as you were
19  talking.  He asked you a question about other
20  comparable companies to EFH, and I think you
21  said that there aren't a lot of comparables as
22  EFH is structured.
23         Do you recall that testimony?
24    A.    Yes.
25    Q.    Did I remember it correctly?

DAVID YING

1
2         Are there any comparables as EFH is
3  structured?
4    A.    The only one actually that is close is
5  a company called InfraREIT, which is also
6  managed by the Hunts.
7    Q.    And that's much smaller than the
8  contemplated Oncor REIT after emergence; is that
9  correct?
10    A.    Yes.
11    Q.    So there really isn't any real
12  comparable in terms of -- in terms of what EFH
13  will look like after emergence?
14         MR. ROGERS:  Objection to form.
15    A.    I'm struggling with the terms "real
16  comparable."
17    Q.    Well, if you were doing a valuation of
18  EFH, something that you would be comfortable
19  relying on in terms of, let's say, a comparable
20  company analysis or a comparable company trading
21  analysis?
22         MR. ROGERS:  Objection to form.
23    A.    Well, we have thought about a
24  comparable company universe, and we have come up
25  with various formulations of what might serve as

DAVID YING

1 one.
2
3   Q.   And what are those formulations?
4   A.   Well, we've looked at the world of
5 energy MLPs, which are primarily pipeline-driven
6 and, therefore, heavily regulated with long-term
7 contracts.  That's one possible universe one
8 might look to for valuation guidance.  It's
9 certainly something you see in the literature
10 that the sell-side analysts who work for the big
11 investment banks have used.
12       There's another universe of companies
13 one might look at which are the energy companies
14 or the power companies who formed what are
15 termed Yield Co's, and there are a number of
16 those.  I was referring to them in my prior
17 testimony today.  Some of them are C corps. with
18 lots of tax attributes.  They don't pay material
19 taxes.  Others are structured in other
20 tax-advantaged forms like an UPREIT, and that's
21 another universe of companies one could look to.
22 And obviously there is InfraREIT, which is
23 smaller, but it happens to be a T&D-regulated
24 utility in the State of Texas.
25   Q.   Have you actually done a valuation of

DAVID YING

1
2 Oncor post-emergence based on the type of
3 comparables you just laid out -- or, I should
4 say has Evercore done that?
5   A.   We have done much of the elemental
6 work that goes into doing a valuation, but we
7 have not produced a valuation report.
8   Q.   Now, I asked you a question before as
9 to whether or not you believed doing a valuation
10 of Oncor post-emergence was relevant to
11 feasibility, and I think you answered that you
12 weren't asked to do that; you were asked to do a
13 specific question.
14       But getting away from what you were
15 asked to do, I'm just asking you now the general
16 question: Do you think an analysis of Oncor's
17 valuation at emergence is something relevant to
18 whether -- to a feasibility analysis of EFH?
19   A.   I'm having a problem responding --
20   Q.   Sure.
21   A.   -- and being helpful to you because
22 you need to be more specific as to some of the
23 definitions in your question.
24       So let's start with a feasibility
25 analysis.

DAVID YING

1
2   Q.   Right.
3   A.   What exactly do you want to measure
4 with respect to feasibility?
5   Q.   In the sense that you used it with
6 respect to your report.
7   A.   Okay.  With respect to the specific
8 objectives of my report, the presumption is that
9 if the deal closes, sophisticated investors that
10 have invested upwards of $7 billion under the
11 belief that the asset is worth at least what
12 they paid for it, if not more, and that the
13 rates of return that they expect to earn, having
14 paid that valuation, will meet their respective
15 risk-adjusted rate of return criteria.
16       And based on that premise -- I think
17 it's a conservative premise, by the way -- the
18 company has a big equity market cap and then
19 we've gone through a quantitative analysis of
20 could the company raise incremental debt and
21 equity to meet the incremental obligations.
22       And so I'm trying to say that I think
23 that's a sufficient premise to present a
24 thorough and thoughtful feasibility analysis
25 given the question posed, and I don't think you

DAVID YING

1
2 have to go into another very elaborate analysis
3 of what would be an investment banker's
4 valuation of Oncor as a REIT.
5   Q.   But your opinion is totally dependent
6 on that premise, correct?  You have prepared no
7 opinions regarding feasibility that are not
8 based on the premise that the transaction will
9 close?
10   A.   That's correct.
11   Q.   And you have done no analysis of the
12 likelihood that the transaction will close?
13   A.   I think that's a completely different
14 question than the one that we addressed in our
15 feasibility report.
16   Q.   Right.  And so you have not done that,
17 you have not done an analysis of the likelihood
18 that the transaction will close?
19   A.   That's correct.
20   Q.   And you are not offering an opinion as
21 to the likelihood that the transaction will
22 close?
23   A.   That is correct.
24   Q.   Let's talk a minute about the Henkin
25 report.  I think you said you've read it?

1          DAVID YING
2    A.   I have.
3    Q.   Did you read the opinions that he lays
4  out in the report?
5    A.   I don't remember the report, but I do
6  remember reading it; so you'll have to refresh
7  my memory.
8    Q.   Do you recall if you disagreed with
9  any of his opinions?
10   A.   If you walk me through his opinions,
11 I'll attempt to recall if I did or did not
12 agree.
13   Q.   Will do.
14   A.   I just don't have a photographic
15 memory.
16   Q.   Yes.  Understood.
17        MR. HARDIMAN:  Let me mark as Ying
18 Confirmation Exhibit 6 the Expert Report of
19 Michael Henkin.
20        (Ying Confirmation Exhibit 6, Expert
21   Report of Michael Henkin, marked for
22   identification, as of this date.)
23 BY MR. HARDIMAN:
24   Q.   And feel free to look at any part of
25 it you want, but there is a summary of his

1          DAVID YING
2  opinions on pages 5 and 6 of the report.
3        (Document review.)
4    A.   I have read his Summary of Opinion
5  section, Roman numeral IV.
6    Q.   Right.  Okay.  Let me just ask one
7  preliminary question.  I asked you before
8  questions about what you intended to do at the
9  hearing and about rebuttals.
10        Have you asked anybody at Evercore to
11 do any work in terms of preparing a response to
12 any of Mr. Henkin's opinions?
13   A.   No.
14   Q.   All right.  The first opinion that Mr.
15 Henkin gives, Opinion 1, which is paragraph 11
16 on page 5, is "the lack of remedies in the
17 Merger and Purchase Agreement is inconsistent
18 with both large utility M&A transactions and
19 large bankruptcy sale transactions."
20        Do you agree with that?
21        MR. ROGERS:  Objection to form.
22   A.   Well, I agree with his summary of the
23 M&A deals that he identified, both public
24 utility -- the public utility mergers and the
25 select group of in-bankruptcy M&A transactions

1          DAVID YING
2  and his assessment of what sort of remedies
3  there were with respect to a situation where the
4  purchaser decided not to close.
5        I think the context in which he states
6  those is different from this one, but as a
7  factual matter, I think his survey of those
8  transactions was accurate.
9    Q.   So you don't agree with his underlying
10 research he did to support this opinion?
11        MR. ROGERS:  Objection to form.
12   A.   Again, I think the factual comparable
13 company sets that he looked at were -- are
14 appropriate.  I think the context of this
15 transaction is different from those.
16   Q.   Okay.  Could you explain what you mean
17 by that, that the context is different?
18   A.   Sure.  We obviously ran an M&A
19 process.  We canvassed a lot of big companies
20 and financial buyers, and your committee was
21 privy to I think every step of the way in terms
22 of how we conducted that process.
23        I think your committee is well aware
24 of the fact that we had one strategic buyer who
25 actually submitted a marked-up contract with all

1          DAVID YING
2  the appropriate customary breakup provisions
3  that the current merger agreement does not have.
4        The auction process that we ran
5  evolved towards the Hunt bid with the
6  T-unsecureds because the Hunts basically stopped
7  pursuing their second-round bid, which was tied
8  in with the PIKs, and they decided they would be
9  more advantaged in the auction process to align
10 themselves with the T-unsecureds.
11        And in fact, they came up with a far
12 superior offer from a price standpoint, and the
13 challenge for us was do we pick a deal that has
14 a billion dollars or more higher price without
15 the customary protections that you would like to
16 see associated with a failed -- or, the buyer
17 pulling out, or would we rather go with a buyer
18 who has at least a billion-dollar lower price,
19 but we could have a specific performance at a
20 low price or a breakup fee of a couple hundred
21 million dollars.
22        So we chose to go with the purchaser
23 who had a substantially higher price even though
24 they don't have the customary breakup fees that
25 one would also like to have, and obviously

