# EXHIBIT A

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | Case No. 14-10979 (CSS) |
| Debtors. | (Jointly Administered) |

**EXPERT REPORT OF MICHAEL HENKIN**

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

## TABLE OF CONTENTS

I.     QUALIFICATIONS ................................................................................................. 1

II.    ASSIGNMENT ...................................................................................................... 2

III.   COMPENSATION ................................................................................................. 5

IV.    SUMMARY OF OPINIONS ................................................................................. 5

V.     BACKGROUND ................................................................................................... 6

    A.    EFH and the Bankruptcy Cases ................................................................. 6

    B.    The Merger and Purchase Agreement ....................................................... 8

    C.    The Settlement Agreement ........................................................................ 12

    D.    The "T-Side" and the Potential Tax Liability at EFH............................... 13

VI.    OPINION 1: THE LACK OF REMEDIES IN THE MERGER AND PURCHASE
    AGREEMENT IS INCONSISTENT WITH BOTH LARGE UTILITY M&A
    TRANSACTIONS AND LARGE BANKRUPTCY SALE TRANSACTIONS ............. 14

    A.    Overview of the Merger and Purchase Agreement ................................... 14

    B.    The Lack of Remedies in the Merger and Purchase Agreement .............. 17

VII.   OPINION 2: THE AGREEMENT BY THE PURCHASERS TO BUY ONCOR AS A
    REIT IS AKIN TO AN OPTION ..................................................................... 21

    A.    The Merger and Purchase Agreement Are Equivalent in Economic Effect to
        an Option Contract ..................................................................................... 21

    B.    The Settlement Agreement Does Not Create an Incentive to Close ......... 23

VIII.  OPINION 3: THE PURCHASERS AND PLAN SPONSORS CAN BE EXPECTED TO
    MAKE THEIR DECISION TO CLOSE THE MERGER BASED ON WHETHER THE
    PERCEIVED VALUE OF THE NEW EFH COMMON STOCK EXCEEDS THE SUM
    OF: (A) THE PURCHASE PRICE PLUS (B) ADDITIONAL PAYMENTS TO BE
    RECEIVED BY CERTAIN PLAN SPONSORS IN THE EVENT THE MERGER DOES
    NOT CLOSE ....................................................................................................... 24

    A.    Information that Will Inform the Purchasers' Determination of Whether to
        Close .......................................................................................................... 24

    B.    Payment to be Received by Certain Plan Sponsors if Transaction Does Not
        Close .......................................................................................................... 26

**IX.**    OPINION 4: THERE ARE NO REASONABLE ASSURANCES THAT THE MERGER WILL CLOSE ................................................................................................ 27

**X.**    OPINION 5: THE INTEREST RATE PAID BY EFH TO TCEH IN CONNECTION WITH THE INTERCOMPANY PROMISSORY NOTES ORIGINALLY ISSUED IN OCTOBER 2007 AND REPAID IN FULL IN 2013 WAS REASONABLE AND REPRESENTED REASONABLY EQUIVALENT VALUE IN EXCHANGE FOR THE ADVANCING OF CREDIT DURING THAT PERIOD ................................................... 31

    **A.**    Overview of the Intercompany and Demand Notes .............................. 31

    **B.**    The EFH Demand Notes Are Similar to Corporate Demand Notes ..................... 36

    **C.**    The Yield Differential Between the EFH Demand Notes and the EFH Public Notes Was Consistent with Similar Ford Securities During the Evaluation Period ................................................................................................ 40

    **D.**    The Yield Differential Between the EFH Demand Notes and EFH Public Notes Was Consistent with the Yield Curve on Select Key Dates ....................... 42

**XI.**    OPINION 6: BASED ON THE IMPLIED MARKET VALUE OF TCEH TODAY, THERE WILL BE NO TAX LIABILITY TO EFH UPON A DISPOSITION OF TCEH IN A TRANSACTION UTILIZING EFH'S NOLS ........................................................ 45

    **A.**    The Tax Hurdle ................................................................................... 45

    **B.**    Implied Market Value of TCEH Is Materially Below the Tax Hurdle ................. 48

    **C.**    TCEH's Decline in Value is Consistent with Energy Markets, Comparable Companies and Projected Earnings Declines ....................................... 48

**XII.**    APPENDIX A: CURRICULUM VITAE ......................................................... 51

**XIII.**    APPENDIX B: LIST OF REFERENCE MATERIALS ..................................... 53

**XIV.**    APPENDIX C: COMPARATIVE NOTE ANALYSIS .................................... 54

**XV.**    APPENDIX D: CORPORATE DEMAND NOTE PROSPECTUS LANGUAGE EXCERPTS ............................................................................................ 55

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

## I.    QUALIFICATIONS

1. Since 2013, I have been a Senior Managing Director and Co-Head of the Restructuring Advisory Group of Guggenheim Securities, LLC ("Guggenheim"). Guggenheim is the investment banking and capital markets division of Guggenheim Partners, LLC, a privately held global financial services firm. Guggenheim is the investment banker to the official committee of unsecured creditors (the "EFH Committee") of EFH, EFIH, EFIH Finance, Inc. and EECI, Inc. Prior to joining Guggenheim, I worked for fourteen years at Jefferies & Company, Inc. ("Jefferies"), where I served as Managing Director and Global Co-Head of the Recapitalization and Restructuring Group.  In addition to my time at Jefferies, I spent approximately six years working in the communications, technology and media industries, including executive positions at Loral Space & Communications Ltd., NextEngine, Inc. and The News Corporation Limited.

2. I received an MBA degree and Global Management Certificate from the Stanford Graduate School of Business in 1996, and graduated summa cum laude with a BA degree in Economics/Business from the University of California, Los Angeles in 1990. I hold the following securities industry licenses from the Financial Industry Regulatory Authority: Series 7, 24 and 63.

3. Throughout my career, I have advised on over $100 billion in transactions, encompassing restructurings, recapitalizations, advisory assignments, financings and mergers and acquisitions ("M&A").  My restructuring experience includes advising a variety of parties-in-interest in large, complex transactions, in both Chapter 11 and out-of-court. I have experience advising official committees of unsecured creditors in

a number of complex Chapter 11 cases, including Federal-Mogul Global, Inc. (District of Delaware), Nortel Networks, Inc. (District of Delaware), Foamex International Inc. (District of Delaware), Loral Space & Communications Ltd. (Southern District of New York), Circuit City Stores, Inc. (Eastern District of Virginia), Extended Stay Inc. (Southern District of New York) and Exide Technologies (District of Delaware).  I have also been qualified as an expert and have testified in more than ten complex litigated matters both in Delaware and other Federal Bankruptcy Courts.

4.   My curriculum vitae and identification of matters in which I have testified as an expert at deposition or trial in the past four years can be found in Appendix A.  I have not authored any publications in the past ten years.

## II.   ASSIGNMENT

5.   On November 12, 2014, Guggenheim was retained by the EFH Committee. Guggenheim is providing certain financial advisory and investment banking services to the EFH Committee, including, among other things: (a) evaluating proposed plans of reorganization, including with respect to the proposed treatment of creditors and disputed claims; (b) advising on the disposition of Oncor Electric Delivery Company LLC ("Oncor") by evaluating related bids and analyzing proposed strategies (and alternatives) for an Oncor sale transaction; and (c) analyzing the Debtors' business plans and financial projections.

6.   In connection with the proceedings to consider the Motion of EFH, et al., to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter Into and Perform Under the Settlement Agreement, filed August 10, 2015 [D.I. 5249] (the

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

"Settlement Motion") and confirmation of the Debtors' fifth amended plan of reorganization (the "Plan") (collectively, the "Confirmation Proceedings"), I have been asked by counsel for the EFH Committee to provide expert testimony on certain matters.[1] Specifically, I have been asked to:

- Analyze the typical remedies available to sellers in large M&A transactions to provide comfort to the seller that a transaction will be consummated if the conditions to closing are met relative to the remedies contained in the Purchase Agreement and Agreement and Plan of Merger (the "Merger and Purchase Agreement");

- Analyze and explain the financial incentives and disincentives that are created by the Merger and Purchase Agreement (and related agreements) and the Settlement Agreement to close the transactions contemplated thereby (the "Merger");

- Analyze the circumstances under which the Purchasers and Plan Sponsors acting in their own financial interest will or will not consummate the Merger based on the structure of the transaction and the information that will be available to the Purchasers and Plan Sponsors at or near closing;

- Analyze whether there are reasonable assurances that the Merger will close;

- Analyze whether the interest rate paid by EFH to TCEH in connection with the intercompany promissory notes between TCEH and EFH from 2007 until

---

[1] Capitalized terms not defined herein shall have the meaning set forth in the Fifth Amended Joint Plan of Reorganization [D.I. 6122] and the Disclosure Statement for the Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code filed 09/21/2015 D.I. 6124 (the "Disclosure Statement").

repaid in full in 2013 was reasonable and represented reasonably equivalent value for the advancing of credit during this period; and

- Analyze whether, based on the implied market value of TCEH today, there is likely to be any tax liability to EFH upon a disposition of TCEH in a transaction utilizing net operating losses ("NOLs") at EFH.

7.   In the course of my analyses, and throughout the engagement of Guggenheim in these Chapter 11 cases, I have reviewed and considered various documents, data and other information. This information includes, but is not limited to, filings with the Bankruptcy Court, transaction documents, deposition transcripts and review and analysis of both publicly available information and confidential information provided to the EFH Committee. An identification of the material documents or other information containing facts or data that I, working with my colleagues at Guggenheim, considered in preparing this report can be found in Appendix B. In addition to reviewing the information listed in Appendix B, I have relied on my training and professional experience, as well as the training and experience of members of my team.

8.   My work in this matter is ongoing, and I reserve the right to supplement my analysis and opinions should more information become available to me.[2] I also reserve the right to respond to the report or testimony of any of the Debtors' experts. At trial, I may rely on visual aids and/or demonstrative exhibits based on this report.

---

[2]   My understanding is that the proponents of the Plan and Settlement Agreement are submitting their expert reports, if any, on the same date as this report and have not yet provided a complete statement of the bases upon which they contend the Bankruptcy Court should confirm the Plan or approve the Settlement Agreement.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

### III.   COMPENSATION

9. Pursuant to its engagement letter with the EFH Committee, Guggenheim is receiving the following consideration for its services in these Chapter 11 cases:

   - a non-refundable cash fee of $250,000 per month; and

   - a cash fee in an amount equal to $9,000,000 upon consummation of a Transaction[3] (the "Transaction Fee"). The Transaction Fee will be reduced by 50% of all monthly fees paid to Guggenheim after May 12, 2015.

10. I understand that Guggenheim would be entitled to receive its Transaction Fee irrespective of whether the Debtors' proposed Plan or another plan of reorganization is consummated.

### IV.   SUMMARY OF OPINIONS

11. Opinion 1. The lack of remedies in the Merger and Purchase Agreement is inconsistent with both large utility M&A transactions and large bankruptcy sale transactions.

12. Opinion 2. The agreement by the Purchasers to buy Oncor as a REIT is akin to an option.

13. Opinion 3. The Purchasers and Plan Sponsors can be expected to make their decision to close the Merger based on whether the perceived value of the common stock of New EFH ("New EFH Common Stock") exceeds the sum of: (a) the purchase price plus (b) additional payments to be received by certain Plan Sponsors in the event the Merger does not close.

---

[3] "Transaction," as defined in the engagement letter, includes the reorganization contemplated by the Debtors' proposed plan of reorganization, along with any other reorganization, rescheduling, recapitalization or repayment of all or any material portion of the Debtors' liabilities.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

14. Opinion 4. There are no reasonable assurances that the Merger will close.

15. Opinion 5. The interest rate paid by EFH to TCEH in connection with the intercompany promissory notes originally issued in October 2007 and repaid in full in 2013 was reasonable and represented reasonably equivalent value in exchange for the advancing of credit during that period.

