Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3    In re:                          :

4                                    :    Chapter 11

5    ENERGY FUTURE HOLDINGS          :

6    CORP., et al.,                  :    Case No. 14-10979(CSS)

7                                    :

8          debtors.                  :    (Joint Administration

9    _____:    Requested)

10

11

12

13                              United States Bankruptcy Court

14                              824 North Market Street

15                              Wilmington, Delaware

16

17                              October 28, 2015

18                              11:04 AM - 3:48 PM

19

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTCHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECR OPERATOR:  LESLIE MURIN

1   HEARING re Fifth Amended Joint Plan of Reorganization of

2   Energy Future Holdings Corp., et al., Pursuant to Chapter 11

3   of the Bankruptcy Code [D.I.; filed September 21, 2015]

4

5   HEARING re EFIH Debtors' Partial Objection to Proof of Claim

6   No. 6347 Filed by the Indenture Trustee for the EFIH

7   Unsecured Notes [D.I. 4964; filed July 9, 2015]

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1   A P P E A R A N C E S :
2

    AKIN GUMP STRAUSS HAUER & FELD LLP

3        Attorneys to Ad Hoc Committee of EFIH Unsecured

4        Noteholders and EFIH Second Lien DIP Commitment

5
6
    BY:  ABID QURESHI

7        ROBERT J. BOLLER

8        SCOTT L. ALBERINO

9
10
    ASHBY & GEDDES PA

11       Attorneys for WSFS Trustee

12
13  BY:  GREGORY TAYLOR
14
15  BLANK ROME LLP
16       Attorneys to Wilmington Trust NA-First Lien Agent
17
18  BY:  MICHAEL D. DEBAECKE
19
    CROSS & SIMON LLC

20       Attorneys for Fidelity

21
22
    BY:  MICHAEL J. JOYCE

23
24
25

1   DRINKER BIDDLE & REATH LLP
          Counsel to Citibank NA, TCEH Dip Agent
2
3
    BY:  HOWARD A. COHEN
4
5
    FOLEY & LARDNER LLP
6
          Attorneys for UMB Bank, N.A. Indenture
7
8
    BY:  MARK F. HEBBEIN
9
10
    FOX ROTHSCHILD LLP
11
          Attorneys for Ad Hoc group of TCEH
12        Unsecured Noteholders
13
14  BY:  L. JOHN BIRD
15       JEFFREY M. SCHLERF
16
17  FRIED, FRANK, HARRIS, SHRIVER & JACOBSON
          Attorneys for Fidelity
18
19
    BY:  GARY L. KAPLAN
20
          MATTHEW ROOSE
21
22
23
24
25

```
 1   HOGAN MCDANIEL
           Attorneys for Contrarian Capital
 2
 3
     BY:  DANIEL K HOGAN
 4
           GARVAN MCDANIEL
 5
 6
     KIRKLAND & ELLIS LLP
 7
           Co-Counsel to the Debtors
 8
 9
     BY:  ANDREW MCGAAN
10
           MARK E. MCKANE
11
           CHAD J. HUSNICK
12         MARC KIESELSTEIN
13
14   KLEHR HARRISON HARVEY BRANZBURG LLP
15         Counsel to UMB Bank N.A. Indenture Trustee
16
17   BY:  RAYMOND LEMISCH
18
     KRAMER LEVIN NAFTALIS & FRANKEL LLP
19
           Attorneys for Second Lien Indenture Trustee
20
21
     BY:  GREGORY HOROWITZ
22
23
24
25
```

1   MCELROY, DEUTSCH, MUVANEY, & CARPENTER, LLP
         Co-Counsel to the TCEH Debtors
2
3
    BY:  DAVID PRIMACK
4
5
    MONTGOMERY, MCCRACKEN, WALKER & RHOADS
6
         Co-Counsel to the EFH Creditors' Committee
7
8
    BY:  NATALIE D. RAMSEY
9
         MARK SHEPPARD
10
11
    MORRIS JAMES LLP
12       Attorney for Law Debenture of New York,
13       Indenture Trustee
14
15  BY:  STEPHEN MILLER
16
17  MORRIS, NICHOLS, ARSHT & TUNNELL LLP
         Attorneys for EFH Equity Owners
18
19
    BY:  ERIN FAY
20
21
22
23
24
25

1    MORRISON & FOERSTER LLP
          Co-Counsel to the TCEH Creditors' Committee
2
3
     BY:  CHET KERR
4
          TODD M. GOREN
5
6
     NIXON PEABODY
7
          Attorneys for AST as EFH Indenture Trustee
8
9
     BY:  RICHARD PEDONE
10
11
     O'KELLY, ERNST & BIELLI LLP
12        Co-Counsel to Energy Future Holdings Corp.
13
14   BY:  DAVID KLAUDER
15
16   O'MELVENY & MEYERS LLP
17        Attorneys for Brookfield, Appollo, Angelo Gordon
18
     BY:  DANIEL SHAMAH
19
          PETER FRIEDMAN
20
21
     PACHULSKI STANG ZIEHL & JONES
22
          Attorneys for Second Lien Indenture Trustee
23
24
     BY:  LAURA DAVIS JONES
25

Page 8

1    PATTERSON BELKNAP

          Attorneys to Law Debenture Trust Co.

2

3

     BY:  BRIAN GUINEY

4

5

     PAUL WEISS RIFKIND WHARTON & GARRISON LLP

6

          Attorneys to Ad Hoc Committee of TCEH First Lien

7    Creditors

8

9    BY:  ADAM BERNSTEIN

10        ALAN KORNBERG

11        JACOB A. ADLERSTEIN

12

     POLSINELLI PC

13

          Co-Counsel to the TCEH Creditors' Committee

14

15

     BY:  CHRISTOPHER A. WARD

16

          JUSTIN K. EDELSON

17

18

     POTTER ANDERSON & CORROON LLP

19

          Attorney for Deutsche Bank New York

20

21

     BY:  R. STEPHEN MCNEILL

22

23

24

1    REED SMITH LLP

         Attorneys for Bank of NY Mellon as Indenture Trustee

2

3

     BY:  KURT GWYNNE

4

5

     RICHARDS, LAYTON & FINGER, P.A.

6

         Co-Counsel to the Debtors

7

8

     BY:  DANIEL DEFRANCHESCHI

9

         JASON M. MADRON

10

11

     SEWARD & KISSEL LLP

12       Counsel to Wilmington Trust NA-First Lien Agent

13

14   BY:  ARLENE R. ALVES

15       MARK D. KOTWICK

16

17   SHEARMAN & STERLING LLP

         Counsel to Deutsche Bank, Agent to DIP Financing

18

19

     BY:  NED S. SCHODEK

20

21

22

23

24

25

1     SULLIVAN & CROMWELL, LLP
          Co-Counsel to the EFH Creditors' Committee
2
3
      BY:  ANDREW DIETDERICH
4
          BRIAN GLUECKSTEIN
5
6
      U.S. TRUSTEE'S OFFICE
7
          U.S. Trustee
8
9
      BY:  RICHARD SCHEPACARTER
10
11
      VENABLE LLP
12        Counsel to Pacific Investment Management Co LLC
13
14    BY:  JAMIE EDMONSON
15        JEFFREY S. SABIN
16
17    WACHTELL, LIPTON, ROSEN & KATZ
          Attorneys for EFH Equity Owners
18
19
      BY:  EMIL KLEINHAUS
20
21
22
23
24
25

```
 1   WHITE & CASE LLP
            Attorneys for Ad Hoc group of TCEH
 2
            Unsecured Noteholders
 3
 4
     BY:  J. CHRISTOPHER SHORE
 5
            THOMAS LAURIA
 6
 7
     WILMER CUTLER PIKKERING HALE & DORR LLP
 8
            Attorneys for Marathon Asset Management
 9
10
     BY:  GEORGE SHUSTER
11
            PHIL ANKER
12
13   YOUNG CONOWAY
14          Attorneys to Ad Hoc Committee of TCEH
15          First Lien Creditors
16
17   BY:  PAULINE K. MORGAN
18
     PACHULSKI STANG ZIEHL & JONES
19
            Attorneys for Second Lien Indenture Trustee
20
21
     BY:  RACHAEL RINGER
22
23
     APPEARING TELEPHONICALLY:
24
     NII-AMAR AMAMOO
25
```

1   CORINNE BALL

2   ASHLEY F. BARTRAM

3   LAUREN BITZIN

4   PEG A. BRICKLEY

5   TREVOR BROAD

6   MATTHEW BROD

7   CHRISTOPHER L. CARTER

8   MARIA CHUTCHIAN

9   KEVIN COCO

10   MARK A. CODY

11   KENT COLLIER

12   LOUIS A. CURCIO

13   JASON D. CURRY

14   ADAM M. DENHOFF

15   DAVID M. DUNN

16   BENJAMINN D. FEDER

17   MARK FLANNAGAN

18   MEGGIE GILSTRAP

19   SETH GOLDMAN

20   ANNA E. GRACE

21   XIAOYU GU

22   MARK W. HANCOCK

23   JOHN HARDIMAN

24   SANDRA HORWITZ

25   NATASHA HWANGPO

1   MATTHEW W. KINSKEY

2   CHARLES KOSTER

3   STUART KOVENSKY

4   ARI D. KUNOFSKY

5   VINCENT LAZAR

6   CATHERIN LO TEMPIO

7   BENJAMIN LOVELAND

8   JONATHAN D. MARSHALL

9   HAL F. MORRIS

10   TINA MOSS

11   MORGAN NIGHAN

12   MEREDITH PFISTER

13   LARRY A. RAPPAPORT

14   MARC B. ROITMAN

15   ANDREA B. SCHWARTZ

16   FREDRIC SOSNICK

17   ROBERT SZWAJKOS

18   ANDREW M. THAU

19   AMER TIWANA

20   MATTHEW J. TROY

21   MATTHEW UNDERWOOD

22   KEVIN M. VAN DAM

23   EDWARD WEISFELNER

24   BRADY C. WILLIAMSON

25   JULIA M. WINTERS

1    APARNA YENAMANDRA

2    DANIELE ZAZOVE

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE CLERK:  All rise.

3            THE COURT:  Please be seated.  Good morning.

4            MR. KIESELSTEIN:  Good morning, Your Honor, Mark

5    Kieselstein, Mark McKane, Andy McGaan, Chad Husnick,

6    Kirkland & Ellis, LLP on behalf of the debtors.

7            Your Honor, we have a couple of things on the

8    agenda today.  The first is the pretrial agenda, and then we

9    intend to deal with that first.  But I just did want to give

10   Your Honor a heads up that there are developments and active

11   discussions on the PIK holder front and some of us are going

12   to go into the hallway while the pretrial is going on and

13   have some further discussions about that.  And then, Your

14   Honor, we'll provide you a full update after the pretrial

15   and it'll inform how we go forward today.

16           THE COURT:  Okay.

17           MR. MCKANE:  With that, Your Honor, Mark McKane of

18   Kirkland & Ellis on behalf of the debtors.

19           Last night, at docket 6706, we filed a notice of

20   joint stipulated final pretrial order.  Your Honor, I have

21   copies for -- to give to the clerk, if I may approach?

22           THE COURT:  I have received the -- well, yeah.  Do

23   you have a copy?

24           MR. MCKANE:  Your Honor, that draft final pretrial

25   order reflected significant efforts by the debtors and the

1    creditors, both in advance of the initial pretrial

2    conference, and then afterwards, memorializing much of the

3    feedback we received, and then trying to make further

4    progress.  It reflects a -- an agreement between or a

5    support by not just the debtors, but also the Official

6    Committee of Unsecured Creditors on the east side.  There

7    are some areas where we were not able to reach a final

8    agreement, and we tried to reflect those in the order.

9             In addition, there are a couple of points that

10   other creditors have raised, where I don't think there was

11   support from both the Committee and the debtors.  We weren't

12   able to reflect that in a black line because sometimes they

13   were actually inconsistent with one another.

14            So what I propose doing, not a line by line walk

15   through, but walk through some of the key provisions,

16   identify those areas in dispute, either where you have

17   others beyond the E Committee and the debtors raising the

18   issue, or where it's engaged between the debtors and the E

19   Committee, and we will know where other creditors who now

20   support the E Committee.

21            THE COURT:  Okay.

22            MR. MCKANE:  Thank you.  Your Honor, starting just

23   with the first enumerated paragraph on page two, there is a

24   consensus that the first -- and in the first, we're going to

25   divide the confirmation proceedings into two phases, with

1    the first phase addressing both the settlement motion and

2    the issues of confirmation not related to the second phase,

3    the second phase, addressing reinstatement.  And that would

4    start November 30th.

5            Then, paragraph two tries to make clear what's in

6    play for confirmation as opposed to separate standalone

7    proceedings for claim objections.  And what we've

8    highlighted there is that the confirmation proceedings will

9    not address issues relating to the merits or amounts of any

10   make whole claims, both petition contract interest claims,

11   fees and expense claims, or certain amounts allegedly due to

12   the EFH or EFIH note.

13           And specifically, what we're trying to convey

14   there, Your Honor, is we recognize that the plan, externally

15   stated, says, and unless otherwise objected to, this shall

16   also serve as a claim objection.  But as you saw with the

17   initial pretrial conference, we have gone and taken material

18   steps to ensure that we have separate proceedings, toward

19   what we would refer to as the disputed parts of the claims,

20   whether that be the EFIH make whole and PIK notes, where

21   you're going to hear the PPI interest potentially later

22   today, or for example, with the EFH legacy notes, to the

23   extent that their dispute involves post-petition interest,

24   make wholes, fees and expenses.

25           We've tried to take those issues to review as

1   rather more parochial to those creditors and put those on

2   separate tracks.

3          And what we've tried to do in particular with the

4   language here is to highlight, given that there was a motion

5   for summary -- a partial motion for summary judgment filed,

6   and an expert report filed specify that as it relates to the

7   EFH legacy notes, those issues are all going to be part of

8   that claim objection, already on file, and are going to be

9   set with the separate schedule, separate proceeding.

10          The EFH legacy notes indentured trustee takes

11   issue with this.  And specifically, this relates to how they

12   interpret the plan versus how we see the plan.  And it could

13   -- it relates to what they call condition precedent number

14   nine.  And that is, will there be -- will the Court deny all

15   the make whole claims?  And if not, if there's a ruling or

16   an alternative, does the plan fail?

17          As we view the evidence that we've presented to

18   Your Honor, it would be -- we're going to move forward, put

19   on our evidence on confirmation.  We have a separate

20   proceeding as it relates to the make whole, that they

21   allegedly do.  We also have reinstatement, and we're going

22   to put on evidence of reinstatement at confirmation.

23          If the Court agrees with us, that no make whole is

24   due, we were -- we've satisfied all of our conditions, we

25   move forward to close.  If the Court concludes a make whole

1    is due, we've already established our ability to go forward

2    with reinstatement, we go forward with reinstatement, we've

3    satisfied our conditions, we close.

4            There's no need for a mini trial or a mini preview

5    of the make whole arguments in confirmation and we frankly

6    view that as (indiscernible).

7            That's what we've tried to clarify in paragraph

8    two.  I know Mr. Pedone has a different view, and obviously,

9    I'll let him address that later.  One question, Your Honor

10   is, I think it's probably best for us to lay out all the

11   issues first and then have others respond.

12           THE COURT:  That's fine.

13           MR. MCKANE:  But if you want to go with issue by

14   issue, then yeah.

15           THE COURT:  That's fine.

16           MR. MCKANE:  All right.

17           THE COURT:  You're not trying to limit any

18   argument on impairment?  So for example, the argument that

19   they're going to pay a make whole is an impairment or -- of

20   a claim?

21           MR. MCKANE:  Not at all, Your Honor.  And in fact,

22   starting on line three of paragraph two, we specifically,

23   with the input of some of the creditors, and this was a

24   suggestion we all agreed to, make that point clear.  And

25   that's because they provided our -- nothing herein precludes

1    a participating party from raising feasibility, that's sub

2    I.   Payment in full -- you know, whether the plan provides

3    payment in full, that's ii, or a iii, whether the plan

4    otherwise alters the claimant's rights with respects to

5    those claims.

6            So that was language that I believe was submitted

7    by the EFIH first lien and second lien creditors, and we

8    absolutely agree with that, that the confirmation

9    proceedings is their opportunity to raise those issues.

10           Your Honor, moving on, paragraph four, relating to

11   trial time and allocation, this is a progress from where we

12   were at the initial pretrial conference, specifically, after

13   working through and filing a final witness list and talking

14   it through with the creditors, those witnesses that will be

15   called.

16           We have reached an agreement with the Committee,

17   that we think 55 hours of trial time is going to be

18   sufficient.   The one caveat of that is that we do not

19   include closing arguments in those 55 hours, but we do

20   include opening statements in those 55 hours.

21           THE COURT:   How is the -- how is this -- how is

22   the mechanism going to work as to keeping track of time?

23           MR. MCKANE:   Yeah, the one thing we will have

24   here, our lawyers, who will be keeping track on -- both on

25   the debtor's side and on the creditors' side and we will be

1    comparing notes in terms of that where there should be no

2    burden on the Court or the Court personnel, and keeping that

3    (indiscernible).

4         THE COURT:  Okay.  And I guess I have to resolve

5    any disputes.

6         MR. MCKANE:  It would be -- it would reflect

7    poorly on us if we ever had to do that.

8         Your Honor, in terms of extending that time,

9    frankly, we had debated whether cause was a sufficient

10   cudgel to enforce the 55 hours or whether we need to go with

11   something higher or a compelling need. Frankly, we recognize

12   that it's been the Court's discretion to allow additional

13   time, but we just would emphasize we all view this as an

14   important conditioning element on all of the parties.

15        As it relates to opening statements, and I believe

16   that there may be -- sometime, I found this from creditors -

17   - we work this out, recognizing that the debtors would have

18   to respond to more issues than just what was raised by the

19   official Committee, but yet there should be some, if not

20   symmetry, equitable allocation.

21        What we've committed to is we'll target 45 minutes

22   for the debtors, no more than an hour all-in, plan

23   supporters will have up to two hours for opening statements

24   with objectives having no more than two hours, with the

25   official Committee committing themselves to a target of 30

1    minutes, and then 10 for all other plan objectives.

2            As it relates, in paragraphs eight and nine and

3    10, we address written direct examinations and the Court's

4    guidance about their willingness to accept written directs,

5    and then some supplemental live testimony as well.  Here is

6    where we are -- and there is a bit of a dispute with

7    creditors -- but it's significantly narrowed them, where we

8    were previously.

9            What the debtors have committed to do is to

10   provide the written directors for their first three

11   witnesses on Friday by four o'clock.  Our goal is to get it

12   to you before four, but no later than four.

13           We will then provide the fourth and fifth

14   witnesses on Sunday, and then the sixth on Monday.  And

15   then, thereafter, recognizing that that first week of trial,

16   you have four trial days.  Then, in the second and third

17   weeks of trial, you have two trial days, and then more time

18   in the work week in advance, recognizing that you have other

19   cases and a full calendar, generally.

20           The debtors proposed that we file written directs

21   72 hours in advance.  And a couple of issues, Your Honor,

22   where I think that we differ from the Committee.  First is

23   the Committee wants to say, "Under no circumstance can you

24   call a witness until those 72 hours have run."

25           Here's our issue with that.  It's somewhat

1    impractical from a trial environment and I mean that for

2    multiple reasons.  One, while even if we submit a written

3    direct, we intend to put people on live as well to highlight

4    and to emphasize some key points for Your Honor.

5            But we don't control the scope of the cross.  And

6    while in most trials, technically, most people would say in

7    all trials, things start off slower and then may accelerate

8    as the trial goes on, as people get to cumulative testimony,

9    there may be circumstances here, where the first week moves

10   faster than expected.  And neither the debtors nor the

11   creditors have control over that.  It is a function of both

12   of us, you know, moving forward, and so, there's that issue.

13           The other -- and so, I don't think you can put it

14   -- we would be -- I think it'd be unrealistic to put some 72

15   hour bar.  We can put the date when we're going to file it,

16   we're going to tell you the sequencing of witnesses, this is

17   our goal.  But, you know, there's also a -- it is somewhat a

18   fluid environment in terms of how you sequence witnesses.

19   And let me turn to that issue section.

20           As it relates to witnesses, we have a preferred

21   sequencing.  We like to put on the company witnesses first,

22   lay the factual predicate for the claims, lay the factual

23   predicate for how we got to this plan, and then call the

24   directors generally to have them discuss their decision

25   making in both approving the plan and approving settlement.

1    That's a -- an overarching approach that we'd like to have.

2            Nonetheless, we don't have control over all of

3    these individual schedules, and some people are not

4    available at the time, but we think from a trial advocacy

5    standpoint, it would be optimal to call them.  And for

6    example, one of our directors, one of our outside directors

7    can only testify on Fridays.  The -- you know, that's the

8    day that that person's available.  And we're going to make

9    that happen.

10           We've already, you know, informed the Committee

11   about how that's going to work.  That's going to be the

12   direct that we're going to be filing on Monday.  Why?

13   Because we have to meet with him on -- Monday's the only

14   time we can meet with him to review the direct and have it -

15   - and have him sign off on it, because it'll be filed under

16   penalty of perjury.

17           So we're in sequence for -- theoretically, if

18   we're moving really slowly, that might be our fifth witness

19   in the ultimate sequencing.  But I can't file it before

20   Monday and I have to get him up and off the stand on Friday

21   because that's really the only time he's going to be

22   available.

23           And that's just trial dynamics.  That's the kind

24   of issue we had raised with you on those Monday morning

25   meetings.  So that's why this -- we think the 72 hour rule

1    is a little too rigid.  But you know, to be clear, and you

2    know, there's no hide the ball here, on Friday, we're going

3    to file a written direct for our first three witnesses, who

4    we anticipate to be Paul Keglevic, the CFO and post-COO,

5    Tony Horton, the Treasurer, and Michael Carter, the Senior

6    Vice President from our -- for Financial Planning and

7    Development.  So that's our first three.

8            From there, it is a little more fluid because of

9    the director, but we also anticipate that we may call Mr.

10   Mendelsohn, who is actually an expert, who is going to be

11   testifying as to one issue as it relates to the intercompany

12   notes.  And because we're putting on the fact testimony

13   relating to those notes relatively early in the case and

14   this witness is relatively discrete on those issues, we put

15   that witness on.

16           And then, if there's time, we may put on a tax

17   witness to address intercompany tax issues before Mr. Smith,

18   but we may not, if we're not -- if we don't have enough

19   time.  Nonetheless, you know, no hide the ball here, that's

20   how we're thinking about things.  And frankly, the way we've

21   worked out that first week in terms of the filing of the

22   written directs, we think accomplishes all the goals that,

23   you know, the Judge, Your Honor raised at the initial

24   pretrial conference, which is get it to me early enough that

25   I can read it and digest it, or at least have an opportunity

1    to do so before they take the stand.

