IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS | ) | Case No. 14-10979 (CSS) |
| CORP., et al., | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

## MEMORANDUM OPINION[1]

UMB Bank, N.A. ("UMB") is the Indenture Trustee for the unsecured 11.25%/12.25% Senior Toggle Notes Due 2018 (the "PIK Notes" and such holders the "PIK Noteholders"). Pursuant to an indenture dated December 5, 2012 (the "PIK Indenture"), Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. (the "EFIH Debtors" and, collectively with its affiliated debtors, the "Debtors") issued approximately $1.4 billion in aggregate principal amount of PIK Notes. The PIK Indenture provides for, among other things, the payment of post-petition interest on overdue principal at the contract rate. Pursuant to the PIK Indenture, UMB timely filed Proof of Claim No. 6347 with an accompanying addendum on behalf of the PIK Noteholders (the "PIK Claim"). The PIK Claim seeks a minimum of approximately $1.57

---

[1] This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bank. P. 7052, which is applicable to this matter by virtue of Fed. R. Bankr. P. 9014. The Court has subject matter jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 11 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The Court has the judicial power to enter a final order.

billion in principal "plus interest, fees and other amounts arising in connection with the

[PIK] Indenture . . ."[2]  The addendum to the PIK Claim states:

> This Master Proof of Claim makes claim to all amounts – whether
> liquidated or unliquidated – due under or relating to the [PIK Notes] or
> arising under the [PIK] Indenture on behalf of the Claimant and the [PIK]
> Noteholders, including, but not limited to, principal, ***premiums, the
> Applicable Premium, pre-payment penalties, make-whole premiums, call
> premiums, interest***, fees, costs, and expenses outstanding as of, and arising
> from and after, April 29, 2014. (emphasis added)

On July 9, 2015, the Debtors filed the EFIH Debtors' Partial Objection to Proof of

Claim No. 6347 Filed by the Indenture Trustee for the EFIH Unsecured Notes (the "Partial

Objection") in which the Debtors objected to the portion of UMB's claim seeking post-

petition interest and payment of a make-whole claim.  This memorandum opinion

addresses that portion of the Partial Objection relating to post-petition interest.  The Court

will render a separate decision related to the make-whole claim.

In the Partial Objection, the Debtors argue that, under section 502(b)(2) of the

Bankruptcy Code, UMB's claim for post-petition interest must be disallowed as

"unmatured interest."  At most, the Debtors argue, UMB's claim for post-petition interest

is limited under section 726(a)(5), made applicable by section 1129(a)(7)(A)(ii), to

"payment of interest at the legal rate," which the Debtors claim is the Federal judgment

rate.  UMB argues that it is entitled to post-petition interest at its contract rate as part the

PIK Claim.

---

[2] The PIK Claim was filed in the amount of $1,647,374,288.21 plus interest, fees, expenses and other amounts "arising in connection with the [PIK] Indenture (see addendum)." PIK Claim (attached as Exh. 1 to the PIK Claim Objection.  Based on the record in these proceedings it is the Court's understanding that there is approximately $1.57 billion in principal, $81 million in pre-petition accrued interest and $109,000 in pre-petition accrued fees and expenses owed under the PIK Notes.

The Debtors are correct that UMB's allowed claim cannot include post-petition interest, i.e., "unmatured interest," because to hold otherwise would violate the plain meaning of section 502(b)(2). Furthermore, sections 726(a)(5) and 1129(a)(7)(A)(ii) do not alter the allowed amount of UMB's claim. UMB's allowed unsecured claim is limited to the amount of principal and accrued fees and interest due under the unsecured notes "as of the date of the filing of the petition" and does not include any post-petition interest, regardless of whether such interest would be calculated at the contract rate, the Federal judgment rate or otherwise. *See In re W.R. Grace & Co.*, 475 B.R. 34, 159 (D. Del. 2012) (Section 502(b)(2) "prohibits the allowance of unmatured interest as part of an allowed unsecured claim. It is well-established that when a debtor files for bankruptcy, the accrual of interest on its loans is suspended, and any subsequent claims brought by unsecured creditors for the amount of this "unmatured interest" is prohibited under § 502(b) of the Bankruptcy Code.").

The parties' arguments, however, miss the mark. To say that UMB's allowed claim excludes post-petition interest is the beginning of the analysis not the end. As one court has noted, there is a distinction between the payment of interest ***on an allowed claim*** as opposed to ***as an allowed claim***. Ultimately, the Debtors must confirm a plan of reorganization. The provisions governing confirmation will determine what the holders of claims must receive in order for the plan to be confirmed. In some instances the holders of unsecured claims such as the PIK Notes at issue here will be entitled to just the allowed amount of the claim excluding post-petition interest while in other instances the holders will be entitled to the allowed amount of the claim plus additional consideration, which

may include post-petition interest. The receipt of post-petition interest, thus, does not arise as part of the allowed amount of the claim but, rather, as a requirement of confirmation. That is a critical distinction. Section 502 defines the amount of the claim while section 1129 and its other related provisions govern confirmation of a plan. They are different sections of the Code with very different purposes. The claim itself does not change. What may change is what the holder of a claim is entitled to receive under a confirmed plan.

To illustrate this distinction, let's explore how this plays out.

