**Exhibit 2**

[Williamson's Deposition Cites]

## SELECT CITES TO DEPOSITION TRANSCRIPT OF BILLIE WILLIAMSON

| **Brief Cite** | **Quote/ Proposition in the Brief** | **Complete Cite(s)** | **Full/Rebuttal/Clarified Cites** |
|---|---|---|---|
| Williamson I Depo. Tr. 46:11-20 | ¶25 "This "guiding light" yielded an unwillingness to commence litigation or pursue a plan of reorganization unless it delivers a global settlement." | Williamson I Depo. Tr. 46:11-20, Williamson II Depo Tr. II 48:6-16, Williamson II Depo Tr. 46:11-47:19 | "Q. So at any point did you consider, prior to entering into the PSA, as plan of reorganization that would be a plan for only EFH, as opposed to a joint plan for all the debtors?<br><br>A. There's some significant tax ramifications to doing that. And I think there are some legal issues to doing that. So throughout the case we have considered a total restructuring of the entire situation."<br><br>*See* Depo II 48:6-16:<br><br>"Well, that -- as I mentioned earlier, that wasn't the first place -- we weren't afraid to go to litigation, if that's where it ended up, and if the settlement negotiations were not successful, but we did not feel that we wanted to go ahead and file lawsuits and that sort of thing at the current time, without at least taking a shot at seeing if we could resolve this in a more amicable and collaborative way."<br><br>Also Depo II 46:11-47:19 (portions excerpted below):<br><br>"Mr. Evans and I both have long business careers and have experience with a variety of different kinds of transactions, both those that are controversial or other types of transactions that are consensual.<br>…<br>So when Don and I talked about it and we went |

| Brief Cite | Quote/ Proposition in the Brief | Complete Cite(s) | Full/Rebuttal/Clarified Cites |
|---|---|---|---|
| | | | through the claims, we consulted with Proskauer, who was our disinterested director advisor, as well as we consulted with the co-restructuring officers, and that sort of thing, and we reached the decision that we wanted to take a run at trying to get to a settlement that would be faster and more cost-effective than going through a prolonged litigation process." |
| Williamson II Depo. Tr. 17:19-18:8 | ¶59. "Plan negotiations also excluded E-side creditors and the EFH Committee, despite their rights under the bidding procedures." | Williamson II Depo. Tr. 17:19-18:8, Williamson I Depo Tr. 23:20-24:17, Williamson Depo II Tr. 22:15-23:3 | "Q. In connection with that plan, did you have any discussions with respect to the EFH official committee with respect to the terms of that plan prior to its approval?

A. Can you tell me who is -- who you are -- the individuals you are referring to so I make sure I answer that correctly, please.

Q: It would have been either yourself, either the principals on the EFH official creditors committee or their advisors at Sullivan & Cromwell.

A. I don't believe so."

*See* Depo I 23:20-24:17:

"Q. At any point before entering into the PSA, did you have any discussions with EFH creditors about the terms of the PSA?

A. I certainly did. We met and have had ongoing conversations with individuals throughout the pendency of the bankruptcy. I met with Fidelity, Chairman Evans, along with our attorneys. And then we had various phone conversations on the |

| Brief Cite | Quote/ Proposition in the Brief | Complete Cite(s) | Full/Rebuttal/Clarified Cites |
|---|---|---|---|
| | | | various topics or comfort in the Plan Support Agreement. We had various phone conversations with other E side creditors. And then our advisors. So both the attorneys that representing EFH, which is Kirkland & Ellis, as well as the disinterested director counsels have had numerous conversations along with our financial advisors. And the financial advisors for EFH as well as the financial advisors for the disinterested director of EFH They had had numerous conversations with various representatives of the EFH creditors as well as the other E side creditors."<br><br>Also Depo II 22:15-23:3:<br><br>"I didn't have those conversations, but our attorneys did. So there was a substantial amount of meetings that occurred between all of the legal advisors and the financial advisors for all of the different parties and that sort of thing, and there was a lot of work that had been done on the various claims, and there was, you know, discussion related to some of those claims, as I understand it, and that type of thing.<br>So it is not like we didn't have the input from various parties." |
| Williamson II Depo. Tr. 16:18-17:13 | ¶65. "Instead, the Conflicted Insiders conducted the negotiations jointly on behalf of all of the Debtors." | Williamson II Depo. Tr. 16:18-17:13, Williamson Depo II Tr. 15:24-16:10 | "Q. I think you said that the plan negotiation process was conducted under the direction of the co-chief restructuring officers; is that correct?<br><br>"A. Yes.<br><br>Q. With respect to the settlement agreement, that was approved on August 9 by the board as well, |

3

| Brief Cite | Quote/ Proposition in the Brief | Complete Cite(s) | Full/Rebuttal/Clarified Cites |
|---|---|---|---|
| | | | correct?

