**REDACTED**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

_____

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: D.I. 6122, 6647** |

_____

## REPLY OF THE TCEH COMMITTEE IN SUPPORT OF
## CONFIRMATION OF JOINT PLAN OF REORGANIZATION

ny-1209267

## TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ..................................................................................... 1

II.   BACKGROUND ..................................................................................................... 3

III.  REPLY ..................................................................................................................... 5

    A.    The Plan Satisfies the Mandatory Provisions Under Section 1123(a) .................. 5

        1.    The Plan Correctly Designates the E-Side Claims  as Unimpaired ........... 6

        2.    Separate Classification and Different Treatment of Claims Held in Classes C4, C5, and C6 Is Appropriate...................................................... 9

    B.    The Plan Includes Appropriate Permissive Provisions Under Section 1123(b)........................................................................................... 11

        1.    The Settlements Embodied in the Plan Should Be Approved ................. 12

        2.    The Plan Releases Should Be Approved ................................................. 14

    C.    The Plan Is Being Proposed In Good Faith ....................................................... 16

    D.    The Plan Is Feasible .......................................................................................... 18

    E.    The EFH Committee's Other "Kitchen Sink" Objections Lack Merit ............... 22

IV.   CONCLUSION...................................................................................................... 24

i

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

In the Matter of Abingdon Realty Corp.,
  530 F.2d 588 (4th Cir. 1976) ..................................................................................8

In the Matter of Sound Radio, Inc.,
  103 B.R. 521 (D.N.J. 1989) ....................................................................................19

In re Arrowmill Development Corp.,
  211 B.R. 497 (Bankr. D.N.J. 1997) ........................................................................16

In re Combustion Engineering, Inc.,
  391 F.3d 190 (3d Cir. 2004)....................................................................................17

In re Exide Technologies,
  303 B.R. 48 (Bankr. D. Del. 2003) .........................................................................11

In re The Flintkote Co.,
  No. 04-11300 (MFW), 2015 WL 4762580 (Bankr. D. Del. Aug. 12, 2015)...........17

In re Huckabee Auto Co.,
  33 B.R. 141 (Bankr. M.D. Ga. 1981)........................................................................8

In re Indianapolis Downs, LLC,
  486 B.R. 286 (Bankr. D. Del. 2013).............................................................16, 19, 20

In re Kaiser Aluminum Corp.,
  No. 02-10429 (JKF), 2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006), aff'd, 343 B.R.
  88 (D. Del. 2006) ...................................................................................................11

In re Master Mortgage Investment Fund, Inc.,
  168 B.R. 930 (Bankr. W.D. Mo. 1994).......................................................14, 15, 16

In re Mirant Corp.,
  No. 03-46590 DML, 2007 WL 1258932 (Bankr. N.D. Tex. Apr. 27, 2007)...........11

In re Smith,
  123 B.R. 863 (Bankr. C.D. Cal. 1991)...................................................................6, 7

In re Spansion, Inc.,
  426 B.R. 114 (Bankr. D. Del. 2010) .....................................................................14, 16

In re Tribune Co.,
  464 B.R. 126 (Bankr. D. Del. 2011) .......................................................................17

In re W.R. Grace & Co.,
   475 B.R. 34 (D. Del. 2012) ..................................................................................6

In re W.R. Grace & Co.,
   729 F.3d 332 (3d Cir. 2013) ...............................................................................17

In re Washington Mutual, Inc.,
   461 B.R. 200 (Bankr. D. Del. 2011) ....................................................................8

In re Zenith Electronics Corp.,
   241 B.R. 92 (Bankr. D. Del. 1999) ...........................................................14, 15, 16

Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.),
   843 F.2d 636 (2d Cir. 1988) ...............................................................................19

Myers v. Martin (In re Martin),
   91 F.3d 389 (3d Cir. 1996) .................................................................................12

Solow v. PPI Enterprises (U.S.), Inc. (In re PPI Enterprises (U.S.), Inc.),
   324 F.3d 197 (3d Cir. 2003) .............................................................................6, 7

United States v. Energy Resources Co., Inc.,
   495 U.S. 545 (1990) ...........................................................................................12

STATUTES

11 U.S.C. § 1103(c)(3) ................................................................................................24

11 U.S.C. § 1123(a) ................................................................................................5, 6

11 U.S.C. § 1123(b)(3)(A) .....................................................................................12, 14

11 U.S.C. § 1123(b)(6) ...............................................................................................11

11 U.S.C. § 1124 ..................................................................................................6, 7, 8

11 U.S.C. § 1129(a) .........................................................................................5, 16, 18

11 U.S.C. § 1129(b) ...............................................................................................11, 22

11 U.S.C. § 1129(c) ....................................................................................................23

OTHER AUTHORITIES

Fed. R. Bankr. P. 9019 ...........................................................................................12, 13

Fed. R. Civ. P. 62(d) ....................................................................................................8

iii

The Official Committee of Unsecured Creditors (the "**TCEH Committee**") of Energy Future Competitive Holdings Company LLC ("**EFCH**"), EFCH's direct subsidiary, Texas Competitive Electric Holdings Company LLC ("**TCEH**"), and their direct and indirect subsidiaries, and EFH Corporate Services Company, by and through its undersigned counsel, hereby files this reply (the "**Reply**") in support of the *Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 6122] as may be modified, amended or supplemented from time to time, the "**Plan**").[1]  In support of the Reply, the TCEH Committee relies on the declaration of Brett H. Miller submitted contemporaneously herewith (the "**Miller Declaration**") and respectfully states as follows:

## I.    PRELIMINARY STATEMENT

1.     The Plan represents the culmination of a highly complex and contentious 18-month long case, which provides the best—and at this point, the only—opportunity to pay all E-side creditors in full while providing potentially meaningful recoveries to T-side creditors.  The Plan is an example of the bankruptcy process working exactly as it should.  It is premised on a compromise among impaired creditors and debtors that will generate far greater recoveries than would have been provided to either T-side or E-side creditors through the plan contemplated under the Debtors' prepetition plan support agreement or a liquidation scenario.  It will also provide those recoveries much more quickly than would be possible if the claims that are being compromised were to be litigated.  Further, the Plan will enable the Reorganized Debtors to emerge from bankruptcy with strong balance sheets and healthy prospects for the future.  In recognition of these benefits, the Plan is overwhelmingly supported by impaired creditors, who

---

[1]     Capitalized terms not otherwise defined herein shall the meaning given to such terms in the Plan.

voted in the aggregate to approve the Plan by well over 90% in both number and amount. Indeed, every single impaired class has approved the Plan.

