REDACTED

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: D.I. 5249** |

### REPLY OF THE TCEH COMMITTEE IN SUPPORT OF
### THE MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, TO APPROVE A
### SETTLEMENT OF LITIGATION CLAIMS AND AUTHORIZE THE DEBTORS TO
### ENTER INTO AND PERFORM UNDER THE SETTLEMENT AGREEMENT

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................... 2

BACKGROUND ............................................................................................................. 3

    I.    Legacy Claims ................................................................................................ 3

    II.   Disinterested Director Settlement ......................................................... 5

    III.  Global Settlement of Claims ................................................................... 6

REPLY ......................................................................................................................... 7

    IV.  The Settlement Agreement Is Fair and Equitable and in the Best Interests of the Debtors' Estates .......................................................... 7

    V.   No Heightened Scrutiny Is Necessary ................................................... 9

    VI.  The Martin Factors Are Met ................................................................. 12

        A.    Probability of Success in Litigation ......................................... 13

            a.    Tax Claims ................................................................... 14

            b.    Tax Free Spin ............................................................... 19

            c.    Foregone Interest on Intercompany Notes ................... 20

            d.    Shared Services and Restructuring Costs .................... 22

            e.    Luminant Generation's Makewhole Claims ............... 23

            f.    Claims Held by EFH/EFIH Against TCEH ................ 24

        B.    Likely Difficulties in Collection ............................................. 25

        C.    Complexity of Litigation, and Associated Expense Inconvenience and Delay ....................................................... 27

        D.    Paramount Interests of the Creditors ....................................... 28

            a.    The Settlement Releases are Appropriate ................... 32

            b.    There is no Departure From the  Absolute Priority Rule ............. 34

CONCLUSION ............................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Conn. Gen Life Ins. Co. v. United Cos. Fin. Corp.* (*Matter of Foster Mortg. Corp.*),
  68 F.3d 914 (5th Cir. 1995) ....................................................................11

*Ebner v. Kaiser (In re Kaiser)*,
  525 B.R. 697 (N.D. Ill. 2014) .................................................................13

*Finkel v. Polichuck (In re Polichuck)*,
  506 B.R. 405 (Bankr. E.D. Pa. 2014) ......................................................14

*G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.)*,
  313 B.R. 612 (Bankr. D.N.J. 2004) .........................................................14

*Gellert v. Coltec Indus. (In re Crucible Materials Corp.)*,
  No. 09-11582 (MFW), 2012 WL 5360945 (Bankr. D. Del. Oct. 31, 2012) ...........................23

*H-M Wexford LLC v. Encorp, Inc.*,
  832 A.2d 129 (Del Ch. 2003) ..................................................................10

*In re Capmark Fin. Group, Inc.*,
  438 B.R. 471 (Bankr. D. Del. 2010) (Sontchi, J.) ................................8, 31

*In re Chassix Holdings, Inc.*,
  533 B.R. 64 (Bankr. S.D.N.Y. 2015) ......................................................11

*In re Dharmasuriya*,
  No. 2:09-BK-28606-PC, 2014 WL 845991 (Bankr. C.D. Cal. Mar. 4, 2014) ....................11

*In re Drexel Burnham Lambert Grp. Inc.*,
  134 B.R. 493 (Bankr. S.D.N.Y. 1991) ....................................................11

*In re Exaeris, Inc.*,
  380 B.R. 741 (Bankr. D. Del. 2008) ........................................................11

*In re ID Liquidation One, LLC*,
  555 F. App'x 202 (3d Cir. 2014) ........................................................8, 30

*In re Jasmine, Ltd.*,
  258 B.R. 119 (D.N.J. 2000) .....................................................................8

*In re Kaiser Aluminum Corp.*,
  339 B.R. 91. ..........................................................................................30

# TABLE OF CONTENTS
(continued)

**Page**

*In re Loudoun Heights, LLC*,
No. 13-15588-BFK, 2014 WL 2928110 (Bankr. E.D. Va. June 27, 2014) .............................11

*In re Moultonborough Hotel Grp., LLC*, No. 10-14214-JMD, 2012 WL 5464630 *8-10
(Bankr. D.N.H. Nov. 8, 2012) ...........................................................................................11

*In re Nortel Networks, Inc.*,
522 B.R. 491 (Bankr. D. Del. 2014) ..................................................................................31

*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D. Del. 2008) ....................................................................................8

*In re Washington Mutual, Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) ...................................................................13, 27, 30

*In re World Health Alts., Inc.*,
344 B.R. 291 (Bankr. D. Del. 2006) .....................................................................................8

*In re Zenith Elecs. Corp.*,
241 B.R. 92 (Bankr. D. Del. 1999) ....................................................................................32

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC* (*In re Charter
Commc'ns*),
419 B.R. 221 (Bankr. S.D.N.Y. 2009) ...............................................................................11

*Myers v. Martin (In re Martin)*,
91 F.3d 389 (3d Cir. 1996)............................................................................................ passim

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
390 U.S. 414 (1968)...............................................................................................................8

*Travelers Indem. Co. v. Lake*,
594 A.2d 38 (Del. 1991) .....................................................................................................20

*Will v. Northwestern Univ. (In re Nutraquest, Inc.)*,
434 F.3d 639 (3d Cir. 2006)..................................................................................................8

## STATUTES

11 U.S.C. § 105(a) ......................................................................................................................7

11 U.S.C. § 550(a)(1).................................................................................................................23

26 U.S.C. § 108(b) ....................................................................................................................17

# TABLE OF CONTENTS
(continued)

Page

26 U.S.C. § 857(a)(2)(B) ............................................................................................20

*Chapter 11 of the Bankruptcy Code*..................................................................... passim

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 9019 ....................................................................................7, 8, 32, 35

The Official Committee of Unsecured Creditors (the "**TCEH Committee**") of Energy Future Competitive Holdings Company LLC ("**EFCH**"), EFCH's direct subsidiary, Texas Competitive Electric Holdings Company LLC and their direct and indirect subsidiaries, and EFH Corporate Services Company, by and through its undersigned counsel, hereby files this reply (the "**Reply**") in support of the *Motion of Energy Future Holdings Corp., et al., to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter Into and Perform Under the Settlement Agreement* [D.I. 5249] (the "**Settlement Motion**").[1]  In support of the Reply, the TCEH Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Settlement Agreement represents a global resolution of significant and contentious issues that have plagued these cases from the outset.  It incorporates both an inter-silo settlement negotiated at arms' length by the Debtors' disinterested directors, each with the assistance of independent counsel and financial advisors, as well as a T-side settlement, which was negotiated with the assistance of a Court-appointed mediator.  The Settlement Agreement paves the way for a smooth exit from Chapter 11, whether pursuant to the Plan or an alternative plan, and, as such, is a critical step in moving these cases to a successful conclusion.

2.      The TCEH Committee joins in the Debtors' reply in support of the Settlement Motion and will not repeat the arguments set forth therein.  The TCEH Committee submits this Reply, however, to separately explain why the Settlement Agreement is in the best interests of the TCEH Committee's constituents and to respond to the objections to the Settlement Motion to the extent they specifically concern the TCEH Committee.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Settlement Motion.

ny-1210496

3.      Based on its extensive investigation into the potential claims by and among each of the Debtor entities and other related parties, the TCEH Committee is uniquely positioned to evaluate the propriety of the proposed settlement.  The TCEH Committee, through its advisors, commenced its investigation into these potential claims shortly after its formation in May 2014. The TCEH Committee identified and reconstructed multiple material transactions, searching for value that could be reclaimed by the TCEH Debtors.  As part of its investigation, the TCEH Committee's professionals reviewed and analyzed close to one million documents.  As potential claims were identified, the TCEH Committee performed an extensive legal and factual analysis to determine each of these claim's strengths and weaknesses.

4.      The TCEH Committee was fully prepared to litigate the valuable claims it identified and expected a substantial recovery.  While confident in its analysis and litigation strategy, the TCEH Committee recognized that all litigation is uncertain and recoveries could always be less than anticipated.  In light of the inherent uncertainty of litigation and the recoveries provided to TCEH creditors under the global settlement (which incorporates the terms set forth in the PSA and the Plan, the Settlement Agreement), the TCEH Committee concludes that the settlement is fair and reasonable.  For the reasons set forth herein, the Settlement Motion should be granted.

