# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------x
                   :    Chapter 11

*In re*                 :

                   :    Case No. 14-10979 (CSS)

Energy Future Holdings Corporation, *et al*.,  :

                   :    Jointly Administered

         Debtors.        :

                   :    **Re:  D.I. 5249, 6122, 6627, 6628, 6640, 6641,**

                   :    **6643, 6644, 6645, 6647**

-------------------------------------------------------x

 

**EFH EQUITY OWNERS' OMNIBUS REPLY IN SUPPORT OF THE
DEBTORS' FIFTH AMENDED PLAN OF REORGANIZATION AND
MOTION TO APPROVE SETTLEMENT OF LITIGATION CLAIMS**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

ARGUMENT ........................................................................................................................6

I.   THE EFH EQUITY OWNERS ARE PROVIDING SUBSTANTIAL VALUE TO
     THE EFH ESTATES UNDER THE SETTLEMENT AGREEMENT. ...................................7

     A.   The Sponsors are relinquishing valuable claims...................................................7

     B.   The Sponsors are assigning their equity upside to the TCEH Unsecured Group. ...............8

     C.   Texas Holdings has agreed not to take a worthless stock deduction before
          consummation of the Plan.................................................................................10

     D.   The Sponsors have made a substantial contribution to the Debtors'
          reorganization.  The EFH Committee mischaracterizes the record in claiming
          otherwise........................................................................................................10

II.  THE CLAIMS IDENTIFIED BY THE EFH COMMITTEE ARE NOT
     VALUABLE AND ARE PROPERLY BEING RELEASED. .............................................13

     A.   The Sponsor releases do not violate the absolute priority rule. ..........................14

     B.   The fiduciary claims identified by the EFH Committee have no value...........................16

          1.   EFH has no viable claims against the Sponsor-directors for breach of the
               duty of loyalty............................................................................................17

          2.   EFH has no viable claims against the Sponsor-directors for breach of the
               duty of care. ...............................................................................................21

          3.   EFH has no viable claims against the Sponsor companies for breach of
               fiduciary duty or aiding and abetting. .........................................................22

     C.   The fraudulent transfer claims identified by the EFH Committee have little or
          no value and would be expensive to litigate. .....................................................23

          1.   The transfers subject to challenge are a null set. .........................................23

          2.   The Sponsors would strongly contest claims of insolvency. .........................26

          3.   The Sponsors provided substantial value in exchange for fees. ...................28

CONCLUSION....................................................................................................................30

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Campbell* v. *Walker*,
  2000 WL 19143 (Tex. App. Jan. 13, 2000) ...................... 22 n.8

*Cates* v. *Sparkman*,
  11 S.W. 846 (Tex. 1889)...................... 21

*Floyd* v. *Hefner*,
  2006 WL 2844245 (S.D. Tex. Sept. 29, 2006) ...................... 22

*Gearhart Indus., Inc.* v. *Smith Int'l, Inc.*,
  741 F.2d 707 (5th Cir. 1984) ...................... 18, 21, 22 n.8

*In re Capmark Fin. Grp. Inc.*,
  438 B.R. 471 (Bankr. D. Del. 2010) ...................... 7, 11

*In re Charter Communications*,
  419 B.R. 221 (Bankr. S.D.N.Y. 2009) ...................... 14

*In re Energy Future Holdings Corp.*,
  527 B.R. 157 (D. Del. 2015)...................... 6, 13

*In re Fid. Am. Fin. Corp.*,
  33 B.R. 623 (Bankr. E.D. Pa. 1983) ...................... 24

*In re Indianapolis Downs, LLC*,
  486 B.R. 286 (Bankr. D. Del. 2013) ...................... 11

*In re Key3Media Grp., Inc.*,
  336 B.R. 87 (Bankr. D. Del. 2005) ...................... 7

*In re Martin*,
  91 F.3d 389 (3d Cir. 1996) ...................... 7, 11, 13

*In re Master Mortg. Inv. Fund, Inc.*,
  168 B.R. 930 (Bankr. W.D. Mo. 1994) ...................... 10

*In re Midway Games Inc.*,
  428 B.R. 303 (Bankr. D. Del. 2010) ...................... 4, 16

*In re Oakwood Homes Corp.*,
  394 B.R. 352 (Bankr. D. Del. 2008) ...................... 8 n.3

*In re Opus E., L.L.C.*,
  480 B.R. 561 (Bankr. D. Del. 2012) ...................... 24

*In re PMTS Liquidating Corp.*,
  452 B.R. 498 (Bankr. D. Del. 2011) ...................... 18 n.6

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000) ...................... 4, 15, 16

*In re Radnor Holdings Corp.*,
353 B.R. 820 (Bankr. D. Del, 2006) ...................................................................... 4

*In re The Brown Sch.*,
368 B.R. 394 (Bankr. D. Del. 2007) ...................................................................... 23

*In re USDigital, Inc.*,
443 B.R. 22 (Bankr. D. Del. 2011) ........................................................................ 21

*In re Vaughan Co.*,
498 B.R. 297 (Bankr. D.N.M. 2013) ............................................................... 26 n.9

*In re Wash. Mut., Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) .................................................................. 11 n.5

*In re Zenith Elecs. Corp.*,
241 B.R. 92 (Bankr. D. Del. 1999) ......................................................... 10, 10 n.4

*Quadrant Structured Prods. Co., Ltd.* v. *Vertin*,
2015 WL 6157759 (Del. Ch. Oct. 20, 2015) .......................................................... 16

*Shandler* v. *DLJ Merchant Banking, Inc.*,
2010 WL 2929654 (Del. Ch. July 26, 2010) .......................................................... 16

*VFB LLC* v. *Campbell Soup Co.*,
2005 WL 2234606 (D. Del. Sept. 13, 2005) ........................................................... 28

**Statutes**

11 U.S.C. § 1129 ........................................................................................................ 14

11 U.S.C. § 544 .......................................................................................................... 24

11 U.S.C. § 548 .................................................................................................... 24, 25

6 Del. C. § 1304 ........................................................................................................ 24

6 Del. C. § 1305 ........................................................................................................ 24

6 Del. C. § 1309 ........................................................................................................ 26

Tex. Bus. Orgs. Code § 7.001 .................................................................................... 21

Tex. Bus. Orgs. Code § 21.418 .............................................................................. 5, 18

Tex. Bus. & Comm. Code § 24.010 ........................................................................... 26

Tex. R. App. P. 47.7 ............................................................................................. 22 n.8

Kohlberg Kravis Roberts & Co. L.P. ("KKR"), TPG Capital, L.P. ("TPG"), and Goldman, Sachs & Co. ("Goldman Sachs"), on behalf of themselves and affiliated funds holding indirect equity interests in Energy Future Holdings Corp. (collectively, the "Sponsors"), and Texas Energy Future Holdings Limited Partnership ("Texas Holdings," together with the Sponsors, the "EFH Equity Owners"), as the holder of more than 99% of the common stock of debtor Energy Future Holdings Corp. ("EFH"), respectfully submit this reply in support of: (1) the Fifth Amended Joint Plan of Reorganization [D.I. 6122] (the "Plan"); and (2) the Motion to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter Into and Perform Under the Settlement Agreement (the "Settlement Motion") [D.I. 5249].[1]

## INTRODUCTION

1.      The EFH Equity Owners strongly support the Plan and the Settlement Motion. After years of relentless activity aimed at achieving a global solution, the Plan and the Settlement Agreement provide the Debtors with by far their best opportunity to maximize creditor recoveries and emerge from bankruptcy.  The EFH Committee's many objections to the relief being sought — including its meritless objection to the releases of the Sponsors — will be fully addressed by the Plan Supporters, but they cannot obscure the fact that no one, including the Committee, has presented a viable alternative.

