# Exhibit B

CONTAINS HIGHLY CONFIDENTIAL PORTION

Page 1

2          UNITED STATES BANKRUPTCY COURT
3            FOR THE DISTRICT OF DELAWARE
4  --------------------------------------x
5  In Re:
6  Energy Future Holdings Corporation,
7  et al.,
8                              Debtors.
9
10 Chapter 11
11 Case No. 14-10979
12 Jointly Administered
13 --------------------------------------x
14
15
16         DEPOSITION OF PAUL KEGLEVIC
17              New York, New York
18               October 1, 2015
19
20 ***This transcript contains a portion that
21   has been designated Highly Confidential***
22
23
24 Reported by: MARY F. BOWMAN, RPR, CRR
25 JOB NO: 98276

|  | Page 106 |  | Page 107 |
|---|---|---|---|
| | Keglevic - Highly Confidential | | Keglevic - Highly Confidential |

|  | Page 108 |  | Page 109 |
|---|---|---|---|
| | Keglevic - Highly Confidential | | Keglevic - Highly Confidential |

Page 109:

    Q.   Do you have an understanding, sir, as co-chief restructuring officer, as to why the terms of the settlement agreement are being presented outside of the plan of reorganization itself?

        MR. McKANE: I was going to instruct you to the extent you can answer the question without disclosing attorney/client communications, please do so.

    A.   I'm not a lawyer, but am generally aware that 9019 settlements occur when settlements occur and don't have to be done in connection with the plan. I think the timing of why we want the settlement agreement now is because there is some consideration that is given up now to get these terms, including the debtor by agreeing to play out the transaction in the plan through April 30, effectively gives up exclusivity.

        And while we have the ability to

Page 110

1  Keglevic - Highly Confidential
2  continue to look for an alternative plan,
3  as long as it meets the defined alternative
4  restructuring terms, we effectively are
5  giving something up because we do have some
6  restrictions that we wouldn't have had if
7  we just pursued exclusivity to the end.
8        The sponsors are giving up
9  something. They have -- they are sitting
10 on a worthless stock deduction of
11 8.3 billion dollars. So times 35 percent,
12 that's real money.
13       If they were to take that
14 deduction now, it would eliminate the
15 amount of NOLs that are available to the
16 estates to come to a deal such as the one
17 contemplated in the RSA and such as the one
18 currently contemplated where we do a
19 tax-free spin but provide a partial basis
20 step-up. That would be modified.
21       And then, of course, as you are
22 probably aware, the sponsors also gave up
23 some other claims that they had with
24 respect to excess consideration and their
25 claims, I think associated with fees that

Page 111

1  Keglevic - Highly Confidential
2  they haven't been paid since the beginning
3  of 2014.
4        All those things we were giving
5  up occurred now, and that's why we thought
6  it was appropriate to get the settlement
7  agreed to now, because that was our
8  consideration to get the releases and those
9  elements in this plan. Or in this
10 settlement, 9019 settlement agreement.

Page 112

1  Keglevic - Highly Confidential

15          .

Page 113

1  Keglevic - Highly Confidential

CONTAINS HIGHLY CONFIDENTIAL PORTION

Page 110

Keglevic - Highly Confidential

```
 1
 2
 3
 4
 5
 6
 7
 8         The sponsors are giving up
 9    something.  They have -- they are sitting
10    on a worthless stock deduction of
11    8.3 billion dollars.  So times 35 percent,
12    that's real money.
13         If they were to take that
14    deduction now, it would eliminate the
15    amount of NOLs that are available to the
16    estates to come to a deal such as the one
17    contemplated in the RSA and such as the one
18    currently contemplated where we do a
19    tax-free spin but provide a partial basis
20    step-up.  That would be modified.
21
22
23
24
25
```

Page 111

Keglevic - Highly Confidential

Page 112

Keglevic - Highly Confidential

Page 113

Keglevic - Highly Confidential

Page 186

Keglevic

Page 187

Keglevic

Page 188

Keglevic

Q. Prior to the filing of the bankruptcy in this case, was there ever a time, Mr. Keglevic, when you believed that EFH was insolvent?

MR. McKANE: Objection to form. Calls for a legal conclusion.

A. You know, that -- I can't recall a specific time. I do know that the last time -- well, certainly this transaction would indicate it was not. I do remember that in 2013, probably about April, we did an analysis, and, in fact, had to make a representation to the Internal Revenue Service to reorganize TCEH, the purpose of which was to eliminate an ELA and a DIG, ELA being an extended loss account and a -- which was $20 billion in size.

Had we not been able to make that representation and gotten IRS agreement, we would be precluded from doing a tax-free spin without triggering tax on that 20 billion dollars. So that was -- that conclusion had a substantial amount of

Page 189

Keglevic
value to EFH in terms of eliminating potential tax down the road, depending on the structure that was going to be taken in the bankruptcy, whether a tax-free or taxable exchange.

And there were other times where we made that determination, but it certainly wasn't a day-to-day determination and analysis.

Q. DIG is deferred intercompany gain, right?

A. Correct.

Q. Just for a dumb litigator like me, to make sure I understand it, was that answer yes, you thought the company was insolvent as of April 2013 in connection with the IRS matter, or no?

A. Just the opposite, that we represented that it was solvent. If we had come to an alternative conclusion, we could not have eliminated the DIG, which -- and the ELA, which had the benefits that I previously enumerated.

Page 230

1  Keglevic
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 231

1  Keglevic
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 232

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 233

1  Keglevic
2
3
4
5
6
7
8
9
10
11
12
13    A.   I'm not aware of any claims that
14  have ever been communicated from EFH
15  against the sponsors.  From the committee
16  or from any group.
17
18
19
20
21
22
23
24
25

Page 362

Keglevic

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 363

Keglevic

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 364

Keglevic

1
2
3     Q.  If the settlement agreement had
4  not provided for the equity interest of the
5  sponsors to be relinquished upon approval
6  of the settlement, do you think that would
7  have been possible for EFH to get the same
8  concessions from the T-side unsecured
9  creditors in terms of the timing of
10 pursuing an alternative and drag rights, et
11 cetera?
12       MR. SHEPPARD:  Objection to form,
13   speculation.
14    A.  I -- I know one of the things
15 that was bargained for is they wanted to
16 take away any upside associated with market
17 developments or the -- getting orders that
18 approve the REIT that potentially could
19 have accrued to the equity sponsors.
20       So they -- the whole -- one of
21 the key parts of this deal that I think is
22 not disputable is that the T unsecured are
23 potentially taking lower settlement of
24 their claims than they otherwise think they
25

Page 365

Keglevic
could have bargained for in return for the
upside associated with the value of Oncor.
       And to the extent that the
existing equity sponsors held on to that
upside, that potentially impaired some of
that recovery.  So that was a key component
to the construct.