# Exhibit E

Page 1

```
 1
 2           UNITED STATES BANKRUPTCY COURT
 3            FOR THE DISTRICT OF DELAWARE
 4   ---------------------------------------x
 5   In Re:
 6   Energy Future Holdings Corporation,
 7   et al.,
 8                               Debtors.
 9
10   Chapter 11
11   Case No. 14-10979
12   Jointly Administered
13   ---------------------------------------x
14
15
16        DEPOSITION OF BILLIE IDA WILLIAMSON
17                 New York, New York
18                 September 30, 2015
19
20
21
22   Reported by:
23   MARY F. BOWMAN, RPR, CRR
24   JOB NO. 98290
25
```

Page 178

Williamson

10  In connection with the releases
11  contained there, did you have an
12  understanding when you approved the
13  settlement agreement as to what particular
14  claims might be released?
15     A.   From EFH's standpoint, we had
16  evaluated whether we thought that there
17  were claims that we had against the
18  sponsors, and we did not come up with any
19  significant claims that we felt we had at
20  EFH against the sponsors.

Page 179

Williamson

Page 180

Williamson

Page 181

Williamson

Page 182

1  Williamson
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20  Q. Did the board, or did you and
21  Mr. Evans consider the possibility of
22  making a claim against the sponsors in
23  connection with trying to recover the
24  sponsor fees that are referenced in number
25  6?

Page 183

1  Williamson
2  A. We considered that, but didn't
3  feel that it was appropriate to do so. We
4  got a great deal of value from the sponsors
5  for the fees that we paid them. Their fees
6  were considered, from our standpoint, were
7  reasonable based on what they were doing
8  and based on comparison to other
9  transactions.

Page 184

1  Williamson
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21  Q. What other pieces of information
22  did you rely upon?
23  A. Thirty-eight years in business
24  where I had seen other transactions of a
25  similar nature, and also I looked at what

Page 185

1  Williamson
2  the sponsors had done for us and what the
3  representatives had done for us and reached
4  that conclusion in my business judgment
5  that those fees were reasonable.

Page 186

Williamson

A. The sponsors were actively engaged in helping us on financial transactions. There were a variety of different transactions, there would be debt transactions, they were hedging transactions. So there were a variety of different transactions. They provided us a lot of guidance and assistance in looking at and evaluating those transactions. They assisted us with regulatory items using their expertise. They helped us look at, as we began to put together budgets and different things like that, I think they were very helpful in putting that together. They served on the board and were not paid a board of director fee.

So they were actively engaged on the board. They helped us think through what kinds of things we might be able to do to help the liquidity of the company.

So they brought a lot of expertise to the table. They brought a lot of expertise also in looking at the market and that type of thing, and we had access

Page 187

Williamson

to, you know, the reports that their analyst put together and that type of thing.

Page 188

Williamson

Page 189

Williamson

Q. So you testified that you spoke with your separate counsel, Proskauer, right?
A. Yes, um-hm.
Q. And they were counsel retained to

48

Page 190

1  Williamson
2  assist the disinterested directors of EFH?
3    A.  Yes.
4    Q.  In connection with the DD
5  settlement, correct?  The disinterested
6  directors settlement?
7    A.  Well, they were our disinterested
8  director advisor.  So they would not just
9  be on the settlement, but they assisted us
10 on the disinterested director settlement.
11   Q.  And did they assist you in your
12 evaluation of potential claims against the
13 sponsor?
14   A.  Yes.
15
16
17
18
19
20
21
22
23
24
25

Page 191

1  Williamson
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 192

1  Williamson
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 193

1  Williamson
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 202

Williamson

Page 203

Williamson

Page 204

Q. Other than the indemnification provision that you testified to earlier, was there any other consideration that EFH received in return for the release of the claims against the sponsors?

A. Yes, as a matter of fact there was.

First off, the sponsors are the majority of the equity holders at EFH, and that piece was given up so that we could pursue the REIT transaction.

Secondly, in the settlement agreement and what we have talked about here, they gave up the payment of approximately -- it was about 80 million dollars worth of management fees. The management fees stopped being paid -- they continued to be accrued, but they were not paid in cash starting with the fourth

Page 205

Williamson

quarter of 2013. So that amount for that quarter and then 2014 and 2015 to date is about 80 million dollars. They don't get that. They have -- you know, the little piece that we talked about in the original DD settlement, they gave that up. It was just a few million dollars but that was given up. And they have not -- they have agreed not to pursue the worthless tax deduction, which could cause some major tax issues, were they to pursue that at the current time.

So they have given that up, and then with the settlement agreement and releases that are in the settlement agreement, they are giving up their right to the indemnity at EFH.