# Exhibit F



# Form 8-K

## Energy Future Holdings Corp /TX/ - TXU

Filed: October 11, 2007 (period: October 05, 2007)

Report of unscheduled material events or corporate changes.

EFH00600268

# Table of Contents

ITEM 1.01     ENTRY INTO A MATERIAL DEFINITIVE AGREEMENT.
ITEM 1.02     TERMINATION OF A MATERIAL DEFINITIVE AGREEMENT.
ITEM 2.03     CREATION OF A DIRECT FINANCIAL OBLIGATION OR AN OBLIGATION UNDER AN
        OFF-BALANCE SHEET ARRA
ITEM 3.01     NOTICE OF DELISTING OR FAILURE TO SATISFY A CONTINUED LISTING RULE OR
        STANDARD; TRANSFER O
ITEM 5.01     CHANGES IN CONTROL OF REGISTRANT
ITEM 5.02     DEPARTURES OF DIRECTORS OR PRINCIPAL OFFICERS; ELECTION OF DIRECTORS;
        APPOINTMENT OF PRINC
ITEM 5.03     AMENDMENTS TO ARTICLES OF INCORPORATION OR BY-LAWS; CHANGE IN FISCAL
        YEAR.
ITEM 8.01     OTHER EVENTS.
ITEM 9.01     FINANCIAL STATEMENTS AND EXHBITS.
SIGNATURE

EX-3.1 (RESTATED CERTIFICATE OF FORMATION)

EX-3.2 (RESTATED BYLAWS)

EX-99.1 (PRESS RELEASE)

EX-99.2 (DEEMED TRANSACTIONS)

EFH00600269

Table of Contents

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549
# Form 8-K
**Current Report**
**Pursuant to Section 13 or 15(d) of**
**the Securities Exchange Act of 1934**
Date of Report (date of earliest event reported) — October 5, 2007

# ENERGY FUTURE HOLDINGS CORP.
(Exact name of registrant as specified in its charter)

| **TEXAS** | **1-12833** | **75-2669310** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

# TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC
(Exact name of registrant as specified in its charter)

| **DELAWARE** | **333-108876** | **75-2967817** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

# ONCOR ELECTRIC DELIVERY COMPANY LLC
(Exact name of registrant as specified in its charter)

| **DELAWARE** | **333-100240** | **75-2967830** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**Energy Plaza, 1601 Bryan Street, Dallas, Texas 75201-3411**
(Address of principal executive offices, including zip code)
**Registrants' (Energy Future Holdings Corp.'s and Texas Competitive Electric Holdings Company's)**
**telephone number, including area code — (214) 812-4600**
**Registrant's (Oncor Electric Delivery Company's)**
**telephone number, including area code — (214) 486-2000**
**TXU Corp. (with respect to Energy Future Holdings Corp.)**
**Oncor Electric Delivery Company (with respect to Oncor Electric Delivery Company LLC)**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of theregistrants under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**TABLE OF CONTENTS**

ITEM 1.01 ENTRY INTO A MATERIAL DEFINITIVE AGREEMENT.

ITEM 1.02 TERMINATION OF A MATERIAL DEFINITIVE AGREEMENT.

ITEM 2.03 CREATION OF A DIRECT FINANCIAL OBLIGATION OR AN OBLIGATION UNDER ANOFF-BALANCE SHEET ARRANGEMENT OF A REGISTRANT.

ITEM 3.01 NOTICE OF DELISTING OR FAILURE TO SATISFY A CONTINUED LISTING RULE ORSTANDARD; TRANSFER OF LISTING.

ITEM 5.01 CHANGES IN CONTROL OF REGISTRANT

ITEM 5.02 DEPARTURES OF DIRECTORS OR PRINCIPAL OFFICERS; ELECTION OF DIRECTORS;APPOINTMENT OF PRINCIPAL OFFICERS; COMPENSATORY ARRANGEMENTS OF CERTAINOFFICERS.

ITEM 5.03 AMENDMENTS TO ARTICLES OF INCORPORATION OR BY-LAWS; CHANGE IN FISCALYEAR.

ITEM 8.01 OTHER EVENTS.

ITEM 9.01 FINANCIAL STATEMENTS AND EXHBITS.

SIGNATURE

Restated Certificate of Formation

Restated Bylaws

Press Release

Deemed Transactions

EFH00600271

**Introductory Note**

On October 10, 2007, TXU Corp. (now known as Energy Future Holdings Corp.), a Texas corporation (the "Company"), completed its merger (the "Merger") with Texas Energy Future Merger Sub Corp ("Merger Sub"), a wholly-owned subsidiary of Texas Energy Future Holdings Limited Partnership ("Parent"), pursuant to the terms and conditions of that certain Agreement and Plan of Merger, dated as of February 25, 2007, by and among Parent, Merger Sub and the Company (the "Merger Agreement"). As a result of the Merger, the Company became a wholly-owned subsidiary of Parent. Parent is controlled by investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P., TPG Capital, L.P. and GS Capital Partners (collectively, the "Sponsor Group").

This Current Report on Form 8-K is being filed jointly by the Company and its subsidiaries, Texas Competitive Electric Holdings Company LLC ("TCEH") and Oncor Electric Delivery Company LLC ("Oncor"). All of the information contained herein is being filed by the Company. TCEH and Oncor are respectively filing only the information with respect to those agreements to which it is a party and are described in Item 1.01, Item 1.02 and Item 2.03.

**ITEM 1.01   ENTRY INTO A MATERIAL DEFINITIVE AGREEMENT.**

Senior Secured Facility — TCEH

*Overview*

In connection with the Merger, TCEH and Energy Future Competitive Holdings Company ("US Holdings"), a subsidiary of the Company and the parent company of TCEH, have entered into a credit agreement (the "TCEH Credit Agreement"), and related security and other agreements, with Citibank, N.A., as administrative agent, collateral agent, swingline lender, revolving letter of credit issuer and deposit letter of credit issuer, Goldman Sachs Credit Partners L.P., as posting agent, posting syndication agent and posting documentation agent, JPMorgan Chase Bank, N.A., as syndication agent and revolving letter of credit issuer, Citigroup Global Markets Inc., J.P. Morgan Securities Inc., Goldman Sachs Credit Partners L.P., Lehman Brothers Inc., Morgan Stanley Senior Funding, Inc. and Credit Suisse Securities (USA) LLC, as joint lead arrangers and bookrunners, Goldman Sachs Credit Partners L.P., as posting lead arranger and sole bookrunner, Credit Suisse, Goldman Sachs Credit Partners L.P., Lehman Commercial Paper Inc. and Morgan Stanley Senior Funding, Inc., as co-documentation agents, and J. Aron & Company, as posting calculation agent, that provide senior secured financing of up to $24.5 billion plus the amount of the TCEH Commodity Collateral Posting Facility (as defined below) (the "TCEH Senior Secured Facilities"), consisting of:

- a senior secured initial term loan facility (the "TCEH Initial Term Loan Facility") in an aggregate principal amount of up to $16.45 billion;

- a senior secured delayed draw term loan facility in an aggregate principal amount of up to $4.1 billion (the "TCEH Delayed Draw Term Loan Facility");

- a senior secured letter of credit facility in an aggregate principal amount of up to $1.25 billion (the "TCEH Letter of Credit Facility");

- a senior secured revolving credit facility in an aggregate principal amount of up to $2.7 billion (the "TCEH Revolving Facility"), which includes borrowing capacity available for letters of credit and for borrowings on same-day notice, referred to as swingline loans; and

- a senior secured cash posting credit facility (the "TCEH Commodity Collateral Posting Facility") described in more detail below that is expected to fund the cash posting requirements for a significant portion of TCEH's long-term hedging program that is not otherwise secured by means of a first lien under the security arrangements described below.

In addition, subject to the satisfaction of certain conditions, TCEH may add one or more incremental term loan facilities, incremental letter of credit facilities and/or increase the commitments under the TCEH Revolving

EFH00600272

Table of Contents

Facility in an aggregate principal amount up to $2.0 billion and/or add one or more incremental cash posting facilities.

TCEH is the borrower under the TCEH Senior Secured Facilities.

*TCEH Commodity Collateral Posting Facility*

The TCEH Commodity Collateral Posting Facility is a senior secured cash posting credit facility, the aggregate principal amount of which, instead of having a fixed maximum amount, is capped by the out-of-the-money mark-to-market exposure of TCEH (and/or its subsidiaries) on a portfolio of hypothetical over-the-counter fixed-for-floating natural gas commodity swap transactions under which TCEH (and/or its subsidiaries) is the "floating price" payor as such portfolio may be amended from time to time (the "Deemed Transactions"). The Deemed Transactions correspond to hedging transactions described in above. Exhibit 99.2 to this Current Report on Form 8-K sets forth the monthly quantities of the Deemed Transactions. Under the TCEH Commodity Collateral Posting Facility, the mark-to-market value of the Deemed Transactions (and corresponding advances and repayments) is based upon the difference between natural gas prices as of each calculation date and prices in effect as of December 29, 2006. As of October 10, 2007, the mark-to-market exposure of TCEH (and its subsidiaries) on the Deemed Transactions was approximately $382.0 million.

*Interest Rates and Fees*

Loans under the TCEH Senior Secured Facilities (other than the TCEH Commodity Collateral Posting Facility) bear interest at per annum rates equal to, at TCEH's option, (i) adjusted LIBOR plus 3.50% or (ii) a base rate (the higher of (1) the prime rate of Citibank, N.A. and (2) the federal funds effective rate plus 0.50%) plus 2.50%. There is a margin adjustment mechanism in relation to term loans, revolving loans and letters of credit commencing after delivery of the financial statements for the first full fiscal quarter ending after October 10, 2007, under which the applicable margins may be reduced based on leverage ratio targets to be determined.

Loans under the TCEH Commodity Collateral Posting Facility bear interest at rates per annum equal to adjusted LIBOR.

A commitment fee is payable quarterly in arrears and upon termination at a rate per annum equal to 0.50% of the average daily unused portion of the TCEH Revolving Facility. The commitment fee will be subject to reduction, commencing after delivery of the financial statements for the first full fiscal quarter ending after October 10, 2007, based on leverage ratio targets to be determined.

A commitment fee is payable quarterly in arrears and upon termination on the undrawn portion of the commitments in respect of the TCEH Delayed Draw Term Loan Facility at a rate per annum equal to, prior to the first anniversary of October 10, 2007, 1.25% per annum, and thereafter, 1.50% per annum.

Letter of credit fees under the TCEH Revolving Facility are payable quarterly in arrears and upon termination at a rate per annum equal to the spread over adjusted LIBOR under the TCEH Revolving Facility, less the issuing bank's fronting fee.

TCEH will pay LIBOR on all borrowings under the TCEH Commodity Collateral Posting Facility and will pay a fixed quarterly maintenance fee through maturity for having procured the facility irrespective of the actual borrowings under the facility.

*Guarantees and Security*

*Guarantee.* The TCEH Senior Secured Facilities are unconditionally guaranteed jointly and severally on a senior secured basis, by US Holdings, TCEH and each existing and subsequently acquired or organized direct or indirect wholly-owned U.S. restricted subsidiary of TCEH (other than certain immaterial subsidiaries and other subsidiaries to be agreed upon), subject to certain other exceptions.

