# Exhibit M

Highly Confidential

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | Case No. 14-10979 (CSS) |
| Debtors. | (Jointly Administered) |

## EXPERT REPORT

## OF

## MARK F. RULE, CFA

## October 12, 2015

Highly Confidential

**Table of Contents**

I.  Introduction ................................................................................................................. 3

II.  Qualifications ............................................................................................................. 4

III.  Summary of Opinions ............................................................................................... 5

IV.  Solvency Pursuant to the Bankruptcy Code.............................................................. 5

V.  Estimation of the Fair Value of EFH Corp.'s Assets ................................................ 7

  A.  Contemporaneous EFH Corp. Asset Valuations by Duff & Phelps ..................... 7

  B.  Analysis of Duff & Phelps Valuation Reports ...................................................10

VI.  Analysis of Consolidated EFH Corp. Solvency from 2008 through 2012 ...............13

VII.  Other Indicia of Consolidated EFH Corp. Insolvency From 2008 to 2012.....................17

VIII.  Analysis of Consolidated EFH Corp. Solvency Indicia After December 2012...............18

IX.  Analysis of EFH Corp. and the E-Side Solvency from 2008 through 2012 ....................19

X.  Analysis of E-Side Solvency Indicia After December 2012 ...........................................22

XI.  SG&A Costs, Corporate Services and Allocations .......................................................24

  A.  Alleged Over-Allocation to TCEH ....................................................................24

  B.  Analysis of the SG&A Allocation to EFIH.........................................................26

XII.  Exchanges and Repurchases of TCEH Debt by EFH Corp. and EFIH .........................28

XIII.  Documents and Information Considered ......................................................................30

XIV.  Additional Analysis and Demonstrative Aids...............................................................30

Highly Confidential

## I.    Introduction

I am a Director in the Financial Advisory Services practice of AlixPartners, LLP ("AlixPartners). AlixPartners has been retained by the Official Committee of Unsecured Creditors (the "Committee") of Energy Future Holdings Corp. ("EFH Corp."), Energy Future Intermediate Holding Company LLC ("EFIH"), EFIH Finance Inc., and EECI, Inc. to serve as financial advisors to the Committee.  I have been asked by Sullivan & Cromwell LLP and Montgomery McCracken Walker & Rhoads, LLP, counsel for the Committee, to analyze 1) the solvency of EFH Corp. and its subsidiaries ("Consolidated EFH Corp.") and 2) the solvency of Consolidated EFH Corp. excluding Energy Future Competitive Holdings Company LLC ("EFCH"), its subsidiaries and EFH Corporate Services Company.  Said differently, the second analysis is the evaluation of EFH Corp. (unconsolidated) plus its subsidiary, Energy Future Intermediate Holding Company LLC ("EFIH") and EFIH's subsidiaries (an unconsolidated EFH Corp. plus EFIH and its subsidiaries, collectively, the "E-Side").

I have been advised by counsel to the Committee that my report and testimony with respect to solvency during the time periods discussed below are for the limited purpose of permitting an evaluation of the existence of potential claims and other uses at the Confirmation Hearing[1] requiring an initial review of solvency.  I have concluded it is reasonable in such circumstances to limit my analysis to the Balance Sheet Test and base my analysis on, among other things, review of certain valuation analyses performed for the Debtors by Duff & Phelps, as discussed in greater detail below.  I reserve the right to review other indicia of solvency and perform further valuation analysis – confirming or replacing the Duff & Phelps valuation analyses – if I am asked to deliver a report or testify with respect to the solvency of EFH Corp. and/or the E-Side in connection with a trial of any such claims on their merits.

In addition, I have been asked by counsel for the Committee to analyze the allocation of selling, general and administrative ("SG&A") expenses to EFH Corp., EFIH and Texas Competitive Electric Holdings LLC ("TCEH").  I have also been asked to analyze the exchanges and repurchases of TCEH debt by EFH Corp. and EFIH.

---

[1] The "Confirmation Hearing" refers to the hearing set by the Court to confirm the Debtors' proposed plan of reorganization (the "Plan") and the Debtors' Motion to Approve the Settlement Agreement (the "Settlement Agreement").

## II.    Qualifications

I have over 15 years of experience providing operational, financial, valuation, litigation, bankruptcy, and management consulting to clients operating in a diverse range of industries.  I have consulted with companies in a number of industries including, but not limited to, energy, chemical, food, healthcare, insurance, mortgage, manufacturing, newspaper, pharmaceutical, retail, telecommunications, and transportation.  I have significant experience in the areas of valuation and solvency.  The Unsecured Creditors' Committee of the Tribune Company designated me as an expert on issues of valuation and solvency in the United States Bankruptcy Court for the District of Delaware.[2]

I graduated with honors from the University of Notre Dame with a Bachelor of Business Administration in finance and computer applications.   I graduated with honors from the University of Chicago Graduate School of Business with a Masters of Business Administration with concentrations in economics, finance and accounting.  In addition, I am a Chartered Financial Analyst ("CFA") charterholder and a member of the CFA Institute, CFA Society of Chicago, Business Valuation Association, American Bankruptcy Institute, and the Turnaround Management Association.

Exhibit 1 contains a copy of my curriculum vitae and my related valuation and solvency experience.

The opinions presented in this report are based on my analysis of the available information and my experience, education and expertise as a financial consultant.  All opinions expressed are expressed to a reasonable degree of professional certainty.  As part of performing my analysis, I utilized a team of professionals at AlixPartners who worked under my direction and control, including professionals holding CFAs, CPAs and MBAs and possessing significant valuation and solvency experience.  The opinions expressed herein are subject to change based upon any additional discovery related to this case or information that we may receive after the date of this

---

[2] Case No. 08-13141 (KJC).

Highly Confidential

report.  I also reserve the right to respond or reply to any opinions offered by Debtor's experts relating to the opinions herein or my areas of expertise.

AlixPartners is being compensated $745 per hour for my time and between $350 and $1,010 per hour for members of the team.

### III.    Summary of Opinions

- Consolidated EFH Corp. was insolvent between December 31, 2008 and December 31, 2012.

- There is no indication that Consolidated EFH Corp. became solvent during the period from December 31, 2012 through the Petition Date.[3]

- EFH Corp. and the E-Side were insolvent between December 31, 2008 and December 31, 2012.

- There is no indication that EFH Corp. or the E-Side became solvent during the period from December 31, 2012 through the Petition Date.

- TCEH's overall SG&A expenses have declined since 2010, and the composition of direct SG&A expenses versus allocated SG&A expenses has changed due to an agreed upon revised allocation methodology.

- The allocation percentages used by Munger Tolles to allocate costs to EFIH is inconsistent with an analysis of recent actual allocations to EFIH.

- As of the Petition Date, EFH Corp. and EFIH held TCEH debt acquired for at least $242 million.

### IV.    Solvency Pursuant to the Bankruptcy Code

According to United States Bankruptcy Code §101(32)(A) insolvent means "with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation…"  (the "Balance Sheet Test").    The Balance Sheet Test is one analysis commonly used by businesses and

---

[3] The Petition Date is April 29, 2014.

stakeholders to assess the solvency of a company. I understand that a similar balance sheet test may be applicable under Texas law as well.[4]

The Balance Sheet Test is comprised of four steps: 1) determination of the appropriate premise of value based on highest and best use of the debtor's assets (i.e., going concern or liquidation); 2) estimation of the fair value of the debtor's tangible and intangible assets; 3) estimation of the value of the debtor's recorded and contingent liabilities; and 4) subtraction of the amount of the debtor's liabilities from the fair value of the debtor's assets to arrive at a solvency conclusion.

I understand that the definition of "fair value" pursuant to section 101(32) of the Bankruptcy Code is generally interpreted to mean fair market value.[5] Fair market value is the cash or cash-equivalent price at which property would change hands between a willing buyer and a willing seller, both being informed of the relevant facts and neither being compelled to buy or sell. The fair market value standard of value contemplates a sale between a hypothetical seller and a hypothetical buyer in an arm's length transaction.[6]

There are three generally accepted approaches used to estimate the fair value of a debtor's assets: 1) the income approach; 2) the market approach; and 3) the cost approach.

The income approach derives an estimate of the fair value of a business or asset based on the value of the cash flows that the business or asset could be expected to generate in the future. An often-used income approach to valuation is the discounted cash flow method ("DCF"). A DCF analysis is comprised of four steps: 1) estimation of future cash flows for a certain discrete

---

[4] This opinion addresses the Balance Sheet Test. I have not evaluated the other tests applicable under the United States Bankruptcy Code or Texas law, including the debtor's ability to pay debts as they become due, which may establish an independent basis for demonstrating insolvency. *See* 11 U.S.C. § 548(a)(1)(B)(ii)(III); Tex. Bus. & Com. Code Ann. § 24.005(a)(2)(B).

[5] Newton, Grant W. *Corporate Bankruptcy: Tools, Strategies, and Alternatives.* John Wiley & Sons, Inc. 2003. Page 171.

[6] Fair market value is defined by the American Society of Appraisers as "the amount at which property would change hands between a willing seller and a willing buyer when neither is acting under compulsion and both have reasonable knowledge of the relevant facts." (Pratt, Shannon P. *Valuing A Business: The Analysis and Appraisal of Closely Held Companies.* McGraw Hill. 2008. Pages 41-42). This definition is consistent with the definition offered by the IRS. According to the IRS, fair market value is defined as the "price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts." (Internal Revenue Service Revenue Ruling 59-60).

projection period; 2) estimation of the present value of the cash flows using a rate of return that considers the relative risk of achieving the cash flows and the time value of money; 3) estimation of the residual value of cash flows subsequent to the discrete projection period; and 4) combination of the present value of the residual value cash flows with the discrete projection period cash flows.

The market, or comparables, approach derives an estimate of the value of the subject business or asset by comparing it to market prices of similar businesses or assets.  The nature and prospects of companies or assets in similar lines of business depend on common factors such as overall demand for their products and services and opportunities and risks directly associated with the industry or sector.  The market approach provides an estimate of the price that could reasonably be expected to be realized from the sale of the subject business or asset.

The cost approach is based on the economic principle of substitution.  An investor will pay no more for an asset than the cost to obtain a substitute asset of equal utility.  The replacement cost new, typically establishes the maximum amount that a prudent investor would pay for an asset under the cost approach.  The cost approach is generally considered less reliable to analyze the fair value of a company's assets under a going-concern premise of value than the income or market approaches because the cost approach captures the market value to replace the individual assets but does not consider their value in use.  Said differently, the cost approach typically does not consider the value of goodwill which reflects the value of the firm in excess of the value of the sum of the individual assets.

## V.    Estimation of the Fair Value of EFH Corp.'s Assets

### A.  Contemporaneous EFH Corp. Asset Valuations by Duff & Phelps

Between October 2007 and December 2012, Duff & Phelps, LLC provided numerous valuation reports to EFH Corp.   The Duff & Phelps valuation reports include:

- Solvency Analysis Presentation as of October 10, 2007[7];

---

[7] No bates stamp.

- Allocation of Purchase Price of Certain Acquired Tangible and Intangible Assets and Liabilities of Energy Future Holdings Corp. as of October 10, 2007[8];

- Quarterly Equity Valuation Analysis as of March 31, 2008 – Confidential Presentation to the Board of Directors on May 15, 2008[9];

- Quarterly Equity Valuation Analysis as of June 30, 2008 – Confidential Presentation to the Board of Directors on August 20, 2008[10];

- Quarterly Equity Valuation Analysis as of September 30, 2008 – Confidential Presentation to the Board of Directors on October 24, 2008[11];

- Quarterly Equity Valuation Analysis as of December 31, 2008 – Confidential Presentation to the Board of Directors on February 12, 2009[12];

- SFAS 142 – Goodwill and Indefinite-Lived Assets Impairment Test as of December 31, 2008[13];

- Equity Valuation Analysis as of June 30, 2009 – Confidential Presentation to the Board of Directors on July 21, 2009[14];

- Equity Valuation Analysis as of December 1, 2009 – Confidential Presentation to the Board of Directors on February 22, 2010[15];

- ASC §350 – Goodwill and Indefinite-Lived Assets Impairment Test as of December 1, 2009[16];

- Equity Valuation Analysis as of June 30, 2010 – Confidential Presentation to the Board of Directors on July 16, 2010[17];

- Equity Valuation Analysis as of December 1, 2010 – Confidential Presentation to the Board of Directors on February 16, 2011[18];

---

[8] EFH00058374-588.
[9] EFH03288113-173.
[10] EFH00085284-352.
[11] EFH03483851-930.
[12] CITIBANK0007404-496.
[13] EFH00058589-811.
[14] CITIBANK0000073-162.
[15] CITIBANK0000863-945.
[16] CITIBANK0292821-3063.
[17] CITIBANK0000779-862.
[18] CITIBANK0000334-427.

