# Exhibit Y

Execution Version

# Energy Future Holdings Corp.

## $500,000,000 10.000% Senior Secured Notes due 2020

---

### Purchase Agreement (the "Agreement")

January 7, 2010

Citigroup Global Markets Inc.
390 Greenwich Street, 4th Floor
New York, New York 10013

and

Goldman, Sachs & Co.
85 Broad Street
New York, New York 10004

and

Credit Suisse Securities (USA) LLC
11 Madison Avenue
New York, NY 10010

and

J.P. Morgan Securities Inc.
270 Park Avenue
New York, New York 10017

As representatives of the several Initial Purchasers
named in Schedule I hereto

Ladies and Gentlemen:

Energy Future Holdings Corp., a Texas corporation (the "**Issuer**"), proposes, subject to the terms and conditions stated herein, to issue and sell to the Initial Purchasers named in Schedule I hereto (each an "**Initial Purchaser**" and collectively, the "**Initial Purchasers**") for whom each of you are acting as representative (each, a "**Representative**" and collectively, the "**Representatives**") $500,000,000 aggregate principal amount of its 10.000% Senior Secured Notes due 2020 (the "**Securities**"). The Securities are to be issued pursuant to an indenture to be dated as of January 12, 2010 (the "**Indenture**") among the Issuer, Energy Future Competitive Holdings Company ("**EFCH**") and Energy Future Intermediate Holding Company LLC ("**EFIH**"), as guarantors (each a "**Guarantor**," and collectively, the "**Guarantors**"), and The Bank of New York Mellon Trust Company, N.A., as trustee (the "**Trustee**"). The Securities will be irrevocably and unconditionally guaranteed (the "**Guarantees**") as to payment of principal,

NYDOCS01/1221554.13

1

premium, if any, interest and Additional Interest (as defined in the Indenture), if any, on an unsubordinated basis, jointly and severally, by each of the Guarantors. The Guarantees will be set forth in the Indenture. EFIH's Guarantee of the Securities will have the benefit of a security interest in the membership interests and other investments that EFIH owns in Oncor Electric Delivery Holdings Company LLC as described in the Pricing Memorandum and the Offering Memorandum (defined below) (the "**Collateral**") and documented by a Pledge Agreement (the "**Pledge Agreement**") dated as of November 16, 2009, a Collateral Trust Joinder (the "**Joinder**") executed by the Trustee and acknowledged by The Bank of New York Mellon Trust Company, N.A., as collateral trustee (in such capacity, the "**Collateral Trustee**"), dated as of the date the Securities are issued (the "**Closing Date**"), the Collateral Trust Agreement dated November 16, 2009, among EFIH, The Bank of New York Mellon Trust Company, N.A. as trustee under indentures governing the Old Notes (as defined below) and the Collateral Trustee (the "**Collateral Trust Agreement**") and the Designation by EFIH of the Securities as "Additional Secured Debt" under the Collateral Trust Agreement (the "**Designation**") and other documents or instruments evidencing or creating or purporting to create a security interest in favor of the Collateral Trustee, for the benefit of the holders of Parity Lien Obligations (as defined in the Collateral Trust Agreement) (collectively, the "**Security Documents**"). The Parity Lien Obligations include the 9.75% Senior Secured Notes due 2019 of the Issuer (the "**Old EFH Notes**") and the 9.75% Senior Secured Notes due 2019 of EFIH and EFIH Finance Inc. (the "**EFIH Notes**," and together with the Old EFH Notes, the "**Old Notes**"). This Agreement, the Registration Rights Agreement (the "**Registration Rights Agreement**") to be dated as of the Time of Delivery (as defined below), the Securities, the Indenture and the Security Documents are hereinafter referred to collectively as the "**Transaction Documents**."

1.      The Issuer and the Guarantors, jointly and severally, represent and warrant to, and agree with, each of the Initial Purchasers that:

(a)      A preliminary offering memorandum, dated January 6, 2010 (the "**Preliminary Offering Memorandum**"), and an offering memorandum, dated January 7, 2010 (the "**Offering Memorandum**"), have been prepared in connection with the offering of the Securities. The Preliminary Offering Memorandum, as amended and supplemented immediately prior to the Applicable Time (as defined in Section 1(b)), is hereinafter referred to as the "**Pricing Memorandum**". All references in this Agreement to the Preliminary Offering Memorandum, the Pricing Memorandum or the Offering Memorandum shall be deemed as of the relevant time and date to refer to and include the documents incorporated by reference therein. Any reference to the Preliminary Offering Memorandum, the Pricing Memorandum or the Offering Memorandum shall be deemed to refer to and include any Additional Issuer Information (as defined in Section 5(f)) furnished by the Issuer on or prior to the completion of the distribution of the Securities. The Preliminary Offering Memorandum or the Offering Memorandum and any amendments or supplements thereto did not and will not, as of their respective dates, contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided, however,* that this representation and warranty shall not apply to any statements or omissions made in reliance upon and in conformity with information furnished in writing to the Issuer by an Initial Purchaser through the Representatives expressly for use therein;

Confidential                                                                                        EFH02433637

(b)     For the purposes of this Agreement, the "**Applicable Time**" is 10:40 a.m. (Eastern time) on the date of this Agreement; the Pricing Memorandum, as supplemented by the information set forth in Schedule III hereto, taken together (collectively, the "**Pricing Disclosure Package**") as of the Applicable Time, did not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; and each Issuer Supplemental Disclosure Document (as defined in Section 6(a)(i)) listed on Schedule II(a) hereto does not conflict with the information contained in the Pricing Memorandum or the Offering Memorandum and each such Issuer Supplemental Disclosure Document, as supplemented by and taken together with the Pricing Disclosure Package as of the Applicable Time, did not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided, however,* that this representation and warranty shall not apply to statements or omissions made in an Issuer Supplemental Disclosure Document in reliance upon and in conformity with information furnished in writing to the Issuer by an Initial Purchaser through the Representatives expressly for use therein;

(c)     None of the Issuer or any subsidiary of the Issuer has sustained since the date of the latest audited financial statements included in the Pricing Memorandum any material loss or interference with its business from fire, explosion, flood or other calamity, whether or not covered by insurance, or from any labor dispute or court or governmental action, order or decree, otherwise than as set forth or contemplated in the Pricing Memorandum; and, since the respective dates as of which information is given in the Pricing Memorandum, there has not been any change in the capital stock (other than repurchases of capital stock from employees in the ordinary course of business) or long-term debt (other than borrowings under revolving credit facilities in the ordinary course of business, payment of debt on scheduled maturities, payment of in-kind interest pursuant to the terms of debt agreements, the issuance of the Old Notes and any acquisition of indebtedness pursuant to the exchange offers disclosed in the Pricing Memorandum and the Offering Memorandum) of the Issuer or any subsidiary of the Issuer (other than Oncor Electric Delivery Holdings Company LLC and its subsidiaries), or any material adverse change, or any development involving a prospective material adverse change, in or affecting the general affairs, management, financial position, stockholders' equity or results of operations of the Issuer or the Issuer's subsidiaries, in each case otherwise than as set forth or contemplated in the Pricing Memorandum;

(d)     The Issuer and the Issuer's subsidiaries have good and marketable title in fee simple to all real property and good and marketable title to all personal property described in the Pricing Memorandum and the Offering Memorandum as owned by them, in each case free and clear of all liens, encumbrances and defects except (i) such as are described in the Pricing Memorandum and Offering Memorandum, (ii) liens granted on, or in connection with the sale of, Transition Bonds or Transition Property (each as defined in the Public Utility Regulatory Act ("**PURA**") contained in the Texas Utilities Code) or in connection with the issuance of, or to secure the payment of, transition bonds issued pursuant to PURA or pursuant to a financing order issued by the Public Utility Commission of

Texas ("**PUCT**"), (iii) any security interest, mortgage, pledge, lien, encumbrance or claim ("**Liens**") granted under the Security Documents (iv) any Lien granted in connection with the Oncor Revolving Credit Facility (as defined in the Pricing Memorandum and Offering Memorandum) and the TCEH Senior Secured Facilities (as defined in the Issuer's Form 10-K for the year ended December 31, 2008, filed with the Securities and Exchange Commission (the "**Commission**")) or (v) such as do not materially affect the value of such property and do not materially interfere with the use made and proposed to be made of such property by the Issuer and the Issuer's subsidiaries; except as described in the Pricing Memorandum and the Offering Memorandum, any real property and buildings held under lease by the Issuer and the Issuer's subsidiaries are held by them under valid, subsisting and enforceable leases, assuming due authorization, execution and delivery by the other parties to such leases, subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding at equity or at law), with such exceptions as are not material and do not materially interfere with the use made and proposed to be made of such property and buildings by the Issuer and the Issuer's subsidiaries. Consistent with the final order in PUCT Docket No. 34077, no assets owned by Oncor Electric Delivery Company LLC have been pledged to support any debt of the Issuer;

(e)     The Issuer and each of the Guarantors has been duly incorporated or formed and is validly existing as a corporation or limited liability company, as applicable, in good standing under the laws of their respective jurisdictions of incorporation or organization, with power and authority (corporate or limited liability company, as applicable) to own, lease and/or operate its properties and conduct its business as described in the Pricing Memorandum and the Offering Memorandum, and has been duly registered or qualified as a foreign corporation or limited liability company, as the case may be, for the transaction of business and is in good standing under the laws of each other jurisdiction in which it owns or leases properties or conducts any business so as to require such qualification, except where the failure to so qualify or to be in good standing could not reasonably be expected to result in a material adverse effect upon the business, properties, financial condition or earnings of the Issuer and the Issuer's subsidiaries taken as a whole (a "**Material Adverse Effect**"); and each subsidiary of the Issuer has been duly incorporated or formed and is validly existing as a corporation, limited partnership or limited liability company, as applicable, in good standing under the laws of its jurisdiction of incorporation, formation or organization;

(f)     As of September 30, 2009, the Issuer had an authorized capitalization as set forth in the Pricing Memorandum and the Offering Memorandum, and all of the issued shares of capital stock of the Issuer have been duly and validly authorized and issued and are fully paid and non-assessable; and all of the issued shares of capital stock, partnership interests or membership interests, as the case may be, of each subsidiary of the Issuer have been duly and validly authorized and issued, are fully paid and non-assessable, and (except for Oncor Electric Delivery Company LLC, DFW Midstream Services LLC, Comanche Peak Nuclear Power Company LLC and LSGT SACROC, Inc.) are owned directly or indirectly by the Issuer, free and clear of all liens and preemptive or similar rights, except

Confidential                                                                      EFH02433639

for (i) liens created pursuant to the TCEH Senior Secured Facilities, (ii) Liens granted under the Security Documents and (iii) preemptive or similar rights granted under the Investor Rights Agreement (as defined in the Pricing Memorandum and the Offering Memorandum);

(g)     The Issuer has duly authorized, executed and delivered this Agreement;

(h)     At the Time of Delivery (as defined below), the Indenture will have been duly authorized by the Issuer and each of the Guarantors, and, when executed and delivered by the Issuer and the Guarantors and, assuming due authorization, execution and delivery thereof by the Trustee, the Indenture will constitute a valid and legally binding instrument of the Issuer and the Guarantors, enforceable against the Issuer and the Guarantors in accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding in equity or at law); at the Time of Delivery, the Securities will have been duly authorized by the Issuer and, when executed and authenticated by the Trustee in accordance with the provisions of the Indenture and delivered to and paid for by the Initial Purchasers pursuant to this Agreement, will have been duly executed, authenticated, issued and delivered by the Issuer and will constitute valid and legally binding obligations of the Issuer, entitled to the benefits provided by the Indenture, subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding in equity or at law); and the Securities and the Indenture will conform to the descriptions thereof in the Pricing Disclosure Package and the Offering Memorandum and will be in substantially the forms previously delivered to you;

(i)     At the Time of Delivery, the Guarantees will have been duly authorized by each of the Guarantors and, upon execution of the Indenture by the Guarantors, will have been duly issued and delivered and will constitute valid and legally binding obligations of each of the Guarantors, entitled to the benefits provided by the Indenture subject, as to enforcement, to applicable bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding in equity or at law); and the Guarantees will conform to the descriptions thereof in the Pricing Disclosure Package and the Offering Memorandum;

(j)     At the Time of Delivery, the Registration Rights Agreement, which will be substantially in the form previously delivered to you, will have been duly authorized by the Issuer and each of the Guarantors and, as of the Time of Delivery, will have been duly executed and delivered by the Issuer and each of the Guarantors, and (assuming due authorization, execution and delivery thereof by the Initial Purchasers) will constitute a valid and legally binding instrument of the Issuer and the Guarantors enforceable against the Issuer and the Guarantors in accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding in equity or at law); and the Registration Rights Agreement will

Confidential                                                                EFH02433640

conform to the description thereof in the Pricing Disclosure Package and the Offering Memorandum;

(k) At the Time of Delivery, the securities to be offered in exchange for the Securities pursuant to the Registration Rights Agreement (collectively, the "**Exchange Securities**") will have been duly authorized by the Issuer, and, when issued and delivered pursuant to this Agreement, the Registration Rights Agreement and the Indenture, will have been duly executed, authenticated, issued and delivered and will constitute valid and legally binding obligations of the Issuer, entitled to the benefits provided by the Registration Rights Agreement and the Indenture, subject, as to enforcement, to applicable bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding in equity or at law); and the Exchange Securities will conform to the descriptions thereof in the Pricing Disclosure Package and the Offering Memorandum;

(l) At the Time of Delivery, the guarantees of the Exchange Securities by the Guarantors will have been duly authorized by each of the Guarantors and, when issued and delivered pursuant to the Registration Rights Agreement and the Indenture, will have been duly issued and delivered and will constitute valid and legally binding obligations of the Guarantors, entitled to the benefits provided by the Registration Rights Agreement and the Indenture subject, as to enforcement, to applicable bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding in equity or at law); and the guarantees of the Exchange Securities will conform to the descriptions thereof in the Pricing Disclosure Package and the Offering Memorandum;

(m) None of the transactions contemplated by this Agreement (including, without limitation, the use of the proceeds from the sale of the Securities as described in the Pricing Memorandum and the Offering Memorandum) will violate or result in a violation of Section 7 of the United States Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), or any regulation promulgated thereunder, including, without limitation, Regulations T, U, and X of the Board of Governors of the Federal Reserve System;

(n) Prior to the date hereof, neither the Issuer, the Guarantors nor any of their respective affiliates that are controlled by the Issuer have taken any action, directly or indirectly, which is designed to or which has constituted or which might have been expected to cause or result, under the Exchange Act or otherwise, in stabilization or manipulation of the price of any security of the Issuer in connection with the offering of the Securities;

(o) Except as set forth or contemplated in the Pricing Memorandum and the Offering Memorandum, the issue and sale of the Securities and the compliance by each of the Issuer and the Guarantors with all of the provisions of the Transaction Documents to which they are a party and the consummation of the transactions herein and therein contemplated will not conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Issuer or any subsidiary of the Issuer is a party or by

Confidential    EFH02433641

which the Issuer or any subsidiary of the Issuer is bound or to which any of the property or assets of the Issuer or any subsidiary of the Issuer is subject, except for such conflicts, breaches, violations or defaults that could not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect; nor will such action result in any violation of (i) the provisions of the Certificate of Incorporation or By-laws or other organizational documents of the Issuer or any subsidiary of the Issuer or (ii) any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over the Issuer or any subsidiary of the Issuer or any of their respective properties, except in the case of (ii) where such violations could not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect; and no consent, approval, authorization, order, registration or qualification of or with any such court or governmental agency or body (each, a "**Governmental Consent**") is required in connection with the issuance and sale of the Securities or the consummation by the Issuer or the Guarantors of the transactions contemplated by this Agreement and the other Transaction Documents to which they are a party, except for Governmental Consents as may have been obtained or may be required in connection with the registration of the Securities and the Guarantees with the Commission pursuant to the United States Securities Act of 1933, as amended (the "**Act**"), pursuant to the Registration Rights Agreement and for such Governmental Consents as may be required under state securities or blue sky laws in connection with the purchase and distribution of the Securities by the Initial Purchasers and the issuance of the Guarantees in the manner contemplated herein and in the Pricing Memorandum and Offering Memorandum or the failure to obtain which would not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect;

(p)    Neither the Issuer nor any subsidiary of the Issuer is (i) in violation of its Certificate of Incorporation or By-laws or other organizational documents or (ii) in default in the performance or observance of any material obligation, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement, lease or other agreement or instrument to which it is a party or by which it or any of its properties may be bound, except in connection with clause (ii) as could not reasonably be expected to result in a Material Adverse Effect;

(q)    The statements set forth in the Pricing Memorandum and the Offering Memorandum under the heading "Certain United States Federal Tax Consequences" insofar as such statements constitute a summary of the legal matters referred to therein, fairly present and summarize, in all material respects, the matters referred to therein; and the statements under the heading "Description of the Notes," insofar as they purport to constitute a summary of the terms of the Securities, are accurate in all material respects;

(r)    The audited consolidated financial statements included in the Pricing Memorandum and the Offering Memorandum, together with the related notes, present fairly, in all material respects, the consolidated financial position of the Issuer and its subsidiaries as of the dates indicated and the consolidated results of operations and cash flows of the Issuer and its subsidiaries for the periods specified and have been prepared in all material respects in conformity with United States generally accepted accounting principles applied on a consistent basis during the periods presented (except as otherwise noted therein); the other

Confidential                                                                    EFH02433642

financial and statistical data set forth in the Pricing Memorandum and the Offering Memorandum under the caption "Summary Historical Consolidated Financial Data" are accurately presented in all material respects and where applicable, have been prepared on a basis consistent with the financial statements and books and records of the Issuer; there are no financial statements (historical or pro forma) that would be required to be included in a registration statement under the Act if the Securities were being registered thereunder that are not included in the Pricing Memorandum and the Offering Memorandum;

