**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' OMNIBUS REPLY TO PLAN CONFIRMATION OBJECTIONS**

---

[1]  The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND ............................................................................................................ 4

I.     Voting Results.................................................................................................. 4

II.    Resolved Objections........................................................................................ 5

III.   Modifications to the Plan................................................................................ 5

ARGUMENT.................................................................................................................. 6

I.     The Debtors Have Proposed the Plan in Good Faith.................................... 6

II.    The Plan Is Feasible. ...................................................................................... 8

      A.     The Merger Is Reasonably Likely to Close. .......................................... 8

            i.     Disarmament and the Drag Provide a Powerful Incentive for the Plan Sponsors to Close the Merger. ........................................... 9

            ii.    Disarmament Is Not a "Sunk Cost." .......................................... 14

            iii.   There Is No Legal Requirement that a Plan Sale Contract Have a Specific Performance Clause. ................................................. 15

            iv.   Contemplated Regulatory Conditions Do Not Render the Plan Infeasible........................................................................... 19

            v.     E-Side Opposition Does Not Draw Feasibility Into Question. ................. 21

            vi.   The Definition of the Plan's Effective Date Is Entirely Consistent with Bankruptcy Law.............................................. 23

      B.     The Possibility That This Court May Allow the EFH Legacy Note Makewhole Claims After Confirmation Does Not Render the Plan Infeasible........................................................................................... 25

      C.     The Possibility That an Appellate Court May Allow Disputed EFH and EFIH Claims After the Effective Date Does Not Render the Plan Infeasible................................................................................... 26

III.   All Creditor Claims Against EFH and EFIH Are Unimpaired. ................................ 28

**TABLE OF CONTENTS (CONT'D)**

Page

A.    EFH and EFIH Unsecured Claims Will Receive the Amount of Postpetition Interest and Fees They Are Entitled to Under the Bankruptcy Code. ...................................................................... 28

B.    The Plan's Treatment of the EFH Indenture Trustee's Makewhole Claim Does Not Render its Claims Impaired. ................................................. 30

C.    Pending or Anticipated Appeals Do Not Impair EFH and EFIH Claims. ............ 30

D.    Nothing in the Plan Otherwise Impairs EFH and EFIH Debt Claims. ................. 34

E.    Allowance of the TCEH Settlement Claim Does Not Impair EFH Claims. ......... 38

IV.    **The Classification and Treatment of Claims Under the Plan Is Entirely Appropriate.** .................................................................... 39

A.    The TCEH First Lien Deficiency Waiver Is Justified. ........................................ 39

B.    There Is No Unequal Treatment of the EFIH PIK Notes. ................................... 46

C.    The Treatment and Classification of EFCH Claims Is Appropriate. .................. 47

V.    **The Court Should Overrule the EFH Committee's Other Objections.** ................... 49

A.    The EFH Committee's Breach of Fiduciary Duty Allegations Are Reckless and Utterly False. .................................................................. 49

B.    There Is No Such Thing as "Artificial *Un*impairment" or "Synthetic Exclusivity." ................................................................................. 53

C.    The Debtors Did Not Impermissibly Exclude the EFH Committee from Plan Negotiations. ......................................................................... 55

VI.    **The Court Should Overrule the Other Objections.** ..................................... 56

A.    The Plan Provides for Adequate Means for its Implementation. .......................... 56

B.    The Court Should Overrule the U.S. Trustee's Objections. ................................. 57

    i.    The Scope of Releases is Appropriate and Critical to the Global Restructuring. .................................................................................. 57

    ii.    The Exculpation Provisions are Appropriate and Tailored. ..................... 65

    iii.    The Professional Fees and Expenses Payable Under the Plan Comply with Section 1129(a)(4) and Should be Approved. .................... 69

C.    The EPA's Objection Should Be Overruled. ....................................................... 72

**TABLE OF CONTENTS (CONT'D)**

**Page**

D.      This Court Should Overrule the Fenicle and Fahy Objection............................. 75

E.      Tex-La's Objection Should Be Overruled. .......................................................... 80

F.      The Treatment of the Contract with FLSmidth USA, Inc. Is Appropriate. .......... 80

G.      The Objection of JoAnn Robinson Should Be Overruled. ................................... 82

H.      The Objection of Christopher Haecker Should Be Overruled............................. 82

VII.    **The Debtors Will Work to Consensually Resolve Assumption and Cure Objections, Which Should Not Stand in the Way of Plan Confirmation. ................. 83**

**CONCLUSION .................................................................................................................. 84**

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re 710 Long Ridge Road Op. Co. II, LLC*,
2014 WL 886433 (Bankr. D. N.J. 2014)..........................................................................61, 64

*In re Adelphia Commc'ns Corp.*,
Case No. 02-41729 (REG) (Bankr. S.D.N.Y. Jan. 5, 2007) .....................................................21

*In re Adelphia Communs. Corp.*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007).......................................................................................49

*In re Am. Solar King Corp.*,
90 B.R. 808 (Bankr. W.D. Tex. 1988) .........................................................................................6

*In re AMR Corp.*,
Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. Oct. 22, 2013) ...................................................21

*In re Armstrong World Indus., Inc.*,
348 B.R. 136 (D. Del. 2006)......................................................................................................49

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999)................................................................................................................7, 49

*In re Best Products Co., Inc.*,
177 B.R. 791 (S.D.N.Y.), *aff'd*, 68 F.3d 26 (2d Cir. 1995) ......................................................33

*In re Bicoastal Corp.*,
146 B.R. 492 (Bankr. M.D. Fla. 1992) ......................................................................................33

*In re Brice Rd. Developments, L.L.C.*,
392 B.R. 274 (B.A.P. 6th Cir. 2008)............................................................................................9

*Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*,
853 F.2d 700 (9th Cir. 1988) .....................................................................................................73

*In re Burns & Roe Enters., Inc.*,
No. 08-4191 (GEB), 2009 WL 438694 (D.N.J. Feb. 23, 2009) ..................................................6

*In re Bush Indus., Inc.*,
315 B.R. 292 (Bankr. W.D.N.Y. 2004) ......................................................................................52

*Bustop Shelters of Louisville, Inc. v. Classic Homes, Inc.*,
914 F.2d 810 (6th Cir. 1990) .....................................................................................................37

i

## TABLE OF AUTHORITIES (CONT'D)

**Page**

*In re Cajun Elec. Power Co-op., Inc.*,
   230 B.R. 715 (Bankr. M.D. La. 1999) ................................................................10

*In re Cajun Elec. Power Coop., Inc.*,
   150 F.3d 503 (5th Cir. 1998) .........................................................................70, 71

*In re The Capital Ctr., LLC*,
   No. 12-06277-8-SWH, 2013 WL 4510248 (Bankr. E.D.N.C. Aug. 22, 2013) ......34

*In re Celotex Corp.*,
   204 B.R. 586 (Bankr. M.D. Fla. 1996) ...............................................................55

*In re Cent. European Indus. Dev. Co. LLC*,
   288 B.R. 572 (Bankr. N.D. Cal. 2003) ...............................................................24

*In re Charter Commc'ns*,
   419 B.R. 221 (Bankr. S.D.N.Y. 2009) ...............................................................65

*In re Chateaugay Corp.*,
   10 F.3d 944 (2d Cir. 1993) ................................................................................33

*In re Chateaugay Corp.*,
   944 F.2d 997 (2d Cir. 1991) ..............................................................................75

*In re Citadel Broad. Corp.*,
   Case No. 09-17442 (BRL) (Bankr. S.D.N.Y. May 19, 2010) ................................21

*In re Clarkson*,
   767 F.2d 417 (8th Cir. 1985) .............................................................................17

*In re Cohn*,
   54 F.3d 1108 (3d Cir. 1995) ..............................................................................51

*In re Combustion Engineering, Inc.*,
   391 F.3d 190 (3d Cir. 2004) .........................................................................54, 77

*Computershare Trust Co., N.A. v. EFIH (In re Energy Future Holdings Corp.)*,
   No. 14-50363 (Bankr. D. Del. Oct. 29, 2015) .....................................................32

*In re Congoleum Corp.*,
   2010 WL 1850182 (D.N.J. May 7, 2010) ............................................................70

*In re Cont'l Airlines*,
   91 F.3d 553 (3d Cir. 1996) .........................................................................32, 37

*In re Continental Airlines*,
   203 F.3d 203 (3d Cir. 2000) .........................................................................61, 62

**TABLE OF AUTHORITIES (CONT'D)**

*In re Coram Healthcare Corp.*,
   271 B.R. 228 (Bankr. D. Del. 2001) ...................................................................52

*In re Coram Healthcare Corp.*,
   315 B.R. 321 (Bankr. D. Del. 2004) ...................................................................59

*In re Couture Hotel Corp.*,
   536 B.R. 712 (Bankr. N.D. Tex. 2015) ...................................................10, 14, 49

*In re DBSD N. Am.*,
   Case No. 09-13061 (REG) (Bankr. S.D.N.Y. July 5, 2011) ............................21, 25

*Del. Trust Co. v. EFIH (In re Energy Future Holdings Corp.)*,
   Adv. No. 14-50363 (2015) ....................................................................................27

*In re DN Associates*,
   144 B.R. 195 (Bankr. D. Me. 1992) .....................................................................55

*In re Edge Petroleum Corp.*,
   Case No. 09-20644 (Bankr. S.D. Tex. 2009) ........................................................17

*In re Edison Mission Energy*,
   Case No. 12-49219 (JPC) (Bankr. N.D. Ill. Mar. 11, 2014) ...............................21

*In re Eisenbarth*,
   77 B.R. 228 (Bankr. D.N.D. 1987) ......................................................................47

*In re Energy Future Holdings Corp.*,
   522 B.R. 520 (Bankr. D. Del. 2015) ....................................................................77

*In re Energy Future Holdings Corp.*,
   No. 14-10979 (Bankr. D. Del. Oct. 30, 2015) .................................................30, 31

*In re Enron Corp.*,
   No. 01-16034 (AJG), 2006 WL 544463 (Bankr. S.D.N.Y. Jan. 17, 2006) .......33, 68

*In re Exaeris, Inc.*,
   380 B.R. 741 (Bankr. D. Del. 2008) ....................................................................59

*In re Exide Techs.*,
   303 B.R. 48 (Bankr. D. Del. 2003) ......................................................................60

*In re Genco Shipping & Trading Ltd.*,
   513 B.R. 233 (Bankr. S.D.N.Y. 2014) .................................................................64

*In re Genesis Health Ventures, Inc.*,
   266 B.R. 591 (Bankr. D. Del. 2001) ...............................................................53, 61

## TABLE OF AUTHORITIES (CONT'D)

*In re Global Crossings, Ltd.*,
  Case No. 02-40188 (REG) (Bankr. S.D.N.Y. Dec. 26, 2002) .................................................21

*In re Global Safety Textiles Holdings LLC*,
  No. 09-12234 (KG), 2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009) ...............................6

*In re Greenwood Point, LP*,
  445 B.R. 885 (Bankr. S.D. Ind. 2011) ...................................................................................34

*In re Greystone III Joint Venture*,
  995 F.2d 1274 (5th Cir. 1991) ...............................................................................................49

*In re Grossinger's Associates*,
  116 B.R. 34 (Bankr. S.D.N.Y. 1990)......................................................................................55

*In re Haardt*,
  65 B.R. 697 (Bankr. E.D. Pa. 1986) ......................................................................................24

*In re Hand*,
  2009 WL 1306919 (Bankr. D. Mont. May 5, 2009) .................................................................9

*Harris v. Viegelahn*,
  135 S. Ct. 1829 (2015)...........................................................................................................51

*In re Hawaiian Telecom Commcn's, Inc.*,
  Case No. 08-02005 (Bankr. D. Haw. Dec. 30, 2009) ......................................................21, 25

*In re Hibbard Brown & Co.*,
  217 B.R. 41 (Bankr. S.D.N.Y. 1998) ......................................................................................42

*In re Highway Truck Drivers & Helpers, Teamsters Local No. 107*,
  100 B.R. 209 (Bankr. E.D. Pa. 1989) ....................................................................................34

*In re Indianapolis Downs*,
  Case No. 11-11046 (Bankr. D. Del. 2013) .............................................................................16

*In re Indianapolis Downs, LLC.*,
  486 B.R. 286 (Bankr. D. Del. 2013) ............................................................................. *passim*

*In re Innkeepers USA Trust.*,
  Case No. 10-13800 (SCC) (Bankr. S.D.N.Y. 2010) (D.I. 1804) .............................................17

*In re Insilco Technologies, Inc.*,
  309 B.R. 111 (Bankr. D. Del. 2004) ................................................................................73, 75

*In re The IT Group, Inc.*,
  339 B.R. 338 (D. Del. 2006).................................................................................................75

## TABLE OF AUTHORITIES (CONT'D)

*In re ITR Concessions Co. LLC*,
  Case No. 14-34284 (PSH) (Bankr. N.D. Ill.)........................................................25

*In re Jones*,
  32 B.R. 951 (Bankr. D. Utah 1983) ....................................................................24

*Jones v. Chemetron*,
  212 F.3d 199 (3d Cir. 2000)...............................................................................80

*In re Journal Register Co.*,
  407 B.R. 520 (Bankr. S.D.N.Y. 2009) ................................................................70

*In re Krueger*,
  66 B.R. 463 (Bankr. S.D. Fla. 1986)...................................................................24

*In re Lightsquared Inc.*,
  Case No. 12-12080 (SCC) (Bankr. S.D.N.Y. Mar. 27, 2015) ..............................21

*In re Loop 76, LLC*,
  465 B.R. 525 (B.A.P. 9th Cir. 2012), *aff'd*, 578 F. App'x 644 (9th Cir. 2014)........9

*In re Machne Menachem, Inc.*,
  371 B.R. 63 (Bankr. M.D. Pa. 2006) ....................................................................9

*In re Majestic Star Casino, LLC*,
  Case No. 09-14136 (KG) (Bankr. D. Del. Mar 10, 2011) ...............................21, 25

*In re Martin*,
  91 F.3d 389 (3d Cir. 1996).................................................................................7

*In re Master Mortgage Inv. Fund Inc.*,
  168 B.R. 930 (Bankr. W.D. Mo. 1994).................................................................53

*In re Maxcom Telecommunicaciones, S.A.B. de C.V.*,
  Case No. 13-11839 (PJW) (Bankr. D. Del. Sept. 10, 2013) ...................................21

*In re McLean Indus., Inc.*,
  70 B.R. 852 (Bankr. S.D.N.Y. 1987)..................................................................56

*In re MCorp. Financial, Inc.*,
  160 B.R. 941 (S.D. Tex. 1993) .....................................................................33, 36

*Merrill Lynch Interfunding Inc. v. Argenti*,
  No. 00 CIV. 933 (TPG), 2000 WL 490739 (S.D.N.Y. Apr. 26, 2000), *aff'd*, 2
  F. App'x 98 (2d Cir. 2001) ................................................................................35

## TABLE OF AUTHORITIES (CONT'D)

**Page**

*In re Midway Games, Inc.*,
   428 B.R. 303 (Bankr. D. Del. 2010) ....................................................................67

*In re MSR Resort Golf Course LLC.*,
   Case No. 11-10372 (SHL) (Bankr. S.D.N.Y. 2011) (D.I. 2039) ...........................17

*Mullane v. Central Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950)................................................................................................80

*In re Multiut Corp.*,
   449 B.R. 323 (Bankr. N.D. Ill. 2011) ...................................................................42

*In re N. Valley Mall, LLC*,
   432 B.R. 825 (Bankr. C.D. Cal. 2010)....................................................................9

*In re Nationwide Sports Distributors, Inc.*,
   227 B.R. 455 (Bankr. E.D. Pa. 1998) ...................................................................45

*Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*,
   330 F.3d 548 (3d Cir. 2003) (*en banc*) .................................................................21

*Ohio v. Kovacs*,
   469 U.S. 274 (1985)..........................................................................................73, 74

*In re Olde Prairie Block Owner, LLC*,
   467 B.R. 165 (Bankr. N.D. Ill. 2012) ...................................................................17

*In re PPI Enterprises*,
   324 F.3d 197 (3d Cir. 2003)..............................................................................30, 31

*Pepper v. Litton*,
   308 U.S. 295 (1939)................................................................................................67

*Pinson v. Thacker*,
   2009 WL 5124996 (Ky. Ct. App. Dec. 30, 2009)..................................................35

*In re PNG Ventures, Inc.*,
   2010 WL 2745952 (Bankr. D. Del. 2010) ............................................................68

*In re Potomac Iron Works, Inc.*,
   217 B.R. 170 (Bankr. D. Md. 1997) ......................................................................24

*In re Premier Int'l Holdings, Inc.*,
   2010 WL 2745964 (Bankr. D. Del. 2010) ............................................................54

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000)........................................................................7, 53, 67

vi

## TABLE OF AUTHORITIES (CONT'D)

*In re Quigley Co., Inc.*,
   377 B.R. 110 (Bankr. S.D.N.Y. 2007) ..................................................................41

*In re Ralph C. Tyler, P.E.*,
   156 B.R. 995 (Bankr. N.D. Ohio 1993) .................................................................17

*Matter of Reading Co.*,
   711 F.2d 509 (3d Cir. 1983) ..................................................................................67

*In re Residential Capital, LLC*,
   501 B.R. 549 (Bankr. S.D.N.Y. 2013) ..................................................................45

*In re River Village Assocs.*,
   161 B.R. 127 (Bankr. E.D. Pa. 1993) ...................................................................71

*Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings,
   Inc.)*,
   407 B.R. 576 (D. Del. 2009) ..................................................................................45

*In re Sea Garden Motel & Apartments*,
   195 B.R. 294 (D.N.J. 1996) .....................................................................................9

*In re Sorenson Commc'ns, Inc.*,
   Case No. 14-10454 (BLS) (Bankr. D. Del. Apr. 10, 2014) ...................................21

*In re Spansion, Inc.*,
   426 B.R. 114 (Bankr. D. Del. 2010) ......................................................................59

*In re Stratford Assocs. Ltd. P'ship*,
   145 B.R. 689 (Bankr. D. Kan. 1992) .....................................................................17

*In re Structurlite Plastics Corp.*,
   91 B.R. 813 (Bankr. S.D. Ohio 1988) ...................................................................56

*In re Sugarhouse Realty, Inc.*,
   192 B.R. 355 (E.D. Pa. 1996) ...............................................................................18

*In re TCI 2 Holdings, LLC*,
   428 B.R. 117 (Bankr. D.N.J. 2010) .......................................................................52

*In re Texas Rangers Baseball Partners*,
   434 B.R. 393 (Bankr. N.D. Tex. 2010) .............................................................36, 37

*In re Thurmon*,
   87 B.R. 190 (Bankr. M.D. Fla. 1988) ...................................................................17

## TABLE OF AUTHORITIES (CONT'D)

*In re Trenton Ridge Investors,*
  LLC, 461 B.R. 440 (Bankr. S.D. Ohio 2011) ...........................................................9

*In re Tribune Co.,*
  464 B.R. 126 (Bankr. D. Del.) .................................................................18, 20, 53

*In re Tribune Media Co.,*
  799 F.3d 272 (3d Cir. 2015).........................................................................37

*In re Tribune Media Co.,*
  Case No. 08-13141 (KJC) (Bankr. D. Del.).......................................................25

*In re Tropicana Entertainment,*
  LLC, Case No. 08-10856 (KJC) (Bankr. D. Del. May 5, 2009)............................21

*United States v. Pound,*
  No. CIV-07-427-RAW, 2010 WL 2330240 (June 8, 2010) ..................................35

*United States v. Sloan,*
  505 F.3d 685 (7th Cir. 2007) .......................................................................15

*In re UNR Indus., Inc.,*
  20 F.3d 766 (7th Cir. 1994) .........................................................................32

*Valente v. Pepsico, Inc.,*
  68 F.R.D. 361 (D. Del. 1975) .......................................................................67

*In re Valley View Shopping Ctr., L.P.,*
  260 B.R. 10 (Bankr. D. Kan. 2001) ...............................................................37

*In re W.R. Grace & Co.,*
  446 B.R. 96 (Bankr. D. Del. 2011) ...............................................................53

*In re W.R. Grace & Co.,*
  475 B.R. 34 (D. Del. 2012) ................................................................... *passim*

*In re W.R. Grace & Co.,*
  729 F.3d 311 (3d Cir. 2013)...................................................................41, 48

*In re Washington Mut., Inc.,*
  442 B.R. 314 (Bankr. D. Del. 2011) ...............................................48, 53, 59, 60

*In re Washington Mut., Inc.,*
  461 B.R. 200 (Bankr. D. Del. 2011) ...........................................................9, 28

## TABLE OF AUTHORITIES (CONT'D)

*In re Whatley*,
155 B.R. 775 (Bankr. D. Colo. 1993), *aff'd*, 169 B.R. 698 (D. Colo. 1994),
*aff'd*, 54 F.3d 788 (10th Cir. 1995) .......................................................................32

*In re Winn-Dixie Stores, Inc.*,
356 B.R. 239 (Bankr. M.D. Fla. 2006) .................................................................68

*In re Wonder Corp. of Am.*,
70 B.R. 1018 (Bankr. D. Conn. 1987) .................................................................25

*In re World Health Alts.,Inc.*,
344 B.R. 291 (Bankr. D. Del. 2006) .....................................................................59

*In re WR Grace & Co.*,
729 F.3d 332 (3d Cir. 2013) .....................................................................9, 16, 77

*In re XO Comm'cns, Inc.*,
330 B.R. 394 (Bankr. S.D.N.Y. 2005) .................................................................65

*In re Yates Dev., Inc.*,
258 B.R. 36 (Bankr. M.D. Fla. 2000) .............................................................25, 34

*Young v. Higbee Co.*,
324 U.S. 204 (1945) ..............................................................................................45

*In re Zenith Elecs. Corp.*,
241 B.R. 92 (Bankr. D. Del. 1999) ............................................................. *passim*

*Zentek GBV Fund IV v. Vesper*,
19 F. App'x 238 (6th Cir. 2001) .........................................................................48

**Statutes**

11 U.S.C. § 105(a) ..................................................................................................77

11 U.S.C. § 502 ..............................................................................................40, 77

11 U.S.C. § 503(b) ................................................................................................72

11 U.S.C. § 503(b)(9) ...........................................................................................82

11 U.S.C. § 507 .....................................................................................................73

11 U.S.C. § 523(a)(7) ...........................................................................................74

11 U.S.C. § 524 .....................................................................................................77

11 U.S.C. § 524(g) ..........................................................................................76, 77

## TABLE OF AUTHORITIES (CONT'D)

**Page**

11 U.S.C. § 524(g)(1)(A)...................................................................................................77

11 U.S.C. § 1103(c) ..................................................................................................56, 57

11 U.S.C. § 1122 ......................................................................................................48, 49

11 U.S.C § 1122(a) ...................................................................................................48, 49

11 U.S.C. § 1123 ...........................................................................................................59

11 U.S.C. § 1123(a) .......................................................................................................41

11 U.S.C. § 1123(a)(4)......................................................................................47, 48, 78

11 U.S.C. § 1123(a)(5)(F)...........................................................................................36, 37

11 U.S.C. § 1123(b)(3)(A)..............................................................................................59

11 U.S.C. § 1124 ...........................................................................................................81

11 U.S.C. § 1124(1) ...................................................................................................29, 32

11 U.S.C. § 1124(2)(B)...................................................................................................26

11 U.S.C. § 1124(a)(4)....................................................................................................71

11 U.S.C. § 1127(a) .........................................................................................................5

11 U.S.C. § 1127(d) .........................................................................................................5

11 U.S.C. § 1129 ...........................................................................................................24

11 U.S.C. § 1129(a)(1)....................................................................................................74

11 U.S.C. § 1129(a)(3)...............................................................................51, 74, 75, 76

11 U.S.C. § 1129(a)(4)....................................................................................................70

