**EXHIBIT 1**

**Excerpts from 9/28/15 Doré Dep. Tr.**

```
                                                               1

 1
 2              UNITED STATES BANKRUPTCY COURT
 3              FOR THE DISTRICT OF DELAWARE
 4    ------------------------------------x
 5    In Re:
 6    Energy Future Holdings Corporation,
 7    et al.,
 8                        Debtors.
 9
10    Chapter 11
11    Case No. 14-10979
12    Jointly Administered
13    ------------------------------------x
14
15              DEPOSITION OF STACEY DORÉ
16                   New York, New York
17                   September 28, 2015
18
19
20    Reported by:
21    MARY F. BOWMAN, RPR, CRR
22    JOB NO. 98268
23
24
25
```

21

1              S. Doré

2   that, but what he stated is the complete

3   and full answer to the question of the

4   debtor's view of the treatment under the

5   plan.

6       Q.   Let me repeat the question again

7   because you said you would be happy to

8   explain it to me.

9            What is the treatment provided

10       under the plan if, before the effective

11       date, an appellate court decides that

12       the EFIH first lien make-whole claim

13       should be allowed?

14       A.   The plan -- as a condition

15   precedent to the plan, make-whole claims

16   are not allowed.  So if make-whole claims

17   are allowed, the plan does not go

18   effective.

19       Q.   Is it if make-whole claims are

20   not allowed, the plan doesn't go effective

21   or if there are --

22       A.   No.  If make-whole claims are

23   allowed, the plan does not go effective.

24       Q.   I misspoke.

25            It is a condition precedent to

1              S. Doré

2      the plan going effective that no

3      make-whole claims be allowed as of the

4      effective date, right?

5      A.    Correct.

6      Q.    But it is also true that the

7   debtors and the plan proponent can waive

8   that condition, right?

9      A.    I suppose that anyone can waive a

10  condition.  I don't know all the different

11  parties that would be required to waive a

12  condition.

13     Q.    Have there been any discussions

14  about whether there will -- about a

15  possible waiver of that condition in the

16  event that any make-whole claims are

17  allowed by the Bankruptcy Court or on

18  appeal prior to the effective date?

19     A.    No.

20           MR. McGAAN:   Object.   Outside the

21     scope.

22           but You can answer.

23     A.    No.

24     Q.    So EFIH has had no discussions

25  with any of the plan proponents on that

177

1              S. Doré

2      Q.   Would you say that you are very
3  familiar with that?
4      A.   I'm pretty familiar with it.  As
5  you know, Cecily Gooch on my team is our
6  debtor's representative on the fee
7  committee.  So she would be more familiar
8  with the details than I am.  But she and I
9  spend quite a bit of time talking about it.
10     Q.   What are the names?  What's the
11 aggregate amount of fee, professional fees
12 that have been incurred in the case to date
13 for retained professionals?
14     A.   For retained?  Well, it is
15 interesting, you know, there is so many
16 different ways to cut the data that I never
17 quite know what that question means.  But
18 I'll give you my understanding is, sitting
19 here today, and then you can ask me
20 questions about it.
21          So my understanding is from the
22 beginning of the case, May 2014, through
23 August of 2015, the debtor's retained
24 professionals have billed in their monthly
25 fee statements approximately 181 million

1                    S. Doré

2    dollars.

3            Now, as you know, not all of that

4    has been put into yet a fee application.

5    Certainly not all of that has been paid.

6    But that is the billed amount to the

7    company through August of 2015.

8            For nondebtor retained

9    professionals, which are primarily the

10   committee's professionals, I think there is

11   some other people in that category, the

12   fees that have been billed in monthly fee

13   statements total 233 million dollars, from

14   inception through August of 2015.

15       Q.   All right.  Let me see if I can

16   match that up with what I think is what

17   you're trying to convey and so that we are

18   on the same page.

19           When you say estate -- when you

20   say debtor professionals, you mean -- do

21   you mean professionals that are working for

22   the debtors?

23       A.   Correct.

24       Q.   Specifically?

25       A.   Correct.

1                   S. Doré

2      aware that there is at least one -- the

3      U.S. trustee, for example, and possibly

4      other parties that are of the view that

5      these fees cannot be paid in this manner?

6          A.    I am aware of that argument.

7          Q.    OK.  And what is your

8      understanding of that?

9              MR. McGAAN:  Object to form.  You

10         can answer if you understand the

11         question.

12         A.    My understanding like many legal

13     issues in this case apparently, there is a

14     difference of opinion about what the law

15     provides and we believe, we believe and I

16     think the plan sponsors parties believe

17     that it is allowed under the law, that

18     there is a reasonable basis for setting it

19     up this way and that's what we plan to

20     argue and we understand that others, in

21     objecting to the plan or settlement

22     agreement might argue to the contrary and

23     ultimately that will be up to the judge to

24     decide.

