**EXHIBIT 2**

**Excerpts from 9/23/15 Ying Dep. Tr.**

1

1                DAVID YING

2    UNITED STATES BANKRUPTCY COURT

3    FOR THE DISTRICT OF DELAWARE
     -------------------------------------------x
4    In Re:

5    Energy Future Holdings Corporation, et al.,

6                Debtors.

7    Chapter 11

8    Case No. 14-10979

9    Jointly Administered

10   -------------------------------------------x

11   * * *PARTIALLY CONFIDENTIAL (PAGES 76-77)* * *

12           DEPOSITION OF DAVID YING

13            New York, New York

14            September 23, 2015

15

16

17

18

19

20

21

22

23

24   Reported by: KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 98065

1                    DAVID YING

2          MR. ROGERS:  Objection to form.

3     A.    It's supposition, but I don't think it

4  would result in a better result.

5     Q.    Sir, are you aware that, at some point

6  in the process, the Hunts began working directly

7  with the T-unsecured creditors on a REIT

8  transaction?

9     A.    Yes.

10    Q.    Do you know how the pairing of the

11 Hunts and the T-unsecured creditors came to be?

12    A.    I know that the Hunts are well

13 advised.  I know that the Hunt Group had been

14 talking to all the various creditor

15 constituencies in the case for quite some time.

16         I suspect that multiple people will

17 claim credit that they are the ones who created

18 the marriage of the Hunts with the T-uns, but I

19 don't know exactly what the sequence of phone

20 calls and meetings and events were.

21    Q.    From the perspective of running the

22 sale process, was it a concern to you that the

23 Hunts were talking to all creditor

24 constituencies?

25         MR. SHORE:  Object to the form.

63

```
 1                    DAVID YING
 2        developed by Fischer Black and Myron Scholes
 3        backed in the early 1970s.  It's a formula
 4        that makes some basic hypothetical
 5        assumptions, but it's basically driven by
 6        two ingredients.  One is the duration of the
 7        option and the other is the volatility of
 8        the underlying asset, and that formula has a
 9        direct correlation between those two
10        variables.
11             Again, I think that when you're
12        talking about an investor group investing $7
13        billion of equity to buy a $20 billion
14        asset, I don't think volatility at all
15        enters into the equation.  It's a long-term
16        investment decision based on a myriad of
17        investment criteria that have nothing to do
18        with the valuation of stock options.
19   BY MR. GLUECKSTEIN:
20        Q.   Okay.  In connection with making your
21   recommendation with respect to this plan, did
22   you advise the board of EFH on the volatility,
23   potential volatility of the Oncor asset?
24             MR. SHORE:  Object to the form.
25        A.   We've informed the board all along
```

1                    DAVID YING

2    contract?

3             MR. ROGERS:   Objection to form.

4        A.    Again, just to be clear, what do you

5    mean by "remedies"?

6        Q.    If the transaction does not close, are

7    there enforceable remedies in the purchase

8    contract that are enforceable by EFH?

9        A.    Okay.  So, again, I think it's

10   important just to highlight that in the

11   traditional M&A context, there are no penalties

12   for the buyer group, but embedded in the

13   settlement agreement, there are significant

14   agreements and obligations that the junior TCH

15   creditors are agreeing to that are

16   significant -- that have significant economic

17   consequences to them and that I believe

18   significantly streamline the ability of the

19   company to reach a consensual deal with the

20   E-side in a manner which heretofore has not been

21   possible to reach.  And to be specific, the T

22   junior creditors are obligated to agree to

23   whatever plan is reached with the E-side

24   creditors and the T-firsts.

25             So, by eliminating another class of

```
 1                         DAVID YING

 2    creditors that could otherwise object on any of

 3    a number of bases to an E-side restructuring

 4    plan, we've, in my opinion, greatly simplified

 5    the possibility of reaching a consensual

 6    reorganization of EFH and EFIH that would be to

 7    the satisfaction of the T-firsts.

 8              So the definition of "remedy" I think

 9    needs to be taken into a much broader context of

10    the unique nature of this transaction and this

11    company's issues and its capital structure and

12    claims.

13        Q.    Are you aware of whether what you

14    referred to as penalties in the traditional M&A

15    sense were pursued by the Debtors in connection

16    with this plan?

17        A.    I believe that we did ask for them but

18    were unable to secure them.

19        Q.    And do you recall what terms were

20    asked for by the Debtors to the buyer group?

21        A.    I don't have a specific recollection

22    of specific terms asked for.

23        Q.    Do you have a recollection of the

24    nature of the type of remedies that were asked

25    for?
```

```
 1                    DAVID YING

 2   proposal, have you ever seen any indication that

 3   there is a feasible plan that provides for a

 4   recovery for E-side -- EFH unsecured creditors

 5   on terms other than those set forth in the plan

 6   on file?

 7        A.    No.

 8        Q.    You were shown a bid or a bid package

 9   received from Hunt, and reference was drawn to

10   the reverse breakup fee.  Do you recall that?

11        A.    Yes.

12        Q.    And do you recall that that reverse

13   breakup fee was $225 million?

14        A.    Yes.

15        Q.    Can you describe what that number is

16   as a function of the monthly administrative burn

17   in these cases?

18        A.    No, I don't know what the number

19   administrative burn in the cases is, but I

20   presume that for just the fees to advisors alone

21   is, you know, tens of millions of dollars a

22   month.  The DIP interest on the two estates is,

23   you know, $20 million plus a month.  I think you

24   could easily add it up and come up with some

25   pretty significant costs of keeping the company
```

1                    DAVID YING

2    in bankruptcy the way we are.

3         Q.    Do you know what the EFIH second lien

4    interest burn is a month?

5         A.    I think it's around $20 million a

6    month.  It's about $2 billion face amount at 12

7    percent, divided by 12 months.

8         Q.    Were you ever asked to do an analysis

9    of how that reverse breakup fee compared to the

10   monthly reorganization burn in the cases?

11        A.    I've never been asked to do that

12   particular calculation, no.

13        Q.    Do you feel qualified, if given enough

14   of the data points, you could do such an

15   analysis?

16        A.    We certainly could.

17        Q.    You were asked a couple of questions

18   about the financial impact, any work on the

19   financial impact in a non-closing scenario.  I

20   just wanted to follow up on that.

21             Is there anything about the -- well, I

22   take it one of the consequences if the

23   transaction doesn't close is that the E-side

24   creditors will be delayed in getting to their

25   distributions?