# EXHIBIT 3

## Excerpts from 9/10/15 Keglevic Dep. Tr.

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

---------------------------------------------x

In Re:

Energy Future Holdings Corporation, et al.,

Debtors.

Chapter 11
Case No. 14-10979
Jointly Administered

---------------------------------------------x

CONFIDENTIAL

DEPOSITION OF PAUL KEGLEVIC

New York, New York

Thursday, September 10, 2015

Reported by:
FRANCIS X. FREDERICK, CSR, RPR, RMR
JOB NO. 97460

P. KEGLEVIC - CONFIDENTIAL

A. That's correct.

Q. So absent exercising the fiduciary out, any alternative plan must require -- must contain the required EFH alternative terms.

A. Correct.

Q. Mr. Keglevic, are those terms set forth there starting on page 27, 6.1B, are those terms that the debtors proposed?

And, sir, those are -- just to be clear, so that I'm clear, those are the terms that imposed requirements on plans with respect to EFH.

A. Tracing the fingerprints through each of these terms to which party, we started with a deal that was done among the T side that was more of a term sheet that had some concepts in it. And then we took that and added some concepts and there was a lot of negotiation. So if you're more specific maybe I can help you with that. But, for example, the initial term sheet brought to us had the $700 million in it. And I had releases among the T estates and I think even some sponsor releases in it. So there -- many, many of

P. KEGLEVIC - CONFIDENTIAL

these concepts were in the initial deal that were brought to the debtor that were not created by the debtor. So I don't know which -- if you're speaking of anything specifically and I'm not even sure if I would know it if you specified it, but I will try.

Q. Did the debtors view the required EFH alternative terms as a benefit in the PSA?

A. Yes.

Q. And with respect to -- there's really, you know, 6.1B(1) is a provision broadly speaking that deals with provisions and releases. 6.1B(2) deals with intercompany claim settlement if I can broadly characterize it that way. Do you agree with that?

A. Yeah. I think that's a good broad characterization.

Q. Broad characterization.

A. Layman's characterization.

Q. Do you recall with respect to those provisions whether those two provisions specifically, the debtors' proposed the inclusion of those terms into the PSA?

A. I wasn't part of the negotiations.

As I said, I know that the $700 million specifically, because I did see the early sheets, were -- had the $700 million on it as an intercompany settlement term. And I know there were some releases baked in to the initial thoughts. But we did not get a fully -- you know, at the beginning of the negotiation, he wasn't a fully baked concept that we threw in new concepts. I know those were in there already. Whether we expanded the releases or not, we very well may have. But I don't have that specific knowledge in terms of how exactly that came about.

But, like I said, I do know that there were settlements in the initial document that was brought to us and I know the 700 million concept was brought to us.

Q. Based on your earlier testimony as I understand it, Mr. Keglevic, it was important to the debtors to have a reasonable -- a settlement of the litigation claims and releases to get that fresh start that we talked about, right?

A. That's right. We thought

resolution should be a global resolution of those issues, not, you know, among certain parties, because if you lose benefits to the estates if, in fact, there are some issues remaining open in terms of the cost, the litigation drag, the time to require all those things, none of those have particular benefits to the estates. And as I said before, we took -- you know, we were not aware that to the extent we expanded the releases to D&Os, for example, that there was ever in any discussions with the EFH committee, the T committee, the T uns, that any -- the T firsts, all the people that spent substantial amounts of time and effort in this case, if they ever put a substantial dollar amount of potential claim from those parties and that, you know, the T side who has done the most work on intercompany claims and, in fact, as you know, who believe they thought they had substantially more than the settlement amount, were willing to accept our disinterested directors settlement. So we kind of considered all of those things in our analysis

and came to that conclusion that it still was the benefit of the estates to move forward with the global releases. If I can use that layman's term.

And, if I can add one thing -- and I do believe that as part of the plan that was on file prior to this, that that was also consistent with what our prior plan said. So it was not a departure from where we were in the plan that was on file with the court.

Q. Right. Mr. Keglevic, is it your understanding that the terms of the PSA, if the PSA's approved, survive for the duration of the case absent an exercise of the complete fiduciary out?

A. Yes. We think, in fact, that's one of the benefits is that contractually once the PSA is approved and the disclosure statement is approved, that we keep -- those provisions survive and, in fact, we put the litigation and the time and expense associated with that litigation in the rear-view mirror. We won't have to worry about that which would give an alternative plan we think a

P. KEGLEVIC - CONFIDENTIAL

undertakings under the PSA, did the debtors not require remedies in the purchase contract itself such as liquidated damages?

A. We considered, you know, both specific performance and liquidated damages. Obviously, those are both subject to litigation. We had a -- obviously, we've had some experience in this case associated with the bid procedures, the RSA, and negotiations with the E side. We got a pretty good feel of what market liquidated damages is. And I think the most we were ever able in any draft of those procedures to get in terms of liquidated damages were in the range of a couple hundred million dollars.

When we view what we got in exchange for this deal in terms of the stand-still piece on the T side and the ability to drag the faster confirmation schedule -- and I apologize for going through the list, but we think it's a substantive list, I've given it to you before -- we think those are substantially more beneficial to the estates than would have been a hundred,

$200 million liquidated damages.

And that presumes we would have been able to get those liquidated damages.

Q. Mr. Keglevic, the PSA -- Section 12.6 of the PSA permits the debtors to terminate the PSA if certain thresholds of creditor groups have not signed onto the PSA by August 31st. Are you familiar with that provision?

A. Yeah. I believe August 31st is the furthest date assuming two payments of $50 million and that we still have received the NRC approval. But April 30 is the initial period. But if you refer me specifically --

Q. I'm talking specifically, just to clarify, sir, about the PSA itself.

A. Yes.

Q. There's a termination right of the debtors. And we can look at it. It's in Section 12.6 on page --

A. 51A.

Q. Yep.

A. Okay.

Q. If the signatories to the PSA

anyone for the debtors ever analyze or break out what it may cost specifically to litigate any claims against the sponsors?

A. I know the disinterested directors considered the risk of litigation, the cost to litigate, and the time to litigate which also then drives costs. So one being the specific cost to defend and the other being the cost you incur while you're defending just because of the passage of time, which, you know, our estates are paying 40 million a month, so it's not insubstantial.

Yes. They did consider all that, but I did not -- you know, how they compared all those and negotiated all those, that's beyond what I'm personally aware of.

Q. And, again, just so I'm clear, and I want to be specific to the claims, the potential claims against the sponsors, when you ticked off those three things, were you considering the cost of litigation against the sponsors in that litany?

A. I think they considered the cost of litigation against all the parties, D&O