EXHIBIT 4

Excerpts from 10/19/15 Ying Dep. Tr.

1

1                    DAVID YING

2    UNITED STATES BANKRUPTCY COURT

3    FOR THE DISTRICT OF DELAWARE
     ------------------------------------x
4    In Re:

5    Energy Future Holdings Corporation, et al.,

6                    Debtors.

7    Chapter 11

8    Case No. 14-10979

9    Jointly Administered

10   ------------------------------------x

11            DEPOSITION OF DAVID YING

12              New York, New York

13              October 19, 2015

14

15

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 99137

1        DAVID YING
2  company counsel, Kirkland & Ellis.
3        Q.    Did company counsel give you any
4  assumptions to make for purposes of your
5  analysis?
6        A.    No; we made them ourselves.
7        Q.    And the "we" in that sentence is
8  Evercore?
9        A.    Evercore and the colleagues who work
10 for me on this assignment.
11       Q.    At Evercore?
12       A.    At Evercore.
13       Q.    And can you briefly describe in your
14 own words the opinion or opinions that you
15 reached with respect to the assignment you have
16 described, period?
17       A.    Well, not to restate the opinion
18 itself, because it's several pages, but we think
19 that EFH should be able to raise enough capital
20 to address an adverse judgment on every and all
21 of the alleged claims.
22       Q.    And by "address," if we were to use
23 simple English, is it fair to say your opinion
24 is that if every single disputed claim is
25 allowed in full with interest post-emergence,

```
                                                           19
 1                DAVID YING
 2   EFH will be able to raise debt and/or equity
 3   capital to pay those liabilities in full,
 4   correct?
 5        A.   That's correct.
 6        Q.   And therefore, it is your opinion, is
 7   it not, sir, that reorganized EFH is not likely
 8   to have to refile for bankruptcy in the event
 9   that all of the liabilities are deemed valid in
10   the full amount sought, right?
11        A.   That's correct.
12        Q.   Can you briefly describe the work you
13   did to reach that conclusion or conclusions?
14        A.   We looked at the pro forma financial
15   statements for EFH as we understand them; we
16   calculated, to the best of our ability, the
17   maximum amount of the alleged claims; and we
18   looked at both the debt capacity of
19   post-confirmation EFH -- and when I say EFH, I'm
20   referring to both EFH and EFIH as a consolidated
21   entity -- we looked at the debt capacity of EFH
22   and we also looked at EFH from the perspective
23   of the equity capital markets and looked at its
24   standing in the capital markets and whether it
25   would have the ability to raise additional
```

```
                                                          56
 1                    DAVID YING
 2   the third category, and they have both the
 3   make-whole and a claim for post-petition accrued
 4   interest, right?
 5        A.   Yes.
 6        Q.   And the post-petition accrued interest
 7   increases over time, right?
 8        A.   Yes.
 9        Q.   And while the principal amount of the
10   make-whole doesn't, the accrued interest --
11   there's interest that builds up on the
12   make-whole, right?
13        A.   That's correct.
14        Q.   And then if you assume every one of
15   those losses occurs, there is an additional
16   $2,229,000,000 in liabilities to be paid on June
17   30, 2017, right?
18        A.   Yes.
19        Q.   But if you then turn to page 37, the
20   equity value assumed as of that time, using all
21   your very conservative assumptions on equity
22   value, is far greater than $2,229,000,000,
23   right?
24        A.   Yes.
25        Q.   It's 5,350 -- I'm sorry, it's
```

58

1        DAVID YING
2        Did I read that correctly?
3   A.   Yes.
4   Q.   Okay. What do you mean by "EFH's
5   strong ratings and credit profile"?
6   A.   Well, we know right now that EFIH has
7   a -- pardon me. Excuse me. We start with the
8   fact we know that Oncor has an investment grade
9   credit rating, and we think that,
10  post-confirmation, the credit rating at EFIH,
11  with the pro forma capital structure that we
12  think EFIH and EFH will emerge with, will have a
13  very strong BB credit rating.
14  Q.   Which would be investment grade,
15  right?
16  A.   "Strong BB" means just below
17  investment grade, but nonetheless, it's a very
18  strong credit rating and means that they would
19  have ample access to the debt capital markets if
20  they needed to raise incremental debt.
21  Q.   Okay. Today, before the
22  restructuring, EFH and EFIH are not investment
23  grade, right?
24  A.   No, they're in bankruptcy. They have
25  defaulted.

                                                                95

1                        DAVID YING

2    and his assessment of what sort of remedies

3    there were with respect to a situation where the

4    purchaser decided not to close.

5              I think the context in which he states

6    those is different from this one, but as a

7    factual matter, I think his survey of those

8    transactions was accurate.

9         Q.   So you don't agree with his underlying

10   research he did to support this opinion?

11             MR. ROGERS:  Objection to form.

12        A.   Again, I think the factual comparable

13   company sets that he looked at were -- are

14   appropriate.  I think the context of this

15   transaction is different from those.

16        Q.   Okay.  Could you explain what you mean

17   by that, that the context is different?

