**EXHIBIT 5**

**Excerpts from 10/1/15 Keglevic Dep. Tr.**

1

1      UNITED STATES BANKRUPTCY COURT

2        FOR THE DISTRICT OF DELAWARE

3   ------------------------------------x

4   In Re:

5   Energy Future Holdings Corporation,

6   et al.,

7                      Debtors.

8

9   Chapter 11

10  Case No. 14-10979

11  Jointly Administered

12  ------------------------------------x

13

14

15           DEPOSITION OF PAUL KEGLEVIC

16              New York, New York

17              October 1, 2015

18

19  ***This transcript contains a portion that

20    has been designated Highly Confidential***

21

22

23  Reported by: MARY F. BOWMAN, RPR, CRR

24  JOB NO: 98276

25

43

1                      Keglevic

2    it is a very small amount in relation to

3    the amount of the 8 and a half billion

4    dollars equity that this entity would be

5    worth.

6        Q.    I just want to get a clear

7    record.  When you say, "It is a very small

8    amount in relation to the amount of the 8

9    and a half billion dollars of equity that

10   this entity would be worth," what is the

11   "it" in that sentence?

12       A.    The -- your hypothetical was we

13   lose 100 percent of all the make-whole

14   cases, and the finding is also that there

15   would be interest on top of those amounts.

16   Rough numbers, in my mind, those

17   make-wholes are about a billion dollars in

18   total, and adding interest for a period of

19   time, I can do the math, on a billion

20   dollars at 10 percent, that's 100 million a

21   year, so say a billion two.

22            If I was the chief financial

23   officer, which I will not be, by the way,

24   of reorganized EFH, and I had a company

25   worth 8 and a half billion dollars, and I

                    Keglevic

 1

 2    had a claim for 1.2 billion dollars, I

 3    would not -- if my alternative being pay it

 4    or file for bankruptcy, I would find a way

 5    for my 8 and a half billion dollars to pay

 6    the amount and not flush the remaining

 7    7.3 billion dollars of equity value in the

 8    estate.

 9            That's why the debtor is not

10    concerned with the proposition.

11        Q.    I think this may just be a way of

12    changing the language, and I don't mean to

13    prolong this.  Is it fair to say that the

14    debtors believe that even if all of the

15    make-wholes are allowed, including

16    interest, that the plan of reorganization

17    is feasible?

18            MR. SHORE:  Objection to form.

19            MR. McKANE:  Objection to form.

20        A.    I do feel on the record, since

21    I've been I think very cooperative in

22    taking all the hypotheticals, that number

23    one, the debtors don't think it is likely

24    that that scenario will take place.

25        Q.    I understand that.

45

1                    Keglevic

2        A.    That being said, if the

3    worst-case scenario were to happen, as you

4    have described it, we still believe that

5    those amounts have sufficient equity

6    coverage to assure their payment.

7        Q.    And you took -- I don't mean this

8    in a critical way -- I will use the word

9    "umbrage," when I referred to "reorganized

10   debtors."  I take it, it is the expectation

11   of the debtors that if this plan is

12   confirmed and goes effective, new EFH will

13   not have to refile for bankruptcy?

14       A.    That is absolutely our

15   assumption.

16       Q.    Well, it is more than an

17   assumption.  It is the belief based on

18   analysis, right?

19       A.    Based on the preponderance of the

20   evidence, we believe it is highly unlikely

21   that they would have to file for

22   bankruptcy.

23       Q.    And is that also your belief,

24   that it would be highly unlikely that

25   reorganized EFH would have to file for

1                           Keglevic

2    doesn't close have substantially more value

3    than if we just got a dollar amount, which

4    in the -- you know, the bids we got from

5    outsiders, none of them were -- as I can

6    recall, exceeded 200 million dollars.

7              I would much rather have the

8    value associated with the remedies I have

9    as a result of the alternative

10   restructuring terms, the settlement

11   agreement, et cetera, than 200 million

12   bucks.  I think that is more valuable to

13   all the estates.

14              So we don't have traditional

15   remedies, but we effectively have remedies

16   if it will not close, and I'm sure, if you

17   look at the 550 million dollar settlement

18   that the T junior securities will receive,

19   and knowing that they started with

20   150 million dollars of unencumbered cash,

21   and that they have to pay their fees out of

22   that 550 million dollars, they commonly

23   refer to not closing as the booby prize,

24   and substantially less than the value they

25   thought they could have got through the

142

1                          Keglevic

2      alternative, but they traded that value to

3      get what they believe is the upside

4      associated with the majority ownership of

5      the new entity.

