## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) Case No. 14-10979 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: D.I. 5249, 6601, 6610, 6616, 6623, 6627, 6640, 6642, 6643** |

## OMNIBUS REPLY IN SUPPORT OF MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, TO APPROVE A SETTLEMENT OF LITIGATION CLAIMS AND AUTHORIZE THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE SETTLEMENT AGREEMENT

---

[1]  The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

# TABLE OF CONTENTS

Page

**PRELIMINARY STATEMENT** ................................................................1

**BACKGROUND** ..................................................................................3

**I.** **THE INTER-DEBTOR SETTLEMENT WAS APPROVED ONLY AFTER A THOROUGH, CAREFUL PROCESS FREE OF CONFLICTS** ............................4

    A.    Settlement was never a foregone conclusion. ..........................................5

    B.    The Disinterested Directors carefully negotiated the inter-Debtor settlement at arm's length after thorough investigation of all potential claims. .......................................................................7

        i.    The Disinterested Directors—with input from a variety of sources including creditors—thoroughly investigated all known litigation claims. ......................................................7

        ii.    The CRO term sheet facilitated, but did not dictate, negotiations. ..............9

        iii.    Negotiations were lengthy, vigorous, and at arm's length.........................10

    C.    The Disinterested Directors properly re-assessed the settlement terms before approving the Settlement Agreement. .........................................15

        iv.    The Disinterested Directors determined that renegotiating the deal was unnecessary after fully informing themselves of the changes. ...........15

**II.** **THE SPONSOR RELEASES WERE APPROVED ONLY AFTER A THOROUGH, CAREFUL PROCESS FREE OF CONFLICTS** ...............................18

    A.    The Sponsor releases were approved by a Special Committee from which Sponsor representatives were excluded. ..................................................18

    B.    The Special Committee considered all known claims against the Sponsors. ........20

        i.    Sidley Austin independently assessed potential claims against the Sponsors prepetition......................................................20

        ii.    The Disinterested Directors sought and considered the EFH Committee's views on all claims. ............................................22

        iii.    The Special Committee was well aware of potential claims against the Sponsors, but concluded they had little to no merit.............................23

**ARGUMENT** ..................................................................................26

II.   THE SETTLEMENT AGREEMENT IS SUBJECT TO ORDINARY RULE
      9019 REVIEW..........................................................................................................26

      A.   Review under the *Martin* factors requires only that the Court "canvass the
           issues" to determine whether the settlement is "fair and equitable."....................26

      B.   A claim-by-claim assessment of the settlement is not required, and would
           render Rule 9019 largely useless in complex cases. ...............................................27

      C.   Heightened scrutiny of the Settlement Agreement is unwarranted in this
           case..........................................................................................................................29

           i.    The "entire fairness" standard does not apply. ...........................................29

           ii.   "Enhanced scrutiny" is unwarranted...........................................................30

III.  THE INTER-DEBTOR SETTLEMENT SATISFIES THE *MARTIN*
      FACTORS. ..............................................................................................................32

      A.   The EFH Committee's view of the merits of settled claims is simplistic
           and one-sided. .........................................................................................................33

           i.    The EFH Committee is unjustifiably dismissive of TCEH claims............33

           ii.   The EFH Committee ignores TCEH defenses to its claims.......................56

      B.   Difficulties in Collection.........................................................................................59

      C.   Complexity, Expense, and Delay of Litigation.......................................................60

      D.   Paramount Interests of the Creditors.......................................................................61

IV.   THE SPONSOR AND D&O RELEASES SATISFY BOTH RULE 9019 AND
      THE *ZENITH* FACTORS.........................................................................................64

      A.   The releases are appropriate elements of the Settlement Agreement. ...................64

      B.   The releases satisfy Zenith, to the extent it applies. ..............................................66

           i.    The Debtors share an identity of interest with their directors and
                 officers and the Sponsors...........................................................................66

           ii.   The Sponsors and the Debtors' directors and officers and have
                 made substantial contributions to the reorganization.................................68

           iii.  The releases in Settlement Agreement are essential to the Debtors'
                 reorganization. ...........................................................................................70

iv.     The non-Debtor releases are supported by the only impaired creditors under the Plan. ...........................................................71

v.      The Plan provides for full payment of all creditors objecting to the releases. .................................................................................72

**V.      THE PAYMENT OF FEES UNDER THE SETTLEMENT AGREEMENT SHOULD BE APPROVED BASED ON THIS COMPREHENSIVE RECORD. ....................................................................................................72**

A.      The Payment of Certain Professionals' Fees under Rule 9019 as Part of a Settlement is Appropriate and Allowable. ............................................74

B.      The Professionals Have Made Substantial Contributions to the Debtors' Restructuring Efforts. .............................................................................75

**VI.     THE SETTLEMENT DOES NOT VIOLATE THE ABSOLUTE PRIORITY RULE OR OTHER PLAN CONFIRMATION REQUIREMENTS ...........................76**

A.      The Settlement Agreement does not violate the equal treatment rule or unfairly discriminate against unsecured creditors. ...................................77

B.      The Settlement Agreement does not violate the absolute priority rule. .................78

i.      The terms of the Settlement Agreement do not trigger the absolute priority rule ...............................................................................78

ii.     Even if the absolute priority rule applied, the Sponsor releases would not violate the rule. ........................................................79

**VII.    THE ONCOR ENTITIES WILL BE RELEASED UNDER THE SETTLEMENT AGREEMENT. ....................................................................82**

**VIII.   THE ASBESTOS OBJECTION SHOULD BE OVERRULED. ................................83**

**CONCLUSION ....................................................................................................................83**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle Street P'ship*,
526 U.S. 434 (1999)..................................................................................................80, 81

*Davis v. Elliot Management Corp. (In re Lehman Bros. Holdings Inc.)*,
508 B.R. 283 (S.D.N.Y. 2014)..................................................................................73, 75, 76

*Depoister v. Mary M. Holloway Found.*,
36 F.3d 582 (7th Cir. 1994) ......................................................................................27

*H-M Wexford LLC v. Encorp, Inc.*,
832 A.2d 129 (Del. Ch. 2003)....................................................................................31

*In re 710 Long Ridge Rd. Operating Co., II, LLC*,
No. 13-13653 (DHS), 2014 WL 886433 (Bankr. D. N.J. Mar. 5, 2014) ....................66

*In re Bevill, Bresler & Shulman Asset Mgmt. Corp.*,
896 F.2d 54 (3d Cir. 1990).........................................................................................57

*In re Blitz U.S.A., Inc.*,
No. 11-13603, 2014 WL 2582976 (Bankr. D. Del. Jan. 30, 2014)...........................70

*In re Buckhead Am. Corp.*,
178 B.R. 956 (D. Del. 1994).......................................................................................51

*In re Calpine Corp.*,
Case No. 05-60200, Order Granting Debtors' Motion for an Order Pursuant .......................74

*In re Capmark Fin. Grp. Inc.*,
438 B.R. 471 (Bankr. D. Del. 2010) (Sontchi, J.)...............................26, 27, 63, 64, 72, 73, 74

*In re Carrozzella & Richardson*,
286 B.R. 480 (D. Conn. 2002).....................................................................................50

*In re Charter Commc'ns*,
419 B.R. 221 (Bankr. S.D.N.Y. 2009) ........................................................................67

*In re Delta Air Lines, Inc.*,
Case No. 05-17923, Order Approving Settlements Between the Debtors and
Section 1114.................................................................................................................74

*In re Dharmasuriya,*
    2014 WL 845991 (Bankr. C.D. Cal. Mar. 4, 2014) ...............................................31

*In re Drexel Burnham Lambert Grp,. Inc.,*
    134 B.R. 493 (Bankr. S.D.N.Y. 1991) .................................................................31

*In re Energy Future Holdings Corp.,*
    527 B.R. 157 (D. Del. 2015) .................................................................................77

*In re Exaeris, Inc.,*
    380 B.R. 741 (Bankr. D. Del. 2008) ...............................................................31, 72

*In re Exide Techs.,*
    303 B.R. 48 (Bankr. D. Del. 2003) .......................................................................70

*In re ID Liquidation One, LLC,*
    555 F. App'x 202 (3d Cir. 2014) ...........................................................................27

*In re Jasmine, Ltd.,*
    258 B.R. 119 (D.N.J. 2000) ..................................................................................27

*In re Jevic Holding Corp.,*
    787 F.3d 173 (3d Cir. 2015)..........................................................77, 79, 80, 82

*In re Jolly "N", Inc.,*
    122 B.R. 897 (Bankr. D.N.J. 1991) .......................................................................55

*In re Kasual Kreation, Inc.,*
    54 B.R. 915 (Bankr. S.D. Fla. 1985).....................................................................67

*In re Lakeside Cmty. Hosp., Inc.,*
    200 B.R. 853 (Bankr. N.D. Ill. 1996) ...................................................................55

*In re Lindell,*
    334 B.R. 249 (Bankr. D. Minn. 2005) ..................................................................45

*In re Martin,*
    212 B.R. 316 (8th Cir. BAP 1997).........................................................................27

*In re Master Mortgage Inv. Fund, Inc.,*
    168 B.R. 930 (Bankr. W.D. Mo. 1994)......................................................64, 66, 67

*In re Mirant Corp.,*
    348 B.R. 735 (Bankr. N.D. Tex.)...........................................................................74

*In re Premier International Holdings, Inc.,*
    2010 WL 2746964 (D. Del. April 29, 2010)..........................................................71

*In re Prussia Assocs.*,
   322 B.R. 572 (Bankr. E.D. Pa. 2005) .................................................................78

*In re Purofied Down Prods. Corp.*,
   150 B.R. 519 (S.D.N.Y. 1993) ............................................................................27

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000) ....................................................................79, 80, 81

*In re SemCrude, L.P.*,
   399 B.R. 388 (Bankr. D. Del. 2009), *aff'd*, 428 B.R. 590 (D. Del. 2010) ...........40

*In re TWA, Inc. Post Confirmation Estate*,
   327 B.R. 706 (Bankr. D. Del. 2005) ...................................................................55

*In re Unified Commercial Capital*,
   2002 WL 32500567 (W.D.N.Y. June 21, 2002) ...................................................50

*In re Valley Steel Prods. Co.*,
   214 B.R. 202 (Bankr. E.D. Mo. 1997) .................................................................54

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012), *aff'd*, 532 F. App'x 264 (3d Cir. 2013) ...................78

*In re Wash.Mut., Inc.*,
   442 B.R. 314 (Bankr. D. Del. 2011) ...............................................28, 63, 64, 66

*In re World Health Alternatives, Inc.*,
   344 B.R. 291 (Bankr. D. Del. 2006) ...................................................................64

*In re Zenith Electronics Corp.*,
   241 B.R. 92 (Bankr. D. Del. 1999) .................................64, 66, 67, 68, 69, 71, 72

*Meyers v. Martin (In re Martin)*,
   91 F.3d 389 (3d. Cir. 1996) .........................................26, 32, 62, 65, 66

*Seagull Energy E&P, Inc. v. Eland Energy, Inc.*,
   207 S.W.3d 342 (Tex. 2006) ...............................................................................41

*Village Place, Ltd. v. VP Shopping, LLC*,
   404 S.W.3d 115 (Tex. App. 2013) .......................................................................41

**Statutes**

11 U.S.C. §§ 105(a) and 363(b) ...............................................................................74

11 U.S.C. § 503(b) ...................................................................................73, 74, 75

11 U.S.C. § 503(b)(3)(D) .........................................................................................75

11 U.S.C. § 503(b)(4) .................................................................................................................75

11 U.S.C. § 507 ...........................................................................................................................78

11 U.S.C. §§ 533 and 502(d) .....................................................................................................60

11 U.S.C. § 547(c)(2) .................................................................................................................54

11 U.S.C. § 550(a)(1) .................................................................................................................51

11 U.S.C. § 553(a) .....................................................................................................................40

11 U.S.C. § 1123(a)(4) ...............................................................................................................77

11 U.S.C. § 1129(b)(2) .........................................................................................................77, 78

Del. Code Ann. tit. 6, § 1308(b)(1) ............................................................................................51

Tex. Bus. & Com. Code § 24.009(b)(1) ......................................................................................51

**Rules**

Bankruptcy Rule 9019(a) .........................................3, 26, 27, 28, 29, 31, 62, 63, 64, 65, 72, 74, 77

## Preliminary Statement[1]

1.      Led by the EFH Committee, the Plan objectors oppose the Settlement Agreement on three primary grounds.  All fail.  The Court should approve the Settlement Agreement.

2.      ***First***, the objectors criticize the *process* by which the Debtors reached the Settlement Agreement.  In particular, they insist that the Disinterested Directors were uninformed regarding potential litigation claims, and that the inter-Debtor negotiations were biased and cursory.  Similarly, the objectors allege that the Sponsor releases were ill-considered and justified post hoc by a hastily-assembled Special Committee.

3.      The sinister narrative presented in the EFH Committee's objection is demonstrably false.  It rests not on the facts, but on the EFH Committee's distortion of the record through mischaracterizations of deposition testimony and untenable lawyer interpretations of historical documents that are not supported by any witness.

4.      The Debtors must correct the record and will do so at trial with a wealth of supporting evidence.  Aided by the court-approved process established with their Disinterested Directors and their Advisors, the Debtors' development and approval of the Settlement Agreement was thorough, rigorous, and free from conflict.  At all times, the Debtors and their directors considered and protected the best interests of their estates.  As the evidence will show, entry into the Settlement Agreement easily passes muster as a sound and well-informed exercise of the Debtors' business judgment.  The Plan objectors' efforts to gainsay that judgment must be rejected.

5.      ***Second***, the objectors argue that the *substance* of the Settlement Agreement is unfair to E-side creditors because it assigns value to potential T-side litigation claims that the

---

[1]   Capitalized terms used but not defined in this Reply have the meanings ascribed to them in the Settlement Motion or Plan, as applicable.

EFH Committee implausibly proclaims worthless, while it allegedly undervalues potential E-side litigation claims.  This argument—which alone occupies 25 pages of the EFH Committee's main brief and 18 pages of its supplemental brief—only reinforces the Settlement Agreement's purpose:  to resolve a multitude of multi-billion dollar litigation claims *without* bogging down the Debtors' restructuring efforts in a quagmire of complex factual and legal disputes.  Even the extensive treatment of the merits of the litigation claims in the Settlement Motion and the EFH Committee's objection is necessarily superficial.  The briefing now before the Court thus underscores that the claims are complicated and contentious, and that litigating them would be costly in both time and resources.

6.      While the EFH Committee contends that the settled claims against the T-side are straightforward (always in the E-side's favor), that is of course just one side of the story.  As the Settlement Motion made clear, there are other viewpoints.  Indeed, before settling, the T-side creditors aggressively investigated and pursued their claims against all potential defendants (all of the Debtors, other creditors, the equity Sponsors (the "Sponsors"), and the Debtors' directors and officers) for months.  They analyzed nearly a million documents, and articulated their theories through letters to the Debtors and standing motions filed in the bankruptcy case.  Those creditors, who demonstrated every intention of litigating claims against EFH if necessary, clearly did not share the EFH Committee's assessment of the merits of those claims.

7.      And notably, despite all the sturm und drang the EFH Committee musters about the allegedly unfair Sponsor releases, the most it can say about claims against the Sponsors is that they are "colorable." The Sponsors, by contrast, have consistently maintained—and they argue forcefully in their response brief—that creditor claims in this case do not even meet that standard.  Whether colorable or not, there is ample basis to settle those claims in light of the

Sponsors' settlement of claims and substantial contributions to the Debtors' restructuring efforts, financial and otherwise.

8.      **_Third_**, the objectors attack the _form_ and _timing_ of the Settlement Agreement, arguing that releases contained therein should only be in the Plan and effective upon emergence, rather than in a standalone agreement and effective upon approval.  Indeed, the PIK Indenture Trustee makes this point clearly by _only_ objecting to the "timing" of the Settlement Agreement— its independence from the Plan.  The timing argument fundamentally misunderstands the Debtors' Rule 9019 motion.  The Court must assess whether the proposed compromise is above the lowest point in the range of reasonableness.  If it is, the Settlement Agreement must be approved.  The Settlement Agreement cannot be rejected just because it may be strategically beneficial to certain creditors to avoid a reasonable global compromise of potential claims.

9.      The EFH Committee's self-serving arguments notwithstanding, the legal and factual disputes around each of the settled claims shows that an informed global compromise, reached after careful deliberations according to principles of good governance, is the most reasonable path forward.  For these reasons, as more fully explained below, this Court should overrule all objections to the Settlement Motion.

## Background

10.      The EFH Committee's 29-page "Statement of Facts" and 15-page "Supplemental Statement of Facts," contain few actual facts.  They are largely works of fiction, crafted from cherry-picked snippets of testimony and documents that are taken out of context, rearranged, and assembled into a misleading revisionist history.  At bottom, these statements of facts largely consist of slanted lawyer arguments that lacks support in the record and will fall flat at trial.

11.     The full record reflects—and the evidence at trial will prove—a very different narrative than the EFH Committee's story.  The framework of that narrative is detailed in the Settlement Motion, and has been borne out in discovery.  Below, the Debtors correct only the most egregious misstatements and false characterizations in the EFH Committee's factual allegations.

## I.     THE INTER-DEBTOR SETTLEMENT WAS APPROVED ONLY AFTER A THOROUGH, CAREFUL PROCESS FREE OF CONFLICTS[2]

12.     The EFH Committee's objection portrays the settlement of claims between the Debtors (the "Inter-Debtor Settlement") as preordained by conflicted insiders.[3]  The EFH Committee insists that the Debtors were locked into a global settlement from the outset, and that the Disinterested Directors ("DDs") played only a "minimal" role to rubber stamp the Inter-Debtor Settlement.[4]  With no factual basis, the EFH Committee characterizes the E-side DDs as "flexible,"[5] suggesting that they would accede to the wishes of others who might be conflicted from negotiating the Inter-Debtor Settlement.  Nothing could be further from the truth.

13.     Each of the DDs was at all times a vigorous advocate for his or her estate.  As was explained in the Settlement Motion, and confirmed in discovery, the Inter-Debtor Settlement resulted from the DDs' extensive, independent efforts—assisted by their legal counsel and other professionals—to identify, investigate, assess, and settle the inter-Debtor claims.  To describe the DDs' involvement in this exhaustive process as "minor" or "flexible" defies reality.[6]

---

[2]   The exhibits referenced herein are included as exhibits to the *Declaration of Brenton A. Rogers, Esq. in Support of the Debtors' Omnibus Reply in Support of Settlement Motion*, filed contemporaneously herewith.

[3]   *See* EFH Committee Obj. ¶¶ 2, 23-29, 32-74, 75-79.

[4]   EFH Committee Obj. ¶¶ 64-67.

[5]   EFH Committee Obj. ¶ 5

[6]   *See* EFH Committee Obj. ¶ 64.

### A.    Settlement was never a foregone conclusion.

14.    Throughout its objection, the EFH Committee insists that the Debtors' have pursued their "desire for 'global settlement'…at all costs to creditors, prioritizing their desire for peace over maximizing distributable value."[7]  That characterization is false and ignores the DDs' own testimony and the facts surrounding their exhaustive investigation and negotiation of inter-Debtor claims.

15.    As the DDs explained, global settlement was not an end in itself, but a means to maximize the value of their estates.  Whether a settlement could be reached was an open question for months.  Accordingly, reasonable alternatives, including litigation, were considered.

