## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) |
|  | )   Chapter 11 |
| Energy Future Holdings Corp., *et al.*,[1] | ) |
|  | )   Case No. 14-10979 (CSS) |
| Debtors. | ) |
|  | )   (Jointly Administered) |

)   **Hearing Date: November 3, 2015 at 11:00 a.m.**
)   **Reply Deadline: October 30, 2015**
)   **Re: Docket Nos. 6817 & 6820**

### THE AD HOC GROUP OF TCEH UNSECURED NOTEHOLDERS' AND THE BACKSTOP PURCHASERS' (I) JOINDER TO THE DEBTORS' OMNIBUS REPLY TO SETTLEMENT MOTION OBJECTIONS; (II) JOINDER TO THE DEBTORS' OMNIBUS REPLY TO PLAN CONFIRMATION OBJECTIONS; AND (III) REPLY IN FURTHER SUPPORT OF THE DEBTORS' SETTLEMENT MOTION AND CONFIRMATION OF THE PLAN

The ad hoc group (the "Ad Hoc Group") of certain holders of approximately $2.7 billion of 10.25% Fixed Senior Notes due 2015 (including Series B) and 10.50%/11.25% Senior Toggle Notes due 2016 issued by TCEH[2] and TCEH Finance, Inc. and the Backstop Purchasers hereby file this (i) joinder to the *Omnibus Reply in Support of Motion of Energy Future Holdings Corp., et al., to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter into and Perform Under the Settlement Agreement* [Docket No. 6820] (the "Debtors' Settlement Reply"); (ii) joinder to the *Debtors' Omnibus Reply to Plan Confirmation Objections* [Docket No. 6817] (the "Debtors' Plan Reply"); and (iii) reply in further support of the *Motion of Energy Future Holdings Corp., et al., to Approve a Settlement of Litigation Claims and Authorize the Debtors to*

---

[1]   The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases (the "Cases"), for which joint administration has been granted, a complete list of the debtors (the "Debtors") and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://efhcaseinfo.com.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Settlement Motion and Plan (as such terms are defined below), as applicable.

*Enter into and Perform Under the Settlement Agreement* [Docket No. 5249] (the "Settlement

Motion") and confirmation of the *Fifth Amended Joint Plan of Reorganization of Energy Future*

*Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 6122] (the

"Plan").  The Ad Hoc Group and the Backstop Parties respectfully represent as follows:

## PRELIMINARY STATEMENT

1.        When the idea first took hold within the Ad Hoc Group that a potential path out of

these Cases would involve (a) raising $12 billion based on a potential REIT structure value

approaching $20 billion, (b) using that new capital to pay E-side creditors in full and

(c) distributing rights to purchase reorganized EFH Corp. equity to T-side unsecured creditors as

their primary recovery, the running joke was that the whole process would be easy—"first you

start with $20 billion."  The irony has not been lost on the Ad Hoc Group that each of the parties

presently objecting to the Plan remains stuck within that joke, premising all of their objections on

a simple assumption—"just start with a plan that creates billions of dollars of value above

anything that is potentially available to us."  Indeed, not a single objecting party seriously

contends that this Court should set aside the contemplated transactions or even grant the

objections of any of the other objecting parties, but rather that the Court should blue-pencil the

Plan to meet the parochial concerns of each potential objecting party regardless of their

economic effects on the deal.  All conveniently assumed the predicate—that the very structure

that is enabling the creditors to argue over such issues as unimpairment, allowance of post-

petition interest and makewhole premiums and the allocation of billions of dollars of settlement

consideration will exist if their objections prevail.

2.        As the group that has, since the first day of these Cases, protected the rights of all

TCEH unsecured creditors, often with the able assistance of the TCEH Committee, the TCEH

Second Lien Notes Trustee and the TCEH Unsecured Notes Trustee, and has played a pivotal

role in architecting a $12.1 billion capital raise, the Ad Hoc Group believes it has earned a voice

in seeking confirmation of the Plan exactly as written, and in commenting on the objections of

those who seek to modify the carefully crafted economics of the capital raise to suit either their

own recovery goals or their ever-increasing strident cries for relevance in the process.

3.      We do not intend to address in exacting detail the myriad of ways in which the

objecting parties have misconstrued, miscited or misrepresented the factual record of these

Cases, or the manner in which the operative Plan documents interact with one another.  Instead,

the Ad Hoc Group intends to rely on the exhaustive trial record that the Debtors will present

making clear that, not only is the Plan fully in compliance with section 1129, it is a triumph of

the bankruptcy process in an extremely challenging legal, economic, regulatory and fiduciary

environment affecting the largest failed leveraged buy-out in history.  What we will address,

however, are the following four points.

4.      First, in Section I, we address the accusations that the Ad Hoc Group either acted

inappropriately, in bad faith or in violation of any of the operative ground rules of these Cases in

connection with plan negotiations.  Simply put, the objections are not only without any record

evidence, they are directly contrary to the existing record in these Cases dating back to the first

day hearings in May 2014.  That record makes clear that the Ad Hoc Group has constantly

sought to level playing fields, keep the Debtors as honest brokers between warring creditor

factions and, as and when appropriate, actively seek consensus with other creditors in the capital

structure.  The fact that objecting parties perceive that they were left out of negotiations of the

Plan (which they were not) is at best chargeable to the fact that for some (such as the PCRB

Trustee) there was simply no principal to negotiate with, for some (the E-side makewhole

Americas 90873537

claimants) they kept on pressing claim treatments that this Court has time and again ruled are not allowable, and for some (the EFH Committee) there has never been a clear sense of what they want or can deliver.  Even still, the Ad Hoc Group continued (and continues) to work to build consensus and turn yet another seeming morass into an economic success in the utmost of good faith.

5.      <u>Second</u>, in Section II, we address the objections of the PCRB Trustee regarding the treatment of PCRB Claims in the Plan.  As set forth therein, there is no issue with respect to the classification of those claims—all creditors in Class C4 are creditors with Allowed unsecured claims against TCEH.  Nor is there a dissimilar treatment problem—all creditors within Class C4 receive a Pro Rata share of Rights and New EFH Common Stock.  What the PCRB Trustee is really objecting to is one aspect of the Settlement Agreement in which holders of TCEH First Lien Claims waive for the benefit of certain T-side creditors their recoveries on the TCEH First Lien Deficiency Claims.  Ostensibly, the PCRB Trustee objects to that allocation on the basis that the settlement of the TCEH Debtors' claims against the holders of TCEH First Lien Claims is unfair to TCEH because it is "arbitrary."  That objection suffers from several patent evidentiary deficiencies and ultimately seeks to challenge cash collateral stipulations that went effective as against the PCRB Trustee months ago.  The actual evidence will show that the holders of Allowed PCRB Claims are recovering distributions far in excess of that which they would receive if the Plan is not confirmed or if they litigated their purported entitlements to "TCEH's" claims against the holders of TCEH First Lien Claims to conclusion.

6.      <u>Third</u>, in Section III, we address various objectors' speculations that the TCEH Debtors' claims against the holders of TCEH First Lien Claims and the E-side Debtors, Oncor and the Sponsors are so "baseless" that T-side unsecured creditors would be content with

terminating their investment rights and taking the $550 million "booby prize."  Again, from the first days of these Cases, the Ad Hoc Group has sought to protect, preserve, diligence, prosecute and monetize T-side avoidance actions for the benefit of all unsecured creditors of the TCEH Debtors.  The <u>only</u> reason the Ad Hoc Group was willing to forego all of its work in that regard was to obtain the possibility of realizing <u>more</u> value through an investment opportunity in reorganized EFH Corp. equity.  Speculation that, having bargained away the right to litigate those claims, the TCEH unsecured creditors are not incentivized to close is rank speculation. The funding contracts are in place, regulatory approvals are proceeding apace and there is nothing in the record to support any hyperbolic contention that there will be a sea change in investor sentiment come the Effective Date of the Plan.

7.     <u>Finally</u>, in Section IV, we address the request of the U.S. Trustee that, notwithstanding the record of these Cases, the Ad Hoc Group must jump through one final procedural hoop—section 503(b) of the Bankruptcy Code—before being reimbursed for fees and expenses incurred in making this confirmation hearing and the success of these Cases possible. The Bankruptcy Code is to the contrary, and the Court needs no further application, argument or evidence to grant the Debtors' authority to pay the reasonable fees and expenses, subject to the Court approving the Settlement and confirming the Plan.

## **JOINDER**

8.     For the reasons set forth in the Debtors' Settlement Reply and the Debtors' Plan Reply, the Court should (i) overrule all objections to the Settlement Motion and Plan, (ii) grant the Settlement Motion and (iii) confirm the Plan.

Americas 90873537

<u>**REPLY**</u>

**I.    Section 1129(a)(3) Is Satisfied: The Plan Has Been Proposed In Good Faith**

9.    Upon a review of the objections to the Settlement Motion and the Plan, it is clear that certain parties in interest in these Cases have very short memories.  In particular, the EFH Committee and the PCRB Trustee attempt to characterize the restructuring contemplated by the Plan and the compromises set forth in the Settlement Motion as the worst possible outcome for creditors that was hatched in secret, nefarious negotiations between the Ad Hoc Group and the Debtors' equity owners pursuant to a "scheme" by the Ad Hoc Group to increase its constituents' recoveries at the expense of other parties in interest.  <u>See</u> *Objection of The Bank of New York Mellon, as Indenture Trustee for the PCRB Claims, to Confirmation of the Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 6621] (the "<u>PCRB Objection</u>") ¶¶ 5, 93; *Trial Brief and Omnibus Objection of the EFH Official Committee to (I) Motion of Energy Future Holdings Corp., et al., to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter into and Perform Under the Settlement Agreement and (II) Confirmation of the Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 6627] (the "<u>EFH Committee Objection</u>") ¶¶ 199-200, 279.  There is and will be no record evidence to support any of those charges.

10.    As discussed below, the remarkable outcome of these Cases was achieved only through the intense arm's-length, good faith negotiations between the Debtors, the Ad Hoc Group, the Backstop Purchasers and the other parties to the Plan Support Agreement (the "<u>PSA Parties</u>").  The Plan was proposed by the Debtors in good faith and satisfies section 1129(a)(3).

