# EXHIBIT 15

```
                                                              Page 1
 1   UNITED STATES BANKRUPTCY COURT
 2   DISTRICT OF DELAWARE
 3
 4   In re:                           :
                                      :    Chapter 11
 5   ENERGY FUTURE HOLDINGS           :
     CORP., et al.,                   :    Case No. 14-10979(CSS)
 6                                    :
             Debtors.                 :    (Jointly Administered)
 7   _____ :
     DELAWARE TRUST COMPANY as        :
 8   INDENTURE TURSTEE,               :
                                      :
 9           Plaintiff,               :
                                      :    Adversary Proceeding
10      v.                            :    No. 14-50363(CSS)
                                      :
11   ENERGY FUTURE INTERMEDIATE       :
     HOLDING COMPANY LLY and          :
12   EFIH FINANCE INC.,               :
                                      :
13           Defendants.              :
     _____ :
14
15
16
                         United States Bankruptcy Court
17
                         824 North Market Street
18
                         Wilmington, Delaware
19
20
21
                         June 1, 2015
22
                         10:45 AM
23
24
25
```

1  B E F O R E :
2  HON CHRISTOPHER S. SONTCHI
3  U.S. BANKRUPTCY JUDGE
4
5  ECR OPERATOR:  AL LUGANO
6
7
8  HEARING re Third Motion of Energy Future Holdings Corp., et
9  al., for Entry of an Order Extending the Debtors' Exclusive
10 Periods to File a Chapter 11 Plan and Solicit Acceptances
11 Thereof Pursuant to Section 1121 of the Bankruptcy Code
12 [D.I. 4441; filed May 11, 2015]
13
14
15
16
17
18
19
20
21
22
23
24 Transcribed by:  Dawn South, Lisa Beck, Linda S. Foley, and
25 Pamela A. Skaw

1  hood of this alleged plan, it isn't there.  It's missing.

2  And while we're happy that people are now engaged in

3  discussions, we don't believe that these debtors, in light

4  of the fact that they haven't reached a real resolution in

5  terms of the settlement, should be given the maximum

6  extension under the Code.

7            Thank you.  We ask that it be limited to 60 days.

8            MR. SHORE:  Good morning, Your Honor.  Chris Shore

9  from White & Case on behalf of the ad hoc group of TCH

10 unsecured creditors.

11           I'd like to focus on two factors from the debtors'

12 papers.  One, are the debtors making progress negotiating

13 with creditors towards a viable plan; and two, is the

14 extension being used to pressure creditors into a bad plan.

15 And I'd like to use the opportunity in discussing both to

16 kind of apprise the Court of where we are in the case which

17 seems fundamentally the purpose of having exclusivity

18 hearings.

19           Let me start here.  When we were last before the

20 Court, the issue at bar was whether and to what extent it

21 was necessary for the debtors to confirm a plan within their

22 exclusive periods.  And that was the primary reason

23 expressed by the Court -- or expressed by the debtors for

24 setting forth the confirmation schedule that they have put

25 forward.  And at that hearing, the Court clearly articulated

1  that exclusivity was not the be-all-end-all of the process
2  but rather it was getting to a consensual plan that was
3  confirmable, a viable plan.  That's why we spent the last
4  hearing establishing a runway for the pursuit of a viable
5  plan, not the debtors' plan, not our plan, but a viable
6  plan.
7           It's not clear from where we are today in the
8  presentation that was made that the debtors heard the
9  message.  Reading the papers and hearing the argument, it
10 seems that authorial pride is -- in filing and prosecuting a
11 plan still has a meaningful influence on what the debtors
12 are doing.  In this case, we believe we're long past the
13 time for pride.  What should matter and matter alone is the
14 creation of a viable plan that maximizes the debtors'
15 distributable value in a structure that meets with Section
16 11.29 of the Code.  That should be it.  If we can get there
17 and a plan signed by the debtors, that's fantastic.  If we
18 can't, we can't.  It's not that big a deal that the debtors
19 are the signatories of the plan or somebody else is the
20 signatory of the plan.  We certainly have no authorial pride
21 in pushing forward a plan.  If we can sponsor a plan and the
22 debtors want to sign it, that's great.
23          The problem is right now that the debtors' grip on
24 the pen and the desire to sign a plan is making it
25 demonstratively harder to get to the viable plan.  It hasn't

