# EXHIBIT 16

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                          :

                                     :    Chapter 11

6    ENERGY FUTURE HOLDINGS          :

     CORP., et al.,                  :    Case No. 14-10979(CSS)

7                                    :

              Debtors.               :    (Jointly Administered)

8    _____ :

9

10

11

12                                   United States Bankruptcy Court

13                                   824 North Market Street

14                                   Wilmington, Delaware

15

16

17                                   June 25, 2015

18                                   10:41 AM

19

20   B E F O R E :

21   HON CHRISTOPHER S. SONTCHI

22   U.S. BANKRUPTCY JUDGE

23

24

25   ECR OPERATOR:   LESLIE MURIN

1   HEARING re Scheduling Conference

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:   Dawn South and Debra McCostlin

1          THE COURT:  Thank you.

2          MR. RUSS:  Thank you.

3          THE COURT:  Mr. Shore?

4          MR. SHORE:  Good morning, Your Honor, Chris Shore

5     from White & Case.

6          I'm actually going to respond to Mr. Mayer's

7     objection, provide some caveats, and then have Mr. Lauria

8     kind of walk through where we are on the deal and update you

9     where it's been since the last time we were before Your

10    Honor.

11          THE COURT:  Okay.

12          MR. SHORE:  I'll avoid comments on the un-ironic

13    use of the catalyst here.  It has some history in this case

14    and I'm going to hold my tongue on I told you so with

15    respect to where they would get with the bid procedures

16    selling forward equity.

17          But essentially where we are right now, you heard

18    the debtors say on the record that their preferred course

19    out right now is back to the prepetition RSA with only two

20    changes.  A $700 million pay over, which they admit now has

21    to be made, at least that amount, and they've got no funding

22    unlike the prepetition RSA, it was funded, this is --

23    there's no funding to do what they want to do right now.

24    And so they're going on a lick and a promise that at some

25    point between now and the time they have to file a plan and

1     disclosure statement they will get that locked up.  Whether

2     they can or not, I'm not going to speculate about whether

3     it's doable on a REIT basis or not REIT basis, but we'll

4     see.  But as they stand here today, they do not have any

5     commitments for that.

6            Here's the October piece for us.  Mr. Lauria will

7     get up and talk about where we are but essentially the T

8     side unsecureds will become the new equity.  We have every

9     interest in stopping the burn, maybe even more so than the

10    first liens.

11           The delta between the effective date of our plan

12    and the effective date of the debtors' plan runs about

13    $220 million a month in expense that would not need to be

14    paid if we're out.  That would be in the form of

15    restructuring fees, legal fees, and interest on all the debt

16    that's going to be taken out in the context of this case.

17           For us, a sine qua non of agreeing to any deal was

18    that we get the first available dates in October.  If people

19    want to object and say they need more time to come in and

20    argue feasibility and make-wholes, they can come back and

21    ask Your Honor to revise the order, but without those first

22    available, consecutive available dates in October we're not

23    on board with the schedule.

24           And to be clear, the debtors going back to their

25    prepetition RSA, in our view, have not learned a whole lot

1    about how to move the case forward, because in order to get

2    the debtors to commit what Mr. Miller described as nirvana,

3    we had to agree to a whole series of dates with respect to a

4    plan that has not been filed, a disclosure statement that

5    has not been filed, and then try to predict what that plan

6    and disclosure statement means in terms of putting forward

7    our case for Your Honor in January.

8              The plan that is put on the table that was just

9    outlined for Your Honor is going to require a settlement of

10   the inner debtor claims and approval by Your Honor, a

11   settlement of the first lien claims over the objections of

12   any TCEH unsecured creditor, the one that's outlined in the

13   standing motion that we deferred, the approval of non-

14   consensual releases by third parties of the insiders and the

15   sponsors without consideration, a valuation of the T side

16   collateral so we can fix the deficiency claim, a value of

17   the E side equity so we can figure out the appropriate

18   splits, and the same regulatory concerns that are addressed

19   by the plan that Mr. Lauria will outlay except for the REIT.

20             In other words, everybody has to go to the PUC,

21   everybody has to go to the IRS, everybody has to go to FERC,

22   everybody has to go to the Nuclear Regulatory Commission.

23             It also is going to require some T side support.

24   I think you heard today how you can translate it is as long

25   as we get everything we want out of the economics of this

1   deal, we'll agree to the debtors' deal coming from the

2   firsts.  As of right now the Debtors have no support from

3   any T side constituent for this path forward.

4           In other words, the T side debtors who have a plan

5   potentially out there which would pay their creditors lots,

6   we'll get to the amount at some later date, is being pushed

7   aside for a plan which is back fixing the E side problem.

