# EXHIBIT 5

## 10/1/15 Keglevic Dep. Tr. Excerpts

```
                                                                 1

 1            UNITED STATES BANKRUPTCY COURT

 2              FOR THE DISTRICT OF DELAWARE

 3     --------------------------------------x

 4     In Re:

 5     Energy Future Holdings Corporation,

 6     et al.,

 7                            Debtors.

 8

 9     Chapter 11

10     Case No. 14-10979

11     Jointly Administered

12     --------------------------------------x

13

14

15            DEPOSITION OF PAUL KEGLEVIC

16                  New York, New York

17                   October 1, 2015

18

19     ***This transcript contains a portion that

20       has been designated Highly Confidential***

21

22

23     Reported by: MARY F. BOWMAN, RPR, CRR

24     JOB NO: 98276

25
```

71

1         Keglevic

2    were referring to them as claims, because

3    they certainly did not -- they weren't

4    claims.  They weren't specified at that

5    point in time as claims.  It was a review

6    of transactions and whether those

7    transactions, in fact, could ultimately

8    become what we are calling as intercompany

9    claims or conflict matters.

10            Similarly, when Kirkland & Ellis

11   has come in, came in, I think probably

12   maybe prior to that time, or certainly

13   since that time, similarly looked at

14   transactions, just as part of our diligence

15   prior to filing, to make sure we were aware

16   of claims that may or may not be raised and

17   the types of arguments around transactions

18   that could be brought to light and would be

19   matters to consider in the case.

20            But at that time, we had not

21   labeled them as claims, and therefore, we

22   certainly didn't label them as conflict

23   matters.

24       Q.    Thank you.  If I can drill down a

25   bit on parts of that.

80

1              Keglevic
2    where that is?
3        Q.    Sure.
4        A.    I know it is here, I'm just not
5    finding it.
6        Q.    Sure.
7              I was just starting with whether
8    you had a general recollection of what the
9    CRO term sheet was and what its purpose
10   was.
11       A.    Yeah.  The purpose was to
12   stimulate discussions and consensus among
13   the parties in the case.  We felt like the
14   parties had stalled in terms of their
15   inter-creditor negotiations, and there were
16   bid-ask spreads, if I can call them that,
17   in terms of what each party wanted from the
18   other party.  They were fairly far apart.
19             And we thought it would be
20   helpful to the process if we picked an
21   illustrative point between the bid-ask
22   spreads of the parties, and those bid-ask
23   spreads were, generally speaking,
24   associated with claims of the T unsecureds
25   against the T firsts, as well as claims of

1               Keglevic

2     the potential for the worthless stock

3     deduction.

4          Q.   If the settlement agreement had

5     not provided for the equity interest of the

6     sponsors to be relinquished upon approval

7     of the settlement, do you think that would

8     have been possible for EFH to get the same

9     concessions from the T-side unsecured

10    creditors in terms of the timing of

11    pursuing an alternative and drag rights, et

12    cetera?

13             MR. SHEPPARD:  Objection to form,

14         speculation.

15         A.   I -- I know one of the things

16    that was bargained for is they wanted to

17    take away any upside associated with market

18    developments or the -- getting orders that

19    approve the REIT that potentially could

20    have accrued to the equity sponsors.

21             So they -- the whole -- one of

22    the key parts of this deal that I think is

23    not disputable is that the T unsecured are

24    potentially taking lower settlement of

25    their claims than they otherwise think they

365

1       ==Keglevic==
2   ==could have bargained for in return for the==
3   ==upside associated with the value of Oncor.==
4           ==And to the extent that the==
5   ==existing equity sponsors held on to that==
6   ==upside, that potentially impaired some of==
7   ==that recovery.  So that was a key component==
8   ==to the construct.==
9           MR. LEES:  I have no further
10  questions.
11          MR. PEDONE:  I have a couple.
12          THE COURT:  Who is going first
13  among your crew?
14          MR. PEDONE:  Why don't I go
15  first.
16          Off the record.
17          (Recess)
18  EXAMINATION BY
19  MR. PEDONE:
20      Q.   What, again, is your
21  understanding of the make-whole amounts
22  that could be due on series Q and R
23  indentures?
24      A.   I don't know if it is just Q and
25  R -- I'm not sure if P gets in there even