# **DX 643**

# **EFH_EVR000016189**

**Covenant Review**

**THE AUTHORITY ON BOND AND LOAN COVENANTS**

Research Date: March 2, 2011

## TXU: Is There a Default Under the Credit Agreement?

> **The Bottom Line™**
>
> - Aurelius Capital Management has alleged defaults under the TCEH Credit Agreement, related to an intercompany loan from TCEH to its parent company, EFH.
> - The TCEH Credit Agreement requires that certain intercompany loans to EFH be on an "arm's–length basis."
> - Aurelius has alleged that the terms of this intercompany loan are not arm's-length.
> - The most recently reported amount of this intercompany loan is approximately $1.9 billion.
> - We discuss the merits of the alleged default and the possible implications on the rest of the TXU capital structure.
> - In particular, we present a possible alternative argument that TCEH could make to avoid the arm's-length basis debate and assert compliance with the TCEH Credit Agreement.
> - We briefly note a *potential* default under the TCEH bonds.
> - This report is intended to provide a general overview of the current situation as well as spot additional issues that we have not yet heard discussed. This report does not represent the complete answer, and we will follow up as more facts are revealed.

### Overview

Texas Competitive Electric Holdings Company LLC ("TCEH") is the borrower under an October 10, 2007 Credit Agreement (as amended by an August 7, 2009 amendment) that governs approximately $23.9 billion of outstanding loans and commitments (the "TCEH Credit Facilities"). We refer to the October 10, 2007 Credit Agreement (as amended) as the "TCEH Credit Agreement."

Citibank (the "Administrative Agent") has informed TCEH that the Administrative Agent received a letter from Aurelius Capital Management, LP ("Aurelius") on behalf of its funds that are lenders under the TCEH Credit Facilities, alleging that TCEH is in default under the terms of the TCEH Credit Facilities. We refer to the letter to the Administrative Agent as the "Aurelius Letter."

The Aurelius Letter principally alleges that certain intercompany loans from TCEH to Energy Future Holdings Corp. ("EFH"), its indirect parent company, do not comply with the requirement in the TCEH Credit Agreement that these loans be made on an arm's–length basis.

ANALYST CONTACT:
Chris Chaice
1-212-716-5780
cchaice@covenantreview.com

Covenant Review, LLC
230 Park Avenue, Suite 812
New York, New York 10169
www.covenantreview.com



# TXU: Is There a Default Under the Credit Agreement?

The Company stated its belief in a February 25, 2011 8-K filing that:

> the loans comply with the arm's-length requirement in the TCEH Senior Secured Credit Facilities and that no event of default has occurred. The loans reflect arm's-length terms that are comparable to the terms that unrelated parties would have negotiated in the market. Information regarding these loans, including the interest rate and amounts outstanding thereunder, has been disclosed in numerous filings with the Securities and Exchange Commission by EFCH and discussed on numerous EFH quarterly investor calls.[1]

We analyze the alleged defaults below.

### Key provisions of the TCEH Credit Agreement

The Aurelius Letter focuses on Section 10.6 of the TCEH Credit Agreement (*Limitation on Dividends*), which limits dividends and other distributions by TCEH to equity. Notably, the Dividends covenant does not specifically limit the making of a loan (which is handled by the Investments covenant – Section 10.5), but the exceptions to the Dividend covenant make clear that certain dividends may be in the form of loans.

There are 22 exceptions (or carveouts) contained in Section 10.6 to the general prohibitions on dividends. Included in those 22 carveouts are the following four carveouts:

- Section 10.6(d):  This carveout permits dividends or loans to any direct or indirect parent company in amounts required by the parent company to pay attributable taxes, general operating expenses and corporate overhead, franchise fees and taxes, customary fees and expenses related to unsuccessful equity / debt offerings, and customary salary, bonus, and other benefits due by that parent.

- Section 10.6(o):  This is a $750 million general basket for dividends or loans to a parent, which can be used for an Investment in an unrestricted Subsidiary[2] of that parent. No more than $250 million may be made in the form of a dividend; i.e., at least $500 million must be in the form of an intercompany loan.

- Section 10.6(r):  This is essentially a carveout to permit TCEH to loan money to EFH and its subsidiaries (other than Oncor) so that EFH and its subsidiaries can make principal and interest payments on debt that existed on the closing date of the loans under the TCEH Credit Agreement (and debt incurred to refinance that debt) plus $250 million of additional payments on debt incurred by EFH after the closing date (which amount may increase pursuant to a basket build).

