## DX 685

**EFH04404842**

# ENERGY FUTURE HOLDINGS CORP.

# SHARED SERVICES REVIEW

**Huron Consulting Group**
**Chicago, IL**
**6/08/09**

## ENERGY FUTURE HOLDINGS CORP.
## SHARED SERVICES REVIEW

Huron Consulting Group ("Huron" or "we" or "our") was retained by Energy Future Holdings Corp. ("EFH") to review and assess the structure and cost allocation methodologies of its corporate and shared services arrangements, and to develop recommendations as appropriate. The objective of the review is to assist management in 1) determining whether common services are provided, and their costs allocated, in accordance with industry practices and regulatory requirements and 2) identifying a desired state for EFH's shared services organization, practices and allocation methodologies.

Huron's review was primarily qualitative in nature and consisted of the following major activities. We

- Identified, reviewed, and summarized the applicable rules that govern EFH's shared services and related cost allocations. *(Appendix 1)*

- Identified, reviewed and summarized industry practices. *(Appendix 2)*

- Identified, reviewed and summarized peer company practices. This included meeting with representatives of Exelon Corporation ("Exelon") and The Southern Company ("Southern") to discuss their specific shared service and cost allocation practices. *(Appendix 3)*

- Reviewed and summarized existing EFH shared services practices. For purposes of this review, the scope of EFH shared services included the corporate holding company ("Corporate") and EFH Corporate Services Company ("EFH Corporate

Confidential

Services"). The CapGemini ("CGE") arrangement was considered in the context of its termination and transition back to EFH. *(Appendix 4)*

- Identified potential constraints and other factors to be considered in determining the desired state of EFH's shared services activities. *(Appendix 5)*

- Summarized our observations and developed recommendations. *(Appendix 6)*

## Executive Summary

Most companies have significant flexibility in the manner in which they perform common services and allocate intercompany costs. Public utility shared services companies, however, are subject to additional rules and regulations. These rules have one common theme – the prevention of market power abuses and cross-subsidization.

The regulatory constraints on EFH's shared services subject the shared services group to significant regulatory scrutiny. The most significant constraints are 1) the prohibition of Oncor Electric Delivery Company ("Oncor") sharing certain activities with non-regulated affiliates, such as engineering and marketing, 2) the merger commitment agreeing that Oncor will be billed by affiliates at cost, and 3) Oncor's burden of proof requirement to justify the recovery of costs charged by an affiliate.

Most utility shared service companies represent the consolidation of transaction-based activity to achieve economies of scale, and expertise-based activity to achieve centers of expertise. Often, the strategy-based and governance-based activity of the holding company is also included in the shared services organization.

Confidential

EFH04404844

As a general observation, EFH's shared services arrangements are more complex than typical. The notable differences from the shared services companies we have seen include the following:

- A significant amount of EFH holding company activity is incurred and recorded directly at Corporate while some is incurred at EFH Corporate Services. In our experience, we note that most entities record such activities at one place or the other, but not at both.

- Some administrative functions are contained in the shared services company, and some (such as insurance, accounts receivable financing and facilities) are/were performed by separate entities. These activities are performed in separate legal entities to facilitate activities, comply with legal or accounting requirements. For example separate insurance companies are required to comply with Vermont laws regarding captive insurers. There is a separate A/R entity which was established to comply with GAAP and legal requirements for bankruptcy remote entities. A separate property company exists to manage the Energy Plaza sale-leaseback and charge market-based rent to Company entities occupying floor space.

- The business units contract directly with CGE, but EFH Corporate Services provides management oversight of CGE and costs relating to the termination of the CGE arrangement are being recorded at Corporate.

Confidential

EFH04404845

5

- Some assets supporting shared service activities are recorded at EFH Corporate Services, some are recorded at the CGE investment-holding entity, and some (for example, facilities) are at other entities. The CGE assets consist of software assets used by the service company and other entities. These assets were assigned to the CGE investment-holding entity because CGE was granted a "royalty free" license to use the software to support EFH activities.

- Most billing is based on a fully allocated costing methodology, but some billings are based on market prices (rent, parking). A return is not charged for the use of shared service or Corporate assets.

The cost allocation methods used by EFH Corporate Services are based on cost-causative principles, as is typical for shared services. But there are several aspects where EFH Corporate Services' practices differ from a number of its peers:

- EFH Corporate Services has developed specific direct or indirect cost causation factors to allocate costs. This contrasts with most other utilities who have determined that certain costs, especially Corporate-type costs or residual costs, are unable to be allocated using identifiable cost causation factors and therefore use a general allocation factor to allocate such costs. This general or "proxy" allocation factor is traditionally based on a weighting of some combination of revenue, property, payroll and/or operating and maintenance expense.

- Compared to other utilities, a relatively large percentage of EFH Corporate Services costs is charged to the holding company (roughly 18% or $21

EFH04404846

million in 2008), even though Corporate incurs a significant amount of costs on its own behalf.   Exhibit 5 summarizes these costs.   In this instance, developing a conclusion by reference to  percentages may not be appropriate, (because of the CGE outsourcing arrangement) yet $21 million as an absolute amount is still higher than most others.

- None of Corporate's administrative and general costs ($127 million in 2008, including the charge from EFH Corporate Services) are allocated to the business units.  For example, the cost to prepare the consolidated federal tax return is allocated from EFH Corporate Services to Corporate, where it remains.  This is an unusual treatment for general corporate costs.  Typically only specific categories of corporate costs, such as merger and acquisition costs and certain corporate governance costs, remain at the holding company.

The outsourcing arrangement with CGE was recently terminated and those activities are being transitioned back to EFH. We noted that some of the  Human Resources activities were not transitioned to EFH Corporate Services.   For example, Oncor assumed responsibility for some of its own HR activity that was previously performed by CGE, and Luminant took on responsibility for employee relations for itself and other EFH entities except Oncor.   While this approach appears to be contrary to the basic consolidation principle of shared services, and potentially dilutes the benefits from economies of scale, centers of excellence, standardization, etc. other factors such as sponsor commitments, ring-fencing issues, etc. were also considered in the determination of which services to provide as shared services or to house in the business units.

Confidential

EFH04404847

7

While not necessarily unusual, EFH is not organized in the manner typically used to maximize resource utilization and minimize the potential for duplicate costs. Each business unit has its own staff (for example, a CFO, Controller, etc.) in various shared services type functions that only perform work for and report to that company's management. An alternative and common approach is to have these individuals report to the shared services functional leader. This maintains regulatory transparency (because costs are recorded directly at the business unit) while improving functional alignment and resource utilization, and minimizing the potential for "shadow organizations" and the resultant duplicate costs.

Representatives from EFH's shared service organization structure have stated that the guiding principles underling the shared service organization include both efficiency and business unit alignment. These principles appear to be a mix between the guiding principles stated by Exelon representatives whose shared service model emphasized cost efficiencies, and Southern's stated focus on business unit operational alignment with efficiencies a secondary consideration. We note that the EFH guiding principles are not committed to writing which leaves them subject to misinterpretation.

On a related note, the sample of existing service level agreements that we reviewed contained no performance standards or metrics. Such provisions would generally focus on the customer service aspects of the business unit relationship that distinguish a shared services organization from a centralized support organization.

EFH04404848

The following recommendations are based on the work performed on this engagement and are supported herein.  We recommend that EFH:

1. Develop a documented set of shared services guiding principles.

2. Embed Corporate activity in EFH Corporate Services.

3. Perform a "necessity and benefit" test for Corporate costs and allocate qualifying costs to business units.

4. Adopt a general "proxy" allocation method for residual costs or other costs that cannot be allocated using cost-causative direct or indirect factors.

5. Charge for the imputed cost of equity related to the use of EFH Corporate Services assets.

6. Have Oncor own shared services assets that are predominantly used by Oncor.

7. Perform a comprehensive review of all existing cost allocation methods.

These recommendations are discussed in detail in Appendix 6.

It is likely that the adoption of these recommendations will result in fewer costs "stranded" at Corporate.  We recognize that there are strategic and regulatory considerations associated with this impact (especially the potential increase in the amount of costs allocated to Oncor) that may influence management's decision to accept the recommendations.  However, adoption of these recommendations will more closely align EFH practices with its peers and the desired state for service organizations and the allocation of shared service costs.

**************************

Confidential

EFH04404849

Huron appreciates the opportunity to assist EFH in the evaluation of its shared services arrangements, and we want to acknowledge and thank EFH personnel for their cooperation in helping us prepare this report.    We welcome any comments or questions that the company may have regarding this report, and would be glad to discuss any aspects of this report with the company at its convenience.    All such requests should be directed to either Al Felsenthal (312-583-8777) or Tim Zeldenrust (312-583-8739).

Confidential

EFH04404850

## APPENDIX 1

## RULES THAT MAY GOVERN EFH'S SHARED SERVICES AND RELATED COST ALLOCATIONS

Huron identified six potential sources of "rules" that might govern EFH's shared services. These are:

- Securities and Exchange Commission (SEC)

- Federal Energy Regulatory Commission (FERC)

- Texas - statutory

- Texas - regulatory

- EFH Merger related agreements

- Service level agreements (SLA's)

A general summary of these rules follows.

### SEC

Prior to its repeal in 2005, the Public Utility Holding Company Act of 1935 ("PUHCA 1935") generally required personnel serving multiple utilities to be employed by a service company, with costs allocated based on approved factors. A number of utilities with operations in several states fell under the purview of PUHCA 1935. TXU Corp., EFH's predecessor, was "exempt" from PUHCA 1935 because it did not have utilities operating in multiple states. With the repeal of PUHCA 1935, the SEC no longer has jurisdiction over or any rules related to EFH's shared services. However, some of the prior SEC positions have carried over to the allocation procedures of EFH peers which impacts the observations we make related to peer group practices.

Confidential

## FERC

PUHCA 1935 was rescinded by the Energy Policy Act of 2005 and replaced with the Public Utility Holding Company Act of 2005 ("PUHCA 2005"). FERC, not the SEC, administers PUHCA 2005 and has issued regulations relating to holding companies, shared services, affiliate transactions and cost allocation. These rules supplement the FERC's existing authority under the Federal Power Act ("FPA") and the Natural Gas Act ("NGA") to protect customers from improper cross-subsidization.

The primary rules under PUHCA 2005 are contained in Order 667. This order mostly concerns books and records, and the allocation of costs for non-power goods and administrative and management services. The rule eliminates the previous PUHCA 1935 distinction between "exempt" and "registered" holding companies, but nevertheless provides for certain waivers of the accounting, record-retention and filing requirements. EFH requested and received these waivers via a filing by TXU Corp. on May 24, 2006, and filings by the new owners of EFH on November 11, 2007.

Because of the waivers, EFH Corporate Services does not need to file the otherwise required annual financial report of shared services companies on FERC Form No. 60. But EFH Corporate Services is required to file a FERC Form 61 which simply provides a narrative description of its service company functions (EFH Corporate Services has apparently never filed this form). In addition, again because of the waivers, EFH Corporate Services is not required to comply with the FERC's Uniform System of Accounts.

Confidential

12

With regard to service company cost allocations, the rules allows service companies that were pricing non-power goods and services "at cost" (which includes EFH Corporate Services) to continue to do so; such companies do not need to change to FERC's traditional "market" pricing.   In addition, there is a presumption that existing "at cost" pricing is reasonable, although complaints may be filed by persons who believe that such cost exceeds market.

There is nothing in PUHCA 2005 that requires the formation of a service company, including when employees perform services for more than one utility.

Under the FPA, FERC has the discretion to require the filing of utility cost-sharing agreements  change cost allocations among jurisdictional companies.  PUHCA 2005 did not change this existing regulatory authority.

In summary, there are no specific FERC rules applicable to EFH shared services other than some limited reporting requirements, the general prohibition of cross-subsidization and the ability to continue to price services at cost.

### Texas – statutory

Section 36.058 of the Texas Public Utility Regulatory Act ("PURA07") governs the regulatory treatment of costs paid by a utility to an affiliate.  To be allowed as a recoverable cost, such costs must be deemed reasonable and necessary, and there must be a finding that

Confidential

EFH04404853

the amount charged by the affiliate is not higher than what it charges other affiliates or non-affiliates.  The findings are normally made in conjunction with a rate filing.

Section 39.157 of the PURA07 addresses various issues related to market power such as the sharing of information, the transfer of employees, preferential treatment, etc.  For the most part these rules relate to dealings of a utility with "competitive" affiliates.  However, this section provides a definition of corporate shared services and examples of the types of services that can and cannot be shared, which are discussed further below.  It also directs the Public Utility Commission of Texas ("PUCT") to adopt rules to prevent cross-subsidization between regulated and competitive activities.

### Texas - regulatory

Sections 25.84, 25.272 and 25.273 of the PUCT Substantive Rules are the detailed rules necessary to implement the provisions of PURA07.  They were specifically developed in response to the PURA07 Section 39.157 directive noted above and govern transactions between a utility and its affiliates "to avoid potential market-power abuses and cross-subsidization".

Section 25.84 addresses various reporting requirements relating to affiliate transactions. These requirements include the filing of an annual report, filing copies of contracts or agreements with affiliates, tracking of employees, and the handling of complaints

Confidential

EFH04404854

Section 25.273 requires a utility to competitively bid for products and services, other than for corporate support services, which are offered by competitive affiliates.

Section 25.272 provides examples of services that can be shared among a utility and its affiliates and those that cannot be shared, or that can only be shared among utility affiliates. Services that cannot be shared with non-utility affiliates include engineering, purchasing of electric transmission facilities and service, transmission and distribution system operations, and marketing. This section also establishes rules regarding codes of conduct and the sharing of information.

Section 25.272 also prescribes how shared services should be priced. In general, "a utility and its affiliates shall fully allocate costs for any shared services". Purchases by a utility from an affiliate shall be priced "at levels that are fair and reasonable to customers of the utility and that reflect the market value of the product, service or asset". Apparently the term "reflect market value" was used instead of "at market value" to avoid a conflict with the then SEC (now FERC) rules under the applicable PUHCA regarding at cost pricing. The section also contains provisions relating to purchases from a utility. Finally this section authorizes the commission, at its discretion, to require a utility to engage, at its own expense, an independent third party to audit its affiliated transactions.

In addition to the PUCT Substantive Rules, PUCT rate case filing instructions contain certain Guiding Principles relating to the utility's burden of proof under the PURA07. It provides

Confidential

EFH04404855

examples of the types of evidence that must be presented to support the utility's recovery of costs paid to an affiliate.

In summary, Texas regulations prohibit the sharing of certain types of services, and place the burden of proof on the utility to justify the recovery of costs charged by an affiliate. The price charged for shared services must be fair and reasonable, and at cost pricing is acceptable.

### Merger Related Agreements

In its April 28, 2008 Order on Rehearing in Docket #34077 the PUCT gave final approval of the merger between Texas Energy Future Holdings Limited Partnership and TXU Corp., now EFH. The merger did not result in any changes in any utility operations, and did not involve the transfer of any utility property. The approval included a listing of various commitments made by Oncor based on a stipulation agreement made with various interveners. Among the commitments is order point #85, "Corporate Support Services Commitment". This item provides that 1) any corporate support services provided by an affiliate to Oncor shall be at cost, and 2) in its 2008 rate case, Oncor will not request affiliate expenses related to corporate support services that exceed the amount included in its last rate case (leaving open the issue of whether CGE costs will be treated as corporate support services). The commitments also include various "ring fencing" provisions, primarily related to financing (i.e. – intercompany borrowing) and Board governance.

EFH04404856

16

### SLA's

EFH Corporate Services has entered into SLA's with the various EFH affiliates. These agreements summarize the services that may be provided, the pricing of such services consistent with PURA07 and the PUCT Substantive Rules, and billing procedures. The SLA's specifically provide that services will be priced at cost with "no profit or return on equity included". The agreements can be terminated by either party with appropriate notice.

Confidential

## APPENDIX 2

## APPLICABLE INDUSTRY PRACTICES RELATED TO SHARED SERVICES AND COST ALLOCATIONS

Huron identified current industry practices related to shared services by looking at general reports by and positions taken by the Edison Electric Institute ("EEI") and the National Association of Regulatory Commissioners ("NARUC").