1          DAVID YING
2 breakup fees are a function of a negotiation
3 with a buyer along with other dimensions, like
4 price and terms and conditions, and clearly the
5 T-unsecureds in the Hunt deal has lots of terms
6 and conditions associated with it, but given the
7 predilection of the creditors who are doing the
8 selling of their claims, we viewed the Hunt's
9 T-unsecured consortium deal met most of the
10 requisite criteria that we needed to actually
11 have a transaction that most people would
12 support.  But obviously, it has the fact that it
13 doesn't have the customary breakup provisions
14 one would ordinarily like to have.  And the
15 problem is the auction wasn't competitive.  They
16 were a billion dollars higher in price.  And
17 which would you rather have?
18     Q.   Are you asking me?
19     A.   That was a rhetorical question.
20     Q.   Okay.  Because, you know, I would
21 always like a billion dollars if you can get it
22 for me.
23     A.   And hopefully, we will.
24     Q.   But in addition to the contract not
25 having any of the customary remedies, there's

1          DAVID YING
2 actually also a provision in the contract that
3 expressly says that the debtors cannot pursue
4 any remedies against the prospective purchasers,
5 am I correct?
6     A.   Yes.
7     Q.   In your career, do you recall being
8 involved in any other transaction that had that
9 kind of express term in the contract?
10     A.   There are lots of terms of this deal
11 that are unique to this deal that I don't recall
12 in other transactions.
13     Q.   But with respect to this particular
14 one, do you recall this particular type of term,
15 a term that says that the debtors cannot pursue
16 any remedies; do you recall that being in any
17 other transaction you've been involved in?
18     A.   I don't.
19     Q.   In fact, do you recall any other
20 transaction you have been involved in where
21 there was not some express remedy actually laid
22 out in the contract of some nature?
23     A.   Well, I have to admit, as a banker, I
24 don't tend to remember and focus on some of the
25 remedies that would go into a purchase contract.

1          DAVID YING
2 All I can say is I think there are many
3 provisions of this agreement that are bespoke to
4 the situation.
5     Q.   If I can just ask you about the
6 preamble you just made to that question.
7          As a banker advising companies in
8 these circumstances, do you view your role
9 simply to come up with a transaction for the
10 company to consider, or do you also view as part
11 of your role to try to come up with a
12 transaction that will actually close?
13          MR. ROGERS:  Objection to the form.
14     A.   Oh, we certainly try to come up with
15 transactions that should be feasible.
16     Q.   And in considering whether a
17 transaction should be feasible, is it your
18 testimony that you as a banker do not consider
19 at all what sort of remedies may or may not
20 exist to cause that transaction to occur?
21          MR. ROGERS:  Objection to form.
22     A.   Well, we try to look at the pluses and
23 minuses of the transaction in their totality.
24     Q.   And in looking at those pluses and
25 minuses in their totality, one thing you would

1          DAVID YING
2 try to be conscious of is what sort of
3 incentives and disincentives the purchaser had
4 to close the transaction, correct?
5          MR. ROGERS:  Objection to form.  And
6     let me just state for the record, counsel,
7     Mr. Ying has been deposed in his individual
8     capacity already on these issues.  He has
9     not been disclosed as an expert offering an
10    opinion on these issues, so I would ask that
11    you move the subject of the examination to
12    Mr. Ying's expert opinions in this
13    deposition.
14     Q.   Can you answer my question, Mr. Ying?
15     A.   Would you please restate it?  I was
16 distracted.
17     Q.   Sure.  Well, here, I can read it to
18 you again.
19          And in looking at those pluses and
20 minuses in their totality, one thing you would
21 try to be conscious of is what sort of
22 incentives and disincentives the purchaser had
23 to close the transaction, correct?
24          MR. ROGERS:  Same objections.
25     A.   Certainly we looked at the incentives

Page 101

1        DAVID YING
2  for the purchasers to close a transaction.
3      Q.   And that's something you would
4  generally do when you were advising a company in
5  connection with a transaction, correct?
6      A.   Yes.
7      Q.   And I take it this is not the first
8  time that you've been involved in an auction
9  process for a company where one party's bid was
10  much better than anybody else's bid?
11        MR. ROGERS:  Objection to form.
12      And can you explain what this has to
13  do with his expert opinions?
14        MR. HARDIMAN:  I'm following up on the
15    statement he made when I asked him questions
16    about the Henkin opinion.
17        MR. ROGERS:  Which is not something
18    that he's been disclosed as offering an
19    expert opinion on.  So I ask the question
20    again:  What does this have to do with his
21    expert opinions?
22        MR. HARDIMAN:  Well, I have asked the
23    witness a question about this opinion, he
24    answered, and I followed up.
25        Now, if you are going to instruct him

Page 102

1        DAVID YING
2    not to answer, instruct him not to answer,
3    but if not, I would like to get an answer to
4    the question.
5        MR. ROGERS:  I think during the
6    limited time we have today, we should talk
7    about his expert opinions.
8  BY MR. HARDIMAN:
9      Q.   Can you answer my question?
10        MR. ROGERS:  You can answer.
11      A.   I'm sorry, I have lost track of your
12  question.
13      Q.   Sure.  I know.
14      A.   I apologize.
15      Q.   And I take it this is not the first
16  time that you've been involved in an auction
17  process for a company where one party's bid was
18  much better than every other party's bid?
19        MR. ROGERS:  Objection to form.
20      Beyond the scope.
21      A.   Actually, I don't recall a situation
22  where there's been this big a discrepancy in one
23  party's offer price.
24      Q.   Do you recall other situations where
25  there was a clear winner in the auction?

Page 103

1        DAVID YING
2        MR. ROGERS:  Objection to form.
3      Beyond the scope.
4      A.   I'm trying to think hard about the
5  definition of what a clear winner is given my
6  history in auction processes.  They tend to be
7  pretty competitive.
8      Q.   Let's go to Opinion Number 2 from Mr.
9  Henkin, which is that, "The agreement by the
10  Purchasers to buy Oncor as a REIT is akin to an
11  option."
12      Do you disagree with that opinion?
13        MR. ROGERS:  Objection to form.
14      Beyond the scope.  This has been covered in
15    his individual deposition.
16      You can answer the question.
17      A.   Well, it's a complicated contract.  I
18  think you can use the term "option," but you
19  have to qualify it by all the provisions of the
20  contract involved.
21      Q.   Well, my question here is simply do
22  you disagree with this conclusion, this opinion
23  by Mr. Henkin that the agreement by the
24  purchasers to buy Oncor as a REIT is akin to an
25  option?

Page 104

1        DAVID YING
2        MR. ROGERS:  Objection to the form.
3      Beyond the scope.  This was covered in his
4      individual deposition.
5      A.   Again, I actually take issue to his
6  definition of American versus European option
7  and some of the language that I recall that he
8  uses in his report.  I think you could vary at
9  50,000 feet describe it as an option, but I
10  think it's a very complicated option with many
11  terms and conditions not typically associated
12  with the terminology of an option in the world
13  of securities.
14      Q.   With respect to the decision at the
15  end of the day of the purchaser group to fund
16  this transaction, what are the complications
17  that affect whether that decision will be an
18  option or not?
19        MR. ROGERS:  Objection to the form.
20      It's beyond the scope.  This was covered in
21      detail in his individual capacity
22      deposition.
23      You can answer the question.
24      A.   I recall in my last deposition I said
25  that, although people have said, gosh, if the

1          DAVID YING
2 trading price of the stock the day after we
3 closed is not higher than the purchase price,
4 that no one's going to fund, I actually wonder
5 if that's really the correct assertion.
6          We're talking about a massive
7 investment that's been diligenced and researched
8 and considered very carefully by the investor
9 group. Like all good investors, they're not
10 looking at the price tomorrow and it's going to
11 be up by a dollar-57 as to why they should write
12 a check at $20.
13          This is a much longer
14 time-horizon-type investment, and I think that,
15 assuming that I can project my brain into those
16 of the people who are making the investment
17 decision, I think they should be making a
18 decision of this nature based on, you know,
19 long-term fundamentals and long-term
20 appreciation and not just the trading price of
21 securities on the day of close.
22     Q.   But if they don't think those
23 long-term fundamentals or long-term appreciation
24 favor them, they won't make the funding
25 decision, will they?