16. Opinion 6. Based on the implied market value of TCEH today, there will be no tax liability to EFH upon a disposition of TCEH in a transaction utilizing EFH's NOLs.

## V.    BACKGROUND

### A.    EFH and the Bankruptcy Cases[4]

17. EFH operates a portfolio of competitive and regulated energy companies serving the Texas energy market. These companies are: (a) Luminant; (b) Oncor; and (c) TXU Energy. Luminant is the largest electricity generator and lignite coal mining company in Texas and also operates a wholesale electricity sales, commodity risk management and hedging and trading activities business. TXU Energy is a retail energy provider that serves 1.7 million residential and commercial consumers in Texas. Oncor is a ring-fenced[5] group of entities that operates the largest electricity transmission and distribution system in Texas. EFH conducts substantially all of its business operations

---

[4]    Sourced from Disclosure Statement and publicly available information.

[5]    In the United States, ring-fencing in the regulated utility arena is the structuring of the legal and operational aspects of a utility such that the utility is substantially insulated from the activities and financial status of its parent and affiliated companies. Often ring-fencing in this context is viewed as protecting the credit rating, and indirectly the ratepayers, of the utility from adverse conditions that may affect the parent or any affiliated companies. Utility companies in the United States are also ring-fenced "to achieve bankruptcy remoteness, through a combination of contract and legislation." Utility companies are ring-fenced "to protect them against internal and external risks, so they can be assured to be able to continue providing the public with essential utilities such as power…" Source: Steven Schwarcz, "Ring Fencing." 87 Southern California Law Review 69 (2013).

in the electricity market overseen by the Electric Reliability Council of Texas ("ERCOT"), which covers the majority of Texas.

18. On February 26, 2007, TXU Corp. (the predecessor of EFH) entered into an agreement to be acquired by a consortium led by Kohlberg Kravis Roberts & Co. L.P. ("KKR"), TPG Capital, L.P. ("TPG") and Goldman, Sachs & Co. ("Goldman Sachs" and collectively with KKR and TPG, the "Sponsors") for an enterprise value of approximately $44.4 billion (the "2007 Acquisition"). EFH's current corporate structure is set forth in Exhibit 1 below.

**Exhibit 1**



Source: TCEH Partial Tax Basis Step-up Transaction presentation dated 03/17/2015 EFH

Dataroom Index 1.15.1.2 (PEO).

19. The 2007 Acquisition was financed with approximately $8.3 billion in equity, and immediately following the acquisition, the Debtors' total funded indebtedness was approximately $36.1 billion (comprised of approximately $28.8 billion at TCEH,

$128 million at EFCH, and $7.2 billion at EFH Corp.). EFH issued and assumed a significant amount of debt and liabilities in connection with the 2007 Acquisition, which was driven, in part, by the expectation that natural gas prices and wholesale electricity prices in the ERCOT market would not materially decline over the long-term. Those assumptions proved to be incorrect. Starting in 2008, there was a precipitous and prolonged decline in natural gas prices which has materially affected EFH's competitive generation business.

20. In particular, as a result of technological breakthroughs which facilitated the increased exploitation and production of "unconventional" natural gas (e.g., shale oil via hydraulic fracturing), natural gas prices materially declined and have remained depressed for the past seven years.

21. Ultimately, based on a revised outlook for natural gas prices and expected market conditions, the Debtors deemed EFH's balance sheet (and those of other Debtor entities) unsustainable given its inability to service, repay and refinance its debt. The Debtors commenced their Chapter 11 cases on April 29, 2014.

**B.     The Merger and Purchase Agreement**

22. Prior to commencing these Chapter 11 proceedings, the Debtors undertook a process with certain significant stakeholders to pursue a conversion of claims into EFH/EFIH's economic ownership interest in Oncor.[6] In connection therewith, the Debtors entered into a prepetition restructuring support agreement (the "RSA"). However, on July 24, 2014, after receiving alternative proposals, including from

---

[6]   EFIH owns approximately 80% of Oncor and its ownership in Oncor is a significant source of value for the "E-Side" Debtors. EFH has an indirect economic ownership interest in Oncor and certain rights through its tax sharing agreement.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

third-party strategic and financial bidders, the Debtors provided a notice of termination of the RSA and subsequently sought approval from the Bankruptcy Court for bidding procedures and an auction process for the sale of Oncor.[7]

23. Following entry of an order approving the revised bidding procedures and auction process on January 14, 2015, the Debtors: (a) received two rounds of bids for Oncor from various strategic and third-party bidders; (b) engaged in extensive due diligence with interested bidders; and (c) exchanged drafts of proposed definitive documentation.  This process took approximately three months.

24. Contemporaneously with exploring potential bids in connection with the formal auction process, the Debtors continued to engage in discussions with their various creditor constituencies regarding the possibility of converting EFH's interest in Oncor into a REIT. Ultimately, the Debtors determined that they would not enter into a definitive agreement for any of the second round bids and instead executed the Merger and Purchase Agreement with Ovation Acquisition I, LLC ("New EFH") and Ovation Acquisition II, LLC ("OV2" and, together with New EFH, the "Purchasers"). The Purchasers are controlled by, and will be funded by, the Hunt-Investor Party[8] and the Creditor-Investor Party[9] (collectively, the "Plan Sponsors"). The Debtors simultaneously executed an agreement (the "Plan Support Agreement" or "PSA")

---

[7]   Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Approving Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C) Approving the Form and Manner of Notice Thereof D.I. 2087. Page 2.

[8]   The Hunt-Investor Party consists of Hunt Power Holdings, L.L.C., Pecos Partners, L.P., Flourish Investment Corporation, and Avenue Capital Management II, L.P.

[9]   The Creditor Investor Party consists of certain holders of TCEH Unsecured Notes that make up the Ad Hoc Group of TCEH Unsecured Noteholders.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

with certain supporting stakeholders including certain TCEH first lien creditors, TCEH second lien creditors, the TCEH Committee, the Hunt-Investor Party, the Creditor-Investor Party and the Sponsors.

25. The Debtors' Plan contemplates EFH taking actions to effect a corporate restructuring of their respective businesses which would include, among other things: (a) a tax-free spin-off of TCEH; (b) a tax basis step-up in TCEH (achieved via a preferred stock sale to trigger a gain); and (c) a sale of EFH's interest in Oncor.

26. The Merger and Purchase Agreement contemplates that the Merger will be financed with Oncor's existing net debt of approximately $6.5 billion <u>plus</u>: (a) approximately $7.1 billion of equity capital from the Plan Sponsors[10]; and (b) approximately $5.1 billion of newly issued debt.[11]

27. The Merger and Purchase Agreement provides an Initial Drop-Dead Date by which the transaction must be consummated. The Initial Drop-Dead Date is expected to occur by May 2016.[12]  However, the agreement also contemplates that the Final Closing date can be extended by the Purchasers, under certain circumstances, until November 2016 (180 days) so that the parties can continue to pursue Required Regulatory Approvals.[13]  The closing would take place on the effective date of the

---

[10]   As set forth in the equity commitment letter and backstop commitment letter attached to the motion to approve the PSA (collectively, the "Equity Commitment Letters").

[11]   As set forth in the debt commitment letter attached to the motion to approve the PSA.

[12]   The Merger and Purchase Agreement provides for the Initial Drop-Dead Date to occur eight months after the date of the Merger and Purchase Agreement (08/09/2015). Merger and Purchase Agreement § 8.2.

[13]   Merger and Purchase Agreement § 8.2.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

Plan (the "Effective Date"), and the proceeds would be applied, in part, to repay claims against EFH and EFIH in accordance with the Plan.

28. Generally, the purchase price paid for Oncor is not a fixed amount, but goes up and down on a dollar-for-dollar basis with the amount of claims against EFH and EFIH to be allowed and repaid in accordance with the Plan.[14]  Based on the current estimate of such claims as of June 30, 2016, the Debtors have estimated that the purchase price will value Oncor at approximately ███████[15]  The necessary price will change as the amount of allowed claims changes, irrespective of the value of Oncor. As discussed herein, the effectiveness of the Plan is contingent upon the closing of the Merger by the Purchasers.

29. The Merger and Purchase Agreement includes a provision that expressly *prevents* the sellers from obtaining specific performance to require the Purchasers to consummate the transaction. Section 9.9(c) of the Merger and Purchase Agreement provides that:

> Notwithstanding anything in this Agreement or any other Transaction Agreement to the contrary, except with respect to any Purchaser's obligation to pay any amount guaranteed pursuant to the Guarantee, none of the Company, EFIH or any of their Affiliates or stakeholders shall be entitled to seek or obtain specific performance of any Purchaser's obligations under this Agreement, including to consummate the Equity Draw-Down (or to cause it to be consummated) or complete (or cause to be completed) any other action or transaction to be completed at the First Closing.

---

[14]   Merger and Purchase Agreement §§ 1.4, 1.8.

[15]   Assumes 100% post-petition interest at the contract rate is payable, and no EFH or EFIH make-whole claims are allowed by the Bankruptcy Court.

30. The Merger and Purchase Agreement also expressly prohibits the sellers from seeking damages and other remedies against the Purchasers and Plan Sponsors. Section 9.9(b) of the Merger and Purchase Agreement provides that:

> [T]he Company and EFIH hereby (i) waive, on behalf of themselves and their Affiliates, any and all common law, statutory or other remedies . . . under any legal theory that such Person or any of their Affiliates may have against the Purchasers or their respective Affiliates in respect of any claims or causes of action under this Agreement and (ii) agree that, to the extent they or any of their Affiliates incur losses arising from or in connection with a breach by any other party hereto or any of their respective Affiliates of its representations, warranties, covenants or agreements contained in this Agreement, in no event shall the Company or EFIH or their Affiliates seek to recover any money damages from (or seek any other remedy, including specific performance, based on any legal, contractual or equitable theory against) the Purchasers or any of their respective Affiliates.

### C.     The Settlement Agreement

31. The Plan provides for the mutual release of claims among all Debtors and consenting holders of claims and interests as well as third-party releases of the Sponsors and its affiliates. In exchange for the value provided and the compromises contained in the Plan, the Debtors entered into a settlement with certain parties (the "Settlement Agreement"). As part of the Settlement Agreement, pursuant to Bankruptcy Rule 9019, the Debtors are seeking to allow a $700 million unsecured claim of TCEH against EFH (the "TCEH Settlement Claim") in exchange for settlement of any prepetition claim or cause of action of the TCEH Debtors against the EFH Debtors, the EFIH Debtors, Oncor and the Sponsors or their affiliates.

32. The TCEH Settlement Claim will be deemed satisfied upon consummation of the Merger, but to the extent confirmation or consummation does not occur, the TCEH

Settlement Claim will nonetheless remain effective if the Settlement Agreement is approved by the Bankruptcy Court.

### D.   The "T-Side" and the Potential Tax Liability at EFH

33. EFH is the common parent of a "consolidated group" of corporations[16] that substantially hold all of its assets and are "disregarded entities" for federal income tax purposes. As such, each entity's assets and liabilities, together with any items of taxable income, expense, loss, gain, deduction and credit attributable to those assets and liabilities, are treated as though they were owned and/or generated directly by EFH (i.e., EFH is generally liable for any federal income tax liability, including those generated by a sale of the assets or equity of those entities). The Debtors have asserted that "any taxable disposition by EFH of the Debtors' assets (either through a confirmed reorganization plan or a pre-confirmation asset sale) likely would result in EFH being left with a potential tax liability."[17] Furthermore, the Debtors provide the following example of the potential tax liability generated at EFH:

> Assume that TCEH's assets are sold for $18 billion. In that situation, the difference between the sales price (i.e., $18 billion) and TCEH's basis in its assets (i.e., $7.5 billion) would constitute a "taxable gain" of $10.5 billion. This gain would in turn be subject to federal income tax at a rate of 35%, resulting in a federal income tax liability for EFH of approximately $3.7 billion…the taxable gain from a sale of TCEH…may be offset by any available "tax attributes," including net operating losses.[18]

---

[16]   The subsidiaries include: EFIH, EFCH, TCEH and Oncor.