2            And then, in those second and third weeks, you

3    know, when you have more -- when, frankly, you have less

4    time seeing us, we'll file those consistent with what the

5    debtors proposed, which is 72 hours in advance.

6            All right.  As it relates to those issues, I

7    believe the PCRBs join on the E Committee's position -- I

8    believe the first liens and second liens want us to disclose

9    all of our witnesses for the first week in advance.

10           I've generally laid out our sequencing, and

11   hopefully, I've addressed all those issues.  I know they

12   want all of them on Sunday, but because of our inability to

13   meet with one of the witnesses, it's just not practical for

14   us to do so.

15           As it relates to debt designations, Your Honor,

16   the Committee and the debtors have agreed that, you know,

17   the plan objectors should be submitting debt designations

18   for fact witnesses, right?  We don't think there should be

19   depth designations for experts.  And the purpose there, Your

20   Honor, is it's -- all the experts are going to testify live,

21   right?  The actual reports are inadmissible.  They're

22   disclosure vehicles, right?

23           Put the witnesses on, ask your questions of the

24   experts live.  We don't think debt designations are an

25   appropriate -- they can be used for impeachment purposes,

1    absolutely.  But putting them on as a form of evidence is --

2    we think is inappropriate.  And that's why we've limited the

3    fact witnesses.

4              As it relates to exhibits, paragraphs 12, 13 are a

5    modification of what we've proposed to do previously, and

6    frankly, it's in response to the extraordinary volume of

7    potential exhibits.  It's significant, Your Honor.  And our

8    goal is to minimize any potential issues for you.  And you

9    should not have to rule on these issues.

10             And so, what we are basically proposing is rather

11   than trying to do all of that in advance, we would identify

12   by a certain date.  Here are all of the exhibits we're going

13   to move in this week, right?  Then, the creditors have, you

14   know, they've already kind of pre-evaluated things.  They

15   tell us of those -- these are the ones we have an issue

16   with.  But there's basically a 24 hour period, and then we

17   hammer them out.

18             And we will move those exhibits into evidence at

19   the close of the week.  We recognize the debtors are

20   somewhat taking a risk here because the witnesses will be up

21   and off the stand.

22             But we've received commitments from creditors that

23   issues like admissibility for authentication, which we've

24   put it in the order, we're going to work together to

25   recognize that these are business records for -- in large

1   part, and address those issues.  But rather than having a

2   lot of court time sucked up at the start of the case,

3   addressing the exhibits that may never be moved into

4   evidence, we're going to take it on a week by week basis,

5   yeah.

6           Just a few other issues we want to highlight.

7   Your Honor, we are very aware of your views at it relates to

8   an open courtroom.  But there are some issues where there is

9   going to be commercially sensitive and material non-public

10  information that may have to be elicited.

11          We have a mechanism built in place with a

12  protective order where folks have to give notice to the

13  producing party, which is largely us, but not exclusively

14  us, meaning the debtors, to -- if they intend to use

15  material, we have no intention of asking for an

16  extraordinary step of sealing the Courtroom.  We were able

17  to work through these issues in other trials with you, and

18  including the compensation -- the incentive compensation

19  hearing.

20          We have discussed that exact type of approach with

21  the creditors, and we will continue to work through those

22  issues, but that's the general approach we're going to be

23  taking as it relates to competitively sensitive information

24  that could be disclosed during the course of the

25  proceedings.

1          Finally, Your Honor, a couple of other issues,

2     really kind of minor.  Demonstratives -- I think we've

3     agreed we'll exchange those the day before, no later than 10

4     o'clock at night, so that people have an opportunity to

5     review them before the trial starts.  I know at least the

6     PCRBs have asked for it a little bit earlier in the day.

7     You know, frankly, the Committee and the debtors have agreed

8     to 10.

9          The other issue, frankly, is post-trial briefing,

10    Your Honor.  The (indiscernible) spread is 10 to 14 days on

11    that.  I'll just leave that as is.  But we are going to --

12    we are continuing our discussions with the creditors about

13    how you want to proceed, what closing arguments.  You know,

14    there's -- it depends on how the case evolves, because

15    there's a possibility that the settlement agreement evidence

16    and record could be closed earlier than the rest of

17    confirmation to the extent that the reinstatement becomes a

18    material phase two, but it may not become a material phase

19    two.

20          Along the -- and let me just use this as an

21    opportunity to report that the debtors have worked very

22    constructively with the creditors, mainly the E Committee

23    and their financial advisors, on an informal basis to

24    provide all the discovery and diligence.  We've -- and that

25    included access, not just to professionals like the Evercore

1    team and the Filsinger team, but also to company personnel

2    as well, not on a deposition basis, but on informal

3    interviews.

4           We concluded that effort on Monday, and we're

5    going to work with the Committee and, you know, the

6    creditors reinstatement issues to see -- we've put forward a

7    proposed schedule.  We'll work with them on that on the back

8    half as well, and we'll update the Court in the prehearing

9    meetings, and in terms of phase two.

10          And then finally, closing arguments, given that

11   that sequencing issue, we hope to raise those issues at that

12   time as well.  And Your Honor, I believe those are the only

13   issues with the order.  There is one intercreditor issue

14   that I would note, and it's an intercreditor issue within

15   the TCEH first liens.

16          We sent it out and referred to it as the marathon

17   issue.  The parties of that dispute have -- are working

18   together to see if they can reach an agreement about whether

19   that can -- whether there can be -- whether that needs to be

20   addressed in the confirmation proceeding at all.

21          If it does need to be addressed at all, my

22   understanding is that it would not require a live testimony

23   time, but they may ask for an -- up to an hour to argue both

24   sides of that, but there is a potential that there may be no

25   issue that needs to be raised with you at this time.  So I'm

1    only giving you -- alerting you to the prospect that maybe

2    in the second week, there may be a request, you know, but we

3    will address it as it comes.  And the hope is that we don't

4    have to address it at all.

5                THE COURT:  It's an internal first lien dispute?

6                MR. MCKANE:  It is.  And it relates to priority

7    between the letters of credit within the TCEH first liens

8    and the other holders.  And I can not -- I believe the

9    counsel for O'Melveny and WilmerHale, who are representing

10   both sides of that dispute are here today, but their report

11   to me was, "We hope not to be--

12               THE COURT:  Okay.

13               MR. MCKANE:  --we are moving forward in a way to

14   take this out of the confirmation proceeding."  The plan

15   served as a catalyst, to I think in some ways, get folks to

16   talk about it.  And we're hopeful that the -- that this will

17   not be an issue for confirmation.

18               THE COURT:  Okay.

19               MR. MCKANE:  With that, Your Honor, I'll cede the

20   podium to Mr. Glueckstein.

21               MR. GLUECKSTEIN:  Good morning, Your Honor.

22               THE COURT:  Good morning.

23               MR. GLUECKSTEIN:  For the record, Brian

24   Glueckstein, Sullivan and Cromwell, for the East Side

25   Committee.

1          We have worked constructively with the debtors on

2     the form of the pretrial order.  And as Mr. McKane outlined,

3     I think we're largely in agreement.  I just wanted to make a

4     couple of points, including on the opening issues that Mr.

5     McKane addressed, as far as the Committee goes.

6          Just Your Honor, on the paragraph four and six of

7     the order that deal with the trial time, allocation of trial

8     time, we have agreed, as Mr. McKane outlined, to go with the

9     proposal of 55 hours, which is essentially the amount of

10    time the Court has currently allotted for phase one of the

11    trial, as part of the calendar, I think is the parties

12    contemplating.

13         We have been working and continue to work with the

14    debtors on whether to refine their list of witnesses and how

15    many witnesses are actually going to be presented during the

16    hearing.  As we stand here today, there's still a bit of an

17    open issue on that.

18         And certainly, at the higher end of the list that

19    they served, which still contains 16 witnesses, combined

20    with the number of objections that have been filed in the

21    case, there is the potential, despite the party's best

22    efforts, that if all of those objections were to remain

23    unresolved, that the total allotment of trial time may prove

24    to be some adjustment.

25         And so, it was important to us to revise the

1    language in paragraph six to make clear that Your Honor, you

2    know, certainly as you would in any event, whether the

3    language is there or not, retain discretion, but that the 55

4    hours in there, while we heard Your Honor last time, that

5    you wanted to have a framework and a cap, that it would be

6    an opportunity, should the need arise, to address whether

7    some additional time might be necessary on the backend.

8            We're all hopeful that we can be efficient here.

9    And certainly, if some objections, for example, have

10   resolved during the course of the trial, I think, you know,

11   there's a likelihood that we will be okay.  I did want to

12   just note that we might need to address that issue at some

13   point, hopefully not.

14           On the two issues that Mr. McKane outlined that

15   remain open, as to the Committee, in paragraph nine, with

16   respect to the written direct, the 72 hour window, if you

17   recall, Your Honor, when we were here two weeks ago, the

18   concern, we expressed a number of concerns about the written

19   direct process, how that would be utilized, how that impacts

20   the allocation of trial time, the ability to prepare, while

21   recognizing the efficiency of doing that.

22           And the notice period on the written directs, and

23   as we understand it, some of these written directs could be

24   voluminous, is important to be able to appropriately prepare

25   cross examination of the narrative type of direct that they

1    are likely to file.

2         And so, we do think the understanding that the

3    trial needs to proceed and we're not going to be holding up

4    the trial, we do think that it's on the debtors to plan and

5    sequence their witnesses in a way that ensures that the

6    objectors and the Court, frankly, have that -- we've

7    proposed a 72-hour window on the initial sets of directs, to

8    ensure that that time exists.

9         Obviously, that would be subject to, if we see the

10   agreement on consenting to a shorter period, or Your Honor

11   saying that, "Nonetheless, we are going to move forward,"

12   but we do think the order should have built in here the 72

13   hour period.  And if that means the debtors need to serve

14   some directs earlier because they're not sure how long

15   things are going to take, you know, frankly, that should be

16   the solution.

17        The only other open issue on the written directs,

18   they have proposed 72 hours or three days for the subsequent

19   witnesses in following weeks.  We think four days is

20   appropriate.  That extra day does make a difference in terms

21   of trial prep, and it is a very minor, or a relatively minor

22   disagreement.

23        The only other open points or issue on the order,

24   Your Honor, relate to the post trial issues.  The post-trial

25   briefing is addressed in this order.  We had proposed what

1   we thought was, you know, already, frankly, a very

2   compressed schedule, understanding the need to wrap this up

3   after trial concludes of phase one of 14 days to brief

4   matters from the close of evidence.  The debtors have come

5   back with 10.

6          Looking at the calendar and understanding not only

7   is phase two of the trial likely to be underway during that

8   14 day period, there's also the Thanksgiving holiday.  We

9   frankly think the 14 day period is more than reasonable and

10  10 is simply too short.

11         Finally, Your Honor, Mr. McKane raised the issue

12  of the closing arguments.  It's not addressed by this order,

13  and I do think that it -- and intentionally, we've left it

14  for another day.  But since Mr. McKane raised it, you know,

15  at this point, we do believe, subject to how things develop,

16  that the debtors have suggested and chosen to make phase one

17  the settlement and the plan issues together and we think

18  that the closings and post-trial matters should address

19  (indiscernible) as well.  Thank you, Your Honor.

20         THE COURT:  Thank you.  Mr. Pedone?

21         MR. PEDONE:  Good morning, Your Honor, Richard

22  Pedone on behalf of American Stock Transfer, indenture

23  trustee for the EFH Bond Debt.  Your Honor, one way that the

24  debtors might elect to establish feasibility is to argue

25  that the make whole should not be allowed.  That's an option

1   that a plain reading of the plan would make you think they

2   may decide to argue in connection with the confirmation

3   hearing.

4           We are filing with having issues related to our

5   claims reserved for later, so long as the debtors are going

6   to hinge their case on confirmation and feasibility on their

7   ability to reinstate.  And they're not going to be looking

8   for a finding, if the claim should be disallowed or put

9   evidence onto that effect.  And Your Honor, this becomes

10  more complicated, when you look at the objections they filed

11  to their claim, to the claims.

12          In our papers, we've argued that the solvent

13  debtor exception applies here, and make wholes, fees and

14  expenses, post-petition interests need to be paid because

15  EFH Corp. at consummation, we're plan -- where all claims

16  will be paid in full, is in fact solvent.  The debtors have

17  contested the solvency of EFH Corp. upon consummation.  And

18  so, we're trying to understand how the fact issues, related

19  to solvency and other issues related to our claims, should

20  be determined.

21          Our view was, everything that affects --

22  everything that affects confirmation, that impacts our

23  claims, should be reserved for another day, whether that's

24  the November 30th date that's currently reserved, or the

25  claim objection hearing, which could be combined with these

1    discreet confirmation issues on November 25th, as currently

2    scheduled, a phase 1.5.  We are fine with any approach.

3           We just want to know what is coming that relates

4    to our claims, if anything, confirmation, and have that --

5    the issues determined.  And I don't believe that they are.

6    Towards that end, we sent over to the debtors some

7    additional language that we wanted included in the order.

8    And if I could pass that up and --

9           THE COURT:  Yes.

10          MR. PEDONE:  -- if you could consider it?

11          THE COURT:  Thank you.  Okay.

12          MR. PEDONE:  So Your Honor, in short, we're open

13   to any arrangement that allows us to avoid being surprised

14   by the merits of our claims being determined in connection

15   with confirmation, and that permits us to argue that the

16   debtors' failure to establish that the claims should be

17   disallowed, in fact, relates to their failure on

18   feasibility.  And we'd look to the Court for guidance on how

19   these issues should be handled.  Thank you.

20          THE COURT:  You're welcome.  Mr. Anker, good

21   morning.

22          MR. ANKER:  Good morning, Your Honor.  For the

23   record, Philip Anker, Wilmer Cutler Pickering Hale and Dorr,

24   for Delaware Trust Company as a first lien trustee on the

25   EFIH side.  As Mr. McKane said at the outset, the debtors

1   did agree to take a number of our -- McKane -- my apologies.

2   I'm notoriously bad with names.

3           THE COURT:  As long as you get mine right, I don't

4   care.

5           MR. ANKER:  I believe I have.  I won't tell you

6   some war stories.  Be that as it may, we did not receive a

7   draft of the order until relatively late yesterday, but

8   nevertheless, quickly provided comments.  And I'm pleased

9   that the debtors did take many of them.  I rise, because

10  there were four narrow issues, but I think important issues.

11          Your Honor, what I might do, I could hand up a

12  black line of -- but to be clear, this is a black line of

13  the version that was sent to us yesterday in draft, before

14  many of the changes were accepted.  I didn't get the final

15  version that was submitted to Your Honor until after I had

16  left the office, but it might be helpful as I walk through

17  the issues, if I could hand this up.

18          THE COURT:  That's fine.

19          MR. ANKER:  Would that be okay?

20          THE COURT:  Yes.  Thank you.  Do you have a copy,

21  an extra copy for Ms. Werkheiser?

22          MR. ANKER:  I do.

23          THE COURT:  That would be helpful.  Thank you.

24          MR. ANKER:  Your Honor, I'll skip over the issues

25  that have been resolved, and one of them is the question you

1    raised, and counsel's right.  In paragraph two, we have

2    suggested the language in the proviso that I think does make

3    it clear that we can raise issues in impairment, and I

4    appreciate the debtor's agreement, to include that language.

5            Our first issue -- I'm just going to go in the

6    order they are set forth in the markup -- is in paragraph

7    nine.  And to be clear, these are really nuts and bolts

8    issues.  They're not theoretical.  They are exactly the kind

9    of practical considerations that have been raised by other

10   counsel today.

11           But we are not asking that we get all directs for

12   the whole week at the beginning of the week.  We're simply

13   asking that on Sunday -- this is the language in paragraph

14   nine that is underlined -- we learn who the debtor plans to

15   call.  I fully appreciate that there are going to be last

16   minute emergencies, and I totally accept, because I've been

17   in this position, of a witness who has to be fit in a

18   particular window and that affects schedule.  But as a

19   practical matter, Your Honor, it helps a lot to know who

20   will likely be called when.

21           Let me give a concrete explanation for why.  As

22   Your Honor's said, graciously, we don't all have to be there

23   every day.  And there are plenty of witnesses here we don't

24   intend to cross examine. I may end up being here, I'm sure

25   at least a lawyer from our firm will be, but I'm not going

1    to have a team here.  If, on the other hand, we're cross

2    examining someone, particularly given time constraints, and

3    not to waste Your Honor's time, I want to be efficient, so I

4    want someone around to help me with exhibits.

5            If I knew, and I'm happy to hear at least that Mr.

6    Keglevic will go early, and that's helpful.  But if I know,

7    for example, Ms. Dore, who I think we are likely to want to

8    cross, will be called likely mid-week of the second week, I

9    then can appropriately plan with my colleagues on how to be

10   here to be efficient.  That's all that is.

11           I understand that things can change.  This is not

12   meant to be a foot fault rule, where for some reason there

13   is a change, oops you can't put it on the stand, but it is

14   basic fairness, and make the trial efficient.  So that's the

15   point in paragraph nine.

16           Paragraph 10, this is also an efficiency point.

17   The debtors propose, if you read this order, to put on their

18   case in direct, both with a respect to fact witnesses and

19   expert witnesses through written direct.  And the notion,

20   the trade that was done here is, how do we make that fair,

21   if there's 27 and a half hours allocated to each side, if 90

22   percent of their case comes in through written direct?

23           Well, the quid pro quo was, we could designate

24   depositions.  We took Mr. Ying's deposition, it was about

25   his expert report.  There was, I think, one objection to one

1   question on form in my examination.  There were zero

2   objections to, you know, exceeds the scope of here's a

3   report.  I can -- I like what I got out of that testimony.

4   I could spend an hour examining it.  It was one hour or I

5   can truncate it to 10 minutes, if I get the deposition

6   excerpts into evidence.

7          And obviously, they're free to object, but there's

8   no reason why if there's not an objection or Your Honor

9   overrules it, we shouldn't have the same rule apply to

10  experts, particularly when they can put in both their fact

11  witnesses and their experts through written direct.

12         The last two issues, Your Honor, are on the last

13  page.  They're paragraphs 16 and 17, demonstratives.  I

14  totally understand, they have to provide demonstratives in

15  advance, but I've never seen that applied with respect to

16  cross.

17         You know, if I want to have a demonstrative to use

18  with Ms. Keglevic or Mr. Ying or Mr. Keglevic or anyone

19  else, I've never known a rule that requires that you in

20  advance, when I don't even know what the direct is going to

21  be, provide the demonstrative in advance.

22         And finally, on post-trial briefing, let me try to

23  be a little bit, even more specific than Mr. Glueckstein.

24  As I understand the schedule, Your Honor, this trial is

25  likely on phase one, to finish on either the Tuesday of the

1    week of Thanksgiving or the Wednesday of the week of

2    Thanksgiving.  If it ends on a Tuesday and we go with a 10

3    day rule, by my calculation, the post-trial briefs would be

4    due the following Friday.

5             That means, unless we're going to ask all of our

6    associates, at peril of -- at risk of their quitting -- to

7    work over Thanksgiving, that means functionally, I have

8    associates I don't do that to.  That means that we're

9    functionally going to have to be working and getting the

10   briefs done in five days.

11            Conversely, if Wednesday is the end of the trial,

12   then I think the way weekends work, functionally, we're

13   talking about one day because the 10th day would be the

14   Saturday of the week after Thanksgiving, which on a 10 day

15   rule, would cause briefing to go to Monday, whereas the 14

16   day rule would get you to Tuesday, in which case, we're

17   arguing that that's functionally next to nothing.

18            But particularly given the possibility that we

19   could end this trial that Tuesday, and given that no one is

20   expecting that this plan, even if confirmed, is going to go

21   effective at any time before April of next year, and Your

22   Honor's going to need time to digest and reach a decision,

23   there really is no reason to force people to work over a

24   holiday family weekend.  Those are my points, Your Honor.

25   Thank you.

1          THE COURT:  Thank you.  Mr. Horowitz?

2          MR. HOROWITZ:  Thank you, Your Honor.  Good

3     afternoon -- good morning.  Gregory Horowitz from Kramer

4     Levin Naftalis & Frankel on behalf of the EFIH second lien

5     indenture trustee.

6          Your Honor, Mr. Anker and I consulted over

7     comments, and I just wanted to state that his comments

8     reflect our sentiments as well.

9          THE COURT:  Thank you.  Mr. Qureshi?

10          MR. QURESHI:  Good morning, Your Honor, Akin Gump

11     Strauss Hauer & Feld for the indenture trustee for the PIK

12     notes.

13          Just two quick things, Your Honor.  With respect

14     to paragraph two, I appreciate the debtor's clarification

15     that we are still free to argue impairment issues.  That's

16     obviously one that's important to us, but just one other

17     clarification.  And again, I don't want to jump ahead.  Your

18     Honor's going to hear some discussion at some point this

19     afternoon, I suspect, regarding a proposed settlement.

20          What I just want to make clear is whether we end

21     up going forward today or not, that to the extent that there

22     is not a set time to address the post-petition interest

23     issue on the merits, we would ask that it be heard in

24     connection with confirmation.  Our preference is certainly

25     that it be addressed separately.  And again, I don't want to

1    jump ahead of the discussion that will take place, with

2    respect to a proposed settlement, just highlighting for Your

3    Honor, that to the extent that we are not going forward

4    today, and that we are ready to go today, to the extent that

5    we end up not going forward, we are going to ask either for

6    a hearing date, separate from confirmation, but sometime on

7    a non-confirmation date, to the extent Your Honor has

8    availability.  Or alternatively, to address it in the

9    context of confirmation.  Thank you.

10            MR. KERR:  Your Honor, good morning.  Charles Kerr

11   of Morrison & Foerster on behalf of the TCEH Official

12   Committee.

13            I just have two minor points, Your Honor.  One, I

14   just, as a practical matter at a trial of this size and

15   moving parts, I just wanted to refer to paragraph nine.

16   This 72 hour provision that has been proposed is really a

17   foot fault.  And it becomes just an impractical reality in

18   terms of doing this.

19            And I think there's smart, capable trial lawyers

20   here.  We can work with each other to give each other as

21   much notice as we can, but I think it's going to force

22   everybody to gerrymander stuff, if we're stuck with this 72

23   hour death notice, if we don't give written testimony in

24   advance.  I just think that's just not a practical way of

25   running a trial, from my experience in doing it, such as

1    this.