Section 1123(a)(1) of the Code requires that a plan designate classes of claims. Under section 1123(a)(2) and (3) a plan must specify any class of claims that is impaired under the plan and the treatment of any impaired class of claims, respectively. Section 1123(b)(1) provides that a plan may impair or leave unimpaired any class of claims. Section 1124 provides that a "class of claims . . . is impaired under a plan unless, with respect to each claim  . . . of such class the treatment satisfies either subsection (1) or (2). Section 1124(1) provides that a class of claims is unimpaired if a plan "leaves unaltered the legal, equitable, and contractual rights to which such claim . . . entitles the holder of such claim" while section 1124(2) provides that a class of claims is unimpaired if the plan provides for the holder of such claim to receive what is generally referred to as reinstatement of the claim.

Section 1126 contains a number of provisions governing acceptance or rejection of a plan. More specifically, section 1126(a) provides that the holder of a claim may accept or reject a plan. Section 1126(c) provides that "a class of claims has accepted a plan if

such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . that have accepted or rejected such plan." Section 1126(f) provides that "a class that is not impaired under a plan, and each holder of a claim . . . of such class, are conclusively presumed to have accepted the plan." And, section 1126(g) provides that "a class is deemed not to have accepted a plan if such plan provides that the claims . . . of such class do not entitle the holders of such claims . . . to receive or retain any property under the plan on account of such claims."

Section 1129 governs confirmation of a plan. It creates a number of requirements for confirmation, including sections 1129(a)(7), (a)(8), (a)(10) and (b). Section 1129(a)(7) provides that in order for a plan to be confirmed, with respect to each impaired class, each holder of a claim that has not accepted the plan "will receive or retain under the plan on account of such claim . . . property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." This is known as the "best interest of creditors" test.

Section 1129(a)(8) requires that in order for a plan to be confirmed with respect to each class of claims such class has either accepted the plan or is not impaired under the plan.

Section 1129(b)(1) provides that a plan may be confirmed even if each impaired class has not accepted the plan "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims that is impaired under, and has not

accepted, the plan." This is, of course, known as cramdown. With respect to unsecured creditors, section 1129(b)(2)(B) provides that a plan is fair and equitable with respect to a class if "(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property."

Finally, section 1129(a)(10) provides that if a class of claims is impaired under the plan, it can only be confirmed if "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."

Thus, there a limited number of scenarios under which a plan can be confirmed and the consideration paid to the holder of an allowed unsecured claim in a class will vary from scenario to scenario.

A plan can provide that a class of claims is impaired or unimpaired. Looking first to impaired classes, a plan that impairs a class of unsecured claims can be confirmed a number of ways.

An impaired class can vote to accept a plan. Creditors are free to agree to virtually any treatment of claims in a class by voting, as a class, to accept a plan. This would include a plan that pays holders of unsecured claims in the class any unpaid principal and accrued fees and interest owed as of the petition date but excluding post-petition interest.

But there is a caveat.  Under the best interests of creditors test, the holder of an impaired claim that votes to reject a plan (even if the class votes to accept the plan) must "receive or retain under the plan on account of such claim . . .  property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." Section 726 of the Code governs the distribution of property of the estate to the holders of claims in Chapter 7 cases.  Under section 726, property is distributed in a waterfall until the estate is depleted.  If holders of claims under the first priority are paid in full then the holders of claims under the second priority receive a distribution, etc.  If the holders of claims under a priority are not paid in full, holders of claims under lower priorities do not receive a distribution.  Under section 726(a)(2), the second priority of distribution is for "payment of any allowed unsecured claim."  Under section 726(a)(5), the fifth priority of distribution includes "payment of interest at the legal rate from the date of the filing of the petition" on any allowed unsecured claim paid under the second priority.

This is significant for two reasons.   First, section 726(a)(2) governs payment of allowed unsecured claims and 726(a)(5) provides for the payment of post-petition interest on allowed unsecured claims.  The distinction in section 726(a)(2) and (a)(5) between the allowed amount of the claim and post-petition interest on the allowed claim, respectively, supports the plain meaning interpretation of section 502(b)(2), i.e., an allowed unsecured claim cannot include post-petition interest.  Otherwise, the distinction between payment under the 2nd and 5th priorities of the allowed claim and interest on the allowed claim,

respectively, would be meaningless. Second, and nonetheless, in order to satisfy section 1129(a)(7), which is necessary to confirm a plan where the holder of a claim in an impaired class has voted to reject the plan, the holder of an allowed claim in the class must receive payment of its allowed claim plus post-petition interest at the legal rate, if and only if, the holder of that claim would receive payment under the 5th priority of distribution under section 726(a) in a hypothetical Chapter 7 liquidation of the debtor's estate. The inquiry is not into the value of the property of the estate and the distributions under the plan before the court but, rather, what would occur in the hypothetical scenario of a Chapter 7 liquidation of the debtor. The point is that nothing in sections 1129(a)(7) nor 726(a) alters the allowed amount of the unsecured claim, which excludes unmatured, i.e., post-petition, interest. Neither do these sections either singularly or in tandem serve to create a universal limitation on the payment of post-petition interest on unsecured debt. Rather, they merely provide that in a certain scenario, in order for a plan to be confirmed, the holders of claims in a class must receive payment in full of the allowed amount of the claim, i.e., unpaid principal and accrued fees and interest due at the petition date, plus the additional consideration of post-petition interest on the claim at the legal rate - however defined.

So, what is the legal rate of interest? This Court adopts that portion of Judge Walrath's ruling in *In re Washington Mutual, Inc.,* 461 B.R. 200 (Bankr. D. Del. 2011) in which she held that the legal rate of interest under sections 726(a) and 1129(a)(7) is the Federal judgment rate.