A. Yes.

Q. With respect to the settlement agreement document itself, was the negotiation process for that document any different than it was with respect to the plan?

A. No.

Q. So the settlement agreement as with the plan was negotiated with the counterparties under the direction of the co-chief restructuring officers?

A. Yes."

*See* Depo II 15:24-16:10:

"There were a lot of people that were involved in the negotiation of those -- of the plan.    It was under the direction of our co-restructuring officers, Ms. Doré and Mr. Keglevic, and then the advisors to EFH, which was Kirkland & Ellis and Evercore, and then of course the disinterested director legal advisors and financial advisors for all three estates, and -- that's a pretty good number of folks." |
| Williamson II Depo. Tr. 48:2-49:10; 282:2-5 | ¶68. "No steps were taken to prepare for litigation: no claim-by-claim litigation budget was created nor requested; no litigation plan was prepared; no consideration was given to commencing litigation to resolve any of the large but spurious claims; and no consideration was | Williamson II Depo. Tr. 48:2-49:10, Williamson II Depo Tr. 282:2-5, Williamson II | "Q. Did you at any point in time consider commencing litigation prior to engaging in settlement with respect to any of the intercompany claims?

A. Well, that -- as I mentioned earlier, that wasn't |

4

| Brief Cite | Quote/ Proposition in the Brief | Complete Cite(s) | Full/Rebuttal/Clarified Cites |
|---|---|---|---|
| | given to resolving some but not all of the intersilo claims that would be settled pursuant to the Intersilo Settlement." | Depo Tr. 54:6-14, Williamson II Depo Tr. 65:15-21 | the first place -- we weren't afraid to go to litigation, if that's where it ended up, and if the settlement negotiations were not successful, but we did not feel that we wanted to go ahead and file lawsuits and that sort of thing at the current time, without at least taking a shot at seeing if we could resolve this in a more amicable and collaborative way.<br><br>Q. At any point during the negotiation process, did you and Mr. Evans on behalf of EFH consider settling some but not all of the intercompany claims?<br><br>A. No.<br><br>Q. Have you ever seen a litigation plan that includes the costs of litigation on a claim-by-claim basis for the intercompany claims?<br><br>A. A detailed litigation plan? No.<br><br>"Q. Have you seen an analysis on a claim-by-claim basis of how much it would have cost the EFH estate to litigate those claims?<br><br>A. We consulted with our own attorneys on that to get a general idea. But we did not put together a detailed litigation plan."<br><br>Also Depo II 282:2-5:<br><br>"Q. To your knowledge, EFH Corp. never created a budget for what it would cost to litigate those claims, did it? |

5

Case 14-10979-CSS   Doc 6797-2   Filed 10/30/15   Page 7 of 11

| Brief Cite | Quote/ Proposition in the Brief | Complete Cite(s) | Full/Rebuttal/Clarified Cites |
|---|---|---|---|
| | | | A. Not a detailed budget, no." *See* also Depo II 54:6-14: "We considered each individual claim and the merits of that claim to determine which claims were riskier than other claims. We considered just our own business knowledge of those claims. We talked through each one of those claims. We talked with whoever was on the other side of those claims and that type of thing. We consulted with our legal advisors as well as our financial advisors. We weighed the cost of litigation and the delay to the bankruptcy as we went through that process." And Depo II 65:15-21: "The items that seemed higher in risk to us would be the intercompany tax claims, the preferential tax payment, the allocation of sponsor fees and shared service expenses, and the interest rate on the intercompany notes. And then certainly the LBO was a very large claim." |
| Williamson II Depo Tr. 54:6-19 | ¶69. "With a clear intention to do nothing but settle, the EFH Disinterested Directors purportedly relied on advice of EFH independent counsel regarding the merits of the underlying claims, but any such advice or analysis remains undisclosed due to privilege assertions." | Williamson II Depo Tr. 53:23-55:4 | "Well, the first thing that we considered was the gross amount of claims that had been alleged, and that was a number that was like 2 billion to 4 and a half billion. So the settlement as a percent of that was, was pretty reasonable in our viewpoint. We considered each individual claim and the |