2.      Incongruously, the vast majority of parties objecting to the Plan are the unimpaired E-side creditors.  Those objections raise a litany of arguments, but nearly all of them boil down to one thing:  E-side creditors want even more.  The E-side creditors are not entitled to more, and their objections should be overruled.

3.      The E-side creditors' objections ignore reality.  The value being provided to creditors under the Plan has two primary sources: (i) the global settlement resolving inter-Debtor claims and claims against the TCEH First Lien Creditors and Prepetition Sponsors arising out of the Debtors' 2007 LBO; and (ii) the equity investment and REIT conversion, which are being led by a consortium of T-side unsecured creditors and outside investors.  Each of those components is the result of hard work and compromise on the part of creditors who, unlike the E-side creditors, are not being made whole.  Moreover, the circumstances surrounding the development of the proposed transactions can leave no doubt that they are being pursued in good faith.

4.      The global settlement was negotiated at arms' length with the assistance of a Court-appointed mediator.  The claims being resolved under the settlement are immensely complex and would have taken many years and tens of millions of dollars to litigate to conclusion while placing creditor recoveries at risk.  The plan support parties have already dedicated millions of dollars and thousands of hours to developing the Plan and papering the underlying transactions.  The investor consortium is fully committed to the transaction and highly motivated to close.  Further, the failure to close the transactions contemplated the under the Plan will leave T-side creditors locked into an alternative plan that provides a fraction of the recovery anticipated to be received by those creditors under the Plan.

2

5.    Critically, the ability of T-side creditors to receive value under the Plan is largely contingent on their first putting new value in.  Thus, the T-side is not taking anything from E-side creditors under the Plan.  To the contrary, the T-side creditors are <u>creating</u> value for all of the Debtors' the estates through the Plan, and the E-side creditors will be beneficiaries of that value even though they have done nothing to contribute to its creation.

6.    On the T-side, the primary unresolved objection is the PCRB Trustee's opposition to the omission of PCRB Claims from the beneficiaries of the TCEH First Lien Claims waiver.  The PCRB Claims are currently the subject of mediation, and the TCEH Committee is hopeful that a consensual resolution of the PCRB Trustee's objection can be reached prior to confirmation.

7.    For the reasons set forth herein, and as will be adduced through evidence presented at the confirmation hearing, the Plan is feasible, fair, and value maximizing, and provides the E-side creditors with everything to which they are entitled under the Bankruptcy Code.  Accordingly, the TCEH Committee respectfully requests that the Court overrule each of the objections and confirm the Plan.

## II.    BACKGROUND

8.    On August 10, 2015, the Debtors filed the *Motion of Energy Future Holdings Corp., et al., to Authorize the Debtors to Enter Into and Perform Under the Plan Support Agreement* [D.I. 5248] (the "**PSA Motion**"), seeking authority to enter into and perform under the Plan Support Agreement attached thereto as Exhibit 1 to Exhibit A (as amended, the "**PSA**"). The TCEH Committee is a party to the PSA.

9.    Also on August 10, 2015, the Debtors filed the M*otion of Energy Future Holdings Corp., et al., to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter into and Perform Under the Settlement Agreement* [D.I. 5249] (the "**Settlement Motion**"),

seeking authority to enter into and perform under the Settlement Agreement attached thereto as Exhibit 1 to Exhibit A (as amended, the "**Settlement Agreement**").  The TCEH Committee is a party to the Settlement Agreement.

10.     On September 18, 2015, the Court entered an order granting the PSA Motion [D.I. 6097].

11.     On September 21, 2015, the Debtors filed the Plan and the disclosure statement related to the Plan [D.I. 6124] (as modified, amended or supplemented from time to time, the "**Disclosure Statement**").

12.     On September 22, 2015, the Court entered an order approving the Disclosure Statement and authorizing the Debtors to solicit votes on the Plan [D.I. 6131].

13.     On October 20, 2015, the Debtors filed the Plan Supplement [D.I. 6544].

14.     On October 23, 2015, the Debtors filed the *Debtors' Memorandum of Law in Support of Confirmation of Joint Plan of Reorganization* [D.I. 6647] (the "**Debtors' MOL**").

15.     On or about October 23, 2015, the following parties (collectively, the "**Objecting Parties**") filed objections (collectively, the "**Objections**") to the Plan:  (i) TXU Railcar Leasing [D.I. 6576]; (ii) FLSmidth Inc. [D.I. 6580] (the "**FLSmidth Objection**"); (iii) Alcoa [D.I. 6582]; (iv) Bank of New York Mellon Trust Company ("**BNYM**") in its capacity as the EFCH 2037 Notes Trustee [D.I. 6585] (the "**EFCH 2037 Notes Trustee Objection**"); (v) Marathon Asset Management, LP [D.I. 6587]; (vi) Tex-La Electric Cooperative and the Rural Utilities Service [D.I. 6590]; (vii) Oracle America, Inc. [D.I. 6592]; (viii) Christopher Haecker as an individual holder of EFIH First Lien Notes [D.I. 6597]; (ix) various Texas Taxing Authorities [D.I. 6608, 6598 & 6662]; (x) Delaware Trust Company in its capacity as EFIH First Lien Notes Trustee [D.I. 6600]; (xi) U.S. Environmental Protection Agency (the "**EPA**") [D.I. 6601] (the "**EPA**

Objection"); (xii) American Stock & Transfer Company, LLC ("**AST**") in its capacity as EFH

Notes Indenture Trustee [D.I. 6609] (the "**AST Objection**") and [D.I. 6645]; (xiii) individual

asbestos plaintiffs Shirley Fenicle and David William Fahy [D.I. 6610]; (xiv) Computershare

Trust Company, N.A. in its capacity as EFIH Second Lien Indenture Trustee [D.I. 6614];

(xv) BNYM in its capacity as PCRB Indenture Trustee [D.I. 6621]; (xvi) Fireman's Fund

Insurance Cos. [D.I. 6625]; (xvii) the EFH Official Committee [D.I. 6627] (the "**EFH**

**Committee Objection**") and [D.I. 6643]; (xviii) Contrarian Capital Management (joining in the

AST Objection) [D.I. 6629]; (xix) UMB Bank, N.A. in its capacity as EFIH PIK Notes Indenture

Trustee [D.I. 6640]; (xx) Fidelity (joining in the AST Objection) [D.I. 6642]; and (xxi) the

Office of the United States Trustee (the "**UST**") [D.I. 6705] (the "**UST Objection**").