## BACKGROUND

### I.      Legacy Claims

5.      Early in the Chapter 11 Cases, the TCEH Committee, the Debtors, the United States Trustee, and other TCEH creditor representatives negotiated and agreed on certain procedures to obtain discovery relating to alleged inter-Debtor and affiliate claims and causes of action (the "**Legacy Discovery**").  These procedures were approved by the Bankruptcy Court on

3

August 13, 2014 by entry of the *Order Establishing Discovery Procedures in Connection with Legacy Discovery* [D.I. 1832] (the "**Legacy Discovery Order**").

6.      On September 16, 2014, the parties executed, and the Bankruptcy Court so-ordered, the *Stipulation and Agreed Order Regarding a Protocol for Certain Case Matters* [D.I. 2051] (as amended on November 13, 2014, and March 31, 2015, the "**Case Matters Protocol**"), to govern the investigation and filing of motions seeking standing with respect to potential inter-Debtor claims, claims against the Sponsors, and claims against the Debtors' directors and officers.[2]

7.      From the outset of these Chapter 11 Cases, the TCEH Committee's advisors collected and reviewed extensive publicly available materials regarding the Debtors' businesses and history.  Building on this work, as part of its claims investigation, the TCEH Committee served over 500 formal requests on the Debtors, the Sponsors, Fidelity, certain members of the First Lien Ad Hoc Committee, and certain members of the Ad Hoc Committee of EFIH Unsecured Noteholders seeking relevant documents.  Through its financial advisors, the TCEH Committee also engaged in informal discovery with the Debtors, the Sponsors, and various creditors.  The TCEH Committee also sought and obtained discovery from Duff and Phelps, which advised the Debtors on valuation issues, and Deloitte, which served as the Debtors' auditor during the period covered by the Legacy Discovery Order.  In response to these formal and informal document requests, the TCEH Committee received and reviewed almost one million documents regarding the activities of the Debtors and affiliates over a ten year period.

---

[2] The TCEH Committee also conducted an extensive investigation of claims against the TCEH First Lien Creditors in accordance with the terms of the Cash Collateral Order.  The First Lien Claims identified in the investigation are set forth in the Standing Motions. [D.I. 3593, 3603, 3605.]  The Settlement Agreement resolved these First Lien Claims, and this part of the settlement was not addressed by the objectors.  Accordingly, the TCEH Committee does not specifically address the First Lien Claims herein, other than as addressed by the discussion of the global settlement as a whole.

4

Through this discovery, the TCEH Committee's team of advisors, including professionals with expertise in bankruptcy, finance, litigation, and tax, spent thousands of hours identifying and evaluating potential claims the TCEH Debtors may have against all other parties in interest.[3] The TCEH Committee engaged extensively with representatives of the Debtors during this process; representatives of the TCEH Committee participated in numerous calls and meetings during which representatives of the Debtors, including individuals with first-hand knowledge of the underlying transactions, were questioned.

8.       As part of these investigations, the TCEH Committee explored numerous claims and causes of action against individual Debtors, the Sponsors, and the Debtors' directors and officers.  As required by the Case Matters Protocol (the "**Litigation Letters**"), the TCEH Committee identified these claims in its letters to the Debtors, dated March 31, 2015 and April 30, 2015.  The TCEH Committee also drafted a detailed standing motion, supported by references to evidence uncovered during the course of discovery, outlining these valuable claims and causes of action.   Until entry into the Settlement Agreement, the TCEH Committee was prepared to file that standing motion and was fully prepared to pursue these inter-Debtor and affiliate claims.

## II.       Disinterested Director Settlement

9.       Contemporaneously with the TCEH Committee's investigation, the Disinterested Director Advisors, at the direction of the Disinterested Directors, conducted their own investigation on inter-Debtor transactions and relationships.  During the course of those investigations, the TCEH Committee met with the TCEH Disinterested Director's advisors and made them aware of the valuable claims that the TCEH Committee had identified.

---

[3] As reflected in its fee applications, the TCEH Committee's advisors spent thousands of hours conducting discovery, reviewing relevant documents, and researching potential claims.

ny-1210496

10.     Ultimately, the Disinterested Directors reached a comprehensive settlement of all prepetition inter-Debtor claims.  A description of the Disinterested Director Advisors' investigation, the terms of the resulting Disinterested Director Settlement, and the claims included in that settlement are described in detail at paragraphs 41-44 of the Settlement Motion and pages 146-161 of the *Disclosure Statement for the Fifth Joint Plan of Reorganization* [D.I. 6124] (the "**Disclosure Statement**").  In support of the Disinterested Director Settlement, EFCH, TCEH, EFIH, and certain Disinterested Directors filed with the Court detailed statements (the "**Disinterested Director Statements**")[4] describing the multiple presentations and memoranda prepared by the TCEH Independent Advisors, the EFH Independent Advisors, and the EFIH Independent Advisors (each as defined in the statements) regarding the claims and causes of action being settled, including the strengths, weaknesses, and potential values of those claims (the "**Presentations**").[5]

### III.    Global Settlement of Claims

11.     Following the Disinterested Director Settlement, the Debtors and certain key constituents at all levels of the TCEH capital structure engaged in extensive, complex, and contentious negotiations regarding the terms of a potential global settlement to facilitate the Debtors' exit from bankruptcy.  Ultimately, the Settlement Parties reached an agreement on the terms of the global settlement, which resolves various inter-Debtor claims as well as claims against the TCEH First Lien Creditors, the Sponsors, and the Debtors' directors and officers.  As described in the Settlement Motion, these claims relate to, among other things, the LBO, intercompany notes, reimbursement agreements, tax matters, shared services fees, restructuring fees, Sponsor fees, the issuance and amendment of First Lien Debt, debt repayments, upstream

---

[4] *See* D.I. 4145, 4146, 4147.

[5] *See* D.I. 4145-1, 4146-2, 4146-3.

guarantees, the Debtors' use of unencumbered cash, and certain other matters.  As a result of this global settlement, the Settlement Agreement contains mutual releases of all claims among the various Settlement Parties.

12.    On August 10, 2015, the Debtors filed the Settlement Motion, seeking (i) approval of the settlement of litigation on the terms outlined in the Settlement Agreement attached thereto as Exhibit 1 to Exhibit A, and (ii) authorization for the Debtors to enter into and perform under the Settlement Agreement.

13.    On September 21, 2015, the Debtors filed the *Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 6122] (the "**Plan**").

14.    On October 23, 2015, various parties filed objections (collectively, the "**Objections**") to the Settlement Motion and Plan.

15.    The Settlement Motion and the Plan are scheduled to be heard by the Court beginning on November 3, 2015.

16.    Contemporaneously herewith, the TCEH Committee has filed a reply in support of plan confirmation (the "**TCEH Committee Plan Reply**").

## REPLY

### IV.    The Settlement Agreement Is Fair and Equitable and in the Best Interests of the Debtors' Estates

17.    Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  In addition, the Court maintains inherent equity powers and statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

18.      "To minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (quotations omitted).  Courts may approve a settlement that is "fair and equitable." *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644, 646 (3d Cir. 2006).  In determining the fairness and equity of a compromise, the Court "need not decide the numerous questions of law or fact raised by litigation, but rather should canvas the issues to determine whether the settlement falls above the lowest point in the range of reasonableness." *In re Capmark Fin. Group, Inc.*, 438 B.R. 471, 515 (Bankr. D. Del. 2010) (Sontchi, J.) (citation omitted).  *See also In re ID Liquidation One, LLC*, 555 F. App'x 202, 207 (3d Cir. 2014) (holding that the bankruptcy court is not required to "have all of the information necessary to resolve the factual dispute, for by so doing, there would be no need of settlement"; rather, the court need only "have a record upon which it [could] make its determination."); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 833 (Bankr. D. Del. 2008) (same); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (citations omitted) ("the Court does not have to be convinced that the settlement is the best possible compromise.  Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities."); *In re Jasmine, Ltd.*, 258 B.R. 119, 123 (D.N.J. 2000) (The court is not supposed to have a "mini-trial" on the merits…..").

19.      Courts within the Third Circuit have adopted a four factor test for determining whether a settlement proposed pursuant to Bankruptcy Rule 9019 is "fair and equitable." *See In re Martin*, 91 F.3d at 393.  The four factors adopted by the *Martin* court are (1) the probability of success in litigation, (2) the likely difficulties in collection, (3) the complexity of the litigation

8

involved, and the expense, inconvenience and delay necessarily attending it; and (4) the

paramount interest of the creditors and a proper deference to their reasonable views.  *Id.*; *accord*

*In re Nutraquest, Inc.*, 434 F.3d at 644.