2.      The EFH Equity Owners have much invested in EFH, both in dollar terms and in human terms.  They own the vast majority of the equity of EFH, which they acquired for approximately $8.3 billion in 2007.  They also hold substantial debt claims, including broad indemnities and claims for approximately $80 million in advisory fees.  Since October 2007,

---

[1]  Capitalized terms not defined herein have the same meanings as in the Settlement Motion.  The EFH Equity Owners join in the arguments made in the Debtors' memoranda of law, pre-trial briefs, and reply briefs in support of the Settlement Motion and Plan.  This reply responds to both the EFH Committee's main trial brief ("Comm. Br.") [D.I. 6627] and the supplemental brief focused on potential claims against the Sponsors ("Supp. Br.") [D.I. 6643].

senior members of KKR, TPG, and Goldman Sachs have served as directors of EFH and other Debtor companies. Those Sponsor-directors, as well as other Sponsor employees, have devoted immense time and effort to their work with the Debtors. Over the last two years, the Sponsor-directors have attended board meetings on at least a weekly basis. Along with their advisors, they have also participated in negotiations with creditors and consulted almost continuously with the Debtors' management and professionals. As co-CRO Stacey Doré testified, the Sponsors have "done everything they could to protect the interest of the companies themselves and the people who work there." Lees Decl. Ex. A (Doré Dep. 424:3-18).[2]

3.    Under the Settlement Agreement, the EFH Equity Owners have agreed to give up essentially everything they invested and are owed. *First*, the Sponsors have agreed to waive all claims against EFH and other Debtors, including claims for approximately $80 million in advisory fees. No one has contested those claims, and the EFH Committee concedes there is "no colorable basis" to challenge the LBO-related agreements under which the claims arise. Comm. Br. ¶ 144. *Second*, as part of the arrangement under which the Hunt/TCEH Unsecured Group will invest over $7 billion of new equity in EFH, the Sponsors have agreed to assign to the TCEH Unsecured Group — *at the time the settlement goes effective* — all future distributions on their existing equity. The Sponsors, therefore, have agreed to walk away from their $8.3 billion investment, without additional compensation, to help the Debtors effectuate a transaction that will pay E-side creditors in full. *Third*, to facilitate the Debtors' use of net operating losses in connection with the spin of TCEH, Texas Holdings has agreed not to take a worthless stock deduction before consummation of the Plan. *See* Point I, *infra*.

---

[2] Citations to "Lees Decl." refer to the transmittal declaration of Alexander B. Lees, submitted contemporaneously with this brief.

4.     In exchange for all this, the *non*-Sponsor directors of EFH and TCEH unanimously agreed that the Debtors would release the EFH Equity Owners.  In doing so, the directors appropriately noted that, in contrast to the unsecured creditors on the T-side, the EFH Committee never identified claims against the Sponsors that it wanted to pursue.  *See, e.g.*, Lees Decl. Ex. B (Keglevic Dep. 233:13-16).  The directors also noted that, prior to the Petition Date, significant E-side creditors had already evaluated potential claims against the Sponsors and agreed to release those claims in the Restructuring Support Agreement.  *See* Lees Decl. Ex. C (Evans Dep. 284:10-19); Ex. D (RSA Ex. A at 20-22).

5.     The Debtors' decision to release the Sponsors and Sponsor-directors, both in the RSA and the Settlement Agreement, came after extensive investigation.  In 2013, EFH retained Sidley Austin (as legal counsel) and Zolfo Cooper (as financial advisor) to conduct an independent review of potential claims against the Sponsors.  As Ms. Doré testified, Sidley and EFH did not leave "a stone unturned as it relates to potential claims against the sponsors."  Lees Decl. Ex. A (Doré Dep. 414:10-20).  After Sidley completed its analysis, which included "hundreds of hours spent and documents reviewed" and "interviews conducted," EFH concluded that it was appropriate to release potential claims against the Sponsors.  *Id.*

6.     Following the Petition Date, the non-Sponsor directors revisited the question of releases.  In April 2015, special committees of both EFH and TCEH, advised by Kirkland & Ellis and Evercore, reviewed and approved the Sponsor releases.  During the same period, EFH's disinterested directors, advised by Proskauer Rose and SOLIC Financial Advisors, separately analyzed the Sponsor releases.   Lees Decl. Ex. E (Williamson Dep. 189:21-190:14).  The releases, accordingly, reflect the considered judgment of the non-Sponsor directors that claims

against the Sponsors are not viable and that settlement of those claims is in the best interests of the estate.

7.      In objecting to the Sponsor releases, the EFH Committee argues that the releases violate the absolute priority rule.  *See* Comm. Br. ¶¶ 225-230.  The releases, however, are *not* "on account" of equity:  rather, the Sponsors are providing significant consideration under the Settlement Agreement, including waiver of contractual claims.  In any event, even without all this consideration, a debtor is entitled to release causes of action against equity owners that are of "only marginal viability," and where litigation would be "time consuming, complicated, protracted and vigorously defended."  *In re PWS Holding Corp.*, 228 F.3d 224, 231, 242 (3d Cir. 2000).  The claims in this case easily meet that description.

8.      The first category of claims identified by the EFH Committee consists of claims against the Sponsor-directors for breach of fiduciary duty.  Cutting through the invective and irrelevant material in the committee's supplemental brief, those claims boil down to the assertion that the Sponsor-directors were *required* to cause EFH to file for bankruptcy in 2009 or 2010, when, according to the committee, EFH was insolvent on a balance-sheet basis.  *See* Supp. Br. ¶¶ 25, 26, 61, 67, 68, 73, 101.

9.      The problems with this fiduciary theory are legion.  Even assuming EFH was insolvent in 2009, which the Sponsors dispute, the law is "settled" that "directors do not have a duty to creditors of an insolvent corporation to abandon the effort to rehabilitate the corporation in favor of creditors' interests."  *In re Midway Games Inc.*, 428 B.R. 303, 316 (Bankr. D. Del. 2010).  And when a creditors' committee "calls 'a discredited deepening insolvency cause of action by some other name,' the claim must, too, be rejected."  *Id.* (quoting *In re Radnor Holdings Corp.*, 353 B.R. 820, 842 (Bankr. D. Del, 2006)).

10.    Here, the EFH Committee cannot even allege "deepening insolvency."  It is undisputed — and the committee's own expert witness has opined — that the value of EFH's interest in Oncor *increased* tremendously between 2009 and EFH's bankruptcy filing.  During that five-year period, the E-side debtors made billions of dollars in interest payments to creditors, including the EFH Committee's constituents, and they have now proposed a chapter 11 plan that would pay EFH creditors in full.  In the face of these undisputed facts, the EFH Committee alleges *no facts at all* to support the assertion that an earlier bankruptcy would have preserved rather than destroyed value.

11.    Beyond all this, the committee's fiduciary theory ignores controlling Texas law. Under Texas statute, a breach-of-loyalty claim cannot be sustained where relevant conflicts are disclosed and disinterested directors approve the transaction.  *See* Tex. Bus. Orgs. Code § 21.418.  As discussed below, that is exactly what occurred here.  *See* Point II.B.1, *infra*.  In addition, under EFH's organizational documents, directors are exculpated for liability absent intentional wrongdoing or other misconduct.  *See* Lees Decl. Ex. F (Certificate of Formation Art. X, at EFH00600290).  Texas law, therefore, precludes any claim for breach of the duty of care. *See* Point II.B.2, *infra*.  For all these reasons, the fiduciary theory articulated in the committee's supplemental brief has *no* value to the EFH estate.

12.    The EFH Committee also invokes claims for constructive fraudulent transfer, but those claims likewise have little or no value.  *See* Point II.C, *infra*.  *First*, as noted above, the EFH Committee has admitted that "there is no colorable basis" to challenge the LBO and related transactions.  Comm. Br. ¶ 144.  As a result, the EFH Committee cannot avoid either the fees paid in connection with the LBO or the contracts executed at that time.

13.    *Second*, although the Supplemental Brief conflates payments by different entities, the indisputable fact is that the E-side debtors made very few transfers to the Sponsors.  EFH paid advisory fees to the Sponsors only in 2009, for a total of $35,862,360.83.  The only financing fee that EFH paid to a Sponsor was a fee of $3,375,000, which was paid to Goldman Sachs in January 2010.  *See* Lees Decl. Ex. Q.  And while EFIH paid approximately $25 million in financing fees to Sponsor entities, the EFH Committee does *not* allege that EFIH was ever insolvent; to the contrary, the committee's expert has said that EFIH was solvent at all times.