*Security.* The TCEH Senior Secured Facilities, including the guarantees thereof and certain commodity and other hedging and trading transactions, are secured by (a) substantially all of the assets of US Holdings,

3

TCEH and TCEH's subsidiaries who are guarantors of such facilities as described above, subject to certain otherexceptions, and (b) a pledge of the capital stock of TCEH and a pledge of the capital stock of each material wholly-ownedrestricted subsidiary of TCEH directly owned by TCEH or any guarantor (limited in the case of pledges of capital stock of anyforeign subsidiaries, to 65% of the capital stock of any first-tier material foreign subsidiary).

### Covenants

The TCEH Senior Secured Facilities contain customary negative covenants, restricting, subject to certain exceptions, USHoldings, TCEH and TCEH's restricted subsidiaries from, among other things:

- incurring additional debt;

- incurring additional liens;

- entering into mergers and consolidations;

- sales of assets;

- dividends, redemptions or other distributions in respect of capital stock;

- acquisitions, investments, loans and advances; and

- payments and modifications of certain subordinated and other material debt.

In addition, the TCEH Senior Secured Facilities require that US Holdings, TCEH and their restricted subsidiaries to maintain amaximum secured leverage ratio beginning on September 30, 2008 of 7.25 to 1.00 and observe certain customary reportingrequirements and other affirmative covenants.

### Maturity and Amortization

The TCEH Initial Term Loan Facility is required to be repaid in equal quarterly installments in an aggregate annual amountequal to 1% of the original principal amount of such facility, with the balance payable on the date which is seven years followingthe closing date. The TCEH Delayed Draw Term Facility is required to be repaid in equal quarterly installments beginning on thelast day of the first fiscal quarter to occur after the second anniversary of October 10, 2007 (the "First DD AmortizationPayment Date") in an aggregate annual amount equal to 1% of the actual principal outstanding under the TCEH DelayedDraw Term Loan Facility as of the First DD Amortization Payment Date, with the balance payable on the date which is sevenyears following October 10, 2007. Amounts borrowed under the TCEH Revolving Facility may be reborrowed from time to timefrom and after the closing date until the date that is the sixth anniversary thereof. The TCEH Letter of Credit Facility will matureon the seventh anniversary of October 10, 2007. The TCEH Commodity Collateral Posting Facility will mature on December 31,2012.

### Events of Default

The TCEH Senior Secured Facilities contain certain customary events of default for senior leveraged acquisition financings theoccurrence of which would allow the lenders to accelerate all outstanding loans and terminate their commitments.

Senior Unsecured Bridge Facility — TCEH

### Overview

On October 10, 2007, in connection with the Merger and the repayment of certain existing indebtedness, US Holdings, TCEHand TCEH Finance, Inc, a Delaware corporation and wholly-owned subsidiary of TCEH ("TCEH Finance" and,together with TCEH, the "Co-Borrowers"), entered into senior unsecured credit facilities ("TCEH UnsecuredBridge Facilities") with Morgan Stanley Senior Funding, Inc., as administrative agent.

4

Table of Contents

The TCEH Unsecured Bridge Facilities provide senior unsecured financing of $6.75 billion, consisting of a:

- $ 5.0 billion senior unsecured cash-pay term loan facility with a term of eight years (the "TCEH Initial Cash-Pay Loans"); and

- $ 1.75 billion senior unsecured toggle term loan facility with a term of nine years (the "TCEH Initial Toggle Loans" and, together with the TCEH Initial Cash-Pay Loans, the "TCEH Initial Loans").

If any borrowings under the TCEH Unsecured Bridge Facilities remain outstanding on the one-year anniversary (the "TCEH Initial Maturity Date") of the closing of the TCEH Unsecured Bridge Facilities, the lenders in respect of the TCEH Initial Cash-Pay Loans and the lenders in respect of the TCEH Initial Toggle Loans will each have the option at any time or from time to time to exchange such TCEH Initial Loans for senior cash-pay notes (the "TCEH Senior Cash-Pay Exchange Notes") or senior toggle notes (the "TCEH Senior Toggle Exchange Notes" and, together with the TCEH Senior Cash-Pay Exchange Notes, the "TCEH Senior Exchange Notes"), respectively, which the Co-Borrowers will issue under a senior indenture. The maturity date of any TCEH Initial Loans that are not exchanged for TCEH Senior Exchange Notes will automatically be extended to the eighth anniversary, in the case of the TCEH Initial Cash-Pay Loans (the "TCEH Cash-Pay Final Maturity Date") and the ninth anniversary in the case of the TCEH Initial Toggle Loans (the "TCEH Toggle Final Maturity Date") of the closing of the TCEH Unsecured Bridge Facilities. The TCEH Senior Cash-Pay Exchange Notes will also mature on the TCEH Cash-Pay Final Maturity Date, and the TCEH Senior Toggle Exchange Notes will also mature on the TCEH Toggle Final Maturity Date. Holders of the TCEH Senior Exchange Notes will have registration rights.

*Interest Rate*

Subject to specified caps, borrowings under the TCEH Unsecured Bridge Facilities for the first six-month period from the closing of the TCEH Unsecured Bridge Facilities will bear interest at a rate equal to LIBOR plus (i) 325 basis points, in the case of the TCEH Initial Cash-Pay Loans and (ii) 350 basis points, in the case of the TCEH Initial Toggle Loans (in each case, the "TCEH Initial Margin"). Interest for the three-month period commencing at the end of the initial six-month period, subject to specified caps, shall be payable at prevailing LIBOR for the interest period plus the TCEH Initial Margin plus 50 basis points. Thereafter, subject to specified caps, interest will be increased by an additional 25 basis points at the beginning of each three-month period subsequent to the initial nine-month period, for so long as the TCEH Initial Loans are outstanding. If issued, the interest rate on the TCEH Senior Exchange Notes will be the same as the interest rate borne by the TCEH Initial Loans; provided, that if any TCEH Senior Exchange Notes are transferred by the lender to a third-party purchaser, the interest rate on those notes will be fixed at the interest rate in effect on the transfer date.

*Prepayments and Redemptions*

The Co-Borrowers will be required to make an offer to repay loans under the TCEH Unsecured Bridge Facilities and, following the TCEH Initial Maturity Date, repurchase TCEH Senior Exchange Notes with net proceeds from specified asset sales. In addition, after any payments required to be made to repay the TCEH Unsecured Bridge Facilities, the Co-Borrowers will be required to offer to repay loans and, if issued, to repurchase the TCEH Senior Exchange Notes upon the occurrence of a change of control. Until the TCEH Initial Loans Maturity Date, the Co-Borrowers will also be required to prepay outstanding TCEH Initial Loans with the net proceeds of any refinancing debt.

The Co-Borrowers may voluntarily repay outstanding TCEH Initial Loans, in whole or in part, at their option at any time upon three business days' prior notice, at par plus accrued and unpaid interest and subject to, in the case of TCEH Initial Loans based on LIBOR, customary "breakage" costs with respect to such LIBOR loans, other than customary "breakage" costs with respect to LIBOR loans. The Co-Borrowers may optionally redeem the TCEH Senior Exchange Notes other than fixed-rate exchange notes, if issued, in whole or in part, at

5

Table of Contents

any time at par plus accrued and unpaid interest to the redemption date, provided that it also optionally prepays any outstanding TCEH Initial Loans on a pro rata basis.

If any TCEH Senior Exchange Note is sold by a lender to a third-party purchaser, and the interest rate on such TCEH Senior Exchange Note becomes fixed, such TCEH Senior Exchange Note will be non-callable for the first three years from the TCEH Initial Maturity Date, in the case of the TCEH Senior Cash-Pay Exchange Notes, and four years from the TCEH Initial Maturity Date, in the case of the TCEH Senior Toggle Exchange Notes, subject to equity clawback and make-whole provisions consistent with those applicable to the notes offered hereby, and will be callable thereafter at a specified premium. The premium will decline ratably on each yearly anniversary of the date of such sale to zero two years prior to the final maturity date, in the case of the TCEH Senior Cash-Pay Exchange Notes, and one year, in the case of the TCEH Senior Toggle Exchange Notes.

*Guarantee*

All obligations under the TCEH Unsecured Bridge Facilities and, if the TCEH Senior Exchange Notes are issued, the senior indenture, are jointly and severally guaranteed on a senior basis by US Holdings and each of TCEH's domestic subsidiaries that guarantees obligations under the TCEH Senior Secured Facilities.

*Certain Covenants and Events of Default*

The TCEH Unsecured Bridge Facilities and the senior indenture contain a number of covenants that, among other things, restrict, subject to certain exceptions, the Co-Borrowers' ability to:

- incur additional indebtedness;

- create liens;

- engage in mergers or consolidations;

- sell or transfer assets and subsidiary stock;

- pay dividends and distributions or repurchase their capital stock;

- make certain investments, loans or advances;

- prepay certain indebtedness;

- enter into agreements that restrict the payment of dividends by subsidiaries or the repayment of intercompany loans and advances; and

- engage in certain transactions with affiliates.

In addition, the TCEH Unsecured Bridge Facilities and the senior indenture impose certain requirements as to future subsidiary guarantors. The TCEH Unsecured Bridge Facilities and the senior indenture also contain certain customary affirmative covenants consistent with those in the TCEH Senior Secured Facilities, to the extent applicable, and certain customary events of default.

Senior Unsecured Bridge Facility — the Company

*Overview*

On October 10, 2007, in connection with the Merger and the repayment of certain existing indebtedness, the Company entered into senior unsecured credit facilities ("Company Unsecured Bridge Facilities") with Morgan Stanley Senior Funding, Inc., as administrative agent.

The Company's Unsecured Bridge Facilities provide senior unsecured financing of $4.5 billion, consisting of a:

- $ 2.5 billion senior unsecured cash-pay term loan facility with a term of ten years (the "Company Initial Cash-Pay Loans"); and

EFH00600276

Table of Contents

- $ 2.0 billion senior unsecured toggle term loan facility with a term of ten years (the "Company Initial ToggleLoans" and, together with the Company Initial Cash-Pay Loans, the "Company Initial Loans").

If any borrowings under the Company Unsecured Bridge Facilities remain outstanding on the one-year anniversary (the "Company Initial Maturity Date") of the closing of the Company Unsecured Bridge Facilities, the lenders in respect of the Company Initial Cash-Pay Loans and the lenders in respect of the Company Initial Toggle Loans will have the option at any time or from time to time to exchange such Company Initial Loans for senior cash-pay notes (the "Company SeniorCash-Pay Exchange Notes") or senior toggle notes (the "Company Senior Toggle Exchange Notes" and,together with the Company Senior Cash-Pay Exchange Notes, the "Company Senior Exchange Notes") that theCompany will issue under a senior indenture. The maturity date of any Company Initial Loans that are not exchanged forCompany Senior Exchange Notes will automatically be extended to the tenth anniversary (the "Company Final MaturityDate") after the closing of the TCEH Senior Secured Facilities. The Company Senior Exchange Notes will also mature onthe Company Final Maturity Date. Holders of the Company Senior Exchange Notes will have registration rights.