- Equity Valuation Analysis as of December 31, 2011 – Confidential Presentation to the Board of Directors in February 2012[19]; and

- Equity Valuation Analysis as of December 1, 2012 – Confidential Presentation to the Board of Directors in February 2013[20].

The Duff & Phelps valuation reports were used by EFH Corp. for several purposes including:

- Determination of the strike price for options;

- Determination of the issuance price for restricted shares;

- Computing option expense pursuant to Statement of Financial Accounting Standards No. 123 / Accounting Standards Codification 718 "Share Based Payment";

- 409A federal income tax purposes; and

- Goodwill impairment testing.

The Duff & Phelps valuation reports estimated the share price of Consolidated EFH Corp. by deducting Consolidated EFH Corp.'s purported liabilities from its enterprise value – the same methodology as the Balance Sheet Test.  However, Duff & Phelps valuation reports were not solvency opinions because the liabilities Duff & Phelps deducted from enterprise value were incorrect for solvency purposes – Duff & Phelps failed to deduct the full amount of the liabilities.  For example, Duff & Phelps deducted the fair market value of Consolidated EFH Corp.'s debt instead of the face value in accordance with generally accepted solvency practice.  I understand that using a face value deduction is also the approach used in United States Bankruptcy Courts,[21] and it was the method used by Duff & Phelps itself in an October 2007 solvency analysis.[22]  As illustrated in Figure 1 below, the impact on equity value of deducting the fair market value of debt instead of the face value is a reduction of between $7.2 billion and $19.7 billion in the years 2008 to 2012.

---

[19] CITIBANK0001189-284.
[20] EFH03484151-237.
[21] *In re Trans World Airlines, Inc.* 134 F.3d 188 (3d Cir. 1998).
[22] TXU Corp. Solvency Analysis Presentation dated October 10, 2007, p. 13.  (no bates stamp).

Highly Confidential

## Difference Between Fair Market and Face Value of Debt

| Figure 1: Fair Market Value vs Face Value of Debt $ in Millions | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|
| Face value of net debt per SEC filings | $(39,449) | $(41,040) | $(39,136) | $(40,222) | $(42,657) |
| Fair market value of net debt per Duff & Phelps | (27,937) | (32,461) | (31,953) | (31,083) | (22,910) |
| Difference | $(11,512) | $ (8,579) | $ (7,183) | $ (9,139) | $(19,747) |

B.   Analysis of Duff & Phelps Valuation Reports

I reviewed and analyzed the Duff & Phelps valuation reports listed above.  My analysis focuses on the December valuation reports, which Duff & Phelps issued for each of the years from 2008 through 2012.  The Duff & Phelps December valuation reports generally correspond to audited financial statement dates for Consolidated EFH Corp., EFIH, Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings") and Oncor Electric Delivery Company LLC ("Oncor").[23]

Duff & Phelps' valuation reports provide an estimate of the value of EFH Corp.'s assets (i.e., enterprise value) including enterprise valuations of EFH Corp.'s two operating subsidiaries – Oncor and TCEH.  In each valuation report, Duff & Phelps provided a range of enterprise values – "low," "mid" and "high" – based on sensitivities to valuation inputs.  Duff & Phelps' conclusions regarding the value of Consolidated EFH Corp.'s equity value were based on the "mid" value and not the "low" or "high" values.  Duff & Phelps' valuation reports were based on a going concern premise of value.  Duff & Phelps purported to apply a fair value and fair market value valuation standard and utilized both the income and market approaches to estimate the fair value of EFH Corp.'s assets.   Specifically, Duff & Phelps states it estimated the fair value of EFH Corp.'s assets using a DCF analysis and a public company trading multiple analysis of peer companies for Oncor and for TCEH.

Duff & Phelps' valuation reports addressed the key aspects under the Bankruptcy Code for valuing assets for a solvency analysis including: 1) determining the appropriate premise of value (Duff & Phelps used a going-concern premise) and 2) estimating the fair value of the assets (fair

---

[23] Duff & Phelps also issued valuation reports as of June 2009 and June 2010.  The values contained in the June reports are in between or lower than those contained in the December valuations reports for the corresponding years and, therefore, would not change a solvency conclusion.

value and fair market value standard according to Duff & Phelps).  Furthermore, in estimating the fair value of the assets, Duff & Phelps applied generally accepted valuation approaches used to estimate fair value, namely the income approach (Duff & Phelps utilized a DCF analysis) and the market approach (Duff & Phelps utilized a comparable companies market multiples analysis).

Consistent with the numerous corporate purposes informed by the Duff & Phelps valuation work, and based on the review and analysis my team at AlixPartners and I conducted, Duff & Phelps' valuation reports provide a reasonable contemporaneous starting point for estimating the fair value of EFH Corp.'s assets for the purposes of this report.  As such, as discussed in more detail below, I incorporated much of Duff & Phelps' enterprise valuations in my solvency analysis.

However, Duff & Phelps' analyses incorporated at least one significant assumption which, in my opinion, is unwarranted – namely the application of a control premium in valuing Oncor.  Duff & Phelps rationale for applying a control premium was that:

> "[t]he Control Premium represents the additional value market participants are willing to pay over and above an observed share price in the marketplace to gain control of a Company.  As opposed to minority shareholders of a company, controlling investors have the ability to elect members of the board, determine management compensation, acquire or liquidate assets, set policy, make acquisitions, award contracts, and liquidate, dissolve, or recapitalize the business."[24]

Consistent with Duff & Phelps' discussion of a control premium, controlling interest shares are generally more valuable than minority interest shares because controlling interest shares contain valuable rights that minority interest do not.  Market participants pay more, or a premium relative to a minority interest, for a controlling interest because the valuable rights include the ability to appoint/change management or the board of directors, change articles of incorporation, set operational and strategy policy, buy or sell assets, negotiate contracts, sell additional shares in the company, declare and pay dividends, or block any of the aforementioned.[25]

---

[24] Energy Future Holdings, Corp. – Quarterly Equity Valuation Analysis as of December 31, 2008 – Confidential Presentation to the Board of Directors on February 12, 2009 at CITIBANK0007452.

[25] Pratt, Shannon P. *Valuing A Business: The Analysis and Appraisal of Closely Held Companies.* McGraw Hill. 2008. Pages 384-385.

Highly Confidential

In my opinion, Duff & Phelps' application of a control premium to trading multiples for EFH Corp.'s interest in Oncor is unwarranted in this case.  A market participant would not pay a premium for EFH Corp.'s 80.03% ownership of Oncor, because the 80.03% ownership does not control Oncor.  Oncor is a ring-fenced entity.  According to EFH Corp.'s SEC filings:

> "The Ring-Fencing Measures effectively separated the daily operational and management control of Oncor Holdings and Oncor from EFH Corp. and its other subsidiaries…
>
> The boards of directors of Oncor Holdings and Oncor have ultimate responsibility for the management of the day-to-day operations of their respective businesses, including the approval of Oncor's capital expenditure and operating budgets and the timing and prosecution of Oncor's rate cases. While both boards include members appointed by EFH Corp., a majority of the board members are independent in accordance with rules established by the New York Stock Exchange, and therefore, **we concluded for purposes of applying the amended accounting standards that EFH Corp. does not have the power to control the activities deemed most significant to Oncor Holdings' (and Oncor's) economic performance….** (emphasis added)
>
> In assessing EFH Corp.'s ability to exercise control over Oncor Holdings and Oncor, we considered whether it could take actions to circumvent the purpose and intent of the Ring-Fencing Measures (including changing the composition of Oncor Holdings' or Oncor's board) in order to gain control over the day-to-day operations of either Oncor Holdings or Oncor. We also considered whether (i) EFH Corp. has the unilateral power to dissolve, liquidate or force into bankruptcy either Oncor Holdings or Oncor, (ii) EFH Corp. could unilaterally amend the Ring-Fencing Measures contained in the underlying governing documents of Oncor Holdings or Oncor, and (iii) EFH Corp. could control Oncor's ability to pay distributions and thereby enhance its own cash flow. We concluded that, in each case, no such opportunity exists."[26]

As discussed above, EFH Corp. does not have "control" of Oncor despite an 80.03% ownership stake because it does not control the daily activities that determine Oncor's performance, cannot declare and pay dividends and does not have the ability to amend or change the ring-fenced measures in attempt to gain control of Oncor.  As such, in my opinion, applying a control premium to the valuation of Oncor is inappropriate.

---

[26] Energy Future Holdings 10K for the period ended December 31, 2010, p. 130.

If the control premium is removed from Duff & Phelps' valuation analyses, the estimated enterprise value for Oncor, all else equal, would decrease Oncor's market approach valuation by between $500 million and $1.5 billion depending on the year (i.e., 2008, 2009, 2010, 2011 or 2012) and the scenario (i.e., low, mid or high) being considered.  As a result, in each year Duff & Phelps overstated, at least for purposes of a solvency analysis, Oncor's enterprise value in an amount between $160 million and $583 million.[27]

## VI.    Analysis of Consolidated EFH Corp. Solvency from 2008 through 2012

As described in Section IV, the first step in the Balance Sheet Test is determining the valuation premise.  Duff & Phelps valued Consolidated EFH as a going concern.  I agree with this premise of value for the purposes of this report.  The second step in a Balance Sheet Test is estimating the fair value of the assets.  As illustrated in Figure 2, the enterprise value for Consolidated EFH Corp. I have used is based on the Duff & Phelps valuation reports from 2008 to 2012.  The third and fourth steps of the Balance Sheet Test are the estimation of the liabilities and the deduction of said liabilities from the fair value of the assets.  As illustrated in Figure 2, I deducted the following liabilities from Consolidated EFH Corp.'s enterprise value to arrive at a solvency conclusion:

- The face value of Consolidated EFH Corp.'s debt and capital lease obligations, net of cash & equivalents and restricted cash per the 10Ks;
- Non-operating assets and liabilities which relate to estimated tax payments for pre-2007 tax periods as calculated by Duff & Phelps with guidance from EFH Corp. management; and
- The 19.97% minority interest in Oncor based on the estimated equity value of Oncor (as discussed below).[28]

---

[27] The difference between the impact on the market approach of $500 million to $1.5 billion and the net impact on the enterprise value of $160 million to $583 million is due to the weighting between the DCF and the market approach.

[28] The percentage was 19.96% in 2008 (EFH Corp. 10K for the period ended December 31, 2008, p. 46).