(s)    Other than as set forth in the Pricing Memorandum, there are no legal or governmental proceedings pending to which the Issuer or any subsidiary of the Issuer is a party or of which any property of the Issuer or any subsidiary of the Issuer is the subject that, if determined adversely to the Issuer or any subsidiary of the Issuer, (i) would individually or in the aggregate reasonably be expected to result in a Material Adverse Effect or (ii) would reasonably be expected to result in a material adverse effect on the performance by the Issuer of the Transaction Documents, the issuance of the Securities or the consummation of any of the transactions contemplated hereby or thereby or described in the Pricing Memorandum and the Offering Memorandum, and to the Issuer's knowledge, no such proceedings are threatened;

(t)    The Issuer and each of the Issuer's subsidiaries maintains insurance covering its properties, operations, personnel and businesses as the Issuer or its subsidiaries deem adequate and customary for companies engaged in similar businesses and all such policies are in full force and effect in all material respects, except where a failure to maintain such insurance policies would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect;

(u)    The Issuer and each of the Issuer's subsidiaries own, possess or can acquire on reasonable terms, adequate rights to use all trademarks, trade names and other rights to inventions, know-how, patents, copyrights, confidential information and other intellectual property (collectively, "**intellectual property rights**") described in the Offering Memorandum as being owned by it or necessary for the conduct of its business (except where a failure to own or possess such intellectual property rights could not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect), and have not received any notice of infringement of or conflict with asserted rights of others with respect to any intellectual property rights, except where any such notice the result of which, individually or in the aggregate, if the subject of an unfavorable decision, ruling or finding, would reasonably result in a Material Adverse Effect;

(v)    (i) Except for such matters that could not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect, neither the Issuer nor any subsidiary of the Issuer (A) is in violation of any statute, any rule, regulation, decision or order of any governmental agency or body or any court, domestic or foreign, relating to the use, disposal or release into the environment of regulated, hazardous or toxic substances or relating to the protection or restoration of the environment or human exposure to hazardous or toxic substances (collectively, the "**environmental laws**"), (B) owns or operates any real property contaminated with any regulated, hazardous or toxic substance that is subject to any remedial

Confidential

EFH02433643

obligation or other liabilities pursuant to any environmental laws, (C) is liable for any off-site disposal or contamination pursuant to any environmental laws, or (D) is subject to any claim arising pursuant to any environmental laws; and (ii) except for the request for information issued by the Environmental Protection Agency under Section 114 of the Clean Air Act in connection with the Big Brown, Monticello and Martin Lake facilities described in the Pricing Memorandum and the Offering Memorandum, the Issuer is not aware of any pending investigation pursuant to any environmental laws which would reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect;

(w)     When the Securities are issued and delivered pursuant to this Agreement and the Indenture, the Securities will not be of the same class (within the meaning of Rule 144A(d)(3) under the Act) as any security of the Issuer which is listed on a national securities exchange registered under Section 6 of the Exchange Act or quoted in a U.S. automated inter-dealer quotation system;

(x)     None of the Issuer or either of the Guarantors is, and after giving effect to the offering and sale of the Securities and the application of the proceeds thereof as described in the Offering Memorandum, none of them will be an "investment company", as such term is defined in the United States Investment Company Act of 1940, as amended (the "**Investment Company Act**");

(y)     Neither the Issuer, the Guarantors nor any person acting on its or their behalf (provided that no representation is made as to the Initial Purchasers or any person acting on their behalf) has offered or sold the Securities by means of any general solicitation or general advertising within the meaning of Rule 502(c) under the Act or, with respect to Securities sold outside the United States to non-U.S. persons (as defined in Rule 902 under the Act), by means of any directed selling efforts within the meaning of Rule 902 under the Act, and the Issuer, any affiliate controlled by the Issuer and any person acting on its or their behalf has complied with and will implement the "offering restrictions" within the meaning of such Rule 902;

(z)     Within the six months preceding the date hereof, neither the Issuer, the Guarantors nor any other person acting on their respective behalf has offered or sold to any person any Securities, or any securities of the same or a similar class as the Securities, other than the Old Notes and the Securities offered or sold to the Initial Purchasers hereunder. The Issuer will take reasonable precautions designed to ensure that any offer or sale, direct or indirect, in the United States or to any U.S. person (as defined in Rule 902 under the Act) of any Securities or any substantially similar security issued by the Issuer, within six months subsequent to the date on which the distribution of the Securities has been completed (as notified to the Issuer by the Representatives), is made under restrictions and other circumstances reasonably designed not to affect the status of the offer and sale of the Securities in the United States and to U.S. persons contemplated by this Agreement as transactions exempt from the registration provisions of the Act;

(aa)    The Issuer and its subsidiaries, on a consolidated basis, maintain a system of internal control over financial reporting (as such term is defined in Rule 13a-15(f) of the Exchange Act) that complies with the requirements of the Exchange Act

Confidential                                                                                      EFH02433644

and has been designed by the Issuer's principal executive officer and principal financial officer, or under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with United States generally accepted accounting principles. The internal control over financial reporting of the Issuer is effective and the Issuer is not aware of any material weaknesses in its internal control over financial reporting;

(bb)    Since the date of the latest audited financial statements included in the Pricing Memorandum, there has been no change in the internal control over financial reporting of the Issuer and its subsidiaries that has materially affected, or is reasonably likely to materially affect, the internal control over financial reporting of the Issuer and its subsidiaries;

(cc)    The Issuer and its subsidiaries, on a consolidated basis, maintain disclosure controls and procedures (as such term is defined in Rule 13a-15(e) of the Exchange Act) that comply with the requirements of the Exchange Act; such disclosure controls and procedures have been designed to ensure that material information relating to the Issuer and its subsidiaries is made known to the Issuer's principal executive officer and principal financial officer by others within those entities; and such disclosure controls and procedures are effective;

(dd)    Deloitte & Touche LLP, which has audited certain financial statements of the Issuer and its subsidiaries, is an independent registered public accounting firm as required by the Act and the rules and regulations of the Commission thereunder;

(ee)    The Issuer is subject to and in compliance in all material respects with the reporting requirements of Section 13 or Section 15(d) of the Exchange Act;

(ff)    At the Time of Delivery, the Security Documents will have been duly authorized, executed and delivered by EFIH (to the extent it is a party thereto) and, assuming due authorization, execution and delivery thereof by the other parties thereto, will constitute valid and legally binding instruments of EFIH (to the extent it is a party thereto), enforceable against EFIH in accordance with their terms, subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding in equity or at law); and, the Pledge Agreement and the Collateral Trust Agreement conform to the descriptions in the Pricing Disclosure Package and Offering Memorandum in all material respects;

(gg)    The Pledge Agreement, after giving effect to the Joinder and the Designation, is effective to create a valid security interest in the Collateral in favor of the Collateral Trustee for the benefit of the holders of Parity Lien Obligations (including the Securities); and the Collateral Trust Agreement, upon delivery of the Designation and execution of the Joinder thereto by the Collateral Trustee and the Trustee, will provide that the Collateral Trustee holds the Collateral for the benefit of the holders of Secured Debt Obligations (as defined in the Collateral Trust Agreement) (including the Securities) subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws of general applicability

Confidential                                                          EFH02433645

relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding in equity or at law);

(hh)     At the Time of Delivery, EFIH will own the Collateral covered by the Security Documents, free and clear of any Liens, except for (i) Liens granted under the Security Documents; (ii) pre-emptive or similar rights granted under the Investor Rights Agreement (as defined in the Pricing Memorandum and the Offering Memorandum); and (iii) the PUCT's right to approve any change in majority ownership, controlling ownership or operational control of Oncor Electric Delivery Company LLC as described in the Pricing Memorandum and the Offering Memorandum.

(ii)     At the Time of Delivery, the security interest of the Collateral Trustee for the benefit of the holders of Parity Lien Obligations (including the Securities) in the Collateral will be perfected by the prior filing of the financing statement in the appropriate office on November 16, 2009;

(jj)     The Issuer and each Guarantor is and immediately after the Time of Delivery, will be Solvent.  As used herein, the term "Solvent" means, (x) with respect to EFIH on a particular date, that on such date (i) the fair market value of the assets of such person is greater than the total amount of liabilities (including contingent liabilities) of such person, (ii) the present fair salable value of the assets of such person is greater than the amount that will be required to pay the probable liabilities of such person on its debts as they become absolute and matured, (iii) such person is able to realize upon its assets and pay its debts and other liabilities, including contingent obligations, as they mature and (iv) such person does not have unreasonably small capital, and (y) with respect to the Issuer and EFCH on a particular date, that on such date (i) such person is able to realize upon its assets and pay its debts and other liabilities, including contingent obligations, as they mature and (ii) such person does not have unreasonably small capital;

(kk)     Assuming the accuracy of the representations, warranties and agreements set forth in this Section 1 of this Agreement and compliance with the limitations and restrictions contained under the heading "Notice to Investors" in the Pricing Memorandum and the Offering Memorandum, it is not necessary in connection with the offer and delivery of the Securities, in the manner contemplated by this Agreement, the Pricing Memorandum and the Offering Memorandum, to register any of the Securities or the Guarantees under the Act, or to qualify the Indenture under the Trust Indenture Act of 1939, as amended, except as may be required under the Registration Rights Agreements; and

(ll)     Any certificate signed by any officer of the Issuer or any Guarantor and delivered to the Initial Purchasers or counsel for the Initial Purchasers in connection with the offering shall be deemed a representation and warranty by the Issuer and each Guarantor, as applicable, as to matters covered thereby to the Initial Purchasers.

2.     Subject to the terms and conditions herein set forth, the Issuer agrees to issue and sell to each of the Initial Purchasers, and each of the Initial Purchasers agrees, severally and not jointly, to purchase from the Issuer, at a purchase price of 97.75% of the principal

Confidential                                                     EFH02433646

amount thereof, the respective principal amount of the Securities set forth opposite the name of such Initial Purchaser in Schedule I hereto.

3.  Upon the authorization by the Issuer of the release of the Securities, the several Initial Purchasers propose to offer the Securities for sale upon the terms and conditions set forth in this  Agreement and the Offering Memorandum and each Initial Purchaser, severally and not jointly, hereby represents and warrants to, and agrees with the Issuer and the Guarantors that:

   (a)  It will offer and sell the Securities only to (i) persons who it reasonably believes are "qualified institutional buyers" within the meaning of Rule 144A under the Act in transactions meeting the requirements of Rule 144A or (ii) upon the terms and conditions set forth in Annex I to this Agreement;

   (b)  It is an Institutional Accredited Investor; and

   (c)  It will not offer or sell the Securities by any form of general solicitation or general advertising, including but not limited to the methods described in Rule 502(c) under the Act.

4.  (a)  The Securities to be purchased by each Initial Purchaser hereunder will be represented by one or more definitive global Securities in book-entry form which will be deposited by or on behalf of the Issuer with The Depository Trust Company ("**DTC**") or its designated custodian. The Issuer will deliver the Securities to Citigroup Global Markets Inc., for the account of each Initial Purchaser, against payment by or on behalf of such Initial Purchaser of the purchase price therefor by wire transfer in Federal (same day) funds, by causing DTC to credit the Securities to the account of Citigroup Global Markets Inc. at DTC.  The Issuer will cause the certificates representing the Securities to be made available to the Initial Purchasers for checking at least twenty-four hours prior to the Time of Delivery (as defined below) at the office of Vinson & Elkins L.L.P., 2001 Ross Avenue, Suite 3700, Dallas, Texas 75201 (the "**Closing Location**"). The time and date of such delivery and payment shall be 9:30 a.m., New York City time, on January 12, 2010, or such other time and date as the Initial Purchasers and the Issuer may agree upon in writing. Such time and date are herein called the "**Time of Delivery**."

   (b)  The documents to be delivered at the Time of Delivery by or on behalf of the parties hereto pursuant to Section 8 hereof, including the cross-receipt for the Securities and any additional documents requested by the Initial Purchasers pursuant to Section 8(i) hereof, will be delivered at such time and date at the Closing Location, and the Securities will be delivered at DTC (or its designated custodian), all at the Time of Delivery. A meeting will be held at the Closing Location at 4:00 p.m., New York City time, on the New York Business Day next preceding the Time of Delivery, at which meeting the final drafts of the documents to be delivered pursuant to the preceding sentence will be available for review by the parties hereto.  For the purposes of this Section 4, "**New York Business Day**" shall mean each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which banking institutions in New York are generally authorized or obligated by law or executive order to close.

Confidential                                                                                    EFH02433647

5.    The Issuer and the Guarantors jointly and severally agree with each of the Initial Purchasers:

(a)    The Issuer will prepare the Offering Memorandum in a form approved by the Initial Purchasers and will furnish the Initial Purchasers with copies thereof; to make no amendment or any supplement to the Offering Memorandum which shall be disapproved by the Initial Purchasers promptly after reasonable notice thereof;

(b)    The Issuer will promptly from time to time  use its reasonable best efforts to obtain the registration or qualification of the Securities for offer or sale by the Initial Purchasers under the securities laws or blue sky laws of such U.S. jurisdictions as they may request and to comply with such laws so as to permit the continuance of sales and dealings therein in such jurisdictions for as long as may be necessary to complete the distribution of the Securities; provided that in no event shall the Issuer or the Guarantors be obligated to qualify to do business in any jurisdiction in which it is not now so qualified or to take any action that would subject it to service of process in suits, other than those arising out of the offering or sale of the Securities, in any jurisdiction in which it is not now so subject. The Issuer will promptly advise the Initial Purchasers of the receipt by the Issuer of any notification with respect to the suspension of the qualification of the Securities for sale in any U.S. jurisdiction or the initiation or threatening of any proceeding for such purpose.

(c)    The Issuer will furnish the Initial Purchasers with written and electronic copies of the Offering Memorandum in such quantities as the Initial Purchasers may from time to time reasonably request, and if, at any time prior to the expiration of six months after the date of the Offering Memorandum, any event shall have occurred as a result of which the Offering Memorandum as then amended or supplemented would include an untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made when such Offering Memorandum is delivered, not misleading, or, if for any other reason it shall be necessary or desirable during such same period to amend or supplement the Offering Memorandum, to notify the Initial Purchasers and upon the request of the Initial Purchasers to prepare and furnish without charge to each Initial Purchaser and to any dealer in securities as many written and electronic copies as they may from time to time reasonably request of an amended Offering Memorandum or a supplement to the Offering Memorandum which will correct such statement or omission or effect such compliance;

(d)    During the period beginning from the date hereof and continuing until the date that is 30 days after the Time of Delivery, the Issuer will not and, up to the Closing Date, the Issuer will use its commercially reasonable efforts to cause the Guarantors not to, offer, sell, contract to sell or otherwise dispose of, or pledge or grant security interests on, except as provided hereunder, any securities of the Issuer that are substantially similar to the Securities, without the prior written consent of the Initial Purchasers;

(e)    Not to be or become, at any time prior to the expiration of two years after the Time of Delivery, an open-end investment company, unit investment trust,

closed-end investment company or face-amount certificate company that is or is required to be registered under Section 8 of the Investment Company Act;

(f)     At any time when the Issuer is not subject to Section 13 or 15(d) of the Exchange Act, for the benefit of holders from time to time of Securities, to furnish at its expense, upon request, to holders of Securities and prospective purchasers of Securities information (the "**Additional Issuer Information**") satisfying the requirements of subsection (d)(4)(i) of Rule 144A under the Act;

(g)     Until the issuance of the Exchange Securities or the effectiveness of the resale registration statement contemplated by the Registration Rights Agreement, the Issuer will not, and will not permit any of its affiliates (as defined in Rule 144 under the Act) controlled by the Issuer to, resell any of the Securities which constitute "restricted securities" under Rule 144 that have been reacquired by any of them;

(h)     To use the net proceeds received by the Issuer from the sale of the Securities pursuant to this Agreement in the manner specified in the Pricing Memorandum under the caption "Use of Proceeds."

(i)     Neither the Issuer, the Guarantors nor any of their respective affiliates that are controlled by the Issuer will take any action, directly or indirectly, which is designed to or which has constituted or which might have been expected to cause or result, under the Exchange Act or otherwise, in stabilization or manipulation of the price of any security of the Issuer in connection with the offering of the Securities;

6.     (a)     (i)     The Issuer represents and agrees that, without the prior consent of the Initial Purchasers, it has not made and will not make any offer relating to the Securities that, if the offering of the Securities contemplated by this Agreement were conducted as a public offering pursuant to a registration statement filed under the Act with the Commission, would constitute an "issuer free writing prospectus," as defined in Rule 433 under the Act (any such offer is hereinafter referred to as a "**Issuer Supplemental Disclosure Document**");

(ii)     Each Initial Purchaser represents and agrees that, without the prior consent of the Issuer and the Representatives, other than one or more term sheets relating to the Securities containing customary information and conveyed to purchasers of securities, it has not made and will not make any offer relating to the Securities that, if the offering of the Securities contemplated by this Agreement were conducted as a public offering pursuant to a registration statement filed under the Act with the Commission, would constitute a "free writing prospectus," as defined in Rule 405 under the Act, required to be filed with the Commission or retained by the Issuer pursuant to Rule 433 under the Act (any such offer (other than any such term sheets), is hereinafter referred to as an "**Initial Purchaser Supplemental Disclosure Document**"); and

Confidential                                                                                                    EFH02433649

(iii)    Any Issuer Supplemental Disclosure Document or Initial Purchaser Supplemental Disclosure Document the use of which has been consented to by the Issuer and the Initial Purchasers is listed on Schedule II hereto.