11 U.S.C. § 1129(a)(4)....................................................................................................71

11 U.S.C. § 1129(a)(4)....................................................................................................70

11 U.S.C. § 1129(a)(4)....................................................................................................72

11 U.S.C. § 1129(a)(7)....................................................................................................39

11 U.S.C. § 1129(a)(10)...............................................................................4, 50, 54, 55

RLF1 13226524v.1

## TABLE OF AUTHORITIES (CONT'D)

**Page**

11 U.S.C. § 1129(a)(11)................................................................................................9, 76, 78

11 U.S.C. § 1129(b)................................................................................................................5, 39

11 U.S.C. § 1129(b)(2)....................................................................................................47, 49, 74

11 U.S.C. § 1129(b)(2)(B)...........................................................................................................82

11 U.S.C. § 1129(b)(2)(B)(ii).....................................................................................................49

11 U.S.C. § 1129(c)....................................................................................................................55

11 U.S.C. § 1141........................................................................................................................74

11 U.S.C. § 1141(d)(1)...............................................................................................................74

11 U.S.C. § 1141(d)(2)...............................................................................................................74

11. U.S.C. § 363..........................................................................................................................80

**Rules**

Bankruptcy Rule 6004(h)...............................................................................................................3

Fed. R. Bankr. P. 3019(a) .............................................................................................................6

Fed. R. Bankr. Proc. 3003..........................................................................................................77

Fed. R. Bankr. Proc. 9019....................................................................................................40, 59

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this reply (this "Reply") to the objections to confirmation (the "Objections") of the *Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* (D.I. 6122) (as modified, amended, or supplemented from time to time, the "Plan").[2]  The Debtors previously filed a separate memorandum setting forth their case in chief in support of confirmation of the Plan (D.I. 6647) (the "Confirmation Brief").[3] Together with this Reply, the Debtors file a reply to objections to the Settlement Motion (the "Settlement Reply").   In response to the Objections, the Debtors respectfully state as follows.[4]

## PRELIMINARY STATEMENT

1.      The Plan should be confirmed.  It satisfies each of the requirements of the Bankruptcy Code.  It gives each of the creditors their legal entitlements—as demonstrated by the *overwhelming* consent of every voting class or the promise to deliver non-voting classes a full recovery on their claims.  And it provides each of the 71 Debtors, their thousands of employees,

---

[2]   This Reply is to objections filed by the following parties:  (a) the indenture trustee for the EFIH first lien notes (D.I. 6600) (the "EFIH First Lien Trustee"); (b) the indenture trustee for the EFIH second lien notes (D.I. 6614) (the "EFIH Second Lien Trustee"); (c) the indenture trustee for the EFIH unsecured notes (D.I. 6640) (the "EFIH PIK Trustee"); (d) the official committee of unsecured creditors of EFH Corp. and EFIH (D.I. 6627, 6643) (the "EFH Committee"); (e) the indenture trustee for the EFH unsecured notes (D.I. 6609) (the "EFH Indenture Trustee"); (f) the indenture trustee for the PCRBs (D.I. 6621) (the "PCRB Trustee"); (g) the United States Trustee (D.I. 6705) (the "U.S. Trustee"); (h) the United States of America, on behalf of the U.S. Environmental Protection Agency (D.I. 6601) (the "EPA"); (i) the indenture trustee for the EFCH 2037 notes (D.I. 6585) (the "EFCH Notes Trustee"); (j) Shirley Fenicle, as successor-in-interest to the Estate of George Fenicle, and David William Fahy (D.I. 6610) (together, the "Asbestos Objectors"); (k) FLSmidth USA, Inc. and FLSmidth Inc. (D.I. 6580) (together, "FLSmidth"); (l) JoAnn M. Robinson, *pro se* (D.I. 6451); and (m) Christopher Haecker, *pro se* (D.I. 6597) (collectively, the "Objectors").  Fidelity joined the objections of the EFH Committee and the EFH Indenture Trustee (D.I. 6642).  Contrarian Capital Management, LLC joined the objection of the EFH Indenture Trustee (D.I. 6629).  This Reply does not separately discuss these joinders except where noted.

[3]   Capitalized terms used but not defined in this memorandum have the meanings ascribed to them in the Confirmation Brief.

[4]   The exhibits referenced herein are included as exhibits to the *Declaration of Brenton A. Rogers, Esq. in Support of the Debtors' Omnibus Reply to Plan Confirmation Objections*, filed contemporaneously herewith.

and the millions of customers that rely on them, closure and the promise of keeping the lights on in Texas.  This is chapter 11 in its highest form.

2.      Unfortunately, for some this is not good enough.  These Objectors are not burdened by the fact that more than 95% of the Debtors' $42 billion capital structure has either consented to or is unimpaired under the Plan.  They essentially fall into three camps:  first, the EFH Committee; second, a series of unimpaired creditors debating exactly what it means to be unimpaired; and, third, a series of creditors that raise parochial issues that the Court must decide but are not fatal to confirmation.

3.      The EFH Committee's Objection is a chapter 11 science project—it cobbles together out-of-context theories and case cites to create a Kafkaesque interpretation of the Bankruptcy Code that would effectively make confirmation of any complex case impossible. Examples of its more creative legal "principles" include:  widespread fiduciary duty violations in chapter 11 that are cured only by plan vote; a specific performance requirement for all financial contracts under plans; a requirement that consummation occur nearly immediately upon confirmation; artificial "unimpairment"; an absolute priority rule for unimpaired creditors; and violations of "synthetic exclusivity."

4.      Yet the Objection hits its nadir when it comes to—and, in particular, the baseless allegations related to—fiduciary duties and good faith.  The EFH Committee apparently believes it is wrong, or improper, for directors and officers of the Debtors to expect closure from the chapter 11 cases.  And that pursuing this justifies endless litigation or, much worse, personal attacks on individuals whose entire lives demonstrate exceptional achievement, service, and integrity.  The EFH Committee is wrong:  a "fresh start" is the cardinal principle of the Bankruptcy Code, not an epithet.  The evidence will show, as it only could, that the Debtors,

their directors, officers, and employees, and many of their stakeholders worked tirelessly to develop consensus around a value-maximizing plan of reorganization. And they succeeded. The unfounded attacks of the EFH Committee on this subject deserve nothing but firm reprimand.

5.      The crux of the remainder of the EFH Committee's Objection is that it is inappropriate for this Court to approve a Plan where, as here, there is delay and uncertainty between confirmation and the effective date. This theory fails for several reasons. First, any restructuring of these Debtors would involve a complex regulatory process and it is impossible to conclude—or in certain instances, begin—that process before confirmation. There is nothing speculative about the proposal in front of the regulators—to the contrary, the Plan Sponsors have consummated this form of transaction before and have put their reputations, their most valuable commodity, on the line. Second, the record has shown and will show that the remedies that the Debtors have under the Plan are (a) preferable from the Debtors' perspective to traditional M&A remedies and (b) create the right incentives for the buyers. Feasibility does not preclude confirmation of this Plan.

6.      Another series of Objections come from various indenture trustees that quibble with the meaning of unimpairment under the Bankruptcy Code. The trustees effectively argue that (a) indentures are instruments that survive post-bankruptcy until every avenue of appeal has been exhausted and (b) it is the Debtors' obligation under the Bankruptcy Code to clearly develop a remedy on appeal. Both these arguments fail. The Bankruptcy Code could not be clearer that the discharge upon confirmation, as well as any order of the Bankruptcy Court, unless stayed, is immediately enforceable. That stay can come, among other ways, through statute—Bankruptcy Rule 6004(h), for example—or through injunctive relief, such as a "stay pending appeal"—a mechanism whose title provides very clear direction to these indenture

3

trustees about what they must do here. It is not the case that these trustees can effectively ignore orders of this Court until their appellate avenues are exhausted. And it is not the Debtors' burden to identify and craft appellate remedies for these parties. Their rights to appeal any order are fully preserved, and the burden is on *them*—not the Bankruptcy Court or the Debtors—to demonstrate to the appellate court that there is a party from whom they can equitably obtain relief.

7.      The remaining Objections raise a number of technical bankruptcy issues, all of which are addressed below and none of which is fatal to confirmation. Accordingly, for the reasons set forth in the Confirmation Brief, this Reply, and the record at trial, the Court should overrule the Objections and confirm the Plan.

## BACKGROUND

## I.      VOTING RESULTS.

8.      The Debtors filed the Voting Report on October 30, 2015. All of the impaired classes of claims and interests entitled to vote—Classes B9, C3, C4, and C5—voted to accept the Plan, exclusive of any acceptance by insiders. *See* Voting Report. Thus, there is an impaired consenting class of claims at each Debtor with a class of impaired non-insider claims. Accordingly, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

9.      The following table summarizes the voting report (with ranges reflecting variance by individual Debtor, as set forth in greater detail in the report):

| Class | Claims and Interests | Percent of Number Accepting | Percent of Amount Accepting | Result |
|---|---|---|---|---|
| Class B9 | Interests in EFIH | 100.00% | 100.00% | Accept |
| Class C3 | TCEH First Lien Secured Claims | 94.72% | 98.86% | Accept |
| Class C4 | TCEH Unsecured Debt Claims | 92.40% - 95.70% | 96.73% - 99.21% | Accept |
| Class C5 | General Unsecured Claims Against the TCEH Debtors Other Than EFCH | 74.19% - 100.00% | 90.48% - 100.00% | Accept |

4

The only voting series of debt with impaired objecting creditors—the PCRBs—voted by approximately 78.0% in number and 30.5% by amount to accept the Plan.

10.     For the reasons set forth in the Confirmation Brief, the Plan also satisfies the cramdown requirements of section 1129(b) of the Bankruptcy Code with respect to those classes of claims or interests that are deemed to reject the Plan.  Thus, the Plan satisfies the voting and cramdown requirements of the Bankruptcy Code.

## II.     RESOLVED OBJECTIONS.

11.     The Debtors have resolved six Plan Objections that were filed by Alcoa, Inc. (D.I. 6582); Oracle America, Inc. (D.I. 6592); the Texas Ad Valorem Taxing Jurisdictions (D.I. 6598); the Texas Taxing Entities (D.I. 6608); the Local Texas Tax Authorities (D.I. 6622); and Fireman's Fund Insurance Company (D.I. 6625).  Further, the parties have agreed to defer litigation of the Marathon Objection (D.I. 6587) pending discussions regarding the potential resolution of that Objection.  In addition, the Debtors resolved the informal objections received from the Internal Revenue Service, the Pension Benefit Guaranty Corporation, and the Texas Comptroller.  Finally, the Debtors have resolved three assumption and cure objections filed by TXU 2007-1 Railcar Leasing LLC (D.I. 6576); Salesforce.com, Inc. (D.I. 6679); and Aetna Inc. and AetnaLife Insurance Company (D.I. 6698).  As of the filing of this Reply, sixteen Plan Objections remained outstanding.

## III.     MODIFICATIONS TO THE PLAN.

12.     The Debtors intend to file a revised Plan to effectuate resolutions of objections and implement language clarifications.  The Bankruptcy Code provides that a plan proponent may modify a plan "at any time" before confirmation.  11 U.S.C. § 1127(a).  It further provides that all stakeholders that previously have accepted a plan should also be deemed to have accepted such plan as modified.  *Id.* § 1127(d).  Courts routinely allow plan proponents to make

nonmaterial changes to a plan without requiring the proponent to resolicit votes for the plan. *See, e.g.*, *In re Global Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (holding that nonmaterial modifications to a plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc.*, No. 08-4191 (GEB), 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009) (confirming a plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

13.     The modifications to the Plan agreed to so far by the Debtors either do not materially and adversely affect the recoveries of the holders of claims and interests or, to the extent such modifications materially and adversely affect such holders, they have accepted the modifications in writing.  Accordingly, the Debtors are not required to resolicit acceptances from holders of claims and interests in voting classes, and their prior acceptances should be deemed votes to accept the modified Plan.

## ARGUMENT

## I.     THE DEBTORS HAVE PROPOSED THE PLAN IN GOOD FAITH.

14.     On its face, the purposes of the Plan are to effectuate two value-maximizing going-concern transactions and a settlement of alleged claims that could otherwise have mired the estates in years of costly litigation.  This basic reality disposes of the half-hearted Objections to the Debtors' good-faith basis for proposing the Plan.

15.     The "touchstone" of the good faith inquiry in the Third Circuit is whether the plan itself is designed to effectuate results that are consistent with chapter 11 policy goals.  *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000); *see also In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012) (stating that this inquiry is the "touchstone" of the good faith standard).  Two core policies of chapter 11 are to preserve going concerns and maximize the value of the estates. *See Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 435 (1999)

6

("[T]he two recognized policies underlying Chapter 11 [are] preserving going concerns and maximizing property available to satisfy creditors . . . .").   Another, equally-critical policy is that "compromises are favored in bankruptcy." *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996).

16.     Because the clear purposes of the Plan are entirely consistent with these policies, the assertions of the EFH Committee and the EFIH PIK Trustee that the Debtors were unduly motivated by a desire for a global settlement or a desire to effectuate insider releases are not colorable.  The Plan will shed over $30 billion of debt through the Merger and the spin-off of the largest competitive utility company in Texas.  It will also settle the billions of dollars of alleged claims arising out of the Debtors' 2007 leveraged buyout and its predecessor and successor transactions, a result born of a virtually-unprecedented conflicts matters protocol, involving four sets of Debtors' advisors and an eight-month discovery process that produced millions of pages of documents.   Effectuating these landmark transactions and settlements is the good-faith purpose of the Plan.

17.     In designing those transactions, the Debtors have left no stone unturned, and, indeed, have considered numerous alternatives, including consolidated transaction structures, equitization transactions, third-party strategic acquisitions, and everything in between.  The end result comes after years of negotiations between the Debtors and their highly-organized stakeholders, dating back to early 2013, and a six-month, Court-approved third-party marketing process in which over 50 potential third-party bidders were contacted.   The Debtors have thoroughly analyzed the resulting Restructuring Transactions and believe that the Plan will be consummated.[5]  At bottom, the Plan unimpairs all "E-side" creditors (through payment in full in

---

[5]     *See* Ex. 1, 9/28/2015 Doré Dep. Tr. at 199:15-20 ("[W]e believe and I think the plan sponsors parties believe that it is allowed under the law [and] that there is a reasonable basis for setting it up this way . . . .").

cash or through Reinstatement) and has the support of nearly all of the key "T-side" creditors. These simple facts are *prima facie* evidence of good faith.

18.      The assertion of the EFH Committee that the Merger has no business justification or that a pursuit of global settlement is somehow a good faith issue are simply contrary to law. As set forth above, effecting value-maximizing transactions and facilitating consensus and settlements are the core policies of chapter 11.   Similarly, the EFH PIK Trustee's contention that releases of largely-unidentified claims against insiders are the primary factors motivating this massive going-concern transaction and this multi-party legacy litigation settlement simply strains credulity.  Thus, the Court should find that the Debtors have proposed the Plan in good faith.

## II.      THE PLAN IS FEASIBLE.

### A.      The Merger Is Reasonably Likely to Close.

19.      The objective facts demonstrate that the Merger is reasonably likely to close, and the Plan is therefore feasible.  The EFH Committee's complaints regarding a lack of "traditional" remedies and general "uncertainty" are not valid bases to deny confirmation.

20.      The standard for feasibility in the Third Circuit is straightforward:  there must be a "reasonable likelihood of the Plan's success."  *In re WR Grace & Co.*, 729 F.3d 332, 349 (3d Cir. 2013).  Indeed, "a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility."  *In re Brice Rd. Developments, L.L.C.*, 392 B.R. 274, 283 (B.A.P. 6th Cir. 2008); *see also In re Washington Mut., Inc.*, 461 B.R. 200, 252 (Bankr. D. Del. 2011) (quoting "low threshold of proof" standard).[6]   The Debtors will

---

[6]      This standard of proof is widely applied in the feasibility context.  *See, e.g., In re Loop 76, LLC*, 465 B.R. 525, 544 (B.A.P. 9th Cir. 2012), *aff'd*, 578 F. App'x 644 (9th Cir. 2014) (same); *In re Sea Garden Motel & Apartments*, 195 B.R. 294, 305 (D.N.J. 1996) ("[I]t is clear that there is a relatively low threshold of proof necessary to satisfy the feasibility requirement."); *In re Trenton Ridge Investors*, LLC, 461 B.R. 440, 479 (Bankr. S.D. Ohio 2011) (same); *In re N. Valley Mall, LLC*, 432 B.R. 825, 838 (Bankr. C.D. Cal. 2010) (same); *In re Hand*, 2009 WL 1306919, at *12 (Bankr. D. Mont. May 5, 2009) (noting that there is a "relatively low threshold of proof to satisfy § 1129(a)(11)"); *In re Machne Menachem, Inc.*, 371 B.R. 63, 71 (Bankr. M.D. Pa.

demonstrate at trial that the Merger is reasonably likely to close and there is no other impediment to the Plan's feasibility.

i.    **Disarmament and the Drag Provide a Powerful Incentive for the Plan Sponsors to Close the Merger.**

21.    The objective facts clearly demonstrate the Plan Sponsors' incentives and intent to consummate the Merger.  As an initial matter, the Debtors and the Plan Sponsors have signed agreements for up to $12.6 billion of debt and equity financing to fund the payments contemplated by the Plan.  This includes the Merger Agreement, as well as the Equity Commitment Letter and the Backstop Agreement, which together provide commitments for the up to $7.1 billion of equity financing necessary to finance the Merger.  *See* Plan Supplement, Ex. M-N (D.I. 6544).  And it includes the Debt Commitment Letter, which commits a syndicate of money-center banks, led by Morgan Stanley, to lend up to $5.5 billion to the purchasers.  *Id.* at Ex. K.

22.    These agreements are backed by a potent remedies package to fit these circumstances:  disarmament and the drag.  Remedies that relegate the TCEH junior creditors to the sidelines if the Plan is not consummated create a powerful incentive for the Plan Sponsors to close this transaction and a powerful deterrent against not closing the transaction.  By doing so, in and of itself this remedies package also provides strong evidence of the Plan Sponsors' intentions sitting here today.  This, together with the reputation, expertise, and motivation of the Plan Sponsors, easily satisfies the low hurdle of a reasonable likelihood of closing.  That is all that is required under the law.  The EFH Committee's inaccurate interpretation of the documents, speculation as to the intentions of the Plan Sponsors, and readily discredited "expert" testimony

---

2006) (quoting "low threshold of proof" standard  and noting that "[t]he standards needed to achieve plan feasibility are not rigorous.").

9

are unavailing.    *See In re Couture Hotel Corp.*, 536 B.R. 712, 737 (Bankr. N.D. Tex. 2015) ("[J]ust as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility." (quoting *In re Cajun Elec. Power Co-op., Inc.,* 230 B.R. 715, 745 (Bankr. M.D. La. 1999)).

23.    The Debtors negotiated disarmament and the drag as the remedies package for the Merger specifically because in the context of a chapter 11 case—as opposed to a regular-way M&A transaction where the concepts of disarmament and the drag are a non sequitur—these remedies simply make the most sense and confer substantial benefits on EFH.[7]  The Debtors did not reach this conclusion in a vacuum.  In the years spent analyzing transactions involving the Debtors' economic interests in Oncor, they considered and negotiated a variety of alternative remedies.

24.    For example, during the bidding process, the Debtors received bids that proposed reverse breakup fees or deposits in the range of $110 million to $225 million.[8]  Applied to these facts, however, this remedy would be woefully inadequate for EFH.  If the Merger did not close, the Debtors would be forced to revert to unresolved legacy litigation.  As it stands, the professional fees run rate in these chapter 11 cases at EFH and EFIH alone is approximately $7 million per month, not including fees payable to the EFIH First and Second Lien Trustees (thanks in no small part to the "activity" of the EFH Committee).  There are many millions more in asserted claims for fees by various unsecured parties.  These fees would be multiplied and exacerbated if and when legacy litigation commenced in earnest.  Moreover, the interest rate

---

[7]    Although the remedies for failure to close the Merger create benefits for all of the estates, given that the EFH Committee's objection is focused on EFH, this portion of the Reply will emphasize the benefits to EFH.  Many of these same benefits and others apply with respect to the other Debtors.

[8]    *See* Ex. 2, 9/23/2015 Ying Dep. Tr. at 145:12-14 ("[Q.] And do you recall that that reverse breakup fee was $225 million? [A.] Yes.").

accumulation on the EFIH DIP and 11%-plus EFIH second lien notes is approximately $40 per month.[9]  And this is without taking into account the administrative costs of bankruptcy on the T-side, including some $100 million a month of adequate protection payments and another $20 million a month in professional fees.[10]  Given that these costs would rapidly consume any damages remedy, it would be virtually impossible for the Debtors to reasonably conclude that a liquidated damages clause was a superior remedy to disarmament and the drag.

25.      Similarly, the Debtors considered a specific performance right.  But in a financial acquisition like the Merger, this right would inevitably be both (a) conditional on the occurrence of certain events and (b) more importantly, limited to a shell entity.  The only party that ever offered the Debtors a specific performance remedy against a money-good entity—albeit, still highly conditional—was a major strategic buyer (and unfortunately this bid would have left the EFH estate without *any* recovery from sale proceeds).[11]  That is hardly the outcome that the EFH Committee would desire.  Unsurprisingly, the Debtors pursued a better alternative.

26.      To that end, the Debtors negotiated for and developed a construct, as embodied in the PSA and Settlement Agreement, that is far superior from the perspective of the estates.  As

---

[9]   *See id.* at 145:22 - 146:2 ("The DIP interest on the two estates is, you know, $20 million plus a month.  I think you could easily add it up and come up with some pretty significant costs of keeping the company in bankruptcy the way we are."); *id.* at 146:3-7 ("[Q.] Do you know what the EFIH second lien interest burn is a month? [A.] I think it's around $20 million a month.  It's about $2 billion face amount at 12 percent, divided by 12 months.").

[10]  The aggregate professional fees in these cases are substantial, viewed from a variety of perspectives.  *See* Ex. 1, 9/28/2015 Doré Dep. Tr. at 177:21 - 178:2 ("So my understanding is from the beginning of the case, May 2014, through August of 2015, the debtor's retained professionals have billed in their monthly fee statements approximately 181 million dollars."); *id.* at 178:8-14 ("For nondebtor retained professionals, which are primarily the committee's professionals, I think there is some other people in that category, the fees that have been billed in monthly fee statements total 233 million dollars, from inception through August of 2015."); Ex. 3, 9/10/2015 Keglevic Dep. Tr. at 87:5-13 ("I know the disinterested directors considered the risk of litigation, the cost to litigate, and the time to litigate which also then drives costs.  So one being the specific cost to defend and the other being the cost you incur while you're defending just because of the passage of time, which, you know, our estates are paying 40 million a month, so it's not insubstantial.").

[11]  *See* Ex. 4, 10/19/2015 Ying Dep. Tr. at 95:18 - 96:25 (referring to specific performance provision of strategic bid).

11

the Court is well aware, the TCEH junior creditors' objections to the Debtors' restructuring efforts and assertions of hugely-complex legacy claims was their most valuable form of currency in these chapter 11 cases.  They made it well known to all parties and the Court that, in their view, these litigation rights were worth billions of dollars, and they backed up those assertions with persistent litigation attacks on any effort to craft a plan that did not assign value to those rights, fighting everything from joint administration to exclusivity.