25         Q.    And let's say, for example, that

                                                          208

1                       S. Doré
2         an objection like that.  I'll respect
3         it.  I'm not really following it.  But
4         all I am asking would she be open to
5         discussions with respect to that?
6              MR. McGAAN:  My concern -- I
7         don't want to get in your way.  The
8         concern is the deposition is not the
9         place to examine someone but how they
10        might negotiate something in the
11        future.  That's not fair of if she has
12        taken a position or the debtor has I
13        have no objection to that.
14             MS. SCHWARTZ:  She said she
15        wasn't aware of that, that's why I
16        followed up with that discussion.
17        A.    No, I wouldn't be open that.
18   This is very important to me personally and
19   to the company that this plan provide
20   global resolution of all issues and that
21   there is no opportunity for anyone to
22   assert lingering claims after the case is
23   over.
24        Q.    I'm not sure what you mean by
25   lingering claims?

                    Dore', Stacey 2015-09-28

1                    S. Doré

2     A.    I believe so.  Because you will
3  recall in the RSA, we had intercompany
4  releases as well.  So there was a basis at
5  the time upon which to do those releases.
6  So that includes an assessment of
7  intercompany claims.  It has always been a
8  premise of every plan that we suggested
9  that there be resolution of all of those
10 issues.
11    Q.    Since you bring up the RSA,
12 remembering back, all the way back to the
13 RSA, do you recall what the treatment or
14 the result of the intercompany claims
15 release was in the RSA?
16    A.    There -- I don't think at the
17 time there was any monetary consideration
18 for the claims.  They were being released
19 in exchange for what the first liens at
20 TCEH viewed to be a quick exit.
21         So there had been a request by
22 the TCEH first liens as part of
23 negotiations in the RSA for a payment.  But
24 at the end of the day, where we landed in
25 that particular negotiation was that there

311

1           S. Doré

2    concern to me because I want to make sure

3    we meet them.  So I, if you could rephrase

4    your question, I'm having a hard time

5    understanding you.

6        Q.    Are there conditions in the plan

7    currently that you are concerned will not

8    be met?

9        A.    No.

10       Q.    How is it that you got

11   comfortable in agreeing to pursue this plan

12   that, in your view, the conditions will, in

13   fact, be met?

14       A.    Through a lot of conversations

15   with counterparties, with advisors, through

16   my own independent evaluation, through

17   conversations with external parties, a lot

18   of thought and diligence has gone into

19   making sure that this plan is achievable.

20   And to the extent that the conditions are

21   within the company's control, our team

22   is -- I have every confidence that our team

23   will execute on what we are required to

24   execute on, because we have one of the most

25   talented and dedicated and committed teams

1               S. Doré

2    around, and everybody is laser focused on

3    getting this plan done.  You could not have

4    a more motivated management team to make

5    sure that every condition in this plan is

6    met, to the extent that it is within our

7    control.

8         Q.    Who was tasked with assessing the

9    ultimate risk of whether or not this plan

10   will close?

11        A.    Well, close or will be confirmed?

12        Q.    Will close.

13        A.    Assuming confirmation?

14        Q.    Assuming confirmation?

15        A.    I don't know that anybody was

16   given the task specifically of assessing

17   the risk of closing.  It was something that

18   we considered, of course, in our

19   negotiations, and it was the motivation

20   behind many of the provisions that we

21   negotiated was to do everything we could to

22   increase the likelihood of the plan

23   closing, and we spent a lot of time

24   thinking about and talking to our board,

25   both Paul and I did and the advisors, as

313

1              S. Doré
2    well as people on my team and people on
3    Paul's team, and everyone who is looking at
4    this tried to think through every risk that
5    there was and do everything we could to
6    mitigate those risks.
7           So I don't think there was a
8    particular person tasked with it.  It was
9    an essential part of the negotiation in the
10   entire process.
11       Q.   And that assessment of risk was
12   done, was that done by you and Paul?
13       A.   I think I just said it was done
14   by the entire team who was working on this.
15       Q.   What factors did the team
16   consider in assessing the likelihood of the
17   transaction to close?
18       A.   We considered the incentives of
19   the counterparties to close.  We considered
20   the relationships of the various parties
21   that they had with regulators.  We
22   considered the legal merits and risks of
23   certain positions that parties were taking.
24   We considered the financial wherewithal of
25   the parties who were making investments.

314

1                     S. Doré

2      We considered the disincentives that they

3      would have not to close.  We considered our

4      own relationships.  We considered the

5      timeline.  We considered interest rates and

6      value of, you know, Oncor and a lot of

7      different factors.  That's not an

8      exhaustive list.

9          Q.    Couple of follow up on a few of

10     these points.

11               You included there the value of

12     Oncor.  You considered in your analysis of

13     risk of closing, the fact -- the value of

14     Oncor at the time of closing would be

15     relevant to whether the deal closes?

16         A.    Sure.

17         Q.    And you considered a potential

18     change in market conditions.  Did you

19     consider that from the perspective of

20     whether -- how that will influence the

21     investors and their decision to close?

22         A.    We did consider that they -- we

23     assume that they will take the market

24     conditions into account as any party who is

25     being asked -- who has agreed to invest 12