18        A.   Sure.  We obviously ran an M&A

19   process.  We canvassed a lot of big companies

20   and financial buyers, and your committee was

21   privy to I think every step of the way in terms

22   of how we conducted that process.

23             I think your committee is well aware

24   of the fact that we had one strategic buyer who

25   actually submitted a marked-up contract with all

1              DAVID YING
2     the appropriate customary breakup provisions
3     that the current merger agreement does not have.
4              The auction process that we ran
5     evolved towards the Hunt bid with the
6     T-unsecureds because the Hunts basically stopped
7     pursuing their second-round bid, which was tied
8     in with the PIKs, and they decided they would be
9     more advantaged in the auction process to align
10    themselves with the T-unsecureds.
11             And in fact, they came up with a far
12    superior offer from a price standpoint, and the
13    challenge for us was do we pick a deal that has
14    a billion dollars or more higher price without
15    the customary protections that you would like to
16    see associated with a failed -- or, the buyer
17    pulling out, or would we rather go with a buyer
18    who has at least a billion-dollar lower price,
19    but we could have a specific performance at a
20    low price or a breakup fee of a couple hundred
21    million dollars.
22             So we chose to go with the purchaser
23    who had a substantially higher price even though
24    they don't have the customary breakup fees that
25    one would also like to have, and obviously

143

1         DAVID YING
2  reading.  I just can't find it now.
3       Q.    In connection with this particular
4  section or in --
5       A.    No, I just found it.  I'm sorry.  I
6  misspoke.  In Section X, entitled Analysis of
7  E-Side Solvency Indicia after December 2012,
8  there is a section that I actually had formed an
9  opinion on and would be happy to share with you.
10      Q.    What in that section have you formed
11 an opinion on?
12      A.    Mr. Rule decides that his focus on the
13 make-whole payment, make-whole payments are
14 things that are triggered when the company
15 decides to proactively trigger the make-whole,
16 and until the company decides to proactively
17 trigger a make-whole, it's not a liability that
18 I think should enter into the calculus of
19 solvency.
20      Q.    But once it's triggered --
21      A.    And I think because it's an obligation
22 that's triggered only if the company takes
23 certain acts, so long as the company doesn't
24 take those acts, I see no reason to calculate a
25 liability that hasn't been crystallized.

Ying, David 2015-10-19

144

DAVID YING

Q. But in fact, if they take the act, it will become crystalized?

A. If they choose to do so, and under what circumstances they would do so I don't understand. For example, if you're doing a calculation of how much is the company worth, what would someone pay for it, as you all know, the buyer can assume the obligations under these agreements.

At most, there's a change in control provision which requires that the issuer make an offer to purchase all these notes at -- I believe the price is 101 percent of par, and otherwise, the buyer can assume the obligations and never crystalize the make-whole.

So I see no reason to assume the worst when no rational purchaser would ever trigger an obligation greater than that they would otherwise want to pay.

Q. Are there any circumstances in which potential E-side liabilities related to make-whole payments should be considered as part of a solvency analysis?

MR. ROGERS: Objection to form.

162

1        DAVID YING

2   of how EFH might reorganize itself if the merger

3   doesn't close because the T-firsts have a very

4   strong vested interest in reaching an E-side

5   recapitalization or equitization as quickly as

6   possible. They have said time and again they

7   want to extract themselves from the bankruptcy

8   and take their assets and go home. And

9   eliminating another class of creditors in the

10  form of the T-uns, who have constantly been

11  asking for value any way they can and not having

12  them part of an E-side equitization plan, which

13  again would be what we have over the months,

14  many months referred to as a Plan B, would

15  greatly simplify that negotiation.

16          So I think the drag concept again was

17  an important aspect of the overall transaction

18  and, again, represents a foregone opportunity

19  that the T-unsecureds have agreed to as part of

20  the price of the transaction and, again, is

21  another implicit part of the option price that

22  they are paying for the right to attempt to

23  merge with Oncor.

24      Q.   Do you have Exhibit 2 in front of you,

25  Mr. Ying? This is your deposition from

167

1      DAVID YING

2  after bad, will do it anyhow because they have

3  agreed to the settlement agreement?

4      MR. ROGERS:  Objection to form.

5      A.   I didn't say that they would, at the

6  moment of truth, do anything that is diseconomic

7  or improvident from their point of view.

8           What I was trying to say was that, in

9  entering into this contract, it is not a

10 costless contract for them to enter into; that

11 they are making sacrifices, at least from their

12 point of view, to have the right to make that

13 decision at the moment of truth.

14     Q.   Right.  And the sacrifice is giving up

15 the claims if any they have against the T-first

16 liens?

17     A.   And against the E-estate, yes.

18     Q.   Have you done anything to assess

19 whether those claims had any merit or not?

20     A.   I have not, no.

21     Q.   You have been told by people that they

22 do, but you have no idea one way or another, do

23 you?

24     MR. ROGERS:  Objection to form.

25     A.   I have no opinion as to the validity