6              And we concur with them, and in

7      fact, that was the difficult part of the

8      negotiation, to give us the kind of

9      remedies that we thought were applicable,

10     and obviously they would have much rather

11     have gotten a different set of remedies,

12     but that's what a negotiation is all about,

13     each side gives.

14         Q.    Did you, Mr. Keglevic, explore in

15     your negotiations with the purchasers

16     including what you referred to as

17     traditional remedies as part of this

18     transaction?

19         A.    Yeah, I think at some point we --

20     you know, typically in a negotiation, you

21     try to get specific performance plus, so

22     yeah, I think at different times we were

23     trying to get as much as we possibly could.

24     Specific performance, break fees, I think

25     at different times those were all

1                       Keglevic

2       that would satisfy either their objectives

3       or ours.  So they moved on to this other

4       transaction.

5           Q.    With respect to the current

6       transaction, did you reach a view with

7       respect to the likelihood that this

8       transaction would close?

9           A.    Yes.

10          Q.    And what is your view?

11          A.    My view is that it has a more

12      likely than not chance of closing.

13          Q.    And you have chosen the term

14      "more likely than not."  What -- how did

15      you --

16          A.    That is a layman's term.

17          Q.    I understand it, but it is a

18      term, and so I'm just trying to understand.

19              How did you conclude that it's

20      more likely than not, in your mind, that

21      this transaction will close?

22          A.    Look, I considered a lot of

23      factors.  One is the financial

24      sophistication, the reputation of the

25      counterparties, the investors to the deal.

1                          Keglevic

2    Obviously, the Hunts have been very

3    interested in acquiring Oncor for a long

4    period of time.  They have a big stake in

5    Texas.  They are -- strategically believe

6    this is a cornerstone of the, you know,

7    progress of the Hunt consolidated group

8    going forward.

9              These assets of this size in a

10   regulated company don't come up for

11   marketing very often, and if you had to buy

12   a currency in the United States associated

13   with a regulated company, Texas would

14   absolutely be the best currency, given the

15   business climate, economic climate and

16   regulatory climate.  So I find them to be

17   highly motivated and people that close more

18   deals than they, you know, don't close.

19             Also, money talks, and the equity

20   commitments and the size of the commitments

21   across the group of the initial investors

22   and backstop parties, there are some very

23   serious names associated with those

24   commitments.

25             So I think when you consider the

1                        Keglevic

2    Hunts and the other investors -- and I'm

3    sure you know their names.  I don't have to

4    go through them with you.  Obviously,

5    having their money committed to a potential

6    deal, and the time and expense and

7    reputational risk of not executing this

8    deal is pretty high.

9              So I think we got a tremendously

10   motivated group of partners, and by the

11   way, both groups had to believe -- the

12   Hunts did their due diligence on the other

13   investors, and the other investors did

14   their due diligence on the Hunts, in terms

15   of their ability to make this happen.

16             Then you get into the IRS issues

17   and whether we will get the treatment we

18   expect from the IRS.  I will tell you I

19   relied -- while I have a general business

20   judgment, certainly we have a situation

21   where in Texas, for assets like this, we

22   have a REIT treatment, you know, InfraREIT.

23   That goes not only to the PUCT, which I

24   will get to in a minute, but to the IRS

25   approval.

1                      Keglevic

2              And I rely heavily on my tax and

3      my external tax team, as well as the tax

4      teams of all these sophisticated financial

5      investors, and I think collectively we all

6      believe we will get the IRS to give us what

7      we need to move forward.

8                   And then kind of the third leg of

9      the stool is the -- you know, as I think

10     about it, is the PUCT, and at the end of

11     the day, you always have to consider

12     options, and if the PUCT doesn't approve

13     this change of control -- first, I think it

14     is going to be very difficult under their

15     stringent rules not to do so, because they

16     just have to get past -- I think the way to

17     summarize the application which we just

18     filed very simply is that they are not

19     taking on any unusual risks that are not

20     compensated for, or there is benefits to

21     the ratepayers, or at least no harm to the

22     ratepayers.

23                  And when you look at the

24     situation that the company is in currently,

25     I would think the PUCT is motivated to get

1                        Keglevic

2      this company out of bankruptcy, and as we

3      stated, this company will be an investment

4      grade, above an investment grade.  We

5      haven't been there since 2007 in our

6      corporate structure.  So it gives a lot of,

7      I think, confidence to the PUCT.

8               And as I said, they have -- they

9      are used to REITs.  And I think the -- just

10     having another REIT in Texas, I think we

11     believe it is -- excuse me for using it

12     again -- more likely than not we can get

13     the PUCT over the hurdle.

14               So looking at all of those

15     things, I think we have a very good chance

16     of coming to closure.  But as I stated

17     earlier, we also recognize that this isn't

18     the simplest transaction, and therefore, we

19     made sure we had the right kind of remedies

20     and received the right kind of benefits in

21     case my evaluation is incorrect.