16.    In discussing the prospect of inter-Debtor litigation, Mr. Evans explained why that path would not be his first choice:  litigation could "go on for years and hundreds of millions of dollars, with no guarantee of success on either side," noting that there is "so much uncertainty" with that route that he did not "know how you would possibly pay off EFH creditors in full."[8] In Mr. Evans' view, litigation did not "seem like a logical strategy or a logical tactic even."[9] Even so, he did not "rule it out."[10] Quite contrary to the EFH Committee's fanciful allegations, Mr. Evans expressly stated that he "never took [litigation] off the table."[11]

17.    Ms. Williamson agreed, noting that after consulting with Mr. Evans and the EFH DDAs, they "wanted to take a run at trying to get to a settlement that would be faster and more cost-effective than going through a prolonged litigation process," but that they "weren't afraid to

---

7    EFH Committee Obj. ¶ 23.

8    Ex. 1 9/25/15 Evans Dep. Tr. at 150:8-15.

9    *Id.* at 180:20-181:5.

10    *See id.* at 181:25-182:3

11    *Id.* at 182:19-22.

go to litigation, if that's where it ended up."[12] However, she recognized that pursuing litigation "would be very costly, and that would eat away at the small amount of cash that is still left at EFH to distribute to our creditors."[13]

18.      Mr. Cremens also considered litigation of EFIH's claim based on $1.3 billion in EFH notes held by EFIH and determined that there was "not enough benefit" to pursue claims at EFH based on litigation expenses as compared to the "great value" provided by the benefit of releases and claims among the Debtors.[14] If EFIH is found to be solvent, he noted, the release of the $1.3 billion claim against EFH is irrelevant, as the benefit of any recovery on that claim would inure to EFH.[15]  On the other hand, if EFIH were insolvent and no settlement was reached, the cash remaining at EFH would likely be consumed in defending litigation of claims, including those EFH faced from TCEH.[16]

19.      Despite the EFH Committee's contention that the DDs never received any information whatsoever about the cost of litigation,[17] on February 6, 2015, they were presented with information concerning the fees and expenses incurred on a monthly basis in these Chapter 11 cases, which were estimated to be $134 million and $219 million to the EFH and EFIH estates, respectively.[18]

---

[12]   Ex. 2 9/30/15 Williamson Dep. Tr. at 47:9-19; 48:2-16.

[13]   *Id.* at 111:9-17; *see also id* at 54:15-19 ("We weighed the cost of litigation and the delay to the bankruptcy as we went through that process.").

[14]   Ex. 3 10/1/15 Cremens Dep. Tr. at 83:5-10; 86:16-22.

[15]   *See id.* at 80:18-81:12.

[16]   *See id.*

[17]   *see* EFH Committee Obj. ¶ 68

[18]   DX 185, Minutes of a Joint Board Meeting (Feb. 2, 2015) [EFH05547064 at EFH05547089, 091].

**B.     The Disinterested Directors carefully negotiated the inter-Debtor settlement at arm's length after thorough investigation of all potential claims.**

20.     The EFH Committee describes the Inter-Debtor Settlement as a "choreographed" result, insinuating that negotiations between the DDs and their advisors were not conducted at arm's length.  The EFH Committee fundamentally distorts the negotiation process.  In fact, that process began not on March 16, 2015, as the EFH Committee implies, but much earlier.  Throughout the process, the DDs exercised their own independent judgment, in consultation with their DDAs.

**i.     The Disinterested Directors—with input from a variety of sources including creditors—thoroughly investigated all known litigation claims.**

21.     The EFH Committee's objection is conspicuously silent regarding the DD's process for investigating potential claims.  That process did not start just with the appointment of the Disinterested Director Advisors, (the "DDAs").  For almost two years prior to the Petition Date, Kirkland & Ellis worked with the Debtors to identify and evaluate transactions that could ripen into claims during a potential chapter 11 restructuring.[19]  In addition, the Debtors and their financial advisors also engaged in the Legacy Discovery process with all creditors and parties in interest, which included the production of millions of pages of documents and extensive informal diligence around historical transactions that could give rise to litigation claims.  The scope of Legacy Discovery, of course, was largely dictated by the discovery requests of creditors who had every interest in fleshing out potentially valuable claims against all potential defendants.

22.     By the time the DDs hired their advisors, there was a wealth of information on potential inter-Debtor claims available.  The EFH DDs "instructed [their advisors] to do their due

---

[19]  *See* Ex. 4 9/28/15 Doré Dep. Tr. at 253:13-254:9; Ex. 5 10/1/15 Keglevic Dep. Tr. at 71:10-19; Ex. 2 9/30/15 Williamson Dep. Tr. at 40:12-12.

diligence, and review millions of pages of information," to identify potential inter-Debtor conflicts.[20]  Similarly, the EFIH DDAs "reviewed all of Sidley's work, Kirkland's work, talked to creditors, talked to employees, did a full review of the . . . possible alleged claims."[21]  In addition to their legal advisors, the DDs' financial advisors played a key role in the process, including by providing input on potential conflict matters.[22]

23.    The DDAs began diligence meetings on December 1, 2014.[23]  From December 1, 2014 through late March, 2015, for example, the EFH DDAs held more than 27 meetings or conference calls with a variety of constituencies to discuss matters that were negotiated in the Disinterested Director Settlement, including at least half-a-dozen meetings with the EFH Committee's advisors at Sullivan & Cromwell and Guggenheim.[24]

24.    The DDs believe that their advisors have made significant contributions to their understanding of the issues and claims and, ultimately, to resolving them in a way that maximized value for their respective estates.  Mr. Evans, for example, testified that the retention and structure of the DDs was a "very wise thing for the Court to do," and a structure and process that "worked."[25] Mr. Cremens considered it "very important," and "relied on Cravath and Goldin to deliver the goods on the review, analysis, and ultimately, with me, determined an appropriate way to move on . . . the possible settlement."[26]

---

20    Ex. 2 9/30/15 Williamson Dep. Tr. at 20:4-8; Ex. 1 9/25/15 Evans Dep. Tr. at 138:10-19.

21    Ex. 3 10/1/15 Cremens Dep. Tr. at 154: 17-22.

22    *See* Ex. 2 9/30/15 Williamson Dep. Tr. at 31:11-20; Ex. 1 9/25/15 Evans Dep. Tr. at 216:4-16; *see also* D.I. 4147-2 at Schedule B (SOLIC and Goldin & Associates participated in diligence.).

23    *See* D.I. 4147-2 at Schedule B.

24    *See id.*

25    Ex. 1 9/25/15 Evans Dep. Tr. at 175:7-14; 237:14-22.

26    Ex. 3 10/1/15 Cremens Dep. Tr. at 155:7-156:1; *see also id.*  at 130:18-25 (noting that Cravath and Goldin were involved in an independent review of the Omnibus Tax Memorandum filed on October 1, 2014 [D.I. 2296].

### ii.    The CRO term sheet facilitated, but did not dictate, negotiations.

25.    At the end of January, 2015, the Debtors' Co-CROs, Stacey Doré and Paul Keglevic, working with Kirkland & Ellis and Evercore, put together ███████████

███████████████████████████████████████████████████████████████

███████████████████"[27]    Given his role as a co-CRO, Mr. Keglevic felt ███████

███████████████████████████████████████████████████████████████

███████████████████████[28] The CRO Term Sheet was put forth to spur creditor plan discussions about paths forward with the goal to ultimately garner proposals for a consensual reorganization.  As the first page disclaimer on the CRO Term Sheet made clear, the Boards and the DDs did not approve the term sheet, nor were they asked to do so.[29]

26.    While the CRO Term Sheet did not state the value of any inter-Debtor claim, the EFH Committee contends that the mere inclusion of a claim by TCEH against EFH dictated the outcome.  This assertion ignores the DDs' testimony that the CRO Term Sheet did not displace their own judgment in the negotiations.[30]

27.    Later, in early March 2015, the co-CROs circulated a revised term sheet to the Debtors' stakeholders that filled in some of the blanks of the January draft, ███████████

███████████████████████████████████    As the EFH Committee acknowledges, Mr. Keglevic explained that this proposed claim amount was not intended to express the co-

---

[27]    *See* DX 50, Overview of Proposed Global Term Sheet and Creditor Plan Proposals (Jan. 30, 2015) [EFH05546954 at EFH05546958-59].

[28]    *See* Ex. 5 10/1/15 Keglevic Dep. Tr. at 80:11-18.

[29]    *Id.*

[30]    Ex. 1 9/25/15 Evans Dep. Tr. at 200:13-16 ("There was a document already out there that had been presented to the creditors by the CROs, which I did not sign on to.").

CROs' view on the merits of the claims to be settled. As a conflict matter, only the DDs, in consultation with their advisors, had the authority to settle at all and on what terms, if any.[31]

### iii.   Negotiations were lengthy, vigorous, and at arm's length.

28.     The negotiations that ultimately concluded with the Inter-Debtor Settlement followed the extensive diligence process discussed above, and included discussions among the DDAs of TCEH, EFH, and EFIH about their relative merits of each the claims to be settled.[32] These discussions among the DDs and their advisors began in late January 2015 and continued through the in-person negotiations held in Dallas on March 24-26, 2015.[33] Before an initial proposal was made, the DDs and their advisors exchanged presentations outlining either respective views of the claims and their merits.[34]

29.     From the EFH DDs' standpoint, the EFH estate faced at least $2.9 billion to $5.4 billion of claims from TCEH *and* EFIH, not including roughly $21 billion in 2007 LBO claims asserted by the TCEH creditors in their Standing Motions.[35] Specifically, claims asserted against the EFH estate by EFIH and TCEH included the following:

| Claims asserted against EFH | Par value Asserted by TCEH | Par value Asserted by EFIH |
|---|---|---|
| Intercompany tax claims. | $754M | |

---

[31] *See* DX957, Email with attachments from S. Doré to D. Evans, J. Young, D. Bonderman (Mar. 9, 2015) [EFH_DD00015209 at EFH_DD00015212]; ; *see also* DX154, EFH Board of Directors Resolutions (Dec. 9, 2014) [EFH_DD00015416] (delegating to the Disinterested Directors "the authority to review and act upon . . . any Conflict Matter . . . ."); DX155, EFIH Board of Managers Resolutions (Dec. 9, 2014) [EFH06002638 at EFH06002640] (same); DX156, TCEH Board of Managers Resolutions (Dec. 9, 2014) [EFH06002646 at EFH06002647] (same).

[32] *See* D.I. 4147-2 at Schedule B.

[33] *Id.*

[34] *See* D.I. 4145-1 at Exs. B-D; *see also* Ex. 1 9/25/15 Evans Dep. Tr. at 204:15-22; Ex. 2 9/30/15 Williamson Dep. Tr. at 172:3-12.

[35] Ex. 2 9/30/15 Williamson Dep. Tr. at 53:23-54:5; *see also* Ex. 1 9/25/15 Evans Dep. Tr. at 212:9-15.

| Claims asserted against EFH | Par value Asserted by TCEH | Par value Asserted by EFIH |
|---|---|---|
| Avoidable tax payment by TCEH to the Company. | $84.4M[36] | |
| Claims arising out of certain SG&A and P&I intercompany notes. | $620M | |
| Claims related to the 2011 Amend & Extend Transactions. | $80M[37] | |
| Claims related to the allocation of sponsor fees and shared services expenses among the Debtors, (including $200M related to underallocations to EFIH). | $265M | |
| Claims related to the 2007 LBO. | 0-$21B | |
| Claims related to EFIH's holdings of Company indebtedness. | | $1.28B |
| Claims related to EFIH avoidance actions against EFH. | | $1.6B |
| Payment to TCEH for consenting a to a tax-free spin off and agreeing to restrictions to preserve the tax-free spin off, rather than a taxable disposition of the T-side Debtors' estates, which would permit TCEH creditors a basis "step-up" to fair market value and cause cash taxes to be payable by EFH. | $700M | |

30.     Similarly, the EFIH estate faced in excess of $359 million in claims by TCEH:[38]

| Claims asserted against EFIH | Par value Asserted by TCEH |
|---|---|
| Claims related to the allocation of sponsor fees and shared services expenses among the Debtors. | $200M |
| Claims by related to the Luminant "make-whole" payments made to EFIH. | $159M |

---

[36] ███████████████████████████████████████████████

████████████████████████████████████████████

██████████████

[37] Represents the pro rata share of approximately $2B in damages based on TCEH first lien debt held by the Equity Sponsors in the 2011 Amend and Extend transaction.

[38] This does not include claims related to the repayment of debt under certain joint credit facilities in 2007, claims related to the dividend of Oncor stock, and claims related to EFIH holding of TCEH indebtedness. DX245, Minutes of the Joint Meeting of the Special Committees of the Board of Managers of TCEH and EFCH (Apr. 9, 2015) [EFH06004372 at EFH06004373].

31.     All told, the EFH, EFIH, and TCEH estates faced inter-Debtor claims in gross totaling at least $8.4 billion, again not including the $21 billion of claims by TCEH against EFH relating to the LBO.

*Figure 1 - Face Value of Inter-Debtor Claims Asserted*



32.     The DDs reached their $700 million TCEH settlement claim against EFH (and sharing up to an $805 million total) not because they were told to, or on a whim, but based on an assessment of the claims to be settled, including their relative risks.[39]  The EFH DDs "considered each individual claim and the merits of the claim to determine which claims were riskier than other claims.  We considered just our own business knowledge of those claims.  We talked through each one of those claims.  We talked with whoever was on the other side of those claims."[40] ██████████████████████████████████

██████████████████████████████████████████████████████[41] ██████

---

[39]  *See* Ex. 2 9/30/15 Williamson Dep. Tr. at 54:6-14.

[40]  *Id.* at 54:6-13; *see also* Ex. 1 9/25/15 Evans Dep. Tr. at 181:21-24 ("I spent most of my time trying to assess the risk of the claims . . . That's what I was spending my time on.").

[41]  *See* Ex. 1 9/25/15 Evans Dep. Tr. at 207:6-15; Settlement Motion at ¶ 151-163; *see also* Ex. 2 9/30/15 Williamson Dep. Tr. at 65:15-17.

████████████████████████████████████████████████

████████████████████████████████[42] In addition, although TCEH did not make a specific monetary demand on the LBO claims in the negotiations, it did note that this large claim existed and would be pursued absent a settlement, and the EFH DDs considered the risk associated with the size of the claim and the uncertainty of litigation, generally.[43]

33.     The EFH DDs also considered what has been referred to as the "Step-Up Matter," or the payment to TCEH for consenting to a tax-free spin-off of the T-side Debtors' estate rather than a taxable disposition of the T-side Debtors' estates.[44]

34.     The DDs only engaged in exchanging proposals and in person negotiations that ultimately yielded the DD Settlement after investigating and assessing the claims with their respective advisors for months.  Then, over the course of nearly two weeks, from March 16-25, 2015, the DDs made various proposals and counter-proposals.[45] Mr. Sawyer described the negotiations over those proposals as "contentious".[46]

---

[42]  Ex. 1 9/25/15 Evans Dep. Tr. at 207:11-15.

[43]  *See id.*  at 207:16-24; *see also* Ex. 2 9/30/15 Williamson Dep. Tr. at 65:20-25.

[44]  Ex. 6 9/24/15 Sawyer Dep. Tr. at 759:14-17.

[45]  *See* DX 215, Minutes of a Meeting of the Disinterested Directors (Apr. 1, 2015) [EFH_DD00004572].

[46]  Ex. 6 9/24/15 Sawyer Dep. Tr. at 613:17-20.

**Figure 2 - Proposals concerning the Disinterested Director Settlement[47]**

| Date | Proposal By | Terms |
|------|-------------|-------|
| March 16 | TCEH | • Allowed unsecured $1.2 billion claim against EFH Corp., including a $200 million claim against EFIH<br>• All NOLs<br>• 100% of Excess Consideration<br>• $10 million to Sponsors<br>• Full releases[48] |
| March 18 | EFH | • Allowed unsecured *pari passu* $100 million claim against EFH Corp.<br>• All NOLs<br>• Reasonable waterfall of Excess Consideration<br>• $10 million to Sponsors<br>• Full releases |
| March 25 | TCEH | • Allowed unsecured *pari passu* $710 million claim against EFH Corp.<br>• 51%/49% split until EFH Corp. receives $42 million, plus 100% of Excess Consideration to TCEH<br>• $10 million to Sponsors<br>• Full releases |
| March 25 | EFH | • Allowed unsecured *pari passu* $675 million claim against EFH Corp.<br>• 50%/50% split up to $800 million plus 100% of Excess Consideration to EFH Corp.<br>• $10 million to Sponsors<br>• Full releases |
| March 25 | TCEH | • Allowed unsecured *pari passu* $705 million claim against EFH Corp.<br>• 50%/50% split up to $925 million plus a 25% (TCEH)/75% split of Excess Consideration<br>• $10 million to Sponsors<br>• Full releases |
| March 26 | EFH | • Allowed unsecured *pari passu* $700 million claim against EFH Corp. along with a $700 million recovery by the Company's creditors<br>• 50%/50% split up to $800 million with 100% of Excess Consideration to EFH Corp.<br>• $10 million to Sponsors |

35.     Ms. Williamson characterized the EFH DDs' consideration of the proposals as deliberative: "[W]e talked down through each of the items. We talked down through each of the

---

[47] DX 215, Minutes of a Meeting of Disinterested Directors (Apr. 1, 2015) [EFH_DD00004572].

[48] The releases of directors and officers and Equity Sponsors was approved in connection with the plan of reorganization filed on April 14, 2105.

par values, and that sort of thing. . . But I don't think we wanted to make rash decisions or anything like that."[49] She characterized the process at arriving their decision as "a fulsome discussion of that with SOLIC and Proskauer."[50] Ultimately, the DDs agreed to resolve the gross total of approximately $8.2 billion in claims in one settlement that included a $700 million claim by TCEH against EFH, and a 50%/50% sharing of excess consideration up to $805 million in total for TCEH.[51]

*Figure 3 - Disinterested Director Settlement of Inter-Debtor Claims*



**C.      The Disinterested Directors properly re-assessed the settlement terms before approving the Settlement Agreement.**

      **iv.      The Disinterested Directors determined that renegotiating the deal was unnecessary after fully informing themselves of the changes.**

36.      The EFH Committee notes that the DD Settlement reached by the DDs in March 2015 "(with minor changes) now forms two of the three parts of the broader Settlement

---

49    Ex. 2 9/30/15 Williamson Dep. Tr. at 82:7-16.

50    *Id.* at 82:17-21.

51    DX 215, Minutes of a Meeting of Disinterested Directors (Apr. 1, 2015) [EFH_DD00004572 at EFH_DD00004572-750].  This agreement for an allowed TCEH claim did not include an agreed allocation of value among the TCEH Debtors. (9/24/15 Sawyer Dep. Tr. 637:24- 638:3 ("As to the settlement negotiations, we did not consider the allocation methodology among the T side creditors.").)

Agreement."[52]    It further acknowledges the DDs that they re-examined the Inter-Debtor

Settlement as incorporated into the Settlement Agreement and determined than it was not

necessary to exercise their fiduciary out.[53]

37.    Nevertheless, despite characterizing to changes in the Inter-Debtor Settlement as

"minor" in paragraph 75 of its brief, in paragraph 154 the EFH Committee argues that the DDs

"failed to adequately inform themselves of the *material changes* between the agreement they

reached in March and the Intersilo Settlement approved in August" (emphasis added).  Even

setting this inconsistency aside, any claim that the DDs were not fully informed of the Settlement

Agreement's terms is baseless.

38.    The DDs received live, real-time updates from their DDAs, the Debtors'

management team, Kirkland, and Evercore as the full Settlement Agreement was negotiated.

Mr. Cremens testified that "Kirkland and management . . . created transparency for the

disinterested directors through the disinterested director advisors because they allowed for the

disinterested director[] advisors to, if not be at the meetings directly during negotiation with

stakeholders, at least be in real-time being up to speed on those negotiations."[54] Ms. Williamson

similarly noted that "our board was actively engaged in talking with our advisors and

understanding where they were going and also in making clear to them what we felt was

---

52    EFH Committee Obj. ¶ 75.

53    *Id.* ¶ 77. The EFH Committee implies that the Disinterested Directors did not negotiate the Settlement
Agreement because it was not deemed a conflict matter.  (*See id.* ¶¶ 64-66.)  The EFH Committee's
characterization is again contrary to the facts: Regardless of whether the Settlement Agreement was deemed a
conflict matter, the Disinterested Directors and their Advisors treated it as such.  (*See* Ex. 2 9/30/15 Williamson
Dep. Tr. at 35:3-12; Ex. 1 9/25/15 Evans Dep. Tr. at 143:22-144:5.)