Americas 90873537

### A. Only The Plan Proponents' Good Faith Is Relevant For Purposes Of Section 1129(a)(3)

11.     Section 1129(a)(3) requires that the plan "has been proposed in good faith."  11 U.S.C. § 1129(a)(3).  As a threshold matter, objections impugning the motives of the Ad Hoc Group and Backstop Purchasers are irrelevant to the good faith inquiry under this section.  By the plain language of the statute, the good faith requirement applies to the act of proposing a plan, and thereby to the plan proponent; it does not consider actions to support a plan, nor parties so supporting or voting on the plan.  See id; 7 COLLIER ON BANKRUPTCY ¶ 1129.02[3][a] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed.) ("Section 1129(a)(3) speaks only to the proposal of a plan and does not address acceptances of such plan.").  For this reason, courts applying section 1129(a)(3) inquire as to the motives of the plan proponent in proposing a plan, not to the motives of parties supporting that plan.  See In re Vill. at Camp Bowie I, L.P., 710 F.3d 239, 247 (5th Cir. 2013) (section 1129(a)(3) imposes a good faith duty on a plan proponent); In re Genco Shipping & Trading Ltd., 513 B.R. 233, 261 (Bankr. S.D.N.Y. 2014) (quoting Argo Fund Ltd. v. Bd. of Dirs. of Telecom Argentina, S.A. (In re Bd. of Dirs. of Telecom Argentina, S.A.), 528 F.3d 162, 174 (2d Cir. 2008) (the Bankruptcy Code requires a showing that the plan "was proposed with honesty and good intentions"); In re Lear Corp., No. 009-14326 ALG, 2009 WL 6677955, at *9 (Bankr. S.D.N.Y. Nov. 5, 2009) (where debtors were plan proponents, inquiring as to "the [d]ebtors' good faith" and finding section 1129(a)(3) satisfied where "[t]he [d]ebtors have proposed the [p]lan in good faith"); In re Heron, Burchette, Ruckert & Rothwell, 148 B.R. 660, 673 (Bankr. D.D.C. 1992) (good faith requires full disclosure and a lack of ulterior motives on the part of the plan proponent).

12.     Further, Delaware courts have articulated several tests for good faith, any one of which may satisfy the good faith requirement and none of which require an inquiry into the

7

motives or behavior of plan supporters.  As set forth in In re Lernout & Hauspie Speech Prods. N.V., 308 B.R. 672, 675 (D. Del. 2004):

> The Bankruptcy Code does not define the term "good faith," but case law has defined the term as requiring, alternatively that (1) the plan be consistent with the objectives of the Bankruptcy Code; (2) the plan be proposed with honesty and good intentions and with a basis for expecting that reorganization can be achieved; **or** (3) there was fundamental fairness in dealing with the creditors.

(emphasis in original) (footnotes omitted); see also In re Coram Healthcare Corp., 271 B.R. 228, 234 (Bankr. D. Del. 2001); In re Greate Bay Hotel and Casino, Inc., 251 B.R. 213, 237-38 (Bankr. D.N.J. 2000); In re Rivers End Apartments, Ltd., 167 B.R. 470, 475-76 (Bankr. S.D. Ohio 1994); In re Gregory Boat Co., 144 B.R. 361, 366 (Bankr. E.D. Mich. 1992).  Notably, each of these tests inquires only as to the motive and action of the debtor and/or plan proponent, rather than examining those of plan supporters.  Although the actions and motives of plan supporters may be relevant in other contexts (none of which have been raised by the objecting parties), such actions and motives are not relevant to the inquiry under section 1129(a)(3).

13.    Here, the Debtors are the only plan proponents, and thus only the Debtors' good faith is relevant to the inquiry under section 1129(a)(3).  As set forth in the Debtors' Plan Reply and the *Debtors' Memorandum of Law in Support of Confirmation of Joint Plan of Reorganization* [Docket No. 6647], the Plan was proposed by the Debtors in good faith and section 1129(a)(3) is satisfied.

**B.    Even If The Good Faith Of The Ad Hoc Group And Backstop Purchasers Were Relevant, They Acted In Good Faith In Sponsoring And Supporting The Plan**

14.    Despite certain objecting parties' characterizations of the Plan and Settlement as a terrible result in these Cases, the Plan and Settlement represent a remarkable outcome that provides all of the Debtors' creditors with enhanced recoveries compared to any other

8

conceivable solution.  However, rather than embrace the fact that their constituencies' positions have drastically improved through no efforts of their own, the EFH Committee and PCRB Trustee cast aspersions on the motives and actions of the parties who have labored over many months, some at their own expense, to bring about this result, including in particular the Ad Hoc Group and Backstop Purchasers.  See PCRB Objection ¶¶ 5, 93; EFH Committee Objection ¶ 279.

15.     The Ad Hoc Group and Backstop Purchasers proudly admit that they have played a central role in the formulation and development of the Plan and Settlement that will result in enhanced recoveries to all creditors in a fully confirmable plan.  There is no evidence or indicia, however, that the motives or actions of the Ad Hoc Group and Backstop Purchasers have been for any purpose other than the legitimate purpose of maximizing and obtaining a fair recovery on their claims against the Debtors.  Simply put, based on the record of these Cases, the good faith of the Ad Hoc Group and Backstop Purchasers cannot be credibly questioned.

16.     From the outset and at all stages of these Cases, the Ad Hoc Group has made every reasonable effort and taken every reasonable opportunity to preserve and maximize the value of the TCEH Debtors' estates and thereby increase the likelihood that the members of the Ad Hoc Group would receive a fair recovery on their claims.  For example, at the start of these Cases, the Ad Hoc Group successfully challenged the TCEH Debtors' proposed waiver of their rights under section 506(c) of the Bankruptcy Code.  See *Omnibus Preliminary Objection of the Ad Hoc Group of TCEH Unsecured Noteholders to (I) the Motion of Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, and (D) Scheduling Final*

Americas 90873537

*Hearing, and (II) the Motion of Texas Competitive Electric Holdings Company LLC and Certain*

*of its Debtor Affiliates for Entry of Interim and Final Orders (A) Authorizing Use of Cash*

*Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and*

*(D) Scheduling Final Hearing* [Docket No. 231] ¶¶ 36-37; *Final Order (A) Authorizing Use of*

*Cash Collateral for Texas Competitive Electric Holdings Company LLC and Certain of its*

*Debtors and Affiliates, (B) Granting Adequate Protection, and (C) Modifying the Automatic Stay*

[Docket No. 855] at 13, ¶ 11(d).  In addition, before and in the nascent stages of these Cases, the

Ad Hoc Group identified various potential claims and causes of action belonging to the TCEH

Debtors against the holders of TCEH First Lien Claims, certain E-side Debtors and entities, the

Debtors' equity holders and the Debtors' directors and officers.  <u>See, e.g.</u>, *Preliminary Objection*

*of the Ad Hoc Group of TCEH Unsecured Noteholders to the Motion of the TCEH Debtors for*

*Entry of an Order Directing Joint Administration of Their Chapter 11 Cases with Those of the*

*Oncor Debtors* [Docket No. 222] ¶¶ 8, 28-39 (explaining that the TCEH Debtors have a number

of significant, value-driving claims and causes of action against the E-side Debtors and detailing

those claims and causes of action).  The Ad Hoc Group's extensive diligence efforts and months-

long review of the "legacy discovery"—at the sole expense of Ad Hoc Group members—

ultimately confirmed that these potential claims and causes of action were indeed colorable and

worthy of pursuit.  <u>See</u> Declaration of Danielle M. Audette in support hereof (the "<u>Audette</u>

<u>Decl.</u>") Ex. 1 (Aug. 13, 2014 Hr'g Tr. at 47:19-48:5) (Shore, C.) ("We've turned the documents

as quickly as we can.  We've negotiated with everybody to get to the day where at least we have

a framework from which we can do what we wanted as we said in the beginning which is to

investigate the assets.  At the same time there has been some disclosure going on both to the data

room and in public filings, which has disclosed that there are real assets of the TC[E]H debtors

which [were] going to [be released] for no consideration, and most notably we have the scheduled intercompany claims . . . all of which would have been released under that plan for no consideration."). Thus, the Ad Hoc Group made abundantly clear early on that the TCEH Debtors' pursuit of these potentially valuable claims and causes of action were vital to the T-side creditors' ultimate recoveries, and took it upon itself, at its own expense, to ensure that these resources would not be squandered. See Audette Decl. Ex. 2 (June 30, 2015 Hr'g Tr. at 132:1-7) (Shore, C.) ("It's been our thesis from the beginning of the case that TC[E]H is a material creditor of both EFH and EFIH starting with the premise that while the TCEH [D]ebtors were insolvent, according to Mr. Keglevic—in 2013, they paid 2.2 billion dollars to affiliates. We have to look at those claims."); Audette Decl. Ex. 3 (July 18, 2014 Hr'g Tr. at 55:5-56:5) (Starner, G.) ("If I may just briefly address the Rule 2004 motion. I just wanted to highlight the fact it has been pending since day one of this case. . . ."); Id. at 55:13-15 (Starner, G.) ("I mean it deals with claims of causes of action that would effectively be critical for any discussion about how this case moves forward. . . ."); Audette Decl. Ex. 4 (Sept. 16, 2014 Hr'g Tr. at 40:4-20) (Shore, C.) ("As we noted since the beginning of the cases there are significant unresolved interestate conflicts. I don't think anybody's disputing that. Whether—for example, whether and to what extent a $770 million intercompany claim from the T-side up to EFH is a legitimate claim. That's a dispute between the estates. Whether or not the T-side has claims arising out of the LBO. ").