1   even advanced to one folk in favor of its plan in the last
2   six weeks.  To that end, we've asked for a short extension;
3   I think we're on the short end.  We're asking through July
4   9th which, again, is not slicing this into tiny slices.
5   We're just all asking for one more hearing, a stop, look and
6   listen over the summer before exclusivity expires.
7           Let me turn to the first factor and let's be frank
8   here.  The debtors are nowhere on their plan.  They filed
9   the plan six weeks ago.  Every one within the capital
10  structure is against the plan.  Even the parties in support
11  of extending exclusivity have made it very clear:  they are
12  not in support of the plan.
13          That plan and that structure are what are causing
14  the problems.  It does nothing on the T-side essentially
15  pitting the unsecureds against the secureds and having them
16  fight it out.  It impairs and gives votes to the make-whole
17  litigants on the E-side.  And it gives the upside and the
18  value of Oncor to a third party bidder.  It promises a
19  litigation between the T-side and the E-side over that
20  independent director settlement.  And at best, it's a
21  structure that has way too many moving pieces for anybody to
22  negotiate around it over the next six months.  In the end,
23  everyone whose vote that matters, and I'll come back to
24  that, in this case is up in arms.  It's hard to think of a
25  large case in which, with an extension of exclusivity out to

1  the statutory maximum, so many creditors would show up and
2  give a vote of no confidence to the debtors because that's
3  what you're hearing in all the objections.  People have
4  fundamentally come to the view, people who had supported
5  previous extensions, like our group, have come to the view
6  that the debtors just can't do this right and are asking the
7  Court to keep them on a much shorter leash than they are
8  asking for.  And that point of showing up for a vote of no
9  confidence, we don't think was lost on the debtors.
10             As of 11:57, I think, on Friday, they had nobody
11  supporting their extension of exclusivity.  Then the EFIH
12  second lien trustee and Fidelity filed short statements in
13  support, two two-page redundant support saying we'll agree
14  to the full extension.  I think the debtors knew that they
15  couldn't come to the hearing with an array of objections and
16  no support.  And the second liens, for their part, hate the
17  current plan which cashes them out at 10 cents on the make-
18  whole.  And there was a deal that was cut.  The second liens
19  were in the process of preparing a counteroffer which
20  increases their payout.  According to the debtors by
21  allowing them to be paid with Oncor equity at an unspecified
22  plan value.  In other words, their counteroffer to a 10 cent
23  cashout was we'll take a cashout but with a currency that we
24  like at a value that we like.
25             Now one might think that the debtors would have

1  shot that down.  They are engaged in litigation with the
2  second lien trustee advancing the point that the second lien
3  trustee has no make-whole claim, is not entitled to anything
4  more than the payment of their principal, and nobody in this
5  case is talking about the second liens not receiving payment
6  in full of their principal in cash on the effective date of
7  the plan.
8          But blow, we get the announcement that the debtors
9  are now considering the counteroffer and the litigation to
10 paying them with the Oncor upside.  And we get the two page
11 responses.
12         They also got a follow on from FIDO.  Now FIDO
13 hasn't said anything about its holdings.  We went back to
14 the PIK papers.  FIDO, at the time of the PIK litigation,
15 was holding a billion dollars of first lien and second lien
16 paper and probably are the single largest creditor to be
17 affected by the ruling on the make-wholes as far as whether
18 they get any recovery on those principal claims in respect
19 of the make-wholes.
20         So one critical view or one critical and cynical
21 view is that in exchange for two-page tepid supports of
22 exclusivity, the debtors went out and said we will publish
23 in a reply a statement that we are considering that.  The
24 debtors, in doing that, have started in exactly the wrong
25 place and I think they know it.  In fact, if we look at

1    paragraph 1 of the EFIH second lien papers, they talk about
2    the very problem.  You shouldn't extend exclusivity because
3    "certain creditor groups may seek to inappropriately
4    manipulate the process by using the threat of objecting to
5    further extensions of exclusivity as leveraging plan
6    negotiations (indeed, that already seems to be the case)."
7    In fact, it does seem to be the case that extensions of
8    exclusivity may be used by people either in support or
9    objections to advance or take plan processes backwards.
10              Now let me turn to the second factor 'cause I
11   don't think that the leverage that's talked about in the
12   exclusivity cases is that.  The second liens say the
13   leverage is that parties will object and then therefore you
14   shouldn't have extensions of exclusivity.  But that's
15   already handled in the Code.  The Code requires extensions
16   of exclusivity for cause, allows creditors to appear and be
17   heard, allows creditors to object.  That's not -- that
18   doesn't harm the process.  That's exactly the process that
19   Congress has set up.  The leverage that they talk about in
20   the cases is more fundamentally related to the very purpose
21   and the balance that was struck by Congress in exclusivity
22   was the concern that debtors would use the leverage of
23   having the exclusivity pen to force parties to accept the
24   terms of their plan or have to wait out the exclusive
25   periods before they could chart their own course.