8   What are we going to do to deal with the make-wholes and to

9   split the equity allocations and the like?  It's frustrating

10  as a T side creditor to be told you can't even solve your

11  own exit until we solve the E side, particularly when we

12  said we'll solve the E side for you.

13          But it's as simple as this, if people get

14  comfortable with the doability of a REIT and Mr. Lauria can

15  explain and answer any question you have with respect to

16  that, there's no question that the debtors should be off the

17  path they said that is their preferred course and on a

18  different path.

19          If people want to continue to fight over this,

20  what we have -- what we've laid out is a schedule which

21  realistically ends to a confirmation order in March versus

22  the end of October or even middle October, which is the

23  incurrence of an additional more than billion dollars in

24  admin expense to get to that point.

25          It seems foolish that we're having to go as far as

1    we are to try to get the debtors off that point, but the

2    notion that they would prefer to spend a billion dollars in

3    admin expense rather than engage fully and get as quickly as

4    possible comfortable with the re-conditionality doesn't make

5    sense to us.

6            Three important qualifications and then I'll turn

7    it over to Mr. Lauria.

8            First, if the debtors choose to go down the path

9    that's in there, to be clear, as I've laid out, there's a

10   lot of litigation to be done.  If they miss any of those

11   deadlines we're going to come back to Your Honor to seek to

12   extend out the deadline.

13           As of right now the debtors have failed to produce

14   the disclosure statement discovery, not the independent

15   directors, we got theirs.  We still have not gotten the

16   discovery that the debtors promised us weeks ago, and they

17   have completely ignored me now for two months on my request

18   to interview people in connection with the inner debtor

19   claims, the standing motions we need to bring, I think, 15

20   days after the disclosure statement.

21           So the debtors are going to have to change their

22   perspective.  If they want to keep these dates, they're

23   going to have to meet all these dates.

24           Second, our agreement to the schedule is premised

25   on the debtors' good faith assessment of the plan.  There

1    will be a presentation to the boards of directors of these

2    entities to do a REIT plan.  We expect that the debtors will

3    be assessing that in good faith and it's not just going to

4    be a check the box exercise so that they can get on with

5    their preferred course.

6            And third, Mr. Kieselstein's representations

7    regarding discussions with the first liens, it is an

8    integral part of the deal and something upon which we are

9    relying that the debtors have not implicitly or explicitly

10   offered any deal to the first liens with respect to the

11   allocation or the allowance of their liens.

12           We are in the process of mediating, and that

13   mediation cannot work if what's happening is the debtors are

14   whispering in the first liens ears that don't worry if the

15   mediation fails, you'll get what you want.  We don't expect

16   them to be doing it.  They've committed on the record that

17   they won't be doing it, and I'm sure they'll be living up to

18   that.

19           So with that, I'd like to turn it over to

20   Mr. Lauria to explain what we've been doing in the time,

21   because what you did last time, Your Honor, was say we want

22   people to work and we've been doing a lot.

23           MR. LAURIA:  Good morning, Your Honor, Tom Lauria

24   of White & Case for the ad hoc group of TCEH unsecured note

25   holders.

1          THE COURT:  Good morning.

2          MR. LAURIA:  We believe that today is a momentous

3    day in the course of these cases, but not for the reasons

4    that Mr. Kieselstein stated on the record.

5          What we think is momentous about today is the fact

6    that we have, since we last were here in April, put together

7    not only the outline but a great deal of the detail around a

8    $19 billion transaction that would end this case with the E

9    side creditors getting all of their allowed claims paid in

10   cash in full, but not on the effective date with respect to

11   the components that are disputed, but when allowed the cash

12   would be there to pay them, and on a consensual basis, on

13   the T side.

14          And further to that, importantly, unlike the

15   preferred plan of the debtors, the proposal that we have

16   been working on today has $12.1 billion of committed equity

17   and debt financing.  And when I say committed I mean it's

18   gone through all of the necessary internal approvals and

19   would be funded on the terms of documents which we have

20   provided to the debtors, complete documents, including a

21   merger and including funding letters upon agreement by the

22   debtors.  We obviously can't provide the signed commitment

23   without a deal, but upon reaching agreement, the commitments

24   have been approved.

25          Now, let's walk through how we got here.  This has

1   been a furious effort on our part and often, if not

2   entirely, in the face of strong headwinds, and I think from

3   the comments that have made on the record the Court can

4   probably surmise where those headwinds have been blowing

5   from.  It's unfortunate, but we have fought on, because our

6   clients believe in the value of proposition here and believe

7   that the answer to this case is not to overpay creditors in

8   a case, but rather to pay them in full and use the surplus

9   value to satisfy other constituencies in the stack.