- Section 10.6(u):  This is a carveout for $350 million of loans to direct or indirect parent companies for working capital purposes so long as made in the ordinary course of business and consistent with past practices.

We highlight these four carveouts (the "Restricted Carveouts") because the last paragraph of Section 10.6 requires that any loan made pursuant to the Restricted Carveouts by TCEH to EFH must be made "on arm's-

---

[1] See: http://www.sec.gov/Archives/edgar/data/1023291/000119312511047641/d8k.htm.
[2] Presumably they meant capitalized "Unrestricted" Subsidiary. There are various typographical errors and formatting glitches in the filed version of the TCEH Credit Agreement.

Confidential                                                                                                              EFH-EVR000016190



**TXU: Is There a Default Under the Credit Agreement?**

length basis." We refer to these loans as "Parent Loans."[3]

Whether these Parent Loans are made on an arm's-length basis is the subject of the current dispute.

### What does "arm's length" mean?

The term "arm's-length" is not defined in the TCEH Credit Agreement. Importantly, this is a subjective, fact-intensive question. In other words, this is not a question to be answered by lawyers; it is one that the readers of this report (i.e., investors) are well suited to answer. As a frame of reference, Black's law dictionary defines "arm's-length" to mean: of or relating to dealings between two parties who are not related or not on close terms and who are presumed to have roughly equal bargaining power; not involving a confidential relationship. TCEH gives its own spin on the meaning of this phrase in the above-quoted language from the February 25th 8-K: "The loans reflect arm's–length terms **that are comparable to the terms that unrelated parties would have negotiated in the market**." (emphasis ours)

As a subjective, fact-intensive question, many things may be considered; for example, prevailing market terms, the credit quality of the borrower (EFH), the credit quality of the lender (TCEH), the terms of the loan, and the protections afforded to the lender under the loan. Perhaps even the cash needs of the lender may be considered (if TCEH were unrelated to EFH, would it have used its cash to reduce its own debt or used the cash to go into the commercial paper business?).

Whatever the actual meaning of the term, it is generally understood that an arm's-length transaction is a transaction between two related or affiliated parties that is conducted as if they were unrelated, so that there is no question of a conflict of interest.

### What are the terms of the Parent Loans?

As of the date of this Report, the contracts which document the Parent Loans have not been filed with the S.E.C., and we are not commenting on them. According to EFH's most recent 10-K, the debt owed by EFH to TCEH was $1.921 billion at December 31, 2010, of which $916 million was related to principal and interest payments (the "P/I Parent Loans"). Such P/I Parent Loans are guaranteed by EFCH and EFIH (two subsidiary holding companies that hold the equity interests in TCEH and Oncor, respectively) on a pari passu basis with their guarantees of the EFH 2017s, with the remaining balance of the debt without subsidiary guarantees. None of the Parent Loans is secured by a pledge of assets. The Parent Loans carry interest at a rate based on the one-month LIBOR rate plus 5.00% and are payable to TCEH "on demand."

We pause to underscore the failing of the S.E.C. disclosure requirements in this instance. The documents that underlie a $2 billion loan and that are the topic of dispute regarding a default under a $24 billion credit facility, and that may cause the acceleration of billions of dollars of additional debt, have not been made public. If the documents are filed on Intralinks and available to some lenders who have passwords and consider themselves publicside while some bondholders do not have access, that is also unfortunate. TCEH should file these documents immediately.

---

[3] The Parent Loans must also have mandatory prepayment provisions that require repayment with the proceeds from the sale of the Oncor Subsidiaries prior to the use of any proceeds to prepay (other than at maturity) any debt of EFH or to make any dividend to equity.

Confidential                                                                                                         EFH-EVR000016191



# TXU: Is There a Default Under the Credit Agreement?

## Is there a default under the TCEH Credit Agreement?

Although there are several defaults alleged in the Aurelius Letter, each is essentially based on whether these Parent Loans were made and continue to be made on an arm's-length basis. At the inception of the TCEH Credit Agreement, the Parent Loans (to the extent then outstanding) were more easily defensible as arm's-length loans given where LIBOR was in 2007 as compared to the then current yields of the EFH 2017s and EFH's legacy bonds that existed prior to the LBO (which are pure holding company debt without subsidiary guarantees, the "EFH Legacy Bonds"). However, given that the EFH 2017s and EFH Legacy Bonds currently trade with double digit yields and at deep discounts to par, the LIBOR plus 5% yield seems tenuous, at best. Additionally, the outlook for natural gas prices and the entire LBO transaction was much brighter in 2007 than it is today.