## EEI

In 1999, Deloitte & Touche ("D&T") prepared a report for EEI entitled Cost Allocations and Affiliated Transactions. The report discusses general cost allocation principles, analyzes the pros and cons of various cost allocation methods, and summarizes the results of a survey of state regulatory commission requirements regarding cost allocations.

The content regarding general cost allocation principles and the various cost allocation methods remains relevant, and while the specific survey results are no longer current, the general conclusions are still valid. The main conclusion in the report is that transfer pricing is an important issue with state commissions to protect against cost subsidization and cost shifting, but that the prescribed methods for allocating costs vary among the states.

The general cost allocation principles are simple - costs directly attributable to a particular affiliate should be charged to that affiliate, and all costs that cannot be directly assigned should be allocated based on cost-causative factors. In some cases, cost-causative factors are

EFH04404858

easily identified (for example, square footage to allocate occupancy costs); in other cases a proxy allocation factor is used (for example, a factor based on weightings of revenue, property and payroll).

A fully-allocated cost methodology was endorsed.  Fully allocated cost was the allocation method previously required by the SEC for non-exempt service companies, results in both regulated and non-regulated affiliates paying the same price for shared services, and many regulators believe that it results in a fair outcome for utility customers.  In addition, this method eliminates cross-subsidization because non-regulated affiliates incur a proportionate share of fixed costs and all of incremental costs attributable to them.  Finally, fully allocated cost is consistent with the average embedded cost method typically used by utilities to allocate costs among their various customer classes.

The report notes that there are certain disadvantages to fully allocated costing, that other methods are used in a number of jurisdictions, and that non-regulated firms are free to allow one segment of the firm to subsidize another and can choose any method that best suits its business objectives.  In effect, there is a range of transfer pricing methods with the focus on the avoidance of cross-subsidization at one end, and the maximization of economic efficiency at the other.

Other cost allocation methods discussed in the EEI Report are:  incremental cost, prevailing market pricing, tariff-based pricing, negotiated pricing, higher of cost or prevailing market, and lower of cost or prevailing market.  The summary of pros and cons of each of these

EFH04404859

methods, as excerpted from the EEI Report, is attached as *Exhibit 1.* Consideration of the use these methods by EFH, within the constraints of the regulatory rules described earlier, are reflected in our recommendations below.


## NARUC

NARUC has issued a policy statement entitled <u>Guidelines for Cost Allocations and Affiliate Transactions.</u> These guidelines provide a framework for regulators to consider when developing their own policies. The stated premise of the guidelines is that allocation methods should not result in subsidization of non-regulated services or products by regulated entities.


 The NARUC guidelines contain general cost allocation principles which are essentially the same as those included in the EEI Report described above - to the maximum extent possible cost should be assigned on a direct basis, and indirect cost should then be charged on a fully allocated cost basis.


The guidelines also support the higher/lower of cost or market methods. That is, charges by a utility to non-regulated affiliates should be at the higher of fully allocated costs or prevailing market prices, and charges to a utility by a non-regulated affiliate should be at the lower of fully allocated cost or prevailing market prices.

Confidential

The NARUC guidelines also note that under appropriate circumstances, regulatory authorities should consider incremental cost, prevailing market pricing or other methods of allocating costs and pricing transactions among affiliates.

In summary, the NARUC guidelines are quite flexible, but have the overriding theme of preventing cross-subsidization.    In its discussions of Order 667, FERC took notice of NARUC's flexibility, but also noted NARUC's assertion that its positions are consistent with that of FERC.

EFH04404861

## APPENDIX 3

## PEER COMPANY PRACTICES RELATED TO SHARED SERVICES AND COST ALLOCATIONS

Huron identified current peer company practices related to shared services by looking at the specific practices of Exelon and Southern. Exelon and Southern were selected for review at the request of EFH. While these companies were used for comparison please note there are notable differences between EFH and these companies and such differences need to be considered during the benchmarking process. Huron did not evaluate non-utility industry practices, except for a limited review of the Cost Accounting Standards applicable to government contracting where allocation requirements are very similar to utility practices.

### Exelon

Huron's review of Exelon's shared services practices consisted of a general review of pertinent publicly available documents, a review of its 2007 FERC Form 60 filing, and a discussion with company representatives.

The general review, as well as the company interviews, were conducted to obtain a general understanding of Exelon's shared services practices by answering the following questions:

- What functions and personnel are contained in the shared services company?

- What functions are excluded, and where are these functions performed?

- How are corporate holding company activities treated?

- What cost allocation methods are used?

EFH04404862

- Are all costs zeroed out?

- Are costs allocated to the holding company and if so, are they re-allocated?

- How is the shared services company capitalized?

- What assets are in the shared services company, how were they acquired and how is their cost charged out?

- How are interest costs charged?

- Where does pension accounting occur and how are the related costs charged or allocated?

- How are costs related to intra-shared services activities allocated?

- How are income taxes allocated?

- What costs, if any, are being allocated to the shared services or holding company from other affiliates?

- What processes are in place to enhance communications and cooperation between the shared services organization and operating units?

Our review included reading the testimony contained in Commonwealth Edison Company's 2007 rate case filing. This testimony describes in detail the services performed and cost allocation methods used by Exelon Business Services Company ("EBSC"). We also met with a number of individuals from EBSC recommended by Exelons's Vice President and CFO.

A summary of the finding from the testimony review and interviews is found in *Exhibit 2*. The key items of note are:

                                                                    EFH04404863

1) There are no employees or activities at the holding company; all such functions are part of the shared-services company.

2)  Organizationally, EBSC uses a "centrally managed, local presence" approach, meaning that support employees that work for only one utility are employees of and physically located at that utility.   But the support employees  have dual reporting relationships (solid line to shared services) and their budgets are owned by the shared services organization. This approach is used for purposes of functional alignment, regulatory transparency, and is believed to have helped prevent the formation of "shadow" organizations.   However, this organizational structure is a topic of on-going management discussion and is currently being re-evaluated.

3)  EBSC does not charge a profit (equity return) on the use of assets.  This approach is consistent with prior SEC requirements under PUHCA 1935.  To mitigate the potential lost revenue impact of this, assets are owned by and recorded in the accounts of the regulated utilities whenever appropriate.

4)  Shared services company costs are fully allocated.  The shared services company operates at break even; it does not report a profit or loss.

5)   In the allocation process, shared services costs are allocated to the holding company, where they are retained and not re-allocated to business units.  This is consistent with prior SEC requirements under PUHCA 1935, and management believes that there are strategic advantages to retaining this approach.  The only costs that are directly assigned to corporate from the shared services company are merger and acquisition costs, and the only costs that are allocated from shared services to corporate are general costs resulting from the

application of a general proxy allocation factor (specifically, a 3-factor formula based on assets, revenue and headcount).

6)   Transmission and distribution operations (meter reading, billing, call center, engineering, etc.) were part of the shared service organization until 2008 when they were moved back to the operating utilities.  Charges between utilities include a return on equity related to the use of the related assets.

7)   There is a well-defined budget process to ensure business unit input into service company priorities, scope of services and costs before the costs are incurred.  There are also well-defined processes of on-going business unit involvement and review of activity during the budget year.

8)   There have been extensive reviews of outsourcing, and a high percentage of activities that are eligible for outsourcing (strategic and proprietary activities are not considered eligible) have been outsourced. Decisions to outsource are made by and contractually executed with EBSC.

Exelon has seemingly given very deliberate thought to the conceptual framework of its shared services. It appears that the adoption of defined principles has resulted in consistent application across business functions and business units, and has minimized traditional conflicts over roles and responsibilities.

## Southern

As with Exelon, Huron's review of Southern's shared services practices also consisted of a general review of pertinent publicly available documents, a review of Southern Company

Services' ("SCS") FERC Form 60 filing for 2007, and a discussion with appropriate company representatives.

The general review sought to answer the same questions presented above for Exelon. A summary of the findings is found in *Exhibit 2*. The key findings are:

1) With one exception, and like Exelon, there are no employees or activities at the holding company; all such functions are part of the shared-services company. The exception is that Southern's board of director costs are recorded directly at the holding company.

2) Organizationally, SCS uses a somewhat different model than Exelon in that the individual business units function on a more stand-alone basis. For example, each utility will have its own CFO, controller, regulatory affairs employees, etc. that only do work for that company and report to that company's management. Where a similar shared function exists at SCS, there is a dotted line relationship. This approach is utilized to prioritize the achievement of operating unit objectives over potential incremental efficiencies from centralization. Although most SCS employees are centrally located, some may be physically located at an operating unit - either because of facility considerations, concentration of talent factors, or because that is where the majority of their work exists.

3) SCS does not charge an equity return on the use of assets. This is consistent with prior SEC requirements under PUHCA 1935, but the continuing appropriateness of this practice is currently being reviewed. As with Exelon, the potential lost revenue impact from this is mitigated by recording and having asset ownership in the utilities whenever appropriate.

Confidential

4) Costs are fully allocated from the shared services company and thus SCS has no profit or loss.

5) Shared services costs are assigned or allocated to the holding company and not re-allocated to business units. Management believes that such costs (mostly external affairs, legal, environmental research and corporate executives) are truly corporate in nature and should not be borne by the business units.

6) Transmission and generation management activities are included in the service company. Fuel supply procurement is performed for the operating units on an agency basis.

7) Customer service activities are split. Non-customer contact activities such as billing and cash processing are performed at SCS. Customer facing activities like meter reading and the call center are at the business unit level. The CIS system is utility owned and charges between utilities include a return on equity related to the use of assets.

8) Southern has recently begun implementing a new process to enhance decision making between the business units and SCS. A new Financial Planning and Business Council headed by the VP of Finance and Treasurer will resolve differences and ensure that, as SCS continues to grow in size, costs are not being duplicated.

9) Decisions to outsource shared services activities are made by and contractually executed with SCS.

The primary difference between Exelon and Southern relates to the organizational relationships of employees that only work for one company in a shared services type activity. Whereas Exelon manages these employees centrally, Southern manages these employees from the business unit level. Both companies noted positives and negatives regarding their

Confidential

particular approach. The associated issues generally involve the maximization of efficiencies, decision-making, the clarity of roles and responsibilities, and general governance issues.

Confidential

EFH04404868

## APPENDIX 4

## EXISTING PRACTICES OF EFH, EFH CORPORATE SERVICES AND CGE

Huron's review of EFH's shared services practices consisted of a review of testimony on the subject filed in the 2008 Oncor rate case, review of various financial reports, and discussions with selected company personnel, as summarized in *Exhibit 3*.

As a general observation, the shared services arrangements at EFH are more involved than at Exelon and Southern. For example, some holding company activities are at Corporate and some activities occur at the shared services organization. Some administrative functions are contained in the shared services company, but some (such as insurance, accounts receivable financing and facilities) are/were performed by separate entities. These functions are performed in separate legal entities to facilitate activities, comply with legal or accounting requirements. For example separate insurance companies are required to comply with Vermont laws regarding captive insurers. There is a separate A/R entity which was established to comply with GAAP and legal requirements for bankruptcy remote entities. A separate property company exists to manage the Energy Plaza sale-leaseback and charge market-based rent to Company entities occupying floor space. Transactional and volume-varying activities for the most part are/were outsourced directly from the operating units to CGE, but EFH Corporate Services provides management oversight of CGE. Some assets that support shared services are at the shared services company, some are at the CGE investment-holding entity, and some (for example, facilities) are at other entities. Certain

EFH04404869

activities are performed by and billed from the utility, including to the shared services organization.    And while most billing is based on a fully allocated costing methodology, some billings are based on market prices (rent, parking).

A summary of EFH's shared services practices is found in *Exhibit 2*.  Key items of note are:

    1) Corporate has roughly 10 employees, with all but the CEO billed 100% to the shared services company for further allocation.   Unlike Exelon and Southern, there is a significant amount of activity/costs at Corporate (over $106 million) in addition to the charges Corporate receives from shared services. See *Exhibit 4*.  Like Exelon and Southern, none of the Corporate costs are allocated to business units.

    2)  Organizationally, EFH is closer to the Southern model than it is to Exelon in that business units have their own staff (for example, a CFO, Controller, etc.) in various shared services type functions that only perform work for and report to that company's management. Like Exelon and Southern, EFH has identified various matters relating to its organization structure (such as governance, roles and responsibilities, etc.) that it plans to review. EFH's guiding principles for its shared service organization structure are both efficiency and business unit alignment.  . This is a mix between  Exelon representatives who stated that its model was to emphasize cost efficiencies, and Southern's stated focus on business unit operational alignment with the efficiencies resulting from sharing services a secondary consideration.  EFH's stated guiding principles do not appear to have been committed to writing.

EFH04404870

3) EFH Shared Services does not charge an equity return on the use of assets. It has roughly $10 million in property as compared to nearly $150 million for both Exelon and Southern. Thus, the potential lost revenue attributable to this is relatively minor, at least at this time. The primary reason for the differences in asset amounts appears to be the CGE arrangement and the greater use of licensed software versus propriety software.

4) Costs are fully allocated from the shared services company and thus the shared services company has no profit or loss.

5) Shared services company costs are both directly assigned and indirectly allocated to the holding company. Nearly $21 million was charged to Corporate in 2008 *Exhibit 5*. While comparisons can be misleading, primarily because of denominator differences, EFH appears to allocate a relatively large dollar amount to Corporate (*Exhibit 6*). As noted earlier, Corporate also directly incurred $106 million in 2008.

6) The CGE outsourcing agreement was recently terminated and activities are transitioning back to EFH. Many of the activities are expected to become part of the shared services organization, with any further outsourcing (for example, payroll processing and benefit plan administration) being contracted by EFH Corporate Services rather than directly by the business units. The assets that have been used to CGE to provide outsourced services to EFH will remain where they are in a separate EFH entity.

7) Where shared services costs cannot be directly assigned to a specific business unit, EFH Corporate Services allocates costs using indirect cost causative allocation methods, such as headcount and square footage. In some instances, there is little cost causation support to the methods chosen. There are no costs allocated using a general allocator factor as EFH Corporate Services purports that all of its allocations are based on direct or indirect

cost causation methods.    This practice contrasts with Exelon, Southern and most other utilities who have determined that certain costs are unable to be allocated using cost causation principles and who use a general allocation factor to allocate such costs.    The general allocation factor typically consists of a 2 or -3 factor allocation methodology using some combination of revenue, property, payroll, headcount or non-fuel operations and maintenance expense and is applied to corporate type costs for which direct or indirect allocation or attribution usually cannot be established.    Examples of costs commonly allocated in this manner include external reporting, executive management, investor relations and finance. Using a formula based on the above factors to allocate certain costs would likely reduce the amount charged to the holding company (because it has relatively little revenue, property, payroll, headcount or non-fuel operations and maintenance expense), and increase the amount charged to the business units.

While the scope of our engagement did not include reviewing each cost allocation method used by EFH Corporate Services, we made a number of observations regarding the existing methods and have included applicable comments in *Exhibit 8.*

8) EFH Corporate Services has informal processes to ensure business unit input into service company priorities, scope of services and costs before they are incurred.    Ongoing business unit involvement and review of activity during the budget year is also informal. While some of the shared services functional leaders described little interaction with the business units, Oncor indicated that it has a good level of involvement with shared services personnel below the functional leader level, and internal audit described extensive involvement with the business units.

EFH04404872

9)    There appears to be some effort or movement by Oncor to become more autonomous and stand-alone with regard to the functions performed by shared services and those that are being transitioned back from CGE.

Confidential

EFH04404873

## APPENDIX 5

### THE DESIRED STATE FOR EFH SHARED SERVICES

The shared services concept was developed to combine the benefits of centralization (economies of scale, centers of expertise, standardization, etc.) with the benefits of decentralization (internal customer responsiveness, business unit customization, etc.). The intended result is to maximize cost effectiveness while retaining a customer service orientation. The internal customer service aspect is what generally distinguishes a shared services organization from a centralized support organization.

In addition to a customer service focus, the desired structure for shared services is the one that best optimizes efficiency and effectiveness after considering any regulatory or other constraints, which are discussed further below.  Efficiency can generally be measured quantitatively.  Effectiveness usually cannot.  For example, effectiveness benefits from factors such as management alignment and unity, the quality of management information, business unit ability to focus on strategic/high value activities, and decision support are generally subjective in nature.