1          DAVID YING
2          MR. ROGERS: Objection to form.
3     A.   I think the observation that if -- I
4 think the observation that the investors have
5 the ability to decide whether they wish to fund
6 or not at the closing date is correct.
7     Q.   Well, that brings us right to Opinion
8 3 of Mr. Henkin, which is that, "The Purchasers
9 and Plan Sponsors can be expected to make their
10 decision to close the Merger based on whether
11 the perceived value of the common stock of New
12 EFH exceeds the sum of the purchase price plus
13 additional payments to be received by certain
14 Plan Sponsors in the event the Merger does not
15 close."
16          Do you agree with that opinion of Mr.
17 Henkin?
18          MR. ROGERS: Objection to form.
19     A.   I think, in general, that's the right
20 observation.
21     Q.   Let's go to Opinion 4, which is,
22 "There are no reasonable assurances that the
23 Merger will close."
24          Do you agree with that opinion of Mr.
25 Henkin?

1          DAVID YING
2          MR. ROGERS: Objection to form.
3     A.   I would have to read again exactly
4 what he wrote. On the face of it, it sounds
5 reasonable, but I don't remember exactly what he
6 said.
7     Q.   If you want to take a minute to look
8 at that section of his report --
9     A.   Sure.
10     Q.   -- feel free.
11     A.   Where would I find it?
12     Q.   I'm going tell that you in a minute.
13          Opinion 4 begins on page 27, paragraph
14 62.
15          MR. ROGERS: And I'll again state an
16 objection to this entire line of
17 questioning, which is beyond the scope of
18 his expert report and was covered in his
19 individual capacity deposition.
20          I'll also object to the extent you're
21 asking him to opine on four or five pages
22 worth of text in Mr. Henkin's report on the
23 spot at this deposition.
24     A.   I perused it. I haven't read every
25 word. Obviously, I participate in the board

1          DAVID YING
2 meetings that the company holds where they
3 inform the directors of how we're progressing
4 and the terms of the transaction. I think we
5 were being fully disclosive to the directors
6 that, quote, there is no assurance that the
7 merger will close, just like there's no
8 assurance that you will wake up in the morning.
9 Something may happen to you at night. Sorry for
10 the analogy, but I'm just saying generally.
11          I think the only issue I have with
12 this statement is that you have to evaluate it
13 in the context of the bankruptcy and how do we
14 resolve the bankruptcy. There was no other
15 alternative to resolving the bankruptcy in the
16 foreseeable future other than this transaction,
17 and as your committee knows, we implored your
18 committee and the other E-side creditors to give
19 us a viable alternative, and your committee,
20 despite its best efforts of its professionals
21 and the actual principals involved who own the
22 securities, I think I used the word "failed" in
23 a very visible fashion to come up with an
24 alternative.
25     Q.   So is it fair to say that your

1        DAVID YING
2 testimony is that you agree there are no
3 reasonable assurances the merger will close, but
4 it's the best you believe that the company could
5 do under the circumstances?
6        MR. ROGERS: Objection to form.
7    A.   And to elaborate on that response, I
8 believe there are very meritorious and good
9 reasons to pursue the closing of this
10 transaction.
11   Q.   But if you could answer my question,
12 which is, is it fair to say that your testimony
13 is that you agree there are no reasonable
14 assurances the merger will close, but it's the
15 best you believe the company could do under the
16 circumstances?
17       MR. ROGERS: Objection to form and
18   asked and answered.
19   Q.   Is that fair to say?
20   A.   Yes, it is.
21   Q.   Going to Opinion 5, and that has --
22   A.   I'm sorry, I lost the page.
23   Q.   I'm sorry, it's page 6, paragraph 15.
24   A.   Thank you.
25   Q.   And that has to do with the interest

1        DAVID YING
2 rate paid by EFH to TCEH in connection with the
3 intercompany promissory notes.
4        Do you agree with that opinion by Mr.
5 Henkin?
6        MR. ROGERS: Objection to the form.
7   Beyond the scope.
8    A.   Actually, I don't recall reading that
9 section at all carefully.
10   Q.   And is this an issue that you have
11 analyzed at all, whether or not the interest
12 rate paid by EFH to TCEH in connection with the
13 intercompany notes was reasonable or not?
14   A.   I'm well-aware of the question. I'm
15 well-aware that the company thinks the rates
16 were appropriate. I'm well-aware that others
17 have asserted over the past several years that
18 it's not. I don't have an opinion.
19   Q.   And finally, the last opinion, which
20 is, "Based on the implied market value of TCEH
21 today" -- and this is Opinion 6, paragraph 16 --
22 "there will be no tax liability EFH upon a
23 disposition of TCEH in a transaction utilizing
24 EFH's NOLs."
25       Do you agree with that opinion --

1        DAVID YING
2        MR. ROGERS: Objection to form.
3   Beyond the scope.
4    Q.   -- of Mr. Henkin?
5    A.   Well, I think if the question is
6 narrowly defined as if TCEH were to separate
7 from EFH in a taxable fashion, would EFH have
8 sufficient tax attributes to shelter the taxable
9 gain that would occur, based on our current
10 valuation of TCEH and its tax basis, I believe
11 the answer to that question is yes.
12       I would, however, wish to point out
13 and qualify the conclusions that one might draw
14 from that statement, and the qualification is
15 that if TCEH were to taxably deconsolidate from
16 EFH, there would not be a tax due upon that
17 taxable de-consolidation.
18       However, EFH would no longer have the
19 ability to, in a tax-efficient fashion, convert
20 to a REIT, and I think that's an important
21 consideration that the EFH UCC and all of the
22 creditors in the company should understand.
23 With the presumption that conversion to a REIT
24 is an attractive alternative, a taxable
25 de-consolidation eliminates any possibility of

1        DAVID YING
2 doing that.
3    Q.   And why does it eliminate any
4 possibility of doing that?
5    A.   Well, this is based on conversations
6 with the company, who obviously has the benefit
7 of tax advice. The problem of -- or, one of the
8 things that a company has to do when it converts
9 from a C Corp. to a REIT is that they have to
10 declare a purging dividend equal to all excess
11 of earnings and profits sitting inside the
12 company, and since this company has been around
13 a long time, it has a very substantial amount of
14 earnings and profits.
15       Again, I don't know the exact figure,
16 but I've heard from the company that their rough
17 calculation is that E&P could be as much as $20
18 billion. Part of the private letter ruling and
19 the discussion with the IRS has been that, as
20 part of the tax-free spin of TCEH, the IRS will
21 allow the allocation of EFH's earnings and
22 profits to be largely allocated to TCEH prior to
23 the spin, and therefore, when EFH elects to
24 convert to a REIT post the TCEH spin, they will
25 have very modest earnings and profits, and

1          DAVID YING
2 therefore, that enables EFH to convert from a C
3 Corp. to a REIT without incurring a large tax
4 obligation on the part of its shareholders.
5    Q.   Okay. And just so I'm clear -- and I
6 appreciate that -- will you be offering an
7 opinion on this topic?
8    A.   Well, I'm not --
9         MR. ROGERS:  Objection to form.
10    A.   -- a tax expert, but that is what I
11 understand the situation to be, and I know that
12 when we have thought about what are the values
13 of EFH as a REIT, we have worked closely with
14 the company and their tax counsel as to ways to
15 minimize a large taxable event to the EFH
16 shareholders that, if we are not able to
17 eliminate it, would make the conversion of EFH
18 to a REIT not feasible.
19    Q.   And again, just so I can understand,
20 is what you're saying is you may offer testimony
21 regarding this topic as a fact witness, but it's
22 not part of your expert opinion?
23         MR. ROGERS:  Objection to form.
24    A.   We have not at all discussed
25 internally what role I might play in describing

1          DAVID YING
2 this aspect of the considerations going into the
3 plan that's been proposed.
4    Q.   But you may have a role?
5         MR. ROGERS:  Objection to form.
6    A.   I just don't know. It's possible.
7 Like in many other things, it is possible.
8    Q.   It is possible.
9         And just to make clear, do you
10 anticipate offering an expert opinion on this
11 topic?
12         MR. ROGERS:  Objection.
13    Q.   As opposed to factual testimony?
14         MR. ROGERS:  Objection to form.
15    A.   Well, I couldn't present myself as a
16 tax expert.
17    Q.   So the answer is no?
18         MR. ROGERS:  Objection to form.
19    A.   If the question is if the company
20 needs an expert witness with respect to tax
21 issues, I'm not the person.
22    Q.   Well, the question is whether or not
23 you would be providing an expert opinion with
24 respect to -- excuse me, in response to Opinion
25 6 of Mr. Henkin?