[17]   Memorandum of Law (Omnibus Tax Memorandum) filed 10/01/2014 D.I. 2296. Page 5.

[18]   Memorandum of Law (Omnibus Tax Memorandum) filed 10/01/2014 D.I. 2296. Pages 9-10. See also, Debtors' Pre-submission Memorandum for Ruling under Sections 368(A)(1)(G) and 355, dated 04/28/2014 where the Debtors assert an $18 billion TCEH valuation based on the then implied market prices of TCEH debt.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

34. As noted by the Debtors, a taxable gain from the sale of TCEH may be offset by tax attributes, including NOLs.  Based on analysis prepared by the Debtors, EFH's NOLs available to offset any taxable gains assuming a June 30, 2016 Effective Date are estimated to be $5.3 billion.[19]

35. The disposition of TCEH would thus generate a taxable gain if TCEH's assets are sold for value in excess of the sum of TCEH's basis in its assets <u>plus</u> any available tax attributes. If the value of TCEH's assets sold are below its basis <u>plus</u> any available tax attributes, then there would be no taxable gain.

## VI.    <u>OPINION 1</u>: THE LACK OF REMEDIES IN THE MERGER AND PURCHASE AGREEMENT IS INCONSISTENT WITH BOTH LARGE UTILITY M&A TRANSACTIONS AND LARGE BANKRUPTCY SALE TRANSACTIONS

### A.    Overview of the Merger and Purchase Agreement

36. The Plan contemplates effectuating the sale of Oncor via the merger of reorganized EFH, into New EFH and the purchase of interests in reorganized EFIH by OV2. Both New EFH and OV2 are controlled by the Plan Sponsors. The Plan Sponsors have committed (subject to certain conditions) to make new money equity investments in one or both of New EFH and OV2 and backstop a public rights offering and a private rights offering by New EFH to TCEH creditors in order to fund amounts payable by New EFH and OV2 under the Merger and Purchase Agreement. As a condition to closing, among other things, the Debtors are required to obtain certain approvals and rulings, including PUCT Approval and the Private Letter Ruling, necessary for the REIT Reorganization and implementation of the Plan.

---

[19]    The estimated $5.3 billion of NOLs is net of a $200 million cushion per TCEH Partial Tax Basis Step-up Transaction presentation dated 03/17/2015 EFH Dataroom Index 1.15.1.2 (PEO).

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

37. While I do not express an opinion on the relative likelihood of any of these individual approvals occurring, I note that the Merger and Purchase Agreement is a highly complex transaction which contemplates the creation of a utility REIT that is unprecedented in its size and complexity. The Merger is not only subject to regulatory and REIT-related approvals and rulings (such as the required Private Letter Ruling), but there are also a number of structural and governance issues associated with the proposed Merger that will require extensive regulatory review and scrutiny.[20]

38. Some of the significant conditions to closing in the Merger Agreement include: (a) regulatory and tax approvals; (b) the availability of debt and equity financing; (c) that no Plan Support Termination Event has occurred (as defined in the Plan Support Agreement); (d) Bankruptcy Court approval of the Settlement Agreement; (e) no allowed make-whole claims against EFH or EFIH and (f) achievement of certain deal milestones and deadlines. All of these conditions add significant uncertainty to the closing of the Merger, and the Debtors correctly note in their Disclosure Statement that "…the Merger may not close as a result of the failure of one or more of these conditions to be satisfied."[21] The Debtors have stated that the Merger and Purchase Agreement contains "out-of-market conditions" and noted "the significant risk that the Merger will not close if, among other things: (a) the IRS

---

[20]    The PUCT Approval alone has already occasioned a number of issues raised by Commissioner Kenneth W. Anderson, Jr. of the PUCT.  In two published memoranda (dated 08/20/2015 and 09/24/2015). Commissioner Anderson raised the following issues, among others: (a) the ability of creditors or equity owners to replace management of the REIT; (b) the prospect of an "enhanced ring fence" being imposed and potential consequences or penalties from a violation of the ring fence; (c) the need for potential restrictions impacting the ability of the REIT to make distributions to service debt at its parent company; and (d) how the economic and tax benefits of the REIT structure will flow to ratepayers.

[21]    See Disclosure Statement at page 197.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

rulings associated with the REIT conversion or conditions imposed by the PUCT upon approval of the transaction affect the intended economics of the transaction; or (b) market conditions shift in a manner that would adversely affect the transaction."[22]

39. In a typical acquisition transaction, the buyer and seller allocate amongst themselves the risks of various contingencies not occurring. For example, if, as in this case, a transaction requires regulatory approvals, a merger agreement will typically describe what the parties will do to seek such approvals (e.g., undertaking "reasonable best efforts") and set out the consequences if regulatory approvals are not obtained by a specific date.

40. In the event that the conditions to closing are satisfied, however, a merger agreement will ordinarily provide remedies to the seller if the buyer fails to consummate the transaction through both: (a) specific performance and (b) financial remedies.[23] Typically, M&A agreements include "a specific performance remedy for both the buyer and seller, subject to payment of termination fees as an alternative remedy under certain circumstances."[24] Thus, in the usual case, the seller will be able to enforce the merger agreement to either force the buyer to complete the transaction (through specific performance) and/or obtain a financial remedy for breach or

---

[22]    Presentation to the Boards of Directors and Managers of EFH, et al., dated 07/30/2015 (the "July 30th Update") EFH06002855.

[23]    Financial remedies include, but are not limited to: (a) common law damages; (b) a reverse termination fee payable by the buyer; (c) forfeiture of deposit; and/or (d) liquidated damages.

[24]    Afra Afsharipour, "Transforming the Allocation of Deal Risk Through Reverse Termination Fees." 63 Vanderbilt Law Review 5 (2010). Page 1176. (Citing a 2008 study of large strategic acquisitions which found that ninety-three percent included a specific performance remedy).

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

termination (which the merger agreement may limit in the form of a liquidated damages clause and/or a reverse termination fee).

**B.      The Lack of Remedies in the Merger and Purchase Agreement**

41. According to the Merger and Purchase Agreement, the Debtors have no rights to enforce any remedies should the Purchasers or Plan Sponsors terminate or breach the agreement. As described herein, the Debtors are not permitted to seek specific performance or financial damages against the Purchasers or Plan Sponsors under the Merger and Purchase Agreement. Furthermore, the Debtors themselves have acknowledged that the Merger and Purchase Agreement lacks "typical remedies" such as specific performance or the right to receive any monetary damages or a termination fee.[25]

42. In my experience, it contradicts customary practices and is virtually unheard of for parties negotiating a large M&A transaction at arm's-length to agree the seller has no remedies to protect against a buyer's change of heart. To my knowledge, I have not been involved in any large M&A transaction in which the seller had neither a remedy of specific performance nor financial remedies against the buyer.

43. In addition to my own experience, and that of my team at Guggenheim, I have also examined data on comparable M&A transactions.

44. My team and I analyzed all M&A transactions at or above $1 billion announced in the last five years (the "Comparable M&A Transactions") involving: (a) public M&A

---

[25]    Debtors' Omnibus Reply to Objections to Plan Support Agreement Motion. D.I. 5978.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

transactions in the power and utility sector[26] and (b) Chapter 11 sale transactions.[27] We then reviewed the specific transaction terms for each Comparable M&A Transaction to determine whether one or more seller protections existed including: (a) specific performance; (b) a reverse termination fee; (c) forfeiture of deposit; and/or (d) liquidated damages.  One or more of these seller protections were present in 100% of the transactions identified.  In over 72% of the transactions, both specific performance and either a liquidated damages, reverse termination fee or deposit forfeiture remedy were available.  Moreover, when you include common law (or general) damages in a review of financial remedies, 100% of the transactions we identified contained both specific performance and at least one form of financial remedy for the benefit of the seller.[28] Exhibits 2 and 3 below summarize this data.

---

[26]   U.S. M&A transactions where public information was available, sourced from SNL Financial, FactSet and Corporate Filings.

[27]   U.S. Chapter 11 transactions with information sourced from The Deal, LLC.

[28]   For the eight transactions that did not have a liquidated damages, reverse termination or deposit forfeiture remedy, my team reviewed the transaction agreements and all permitted common law damages for breach.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

## Exhibit 2

| Power & Utility Industry M&A Transaction Analysis | | | | | Selected Seller/Deal Protections ($ in millions) | | |
|---|---|---|---|---|---|---|---|
| Buyer | Seller | Announcement Date | Closing Date | Value | Specific Performance | Reverse Termination Fee | Liquidated Damages |
| Emera Incorporated | TECO Energy, Inc. | 09/04/2015 | Pending | $10,183 | ✓ | ✓ | ✗ |
| Southern Company | AGL Resources Inc. | 08/24/2015 | Pending | 12,059 | ✓ | ✗ | ✗ |
| SunEdison | Vivint Solar | 07/20/2015 | Pending | 2,200 | ✓ | ✗ | ✓ |
| Talen Energy Corporation | MACH Gen LLC | 07/20/2015 | Pending | 1,175 | ✓ | ✓ | ✓ |
| Iberdrola, S.A. | UIL Holdings Corporation | 02/25/2015 | Pending | 4,756 | ✓ | ✗ | ✗ |
| NextEra Energy, Inc. | Hawaiian Electric Industries, Inc. | 12/03/2014 | Pending | 3,963 | ✓ | ✓ | ✗ |
| Macquarie, British Columbia Investment Mgmt, Manulife Financial, John Hancock | Cleco Corporation | 10/20/2014 | Pending | 4,684 | ✓ | ✓ | ✓ |
| Wisconsin Energy Corporation | Integrys Energy Group, Inc. | 06/23/2014 | 06/29/2015 | 9,073 | ✓ | ✓ | ✗ |
| Exelon Corporation | Pepco Holdings, Inc. | 04/29/2014 | Pending | 6,800 | ✓ | ✓ | ✗ |
| Fortis Inc. | UNS Energy Corporation | 12/11/2013 | 08/15/2014 | 4,310 | ✓ | ✗ | ✓ |
| Berkshire Hathaway Inc. | NV Energy, Inc. | 05/29/2013 | 12/19/2013 | 10,453 | ✓ | ✗ | ✓ |
| NRG Energy, Inc. | GenOn Energy, Inc. | 07/22/2012 | 12/14/2012 | 3,909 | ✓ | ✓ | ✓ |
| Fortis Inc. | CH Energy Group, Inc. | 02/21/2012 | 06/27/2013 | 1,610 | ✓ | ✗ | ✓ |
| Exelon Corporation | Constellation Energy Group, Inc. | 04/28/2011 | 03/12/2012 | 10,623 | ✓ | ✓ | ✗ |
| AES Corporation | DPL Inc. | 04/20/2011 | 11/28/2011 | 4,613 | ✓ | ✗ | ✗ |
| Duke Energy Corporation | Progress Energy, Inc. | 01/10/2011 | 07/02/2012 | 25,717 | ✓ | ✓ | ✗ |
| AGL Resources Inc. | Nicor Inc. | 12/06/2010 | 12/09/2011 | 3,400 | ✓ | ✓ | ✗ |
| Northeast Utilities | NSTAR | 10/18/2010 | 04/10/2012 | 7,567 | ✓ | ✓ | ✗ |
| Blackstone Group | Dynegy Inc | 08/13/2010 | 11/23/2010 | 4,616 | ✓ | ✓ | ✓ |
| RRI Energy, Inc. | Mirant Corporation | 04/11/2010 | 12/03/2010 | 2,204 | ✓ | ✓ | ✗ |
| FirstEnergy Corp. | Allegheny Energy, Inc. | 02/11/2010 | 02/25/2011 | 9,273 | ✓ | ✓ | ✗ |

Source: SNL Financial, FactSet and Corporate Filings as of 10/07/2015.