2            The second thing, Your Honor, and I just want to

3    confirm with Mr. McKane, in paragraph 13 there is a

4    requirement that exhibits -- participating parties should

5    give notice by Tuesday 12 noon of all exhibits intended to

6    move into evidence that week.  I believe the week of

7    November 22nd, our first day is a Monday?  And that -- I'm

8    not sure if that's going to work for that week, so I don't

9    know how to adjust that, but I just wanted to--

10           MR. MCKANE:  That's a fair point.

11           MR. QURESHI:  --pass that along, so that's all,

12   Your Honor.

13           THE COURT:  Thank you.  Okay, I'm trying to keep

14   track.

15           MR. SHUSTER:  Good morning, Your Honor.  George

16   Shuster of Wilmer Hale for Marathon Asset Management.  I

17   wanted to address quickly the point that Mr. Kane mentioned

18   at the end.  So Marathon has filed an objection to

19   confirmation, essentially saying that the plan--

20           THE COURT:  Which -- what debt do you hold?  I'm

21   sorry.

22           MR. SHUSTER:  We are in the TCEH first lien debt.

23           THE COURT:  Okay.

24           MR. SHUSTER:  And we filed an objection, arguing

25   that the plan should not, as it does, as it's now stated,

1    cut off Marathon's rights to pursue an intercreditor action

2    that is pending in the New York Federal Court against

3    effectively other first lien lenders in the TCEH first lien

4    debt.

5            In that action, which is pending under New York

6    Federal Court, there is a dispute, actually, about whether

7    it should be remanded to the New York State Court, where it

8    was filed, or whether the venue should be transferred to

9    this Court, for hearing that intercreditor issue on the

10   merits.

11           The agreement that we've now reached with the

12   other side of that litigation in New York is that we would

13   withdraw Marathon's objection to plan confirmation in return

14   for the plan carving out the intercreditor issue that

15   Marathon has, in the same way that the other intercreditor

16   issue in the plan is carved out and that issue would be

17   heard in this Court with Marathon's consent rather than in

18   the New York State or Federal Court.

19           In connection with that agreement, Marathon would

20   not seek to interrupt plan distributions in any way, would

21   not seek any reserves.  Its sole recourse would be against

22   the other lenders who Marathon would argue receive over

23   distributions under the plan.

24           All of this would be embodied in the stipulation

25   that we would submit to the Court and obviously on notice to

1    all other parties who would also obviously have to agree to

2    the plan amendments that would carve the Marathon action

3    out.

4            But I do think this stipulation, if it were

5    to be agreed and approved, would take Marathon's plan

6    confirmation objection off the table.  If for any reason all

7    that fails, the Marathon plan confirmation objection we

8    think is a sort of standalone set piece, does not require

9    witness testimony.

10           I think the other side agrees as well.  And we've

11   asked that some amount of time be set aside.  We think it is

12   a relatively short period of time for argument on that

13   objection at the backend of Phase 1.  But we also think we

14   could observe on the exact timing of that until we see

15   whether the stipulation does go forward and we could present

16   something to the Court later in the confirmation process if

17   that happens.

18           THE COURT:  Okay.  Thank you.

19           MR. SHUSTER:  Thank you.

20           THE COURT:  Just so we're clear, I can't make a

21   judge transfer venue to Delaware.

22           MR. SHUSTER:  No, Your Honor.  And one possibility

23   would be that we would actually withdraw that action in New

24   York and file a new declaratory judgment action in this

25   Court that this Court will do what it will with.

1              THE COURT:  Okay.

2              MR. SHUSTER:  It would, you know, accept

3    jurisdiction if it feels it has jurisdiction and decide that

4    issue on the merits subject to whatever rights and defenses

5    both parties have.

6              MR. FRIEDMAN:  Your Honor, Peter Friedman of

7    O'Melveny & Myers.  A pro hoc has been filed for me this

8    morning representing Angela Gordon, Apollo and Brookfield,

9    the other side to the matter that Mr. Shuster just

10   referenced.  His portrayal of the agreement that the

11   defendants, interveners in that action have agreed to is

12   correct.

13             As he did note various issues need to be addressed

14   by all plan support parties to modify the plan along the

15   lines of the agreement that the parties to the dispute have

16   reached.  We hope that'll happen but reserve rights to deal

17   with the issue in context of confirmation if necessary.

18             THE COURT:  Okay.  Thank you.

19             MR. FRIEDMAN:  Thank you, Your Honor.

20             THE COURT:  Anyone else?  Mr. McKane?

21             MR. MCKANE:  Thank you, Your Honor, and I'll be

22   brief.  Your Honor, as it relates to Mr. Pedone's proposal

23   for the EFI's indentured trustee, frankly, Your Honor, we

24   don't think it's necessary.  The language, you know, it

25   actually probably creates more confusion than anything else.

1    And to the extent that there's an issue about whether the

2    calculation of his interests or his expenses are part of the

3    claim objection, we can amend the claim objection to make

4    that point clear.

5            He's free to make whatever argument he wants about

6    whether the fact that there is a proceeding as relates to

7    calculations of certain of his claims would either we didn't

8    satisfy condition precedent or it's not feasible, those are

9    arguments that can be addressed at confirmation.

10           As we've explained in open court, I believe

11   multiple times now, our plan provides for win or lose on the

12   make whole, we have a means by which to move forward and

13   satisfy feasibility and that's the evidence we're going to

14   be putting on in confirmation.

15           THE COURT:  Okay.

16           MR. MCKANE:  As it relates to the issues I believe

17   Mr. Anker raised, I'll just be brief.

18           I think we've given a preview of the witnesses for

19   that first week.  We'll continue to provide those previews.

20   Ms. Dore is a classic--and first of all, to be clear,

21   Keglevic is first.  So we're probably on--whenever we finish

22   with opening statements on Tuesday, Mr. Keglevic is going to

23   be our first witness.

24           Ms. Dore is a classic witness.  That may be

25   unlikely to be at the end of the first week.  We frankly

1    expected first week lots of people will have lots of

2    questions for the witnesses.  If we're wrong, then we'll

3    adjust and we'll advise Your Honor, okay, she may be our

4    sixth witness or our seventh witness.

5            But we have -- our preferred preference would be

6    to get Ms. Dore on before we get to assistant directors and

7    sponsor directors.  But because of people's availability,

8    that may not work.  And so it may also--she may move a

9    little bit and, frankly, as one of our corporate

10   representatives, she'll be in the Courtroom and that gives

11   us additional flexibility with her.  So the trial dynamics

12   are not as rigid as some may think.

13           Frankly, as it relates to expert depositions, we

14   could, you know, Mr. Ying's going to be here.  He can ask

15   those questions.  Not really an issue.

16           As it relates to demonstratives on 16, here's the

17   issue.  First of all, we want to use a demonstrative with

18   someone on cross that has never seen a demonstrative before,

19   you know, that, you know, setting aside the trial issues

20   with that.

21           What we've agreed to do is call witnesses once

22   and, therefore, objectors are going to be putting in their

23   case in chief, right, at the same time, right.  That's why

24   the scope of the cross is allowed to go beyond the scope of

25   the direct.  Regardless of what we do, they can go outside

1    the scope of direct and put on their direct.  So there's no

2    symmetry to the use of declarations--or, sorry,

3    demonstratives if you're going to use a demonstrative with a

4    witness in the direct as opposed to the cross, part of the

5    examination.  That's why we try to make it, you know, a

6    cross for everybody.

7           And then finally, as it relates to post-trial

8    briefing and the fact that people have to work over holidays

9    and weekends, clearly he hasn't done a lot of debtor cases

10   because that's our existence.  But where we just add and,

11   frankly, Your Honor, the trial may not be over right before

12   Thanksgiving.

13          Frankly, you know, there's a whole Phase 2 that's

14   contemplated after Thanksgiving.  So to the extent that

15   we're doing briefing, we don't think that Thanksgiving

16   holiday comes into play unless Your Honor decides I want to

17   do a separate closing argument on the settlement hearing

18   because we have a lot of hearing days left on reinstatement.

19          And that, Your Honor, is going to be--that's why

20   we left closing arguments open for you.  You can decide that

21   issue at that point in time based on where we are, how much

22   progress we've made and what remaining issues are in play.

23          Unless Your Honor has any further questions, I

24   have nothing further.

25          THE COURT:  I don't.

1           MR. MCKANE:   Thank you, Your Honor.

2           THE COURT:   Okay.   Let me make some rulings.

3    First of all, just a reminder that anything you're going to

4    hand up to me throughout the trial, if you can please have

5    an extra copy for Ms. Werkheiser and there may be another

6    clerk actually participating as well, so two extra copies.

7    That would be very helpful.

8           Let's see.   All right.   We'll start with the E-

9    side Committee's comments.   First of all, what I've seen as

10   uncontested and agreed to is fine.   It's terrific.   I'm

11   really glad people were able to work together so

12   professionally and I like the mechanisms that have been put

13   in place.

14          Okay, on this idea in Paragraph 9, the Committee

15   comment looking for--it's sort of--there are two provisions

16   here.   There's this preliminary provision that says no less

17   than 72 hours after written direct is provided to the

18   participating parties.   And then it goes on to say later at

19   least 72 hours or four calendar days.   I guess we're trying

20   to distinguish between what happens the first week and what

21   happens sort of as the case goes forward.

22          I'm not going to put the I will strike or not

23   adopt the first Committee suggestion setting sort of in no

24   circumstantial witness be called to testify less the 72

25   hours after written direct is provided.   I think that the

1    debtors have laid out why there needs to be some flexibility

2    there and they set a specific schedule for that the first

3    week so that we know except for one witness who will only be

4    called on Friday in any event, so we know that the Monday

5    declaration, Monday afternoon declaration will be for a

6    Friday witness.  The others I think there's enough time to

7    prepare.

8             However, I will accept the Committee's second

9    comment in that paragraph that four calendar days before the

10   witness is called and any testimony is offered is

11   appropriate.  I worry about 72 hours because I worry about

12   me and getting something at, you know, something gets filed

13   noon on Saturday and it's possible--I can't remember how the

14   trial dates work out but it's possible, you know, we're

15   going to be in court noon on Tuesday and I'm going to be

16   expected to--and I'm going to do my best to stay on top of

17   the papers but I think it doesn't do anybody any good to

18   start cross examination or supplemental direct if I haven't

19   read the initial direct.

20            So I am going to go with four calendar days.  I

21   think with the way the schedule works out that shouldn't be

22   a problem because you have weekends built in.  So it

23   shouldn't be too bad.

24            On post-trial briefing, I am going to go 14

25   calendar days.  Now, I would remind Mr. Anker and everybody

1    else it's not just that the plan is effective by April or

2    whatever it is.  It has to get approved by me by January

3    15th I think is the outside date under the PSA.

4              So it's important that the Court have a reasonable

5    opportunity to have the trial, to have post-trial briefing

6    and an opportunity to be actually think about it and give a

7    decision hopefully that makes some sense and creates a

8    record for whatever's going to happen after I make a

9    decision.

10             I'm going to want--and I haven't thought about the

11   exact mechanisms but I would like at least the opportunity

12   to ask for--of course I'll get a proposed confirmation

13   order; I always do, but perhaps something more immediate

14   like proposed findings with citation to the record.

15             That's going to take more time than simply filing

16   a brief.  Somebody's going to have to dig through the

17   record.  It's going to be an extensive record and you have a

18   lot more bodies and a lot more skin in the game than I do.

19   So I may be relying on you like I have in some of the

20   previous issues we've had before the Court that have allowed

21   me to turn--helped me to turn things quickly which has been

22   helpful for the case.  So I think 14 days makes a lot of

23   sense and we can talk about this, dynamics of how we do that

24   at a later date.

25             Mr. Pedone's comments, let me just ask.  It wasn't

1  clear, Mr. McKane, how you were on this inclusion of the

2  carve out of fees and expenses claims that he's suggesting

3  here at the beginning of Paragraph 2.

4           MR. MCKANE:  Your Honor, as it relates to the

5  first sentence of Paragraph 2, we are fine having the fees

6  and expenses and interest issues addressed in the separate

7  claim proceeding.

8           THE COURT:  Right.

9           MR. MCKANE:  So that language is fine and then

10  whenever I reference to the offer to clarify the claim

11  objection as needed to address that, we can do that.  It's

12  really the sentence that starts specifically that we had

13  struck previously that we did ask the Court to strike.

14           THE COURT:  Okay.  I was going to get to that.  I

15  just, I wasn't sure about the first two inserts.  So the

16  first to inserts are fine including fee and expense claims

17  and interest over fee and expense claims, that's fine.  I am

18  not going to require the sentence beginning specifically.  I

19  agree.

20           I think it creates more trouble than it solves.

21  You know, it's a bit of a gray area here how exactly we're

22  going to go through this but I think the debtors understand

23  that they have the burden, the burden on feasibility and

24  they have this concept out here that if there's no--if

25  there's a payment of a make whole, that that's a condition

1    that can't be met unless it's otherwise agreed to be waived

2    or it goes to reinstatement.

3         So, you know, if we get to a place where that

4    becomes relevant, we'll, you know, we'll have to figure that

5    out.  And it might come, you know, if the case, you know, if

6    the case on reinstatement doesn't go well for the debtor, we

7    might need to be flexible on how we address that in order to

8    deal with this condition to effective date.  But I don't

9    think we need this sentence.  So I won't include that.

10        Mr. Anker, okay.  Looking at Mr. Anker's draft,

11   all right.  Looking at his changes to Paragraph 9, I'm not

12   going to require a, you know, list of witnesses during the,

13   you know, upcoming week to be set in stone.  I think that we

14   do need to be flexible.  Things are going to go shorter or

15   go longer and are more likely to go longer but hopefully

16   they go shorter.  We'll have to sort of see things as they

17   develop.

18        You know, I don't want people to be surprised if

19   at all possible so that, you know, Mr. Anker can be prepared

20   and have his team here at a time that makes economic sense.

21   But there is, as I said earlier when I said you don't need

22   to be here all the time, if you're not here and something

23   bad happens, you know, it's kind of, you know, your lookout.

24   So work with the debtors.

25        I don't think it'll be a problem.  I think our

1    pre-hearing meetings are designed to hopefully address this

2    a little bit.  We're going to go through things very

3    quickly, who are the witnesses going to be for today, what's

4    the order of, you know, cross if we can figure that out.

5    You know, plan the day and hopefully that'll give people an

6    opportunity to have a feel for how things are going to go as

7    this thing develops.  But I don't--I'm not going to require

8    a formal list.

9            Let's see.  I think expert deposition designations

10   may be appropriate.  We'll have to see how it plays out.

11   But I think Mr. Anker makes a good point about use of those,

12   so I'll add expert witnesses to the deposition designations,

13   although I would again say, you know, that really probably

14   will come up in the context of cross more than direct.  You

15   know, if you're going to do direct you're better off

16   proceeding by written declaration and, you know, oral direct

17   rather than just referencing about your deposition

18   designations to the Court to read.

19            That can be helpful on cross.  Try to figure them

20   out from direct, just the nature of the way people ask

21   questions in a deposition.  It's hard to get a sort of

22   narrative that really holds together.  So for terms of good

23   advocacy, that would be limited to the utility for direct.

24            I'm not going to--I think requiring demonstratives

25   the night before, 10:00 p.m. the night before is appropriate

1   even for cross.  You are telegraphing your cross a little

2   bit.  I understand not wanting to do that, but I agree with

3   Mr. McKane given the fact that, you know, we're only calling

4   witnesses once in cross to be sort of pseudo direct, you

5   know, it's hard to parse exactly how that's going to play

6   out and I don't think it's, you know -- you may show them

7   the exhibit but they don't know the questions you're going

8   to ask.  So you are telegraphing your cross a little bit but

9   I think it's a fair tradeoff for purposes of trial

10  management.

11          I think that was it on that, which takes care of

12  the (indiscernible), UMB -- not quite sure what you want me

13  to do with that sort of reservation of rights on the post-

14  petition interest issue for today.

15          MR. SHUSTER:  Your Honor, for right now, I think

16  nothing until we've resolved the issue with this settlement.

17  I just want to hold open the possibility depending on what

18  happens with that of asking for either a date certain to

19  hear the dispute and, failing that, then be heard in

20  connection with confirmation.  So for right now, nothing.  I

21  think we can just hold that for now.  Thank you.

22          MR. MCKANE:  Your Honor, we'll submit an order

23  today reflecting all those changes.

24          THE COURT:  Okay.  I think I dealt with the T-side

25  Committee comment.  Is that right?  Yes?

1          MR. SHUSTER:  Yes.

2          THE COURT:  Okay.  And we'll see what happens with

3    Marathon asset and Angela Gordon.  I'd be more than happy to

4    take on another dispute.  Yeah, let's submit an order under

5    certification of counsel.

6          Now, I am supposed to be in a meeting, so what's

7    next on the agenda?

8          MR. KIESELSTEIN:  Well, that's convenient, Your

9    Honor, because we were going to suggest that a short recess

10   for the parties on the PPI settlement or Mason settlement

11   could benefit from an opportunity to talk and to talk to

12   their clients?

13         THE COURT:  Okay.  We also have--I have a

14   discovery dispute with the E-side Committee.  I have a

15   discovery dispute with the, Mr. Gwynne's client, the

16   pollution control bonds and I have a discovery dispute maybe

17   on the Alcoa issue I have to address today.

18         MR. MCKANE:  Your Honor, Mark McKane on behalf of

19   the debtors.  The Alcoa issue is not for today.

20         THE COURT:  Not for today, okay.  Can we recess

21   now?  I have to keep people here if they don't have to but I

22   really am supposed to be at this meeting and I want to get

23   the chief mad at me.  Yes?

24         MR. SZWAJKOS:  Your Honor, this is Robert Szwajkos

25   on the telephone.  We represent FL Schmidt USA.  We are

1    listed on Page 1 on the agenda for this morning.  There is a

2    matter which involves am executory contract that need not be

3    addressed today.  We talked to counsel for the debtor

4    yesterday and we're working on this and I'd like to be

5    excused for today.

6              MR. MCKANE:  Your Honor, the debtors have no

7    objection to that.  That issue will not be addressed today.

8              THE COURT:  Okay.  Thank you, sir.  Absolutely.

9    All right.  We'll take a recess till 1:00?

10             MR. MCKANE:  Yes, Your Honor.

11             THE COURT:  Okay, very good.

12             MR. MCKANE:  Thank you, Your Honor.

13             MR. SZWAJKOS:  Thank you very much, Your Honor.

14             MR. KIESELSTEIN:  Good afternoon, Your Honor.

15    Mark Kieselstein on behalf of the debtors.  Your Honor,

16    thank you for affording us the break.

17             I want to report on the latest with respect to the

18    PPI situation and the PIK holders.  I think it impacts how

19    we go forward the rest of the afternoon.

20             As Your Honor may be aware, yesterday a majority

21    of the PIK holders executed a stipulation to settle their

22    PPI claims for 57.5 cents plus a 2.5 cent consent fee.

23             Those same parties, Your Honor, also signed an

24    amended plan support agreement.  And to be clear, the plan

25    support agreement was amended only insofar as to incorporate

1    this settlement.

2             Third, Your Honor, a majority of the holders sent

3    a Letter of Direction to the indenture trustee for the PIKs,

4    instructing them to stand down on the PPI litigation as well

5    as on the settlement motion and the plan objection.

6             Your Honor, we understand that the indenture

7    trustee has taken that letter under advisement and is in

8    consultation with its counsel.  But to my knowledge, and

9    that may have changed over the lunch hour, has not taken a

10   definitive position on whether the instruction will be

11   complied with, disregarded, or negotiated.

12            Your Honor, that leaves us in an odd position in

13   terms of the PPI argument before you.  We understand that

14   counsel to the indenture trustee will take the position that

15   they are ready for the argument to go forward.  Whether they

16   are desirous of the argument going forward they'll have to

17   speak to.

18            What I can say is that the debtor is not just

19   ready but eager to go forward with the argument and get all

20   the arguments, pro and con, out on the table for Your

21   Honor's consideration.

22            What we would suggest, if we go forward today, is

23   that Your Honor hold your ruling in abeyance for a

24   relatively brief period of time to see if other PIK holders

25   get onboard with the settlement, and then if that may

1    resolve both that issue and larger issues related to the

2    instruction, the settlement motion, and the plan.

3            Obviously, Your Honor, we think settlements are a

4    good thing but I want to make it clear that this settlement

5    is in the context of the merger plan only.  In other words,

6    if the merger plan is confirmed and goes effective, the plan

7    sponsors, the new owners of EFH, would be writing the check

8    for the PPI claim.

9            It does not apply in an alternative plan scenario

10   and, candidly, the debtor doesn't believe 60 cents would be

11   the right number in that scenario.  But since it's someone

12   else paying the tab, we don't have an issue with that

13   settlement occurring, of course.

14           The other thing I want to make clear is that the

15   stipulation would bind only those parties who have signed

16   up.  So, this is not binding on any other PIK holder who

17   feels that the recovery is too low and that they want more.

18           THE COURT:  Aren't they bound by their indenture?

19           MR. KIESELSTEIN:  Your Honor, I think the question

20   of whether they can on their own contest or seek a higher

21   recovery is one that's an open question.  I think that is

22   something we would have to hash out over time.

23           But by its terms, the stipulation is not seeking

24   to bind anyone else.  If someone were to hire their own

25   attorney or hire the existing indenture trustee counsel to

1    pursue the PPI claims, their rights would be whatever they

2    are.  I don't think we're asking Your Honor to make any sort

3    of determination on that today.

4           Your Honor, that's ...  that's with respect to the

5    settlement.  And I know other folks want to be heard on the

6    argument and whether it should go forward.  Our position is

7    that it should.  With respect to the order itself to approve

8    the stipulation, obviously parties only received the final

9    documents yesterday.

10          Those documents have been floating around for a

11   week or more so they're not sort of news to anybody.  And

12   given the fact it's Plan A only and wouldn't apply in an

13   alternative scenario and that it binds only the signatories

14   in our view, we don't think there is prejudice from an

15   expedited entry of the order.  That said, obviously, Your

16   Honor, if you feel that additional due process is required

17   for other people to react -- and we know the EFH Committee

18   has suggested that additional time is required -- that's

19   obviously something we will live with.

20          We don't think it needs to go out on sort of full

21   motion and notice.  We think this is in the nature of a

22   creditor resolving a claim objection through a stipulation.

23   So, if there is going to be more time for folks to weigh in,

24   we think that time should be relatively brief.

25          That's the update from our perspective, Your

1    Honor.  I know others want to be heard as well.

2              THE COURT:  Okay.

3              MR. DIETDERICH: Hello, Your Honor, Andy Dietderich

4    at Sullivan & Cromwell for the Official Committee.  This

5    group of bondholders is in our constituency and seems to

6    have been deprived, at least momentarily from an effective

7    trustee.

8              I want to speak to what I understand are the facts

9    but I'm trying hard to catch up.  The majority is optimistic

10   at best.  50.4 percent of the bondholders apparently sent

11   the instruction.  To our knowledge, every one of them is

12   involved in the T-side transaction.  When this was filed it

13   purported to be actual permanent allowance of the claim.  We

14   objected to the permanent relief.