Now that all issues have been presented to the Court, the Court concludes that the better view is that the federal judgment rate is the appropriate rate to be applied under section 726(a)(5), rather than the contract rate. The Court's conclusion is supported by many factors.

First, section 726(a)(5) states that interest on unsecured claims shall be paid at "the legal rate" as opposed to "a" legal rate or the contract rate. As the LTW Holders note, where Congress intended that the contract rate of interest apply, it so stated.

Second, the payment of post-judgment interest is procedural by nature and dictated by federal law rather than state law, further supporting use of the federal judgment rate.

Third, the use of the federal judgment rate promotes two important bankruptcy goals: "fairness among creditors and administrative efficiency."

*Id.* at 242-43 (citations omitted). *See also In re Dow Corning Corp.* ("*Dow I*"), 237 B.R. 380, 412 (Bankr. E.D. Mich. 1999) ("the Court concludes that, within the context of § 726(a)(5), 'interest at the legal rate' means the federal judgment rate.").

An impaired class can also vote to reject a plan.  As a preliminary matter, section 1129(a)(7) also applies if a class votes to reject a plan.  So, in order for the plan to be confirmed, the holder of an allowed claim in the class must receive payment of its allowed claim plus post-petition interest at the Federal judgement rate, if and only if, the holder of that claim would receive payment under the 5th priority of distribution under section 726(a) in a hypothetical Chapter 7 liquidation of the debtor's estate

Regardless of the application of the best interest of creditors test, under section 1129(a)(8), all impaired classes must vote to accept the plan for it to be confirmed. Notwithstanding that provision, under section 1129(b)(1), a plan may be crammed down on a rejecting impaired class and confirmed "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims that is impaired under, and

has not accepted, the plan." As stated earlier, with respect to unsecured creditors, section 1129(b)(2)(B) provides that a plan is fair and equitable with respect to a class if "(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." Importantly, section 1129(b)(2)(B) is written in the disjunctive and satisfaction of either prong is sufficient to cram down the plan on the rejecting class.

Assume that a plan provides that holders of claims in the unsecured class receive payment on the effective date in cash in the amount of any unpaid principal and accrued fees and interest owed as of the petition date but excluding post-petition interest and that no claims or interests junior to the unsecured class receive any distribution. The plan can be crammed down on the rejecting unsecured class under section 1129(b)(2)(B)(ii) because "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property."

Now assume that a plan provides that holders of claims in the unsecured class receive payment on the effective date in cash in the amount of any unpaid principal and accrued fees and interest owed as of the petition date but excluding post-petition interest and that one or more classes of claims or interests junior to the unsecured class receives a distribution. The plan cannot be crammed down on the rejecting unsecured class under

section 1129(b)(2)(B)(ii) because the holder of a junior claim or interest is receiving a distribution under the plan on account of such junior claim or interest.

That leaves section 1129(b)(2)(B)(i).  Under the plain meaning of the statute, the plan can be crammed down on the rejecting class even though junior claims or interests are receiving a distribution because each holder of an unsecured claim is receiving on account of such claim cash, as of the effective date of the plan, equal to the allowed amount of such claim, i.e., unpaid principal and accrued fees and interest owed as of the petition date, excluding unmatured, i.e., post-petition interest.

But there is a complication.  Section 1129(b)(2) actually provides that "[f]or purposes of this subsection, the condition that a plan be fair and equitable with respect to a class *includes*" the requirements of subsections (b)(2)(A) through (C).  UMB argues that the use of the words "includes" means that for a plan to be fair and equitable with respect to unsecured claims, the plan must satisfy *either* clause (i) or clause (ii) of section 1129(b)(2)(B), *plus* any other unenumerated requirements that may be applicable.  UMB goes on to argue that in the context of solvent debtor reorganizations, i.e., when equity holders are receiving a distribution, payment to unsecured creditors of post-petition interest at the contract rate is one of the additional requirements that must be satisfied for a plan to be fair and equitable.  In support of this proposition UMB cites to pre-Code and post-Code case law.

The Court disagrees with UMB's argument.  The use of the word "includes" in section 1129(b)(2) does not create a requirement that unsecured claims must receive post-petition interest at the contract rate in order to cramdown a plan on a class of unsecured

creditors that are receiving payment in full of their allowed claims under section 502(b) when a junior class is receiving a distribution.

First, as a textual matter, the word "includes" applies to all three types of claims and interests in section 1129(b)(2) – secured claims, unsecured claims and interests. As such, one would expect the unenumerated requirements under the fair and equitable test to apply to all three categories of claims and interest. But UMB does not argue that post-petition interest is required as an unenumerated requirement in all three cases. Nor could it. 1129(b)(2)(A) provides for the payment of allowed secured claims, which specifically includes post-petition interest at the contract rate; and post-petition interest is something that would never be applicable to interests under section 1129(b)(2)(C). What then are the unenumerated requirements for secured claims and interests? If the use of the word "includes" is important for unsecured creditors it must also be important for secured creditors and interests. But UMB does not specify what significance it holds for those other categories.

Second, UMB's reliance on pre-Code case law, which it argues has not been abrogated by adoption of the Bankruptcy Code, is inapposite. UMB relies on the Supreme Court's holding in *Consolidated Rock Products Co. v. Dubois*, 312 U.S. 510 (1941), stating that the court held that a plan of reorganization runs afoul of the absolute priority rule if equity holders receive value before bondholders are paid their full contract rate of interest. What UMB conveniently fails to note, however, is that the bondholders in *Consolidated Rock* were secured creditors. The treatment of unsecured claims was not

before the court because under the plan "the claims of general creditors will be paid in full or assumed by the new company." *Id*. at 515 n. 9.