6

| Brief Cite | Quote/ Proposition in the Brief | Complete Cite(s) | Full/Rebuttal/Clarified Cites |
|---|---|---|---|
| | | | merits of that claim to determine which claims were riskier than other claims. We considered just our own business knowledge of those claims. We talked through each one of those claims. We talked with whoever was on the other side of those claims and that type of thing.<br><br>We consulted with our legal advisors as well as our financial advisors. We weighed the cost of litigation and the delay to the bankruptcy as we went through that process.<br><br>And we also felt that it was important -- there had been a lot of, you know, threats thrown back and forth, and people arguing about various things and that sort of thing, and we really needed to get the whole process off of dead center. We needed to move forward with the bankruptcy and getting out of bankruptcy, and so that weighed into the settlement." |
| Williamson II Depo. Tr. 109:24-110:8 | ¶154. "The EFH directors and officers also failed to adequately inform themselves of the material changes between the agreement they reached in March and the Intersilo Settlement approved in August. The Disinterested Directors were not involved in negotiating those changes." | Williamson II Depo. Tr. 109:24-110:8, Williamson II Depo. Tr. 105:6-24 | "Q. Did you or anybody else, the EFH board, seek to insure the settlement agreement required a tax-free reorganization in an alternative restructuring?<br><br>A. I did not sit through all of the negotiations. But I believe that was discussed, argued over, and ultimately, the agreement is as it stands."<br><br>*See* Depo II 105:6-24:<br><br>"Q. At the time that the settlement agreement was approved in August, did the disinterested directors -- I'll start with at the time this was approved in August, did you and Mr. Evans revisit any of the |

| Brief Cite | Quote/ Proposition in the Brief | Complete Cite(s) | Full/Rebuttal/Clarified Cites |
|---|---|---|---|
| | | | other terms of the disinterested director settlement? <br><br> A. We certainly did. We had a meeting with Proskauer and with Solic. We went through all these documents, including the settlement agreement document. We talked about was there any reason that we should exercise our fiduciary out associated with the disinterested director settlement. We went through a variety of discussions, and we ultimately decided to approve the settlement agreement and the overall plan that we have entered into." |
| Williamson I Depo. Tr. 60:20-61:5 <br><br> *See also* <br> Williamson II Depo. Tr. 141:6-142:10. | ¶ 232. "As discussed below, the proposed Plan is not the pivotal event of these chapter 11 cases that it must be to be confirmed. The record is clear that the Plan is not justified by the E-side Debtors on its own merits, but exists primarily as a partial settlement payment to incent a subset of the Purchasers to forgo future litigation. At its heart, the purpose of the Merger Agreement, for the E-side Debtors, is not to sell Oncor, but to buy a settlement." | Williamson I Depo. Tr. 60:3-61:5, Williamson I Depo Tr. 141:6-142:10, Williamson I Depo. Tr. 21:17-24, Williamson I Depo Tr. 63:25-64:7. | "Well, I wouldn't use the term 'option,' per se. I think any merger transaction has different conditionality or options in it. And so this does not seem like a -- different than other merger option -- I mean merger agreements that I have been associated with. <br><br> And, you know, every one has clear choices in a merger agreement. The issue is what are the consequences of the choices that they make. <br><br> So there are many agreements or merger agreements that are subject to regulatory approval and various things like that. And so, you know, I think of option is a word that was used in the presentations made to the board, but I think it's about conditionality and optionality here. And so we have given some conditionality in the merger agreement. But in return what we have gotten is a potential for full payout on the E side. We have gotten the T side consensus, which is very |

8

| Brief Cite | Quote/ Proposition in the Brief | Complete Cite(s) | Full/Rebuttal/Clarified Cites |
|---|---|---|---|
| | | | valuable to us. We've gotten disarmament. And we have also gotten the opportunity to do an alternative restructuring if that merger should not close for whatever reason."<br><br>Q. And -- for whatever reason, the purchasers decide not to close the transaction, what remedies does EFH have against the purchasers?<br><br>MR. STARNER: Objection.<br><br>A. We do not have a remedy to purchase them to close. However, we think we have got something that is much more valuable through the other parts of the transaction we got. So disarmament, things like not having to fight over different things that are the claims, not having to litigate those claims, not having to spend precious value or cash on litigating those claims and the time associated with that. Plus we have the support of the T-side in terms of voting for alternative plans, and we believe we will be able to move forward very quickly, and we believe that that is extremely positive for the company.<br><br>So we kind of got paid up front. We got what we wanted up front, and I think that, again, that takes a lot of the controversy out of this bankruptcy, and it provides us with some decisions on things that we have been arguing about and having threatening discussions and all sorts of things -- and so I think it has been very positive."<br><br>*See* Depo I 21:17-24: |

9

| Brief Cite | Quote/ Proposition in the Brief | Complete Cite(s) | Full/Rebuttal/Clarified Cites |
|---|---|---|---|
| | | | "Well, in the year and a half since the bankruptcy began there have been different ideas floated, different plans that were considered and that sort of thing. But there was no plan that would have provided full payment on the E side and there was no plan that had the multi-creditor support that this one does." <br><br> Also Depo I 63:25-64:7: <br><br> "What was part of the analysis was the fact that we do not have any other plan or any other agreement or any other term sheet that will fully pay off the E side. And we did get many things that were very valuable to us as we have talked about. So -- and we received that upfront." |

10