16.     On October 27, 2015, the Debtors filed the *Amended Notice of Settlement of EFIH*

*PIK Note Claims with Certain EFIH PIK Noteholders* [D.I. 6699], which attached, among other

things, an amended and restated PSA.

17.     On October 29, 2015, the Debtors filed the voting report (the "**Voting Report**").

18.     Contemporaneously herewith, the TCEH Committee filed a reply in support of the

Settlement Motion (the "**TCEH Committee Settlement Reply**").

**III.    REPLY**

     **A.     The Plan Satisfies the Mandatory Provisions Under Section 1123(a)**

19.     Bankruptcy Code section 1129(a) requires that the Plan comply with "the

applicable provisions of this title," including the mandatory provisions of Bankruptcy Code

section 1123(a).  11 U.S.C. §§ 1129(a)(1); 1123(a).

### 1.    The Plan Correctly Designates the E-Side Claims as Unimpaired

20.    Section 1123(a)(2) requires the Plan to "specify any class of claims or interests that is not impaired under the Plan." 11 U.S.C. § 1123(a)(2).  The Plan designates all classes of E-side claims held by parties that are not party to the PSA as unimpaired.  (See Plan, Arts. III.A.1, A.2.)  A claim is unimpaired if the plan either "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest" or cures defaults and reinstates the maturity of the claim.  11 U.S.C. § 1124.

21.    A number of the Objecting Parties assert that their claims are impaired under the Plan in violation of section 1123(a)(2).  (See D.I. 6590; 6600; 6609; 6614; and 6640.)  In particular, those Objecting Parties assert that they are impaired to the extent the Plan seeks to disallow their claims for makewholes, post-petition interest, interest-on-interest/additional interest, and post-Effective Date fees and expenses, or releases liens securing their claims as of the Effective Date, notwithstanding the pendency of any appeal of the disallowance of the foregoing claims.

22.    The Third Circuit has held that if the Bankruptcy Code partially disallows or caps a claim, the claim is nonetheless unimpaired so long as the allowed amount is repaid in full in cash.  "[A] creditor's claim outside of bankruptcy is not the relevant barometer for impairment; we must examine whether the plan itself is a source of limitation on a creditor's legal, equitable, or contractual rights."  Solow v. PPI Enters.(U.S.), Inc. (In re PPI Enters.(U.S.), Inc.), 324 F.3d 197, 204 (3d Cir. 2003); see also In re W.R. Grace & Co. 475 B.R. 34, 161-162 (D. Del. 2012) ("[W]here the Bankruptcy Code alters any alleged nonbankruptcy claims that the Bank Lenders may have, there is no alteration of legal, equitable, or contractual rights for the purposes of § 1124(1) impairment under PPI Enterprises."); In re Smith, 123 B.R. 863, 867 (Bankr. C.D. Cal.

6

1991) ("[A] plan may limit payment of claims to 'the extent allowed,' without impairing them; for until claims are allowed, or deemed allowed, the holders thereof are not entitled to distribution from the bankruptcy estate.").

23.     Here, the Plan contemplates the payment in full of allowed claims, and seeks to reduce the amount of those claims not by operation of the Plan itself but through obtaining a Court ruling determining that, pursuant to other provisions of the Bankruptcy Code or applicable state law, the disputed claims for makewholes, post-petition interest, and fees are subject to disallowance.  (See Plan, Arts. III.B.4(c), B.5(c), B.6(c), B.18(c), B.19(c), B.20(c), B.21(c).)  At least some of these disputed claims have already been ruled upon by the Court in connection with adversary proceedings or claims objections, and others are the subject of pending claims objections.[2]  Under PPI Enterprises, the disallowance of those claims outside of the Plan does not constitute impairment under section 1124.

24.     Moreover, the Plan provides for the release of liens securing allowed claims upon the Effective Date of the Plan once they have been paid in full or disallowed.  (See Plan, Art. III.B.)  The Objecting Parties are not entitled to maintain liens securing claim amounts that have been disallowed or satisfied under the terms of the applicable debt instruments or other non-bankruptcy law.  Accordingly, the release of such liens under the Plan will not alter the Objecting Parties' legal, equitable, or contractual rights.

25.     Additionally, as a matter of federal practice, a judgment pending appeal is entitled to the same preclusive effect as a final judgment.  See, e.g., New Haven Inclusion Cases, 399 U.S. 392 (1970).  Accordingly, the entry of an order disallowing a claim changes the creditor's

---

[2]     Delaware Trust Co. v. Energy Future Intermediate Holding Co. LLC (In re Energy Future Holdings Corp.), Adv. Proc. No. 14-50363 (CSS) (Bankr. D. Del. July 8, 2015) [D.I. 304]; Computershare Trust Co., N.A. v. Energy Future Intermediate Holding Co. LLC (In re Energy Future Holdings Corp.), Adv. Proc. No. 14-50363 (CSS) (Bankr. D. Del. Oct. 28, 2015) [D.I. 321]; Memorandum Opinion [D.I. 6781].

rights with respect to those claims, whether or not an appeal is brought.  To the extent an

appellant wishes to preserve the status quo pending the appeal, it is incumbent on the appellant to

post a supersedeas bond to secure a stay pending appeal.  See Fed. R. Civ. P. 62(d) ("If an appeal

is taken, the appellant may obtain a stay by supersedeas bond…."); In re Washington Mut., Inc.,

461 B.R. 200, 219 (Bankr. D. Del. 2011) ("[W]hen there is no stay pending appeal, the

bankruptcy court retains jurisdiction to enforce an order that is on appeal.") (citations omitted);

In the Matter of Abingdon Realty Corp., 530 F.2d 588, 589 (4th Cir. 1976) ("It is settled law that

the filing of a petition to review an order of a bankruptcy judge (formerly a referee in

bankruptcy), does not stay the effect or operation of the order unless a supersedeas bond is filed

or the order itself provides for a stay.").  The Objecting Parties effectively contend that the

Debtors are precluded from effectuating the provisions of the Plan, including by releasing liens

securing claims that have been disallowed, solely because such disallowance is being appealed.