## V.    No Heightened Scrutiny Is Necessary

20.     Contrary to the EFH Committee's assertions,[6] the Settlement Motion is not

subject to any heightened or enhanced level of scrutiny because the Settlement: (i) does not

constitute a breach of the directors' fiduciary duties, (ii) is not an "insider transaction" simply

because the Debtors' directors and officers are receiving releases thereunder, and (iii) does not

constitute merger consideration in the sale of Oncor.

21.     The Disinterested Directors have spent significant time and effort analyzing the

claims and causes of action being settled, including the strengths, weaknesses, and potential

values thereof.[7]  Following their evaluation, the Disinterested Directors met with each other and

their respective advisors, as well as with various other parties in interest in the Chapter 11 Cases

to discuss the relative merits and values of the claims.[8]  After fully informing themselves of the

material information regarding each of the claims, the Disinterested Directors ultimately reached

a settlement of these claims in March 2015.

22.     Following the Disinterested Directors' Settlement, various parties in interest,

including the Disinterested Directors, negotiated the terms of a global settlement, which includes

the Inter-Debtor Settlement, the First Lien Settlement, and the S/D/O Settlement, each of which

are embodied in the Settlement Agreement.  The notion that the Disinterested Directors breached

their fiduciary duties in agreeing to the Settlement Agreement borders on the absurd.  As the

---

[6] *See* EFH Committee Objection ¶¶ 145-184.

[7] *See* Settlement Motion ¶¶ 79-224; Disclosure Statement at 146-161; Presentations, generally.

[8] *Id.*

evidence at trial will show, the Disinterested Directors, with the assistance of the Disinterested

Director Advisors, engaged in a thorough and exacting process to investigate the claims and

negotiate the Settlement Agreement.  That process involved over thirty individual parties

representing a variety of interests (including the Debtors, directors, officers, Sponsors, TCEH

First Lien Creditors, TCEH Second Lien Noteholders, TCEH Unsecured Noteholders, and the

TCEH Committee) as well as time-consuming, extensive, and often contentious negotiations

regarding the terms of the Settlement Agreement in an arm's length, mediated process lasting

several months.  Indeed, this process was the opposite of "rushed"[9] when considering the fact

that all parties involved have been analyzing claims and considering potential ways to maximize

value for the Debtors' estates since the case filed in April 2014 (and in some instances, before).

Thus, there is no basis to conclude that any aspect of the negotiations of the Settlement

Agreement requires a heightened level of scrutiny.

      23.     The EFH Committee also argues that heightened scrutiny must be utilized

because the Settlement Agreement was negotiated by insiders, who benefit from the settlement in

the form of releases.[10]  The mere fact that the Debtors' directors and officers are receiving

releases under the Plan and Settlement Agreement—as do nearly all directors and officers in

bankruptcy cases—does not mean that the process was flawed in any way or the result of a

breach of fiduciary duties.  *See H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 149-50 (Del

Ch. 2003) (holding that negotiated releases for directors and officers in a settlement agreement

does not make the settlement an "interested party transaction" because such releases are more or

less "universal"). The cases cited by the EFH Committee are all factually distinguishable either

---

[9] *See* EFH Committee Objection ¶ 70.

[10] *See* EFH Committee Objection ¶ 169.

because the referenced settlements involved a single insider with significant negotiating power,[11]

or the Court declined to apply heightened scrutiny to the settlement.[12]  Here, in contrast,

numerous case constituencies were involved in highly contentious negotiations, and all parties

were well informed, fought hard for their positions, and negotiated in good faith.    Indeed, there

is no case that the TCEH Committee is aware of that applied heighted scrutiny to a settlement

negotiated by disinterested directors and advisors merely because such directors were receiving

releases under the settlement.

24.      The EFH Committee also argues that enhanced scrutiny should be applied

because the "Intersilo Settlement is properly viewed as merger consideration in a change-of-

control transaction."[13]  This is simply not true.  While the Settlement Agreement may have been

a critical component of the Debtors' determination to move forward with the Plan, that does not

---

[11]*See e.g.*, *In re Chassix Holdings, Inc.*, 533 B.R. 64, 70 (Bankr. S.D.N.Y. 2015) (heightened scrutiny applied where debtors' claims against its private equity sponsor relating to pre-bankruptcy dividend were released pursuant to a settlement negotiated by debtors, their noteholders and sponsor, and sponsor controlled debtors at time dividend was paid); *In re Loudoun Heights, LLC*, No. 13-15588-BFK, 2014 WL 2928110, at *13 (Bankr. E.D. Va. June 27, 2014) (heightened scrutiny applied where settlement involved only two parties, debtor and its secured creditor, and wife of debtor's sole manager benefited as a result of settlement); *In re Moultonborough Hotel Grp.*, LLC, No. 10-14214-JMD, 2012 WL 5464630, at *9-10 (Bankr. D.N.H. Nov. 8, 2012) (heightened scrutiny applied where debtor's chapter 11 plan, negotiated by the debtor and its secured creditors, released debtor's claims against its principal and managing member); *In re Dharmasuriya*, No. 2:09-BK-28606-PC, 2014 WL 845991, at *3 (Bankr. C.D. Cal. Mar. 4, 2014) (heightened scrutiny applied where settlement, negotiated between chapter 7 trustee and debtor's spouse after five days of mediation, released claims against spouse in exchange for payment to estate); *Conn. Gen Life Ins. Co. v. United Cos. Fin. Corp.* (*Matter of Foster Mortg. Corp.*), 68 F.3d 914, 919 (5th Cir. 1995) (heightened scrutiny applied where settlement involved only two parties, debtor-subsidiary and its parent company, and parent company entered settlement without properly examining basis for settlement); *In re Drexel Burnham Lambert Grp. Inc.*, 134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991) (heightened scrutiny applied where law firm representing debtors in negotiation of settlement with former CEO had previously represented CEO in negotiation of CEO's original employment agreement with debtors);

[12] *See e.g.*, *In re Exaeris, Inc.*, 380 B.R. 741, 746-47 (Bankr. D. Del. 2008) (refusing to approve a sale of substantially all of the debtors' assets for $2.5 million but noting that "[w]hether courts are required to apply a stricter standard when evaluating settlements negotiated by insiders of a debtor is not necessary to decide now."); *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC* (*In re Charter Commc'ns*), 419 B.R. 221, 241 (Bankr. S.D.N.Y. 2009) ("Given the role played by the independent directors and the evidence indicating that Mr. Allen did not exert any undue influence over Charter in negotiating the CII Settlement, the CII Settlement should be evaluated under the standards applicable to approval of bankruptcy settlements in this Circuit and not under the 'entire fairness' standard of Delaware law applicable to transactions with controlling insiders.")

[13] *See* EFH Committee Objection ¶ 164.

mean it is part of the "consideration" for the Oncor REIT transaction. The parties agreed to the Inter-Debtor Settlement, and the global Settlement Agreement, in an effort to move the Chapter 11 Cases forward with a plan of reorganization and enable the Debtors to ultimately exit bankruptcy. In fact, the terms of the Inter-Debtor Settlement largely track the Disinterested Director Settlement, which was agreed to by the Disinterested Directors before the plans crystallized for the Oncor REIT transaction.

25.    For these reasons, there is no reason to apply any heightened or enhanced or higher level of scrutiny to the Settlement Motion.

## VI.    The *Martin* Factors Are Met

26.    The Settlement Agreement represents a fair and equitable resolution of many of the claims and disputes in these Chapter 11 Cases. The proposed settlement provides a fair and practical resolution of a host of complex claims, which, if litigated to their conclusion, would consume vast amounts of the Debtors' time and resources, leading to significant delay and uncertainty regarding the conclusion of the Chapter 11 Cases. The Settlement Agreement was the product of significant and lengthy discussions and negotiations between the Debtors and numerous parties-in-interest over the course of several months, culminating in a mediated settlement that falls within the range of reasonable litigation outcomes. As discussed below, each of the applicable *Martin* factors weighs in favor of approving the settlement.

27.    During the course of these Chapter 11 Cases, several parties have made the Court aware of the various claims and causes of action being settled, including the factual and legal analyses, strengths, weaknesses, and potential values of those claims.[14] Despite the EFH

---

[14] *See* Standing Motions (and related objections and replies), Litigation Letters, Settlement Motion ¶¶ 79-224; Disclosure Statement at 146-161; Presentations, generally.

Committee's position to the contrary,[15] in canvassing the issues to determine whether a global settlement falls above the lowest point in the range of reasonableness, the Court need not undertake a "mere math exercise comparing the sum of the parts to the whole" because there are "benefits to be recognized by a global settlement of all litigation . . . that may recommend a settlement that does not quite equal what would be a reasonable settlement of each part separately." *In re Washington Mutual, Inc.*, 442 B.R. 314, 329 (Bankr. D. Del. 2011). Nonetheless, the TCEH Committee will discuss briefly the merits of its key claims against the E-side to highlight the significant factual and legal issues that remain outstanding for each of the claims to demonstrate why settlement of such claims is warranted.