14.    *Third*, the EFH Committee cannot even seek to recover the fees paid by EFH in 2009 or 2010:  In its main brief, the committee acknowledges that a *four-year* lookback period would be applicable to fraudulent transfer claims.  Comm. Br. ¶ 113.  Accordingly, payments in 2009 and early 2010 are outside the limitations period.

15.    *Fourth*, to whatever limited extent the EFH Committee could even attempt to pursue fraudulent transfer claims, those claims would be expensive to litigate and the prospects of success would be low.  The Sponsors would vigorously contest any claim that EFH was insolvent in 2009 or 2010.  The Sponsors would also refute any claim that they did not provide value for their fees.  In both areas, company witnesses and contemporaneous documents unequivocally support the Sponsors' position rather than the EFH Committee's.

16.    For these reasons, all objections to the Sponsor releases should be overruled.  In addition, for the reasons set forth in the Debtors' pre-trial brief and reply, all other objections to the Plan and the Settlement Agreement should also be overruled.

## ARGUMENT

17.    Settlements "are favored in order to minimize litigation and expedite the administration of the bankruptcy estate."  *In re Energy Future Holdings Corp.*, 527 B.R. 157,

163 (D. Del. 2015) (citing *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996)).  The Court may

approve a settlement that is "fair and equitable."  *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471,

514 (Bankr. D. Del. 2010).  In reviewing a settlement, the Court does not need to "decide the

numerous questions of law or fact raised by litigation" (*id*. at 515), or "have a 'mini-trial' on the

merits" (*In re Key3Media Grp., Inc.*, 336 B.R. 87, 93 (Bankr. D. Del. 2005)).  Instead, all the

Court must do is "canvas the issues to determine whether the settlement falls above the lowest

point in the range of reasonableness."  *Capmark*, 438 B.R. at 515.

## I.      THE EFH EQUITY OWNERS ARE PROVIDING SUBSTANTIAL VALUE TO THE EFH ESTATES UNDER THE SETTLEMENT AGREEMENT.

### A.      The Sponsors are relinquishing valuable claims.

18.      At the time of the Sponsors' acquisition of EFH in 2007, EFH entered into a

Management Agreement under which KKR, TPG, and Goldman Sachs agreed "to provide

management, consulting and financial services" to EFH and its subsidiaries.  Lees Decl. Ex. G

(Management Agreement at 1).  EFH was obligated under that agreement to pay the Sponsors

$35 million per year in advisory fees (increasing by 2% per year).  *Id*.  In October 2013, KKR,

TPG, and Goldman Sachs decided to suspend collection of those fees, but they have continued to

perform under the agreement.  *See, e.g.*, Lees Decl. Ex. A (Doré Dep. 403:8-15, 423:9-23); Ex. H

(Smidt Dep. 14:16-18:25).  To date, approximately *$80 million* in fees have accrued and not been

paid.  Lees Decl. Ex. I (MacDougall Dep. 110:17-22).

19.      The Sponsors have indemnity rights against the Debtors as well.  Under the

Management Agreement, EFH is obligated to reimburse the Sponsors and their employees "for

all reasonable out-of-pocket expenses incurred . . . in connection with this retention," including

"expenses of any legal, accounting or other professional advisors" to the Sponsors.  Lees Decl.

Ex. G (Management Agreement § 5).  Under a separate Indemnification Agreement, EFH has

also indemnified the Sponsors and their employees for, among other things, any losses, fees, and expenses arising in connection with any "action or failure to act" by any of the Debtors, the service of Sponsor employees as directors, or the provision of services to the Debtors.  Lees Decl. Ex. J (Indemnification Agreement § 2).  EFH's Certificate of Formation further requires the company to indemnify its directors and advance their litigation expenses.  Lees Decl. Ex. F (Certificate of Formation Art. IX, at EFH00600288-290).

20.    The Sponsors filed proofs of claim for all fees and expenses owing under the Management Agreement, the Indemnification Agreement, and the Certificate of Formation.  *See, e.g.*, Lees Decl. Ex. K.   Under the Settlement Agreement, the Sponsors have agreed to release those and other claims against the Debtors, with the exception of a claim for up to $15 million of professional fees, which EFH has agreed to pay if the Plan is consummated.  *See* Settlement Agreement §§ 2.3(e), 2.7(b).[3]  That release is plainly valuable to the Debtors' estates.  Absent the settlement, the Sponsors would continue to assert not only pre-petition claims but also administrative priority claims in relation to services provided after the Petition Date.  The Sponsors are willing to release those claims on the terms set forth in the Settlement Agreement.

**B.    The Sponsors are assigning their equity upside to the TCEH Unsecured Group.**

21.    Under the Settlement Agreement, Texas Holdings — the direct holder of more than 99% of EFH's common stock, and the entity through which Sponsor-managed funds hold their interests — has agreed to assign the proceeds of any recovery received on account of its EFH equity to the TCEH Unsecured Group.  *See* Settlement Agreement § 2.3(a).  This means, in short, that the EFH Equity Owners have agreed to forgo any "upside" on account of their $8.3

---

[3]  No one has objected to this settlement of the Sponsors' claim for reimbursement of professional fees, nor would any such challenge be viable.  *See In re Oakwood Homes Corp.*, 394 B.R. 352, 356 (Bankr. D. Del. 2008) ("[A]ttorneys' fees authorized by prepetition contracts may be awarded even if they are incurred" post-petition).

billion investment in EFH.  This is a critical concession:  As reflected by the REIT transaction embedded in the Plan, a consortium of highly sophisticated investors — which includes the Hunt Investors — has agreed to acquire EFH for a price sufficient to pay all E-side creditors or leave them unimpaired.  The Plan, therefore, is predicated on a market-based valuation of Oncor as a REIT that exceeds the value of E-side claims.  The Sponsors' agreement to relinquish their "upside," without insisting on additional compensation for this excess value at Oncor, is essential to the transactions contemplated by the Plan.  *See* Lees Decl. Ex. E (Williamson Dep. 204:7-17) ("[T]he sponsors are the majority of the equity holders at EFH, and that piece [their potential equity recovery] was given up so that we could pursue the REIT transaction.").

22.    Texas Holdings' assignment of equity recoveries will occur as soon as the Settlement Agreement goes into effect.  Texas Holdings is thus assigning its recoveries *before* consummation of the Plan.  As the Debtors' Co-CRO has testified, this timing was "one of the things that was bargained for" by the T-side unsecured creditors and is a "key component" of the Plan transactions.  Lees Decl. Ex. B (Keglevic Dep. 364:4-365:8).  Completing the acquisition will require a significant investment of resources by the TCEH Unsecured Group, with no guarantee that the Debtors will not exercise their "fiduciary out" and pursue an alternative.  As a result, the members of that group negotiated for assurance that, if the Debtors pursue a different transaction, they, rather than the Sponsors, would receive any surplus value above the level of the E-side debt.  *See* Lees Decl. Ex. I (MacDougall Dep. 115:24-116:25); Ex. B (Keglevic Dep. 364:4-365:8).

23.    The Sponsors had no obligation to assign their equity recoveries, as part of the settlement, in order to help facilitate the REIT transaction.  Nor were they obligated to support a Plan structure that pays E-side creditors in full but provides no recovery to equity.  They agreed

to the assignment, and to support the Plan more generally, only on the terms set forth in the

Settlement Agreement.

### C. Texas Holdings has agreed not to take a worthless stock deduction before consummation of the Plan.

24.     Texas Holdings invested approximately $8.3 billion in equity in EFH.  *See* Lees

Decl. Ex. L (Funds Transfer Memorandum at EFH00848578).  Under the Settlement Agreement,

Texas Holdings has agreed not to take a "worthless stock" deduction with respect to that equity

before consummation of the Plan, if doing so would give rise to a change in ownership for tax

purposes.  *See* Settlement Agreement § 2.3(b).  As the Debtors' Co-CRO testified, the agreement

by Texas Holdings to defer a deduction was critical to enabling "the estates to come to a deal . . .

such as the one currently contemplated."  Lees Decl. Ex. B (Keglevic Dep. 110:8-20).  A central

component of the Plan is a tax-free spin-off of TCEH, with EFH's net operating losses ("NOLs")

available to provide reorganized TCEH with a partial step-up in the basis of its assets.  If Texas

Holdings were to take a worthless stock deduction before consummation of the Plan, that could

affect the Debtors' ability to utilize their NOLs.  *Id.*

### D. The Sponsors have made a substantial contribution to the Debtors' reorganization.  The EFH Committee mischaracterizes the record in claiming otherwise.