*Interest Rate*

Subject to specified caps, borrowings under the Company Unsecured Bridge Facilities for the first six-month period from theclosing of the TCEH Senior Secured Facilities will bear interest at a rate equal to LIBOR plus (i) 400 basis points, in the case ofthe Company Initial Cash-Pay Loans and (ii) 425 basis points, in the case of the Company Initial Toggle Loans (in each case,the "Company Initial Margin"). Interest for the three-month period commencing at the end of the initial six-monthperiod, subject to specified caps, shall be payable at prevailing LIBOR for the interest period plus (A) the Company InitialMargin plus (B) 50 basis points. Thereafter, subject to specified caps, interest will be increased by an additional 25 basis points atthe beginning of each three-month period subsequent to the initial nine-month period, for so long as the Company Initial Loansare outstanding. If issued, the interest rate on the Company Senior Exchange Notes will be the same as the interest rate borne bythe Company Initial Loans; provided, that if any Company Senior Exchange Notes are transferred by the lender to a third-partypurchaser, the interest rate on those notes will be fixed at the interest rate in effect on the transfer date.

*Prepayments and Redemptions*

The Company will be required to make an offer to repay loans under the Company Unsecured Bridge Facilities and, followingthe Company Initial Maturity Date, repurchase Company Senior Exchange Notes with net proceeds from specified asset sales. Inaddition, after any payments required to be made to repay the TCEH Senior Secured Facilities, the Company will be required tooffer to repay loans and, if issued, to repurchase the Company Senior Exchange Notes upon the occurrence of a change ofcontrol. Until the Company Initial Loans maturity date, the Company will also be required to prepay outstanding Company InitialLoans with the net proceeds of any refinancing debt.

The Company may voluntarily repay outstanding Company Initial Loans, in whole or in part, at its option at any time uponthree business days' prior notice, at par plus accrued and unpaid interest and subject to, in the case of Company InitialLoans based on LIBOR, customary "breakage" costs with respect to such LIBOR loans, other than customary "breakage" costs with respect to LIBOR loans. The Company may optionally redeem the Company Senior ExchangeNotes other than fixed-rate exchange notes, if issued, in whole or in part, at any time at par plus accrued and unpaid interest tothe redemption date, provided that it also optionally prepays any outstanding Company Initial Loans on a pro rata basis.

If any Company Senior Exchange Note is sold by a lender to a third-party purchaser, and the interest rate on such CompanySenior Exchange Note becomes fixed, such Company Senior Exchange Note will be non-callable for the first four years from theCompany Initial Maturity Date, subject to equity clawback and make-whole provisions consistent with those applicable to thenotes offered hereby, and will be callable thereafter at a

7

EFH00600277

Table of Contents

specified premium. The premium will decline ratably on each yearly anniversary of the date of such sale to zero two years prior to the Company Final Maturity Date.

*Guarantee*

All obligations under the Company Unsecured Bridge Facilities and, if the Company Senior Exchange Notes are issued, the senior indenture are jointly and severally guaranteed on a senior unsecured basis by Energy Future Intermediate Holding Company LLC, a Delaware limited liability company and wholly-owned subsidiary of the Company ("Intermediate Holding"), and US Holdings.

*Certain Covenants and Events of Default*

The Company Unsecured Bridge Facilities and the senior indenture contain a number of covenants that, among other things, restrict, subject to certain exceptions, the Company's ability to:

- incur additional indebtedness;

- create liens;

- engage in mergers or consolidations;

- sell or transfer assets and subsidiary stock;

- pay dividends and distributions or repurchase its capital stock;

- make certain investments, loans or advances;

- prepay certain indebtedness;

- enter into agreements that restrict the payment of dividends by subsidiaries or the repayment of intercompany loans and advances; and

- engage in certain transactions with affiliates.

In addition, the Company Unsecured Bridge Facilities and the senior indenture impose certain requirements as to future subsidiary guarantors. The Company Unsecured Bridge Facilities and the senior indenture also contain certain customary affirmative covenants consistent with those in TCEH Senior Secured Facilities, to the extent applicable, and certain customary events of default.

Intercreditor Agreement

On October 10, 2007, in connection with the Merger, TCEH, US Holdings and the subsidiary guarantors under the TCEH Senior Secured Facilities entered into a Collateral Agency and Intercreditor Agreement (the "Intercreditor Agreement") with Citibank, N.A., as collateral agent and administrative agent, and four secured commodity hedge counterparties, Lehman Brothers Commodity Services Inc., J. Aron & Company, Morgan Stanley Capital Group Inc. and Citigroup Energy Inc. (collectively, the "Secured Commodity Hedge Counterparties").

The Intercreditor Agreement provides that the lien granted to the Secured Commodity Hedge Counterparties should rank pari passu with the lien granted to the secured parties under the TCEH Senior Secured Facilities on the collateral under the TCEH Senior Secured Facilities (the "Group Collateral") and the Secured Commodity Hedge Counterparties will be entitled to share, on a pro rata basis, in the proceeds of any liquidation of the Group Collateral in connection with a foreclosure on the Group Collateral in an amount provided in the TCEH Credit Agreement.

The Intercreditor Agreement also provides that the Secured Commodity Hedge Counterparties will have voting rights with respect to any amendment or waiver of any provision of the Intercreditor Agreement that change the priority of the Secured Commodity Hedge Counterparties' lien on the Group Collateral relative to the priority of lien granted to the secured parties under the TCEH Senior Secured Facilities or the priority of payments to the Secured Commodity Hedge Counterparties upon a foreclosure and liquidation of the Group

EFH00600278

Table of Contents

Collateral relative to the priority of the lien granted to the secured parties under the TCEH Senior Secured Facilities.

Revolving Credit Facility — Oncor

*Overview*

Oncor has entered into a revolving credit agreement (the "Oncor Credit Agreement") with JPMorgan ChaseBank, N.A., as administrative agent, fronting bank and swingline lender, Citibank, N.A., as syndication agent and fronting bank,Credit Suisse, Cayman Islands Branch, Goldman Sachs Credit Partners L.P., Lehman Commercial Paper Inc., Morgan StanleySenior Funding, Inc. as co-documentation agents, J.P. Morgan Securities Inc., Citigroup Global Markets Inc., Credit SuisseSecurities (USA) LLC, Goldman Sachs Credit Partners L.P., Lehman Brothers Inc. and Morgan Stanley Senior Funding, Inc. asjoint lead arrangers and bookrunners and the other agents named in the Oncor Credit Agreement, to provide for a securedrevolving credit facility in an aggregate principal amount of up to $2.0 billion. Oncor is the borrower under the secured revolvingcredit facility (the "Oncor Revolving Credit Facility").

*Interest Rates and Fees*

Loans under the Oncor Revolving Credit Facility bear interest at per annum rates equal to, at Oncor's option,(i) adjusted LIBOR plus a spread of 0.275% to 0.800% (which spread shall depend on the rating assigned to Oncor'ssenior secured debt) or (ii) a base rate (the higher of (1) the prime rate of JPMorgan Chase Bank, N.A. and (2) the federal fundseffective rate plus 0.50%). Based on Oncor's current ratings, its LIBOR-based borrowings will bear interest at LIBORplus 0.575%.

A facility fee is payable quarterly in arrears and upon termination or commitment reduction at a rate per annum equal to0.100% to 0.200% (such spread shall depend on the rating assigned to Oncor's senior secured debt) of the commitmentsunder the Oncor Revolving Credit Facility. Based on Oncor's current ratings, its facility fee will be 0.175%.

A utilization fee is payable quarterly in arrears and upon termination on the average daily amount outstanding (to the extent ofborrowings in excess of 50% of the commitments) under the Oncor Revolving Credit Facility at a rate per annum equal to 1.25%per annum.

Letter of credit fees under the Oncor Revolving Credit Facility are payable quarterly in arrears and upon termination at a rateper annum equal to the spread over adjusted LIBOR under the Oncor Revolving Credit Facility, less the issuing bank'sfronting fee.

*Security*

The Oncor Revolving Credit Facility, including hedging transactions, will be secured, on a post-closing basis, by certain ofOncor's assets used in connection with its the transmission and distribution business.

*Covenants*

The Oncor Revolving Credit Facility contains customary covenants for facilities of this type, restricting, subject to certainexceptions, Oncor and its subsidiaries from, among other things:

- incurring additional liens;

- entering into mergers and consolidations;

- sales of substantial assets; and

- acquisitions and investments in subsidiaries.

In addition, the Oncor Revolving Credit Facility requires that Oncor maintain a maximum consolidated senior debt tocapitalization ratio of 0.65 to 1.00 and observe certain customary reporting requirements and other affirmative covenants.

9

Table of Contents

*Maturity*

Amounts borrowed under the Oncor Revolving Credit Facility may be reborrowed from time to time from and afterOctober 10, 2007 until the date that is the sixth anniversary thereof.

*Events of Default*

The Oncor Revolving Credit Facility contains certain customary events of default for facilities of this type the occurrence ofwhich would allow the lenders to accelerate all outstanding loans and terminate their commitments.

Relationships

With respect to the other parties to the TCEH Credit Agreement, TCEH Unsecured Bridge Facilities, the Company UnsecuredBridge Facilities, the Intercreditor Agreement, and the Oncor Credit Agreement, each of the Company, TCEH and Oncor has ormay have had customary banking relationships based on the provision of a variety of financial services, including investmentbanking, underwriting, lending, commercial banking and other advisory services. None of these services are material to theCompany, TCEH or Oncor individually or in the aggregate with respect to any individual party.

Management Agreement

On October 10, 2007, in connection with the Merger, Kohlberg Kravis Roberts & Co. L.P., TPG Capital, L.P., Goldman,Sachs & Co. and Lehman Brothers Inc. entered into a management agreement with the Company (the "ManagementAgreement"), pursuant to which affiliates of the investors will provide management, consulting, financial and otheradvisory services to the Company. Pursuant to the Management Agreement, the Sponsor Group is entitled to receive an aggregateannual management fee of $35.0 million, which amount will increase 2% annually, and reimbursement of out-of-pocket expensesincurred in connection with the provision of services pursuant to the Management Agreement. The Management Agreement willcontinue in effect from year to year, unless terminated upon a change of control of the Company or in connection with an initialpublic offering of the Company or if the parties mutually agree to terminate the Management Agreement. Pursuant to theManagement Agreement, the Sponsor Group is also entitled to receive aggregate transaction fees of $300.0 million in connectionwith certain services provided in connection with the Merger and related transactions. In addition, the Management Agreementprovides that the Sponsor Group will be entitled to receive a fee equal to a percentage of the gross transaction value inconnection with certain subsequent financing, acquisition, disposition, merger combination and change of control transactions, aswell as a termination fee based on the net present value of future payment obligations under the Management Agreement in theevent of an initial public offering or under certain other circumstances.

Supplemental Indenture — Company 4.80% Series O Senior Notes

On October 5, 2007, the Company and The Bank of New York entered into a First Supplemental Indenture ("Series OSupplemental Indenture"). The Series O Supplemental Indenture amends and supplements that certain Indenture (ForUnsecured Debt Securities Series O), dated as of November 1, 2004, between the Company and The Bank of New York (the"Series O Indenture") and the related Officers' Certificate ("Series O Officers'Certificate"), dated November 26, 2004, that establishes the terms of the Company's 4.80% Series O Senior Notesdue 2009 (the "Series O Notes"). The amendments to the Series O Indenture and the Series O Officers'Certificate, among other things, eliminate certain covenants contained in the Series O Indenture and the Series O Officers'Certificate, eliminate certain events of default, modify covenants regarding mergers and consolidations, and modify or eliminatecertain other provisions, including certain provisions relating to satisfaction and discharge. The Series O Supplemental Indenturewas approved by not less than a majority of the outstanding aggregate principal amounts of the Series O Notes.