Highly Confidential

## Consolidated EFH Corp. Was Insolvent From 2008 through 2012

| Figure 2: Consolidated EFH Corp. Solvency | December 2008 | | | December 2009 | | | December 2010 | | | December 2011 | | | December 2012 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (In $ Millions) | Low | Mid | High | Low | Mid | High | Low | Mid | High | Low | Mid | High | Low | Mid | High | |
| Enterprise Value - Consolidated EFH Corp. | $35,000 | $37,250 | $39,250 | $36,750 | $39,250 | $42,000 | $33,500 | $36,250 | $38,500 | $33,000 | $35,000 | $37,750 | $30,500 | $32,750 | $34,750 | [1] |
| Consolidated EFH Corp. Debt and Capital Lease Obligations | (42,460) | (42,460) | (42,460) | (43,426) | (43,426) | (43,426) | (41,943) | (41,943) | (41,943) | (42,211) | (42,211) | (42,211) | (46,314) | (46,314) | (46,314) | [4] |
| Consolidated EFH Corp. Cash & Equivalents | 1,689 | 1,689 | 1,689 | 1,189 | 1,189 | 1,189 | 1,566 | 1,566 | 1,566 | 837 | 837 | 837 | 1,958 | 1,958 | 1,958 | [4] |
| Consolidated EFH Corp. Restricted Cash | 1,322 | 1,322 | 1,322 | 1,197 | 1,197 | 1,197 | 1,237 | 1,237 | 1,237 | 1,149 | 1,149 | 1,149 | 1,698 | 1,698 | 1,698 | [4] |
| Consolidated EFH Non-Operating Assets & Liabilities | (1,152) | (1,152) | (1,152) | (1,200) | (1,200) | (1,200) | (750) | (750) | (750) | (600) | (600) | (600) | - | - | - | [2] |
| Equity Value - Consolidated EFH Corp. (100%) | (5,601) | (3,351) | (1,351) | (5,490) | (2,990) | (240) | (6,390) | (3,640) | (1,390) | (7,825) | (5,825) | (3,075) | (12,158) | (9,908) | (7,908) | |
| Minority Interest in Oncor | (1,202) | (1,301) | (1,451) | (1,308) | (1,507) | (1,657) | (1,436) | (1,686) | (1,886) | (1,683) | (1,883) | (2,182) | (1,840) | (2,139) | (2,339) | [5] |
| **Equity Value - Consolidated EFH Corp.** | **(6,803)** | **(4,652)** | **(2,802)** | **(6,798)** | **(4,497)** | **(1,897)** | **(7,826)** | **(5,326)** | **(3,276)** | **(9,508)** | **(7,708)** | **(5,257)** | **(13,998)** | **(12,047)** | **(10,247)** | |
| Adjustment Eliminating Oncor Control Premium ("CP") | (260) | (160) | (210) | (333) | (500) | (417) | (333) | (417) | (583) | (250) | (167) | (167) | (333) | (500) | (333) | [3] |
| Adjustment to Minority Interest for Elimination of CP | 52 | 32 | 42 | 67 | 100 | 83 | 67 | 83 | 116 | 50 | 33 | 33 | 67 | 100 | 67 | |
| **Adjusted Equity Value - Consolidated EFH Corp.** | **(7,011)** | **(4,780)** | **(2,970)** | **(7,064)** | **(4,897)** | **(2,231)** | **(8,093)** | **(5,659)** | **(3,742)** | **(9,708)** | **(7,841)** | **(5,391)** | **(14,264)** | **(12,447)** | **(10,514)** | |

Sources & Notes:
[1] **2008:** D&P 2008 Valuation Report, page 9; **2009:** D&P 2009 Valuation Report, page 9; **2010:** D&P 2010 Valuation Report, page 9; **2011:** D&P 2011 Valuation Report, page 10; **2012:** D&P 2012 Valuation Report, pages 11, 12, 25, 39.
[2] **2008:** D&P 2008 Valuation Report, page 9, 66; **2009:** D&P 2009 Valuation Report, page 9, 66; **2010:** D&P 2010 Valuation Report, page 9; **2011:** D&P 2011 Valuation Report, page 10; **2012:** D&P 2012 Valuation Report, pages 7, 12.
Note in 2012 based on discussions with the EFH tax group, EFH's Net Operating Loss position was assumed to off-set future non-operating liabilities related to outstanding tax settlements.
[3] **2008:** D&P 2008 Valuation Report, page 51; **2009:** D&P 2009 Valuation Report, page 46; **2010:** D&P 2010 Valuation Report, page 47; **2011:** D&P 2011 Valuation Report, page 48; **2012:** D&P 2012 Valuation Report, page 46.
[4] **2008:** EFH Corp. Form 10-K dated 12/31/2009, page 120; **2009:** EFH Corp. Form 10-K dated 12/31/2010, page 118; **2010:** EFH Corp. Form 10-K dated 12/31/2011, page 112; **2011:** EFH Corp. Form 10-K dated 12/31/2012, page 99; **2012:** EFH Corp. Form 10-K dated 12/31/2013, page 105.
[5] **2008:** EFH Corp. Form 10-K dated 12/31/2009, page 165; **2009:** EFH Corp. Form 10-K dated 12/31/2009, page 167; **2010:** EFH Corp. Form 10-K dated 12/31/2010, page 165; **2011:** EFH Corp. Form 10-K dated 12/31/2011, page 144; **2012:** EFH Corp. Form 10-K dated 12/31/2012, page 154.

Based on the significant negative equity values shown in Figure 2 above, I conclude that Consolidated EFH Corp. was insolvent from December 2008 through December 2012 (with or without an adjustment to the control premium as discussed above). As shown, Consolidated EFH Corp. became more insolvent with the passage of time from -$4.652 billion (midpoint) as of December 2008 to -$12.047 billion (midpoint) as of December 2012 unadjusted (-$4.780 billion to -$12.447 billion adjusted to eliminate the Oncor control premium used by Duff & Phelps).

My conclusions are supported by additional indicia of insolvency from 2008 to 2012. For example, Consolidated EFH Corp.'s book value of equity was significantly negative from December 2008 through December 2012. This is consistent with the trend and conclusions illustrated in Figure 2 and is another indication that Consolidated EFH Corp. was insolvent between December 2008 and December 2012. As illustrated in Figure 3, Consolidated EFH Corp.'s equity book value was -$2.318 billion as of December 2008 and -$10.923 billion as of December 2012.

Highly Confidential

### Since December 2008, Consolidated EFH Corp. Had Negative Book Value

| Figure 3: Consolidated EFH Corp. Book Value of Equity (In $ Millions) | December 2007 | December 2008 | December 2009 | December 2010 | December 2011 | December 2012 |
|---|---|---|---|---|---|---|
| Consolidated EFH Corp. Book Value | $ 6,685 | $ (2,318) | $ (1,836) | $ (5,911) | $ (7,757) | $(10,923) [1] |
| $ Change | n/a | $ (9,003) | $ 482 | $ (4,075) | $ (1,846) | $ (3,166) |
| Cumulative $ Change | | $ (9,003) | $ (8,521) | $(12,596) | $(14,442) | $(17,608) |

Sources & Notes:

[1] **2007:** EFH Corp. Form 10-K dated 12/31/2008, page 121; **2008:** EFH Corp. Form 10-K dated 12/31/2009, page 120; **2009:** EFH Corp. Form 10-K dated 12/31/2010, page 118; **2010:** EFH Corp. Form 10-K dated 12/31/2011, page 112; **2011:** EFH Corp. Form 10-K dated 12/31/2012, page 99; **2012:** EFH Corp. Form 10-K dated 12/31/2013, page 105.

The decline in Consolidated EFH Corp.'s equity value, as illustrated in Figures 2 and 3, is consistent with Consolidated EFH Corp.'s deteriorating operational performance after 2007. Since the 2007 leveraged buyout, there has been a general increase in supply of natural gas caused by the rise of hydraulic fracturing and advances in directional drilling techniques. The increase in the supply of natural gas caused a significant decline in natural gas prices and wholesale electricity prices in the Electric Reliability Council of Texas ("ERCOT") market because wholesale electricity prices are closely linked to natural gas prices. As a result of the significant decline in wholesale electricity in ERCOT and higher fuel and environmental costs, the profitability of Consolidated EFH Corp. declined significantly. The economic recession in 2008 and 2009 exacerbated the decline in wholesale electricity prices through overall lower demand for electricity in the ERCOT market.[29]

Statements by EFH and its equity sponsors further support my opinion regarding Consolidated EFH Corp.'s solvency. For example, on March 17, 2009, Paul Keglevic, in an email to equity sponsors, Goldman Sachs, KKR and TPG, stated that Consolidated EFH Corp. was insolvent if the face value of debt was used instead of the fair market value of debt. This confirms my opinion that Consolidated EFH Corp. was insolvent as of December 2008 as illustrated in Figure 2. The following is Mr. Keglevic' s statement regarding insolvency:

> "I wanted to outline an opportunity to potentially pay the sponsors a dividend. This would be an EFH dividend… To make this happen we would need several BOD resolutions and a shareholder vote on Stated Capital which are outlined in the attached and should be fairly easy. Another critical item would be to get DP [Duff & Phelps] to give us a FV [fair value] surplus report (similar to the 12/31

---

[29] Disclosure Statement for the Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code, pp. 4 and 64.

share valuation) and a solvency opinion. The Texas law regarding solvency seems to give us some latitude regarding using FV of debt – **if Face value of debt is required we would not be solvent for dividend purposes**…"[30] (emphasis added)

In a follow-up to this email, Mr. Keglevic confirms that Duff & Phelps is concerned that a solvency opinion would require the use of the face value of debt and would cause Consolidated EFH Corp. to "fail" a solvency test.[31]

Similarly, in October 2011, in a board of directors' presentation, EFH Corp. management recognized that Consolidated EFH Corp. was insolvent, with an enterprise value of $33 billion and net debt of $41.3 billion as of October 2011. The fair market value of Consolidated EFH Corp. net debt was $29.8 billion as compared to face value of $41.3 billion (a 27.8% discount to par) which indicates market investors viewed Consolidated EFH Corp. as insolvent. Furthermore, EFH Corp. management projected that Consolidated EFH Corp. would remain insolvent until 2017.[32]



---

[30] Paul Keglevic email dated March 17, 2009 (EFH-SP00040957).
[31] Jeff Law at TPG email dated March 17, 2009 (LEG_SP_00090309).
[32] Board Strategy Session dated October 27, 2011 (EFH-SP00101089 at 110; 199-200; 204; 210).

Highly Confidential



In February 2012, in a KKR presentation, KKR acknowledged that Consolidated EFH Corp.'s face value of net debt was $40.193 billion while the fair market value was only $27.481 billion (a 31.6% discount to par), again, indicating that Consolidated EFH Corp. was insolvent.[33]

These statements by EFH Corp. management and its equity sponsors demonstrate that they understood Consolidated EFH Corp. was insolvent from early 2009 through early 2012 which further confirms my analysis in Figure 2.

## VII.    Other Indicia of Consolidated EFH Corp. Insolvency From 2008 to 2012

The value of a bond is equal to the present value of its expected future cash flows, namely interest payments and the payment of the principal or par value at maturity.  Typically, if a bond is trading at a significant discount to its par value then investors believe they will not receive a significant portion of the promised payments.  This generally means that investors believe the issuer is unable to make a significant portion of the payments and, consequently, is insolvent.

---

[33] EFH Discussion Materials dated February 2012 (LEG_SP_00315318 at 319 and 333).

The conclusion that Consolidated EFH Corp. was insolvent from December 2008 through December 2012 is supported by the trading prices of EFH Corp.'s debt. For example, as illustrated in Figure 4, EFH Corp.'s debt traded at significant discounts to par from December 2008 through December 2012. In 2008, the 6.55% Fixed Series R Senior Notes traded at $36.93 for every $100 of par value which, in my opinion, indicates that investors did not expect full payment of promised interest and principal.

### EFH Corp.'s Debt Traded Materially Below Par

| Figure 4 Per Bloomberg | | | Price of EFH Corp. Debt As of December 31, | | | | |
|---|---|---|---|---|---|---|---|
| Issuer | Debt Instrument | Amount Issued | 2008 | 2009 | 2010 | 2011 | 2012 |
| Energy Future Holdings Corp (Parent Entity) | 6.55% Fixed Series R Senior Notes due November 15, 2034 | 750,000,000 | 36.93 | 45.00 | 33.17 | 38.61 | 56.93 |
| Energy Future Holdings Corp (Parent Entity) | 5.55% Fixed Series P Senior Notes due November 15, 2014 | 1,000,000,000 | 47.00 | 74.10 | 57.55 | 64.60 | 87.00 |
| Energy Future Holdings Corp (Parent Entity) | 6.50% Fixed Series Q Senior Notes due November 15, 2024 | 749,750,000 | 32.25 | 49.00 | 38.00 | 38.55 | 58.41 |
| Energy Future Holdings Corp (Parent Entity) | 10.875% Fixed Senior Notes due November 1, 2017 | 1,984,600,000 | | 82.00 | 70.35 | 73.76 | 94.50 |
| Energy Future Holdings Corp (Parent Entity) | 11.25% / 12.00% Senior Toggle Notes due November 1, 2017 | 2,500,000,000 | | 69.00 | 59.26 | 83.16 | 94.50 |
| Energy Future Holdings Corp (Parent Entity) | 6.50% Fixed Series Q Senior Notes due November 15, 2024 | 750,000,000 | 37.50 | 45.38 | 39.31 | 44.69 | 60.06 |
| Note: the prices reflect the most recent trade on or prior to December 31st of each year. | | | | | | | |

## VIII.    Analysis of Consolidated EFH Corp. Solvency Indicia After December 2012

Duff & Phelps provided valuation reports through December 2012. I am not aware of any Duff & Phelps valuation reports between December 2012 and the Petition Date. Furthermore, I understand that certain information that would be necessary to perform a comprehensive independent valuation and solvency analysis after December 2012, including contemporaneous projections for Oncor and TCEH, has not been made available to the Committee. Given the limited available information and in light of the purposes of the present analyses, I have not performed a full valuation and solvency analysis of Consolidated EFH Corp. after December 2012. I have, however, reviewed and analyzed the publicly available information for Consolidated EFH Corp. to assess if there is any indication that Consolidated EFH Corp. became solvent after December 2012.