7.    The Issuer and each of the Guarantors, jointly and severally, covenants and agrees with the several Initial Purchasers that the Issuer and each of the Guarantors will pay or cause to be paid the following: (i) the fees, disbursements and expenses of the Issuer's counsels and accountants in connection with the issue of the Securities and all other expenses in connection with the preparation, printing, reproduction and filing of the Pricing Memorandum and the Offering Memorandum and any amendments and supplements thereto and the mailing and delivering of copies thereof to the Initial Purchasers and dealers; (ii) the cost of printing or producing any agreement among the Initial Purchasers, this Agreement, the Indenture, the Registration Rights Agreement, the Security Documents, the blue sky memorandum, closing documents (including any compilations thereof) and any other documents in connection with the offering, purchase, sale and delivery of the Securities; (iii) all expenses in connection with any registration or qualification of the Securities and the Guarantees for offer and sale under the blue sky laws of the several states as provided in Section 5(b) or any non-U.S. jurisdiction (including filing fees and the reasonable fees and expenses of counsel for the Initial Purchasers relating to such registration and qualification); (iv) any fees charged by securities rating services for rating the Securities; (v) the cost of preparing, authenticating, issuing and delivering the Securities; (vi) the fees and expenses of the Trustee and the Collateral Trustee, respectively, and any agent of the Trustee and the Collateral Trustee, respectively, and the fees and disbursements of counsel for the Trustee and the Collateral Trustee, respectively, in connection with the Indenture, the Security Documents and the Securities; and (vii) all other costs and expenses incident to the performance by the Issuer and the Guarantors of their respective obligations hereunder which are not otherwise specifically provided for in this Section. It is understood, however, that, except as provided in this Section, and Sections 9 and 12 hereof, (a) the Initial Purchasers will pay all of their own costs and expenses, including the fees of their counsel, transfer taxes on resale of any of the Securities by them, and any advertising expenses connected with any offers they may make, (b) the Issuer and the Initial Purchasers shall bear all of their respective travel expenses in connection with any "roadshow" presentations to investors, and (c) the Issuer, on the one hand, and the Initial Purchasers, on the other hand, shall each pay 50% of the cost of any chartered plane used in connection with such "roadshow" presentations.

8.    The obligations of the Initial Purchasers under this Agreement shall be subject to the accuracy of the representations and warranties on the part of the Issuer and the Guarantors contained herein at the Time of Delivery (unless such representation or warranty speaks only as of a certain date, in which case such representation and warranty need only be true as of such date), to the accuracy, as of the date of such certificate, of the statements of the Issuer and the Guarantors made in any certificates pursuant to the provisions hereof, to the performance by the Issuer and the Guarantors of their obligations hereunder and to the following additional conditions:

(a)    Shearman & Sterling LLP, counsel for the Initial Purchasers, shall have furnished to the Initial Purchasers their written opinion and negative assurance letter, in each case, dated the Time of Delivery, with respect to such matters as the Representatives may reasonably request, and such counsel shall have received

Confidential                                                                                      EFH02433650

such papers and information as they may reasonably request to enable them to pass upon such matters;

(b)    (i)    Simpson Thacher & Bartlett LLP, counsel for the Issuer and the Guarantors, shall have furnished to you their written opinion, dated the Time of Delivery, substantially in the form of Exhibit A-1 hereto, subject to customary qualifications, assumptions and exceptions;

    (ii)    Vinson & Elkins LLP, counsel for the Issuer and the Guarantors, shall have furnished to you their written opinion and negative assurance letter, dated the Time of Delivery, substantially in the form of Exhibit A-2 hereto, subject to customary qualifications, assumptions and exceptions;

    (iii)    Morgan, Lewis & Bockius LLP, Nuclear Regulatory Commission counsel for the Issuer and the Guarantors, shall have furnished to you their written opinion, dated the Time of Delivery, substantially in the form of Exhibit A-3 hereto, subject to customary qualifications, assumptions and exceptions; and

    (iv)    Andrew M. Wright, Vice President and Associate General Counsel of EFH Corporate Services Company, a wholly-owned subsidiary of the Issuer, shall have furnished to you his written opinion, dated the Time of Delivery, substantially in the form of Exhibit A-4 hereto, subject to customary qualifications, assumptions and exceptions;

(c)    On the date of the Offering Memorandum prior to the execution of this Agreement and also at the Time of Delivery, Deloitte & Touche LLP shall have furnished to the Initial Purchasers a letter or letters, dated the respective dates of delivery thereof, in form and substance satisfactory to the Initial Purchasers;

(d)    (A) None of the Issuer or any of the Issuer's subsidiaries shall have sustained since the date of the latest audited financial statements included in the Pricing Memorandum any loss or interference with its business from fire, explosion, flood or other calamity, whether or not covered by insurance, or from any labor dispute or court or governmental action, order or decree, otherwise than as set forth or contemplated in the Pricing Memorandum, and (B) subsequent to the date hereof or, if earlier, the dates as of which information is given in the Pricing Disclosure Package and the Offering Memorandum (exclusive of any amendment or supplement thereto), there shall not have been (i) any change specified in the letter or letters referred to in paragraph (c) of this Section 8 or (ii) any change, or any development involving a prospective change, in or affecting the condition (financial or otherwise), prospects, earnings, business or properties of the Issuer, the Guarantors or any of their respective subsidiaries, taken as a whole, whether or not arising from transactions in the ordinary course of business, except as set forth in or contemplated in the Pricing Disclosure Package and the Offering Memorandum (exclusive of any amendment or supplement thereto), the effect of which, in any case referred to in clause (A) or (B) above, is, in the sole judgment of the Initial Purchasers, so material and adverse as to make it impractical or inadvisable to market or deliver the Securities as contemplated by the Pricing Disclosure Package and the Offering Memorandum (exclusive of any amendment or supplement thereto);

Confidential          EFH02433651

(e)     On or after the Applicable Time (i) (A) no downgrading shall have occurred in the rating accorded the Issuer or the rating accorded to any of the Securities, the Old EFH Notes or the EFIH Notes by any "nationally recognized statistical rating organization", as that term is defined by the Commission for purposes of Rule 436(g)(2) under the Act and (B) no downgrading of more than one notch shall have occurred in the rating accorded any of the Issuer's debt securities (other than the Old EFH Notes and the Securities) by any such organization, and (ii) no such organization shall make a public announcement that it has under surveillance or review, with possible negative implications, its rating of the Issuer or any of the Issuer's debt securities, other than (x) any announcement which represents a reaffirmation of, or improvement on, an announcement with respect to such surveillance or review made prior to the Applicable Time or (y) any announcement relating to a possible downgrading of not more than one notch in the rating accorded the debt securities of the Issuer referred to in clause (i)(B) above (provided that this clause (y) shall not apply with respect to any particular debt securities if a downgrading shall have occurred in the rating accorded such debt securities on or after the Applicable Time and prior to the announcement);

(f)     On or after the Applicable Time there shall not have occurred any of the following: (i) a suspension or material limitation in trading in securities generally on the New York Stock Exchange; (ii) a suspension or material limitation in trading of the Issuer's securities on any exchange or in any over-the-counter market (other than in circumstances described in clause (i) above); (iii) a general moratorium on commercial banking activities declared by either Federal or New York State authorities or a material disruption in commercial banking or securities settlement or clearance services in the United States; (iv) the outbreak or escalation of hostilities involving the United States or the declaration by the United States of a national emergency or war or (v) the occurrence of any other calamity or crisis or any material and adverse change in financial, political or economic conditions in the United States or elsewhere, if the effect of any such event specified in clauses (iv) or (v) in the collective judgment of the Initial Purchasers makes it impracticable or inadvisable to proceed with the offering, sale or the delivery of the Securities on the terms and in the manner contemplated in the Offering Memorandum;

(g)     The Initial Purchasers shall have received a counterpart of the Registration Rights Agreement that shall have been executed and delivered by duly authorized officers of the Issuer and the Guarantors;

(i)      Each of the Issuer and the Guarantors shall have furnished or caused to be furnished to you at the Time of Delivery a certificate or certificates of the Issuer and each of the Guarantors satisfactory to you, signed by the Chief Financial Officer and a senior vice president of each of the Issuer and each of the Guarantors respectively, dated as of the Closing Date, to the effect that the signers of such certificate have examined the Pricing Disclosure Package, the Offering Memorandum and this Agreement and that:

        (A)     the representations and warranties of the Issuer and each of the Guarantors, as the case may be, in this Agreement are true and correct in all material respects as if made at the Time of Delivery (unless such representation or warranty speaks only as of a

Confidential                                                                          EFH02433652

certain date, in which case such representation and warranty need only be true as of such date), and each of the Issuer and each of the Guarantors, as the case may be, has in all material respects performed all covenants and agreements and satisfied all conditions on its part to be performed or satisfied at or prior to the Time of Delivery;

(B)     subsequent to the respective dates as of which information is given in the Pricing Disclosure Package and the Offering Memorandum, there has not been any event or development with respect to such entity and such entity's consolidated subsidiaries, considered as one entity, that would reasonably be expected to result in a Material Adverse Effect, otherwise than as set forth or contemplated in the Pricing Disclosure Package and the Offering Memorandum; and

(j)     Prior to the Time of Delivery, the Issuer and the Guarantors, as applicable, shall have obtained all consents, approvals, authorizations and orders of, and shall have duly made all registrations, qualifications and filing with, any court or regulatory authority or other governmental agency or instrumentality required in connection with the execution, delivery and performance of this Agreement, other than such consents, approvals, authorizations, orders, registrations, qualifications and filings that, if not obtained or made, would not be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect.

(k)     The Joinder shall have been executed and delivered by the Trustee and the Collateral Trustee.

(l)     Prior to the Time of Delivery, the Issuer shall have delivered to the Initial Purchasers and their counsel such further information, certificates and documents related to the transactions contemplated by this Agreement as they may reasonably request.

If (i) any of the conditions specified in this Section 8 shall not have been fulfilled when and as provided in this Agreement, or (ii) any of the opinions and certificates mentioned above or elsewhere in this Agreement shall not be reasonably satisfactory in form and substance to the Initial Purchasers and their counsel, this Agreement and all obligations of the Initial Purchasers hereunder may be cancelled by the Initial Purchasers at, or at any time prior to, the Time of Delivery.  Notice of such cancellation shall be given to the Issuer in writing or by telephone or facsimile and confirmed in writing.

9.     (a)     The Issuer and each of the Guarantors, jointly and severally, agree to indemnify and hold harmless each Initial Purchaser against any losses, claims, damages or liabilities, joint or several, to which such Initial Purchaser may become subject, under the Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon an untrue statement or alleged untrue statement of a material fact contained in any Preliminary Offering Memorandum, the Pricing Memorandum, the Offering Memorandum, or any amendment or supplement thereto, any Issuer Supplemental Disclosure Document, or arise out of or are based upon the omission or alleged omission to state therein a material fact necessary to make the statements therein not

Confidential

EFH02433653

misleading, and will reimburse each Initial Purchaser for any legal or other expenses reasonably incurred by such Initial Purchaser in connection with investigating or defending any such action or claim as such expenses are incurred; *provided, however,* that the Issuer and the Guarantors shall not be liable in any such case to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in any Preliminary Offering Memorandum, the Pricing Memorandum, the Offering Memorandum or any such amendment or supplement, or any Issuer Supplemental Disclosure Document, in reliance upon and in conformity with written information furnished to the Issuer by any Initial Purchaser through the Representatives expressly for use therein.

(b)    Each Initial Purchaser, severally and not jointly, will indemnify and hold harmless the Issuer and each Guarantor, against any losses, claims, damages or liabilities to which the Issuer or any Guarantor may become subject, under the Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon an untrue statement or alleged untrue statement of a material fact contained in any Preliminary Offering Memorandum, the Pricing Memorandum, the Offering Memorandum, or any amendment or supplement thereto, or any Issuer Supplemental Disclosure Document, or arise out of or are based upon the omission or alleged omission to state therein a material fact necessary to make the statements therein not misleading, in each case to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in any Preliminary Offering Memorandum, the Pricing Memorandum, the Offering Memorandum or any such amendment or supplement, or any Issuer Supplemental Disclosure Document in reliance upon and in conformity with written information furnished to the Issuer by such Initial Purchaser through the Representatives expressly for use therein; and will reimburse the indemnified parties for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such action or claim as such expenses are incurred.

(c)    Promptly after receipt by an indemnified party under subsection (a) or (b) above of notice of the commencement of any action, such indemnified party shall, if a claim in respect thereof is to be made against the indemnifying party under such subsection, notify the indemnifying party in writing of the commencement thereof; but the omission so to notify the indemnifying party shall not relieve it from any liability which it may have to any indemnified party otherwise than under such subsection. In case any such action shall be brought against any indemnified party and it shall notify the indemnifying party of the commencement thereof, the indemnifying party shall be entitled to participate therein and, to the extent that it shall wish, jointly with any other indemnifying party similarly notified, to assume the defense thereof, with counsel satisfactory to such indemnified party, and, after notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof, the indemnifying party shall not thereafter be responsible for the fees and expenses of the indemnified party, including fees and expenses of any separate counsel retained by the indemnified party or parties, other than reasonable costs incurred in cooperating with the indemnifying party in connection with such action, except as set forth below. Notwithstanding the indemnifying party's election to appoint counsel (including local counsel) to

Confidential                                                                 EFH02433654

represent the indemnified party in an action, the indemnified party shall have the right to employ separate counsel (including local counsel), and the indemnifying party shall bear the reasonable fees, costs and expenses of such separate counsel if (i) the use of counsel chosen by the indemnifying party to represent the indemnified party would present such counsel with a conflict of interest; (ii) the actual or potential defendants in, or targets of, any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party; (iii) the indemnifying party shall not have employed counsel reasonably satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of the institution of such action; or (iv) the indemnifying party shall authorize the indemnified party to employ separate counsel at the expense of the indemnifying party.    An indemnifying party will not, without the prior written consent of the indemnified parties, settle or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (with respect to which the indemnified parties (i) are actual parties, or (ii) would reasonably be expected to become parties, to such claim, action, suit or proceeding) unless such settlement, compromise or consent includes an unconditional release of each indemnified party from all liability arising out of such claim, action, suit or proceeding and does not include any statement as to or any admission of fault, culpability or failure to act, by or on behalf of any indemnified party.

(d)     If the indemnification provided for in this Section 9 is unavailable to or insufficient to hold harmless an indemnified party under subsection (a) or (b) above in respect of any losses, claims, damages or liabilities (or actions in respect thereof) referred to therein, then each indemnifying party shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities (or actions in respect thereof) in such proportion as is appropriate to reflect the relative benefits received by the Issuer and the Guarantors on the one hand, and the Initial Purchasers on the other, from the offering of the Securities.  If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law or if the indemnified party failed to give the notice required under subsection (c) above, then each indemnifying party shall contribute to such amount paid or payable by such indemnified party in such proportion as is appropriate to reflect not only such relative benefits but also the relative fault of the Issuer and the Guarantors on the one hand, and the Initial Purchasers on the other, in connection with the statements or omissions which resulted in such losses, claims, damages or liabilities (or actions in respect thereof), as well as any other relevant equitable considerations.  The relative benefits received by the Issuer and the Guarantors on the one hand, and the Initial Purchasers on the other, shall be deemed to be in the same proportion as the total net proceeds from the offering of the Securities (before deducting expenses) received by the Issuer bear to the total discounts and commissions received by the Initial Purchasers, therefrom, in each case as set forth in Schedule IV. The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Issuer or the Guarantors on the one hand,

or the Initial Purchasers on the other, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The Issuer, the Guarantors and the Initial Purchasers agree that it would not be just and equitable if contribution pursuant to this subsection (d) were determined by *pro rata* allocation (even if the Initial Purchasers were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to above in this subsection (d). The amount paid or payable by an indemnified party as a result of the losses, claims, damages or liabilities (or actions in respect thereof) referred to above in this subsection (d) shall be deemed to include any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this subsection (d), (i) no person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation and (ii) no Initial Purchaser shall be required to contribute any amount in excess of the amount by which the total price at which the Securities purchased by it and distributed to investors were offered to investors exceeds the amount of any damages which such Initial Purchaser has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. The Initial Purchasers' obligations in this subsection (d) to contribute are several in proportion to their respective purchase obligations in connection with the Securities and not joint.

(e)    The obligations of the Issuer and the Guarantors under this Section 9 shall be in addition to any liability which the Issuer and the Guarantors may otherwise have and shall extend, upon the same terms and conditions, to directors, officers, employees and agents of each Initial Purchaser, any affiliate of each Initial Purchaser and each person, if any, who controls any Initial Purchaser within the meaning of the Act; and the obligations of the Initial Purchasers under this Section 9 shall be in addition to any liability which the respective Initial Purchasers may otherwise have and shall extend, upon the same terms and conditions, to each officer and director of the Issuer and the Guarantors and to each person, if any, who controls the Issuer or the Guarantors within the meaning of the Act.

10.    (a)    If any Initial Purchaser shall default in its obligation to purchase the Securities which it has agreed to purchase hereunder, the Initial Purchasers may in their discretion arrange for the Initial Purchasers or another party or other parties to purchase the Securities on the terms contained herein. If within thirty-six hours after such default by any Initial Purchaser the Representatives do not arrange for the purchase of the Securities, then the Issuer shall be entitled to a further period of thirty-six hours within which to procure another party or other parties satisfactory to the Representatives to purchase such Securities on such terms. In the event that, within the respective prescribed periods, the Initial Purchasers notify the Issuer that they have so arranged for the purchase of such Securities, or the Issuer notifies the Initial Purchasers that it has so arranged for the purchase of such Securities, the Initial Purchasers and the Issuer shall have the right to postpone the Time of Delivery for a period of not more than seven days, in order to effect whatever changes may thereby be made necessary in the Offering Memorandum, or in any other documents or arrangements, and the

Issuer agrees to prepare promptly any amendments to the Offering Memorandum which in the opinion of the Initial Purchasers may thereby be made necessary. The term "Initial Purchaser" as used in this Agreement shall include any person substituted under this Section with like effect as if such person had originally been a party to this Agreement with respect to such Securities.

(b)     If, after giving effect to any arrangements for the purchase of the Securities of a defaulting Initial Purchaser or Initial Purchasers by the Issuer as provided in subsection (a) above, the aggregate principal amount of such Securities, which remains unpurchased does not exceed one-eleventh of the aggregate principal amount of all the Securities, then the Issuer shall have the right to require each non-defaulting Initial Purchaser to purchase the principal amount of Securities which such Initial Purchaser agreed to purchase hereunder and, in addition, to require each non-defaulting Initial Purchaser to purchase its *pro rata* share (based on the principal amount of the Securities which such Initial Purchaser agreed to purchase hereunder) of the Securities of such defaulting Initial Purchaser or Initial Purchasers for which such arrangements have not been made; but nothing herein shall relieve a defaulting Initial Purchaser from liability for its default.