27.    Under the Settlement Agreement, the TCEH junior creditors agree to figuratively "lay down their arms," even if, for *any reason*, the Merger does not close.  This completely nullifies the substantial asserted upside of their litigation claims.  *See* Settlement Agreement § 2 (D.I. 6085).  In place of this potential upside, they must accept, without objection, a $550 million recovery, less professional fees expected to be as much as $50 million, all of which is carved out of the TCEH first lien collateral.  *See* PSA § 5.1 (D.I. 6097).  In other words, they agreed to lock-in a recovery in this downside scenario that amounts to approximately six cents on the dollar.[12]

28.    If the Merger were not to close and the Debtors were limited to some form of damages remedy—as the EFH Committee would appear to prefer—the TCEH junior creditors could reestablish the status quo and continue the pursuit of the perceived upside associated with legacy litigation.  Put differently, these TCEH junior creditors would almost certainly happily trade, at the time of a termination of the Merger, $100 to $200 million to regain this potential litigation upside.  By eliminating this potential upside, and instead requiring the TCEH junior

---

[12]    *See* Ex. 5, 10/1/2015 Keglevic Dep. Tr. at 141:14 - 142:5 ("So we don't have traditional remedies, but we effectively have remedies if it will not close, and I'm sure, if you look at the 550 million dollar settlement that the T junior securities will receive, and knowing that they started with 150 million dollars of unencumbered cash, and that they have to pay their fees out of that 550 million dollars, they commonly refer to not closing as the booby prize, and substantially less than the value they thought they could have got through the alternative, but they traded that value to get what they believe is the upside associated with the majority ownership of the new entity.").

creditors to dutifully accept six cents on the dollar as their sole recovery, disarmament and the drag create an incentive for closing that is worth far more than the liquidated damages the Debtors could have obtained.[13]

29.    Indeed, the fact that the Plan Sponsors agreed to disarmament and the drag also provides strong evidence of their intention to close the transaction *today*, which is the appropriate time to evaluate feasibility.  *See In re Couture Hotel Corp.*, 536 B.R. 712, 737 (Bankr. N.D. Tex. 2015) (speculation as to future events not a valid basis for a feasibility objection); *In re Indianapolis Downs, LLC.*, 486 B.R. 286, 298 (Bankr. D. Del. 2013) (same). As the Court recognized from the moment the transaction was announced, it is—to say the least—counterintuitive to believe that this less than $550 million alternative recovery is the result these highly-sophisticated and well-organized junior creditors spent years fighting for in this restructuring.  *See* Hr'g Tr. Aug. 25, 2015, at 71-72 ("[Y]ou think they're putting a deal together that puts $12 billion of money on the table [and] requires them to go seek approval from four different government entities . . . so they can walk away from all the time, effort, and

_____

[13]    *See* Ex. 2, 9/23/2015 Ying Dep. Tr. at 68:9 - 69:12 ("[E]mbedded in the settlement agreement, there are significant agreements and obligations that the junior TCH creditors are agreeing to . . . that have significant economic consequences to them and that I believe significantly streamline the ability of the company to reach a consensual deal with the E-side in a manner which heretofore has not been possible to reach.  . . . [B]y eliminating another class of creditors that could otherwise object on any of a number of bases to an E-side restructuring plan, we've, in my opinion, greatly simplified the possibility of reaching a consensual reorganization of EFH and EFIH that would be to the satisfaction of the T-firsts.  So the definition of 'remedy' I think needs to be taken into a much broader context of the unique nature of this transaction and this company's issues and its capital structure and claims."); Ex. 3, 9/10/2015 Keglevic Dep. Tr. at 73:5 - 74:4 ("We considered, you know, both specific performance and liquidated damages.  Obviously, those are both subject to litigation.  We had a -- obviously, we've had some experience in this case associated with the bid procedures, the RSA, and negotiations with the E side.  We got a pretty good feel of what market liquidated damages is. And I think the most we were ever able in any draft of those procedures to get in terms of liquidated damages were in the range of a couple hundred million dollars.  When we view what we got in exchange for this deal in terms of the stand-still piece on the T side and the ability to drag the faster confirmation schedule -- and I apologize for going through the list, but we think it's a substantive list, I've given it to you before -- we think those are substantially more beneficial to the estates than would have been a hundred, $200 million liquidated damages.  And that presumes we would have been able to get those liquidated damages."); *id.* at 115:8-14 ("Our remedy is that they have to agree with the alternative plan, that they agree to a 90-day schedule, that they have a drag right for that creditor group.  The Hunts have to stand on the sidelines in Austin, Texas and not interfere with an alternative plan.").

commitment there to take a $400 million cash prize at the end of the day?"). The fact that these creditors have agreed to a preapproved Settlement Agreement, which permanently relinquishes their upside should the Merger not close, demonstrates the Plan Sponsors' belief in this transaction. The Objectors offer no *evidence*, but only speculation, in support of their contrary assertion.

30.    For these reasons, the Plan is reasonably likely to close. Yet, notwithstanding the low standard for feasibility and the plain facts, the EFH Committee devotes a large portion of its Objection to fighting this uphill battle. Not surprisingly, each of its arguments fail.

ii.    **Disarmament Is Not a "Sunk Cost."**

31.    The Committee's assertion that disarmament and the drag provide no closing incentive because disarmament is a "sunk cost" fails on its own pseudo-academic terms. A sunk cost is "a cost that has already occurred." S. Ross, R. Westerfield, and J. Jaffe, *Corporate Finance* 198 (8th ed. 2008). Rational actors ignore them because they have been "actually incurred" and "cannot be recovered regardless of future events." *United States v. Sloan*, 505 F.3d 685, 698 (7th Cir. 2007).

32.    But the cost of disarmament and the drag is only felt by the Plan Sponsors if they fail to consummate the Merger *in the future*. It is thus not a cost that is "incurred" by the Plan Sponsors when the Court enters the Settlement Order but rather a known consequence that hangs over their collective heads. It is certainly approved at the time the Settlement Order is entered, and as a legal matter the releases take effect at that time. Yet as an economic matter, which is what matters to rational actors, the cost remains contingent from the perspective of the Plan Sponsors.

33.    Disarmament has no effect on the Plan Sponsors if the Merger closes but has a very real effect if it does not. The Plan Sponsors' litigation rights as TCEH junior creditors are

14

worthless to them in the "Plan A" scenario, where the Merger closes and they become the owners of New EFH.    Their recovery in that scenario comes solely from the upside value of Oncor, not from any litigation claims at TCEH, so whether or not those claims are released has no effect on their recovery in Plan A.    But by fundamentally altering the state of the world in the "Plan B" scenario—stripping the Plan Sponsors of the upside potential and litigation options they would otherwise have where their remedies consisted of damages or specific performance— disarmament alters the Plan Sponsors' calculus on the eve of closing in a way that strongly incentivizes consummating the transaction.

34.    In sum, in a world without disarmament, the Plan Sponsors would have a choice between closing the Merger, on the one hand, and paying a modest reverse breakup fee and returning to the upside potential of legacy litigation, on the other.    In a world with Court-approved disarmament, the Plan Sponsors instead have a choice between closing the Merger or receiving a six-cent recovery.    Disarmament thus demonstrably changes the Plan Sponsors' cost-benefit analysis at closing.    The Committee's sunk-cost theory is a fallacy.

### iii.    There Is No Legal Requirement that a Plan Sale Contract Have a Specific Performance Clause.

35.    There is no bright-line rule that a plan premised on a transaction is not feasible unless the purchase agreement has a specific performance right.    The EFH Committee's assertion that the Merger documents are "unenforceable"—when they are signed agreements subject to a clear remedy, disarmament—is an invalid attempt to require as much.

36.    To the contrary, it is Third Circuit law that the plan's effectiveness need not be "guaranteed."    *See WR Grace & Co.*, 729 F.3d at 349.    The plan confirmed by Judge Shannon in *Indianapolis Downs*—in a confirmation opinion that the Committee relies on—is an instructive example:    the purchase agreement there included a $25 million liquidated damages deposit as its

*sole remedy*, with no specific performance right.  Asset Purchase Agreement § 11.2(d), *In re Indianapolis Downs*, Case No. 11-11046 (Bankr. D. Del. 2013) (D.I. 1546) ("[S]uch liquidated damages shall be the sole and exclusive remedy . . . of Sellers against Purchasers.").[14]  Indeed, bankruptcy courts have approved transaction agreements without specific performance rights under sale plans in a number of other cases.[15]

37.     The cases the EFH Committee cites for the proposition that specific performance is a confirmation requirement are inapt, to put it mildly.  They involved small and relatively unsophisticated debtors and plans that did not include *signed agreements* for the necessary financing—and none of them have anything to do with whether a signed agreement had a specific performance right.  *See In re Clarkson*, 767 F.2d 417, 420 (8th Cir. 1985) (family farm debtors did not have $75,000 necessary to fund plan); *In re Olde Prairie Block Owner, LLC*, 467 B.R. 165, 171 (Bankr. N.D. Ill. 2012) (single-asset real estate plan was infeasible where commitment letter was only for $6 million of necessary $65 million in plan financing); *In re Ralph C. Tyler, P.E.*, the court 156 B.R. 995, 997 (Bankr. N.D. Ohio 1993) (plan simply cited "outside sources" of funding but there was "no evidence of any commitment to such financing"); *In re Stratford Assocs. Ltd. P'ship*, 145 B.R. 689, 699 (Bankr. D. Kan. 1992) (plan was feasible, despite no signed agreement, because debtor had a personal check from buyer that "would cover

---

[14]   Although creditors raised feasibility objections in *Indianapolis Downs*, no party asserted that the lack of a specific performance clause raised a feasibility issue, which is by all appearances a novel argument.  The court therefore did not address the issue in its confirmation opinion.  The court, however, had no problem finding that the purchasers had committed to finance the transaction—which is as plainly the case here as it was there. *See In re Indianapolis Downs*, 486 B.R. 286, 298 (Bankr. D. Del. 2013) ("[The purchaser] has committed half a billion dollars to this deal.").

[15]   *See e.g.*, Agreement of Purchase and Sale § 9.4, *In re MSR Resort Golf Course LLC.*, Case No. 11-10372 (SHL) (Bankr. S.D.N.Y. 2011) (D.I. 2039) (Debtor's "sole remedy shall be to terminate this Agreement and retain the Deposit."); Agreement of Purchase and Sale § 9.3, *In re Innkeepers USA Trust.*, Case No. 10-13800 (SCC) (Bankr. S.D.N.Y. 2010) (D.I. 1804) (same); Purchase and Sale Agreement § 17.4, *In re Edge Petroleum Corp.*, Case No. 09-20644 (Bankr. S.D. Tex. 2009) (D.I. 18) (Debtor's "sole and exclusive remedy" is to retain the deposit paid under the agreement.).

the entire amount necessary to fund the Plan, $247,800.00"); *In re Thurmon*, 87 B.R. 190, 192 (Bankr. M.D. Fla. 1988) (purchaser of individual debtor's horse breeding business had not yet applied for bank financing).

38.    The Committee also relies heavily on *In re Sugarhouse Reality, Inc.*, a case involving the site of a hundred-year-old abandoned sugar refinery, for the proposition that it would "conflict . . . with the Bankruptcy Code" if a purchaser had any right to "withdraw" before the effective date.  192 B.R. 355, 368 (E.D. Pa. 1996).  This incredibly broad proposition proves far too much and simply cannot be true.  Every sale contract in a large transaction between sophisticated parties has some level of conditionality and some ability of the purchaser to "withdraw"—even a contract with a breakup fee allows a party to withdraw and simply pay the fee.  *See, e.g.*, *Indianapolis Downs,* 486 B.R. at 298 (finding plan feasible despite significant regulatory conditions); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del.) (same).  Moreover, the court in *Sugarhouse* was not articulating a feasibility principle, it was construing a contract, making the case inapposite.  For its part, the Committee concedes in a footnote that the law does not actually require any particular form of remedies in a plan sale contract.  *See* EFH Committee Objection ¶ 106 n.23.

39.    So, faced with an utter lack of applicable case law, the Committee relies on its feasibility expert, Mr. Henkin, for the proposition that it is almost unprecedented not to have a specific performance right in a large M&A transaction.  The most significant flaw in this analysis is that it relies on the proposition that disarmament is a "sunk cost," and therefore provides no closing incentive, which, as set forth above, is wrong.  Mr. Henkin expressly ignores the incentive provided by disarmament and the drag, while analyzing regular-way M&A transactions

17

where this type of remedy is unavailable or even ordinary bankruptcy transactions where the remedy may not have been applicable.

40.     Yet this is not the only shortcoming of the Henkin report:  it fails to distinguish between strategic acquisitions and financial acquisitions.   Strategic acquisitions (where the purchaser is an operating company) and financial acquisitions (where the purchaser is a financial institution) involve fundamentally different remedies packages.[16]   As explained in a study cited by Mr. Henkin, the typical remedies package in a financial deal is a reverse breakup fee coupled with a specific performance right against a "shell entity," conditioned on the availability of financing.   Afra Afsharipour, *Transforming the Allocation of Deal Risk Through Reverse Termination Fees*, 63 Vand. L. Rev. 1161, 1184 (2010) ("The shell buyer is generally the only buyer entity that is a party to the acquisition agreement so as to limit the seller's recourse to the private equity firm for breaches of the agreement.").   To say the least, "the enforceability of such covenants [is] uncertain given that the shell subsidiaries [are] empty acquisition vehicles," arguably providing "little more than a false sense of security to targets."  *Id.* at 1186.  The failure to understand and acknowledge this distinction is fatal to the Committee's expert report.

41.     Indeed, the distinction is highly relevant here.   The Plan Sponsors are financial buyers.   Although the Committee rails against the lack of a specific performance clause, the typical formulation of that clause in a financial acquisition like the Merger is worth little more than the paper it is written on.  *See id.*  Moreover, in a "club deal" like this one, where multiple financial buyers participate, obtaining a joint-and-several specific performance right is virtually unprecedented, even further weakening the efficacy of the remedy.   The Debtors traded a meaningless specific performance remedy in exchange for a remedies package that is uniquely

---

[16]   *See* Ex. 6, 10/21/2015 Henkin Dep. Tr. at 116:4 - 117:17, 135:17 - 136:15.

Case 14-10979-CSS   Doc 6817   Filed 10/31/15   Page 34 of 103

tailored to maximize the incentive to close under the circumstances.  As such, the absence of a specific performance remedy does nothing to render the Plan infeasible.

iv.      **Contemplated Regulatory Conditions Do Not Render the Plan Infeasible.**

42.      The complexity of the transactions and regulatory approvals contained in the Plan are necessary to maximizing the value of the estates and certainly not fatal to confirmation.  But, citing the complexity of the proposed Oncor REIT restructuring and the need for significant regulatory approvals, the EFH Committee asserts that the Plan is simply too complex and involves too many uncertainties to be confirmable.  This is an astonishing argument for the Committee to raise in the context of a Plan that, if confirmed, would provide a complete recovery on the allowed claims of its stakeholders where no alternative comes close.

43.      In what appears to be an abdication of *its* fiduciary duties, the EFH Committee seems to be urging the Debtors to abandon a transaction that gives EFH creditors the *only* prospect of receiving a recovery from Oncor.  Indeed, if complexity and uncertainty were a valid basis for a confirmation objection, it would be impossible for the Debtors to confirm a Plan.  That is, of course, not the case.  The fact is that the level of complexity associated with the transaction is quite manageable, and these same investors have been involved in similar transactions.

44.      As an initial matter, it is beyond dispute that significant regulatory contingencies do not render a plan infeasible.  As the court explained in *Indianapolis Downs*, "[i]t is not at all unusual for consummation of a Chapter 11 plan to be conditioned upon the expectation of approval by regulatory authorities, and courts have not typically held up confirmation of a plan to wait for issuance of such approvals."  *Indianapolis Downs,* 486 B.R. at 298; *see also In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del.) (finding plan feasible despite significant

19

RLF1 13226524v.1

regulatory conditions).  Courts have confirmed countless plans conditioned on obtaining virtually every manner of regulatory approval.[17]

45.    After the notable success in January of the initial public offering undertaken by InfraREIT—a Texas transmission-and-distribution REIT—Oncor's REIT restructuring became a focal point for creditors and potential investors.   No party disputes that converting New EFH to a REIT has the potential to create massive incremental value.  And the Debtors' mandate is to "maximize the value of the bankruptcy estate."  *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (*en banc*).  The Debtors are not required to ignore this value-maximizing opportunity solely because it involves additional complexity or regulatory approvals, but rather were duty-bound to pursue it.

46.    Moreover, the Debtors and the Plan Sponsors are extremely well-positioned to execute this transaction.  The Debtors and Oncor have management teams with decades of utility-industry experience and a set of highly-sophisticated regulatory, M&A, and tax advisors.[18]

---

[17]  *See, e.g.*, *In re Lightsquared Inc.*, Case No. 12-12080 (SCC) (Bankr. S.D.N.Y. Mar. 27, 2015) (D.I. 2276) (Federal Communications Commission); *In re Sorenson Commc'ns, Inc.*, Case No. 14-10454 (BLS) (Bankr. D. Del. Apr. 10, 2014) (D.I. 180) (Federal Communications Commission); *In re Edison Mission Energy*, Case No. 12-49219 (JPC) (Bankr. N.D. Ill. Mar. 11, 2014) (D.I. 2206) (Federal Energy Regulatory Commission); *In re AMR Corp.*, Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. Oct. 22, 2013) (D.I. 10367) (Federal Aviation Administration and Department of Transportation); *In re Maxcom Telecommunicaciones, S.A.B. de C.V.*, Case No. 13-11839 (PJW) (Bankr. D. Del. Sept. 10, 2013) (D.I. 148) (the Mexican Government under Mexican telecommunications law); *In re DBSD N. Am.*, Case No. 09-13061 (REG) (Bankr. S.D.N.Y. July 5, 2011) (D.I. 1159) (Federal Communications Commission); *In re Majestic Star Casino, LLC*, Case No. 09-14136 (KG) (Bankr. D. Del. Mar 10, 2011) (D.I. 1059) (State gaming regulators); *In re Citadel Broad. Corp.*, Case No. 09-17442 (BRL) (Bankr. S.D.N.Y. May 19, 2010) (D.I. 369) (Federal Communications Commission); *In re Tropicana Entertainment*, LLC, Case No. 08-10856 (KJC) (Bankr. D. Del. May 5, 2009) (D.I. 2001, 2002) (State gaming regulators); *In re Hawaiian Telecom Commc'n's, Inc.*, Case No. 08-02005 (Bankr. D. Haw. Dec. 30, 2009) (D.I. 1570) (Hawaii Public Utilities Commission and the Federal Communications Commission); *In re Adelphia Commc'ns Corp.*, Case No. 02-41729 (REG) (Bankr. S.D.N.Y. Jan. 5, 2007) (Federal Trade Commission); *In re Global Crossings, Ltd.*, Case No. 02-40188 (REG) (Bankr. S.D.N.Y. Dec. 26, 2002) (D.I. 2586) (Federal Communications Commission).

[18]  *See* Ex. 7, 10/05/2015 Baker Dep. Tr. at 111:22 - 112:13 (basing confidence in ability to obtain regulatory approval on thirty years' experience); *id.* at 107:20- 109:15 ("[I]t is my view that we will receive regulatory approval from the FERC and the Public Utility Commission of Texas; otherwise, we wouldn't be sitting here today."); Ex. 5, 10/1/2015 Keglevic Dep. Tr. at 165:5-169:21 (explaining reasons for view that Merger "has a more likely than not chance of closing," including the counterparties' sophistication and that Oncor would be a

And the Plan Sponsors include the Hunt group, which is the manager and architect of InfraREIT/Sharyland, the Texas utility that serves as the template for this transaction and the attendant PUCT and IRS processes.  As the bankruptcy court put it in *Indianapolis Downs*, there are "readily apparent and practical considerations that give the Court confidence that there is a reasonable assurance of success: [the purchaser] is already in this business in the State of Indiana, and has thus already successfully gone through the licensing process."  486 B.R. at 299. What was true there is equally true here:  "it is almost inconceivable that [the purchaser], the Debtors and the other stakeholders in these cases would have headed down this path unless they were confident that the necessary licenses and approvals would be obtained."  *Id.*  This factor only further counsels in favor of a finding of feasibility.

### v.       E-Side Opposition Does Not Draw Feasibility Into Question.

47.      The alleged lack of support from EFH and EFIH creditors does not weigh against the feasibility of the Plan.  Both the present facts and the nature of the E-side objections belie the EFH Committee's assertion to the contrary.

48.      As a threshold matter, in light of their recent settlement, subject to Court approval, the Plan has the support of the majority of the EFIH PIK noteholders.  So, now, the Plan has the support of one of the EFH Committee's largest creditor constituencies.

49.      In any event, it may be true, as the court in *Indianapolis Downs* put it, that under normal circumstances "[t]he best indicator of feasibility is the position of the creditors whose economic interests are at stake."  486 B.R. at 298.  But this indicator does nothing to undermine

---

"cornerstone of" Hunt's progress "going forward"); 9/28/2015 Doré Dep. Tr. at 311:6- 314:8 (discussing reasons for confidence in ability to consummate deal); 9/23/2015 Ying Dep. Tr. at 36:10-15 ("I know that the Hunts are well advised.").

feasibility in this case because the vast majority of E-side creditors do not, in fact, contest the feasibility of the Plan.  And those that do contest feasibility have clear ulterior litigation motives.

50.     There is roughly $8.7 billion of funded debt at EFIH, including the DIP facility, and approximately $648 million of funded debt at EFH held by third parties.   All of these debtholders depend on the closing of the Merger to receive their recoveries under the Plan—and yet not one EFIH creditor asserted a feasibility objection regarding likelihood of closing. Instead, the EFIH Objections go almost exclusively to impairment.  In other words, where they do object, the vast majority of the economic stakeholders on the E-side simply argue—not that the Merger will not close—but that they should receive more cash or other entitlements when it does.

51.     Only the EFH Committee filed an Objection contesting feasibility, and the EFH Indenture Trustee and Fidelity join in that Objection.  But, like the EFIH Objectors, the EFH Indenture Trustee devotes most of its separately filed brief to arguments that it is entitled to more cash when the Merger closes, in the form of makewholes and postpetition interest at the contract rate.   And, other than the EFH Indenture Trustee, the Committee consists of one retail bondholder and asbestos plaintiffs.[19]  The Committee, therefore, consists entirely of parties with litigation motives.

52.     So there is not, as the Committee contends, an overwhelming body of economic stakeholders contesting feasibility, and those that do contest it are more simply focused on their desire to increase the allowed amount of their disputed claims rather than a genuine concern as to the likelihood of recovery on their uncontested claims.  This factor therefore does nothing to undermine the feasibility of the Plan.

---

[19]   The members of the EFH Committee are Brown & Zhou, LLC, Peter Tinkham, Shirley Fenicle, David William Fahy, and the EFH Indenture Trustee (D.I. 3403).

vi.    **The Definition of the Plan's Effective Date Is Entirely Consistent with Bankruptcy Law.**

53.    The definition and expected timing of the Plan's Effective Date is entirely reasonable under the circumstances and consistent with practice in complex corporate reorganizations.  Thus, the EFH Committee's attempt to repackage its feasibility argument as a challenge to the nature of the Effective Date falls flat.

54.    There is no confirmation requirement under section 1129 of the Bankruptcy Code with respect to the effective date of the plan.  11 U.S.C. § 1129.  Nor does the Bankruptcy Code otherwise define "effective date" or impose any requirements with respect to a plan's effective date.  *See, e.g*, *id*. § 101.  Nor does it appear that any court in Delaware has ever denied confirmation of a plan due to alleged issues associated with the plan's effective date.

55.    Unmoored from any requirement in the Bankruptcy Code or bankruptcy jurisprudence, the Committee relies on a series of wholly inapposite cases.  In a number of these cases, the issue was whether a claim could be unimpaired by cash installment payments after the effective date, which is of course entirely irrelevant to this case.  *See In re Jones*, 32 B.R. 951 (Bankr. D. Utah 1983); *In re Haardt*, 65 B.R. 697, 701 (Bankr. E.D. Pa. 1986).