22         Q.    Would you agree, Mr. Keglevic,

23     that ultimately the investors will make a

24     decision at the time of closing as to

25     whether it is in their financial interest

249

Keglevic

1    make-whole.  That's why I didn't add it.

2        Q.    Is it your understanding that

3    the -- a condition precedent to allowance

4    of a plan -- strike that.

5            Is it your understanding that a

6    condition precedent to the plan going

7    effective is disallowance of any make-whole

8    on Q and R?

9            MR. McKANE:  Objection, form.

10           Go ahead.

11       A.    I'm not sure.  I'd have to

12   consult with my counsel as to whether

13   that's a condition.  I don't recall.

14       Q.    Have you participated in any --

15   give me just one second.

16           Do you have any understanding of

17   what events might cause the debtors to

18   elect to attempt to reinstate?

19       A.    I -- no.  We -- like I said, we

20   would have to do an analysis and evaluate,

21   you know, the commercial -- see first if

22   the two parties who have to exchange

23   consideration, the TCEH emerged company and

24   EFH emerged company, came to an agreement,

250

1                        Keglevic

2    and then I think we would have to apply our

3    debtor standards to whether, in fact, we

4    still believed that if transferred, that

5    new T would be sustainable.

6              And as I said, I don't view that

7    as being a significant hurdle for new T,

8    given the guidelines we have in the

9    disclosure statement, but those would be at

10   least some of the things we would consider

11   before that transaction was consummated.

12        Q.    Have you been part of any

13   discussions in which allowance or

14   disallowance of the make-whole on Series Q

15   and R would be a factor considered in

16   connection with the debtors' decision to

17   reinstate or not reinstate?

18        A.    I have not, but it is not

19   illogical that that might be a

20   consideration.  If it is reinstated under

21   T, there is no make-whole payment.

22   Obviously, we pay the principal due for the

23   life, and therefore, it obviates the need

24   for a make-whole.

25        Q.    Are you aware of any affirmative

328

1                     Keglevic

2        Q.    And in your proposed

3    reorganization, what happens to this

4    approximately billion dollars in account

5    receivables that these three companies

6    hold?

7        A.    Well, what has happened to date

8    is the parent has funded all of the cash

9    needs of those entities in satisfaction of

10   any liabilities they have.  Once those cash

11   needs are satisfied, if -- you know, and

12   there are no longer any liabilities

13   associated with those entities, I would

14   assume the receivable would be canceled and

15   eliminated in consolidation with the

16   reorganized E.

17            But as I said, those claims

18   against those entities have not been

19   resolved or released as part of our

20   proposed bankruptcy.  So effectively, the

21   ability to pay to recover those receivables

22   to the extent needed will be assumed by the

23   new entity, reorganized EFH, which will

24   begin with a substantial amount of equity,

25   billions -- I think today we calculated 8

329

Keglevic

1

2    and a half billion dollars in my first

3    round of questioning and also would expect

4    that entity to be an investment grade

5    company.

6            So I think the amount of credit

7    support for the asbestos or other claims of

8    that, of those entities is well secured.

9        Q.    What liabilities does EECI have

10    other than for asbestos and these other

11    post -- other benefits that you mentioned

12    that you calculated around 50 million?

13            MR. McKANE:  Objection to form.

14        A.    I don't have the schedules in

15    front of me, but my understanding is of the

16    group of companies we talked about, that

17    is, those are the total liabilities.  There

18    aren't any additional ones.

19        Q.    Would the same be true of EEC

20    Holdings?

21        A.    Yes, sir.

22        Q.    And the Sacroc as well?

23        A.    Yes, sir.

24        Q.    You do not view these companies

25    as creditors in this bankruptcy, but rather

330

1                      Keglevic

2    as sources of the elimination of these

3    receivables as part of the resolution of

4    the bankruptcy, is that correct?

5              MR. McKANE:  Objection to form.

6              Go ahead.

7        A.    I think I generally agree with

8    you, but can I say it another way, that the

9    claims that those entities have against EFH

10   are not released as part of any part of the

11   bankruptcy, and therefore, will continue,

12   will travel, as I like to call it, with the

13   reorganized EFH.  And, therefore, that will

14   be the source of any required funding of

15   the 50 million dollars or whatever that

16   liability -- those liabilities turn out to

17   be.

18       Q.    No matter how large those

19   liabilities turn out to be?

20       A.    No matter how large those

21   liabilities turn out to be.

22       Q.    When we are told that the plan

23   will pay all E-side creditors in full, you

24   are not including these three subsidiaries

25   collecting their accounts receivables in