54    Ex. 7 9/15/15 Cremens Dep. Tr. at 31:20-32:4.

important for EFH," and that the DDAs were involved in the negotiation of the Settlement Agreement.[55]

39.     Along the way, the DDs "asked the question a lot of [their] advisors as to are we seeing any change, a material enough change where we should consider exercising a fiduciary out."[56] From the standpoint of EFH, no such action was necessary, because as Mr. Evans testified: "for EFH, I think one can argue that the agreement is *better* today that it was March the 26th."[57]

40.     The specific "points of ignorance" posited by the EFH Committee in its Objection are mischaracterizations. *First*, the EFH Committee suggests that the DDs misunderstood that the DD Settlement "was changed to give the TCEH First Lien Creditors the right to file an alternative plan that includes a taxable disposition of TCEH."[58]   In fact, the EFH Committee misunderstands what the EFH DDs well knew: that the TCEH creditors "always had that right" upon termination of the Debtors' exclusivity period.[59] In fact, the Boards were specifically advised of this possibility in connection with approval of the Settlement Agreement on August 9, 2015.[60]

41.     *Second*, the EFH Committee argues that the EFH DDs were uninformed because they "were not provided updated valuation information with respect to whether a tax-free

---

[55]   Ex. 8 9/15/15 Williamson Dep. Tr. at 29:10-19; Ex. 2 9/30/15 Williamson Dep. Tr. at 15:21-17:2.

[56]   Ex. 1 9/25/15 Evans Dep. Tr. at 213:16-214:13.

[57]   *Id*. at 188:4-6.

[58]   EFH Committee Obj. at ¶ 78.

[59]   Ex. 2 9/30/15 Williamson Dep. Tr. at 109:9-20; *see also* Ex. 1 9/25/15 Evans Dep. Tr. at 340:7-12 (stating that he was aware that E-side creditors are subject to a risk that the T-side creditors may pursue a taxable transaction if the plan fails).

[60]   *See* DX 301, Presentation to Joint Boards dated Aug. 9, 2015 [EFH06002898 at EFH06002909].

transactions was even necessary."[61]   Again, it is the EFH Committee that is poorly informed or advised.  A tax-free spinoff of TCEH is necessary not only to avoid potential cash taxes at EFH but also to facilitate the Plan's proposed REIT transaction.[62] In any event, the DDs "continued to look at [the Inter-Debtor settlement] holistically and in total," such that fluctuations in the value of a single element of the deal are just one part of the analysis.[63]

42.     *Third*, the EFH Committee states that "the EFH Disinterested Directors never discussed and were never advised of—how removing the [Inter-Debtor] settlement from the Plan affects the rights of creditors to vote on or otherwise ratify the terms of the Settlement Agreement."[64]   But a cursory read of Ms. Williamson's cited testimony reveals that she testified to *no such thing*.  Ms. Williamson's testimony instead rightly points out that the only creditors who may vote are impaired creditors, which under this Plan does not include E-side creditors.[65]

## II.     THE SPONSOR RELEASES WERE APPROVED ONLY AFTER A THOROUGH, CAREFUL PROCESS FREE OF CONFLICTS

### A.     The Sponsor releases were approved by a Special Committee from which Sponsor representatives were excluded.

43.     The EFH Committee impugns the corporate governance surrounding the Sponsor releases by misrepresenting what actually happens.  It wrongly contends that the DDs approved the Sponsor releases on April 1, 2015, but then created a Special Committee at the behest of

---

61   EFH Committee Obj. ¶ 78.

62   Ex. 9 10/21/15 Henkin Dep. at 275:15-276:1; Ex. 10 9/23/15 Ying Dep. at 80:2-9.

63   Ex. 1 9/25/15 Evans Dep. Tr. at 213:16-214:13.

64   EFH Committee Obj. ¶ 79.

65   Ex. 2 9/30/15 Williamson Dep. Tr. at 112:7-19.

Sponsors as a "post-hoc effort to legitimize" the releases "despite the fact that identical releases had been included in the previously approved disclosure statement and plan."[66]

44.     That account is false.  The DD's Joint Statement of Summary of Settlement of Intercompany Claims did not release claims against the Sponsors.[67]  Special Committees without Sponsor-related directors were formed by the boards of EFH and TCEH.  The Special Committees first approved the Sponsor releases, not the DDs. And the Special Committees approved the releases *before* they were included in the Initial Plan and Disclosure Statement.

45.     On April 3, 2015, at a joint meeting, the EFH and TCEH Boards each created a Special Committee comprising exclusively of non-Sponsor representatives.  To each Special Committee, the Boards delegated authority to "review and decide whether to release the Company's Alleged Claims against the Sponsors."[68]  The EFH Special Committee, which included Mr. Evans and Ms. Williamson,[69] considered and approved releases of the Sponsors on April 7, 2015 and again on April 10, 2015.[70]  The Special Committee thus approved the Sponsor releases before their inclusion in the Initial Plan and Disclosure Statement, which was filed on April 13.

46.     As for the Settlement Agreement approved by the Debtors' Boards in August, the EFH Committee suggests something is amiss because a "Special Committee was never

---

66    EFH Committee Supp. Obj. ¶¶ 36-41, 71.

67    *See* DX 215, Minutes of a Meeting of the Disinterested Directors (Apr. 1, 2015) [EFH_DD00004572].; D.I. 4145.

68    DX 238, Minutes of Joint Meeting (Apr. 3, 2015) [EFH06004309 at EFH06004318-21].

69    The TCEH Special Committee, which included Mr. Sawyer, considered and approved the Sponsor releases on April 9, 2015.

70    DX 240, Minutes of EFH Corp. Special Committee (Apr. 7, 2015) [EFH06004369]; DX 257, Minutes of EFH Corp. Special Committee (Apr. 10, 2015) [EFH06004366].

reconvened" to *re-approve* the same Sponsor Releases.[71]  But when asked, Ms. Williamson indicated "since we'd met in April and nothing had changed between April and August, it was not considered necessary to have another meeting."[72]

### B.    The Special Committee considered all known claims against the Sponsors.

#### i.    Sidley Austin independently assessed potential claims against the Sponsors prepetition.

47.    In the year before filing for bankruptcy, the Debtors retained Sidley Austin, LLP ("Sidley") and their financial advisors, Zolfo Cooper, LLP ("Zolfo") to evaluate potential claims against the Sponsors.  The EFH Committee gives short shrift to the extensive diligence and analysis Sidley and Zolfo performed, reducing it to a "review [that] appeared to focus[] upon an analysis of the statute of limitations applicable to potential claims" against the Sponsors, and proclaiming that it is "inexplicabl[e]" that "Sidley was again brought in to advise the Board" on Sponsor releases given that the statute of limitations had supposedly run.[73]

48.    While Sidley analyzed available statutes of limitations potentially applicable to claims against the Sponsors, they were not retained for such limited purpose.[74]  Sidley evaluated:

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████[75]

---

[71]    *See* EFH Committee Supp. Obj. ¶ 52.

[72]    Ex. 8 9/15/15 Williamson Dep. Tr. at 81:7-10.

[73]    *See* EFH Committee Supp. Obj. ¶¶ 33-35.

[74]    *See* EFH Committee Supp. Obj. ¶ 33.

[75]    *See* Ex. 4 9/28/15 Doré Dep. Tr. at 377:4-24.

49.    Sidley's work was thorough.  Its team reviewed hundreds of thousands of pages of documents in evaluating Sponsor claims, and conducted over 20 interviews with current and former company employees and legal and financial advisors, as well as representatives of KKR, TPG and Goldman Sachs.[76]

50.    As early as February of 2013, EFH Corp. began to hold meetings of directors from which all Sponsor representatives were excluded, to discuss issues related to Sidley's engagement.[77]  These meetings continued through the fall, where the non-Sponsor Directors were informed of the scope and focus of the Sidley investigation.[78]

51.    Following its initial investigation, Sidley returned in April of 2014 to educate and advise the EFH, TCEH and EFIH DDs on Sponsor releases in connection with the Restructuring Support Agreement ("RSA").  This was particularly valuable for Mr. Cremens, who joined the EFIH Board in February 2014, after the initial October 2013 Sidley presentation.[79] In connection with approving the RSA, Mr. Evans (as well as Mr. Cremens and Mr. Sawyer) met with Sidley and Kirkland & Ellis to discuss proposed releases of potential claims EFH Corp. had, including against the Sponsors.[80]

---

[76]    *See also id.* at 414:14-20 ("I don't think we left a stone unturned as it relates to the potential claims against the Sponsors.")

[77]    *See* DX 123, EFH Corp. Minutes of Non-Sponsor Directors Meeting (Aug. 1, 2013) [EFH03932565]; DX 124, EFH Corp. Minutes of Non-Sponsor Directors Meeting (Aug. 30, 2013) [EFH03932567]; DX 101, EFH Corp. Minutes of Non-Sponsor Directors Meeting dated Sept. 11, 2013 [EFH04293387].

[78]    *See e.g.*, DX 103, EFH Corp. Minutes of Non-Sponsor Directors Meeting (Sept. 20, 2013) [EFH04293389]; DX 105, EFH Corp. Minutes of Non-Sponsor Directors Meeting (Oct. 3, 2013) [EFH04293390].

[79]    *See* Ex. 7 9/15/15 Cremens Dep. Tr. at 10:4-9.

[80]    DX 71, Minutes of Joint Meeting (Apr. 28, 2014) [EFH2D00090303 at EFH2D00090326, 341]; *see also* 10/1/15 Cremens Dep. Tr. at 154:13-15 ("[S]oon after I joined the board, I met with Sidley & Austin and had them provide an update of claims.")

52.     *Second*, the EFH Committee states that the Special Committees approved the releases in April 2015 "despite not receiving any new information."[81]    Again, this claim is misleading.    The potential claims or allegations against Sponsors assessed by the Special Committee involved pre-petition conduct.[82]

53.     On April 7, 2015 the EFH Special Committee received an 18-page presentation from Kirkland that:



ii.     **The Disinterested Directors sought and considered the EFH Committee's views on all claims.**

54.     The    EFH    Committee    and    Fidelity[83]    claim    they    suffered    "complete disenfranchisement" by the DDs' negotiation of the Disinterested Director Settlement and agreement to the Settlement Agreement.[84]   The facts tell a different story.   As an initial matter, as a party to the pre-petition RSA, Fidelity supported full releases of inter-Debtor claims and claims against Sponsors, directors and officers.   Prior to approving the Settlement Agreement, the EFH

---

81    EFH Committee Supp. Obj. at ¶ 39.

82    *See* Ex. 4 9/28/15 Doré Dep. Tr. at 415:15-22 ("There has been no suggestion, and I certainly see no evidence to suggest, that there is conduct since October 2013 by the sponsors that would have led to claims.").

83    Fidelity has filed a joinder adopting the Committee's arguments. D.I. 6442.

84    *See* EFH Committee Obj. ¶ 6.

DDs, "met with Fidelity and their legal representatives and their financial representatives . . . [and] talked about the 700 million dollar settlement," in the context of a plan Fidelity considered proposing.[85]   The EFH DDs' discussions with Fidelity covered many settlement-related topics, including whether the settlement would be independent of the current Plan.[86]

55.    In addition to these meetings with the EFH DDs, representatives of other E-side creditors engaged in numerous meetings and discussions with the DDAs throughout the process.[87]

### iii.    The Special Committee was well aware of potential claims against the Sponsors, but concluded they had little to no merit.

56.    The EFH Committee criticizes the EFH DDs as "uninformed" of "claims that could be asserted by EFH" against the Sponsors, directors, and officers.[88]   It bases this allegation on a highly selective use of deposition testimony in which DDs agreed they were unaware of *meritorious* or *valuable* claims against the Sponsors, not that they were unaware of any potential claims at all.

57.    *First*, the EFH Committee cites to six pages of testimony by Ms. Doré to claim that the DDs "testified that they were unaware of the claims that they were releasing."[89]   But Ms. Doré's testimony says no such thing.[90]   What the EFH Committee fails to mention is Ms. Williamson's testimony that not only did Sidley evaluate claims against the Sponsors, but

---

[85]   Ex. 2 9/30/15 Williamson Dep. Tr. at 97:14-98:8.

[86]   *Id.* at 98:9-20.

[87]   *See id.* at 194:8-12 ("[O]ur legal advisors and our financial advisors were involved in numerous meetings that had financial advisors and legal advisors from the E-side creditors."); Ex. 3 10/1/15 Cremens Dep. Tr. at 167:14-20.

[88]   EFH Committee Supp. Obj. ¶¶ 44-47.

[89]   EFH Committee Supp. Obj. at ¶ 44.

[90]   Ex. 4 9/28/15 Doré Dep. Tr. at 409:4-414:9.

advisors for the EFH DDs at Proskauer Rose also investigated those claims.[91]  The same is true

for Mr. Cremens.[92]

58.    Second, the EFH Committee ignores testimony by Ms. Williamson and Mr. Evans

that contradicts its own thesis.  Ms. Williamson testified that EFH had "evaluated whether we

thought that there were claims that we had against the sponsors, and we did not come up with

any significant claims that we felt we had at EFH against the Sponsors."[93] Further, when asked

what claims the board considered pre-petition that could be released, Mr Evans stated that "[t]he

one that sticks out to me [is] the whole LBO claim that could have been against the sponsors."[94]

Mr. Cremens echoes the same findings: "Just so you know, I've never heard of any claims

against directors or officers.  As it relates to sponsors there was a lot always threatened but

nothing that ever ended up being anything specific."[95]

59.    In further support of its story, the EFH Committee cites to a December 2014

email from the EFH Committee to the Debtors that purportedly "put[] the Debtors on notice" of

such claims.[96]  That email does not identify a single claim against Sponsors, directors or officers.

It merely suggests that there may be "claims," without more.[97]   As Mr. Cremens testified,

nothing "specific."[98]  The first time the EFH Committee ever mentioned *any* specific claim was

---

[91]  Ex. 2 9/30/15 Williamson Dep. Tr. at 159:21-160:21.

[92]  Ex. 7 9/15/15 Cremens Dep. Tr. at 76:15-77:2 ("[W]e . . . had a review by my disinterested director advisors of independent counsel's review of these issues, which was Sidley & Austin.  Cravath at the time came back and we talked through the merits of – the issues of directors and officers and sponsors.").

[93]  Ex. 2 9/30/15 Williamson Dep. Tr. at 178:15-20; *see also id.* at 226:17-20.

[94]  Ex. 1 9/25/15 Evans Dep. Tr. at 285:18-286:4.

[95]  Ex. 7 9/15/15 Cremens Dep. Tr. at 77:3-9.

[96]  EFH Committee Supp. Obj. ¶ 46, n.6.

[97]  DX 559, Email with attachment from A. Kranzley to E. Sassower (Dec. 11, 2014) [EFIH_DD00003421 at EFIH_DD00003422].

[98]  Ex. 7 9/15/15 Cremens Dep. Tr. at 77:3-9.

only a few weeks ago, well *after* each of the EFH DDs had been deposed for this trial. Given more than a year of silence, it is evident the EFH Committee endeavored to identify something at the last minute solely to have something to say at trial.

60.     In early December 2014, the Debtors, along with the DDAs, proposed to the EFH Committee a list of claims for a comprehensive settlement, giving the Committee an opportunity to review and respond to those claims.[99]  A week later, the EFH Committee responded, with nine new categories of claims to consider, but *not one* specific claim against a Sponsor, director, or officer.  Instead, it said of potential Sponsor claims, in the most generic and non-specific language possible: "Other claims against sponsors, sponsor affiliates and designees, belonging to EFH and EFIH, including affirmative claims and grounds for disallowance or subordination, to the extent such claims are included in a 'Comprehensive Settlement'."[100]

61.     Not only did the EFH Committee fail to identify any specific claim, it added in no uncertain terms that it was "***not in a position at this time to enumerate specific claims against sponsors and their affiliates*** (or Ds, Os or other insiders for prepetition acts or omissions)."[101]  Again, the EFH Committee waited until October 7, 2015—less than a month before trial and more than seven months after the close of Legacy Discovery—to identify any possible claims against the Sponsors, directors, and officers.[102]  In its letter, the Committee alleges only that it "intends to/may assert" claims, including those concerning the 2007 LBO.[103]  Now, two-and-a-

---

[99]   DX 955, Email from A. Kranzley to E. Sassower (Dec. 4, 2014)"; *see also* Ex. 2 9/30/15 Williamson Dep. Tr. at 267:7-9 "[W]e had asked creditors if they had any claims to add on to that list."

[100]   DX 968, Letter from N. Ramsey to A. Yenamandra re Notice of Claims under Directors & Officers Liability Policies (Oct. 7, 2015).

[101]   *Id.* (emphasis added)

[102]   Ex. 968, Letter from N. Ramsey to A. Yenamandra re Notice of Claims under Directors & Officers Liability Policies (Oct. 7, 2015).

[103]   *Id.*

half weeks after its letter in connection with its Objection, the Committee has determined the LBO is "not seriously in dispute," and there is "no colorable basis" to challenge it.[104]  As to other potential Sponsor claims, all it can muster is that some are allegedly "colorable."[105]  The EFH Committee has never asserted (much less demonstrated) that any potential Sponsor claim is strong or compelling, and why.

**Argument**

II.     **The Settlement Agreement Is Subject to Ordinary Rule 9019 Review.**

    A.     **Review under the *Martin* factors requires only that the Court "canvass the issues" to determine whether the settlement is "fair and equitable."**

62.     To be approved under Rule 9019, a settlement need only be "fair and equitable," falling "above the lowest point in the range of reasonableness." *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 475-76 (Bankr. D. Del. 2010) (Sontchi, J.).  To make this assessment, courts in the Third Circuit apply the *Martin* factors, considering: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Id*. at 515 (quoting *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d. Cir. 1996)).

63.     In applying the *Martin* factors, courts in this Circuit "canvass" the issues, and may approve a settlement only when supplied with sufficient information to form an "intelligent and objective opinion" on the claims being settled.  *See In re Capmark*, 438 B.R. at 514 (internal quotations and citation omitted).  Courts do not require a full evidentiary hearing or a "mini trial" on the merits of the claims being settled.  *Id.* at 515; *In re Jasmine, Ltd.*, 258 B.R. 119, 123 (D.

---

[104]  EFH Committee Obj. ¶ 144.  The EFH Committee filed a standing motion stating that it intended to assert claims against Luminant in connection with the 2007 LBO.  [D.I. 3605].  Despite believing on February 20, 2015 that these claims were meritorious, the EFH Committee now believes that claims related to the 2007 LBO are meritless.

[105]  EFH Committee Obj. ¶ 144.

N.J. 2000) (stating that when deciding whether to approve a proposed compromise in a bankruptcy, the court is not to conduct a "'mini-trial' on the merits") (citations omitted); *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) (noting that the court "need not conduct a 'mini-trial' to determine the merits of the underlying litigation" being settled).  Not only is a full evidentiary hearing not required before approving a settlement, but "the avoidance of litigating the issues is one of the main advantages of settlement."  *In re ID Liquidation One, LLC*, 555 F. Appx 202, 207 (3d Cir. 2014) (citing *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994) and  *In re Martin*, 212 B.R. 316, 319 (8th Cir. BAP 1997) (noting that "it is not necessary for a bankruptcy court to conclusively determine claims subject to a compromise, nor must the court have all of the information necessary to resolve the factual dispute, for by so doing, there would be no need of settlement")).