17.    Indeed, the Ad Hoc Group played a central role in exposing the fatal flaws of the prepetition restructuring support agreement (the "RSA"), including that the restructuring transaction contemplated therein ascribed no value to the claims of the TCEH Debtors' estates identified by the Ad Hoc Group. See *Objection of the Ad Hoc Group of TCEH Unsecured*

11

*Noteholders to the Motion of Energy Future Intermediate Holding Company LLC and EFIH*

*Finance Inc. for Entry of an Order (A) Approving Postpetition Second Lien Financing,*

*(B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing*

*the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing*

*Entry into and Payment of Fees Under the Commitment Letter, and (F) Modifying the Automatic*

*Stay and Limited Objection to the Related Motion to Approve EFIH Second Lien Settlement*

[Docket No. 1087] ¶ 21 (demonstrating that prior to entering into the RSA there was no attempt

to analyze or protect any TCEH claims against affiliates).  The Debtors' ultimately abandoned

the RSA and began considering other restructuring alternatives.  See *Debtors' Notice of*

*(A) Termination of Restructuring Support Agreement, (B) Withdrawal of Second Lien Opt-In,*

*and (C) Withdrawal of EFIH Settlement Motion, EFIH Second Lien DIP Motion, and*

*Restructuring Support Agreement Assumption Motion* [Docket No. 1697] at 2.

      18.    The push to maximize TCEH Debtors' assets then continued.  Concerned that the

Debtors lacked the appropriate independent fiduciaries to analyze the inter-Debtor claims and

other matters of conflict between the estates, the Ad Hoc Group continued to object to certain

relief requested by the Debtors, including their request to approve bidding procedures for the

Debtors' interest in Oncor, and publicly and privately urged the Debtors to resolve such issues by

having their Disinterested Directors and Managers obtain separate counsel and by granting such

directors and managers authority over conflict matters.  See, e.g., Audette Decl. Ex. 5 (Oct. 27,

2014 Hr'g Tr. at 139:24-140:4).  As a result of those challenges, the Debtors ultimately did grant

the Disinterested Directors and Managers authority over conflict matters and such directors and

managers obtained separate counsel.

19.    Thereafter, the Disinterested Directors and Managers and their advisors investigated and began negotiating a potential settlement of the inter-Debtor claims, which led to the Debtors' filing in April 2015 of a proposed plan of reorganization that incorporated a proposed settlement of inter-Debtor claims and, in essence, provided TCEH with an allowed $700 million general unsecured claim against EFH Corp. See *Statement of the Disinterested Directors of Debtor Energy Future Holdings Corp. Regarding Proposed Settlement of Conflict Matters as Part of Proposed Plan of Reorganization* [Docket No. 4147]; *Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 4142].  The plan filed by the Debtors in April 2015, however, provided little recovery to T-side junior creditors and garnered no creditor support, compelling the Debtors to continue exploring alternative paths forward.  See Audette Decl. Ex. 6 (Apr. 14, 2015 Hr'g Tr. at 59:15-19) (Weisfelner, E.) ("I think today is fairly remarkable in the sense that there does appear to be a consensus . . . and the consensus that we've reached is that we all hate the plans that they filed.").

20.    In that regard, in addition to its efforts to preserve and pursue the TCEH Debtors' inter-Debtor and certain other potentially valuable claims, the Ad Hoc Group was open at all times to discussing with the Debtors and other parties in interest settlement and restructuring alternatives that would provide its members with a fair recovery on their claims.  See Audette Decl. Ex. 7 (Jan. 13, 2015 Hr'g Tr. at 26:5-10) (Shore, C.) ("We're going to actively pursue the efforts along with the committee and along with the second liens to maximize the value of the actual assets in which TCEH has an interest. . . .").  One such alternative, which ultimately formed the basis for the Plan, included the possibility of converting reorganized EFH Corp. into

13

a REIT and providing the TCEH Debtors' unsecured creditors with the opportunity to invest in the equity of reorganized EFH Corp.

21.     Realizing that such a restructuring would require unimpairment of E-side creditors' claims and a settlement with the Debtors' equity holders, the Ad Hoc Group began in earnest to discuss such a potential settlement with advisors for the Debtors' equity holders.[3]  See Audette Decl. Ex. 8 (



); Audette Decl. Ex. 9

After such discussions proved fruitful, the Ad Hoc Group expanded its discussions regarding a REIT plan to include the Debtors and certain other necessary parties, including the holders of TCEH First Lien Claims.  See Audette Decl. Ex. 10 (

; Audette Decl. Ex. 11

As discussions with those parties progressed and the REIT plan began to take shape, the Ad Hoc Group also sought to speak with potential operators for the Oncor assets.  In that regard, the Ad Hoc Group was open and transparent with the Debtors about its intentions and consulted with

---

[3]     Despite the EFH Committee's bald assertions to the contrary, there was nothing nefarious or inappropriate about such discussions, including that they did not initially include the Debtors.  Indeed, without the potential for settlement with the Debtors' equity holders regarding the potential equity upside of the Oncor assets after payment in full of claims against the E-side Debtors, it did not make sense to directly include the Debtors in such discussions.

Americas 90873537

Debtors' counsel before attempting to reach out to Hunt Consolidated, Inc. ("Hunt").  See

Audette Decl. Ex. 12 ███████████████████████████████████████████████████

████████████████████████████████████████ .  The Ad Hoc Group and Backstop

Purchasers ultimately reached agreement with Hunt to join as a potential sponsor of the Plan.

Thereafter, following months of intense, arm's-length negotiations with the Debtors and the

other PSA Parties,[4] the parties entered into the Plan Support Agreement and Settlement

Agreement and the Debtors filed the Plan.

22.      As the record of these Cases demonstrates, at all relevant times the Ad Hoc Group

and the Backstop Purchasers have been open and transparent with the Court and parties in

interest about what they were trying to accomplish with a plan and the progress of their and other

parties' efforts in creating a workable plan framework.  See, e.g., Audette Decl. Ex. 6 (April 14,

2015 Hr'g Tr. at 64:12-70:7) (Shore, C.) (explaining that the Ad Hoc Group was arranging an

alternate REIT transaction structured around an $11 billion debt and equity raise that would pay

E-side claims in full); Audette Decl. Ex. 13 (May 13, 2015 Hr'g Tr. at 27:20-29:24) (Shore, C.)

(informing the court that significant strides have been made around the contemplated alternate

transaction including finalizing a non-disclosure agreement with the Debtors, significant

negotiations of a term sheet and drafting a backstop commitment plan term sheet and plan

support agreement); Audette Decl. Ex. 14 (May 28, 2015 Hr'g Tr. at 13:8-16:11) (Shore, C.)

(explaining that the contemplated transaction would be an end to the auction because E-side

claims would be taken out in full; discussing negotiations regarding a potential "toggle" to an

alternative plan in the event the REIT transaction is not consummated); Audette Decl. Ex. 15

(June 1, 2015 Hr'g Tr. at 40:8-52:18) (Shore, C.) (describing the toggle concept in detail and the

---

[4]      Can anyone seriously contend that the relationship between the Debtors and the Ad Hoc Group in these
Cases has not been adverse?

difficulty it imposed on negotiation of the REIT transaction); Audette Decl. Ex. 16 (June 25, 2015 Hr'g Tr. at 48:4-66:19) (Lauria, T.) (detailing the REIT transaction and informing the court that the Ad Hoc Group had $12.1 billion of committed equity and debt financing for that transaction); Audette Decl. Ex. 17 (Aug. 11, 2015 Hr'g Tr. at 30:16-35:4) (Lauria, T.) (announcing and detailing the Plan and Settlement Agreement).  Indeed, the motives and actions of the Ad Hoc Group have been very straightforward: preserve and maximize the value of the TCEH Debtors' estates and obtain a fair recovery with respect to its members' claims against the Debtors.

23.    Simply put, even if "creditor good faith" were relevant to the Court's inquiry under section 1129(a)(3), there is no evidence that can credibly be offered to call into question the good faith of the Ad Hoc Group and Backstop Purchasers in negotiating and supporting the Plan and Settlement.  Not surprisingly, no such evidence has been offered by the EFH Committee, the PCRB Trustee or any other objecting party.  The Plan and the related Settlement were formulated, negotiated and proposed in good faith, and, under any analysis, section 1129(a)(3) is satisfied.

## II.    The PCRB Trustee's Objections To Confirmation Of The Plan And Approval Of The Settlement Should Be Overruled

24.    By its objections to the Plan and the Settlement [Docket No. 6623] (the "PCRB Settlement Objection"), the PCRB Trustee directly challenges the Plan and proposed settlement with the holders of TCEH First Lien Claims on the basis that it is arbitrary, abusive and patently unfair.  The PCRB Trustee then contends that all such accusations and concerns will evaporate if the Court orders that the holders of PCRB Claims share equally with all other T-side unsecured creditors in the benefit of the waiver of TCEH First Lien Deficiency Claims, regardless of which TCEH Debtors are liable on their claims.  That proposed result, however, is, in fact, arbitrary,

abusive and patently unfair to holders of more than $30 billion in funded debt claims at the

TCEH Debtors other than TCEH and has absolutely no basis in fact.

> **A.  The Claims Identified By The PCRB Trustee As Claims Of TCEH Are, At Best, Claims Of All TCEH Debtors And Do Not Justify Reallocating The Benefit Of The Waiver Of The TCEH First Lien Deficiency Claims**

25.     For years now, the Court has witnessed disputes between (i) the T-side Debtors

and the E-side Debtors regarding inter-Debtor claims and causes of action, and (ii) the T-side

unsecured creditors against the holders of TCEH First Lien Claims.  All those disputes addressed

the extent to which unencumbered recoveries in those disputes would be made available to

unsecured creditors of the TCEH Debtors.  Fundamentally, the issue raised by the PCRB

Objection presumes the actual receipt of unencumbered value by the TCEH Debtors and protests

the actual allocation of that unencumbered value between the individual TCEH Debtors.

26.     No party-in-interest in these Cases has done a detailed, evidentiary-quality

analysis of what unencumbered value of the TCEH Debtors resides exclusively at TCEH or

resides at the subsidiary TCEH Debtors.  That distinction <u>only</u> comes into play with respect to

the PCRB Claims totaling approximately $881 million asserted only against TCEH as opposed to

all of the TCEH Debtors.  That said, some relevant and basic facts concerning allocation are

known.  <u>First</u>, all of the TCEH Debtors are insolvent and have been for years.  <u>Second</u>, the

subsidiary TCEH Debtors benefit from most (if not all) of the claims and causes of action against

the holders of TCEH First Lien Claims.  <u>Third</u>, TCEH is a holding company that has few

tangible assets and no revenues of its own.  And <u>fourth</u>, the subsidiary TCEH Debtors hold all of

the income-producing assets of the TCEH Debtors that are subject to avoidable liens.