1         The question at bar then is not whether creditors
2    can leverage the debtors into plan negotiations but rather
3    whether the debtors will leverage creditors into their own
4    plan.  And we think that's what's going on here and why
5    we're asking for a shorter extension of exclusivity.  I have
6    no interest in getting into a he-said-she-said or he-said-
7    he-said fight in front of the Court.  We heard you loud and
8    clear on Friday -- or Thursday about that.  The debtors
9    promise that they are not denigrating anybody.  We take them
10   at their word.  They promise that they are actively
11   supporting plans and are not trying in back channels to
12   undercut them.  We take them at their word.  If we find out
13   that's not true, we'll bring it to the Court's attention.
14   But they are being very frank about how they see the
15   negotiation process going forward while they have
16   exclusivity.
17        In paragraph 17 of their reply, they state as
18   follows:  "The Debtors have insisted from the very outset of
19   discussions around the REIT structure and continue to insist
20   that any deal with the TCH unsecured ad hoc group regarding
21   a REIT structure must include a clear and unambiguous
22   toggle."  That's their statement of how they are going to
23   use exclusivity.
24        Let me digress on what a toggle means because
25   you're going to hear it a lot and I think there's a

1  misunderstanding that everybody needs to be clear on before
2  we start. The architect of the toggle concept -- or the
3  architects are here and Mr. Kieselstein and Mr. Luria from
4  the Visteon case. As the Court may recall from that case,
5  White & Case was representing an ad hoc group of unsecured
6  creditors seeking to fund a rights offering that would
7  maximize value and increase unsecured recoveries. Kirkland
8  & Ellis was representing Visteon which had a fully
9  negotiated plan on file. The only party who was outside of
10 it was the unsecured group. In that case, the debtors
11 insisted that the backstop parties address concerns that the
12 group simply wouldn't fund at exit. In other words, if the
13 debtors were going to forego what they thought was a live
14 bird in hand, the backstop parties had to put teeth in their
15 commitment so that we didn't get to a position where there
16 was a non-funding and a non-consummation at the fault of the
17 backstop parties. Given the case and the volatility in the
18 markets at the time, specific performance wasn't an option
19 for the backstop. Liquidated damages weren't an option for
20 the backstop. The toggle became a remedy. A remedy to fix
21 one concern about parties' failure to allow a condition to
22 occur because of their own acts.
23         The toggle that the debtors are talking about in
24 their papers is not a remedy. It is a confirmation gaiting
25 item and a precondition to any negotiations. What's the

1    problem with that?  There are five as I have laid out here.
2            First, it's forcing the parties to start
3    negotiating an agreement at the remedy section.  No
4    negotiation goes well when the parties start out talking
5    what's going to happen when you fail to perform and until
6    you assuage my concerns about your performance, I'm not
7    going to talk to you at all.  Second, because there is no
8    agreed plan on file -- quite to the contrary, there's a plan
9    on file that, if voted upon now, would get resounding nos
10   across the room -- it's empowering the wrong people in the
11   negotiations.  The elegance of a REIT plan is that it pays
12   or gives the full legal entitlements to the whole E-side
13   creditor stack all the way up to EFH Legacy equity.  And
14   insisting on toggle as a precondition, the debtors are
15   requiring a negotiation of an impaired treatment for all of
16   those creditors.  In other words, in order to get a shot at
17   maximizing value, one that would pay everybody in full, you
18   have to give votes to the people who would paid in full.
19   And you have to, before you can solicit a plan such as that,
20   negotiate the terms under which they will accept an impaired
21   treatment.  You give a yes or no vote to the people, the
22   very people who got up now and said we are interested in
23   taking the Oncor equity.  So even if we get paid in full
24   under the plan, as long as we vote no, we get the Oncor
25   upside.  It doesn't work in the context of a plan which

1  doesn't yet have support.

2         Third, it's -- they insisted on a toggle, and this

3  is the delicate situation which is why I paused, it's

4  getting in the way of key negotiations.  We're moving

5  forward and hope to get in front of the Court on that June-

6  July time frame to come in with a fully-negotiated plan.

7  The insistence on a toggle though in setting forth the

8  complete backstop for what happens if we don't get to the

9  value maximization is forcing all parties, not just the

10 creditors in the case but all participating parties, to

11 continue to negotiate the terms under which they will accept

12 a fall-back treatment and it's, again, adding more

13 complexity to an already extremely complex situation.