10          So what have we done?  We organized the core group

11   of investors to lead the deal.  This group is comprised of

12   people who owed over $4 billion dollars of the TCEH

13   unsecured claims, but they also hold TCEH first lien debt,

14   they hold TCEH second lien debt, and they E side PIK debt.

15   So we do have an important voice and important perspective

16   within the funding group.

17          These funders have all gotten restricted.  They've

18   entered into NDA's with the debtor and with Oncor and with

19   Hunt, and I'll explain the participation of Hunt in a

20   moment, and have been engaged in a detailed diligence

21   process, which has included not only access to data and

22   reviewing information that's not public, but also engaging

23   in regular meetings with Oncor Management and also with the

24   Hunt Group.

25          Now, who is Hunt?  Hunt, in fact, is Hunt

1    Consolidated.  Hunt Consolidated orchestrated a utility REIT

2    transaction in Texas which was approved both through the PUC

3    in Texas and also the IRS, and we view as a model for the

4    transaction that we're pursing here.

5            They have not only operational expertise, which

6    has been recognized in the State of Texas, but they also

7    have the regulatory connections and experience that we

8    believe is vital to going forward with the transaction.

9            So we developed a REIT structure, together in

10   consultation with Hunt Consolidated and its representatives.

11   And the key thing about a REIT structure -- we keep talking

12   about REIT approval -- for EFH to convert into a REIT it has

13   to own only real estate assets from a tax perspective and

14   the non-real estate assets have to be transferred out to a

15   separately owned operating company.  So we need to get the

16   PUC on board with that transaction where we would separate

17   the real property assets from the operating company.  And

18   the entity owned by the REIT can only collect rent.  That's

19   what its business has to be, leasing its property and

20   collecting rent.

21           The Hunts, of course, have done this with infra

22   REIT and so we've taken a lot of guidance from them, but

23   we've done a lot of homework on our own, and we ultimately

24   came up with a structure that we think works as far as

25   grading the Opco/Propco structure, and we needed to find

1    management and ownership.

2           So we engaged in discussions not only with Hunt

3    but also with Oncor Management and a number of third parties

4    and we ultimately concluded that the best way to support

5    this investment and to ensure its consummation was to

6    partner with Hunt Consolidated, which we have done.

7           We have reached an agreement pursuant to which

8    Hunt will buy the Opco assets and own Opco, but they will

9    retain the existing management group, and we've been told by

10   the management group at Oncor, who we understand is viewed

11   in Texas as the premier management team of the largest

12   utility in the State of Texas, that they're going to stay

13   on.  They'll work with us whichever direction we go, and so

14   our expectation is that we will have what we think is the

15   dream team from an operational perspective and from a

16   regulatory perspective coming out of this transaction.

17   We'll have Hunt as the owner and we'll have the existing

18   Oncor Management team running the business.

19          We've worked out all the details and, importantly,

20   the price of this transaction to the investors, and it's not

21   a cheap price, Your Honor, but it's a price that at the end

22   of the day the investor group concluded made sense when the

23   objective was to conclude this transaction, to maximize

24   execution.

25          The next thing we had to do was develop a capital

1    structure.  As the Court may be aware, the Oncor asset is

2    today the subject of a ring-fence.  That's because of

3    concerns about the impact the highly levered corporate

4    structure would pose for the asset in the absence of the

5    ring-fence.  And that's the reason Oncor today is not in

6    these proceedings.  It has been ring-fenced.  There's no

7    default on there.  It's operating.  There are no issues to

8    Oncor as a consequence of the bankruptcy other than ongoing

9    uncertainty regarding ultimate ownership of the business.

10            So we started out with an idea that would require

11   a 2- or $3 billion equity investment and it would be funded

12   with debt, but through our discussions with Hunt, through

13   our discussions with Oncor Management and our own diligence

14   in Texas, we have concluded that we need to put in far more

15   equity and far less debt, again, to make this business work

16   and to address the historic concerns of the Texas

17   regulators.

18            So where are we today?  We believe that this

19   transaction should be executed with about $7.1 billion of

20   equity and initially $5 billion of debt.  The debt would be

21   structured in two components; a $3.5 billion permanent

22   facility and a one and a half billion dollar bridge facility

23   that would be in place until after exit we could have an IPO

24   and use the proceeds of the IPO to retire that bridge.

25            We believe that this will result in investment

1    grade credit rating for this entity at reorganization, which

2    we think is critical not only to the quality of our

3    investment to maximizing the value, to try to maximize the

4    recovery of unsecured creditors on the T side who haven't

5    been provided this opportunity, but to get the regulators on

6    board with the deal.