Given that the Parent Loans are demand loans (i.e., may be required to be repaid at the demand of TCEH ), it is also alleged that the failure to demand repayment of the Parent Loans is a breach of the Transactions with Affiliates covenant of the TCEH Credit Agreement (*Section 9.9 – Transactions with Affiliates*).

Lastly, there is also a claim that to the extent the Parent Loans were not made, an excess cash flow sweep should have been made in 2008.

Below are potential TCEH defenses to these claims as well as our thoughts on those potential defenses.

   *Possible defense: The Parent Loans are on an arm's-length basis.*

As stated above, with respect to Parent Loans in existence on the closing date of the TCEH Credit Facilities or made shortly thereafter, such an arm's-length claim is more easily made, especially with respect to P/I Parent Loans, because the P/I Parent Loans have guarantees from EFIH and EFCH and thus are structurally senior to the EFH Legacy Bonds. But as EFH descended in financial trouble and as EFH unsecured debt began to trade significantly below par, a claim that unsecured EFH paper (with or without subsidiary holdco guarantees) with a yield of LIBOR plus 5% becomes significantly more strained.

Of course, TCEH could point to the demand feature of the Parent Loans, thus making the Parent Loans analogous to short term commercial paper. As discussed above, what is or is not arm's-length is a subjective, fact-driven inquiry that implicates valuation analysis and an assessment of market conditions (among other things). So we ask, outside of a loan-to-own strategy, would you (our subscribers) loan billions of dollars on an unsecured basis to an insolvent entity at any rate, let alone at LIBOR plus 5%, even if that loan had a demand feature? We suspect that the answer is no. We also suspect that to the extent such loans were already outstanding, many unaffiliated lenders would use the demand feature to threaten to demand repayment of the loans unless the Parent Loans are re-priced (which is somewhat analogous to what lenders under the TCEH Credit Facilities may be trying to do for their loans via the alleged defaults).

   *Possible defense: The Parent Loans were made pursuant to a binding commitment to fund, and the terms of that commitment were negotiated in 2007, when the price of the Parent Loans was market.*

Although we have not reviewed the terms of the Parent Loans, we would find such a claim hard to believe. Intercompany loans are typically promissory notes where funds are loaned in mutually agreed amounts at mutually agreed times and places. More complex terms are typically not needed given the relationship between lender and borrower. Firm contractual commitments to loan money in an intercompany loan would be odd, to

Confidential

EFH-EVR000016192



# TXU: Is There a Default Under the Credit Agreement?

say the least, given that one entity owns both the lender and borrower. And even if such a commitment were to exist, is EFH paying TCEH a commitment fee in consideration for its commitment to fund? More over, such a commitment to fund would seem to be logically at odds with a demand feature. Imagine the conversation: Lender: "I demand that you repay the outstanding amounts." Borrower: "Okay, but I demand that you immediately fund new loans to me in the exact same amount." Perhaps such an arrangement is possible, and those bizarre terms could be called many things, but arm's length would not be one of them.

If the Parent Loans are not made pursuant to a firm commitment, as we suspect, then TCEH would be free not to fund under the current terms and to negotiate better (arm's length) terms.

> *Possible defense: Some of the intercompany loans are Parent Loans that were made on an arm's length basis and other intercompany loans were not Parent Loans at all (i.e., not made pursuant to the Restricted Carveouts, and thus not subject to the arm's-length requirement).*

This defense would take in part from the first defense described above i.e., that some loans – for example, loans made in 2007 / 2008 – were on arm's length at the time when made. Now such a defense would hinge in part on the yield of the EFH 2017s and EFH Legacy Bonds as compared to the Parent Loans when made, and on the credit quality of EFH at that time. In short, this tactic would provoke a valuation battle on a loan by loan basis. Notably, if any Parent Loans meet the "arm's length" threshold in the Dividend covenant, then the making of that Parent Loan would be carved out of the Transactions with Affiliates covenant of the TCEH Credit Agreement (*Section 9.9 – Transactions with Affiliates*), because clause (b) of that covenant specifically carves out "transactions permitted by Section 10.6"; i.e., the Dividend covenant.