Because different and sometimes conflicting views will exist on these subjective matters, even within the same company, no single shared services model is appropriate for all organizations.  For this reason, taking a project approach to defining a desired shared services state is appropriate.  A project approach typically includes these major steps:

EFH04404874

- Define external or internal constraints.

- Establish guiding principles.

- Define decision-making criteria.

- Define products and services.

- Establish cost allocation methodologies.

- Define accounting and reporting requirements.

- Establish governance processes.

Without such a systematic project approach, there is a high likelihood that the shared services organization will lack cohesiveness, and the benefits of shared services will not be maximized.

## Constraints

Following are some common constraints that must be considered when defining the desired state of a shared services organization:

*Strategic objectives.*  While more a consideration than a constraint, strategic objectives can influence decisions regarding shared services.  For example, if there are potential plans to sell or spin off a business unit, there may be a greater need to sacrifice some of the efficiencies of shared services in order to built autonomous functions necessary to make a unit more sale-ready.  Another example would be the strategic decision to forgo the allocation of certain types of costs to regulated affiliates in order to minimize risk in regulatory proceedings.

*Minority ownership interests.*  Absent regulatory or tax considerations, companies have significant flexibility in the manner in which they allocate intercompany costs.

EFH04404875

However, the existence of minority owners may impact this ability. Minority interests must be considered or there is a risk of potential challenges (including legal challenges) regarding the necessity and benefit of various services and charges.

*Unions.* The existence of union contracts may influence the shared services structure. For various reasons, it may be decided that union workers need to remain at the operating companies rather than become employees of the shared services company. This could result in additional organizational complexity if some activities involve both unionized and non-unionized work forces. For example, supply chain may be centrally managed at the service company, but unionized warehousing employees may remain at the operating company level.

*Accounting.* The robustness of the accounting system may influence the granularity of cost allocations. For example, direct costs and related overheads may be allocated at the individual or departmental level, clearings may be made monthly or quarterly, and allocation factors may be changed monthly or annually. In addition, the precision of cost allocations will often depend how costs are captured and accumulated in the general ledger. Granularity typically becomes more topical as a shared services organization matures and operating units become more detailed in analyzing cost allocations.

*Simplicity/cost benefit.* Like the accounting constraint, this constraint relates to granularity. Some organizations believe that the complexity added by detailed cost allocations (more cost pools, more allocation methods, timekeeping, etc.), detailed service level agreements and the like simply add administrative costs that then must be shared among operating companies. Others view these as necessary controls that improve precision (for example, more direct billing versus allocated billings due to mandated time-keeping) and lead to better service, greater regulatory transparency and reduced costs.

                                                    EFH04404876

An example relating to simplicity is corporate/holding company activities. These costs may be incurred at the corporate level, or may be embedded in the shared services company to reduce various administrative activities, such as payroll tax requirements. And Huron is aware of one utility shared services company that does not allocate any of its general shared services costs to the holding company simply to eliminate the additional re-allocation from the holding company to business units (this particular utility holding company retains only very specific types of costs). Another example relates to certain corporate or other costs that are often not recoverable for regulatory purposes, such as corporate diversification and lobbying costs. Some companies do not allocate these costs at all or allocate them 100% to corporate in order to avoid the resulting regulatory "noise". Others elect to allocate these costs and deal with the regulatory treatment at the utility level, either as a below-the-line item or in a rate case proceeding as a pro-forma adjustment removing these items from revenue requirements. A final example relates to cost allocation methodologies. Some companies employ literally dozens of cost-causative allocation factors while others use only a few allocation factors with heavier use of a general proxy allocation method, such as the 3-factor formula used by Exelon.

*Regulatory rules.* The regulatory rules that relate to EFH were already discussed. For the most part, the regulatory rules in Texas are not particularly restrictive - shared service costs must be deemed reasonable and necessary, and the burden of proof is on the utility to justify regulatory cost recovery. While the rules do not appear restrictive, we note that the burden of proof requirement has proven to be a high hurdle in Texas rate cases for many regulated entities.

Confidential

*Merger conditions.*  The merger conditions that relate to EFH Corporate Services were already discussed and do not present any particular constraints to EFH, except that Oncor can only be billed at cost.  It is uncertain whether the definition of cost includes a return on equity.

*Management preference/philosophy.*  As noted earlier, different individuals may have significantly different views when it comes to shared services.  These can range from issues of management control and cost allocation to resource allocation and even incentive compensation.  Any one of these issues can become quite complex and controversial.  This is especially true regarding the reporting relationship of employees that perform a shared-service type function but only work for one operating unit.

When it comes to cost allocations, some look at this from the regulatory perspective of transparency and rate recovery.  Thus, they would only charge utilities for costs that are relatively certain of rate recovery. Others believe that all corporate and service company costs should be allocated to operating units.  As to corporate costs, some take the view that these costs should not be allocated at all because they provide limited benefits to operating units.  Others believe that such costs are a just part and parcel of belonging to a consolidated group, that they do provide valuable benefits, that the funding of such costs must necessarily come from the business units, and that the allocation of such costs is therefore appropriate.  For the most part, and absent the consideration of other constraints, the ultimate decision on these items is based on management's judgment and preferences to achieve its various business objectives.

*Corporate governance.*  This is much like the preceding constraint. Even though shared services are normally support functions, there are likely to be issues over who

Confidential

determines the types of services to be performed, the related performance standards, the resources allocated to each activity and each business unit, priorities, etc. These issues are typically dealt with annually during the budget process, and impact the ability to optimize shared services benefits.

## Guiding Principles

Guiding principles reflect management's overall philosophy regarding shared services and establish a foundation to ensure consistency among functional areas and between business units. Following are some typical guiding principles to consider:

- No opting out. This means that when there is a common service among more than one business unit, that service will be provided by the shared services company. Exceptions should be rare, based on sound reasoning, and be specifically approved by the appropriate corporate executive.

- Outsourcing decisions will be made by the shared services organization. Business units look to the shared services organization to meet their needs, and the shared services organization determines the best way to deliver those services. This is similar to best practices for procurement in general. New shared service organizations often prohibit outsourcing until a baseline of internally optimized costs can first be established.

- All shared services costs will be fully allocated to the business units that receive a particular service. Costs will be directly assigned to the maximum extent possible. Indirect costs will be allocated based on cost causation. Costs that cannot be indirectly allocated based on cost causation will be allocated based on a

                                                                 EFH04404879

proxy allocation method that averages factors such as revenue, property and payroll.

- Shared services priorities, service levels and costs will generally be determined by the business units. This recognizes the fact that most shared services are demand driven. Corporate type costs are a notable exception. Shared services functional leads will identify and resolve conflicts between individual business unit demands and the maximization of consolidated benefits.

### Decision Criteria

Because decisions on subjective matters involve judgment, can be influenced by personal preferences and motives, and because perspectives and priorities differ by person, it is helpful to establish pre-determined criteria to aid decision-making and resolve inevitable internal conflict. The following questions are often used to evaluate shared services issues:

- Does it create economies of scale?
- Does it prevent duplication?
- Does it promote standardization of performance or processes?
- Does it optimize resource utilization, including human resources?
- Does it facilitate focused management, expertise and specialization?
- Does it enhance the ability to implement best practices?
- Does it promote processes for planning, monitoring and managing costs?

These types of questions typically come into play only at the time a shared services organization is first formed, or during periodic reviews. However, they are particularly relevant now for EFH given the transition of CGE activities, and what appears to be a desire

EFH04404880

by Oncor to become more autonomous by opting out of certain shared service activities. These questions can also help resolve some of the more subjective shared services matters, particularly when the questions are framed as to how they can enhance the easier determined quantitative analysis.

## Products and Services

Defining products and services is essentially a matter of determining the appropriate level of detail at which to manage the various shared services and the related cost allocations. The primary determinants should be how the customer (business unit) views the service and how costs will be allocated. From the cost allocation perspective, if only some business units take a particular service, costs must necessarily be accumulated separately for these services so that costs will only be allocated to those units that benefit from the service. An effort should be made to limit the number of products and services to no more than 5-10 for each functional area. For example, accounting and finance may have products and services for external reporting, tax, accounts payable, investor relations, SOX, etc.

## Cost Allocations

As noted earlier in the sections discussing EEI and NARUC positions, with few exceptions, utility company shared services organizations typically allocate all of their costs to business units. There is a mixed treatment when it comes to the treatment of the holding company and holding company costs. However, for most of the companies with which Huron is familiar, the vast majority of holding company activity is embedded in the shared services company

Confidential

and corporate-type costs are allocated to the business units, except for specific and limited categories of cost such as diversification costs

The general principles of cost allocation should be those that were discussed earlier – direct assignment whenever possible followed by indirect allocation based on cost causation. Where indirect allocation is not possible, we recommend use of a 2-or-3 factor proxy allocation method. There is no way to know whether positive time reporting would produce more direct charges than exception time reporting. But because positive time reporting typically increases administrative costs, we do not believe it should be required.

## Accounting and Reporting

The purpose of the accounting and reporting as it relates to shared services is to aid the management and control of costs in order to ensure that the benefits of sharing services is maximized. Thus, reports need to be tailored to suit both the shared services functional leads and the business unit leads. Functional area reports typically show costs by product and service, with appropriate detail of labor and non-labor, and variances from budget, both on a monthly a year-to-date basis. Business unit reports typically show costs by originating shared service functional area, the split between direct, indirect and proxy allocation charges, and also variances from budget, both on a monthly basis and year-to-date basis. To ensure that the customer service aspect of shared services is also managed, there are typically reports that address the status of performance metrics contained in SLA's.

## Governance Processes

Developing governance processes is often the most difficult step in establishing a desired state for shared services. This is because it involves some of the most subjective subject matters such as roles and responsibilities, reporting relationships, decision authority, service standards and metrics, etc.

As noted earlier, Exelon and Southern have chosen different approaches to organizational structure, one of the most sensitive topics to address. Exelon's structure maximizes cost efficiencies while the Southern model emphasizes tailored customer service. We believe that the Southern model increases the potential for duplicate costs and less efficient use of resources. We also believe that the Exelon model maximizes cost effectiveness and, with proper care, can achieve the requisite level of customer service.

Developing SLA's is an important aspect of the governance process. More than simply a cost allocation agreement, this document should focus on customer service aspects of the business unit relationship and promote a dialog regarding service expectations.

Confidential                                                                                                EFH04404883

## APPENDIX 6

## OBSERVATIONS AND RECOMMENDATIONS

Following are recommendations resulting from our review.  These recommendations stem from our general experience with shared service organizations/cost allocations as well as from specific observations we noted during this engagement.  It is likely that the adoption of these recommendations will result in fewer costs "stranded" at the holding company.  We recognize that there are strategic and regulatory considerations associated with their impact (especially a potential increase in the amount of costs allocated to Oncor) that may influence management's decision to accept the recommendations.  However, adoption of these recommendations will more closely align EFH practices with its peers and the desired state for service organizations and the allocation of shared service costs.

## Recommendation #1

*Observation.*   EFH identified its guiding principles as both efficiency and business unit alignment.  These principles do not appear to have been committed to writing.

*Recommendation.* EFH should develop in writing its guiding principles for its shared services organization. Consideration should be given to any changes which may be necessary in these principles in connection with the insourcing of CGE activity EFH has engaged a consultant to evaluate roles and responsibilities as it relates to shared service activities and Huron concurs that this is needed.  The results of this engagement should be reflected in the guiding principles.  The guiding principles should include such important considerations as allocation

Confidential                                                                                                    EFH04404884

approach (cost causation), services to be provided by the service company, which groups should use positive time reporting, what needs to be done to opt out, charging returns for the use of assets and the budgeting process, etc.

## Recommendation #2

*Observation.*  Some EFH holding company activity is incurred and recorded directly at Corporate.  Other holding company activity is embedded in EFH Corporate Services.

*Recommendation.*  For the sake of simplicity, EFH should consider embedding all Corporate activity in EFH Corporate Services. This is very common in the industry.  In addition, most of the costs that currently are being recorded directly at Corporate are managed by service company personnel.

## Recommendation #3

*Observation.*  Corporate SG&A costs are not allocated to the EFH business units.  As shown on Exhibit 4, the amount of unallocated Corporate SGA is significant – roughly $127 million in 2008, including $20 million originating at EFH Corporate Services.

*Recommendation.*  EFH should perform an analysis to determine the necessity and benefit of all corporate activity, with the expectation that this analysis will support allocating appropriate Corporate costs to the business units.  The analysis should be similar to that used to support the necessity and benefit of EFH Shared Services costs in the last Oncor rate case.  *Exhibit 4* includes a preliminary necessity and benefit analysis performed by Huron.  Subject to further review, it appears that some of the Corporate costs will satisfy the necessity and benefits test and therefore should be allocated to business units.  Some costs may need to

EFH04404885

remain at Corporate — for example merger acquisition/transaction costs (as opposed to merger integration/transition costs), and the owners management advisory fee (if it is in the nature of an investment return rather than for actual services rendered).

The method of allocating corporate costs will depend on whether recommendation #2 above is adopted (embedding Corporate in EFH Corporate Services). If recommendation #2 is not adopted, new corporate allocation methodologies (and related corporate SLA's) will need to be developed, and Huron would recommend using a general allocation factor (such as a 3-factor formula) which is common in the industry for corporate-type costs. If recommendation #2 is adopted, then these costs will be either directly assigned or indirectly allocated from the shared services company.

### Recommendation #4

*Observation.* As shown on Exhibit 5, nearly $21 million of EFH Corporate Services' 2008 costs were allocated to Corporate. This represents almost 18% of all EFH Corporate Services costs. As shown on Exhibit 6, this percentage is at the high end when compared to other selected utilities. While comparisons can be misleading, primarily because of denominator differences such as the CGE arrangement, EFH still appears to allocate a relatively large dollar amount to Corporate. And this is before recognizing the significant amount of costs (approximately $106 million) that are recorded directly at corporate.

*Recommendation.* Adopting the preceding two recommendations (moving all corporate activity into the service company and then performing a necessity and benefit test on this activity), along with recommendation #5 below relating to cost allocations, will likely reduce

EFH04404886

the amount of shared services costs charged to Corporate. The only costs that would be allocated to Corporate will be direct costs that do not pass the necessity and benefit test, and some minimal amount of allocated costs.

### Recommendation #5

*Observation.* EFH Corporate Services uses a variety of indirect methods to allocate certain corporate-type costs that its peers and others allocate using a general allocator (such as a 3-factor allocation methodology).

*Recommendation.* Certain costs do not lend themselves to direct or indirect allocation. EFH has developed indirect methods to allocate certain corporate type costs that Exelon, Southern and others allocate using a general allocation approach. For the sake of simplicity and alignment with best practices, consideration should be given to the greater use of single 3-factor proxy allocation method for many corporate-type costs.

### Recommendation #6

*Observation.* EFH Corporate Services does not include a profit component in its charges to business units for the use of assets. This is currently a relatively minor amount, but has the potential of becoming more significant depending on the return of CGE activity and future information system developments.

*Recommendation.* EFH Corporate Services should consider including a charge for the imputed cost of equity to fund assets. This will likely require amendments to the existing SLA's. It may be appropriate to exempt Oncor due to regulatory considerations, including the merger commitment to only charge Oncor at cost. Huron recognizes that Exelon,

Southern, and certain other utility service companies do not charge a return on equity for the use of shared service company assets. This is primarily a carryover from SEC positions that existed under PUHCA 1935. But there is now nothing that prohibits this charge, and Huron has identified other utility service companies that charge for the return on equity related to assets. If the particular service was acquired at a market price it would include a profit element, and including a profit is an accepted technique under established pricing principles.

### Recommendation #7

*Observation.* Because EFH Corporate Services does not charge for the cost of equity related to assets used by Oncor and benefiting Oncor customers, Oncor ratepayers do not pay a cost that they otherwise would if the assets were owned directly by Oncor.

*Recommendation.* EFH should consider having assets that are predominantly used by Oncor owned by Oncor. If the assets are partially used by another EFH entity, then Oncor could charge that entity in accordance with its existing intercompany billing processes. Both Exelon and Southern own and account for similar type assets at their regulated utilities.