1          DAVID YING
2         MR. ROGERS:  Objection to form. I
3 think I have answered that question for you.
4    A.   I don't know the answer to the
5 question. You'll have to -- we'll have to talk
6 it out with K&E and the company as to what we
7 do.
8         MR. HARDIMAN:  I have nothing else at
9 this time, subject to the reservation I made
10 at the beginning of the deposition that we
11 reserve the right to call you back on the
12 reinstatement issues, which we don't think
13 are ripe for discovery yet.
14         Number two, were you to put in a
15 rebuttal report, we would certainly reserve
16 the right to call you back to discuss the
17 rebuttal report; and, third, I reserve the
18 right, to the extent we receive any
19 information that you're providing any
20 additional expert testimony at the hearing,
21 to depose you with respect to that.
22         Other than that, I'm finished for the
23 day.
24         Thank you.
25         MR. ROGERS:  And just to follow up on

1          DAVID YING
2 your last reservation of rights, Mr. Ying
3 has been disclosed as providing expert
4 opinions in response to Mr. Rule's report.
5 I note that you have not asked him any
6 questions about that.
7         MR. HARDIMAN:  That's because the next
8 questioner is going to cover that.
9         MR. ROGERS:  Fair enough. Okay.
10         MR. PEDONE:  Let's take a two or
11 three-minute break, and then I'll have a few
12 questions, which won't be very long.
13         (Recess; Time Noted: 10:28 a.m.)
14         (Time Noted: 10:36 a.m.)
15 EXAMINATION BY
16 MR. NELSON:
17    Q.   Mr. Ying, my name is Lathrop Nelson.
18 I am conflicts counsel for the Official E-Side
19 Committee, and I have a couple of followup
20 questions for you.
21    A.   What firm are you with?
22    Q.   Montgomery McCracken.
23    A.   Okay.
24         MR. NELSON:  First, before we start, I
25 just want to put on the record that to the

1        DAVID YING
2 extent that the debtors intend to call Mr.
3 Ying to testify in rebuttal to the expert
4 report of Mark Rule, we object.  Mr. Ying
5 has not provided an expert report that's
6 required by the rules.  We have made a
7 request for an expert report, which debtors
8 have denied.  We'll go forward today but
9 reserve all of our rights.
10        MR. ROGERS:  I don't believe there's
11 been a request for an expert report, but the
12 point that we have not provided one is
13 correct; and as we said, you are free to ask
14 him any questions you like today about his
15 opinions on Rule.
16        MR. NELSON:  We have in fact provided
17 and requested an expert report, if it
18 intends -- if debtors intend to call him to
19 testify.  Given the lack --
20        MR. ROGERS:  Sure.  You will have to
21 point me to that, but...
22        MR. NELSON:  Given the lack of an
23 expert report, we'll treat this deposition
24 as a discovery deposition, taken without the
25 discovery which we're entitled under Rule

1        DAVID YING
2    26, and object to the debtors' designating
3    any portion of this testimony at the
4    November 3 hearing.
5 BY MR. NELSON:
6    Q.   Mr. Ying, you have testified that you
7 reviewed the expert report of Mark Rule; is that
8 correct?
9    A.   Yes.
10    Q.   And you, as you sit here today, you
11 are prepared to answer questions about it?
12    A.   Yes.
13    Q.   But counsel has not asked you to
14 testify at the upcoming hearing regarding this
15 report; is that correct?
16    A.   No, they have not.
17    Q.   Do you understand that you have been
18 noticed as providing review and commentary on
19 any analysis of EFH's solvency conducted by Mark
20 F. Rule as an expert witness for the EFH
21 committee?
22    A.   Yes.
23    Q.   And have you been given any assignment
24 in connection with the Rule report?
25    A.   I have spoken to counsel at K&E about

1        DAVID YING
2 my reactions to the contents of Mr. Rule's
3 report.
4    Q.   And have you formed any opinions
5 regarding the Rule report?
6    A.   Well, I'm still reviewing it because
7 parts of it I can't figure out, but I do have
8 some reactions and thoughts after having read
9 it.
10    Q.   And we'll get to that.
11        Your current report that you have
12 provided and is an exhibit today has nothing to
13 do with pre-petition solvency of EFH or the
14 E-side; is that correct?
15    A.   That's correct.
16    Q.   And in fact, in your expert report you
17 disclaim any analysis, solvency analysis; is
18 that correct?
19    A.   That is correct.
20    Q.   You have said that you have reviewed
21 the report and have developed opinions, is that
22 correct, regarding Mr. Rule's report?
23    A.   That is what I said.
24    Q.   What opinions have you developed in
25 connection with this report?

1        DAVID YING
2    A.   Well, it's a long report, but let me
3 see if I can remember a couple of reactions that
4 I had.
5        I think at the beginning of his
6 report, he critiques one of the Duff & Phelps'
7 valuation methodologies, and I think it
8 specifically relates to Oncor, where he says
9 that a control premium, which is shorthand for
10 saying, you know, what would Oncor trade for as
11 a -- in a sale process, should not be taken into
12 account because Oncor has a ringfence, and I
13 don't think that is correct.
14        We obviously have been running an
15 extensive M&A process.  We approached many large
16 corporate strategic acquirers in those
17 discussions.  Not a single one of them raised
18 the ringfence as an obstacle to their interest
19 in acquiring Oncor, and in the one corporate bid
20 that we did get -- and the, again, the EFH UCC
21 was privy to all of the documentation and
22 process around that bid -- there was no
23 reservation or discount that they applied
24 because of the ringfence that exists at Oncor.
25    Q.   Let's do this.  Why don't I provide to

DAVID YING

1
2 you -- I'm going to hand it to the court
3 reporter, and this is Ying Confirmation Exhibit
4 No. 7.
5        (Ying Confirmation Exhibit 7, Expert
6     Report of Mark F. Rule, CFA, October 12,
7     2015, marked for identification, as of this
8     date.)
9 BY MR. NELSON:
10   Q.   The expert report of Mark F. Rule.
11       Do you recognize this document?
12   A.   Yes.
13   Q.   And this is the expert report which
14 you have reviewed in advance of today's
15 deposition?
16   A.   Yes.
17   Q.   And if I can take you to page 11 --
18       MR. ROGERS:  Before you ask any
19   questions, counsel, can you wait until I
20   have a copy?
21       MR. NELSON:  Sure.
22       (Document handed.)
23 BY MR. NELSON:
24   Q.   So direct you to page 11.
25   A.   I have it.

1              DAVID YING
2   Q.   And halfway down the page, there is a
3 reference to "Duff & Phelps' analyses
4 incorporating at least one significant
5 assumption which, in my opinion, is
6 unwarranted -- namely, the application of a
7 control premium in valuing Oncor."
8       Is that the issue you just testified?
9   A.   Yes.
10   Q.   And you do not agree with the opinion
11 as it's stated here; is that correct?
12   A.   Yes.
13   Q.   And are you aware of the SEC's -- EFH
14 Corporation's SEC filing that discusses the
15 control of the Oncor Holdings board of directors
16 regarding the management of day-to-day
17 operations of Oncor?
18   A.   Yes.
19   Q.   And have you taken that into
20 consideration in connection with your opinion?
21   A.   Yes.
22   Q.   And what -- have you taken an opinion
23 of what is the effect of the disclosures
24 regarding Oncor Holdings' ultimate
25 responsibility in connection with your opinion?

1              DAVID YING
2   A.   I'm sorry.  Please ask the question
3 again.
4   Q.   You have stated that you have taken
5 the SEC -- EFH Corporation's SEC filing in
6 connection with your opinion regarding the use
7 of a control premium, correct?
8   A.   Yes.
9   Q.   Okay.  And how have you taken that
10 into consideration?
11   A.   Well, I'm fully aware of the corporate
12 governance implications of the ringfence and I'm
13 aware of the company's disclosure in its filings
14 with the Securities and Exchange Commission
15 describing that corporate governance
16 arrangement, but I know that, in practice and
17 speaking to strategic acquirers, none of them
18 saw that as a major impediment in making or
19 considering an offer to acquire Oncor.
20       And to repeat what I said a minute or
21 two ago, we have evidence from a strategic
22 acquirer that the EFH UCC is fully aware of
23 where they made an offer that had a control
24 premium in it and didn't raise the ringfence
25 arrangement as an impediment to them making

1              DAVID YING
2 their bid.
3   Q.   But that was not done in connection
4 with a solvency opinion, was it?
5       MR. ROGERS:  Objection to form.
6   A.   Was what?  I'm sorry.  Please ask the
7 question again.
8   Q.   Was the bid that was offered and the
9 use of a control premium in connection with
10 that, that was not in connection with providing
11 a solvency analysis of EFH; is that correct?
12   A.   I'm talking about a completely
13 different process at a completely different
14 point in time, but I'm just saying, in the real
15 world, control premiums would exist for Oncor,
16 and the assertion that there shouldn't be a
17 control premium I think is incorrect.
18   Q.   But what we're talking about what --
19 excuse me.  What the Rule report discusses is a
20 solvency analysis of EFH Corp.; is that correct?
21   A.   I think, in this context, he's
22 referring to the analysis that Duff & Phelps
23 did.
24   Q.   And whether or not Duff & Phelps
25 appropriately included a control premium in