## Exhibit 3

| Chapter 11 Bankruptcy Sale Transaction Analysis | | | | | | Selected Seller/Deal Protections ($ in millions) | | | |
|---|---|---|---|---|---|---|---|---|---|
| Buyer | Seller | Announcement Date | Closing Date | Value | Jurisdiction | Specific Performance | Forfeit Deposit[29] | Reverse Termination Fee | Liquidated Damages |
| Concession Acquisitions | ITR Concession Company | 03/11/2015 | 05/27/2015 | $5,725 | Northern District of Illinois | ✓ | ✗ | ✓ | ✓ |
| New Cingular Wireless Services, Inc. | NII Holdings | 01/26/2015 | 04/30/2015 | 1,875 | Southern District of New York | ✓ | ✗ | ✗ | ✗ |
| NRG Energy, Inc. | Edison Mission | 10/18/2013 | 04/01/2014 | 2,840 | Northern District of Illinois | ✓ | ✗ | ✗ | ✗ |
| US Airways Group Inc. | AMR Corp. | 02/14/2013 | 12/09/2013 | 11,000 | Southern District of New York | ✓ | ✗ | ✗ | ✗ |
| Supermedia Inc. | Dex One Corporation | 08/21/2012 | 04/30/2013 | 1,570 | District of Delaware | ✓ | ✗ | ✗ | ✗ |
| Govt. of Singapore Investment Corp. | MSR Golf Resort LLC | 08/16/2012 | 02/28/2013 | 1,502 | Southern District of New York | ✗ | ✓ | ✗ | ✓ |
| Berkshire Hathaway Inc. | Residential Capital, LLC | 06/11/2012 | 02/05/2013 | 1,500 | Southern District of New York | ✓ | ✗ | ✗ | ✗ |
| Ocwen Loan Services, LLC | Residential Capital, LLC | 10/23/2012 | 01/31/2013 | 3,000 | Southern District of New York | ✓ | ✗ | ✗ | ✗ |
| Gamma Acquisition LLC (Dish Network Corporation) | TerreStar Networks | 06/15/2011 | 03/12/2012 | 1,357 | Southern District of New York | ✓ | ✓ | ✗ | ✗ |
| Dish Network Corporation | DBSD North America | 02/01/2011 | 03/12/2012 | 1,490 | Southern District of New York | ✓ | ✗ | ✓ | ✓ |
| Chatham Lodging, L.P | Innkeepers USA Trust | 05/03/2011 | 10/27/2011 | 1,020 | Southern District of New York | ✗ | ✓ | ✗ | ✓ |
| Rockstar Bidco L.P. (Sony Corp. / Microsoft Corp. / Research In Motion Ltd. / More) | Nortel Networks, Inc. | 06/30/2011 | 07/29/2011 | 4,500 | District of Delaware | ✓ | ✓ | ✗ | ✗ |
| Constellation Holdings, Inc. | Boston Generating, LLC | 08/09/2010 | 01/04/2011 | 1,100 | Southern District of New York | ✓ | ✓ | ✗ | ✗ |
| Fairholme Capital | General Growth Properties[30] | 02/24/2010 | 11/09/2010 | 6,550 | Southern District of New York | ✓ | ✗ | ✗ | ✗ |
| CP ESH Investors, LLC | Extended Stay Inc. | 02/19/2010 | 10/08/2010 | 3,925 | Southern District of New York | ✓ | ✗ | ✗ | ✗ |

Source: Corporate Filings.

---

[29] Note: If applicable, a buyer would forfeit its deposit only in certain circumstances.

[30] Note: Reviewed Cornerstone Investment Agreement dated as of 03/31/2010 and all amendments and Stock Purchase Agreement dated as of 03/31/2010 and all amendments.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

45. Similar to the results summarized above, in an April 2015 Schulte Roth & Zabel study of large M&A transactions from 2013 and 2014 (PE buyer/public target), 98% provided the seller with some form of specific performance remedy against the buyer. Furthermore, 92% of those transactions also included a reverse termination fee. For the 8% of transactions that did not include a reverse termination fee, all of them included a specific performance remedy.[31] Accordingly, 100% of the transactions in the study included at least one of these seller remedies and a substantial majority included both.[32]

**Exhibit 4**



Source: Schulte Roth & Zabel. See footnote 32.

46. In addition, I also reviewed the terms of the 2007 Acquisition when the Sponsors purchased TXU Corp. The 2007 Acquisition agreement contained a number of customary seller remedies, including both a specific performance clause and a reverse

---

[31]  Based on an independent analysis of those transactions performed by my team.

[32]  Schulte Roth & Zabel. Private Equity Buyer/Public Target M&A Deal Study 2013-2014 Review and Comparative Analysis dated April 1, 2015. Large M&A deals are defined as transactions involving consideration of at least $500 million in enterprise value.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

termination fee. The reverse termination fee entitled the sellers to a cash payment of $1 billion as a remedy under certain circumstances.

47. Based on the foregoing analyses, the lack of specific performance and financial remedies in the Merger and Purchase Agreement is inconsistent with the disposition of businesses of this type.  The lack of such remedies creates additional uncertainty for the seller because, as discussed below, it means that the Purchasers essentially have an option to close the transaction.  This uncertainty of closing is in addition to the large number of regulatory, tax and other conditions to closing contained in the Merger and Purchase Agreement.

## VII.   OPINION 2: THE AGREEMENT BY THE PURCHASERS TO BUY ONCOR AS A REIT IS AKIN TO AN OPTION

### A.    The Merger and Purchase Agreement Are Equivalent in Economic Effect to an Option Contract

48. Options, as their name implies, are agreements that provide investors with flexibility. Fundamentally, an option is a contract which conveys to its holder the right, but not the obligation, to buy or sell a specified quantity of an underlying asset at a stated price (strike or exercise price) on a stated date (European style option) or at any time before or on the stated expiration date (American style option).[33] Generally the buyer of the option contract will pay the seller a fee (or premium) for this right.

---

[33]   Damodaran (2012) "Real Options, Acquisition Valuation and Value Enhancement;" The Options Clearing Corporation (1994) "Understanding Stock Options;" and Federal Reserve Board "Futures, Forward, and Option Contracts" (2015 and 1992).

49. Analyzing the Merger, EFH can be seen as the "seller" of an option to purchase the New EFH Common Stock for up to $███████ (i.e., the exercise price).[34] For the Purchasers and Plan Sponsors, the Merger and Purchase Agreement resembles an American style call option because it provides the Purchasers and Plan Sponsors with the exclusive right, but not the obligation, to fund the Merger and "exercise" the option on or before the First Closing date (which can occur as late as May 2016, subject to certain further extensions up to 180 days). Even the Debtors have acknowledged that "the documents governing the Merger and the equity financing are drafted with sufficient conditionality to effectively create an option for the Investors to close the transaction."[35]

50. In short, the characteristics of the Merger and Purchase Agreement described above mean that the final decision by the Purchasers as to whether or not to acquire Oncor has not taken place and will not occur until the transaction needs to be funded. This provides the Purchasers with a "real" option in which the Purchasers have the exclusive right, but not the obligation, to invest and complete the transaction.[36]

51. In this case, it is only when the Purchasers' decision to acquire Oncor can no longer be deferred that "the real option expires and the decision at that point compares in present value the benefit of the assets to their costs, as in standard DCF analysis. Prior

---

[34]   See Presentation to the Boards of Directors and Managers of EFH, et al., dated 08/09/2015 (the "August 9th Approval") at slide 25 EFH06002923. Assumes 100% post-petition interest at the contract rate is payable, and no EFH or EFIH make-whole claims are allowed by the Bankruptcy Court.

[35]   See August 9th Approval at slide 5 EFH06002903.

[36]   A corporate investment opportunity is like a call option when it provides the right (but not the obligation) to acquire (buy or build or expand) something, such as a business or asset; See Copeland and Tufano (2004) Harvard Business Review "A Real-World Way to Manage Real Options;" and Damodaran (2012) "Real Options, Acquisition Valuation and Value Enhancement."

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

to expiration, however, the investment decision can be deferred, creating option value: if the asset value changes during this period, there is the ability to make the investment selectively only when beneficial, not proceeding otherwise."[37]

**B.    The Settlement Agreement Does Not Create an Incentive to Close**

52. The Debtors have argued that the Settlement Agreement provides an effective remedy for failure to consummate the transactions contemplated by the Merger and Purchase Agreement, and thus that the Merger and Purchase Agreement does not simply provide an option. For example, in paragraphs 6-7 of the Debtors' Omnibus Reply to Objections to Plan Support Agreement Motion, the Debtors state that "[i]nstead of the typical remedies for a financial buyer—a reverse breakup fee or liquidated damages clause—the PSA mandates a complete disarmament through implementation of the Alternative Restructuring," and "disarmament is both more punitive than a reverse breakup fee and, from the Debtors' perspective, superior to one."

53. The Debtors' position is not supported by the financial incentives created by the parties' agreements. My understanding is that the Settlement Agreement is binding upon the creditor parties if approved by the Bankruptcy Court, which approval has been requested in conjunction with Plan confirmation, well before the Effective Date. Accordingly, creditors entering into the Settlement Agreement will treat the value they are providing to the Debtors as already granted upon Bankruptcy Court approval of the Settlement Agreement. And, just as the purchase price of an option (or

---

[37] Hodrick (2014) Columbia Business School Course Packet "Note on Valuing Real Options."

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

premium paid) is a sunk cost,[38] and has no economic bearing on whether the option holder will elect to exercise that option in the future, the Settlement Agreement will have no economic bearing on whether the Purchasers will consummate the Merger at closing.

54. As discussed below, under the terms of the Settlement Agreement, if the Merger does not close and the Plan fails to consummate, TCEH junior creditors will receive a $550 million payment. Under certain scenarios, the TCEH junior creditors could view the $550 million as more attractive than exercising their option to purchase the New EFH Common Stock. Thus, the expected payments in the event the Merger does not close are relevant when examining the financial incentives for the Purchasers to close or not.

## VIII.  OPINION 3: THE PURCHASERS AND PLAN SPONSORS CAN BE EXPECTED TO MAKE THEIR DECISION TO CLOSE THE MERGER BASED ON WHETHER THE PERCEIVED VALUE OF THE NEW EFH COMMON STOCK EXCEEDS THE SUM OF: (A) THE PURCHASE PRICE PLUS (B) ADDITIONAL PAYMENTS TO BE RECEIVED BY CERTAIN PLAN SPONSORS IN THE EVENT THE MERGER DOES NOT CLOSE

### A.      Information that Will Inform the Purchasers' Determination of Whether to Close

55. The Merger and Purchase Agreement allows the Purchasers to make a decision whether or not to close on the Merger up until the First Closing date (*i.e.* the Effective Date of the Plan), which could be extended as late as November 2016. The Purchasers' view of the fair market value of Oncor at that point in time will be informed significantly by the market trading values of the rights to acquire New EFH

---

[38]   Absent any crediting mechanism towards future costs, which is not the case with respect to the Merger and Purchase Agreement.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

Common Stock.  That view is likely to be different than the Purchasers' view of the fair market value of Oncor at the time when the Merger and Purchase Agreement was executed.

56. The Plan contemplates a public rights offering that will include the issuance of rights (the "Rights") to purchase common shares of New EFH and those Rights will be publicly tradable prior to consummation of the Merger.  Under the Plan, New EFH shall conduct public and private rights offerings (the "Rights Offering") "no later than twenty (20) Business Days following the later of the Confirmation Date and the Rights Registration Effective Date, and prior to the Effective Date."[39] It is during those twenty (20) business days that the Rights will be tradeable. The trading of the Rights will generate information on their perceived market value, which will in turn provide a market indication of the expected value of the New EFH Common Stock.

57. In addition, the completion and related results of the Rights Offering will be an indicator of the potential demand for the New EFH Common Stock which will be issued on the Effective Date.

58. The public Rights Offering will therefore provide the Purchasers with real-time information on the expected public market value of New EFH Common Stock. Therefore, immediately prior to closing, the Purchasers will be able to compare the price the Purchasers have agreed to pay for the New EFH Common Stock with the public market's value of the rights to purchase that stock when issued on the Effective

---

[39]    See Disclosure Statement at page 94.