15             In our view, it was another attempt to get

16   permanent relief on the back of an unenforceable plan.  Now

17   they're paying only in REIT monopoly money.  And Mr.

18   Kieselstein we think with other people's money they can pay

19   whatever they want.

20             However we have two concerns: First, we think

21   litigation should continue.  We think it's prejudicial to

22   the ability of the eastside estate to do an alternative plan

23   not to have the PPI litigation resolved, or at least make

24   every effort we can to get clarity to the parties.  We think

25   that one of the reasons why this was done when it was done

1    is to try to avoid that clarity by some of the large PIK

2    holders.

3              Second, and perhaps most importantly just

4    procedurally, we don't think this should be done on

5    stipulation on these facts.  The situation with minority

6    bondholders is confusing enough.  This is a payment to

7    resolve a plan objection.  Its supporters are all on the

8    other side.

9              The settlement is all about the plan.  The

10   settlement only applies if the plan closes, and the

11   settlement goes away if the plan doesn't close.  And it

12   raises the question, why are they trying to buy unimpaired

13   votes?

14             This appears to be a run-around deathtrap

15   jurisprudence in the Third Circuit.  All the creditors are

16   supposed to get the carrot and all the creditors in the

17   class are supposed to get the stick.  What this does is take

18   something effective only upon the effectiveness of the plan

19   and create an election to the class that has that exact same

20   effect but isn't subject to the discipline of being in a

21   plan of reorganization.

22             If it was a deathtrap, which seems to be what it

23   is for the class, it's fine for that to be semi-coercive.

24   We have jurisprudence that resolves that.  But it should be

25   in the plan of reorganization.  And, of course, if it's in

1    the plan of reorganization as is its practical effect,

2    creditors would vote on it and creditors would be impaired.

3              What does all this mean?  I don't really know yet,

4    but I do know that we want some time to figure it out and we

5    want some time to solicit the views of the minority

6    bondholders.  And when we do that, the Committee will have a

7    position.  How much time do we need?  Notice and a hearing.

8    Thank you.

9              MR. PEDONE:  Your Honor, Richard Pedone on behalf

10   of the EFH indenture trustee.  Your Honor, the legacy notes

11   -- I'm sorry, the EFH LBO Senior Unsecured Notes in Class A6

12   are guaranteed at EFIH and we're evaluating the situation

13   and there may be a disparate treatment -- argument, and we

14   reserve all of our rights and response to this to amend our

15   plan objection and join the Committee's comments.  Thank

16   you.

17             MR. QURESHI:  Good afternoon, Your Honor.  For the

18   record, Abid Qureshi, Akin Gump Strauss Hauer Feld on behalf

19   of UNB as indenture trustee to the PIK notes.  Mr.

20   Kieselstein is certainly correct that this set of facts does

21   present a somewhat awkward situation for the indenture

22   trustee.

23             First, let me be clear that the indenture trustee

24   absolutely encourages its settlements.  We have no issue

25   whatsoever with the fact that an apparent majority of the

1    PIK note holders have decided to settle the claims -- in

2    fact, that's something we have been trying to encourage and

3    we hope there is more of that.

4            Whether this settlement, in fact, creates

5    disparate treatment issues is not for today.  That's a plan

6    issue.  I will say, Your Honor, that the indenture trustee

7    received I think with attachments 1000-page plus direction

8    letter somewhere around 6 or 7 p.m. last night.

9            So it's of no surprise that we are not in a

10   position to simply sign the direction letter.  These things

11   are customarily negotiated.  This one has not yet been

12   negotiated.  We had no substantial preview of it prior to

13   getting it last night.  And it is the intention of the

14   indenture trustee to negotiate the direction letter.  In its

15   present form it is not acceptable.  But, again, the trustee

16   does intend to negotiate that letter.

17           So, where does that leave us for today?  Well,

18   Your Honor, it won't surprise you to know that we are, of

19   course, ready to proceed.  This argument was scheduled some

20   time ago and, of course, has been fully briefed for some

21   time now.

22           All I think I can say with respect to that issue

23   is we're ready and we are at the Court's pleasure.

24           THE COURT:  Well, are you going to talk about this

25   issue, Mr. Gwynne?

1            MR. GWYNNE:  Good afternoon, Your Honor, Kurt

2    Gwynne from Reed Smith on behalf of Bank of New York Mellon

3    as indenture trustee for the PCRBs.

4            We filed a limited objection this morning when we

5    saw that the 3 p.m. hearing was canceled, Docket Item 6711.

6    Our objection doesn't go to the merits of the settlement

7    agreement.  We just wanted to point out an important sort of

8    procedural issue.

9            This settlement would be embodied in an amended

10   and restated plan support agreement.  As Your Honor knows,

11   this Court approved the plan support agreement over the

12   objection of Bank of New York Mellon previously.  Bank of

13   New York Mellon filed a Notice of Appeal.  The filing of a

14   Notice of Appeal is a matter of jurisdictional significance

15   immediately confirming jurisdiction on the Appellate Court

16   of the issues evolved in the appeal and divesting the trial

17   for the jurisdiction over those issues.

18           Notwithstanding that, a trial court has the

19   authority to enforce, implement, and otherwise treat its

20   order as valid unless it's stayed.  That hasn't happened

21   here.  All we want to ensure is that the approval of an

22   amended plan support agreement does not disturb the District

23   Court's jurisdiction over the appeal the Bank of New York

24   Mellon filed of the plan support agreement.

25           I spoke to debtor's counsel this morning.  I

1    believe that they would not argue that Your Honor's approval

2    of an amended PSA to include this settlement would disturb

3    in any way the District Court's jurisdiction.  But it's

4    really an issue, frankly, that we wanted to bring to Your

5    Honor's attention so that the Court could deal with it

6    however it sees fit in approving the settlement agreement.

7    Thank you, Your Honor.

8              THE COURT:  Thank you.

9              MR. SHORE:  Good afternoon, Your Honor.  Chris

10   Shore from White & Case on behalf of the TSH ad hoc

11   unsecured noteholders.

12             Look, we've been candid with the Court for weeks

13   now.  We're trying to get to a consensual confirmation.

14   We're in mediation with the PIKs right now, we've got a call

15   with FIDO and their counsel this afternoon.  We continue

16   discussing settlements with PIK holders and we're vectoring

17   towards exactly what the confirmation should be, which is as

18   consensual as possible.

19             We're going to continue to discuss with PIK

20   holders, unless the Court thinks we should do otherwise, the

21   possibility of settlement.  And I want to address in

22   particular the objection of the EFH Committee and also just

23   address some misconceptions that Mr. Gwynne has.  Let me

24   deal with that first.

25             The order that's proposed to the Court does not

1    seek to have the Court approve entry into the PSA.  Under

2    the terms of the PSA order, amendments to the PSA could be

3    done without Court approval.

4            So you'll note that the order doesn't request that

5    that addresses his concerns, but we certainly are going to

6    continue to try to negotiate with people, get people to

7    settle and sign PSAs.  And we don't think that an absence of

8    a stay from the District Court on that appeal, that the

9    Court should in any way be precluded from encouraging people

10   to settle and approving settlements.

11           Let me address the Committee's objection -- and in

12   our view, reflects an extremely low point in this case for

13   the following reasons: The PIK PPI and make-whole issues

14   have been pending for months.  The PIK trustee was the only

15   party who objected to that.  No one else.  And they were

16   acting at the direction of the majority to pursue that.

17   There were no ad hoc -- there is an ad hoc group out there.

18   They didn't join.  There are individual holders out there

19   who hold hundreds of millions of dollars of claims; they did

20   not join.

21           Everybody was content to have the indenture

22   trustee do it and spread the cost of that representation

23   among all holders, including holders who wanted to see the

24   plan go forward.  In other words, the people who've been

25   parties to the PSA have been paying the substantial portion

1   of Akin's fees and objecting to the plan that they want to

2   see done.  Now the tables have turned and we'll see how the

3   trustee and the ad hoc group deal with that.

4          But the EFH Committee, which is a fiduciary at

5   both the EFH estate and the EFIH estate, never appeared,

6   taking the position that the debtors can carry the water

7   with respect to the extent to which either make-wholes will

8   be allowed or post-petition interest claims will be allowed.

9   Those claims, as you know, are massive, they have

10  significant consequences in the waterfall for both EFIH

11  unsecured creditors and EFH unsecured creditors.

12         I have no idea why the indenture -- or why the EFH

13  Committee did not appear and seek to be heard on that.  But

14  the message was clear: The debtors are going to carry the

15  water on that and the debtors are going to settle.

16         The debtors have settled and Mr. Kieselstein laid

17  out the terms.  I will clarify that there are holders --

18  remember, we came in with 40 percent; we're now at 50.2

19  percent.

20         We're not parties to the prior PSA and have now

21  joined in EFIH PIK holders who support a settlement at 57.5.

22  And, again, that settlement only applies with respect to our

23  plan consummating.  So I have no idea why having not

24  appeared and be heard, the EFH Committee would come in and

25  try to get in the way of this settlement.  The only way that

1   people get 60 cents is if every single constituent on the E

2   side is either paid in full in cash or otherwise unimpaired

3   under the plan.

4          There is no economic objection here from the EFH

5   Committee and, quite frankly, I can't even tell right now

6   whether they think the settlement is too high or too low.

7   All they're saying is, in the pleading they filed with the

8   Court, that we shouldn't have settlements right now, or the

9   parties who are writing the check shouldn't have the pen, at

10  least as far as getting the economics of the deal done,

11  which is exactly what happened -- a negotiation over

12  economics followed by the debtors getting on top of that and

13  figuring out all the issues with respect to supporting the

14  plan and how it plays through in various scenarios.

15         The best I can say about the EFH Committee

16  objection is that an objection to the sound of the train

17  leaving the station.  This is an objection to the settlement

18  purely on the basis that a settlement makes it more likely

19  that the plan will be confirmed.  It derisks a substantial

20  portion of the case.  It has freed up -- if approved it will

21  free up cash which was otherwise going to be reserved to be

22  put into the new structure or otherwise dealt with in the

23  context of further plan negotiations.

24         There is no legitimate basis at all for the EFH

25  Committee to come in now having left the economics to

1    somebody else, to come in now and say I object to any kind

2    of settlement not on anything other than I want to stand for

3    the little guy.  If they wanted to stand for the little guy,

4    they would have been in here on the claims objections.  They

5    would have intervened.  They would have joined.  They would

6    have taken a position.  It should be federal judgment rate.

7    It should be default interest rate.  I don't even know what

8    the objection is.  What's his position going to be with

9    respect to standing for the little guys?  Is he going to

10   take the position it should be the contract rate?  Is he

11   going to take the position it should be the federal judgment

12   rate?

13           If he's going to take the position it should be

14   the federal judgment rate, then why is he saying I want to

15   stand for the little guy?  He should be saying I want to

16   stand for all the other people.  I want to stand for the EFH

17   creditors who would be impacted.

18           We can't have a process here where what we do is

19   go out with the debtors and try to settle claims.  And all

20   we can do is settle with objections in front of us.  There

21   is one objection to the treatment of the federal judgment

22   rate.  That is by the indentured trustee, not by any other

23   holder.  Now they're saying, well, you've got to deal with

24   these people but now you've got to deal with the other

25   people who didn't come forward.  And then what?  I'm going

1    to settle with them and then we're going to come back with,

2    well, wait, I've got some more people who weren't inside

3    that group or I'm in the ad hoc group.  We've got retail

4    holders.  Well, they decide the retail holders -- we have

5    retail holder retail holders, grandmothers and grandfathers

6    who haven't been paid.  Now you've got to settle with them.

7           All we can do and all Your Honor has done with a

8    confirmation and with scheduling steps and keeping a date on

9    track is deal with people who have filed objections.

10          What's happening right now is people who didn't

11   file objections and told the Court and every other party and

12   interest in the case we're indifferent to the resolution to

13   this, coming forward for non-economic reasons saying stand

14   in front of the deal because I have another axe to grind.

15          I want to block confirmation of a plan when,

16   again, the only time the settlement applies is in the

17   context in which EFH creditors are being paid in full.

18          So look, Your Honor, I addressed you last time.  I

19   think that Your Honor can take up today the settlement.  If

20   you don't want to take up the settlement today, you want to

21   give people an opportunity beyond what they've had today to

22   appear and be heard, Your Honor can set it.  I would set it

23   short.

24          We should have this done and resolved to allow

25   other people who say or are basically saying to the Court I

1   want to continue to litigate.  I will not accept the 575

2   settlement.  If that's what they want then there should be a

3   hearing at some point and Your Honor can express your views

4   on that.

5           But I don't think that establishing a dynamic in

6   which what ends up happening is the debtors and the plan

7   support parties settle with the people who have actually

8   made objections opening themselves up to people that never

9   made objections, coming forward and saying, well, now I

10  care, particularly when the reason they're standing up and

11  saying now I care has nothing to do with the economics and

12  everything to do with ulterior motives.

13          THE COURT:  Thank you.  Mr. Dietderich?

14          MR. DIETDERICH:  Andy Dietderich for the

15  Committee.  I'm not exactly sure what our ulterior motives

16  could be, why Mr. Shore marched into that tirade.  What I

17  asked the Court for was notice so that we could take a

18  position and talk to our constituency on something that was

19  done really fundamentally in the dead of night under

20  circumstances that we regard as suspicious, right?

21          What the Committee's position is, the Committee is

22  fiduciary for both sides of this, for EFH and EFIH.  I don't

23  know what the Committee's position is, Mr. Shore.  I don't

24  know.  But I do know I want some time to figure out.  And I

25  do know that such a strident speech against a proposition

1    that we give notice to constituencies and some time to think

2    about it is warranted.

3                THE COURT:  Mr. Qureshi.

4                MR. QURESHI:  Again, Your Honor, for the record,

5    Abid Qureshi, Akin Gump on behalf of the trustee.  I do want

6    to respond to something that I think perhaps Mr. Shore is

7    laying the groundwork for and that if I'm right on that is

8    very disturbing.

9                The indenture trustee cannot sign onto or take a

10   direction that is prejudicial to the minority.  And what I

11   heard Mr. Shore say is, well, there's only one pleading that

12   was filed in opposition to the claim objection and that was

13   by the trustee.

14               What we do know, Your Honor, is that there is a

15   significant minority, right now 49 percent to be precise,

16   that are not interested for now at least in signing on to

17   the settlement.  It cannot be the case, Your Honor, that to

18   the extent we don't go forward today and that the trustee

19   ultimately accepts the direction and stands down as directed

20   from the dispute, that Mr. Shore can then stand up and say,

21   well, wait a minute, the minority holders, the 49 percent,

22   they never filed a pleading.

23               So they're now barred from objecting to the

24   settlement, objecting to the plan or continuing to litigate

25   with respect to PPI.

1            I don't know if that's what he was suggesting

2      because he wasn't entirely clear about it but that certainly

3      seemed to be the groundwork that he was laying.

4            THE COURT:  All right.

5            MR. QURESHI:  The minority most certainly has a

6      direct economic stick here, Your Honor.

7            THE COURT:  Let me ask you -- I'm going to ask you

8      some questions.  I know you're in a difficult situation.

9      You know, as you stand here today, you are not in a position

10     to stand down from your response to the plan objection --

11     claim objection.

12           MR. QURESHI:  Your Honor, as we stand here today,

13     we have received a direction.

14           THE COURT:  Right.

15           MR. QURESHI:  The direction itself is not in a

16     form that is presently acceptable to the trustee and that is

17     because it was not something that, again, as is typically

18     done, was negotiated with the trustee before and we intend

19     to have that negotiation.  I can't tell Your Honor standing

20     here now whether that will take one day or two days or

21     longer.

22           THE COURT:  All right, so if we have argument

23     today, which I'm inclined to do because, you know, if for

24     whatever reason the decision has to be made by the Court, I

25     really want to give parties the opportunity to give argument

1    on an issue that involves so much money.  I mean, I could go

2    without argument but I prefer to have argument, so scheduled

3    for today, I have time today, time is of a premium, as you

4    know and so I'd be inclined to hear it today.

5                Assuming we have argument, I heard from Mr.

6    Kieselstein he'd like to have argument, prefers to have

7    argument but would like me to hold my decision in abeyance.

8    What would your position on that be?

9                MR. QURESHI:  My position, Your Honor, I don't

10   think in the circumstance that I can say anything more than

11   that we are at the pleasure of the Court and we're ready.

12               THE COURT:  Okay.  Do you have a position on

13   whether the Court should approve the stipulation today or

14   provide some period for notice in a hearing?

15               MR. QURESHI:  Again, Your Honor, we -- I don't

16   think that in its present form because the stipulation

17   includes things like certain modifications to the charging

18   lien that is of concern to the trustee, I don't think the

19   stipulation is something that in its present form can be

20   approved by the Court today.

21               But, again, to be clear, the trustee has no

22   opposition whatsoever to the idea that the majority wants to

23   settle.

24               THE COURT:  Okay.  Thank you.  Mr. Gwynne.

25               MR. GWYNNE:  Kurt Gwynne from Reed Smith on behalf

1    of the PCRB trustee.  Mr. Shore indicated that the order was

2    not approving the amended and restated PSA but Paragraph 2

3    of the order says the stipulation of true and correct copy

4    which is attached as Exhibit 1 is approved in its entirety

5    and the amended and restated PSA is attached to the

6    stipulation.

7              So our only concern, Your Honor, is that, if Your

8    Honor's approving the settlement, that it not affect the

9    appeal.  I don't think anybody takes the position that it

10   should.  Thank you.

11             MR. KIESELSTEIN:  And, Your Honor, the debtor

12   agrees.  This is apples and oranges.  It's not meant to

13   impact the appeal whatsoever.

14             THE COURT:  Okay.  Okay.  Well, let me say that I

15   certainly encourage settlement and I am not adverse to

16   settlement and having said that, details matter and due

17   process matters.

18             Now, normally, if we were to have a claim

19   objection subject to, you know, a dispute and set up for a

20   hearing and the parties were to reach agreement on the doors

21   of the Courthouse, on the steps of the Courthouse and say,

22   hey, we've agreed it will be allowed in the amount of

23   $100,000 and paid under Class 5 and, you know, whatever, I

24   would say that's great.  Do you have an order?  You know,

25   nobody signed it because the parties who cared and who are

1    affected have been -- are the ones who have reached the

2    agreement.

3              Now, it may very well be that Mr. Shore is correct

4    that from an economic perspective this has zero impact on

5    anybody else and as a result there really -- you know,

6    Judge, there's no harm.  The people who care have signed

7    off, go ahead, approve the settlement.  It's not different

8    from any other claim objection settlement that you would

9    ever have.

10             I think it's complicated by the fact that it's

11   unclear to me as I sit here today with no record whether

12   that is, in fact, true on the economic side.  The other part

13   is that it definitely has an impact on how the plan might

14   develop.  The third piece is it's a significant amount of

15   money.  So it raises concerns just by the sheer size of the

16   amount of money involved.

17             So while I don't think it's appropriate to require

18   formal 9019 motion and I note that the order, at least the

19   order I saw, sort of kept talking about a motion and there

20   is no actual motion in front of the Court.  There is a

21   stipulation resolving a plan objection and claim objection.

22             So I don't think it's appropriate and I'm not

23   going to require a final -- filing of a rule 9019 motion.  I

24   do think it's appropriate to provide some notice to other

25   parties to either object or at the very least perhaps

1    negotiate the terms of the order to make sure their issues

2    are resolved or unimpaired and not using it as a term of

3    art, for example, Mr. Gwynne's issues which are of a

4    language issues that, you know, can be, I'm sure, worked out

5    very quickly.

6              But you need time to do these things.  So what I

7    would like to do is set up a hearing and an objection

8    deadline to decide whether or not to approve the

9    stipulation.

10             Now, I'm going to do it in short order for a

11   couple reasons.  One, we had a plan confirmation that starts

12   on Tuesday and whether or not the PIK noteholders are still

13   objecting to confirmation and whether they're objecting to

14   their designation as being unimpaired is a big piece of

15   what's going on.  And to resolve objections, especially

16   significant ones, is a good idea and it will shape how the

17   hearing proceed sand it'll shape how the indentured trustee

18   participates in the hearing.

19             You know, second, it makes a significant impact on

20   the plan and I'd like that to be sort of buttoned down

21   sooner rather than later as we move into the plan

22   confirmation process.

23             Third, I have had these matters under advisement.

24   I think that they are -- there's a host of them, actually,

25   but the two specific issues we're talking about are the make

1    whole and the post-petition.  We keep talking about post-

2    petition interest but the make whole is included as well,

3    correct?

4              MAN:  Yes.

5              THE COURT:  Yes, okay.  You know, those are out

6    there and we've already heard argument on half of that.

7    We're going to hear argument on the other half today.  I'd

8    just like to, you know, issue a decision.  I think I don't

9    want to get in the way of settlement.  I think that, you

10   know, once it's sort of six one-half dozen.  The other, you

11   know, settle -- we're going to settle because we're afraid

12   he'll make a decision, so let's settle.  God knows what

13   he'll do.  Or, oh thank God, he's made a decision.  Now we

14   can settle now we know what the law is.

15             So right now we appear to be in whatever you do,

16   don't let him make a decision mode, which is pushing

17   settlement, so I don't want to get in the way of that.  But

18   I do think it's important that the matter get decided.

19             So that said, ay corumba.  When do we do this?

20   First of all, it's -- the notice is going to be very short

21   and I know people are going to feel like it's no notice

22   whatsoever but it's the best I'm going to be able to do in

23   the context of what's going on and the timing.

24             We're going to take a short recess.  I need to

25   check something in chambers.  Very short.

1              [RECESS]

2              THE CLERK:  All right.

3              THE COURT:  Please be seated.  Okay.  Here's what

4    we're going to do.  We're going to have a hearing Friday at

5    3:00, objections by Friday at noon.  I know it's only 48

6    hours but I do think these issues need to be buttoned down

7    before confirmation starts and I'm simply unavailable Monday

8    or I would do it Monday.  I'm in New York.

9              And I'm really going to want a definitive answer

10   at least from the debtors on Friday about whether you want

11   me to issue a decision or not.  I'm going to hold off a

12   decision on the merits until then on both the make whole and

13   the post-petition interest issue.

14             I know Mr. Qureshi, you may not be in a position

15   to give me any more concrete an answer that you've already

16   given me today.  I understand why.

17             Okay, so I'm moving some things around but we'll

18   see you 3:00 p.m. on Friday, objections noon on Friday.  Can

19   you -- I'm going to need them delivered to chambers as soon

20   as possible, you know, after they're filed so that I have

21   them, I have --

22             [PHONE RINGING]

23             THE COURT:  I have court at 12:00 but it shouldn't

24   take that long.