Moreover, the holding in that case was codified in sections 506(b) and 1129(b)(2)(A), which in combination provide that in order for a plan to be fair and equitable to a class of secured creditors when a junior class is receiving a distribution the secured class must receive post-petition interest at the contract rate. Thus, UMB's argument that the holding in *Consolidated Rock* was not abrogated by passage of the Bankruptcy Code is incorrect. Importantly, however, the holding in *Consolidated Rock* was not incorporated in section 1129(b)(2)(B) governing the treatment of unsecured creditors. At most, *Consolidated Rock* stands for the proposition articulated by the Supreme Court in *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 165 (1946) that it is "manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtors." *But see In re Manchester Gas Storage, Inc.*, 309 B.R. 354, 385 (Bankr. N.D. Okla. 2004) ("The Court is not comfortable with the notion that the *Vanson* case gives permission to present-day bankruptcy courts bound by the bankruptcy Code to override section 502(b) of the Code by invoking equity . . . The concept that post-petition interest is a matter of the bankruptcy court's equitable jurisdiction has been superseded by statute.").

The only other pre-Code cases identified by UMB are *In re Realty Associates Security Corp.*, 163 F.2d 387 (2d Cir. 1947) and *Empire Trust Co. v. Equitable Office Building Corp.*, 167 F.2d 346 (2d Cir. 1948), which are cited for the proposition that contract rate is the

proper rate for calculation of post-petition interest.  But whether to use contract rate is not the issue.  The issue is whether *any* post-petition interest must be paid to unsecured creditors under the absolute priority rule and neither of those cases stand for that proposition.

Third, UMB's reliance on post-Code case law is not persuasive.  In making this argument UMB relies on the *Dow Corning* line of cases out of the Sixth Circuit,  specifically *In re Dow Corning Corp. ("Dow II")*, 244 B.R. 678 (Bankr. E.D. Mich. 1999); and *In re Dow Corning Corp. ("Dow III")*, 456 F.3d 668 (6th Cir. 2006). But those cases do not stand for the proposition that payment to unsecured creditors of post-petition interest at the contract rate when a junior class is receiving a distribution is required for a plan to be fair and equitable.  The court in *Dow II* went through an exhaustive and scholarly recitation of the origins of section 502(b)(2), 726(a) and 1129(b) of the Bankruptcy Code.   The court concluded that post-petition interest is not part of an allowed claim under section 502(b) and that the legal rate under section 726(a) is the Federal judgment rate but does not serve as a cap on post-petition interest that applies throughout the Code.  In addition, the court concluded that in applying the fair and equitable test under section 1129(b)(2) it has the discretion to exercise its equitable power to require, among other things, the payment of post-petition interest.  Specifically, the court held that "[t]he wide parameters associated with the fairness inquiry, in conjunction with the discretion which we are generally accorded in matters concerning post-petition interest, lead us to conclude that a plan which would pay the dissenting class [post-petition] interest at the minimum rate pursuant to sections 1129(a)(7)(ii)/726(a)(5) is *not necessarily* 'fair and equitable' for

purposes of section 1129(b)." *Dow II* at 695 (emphasis added).  The court then went on to determine, based on the evidence, whether the plan before it was, in fact, "fair and equitable."  The court found that, in its case, the plan proponents offered no persuasive evidence in support of paying less than the contract interest and that to do otherwise would not be fair and equitable.  Nonetheless, the unsecured creditors were not fully vindicated as the court declined to award default interest due under the contract.

For the next five years the parties litigated the validity of the claims that would be paid under the plan.  The bankruptcy court ultimately determined on summary judgment that it could not award default interest because there was no evidence that it would be fair and equitable to do so and because the debtor had not been in default on the date of the bankruptcy filing.  The unsecured creditors appealed and the district court affirmed the bankruptcy court's ruling on default interest.  The 6th Circuit reversed.  The court noted that where debtors are insolvent, bankruptcy courts have concluded that whether to award default interest under 1129(b) is determined on a case-by-case basis based on the facts and equities of each specific case. The court went on to note, however, that, "in solvent debtor cases, rather than considering equitable principles, courts have generally confided themselves to determining and enforcing whatever pre-petition rights a given creditor has against the debtor." *Dow III*, 456 F.3d at 679.  The court went on to state that "[w]hen a debtor is solvent, the presumption is that a bankruptcy court's role is merely to enforce the contractual rights of the parties, and the role that equitable principles play in the allocation of competing interest is significantly reduced." *Id*.  Note that the court stated that the role of equitable principles is reduced – not eliminated.  Thus, the 6th

Circuit held that, in solvent debtor cases, there is a presumption that the default interest rate should be awarded. Nonetheless, the court held that the record before it was not sufficiently developed for it to determine whether the general rule calling for the payment of default interest in solvent debtor cases, when considered with other equitable factors, made the award of default interest in the case appropriate. Thus, the court remanded the case to bankruptcy court for proceedings consistent with its decision "including the consideration of any equitable factors affecting the interest rate." *Id.* at 680.