This would result in appealing claimants receiving more rights than otherwise provided under

applicable non-bankruptcy law.  Such an outcome would turn the impairment standard on its

head and should be rejected by the Court.

26.     On a related note, AST argues that the allowance of the $700 million claim

against EFH in favor of TCEH results in the impairment of EFH creditors.  (See AST Objection

at ¶ 90.)  The potential reduction in the amount that EFH noteholders might receive on account

of their claims under an alternative plan scenario is a product of the Settlement Agreement, not

the Plan itself.  A speculative alteration in recoveries under a hypothetical future plan does not

constitute impairment under this Plan as described in section 1124.  See e.g., In re Huckabee

Auto Co., 33 B.R. 141, 147 n.3 (Bankr. M.D. Ga. 1981) ("It should also be noted here that since

the legal rights between GMAC and Debtors are established by the settlement agreement, and

8

Debtors' plan does not alter the rights established therein, in actuality this claim is unimpaired by Debtors' plan.").

### 2.    Separate Classification and Different Treatment of Claims Held in Classes C4, C5, and C6 Is Appropriate

27.    Certain creditors of TCEH Debtors have objected to the separate classification and resulting different treatment of their unsecured claims.  (See FLSmidth Objection at ¶ 14 (arguing that vendors and suppliers are entitled to payment in full); EPA Objection at ¶¶ 28-35 (arguing that Class 5 and Class 6 should receive equal treatment); EFCH 2037 Notes Trustee Objection at ¶¶ 18-21 (arguing, among other things, that the Debtors have failed to explain the basis for separate classification of the Class C6 claims).)  The separate classification of Claims in Class C4 (TCEH Unsecured Debt Claims), Class C5 (General Unsecured Claims Against the TCEH Debtors Other Than EFCH), and Class C6 (General Unsecured Claims Against EFCH) is appropriate because, as the evidence presented at trial will show, (i) legitimate business reasons exist to separately classify and treat trade claims differently from the TCEH Debtors' unsecured funded debt claims, and (ii) because EFCH has no unencumbered assets that could provide a recovery to unsecured creditors.

28.    Trade creditors, who are classified in Class C5, have the ability to make the Cash-Out Election under the Plan, which will provide them with a pro rata cash payment from a fixed pot of cash.  (See Plan, Art. III.B.30.)  Creditors that make the Cash-Out Election are projected to receive a recovery that is within the range of illustrative recoveries that may be received by creditors in Class C4 that receive and exercise rights under the Plan.  (See Disclosure Statement at p. 23 n. 13.)  The holders of the TCEH Debtors' notes are, by and large, financial institutions or other sophisticated parties with experience and an interest in holding equity in Reorganized EFH.  In contrast, the TCEH Debtors' trade creditors and vendors are, as a general matter, not in

9

the equity investment business.  Furthermore, they may lack the financial wherewithal needed to exercise the rights and recognize the full value of their distributions.  Accordingly, the TCEH Committee advocated on behalf of trade creditors for separate classification and the ability to make the Cash-Out Election under the Plan on the basis that it will help to ensure that creditors of the TCEH Debtors with disparate interests will all receive appropriate and meaningful distributions under the Plan.

29.    With respect to the separate classification of Class C6, the TCEH Committee is unaware of any EFCH assets that are unencumbered by the liens of TCEH's secured creditors based on the schedule of assets and liabilities filed for EFCH [D.I. 1273].  Further, the TCEH Committee investigated potential claims against the TCEH First Lien Lenders and the Prepetition Sponsors on behalf of all TCEH Debtors as well as intercompany claims, and, with respect to certain of those claims, sought standing to assert them on behalf of all TCEH Debtors.[3] Although those claims are being settled for value under the Plan and Settlement Agreement, none of those claims were likely to provide value to EFCH if they were to be successfully litigated.

30.    More specifically, the claims against the TCEH First Lien Creditors primarily sought one of three remedies:  the avoidance of liens; the return of cash paid by TCEH or its subsidiaries from the TCEH money pool; or the reduction of debt.  (Id.)  Because EFCH is merely a holding company and has no operating assets,[4] as a practical matter, no debt obligations could have been enforced against it and therefore the avoidance of liens and reduction of debt

---

[3]    See Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Exclusive Standing and Authority to Commence, Prosecute, and Settle Certain Claims for Declaratory Judgment, Avoidance and Recovery of Liens, Security Interests, Obligations, Fees, and Interest Payments, and Disallowance of Claims [D.I. 3593] (the "TCEH Committee Standing Motion").

[4]    See [D.I. 1273]; Form 10-Q for EFCH for the Quarterly Period Ended June 30, 2015, available at http://www.sec.gov/Archives/edgar/data/1445049/000144504915000009/efch-6302015x10q.htm.

10

would not provide any benefit to EFCH's unsecured creditors.  Further, because EFCH is not a subsidiary of TCEH and did not contribute to the TCEH money pool,[5] it would not entitled to share in the return of any payments made from the TCEH money pool.  In this respect, EFCH is distinguishable from all other TCEH Debtors, and the separate classification of claims held by its creditors is warranted.  See, e.g., In re Kaiser Aluminum Corp., No. 02-10429 (JKF), 2006 WL 616243, at *5-6 (Bankr. D. Del. Feb. 6, 2006) (permitting classification scheme after consideration of creditors' legal rights), aff'd, 343 B.R. 88 (D. Del. 2006); In re Exide Techs., 303 B.R. 48, 79-80 (Bankr. D. Del. 2003) (stating that there may be a basis for separately classifying creditors of the same priority level); see also In re Mirant Corp., No. 03-46590 DML, 2007 WL 1258932, at *7 (Bankr. N.D. Tex. Apr. 27, 2007) (permitting separate classification because holders of claims had different legal interests in the debtor's estate).  In fact, EFCH's only material asset is its equity interests in TCEH.  Because TCEH claims, which are senior in priority to interests, are not being paid in full, creditors of EFCH are not entitled to any recovery on account of those interests.  See 11 U.S.C. § 1129(b)(2)(B)(ii).  The Court should therefore overrule the EFCH Notes Trustee Objection.