### A.    Probability of Success in Litigation

28.    While the TCEH Committee believes that the TCEH Debtors' claims (as identified in the Settlement Motion, the Standing Motions, the Litigation Letters, and the Presentations) against the E-side Debtors, the TCEH First Lien Creditors, the Sponsors, and the Debtors' directors and officers are strong, valuable claims, these claims are not without risk. Certain of these claims involve legal matters of first impression in the Third Circuit, and many of these claims are highly fact-intensive.

29.    For example, certain of the claims relate to transactions or transfers occurring in early 2007 or before or arise from the 2007 LBO, the 2007 Management Agreement, and the Intercompany Notes. The TCEH Committee believes that its arguments that these claims are not time-barred based on application of the extended statute of limitations available to the IRS as an unsecured creditor are sound.[16] As reflected in the objectors' briefs filed in connection with the

---

[15] *See* EFH Committee Objection ¶ 186.

[16] *See e.g.*, *Ebner v. Kaiser (In re Kaiser)*, 525 B.R. 697, 713 (N.D. Ill. 2014) ("The view that the statute of limitations available to the IRS may not be invoked by a bankruptcy trustee has no basis in the plain language of section 544(b). It is well established that suits by the Trustee under section 544(b) are derivative; the Trustee steps

Standing Motions, however, various parties in interest vigorously dispute the availability of the extended statute of limitations.[17]    The Settlement Parties recognize that the Third Circuit has not yet ruled on this issue, resulting in substantial questions as to the viability of certain of the older claims.

30.    Notwithstanding that many of these claims involve fact-intensive issues and, in some instances, legal decisions of first impression, the TCEH Committee believes that TCEH has legitimate claims worth billions of dollars against EFH, EFIH, and Oncor, as described below.

### a.    Tax Claims

31.    For the reasons identified in the Litigation Letters, the Presentations, the Settlement Motion and the Disclosure Statement,[18] TCEH has strong claims against EFH (i) in the aggregate amount of $754 million arising under the TAA and from the parties' course of dealing, consisting of amounts payable from EFH to TCEH relating to TCEH's alternative minimum tax credits ("**AMT**"), net operating losses, and net operating loss carryovers (together, the "**NOLs**"), and (ii) for tax payments in the aggregate amount of approximately $101.7 million relating to the settlement of the 1997-2002 IRS and Texas state tax audits.

---

[17] *See* D.I. 3732 (citing *In re Vaughan Co.*, 498 B.R. 297 (Bankr. D.N.M. 2013), which rejected the idea that the Internal Revenue Code can be used to extend the statute of limitations for fraudulent conveyances on the basis that the extended statute of limitations can only be used by a sovereign power and not by private parties).

[18] Presentation at D.I. 4145-1 at *See* Miller Decl., Ex. B; Settlement Motion at ¶¶ 195-222; Disclosure Statement at 159-160.

into the shoes of a creditor and enforces the rights of that creditor for the benefit of the bankruptcy estate."); *Finkel v. Polichuck (In re Polichuck)*, 506 B.R. 405, 427 (Bankr. E.D. Pa. 2014) ("Generally speaking, the IRS is an unsecured creditor that is able to avail itself of the avoidance provisions of PUFTA and the Trustee may properly use the IRS' status as a creditor."); *accord G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.)*, 313 B.R. 612, 636 (Bankr. D.N.J. 2004) (holding that an official committee could bring a fraudulent transfer action on behalf of the New Jersey Department of Environmental Protection and take advantage of the NJDEP's ten-year statute of limitations period for asserting a fraudulent transfer action).

ny-1210496

32.     The $754 million claim, which was included on EFH's SOFAs and Schedules filed with the Court and not listed as contingent, unliquidated or disputed when filed, is not a "book-keeping error" as alleged by the EFH Committee.[19]  Rather, these amounts were recorded on the Debtors' books and records based on the Debtors' application of the TAA, which was intended to ███████████████████████████████████████████████████████

███████████████████████████████████████████████ (*See* Miller Decl., Ex. 1, Keglevic Dep. 10/1/15, 377:23-378:3.)

33.     While numerous parties have analyzed the TAA and its proper application, the parties have yet to reach agreement as to the meaning of the term "members" as used in the TAA and whether netting is properly allowed under the TAA.  (*See* Miller Decl., Ex. 1, Keglevic Dep. 10/1/15, 377:14:22 ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████ *id*., 378:25-379:4 ██████████

███████████████████████████████████████████████

████████████████████████)[20]  This gating issue of contract interpretation means that any litigation regarding the merits of these claims would involve an intensive factual dispute.

34.     Based on its extensive investigation of the tax claims, the TCEH Committee believes that the $754 million tax claim is valid.

35.     The TCEH Committee contends, based on the language of the TAA and the extrinsic evidence identified in the Settlement Motion at ¶ 199, that the disregarded entities are "members" for purposes of the TAA.  As "members", the payables to and receivables from EFH

---

[19] *See* EFH Committee Objection ¶ 98.

[20] *Compare positions set forth in* Settlement Motion ¶¶ 197-203 *with* EFH Committee Objection ¶¶ 105-112.

ny-1210496

under the TAA should ***not*** be netted.[21]  (*See* Miller Decl., Ex. 3, Sections 3(a)-(c) of the TAA, which provide that any amounts allocated to a member under Step 1 and Step 2 are to be paid directly by the applicable TCEH Debtor to EFH, and any amounts under Step 3 are to be paid directly by EFH to the applicable TCEH Debtor.)  Further, although the TAA by its terms is effective as of January 1, 2010, ███████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████  (*See* Miller Decl., Ex. 4, Transaction Decision Paper – Mark-to-Market Settlement and Tax Sharing Considerations, dated September 5, 2013, at 6 of 10 (EFH04634531-40)); *see also* Ex. 1, Keglevic Dep. 10/1/15, 379:5-10 ████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████

     36.     Accordingly, the EFH Committee's proposal to net the tax payments owed by EFH to TCEH for use of its NOLs against Luminant Generation's income runs directly contrary

---

[21] In its independent investigation, the TCEH Committee uncovered significant evidence supporting a reading of the TAA that ██████  *See e.g.*, *See* Miller Decl., Ex. 2, Transaction Decision Paper – Tax Sharing Agreement, dated October 10, 2011 at 4 of 11 (EFH03344498-508) ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████  Miller Decl., Ex. 5, Notes for Q4 2012 EFH Investor Call, EFH Corporate, at 3 (EFH03041132-63) ████████████████████████████

Miller Decl.,  Miller Decl., Ex. 6, Discussion Deck for the 2012 Edison Electric Institute Financial Conference, dated November 11-14, at 40 (EFH02659408-55) (same); Miller Decl., Ex. 7, EFH, Annual Report (Form 10-K for 2012) (Feb. 19, 2013) at 82 ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████  Miller Decl., Ex. 8, TCEH Consolidated Financial Statements as of December 31, 2012 and Independent Auditors' Report at 24 (EFH00988395-464) ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

to the plain terms of the TAA and to the rules and principles that long governed the Debtors' understanding of their respective rights and obligations.  TCEH should be compensated by EFH for use of its NOLs.  For these reasons, the TCEH Committee believes that TCEH has potential claims against EFH under the TAA for the value and use of its NOLs.

37.    The TCEH Committee also believes that TCEH should be compensated by EFH for use of its AMT credits.  <u>First</u>, the TAA is effective for "***all open taxable years*** beginning after December 31, 2009." (Section 6.4 of the TAA (emphasis added).)[22]  At the time the TAA was entered into, the taxable year to which the AMT claim relates was "open".[23]  Furthermore, as discussed above, the TAA memorialized the rules that the EFH group had historically followed, and so the methods described in the TAA should be applicable to tax years prior to 2010.  <u>Second</u>, the TCEH Committee's investigation uncovered documentation showing that

███████████████████████████████████████████████

████ ████[24]  <u>Third</u>, as noted above, the TAA was intended to treat each entity as if it filed its own separate tax return.[25]  As part of the aforementioned IRS audit resolution, TXU Europe realized excludable cancellation of debt income.  On a stand-alone basis, TXU Europe would have had to reduce its tax attributes following the exclusion of that income.[26]  However, because TXU Europe was part of the EFH Group, the tax attributes of other members (i.e., TCEH) were reduced instead.  While it is reasonable for the Chief Financial Officer to determine that one

---

[22] This language must logically refer to open tax years prior to 2010 because at the time the TAA was signed, all tax years from 2010 and forward were still open.  If the language was meant to include only tax years after 2009 but exclude open tax years prior to 2010, then the qualifier "open" would be unnecessary.