25.     In evaluating releases given to non-debtors, courts often apply the so-called

*Zenith* or *Master Mortgage* factors.  Those factors are typically used to evaluate releases and

injunctions under a plan of reorganization.  *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 110

(Bankr. D. Del. 1999) (analyzing release provision in plan); *In re Master Mortg. Inv. Fund, Inc.*,

168 B.R. 930, 934 (Bankr. W.D. Mo. 1994) (same).[4]  In this case, where the Sponsors are

---

[4]  The factors are:  "(1) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (2) substantial contribution by the non-debtor of assets to the reorganization; (3) the essential nature of the injunction to the reorganization to the extent

providing significant consideration to the Debtors under a global settlement that is separate from the Plan, the settlement may be approved as long as it is "fair and equitable."  *Capmark*, 438 B.R. at 475-76; *see Martin*, 91, F3d at 393.[5]

26.     Nonetheless, as demonstrated in the Debtors' reply in support of the Settlement Motion, the *Zenith* factors can also be "instructive" and, in this case, they too support approval of the releases.  *See* Debtors' Reply Part III.  The second factor — namely, the "substantial contribution" by the non-debtor — carries particular weight here.  In applying that factor, the Court can take into account not only the consideration being provided under the Settlement Agreement but also whether the Sponsors "continued performing services for the Debtors post-petition without receiving compensation."  *In re Indianapolis Downs, LLC*, 486 B.R. 286, 303-04 (Bankr. D. Del. 2013).

27.     As the evidence at trial will show, the Sponsors have been intensely engaged in supporting the Debtors throughout the restructuring process.  Members of KKR, TPG, and Goldman Sachs have devoted significant time to advising the Debtors and working with senior management to address the array of challenges presented by these cases.  As the Debtors' Co-CRO testified, the Sponsors provided "invaluable counsel and advice and assistance to all of the boards and management to help us get through this process."  Lees Decl. Ex. A (Doré Dep. 420:10-22, 423:9-424:18); *accord* Ex. C (Evans Dep. 298:5-299:15) ("[The Sponsors] have stayed with this, given good advice, good counsel, good wisdom throughout this very tough

---

that, without the injunction, there is little likelihood of success; (4) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes 'overwhelmingly' votes to accept the plan; and (5) provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction."  *Zenith*, 241 B.R. at 110.

[5]  Even when litigation settlements are embedded in a chapter 11 plan, they have been evaluated in the first instance under the *Martin* standard.  *See In re Wash. Mut., Inc.*, 442 B.R. 314, 347 (Bankr. D. Del. 2011) (approval of "Global Settlement" as "fair and reasonable" under the *Martin* standard "le[d] the Court to conclude that the releases . . . meet the *Master Mortgage* standards").

process."). And they have provided those services "all for free." Lees Decl. Ex. A (Doré Dep. 423:9-23).

28.    The evidence at trial will also show that the Sponsors, in consultation with the Debtors, have communicated extensively with other stakeholders in an effort to achieve consensus and solve problems. Among other examples, prior to the Petition Date, senior members of KKR interacted with senior members of firms holding TCEH first-lien debt regarding the benefits of a tax-free spin as compared to a taxable transaction. *See* Lees Decl. Ex. H (Smidt Dep. 100:3-25). That discussion, among others, led to agreement on the tax-free spin of TCEH, which "is very valuable to the EFH estate." *Id*. More recently, as reflected by documents submitted by the EFH Committee, Sponsor representatives worked to break the impasse with the TCEH Unsecured Group by exploring alternative plan structures, including the REIT conversion. *See* Glueckstein Decl. Exs. 33-38.

29.    The EFH Committee, in its main brief, strains to find something sinister in the Sponsors' communications with the TCEH Unsecured Group. *See* Comm Br. ¶¶ 44-47. But the committee's "statement of facts" in this area is pure fiction. In paragraph 44 of its main brief, the EFH Committee asserts that, during the Oncor auction process, the TCEH Unsecured Group "reached out to the Controlling Owners to discuss a new proposal," which involved a "simple *quid pro quo*: let us bid exclusively and we will give you releases." *Id*. ¶ 44. But the exhibit cited for that assertion — Exhibit 33 to the Declaration of Brian Glueckstein — is an email from Tom Lauria of White & Case to Marc Kieselstein of Kirkland & Ellis; **no Sponsor representative is even copied**. *See* Glueckstein Decl. Ex. 33.

30.    Moreover, the email to Mr. Kieselstein — the supposed evidence of a "quid pro quo" and "exclusive" bidding — says **absolutely nothing** about either of those topics. The email

summarizes a potential transaction structure called "Return to Olympus" and merely states, as part of a summary of terms, that the "return to the olympus structure" would settle "T-side claims against the E-side and the sponsors."  *Id.*

31.     The EFH Committee asserts more broadly that the Debtors decided to pursue the REIT transaction "at the expense of the Court-approved auction" and based on "the Controlling Owners' preference."  Comm Br. ¶¶ 47.  But the committee again does not back up its allegations with any evidence.  At trial, the evidence will show that the Debtors, supported fully by the Sponsors, did *not* cancel the auction until multiple rounds of bids were received, and even then they negotiated intensely with the TCEH Unsecured Group before agreeing on the terms of the Plan.  The committee's allegations of "improper" conduct (Comm. Br. at 15) are devoid of factual support and not worthy of further attention.

## II.     THE CLAIMS IDENTIFIED BY THE EFH COMMITTEE ARE NOT VALUABLE AND ARE PROPERLY BEING RELEASED.

32.     In analyzing the settlement between the Debtors and the Sponsors, the Court must "assess and balance" the value being provided to the estate — namely, the consideration set forth in Point I above — against "the value of the claim that is being compromised."  *Energy Future Holdings Corp.*, 527 B.R. at 163 (quoting *Martin*, 91 F.3d at 393).  In valuing the claim being compromised, the Court should consider:  "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."  *Martin*, 91 F.3d at 393.

33.     Here, as discussed in Point I, the value being provided by the Sponsors under the Settlement Agreement is substantial.  And as discussed below, the value of the claims identified by the EFH Committee is marginal at best, and those claims would be extremely costly and

complex to pursue.  This conclusion disposes of all possible objections to EFH's settlement with the Sponsors:  Since EFH and its creditors will gain little by litigating and much by settling, the Settlement Agreement is neither a violation of the absolute priority rule nor an "unreasonable" compromise under Rule 9019.

### A.    The Sponsor releases do not violate the absolute priority rule.

34.    The EFH Committee argues, in its main brief, that releases of the EFH Equity Owners violate the absolute priority rule.  *See* Comm. Br. ¶¶ 225-230.  The committee is wrong. The absolute priority rule forbids distributions to shareholders "on account of" their equity interests if creditors are not being paid in full under a plan.  *See* 11 U.S.C. § 1129(b)(2)(B)(ii). Here, for two independent reasons, the releases in the Settlement Agreement are not "on account of" the Sponsors' equity interests.

35.    *First*, as explained above, the Sponsors are providing valuable consideration under the Settlement Agreement.  The Sponsors are releasing substantial and uncontested creditor claims; they agreed to assign any equity recoveries to the TCEH Unsecured Group to facilitate the REIT transaction; and they agreed that Texas Holdings would not take a worthless stock deduction before Plan consummation.  EFH's disinterested directors and Co-CROs have all attested to the value and importance of these concessions to the Debtors.  *See, e.g.*, Lees Decl. Ex. E (Williamson Dep. 204:7-205:18); Ex. C (Evans Dep. 294:8-23, 347:20-348:7); Ex. B (Keglevic Dep. 110:8-111:10); Ex. A (Doré Dep. 419:21-420:22).