10

Supplemental Indenture — TCEH 6.125% Senior Notes and 7.00% Senior Notes

On October 5, 2007, TCEH and The Bank of New York entered into a First Supplemental Indenture ("TCEHSupplemental Indenture"). The TCEH Supplemental Indenture amends and supplements that certain Indenture (ForUnsecured Debt Securities), dated as of March 1, 2003, between TCEH and The Bank of New York (the "TCEHIndenture") and the related Officers' Certificate ("TCEH Officers' Certificate"), datedMarch 11, 2003, that establishes the terms of TCEH's 6.125% Senior Notes due 2008 and 7.000% Senior Notes due 2013(collectively, the "TCEH Notes"). The amendments to the TCEH Indenture and the TCEH Officers'Certificate, among other things, eliminate certain covenants contained in the TCEH Indenture and the TCEH Officers'Certificate, eliminate certain events of default, modify covenants regarding mergers and consolidations, and modify or eliminatecertain other provisions, including certain provisions relating to satisfaction and discharge. The TCEH Supplemental Indenturewas approved by not less than a majority of the outstanding aggregate principal amounts of the TCEH Notes.

Supplemental Indenture — Company Floating Rate Convertible Senior Notes

On October 10, 2007, in connection with the Merger, the Company and The Bank of New York entered into a FirstSupplemental Indenture ("Convertible Notes Supplemental Indenture"). The Convertible Notes SupplementalIndenture amends and supplements that certain Indenture (For Unsecured Debt Securities Series N), dated as of July 1, 2003,between the Company and The Bank of New York (the "Convertible Notes Indenture") and the relatedOfficers' Certificate ("Convertible Notes Officers' Certificate"), dated July 15, 2003, that establishesthe terms of the Company's Floating Rate Convertible Senior Notes due 2033 (the "Convertible Notes"). TheConvertible Notes Supplemental Indenture provides that each Convertible Note is convertible into the amount of cash receivableupon the Merger by a holder of a number of shares of common stock of the Company issuable upon conversion of suchConvertible Notes immediately prior to the Merger which is $4,274.05.

Tax Sharing Agreement

In connection with the Merger, on October 10, 2007, Oncor, Oncor Electric Delivery Holdings Company LLC, Oncor'sparent company and an indirect wholly-owned subsidiary of the Company ("Oncor Holdings"), and the Companyentered into a Tax Sharing Agreement (the "Tax Sharing Agreement"). The terms and conditions of the Tax SharingAgreement provide that, among other things, the allocation of tax liability to each of Oncor Holdings and Oncor will occursubstantially as if these entities were stand-alone corporations and will require tax payments determined on that basis (withoutduplication for taxes paid by a subsidiary of Oncor or Oncor Holdings).

Oncor Limited Liability Company Agreement

In connection with the Merger, Oncor was converted from a Texas corporation to a Delaware limited liability company underthe laws of the States of Texas and Delaware and entered into a limited liability company agreement (as amended, the"Oncor LLC Agreement"). The Oncor LLC Agreement provides that the independent directors of Oncor (who mustcomprise a majority of the members of Oncor's board of directors), acting by majority vote, shall have the authority toprevent Oncor from making any distribution if they determine that it is in Oncor's best interests to retain such amounts tomeet expected future requirements (including continued compliance with the debt-to-equity ratio established from time to timeby the Public Utility Commission of the State of Texas for ratemaking purposes). The Oncor LLC Agreement also provides thatthe Board of Directors of Oncor shall not distribute any amounts to Oncor's member(s) to the extent that the Board ofDirectors of Oncor determines in good faith that it is necessary to retain such amounts to meet expected future requirements ofthe applicable entity. In addition to such restrictions on distributions, the Oncor LLC

11

Table of Contents

Agreement contains certain separateness provisions that require Oncor to conduct its activities separate and distinct from theactivities of the Company and its other subsidiaries, including, without limitation, holding itself out as a separate legal entity.

## ITEM 1.02   TERMINATION OF A MATERIAL DEFINITIVE AGREEMENT.

### $3.5 Billion Amended and Restated Credit Agreement

On October 10, 2007, in connection with the Merger, TCEH and Oncor repaid in full all outstanding loans, together withinterest and all other amounts due in connection with such repayment under the $3,500,000,000 Amended and Restated CreditAgreement, dated as of March 31, 2005, by and among TCEH, Oncor, JP Morgan Chase Bank, N.A., Citibank, N.A., WachoviaBank, National Association, Bank of America N. A., Calyon New York Branch and the other financial institutions from time totime parties thereto (the "Existing $3.5B Credit Facility"). No material penalties were due in connection with suchrepayments. Interest rates for borrowings under the Existing $3.5B Credit Facility were based on market rates. Borrowings underthe credit agreement governing the Existing $3.5B Credit Facility bore interest, at TCEH's and Oncor's option, atthe alternative base rate from time to time or the applicable LIBOR rate plus an applicable percentage depending uponTCEH's or Oncor's credit ratings at the time of such borrowings. The credit agreement governing the Existing$3.5B Credit Facility contained customary covenants and events of default.

### $500 Million Credit Agreement

On October 10, 2007, in connection with the Merger, TCEH repaid in full all outstanding loans, together with interest and allother amounts due in connection with such repayment under the $500,000,000 Credit Agreement, dated as of November 4, 2004,between TCEH and Wachovia Bank, National Association (the "Existing $500M Credit Facility") . TCEH incurredapproximately $13.1 million of early termination fees in connection with the termination of the Existing $500M Credit Facility.Interest rates for borrowings under the Existing $500M Credit Facility were based on market rates. Borrowings under the creditagreement governing the Existing $500M Credit Facility bore interest, at TCEH's option, at the alternative base rate fromtime to time or the applicable LIBOR rate plus 1.25%. The credit agreement governing the Existing $500 Credit Facilitycontained customary covenants and events of default.

### $1.5B Revolving Credit Agreement

On October 10, 2007, in connection with the Merger, TCEH repaid in full all outstanding loans, together with interest and allother amounts due in connection with such repayment under the $1,500,000,000 Revolving Credit Agreement, dated as ofMarch 1, 2007, by and among TCEH, Credit Suisse, Cayman Islands Branch, Citibank, N.A., Credit Suisse Securities (USA) LLCand Citigroup Global Markets Inc. (the "Existing $1.5B Revolving Credit Facility"). No material penalties were duein connection with such repayments. Interest rates for borrowings under the Existing $1.5B Revolving Credit Facility were basedon market rates. Borrowings under the credit agreement governing the Existing $1.5B Revolving Credit Facility bore interest, atTCEH's option, at the alternative base rate from time to time or the applicable LIBOR rate plus an applicable percentagedepending upon TCEH's credit ratings at the time of such borrowings. The credit agreement governing the Existing $1.5BRevolving Credit Facility contained customary covenants and events of default.

### $1.0B Revolving Credit Agreement

On October 10, 2007, in connection with the Merger, TCEH and Oncor repaid in full all outstanding loans, together withinterest and all other amounts due in connection with such repayment under the $1,000,000,000 Revolving Credit Agreement,dated as of August 12, 2005, by and among TCEH, Oncor, Citibank, N.A., JP Morgan Chase Bank, N.A., Calyon New YorkBranch, Deutsche Bank AG New York Branch and Wachovia Bank, National Association and the other financial institutions fromtime to time parties thereto (the "Existing $1.0B Revolving Credit Facility"). No material penalties were due inconnection with such

12

EFH00600282

Table of Contents

repayments. Interest rates for borrowings under the Existing $1.0B Revolving Credit Facility were based on market rates. Borrowings under the credit agreement governing the Existing $1.0B Revolving Credit Facility bore interest, at TCEH's and Oncor's option, at the alternative base rate from time to time or the applicable LIBOR rate plus an applicable percentage depending upon TCEH's or Oncor's credit ratings at the time of such borrowings. The credit agreement governing the Existing $1.0B Revolving Credit Facility contained customary covenants and events of default.

With respect to the other parties to the Existing $3.5B Credit Facility, Existing $500M Credit Facility, Existing $1.5B Revolving Credit Facility and Existing $1.0B Revolving Credit Facility, each of TCEH and Oncor has or may have had customary banking relationships based on the provision of a variety of financial services, including investment banking, underwriting, lending, commercial banking and other advisory services. None of these services are material to TCEH or Oncor individually or in the aggregate with respect to any individual party.

**ITEM 2.03    CREATION OF A DIRECT FINANCIAL OBLIGATION OR AN OBLIGATION UNDER AN OFF-BALANCE SHEET ARRANGEMENT OF A REGISTRANT.**

The information set forth relating to the TCEH Senior Secured Facility, the TCEH Senior Unsecured Bridge Facility, the Company Senior Unsecured Bridge Facility, the Intercreditor Agreement and the Oncor Revolving Credit Facility of Item 1.01 of this Current Report on Form 8-K is incorporated by reference in this Item 2.03.

**ITEM 3.01    NOTICE OF DELISTING OR FAILURE TO SATISFY A CONTINUED LISTING RULE OR STANDARD; TRANSFER OF LISTING.**

In connection with the consummation of the Merger, the Company notified the New York Stock Exchange (the "NYSE") and the Chicago Stock Exchange ("CSE") that on October 10, 2007, each share of common stock of the Company outstanding immediately prior to the effective time of the Merger (other than certain specified shares) was converted into the right to receive $69.25, without interest, and requested that the NYSE and the CSE file with the Securities and Exchange Commission an application on Form 25 to remove the shares from listing on the NYSE and CSE and registration under Section 12(b) of the Securities Exchange Act of 1934, as amended.

**ITEM 5.01    CHANGES IN CONTROL OF REGISTRANT**

On October 10, 2007, pursuant to the terms of the Merger Agreement, investment funds affiliated with the Sponsor Group consummated the acquisition of the Company through the merger of Merger Sub with and into the Company. As a result of the Merger, the Company became a wholly-owned subsidiary of Parent. Parent is owned by affiliates of the Sponsor Group and certain other investors (collectively, the "Investors"). The aggregate purchase price paid for all of the equity securities of the Company (on a fully-diluted basis) was approximately $32.4 billion, which purchase price was funded by the equity financing from the Investors and by the new credit facilities described in Item 1.01 of this Current Report on Form 8-K. A copy of the press release issued by the Company on October 10, 2007 announcing the consummation of the Merger is attached as Exhibit 99.1 to this Current Report on Form 8-K and incorporated herein by reference.