Since 2012, Oncor's EBITDA has increased from approximately $1.747 billion to $1.856 billion as of December 31, 2013, an increase of $109 million.[34]   Since 2012, TCEH's EBITDA has declined from $3.574 billion to $2.919 billion as of December 31, 2013, a decrease of $655 million.[35]   As of December 31, 2013, Consolidated EFH Corp.'s net debt was $44.247 billion.[36] The last Duff & Phelps valuation report, as of December 2012, estimated Consolidated EFH Corp.'s enterprise value of approximately $30.500 billion to $34.750 billion – approximately $10.267 billion to $14.026 billion less than its net liabilities and the minority interest in Oncor.[37] Based on Oncor's and TCEH's financial performance and possible increases in the average comparable company EBITDA multiple for TCEH and Oncor, there is no indication that between December 2012 and the Petition Date the value of Consolidated EFH Corp.'s assets increased significantly such that asset value exceeded Consolidated EFH Corp.'s net debt of $44.247 billion as of December 31, 2013.   This is consistent with the 2011 analysis of EFH management, which recognized that Consolidated EFH Corp. would remain insolvent through at least 2017.[38]

Furthermore, as previously noted, Consolidated EFH Corp. became increasingly insolvent over time between 2008 and 2012.   Consistent with this trend, Consolidated EFH Corp.'s (negative) book value of equity has continued to decline from -$10.923 billion as of December 31, 2012 to -$13.255 billion as of December 31, 2013, which is another indication that Consolidated EFH Corp. remained insolvent between December 2012 and the Petition Date.

## IX.    Analysis of EFH Corp. and the E-Side Solvency from 2008 through 2012

I analyzed the solvency of EFH Corp. and the E-Side in a similar manner to my analysis of Consolidated EFH Corp.'s solvency.   The EFH Corp. and E-Side solvency analysis reflects EFH Corp.'s equity value after taking into account the value of its investment in EFIH, as well as the additional assets and liabilities on EFH Corp.'s balance sheet.     EFIH's enterprise and equity values are largely derived from the value of Oncor.  As a starting point for the E-Side solvency

---

[34] Energy Future Holdings Corp. 10K for the period ended December 31, 2013, Exhibit 99(d).
[35] Energy Future Holdings Corp. 10K for the period ended December 31, 2013, Exhibit 99(c).
[36] Energy Future Holdings Corp. 10K for the period ended December 31, 2014, p. 87 and EFIH 10K for the period ended December 31, 2014, Exhibit 99(c).
[37] See Figure 2.
[38] Board Strategy Session dated October 27, 2011 (EFH-SP00101089 at 199-200).

analysis, I utilized the contemporaneous Duff & Phelps' fair value estimates as the basis for Oncor's enterprise value. As illustrated in Figure 5 below, from Oncor's enterprise value, I deducted the following:

- The face value of Oncor's debt and capital lease obligations, net of Oncor's cash & equivalents and restricted cash per the 10Ks;
- Non-operating assets and liabilities per the 10Ks; and
- The 19.97% minority interest in Oncor based on the estimated equity value of Oncor.[39]

This results in the value of Oncor to its parent, Oncor Holdings. To estimate the equity value of EFIH, the parent of Oncor Holdings, I added the assets of both Oncor Holdings and EFIH and deducted their liabilities, per their unconsolidated balance sheets. This results in the value of EFIH to its parent, EFH Corp. To estimate the equity value of EFH Corp. and evaluate its solvency, I added EFH Corp.'s assets and deducted its liabilities per its balance sheets to the value of EFIH's equity. As illustrated in Figure 5 based on this analysis, EFH Corp.'s equity value is negative in every scenario from 2008 through 2012 (after eliminating Oncor's control premium), and as a result, the E-Side was insolvent from December 2008 through December 2012.

---

[39] The deduction of Oncor's net debt and the value of the equity stake not owned by Oncor Holdings, Oncor's parent company, are appropriate deductions to estimate the value of Oncor available to Oncor Holdings.

Highly Confidential

## The E-Side Was Insolvent From 2008 through 2012

| Figure 5: E-Side Solvency | December 2008 | | | December 2009 | | | December 2010 | | | December 2011 | | | December 2012 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (In $ Millions) | Low | Mid | High | Low | Mid | High | Low | Mid | High | Low | Mid | High | Low | Mid | High | |
| Enterprise Value - Oncor | $11,500 | $12,000 | $12,750 | $12,250 | $13,250 | $14,000 | $13,000 | $14,250 | $15,250 | $14,500 | $15,500 | $17,000 | $15,500 | $17,000 | $18,000 | [1] |
| Oncor Debt and Capital Lease Obligations | (5,550) | (5,550) | (5,550) | (5,720) | (5,720) | (5,720) | (5,827) | (5,827) | (5,827) | (6,030) | (6,030) | (6,030) | (6,260) | (6,260) | (6,260) | [2][3] |
| Cash & Equivalents | 125 | 125 | 125 | 28 | 28 | 28 | 32 | 32 | 32 | 11 | 11 | 11 | 45 | 45 | 45 | [2][3] |
| Restricted Cash | 67 | 67 | 67 | 61 | 61 | 61 | 69 | 69 | 69 | 73 | 73 | 73 | 71 | 71 | 71 | [2][3] |
| Non-Operating Assets & Liabilities | (122) | (122) | (122) | (71) | (71) | (71) | (82) | (82) | (82) | (126) | (126) | (126) | (144) | (144) | (144) | [4] |
| Equity Value - Oncor | 6,020 | 6,520 | 7,270 | 6,548 | 7,548 | 8,298 | 7,192 | 8,442 | 9,442 | 8,428 | 9,428 | 10,928 | 9,212 | 10,712 | 11,712 | |
| Less: Minority Interest | (1,202) | (1,301) | (1,451) | (1,308) | (1,507) | (1,657) | (1,436) | (1,686) | (1,886) | (1,683) | (1,883) | (2,182) | (1,840) | (2,139) | (2,339) | [5] |
| Oncor Holdings Interest in Oncor | 4,818 | 5,219 | 5,819 | 5,240 | 6,041 | 6,641 | 5,756 | 6,756 | 7,556 | 6,745 | 7,545 | 8,746 | 7,372 | 8,573 | 9,373 | |
| Oncor Holdings Debt | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | [3] |
| Oncor Holdings Cash & Equivalents | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | - | - | - | [3] |
| Oncor Holdings Restricted Cash | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | [3] |
| Oncor Holdings Other Assets | 3 | 3 | 3 | 5 | 5 | 5 | 2 | 2 | 2 | - | - | - | - | - | - | [3] |
| Oncor Holdings Other Liabilities | (440) | (440) | (440) | (415) | (415) | (415) | (348) | (348) | (348) | (309) | (309) | (309) | (291) | (291) | (291) | [3] |
| EFIH Interest in Oncor Holdings | 4,382 | 4,783 | 5,383 | 4,831 | 5,632 | 6,232 | 5,411 | 6,411 | 7,211 | 6,437 | 7,237 | 8,438 | 7,081 | 8,282 | 9,082 | |
| EFIH Debt | - | - | - | (141) | (141) | (141) | (2,321) | (2,321) | (2,321) | (2,727) | (2,727) | (2,727) | (6,504) | (6,504) | (6,504) | [6] |
| EFIH Cash & Equivalents | - | - | - | - | - | - | 43 | 43 | 43 | 46 | 46 | 46 | 424 | 424 | 424 | [7] |
| EFIH Restricted Cash | - | - | - | - | - | - | - | - | - | - | - | - | 680 | 680 | 680 | [7] |
| EFIH Other Assets | 58 | 58 | 58 | 181 | 181 | 181 | 2,960 | 2,960 | 2,960 | 3,751 | 3,751 | 3,751 | 5,465 | 5,465 | 5,465 | [7] |
| EFIH Other Liabilities | (44) | (44) | (44) | (54) | (54) | (54) | (182) | (182) | (182) | (276) | (276) | (276) | (248) | (248) | (248) | [7] |
| EFH Corp. Interest in EFIH | 4,396 | 4,797 | 5,397 | 4,817 | 5,618 | 6,218 | 5,911 | 6,911 | 7,711 | 7,231 | 8,031 | 9,232 | 6,898 | 8,099 | 8,899 | |
| EFH Corp. Debt | (6,343) | (6,343) | (6,343) | (6,626) | (6,626) | (6,626) | (7,286) | (7,286) | (7,286) | (7,619) | (7,619) | (7,619) | (7,895) | (7,895) | (7,895) | [8] |
| EFH Corp. Cash & Equivalents | 1,075 | 1,075 | 1,075 | 1,059 | 1,059 | 1,059 | 1,443 | 1,443 | 1,443 | 659 | 659 | 659 | 299 | 299 | 299 | [8] |
| EFH Corp. Other Assets | 1,272 | 1,272 | 1,272 | 1,862 | 1,862 | 1,862 | 2,780 | 2,780 | 2,780 | 2,928 | 2,928 | 2,928 | 2,673 | 2,673 | 2,673 | [8] |
| EFH Corp. Other Liabilities | (3,435) | (3,435) | (3,435) | (4,128) | (4,128) | (4,128) | (5,699) | (5,699) | (5,699) | (5,227) | (5,227) | (5,227) | (3,763) | (3,763) | (3,763) | [8] |
| Equity Value - EFH Corp. (E-Side only) | (3,035) | (2,634) | (2,034) | (3,016) | (2,215) | (1,615) | (2,851) | (1,851) | (1,051) | (2,028) | (1,228) | (27) | (1,788) | (587) | 213 | |
| Adjustment Eliminating Oncor Control Premium ("CP") | (260) | (160) | (210) | (333) | (500) | (417) | (333) | (417) | (583) | (250) | (167) | (167) | (333) | (500) | (333) | [9] |
| Adjustment to Value of Minority Interest for Elimination of CP | 52 | 32 | 42 | 67 | 100 | 83 | 67 | 83 | 116 | 50 | 33 | 33 | 67 | 100 | 67 | |
| Adjusted Equity Value - EFIH Corp. (E-Side only) | (3,243) | (2,762) | (2,202) | (3,282) | (2,615) | (1,949) | (3,118) | (2,184) | (1,517) | (2,228) | (1,361) | (161) | (2,054) | (987) | (54) | |