(c)     If, after giving effect to any arrangements for the purchase of the Securities of a defaulting Initial Purchaser or Initial Purchasers by the Issuer as provided in subsection (a) above, the aggregate principal amount of the Securities which remains unpurchased exceeds one-eleventh of the aggregate principal amount of all the Securities, or if the Issuer shall not exercise the right described in subsection (b) above to require non-defaulting Initial Purchasers to purchase the Securities of a defaulting Initial Purchaser or Initial Purchasers, then this Agreement shall thereupon terminate, without liability on the part of any non-defaulting Initial Purchaser or the Issuer, except for the expenses to be borne by the Issuer and the Initial Purchasers as provided in Section 7 hereof and the indemnity and contribution agreements in Section 9 hereof; but nothing herein shall relieve a defaulting Initial Purchaser from liability for its default.

11.     The respective indemnities, agreements, representations, warranties and other statements of the Issuer, the Guarantors and the several Initial Purchasers, as set forth in this Agreement or made by or on behalf of them, respectively, pursuant to this Agreement, shall remain in full force and effect, regardless of any investigation (or any statement as to the results thereof) made by or on behalf of any Initial Purchaser or any controlling person of any Initial Purchaser, or the Issuer, the Guarantors, or any officer or director or controlling person of the Issuer or any Guarantor, and shall survive delivery of and payment for the Securities.

Confidential                                                                                      EFH02433657

12.     If this Agreement shall be terminated (i) pursuant to Section 8(f) hereof because any condition specified therein shall not have been satisfied (other than the condition specified in Section 8(f)(ii)), (ii) pursuant to Section 10 hereof or (iii) as a result of any other default by any of the Initial Purchasers (each, a "**Selected Termination**"), the Issuer and the Guarantors shall not then have any liability to any Initial Purchaser except as provided in Sections 7 and 9 hereof. If the Securities are not delivered by or on behalf of the Issuer as provided herein, other than due to any Selected Termination, the Issuer and the Guarantors shall not then have any liability to any Initial Purchaser except (a) as provided in Sections 7 and 9 hereof and (b) that the Issuer and the Guarantors will reimburse the Initial Purchasers on demand for all reasonable expenses (including the reasonable fees and disbursements of Shearman & Sterling LLP) that shall have been incurred by them in connection with the proposed purchase and sale of the Securities.

13.     All statements, requests, notices and agreements hereunder shall be in writing, and if to the Initial Purchasers shall be delivered or sent by mail or facsimile transmission in care of Citigroup Global Markets General Counsel (fax no.: (212) 816-7912) and confirmed to Citigroup Global Markets at 388 Greenwich Street, New York, New York  10013, Attention:  General Counsel Office; to Goldman, Sachs & Co. at 200 West Street, New York, New York 10282, Attention: Registration Department, (212) 902-3000; to Credit Suisse Securities (USA) LLC at Eleven Madison Avenue, New York, N.Y. 10010-3629, Attention: IBD Legal; to J.P. Morgan Securities Inc. at 270 Park Avenue, New York, N.Y. 10017, Attention: Larry Landry; and if to the Issuer or the Guarantors shall be delivered or sent by mail or facsimile transmission to the address of the Issuer set forth in the Offering Memorandum, Attention: General Counsel. Any such statements, requests, notices or agreements shall take effect upon receipt thereof.

14.     This Agreement shall be binding upon, and inure solely to the benefit of, the parties hereto and, to the extent provided in Sections 9 and 11 hereof, the officers and directors of the Issuer and the Guarantors and each person who controls the Issuer, the Guarantors or any Initial Purchaser, and their respective heirs, executors, administrators, successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement. No purchaser of any of the Securities from any Initial Purchaser shall be deemed a successor or assign by reason merely of such purchase.

15.     Time shall be of the essence of this Agreement.

16.     Each of the Issuer and the Guarantors acknowledge and agree that (i) the purchase and sale of the Securities pursuant to this Agreement is an arm's-length commercial transaction between the Issuer and the Guarantors, on the one hand, and the several Initial Purchasers, on the other, (ii) in connection therewith and with the process leading to such transaction each Initial Purchaser is and has been acting solely as a principal and is not the agent or fiduciary of the Issuer or any of the Guarantors, or their respective affiliates, stockholders, creditors or employees or any other party, (iii) no Initial Purchaser has assumed or will assume any advisory or fiduciary responsibility in favor of the Issuer or the Guarantors with respect to the offering contemplated hereby or the process leading thereto (irrespective of whether such Initial Purchaser has advised or is currently advising the Issuer or the Guarantors on other matters) or any other obligation to the Issuer or the Guarantors except the obligations expressly set forth in this Agreement, (iv) the several Initial Purchasers and their respective affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Issuer or the Guarantors and that the several Initial Purchasers have no obligation to

Confidential                                                                                          EFH02433658

disclose any of such interest by virtue of any fiduciary or advisory relationship, and (v) the Initial Purchasers have not provided any legal, accounting, regulatory or tax advice with respect to the offering contemplated hereby and the Issuer and each Guarantor have consulted their own legal, accounting, regulatory and tax advisors to the extent they deemed appropriate. Each of the Issuer and the Guarantors agree that, it will not claim that the Initial Purchasers, or any of them, has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to any of the Issuer or the Guarantors, in connection with such transaction or the process leading thereto.

17.    In accordance with the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), the Initial Purchasers are required to obtain, verify and record information that identifies their respective clients, including the Issuer, which information may include the name and address of their respective clients, as well as other information that will allow the Initial Purchasers to properly identify their respective clients.

18.    This Agreement supersedes all prior agreements and understandings (whether written or oral) between the Issuer, the Guarantors and the Initial Purchasers, or any of them, with respect to the subject matter hereof.

19.    **This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.**

20.    Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

21.    This Agreement may be signed in one or more counterparts, each of which shall constitute an original and all of which together shall constitute one and the same instrument.

22.    Notwithstanding anything herein to the contrary, the Issuer (and the Issuer's employees, representatives, and other agents) is authorized to disclose to any and all persons, the tax treatment and tax structure of the potential transaction and all materials of any kind (including tax opinions and other tax analyses) provided to the Issuer relating to that treatment and structure, without the Initial Purchasers' imposing any limitation of any kind.  However, any information relating to the tax treatment and tax structure shall remain confidential (and the foregoing sentence shall not apply) to the extent necessary to enable any person to comply with securities laws. For this purpose, "tax treatment" means US federal and state income tax treatment, and "tax structure" is limited to any facts that may be relevant to that treatment.

If the foregoing is in accordance with your understanding, please sign and return to us counterparts hereof, and upon the acceptance hereof by you, on behalf of each of the Initial Purchasers, this letter and such acceptance hereof shall constitute a binding agreement between each of the Initial Purchasers, the Issuer and the Guarantors. It is understood that your acceptance of this letter on behalf of each of the Initial Purchasers is pursuant to the authority set forth in a form of Agreement among Initial Purchasers, the form of which shall be submitted to the Issuer for examination upon request, but without warranty on your part as to the authority of the signers thereof.

Confidential                                                                                                     EFH02433659

ENERGY FUTURE HOLDINGS CORP.

By: _____

Name: Anthony R Horton

Title: Senior Vice President and Treasurer

ENERGY FUTURE COMPETITIVE HOLDINGS
COMPANY, as Guarantor

By: _____

Name: Anthony R. Horton

Title: Senior Vice President and Treasurer

ENERGY FUTURE INTERMEDIATE HOLDING
COMPANY LLC, as Guarantor

By: _____

Name: Anthony R Horton

Title: Senior Vice President and Treasurer

Purchase Agreement Signature Page

Confidential

Accepted as of the date hereof:


Citigroup Global Markets Inc.
Goldman, Sachs & Co.
Credit Suisse Securities (USA) LLC
J.P. Morgan Securities Inc.

For themselves and as
Representatives of the
Several Initial Purchasers
Named in Schedule I hereto


By:  Citigroup Global Markets Inc.

By: _____
     Name:  BARBARA  MATAS
     Title:  MANAGING  DIRECTOR


By:  Goldman, Sachs & Co.

By: _____
     (Goldman, Sachs & Co.)


By:  Credit Suisse Securities (USA) LLC

By: _____
     Name:
     Title:


By:  J.P. Morgan Securities Inc.

By: _____
     Name:
     Title:


Purchase Agreement Signature Page

Accepted as of the date hereof:

Citigroup Global Markets Inc.
Goldman, Sachs & Co.
Credit Suisse Securities (USA) LLC
J.P. Morgan Securities Inc.

For themselves and as
Representatives of the
Several Initial Purchasers
Named in Schedule I hereto

By:  Citigroup Global Markets Inc.

By:
    _____
    Name:
    Title:

By:  Goldman, Sachs & Co.

By:  _____
    (Goldman, Sachs & Co.)

By.  Credit Suisse Securities (USA) LLC

By:
    _____
    Name:
    Title:

By:  J.P. Morgan Securities Inc.

By:
    _____
    Name.
    Title:

Purchase Agreement Signature Page

Confidential                                          EFH02433662

Accepted as of the date hereof:

Citigroup Global Markets Inc.
Goldman, Sachs & Co.
Credit Suisse Securities (USA) LLC
J.P. Morgan Securities Inc.

For themselves and as
Representatives of the
Several Initial Purchasers
Named in Schedule I hereto


By: Citigroup Global Markets Inc.

By:

    Name:
    Title:


By: Goldman, Sachs & Co.

By:

    (Goldman, Sachs & Co.)


By: Credit Suisse Securities (USA) LLC

By:

    Name: Jean-Pierre Boudrias
    Title:    Director


By: J.P. Morgan Securities Inc.

By:

    Name:
    Title:


Purchase Agreement Signature Page

Confidential                                                                    EFH02433663

Accepted as of the date hereof:

Citigroup Global Markets Inc.
Goldman, Sachs & Co.
Credit Suisse Securities (USA) LLC
J.P. Morgan Securities Inc.

For themselves and as
Representatives of the
Several Initial Purchasers
Named in Schedule I hereto

By: Citigroup Global Markets Inc.

By: _____
    Name:
    Title:

By: Goldman, Sachs & Co.

By: _____
    (Goldman, Sachs & Co.)

By: Credit Suisse Securities (USA) LLC

By: _____
    Name:
    Title:

By: J.P. Morgan Securities Inc.

By: _____
    Name:    Mark H. Radin
    Title:    Executive Director

Purchase Agreement Signature Page

Confidential                                                    EFH02433664

## SCHEDULE I

| Initial Purchasers | | Principal Amount of Notes to be Purchased |
|---|---|---:|
| Citigroup Global Markets Inc. | $ | 150,000,000 |
| Goldman, Sachs & Co. | $ | 150,000,000 |
| Credit Suisse Securities (USA) LLC | $ | 75,000,000 |
| J.P. Morgan Securities Inc. | $ | 75,000,000 |
| Banc of America Securities LLC | $ | 25,000,000 |
| Morgan Stanley & Co. Incorporated | $ | 25,000,000 |
| Total | $ | 500,000,000 |

I-1

Confidential

EFH02433665

**SCHEDULE II**

(a)    Approved Issuer Supplemental Disclosure Documents:

- electronic roadshow presentation relating to the offering of the Securities, dated on or after January 6, 2010.

(b)    Approved Initial Purchaser Supplemental Disclosure Documents:

None

II-1

SCHEDULE III

# Energy Future Holdings Corp.

## $500,000,000 10.000% Senior Secured Notes due 2020

January 7, 2010

| | |
|---|---|
| Issuer: | Energy Future Holdings Corp. |
| Guarantors: | Energy Future Intermediate Holding Company LLC and Energy Future Competitive Holdings Company |
| Securities: | 10.000% Senior Secured Notes due 2020 |
| Distribution: | Regulation S/144A with registration rights |
| Maturity: | January 15, 2020 |
| Principal Amount: | $500,000,000 |
| Gross Proceeds: | $500,000,000 |
| Net Proceeds (before expenses): | $488,750,000 |
| Coupon: | 10.000% per annum |
| Issue Price: | 100.000% of principal amount |
| Yield to Maturity: | 10.000% |
| Settlement Date: | January 12, 2010 |
| Interest Payment Dates: | January 15 and July 15 of each year, beginning on July 15, 2010 |
| Redemption: | On and after January 15, 2015, the Issuer may redeem the notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice, at the redemption prices (expressed as percentages of principal amount of the notes to be redeemed) set forth below, plus accrued and unpaid interest thereon and additional interest, if any, to the applicable redemption date, if redeemed during the twelve-month period beginning on January 15 of each of the years indicated below: |

| Year | Price |
|---|---|
| 2015 | 105.000% |
| 2016 | 103.333% |

III-1

Confidential

|  |  |
|---|---|
| 2017 | 101.667% |
| 2018 and thereafter | 100.000% |

At any time prior to January 15, 2015, the Issuer may redeem all or a part of the notes, upon not less than 30 nor more than 60 days' prior notice, at a redemption price equal to 100% of the principal amount of the notes redeemed plus an applicable make-whole premium as of, and accrued and unpaid interest and additional interest, if any, to the date of redemption.

**Equity Clawback:** In addition, until January 15, 2013, the Issuer may, at its option, on one or more occasions redeem up to 35% of the aggregate principal amount of notes at a redemption price equal to 110.000% of the aggregate principal amount of the notes, plus accrued and unpaid interest thereon and additional interest, if any, to the applicable redemption date, with the net cash proceeds of one or more equity offerings. However, the Issuer may only make such redemption if at least 50% of the aggregate principal amount of the notes issued under the Indenture remain outstanding immediately after the occurrence of such redemption, and if each such redemption occurs within 90 days of the date of closing of each such equity offering.

**Joint Book-Running Managers:** Citigroup Global Markets Inc.
Goldman, Sachs & Co.
Credit Suisse Securities (USA) LLC
J.P. Morgan Securities Inc.

**Co-Managers:** Banc of America Securities LLC
Morgan Stanley & Co. Incorporated

**CUSIP/ISIN:** *Rule 144A:* 292680 AG0 / US292680AG02

*Reg. S:* U29191 AD2 / USU29191AD22

The notes have not been registered under the Securities Act. The notes may not be offered or sold in the United States or to U.S. persons, except to qualified institutional buyers in reliance on the exemption from registration provided by Rule 144A and to certain persons in offshore transactions in reliance on Regulation S. You are hereby notified that sellers of the notes may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A.

The information in this term sheet supplements the Issuer's preliminary offering memorandum, dated January 6, 2010 (the "Preliminary Offering Memorandum") and supersedes the information in the Preliminary Offering Memorandum to the extent inconsistent as so supplemented, with the information in the Preliminary Offering Memorandum. This term sheet is qualified in its entirety by reference to the Preliminary Offering Memorandum.

ANY DISCLAIMERS OR OTHER NOTICES THAT MAY APPEAR BELOW ARE NOT APPLICABLE TO THIS COMMUNICATION AND SHOULD BE DISREGARDED.  SUCH DISCLAIMERS OR OTHER NOTICES WERE AUTOMATICALLY GENERATED AS RESULT OF THIS COMMUNICATION BEING SENT VIA BLOOMBERG OR ANOTHER EMAIL SYSTEM.

Confidential

EFH02433668

## SCHEDULE IV

Net Proceeds to the Issuer (before expenses): $488,750,000

Initial Purchaser Purchase Price: 97.75% ($488,750,000)

IV-1

ANNEX I

(1) The Securities have not been and will not be registered under the Act and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except in accordance with Regulation S under the Act or pursuant to an exemption from the registration requirements of the Act.   Each Initial Purchaser, severally and not jointly, represents that it has offered and sold the Securities, and will offer and sell the Securities (i) as part of their distribution at any time and (ii) otherwise until 40 days after the later of the commencement of the offering and the Time of Delivery, only in accordance with Rule 903 of Regulation S or Rule 144A under the Act. Accordingly, each Initial Purchaser, severally and not jointly, agrees that neither it, affiliates that are controlled by such Initial Purchaser nor any persons acting on its or their behalf has engaged or will engage in any directed selling efforts with respect to the Securities, and it and they have complied and will comply with the offering restrictions requirement of Regulation S. Each Initial Purchaser, severally and not jointly, agrees that, at or prior to confirmation of sale of Securities (other than a sale pursuant to Rule 144A), it will have sent to each distributor, dealer or person receiving a selling concession, fee or other remuneration that purchases Securities from it during the restricted period a confirmation or notice to substantially the following effect:

"The Securities covered hereby have not been registered under the U.S. Securities Act of 1933 (the "Securities Act") and may not be offered and sold within the United States or to, or for the account or benefit of, U.S. persons (i) as part of their distribution at any time or (ii) otherwise until 40 days after the later of the commencement of the offering and the closing date, except in either case in accordance with Regulation S (or Rule 144A if available) under the Securities Act.  Terms used above have the meaning given to them by Regulation S."

Terms used in this paragraph have the meanings given to them by Regulation S.

Each Initial Purchaser, severally and not jointly, further agrees that it has not entered and will not enter into any contractual arrangement with respect to the distribution or delivery of the Securities, except with its affiliates or with the prior written consent of the Issuer.

(2) Notwithstanding the foregoing, Securities in registered form may be offered, sold and delivered by the Initial Purchasers in the United States and to U.S. persons pursuant to Section 3 of this Agreement without delivery of the written statement required by paragraph (1) above.

(3) Each Initial Purchaser, severally and not jointly, agrees that it will not offer, sell or deliver any of the Securities in any jurisdiction outside the United States except under circumstances that will result in compliance with the applicable laws thereof, and that it will take at its own expense whatever action is required to permit its purchase and resale of the Securities in such jurisdictions. Each Initial Purchaser understands that no action has been taken to permit a public offering in any jurisdiction outside the United States where action would be required for such purpose. Each Initial Purchaser, severally and not jointly, agrees not to cause any advertisement of the Securities to be published in any newspaper or periodical or posted in any public place and not to issue any circular relating to the Securities, except in any such case with Citigroup Global Markets Inc.'s express written consent and then only at its own risk and expense.