56.    The others generally involved small and uncomplicated bankruptcies where there was no legitimate need for the lengthy delays of the effective date proposed by the debtor.  *See In re Potomac Iron Works, Inc.*, 217 B.R. 170, 173 (Bankr. D. Md. 1997) (one-year delay unreasonable "in this instance" where debtor's only material assets were a few million dollars' worth of accounts receivable); *In re Cent. European Indus. Dev. Co. LLC*, 288 B.R. 572 (Bankr. N.D. Cal. 2003) (chapter 11 case with only one creditor dismissed because probability of confirmation was too remote); *In re Krueger*, 66 B.R. 463, 465 (Bankr. S.D. Fla. 1986) (too much delay in plan of liquidation for single-asset case where creditors would be better off in

23

foreclosure); *In re Yates Develop., Inc.*, 258 B.R. 36, 43 (Bankr. M.D. Fla. 2000) (involving a parcel of land in rural Florida and having nothing to do with the timing of the effective date).

57.     At best, the cases cited by the EFH Committee stand for the proposition that the proposed effective date must be reasonable.  As one court put it, in a case that at least involved multiple creditors and a plan of reorganization, the effective date should be "linked to the happening of a particular event and [be] no later than is reasonably necessary to accomplish a legitimate purpose."  *In re Wonder Corp. of Am.*, 70 B.R. 1018 (Bankr. D. Conn. 1987).  It is standard course in large, complex reorganizations for the effective date to occur many months after confirmation for a variety of reasons, some intrinsic, such as the need for regulatory approval, and some tactical, such as a post-confirmation marketing process.

58.     The following cases present just a handful of examples:

| Case | Confirmation Date | Effective Date | Approximate Period |
|---|---|---|---|
| *In re DBSD N. Am.*, Case No. 09-13061 (REG) (Bankr. S.D.N.Y.) | 7/5/2011 (D.I. 1159) | 3/9/2014 (D.I. 1274) | 8 months |
| *In re Hawaiian Telecom Commcn's, Inc.*, Case No. 08-02005 (Bankr. D. Haw.) | 12/30/2009 (D.I. 1570) | 10/28/2010 (D.I. 1950) | 10 months |
| *In re ITR Concessions Co. LLC*, Case No. 14-34284 (PSH) (Bankr. N.D. Ill.) | 10/28/2014 (D.I. 183) | 5/27/2015 (D.I. 273) | 7 months |
| *In re Majestic Star Casino, LLC*, Case No. 09-14136 (KG) (Bankr. D. Del.) | 3/10/2011 (D.I. 1059) | 12/1/2011 (D.I. 1376) | 9 months |
| *In re Tribune Media Co.*, Case No. 08-13141 (KJC) (Bankr. D. Del.) | 7/23/2012 (D.I. 12074) | 12/31/2012 (D.I. 12939) | 5 months |

59.     Here, as with these other complex cases, the effective date is linked to rigorously defined closing conditions, including the issuance of a private letter ruling from the IRS and PUCT approval of Oncor's change of control application.  And the Debtors are already diligently working with the IRS, PUCT, and other regulators to hasten the effective date.  The effective date will be no later than reasonably necessary to implement the Debtors' inherently complex restructuring transactions and to obtain the approvals of the Debtors' many regulators, as is

required by law and would be necessary under any chapter 11 plan.  Nothing further is required

under the Bankruptcy Code.

> **B.**     **The Possibility That This Court May Allow the EFH Legacy Note**
> **Makewhole Claims After Confirmation Does Not Render the Plan Infeasible.**

60.     The EFH Indenture Trustee's assertion that the Plan is not feasible because the

Court has not yet addressed the makewhole claims on the EFH Legacy Notes is easily

dispatched.  The Plan provides that the EFH Legacy Notes will either be repaid in full in cash or

reinstated, at the Debtors' election.   For the reasons set forth in the Confirmation Brief,

reinstatement of the EFH Legacy Notes is permissible given the relative lack of covenants or

known defaults other than overdue payments.  *See* Confirmation Brief ¶¶ 70-73.  This issue is on

a bifurcated briefing schedule, and the Debtors will reply to any objections the EFH Indenture

Trustee may have at the appropriate juncture.

61.     If the Court finds that reinstatement of the EFH Legacy Notes is permissible

(which it is), this feasibility Objection falls away entirely.  Reinstatement would, of course, not

involve a repayment of the EFH Legacy Notes at all, other than at their original maturity date.

*See* 11 U.S.C. § 1124(2)(B) (reinstatement returns a debt instrument's maturity to its original

date).  Reinstatement therefore cannot trigger a makewhole payment on the EFH Legacy Notes

even if that payment would otherwise be due upon repayment under the Plan.  *See* EFH Legacy

Notes Indentures, Form of Reverse of Notes (D.I. 6463) (providing for payment of certain

specified redemption prices upon an optional redemption before maturity).  The Court should

overrule this Objection on this straightforward basis.

62.     Even if the EFH Legacy Notes were somehow not subject to reinstatement, this

Objection does not render the Plan infeasible.  The makewhole premium on the EFH Legacy

Notes is approximately $193 million assuming a Plan Effective Date in June 2016.  Although the

Plan is conditioned on the disallowance of all makewhole claims, not all makewhole claims are similarly sized.  The condition is of course primarily focused on the roughly $850 million of alleged EFIH makewhole claims that have already been disallowed.  If the EFH Legacy Notes' makewhole is later allowed and the notes are not subject to reinstatement, the Debtors could negotiate a waiver of this condition.   Testimony at confirmation will show that the Debtors believe that this waiver is reasonably likely to be obtainable in the context of this $12 billion transaction.  The Court should thus overrule this Objection even in the unlikely event it finds that reinstatement is impermissible.

      **C.**      **The Possibility That an Appellate Court May Allow Disputed EFH and EFIH Claims After the Effective Date Does Not Render the Plan Infeasible.**

      63.     None of the Objectors assert that the Plan is infeasible due to possibility that an appellate court may allow disputed EFH and EFIH claims after the Effective Date.  The EFIH Second Lien Trustee does assert, however, that the Court must enter a finding that New EFH would be able to pay any such claims—without disputing that the finding is appropriate.  The Court has, likewise, stated that it will need some evidence on this point.  *See* Hr'g Tr. Oct. 15, 2015, at 128:17-129:14.  There are ample grounds for the Court to make this finding.

      64.     For purposes of determining feasibility, the Court must adjust the expected value of these disputed claims by their likelihood of success on appeal.  *See In re W.R. Grace & Co.*, 475 B.R. 34, 118 (D. Del. 2012) (low likelihood that claims would be allowed on appeal "significantly weakened" feasibility argument).  The Court has, of course, already disallowed the EFIH first lien and second lien makewhole claims.  *See Del. Trust Co. v. EFIH (In re Energy Future Holdings Corp.)*, Adv. No. 14-50363 (2015) (D.I. 245, 304).  Given the substantial body of case law that similarly holds, it is entirely appropriate for the Court to severely discount the face amount of the disallowed makewhole claims for purposes of feasibility.  As to makewhole

claims that the Court has not yet addressed, the Court can still apply a significant discount for the purposes of feasibility given its existing ruling.

65.    Similarly, although the Court has not yet addressed postpetition interest, the fact that a majority of courts apply the federal judgment rate approach warrants a significant discount of the expected value of these claims. *See W.R. Grace*, 475 B.R. at 200 ("The majority approach taken by most courts today is the federal judgment rate approach."); *see also In re Washington Mut., Inc.*, 461 B.R. 200, 242 (Bankr. D. Del. 2011) (applying the federal judgment rate approach).    And the compound probability that appellate courts would simultaneously find that all of these claims are allowed is lower than the probability of an adverse ruling any particular one of them.    Moreover, a scenario in which these disallowed claims were later allowed on appeal after the Effective Date would require both that the Merger have closed without having been stayed and that any appeal not have been dismissed, only further reducing the probability that this hypothetical comes to pass.

66.    Even absent this discounting, the record will reflect that New EFH could satisfy all disputed EFH and EFIH claims if subsequently ordered to do so on appeal.    The aggregate amount of all disputed makewhole and postpetition interest claims would be approximately $2.2 billion, assuming a mid-2017 judgment.[20]    Yet the Merger will capitalize New EFH with approximately $7.0 billion of new equity.[21]    Although it would eviscerate the Plan Sponsors' investment thesis, New EFH would be able to pay these claims in full in cash with a mix of new

---

[20]    *See* Ex. 4, 10/19/2015 Ying Dep. Tr. at 56:14-18 ("[Q.] And then if you assume every one of those losses occurs, there is an additional $2,229,000,000 in liabilities to be paid on June 30, 2017, right? [A.] Yes."); Ex. 5, 10/1/2015 Keglevic Dep. Tr. at 45:2-6 ("That being said, if the worst-case scenario were to happen, as you have described it, we still believe that those amounts have sufficient equity coverage to assure their payment.").

[21]    *See* Ex. 2, 9/23/2015 Ying Dep. Tr. at 63:11-15 ("I think that when you're talking about an investor group investing $7 billion of equity to buy a $20 billion asset . . . .").

27

debt and equity financing, given its strong projected ratings and credit profile.[22]  Thus, the Court should find that the Plan is feasible notwithstanding the possibility that disputed EFH or EFIH claims are later allowed on appeal.

## III.    ALL CREDITOR CLAIMS AGAINST EFH AND EFIH ARE UNIMPAIRED.

67.    The Plan is premised on the unimpairment of all creditors of EFH and EFIH. A claim is impaired if the plan alters "the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest."  11 U.S.C. § 1124(1).  The EFIH Objectors, along with the EFH Indenture Trustee, assert a litany of arguments to generate additional recoveries or entitlements.  These arguments all fail under the statutory definition of impairment.

### A.    EFH and EFIH Unsecured Claims Will Receive the Amount of Postpetition Interest and Fees They Are Entitled to Under the Bankruptcy Code.

68.    The Court need not determine whether unsecured claims are entitled to postpetition interest at the contract rate to confirm the Plan because these claims will be unimpaired no matter which way the Court rules on the issue after confirmation.  The same goes for professional fees and expenses asserted under unsecured indentures.  The EFIH PIK Trustee

---

[22]  *See* Ex. 4, 10/19/2015 Ying Dep. Tr. at 18:22 - 19:5 ("[Q.] . . . [I]s it fair to say your opinion is that if every single disputed claim is allowed in full with interest post-emergence, EFH will be able to raise debt and/or equity capital to pay those liabilities in full, correct?  [A.] That's correct."); *id.* at 58:7-20 ("We start with the fact we know that Oncor has an investment grade credit rating, and we think that, post-confirmation, the credit rating at EFIH, with the pro forma capital structure that we think EFIH and EFH will emerge with, will have a very strong BB credit rating.  [Q.] Which would be investment grade, right?  [A.] 'Strong BB' means just below investment grade, but nonetheless, it's a very strong credit rating and means that they would have ample access to the debt capital markets if they needed to raise incremental debt."); Ex. 5, 10/1/2015 Keglevic Dep. Tr. at 43:12 - 44:12 ("The -- your hypothetical was we lose 100 percent of all the make-whole cases, and the finding is also that there would be interest on top of those amounts.  Rough numbers, in my mind, those make-wholes are about a billion dollars in total, and adding interest for a period of time, I can do the math, on a billion dollars at 10 percent, that's 100 million a year, so say a billion two.  If I was the chief financial officer, which I will not be, by the way, of reorganized EFH, and I had a company worth 8 and a half billion dollars, and I had a claim for 1.2 billion dollars, I would not -- if my alternative being pay it or file for bankruptcy, I would find a way for my 8 and a half billion dollars to pay the amount and not flush the remaining 7.3 billion dollars of equity value in the estate.").

and EFH Indenture Trustee nonetheless assert that the Court cannot find that their claims are unimpaired unless it finds, at the confirmation hearing, that they are entitled to postpetition interest at the contract rate and professional fees and expenses provided for in the indentures. But this is contrary to governing Third Circuit law and law of the case. *See In re PPI Enterprises*, 324 F.3d 197, 204 (3d Cir. 2003) ("[A] creditor's claim outside of bankruptcy is not the relevant barometer for impairment; we must examine whether the plan itself is a source of limitation on a creditor's legal, equitable, or contractual rights."); *In re Energy Future Holdings Corp.*, No. 14-10979, at *27 (Bankr. D. Del. Oct. 30, 2015) (D.I. 6782) ("[T]he plan in this case need not provide for the payment in cash on the effective date of post-petition interest at the contract rate in order for the PIK Noteholders to be unimpaired.").

69.     In its recent ruling, the Court held that for the EFIH PIK Note Claims to be unimpaired, they may be entitled to "post-petition interest at an appropriate rate if [the Court] determines to do so under its equitable power." *Id.* at *29.  The Plan and pretrial order make clear that this issue is reserved for adjudication at a later date to be determined. *See Joint Stipulated Final Pre-Trial Order* (D.I. 6748).  But the Plan also makes clear that EFH and EFIH unsecured claims are unimpaired and will be paid in full in cash, regardless of how the Court ultimately rules on postpetition interest.  Put differently, if the Court rules that payment of postpetition interest is required to unimpair the Trustees' Claims, the Debtors must pay any such amounts on the Effective Date under the Plan.  That is the end of the issue for the purposes of Confirmation.

70.     Similarly, the Court need not address at the confirmation hearing the allowance of claims for the fees and expenses of the EFIH PIK Notes Indenture Trustee and the EFH Notes Indenture Trustee.  These fee claims are (or will be) subject to separate objections, and the

parties have agreed these objections will be heard at a separate hearing. *See id.* To the extent such claims are ultimately allowed by the Bankruptcy Court, they will be paid in full in cash as general unsecured claims of either EFH or EFIH under the Plan. If, on the other hand, the Bankruptcy Court disallows such claims, the Debtors need not pay such disallowed claims to render them "unimpaired" under the Plan. *See PPI Enterprises*, 324 F.3d at 204 (holding that statutory impairment of claims under the Bankruptcy Code is not impairment under a plan). Thus, the Court should find that EFH and EFIH unsecured claims are unimpaired notwithstanding pending postpetition interest and fee objections.

> **B.    The Plan's Treatment of the EFH Indenture Trustee's Makewhole Claim Does Not Render its Claims Impaired.**

71.    The EFH Indenture Trustee's argument that its claims are somehow impaired because the effectiveness of the Plan is conditioned on disallowance of makewhole claims by the Court is, in fact, not an impairment issue. As an initial matter, the makewhole is not being adjusted by the Plan—it is subject to a separate objection. Moreover, the makewhole claim is not being "treated" under the Plan—instead, the Plan is simply conditioned on the disallowance of the claims. *See* Plan, Art. IX.B.9. If this condition is waived, then the claims must be paid. In other words, in no circumstance will the Plan become effective but not provide for payment of any ultimately allowed makewhole claim. The Trustee's confused Objection on this point is therefore at best a purported feasibility issue (which fails for the reasons set forth above). For these straightforward reasons, the Court should overrule this Objection.

> **C.    Pending or Anticipated Appeals Do Not Impair EFH and EFIH Claims.**

72.    The Plan need not provide for amounts hypothetically allowed on appeal after the Plan's Effective Date to render claims unimpaired. Similarly, the release of liens that

purportedly secure claims that have been disallowed or paid in full is consistent with bankruptcy law.[23]

73.     Again, a claim is impaired if the plan alters "the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest."  11 U.S.C. § 1124(1).  The situation that the EFIH First Lien Trustee, the EFIH Second Lien Trustee, and the EFIH PIK Trustee complain of—that the Court's orders disallowing certain of the Trustees' claims take effect unless stayed, and that the Debtors are entitled to rely on and implement those orders—is the status quo, not an alteration of rights.  Anything otherwise would turn the burdens on their head and lead to absurd results, in effect requiring the prevailing party to bond the losing party's appeal.  Put another way, no plan could ever be consummated over the objection of a secured creditor without eliminating any risk to the lender for the pendency of what may be frivolous or barely colorable appeals intended to frustrate a debtor's reorganization.

74.     Absent a stay, a bankruptcy court order disallowing a claim becomes effective immediately, and the debtor need not pay or reserve for disallowed claims.  *In re Whatley*, 155 B.R. 775, 781 (Bankr. D. Colo. 1993), *aff'd*, 169 B.R. 698 (D. Colo. 1994), *aff'd*, 54 F.3d 788 (10th Cir. 1995) ("Like the order disallowing the claim of WRJV, the order allowing the Mansfield claim, the order authorizing the sale of the Ranch and the order confirming the plan were all self-executing orders."); *see also In re Cont'l Airlines*, 91 F.3d 553, 565 (3d Cir. 1996) (emphasizing "the importance of allowing approved reorganizations to go forward in reliance on bankruptcy court confirmation orders"); *In re UNR Indus., Inc.*, 20 F.3d 766, 770 (7th Cir. 1994) ("A stay not sought, and a stay sought and denied, lead equally to the implementation of the plan

---

[23]    The EFIH Second Lien Trustee also argues that the Plan somehow impairs its ability to litigate its makewhole in *this* Court, but given that the Court has ruled on its makewhole, this argument is moot.  *See* Memorandum Opinion, *Computershare Trust Co., N.A. v. EFIH (In re Energy Future Holdings Corp.)*, No. 14-50363 (Bankr. D. Del. Oct. 29, 2015).

of reorganization."). Likewise, absent a stay, liens can be released on the effective date of the plan. *See In re Best Products Co., Inc.*, 177 B.R. 791, 804-05 (S.D.N.Y.), *aff'd*, 68 F.3d 26 (2d Cir. 1995) ("After the Plan was confirmed and/or consummated, numerous transactions were entered into by the reorganized Debtors . . . . For example, . . . liens have been released . . . .").

75.    A party that disagrees with this result—that is, the immediate effectiveness of an unstayed bankruptcy court order disallowing a claim—bears the burden of demonstrating that it is entitled to the extraordinary remedy of a stay pending appeal. *See, e.g., In re W.R. Grace & Co.*, 475 B.R. 34, 220 (D. Del. 2012). As the court in *In re MCorp. Financial, Inc.* explained, bankruptcy courts can and must rely on their own orders disallowing claims:

> Once an adjudication at the trial level has been made, the claim is no longer contingent; it is allowed to some extent or disallowed. To hold otherwise would mean that no bankruptcy estate could ever make a distribution without every disputed claim, no matter how frivolous or how unseasonably brought, having been fully litigated through the trial court and three appellate levels. This is not the system that congress created.

160 B.R. 941, 962-63 (S.D. Tex. 1993).

76.    The Trustees' argument is essentially that, unless the plan addresses a hypothetical result on appeal, the plan impairs their appellate rights. But the Trustees do not have an existing right to have the Plan or the Court preemptively fashion an appellate remedy, and they cite no authority to the contrary. This is because "neither the Bankruptcy Code nor tenets of due process require that a reorganized company in effect bond an appeal by a losing claimant." *In re Chateaugay Corp.*, 10 F.3d 944, 961 (2d Cir. 1993); *see also In re Enron Corp.*, No. 01-16034 (AJG), 2006 WL 544463, at *8 (Bankr. S.D.N.Y. Jan. 17, 2006) (debtors were not required to reserve for disallowed claim because, among other things, creditor had "right to seek entry of an order staying the effectiveness of the disallowance order pending a resolution of the appeal"); *In re Bicoastal Corp.*, 146 B.R. 492, 494 (Bankr. M.D. Fla. 1992) ("The fact that the

Plan has a provision setting aside a 'reserve' to deal with disputed claims involves only disputed claims which ultimately may or may not be allowed, but does not involve . . . claims [that] have been disallowed . . . ."). Otherwise, there would be no distinction between whether a debtor won or lost an objection to a secured creditor's claim prior to emergence. Either way the debtor would have to establish a reserve or retain liens. That is not the law.

77.     Indeed, the notable dearth of case law in the EFIH First and Second Lien Trustees' briefs is indicative of how far afield they are. Of the cases they cite, none establishes the proposition that a creditor is impaired unless the plan provides for payment of their disallowed claims based on hypothetical appellate rulings. For example, in *In re Highway Truck Drivers & Helpers, Teamsters Local No. 107*, a nonbankruptcy trial court entered a judgment *against* the debtor. 100 B.R. 209, 213-14 (Bankr. E.D. Pa. 1989). While the debtor's appeal was pending, the debtor filed a plan that proposed to escrow the judgment amount on the effective date and require the *creditor* to post an appellate bond. *Id.* Similarly, in *In re Yates Dev., Inc.*, the court *allowed* a disputed portion of a claim against the debtor, and then the debtor filed a plan purporting not to pay the disputed amount on the effective date or otherwise. 258 B.R. 36 (Bankr. M.D. Fla. 2000). Not surprisingly, on facts that are the opposite of those at issue here, these courts found that the creditors' claims were impaired.

78.     Similarly, all of the cases the EFIH First Lien Trustee cites regarding its nondischargeable lien theory are inapposite. In *In re Greenwood Point, LP*, the court found that a creditor was impaired because the plan released a tax lien on the effective date but paid the underlying liability in *two installments* after the effective date. 445 B.R. 885, 907 (Bankr. S.D. Ind. 2011); *see also In re The Capital Ctr., LLC*, No. 12-06277-8-SWH, 2013 WL 4510248, at *6 (Bankr. E.D.N.C. Aug. 22, 2013) ("[I]n contrast to *In re Greenwood Point,* the debtor's plan

retains Wake County's lien until all of the payments have been made, leaving the claim unimpaired by the plan."). The Debtors are not proposing an installment plan for allowed claims; the claims here have been disallowed.

79.     Similarly, the nonbankruptcy cases the EFIH First Lien Trustee cites involve fact-specific issues of appellate procedure and state or other nonbankruptcy law that are irrelevant here. *See Merrill Lynch Interfunding Inc. v. Argenti*, No. 00 CIV. 933 (TPG), 2000 WL 490739, at *4 (S.D.N.Y. Apr. 26, 2000), *aff'd*, 2 F. App'x 98 (2d Cir. 2001) (payment of approximately 10% of mortgage note based on net result of trial court judgment sustaining counterclaim, which was reversed on appeal, did not result in obligation to release lien under particular provision of Connecticut statute); *United States v. Pound*, No. CIV-07-427-RAW, 2010 WL 2330240, at *1 (June 8, 2010) (providing, in what was expressly characterized as "*obiter dictum*," that the losing party did not need to release a lien pending appeal, in part because the opposing party had not requested as much); *Pinson v. Thacker*, 2009 WL 5124996, at *3 (Ky. Ct. App. Dec. 30, 2009) (lien would not be released where *borrower* appealed).

80.     Having failed to find support in the law, the EFIH First and Second Lien Trustees—and in particular the EFIH First Lien Trustee—pack their briefs with reams of quotations from deposition transcripts and produced documents. These Objections are entirely legal in nature, and the statements of lay (or legal) witnesses do nothing to alter the clear legal analysis discussed above. For these reasons, the Court must overrule the Trustees' objections.

### D.    Nothing in the Plan Otherwise Impairs EFH and EFIH Debt Claims.

81.     Various other increasingly strained arguments forwarded by the EFIH First Lien Trustee, the EFIH Second Lien Trustee, and the EFIH PIK Trustee, which are mostly variations on these same themes, are likewise unsupported by the law.

82.    *First*, the EFIH First and Second Lien Trustees assert that their claims are impaired because the Plan does not provide for postpetition and post-Effective Date interest on their alleged makewhole premiums or for post-Effective Date fees and expenses and because the Plan would cancel the applicable indentures.  But, again, their claims for makewhole premiums have been disallowed by the Court, which, of course, disallows any interest on that premium as well.  The Plan need not provide for any interest on that disallowed claim any more than it needs to provide for payment of the claim itself, for all the reasons set forth above.