**B.    A claim-by-claim assessment of the settlement is not required, and would render Rule 9019 largely useless in complex cases.**

64.    Given the deferential standard of review under Rule 9019, it is unsurprising that the EFH Committee spends a significant portion of its brief attempting to avoid it.[106]   As significant as the Settlement Agreement may be to the parties, it is an ordinary compromise and release of claims, subject to ordinary Rule 9019 review.

65.    The EFH Committee begins its assault on the 9019 standard by asking the Court to assess the merits of a *global* settlement on a *claim-by-claim* basis.[107]   While the Court certainly requires information sufficient to assess the issues resolved in the settlement, the Court need not dissect the parts of a settlement to decide whether the global resolution is reasonable. To do so would reduce the Court's process to a "math exercise," and increase the Court's and the

---

106    *See, e.g.,* EFH Committee Obj.  ¶¶ 149-164, 182-184.

107    EFH Committee Obj. at ¶ 75.

settlement proponents' burden by requiring each issue to be marked with a price tag. *See In re Wash.Mut., Inc.*, 442 B.R. 314, 329 (Bankr. D. Del. 2011) (holding that assessment of a global settlement under Rule 9019 is not "a mere math exercise comparing the sum of the parts to the whole"). Such a procedure would undermine the purpose and ignore the reality of a global settlement, which, because it fully resolves a slate of contested issues, has a value that exceeds the sum of its parts, as courts routinely explain. *See*, *e.g., id.* ("[T]he Court recognizes that there are benefits to be recognized by a global settlement of all litigation (eliminating the costs of continued litigation and delay in distributions to creditors and shareholders) that may recommend a settlement that does not quite equal what would be reasonable of each part separately.")

66.     In addition, the Objectors' view that the Inter-Debtor Settlement should be assessed on granular, issue-by-issue basis, consistent with their criticism of the EFH DDs for not placing a settlement value on each claim, would make global settlements of this magnitude impossible.[108]  The majority of the claims or issues have a face value, of which the Objectors are fully aware.[109]  The value of a roster of claims and issues does not need to be broken down to individual claims either for negotiation of a settlement or for its assessment for reasonableness. Each party can have its own estimate of the value of the collected claims without agreeing or declaring what drives the bottom line.  The Court, for its part, can assess where the significant claims and defenses sit, the benefits of settlement, and a global settlement in particular, and reach its own view on whether the agreement is fair and equitable based on the facts provided on the underlying issues.  The settling parties are not before the Court to try their potential claims and prove their ultimate value but to resolve them on a global basis for the benefit of each estate.

---

108     *See, e.g.,* EFH Committee Obj. ¶ 153.

109     *See, e.g.,* EFH Committee Obj. ¶ 90.

C.      **Heightened scrutiny of the Settlement Agreement is unwarranted in this case.**

67.     In addition to seeking claim-by-claim tabulation that is inconsistent with Rule 9019, the EFH Committee presents a number of theories for why the standard of review should be expressly elevated.  The EFH Committee's hodgepodge of theories for heightened review are not grounded the record.

i.      **The "entire fairness" standard does not apply.**

68.     The EFH Committee begins ambitiously by arguing that the "entire fairness" standard should apply to the Court's assessment of the Settlement Agreement.  Specifically, the EFH Committee contends that it has made a sufficient showing that the Debtors' directors and officers have breached their duties of care (because they were "inadequately informed") and loyalty (because they were "impermissibly interested") such that their actions are no longer protected by the business judgment rule.[110]

69.     The EFH Committee's allegations of breaches of fiduciary duty are bold, but find no support in the record.  The EFH Committee asserts, for instance, that the EFH directors breached their duty of care because they (1) did not understand the merits of the settled claims, (2) blindly followed the lead of the co-CROs in agreeing to a settlement with the other estates, (3) did not assign value to each settled claim individually, and (4) failed to understand changes between the Disinterested Director settlement and the Settlement Agreement.[111]  As summarized above, the evidence tells a different story.  In fact, the DDs took great effort to learn the facts and understand the merits of the settled claims, exercised their own independent judgment in

---

110   EFH Committee Obj. ¶ 149.

111   EFH Committee Obj. ¶¶ 151-154.

negotiating the inter-Debtor settlement, assessed the risks associated with each claim, and kept track of the inter-Debtor settlement as it evolved.

70.     The EFH Committee next argues that the directors and officer breached their duty of loyalty because they had a personal stake in the releases of directors and officers.[112]   This argument proves too much—it would require entire fairness review of *any* settlement that include releases of sitting directors and officers.   Conspicuously absent from the EFH Committee's brief is any case law to support this categorical proposition.   That is because it is not the law, nor could it be without.

### ii.     "Enhanced scrutiny" is unwarranted.

71.     The EFH Committee has two fallbacks to their entire fairness argument, and neither fares any better.   *First*, it contends that "enhanced scrutiny" should apply because the Settlement Agreement is "part of a change-of-control transaction," triggering extra scrutiny under Delaware law.[113]   In support, the Objectors cite *Revlon* and other Delaware cases, but no case showing that a settlement in bankruptcy related (in any way) to a sale has garnered enhanced scrutiny.

72.      In any event, the EFH Committee's premise is false: the Settlement Agreement may provide critical support for the transactions contemplated in the Plan, but ultimately the Settlement Agreement is independent of the Plan, and will stand on its own even if the "change-of-control transaction" is not consummated.   Once again, the EFH Committee's argument proves too much.   If it were correct, then *any* settlement before plan confirmation would be subject to enhanced scrutiny.

---

112   EFH Committee Obj. ¶¶ 155-160.

113   EFH Committee Obj. ¶¶ 161-164.

73.     *Second*, the EFH Committee contends that "courts" will apply heightened scrutiny to settlements "negotiated by insiders or contain other financial advantages for insiders."[114]  The EFH Committee's cited cases reveal, however, that it is not Third Circuit law to apply heightened scrutiny in circumstances where "an insider" benefitted from or negotiated the settlement at issue.  *See In re Exaeris, Inc.*, 380 B.R. 741, 746 (Bankr. D. Del. 2008) ("Whether courts are required to apply a stricter standard when evaluating settlements negotiated by insiders of a debtor is not necessary to decide now.").  Indeed, many of the cases the EFH Committee cites in support of heightened scrutiny simply applied factors familiar to Rule 9019 review and concluded that the settlements were fair, equitable, within the range of reasonableness, and in the best interest of the estate.  *See, e.g., In re Dharmasuriya*, 2014 WL 845991, at *3-*6 (Bankr. C.D. Cal. Mar. 4, 2014); *In re Drexel Burnham Lambert Grp,. Inc.,* 134 B.R. 493, 496-97 (Bankr. S.D.N.Y. 1991).

74.     Even if it were the law that higher scrutiny applied to settlements involving insider transactions (it is not), the EFH Committee has not come forward with any evidence that the Settlement Agreement was negotiated by "insiders" or that any "insider" is receiving a financial benefit from the Settlement Agreement.  As discussed above, if releases for directors and officers qualify as financial benefits for insiders, then all global settlements would be subject to heightened scrutiny, and that is simply not the law.  *See H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 149-50 (Del. Ch. 2003) (holding that negotiated releases for directors and officers in a settlement agreement does not make the settlement an "interested party transaction" because such releases are more or less "universal").

---

[114]   EFH Committee Obj. ¶ 182.

75.     The EFH Committee's campaign for heightened scrutiny is consistent with their misunderstanding of how the Court will review the proposed settlement.  The question before the Court has nothing to do with a director or officer's subjective evaluation or intent in settling a claim, but whether, objectively, the settlement falls above the lowest point in the range of reasonableness.  As the Court explained in September: "[p]ut evidence before the court as to what the litigation claims were worth and compare it to what's being provided or divvyed up in connection with the settlement, that's how we get to whether it's fair, not whether parties had a subjective belief as to what the claims were worth for individual entities when they were negotiating them."[115]

## III.    THE INTER-DEBTOR SETTLEMENT SATISFIES THE *MARTIN* FACTORS.

76.     The Debtors' Settlement Motion provided a thorough overview of the claims at issue in the settlement from the perspective of EFH, EFIH, and TCEH.  In its objection, the EFH Committee argues that ***all*** T-side claims against the E-side are utterly worthless and that EFH has "100%" likelihood of prevailing in litigation on more than a billion dollars of claims.[116]  Beyond that, the EFH Committee contends that all of the TCEH claims against the E-side can be reduced to six issues that could be "resolved in the early stages of litigation, including the inability to meet federal pleading standards."[117]

77.     The EFH Committee's hyperbolic assertions about the relative merits of TCEH's claims and EFH's claims do not withstand scrutiny.  The Debtors' opening memorandum more than adequately refutes such assertions that either side could run the table on their respective

---

[115]   9/16/15 Hr'g Tr. 35:10-15 (Sontchi, J.).

[116]   EFH Committee Obj. ¶ 187.

[117]   EFH Committee Obj. ¶ 192.

claims, that the claims are simple or that the claims can be boiled down to a few legal issues and easily dispatched.

78.     In this reply on the eve of trial, the Debtors address some of the EFH Committee's distortions and highlight some of the key evidence supporting the settlement.  At trial, the evidence refuting the EFH Committee's hyperboles will be stark and overwhelming.

**A.      The EFH Committee's view of the merits of settled claims is simplistic and one-sided.**

**i.      The EFH Committee is unjustifiably dismissive of TCEH claims.**

a.      The EFH Committee ignores TCEH defenses to its claims.

79.     The EFH Committee first argues that a reduction in value of TCEH and its consolidated subsidiaries means that TCEH could be sold in a taxable transaction without triggering a cash tax liability at EFH.[118]  Because there is no possibility of a cash tax liability at EFH, the EFH Committee asserts, there is no rational basis for providing any consideration to TCEH for forgoing a taxable transaction.[119]

80.     Unsurprisingly, matters are not so simple.  Whether a taxable TCEH separation will result in an EFH cash tax liability depends on (i) the fair market value of TCEH's assets as of the closing date and (ii) the NOLs available as of the closing date to offset any taxable gain from the separation.[120] Expert valuations do not determine the taxable gain that will be triggered at the time of sale.  Absent a marketing process and sale, it is the trading value of TCEH's stock on the effective date that the IRS will use to determine the taxable gain.[121] ▄▄▄▄▄▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

---

[118]   *See* EFH Committee Obj. ¶¶ 94-96.

[119]   *Id.*

[120]   *See* Ex. 9 10/21/15 Henkin Dep. Tr. at 265:12-24.

[121]   *See* Ex. 1 9/25/15 Evans Dep. Tr. at 187:4-13.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████[122]

The EFH Committee argues that TCEH's market value can only decline, but fails to offer any support for its position.  All of the EFH Committee experts disclaimed expertise in natural gas price forecasting, the key driver of the value of TCEH assets,[123] and Mr. Henkin acknowledged that nobody could predict the market value of TCEH six to nine months from now.[124]

81.    Whether all of the Debtors' NOLs will be available solely to offset gain from a taxable TCEH separation is similarly uncertain.  The EFH Committee provides no support for its assumption that all NOLs will be available to offset gain from a taxable TCEH separation and ignores the possibility of a taxable disposition of EFH's other assets (including its interests in Oncor) or other events (or challenges to tax positions) that could reduce available NOLs.  Given these two uncertainties—TCEH value and NOL availability—on a yet-undetermined date, it is practically impossible to eliminate the risk that a taxable separation of TCEH would result in a cash tax liability to EFH.

82.    While dismissing the risk that a taxable disposition of TCEH and its subsidiaries could cause EFH to have a cash tax liability, the EFH Committee casually proposes that EFH could simply "check the box" to treat TCEH and/or certain of its subsidiaries as corporations (rather than as disregarded entities) for tax purposes if a cash tax liability were to arise.  In that case, they assert that the newly "checked" entities would become liable for any resulting tax liability and be required to use their own available cash to settle the liability.[125]  ███████████

---

122    *See* Ex. 9 10/21/15 Henkin Dep. Tr  at 262:12-20.

123    *Id.* at 99: 3-24; Ex. 12 10/22/15 Rule Dep. Tr. at 162:23-163:10.

124    Ex. 9 10/21/15 Henkin Dep. Tr. at 262:8-11.

125    *See* EFH Committee Obj. ¶ 97.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

83.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████  ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

84.    Finally, the EFH Committee entirely misses that a taxable sale of TCEH's assets would make an EFH REIT transaction economically impractical.  The Debtors explained this point in their Confirmation Brief,[126] and there is no need to repeat that full discussion here.  It suffices to say that TCEH's agreement to a tax-free separation is critical to any E-side REIT conversion, which all agree is value-maximizing.[127]  It is the REIT conversion that makes it possible for the Debtors to pursue a plan of reorganization that proposes to pay E-side claims in full and it is not surprising that the T-side would seek some consideration for the costs and risks it assumes in that transaction possible.

---

[126]    *See* Memorandum of Law in Support of Confirmation of Joint Plan of Reorganization [D.I. 6647] ¶¶ 12-16.

[127]    Ex. 9 10/21/15 Henkin Dep. Tr. at 275:15-276:1; Ex. 10 9/23/12 Ying Dep. Tr. at 80:2-80:9.

b.      Tax Sharing Claims

85.      The EFH Committee argues that the $754 million claim sought by TCEH under the Federal and State Income Tax Allocation Agreement Among the Members of the Energy Future Holdings Corp. Consolidated Group ("TAA") is the product of a bookkeeping error in the Debtors' schedules of assets and liabilities.[128]  Matters are, of course, not so simple.  Even if the company had booked the "net claim" in the manner the EFH Committee contends would be appropriate, nothing would have stopped the TCEH from arguing that the "net claim" was improperly booked.

i.      Applicable Years for the TAA

86.      Even if the $754 million claim is not the result of an error, the EFH Committee argues that there is no possibility that such claim would be valid under several theories.  Here too, the EFH Committee's arguments are dangerously simple and ignore the complex reality of the situation.  As an initial matter, the EFH Committee asserts that some of the adjustments agreed to in the audit settlements that give rise to TCEH's $754 million claim relate to years that pre-date the application of the TAA and thus should not result in any tax sharing payments.

87.      The EFH Committee does not engage the multitude of reasons stated in the Debtors opening brief for why the TAA may apply before January 2010, including the arguably ambiguous language of the TAA.[129]  Indeed, there is evidence indicating that the Debtors' management—including its CFO, who is vested with authority under the TAA to determine any issue not expressly addressed in the agreement—interpreted the TAA to apply to *all* tax sharing obligations arising from the audit settlements.

---

128    EFH Committee Obj. ¶ 98.

129    *See* Settlement Motion ¶ 205.

88.     Additionally, when the TAA was drafted and executed, IRS audits dating back to tax year 1997 were pending; applying one set of rules to pre-2010 adjustments, and another set of rules to post-2010 adjustments, arguably would lead to absurd results that would be extremely difficult to administer.  For example, a substantial portion of the tax attributes used to offset the gain agreed to in the audit settlements were generated *after* the execution of the TAA but properly applied under the applicable tax rules to offset adjustments increasing income in pre-2010 years.  It would be administratively difficult, and would arguably lead to bizarre and inequitable results, to apply the TAA to some, but not all, of these adjustments.

89.     Finally, even if a determination was made that the TAA did not apply to pre-2010 tax years, parties could attempt to prove that an implied-in-fact tax sharing arrangement governed those years; the results under such an implied agreement may or may not be different than results under the TAA.[130]

ii.     AMT Claim

90.     The EFH Committee argues that $395 million of TCEH's $754 million claim arises from the elimination of AMT credits, but the TAA "plainly on its face provides no justification for the AMT Claim."[131]  This claim, the EFH Committee argues, cannot arise under the TAA for "three obvious reasons": (1) the TAA "only applies beginning in January 2010," (2) "there is no evidence that the lost AMT credits belonged to TCEH in the first place," and (3) "the TAA does not compensate any party for AMT credits relating to excluded cancellation of

---

[130]  Mr. Ashby also testified that, in his view, entry into the TAA did not alter the tax sharing obligations of EFH and its subsidiaries. Ex. 13 10/2/15 Ashby Dep. Tr. at 95:9-17.

[131]  EFH Committee Obj. ¶ 100.  The EFH Committee incorrectly asserts that $395 million of the $754 million scheduled claim is related to reimbursement for use of alternative minimum tax ("AMT") credits. ▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

indebtedness income."[132]  These are all points that the E-side may argue, of course, but none are "obvious" and would each be hotly contested in litigation.  As discussed above, the issue of the retroactivity of the TAA is anything but obvious.

91.    The EFH Committee's assertion that there is no evidence that AMT credits in question belonged to TCEH is also easy to refute.  There is, in fact, evidence supporting the position that the reduced AMT credits belonged to TCEH.  ████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████.[133] ██████████

████████████████████████████████████████

92.    There is also evidence supporting the position that TCEH was entitled to compensation for the reduction of these AMT credits.  It is true that AMT credits (as opposed to alternative minimum tax liability) are not expressly addressed by the text of the TAA.  However, AMT credits are a potentially valuable deferred tax asset.  Indeed, as discussed above, █████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████[134]

93.    To be sure, the Debtors' treatment of AMT credits, both as it relates to the AMT Claim and as it relates to the Debtors' tax sharing practices more generally, could be subject to dispute.  There are colorable arguments on both sides regarding the proper interpretation of the

---

132  EFH Committee Obj. ¶ 101

133  DX 450, YE 2013 AMT Credit Walkby Business Unit (Feb. 10, 2014) [EFH02029826].

134  *See* DX 891, "A- Output" tab [EFH02029800] ████████████████████
     EX 842 [EFH05511093] ████████████████████

TAA, the location of the AMT credits on the Debtors' books and the calculations underlying the tax sharing entries actually made.  However, all this proves is that these are all complex, litigable, and settlement-worthy issues.

iii.    NOL Claim

94.    Next the EFH Committee attempts to eliminate the portion of TCEH's $754 million claim that relates to the use of NOLs that were attributed to TCEH, which the EFH Committee refers to as the "NOL Claim."[135]  This claim generally arises from the settlement of the IRS audit of the Debtors' 2003-2006 tax years. ████████████████████

████████████████████████████████████████████

███████    ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████

95. The EFH Committee argues that the TAA unambiguously requires that the NOL Claim and Luminant Generation's $1.3 billion payable to EFH should have been netted under the

---

135  *See* EFH Committee Obj. ¶ 102.

136  DX 668, Letter from IRS to Mary McNulty and enclosures (July 29, 2015) [EFH06244768];; Ex. 13 10/2/15 Ashby Dep. Tr. at 107:6-24.

137 

TSA, before they resulted in any obligations among TCEH, Luminant Generation, and EFH that could be subject to the rule against triangular setoffs.[138] ██████████████████

████████████████████████████████████████████

████████████████████████.[139]   But this type of three-party, or triangular, setoff is not allowed in bankruptcy.  *See* 11 U.S.C. § 553(a); *see also In re SemCrude, L.P.*, 399 B.R. 388, 393-96 (Bankr. D. Del. 2009), *aff'd*, 428 B.R. 590 (D. Del. 2010) ("Because of the mutuality requirement in Section 553(a), courts have routinely held that triangular setoffs are impermissible in bankruptcy.").  Therefore, a closer examination of the nature of the claims and their origins is required.

96. The EFH Committee's netting argument turns on the definition of "member" in the TAA.  In particular, the EFH Committee argues that "member" unambiguously does not include disregarded entities (such as Luminant Generation and TCEH).  Because of this, the EFH Committee asserts that Luminant Generation's additional income and TCEH's losses should be "netted" at their common corporate parent—EFCH (which was a corporation in the relevant years)—and therefore there should not be separate payables between EFH and TCEH or EFH and Luminant.[140]

97. Against this, however, the T-side can argue that all signatories to the TAA (whether corporate or disregarded) are treated as "members" for its purposes.  Under this interpretation, the netting called for by the EFH Committee should not occur.

---

[138]   *See* EFH Committee Obj. ¶ 109, n.10.