27.     In light of the objection of the PCRB Trustee, the proper allocation of claims and

causes of action among the various TCEH Debtors is a binary exercise: what percentage of assets

available for distribution to general unsecured creditors are at TCEH (the "X"), and what amount of assets available for distribution to general unsecured creditors are at the subsidiary TCEH Debtors (the "Y")?  Putting aside the rhetoric, this "X vs. Y" analysis lies at the heart of the dispute between the PCRB Trustee and the holders of other TCEH Unsecured Debt Claims and arose only once creditors who had an economic stake in the result of this X vs. Y analysis began to play a meaningful role in the plan formulation process.

28.    At heart, the PCRB Objection is that the members of the Ad Hoc Group proposed and convinced the other PSA Parties to adopt an unfair split of X and Y.  That is demonstrably false.  Despite having no principal counterparty with which to engage on the X vs. Y analysis at the time of plan formulation,[5] the Ad Hoc Group proposed a compromise as part of the Settlement and the Plan: X (the distributable value at TCEH) would equal <u>all</u> of the Settlement consideration to be received by TCEH from the E-side Debtors in the form of the opportunity to acquire the Oncor assets.  Moreover, in exchange for TCEH's release of claims against the holders of TCEH First Lien Claims, only the TCEH First Lien Deficiency Claims would share in that E-side consideration, effectively waiving $14 billion to $15.4 billion of allowed funded debt claims against TCEH's estate.  Y (the distributable value at TCEH Debtors other than TCEH) would equal the portion of the value derived from the settlement of the TCEH Debtors' claims against the holders of TCEH First Lien Claims in the form of the benefit of the waiver of the TCEH First Lien Deficiency Claims.

29.    While this compromise may be characterized as "rough justice," in the absence of contrary evidence as to the relative value of X (TCEH-only claims (if any) against the holders of

---

[5]    <u>See</u> Audette Decl. Ex. 18 (Sept. 17, 2015 Hr'g Tr. at 36:18-24) (Shore, C.) ("[T]he only reason the PCRBs are disenfranchised is because they disenfranchised themselves.  There has still not been a single holder of a PCRB who has appeared in this case either individually or through counsel who has the ability to negotiate for a compromise of their principal and interest.").

TCEH First Lien Claims) and Y (claims of the subsidiary TCEH Debtors against those same senior creditors), the Court should not adopt the unquestionably arbitrary and unsupportable reallocation advocated for by the PCRB Trustee, but rather, should leave undisturbed the fair and equitable allocation of Settlement consideration that affords the holders of Allowed PCRB Claims a recovery far greater than what they would receive in the absence of the Settlement, as discussed below.[6]

30.     In an attempt to demonstrate that X equals something more than zero and thereby justify its demand for an equal share, the PCRB Trustee has pointed exclusively to the existence of two claims purportedly held by TCEH against the holders of TCEH First Lien Claims: (i) claims related to the "2011 amend and extend" transactions and (ii) claims related to the "2013 revolver extension." See PCRB Objection ¶¶ 19-21. The PCRB Trustee alleges that those claims belong exclusively to TCEH based solely upon the testimony of Mr. Hugh Sawyer, the disinterested manager of EFCH and TCEH. Id. at ¶ 19. That testimony, however, does not support the conclusion that claims exist solely for the benefit of TCEH and that no other TCEH Debtor has claims relating to the same transactions. See Audette Decl. Ex. 19 (Sept. 24, 2015 Deposition of Hugh E. Sawyer Tr. at 660:16-23) ██████████████████████

---

[6]     Based on an impossible and hypothetical set of facts (where all claims of the TCEH Debtors reside at TCEH and none at the subsidiary TCEH Debtors), the PCRB Trustee urges the Court to order that the holders of Allowed PCRB Claims should benefit from the waiver of the TCEH First Lien Deficiency Claims because, the PCRB Trustee argues, the Plan Support Agreement and Settlement Agreement contemplate that result. The fact that the parties to the Settlement Agreement and Plan Support Agreement agreed to language that prevents the parties thereto from being excused from their obligations thereunder (including the obligation to support the Plan) in the event the Court ordered that the holders of PCRB Claims should also benefit (equally or otherwise) from the waiver of the TCEH First Lien Deficiency Claims does not support the PCRB Trustee's demand for an arbitrary and unsupportable reallocation of the benefit of that waiver. The Settlement Agreement and Plan Support Agreement provisions (and the related language in Article IV.B.15 of the Plan) were demanded by, and included for the benefit of, certain parties thereto that wanted to ensure that the holders of TCEH Unsecured Note Claims and TCEH Second Lien Note Claims party to those agreements would not be able to terminate the Settlement Agreement and Plan Support Agreement in the event the Court disagreed with those holders' views as to the proper allocation of X and Y. The provisions cited by the PCRB Trustee do not confer any rights on the PCRB Trustee or the holders of PCRB Claims.

Americas 90873537



663:24-664:11

; 664:12-665:6

).[7]

31.    Even if one were to assume that TCEH has exclusive "claims" to the subject

transactions, the PCRB Trustee has offered no evidence of the value that may be derived from

those claims.  Id. at 657:2-6

.  Instead, the PCRB Trustee just assumes that the value of a litigation claim is

equal to the amount of the claim.  This is incorrect.

---

[7]    As discussed below, the $340 million "claim" is actually a cause of action to avoid the incurrence of an
obligation of TCEH and the liens on and security interests in, the assets of the subsidiary TCEH Debtors granted in
connection with the incurrence of that obligation, rather than a claim to recover $340 million in property.

Americas 90873537

32.      In addition, the two "TCEH" claims identified are subjects of the Standing

Motion filed by the TCEH Committee (of which the PCRB Trustee is a member), as well as the

Standing Motion filed by the Ad Hoc Group.  In the TCEH Committee Standing Motion, the

transfers, obligations, liens and security interests subject to those "claims" are alleged to have

been made and incurred, as applicable, by the "TCEH Debtors," not merely TCEH.  Specifically,

in the complaint attached to the TCEH Committee Standing Motion, the TCEH Committee

sought to recover approximately $2 billion of fees, incremental interest and other amounts paid

by "the TCEH Debtors" on account of the "2011 amend and extend transactions."  See TCEH

Committee Standing Motion, Ex. A ¶¶ 123, 126 ("[T]he TCEH Debtors paid to Defendants fees

in the aggregate amount of over $800 million, plus over $530 million in incremental interest

under the Credit Agreement, plus approximately $420 million in incremental interest on the

Notes, as well as the approximately $330 million Prepayment Benefit [that] should be avoided . .

. and recovered by the Debtors' estates . . . .") (emphasis added); see also TCEH Unsecured

Group Standing Motion, Ex. A ¶¶ 122, 125 (same).  In that same complaint, the TCEH

Committee sought to avoid the incurrence of an obligation of TCEH and associated liens on and

security interests in the assets of the subsidiary TCEH Debtors in the amount of $340 million in

connection with the "2013 revolver extension."  See TCEH Committee Standing Motion, Ex. A

¶¶ 160, 164 ("In connection with the 2013 Amendment, the TCEH Debtors issued the [$340

million] Fee Note to Defendants and granted Defendants a first priority lien and security interest

to secure the repayment of the Fee Note. . . . The liens, obligations, and security interests

associated with the Fee Note should be avoided . . . and recovered by the Debtors' estates . . .

and/or automatically preserved for the benefit of the Debtors' estates . . . .") (emphasis added);

see also TCEH Unsecured Group Standing Motion, Ex. A ¶¶ 159, 163 (same).

21

33.     Based solely upon limited, vague testimony of Mr. Sawyer, which is contrary to the allegations contained in the TCEH Committee's Standing Motion and the attached complaint, the PCRB Trustee claims that the allocation of the benefit of the waiver of the TCEH First Lien Deficiency Claims set forth in the Plan and the Settlement was arrived at arbitrarily, because, it argues, it is not based on a "principled analysis" that takes into account the fact that TCEH, like the subsidiary TCEH Debtors, has claims against the holders of TCEH First Lien Claims.  See PCRB Objection ¶ 10.  What the PCRB Trustee fails to appreciate is that, by insisting upon equal participation in the waiver of the TCEH First Lien Deficiency Claims (i.e., that X is everything and Y is nothing), it advocates for an impossible result that has absolutely no basis in fact.  For a creditor with a claim only against TCEH to share equally with creditors holding claims against TCEH and the subsidiary TCEH Debtors, TCEH would have to own all of the settled claims against the holders of TCEH First Lien Claims, and the subsidiary TCEH Debtors would have to own none.  Not even the PCRB Trustee has asserted that to be the case.  And yet, the PCRB Trustee has nonetheless steadfastly maintained that X must be everything, Y must be nothing, and the holders of Allowed PCRB Claims must therefore share equally in the benefit of the waiver of the TCEH First Lien Deficiency Claims.

**B.  The Settlement Benefits TCEH's Estate And Is Fair And Equitable To The Holders of PCRB Claims**

34.     The Court need not, however, make a judicial finding as to the exact contours of X and Y in light of the proposed Settlement that has been approved by an overwhelming majority of creditors of TCEH and the subsidiary TCEH Debtors.  The Court may approve a settlement under Bankruptcy Rule 9019 that is "fair and equitable."  In re Capmark Fin. Grp. Inc., 438 B.R. 471, 514 (Bankr. D. Del. 2010).  In considering whether a settlement satisfies this standard, the Court "need not decide the numerous questions of law or fact raised by litigation,

but rather should canvas the issues to determine whether the settlement falls above the lowest point in the range of reasonableness." Id. at 515.  A court considering a motion to approve a compromise should balance the following four factors: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996); see also Will v. Nw. Univ. (In re Nutraquest, Inc.), 434 F.3d 639, 644-45 (3d Cir. 2006); In re Capmark Fin. Grp., Inc., 438 B.R. at 476.  Importantly, while the "approval of a settlement rests in the Court's sound discretion, the debtor's business judgment should not be ignored." In re Charter Commc'ns, 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009) (internal citation omitted); see also In re Key3Media Grp., Inc.; 336 B.R. 87, 93 (Bankr. D. Del. 2005); Audette Decl. Ex. 20 (June 6, 2014 Hr'g Tr. at 259:17-25) (approving first lien settlement under Bankruptcy Rule 9019 as a "reasonable exercise of [the debtors'] business judgment.").  For all the reasons set forth in the Settlement Motion and the Debtors' Settlement Reply, the Settlement (including the X and Y allocations) is fair, equitable and in the best interests of the Debtors' estates and therefore, should be approved.