14         Fourth, insisting on a fail safe of a debtor plan

15 forces creditors to bear disproportionate risks.  Again,

16 we're not talking about a failure to fund, unlike this

17 (indiscernible), I don't think there's any question here as

18 to the wherewithal of backstop parties who are known to the

19 debtors, who are in NDA's with the debtors, who are locked

20 up in these cases that they have the checks that are large

21 enough to fulfill the backstop agreement that's being talked

22 about.

23         What the debtors are talking about on the toggle

24 is the failure to get to the structure which creates value;

25 that is, the insistence that all of the risk with respect to

1  a REIT transaction be borne by the backstop parties and the

2  TCEH unsecured creditors.

3          If we can get there, great, it maximizes

4  distributable value, nobody's disputing that, but insisting

5  on a toggle the debtors are conditioning this -- the

6  prospect of value in piece on the negotiation of the terms

7  of surrender.  There are, in fact, other fixes than a

8  toggle.  The debtors going on the record repeatedly saying

9  the only fix we will agree to is the toggle, is an

10 inappropriate use of exclusivity.  They need to engage on

11 other ways of fixing it.

12         There is a current proposal for a de-link plan

13 which would, if we got to the case in which the T side got

14 all their work done and the E side was not done, you could

15 allow a spin and allow it to happen such that the entire

16 plan structure isn't dependent upon a REIT approval, and

17 we're working on that, right?  But the debtors are -- have

18 dug in and unapologetically so in saying there will be no

19 structure that does not get us out in 15 months, and that

20 leads me to my fifth point.

21         The insistence on an acceptance of the toggle

22 concept upends Congress's view with respect to who

23 ultimately gets to choose what level of execution risk

24 occurs.  Creditors with votes get to choose their risks of

25 emergence bounded only by feasibility.  If creditors vote

1   for a plan and choose a high-risk, high-reward strategy, as
2   long as that plan is feasible, it should be confirmed.
3           What's happening here is the debtors are imposing
4   not a feasibility reasonably likely but absolutely certain
5   standard before they say they will solicit any plan.  The
6   votes are not, as the debtors denigrate them, parochial
7   concerns of creditors.  It is the right granted to creditors
8   by the code when debtors lend -- or borrow $45 billion.
9   They have to deal with the votes.  Creditors who have votes
10  get to dictate the level of risk they are willing to accept
11  here, not management.  Clearly, management would like to get
12  out of bankruptcy.  I've never met management who wanted to
13  stay in bankruptcy a day longer than they had to.  But the
14  fact is is the process is complex.  It may be that the
15  debtors have to proceed because their creditors tell them to
16  with a plan that maximizes value but has execution risk
17  associated with it.
18          So, in sum, we're caught right now between an
19  elegant solution -- and there may be many elegant solutions
20  that reduce the complexity in the case -- and the debtors'
21  insistence that we keep all the complexity there, that we
22  negotiate every possibility and every permutation before
23  they are willing to give up the pen.
24          We think exclusivity should be carried through the
25  July 9th conference because that, quite frankly, is the

Page 52

1    first issue of exclusivity, which is who holds the pen on
2    the first lien settlement.
3              We're going to continue over the ensuing weeks to
4    try to convince the debtors that what they should be doing
5    is move forward as quickly and as diligently as possible
6    with getting to a solution and we can address the concerns
7    with the executability of that at a later date.
8              But the process is too fragile and the debtors'
9    motivations right now too skewed to give up the opportunity
10   to come back once over the summer and address where we are
11   and what's happening and, hopefully, we come back at that
12   hearing with no fight, that we get to the point where what
13   we've done is we've addressed the debtors' concerns, that
14   they have a plan that they're willing to execute that has
15   more -- not only more than one vote but the billions of
16   votes that are necessary to have a viable plan and support a
17   further extension of exclusivity.
18             Thank you, Your Honor.
19             THE COURT:  You're welcome.
20             MR. JONAS:  Morning, Your Honor.  Jack Jonas from
21   Brown, Rudnick for Wilmington Savings Fund Society, the T
22   side second lien indenture trustee.
23             Your Honor, as set forth in our limited objection,
24   we suggest that exclusivity be extended through the
25   June 25th status conference when the Court can consider a