7           So it's still moving.  We're still trying to

8    figure out what we're going to do as far as the exact debt

9    equity mix.  There has been some discussion about the

10   ability to bring other constituencies into the transaction

11   if they view the investment opportunity is favorable and

12   maybe we'll reduce that bridge component at the end of the

13   day.  We're having these conversations, but we're prepared

14   to go forward as we are and we have the 12.1 in the truck at

15   the curb.

16          So what have we also done?  At the same time we've

17   done an extraordinary amount of work trying to figure out a

18   transaction that is extremely complex.  I think everybody

19   has to concede that point.

20          We have delivered documents to the debtors

21   reflecting -- we have a proposed plan support agreement with

22   an over 60-page term sheet regarding the plan of

23   reorganization and the related critical transactions.  We've

24   delivered a purchase agreement and plan or merger to the

25   debtors.  We have delivered forms of equity commitment

1    letters, and we've delivered a form of limited guarantee

2    regarding a reverse breakup fee.

3           We are in the process up preparing and will

4    deliver to the debtor shortly definitive backstop agreements

5    and the other material agreements that are required to go

6    forward with this transaction.

7           So are we done?  No.  Of course we're not done.

8    We've received comments and input from the debtor and other

9    stakeholders regarding the documents that we've provided.

10   Those comments suggest there are a lot of issues.  There are

11   a lot of things to work out.  But I think as Mr. Kieselstein

12   said, importantly, we believe these are issues that can be

13   resolved and they can be resolved quickly.

14          The issues are, at the end of the day, focused

15   around conditionality.  What are the conditions to our

16   obligation to fund this transaction and will we, in fact,

17   fund the transaction if all of the conditions are satisfied?

18          Now, with respect to conditionality I think you

19   really break it down into regulatory approval and

20   commitment.

21          On the regulatory approval front, I think this is

22   really critical because we think we've checked the boxes.

23   There's been a lot said about concern about regulatory

24   approval.  What have we done?  What have we done to address

25   what we understand to be the regulator's concerns, which is

1      they want to have quality operational expertise at the helm

2      and they want to have a stable business in terms of capital

3      structure and access to liquidity going forward.

4              We've put together the dream team.  I don't think

5      anybody is going to say that between Oncor Management and

6      the expertise brought to the table by Hunt Consolidated that

7      you could possibly conceive of a stronger management team

8      for this business going forward.

9              We've implemented a massive deleveraging of the

10     balance sheet.  We're taking this down to three and a half

11     billion dollars of debt, and we're going to have a widely

12     held publicly company at exit, which gives us access to the

13     capital markets for the funding of future operating expenses

14     and cap backs, all of which everybody understands and agrees

15     are large numbers, and we've got to have access to the

16     capital markets to provide it.  Anybody would.  In fact,

17     there are those who say that these assets have suffered some

18     from a lack of that access because of the prior private

19     ownership.  So we think we've checked all the boxes.

20             An important thing that the parties are going to

21     have to grapple with though and ultimately may come to the

22     Court is the regulators will only consider one transaction

23     at a time.  So we have to make a choice and we have to make

24     it pretty soon as to which deal is going to be presented to

25     the regulators because they won't look at two.  They won't

1      say, okay, one -- you know, we'll approve one or both or

2      neither and then you guys decide what you want to do.  We

3      have to put a transaction in front of them and they're going

4      to have to act.

5              Now, under Texas law they're required to act at

6      180 days from when the request is made, and if they don't

7      act then the transaction is deemed approved.

8              Now, there's dispute about what's included in that

9      180 days and what's not, but we think working with the Hunt

10     organization we have the best way of making that

11     presentation and we want to make it quickly so that we can

12     get that 180 day clock ticking.  And our view is that we can

13     make that filing basically the moment we're in a position to

14     have our plan on file, that we're moving forward with the

15     transaction.  So if we can get a plan on file in July we're

16     in a position to have regulatory approval in the early part

17     of Q1 2016.  The debtors other plan won't even have gotten

18     confirmed by then and that is a differential, the

19     differential between exit is $220 million a month in costs

20     in this case.  It's unfortunate but that's what it is.

21             So our ability to move forward quickly is critical

22     to making this deal work and, Your Honor, I'm sure you

23     understand this, but $7.1 billion of equity capital and

24     $5 billion of debt can't sit as an open offer indefinitely.

25     We've got a window of opportunity to get this deal in front

Page 63

1       of the Court, to get it in front of the regulators, and to

2       consummate it, and so we need to move fast and we need the

3       headwinds to stop, and if they don't, as my colleague,

4       Mr. Shore, said, we may well be back here on a motion to

5       terminate exclusively.