It is questionable whether the failure of TCEH to demand repayment of a Parent Loan would also be captured by "transactions permitted by" the Dividend covenant or whether such a failure would be an independent event needing an independent exception from the Transactions with Affiliates covenant. However, it is also questionable whether the Transactions with Affiliates covenant would even apply to a failure to make a demand, because that covenant only restricts how TCEH "will conduct … all transactions with any of its Affiliates …". Is the failure to demand repayment itself the conduct of a transaction? Perhaps not. The failure to take an action is typically not thought of as a "transaction." It is important to note that the Transactions with Affiliates covenant in the TCEH Credit Agreement was drafted in this narrow way. It could have could have used broader language to include: "any transaction, contract, agreement, **understanding**, loan, advance or guarantee with, or for the benefit of, any Affiliate of TCEH." Note that the quoted language is from the TCEH bond indentures.

With respect to other loans, TCEH could claim that some of the loans are not Parent Loans at all, and thus not subject to the arm's-length requirement. Remember, only loans made under the Restricted Covenants need be made on an arm's-length basis. For example, could TCEH claim that $500 million of the loans were made pursuant to Section 10.6(c), which is a $500 million general basket? Perhaps not, because that carveout is limited to "dividends" made by TCEH, and the $1.9 billion in question was reportedly transferred to EFH in the form of loans, not dividends.

Could the loans have been made pursuant to the Investments covenant contained in Section 10.5 (Limitation on Investments), rather than the Dividends covenant (i.e., Section 10.6)? If this is the case, then the arm's length requirement of 10.6 may not be implicated. An Investment is defined to include the making of a loan, so a carveout to the general restrictions in the Investment covenant would be needed. 10.5(i) provides for a $1 billion general investments basket. Section 10.5(v) provides for another $500 million general investments

Confidential                                                                                                    EFH-EVR000016193

 TXU: Is There a Default Under the Credit Agreement?

basket. Section 10.5(m) permits "loans and advances to any direct or indirect parent of the Borrower in lieu of, and not in excess of the amount of, dividends to the extent permitted to be made to such parent in accordance with Section 10.6[.]" Would the "to the extent permitted" language shoehorn the arm's length requirement from 10.6 for these loans? Perhaps. But the $1.5 billion of general Investments capacity is clearly not subject to the arm's-length requirement of Section 10.6. However, investments made pursuant to the Investments covenant (Section 10.5) are not specifically carved out of the Transactions with Affiliates covenant (as is the case with transactions made pursuant to the Dividend covenant – Section 10.6). Accordingly, unless otherwise carved out, those loans would have to be arm's length as required by the Transactions with Affiliates covenant.

Critically, the Transactions with Affiliates covenant has a parenthetical that exempts "transactions between or among the Borrower and the Restricted Subsidiaries and, between or among the Borrower, the Restricted Subsidiaries and to the extent in the ordinary course or consistent with past practice the Parent and any of its other Subsidiaries, including the Oncor Subsidiaries." Accordingly, transactions between TCEH and the Parent (i.e., EFH) are exempted if done in the ordinary course or consistent with past practice. A tenable argument could be that all loans were made under the Investments covenant, and that the early loans were on an arm's-length basis, and the later ones were consistent with past practices, and thus exempt.

Although TCEH has already engaged in a debate as to whether the loans are arm's- length and thus seems to have conceded the point, it might rethink the argument.

<u>How can the loans be accelerated?</u>

Section 11 of the TCEH Credit Agreement (*Events of Default*) lists the various Events of Default.[4] Any default of the covenants contained in Section 10 of the TCEH Credit Agreement (such as Dividends and Investments) is an automatic default under Section 11.3(a), while a default under Section 9 (such as Transactions with Affiliates) can be a default after 30 days notice.

Section 11 provides that upon the occurrence of an Event of Default that is then continuing, the Administrative Agent <u>may</u>, and if instructed by the Required Lenders, <u>must</u> terminate the commitments and accelerate the loans.

The Required Lenders are generally the majority of the loans and commitments under the TCEH Credit Facilities voting together as one class. Importantly, although the Required Lenders are sufficient to cause the Administrative Agent to act, they are not necessary. The Administrative Agent may pursue a perceived default even when less than a majority has called on the Administrative Agent to act.