### Recommendation #8

*Observation.* The CGE outsourcing arrangement is being terminated and activities that had been outsourced will return to EFH. With the termination of the CGE arrangement, additional allocation methods will need to be developed for the activity that will be returning.

*Recommendation.* Besides establishing allocation methods for the returning CGE activity, EFH should also determine the impact of the transition on existing allocation calculations and implement any required changes as the transition occurs. The transition of the CGE

EFH04404888

functions, along with adoption of the recommendations contained in this report, suggest that a comprehensive review of all allocation methods would be appropriate.  This should be coordinated with accounting so that the costs to be allocated are appropriately accumulated in the general ledger.

EFH04404889

## Index of Exhibits

Exhibit 1 – Transfer pricing policy choices

Exhibit 2 – Comparative shared services practices

Exhibit 3 – EFH meeting participants

Exhibit 4 - EFH corporate SG&A

Exhibit 5 – Shared services charges to corporate

Exhibit 6– Comparative percentage of shared services charges to corporate

Exhibit 7 – Comparative shared services costs as a percentage of total SG&A

Exhibit 8 – Summary of Allocation Methods

Confidential

EFH04404890

# Accounts Payable Expense Voucher

| Company Name | Select One |
|---|---|
| Huron Consulting Services LLC | |
| Speltz & Weis LLC | |
| Huron Consulting Group Inc. | |

Vendor Name:          Autonomy

Vendor Invoice #:     148204

Amount of Invoice:   $19,725.00

Project Number:      01511-049

Cost Code #:

                     (A/P Use Only)

Office:               Chicago

Expense Type:        **(Check expense type from list below)**

### EXPENSE TYPES (Check X)

| | | |
|---|---|---|
| Airfare | Insurance Expense | Repairs & Maintenance – Facilities |
| Business Meals (100%)ME34 | Legal Fees | Research |
| Business Meals (50%)ME40&32 | Mileage | Stationery & Printing |
| Business Meals (0%) | Office Supplies | Sponsorships |
| Company Events | Misc. Non-Prof. Service | Tax Payments |
| Dues/Membership - Prof. Society | X  Misc. Prof. Service | Telecom |
| Equipment Lease | Parking & Tolls | Tuition Reimbursement |
| Ground Transportation | Postage and Freight | Utilities |
| Hotel/Lodging | PR/Articles/Ads | Other: _____ |
| | Rent Expense – Facilities | (Describe) |

Completed By:         Danish Butt

Management Approval:  _____Scott Rosenburg_____
                              (Print Name)

Approval:             _____
                              (Signature)

Date:        6/12/2009

EFH04404891

# Accounts Payable Expense Voucher

| Company Name | Select One |
|---|---|
| Huron Consulting Services LLC | |
| Speltz & Weis LLC | |
| Huron Consulting Group Inc. | |

Vendor Name:     Autonomy

Vendor Invoice #:     148188

Amount of Invoice:     $44.67

Project Number:     01511-049

Cost Code #:

     (A/P Use Only)

Office:     Chicago

Expense Type:     **(Check expense type from list below)**

### *EXPENSE TYPES (Check X)*

| | | |
|---|---|---|
| Airfare | Insurance Expense | Repairs & Maintenance – Facilities |
| Business Meals (100%)ME34 | Legal Fees | Research |
| Business Meals (50%)ME40&32 | X  Mileage | Stationery & Printing |
| X  Business Meals (0%) | Office Supplies | Sponsorships |
| Company Events | Misc. Non-Prof. Service | Tax Payments |
| Dues/Membership - Prof. Society | Misc. Prof. Service | Telecom |
| Equipment Lease | Parking & Tolls | Tuition Reimbursement |
| Ground Transportation | Postage and Freight | Utilities |
| Hotel/Lodging | PR/Articles/Ads | Other: |
| | Rent Expense – Facilities | (Describe) |

Completed By:     Danish Butt

Management Approval:     _____ Scott Rosenburg
                                              (Print Name)

Approval:     _____
                              (Signature)

Date:     6/12/2009

EFH04404892

PCL XL error

        Subsystem:  KERNEL

        Error:      IllegalOperatorSequence

        Operator:  EndChar

        Position:  29

Confidential

EFH04404893

**Exhibit 1**
**Transfer Pricing Policy Choices: Pros and Cons**

| METHOD | PROS | CONS |
|---|---|---|
| *Prevailing Market Price* | • Captures actual market demand and supply conditions<br>• Preferred method according to economic theory because *prevailing market price* simultaneously reflects suppliers' costs of production and consumers' measure of value<br>• Compatible with comparable pricing, price to affiliate comparable to price for any third party competitor | • May not exist for certain products and services<br>• May not always reflect conditions consistent with a robust competitive market<br>• Prevents utility-affiliate umbrella company from receiving the benefits of scope economies because it forces an "arms length" transaction between the affiliate and utility that would normally be internal |
| *Fully Allocated Cost* | • Familiar to regulators because of extensive historical application<br>• Typically considered by regulators to be fair to consumers of regulated services<br>• From an economic perspective, eliminates cross subsidization because the affiliate bears some of the fixed costs<br>• Incorporates identifiable and verifiable costs | • From an economic perspective, the incorrect threshold price for detecting and defining cross subsidies<br>• Prevents utility-affiliate umbrella company from receiving the benefits of scope economies<br>• May prevent or discourage otherwise economical utility-affiliate transactions that can benefit consumers of regulated and non-regulated services |
| *Incremental Cost* | • From an economic perspective, the proper threshold price for detecting and defining cross subsidies<br>• Avoids discouraging or preventing economically justified utility-affiliate transactions | • Does not permit the benefits of economies of scope that arise from the transaction to be shared with regulated services customers<br>• Deviates from traditional regulatory cost-based pricing rules developed for utility services<br>• Competitors may find it more difficult to compete against a relatively more efficient affiliate |
| *Negotiated Price* | • Sensitive to changing market (supply and demand) conditions | • Leads to discrimination in pricing across customer classes |

EFH04404894

| | | |
|---|---|---|
| | • Avoids economic distortions caused by rigid transfer prices | and within customer segments<br>• May not be viewed by regulators as fair to all consumers of regulated services |
| *Tariff Based Price* | • Pre-approved by the commissions<br>• Allows for the up front resolution of issues<br>• Nondiscriminatory since all customers generally pay the same price | • Can be burdensome if they do not allow prices to be quickly modified.<br>• May prevent or discourage otherwise economical utility-affiliate transactions that can benefit consumers of regulated and non-regulated services |
| *Asymmetrical — Higher of Cost or Prevailing Market/ Lower of Cost or Prevailing Market Pricing* | • Ensures that no cross subsidies will flow between utility and non-regulated affiliate<br>• May lead to less regulatory oversight | • Incompatible with comparable pricing<br>• May discourage otherwise economical transactions<br>• Inconsistent with normal cost-based regulatory pricing rules for utility services<br>• May go beyond necessary measures to address cross subsidy concerns<br>• Potentially higher cost-of-service for utility customers |

EFH04404895

Exhibit 2
Energy Future Holdings Corp.
Shared Services Company Review
Summary of Shared Services Attributes

| | Exelon | Southern | EFH |
|---|---|---|---|
| Shared service functions | Practice areas:<br>Information technology<br>Supply chain<br>Commercial operations (a/p, payroll, etc)<br>Finance<br>Human resources<br>Government and environmental affairs<br>General counsel (legal)<br>Corporate secretary<br>Strategy<br>Communications<br>Energy Delivery Shared Services (EDSS)<br>  (ComEd and PECO only, only until 2008)<br>  (just the mangement of these areas)<br>Cost centers:<br>  Executive services<br>  Corporate SLA<br>  General company activity<br><br>Exelon categorizes its shared services as follows:<br>  - corporate activities<br>  - transactional/traditional shared services<br>  - centrally managed, local presence<br>  - governance and oversight (promotes consistency<br>    and standardization)<br><br>Includes some union employees.  This was not a factor in employee placement. | Information technology<br>Supply chain<br><br>Finance and accounting, internal audit<br>Human resources<br>External affairs<br>Corporate counsel<br><br><br><br>Engineering<br>Generation services<br>Marketing<br>Research and environmental<br>Executive<br>System air<br>Transmission/transmission planning<br><br><br><br><br><br><br><br><br><br>Minimal, if any, union employees. | Information technology<br>- - -<br>OBM (CapGemini oversight)<br>Finance, accounting, tax, internal audit<br>Human resources<br><br>General counsel<br>Corporate secretary/governance<br>Corporate strategy, corporate planning<br>Corporate affairs<br><br>Administrative services<br>Energy and land development<br><br>Special assignments<br>Aviation support<br><br><br><br>The shared services company mostly consists of corporate type activities and administrative functions not sourced out to CapGemini<br><br>No union employees at shared services. |
| Excluded functions | Outsourced:<br>SSO outsources or contracts out roughly 25% of its total costs<br>Utility retained because these employees only do work for the utility:<br>  EDDS starting in 2008<br>  Information technology - 11 employees<br>  Supply - 146<br>  Commercial operations - 0<br>  Finance - 36<br>  Human resources -12<br>  Government and environmental affairs - 50<br>  General counsel (legal) - 1<br>  Corporate secretary - 0<br>  Strategy - 0<br>  Communications - 8<br>  Executive - 5<br><br>These are the "centrally manged, local presence" category noted above.  These generally have dual reporting relationships and budgets are owned by the shared services management.  Done this way for functional alignment, but local presence. Also done for regulatory purposes.<br><br>For non-regulated, all of these same types of employees are at the shared services company. | Personel working for only one company are employees of and report thru that business unit.<br><br>Customer facing activities are at the business unit level, and non customer facing activities such as billing and cash processing is at the service company. | All T&D functions remain at the utility:<br>  Engineering<br>  Design<br>  Customer operation<br>  Community affairs<br>  Regulatory<br><br>Outsourced by business units to<br>Cap Gemini (transactional/volume varying  activity):<br>  Information technology*<br>  Supply chain*<br>  Finance and accounting*<br>  Human resources* ***<br>  Revenue management**<br>  Customer care**<br>  * previously performed by EFH Corporate Services<br>  ** previously performed within Oncor<br>  *** Returned to EFH Shared Services in 2008<br>Cap Gemini arrangement is in process of being terminated (Project Phoenix)<br><br>Other via specialized subsidiaries:<br>  Vehicle parking<br>  Receivable financing (terminated in 2008)<br>  Insurance (terminated in 2008)<br><br>Activites at the holding company:<br>  CEO<br>  KKR fees<br>  Project Phoenix costs (CGE termination) |
| Holding company functions | None.  All such activity is performed at the shared services company.<br><br><br><br><br><br><br><br><br><br><br><br><br>Costs are allocated from shared services to the holding company where they remain.<br><br>There is parent company interest expense.<br><br>None of the holding company costs are re-allocated. | None.  All such activity is performed at the shared services company.<br><br><br><br><br><br><br><br><br><br><br><br>The only costs incurred directly at parent are director costs.<br><br>Costs are allocated from shared services to the holding company where they remain.<br><br>There is parent company interest expense.<br><br>None of the holding company costs are re-allocated. | Significant expenses (>$100 million) at the holding company beyond allocations from shared services<br><br>Major Activites at the holding company:<br>  CEO<br>  KKR fees<br>  Project Phoenix costs CGE termination)<br>  Project Eagle (merger related)<br>  Director Costs<br>The CEO is at the holding company.<br>(Some other officers are actually employees of<br><br>Approx. 10 employees of holding company, but all except CEO are allocated to service company.<br><br>Costs are allocated from shared services to the holding company where they remain.<br><br>There is parent company interest expense.<br><br>None of the holding company costs are re-allocated. |

Confidential

Exhibit 2
Energy Future Holdings Corp.
Shared Services Company Review
Summary of Shared Services Attributes

| | Exelon | Southern | EFH |
|---|---|---|---|
| Cost allocation methods | Fully allocated cost:<br>  Direct where applicable<br>  Then cost causation<br>  Heavy use of modified Mass. Formula (MMA)<br>    (equal assets, revenue and headcount)<br>    (special adjustments for holding company)<br><br>Majority of allocation methods in line with prior SEC authorization.<br><br>Unit pricing is used with variances cleared using the MMA. Done to aid benchmarking. | Fully allocated cost:<br>  Direct where applicable<br>  Then cost causation<br><br>Three factor formula called "financial basis is used" Equal weighting of net fixed assets, revenues and operating expenses.<br><br>17 allocation methods based on Form 60 | Fully allocated cost:<br>  Direct where applicable<br>  Then cost causation<br><br>Positive or exception time-keeping is not universal.<br><br>A 3-factor formula allocation methodology is not used.<br><br>No unit pricing. |
| Costs retained/ zeroed out | None. Zeroed out. | None. Zeroed out. | None. Zeroed out. |
| Costs allocated to holding company | Yes. Cost allocated to holding company with no further re-allocation.<br><br>The only costs directly allocated to corporate are M&A costs.<br><br>The only allocation method that results in costs allocated to corporate is the 3 factor MMF. | Yes. Cost allocated to holding company with no further re-allocation.<br><br>The types of costs that are charged directly to corp. are director fees, parent company litigation, research projects, parent merger and acquisition costs.<br><br>CEO costs are allocated. | Yes. Cost allocated to holding company with no further re-allocation. |
| SSO capitalization | 100% equity. No LTD.<br>Short-term debt thru inter-company money pool. | 100% equity. No LTD. | 100% equity. No LTD.<br>Short-term debt thru inter-company money pool. |
| SSO assets | No return on assets.<br>Placed in business units as much as possible.<br>Utilities do charge return on assets when billing other affiliates. | No return on assets.<br>Placed in business units as much as possible.<br>Utilities do charge return on assets when billing other affiliates. | No return on assets, but limited amount of assets.<br>Placed in business units as much as possible.<br>Utilities do charge return on assets when billing other affiliates. |
| SSO interest | Interest allocated like any other shared-services cost.<br>Interest on debt at parent company is not allocated. | Interest allocated like any other shared-services cost. | Interest allocated as a overhead cost. |
| Pension costs | GAAP expense allocated. Assets and liabilities on SSO balance sheet. | GAAP expense allocated. Assets and liabilities on SSO balance sheet. | GAAP expense allocated. Assets and liabilities on corporate balance sheet. |
| Intra-SSO cost allocation | Costs are cross-charged within the shared services company before being charged out by the receiving function. | Costs are cross-charged within the shared services company before being charged out by the receiving function. | Costs are not cross-charged within shared services. Allocated as part of originating department's costs. CGE costs applicable to SSO are charged to SSO then re-allocated. |
| Taxes | Tax expense due to permanent items and valuation adjustments. Corporate tax benefits paid down and added to paid-in-capital. | Tax expense due to permanent items and valuation adjustments. | Tax expense due to permanent items and valuation adjustments. |
| Costs from utility | Rent from ComEd to shared services.<br><br>Utilities cross-charge for EDSS services and systems. They include a charge for ROA. | Rent from business units.<br><br>Utilities cross-charge for customer service and other. They include a charge for ROA. | Misc. projects, shared Oncor employees<br><br>Market rates for Energy Plaza rent, parking<br><br>All else at cost<br><br>Oncor has its own shared services - most costs are for TXU Generation, but sends about $4 million annually to EFH shared services |
| Budget process | Extensive formal processes to ensure business unit input and review of SSO budgets and costs | Currently implementing a new process to enhance decision-making and ensure that duplicate costs are eliminated. | Informal processes to ensure business unit input and review of SSO budgets and costs. |

EFH04404897

**Exhibit 3**
**EFH Interview Participants**

| Interviewees | Department |
|---|---|
| Gary Clinton | Director Corporate Accounting |
| Trevor Dahlen | Shared Services Accounting |
| Stan Szlauderbach | SVP & Controller |
| Joe Ho | VP Planning & Performance Management |
| Stephen Ragland | Director of Regulatory Financial (Oncor) |
| Drew Cameron | VP Audit & Risk |
| Riz Chand | EVP Human Resources and Administration |
| Bob Keith | EFH Properties |
| Bill Wysoski | EFH Properties |