Page 125

DAVID YING

1
2 connection with that solvency analysis?
3     A.    Well, actually, I think Duff & Phelps'
4 report is a valuation analysis for GAAP purposes
5 for determining impairment of goodwill.  I don't
6 recall that report addressing the issue of
7 solvency.
8     Q.    Do you understand in connection with
9 the report how Mr. Rule uses the Duff & Phelps
10 solvency opinion?
11        MR. ROGERS:  Objection to form.  He
12 just said it wasn't a solvency opinion.
13     Q.    Do you understand how -- well, answer
14 the question.
15        MR. ROGERS:  No.  Objection to form.
16     A.    Would you please ask the question
17 again?
18     Q.    You understand how Mr. Rule uses the
19 Duff & Phelps report in connection with his
20 solvency opinion?
21     A.    I do understand how Mr. Rule tries to
22 use the Duff & Phelps report to write his
23 report, yes.
24     Q.    And how do you understand that?
25     A.    Well, he says that the valuation that

Page 126

DAVID YING

1
2 Duff & Phelps uses for Oncor includes a control
3 premium, and Mr. Rule asserts that that should
4 not be used; and I don't think that that is a
5 correct assertion.
6     Q.    If you take a step back to page 5 of
7 the report, there is listed a Summary of
8 Opinions.  Do you see that?
9     A.    Yes.
10     Q.    And in connection with that Summary of
11 Opinions, have you formed -- the first one is,
12 "Consolidated EFH Corp. was insolvent between
13 December 31, 2008 and December 31, 2012."  Do
14 you see that?
15     A.    Yes.
16     Q.    Have you formed an opinion in
17 connection with that opinion?
18     A.    Well, I did look at -- I believe it's
19 page 14, which I think is the chart at the top
20 of the page where he's, under Roman numeral VI,
21 Analysis of Consolidated EFH Corp. Solvency from
22 2008 to 2012.
23     Q.    Yes.
24     A.    I did look at that chart, and I was
25 perplexed by the financial analysis that I saw;

Page 127

DAVID YING

1
2 and the reason I was perplexed is that I think
3 everybody in this room understands the corporate
4 structure of EFH, so I won't belabor the -- a
5 recitation of the corporate structure, but
6 clearly when you have a holding company parent
7 that owns the stock of two sister subsidiaries,
8 I think the right way to look at the solvency of
9 the parent is to look at whether its equity
10 ownership of each of the sister subsidiaries
11 standing separately has equity value or not.
12        And clearly the chart on the top of
13 page 14 takes a consolidated view, and as a
14 result of that, I don't think that that's an
15 appropriate analysis to make in this context.
16 So I was very confused by his analytical
17 approach.
18     Q.    And can you explain what you mean by
19 "his analytical approach"?
20     A.    I would not take a consolidated view.
21 I don't think it's an appropriate way to analyze
22 the solvency of EFH.
23     Q.    But do you have any opinions regarding
24 how he calculates the consolidated EFH solvency?
25     A.    Well, do I have a dispute with his

Page 128

DAVID YING

1
2 ability to add and subtract numbers?  No, but I
3 don't think he's doing the analysis correctly.
4     To be more explicit, I think he has to
5 look at the assets and liabilities of TCEH to
6 calculate whether his equity value in EFH's
7 ownership of TCEH, and then I think he needs to
8 look at the assets and liabilities of EFIH to
9 determine whether there is equity value in EFH's
10 ownership of the equity of EFIH, and looking at
11 a consolidated view I think is inappropriate, if
12 not misleading.
13     Q.    You understand that this opinion is
14 being conducted using a balance sheet test,
15 correct?
16     A.    I understand that.
17     Q.    And you are familiar with what the
18 balance sheet test is?
19     A.    I believe I am.
20     Q.    And if you were to conduct an analysis
21 of a consolidated EFH Corporation, how would you
22 conduct that under the balance sheet test?
23     A.    I just described it.
24     Q.    You would --
25     A.    Would you like me to repeat it?

Page 129

1          DAVID YING
2    Q.   No.  You would take the -- isn't it
3 correct you would take the enterprise value of
4 the consolidated entity?
5    A.   That's incorrect.
6    Q.   How is that incorrect?
7    A.   I just described it.  Would you like
8 me to repeat it?
9    Q.   You can answer my question.  How is it
10 incorrect?
11   A.   You have to look at the two
12 subsidiaries separately and look at the equity
13 value that EFH has in each of its primary
14 subsidiaries.
15   Q.   And so you take issue with the Rule
16 report because it does not do that and, instead,
17 deducts the liabilities from the enterprise
18 value?
19        MR. ROGERS:  Objection to form.
20   A.   To help you along, again, I don't
21 think you can look at EFH as a consolidated
22 entity.  You must look at the structural
23 differences between where the assets and the
24 liabilities sit in its two primary subsidiaries.
25        Now, to Mr. Rule's credit, he attempts

Page 130

1          DAVID YING
2 to do the correct analysis on a subsequent page
3 where he tries to look at just what is the
4 assets minus liabilities at EFIH and how they
5 flow up to EFH.
6    Q.   Have you conducted a solvency analysis
7 of EFH Corp. on a consolidated basis?
8    A.   No.
9    Q.   Have you asked any of your staff to
10 conduct that analysis?
11   A.   No.
12   Q.   Sitting here today, do you have an
13 opinion regarding the solvency of EFH on a
14 consolidated basis?
15        MR. ROGERS:  Objection to form.
16        MR. PEDONE:  Objection.
17   A.   You would have to be more specific.
18 And I haven't formed any opinions, but it's a
19 very vague question.
20   Q.   Sitting here today, have you conducted
21 a solvency analysis of consolidated EFH
22 Corporation from 2008 to 2012?
23        MR. ROGERS:  Objection to form.
24   A.   No.
25   Q.   If you take a look at that Section VI,

Page 131

1          DAVID YING
2 which we have just been talking about, Analysis
3 of Consolidated EFH Corporation Solvency from
4 2008 to 2012, you have reviewed this section,
5 correct?
6    A.   Yes.
7    Q.   And have you developed any other
8 opinions beyond those that you have just
9 testified to in connection with this section?
10   A.   No.
11   Q.   Are you prepared to offer any opinions
12 at the hearing starting November 3 in connection
13 with this section other than what you have just
14 testified to?
15   A.   I have no idea because I have not
16 discussed with counsel whether I will be asked
17 or whether I need to be an expert witness or
18 rebuttal to Mr. Rule's report.
19   Q.   If you take a look at Section VII,
20 Other Indicia of Consolidated EFH Corp.
21 Insolvency from 2008 to 2012, have you reviewed
22 that section?
23   A.   I have.  I have to refresh my memory
24 as to what it says.
25   Q.   Please do.

Page 132

1          DAVID YING
2        (Document review.)
3    A.   I have.
4    Q.   Have you formed any opinions in
5 connection with this section of the Rule report?
6    A.   I have one reaction.
7    Q.   What is that reaction?
8    A.   Well, if I looked at every company in
9 the high yield universe at these dates, I would
10 have said that 80 percent of the high yield
11 market would have gone bankrupt.
12   Q.   And why do you say that?
13   A.   Because 80 percent of the market was
14 trading at a discount.  Obviously that never
15 happened, much to the disappointment of most of
16 the people in this room.
17        I don't think you can use market value
18 of debt as a definitive indicator of solvency or
19 insolvency.  It's a time-proven test, and market
20 value of debt is not an indicator.
21   Q.   Earlier in response to some questions
22 from Mr. Anker, you testified that investment
23 bankers will look to the market to determine an
24 indicia of value; is that correct?
25   A.   That is correct.