Date, allowing the Purchasers to use this information to decide whether they should close the Merger or not.

59. In addition to the Rights Offering, the Purchasers' view regarding Oncor's valuation and the associated value of the New EFH Common Stock will be informed by other information that will be available to the Purchasers at the time they have to close the Merger. Examples of such information include, among others, the completion of the Registration Statement for the Rights Offering, the level of participation by "T-Side" creditors in the Rights Offerings, whether or not there are sufficient funds to consummate the Merger (i.e., whether any Plan Sponsor has failed to fund its equity commitment), market valuations of comparable utility companies (many of which are publicly traded), regulatory and tax issues (including the type and extent of any conditions imposed by the PUCT), the financial and operational affairs of Oncor and general market and industry conditions. As a result, the Purchasers will have a better ability to value Oncor at the time of closing than when they originally executed the Merger and Purchase Agreement as of August 9, 2015.

**B.      Payment to be Received by Certain Plan Sponsors if Transaction Does Not Close**

60. Under the terms of the Settlement Agreement, if the Merger does not close and the Plan fails to consummate, TCEH junior creditors will receive a $550 million payment[40] and will be required to support an Alternative Restructuring that contains the Required Alternative Terms. Therefore, the TCEH junior creditors, who are also Plan Sponsors, would have a financial incentive to fund their equity commitments

---

[40]    Such payment may be adjusted pursuant to provisions in the Plan Support Agreement and Settlement Agreement.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

and cause the Purchasers to close on the Merger only if their perceived value of New EFH at such time is greater than the sum of the purchase price for New EFH Common Stock <u>plus</u> their share of the $550 million payment.  In other words, for it to be in the financial interest of the TCEH junior creditors to close, the value of New EFH must exceed the agreed purchase price by their share of the $550 million payment.  If, for example, the value of New EFH happened to be exactly equal to the purchase price, then the TCEH junior creditors would be expected to fail to cause the Purchasers to close the Merger.

61. Because, as discussed above, the Merger and Purchase Agreement and Settlement Agreement impose no financial penalties on the Purchasers or Plan Sponsors if they do not close on the Merger, their decision on whether to close, or not, can be expected to be based on whether their perceived value of the New EFH Common Stock exceeds the sum of: (a) the purchase price <u>plus</u> (b) any amount that certain Plan Sponsors expect to receive in the event the Merger does not close.

## IX.    <u>OPINION 4</u>: THERE ARE NO REASONABLE ASSURANCES THAT THE MERGER WILL CLOSE

62. In determining whether to approve a large M&A transaction, boards of directors will consider the likelihood that the transaction will close. For example, the board of a seller will consider issues related to: (a) the degree of conditionality inherent in the proposed transaction; (b) the extent of deal protections and remedies available to the seller in the event the buyer fails to close; and (c) other issues relevant to assessing the risks of the transaction not closing, which may include items such as timing milestones.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

63. Between July and August 2015, the Debtors' board (the "Board") received at least three detailed presentations (the "Board Presentations")[41] outlining the status of negotiations, key terms, the high degree of conditionality and other information regarding the Merger.

*July 20th Update*

64. On July 20, 2015, the Board was advised on the status of ongoing negotiations with the "Hunt/TCEH unsecured group" and the "TCEH first lien group" regarding terms for a merger and related plan and settlement terms.[42] The July 20th Update stated that while the parties were making progress on certain fronts, there remained several key open issues.[43] The July 20th Update referenced certain "Risks," which included the following:

> "The critical tradeoff of the Hunt/TCEH unsecured group transaction is its REIT conditionality, which is likely to be high. Although the parties are still negotiating the definitive transaction documents, the Hunt/TCEH unsecured group has generally insisted on broad rights to terminate the transaction based on the outcome of REIT-related approvals and rulings, which are uncertain."[44]

*July 30th Update*

65. On July 30, 2015, the Board was advised that the Debtors had made "significant progress on the principal terms of the merger" with the "TCEH first lien group and

---

[41]    See generally, Presentation to the Boards of Directors and Managers of EFH, et al., dated 07/20/2015 (the "July 20th Update"); the July 30th Update; and the August 9th Approval.

[42]    See July 20th Update at slides 3 and 11 EFH05552030 and EFH05552038.

[43]    See July 20th Update at slide 13 EFH05552040.

[44]    See July 20th Update at slide 18 EFH05552045.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

the Hunt/TCEH unsecured consortium."[45]   The July 30th Update contained details on the terms and conditions of the Merger and also referenced the conditionality of the transaction multiple times:

> "…the merger agreement and related definitive documents have effectively been structured as an ***option*** with out-of-market conditions related to PUCT approvals, IRS rulings, and market factors.

> **Significant Conditionality.**  This significant conditionality effectively creates an option for the Investors to close…There is significant risk that the Merger will not close if, among other things:

> - the IRS rulings associated with the REIT conversion or conditions imposed by the PUCT upon approval of the transaction affect the intended economics of the transaction; or

> - market conditions shift in a manner that would adversely affect the transaction."[46]

> "There is a substantial degree of conditionality in the merger agreement, in particular with respect to the regulatory approvals and IRS rulings associated with the REIT conversion.  The Investors may terminate the merger agreement if the PUCT approves the Merger with conditions that negatively affect the desired economics of the transaction."

> "Moreover, there is the risk that, even if the Investors seek to close the transaction, one or more Investors nevertheless fail to fund the Merger."[47]

---

[45]   See July 30th Update at slide 3 EFH06002846.

[46]   See July 30th Update at slide 12 EFH06002855 (bold and underlined words shown exactly as presented in the Debtors' July 30th Update).

[47]   See July 30th Update at slide 36 EFH06002879.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

*August 9th Approval*

66. On August 9, 2015, the date of the Merger and Purchase Agreement, the Board received a detailed update on the resolution of material open items and, among other things, a presentation summarizing the transaction, a financial analysis related thereto and a description of the resolution of open issues.[48]  The August 9th Approval also included details on the implementation of the transaction, milestones and expected benefits to various parties.  The August 9th Approval included a "Recommendation" section that examined the benefits and risks of the transaction, once again recognizing its optionality:

> "Risk that investors decline to close the Merger, including due to effective optionality of agreement and lack of enforcement rights."[49]

67. None of the Board Presentations indicate that the Board was ever provided with a basis to conclude that there were reasonable assurances that the Merger would close. To the contrary, as the excerpts above make clear, the Merger was consistently presented to the Board as a transaction with a high degree of conditionality and uncertainty that, in effect, provided the Purchasers with an option. The Board presentations make explicit that the transaction the Board approved, as documented in the Merger and Purchase Agreement, was one with "effective optionality" and a "lack of enforcement rights."[49]

68. Based on my assessment of the factors and the risks outlined in the Board Presentations in support of the Merger and Purchase Agreement, as well as the

---

[48]   See August 9th Approval at slide 3 EFH06002901.

[49]   See August 9th Approval at slide 37 EFH06002935.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

analyses set forth in Opinions I-III, above, it is my opinion that there are no reasonable assurances that the Merger will close.

X.  **OPINION 5**: **THE INTEREST RATE PAID BY EFH TO TCEH IN CONNECTION WITH THE INTERCOMPANY PROMISSORY NOTES ORIGINALLY ISSUED IN OCTOBER 2007 AND REPAID IN FULL IN 2013 WAS REASONABLE AND REPRESENTED REASONABLY EQUIVALENT VALUE IN EXCHANGE FOR THE ADVANCING OF CREDIT DURING THAT PERIOD**

A.  **Overview of the Intercompany and Demand Notes**

69. Between 2007 and 2014, EFH and several of its affiliates issued certain intercompany notes (the "Intercompany Notes"). These Intercompany Notes include transactions between: (a) EFH as borrower and TCEH as lender; (b) TCEH as borrower and EFH as lender; (c) EFCH as borrower and EFH as lender; and (d) EFCH as borrower and TCEH as lender. The Intercompany Notes were similarly structured and were revolving in nature (meaning they were borrowed and repaid from time to time). Exhibit 5 provides a summary of the EFH Intercompany Demand Notes.

**Exhibit 5**

| Summary of Energy Future Holdings Intercompany Demand Notes | | | | | |
|---|---|---|---|---|---|
| Borrower | EFH-P&I | EFH-SG&A | TCEH | EFCH | EFCH [50] |
| Lender | TCEH | TCEH | EFH | EFH | TCEH |
| Guarantors | EFIH / EFCH | EFIH / EFCH | N/A | N/A | N/A |
| Date Created | October 10, 2007 | October 10, 2007 | February 2010 | March 2010 | February 2008 |
| Repayment | On Demand | On Demand | On Demand | On Demand | On Demand |
| Interest Rate | L + 500 | L + 500 | L + 350 | L + 500 | L + 500 |
| Maximum Amount Outstanding ($mm) | $1,381.0 | $1,031.0 | $770.0 | $108.0 | $24.0 |

Source: Corporate Filings, Intercompany Promissory Notes.

70. In particular, I reviewed the terms and conditions of certain Intercompany Notes between EFH as borrower and TCEH as lender (the "EFH Demand Notes") during

---

[50]  EFCH to TCEH intercompany promissory note data based on intercompany loan and interest schedules.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

the period which they were outstanding (October 2007 - January 2013) (the "Evaluation Period").[51]

71. The EFH Demand Notes provided for two types of borrowings: (a) payment of principal and interest (the "P&I Demand Notes"); and (b) payment of certain corporate expenses (the "SG&A Demand Notes"). The EFH Demand Notes included a floating rate of interest, calculated daily based on LIBOR + 5% (or 500 basis points) and most importantly, were payable at any time upon demand by TCEH.[52] Borrowings under the EFH Demand Notes increased and decreased frequently (and on many occasions, daily) as amounts were borrowed and repaid.

72. The EFH Demand Notes ultimately were repaid in full (with interest) and were canceled in January 2013.[53] In addition, the EFH Demand Notes provided guaranties on performance and a limitation on the maximum amount of permitted borrowings during the Evaluation Period.  Exhibit 6 sets forth a timeline of the EFH Demand Notes.

---

[51] The EFH Demand Notes represented a series of borrowing transactions between EFH and TCEH which provided an ability for TCEH to loan funds to EFH for "corporate overhead costs, SG&A expenses, taxes and principal and interest payments. See page 164 of EFH 2010 Form 10-K.

[52] EFH Intercompany Promissory Note dated 10/10/2007.

[53] The P&I Demand Note was also paid in full, voided on 11/06/2008 and reissued on 05/01/2010.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

**Exhibit 6**



Source: Company Filings, Intercompany Promissory Notes, Munger Tolles.

73. In connection with my review of the EFH Demand Notes, I reviewed a presentation prepared by the TCEH Disinterested Director Advisors (the "Munger Tolles Report").[54] The Munger Tolles Report asserts, among other things, that the interest rate on the EFH Demand Notes did not provide reasonably equivalent value to TCEH, and alleges that TCEH was exposed to EFH credit risk without adequate compensation.[55]

74. At the outset, I note that the Munger Tolles Report appears to disregard the rate paid by TCEH as a borrower from EFH through other Intercompany Notes during the same time period. As summarized in Exhibit 5 above, EFH loaned money to TCEH with an interest rate of LIBOR + 3.5% (the "TCEH Demand Notes"), which is 150 basis points *lower* than the rates paid by EFH to TCEH during the Evaluation Period. It should also be noted that the TCEH Demand Notes were not guaranteed by any other Debtor entity, whereas the EFH Demand Notes were guaranteed by both EFIH and EFCH as of April 7, 2011.

---

[54]  Energy Future Competitive Holdings Company LLC Texas Competitive Electric Holdings Company LLC Presentation to Proskauer Rose LLP 03/05/2015, prepared by Munger Tolles & Olson LLP.