25             MR. DIETDERICH:  Your Honor, Andy Dietderich with

1    one quick question.

2              THE COURT:  Yes.

3              MR. DIETDERICH:  One quick question because this

4    will ease the Committee's position on this significantly.

5    There has been a question raised about whether or not

6    minority bondholders have lost the right to object to the

7    plan in the event the trustee doesn't continue to pursue its

8    objection to the plan.  That's an issue that I think is

9    important to try to get our minds around.  And I would ask

10   the Court how we might consider addressing that.

11             THE COURT:  Well, I mean, part of the problem is I

12   don't know what the indenture says.  I mean, there are

13   plenty of indentures that say you can't object.  You can't

14   take the position contrary to what the majority has

15   instructed the trustee to take.  I don't know what this

16   indenture says.  I know what a lot of it says.  I don't know

17   what that section says.

18             Assuming that minority, what are now minority

19   holders are not contractually prevented from objecting and

20   can make a case to the Court that they've been relying on

21   instructions being given to the trustee to carry the water,

22   I would be open to an argument that would allow them to file

23   an objection.

24             MR. DIETDERICH:  Thank you, Your Honor.

25             THE COURT:  But I'm not going to say more than

1     that.

2              MR. DIETDERICH:  Thank you, Your Honor.

3              THE COURT:  Should we deal with these discovery

4     disputes before we do -- how does everybody want to proceed

5     before we do our -- why don't we do the argument?  Let's get

6     that done.  Is that all right?

7              MR. MCGAAN:  That's fine.

8              THE COURT:  I'm making this up as I go along.

9              MR. MCGAAN:  It's just the enthusiasm.

10             THE COURT: Oh, no.

11             MR. MCGAAN:  We'll do it in whatever order you

12    want.

13             THE COURT:  Let's talk about post-petition

14    interest, PPI, and In Re: PPI.  I'm on --

15             MR. MCGAAN:  Yeah, we'll talk about both those.

16    They both will come up.  Sorry.

17             THE COURT:  No, no, take your time.  Get

18    organized.

19             MR. MCGAAN:  Good afternoon, Your Honor, Andrew

20    McGaan, Kirkland and Ellis for the debtors.  The issues I'm

21    going to address today with respect to our claim objection

22    to the PIK noteholder trustee, I'll refer to them as the

23    PIKS, the trustee, their claim for post-petition interest.

24             So I'm going to address whether the code or a

25    third-circuit law provides the PIK noteholders the post-

1    petition interest they're claiming here and, if so, at what

2    rate.  So I'm going to focus I believe entirely on legal

3    issues.  But before I do it, I was sort of listening to Mr.

4    Shore talk about the waterfall and the papers and there's

5    been a lot filed on this as Your Honor knows.  Spent a lot

6    of time almost exclusively on the legal issues.

7              But just to set the table, they've spent less time

8    on what is it we're talking about here.  And I want to just

9    walk through what the PIK noteholder claims are.  The

10   principle their claim -- these are in rounded numbers --

11   their claim to principle is $1.6 billion and to pre-petition

12   accrued interest $81 million.  That's about $1.7 billion,

13   the size of their claim as to the time of the petition.

14             If we assume a mid-2016 emergence, the post-

15   petition interest claim they're making at the contract rate

16   is as much or more than $460 million.  So if you look down

17   beneath them in the E-side stack by contrast, for example,

18   the EFH unsecured noteholders that Mr. Shore referred to,

19   their principle and accrued pre-petition interest together

20   is in round number about $600 million.  That doesn't include

21   their claim to post-petition interest.

22             That means, again coming back to the PIKS claim,

23   that means $460 million or more post-petition interest claim

24   on top of their claim at the time of the petition.  That's

25   about 38 percent, if my math is correct, 35 percent I

1   believe, 35 percent addition to par, so they recover 135

2   percent of that claim if they're allowed their full post-

3   petition interest claim.  So I'm going to turn to the legal

4   issues.

5           And I want to begin by talking about one of the

6   principle, if not the principle argument that the PIKS make

7   here for entitlement to post-petition interest at the

8   contract rate.  And that's under Code Section 1124(1)

9   governing the impairment of claims.  They argue that that

10  section should control Your Honor's decision.  They argue

11  that it says, that the code says that their contract rights

12  cannot be altered if they're to be unimpaired by the plan.

13  The plan says they'll be paid -- post-petition interest at

14  the federal judgment rate, saying our contract rate, their

15  cash pay contract rate is 11.25 percent.  So therefore,

16  their argument goes that alters our contract, right, and we

17  must pay that contract provision of 11.25 percent in order

18  to unimpair them or we're in violation somehow with 1124(1).

19          And our position is that that is utterly incorrect

20  and PPI Enterprises the Third Circuit's decision and PPI

21  Enterprises says so.  1124(1) doesn't determine the amount

22  of anyone's allowed claim under the code.  It certainly

23  doesn't determine what post-petition interest the code

24  requires, if any under any circumstances.

25          And I'm sure Your Honor's well familiar with it,

1    what PPI Enterprises involved was the application of the

2    allowed -- the application of 502(b)(6), the rent cap, how

3    much of a claim for unpaid rent should be allowed and, in

4    that case, the landlord has significant claim to rent that

5    was dramatically reduced under application of 502(b)(6), the

6    rent cap.

7              And what the Third Circuit says is what -- their

8    analysis begins where Your Honor's analysis needs to begin

9    is with the code's language and I'm going to emphasize that

10   throughout my argument today.  It's logical in construing a

11   statute where a party is claiming that the statute provides

12   them the right to a recovery, particularly one this massive

13   but I hardly matters the size of it.

14             You need to find out whether the code provides you

15   the authority to award them the claim they're seeking and

16   that's what the Third Circuit says.  That's where we have to

17   begin.

18             What its reasoning -- in PPI Enterprises, what its

19   reasoning says, and it's important here in the application

20   of -- important here in applying it to their  claim is that

21   -- and I'm quoting from the opinion -- "impairment results

22   from what the plan does" not what the statute does.  And the

23   Court goes on to say, I'm quoting again, "Section 1124(1)

24   does not address a creditor's claim under non-bankruptcy

25   law".  And what the Court reasons there is from the language

1    1124(1) right in the statute, it says a claim is impaired

2    unless the plan -- and this is 1124(1) -- leaves unaltered

3    the legal, equitable and contractual rights and that's

4    essentially where the PIK trustee stops.

5            Unless the plan leaves unaltered their legal,

6    equitable and contractual rights and they stop and they say

7    well, let's look at our contract.  It requires payment of

8    11.25 percent interest -- end of analysis.  You need to

9    award post-petition interest as they have claimed it. But

10   PPI Enterprises goes on to say well, no, it says the legal,

11   equitable and contractual rights to which such claim or

12   interest entitles the holder. So, it presupposes that the

13   Court knows what the claim is. That's why the Third Circuit

14   said, and again I'm quoting, "A creditor's claim outside of

15   bankruptcy, i.e. under the contract, the creditor's claim

16   outside of bankruptcy is not the relevant barometer for

17   impairment."  So the question isn't whether they're getting

18   their 11.25 percent under their contract or not.  That's not

19   the barometer.

20           So the holding in that case was that limitation on

21   the lessor's recovery of rent under 502(b)(6) is the effect

22   of federal law, the rent cap, and therefore, he's not

23   impaired.  And the Court even went on to say that surely, if

24   the lessor had sought to recover unpaid rent of any amount

25   to which he was entitled outside of the bankruptcy, he would

```
1    have achieved a much larger recovery.  But that potential

2    recovery outside of bankruptcy, in the Third Circuit's

3    words, becomes irrelevant once the lessee, in this case,

4    filed for Chapter 11.

5            So what the PIK trustee has argued in their

6    papers, and I'm quoting now from their papers, "...that

7    section 1124(1) entitles the PIK noteholders to payment of

8    PPI at the contract rate on their allowed claims."  And

9    under the reasoning of PPI Enterprises, under the language

10   of the statute, it doesn't do that.

11           THE COURT:  Well, doesn't PPI have a conflict in

12   it, which is that it says that 502(b)(6) is statutory

13   impairment, not planned impairment?

14           MR. MCGAAN:  Right.

15           THE COURT:  By extension, and I think W.R. Grace

16   says this, if they meant 502(b)(6) was statutory impairment,

17   certainly 502(b)(2) is statutory impairment, and that says

18   no unmatured interest, which is post-petition interest.  So,

19   that's the next step.

20           But at the same time, PPI says that, because it's

21   a solvent debtor case, they get post-petition interest.

22           MR. MCGAAN:  Yes, it does.

23           THE COURT:  And W.R. Grace says what PPI stands

24   for is, they may not get default rate contract interest, but

25   it's clear they get some interest.  Well, where does that
```

1    right to that interest come from?  Because if it's not a

2    contractual right that's being taken care of under

3    502(b)(2), where does this interest come from, and how do I

4    figure out what that is?  Did the Third Circuit miss the

5    conflict they were creating?  Because even Judge Walsh sort

6    of points out yeah, they're getting (indiscernible) under

7    502(b)(6), but look, they're getting pre- and post-petition

8    interest.  So, you know, he sort of makes a point as to why

9    they're unimpaired.  They're unimpaired because it's

10   statutory impairment and they're getting interest.

11           So in this situation, you sort of want to say

12   okay, under 502(b)(2), that's statutory impairment.  They

13   don't get post-petition interest.  But at the same time, PPI

14   is telling me I have to give them interest.

15           MR. MCGAAN:  Right, PPI Enterprises does say that

16   some post-petition interest must be provided on the allowed

17   claim of an unsecured creditor in a solvent debtor case.  It

18   does not say, as W.R. Grace makes clear, it does not say

19   it's the contract rate.  And in fact, in the W.R. Grace

20   case, the argument the unsecured creditors made there is

21   that we have a state law contract right to a default

22   interest rate, and you must award that, or we are impaired.

23   And the District Court in W.R. Grace said that's flat wrong.

24   That's not what PPI Enterprises says.

25           So that eviscerates one of the other principal

1    arguments the PIK noteholders make here, which is we have a

2    state law contract entitlement to 11.25 percent.  If you

3    don't award it, Judge, we are impaired for purposes of

4    confirmation.  That's not what PPI Enterprises says.  That's

5    now how W.R. Grace and the District Court read it.

6            So, now we're down to your question, which is

7    then, what do you do?  And I think the place where you're

8    required to go is what, first of all, the code tells you.

9    And as you point out, Your Honor, 502(b)(2) flatly prohibits

10   the award of post-petition interest.  So, one might say,

11   well, let's stop there.  They don't get post-petition

12   interest.  But again, you've been told, we've been told by

13   the Third Circuit that some post-petition interest has be

14   provided if the debtors here want to unimpair the PIK

15   noteholders.

16           So, you need to be guided, I believe Your Honor,

17   and I believe this is what PPI Enterprise is saying, and

18   this is what WAMU did, and I'm going to come to that

19   decision.  It's saying you need to start with the language

20   of the code, look at the distribution scheme that Congress

21   has provided for in the code, in the only place where it

22   provides for a distribution in a solvent debtor case to

23   unsecured creditors.  And you have there a barometer that

24   comes from federal law.  And ask yourself, is there any

25   obligation under the code or under controlling law in this

1    district that you will award the contract rate that they've

2    asked for?  And the answer is simply there's none.  There's

3    no case that says that.  There's no provision in the code

4    that says it.

5            So, flip it over, and our argument, Your Honor, is

6    that the federal judgment rate that this plan provides, that

7    is post-petition interest at the federal judgment rate,

8    fully satisfies Third Circuit law, fully is consonant with

9    what Congress has said in the code.  There is no argument

10   unless you leave the code entirely, leave the constraints

11   that it sets up, leave the intent about the waterfall that

12   Congress expressed in 1129(a)(7) and, in effect, make it up

13   as you go along.

14           THE COURT:  Well, yeah, if you want to look to

15   1129(a)(7), which is fair under the best interest of

16   creditors test.  But they're going to say don't look at

17   1129(7).  Look at 1129(b), the fair and equitable test.  And

18   they're going to argue, under the fair and equitable test,

19   you have to give post-petition interest at the contract

20   rate, and they cite some cases that may or may not stand for

21   that proposition.  So, if I'm going to look to non-code case

22   law -- or excuse me, if I'm going to look beyond this idea

23   of 1124(1), in planned impairment versus statutory

24   impairment, you want me to borrow from 1129(a)(7), federal

25   judgment rate.  They want me to borrow, perhaps, from

1    1129(b) and say contract rate under Consolidated Rock and

2    Dow Corning, arguably.  How do I pick which one to figure

3    out?

4            If I'm going to do that, don't I have to think

5    about old 1124(3), and the fact that Congress said the New

6    Jersey Court messed up by reading the statute?

7            MR. MCGAAN:  In New Valley, right.

8            THE COURT:  Right, in New Valley, and they allowed

9    a situation, which is completely defensible in the way it

10   was written, that says no interest at all as opposed to what

11   they could get if they were impaired under the fair and

12   equitable, which would have been contract rate.  So, if I'm

13   going to give respect to the legislative history beyond the

14   repeal of 1124(3), doesn't that seem to indicate fair and

15   equitable test, as opposed to best interest of creditors

16   test?  And then we get a fight about what the fair and

17   equitable test means.

18           MR. MCGAAN:  Right, well I'll walk through a

19   couple of those things, and I touch on all of that.  I think

20   the quick answer to your concern about the congressional

21   reversal, if you will, of New Valley in 1994, PPI

22   Enterprises, as Your Honor well knows, dealt with that in

23   what it means and did not say -- and then W.R. Grace dealt

24   with it again in a post-petition interest debate in the

25   District Court that said it does not mean, and does not say,

1    and we're not holding that you must give the contract rate

2    to unimpair creditors in the PIK noteholder's position.

3    That's not how this circuit has interpreted it or enforced

4    it, and there is no case that says so.

5            So, again, it doesn't fully answer your question,

6    because we don't have a crystal clear statement in the code

7    with respect to this issue beyond 502(b)(2), which says they

8    don't get post-petition interest.  So we're living in a

9    world here where Congress has said to you, in the flattest,

10   most direct terms possible, you may not award post-petition

11   interest to unsecured creditors, solvent or un-solvent.

12   They don't get it.  I'm sorry, unsecured creditors, they

13   don't get it.  But we have Third Circuit law that's looking

14   at the very congressional enactment you're talking about

15   that says well, they have to have some.  That's how we're

16   reading it; they have to have some.  So is the answer that

17   you depart completely in the other direction and say that

18   they are going to get a $460 million, maybe greater, bonanza

19   here because the code hasn't said -- or rather, the Third

20   Circuit says well, you know, you've got to stop somewhere?

21           The argument from the Third Circuit in consolidate

22   -- the Sixth Circuit, rather, in Dow Corning in the

23   Consolidated Rock case is premised on pre-code law that is

24   not giving Your Honor either current or accurate guidance.

25   Consolidated Rock, I mean, we're talking about -- where we

1    are here is to deal directly with -- you put your finger on

2    the key question here and the key struggle.  What the PIK

3    noteholders have done in this position is they said look, we

4    lose under the code.  We don't have code lines.  1124(1) is

5    a complete red herring. PPI Enterprises destroys that

6    argument.  And I'm going to turn to the confirmation

7    standards in 1129, both best interests and fair and

8    equitable tests, because they don't help them out either,

9    and I'm going to talk about that in a moment.

10             So what do they do?  They say, well, we've got to

11   believe the code.  In fact, we have to go back to the

12   invasion of Pearl Harbor and find, in a Supreme Court case

13   that was decided decades before the code was enacted, to

14   argue that it stands for the proposition that under the fair

15   and equitable test, which of course the concept of fair and

16   equitable treatment of creditors, no one disputes, long

17   predates the code.  They go all the way back there to say

18   Consolidated Rock clearly says that unsecured creditors in

19   the position we're in today are entitled in a solvent debtor

20   case to contract rate interest.

21             And you go read Consolidated Rock, and it doesn't

22   say that at all.  It's talking about secured creditors.  So

23   to the extent it spoke to an aspect of the fair and

24   equitable test that they argue, and we'll accept for the

25   sake of argument, lives on past the enactment of the code in

1    1978, it lives on in 506(b), which provides for post-

2    petition interest for over secured creditors, which is not

3    them.  That lines up with what Consolidated Rock's holding

4    was.  Their position doesn't.  It doesn't say that at all.

5            And so, what Congress does in 1978 is say, look,

6    no unmatured interest -- none.  And then it carves out a

7    couple -- two statutory exceptions.  And that's why the

8    code, the code, the code.  Secured creditors, 506(b), they

9    get post-petition interest on their claim because Congress

10   said so.  And they didn't just say so generally.  They said

11   so as provided under the agreement or state statute under

12   which the claim arose.  There's no language anywhere in the

13   code that says anything like that with respect to the

14   position that the PIK noteholders are in.

15           What's the other exception?  Well, it's

16   1129(a)(7), which incorporates 726(a)(5).  And here's where

17   unsecured creditors come to the trough, if you will, and can

18   recover post-petition interest.  But there, it's not what

19   the agreement says.  So Congress knows how to do that.

20   Congress knows how to say if you have 11.25 percent cash pay

21   interest and nearly a half a billion dollar post-petition

22   interest claim, why, that's what governs.  No, they said

23   that for over secured creditors.  Look to the agreement.

24   And when it came to 726(a)(5), the waterfall that 1129(a)(7)

25   incorporates here, that's the other barometer.  They say

1     it's the legal right.

2               So that's what you've been told by the code, and

3     there's absolutely nothing that grants them the claim that

4     they're asking for.  In fact, 502(b)(2) says the opposite.

5     It says no.  So wherever we end up here, it almost cannot be

6     the contract rate and be consistent with the expression of

7     congressional intent.

8               So, now I want to deal with 1129(a)(7) and the

9     question you were asking, sort of this versus the fair and

10    equitable test.  You know, what do you do with that?  Is it

11    really the alternate pathway they've argued that it is?

12    Well, one of the things that PIK noteholders have said about

13    our argument that you ought to take from 726(a)(5), again,

14    through the best interest test so it's applicable here, you

15    take from it the limitation to the legal interest rate.  I'm

16    going to talk, very briefly in a few moment, about why the

17    legal rate is the federal judgment rate.

18              But one of their principle arguments in opposition

19    to doing that is, well wait a minute, they say.  1129(a)(7)

20    isn't an allowance provision under the code, so we can't go

21    there to say that's how we decide what their allowed claim

22    is.  And of course, that's not the argument we're making,

23    and we agree that's true.  It's not an allowance provision

24    under the code.  The way the language works in 1129(a)(7),

25    the Court needs to decide what the allowed claim is first,

1    and then assess whether the planned distribution to that

2    allowed claim is equal to what the creditor would have

3    received under a Chapter 7 distribution, and provide post-

4    petition interest at the legal rate on that allowed claim.

5           But the fair and equitable test that they retreat

6    to is in the very same boat.  It's not an allowance

7    provision either, by their very argument.  It's just another

8    test for confirmation, and it, too, has language that

9    requires in the case of a distribution to junior creditors

10   or equity that you must give an amount equal to the allowed

11   claim -- that's the language in 1129 -- to the PIK

12   noteholders here.  So, 1129(b)(2)(b) doesn't create any

13   allowance to post-petition interest at any rate or any level

14   for the PIK noteholders.  You still need to grapple with

15   what's the allowed claim, what should the allowed claim be.

16          So, like I say, they don't have an answer in the

17   code.  The 1129 confirmation tests don't give them this

18   claim under any circumstances, so that's why they've gone to

19   Consolidated Rock.  And that's why they've gone to the Sixth

20   Circuit and what Dow Corning says, which is the Dow Corning

21   opinion, in our judgment, is simply carrying over and

22   maintaining an aspect of pre-code practice that has never

23   been accepted in this circuit.  It was rejected in the WAMU

24   decision, as Your Honor knows.  The Sixth Circuit decision

25   in Dow Corning as a source of the determination of post-

1    petition interest was rejected, and it's been rejected by

2    other courts, including Cardelucci.  At least the reasoning

3    has been rejected by Cardelucci in the Ninth Circuit.

4            So the allowed claim, if you sort of continue to

5    follow where the code takes us, the allowed claim that the

6    PIK noteholders have here is to principal and accrued pre-

7    petition interest, $1.7 billion claim.  And we're arguing

8    that the post-petition interest, that yes, they're entitled

9    to it, but it is limited to the federal judgment rate, the

10   legal rate that's provided for in 1129(a)(7).  And so, I

11   want to talk, and I'm going to come back to why I think,

12   finally, Your Honor should do that, and why you should

13   reject their arguments.

14           But I just want to say a few words on the

15   language, the legal rate in 726(a)(5), because they take

16   issue with that.  And I think their argument there, when you

17   read it, is enormously strained.  The overwhelming majority

18   rule is that when Congress said the legal rate, they meant

19   the federal judgment in 28 U.S.C. 1961.  It's what the WAMU

20   court held.  But both in terms of not just that precedent,

21   but the text of the statute, and we've laid this out in our

22   paper, so I won't belabor it, and the policy considerations

23   behind it, the legal rate, in plain English, refers to a

24   single rate, not any rate or a rate or a contract rate.

25           Again, Congress has shown its capability of

1    expressing its intent to borrow from or defer to a privately

2    negotiated agreement, if it meant to do that, and it didn't

3    do it here.  The modifier legal also refers, in our judgment

4    only refers, to the federal judgment rate that is oftentimes

5    referred to as the legal rate.  It is what the bankruptcy

6    court in the Dow Corning litigation and confirmation

7    proceedings held that it meant, as well.  The Sixth Circuit

8    there did not disturb that conclusion.

9            The policy, and the policy interests here are that

10   also argue in favor of construing the legal rate to mean the

11   federal judgment rate, are policy considerations that also,

12   I think, should guide Your Honor in determining that the

13   legal rate should apply here, regardless of whether we're

14   talking about the fair and equitable standard, or the best

15   interest of creditors test.  And that is reasoning that was

16   adopted in WAMU; it was laid out very clearly by the Ninth

17   Circuit in Cardelucci.  That is that the creditor's claims,

18   as Your Honor knows, under 502(b) are determined at the time

19   of the petition.  And interest stops accruing, and that's

20   what the W.R. Grace opinion said, that upon filing of the

21   petition, accrual of interest is suspended.

22           And so, what we have is something that's analogous

23   in the terms of a claim subject to objection and putting us

24   where we are here today in bankruptcy.  It's analogous to

25   the post-judgment interest rules in federal court.  And that

1    is that, before a judgment is rendered on, say, a contract,

2    a party is entitled to its contract interest rate.  Here,

3    they are entitled to accrue and collect, as part of an

4    allowed claim, the contract interest rate up to the filing

5    of the petition, which is analogous to the judgment.  And

6    after the claim is filed or a judgment is entered, it is now

7    a question of federal procedural law what sort of interest

8    accrues at that point and thereafter.