The import of the use of the word "includes" in section 1129(b)(2) is less than clear. What is clear, however, is that UMB is overreaching in arguing that the term somehow requires that, when a junior class is receiving a distribution, unsecured claims must receive post-petition interest at the contract rate in order to cramdown a plan on a class of unsecured creditors that are receiving payment in full of their allowed claims under section 502(b). At most, it allows a court to weigh equitable considerations in deciding whether to award post-petition interest. Whether to invoke that equitable power here would require an evidentiary record that is not before the Court. But it is not necessarily the case that equitable considerations require the payment of post-petition interest to unsecured creditors any time equity holders are receiving a distribution. For example, in a case such as this, the ultimate equity holders of the enterprise are not receiving a distribution. Rather, the equity is held by another debtor entity in an integrated capital structure. To require the payment of post-petition interest in a case such as this would reduce the consideration available to pay other creditors of the enterprise not the ultimate equity holders. It is not clear to the Court that it would be equitable in this situation to

require the payment of post-petition interest.  Indeed, the court in *Dow II* specifically noted that inherent in the court's discretion in applying its equitable powers is the ability not to require the payment of post-petition interest, especially when "such payments may mean a *pro tanto* reduction in the payment of *principal* owed to lower-priority creditors." *Dow II*, 244 B.R. at 691.

In any event, this Court holds that the plain meaning of section 1129(b)(2) does ***not*** require payment to unsecured creditors of post-petition interest when a junior class is receiving a distribution for a plan to be fair and equitable.  Rather, the Court has the discretion to exercise its equitable power to require, among other things, the payment of post-petition interest.  The rate of interest may be the contract rate or such other rate as the Court deems appropriate.[3]  Exercise of the Court's discretion to award interest will vary on a case by case basis and must be based on an evidentiary record.  There is no hard and fast rule and the Court has the full authority to decline to exercise its discretion at all and leave the fair and equitable requirement to the elements specified in the statute, which provide for the payment of allowed claims that exclude the payment of unmatured, i.e., post-petition interest.

So where does that leave unsecured creditors where its class has voted to reject a plan that does not provide for the payment of post-petition interest?  Are they confined to a world where they will always be subject to cramdown and never receive post-petition

---

[3] The Court disagrees with the 6th Circuit's adoption of a presumption that interest should be awarded at a specific rate whether it be the contractual default rate or otherwise. *Dow III*, 456 F.3d at 679.  The Court sees no reason to create a presumption one way or the other.  Nor does the Court believe that its role in weighing equitable principles to determine an appropriate rate of interest is reduced in solvent debtor cases.

interest?  No. At the very least, section 1129(a)(7) might require that they receive post-petition interest at the Federal judgment rate.  In addition, the court might exercise its equitable power under the fair and equitable requirement of 1129(b)(2) to award post-petition interest at an appropriate rate, which might be at that provided in the contract. But the unsecured creditors also have the protection of section 1129(a)(10), which provides that if a class of claims is impaired under the plan, it can only be confirmed if "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."  Note that 1129(a)(10) requires acceptance by one class of claims – interests, i.e., equity, are excluded. Thus, a plan that fails to pay unsecured creditors post-petition interest at the contract rate will be unconfirmable unless a class of impaired creditors votes to accept the plan.  In most cases where unsecured claims are being paid the full amount of their allowed claims plus post-petition interest at the Federal judgment rate and equity holders are receiving a distribution the only impaired class will be the unsecured creditors and they will control their own destiny – their rejection of the plan that does not pay them at the contract rate will render the plan unconfirmable.  Only in the rare case where another class of impaired claims exists, such as a secured class, that has voted to accept the plan will the class of unsecured creditors be at risk of receiving, at most, post-petition interest at the Federal judgment rate.  So how does a debtor confirm a plan where, as here, it lacks the support of any of its creditors and avoid the problem of section 1129(a)(10)?  By unimpairing its creditors.  That leads to the question of whether a class of unsecured creditors must receive post-petition interest at the contract rate in order to be unimpaired.

18

As just noted, a plan can provide that a class of claims is not impaired under the plan, which under section 1124(1) would mean that the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim . . . entitles the holder of such claim." A plan can also leave a class of creditors unimpaired by reinstating the claims under section 1124(2) but that is not relevant here. The proposed plan in this case purports to leave the PIK Noteholders unimpaired under section 1124(1). More specifically, the plan provides that each holder of general unsecured claims against the EFIH Debtors, which includes the PIK Noteholders, will receive "up to the Allowed amount of its Claim, payment in full in Cash or other treatment rendering such Claim unimpaired." The plan further provides that Allowed Claims will include accrued principal, fees and interest due as of the petition date plus "accrued postpetition interest at the Federal Judgment Rate." UMB argues that in addition to the payment of the principal, fees and interest due as of the petition date the PIK Noteholders' treatment under the plan must include the payment in cash of post-petition interest at the contract rate (rather than the Federal judgment rate) that has accrued as of the effective date of the plan in order for its class to be unimpaired.

The Third Circuit described impairment in *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197, 202-203 (3d Cir. 2003) ("*PPI II*").

"Impairment" is a term of art crafted by Congress to determine a creditor's standing in the confirmation phase of bankruptcy plans. Each creditor has a set of legal, equitable, and contractual rights that may or may not be affected by bankruptcy. If the debtor's Chapter 11 reorganization plan does not leave the creditor's rights entirely "unaltered," the creditor's claim will be labeled as impaired under section 1124(1) of the Bankruptcy Code. If the creditor's claim is impaired, the Code provides the creditor with a vote that,

depending on the value of the creditor's claim, may be sufficient to defeat confirmation of the bankruptcy plan.

The Bankruptcy Code creates a presumption of impairment "so as to enable a creditor to vote on acceptance of the plan." Under section 1124(1), the presumption of impairment is overcome only if the plan "leaves unaltered the [creditor's] legal, equitable, and contractual rights." The burden is placed on the debtor to demonstrate the plan leaves the creditor's rights unaltered.