### B.    The Plan Includes Appropriate Permissive Provisions Under Section 1123(b)

31.    Bankruptcy Code section 1123(b) provides that a chapter 11 plan may include, among other things, "any other appropriate provision not inconsistent with the applicable provisions of this title."  11 U.S.C. § 1123(b)(6).  This is a broad grant of authority.  As stated by the United States Supreme Court:  "The Code . . . grants the bankruptcy courts residual authority

---

[5]    See, e.g., *Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Authorizing the Debtors to (I) Continue Using Their Existing Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms, and (III) Continue Using Certain Investment Accounts; (B) Authorizing Continued Intercompany Transactions and Netting of Intercompany Claims; and (C) Granting Postpetition Intercompany Claims Administrative Expense Priority* [D.I. 37] at ¶¶ 20, 26.

to approve reorganization plans including any . . . appropriate provision not inconsistent with the applicable provisions of this title." <u>United States v. Energy Res. Co., Inc.</u>, 495 U.S. 545, 549 (1990) (internal quotations omitted).  The Plan contains a number of permissive provisions, all of which are intended to facilitate a prompt resolution of the Chapter 11 Case and are appropriate under the circumstances.

### 1.    The Settlements Embodied in the Plan Should Be Approved

32.    The Bankruptcy Code states that a plan may "provide for . . . the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  11 U.S.C. § 1123(b)(3)(A).  Settlements under a plan are generally subject to the same standard applied to settlements under Bankruptcy Rule 9019, although the court should consider all factors relevant to a "full and fair assessment of the wisdom of the proposed compromise."  The Third Circuit applies the four-factor test under <u>Myers v. Martin (In re Martin)</u>, 91 F.3d 389, 393 (3d Cir. 1996), in considering motions to approve settlements under Bankruptcy Rule 9019, weighing: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interests of the creditors.  The basis for the global settlement of inter-Debtor claims, and legacy claims against the Prepetition Sponsors and TCEH First Lien Creditors embedded in the Plan will have already been addressed by the Court in connection with the Settlement Motion, and for the same reasons set forth therein and in the TCEH Committee Settlement Reply, that global settlement satisfies the <u>Martin</u> test.  The compromise remains equally fair and reasonable when viewed in the context of the Plan as a whole, warranting its approval by the Court as incorporated in the Plan.

33.    The EPA objects to the global settlement on the basis that it is substantively unfair because no settlement value is allocated to EFCH.  (<u>See</u> EPA Objection at ¶¶ 28-35.)  The EPA

also objects that the global settlement is procedurally unfair because the interests of creditors holding claims solely against EFCH were not adequately represented in connection with the negotiation of the Settlement Agreement and the allocation of settlement value under the Plan. (Id. at ¶ 33.)  As an initial matter, the fact that no individual member of the TCEH Committee holds claims solely against EFCH does not lessen the TCEH Committee's fiduciary duties owed to all creditors of EFCH and does not, as the EPA argues, "suggest[] that the interests of this creditor group were inadequately represented at settlement negotiations."  (Id. at ¶ 31.)  To the contrary, the TCEH Committee was attentive to the interests of creditors of the TCEH Debtors, including those of EFCH, and negotiated zealously on their behalf.  However, as set forth in greater detail above, the TCEH Committee is unaware of any unencumbered assets or settled claims residing at EFCH that could reasonably be expected to provide value to EFCH's unsecured creditors.  Accordingly, the EPA's objection on these points should be overruled.

34.     In addition, the UST objects to the proposed payment of professional fees under the Plan and Settlement Agreement on the basis that the Debtors have not provided adequate disclosure regarding the amount of those fees or legal justification for the payment of those fees outside of the fee review process applicable to estate retained professionals.  (See UST Objection at ¶¶ 30-36.)  The justification for those fees is straight-forward—they are part of the settlement consideration agreed to in connection with the global settlement.  The parties to the settlement bargained for the payment of fees incurred during the case in order to defray some of the costs of entering into and defending the settlement, which, as will be shown at trial, provides an immense benefit to the Debtors' estates.  The precise amount of those fees cannot be disclosed at this time because those fees are still accruing and will depend in significant part on how contentious the confirmation hearing is.  However, the fees to be paid are required to be "reasonable and documented."  (See Settlement Agreement, § 2.7(a); Plan, Art. IV.R.)  And, as the chair of

13

EFH's audit committee has testified, the Debtors have in place a rigorous review process for vetting accounts payable, including legal invoices. (See Miller Decl., Ex. 20, 9/30/2015 Williamson Dep. Tr. at 247:24-249:3 (explaining that "███████████████████████████████ ███████████████████████████████████████████████.").) Further, the Debtors considered ███████████████████████████████████████████████ ██████████████████████████████████." (Id. at 254: 3-10.) Moreover, those fees are ultimately being paid out of recoveries of parties to the settlement or creditors who are directly benefitting from the settlement. Accordingly, the payment of those reasonable and documented fees as a component of the global settlement is justified and appropriate under the circumstances.

### 2.    The Plan Releases Should Be Approved

35.    Article VIII.C of the Plan (the "**Debtor Release**") is a release of claims belonging to the Debtors and the bankruptcy estate against each Released Party, defined to include the Plan Sponsors, the Prepetition Sponsors, and the Debtors' directors and officers. (See Plan at Art. I.A.284.) Courts in this District have held that a plan may provide for releases by a debtor of non-debtor third parties after considering the specific facts and equities of each case. In re Zenith Elecs. Corp., 241 B.R. 92, 110 (Bankr. D. Del. 1999). A debtor may release claims in a plan pursuant to Bankruptcy Code section 1123(b)(3)(A), if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate. In re Spansion, Inc., 426 B.R. 114, 143 (Bankr. D. Del. 2010) (citing In re DBSD North America, Inc., 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009)).