[23] The IRS settlement closing agreement to which the AMT component of the $754 million claims relates was not finalized until August 30, 2013.  (*See* Miller Decl., Ex. 9, EFH02029022.)

[24] *See* Miller Decl., Ex. 10, EFH02029826.

[25] *See* Miller Decl., Ex. 1, Keglevic Dep. 10/1/15, 377:23-378:3; *see also* Miller Decl., Ex. 2, Transaction Decision Paper – Tax Sharing Agreement, dated October 10, 2011 at 3 of 11 (EFH03344498-508).

[26] *See* 26 U.S.C. § 108(b).

member should pay another member (through EFH as the TAA provides) if the first member has excludable cancellation of debt income, thereby causing a reduction of another's AMT credits under the TAA,[27] it would be unreasonable and inconsistent with the purpose of the TAA if TCEH was not compensated for the reduction of its AMT credits.[28]  Accordingly, the TCEH Committee believes it has a valid claim against EFH for the value of its AMT credits.

38.    TCEH also has preference claims against EFH relating to the payment of taxes. During the one year period prior to the Petition Date, TCEH made tax sharing payments to EFH in the aggregate amount of approximately $101.7 million for settlement of the 1997-2002 IRS and Texas state audits.[29]  Neither the 1997-2002 IRS and Texas audit settlements nor the associated payments of approximately $101.7 million were an occurrence that arose in the ordinary course of the Debtors' business.  Unlike the quarterly and year-end tax payments that occurred regularly and with the passage of time, payments related to the audit settlements were extraordinary events that arose only after the IRS and the Texas Comptroller initiated audits and only after extensive negotiations with such taxing authorities.  Thus, the TCEH Committee believes that these valuable preference claims are not subject to an "ordinary course" defense by EFH.

---

[27] This would be permitted under Step 3 of the TAA, which provides that the Chief Financial Officer determines the "consistency and reasonableness" of the method of allocating items of income, deduction, net operating losses, and tax credits. (*See* Miller Decl., Ex. 3, TAA Section 1.2, Step 3.)

[28] Under TAA Section 1.2, Step 3 and Section 3(c), a member whose tax credits are attributable to amounts allocated under Step 2 shall be paid for these tax credits. (*See also* Miller Decl., Ex. 4, Transaction Decision Paper – Mark-to-Market Settlement and Tax Sharing Considerations, dated September 5, 2013 at 7 of 10 (EFH04634531-40)) ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████

[29] Specifically, (i) on September 9, 2013, TCEH made a cash payment of $84,439,285.44 to EFH in connection with the resolution of certain issues raised by the IRS in the 1997-2002 audit cycle, and (ii) on September 19, 2013, TCEH made a payment of $17,348,546 to EFH resulting from the resolution of the 1997-2002 Texas state audit. (*See* Miller Decl., Ex. 11, EFH02157733 and Ex. 12, EFH05859571.)

39.     For these reasons, the TCEH Committee believes, based on its extensive investigation to date, that the TCEH Debtors have significant and valuable claims against EFH in the aggregate amount of approximately $855 million relating to the tax claims.

### b.     Tax Free Spin

40.     The EFH Committee's argument that EFH is not at risk from a taxable disposition of the TCEH Debtors is also wrong.[30]  The EFH Committee contends there is no reason to pay the TCEH Debtors any value for consenting to a tax-free spin of TCEH and a reduced step-up in the tax basis of TCEH assets because there is no foreseeable circumstance in which EFH is at risk for the payment of taxes based upon a taxable disposition of TCEH.[31]  However, regardless of the cash tax liability assumptions, the Plan *must include a tax-free spin* of TCEH to effect the REIT reorganization.  The REIT is a critical component of the Debtors' reorganization because it significantly enhances the value of the Debtors' estates, allowing the E-side creditors to be paid in full.[32]  The Debtors believe that all creditors, including E-side creditors, would be worse off in an alternative plan scenario because any alternative reorganization or liquidation not involving a REIT would not realize the significant value of the estate.[33]

41.     A tax-free spin is necessary to effectuating the REIT reorganization because, under the Internal Revenue Code, an entity that converts to a REIT must distribute its "earnings and profits" (as defined in the Internal Revenue Code) ("**E&P**") attributable to any non-REIT year by the end of the first taxable year of the conversion to a REIT (the "**E&P Purging**

---

[30] *See* EFH Committee Objection ¶ 96.

[31] *See* EFH Committee Objection ¶¶ 96-97.  The EFH Committee's assertion that there is no foreseeable circumstance in which EFH is at risk for the payment of taxes is inaccurate considering the uncertainty regarding what the value of TCEH's assets will be and what NOLs will be available by the time TCEH emerges from bankruptcy.

[32] *See* Debtors' Memorandum of Law in Support of Confirmation of Joint Plan of Reorganization [D.I. 6647] (the "Debtors' MOL") ¶ 12.

[33] *See* Disclosure Statement at 2.

Dividend").[34]  The Debtors' current estimate of E&P at emergence is $25-30 billion.[35]  Thus, in

a taxable disposition of TCEH (as proposed by the EFH Committee) involving a REIT

conversion, all of the E&P would be attributable to EFH, and so EFH would be required to pay a

$25-30 billion E&P Purging Dividend, at least $5-6 billion of which would need to be in cash.[36]

Such a distribution would destroy the economics of the Plan.  The REIT would not be capable of

paying an E&P Purging Dividend of this magnitude, and so a REIT conversion would be

unattainable.  However, pursuant to the relevant Treasury regulations,[37] a tax-free spin of TCEH

(as proposed under the Plan and Settlement) allocates most of the E&P to TCEH and allows the

REIT to be formed without the E&P Purging Dividend becoming prohibitive.

### c.  Foregone Interest on Intercompany Notes

42.    The TCEH Committee's extensive investigation also revealed that TCEH has

valuable constructive fraudulent transfer claims against EFH based on EFH's failure to provide

reasonably equivalent value to TCEH as a result of the low interest rate paid to TCEH under the

TCEH Intercompany Notes.  Specifically, TCEH was undercompensated by at least █████

██████, and up to ██████████, depending on the applicable statute of limitations and

prejudgment interest rate.  (*See* Miller Decl., Ex. 13, Report of Eric R. Mendelsohn, Managing

Director of Greenhill & Co. LLC, at 31 (October 12, 2015) (the "**Mendelsohn Report**").)[38]

---

[34] See 26 U.S.C. § 857(a)(2)(B).

[35] *See* Debtors' MOL, ¶ 15.

[36] *See* Debtors' MOL, ¶¶ 15-16.

[37] *See* Treas. Reg. § 1.312-10(a).

[38] The six year statute of limitations and pre-judgment interest rate available under New York law applies to this constructive fraudulent transfer claim.  Delaware courts typically apply the "most significant relationship" test to determine which state's law applies to a fraudulent transfer claim, taking into account: (i) the place where the injury occurred, (ii) the place where the conduct causing the injury occurred, (iii) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (iv) the place where the relationship, if any, between the parties is centered.  *See Travelers Indem. Co. v. Lake*, 594 A.2d 38, 47 (Del. 1991).   For the reasons identified in the Debtors' Reply, New York law applies because the parties most significantly impacted—the Debtors' funded

43.    The EFH Committee's argument that the TCEH Intercompany Notes provide TCEH with "negative arbitrage" and "were more profitable than any alternative available to TCEH"[39] is nonsensical—TCEH's investment would have been more profitable if it had obtained market rate interest on each new advance under the Intercompany Notes.  While the effective interest rate on the Intercompany Notes (priced at LIBOR + 5.0%) may have been fair at issuance, TCEH was undercompensated with each new advance as LIBOR decreased and EFH's credit risk increased.  (See Miller Decl., Ex. 14, Mendelsohn Dep. 10/21/15, 119:19-22

███████████████████████████████████████████████████████████

███████████████████████████████  Miller Decl.,  Ex. 13, Mendelsohn Report at 16-17.)[40]  This discrepancy is highlighted when TCEH's yield on the Intercompany Notes is compared to the yield on ████████████████████  (See Miller Decl., Ex. 13, Mendelsohn Report at 20

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

44.    It is appropriate to compare the Intercompany Notes to the Third Party EFH Unsecured Notes[41] because, among other things, all were subject to the same credit risk with EFH as borrower and all had a similar maturity.[42]  While the Intercompany Notes were fully

---

indebtedness creditors—are based primarily in New York and their agreements with the Debtors are likewise governed by New York law.