36.    In a highly analogous case, *In re Charter Communications*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009), the debtor sought to release claims against its controlling shareholder, Paul Allen, in exchange for Allen's agreement to transfer "valuable interests" in the debtor, compromise contractual claims against the estate, and cooperate in ensuring that a "change of control" would not take place, thus preserving value for the estate.  *Id.* at 230, 241 n.15, 269.  In

light of those agreements, the court held that Allen was "not obtaining a recovery 'on account of' his equity interest," and that an objection to the release "based on the absolute priority rule mischaracterizes the settlement with Mr. Allen and is without merit." *Id.* at 269.   The same analysis applies here.

37.    *Second*, the Third Circuit has held that a release is not "on account" of equity, and does not run afoul of the absolute priority rule, where it is based on an informed determination by the Debtors that the released claims "are of only marginal viability and could be costly for the reorganized entity to pursue." *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000).  In *PWS*, the court thus upheld a debtor's release of an equity sponsor where the debtors determined, after an investigation, that the claims "were unlikely to have any value." *Id.* at 242.

38.    In this case, EFH and its non-Sponsor directors were advised by three separate law firms — Sidley Austin, Kirkland & Ellis, and Proskauer — as well as management and various financial advisors.  After extensive consideration, EFH concluded that any claims against the Sponsors or Sponsor-directors are not valuable and should be released.  As every EFH witness has testified, the non-Sponsor directors "did not come up with any significant claims that we felt we had at EFH against the sponsors."  Lees Decl. Ex. E (Williamson Dep. 178:10-20); *accord* Ex. C (Evans Dep. 228:20-229:1).  That conclusion was based on a vast record.  Before the Petition Date, the Sponsors cooperated fully in the investigation led by Sidley Austin.  After the Petition Date, the Sponsors again cooperated fully in the Rule 2004 investigation, producing over one million pages from the files of 21 individuals.  The decision to release the Sponsors, therefore, followed multiple investigations that led to the same result:  there are no claims that are viable and valid.

39.     A review of the claims identified in the EFH Committee's supplemental brief independently confirms that they are "not worth pursuing." *PWS*, 228 F.3d at 231.  As explained next, those claims have little or no value and would be complex and expensive to litigate.

**B.     The fiduciary claims identified by the EFH Committee have no value.**

40.     The central allegation lodged by the EFH Committee is that the Sponsor-directors breached their fiduciary duties because they did not cause EFH to file for bankruptcy in 2009 or 2010.  Instead, they approved debt exchanges, debt repurchases, and other transactions that extended maturities and reduced the risk of default.  *See* Supp. Br.  ¶¶ 25, 26, 61, 67, 68, 73, 101.

41.     The EFH Committee cites no case law, from Texas or Delaware, that supports fiduciary liability based on a delay in filing for bankruptcy.  The cases on point reject the committee's theory.  Courts have repeatedly dismissed fiduciary claims based on "delayed bankruptcy," concluding that "directors do not have a duty to creditors of an insolvent corporation to abandon the effort to rehabilitate the corporation in favor of creditors' interests." *In re Midway Games Inc.*, 428 B.R. 303, 316 (Bankr. D. Del. 2010); *see also, e.g.*, *Shandler* v. *DLJ Merchant Banking, Inc.*, 2010 WL 2929654, at *14 (Del. Ch. July 26, 2010) (rejecting claim based on delayed filing).  In a very recent case, the Delaware Chancery Court roundly rejected the notion that continuing to operate a business in the hopes of improving its financial position is a breach of fiduciary duty:  "Generating returns for equity holders is the opposite of a fiduciary wrong; it is the purpose of a for-profit entity." *Quadrant Structured Prods. Co., Ltd.* v. *Vertin*, 2015 WL 6157759, at *1 (Del. Ch. Oct. 20, 2015).

42.     The EFH Committee has not only failed to cite case law that imposes a "duty to file bankruptcy," but it has also failed to present *any facts* showing that an earlier bankruptcy filing would have benefited EFH and its creditors.  The EFH Committee asserts that "over $3 billion in payments were made by EFH and EFIH that would not have been made" had the

company not "delay[ed] in filing for bankruptcy." Supp. Br. ¶ 25. But of that amount, more than $2.9 billion is identified by the EFH Committee as "cash paid for interest" (*id.*) — *i.e.*, interest payments due and owing to the E-side creditors, including the EFH Committee's own constituents. Furthermore, as the EFH Committee's expert witness has noted, EFH's equity interest in Oncor rose by *billions of dollars* between the LBO and the bankruptcy filing (*see* Lees Decl. Ex. M (Rule Rep. at 21)) — and that value enabled the E-side debtors to pay their debts when due and, more recently, to put forward a Plan that contemplates payment of E-side creditors in full.

43.    In short, the EFH Committee has cited *no* case that supports its "duty to file bankruptcy" theory, and it has offered *no* factual support for its claim that EFH was injured as a result of transactions that improved the company's liquidity and enabled it to continue paying creditors. Although that should end the discussion, as shown next, each of the fiduciary claims identified by the EFH Committee suffers from other basic flaws as well.

### 1.    EFH has no viable claims against the Sponsor-directors for breach of the duty of loyalty.

44.    The EFH Committee's first set of purported fiduciary claims against the Sponsor-directors is for breach of the duty of loyalty. According to the EFH Committee, the Sponsors were "interested" parties in the Debtors' liability-management transactions because: (1) prolonging operations outside bankruptcy made it more likely the Sponsors' equity interests would appreciate; and (2) the Sponsors or affiliates received fees in connection with the transactions. Supp. Br. ¶ 61.

45.    There is no dispute that the Sponsors and Sponsor-directors wanted EFH to be financially sound and capable of providing a return to equity. Nor is there any dispute that Sponsor entities received fees in connection with financing transactions. Most of the financing

fees were earned by Goldman Sachs in its capacity as an investment bank, as part of the broader

fee structure the Debtors negotiated with numerous financial institutions.  *See* Lees Decl. Ex. H

(Smidt Dep. 235:23-236:25) (financing fees paid to Goldman Sachs's "Capital Markets Group"

for "helping the company in a very prominent role alongside Citigroup"); *see also* Ex. Z (receipt

showing fees paid to Goldman Sachs, Citigroup, Credit Suisse, and JPMorgan entities).  The

remaining financing fees were paid to KKR and TPG entities for their services as broker-dealers

and financial advisors to the Debtors.  *See* Lees Decl. Ex. H (Smidt Dep. 128:24-129:16

(financing fees paid to KKR Capital Markets for "advice that they provided the company in their

capacity as a broker-dealer/advisor").

46.    These facts in no way support a duty-of-loyalty claim.  Under Texas law,[6] the

duty of loyalty may be implicated when a director is "interested" in a transaction.  *Gearhart*

*Indus., Inc.* v. *Smith Int'l, Inc.*, 741 F.2d 707, 720 (5th Cir. 1984); Tex. Bus. Orgs. Code

§ 21.418(a).  But merely having an interest or receiving a benefit does not give rise to liability.

The Texas Business Organizations Code provides that "neither the corporation nor any of the

corporation's shareholders will have a cause of action against [an interested director] for breach

of duty" if *either* (i) the transaction was "fair" to the corporation, *or* (ii) the "material facts"

relating to the director's interest are "disclosed to or known by" the disinterested directors, and a

majority of disinterested directors approves the transaction in good faith.  Tex. Bus. Orgs. Code

§ 21.418(b), (e).

47.    The minutes of the relevant board meetings squarely refute the EFH Committee's

vague assertion that the Sponsor-directors failed to "disclose material facts" to non-Sponsor

---

[6] As the EFH Committee agrees (Supp. Br. ¶ 55 n.7), because EFH is a Texas corporation, any fiduciary-duty claim
brought on its behalf would be governed by Texas law.  *E.g.*, *In re PMTS Liquidating Corp.*, 452 B.R. 498, 507
(Bankr. D. Del. 2011).

directors.  Supp. Br. ¶¶ 63, 68.  For example, at a meeting on September 3, 2009, EFH's

Executive Committee considered "management's proposal to delever and restructure the

Company's debt obligations."  Lees Decl. Ex. N.  The members discussed the fact that

individuals associated with TPG and KKR would act as financial advisors and assist

management in evaluating "the price of any new notes under the contemplated restructuring."