**ITEM 5.02    DEPARTURES OF DIRECTORS OR PRINCIPAL OFFICERS; ELECTION OF DIRECTORS; APPOINTMENT OF PRINCIPAL OFFICERS; COMPENSATORY ARRANGEMENTS OF CERTAIN OFFICERS.**

Pursuant to the terms of the Merger Agreement, each of Leldon E. Echols, Kerney Laday, Jack E. Little, Gerardo I. Lopez, J.E. Oesterreicher, Michael W. Ranger, Lenard H. Roberts, Glenn F. Tilton, and C. John

EFH00600283

Table of Contents

Wilder voluntarily resigned from the board of directors of the Company on October 10, 2007, as of the effective time of theMerger. At the effective time of the Merger, pursuant to the terms of the Merger Agreement, the directors of Merger Sub, MarcS. Lipschultz and Michael MacDougall, became the members of the board of the directors of the Company. Following theMerger, in addition to the then current members of the board of directors, Parent, as the sole shareholder of the Company, electedDavid Bonderman, Donald L. Evans, Steven Feldman, Frederick M. Goltz, James R. Huffines, Scott Lebovitz, Jeffrey Liaw,Lyndon L. Olson, Kenneth Pontarelli, William K. Reilly, Jonathan D. Smidt and Kneeland Youngblood as additional members ofthe Company's board of directors.

As a result of their respective positions with Sponsor Group, one or more of the directors of the Company may be deemed tohave an indirect material interest in the Management Agreement, which was executed by the Company on October 10, 2007, andthe information relating to the Management Agreement in Item 1.01 of this Current Report on Form 8-K is incorporated byreference into this Item 5.02.

On October 10, 2007, C. John Wilder, the Chief Executive Officer and President of the Company, and the Company enteredinto a Severance and Release Agreement (the "Severance Agreement"). Pursuant to the terms of the SeveranceAgreement, Mr. Wilder will, on October 11, 2007, resign for "good reason" (as defined in the EmploymentAgreement ("Wilder Employment Agreement"), dated February 21, 2004, as amended, between Mr. Wilder and theCompany) as the Chief Executive Officer and President of the Company. Under the terms of the Severance Agreement, andconsistent with the Company's previously disclosed change-in-control policies, the Company will provide Mr. Wildercertain severance payments and other benefits, including, among other things: (i) a one-time cash severance payment equal totwo times the sum of Mr. Wilder's base salary and target bonus under the Company's Executive Annual IncentivePlan ("EAIP"); (ii) a one-time, pro-rated bonus consistent with the EAIP based on actual performance of theCompany for 2007 in the amount of $2.1 million as determined by the Company's Organizational and CompensationCommittee of the Board of Directors prior to the closing of the Merger; (iii) payment or reimbursement for office space andsecretarial assistance for one year and (iv) the establishment of a secular trust to hold certain amounts relating to theCompany's potential obligation to gross-up certain payments obligations of Mr. Wilder under Section 4999 and 409A ofthe Internal Revenue Code. Mr. Wilder and the Company and certain of its affiliates have agreed to a mutual release and waiverrelating to Mr. Wilder's employment by the Company under the terms of the Severance Agreement. In addition, aspreviously disclosed, under the terms of the Severance Agreement, the disposition of Mr. Wilder's previously awardedincentive compensation will include the following primarily performance-based components: (i) a single lump sum cash paymentfor Mr. Wilder's 2005, 2006 and 2007 long-term incentive compensation awards ; (ii) distribution of all earned and vestedlong-term incentive awards that were deferred in 2006 and 2007; (iii) distribution of a vested and deferred Special IncentiveCompensation Award (as defined in the Wilder Employment Agreement); and (iv) distribution of all other vested benefits oraccount balances under certain other Company employee benefit plans. Payment of the equity-based awards described in theprevious sentence will be based on the number of shares of the Company's common stock payable pursuant to each suchaward multiplied by $69.25, the price per share of Company common stock to be paid in the Merger, and distributed toMr. Wilder by previously established rabbi trusts on or after January 2, 2008.

On October 10, 2007, the Company entered into an agreement with each of David P. Poole, the Company's ExecutiveVice President and General Counsel, and David A. Campbell, the Company's Executive Vice President and ChiefFinancial Officer (each such agreement, the "Excise Tax Agreement"). Under the terms of each Excise TaxAgreement, the Company has agreed, among other things, (i) to establish a secular trust to hold certain amounts relating to theCompany's obligation to gross-up certain payments to Mr. Poole and Mr. Campbell, respectively, which may be subject toexcise taxes under Section 4999 of the Internal Revenue Code and (ii) that Mr. Poole's and Mr. Campbell's cashbonus under the Company's Annual Incentive Plan ("AIP") shall not be less than the percentage of the targetpool established under the AIP used in determining the 2007 award for all other participants in the AIP with a personal modifierof at least 100%. In addition, if Mr. Poole or Mr. Campbell's employment with the Company terminates prior toDecember 31, 2007, Mr. Poole or Mr. Campbell shall receive a prorated 2007 bonus prorated on the basis of the number ofmonths Mr. Poole or Mr. Campbell (as applicable) was employed by the Company in 2007.

14

EFH00600284

Table of Contents

**ITEM 5.03    AMENDMENTS TO ARTICLES OF INCORPORATION OR BY-LAWS; CHANGE IN FISCAL YEAR.**

In connection with the consummation of the Merger and in accordance with the Merger Agreement, the Company's Certificate of Formation and Bylaws were restated, effective October 10, 2007, so that they read in their entirety as the Certificate of Formation and Bylaws of Merger Sub, respectively, read immediately prior to the time of the execution of the Merger Agreement (except that the name of the Company was retained).

Following the consummation of the Merger, the Company's then Certificate of Formation was restated a second time. In such Restated Certificate of Formation, the Company changed its name to Energy Future Holdings Corp. A copy of the Company's Restated Certificate of Formation is attached as Exhibit 3.1 to this Current Report on Form 8-K and is incorporated herein by reference.

Following the consummation of the Merger, the Company's then Bylaws were restated a second time. A copy of the Company's Restated Bylaws is attached as Exhibit 3.2 to this Current Report on Form 8-K and is incorporated herein by reference.

**ITEM 8.01    OTHER EVENTS.**

On October 10, 2007, the Company completed the Merger with Merger Sub pursuant to the terms and conditions of the Merger Agreement. As a result of the Merger, the Company became a wholly-owned subsidiary of Parent. Parent is controlled by investment funds affiliated with the Sponsor Group. For a further description of the Merger see the Introductory Note and Item 5.01 above.

**ITEM 9.01    FINANCIAL STATEMENTS AND EXHBITS.**

(d) Exhibits

| Exhibit No. | Description |
| --- | --- |
| 3.1 | Restated Certificate of Formation of Energy Future Holdings Corp. |
| 3.2 | Restated Bylaws of Energy Future Holdings Corp. |
| 99.1 | Press Release regarding the Merger |
| 99.2 | Deemed Transactions |

15

EFH00600285

Table of Contents

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, each registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**ENERGY FUTURE HOLDINGS CORP.**

By: /s/ Stanley J. Szlauderbach
Name Stanley J. Szlauderbach
Title: Senior Vice President and Controller

**TEXAS COMPETITIVE
ELECTRIC HOLDINGS
COMPANY LLC**

By: /s/ Stanley J. Szlauderbach
Name Stanley J. Szlauderbach
Title: Senior Vice President and Controller

**ONCOR ELECTRIC DELIVERY
COMPANY LLC**

By: /s/ David M. Davis
Name David M. Davis
Title: Vice President and Chief Financial Officer

Dated: October 10, 2007

16

EFH00600286

Exhibit 3.1

**Restated Certificate Of Formation**
**Of**
**Energy Future Holdings Corp.**
**ARTICLE I.**

The name of the corporation is Energy Future Holdings Corp. (the "Corporation").

**ARTICLE II.**

The Corporation is a for-profit corporation.

**ARTICLE III.**

The purposes for which the Corporation is formed are all lawful purposes for which for-profit corporations may be formed under the Texas Business Organizations Code (the "TBOC").

**ARTICLE IV.**

The street address of the registered office of the Corporation is 350 North St. Paul Street, Dallas, Texas 75201, and the name of its registered agent at such address is CT Corporation System.

**ARTICLE V.**

The number of directors currently constituting the board of directors is fourteen, and the names and addresses of the persons who are to serve as directors until the next annual meeting of shareholders or until their successors are elected and qualified are as follows:

| Name | Address |
| --- | --- |
| David Bonderman | 1601 Bryan St., Dallas, Texas 75201 |
| Donald L. Evans | 1601 Bryan St., Dallas, Texas 75201 |
| Steven Feldman | 1601 Bryan St., Dallas, Texas 75201 |
| Frederick M. Goltz | 1601 Bryan St., Dallas, Texas 75201 |
| James R. Huffines | 1601 Bryan St., Dallas, Texas 75201 |
| Scott Lebovitz | 1601 Bryan St., Dallas, Texas 75201 |
| Jeffrey Liaw | 1601 Bryan St., Dallas, Texas 75201 |
| Marc S. Lipschultz | 1601 Bryan St., Dallas, Texas 75201 |
| Michael MacDougall | 1601 Bryan St., Dallas, Texas 75201 |
| Lyndon L. Olson | 1601 Bryan St., Dallas, Texas 75201 |
| Kenneth Pontarelli | 1601 Bryan St., Dallas, Texas 75201 |
| William K. Reilly | 1601 Bryan St., Dallas, Texas 75201 |
| Jonathan D. Smidt | 1601 Bryan St., Dallas, Texas 75201 |
| Kneeland Youngblood | 1601 Bryan St., Dallas, Texas 75201 |

## ARTICLE VI.

1. *Authorized Capital.*The Corporation is authorized to issue one class of stock to be designated "CommonStock," without par value. The total number of shares which the Corporation is authorized to issue is 2,000,000,000.

2. *Stock Split.*Effective as of the effectiveness of this Restated Certificate of Formation pursuant to Section 3.063(c) of theTBOC (the "Effective Time"), and without any further action on the part of the Corporation or its shareholders,each share of Common Stock issued and outstanding at such time shall be and hereby is automatically reclassified, changed andconverted into 1,660,000 shares of Common Stock without any action by the holder thereof. Such reclassification, change andconversion shall not change the par value of the Common Stock.

## ARTICLE VII.

Any action required by the TBOC to be taken at any annual or special meeting of shareholders, or any action which may betaken at any annual or special meeting of shareholders, may be taken without a meeting, without prior notice, and without a vote,if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of shares having not less thanthe minimum number of votes that would be necessary to take such action at a meeting at which the holders of all shares entitledto vote on the action were present and voted. Prompt notice of the taking of any action by shareholders without a meeting byless than unanimous written consent shall be given to those shareholders who did not consent in writing to the taking of suchaction.

## ARTICLE VIII.

No shareholder shall have any preemptive right to acquire any proportional amounts of the Corporation's unissued ortreasury shares on the decision of the board of directors to issue such shares.

## ARTICLE IX.

1. *Right to Indemnification.*Subject to the limitations and conditions as provided in this Article IX, each person who was or ismade a party or is threatened to be made a party to or is involved in any threatened, pending or completed action or otherproceeding, whether civil, criminal, administrative, arbitrative or investigative, or any appeal in such a proceeding or any inquiryor investigation that could lead to such a proceeding (hereinafter a "proceeding"), by reason of the fact that he orshe, or a person of whom he or she is the legal representative, is or was a director or officer of the Corporation or while adirector or officer of the Corporation is or was serving at the request of the Corporation as a director, officer, partner, venturer,proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic corporation, limited liability company,partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be indemnified by theCorporation to the fullest extent permitted by the TBOC, as the same exists or may hereafter be amended against judgments,penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including,without limitation, attorneys' fees) actually incurred by such person in connection with such proceeding, andindemnification under this Article IX shall continue as to a person who has ceased to serve in the capacity which initially entitledsuch person to indemnity hereunder. The rights granted pursuant to this Article IX shall be deemed contract rights, and noamendment, modification or repeal of this Article IX shall have the effect of limiting or denying any such rights with respect toactions taken or proceedings arising prior to any such amendment, modification or repeal. It is expressly acknowledged that theindemnification provided in this Article IX could involve indemnification for negligence or under theories of strict liability.