Sources & Notes:
[1] **2008:** D&P 2008 Valuation Report, page 9; **2009:** D&P 2009 Valuation Report, page 9; **2010:** D&P 2010 Valuation Report, page 9; **2011:** D&P 2011 Valuation Report, page 10; **2012:** D&P 2012 Valuation Report, page 12.
[2] **2008:** EFIH Form 10-K dated 12/31/2008, Exhibit 99(F), page 5; **2009:** EFIH Form 10-K dated 12/31/2010, page 44; **2010:** EFIH Form 10-K dated 12/31/2011, page 45; **2011:** EFIH Form 10-K dated 12/31/2012, page 44; **2012:** EFIH Form 10-K dated 12/31/2013, page 59.
[3] **2008:** EFIH Form 10-K dated 12/31/2008, Exhibit 99(F), page 38; **2009:** EFIH Form 10-K dated 12/31/2010, Exhibit 99(F), page 38; **2010:** EFIH Form 10-K dated 12/31/2011 Exhibit 99(d),page 41; **2011:** EFIH Form 10-K dated 12/31/2012, Exhibit 99(d), page 40; **2012:** EFIH Form 10-K dated 12/31/2013, Exhibit 99(d), page 39.
[4] **2008:** 2008: EFIH Form 10-K dated 12/31/2010, Exhibit 99(f), page 15; 2009: EFIH Form 10-K dated 12/31/2011, Exhibit 99(d), page 17; 2010: EFIH Form 10-K dated 12/31/2012, Exhibit 99(d), page 16; 2011: EFIH Form 10-K dated 12/31/2013, Exhibit 99(d), page 15.
[5] **2008:** EFH Corp. Form 10-K dated 12/31/2008, page 46; **2009:** EFH Corp. Form 10-K dated 12/31/2009, page 167; **2010:** EFH Corp. Form 10-K dated 12/31/2010, page 165; **2011:** EFH Corp. Form 10-K dated 12/31/2011, page 144; **2012:** EFH Corp. Form 10-K dated 12/31/2012, page 154.
[6] **2008:** EFIH Form 10-K dated 12/31/2009, page 66; **2009:** EFIH Form 10-K dated 12/31/2010, page 47; **2010:** EFIH Form 10-K dated 12/31/2011, page 49; **2011:** EFIH Form 10-K dated 12/31/2012, page 49; **2012:** EFIH Form 10-K dated 12/31/2013, page 64.
[7] **2008:** EFIH Form 10-K dated 12/31/2009, page 88; **2009:** EFIH Form 10-K dated 12/31/2010, page 38; **2010:** EFIH Form 10-K dated 12/31/2011, page 39; **2011:** EFIH Form 10-K dated 12/31/2012, page 38; **2012:** EFIH Form 10-K dated 12/31/2013, page 48.
[8] **2008:** EFH Corp. Form 10-K dated 12/31/2009, page 219; **2009:** EFH Corp. Form 10-K dated 12/31/2010, page 213; **2010:** EFH Corp. Form 10-K dated 12/31/2011, page 237; **2011:** EFH Corp. Form 10-K dated 12/31/2012, page 224; **2012:** EFH Corp. Form 10-K dated 12/31/2013, page 235.
[9] **2008:** D&P 2008 Valuation Report, page 51; **2009:** D&P 2009 Valuation Report, page 46; **2010:** D&P 2010 Valuation Report, page 47; **2011:** D&P 2011 Valuation Report, page 48; **2012:** D&P 2012 Valuation Report, page 46.

My analysis of the insolvency of the E-Side is further supported by a March 2010 J.P. Morgan presentation evaluating Consolidated EFH Corp. recapitalization options. According to J.P. Morgan, "[c]urrent valuations imply the existing equity is impaired at all levels… Residual Oncor value to EFH of $5.0 - $7.0 billion against $7.3 billion in funded debt." The subsequent page shows E-side equity values of -$1.3 billion to -$2.4 billion.[40] Furthermore, according to a April 1, 2010 email from Jonathan Smidt of KKR, "…the value of the equity stake EFH owns in Oncor and the debt that sits between us and that equity value… there is $1.5bn to $2.5bn of debt in excess of that equity value."[41] These statements and the negative equity values further supports my opinion that the E-Side was insolvent by this time.

---

[40] J.P. Morgan presentation dated March 2010 (EFH02992652 at 654 and 655).
[41] April 1, 2010 email from Jonathan Smidt at KKR to Henry Kravis, et al. (LEG_SP_00022959-60).

Highly Confidential

Finally, as illustrated in Figure 4 above, EFH Corp.'s debt traded materially below par between 2008 and 2012 which, in my opinion, indicates that investors did not expect full payment of promised interest and principal. This supports my conclusion that the E-Side was insolvent from 2008 through 2012.

## X.    Analysis of E-Side Solvency Indicia After December 2012

As with my analysis of the solvency of EFH Corp. after December 2012 set forth in Section VIII, above, I have not performed a full valuation and solvency analysis of the E-Side after December 2012. I have, however, reviewed and analyzed the publicly available information for the E-Side to assess if there is any indication that the E-Side became solvent after December 2012. Oncor's EBITDA increased from December 31, 2012 to December 31, 2013 and the average comparable company EBITDA multiples for Oncor may have increased as well. Standing alone, these changes might indicate an increase in asset value between December 31, 2012 and the Petition Date. However, I do not believe there is an indication of solvency during this period.

First, it is my understanding that there may be significant off-balance sheet liabilities to consider in a solvency analysis after December 31, 2012 (i.e., liabilities that were not included in the E-Side solvency analysis as of December 31, 2012). For example, it is my understanding that there are potential E-Side liabilities related to "make-whole" payments and, if the disputed Settlement Agreement is approved, payments to EFCH/TCEH on account of intercompany claims; these would be relevant off-balance sheet liabilities to consider in a Balance Sheet Test. Adding these liabilities to the E-Side balance sheet could render the E-Side insolvent for this period regardless of any potential change in asset value based solely on a market comparable basis.

Second, the insolvency of the E-Side during this period is indicated by the trading prices of EFH Corp. bonds. As illustrated in Figure 6, as of December 31, 2013 several issuances of EFH Corp.'s bonds were trading below $43 per $100 of par value. In fact, the trading prices of all EFH Corp. bonds declined significantly from December 31, 2012 to December 31, 2013. In my opinion, these prices indicate that investors did not expect full payment of promised interest and principal and, as of December 31, 2013, investors expected less in promised payments than a year earlier. In performing a comprehensive valuation and solvency analysis, it would be

Highly Confidential

important for a solvency professional to compare the solvency conclusion derived from these trading prices with the solvency conclusion derived from generally accepted valuation approaches, and, if the conclusions are inconsistent with each other, perform further analysis to explain the inconsistency and determine the more accurate determinant of solvency. That said, as a preliminary matter, these trading prices are indicative of insolvency.

### EFH Corp.'s Debt Traded Materially Below Par

| Figure 6 Per Bloomberg | | | Price of EFH Corp. Debt As of December 31, | | | | | |
|---|---|---|---|---|---|---|---|---|
| Issuer | Debt Instrument | Amount Issued | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Energy Future Holdings Corp (Parent Entity) | 6.55% Fixed Series R Senior Notes due November 15, 2034 | 750,000,000 | 36.93 | 45.00 | 33.17 | 38.61 | 56.93 | 37.81 |
| Energy Future Holdings Corp (Parent Entity) | 5.55% Fixed Series P Senior Notes due November 15, 2014 | 1,000,000,000 | 47.00 | 74.10 | 57.55 | 64.60 | 87.00 | 38.00 |
| Energy Future Holdings Corp (Parent Entity) | 6.50% Fixed Series Q Senior Notes due November 15, 2024 | 749,750,000 | 32.25 | 49.00 | 38.00 | 38.55 | 58.41 | 30.80 |
| Energy Future Holdings Corp (Parent Entity) | 10.875% Fixed Senior Notes due November 1, 2017 | 1,984,600,000 | | 82.00 | 70.35 | 73.76 | 94.50 | 79.60 |
| Energy Future Holdings Corp (Parent Entity) | 11.25% / 12.00% Senior Toggle Notes due November 1, 2017 | 2,500,000,000 | | 69.00 | 59.26 | 83.16 | 94.50 | 69.25 |
| Energy Future Holdings Corp (Parent Entity) | 6.50% Fixed Series Q Senior Notes due November 15, 2024 | 750,000,000 | 37.50 | 45.38 | 39.31 | 44.69 | 60.06 | 42.31 |
| Note: the prices reflect the most recent trade on or prior to December 31st of each year. | | | | | | | | |

Finally, I note that the current bid to purchase the 80.03% interest in Oncor by the TCEH Unsecured Ad Hoc Group and Hunt Consolidated, Inc. (the "Hunt Bid") is not a reliable basis upon which to evaluate the pre-petition solvency of the E-Side. I understand that the Hunt Bid is premised on the formation of a real estate investment trust ("REIT") to hold Oncor's assets which would "unlock value" through favorable IRS tax treatment (which is contingent on favorable rulings from the IRS and the Texas Public Utility Commission).[42] Oncor is currently not organized as a REIT and, therefore, does not enjoy the tax benefits of a REIT. Accordingly, the value of Oncor implied by the Hunt Bid is not applicable to valuing the pre-petition assets of Oncor or its solvency.

---

[42] Disclosure Statement for the Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code, p. 90.

Highly Confidential

## XI.    SG&A Costs, Corporate Services and Allocations

### A.  Alleged Over-Allocation to TCEH

The following is a summary of SG&A costs incurred by TCEH and EFH Corp./EFIH for the years ended December 31, 2008 through December 31, 2014:

**Figure 7: SG&A Expense Allocation**
*(In $ Millions)*

| TCEH | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| TCEH Direct | $ 611.1 | $ 657.8 | $ 530.2 | $ 516.7 | $ 384.3 | $ 376.7 | $ 396.1 |
| TCEH Allocated | 68.7 | 81.6 | 192.7 | 212.6 | 235.6 | 250.0 | 223.6 |
| Total before One-Time Costs | 679.8 | 739.4 | 722.9 | 729.3 | 619.8 | 626.7 | 619.7 |
| One-Time Costs | | | | | 40.7 | 63.0 | 29.5 |
| Total TCEH SG&A | $ 679.8 | $ 739.4 | $ 722.9 | $ 729.3 | $ 660.5 | $ 689.7 | $ 649.3 |

| EFH Corp. / EFIH | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| EFH Corp./EFIH Direct Cost | $ 99.3 | $ 120.9 | $ 33.2 | $ 22.1 | $ 58.5 | $ 31.2 | $ 52.1 |
| EFH Corp./EFIH Allocated | 24.4 | 23.1 | 10.1 | 12.5 | 7.9 | 8.4 | 16.2 |
| Total before One-Time Costs | 123.7 | 144.0 | 43.3 | 34.6 | 66.4 | 39.6 | 68.3 |
| One-Time Costs | | | | | 2.2 | 42.0 | 19.7 |
| Total EFH/EFIH SG&A | $ 123.7 | $ 144.0 | $ 43.3 | $ 34.6 | $ 68.6 | $ 81.6 | $ 88.0 |

| EFH Consolidated | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| Consol. Direct Cost | $ 710.4 | $ 778.7 | $ 563.5 | $ 538.7 | $ 442.7 | $ 408.0 | $ 448.2 |
| Consol. Allocated (excl. Oncor) | 93.1 | 104.8 | 202.8 | 225.1 | 243.5 | 258.4 | 239.8 |
| Total before One-Time Costs | 803.5 | 883.4 | 766.2 | 763.9 | 686.2 | 666.4 | 688.0 |
| One-Time Costs | - | - | - | - | 42.9 | 105.0 | 49.2 |
| Total Consol. SG&A | $ 803.5 | $ 883.4 | $ 766.2 | $ 763.9 | $ 729.1 | $ 771.4 | $ 737.2 |

Sources & Notes:
2.11.119 PEO - Competitive SGA by BU 2008-2014  10062015.
2.11.121 PEO - 5i. 2008-2014 Service Bill Historical View - AZH - 151001.
EFH Corp. Form 10-K for the fiscal year ended December 31, 2010, page 199.
EFH Corp. Form 10-K for the fiscal year ended December 31, 2012, page 96.
EFH Corp. Form 10-K for the fiscal year ended December 31, 2013, page 102, Exhibits 99(b) and 99(c).
EFH Corp. Form 10-K for the fiscal year ended December 31, 2014, page 84.

As illustrated in Figure 7, for the year ended December 31, 2008, TCEH incurred a total of $679.8 million of SG&A expenses, of which $611.1 was paid directly by TCEH, and $68.7 million was allocated to TCEH by EFH Corporate Services, an entity within the EFH Corp. structure that provides centralized services to EFH Corp. and many of its direct and indirect subsidiaries. Total SG&A expense in 2008 for TCEH and EFH Corp/EFIH was $803.5 million.

For the year ended December 31, 2009, TCEH incurred a total of $739.4 million of SG&A expenses, of which $657.8 million was paid directly by TCEH, and $81.6 million was allocated

to TCEH by EFH Corporate Services. Total SG&A expense in 2009 for TCEH and EFH Corp/EFIH was $883.4 million.