Annex-1

**Exhibit A-1**

<u>Opinion of Simpson Thacher & Bartlett LLP, Counsel for the Issuer and the Guarantors</u>

We have acted as counsel to Energy Future Holdings Corp., a Texas corporation (the "Company"), Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("Intermediate Holdings"), and Energy Future Competitive Holdings Company, a Texas corporation ("Competitive Holdings" and, together with Intermediate Holdings, the "Guarantors"), in connection with the purchase by you of $500,000,000 aggregate principal amount of 10.000% Senior Secured Notes due 2020 (the "Notes") issued by the Company and unconditionally guaranteed by the Guarantors, pursuant to the Purchase Agreement dated January 7, 2010 (the "Purchase Agreement") among the Company, the Guarantors and you, as initial purchasers (the "Initial Purchasers").

We have examined the Preliminary Offering Memorandum dated January 6, 2010, relating to the sale of the Notes (the "Preliminary Offering Memorandum") and the Offering Memorandum dated January 7, 2010, relating to the sale of the Notes (the "Offering Memorandum"), each of which incorporates by reference the Company's Annual Report on Form 10-K for the year ended December 31, 2008 (except for items 6, 7 and 8 which have been superseded by the Company's Current Report on Form 8-K filed on May 20, 2009), the Company's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2009, June 30, 2009 and September 30, 2009 and the Company's Current Reports on Form 8-K filed on January 15, 2009, February 23, 2009, May 20, 2009, July 20, 2009, August 10, 2009, September 1, 2009, October 5, 2009, October 21, 2009, November 20, 2009 and December 28, 2009, each as filed under the Securities Exchange Act of 1934, as amended; the pricing term sheet, dated January 7, 2010, relating to the Notes in the form annexed to the Purchase Agreement (such pricing term sheet, together with the Preliminary Offering Memorandum, the "Pricing Disclosure Package"); the Indenture, dated as of January 12, 2010 (the "Indenture"), among the Company, the Guarantors and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Trustee"), relating to the Notes; duplicates of the global notes representing the Notes; the guarantee of the Notes by Intermediate Holdings whose terms are set forth in the Indenture (the "EFIH Guarantee"); the guarantee of the Notes by Competitive Holdings whose terms are set forth in the Indenture (the "EFCH Guarantee" and, together with the EFIH Guarantee, the "Guarantees"); the Pledge Agreement, dated November 16, 2009 (the "Pledge Agreement"), from Intermediate Holdings to The Bank of New York Mellon Trust Company, N.A., as Collateral Trustee (the "Collateral Trustee"); the Collateral Trust Agreement, dated as of November 16, 2009 (the "Collateral Trust Agreement"), among Intermediate Holdings, The Bank of New York Mellon Trust Company, N.A., as First Lien Trustee, the other Secured Debt Representatives named therein and the Collateral Trustee; the Joinder, dated January 12, 2010 (the "Joinder"), by the Trustee and acknowledged by the Collateral Trustee; the Additional Secured Debt Designation, dated January 12, 2010 (the "Designation" and, together with the Joinder, the "Joinder Documents"), by Intermediate Holdings and acknowledged by the Collateral Trustee; the Registration Rights Agreement, dated as of January 12, 2010 (the "Registration Rights Agreement"), among the Company, the Guarantors and the Initial Purchasers; and the Purchase Agreement. We have also examined a copy of the financing statement (the "Delaware Financing Statement"), naming Intermediate Holdings as debtor and the Collateral Trustee as secured party, which was filed in the Office of the Secretary of State of Delaware (the "Delaware Filing Office") on November 16, 2009. In addition, we have examined, and have relied as to matters of fact upon, the documents delivered to you at the closing and upon originals, or duplicates or certified or conformed copies, of such corporate and other records, agreements, documents and other instruments and such certificates or comparable

A-1-1

documents of public officials and of officers and representatives of the Company and the Guarantors and have made such other investigations, as we have deemed relevant and necessary in connection with the opinions hereinafter set forth.

In such examination, we have assumed the genuineness of all signatures, the legal capacity of natural persons, the authenticity of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as duplicates or certified or conformed copies and the authenticity of the originals of such latter documents. We have also assumed that (i) the Company and Competitive Holdings are validly existing and in good standing under the law of the State of Texas; (ii) the Company has duly authorized, executed, issued and delivered the Indenture, the Notes, the Registration Rights Agreement and the Purchase Agreement in accordance with the law of the State of Texas; (iii) Competitive Holdings has duly authorized, executed, issued and delivered the Indenture, the EFCH Guarantee, the Registration Rights Agreement and the Purchase Agreement in accordance with the law of the State of Texas; (iv) the execution, delivery, issuance and performance, as applicable, by the Company and Competitive Holdings of the Indenture, the Notes, the EFCH Guarantee, the Registration Rights Agreement and the Purchase Agreement do not violate the law of any jurisdiction (except that no such assumption is made with respect to the federal law of the United States and the law of the State of New York and the Delaware Limited Liability Company Act); and (v) the execution, delivery, issuance and performance by the Company and Competitive Holdings, as applicable, of the Indenture, the Notes, the EFCH Guarantee, the Registration Rights Agreement and the Purchase Agreement do not constitute a violation or breach of any agreement or instrument which is binding upon the Company or Competitive Holdings or any of their respective charters, by-laws or similar organizational documents. We have further assumed that (1) Intermediate Holdings has rights in the Collateral (as defined in the Offering Memorandum) existing on the date hereof and will have rights in property which becomes Collateral after the date hereof and (2) "value" (as defined in Section 1-201(44) of the Uniform Commercial Code as in effect on the date hereof in the State of New York (the "New York UCC")) has been given by the holders of the Notes to Intermediate Holdings for the security interests and other rights in the Collateral.

Based upon the foregoing, and subject to the qualifications, assumptions and limitations stated herein, we are of the opinion that:

1.      Intermediate Holdings has been duly formed and is validly existing and in good standing as a limited liability company under the law of the State of Delaware and has full power and authority to conduct its business as described in the Pricing Disclosure Package and Offering Memorandum.

2.      The Purchase Agreement has been duly authorized, executed and delivered by Intermediate Holdings.

3.      The Indenture has been duly authorized, executed and delivered by Intermediate Holdings and, assuming that the Indenture is the valid and legally binding obligation of the Trustee, constitutes a valid and legally binding obligation of each of the Company and the Guarantors enforceable against each of the Company and the Guarantors, respectively, in accordance with its terms.

4.      Assuming due authentication of the Notes by the Trustee and upon payment and delivery in accordance with the Purchase Agreement, the Notes will

A-1-2

EFH02433672

constitute valid and legally binding obligations of the Company enforceable against the Company in accordance with their terms and entitled to the benefits of the Indenture.

5.     The EFIH Guarantee has been duly authorized, executed and issued by Intermediate Holdings and, assuming due authentication of the Notes by the Trustee and upon payment for and delivery of the Notes in accordance with the Purchase Agreement, the EFIH Guarantee will constitute a valid and legally binding obligation of Intermediate Holdings enforceable against Intermediate Holdings in accordance with its terms and entitled to the benefits of the Indenture.

6.     Assuming due authentication of the Notes by the Trustee and upon payment for and delivery of the Notes in accordance with the Purchase Agreement, the EFCH Guarantee will constitute a valid and legally binding obligation of Competitive Holdings enforceable against Competitive Holdings in accordance with its terms and entitled to the benefits of the Indenture.

7.     The Pledge Agreement has been duly authorized, executed and delivered by Intermediate Holdings and constitutes a valid and legally binding obligation of Intermediate Holdings enforceable against Intermediate Holdings in accordance with its terms.

8.     The Collateral Trust Agreement has been duly authorized, executed and delivered by Intermediate Holdings and, assuming that the Collateral Trust Agreement, including the Joinder Documents, is the valid and legally binding obligation of the Collateral Trustee, the Collateral Trust Agreement, including the Joinder Documents, constitutes a valid and legally binding obligation of Intermediate Holdings enforceable against Intermediate Holdings in accordance with its terms.

9.     The Pledge Agreement, together with the Joinder Documents, creates a valid security interest in favor of the Collateral Trustee for the benefit of the Trustee and the holders of the Notes in the collateral described therein in which a security interest may be created under Article 9 of the New York UCC (the "Article 9 Collateral").

10.     The guarantee by Intermediate Holdings of the securities which may be offered in exchange for the Notes pursuant to the Registration Rights Agreement has been duly authorized by Intermediate Holdings.

11.     The Registration Rights Agreement has been duly authorized, executed and delivered by Intermediate Holdings and, assuming that the Registration Rights Agreement is the valid and legally binding obligation of the Initial Purchasers and has been duly authorized, executed and delivered by the Company and Competitive Holdings, constitutes a valid and legally binding obligation of the Company and the Guarantors enforceable against the Company and the Guarantors in accordance with its terms.

12.     The statements made in the Pricing Disclosure Package and the Offering Memorandum under the caption "Description of the Notes," insofar as they purport to constitute summaries of certain terms of documents referred to therein, constitute accurate summaries of the terms of such documents in all material respects.

Confidential
EFH02433673

13.    The issuance and sale of the Notes by the Company, the issue of the Guarantees by the Guarantors, the execution, delivery and performance by the Company and the Guarantors of the Purchase Agreement and the Registration Rights Agreement, the execution and delivery of the Indenture by the Company and the Guarantors and the delivery of the Designation by Intermediate Holdings will not breach or result in a default under any of the agreements or instruments identified on Schedule I hereto, nor will such actions violate the certificate of formation or limited liability company agreement of Intermediate Holdings or any U.S. federal or New York state statute or the Delaware Limited Liability Company Act or any rule or regulation that has been issued pursuant to any U.S. federal or New York state statute or the Delaware Limited Liability Company Act or any order known to us issued pursuant to any U.S. federal or New York state statute or the Delaware Limited Liability Company Act by any court or governmental agency or body having jurisdiction over Intermediate Holdings or any of its properties, except that it is understood that no opinion is given in this paragraph 13 with respect to (i) any matters subject to federal law and regulations relating to the generation, storage, sale or transmission of electricity or the ownership or operation of generating facilities (including, without limitation, nuclear generating facilities) or transmission facilities (including, without limitation, the Atomic Energy Act of 1954, as amended, the Federal Power Act, the Energy Policy Act of 2005, the Interstate Commerce Act and the Public Utility Holding Company Act of 2005, and in each case, the rules and regulations promulgated thereunder and such other rules, regulations and orders administered by the Federal Energy Regulatory Commission, the U.S. Nuclear Regulatory Commission and the U.S. Environmental Protection Agency) or (ii) any federal or state securities law or any rule or regulation issued pursuant to any federal or state securities law.

14.    No consent, approval, authorization, order, registration or qualification of or with any U.S. federal or New York state governmental agency or body or any Delaware state governmental agency or body acting pursuant to the Delaware Limited Liability Company Act or, to our knowledge, any U.S. federal or New York state court or any Delaware state court acting pursuant to the Delaware Limited Liability Company Act is required for the issue and sale of the Notes by the Company, the issue of the Guarantees by the Guarantors, compliance by the Company and the Guarantors with all of the provisions of the Purchase Agreement, the Registration Rights Agreement and the Indenture, and compliance by Intermediate Holdings with all of the provisions of the Pledge Agreement and the Collateral Trust Agreement, including the Joinder Documents, except that it is understood that no opinion is given in this paragraph 14 with respect to (i) any matters subject to federal law and regulations relating to the generation, storage, sale or transmission of electricity or the ownership or operation of generating facilities (including, without limitation, nuclear generating facilities) or transmission facilities (including, without limitation, the Atomic Energy Act of 1954, as amended, the Federal Power Act, the Energy Policy Act of 2005, the Interstate Commerce Act and the Public Utility Holding Company Act of 2005, and in each case, the rules and regulations promulgated thereunder and such other rules, regulations and orders administered by the Federal Energy Regulatory Commission, the U.S. Nuclear Regulatory Commission and the U.S. Environmental Protection Agency) or (ii) any federal or state securities law or any rule or regulation issued pursuant to any federal or state securities law.

15.    Neither the Company nor any of the Guarantors is, and after giving effect to the offer and sale of the Notes and the Guarantees and the application of the net

A-1-4

proceeds therefrom (as described in the Offering Memorandum), none of them will be, an "investment company" within the meaning of and subject to regulation under the Investment Company Act of 1940, as amended.

16.     No qualification of the Indenture under the Trust Indenture Act of 1939, as amended, is required for the offer and sale of the Notes and the Guarantees by the Company and the Guarantors to the Initial Purchasers or the reoffer and resale of the Notes by the Initial Purchasers to the initial purchasers therefrom solely in the manner contemplated by the Offering Memorandum, the Purchase Agreement and the Indenture.

We express no opinion as to the law of the State of Delaware (other than the Delaware Limited Liability Company Act); however, we have reviewed Article 9 of the Uniform Commercial Code in effect in the State of Delaware as set forth in the Commerce Clearing House, Inc. Secured Transactions Guide as supplemented through January 5, 2010 (the "Delaware UCC") and, based solely on such review, we advise you that (a) the Delaware Financing Statement is in appropriate form for filing in the Delaware Filing Office and (b) the Delaware Financing Statement having been filed in the Delaware Filing Office, the Collateral Trustee has a perfected security interest for the benefit of the Trustee and the holders of the Notes in that portion of the Article 9 Collateral in which a security interest is perfected by filing a financing statement in the Delaware Filing Office.

Our opinions set forth in paragraphs 3, 4, 5, 6, 7, 8, 9 and 11 above are subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, (ii) general equitable principles (whether considered in a proceeding in equity or at law) and (iii) an implied covenant of good faith and fair dealing.  Our opinion in paragraph 11 above is further limited by considerations of public policy.

Our opinions in paragraphs 7 and 8 above are subject to the qualification that certain provisions of the Pledge Agreement and the Collateral Trust Agreement may not be enforceable in whole or in part, although the inclusion of such provisions would not render the Pledge Agreement or the Collateral Trust Agreement invalid, and the Pledge Agreement and the Collateral Trust Agreement and the law of the State of New York contain adequate remedial provisions for the practical realization of the rights and benefits afforded thereby.

Our opinion in paragraph 9, and our advice in the third preceding paragraph, are limited to Article 9 of the New York UCC or the Delaware UCC, as the case may be, and, therefore, such opinion and advice paragraphs do not address (i) collateral of a type not subject to Article 9 of the New York UCC or the Delaware UCC and (ii) the issue of which law governs perfection of the security interests granted in the collateral covered by this opinion letter.

We express no opinion as to the validity, legally binding effect or enforceability of any provisions of the Indenture or Notes that requires or relates to payment of any interest at a rate or in an amount that a court would determine in the circumstances under applicable law to be commercially unreasonable or a penalty or a forfeiture.  In addition, we express no opinion as to the validity, legally binding effect or enforceability of (i) the waiver of rights and defenses contained in Section 4.06 of the Indenture or (ii) Section 13.13 of the Indenture, relating to the severability of provisions of such documents.

A-1-5

We express no opinion and render no advice with respect to:

      (i)      perfection of any security interest in (1) any collateral of a type represented by a certificate of title and (2) any collateral consisting of money or Cash Equivalents;

      (ii)     the effect of § 9-315(a)(2) of the New York UCC with respect to any proceeds of Collateral that are not identifiable;

      (iii)    perfection of any security interest whose priority is subject to Section 9-334 of the New York UCC;

      (iv)    the priority of any security interest;

      (v)     the effect of Section 552 of the Bankruptcy Code (11 U.S.C. 552) (relating to property acquired by a pledgor after the commencement of a case under the United States Bankruptcy Code with respect to such pledgor) and Section 506(c) of the Bankruptcy Code (11 U.S.C. 506(c)) (relating to certain costs and expenses of a trustee in preserving or disposing of collateral); or

      (vi)    the effect of any provision of the Pledge Agreement or the Collateral Trust Agreement which is intended to establish any standard other than a standard set forth in the New York UCC as the measure of the performance by any party thereto of such party's obligations of good faith, diligence, reasonableness or care or of the fulfillment of the duties imposed on any secured party with respect to the maintenance, disposition or redemption of collateral, accounting for surplus proceeds of collateral or accepting collateral in discharge of liabilities.

Our opinions set forth in paragraphs 13 and 14 above are limited to our review of only statutes, rules and regulations that, in our experience, are customarily applicable to transactions of the type contemplated by the Offering Memorandum, the Purchase Agreement and the Indenture.

We understand that, with respect to matters of Texas law, you are relying on the opinions of Vinson & Elkins LLP, counsel to the Company and Andrew Wright, Esq., Vice President and Associate General Counsel of the Company, and, with respect to matters of federal law and regulations relating to the generation, storage, sale or transmission of electricity or the ownership or operation of generating facilities or transmission facilities, you are relying on the opinion of Morgan, Lewis & Bockius LLP, nuclear regulatory commission counsel to the Company, each dated the date hereof.

We do not express any opinion herein concerning any law other than the law of the State of New York, the federal law of the United States and the Delaware Limited Liability Company Act.

This opinion letter is rendered to you in connection with the above-described transaction. This opinion letter may not be relied upon by you for any other purpose, or relied upon by, or furnished to, any other person, firm or corporation without our prior written consent, except that the Trustee may rely upon paragraphs 1, 3, 4, 5, 6, 10, 14, 15 and 16 above and the Collateral Trustee may rely upon paragraphs 7, 8 and 9 above, subject to the qualifications, assumptions and limitations relating thereto.

Confidential

Very truly yours,


SIMPSON THACHER & BARTLETT LLP

A-1-7

Confidential
EFH02433677

Schedule I

1.    Credit Agreement, dated as of October 10, 2007, among Energy Future Competitive Holdings Company, Texas Competitive Electric Holdings Company LLC, the lending institutions from time to time parties thereto, Citibank, N.A., as Administrative Agent and as Collateral Agent, Swingline Lender, Revolving Letter of Credit Issuer and Deposit Letter of Credit Issuer, and the other Agents and entities parties thereto (the "Credit Agreement").

2.    Amendment No. 1, dated as of August 7, 2009, to the Credit Agreement.

3.    Guarantee, dated as of October 10, 2007, among Energy Future Competitive Holdings Company, Texas Competitive Electric Holdings Company LLC and the Subsidiary Guarantors, in favor of Citibank, N.A., as Collateral Agent for the benefit of the Secured Parties under the Credit Agreement.