83.    Likewise, because the allowed amounts of their claims—as determined by this Court—will be paid in full, the Plan can cancel the EFIH first and second lien indentures on the Effective Date for the same reasons that it can release the applicable liens.  *See, e.g.*, 11 U.S.C. § 1123(a)(5)(F) (providing for cancelation of indentures under a chapter 11 plan); *MCorp. Financial*, 160 B.R. at 962-63 ("Once an adjudication at the trial level has been made, the claim is no longer contingent; it is allowed to some extent or disallowed.").  Indeed, it would be impossible to procure exit financing if liens on disallowed claims by secured creditors had to be maintained through two levels of appeal and denial of a writ of certiorari.  Instead, if an appellate court later finds that the Trustees were not in fact paid in full, that court will—subject to prudential considerations—fashion an appropriate remedy.  The Trustees' right to argue, at that time, that this remedy should include amounts that would otherwise have accrued under the indenture, including interest and fees, is fully preserved.  Thus, these arguments, which are all premised on the same misguided propositions, are invalid.

84.    *Second*, the EFIH PIK Trustee likewise asserts that its indentures must continue after the Effective Date for it to be unimpaired.  This argument is invalid for the same reasons set forth above.  Contrary to the EFIH PIK Trustee's assertions, in *In re Texas Rangers Baseball*

RLF1 13226524v.1

*Partners*, the court stated that unimpairment does *not* require that unsecured creditors receive any amounts that would otherwise be due after the plan effective date had the debt not been repaid.   434 B.R. 393, 406-10 (Bankr. N.D. Tex. 2010) (stating that a "typical unsecured creditor" is unimpaired if it receives "everything to which the creditor would be entitled in a judgment entered *immediately following the plan's effective date*" (emphasis added)).   In the portion of the opinion that the EFIH PIK Trustee relies on for the proposition that its indentures must continue after the Effective Date, the *Texas Rangers* court was addressing a highly-unusual partial guarantee of the debt of a non-debtor affiliate.   *Id.*   The monetary obligations of the non-debtor were not fully satisfied under the plan, but the guarantee agreement included nonmonetary obligations against the debtor that were being violated by the plan.   *Id.*   This is not the case here, so the *Texas Rangers* court's rulings in connection with this atypical structure are inapplicable.

85.     The other cases the EFIH PIK Trustee relies on are equally inapplicable.   *See Bustop Shelters of Louisville, Inc. v. Classic Homes, Inc.*, 914 F.2d 810, 814 (6th Cir. 1990) (involving assumption of prepetition debt by the reorganized company rather than repayment and, in any case, finding the creditor unimpaired); *In re Valley View Shopping Ctr., L.P.*, 260 B.R. 10, 32 (Bankr. D. Kan. 2001) (involving a deferred payment after the effective date of the plan).   Nothing prevents the Plan from canceling the EFIH PIK Trustee's indenture on the Effective Date after its allowed claims are repaid in full in cash.   *See* 11 U.S.C. § 1123(a)(5)(F).

86.     ***Third***, and most implausibly, the EFIH PIK Trustee asserts that, by "preserving the right to argue equitable mootness," the Debtors have rendered the EFIH PIK Notes impaired. But equitable mootness is a preexisting, and longstanding, doctrine of appellate law. *See e.g.*, *In re Tribune Media Co.*, 799 F.3d 272, 278 (3d Cir. 2015) ("We first recognized the doctrine of

equitable mootness in *In re Continental Airlines,* 91 F.3d 553 (3d Cir. 1996) (*en banc* ).").   Neither its mere existence nor the Debtors' preexisting right to assert it in any way alters the EFIH PIK Trustee's legal rights.   Moreover, a finding of equitable mootness is not *the plan* altering the legal rights of any party.   It is the application of a legal standard to their appeal.   A finding of equitable mootness would no more impair any party's rights than the filing of a timely notice of appeal.   In essence, the EFIH PIK Trustee is requesting that the Court either direct an appellate court not to evaluate well-established prudential considerations or direct the parties not exercise preexisting appellate rights.   The Court should decline this request.

87.     ***Fourth***, neither the EFIH First Lien Trustee nor the EFIH Second Lien Trustee is impaired by virtue of the Collateral Trust Agreement.   The Collateral Trust Agreement provides that, before discharge of the EFIH First Lien Notes, EFIH may not make a payment to the EFIH Second Lien Trustee "from the proceeds of Collateral."   Collateral Trust Agreement § 2.4(c).   But, as discussed above, the EFIH First Lien Notes will be discharged by an order of the Court after they are repaid in full in cash under the Plan, making this provision inapplicable.   Similarly, the Collateral Trust Agreement, and claims under the agreement, may be discharged and released on the effective date just as the indentures are.

88.     Moreover, the EFIH Second Lien Notes are not being repaid from the proceeds of collateral under the Plan:  they are being repaid from the proceeds of a merger at the parent level.   The sole collateral securing the EFIH First Lien Notes are the equity interests in Oncor Electric Delivery Holdings Company LLC held by EFIH.   EFIH is not selling or otherwise disposing of these holding company equity interests under the Plan.   Indeed, these interests will remain intact.

89.     Likewise, the EFIH Second Lien Trustee's assertions that it is impaired based on the likelihood that it may have to disgorge amounts under the Collateral Trust Agreement are

incorrect.  The *Plan* cannot impair creditors based on rights they may have against one another. Thus, the Trustees' Objections as to the Collateral Trust Agreement should be overruled.

90.     **Fifth**, the fact that the Plan does not pay interest on accrued fees and expenses under the EFIH First Lien Trustee's indenture does not render its claims impaired.   The indentures do not provide for payment of such amounts.  *See* EFIH First Lien Indenture § 7.07. The provision that the EFIH First Lien Trustee quotes from simply states that interest and obligations, including fee obligations, *are secured*.  *Id.* § 10.04 ("The due and punctual payment of the principal, premium, if any, and interest on the Notes when and as the same shall be due and payable . . . on the Notes and performance of all other Obligations of EFIH to the Holders of Notes or the Trustee under this Indenture and the Notes, according to the terms hereunder or thereunder, are secured . . . .").  Thus, the Trustee's contract does not entitle it to these amounts.

91.     **Sixth**, the EFIH Second Lien Trustee asserts that the Debtors have improperly objected to its claims through the Plan rather than a separate claims objection.  But the EFIH Second Lien Trustee's makewhole claim has been disallowed by this Court through an adversary proceeding.   The other amounts that the Trustee asserts an entitlement to—interest on its makewhole claims, post-Effective Date amounts as a result of not have received its makewhole premium, and so forth—are all plainly disallowed by that same ruling or still pending judgment. The Court should therefore overrule these Objections.[24]

### E.     Allowance of the TCEH Settlement Claim Does Not Impair EFH Claims.

92.     The EFH Indenture Trustee's argument that allowance of the TCEH Settlement Claim impairs its note claims at EFH is simply not plausible.  It should go without saying that

---

[24]    The Court should likewise overrule any E-side Objections premised on the best interests of creditors test, the cramdown provisions, or any other rights of unimpaired creditors.  *See* 11 U.S.C. § 1129(a)(7) (applying only "[w]ith respect to each impaired class of claims or interests"); *id.* § 1129(b) (same).

"any alleged impairment would have to result from what the *plan* does." *In re W.R. Grace & Co.*, 475 B.R. 34, 161 (D. Del. 2012) (emphasis in original and internal quotation marks omitted).    Under the Plan, the TCEH Settlement Claim will be deemed satisfied, without payment, and the EFH Indenture Trustee's allowed claims will be repaid in full in cash or reinstated.    The TCEH Settlement Claim is thus irrelevant to the EFH Indenture Trustee's treatment under the *Plan*, which disposes of this Objection.

93.    If the Plan does not become effective, the question whether the EFH Indenture Trustee's claims are impaired will depend on their treatment under an alternative plan that is not before the Court.    Not surprisingly, however, the Bankruptcy Code permits the Court to allow claims against the estate.    *See* 11 U.S.C. § 502.    And the Bankruptcy Rules permit the Court to approve settlements.    *See* Fed. R. Bankr. Proc. 9019.    None of these facts have any relationship to impairment under a plan.    If the EFH Indenture Trustee takes issue with the TCEH Settlement Claim or the approval of the Settlement Agreement through which the Debtors have requested it be allowed, its objection is appropriately addressed in that context.

## IV.    THE CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN IS ENTIRELY APPROPRIATE.

### A.    The TCEH First Lien Deficiency Waiver Is Justified.

94.    The TCEH First Lien Deficiency Waiver implements, among other things, a fair settlement of a lien challenge that would not inure to the benefit of the PCRBs if it were successful.    The PCRB Trustee's assertion that the waiver constitutes impermissible unequal treatment of its claims under the Plan, or that it is somehow indicative of a lack of good faith, is therefore incorrect.

95.    The Plan provides for identical treatment within each Class.    The Holders of TCEH Unsecured Debt Claims (Class C4), which include the TCEH First Lien Deficiency

Claim, the TCEH Second Lien Note Claims, the TCEH Unsecured Note Claims, and the PCRB Claims, will all receive their *pro rata* share of $150 million of Reorganized EFH Stock and approximately $5.1 billion of Rights to participate in the Merger.  This results in an identical recovery to all class members on account of them giving up their debt claims.

96.    As a critical component of the settlement of, among other things, litigation to avoid the liens securing the TCEH First Lien Secured Claims, the Plan provides that the Holders of TCEH First Lien Secured Claims, whose Claims are secured by the asset-holding TCEH subsidiaries like Luminant and TXU Energy, will waive their recovery under the TCEH First Lien Deficiency Claim for the benefit of holders of TCEH Unsecured Debt Claims that *also hold guarantees against the asset-holding TCEH subsidiaries* (e.g., the TCEH Second Lien Note Claims and the TCEH Unsecured Note Claims but excluding the PCRB Claims, which are only obligations of TCEH).  Thus, it is this settlement—which is implemented through the Plan but is distinct from the PCRBs' treatment on account of their claims against the estates—that results in the difference in recoveries received by holders of the PCRBs and other holders of TCEH Unsecured Debt Claims.

97.    Even if the Plan actually provided for different treatment of claims in Class C4 (it does not), such treatment is consistent with Third Circuit law.  Section 1123(a) requires "only approximate equality," not "precise equality."  *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) (quoting *In re Quigley Co., Inc.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007)).  Courts in the Third Circuit examine whether particular class members "give up the same degree of consideration for their distribution under the plan."  *W.R. Grace*, 729 F.3d at 121.  To that end, courts have "approved settlements where the class members received different percentages of recovery to take into account different factors so long as the settlement terms are rationally based

on legitimate consideration[s]." *In re Multiut Corp.*, 449 B.R. 323, 335-36 (Bankr. N.D. Ill. 2011) (quoting *In re Hibbard Brown & Co.,* 217 B.R. 41, 47 (Bankr. S.D.N.Y. 1998)).  This is precisely the case here.

98.     Again, all TCEH debt claims, other than the PCRBs, are guaranteed by a group of TCEH subsidiaries that hold the operating assets.  The liens securing the TCEH first lien claims, too, are against the assets of both TCEH itself and its subsidiaries.  Of the approximately $32 billion of prepetition debt at TCEH, virtually all of it can be asserted against both TCEH and its subsidiaries.  The one exception is the approximately $855 million of PCRBs—which can only be asserted against TCEH.

99.     In February 2015, the TCEH Creditors' Committee and the TCEH unsecured group filed standing motions in an effort to cause the TCEH Debtors to prosecute, among other things, claims against the TCEH first lien creditors to avoid substantially all of their liens (D.I. 3593, 2603).  After months of arm's-length negotiations under a Court-approved mediation process, the TCEH first lien group agreed to waive its deficiency claims in favor of the TCEH Unsecured Debt Claims, as a settlement of that lien challenge, among other things.

100.    The fact that the PCRBs lack subsidiary guarantees both explains why (a) the PCRBs could not in good faith have filed a lien challenge and (b) completely justifies the way this settlement was structured.  If the liens were avoided, what would remain is roughly $32 billion of unsecured debt at TCEH.  There would also be roughly $31.1 billion of unsecured guarantee claims against the TCEH subsidiaries—i.e., $32 billion minus the $855 million of PCRB claims, which would not have recourse against the subsidiaries and would therefore be structurally subordinate to this wall of debt.  The unsecured claims at the subsidiary level would recover their *pro rata* share of the TCEH operating assets—and would consume those assets in

their entirety, given that the assets have a midpoint value of only approximately $10.646 billion in the aggregate. This would result in an approximately 34% recovery on the unsecured debt at the subsidiary level and, therefore, no value would flow up to TCEH on account of the deficiency waiver.

101.    The holders of TCEH first lien debt, second lien debt, and unsecured notes would still have claims against TCEH for the full amount. The only recovery on the $855 million of PCRBs, therefore, would be to share *pro rata* in the residual value of TCEH with the other $31.1 billion of TCEH-level unsecured claims. This would result in the PCRBs receiving approximately 1/36th of any assets remaining at TCEH after satisfaction of administrative claims, including the TCEH DIP financing. In contrast, under the Settlement Agreement, the PCRBs are able to receive approximately 1/18th of any assets available at TCEH after satisfaction of administrative claims because the TCEH first lien lenders agreed to reduce their deficiency claim against TCEH from $25 billion to up to $9.5 billion. Thus, the PCRBs are better off under the Plan and Settlement Agreement than they would be without the Settlement Agreement and they need not share in the benefit of the TCEH first lien lenders' agreement to waive the deficiency claim against TCEH's subsidiaries.

102.    It is of course correct, as the PCRB Trustee points out, that these subsidiary guarantees have little value so long as the liens securing the TCEH first lien debt remain in place. PCRB Trustee Objection ¶ 70. This is why it makes sense to classify the PCRB claims with the other TCEH Unsecured Debt Claims. But, in settlement of litigation that would *fundamentally alter* the current state of affairs if it were to succeed, the would-be beneficiaries of that litigation are entitled to the first cut of the proceeds from a settlement of that litigation.

103.    The PCRB Trustee attempts to circumvent this logic by pointing to deposition transcripts where the Trustee asked various witnesses if they analyzed the issue.    But whether various parties analyzed the issue is irrelevant:  the waiver was born of a settlement of claims that, as a matter of logic and corporate structure, would not have benefitted the PCRBs.  The views of various parties does not dictate whether the settlement terms are rationally based on legitimate considerations, which is an objective inquiry based on the nature of the debt claims.

104.    Similarly, the PCRB Trustee asserts, coyly, that this justification cannot be legitimate because Class C5 (General Unsecured Claims Against the TCEH Debtors Other Than EFCH) includes trade claims at the TCEH level that are not affected by the waiver.  But the issue of trade claims actually cuts the other way:  virtually all of the TCEH Debtors' trade claims are at the relevant operating companies, either Luminant, TXU Energy, or one of their subsidiaries.  Thus, like the TCEH Unsecured Debt Claims, trade claims, too, would be entitled to recover from the operating assets if the TCEH first lien debt were avoided.  In such case, they would not be structurally subordinated.  The PCRBs would be.

105.    The PCRB Trustee also asserts that the settlement cannot be a justification for the deficiency waiver because claims against the TCEH first lien creditors belong to the TCEH Debtors, and thus the PCRBs are entitled to share in any proceeds of the litigation of those claims.  This line of argument is indicative of a fundamental misunderstanding that permeates the PCRB Trustee's Objection:  the "TCEH Debtors" include TCEH *and its subsidiaries*.  The applicable causes of action—arising out of the liens granted by TCEH and its subsidiaries—are thus held by this entire group of debtors.  And, for the reasons set forth above, avoiding the liens would inure entirely to the benefit of debt guaranteed by the subsidiaries.  The result, once again,

is that if the lien challenge were successful, the liens would be avoided at the subsidiaries against which the PCRBs do not have claims.

106.    None of the cases that the PCRB Trustee cites in an attempt to refute this logic are on point.  For example, one involved the issue of whether particular members of a class had consented to disparate treatment.  *See Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.)*, 407 B.R. 576 (D. Del. 2009).  The Debtors are not alleging that the PCRBs have consented to their treatment under the Plan, so this case is inapposite.  Similarly, the PCRB Trustee cites a case that holds that secured creditors are entitled to aggregate their collateral against multiple entities for the purposes of determining their deficiency claims.  *See In re Residential Capital, LLC*, 501 B.R. 549, 598 (Bankr. S.D.N.Y. 2013).  This case is inapposite, however, because the question at issue here is what the state of the world would be if the liens securing the TCEH First Lien Debt were avoided, in which case there would be no collateral to aggregate.

107.    It is true that, in *In re Nationwide Sports Distributors*, *Inc.*, the court declined to approve a settlement of litigation that disproportionally benefitted one group of creditors over another.  227 B.R. 455, 465 (Bankr. E.D. Pa. 1998).  But there was no distinction there—no structural priority of distribution—between the claims receiving the benefit and those not receiving it, and the court also found that the transaction was tainted by self-dealing.  *See id.*  The Supreme Court's 1945 decision in *Young v. Higbee Co.*, likewise, involved disparate treatment of *identically situated* stakeholders.  324 U.S. 204 (1945).  These cases are not relevant given the critical lack of subsidiary guarantees in favor of the PCRBs.  In sum, because the deficiency waiver is justified by a legitimate disparity of legal entitlements, which are directly

44

linked to the nature of the settled litigation, the Court should overrule the PCRB Trustee's Objection.[25]

108.    The PCRB Trustee's Objection as to good faith fares no better than its unequal treatment argument.  As an initial matter, approximately 78.0% in number and 30.5% by amount of PCRBs voted to accept the Plan.  These voting results alone belie the notion that the Debtors proposed the Plan for anything but the good faith purpose of maximizing the value of the estates.  Nonetheless, the Trustee contests good faith on essentially two grounds, both of which are unavailing.

109.    *First*, the Plan is proposed in good faith notwithstanding the fact that, in earlier versions of the Plan, the PCRBs shared in the waiver of the TCEH First Lien Deficiency Claim and that, in negotiations, the Debtors initially resisted revising the structure of the deficiency waiver.  Earlier versions of the Plan were filed before the parties entered into the intercreditor settlement that gave rise to the current iteration of the deficiency waiver in the first place.  The fact that the Debtors initially resisted changes to their existing plan construct is unsurprising.  But this says nothing about the rational justification that the PCRBs are structurally subordinate to the rest of the approximately $31.1 billion of TCEH debt if the liens securing the TCEH First Lien Secured Claims were successfully avoided, as discussed in detail above.

110.    *Second*, the Trustee's assertion that the waiver of the TCEH First Lien Deficiency Claim was somehow designed to control voting is misplaced.  The vote of the relevant class could be carried with or without the PCRBs, which represent a small minority.  Likewise, the PCRB Trustee's assertion that the TCEH Second Lien Note Claims were included in the waiver

---

[25]    But it is not fatal to confirmation if the Court does not overrule the Objection.  Under the express language of the Plan, the TCEH First Lien Deficiency Waiver takes effect "unless otherwise ordered by the Bankruptcy Court."  Plan, Art. IV.B.15.

45

to influence voting relies on the false premise that the votes of these claims were necessary to carry this class.  The TCEH First Lien Deficiency Claims and the TCEH Unsecured Note Claims dwarf the class, with or without the votes of either the PCRBs or the TCEH Second Lien Notes.  Moreover, the inclusion of the TCEH Second Lien Note Claims in the waiver is justified on the same basis as the inclusion of the TCEH Unsecured Note Claims:  they both have subsidiary guarantees, and the PCRBs do not.

111.    Even if the Debtors had separately classified the PCRBs, the Plan could nonetheless have been crammed down over the objection of the PCRBs.  The treatment of the PCRBs complies with the "fair and equitable" requirement of section 1129(b)(2) of the Bankruptcy Code because no class that is junior to the PCRB Claims is receiving any recovery under the Plan.  Likewise, the Plan does not discriminate unfairly against the PCRB claims because no other class of claims is limited to claims against TCEH (as compared to  TCEH's asset-holding subsidiaries).  Thus, the PCRB Trustee's Objection as to good faith should also be overruled.

### B.    There Is No Unequal Treatment of the EFIH PIK Notes.

112.    The EFIH Unsecured Notes Trustee's assertion that EFIH Unsecured Notes receive unequal treatment under the Plan because certain EFIH PIK noteholders have negotiated the right to invest in the Merger is not colorable.  The Bankruptcy Code states that "a *plan* shall . . . provide the same treatment for each claim or interest of a particular class."  11 U.S.C. § 1123(a)(4).   Moreover, the question is whether the *claim*, receives equal treatment, not the claimant.  *See In re Eisenbarth*, 77 B.R. 228, 235-36 (Bankr. D.N.D. 1987) ("The focus on a particular claim should not be the claimholder, but rather the legal nature of the claim.").  This flows from the established principle of Third Circuit law that "the 'same treatment' standard of

46

section 1123(a)(4) does not require that all claimants within a class receive the same amount of money." *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013).

113.    Here, the EFIH PIK Trustee fails to cite a single provision of the Plan in this section of its argument.   This is because the Plan does not offer *any* EFIH Unsecured Noteholders—which are all being repaid in full in cash—the right to participate in the investment in the Merger.  This ends the inquiry as a matter of law.  Even if it were relevant, which it is not, the *Debtors* also did not offer any EFIH Unsecured Noteholders the investment opportunity. Instead, two EFIH Unsecured Noteholders independently negotiated the right to invest in the Merger.   The EFIH Unsecured Notes Trustee points to nothing in the Bankruptcy Code or otherwise that proscribes this type of transaction.

114.    The one authority the Trustee relies on, other than those setting forth uncontroversial propositions of general bankruptcy law, is a case in which the plan expressly excluded some members in the same *impaired* class from participation in a rights offering, the only purported justification being administrative convenience.  *In re Washington Mut., Inc.*, 442 B.R. 314, 360-61 (Bankr. D. Del. 2011).  Simply put, the independently-negotiated commitment of certain EFIH PIK noteholders to invest in the Merger has no effect on, and nothing to do with, the value of distributions to EFIH creditors (which are, in any case, being repaid in full in cash). Accordingly, the Court should overrule the EFIH PIK Trustee's Objection.

**C.    The Treatment and Classification of EFCH Claims Is Appropriate.**

115.    The EFCH Notes Trustee's argument that the EFCH Notes Claims must be classified with the rest of the T-side funded debt claims ignores the fact that the EFCH Notes Claims have different legal entitlements than the rest of the T-side funded debt.

116.    Claims may only be classified together under section 1122 of the Bankruptcy Code if they are "substantially similar."  11 U.S.C § 1122(a); *see also Zentek GBV Fund IV v.*

47

*Vesper*, 19 F. App'x 238, 248 (6th Cir. 2001) (section 1122 "clearly dictates that only substantially similar claims may be placed together"); *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 160 (D. Del. 2006) (holding that the plan satisfied section 1122(a) because it placed substantially similar claims in the same class and places claims and equity interests in different classes).  Claims with different priorities are by definition not substantially similar. *In re Greystone III Joint Venture*, 995 F.2d 1274, 1278 (5th Cir. 1991), *on reh'g*, (Feb. 27, 1992) ("[S]ubstantially similar claims [are] those which share common priority and rights against the debtor's estate."); *In re Couture Hotel Corp.*, 536 B.R. 712, 734 (Bankr. N.D. Tex. 2015) (holding that claims with different priorities in the collateral are not similarly situated and are therefore properly classified separately).  Indeed, classifying claims with different priorities is mandated by the absolute priority rule. *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 442 (1999) (describing the absolute priority rule); *see also* 11 U.S.C. § 1129(b)(2).

117.    Here, the EFCH unsecured claims are structurally subordinate to TCEH unsecured claims.  EFCH is the parent company of TCEH, and EFCH's only material asset is its equity interests in TCEH.  *See In re Adelphia Communs. Corp.*, 368 B.R. 140, 191 (Bankr. S.D.N.Y. 2007) (explaining equitable subordination).  As an equity holder in TCEH, EFCH is only entitled under the absolute priority rule to recover from the assets of TCEH after all TCEH claims are paid in full.  *See* 11 U.S.C. § 1129(b)(2)(B)(ii). The Court should therefore overrule the EFCH Notes Trustee's Objection.