[139]   *See* DX 663, Grant Thornton Report (Feb. 21, 2105) ("Grant Thornton Report") at ¶ 144(c)(i) [EFH04634391 at EFH04364427-428].

[140]   The EFH Committee's position also nets the AMT Claim (if it is valid) against the NOL Claim, even though the AMT Claim arises in tax year 2006, while the majority of the NOL Claim arises in other years.  It is unclear that this is appropriate, though, because there is a strong argument that the AMT Claim arising from adjustments to 2006 should not be offset against adjustments arising in 2007 - 2012.

98. The T-side can point to various provisions in the TAA and other substantial extrinsic evidence to support this position, which, from the T-side's perspective, shows that the TAA is ambiguous.  For instance:[141]

- The provisions relied on by the EFH Committee alternatively could be read to support a view that every signatory to the TAA is a "member," and that the disregarded entities referred to by the TAA are disregarded entities *that did not sign the TAA*.  The fact that several material T-side entities did not sign the TAA, but that the Company included in its tax sharing practices, supports this interpretation.

- Entities that were disregarded for federal income tax purposes joined the TAA and were referred to as "new members" in their joinder forms.[142]

- The opening proviso of Article 3 of the TAA states that it governs the rights and obligations among "members," but goes on to discuss disregarded entities.

- Section 4.2 discusses calculation of interest on payments and only applies to "members" despite the fact that disregarded entities have payment obligations.

- Section 6.2 discusses notice requirements and only refers to members despite the fact that many signatories are disregarded entities.

- The second recital of the TAA speaks to *parties*, not members or disregarded entities, and says that such allocation should "fairly preserve the economic rights and privileges that would have accrued to *each of [the parties]* from the filing of separate returns."[143]

99. █████████████████████████████████

---

[141]  The EFH Committee erroneously asserts that TCEH would have to show that the "specific text of 1.2 of the [TAA] is 'ambiguous'" to support its argument.  EFH Committee Obj. ¶ 108.  Under Texas law, a finding of ambiguity is based on the contract as a whole.  *See Village Place, Ltd. v. VP Shopping, LLC*, 404 S.W.3d 115, 124-25 (Tex. App. 2013) ("No single provision taken alone will be give controlling effect; rather all provisions must be considered with reference to the whole instrument.") (quoting *Seagull Energy E&P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006)).

[142]  *See* DX 651, Annex A Admission of New Group Member - Greenway Development Holding Company LLC (Nov. 27, 2012) [EFH04414833]; DX 653, Annex A Admission of New Group Member - Decordova II Power Company LLC (Jan. 4, 2013) [EFH04414832]; DX 654, Annex A Admission of New Group Member - TXU Energy Receivables Company LLC (Jan. 4, 2013) [EFH04414834].)

[143]  DX 648. Federal and State Income Tax Allocation Agreement Among the Members of the Energy Future Holdings Corp. Consolidated Group , 2d Recital (May 15, 2012) [EFH02028964].



100.    Moreover, the EFH Committee fails to understand that its purported reliance on

the plain text of the TAA, on one hand, and the Debtors' historical tax sharing practices, on the

---

144  DX 445, Corrected Grant Thornton Report at ¶ 61(c) (Apr. 2, 2015) [EFH05524580 at EFH05524598].

145  DX 424 Transaction Decision Paper Tax Sharing Agreement, § 3 (Oct. 10, 2011) [EFH03344498 at EFH03344499].

146  *See* DX 454, 20920T NOL_2010 Return_110919 [EFH02029993].  Moreover, in various places, the EFH Committee attempts to buttress its position by citing the testimony of the Senior Director of EFH's Corporate Tax Group, Kevin Ashby, and in particular, the fact that Mr. Ashby was surprised by the way the payables at issue had been recorded in the books and records.  That said,

147  *See* EFCH, Quarterly Report (Form 10-Q) for the period ended Sep. 30, 2014 at 55 (available on EDGAR) (emphasis added).

other hand, are at odds. Under the EFH Committee's reading of the agreement, only EFCH (for the years in which it was a corporation), EFH, and any other corporate signatory to the TAA (of which there are a few minor examples, not relevant to the claims at issue) would be treated as members. Under this theory, all taxable income, gains, losses and deductions of EFCH and its non-corporate subsidiaries would be netted together, producing a single net payment to be made between EFCH and EFH.[148]

101.



102.    An example helps to clarify that this is a distinction with dramatic implications for legal obligations. Under the EFH Committee's view, if EFCH is the relevant "member," TCEH has $100 of loss, and Luminant Generation has $100 of income, *no payables or receivables would be recorded at all*. This is because the "member," EFCH, has no income on a

---

[148]  The EFH Committee apparently believes so strongly in this argument that *it rewrote Mr. Ashby's testimony in support, replacing "TCEH" with "EFCH."*  *See* EFH Commttee Obj. ¶ 109 (quoting Mr. Ashby as testifying that "normal practice and expectation was that [$1.29 billion payable from Luminant] would have gone up to [EFCH], the parent"). The actual testimony was: "Q: So normal practice and expectation was that the payable would have gone up to **TCEH, the parent, TCEH**? A: Correct." Ex. 13 10/2/15 Ashby Dep. Tr. at 109:20-23 (emphasis added).

[149]  DX 663, Grant Thornton Report ¶ 144(c)(i) [EFH04634391 at EFH04634427-428]. Before the TCEH money pool, TCEH subsidiaries settled tax payables and receivables directly with EFH. *See id.* ¶ 147.

net basis (Luminant Generation's $100 of income offsets TCEH's $100 of loss), and the EFH

Committee's argument only results in a payable of any kind to the extent a "member" has

income to allocate to its lower-level disregarded entities. ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████  ██████

████████████████████████████████████████████████████████████████

██████████████████████████████  ████████████████████████████

████████████████████████████████████████████████████████████████

████████████

     103.    The issues described above are complex and uncertain enough on their own to

justify settlement.  It is quite possible that the issues relating to the payables that were reflected

in the SOFAs and Schedules would only scratch the surface of litigable tax sharing issues.  The

T-side has asserted a wide variety of potential claims relating to the Debtors' historical tax

sharing practices, including:  (1) avoidance actions with respect to every tax sharing payment

that has ever been made in any year that can be challenged under their asserted 10-year (or more)

statute of limitations; (2) claims based on *failure* to pay tax sharing amounts that may have been

owed; and (3) claims based on failure to apply the agreement properly, among many others.

     104.    As the Settlement Motion explained, these tax sharing issues are highly disputed

with uncertain outcomes.  Litigation would potentially involve completely recalculating the

entire tax sharing history of the Debtors, potentially back to 1997—a task that, even if it is

---

150 

possible, would involve tremendous cost and expense.  In short, these claims are ripe for settlement by parties aware of the uncertainties. The EFH Committee's attempt to show that there is an obvious resolution here, and in its favor, are unavailing.

c.    TCEH Intercompany Notes

105.    From October 2007 to January 2013, EFH borrowed hundreds of millions of dollars from TCEH pursuant to intercompany notes (the "TCEH Intercompany Notes"), using the proceeds to fund its operating expenses and debt payments.  For nearly all this period, the interest rate that EFH paid to TCEH for these borrowings – LIBOR plus 5% – was only a fraction of the yield third parties demanded on EFH's unsecured public debt securities.  Indeed, EFH paid a substantially higher rate of interest on its unsecured borrowings from other E-Side Debtors through the EFH money pool.  As explained in the Settlement Motion, TCEH asserts that EFH's failure to pay a reasonable rate of interest on the TCEH Intercompany Notes constituted a fraudulent transfer.  TCEH's expert witness, Eric Mendelsohn, will testify that EFH undercompensated TCEH by at least $425 million.

106.    The EFH Committee does not dispute that, if EFH indeed failed to pay a reasonable interest rate to TCEH, EFH would liable for a fraudulent transfer.  Instead, the EFH Committee attacks the TCEH claim on the grounds that (a) the interest rate on the TCEH Intercompany Notes was reasonable because the notes contained a "demand" feature, which purportedly had significant value to TCEH, and (b) even assuming the interest rate was unreasonable, TCEH's actual damages are "only" $187.2 million.  Neither argument withstands scrutiny, let alone casts doubt on the reasonableness of the Settlement Agreement.

107.    As an initial matter, if the issue were litigated, TCEH would introduce evidence that the interest payments TCEH received under the Intercompany Notes undercompensated it in comparison to market-tested measures of reasonably equivalent value.  *See In re Lindell*, 334

B.R. 249, 256 (Bankr. D. Minn. 2005) (explaining that reasonably equivalent value is "measured against market reality") (internal quotation and citation omitted).

108.    EFH's creditworthiness declined over the life of the TCEH Intercompany Notes, and the interest rates of those Notes was never adjusted.  By way of example, S&P and Moody's downgraded the creditworthiness of EFH between the LBO closing in October 2007 and the repayment of the TCEH Intercompany Notes in January 2013, from B- and B2, to CCC and Caa3, respectively.  By early 2009, the *difference* between the yield on EFH's public notes and the rate on the Intercompany Notes exceeded ten percentage points.  Had TCEH received an interest rate reasonably equivalent to market yields on EFH public debt with guarantees identical to those in the Intercompany Notes, TCEH contends it would have received additional interest payments in the range of $425 million to $605 million before prejudgment interest, and up to $557 million to $834 million including prejudgment interest.[151]

109.    Rather than addressing the impact that EFH's declining creditworthiness had on the interest rate of the TCEH Intercompany Notes, the EFH Committee focuses on the proxies by which TCEH measures the size of its underpayment of interest claim.[152]  The EFH committee asserts that there "is no basis" for comparing the yield on EFH's market traded debt with the interest rate on the Intercompany Notes.  But the EFH Committee ignores that EFH made this comparison when setting the initial rate on the Intercompany Notes.[153]  Specifically, EFH sought to match the then-current rate on EFH public notes with 7 to 10 year maturities.[154]  As testimony will show, this was consistent with EFH's original intention that the notes would remain

---

[151]  *See* Ex. 14, Expert Report of Eric Mendelsohn at 28.

[152]   EFH Committee Obj. ¶¶117-120.

[153]  DX 517, TCEH Intercompany Loans Presentation (Feb. 28, 2011) [EFH04073455 at EFH04073458].

[154]  *Id.*

outstanding for 7-10 years.  Though EFH would argue that there was never any obligation to reset the interest rate on these notes, TCEH would argue strenuously to the contrary.  Moreover, the EFH Committee ignores that third-party financial professionals contemporaneously made the same comparison in assessing the interest rate.[155]  In short, TCEH contends it is reasonable to compare the rate on the Intercompany Notes to market-tested metrics of EFH's credit risk, as EFH, third party professionals, and TCEH's expert witness all have done.[156]  And while EFH would have many arguments to refute this contention, the complexity and contested nature of this claim is precisely what makes it ripe for a reasonable settlement.

110.    The EFH Committee's argument regarding the TCEH Intercompany Note rests almost entirely on the provision in the Intercompany Notes stating they were "payable on demand" of TCEH, and thus the Notes were short-term interest instruments for which a LIBOR + 5.0% rate was appropriate.[157]  TCEH would introduce contrary evidence that this feature was not in reality functional.  That contrary evidence includes:

- The borrower (EFH) was the 100% owner of the lender (TCEH), and the same person signed the notes for both sides (though EFH would respond that these intercompany notes were expressly allowed by TCEH's credit documents)..[158]

- The person who signed the notes for both sides will testify that EFH intended the notes to remain outstanding for 7 to 10 years.

- TCEH continued to make substantial new advances under the Notes, even as EFH's credit profile deteriorated and the interest rate on the Intercompany Notes plummeted (at times to less than one third of yields on comparable EFH public debt).

---

[155] DX 643, Covenant Review Report (Mar. 2, 2011) [EFH-EVR000016189 at EFH-EVR000016192] (criticizing the LIBOR + 500 basis point yield on the Intercompany Notes "given that the EFH 2017s and EFH Legacy Bonds [then traded] with double digit yields and at deep discounts to par")).

[156] The EFH Committee asserts that "the combined credit of EFH and EFIH . . . fully guaranteed [the Intercompany Notes] but not any of the 'benchmark' EFH securities cited by the Debtors." (EFH Committee Obj. ¶ 116). That is simply false.  The EFH third party notes used as benchmarks had identical guarantees as the Intercompany Notes.  (*See* Ex. 14, Expert Report of Eric Mendelsohn at 18).

[157]    EFH Committee Obj. ¶¶ 116-117.

[158]    *See, e.g.*, DX 644, April 2011 P&I Note [EFH00030576].

- There is no evidence that TCEH ever demanded repayment from its parent, EFH. [159]

- At times, EFH did not have sufficient cash to repay outstanding balances "on demand" and potentially required additional borrowings under the Intercompany Notes to "have sufficient cash flows to meet its obligations."[160]

- As a practical matter, if TCEH had demanded repayment, EFH likely would have been forced to borrow from higher-cost third-party sources, assuming it would have access to such market financing. This is, in fact, precisely what happened when the Intercompany Notes were ultimately repaid.

111.    Based entirely on this premise,[161] Mr. Henkin opines that the Intercompany Notes were comparable to third party Corporate Demand Notes issued by Ford Motor Credit Company (and a few other companies) to conclude that the interest paid to TCEH was reasonable.  Mr. Henkin concedes that he was the first person to draw this comparison.[162]   Henkin's novel analogy does not withstand scrutiny.   Corporate demand note programs are similar to retail checking accounts (exclusive of FDIC insurance).[163]  The lenders in such corporate demand note programs are third parties—*i.e.*, the borrower does not control the lender.   Investors in such corporate demand programs regularly made demands for repayment (*e.g.*, when they wrote a check or closed an account).   For example, when Ford Motor Company's credit quality deteriorated in 2008, the balance outstanding on its demand notes shrank dramatically, from

---

[159]  The EFH Committee argues that the "allegation that the demand feature is 'not functional' is irreconcilable with the 359 separate repayment [sic] and advances within the four year period to [sic] the Petition Date." (EFH Committee Obj. ¶ 118).  The E-committee neglects to mention that nearly all of the 359 "repayment[s] and advances" were new *advances to EFH*.  (*See* Glueckstein Decl., Ex. 83, EFH Borrowings 2013, June 13, 2014).  Only a small number (about 25) were optional pre-payments, as permitted under the notes, mostly early in the program before the interest differential moved so substantially in EFH's favor.  (*See, e.g.*, Tr. Ex. 644, April 2011 P&I Note reflecting EFH's right to prepay "at any time in whole [or] in part . . . without penalty").  And none of EFH's optional prepayments reflect a demand because there is no evidence that TCEH ever made one, as the EFH Committee's own expert has acknowledged.  (Ex. 9 10/21/15 Henkin Dep. Tr. at 48:8-15).

[160]   EFH Form 8-K. Ex. 99.1 at 12, (Jan. 31, 2012) (available on EDGAR).

[162]   Ex. 9 10/21/15 Henkin Dep. Tr. at 26:2-9.

[163]   Glueckstein Decl., Ex. 22, Expert Report of Michael Henkin at 38 n.61, 58.

approximately $5.4 billion to $2 billion.[164]   This lender exodus from Ford's demand note program reflects that lenders there could and would actually use the demand feature.

112.    By contrast, the balance outstanding under the Intercompany Notes actually grew during periods where EFH's credit profile worsened, and there is no evidence that TCEH ever made a demand.  Mr. Henkin also admits that he could not identify a corporate demand note program in which not a single demand was made over a 5 year period, as is the case with the Intercompany Notes.[165] There is also no indication that TCEH or EFH ever viewed any of Mr. Henkin's Corporate Demand Notes as a point of comparison for the appropriate interest rate on the Intercompany Notes.  Instead, contemporaneous documents reflect that EFH itself compared the rate on the Intercompany Notes to EFH's market traded debt.[166]

113.    Finally, the EFH Committee argues that the Intercompany Notes served as a "cash management product" for TCEH.   However, the evidence shows that the purpose of the Intercompany Notes was to provide liquidity to EFH to pay SG&A ("selling, general and administrative" expenses) and P&I ("principal and interest" payments), which is why the notes were called the "SG&A Note" and the "P&I" Note.  The EFH Committee also cites to board material from 2012 to argue that TCEH had reason not to demand repayment of the Intercompany Notes.[167]   But, as the Committee's expert admitted, any purported reason not to demand repayment is immaterial to an assessment of the appropriate interest rate on the notes.[168]

---

[164]  Ford Motor Credit Company LLC Form 10-K at Note 10 (Dec. 31, 2008) (available on EDGAR).

[165]  Ex. 9 10/21/15 Henkin Dep. Tr. at 48:16-50:6.

[166] DX 517, TCEH Intercompany Loans Presentation (Feb. 28, 2011) [EFH04073455 at EFH04073458].

[167]  EFH Committee Obj. ¶ 116.

[168]  Ex. 9 10/21/15 Henkin Dep. Tr at 70:14-23.   TCEH's expert, Mr. Mendelsohn, agrees. (*See also* Ex. 15 10/21/15 Mendelsohn Dep. Tr. at 214:16-216:8.)

114.    In short, TCEH has a slew of arguments that it was underpaid by at least $425 million dollars, assuming a four-year look-back period and excluding pre-judgment interest, and by up to $834 million if looking back to the inception of the TCEH Intercompany Notes in October 2007 and including a pre-judgment interest rate of 9%.[169]

d.    Shared Services

115.    As explained in the Settlement Motion, TCEH contends that beginning in 2010, EFH began over-allocating shared services costs to the TCEH Debtors allegedly for the benefit of EFH, EFIH, and Oncor.  Consequently, the TCEH Debtors did not receive reasonably equivalent value for their shared services allocations during a period in which they were allegedly balance sheet insolvent.

116.    Several facts underscore the potential exposure of the E-side Debtors on this claim.  First, EFH did not allocate *any* shared services costs to EFIH until 2014.  Second, over the same period, EFH allocated several corporate overhead costs entirely or almost entirely to the TCEH Debtors even though those costs arguably benefited the entire EFH corporate family.  Third, starting in 2010, EFH allocated 100% of the Sponsor Fees to the TCEH Debtors.  These facts alone a raise substantial argument about whether the TCEH Debtors received reasonably equivalent value for the shared services allocations during the 2010-2013 period.

---

[169] In addition, the EFH Committee's alternative damage calculations are premised on (a) EFH prevailing on disputed choice of law issues relating to statute of limitation and prejudgment interest rate, and (b) prevailing on an argument as to whether TCEH can step into the shoes of the IRS for limitations purposes, an issue previously briefed to the Court (*See* Reply in Support of Standing Motion of the Official Committee of TCEH Unsecured Creditors at 28-34 [D.I. 4031]).  And in any event, the EFH Committee calculation improperly disregards all balances first outstanding prior to the Committee's lookback period, even though TCEH contends that EFH failed to pay appropriate interest on those balances throughout that lookback period as well as on the new principal advanced during that period.  *See e.g., In re Carrozzella & Richardson*, 286 B.R. 480, 489 (D. Conn. 2002) (noting the "universally accepted fundamental commercial principal that, when you loan an entity money for a period of time in good faith, you have given value and you are entitled to a reasonable return"); *In re Unified Commercial Capital*, 2002 WL 32500567, at *6 (W.D.N.Y. June 21, 2002) (noting the "[t]he simple fact . . . that the use of funds for a period of time has value").