35.    The PCRB Trustee does not challenge the Settlement, except with respect to the Settlement parties' allocation of certain Settlement consideration among the T-side junior creditors.  See Audette Decl. Ex. 21 (Oct. 28, 2015 Hr'g Tr. at 152:12-14, 23-25) (Gwynne, K.) ("We are not challenging the sufficiency of the settlement.  We never were, and we're not doing it now.  We're not saying more should have come in. . . .  All we're saying is that we have a right as a creditor of TCEH to share in whatever the distribution is.  That's a legal issue. It's not a factual issue.").  The PRCB Trustee's objection to the Settlement on that limited basis should be

Americas 90873537

overruled because, notwithstanding the effect of that allocation, the Settlement is fair and

equitable to the holders of Allowed PCRB Claims because they recover more under the

Settlement and the Plan than they could reasonably expect to in the absence of the Settlement

(and even if one accepted the PCRB Trustee's claims as to the extent of TCEH's assets as true).

36.    As discussed above, the PCRB Trustee points to two claims that it believes are

assets of TCEH alone: (i) $2 billion of claims against the holders of TCEH First Lien Claims

related to the "2011 amend and extend" transactions and (ii) $340 million of claims against

certain holders of TCEH First Lien Claims related to the "2013 revolver extension."  <u>See</u> PCRB

Objection ¶¶ 19-21.  Recovery (if any) on those claims comes at the price of the Settlement—one

cannot both pursue claims against the holders of TCEH First Lien Claims and reap the benefits

of the Settlement.  Accordingly, even if at some future date TCEH were to "recover" on those

claims,[8] the holders of PCRB Claims would be entitled to only 2.8% of the ultimate recovery

($881 million of PCRB Claims / $31.2 billion of unsecured funded debt claims against TCEH).

Putting aside the uncertainty, cost and delay attendant to prosecuting those claims (none of

which the PCRB Trustee considers and all of which must be considered as part of the <u>Martin</u>

analysis), holders of Allowed PCRB Claims would recover $56.0 million (or 2.8% of $2 billion)

in a best case scenario, and nothing in a worst case scenario.  When compared to an

appropriately risk-, cost- and delay-adjusted litigation outcome with respect to those claims, the

projected recovery for holders of Allowed PCRB Claims under the Plan (ranging from $25.56

million (at a $19 billion valuation and assuming TCEH First Lien Deficiency Claims of $9.5

billion) to $182.47 million (at a $24 billion valuation and assuming TCEH First Lien Deficiency

Claims of $8.1 billion))—taking into account the elimination of $14 billion to $15.4 billion of

---

[8]      Again, recovery on account of the "2013 revolver extension" claim will merely result in the avoidance of
$340 million of TCEH First Lien Claims, not a recovery of $340 million in cash.

the deficiency claim against TCEH's estate—certainly falls above the lowest point in the range of reasonableness, even absent any benefit from the waiver of the TCEH First Lien Deficiency Claims.

### C. The PCRB Trustee's Failure To Challenge The Cash Collateral Stipulations Means It Is Not Entitled To The Benefit Of The Waiver Of The TCEH First Lien Deficiency Claims

37.     All of the foregoing debate over a proper allocation of recoveries from holders of TCEH First Lien Claims assumes, however, that the PCRB Trustee is in a position to challenge any of the claims of the holders of TCEH First Lien Claims at TCEH.  The entirety of the PCRB Trustee's argument that holders of Allowed PCRB Claims should be entitled to benefit from the waiver of the TCEH First Lien Deficiency Claims is based on its assertion that (1) TCEH has (2) claims against the TCEH First Lien Creditors that (3) are part of the claims being compromised pursuant to the Settlement and Plan.  The PCRB Trustee, however, is unquestionably bound by the stipulations contained in the Cash Collateral Order waiving any of TCEH's claims and thus is barred from now asserting that any claims exist against the holders of TCEH First Lien Claims, by TCEH or otherwise.

38.     Under the Cash Collateral Order and various extensions of challenge deadlines under Orders of the Court, all of the TCEH First Lien Claims are "allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the TCEH Debtors' Cases . . ." by any party other than the TCEH Committee and the Ad Hoc Group.  See *Final Order (A) Authorizing Use of Cash Collateral for Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates, (B) Granting Adequate Protection, and (C) Modifying the Automatic Stay* [Docket No. 855] ¶ 15; *Stipulation and Consent Order Extending Certain Deadlines in the Final Cash Collateral Order*

Americas 90873537

[Docket No. 5922] ¶ 1.  The TCEH Committee and the Ad Hoc Group were the only parties-in-interest who filed timely challenges to the stipulations in the Cash Collateral Order.  As a result, by operation of Court Order, all other parties-in-interest in these Cases are barred from asserting that claims exist against the holders of TCEH First Lien Claims, including the PCRB Trustee and the holders of PCRB Claims.

39.    The PCRB Trustee could have avoided this result by doing as the Ad Hoc Group did, and incurring the expense of participating in the investigation of claims against the holders of TCEH First Lien Claims and preparing and filing a Standing Motion and accompanying complaint (or even by simply joining in the TCEH Committee Standing Motion).  Instead, the PCRB Trustee elected not to do so and now faces the consequence of that decision—having no ability to assert and pursue claims against the holders of TCEH First Lien Claims in exchange for participating in the benefit of the waiver of the TCEH First Lien Deficiency Claims.

40.    Despite being the representative of holders of the sole category of funded debt that has recourse only to TCEH, the PCRB Trustee elected not to preserve its right to assert that claims exist, by TCEH or otherwise, against the holders of TCEH First Lien Claims.  Instead, the PCRB Trustee apparently relied upon the TCEH Committee and other parties to do so, and thus the PCRB Trustee should not now be heard to complain about how those claims are compromised.  In short, in choosing to rely upon the TCEH Committee to fight its battle, the PCRB Trustee ran the risk that the TCEH Committee might ultimately decide to compromise, or even abandon altogether, its pursuit of claims against the TCEH First Lien Creditors.[9]  Its objection to the Plan on this point should therefore be disregarded and overruled.

---

[9]    The Ad Hoc Group does not dispute that the claims subject to the Standing Motions are, and any proceeds of those claims would be, property of one or more of the TCEH Debtors' estates.  The Ad Hoc Group does, however, disagree with the PCRB Trustee's position that all such claims are, and such proceeds would be, property of TCEH's estate.  The waiver of the TCEH First Lien Deficiency Claims solely for the benefit of the Deficiency

26

### D. The Differing Recoveries Of Holders Of Class C4 Claims Does Not Violate Section 1123(a)(4): All Claims in Class C4 Are Being Treated Similarly

41.     It cannot be credibly argued that the holders of unsecured funded debt claims against the TCEH Debtors in Class C4 are being treated differently.  Article III.B.29 of the Plan clearly provides, in relevant part:

> *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class C4 agrees to less favorable treatment of its Allowed Claim, and subject to Article IV.B.15 of the Plan, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class C4, **each such Holder shall receive its Pro Rata** (calculated based on the aggregate amount of Allowed Class C4 and Allowed Class C5 Claims) **share of**:
>
> (i)     the Rights to purchase $5,087,250,000 (which amount is subject to reduction in the event the Minority Buy-Out does not occur or occurs only in part) in the aggregate of New EFH Common Stock pursuant to the Rights Offering and on and subject to the occurrence of the Effective Date, the New EFH Common Stock purchased pursuant to the exercise of the Rights; and
>
> (ii)    the Reorganized EFH Common Stock, which shall be converted to approximately 2% of New EFH Common Stock (after accounting for dilution by the Merger and Rights Offering).

Plan, Art. III.B.29 (emphasis added).

42.     As opposed to altering the "pro rata" treatment of the TCEH Unsecured Debt Claims in Class C4, Article IV.B.15 of the Plan merely embodies the agreement, compromise and settlement among the holders of TCEH First Lien Claims, on the one hand, and the holders of TCEH Second Lien Note Claims, TCEH Unsecured Note Claims and the TCEH Committee, on the other hand, that distributions that would otherwise be made to holders of Allowed TCEH

---

Claim Recipients (as defined below) is not an attempt by the Ad Hoc Group to appropriate estate claims or the proceeds thereof (and thereby confer a disproportionate benefit upon the Deficiency Claim Recipients), but rather, an acknowledgement that the vast majority (if not all) of the claims asserted against the holders of TCEH First Lien Claims would, if successful, inure to the benefit of the subsidiary TCEH Debtors' estates where the Deficiency Claim Recipients—unlike the holders of PCRB Claims—have claims entitling them to a greater recovery.