6                   Now, we've got some things to do, no question

7       about it.  We've got to get the TCEH first lien group on

8       board.  We're in discussions with them.  I think we

9       understand our differences and I think we're committed to

10      seeing if there's a path forward to solve them.  And these

11      are not -- this is not 29 issues.  It's two or three or four

12      issues.  We got to deal with conditionality.  We got to deal

13      with economics.

14                  The irony on timing, by the way, is that at the

15      end of the day we think we'll likely be ready to consummate

16      the transaction earlier than the T side first group will be

17      to take their business in a tax-free spin.

18                  And just to remind the Court, the transaction we

19      envision is that there will be a tax-free spinoff of TCEH,

20      or actually a subsidiary of TCEH, that takes with it all of

21      the collateral of the TCEH first lien lenders and

22      satisfaction of their claims and allows the TCEH unsecureds,

23      which as a practical matter at this point we believe

24      includes the TCEH second liens, the notes, and the pollution

25      control bond, getting their entire recovery in this case by

1    making this investment in reorganized EFH which would own

2    Oncor as a REIT.

3           That's the transaction.  It's very simple.  It

4    really involves three constituencies to the deal.  It's our

5    group that's got to put up the money.  And by the way, the

6    investment commitment is in the form really of two

7    components.  There's a primary commitment to buy

8    $900 million of equity and then the balance is backstopping

9    a rights offering of $5.2 billion.

10          And I guess one thing I've been remiss in

11   mentioning but I've been authorized to represent, when I say

12   that the 7.1 is committed, Hunt Consolidated is investing

13   with us in this transaction as a show of strength and belief

14   in the transaction, $250 million.  And certain of Hunt's

15   limited partners are investing in the transaction, another

16   $750 million.  And I have been authorized to represent on

17   their behalf that their billion dollars is committed right

18   next to ours.

19          So you've got 900- that comes in as a direct

20   purchase, you've 5.2 that's the backstopping of a rights

21   offering to all of the TCEH unsecured creditors.

22          We think that if we can get to confirmation in

23   October we can initiate the rights offering which would be a

24   registered rights offering immediately thereafter, and that

25   we can have the money that everybody is so worried about up

Page 65

1    and in escrow before the end of the year with an eye toward,

2    again, consummation in Q1 of 2016.

3            And we'll deal with the E side creditors.  The

4    plan is going to provide that they're going to be

5    unimpaired.  And that's the requirement we have to jump

6    through to get our early confirmation hearing.

7            Now, there's going to be dispute about the amount

8    of their claims, whether or not they're entitled to a make-

9    whole.  The Court has already gotten involved in those

10   issues.

11           As for post-petition interest, the purchase price

12   that we're providing, the cash that we're putting up fully

13   escrows against any unpaid post-petition interest up to the

14   full contract amount.  Now, our review is that under

15   controlling law in the Third Circuit it's the federal

16   judgment rate, not the contract rate, but we're putting the

17   money in the bank so that if the Court determines its full

18   contract rate, it's there to be paid.

19           So, Your Honor, we support the order that's been

20   presented, but we support it because it gives us the

21   opportunity to take our shot at executing our transaction,

22   which we believe by far maximizes value, because that upside

23   value over the setup here, which is under $19 billion, that

24   upside value goes to stakeholders to satisfy their claims.

25   And it's a risk that people are putting their money where

1    their mouth is that that upside will be realized.  We do

2    require that the REIT approvals be obtained, but whether or

3    not that drives the economic outcome that people think it

4    will, that's our risk.

5            The October dates are critical to us in part

6    because we decided in exchange for that opportunity not to

7    raise the objection to the debtors' request to set a

8    detailed confirmation timeline without first filing the

9    amended plan.  We've all kind of taken it on faith that

10   there will be an amended plan and that it will say things

11   that we expect it to say and that the litigation timeline

12   that's been developed accommodates that and it's a big leap

13   of faith.  I don't know that there's any precedent for

14   getting this type of order without the plan actually being

15   on file.  But we've agreed to go forward.  We've agreed not

16   to make that opposition as long as we get our October shot.

17           Thank you.  I'm happy to answer any questions the

18   Court may have.

19           THE COURT:  No, I don't have any.  Thank you.

20           MR. KIESELSTEIN:  Your Honor, very briefly.

21           THE COURT:  Yeah.

22           MR. KIESELSTEIN:  A couple of points, Your Honor.

23           I've said from the beginning when Mr. Lauria

24   surfaced with his plan that it has --

25           THE COURT:  Can you speak up, please?