<u>Can TCEH remedy a breach?</u>

The lenders under the TCEH Credit Facilities may only accelerate the loans with respect to an Event of Default that is continuing. Accordingly, to the extent TCEH wishes to cure a default caused by the Parent Loans being deemed to be not on an "arm's-length basis," TCEH could alter the terms of the Parent Loans in an attempt to make the Parent Loans arm's length. For example, the interest payable on the Parent Loans could be increased or the P/I Parent Loans could be secured by a second priority pledge of the Oncor equity interest held by EFIH.

---

[4] The formatting of Section 11 is extremely confusing. Each subheading is an individual Event of Default (for example, Section 11.1 – Payments describes payment defaults), and then the acceleration mechanisms appear under what looks like the heading for Section 11.13 – Change of Control. The actual provisions may make sense, but the sloppy formatting and subheadings do not.

Confidential    EFH-EVR000016194



## TXU: Is There a Default Under the Credit Agreement?

Even if a cure idea is plausible, the steps to do so involve many other considerations (such as, do the other debt documents allow pledges?) that would have to be explored.

**Can an individual lender sue for breach of contract even if the Required Lenders have not caused the Administrative Agent to accelerate?**

We do not see any provision in the TCEH Credit Agreement that would prevent a lender from bringing suit in state court for a breach of the TCEH Credit Agreement. However, such a suit would seem challenging for several reasons. First, if the suit is brought for money damages, there would be a significant question as to what those damages are given that the lenders are currently receiving interest. Any claim that such a default would impair the principal amount of the loans might seem to be too speculative to be adjudicated at this point. In addition, the pro rata sharing provisions for the TCEH Credit Agreement (See *Section 13.8 – Adjustments; Set-Off*) would require any lender who receives payment on account of its loans to share those payments with the other lenders. This would also be applicable to any recoveries received on account of a breach of the excess cash flow sweep.[5]

Any equitable remedy, such as a declaratory judgment or an injunction, may be more difficult to attain, especially if the court determines that the TCEH Credit Agreement adequately deals with breaches of the provisions contained therein.

**Could the lenders bring a state law claim for fraudulent transfer outside of bankruptcy?**

If the lenders lack the requisite size to compel the Administrative Agent to act, one *potential* tactic would be to file a state law cause of action for fraudulent transfer based on the transfer of value from TCEH to EFH represented by the Parent Loans. We have not in anyway undertaken a choice of law or forum analysis that would be necessary to determine which state law should apply; in this instance, we are simply issue spotting.

Many states provide for fraudulent transfer causes of action similar to those provided for under the U.S. Bankruptcy Code. Under federal law, transfers of value may be avoided – and the transferred value may be "clawed back" to the transferor – if the transfer meets certain criteria. Generally speaking, the criteria for constructive fraudulent transfer is met if both (1) the transferor did not receive reasonably equivalent value in exchange for the transfer and (2) the transferor was insolvent at that time of the transfer or became insolvent as a result of the transfer. To the extent that the applicable state law provides for a similar cause of action, a claim could be filed in state court to halt future Parent Loans and to potentially address past Parent Loans. If the criteria under the applicable state law are similar, the lender group would have to show that TCEH is insolvent at the time of a loan and that TCEH is not getting fair value in return (i.e., unsecured paper from another insolvent entity at LIBOR plus 5%).

Filing such a state law claim for fraudulent transfer outside of the confines of a bankruptcy court and with respect to a company that is currently paying its debts as they come due is not for the faint of heart (but neither is claiming an Event of Default by a lender which owns 0.2% of the loans).

**How would a default impact the TXU capital structure?**

---

[5] We have no view as to the potential magnitude of any cash flow sweep that would have been required absent the Parent Loans. In addition, it's not clear to us whether the Parent Loans impacted the calculation of the cash flow sweep in the first place.

Confidential                                                                                                                                                                        EFH-EVR000016195



## TXU: Is There a Default Under the Credit Agreement?

The ramifications of an Event of Default under the TCEH Credit Agreement or the acceleration of the loans under the TCEH Credit Facilities would of course be significant.

First, if there is an Event of Default under the TCEH Credit Agreement, TCEH would not be able to draw on its revolver, because it is a condition to revolver draws that that no Default or Event of Default has occurred and is continuing.