EFH04404898

**Exhibit 4**
**EFH Corporate SG&A and Other Deductions**
**2008**

($ in million)                    Necessity and Benefits Test

| | 2008 | Necessity | Benefit | Comments |
|---|---|---|---|---|
| | | (see codes below) | | |
| Office of CEO | $4,305 | 1,4 | 1,4 | Allocate, but consider regulatory risk |
| Consulting & Other Outside Services | | | | |
| Deloitte Costs - tax consulting Oncor | 363 | 1 | 5 | 100% Oncor |
| Deloitte Costs - tax consulting | 249 | 3 | 5 | Allocate to affiliates benefitting from service |
| Boston Consulting Group | 467 | 1 | 4 | General allocation |
| Korn Ferry International | 194 | 5 | 2 | Allocate to affiliates benefitting from service |
| Other | 194 | ? | ? | ? |
| Board of Directors Expenses/Meetings | 787 | 1 | 1,4 | Allocate to all affiliates except Oncor as they have separate board. |
| Board of Directors Expense-VC | 1,759 | 1 | 1,5 | Allocate to all affiliates except Oncor as they have separate board. |
| Board of Directors-Valuation of Options | 230 | 1 | 1,6 | Allocate to all affiliates except Oncor as they have separate board. |
| Bank/Financing Fees | | | | |
| Moody's | 100 | 4 | 3 | Allocate to affiliates benefitting from service |
| Credit Facility Fees | 134 | 1 | 5 | General allocation to all affiliates except Oncor as they don't benefit because of ring-fencing |
| Other | 48 | ? | ? | ? |
| Legal & Court Costs | | | | |
| Legal - Directors and Officers Insurance | 1,863 | | | Allocate consistent with directors and officers |
| Legal - Executive Compensation | 349 | | | Allocate in same manner as executives |
| Derivative Litigation | 353 | | | |
| Legal - Credit Facility | 104 | | | General allocation to all affiliates except Oncor as they don't benefit because of ring-fencing |
| Legal - Other | 2,447 | | | Allocate unless M&A related |
| Auditing (D&T) | 1,063 | 2 | 1 | Allocate |
| Insurance | 1,849 | 1 | 1 | Allocate, directors portion consistent with director cost allocation |
| Service company charges | 20,209 | Various | | See comments related to EFH Service Company allocation methods. |
| Management advisory fees | 36,121 | 1 | None | Do not allocate unless benefits can be supported |
| Transition costs | 7,532 | 1 | None | Do not allocate transaction costs, allocate transition expenses |
| Project Phoenix | 25 | | | Allocate |
| Sponsor expenses | 1,291 | 1 | None | Do not allocate unless benefits can be supported |
| CJW expense | 314 | 1,3 | 1 | Allocate |
| CEO/VC non-cash comp | 4,469 | 1 | 1,4 | Allocate in a similar manner as CEO costs |
| Oncor pension offset | 3,501 | | | 100% Oncor |
| Board of directors compensation | 14,595 | 1 | 1 | Allocate to all affiliates except Oncor as they have separate board. |
| All other | 106 | | | Allocate |
| Total corporate SG&A | 105,020 | | | |
| Franchise and revenue based taxes | (294) | | | Allocate |
| Other income | 16 | | | Allocate |
| "Make Whole" payment | 8,349 | 3 | 1 | Allocate to Oncor |
| Trailing "merger-related" costs | 6,173 | 1 | None | Do not allocate transaction costs, allocate transition expenses |
| Project "Phoenix" expenses | | | | |
| Consulting Costs - HR transition | 2,970 | 5 | 5 | Likely one-time costs. Consider allocating to affiliates that will benefit |
| Internal Personnel Costs | 1,360 | 5 | 5 | Likely one-time costs. Consider allocating to affiliates that will benefit |
| Consulting Costs - IT transition | 134 | 5 | 5 | Likely one-time costs. Consider allocating to affiliates that will benefit |
| Litigation accrual | 3,000 | 3 | 4 | Allocate to applicable entities. |
| Other misc. items | 278 | Various | Various | Allocate |
| Total other deductions | 22,264 | | | |
| Total corporate expenses | 127,006 | | | |

Necessity attributes:
1. Corporate governance
2. Regulatory mandate
3. Legal compliance
4. Management control
5. Operational execution
6. Strategic planning

Benefit attributes:
1. Reduce risk
2. Increase employee productivity
3. Provide management information
4. Enhance corporate performance
5. Reduce or avoid risk
6. Increase reliability

Confidential

**Exhibit 5**
**EFH Corporate Services Costs - 2008**

|  | Total | Charged to Corporate | % |
|---|---|---|---|
| Office of CFO | $1,796,691 | $317,112 | 17.6% |
| General Counsel | 9,260,002 | 4,197,226 | 45.3% |
| Internal Legal | 1,173,618 | 311,126 | 26.5% |
| OBM | 21,621,672 | 2,376,684 | 11.0% |
| Internal audit | 5,251,782 | 56,194 | 1.1% |
| Energy and land development | 2,729,449 | 10,680 | 0.4% |
| Administrative services | 5,591,728 | 393,604 | 7.0% |
| Corporate controller | 7,230,464 | 630,364 | 8.7% |
| Finance | 5,969,212 | 2,387,684 | 40.0% |
| Investor relations | 343,744 | 151,103 | 44.0% |
| Corporate secretary | 3,054,533 | 1,648,193 | 54.0% |
| Corporate tax | 20,608,132 | 7,448,110 | 36.1% |
| Human resources | 10,285,192 | 19,224 | 0.2% |
| Corporate plannning | 2,758,472 | 476,648 | 17.3% |
| Performance improvement | 831,917 | 207,979 | 25.0% |
| Enterprise risk management | 2,443,934 | 0 | 0.0% |
| Public affairs | 11,558,313 | 0 | 0.0% |
| Chief information officer | 1,539,728 | 0 | 0.0% |
| Corporate strategy | 2,556,156 | 0 | 0.0% |
| All other, net | 70,749 | (14,829) | -21.0% |
| Total | $116,675,488 | 20,617,102 | 17.7% |

| Charges to other affiliates: |  |  |  |
|---|---|---|---|
| Luminant Generation Co. |  | $33,298,960 | 28.5% |
| Oncor Electric Delivery |  | 23,538,440 | 20.2% |
| TXU Energy Retail Services |  | 14,532,216 | 12.5% |
| Luminant Energy Company |  | 12,188,452 | 10.4% |
| Luminant Construction Services |  | 5,502,287 | 4.7% |
| EFH Properties Company |  | 3,457,171 | 3.0% |
| Generation Development Co. |  | 3,113,444 | 2.7% |
| All other |  | 427,416 | 0.4% |
|  |  | $116,675,488 | 100.0% |

Confidential

Exhibit 6
Service Billings to Holding Company

| Holding Company | Direct Costs Charged | Indirect Costs Charged | Compensation for Capital Charged | Total Amount Billed by Service Company to Holding Co. | Percentage of Total Amount Billed to Holding Co. | Gross Costs Charged | Indirect Costs Charged | Compensation for Capital | Total Amount Billed to Holding Co. | Total Amount Billed by Service Co. | Percentage of Total Amount Billed to Holding Co. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2007 | | | | | 2008 | | | |
| American Electric Power Company, Inc. | $7,208,879 | $807,072 | $19,067 | $8,035,018 | 0.71% | $3,821,563 | $5,993,899 | $154,341 | $7,869,833 | $1,239,592,895 | 0.64% |
| Allegheny Energy, Inc. | $3,927,327 | $485,355 | $0 | $3,515,682 | 0.64% | $3,420,048 | $5,427,450 | $0 | $3,857,498 | $578,538,033 | 0.67% |
| Alliant Energy Corporation | $2,110,072 | $444,219 | $0 | $2,554,291 | 0.78% | $1,419,873 | $416,017 | $0 | $1,835,680 | $321,233,601 | 0.57% |
| Ameren Corporation | $1,111,050 | $1,484,923 | $0 | $12,375,973 | 2.82% | $12,389,373 | $1,706,239 | $0 | $14,186,012 | $485,882,142 | 2.92% |
| Black Hills Corporation | $8,905,564 | $458,158 | $0 | $10,383,722 | 18.70% | | | | | | |
| Dominion Resources, Inc. | $41,362,968 | $11,473,132 | $108,871 | $52,727,229 | 8.97% | $15,592,096 | $3,278,960 | $49,810 | $18,821,255 | $783,023,533 | 2.40% |
| Duke Energy Corporation | $789,819 | $0 | $0 | $789,819 | 0.13% | | | | | | |
| Entergy East Corporation | $13,135,850 | $3,639,210 | $3,111,404 | $19,886,564 | 14.42% | $18,115,518 | $2,809,413 | $4,066,428 | $23,991,360 | $146,133,880 | 16.90% |
| Entergy Corporation | $23,232,794 | $2,511,263 | $0 | $25,744,057 | 1.31% | $118,486,003 | $5,138,290 | $0 | $123,636,293 | $2,003,862,726 | 6.17% |
| Exelon Corporation | $736,209 | $20,973,449 | $268,008 | $50,977,926 | 4.14% | $3,413,083 | $27,847,883 | $24,822 | $31,085,774 | $605,125,011 | 4.47% |
| FirstEnergy Corp. | $119,171,369 | $36,468,972 | $0 | $27,640,331 | 4.86% | $13,374,300 | $7,309,707 | $0 | $23,184,007 | $547,852,843 | 4.23% |
| Great Plains Energy, Inc. | $2,318,445 | $4,336,558 | $0 | $6,655,003 | 29.80% | $2,775,304 | $2,963,375 | $0 | $5,638,679 | $547,851,798 | 20.99% |
| Integrys | | | | | | $34,861,515 | $431,453 | $18,199 | $35,339,167 | $429,320,697 | 8.25% |
| National Grid USA | $8,593,268 | -$4,006 | -$121,788 | $8,472,563 | 1.68% | | | | | | |
| Northeast Utilities | $2,434,080 | $104,840 | $25,898 | $2,564,921 | 0.70% | $2,351,086 | $122,457 | $17,895 | $2,491,436 | $390,080,858 | 0.63% |
| NiSource Inc. | $7,337,520 | $5,374,075 | $322,676 | $9,734,271 | 2.50% | $5,635,502 | $1,273,176 | $18,413 | $6,927,091 | $372,307,728 | 1.86% |
| Pepco Holdings, Inc. | $151,273 | $2,013,977 | $0 | $2,785,250 | 10.20% | $219,543 | $3,138,782 | $86,698 | $3,271,647 | $455,026,142 | 0.71% |
| PNM Resources, Inc. | $15,137,814 | $4,471 | $0 | $15,142,285 | 1.98% | | | | | | |
| Progress Energy, Inc. | $3,154,331 | $3,399,664 | $0 | $6,553,780 | 1.98% | $2,783,794 | $1,158,694 | $0 | $3,542,488 | $360,809,435 | 1.09% |
| SCANA Corporation | $222,366 | $357,240 | $0 | $579,606 | 0.20% | $1,229,240 | $358,302 | $0 | $1,587,760 | $366,995,405 | 0.43% |
| Southern Company | $57,732,328 | $8,828,902 | $128,940 | $66,688,480 | 3.85% | $55,379,454 | $4,361,075 | $127,013 | $63,868,442 | $1,864,507,705 | 3.25% |
| Unitil Corporation | $8,781 | $8,815 | $0 | $17,596 | 0.03% | $1,359,336 | $782,805 | $0 | $2,142,141 | $25,232,369 | 8.49% |
| Xcel Energy Inc. | $615,595 | $6,782,226 | $86 | $7,397,907 | 1.07% | $840,034 | $7,771,365 | $14,160 | $8,726,459 | $711,285,451 | 1.23% |
| Energy Future Holdings | | | | $29,567,122 | 18.91% | | | | $20,617,102 | $116,573,488 | 17.67% |
| **Mean** | | | | | 4.79% | | | | | | 4.48% |
| **Median** | | | | | 1.08% | | | | | | 2.40% |

EFH04404901

Exhibit 7

Allocation of General and Administrative Expenses to Holding Company

| Holding Company | Total Service Company General and Administrative | Total Company Finance Maintenance & Maintenance | Total Company Revenue (2007) | Service Company as a % of Total Company Other O&M Expense | Service Company as % of Total Company Revenue | Total Service Company General and Administrative | Total Company Other Operating & Maintenance Expense | Total Company Revenue (2008) | Service Company as a % of Total Company Other O&M Expense | Service Company as a % of Total Company Revenue |
|---|---|---|---|---|---|---|---|---|---|---|
| American Electric Power Company, Inc. | $237,444,984 | $3,857,000,000 | $13,380,000,000 | 6.14% | 1.77% | $816,828,498 | $3,225,000,000 | $14,440,000,000 | 20.61% | 5.66% |
| Allegheny Energy, Inc. | $524,873,538 | $667,050,000 | $3,307,020,000 | 78.40% | 15.87% | $548,995,107 | $674,914,000 | $3,385,916,000 | 81.34% | 18.21% |
| Alliant Energy Corporation | $290,725,475 | $896,100,000 | $3,437,900,000 | 31.25% | 8.72% | $391,944,753 | $1,200,000,000 | $3,881,700,000 | 24.35% | 7.93% |
| Ameren Corporation | $347,475,377 | $1,687,000,000 | $7,562,000,000 | 20.85% | 4.60% | $452,385,252 | $1,687,000,000 | $7,839,000,000 | 24.38% | 5.77% |
| Black Hills Corporation | $75,210,920 | $180,082,000 | $574,838,000 | 41.76% | 13.08% | | | | | |
| Dominion Resources, Inc. | $602,419,433 | $4,125,000,000 | $14,818,000,000 | 14.79% | 4.67% | $625,140,993 | $3,257,000,000 | $16,290,000,000 | 19.19% | 3.84% |
| Duke Energy Corporation | $307,021,969 | $3,324,000,000 | $12,720,000,000 | 9.24% | 2.41% | | | | | |
| Entergy East Corporation | $125,354,564 | $1,018,814,000 | $5,178,198,000 | 12.31% | 2.42% | | | | | |
| Entergy Corporation | $989,818,911 | $2,048,854,000 | $11,484,388,000 | 28.40% | 6.10% | $1,545,705,983 | $2,742,762,000 | $10,093,756,000 | 58.30% | 11.80% |
| Exelon Corporation | $880,441,935 | $4,289,000,000 | $18,916,000,000 | 15.86% | 3.60% | $825,350,118 | $4,566,000,000 | $18,838,000,000 | 13.78% | 3.34% |
| FirstEnergy Corp. | $519,504,125 | $3,086,000,000 | $12,802,000,000 | 16.83% | 4.06% | $496,388,791 | $3,042,000,000 | $13,627,000,000 | 16.34% | 3.65% |
| Great Plains Energy, Inc. | $22,395,681 | $397,500,000 | $1,282,700,000 | 5.78% | 1.73% | $25,050,118 | $499,700,000 | $1,670,100,000 | 5.19% | 1.55% |
| Integrys | $223,717,155 | $1,172,874,008 | $5,822,226,000 | 19.07% | 3.84% | $278,819,668 | $1,091,250,000 | $14,407,600,000 | 25.77% | 1.82% |
| Northeast Utilities | $325,543,534 | $1,433,400,000 | $7,960,800,000 | 22.97% | 4.18% | $358,989,354 | $1,275,742,000 | $5,500,085,000 | 28.14% | 6.19% |
| NiSource Inc. | $362,180,421 | $1,485,000,000 | $9,396,400,000 | 28.65% | 4.08% | $349,994,488 | $1,454,000,000 | $8,874,200,000 | 24.04% | 3.94% |
| Pepco Holdings, Inc. | $135,600,093 | $473,845,006 | $1,914,029,000 | 28.65% | 7.08% | $404,119,716 | $1,525,000,000 | $10,700,000,000 | 24.72% | 3.78% |
| PNM Resources, Inc. | $337,000,030 | $1,872,000,000 | $3,153,000,000 | 18.00% | 3.60% | | | | | |
| Progress Energy, Inc. | $185,861,624 | $648,000,000 | $4,821,000,000 | 28.68% | 4.02% | $280,119,271 | $1,817,000,000 | $9,167,000,000 | 15.42% | 3.05% |
| SCANA Corporation | $1,241,825,500 | $3,670,000,000 | $16,333,000,000 | 33.83% | 8.99% | $250,937,118 | $675,000,000 | $5,318,000,000 | 38.51% | 4.80% |
| Southern Company | $20,476,052 | $28,800,000 | $302,300,000 | 68.71% | 7.79% | $1,557,520,448 | $3,748,000,000 | $17,127,000,000 | 41.57% | 9.10% |
| Unitil Corporation | $655,481,668 | $1,860,857,000 | $10,034,170,000 | 34.67% | 6.53% | $323,479,079 | $34,300,000 | $298,200,000 | 77.49% | 8.15% |
| Xcel Energy, Inc. | $150,332,975 | $2,320,000,000 | $7,902,000,000 | 6.74% | 1.86% | $536,155,276 | $1,865,646,000 | $11,203,158,000 | 28.29% | 4.79% |
| Energy Future Holdings Corp. | | | | | | $116,675,436 | $2,460,000,000 | $11,384,000,000 | 4.74% | 1.03% |
| **Mean** | | | | 26.67% | 5.82% | | | | 31.42% | 5.86% |
| **Median** | | | | 22.97% | 4.18% | | | | 24.54% | 4.64% |