DAVID YING

2    Q.    And that what an investor might pay
3  for a particular asset may be relevant to value;
4  is that correct?
5    A.    That is correct.
6    Q.    And does not what's depicted in Figure
7  4 in the analysis of EFH Corp.'s debt in 2008 to
8  2012 reflect what the market is valuing the
9  asset?
10        MR. ROGERS:  Objection to form.
11        Which asset?
12    Q.    Does that not reflect -- I'll repeat
13  that so the record is clear.
14        Does not Figure 4 depict the -- excuse
15  me.  Does not the debt that's reflected in
16  Figure 4 regarding EFH Corporation's debt
17  between 2008 and 2012 reflect what the market is
18  valuing EFH Corp.?
19    A.    I don't think the chart at the top of
20  page 17 is useful or relevant or helpful, and I
21  think your reference to an earlier statement is
22  being taken out of context.
23        Investment bankers obviously look to
24  comparable companies and look at their valuation
25  multiples as an indicator of valuation.  It's,

DAVID YING

2  again, a time-proven methodology looking at
3  comparable company analysis.
4        Obviously one has to be careful as to
5  what comparables you look at.  Obviously there's
6  been lots of dispute over whether you can look
7  at a company whose debt trades at big discounts
8  to par as a valuation comparable, and so that
9  when I said that you do look at comparable
10  companies for their trading values, we generally
11  only look at companies where their debt is
12  trading at a -- not at a distressed level, as a
13  measure of valuation.
14        So I just want to make that reference
15  very clear.  Again, I don't think you can really
16  look at how EFH or EFIH or TCEH's debt was
17  trading in the marketplace in this time period.
18  Obviously, that time period was marked by what
19  we now refer to as the Great Recession.  A
20  substantial portion of the high yield bond
21  market was trading at significant discounts, in
22  fact, at distressed trading levels.
23        Most of the companies' debt came back
24  to trade close to par.  Most of those companies
25  accessed the capital markets and refinanced

DAVID YING

2  their indebtedness, and I think picking a point
3  in time like that and saying debt trades at
4  discounts is a measure of insolvency is an
5  interesting observation, but I don't think there
6  is a substantive, educated, well-founded body of
7  literature, let alone in practice, methodology
8  that says that, therefore, these companies were
9  all insolvent.
10    Q.    I'll dissect that in a second, but
11  first, you mentioned distressed level.  How
12  would you define debt trading at a distressed
13  level?
14    A.    Again, I think that you often see
15  reference in the literature to debt trading at
16  distressed levels when it trades at a yield to
17  maturity that is a thousand basis points higher
18  than the relevant maturity of United States
19  Treasury notes.
20    Q.    And you testified regarding most of
21  the companies' debt came back to trade close to
22  par.
23        Did EFH debt ever come back to trade
24  close to par?
25    A.    Some of it had.  Some of it has.  Some

DAVID YING

2  of it is now.
3    Q.    For instance, the Q Series senior
4  notes, the 6.5 percent fixed Series Q senior
5  notes due November 15, 2024, have those ever
6  returned to par?
7    A.    I believe the last I saw, they were
8  trading at around 98, and I think a couple
9  months ago they were trading above par.
10    Q.    Do you have any other opinions in
11  connection with this section of Mr. Rule's
12  report?
13    A.    No.
14    Q.    The next section of Mr. Rule's report,
15  Analysis of EFH Corp. and the E-Side Solvency
16  from December 2008 to 2012.  See that?
17    A.    This is starting on page 19?
18    Q.    That's correct.
19    A.    I'm looking at it, yes.
20    Q.    Have you formed an opinion in
21  connection with this section of the report?
22    A.    Well, I've spent some time looking at,
23  in particular, at the chart on page 21.
24    Q.    Right.
25    A.    A couple minutes ago, I actually said

DAVID YING

2 to you that, in lieu of looking at EFH's
3 solvency on a consolidated basis, it's probably
4 more appropriate to look at whether EFH has
5 equity value in its primary two subsidiaries,
6 TCEH and EFIH.
7        I think on page 21 he's attempting to
8 do that by looking at whether EFH has equity value in
9 whether EFH has equity value in EFIH.  So I
10 think he's tried to disaggregate from the
11 consolidated results TCEH, which again I think
12 is the right way to look at it.
13       I must say I am completely befuddled
14 by some of the numbers that he's producing.  For
15 example, if you look at the far right-hand
16 columns on page 21, he looks at, at the end of
17 the year 2012, the value of Oncor per the Duff &
18 Phelps report, and then he attempts to add and
19 subtract assets and liabilities in addition to
20 the economic ownership in Oncor, the assets and
21 liabilities at EFIH, and then he does the same
22 thing at EFH.
23       And the thing that I just can't
24 understand is exactly where he came up with
25 these numbers.  They don't resemble any numbers

DAVID YING

2 that I have seen.  Again, I had a lot of problem
3 and I've asked my colleagues to try to figure
4 out what his adjustments were.
5        I do recall back then that, at the end
6 of 2012, I thought there was approximately $6
7 billion of third-party debt at EFIH and
8 approximately a billion-8 of third-party debt at
9 EFH, and that you could calculate the solvency
10 of EFH based on those third-party debt amounts
11 and an imputed value for the 80 percent interest
12 that EFIH owns in Oncor, but obviously those
13 numbers are radically different than the net
14 debt numbers included in his report, and I just
15 can't figure out where he came up with them.
16   Q.    You see that on the far right it has a
17 citation, the very last column has a series of
18 citations incorporated into the chart; do you
19 see that?
20   A.    Yes, I do.
21   Q.    And have you analyzed the citations
22 and the documents referenced therein?
23   A.    I have asked my colleagues, who work
24 for me, to look at those, and they have, but
25 they can't explain to me what he did.

DAVID YING

2   Q.    Have you looked at them?
3   A.    I have not read the citations and the
4 specific schedules, but the people who work for
5 me are very good at this and they can't figure
6 out what he did.
7   Q.    And you said you had questions of --
8 there were other calculations you had questions
9 about?
10   A.    I was just laying -- excuse me.
11 Pardon me.  What I said was that I was talking
12 specifically about the year 2012.  I believe --
13 I haven't carefully examined the other preceding
14 years, but I suspect we have a similar problem
15 in terms of understanding exactly what
16 adjustments he made to come up with these
17 numbers.
18       They are not readily apparent from the
19 public disclosures of the company and what we
20 know about the capital structure.
21   Q.    Do you have any other opinions in
22 connection with Figure 5 on E-side solvency?
23   A.    I have no other observations to make
24 with regard to the chart on page 21 other than
25 those that I just gave you.

DAVID YING

2   Q.    Have you conducted any analysis
3 regarding E-side solvency from 2008 to 2012?
4   A.    No, I have not.
5   Q.    Have you asked anyone under your
6 direction to do so?
7   A.    No, I have not.
8   Q.    Do you have an opinion regarding
9 E-side solvency from 2008 to 2012?
10   A.    I do not.
11   Q.    Do you intend to provide an opinion at
12 the hearing on November -- starting commencing
13 November 3 in connection with E-side solvency
14 between 2008 and 2012?
15   A.    I don't know.  Again, you have asked
16 me that question in prior forms, and I just
17 don't know the answer to that.
18   Q.    No one's asked you to do so?
19   A.    No.
20   Q.    If you turn to Section X, Analysis of
21 E-Side Solvency Indicia after December 2012,
22 have you reviewed this section of the report?
23   A.    No, I think my prior comments cover
24 this section as well.
25   Q.    Have you developed an opinion

1       DAVID YING
2 regarding E-side solvency after December 2012 to
3 the petition date?
4   A.   Didn't you just ask me that question?
5 I'm happy to answer it.
6   Q.   I asked you between 2008 and 2012. My
7 question to you now is have you developed an
8 opinion regarding solvency of E-side solvency
9 between December 2012 and the petition date?
10   A.   Oh, I'm sorry. I wasn't listening
11 carefully enough.
12       No, I have not.
13   Q.   And you have not asked anyone to
14 conduct that analysis, have you?
15   A.   No, I have not.
16   Q.   Turn to Section XI, SG&A Costs,
17 Corporate Services and Allocations. Have you
18 reviewed this section of the report?
19   A.   I have looked at it, yes.
20   Q.   Have you formed any opinions in
21 connection with this section?
22   A.   Not as of yet.
23   Q.   Do you intend to form any opinions in
24 connection with this section of the report?
25   A.   I haven't spent much time researching

1       DAVID YING
2 SG&A allocations, so I suspect I won't, but I
3 haven't really delved into this very much.
4   Q.   So sitting here today you have no
5 opinions in connection with this section?
6   A.   That is correct.
7   Q.   Turn your attention to Section XII,
8 Exchanges and Repurchases of TCEH Debt by EFH
9 Corp. and EFIH, do you see that?
10   A.   Yes.
11   Q.   Have you reviewed this section of the
12 report?
13   A.   Yes.
14   Q.   Have you formed any opinions in
15 connection with this section of the report?
16   A.   I don't think so, no.
17   Q.   Has anyone asked you to evaluate this
18 section of the report?
19   A.   Counsel had asked me to read through
20 the entire report and give them my thoughts.
21   Q.   Have you provided thoughts in
22 connection with this section of the report?
23   A.   No, I don't think so.
24       I'm sorry, I'm a little perplexed.
25 There is a section in here that I do remember

1       DAVID YING
2 reading. I just can't find it now.
3   Q.   In connection with this particular
4 section or in --
5   A.   No, I just found it. I'm sorry. I
6 misspoke. In Section X, entitled Analysis of
7 E-Side Solvency Indicia after December 2012,
8 there is a section that I actually had formed an
9 opinion on and would be happy to share with you.
10   Q.   What in that section have you formed
11 an opinion on?
12   A.   Mr. Rule decides that his focus on the
13 make-whole payment, make-whole payments are
14 things that are triggered when the company
15 decides to proactively trigger the make-whole,
16 and until the company decides to proactively
17 trigger a make-whole, it's not a liability that
18 I think should enter into the calculus of
19 solvency.
20   Q.   But once it's triggered --
21   A.   And I think because it's an obligation
22 that's triggered only if the company takes
23 certain acts, so long as the company doesn't
24 take those acts, I see no reason to calculate a
25 liability that hasn't been crystallized.