[55]  See Munger Tolles Report at slide 20.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

75. In support of the allegation that the interest rate set by the EFH Demand Notes was too low, the Munger Tolles Report does not compare the EFH Demand Notes to the TCEH Demand Notes.  Instead, the Munger Tolles Report relies on certain analyses comparing the yield of the EFH Demand Notes to two EFH unsecured, publicly traded corporate notes (the "EFH Public Notes")[56] and concludes that "[f]rom November 2007 to January 2013, TCEH received average annual interest of 5.9% [from the EFH Demand Notes] relative to an average YTM on EFH unsecured third party debt [the EFH Public Notes] of between 15.8% and 17.2%."[57] The Munger Tolles report then calculates a hypothetical yield on the EFH Demand Notes using the EFH Public Notes as a proxy.  Exhibit 7 below sets forth a portion of the Munger Tolles report.

---

[56]  EFH 5.55% 2014 Notes and EFH 10.875% 2017 Senior Notes. See Munger Tolles Report at slide 18.

[57]  See Munger Tolles Report at slide 18.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

**Exhibit 7**



Source: Munger, Tolles & Olson. Red circles show source of information used in Exhibit 11.

76. In order to evaluate the reasonableness of the interest rate on the EFH Demand Notes and related conclusions in the Munger Tolles Report, I performed the following:

- Comparison of key terms of the EFH Demand Notes with certain demand securities of other corporate issuers (the "Corporate Demand Notes")[58] and the EFH Public Notes;

---

[58]    The Corporate Demand Notes include variable rate demand notes issued by Ally Financial Inc., Caterpillar Financial Services Corporation, Duke Energy Corporation and Ford Motor Credit Company, LLC ("Ford"). The research conducted by my team identified these issuers as the largest current issuers of demand notes, excluding municipalities, with publicly available data.

- Comparison of interest rate and yields of the EFH Demand Notes with the Corporate Demand Notes, their related unsecured notes and the EFH Public Notes; and

- Examination of the U.S. Treasury Yield Curve (the "Yield Curve") on select key dates during the Evaluation Period.

78. Based on my research and analyses, the demand feature provided by the EFH Demand Notes represented substantial value.  In addition, the EFH Demand Notes contained additional enhancements over time such as corporate guarantees and limitations on borrowings and were ultimately repaid in full.  The interest rate associated with the EFH Demand Notes had similar characteristics with the Corporate Demand Notes I analyzed, all of which charge interest at much lower rates than their corresponding corporate unsecured longer-term debt.  Furthermore, on key dates during the Evaluation Period, the Yield Curve reflected greater yields for longer maturities, consistent with the higher yields of the EFH Public Notes.

79. It is my opinion that during the period when the EFH Demand Notes were outstanding, the interest rate was reasonable. Furthermore, the analyses and conclusions in the Munger Tolles Report regarding the interest rate on the EFH Demand Notes are fundamentally flawed, given their reliance on the market yield of the EFH Public Notes, which is not comparable to the EFH Demand Notes.

**B.    The EFH Demand Notes Are Similar to Corporate Demand Notes**

80. The EFH Demand Notes contain features similar to demand notes generally, which typically provide a lower interest rate relative to other fixed income securities, due primarily to the fact that they are payable upon demand by the holder.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

81. One of the most important characteristics of a demand note, as reflected in the name of the instrument, is the ability of the holder to demand repayment from the issuer (i.e., put the note) at any time.  This put feature is a particularly significant benefit for investors in such securities as it mitigates long-term credit risk and enhances liquidity.

82. Given the demand feature, the interest rate provided by demand notes is not intended to be comparable to longer-term fixed income securities and may not provide compensation for the future credit risk of the issuer.  Notably, the offering documents for the Corporate Demand Notes I reviewed all contain similar explanatory language that the interest on the underlying notes "may not provide a basis for comparison with…investments which pay a fixed yield for a stated period of time" and "does not necessarily bear any relation to the risks associated with or changes in our creditworthiness, credit rating or financial condition and may not compensate…for any increase in credit risk of investment in the [n]otes."[59]

83. I compared a number of key terms of the EFH Demand Notes to the Corporate Demand Notes and EFH Public Notes, a summary of which is set forth in Exhibit 8 below.[60]

---

[59] Duke Energy Premier Notes Prospectus dated 12/06/2013. See Appendix D for excerpts with comparable language for other Corporate Demand Notes.

[60] See Appendix C for the detailed comparison of key terms.

**Exhibit 8**

|  | EFH Demand Notes | Corporate Demand Notes | EFH Public Notes |
|---|---|---|---|
| Not Publically Traded | ✓ | ✓ | ✗ |
| Variable Rate | ✓ | ✓ | ✗ |
| No Fixed Maturity | ✓ | ✓ | ✗ |
| Payable on Demand | ✓ | ✓ | ✗ |

Source: Company Filings, FactSet, Bloomberg.

84. Similar to the EFH Demand Notes, the Corporate Demand Notes are not publicly traded, have a variable rate of interest and, most importantly, are payable on demand. While there are some differences between the EFH Demand Notes and the Corporate Demand Notes, such as the retail/consumer nature of Corporate Demand Notes,[61] the EFH Demand Notes were structured and functioned much more like the Corporate Demand Notes than the EFH Public Notes.

85. In addition to reviewing the key terms of the Corporate Demand Notes, I compared their current interest rates to the interest rates of publicly traded unsecured notes of the same issuers.  There exists a meaningful differential between the interest rate of the Corporate Demand Notes and the weighted average unsecured note interest rate for each issuer. Exhibit 9 below shows the spread between Corporate Demand Note interest rates, and their issuer's weighted average coupon for their outstanding unsecured debt.

---

[61]    The Corporate Demand Notes generally provide the holder the ability to write checks against the account, and periodically reset rates as often as weekly. The EFH Demand Notes contained no interest rate reset feature.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

**Exhibit 9**

| Company | Corporate Demand Note Rate[62] | Unsecured Notes Weighted Avg. Coupon[63] | BPS Differential[64] | % Differential[65] | S&P / Moody's Credit Rating |
|---|---|---|---|---|---|
| Ally Financial, Inc | 1 15% | 4 32% | 317 | 275% | BB+ / B1 |
| Caterpillar Fin Svcs Corp | 0 90% | 2 63% | 173 | 193% | A / A2 |
| Duke Energy Corp | 1 25% | 5 17% | 392 | 314% | A- / A3 |
| Ford Motor Credit Co | 1 05% | 3 46% | 241 | 229% | BBB- / Baa3 |

Source: Company Filings, FactSet, Bloomberg.

86. The Corporate Demand Notes exhibit a materially lower interest rate than the longer term unsecured debt.   In fact, as illustrated by the Ford analysis set forth below, demand notes have maintained their lower yield even in periods of significant distress.

87. Based on my analysis, the EFH Demand Notes are more similar to the Corporate Demand Notes than to the EFH Public Notes.  The EFH Demand Notes contained the most significant feature found in the Corporate Demand Notes: the ability to demand repayment at any time.  They also contained a variable interest rate, which resulted in significant interest differentials from the EFH Public Notes, which is consistent with the differences between the Corporate Demand Notes and unsecured notes I analyzed.

---

[62]   Corporate Demand Note Rates are published weekly by issuers. Rates for investments > $50K as of 10/05/2015.

[63]   Unsecured Notes Weighted Average Coupon is a blended rate calculated by summing the coupons as a proportion of total unsecured debt outstanding. Weighted average maturities for the issuers as presented in Exhibit 9 are 5.8, 2.6, 3.5 and 8.5 years, respectively, in order presented in the chart.

[64]   Basis Point ("BPS") Differential is the absolute difference between the Unsecured Notes Weighted Average Coupon rate and the Corporate Demand Note Rate.

[65]   % Differential is the BPS Differential expressed as a percentage of the Corporate Demand Note Rate.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

**C.     The Yield Differential Between the EFH Demand Notes and the EFH Public Notes Was Consistent with Similar Ford Securities During the Evaluation Period**

88. According to the Munger Tolles Report, the yield differential between the EFH Demand Notes and the EFH Public Notes supports the allegation that TCEH did not receive "adequate compensation" for EFH's credit risk.  However, relying on the yield of EFH Public Notes to establish "adequate compensation" for the EFH Demand Notes is fundamentally flawed because the two securities and associated yields are not comparable.  This is further supported by analyzing the yield differentials between similar third party securities during the Evaluation Period.

89. For purposes of this analysis, I examined the yield differential between the demand notes and public corporate unsecured notes of a third-party issuer during the Evaluation Period. I selected Ford for this analysis, given its non-investment grade rating and availability of public data during the entire Evaluation Period. I then identified a Ford unsecured corporate note to serve as a reference security for the analysis.[66] The yields of Ford's demand notes and public corporate notes during the Evaluation Period are shown in the following chart.

---

[66]     I identified an unsecured note with a similar maturity to the EFH Public Notes, that was outstanding during the entire Evaluation Period and with pricing data available. The Ford security that met this criteria is the Ford Motor Credit Co. 8.0% 12/15/2016 note.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

**Exhibit 10**



Source: Company Filings, Bloomberg.

90. The chart shows a relatively stable yield environment for Ford's demand notes, with its public corporate notes exhibiting significant changes in yield during the Evaluation Period. In other words, throughout the Evaluation Period, including the most volatile timeframe (i.e., 2008 – 2009), investors were willing to advance credit to Ford in the form of demand notes at a much lower yield in comparison to its other public unsecured notes.

91. In addition, the yields of Ford's securities during the Evaluation Period reflect a similar pattern when compared to the EFH Public Notes in the Munger Tolles Report, as shown in the following table.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

**Exhibit 11**

|  | Ford Motor Credit Co. Corporate Demand Notes | Ford Motor Credit Co. 8% 12/15/2016 |
|---|---|---|
| High | 5.79% | 28.48% |
| Low | 1.10% | 2.23% |

|  | EFH Demand Notes: 1M L + 500 | Third Party Yields | |
|---|---|---|---|
|  |  | EFH 10.875% 2017 Notes[71] | EFH 5.55% 2014 Notes |
| High | 10.25% | 25.34% | 46.64% |
| Low | 5.19% | 9.75% | 9.05% |

Source: Munger Tolles & Olson, Bloomberg.

92. Based on these analyses, the yield differential between the EFH Demand Notes and EFH Public Notes during the Evaluation Period was consistent with that of the demand and unsecured notes of Ford. This further supports my opinion that the interest rate paid on the EFH Demand Notes was reasonable.

**D.    The Yield Differential Between the EFH Demand Notes and EFH Public Notes Was Consistent with the Yield Curve on Select Key Dates**

93. In a normal yield environment, longer-term fixed income securities offer higher interest rates than shorter-term securities. A widely accepted benchmark for measuring the yield of fixed income securities is the Yield Curve, which plots the yields of actively traded treasury securities at fixed maturities. The most typical shape observed for the yield curve is an upward slope, also referred to as a "normal" yield curve. Across the normal yield curve, the longer the maturity, the higher the yield.[68]

---

[67]    EFH 10.875% 2017 Notes are guaranteed by EFH and EFIH.

[68]    Fabozzi, F. J. (2000) "Fixed Income Analysis for the CFA Program;" and Federal Reserve Bank of San Francisco (July 2004) "What is a yield curve, and how do you read them? How has the yield curve moved over the past 25 years?"

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

94. Relying on the Yield Curve as a benchmark for the relationship between short and long term maturities, I examined it on three key dates during the Evaluation Period.[69]

**Exhibit 12**



Source: U.S. Treasury Department.

95. At all of the key dates above, the Yield Curve demonstrated similar characteristics regarding yield and maturity to that of the EFH Demand Notes and EFH Public Notes. In other words, as is most often the case, the interest rates for longer dated securities was higher than the shortest maturities. Accordingly, one would expect, contrary to the assertions in Munger Tolles Report, that the interest rate on the EFH Demand Notes would be lower than the interest rate on the EFH Public Notes.

---

[69]    The three dates selected for this analysis included: (a) 10/10/2007 (Demand Note issuance); (b) 05/01/2009 (P&I Note re-issuance); and (c) 04/07/2011 (amendment of EFH Demand Notes).