9              And in the federal courts, that 28 U.S.C. 1961 in

10   the case of post-judgment interest.  And what's being

11   compensated there?  What's being compensated is the delay in

12   collecting the judgment.  Whether it's through appeals or

13   other post-trial actions, or other delays, the federal law

14   says you are compensated for it.  And similarly, in

15   Cardelucci and in WAMU, the Courts have said in the

16   bankruptcy setting the very same logic applies.  What

17   happens after the claim is determined as of the petition

18   date is waiting around for this process to complete, so they

19   can obtain a distribution, in this case, 100 cents on the

20   dollar.  And federal law should govern, in a uniform

21   fashion, what the rate of interest is from then on.

22              So it's a policy based argument that's been

23   adopted by a fellow judge in this Court.  It's been adopted

24   by a well-reasoned decision out of the Ninth Circuit that

25   should argue also in favor of answering the question you

1    asked at the very outset, Your Honor.  What do I do, then,

2    if they're saying I've got to look at the fair and equitable

3    test?  Doesn't it require the contract rate?  It doesn't say

4    that at all.  It doesn't say anything about awarding post-

5    petition interest.  But Congress has said something about

6    it.  In the case of a waterfall that goes down to unsecured

7    creditors where there's going to be a distribution to

8    equity, and that should be the legal rate.  And that lines

9    up perfectly with the policy interests that have been

10   expressed by these courts.

11          So, our argument is that Your Honor should apply

12   the legal rate here in determining how much of this claim to

13   allow.  The plan -- and I'm going to just tick off the

14   reasons and I'll be done -- the current plan proposes to pay

15   the PIK noteholders the federal judgment rate, and it does

16   satisfy Third Circuit law.  It does satisfy the code.  All

17   PPI Enterprises says in its solvent debtor case, the

18   unsecured creditor must receive post-petition interest.  And

19   as Your Honor pointed out, W.R. Grace, of course, construes

20   that in a post-petition interest setting where the very

21   similar if not same argument was being made.  State contract

22   interest rate provisions were being forced upon the Court

23   there, and it said no.  It said that is not what the law

24   requires here.  It's not what PPI Enterprises says.  Only

25   that some form of post-petition interest should be awarded.

1   That's what W.R. Grace says in following PPI Enterprises.

2           Where do you find it?  You find it in 726(a)(5),

3   because Congress said not only is that the preferred

4   distribution in that setting, but we're adopting it for

5   purposes of 1129.  So, it is the closest guidepost you have

6   to do the right thing, consistent with congressional intent

7   here.  Precedent would support you on that, Your Honor.

8   Even though the Washington Mutual case, WAMU, was focused on

9   1129(a)(7), and the PIK noteholders have argued, well, then

10  it's completely irrelevant, because we're allowed to talk

11  about the fair and equitable test, there's really no reason

12  why it would change.  In fact, their argument suggests --

13  more than suggests -- it requires you to find that under the

14  confirmation tests in section 1129, a party's allowed claim

15  changes.  Under one confirmation test, they're allowed

16  claims apparently of one size -- same party, same facts,

17  same clients.  But under another subsection of the

18  confirmation standards, they get a much bigger allowed claim

19  when, as they have argued, none of those provisions are

20  allowance provisions under the code.

21          THE COURT:  Isn't it not a question of claim

22  allowance as it is confirmation standards?  In other words,

23  the allowed claim is defined by 502(b)(2).

24          MR. MCGAAN:  Yes.

25          THE COURT:  But that just starts where you have --

1    that's the beginning of the analysis.  So now, I have an

2    allowed claim of $100 million.  Now I want to confirm a

3    plan, and that's when I have to look at 1129(a)(7) or

4    1129(b) to figure out, okay, what do I do with that allowed

5    claim?  And I'm trying to remember the case that says

6    there's a distinction between interest as an allowed claim

7    and interest on an allowed claim.

8              MR. MCGAAN:  I can't put my finger on it, but I

9    know what you're referring to.

10             THE COURT:  And aren't what we talking about is,

11   okay, the allowed claim doesn't include interest, doesn't

12   include post-petition interest.  But now what do we do with

13   it?  Now we want to confirm a plan, and that might require

14   interest on an allowed claim, as opposed to interest as an

15   allowed claim.

16             MR. MCGAAN:  Right.

17             THE COURT:  And that's when we get into these

18   ideas of, okay, impairment, what does that mean --

19   unimpaired, impaired?  I mean, that's a confirmation

20   standard, and we have to figure out what it means.  So it's

21   sort of interesting to talk about what the allowed claim

22   might be, but it kind of only begins the analysis, doesn't

23   it?

24             MR. MCGAAN:  I agree; it absolutely begins the

25   analysis, and it frames it.  Because when you look at the

1    best interest of creditors test, it's referring to an

2    allowed claim and talking about paying interest at the legal

3    rate on that claim.  The fair and equitable test does

4    something very similar in its language, and talks about --

5    find my note here -- that the plan must -- just sort of

6    jumping to the language in 1129(b)(2)(b)(2) -- the plan

7    provides an amount, as of the effective date, equal to the

8    allowed amount of such claim.

9             So, again, both embody the concept that you've

10   gone to the starting place and found the allowed claim, and

11   now we're talking about what does federal law provide should

12   be post-petition interest on that claim?

13            THE COURT:  Right, but then the other side deals

14   with that by saying yes, that's what 1129(b)(2)(b)(2) says,

15   allowed claim, but it says includes(b)(2)(b)(1) or

16   (b)(2)(b)(2).  And so, okay yeah, allowed claim, no

17   interest, but we have to deal with the word includes, and

18   that's where they wrap in what they say Consolidated Rock

19   means, which means that means post-petition interest in a

20   solvent debtor case.

21            MR. MCGAAN:  Right, but that's not much -- I mean,

22   that's an awfully thin reed, with respect, Your Honor.

23   Because that's not much different than saying I had a

24   contract, I had a dispute in federal court, and my contract

25   provided me this massively above market rate of 11.25

1    percent.  And I've obtained a judgment on it, and my

2    judgment includes the right to recover the judgment, plus

3    post-judgment interest.  And that isn't an argument say oh,

4    well then, we jettison the post-judgment interest rate under

5    federal law and we go back to your contract.  One doesn't

6    follow the other at all.  In fact, I think the opposite is

7    true.  That's interesting.

8              But the question you asked at the very outset is

9    what do I do here?  If under the fair and equitable test,

10   they have an allowed claim to about $1.7 billion dollars,

11   and they're saying look, unimpair me.  You've got to give me

12   the contract rate. It doesn't say that.  The federal

13   judgment rate, which again, Congress has explicitly

14   incorporated -- maybe silent under the fair and equitable

15   test, but explicitly incorporated in the waterfall that it

16   expressed was fair in the case of unsecured creditors under

17   the best interest test.  That's the federal judgment rate,

18   but now their allowed claim, now the interest rate -- I

19   mean, I don't even know what the factor is.  If you compare

20   the federal judgment rate here to 11.25 percent, it's

21   something like a 1,000 percent increase, just because you're

22   in a different confirmation standard.  That can't possibly

23   be what Congress intended.

24              And you're now left, sort of you're outside the

25   space capsule called the code.  You're just floating around

1   saying -- and it really is -- another illogical aspect to

2   what they're saying is let's not forget, the code says in

3   502(b)(2), claiming not include unmatured interest.  And

4   their argument says it can be anything in your equitable

5   discretion you decide it can be.  How does that square with

6   that mandate?  Where do you find a limit that makes sense in

7   light of that, given that PPI Enterprises says, well, some,

8   some post-petition interest must be awarded in the case of

9   an unsecured creditor with a solvent debtor.

10              THE COURT:  Let's fight with the Third Circuit.

11  Where the heck does that come from?  I mean, that rule makes

12  no sense.

13              MR. MCGAAN:  They connect it to -- the clear

14  reading of the statute is they don't get any post-petition

15  interest, period.  That's what the statute says.  So, I've

16  got to argue, and you've got to consider what the Third

17  Circuit has said, whether it's logical or not.  But they are

18  reacting to the way the opinion is laid out.  They're

19  reacting to what Congress did to the New Valley decision.

20              And it's a far cry from say that, therefore,

21  Congress has now mandated that depending on which

22  confirmation test you invoke, your claim could be, as would

23  be the case here, your claim is either $4 million or half a

24  billion.  Does anything else in the code work that way?  I

25  don't think so.  And looking at PPI Enterprises, this sort

1    of runs through the debate that happened in the W.R. Grace

2    case is instructive, too.  Again, there, the very same

3    principle was being pressed upon the Court.  We have a

4    contract, and state law says we get our interest rate.  And

5    it was a default interest rate.  It was much higher than

6    they were getting, and of course, that's not at all what the

7    law is.  And that's what we're arguing to you, Your Honor.

8    If you're going to find a way to anchor your decision in the

9    best guidance the code gives you, it's the federal judgment

10   rate.

11              THE COURT:  Okay.

12              MR. MCGAAN:  And it complies, Your Honor.  It just

13   flatly satisfied Third Circuit law.  It certainly doesn't

14   contravene it.  It is consistent with the code, and there's

15   nothing, then, that requires you to award post-petition

16   interest rate at the contract rate that would give them this

17   38 percent premium over par, half a billion dollars in this

18   case.  Thank you.

19              THE COURT:  Thank you.

20              MR. QURESHI:  Again for the record, Your Honor,

21   Abid Qureshi, Akin Gump, on behalf of the PIK trustee.  I

22   have a presentation to walk the Court through.  May I

23   approach?

24              THE COURT:  Yes.  Thank you.

25              MR. QURESHI:  Your Honor, I should start by saying

1    don't be alarmed at the thickness of the deck, because as

2    I'm about to explain, I actually don't think that we need to

3    get to all of it, and I'll walk the Court through why I

4    think that's the case.  But what I'd like to start with,

5    Your Honor, is to just bring us back to exactly what the

6    dispute is that we are here on, and how the debtor framed

7    it, and exactly how broad of a proposition it is that the

8    debtor is seeking, because I do think that's important in

9    context.

10             And what Your Honor will see on the first slide is

11   a quote from the debtor's letter to the Court.  And then

12   subsequent to that, to the transcript, where we argued back

13   in August about the procedural posture.  And what they are

14   seeking here, what they call a narrow issue, which I think

15   is anything but, whether as a matter of law the post-

16   petition interest claim here should be capped at the federal

17   judgment rate.  So that means, for all unsecured creditors

18   in every solvent debtor case, should it as a matter of law

19   be capped?

20             That is a very broad proposition, Your Honor, to

21   be sure.  It is one that we don't think has any support in

22   the text of the bankruptcy code itself, nor do I think it

23   has any support in the legislative history of any of the

24   relevant sections of the code.  And also, Your Honor, I

25   think that ruling on that proposition would also run

1    completely contrary to settled commercial practice.  And

2    I'll explain why I think that that is the case, as well.

3            But, again, let's start with the contract, which

4    on the next slide we have up Your Honor, the provision of

5    the PIK indenture that we are talking about.  And I want to

6    be very clear on this:  The debtors have never taken the

7    position that under state law, this provision of the PIK

8    indenture, which raises the entitlement to post-petition

9    interest, is somehow invalid.  That argument has never been

10   made.  So the context here is that we are dealing with a

11   presumptively valid and unchallenged contract in a solvent

12   debtor reorganization.  And the question is simply, ought

13   that provision of the contract to be enforced and honored as

14   a matter of law?

15           So, let me then get to, in the next slide Your

16   Honor, the overview of the argument and why I think that a

17   substantial part of the deck I won't get to.  So, the

18   debtor's argument is 726(a)(5).  That is the source of the

19   alleged legal rule that we are capped at the federal

20   judgment rate for purposes of PPI.  Now, we are here, of

21   course, in the context of their plan, their plan, pursuant

22   to which they purport to unimpair us.  We briefed 1129(b),

23   the fair and equitable test, out of an abundance of caution.

24   But I think under the clear terms of their plan, we don't

25   get there, so it's not directly relevant.  And for that

1    reason, we never get to Washington Mutual.  We never get to

2    1129(7).  So that's not the procedural posture where, again,

3    they purport to unimpair us.

4           So, where I want to start is 726(a)(5), and I

5    start there, Your Honor, because of what the debtors say in

6    their reply.  They say that the only relevant statutory

7    basis for post-petition interest is through 726(a)(5), and

8    therein lies the cap at the federal judgment rate.  Now,

9    that's not what 726(a)(5) says on its face, first of all.

10   But second, Your Honor, in making this argument and in

11   framing it that way, they're essentially asking the Court to

12   rule to basically ignore another provision of the code where

13   we think there is an entitlement, and that is 1124.  And

14   also, to ignore the solvent debtor exception, which of

15   course has tons of cases supporting it.

16          So, let's go to the text of 726(a)(5), Your Honor,

17   on the next page.  Now, 726(a)(5), on its face, as a result

18   of section 103(b) of the code, does not apply in Chapter 11.

19   Its application is limited to Chapter 7, except when it's

20   brought into play through the best interest test.  And the

21   Tribune decision by Judge Carey made that point clear, that

22   just because 726(a)(5) can get dragged in in the context of

23   the best interest test, under 1129(a)(7) does not render

24   726(a)(5) to be somehow incorporated, generally, into

25   Chapter 11.

1             So, fundamentally Your Honor, they rely on a

2    provision of the code that the code itself says does not

3    apply here.  We are being treated as an unimpaired creditor

4    not entitled to vote, so they just can't get there.  And

5    they don't contend otherwise, Your Honor.  On Slide 9, we

6    have an excerpt from their reply to the disclosure statement

7    objections.  And what they said with reference to 1129(a)(7)

8    -- again, that is the only path through which 726(a)(5) can

9    come into play at all.  And what the debtor tells the Court

10   there is that that section of the bankruptcy code, by its

11   own terms, is inapplicable to the E-side creditors who are

12   unimpaired and not entitled to vote.  So we don't get there.

13            So, where then does this entitlement that we

14   allege come from?  Your Honor, it comes from the solvent

15   debtor exception and from 1124.  And I want to start with

16   the solvent debtor exception.  There is a long line of

17   cases, Your Honor, starting with Consolidated Rock and many,

18   many since, that stand for the proposition that in a solvent

19   debtor case, the contractual provisions of creditors, the

20   contractual rights of creditors ought to be respected.  That

21   is certainly the message from Consolidated Rock.

22            On Slide 11, Your Honor, we have what I think is a

23   very clear statement from Your Honor of that very

24   proposition.  That was, Your Honor, in the context of the

25   first lien make whole dispute, where Your Honor wrote that

1    while solvent debtor cases are somewhat of a rarity, the

2    available precedent consistently defers to previously

3    contracted bargains and provisions when dealing with solvent

4    debtors in varying situations.  And Your Honor went on to

5    say that the debtors may not rely on the bankruptcy code to

6    deny payment when we're talking about contractual provisions

7    that can be enforced under state law.  That is, Your Honor,

8    I think fairly described as a bedrock principle of

9    bankruptcy law, that when a debtor is solvent, there simply

10   is no justification, equitable or otherwise, to walk away

11   from the contractual rights of the creditor, and case after

12   case says that, Your Honor.

13           And over onto Slide 12, we have a number of

14   decisions cited on that page that deal with contractual

15   rights specifically involving post-petition interest.  And I

16   won't -- these are all cases that are discussed in the

17   pleadings, Your Honor.  There's no need for me to dwell on

18   them.  But I do want to highlight, because I think it's

19   particularly apt, the Second Circuit's language in the

20   Ruskin case, which is the last one that's on page 12, where

21   they said, and I quote, "It seems to us the opposite of

22   equity to allow the debtor to escape the expressly bargained

23   for result of its act."  And that is exactly right.  That is

24   where this principle comes from, Your Honor, that there is

25   no justification to simply walk away from contract rights

1    when you are solvent, when respecting those rights doesn't

2    prejudice anybody.  Provided, of course, that they

3    underlying contractual rights are valid under state law.

4            And next slide, Your Honor, again yet more cases

5    that stand for the same proposition.  And again, I won't

6    dwell on them, but there is a long line of juris prudence

7    that is consistent with that bedrock proposition.

8            Now, Your Honor, I mentioned at the outset that it

9    is also our view, and I think it's an important factor for

10   the Court to consider -- and this is in connection with the

11   sheer breadth of the proposition that the debtors are asking

12   Your Honor to sign onto -- that I think it is contrary to

13   settled commercial practice.  And we've cited on Slide 14 a

14   number of plans.  Now, these are, to be clear Your Honor,

15   all cases in which there was no dispute before each of these

16   courts with respect to post-petition interest.  But this is

17   a number of plans where the plan itself provided for post-

18   petition interest at the contract rate.  So, fairly recently

19   in the OSG case, in American Airlines, in General Growth

20   Property in the Southern District.  In Your Honor's case,

21   which was Six Flags Premier International holdings, in

22   Chemtura before a Judge Gerber, in Calpine.  And there are,

23   no doubt, many, many more, Your Honor.

24           And so, it is, I think, fair to characterize the

25   accepted practice, certainly in this district, certainly in

1    New York, that in solvent debtor cases, because of the

2    solvent debtor exception, unsecured creditors are indeed

3    entitled to post-petition interest at the contract rate.

4            Now, what is the context here?  So here, the

5    context is we're being treated as unimpaired.  So the

6    question before the Court is can we, in fact, be considered

7    as unimpaired under 1124, if our interest is capped at the

8    federal judgment rate?  Now, it was the debtor's decision,

9    of course Your Honor, to proceed this way.  they could have

10   instead tried to invoke the cram down sections of the code,

11   and we would have been before Your Honor under 1129 in fair

12   and equitable, but --

13           THE COURT:  No, they couldn't, because they'd

14   never get in the impaired class to vote, yes.

15           MR. QURESHI:  Correct.  And so, where they decided

16   to go, the only option I guess they had in the

17   circumstances, was to proceed under 1124(1) and to try to

18   argue that we're unimpaired under that section.  But, Your

19   Honor, 1124 -- and I think it's important to spend a little

20   bit of time both on subsections one and two and the former

21   subsection three.  So we've set forth subsections one and

22   two on Slide 17, and I think it's worth just focusing on the

23   words for a minute.  So the debtor has a choice when they

24   want to unimpair a creditor, proceeding either under

25   subsection one or two.  But both of those subsections have

1    one common proposition running through them, and the words

2    couldn't be more clear in subsection one.  Leave unaltered

3    the legal, equitable and contractual rights to which such

4    claim or interest entitles the holder of such claim or

5    interest.  So, where do we think the right to post-petition

6    interest at the contract rate derives from?  Right here,

7    1124(1).  It says leave unaltered our contractual right.  I

8    don't think there --

9                THE COURT:  The same argument was made by the

10   landlord in PPI, which is I have a state law right under my

11   contract to all my unpaid rent.

12               MR. QURESHI:  Right.

13               THE COURT:  And you're going to say, but the plan

14   purports to unimpair me, but caps my rent under 502(b)(6).

15   And the same logic would apply, even though you have a

16   contractual rate of interest, the code is trumped then,

17   under 502(b)(2).  So it's statutory impairment, not planned

18   impairment, right?

19               MR. QURESHI:  Certainly, in PPI it was statutory

20   impairment, Your Honor, because the code very clearly capped

21   that claim.  But here it doesn't, because we have the

22   solvent debtor exception.  The Third Circuit has said that

23   there is a solvent --

24               THE COURT:  But you just told me that 1129(b) was

25   un-applicable.  In other words, the solvent debtor exception

1    you're talking about is a question of the fair and equitable

2    test, right?

3            MR. QURESHI:  The solvent debtor exception cases

4    do arise, generally, under 1129, Your Honor.  But the

5    principle that, in a solvent debtor case, unsecured

6    creditors ought to be entitled to their contractual rights.

7            THE COURT:  I'm sorry, let's just back up a

8    second.

9            MR. QURESHI:  Sure.

10            THE COURT:  PPI Enterprises was a solvent debtor

11    case.

12            MR. QURESHI:  Yes.

13            THE COURT:  And they still applied the 502(b)(6)

14    as statutory impairment.

15            MR. QURESHI:  In the PPI case, Your Honor, it was

16    the rejection of the lease.  And I think there was a clear

17    statutory provision there that said your lease rejection

18    damages are capped under the code.  But what I'm saying is

19    here, Your Honor, the 502(b)(2), which says no unmatured

20    interest, if that is read as disallowing any post-petition

21    interest at all, courts have said wait a minute -- and the

22    Third Circuit has said well, wait a minute, there's a

23    solvent debtor exception.

24            THE COURT:  Right.

25            MR. QURESHI:  So, we don't get there.  So, Your

Page 119

1    Honor has to, I think, read 1124(1), together with the Third

2    Circuit solvent debtor exception.  And that's what takes us,

3    then, to the proposition that there is no doubt that --

4            THE COURT:  Okay, so yes, but then where does that

5    get us on contractual rate?  Because the cases, W.R. Grace,

6    the post-PPI Enterprises case that dealt with this issue

7    said it's not contract rate.  It's something less than

8    contract rate -- contract default rate.

9            MR. QURESHI:  So let's deal with W.R. Grace first,

10   because I think it's important that those facts are before

11   the Court.  So there, the Court found that the default

12   interest rate did not apply because the Court found that

13   there was no default.

14           THE COURT:  Right.

15           MR. QURESHI:  That's the first point.  And there,

16   the creditors also didn't end up with FJR, with the federal

17   judgment rate, Your Honor.  They got a rate --

18           THE COURT:  Somewhere between.

19           MR. QURESHI:  -- that was somewhere in between

20   that was higher.  And the Court acknowledged that there was

21   an established exception to 502(b)(2), again, the solvent

22   debtor exception, but stated there that that solvent debtor

23   exception didn't apply, because in the context of W.R.

24   Grace, Your Honor, there actually had not been a

25   determination of solvency.  So, I don't think the debtor can

1    point to W.R. Grace.

2              THE COURT:  Yeah, the problem with W.R. Grace is

3    it sort of says okay, there's been no default.

4              MR. QURESHI:  Right.

5              THE COURT:  So no claim.

6              MR. QURESHI:  Right.

7              THE COURT:  But, even if there were, I haven't

8    determined solvency yet, so no claim.  But, even if I were

9    -- and the problem is unless I assume that most of the

10   opinion is dicta, I have to deal with the fact that the

11   Court did say what it said in each of those sections.  Now,

12   it may be distinguishable to a certain extent because there

13   has been -- well, we're not asking for default rate

14   interest, so the existence of a default doesn't matter.  And

15   we're not -- solvency, at least at the EFIH level, well, I

16   don't believe is an issue.  Maybe it is.  I don't know.