Under section 502(b), the PIK Claim does not include post-petition interest. The question is whether a plan that does not provide for the payment of post-petition interest at the contract rate "leaves unaltered the legal, equitable, and contractual rights to which such claim . . . entitles the holder of such claim." As UMB argues in its sur-reply, "[i]f the Plan does not leave 'unaltered the . . . contractual rights,' then the PIK Noteholders are impaired. Because anything short of the contract rate would alter their contractual rights, *a fortiori* the PIK Noteholders must receive postpetition interest **at the contract rate** in order to be treated as unimpaired under the Plan." D.I. 6303, Exh. A at 3 (emphasis in original). But it is not that simple.

Prior to 1994, section 1124 provided that "a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan . . . (3) provides that, on the effective date of the plan, the holder of such claim or interest receives, on account of such claim or interest, cash equal to (A) with respect to a claim, the allowed amount of such claim." Because under section 502(b)(2) allowed unsecured claims do not include post-petition interest, under the plain meaning of section 1124(3)(A), a debtor could render an unsecured class unimpaired by paying the allowed claim in full without post-petition interest even if the debtor was solvent and providing

a distribution to a junior class. Indeed, the New Jersey bankruptcy court so held in *In re New Valley Corp.*, 168 B.R. 73 (Bankr. D.N.J. 1994). As described by Judge Walsh, "the result in *New Valley* stood in contrast with a line of cases holding that where a debtor is solvent, unsecured creditors must be paid in full, including postpetition interest, pursuant to the 'fair and equitable' test of section 1129(b)(2) when the debtor is cramming down that creditor's claim. Thus, solvent debtors could avoid paying 'unimpaired' unsecured creditors postpetition interest by paying them in full in cash, yet the same solvent debtor would be required to pay postpetition interest to an 'impaired' dissenting class of unsecured creditors." *In re PPI Enterprises (U.S.), Inc.*, 228 B.R. 339, 351 (Bankr. D. Del. 1998) ("*PPI I*"). While this Court disagrees that there is a requirement to pay post-petition interest in a solvent debtor case, there was certainly the potential for an inconsistent result.

Congress agreed and, in 1994, removed section 1124(3) from the Bankruptcy Code. The legislative history makes clear Congress's intent.

> [t]he principal change in this section ... relates to the award of postpetition interest. In a recent Bankruptcy Court decision in *New Valley*, unsecured creditors were denied the right to receive postpetition interest on their allowed claims even though the debtor was liquidation and reorganization solvent. The *New Valley* decision applied section 1124(3) of the Bankruptcy Code literally by asserting, in a decision granting a declaratory judgment, that a class that is paid the allowed amount of its claims in cash on the effective date of a plan is unimpaired under section 1124(3), therefore is not entitled to vote, and is not entitled to receive postpetition interest. The Court left open whether the good faith plan proposal requirement of section 1129(a)(3) would require the payment of or provision for postpetition interest. In order to preclude this unfair result in the future, the Committee finds it appropriate to delete section 1124(3) from the Bankruptcy Code.

H.R.Rep. No. 835, § 214 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340.

Judge Walsh summarized the effect of the deletion of section 1124(3) and the interplay with section 1124(1) as follows:

> Section 1124(3) created nonimpairment status by a cash payment equal to the allowed amount of the claim but without postpetition interest. Such treatment could not qualify for nonimpairment under § 1124(1) because the failure to pay postpetition interest does not leave unaltered the contractual or legal rights of the claim. If, in a nonbankruptcy context, the creditor would be entitled to interest on its claim to the date of payment, then in a bankruptcy context the claim is altered absent the interest payment. Section 1124(3) may be viewed as an exception to the test set forth in § 1124(1). Congress, of course, deleted the section for the reason discussed above. *Now the holder of a claim can only be deemed unimpaired if the cash payment is both equal to the claim and includes postpetition interest.*
>
> *PPI I,* 228 B.R. at 352-53 (emphasis added).

The Third Circuit specifically endorsed this view. *PPI II,* 324 F.3d at 207.

But that is not the end of the analysis. The Court must address the issue of statutory impairment versus plan impairment.

The issue in *PPI* was whether a landlord's lease rejection claim was impaired by the statutory cap on the claim under section 502(b)(6) of the Code. The plan in *PPI* purported to treat the landlord as unimpaired by paying him the entire amount of his section 502(b)(6) capped rent claim, plus pre- and post-petition interest. The landlord argued that the failure to pay him the full amount of his claim under state law for breach of his lease as opposed to the allowed amount of his claim capped under section 502(b)(6) altered "the legal, equitable, and contractual rights to which such claim . . . entitles the holder of such claim" and, thus, his claim was impaired. Judge Walsh, however, disagreed, finding that the landlord was confusing "two distinct concepts: (i) plan impairment, under which the debtor alters the 'legal, equitable, and contractual rights to

which [their] claim entitles the holder of such claim,' and (ii) statutory impairment, under

which the operation of a provision of the Code alters the amount that the creditor is

entitled to under nonbankruptcy law." *PPI I*, 228 B.R. at 353.   Judge Walsh went on to

state:

> By its very language, § 1124(1) embodies this distinction. It requires the plan
> to leave unaltered those rights to which the creditor's "claim or interest
> ***entitles*** the holder of such claim or interest." § 1124(1) (emphasis added).
> Note that the quoted provision does not say "entitles the holder under
> nonbankruptcy law"; it includes bankruptcy law and in this case § 502(b)(6)
> determines that entitlement. Thus, it is not PPI's Plan which proposes to
> alter [the landlord's] rent claim; PPI's Plan provides for payment in full of
> the capped rent claim plus interest. Instead, it is the operation of the Code
> itself that has altered the $4.7 million amount owed by PPI [under state
> law]. That $4.7 million is not a right of payment to which [the landlord] is
> entitled to as a result of his bankruptcy claim.