36.    The Debtor Release is appropriate under the Zenith/Master Mortgage test, which requires a court to evaluate, on a non-exclusive basis, whether there is: (1) an identity of interest between the debtor and the non-debtor such that a suit against the nondebtor will deplete the

14

estate's resources; (2) a substantial contribution to the plan by the nondebtor; (3) the necessity of the release to the reorganization; (4) the overwhelming acceptance of the plan and release by creditors and interest holders; and (5) the payment of all or substantially all of the claims of the creditors and interest holders under the plan.  See In re Zenith Elecs. Corp., 241 B.R. at 110; In re Master Mortg. Inv. Fund, Inc., 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994).

37.     Here, the Plan is premised on a global cease-fire that will enable the Reorganized Debtors, as well as the Prepetition Sponsors, creditors, directors and officers who are making the restructuring possible, to move forward with a clean slate.  The Prepetition Sponsors have made substantial contributions to the Plan by, among other things, consenting to the allowance of the $700 million TCEH Settlement Claim, which primes their equity interests, waiving their claims for unpaid management fees and expenses (totaling approximately $69 million), and agreeing not to take any "worthless stock deduction" with respect to its EFH equity to the extent such an action would adversely affect the partial basis step-up contemplated by the Plan.  (See Debtors' MOL at ¶ 113.)  In addition, the Prepetition Sponsors and the directors and officers (who have indemnification rights against the Debtors) have also made significant non-monetary contributions to this restructuring, including their participation in 75 joint board and committee meetings in 2015 alone.  (Id.)  The Debtor Release is an inextricable component of a highly complex deal that will allow for the payment in full of all allowed claims on the E-side and allow the Debtors to pursue a REIT conversion that will provide meaningful value to the T-side. Accordingly, the Debtor Release is necessary to the reorganization and, because that reorganization will make it possible for all creditors to receive significant recoveries on account of their claims, the Released Parties are, directly or indirectly, providing financial contributions critical to the feasibility of the Plan.  All classes consisting of non-Debtor claims under the Plan

15

are either unimpaired and deemed to accept, or are impaired and voted to approve the Plan by a

significant majority in both number and amount.  (See Voting Report.)  Accordingly, each of the

Zenith/Master Mortgage factors weighs in favor of approving the Debtor Release.

38.    Section VIII.D of the Plan (the "**Third Party Release**") provides for a release of

each Debtor, Reorganized Debtor, and Released Party of any and all claims existing as of the

Plan's Effective Date by each Releasing Party, which is defined to include (i) all holders of

Claims and Interests that are deemed to accept the Plan; (ii) all holders of Claims and Interests

who vote to accept the Plan; (iii) all holders in voting Classes who abstain from voting on the

Plan and who do not opt out of the releases provided by the Plan; and (iv) all holders of Claims

and Interests with respect to releases of all Holders of Interests in EFH Corp.  (See Plan, Art.

I.A.285.)

39.    Indisputably, creditors may consent to the release of claims against non-debtors

under a plan.  See, e.g., In re Arrowmill Dev. Corp., 211 B.R. 497, 506-7 (Bankr. D.N.J. 1997).

Here, the vast majority of third party releases under the Plan are consensual.  All non-Debtor

impaired classes voted overwhelmingly in support of the Plan, and had the ability to opt-out of

the releases by voting against the Plan.  (See Voting Report.)  Moreover, Delaware bankruptcy

courts have held that, under applicable Third Circuit law, an unimpaired creditor who is

deemed to accept a chapter 11 plan has also consented to any third party releases contained

therein.  See In re Indianapolis Downs, LLC, 486 B.R. 286, 306 (Bankr. D. Del. 2013); In re

Spansion, Inc., 426 B.R. at 144.  Accordingly, any objections to the third party releases

asserted by or on behalf of unimpaired creditors should be overruled.

### C.    The Plan Is Being Proposed In Good Faith

40.    Bankruptcy Code section 1129(a)(3) requires that a chapter 11 plan be "proposed

in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  The Third

16

Circuit has stated that the "important point" of the good faith inquiry "is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  In re W.R. Grace & Co., 729 F.3d 332, 346 (3d Cir. 2013) (citations omitted).  Those objectives and purposes include "preserving going concerns and maximizing property available to satisfy creditors," "discourag[ing] debtor misconduct," and "achieving fundamental fairness and justice."  Am. Capital Equip., LLC, 688 F.3d 145, 156-57 (3d Cir. 2012) (internal citations and quotation marks omitted); see also In re Tribune Co., 464 B.R. 126, 154 (Bankr. D. Del. 2011) ("The good faith standard requires that the plan be proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code.") (internal quotations and citations omitted).

41.    The requirement of good faith must be viewed in light of the "totality of the circumstances" surrounding the proposal of the Plan.  In re Combustion Eng'g, Inc., 391 F.3d 190, 241 n.55 (3d Cir. 2004), as amended (Feb. 23, 2005) (citations omitted); see, e.g., In re The Flintkote Co., No. 04-11300 (MFW), 2015 WL 4762580, at *17 (Bankr. D. Del. Aug. 12, 2015) ("In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the terms of the Plan, the process leading to the formulation of the Plan, and the solicitation of votes on the Plan.").

42.    The Plan is entirely consistent with the underlying objectives and purposes of the Bankruptcy Code.  Evidence at trial will show that the Plan is the result of extensive arms' length negotiations among the Debtors, the Prepetition Sponsors, the independent directors, and impaired creditors, among others, with the assistance of a Court-appointed mediator, and

17

encompasses the terms of a comprehensive settlement between those parties.  Evidence at trial will further show that the Plan has been proposed by the Plan proponents with the legitimate and honest purpose of rehabilitating the Debtors' businesses and providing for the timely, efficient, and fair satisfaction of substantial claims against the Debtors through the consensual resolution of complex and potentially expensive and time-consuming litigation.  All of these goals and processes are consistent with the purposes of a chapter 11 case.

43.    The TCEH Committee and the Debtors believe that the Plan presents the only opportunity to maximize the value of the ultimate recoveries to all creditor groups—a point that no Objecting Party seriously contests.  Instead, the Objecting Parties point to what will happen if the Plan does not go effective as evidence of bad faith.  These arguments inappropriately shift the focus from the most important point of the good faith inquiry—the Plan itself.  The overwhelming acceptance of the Plan by all classes entitled to vote reflects the overall fairness of the Plan and the acknowledgment by the Debtors' creditors that the Plan has been proposed in good faith and for proper purposes.  In addition, as described below and in the Disclosure Statement, the Debtors believe that creditors will receive greater and more expeditious distributions under the Plan than they would receive through a chapter 7 liquidation.  Because the Plan promotes the rehabilitative objectives and purposes of the Bankruptcy Code, the TCEH Committee submits that the Plan has been filed in good faith, and the requirements of Bankruptcy Code section 1129(a)(3) are satisfied.