[39] See EFH Committee Objection ¶ 116.

[40] From 2007 to 2013, EFH's creditworthiness was decreasing steadily.  See Miller Decl., Ex. 13, Mendelsohn Report at 13 (in 2007, EFH was issued a B- rating by S&P and a B2 rating by Moody's; in 2013, EFH was issued a CCC rating by S&P and a Caa3 rating by Moody's).

[41] The EFH Committee's suggestion that the Intercompany Notes should be compared to the notes EFH issued to TCEH (see Miller Decl., Ex. 15, Report of Michael Henkin, Senior Managing Director of Guggenheim Partners, LLC ¶ 74 (October 12, 2015) (the "Henkin Report")) fails to take into account the fact that the borrower/lender relationship is different, as well as the relative functionality of the demand feature.

[42] See Miller Decl., Ex. 13, Mendelsohn Report at 16-19.  See also Miller Decl., Ex. 14, Mendelsohn Dep. 10/21/15, 226:8-11 ████████████████████████████████████████████

repaid after 5.2 years, the Debtors believed, at issuance, that the note program would be outstanding for 7 to 10 years.[43]  The fact that the Intercompany Notes contain a "demand feature" does not impact the expected maturity because the demand feature in this case was not functional.[44]  Thus, the interest rate on the Intercompany Notes should have been higher to take into account TCEH's extended exposure to EFH's credit risk for the full 7 to 10 year term.

### d.    Shared Services and Restructuring Costs

45.    The TCEH Committee's investigation also revealed that TCEH has valuable claims against EFH and EFIH due to TCEH's failure to receive reasonably equivalent value in exchange for the payments it made for shared services and restructuring costs.  Specifically, EFH over-allocated a disproportionate amount of the shared services and restructuring costs to TCEH and under-allocated shared services and restructuring costs to EFH and EFIH over a period of four years.[45]  Indeed, in its investigation, the TCEH Committee identified an email from an EFH employee acknowledging ███████████████████████████████████████████████████



---

██████████████████████████ 148:23-149:3 █████████████████████████

██████████████████████

[43] Miller Decl., Ex. 14, Mendelsohn Dep., 131:16-22 ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[44] The demand feature on the Intercompany Notes is not functional—it is extremely unlikely that EFH (as parent of TCEH) would use TCEH (its subsidiary/lender) to effectively demand repayment of itself.  (*See* Miller Decl., Ex. 14, Mendelsohn Dep. 10/21/15, 116:9-11 ████████████████████████████ *Id.* at 210:11-17 ████████████████████████████████████████  This is particularly true where, as here, EFH would have to borrow at a higher rate to repay the debt.  (*See* Miller Decl., Ex. 13, Mendelsohn Report at 19.)

[45] Contrary to the EFH Committee's assertions, the TCEH Debtors are not arguing that services provided "at cost" are too expensive and should have been provided at less than cost.  *See* EFH Committee Objection ¶ 98; *see also* Settlement Motion at ¶¶ 190-194; D.I. 4145-1 at 41; Disclosure Statement at 159.

notwithstanding that EFH was the primary beneficiary of shared services and ███████████

███████████████████████████████████████████.[46]

46.    The EFH Committee's argument that EFH was "not the recipient of any payment from TCEH under this agreement"[47] is a red herring—an action lies here because EFH and EFIH received a benefit to the detriment of TCEH.  Section 550(a) allows the trustee to recover a fraudulent transfer from the initial transferee "or the entity for whose benefit such transfer was made."  11 U.S.C. § 550(a)(1).  Case law reflects that a debtor does not receive reasonably equivalent value when it assumes its affiliates' financial responsibilities and receives nothing in return.  *See Gellert v. Coltec Indus. (In re Crucible Materials Corp.)*, No. 09-11582 (MFW), 2012 WL 5360945, at *7 (Bankr. D. Del. Oct. 31, 2012) (holding that a litigation trustee could recover under section 550 the value of a fraudulent transfer from a guarantor who received no funds but was an "entity for whose benefit such transfer was made").

### e.    Luminant Generation's Makewhole Claims

47.    The TCEH Committee's investigation also revealed that Luminant Generation has valuable claims against EFIH and Oncor[48] for at least $159 million due to Luminant Generation's failure to receive reasonably equivalent value under the Reimbursement

---

[46] *See e.g.*, Miller Decl., Ex. 16, Email from Terri Woodlee, EFH to John Thompson, EFH, dated June 17, 2011 (EFH00771153-54) ████████████████████████████████████████████████████

████████████████████ Miller Decl., Ex. 17, Memorandum of Jennifer Bonhard, Director of Technical Accounting regarding Application of ASU 2009-17 to EFH Business Services Corp. (EFH00552249-253, at EFH00552253) ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

[47] Contrary to the EFH Committee's assertions, the TCEH Debtors also are not proposing to bring claims against EFH Corporate Services.

[48] As described in the Settlement Motion at ¶ 174, EFIH and Oncor both would be defendants in this dispute because the original agreements were between Luminant Generation and Oncor, and then EFIH stepped in as an intermediary for the proposed settlement.

Agreements.  Specifically, in September 2012, Luminant Generation's remaining future payments to Oncor/EFIH under the Reimbursement Agreements, which would have totaled $212 million from September 2012 through the May 2016 agreement termination date, were settled for an up-front payment of $159 million.  By requiring the early payment several years prior to the termination date, *after* the Debtors hired restructuring counsel and admitted their insolvency in public filings, Oncor/EFIH substantially reduced their exposure to the risk that Luminant Generation would be unable to make all of the scheduled payments under the Reimbursement Agreements.  Thus, Luminant Generation's transfer of $159 million to Oncor/EFIH—prematurely satisfying payments that were not yet due at a time when the Debtors were indisputably preparing for a bankruptcy filing—was a fraudulent transfer for which Luminant Generation did not receive reasonably equivalent value.

### f.    Claims Held by EFH/EFIH Against TCEH

48.    Despite the EFH Committee's arguments to the contrary,[49] the Disinterested Directors determined that the TCEH Debtors' claims against the E-side were significantly stronger than the E-side's claims against the TCEH Debtors, such that any settlement should include a net payment from the E-side to the T-side.[50]  First, as the EFH Committee admits,[51] the E-side Debtors cannot use their funded debt holdings issued by the TCEH Debtors to set off claims against them because mutuality is lacking.  Second, EFH's avoidance actions against TCEH for payment of advances are unlikely to succeed because there is no evidence that any of the transfers were made for less than reasonably equivalent value and there is no evidence that EFH was insolvent at the time of the transfers.  Third, it is entirely unclear how the EFH

---

[49]  *See* EFH Committee Objection ¶¶ 131-139.

[50]  *See* Disinterested Director Settlement; Settlement Agreement.

[51]  *See* EFH Committee Objection ¶ 133.

Committee contends that EFH's purchase of TCEH debt on the open market constitutes a fraudulent conveyance because the purchase confers no benefit whatsoever on TCEH and was at market rates. Fourth, there is no evidence that the interest rate on the EFH Demand Note undercompensated EFH for TCEH's credit risk for the time the EFH Demand Note was outstanding. The Debtors' Disinterested Directors and advisors evaluated all of the claims among the Debtors (as detailed in the Presentations),[52] and for these reasons, determined to settle them as part of the Settlement Agreement with the net value going in favor of the TCEH Debtors.

49.     In sum, the TCEH Committee's investigation leads to the conclusion that the TCEH Debtors have substantial, valuable claims against EFH, EFIH, and Oncor potentially worth billions of dollars. As noted above, however, the TCEH Committee recognizes that there is a meaningful risk associated with prosecuting these claims, as many of them involve fact-intensive issues and, in some instances, present legal issues of first impression in this Circuit. Accordingly, the TCEH Committee submits that the global settlement embodied in the Settlement Agreement is fair and falls within the range of reasonableness. In light of the foregoing, the first *Martin* factor weighs significantly in favor of approving the Settlement Motion.

## B.    Likely Difficulties in Collection

50.     If any Debtor (T-side or E-side) were to obtain a large net judgment against any other Debtor, that Debtor would have an unsecured claim in the Chapter 11 Cases and likely face difficulty in collection. The collectability of any judgment will depend, in part, on the overall valuation of the defendant Debtor at the time of collection. In addition, any net judgment by one

---

[52] Presentations at D.I. 4145-1, 4146-2, 4146-3.