*Id.*  The minutes also contain express acknowledgements that Goldman Sachs and affiliates

would serve as Dealer Managers with respect to the transactions, and that "material facts as to

the relationship" of Goldman Sachs and its board designees were disclosed to or known by the

Executive Committee members "as contemplated by Section 21.418 of the Texas Business

Organizations Code."  *Id.*  The Executive Committee — including two members who were non-

Sponsor directors — unanimously approved the transactions.  *Id.*  The minutes of meetings

covering other liability-management transactions contain analogous disclosures.[7]

48.    The EFH Committee does not mention these disclosures, and instead alleges that

the Sponsor-directors "voted to authorize at least one of [the financing] transactions without the

knowledge or involvement of the non Sponsor Directors."  Supp. Br. ¶ 16.  That is simply not

true.  The very board minutes that the EFH Committee cites for this assertion — namely, minutes

of a March 15, 2011, joint meeting of the Debtors' boards to consider amendments to and

extensions of TCEH debt — reveal that non-Sponsor directors Arcilia Acosta, Donald Evans,

James Huffines, Lyndon Olson, Jr., John Young, and Kneeland Youngblood were *all* present,

and they *all* voted in favor of the transaction "[f]ollowing extended discussions."  Liebesman

Decl. Ex. 15.

---

[7]  *See* Lees Decl. Ex. O (March 15, 2011, Minutes of Joint Meeting, at EFH00056868); Ex. P (August 6, 2012, Unanimous Written Consent, at EFH00056310).

49.    The EFH Committee's other allegations of nondisclosure are no more compelling. The committee contends that the Sponsor-directors failed to disclose that the Sponsors had an interest "in palliating investors in the Controlling Owners' funds invested in EFH and in making EFH appear as financially healthy as possible in the hope that the energy industry would improve."  Supp. Br. ¶ 63.  Whatever this means, there is no question that every EFH director knew that the Sponsor-directors worked at private equity firms, wanted EFH to perform well financially, and hoped the energy industry would improve.

50.    The EFH Committee also contends that the Sponsor-directors made "insufficient disclosures of . . . the fact that EFH was insolvent."  Supp. Br. ¶ 68.  This claim, too, defies logic. The primary evidence that the EFH Committee has offered in alleging that the company was insolvent after 2008 are analyses conducted by the company's financial advisor Duff & Phelps, *which were presented to the board of directors*.  *See id.* ¶ 95.  The members of the board, which included the company's Chief Executive Officer, John Young, did not have to rely on EFH's equity owners to apprise them of the company's financial condition.

51.    In addition, the claim that the Sponsors did not disclose the company's "insolvency" in 2009 or 2010 ignores every contemporaneous assessment of EFH's value — including the Duff & Phelps analyses, which reported that EFH had *positive* equity value, as well the Sponsors' internal valuations, which also showed that EFH's enterprise value exceeded its debt.  *Infra* ¶¶ 67-70.  The EFH Committee's claim is thus predicated on non-disclosure of a "fact" that neither the Debtors nor the Sponsors believed to be true at the time, and which instead is being asserted six years later by lawyers and hired experts.

52.    The EFH Committee, accordingly, has provided no basis for its claim that the Sponsor-directors failed to disclose material conflicts to other board members.  The committee

has also failed to present facts showing that any particular transaction was not "fair" to EFH, which would be an independent basis to dismiss any duty-of-loyalty claim.

### 2.    EFH has no viable claims against the Sponsor-directors for breach of the duty of care.

53.    The EFH Committee's claims based on the duty of care also cannot withstand scrutiny.  EFH's Certificate of Formation exculpates directors from personal liability except to the extent they are found liable for a breach of the duty of loyalty, bad faith, intentional misconduct, the receipt of an improper benefit, or violation of a statute.  Lees Decl. Ex. F (Certificate of Formation Art. X, at EFH00600290); *see* Tex. Bus. Orgs. Code § 7.001 (permitting exculpation in certificates of formation).  Claims alleging a breach of the duty of care fall squarely within the exculpation provision, and thus would not survive a motion to dismiss. *See, e.g.*, *In re USDigital, Inc.*, 443 B.R. 22, 43 (Bankr. D. Del. 2011) (dismissing exculpated duty-of-care claims).

54.    Even without exculpation, any claim alleging a breach of the duty of care would have to overcome the business judgment rule.  Under Texas law, which is even more protective of corporate fiduciaries than Delaware law, directors cannot be held liable for breaches of the duty of care "unless the challenged action is ultra vires or is tainted by fraud."  *Gearhart*, 741 F.2d at 721, 719 n.4 (declining to follow Delaware law; citing *Cates* v. *Sparkman*, 11 S.W. 846, 849 (Tex. 1889)).  The EFH Committee's conclusory allegations that the Sponsor-directors were "reckless" or "indifferent" toward EFH — in addition to lacking any factual support — are thus insufficient to show that the company has a viable claim.

55.    The EFH Committee wrongly asserts that allegations of "gross negligence" would suffice to overcome the business judgment rule.  Although there is no evidence whatsoever that the timing of EFH's bankruptcy filing resulted from "gross negligence," that is not the standard.

The principal authorities on which the EFH Committee relies are federal district court decisions from the 1990s dealing with failed banking institutions.  *See* Supp. Br. ¶ 69.  As explained by a more recent decision, however, "the District Court opinions that held directors liable for gross negligence appear to be the product of the special treatment that banks may receive under Texas law," and are inapplicable in cases dealing with other kinds of businesses.  *Floyd* v. *Hefner*, 2006 WL 2844245, at *28 (S.D. Tex. Sept. 29, 2006) (rejecting "the proposition that directors can be held liable for gross negligence under Texas law as it exists now").[8]

### 3.      EFH has no viable claims against the Sponsor companies for breach of fiduciary duty or aiding and abetting.

56.      The EFH Committee further argues that EFH could sue KKR, TPG, and Goldman Sachs for breach of fiduciary duty in their capacity as "controlling shareholders," and for aiding and abetting breaches by the Sponsor-directors.  Yet in the five pages dedicated to this position, the EFH Committee presents no evidence of any kind of misconduct — and there is none.  Stripped of rhetoric, the Committee's assertions are that the Sponsor-directors:

- "held a majority of EFH's Board seats" (Supp. Br. ¶ 76);

- held informal discussions "by email and phone" that "did not include the non-Sponsor Directors" (*id.* ¶ 77);

- reviewed and gave input on EFH's "Long Range Plans" before they were formally presented to the board (*id.* ¶ 79);

- monitored the Debtors' performance and assisted in the Debtors' efforts to manage their balance sheet (*id.* ¶¶ 80-82, 74); and

---

[8] The only other authority cited by the EFH Committee on this issue is *Campbell* v. *Walker*, 2000 WL 19143 (Tex. App. Jan. 13, 2000).  Yet that case did not "apply[] a gross negligence standard," as the EFH Committee claims (Supp. Br. ¶ 69).  Rather, it followed *Gearhart* in holding that duty of care claims require conduct that is "ultra vires or is tainted by fraud," and found in any event that the plaintiff's allegation of gross negligence was not supported by the record.  2000 WL 19143, at *12.  Regardless, *Campbell* is an unpublished decision and, under Texas law, has no precedential value.  Tex. R. App. P. 47.7.

- performed analyses of natural gas prices and their effect on EFH's value (*id.* ¶ 83).

57.     The EFH Committee does not and cannot cite any authority holding that owners of a business violate their fiduciary duty by controlling the board, monitoring the company's performance, and holding private conversations with other owners.  For all of the reasons discussed above, there is no substance to the claim that the Sponsor-directors breached their fiduciary duties.  It follows that the Sponsors cannot be held liable either.

**C.     The fraudulent transfer claims identified by the EFH Committee have little or no value and would be expensive to litigate.**

58.     The EFH Committee asserts that the "Controlling Owners received direct transfers from EFH and EFIH" that "constitute constructive fraudulent transfers," and that the Sponsors are liable as the "beneficiaries" of other avoidable transfers.  Supp. Br. ¶ 90.  It provides virtually no detail, however, as to which specific transfers can be avoided, or when those avoidable transfers occurred.  The failure to spell out these simple facts — notwithstanding the enormous discovery record — thoroughly discredits the EFH Committee's contention that it has identified colorable claims.  *See, e.g.*, *In re The Brown Sch.*, 368 B.R. 394, 404 (Bankr. D. Del. 2007) (dismissing fraudulent transfer claims where trustee failed to allege which transfers were avoidable or the dates of the transfers).  Moreover, when the actual facts concerning payments to the Sponsors are reviewed, it is readily apparent that the EFH estate does *not* have fraudulent transfer claims worth pursuing.