2

EFH00600288

2. *Advancement of Expenses.* The right to indemnification conferred in this Article IX shall include the right to be paid or reimbursed by the Corporation the reasonable expenses incurred by a person of the type entitled to be indemnified above who was, is or is threatened to be made a named defendant or respondent in a proceeding in advance of the final disposition of the proceeding and without any determination as to the person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such person in advance of the final disposition of a proceeding shall be made only upon delivery to the Corporation of a written affirmation by such indemnified person of his or her good faith belief that he or she has met the standard of conduct necessary for indemnification under this Article IX and a written undertaking, by or on behalf of such person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified person is not entitled to be indemnified under this Article IX or if such indemnification is prohibited by applicable law.

3. *Indemnification of Employees and Agents.* The Corporation, by adoption of a resolution by the board of directors or a duly appointed committee of the board of directors, may indemnify and advance expenses to an employee or agent of the Corporation to the same extent and subject to the same conditions under which it may indemnify and advance expenses to directors and officers under this Article IX; and the Corporation, by adoption of a resolution by the board of directors or a duly appointed committee of the board of directors, may indemnify and advance expenses to persons who are not or were not directors, officers, employees or agents of the Corporation but who are or were serving at the request of the Corporation as a director, officer, manager, member, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic corporation, limited liability company, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him or her and incurred by him or her in such a capacity or arising out of his or her status as such a person to the same extent that it may indemnify and advance expenses to directors and officers under this Article IX.

4. *Appearance as a Witness.* Notwithstanding any other provision of this Article IX, the Corporation may pay or reimburse expenses incurred by a director, officer, employee, agent or other person in connection with his or her appearance as a witness or other participation in a proceeding at a time when he or she is not a named defendant or respondent in the proceeding.

5. *Nonexclusivity of Rights.* The right to indemnification and the advancement and payment of expenses conferred in this Article IX shall not be exclusive of any other right which a director or officer or other person indemnified pursuant to this Article IX may have or hereafter acquire under any law (common or statutory), provision of this certificate of formation or the bylaws of the Corporation, agreement, vote of shareholders or disinterested directors or otherwise.

6. *Insurance.* The Corporation may purchase, procure, establish and maintain, at its expense, insurance or another arrangement to indemnify or hold harmless, to protect itself and any person who is or was serving as a director, officer, employee or agent of the Corporation or is or was serving at the request of the Corporation as a director, officer, manager, member, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic corporation, limited liability company, partnership, joint venture, proprietorship, employee benefit plan, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under this Article IX.

7. *Savings Clause.* If this Article IX or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Corporation shall nevertheless indemnify and hold harmless each director, officer or any other person indemnified pursuant to this Article IX as to costs, charges and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement with

3

respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this Article IX that shall not have been invalidated and to the fullest extent permitted by applicable law.

For purposes of this Article IX, the term "Corporation" shall include any predecessor of the Corporation and any constituent corporation (including any constituent of a constituent) absorbed by the Corporation in a consolidation or merger; the term "other enterprise" shall include any corporation, limited liability company, partnership, joint venture, trust or employee benefit plan; service "at the request of the Corporation" shall include service as a director, officer, manager, member or employee of the Corporation which imposes duties on, or involves services by, such director, officer, manager, member or employee with respect to an employee benefit plan, its participants or beneficiaries; any excise taxes assessed on a person with respect to an employee benefit plan shall be deemed to be indemnifiable expenses; and action by a person with respect to an employee benefit plan which such person reasonably believes to be in the interest of the participants and beneficiaries of such plan shall be deemed to be action not opposed to the best interests of the Corporation.

## ARTICLE X.

A director of the Corporation shall not be liable to the Corporation or its shareholders for monetary damages for any act or omission in the director's capacity as a director, except that this provision does not eliminate or limit the liability of a director to the extent the director is found liable under applicable law for:

(a) a breach of the director's duty of loyalty to the Corporation or its shareholders;

(b) an act or omission not in good faith that constitutes a breach of duty of the director to the Corporation or that involves intentional misconduct or a knowing violation of the law;

(c) a transaction from which the director received an improper benefit, regardless of whether the benefit resulted from an action taken within the scope of the director's duties; or

(d) an act or omission for which the liability of the director is expressly provided for by an applicable statute.

If the TBOC is amended to authorize action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the TBOC as so amended. Any repeal or modification of this Article X shall not adversely affect any right of protection of a director of the Corporation existing at the time of such repeal or modification.

## ARTICLE XI.

The bylaws of the Corporation may be altered, changed or amended as provided by statute, or at any meeting of the board of directors by affirmative vote of a majority of all of the directors.

## ARTICLE XII.

A. *Certain Definitions*. For purposes of this Article XII, (i) "Affiliate" of any Person shall include any principal, member, director, partner, shareholder, officer, employee or other representative of any Person that, directly or indirectly, is controlled by such Person, controls such Person or is under common control with such Person (other than the Corporation and any entity that is controlled by the Corporation) or any

4

Person that, directly or indirectly, is controlled by such Person, controls such Person or is under common control with suchPerson, (ii) "Person" shall mean any individual, corporation, general or limited partnership, limited liabilitycompany, joint venture, trust, association or any other entity and (iii) "Sponsor-Affiliates" shall mean KohlbergKravis Roberts & Co. L.P., TPG Capital, L.P., Goldman, Sachs & Co. and each of their respective Affiliates.

B.*Certain Activities.* In anticipation of the benefits to be derived by the Corporation through its continued contractual, corporateand business relationships with the Sponsor-Affiliates and in anticipation and recognition that (i) certain directors, principals,officers, employees and/or other representatives of Sponsors-Affiliates may serve as directors or officers of the Corporation,(ii) the Sponsor-Affiliates may now engage and may continue to engage in the same or similar activities or related lines ofbusiness as those in which the Corporation, directly or indirectly, may engage and/or other business activities that overlap with orcompete with those in which the Corporation, directly or indirectly, may engage, and (iii) members of the Board of Directors whoare not employees of the Corporation ("Non-Employee Directors") and their respective Affiliates may now engageand may continue to engage in the same or similar activities or related lines of business as those in which the Corporation,directly or indirectly, may engage and/or other business activities that overlap with or compete with those in which theCorporation, directly or indirectly, may engage, the provisions of this Article XII are set forth to define the circumstances inwhich the fiduciary duties of the Non-Employee Directors and the Sponsor-Affiliates would not be breached even if certainclasses or categories of business opportunities are alleged to have been usurped by one or more of the Sponsor-Affiliates, theNon-Employee Directors or their respective Affiliates.

C.*Certain Transactions.* None of (i) any Sponsor-Affiliate or (ii) any Non-Employee Director or his or her Affiliates (any suchPerson identified in clause (i) or (ii), an "Identified Person") shall be in breach of a fiduciary duty for failing torefrain from directly or indirectly (A) engaging in a corporate opportunity in the same or similar business activities or lines ofbusiness in which the Corporation or any of its Affiliates has a reasonable expectancy interest or property right or (B) otherwisecompeting with the Corporation. For the avoidance of doubt, to the extent that any purchase, sale or other transaction by anyIdentified Person involving any securities or indebtedness of the Corporation or any of its Affiliates (or involving any hedge,swap, derivative or other instrument relating to or in respect of any of the foregoing securities or indebtedness) may deemed tobe a corporate opportunity or to be in competition with the Corporation, the Identified Persons shall be fully protected by theforegoing provisions of this Article XII in pursuing such purchase, sale or other transaction or in taking any other action inrespect of or affecting such securities, indebtedness or other instrument. The Corporation hereby renounces any reasonableexpectancy interest or property right in any business opportunity which may be a corporate opportunity for both an IdentifiedPerson and the Corporation or any of its Affiliates, except as provided in paragraph D of this Article XII. In the event that anyIdentified Person acquires knowledge of a potential transaction or other business opportunity which may be a corporateopportunity for itself, himself or herself and the Corporation or any of its Affiliates, such Identified Person would not be inbreach of a fiduciary duty for failing to communicate or offer such transaction or other business opportunity to the Corporation orany of its Affiliates. To the fullest extent permitted by law, no Identified Person can be held individually liable to theCorporation or its stockholders or creditors for any damages as a result of engaging in any of activities permitted pursuant to thisparagraph C.

D.*Usurping Certain Corporate Opportunities Are Breaches of Fiduciary Duty.* The Corporation does not renounce itsexpectancy interest or property right in any corporate opportunity offered to any Non-Employee Director (including anyNon-Employee Director who serves as an officer of the Corporation) if such opportunity is expressly offered to such personsolely in his or her capacity as a director or officer of the Corporation and the provisions of paragraph C of Article XII shall notapply to any such corporate opportunity.

5

E. *Exclusion*. In addition to and without limiting the foregoing provisions of this Article XII, a corporate opportunity shall not bedeemed to be a potential corporate opportunity for the Corporation if the Corporation is not financially capable or contractuallypermitted or legally able to undertake it, or if it is, from its nature, not in the line of the Corporation's business or is of nopractical advantage to it or it is one in which the Corporation has no reasonable expectancy interest of property right.

The undersigned signs this document subject to the penalties imposed by the law for a submission of a materially false orfraudulent instrument.

Date: October 10, 2007                                   /s/ David P. Poole
                                                         _____
                                                         Name:  David P. Poole
                                                         Title:   Executive Vice President and
                                                                  General Counsel

EFH00600292

Exhibit 3.2

## ENERGY FUTURE HOLDINGS CORP.
### Amended and Restated Bylaws

**Section 1. Registered Office.** The registered office of the Corporation required by the Texas Business Organizations Code (the "TBOC") to be maintained in the State of Texas shall be the registered office named in the Certificate of Formation of the Corporation (the "Certificate of Formation") or such other office (which need not be a place of business of the Corporation) as may be designated from time to time by the board of directors in the manner provided by law.

**Section 2. Place of Meetings.** All meetings of the shareholders shall be held at the principal place of business of the Corporation or at such other place within or without the State of Texas as shall be specified or fixed in the notices or waivers of notice thereof.

**Section 3. Quorum; Required Vote for Shareholder Action; Adjournment of Meetings.**

(a) *Quorum.* With respect to any matter, a quorum shall be present at a meeting of shareholders if the holders of a majority of the shares entitled to vote on that matter are represented at the meeting in person or by proxy, unless otherwise provided in the Certificate of Formation of the Corporation, as the same may be amended from time to time, in accordance with the TBOC.

(b) *Voting on Matters Other Than the Election of Directors.* With respect to any matter, other than the election of directors or a matter for which the affirmative vote of the holders of a specified portion of the shares of any class or series entitled to vote is required by the TBOC, the affirmative vote of the holders of a majority of the shares of any class or series entitled to vote on that matter and represented in person or by proxy at a meeting of shareholders at which a quorum is present shall be the act of the shareholders, unless otherwise provided in the Certificate of Formation or these bylaws in accordance with the TBOC.