Beginning in late 2009, in an effort to reduce overall SG&A costs for the Consolidated EFH Corp. and to better match SG&A costs with the particular entity that utilized the service or benefited from such cost, EFH Corp. restructured its centralized corporate services operation by reallocating a significant amount of SG&A incurrence (*i.e.*, purchasing of SG&A goods and services) from TCEH and EFH Corp./EFIH into EFH Corporate Services. Beginning in the year ended December 31, 2010, the costs in connection with the centralized operations were allocated from EFH Corporate Services to TCEH and EFH Corp./EFIH utilizing a revised allocation methodology, adopted by EFH following a cost allocation study by Huron Consulting Group.[43]

As a result of the increased centralization of costs in EFH Corporate Services starting in 2010, the incurrence of direct costs by both TCEH and EFH Corp./EFIH declined significantly. By 2014, TCEH's direct SG&A costs were reduced by $261.7 million (from $657.8 million in 2009 to $396.1 million in 2014). During this same timeframe, TCEH's allocated costs increased by only $142.0 million (from $81.6 million in 2009 to $223.6 million in 2014[44]). This increase in allocated costs was primarily related to the decrease in directly paid costs. As a result, TCEH's directly paid SG&A costs decreased by $119.7 million more than allocated costs were increased from 2009 to 2014.

As previously mentioned, the increase in costs allocated to TCEH was related to the change in cost allocation methodologies adopted in 2010. Prior to 2010, the majority of certain corporate costs were borne directly by EFH Corp., including sponsor fees, corporate payroll, legal fees, board of directors compensation and consulting costs. EFH Corp. determined that TCEH received the primary benefit of the majority of these services, and as such, allocated a substantial portion of the costs associated to such services to TCEH beginning in 2010. Additionally, TCEH benefitted by not receiving a larger allocation of these costs prior to 2010. Figure 8 below shows, that had the allocation methodology adopted by Consolidated EFH Corp. in 2010 been in

---

[43] EFCH00019308.
[44] Excluding, for comparison purposes, "one-time" costs of $29.5 million related to "Project Olympus" in 2014.

Highly Confidential

place during 2008 and 2009, approximately $132 million of costs borne by EFH Corp. during those years would have been allocated to TCEH.

| Figure 8: Pro Forma Impact of Post-2010 SG&A Allocation on TCEH | | | | | | | |
|---|---|---|---|---|---|---|---|
| (In $ Millions) | % | 2008 | 2009 | | % | 2008 | 2009 |
| Total SG&A | | $ 827.1 | $ 905.8 | Total Allocated | | $ 297.2 | $ 325.5 |
| Pro Forma: | | | | Pro Forma: | | | |
| TCEH Direct | 59% | 490.5 | 537.2 | TCEH | 84% | 249.8 | 273.5 |
| EFH Corp. Direct | 5% | 39.4 | 43.1 | Oncor | 12% | 36.3 | 39.8 |
| EFH CS Allocated | 36% | 297.2 | 325.5 | EFH Corp. | 4% | 11.1 | 12.2 |
| | | | | | | | |
| TCEH Direct | | | | TCEH Allocated | | | |
| Pro Forma | | 490.5 | 537.2 | Pro Forma | | 249.8 | 273.5 |
| Actual | | 611.1 | 657.8 | Actual | | 68.7 | 81.6 |
| Pro Forma Adjustment | | $ (120.6) | $ (120.6) | Pro Forma Adjustment | | $ 181.0 | $ 191.9 |

| | | |
|---|---|---|
| Difference 2008: | $ | 60.4 |
| Difference 2009: | $ | 71.3 |
| Total: | $ | 131.7 |

Sources & Notes:
2.11.119 PEO - Competitive SGA by BU 2008-2014  10062015.
2.11.121 PEO - 5i. 2008-2014 Service Bill Historical View - AZH - 151001.
EFH Corp. Form 10-K for the fiscal year ended December 31, 2010, page 199.
EFH Corp. Form 10-K for the fiscal year ended December 31, 2012, page 96.
EFH Corp. Form 10-K for the fiscal year ended December 31, 2013, page 102, Exhibits 99(b) and 99(c).
EFH Corp. Form 10-K for the fiscal year ended December 31, 2014, page 84.

Not only did TCEH's total SG&A expenses reduce substantially between 2009 and 2014 (by approximately $90 million), but total SG&A expense for TCEH and EFH Corp./EFIH was reduced substantially, as well, from $883.4 million in 2009 to $688.0 million in 2014,[45] a total reduction of over $195 million.

B.  Analysis of the SG&A Allocation to EFIH

In their Motion to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter into and Perform Under the Settlement Agreement, the Debtors note that "… no shared services costs were allocated to EFIH before 2014…" and  "The TCEH Debtors contend that EFIH should have been allocated at least a portion of these expenses."[46] Exhibit D of a statement by EFCH and TCEH in support of a settlement of intercompany claims is a "Presentation to Cravath, Swaine & Moore LLP" dated March 16, 2015 prepared by Munger, Tolles & Olson,

---

[45] Excluding, for comparison purposes, "one-time" costs of $49.2 million related to "Project Olympus" in 2014.
[46] Motion of Energy Future Holdings Corp., et al., to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter Into and Perform Under the Settlement Agreement [D.I. 5249], at ¶ 192.

Highly Confidential

LLP ("Munger Tolles"), counsel to EFCH and TCEH Disinterested Managers. In this presentation, Munger Tolles asserts that there was an "underallocation" of certain SG&A costs to EFIH during the period of 2010 to 2013 in the amount of between $69 million and $138 million.[47] Munger Tolles includes a calculation of this range as follows:

| Figure 9: Munger Tolles Analysis | | | |
|---|---|---|---|
| **Summary of Munger Tolles Analysis** | | | |
| *(in $ millions)* | 2010 - 2013 | **Potential Reallocation to EFIH** | |
| **Selected Categories** | **Total** | **20%** | **40%** |
| Corporate Board & Related Expenses | $      18 | $      4 | $      7 |
| TXU Corporate Controller & Admin | 25 | 5 | 10 |
| Corporate Planning | 11 | 2 | 4 |
| Financial & Investor Relations | 16 | 3 | 7 |
| Corporate Secretary & Governance | 7 | 1 | 3 |
| Corp. Development & Strategy | 10 | 2 | 4 |
| Business Services Administration | 23 | 5 | 9 |
| Corporate Tax | 29 | 6 | 12 |
| External Affairs | 63 | 12 | 25 |
| Sponsor Fees | 141 | 28 | 57 |
| Total | $      345 | $      69 | $      138 |
| Sources & Notes: | | | |
| Exhibit D to Energy Future Competitive Holdings Company LLC and Texas Competitive Holdings Company LLC's Statement in Support of Intercompany Settlement in the Plan, page 6. | | | |

This calculation is based upon reallocating approximately 20 to 40 percent of certain SG&A costs to EFIH. This is wholly unexplained by Munger Tolles, and is not supported by the underlying data or the historical practice of the Debtors. With respect to the historical practice of the Debtors, I have calculated the percentage of these same line item costs that have been allocated to EFIH for the nine months ended September 30, 2014, after EFH changed its methodology of allocation to include EFIH. As set forth in Figure 10, my analysis illustrates that approximately only 10.9% of these costs were allocated to EFIH which is inconsistent with the unsourced 20% to 40% utilized by Munger Tolles.

---

[47] Exhibit D to Energy Future Competitive Holdings Company LLC and Texas Competitive Holdings Company LLC's Statement in Support of Intercompany Settlement in the Plan [D.I. 4145].

Highly Confidential

| Figure 10: Allocation Under Shared Services Agreement | | | | |
|---|---|---|---|---|
| *(in $ millions)* | | **Allocation Under SSA** | | |
| | | | **YTD Sep-2014** | |
| **Selected Categories** | **Total** | | **EFIH** | **EFIH%** |
| Corporate Board & Related Expenses | $ | 1.3 | $ | - | 0.0% |
| TXU Corporate Controller & Admin | | 3.3 | | 0.6 | 19.8% |
| Corporate Planning | | 2.3 | | 0.4 | 19.6% |
| Financial & Investor Relations | | 2.6 | | 0.5 | 19.8% |
| Corporate Secretary & Governance | | 1.4 | | - | 0.0% |
| Corp. Development & Strategy | | 0.8 | | - | 0.0% |
| Business Services Administration | | 2.3 | | 0.4 | 19.2% |
| Corporate Tax | | 4.5 | | 0.2 | 5.5% |
| External Affairs | | 13.0 | | - | 0.0% |
| Sponsor Fees | | 13.0 | | 2.5 | 19.5% |
| Total | $ | 44.5 | $ | 4.8 | 10.9% |
| Sources & Notes: | | | | | |
| 2.11.121 PEO - 5i. 2008-2014 Service Bill Historical View - AZH - 151001. | | | | | |

## XII.    Exchanges and Repurchases of TCEH Debt by EFH Corp. and EFIH

During 2009 to 2011, EFH Corp. and EFIH purchased TCEH notes payable from third parties. EFH Corp. and EFIH held many of these notes as assets on their balance sheets (i.e., investments) as of the Petition Date, and I understand they are proposed to be cancelled.[48]

In order to determine the amount EFH Corp. and EFIH contributed to repurchase TCEH notes payable, I determined the total principal amount of the notes acquired, as disclosed in EFH Corp.'s public filings. I then determined the range of trading prices on the notes during the periods in which the debt was acquired using Bloomberg.  I then made a conservative estimate of the amounts paid by EFH Corp. and EFIH for these debt instruments by multiplying the principal amount of the notes purchased by the lowest daily "PX_MID" price available in Bloomberg for each transaction period, which totaled approximately $242 million.[49]  This methodology assumes EFH Corp. and EFIH purchased the securities on the day within the period that it disclosed that had the lowest cost to them.  If I had used the highest daily "PX_MID" price, the cost of the notes is approximately $281 million.

---

[48]  EFH Corp. 10Ks the periods ended December 31, 2009 (at 149), 2010 (at 145), 2011 (at 135), 2012 (at 123), 2013 (at 136-137), and 2014 (at 118); EFIH's 10Ks for the periods ended December 31, 2009 (at 48), 2010 (at 45), 2011 (at 46), 2012 (at 45), 2013 (at 70), and 2014 (at 60).  The TCEH notes payable that were held by EFH Corp. and EFIH were eliminated upon consolidation of the EFH financial statements.[48]

[49]  The source of the "PX_MID" prices is Bloomberg.  The range of periods varied from one month to one quarter.

The following is a summary of the repurchases and debt exchanges I have identified:

- In 2009, EFH Corp. issued 9.75% Senior Secured Notes, and EFIH issued 9.75% Senior Secured Notes to third parties in exchange for approximately $143 million principal amount of TCEH notes payable.[50]

- In 2010, EFH Corp. repurchased $180 million principal amount of TCEH notes payable. In addition, EFH Corp. repurchased $20 million principal amount of term loans under the TCEH Senior Secured Facilities.[51]

- In 2011, EFH Corp. repurchased $40 million principal amount of TCEH notes payable.[52]

Figure 11, illustrates the principal amounts of the specific TCEH notes payable acquired by EFH Corp. and EFIH and the cumulative balances of the notes held by each debtor group for each of the period until to Petition Date, as well as my estimate of the amount paid to purchase the notes. As of the Petition Date, EFH Corp. and EFIH held $383 million of TCEH issued debt which was acquired for at least $242 million.

| Figure 11: TCEH Debt Acquired By EFH Corp. and EFIH | | | | |
|---|---|---|---|---|
| ($ in Millions) | EFH Corp. | EFIH | Principal Totals | Purchase Amount |
| **2009:** | | | | |
| Exchanges: | | | | |
| TCEH 10.25% Fixed Senior Notes due November 1, 2015 | $ 25 | $ 31 | $ 56 | $ 40 |
| TCEH 10.25% Fixed Senior Notes due November 1, 2015, Series B | 39 | 48 | 87 | 62 |
| **Balance at December 31, 2009** | **64** | **79** | **143** | **102** |
| **2010:** | | | | |
| Repurchases: | | | | |
| TCEH 10.25% Fixed Senior Notes due November 1, 2015 | 117 | - | 117 | 76 |
| TCEH 10.25% Fixed Senior Notes due November 1, 2015, Series B | 63 | - | 63 | 38 |
| TCEH Senior Secured Facilities | 20 | - | 20 | 14 |
| **Balance at December 31, 2010** | **264** | **79** | **343** | **230** |
| **2011:** | | | | |
| Repurchases: | | | | |
| TCEH 10.25% Fixed Senior Notes due November 1, 2015 | 40 | - | 40 | 12 |
| **Balance at December 31, 2011, 2012, 2013 and April 29, 2014** | **$ 304** | **$ 79** | **$ 383** | **$ 242** |
| Sources & Notes: | | | | |
| Bloomberg | | | | |
| EFH Corp. Form 10-K for the fiscal year ended December 31, 2009, pages 151-152. | | | | |
| EFH Corp. Form 10-K for the fiscal year ended December 31, 2010, page 147. | | | | |
| EFH Corp. Form 10-K for the fiscal year ended December 31, 2011, page 142. | | | | |
| EFH Corp. Form 10-Q for the quarterly period ended June 30, 2010, pages 19-20. | | | | |
| EFH Corp. Form 10-Q for the quarterly period ended September 30, 2010, page 21. | | | | |
| EFIH Form 10-K for the fiscal year ended December 31, 2010, page 44. | | | | |

[50] EFH's annual report filed on Form 10-K with the SEC for the periods ended December 31, 2009 at 152.