4.    Revolving Credit Agreement, dated as of October 10, 2007, among Oncor Electric Delivery Company LLC, the lenders listed in Schedule 2.01 thereof, JPMorgan Chase Bank, N.A., as Administrative Agent, Citibank, N.A., as Syndication Agent, Credit Suisse, Cayman Island Branch, Goldman Sachs Credit Partners L.P., Lehman Commercial Paper Inc. and Morgan Stanley Senior Funding, Inc. as Co-Documentation Agents, J.P. Morgan Securities Inc., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Goldman Sachs Credit Partners L.P., Lehman Brothers Inc. and Morgan Stanley Senior Funding, Inc., as Joint Lead Arrangers and Bookrunners, JPMorgan Chase Bank, N.A., as Swingline Lender and JPMorgan Chase Bank, N.A. and Citibank, N.A. as Fronting Banks.

5.    Indenture, dated as of October 31, 2007, as supplemented by the Supplemental Indenture, dated as of July 8, 2008, and the Second Supplemental Indenture, dated as of August 3, 2009, each among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A. (as successor to The Bank of New York), as trustee, pursuant to which the 10.875% Senior Notes due 2017 and the 11.250%/12.000% Senior Toggle Notes due 2017 were issued.

6.    Indenture, dated as of October 31, 2007, as supplemented by the Supplemental Indenture, dated as of December 6, 2007 and the Second Supplemental Indenture, dated as of August 3, 2009, each among Texas Competitive Electric Holdings Company LLC, TCEH Finance, Inc., the guarantors named therein and The Bank of New York Mellon (formerly known as The Bank of New York), as trustee, pursuant to which Texas Competitive Electric Holdings Company LLC's and TCEH Finance, Inc.'s 10.25% Senior Notes due 2015, 10.25% Senior Notes due 2015, Series B, and 10.50%/11.25% Senior Toggle Notes due 2016 were issued.

7.    Energy Future Holdings Corp. Senior Notes, issued in November 2004, in the following series:

    •   5.550% Series P Senior Notes due November 15, 2014;

    •   6.500% Series Q Senior Notes due November 15, 2024; and

    •   6.550% Series R Senior Notes due November 15, 2034.

A-1-8

8.    The following Oncor Electric Delivery Company LLC Senior Notes and Debentures:

    (a)    Oncor Electric Delivery Company LLC Senior Notes, issued in May 2002 in the following series:

- 6.375% Fixed Senior Notes due 2012; and

- 7.000% Fixed Senior Notes due 2032.

    (b)    Oncor Electric Delivery Company LLC Senior Notes, issued in December 2002 in the following series:

- 6.375% Fixed Senior Notes due 2015; and

- 7.250% Fixed Senior Notes due 2033.

    (c)    Oncor Electric Delivery Company LLC 7.000% Fixed Debentures due 2022 issued in August 2002.

    (d)    Oncor Electric Delivery Company LLC Senior Secured Notes, issued in September 2008 in the following series:

- 5.95% Senior Secured Notes due 2013;

- 6.80% Senior Secured Notes due 2018; and

- 7.50% Senior Secured Notes due 2038.

9.    Investor Rights Agreement, dated as of November 5, 2008, by and among Oncor Electric Delivery Company LLC, Oncor Electric Delivery Holdings Company LLC, Texas Transmission Investment LLC and Energy Future Holdings Corp.

10.    Indenture, dated as of November 16, 2009, among Energy Future Holdings Corp., the Guarantors named therein and The Bank of New York Mellon Trust Company, N.A., pursuant to which Energy Future Holdings Corp.'s 9.75% Senior Secured Notes due 2019 were issued.

11.    Indenture, dated as of November 16, 2009, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and The Bank of New York Mellon Trust Company, N.A., pursuant to which Energy Future Intermediate Holding Company LLC's and EFIH Finance Inc.'s 9.75% Senior Secured Notes due 2019 were issued.

12.    Pledge Agreement, dated November 16, 2009, from Intermediate Holdings to The Bank of New York Mellon Trust Company, N.A., as Collateral Trustee.

13.    Collateral Trust Agreement, dated November 16, 2009, among Intermediate Holdings, The Bank of New York Mellon Trust Company, N.A., as First Lien Trustee, the other Secured Debt Representatives named therein and The Bank of New York Mellon Trust Company, N.A., as Collateral Trustee.

Confidential

EFH02433679

**Exhibit A-2**

<u>Negative Assurance Letter of Vinson & Elkins LLP,  Counsel for the Issuer and the
Guarantors</u>

Re:    Senior Secured Notes – Energy Future Holdings Corp.

Ladies and Gentlemen:

We have acted as counsel for Energy Future Holdings Corp., a Texas corporation
("<u>EFH Corp.</u>"), Energy Future Intermediate Holding Company LLC, a Delaware limited
liability company ("<u>EFIH</u>"), and Energy Future Competitive Holdings Company, a Texas
corporation ("<u>EFCH</u>," and together with EFIH, the "<u>Guarantors</u>"), in connection with the
purchase by you of $500,000,000 aggregate principal amount of 10.000% Senior Secured
Notes due 2020 (the "<u>Notes</u>") issued by EFH Corp. and unconditionally guaranteed by the
Guarantors, pursuant to the Purchase Agreement, dated January 7, 2010 (the "<u>Purchase
Agreement</u>"), among EFH Corp., the Guarantors and you, as the initial purchasers (the
"<u>Initial Purchasers</u>").

We have not independently verified the accuracy, completeness or fairness of the
statements made or included in the Preliminary Offering Memorandum, dated January 6,
2010 (the "<u>Preliminary Offering Memorandum</u>," and together with the information set forth on
Schedule III to the Purchase Agreement, the "<u>Pricing Disclosure Package</u>") or the Offering
Memorandum dated January 7, 2010 (the "<u>Offering Memorandum</u>"), and we take no
responsibility therefor, except as and to the extent set forth in numbered paragraph 9 of our
opinion letter to you dated the date hereof.

We have participated in conferences with representatives and officers of EFH Corp.
and the Guarantors, with representatives of EFH Corp.'s independent registered public
accountants, and with representatives of, and counsel to, the Initial Purchasers, at which
conferences the contents of the Pricing Disclosure Package, Offering Memorandum and
related matters were discussed, and based on the participation described above, no facts
have come to our attention that have caused us to believe that (i) the Pricing Disclosure
Package, as of the Applicable Time (as defined in the Purchase Agreement), contained any
untrue statement of a material fact or omitted to state any material fact necessary in order to
make the statements therein, in the light of the circumstances under which they were made,
not misleading, or (ii) the Offering Memorandum, as of its date or as of the date hereof,
contained or contains any untrue statement of a material fact or omitted or omits to state any
material fact necessary in order to make the statements therein, in the light of the
circumstances under which they were made, not misleading.  Notwithstanding the foregoing,
we express no view, belief or comment with respect to the form, accuracy, completeness or
fairness of the financial statements, including the related notes and schedules thereto and

A-2-1

EFH02433680

the auditors' reports thereon or other financial or accounting information contained or incorporated by reference therein or excluded therefrom.

This letter speaks as of the dates referenced in the immediately preceding paragraph and we undertake no, and hereby disclaim any, obligation to advise you regarding any changes subsequent to the date hereof in, or otherwise communicate with you with respect to, the matters addressed herein.

The statements made herein are solely to your benefit in connection with the above-described transaction and may not be relied upon by you for any other purpose and may not be used or relied upon for any purpose by any other person without our prior written consent.  Except for the use permitted herein, this letter is not to be quoted or reproduced in whole or in part or otherwise referred to in any manner nor is it to be filed with any governmental agency or delivered to any other person without our prior written consent.

Very truly yours,

A-2-2

EFH02433681

<u>Opinion of Vinson & Elkins LLP, Counsel for the Issuer and the Guarantors</u>

Ladies and Gentlemen:

We have acted as counsel for Energy Future Holdings Corp., a Texas corporation ("<u>EFH Corp.</u>"), Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("<u>EFIH</u>"), and Energy Future Competitive Holdings Company, a Texas corporation ("<u>EFCH</u>," and together with EFIH, the "<u>Guarantors</u>"), in connection with the purchase by you of $500,000,000 aggregate principal amount of 10.000% Senior Secured Notes due 2020 (the "<u>Notes</u>") issued by EFH Corp. and unconditionally guaranteed by the Guarantors, pursuant to the Purchase Agreement, dated January 7, 2010 (the "<u>Purchase Agreement</u>"), among EFH Corp., the Guarantors and you, as the initial purchasers (the "<u>Initial Purchasers</u>").

In rendering the opinions set forth below, we have reviewed copies of the following documents and instruments:

(i)     the Preliminary Offering Memorandum, dated January 6, 2010, relating to the sale of the Notes (the "<u>Preliminary Offering Memorandum</u>"),

(ii)    the final term sheet attached as Schedule III to the Purchase Agreement (the "<u>Final Term Sheet</u>," and together with the Preliminary Offering Memorandum, the "<u>Pricing Disclosure Package</u>"),

(iii)   the Offering Memorandum, dated January 7, 2010, relating to the sale of the Notes (the "<u>Offering Memorandum</u>"),

(iv)    the Indenture, dated January 12, 2010 (the "<u>Indenture</u>"), among EFH Corp., the Guarantors and The Bank of New York Mellon Trust Company, N.A., as trustee (the "<u>Trustee</u>"),

(v)     the global note representing the Notes,

(vi)    the guarantees by the Guarantors of the Notes, whose terms are set forth in the Indenture (the "<u>Guarantees</u>"),

(vii)   the Purchase Agreement,

(viii)  the Registration Rights Agreement, dated January 12, 2010, among EFH Corp., the Guarantors and the Initial Purchasers relating to the Notes (the "<u>Registration Rights Agreement</u>"),

A-2-3

(ix)     the Pledge Agreement, dated November 16, 2009, by EFIH to The Bank of New York Mellon Trust Company, N.A. (the "Collateral Trustee"),

(x)     the Collateral Trust Agreement, dated November 16, 2009, among EFIH, the Trustee, the Collateral Trustee and the other Secured Debt Representatives from time to time party thereto,

(xi)     the Joinder, dated January 12, 2010, by the Trustee and acknowledged by the Collateral Trustee,

(xii)     the Additional Secured Debt Designation, dated January 12, 2010, by EFIH and acknowledged by the Collateral Trustee,

(xiii)     the organizational documents of each of EFH Corp. and EFCH as listed on Schedule I hereto (such organizational documents herein referred to as the "Organizational Documents"),

(xiv)     the authorization documents listed on Schedule II hereto,

(xv)     the existence and good standing certificates listed on Schedule III hereto, and

(xvi)     each of the Applicable Contracts (as defined below).

The documents listed in clauses (i) through (xii) above are referred to herein as the "Transaction Documents."  In rendering the opinions set forth herein, we have, with your consent, relied only upon examination of the documents described above.  As to any facts material to our opinions, we have made no independent investigation of such facts and have relied, to the extent that we deem such reliance proper, upon statements of public officials and officers or other representatives of EFH Corp. and the Guarantors and on the representations and warranties set forth in the Transaction Documents.

In rendering the opinions expressed below, we have assumed the legal capacity of all natural persons, the genuineness of all signatures, the authenticity of all documents submitted to us as originals, the conformity to authentic original documents of all documents submitted to us as copies, and the accuracy and completeness of all corporate, limited liability company, partnership and other entity records made available to us, which assumptions we have not independently verified.  In addition, with your permission and without independent verification, we have made the following assumptions:

A-2-4

(i)     Each party to the Transaction Documents (each, a "<u>Transaction Party</u>") is a corporation, partnership, limited liability company or other entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, except we have not made such assumption as to EFH Corp. or EFCH with respect to the matters addressed in our opinions in paragraph 1 below.

(ii)    Each Transaction Document has been duly authorized, executed and delivered by each Transaction Party that is a party thereto, except we have not made such assumption as to EFH Corp. or EFCH with respect to the matters addressed in our opinions in paragraphs 2, 3, 4, 5, 6, 7 and 8 below.

(iii)   The execution, delivery and performance by each Transaction Party of the Transaction Documents to which it is a party and the consummation of the transactions contemplated thereby do not violate the bylaws or other Organizational Documents of such Transaction Party, except that we have not made such assumptions as to EFH Corp. or EFCH with respect to the matters addressed in our opinions in paragraph 11(i) below.

(iv)    The execution, delivery and performance by each Transaction Party of the Transaction Documents to which it is a party and the consummation of the transactions contemplated thereby do not conflict with, breach or result in a default under any document or instrument binding on it, except that we have not made such assumption as to EFH Corp. and the Guarantors with respect to any Applicable Contracts (as defined below) to the extent of the matters addressed in our opinion in paragraph 11(ii) below.

(v)     The execution, delivery and performance by each Transaction Party of the Transaction Documents to which it is a party and the consummation of the transactions contemplated thereby do not result in a violation of any provision of any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award applicable to any of them, except that we have not made such assumption as to EFH Corp. and the Guarantors with respect to Applicable Laws (as defined below) and Applicable Orders (as defined below) to the extent of the matters addressed in our opinions in paragraphs 11(iii) and 11(iv) below.

(vi)    No authorization, approval, consent, order, license, franchise, permit or other action by, and no notice to or filing with, any nation or government, any state, province, territory or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including without limitation the Electric Reliability Council of Texas ("<u>Governmental Authority</u>"), or any other third party is required for the due execution, delivery and performance by each Transaction Party of the Transaction Documents to which it is a party

Confidential                                                                                      EFH02433684

that has not been duly obtained or made and that is not in full force and effect, except that we have not made such assumption with respect to Governmental Approvals (as defined below) required to be obtained or taken by EFH Corp. or either Guarantor or compliance with Texas Electric Utilities Laws (as defined below) as to which we express our opinion in paragraphs 11 and 12 below.

(vii)    Each Transaction Document constitutes a valid and binding obligation of each party thereto, enforceable against each such party under the law of the jurisdiction chosen to govern such Transaction Document.

(viii)    The laws of any jurisdiction other than the laws that are the subject of this opinion letter do not affect the terms of the Transaction Documents.

Based upon the foregoing, and subject to the assumptions, qualifications, exceptions and limitations set forth herein, it is our opinion that:

1.    Each of EFH Corp. and EFCH is a corporation validly existing, and each of EFH Corp. and EFCH is in good standing, under the laws of the State of Texas, and has full corporate power and authority to conduct its business as described in the Pricing Disclosure Package and the Offering Memorandum.

2.    The execution and delivery of the Indenture by EFH Corp. and EFCH and the performance of their respective obligations thereunder have been duly authorized by all necessary corporate action of EFH Corp. and EFCH.  The Indenture has been duly executed and delivered by EFH Corp. and EFCH.

3.    The execution and delivery of the Notes by EFH Corp. and the performance of its obligations thereunder have been duly authorized by all necessary corporate action of EFH Corp.  The Notes have been duly executed and delivered by EFH Corp.

4.    The execution and delivery of EFCH's Guarantee by EFCH and the performance of its obligations thereunder have been duly authorized by all necessary corporate action of EFCH.  EFCH's Guarantee has been duly executed and delivered by EFCH.

5.    The execution and delivery of the Exchange Securities (as defined in the Purchase Agreement) by EFH Corp. and the performance of its obligations thereunder have been duly authorized by all necessary corporate action of EFH Corp.

A-2-6

6.      The execution and delivery of EFCH's guarantee of the Exchange Securities (as defined in the Purchase Agreement) by EFCH and the performance of its obligations thereunder have been duly authorized by all necessary corporate action of EFCH.

7.      The execution and delivery of the Registration Rights Agreement by EFH Corp. and EFCH and the performance of their respective obligations thereunder have been duly authorized by all necessary corporate action of EFH Corp. and EFCH.  The Registration Rights Agreement has been duly executed and delivered by EFH Corp. and EFCH.

8.      The execution and delivery of the Purchase Agreement by EFH Corp. and EFCH and the performance of their respective obligations thereunder have been duly authorized by all necessary corporate action of EFH Corp. and EFCH.  The Purchase Agreement has been duly executed and delivered by EFH Corp. and EFCH.

9.      The statements made in each of the Pricing Disclosure Package and the Offering Memorandum under the heading "Certain United States Federal Tax Consequences," insofar as they purport to constitute summaries of United States federal tax law and regulations or legal conclusions with respect thereto, constitute accurate summaries of the matters described therein in all material respects.

10.     No registration under the Securities Act of 1933, as amended, of the Notes or the Guarantees is required for the offer and sale of the Notes and the Guarantees by EFH Corp. and the Guarantors to the Initial Purchasers or the reoffer and resale of the Notes by the Initial Purchasers to the initial purchasers therefrom solely in the manner contemplated by the Pricing Disclosure Package, the Offering Memorandum, the Purchase Agreement and the Indenture.

11.     The execution, delivery and performance by EFH Corp., EFIH and EFCH of the Transaction Documents to which it is a party and the consummation by EFH Corp., EFIH and EFCH of the transactions contemplated thereby will not:

(i)      violate EFH Corp.'s or EFCH's Organizational Documents,

(ii)     breach or result in a default under any agreement or instrument listed in Part A of <u>Schedule IV</u> hereto (collectively, the "<u>Applicable Contracts</u>"),

A-2-7

EFH02433686

(iii)    result in any violation by EFH Corp., EFIH or EFCH of any Applicable Law (as defined below),

(iv)    result in any violation by EFH Corp., EFIH or EFCH of any order, writ, judgment or decree listed in Part B of <u>Schedule IV</u> hereto (collectively, the "<u>Applicable Orders</u>"), or

(v)    result in the creation or imposition of any lien on any properties of EFH Corp., EFIH or EFCH pursuant to any Applicable Contract, other than as may be contemplated by the Transaction Documents.