## V.    THE COURT SHOULD OVERRULE THE EFH COMMITTEE'S OTHER OBJECTIONS.

### A.    The EFH Committee's Breach of Fiduciary Duty Allegations Are Reckless and Utterly False.

118.    The EFH Committee's bald assertions regarding alleged breaches of fiduciary duties should be dismissed out of hand.  They are completely unfounded.  The Committee's position in its simplest form is that including sponsor, director, and officer releases in a plan is a *per se* breach of fiduciary duties.  The Committee apparently recognizes that this would mean that virtually every major debtor that has confirmed a plan in Delaware breached its fiduciary duties.  It would seem to follow, incredibly, that all of these plans are therefore unlawful simply because they include such releases.  Instead of stopping at this absurd proposition, the Committee explains that debtors do, in fact, routinely breach their fiduciary duties, under court supervision, but these breaches are "ratified" by the creditor voting process.  EFH Committee Objection ¶ 267 ("Section 1129(a)(10) can be seen to work as ratification of breaches of the duty of loyalty in the vast majority of bankruptcy cases . . . .").    The Court should reject the Committee's attempt to create fiduciary duty law in bankruptcy from whole cloth.

119.    In reality, the undisputed record here shows pristine process.  Special committees of non-sponsor directors and officers at EFH and TCEH approved the sponsor releases in the first iteration of the Plan, filed in April.  And the Settlement Agreement and the first iteration of the Plan embodying the Merger, which contained releases that were substantially unchanged in scope, were approved in separate sessions by the disinterested directors (who are not sponsor affiliated) to the extent of actual conflicts matters.  The director and officer releases—which, of course, are commonly found in nearly every chapter 11 plan—were approved by the Debtors' board as a part of an overall Plan and Settlement Agreement meant to work a global resolution of litigation.  Notwithstanding one of the most comprehensive legacy discovery processes in

49

chapter 11 history, not one claim of substance has been alleged to date against the Debtors' directors and officers—other than the Committee's self-serving and vague allegations documented for record-creation purposes.[26]

120.     Setting aside the merits, any such claims would also be subject to indemnification by EFH.  So, in essence, the Committee's core theory is that releases by EFH of claims that have hardly been alleged, which EFH would have to pay itself if they did in fact exist, are the fundamental drivers behind a multi-party settlement of tens of billions of dollars of actually alleged inter-Debtor and inter-"T-silo" claims, a $12 billion Merger, and tax-free spinoff of the largest competitive utility in Texas.  This strains credulity, to put it mildly.

121.     To the contrary, these releases are one component of the Debtors' overall effort to restructure their balance sheets and obtain the fresh start that is at the heart of bankruptcy policy. *See Harris v. Viegelahn*, 135 S. Ct. 1829, 1835 (2015) ("The Bankruptcy Code provides diverse courses overburdened debtors may pursue to gain discharge of their financial obligations, and thereby a 'fresh start.'"); *see also In re Cohn*, 54 F.3d 1108, 1113 (3d Cir. 1995) ("The overriding purpose of the Bankruptcy Code is to relieve debtors from the weight of oppressive indebtedness and provide them with a fresh start"); *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012 ("In its assessment, the Court should "keep[ ] in mind [that] the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start.").

122.     Unsurprisingly, the Committee is unable to cite to a single case that has applied the entire fairness standard, let alone found a breach of fiduciary duty, based on approval of director and officer releases.  In *In re Zenith Electronics Corp.*, the bankruptcy court held that section 1129(a)(3) incorporates state law fiduciary duty standards and that this requires entire

---

[26]   As discussed further in the Settlement Reply, the December 2014 email the Committee sent to the Debtors expressly noted that it was *not* a specific enumeration of claims.

fairness review of transactions with controlling shareholders.  241 B.R. 92, 108-10 (Bankr. D.

Del. 1999).  The insider transaction in *Zenith*—where a controlling shareholder was acquiring

the entire company under the plan—is not even remotely comparable to this situation, where the

only "transaction" with a controlling shareholder, if any, would be the fact that the sponsors

signed a settlement agreement that dozens of other stakeholders signed.  *Id.*  Indeed, in *Zenith*,

the court reviewed and approved sponsor and director and officer releases under normal

bankruptcy law standards—not under the entire fairness standard.  *Id.*  Moreover, when it did

apply the entire fairness standard, it noted with approval the use of a non-sponsor special

committee, and it ultimately found the transaction entirely fair.  *Id.*

123.    The other cases the Committee cites either did not find any breach of fiduciary

duty or they involved egregious instances of self-dealing, not routine approvals of provisions that

are commonly found in most major chapter 11 cases.  *See, e.g.*, *In re Bush Indus., Inc.*, 315 B.R.

292, 295 (Bankr. W.D.N.Y. 2004) (chairman and CEO negotiated a golden parachute for himself

in prepetition RSA and then terminated his employment immediately before filing); *In re Coram*

*Healthcare Corp.*, 271 B.R. 228, 236-37 (Bankr. D. Del. 2001) (CEO was also employee of a

major creditor, receiving a $1 million a year salary from that creditor, and CEO caused debtors to

make cash interest payments on that creditors' underwater notes immediately prepetition); *In re*

*TCI 2 Holdings, LLC*, 428 B.R. 117, 171 (Bankr. D.N.J. 2010) (finding no breach of fiduciary

duties).  The EFH Committee's reckless and unsubstantiated breach of fiduciary duty allegations

should therefore be overruled.

124.    In addition, to the extent the EFH Committee objects to the absence of a carveout

in the Releases for Claims and Causes of Action related to acts or omissions that are determined

by Final Order to have constituted willful misconduct or gross negligence, such an objection

should be overruled.  While there is case law in this District holding that such carveouts are required in the context of *exculpation* provisions, those cases do not extend either by their holding or by analogy to *release* provisions.  Indeed, the courts that have ruled on the necessity of the carveout in the exculpation context have used an entirely different framework in assessing Plan releases.  In the most recent Third Circuit case on this issue, *In re Indianapolis Downs, LLC*, 486 B.R. 286 (Bankr. D. Del. 2013), the court identified the Third Circuit standard of exculpation as being that "a creditors' committee, its members, and estate professionals may be exculpated under a plan for their actions in the bankruptcy case, except for willful misconduct or gross negligence." *Id.* at 306 (citing *In re Wash. Mut., Inc.*, 442 B.R.314, 350 (Bankr. D. Del. 2011) and *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000). The Court did not apply this standard in reviewing the potential releases and instead applied a five factor test under *In re Master Mortgage Inv. Fund Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994) to assess the permissibility of the plan releases.  This distinction makes sense—exculpation provisions and release provisions are intended to address two very different concerns.  Exculpation provisions provide limited immunity to estate fiduciaries for actions taken within the context of a chapter 11 case.  Release provisions, on the other hand, release third-parties from prepetition and postpetition claims and causes of action.  Fiduciaries, both in and out of chapter 11, are generally held to a higher standard and it is therefore both consistent with non-bankruptcy law as well as not surprising that exculpation provisions in a plan of reorganization would include the same exculpation provisions for fiduciaries set forth in, by way of example, limited liability agreements or corporate bylaws. *See, e.g.*, *In re W.R. Grace & Co.*, 446 B.R. 96 (Bankr. D. Del. 2011) (finding that the *Genesis* factors described below do not apply to exculpation provisions because exculpation provisions and release provisions serve distinct purposes); *In re Tribune Co*,

464 B.R. 126 (Bankr. D. Del. 2011) (stating that the exculpation provision merely states "that standard to which estate fiduciaries should be held); *In re Premier Int'l Holdings, Inc.*, 2010 WL 2745964 (Bankr. D. Del. 2010) (approving the exculpation provisions in the Plan as consistent with the exculpation provisions contained within the operative corporate governance documents).    Importantly, there is ample precedent in this District where bankruptcy courts have supported the difference between release provisions and exculpation provisions and, consequently, confirmed plans of reorganization that do not contain the kind of carveout referenced by the EFH Committee.[27]

### B.    There Is No Such Thing as "Artificial *Un*impairment" or "Synthetic Exclusivity."

125.    "Artificial unimpairment" and "synthetic exclusivity," as their monikers suggest, are not actual legal doctrines outside of the EFH Committee's laboratory, and the Committee's Objections based on these nonexistent doctrines must be overruled.

126.    Again, there is no such thing as "artificial *un*impairment."    There is no colorable objection to paying off creditors in full, and cases related to gerrymandering and impairment are inapposite.    The reasoning animating these cases—and the logic behind these established doctrines—is an effort to prevent debtors from end-running the impaired class requirement by using the vote of an otherwise unimpaired class to satisfy section 1129(a)(10).    *See In re*

---

[27]    *See, e.g., GSE Environmental, Inc.*, No. 14-11126 (Bankr. D. Del. 2014) [D.I. 340]; *Dex One Corp.*, No-13-44106 (Bankr. D. Del. 2013) [D.I. 192]; *FAH Liquidation Corp.*, No. 13-13087 (KG) (Bankr. D. Del. 2013) [D.I. 1137]; *Local Insight Media*, No. 10-13667 (Bankr. D. Del. 2011) [D.I. 1037]; *N. Am. Petroleum Corp.*, NO. 10-11707 (Bankr. D. Del. 2011) [D.I. 1056]; *Amicus Wind Down Corporation*, No. 11-131167 (KG) (Bankr. D. Del. 2011) [D.I. 1123]; *Caribe Media, Inc.,* No. 11-11387 (Bankr. D. Del. 2011) [D.I. 275]; *U.S. Concrete*, No. 10-11407 (Bankr. D. Del. 2010) [D.I. 362]; *Lear Corp.*, No. 09-14326 (Bankr. D. Del. 2009) [D.I. 1070]; *Source Interlink Co.*, No. 09-11424 (Bankr. D. Del. 2009) [D.I. 237]; *Leiner Health*, No. 08-10446 (Bankr. D. Del. 2008) [D.I. 822]; *Flying J Inc.*, No. 08-13384 (Bankr. D. Del. 2008) [D.I. 3650]; *Dura Auto. Sys. Inc.*, No. 06-11202 (Bankr. D. Del. 2008) [D.I. 3332]; *Hines Horticulture, Inc.*, No. 08-1122 (Bankr. D. Del. 2008) [D.I. 522]; *J.L. French Automotive Castings*, No. 06-10119 (Bankr. D. Del. 2006) [D.I. 644]; *Exide Tech*, No. 02-11125 (Bankr. D. Del. 2002) [D.I. 2745].

*Combustion Eng'g, Inc.*, 391 F.3d 190, 243 (3d Cir. 2004). No such concern exists here where section 1129(a)(10) is simply inapplicable to the transaction. There are no impaired classes of third-party claims at the E-side debtors under the Plan. *See* Plan Art. III.A.1-2. The Court should reject this argument.

127.     The EFH Committee's complaints about "synthetic exclusivity" face a similar fate. The crux of the Committee's argument is that confirmation of the Plan will make it impossible for the Court to confirm an alternative plan. On this point the Committee is correct: section 1129(c) of the Bankruptcy Code clearly restrict the Court's ability to to confirm more than one plan. It would make little sense for the Court to waste the time to consider alternative plans when the Debtors and the Plan Sponsors are working to consummate the Plan. *See In re Celotex Corp.*, 204 B.R. 586, 612 (Bankr. M.D. Fla. 1996) ("[T]he Bankruptcy Court is not required to compare the Plan to a hypothetical plan."). That said, the Debtors negotiated for and obtained the right to negotiate a backup plan while pursuing confirmation and consummation of the Plan. Put another way, the Plan Sponsors agreed to an extraordinarily unusual provision that allows the Debtors to negotiate and be prepared to file a backup plan should the Merger not close.

128.     Even absent the ability to negotiate a backup plan, nothing prohibits third parties from contracting not to file plans, and the Committee cites no case to the contrary. Instead, the Committee cites two cases where a debtor filed an absurdly unconfirmable plan immediately before expiration of the exclusive filing period for the sole purpose of extending exclusivity. *See In re Grossinger's Associates*, 116 B.R. 34, 36 (Bankr. S.D.N.Y. 1990) (plan proposed that equity would retain its interests and unsecured creditors would receive 10 cents on the dollar); *In re DN Associates*, 144 B.R. 195, 197 (Bankr. D. Me. 1992) (noting, in a footnote, that earlier in

the case the court had terminated exclusivity because, among other things, the debtor filed an unconfirmable plan on the day exclusivity expired). Citations to these types of cases tells the Court all it needs to know about just how specious this theory is. On the contrary, nearly every plan support agreement limits party's rights to file plans, irrespective of whether the Debtors have exclusivity. The Court should overrule the Committee's "synthetic exclusivity" Objection to what is a very standard bankruptcy practice.

### C.     The Debtors Did Not Impermissibly Exclude the EFH Committee from Plan Negotiations.

129.    The Debtors did not violate section 1103(c) of the Bankruptcy Code. The EFH Committee's limited role in plan negotiations was appropriate given that E-side creditors are unimpaired under the Plan.

130.    Section 1103(c) states that a committee "*may* . . . participate in the formulation of a plan." 11 U.S.C. § 1103(c) (emphasis added). The Committee cites two cases from the 1980s for the proposition that negotiations with official committees are essentially a prerequisite to any plan filing. Neither case provides support this remarkable proposition of law. *See In re McLean Indus., Inc.*, 70 B.R. 852, 853 (Bankr. S.D.N.Y. 1987) (separate committees in jointly administered cases not a *per se* requirement); *In re Structurlite Plastics Corp.*, 91 B.R. 813, 814 (Bankr. S.D. Ohio 1988) (approving a motion to permit a committee to review draft sale documents where it would otherwise not have time to formulate an objection and where the debtor asserted no reason why not). To the contrary, to the extent the permissive language of section 1103(c) imposes any obligation whatsoever on a debtor, "the proper role of the committee in a Chapter 11 reorganization is necessarily a factual inquiry to be determined on a case-by-case basis." *Structurlite*, 91 B.R. at 814.

131.    Here, the EFH Committees' level of involvement in the Plan negotiations was appropriate under the circumstances.  The Debtors do not dispute the general importance of statutory creditors' committees or the need for such committees to be meaningfully involved in the plan process.  The plan process began well in advance of the April plan filing, and the EFH Committee has been heavily involved in that process since the beginning.  The Debtors participated in many discussions with the EFH Committee's advisors regarding the various drafts of the plan term sheets and initial drafts of the plan.  It is true that, leading up to the signing of the Merger Agreement, the Debtors focused on negotiations with large economic stakeholders at EFH and EFIH—including Fidelity and the EFIH PIK group, the Committee's largest constituents.  The Debtors focused on these stakeholders because they are in a position to convert large tranches of debt to equity.  During this relatively brief window, when dual-track negotiations were at every moment on the brink of breaking down completely, it was not unreasonable for the Debtors to focus on these economic stakeholders.

132.    Moreover, the Plan Sponsors' plan construct, from the outset, has contemplated full unimpairment on the E-side.  Although the EFH Committee was not directly involved in the negotiations with the Plan Sponsors, the Debtors kept the Committee (and the Court) apprised as to developments.  *See* Hr'g Tr. Apr. 14, 2015, at 37:18-25; Hr'g Tr. May 4, 2015, at 29:12-31:1; Hr'g Tr. June 1, 2015, at 16:8-17:6, 22:17-23:4; Hr'g Tr. June 25, at 19:14-20:9.  Regardless, the EFH Committee's perceived feelings of disenfranchisement are not a basis for a Plan objection The Court should, therefore, overrule the Committee's section 1103(c) Objection.

## VI.    THE COURT SHOULD OVERRULE THE OTHER OBJECTIONS.

### A.    The Plan Provides for Adequate Means for its Implementation.

133.    The Plan provides adequate means for its implementation, even in the absence of a specific performance remedy.  Like other major corporate transactions with limited or no

specific performance rights, including various approved plan transactions cited in section II.A.iii of this Reply, the means for implementation of the Merger are the extensive mechanics detailed in the Plan and definitive documentation and the closing incentives provided by the Debtors' signed agreements.  Distributions for E-side creditors are funded from the up to $12 billion equity and debt financing from the Plan Sponsors (as reflected in the Merger and Purchase Agreement, the Backstop Agreement, and the Equity Commitment Letter, and as further described in the amended and restated Equity Commitment Letter included in the Plan Supplement filed on October 21, 2015 (D.I. 6544-40).  Distributions to T-side creditors are funded from Reorganized TCEH Common Stock, the TCEH First Lien Debt Term Sheet (D.I. 6544-36), and the TCEH Preferred Stock Term Sheet (D.I. 6544-37).  With respect to implementing a T-side Reorganization, the sources of funding largely inure to the benefit of the Holders of Class C3 Claims (who, again, overwhelmingly support the Plan and who are party to the Plan Support Agreement) and thus do not affect the ability of the Debtors to implement the Plan as it relates to the T-side.  Accordingly, the Court should overrule the EFH Committee's Objection on this ground.

**B.     The Court Should Overrule the U.S. Trustee's Objections.**

134.    The scope of the release provisions, the exculpation provision, and the professional fee provisions in the Plan are appropriate under the facts and circumstances of these cases.  The Court should therefore overrule the U.S. Trustee's Objection.

**i.     The Scope of Releases is Appropriate and Critical to the Global Restructuring.**

135.    The Plan contemplates two types of Releases:  (a) Releases of Claims and Causes of Action held by the Debtors' estate (set forth in Article VIII.C. of the Plan) and (b) Releases of Claims and Causes of Action held by non-Debtor third parties (set forth in Article VIII.D. of the

Plan). The U.S. Trustee's objection seeks additional support of each type of Release. As described below, the Debtors believe each type of Release is appropriate in light of the role the Releases play in the Debtors' global restructuring efforts, the extensive diligence efforts and negotiations that ultimately yielded the Releases, and the substantial contributions of the Released Parties. Indeed, the Debtors have provided exhaustive descriptions of each of the foregoing in the Settlement Motion, the Confirmation Brief, and the Settlement Reply contemporaneously filed herewith, each of which is incorporated herein by reference.

136. Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[28] A debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[29] Courts in the Third Circuit generally assess the propriety of a debtor release in a plan of reorganization using the five Zenith factors:[30]

- whether there is an identity of interest between the debtor and the third party;

- whether a substantial majority of creditors support the release;

- whether the plan provides for payment of all or substantially all of the claims in the class or classes affected by the release;

---

[28] See In re Coram Healthcare Corp., 315 B.R. 321, 334-35 (Bankr. D. Del. 2004) ("The standards for approval of settlement under section 1123 of the Bankruptcy Code are generally the same as those under Bankruptcy Rule 9019. . ."). Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness." See, e.g., In re Exaeris, Inc., 380 B.R. 741, 746-47 (Bankr. D. Del. 2008); In re World Health Alts.,Inc., 344 B.R. 291, 296 (Bankr. D. Del. 2006) (stating that settlement must be "Within the reasonable range of litigation possibilities") (internal quotation marks omitted).

[29] See In re Spansion, Inc., 426 B.R. 114, 143 (Bankr. D. Del. 2010); see also In re Wash. Mut., Inc., 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.") (internal quotation marks omitted)).

[30] See In re Indianapolis Downs, LLC, 486 B.R. 286, 303 (Bankr. D. Del. 2013) (citing In re Zenith Elecs. Corp., 241 B.R. 92 (Bankr. D. Del. 1999))

- whether the third party has made a substantial contribution to the debtor's reorganization; and

- whether the release is essential to the debtor's organization.

137.    These factors are intended to assist in a court in determining whether to approve debtor releases; importantly, debtors are not required to prove every factor and no one factor is dispositive.  *See, e.g.*, *Wash Mut.*, 442 B.R. at 346 ("The [Zenith] factors. . . simply provide guidance in the [c]ourt's determination of fairness."); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that the *Zenith* factors are neither exclusive nor conjunctive).  Here, each of the *Zenith* factors is satisfied.

138.    ***First***, there is an identity of interest between the Debtors and the parties to be released.  The Released Parties generally fall into one of three categories:  (a) parties to the Plan Support Agreement and/or the Settlement Agreement (whose support of the Plan is critical to the Debtors' ability to expeditiously exit chapter 11); (b) Holders of "E-side" Claims who are rendered Unimpaired (either through payment in full of their Allowed Claims in Cash or through Reinstatement); and (c) those entities whose guidance, support, and willingness to support the Plan process has been critical to the Debtors' efforts to develop a comprehensive, value-maximizing restructuring.  Each of the Released Parties generally share a common goal with the Debtors—the desire to close the Merger and implement the transactions contemplated thereunder.

139.    ***Second***, a substantial majority of creditors support the Releases.  As reflected in the Voting Report, the Debtors' stakeholders who were entitled to vote on the Plan overwhelmingly support the Plan.  Every single Voting Class voted to accept the Plan.  Creditors voting to accept the Plan hold more than $45 billion in Claims, and in each Class entitled to vote (which includes those Classes that are most severely Impaired by the Plan), over 90% in amount

59

and 74% in number voted to accept the Plan.  This leaves little doubt that the substantial majority of the Debtors' creditors support the Releases.

140.    ***Third***, the Plan renders Unimpaired all Allowed Claims and Interests asserted against the "E-side."  The fact that more than 95% of the Debtors' $42 billion capital structure either support or are Unimpaired under the Plan demonstrated that the Releases satisfy the second and third *Zenith* factors. As discussed in greater detail below, the Released Parties have made a substantial contribution to the Debtors and their Estates, in the form of, among other things, their willingness to support the Plan (as reflected in the Plan Support Agreement), their agreement to terms that ultimately engendered the support of the TCEH Unsecured Ad Hoc Group and allowed the Debtors to render the "E-side" Unimpaired, and, ultimately, their efforts to bring to close a three-year restructuring process.

141.    With respect to non-consensual third-party releases, in the seminal Third Circuit case to address the issue, the Third Circuit declined to establish a "blanket rule prohibiting all non-consensual releases."  *In re Continental Airlines*, 203 F.3d 203, 213 (3d Cir. 2000).  In so doing, the Third Circuit recognized that other circuits have approved non-consensual third-party releases under certain circumstances.  *Id.* at 212.  The Court established the "hallmarks of permissible, non-consensual releases—fairness, necessity to the reorganization, and specific factual findings to support" the necessity of non-consensual releases.  *Id.* at 214.  Following the ruling in *Continental*, the Delaware bankruptcy court identified a number of factors to use in assessing whether non-consensual releases should be approved:  (a) whether the non-consensual release is necessary to the success of the reorganization; (b) whether the parties to be released have provided a critical financial contribution to the debtor's plan; (c) whether such financial contribution is necessary to make the plan feasible; and (d) whether the release is fair to the non-

consenting creditors (i.e., whether the non-consenting creditors received reasonable compensation in exchange for the release).  *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607-08 (Bankr. D. Del. 2001).  Thus, the analysis of whether non-consensual third-party releases is a case-by-case, fact-specific determination.   *See, e.g., In re 710 Long Ridge Road Op. Co. II, LLC*, 2014 WL 886433, at *13 (Bankr. D. N.J. 2014) (stating that in the Third Circuit, non-consensual releases that are fair, necessary, and supported by factual findings may be permitted).

142.    As discussed at length in the Settlement Reply and the Confirmation Brief, the Debtors' proposed Releases satisfy each of the *Continental* factors.   ***First****,* as many key players in the Debtors' restructuring have indicated, the Releases were critical to providing "full closure" to these chapter 11 cases.[31]  This is not a surprising result.  The Claims and Causes of Action subject to the Releases were the subject of intense investigation, negotiation, and settlement over many months.[32]  Groups from across the capital structure with extraordinarily different stakes in the Debtors' restructuring (including both official committees and a host of ad hoc creditor groups) had several months to review the Claims and Causes of Action that are subject to the Releases and, indeed, a number of these parties are now party to the Plan Support Agreement and support the Releases.