117.     The EFH Committee's arguments do not demonstrate the contrary.  First, the EFH Committee contends that TCEH Debtors have "targeted the wrong party" with this claim because EFH Corporate Services, a subsidiary of EFH, actually performed the services for which the TCEH Debtors were charged.[170]     The EFH Committee simply misapprehends the nature of the TCEH Debtors' claim.  The TCEH Debtors contend that EFH over-allocated the costs to the TCEH Debtors – that is, the TCEH Debtors were paying for services that were actually rendered to EFH or EFIH.  The Bankruptcy Code, Delaware and Texas law are clear that an avoidance action may be brought against the initial transferee "*or* the entity for whose benefit such transfer was made . . . . "  11 U.S.C. § 550(a)(1) (emphasis added);  Del. Code Ann. tit. 6, § 1308(b)(1); Tex. Bus. & Com. Code § 24.009(b)(1); *see also In re Buckhead Am. Corp.*, 178 B.R. 956, 961-62 (D. Del. 1994).  Here, EFH and EFIH plainly benefited insofar as shared services costs were over-allocated to the TCEH Debtors and are therefore property "targets" of fraudulent transfer claims

118.     Second, the EFH Committee argues that the TCEH Debtors received reasonably equivalent value because EFH Corporate Services was compensated for its services at cost.[171] This again misconstrues the TCEH Debtors' claim.  The TCEH Debtors do not contend that EFH Corporate Services was over-compensated for its services.  Rather, the TCEH Debtors contend that the costs of those services – which, again, were provided to all of the Debtors—were over-allocated to the TCEH Debtors and that this over-allocation inured to the benefit of EFH and EFIH, which were under-allocated shared services costs.

---

[170] EFH Committee Obj. ¶ 122.

[171] EFH Committee Obj. ¶ 122.

119.    The EFH Committee's brief reads as if TCEH has made no effort to support its transfer claims concerning shared services, but in truth there were significant liability and damages issues.  TCEH's primary contention was that it overpaid for corporate services between 2010 and 2014.[172]  TCEH noted that the percentage of shared services costs allocated to TCEH went from 58% in 2008 to 85% in 2013, whereas the percentage of shared services costs allocated to the E-Side and Oncor over the same time period materially declined.[173]  TCEH disputed that this increased allocation was justified by the benefits that the TCEH Debtors received from the underlying services.[174]  For example, TCEH pointed out that beginning in 2010, it was allocated and paid 100% of the Sponsor advisory fees, despite the fact that the 2009 Huron Consulting Report expressly recommended against allocating down to the business units "unless benefits can be supported."[175]  Total Sponsor fees paid by TCEH in the four years prior to the Petition Date were $141 million, of which none were allocated to EFIH prior to 2014.[176]  To defend this allocation, EFIH would argue that it received no benefit from the Sponsors' advisory role until 2014.

120.    Third, in an attempt to justify the historical allocation of shared services costs to the TCEH Debtors, the EFH Committee argues that the 2010-2013 shared services allocations

---

[172]  EFH Committee Obj. ¶ 123.

[173]  EFIH and TCEH Debtors Statement in Support of Intercompany Plan and Settlement, Exhibit D at slide 5 (Apr. 14, 2015) [D.I. 4145].  By contrast, EFIH received a roughly 20% allocation for 2014; if carried back to the 2010-13 fees, that would result in an additional roughly $28 million in allocation to EFIH (and reduction to TCEH allocation).

[174]  Based on its investigation, TCEH estimated in settlement negotiations that, if litigated, a court would find that EFIH was under-allocated shared services costs by between 20% and 40%, which would imply that TCEH had a claim against EFH of between $69 and $134 million.  EFIH and TCEH Debtors Statement in Support of Intercompany Plan and Settlement, Exhibit B and slide 31, Exhibit D at slide 4-5 (Apr. 14, 2015) [D.I. 4145].

[175]  EFIH and TCEH Debtors Statement in Support of Intercompany Plan and Settlement, Exhibit B at slide 30 (Apr. 14, 2015) [D.I. 4145]; DX 685, Huron Consulting Report (June 8, 2009) [EFH04404842 at EFH04404899].

[176]  EFIH and TCEH Debtors Statement in Support of Intercompany Plan and Settlement, Exhibit B at slide 30 (Apr. 14, 2015) [D.I. 4145]; DX 339, Management Agmt. ¶ 1 [EFH04173219 at EFH04173219-220].

merely followed from the Huron Consulting Group's recommendations.  But this Huron report cannot bear the weight that the EFH Committee places on it.  As the EFH Committee's expert witness, Mark Rule, acknowledged, the Huron report did not recommend specific allocations of shared services costs among the Debtors, let alone advise that EFH should not allocate any shared services costs whatsoever to EFIH.  Instead, Huron made general recommendations as to the methodology that EFH should apply in allocating shared services costs -- and the TCEH Debtors dispute that EFH properly implemented that methodology.

121.    Finally, the EFH Committee's argument that TCEH's total SG&A costs were reduced by approximately $90 million between 2009 and 2014 is just half the story.[177]  Even assuming that TCEH's SG&A costs had been reduced by that amount—which TCEH disputes— that amount, according to TCEH, should and would have been reduced further had EFIH been allocated any portion of the shared services costs before 2014.

e.    Overpayment of Sponsor Fees

122.    Finally, with respect to EFH's allocation of 100% of Sponsor Fees to the TCEH Debtors, the EFH Committee asserts that this was somehow a "*quid pro quo*" for the fact that EFH paid the Sponsor Fees in 2008 and 2009.[178]  To the contrary, EFH's payment of the Sponsor Fees in 2008 and 2009 underscores (in the view of the TCEH Debtors) the unreasonableness of allocating those fees in their entirety to the TCEH Debtors over the next four years.  In this regard, it is worth noting that in 2014, EFH began allocating 19.5% of the Sponsor Fees to EFIH

---

[177]  EFH Committee Obj. ¶ 124.

[178]  The EFH Committee also suggests that Huron recommended allocating 100% of the Sponsor Fees to the TCEH Debtors.  In fact, Huron recommended *against* allocating the Sponsor Fees to the TCEH Debtors insofar as those fees were "in the nature of an investment return rather than for actual services rendered."  (DX 685, Huron Consulting Report at 45 (June 8, 2009 [EFH04404842 at EFH04404886].)  The TCEH Debtors contend that the Sponsor Fees were, in fact, an investment return rather than for valuable services rendered – a position that the EFH Committee is in no position to dispute given its own allegation that the Sponsors were "harvest[ing]" fees from the Debtors over the same period.  See EFH Committee Supp. Obj. ¶ 11.

– a change that is conspicuously unmentioned in the EFH Committee report.  Indeed, if one were to apply the 2014 shared services allocations (when EFH first began allocating costs to EFIH) retroactively to 2010-2013, it would result in an additional allocation of $37 million to EFH and a corresponding reduced allocation to the TCEH Debtors.  This is a conservative estimate the value of the TCEH Debtors' potential fraudulent transfer claims against EFH and EFIH based on the historical allocation of shared services cost.

f.      Contribution to IRS Settlement

123.    In 2013, TCEH transferred $███████ to EFH in payment of its obligations under the TAA relating to an audit settlement with the IRS for the 1997-2002 tax years ("2013 Transfer").[179]  TCEH contends this is a classic preferential transfer because:  (a) at the time of the transfer, TCEH was insolvent; (b) the payment satisfied an antecedent debt; and (c) the payment was made to an insider, EFH, within one year of TCEH's petition date.  The EFH Committee's only response to this claim is to assert that EFH would have a viable "ordinary course of business" defense to preference liability.[180]  But the viability of that defense is uncertain.  As an initial matter, the 2013 Transfer was a one-time settlement payment that resolved some, but not all, of the intercompany liabilities arising from the 1997-2002 tax settlement.  Several cases hold that this assertion ignores case law holding that settlement payments, such as payments to settle claims for taxes owed from previous taxable years, are not "ordinary course" under 11 U.S.C. § 547(c)(2).  *See In re Valley Steel Prods. Co.*, 214 B.R. 202, 207 (Bankr. E.D. Mo. 1997) (payments for back taxes not in the ordinary course of business); *In re Lakeside Cmty. Hosp., Inc.*, 200 B.R. 853, 857 (Bankr. N.D. Ill. 1996) ("Payment of taxes

---

179  ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

180  EFH Committee Obj. ¶ 128.

years after they fell due is not in the ordinary course of business."); *see also In re Jolly "N", Inc.*, 122 B.R. 897, 907 (Bankr. D.N.J. 1991) (ordinary course of business defense did not apply to lump-sum settlement in satisfaction of antecedent debt).  TCEH also contends that the fact that the payment was made by TCEH's parent corporation – at a time when TCEH anticipated filing for bankruptcy – further undermines any ordinary course defense.

124.    Against this evidence and authority, the EFH Committee asserts without basis that "[a]mple evidence" demonstrates that such payments were common between EFH and TCEH is unsupported.[181]  But TCEH views the "ample evidence" cited by the EFH Committee as thin at best.  The EFH Committee plucks selective quotes from the Grant Thornton Report to suggest that the payment was ordinary course, but that report was not intended to assess whether the payment was ordinary course for preference purposes.  ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

125.    ███████████████████████████████████████████████

█████████████████████████████  ██████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████    *In re TWA, Inc. Post Confirmation Estate*, 327 B.R. 706, 708 (Bankr. D. Del. 2005) (that payment was made pursuant to terms of existing agreement between parties does not establish that the payments

---

[181]  EFH Committee Obj. ¶ 128

[182]  DX 663, Grant Thornton Report ¶ 191 [EFH04634391 at EFH04634439] (emphasis added).

[183]  EFH Committee Obj. ¶ 52.

were within the ordinary course of business).  █████████████████████████

████████████████████████████████████████████████████████████

████████████████████

g.    The 2007 LBO

126.    The EFH Committee glosses over the 2007 LBO by asserting incorrectly that the TCEH Debtors attributed "zero value" to the LBO-related claims during settlement negotiations. Rather, in light of the size of those claims, and the significant litigation risks, the TCEH Debtors did not attempt to *quantify* a value, but did insist that the claims presented a litigation risk to EFH and would be pursued if not settled.[184]

127.    The EFH Committee asserts without explanation that the settlement structure precludes EFH from paying value on the LBO claims while releasing the Sponsors.  But the settlement is a collection of consideration from various parties, including from the Sponsors' release of claims for indemnity against EFH, unpaid management fees against EFH, and others. Thus it is not inconsistent to include some value for the LBO claims against EFH embedded within the overall settlement consideration.  In short, the LBO claims were an extremely large (albeit uncertain) potential exposure for EFH, the release of which provided some additional value to EFH.

**ii.    The EFH Committee ignores TCEH defenses to its claims.**

128.    The EFH Committee contends that EFH has winning claims against TCEH and Luminant that would be lost as part of the proposed Settlement Agreement.[185]  The identified claims would involve substantial disputes of fact and a prospect of recovery that is at best uncertain.

---

[185]  *See* EFH Committee Obj. ¶ 132.

129.    To begin, the EFH Committee touts what it describes as the $1.3 billion of "undisputed" claims EFH has against TCEH and Luminant.[186]  It quickly adds a significant caveat to that large number: it "agrees with the Debtors that these prepetition claims could not be set off against the TCEH avoidance claim[.]"[187]  The EFH Committee is left with a more modest "undisputed" claim for $284 million under the TCEH unsecured notes that "can be set off against any claim by TCEH under the Tax Allocation Agreement."[188]  But even this would be disputed. The EFH Committee's assessment fails to account for the likely response from TCEH Debtors that such offset would be precluded by the terms of the applicable indenture and creditor agreement, among other reasons.[189]

130.    The EFH Committee then asserts that EFH has three valuable avoidance claims against TCEH and Luminant that were "not mentioned in the Settlement Agreement."[190]   As an initial matter, the EFH Committee identified claims rely on Mark Rule's opinion that EFH was insolvent for the four-year period before the Petition Date.[191]  They ignore criticisms of Mr. Rule's solvency analysis, the rebuttal report by Mr. Ying and the substantial factual record that supports EFH's solvency.  Even setting aside the solvency dispute, the three avoidance actions are still uncertain, at best.

---

[186]  *See id.*

[187]  *See id.* ¶ 133.

[188]  *Id.*

[189]  Settlement Motion at ¶ 165 (citing *In re Bevill, Bresler & Shulman Asset Mgmt. Corp.*, 896 F.2d 54, 59 (3d Cir. 1990).

[190]  EFH Committee Obj. ¶ 134.

[191]  *Id.*

131.    EFH identifies an avoidance claim is based on a $107.6 million "advances" that EFH made to EFCH in March 2010.[192]  The evidence will show that these advances were made pursuant to an intercompany note issued by EFCH (the "EFCH Note"), which was not guaranteed by TCEH or any of the other TCEH Debtors.  The EFH Committee suggests that EFCH's borrowings constituted a fraudulent transfer because EFCH did not have the ability to repay the advances, but it offers no evidence or analysis in support of that contention.  To the extent EFCH did not repay the advances, EFH would have an unsecured claim against EFCH only, not against any of the other TCEH Debtors.

132.    In addition, the EFH Committee asserts that, to the extent TCEH has a fraudulent transfer claim under the TCEH intercompany Notes, EFH has an avoidance claim on a note from EFH to TCEH because it was at an unreasonably low interest rate (the "EFH Note").[193]   TCEH borrowed approximately $770 million from EFH under this note, which it repaid about a year later.  Given the disparity between the magnitude and duration of the EFH Note and the TCEH Intercompany Notes, it is notable that the EFH Committee does not attempt to quantify any alleged underpayment of interest on this note.  In any event, TCEH contends that the EFH Committee ignores material distinctions between the EFH Note and the TCEH Intercompany Notes, including the absence of any evidence that the parties intended to keep this note outstanding for several years (as with the TCEH Intercompany Notes). TCEH also would dispute that the demand feature in the EFH Note is analogous, for purposes of analyzing a reasonable interest rate, to the demand provisions in the TCEH Intercompany Notes.   The EFH Committee next argues that EFH's purchases of TCEH public debt constituted a fraudulent transfer "for

---

[192]  *Id.* ¶ 135.

[193]  EFH Committee Obj. ¶¶ 138-139.

which EFH received no reasonable equivalent value."[194]  This contention is without merit.  As an initial matter, the EFH Committee utterly fails to articulate any basis for holding TCEH liable in fraudulent transfer (or otherwise) for EFH's purchases of TCEH debt *from third parties on the open market*.[195]  TCEH did not receive the proceeds of any of these debt purchases, and even if it did, EFH indisputably paid market prices and therefore received reasonable equivalent value for what it received in exchange.

133.    EFH holds approximately $19 million of TCEH First Lien Debt and approximately $284 million of TCEH unsecured 10.25% senior notes.  To be sure, TCEH could have benefited if EFH had "gifted" its TCEH debt holdings to TCEH, thereby foregoing any recovery on these claims.  But EFH did nothing of the sort.  To the contrary, the evidence will show that EFH collected more than *$100 million* of interest payments from TCEH during the prepetition period.  And as discussed above, during the negotiation of the DD Settlement, EFH reasonably asserted that it could use its holdings of TCEH to set off its potential liability on TCEH's claims, but there is no plausible basis for EFH to assert that its purchases of TCEH debt constituted a fraudulent transfer.

## B.    Difficulties in Collection

134.    As explained in the Debtors' Settlement Motion, there would be significant collectability problems with any inter-Debtor judgment.[196]  In its objection, the EFH Committee contends that EFH's claims against TCEH would be collectable but concedes, as it must, that its

---

194  *Id.* ¶ 136.

195  *See* Glueckstein Decl., Ex. 23, Expert Report of Mark Rule at 28-29 (acknowledging that EFH purchased its holdings of TCEH debt on the open market).

196  *See* Settlement Motion ¶¶ 231-234.

recovery would be "low" given the large pool of unsecured debt at TCEH.[197]    This is a significant understatement, to put it mildly.  If EFH were to prevail on any claims against TCEH, its recovery would be at best pennies on the dollar.  The EFH Committee then contends that TCEH would have a collectability problem because of EFH's setoff rights under Bankruptcy Code sections 533 and 502(d).[198]  The EFH Committee does not expand or develop this point, which further indicates that litigation may be required to the determine not only the amount of liability but the ability for TCEH to receive a portion of that recovery.

### C.    Complexity, Expense, and Delay of Litigation

135.    Litigation among the estates would be tremendously complex and costly.  The intercompany tax claims, central to EFH and TCEH arguments, are a prime example.  Litigating tax-sharing issues under the TAA would require a deep dive into the Debtors' past tax practices, a daunting undertaking, requiring extensive expert work and fact discovery.  As the forgoing discussion of the EFH Committee's favored claims and defenses illustrates, fact disputes permeate these claims, including questions of solvency and reasonably equivalent value.  Many of these easily plead and factually-intensive fraudulent conveyance claims cannot be quickly resolved "in the early stages of litigation" under federal pleading standards, as the EFH Committee implausibly suggests.[199]

136.    Recognizing that it would be impossible to litigate the inter-Debtor claims in bankruptcy without substantially extending these chapter 11 cases, the EFH Committee proposes that the Debtors could set up an appropriate reserve and allow these claims could to live on after bankruptcy.  Setting aside the uncertainty of the necessary reserves given the widely differing

---

[197]  EFH Committee Obj. ¶ 188.

[198]  *Id.*

[199]  *Id.* ¶ 192.

views on ultimate value of the claims, it is entirely reasonable for the Debtors to seek a fresh start and to exit from chapter 11 without a long tail of value-destructive litigation.  So long as the claims are being settled reasonably, as here, it is not for the EFH Committee to gainsay the Debtors' business judgment in pursuing a global settlement.

137.    The complexity and uncertainty of litigation of inter-Debtor claims strongly favors settlement, and all the more so given the extensive work the Debtors have done to identify claims, assess their merits, educate their boards, and negotiate a global and fair resolution.

### D.    Paramount Interests of the Creditors

138.    The Settlement Agreement is in the best interests of the creditors. As explained in the Debtors Settlement Motion, the settlement avoids draining estate resources in massive litigation, provides certainty to creditors, and hastens the Debtors' emergence from bankruptcy.  Moreover, further delay in in resolution of inter-Debtor claims could be injurious to the Debtors' value and change the market environment for Oncor.  All of these factors would of course affect the Debtors' ability to pay their creditors.

139.    The Settlement Agreement has the overwhelming support of T-side creditors.  E-side creditors object to the Agreement because, principally, they speculate that they would be prejudiced in the context of a different plan.  As the EFH Committee puts it, the inter-Debtor settlement is "intended to prevent the E-side Debtors from monetizing litigation assets against insiders by forfeiting those litigation assets definitively today, before they may become relevant in the future."[200]  In other words, the EFH Committee argues that the Settlement Agreement is not in the best interest of the creditors because it may diminish E-side creditors' leverage in the

---

[200]  EFH Committee Obj. ¶ 197; *see also* PIK Settlement Obj. ¶ 31.

context of different plans, should this Plan not be consummated.  This argument misunderstands how this Court will assess the Settlement Agreement under Rule 9019.

140.    The question for the Court is whether compromising the particular claims identified for $700 million is above the lowest point in the range of reasonableness—and that would be the question whether the Settlement Agreement was being considered alone or in parallel with plan confirmation.  The test is not whether the claims should not be settled because in the future they *may* have some hold-up value.  The EFH Committee cites no case where potential hold-up value is incorporated in a court's review under Rule 9019, under the *Martin* factors or otherwise.  Viewed from the Debtors' perspective, removal of that hold-up value in future negotiations is simply another reason to settle these claims and remove the cloud of complex and costly litigation over inter-Debtor claims from the Debtors' restructuring efforts.

141.    Even if speculation about the future value of the claims being settled—in the unlikely scenario that the Settlement Agreement is approved but the Plan is not, or the Settlement Agreement is approved and Plan confirmed but does not close—were a relevant consideration for the Court, the Settlement Agreement would still be in the best interests of the creditors.  The Settlement Agreement has near complete support from T-side creditors, who, like the E-side, bear some confirmation- and closing-related risk.  T-side creditors are accepting far less on their claims in order to settle and give the Debtors an opportunity to pursue this full-pay Plan and their potential upside from the deal.  On the E-side, creditors view the risk differently and have therefore objected.  The Settlement Agreement, however, is what gives them the opportunity to get paid in full, to which they would have no objection. Without the Settlement Agreement—in light of the alternatives available to the Debtors in the bidding procedures, for example—the E-side's potential recovery would be diminished and E-side creditors would object to that too.