First Lien Deficiency Claims will be made to the holders of the Allowed TCEH Deficiency

Recipient Claims (the "Deficiency Claim Recipients").  That agreement, compromise and

settlement also results in (i) the fixing of the amount of the TCEH First Lien Deficiency Claims

as against each TCEH Debtor—including at the estate of TCEH, the primary obligor with respect

to all of the approximately $31.2 billion of TCEH First Lien Claims (net of total anticipated

adequate protection payments), TCEH Second Lien Note Claims, TCEH Unsecured Note Claims

and PCRB Claims, that has few (if any) unencumbered assets—in the amount of $8.1 billion to

$9.5 billion; (ii) the corresponding elimination of approximately $14 billion to $15.4 billion of

deficiency claims against TCEH's estate;[10] and (iii) the waiver of the remaining $8.1 to

$9.5 billion of TCEH First Lien Deficiency Claims for the benefit of the Deficiency Claim

Recipients who are similarly situated holders of funded debt claims guaranteed by the subsidiary

TCEH Debtors.  Notably, fixing of the TCEH First Lien Deficiency Claims at $8.1 billion to

$9.5 billion alone results in a reduction of TCEH's total general unsecured claims pool by

approximately one-half (from $31.2 billion to $15.8-$17.2 billion) and a corresponding increase

in the recoveries of other holders of general unsecured claims against TCEH to nearly double

what those recoveries would otherwise be in the absence of the Settlement.  In other words, even

without benefitting from the waiver of the TCEH First Lien Deficiency Claims, the recoveries of

holders of Allowed PCRB Claims are significantly greater than they would be in the absence of

the Settlement.  Even taking the PCRB Trustee's allegations as true, all that TCEH's estate has to

---

[10]        Contrary to the PCRB Trustee's assertion, the holders of TCEH First Lien Claims are entitled to assert their entire claim as a deficiency claim against TCEH—the primary obligor—notwithstanding the existence of collateral at the subsidiary TCEH Debtors' estates.  See In re LightSquared Inc., No. 12-12080(SCC), 2014 WL 5488413, at *7 (Bankr. S.D.N.Y. Oct. 30, 2014) ("Long-standing principles of commercial law would be overturned if . . . a secured creditor with a contractual right to seek payment from multiple sources could be precluded from seeking recovery from a co-obligor merely because of an allegation that it is oversecured by the collateral of another co-obligor.").  The court's decision in In re Residential Capital, LLC, 501 B.R. 549 (Bankr. S.D.N.Y. 2013), regarding how to apply section 506(b) in a multi-debtor case, is inapposite.

Americas 90873537

give up for the holders of Allowed PCRB Claims (and other general unsecured creditors of

TCEH) to enjoy the benefit of the elimination of $15.8 billion to $17.2 billion of deficiency

claims is disputed claims to recover some amount less than $2 billion at some later date.

43.     The waiver of the TCEH First Lien Deficiency Claims, the recoveries on account

of which are <u>not</u> assets of the Debtors, does not result in different treatment of the claims in

Class C4.  Instead, it merely augments the ultimate recoveries of certain of the holders of those

claims with differing legal rights.  The PCRB Trustee fails to appreciate the distinction between

plan treatment and plan recoveries.  The former must be the same in order for section 1123(a)(4)

to be satisfied.  <u>See</u> 11 U.S.C. § 1123(a)(4) (stating that a plan shall "provide the same <u>treatment</u>

for each claim or interest of a particular class") (emphasis added).  The latter can differ for a

variety of reasons that do not implicate section 1123(a)(4).  For example, in <u>In re Exide</u>

<u>Technologies</u>, 303 B.R. 48, 77 (Bankr. D. Del. 2003), certain unsecured creditors argued that the

debtor's plan unfairly discriminated in its treatment of unsecured creditors in violation of section

1123(a)(4) and "that any settlement or reallocation must be distributed equally among all

unsecured creditors."  <u>Id.</u>  The debtor claimed that the disparate treatment of unsecured creditors

was permissible "because the payments result from the Prepetition Lenders' agreement to

redistribute $8.5 million of their recovery to pay the general unsecured creditors and 10% Senior

Noteholders" (to the exclusion of certain other unsecured creditors).  <u>Id.</u>  The debtor highlighted

that other courts have permitted senior creditors to allocate part of their recovery to certain

creditors while excluding others.  <u>Id.</u> (citing <u>Official Unsecured Creditors' Comm. v. Stern (In re</u>

<u>SPM Mfg. Corp.)</u>, 984 F.2d 1305 (1st Cir. 1993); <u>In re MCorp Fin., Inc.</u>, 160 B.R. 941 (S.D.

Tex. 1993); <u>Genesis Health Ventures</u>, 266 B.R. 591, 612 (Bankr. D. Del. 2001)).  The court

found that "[t]he Debtor correctly indicate[d] that the <u>SPM</u> court decided that a senior creditor

could agree to reallocate the net proceeds from the sale of assets subject to its lien to a junior

creditor without regard to the Bankruptcy Code's priority provisions." Id. (citing SPM, 984 F.2d

at 1313 ("The Code does not govern the rights of creditors to transfer or receive nonestate

property.  While the debtor and the trustee are not allowed to pay nonpriority creditors ahead of

priority creditors, . . . creditors are generally free to do whatever they wish with the bankruptcy

dividends they receive, including to share them with other creditors.")).  It further noted that

courts have approved chapter 11 plans that included such reallocations.  Id. (citing MCorp, 160

B.R. at 960 (approving a plan in which senior creditors agreed to fund a settlement with a

specific junior creditor by reallocating a portion of their recovery); Genesis Health Ventures, 266

B.R. 591 (approving a plan in which senior lenders agreed to reallocate a portion of their

distribution to certain classes of unsecured creditors)).

44.     The authority cited by the PCRB Trustee does not alter this conclusion.  The plan

at issue in Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.),

407 B.R. 576 (D. Del. 2009), differed significantly from the Plan at issue here.  The New

Century plan provided for different percentage distributions to claimants in the same class based

upon whether a claimant held a claim against a single debtor (100% recovery) or a joint and

several claim against multiple debtors (130% recovery).  Id. at 583.  Because this plan treatment

resulted in less favorable treatment of the single-debtor claimants without their consent, the

District Court concluded the plan at issue violated section 1123(a)(4) and could not be

confirmed.  Id. at 592.

45.     By contrast, under the Debtors' Plan, the distributions to holders of claims in

Class C4 are the same.  See Plan, Art. III.B.29 (describing distributions as "pro rata").

Accordingly, there is no issue of consent or even less favorable treatment.  What differs is the

Americas 90873537

ultimate <u>recoveries</u> of certain holders of claims in Class C4, some of whose recoveries are

augmented not by operation of the Plan but as a result of the Settlement and agreement of certain

other claimants properly classified in the same class to forego their recoveries as holders of

general unsecured claims for the benefit of certain other holders of such claims.  <u>See</u> Settlement

Agreement § 2.2(b).

### E.  The Fact That Holders of TCEH Unsecured Note Claims Have Claims Against Multiple TCEH Debtors Does Not Place In Issue Their Motives

46.    The PCRB Trustee attempts to impugn the motives of the Ad Hoc Group in

negotiating the Settlement, and to set aside the Settlement ostensibly arguing it is on both sides

of the "X vs. Y" debate.  <u>See</u> PCRB Objection ¶¶ 2, 83-90; PCRB Settlement Objection ¶ 22.  As

support for the notion that the Ad Hoc Group pressured the Debtors into shortchanging the

holders of PCRB Claims, the PCRB Trustee points to the Debtors' earlier-filed plans (that had

not been scrutinized by creditors interested in ensuring that the recoveries of holders of PCRB

Claims reflected their recourse solely to TCEH) and drafts of the Plan that (reflecting such later

scrutiny) included a waiver of the TCEH First Lien Deficiency Claims for the benefit of the

Deficiency Claim Recipients.

47.    The time spent by the PCRB Trustee spouting innuendo based on less than

compelling circumstantial evidence would have been better spent investigating whether TCEH

alone holds any claims against the holders of TCEH First Lien Claims that would justify the

holders of Allowed PCRB Claims sharing equally in the benefit of the waiver of the TCEH First

Lien Deficiency Claims.  To be clear, this is not an abusive settlement.  In the absence of such

evidence and a reasoned justification to depart from the allocation of recoveries resulting from

the waiver of the TCEH First Lien Deficiency Claims for the benefit of the Deficiency Claim

Recipients, there is no legitimate basis upon which to call into question the motives of the Ad

Hoc Group in attempting (and convincing the Debtors and the TCEH Committee to attempt) to do "rough justice" in allocating the value derived from the settlement of claims against the holders of TCEH First Lien Claims among T-side junior creditors.  See In re Adelphia Commc'ns Corp., 359 B.R. 54, 64 (Bankr. S.D.N.Y. 2006) ("[T]he law has long upheld creditors' efforts to maximize their individual recoveries in their self-interest as creditors under a plan."); see also In re Landing Assocs., Ltd., 157 B.R. 791, 803 (Bankr. W.D. Tex. 1993) ("The Code does not require, nor could it reasonably expect, creditors to act with 'selfless disinterest' . . . . 'If a selfish motive were sufficient to condemn reorganization policies of interested parties, very few, if any, would pass mustard [sic, muster].' . . .  If a creditor sufficiently manifests a proper motive for the questioned activity, courts have been unwilling to second-guess the wisdom of the creditor's exercise of business judgment.") (internal citations omitted).

## III.    The Plan Is Not Rendered Infeasible By The Terms Of The Plan Documents

48.    Among its objections to the Plan, the EFH Committee argues that the Plan is not feasible because the Plan Sponsors have not provided a firm commitment with respect to the equity financing necessary to close the Merger.  EFH Committee Objection ¶¶ 236-42.  The EFH Committee contends that the Plan Sponsors have been granted a free option to acquire the Oncor assets and they likely will not exercise that option when the conditions to close the Merger have been satisfied because the value of Oncor at that time may have declined.  Id. at ¶¶ 243-44.  In other words, regardless of whether under the present facts it is reasonably likely that the Merger will close and the Plan will be consummated, the EFH Committee asks the Court to find that the Plan is not feasible based on a hypothetical scenario where, between confirmation and consummation of the Plan, the value of Oncor has declined to the point where it makes more economic sense for the Plan Sponsors to breach the Merger Agreement rather than close.

32

Fortunately for the Court, it does not need to engage in an analysis of such unsupported hypotheticals and can find on the facts before it, including the fact that the Plan Sponsors' financing commitments are sufficiently firm, that the Plan is feasible.

**A.    The Court Should Not Consider The Unsupported Hypotheticals Offered By The EFH Committee In Deciding Whether The Plan Is Feasible**

49.    The plain text of section 1129(a)(11) requires a determination that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan. . . ."  11 U.S.C. § 1129(a)(11).  In other words, the plan must be "feasible."