Second, none of the bonds in the TXU capital structure, including the TCEH bonds, the EFH 2017s, or the EFH Legacy Bonds have "cross default" provisions that would be triggered by an Event of Default under the TCEH Credit Agreement. The TCEH bonds each have "cross acceleration" provisions and thus would be in default only when the lenders under the TCEH Credit Facilities accelerate their loans or if TCEH filed for bankruptcy. In addition, the EFH 2017s (as well as the EFH bonds that are secured by the equity interests in Oncor held by EFIH) have a similar cross acceleration provision and thus would be in default only when the lenders under the TCEH Credit Facilities accelerate their loans or if TCEH filed for bankruptcy, assuming in both cases that TCEH is still a Restricted Subsidiary under those indentures. If the lenders get paid an amendment fee to not accelerate, then there is no impact on the bonds. Lastly, the Events of Default for the EFH Legacy Bonds do not tie in anyway to TCEH.

### Is there a potential default under the TCEH bonds?

The indentures for the TCEH bond indentures also have an arm's length requirement with respect to the Parent Loans. Those indentures use the defined term "Intercompany Loan" and require that those loans have an "interest rate commensurate with an arm's length relationship". In addition, those indentures also each have a Transactions with Affiliates covenant with an arm's length requirement, but importantly with a general prohibition that is even broader than the one in the TCEH Credit Agreement: "TCEH shall not, and shall not permit any of its Restricted Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, **understanding**, loan, advance or guarantee with, or for the benefit of, any Affiliate of TCEH…"

All Restricted Payments and Permitted Investments permitted by those indentures are carved out of the Transactions with Affiliates covenants but to the extent the Parent Loans do not meet the defined term "Intercompany Loans" of those indentures they might not be carved out and thus would be subject to the Transactions with Affiliates covenant.[6] In addition, given the broader language of the covenant, a failure to demand payment might very well be captured by the "understanding" language quoted above.

If there is a default, then it would conceptually be easier to accelerate any one of the TCEH bonds as compared to the loans under the TCEH Credit Agreement, because the unsecured bonds vote as one class and the secured bonds vote as a separate class, and only 30% of each class are required to declare an Event of Default and accelerate.

We note that holders of the TCEH bonds may not have any incentive to pursue a default given that such a default could decrease the value of those bonds. But we have included these thoughts for the sake of completeness, and bondholders may have economic interests that are not obvious or without conflict.

---

[6] We have not completely analyzed the potential for an indenture breach given time constraints in order to quickly address the loan issues.

Confidential                                                                                                                                                       EFH-EVR000016196



**TXU: Is There a Default Under the Credit Agreement?**

**Final words (for now)**

We have of course covered a lot of ground in this Report, and much of the analysis addressed herein can and will be expanded upon as subscriber questions and comments are received. This report is intended to provide a general overview of the current situation as well as spot additional issues that we have not yet heard discussed. We acknowledge that some important documents and facts are not known, and so this is not the complete answer and we will follow up as more facts are revealed.

— *Covenant Review*



## TXU: Is There a Default Under the Credit Agreement?

### Disclosures

All content is copyright 2011 by Covenant Review, LLC. The recipient of this report may not redistribute or republish any of the information contained herein, in part or whole, without the express written permission of Covenant Review, LLC and we will criminally and civilly prosecute copyright violations against firms and individuals who unlawfully distribute our work. The use of this report is further limited as described in the subscription agreement between Covenant Review, LLC and the subscriber. The information contained in this report in intended to generally describe certain covenant features. This report is not comprehensive, is not confidential to any person or entity, and should not be treated as a substitute for professional advice in any specific situation. Covenant Review, LLC makes no warranty, express or implied, as to the fitness of the information in this report for any particular purpose. If you require legal or other expert advice, you should seek the services of a qualified attorney or investment professional. Covenant Review, LLC does not render, and nothing in this report constitutes, legal or investment advice, and recipients of this report will not be treated or considered by Covenant Review, LLC as clients or customers except as described in the subscription agreement between Covenant Review, LLC and the subscriber. The covenants discussed herein may be based on those published in the preliminary offering memorandum distributed by the issuer in connection with the issuance of the notes, and the covenants published in the final offering memorandum or contained in the final indenture may differ from those presented herein. The reader should be aware that the final interpretation of any bond indenture will generally be determined by the issuer or its counsel, or in certain circumstances, by a court or administrative body.

Confidential                                                                                                              EFH-EVR000016198