Confidential

EFH04404902

Confidential

2009 Project Description Methodology

| Project Id | Project Title | Service Provider Dept Id | Service Provider Description | Project Description | Project Billing Methodology | Methodology Reasonableness | Horani Comment |
|---|---|---|---|---|---|---|---|
| 10015000 | Risk Management | 600150 | Risk Management | GENERAL TEXT | Direct Billed 100% to TXUET. | Direct Billed 100% TXUET. Direct charging is a reasonable method for billing costs that are specifically identifiable to a particular affiliate. | Reasonable. |
| 10015200 | Credit Risk | 600150 | Risk Management | Includes costs associated with responsibility for counterparty credit risk assessment for Wholesale, Structured Deals, Generation, and other EFH Business Services transactions, including construction services and real estate development. The group also determines credit limits (both dollar amounts and tenor), defines the credit risk policy and reports on credit and liquidity risk through various daily and monthly reports. | Assigned to affiliates based on staff assignments. | Assigned to affiliate businesses based on staff assignments per client. Labor is the primary cost-causative cost driver for Credit Risk. Assignment of costs of Credit Risk on the basis of staff assignments per client is a reasonable approach for assigning costs to affiliates. | Reasonable |
| 10022000 | Internal Legal | 600500 | General Counsel_EVP | | Billed to affiliates based on time tracking. | Costs are assigned to affiliates based on time spent. It is reasonable to bill the internal legal department's costs based on time spent to the affiliates because a significant cost driver is labor and the resulting labor efforts expended. | Reasonable method. Review projects to ensure corporate projects have no benefit to affiliates. For example, if the legal work is related to merger, then amounts should be charged to Corporate. If the legal matter is an EFH matter which is necessary to the entity as whole, then amounts should be allocated to all affiliates. |
| 10022100 | Internal Legal – EFH Corporate | 600500 | General Counsel_EVP | This project captures internal legal expenses that can be attributed to a specific affiliate. | Direct Billed 100% to TXU. | Direct Billed 100% TXU. Direct charging is a reasonable method for billing costs that are specifically identifiable to a particular affiliate. | Reasonable |
| 10022200 | Internal Legal - Discontinued Operations | 600500 | General Counsel_EVP | This project captures internal legal expenses that can be attributed to a specific affiliate. | Direct Billed 100% to ENS. | Direct Billed 100% ENS. Direct charging is a reasonable method for billing costs that are specifically identifiable to a particular affiliate. | Reasonable |
| 10022300 | Internal Legal - Power | 600500 | General Counsel_EVP | This project captures internal legal expenses that can be attributed to a specific affiliate. | Direct Billed 100% to GEN. | Direct Billed 100% GEN. Direct charging is a reasonable method for billing costs that are specifically identifiable to a particular affiliate. | Reasonable |
| 10022400 | Internal Legal - ONCOR | 600500 | General Counsel_EVP | This project captures internal legal expenses that can be attributed to a specific affiliate. | Direct Billed 100% to ESD. | Direct Billed 100% ESD. Direct charging is a reasonable method for billing costs that are specifically identifiable to a particular affiliate. | Reasonable |
| 10022500 | Internal Legal - TXU Energy | 600500 | General Counsel_EVP | This project captures internal legal expenses that can be attributed to a specific affiliate. | Direct Billed 100% to ELREP. | Direct Billed 100% ELREP. Direct charging is a reasonable method for billing costs that are specifically identifiable to a particular affiliate. | Reasonable |
| 10110000 | Governmental Advocacy | 600200 | Public Affairs | Include costs associated with the Dallas and Austin offices that provide leadership to all EFH companies on public policy issues. | Assigned to affiliates based on number of bills at Texas Legislature (80th session by Analyst and Company) | Assigned to affiliate businesses based on bill count at Texas Legislature per client. Bill count is the primary cost-causative cost driver for Governmental Advocacy. Assignment of costs of Governmental Advocacy on the basis of bill count at Texas Legislature per client is a reasonable approach for assigning costs to affiliates. | Consider specific analysis. (Is the number of bills before the Texas legislature a cost causative method?) |
| 10120000 | Corporate Communications | 600200 | Public Affairs | Includes costs associated with the EFH internal and external corporate communications, including website development and content. | Assigned to affiliates based on number of bills at Texas Legislature (80th session by Analyst and Company) | Assigned to affiliate businesses based on bill count at Texas Legislature per client. Bill count is the primary cost-causative cost driver for Corporate Communications. Assignment of costs of Corporate Communications on the basis of bill count at Texas Legislature per client is a reasonable approach for assigning costs to affiliates. | Consider general allocator. These costs don't seem to relate to allocation method selected. |
| 10130000 | Federal Policy | 600200 | Public Affairs | Include costs associated with the Washington, D.C. office that serves all EFH companies and provide corporate interface with Congressional offices and federal agencies. | Assigned to affiliates based on number of bills at Texas Legislature (80th session by Analyst and Company) | Assigned to affiliate businesses based on bill count at Texas Legislature per client. Bill count is the primary cost-causative cost driver for Federal Policy. Assignment of costs of Federal Policy on the basis of bill count at Texas Legislature per client is a reasonable approach for assigning costs to affiliates. | Consider general allocator. These costs don't seem to relate to allocation method selected. |
| 10140000 | Real Resources | 600200 | Public Affairs | Include costs associated with properties managed by Governmental Advocacy for EFH company offsite meetings and special events. | Assigned to affiliates based on number of bills at Texas Legislature (80th session by Analyst and Company) | Assigned to affiliate businesses based on bill count at Texas Legislature per client. Bill count is the primary cost-causative cost driver for Real Resources. Assignment of costs of Real Resources on the basis of bill count at Texas Legislature per client is a reasonable approach for assigning costs to affiliates. | Links closely with 10110000. Consider specific analysis. (Is the number of bills a cost causative method?) |
| 10150000 | Corporate Requests | 600200 | Public Affairs | Include consulting and other outside service costs associated with Public Policy work requested specifically from EFH executives (unplanned) | Assigned to affiliates based on number of bills at Texas Legislature (80th session by Analyst and Company) | Assigned to affiliate businesses based on bill count at Texas Legislature per client. Bill count is the primary cost-causative cost driver for Corporate Requests. Assignment of costs of Corporate Requests on the basis of bill count at Texas Legislature per client is a reasonable approach for assigning costs to affiliates. | Consider general allocator. |
| 10160000 | Marketing Sponsorship Support | 600200 | Public Affairs | Include consulting and other outside service costs associated with Marketing Sponsorship Support work requested specifically from EFH executives (unplanned). | Assigned to affiliates based on number of bills at Texas Legislature (80th session by Analyst and Company) | Assigned to affiliate businesses based on bill count at Texas Legislature per client. Bill count is the primary cost-causative cost driver for Marketing Sponsorship Support. Assignment of costs of Marketing Sponsorship Suppor on the basis of bill count at Texas Legislature per client is a reasonable approach for assigning costs to affiliates. | Consider general allocator. These costs don't seem to relate to allocation method selected. |
| 10170000 | Advertising | 600200 | Public Affairs | Include consulting and other outside service costs associated with Advertising work requested specifically from EFH executives. (unplanned) | Assigned to affiliates based on number of bills at Texas Legislature (80th session by Analyst and Company) | Assigned to affiliate businesses based on bill count at Texas Legislature per client. Bill count is the primary cost-causative cost driver for Advertising. Assignment of costs of Advertising on the basis of bill count at Texas Legislature per client is a reasonable approach for assigning costs to affiliates. | Consider general allocator. These costs don't seem to relate to allocation method selected. |
| 11600000 | Leasehold Improvements TXU | 622100 | Administrative Services - Admin | Related costs associated with improvements to Energy Plaza. | Direct billed 100% to TXU. | Direct Billed 100% TXU. Direct charging is a reasonable method for billing costs that are specifically identifiable to a particular affiliate. | Reasonable |
| 11830000 | Leasehold Improvements-EP 6 | 622100 | Administrative Services - Admin | Related costs associated with improvements to Energy Plaza. | Direct billed 100% to ENS. | Direct Billed 100% ENS. Direct charging is a reasonable method for billing costs that are specifically identifiable to a particular affiliate. | Reasonable |

EFH04404903

2009 Project Description Methodology

Confidential

| Project Id | Project Title | Service Provider Dept Id | Service Provider Description | Project Description | Project Billing Methodology | Methodology Reasonableness | Huron Comment |
|---|---|---|---|---|---|---|---|
| 19000000 | Real Estate & Facilities Adm | 622100 | Administrative Servcs - Admin | Management of the Administrative Services, Corp Real Est Srvs and Corporate Services functions. Activities include cost associated with maintaining the Corporate offices and the officer service functions | Based on the square footage occupied at Energy Plaza and Bank One Center. | Assignment of costs based on the square footage occupied at Energy Plaza and Bank One. Assignment of costs based on square footage is a reasonable method for assigning the costs to affiliates. | Reasonable Allocation Method. Consider removing vacant space from calculation and also consider including Service Company occupied space in calculation. This would create additional costs in service company which would need to be billed back out. |
| 18300000 | Facilities Management | 622100 | Administrative Servcs - Admin | Services include: Copy Paper Storage and Delivery, Mail & Courier Services, Operation of Energy Plaza Conference Center, PBX Operations, Light Office Moves, BRG Rent Roll Maintenance, Carpet Maintenance, Paint and Patch, and Energy Plaza Tenant Space Maintenance | Project billed based on the square footage occupied at Energy Plaza. | Facilities Management services are provided to the tenants of Energy Plaza. Assignment of costs based on the square footage occupied at Energy Plaza is a reasonable method for assigning the costs to affiliates. | Reasonable Allocation Method. Consider removing vacant space from calculation and also consider including Service Company occupied space in calculation. This would create additional costs in service company which would need to be billed back out. |
| 19312000 | Energy Plaza Conference Center | 622100 | Administrative Servcs - Admin | Provide facilities management services for the Energy Plaza conference center, located on the 2nd floor EP. Services include but are not limited to room scheduling and set up; beverages, audio visual equipment, video conferencing equipment, white boards, markers, flipcharts, copier, fax and shredder. All rooms are internet ready. | Based on the square footage occupied at Energy Plaza. | Facilities Management services are provided to the tenants of Energy Plaza. Assignment of costs based on the square footage occupied at Energy Plaza is a reasonable method for assigning the costs to affiliates. | Reasonable Allocation Method. Consider removing vacant space from calculation and also consider including Service Company occupied space in calculation. This would create additional costs in service company which would need to be billed back out. |
| 19316100 | Parking Facilities | 622100 | Administrative Servcs - Admin | Captures the parking revenues and expenses associated with the Parking Facilities. | Based on parking revenues recorded. | Based on the recorded parking revenue. Parking revenue is the cost driver of the Parking Facilities and is a reasonable approach for assigning cost to affiliates. | Reasonable |
| 19317000 | Building Services - PBX | 622100 | Administrative Servcs - Admin | Captures the expenses associated with the operation of the PBX handles calls at Energy Plaza and Lincoln Plaza. | Project billed based on the square footage occupied at Energy Plaza and Lincoln Plaza. | PBX services are provided to the tenants of Energy Plaza and Lincoln Plaza. Assignment of costs based on the square footage occupied at Energy Plaza and Lincoln Plaza is a reasonable method for assigning the costs to affiliates. | Reasonable Allocation Method. Consider removing vacant space from calculation and also consider including Service Company occupied space in calculation. This would create additional costs in service company which would need to be billed back out. |
| 19322000 | Mail Services | 622100 | Administrative Servcs - Admin | Mail Services for Energy Plaza. Services include sorting and distributing USPS mail, and courier deliveries. | Project billed based on the square footage occupied at Energy Plaza. | Mail services are provided to the tenants of Energy Plaza. Assignment of costs based on the square footage occupied at Energy Plaza is a reasonable method for assigning the costs to affiliates. | Reasonable Allocation Method. Consider removing vacant space from calculation and also consider including Service Company occupied space in calculation. This would create additional costs in service company which would need to be billed back out. |
| 19322500 | Mail Receiving Facility | 622100 | Administrative Servcs - Admin | Mail Receiving Center provides x-ray and bomb detection services for all USPS and accountable mail and packages addressed to the Downtown Dallas facilities (EP, BOC & LP). Expenses incurred for the mail services facility including contractor labor, janitorial services, utilities, delivery services to all locations and lease payments. | Based on the square footage occupied at Energy Plaza, Bank One and Lincoln Center. | Based on the square footage occupied at Energy Plaza, Bank One and Lincoln Plaza. Number of square feet occupied is the primary cost driver and provides a reasonable method for assigning the cost of the mail receiving facility | Reasonable Allocation Method. Consider removing vacant space from calculation and also consider including Service Company occupied space in calculation. This would create additional costs in service company which would need to be billed back out. |
| 19400000 | Print Services | 622100 | Administrative Servcs - Admin | Print Services includes all off-set printed items such as brochures, posters, manuals, company stationery items and other miscellaneous printing | Cost per individual print job. | The cost of individual print jobs is the primary cost driver and provides a reasonable method for assigning the cost of Print Services to affiliate companies | Reasonable |
| 19420000 | Printing Services - Forms Mgmt | 622100 | Administrative Servcs - Admin | Off-set printed items considered to be a Form such as Departmental Forms, Company Contracts, Bank Drafts, Checks, Door Hangers, Equipment tags, etc. Services also include form design consultation from idea to production with a partnership with a vendor that prints, stores and distributes stock forms. | Cost per individual standardized job. | Cost per individual standardized job. The cost of individual standardized jobs is the primary cost driver and provides a reasonable method for assigning the cost of Print Services - Forms Management services to affiliate companies. | Reasonable |
| 19430000 | Printing Services - Copier Ser | 622100 | Administrative Servcs - Admin | The administration of copier/fax equipment and lease agreements has been centralized for inventory management and control. Other services are office equipment rentals and short-term copier/fax leasing; entering, upgrading and equipment consultation; and copier/fax equipment project management. | The assignment of the cost of the Copier Services is based on the number of copiers and faxes per affiliate. | The assignment of the cost of the Copier Services is based on the number of copiers and faxes per affiliate. The number of copiers and faxes is the primary cost drivers for Printing Services - Copier Service and is a reasonable billing method. | Reasonable |
| 19440000 | EP Copy Center | 622100 | Administrative Servcs - Admin | EP Copy Center services include but not limited to B/W Copies, Color Copies, brochures, manuals, labels and other miscellaneous printing and bindery services. | Cost per individual copy. | Cost per individual copy. The cost per copy is the primary cost driver and provides a reasonable method for assigning the cost of EP Copy Center to affiliate companies | Reasonable |
| 19500000 | Aviation Services-Fixed Cost | 622240 | Aviation Support | Activity include remaining shutdown costs associated with the sale of the airplanes | Direct Billed 100% to TXU. | Direct Billed 100% TXU. Direct charging is a reasonable method for billing costs that are specifically identifiable to a particular affiliate. | Reasonable |
| 19720000 | Corp Document Srvs-Offsite Rec | 622100 | Administrative Servcs - Admin | Storage and disposition services to provide access to legal documents. Retention of these documents is in accordance with guidelines set by various federal and state agencies including Security & Exchange Commission, Federal Energy Regulatory Commission, Internal Revenue Service, Public Utility Commission, Railroad Commission and the Environmental Protection Agency. | Based on the number of boxes stored. | Based on the number of boxes stored. The number of boxes stored is the primary cost driver and provides a reasonable method of assigning the cost of Corporate Document Services - Offsite Record Storage to affiliate companies. | Reasonable |
| 19810000 | Corp Real Est Srvs-Comm Re Ser | 622100 | Administrative Servcs - Admin | Provide property management services, property lease administration and acquisition & disposal of commercial real estate. | Based on affiliated work performed | Based on the time spent on affiliate properties acquired and/or disposed and the number of leases administered. Time spent is a reasonable approach to assigning costs to affiliates | Reasonable |
| 19820000 | Corp Real Est Srvs-Design & Co | 622100 | Administrative Servcs - Admin | Services include architectural, engineering, space planning and design, underground storage tank design/maintenance, and construction management services for projects. Also, services include small remodeling projects, repairs to HVAC & electrical system, modular furniture installation and periodic maintenance & repairs of building systems. | Number of hours work performed. | Time spent is the primary cost driver for Corporate Real Estate Services - Design & Construction services. Time spent provides a reasonable method for assigning the cost of Corporate Real Estate Services - Design & Construction services to affiliate companies. | Reasonable |