1       DAVID YING
2   Q.   But in fact, if they take the act, it
3 will become crystalized?
4   A.   If they choose to do so, and under
5 what circumstances they would do so I don't
6 understand. For example, if you're doing a
7 calculation of how much is the company worth,
8 what would someone pay for it, as you all know,
9 the buyer can assume the obligations under these
10 agreements.
11       At most, there's a change in control
12 provision which requires that the issuer make an
13 offer to purchase all these notes at -- I
14 believe the price is 101 percent of par, and
15 otherwise, the buyer can assume the obligations
16 and never crystalize the make-whole.
17       So I see no reason to assume the worst
18 when no rational purchaser would ever trigger an
19 obligation greater than that they would
20 otherwise want to pay.
21   Q.   Are there any circumstances in which
22 potential E-side liabilities related to
23 make-whole payments should be considered as part
24 of a solvency analysis?
25       MR. ROGERS: Objection to form.

1         DAVID YING
2     A.   I would have to think long and hard
3  about why in a solvency analysis a make-whole
4  premium has to be incorporated, because I always
5  think there's a way for a buyer to buy a company
6  without incurring the make-wholes.
7     Q.   Is there anything else in connection
8  with this section of the report --
9     A.   No.
10    Q.   -- that you have reviewed and have an
11 opinion on?
12    A.   No.  I'm sorry I didn't remember it
13 when we passed through it, but, no, I don't
14 remember anything else.
15    Q.   At the bottom of that section on page
16 23, there is a statement regarding "that the
17 current bid to purchase 80.03 percent interest
18 in Oncor by the TCEH Unsecured Ad Hoc Group and
19 Hunt Consolidated, Inc. (the 'Hunt Bid') is not
20 a reliable basis upon which to evaluate the
21 pre-petition solvency of the E-side."  Do you
22 see that?
23    A.   Yes, I do.
24    Q.   Do you have an opinion in connection
25 with that statement?

1         DAVID YING
2     A.   I think that's a fair assertion for
3  him to make.  Here we are in 2015.  It's a
4  unique set of circumstances.  He's evaluating
5  solvency in 2008 through 2012.
6         People have been talking about
7  converting Oncor to a REIT for many years, but
8  no one had, up until most recently, figured out
9  the technology to do it, and so I think it's --
10 I think it's fair for him to not incorporate
11 REIT valuations into attempts to put a valuation
12 on Oncor.
13    Q.   Do you have any other opinions in
14 connection with the Rule report that we haven't
15 discussed already?
16    A.   No.
17         MR. NELSON:  Can I just take a short
18    break for a second?
19         THE WITNESS:  Sure.
20         MR. ROGERS:  Sure.
21         (Recess; Time Noted:  11:15 a.m.)
22         (Time Noted:  11:21a.m.)
23 BY MR. NELSON:
24    Q.   Mr. Ying, you had testified regarding
25 how the make-whole claims should not be booked

1         DAVID YING
2  as a liability because no one would book them
3  that way; do you recall that?
4     A.   Yes.
5         MR. ROGERS:  Objection to form.
6         MR. LEES:  Object to form.
7     Q.   What experience do you have on how a
8  company should book certain liabilities?
9         MR. ROGERS:  Objection to form.
10    A.   Well, I was really speaking from my
11 experience as a banker in terms of how companies
12 acquire other companies and whether they worry
13 about make-whole claims.  I'm not a expert in
14 booking things because I'm not an accountant.
15    Q.   Right, you're not -- you don't have an
16 accounting background?
17    A.   That is correct.
18         MR. NELSON:  With that, I'll pass the
19    chair, although I'll reserve our right to
20    call you back as a rebuttal witness and
21    renew my objection earlier at the start of
22    the questioning.
23 EXAMINATION BY
24 MR. PEDONE:
25    Q.   Mr. Ying, I'm Richard Pedone, counsel

1         DAVID YING
2  for American Stock Transfer, the Indenture
3  Trustee of the holding company.
4         Has Evercore ever prepared a
5  liquidation analysis for EFH Corp.?
6     A.   No.
7     Q.   And that would include your staff as
8  well as you personally, correct?
9     A.   Yes.
10    Q.   Do you know whether or not anyone has
11 prepared a liquidation analysis for EFH Corp.,
12 draft or otherwise?
13    A.   I think some analysis has been
14 prepared of a liquidation analysis in the
15 context of the disclosure statement.
16    Q.   For EFH?
17    A.   Under the requirements of the best
18 interests test, but I don't think anyone has
19 done any liquidation analysis with regard to
20 solvency.
21    Q.   And have you personally ever seen a
22 liquidation analysis for EFH Corp.?
23    A.   In what context?
24    Q.   In any context at all.
25    A.   I think we have, again, a liquidation

Page 149

1        DAVID YING
2 analysis as required by the best interests test
3 in the disclosure statement, but I don't think
4 we've done -- I've never seen a solvency
5 analysis or a liquidation analysis in the
6 context of any solvency analysis.
7    Q.   Could you take a moment and point me
8 to -- the disclosure statement was marked as an
9 exhibit today.  Could you point me to the
10 section you are referring to?
11    A.   I'm afraid it would take a long time
12 for me to find it.
13    Q.   Why don't we go off the record for a
14 minute while you review it and perhaps counsel
15 can help you find it.
16        (Whereupon, there was a pause in the
17 proceedings and a discussion off the record.)
18 BY MR. PEDONE:
19    Q.   Mr. Ying, we were off the record and
20 you had a chance to look through the disclosure
21 statement.  Sitting here today, you're not aware
22 of any liquidation analysis actually being
23 included in this disclosure statement that was
24 marked as an exhibit today, are you?
25    A.   That's correct.

Page 150

1        DAVID YING
2        MR. ROGERS:  For EFH Corp.
3    Q.   For EFH Corp.
4    A.   That's correct.  I was reminded that
5 there is none in the disclosure statement, even
6 though we've had internal discussions about the
7 possibility of having to provide one.
8    Q.   Okay.  And in connection with those
9 internal discussions or otherwise, have you ever
10 seen a draft liquidation analysis for EFH Corp.?
11    A.   I'm sorry, I lost my train of thought.
12 Would you please ask the question again?
13    Q.   Sure.  In connection with those
14 internal discussions or otherwise, have you ever
15 seen a draft of a liquidation analysis for EFH
16 Corp.?
17    A.   No, I haven't seen a draft.  I've only
18 had oral communication with counsel on the
19 subject.
20    Q.   And other than your expert report
21 which has been marked as an exhibit today and
22 the opinions therein and the possibility that
23 you will offer rebuttal testimony concerning Mr.
24 Rule's report, has anyone asked you to consider
25 providing any other opinions in connection with

Page 151

1        DAVID YING
2 the trial, confirmation trial?
3    A.   No.
4    Q.   In connection with the feasibility
5 analysis contained in your report -- and you
6 should feel free to refer to it -- you indicated
7 that you evaluated the ability of EFH Corp. to
8 pay the make-wholes and pre-petition -- and PPI,
9 post-petition interest, as of I believe it was
10 mid 2017; is that correct?
11    A.   Yes.
12    Q.   And in connection with your analysis,
13 did you evaluate what would happen if appeals or
14 other events took longer and the payments or
15 judgment did not occur until 2018 or later?
16    A.   I have not run the math for 2018 or
17 later.
18    Q.   And you would agree that, separate
19 from running the math, an analysis of whether or
20 not the company would be able to pay in 2018
21 would also involve a valuation of market
22 circumstances, correct?
23    A.   Well, I think that our analysis
24 assumes normal capital markets in any event,
25 whether it's '17, '18 or whatever timeframe you

Page 152

1        DAVID YING
2 wish to propose.
3    Q.   And do you have an opinion with regard
4 to whether or not the company would be able to
5 make the payments in mid 2018?
6    A.   Well, as you can see --
7        MR. ANKER:  Object to the form of the
8 question.
9    A.   As you can see, I have not run the
10 mathematics for 2018; only for 2017.
11    Q.   And aside from the mathematics, do you
12 have an opinion with regard to the other
13 circumstances that might affect the company's
14 ability to pay in 2018 as opposed to 2017?
15    A.   What other circumstances are you
16 thinking about?
17    Q.   Built into your analysis of whether
18 the company can pay in 2017 are assumptions
19 concerning the market and the value -- and the
20 profitability of the company, correct?
21    A.   Built into our analysis are
22 assumptions with regard to the leverage levels
23 and the value of the equity account of the
24 company.  We are not making any predictions as
25 to market conditions at those dates.