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

96. In conclusion, the EFH Demand Notes contained a valuable demand feature, along with other protective features, that support the reasonableness of the EFH Demand Note interest rate as compared to the rates of the EFH Public Notes. The EFH Demand Notes are similar to the Corporate Demand Notes I analyzed, which also have a significantly lower interest rate and lower yield than longer-term unsecured debt securities of the same issuer. Moreover, the relationship between the yields of the EFH Demand Notes and the EFH Public Notes was consistent with similar Ford securities during the Evaluation Period, during which Ford's investors were willing to accept materially lower yields on its demand notes, notwithstanding substantially higher yields on its other unsecured debt.  In addition, the lower yields associated with the EFH Demand Notes compared to the longer-term EFH Public Notes was consistent with the Yield Curve on key dates during the Evaluation Period.

97. Conversely, the conclusions and analyses contained in the Munger Tolles Report pertaining to the EFH Demand Notes are based on the premise that the EFH Demand Notes and EFH Public Notes are similar securities with similar features, and that the interest rate on the EFH Demand Notes needed to be "trued-up" to reflect the yield on the longer-dated EFH notes during the Evaluation Period. This position is not supportable.

98. It is my opinion that the interest paid to TCEH on the EFH Demand Notes issued in October 2007 and repaid in full in 2013 was reasonable, and represented reasonably equivalent value in exchange for the advancing of credit during that period.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

XI.    **OPINION 6: BASED ON THE IMPLIED MARKET VALUE OF TCEH TODAY, THERE WILL BE NO TAX LIABILITY TO EFH UPON A DISPOSITION OF TCEH IN A TRANSACTION UTILIZING EFH'S NOLS**

A.    **The Tax Hurdle**

99. The implied market value of TCEH has materially declined since the filing of the Disclosure Statement to a point at which it is likely that there will be no tax liability to EFH in connection with a disposition of TCEH in a step-up transaction (the "Disposition"). Based on the market values of TCEH first lien debt securities, the implied enterprise value of TCEH as of the date of this report is approximately $9.6 billion (see Exhibit 14 below), substantially below the projected $12.0 billion Tax Hurdle (as defined below) for creating a tax liability associated with the Disposition. The decline in TCEH's implied enterprise value (and Luminant's in particular) is due, in large part, to some of the same factors impacting the energy sector –sharp price declines in natural gas negatively impacting expected future cash flows.[70] It is my opinion that based on the implied market value of TCEH today, there will be no tax liability to EFH upon a disposition of TCEH in a transaction utilizing EFH's NOLs. The chart below shows the variance in TCEH's implied market value between the filing date of the Disclosure Statement and October 8, 2015.

---

[70]    In addition, I understand that TCEH will be revising its projections to reflect these current market conditions, and that Evercore will be revisiting its TCEH valuation estimates accordingly.

**Exhibit 13**

| TCEH Implied Market Value (March 24, 2015 vs. October 8, 2015) | | | | | | | | ($ in millions) |
|---|---|---|---|---|---|---|---|---|
| | Principal Outstanding[71] | Market Value (03/24/2015)[72] | | Market Value (10/08/2015)[72] | | Variance | | % Change in Value |
| | | Price | Value | Price | Value | Price | Value | |
| $3.375M DIP Facility[73] | $1,425 | 100 0% | $1,425 | 100 0% | $1,425 | 0 0% | -- | 0 0% |
| Other TCEH Secured Claims[7 ] | 52 | 100 0% | 52 | 100 0% | 52 | 0 0% | -- | 0 0% |
| Credit Agreement[75] | 22,635 | 59.8% | 13,524 | 37.4% | 8,460 | (22.4%) | (5,065) | (37.4%) |
| First Lien Notes | 1,750 | 62.3% | 1,089 | 41.8% | 732 | (20.5%) | (358) | (32.9%) |
| First Lien Commodity Hedges/Interest Rate Swaps[76] | 1,235 | 62.3% | 769 | 41.8% | 516 | (20.5%) | (253) | (32.9%) |
| **TCEH First Lien Debt** | **$27,097** | | **$16,860** | | **$11,185** | | **($5,675)** | **(33.7%)** |
| Less: TCEH Cash (as of 02/28/2015 and 08/30/2015)[77] | | | (1,623) | | (1,566) | | 57 | |
| **TCEH First Lien Net Debt** | | | **$15,236** | | **$9,619** | | **($5,618)** | **(36.9%)** |
| Tax Hurdle (est. as of 06/30/2016) | | | 12,000 | | 12,000 | | | |
| **Net Gain (Excess NOLs)** | | | **$3,236** | | **($2,381)** | | | |

Source: Guggenheim analysis based on publicly available information and TCEH Partial Tax

Basis Step-up Transaction presentation dated 03/17/2015 EFH Dataroom Index 1.15.1.2

(PEO).

100.    On March 17, 2015, EFH and its advisors prepared a presentation (the "Step-Up

Presentation") regarding a potential Disposition and referenced a hurdle as of

December 31, 2015 (the "Initial Tax Hurdle") of $11.4 billion in order to fully utilize

EFH's NOLs. In addition, the Step-Up Presentation included a tax-basis and step-up

analysis (the "Step-Up Analysis") that identified a range of tax-basis outcomes

assuming a full basis step-up and usage of $4.7 billion in NOLs as set forth below.

---

[71]    Per Disclosure Statement and discussions with the Debtors.

[72]    Per Bloomberg.

[73]    Consists of a $1.95B unfunded Revolving Credit Facility and $1.425B Term Loan Facility. Market value based on par recovery per Disclosure Statement.

[74]    Market value based on par recovery per Disclosure Statement.

[75]    Market value based on trading price of 2017 Term Loan tranche (represents ~70% of Credit Agreement).

[76]    Market value based on trading price of First Lien Notes.

[77]    Per monthly operating reports filed on 04/20/2015 and 09/30/2015, respectively.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

**Exhibit 14**

| Illustrative TCEH Tax Basis Sensitivity (12/31/15 Emergence) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Full Basis Step-Up | $12,000 | $13,000 | $14,000 | $15,000 | $16,000 | $17,000 | $18,000 |
| Less: Existing Tax Basis | (6,700) | (6,700) | (6,700) | (6,700) | (6,700) | (6,700) | (6,700) |
| **Tax Basis Write-Up** | **$5,300** | **$6,300** | **$7,300** | **$8,300** | **$9,300** | **$10,300** | **$11,300** |
| Less: Available NOLs (Net of $200 million cushion) | (4,700) | (4,700) | (4,700) | (4,700) | (4,700) | (4,700) | (4,700) |
| **Forgone Tax Basis in Tax-Free Separation with Partial Step-up** | **$600** | **$1,600** | **$2,600** | **$3,600** | **$4,600** | **$5,600** | **$6,600** |
| *Memo: Partial Step-Up as a % of Full Basis Step-Up* | *95%* | *88%* | *81%* | *76%* | *71%* | *67%* | *63%* |
| **Nominal Value of Forgone Tax Basis @ 35% Tax Rate** | **$210** | **$560** | **$910** | **$1,260** | **$1,610** | **$1,960** | **$2,310** |

Source: TCEH Partial Tax Basis Step-up Transaction presentation dated 03/17/2015 EFH Dataroom
Index 1.15.1.2 (PEO). Note: Dollar figures in millions.

101.    The Step-Up Presentation also contains estimates for projected NOLs as of June
30, 2016, which is the Debtors' most recent estimate of the date the Disposition will
occur. As a result, the Initial Tax Hurdle will increase to $12.0 billion (the "Tax
Hurdle") due to the Debtors' estimated monthly accrual of approximately $100
million of NOLs in 2016. The table below shows the same sensitivity using the more
recent June 30, 2016 Effective Date estimate.

**Exhibit 15**

| Revised Illustrative TCEH Tax Basis Sensitivity (06/30/2016 Emergence) | | | | | | | ($ in millions) |
|---|---|---|---|---|---|---|---|
| Full Basis Step-Up | $12,000.0 | $13,000.0 | $14,000.0 | $15,000.0 | $16,000.0 | $17,000.0 | $18,000.0 |
| Less: Existing Tax Basis | (6,700.0) | (6,700.0) | (6,700.0) | (6,700.0) | (6,700.0) | (6,700.0) | (6,700.0) |
| **Tax Basis Write-Up** | **$5,300.0** | **$6,300.0** | **$7,300.0** | **$8,300.0** | **$9,300.0** | **$10,300.0** | **$11,300.0** |
| Less: Available NOLs (Net of $200 million cushion) | (5,300.0) | (5,300.0) | (5,300.0) | (5,300.0) | (5,300.0) | (5,300.0) | (5,300.0) |
| **Forgone Tax Basis in Tax-Free Separation with Partial Step-up** | **$0.0** | **$1,000.0** | **$2,000.0** | **$3,000.0** | **$4,000.0** | **$5,000.0** | **$6,000.0** |
| **Nominal Value of Forgone Tax Basis @ 35% Tax Rate** | **$0.0** | **$350.0** | **$700.0** | **$1,050.0** | **$1,400.0** | **$1,750.0** | **$2,100.0** |

Source: Guggenheim analysis based on TCEH Partial Tax Basis Step-up Transaction presentation dated
03/17/2015 EFH Dataroom Index 1.15.1.2 (PEO). Per page 5, using Debtors' estimate of $5.5
billion in EFH NOLs as of 06/30/2016, less $200 million cushion.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

102.    The Disposition would thus have to generate a value in excess of the Tax Hurdle before there would be any tax liability to EFH.

**B.    Implied Market Value of TCEH Is Materially Below the Tax Hurdle**

103.    Utilizing the information contained in the Step-Up Presentation, the Tax Hurdle as of June 30, 2016 would be approximately $12.0 billion ($6.7 billion of existing TCEH tax basis and $5.3 billion of available NOLs as of June 30, 2016).[78] Therefore, there would be no tax liability based on the current implied market value of TCEH ($9.6 billion as of October 8, 2015). In fact, the implied market value of TCEH would need to increase by over $2.4 billion (or 25%) in value in order to generate any expected tax liability in a Disposition.

**C.    TCEH's Decline in Value is Consistent with Energy Markets, Comparable Companies and Projected Earnings Declines**

104.    Energy markets and related companies experienced declining values subsequent to the filing of the Disclosure Statement. These results are consistent with the erosion in TCEH's implied market value and reduction in TCEH's projected terminal EBITDA as illustrated in the table below.

---

[78]    Net of a $200 million cushion.

Exhibit 16



Source: Guggenheim analysis based on Company financials, Bloomberg, SNL Financial, Filsinger

0+12 2015 EBITDA Extension to 2021 presentation dated March 2015 (PEO) and 2016-21

LRP Review dated September 2015 (PEO).

105.    The implied market value of TCEH has materially decreased since the filing of

the Disclosure Statement. Based on current market valuations and the Step-Up

Analysis, the Disposition would fall significantly short of generating any taxable

---

[79]    Per Bloomberg.

[80]    Comparable companies represent the set of companies that Evercore used in its TCEH comparable company valuation analysis (Calpine Corporation, Dynegy Inc. and NRG Energy, Inc.). The enterprise value of NRG Energy, Inc. has been adjusted in order to exclude the value of NRG Yield, Inc. (consistent with Evercore's treatment of NRG Energy, Inc. in its comparable company valuation analysis).

[81]    Sources: (1) Filsinger 0+12 2015 EBITDA Extension to 2021 presentation dated March 2015 (PEO); (2)  2016-21 LRP Review dated September 2015 (PEO).

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

gain. It is therefore my opinion that there would be no tax liability to EFH upon a disposition of TCEH in a transaction utilizing EFH's NOLs.