17             MR. QURESHI:  Well, certainly for purposes of this

18   hearing, it's not an issue.

19             MR. QURESHI:  Correct.  That's a fair statement.

20   But it still sort of says what it says, which is yeah, but

21   you don't have to give them the default rate, which is the

22   contract rate.

23             MR. QURESHI:  But again, Your Honor, I think the

24   key distinction between our case and W.R. Grace is that

25   here, there's no challenge to our contractual provision.  It

Page 121

1    says what it says.  It's valid under state law.  They

2    haven't suggested otherwise.  In W.R. Grace, the Court said

3    well, wait a minute, you're asking for default interest, but

4    there hasn't been a default.  So, I think it's fundamentally

5    distinguishable on that basis, Your Honor.

6           And, to focus again on PPI, if Your Honor looks at

7    the quote that we have from PPI on Page 17 of the deck, not

8    surprisingly, the Third Circuit tracks exactly the language

9    of 1124(1).  The Third Circuit says that the proposed

10   treatment there, it must leave unaltered the contractual and

11   legal rights, so we come back to that same language.

12          Now, I do think, Your Honor, that in construing

13   1124(1) and what it means, it's important to look both at

14   1124(2) and (3), and I'm going to start with (3).  So (3),

15   again, is the provision that's been excised from the code.

16   And in the New Valley case, that provision was basically

17   used to authorize a solvent debtor from avoiding to pay

18   post-petition interest on unsecured claims.  And the

19   legislative history, Your Honor, I think is telling.  And

20   we've set forth a quote from that on Page 19.  Congress

21   considered that result to be an unfair result, to strip from

22   a creditor, in a solvent case, the right to post-petition

23   interest.  And so, Congress very clearly said to avoid that

24   kind of an unfair result in the future, we're going to

25   delete 1124(3) from the code.  And that is something that

1    the bankruptcy court in PPI also commented on.  So, it's

2    telling Your Honor, that that was something that Congress

3    expressly found to be inequitable and excised it.

4         Now, I want to jump to 1124(2) for a minute,

5    because I think this is also a crucial point, Your Honor.

6    1124, in its present form, it gives a debtor the flexibility

7    in terms of how to unimpair a creditor.  A debtor

8    fundamentally, Your Honor, has two choices.  If prevailing

9    interest rates, again in a solvent case of course, if

10   prevailing interest rates are lower that whatever the

11   contract rate is, the debtor has an option.  They can go

12   out, raise new financing, cheaper financing, and pay off

13   that prior debt in full in cash.  And in substance, that's

14   what the debtors here are proposing to do.  That's the

15   1124(1) path to unimpairment.  And of course, we say,

16   because of the plain language of 1124(1), if you're going to

17   do that, you must respect our contract rates.

18        But what does 1124(2) say?  1124(2) says well, you

19   have a second option.  Let's suppose prevailing interest

20   rates are higher than the contract rate, and so you don't

21   want to pay me off.  You would rather have my contract

22   maturity date reinstated.  So you can rely on 1124(2).  Now,

23   what do you have to do?  You have to cure any defaults.  You

24   have to pay all accrued and unpaid interest, of course at

25   the contract rate.  And then, you can reinstate the maturity

1    date, but of course, at the contract rate.  You don't get to

2    change it.

3            So, what the debtors are suggesting, Your Honor,

4    is fundamentally inconsistent with how Congress drafter

5    1124.  They're saying yes, Congress gave me the choice, two

6    different paths to unimpair a creditor.  And if I choose

7    path one, subsection one, I can eviscerate that creditor's

8    contract right.  But if I choose path two, and instead I

9    choose to reinstate that debt, then I'm stuck with their

10   contract rate.  The debtor is not arguing, I believe, that

11   they can reinstate debt at anything other than the contract

12   rate.

13           Now, there is absolutely nothing, Your Honor, in

14   the legislative history of 1124, to suggest that Congress

15   could possibly have intended such a diametrically opposed

16   result within that section, within subsections one or two.

17   That just can't be the case.  So, I think that, Your Honor,

18   it's just not open to question under 1124(1), given the

19   language that you've got to respect our contract rights.

20   That is the proposition that I think PPI supports.  And

21   again, to just go back, Your Honor, to what the Third

22   Circuit said, that failure to pay post-petition interest in

23   the PPI case would not leave unaltered the contractual or

24   the legal rights of the claim.

25           So, Your Honor also asked, and I want to come back

1    to that, in the context of the PPI case, did the Third

2    Circuit somehow create a conflict in its PPI decision?  And

3    respectfully, Your Honor, I don't think they did.  I think

4    that the Third Circuit was very clear, just like 1124(1) on

5    its face is very clear, which is the contract says what it

6    says.  The debtors are free to object.

7            THE COURT:  I don't see how they couldn't have

8    created a conflict in hanging their hat on 502(b)(6), and

9    then saying you have to give post-petition interest, without

10   considering the fact that that violated 502(b)(2), which

11   they're silent about.

12           MR. QURESHI:  Well, it's certainly not the case,

13   Your Honor, that the Third Circuit intended in PPI to

14   somehow walk away from the solvent debtor exception.  And

15   again, that's why I come back to 1124(1).

16           THE COURT:  No, I'm not saying they did.  But I

17   mean, I think that look, it's the law, so it doesn't really

18   matter if we fight about what they intended or didn't

19   intend.  It is what it is, but I don't think they thought

20   through the potential situation we have here, where you have

21   an unsecured creditor in a solvent debtor case, like you

22   have a landlord in a solvent debtor case, where the claim

23   excludes unmatured interest, like the claim has a cap on

24   rejection damages claims, and then say but you have to give

25   them interest.  That's like saying okay, the claim is

1    capped, but you still have to pay them the full amount of

2    the claim.  I think there is an inherent conflict in there.

3              It doesn't really matter, because it is what it

4    is, and I've got to figure out how to deal with it.

5              MR. QURESHI:  Right, and certainly, I think that

6    that's right, Your Honor, that the Third Circuit -- it is

7    the state of law that the solvent debtor exception exists.

8    And I think PPI must be read in that light, and in that

9    light, Your Honor, the PPI case very clearly repeats exactly

10   what 1124(1) says in its plain language.  And again, I just

11   think the proposition, Your Honor, that 1124(1) could be

12   read in a way to deny unsecured creditors their contract

13   rights, in a way that 1124(2) could never be, that's just

14   such a fundamental inconsistency that I think it is an

15   implausible interpretation of the code.

16             So, Your Honor, what I'd like to wrap up with is

17   this:  You heard from Mr. McGaan -- I think I lost track --

18   something like six times about the size of the post-petition

19   interest claim, the fact that it's hundreds of millions of

20   dollars.  At one point, he called it a bonanza.  Your Honor,

21   that is fundamentally the wrong way to think about it.  If

22   there's a bonanza here, the bonanza goes to the plan

23   sponsors.  Because let's remember, they have escrowed, or

24   agreed to escrow in cash, the full amount of the post-

25   petition interest claim at the contract rate.  And to the

1    extent that Your Honor were to cap the claim at the federal

2    judgment rate, what's the effect of that?  Your Honor, it

3    effectively amounts to a $500 million discount on the

4    purchase price, to the benefit of the plan sponsors, and the

5    detriment of the holders of the PIK notes who negotiated an

6    indenture with the debtors that is very, very clear on its

7    face, that says that this is the contract rate, and you have

8    to pay it.  And that provision of the contract is not being

9    challenged.

10          So, if we're going to view this through the lens

11   of fairness and of equity, Your Honor -- and again, our

12   argument I think is squarely grounded in the code.  But if

13   we're going to view this through the fairness prism or

14   equitable considerations, they very clearly run the other

15   way.  And that is indeed why a solvent debtor exception

16   exists in the first place, and why court after court after

17   court has said, Your Honor, that in the case of a solvent

18   debtor, contractual rights ought to be respected.  And

19   fundamentally, that is all that we're asking for here.

20          THE COURT:  Well, in the equity cases that talk

21   about the solvent debtor exception, there are cases that

22   have noted that even if one is going to consider awarding

23   interest as a matter of equity, that it might not be

24   equitable to give that interest if it would result in a

25   reduction to other creditors.  So, hypothetically talking in

1    this case, the solvent debtor case here doesn't mean that

2    the ultimate equity sponsors are solvent, are getting a

3    recovery.  It's that the other debtor is getting a recovery.

4    And one could argue that, well, if I give you post-petition

5    interest, what I'm really doing is taking away currency from

6    other creditors.  Because money that doesn't go to equity is

7    money that doesn't go to another debtor, that would then use

8    that money to pay its creditors.  It's not money that goes

9    to the ultimate equity holders of the enterprise.

10              MR. QURESHI:  So, Your Honor, I certainly don't

11   agree with that argument.  I understand that that's

12   something they might argue if we were in fair and equitable

13   land under 1129.  Our view, Your Honor, is under 1124(1),

14   that there's actually not that kind of discretion.  1124(1)

15   says contractual rights.  And barring some other reason

16   unrelated to our contract that there should be an equitable

17   adjustment of the rate, the rate should be what the contract

18   says.

19              THE COURT:  Okay.

20              MR. QURESHI:  Thank you, Your Honor.

21              THE COURT:  You're welcome.  Mr. McGaan?

22              MR. MCGAAN:  Thank you, Your Honor.  Andrew McGaan

23   for the debtors again.  Just want to touch on a couple of

24   points that Mr. Qureshi raised.  The reliance on Your

25   Honor's opinion in the first lien make whole dispute, I

1   think is -- I don't want to spend a lot of time on it -- I

2   think it's way oversold.  Your Honor will recall, I don't

3   think it's acknowledged in the PIK noteholder's brief,

4   that's a discovery opinion.  And the interpretation they're

5   giving Your Honor's consideration of some cases that talk

6   about solvent debtor decisions, and the way they seek to use

7   it, is putting you in the position of the lessee in PPI

8   Enterprises, where the unsecured lender is arguing for

9   contract rate default interest in W.R. Grace.  Meaning,

10  they're interpreting it, clearly, to say that Your Honor has

11  bought onto the idea that there is no limit to the solvent

12  debtor exception.  And because they have a contract right to

13  11.25 percent interest, the solvent debtor exception, which

14  you cannot find in the code, prohibits you from doing it.

15  And that flies in the fact of PPI Enterprises, which is

16  really one way to look at that.  But the Third Circuit has

17  said the solvent debtor exception means here, that is in

18  this circuit, because it is not anywhere near as broad as

19  they argue or they need you to find to award contract rate

20  post-petition interest here.

21          In the bankruptcy court's decision in the PPI

22  case, the Court says, among other things, and I'm quoting,

23  "There is no suggestion in the code that the application of

24  502(b)(6), or any other provision which curtails creditor

25  rights, is limited by a consideration of the circumstances

1   of a particular chapter or case."  So, what it does is it

2   rejects the argument the lessee was making there, that

3   502(b)(6), under the code, doesn't apply in solvent debtor

4   cases.  It says just the opposite.  The Court said Congress

5   clearly contemplated value being given to equity holders,

6   even where creditors' non-bankruptcy law rights are

7   materially adversely affected by the code.  So the fact that

8   the code may put constraints on their ability, that is, the

9   PIK noteholder's ability to recover the full contract rate,

10  which we believe strongly that it does, is not some

11  outrageous proposition.  It's been blessed in the circuit,

12  and that reasoning was affirmed by the Third Circuit.

13          Mr. Qureshi argued that there was something wrong

14  with apparently the breadth of the proposition, that if the

15  Court accepted the debtor's arguments here and limited their

16  post-petition interest recovery, the federal judgment rate

17  would be some cataclysmic decision.  But there's a couple --

18  it is a dramatic overstatement.  Congress, as we talk about

19  over and over here, Congress in the statute prohibited the

20  collection of unmatured interest, and the world didn't

21  collapse.  The fact is that in the PIK noteholder's own

22  brief, this is the one they filed on September 4, they argue

23  for similarly broad proposition going the other way, which

24  they haven't stepped up to the plate to hear, saying they

25  want a ruling that they're entitled to their full contract

1    rights.  Which of course is the flip side of it, that in

2    every case where an unsecured creditor is seeking post-

3    petition interest from a solvent in a solvent debtor case,

4    they get the full contract rights, regardless, and that is

5    the exact argument that they made.

6            Two other points:  With respect to W.R. Grace, the

7    midpoint post-petition interest that was approved there was

8    done by agreement, not by a court going through the analysis

9    of what is the right level and an order being entered, which

10   the parties here are asking you to grapple with here.  So

11   that would be maybe helpful if the case had opened up that

12   way, but it didn't.  Alternative, Your Honor pointed out how

13   the lengthy W.R. Grace opinion says if, but, if, but, if,

14   but, which provides for a series of alternate holdings.  And

15   I simply wanted to suggest, Your Honor, that alternate

16   holdings are not dicta.

17           THE COURT:  Right.

18           MR. MCGAAN:  So if you think of it that way, it

19   doesn't preclude you from looking at it and taking guidance

20   from it, at least on the basis that one might say it's

21   dicta.  It's not.

22           And we obviously have a fundamental disagreement

23   with the PIK noteholders on what the PPI Enterprises case

24   means.  But this is from the W.R. Grace opinion.  PPI

25   Enterprises does not stand for the proposition that

```
1    unsecured creditors must receive post-petition interest at

2    the contractual default rate in order to render their claims

3    unimpaired.  So, they really haven't -- their claim here

4    doesn't get out from under the limitations that PPI

5    Enterprises places on it, at least to the extent one wants

6    to call it a ratification of some form of solvent debtor

7    exception in this circuit.  And, Your Honor, that's all I

8    have.

9              THE COURT:  Okay, thank you.

10             MR. QURESHI:  Your Honor, just two very, very

11   quick points, if I may.  One thing I should have mentioned

12   earlier with respect to 502(b)(2), while I don't think it's

13   critical, 502(b)(2) on its face does not address interest

14   that matures after the filing date.

15             But, Your Honor, what I want to also respond to is

16   Mr. McGaan is right; we're asking for the flip side of their

17   proposition, that as a matter of law, we are entitled to

18   post-petition interest at the contract rate.  That is

19   something that we think is, obviously, consistent with

20   established commercial practice along the lines of all of

21   the consensual confirmation orders that we cited to.

22             But in terms of what the impact would be if Your

23   Honor went the other way, think about this example, Your

24   Honor.  That if the debtor's legal proposition were right,

25   that in a solvent debtor case, they can ignore the
```

1    contractual interest rate of unsecured creditors, that would

2    allow a solvent debtor who commences a Chapter 11 proceeding

3    to put the brakes on a contractual interest rate that might

4    be dramatically higher than the prevailing federal judgment

5    interest rate, have hundreds of millions of dollars of

6    savings of contractual interest through the pendency of the

7    case, and then come out the other side with equity retaining

8    its interest, having saved hundreds of millions of dollars.

9              THE COURT:  That's exactly what happened in PPI.

10   Exactly what happened.

11             MR. QURESHI:  Well, except for in P --

12             THE COURT:  They saved hundreds of thousands of

13   dollars in rent damages.

14             MR. QURESHI:  Right, and they did it pursuant to a

15   very clear provision of the bankruptcy code, Your Honor,

16   that said that your rent damages are capped.

17             THE COURT:  Right, well 502(b)(2) says you don't

18   get unmatured interest, which means post-petition interest,

19   just as clear.

20             MR. QURESHI:  But the Third Circuit has said not

21   so in the case of a solvent debtor, Your Honor.  That is the

22   law of the land in the Third Circuit.

23             THE COURT:  It was a solvent debtor in PPI, too.

24   I'm fighting with the Third Circuit; I'm not fighting with

25   you.

1           MR. QURESHI:  I understand.

2           THE COURT:  I don't understand.

3           MR. QURESHI:  I understand, Your Honor.  And the

4      Third Circuit --

5           THE COURT:  But I've got to make sense of it, so

6      we'll figure it out.  All right, anything else on that?

7      Okay, thank you very much.  Obviously, I'll take it under

8      advisement, but I will not issue a decision before 3:00 on

9      Friday, and we'll re-discuss it at that time.  We have the

10     two discovery disputes to talk about.  Let's take a short

11     recess, five or ten minutes, and then we'll deal with those.

12     Thank you.

13           [BREAK]

14           MR. GLUECKSTEIN:  Good afternoon, Your Honor. For

15     the record, Brian Glueckstein, Sullivan & Cromwell, on

16     behalf of the E Side Committee.  And thank you, Your Honor,

17     for addressing these matters this afternoon at the end of a

18     long day.

19           We're here -- we filed a letter yesterday with the

20     Court in response to the T Side, the TCEH Unsecured Group,

21     serving a 30(b)(6) notice served on the Committee to depose

22     a representative in the come -- on the eve of trial here

23     before the trial starts next week with respect to all

24     factual allegations, as they put it, that are contained in

25     the Committee's settlement and plan objections that were

1   filed with the Court last week.  And also, with respect to

2   any evidence that the Committee intends to rely on at trial.

3            And we submit, Your Honor, that we believe there

4   is no legitimate purpose, or any sense whatsoever, to this

5   discovery request at this stage.  Certainly the benefits of

6   any deposition going forward, and we would submit there are

7   none, but to the extent there are any would be minimal and

8   would be outweighed by the burden at these stage of the

9   proceedings.

10           First, Your Honor, as the -- as counsel knows,

11  witness lists have now been exchanged.  And, as all the

12  parties of interest know, there is no Committee

13  representative who will be testifying at trial as a fact

14  witness.

15           To date, there's been no document or other

16  discovery sought from the Committee by the debtors or any

17  other party in interest.  And that's consistent with the

18  record that has been developed over the course of the last

19  number of weeks with respect to discovery.

20           The Committee's brief rely extensively, and cite

21  extensively, to record evidence that has been developed to

22  date in the proceedings from the debtors and from other

23  parties in the case, none of whom are the Committee.  That

24  is the relevant evidence to the Committee's briefs and

25  whatever arguments are to be made in response, not

1   information to be obtained from Committee members at this

2   stage.

3           And this is consistent, Your Honor, with the

4   position that the TCEH Unsecured Group themselves took when

5   we were before Your Honor a number of weeks ago at this

6   point, where they opposed the overwhelming majority of the

7   discovery that we sought from their clients, and that the

8   Court precluded.

9           And they argued strenuously that at the

10  confirmation trial, it would be the debtor's burden to put

11  on evidence, and that the information that we were seeking

12  from them was simply not relevant to arguments we were going

13  to make. It's hard to see how the Committee, the Statutory

14  Committee, would have any relevant evidence whatsoever under

15  that or any other standard.

16          As Your Honor knows, the trial is starting next

17  Tuesday.  At trial on these matters, the relevant evidence

18  will be put into the record, into the evidentiary record.

19  Your Honor will hear from the witnesses.

20          The debtors will have the proof at trial, as we

21  know, on all issues.  And the Committee's case will include,

22  in addition to certain expert witnesses that we're

23  proffering who have been deposed by all parties, including

24  the TCEH Unsecured Group, will consist of cross-examination

25  and testimony from the debtor's witnesses.

1            Certainly the scheduling order already provides

2    plenty of opportunity for plan supporters to submit

3    responses to the Committee's pleadings.  I have no doubt

4    that they will as soon as this Friday.  And then post-trial

5    when -- on the full evidentiary record, there will be

6    further briefings, as we talked about this morning.

7            So we submit, Your Honor, that there is simply

8    nothing necessary or relevant in any evidence that could be

9    developed on the issues addressed in our brief from the

10   Committee at this point.  And when we inquired prior to

11   today with counsel as to why they felt this deposition

12   should proceed, all we were told is that they wanted to

13   explore some sort of unspecified admissions from Committee

14   members.

15           We submit, Your Honor, that given the existing

16   factual record and the nature of the arguments presented in

17   our brief, that the relevant information is the discovery

18   record that everybody has access to, and that there's no

19   relevant information that should be -- that there is to be

20   developed from Committee -- from the Committee itself at

21   this stage.

22           And as a result, we would ask Your Honor quash the

23   deposition notice and allow the parties to proceed with

24   continued pretrial preparations.

25           THE COURT:  Thank you.  Mr. Gwynne, why don't I

1    hear from you as well before I turn it over to Mr. Shore.

2           MR. GWYNNE:  Good afternoon, Your Honor.  Kurt

3    Gwynne from Reed Smith for the Bank of NY Mellon as PCRB

4    Trustee.

5           Your Honor, we -- I addressed these issues in

6    significant detail in a letter that I filed yesterday.  I

7    don't know if Your Honor's had a chance to read it.

8           THE COURT:  I did read the correspondence.

9           MR. GWYNNE:  Okay.  Then I will be briefer than

10   normally.  First of all, Your Honor, we raised basically two

11   issues to the plan.  One is violation of Section 1123(a)(4)

12   of the code, which says must provide the same treatment to

13   creditors in the class.

14          We also allege that the failure to comply with

15   that violates 1129(a)(1) and (a)(2) with respect to the plan

16   and their proponent.

17          The second issue we raise is 1129(a)(3), that the

18   plan was not proposed in good faith because of that

19   disparate treatment, contrary to 1123(a)(4), and we talk in

20   our papers about how the debtors and the TCEH Committee

21   originally were in favor of pari passu treatment.  But it

22   was the TCEH Ad Hoc Unsecured Group that insisted upon the

23   disparate treatment of the PCRBs, and that eventually the

24   debtors succumb to that.

25          The documents supporting the PCRB's objections on

1    those issues, Your Honor, are documents like the plan and

2    each of the amendments of the plan, starting with the third

3    amendment, the fourth and fifth amendment, which were the

4    ones where the disparate was first introduced, the

5    disclosure statement, documents produced by the debtors and

6    other parties that are in the repository.

7              There's no correspondence.  There are no emails

8    from Bank of NY Mellon that we rely upon with respect to

9    those objections.

10              Putting aside the documentary evidence, the

11    testimony that Bank of NY Mellon will rely upon would be the

12    testimony of Hugh Sawyer, the TCEH disinterested manager,

13    and then the testimony of several of the financial advisors

14    who at their depositions acknowledged that they did

15    absolutely no analysis whatsoever of whether a discount on

16    the PCRB claims was appropriate.

17              There's no testimony from Bank of NY Mellon that's

18    been proposed.  Nobody served a document request of Bank of

19    NY Mellon because I'm sure all the parties in interest

20    understood that Bank of NY Mellon didn't have documents that

21    were relevant on these issues.

22              No party listed Bank of NY Mellon, or a

23    representative of Bank of NY Mellon, on the preliminary

24    witness statements, and nobody listed -- no debtor party in

25    interest, TCEH Ad Hoc or anyone, listed Bank of NY Mellon on

1    a final list of witnesses as well.  Why?  Because there's no

2    basis to take the deposition of Bank of NY Mellon.  It has

3    no -- it's not a source of disputed facts relating to the

4    issues for the trial.