> *Id.* (emphasis in original).

As the plan was to pay the landlord exactly what he was entitled to receive, subject to the

cap on the claim under section 502(b)(6), Judge Walsh found that the plan did not alter

the landlord's rights and his claim was not impaired.

The Third Circuit affirmed Judge Walsh's ruling.  Adopting the analysis of *In re

American Solar King Corp.*, 90 B.R. 808 (Bankr. W.D. Tex. 1988), upon which Judge Walsh

also relied, the court held:

> The relevant impairment language requires bankruptcy plans to leave
> unaltered those rights to which the creditor's "claim or interest entitles the
> holder of such claim or interest." This language in section 1124(1) does not
> address a creditor's claim "under nonbankruptcy law."   The use of a
> present-tense verb suggests a creditor's rights must be ascertained with
> regard to applicable statutes, including the section 502(b)(6) cap.  In other
> words, a creditor's claim outside of bankruptcy is not the relevant
> barometer for impairment; we must examine whether the plan itself is a
> source of limitation on a creditor's legal, equitable, or contractual rights.

*PPI II*, 324 F.3d at 204.

The court then went on to conclude:

> In sum, [PPI's plan] intends to pay [the landlord] his "legal entitlement" and provide him with "full and complete satisfaction" of his claim on the date the Plan becomes effective. [The landlord] is only "entitled" to his rights under the Bankruptcy Code, including the section 502(b)(6) cap. [The landlord] might have received considerably more if he had recovered on his leasehold claims before [PPI] filed for bankruptcy. But once [PPI] filed for Chapter 11 protection, that hypothetical recovery became irrelevant. [The landlord] is only entitled to his "legal, equitable, and contractual rights," as they now exist. Because the Bankruptcy Code, not the Plan, is the only source of limitation on those rights here, [the landlord's] claim is not impaired under section 1124(1).

*Id.* at 205.[4]

But if the limit on rejection damages under section 502(b)(6) is statutory impairment not plan impairment then what about the exclusion of unmatured, i.e., post-petition, interest on unsecured claims under section 502(b)(2)? The same analysis should apply. *See W.R. Grace*, 475 B.R. at 161 ("It is unlikely that the Third Circuit meant to sift the statutory grains of sand here so finely – if it found no impairment on the basis of application of subsection (b)(6) to a creditor's claim, then it stands to reason that there likewise would be no impairment from the application of subsection (b)(2)."). Indeed,

---

[4] One could argue that section 1124(1)'s reference to "claim," which is defined in section 101(5) as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured," is broader than "allowed claim" under section 502(b) and, thus, any limitation on allowance is irrelevant for purposes of determining whether a claim is impaired under section 1124(1). Indeed, this was the landlord's argument in *PPI*. Judge Walsh, however, specifically rejected that argument in *PPI I*, 228 B.R. at 353, which the Third Circuit endorsed in *PPI II*, 324 F.3d at 204. *See also In re Smith*, 123 B.R. 863, 867 (Bankr. C.D. Cal. 1991) ("[A] plan may limit payment of claims to `the extent allowed,' without impairing them; for until claims are allowed, or deemed allowed, the holders thereof are not entitled to distribution from the bankruptcy estate.").

one can easily replace the reference to section 502(b)(6) in the Third Circuit's conclusory

paragraph.

> In sum, [the Debtors' plan] intends to pay [the PIK Noteholders their] "legal entitlement" and provide [them] with "full and complete satisfaction" of [their] claim on the date the Plan becomes effective. [The PIK Noteholders are] only "entitled" to [their] rights under the Bankruptcy Code, including the [the exclusion of unmatured interest under section 502(b)(2)]. [The PIK Noteholders] might have received considerably more if [they] had recovered on [their] claims [under the PIK Notes] before [the Debtors] filed for bankruptcy. But once [the Debtors] filed for Chapter 11 protection, that hypothetical recovery became irrelevant. [The PIK Noteholders are] only entitled to [their] "legal, equitable, and contractual rights," as they now exist. Because the Bankruptcy Code, not the Plan, is the only source of limitation on those rights here, [the PIK Noteholders' claim is] not impaired under section 1124(1).

A finding that the exclusion of post-petition interest at the contract rate on the PIK

Noteholders' claims under the plan in this case is a result of the statute, i.e., section

502(b)(2), and not the plan and, thus, the plan does not impair their claim is the logical

and, indeed, unavoidable extension of the holding in both *PPI* cases that the limit on

rejection damages under section 502(b)(6) is statutory impairment not plan impairment.

Such a ruling, however, appears to create an irreconcilable conflict with the findings in

both *PPI* cases that the holder of an unsecured claim against a solvent debtor can only be

deemed unimpaired if the cash payment is both equal to the claim and includes post-

petition interest. *See PPI I*, 228 B.R. at 353; and *PPI II*, 324 F.3d at 207. Indeed, Judge

Walsh specifically found that the plan in *PPI* did not impair the landlord's claim because

he was to receive pre- and post-petition interest. *PPI I, 228 B.R. at 354.*

The conflict is resolved by returning to the text of section 1124(1), which provides

that a class is unimpaired if the plan does not alter "the legal, *equitable*, and contractual

rights to which such claim . . . entitles the holder of such claim." (emphasis added) Section 502(b)(2), like 502(b)(6), has altered by statute the terms of the parties' contract. The contractual right to post-petition interest has been trumped by the Bankruptcy Code. Nor is there a legal right to post-petition interest because no other provision of the Bankruptcy Code providing for payment of such interest, such as section 1129(a)(7), is applicable. But what of the claimant's equitable rights?