### D.    The Plan Is Feasible

44.    Bankruptcy Code section 1129(a)(11) requires that the Court find that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(11).

18

Section 1129(a)(11) is a relatively low bar and does not require an absolute assurance of financial success by the debtor.  Rather, the feasibility standard requires only that "the plan provides reasonable assurance that the debtor will remain commercially viable for a reasonable time." In the Matter of Sound Radio, Inc., 103 B.R. 521, 523 (D.N.J. 1989); accord Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.), 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed."); In re Indianapolis Downs, LLC, 486 B.R. at 298 ("The purpose of the feasibility test is to protect against visionary or speculative plans.  Just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure will not defeat feasibility.").

45.    The EFH Committee asserts that the Plan is not feasible because is based on an "illusory contract" under which the parties to the Merger may have no intention of actually performing, and is subject to too many regulatory approvals and other conditions precedent to present a realistic chance of closing.  (See EFH Committee Objection at ¶¶ 51-61; 243-254.) This argument completely ignores current reality and presents only a speculative prospect of failure that is insufficient to defeat feasibility as a matter of law.

46.    Judge Shannon's opinion in In re Indianapolis Downs, LLC is particularly relevant to the Court's evaluation of the Plan's feasibility.  In that case, the bankruptcy court approved a plan that was premised on a sale of the debtors' horse racing track and casino or "racino", even though the proposed purchaser still needed to obtain various regulatory approvals to operate the business, noting that "[i]t is not at all unusual for consummation of a Chapter 11 plan to be conditioned upon the expectation of approval by regulatory authorities, and courts have not typically held up confirmation of a plan to wait for issuance of such approvals." Id. at 298.  Judge Shannon observed that the proposed purchaser was already the duly licensed

operator of the only other racino in the state, and had committed half a billion dollars to closing the transaction with the debtors, thereby providing "readily apparent and practical considerations that give the Court confidence that there is a reasonable assurance of success." Id. at 299. Judge Shannon also found that "[t]he first, best indicator of feasibility is the position of the creditors whose economic interests are at stake. The support or opposition of creditors with skin in the game and an opportunity to study a debtor's proposal is more illuminating to the Court than any expert report or accountant's projections." Id. at 298.

47.    This case presents a similar fact pattern. The Hunts currently operate the only other utility-based REIT in the ERCOT market. They understand the regulatory process and hurdles, and have successfully navigated them in the past. (See Miller Decl., Ex. 23, 9/30/2015 Williamson Dep. Tr. at 138:18-139:9 (observing that ███████████████████████ ████████████████████████████████████").) In addition, they have demonstrated an interest in the Debtors' assets for an extended period of time, and have already invested significant time and expense in pursuing the Merger. (See Miller Decl., Ex. 21, 9/25/2015 Evans Dep. Tr. at 262:22-264:4 (noting that █████████████████ ████████████████████████"); Miller Decl., Ex. 22,10/1/2015 Keglevic Dep. Tr. at 166:1-4, 16-18 ("██████████████████████████████████ ████████████████████████████████████████ █████████████████").) Notably, the process for obtaining the necessary approvals from the PUCT has already commenced. Given that the Hunts are already subject to regulation by the PUCT and other regulators whose approval of the Merger and REIT conversion will be required, it should be self-evident that the Hunts would not risk their reputations with those regulators by pursuing approval of a transaction that they believe is unlikely to actually close. Likewise, the

unsecured creditors of TCEH who will be injecting substantial amounts of new capital into

Reorganized EFH are doing so with the expectation that the transaction will close.  The

contention that they are doing so merely to preserve "option" value, and may be willing to walk

away on a whim to instead accept the markedly lower recoveries to which they will be limited

under an alternative plan scenario are unlikely based on the facts as they exist at <u>this</u> point in

time.  The ability of the Plan Objectors to imagine a scenario in which it may not be in the

investment parties' economic interests to close the Merger on the Plan's Effective Date has

absolutely no bearing on whether such a scenario will occur, and the Plan Objectors have

presented no evidence indicating that such a scenario is in fact likely to occur.

48.    Furthermore, the Debtors have already obtained committed financing necessary to

fund the debt transactions contemplated under the Merger.  (<u>See</u> Merger and Purchase

Agreement, filed as Exhibit M to the Plan Supplement, at 37.)  In addition, the Purchasers and

Backstop Parties have delivered to the Debtors the executed Backstop Agreement, the Guarantee

and the executed Equity Commitment Letter, pursuant to which they have incurred commitment

fees and have earmarked funds for closing the Merger and Equity Investment, which effectively

limits their options to pursue other transactions.  (<u>See</u> <u>id</u>. at 38; Backstop Agreement, filed as

Exhibit N to the Plan Supplement.)  Taken together, the combined efforts of the various parties

to effectuate the proposed Plan transactions to date provide the Court with ample evidence of

both their ability and intent to close, which has not been contradicted by the Plan Objectors.

49.    Finally, the Plan requires payment of all allowed claims for postpetition interest

or fees on the E-side and provides for the escrowing of disputed postpetition interest amounts.

(<u>See</u> Plan, Arts. III.B, VII.K.)  Thus, to the extent the Court allows E-side noteholder claims for

postpetition interest or fees, those claims will be paid.  The only disputed E-side claims that

could potentially render the Plan infeasible if not disallowed are makewhole claims, and that is a function of the Plan terms, which require the disallowance of makewhole claims as a condition to effectiveness, although that condition may be waived by the Debtors with the consent of the Plan Sponsors, the TCEH Supporting First Lien Creditors, the TCEH Supporting Second Lien Creditors and the TCEH Committee.  (See Plan, Art. IX.C.)  Significantly, the Court has already disallowed makewhole claims asserted by each of the EFIH First Lien Noteholders,[6] EFIH Second Lien Noteholders,[7] and EFIH PIK Noteholders,[8] leaving only the makewhole claims of the EFH Noteholders unresolved.  The Debtors will adduce evidence at the confirmation hearing demonstrating that, even if the remaining disputed make-whole claims are allowed and all post-petition interest and fee claims are allowed, the Reorganized Debtors will have the financial wherewithal to honor all of their obligations under the Plan.  (See also Debtors' MOL at ¶ 87 n. 136.)