Debtor against another may end up having little to no value (particularly after taking litigation costs into account). For example, if the TCEH Debtors are successful in obtaining a multi-billion dollar claim against EFH, the judgment may be partially collectible but it likely would significantly dilute the EFH claims pool threatening EFH's ability to pay its creditors in full, particularly in an alternative plan not involving the proposed REIT reorganization. As a result, the TCEH Debtors' recovery in this instance may not significantly exceed the settlement amount.

51.     If, in contrast, EFH were successful on its claims, EFH's judgment against TCEH likely would not be collectible at all. As reflected in the Plan, the TCEH First Lien Creditors have liens on substantially all of the Debtors' assets (subject to the Challenge) and under the plan, the TCEH First Lien Creditors will receive all of the assets of TCEH in a tax free spinoff. The TCEH Second Lien Creditors, whose interests are secured by the same collateral, are not recovering anything on account of their secured claims because the parties have determined that the value of the TCEH Debtors' assets does not exceed the TCEH First Lien Debt. Thus, if EFH were to obtain a net judgment against TCEH, it would share in the general unsecured claims pool with significantly lower recoveries due to TCEH's encumbered assets.

52.     Where collectability is questionable, as it is here, there is little potential upside in litigating the claims. *See In re Wash. Mut., Inc.*, 442 B.R. 314, 344 (Bankr. D. Del. 2011) (finding this factor in favor of settlement where, among other things, the court determined that if the debtors are successful in proving any claim against the FDIC as receiver, "it would be but one of many claims against the receivership with little prospect of any meaningful distribution.").

26

### C.    Complexity of Litigation, and Associated Expense Inconvenience and Delay

53.    Numerous parties have submitted briefs (along with the earlier filed Standing Motions, Litigation Letters, Presentations, and Disclosure Statement) disputing whether the Settlement Agreement is fair.  It is clear that each of the T-side and E-side constituents strongly believe in the merits of their respective claims and defenses—they have spent hundreds (if not thousands) of pages detailing and advocating for their claims, in most instances, citing a mountain of evidence and reams of case law.  These facts alone indicate that this is precisely the kind of case that "cries out for settlement."  *See In re Washington Mut., Inc.*, 442 B.R. at 329 (approving a global settlement of multi-faceted litigation where each individual disputed claim involves a multiplicity of issues raising complex and overlapping arguments).

54.    Litigation of these claims will require a significant amount of additional discovery (including depositions and expert discovery) and briefing, and likely will cost the parties several years of delay and tens of millions of dollars in fees.  In particular, there are numerous fact intensive questions relating to transactions that have occurred over the prior 10 years.  Resolution of many of these claims would require an analysis of the Debtors' solvency at various points in time and whether reasonably equivalent value was received in connection with numerous transactions (including, among others, the transfers of liens and fees to the TCEH First Lien Creditors, payments under the TAA, payments of interest on the Intercompany Notes, the allocation of payments relating to shared services and restructuring costs, and payments under the Reimbursement Agreements).  Further, as discussed above, the claims also cover, in some instances, novel issues of law or issues of first impression in this Circuit.  Given the high stakes for many of these claims, a resolution of the claims likely will result in one or more appeals.  While the TCEH Committee believes that its claims are valid and valuable based on its

investigation to date, a significant amount of work remains to be done to actually collect on these claims.

55.     Absent a settlement, the complexity of litigation over all of these claims would significantly delay the Debtors' exit from bankruptcy, possibly resulting in additional postpetition interest on various note claims, additional adequate protection payments, additional professionals' fees (which, at the current burn rate, could be hundreds of millions of dollars), and the continued distraction of management from the Debtors' day-to-day operations.

56.     In contrast, the benefits of the Settlement Agreement are clear—the Settlement Agreement represents a significant step forward in these Chapter 11 Cases as it achieves nearly complete consensus among the T-side creditors, obtained after months of hard-fought, and often precarious, negotiations with the assistance of a Court-appointed mediator.  This consensus greatly facilitates the Debtors' expeditious exit from bankruptcy and forms the foundation of a Plan that, in the TCEH Committee's judgment, represents the best opportunity to maximize value for all creditors, and specifically, the TCEH Debtors' unsecured creditors.  Critically, the peace that has been brokered under the Settlement Agreement will survive even if the Plan ultimately is not consummated.  The complex T-side and inter-silo issues will remain settled, including all inter-Debtor claims and all claims against the TCEH First Lien Creditors, the Sponsors, and the Debtors' directors and officers.  This arrangement will confer a lasting benefit on the Debtors, their estates, and their creditors because the Settlement Parties will not be forced to start over years into these Chapter 11 Cases in the unlikely event that the transactions contemplated in the Plan do not close.

### D.      Paramount Interests of the Creditors

57.     The global settlement is also in the paramount interests of all creditors as it resolves incredibly complex claims and paves the way for the Debtors to move forward with the

28

only plan that presents an opportunity to maximize the value of recoveries to all creditor groups, including payment in full of the E-side claims.  Notably, the global settlement has the support of T-side creditors at all levels of the capital structure, and even when analyzed from the perspective of the non-settling creditors, the global settlement is eminently fair and equitable. All parties would suffer a significant loss if the Settlement Motion is not approved because entry of the Settlement Order is a condition precedent to plan confirmation.[53]  The current Plan is the only plan that will pay the E-side creditors in full (or otherwise leaves them unimpaired) due to the anticipated increased value associated with the equity investment and REIT conversion. Further, to the extent an alternative plan not involving the global settlement could even be confirmed, any such  plan  would require the Debtors to establish a litigation trust to resolve the numerous claims outlined in the Settlement Motion, the Presentation, the Standing Motions, and the Litigation Letters, and it would take the parties many years and tens of millions of dollars to litigate to conclusion while placing creditor recoveries at risk and significantly delaying the distribution to E-side creditors.

58.    One of the primary benefits of the global settlement is its staying power.  While the investor consortium is fully committed to the Oncor REIT transaction and highly motivated to close, the Plan is subject to regulatory approvals and other conditions precedent.  The global settlement ensures that, if the Plan transactions fail to close, the T-side creditors will remain locked into an Alternative Restructuring on the terms set forth in the Settlement Agreement. These pre-negotiated terms will greatly facilitate the Debtors' expeditious exit from bankruptcy by removing the possibility that the parties will attempt to litigate the intercompany and first lien claims for years to come. This, in turn, will significantly benefit all parties by avoiding the

---

[53] *See* Plan, IX.A.1.

expense, delay, inconvenience and uncertainty attendant to any litigation and funds can instead be used to satisfy creditor claims (rather than pay litigation and interest costs). Courts have recognized that there are "benefits to be recognized by a global settlement of all litigation (eliminating costs of continued litigation and delay in distributions to creditors and shareholders) that may recommend a settlement that does not quite equal that would be a reasonable settlement of each part separately." *In re Washington Mut., Inc.*, 442 B.R. at 329. *See also In re Kaiser Aluminum Corp.*, 339 B.R. 91, 96 (approving a settlement that "will facilitate a plan of reorganization that will ultimately benefit all creditors and reduce the fees, costs, and expenses that the estate would have had to bear in order to litigate the extensive, complex, and uncertain issues raised by [the] claim."); *In re ID Liquidation One, LLC*, 555 F. App'x at 207 (holding that the bankruptcy court "used what it knew about the multiple claims at issue" to compare the "prospect of the achievement of real value" with "the concrete opportunity for reorganizing" and committed no error when it determined that the debtors' "decision to settle and walk away from the [released claims] in the context of an overall settlement" reflected "the exercise of [the debtors'] best business judgment.").

59.    While the TCEH Committee believes that the each component of the Settlement Agreement is reasonable, when viewed in the aggregate, there can be little question that the overall resolution of these claims is better than continued litigation. As noted above, after conducting an extensive investigation, the TCEH Committee concluded that the TCEH Debtors have strong and valuable claims against the E-side Debtors, potentially worth billions of dollars. In fact, the TCEH Committee was preparing to dispute the Disinterested Director Settlement, which settled only the Inter-Debtor Claims for $700 million (with potential recoveries of up to $805 million), on the basis that the settlement amount was much too low. However, upon

reaching the global settlement resolving all Inter-Debtor Claims, First Lien Claims, and S/D/O

Claims in favor of moving forward with the proposed Plan, the TCEH Committee determined

that the proposed terms would be acceptable in an Alternative Restructuring, provided that all

parties were fully committed to supporting the Plan at hand.  The TCEH Committee believes

there is significant value not only in the terms of the settlement itself, but also in the fact that the

Settlement Agreement will provide the building blocks to a successful restructuring, even if,

despite the parties' best efforts, the Plan transactions fail to close.  *See In re Nortel Networks,*

*Inc.*, 522 B.R. 491, 514 (Bankr. D. Del. 2014) (considering not only "the massive potential

amount of post-petition interest which could be owed," but also the "great benefit [to] the estate

in terms of resolving a major dispute [and] providing certainty . . . [and] a building block on

which parties-in-interest could perhaps construct a resolution to these cases as a whole.").