**1.     The transfers subject to challenge are a null set.**

59.     The Debtors' payments to the Sponsors generally fall into two categories.  *First*, at the time of the 2007 LBO, the Sponsors entered into a Management Agreement, under which they agreed to provide advisory services and the Debtors agreed to pay fees of $35 million per year for those services (increasing 2% annually).  *Second*, as discussed above, KKR and TPG

received fees for their roles as financial advisors and broker-dealers in connection with financing transactions, and Goldman Sachs received fees (along with other financial institutions) for its role as an investment bank. *See* Lees Decl. Ex. Z.

60.     The EFH Committee sweepingly asserts that the Sponsors could be sued under theories of constructive fraudulent transfer for nearly $200 million in fee payments. Supp. Br. ¶ 103. But this allegation conflates distinct Debtor entities, as well as different time periods and different types of payments for different services. When the payments to the Sponsors are reviewed individually, it becomes apparent that the EFH Committee has not identified a *single transfer* that it could avoid on behalf of the EFH estate.

61.     As a starting point, it is fundamental that a fraudulent transfer claim requires proof of a transfer of the *debtor's* interest in property. 11 U.S.C. §§ 548, 544(b); *see also, e.g.*, 6 Del. C. §§ 1304, 1305 (requiring "transfer made or obligation incurred by a debtor"). EFH, therefore, would lack standing to challenge payments by one of its subsidiaries. *See, e.g.*, *In re Fid. Am. Fin. Corp.*, 33 B.R. 623, 625 (Bankr. E.D. Pa. 1983) (trustee cannot avoid mortgage placed on property of debtor's subsidiary); *accord In re Opus E., L.L.C.*, 480 B.R. 561, 575 (Bankr. D. Del. 2012) (trustee lacks standing to bring cause of action belonging to debtor's subsidiary).

62.     This basic principle — combined with the fact that the EFH Committee does not allege that EFH was insolvent until *2009*, or that EFIH was ever insolvent — deprives the committee of any viable claims. The following chart, which compiles information the Debtors produced in discovery, summarizes the fees paid by the Debtors to the Sponsors after the LBO, identifying the Debtor that paid the fees and the Debtor to which the fees were allocated internally:

| Fees paid to Sponsors Through 9-30-2013 | | | | | | |
|---|---|---|---|---|---|---|
| **Financing Fees** | | | | | | Allocated |
| | Goldman | KKR | TPG | Total | Entity | Payor |
| 2009 | $ 705,454.75 | $ 264,224.87 | $ 256,529.00 | $ 1,226,208.62 | EFIH | EFIH |
| 2010 | 3,375,000.00 | | | 3,375,000.00 | EFH Corp | EFH Corp |
| 2010 | 6,999,769.96 | | | 6,999,769.96 | EFIH | EFIH |
| 2010 | 1,400,000.00 | | | 1,400,000.00 | TCEH | TCEH |
| 2011 | 26,767,330.54 | 5,000,000.00 | 5,000,000.00 | 36,767,330.54 | TCEH | TCEH |
| | $ 39,247,555.25 | $ 5,264,224.87 | $ 5,256,529.00 | $ 49,768,309.12 | | |
| | | | | | | |
| 2012 | | | | | | |
| | $ 4,480,000.00 | $ 800,000.00 | $ 800,000.00 | $ 6,080,000.00 | EFIH | EFIH |
| | 2,082,500.00 | 371,875.00 | 371,875.00 | 2,826,250.00 | EFIH | EFIH |
| | 3,275,000.00 | 818,750.00 | 818,750.00 | 4,912,500.00 | EFIH | EFIH |
| | 884,499.00 | 221,124.75 | 221,124.75 | 1,326,748.50 | EFIH | EFIH |
| | $ 10,721,999.00 | $ 2,211,749.75 | $ 2,211,749.75 | $ 15,145,498.50 | | |
| 2013 | | | | | | |
| Jan Exch. | $ 1,553,865.95 | $ - | $ - | $ 1,553,865.95 | EFIH | EFIH |
| | | | | | | |
| **Total** | | | | | | |
| **Financing** | | | | | | |
| **Fees** | $ 51,523,420.20 | $ 7,475,974.62 | $ 7,468,278.75 | $ 66,467,673.57 | | |
| | | | | | | |
| | | | | | | |
| **Monitoring** | | | | | | |
| **Fees** | | | | | | |
| 2007 | $ 2,170,507.00 | $ 2,894,199.00 | $ 2,894,199.00 | $ 7,958,905.00 | EFH Corp | EFH Corporate Services Company (TUS) |
| 2008 | 9,588,410.00 | 12,785,384.00 | 12,785,384.00 | 35,159,178.00 | EFH Corp | EFH Corporate Services Company (TUS) |
| 2009 | 9,780,178.33 | 13,041,091.25 | 13,041,091.25 | 35,862,360.83 | EFH Corp | Energy Future Holdings Corp |
| 2010 | 9,975,781.90 | 13,301,913.49 | 13,301,913.49 | 36,579,608.88 | TCEH | EFH Corporate Services Company (TUS) |
| 2011 | 10,175,297.55 | 13,567,951.78 | 13,567,951.76 | 37,311,201.09 | TCEH | EFH Corporate Services Company (TUS) |
| 2012 | 10,378,803.50 | 13,839,310.76 | 13,839,310.74 | 38,057,425.05 | TCEH | EFH Corporate Services Company (TUS) |
| 2013 (thru 9/30) | 7,903,838.43 | 10,539,141.00 | 10,539,141.30 | 28,982,120.73 | TCEH | EFH Corporate Services Company (TUS) |
| | $ 59,972,816.71 | $ 79,968,991.28 | $ 79,968,991.59 | $ 219,910,799.58 | | |

Lees Decl. Ex. Q.

63.     As reflected in the summary, EFH paid $35,862,360 in advisory fees to the

Sponsors in 2009.  After 2009, the Sponsors were paid by EFH Corporate Services Company —

a subsidiary of EFH, and not one of the entities represented by the EFH Committee.  Moreover,

after 2009, the cost of the advisory fees was internally allocated to *TCEH*, as opposed to EFH.

64.     Thus, with respect to advisory fees, the EFH estate could only seek to recover the

fees paid in 2009.  But that claim would be time-barred.  Transfers occurring more than two

years before the April 29, 2014, petition date cannot be avoided under section 548 of the

Bankruptcy Code.  *See* 11 U.S.C. § 548.  And as the EFH Committee has itself contended

(Comm. Br. ¶ 113), transfers occurring more than four years before the bankruptcy filing cannot

be avoided under applicable state law, whether the fraudulent transfer statute of Texas (EFH's

place of incorporation and headquarters) or Delaware (the venue of these cases) were to apply. *See* 6 Del. Code § 1309; Tex. Bus. & Comm. Code § 24.010.[9]

65.    With respect to the financing fees, the summary above shows that — with just one exception, namely $3,375,000 paid in 2010 — all the fees were paid by TCEH or EFIH.  The Committee, however, does not contend that that EFIH was ever insolvent, and its expert has opined that EFIH was solvent by a large margin at all relevant times.  Lees Decl. Ex. M (Rule Rep. at 21).  As for the 2010 fee, the Debtors' records show that it was collected in January of that year, and thus it too falls outside the 4-year lookback period. Lees Decl. Ex. Y (Purchase Agreement, at EFH02433665, 669) (providing that Goldman Sachs would purchase $150 million in notes from EFH at 2.25% discount); Ex. Y (payment receipt dated January 12, 2010).[10]

66.    As explained next, even if the EFH estate were to try to pursue fraudulent transfer claims to recover the limited amounts paid in 2009 or 2010, litigation would be costly and contentious, and the estate would face long odds.