(c) *Voting in the Election of Directors.* Unless otherwise provided in the Certificate of Formation or these bylaws in accordance with the TBOC, directors shall be elected by a plurality of the votes cast by the holders of shares entitled to vote in the election of directors at a meeting of shareholders at which a quorum is present.

(d) *Adjournment.* Notwithstanding the other provisions of the Certificate of Formation or these bylaws, the chairman of the meeting or the holders of a majority of the shares entitled to vote that are represented in person or by proxy at any meeting of shareholders, whether or not a quorum is present, shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the adjourned meeting. If such meeting is adjourned by the shareholders, such time and place shall be determined by a vote of the holders of a majority of the shares entitled to vote that are represented in person or by proxy at such meeting. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

**Section 4. Annual Meetings.** An annual meeting of the shareholders, for the election of directors to succeed those whose terms expire and for the transaction of such other business as may properly come before the meeting, shall be held at such place, within or without the State of Texas, on such date and at such time as the board of directors shall fix and set forth in the notice of the meeting.

EFH00600293

**Section 5. Special Meetings.**Unless otherwise provided in the Certificate of Formation, special meetings of the shareholders for any proper purpose or purposes may be called at any time by (a) the chairman of the board (if any), the president, the board of directors, or such other person or persons as may be authorized in the Certificate of Formation or (b) unless the Certificate of Formation provides otherwise, the holders of at least twenty-five percent of all the shares entitled to vote at the proposed special meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) required by these bylaws may be conducted at a special meeting of the shareholders.

**Section 6. Record Date.**For the purpose of determining shareholders entitled to notice of or to vote at any meeting of shareholders or any adjournment thereof, or to receive payment of any dividend, or for any other proper purpose, the board of directors may fix in advance a record date for any such determination, such date to be not more than sixty days and, in case of a meeting of shareholders, not less than ten days, prior to the date on which the particular action requiring such determination of shareholders is to be taken.

**Section 7. Notice of Meetings.**Written or printed notice stating the place, day and hour of the meeting, the means of any remote communications by which shareholders may be considered present and may vote at the meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten days nor more than 60 days before the date of the meeting, personally, by electronic transmission or by mail, by or at the direction of the president, the secretary or the officer or calling the meeting, to each shareholder entitled to vote at such meeting.

**Section 8. Voting.**Unless otherwise required by law or provided in the Certificate of Formation, each outstanding share, regardless of class, shall be entitled to one vote on each matter submitted to a vote at a meeting of shareholders. If the Certificate of Formation provides for more or less than one vote per share for all the outstanding shares or for the shares of any class or series on any matter, every reference in these bylaws or in the Certificate of Formation (unless expressly stated otherwise therein), in connection with such matter, to a specified portion of such shares shall mean such portion of the votes entitled to be cast in respect of such shares by virtue of the provisions of such Certificate of Formation.

**Section 9. Action by Written Consent.**Any action required by the TBOC to be taken at any annual or special meeting of shareholders, or any action which may be taken at any annual or special meeting of shareholders, may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of shares having not less than the minimum number of votes that would be necessary to take such action at a meeting at which the holders of all shares entitled to vote on the action were present and voted. Prompt notice of the taking of any action by shareholders without a meeting by less than unanimous written consent shall be given to those shareholders who did not consent in writing to the taking of such action

**Section 10. Form Of Certificates Of Stock, Uncertificated Shares And Transfer Of Shares.**The shares of the Corporation's stock may be certificated or uncertificated, as provided under the TBOC, and shall be entered in the books of the Corporation and registered as they are issued. Certificates of stock of the Corporation shall be of such form and device as the board of directors may from time to time determine. The stock of the Corporation shall be transferable only on the books of the Corporation by registered owners of uncertificated shares and by the holders in person or by attorney on surrender of the certificates therefor properly endorsed. Upon surrender to the Corporation or the transfer agent of the Corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignment, or authority to transfer, and upon payment of all taxes as may be imposed by law, it shall be the duty of the Corporation to issue a new certificate or evidence of the issuance of uncertificated shares to the person entitled thereto, cancel the old certificate, and record the transaction upon the Corporation's books. The board of directors may appoint one or more transfer agents and one or more registrars of the stock. The Corporation shall be entitled to treat the holder of record of any shares of the

EFH00600294

Corporation as the owner thereof for all purposes, and shall not be bound to recognize any equitable or other claim to, or interest in, such shares or any rights deriving from such shares, on the part of any other person, unless and until such other person becomes the holder of record of such shares, whether or not the Corporation shall have either actual or constructive notice of the interest of such other person. Within a reasonable time after the issuance or transfer of uncertificated stock, the Corporation shall send to the registered owner thereof a written notice that shall set forth the information required by Section 3.205(a) of the TBOC.

**Section 11. Signing Of Certificates Of Stock.** Certificates of stock of the Corporation shall be signed by the chairman of the board, the chief executive, the president or any vice president and either the secretary or an assistant secretary, and shall be sealed with the seal of the Corporation or a facsimile thereof. The signatures of such officers upon a certificate may be facsimiles if the certificate is countersigned by a transfer agent or registered by a registrar, either of which is other than the Corporation itself or an employee of the Corporation. In case any officer who has signed or whose facsimile signature has been placed upon such certificate shall have ceased to be such officer before such certificate is issued, it may be issued by the Corporation with the same effect as if he were such officer at the date of its issuance.

**Section 12. Directors.** The board of directors shall consist of not less than two nor more than fifteen directors. Subject to the foregoing sentence, the specific number constituting the board of directors shall be determined by resolution of the board of directors, but no decrease in the number of directors shall have the effect of shortening the term of any incumbent director. Meetings of the board of directors shall be held at the time and place fixed by resolution of the board of directors or upon the call of the chairman of the board or the president. The secretary or officer performing his duties shall give two days' notice of all meetings of directors by mail or telegram to the last known address of each director, or, on consent of a director, by electronic transmission, provided that a meeting may be held without notice immediately after the annual election, and notice need not be given of regular meetings held at such time as may be fixed by a resolution of the board. Meetings of the directors may be held at any time without notice if all directors are present or if those not present waive notice either before or after the meeting. At any meeting of directors a majority of the whole number of directors shall constitute a quorum, but less than aquorum shall have power to adjourn the meeting from time to time.

**Section 13. Officers.** Each year, the board of directors may elect one of their number chairman of the board, shall elect a president of the Corporation, shall elect one or more vice presidents, a secretary and a treasurer, and may elect one or more assistant secretaries and assistant treasurers and such other officers as they may from time to time deem proper. The same person may be elected to and hold more than one office, except that the president and the secretary shall not be the same person. The term of office of all officers shall be one year, or until their respective successors are chosen and qualified, but any officer may be removed from office for or without cause at any time by the board of directors. Whenever any vacancy shall occur in any office by death, resignation, increase in the number of offices of the Corporation, or otherwise, the same shall be filled by the board of directors, and the officer so elected shall hold office until his successor is chosen and qualified. The officers of the Corporation shall have such powers and duties as usually pertain to their offices, respectively, as well as such powers and duties as may from time to time be conferred by the board of directors.

**Section 14. Committees.** The board of directors may establish committees, each committee to consist of one or more directors, which committees shall have such power and authority and shall perform such functions as may be provided in such resolution. Unless the chair is appointed by the board, each committee shall designate a chair by majority vote of the committee. Each committee may make rules for the conduct of its business as it may deem necessary. A majority of the members of each committee shall constitute a quorum. Each committee shall act only on the affirmative vote of a majority of the members present at a meeting.

EFH00600295

**Section 15. Insurance, Indemnification And Other Arrangements.** Without further specific approval of the shareholders of the Corporation, the Corporation may purchase, enter into, maintain or provide insurance, indemnification or other arrangements for the benefit of any person who is or was a director, officer, employee or agent of the Corporation or is or was serving another entity at the request of the Corporation as a director, officer, manager, member, partner, venturer, proprietor, trustee, employee, agent or similar functionary, to the fullest extent permitted by the laws of the State of Texas, including without limitation Chapter 8 of the Texas Business Organizations Code or any successor provision, against any liability asserted against or incurred by any such person in any such capacity or arising out of such person's service in such capacity whether or not the Corporation would otherwise have the power to indemnify against any such liability under the Texas Business Organizations Code. If the laws of the State of Texas are amended to authorize the purchase, entering into, maintaining or providing of insurance, indemnification or other arrangements in the nature of those permitted hereby to a greater extent than presently permitted, then the Corporation shall have the power and authority to purchase, enter into, maintain and provide any additional arrangements in such regard as shall be permitted from time to time by the laws of the State of Texas without further approval of the shareholders of the Corporation. No repeal or modification of such laws or this Section 15 shall adversely affect any such arrangement or right to indemnification existing at the time of such repeal or modification.

**Section 16. Compensation Of Directors.** The board of directors shall have power to authorize the payment of compensation to the directors for services to the Corporation, including fees for attendance at meetings of the board of directors, committees, and to determine the amount of such compensation and fees.

**Section 17. Amendment Of Bylaws.** These bylaws may be altered, changed or amended as provided by statute, or at any meeting of the board of directors by affirmative vote of a majority of all of the directors.

EFH00600296

Exhibit 99.1

# Energy Future Holdings

 TXU

## News Release

**FOR IMMEDIATE RELEASE**

### TXU Corp. Announces Completion of Acquisition by Investors Led by KKR and TPG

o  **15% Retail Price Cut Being Implemented**

o  **Eight Coal Plant Air Permits To Be Withdrawn**

o  **Secretary Donald L. Evans Becomes Chairman**

**Dallas — October 10, 2007 —**TXU Corp.**(NYSE: TXU)**today announced the completion of its merger agreementwith Texas Energy Future Holdings Limited Partnership (TEF). TEF is led by a group of investors including Kohlberg KravisRoberts & Co. (KKR), Texas Pacific Group (TPG) and Goldman Sachs Capital Partners. TXU shareholders overwhelminglyapproved the merger at the company's Annual Meeting on September 7, 2007.

With the completion of the merger, TXU Corp. has changed its name to Energy Future Holdings Corp. Shares of TXU commonstock, which are listed on the New York Stock Exchange and the Chicago Stock Exchange, ceased trading at close of markettoday and will be delisted. Under the terms of the merger agreement, TXU shareholders are entitled to $69.25 in cash for eachshare of TXU common stock held. Lehman Brothers, Citigroup and Morgan Stanley became equity investors at closing.

Completion of the merger agreement marks the final step in the transformation into a privately held company that is alreadydelivering price cuts, price protection and low-income customer benefits, as well as taking actions to provide affordable powerfor years to come. In addition, the company will seek to achieve top environmental performance in the industry and greaterinvolvement and dialogue with environmental, government and community leaders.

"Our investment horizon allows the board, management and employees to formulate and implement a long-term strategyto meet customer needs and to respond to the significant energy challenges in Texas," said Marc Lipschultz of KKR.

Since the announcement of the merger transaction on February 26, 2007, TEF's plans for the company's newdirection have received support from consumer groups, environmental groups, labor unions, business leaders and elected officialsfrom communities across Texas.

"We have maintained open and productive dialogues with legislators, regulators, customers and consumer advocates.Together, we are proud to be part of a transformation that will benefit — and in fact already is benefiting —customers and residents of the state of Texas," said Michael MacDougall of TPG.