[51] EFH's annual report filed on Form 10-K with the SEC for the periods ended December 31, 2010 at 148. The disclosure states $181 million; the $1 million difference is due to rounding.

52 EFH's annual report filed on Form 10-K with the SEC for the period ended December 31, 2011 at 142.

Highly Confidential

## XIII.    Documents and Information Considered

Documents and information that we relied upon in conjunction with my analysis are cited throughout this report and/or cited on Exhibit 2.

## XIV.    Additional Analysis and Demonstrative Aids

I reserve the right to amend and/or supplement this report based upon any new and/or additional facts or other documents which may come to our attention, or information, including expert reports, deposition testimony and related document exhibits thereto, which may be produced.  I also reserve the right to reply or respond to the opinions or testimony of the Debtors' experts relating to my opinions or areas of expertise.

If I am called upon to testify, I may prepare demonstrative aids, such as graphs, charts or tables.

_____

Mark F. Rule
October 12, 2015



# Mark F. Rule, CFA

**Director**
**Chicago**
+1 (312) 705-3960
*mrule@alixpartners.com*

| | |
|---|---|
| **Professional Highlights** | Mark's more than 15 years of experience covers a broad range of accounting, financial, valuation, litigation and bankruptcy engagements including financing, mergers and acquisitions, damages analysis, purchase price disputes, lost profit determinations, valuations, solvency determinations, forensic accounting, corporate investigations and tax planning. During his career, he has analyzed economic and financial issues, assisted in financial restructuring and bankruptcy activities, analyzed fraudulent conveyance and preference actions, investigated fraud and accounting irregularities, prepared lost profits and damage analyses, and valued a wide range of assets, securities and businesses.  Mark has advised banks, law firms and public and private companies.  Mark has also been designated as an expert in federal bankruptcy court. |
| **Client Experience** | Mark has provided consulting services on numerous assignments across a variety of industries including chemical, energy, food, healthcare, insurance, mortgage, manufacturing, newspaper, retail, telecommunications, and transportation, to name a few.  A sample of Mark's valuation and solvency work includes:<br>• Advised the Unsecured Creditors Committee in a multi-billion dollar bankruptcy of multimedia company on issues of valuation and solvency.  Designated in federal bankruptcy court as a valuation expert on behalf of the Committee.<br>• Engaged by outside counsel to a major energy company to evaluate the merits of closing a proposed multi-billion acquisition of a competing electric utility company.<br>• Provided valuation and litigation consulting services to an electric utility generation and transmission cooperative related to a hundred million dollar disputed transaction.<br>• Engaged by a bankruptcy trustee of a restaurant chain to performed valuation analyses to determine deepening insolvency claims and damages to creditors resulting from actions undertaken by management. |
| **Affiliations** | Mark graduated with honors from the University of Notre Dame with a Bachelor of Business Administration in finance and holds an MBA with honors from the University of Chicago Graduate School of Business with concentrations in economics, finance and accounting.  In addition, he is a CFA charterholder and a member of the CFA institute, CFA Society of Chicago, American Bankruptcy Institute, the Turnaround Management Association and Business Valuation Association. |

AlixPartners

# Mark F. Rule – Representative Assignments

- Financial advisor to the Unsecured Creditors Committee in a multi-billion dollar bankruptcy of a newspaper and television company. Advised the Committee on issues of valuation, solvency and fraudulent conveyance. Designated in federal bankruptcy court as an expert on behalf of the Committee on issues of valuation.

- Financial advisor to the Unsecured Creditors Committee in a multi-billion dollar bankruptcy of a privately held energy company with a portfolio of competitive and regulated energy companies. Advised counsel for the Committee on issues of valuation and solvency.

- Engaged by outside counsel to a major energy company to evaluate the merits of closing a proposed multi-billion acquisition of a competing electric utility company. This engagement included an assessment of pro forma financial projections and valuation factors which were considered in closing the acquisition.

- Provided valuation and litigation consulting services to an electric utility generation and transmission cooperative related to a hundred million dollar disputed transaction. This assignment included a valuation of the company, an assessment of its collateral base, a detailed assessment of expected liabilities associated with a structured finance transaction and the cost to exit the transaction.

- Engaged by a bankruptcy trustee of a restaurant chain to analyzed fraudulent conveyance claims and performed valuation analyses to determine deepening insolvency claims and damages to creditors resulting from actions undertaken by management. This engagement included an analysis of various contemporaneous projections of financial performance, actual performance and the related diminution of value.

- As part of a multi-billion dollar Chapter 11 bankruptcy proceeding, provided valuation, solvency, fraudulent conveyance and litigation consulting services in the chemical industry. The valuation and solvency analyses were used during the negotiation of the plan of reorganization.

- In a litigation matter, providing accounting investigation, valuation and solvency analyses related to a multi-billion dispute in the oil and gas industry. As part of these analysis, evaluated financial projections and valuation appraisals conducted by contemporaneous third parties. The analyses are being used by an international oil and gas company to negotiate its share of environmental liabilities as well as plan and defend an ongoing litigation.

- Provided valuation and litigation consulting services to outside counsel and their client for a multi-billion dollar merger dispute between the shareholders of competing chemical companies. The valuation and consulting analyses were utilized by the company and its shareholders to evaluate closing the merger.



# Mark F. Rule – Representative Assignments

▸ Provided valuation, solvency, fraudulent conveyance and litigation consulting services to outside counsel and their client for a multi-billion dollar leveraged transaction dispute between two chemical companies.  The consulting analyses were utilized by the law firm and its client for developing strategies for a potential settlement as well as ongoing litigation.

▸ Retained by a multi-billion financial services company in connection with a policyholder litigation related to a corporate restructuring to evaluate its ability to pay its debts as they come due with respect to an alleged fraudulent conveyance.  As part of this analysis, solvency was analyzed using various tests which considered future expected financial performance of the entity and its investments as well as the expected future development of various liabilities, including structured finance obligations.

▸ In a litigation matter, engaged by outside counsel of a financial service company to provide valuation and litigation consulting services related to a multi-billion lawsuit in the mortgage industry.  This engagement included an analysis of projections of financial performance, market data and value received by shareholders.

▸ Engaged by outside counsel to major bank who committed several billion dollars to finance a merger between two retail companies.  This assignment included providing valuation, solvency and litigation consulting services related to the bank's concerns over the post-merger solvency of the combined company.  The valuation and solvency analyses were based on contemporaneous projections, stock market data and comparable company transaction multiples.

▸ Valued and assessed the solvency of a global, multi-billion dollar satellite telecom provider for a high-profile fraudulent conveyance litigation assignment.  The Court's ruling was largely based on our valuation analyses.

▸ Engaged by outside counsel to a Tier 1 automotive supplier to value the supplier's ownership in several automotive joint ventures with a Japanese competitor.  The valuation estimates were used in the term sheets that contemplated the dissolution of the joint ventures through the supplier's buyout of the Japanese competitor.

▸ Financial advisor to packaging manufacturer in the food & beverage industry.  Advised the client on the sale of certain intellectual property technologies including the development of financial projections and a transaction valuation model.



# Mark F. Rule – Representative Assignments

▸ In a bankruptcy liquidation and related litigation, provided valuation analyses of a start-up international telecommunication company.   The critical issue in this assignment was the reasonableness of the financial projections given the limited operating history of the start-up.

▸ Retained by a company in the snack foods industry to provide valuation consulting services related to a shareholder purchase price dispute.  This engagement included a review and assessment of several valuation appraisals and the determination of the appropriate valuations inputs such as projections and discount rates.

▸ Engaged by an international food conglomerate to value the intellectual property acquired in a multi-billion dollar purchase of a rival international food company for both tax and purchase accounting purposes.  The analysis included valuing all categories of identifiable intellectual property, such as trademarks, patents, in-process research and development, existing licensing agreements, and customer relationships, as well as determining the goodwill resulting from the transaction.  The findings were used by the client to comply with both United States taxing authorities and its financial reporting requirements under the International Financial Reporting Standards.

▸ Retained by an international food & beverage company to value the intellectual property acquired in a multi-billion acquisition of a frozen food business for tax and purchase accounting purposes. The analysis included valuing all categories of identifiable intellectual property, such as trademarks, patents, in-process research and development, existing licensing agreements, and customer relationships, as well as determining the goodwill resulting from the transaction. The findings were used by the client to comply with both United States taxing authorities and its financial reporting requirements under the International Financial Reporting Standards.

▸ Valued the intellectual property of a national ice cream manufacturer and distributor for United States tax transfer accounting purposes.  The valuation determined the fair market value of the acquired intellectual property consistent with the United States transfer pricing guidance

▸ Valued the intellectual property of a regional food and distribution company for both tax and purchase accounting purposes including United States tax transfer accounting purposes. The findings assisted the client in complying with both United States tax and its financial reporting requirements under the International Financial Reporting Standards.

▸ Engaged by a international pharmaceutical company to value the tangible and intangible property acquired in the company's several hundred million dollar acquisition of a dermatological company for financial reporting purposes. The engagement included the valuation of significant intellectual property related to existing pharmaceutical products as well as numerous R&D stage products.

4



# Mark F. Rule – Representative Assignments

▸ Retained by a paper manufacturing company to value various categories of the company's equity. The valuations were used to support a convertible preferred stock offering as part of a recapitalization.

▸ As part of a Chapter 11 bankruptcy proceeding in the automotive industry, valued a subsidiary of the debtor for federal tax planning purposes.

▸ As part of a Chapter 11 bankruptcy, assisted the bankruptcy trustee evaluate the valuation considerations of certain assets in the recreation industry of the bankruptcy estate.

▸ Engaged by an executive search firm to provide an annual valuation of its employee stock ownership plan.

▸ Engaged by a commercial construction company to provide an annual valuation of its employee stock ownership plan.

▸ Engaged by a manufacturing company to provide  an annual valuation of its employee stock ownership plan.

▸ Engaged by a manufacturing company to evaluate the merits of establishing an employee stock ownership plan. This engagement included a valuation of the company's equity.

▸ Participated in a litigation matter involving a collectible & giftware manufacturer. As part of this engagement, performed valuation analyses to determine loss profits damages stemming from a software company's failure to fulfill its contractual duties. As part of this analysis, evaluated various projections of operational performance versus actual performance to estimate lost sales and related diminution of value.

▸ Participated in a litigation matter involving a construction company. As part of this engagement, performed valuation analyses to determine damages related to business interruption caused by the construction company's breach of contract. This engagement included an analysis of projected and actual financial performance as well as an analysis of cost overruns.

▸ Retained by counsel for an individual who alleged damages arising from being prevented from participating in an acquisition in the manufacturing industry. Provided valuation analysis of the investment opportunity under various projected outcomes and damages analyses for litigation and settlement purposes.

▸ In a litigation matter, provided valuation analyses to determine lost profits damages in the pharmaceutical industry related to a delayed Phase 3 study. This engagement included an examination of financial projections and mitigation factors.



# Mark F. Rule – Representative Assignments

‣ Engaged by a mushroom manufacturer to provide valuation analyses to determine damages stemming from an alleged breach of contract.  As part of this analysis, analyzed sales and expense information related to the development of a new mushroom farm and the lost profits stemming from cost overruns and lost sales.

‣ Retained by a steel company to perform valuation analyses and estimate damages stemming from misrepresentations related to an asset purchase.  This engagement included analysis of similar transactions and a valuation of the steel company based on adjusted projections that assumed historical and projected financial information were presented accurately.