"<u>Applicable Laws</u>" means those laws, rules and regulations of the State of Texas and the rules, orders and regulations adopted thereunder (including protocols, rules and guidelines of the Electric Reliability Council of Texas), and including any order known to us that is issued by any Texas court, that, in our experience, are normally applicable to transactions of the type contemplated by the Transaction Documents, including without limitation Title 2 of the Texas Utilities Code and the rules, orders and regulations adopted thereunder and the final order in PUCT Docket No. 34077 (herein referred to collectively as the "<u>Texas Electric Utilities Laws</u>").  However, the term "<u>Applicable Laws</u>" does not include, and we express no opinion with regard to (i) any state laws, rules or regulations relating to:  (A) pollution or protection of the environment; (B) zoning, land use, building or construction; (C) occupational safety and health or other similar matters; (D) labor, employee rights and benefits; (E) the regulation of utilities, except as to the Texas Electric Utilities Laws; (F) antitrust and trade regulation; (G) tax; (H) securities, including without limitation Texas state securities laws, rules and regulations; (I) corrupt practices; and (J) copyrights, patents and trademarks, and (ii) any laws, rules or regulations of any county, municipality or similar political subdivision or any agency or instrumentality thereof. For the avoidance of doubt, the term "<u>Applicable Laws</u>" does not include, and we express no opinion with regard to, the laws, rules and regulations of the federal government of the United States (except as provided in paragraph 10).

12.    No Governmental Approval that has not been obtained or taken and is not in full force and effect is required to be obtained or taken by EFH Corp. or the Guarantors for the issuance and sale of the Notes by EFH Corp., the issuance of the Guarantees by the Guarantors or the performance by EFH Corp. or the Guarantors of their respective obligations under each Transaction Document, as applicable.

Confidential

EFH02433687

"<u>Governmental Approvals</u>" means any consent, approval, license, permit, registration, certification, authorization or validation of, or filing, final order by, recording or registration with, any Governmental Authority pursuant to any Applicable Laws.

The opinions set forth above are subject to the following qualifications and exceptions:

A.     The opinions expressed herein are limited to the matters discussed above; no opinion is implied or may be inferred beyond such matters.

B.     In rendering our opinions in paragraphs 11(iii), 11(iv) and 12 above, we have assumed, with your permission and without independent verification, that (i) neither EFH Corp. nor the Guarantors are an "electric utility" as such term is defined in Section 31.002(6) of the Texas Utilities Code; (ii) each entity owning in excess of a 4.5% direct or indirect equity interest in EFH Corp. or either Guarantor either (A) owns no interest in electric generating facilities that generate electricity that is offered for sale in the State of Texas or (B) is a broker or dealer registered under the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>"), or a bank or insurance company, as defined in the Exchange Act; (iii) no entity owning any interest in electric generating facilities that generate electricity that is offered for sale in the State of Texas, which acquired any direct or indirect interest in EFH Corp. or either Guarantor, either has the ability to take, or has taken, any action that could reasonably be perceived to exert substantial influence or control over the policies and actions of EFH Corp. or either Guarantor, or any of their respective subsidiaries, prior to acquiring a direct or indirect equity interest in EFH Corp. or such Guarantor; and (iv) all sales of electricity by each of EFH Corp., EFIH or EFCH will be to wholesale customers located within the Electric Reliability Council of Texas. Due to the absence of controlling judicial precedent, our opinions in paragraphs 11(iii) and 12 above are necessarily a reasoned application of general legal principles, rules of construction and legal precedent that we believe may be persuasive, but not necessarily controlling. Accordingly, our opinions are not intended as a guaranty as to what position the Public Utility Commission of Texas might take or as to what a particular court would actually hold; rather, our opinion is an expression of our professional judgment as to the decision a court should reach if the issue were properly presented to it and the court followed what we believe to be the applicable legal principles under existing statutory and judicial precedent. In addition, Governmental Approvals may be required to foreclose on the

Confidential                                                                                                  EFH02433688

collateral securing EFIH's Guarantee of the Notes, or otherwise to assume control of Oncor Electric Delivery Holdings Company LLC.

C.    With respect to our opinion set forth in paragraph 1 above, we have relied solely on the certificates set forth on Schedule III hereto.

D.    In rendering the opinion expressed in paragraphs 11(ii) and 11(v) above:  (i) we have not reviewed, and express no opinion with respect to, documents other than the Applicable Contracts, irrespective of whether they secure, support or otherwise relate to or are referred to in the Applicable Contracts or might under certain circumstances result in an event of default or require early payment under any of the Applicable Contracts; (ii) we have made no examination of, and express no opinion with respect to, any financial, accounting or similar covenant or provision contained in the Applicable Contracts to the extent that any such covenant or provision would require a determination as to any financial or accounting matters; (iii) we express no opinion as to any breach of any confidentiality provision contained in any Applicable Contract caused by any Transaction Document or EFH Corp.'s or the Guarantors' actions pursuant thereto or in contemplation thereof; and (iv) our opinions in paragraphs 11(ii) and 11(v) above are limited to the laws of the State of Texas, except with respect to the agreements and instruments listed in Section 6 of Part A of Schedule IV hereto, which are limited to the Limited Liability Company Act of the State of Delaware.  Some of the Applicable Contracts provide that they are governed by other governing law.  In every case, we have assumed that a court would enforce the Applicable Contracts as written, and we have limited our opinion to matters readily ascertainable from the face of the Applicable Contracts.

This opinion has been prepared in accordance with the customary practice of lawyers who regularly give, and lawyers who regularly advise recipients regarding, opinions of this kind.

We express no opinion as to the laws of any jurisdiction other than Applicable Laws (except as provided in paragraph 10 and, with respect to paragraphs 11(ii) and 11(v), paragraph D(iv)).  We express no opinion as to the federal laws of the United States (except as provided in paragraph 10).  We call to your attention that certain of the documents that we have reviewed are governed by laws of jurisdictions other than those described above, and we express no opinion as to the effect of any such other laws on the opinions expressed herein.

Confidential                                                                                          EFH02433689

This opinion letter is rendered as of the date set forth above.  We expressly disclaim any obligation to update this opinion letter after such date.

This opinion letter is given solely for your benefit in connection with the transactions contemplated by the Transaction Documents and may not be furnished to, or relied upon by, any other person or for any other purpose without our prior written consent, except that the Trustee may rely upon paragraphs 1, 2, 3, 4, 5, 6, 10, 11 and 12 above and the Collateral Trustee may rely on paragraph 11 and 12 above, subject to the qualifications, assumptions and limitations relating thereto.

Very truly yours,

Confidential
EFH02433690

SCHEDULE I

Organizational Documents

1.    Restated Certificate of Formation of Energy Future Holdings Corp. dated October 10, 2007.

2.    Amended and Restated By-Laws of Energy Future Holdings Corp. dated May 15, 2008.

3.    Second Amended and Restated Articles of Incorporation of Energy Future Competitive Holdings Company dated October 5, 2007.

4.    Restated Bylaws of TXU US Holdings Company (now known as Energy Future Competitive Holdings Company) dated January 1, 2002.

Schedule I-1

SCHEDULE II

Authorization Documents

1.    Resolutions of the Executive Committee of the Board of Directors of Energy Future Holdings Corp. dated December 8, 2009.

2.    Resolutions of the Pricing Committee of the Executive Committee of the Board of Directors of Energy Future Holdings Corp. dated January 7, 2010.

3.    Resolutions of the Board of Directors of Energy Future Competitive Holdings Company dated December 8, 2009.

Schedule II-1

SCHEDULE III

Existence and Good Standing Certificates

| Name of Entity | Texas Secretary of State Certificate of Fact | Texas Comptroller of Public Accounts Certificate of Account Status |
|---|---|---|
| Energy Future Holdings Corp. | January 12, 2010 | January 12, 2010 |
| Energy Future Competitive Holdings Company | January 12, 2010 | January 12, 2010 |

Schedule III-1

Confidential                                                                                 EFH02433693

SCHEDULE IV

Part A

Applicable Contracts

1.    **Receivables Facility**

a.    Eighth Omnibus Amendment dated as of October 10, 2007 (the "Eighth Omnibus Amendment"), among TXU Receivables Company, a Delaware corporation, in the capacities therein stated ("TXU Receivables"), TXU Business Services Company, a Texas corporation, in the capacities therein stated ("TXUBS"), TXU Energy Retail Company LLC, a Texas limited liability company, as an Originator ("TXU Energy Retail"), TXU SESCO Energy Services Company, a Texas corporation, as an Originator ("TXU SESCO" and together with TXU Energy Retail, the "Originators"), TXU Corp., a Texas corporation ("TXU"), Citibank, N.A., and Citicorp North America, Inc., in the capacities therein stated, including as Administrative Agent (the "Agent").

b.    Second Amended and Restated Contribution and Sale Agreement by and among TXU Energy Retail Company LP, TXU SESCO Energy Services Company, each as an Originator, and TXU Receivables Company, as Buyer, and TXU Business Services Company, as Buyer's Collection Agent and TXU Corp., dated as of August 4, 2003, as amended by the Omnibus Amendment Agreement dated as of September 25, 2003, the Second Omnibus Amendment Agreement, dated as of September 30, 2003, the Third Omnibus Amendment Agreement, dated as of October 1, 2003, the Fourth Omnibus Amendment Agreement, dated as of November 5, 2003, the Fifth Omnibus Amendment Agreement, dated as of June 30, 2004, the Sixth Omnibus Amendment Agreement, dated as of April 29, 2005, the Seventh Omnibus Amendment Agreement, dated as of June 17, 2005, and the Eighth Omnibus Amendment Agreement (the "Contribution and Sale Agreement").

c.    Amended and Restated Trade Receivables Purchase and Sale Agreement by and among TXU Receivables Company, as Seller, TXU Business Services Company, as Collection Agent, JPMorgan Chase Bank, N.A., ABN AMRO Bank N.V., Calyon, New York Branch and Citicorp North America, Inc., as Administrative Agent, dated as of August 4, 2003, as amended by the Omnibus Amendment Agreement dated as of September 25, 2003, the Second Omnibus Amendment Agreement, dated as of September 30, 2003, the Third Omnibus Amendment Agreement, dated as of October 1, 2003, the Fourth Omnibus Amendment Agreement, dated as of November 5, 2003, the Fifth Omnibus Amendment Agreement, dated as of June 30, 2004, the Sixth Omnibus Amendment Agreement, dated as of April 29, 2005, the Seventh Omnibus Amendment Agreement, dated as of June 17, 2005, and the Eighth Omnibus Amendment Agreement (the "Parallel Purchase Commitment").

Schedule IV-1

EFH02433694

d.   Fourth Amended and Restated Trade Receivables Purchase and Sale Agreement by and among TXU Receivables Company, as Seller, TXU Business Services Company, as Collection Agent, and Chariot Funding LLC (as assignee of Jupiter Securitization Corporation), Windmill Funding Corporation, Ciesco LLC and Atlantic Asset Securitization LLC (as successor to Atlantic Asset Securitization Corp.) as Purchasers, and JPMorgan Chase Bank, N.A., ABN AMRO Bank N.V., Citicorp North America, Calyon, New York Branch, and Citicorp North America, Inc, as Administrative Agent, dated as of August 4, 2003, as amended by the Omnibus Amendment Agreement dated as of September 25, 2003, the Second Omnibus Amendment Agreement, dated as of September 30, 2003, the Third Omnibus Amendment Agreement, dated as of October 1, 2003, the Fourth Omnibus Amendment Agreement, dated as of November 5, 2003, the Fifth Omnibus Amendment Agreement, dated as of June 30, 2004, the Sixth Omnibus Amendment Agreement, dated as of April 29, 2005, the Seventh Omnibus Amendment Agreement, dated as of June 17, 2005, and the Eighth Omnibus Amendment Agreement (the "Fourth Amended Agreement" and together with the Parallel Purchase Agreement, the "Receivables Purchase Agreements").

e.   Subordinated Note dated October 10, 2007 by TXU Receivables Company in favor of TXU SESCO.

f.   Subordinated Note dated October 10, 2007 by TXU Receivables Company in favor of TXU Energy Retail Company LLC.

g.   Second Amended and Restated Parent Undertaking Agreement, dated as of October 10, 2007, made by Texas Competitive Electric Holdings Company LLC in favor of TXU Receivables Company, CAFCO, LLC, CHARTA, LLC, CRC Funding, LLC, Citibank, N.A., the other Purchasers and Banks that from time to time become party to either of the Purchase Agreements referred to below, Citicorp North America, Inc., and the other Managing Agents, Group Managing Agents and other Indemnified Parties under the Receivables Agreements as defined and referred to therein.

2.   **Pollution Control Bonds**

   a.   Brazos River Authority

      i.   Pollution Control Revenue Refunding Bonds (Texas Utilities Electric Company Project) Series 1994A

         1.   Trust Indenture amended and restated as of April 1, 2001, between Brazos River Authority and The Bank of New York, as Trustee.

         2.   Installment Payment and Bond Amortization Agreement amended and restated as of April 1, 2001, between Brazos River Authority and TXU Energy Company LLC.

Schedule IV-2

ii.    Pollution Control Revenue Refunding Bonds (TXU Electric Company Project) Series 1999A:

    1.    Trust Indenture amended and restated as of April 1, 2001, between Brazos River Authority and The Bank of New York, as Trustee.

    2.    Installment Payment and Bond Amortization Agreement amended and restated as of April 1, 2001, between the Brazos River Authority and TXU Electric Company.

iii.    Pollution Control Revenue Refunding Bonds (TXU Electric Company Project) Series 1999B:

    1.    Trust Indenture amended and restated as of December 1, 2001, between Brazos River Authority and The Bank of New York, as Trustee.

    2.    Installment Payment and Bond Amortization Agreement amended and restated as of December 1, 2001, between the Brazos River Authority and TXU Energy Company LLC.

iv.    Pollution Control Revenue Refunding Bonds (TXU Electric Company Project) Series 1999C:

    1.    Trust Indenture amended and restated as of December 1, 2001, between Brazos River Authority and The Bank of New York, as Trustee.

    2.    Installment Payment and Bond Amortization Agreement amended and restated as of December 1, 2001, between the Brazos River Authority and TXU Energy Company LLC.

v.    Pollution Control Revenue Refunding Bonds (TXU Electric Company Project) Series 2001A:

    1.    Trust Indenture dated as of April 1, 2001, and amended restated as of November 1, 2003, between Brazos River Authority and The Bank of New York, as Trustee, as amended by an Amendment to 2001A Indenture dated as of June 1, 2008.

    2.    Installment Payment and Bond Amortization Agreement dated as of April 1, 2001, between the Brazos River Authority and the Company.

    3.    Covenant Agreement dated June 18, 2008, from Texas Competitive Electric Holdings Company LLC to The Bank of New York, as Trustee.

Schedule IV-3

EFH02433696

vi.    Pollution Control Revenue Refunding Bonds (TXU Electric Company Project) Series 2001C:

1.    Trust Indenture dated as of November 1, 2001, between Brazos River Authority and The Bank of New York, as Trustee.

2.    Installment Payment and Bond Amortization Agreement dated as of November 1, 2001, between Brazos River Authority and TXU Energy Company LLC.

vii.    Pollution Control Revenue Refunding Bonds (TXU Electric Company Project) Series 2001D-1 and Series 2001D-2:

1.    Trust Indenture dated as of November 1, 2001, and amended and restated November 1, 2003, between Brazos River Authority and The Bank of New York, as Trustee as amended by an Amendment to 2001D Indenture dated as of June 1, 2008.

2.    Installment Payment and Bond Amortization Agreement dated as of November 1, 2001, between Brazos River Authority and TXU Energy Company LLC.

3.    Covenant Agreement dated June 18, 2008, from Texas Competitive Electric Holdings Company LLC to The Bank of New York, as Trustee.

viii.    Pollution Control Revenue Refunding Bonds (TXU Electric Company Project) Taxable Series 2001I:

1.    Trust Indenture dated as of December 1, 2001, between Brazos River Authority and The Bank of New York, as Trustee.

2.    Installment Payment and Bond Amortization Agreement dated as of December 1, 2001, between Brazos River Authority and TXU Energy Company LLC.

ix.    Pollution Control Revenue Refunding Bonds (TXU Electric Company Project) Series 2002A:

1.    Trust Indenture dated as of May 1, 2002, between Brazos River Authority and The Bank of New York, as Trustee.

2.    Installment Payment and Bond Amortization Agreement dated as of May 1, 2002, between Brazos River Authority and TXU Energy Company LLC.

x.    Pollution Control Revenue Refunding Bonds (TXU Energy Company LLC Project) Series 2003A:

Schedule IV-4

      1.      Trust Indenture dated as of March 1, 2003, between Brazos River Authority and The Bank of New York, as Trustee.

      2.      Installment Payment and Bond Amortization Agreement dated as of March 1, 2003, between Brazos River Authority and TXU Energy Company LLC.

xi.      Pollution Control Revenue Refunding Bonds (TXU Energy Company LLC Project) Series 2003B:

      1.      Trust Indenture dated as of June 1, 2003, between Brazos River Authority and The Bank of New York, as Trustee.

      2.      Installment Payment and Bond Amortization Agreement dated as of June 1, 2003, between Brazos River Authority and TXU Energy Company LLC.

xii.      Pollution Control Revenue Refunding Bonds (TXU Energy Company LLC Project) Series 2003C:

      1.      Trust Indenture dated as of October 1, 2003, between Brazos River Authority and The Bank of New York, as Trustee.

      2.      Installment Payment and Bond Amortization Agreement dated as of October 1, 2003, between Brazos River Authority and TXU Energy Company LLC.

xiii.      Pollution Control Revenue Refunding Bonds (TXU Energy Company LLC Project) Series 2003D:

      1.      Trust Indenture dated as of October 1, 2003, between Brazos River Authority and The Bank of New York, as Trustee.

      2.      Installment Payment and Bond Amortization Agreement dated as of October 1, 2003, between Brazos River Authority and TXU Energy Company LLC.

xiv.      Pollution Control Revenue Bonds (TXU Energy Company LLC Project) Series 2006:

      1.      Trust Indenture dated as of March 1, 2006, between Brazos River Authority and The Bank of New York, as Trustee.

      2.      Installment Sale and Bond Amortization Agreement dated as of March 1, 2006, between Brazos River Authority and TXU Energy Company LLC.

b.      Sabine River Authority of Texas

Confidential      EFH02433698

i.      Pollution Control Revenue Refunding Bonds (TXU Electric Company Project) Series 2000A:

      1.      Trust Indenture dated as of August 1, 2000, between the Sabine River Authority of Texas and The Bank of New York, as Trustee.