---

[31]    *See* Ex. 8, 10/1/2015 Cremens Dep. Tr. at 175:11 - 176:9 (describing the thorough investigation of certain of the Claims and Causes of Action subject to the Releases); Ex. 7, 10/5/2015 Baker Dept. Tr. at 54:7-18 (identifying the Hunt Consortium's interest in the releases as a necessary tool to emerging from chapter 11); *id.* at 170:15 - 171:14 (discussing the role of the Releases played in facilitating execution of key transaction documents and moving forward with a global transaction); Ex. 3, 9/10/2015 Keglevic Dep. Tr. at 42:14 - 43:7 (stating that many of the concepts in the CRO term sheet, including to some extent the Releases, were introduced by other parties); Ex. 9, 10/2/2015 MacDougall Dep. Tr. at 114:8 - 117:9 (identifying the importance of the releases to the Holders of EFH Equity Interests and the value contributed by such Holders to the Debtors' restructuring).

[32]    *See* Ex. 10, 9/24/2015 Sawyer Dep. Tr. at 541:25 - 542:3 (stating that the Debtors did an exhaustive investigation of the Claims subject to the Releases); Ex. 11, 9/15/2015 Williamson Dep. Tr. at 45:16-23 (stating that the prospect of Releases has been apparent to creditors across the capital structure since the RSA).

143.     *Second*, there can be no doubt that the Released Parties have provided a critical

financial contribution.  On the "E-side," the billions of dollars in new financing from the Plan

Sponsors (up to $12 billion in debt and equity financing) speak for themselves.  On the "T-side,"

the Holders of TCEH first lien Secured Claims waived billions of dollars in deficiency claims for

the benefit of TCEH junior creditors.   For their part, the Holders of EFH Equity Interests agreed

to assign any recovery interest to Holders of TCEH unsecured Claims and agreed to forego

certain advisory fees that they may have otherwise been entitled to under the Management

Agreement.  Such Holders also agreed to cause Texas Holdings to delay claiming a worthless

stock deduction with respect to its EFH stock until the year of the Effective Date.[33]

144.     Finally, the Releases provided to the Debtors' current and former directors and

officers reflect the over 260 board meetings and committee meetings such parties have

participated in since 2013 (with over half of those meetings occurring in the 18 months following

the Petition Date).  Importantly, the Debtors would have been required to indemnify the directors

and officers under various indemnification agreements and have released certain potential claims

(other than claims arising from a violation of good faith or fair dealing) under the operative LLC

agreements.   In light of the foregoing, the Debtors submit that the Released Parties have

provided critical contributions to the Debtors' restructuring efforts.

145.     *Third*, these contributions paved the way for an overwhelmingly consensual

restructuring and the Unimpairment of a dozen Classes of Claims.  *Fourth*, the Releases are fair

with respect to the non-consenting creditors, who fall into two discrete classes:  (a) certain

Holders of "E-side" Claims and (b) a very small set of Holders of "T-side" Claims.  The Holders

---

[33]   If Texas Holdings was to claim a worthless stock deduction in a year before the Effective Date occurs (*e.g.*, in
       2015), the Debtors might be prevented from using a portion of their NOLs to offset taxable gain and provide a
       partial basis step-up.  In other words, the total basis step-up that could be delivered in TCEH's assets could be
       reduced.

of Allowed "E-side" Claims are Unimpaired under the Plan.  The non-consenting third-party Releases do not adversely affect the Holders of any Allowed "E-side" Claims; indeed such Holders would not be entitled to a greater recovery than what they are receiving even in the absence of such Releases.  As evidenced by the Disinterested Director Settlement, the Debtors' disinterested directors and managers believe that the inter-Debtor Claims net to a general unsecured claim by TCEH against EFH Corp. (i.e., that TCEH has more valuable claims against EFH than vice versa).  Virtually all significant "T-side" constituencies, however, support the Plan (including the Releases) and the Settlement Agreement.  In light of the tremendous support of the "T-side" constituencies and the substantial contributions made by the TCEH first lien creditors to maximize the value distributed to TCEH junior creditors (who constitute the vast majority of the non-consenting parties), the Debtors submit that the Releases are fair to non-consenting "T-side" creditors.

146.    Courts in the Third Circuit and other Circuits have approved non-consensual third-party releases under similar facts.  *See 710 Long Ridge*, 2014 WL 886433, at *15-16 (approving non-consensual third-party releases where the released entities provided substantial funding and waived significant claims, and the consideration provided to non-consenting creditors under the Plan was greater than the recovery that would have been received in a chapter 7 liquidation) *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 272 (Bankr. S.D.N.Y. 2014) (approving non-consensual third-party releases where certain of the released parties (a) agreed to forego consideration to which they would otherwise be entitled, (b) agreed to backstop a $100 million rights offering, and (c) agreed to receive new equity instead of new debt, collectively permitting the debtors to shed approximately $120 million in prepetition funded debt obligations).

147.    Like the released parties in *710 Longridge* and *GenCo*, the Supporting Parties here are providing significant value to the Debtors' estates, including in the form of billions of dollars of value in equity and debt financing, settling a host of complex Claims and Causes of Action of uncertain value but that would have undoubtedly required time and resources to litigate, and waiving significant deficiency claims for the benefit of unsecured creditors.  As described above, the non-consenting creditors are within Classes that overwhelmingly voted to accept the Plan and who are receiving, in the aggregate, *all* of the value of Reorganized TCEH (including all Cash on hand at the TCEH Debtors), $150 million of Reorganized EFH Common Stock, and Rights to purchase up to $5.1 billion of New EFH equity.  Additionally, as described in the Disclosure Statement, and after considering the potential enterprise value of Reorganized EFH, these recoveries are staggering for such creditors, many of whom would have otherwise been left with no recovery in a liquidation.  As a result, the non-consenting creditors are not merely receiving a recovery marginally in excess of what they would have received in a chapter 7 liquidation; they are receiving a significantly higher recovery made possible by the Restructuring Transactions contemplated by the Plan.

148.    Similarly, in other cases in which courts have approved non-consensual third-party releases, the focus of the analysis has been on the necessity of the proposed releases to consummate a settlement of litigation.  *See, e.g., In re Charter Commc'ns*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009) (identifying the necessity of the releases as a required condition of a global settlement, negotiated at arms' length, with multiple creditor constituencies as a substantial basis for approving such releases);  *In re XO Comm'cns, Inc.*, 330 B.R. 394, 440 (Bankr. S.D.N.Y. 2005) (identifying the proposed releases as a "litigation condition" necessary to consummate the Plan).  Here, the releases are a cornerstone of the Plan and the Settlement Agreement (which

itself is a principle component of the Restructuring Transaction).[34]    In the absence of full releases, the Debtors would not have obtained the significant debt and equity financing contemplated in connection with the Merger on the same terms or the significant concessions from the supporting "T-side" constituencies (e.g., waiver of substantial deficiency claims and agreement to not pursue intra-T-side litigation).    At bottom, the releases contemplated by the Plan are the product of thorough due diligence efforts and negotiations and represent a key part of the Debtors' Restructuring Transactions, the unwinding of which would unravel a restructuring that has been three years in the making.[35]

### ii.    The Exculpation Provisions are Appropriate and Tailored.

149.    The Exculpation provision is limited in two ways:  to estate fiduciaries and to claims not involving actual fraud, willful misconduct, or gross negligence.  Here, the Plan's definition of Exculpated Parties is limited to the following estate fiduciaries:

> (a) the Debtors and Reorganized Debtors; (b) the Committees; and (c) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.[36]

---

[34]    *See* Ex. 1, 9/28/2015 Doré Dep. Tr. at 277:2-10 (noting that every plan of reorganization ever proposed by the Debtors contemplated releases); Ex. 3, 9/10/2015 Keglevic Dep. Tr. at 46:6-10 (stating that releases were contemplated in prior versions of the Plan).

[35]    *See* Ex. 1, 9/28/2015 Doré Dep. Tr. at 208:17-23 (stating the importance of ensuring that the Plan provide global resolution of all issues without an opportunity for parties to assert lingering claims after the Effective Date); Ex. 3, 9/10/2015 Keglevic Dep. Tr. at 44:25-46:5 (stating that the releases were critical to obtaining global resolution in these chapter 11 cases).

[36]    Plan, Art. I.A.179.  For the avoidance of doubt, the "Committees" refers only to the official committees of unsecured creditors appointed by the U.S. Trustee on May 13, 2014 [D.I. 420] and October 27, 2014 [D.I. 2570].

150.    The U.S. Trustee argues that certain of the entities identified as "Exculpated Parties" are not estate fiduciaries, including "current and former equity holders," "affiliates," and "employees."    It is appropriate to include these entities within the definition of "Exculpated Parties," given their roles in the Debtors' restructuring, and the assertions of various objectors regarding potential claims against such entities related to the Debtors' restructuring.  The Third Circuit implicitly recognized the propriety of extending the protection of exculpation to some who may not technically be fiduciaries for the estates but in effect are acting as such, when it upheld an exculpation clause that shielded "the Debtors, the Reorganized Debtors, New Bruno's, the Creditor Representative, the Committee or any of their respective members, officers, directors, employees, advisors, professionals or agents . . . ."  *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (emphasis added).

151.    Courts in all circuits, including the Supreme Court, recognize that there are circumstances in which shareholders may owe fiduciary duties to a corporation.  *See, e.g.*, *Pepper v. Litton*, 308 U.S. 295 (1939) (holding that directors are fiduciaries and stating that shareholders can, in some instances, also be considered fiduciaries); *Matter of Reading Co.*, 711 F.2d 509, 517 (3d Cir. 1983) (stating that under Delaware law, shareholders may have fiduciary duty obligations to a corporation under certain circumstances); *Valente v. Pepsico, Inc.*, 68 F.R.D. 361, 364 (D. Del. 1975) (finding that ownership in a Debtor can give rise to a fiduciary obligation); *In re Midway Games, Inc.*, 428 B.R. 303, 320 (Bankr. D. Del. 2010) (noting that shareholders can, in certain circumstances, be considered fiduciaries).  From every level of the federal court system, courts have recognized that there are circumstances in which shareholders have been found to owe fiduciary duties.   Indeed, the EFH Committee spends many pages in its objection to the Plan and Settlement Agreement asserting breach of fiduciary duty claims against

66

the Debtors' equity holders.  As such, it is appropriate for current and former equity holders to be exculpated under the Plan.

152.    It is likewise appropriate to include "employees" as Exculpated Parties with respect to services provided in furtherance of the Debtors' restructuring efforts.  *See, e.g., In re PWS Holding Corp.*, 228 F.3d 224, 247 (3d Cir. 2000) (approving an exculpation provision that included employees on the basis that all exculpated parties were subject to the same carveout for willful misconduct and gross negligence and noting that such provisions were "a commonplace provision in Chapter 11 Plans"); *In re PNG Ventures, Inc.*, 2010 WL 2745952, at *5, 19 (Bankr. D. Del. 2010) (approving a Plan exculpation provision that included employees as "fair [and] necessary to the Debtors' reorganization"); *In re Winn-Dixie Stores, Inc.*, 356 B.R. 239, 261-62 (Bankr. M.D. Fla. 2006) (approving an exculpation provision that included employees and noting that the exculpation provision was appropriate in light of the "significant contributions made to this case by the beneficiaries of the exculpation clause, the beneficiaries' expectation that the exculpation would be included in the Plan in exchange for their participation, and the overwhelming acceptance of the Plan").  In addition, as noted by the district court in *Enron*, without the protection afforded by the exculpation provision, "key personnel might abandon efforts to help the reorganized debtor entities follow through on the Plan".  326 B.R. 497, 503 (S.D.N.Y. 2005).  Here, the Debtors' chapter 11 cases are immensely complex.  Without the efforts of the Debtors' personnel (more than just officers and directors) in developing, reviewing, negotiating, and discussing the Debtors' key restructuring documents as well as accommodating intensive diligence efforts across the capital structure was critical, the Debtors would not now find themselves on the eve of confirmation.

153.     Additionally, while much has been said about the Plan, the Merger, the Plan Support Agreement, and the Settlement Agreement, it is important to recognize that these chapter 11 cases have been extraordinarily active from an operational perspective as well.  As demonstrated by the docket (which has over 6,700 entries) as of the date hereof, the Debtors have successfully obtained various kinds of relief with respect to, among other things, their retail operations, their generation activities, and their contract counterparties.  The Debtors' personnel played a key role in engaging in discussions and due diligence efforts with various stakeholders, ultimately yielding, in most instances, the consensual entry of an order.  Through these efforts, the Debtors' personnel, much like the Debtors' advisors, worked to maximize the value of the Debtors' estates and bring a close to these chapter 11 cases.  Consequently, the Debtors submit that inclusion of employees as Exculpated Parties is appropriate and warranted under the circumstances.

154.     Finally, it is appropriate to include affiliates of the Debtors within the definition of Exculpated Parties where those affiliates are in effect fiduciaries for the Debtors' estates.  The clearest example is Oncor—the non-Debtor affiliate that owns and operates the EFH Debtors' single largest asset.  As all parties are well aware, the value of EFH Corp.'s interest in Oncor has been, and continues to be, a driving force in these chapter 11 cases.  Because all of the value in EFIH is directly tied to the value of Oncor, Oncor is effectively serving as a fiduciary for the Debtors' assets (i.e., EFIH's 80% indirect interest in Oncor).  In addition, Oncor's cooperation in facilitating the Merger and the Plan Sponsors' diligence efforts was critical to the Debtors' Plan efforts.  Beginning in early 2015, the Debtors and Oncor commenced a rigorous due diligence process to evaluate the potential of a REIT reorganization while facilitating simultaneous due diligence efforts with multiple creditor constituencies.  Given the ring-fenced nature of Oncor,

the cooperation of Oncor's management team and its advisors in facilitating these due diligence efforts—without which the Merger Transaction would never have blossomed—was key to developing a value-maximizing transaction.  More specifically, as has been stated time and time again, obtaining the regulatory approvals necessary to change control of EFIH's indirect 80% in Oncor and restructure Oncor for purposes of forming a REIT-qualifying entity is critical to ensuring the Merger closes.   To that end, Oncor, which is the regulated utility, is an indispensable party to the required regulatory filings, pursuant to Sections 14.101(b), 37.154(a), 39.262(l), and 39.915(a) of the Texas Utilities Code.  Oncor's cooperation in preparing a joint application with the Hunt Consortium to the PUCT and the FERC, and its willingness to engage in extensive discussions regarding various regulatory considerations has been indispensable to the Debtors' restructuring efforts.  In addition, action by Oncor will be required in order to effect the Oncor Restructuring elements of the Debtors' proposed IPO Conversion Plan, a critical step required to effect the proposed REIT structure.  At bottom, *Oncor*'s efforts in maximizing the value of its assets—the key driver for the significant funding commitments contemplated by the Supporting Parties—has been critical to ensuring that the *Debtors* can maximize the value returned to their stakeholders.  Accordingly, Oncor is indispensable to the ultimate closing of the Merger Transaction, and it is appropriate to include Oncor and its members, officers, directors, employees, advisors, professionals, and agents, within the definition of Exculpated Parties.

### iii.    The Professional Fees and Expenses Payable Under the Plan Comply with Section 1129(a)(4) and Should be Approved.

155.    Under section 1129(a)(4) of the Bankruptcy Code, professional fees and expenses incurred in connection with a chapter 11 plan are subject to approval by the Court as reasonable.[37]  Determining what constitutes "reasonable" involves a case-by-case assessment of

---

[37]   11 U.S.C. § 1129(a)(4).

which entity will ultimately make the payment, which entities are receiving the payments, and the effect of the payments on the Debtors' estate.[38]    Based on each of these factors, the professional fees and expenses payable under the Plan should be approved.

156.    As a preliminary matter, the U.S. Trustee's objection to the Plan is narrowly focused on the following Plan provision:

> "The EFH Debtors shall pay in cash in full on the Effective Date, the reasonable and documented fees and expenses (including professional and other advisory fees and expenses) incurred through the Effective Date of the TCEH Unsecured Notes Trustee, the TCEH Second Lien Notes Trustee, the TCEH Second Lien Notes Collateral Agent, the members of the TCEH Unsecured Ad Hoc Group, and the members of the TCEH Second Lien Consortium."[39]

157.    In considering the first factor of "reasonableness," the payments identified by the U.S. Trustee are payable by the EFH Debtors on the Effective Date.  This means, in effect, that the Supporting Parties (i.e., not the Debtors) will be satisfying such payment obligations.  Importantly, Allowed Claims asserted against the EFH Debtors—the entities responsible for the payment obligation set forth above—are Unimpaired.   As a result, imposing a payment obligation on the EFH Debtors (which in effect will be satisfied by the Supporting Parties) does not affect any creditor whose recovery might otherwise have been increased in the absence of such a payment obligation.  Courts in various cases have used the fact that non-Debtor entities are ultimately satisfying payment obligations as a per se indicia of reasonableness.  *See, e.g.,*

---

[38]    *In re Cajun Elec. Power Coop., Inc.*, 150 F.3d 503, 517 (5th Cir. 1998) ("What constitutes a reasonable payment will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate."); *see also In re Congoleum Corp.*, 2010 WL 1850182, at *5 (D.N.J. May 7, 2010) (quoting same); *In re Journal Register Co.*, 407 B.R. 520, 537 (Bankr. S.D.N.Y. 2009) ("The determination whether a payment is reasonable under § 1129(a)(4) requires an analysis of the issue of reasonableness based on the facts and circumstances of the payments.").

[39]    Plan, Art. IV.R; *See* paragraph 10 of the U.S. Trustee's Objection identifying the "second paragraph of Article IV.R. of the Plan" as the focus of its Plan objection as it relates to the payment of professional fees and expenses.  The U.S. Trustee also objects to the payment of professional fees and expenses under the Settlement Agreement.  The Debtors will address those objections in the Settlement Reply.

*Cajun Elec.*, 150 F.3d at 517 ("where . . . the payment . . . will not be reimbursed by the bankruptcy estate, the court will ordinarily have little reason to inquire further. . .); *In re River Village Assocs.*, 161 B.R. 127, 141 (Bankr. E.D. Pa. 1993) (declining to apply section 1124(a)(4) where such payments were not ultimately made from estate property).

158.    Similarly, with respect to the second factor regarding "reasonableness," the payments at issue are essentially being made from the Plan Sponsors to parties who helped to facilitate resolution of these chapter 11 cases.  Finally, with the payments to be made under the Plan being made only in the circumstances in which the Plan goes effective, and all "E-side" Claims are paid in full, payment of fees to the limited group of recipients described above will not have a detrimental effect on the Debtors' estates.  In light of the foregoing considerations, the Debtors submit that they have satisfied the conditions of 1129(a)(4) of the Bankruptcy Code.

159.    Additionally, to the extent section 503(b) of the Bankruptcy Code applies in assessing the professional fees identified by the U.S. Trustee, the Debtors submit that allowance of such fees and expenses is supported by the record in light of the pivotal role played by the Plan Sponsors and the necessity of their support in confirming the Plan.  Here, the holding of the court in *Indianapolis Downs* rings especially true.  In *Indianapolis Downs*, the court approved professional fees under section 503(b) based on the record, where the fees were payable to the restructuring support parties who "performed a central role in the formulation of the confirmable Plan and otherwise ke[pt] the proceedings moving forward" and in whose absence, the debtor's chapter 11 cases would have likely devolved into litigation. *Indianapolis Downs*, 486 B.R. at 301. The facts here are nearly identical.  In the absence of these parties' support of the Settlement Agreement and "disarmament," the Debtors would have been mired in intra-"T-side" litigation for the foreseeable future, and it would have been extraordinarily difficult to develop a

71

comprehensive restructuring transaction under the specter of such prolonged litigation. Accordingly, the fee payment provisions of the Plan should be approved.

### C.    The EPA's Objection Should Be Overruled.

160.    The Plan properly classifies EFCH unsecured claims in Class C6, the Bankruptcy Code supports the discharge of the EPA Claim (as defined herein), and the Plan is filed in good faith and is feasible.  The Court should therefore overrule the EPA Objection.

161.    The EPA claim for $23,153,204 in monetary damages (Claim No. 10059) (the "EPA Claim")[40] is a general unsecured claim because the EPA Claim relates to the Debtors' predecessors' alleged pre-petition conduct.  *See Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 709 (9th Cir. 1988) (holding that a claim for damages resulting from cleanup of prepetition environmental violations are "not entitled to administrative expense priority").  Further, the EPA Claim is a general unsecured claim because the Debtors no longer own or control the property subject to the alleged CERCLA violation.  *See*, *e.g.*, *In re Insilco Technologies, Inc.*, 309 B.R. 111, 116 (Bankr. D. Del. 2004) (holding that because the debtor did not own the property at issue, costs incurred "in remediating the contamination at the [p]roperty [would] not benefit the estate" and, therefore, are unsecured claims); *In re Dant & Russell, Inc.*, 853 F.2d at 709 (citing *Ohio v. Kovacs*, 469 U.S. 274 (1985) for the proposition that a government entity is not entitled to administrative priority for "cleanup costs resulting from property not owned by the bankruptcy estate.").

162.    *First*, the EPA asserts that the Plan violates section 507 of the Bankruptcy Code because the Plan fails to provide sufficient grounds for the disparate treatment of unsecured EFCH creditors in Class C6 from that to be received by unsecured TCEH creditors in Class C5.

---

[40]   The underlying CERCLA liability included in the EPA Claim may potentially be asserted against non-Debtor affiliate EFH Properties Company ("EFH Properties").

The EPA incorrectly presumes that EFCH unsecured claims, and the unsecured EPA Claim, are similarly situated to that of TCEH unsecured creditors. As set forth in Section III.C.ii. of this Reply, EFCH unsecured claims are structurally subordinate to TCEH unsecured claims in the Debtors' corporate structure. As all TCEH unsecured claims are not being paid in full under the Plan, EFCH unsecured claims are not entitled to any recovery under section 1129(b)(2) of the Bankruptcy Code. The EPA's objection to the disparate treatment of EFCH and TCEH unsecured Claims is thus not supported by the Bankruptcy Code.

163. *Second*, the EPA incorrectly asserts that the Plan's cancellation and release of the EPA Claim is impermissible under sections 1129(a)(1) and 1129(a)(3) the Bankruptcy Code. The EPA alleges that the Debtors' CERCLA and other environmental obligations are not "claims" that are dischargeable under the Bankruptcy Code because such obligations are ongoing police and regulatory obligations. The EPA's reliance upon cases regarding the non-dischargeability of certain injunctive or cleanup orders is inapposite to this case.[41] Rather than enforce an injunction or cleanup order against the Debtors, the EPA filed the EPA Claim for $23,153,204 in monetary remedies for alleged CERCLA violations committed by the Debtors or their predecessors. Further, the Debtors do not own and control the property at issue and, therefore, there is no police and regulatory power at issue, but instead the government is acting in its own pecuniary interests to collect an alleged debt.