142.    In the unlikely event that the Plan does not close, the Settlement Agreement is still in the best interests of the creditors because it disposes of the inter-Debtor, Sponsor, and director and officer claims for what they are worth.  It does so after extensive diligence, full consideration by the DDs and their advisors, and arm's-length negotiations, as the Debtors have described in detail in the Settlement Motion, in this Reply, and will demonstrate at trial.  The result is more than reasonable.

143.    The EFH Committee also objects that the Settlement Agreement is not in the best interests of the creditors because of T-side favoritism and the alleged exclusion of E-side creditors from negotiations.    As discussed above, however, this misstates the facts. Representatives of E-side creditors, including the EFH Committee, had numerous meetings with the DDs and DDAs regarding a potential settlement, and their views were taken into consideration.[201]  In any event, "[w]hile it is certainly true that the settlement affects the Debtors' unsecured creditors, there is no requirement that those creditors be actively involved in the settlement negotiations."  *In re Capmark*, 438 B.R. at 520.

144.    Ultimately, it is not a valid objection to the Settlement Agreement to argue that, from the perspective of certain creditors, it is less than ideal in process or substance.  Were that so, the Rule 9019 standard would be transformed from a judicial check on whether the Debtors are exercising their reasonable business judgment for the benefit of the estates to whether this is the best possible agreement for every constituency.  That is not the law.  *See, e.g., In re Wash. Mut.*, 442 B.R. at 328 ("The court does not have to be convinced that the settlement is the best possible compromise, but only that the settlement falls within a reasonable range of litigation

---

[201]  *See, e.g., supra,* Background II.B.2.

possibilities."); *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (same).

## IV.    THE SPONSOR AND D&O RELEASES SATISFY BOTH RULE 9019 AND THE *ZENITH* FACTORS.

### A.    The releases are appropriate elements of the Settlement Agreement.

145.    The EFH Committee claims that the releases in the Settlement Agreement cannot be approved because they do not satisfy *Zenith*, which identifies five non-exclusive factors relevant to the Court's evaluation of non-Debtor releases under a chapter 11 plan. *See In re Zenith Electronics Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999); *In re Washington Mut.*, 442 B.R. at 346-47 (citing *Master Mortgage Inv. Fund., Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)).  At the outset, it should be emphasized that the agreement between the Sponsors and the Debtors is ***different from*** a typical plan release analyzed under *Zenith*.  The Debtors have agreed to release the Sponsors under the Settlement Agreement in exchange for significant ***pre-Plan*** consideration from the Sponsors—including, as discussed below, releases by the Sponsors of their own significant claims and assignment of recoveries.  Thus, as with any Rule 9019 settlement of litigation claims, the critical question is whether the agreement is "fair and equitable" from the estate's perspective and "above the lowest point in the range of reasonableness." *In re Capmark Fin. Grp. Inc.*, 438 B.R. at 475-76.  Thus, while the *Zenith* factors may be borrowed from the plan context to provide guidance, those factors should not obscure the fact that the Debtors and the Sponsors, much like the E-side and the T-side Debtors, have agreed to a pre-plan *settlement* of potential litigation, with the Sponsors providing immediate and essential consideration under the Settlement Agreement.

146.    Under a traditional Rule 9019 analysis pursuant to *Martin* and its progeny, the releases easily pass muster.  The most notable potential claims being released against the

Sponsors relate the 2007 LBO and the Management Agreement.[202]    The Committee, however, has now conceded that those claims have "no colorable basis."[203]

147.    The EFH Committee in its Supplemental Brief has now articulated certain additional potential claims that it touts as "*colorable*."[204]  The Sponsors have ample responses to these recently-articulated claims in their supporting brief demonstrating why such claims are, in fact, worthless. The Debtors hereby join and adopt the Sponsors' response to the EFH Committee's claims, which forcefully explains why claims against the Sponsors are being released.

148.    Moreover, even if the EFH Committee's claims were to reach discovery and trial, litigating any such claims—which involve complex factual disputes against parties as sophisticated, well-funded, and well-represented as the Sponsors—would drain the Debtors' resources to the detriment of its junior creditors.  As for the non-Sponsor directors and officers, the EFH Committee has yet to articulate even a "colorable" claim.  Instead, it only makes vague allegations of breach of fiduciary duty.  Those allegations, made for the first time in the EFH Committee's objections, have not been pursued by any other litigant and find no support in the record.

149.    At the same time, as discussed more fully below, the Sponsors and Debtors' directors and officers have made critical contributions to the Debtors' restructuring, and are vital to the success of the Plan.  Under these circumstances, the releases in the Settlement Agreement fall well within the range of reasonable compromises.

---

202    *See* Settlement Motion ¶¶ 86-110.

203    EFH Committee Obj. ¶ 144.

204    *E.g.*, EFH Committee Obj. ¶ 25.

**B.    The releases satisfy Zenith, to the extent it applies.**

150.    The *Zenith* (or *Master Mortgage*) factors are: "(1) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (2) substantial contribution by the non-debtor of assets to the reorganization; (3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (4) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes 'overwhelmingly' votes to accept the plan; and (5) provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction."  *In re Zenith*, 241 B.R. at 110; Settlement Motion at ¶ 253.   "These factors are not considered requirements for the approval of third-party releases, but they may be instructive to the court." *In re 710 Long Ridge Rd. Operating Co., II, LLC*, No. 13-13653 (DHS), 2014 WL 886433, at *14 (Bankr. D. N.J. Mar. 5, 2014) (citing *In re Washington Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) ("These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness.").

151.    Application of the *Zenith* factors, like application of the *Martin* factors, supports approval of the settlement.

**i.    The Debtors share an identity of interest with their directors and officers and the Sponsors.**

152.    Courts have consistently held that an indemnification relationship is sufficient to satisfy an identity of interest. *See, e.g., In re Washington Mut., Inc.*, 442 B.R. 314, 349 (Bankr. D. Del. 2011) (holding that an identity of interest existed between the directors/officers and the debtors where the debtors had to indemnify directors/officers for claims asserted against them); *In re Charter Commc'ns*, 419 B.R. 221, 259 (Bankr. S.D.N.Y. 2009) (holding that "the

indemnification obligations between the Debtors and their directors, officers, agents, and professionals produce an identity of interest."); *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994) (noting that the identity of interest is "usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor").

153.    The EFH Committee argues that the indemnification obligations do not establish an identify of interest in this case because: (i) there are carve-outs to the indemnification obligations for gross negligence and fraud; (ii) they are prepetition obligations giving rise to prepetition claims that will only provide for a full recovery if the E-side Debtors are solvent; and (iii) to the extent that the E-side debtors must indemnify the directors and officers, the Debtors have director and officer ("D&O") liability insurance to cover the obligation.[205]   None of these arguments undermines the identity of interest between the Debtors and its Sponsors and directors and officers.

154.    The EFH Committee cites no authority for the proposition that a carve-out to an indemnification obligation destroys any identity of interest.  The only case the EFH Committee does cite, *In re Kasual Kreation, Inc.*, 54 B.R. 915, 917 (Bankr. S.D. Fla. 1985), does not even pertain to the approval of releases.  *See id.* (enjoining court proceedings against a non-debtor party and finding that "failure to obtain the Injunctive Relief requested *would* result in severe and irreparable harm to the bankruptcy estate.")  The first *Zenith* factor does not require the Court to determine whether there is a *complete* identity of interest but only to take into account "*an* identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor *or will deplete assets of the estate*." *In re Zenith*, 241 B.R. at 110 (emphasis added). A carve-out for gross negligence or fraud does not weaken the identity

---

[205]    *See* EFH Committee Obj. ¶ 208; *see also* EFH Committee Obj. ¶ 107.

of interest between the Debtors, their directors and officers, and the Sponsors, especially where, before the EFH Committee filed its supplemental objection, *no one* had even identified any *potential* claims for gross negligence or fraud on behalf of the directors, officers, or Sponsors. For the very first time, the EFH Committee's supplemental objection levels only vague allegations of gross negligence based on the Sponsors' alleged failure to cause EFH to "seek bankruptcy protection long before it eventually did."[206]  The EFH Committee cites no authority for the bizarre proposition that *failing to put a company into bankruptcy* constitutes gross negligence, and the evidence does not support such an outlandish claim.

155.    Whether the Sponsors, directors and officers would recover fully on their claims against the E-side Debtors is not relevant.  Assuming there are valid, valuable claims against the Sponsors and directors and officers, those claims could cause severe and irreparable harm to the Debtors' estates by reducing the distributable value available to creditors, even if the Debtors are insolvent.

156.    Finally, the EFH Committee does not point to a single case holding that where D&O insurance is available to cover indemnification obligations, there can be no identity of interest.  Such a principle would make little sense, since depletion of liability insurance (itself an asset of the Debtors) could cause harm to the Debtors.

### ii.    The Sponsors and the Debtors' directors and officers and have made substantial contributions to the reorganization.

157.    The Sponsors have agreed to give up valuable consideration and substantial recoveries *now* in connection with approval of the Settlement Agreement.  These surrendered recoveries include all of the Sponsors' asserted claims under the Management Agreement and Indemnification Agreement, which includes some $80 million in unpaid management fees and

---

[206]    EFH Committee Supp. Obj. ¶ 73.

related expenses.[207]    Additionally, Texas Energy Future Holdings Limited Partnership ("Texas Holdings")—the direct interest holder in EFH, which is owned by Sponsor-managed funds—agreed that it will not take any "worthless stock deduction" with respect to its EFH equity prior to consummation of the Plan, if doing so would give rise to an ownership change for tax purposes.[208]    Such action by Texas Holdings could limit the Debtors' ability to use a portion of their net operating loss deductions to offset taxable gain triggered to provide the partial basis step-up, a critical component of the Plan.

158.    Most significantly, Sponsors agreed to assign the proceeds of **any** recovery received on account of its equity interest in EFH to the TCEH Unsecured Group, giving up any upside to its $8.3 billion equity investment in EFH.[209]    This assignment of proceeds occurs upon approval of the Settlement Agreement and not under **any** plan, whether the current Plan or some alternative.  (*Id.*)  The EFH Committee's assertion that the Sponsors are forgoing potential future recoveries only in connection with this Plan is simply incorrect.[210]    As for the current Plan, without access to the potential upside relinquished by the Sponsors, it is highly unlikely that TCEH unsecured group would have been willing to pursue it.[211]

159.    The EFH Committee urges that the Sponsors' relinquishment of their recovery is "misleading" because, should this Plan fail, an alternative plan may leave the E-Side deeply impaired, thus rendering the Sponsors' forfeiture illusory.[212]  But even if the excess value at EFH

---

[207]    *See* Ex. 16 10/2/15 MacDougall Dep. Tr. at 110:13-22.

[208]    Settlement Agreement § 2.3(a).

[209]    *See* Settlement Agreement § 2.3(a).

[210]    EFH Committee Obj. ¶ 209.

[211]    Ex. 5 10/1/15, Keglevic Dep. Tr. at 364:15 - 365:8; Ex. 2 9/30/15 Williamson Dep. Tr. at 204:14-17 and 206:8-23.

[212]    Ex. 2 9/30/15 Williamson Dep. Tr. at 204:14-17 and 206:8-23.

is not ultimately realized, the Sponsors' agreement to forgo *now* the *right* to this potential recovery, no matter what happens in the future, is critical to global settlement that is critical to the Plan. *See In re Blitz U.S.A., Inc.*, No. 11-13603, 2014 WL 2582976 at \*4 (Bankr. D. Del. Jan. 30, 2014) (holding that consideration provided by Wal-Mart constitutes a substantial contribution where part of the consideration included agreement to relinquish valuable insurance rights).

160.    With respect to the directors and officers, they too are releasing valuable rights. For example, Ms. Williamson has filed a proof of claim in this case because she is not being paid the equity she is entitled to on account for her director fees due to suspension in bankruptcy.[213] Under the Settlement Agreement, that claim is relinquished.

161.    Additionally, the directors, officers, and Sponsors have all made substantial non-monetary contributions through significant investments of time and effort to the Debtors' restructuring.  While the EFH Committee suggests that this provides no basis for releasing former directors and officers, the Company's restructuring efforts have been ongoing since 2012. *See In re Exide Techs.*, 303 B.R. 48, 74 at n.37 (Bankr. D. Del. 2003) (declining to hold that "the price of a release of officers, directors and others must always involve the contribution of tangible 'assets' or that efforts alone of officers and directors are never sufficient to warrant such a release.")  The efforts of these former directors and officers have been valuable to EFH.

### iii.    The releases in Settlement Agreement are essential to the Debtors' reorganization.

162.    The releases in the Settlement Agreement are necessary now in order to secure the global resolution of claims from the Debtors' most impaired creditors—the TCEH unsecured creditors.  The Sponsors' agreement to support the Settlement Agreement, the Plan, and the

---

[213]  *Id.* at 278:19-279:23.

Alternative Plan, and to cooperate moving forward ensures necessary closure regarding key open issues among the Settlement Agreement parties.

163.    Moreover, the releases will permit the Debtors' directors and officers to focus on running the business instead of being distracted by litigation.  *See Zenith*, 241 B.R. at 111 (finding a release of Directors and Officers "necessary to the continued success of the reorganized Zenith, because they assure that the Directors and Officers are not distracted by litigation by the estate."); *In re Premier International Holdings, Inc.,* 2010 WL 2746964 at \*10 (D. Del. April 29, 2010) (approving a release of claims against the Debtors' officers and directors, noting the release was "necessary for the continued success of the Reorganized Debtors because it assures that the officers and directors are not distracted by litigation by or on behalf of the estate.").

### iv.    The non-Debtor releases are supported by the only impaired creditors under the Plan.

164.    The releases are supported by creditors at *all* levels of TCEH's capital structure, the only impaired creditors under the Plan.  Moreover, the EFH Committee glosses over the fact that there are ***ten constituencies of E-side creditors*** who hold unsecured claims at EFIH (also known as PIK creditors) who are parties to the Plan Support Agreement.  The fourth *Zenith* factor is therefore satisfied, as there is "an agreement by a substantial majority of creditors to support the injunction, specifically . . . the impacted class or classes 'overwhelmingly' votes to accept the plan."

165.    The objecting E-side creditors are deemed to accept the current Plan because they are unimpaired, and they are largely irrelevant to the standard *Zenith* inquiry.  *See Zenith*, 241 B.R. at 111 (upholding releases where "[n]o impaired class of creditors has rejected the Plan.").  Regardless, the EFH Committee did not state its intent to seek standing to bring claims against

the Sponsors and directors and officers until only two weeks ago.  This late and contrived announcement that the EFH Committee wants to pursue its "colorable claims" should receive no weight in the Court's analysis.

> **v.    The Plan provides for full payment of all creditors objecting to the releases.**

166.    The Plan provides for payment in full of all E-side creditors.  Nevertheless, the EFH Committee claims that because the releases are not inextricably tied to the Plan, they do not satisfy the fifth *Zenith* factor.  To start, this factor only highlights that the *Zenith* factors are not designed to apply to standalone settlements under Rule 9019.  Regardless, the Settlement Agreement, although separate from the Plan, is a condition precedent to full payment of all E-side creditors under the Plan.  Under those circumstances, the fifth *Zenith* factor weighs in favor of the releases.

167.    The EFH Committee further argues that "valuable" claims are being distributed on account of a controlling equity position and allegedly violate the absolute priority rule.[214]  The Debtors address the EFH Committee's argument concerning the absolutely priority rule below and will not do so again here.  Here, the Debtors merely note that neither of the cases the EFH Committee's cites touches this issue.[215]

## V.    THE PAYMENT OF FEES UNDER THE SETTLEMENT AGREEMENT SHOULD BE APPROVED BASED ON THIS COMPREHENSIVE RECORD.

168.    Section 2.7(a) of the Settlement Agreement seeks approval for TCEH to pay *up to* $49.75 million of "*reasonable and documented* out-of-pocket fees, expenses, and

---

[214]  *See* EFH Committee Obj. ¶ 212-213.

[215]  *See* EFH Committee Obj. ¶ 213, 213 n.20) (citing *In re Exaeris*, 380 B.R. at 745-46 (declining to to approve a sale of substantially all of the debtors' assets to insiders, and therefore not ruling on the settlement which would have included releases); *In re Capmark*, 438 B.R. at 512-3 (approving a pre-petition settlement of secured lenders' claims).

reimbursements" (collectively the "Professional Fees"),[216] to the: (1) members of the ad hoc committee of TCEH First Lien Creditors; (2) the TCEH Unsecured Group; (3) the TCEH Unsecured Notes Trustee; (4) the TCEH Second Lien Group; (5) the TCEH Second Lien Trustee; and (6) Bank of New York Mellon Trust Company, N.A. as collateral agent under the TCEH Second Lien Notes Indenture—but *not* to any individual members thereof, (collectively, the "Professionals").[217]

169.    The Office of the United States Trustee ("U.S. Trustee") proclaims that these are improper Professional Fees to "several non-estate retained professionals without adequate disclosure or legal justification."[218]    The U.S. Trustee asserts that it is unable to "evaluate the propriety" of the Professional Fees, and that is reason enough to deny approval.[219]    The U.S. Trustee further contends that payment of the Professional Fees requires compliance with section 503(b) of the Bankruptcy Code[220]    Alternatively, the U.S. Trustee seeks several amendments of and "clarifications" to the Settlement Agreement, which are actually requests for this Court to apply section 503(b) to the Professional Fees.[221]    The U.S. Trustee's objections and requests should be overruled.

---

[216]  *See* Settlement Agreement at § 2.7(a) (emphasis added).

[217]  *See id.*

[218]  UST Obj. ¶¶ 30-36.  The U.S. Trustee does not object to section 2.7(b) of the Settlement Agreement, which provides that EFH will pay Texas Holdings up to $15 million, only on the Effective Date of the Plan, for fees and expenses.  That payment is part of the Debtors' overall settlement with the Sponsors, who have broad and uncontested indemnity claims under pre-petition contracts with EFH.

[219]  *See id.* ¶ 31.

[220]  *See id.* ¶ 33 (citing *Davis v. Elliot Management Corp. (In re Lehman Bros. Holdings Inc.)*, 508 B.R. 283, 290 (S.D.N.Y. 2014).); *id.* ¶ 34, n.10.

[221]  *See id.* ¶ 36.

A. **The Payment of Certain Professionals' Fees under Rule 9019 as Part of a Settlement is Appropriate and Allowable.**

170. The U.S. Trustee does not dispute that the Settlement Agreement is fair, equitable, in the best interests of the Debtors' estates and falls above the lowest point in the range of reasonableness. *See Capmark Fin. Grp.*, 438 B.R. at 514. Courts have routinely approved settlement agreements providing for the payment of creditor's professionals' fees without applying the standards of section 503(b),[222] and, based on the comprehensive record put forth in these chapter 11 cases, this Court should do the same.

171. Here, the inclusion of the Professional Fees provision in an otherwise intricate settlement was negotiated on an arms-length, good faith basis, and as bargained-for consideration.[223] The Professional Fees are supported by the the T-side creditors who will own reorganized TCEH, the payor of the fees. It is well settled that a court should refrain from selectively approving and enforcing the terms of an arm's-length settlement. *See e.g., In re Mirant Corp.*, 348 B.R. 735, 743 (Bankr. N.D. Tex.).