50.    As an initial matter, the feasibility inquiry merely requires consideration of the debtor's post-emergence business prospects assuming the plan has become effective; it is not a test of the likelihood of a condition to the effectiveness of the plan occurring.  See In re AMR Corp., 11-15463 (SHL) (Bankr. S.D.N.Y. Oct. 22, 2013) [Docket No. 10367] ("The evidence proffered or adduced at the Confirmation Hearing . . . establishes that the Plan, subject to the occurrence of the Effective Date and consummation of the Merger, is feasible and that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or the Reorganized Debtors, thus satisfying the requirements of section 1129(a)(11) of the Bankruptcy Code.") (emphasis added); In re Prudential Energy Co., 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986) (noting that the intent of section 1129(a)(11) is to avoid confirmation of a plan where a debtor is "likely to return to bankruptcy"); In re WorldCom, Inc., No. 02-13533 (AJG), 2003 WL 23861928, at *58 (Bankr. S.D.N.Y. Oct. 31, 2003) (finding WorldCom's plan feasible because the "Reorganized Debtors appear to be a competitive viable operating entity"); In re Leslie Fay Cos., 207 B.R. 764, 789 (Bankr. S.D.N.Y. 1997) ("Basically, feasibility involves the question of the emergence of the

Americas 90873537

reorganized debtor in a solvent condition and with reasonable prospects of financial stability and success."); see also 7 COLLIER ON BANKRUPTCY ¶ 1129.02[11] ("The inquiry is on the viability of the reorganized debtor, and its ability to meet its future obligations, both as provided for in the plan and as may be incurred in operations.") (emphasis added).  Thus the Court need not consider the likelihood of conditions precedent to the Effective Date of the Plan occurring, including consummation of the Merger, to find that the Plan satisfies section 1129(a)(11), and the EFH Committee's objections with respect to the same should be disregarded.

51.     In any event, the feasibility inquiry requires a relatively low threshold of proof and requires only that the plan present a workable business model that has a reasonable likelihood of success; success of the plan need not be guaranteed.  See In re WR Grace & Co., 729 F.3d 332, 349 (3d Cir. 2013) (stating that the plan proponent need only demonstrate a "reasonable likelihood of success, not an absolute certainty"); Kane v. Johns-Manville Corp. (In re Johns-Manville), 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed."); In re Indianapolis Downs, LLC., 486 B.R. 286, 298 (Bankr. D. Del. 2013) ("[Section] 1129(a)(11) does not require a guarantee of the plan's success; rather the proper standard is whether the plan offers a 'reasonable assurance' of success."); In re Wash. Mut., Inc., 461 B.R. 200, 252 (Bankr. D. Del. 2011) ("Feasibility does not require that success be guaranteed but rather only a reasonable assurance of compliance with plan terms.") (internal quotation omitted); In re Aleris Int'l, Inc., No. 09-10478 (BLS), 2010 WL 3492664, at *27 (Bankr. D. Del. May 13, 2010) ("A relatively low threshold of proof will satisfy the feasibility requirement." (citing Mercury Capital Corp. v. Milford Conn. Assocs., L.P., 354 B.R. 1, 9 (Bankr. D. Conn. 2006))).

52.     Indeed, mere future financial uncertainty or the potential of failure is not fatal to a finding that a plan is feasible.  See S & P Inc. v. Pfeifer, 189 B.R. 173, 182-83 (N.D. Ind. 1995) ("The mere potential for failure of the plan is insufficient to disprove feasibility" (quoting In re Drexel Burnham Lambert Grp., Inc., 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992))); In re Aleris Int'l, Inc., 2010 WL 3492664, at *28 (citing In re Drexel Burnham Lambert Grp., Inc., 138 B.R. at 762); see also In re TCI 2 Holdings, LLC, 428 B.R. 117, 148 (Bankr. D.N.J. 2010) ("[M]ere potential for failure of the plan is insufficient to disprove feasibility." (citing In re Wiersma, 227 F. App'x 603, 606 (9th Cir. 2007))).  As such, a court need not entertain feasibility objections based on speculative hypotheticals of plan failure.  See Indianapolis Downs, 486 B.R. at 298 ("speculative prospects of failure will not defeat feasibility."); see also In re Cheatham, 91 B.R. 377, 380-81 (E.D.N.C. 1988) (refusing to apply a "wooden application" of feasibility and confirming a plan notwithstanding likely "extreme fluctuations" in commodity prices).

53.     Although the EFH Committee states that "the Court's feasibility determination must be 'firmly rooted in predictions based on objective facts,'" the EFH Committee without irony then asks the Court to rely on speculative hypotheticals, not objective facts supported by evidence, to support a contention that it is unlikely the Plan Sponsors will provide the funding they have committed to provide to consummate the Merger and the Plan.  EFH Committee Objection ¶ 250.  Specifically, the EFH Committee contends that "whether the [Plan Sponsors] close the transaction will depend on the value of Oncor at the time of the proposed closing, which may be as late as August 2016" and "if the value of Oncor is lower than the contractual price," the Plan Sponsors likely will breach the Merger Agreement and "abandon the Plan."  Id. at 243 (emphasis added).  The EFH Committee, however, offers no evidence to support its contention that the value of Oncor will be, or even may be, lower in August 2016.

35

54.     Indeed, although the EFH Committee speculates about factors that could affect

the value of Oncor in the future, the EFH Committee's offered expert, Michael Henkin, testified

that he has not conducted any analysis regarding such factors.  <u>See</u> Audette Decl. Ex. 22 (Oct.

21, 2015 Deposition of Michael Henkin Tr. at 252:11-254:17) ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████  Moreover, Mr. Henkin testified that he could not even determine based on current

market conditions whether or not it was likely that the Plan Sponsors would fund the Merger

transaction.  <u>See</u> <u>id.</u> at 291:24-292:8; 292:16-293:14 ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████  If the EFH Committee cannot determine based on current facts whether or

not it is likely that the Plan Sponsors will close the transaction, how can it suggest that the Court

can determine that the Plan Sponsors are <u>unlikely</u> to close the transaction based on unknown

conditions sometime in the future?  It cannot credibly do so.

55.     Put simply, the potential for market conditions to adversely affect the likelihood

of consummating the Merger is a speculative concern—not evidence that the Merger will not

close or that the Plan is not feasible.  The Plan is feasible and the EFH Committee objection should be overruled.

### B.    The Plan Sponsors Are Incentivized By The Settlement To Close And Avoid The Penalty Of An Alternative Restructuring

56.    In addition to asking the Court to consider its speculative hypotheticals to defeat a finding that the Plan is feasible, the EFH Committee continues its refrain that the Plan Sponsors' financing commitment is not sufficiently firm to support a finding of feasibility because, the EFH Committee argues, the Plan Sponsors have been granted a "free option" and "there are no adverse consequences for failing to perform under the Merger Agreement."  See EFH Committee Objection ¶ 243.  The EFH Committee's position ignores reality.[11]

57.    The EFH Committee seems unwilling to accept that the Plan, the Plan Support Agreement, the Settlement Agreement, the Merger Agreement, and the other restructuring documents were all negotiated together as part of a complex inter-related deal.  Instead, the EFH Committee continues to focus solely on the Merger Agreement to support its "free option" refrain and offers a survey by Mr. Henkin of power and utility deals and bankruptcy exits to suggest that the Plan Sponsors' financing is not committed because the Debtors purportedly have no remedies against the Plan Sponsors for a failure to perform.  See EFH Committee Objection ¶ 238.  Whether the Merger Agreement resembles the agreements in the unrelated deals surveyed by Mr. Henkin with respect to remedies, however, is of no moment.

---

[11]    American Stock Transfer & Trust Company, LLC, as indenture trustee of the EFH Notes joins the EFH Committee's argument regarding the feasibility of the Plan in its objection to confirmation of the Plan.  See *EFH Indenture Trustee's Objection and Pretrial Brief for Phase I Trial Regarding Confirmation of Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp.,* et al. ¶ 100 [Docket No. 6609] (the "EFH Indenture Trustee Objection").  In turn, Contrarian Capital Management, LLC joins in this aspect of the EFH Indenture Trustee Objection [Docket No. 6629].  Fidelity Management & Research Company also filed a joinder to the EFH Committee Objection, pending the potential resolution of its objections [Docket No. 6642].  Accordingly, the reply set forth herein is meant to address all objections that join this particular argument of the EFH Committee.

Americas 90873537

58.     Unlike a liquidated damages provision or a reverse break-up fee, which generally require a breach by the party, or at least some action or inaction by such party, as a condition to a debtor having the right to such damages or fee, the Plan Sponsors have agreed that they will forfeit their litigation rights and accept without argument a single-digit, pennies-on-the-dollar recovery, at best, on their claims against the Debtors if the transactions contemplated by the Plan fail for virtually any reason, even through no fault, action or inaction of their own.  The record of these Cases outlined in Section I, supra, makes clear that such an outcome is not what the Ad Hoc Group has been fighting to achieve over the past three years, and forfeiting their litigation rights for such a recovery would indeed be a penalty if the transactions contemplated by the Plan are not consummated.  It's simply not credible for the EFH Committee to argue that, in the face of such a potential penalty, the Plan Sponsors are not sufficiently bound, committed and incentivized to provide the funding they have committed to provide under the relevant transaction documents.

59.     In short, the Plan Sponsors do not have an "option" to close the Merger and consummate the Plan.  To the contrary, the deal documents, taken together, evidence binding commitments that the Plan Sponsors can choose not to perform only by breaching the agreements.  To the extent they do so, they will face significant costs and harsh penalties.  Thus the Plan Sponsors financing commitments are more than sufficiently firm to support a finding of feasibility of the Plan under section 1129(a)(11).