EFH04404904

Exhibit B
2009 Project Description Methodology

| Project ID | Project Title | Service Provider Title | Service Provider (Cost Ctr) | Service Provider Description | Brief Project Description | Project's Billing Methodology | Methodology Reasonableness | Horlick Comment |
|---|---|---|---|---|---|---|---|---|
| 19850000 | Bank Ohe Facilities Management | Administrative Service - Admin | 821100 | Captures the expenses related to administrative services for the TXU tenant space at the Bank One Center. | Based on the square footage occupied at Bank One. | Based on the square footage occupied at Bank One. Number of billing months used for assigning cost is based on the primary cost driver and provides a reasonable method for assigning the cost of free mail receiving facility. | Reasonable Allocation Method. Consider removing vacant space allocation and also consider including Service Company occupied space in calculations. This would create additional space in calculation. This would need to be billed back out. |
| 22350000 | Government Relations - TXU | TXU Corporate Controller | 823210 | Activities associated with communications between TXU and state/federal regulatory and legislative bodies, including recommending positions or actions on proposed rules. | Direct billed 100% to TXU. | Direct Billed 100% TXU. Direct charging is a reasonable method for billing costs that are specifically identifiable to a particular affiliate. | Not sure how these functions differ from Government Advisory above - Please explain. |
| 42600000 | UT Mgmt & Admin | IT Administration | 814100 | UT Administrative Services | Billed to affiliates based on IT spend | The billing of IT based on the IT spend is a reasonable billing methodology for this project. | Reasonable |
| 50000000 | Admin - Finance | Finance - Admin | 824100 | Includes services associated with financing activities, including negotiation, compliance, and regulatory support; negotiating terms and conditions and executing financial transactions; maintaining and rating agency relationships; cash management; net issuing and aggregating capital through non-capital market transactions, including leasing and non-traditional bank financings and other structured financings | Assigned to affiliates based on the Affiliate pro rata share of net property, plant and equipment. | Assigned to affiliates based on the Affiliate pro rata share of net property, plant and equipment. Net property, plant and equipment is a reasonable approach for assigning costs to affiliates. | Consider general allocator. Current method allocates Onoor costs to Holding Company because of "ring fencing". If the Service Company is doing services for Onoor they should bill Onoor |
| 50200000 | Investor Relations | Investor Relations, Admin | 824230 | Include services associated with investment community of state the corporation to facilitate full valuation, responding to investment community inquiries and communicating investor and analyst outlook to management. | Assigned to affiliates based on a portion of long-term debt and direct billed 50% to TXU. | Assigned to affiliates based on a portion of long-term debt and direct billed 50% to TXU. Debt is the primary cost-causalism cost driver for Investor Relations. Assignment of costs of Investor Relations services on the basis of long-term debt and direct billing are a reasonable approach for assigning costs to affiliates. | The 50% to Holding Company seems arbitrary. Also, it looks like none of these costs is allocated to Onoor. Consider general allocator. |
| 51000000 | Corporate Strategy | Corporate Strategy | 824800 | Includes costs associated with identification and coordination of emerging issues, supporting executive management in developing goals and strategies, analyzing strategic alternatives, and reviewing business plans. | Assigned to affiliates based on a portion of property, plant & equipment and direct billing to DEVCo and TXU. | Assigned to affiliates based on a portion of property, plant & equipment and direct billing to DEVCo and TXU is the primary cost driver for Corporate Strategy. Assignment of costs of Corporate Strategy services on the basis of property, plant & equipment and direct billing are a reasonable approach for assigning costs to affiliates. | Consider general allocator. Is the property plant and equipment premise used here the same as that used in 50000000 Admin - Finance? |
| 51000004 | Shell Wind | Corporate Strategy | 824600 | Includes costs associated with work realted to a Shell Wind renewable project. | Direct Billed 100% To SHDVP | Direct Billed 100% To SHDVP. Direct charging is a reasonable method for billing costs that are specifically identifiable to a particular affiliate | Reasonable |
| 53100000 | Corporate Secretaries Services | Corp Secretary, Governance Grp | 825100 | Includes services associated with corporate secretarial and administrative services including the preparation, coordination, and follow-up for the Board of Directors meetings and corporate records management necessary to maintain compliance with all applicable state and federal laws and regulation pertaining to Corporate organization. | Direct Billed 100% To TXU | Direct Billed 100% TXU. Direct charging is a reasonable method for billing costs that are specifically identifiable to a particular affiliate. | Consider general allocator or method chosen for EFH Board of Director costs |
| 53140000 | Corporate Secretarial - Board of Directors | Corp Secretary, Governance Grp | 825100 | Expenses related to Board of Directors meetings. | Direct Billed 100% To TXU | Direct Billed 100% TXU. Direct charging is a reasonable method for billing costs that are specifically identifiable to a particular affiliate. | Consider general allocator or method chosen for EFH Board of Director costs. |
| 53800000 | Tax Services | Corp Tax Services - Admin | 825000 | Includes services associated with the administration of various tax services and issues such as state tax, federal tax, local tax, domestic tax and international tax. | Assigned to affiliates based on time required. | Assigned to affiliates based on time required. Labor is a primary cost driver for Corporate Tax Services. Assignment on the basis of time required is a reasonable approach for assigning costs to affiliates. | Assigned to affiliates based on time required. Review process to ensure corporate projects have no benefit to affiliates. |
| 53850000 | Tax Services | Corp Tax Services - Admin | 825000 | Includes services associated with the administration of various tax issues such as state tax, federal tax, local tax, domestic tax and international tax. This particular project is for expense that covers 100% to TXU Corp. | Direct Billed 100% To TXU | Direct Billed 100% TXU. Direct charging is a reasonable method for billing costs that are specifically identifiable to a particular affiliate. | Reasonable provided corporate projects have no benefit to affiliates |
| 54200000 | Claims & Legal Admin Services | General Counsel_EVP | 500500 | Includes services associated with the investigation and resolution of liability claims and lawsuits filed against affiliates. | Billed to affiliates based on time tracking. | Billed to affiliates based on time tracking. Time tracking is a reasonable method for billing costs that are specifically identifiable to a particular affiliate. | Reasonable |
| 54300000 | Corporate Security Services | Corp Secretary, Governance Grp | 825100 | Include services associated with evaluating the effectiveness of safeguards for protecting System assets from loss and investigating security-related services performed. | Billed to affiliates based on the assessment of investigation/ security-related services provided. | Billed to affiliates based on assessment of investigation/ security-related services provided. Time tracking is a reasonable method for billing costs that are specifically identifiable to a particular affiliate. | Reasonable |
| 54600000 | Compliance & Corporate Ethics | Corp Secretary, Governance Grp | 825100 | Day to day management of the Compliance Program including development and provision of Code of Conduct training, obtaining signature affirmations of compliance from TXU employees, providing courses in response to inquiries, participating in investigations, and management of company policies, and other governance activities for the Corporate Secretary. | Assigned per affiliate headcount. | Assigned per Affiliate headcount. Affiliate headcount is the primary cost-causalism cost driver for Compliance and Corporate Ethics. Assignment of Compliance and Corporate Ethics costs on the basis of affiliate headcount is a reasonable approach for assigning costs to affiliates. | Reasonable |
| 60017000 | Planning & Finance - Admin | Office of the CFO | 600170 | Services include administrative costs associated with the CFO organization | Assigned to affiliates based on composite of direct reports' belongs to affiliates. These direct reports include Finance, Internal Audit, Controller, Corp Tax, IAR, Corp Planning and Land Development & Admin Svcs. | Assigned to affiliates based on composite of direct reports' belongs to affiliates. Direct Reports' belongs is the primary cost driver for Planning & Finance Admin. Assignment of costs of Planning & Finance Admin on the basis of composite of direct reports' belongs of affiliates is a reasonable approach for assigning costs to affiliates. | Consider general allocator |
| 60018000 | CIO | Office of the CIO | 600180 | Services include administrative costs associated with supporting the information and communications technologies under the CIO | Assigned to affiliates based on the IT Cost to affiliates. | Assigned to affiliates based on the IT Cost to affiliates. The IT Cost is the primary cost driver for CIO. Assignment of costs of CIO on the basis of the cost of the IT Costs to affiliates is a reasonable approach for assigning costs to affiliates. | Reasonable |
| 60090000 | CBM (CGE JV Management) | CBM | 500800 | Oversight and management of Capgemini Energy as the service provider for the outsourced functions. Activities include contract management, financial analysis, performance tracking, relationship management, and liason with service provider. | Billed to affiliates based on the assignment of the CGE bill to TXU. | Cost are based on the CGE billings to TXU Affiliates. It is reasonable to assign the CGE partnership for TXU Business operations to the affiliates based on the CGE billings to the affiliates because it is the CGE relationship that initiated the partnership charge. | Reasonable |

Page 3 of 6

2009 Project Description Methodology

Confidential

| Project ID | Project Title | Service Provider (Dept ID) | Service Provider Description | Project Description | Project Billing Methodology | Methodology Reasonableness | Huron Comment |
|---|---|---|---|---|---|---|---|
| 60060001 | CGE JV Mgmt - Dept & Interest | 600600 | OBM | This project records TXU Business Services portion of the CGHLP earnings/loss. CGHLP owns approx 3% of CGE, TXUBS owns 21.5% of CGHLP | Billed to affiliates based on the assignment of the CGE bill to TXU. | Cost are assigned to affiliates based on the CGE billings to TXU Affiliates. It is reasonable to assign the CGE partnership for TXU Business Servcies to the affiliates based on the CGE billings to TXU affiliates because it is the CGE relationship that initiated the partnership charge. | Reasonable |
| 60300000 | Tax Accounting | 623210 | TXU Corporate Controller | Services include accounting for the consolidated federal and state income tax provision, maintaining tax ledger, reconciliation of deferred tax assets/liabilities, regulatory reporting, coordination with Corporate Tax on proper treatment of transactions, management reporting, preparation of reports to inquiries from both internal and external auditors and other reporting requirements as required. | Billed to affiliates based on embedded Controller headcount. | Billed to affiliates based on embedded Controller headcount. Embedded Controller headcount is the primary cost driver for Tax Accounting and assigning costs to affiliates based on this is a reasonable approach. | Consider general allocator or specific estimate. |
| 60310000 | Controller - Admin | 623210 | TXU Corporate Controller | Services include the administration of the Corporate Controller's organization which includes  Corporate Financial Reporting, Consolidations and General Accounting. | Billed to affiliates based on embedded Controller headcount. | Billed to affiliates based on embedded Controller headcount. Embedded Controller headcount is the primary cost driver for TXU Corporate Controller assigning costs to affiliates based on this is a reasonable approach. | Consider general allocator |
| 60590002 | Corporate Planning | 628900 | Corporate Planning | Include costs associated with the development, implementation and evaluation of business unit strategies; prepare and analyze information requirements of the business unit; analyze and report the O&M and capital action plans of the business unit. | Assigned to affiliates based on staff assignments. | Assigned to affiliate businesses based on staff assignments per client.  Labor is the primary cost-causative cost driver for Corporate Planning.  Assignment of costs of Corporate Planning on the basis of staff assignments per client is a reasonable approach for assigning costs to affiliates. | Reasonable |
| 60800000 | Energy & Land Development | 608000 | Energy and Land Development | Sr. Vice President and team participate in ongoing restructuring of TXU's facilities and identifying new opportunities within and outside of TXU.  Oversight of TXU's mineral and land holdings. | Project billed based on the square footage occupied at Energy Plaza. | Energy & Land Development Admin services are provided to the tenants of Energy Plaza. Assignment of costs based on the square footage occupied of Energy Plaza is a reasonable method for assigning the costs to affiliates. | Reasonable allocation method.  Consider removing vacant space from calculation and also consider including Service Company occupied space in calculation.  This would create additional costs in service company which would need to be billed back out. |
| 63100000 | Performance Improvement | 631000 | Performance Improvement | Includes costs associated with developing and operating a program office function for tracking the progress of the performance improvement program.  Specifically, including tracking progress towards the overall goal, tracking initiatives, and developing communications with Corporate and the broad employee base. | Assigned to affiliates based on staff assignments. | Assigned to affiliate businesses based on staff assignments per client.  Labor is the primary cost-causative cost driver for Performance Improvement.  Assignment of costs of Performance Improvement on the basis of staff assignments per client is a reasonable approach for assigning costs to affiliates. | Reasonable |
| 64000000 | Internal Audit Services | 604100 | Internal Audit_Admin | Operational reviews, internal control advice, management requests, and task force participation, Internal Audit activities are performed in order to provide executive management and the audit committee of the TXU Board of Directors assurance regarding the adequacy and effectiveness of internal controls throughout TXU. | Time spent on each project is accumulated in an electronic time keeping system. Each entity is charged a portion of IA's costs based on the number of hours spent on projects in that entity compared to all time spent on all projects. | Time spent on each project is accumulated in an electronic time keeping system. Each entity is charged a portion of IA's costs based on the number of hours spent on projects in that entity compared to all time spent on all projects. Assessment of time spent is a reasonable method to assign the cost of Internal Audit to affiliates. | Reasonable |
| 64100000 | Sarbanes Oxley Section 404 PMO | 623210 | TXU Corporate Controller | The purpose of the PMO is to provide consistent guidance to the business units on controls documentation, assessment and testing as well as guide the remediation of any control deficiencies identified in time to support management's assertions on internal controls and D&T's attestation efforts. | Billed to registrants evenly based on the reporting requirements of the Sarbanes-Oxley Act. | Billed evenly to the registrants. | Please explain "billed evenly". I reviewed the 2008 billings and don't understand how these costs were billed.  Consider general allocator |
| 71000000 | HR Admin | 626100 | Human Resources - Admin | Include administrative costs associated with the VP of Human Resources. | Assigned per affiliate headcount. | Assigned per affiliate headcount. Affiliate headcount is the primary cost-causative cost driver for Human Resources. Assignment of HR Admin costs on the basis of affiliate headcount is a reasonable approach for assigning costs to affiliates. | Reasonable |
| 71000001 | Talent Mgmt | 626100 | Human Resources - Admin | Includes costs associated with the development and management of Learning & Development, Performance Management and Organizational Effectiveness/Development across the entire EFH Corporate companies. | Assigned per affiliate headcount. | Assigned per affiliate headcount. Affiliate headcount is the primary cost-causative cost driver for Human Resources. Assignment of Talent Management costs on the basis of affiliate headcount is a reasonable approach for assigning costs to affiliates. | Reasonable |
| 71000002 | Recruiting | 626100 | Human Resources - Admin | Includes costs associated with the pre-employment process of employees joining the entire EFH Corporate companies (excluding ONCOR).  These services include:  managing the requisition and posting of positions (both internal and external), sourcing of candidates, prescreening, selection process along with the hiring manager | Assigned per affiliate headcount (excluding ONCOR). | Assigned per affiliate headcount (excluding ONCOR).  Affiliate headcount is the primary cost-causative cost driver for Human Resources.  Assignment of Recruiting costs on the basis of affiliate headcount is a reasonable approach for assigning costs to affiliates. | Reasonable provided that Oncor maintains this function separately. |
| 71000003 | Diversity | 626100 | Human Resources - Admin | Includes costs associated the EFH Corporate Worforce and Supplier Diversity activities.  These activities include participation of sponsorships and memberships, maintaining on-line directory of diversity suppliers, gold star program and compliance reporting with the PUC and Federal government. | Assigned per affiliate goods and services spend. | Assigned per affiliate goods and services spend.  Affiliate goods and services spend is the primary cost-causative cost driver for Diversity.  Assignment of Diversity costs on the basis of affiliate goods and services spend is a reasonable approach for assigning costs to affiliates. | Reasonable |
| 71230000 | Total Rewards | 626100 | Human Resources - Admin | Services related to the design and implementation of the compensation, benefit, and reward programs for TXU.  Services include the development and management of comprehensive strategy for health & welfare design and cost containment, base pay and incentive plan development (short and long-term), and the development of communication for total rewards related information for employees and retirees.  Provides oversight of the compensation, benefit, and reward transactional HR services provided by CGE/Hewitt to TXU.  Provides compensation & benefit analyses and makes recommendations related to business transactions (i.e., mergers and acquisitions).  Monitors external events to identify best practices and impacts on TXU's total rewards programs. | Assigned per affiliate headcount. | Assigned per affiliate headcount. Affiliate headcount is the primary cost-causative cost driver for Human Resources.  Assignment of Total Rewards costs on the basis of affiliate headcount is a reasonable approach for assigning costs to affiliates. | Reasonable |