1        DAVID YING
2    Q.   In your earlier testimony, you made a
3 comment to the effect that, until now, no one
4 had figured out the, quote, technology to
5 convert to a REIT.
6        Do you recall a statement to that
7 effect?
8    A.   Yes.
9    Q.   What did you mean by that?  Would you
10 explain more fully?
11   A.   Well, no one had figured out how to
12 extract EFH from -- or, pardon me, no one had
13 figured out how to extracts Oncor from its
14 current corporate structure and convert it into
15 a REIT.
16   Q.   And is that something that you believe
17 has been figured out during the pendency of
18 these cases?
19   A.   Yes.
20   Q.   And that's something that contributes
21 significantly to the value of EFH, correct?
22   A.   Yes, I believe it does.
23   Q.   Have you calculated the increase in
24 value attributable to that, figuring out that
25 technology or coming to terms with that

1        DAVID YING
2 conversion?
3    A.   Well, I think a reflection of the
4 valuation difference is the value proposal we
5 got from a strategic acquirer to buy EFH -- they
6 certainly were going to keep it as a C Corp. and
7 they themselves are a C Corp. -- relative to the
8 valuation that's being preposed by the investor
9 group, and as I indicated earlier, it's at least
10 a billion dollars higher.
11       MR. PEDONE:  I have no further
12   questions today.  Again, to reiterate, we
13   believe that we have the right to have you
14   come back to talk about reinstatement issues
15   at a later point.
16       Thank you.
17       MS. KAM:  Can I have ten minutes while
18   we switch seats?
19       MR. PEDONE:  Sure.
20 EXAMINATION BY
21 MS. KAM:
22   Q.   My name is Sarah Kam, and I'm from
23 ReedSmith and we're counsel for the Bank of New
24 York Mellon as Indenture Trustee for the
25 Pollution Control Revenue Bonds and the

1        DAVID YING
2 Pollution Control Revenue Refunding Bonds, which
3 are referred to together as the PCRB claims.
4 Okay?
5    A.   Yes.
6    Q.   During negotiations regarding the
7 plan, do you recall forming a view as to whether
8 the PCRB claims should be treated pari passu
9 with other T-side unsecured creditors?
10       MR. ROGERS:  Objection to the form.
11   Beyond the scope.
12   A.   Well, I know the PCRBs don't have
13 guarantees from the subsidiaries of TCEH, so I
14 believe that their claims on assets differ from
15 the unsecured notes and the other unsecured
16 creditors, but I didn't form any views as to
17 what the treatment of the PCRBs in the plan was
18 to be.
19   Q.   And you're aware that the TCEH
20 unsecured Ad Hoc Group also became unwilling to
21 treat the PCRB claims pari passu with other
22 T-side unsecured creditors?
23       MR. ROGERS:  Objection to form.
24   A.   Yes, I am aware that -- of the
25 position that the T-unsecured committee has

1        DAVID YING
2 taken.
3    Q.   And do you have a view as to why the
4 Ad Hoc Group was not willing to treat the PCRB
5 claims pari passu with other T-side unsecured
6 creditors?
7    A.   They haven't told me their innermost
8 thinking.  All I know is their position.
9    Q.   So under the plan, the debtors did in
10 fact agree that the PCRB claims not be treated
11 pari passu with other T-side unsecured
12 creditors?
13   A.   That is correct.
14   Q.   And you are aware that under the plan,
15 the PCRB claims are not sharing in the waiver of
16 the TCEH first lien deficiency claim?
17   A.   I am aware of that, yes.
18   Q.   Do you have a view as to the basis for
19 the PCRB claims not sharing in the waiver of the
20 TCEH first lien deficiency claim?
21       MR. ROGERS:  Objection to the form.
22   A.   I do not.
23   Q.   Do you have a view as to why the Class
24 C5 general unsecured claims against the TCEH
25 debtors other than EFCH are entitled to share in

DAVID YING

2 the waiver of the TCEH first lien deficiency
3 claim but the PCRB claims are not?
4     MR. ROGERS: Objection to form.
5 A.   I don't have a point of view on that.
6 Q.   Are you aware that the Class C5
7 general unsecured claims against the TCEH
8 debtors other than EFCH includes creditors with
9 trade claims against TCEH alone?
10     MR. ROGERS: Objection to form.
11 A.   I am aware of that, yes.
12 Q.   Do you recall anyone preparing an
13 analysis regarding the financial impact on the
14 holders of the PCRB claims resulting from the
15 proposed exclusion of the PCRB claims from
16 participation in the waiver of the TCEH first
17 lien deficiency claim?
18     MR. ROGERS: Objection to form.
19 A.   I'm not aware of any analysis.
20 Q.   Do you recall anyone preparing an
21 analysis of the distribution to creditors of the
22 TCEH subsidiaries versus the creditors only of
23 TCEH?
24     MR. ROGERS: Objection to form.
25 A.   I'm not aware of any such analysis.

DAVID YING

2 Q.   And do you recall anyone preparing an
3 analysis to determine whether the discount on
4 the distribution that the PCRB claims are
5 receiving under the plan is appropriate?
6     MR. ROGERS: Objection to form.
7 A.   No, I do not.
8     MS. KAM: Thank you.
9     MR. ROGERS: Anyone else?
10     I'll have some questions for the
11 witness. It should be very short, but let's
12 take a break.
13     (Recess; Time Noted: 11:36 a.m.)
14     (Time noted: 11:41 a.m.)
15 EXAMINATION BY
16 MR. ROGERS:
17 Q.   Good morning, Mr. Ying. My name is
18 Brent Rogers, and I represent the debtors in
19 this matter.
20     You were asked some questions by
21 counsel today about an opinion in Mr. Henkin's
22 report, Opinion No. 4, which is that there are
23 no reasonable assurances that the merger will
24 close.
25     Do you recall those questions

DAVID YING

2 generally?
3 A.   Yes.
4 Q.   I want to ask you about a few concepts
5 that have come up in the course of this
6 bankruptcy. One of them is the concept of
7 disarmament.
8     Are you familiar with that?
9 A.   Yes.
10 Q.   What is your understanding of
11 disarmament in this case?
12 A.   I think it refers, in general, to the
13 settlement agreement that's being proposed as
14 part of the confirmation hearing, and the
15 settlement basically says that there will be, in
16 effect, global releases by all the parties
17 against all other parties with respect to causes
18 of action, and it also, I believe, endorses and
19 memorializes the intercreditor settlement that
20 the disinterested directors reached back in
21 March of this year.
22     And I think a settling of all those
23 alleged claims is a very beneficial, important
24 effect of this transaction, and my understanding
25 is that disarmament would survive even if for

DAVID YING

2 some reason the merger does not close.
3 Q.   Do you have a view on whether this
4 disarmament concept has an impact on the
5 likelihood that the transaction will close?
6     MR. HARDIMAN: Object to the form.
7     MR. ANKER: Mr. Rogers, can we have a
8 stipulation that an objection to form by one
9 objector will apply to all so that we don't
10 all have to speak up?
11     MR. ROGERS: Certainly.
12     THE WITNESS: Well, I think it is
13 actually a price that the T-unsecureds who
14 have claims -- who have alleged claims
15 against all the various estates is giving up
16 in return for the right to merge with EFH
17 and convert Oncor to a REIT.
18     So I think in fact it's part of the
19 bargain and it's actually part of the price
20 of their so-called option.
21 BY MR. ROGERS:
22 Q.   And do you have a view of whether that
23 price increases or decreases or has any impact
24 on the likelihood that the transaction will
25 close?