Signed on the 12th day of October, 2015, at San Francisco, California

_____

Michael Henkin

***Remainder of Page Intentionally Left Blank***

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

## XII.   Appendix A: Curriculum Vitae

## Curriculum Vitae

| | |
|---|---|
| Investment Banking and Restructuring Advisory Experience | **Guggenheim Securities, LLC**, *Senior Managing Director and Co-Head of Restructuring Group*<br><br>Responsible for managing all aspects of restructuring transactions for debtors, creditors and other parties-in-interest.<br>(2013 – Present)<br><br>**Professional Consulting**<br><br>Independent restructuring advisory and expert witness service provision<br>(2012 – 2013)<br><br>**Jefferies & Company, Inc.**, *Managing Director and Global Co-Head of Restructuring and Recapitalization Group*<br>Responsible for managing all aspects of restructuring transactions for debtors, creditors and other parties-in-interest.<br><br>Previous titles:  Senior Vice President, Vice President, Associate, Analyst<br>(2001 – 2011; 1991 – 1994) |
| Corporate Executive | **NextEngine, Inc.**, *President and Chief Operating Officer*<br>Joined technology company at inception and built and managed finance, operations, marketing and business development teams. Led capital raising activity from both venture capital and strategic investors.<br>(1999 – 2001)<br><br>**Loral Space & Communications Ltd.**, *Senior Vice President, Business Development, and Director, Operations Planning*<br>Responsible for corporate business development, M&A and operations strategy and planning for this global satellite communications company.<br>(1998 – 1999)<br><br>**The News Corporation Limited**, *Vice President, Business Development, News Technology Group*<br>Responsible for business development and financial oversight of group which developed and implemented technologies across all News Corp. divisions and had responsibility for four technology-based operating companies with over $250 million in revenue.<br>(1995 – 1998) |
| Education | MBA, Global Management Program – Stanford Graduate School of Business – 1996<br><br>Vocational Certificate – Musicians Institute, Guitar Institute of Technology – 1991<br><br>BA in Economics/Business, *Summa Cum Laude* – University of California, Los Angeles – 1990 |

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

**Publications Authored in Past Ten Years**

      None

**Expert Testimony at Deposition or Trial in Past Four Years**

| Company | Filing Date | Testimony Date | Case Number | Judge | Court |
|---|---|---|---|---|---|
| Exide Technologies | 06/10/2013 | 10/31/2014 | 13-11482 | Kevin J. Carey | U.S. Bankruptcy Court –  Delaware |

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

# XIII.   Appendix B: List of Reference Materials

| # | Category | Document |
|---|----------|----------|
| | **List of Documents Reviewed** | |
| 1 | Bankruptcy Court Docket | Chapter 11 Voluntary Petition |
| 2 | Bankruptcy Court Docket | Debtors' Omnibus Reply to Objections to Plan Support Agreement Motion |
| 3 | Bankruptcy Court Docket | Disclosure Statement |
| 4 | Bankruptcy Court Docket | Fifth Amended Plan of Reorganization |
| 5 | Bankruptcy Court Docket | Merger Agreement |
| 6 | Bankruptcy Court Docket | Motion to Approve Bidding Procedures |
| 7 | Bankruptcy Court Docket | Omnibus Tax Memorandum |
| 8 | Bankruptcy Court Docket | Plan Support Agreement - Exhibit 1 to Exh bit A |
| 9 | Bankruptcy Court Docket | Pre-submission memo |
| 10 | Bankruptcy Court Docket | Settlement Agreement |
| 11 | Bankruptcy Court Docket | Settlement Agreement |
| 12 | Bankruptcy Court Docket | TCEH Intercompany Notes Claim by Munger Tolles & Olsen LLP |
| 13 | Corporate Documents | Analysis and public and confidential information for the Intercompany Notes |
| 14 | Corporate Documents | Analysis and public information for the Corporate Demand Notes |
| 15 | Corporate Documents | Transaction documents for all M&A transactions listed in Exhibits 2 and 3 |
| 16 | Deposition Transcript | Selected excerpts from 09/10/2015 deposition of Paul Keglevic |
| 17 | Deposition Transcript | Selected excerpts from 09/23/2015 deposition of David Ying |
| 18 | Deposition Transcript | Selected excerpts from 09/24/2015 deposition of Hugh Sawyer |
| 19 | Litigation Documents | Aurelius Capital Master, Ltd. v. Acosta |
| 20 | PEO | 2016-21 LRP Review dated September 2015 (PEO) |
| 21 | PEO | Filsinger 0+12 2015 EBITDA Extension to 2021 presentation dated March 2015 (PEO) |
| 22 | PEO | Presentation to the Board of Directors and Managers - 07/10/2015 (PEO) |
| 23 | PEO | Presentation to the Board of Directors and Managers - 07/20/2015 (PEO) |
| 24 | PEO | Presentation to the Board of Directors and Managers - 07/30/2015 (PEO) |
| 25 | PEO | Presentation to the Board of Directors and Managers - 08/09/2015 (PEO) |
| 26 | PEO | TCEH Partial Tax Basis Step-Up Transaction (PEO) |
| 27 | Public Financials | Various public filings of the Debtors and comparable companies from 2007 to present |
| 28 | Regulatory | Memo from Commissioner Anderson - 08/20/2015 |
| 29 | Regulatory | Memo from Commissioner Anderson - 09/24/2015 |
| 30 | Research Materials | A primer on variable-rate demand notes - Wells Fargo |
| 31 | Research Materials | Copeland and Tufano (2004) Harvard Business Review "A Real-World Way to Manage Real Options." |
| 32 | Research Materials | Damodaran (2012) "Real Options, Acquisition Valuation and Value Enhancement." |
| 33 | Research Materials | Fabozzi, F.J. (2000) "Fixed Income Analysis for the CFA Program." |
| 34 | Research Materials | Federal Reserve Bank of San Francisco (July 2004) "What is a yield curve, and how do you read them? How has the yield curve moved over the past 25 years?" |
| 35 | Research Materials | Federal Reserve Board "Futures, Forward, and Option Contracts" (2015 and 1992) |
| 36 | Research Materials | Hodrick (2014) Columbia Business School Course Packet "Note on Valuing Real Options." |
| 37 | Research Materials | Schulte Roth & Zabel - M&A deal study (2013-2014) |
| 38 | Research Materials | Southern California Law Review "Ring-fencing" by Steven Schwarcz |
| 39 | Research Materials | The Options Clearing Corporation (1994). "Understanding Stock Options." |
| 40 | Research Materials | Vanderbilt Law Review. "Transforming the Allocation of Deal Risk Through Reverse Termination Fees" by Afra Afsharipour |

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

# XIV.   Appendix C: Comparative Note Analysis

| | Demand Notes | | EFH Notes | |
| | P&I | SG&A | 10.875% 2017 | 5.55% 2014 |
|---|---|---|---|---|
| Description | Intercompany Demand Notes | Intercompany Demand Notes | Senior Unsecured | Senior Unsecured |
| Date Issued | October 10, 2007 [1] [2] | October 10, 2007 [1] | January 30, 2009 | August 15, 2005 |
| Issuer | EFH | EFH | EFH | EFH |
| Holder | TCEH | TCEH | Publicly traded | Publicly traded |
| Issued | Up to 2 billion [1] | Up to 2 billion [1] | $1.98 billion | $1.00 billion |
| Interest | Floating | Floating | Fixed | Fixed |
| Interest Rate | 1M L + 500 | 1M L + 500 | 10.875% | 5.550% |
| Calculation | Daily | Daily | -- | -- |
| Maturity | On Demand | On Demand | November 1, 2017 | November 15, 2014 |
| Security | None | None | None | None |
| Guarantees | Yes [2] | Yes [1] | Yes | No |

Source: Company Filings, FactSet, Bloomberg.

(1) April 7, 2011 note amended.
(2) May 1, 2009 new note issued.

| | Demand Notes | | Other Corporate Demand Notes | | | |
| | P&I | SG&A | Ally Demand Notes | CAT Power Investment | Duke Premier Notes | Ford Interest Advantage |
|---|---|---|---|---|---|---|
| Description | Intercompany Demand Notes | Intercompany Demand Notes | Variable Rate Demand Notes | Variable Rate Demand Notes | Variable Rate Demand Notes | Variable Rate Demand Notes |
| Date Issued | October 10, 2007 [1] [2] | October 10, 2007 [1] | May 1, 2014 | October 8, 2014 | December 6, 2013 | February 21, 2014 |
| Issuer | EFH | EFH | Ally Financial | Caterpillar Financial Services | Duke Energy | Ford Credit Company |
| Holder | TCEH | TCEH | Individuals - not tradable | Individuals - not tradable | Individuals - not tradable | Individuals - not tradable |
| Issued | Up to 2 billion [1] | Up to 2 billion [1] | Up to $12.5 billion | Up to $2 billion | Up to $3 billion | Up to $ 10 billion |
| Interest | Floating | Floating | Floating | Floating | Floating | Floating |
| Interest Rate | 1M L + 500 | 1M L + 500 | Variable [3] | Variable [3] | Variable [3] | Variable [ ] |
| Calculation | Daily | Daily | Weekly | Weekly | Weekly | Weekly |
| Maturity | On Demand | On Demand | On Demand | On Demand | On Demand | On Demand |
| Security | None | None | None [5] | None [5] | None [5] | None [5] |
| Guarantees | Yes [2] | Yes [1] | None [5] | None [5] | None [5] | None [5] |

Source: Company Filings, FactSet, Bloomberg.

(1) April 7, 2011 note amended.
(2) May 1, 2009 new note issued.
(3) Interest rates are determined by independent committee at it's sole discretion.
(4) Interest rates are determined by independent committee at it's sole discretion subject to a money market + 25 bps floor.
(5) Notes are unsecured obligations of the issuers, and not insured / guaranteed by FDIC, or any other third party.

HIGHLY CONFIDENTIAL – CONTAINS PEO MATERIAL

## XV.    Appendix D: Corporate Demand Note Prospectus Language Excerpts

| | |
|---|---|
| **Ally Demand Notes**<br>Ally Financial, Inc.<br><br>May 1, 2014 Prospectus | **The interest rate paid on the Demand Notes may not bear any relation to the investment risk.**<br>The Demand Notes bear interest at a floating rate determined by the Demand Notes Committee, which may consist of officers, directors or employees of Ally. The Demand Notes Committee chooses the interest rate in its sole discretion and the interest rate chosen by the Demand Notes Committee does not necessarily bear any relation to the risks associated with an investment in the Demand Notes or in Ally. Moreover, the Demand Notes Committee may establish different interest rates applicable to Demand Notes that do not have the same principal amount. The Demand Notes may not provide a basis for comparison with bank deposits or money market funds, which may use a different method of calculating yield, or other investments which pay a fixed yield for a stated period of time. |
| **CAT Power Investment**<br>Caterpillar Financial Services Corp.<br><br>October 8, 2013 Prospectus | The interest rate paid on investments in the Notes may not provide a basis for comparison with bank deposits or money market funds, which may use a different method of calculating yield, or other investments which pay a fixed yield for a stated period of time. The interest rate also does not necessarily bear any relation to the risks associated with or changes in our, or Caterpillar Inc.'s, creditworthiness, credit rating or financial condition and may not compensate you for any increase in credit risk of investment in Notes. |
| **Duke Energy Premier Notes**<br>Duke Energy Corp.<br><br>December 6, 2013 Prospectus. | The interest rate paid on investments in the Notes may not provide a basis for comparison with bank deposits or money market funds, which may use a different method of calculating yield, or other investments which pay a fixed yield for a stated period of time. The interest rate also does not necessarily bear any relation to the risks associated with or changes in our creditworthiness, credit rating or financial condition and may not compensate you for any increase in credit risk of investment in the Notes. |
| **Ford Interest Advantage**<br>Ford Motor Credit Co.<br><br>December 6, 2013 Prospectus | **The Interest Rate Paid on the Notes May Not Bear Any Relation to the Investment Risk.** The interest rate on the Notes, which is the base rate described below under "Description of Notes — Interest Rate Information" plus any incremental rate we may choose to pay in our sole discretion, does not necessarily bear any relation to the risks associated with or change in the creditworthiness, credit rating or financial condition of either Ford or Ford Credit. |