5            Yesterday, we had the meet and confer required by

6    the rules before filing a motion seeking Your Honor's

7    intervention.  I asked Mr. Shore what he was seeking from

8    Bank of NY Mellon.  The response simply was, you're

9    challenging the good faith.  I want to hear what your guy

10   has to say.  I said, Well, other than that.

11           I explained the basis for our good faith challenge

12   or documents, communications between Mr. Shore's firm or his

13   client and the debtors.  There's no document from Bank of NY

14   Mellon on which we rely.  I asked if there was any other

15   basis, and he said I'm not going to tell you what my

16   questions are.

17           So I don't know what else he would say when he

18   gets to the podium, but I don't think the deposition notice

19   is reasonably calculated to lead to any admissible evidence

20   on any of the issues.

21           And with respect to the burden.  As Your Honor

22   knows, when Amended Rule 26 takes effect, the change is

23   going to be from whether something's reasonably calculated

24   to lead to admissible evidence, to whether the discovery is

25   proportional, and whether the burden imposed by the

1    discovery is -- makes sense in light of the benefit to be

2    gained from it.

3            And I would submit that here, the burden on Bank

4    of NY Mellon of having to prepare and produce a witness for

5    a deposition that's going to be non-productive outweighs any

6    benefit to the Ad Hoc groups from taking that deposition.

7            As Your Honor knows, we previously sought

8    discovery from the Ad Hoc group.  And the reason we sought

9    discovery from the Ad Hoc group is we knew, like the

10   documents indicate, that they were the architects of the

11   planned revisions providing for the disparate treatment of

12   the PCRBs.  We wanted to know why they thought that was

13   appropriate, what the basis for that disparate treatment

14   was, and why the percentage discount was so high.

15           Mr. Shore opposed that discovery, and said it's

16   not our burden.  It's the debtor's burden.  Mr. Shore

17   specifically said it at that prior telephonic hearing that

18   one of the issues we could raise would be good faith, and

19   that's not their issue. It's the debtor that has the burden

20   of proof.  Now he's seeking discovery from us on the same

21   issue that he asked Your Honor to preclude us from taking

22   discovery against his client.

23           But in addition, Your Honor ruled in connection

24   with our prior discovery requests when Your Honor struck

25   them.  And it doesn't matter what party thinks; for example,

1  we wanted to take discovery regarding the various claims

2  that were settled what the debtor believes they were worth

3  in connection with the settlement.  And Your Honor said all

4  that matters is what they were settled for, not what the

5  debtors thought they were worth.  So that is the way in

6  which we tried to conduct the discovery within those limits.

7          But the same thing has to be true here, Your

8  Honor.  What Bank of NY Mellon thinks about whether the plan

9  is fair or unfair or good faith or bad faith shouldn't be

10  relevant.  Number one, it's the debtor's burden of proof, as

11  Mr. Shore said before.

12          But secondly, all that matters is whether it, in

13  fact, is good faith or not, whether the treatment is

14  justified, notwithstanding the lack of any analysis

15  supporting it, and whether 1123(a)(4) is violated as a

16  matter of law by having the PCRBs in a class with other

17  creditors where everybody gets a different treatment.

18          But on none of those issues is there any

19  documentary or testimony evidence from Bank of NY Mellon

20  that would be relevant.  That's all I have Your Honor.  Do

21  you have questions?

22          THE COURT:  No.

23          MR. GWYNNE:  Thank you, Your Honor.

24          MR. SHORE:  I guess the common theme in today's

25  afternoon proceedings is people love it when the Court tags

1    the people who are senior to them in the capital structure,

2    but when they actually have to answer to themselves, of

3    course, everything that people seek from them is offensive.

4           Both the EFH Committee and the PCRBs have

5    benefited from the fact that every other party in interest

6    here is given discovery and they cited it profusely, and

7    we're seeking to take short depositions of each of them and

8    I'll explain why.

9           We issued timely deposition notices to the PCRBs

10   and to the EFH Committee under the Order.  The EFH Committee

11   served discovery on us.  We had agreed to produce that

12   discovery and agreed that the PCRBs could go onto that

13   discovery as well; and, in fact, that happened.  We produced

14   the documents that were made available to both the EFH

15   Committee and the PCRBs.  They were heavily cited in their

16   relative -- or respective objections.  They both questioned

17   Mr. Seager who was our FA.

18          An issue arose after we served the notices with

19   both the PCRBs and the EFH Committee taking the position

20   that under no circumstances would they produce somebody for

21   a deposition.  They didn't have any information.  Both

22   threatened to come to the Court and seek a protective order

23   in late-September, both saying we have no facts at all.  I

24   said to Mr. Glueckstein and to Mr. Gwynne, well, let's see

25   what your objecting says then.

1           If your objection doesn't raise any facts that we

2    need discovery into, then I won't need the depositions, so

3    why don't we ponder.  And we both -- both Mr. Glueckstein

4    and I, and Mr. Gwynne and I reached a deal, that we defer

5    the deposition until after the objections were filed.

6           They each make a witness available within the time

7    frame available, knowing that we were only going to have a

8    week.  That nobody was going to claim that we were out of

9    time or not in compliance with the order in seeking the

10   deposition post-objection.  And that all -- that they would

11   reserve all issues as to the need for testimony.

12          I think both parties are living up to the deal.

13   Mr. Glueckstein's letter seems to be backtracking a bit.

14   But from our perspective, the only question is whether or

15   not there is relevant evidence in the possession of the

16   PCRBs and the EFH Committee that can't be obtained from

17   another existing source.  Even then, that would be limiting

18   it because we could seek the discovery from them.

19          I have no intent of taking them through discovery

20   that they receive from other people.  But they have each

21   alleged facts that I want to question.  The Court has a

22   couple hundred pages from the PCRBs and the EFH Trustee in

23   front of it, and they named leveled -- actually, I even

24   handed it to you, but you have it.

25          THE COURT:  I was going to say I don't.

1              MR. SHORE:  No, okay.

2              THE COURT:  I have a couple-page letters.

3              MR. SHORE:  Okay.  The -- any claim that the PCRB

4     Trustee or the EFH Committee have no facts, other than what

5     is cited, in this record is plainly untrue.

6              Let me focus on the EFH Committee, and just give

7     you a sense of what I'm looking for, and just starting in

8     their preliminary statement.  They start off talking as they

9     had the alternative plan.

10             Debtors have totally thwarted our ability to put

11    together an alternative plan.  I think in fairness, the

12    parties who have an understanding of what alternative plan

13    was out there for the E Side, the EFH Committee, you're

14    going to have to say: who did you talk to; did you arrange

15    financing; explain to me why you weren't able to get that

16    plan done?

17             They can't come in and make allegations that

18    there's been a thwart of an ability to put together an

19    alternative plan, and then refuse to produce discovery as to

20    whether anything was possible; and if it wasn't possible,

21    why it wasn't possible.  And to be clear, that issue

22    pervades the objection in the responses that will come later

23    this week.

24             How can you complain about this so-called option

25    if that was the only option?  A badly priced option is

1    certainly better than no option at all.

2            So we are entitled to find out whether or not this

3    specter of an alternative plan was ever a real thing, or

4    this is just a made up rhetorical argument trying to

5    convince Your Honor that we should go back to the abyss.

6            There are allegations that the harm caused to the

7    E Side creditors by the lack of stewardship of the estates.

8    What harm?  What harm have you suffered by any of this

9    process?  That's a fair question to a fact witness.  The E

10   Side debtors could have reorganized yesterday without the T

11   Side debtors.

12           Okay?  What does that plan look like?  What are

13   you talking about?  You make an allegation that there could

14   have been a plan of reorganization for the E Side debtors?

15   Walk me through how that works without a T Side resolution.

16           The inter-silo settlement is a violation of the

17   fiduciary duties of the E Side debtors and cannot be

18   approved.  What circumstances can someone allege that

19   debtors or professionals are breaching their fiduciary

20   duties, and the party levels the accusation can't produce

21   itself for a deposition to address questions of affirmative

22   defenses to a claim of breach of fiduciary duty.

23           For example, this whole concept that they've been

24   disenfranchised from the process.  You heard repeatedly, oh,

25   we weren't able to talk to anybody.  We didn't -- they

1    didn't answer our questions.  We got frozen out of the

2    negotiations.

3              How can it be that they can make those allegations

4    and then not produce somebody to actually say:  when did you

5    reach out to the debtors, what did they say to you; when did

6    you reach out to the T side, what did they say to you; what

7    about the first, what about the second liens, any of that

8    kind of stuff.

9              The smoke that they've created that somehow this

10   is a terrible event that has snuck up on them I don't think

11   is true.  But certainly if they're going to make that

12   allegation, they have to put somebody in the witness stand

13   to talk about how that was done, because the other side of

14   the equation is certainly going to come in front of Your

15   Honor about all the efforts everybody made to make this a

16   comprehensive process -- staged though it was -- but it was

17   inclusive and is still going on to this day.

18             The -- so the two big order issues from my

19   perspective are this -- the issue of an alternative plan and

20   good faith; in other words, that they were frozen out of the

21   process.  But throughout the objection, there are factual

22   statements replete.

23             They make allegations that had voting occurred, it

24   would have been -- everybody would have rejected.  Where's

25   the basis for that?  They make allegations that claims

1    against the TCEH estate are collectible.  Claims against

2    Luminant Generation are collectible.

3            How can they make these statements without putting

4    someone forward to say, okay, here's -- here are the facts

5    underlying the conclusory statement that was presented to

6    the Court.

7            Likewise with the PCRBs.  The PCRBs are making a

8    good faith claim, we were frozen out of the process.  I want

9    their witness.

10           First of all, PCRB Trustee is one the EF -- sorry

11   -- on the T Side UCC.  So someone's going to have to start

12   answering questions.  You mean this was a surprise to you

13   that this plan was being negotiated; did you not attend the

14   Committee meetings.

15           Did you not see the claims that were being

16   asserted; why didn't you do due diligence into those claims?

17   You clearly knew about the standing deadline for the cash

18   collateral order, didn't you; why didn't you file a

19   challenge like other parties and interested in the cases?

20           Are you saying you were relying on the Committee;

21   was your reliance on the Committee justifiable under the

22   circumstances?  Did you vote at all on approving the plan of

23   reorganization that is supported by the UCC?  Did you have

24   an opportunity to discuss the issue with the UCC?  Did the

25   UCC request that in order to have support for the plan,

1    there had to be changes to the PCRB treatment?

2         All of those questions go to the allegation that

3    this was done in bad faith.

4         Also, they state throughout their papers, you

5    shouldn't -- the settlement is terrible because TCEH has

6    claims, citing Hugh Sawyer, who says TCEH has claims.  The

7    fact that TCEH may have claims is irrelevant to the

8    questions I want to ask, which is: have you analyzed the

9    claims; have you done a litigation budget; do you have any

10   understanding as to how long it would take to monetize those

11   claims; have you done any analysis of collectability of

12   those claims?

13        Is it really your position that the Court should

14   not confirm the plan because Hugh Sawyer said that PCEH has

15   $2 billion of claims, and you thought that meant that TCEH

16   has $2 billion of assets on its balance sheet that should be

17   distributed to you?

18        Those are all fair questions in the context of

19   somebody who's saying you should not approve the plan

20   because it's not in my best interests.

21        So where we are right now is you've got two

22   parties who, notwithstanding the knowledge that they were

23   going to get a renewed deposition notice when they filed

24   this, made a whole bunch of statements for the Court -- some

25   of them very inflammatory; granted, I tend to respond badly

1    to inflammatory allegations like we've been dealing in bad

2    faith throughout this process.

3             But I don't know how you claim someone breached

4    their fiduciary duties -- and by implication, the people who

5    were working with them were aiding and abetting the breach

6    of fiduciary duties? -- and they don't have to bring someone

7    forward.  Or you could say this was all done in bad faith or

8    in the secret of the night, and not actually have to talk

9    about what you knew and when you knew it and why you didn't

10   do something.

11            So we think it's fair that they be -- they be

12   ordered to appear for a deposition.  I'll keep them short.

13   I'm going to keep them to the factual allegations they had.

14   And I'm not going to be questioning them about things that

15   are purely based on other peoples' evidence, except to the

16   extent that they're making conclusions from that evidence,

17   and I'm entitled to test their conclusions.

18            MR. GLUECKSTEIN:  Your Honor, briefly, if I may.

19   Brian Glueckstein on behalf of the E Side.

20            Your Honor, there's going to be a trial.  It's

21   going to happen next week.  You're going to hear from the

22   witnesses.  Mr. Shore can argue all he wants on the evidence

23   that's in the record that the presentation of evidence that

24   we make is incorrect, is unsupportable, that his version of

25   the facts as he hears the testimony is correct, and then

1   Your Honor will make a decision.

2           Mr. Shore refers to a number of items from our

3   brief -- I turned to one of them -- this idea that this was

4   done in dead of night that there were not discussions.

5   There are citations in the brief to evidence in the record

6   from the debtor's witnesses, specifically on the question of

7   whether they talked to the Committee or creditor on specific

8   points that we asked about the subject of discussion.

9           The basis of -- he calls it allegations of the

10  argument that is presented in our brief is from the record

11  evidence.  Your Honor is going to take into evidence from

12  the witnesses live and the other evidence that's presented,

13  the evidence, and there will be an evidentiary record of

14  this case, for which both sides will make arguments -- this

15  happens at every trial -- and Your Honor, the trier of fact,

16  will make a decision on the issues that are before the

17  Court.

18          There is nothing about the fact that we filed the

19  brief marshalling in the evidence that we have developed

20  that requires a deposition of the Committee, or that makes

21  the Committee's subjective views on any of this relevant to

22  the questions that'll be before the Court.  Either the

23  debtors will carry their burden on these points, and we will

24  rebut them, or we won't.  But none of -- nothing in here

25  relies on the thoughts, mental impressions, or any other

1    evidence that is in the possession of the Committee; and,

2    therefore, we submit that the deposition is inappropriate.

3              THE COURT:  Thank you.

4              MR. GWYNNE:  Kurt Gwynne for the Bank of NY Mellon

5    as PCRB Indenture Trustee.

6              Your Honor, first of all, with respect to the

7    assertion about Bank of NY Mellon being frozen out of the

8    process, there's a document in the repository that Mr. Shore

9    had access to like everyone else did, where Committee

10   counsel advises Mr. Husnick of Kirkland that the PCRB

11   Trustee wants to participate in the mediation.  And Mr.

12   Husnick says that would be unnecessary noise, which I thank

13   him for that.

14             But, Your Honor, we don't rely upon that though in

15   our objection where we say it's bad faith.  We day it's bad

16   faith because the Ad Hoc group negotiated our rights to

17   increase the distribution to the Ad Hoc group.  That's what

18   we say, and that's what we wanted to depose Mr. Shore's

19   client about.

20             They participated in that process.  They

21   negotiated away our distributions to themselves.  And if we

22   can't depose them about that, then how can they depose us

23   because we're just saying that's what they did?  It's a

24   process they were part of.  We weren't part of it.

25             The negotiations and the documents are all between

1    the debtors and wait in case.  They were in that process.

2              With respect to due diligence and whether we

3    should have challenged or filed our own challenge.  As Your

4    Honor said before, what party thinks doesn't matter.  We

5    didn't file a challenge.  That's the bottom line.  If Mr.

6    Shore thinks that's relevant, he can make that argument.  We

7    don't think it's relevant, but he can make that argument.

8    What the process was for deciding not to bring a challenge

9    is irrelevant.

10             With respect to Mr. Shore asking if we due

11   diligence to claims and if we were going to do a litigation

12   budget for them.  We are not challenging the sufficiency of

13   the settlement.  We never were, and we're not doing it now.

14   We're not saying more should have come in.

15             All we're saying is that our claims that belong to

16   TCEH, that whatever they were worth, they were settled.  And

17   when those claims were settled, we were shut entirely out of

18   the distribution.  We did zero recovery from the waiver of

19   the TCEH first lien deficiency claim, which was declared pro

20   quo for waiving all the T Side claims against the first lien

21   creditors.

22             But we're not challenging the debtor's decision to

23   settle them.  All we're saying is that we have a right as a

24   creditor of TCEH to share in whatever that distribution is.

25   That's a legal issue.  It's not a factual issue.  It doesn't

1    require analysis of the claims or litigation budgets.

2          With respect to some of the things Mr. Shore

3    talked about, wanted to know how Bank of NY Mellon voted on

4    the plan.  I think now he's talking about deposing Bank of

5    NY Mellon in its capacity as creditor's Committee member

6    versus Bank of NY Mellon as objector for the PCRB Trustee.

7    I also want to point out that's actually new, and none of

8    this stuff that Mr. Shore told Your Honor was the basis for

9    taking this deposition that he mentioned as part of the meet

10   and confer.

11         But secondly, when you look at the deposition

12   notice, which was attached as Exhibit A to my letter,

13   nowhere in there do you see these things that Mr. Shore is

14   talking about, none of them.  All they do are cite two

15   factual allegations in our plan objection.  And each of

16   those factual allegations, as we point out in detail in the

17   letter we filed yesterday, are based on documents in the

18   repository or testimony of other parties in interest.  None

19   of them come from Bank of NY Mellon in any way, Your Honor.

20         That's all I have, unless Your Honor has any

21   questions.

22         THE COURT:  No, thank you.

23         MR. GWYNNE:  Thank you, Your Honor.

24         THE COURT:  Mr. Shore, briefly.

25         MR. SHORE:  Very briefly.  Let me explain the

1    problem we have here.  So paragraph 59 of the trial brief of

2    the EFH Committee: plan negotiations also excluded E Side

3    creditors and the EFH Committee, despite their rights under

4    the bidding procedures.

5              Mr. Glueckstein says, well, I've cited it, I've

6    cited it, I've given evidence.  He gave the deposition of

7    Ms. Williamson, the deposition of Mr. Evans, and the

8    deposition of Mr. (indiscernible), three directors.  That

9    does not answer the question as to whether Mr. Dietderich or

10   a Committee member had a discussion with the debtors at all.

11   It doesn't solve the problem.  He is going to make an

12   allegation, I'm out, it wasn't done.

13             With respect to Mr. Gwynne.  I'm going to go

14   through his objection the same way.  The first paragraph:

15   The plan and the settlement agreement, however, seem to

16   strip the holders of PCRB claims of any share in the

17   proceeds of the TCEH's estates $2 billion in claims.  Is Mr.

18   Gwynne now saying -- actually I have not -- those $2 billion

19   claims might be worth zero.

20             But I meant to say to the Court is it strips of

21   the opportunity to assert a claim that would be subject to

22   years of litigation.  That's the kind of thing that the

23   witness should be answering and saying, no, that's what I

24   really mean here.

25             But this is paragraph three: The discount is not

1    based upon analysis of the TCEH estates cause of action

2    compared to the TCEH subsidiaries cause of action.  Have

3    they done an analysis?  Are they just saying this one is

4    arbitrary, but I got a different arbitrary one for the Court

5    to do?  We're entitled to know that.

6              And then finally, the TCEH Unsecured Ad Hoc Group

7    scheme to increase their recoveries, and the debtors

8    acquiescence in that scheme demonstrates a lack of good

9    faith.

10             My point is now, if they were a part of the

11   Committee and they were participating in the Committee --

12   and what the Committee was doing here was negotiating for a

13   better treatment of the PCRBs it -- and the Ad Hoc Committee

14   and the funding parties agree that what they were going to

15   do was change the treatment -- it hardly seems to me to make

16   a difference whether the concessions that the PCRBs got were

17   directly in the negotiations or through the Committee

18   without the noise of being involved directly in the

19   Committee -- in the mediation process really makes a

20   difference.

21             THE COURT:  Okay.  Thank you.  All right, I'm

22   going to allow the depositions limited to the factual

23   allegations contained in the objections that were filed.  I

24   think it's fair for the Ad Hoc Committee have an opportunity

25   to test those allegations.  It may be that the answers are

1    it was based on debtor this -- it was, you know, it was

2    based on not personal knowledge.  It was based on this

3    information, this information, this information, all of

4    which, you know, I got from other people.  But I think Mr.

5    Shore should be given an opportunity to test that.

6          I don't think the ultimate clients here who put

7    these issues at play, especially good faith, should really

8    be allowed to hide behind the lawyers and the briefs, and

9    not be answerable to reasonable questions testing the

10   factual allegations that they made in pleadings they filed

11   before the Court.

12         So I have to say my initial response -- and I

13   didn't know the full story here -- my initial response was

14   what is this going on so late in the game.  This can't have

15   been contemplated by the parties.  The way I'm giving Mr.

16   Shore an eve of confirmation deposition, unless - you know,

17   because it's not on the scheduling order, et cetera.

18         Now I understand that this was something that was

19   discussed all the way back to September.  And we're really

20   talking not about timing; we're talking about substance, and

21   I think it's a fair deposition.  The timing result is really

22   a result based on the parties' agreement way back in

23   September, and it's unfortunate.  It means it's going to

24   have to be over the weekend, but that's too bad.  That's

25   just the way it's going to be.  So short deposition; four

1    hours each, Mr. Shore?

2              MR. SHORE:  I can do it in four hours.

3              THE COURT:  Four hours each.  I don't want to kill

4    too much time on this.  Be reasonable.  I mean, if you spend

5    three hours objecting, obviously, and you call me on Sunday

6    afternoon saying you need more time, he's going to get more

7    time.  Okay?  So I'll allow those deposition.  Is anything

8    else for today?

9              MR. KERR:  Your Honor, I just have one -- one

10   point.  We're now going to receive at the end of the week

11   pleadings by Mr. Shore on behalf of his clients with similar

12   factual allegations in argument.

13             THE COURT:  Do you have any -- do you have any --

14   you've already taken -- you've already gotten discovery.

15             MR. KERR:  No, we've not -- we're not committed to

16   actually taking a deposition of his client, for whom he'll

17   be speaking on his behalf, making probably similar

18   allegations (indiscernible).

19             MR. SHORE:  They took the deposition in this

20   procedure.  I attended that --

21             MR. KERR:  I'm not speaking to this procedure.

22   I'm speaking of once we get the clients --

23             MR. SHORE:  Yeah.

24             THE COURT:  Do you have -- did you have an

25   agreement to take his depositions after he filed his

Page 158

1    response back in September?

2            MR. KERR:  I'll confer to you, Brian.

3            THE COURT:  If not, no, he can't have them.  Okay,

4    no he can't have them.  All right, we're adjourned.

5                          * * * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2

3     I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5     Sonya Ledanski          Digitally signed by Sonya Ledanski Hyde
                              DN: cn=Sonya Ledanski Hyde, o=Veritext,
6     Hyde                    ou, email=digital@veritext.com, c=US
                              Date: 2015.10.29 16:42:53 -04'00'
7

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  October 29, 2015