Although *Consolidated Rock* and *Vanston* are not directly applicable, allowing for the award of post-petition interest on an allowed claim to unimpaired unsecured creditors in a solvent debtor case as a matter of equity is consistent with the spirit and principles behind the Supreme Court's decisions.[5] It also resolves a conflict between the holdings in the *PPI* cases and the legislative history behind Congress's deletion of section 1124(3) in which Congress clearly expressed its disagreement with the decision in *New Valley* that a debtor could render an unsecured class unimpaired by paying the allowed claim in full without post-petition interest even if the debtor was solvent and providing a distribution to a junior class. To strictly apply the reasoning of the *PPI* cases as to statutory impairment to the facts of this case would result in exactly the same result that led Congress to delete section 1124(3) from the Bankruptcy Code.

Such a strict holding would also create a conflict between the treatment of impaired and unimpaired creditors in solvent reorganization cases such that unimpaired

---

[5] *See Vanston*, 329 U.S. at 165 (it is "manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtors.").

creditors might receive *inferior* treatment than that accorded impaired creditors.  Recall that, under the fair and equitable requirement of section 1129(b)(2), the court has the equitable power to award post-petition interest to impaired unsecured creditors when a junior class is receiving a distribution.  Granting unimpaired creditors the equitable right to seek post-petition interest puts them on the same footing as impaired creditors under the fair and equitable test.

Nonetheless, impaired creditors are potentially in a better position than unimpaired creditors in at least one instance.  Separate from the application of equitable principles, impaired creditors have the protection of section 1129(a)(7) that might require such impaired creditors to receive post-petition interest at the Federal judgment rate.  But neither sections 1129(b) nor 1129(a)(7) apply to unimpaired creditors.[6]

In the end, the only way to reconcile the Third Circuit's decision in *PPI II* is to hold that the plan in this case need not provide for the payment in cash on the effective date of post-petition interest at the contract rate in order for the PIK Noteholders to be unimpaired.  Indeed, the plan need not provide for any payment of interest at all, even at the Federal judgement rate, as what would be the basis for the payment of post-petition interest other than the contract?  But the plan must allow for the PIK Noteholders to be awarded post-petition interest at an appropriate rate under equitable principles.  In effect,

---

[6] While the plan need not pay the PIK Noteholders any post-petition interest for the class to be unimpaired that is not to say it can't.  The discussion here has focused on the minimum required.  There is nothing to keep a plan from paying such interest at any rate, including at the Federal judgment rate.  Indeed, this plan so provides.  As such, it moots any argument that as unimpaired creditors the PIK Noteholders are being deprived of the benefit they would receive under section 1129(a)(7) as impaired creditors.  Were section 1129(a)(7) applicable, the PIK Noteholders would be entitled under that section to receive, at most, post-petition interest at the Federal judgment rate, which is what they are receiving under the plan.

the Court holds that the fair and equitable test as applied to unsecured creditors in solvent debtor cases, *see* p. 17, *supra*, must also be met in solvent debtor cases for such creditors to be unimpaired.  As with the fair and equitable test, the rate of interest may be the contract rate or such other rate as the Court deems appropriate.[7]  Whether such interest would be awarded and at what rate in this case cannot be determined at this time, but the Court has already noted that it is less than clear that an award of post-petition interest under the facts of this case would be equitable.

Thus, the Court will sustain the Debtors' Partial Objection to UMB's claim.  The PIK Claim is limited to the principal and accrued fees and interest due as of the petition date and excludes unmatured, i.e., post-petition interest.  The Court further finds that the legal rate of interest under section 726(a) is the Federal judgment rate but the applicability of section 726(a) is limited to its incorporation in section 1129(a)(7) and does not create a general rule establishing the appropriate rate of post-petition interest.  Moreover, the plain meaning of section 1129(b)(2) does not require payment to unsecured creditors of post-petition interest when a junior class is receiving a distribution for a plan to be fair and equitable.  Rather, the Court has the discretion to exercise its equitable power to require, among other things, the payment of post-petition interest, which may be at the contract rate or such other rate as the Court deems appropriate.  Finally, the plan in this

---

[7] *See W.R. Grace*, 475 B.R. at 164 ("Therefore, [*PPI II*] at most stands for the proposition that a claim must receive *some* form of post-petition interest in a *solvent* debtor case to qualify as unimpaired . . . [it] does not stand for the proposition that unsecured creditors must receive post-petition interest at the contractual default rate in order to render their claims unimpaired. Rather, [*PPP II*] can at most be applied here to require the [unsecured creditors] to receive some form of post-petition interest, regardless of whether or not that interest is at the contractual rate of interest.") (emphasis in original).

case need not provide for the payment in cash on the effective date of post-petition interest at the contract rate for the PIK Noteholders to be unimpaired.  Indeed, the plan need not provide for any payment of interest, even at the Federal judgement rate.  But in order for the PIK Noteholders to be unimpaired the plan must provide that the Court may award post-petition interest at an appropriate rate if it determines to do so under its equitable power.

   An order will be issued.

BY THE COURT:

_____
Christopher S. Sontchi
United States Bankruptcy Court

Dated: October 30, 2015