50.     For the foregoing reasons, the Objections to the Plan's feasibility should be overruled.

### E.     The EFH Committee's Other "Kitchen Sink" Objections Lack Merit

51.     The EFH Committee also opposes confirmation of the Plan on a number of other bases, many of which are completely novel and are unsupported by any legal precedent.  As set forth below, each of these arguments lack merit and are easily dismissed.

52.     The EFH Committee argues that the Plan is "blatant gerrymandering of impaired creditors," because it disenfranchises them by paying their claims in full.  (See EFH Committee Objection at ¶¶ 269-279.)  Gerrymandering in the plan context typically refers to the improper

---

[6]     Delaware Trust Co. v. Energy Future Intermediate Holding Co. LLC (In re Energy Future Holdings Corp.), Adv. Proc. No. 14-50363 (CSS) (Bankr. D. Del. July 8, 2015) [D.I. 304].

[7]     Computershare Trust Co., N.A. v. Energy Future Intermediate Holding Co. LLC (In re Energy Future Holdings Corp.), Adv. Proc. No. 14-50363 (CSS) (Bankr. D. Del. Oct. 28, 2015) [D.I. 321].

[8]     Memorandum Opinion [D.I. 6781].

22

classification or artificial impairment of creditors, so as to manufacture an impaired, accepting class to satisfy the cramdown requirements of Bankruptcy Code section 1129(b), thereby circumventing confirmation requirements and protections.  It is difficult to understand how the E-side creditors could possibly be harmed by the T-side creditors' insistence that E-side creditors be rendered unimpaired under the Plan.  The Plan simply follows the Bankruptcy Code— unimpaired creditors are not entitled to vote.

53.    The EFH Committee also suggests that the Plan and Settlement Agreement are structured in order to deprive E-side creditors of the right to vote on the global settlement or an alternative plan.  (See EFH Committee Objection at ¶¶ 79-86.)  However, creditors are never entitled to vote on a settlement; they are merely entitled to object and be heard, and they have that right now.  Moreover, in the event the Plan fails and an alternative plan is proposed that impairs E-side creditors, they will have the ability to vote on that plan.  Accordingly, the EFH Committee's arguments relating to disenfranchisement fail.

54.    The EFH Committee further objects that confirmation of the Plan and approval of the Settlement Agreement create "synthetic exclusivity" in favor of the Debtors.  (See EFH Committee Objection at ¶¶ 280-286.)  "Synthetic exclusivity" is a misnomer, however; upon confirmation of the Plan, E-side creditors will not be prevented from developing their own plan and even filing it with the Court with a request that they be permitted to solicit votes on such plan in the event the current Plan does not go effective.  The Bankruptcy Code simply bars the confirmation of more than one plan at a time.  11 U.S.C. § 1129(c).  Thus, any "synthetic exclusivity" is simply a statutorily mandated result of the Plan's confirmation, rather than a scheme concocted by the Plan's supporters to prevent an alternative plan from being pursued. Moreover, E-side creditors have had over a year to put together an alternative plan proposal for

the Debtors' consideration and have not done so because no other viable exit strategy exists at this point in time. The fact that E-side creditors will be limited in their ability to pursue confirmation of their own plan unless and until it is shown that the Plan will not become effective is nothing more than a hollow complaint that creditors will be prevented by statute from doing something that they are already unable to do as a matter of fact.

55.    Finally, the EFH Committee argues that the Plan violates Bankruptcy Code section 1103 because the EFH Committee was not involved in the negotiation of the Plan. (See EFH Committee Objection at ¶¶ 287-290.) Section 1103 provides that an official committee "may participate in the formulation of a plan." 11 U.S.C. § 1103(c)(3) (emphasis added). There is no affirmative requirement under either the Bankruptcy Code or case law requiring that a committee be involved in plan formulation. Although the failure to include a committee in plan negotiations may raise concerns about the fairness of the plan to such committee's constituents in certain circumstances, such concerns are not present where, as here, those constituents are unimpaired under the plan and the committee is given ample opportunity to challenge the plan.

### IV.    CONCLUSION

56.    The Plan is the result of many months of constructive, good faith negotiations among the Debtors, their independent directors, impaired creditors, and other constituencies in these Chapter 11 Cases. As described in this Reply and the Debtors' MOL and reply in support of confirmation, the Plan complies with every one of the requirements enumerated in the Bankruptcy Code for confirmation of a chapter 11 plan. Among other things, the Plan is fair, reasonable, and feasible, and all creditors and interest holders will receive at least as much under the Plan as they would receive in a chapter 7 liquidation. Moreover, each of the impaired classes entitled to vote on the Plan voted overwhelmingly to accept the Plan.

Dated: Wilmington, Delaware

October 30, 2015                    **MORRISON & FOERSTER LLP**
                                   James M. Peck
                                   Brett H. Miller
                                   Lorenzo Marinuzzi
                                   Todd M. Goren
                                   Samantha Martin
                                   250 West 55th Street
                                   New York, New York 10019-9601
                                   Telephone:  (212) 468-8000
                                   Facsimile:  (212) 468-7900
                                   E-mail:    jpeck@mofo.com
                                              brettmiller@mofo.com
                                              lmarinuzzi@mofo.com
                                              tgoren@mofo.com
                                              smartin@mofo.com

                                              -and-

                                   */s/ Christopher A. Ward*
                                   **POLSINELLI PC**
                                   Christopher A. Ward (Del. Bar No. 3877)
                                   Justin K. Edelson (Del. Bar No. 5002)
                                   Shanti M. Katona (Del. Bar No. 5352)
                                   222 Delaware Avenue, Suite 1101
                                   Wilmington, Delaware 19801
                                   Telephone: (302) 252-0920
                                   Facsimile:  (302) 252-0921
                                   E-mail:    cward@polsinelli.com
                                              jedelson@polsinelli.com
                                              skatona@polsinelli.com

                                   *Attorneys for the Official Committee*
                                   *of TCEH Unsecured Creditors*