60.    The EFH Committee's argument that the settlement is not fair because the EFH

Committee  was  not  involved  in  settlement  negotiations  lacks  any  merit.[54]    There  is  no

requirement  that  all  creditors  impacted  by  a  settlement  must  participate  in  settlement

negotiations.  *See In re Capmark Fin. Grp., Inc.*, 438 B.R. at 519-20 ("While it is certainly true

that the settlement affects the Debtors' unsecured creditors, there is no requirement that those

creditors be actively involved in the settlement negotiations. Certainly it is within the debtors'

prerogative to exclude them.").  The interests of the EFH Committee and all E-side creditors

were  adequately  represented  by  the  EFH  and  EFIH  Disinterested  Directors,  and  there  is  no

evidence in the record that anything untoward occurred during settlement negotiations.[55]    The

---

[54] *See* EFH Committee Objection ¶¶ 199-202.

[55] The TCEH Committee responds similarly to the EPA's Objection. *See* D.I. 6601 ¶ 31.  The fact that no individual member of the TCEH Committee holds claims solely against EFCH does not "suggest[] that the interests of this creditor group were inadequately represented at settlement negotiations."  The TCEH Committee owes fiduciary duties owed to all creditors of the TCEH Debtors and, in accordance with those fiduciary duties, the TCEH

31

EFH Committee also suggests that the Plan and Settlement Agreement were structured in order to deprive E-side creditors of the right to vote on the global settlement or an alternative plan.[56] However, creditors are never entitled to vote on a settlement; they are merely entitled to object and be heard, and they have that right now.  Moreover, in the event the Plan fails and an alternative plan is proposed that impairs E-side creditors, they will have the ability to vote on that plan.

### a.    The Settlement Releases are Appropriate

61.    The EFH Committee seeks to apply the five factor test set forth in *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999), to the debtors' releases against third parties in the Settlement Agreement; however, there is no support for application of *Zenith* to non-Plan releases.[57]  Rather, the releases must be considered under the *Martin* factors in the context of the global settlement.[58]

62.    The TCEH Committee believes the S/D/O releases are fair and appropriate in light of the numerous compromises embodied by the Settlement Agreement.  Each of the Sponsors and the Debtors' directors and officers are giving up rights to assert valuable indemnification claims against the Debtors' estates.[59]  The Sponsors also are giving up significant additional value by agreeing that Texas Energy Future Holdings LP (which the Sponsors own and control) will not take a worthless stock deduction (which would result in

---

Committee was attentive to the interests of creditors of all TCEH Debtors, including those of EFCH, and negotiated zealously on their behalf.

[56] EFH Committee Objection at ¶¶ 79, 86.

[57] The EFH Committee cites to no case applying the *Zenith* factors to a settlement under Rule 9019 outside of the plan context, and the TCEH Committee was unable to find any such case.

[58] To the extent the Court determines the *Zenith* factors are necessary to evaluate the settlement releases, the TCEH Committee has applied the *Zenith* factors to the plan releases in the TCEH Committee Plan Reply, which are substantially similar.

[59] *See* Debtors' MOL ¶ 113; *see also* Miller Decl., Ex. 18, Dore Dep. 9/28/15, 420:2-9.

adverse tax consequences to the Debtors) and by agreeing to give up their rights to certain fees under the Management Agreement after September 30, 2013.[60]  Relinquishing the Management Agreement fees alone potentially cost the Sponsors over $200 million in value.

63.     Even more importantly, however, the Sponsors are giving up the right to receive any upside value (which could be significant) from their equity interests in the Oncor REIT post-merger.[61]  This particular compromise was critical for creating value for the TCEH Debtors' creditors and getting the T-side constituents on board with the settlement and consensual plan.  If the Sponsors had instead opted to retain their equity, there would be no value to the REIT restructuring from the perspective of the T-side creditors and a settlement likely could not have been reached.  Further, if the T-side parties were not inclined to pursue the REIT restructuring for the benefit of the Sponsors and instead pursued an alternative plan, the E-side would not be receiving payment in full.  Thus, the Sponsors' decision to give up their equity enables the REIT reorganization to occur, and it is the REIT reorganization that provides the E-side with significant value because the estimated REIT value is allowing the Debtors to pay E-side creditors in full—without the REIT, there is not enough money to do so.[62]

64.     For these reasons, the TCEH Committee determined that it was fair and equitable to provide the S/D/O Releases in light of all of the compromises made by the Sponsors, directors, and officers in the global settlement.

---

[60] *See* Debtors' MOL ¶ 113; *see also* Miller Decl., Ex. 18, Dore Dep. 9/28/15, 420:2-9 █████████████
███████████████████████████████████████████████████████████████████████
████████████████████████████

[61] *See* Miller Decl., Ex. 18, Dore Dep. 420:10-16 ████████████████████████████████
████████████████████████████████████████

[62] (*See* Miller Decl., Ex. 19, Ying Dep. 9/23/15, 88:4-14; Miller Decl., Ex. 1, Keglevic Dep. 10/1/15, 364:15 - 365:8; Miller Decl., Ex. 20, Williamson Dep. 9/30/15, 204:14-17 and 206:8-23.)

**b.      There is no Departure From the
Absolute Priority Rule**

65.      The EFH Committee's assertion that the settlement violates the absolute priority rule is simply wrong.  As discussed above, the Sponsors' releases were not granted on account of their junior interests.  Rather, the Sponsors gave up valuable rights and claims in consideration for those releases, including the right not to have Texas Energy Future Holdings LP take a worthless stock deduction and their right to receive over $200 million in fees under the Management Agreement.  Thus, there is no departure from the absolute priority rule here—the Sponsors' releases were granted in settlement of the parties' respective rights and claims.

66.      For the foregoing reasons, the paramount interest of creditors will be best served in these Chapter 11 Cases by approving the Settlement Motion, which resolves a significant amount of the Debtors' outstanding litigation and paves the way for the Debtors and parties in interest to maximize the value of recoveries to all creditor groups.  Importantly, the global settlement has the full support of T-side creditors at all levels of the capital structure, including the TCEH Committee, which thoroughly investigated all of the claims subject to settlement and participated in negotiations and discussions with the Debtors and parties in interest throughout these Chapter 11 Cases.  Accordingly, the fourth *Martin* factor weighs in favor of approving proposed settlement.

## CONCLUSION

67.     A review of the *Martin* factors set forth above clearly demonstrates that the global settlement is in the best interest of the Debtors, their estates, and their creditors.  Thus, the TCEH Committee submits that the Settlement Agreement satisfies Bankruptcy Rule 9019.

68.     Based on the foregoing, the TCEH Committee respectfully requests that the Court overrule the Objections and grant the Settlement Motion.

Dated: Wilmington, Delaware

October 30, 2015                          **MORRISON & FOERSTER LLP**
                                         James M. Peck
                                         Brett H. Miller
                                         Lorenzo Marinuzzi
                                         Todd M. Goren
                                         Samantha Martin
                                         250 West 55th Street
                                         New York, New York 10019-9601
                                         Telephone:  (212) 468-8000
                                         Facsimile:  (212) 468-7900
                                         E-mail:    jpeck@mofo.com
                                                    brettmiller@mofo.com
                                                    lmarinuzzi@mofo.com
                                                    tgoren@mofo.com
                                                    smartin@mofo.com

                                                    -and-

                                         */s/ Christopher A. Ward*
                                         **POLSINELLI PC**
                                         Christopher A. Ward (Del. Bar No. 3877)
                                         Justin K. Edelson (Del. Bar No. 5002)
                                         Shanti M. Katona (Del. Bar No. 5352)
                                         222 Delaware Avenue, Suite 1101
                                         Wilmington, Delaware 19801
                                         Telephone: (302) 252-0920
                                         Facsimile:  (302) 252-0921
                                         E-mail:    cward@polsinelli.com
                                                    jedelson@polsinelli.com
                                                    skatona@polsinelli.com

                                         *Attorneys for the Official Committee*
                                         *of TCEH Unsecured Creditors*