### 2.    The Sponsors would strongly contest claims of insolvency.

67.    A constructive fraudulent transfer claim to avoid payments to the Sponsors would require proof that EFH was insolvent.  There is substantial reason to doubt that the EFH estate would prevail on that issue if it were litigated.

---

[9]  Contradicting its main brief, the EFH Committee asserts in a footnote to its supplemental brief that "there are viable theories that may be advanced which will extend the applicable statute of limitations beyond four years." Supp. Br. ¶ 103 n.17.  But it does not articulate any such theory.  If the EFH estate were to pursue litigation, the Sponsors would vigorously oppose application of a longer lookback period. *See, e.g.*, *In re Vaughan Co.*, 498 B.R. 297 (Bankr. D.N.M. 2013) (declining to endorse theory that would allow debtor to ignore state-law time limits on fraudulent transfer claims).

[10]  The EFH Committee asserts that the "Debtors' contention that the inter-company settlement is reasonable and appropriate provides EFH with a claim" to recover transfers made by *TCEH*.  Supp. Br. ¶ 103.  It cites no authority for this extraordinary proposition and there is none.  If the TCEH estate had any fraudulent transfer claims against the Sponsors, it has not assigned those claims.  That EFH has brought a motion to settle disputes with TCEH does not change that fact.

68.     EFH was indisputably solvent following the 2007 LBO.  The EFH Committee admits that "there is no colorable basis" to challenge the LBO.  Comm. Br. ¶ 144.  But there is also ample evidence that EFH remained solvent through the pre-petition period.  Paul Keglevic, EFH's Chief Financial Officer since 2007, has testified that he did not believe that EFH Corp. was insolvent at any time before the Petition Date.  Lees Decl. Ex. B (Keglevic Dep. 188:3-189:24).  Company documents support this conclusion.  For example, at the beginning of 2013, EFH conducted an analysis showing that the value of EFH's Oncor investment, on its own, exceeded the par value of the E-side debt.  Lees Decl. Ex. R (EFH-SP00101480, 482); Ex. S (EFH-SP00101517).  Likewise, in 2012, ███████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Lees Decl. Ex. B (Keglevic Dep. 188:3-189:24); *see also* Lees Decl. Ex. T (EFH02367162 at 168, 196) ████████████████████████████████████████████████

██████████████████████████████

69.     The Sponsors themselves separately monitored EFH's performance and valued their equity.  Lees Decl. Ex. H (Smidt Dep. 33:22-34:2); Ex. I (MacDougall Dep. 87:16-21).  Up until the EFH bankruptcy, both KKR and TPG concluded, in valuation reports that were thoroughly reviewed and vetted, that EFH's enterprise value exceeded the face amount of its debt.  *See, e.g.*, Lees Decl. Ex. H (Smidt Dep. 163:5-164:13) (there was no period "subsequent to the closing of the LBO to the filing of the bankruptcy petition" where KKR concluded that "EFH on a consolidated basis was insolvent"); Lees Decl. Ex. I (MacDougall Dep. 124:4-23) ("[I]f you look at our [TPG's] quarterly valuations, we valued EFH equity as having value every quarter throughout our investment period, and the company had adequate liquidity throughout our

investment period."). In 2009 — the only year when EFH paid advisory fees to the Sponsors — KKR publicly assigned its equity investment a mark between 70% and 50% of cost. Lees Decl. Ex. U (KKR Form 425, at 2 (May 15, 2009); KKR Form S-1, at S-98 (Mar. 31, 2010)).

70.      If the EFH estate were to commence fraudulent transfer claims, these "contemporaneous views" of the company and its equity investors — developed outside the context of litigation — would be entitled to significant weight. *VFB LLC* v. *Campbell Soup Co.*, 2005 WL 2234606, at *26 (D. Del. Sept. 13, 2005). By contrast, the post hoc analysis of Mark Rule, the EFH Committee's hired expert, would be strictly scrutinized. Mr. Rule did not conduct an independent valuation of EFH; instead, his expert report invokes materials prepared by Duff & Phelps — all of which concluded that EFH had *positive* equity value (*e.g.*, Lees Decl. Ex. V, at EFH03484161)) — and contends that making adjustments to those analyses would lead to the conclusion (never reached by Duff & Phelps) that EFH was insolvent between 2009 and 2012. But as reflected in the Debtors' motion to exclude Mr. Rule's testimony, and as will be shown at trial, the adjustments Mr. Rule makes to the Duff & Phelps analyses are results-driven and flawed. Moreover, Mr. Rule failed to consider an array of facts that would be critical to an informed expert, including the contemporaneous valuation analyses conducted by EFH itself and the Sponsors. *E.g.*, Lees Decl. Ex. W (Rule Dep. 102:9-104:8, 136:13-137:7, 180:7-181:17). In short, the Sponsors would have various strong grounds to challenge Mr. Rule's conclusions and contest any allegations of insolvency.

### 3.      The Sponsors provided substantial value in exchange for fees.

71.      A constructive fraudulent transfer claim to avoid any fee payments to the Sponsors would also require proof that the Debtors received less than reasonably equivalent value in return. The Sponsors would vigorously contest this element as well and present evidence of the value they provided.

72.    Contemporaneous documentation of the Sponsors' services confirms that the advisory fees were paid in exchange for substantial value. █████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

73.    Subsequently, the fees paid to the Sponsors were the subject of significant additional analysis by EFH and its advisors.  EFH director Billie Williamson testified that as part of the analysis of possible claims against the Sponsors, EFH considered whether to bring claims "trying to recover the sponsor fees."  Lees Decl. Ex. E (Williamson Dep. 182:20-183:9).  The company decided that it was not "appropriate to do so," because the debtors "got a great deal of value from the sponsors for the fees that we paid them."  *Id.*  As Ms. Williamson explained, "[t]he sponsors were actively engaged in helping us on financial transactions," including providing "guidance and assistance" in "looking at and evaluating" a variety of different transactions, including debt refinancing and hedges.  *Id.* at 186:2-187:4.  In addition, the Sponsors "assisted us with regulatory items using their expertise.  They helped us . . . put

together budgets and different things like that." *Id.*; *see also* Lees Decl. Ex. H (Smidt Dep. 14:16-15:2, 17:8-18:25) (describing the consulting and advisory services provided by the Sponsors).  In the words of Ms. Williamson, the fees "were considered, from our standpoint, [to have been] reasonable based on what they were doing and based on comparison to other transactions."  Lees Decl. Ex. E (Williamson Dep. 182:20-183:9, 184:19-185:5).

74.    The EFH Committee has no answer to the company's contemporaneous documents or the after-the-fact review described by Ms. Williamson.  Aside from the conclusory assertion that the fees paid to the Sponsors "were not actually tied to any particular type of service" because in some cases they were shared equally between different firms (Supp. Br. ¶ 102), the EFH Committee offers no evidence suggesting that the consulting, broker-dealer, and banking services provided by the Sponsors were not valuable.  The committee, accordingly, has not even shown that the issue of value is litigable.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth by the Debtors, the Settlement Motion should be approved and the Plan should be confirmed.

Dated:  October 30, 2015
        Wilmington, Delaware


**ABRAMS & BAYLISS LLP**


/s/ John M. Seaman
Kevin G. Abrams (No. 2375)
John M. Seaman (No. 3868)
20 Montchanin Road, Suite 200
Wilmington, DE  19807
Telephone: (302) 778-1000
Facsimile:  (302) 778-1001

*Counsel for Goldman, Sachs & Co.*

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**


/s/ Derek C. Abbott
Derek C. Abbott (No. 3376)
Erin R. Fay (No. 5268)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE  19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for Kohlberg Kravis Roberts & Co. L.P., TPG Capital, L.P. and Texas Energy Future Holdings Limited Partnership*

-and-

**WACHTELL, LIPTON, ROSEN & KATZ**

Richard G. Mason
Emil A. Kleinhaus
Alexander B. Lees
Angela K. Herring
51 West 52nd Street
New York, NY  10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000

*Counsel for Kohlberg Kravis Roberts & Co. L.P., TPG Capital, L.P., Goldman, Sachs & Co. and Texas Energy Future Holdings Limited Partnership*