1

**New Leadership**

With the close of the transaction, Donald L. Evans becomes non-executive chairman of Energy Future Holdings Corp. Evans previously served as U.S. Secretary of Commerce for four years under President George W. Bush.

"We are excited about the opportunities that the completion of this merger provides. This transaction is not only good for TXU shareholders, but also for employees, customers and residents across the state of Texas," said Evans. "I look forward to working with management and employees to demonstrate our commitment to being a leading corporate citizen, to implementing stronger environmental policies and to providing reliable and affordable power."

As non-executive chairman, Evans will lead the company's board of directors, which as previously announced will include: William Reilly, Chairman Emeritus of the World Wildlife Fund and former EPA Administrator; Lyndon Olson, former U.S. Ambassador to Sweden; James Huffines, Chairman of the Central Region Plains Capital Bank; and Kneeland Youngblood of Pharos Capital Group, LLC. Former U.S. Secretary of State James A. Baker, III will serve as advisor to the company.

"This company and its employees are ready for the next step. We look forward to implementing additional separation of our three businesses so each can focus on the distinct customers they serve," said Tom Baker, Vice-Chairman of TXU Corp. who will transition to Chairman Emeritus of Energy Future Holdings Corp.

As previously announced, with the successful completion of the transaction, C. John Wilder has resigned as TXU Corp. Chairman and CEO. Since his arrival in February 2004, Wilder led the company to substantial performance improvements including: outstanding shareholder returns; a successful business turnaround; and a major restructuring of the operations and growth program.

"I am proud of what TXU has become and confident that the company is in good hands. Because of the hard work of TXU employees, these businesses are operating at safe, high-performance levels across many dimensions," said Wilder.

Evans concluded, "I'd like to thank John Wilder and the outgoing board of directors for their years of service to the company. They leave a company of outstanding men and women, dedicated to excellence in customer service and energy reliability. We wish them well in their future endeavors."

**Three Separate and Distinct Companies**

Energy Future Holdings Corp., a holding company, will continue the transition of its businesses into three separate and distinct business units with separate boards, management teams, and headquarters.

Each business will operate independently under the leadership of a CEO:

- Jim Burke will serve as CEO of TXU Energy, a competitive electricity retailer;

- Mike Greene will serve as CEO of Luminant, a competitive power generation business, including mining, wholesale marketing and trading, and construction; and

- Bob Shapard will serve as CEO of Oncor, a regulated electric distribution and transmission business.

2

EFH00600298

To maintain smooth ongoing operations, current business unit management and organizational structures will remain in place at least through a transition period, which is expected to be complete in the first half of 2008. Beyond the further separation of the three primary businesses, most employees will experience few differences in their day-to-day jobs. The transition will be seamless to customers.

Headquarters for each of the three businesses will remain in the Dallas/Fort Worth area.

**Price Cuts**

As a result of the close of the transaction, TXU Energy will reduce retail prices by an additional 5%, resulting in a total 15% price reduction in 2007 for residential customers who had not already chosen one of TXU Energy's lower-priced or environmentally friendly options. With this additional reduction TXU Energy will continue to offer the lowest prices of any incumbent competitive retailer in Texas. The value of TXU Energy's lower prices, innovative range of products to meet customer needs, and focus on customer service have contributed to an increase in customer count over the past few months.

**$150 Million Commitment to Low-Income Assistance**

TEF and TXU Energy have announced the creation of TXU Energy Access, a comprehensive program representing a commitment of more than $150 million over 5 years to assist low-income customers.

**Environmental Benefits**

As part of the transaction, TEF made a range of commitments to strengthen environmental policies, make significant investments in alternative energy and institute corporate policies tied to climate stewardship. Those efforts helped earn the endorsement of Environmental Defense and the Natural Resources Defense Council, two of the nation's largest and most respected environmental organizations.

In keeping with the commitment to reduce the number of planned coal-fueled generation units from 11 to three, the eight air permit applications will be withdrawn by Luminant. The eight air permit applications were suspended shortly following the announcement of the merger agreement.

In addition, Energy Future Holdings Corp. will create a Sustainable Energy Advisory Board comprised of individuals who represent the following interests: the environment; customers; Texas economic development; and ERCOT reliability standards. Board member William Reilly, Chairman Emeritus of the World Wildlife Fund and former Administrator of the U.S. Environmental Protection Agency, will lead the effort to make climate stewardship central to corporate policies.

**Oncor**

In advance of the close of the transaction, Oncor and TEF reached an agreement in principle with the key parties that would resolve all outstanding issues in the Public Utility Commission of Texas (PUC) review under Public Utility Regulatory Act Section 14.101 related to the change in control of Oncor. The agreement includes provisions under which the PUC would dismiss Oncor's pending rate case. The agreement is subject to approval by the PUC.

Following the close of the acquisition of TXU Corp. and as previously disclosed, TEF will sell a twenty percent stake in Oncor. Now that the acquisition is complete, the minority stake sale

3

process will commence shortly and is an important element of the investor group's plan. The sale of a twenty percentminority stake in Oncor has long been part of TEF's plan to enhance Oncor's independence and separation fromTXU Corp., TXU Energy and Luminant. The purchaser of the twenty percent stake will not be affiliated with any of thecompanies owned by TXU Corp. or the parties involved in this transaction, and will have meaningful representation on the Oncorboard of directors.

In addition, Oncor plans to secure all of its currently existing long-term debt. This does not include the $800 million principalamount of floating rate senior notes that were redeemed upon completion of the merger as required by the terms of the notes.Oncor's $2 billion credit facility is also secured.

## Shareholder Information

Shareholders of record of TXU Corp. common stock who have stock certificates will receive instructions and a letter oftransmittal from Mellon Investor Services LLC, the disbursing agent for the merger, concerning how and where to forward stockcertificates for exchange and payment. Shareholders of record whose shares are held in book entry (electronic) form will receive acheck from Mellon without needing to take any action. For shares held in "street name" through a broker, bank orother nominee, shareholders need not take any action to have shares exchanged for cash through the broker, bank or othernominee. For street name shareholders, questions about the receipt of compensation for shares should be directed to theappropriate broker, bank or other nominee. For all other questions regarding the exchange of TXU Corp. common stock shares,please call Mellon Investor Services LLC toll free at 1-877-277-9913.

* * *

## About Energy Future Holdings

Energy Future Holdings Corp., formerly named TXU Corp., is a Dallas-based energy holding company, with a portfolio ofcompetitive and regulated energy subsidiaries, primarily in Texas, including TXU Energy, Luminant and Oncor. TXU Energy is acompetitive retailer that provides electricity and related services to 2.1 million electricity customers in Texas. Luminant is acompetitive power generation business, including mining, wholesale marketing and trading, construction and developmentoperations. Luminant has over 18,300 MW of generation in Texas, including 2,300 MW of nuclear and 5,800 MW of coal-fueledgeneration capacity. Luminant is also the largest purchaser of wind-generated electricity in Texas and fifth largest in the UnitedStates. Oncor is a regulated electric distribution and transmission business that uses superior asset management skills to providereliable electricity delivery to consumers. Oncor operates the largest distribution and transmission system in Texas, providingpower to three million electric delivery points over more than 101,000 miles of distribution and 14,000 miles of transmissionlines. Visit www.txucorp.com for more information.

## About TEF

Texas Energy Future Holdings Limited Partnership is the holding company formed by Kohlberg Kravis Roberts & Co., TexasPacific Group and other investors to acquire TXU Corp.

## Forward Looking Statements

This release contains forward-looking statements, which are subject to various risks and uncertainties. Discussion of risks anduncertainties that could cause actual results to differ materially from management's current projections, forecasts, estimatesand expectations is contained in Energy Future Holdings Corp. or TXU Corp.'s filings with the Securities and ExchangeCommission. Specifically, TXU

4

EFH00600300

Corp. makes reference to the section entitled "Risk Factors" in its annual and quarterly reports. In addition to therisks and uncertainties set forth in the SEC reports or periodic reports, the proposed transactions described in this release couldbe affected by, among other things, the occurrence of any event, change, market conditions or other circumstances that couldprevent TEF from completing the sale of the 20 percent interest in Oncor.

-END-

| **Corporate Communications:** | **Investor Relations:** | | **Energy Future Holdings:** |
|---|---|---|---|
| Brian Tulloh | Tim Hogan | Bill Huber | Jeff Eller |
| 214.812.8395 | 214.812.4641 | 214.812.2480 | 214.812.1176 |

5

EFH00600301

Exhibit 99.2

Deemed Transactions

| Delivery Period (month) | Volumes (MMBtus) | Delivery Period (month) | Volumes (MMBtus) |
|---|---|---|---|
| Nov-07 | 3,298,240 | Jun-10 | 17,007,933 |
| Dec-07 | 3,521,848 | Jul-10 | 17,571,422 |
| Jan-08 | 9,355,222 | Aug-10 | 17,633,313 |
| Feb-08 | 8,854,961 | Sep-10 | 17,198,450 |
| Mar-08 | 9,414,274 | Oct-10 | 17,766,733 |
| Apr-08 | 9,173,946 | Nov-10 | 17,327,402 |
| May-08 | 9,470,702 | Dec-10 | 17,893,872 |
| Jun-08 | 9,229,904 | Jan-11 | 26,571,975 |
| Jul-08 | 9,525,449 | Feb-11 | 24,521,919 |
| Aug-08 | 9,555,350 | Mar-11 | 26,756,193 |
| Sep-08 | 9,311,385 | Apr-11 | 26,143,868 |
| Oct-08 | 10,658,632 | May-11 | 26,959,302 |
| Nov-08 | 13,474,034 | Jun-11 | 26,333,223 |
| Dec-08 | 12,835,821 | Jul-11 | 27,168,725 |
| Jan-09 | 14,591,386 | Aug-11 | 27,262,633 |
| Feb-09 | 13,393,047 | Sep-11 | 26,643,958 |
| Mar-09 | 14,661,286 | Oct-11 | 27,476,747 |
| Apr-09 | 14,285,261 | Nov-11 | 26,837,348 |
| May-09 | 14,738,465 | Dec-11 | 27,687,029 |
| Jun-09 | 14,359,681 | Jan-12 | 8,281,818 |
| Jul-09 | 14,813,021 | Feb-12 | 7,818,458 |
| Aug-09 | 14,855,649 | Mar-12 | 8,327,635 |
| Sep-09 | 14,474,774 | Apr-12 | 8,106,777 |
| Oct-09 | 14,935,476 | May-12 | 8,373,368 |
| Nov-09 | 14,554,808 | Jun-12 | 8,153,816 |
| Dec-09 | 15,013,031 | Jul-12 | 8,422,825 |
| Jan-10 | 17,197,279 | Aug-12 | 8,445,826 |
| Feb-10 | 15,793,341 | Sep-12 | 8,225,547 |
| Mar-10 | 17,311,019 | Oct-12 | 8,494,686 |
| Apr-10 | 16,888,514 | Nov-12 | 8,272,662 |
| May-10 | 17,441,342 | Dec-12 | 8,545,785 |
| | | Total | 929,218,396 |

17

Created by 10KWizard    www.10KWizard.comSource: Energy Future Holdin, 8-K, October 11, 2007

EFH00600302