‣ In a litigation matter, retained by a software company to perform a damages analysis of an alleged failed enterprise resource planning system in the healthcare industry.  The damages analysis included an examination of financial projections, incurred costs, lost cost savings and replacement options.

‣ In a litigation matter, provided valuation analyses to determine lost profits damages and unjust enrichment related to an alleged breach of contract and copyright infringement by a survey and opinion polling company.  Also, analyzed counterclaims for wrongful termination and lost wages.  This engagement included an analysis of survey data, expected future sales versus actual sales by the plaintiff and incremental sales by the defendant.

‣ In a litigation matter, provided valuation analyses to determine lost profits damages in the health care industry related to the failed implementation of an enterprise resource planning system.  This engagement included the analyses of various projections of operating performance and mitigating factors undertaken.



**Documents and information relied upon are cited throughout the report and/or listed below**                                                                                  **Exhibit 2**

*Legal Filings and Communications:*

Disclosure Statement for the Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code

*In re Trans World Airlines, Inc.* 134 F.3d 188 (3d Cir. 1998)

*Motion to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter into and Perform Under the Settlement Agreement*

*Production Documents:*

2.11.119 PEO - 21. Competitive SGA Breakout 2008-2014

2.11.119 PEO - Competitive SGA by BU 2008-2014  10062015

2.11.120 PEO - Summary of Sponsor Fees Updated 04032015

2.11.121 PEO - 5i. 2008-2014 Service Bill Historical View - AZH - 151001

2.11.32 PEO - Service Bill 2013- Sept 14 Actuals & Sep 14 Reconciliation

2015.04.14 [4145-1] Declaration in Support - Intercompany Settlement in Plan  - filed by TCEH Debtors Exhibit 1

Allocation of Purchase Price of Certain Acquired Tangible and Intangible Assets and Liabilities of Energy Future Holdings Corp. as of October 10, 2007 (EFH00058374)

April 1, 2010 email from Jonathan Smidt at KKR to Henry Kravis, et al. (LEG_SP_00022958)

ASC §350 – Goodwill and Indefinite-Lived Asset Impairment Test as of December 1, 2009 (CITIBANK0292821)

Board Strategy Session dated October 27, 2011 (EFH-SP00101089)

Equity Valuation Analysis as of December 1, 2009 – Confidential Presentation to the Board of Directors on February 22, 2010 (CITIBANK0000863)

Equity Valuation Analysis as of December 1, 2010 – Confidential Presentation to the Board of Directors on February 16, 2011 (CITIBANK0000334)

Equity Valuation Analysis as of December 1, 2012 – Confidential Presentation to the Board of Directors in February 2013 (EFH03484151)

Equity Valuation Analysis as of December 31, 2011 – Confidential Presentation to the Board of Directors in February 2012 (CITIBANK0001189)

Equity Valuation Analysis as of June 30, 2009 – Confidential Presentation to the Board of Directors on July 21, 2009 (CITIBANK0000073)

Equity Valuation Analysis as of June 30, 2010 – Confidential Presentation to the Board of Directors on July 16, 2010 (CITIBANK0000779)

Huron Consulting Group Energy Future Holdings Corp. Shared Services Review (EFCH00019308)

J.P. Morgan presentation dated March 2010 (EFH02992652)

KKR EFH Discussion Materials dated February 2012 (LEG_SP_00315318)

March 17, 2009 email from Jeff Liaw to Michael MacDougall (LEG_SP_00090309)

March 17, 2009 email from Paul Keglevic (EFH-SP00040957)

Quarterly Equity Valuation Analysis as of December 31, 2008 – Confidential Presentation to the Board of Directors on February 12, 2009 (CITIBANK0007404)

Quarterly Equity Valuation Analysis as of June 30, 2008 – Confidential Presentation to the Board of Directors on August 20, 2008 (EFH00085284)

Quarterly Equity Valuation Analysis as of March 31, 2008 – Confidential Presentation to the Board of Directors on May 15, 2008 (EFH03288113)

Quarterly Equity Valuation Analysis as of September 30, 2008 – Confidential Presentation to the Board of Directors on October 24, 2008 (EFH03483851)

SFAS 142 – Goodwill and Indefinite-Lived Asset Impairment Test as of December 31, 2008 (EFH00058589)

TXU Corp. Solvency Analysis Presentation dated October 10, 2007 (No Bates Stamp).

*Publicly Available Information:*

Bloomberg

Capital IQ

11 U.S.C. § 548(a)(1)(B)(ii)(III)

ASC §718: Share Based Payment"

Internal Revenue Service Revenue Ruling 59-60

Newton, Grant W. *Corporate Bankruptcy: Tools, Strategies, and Alternatives.*  John Wiley & Sons, Inc. 2003.  Page 171.

Pratt, Shannon P. *Valuing A Business: The Analysis and Appraisal of Closely Held Companies.* McGraw Hill. 2008.

Tex. Bus. & Com. Code Ann. § 24.005(a)(2)(B)

United States Bankruptcy Code §101(32)(A)

Energy Future Competitive Holdings Company Form 10-K for the fiscal year ended December 31, 2008

Energy Future Competitive Holdings Company Form 10-K for the fiscal year ended December 31, 2009

Energy Future Competitive Holdings Company Form 10-K for the fiscal year ended December 31, 2010

Energy Future Competitive Holdings Company Form 10-K for the fiscal year ended December 31, 2011

Energy Future Competitive Holdings Company Form 10-K for the fiscal year ended December 31, 2012

Energy Future Competitive Holdings Company Form 10-K for the fiscal year ended December 31, 2013

Energy Future Competitive Holdings Company Form 10-K for the fiscal year ended December 31, 2014

Energy Future Holdings Corp. Form 10-K for the fiscal year ended December 31, 2008

Energy Future Holdings Corp. Form 10-K for the fiscal year ended December 31, 2009

Energy Future Holdings Corp. Form 10-K for the fiscal year ended December 31, 2010

Energy Future Holdings Corp. Form 10-K for the fiscal year ended December 31, 2011

Energy Future Holdings Corp. Form 10-K for the fiscal year ended December 31, 2012

Energy Future Holdings Corp. Form 10-K for the fiscal year ended December 31, 2013

Energy Future Holdings Corp. Form 10-K for the fiscal year ended December 31, 2014

Energy Future Holdings Corp. Form 10-Q for the quarterly period ended June 30, 2010

Energy Future Holdings Corp. Form 10-Q for the quarterly period ended June 30, 2011

Energy Future Holdings Corp. Form 10-Q for the quarterly period ended June 30, 2015

Energy Future Holdings Corp. Form 10-Q for the quarterly period ended March 31, 2010

Energy Future Holdings Corp. Form 10-Q for the quarterly period ended March 31, 2011

Energy Future Holdings Corp. Form 10-Q for the quarterly period ended September 30, 2010

Energy Future Holdings Corp. Form 10-Q for the quarterly period ended September 30, 2011

Energy Future Intermediate Holding Company LLC Form 10-K for the fiscal year ended December 31, 2009

Energy Future Intermediate Holding Company LLC Form 10-K for the fiscal year ended December 31, 2010

Energy Future Intermediate Holding Company LLC Form 10-K for the fiscal year ended December 31, 2011

Energy Future Intermediate Holding Company LLC Form 10-K for the fiscal year ended December 31, 2012

Energy Future Intermediate Holding Company LLC Form 10-K for the fiscal year ended December 31, 2013

Energy Future Intermediate Holding Company LLC Form 10-K for the fiscal year ended December 31, 2014

Energy Future Intermediate Holding Company LLC Form 10-Q for the quarterly period ended June 30, 2015

Oncor Electric Delivery Company LLC Form 10-K for the fiscal year ended December 31, 2009

Oncor Electric Delivery Company LLC Form 10-K for the fiscal year ended December 31, 2010

Oncor Electric Delivery Company LLC Form 10-K for the fiscal year ended December 31, 2011

Oncor Electric Delivery Company LLC Form 10-K for the fiscal year ended December 31, 2012

Oncor Electric Delivery Company LLC Form 10-K for the fiscal year ended December 31, 2013

Oncor Electric Delivery Company LLC Form 10-K for the fiscal year ended December 31, 2014

PRIVILEGED AND CONFIDENTIAL – CONTAINS ATTORNEY-CLIENT COMMUNICATIONS

# ENERGY FUTURE HOLDINGS CORP.
## MINUTES OF THE EXECUTIVE COMMITTEE MEETING

| | |
|---|---|
| **Date:** | September 3, 2009 at 10:00 a.m., CDT |
| **Location:** | Telephone Conference Call Originating at Energy Future Holdings Corp., Energy Plaza, 1601 Bryan Street, Dallas, Texas |

| **Committee:** | Donald L. Evans | Frederick M. Goltz | Michael MacDougall | Kenneth Pontarelli | John F. Young |
|---|---|---|---|---|---|
| **Others:** | Scott Lebovitz | Jeffrey Liaw | Anthony R. Horton | Paul M. Keglevic | Robert C. Walters |
| | Lisa M. Winston | Andrew M. Wright | | | |
| **Advisors:** | Jason Ridloff *(KKR)* | Chris Holdyk *(TPG)* | Jack Weingart *(TPG)* | | |

A quorum was present, with Marc S. Lipschultz absent. All attendees participated in the meeting by telephone conference call. Evans, Chair, presided and Winston, Secretary, acted as secretary. Participants referred to the applicable materials provided in advance of the meeting.

**Project Nautilus:** Keglevic, Executive Vice President and Chief Financial Officer, summarized actions to date and market conditions affecting management's proposal to delever and restructure the Company's debt obligations. Keglevic provided an analysis of the debt reduction that could have been captured at various trading levels since June and described the principal advantages of implementing a new exchange priority in restructuring the Company's debt. Extensive discussions followed regarding timing considerations, restructuring options, incentives and risks associated with restructuring the existing debt to capture debt discounts. It was also noted that management would apprise the Company's Board of any decisions regarding a restructuring. Walters, Executive Vice President and General Counsel, reviewed the legal risks associated with the restructuring.     Redacted     Following a discussion on the pricing considerations, the Committee expressed its preference and then agreed to form a working group of directors and expert advisors to advise the proposed Pricing Committee regarding the price of any new notes under the contemplated restructuring. It was determined that the working group would consist of directors Liaw, Lebovitz and Smidt; expert advisors, Ridloff and Weingart; and certain management, namely Horton, Keglevic, Walters and Wright. Keglevic noted that the Company has other options in the event there is low participation in the exchange offer, and that it will be important to remain price disciplined during the exchange offer. Following further discussion, on motion duly seconded, the following were unanimously adopted:

WHEREAS, the Executive Committee (the "Committee") of the Board of Directors of Energy Future Holdings Corp. (the "Company") has determined that, subject to the satisfaction of the Condition (as defined below), it is desirable and in the best interests of the Company and its stockholders and subsidiaries that the Company and its wholly owned subsidiaries, Energy Future Intermediate Holding Company LLC ("Intermediate Holding") and EFIH Finance Inc. ("EFIH Finance"), commence offers to exchange (the "Exchange Offers") certain outstanding senior notes or other outstanding debt of the Company and/or its wholly owned subsidiaries, Texas Competitive Electric Holdings Company LLC ("TCEH") and TCEH Finance, Inc. (collectively, the "Old Notes"), for New Notes (as defined below);

WHEREAS, the Committee has determined that, subject to the satisfaction of the Condition, it is desirable and in the best interests of the Company and its stockholders and subsidiaries that, concurrently with the Exchange Offers, the Company make solicitations (the "Consent Solicitations") of consents (the "Consents") from holders of certain of the Old Notes to amendments (the "Proposed Amendments") to certain provisions in the indentures governing such Old Notes (the "Old Indentures"), which Proposed Amendments would modify or eliminate substantially all of the restrictive covenants contained in the Old Indentures, modify or eliminate certain events of default, modify covenants regarding mergers and consolidations and modify or eliminate certain other provisions;

WHEREAS, it is proposed that upon receipt of the requisite Consents as required under the Old Indentures to approve the Proposed Amendments, the Company, Intermediate Holding and the Company's wholly owned subsidiary, Energy Future Competitive Holdings Company ("EFCH Holdings"), as applicable, shall

Confidential

EFH00056655