      2.      Installment Payment and Bond Amortization Agreement dated as of August 1, 2000, between the Sabine River Authority of Texas and TXU Electric Company.

ii.     Pollution Control Revenue Refunding Bonds (TXU Electric Company Project) Series 2001A:

      1.      Trust Indenture dated as of November 1, 2001, between the Sabine River Authority of Texas and The Bank of New York, as Trustee.

      2.      Installment Payment and Bond Amortization Agreement dated as of November 1, 2001, between the Sabine River Authority of Texas and TXU Electric Company.

iii.    Pollution Control Revenue Refunding Bonds (TXU Electric Company Project) Series 2001B:

      1.      Trust Indenture dated as of November 1, 2001, between the Sabine River Authority of Texas and The Bank of New York, as Trustee.

      2.      Installment Payment and Bond Amortization Agreement dated as of November 1, 2001, between the Sabine River Authority of Texas and TXU Electric Company.

iv.     Pollution Control Revenue Refunding Bonds (TXU Electric Company Project) Series 2001C:

      1.      Trust Indenture dated as of November 1, 2001, between the Sabine River Authority of Texas and The Bank of New York, as Trustee.

      2.      Installment Payment and Bond Amortization Agreement dated as of November 1, 2001, between the Sabine River Authority of Texas and TXU Electric Company.

v.      Pollution Control Revenue Refunding Bonds (TXU Energy Company LLC Project) Series 2003A:

      1.      Trust Indenture dated as of June 1, 2003, between the Sabine River Authority of Texas and The Bank of New York, as Trustee.

Schedule IV-6

2.    Installment Payment and Bond Amortization Agreement dated as of June 1, 2003, between the Sabine River Authority of Texas and TXU Energy Company LLC.

vi.    Pollution Control Revenue Refunding Bonds (TXU Energy Company LLC Project) Series 2003B:

1.    Trust Indenture dated as of October 1, 2003, between the Sabine River Authority of Texas and The Bank of New York, as Trustee.

2.    Installment Payment and Bond Amortization Agreement dated as of October 1, 2003, between the Sabine River Authority of Texas and TXU Energy Company LLC.

c.    Trinity River Authority of Texas

i.    Pollution Control Revenue Refunding Bonds (TXU Electric Company Project) Series 2000A

1.    Trust Indenture dated as of May 1, 2000, and amended and restated as of April 1, 2001, between the Trinity River Authority of Texas and The Bank of New York, as Trustee.

2.    Installment Payment and Bond Amortization Agreement dated as of May 1, 2000, and amended and restated as of April 1, 2001, between the Trinity River Authority of Texas and TXU Energy Company LLC.

3.    **Energy Plaza Lease**

a.    Lease Agreement dated as of February 14, 2002 between U.S. Bank, N.A. (as successor-in-interest to State Street Bank and Trust Company of Connecticut, National Association), as owner trustee of the ZSF/Dallas Tower Trust, as Lessor, and TXU Properties Company, as Lessee

b.    First Amendment to Lease Agreement dated as of June 1, 2007

c.    Master Letter Agreement dated as of June 1, 2007 among TXU Properties Company, the Lessor, various lenders and others.

4.    **U.S. Holdings – Comanche Peak Debt**

a.    Deed of Trust and Security Agreement to Secure Assumption made by and between Texas Utilities Electric Company, Don T. Collins, Trustee, for the benefit of The United States of America, Acting by and Through the Administrator of the Rural Electrification Administration, and TEX-LA Electric Cooperative of Texas, Inc., dated as of February 1, 1990

Schedule IV-7

EFH02433700

b.      Amended Agreement between TEX-LA Electric Cooperative of Texas, Inc., Tex-La, and Texas Utilities Electric Company, TU Electric, dated as of January 30, 1990

c.      Guaranty Agreement pursuant to which Texas Utilities Company Guarantees the full and prompt payment of all sums when due pursuant to the Assumption Agreement.  Dated February 1, 1990

d.      Assumption Agreement entered into February 1, 1990 by and between Texas Utilities Electric Company, Tex-La Electric Cooperative of Texas, and the United State of America acting by and through the Administrator of the Rural Electrification Administration.

5.      **7.460% U.S. Holdings Combustion Turbine Leveraged Lease**

a.      Permian Basin – Morgan Creek

    i.      Lease Agreement dated as of December 1, 1987, between The Connecticut National Bank as Owner Trustee, as Lessor, and Texas Utilities Electric Company (New York governing law)

    ii.     Lease Agreement Supplement No. 1 dated as of May 20, 1988, between The Connecticut National Bank as Owner Trustee, as Lessor, and Texas Utilities Electric Company dated as of May 20, 1988

    iii.    Lease Agreement Supplement No. 2 dated as of August 18, 1988, between The Connecticut National Bank as Owner Trustee, as Lessor, and Texas Utilities Electric Company

    iv.     Lease Agreement Supplement No. 3 dated as of August 25, 1988, between The Connecticut National Bank as Owner Trustee, as Lessor, and Teas Utilities Electric Company

    v.      Lease Agreement Supplement No. 4 dated as of December 1, 1988, between The Connecticut National Bank as Owner Trustee, as Lessor, and Texas Utilities Electric Company

    vi.     Lease Agreement Supplement No. 5 dated as of June 1, 1989, between The Connecticut National Bank as Owner Trustee, as Lessor, and Texas Utilities Electric Company

    vii.    Lease Agreement Supplement No. 6 dated as of July 1, 1993, between Shawmut Bank Connecticut, National Association, as Owner Trustee, as Lessor, and Texas Utilities Electric Company

    viii.   Participation Agreement dated December 1, 1987, among  The Connecticut National Bank, Owner Trustee, The First National Bank of Chicago, Indenture Trustee, U.S. West Financial Services, Inc., Owner

Schedule IV-8

Participant, Certain Institutions, Initial Loan Participants, CAPCORP, Inc., Seller, and Texas Utilities Electric Company (New York governing law)

ix.    Supplement No. 2 to the Participation Agreement among The Connecticut National Bank, The First National Bank of Chicago, Nynex Credit Company, The Initial Loan Participants, and Texas Utilities Electric Company, dated as of August 18, 1988

x.    Supplement No. 3 to the Participation Agreement among The Connecticut National Bank, The First National Bank of Chicago, Nynex Credit Company, and Texas Utilities Electric Company, dated as of December 1, 1988

xi.    Supplement No. 4 to the Participation Agreement among Shawmut Bank Connecticut, National Association, First National Bank of Chicago, Nynex Credit Company and Texas Utilities Electric Company dated as of June 17, 1993

xii.    Assumption and Assignment Agreement dated December 28, 2001, between TXU Energy Company, LLC and TXU Electric Company relating to Lease Agreement between State Street Bank, successor to Fleet National Bank, formerly The Connecticut National Bank, and Texas Utilities Electric Company, dated as of December 1, 1987

xiii.    Trust Indenture, Security Agreement and Mortgage dated as of December 1, 1987, among The Connecticut National Bank, Texas Utilities Electric Company and The First National Bank of Chicago, as Indenture Trustee (New York governing law)

xiv.    Trust Indenture, Security Agreement and Mortgage Supplement No. 1 dated as of May 1, 1988, among The Connecticut National Bank, Texas Utilities Electric Company, and The First National Bank of Chicago, as Indenture Trustee (New York Governing law)

xv.    Trust Indenture, Security Agreement and Mortgage Supplement No. 3 dated as of August 1, 1988, among The Connecticut National Bank, Texas Utilities Electric Company, and The First National Bank of Chicago, as Indenture Trustee

xvi.    Trust Indenture, Security Agreement and Mortgage Supplement No. 4 dated as of July 1, 1993, among Shawmut Bank Connecticut, National Association, Texas Utilities Electric Company and The First National Bank of Chicago

6.    **Organizational Documents of Oncor Electric Delivery Holdings Company LLC and Oncor Electric Delivery Company LLC**

Schedule IV-9

a.      Certificate of Formation of Oncor Electric Delivery Holdings Company LLC, dated October 5, 2007

b.      Second Amended and Restated Limited Liability Company Agreement of Oncor Electric Delivery Holdings Company LLC, dated November 5, 2008, among Energy Future Intermediate Holding Company LLC, William T. Hill, Jr. and Richard W. Wortham III

c.      Certificate of Formation of Oncor Electric Delivery Company LLC, dated October 5, 2007

d.      Second Amended and Restated Limited Liability Company Agreement of Oncor Electric Delivery Company LLC, dated as of November 5, 2008, by and among Oncor Electric Delivery Holdings Company LLC, Texas Transmission Investment LLC and Oncor Management LLC, as amended by the First Amendment to the Second Amended and Restated Limited Liability Company Agreement of Oncor Electric Delivery Company LLC, entered into as of February 18, 2009, by and among Oncor Electric Delivery Holdings Company LLC, Texas Transmission Investment LLC and Oncor Management LLC

Part B

Applicable Orders

1.      Order on Rehearing, PUCT Docket No. 34077, Joint Report and Application of Oncor Electric Delivery Company and Texas Energy Future Holdings Limited Partnership Pursuant to PURA § 14.101.

Schedule IV-10

**Exhibit A-3**

<u>Opinion of Morgan, Lewis & Bockius LLP, Nuclear Regulatory Commission Counsel for the Issuer and the Guarantors</u>

Re:     Senior Secured Notes – Energy Future Holdings Corp.

Ladies and Gentlemen:

We have acted as special nuclear counsel for Energy Future Holdings Corp., a Texas corporation ("<u>EFH Corp.</u>" or the "Issuer"), Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("<u>EFIH</u>"), and Energy Future Competitive Holdings Company, a Texas corporation ("<u>EFCH</u>," and together with EFIH, the "<u>Guarantors</u>"), in connection with the purchase by you of $500,000,000 aggregate principal amount of 10.000% Senior Secured Notes due 2020 (the "<u>Notes</u>") issued by EFH Corp. and unconditionally guaranteed by the Guarantors, pursuant to the Purchase Agreement, dated January 7, 2010 (the "<u>Purchase Agreement</u>"), among EFH Corp., the Guarantors and you, as the initial purchasers (the "<u>Initial Purchasers</u>").

In rendering the opinions set forth below, we have reviewed copies of the following documents and instruments:

(i)     the Offering Memorandum, dated January 7, 2010, relating to the sale of the Notes (the "<u>Offering Memorandum</u>"),

(ii)     the Indenture, dated January 12, 2010 (the "<u>Indenture</u>"), among EFH Corp., the Guarantors and The Bank of New York Mellon Trust Company, N.A., as trustee (the "<u>Trustee</u>"),

(iii)     the global note representing the Notes,

(iv)     the guarantees by the Guarantors of the Notes, whose terms are set forth in the Indenture (the "<u>Guarantees</u>"),

(v)     the Purchase Agreement,

(vi)     the Registration Rights Agreement, dated January 12, 2010, among EFH Corp., the Guarantors and the Initial Purchasers relating to the Notes (the "<u>Registration Rights Agreement</u>"),

(vii)     the Pledge Agreement, dated November 16, 2009, by EFIH to The Bank of New York Mellon Trust Company, N.A. (the "<u>Collateral Trustee</u>"),

A-3-1

EFH02433704

(viii)    the Collateral Trust Agreement, dated as of November 16, 2009 (the "Original Collateral Trust Agreement"), among EFIH, the Trustee, the Collateral Trustee and the other Secured Debt Representatives from time to time party thereto, and the Collateral Trust Joinder, dated January 12, 2010, between the Trustee and the Collateral Trustee (together with the Original Collateral Trust Agreement, the "Collateral Trust Agreement") and

(ix)    the Additional Secured Debt Designation, dated January 12, 2010, by EFIH and acknowledged by the Collateral Trustee.

The documents listed in clauses (ii) through (ix) above are referred to herein as the "Transaction Documents."  In rendering the opinions set forth herein, we have, with your consent, relied only upon examination of the documents described above.  As to any facts material to our opinions, we have made no independent investigation of such facts and have relied, to the extent that we deem such reliance proper, upon statements of public officials and officers or other representatives of EFH Corp. and the Guarantors and on the representations and warranties set forth in the Transaction Documents.

In rendering the opinions expressed below, we have assumed the legal capacity of all natural persons, the genuineness of all signatures, the authenticity of all documents submitted to us as originals, the conformity to authentic original documents of all documents submitted to us as copies, and the accuracy and completeness of all corporate, limited liability company, partnership and other entity records made available to us, which assumptions we have not independently verified.

Based upon the foregoing, and subject to the assumptions, qualifications, exceptions and limitations set forth herein, it is our opinion that:

1.    The execution and delivery by the Issuer, EFIH and EFCH of the Transaction Documents to which it is a party and the consummation by the Issuer, EFIH and EFCH of the transactions contemplated thereby, including the issue and sale of the Notes by the Issuer, will not:

(i)    result in any violation by the Issuer, EFIH or EFCH of any Applicable Nuclear Laws (as defined below),

(ii)    result in any violation by the Issuer, EFIH or EFCH of any order, writ, judgment or decree known to us issued under Applicable Nuclear Laws.

"Applicable Nuclear Laws" means the Atomic Energy Act of 1954, as amended, and the related rules, regulations or orders of the U.S. Nuclear Regulatory Commission ("NRC").

2.    No NRC Approval is required to be obtained or taken by EFH Corp., EFIH or EFCH for the issuance and sale of the Notes by the Issuer, the issuance of the guarantee of the Notes by EFIH, the issuance of the guarantee of the Notes by

A-3-2

EFH02433705

EFCH or the performance by the Issuer, EFIH or EFCH of their respective obligations under each Transaction Document, as applicable.

"NRC Approvals" means any consent, approval, license, permit, registration, certification, authorization or validation of, or filing, recording or registration with, the NRC pursuant to any Applicable Nuclear Laws.

The opinions expressed herein are limited to the matters discussed above; no opinion is implied or may be inferred beyond such matters.

This opinion has been prepared in accordance with the customary practice of lawyers who regularly give, and lawyers who regularly advise recipients regarding, opinions of this kind.

We express no opinion as to the laws of any jurisdiction other than Applicable Nuclear Laws.

This letter is rendered as of the date set forth above. We expressly disclaim any obligation to update this letter after such date.

This letter is given solely for your benefit in connection with the transactions contemplated by the Transaction Documents and may not be furnished to, or relied upon by, any other person or for any other purpose without our prior written consent, except that the Trustee and Collateral Trustee may rely upon this letter as though this letter were addressed to them.

Sincerely,

A-3-3

**Exhibit A-4**

<u>Opinion of Andrew Wright, Vice President and Associate General Counsel of EFH Corporate
Services Company</u>

Ladies and Gentlemen:

I am the Vice President and Associate General Counsel of EFH Corporate Services Company,
a wholly-owned subsidiary of Energy Future Holdings Corp. (the "<u>Issuer</u>").  As such, I have
acted as counsel to the Issuer, Energy Future Intermediate Holding Company LLC ("<u>EFIH</u>") and
Energy Future Competitive Holdings Company ("<u>EFCH</u>," and together with EFIH, the
"<u>Guarantors</u>") in connection with the issuance and sale by the Issuer of $500,000,000 in
aggregate principal amount of its 10.000% Senior Secured Notes due 2020, pursuant to that
certain Purchase Agreement dated January 7, 2010 (the "<u>Purchase Agreement</u>") among the
Issuer, the Guarantors and you, as the initial purchasers (the "<u>Initial Purchasers</u>"). Capitalized
terms used in this opinion and not defined herein shall have the respective meanings assigned
thereto in the Purchase Agreement.  This opinion is delivered to you pursuant to Section 8(b)(iv)
of the Purchase Agreement.

I have examined the Preliminary Offering Memorandum dated January 6, 2010 (the "<u>Preliminary
Offering Memorandum</u>" and, together with the information set forth on Schedule III to the
Purchase Agreement, the "<u>Pricing Disclosure Package</u>") and the Offering Memorandum dated
January 7, 2010 (the "<u>Offering Memorandum</u>").

Based upon, and subject to, the limitations and qualifications stated below, I am of the opinion
that, as of the date hereof, other than as disclosed in or incorporated by reference into the
Pricing Disclosure Package and the Offering Memorandum, (i) to my knowledge, there is no
action, suit or proceeding now pending before or by any court, arbitrator or governmental
agency, body or official to which the Issuer or any Guarantor is a party or to which the business,
assets or property of the Issuer or any Guarantor is subject, and (ii) to my knowledge, no action,
suit or proceeding is currently threatened in writing to which the Issuer or any Guarantor would
be a party or to which the business, assets or property of the Issuer or any Guarantor would be
subject, that in each case of (i) or (ii), could reasonably be expected to result in a Material
Adverse Effect or could reasonably be expected to result in a material adverse effect on the
performance by the Issuer or the Guarantors of the Purchase Agreement and the other
Transaction Documents, the issuance of the Securities or the consummation of any of the
transactions contemplated thereby or described in the Pricing Disclosure Package and the
Offering Memorandum (exclusive of any amendment or supplement thereto).

I am a member of the Bar of the State of Texas. I do not express any opinion herein concerning
any law other than the law of the State of Texas and the federal law of the United States. I have
relied as to various questions of fact upon representations and warranties made by the Issuer
and the Guarantors contained in the Purchase Agreement and upon certificates of officers of the
Issuer and the Guarantors furnished pursuant to the Purchase Agreement. In addition, I have
examined, and have relied as to matters of fact upon, the documents delivered to you at the
closing and originals, or duplicates or certified or conformed copies, of such corporate records,
agreements, documents and other instruments and such certificates or comparable documents
of public officials and of officers and representatives of the Issuer and the Guarantors and have
made such other investigations as I have deemed relevant and necessary in connection with the
opinion hereinafter set forth.

A-4-1

EFH02433707

This opinion is limited to the laws and facts in effect on the date hereof.  I disclaim any obligation to advise you of facts, circumstances, events or developments that hereafter may be brought to my attention and that might alter, affect or modify the opinion expressed herein.

This opinion is given to you solely for the use of the Initial Purchasers in connection with the Purchase Agreement and the transactions contemplated therein and may not be relied upon by (or delivered to) any other person.


Sincerely,


Andrew M. Wright
Vice President and Associate General Counsel
EFH Corporate Services Company

A-4-2