164. The Bankruptcy Code explicitly recognizes civil penalties as a category of claims that are dischargeable against a reorganized corporate debtor. 11 U.S.C. § 523(a)(7); § 1141(d)(1)-(2). Environmental claims are dischargeable under section 1141 of the Bankruptcy Code if they are monetary claims or, in the case of non-monetary claims, if they can be reduced

---

[41]  *See* EPA Obj., at note 3. All cases cited by the EPA relate to instances where a governmental entity sought to enforce an injunction or a cleanup order, rather than a request for monies.

to an "obligation to pay money." *Kovacs*, 469 U.S. at 283 (1985) (holding that a debtor's obligation to comply with a state environmental cleanup injunction was a "debt" and thus dischargeable where "the cleanup order had been converted into an obligation to pay money"); *see also In re Chateaugay Corp.*, 944 F.2d 997, 1008 (2d Cir. 1991) (holding that because the EPA had the option to do the clean-up itself and sue for response costs, it had a "right to payment" and thus a "claim" that was dischargeable); *In re The IT Group, Inc.*, 339 B.R. 338, 343 (D. Del. 2006) (holding that a state environmental agency's claim was dischargeable when the administrative order involved a "monetary penalty" and "more closely resembled a claim for monetary damages intended to compensate for past alleged acts; rather than a claim for injunctive relief aimed at preventing future harm"); *Insilco Technologies*, 309 B.R. at 116 (stating that the state environmental agency's claims were subject to discharge because the claims sought only a monetary reimbursement for the largely future costs of remediating a property formerly owned by the debtors).

165.    In this case, the EPA is not attempting to enforce an injunction or cleanup order. *See* EPA Claim, ¶ 47.  Rather, the EPA is seeking a monetary claim for what it estimates to be the future costs associated the Debtors' and other potentially responsible parties' alleged CERCLA liability.  *See* EPA Claim, ¶ 40.  This claim is a monetary remedy sought for the Debtors' alleged CERCLA violations that arose decades before the Petition Date.  Therefore, the EPA Claim is a "claim" under the Bankruptcy Code that may be properly discharged.[42]

166.    ***Third***, the EPA asserts that the Plan violates section 1129(a)(3) of the Bankruptcy Code and is not in good faith because the Plan allows for the dissolution of non-Debtor affiliates

---

[42]    Further, Article VIII.H of the Plan, which language was negotiated with, and included at the request of, the EPA, does not seek to limit the United States from exercising its police or regulatory authority to protect human health and the environment.  *See* Plan, Art. VIII.H.

or distribution of non-Debtor affiliates' assets without providing sufficient funds to meet environmental obligations after such dissolution or distribution.  In particular, the EPA alleges that the Debtors' proposed treatment of non-Debtor affiliate EFH Properties would render EFH Properties insufficiently capitalized to meet its ongoing environmental obligations.  The EPA is particularly concerned with EFH Properties because EFH Properties may be liable on the underlying CERCLA liability that is the basis of the EPA Claim.

167.    As previously stated in section I of this Reply, the Plan is feasible and satisfies the requirements of section 1129(a)(11) for both Debtors and non-Debtor affiliates.  The proposed treatment of non-Debtor affiliate EFH Properties under the Plan does not render EFH Properties insufficiently capitalized to meet ongoing liabilities, including potential environmental liabilities.[43]  Further, and as more fully stated in section IV in this Reply, the Plan was filed in good faith and satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

168.    The EPA also incorrectly asserts that the Debtors propose to discharge and release the liabilities of EFH Properties.  To make this clear, the Debtors will include language in the Sixth Amended Plan that clarifies that no EFH Properties liabilities, including environmental liabilities, if any, will be released or discharged pursuant to the Plan.  Based on the foregoing, the Debtors request that the Court overrule the EPA Objection in its entirety.

**D.    This Court Should Overrule the Fenicle and Fahy Objection.**

169.    The Asbestos Objectors, Fenicle and Fahy object to confirmation on five bases, regurgitating many of the same arguments this Court has already rejected.  Once and for all, this Court should reject them again.

---

[43]   The Plan proposes that with the consent of TCEH and the TCEH Supporting First Lien Creditors the equity interests in EFH Properties or the lease for the Debtors' corporate headquarters at "Energy Plaza" held by EFH Properties will be transferred to Reorganized TCEH from the EFH Debtors as part of the Spin-Off.

170.  *First*, Fenicle and Fahy argue that section 524(g) of the Bankruptcy Code is mandatory.  This Court previously rejected this argument in a published opinion that was not appealed.  Congress plainly made section 524(g) an optional mechanism for debtors to address asbestos liability:  "After notice and hearing, a court that enters an order confirming a plan of reorganization under chapter 11 *may* issue, in connection with such order, an injunction in accordance with this subsection *to supplement the injunctive effect* of a discharge under this section."  *See* 11 U.S.C. § 524(g)(1)(A) (emphases added).  Faithfully applying the Code, this Court concluded, "The formation of a trust pursuant to section 524 is permissive . . . . In short, a channeling injunction is not required."  *See In re Energy Future Holdings Corp.*, 522 B.R. 520, 539 (Bankr. D. Del. 2015) ("As a result of the plain meaning of Bankruptcy Rule 3003 and section 524 of the Bankruptcy Code, the Court finds that a bar date must be established for all claims, including Unmanifested Claims, even though the Court may later extend such bar date for cause shown."); *see also In re WR Grace & Co.*, 729 F.3d 332, 339 (3d Cir. 2013) ("Section 524(g) provides *a* mechanism that allows companies to handle overwhelming present and future asbestos liability through a trust created in conjunction with a Chapter 11 bankruptcy plan." (emphasis added)).

171.  Fenicle and Fahy offer *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004), for their argument that the Debtors must use a section 524(g) injunction.  Nowhere in that 136-page decision, however, does the Third Circuit say anything of the sort.  Instead, the Third Circuit discussed "the prerequisites" for using a section 524(g) injunction and narrowly held, "Based on the facts here, we do not believe that [11 U.S.C.] § 105(a) can be employed to extend a channeling injunction to non-debtors in an asbestos case where the requirements of § 524(g) are not otherwise met."  *Combustion Eng'g, Inc.*, 391 F.3d at 233-34.  Here, the Debtors are not

76

seeking a section 105(a) injunction or a section 524(g) injunction. Instead, the Plan utilizes the Court-approved asbestos bar date, and the Debtors intend to Reinstate the Holders of Class A3 asbestos Claims, including Fenicle and Fahy..

172.    **Second**, Fenicle and Fahy raise concerns about intercompany claims that the asbestos Debtors, including EECI, Inc., may have against EFH Corp. The Debtors will amend the Plan to clarify that all EFH Debtor Intercompany Claims of EFH Corp., LSGT Gas Company LLC, EECI, Inc., EEC Holdings, Inc., and LSGT SACROC, Inc. against one or more of EFH Corp., LSGT Gas Company LLC, EECI, Inc., EEC Holdings, Inc., and LSGT SACROC, Inc. shall be Reinstated.[44]

173.    **Third**, Fenicle and Fahy argue that the Plan violates section 1123(a)(4) of the Bankruptcy Code by treating Class A3 manifested claimants differently from Class A3 unmanifested claimants. *See* 11 U.S.C. § 1123(a)(4) (requiring that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment"). The Plan leaves unimpaired all Class A3 Claims, and the Debtors intend to Reinstate all Class A3 asbestos claims—both manifested and unmanifested.[45] The Plan makes no distinction between manifested and unmanifested claimants. Accordingly, the Plan provides the same treatment to each asbestos Claim in Class A3, satisfying section 1123(a)(4).

---

[44]    *See* Ex. 5, 10/1/2015 Keglevic Dep. Tr. at 328:2-330:21 ("[T]he claims that those entities have against EFH are not released as part of any part of the bankruptcy, and therefore, will continue, will travel, as I like to call it, with the reorganized EFH. And, therefore, that will be the source of any required funding of the 50 million dollars or whatever that liability -- those liabilities turn out to be. . . . No matter how large those liabilities turn out to be."). These intra-silo claims are not released through the Settlement Agreement. To the extent necessary the Debtors will clarify this point.

[45]    *See* Plan, Art. III.B.3.

174.    **Fourth**, Fenicle and Fahy challenge the Plan's feasibility under section 1129(a)(11) of the Bankruptcy Code.  *See* 11 U.S.C. § 1129(a)(11) (requiring that "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.").  They speculate that because the asbestos bar date (December 14) is after the confirmation hearing's scheduled conclusion, the Debtors cannot forecast their asbestos liability.  To the contrary, that liability is forecastable:  the Debtors' total historical expense for asbestos claims is approximately $26.4 million, with an average yearly spend of $2 million.  In the context of this $42 billion reorganization, that liability is no impediment to feasibility, no matter the ultimate size of Class A3 (including any Claims filed between confirmation and the asbestos bar date).[46]

175.    Moreover, contrary to Fenicle and Fahy's assertion, there is no need to liquidate or estimate the Debtors' asbestos liabilities for purposes of distribution under the Plan.  The Debtors intend to reinstate all Class A3 asbestos Claims.[47]  The Plan does not call for any liquidation or estimation (or capping) of such Claims.  Accordingly, Fenicle and Fahy's jurisdiction objections are misplaced.

176.    **Fifth**, Fenicle and Fahy argue that the Plan does not satisfy due process for unmanifested claimants.  Even if Fenicle and Fahy had standing to raise this objection, the record demonstrates the extensiveness of the asbestos notice plan.  After this Court entered its bar date order, the Debtors negotiated a substantial notice plan with the EFH Committee, represented by

---

[46]    *See* Ex. 5, 10/1/2015 Keglevic Dep. Tr. at 328:2 - 330:21 (stating that Reorganized EFH "will be the source of any required funding of the 50 million dollars or whatever that liability -- those liabilities turn out to be. . . . No matter how large those liabilities turn out to be.").

[47]    *See* Plan, Art. III.B.3.

legal counsel and their own retained asbestos noticing expert, for the very purpose of satisfying due process.  This Court entered an order approving the notice plan.[48]  No party appealed that order.

177.    The $2.5 million notice plan provides direct notice to current or former employees of the Debtors or their predecessors who may have been exposed to asbestos.  It also provides comprehensive publication notice in print, broadcast, and online media.  The asbestos noticing expert determined, "The combined measureable, media effort will reach approximately 90.1% of men aged 65+ in the U.S. an average of 3.4 times each, 89.4% of adults aged 45+ in the U.S. an average of 3.5 times each, and approximately 85.7% of adults aged 18+ in the U.S. an average of 3.1 times each."[49]  To reduce any lingering due process concerns, the asbestos bar date is limited in scope to those most likely to receive direct and publication notice—for example, by applying only to those debtors, predecessors, and facilities that are expressly identified in the notice plan. For these reasons, this Court can comfortably conclude that notice was "reasonably calculated, under all the circumstances, to apprise [potential asbestos claimants] of the pendency of the action and afford them an opportunity to" file a Proof of Claim.  *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

178.    Finally, Fenicle and Fahy's exploration of successor liability and section 363 of the Bankruptcy Code is irrelevant to issues at bar.  Likewise, their discussion of *Jones v. Chemetron*, 212 F.3d 199, 210 (3d Cir. 2000), misses the mark.  The Debtors are not seeking to affect future asbestos liabilities such as those at issue in *Chemetron*.  Accordingly, the Court should overrule the Fenicle and Fahy Objection.

---

[48]    *See Order (A) Setting Bar Date for Filing Asbestos Proofs of Claim, (B) Approving the Form of and Manner for Filing Asbestos Proofs of Claim, and (C) Approving Notice Thereof* (D.I. 5171).

[49]    *See* Ex. 12, Asbestos Claims Bar Date Revised Notice Plan (July 13, 2015), at 7.

### E.    Tex-La's Objection Should Be Overruled.

179.    Tex-La and the Rural Electrification Administration ("RUS") filed a limited objection to ensure their rights in the Tex-La Obligations are not impaired.  In fact, Tex-La and RUS "do not oppose confirmation of the Debtors' Plan" provided that the Debtors do not impair Tex-La's and RUS's rights under the Tex-La Obligations.  While the Debtors understand Tex-La's and RUS's positions, this limited objection is unnecessary.  Tex-La and RUS filed a claim based on the Tex-La Obligations with Tex-La asserting a secured claim against the TCEH Debtors that is classified in Class C1 - Other Secured Claims Against the TCEH Debtors and RUS asserting an unsecured guaranty claim against EFH that is classified in Class A11 - Tex-La Guaranty Claims.  As stated in the Plan, both claims are unimpaired.  Thus, in accordance with section 1124 of the Bankruptcy Code, the Plan treats Tex-La's and RUS's claims consistent with the terms of the Tex-La Obligations to leave such claims unimpaired.  Additional clarifying language will not further emphasize the point that these claims are unimpaired.

180.    Further, Tex-La and RUS request that the Plan expressly state that their rights to seek all claimed amounts that may be due under the Tex-La Obligations not be precluded or limited on a post-confirmation basis.  The Plan does not preclude the Debtors, Tex-La, or RUS from asserting their respective rights with respect to Tex-La's and RUS's claims in determining such claims' Allowed amount.   Additional language will not further clarify this issue. Accordingly, the Court should overrule the Tex-La and RUS objection.

### F.    The Treatment of the Contract with FLSmidth USA, Inc. Is Appropriate.

181.    Luminant Generation Company LLC and FLSmidth USA, Inc. ("FLSmidth") are parties to a prepetition agreement (the "FLSmidth Agreement"). The Debtors included the FLSmidth Agreement on Exhibit C to the Plan Supplement, with assumption of the FLSmidth Agreement conditioned upon successful negotiation of a contract amendment and cure amount.

After being unable to negotiate a resolution with FLSmidth on the terms of assumption of the FLSmidth Agreement, the Debtors sent a notice of rejection to FLSmidth on October 27, 2015 for rejection upon entry of the Confirmation Order.[50]

182.    FLSmidth's objections to the Plan are based on a misunderstanding of the Plan and applicable bankruptcy law.[51]  *First*, FLSmidth asserts that the Plan does not provide for the Debtors' release of claims against FLSmidth—this is not true.   Article VIII.C of the Plan provides for a release of the Debtors' claims against FLSmidth as a "Released Party," including causes of action relating to preference or avoidance claims, which are also explicitly released in Article IV.Q of the Plan.  *Second*, FLSmidth asserts that the Plan provides for payment to junior creditors prior to FLSmidth being paid in full.  Again, this is not true.  As set forth more fully in the Confirmation Brief, the Plan provides fair and equitable treatment for unsecured creditors consistent with section 1129(b)(2)(B) of the Bankruptcy Code.  No creditor or interest holder junior to FLSmidth (as a Class C5 Claimholder) will receive a recovery under the Plan.[52] Indeed, FLSmidth does not point to any particular class that it believes violates section 1129(b)(2)(B) of the Bankruptcy Code.  Rather, FLSmidth has flipped the security and priority scheme under the Bankruptcy Code on its head, asserting that vendors and suppliers should be

---

[50]  Given FLSmidth's troubling assertions that it may terminate or modify terms under the contract in its sole discretion (FLSmidth Objection, ¶ 13), the Debtors clarify for the avoidance of doubt that FLSmidth is not excused from performance under the FLSmidth Agreement while rejection is pending, and any failure to perform before the rejection date would constitute a breach of such agreement.

[51]  *See Objection of FLSmidth USA, Inc. and FLSmidth Inc. to Confirmation of Fifth Amended Plan of Reorganization* (D.I. 6580) (the "FLSmidth Objection").

[52]  FLSmidth has asserted Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code and unsecured Claims that would fall into Class C5 (General Unsecured Claims Against the TCEH Debtors Other Than EFCH).  FLSmidth would be unimpaired and receive payment in full for any Allowed 503(b)(9) Claims, so this portion of the Reply discusses only FLSmidth's Allowed Class C5 Claims (if any), which are impaired and receive the treatment provided in the Plan for such Claims (specifically, FLSmidth would receive a combination of stock and rights to purchase stock for any Allowed Class C5 Claims, since FLSmidth did not elect to receive a cash distribution).

paid in full "prior to diversion of cash proceeds up stream to holding companies for payment of costs of administration and bondholders who provide no goods or services to the Debtor" (FLSmidth Objection, ¶ 14). While FLSmidth may desire this to be the case, there can be no doubt that the law provides that secured debtholders' claims are senior in priority to unsecured vendor claims. And because the value of the TCEH Debtors' estates has left even the senior secured creditors impaired, its value is clearly not sufficient to pay the claims of all vendors and suppliers in full. Accordingly, the FLSmidth Objection should be overruled.

**G.     The Objection of JoAnn Robinson Should Be Overruled.**

183.    The Debtors received an objection from *pro se* claimant JoAnn Robinson asserting that the claimant is entitled to vote on the Plan (D.I. 6451). The Debtors have reached out to the claimant by email, phone, and a letter sent by federal express to attempt to resolve the objection. The claimant was not entitled to vote under the Court-approved solicitation procedures because the claimant's asserted claim is (i) subject to a pending claims objection (filed at D.I. 3212 and adjourned indefinitely as set forth in the certification of counsel filed at D.I. 3453) and (ii) even if it were not subject to a pending objection, the claim is asserted against EFH Corp. and therefore unimpaired under the Plan and deemed to accept. The Debtors have not received a response. Accordingly, the Robinson Objection should be overruled.

**H.     The Objection of Christopher Haecker Should Be Overruled.**

184.    The Debtors received an objection from *pro se* claimant Christopher Haecker, an alleged beneficial holder of EFIH First Lien Notes, asserting that the Plan should be amended to provide for repayment of the principal on the EFIH First Lien Notes (D.I. 6597). The Debtors repaid the principal on the EFIH First Lien Notes in full in cash in June of 2014 after the Court approved the EFIH DIP facility expressly for that purpose (D.I. 859). The Court should therefore overrule this Objection.

**VII.   THE DEBTORS WILL WORK TO CONSENSUALLY RESOLVE ASSUMPTION AND CURE OBJECTIONS, WHICH SHOULD NOT STAND IN THE WAY OF PLAN CONFIRMATION.**

185.    The Debtors received various objections and reservations of rights regarding the assumption of certain executory contracts and proposed cure amounts set forth in Exhibit C to the Plan Supplement (the "Assumption Objections," and such parties, the "Assumption Objectors").[53]  While the Debtors believe that the various assumptions and cure amounts listed in Exhibit C to the Plan Supplement are generally accurate, the Debtors are working and will continue to work with the Assumption Objectors to determine accurate cure amounts, identify assumed contracts, and otherwise consensually resolve the Assumption Objections.  For the avoidance of doubt, the Debtors intend to continue to pay postpetition amounts due under its contracts in the ordinary course of business.  Unless otherwise agreed, the Debtors will include language in the Confirmation Order that they will not seek to assume, cure, or otherwise treat any contract pursuant to the Confirmation Order that is the subject of an outstanding Assumption Objection at the time of entry of the Confirmation Order.   Any party with an outstanding Assumption Objection will have an opportunity to be heard at the omnibus hearing scheduled for

---

[53]   The Assumption Objections comprise the following: *Reservation of Rights by TXU 2007-1 Railcar Leasing LLC With Respect to Fifth Amended Joint Plan of Reorganization* (D.I. 6576); *Objection of FLSmidth USA, Inc. and FLSmidth Inc. to Confirmation of Fifth Amended Plan of Reorganization* (D.I. 6580); *Objection to Proposed Cure Amounts* (filed by Buffalo Industrial Supply, Inc.) (D.I. 6586); *Oracle's Limited Objection and Reservation of Rights Regarding (I) the Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code; and (II) Notice of (A) Executory Contracts and Unexpired Leases to be Assumed by the Debtors Pursuant to the Plan; (B) Cure Amounts, if any; and (C) Related Procedures in Connection Therewith* (D.I. 6592); *Objection of Cellco Partnership D/B/A Verizon Wireless to Proposed Cure Amounts in Plan Supplement* (D.I. 6678); *Cure Objection and Reservation of Rights of Salesforce.com, Inc. Related to the Proposed Assumption of Certain Executory Contracts and Unexpired Leases Pursuant to the Joint Plan of Reorganization of Energy Future Holdings Corp., et. al., Pursuant to Chapter 11 of the Bankruptcy Code* (D.I. 6679); *Michelin North America, Inc.'s Objection to the Proposed Cure Amount on the Debtors' Notice of Executory Contracts and Unexpired Leases to be Assumed and Plan Supplement* (D.I. 6681); *Objection to Proposed Cure Amount* (filed by MoreTech, Inc.) (D.I. 6684); *Limited Objection and Reservation of Rights of Tannor Partners Credit Fund, L.P. to Proposed Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* (D.I. 6687); and *Limited Objection and Reservation of Rights with Respect to the Proposed Cure Amount Set Forth in the Plan Supplement for the Fifth Amended Joint Plan of Reorganization* (filed by Aetna Inc., Aetna Life Insurance Company) (D.I. 6698).

December 16, 2015, or another hearing that is convenient to the Court.  Unless otherwise agreed, the Debtors will not assume any contract that is the subject of an Assumption Objection until the Assumption Objection has been consensually resolved or the Court has made a determination on the Assumption Objection.  Therefore, the Assumption Objections should in no way prevent the Court from confirming the Plan.

## **CONCLUSION**

186.    For the reasons set forth herein, the Debtors respectfully request that the Court overrule the Objections.

*[Remainder of page intentionally left blank.]*

84

Dated: October 30, 2015
      Wilmington, Delaware

*/s/ Joseph C. Barsalona II*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
Joseph C. Barsalona (No. 6102)
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:       collins@rlf.com
              defranceschi@rlf.com
              madron@rlf.com
              barsalona@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:       edward.sassower@kirkland.com
              stephen.hessler@kirkland.com
              brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:       james.sprayregen@kirkland.com
              marc.kieselstein@kirkland.com
              chad.husnick@kirkland.com
              steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession

Dated: October 30, 2015
      Wilmington, Delaware

*/s/ Mark Thomas*

**O'KELLY ERNST & BIELLI, LLC**
David M. Klauder (No. 5769)
Shannon J. Dougherty (No. 5740)
901 N. Market Street, Suite 1000
Wilmington, DE 19801
Telephone:    (302) 778-4000
Facsimile:    (302) 295-2873
Email:        dklauder@oeblegal.com
              sdougherty@oeblegal.com

-and-

**PROSKAUER ROSE LLP**
Jeff J. Marwil (admitted *pro hac vice*)
Mark K. Thomas (admitted *pro hac vice*)
Peter J. Young (admitted *pro hac vice*)
Three First National Plaza
70 W. Madison Street, Suite 3800
Chicago, IL 60602
Telephone:    (312) 962-3550
Facsimile:    (312) 962-3551
Email:        jmarwil@proskauer.com
              mthomas@proskauer.com
              pyoung@proskauer.com

Co-Counsel to the Debtor Energy Future Holdings Corp.

Dated: October 30, 2015
      Wilmington, Delaware

*/s/ Richard Levin*

**STEVENS & LEE, P.C.**
Joseph H. Huston, Jr. (No. 4035)
1105 North Market Street, Suite 700
Wilmington, Delaware 19801
Telephone:    (302) 425-3310
Facsimile:    (610) 371-7927
Email:    jhh@stevenslee.com

-and-

**CRAVATH, SWAINE AND MOORE LLP**
Michael A. Paskin, Esq.
Trevor M. Broad, Esq.
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Telephone:    (212) 474-1760
Facsimile:    (212) 474-3700
Email:    mpaskin@cravath.com
              tbroad@cravath.com

-and-

**JENNER & BLOCK**
Richard Levin
919 Third Avenue
New York, NY 10022-3908
Telephone:    (212) 891-1601
Facsimile:    (212) 891-1699
Email:    rlevin@jenner.com

Co-Counsel to Energy Future Intermediate Holding Company
LLC

Dated: October 30, 2015
      Wilmington, Delaware

*/s/ Seth Goldman*

**MCELROY, DEUTSCH, MULVANEY
& CARPENTER, LLP**
David P. Primack (No. 4449)
300 Delaware Avenue, Suite 770
Wilmington, DE  19801
Telephone:    (302) 300-4515
Facsimile:    (302) 654-4031
Email:        dprimack@mdmc-law.com

-and-

**MUNGER, TOLLES & OLSON LLP**
Thomas B. Walper
Seth Goldman
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071
Telephone:    (213) 683-9100
Facsimile:    (213) 683-4022
Email:        Thomas.Walper@mto.com
                 Seth.Goldman@mto.com

Co-Counsel to the TCEH Debtors