172. In return for the Professional Fees, the Professionals have agreed to provide valuable support for the Debtors in their ability to consummate the Plan, and any Alternative Restructuring Transaction, should that scenario arise.[224] Most importantly, the Professionals are providing their consent to releases of inter-Debtor and legacy claims—the key to complete

---

[222] *See e.g., In re Delta Air Lines, Inc.*, Case No. 05-17923, Order Approving Settlements Between the Debtors and Section 1114 Retiree Committees to Modify Retiree Benefits at 10 (Bankr. S.D.N.Y. Oct. 19, 2006, Dkt. No. 3428) ("Delta agrees to pay the reasonable expenses of the 1114 Non-Pilot Committee, including its expenses in connection with its prior newsletters to Retirees, and its subsequent reasonable efforts to communicate the agreement reflected in this Term Sheet with Retirees"); *In re Calpine Corp.*, Case No. 05-60200, Order Granting Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Bankruptcy Rule 9019(a) to Approve a Settlement with the Calpine Canadian Debtors at ¶ 26 (Bankr. S.D.N.Y, Dkt. No. 5422, July 26, 2007) (approving allowance of an unsecured claim, which included a component for "Reasonable Costs" of an ad hoc committee of bondholders and an indenture trustee).

[223] *See* Settlement Agreement § 2.7(a) ("In exchange for the applicable Parties' agreements contained in the Plan Support Agreement, as well as their agreement to the settlements and releases set forth herein . . ..").

[224] *See* Settlement Motion at ¶¶ 66-70.

disarmament for the Debtors.  In doing so, the Professionals are helping to *prevent* the Debtors from incurring additional fees and expenses by eliminating the threat of months, if not years, of contentious litigation which would surely deplete the Debtors' resources.  This factor, in and of itself, demonstrates the reasonableness of the Professional Fees provision.

**B.    The Professionals Have Made Substantial Contributions to the Debtors' Restructuring Efforts.**

173.    Even under section 503(b), the Professional Fees should be approved in light of the Professionals' substantial contributions to this case.  Under section 503(b)(3), creditors and ad hoc committees of creditors who provide substantial contribution to a chapter 11 restructuring effort, as the Professionals have done here, are entitled to reimbursement of their "actual, necessary expenses," (including amounts incurred by employed professionals) *except* for expenses paid to employ attorneys or accountants.  11 U.S.C. § 503(b)(3)(D) (emphasis added); *see In re Lehman Bros. Holding Inc.*, 508 B.R. 283, 296 (Bankr. S.D.N.Y. 2014.)

174.    For amounts paid for legal and accounting professional services, a party must seek reimbursement under section 503(b)(4) of the Bankruptcy Code, which permits "reasonable compensation" for such professionals.  In *In re Lehman Bros. Holdings, Inc.*, the court found that a creditor or ad hoc committee of creditors was entitled to fees and expenses "by virtue of having made a 'substantial contribution' to the bankruptcy case."[225]

175.    As in *Lehman*, the narrowly tailored group of Professionals included in section 2.7(a) of the Settlement Agreement substantially contributed to the Debtors' efforts to bring these chapter 11 cases to a close in at least three ways:  (a) by providing billions of dollars in new debt and equity financing—allowing the Debtors to render unimpaired dozens of classes of claims; (b) by agreeing to waive billions of dollars in valuable deficiency claims for the benefit

---

[225]  508 B.R. at 296.

of unsecured creditors who would have otherwise received nothing in a liquidation; and (c) by agreeing to forego intra-T-side litigation in an effort to maximize parochial, T-side interests. These contributions required extensive efforts by the respective Professionals.

176.    With respect to the new debt and equity financing, the terms of such financing are set forth in the Equity Commitment Letter (as amended and restated in the Plan Supplement), the Backstop Agreement, and, of course, the Merger and Purchase Agreement, all of which were the subject of intense negotiation over a very short time-period amongst the Professionals.

177.    Similarly, the TCEH first lien deficiency waiver was the product of significant negotiations among the Professionals for the TCEH junior creditors and the TCEH first lien creditors.

178.    Finally, the intra T-side litigation involved review of millions of pages of legacy discovery materials, negotiations regarding the Challenge Deadline under the TCEH Cash Collateral Order, and the drafting of hundreds of pages of pleadings, which served as an impetus for mediation and ultimately settlement discussions.

179.    Without the dedicated and focused efforts of the Professionals to advocate for their constituencies while working towards a consensual resolution, the Debtors would not now find themselves on the brink of plan confirmation.

## VI.    THE SETTLEMENT DOES NOT VIOLATE THE ABSOLUTE PRIORITY RULE OR OTHER PLAN CONFIRMATION REQUIREMENTS.

180.    At least three parties, the United States Environmental Protection Agency, the Indenture Trustee for the PCRB Claims, and the EFH Committee have objected to the Settlement Agreement by attempting to import rules unique to the *plan confirmation* process into the Court's settlement approval analysis.  Specifically, these creditors argue that the Settlement Agreement violates the Bankruptcy Code's absolute priority rule under 11 U.S.C. § 1129(b)(2)

and equal treatment rule under § 1123(a)(4).[226]   That is improper.   None of those Code

provisions apply to a pre-plan Settlement Agreement Motion filed pursuant to Rule 9019.

> ### A.   The Settlement Agreement does not violate the equal treatment rule or unfairly discriminate against unsecured creditors.

181.   The PCRB Indenture Trustee's objection that the Settlement Agreement violates

the equal treatment rule should be rejected.[227]   Section 1123(a)(4) by its own terms only applies

to plans of reorganization, not settlements under Bankruptcy Rule 9019.   *See In re Energy

Future Holdings Corp.*, 527 B.R. 157, 167 (D. Del. 2015).   The PCRB Trustee has also asserted

this equal treatment argument in its objection to the Plan, where it is admittedly properly before

the Court, and the Debtors' Plan Reply addresses the PCRB Trustee's argument in detail.[228]

182.   The EPA's Settlement Objection (to the extent that it even asserts a challenge to

the Settlement Agreement) reflects a similar misunderstanding of Bankruptcy law.   The EPA

claims that the Plan unfairly discriminates against the general unsecured creditors of EFCH in

favor of creditors of TCEH's direct and indirect subsidiaries, in violation of section 507 of the

Bankruptcy Code.[229]   This argument fails, because EFCH creditors are not similarly situated to

TCEH creditors.   EFCH is the ultimate equity owner of TCEH, and cannot recover until all of

TCEH's creditors are satisfied in full.   *See* 11 U.S.C. § 1129(b)(2).   Because TCEH's creditors

are impaired, the absolute priority rule *requires* that EFCH (and its creditors, including the EPA)

---

[226]  EPA Obj. ¶¶ 21-28; PCRB Obj. ¶¶ 48-98; EFH Committee Obj. ¶¶ 220-30.

[227]  *See* PCRB Obj. ¶¶ 48-78 (citing 11 U.S.C. § 1123(a)(4)).

[228]  The PCRB Trustee also argues that the Settlement Agreement "does not comply with the Bankruptcy Code's Priorities," citing heavily from the Third Circuit's opinion in *In re Jevic Holding Corp.*, 787 F.3d 173 (3d Cir. 2015).  (PCRB Objection ¶ 80.)  *Jevic* explores the application of the absolute priority rule to pre-confirmation settlements.   To the extent the PCRB Trustee is asserting the Settlement Agreement violates the absolute priority rule by denying PCRB Claimants the opportunity to share in certain benefits along with other TCEH Unsecured Debt Claimants, this argument is without merit.  The PCRB Claimants are in the *same* class as other TCEH Unsecured Claimants. The PCRB's remaining objections to the Settlement Agreement sound in fairness, which is addressed in section IV.A of the Debtors' Plan Reply.

[229]  EPA Obj. ¶¶ 21-22.

receive no recovery.  Of course, none of this argument is directly applicable to the Settlement Agreement.

## B.    The Settlement Agreement does not violate the absolute priority rule.

183.    The EFH Committee asserts that the Settlement Agreement violates the absolute priority rule by granting releases to the Sponsors while leaving unsecured creditors potentially impaired.[230]  But the EFH Committee represents creditors who are *not* impaired under the Plan and therefore have no basis to assert an absolute priority challenge.  In any event, the absolute priority rule would not bar approval of the Sponsor releases even if it applied.

### i.    The terms of the Settlement Agreement do not trigger the absolute priority rule

184.    The absolute priority rule "only applies to unsecured creditors that are impaired by the terms of the plan."  *In re W.R. Grace & Co.*, 475 B.R. 34, 202 (D. Del. 2012), *aff'd*, 532 F. App'x 264 (3d Cir. 2013).  There is no violation of the rule where, as here, the objecting party will be paid in full under the terms of the Plan.  *See id*; *see also In re Prussia Assocs.*, 322 B.R. 572, 593-94 (Bankr. E.D. Pa. 2005) (rejecting an absolute priority rule objection even though the objecting creditor would not be paid in full until seven years after confirmation).  The EFH Committee cites no contrary case law.

185.    While the EFH Committee suggests that "unsecured creditors are potentially impaired" under the Plan,[231] that is not true for E-side creditors.  Under the Plan, all E-side creditors are unimpaired, and have no standing to raise an absolute priority rule objection.  The parties that *are* actually impaired under the Plan—the TCEH junior creditors—support the Sponsor releases.

---

230    *See* EFH Committee Obj. ¶ 225.

231    EFH Committee Obj. ¶ 224.

186.    Moreover, the EFH Committee's heavy reliance on *In re Jevic Holding Corp.*, is misplaced.[232]    In *Jevic*, a settlement agreement distributed *cash assets* to unsecured creditors, while skipping an entire class of creditors holding uncontested priority wage claims.  *See id.* at 177.  It was this provision of a *cash recovery* to junior creditors, while denying any recovery to senior claimants that triggered scrutiny under the absolute priority rule.

187.    This case is much different.  The Sponsors are not receiving any distribution under the Settlement Agreement, and in fact are foregoing a valuable equity interest they would otherwise have.  There is thus no basis under *Jevic* to apply the absolute priority rule to the Sponsor releases in the Settlement Agreement.

### ii.    Even if the absolute priority rule applied, the Sponsor releases would not violate the rule.

188.    Even if the absolute priority rule applied, the Settlement Agreement does not violate it for two independent reasons.  ***First***, the releases granted to the Sponsors were ***not*** granted "on account of" these parties' status as the ultimate equity owners of EFH Corp.  *See In re PWS Holding Corp.*, 228 F.3d 224, 238 (3d Cir. 2000).  ***Second***, to the extent that the releases could be considered a technical violation of absolute priority, there are "specific and credible grounds to justify" a slight deviation from the rule, *see Jevic*, 787 F.3d at 184 (internal quotation omitted).

189.    The EFH Committee's argument that the Sponsor releases violate the absolute priority rule rests almost entirely on *In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000).  But that case actually ***undermines*** the Committee's objection.  There, the court held that a chapter 11 plan of reorganization granting releases to a debtor's equity holders did *not* violate the absolute priority rule because the releases were not granted "on account" of the released party's equity

---

[232]    EFH Committee Obj. ¶¶ 221-222.

interest but instead were provided for other reasons. *See id.* at 238-39 (citing *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle Street P'ship*, 526 U.S. 434 (1999)).  Thus, the court found that there was no "causal connection" between the equity holder's status as residual owner of the debtor and its release from certain potential avoidance claims.  *Id.*

190.     The EFH Committee argues that the Sponsor releases were granted "on account of" the Sponsors' equity interest because the Sponsors allegedly "bargain[ed] for releases in their capacity as owners" of the Debtors.[233]  *PWS Holding* expressly rejected this simplistic reasoning:

> The objectors argue that] KKR had an equity interest in the corporation, and therefore the Debtors must have made the releases for that reason.  If we were to accept this position, *without* some evidence of a causal relationship, any time that old equity received anything of value under a reorganization plan we would have to conclude that it was received 'on account of' the interest—the position rejected by the Supreme Court in *203 North LaSalle*.

228 F.3d at 242.

191.     Instead, the court assessed the causal connection by considering the "two basic goals of Chapter 11: those of 'preserving going concerns and maximizing property available to satisfy creditors.'"  *Id.* at 238 (citing *203 N. LaSalle*, 526 U.S. at 453).  These policies in turn centered the court's analysis on two key facts: "there was a low likelihood of recovery on the [released] claims"; and "the potential cost to the estate of prosecuting the action and defending and paying indemnification claims, cross claims, and counterclaiming arising out of the prosecution was high."  *Id.* at 239.  For reasons discussed at length above and in the Sponsors' reply brief those are precisely the circumstances of this case.

192.     The EFH Committee attempts to distinguish the facts of *PWS Holding* by alleging the "exclusive nature of the negotiations about the [Sponsor] releases and absence of a

---

[233]     EFH Committee Obj. ¶ 227.

market test."[234]  But these are not valid distinctions.  In approving the releases in question, the *PWS Holding* court acknowledged that the equity owners in that case "had an exclusive opportunity to gain the release in the reorganization," *id.* 228 F.3d at 239, and that "the Debtors had the exclusive opportunity to dispose of the Debtors' priority," *id.* at 239 n.11.  Moreover, the releases in this case have been "market tested" insofar as all claims were heavily investigated by the T-side creditors approving of the releases, and no potential claims against the Sponsors were identified with any specificity by E-side creditors until shortly before filing their objections.

193.    Because there is no "direct evidence of causation" that the releases resulted from the Sponsors' status as equity owners, they do not violate any rules of absolute priority.  *See PWS Holding*, 228 F.3d at 242 (rejecting absolute priority objection "in the particular circumstance in which the estate's claims are of only marginal viability and could be costly for the reorganized entity to pursue").  Thus, the Court should reject the EFH Committee's Objection on this basis.

194.    An additional independently sufficient reason why the EFH Committee's objection must be rejected is that, under the Third Circuit's decision in *Jevic*, a court may approve a settlement agreement that deviates from the absolute priority rule when it has "specific and credible grounds" to do so.  787 F.3d at 184.  While acknowledging that the Third Circuit "did not provide specific factors" to determine specific and credible grounds, the EFH Committee nonetheless asserts that "extraordinary circumstances" are required.[235]   This requirement does not exist in the law.

---

[234]    EFH Committee Obj. at ¶ 228.

[235]    EFH Committee Obj. ¶ 222.

195.    In this case, there are "specific and credible grounds" to approve any purported deviation from the absolute priority rule.  The Sponsors have made substantial contributions warranting releases.   Moreover, the creditors groups who are actually impaired under the Debtors' Plan fully support the grant of releases contemplated by the Settlement Agreement. These circumstances satisfy the "specific and credible grounds" standard under *Jevic*.

196.    For all of these reasons, the Court should reject the EFH Committee's absolute priority rule objection to the Settlement Agreement.

## VII.    THE ONCOR ENTITIES WILL BE RELEASED UNDER THE SETTLEMENT AGREEMENT.

197.    The EFIH PIK Trustee and the EFIH Second Lien Trustee object to the Settlement Agreement because it does not release potential claims against Oncor. That is incorrect. Oncor is released under the Settlement Agreement.

198.    In their objections, these objectors point out that section 2.1(a) of the Settlement Agreement releases all claims against the Debtors. Oncor, which is not a debtor, is not covered by this definition. Section 2.3(e) of the Settlement Agreement provides releases to the Debtors and their subsidiaries, which includes Oncor, from potential claims by the "Settling Interest Holders," i.e., the Sponsors and Sponsor Managers.[236] Thus these objectors read the Settlement Agreement to only partially release Oncor.

199.    The EFIH PIK Trustee and EFIH Second Lien Trustee have simply missed the relevant provision of the Settlement Agreement.   In Section 2.3(c), the EFH Interest Holder Releasor Parties, i.e., the Debtors and all the creditor parties to the Agreement, release the EFH Interest Holder Released Parties, which includes holders of EFH Interests, and "each such Entity's . . .  subsidiaries."  This includes Oncor, which is an indirect subsidiary of the holders of

---

[236]    Settlement Agreement. § 2.3(e).

EFH Interests. There is no qualifier on "subsidiaries"—i.e., nothing limiting the release to "wholly-owned" or "direct" subsidiaries only and no other proviso limits Oncor's inclusion among EFH Interest Holder Released Parties.

200.    Thus, any objections based on the failure to include Oncor as a released party are based on a misreading of the Settlement Agreement and must be overruled.

## VIII.    THE ASBESTOS OBJECTION SHOULD BE OVERRULED.

201.    Fenicle and Fahy raise concerns about intercompany claims that the asbestos Debtors, including EECI, Inc., may have against EFH Corp.[237]  But the Settlement Agreement is clear on its face—section 2.1(a) only releases "Non-EFH Debtor Intercompany Claims" against the EFH Debtors, which does not include the intercompany claims held by EECI, Inc. and the other EFH Debtors against EFH Corp.[238]

### <u>Conclusion</u>

202.    For the reasons stated above and in the Settlement Motion, the Debtors respectfully request that the Court overrule the objections and approve the Settlement Agreement.

*[Remainder of page intentionally left blank.]*

---

[237]    Fenicle & Fahy Obj. ¶¶ 42-25.

[238]    *See* Settlement Agreement, § 1 (definition of "Non-EFH Debtor Intercompany Claim")).

Dated: October 31, 2015
      Wilmington, Delaware

*/s/ Joseph C. Barsalona II*
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
Joseph C. Barsalona II (No. 6102)
920 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701
Email:     collins@rlf.com
     defranceschi@rlf.com
     madron@rlf.com
     barsalona@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:     edward.sassower@kirkland.com
     stephen.hessler@kirkland.com
     brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:     james.sprayregen@kirkland.com
     marc.kieselstein@kirkland.com
     chad.husnick@kirkland.com
     steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession

Dated:  October 31, 2015
      Wilmington, Delaware

*/s/ Mark K. Thomas*
_____

**BIELLI & KLAUDER, LLC**
David M. Klauder (No. 5769)
1204 N. King Street
Wilmington, DE 19801
Telephone:    (302) 803-4600
Facsimile:    (302) 397-2557
Email:      dklauder@bk-legal.com


-and-


**PROSKAUER ROSE LLP**
Jeff J. Marwil (admitted *pro hac vice*)
Mark K. Thomas (admitted *pro hac vice*)
Peter J. Young (admitted *pro hac vice*)
Three First National Plaza
70 W. Madison Street, Suite 3800
Chicago, IL 60602
Telephone:    (312) 962-3550
Facsimile:    (312) 962-3551
Email:      jmarwil@proskauer.com
           mthomas@proskauer.com
           pyoung@proskauer.com

Co-Counsel to the Debtor Energy Future Holdings Corp.

Dated:  October 31, 2015
     Wilmington, Delaware       */s/ Richard Levin*

**STEVENS & LEE, P.C.**
Joseph H. Huston, Jr. (No. 4035)
1105 North Market Street, Suite 700
Wilmington, Delaware 19801
Telephone:    (302) 425-3310
Facsimile:    (610) 371-7927
Email:        jhh@stevenslee.com

-and-

**CRAVATH, SWAINE AND MOORE LLP**
Michael A. Paskin, Esq.
Trevor M. Broad, Esq.
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Telephone:    (212) 474-1760
Facsimile:    (212) 474-3700
Email:        mpaskin@cravath.com
                tbroad@cravath.com

-and-

**JENNER & BLOCK**
Richard Levin
919 Third Avenue
New York, NY 10022-3908
Telephone:   (212) 891-1601
Facsimile:   (212) 891-1699
Email:      rlevin@jenner.com

Co-Counsel to Energy Future Intermediate Holding Company
LLC

Dated:  October 31, 2015
      Wilmington, Delaware       */s/ Seth Goldman*

                                           **MCELROY, DEUTSCH, MULVANEY**
                                           **& CARPENTER, LLP**
                                           David P. Primack (No. 4449)
                                           300 Delaware Avenue, Suite 770
                                           Wilmington, DE  19801
                                           Telephone:    (302) 300-4515
                                           Facsimile:    (302) 654-4031
                                           Email:         dprimack@mdmc-law.com

                                           -and-

                                           **MUNGER, TOLLES & OLSON LLP**
                                           Thomas B. Walper
                                           Seth Goldman
                                           355 South Grand Avenue, 35th Floor
                                           Los Angeles, CA 90071
                                           Telephone:    (213) 683-9100
                                           Facsimile:    (213) 683-4022
                                           Email:         Thomas.Walper@mto.com
                                                             Seth.Goldman@mto.com

                                           Co-Counsel to the TCEH Debtors