## IV.     The U.S. Trustee's Objections To The Payment Of Fees Should Be Overruled

60.     By the *United States Trustee's Objection to the Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp.,* et al.*, Pursuant to Chapter 11 of the Bankruptcy Code and the Motion of Energy Future Holdings Corp.,* et al.*, to Approve a*

38

*Settlement of Litigation Claims and Authorize the Debtors to Enter into and Perform Under the Settlement Agreement (D.I. 5249, 6085, 6122)* [Docket No. 6705] (the "UST Objection"), the U.S. Trustee opposes the payment of the reasonable and documented fees and expenses (including professional and other advisory fees and expenses) of, among others, the Plan Sponsors, the TCEH Unsecured Notes Trustee and the members of the Ad Hoc Group, pursuant to, and subject to the occurrence of the Effective Date of, the Plan, and the Ad Hoc Group (but not the individual members thereof) and the TCEH Unsecured Notes Trustee, pursuant to, and on the effective date of, the Settlement, except to the extent the procedural and substantive requirements of section 503(b)(3)(D) and (4) are satisfied.  See UST Objection ¶¶ 30-32.  The U.S. Trustee contends that section 503(b)(3)(D) and (4) of the Bankruptcy Code is the only basis upon which the Debtors can pay those fees.  Id. at ¶ 33 (citing Davis v. Elliot Mgmt. Corp. (In re Lehman Bros. Holdings Inc.), 508 B.R. 283, 290 (S.D.N.Y. 2014)).

61.     Contrary to the U.S. Trustee's contention, section 503(b)(3)(D) and (4) is not the sole basis upon which the Debtors can pay, subject to authorization by the Court, the reasonable fees and expenses of creditors and indenture trustees.  The payment of such fees and expenses under a plan of reorganization, a Bankruptcy Rule 9019 settlement or other agreement approved under section 363(b) of the Bankruptcy Code is distinct from the right to compel such payment pursuant to an application for allowance of an administrative expense under section 503(b) of the Bankruptcy Code.

62.     With respect to a plan of reorganization, section 1123(b)(6) provides a chapter 11 plan may "include any . . . appropriate provision not inconsistent with the applicable provisions of this title."  U.S.C. § 1123(b)(6).  Courts interpret section 1123(b)(6) broadly and generally permit the inclusion of any provision in a reorganization plan, including provisions for the

Americas 90873537

payment of fees, as long as such provision does not run afoul of any other provision of the

Bankruptcy Code.  In turn, section 1129(a)(4) provides the standard for the review and approval

of any fees to be paid under a fee payment provision properly included in a plan pursuant to

section 1123(b)(6).  <u>See</u> 11 U.S.C. § 1129(a)(4) ("Any payment made or to be made by the

proponent, [or] by the debtor . . . for services or for costs and expenses . . . in connection with the

plan and incident to the case, has been approved by, or is subject to the approval of, the court as

reasonable.").  Accordingly, so long as the proposed fee reimbursements pass muster as "plan

payments" under sections 1123(b)(6) and 1129(a)(4), no additional Bankruptcy Code authority is

required.

      63.    Looking solely to these two Bankruptcy Code provisions, bankruptcy courts have

approved plan provisions similar to the fee and expense payment provisions here.  <u>See, e.g.</u>, <u>In re

Adelphia Commc'ns Corp.</u>, 441 B.R. 6, 13-22 (Bankr. S.D.N.Y. 2010) (approving payment of

creditors' professional fees without the need for submitting substantial contribution applications

because "section 503(b) does not provide, in words or substance, that it is the <u>only</u> way by which

fees of this character may be absorbed by an estate.  Thus the Court is free to look at other

provisions of the Code that might also authorize payment;" and finding that section 1129(a)(4)

permits payment of "reasonable fees" of certain creditors where, as here, "the provision for fees

is an element of a chapter 11 reorganization plan") (emphasis in original)); <u>In re AMR Corp.</u>,

497 B.R. 690, 694-96 (Bankr. S.D.N.Y. 2013) (following reasoning of <u>Adelphia</u> and concluding

that professional fees for individual committee members provided for in a plan were permitted

under sections 1129(a)(4) and 1123(b)(6) and would be approved).

      64.    Other courts (including courts in this District), even in the wake of the <u>Lehman</u>

decision upon which the U.S. Trustee relies, have also recognized that section 503(b) is not the

exclusive avenue for payment of a creditor's fees and expenses, and have approved the payment of such fees and expenses without requiring notice, a hearing or "substantial contribution" under section 503(b).  See, e.g., In re Altegrity, Inc., No. 115-10226 (LSS) (Bankr. D. Del. Mar. 16, 2015) [Docket No. 208] (approving payment of fees and expenses pursuant to section 363(b) of the Bankruptcy Code under assumed restructuring support agreement without requiring a showing of substantial contribution); In re Legend Parent, Inc., No. 14-10701 (RG) (Bankr. S.D.N.Y. July 21, 2014) [Docket No. 390] (confirming plan that provided for payment of fees and expenses of parties to plan support agreement "without the need of such parties to file fee applications with the [b]ankruptcy [c]ourt or motions seeking payment of such fees as administrative claims pursuant to Bankruptcy Code section 503(b)"); In re Dendreon Corp., No. 14-12515 (PJW) (Bankr. D. Del. Dec. 23, 2014) [Docket No. 215] (overruling U.S. Trustee's objection that creditors must seek reimbursement for fees and expenses under sections 503(b)(3)(D) and (b)(4) of the Bankruptcy Code and approving payment of unsecured noteholders' professional fees and expenses pursuant to plan support agreements provided that the creditors' committee and U.S. Trustee received copies of the invoices); In re MPM Silicones, LLC, No. 14-22503 (RDD) (Bankr. S.D.N.Y. June 23, 2014) [Docket No. 507] (approving payment of creditors' fees and expenses in connection with assumed restructuring support agreement as an "actual and necessary cost and expense to preserve the Debtors' estates" without further application to the court); In re Amicus Wind Down Corp., No. 11-13167 (KG) (Bankr D. Del. June 5, 2012) [Docket No. 1123] (confirming plan (Docket No. 948) providing for payment of the full, reasonable, documented and necessary fees and expenses of members of the official creditors' committee without the need to file application with bankruptcy court, subject to provision of supporting documentation to the debtors or liquidating trustee); In re Tribune Co.,

No. 08-13141 (KJC) (Bankr. D. Del. July 23, 2012) [Docket No. 12074] (confirming plan

(Docket No. 11747) that provided that creditors' committee members would submit to the

debtors and the U.S. Trustee, within 45 days of the plan effective date, reasonably detailed

statements of their fee claims for payment, subject to a cap).  Indeed, this very Court, in In re

USEC Inc., No. 14-10475 (CSS) (Bankr. D. Del. Apr. 21, 2014) [Docket No. 190], approved the

assumption of plan support agreements and the payment of creditor fees and expenses without

the need for further application or approval by the bankruptcy court.  See also In re Visteon

Corp., No. 09-11786 (CSS), 2009 WL 8519819, at *18 (Bankr. D. Del. May 28, 2009)

(authorizing debtors to pay DIP lender's and DIP agent's professionals' fees and expenses under

section 363(b) and stating that "payment of all such fees and expenses shall not be subject to

allowance by the [c]ourt," and that such professionals "shall not be required to comply with the

U.S. Trustee fee guidelines," but must simply provide copies of fee and expense statements to

the U.S. Trustee and creditors' committee) (emphasis added).  These cases overwhelmingly

demonstrate, contrary to court's findings in Lehman, that even though sections 503(b)(3)(D) and

(b)(4) specifically address the payment of a creditor's fees and expenses, courts are not

precluded from authorizing the payment of such fees and expenses under other provisions of the

Bankruptcy Code.

     65.     Similarly, bankruptcy courts (including courts in this District) have authorized the

payment of creditors' fees and expenses pursuant to Bankruptcy Rule 9019 as a term of the

settlement without the necessity of the settling parties' (or their professionals') compliance with

section 503(b)(3)(D) and (4).  See In re Smurfit-Stone Container Corp., No. 09-10235 (BLS),

2009 WL 8188930, at ¶ 10 (Bankr. D. Del. Jan. 26, 2009) (confirming plan and approving,

pursuant to Bankruptcy Rule 9019, the payment of professional fees and expenses of certain ad

Americas 90873537

hoc groups of creditors without requiring that such professionals file an application for court approval); see also In re Aleris Int'l, Inc., 2010 WL 3492664, at *10, *35 (confirming plan and approving Bankruptcy Rule 9019 settlement that allowed debtors, as part of the settlement, to reimburse fees and expenses of counsel to certain lenders who were party to the settlement).

66.    Accordingly, the Debtors have (subject to the Court approving the Settlement and confirming the Plan) the authority necessary to pay the reasonable and documented fees and expenses (including professional and other advisory fees and expenses) of, among others, the Ad Hoc Group, the Plan Sponsors, the members of the Ad Hoc Group and the TCEH Unsecured Notes Trustee, regardless of whether the procedural and substantive requirements of section 503(b)(3)(D) and (4) are satisfied.

## CONCLUSION

WHEREFORE, the Ad Hoc Group respectfully requests that the Court (i) overrule all objections to the Plan and Settlement Motion; (ii) enter orders granting the Settlement Motion and confirming the Plan, and (iii) grant such other and further relief as the Court may deem just and proper.

*[Remainder of page left intentionally blank.]*

Americas 90873537

Dated: Wilmington, Delaware
October 30, 2015

FOX ROTHSCHILD LLP

By:     */s/ L. John Bird*
Jeffrey M. Schlerf (No. 3047)
L. John Bird (No. 5310)
919 North Market St., Suite 300
Wilmington, DE 19801
Telephone:  (302) 654-7444
Facsimile:  (302) 463-4971
jschlerf@foxrothschild.com
lbird@foxrothschild.com

and

WHITE & CASE LLP
Thomas E Lauria (admitted *pro hac vice*)
Matthew C. Brown (admitted *pro hac vice*)
Southeast Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, FL 33131
Telephone:  (305) 371-2700
Facsimile:  (305) 358-5744
tlauria@whitecase.com
mbrown@whitecase.com

J. Christopher Shore (admitted *pro hac vice*)
Gregory M. Starner (admitted *pro hac vice*)
1155 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 819-8200
Facsimile:  (212) 354-8113
cshore@whitecase.com
gstarner@whitecase.com

*Counsel to the Ad Hoc Group of TCEH Unsecured
Noteholders and the Backstop Purchasers*

Americas 90873537