EFH04404906

Exhibit B
2009 Project Description Methodology

Confidential

| Project Id | Project Title | Service Provider Id | Service Provider Description | Project Description | Project Billing Methodology | Methodology Reasonableness | Huron Comment |
|---|---|---|---|---|---|---|---|
| 71230001 | Total Rewards - Corp Projects | 626100 | Human Resources - Admin | Includes consulting and other outside service costs associated with Total Rewards activities that are requested by EFH Corporate executives (unplanned). | Assigned per affiliate headcount. | Assigned per affiliate headcount. Affiliate headcount is the primary cost-causative cost driver for Human Resources. Assignment of Total Rewards - Corp Projects costs on the basis of affiliate headcount is a reasonable approach for assigning costs to affiliates. | Reasonable |
| 71310000 | Employee Relations - Invest | 626100 | Human Resources - Admin | Includes costs associated with Employee Relations Investigation services. These services include all company "inquiries" into allegations of inappropriate behavior, including violations of the Code of Conduct, policies, or other conduct which may result in discipline | Assigned per affiliate headcount (excluding ONCOR) | Assigned per affiliate headcount (excluding ONCOR). Affiliate headcount is the primary cost-causative cost driver for Human Resources. Assignment of Employee Relations - Investigations costs on the basis of affiliate headcount is a reasonable approach for assigning costs to affiliates. | Reasonable provided that Oncor maintains this function separately. |
| 71320000 | Employee Relations - Comp | 626100 | Human Resources - Admin | Includes costs associated with Employee Relations - Compliance services. These services include the following enterprise-wide activities such as policy development/maintenance, worksite postings, unemployment claims administration and compliance reporting. | Assigned per affiliate headcount. | Assigned per affiliate headcount. Affiliate headcount is the primary cost-causative cost driver for Human Resources. Assignment of Employee Relations - Compliance costs on the basis of affiliate headcount is a reasonable approach for assigning costs to affiliates. | Reasonable |
| 99100000 | General Admin Overheads | 623210 | TXU Corporate Controller | Infrequent entries recorded by Corporate Accounting that are appropriately assigned via overhead distribution, such as split dollar life insurance adjustments. Also, includes compensation plan expense amortization for TXUBS retirees or terminated employees. | Assigned during the service bill allocation process based on total project dollars as a percentage of total service bill dollars. | It is reasonable to assign costs that are attributable to the entire service bill based on the overhead assignments, as well as any immaterial amounts that cannot be readily identifiable with a particular service provider. | Consider consistent general allocator although this sounds like a general allocation method. |
| 99400000 | Interest - Services | 624100 | Finance - Admin | Includes charges for interest incurred to the TUS affiliate not assignable to plant in service or capital projects. | Assigned during the service bill allocation process based on total project dollars as a percentage of total service bill dollars. | Interest is incurred by TUS due to the month lag between when services are rendered by the TUS Service Providers (during the entire month) and when it is recovered via the service bill process (at the end of the month). Since it is the effort of all the Service Providers that prompt the monthly expense, it is appropriate that the interest be assigned based on the project O&M as a percentage of total monthly O&M expense in TUS. | Consider consistent general allocator although this sounds like a general allocation method. |
| 99700000 | Payroll Taxes & Empl Benefits | 626100 | Human Resources - Admin | Clears the difference between the employee labor loading rates and actual expenses each month. | Assigned during the service bill allocation process based on total project labor dollars as a percentage of total service bill labor dollars. | It is reasonable to assign the difference between the labor related expenses and what was recovered via the labor loading rates based on the percentage of each project's labor dollars in proportion to total labor dollars because labor is a primary driver of the labor related expense and the generation of any difference between the loading rate and the monthly expenses incurred. | Reasonable |
| 99700001 | Pension/OPEB w/o ONCOR | 626100 | Human Resources - Admin | This project was set-up at the direction of Jerry Hunt. A new project ID will need to be set up for the pre-2005 bucket cost that does not allocate to Oncor. A pension/OPEB allocation issue was discovered relating to how we re-allocated obligations in 2005. For pre-2005 TUS retirees, ~64% of their obligation was assigned to Oncor. Thus, for these employees, Oncor has 64% of their related obligation on their books and are already recording the related expense. The remaining 36% of the obligation related to these employees is recorded in TUS, and the related expense is recorded by TUS. This expense is then allocated to all BU's, including Oncor, through the service bill. Thus, we have been in essence double-dipping Oncor. | Assigned per affiliate headcount. | Assigned per affiliate headcount. Affiliate headcount is the primary cost-causative cost driver for Human Resources. Assignment of Personnel Misc Benefits on the basis of affiliate headcount is a reasonable approach for assigning costs to affiliates. | Reasonable |
| 99700002 | Pension/OPEB w/o ONCOR | 626100 | Human Resources - Admin | This project created in July to correctly re-book the pension and OPEB adjustments from June. This project excludes Oncor from the calculated metrics allocation. A pension/OPEB allocation issue was discovered relating to how we re-allocated obligations in 2005. For pre-2005 TUS retirees, ~64% of their obligation was assigned to Oncor. Thus, for these employees, Oncor has 64% of their related obligation on their books and are already recording the related expense. The remaining 36% of the obligation related to these employees is recorded in TUS, and the related expense is recorded by TUS. This expense is then allocated to all BU's, including Oncor, through the service bill. Thus, we have been in essence double-dipping Oncor. | Assigned per affiliate headcount. | Assigned per affiliate headcount. Affiliate headcount is the primary cost-causative cost driver for Human Resources. Assignment of Personnel Misc Benefits on the basis of affiliate headcount is a reasonable approach for assigning costs to affiliates. | Reasonable. |
| 99700003 | Pension/OPEB corr w ONCOR | 626100 | Human Resources - Admin | This project set up in July to correctly re-book pension and OPEB corrections from June 07. This project excludes Oncor in the calculated metrics allocation. A pension/OPEB allocation issue was discovered relating to how we re-allocated obligations in 2005. For pre-2005 TUS retirees, ~64% of their obligation was assigned to Oncor. Thus, for these employees, Oncor has 64% of their related obligation on their books and are already recording the related expense. The remaining 36% of the obligation related to these employees is recorded in TUS, and the related expense is recorded by TUS. This expense is then allocated to all BU's, including Oncor, through the service bill. Thus, we have been in essence double-dipping Oncor. | Assigned by percentage of total YTD billings to affiliates. | It is reasonable to assign these costs based on total 2009 YTD billings to affiliates because labor and non-labor both contribute to the OPEB targets and goals. | Reasonable. |
| 99800000 | General Overheads - Taxes | 625500 | Corp Tax Services - Admin | General taxes incurred by TUS such as federal income tax, state income or franchise tax, and ad valorem taxes. | Assigned during the service bill allocation process based on total project dollars as a percentage of total service bill dollars. | It is reasonable to assign TUS tax expense based on a project's percentage of the total monthly service bill because the tax is not generated by one specific Service Provider or TUS project. | Consider consistent general allocator although this sounds like a general allocation method. |
| 10022ROB | Internal Legal - EFH Mgmt Fee | 600500 | General Counsel_EVP | This project captures all labor and expenses associated with the General Counsel EVP. | Billed to affiliates based on 50% time tracking (legal 10022SRN) and 50% number to bills at Texas Legislature (80th Session) by Analyst & Co) (public affairs 10110000). | Time-tracking and 50% of bill count at Texas Legislature per client. Time-tracking and Bill count is the primary cost-causative cost driver for EFH Mgmt fee (EVP). Assignment of costs of EFH Mgmt fee (Legal EVP) on the basis of 50% time-tracking and 50% bill count at Texas Legislature per client is a reasonable approach for assigning costs to affiliates | Reasonable allocation method with respect to time reporting. See comments above with respect to allocation method based on count of bills in Texas legislature. |
| 100226NR | Internal Legal Department-Senior Counsel | 600500 | General Counsel_EVP | This group manages the legal affairs of the Company (particularly regulatory matters, litigation matters and corporate matters). This project includes salary & other employee related costs and legal expenses. | Billed to affiliates based on time tracking. | Costs are assigned to affiliates based on time spent by Senior Counsel. It is reasonable to bill the internal legal department's costs based on time spent of Senior Counsel to the affiliates because a significant cost driver is labor and the resulting labor efforts expended. | Reasonable |

EFH04404907

2008 Project Description Methodology

Confidential

| Project # | Project Title | Service Provider Dept Id | Service Provider Description | Project Description | Project Billing Methodology | Methodology Reasonableness | Human Comment |
|---|---|---|---|---|---|---|---|
| 117VACAT | TXU BS Vacation Accrual | 623210 | TXU Corporate Controller | This project is used to record accrued TXU Business Services employee vacation allowed to roll over from one year to the next in accordance with Corporate Accounting's accounting policy and procedure. | These costs represent an aggregate of vacation carryover for TXU Business Services and are assigned by percentage of total service billings to affiliates through November of the year. | These costs represent an aggregate of vacation carryover for TXU Business Services and are assigned by percentage of total service billings to affiliates through November of the year. Total service billings represent the aggregate billings from TXU Business Services and are representative of all Service Provider organizational billings. Therefore, it is reasonable to assign the aggregate vacation carryover costs on the basis of total service billings through November of the year. | Consider allocating based on headcount as this amount is related to vacation accrual. |
| 8031EZPY | Controller - Admin | 623210 | TXU Corporate Controller | To bill out depreciation costs associated with the 2007 EZ Pay upgrade. | Assigned per affiliate headcount. | Assigned per affiliate headcount. Affiliate headcount is the primary cost-causative cost driver for the EZ Pay system. | Reasonable |
| CGETXUBS | TXUBS CGE Bill | 600600 | OBM | Record monthly Capgemini costs to TUS from Capgemini. | Assigned by percentage of total YTD EFH Corporate Service billings to affiliates. | Costs are assigned to affiliates based on Year to Date Affiliate Billings. It is reasonable to assign these costs based on total YTD billings to affiliates because CGE provides services to all EFH Corporate Service providers. | Reasonable. These costs are the Cap Gemini costs for resources used by the Service Company. This is a general cost causative method to allocate these costs. |
| CGFACLTY | Capgemini Facility Expense | 600600 | OBM | This project captures ongoing facility related costs related to Capgemini and Hewitt. | Billed to affiliates based on the assignment of the CGE bill to TXU (excl CC/Rev Mgmt). | Costs are assigned based on billings by CGE to the Affiliate. It is reasonable to bill Capgemini/Hewitt facility costs based on CGE billings to TXU affiliates (excluding Customer Care/Revenue Management) because that is the way it would bill if it were incurred directly by Capgemini/Hewitt and billed back to TXU. | Reasonable |
| DEPINTCR | Dep&Int for Contr Str Assets | 600600 | OBM | Depreciation and interest for stranded assets in TXUBS that did not transfer to Capgemini but are related to the outsourced Controller function. | Billed to affiliates based on number of FIM users of the system (2004 Project 60340000 billings). | Billed to affiliates based on FIM users of the system. FIM users is the primary cost driver for FIM Support and assigning costs to affiliates based on FIM users is a reasonable approach. | Reasonable |
| DEPINTIT | Dep&Int for IT Stranded Assets | 600600 | OBM | Depreciation and interest for stranded assets in TXUBS that did not transfer to Capgemini but are related to the outsourced Information Technology function. | Billed to affiliates based on Information Technology's composite billing in 2004. | Costs are assigned based on 2004 Information Technology billings to a given Affiliate. It is reasonable to assign this depreciation and interest based on 2004 billings to affiliates because the assets would have been recorded and billed from various IT project costs prior to the Capgemini transaction. | Reasonable |
| DEPINTRP | Dep&Int for Revenue Processing Building Stranded Assets | 600600 | OBM | Depreciation and interest for stranded assets in TXUBS that did not transfer to Capgemini but are related to the outsourced Revenue Processing function. | Direct Billed 100% to ELREP. | Direct Billed 100% ELREP. Direct charging is a reasonable method for billing costs that are specifically identifiable to a particular affiliate. | Reasonable |
| DEPRSIGN | Dep & Int for TXU Ext & Sign | 600600 | OBM | Depreciation and interest for stranded assets in TXUBS that did not transfer to affiliates in 2005 but are related to the Communications function that was embedded. | Direct Billed 100% to ELREP. | Direct Billed 100% ELREP. Direct charging is a reasonable method for billing costs that are specifically identifiable to a particular affiliate. | Reasonable |
| ED08CASE | 2008 ED PUC RATE CASE | 623210 | TXU Corporate Controller | Expenses incurred in support of the 2008 Electric Delivery PUC Rate Case which includes filings, litigation expenses, employee expenses and office support. | Direct Billed 100% to ESD. | Direct Billed 100% ESD. Direct charging is a reasonable method for billing costs that are specifically identifiable to a particular affiliate. | Reasonable |
| SHELWIND | SHELL WIND PROJECT | 800702 | Renewables Tower | | | | No method specified |
| TUSCLOSE | TUS/ Year-End Billings  O/U | 623210 | TXU Corporate Controller | Adjustment to clear over-under recovery for TUS Corporate projects at year-end. | Direct Billed 100% to TXU. | Direct Billed 100% TXU. Direct charging is a reasonable method for billing costs that are specifically identifiable to a particular affiliate. | Why is this related at Holding Company? |
| TUSLAND1 | Land Development | 608000 | Corporate Development | Expenses associated with Land Development for DEVC2. | Direct Billed 100% to DEVC2. | Direct Billed 100% DEVC2. Direct charging is a reasonable method for billing costs that are specifically identifiable to a particular affiliate. | Reasonable |
| TUSMINR1 | Mineral Development | 608000 | Corporate Development | Expenses associated with Mineral Development for DEVC2. | Direct Billed 100% to DEVC2. | Direct Billed 100% DEVC2. Direct charging is a reasonable method for billing costs that are specifically identifiable to a particular affiliate. | Reasonable |
| TUSPIPL1 | Pipe Line Development | 608000 | Corporate Development | Expenses associated with Pipeline Development for DEVC2. | Direct Billed 100% to DEVC2. | Direct Billed 100% DEVC2. Direct charging is a reasonable method for billing costs that are specifically identifiable to a particular affiliate. | Reasonable |
| TUSSUSPN | Ref Plant Equipment | 600700 | Corporate Development | Expenses associated reference plant equipment. | Direct Billed 100% to GNDVP. | Direct Billed 100% GNDVP. Direct charging is a reasonable method for billing costs that are specifically identifiable to a particular affiliate. | Reasonable |

EFH04404908