UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

In re: :
: Chapter 11
ENERGY FUTURE HOLDINGS :
CORP., et al., : Case No. 14-10979(CSS)
:
Debtors. : (Jointly Administered)
__________________________:

United States Bankruptcy Court
824 North Market Street
Wilmington, Delaware
November 3, 2015
10:22 a.m. - 5:19 p.m.

B E F O R E :
HON CHRISTOPHER S. SONTCHI
U.S. BANKRUPTCY JUDGE

ECRO OPERATOR: LESLIE MURIN

HEARING re Motion of Energy Future Holdings Corp., et al., to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter Into and Perform Under the Settlement Agreement [D.I. 5249; filed August 10, 2015]

HEARING re Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code [D.I. 6122; filed September 21, 2015]

HEARING re Debtors' Motion in Limine to Limit the Expert Report and Testimony of Mark Rule [D.I. 6737; filed October 28, 2015]

HEARING re EFH Committee's Motion and Memorandum of Law in Support of its Motion in Limine to Exclude Evidence of the Purchasers' Subjective Intent to Close the Transaction Contemplated in the Plan (Redacted) [D.I. 6739; filed October 28, 2015]

HEARING re EFH Committee's Motion and Memorandum of Law in Support of its Motion in Limine to Exclude Evidence Concerning the Value of Oncor [D.I. 6740; filed October 28, 2015]

HEARING re EFH Committee's Motion and Memorandum of Law in

Support of its Motion in Limine to Exclude Evidence of Consultation with Counsel Offered to Support Reasonableness of Settlement (Redacted) [D.I. 6741; filed October 28, 2015]

HEARING re Debtors' Motion in Limine to Limit the Expert Report and Testimony of Michael Henkin (Redacted) [D.I. 6742; filed October 29, 2015]

Transcribed by: Sonya Ledanski Hyde

A P P E A R A N C E S :

ASHBY & GEDDES PA

Attorney for WSFS Second Lien Indenture Trustee

BY: WILLIAM BOWDEN

BROWN RUDNICK LLP

Attorneys for WSFS Second Lien Trustee

BY: JEFFREY L. JONAS

JONATHAN D. MARSHALL

FOX ROTHSCHILD LLP

Attorney to Ad Hoc Committee of EFIH Unsecured Noteholders and EFIH Second Lien DIP Commitment

BY: L. JOHN BIRD

JEFFREY M. SCHLERF

HOGAN MCDANIEL

Attorneys for Fenicle & Fahy

BY: DANIEL K HOGAN

KIRKLAND & ELLIS LLP

Co-Counsel to the Debtors

BY: ANDY MCGAAN

MARK E. MCKANE

CHAD J. HUSNICK

MARC KIESELSTEIN

KRAMER LEVIN NAFTALIS & FRANKEL LLP

Attorneys for Second Lien Indenture Trustee

BY: JOSHUA BRODY

GREGORY HOROWITZ

MCELROY, DEUTSCH, MUVANEY, & CARPENTER, LLP

Co-Counsel to the TCEH Debtors

BY: DAVID PRIMACK

MORRIS JAMES LLP

Attorney for Law Debenture of New York, Indenture Trustee

BY: STEPHEN MILLER

MORRIS NICHOLS ARSHT & TUNNELL LLP

Attorneys for Equity Sponsors

BY: DEREK C. ABBOTT

MORRISON & FOERSTER

Attorneys to TCEH Official Committee

BY: CHARLES KERR

NIXON PEABODY LLP

Attorneys for AST as EFH Indenture Trustee

BY: RICHARD PEDONE

MORGAN NIGHAN

GEORGE SHELLY

O'KELLY, ERNST & BIELLI LLP

Co-Counsel to Energy Future Holdings Corp.

BY: DAVID KLAUDER

PACHULSKI STANG ZIEL & JONES

Attorney for Second Lien Indenture Trustee

BY: LAURA DAVIS JONES

PATTERSON BELKNAP

Attorney for Law Debenture of New York, Indenture Trustee

BY: DANIEL A. LOWENTHAL

PAUL WEISS RIFKIND WHARTON & GARRISON LLP

Counsel to Ad Hoc Committee Of TCEH First Liens

BY: JACOB A. ADLERSTEIN

ANDREW EHRLICH

BRIAN HERMANN

ALAN KORNBERG

POTTER ANDERSON & CORROON LLP

Attorney for Deutsche Bank New York

BY: R. STEPHEN MCNEILL

JEREMY RYAN

PROSKAUER ROSE LLP

Attorneys for EFH Corp DDs

BY: MICHAEL FIRESTEIN

MARK K. THOMAS

RICHARDS, LAYTON & FINGER, P.A.

Co-Counsel to the Debtors

BY: DANIEL DEFRANCHESCHI

JASON M. MADRON

THERESE SCHER

Attorney for DTC Company as Indenture Trustee

BY: THERESE SCHER

U.S. TRUSTEE'S OFFICE

U.S. Trustee

BY: RICHARD SCHEPACARTER

ANDREA B. SCHWARTZ

VENABLE LLP

Attorney for PIMCO

BY: JAMIE EDMONSON

JEFFREY S. SABIN

WACHTELL

Attorneys for Equity Sponsors

BY: EMIL KLEINHAUS

WHITE & CASE LLP

Attorney to Ad Hoc Committee of EFIH Unsecured Noteholders and EFIH Second Lien DIP Commitment

BY: THOMAS LAURIA

J. CHRISTOPHER SHORE

WILMER CUTLER PICKERING HALE & DORR LLP

Attorney for EFIH First Lien Indenture Trustee

BY: PHIL ANKER

ISLEY M. GOSTIN

YOUNG CONAWAY

Counsel to Ad Hoc Group of TCEH Unsecured Noteholders

BY: PAULINE K. MORGAN

APPEARING TELEPHONICALLY:

DESIREE M. AMADOR

NII-AMAR AMAMOO

LAUREN BITZIN

PEG A. BRICKLEY

EMILY A BUSSIGEL

MARIA CHUTCHIAN

KEVIN COCO

MARK A. CODY

LOUIS A. CURCIO

ADAM M. DENHOFF

EPHRAIM DIAMOND

ARNISH R. DOSHI

DAVID M. DUNN

BENJHAMIN D. FEDER

MARK A. FINK

MARK FLANNAGAN

SCOTT FRIEDMAN

JULIA FROST-DAVIES

THOMAS A. GAA

MEGGIE GILSTRAP
JOHN GIONIS
RICHARD GITLIN
ANDREW GLENN
DAVID GRINGER
XIAOYU GU
BRIAN GUINEY
CHRISTOPHER HAHM
MARK F. HEBBEIN
SANDRA HORWITZ
NATASHA HWANGPO
ANNA KALENCHITS
HAROLD KAPLAN
MATTHEW W. KINSKEY
CHARLES KOSTER
STUART KOVENSKY
MICHELLE F. KYROUZ
PHILIP G. LAROCHE
ALEXANDER LEES
KEVIN LIPPMAN
ROBERT K. MALONE
RICHARD G. MASON
BRIAN MORGAN
HAL F. MORRIS
TINA MOSS

JAMES OSBORNE
MEREDITH S. PARKINSON
LARS A PETERSON
BRIAN PFEFFER
MEREDITH PFISTER
ABID QURESHI
ELIZABETH RASSKAZOVA
ERICA RICHARDS
RACHAEL RINGER
MARC B. ROITMAN
MATTHEW ROOSE
CHARLES SIEVING
FREDRIC SOSNICK
PATRICIA SMOOTS
RICHARD A. STIEGLITZ
ANDREW M. THAU
AMER TIWANA
BRIAN TONG
CARL TULLSON
MICHAEL TURKEL
MATTHEW UNDERWOOD
KEVIN M. VAN DAM
BRADY C. WILLIAMSON
APARNA YENAMANDRA
DANIELE ZAZOVE

DAVID ZYLBERBERG

CHETAN BANSAL

P R O C E E D I N G S

CLERK: All rise.

THE COURT: Please be seated. Excuse me. Good morning.

MR. KIESELSTEIN: Good morning, Your Honor. Marc Kieselstein, Andrew McGaan, and Mark McKane on behalf of the Debtors. Your Honor, before I start my opening, I do have a handful of slides that I'm going to intermittently refer to. May I approach?

THE COURT: Yes. Thank you. Before we start, I just want to -- if you're going to be speaking, try to -- we have a lot of people, and this room eats noise. We're actually getting more speakers; they were supposed to be in before the trial started, but they're not. Welcome to the government. So, please try to keep -- make sure you're speaking into the microphones, and try to keep your voices up as much as possible in order -- it won't be a problem for Mr. Kieselstein, but others, please keep your voices up so everybody can hear.

MR. KIESELSTEIN: No microphone necessary, Your Honor, yeah.

THE COURT: All right. Let's get started.

MR. KIESELSTEIN: Your Honor, this is an enormously important day for these Debtors, their employees, their customers, and their stakeholders, for, after several

years of painful, expensive, and nonstop struggle, these companies are on the verge of accomplishing something that looked nearly impossible a year ago today, an almost entirely consensual restructuring, one that has the overwhelming support of impaired creditors and leaves the rest unimpaired, one that now has the support of a majority of the largest E-side unsecured group.

And, as I was stepping up to the podium, I was informed that there's a deal, in principle, with the PCRBs to resolve their objection. So, we are running out of chairs on this side of the room.

Your Honor, if one had said a year ago that these Debtors could exit Chapter 11 consensually, without having a cram-down fight or two, one might have had one's sanity questioned, and with good reason.

Your Honor, the evidence you will hear will speak much more eloquently than I ever could, so I am going to be relatively brief and relatively high-level. But I want to start with where we were exactly one year ago today.

Your Honor said, at the end of one of our many contested hearings, you strenuously urged the parties to begin plan negotiations, noting that, quote, "opening that dialogue sooner rather than later, even over a dinner, can only be beneficial for all parties." Now, I don't think it's a shining moment for a group of adult professionals to

have to be told that by a judge, but that's where we were a year ago, in the land of Mr. Shore's lobster and potato chips.

And how did we get from that place to this place? And I want to talk briefly about that, not for the purpose of imparting a history lesson, but because the many steps that led to the settlement agreement and the plan are the epitome of good faith, and they undermine the objectors' major theme that some sort of secret and corrupt process is what gathers us here all together today.

I want to start with the CRO term sheet. Your Honor, the CRO term sheet was circulated in March of 2015, but the knowledge at the end of 2014 that a CRO term sheet might be circulated is what started the ball rolling, however slowly. All of our stakeholders said it would impede dialogue, but frankly there was no dialogue to impede. We convened awkward global meetings at the end of 2014 that were marked by stony silence, punctuated by the occasional unduly personal remark.

Now, Your Honor, when the CRO term sheet was circulated, the reaction was predictable. Everyone hated it. Yet the conversations became more substantive from that point on. And some of the concepts in that term sheet survive to this day and are in the plan.

Second, Your Honor, there was the retention of the

conflict matter advisors. This helped quiet the ceaseless din around conflicts, and of course led to the disinterested directed deal that is a key component of the proposed settlement agreement.

Third, Your Honor, bid procedures with definitive deadlines: toward the end of 2014, the Debtors sought the Court's approval of bid procedures, in light of indications that the Oncor value was more than originally anticipated. That in part led to the termination of the original RSA. And after installing governance required by the Court in January, Your Honor approved bid procedures for the disposition of the Oncor stake. That order had firm, aggressive, but achievable deadlines.

And what did that do to galvanize the process? Well, it quickened the pulses of those stakeholders who saw Oncor upside leaving the estate. And quickened pulses in restructuring often lead to open checkbooks. And here, after many months of hard-fought negotiation, we had the $12 billion of debt and equity commitments that undergird our proposed plan.

Fourth, Your Honor, the filing of the initial plan in April of 2015: again, this was a Debtor in good faith doing its job of pushing the pile up the hill, with or without creditor support. That plan contemplated either a fail or an in-money deal or a standalone equitization.

And I'm sure Your Honor recalls the conga line of stakeholders shimmying their way to the podium to profess their undying enmity for that plan. And, as Mr. Weisfelner colorfully put it on that day in April, quote, "There does appear to be a consensus. The consensus that we've reached is that we all hate the plan they've filed."

And fifth, the scheduling order: despite the enmity for our original plan, we asked for, and Your Honor entered, over many objections, a scheduling order with firm deadlines, on a plan and disclosure statement that had no support. And that was critical, because it told the stakeholders that, while the Debtors didn't know exactly which path they were going to choose, and we didn't precisely know how we were going to get there, this case was not going to stand still.

But, at the same time, Your Honor told us that, if we showed up at a confirmation hearing with no support, it would be the world's shortest confirmation hearing. And we heard you loud and clear. The pressure all around the table that was necessary and appropriate was created.

Sixth, Your Honor, the legacy litigation protocol: Your Honor, that ongoing project was critical, though hugely expensive and torturous, to be sure. Completion of that massive project allowed stakeholders brave enough to enter our cavernous data room all the information they needed to

assess and compare the risks and opportunities of a restructuring versus a descent, as some of the objectors still crave, into a multiyear litigation quagmire.

Without that work having been done, without the production of a million documents and five million pages of discovery, without the thousands of hours spent, including by our worthy adversaries, reviewing and producing those documents, we would not be here today.

Seventh, Your Honor, 18 months of exclusivity: Your Honor, this Court's decision to grant the full measure of exclusivity was vital. It provided the centripetal force that kept this case from breaking apart into an asteroid belt of competing plans, with stakeholders stuck in orbit around their parochial concerns. Crucially, that allowed the Debtor to create a competitive marketplace between bidders in the Oncor sale process on the one hand and potential plan sponsors, including the T-unsecureds, Fidelity, and others, on the other -- on the other hand.

Now, you'll hear from the objectors that we somehow sabotaged our own auction process. But the facts will tell you otherwise.

Finally, Your Honor, the mediation: the Court-authorized mediation process on the T-side helped parties who had trouble communicating directly to speak to one another through an intermediary so they could settle their

own massive corner of these cases, a $25 billion lien avoidance and subordination dispute. That resolution, built into the settlement agreement, is an essential piece of the puzzle, without which we would not be here today. And we again thank Mr. Borowitz for striding into the lion's den and coming out with a deal.

Now, looking back, Your Honor, the contentious start to these cases was probably unavoidable, given the enormous sums at stake, the presence of so many smart distressed players, a sleepy restructuring market in general, and the theatrical rambunctiousness of parties not yet in a compromising frame of mind.

Now, no one, including the Debtors, is blameless. But this is a textbook case of a Debtor, with the assistance of a Court, where we earned it, pulling a case out of the doldrums and putting it firmly on a path toward a value-maximizing emergence. What has happened in the last year is what Chapter 11 is all about. It radiates good faith, good faith that permeates the settlement agreement and the plan.

That said, we know that all the hard work and progress is for naught if we fail to meet our burden and persuade Your Honor that the settlement agreements should be approved and the plan confirmed. And we know full well Your Honor will cut us no slack, whatever the consequences of failure. And we ask for no quarter.

Fortunately, Your Honor, the evidence that we will, with apologize, inundate the Court with over the next few weeks will leave no room for doubt that we have resoundingly met that burden. So, let me start to turn to that now.

Your Honor, at a high level, the settlement agreement resolves the intercompany claims, the intercreditor claims at TCEH, and the claims by and against the sponsors and the directors and officers. As you will hear repeatedly throughout the trial, the settlement agreement facilitates the plan, indeed makes the plan possible, by ensuring a critical degree of certainty in the unlikely but not unthinkable event that the plan is confirmed but does not consummate.

Think of the settlement agreement as an insurance policy to make certain that under no circumstances do we find ourselves back where we were on November 3rd, 2014, on the precipice of all-out litigation, only this time beyond the outer bounds of exclusivity. As you will hear, Your Honor, the settlement agreement and all of its integral components preclude that nightmare scenario.

As to the plan, at a high level, everyone knows what the plan contemplates: full payment through cash at emergence, or through reinstatement, for certain series of EFH bonds. And that's on the E-side. On the T-side, a

change of control with the TCEH first-lien lenders emerging as the new owners, with specified recoveries to unsecured creditors.

So, what are the major issues that the objectors raise? Well, when you think about where we were a year ago, they are remarkably few in number. But given the substance and the structure of the settlement agreement and the plan, it's not surprising that the overarching disputes are so few, few enough, in fact, that you could count them on one hand with a couple of digits to spare.

As to the settlement agreement, there really only is one issue: does it satisfy the well developed standards under Rule 9019 for approval of compromises? As to the plan, was it proposed in good faith? And is it feasible as to EFH? Your Honor's recent rulings have, we believe, largely vitiated complaints about impairment from the E-side.

And in the interests of time, we will deal with all the other plan objections at closing. But rest assured, to the extent they turn on the factual record, we will lay down that evidence in the next few weeks.

So, let's start with the settlement agreement, and in particular the controlling law. And we start with first principles; compromises are favored in bankruptcy. So said the Third Circuit 20 years ago in Martin, and that's not a

proposition that's open to serious dispute. Every administrative dollar spent in litigation is one less dollar for recovery to creditors, one less dollar that can be invested in the business. And even operationally healthy and profitable companies, such as these, don't have infinite assets, as Your Honor recently noted on October 15th.

So, as the evidence will demonstrate, and I don't think the objectors will seriously dispute, the transactions and claims being settled here number in the tens of thousands. Some of those are in the billions of dollars. And they cover a decade of frenetic activity.

As Judge Walrath said in WaMu, this is, quote, "the precise type of multifaceted litigation that cries out for settlement," close quote. And WaMu was a liquidation case. And what was true there is even more true here for an operating business: years of continued litigation and appeals would be an enormous drag on these going concerns.

And a couple of observations on the objections as they relate to this point: first, Your Honor, in a show of admirable restraint, the committee does not allude to the concept of a litigation trust all the way until page two of their brief. Well, according to the committee, it's no problem for the Debtors to emerge from Chapter 11 towing an 18-wheeled litigation trust behind it as it goes. But history and logic tells us otherwise.

First, Your Honor, litigation among these Debtors would likely preclude an exit until such time as the litigation concluded. But even if the Debtors could emerge wearing concrete galoshes, the cost and drag on the business would be enormous. And we don't believe that there can be serious dispute about that.

The largest fee cases ever in bankruptcy, as all the professionals in this room know, are the large liquidations with litigation trusts: the Mortells, the Adelphias, the WorldComs, the Rescaps, the Lehmans, et cetera. They are an all-you-can-eat buffet for professionals, and they are inimical to the fresh start that bankruptcy Debtors so badly need.

And one clash of visions you will hear throughout this case is whether the fresh start of bankruptcy and the closure it provides, including standard releases, is a good thing. And (indiscernible) a cardinal principle of bankruptcy enshrined in the Code, as we assert, or an insider protection scam that drives self-interested behavior, as the objectors suggest.

Second, the committee asserts that the intercompany claims are simple and straightforward, all of them, of course, without exception, simple and straightforward in favor of the E-side. But there's a rule of logic. I think it goes back to the early Greek

philosophers. It goes like this: if it takes almost 200 pages or scrolls to explain how simple and straightforward something is, it is neither simple nor straightforward.

And the evidence here, we are confident, will persuade you of the complexity, unfortunately the often mind-numbing complexity, of many of the disputes the settlement agreement mercifully resolves.

Just one example: the committee suggests that the $700 million intercompany settlement has a large component attributable to compensating the T-firsts for agreeing to a tax-free spin. That tax-free spin spares the E-side from what could be a very considerable tax liability, but only permits a partial rather than a full step-up in basis at reorganized TCEH. At certain values, agreeing to forego the full step-up would cost reorganized TCEH, and derivatively its new owners, a lot of money, something they, not surprisingly, would want to be compensated for.

Now, as the value of TCEH has diminished of late, due to degrading power prices, there is no doubt that the difference between the partial and the full step-up has diminished, and maybe even disappeared, and that drop of values also means, as we stand here today, that a taxable deal might not create the same magnitude of liability for reorganized EFH as previously thought. And so, the committee says, "Aha, the settlement therefore can't be

approved."

But the reality is not nearly so simple, nor so straightforward. First of all, the step-up issue is one of a dozen or more material issues. Second, what goes down may very well go up. This plan, if approved, will likely not consummate for six to nine months. If any of us could predict with certainty what the power price curve was going to look like, say, six to nine months from now, we wouldn't be here. We'd be on our private beach somewhere, enjoying an adult beverage.

The measurement that will determine whether the partial as opposed to the full step-up will create a liability for reorganized TCEH will not happen until after the effective date, based on post-emergence trading values. And even the committee's expert conceded he had no earthly idea what the value of TCEH would be come mid-2016. He further conceded that value could swing billions of dollars in that timeframe, as it has of late. And those were two wise concessions.

But there's more to this alleged simple and straightforward story. Even if it turns out there is no financial impact on reorganized TCEH from a tax-free deal, and even if a taxable deal would not create liability at reorganized EFH, and we don't concede that point, there is yet another reason why this transaction needs to be based on

a tax-free spin of TCEH and we need to get the consent of the T-firsts for that to happen. That reason relates to the ability to successfully pursue a REIT conversion.

For reasons that we set out in our confirmation brief, and the committee has ignored, a taxable spinoff at TCEH would result in an allocation of earnings and profits to EFH that would, in the context of a REIT, require a cash dividend of something around $5 billion. Suffice it to say that required dividend would all but destroy the economic viability of the REIT option, which everyone agrees, even on the E-side, is the structure that maximizes value.

So, when the committee says these claims are all so simple and so straightforward, grab your wallet. There are many claims even far more complicated than this issue. So, we don't think simple and straightforward and these -- this universe of claims are terms that should be used in the same paragraph.

And, Your Honor, this example demonstrates why the law is clear that the Court need not try the claims in full or in miniature to gauge the appropriateness of the settlement, but rather need only canvass the issues with sufficient specificity to be able to assess the reasonableness of the compromise. Obviously, Your Honor, sparing the expense of trying the claims in full, or even in truncated fashion, is what captures the financial and

temporal savings that settlements are designed to provide.

And even with all that, Your Honor, I submit this will be one of the longest and most detailed 9019 hearings any of us have been involved in. At the end of many days, Your Honor, the evidence will demonstrate that the settlement agreement is fair and equitable, meeting the standards this Court articulated in Capmark.

Your Honor, the objectors, particularly the committee, no doubt recognize that the well settled legal test under Rule 9019 is lethal to their objections. So, in their zeal, what does the EFH committee do? Unfortunately, it takes a low road to try to escape the vast body of liberal Rule 9019 jurisprudence.

And, to their shame, I must say, they accuse the disinterested directors in turns of being stupid, lazy, in the pockets of the sponsors, and fixated on their own releases. Their brief contains a pastiche of wildly out-of-context deposition fragments to try and make that case. And some of that same regrettable rhetoric seeps into their arguments on the good faith elements of the plan.

I don't want to spend a lot of time dignifying what was alleged, other than to say Your Honor will hear from a number of the disinterested directors, and you can determine yourself their level of intelligence, integrity, work ethic, and the purity of their motives.

I'll just say that attempts to escape Rule 9019 jurisprudence in favor of entire fairness, based on alleged derelictions of the duty of care and loyalty, or attempts to apply heightened scrutiny by contorting the settlement agreement into a change of control transaction, and other, more outlandish theories will shrivel up in the cold light of the facts.

But let me briefly turn to what the evidence will show about the process leading to the intercompany settlement. First, Your Honor, the evidence will show that the disinterested directors, along with the entire board, had a thorough grounding in potential intercompany claims and sponsor claims well before the disinterested director advisors were retained.

Second, the evidence will show that the focus on intercompany claims intensified when the disinterested director advisors came on board. They immediately went to work reviewing the trove of documents, which all objectors have had full access to, provided interviews and (indiscernible) sessions, and they heard a variety of views, including, on multiple occasions, those of the allegedly disenfranchised EFH committee.

Third, Your Honor, each of the disinterested directors and their advisors engaged in dialogue with their counterparts, exchanged presentations, advocated the

strengths of their respective positions, pointed out the weaknesses of the other estate's claims, and, after the groundwork had been laid, exchanged a series of proposals and counterproposals.

And ultimately, an agreement was reached, one that the objectors take strong issue with on the merits. Fair enough. But the evidence will show that the assertion that this process was rushed or cursory or some rubber-stamping exercise is simply not true.

Now, Your Honor, on the next two slides, I've listed the categories of claims by and among EFH, EFIH, and TCEH. And I'm not going to repeat them here. It's merely to give the Court a sense of the 31 flavors or so of claims resolved in the settlement. And you will hear a great deal of detail, more than you want, from a number of witnesses, about the complicated facts surrounding these claims.

Your Honor, there's also a slide to remind the Court of the magnitude of the T-side intercreditor settlement, which, of course, would likely need to be tried in a far more comprehensive fashion than Rule 9019 requires if we were engaged in a hotly contested cram-down fight.

So, putting aside what standard a review should apply, what are the objectors substantive complaints, again, primarily asserted by the E-committee? Now, this is actually something that is simple and straightforward: too

much, too soon, too broad.

As to the first, that the 700 million is an unreasonably high number, we will let the evidence speak for itself. While reasonable minds can always disagree, well informed minds here disagree over whether 700 million is too high, too low, or just right. We think that alone means that we have met our burden.

But I do want to spend a few minutes on "too soon" and "too broad." By "too soon," the objectors mean that the settlement agreement should not be approved by separate order in this hearing, but should only be approved conditionally and tied to the consummation of the plan itself. In their view, only if the plan consummates should the settlement become final. If the plan fails to consummate, the settlement agreement fails, too, and we are back to square one, litigation central.

A few observations: first, Your Honor, the claims being settled are historical in nature. The facts surrounding those claims are immutable. There is no theory of relativity that changes the nature of the claims depending on the frame of reference of the observer or the date of the observation. There is no spooky action that will mysteriously transform these claims into something better or worse six months from now.

And that is why settlements untethered to plans

happen all the time. They rise or fall on their own merits, or lack thereof. And Your Honor will recall, in the context of the scheduling order, the EFH committee was chomping at the bit to have an immediate adjudication on the merits of the intercompany claims.

We thought it made sense for it to be heard as it is being heard, in conjunction with but independent of the plan. So, even the EFH committee has acknowledged that the facts that form the basis of the settlement agreement are fixed, not variable.

Second, while it's magnanimous of the objectors to agree to the settlement in the context of a consummated plan, it's a meaningless concession. If the plan consummates, all the E-side creditors get paid in full, and unimpairment means, by definition, they have no residual claims against the T-side, the sponsors, or the fiduciaries.

But third, and most importantly, the evidence will show that the freestanding existence and permanence of the settlement agreement actually lays down the track by which the E-side creditors will be paid in full in cash or reinstated. And what do I mean by that? Well, let me give a couple of examples.

Under the settlement agreement, the sponsors give up any and all upside at EFH to which they would otherwise be entitled, most notably the added value potentially

generated by the conversion of Oncor to a REIT as the plan contemplates. Giving up that upside obviously benefits the TCEH junior creditors. And that is a permanent concession, true under this plan or any alternative plan.

Now, keep in mind that, while only time will tell what reorganized EFH would be worth with a REIT structure, Mr. Seager at his deposition suggested that it might -- and I emphasize "might" -- be worth well north of $20 billion. Given the hurdle to recovery by the sponsors, even taking into account the $700 million intercompany claim, is approximately $19.5 billion, the sponsors are potentially leaving an enormous payday on the table.

And the sponsors, of course, are structurally senior to the TCEH creditors when it comes to surplus value at EFH. If that surplus value was simply going to be waylaid by the sponsors, the TCEH unsecured creditors would of course not be writing a $7 billion equity check. And it is that check that is making full payment or reinstatement available for the E-side creditors. And, not surprisingly, the sponsors would not be agreeing to that permanent concession if their releases were only temporary or conditional.

Another example: the plan sponsors have agreed to disarmament and drag, to give up all of their litigation rights if, for any reason, the plan confirms but does not

consummate, let's say for regulatory reasons. And they only agreed to give up those litigation rights and that option if they knew that they would get the $550 million carve-out from the collateral of the first-lien lenders in any alternative plan scenario.

Without that floor under their potential recovery, the plan sponsors, again, would not have agreed to give up their litigation rights, inject $7 billion of equity, and pursue the merger transaction that makes full E-side recoveries under this plan possible.

A third example: the TCEH first-lien lenders agreed to let the plan go forward and wait for the process to play out because they knew that the settlement agreement permanently shelved intercompany and intercreditor and sponsor litigation that could tie up the TCEH estate for years. Without that assurance, they would not have agreed to the plan, the tax-free spinoff, or the carve-out from their collateral. And, again, without that floor recovery, there is no $7 billion equity check to be had.

One last example, Your Honor: the TCEH first-lien lenders also would not have agreed to pay $550 million under any circumstances under an alternative plan scenario if they did not know that there would be an allowed $700 million claim of TCEH against EFH to defray, in part or in full, the cost of that carve-out from their collateral. No one, of

course, knows what that claim will yield in the context of an alternative plan scenario. But one suspects it would yield a material amount to at least partially defray the insurance policy the T-firsts are writing.

I could give more examples, but hopefully the point is, to coin a phrase, simple and straightforward. The evidence will show that moving the settlement agreement into the plan or making it contingent on consummation of the plan would basically strangle the plan in the cradle. That same evidence will also show that the settlement agreement is a carefully constructed set of give-and-takes. Pull out the pieces; the objectors don't like, as they urge the Court to do, and the whole settlement agreement comes crashing down, and with it the plan itself.

As to "too broad," Your Honor, that goes to the proposed release of potential claims against the sponsors, an issue that also comes up in the good faith element of the plan as well. And what I say about the state of the evidence here will apply in that context, too.

First, as I said a moment ago, a permanent release of the sponsors in the settlement agreement is of critical importance to the structure and integrity of that agreement. And again, they are given in exchange for important and permanent economic concessions from the sponsors that are -- include but are by no means limited to conceding the upside

at EFH.

Second, Your Honor, the evidence will show that the claims against the sponsors have been thoroughly vetted over a period of years by the Debtors, with the input of any number of advisors.

Third, the evidence will show that proper governance was punctiliously followed. The sponsor releases were reviewed and approved by special board committees of the Debtors, without sponsor participation or representation.

Fourth, the evidence will show that the proposed claims against the sponsors from the E-side are thin to the point of invisibility. Even the E-committee's own experts confess that the biggest single payment to the sponsors at the closing of the LBO cannot be challenged on a colorable basis.

And the bulk of other payments received by the sponsors in exchange for what the evidence will show were good and valuable services was paid for from the cash flows of TCEH. In fact, that over-allocation of expense to the T-side was set to be corrected so the E-side could start to pay its fair share, but, before implementation, the sponsors, of their own accord, suspended the receipt of any additional management fee payments. And they did so while continuing to provide those services which they are doing up

until today.

Your Honor, the timing of the assertion of these allegedly valuable claims is telling and highly suspect. The potential claims alleged against the sponsors were first identified with any degree of particularity only within the last two weeks, not when the intercompany settlement, which contemplated sponsor releases, was made known in the spring of 2015; not when the CRO term sheet contemplating global releases was circulated early in 2015; not when the first plan was actually filed containing global releases in April; not when the amended plans were filed all the way through August, all with global releases.

The EFH committee, as it railed against the intercompany settlement, never had anything the least specific to say about the sponsors. And despite full access to the litigation database, for many months, neither this Court nor the Debtor heard anything in particular about the sponsors, until, we suspect, it occurred to the E-committee that these newly articulated claims against the sponsors might provide a way around Rule 9019. You will hear a lot of talk, but not much evidence, on these claims.

Your Honor, when King William III urged his soldiers in England to defend and die in the last ditch, he wasn't thinking about these claims, but he might have been, because that -- it fits. That's where these claims belong,

in the last ditch. So, in sum, Your Honor, the cries of "too much, too soon, and too broad" will all yield to the weight of the evidence.

Now let me turn, with my remaining time, to the plan. And I'm only, again, going to touch on good faith and feasibility. The rest we will cover in the closing, no disrespect to the U.S. Trustee or the PCRB Trustees or any of the other objectors. I'm just trying to save time.

Your Honor, as to good faith, it is somewhat astonishing to us that the objectors have focused on this. But then again, when a plan leaves your entire constituency unimpaired, one must search high and low to find something to complain about. But the law is clear from PWS and W.R. Grace in the Third Circuit, and it's similar in other circuits: good faith turns on whether a proposed plan is consistent with the policy goals of Chapter 11, preserving going concerns and maximizing recoveries.

And it's really hard to argue with a straight face that this plan fails to preserve value or fails to maximize recoveries when it sheds $30 billion of debt with the consent of every single voting class; when it has the support of a majority of the pick holders, the largest E-side unsecured constituency; when it pays all E-side creditors in full, in cash or reinstates; when it allows TCEH to emerge with a sustainable capital structure in the

hands of an -- of new owners, and when it allows EFH to emerge expeditiously under a value enhancing REIT structure, all without the albatross of endless litigation.

This plan cannot maximize E-side creditor recoveries any more than it already does. Also, as I detailed earlier, Your Honor, the arduous process of getting to where we are today with multiple proposed plans, due diligence, endless negotiations on both the E-side and the T-side, they all paint a vivid picture of good faith.

And, Your Honor, while I'm on the topic, I wanted to touch on some of the more, shall we say, esoteric theories set forth by the committee in their objection. They aren't tethered to any particular provision of Section 1129 as far as I can tell, but they feel like a veiled attack on the good faith of the plan.

And these are purported Chapter 11 concepts with which I think many of us are not familiar. And I'm talking about the notion that every plan proposed with director and officer releases is a per se breach of fiduciary duty, and that every plan containing such provisions, which means 99 percent of plans, must be judged by a more onerous legal standard.

Clearly why every plan that proposes D&O releases is not followed by an immediate motion for appointment of the Chapter 11 Trustee, for that per se breach of duty. And

that would certainly make the Chapter 11 Trustee business one worth getting into.

Your Honor, then there is the complaint that an official committee not deeply involved in the negotiation of a plan that leaves its stakeholders unimpaired, if they're not involved from the start at every meeting, that the plan needs to be rejected.

I'm also referring to alien notions of artificial unimpairment and synthetic exclusivity. Your Honor, these ideas, these theories, have no textual or case support. But they do demonstrate the extraordinary challenge of filling almost 200 pages objecting to a plan that pays your constituents in full, and the extraordinary creativity needed to meet that challenge. In sum, Your Honor, the evidence will establish that this plan and the process that led to it are the very picture of good faith.

And let me spend my last few minutes on feasibility, Your Honor. When you take a step back, this is a really odd objection. If the objection is successful, the E-side creditors will never know if they would have received a full cash recovery. And until this case, I thought a full cash recovery was a phenomenal outcome in any Chapter 11.

Now, are the objectors so convinced that the plan won't be consummated that they are not willing to wait and see the outcome, particularly when the evidence will show

there is no other alternative plan that could produce that result or could get done in the meantime? It does make one wonder what the committee is thinking, and perhaps explains why no actual principals on the E-side filed independent feasibility objections asserting that the merger would not close.

That aside, what are the feasibility issues? First, Your Honor, will the regulators approve? And second, will the plan sponsors close, or will they walk? At the outset, Your Honor, there is no real dispute that the law on feasibility requires a Debtor to show only a reasonable likelihood of success, not a guarantee. To make this showing, a Debtor must clear only a, quote, "relatively low threshold of proof," close quote. That's the Brice Road Development case, quoted also by -- with approval by Judge Walrath in WaMu.

Your Honor, as to the regulatory question, there are complaints about the absence of regulatory certainty. But that is something that is available to no one, ever, and cannot in and of itself be a bar to a finding of feasibility. Regulators, like judges, don't broadcast their conclusions in advance. And, as Your Honor noted, no one can or should be able to compel a PUC commissioner or an IRS official to take the stand and testify as to future regulatory outcomes. A baseline level of uncertainty just

comes with the territory.

So, what evidence will we adduce to give the Court the relatively relaxed level of comfort necessary to show that approvals are reasonably likely to be obtained? First, Your Honor, you will hear about the involvement of the Hunt entities. The Hunts are well experienced in this area, as experienced as anyone on the planet, having shepherded the only utility REIT through the PUC process.

Again, that's no guarantee of success. This is a larger transaction with different dimensions and different issues. But it is a highly relevant data point. The Hunts are experienced players in Texas in general and in the utility space in particular. They have evinced a strong interest in these assets, very unique assets, for some 10 years. They are heavily invested in a successful outcome, and they have devoted enormous time and resources to this project. And the $550 million in the alternative plan scenario does nothing for them.

Similarly, the plan sponsors here are large, well respected, and sophisticated institutions. They have also devoted enormous time to this endeavor and put their reputations on the line. This would be a flagship transaction for these institutions.

Your Honor, the evidence will also show that the PUC process is well underway. Applications have been

submitted. Numerous meetings have been held with staff. Feedback has been received, assimilated, and responded to. Dates have been set for a January hearing on the merits, and for a late March 2016 decision.

All that can be done is being done. And Debtor representatives will testify to their reasonable and well-informed belief that the necessary approvals will ultimately be obtained. And evidence will support a similar conclusion with respect to the IRS, FERC, and the Nuclear Regulatory Commission.

And the case law, Your Honor, and standard big case practice demonstrate that regulatory processes are no burden to a finding of feasibility. And we cited many of those cases in our briefing. And that makes sense. Regulated businesses are not immune from the pressures that force companies into Chapter 11. And they need a way out of Chapter 11, same as any other business.

Now, Your Honor, as to the question of the mythical free option, the evidence will show that the Debtor considered an array of remedies over a number of months as the negotiations took their course, and concluded that disarmament and drag rights were far more valuable than traditional M&A remedies like a reverse breakup fee or specific performance.

The E-committee complains that standard M&A deals

contain standard M&A remedies, but this one doesn't. This is not a standard M&A deal, Your Honor. Disarming and dragging do not exist in the rarefied air outside of Chapter 11. Disarm from what? Drag to what? The evidence will show why the decision to pursue disarmament and drag was the right decision. For purposes of time, I will just say that the amount of any breakup fee offset by the time, money, and continued opportunity costs from the unending stresses of additional litigation and restructuring would pale in comparison the benefits conferred here by disarmament and drag and their deterrent effects against walking away from closing.

Your Honor, would I love have a breakup fee and specific performance and disarmament and drag? Sure. I'd like to have Mr. Lauria's firstborn if his clients don't close the transaction.

MR. LAURIA: Okay.

MR. KIESELSTEIN: Maybe, maybe not. But if I can only have one of those remedies, Your Honor, the evidence will clearly demonstrate that we would take disarmament and drag all day long. Your Honor, as he -- as Your Honor has noted, and the evidence will be enforced, the notion that the plan sponsors have constructed this elaborate diversionary tactic so they can lock in the $450 million consolation prize, that beggars belief, Your Honor. But if,

against all the evidence, that is the plan sponsor's secret agenda, disarmament and drag will lay the groundwork for what comes after: a streamlined expedited process to pursue an alternative plan, and will do so in a way that a couple of 100 million dollars more for consumption by hordes of professionals.

And as for the other feasibility items, Your Honor, we believe the evidence will show that reorganized EFH can handle the cost of any make-whole claim that some appellate court may award long after emergence. Even so, the law is clear that for feasibility purposes, The Court must discount the face amount of those disallowed claims at EFIH by the likelihood of any court reversing.

And based on the record, on the merits established in this court, we believe the likelihood of success of those appeals is extremely low. And as for the end result, EFIH legacy bond make-whole claims, the Debtors are seeking in phase two of this trial to establish the right to pursue the reinstatement option in lieu of paying cash, should this court letter allow the claim.

Now, Your Honor, I will leave for closing what's left of the impairment objections after your make whole and PPI rulings, and again, the same goes for the PCRB trustee's objection on a release and professional fee issues. We're not forgetting them. We're just trying to save time, and I

see my time is about up. And I know, no matter what they say, it was Mr. McGaan and Mr. McKane who lobbied my time limit into the order and not the objectors. But that was probably a wise choice on their part.

Your Honor, I would just leave you with this. After you hear all the evidence and suffer the tedium of the next few weeks, we very respectfully believe that these will not be close calls and that Your Honor will agree with us that the settlement agreement should be approved and the plan confirmed. Thank you.

THE COURT: Thank you.

MR. KIESELSTEIN: Your Honor, I am told that there's a couple of housekeeping items before we get to the next opening statement by Mr. Husnick.

THE COURT: Alright.

MR. KIESELSTEIN: Thank you, Your Honor.

THE COURT: Thank you.

MR. HUSNICK: Morning, Your Honor. Chad Husnick with Kirkland & Ellis on behalf of the Debtors. Very quickly, two quick statements that I think will clean up two of the pending objections.

First, with respect to the United States trustee, the plan of reorganization talks about a reorganized management incentive plan. As Your Honor may recall or know, one of the documents filed in the plan supplement was

a term sheet regarding a reorganized Debtor management incentive plan. We are not seeking approval of the management incentive plan today or as part of confirmation. And to be clear nothing in the plan or the confirmation order will establish the terms of the reorganized Debtor management incentive plan.

The plan will be established by the new board of reorganized TCEH. This new board and any compensation committee appointed by the new board will establish the plan, determine the rights to compensation of individual managers under the reorganized deter management incentive plan, and award those rights. This is what is reflected in the filed plain supplement, and we will make that clear in the plan as well.

Your honor, the second statement that I'd like to make is with respect to the objection of Tex-La and RUS. Your Honor, the Debtors engaged in discussions with Tex-La and RUS, and I'm happy to report that we've been able to negotiate language that I won't summarize here, but we've negotiated language that'll be included in the plan and confirmation order that resolves that objection, and I believe Mr. Fine is secluded in the overflow room, but he wanted me to make that statement so he can depart from Wilmington.

THE COURT: All right, thank you.

MR. HUSNICK: Your Honor, with that, I will, unless you have any questions, turn it over to Mr. Thomas.

THE COURT: Okay, thank you.

MR. THOMAS: Good morning, Your Honor.

THE COURT: Good morning.

MR. THOMAS: Mark Thomas from Proskauer, counsel to Energy Future Holdings Corp, acting on behalf of and at the direction of the disinterested directors, Mr. Donald Evans and Ms. Billie Williamson.

THE COURT: Go ahead.

MR. THOMAS: Thank you, Your Honor. I'll do -- I will be brief. Your Honor, the disinterested directors of EFH Corp. have been acting since 2013, well in advance of the filing of these cases, and the evidence will show that commencing in 2013, the EFH it disinterested directors had numerous meetings of board meetings that excluded sponsor directors or affiliates to review issues relating to the sponsors.

Your Honor, the objections that have been filed are replete with the statements, fall citations, and revisionist history. And we filed a response, docket number 6797, to the objections, Your Honor, on behalf of the EFH Corp. disinterested directors. We also reviewed, revised, enjoined, and signed the replies filed by the Debtors at docket number 6817 and 6820, but one telling example of how

these objections are replete with revisionist history is the statement at paragraph 199, page 84 of the committee's objection that says, quote, the evidence at trial will show that EFH gave TCEH an effective consent right over matters such as the disposition of Oncor, close quote.

That statement is utterly false, Your Honor. Your Honor's November 3rd ruling at pages 18 and 19 ruled that in connection with any Oncor sale process, that the TCEH board and the disinterested manager of TCEH, Mr. Hugh Sawyer, had to first approve bidding procedures; second, approve the choice of a stalking horse bidder; and third, approve the choice of the winning bidder. And the committee knows that.

Your Honor, what did the disinterested directors do? In this case, the evidence will show the professionals were retained by EFH disinterested directors in November and December of 2014, and those professionals dove into extensive document review and investigation. We interviewed numerous personnel. We had meetings with numerous creditor representatives, including representatives of picks, EFIH picks, EFIH second liens, and Fidelity, and the EFH committee, and a partial listing of those meetings of those meetings is set forth in docket 4147.

Your Honor, the evidence will show that there were numerous formal meetings of the disinterested directors. Minutes have been produced. There were not less than 12

such meetings between December and April. In addition, there were numerous informal meetings with telephone calls, electronic communications. The disinterested directors also were fully informed, through board of directors meetings that were held almost weekly throughout this process, and during those board of directors meetings, the status of the cases was discussed.

Your Honor, contrary to the allegations of the objections, the evidence will show that litigation was always an option for the EFH Corp. disinterested directors, and that if a settlement was not reached, there was a litigation option, and it was a bad option for EFH Corp. The expense, the time, and the risk of the litigation will be proven. And the fact that there was no upside to EFH Corp. in litigating against TCEH will also be proven.

Your Honor can take judicial notice that the make-whole litigation with the EFIH first liens, which was a dispute over an unambiguous contract commenced in May of 2014, and now 17 months later, the first brief and the U.S. District Court has finally been filed. What was the result of the disinterested directors work for -- on behalf of EFH Corporation?

On April 3, 2014 -- I'm sorry, 2015 -- the disinterested directors settlement was published and made known. It had a few primary items. One is EFIH, another

Debtor with its own disinterested manager, released EFH Corp. from legacy note holdings in excess of $1.2 billion. TCEH released litigation claims that, exclusive of an LBO claim, ranged in excess of $1.8 billion, and one $700 million claim was allowed in lieu of all these billions of dollars of claims. And disinterested directors settlement, Your Honor, had a fiduciary out.

Now the committee claims that the disinterested directors settlement was concocted in stealth and presented as a fait accompli, and the record will show that everyone that was paying attention and that was a stakeholder in this case knew what the disinterested directors were investigating and what the disinterested director advisers were investigating. And, Your Honor, a fiduciary out is the antithesis of a fait accompli.

Your Honor, since the announcement of the disinterested directors settlement on April 3rd, the EFH Corp. disinterested directors have continued their diligence, and have continued with meetings, continued receiving input from creditor representatives, and continued to consider the appropriateness of exercising their fiduciary out from the settlement. They were, at all times, involved in the Oncor sale process, pursuant to the bidding procedures that stretched from January through June. And, Your Honor, the evidence will show that the result of that

Oncor sale process was an unacceptable bid that would not have paid the EFIH undisputed creditor claims and full. And that meant for the EFH Corp. disinterested directors that the settlement was much better now than it was in April of 2015.

So what are the current alternatives for EFH Corp.? One alternative is to prosecute this plan and the settlement agreement with an opportunity to pay all our creditors in full, yet, at the same time, we have a fiduciary out under the plan support agreement Your Honor approved as well as the merger agreement. We have a shop right to shop for alternative transactions. We have the right to negotiate inbound transactions, so we are available if there is a better alternative.

There is no alternative plan, Your Honor. There is no alternative plan that has been proposed by the objectors. There was no alternative plan with any E-side creditor support whatsoever. Given EFH Corp.'s few current alternatives, what are the future options available to EFH Corp.? Again, we have the fiduciary right. The committee in its objections states that the Oncor value is volatile. Where might EFH Corp. be if this transaction does not close?

Your Honor, we don't know, but we think it's a fair bet that if this transaction does not close, it's because the Oncor value has materially decreased as opposed

to stayed the same or increased, and again, in that situation, the alternative restructuring terms in the plan support agreement, the drag rights, the disarmament, and the approval of the settlement agreement that resolves inter creditor litigation, inter Debtor litigation, and potential sponsor director and officer litigation is of great benefit to EFH Corp.

Your Honor, we believe that the settlement agreement and plan have met all of the required standards, and should be approved under any level of scrutiny you wish to provide. We think the business judgement has just the right test, but these transactions merit approval under even more stringent scrutiny. If required, we would request Your Honor to overrule all objections, grant the motion approving the settlement agreement, and confirm the plan. Thank you.

THE COURT: Thank you.

MR. WALPER: I've got to catch my breath, Your Honor. It's a long walk. Good morning, Your Honor.

THE COURT: Good morning.

MR. WALPER: Thomas Walper, Munger, Tolles & Olson, counsel for TCEH and EFCH as directed by disinterested manager, Mr. Hugh Sawyer. I will be more short than Mr. Thomas figuratively. It has really been a remarkable year, what's transpired in these cases. There's been a fundamental transformation. The T-side was meshed in

litigation, and the cases seemed handcuffed to years and years of the same thing. Now we have a plan that's sponsored by the T-side with, as of, I guess, today, complete agreement now that the PCRBs have a settlement and we'll, I guess, hear more about that, and the E-side is being paid off in full.

Coupled with a settlement agreement, which we think is particularly important, we create a path not only for the confirmation of this highly valuable plan, but also a path for an alternative plan free from the morass of litigation that prevented the reorganization of these companies and progress going forward a year ago.

Harkening back, as Mr. Thomas did, to the November hearing about the bid procedures, and Mr. Sawyer takes the admonition of The Court with respect to the independent duties very, very seriously. And you will hear an evidence in great detail the tireless efforts of Mr. Sawyer on behalf of the T-side to advocate for the constituents.

As This Court may know, certainly in the record -- certainly in the record and he has testified already in this case -- he is a seasoned professional, Mr. Sawyer, with over 35 years of reorganization and business experience. He has been a CEO of several companies, he has been a CRO of companies, and also has been a director on many boards. He, along with the adviser's that he retained, Greenhill and

Munger, Tolles & Olson, over a four-month period, investigated assiduously the claims. Exhibit DX-10, it's a very long exhibit, but it does outline many of the actions that were undertaken by Mr. Sawyer in connection with that diligence.

He and his professionals also during that time engaged in a virtual walkabout to all of the T-side constituents -- unsecured, secured creditors, second lien creditors -- to get input with respect to those claims and to fully understand the interests of the T-side constituents.

We'll hear testimony about the claims analysis that was undertaken, the size of the claims. There were a number, in particular, a tax-sharing claim, which has been accused of being contrived. And the amount of that claim is approximately $754 million, and it was so contrived, of course, that it appears on the Debtor's schedules.

We'll hear about the intercompany notes claim valued at $400 to $800 billion was undercharging of interest between the estates. You'll hear about a tax preference claim of about $100 million, and of course you'll hear in detail about the possibility of a leveraged buyout of (indiscernible) claim in excess of $21 billion.

No also, through the testimony of Mr. Sawyer, be taken to the negotiating room and hear about the highly

adversarial and contentious negotiations that were undertaken after the analysis of the claims between the disinterest the ed directors in order to try to reach a settlement. In this respect, Mr. Sawyer is particularly credible because nobody can accuse him of breaching his duties, or nobody has accused him of breaching his duties in connection with the settlement, and he has simply no relationship whatsoever with the other directors or the sponsors.

Also, you'll hear that he was fully prepared to proceed with litigation at any time in the event that this settlement, or a settlement, could not be reached. The evidence will show that Mr. Sawyer continued his role as disinterested director even after the settlement was reached, overseeing the evolution of the plans and protecting the interests of the T-side Debtors as a whole.

Your Honor, the settlement is monumental. There's really a panacea for these cases because it would survive in case the plan did not go effective, and the plan itself is simply the only actionable approach to reorganization. And it provides a seemingly unattainable result in its consensus of the T-side and its full payment of the E-side. One can wonder why it is there are even objections to this plan. Thank you, Your Honor.

THE COURT: Thank you. Mr. Kornberg.

MR. KORNBERG: Good morning, Your Honor. Alan Kornberg from Paul, Weiss, Rifkind, Wharton & Garrison, on behalf of the ad hoc committee of TCEH first lien creditors.

THE COURT: Go ahead. I'm sorry.

MR. KORNBERG: Today we join the Debtors and the majority of their key stakeholders in supporting a value maximizing plan that enjoys a near unanimous, or maybe even unanimous, T-side support and renders all E-side claims unimpaired. None of the objections raised, no matter how voluminous, should stand in the way of what has been a heroic effort after several failed attempts to restructure a massive enterprise with a very complex capital structure.

The Debtors have fully and effectively responded to the various objections, so there are just a very few points that we wish to make with respect to the settlement agreement in particular. First, no party has objected to the $550 million inter-creditor settlement among TCEH's first lien creditors, our clients, and junior creditors in that silo. This settlement was the product of intense arm's length negotiations conducted as part of the court ordered mediation process.

The T-side inter-creditor settlement resolves litigation that threatened to bog these cases down for years, an outcome that would be a disaster for TCEH and their stakeholders. Second, the resolution of intercompany

claims was also critically important to our committee. One of the fundamental objectives, or what was referred to throughout the mediation as a pillar of that process, was that and a settlement that we negotiated be durable.

In other words, if the re-plan failed, we did not want to start over again by facing the prospect of years of litigation over T-side inter-creditor issues or claims between the T side and the E side of silence. As to this latter category, all stakeholders were fortunate to have the benefit of the hard work of the disinterested directors and their independent advisers in handing out what was a very complex intercompany settlement resolving many difficult issues. It would be wasteful in the extreme, Your Honor, not to take advantage of their efforts in settling these complex matters.

So even if there are substantial terms that remain to be hammered out in an alternative restructuring scenario, a scenario that we sincerely hope that none of us and that This Court will ever have to face, including potentially complex tax and other matters, we won't be starting from scratch. The T-side inter-creditor disputes into the T-side/E-side intercompany claims will have been put to bed permanently. This is a principle and important objective of the settlement agreement and a huge benefit to these cases and these estates.

The objectives would like to pick and choose among the various terms of the settlement agreement. That is simply not possible here. If it is often said about settlements presented to The Court for approval that they're integrated transactions. That is certainly true about this settlement. Each and every part of it is a necessary component of a global compromise. When you unravel one piece, the others fall away.

For example, as Mr. Kieselstein mentioned, the E-side committee suggests that because the T-side has lost so much value, a taxable transaction could be accomplished without significant tax liability to the E-side. Without debating the technical aspects of that argument, that suggestion borders on the irresponsible when one considers that values can and will shift in the protracted period between the effective date, or through the effective date, and such an approach today as Mr. Kieselstein mentioned would effectively kill the possibility of using a REIT to maximize value on the E-side.

So this is an appropriate moment to consider where we are and where we are not. The objectors complain about a plan, that although not a certainty, will pay them in full under any reasonable interpretation of that term. While the E-side creditors have been good at complaining and grasping for more value, they have repeatedly failed to coalesce

around a valuable -- a viable alternative.

As we have reminded parties at virtually every hearing before This Court, the T-side has lost a staggering amount of value since these cases began. Added to such loss in value is the extraordinary course of running these cases. The Debtors have spent the last 18 months trying to solve the E-side capital structure, whether through an Oncor sale or an all-equity plan, both of which approaches failed.

Meanwhile, the TCEH creditors have had to stand by as the parties attempt to achieve a tax-free restructuring to the benefit of the E-side. Enough is enough. The plan and the settlement agreement together represent the only viable option available today, and the plan and the confirmation -- the plan and the settlement agreement meet all relevant standards for confirmation and approval.

The TCEH creditors should not be held hostage in any longer to the E-side's inability to restructure their estates. The Court should approve the settlement agreement and confirm the plan, and all parties should move expeditiously to consummate the transactions they provide for. Thank you, Your Honor.

THE COURT: Thank you, Mr. Kornberg. Mr. Jonas.

MR. JONAS: Good afternoon, Your Honor, Jeff Jonas from Brown Rudnick for the ad hoc consortium of TCEH second lien noteholders. Some 18 months ago, Your Honor, on about

the first day of this case, I stood here the arguing for the change of venue of these chapter 11 cases to Texas. We're not renewing that motion today, Your Honor.

Today, Your Honor, my clients fully support the Debtor's plan --

THE COURT: You might -- you might get it granted today.

MR. JONAS: Unless you'd like us to, Your Honor.

THE COURT: No, no.

MR. JONAS: Today, Your Honor, my clients fully support the Debtor's plan and settlement agreement, and they're obviously not alone. Of course, we wait to hear details of additional settlements, but we'll promptly responds to those when appropriate. As you've heard from the Debtors, the plan enjoys nearly universal support from the secured and unsecured lenders at TCEH, all of whom are not impaired -- all of whom are impaired under the plan, and each and every impaired class of claims and interests that are entitled to vote under the plan hasn't voted to accept it.

Given where we were 18 months ago, that fact is truly remarkable. Of course, this broad consensus among the Debtor's constituents wasn't always the case. At the outset, my clients were at odds with a number of parties, including the Debtor's sponsors, TCEH first liens, and we

took issue over, among other things, what we perceived to be missed or ignored opportunities to unlock value for all of the Debtor's constituents and what to do with the value of the legacy litigation.

Few if any of us thought we'd be standing here before you today all supporting the settlement agreement, which embodies a global resolution of all of those litigation claims in a plan that pays all E-side creditors in full, in cash -- likely in cash -- and provides a valuable investment opportunity for many.

This is truly a success story borne out of many different parties deciding it was in everyone’s economic interest to lay down arms and use the tools provided by the Bankruptcy Code to build a confirmable Chapter 11 plan. And we believe, Your Honor, that the plan is confirmable. I won’t belabor the points that the Debtors and others have and will make as to why this plan satisfies all the requirements under the Code, but we have independently assessed those merits and believe the record will show that the plan satisfies those requirements.

Finally, Your Honor, we owe a debt of gratitude for the patience and guidance you’ve given us throughout the process. Now that we’ve progressed beyond the in-fighting and arrived at the point of confirmation, we respectfully request that you overrule all objections to the settlement

agreement and the plan.

Your Honor, the extent you don't see me or Mr. Weisfelner in the Courtroom, our colleague, Jonathan Marshall, who I think you met this morning and our local counsel, Bill Bowden, will be present and available if the Court has any questions for us. Thank you, Your Honor.

THE COURT: You're welcome. Mr. Miller?

MR. MILLER: Good afternoon, Your Honor. Brett Miller of Morrison and Foerster for the TCEH Committee. We have come a long way from the plan kickoff dinners of a year ago. The path to get here was at times painful, but it got us to the right result. I'm proud to be standing here on behalf of the TCEH Committee in full support of both the plan and the settlement agreement. As an outspoken advocate for a global settlement and an early party to the plan support agreement, the TCEH Committee has been involved in the negotiation of the plan and settlement agreement.

As a fiduciary for unsecured Creditors, on the T side, we believe that this is the best opportunity to maximize value for our constituents, and in light of the likely resolution of the PCRB Trustee's objection, it looks like the entire T side is now in agreement in support of the plan and settlement agreement.

Notably though, our counterpart, the EFH Committee, is one of the most vociferous opponents to the

plan and settlement agreement. This is despite that fact that its constituents will be paid in full under then plan. To return to Mr. Shore's early airplane analogy, which was adopted by Mr. Weisfelner, the E side Committee is sitting in first class, getting ready for its champagne, its lobster and its filet mignon, but suddenly decides it doesn't like the menu, doesn't like the destination, doesn't really like the departure schedule, so it'd rather start the whole trip from scratch. Why? It makes no sense.

The biggest issue that the E side Committee is complaining about is that it wants more money. This plan is the only plan, though. We were shocked by the revisionist history, as others have stated before us, in the trial brief and omnibus objection to the settlement and plan confirmation filed by the E side Committee. It completely erases the painstakingly deliberate process undertaken by the disinterested directors, and their advisors, to reach the settlement, and in place, fabricates a tale based on failed fiduciary duties and prejudice to E side Creditors.

The evidence to be presented over the next few weeks will set the record straight and demonstrate that the E side Creditors are getting everything under the plan they are entitled to as a matter of law, and the objections lack merit.

The case management protocol was put in place last

year to remedy exactly what the E side Committee is complaining about. The disinterested directors and their advisors should be lauded, not skewered, for correcting the flaw that was exposed last year in the Debtor's corporate governance.

With regard to the Oncor sales process, the TCEH Committee professionals, like the EFH Committee professionals, were both under the sales tent, the code of silence. Sullivan & Cromwell, and Guggenheim, on behalf of the E side Committee was involved, together with Morrison & Foerster and Lazard, in participating in twice-weekly update calls for months with the Debtor's advisors regarding the sales process. None of the advisors on either side was shy in stating their concerns along the way. But no one disputes that the sales process failed to produce a viable bid. It just didn't work.

What we agree on is it did propel us towards the plan that we are seeking to confirm today. The only proposal that presented sufficient value to pay the E side Creditors in full was in fact, this plan, the re plan. David Kurtz of Lazard foretold this at the hearing on the sale procedures approval, and I'll quote him: "The matter of Oncor, and whether or not it should be sold at all, is something that should be done in the context of the plan of reorganization discussions. And perhaps we could use the

potential of the Oncor sale as an inflection point to drive those negotiations. The plan should determine whether or not there is a sale. The sale shouldn't drive the terms of the plan." And I may need to remind you of that when I'm defending Lazard's final fee application.

THE COURT: Mm hmm.

MR. MILLER: For the E side to suddenly attack the process in which it was an active participant, and the parties who came up with the construct that pays all the E side Creditors in full while providing a satisfactory resolution for the T, side, because it's not entirely liking all of the bits and pieces of the plan, is quite audacious. Its own adviser agreed in yesterday's deposition that the E side has failed to come up with a viable plan alternative. Again, why do they want to get off the airplane when there is no alternative flight available?

The EFH Committee has gone rogue in its approach to the settlement agreement. With all due respect, it is an extremely distorted view of the value of the claims it sets forth in its brief. As explained in our reply, the TCEH Committee conducted and exhaustive investigation of claims and causes of action against individual Debtors, their directors, officers and the sponsors. In arriving at the conclusion that the proposed settlement agreement is reasonable, the TCEH Committee looked at not only the claims

in favor of the T side, but also the likely counterclaims, defenses, potential delay and the massive expense related to litigating those claims to fruition.

Absent this settlement and the plan, the TCEH Committee would absolutely be seeking more value from the E side, but given the tremendous complexity and high stakes of those claims, the proposed settlement of those claims is manifestly reasonable and will maximize value to all Creditors.

The EFH Committee appears to focus solely on the value and strength it attributes to the E side claims. As a result, the EFH Committee's position is based on a funhouse view mirror of the world, and it is not that -- and it is not a view that is supported by a significant portion of its own constituents, as we have seen, and it is not a view that should be adopted by the Court.

Instead, Your Honor, we respectfully request that the Court take note of the overwhelming support of Creditors who are impaired under the plan, who have nonetheless committed to putting billions of dollars new capital, and who have agreed to stand aside and remain bound by the settlement if the plan should not go effective.

We believe that these concrete facts, and not the E side Committee's wild speculations, are entitled to significant weight and should provide the Court with all the

comfort it needs that the settlement is reasonably fair and the plan is proposed in good faith and reasonable. Excuse me the pop culture reference, but doesn't the E side Committee look a lot like Sheriff Bart from Blazing Saddles with the gun to its own head?

THE COURT: Hm.

MR. MILLER: It's time for disarmament, not more fighting, and accordingly, we request that the Court approve the settlement agreement and confirm the plan. Thank you.

THE COURT: Thank you. Mr. Shore?

MR. SHORE: Good afternoon, Your Honor. Chris Shore from White & Case on behalf of the ad hoc group of TCEH Unsecured Notes. In deference to the tree apocalypse that's gone on here, I've got just a one-pager, if I may approach?

THE COURT: Yes. Thank you. Hm.

MR. SHORE: Your Honor, I put down three thoughts that I think are going to be useful to focus on, as you hear the evidence come in and assess the objections that are being put forward, because really, this confirmation hearing, 20 days of -- in phase one is all about the objections.

$11,537,279 dollars. That was the amount that the EFH Committee billed the Debtors for professional fees through August 31, which was the time the plan was set and

the confirmation scheduling order was put in. That does not include any of the fees that have been incurred by the E side indentured Trustees, EFH, EFIH picks, first liens and second liens. Throughout this trial, you're going to hear questions and arguments to the effect that the negotiations of the plan up through August were corrupted, that the EFH objectors were frozen out of the negotiation, that EFH Creditors were powerless against the Debtor that was dead set on consensus and an end to litigation, that the TCEH Unsecured creditors were granted an upper hand in the negotiations, that there were other, better ways to structure the negotiation.

While all that was playing out, the EFH Committee ran up $11,537,279 dollars in fees that they have sought compensation for, and others, obviously, millions in pursuing what they're doing. It is somewhat insulting to the parties that are ultimately going to be paying those fees to respond to objections such as, "deeply subordinated Creditors, who funded themselves and other estates outfoxed us," especially when coming from an estate-funded fiduciary who must have been 20,000 hours into the case by that time.

It's also somewhat insulting for the Court to have to hear protests of powerlessness when time and again, throughout this case, this Court has made itself available on almost no notice to assist all parties who felt wronged

or disenfranchised in the process. The evidence will show that the negotiation process worked and everybody, every Creditor in these cases, was given a fair shot at the prize.

The next thought, WTFA. What's the feasible alternative? The next category --

(Laughter)

MR. SHORE: Got that right. The next category --

(Laughter)

MR. SHORE: The next category of evidence and arguments you're going to hear from the objecting parties are all blithely premised on some other hypothetical deal out there. So, for example, the EFH Committee in its brief contented EFH could be out of Chapter 11 tomorrow. There should have been a taxable transaction. Why can't the E side just litigate?

I think the Court can fairly conclude from the record that these cases, starting on the first day of these cases, that a deal led by the TCEH unsecured creditors was probably the last place that these Debtors wanted to end up. In fact, you're going to hear from Mr. Keglevich about how many rocks the Debtors overturned to find any deal that promised a path out. Even then, how many times did this Court have to hear, even after a fully baked TCEH plan was presented, that the Debtors were still marching on to preserve alternative plans and alternative structures?

While that was playing out, the EFH Committee has had access to Sullivan & Cromwell and Montgomery McCracken, they've had access to Guggenheim Securities, they've had access to management of the Debtors and professionals, they've had access to the Court, and they've had no apparent budgetary constraints on what they were doing. It's now the day of the confirmation. WTFA? And the F here, as always, is important.

(Laughter)

MR. SHORE: If it was going to be a litigation plan that they wanted, is that plan feasible? What's the budget? How's it getting funded. What's the timeline? What Creditors even want that? Is there a single Creditor who's expressed the view that they want more litigation and to defer recoveries further? We're doing now what's going to be a $10 million dollar trial on a 9019 of the settlement. How is a trial on the merits ever going to be resolved in our lifetimes? If it's a tax deconsolidation plan with this list of massive tax, that the Committee says, "Don't worry about it," where, today, are E side Creditors or T side Creditors, the ones who would have to vote for that plan in requisite number and amount, to say, you know what? We want to take the risk of a taxable deconsolidation.

If the EFH Committee is going to insist on

funding, backed by a specific performance right, where is the hypothetical funding party today who is willing to do that deal? It's time, today, to stop hearing about hypothetical, higher, better alternatives and for the Court to asses the plan that is on the docket, which is the only plan.

Finally, Ned Ludd and the industrial revolution. It's not a band name, it should be. I'm talking to my son about that.

(LAUGHTER IN THE COURTROOM)

MR. SHORE: Ned Ludd was an 18th Century British kid who smashed stocking frames to protest the anticipated loss of work by -- of people who still wove by hand, and now we've got the phrase a Luddite to express someone with an irrational fear of innovation. There's a whole lot of Luddite sentiment running through the objections here.

Synthetic exclusivity, how could that be? It must be stopped. Disarmament in drag, oh, no, un-impairing entire estates, but what work will we do then? Utility reconversions? It's never been done. But really, what's the problem with any of that? The fact that a difficult case has produced new solutions is not, in and of itself, a bad thing. It's innovation, and if innovation works right, it ultimately reduces the cost of the process and benefits everyone.

So when the Court hears questions like, don't most major M&A contracts have at least a liquidated break fee? To us, that seems like just a continuation of an 18th century protest that stocking frames will put people out of work. At the end of the day, what's in front of the Court, and what the Court needs to assess is, does this plan work? Is this plan feasible? We think the evidence is going to show that this plan, with its innovations, is a feasible mechanism for getting everybody and all of these boxes out of your court.

THE COURT: Thank you, Mr. Shore.

MR. KLEINHAUS: Good afternoon, Your Honor. Emil Kleinhaus from Wachtell, Lipton, Rosen & Katz. I represent Kohlberg Kravis Roberts & Co., LLP, TPG Capital LLP. and Goldman Sachs & Co., along with affiliated funds that own indirect equity interest in EFH as well as Texas Energy Future Holdings Limited Partnership, which is the direct equity owner of EFH.

As Your Honor is going to hear throughout the course of this trial, senior members of KKR, TPG and Goldman Sachs, as board members of the Debtor companies, as advisors to the Debtors, and as equity owners, have devoted an enormous amount of time for almost three years to helping the Debtors find a viable restructuring path. They've held weekly board meetings, sometimes more, and they've worked

tirelessly with management and with other Creditors to try to find a consensual solution. The comprehensive settlement and plan that's before the Court, which would resolve all disputes on the T side and pave the way for a 100 cent recovery on the E side, represents a milestone for them as it does for the Debtors and the sponsors fully support the relief the Debtors are seeking.

I'm going to refer to my client generally as the sponsors or the EFH Equity owners, but they're more. They're also Creditors. KKR, TPG and Goldman Sachs have all filed proofs of claim in this case for indemnities, and also for unpaid fees of approximately $80 million dollars under the management agreement. No one has objected to those claims, and so my clients are here not only as equity owners but also as Creditors of these estates.

There's really just one disputed issue before the Court that relates to the sponsors and the EFH Equity owners, and that's the EFH Committee's objection to releases in the settlement agreement. We filed an extensive brief at Docket No. 6810 in response to the supplemental brief and the main brief filed by the Committee so I'm just going to limit myself today to a few additional comments about those releases.

First, process. These releases come after two major investigations, two independent investigations.

First, in 2013, what the evidence will show is that the Debtors, the non-sponsor directors at EFH retained Sidley & Austin to conduct an exhaustive, independent investigation of potential claims against the sponsors. Before the RSA was signed and entered into, Sidley & Austin reported to the non-sponsor directors of the board after full cooperation with the sponsors in that investigation, and releases were approved in that context.

After the bankruptcy, we've had a second investigation, and that's what's been called Legacy Discovery, or Rule 2004. That process, as it relates to the EFH Equity owners, has occurred completely behind the scenes. Nobody has come to the Court in all of the discovery disputes that have happened over the last year and a half and said the sponsors aren't cooperating, the sponsors are resisting, or anything along those lines, and that's because it's not true. We were asked for essentially every piece of paper that exists relating to this company going back to 2006, and that's what we gave to the Creditors in response.

And the reason I focus on this up front is that these releases are the result of an exhaustive process, and they're based on an exhaustive record, and the releases that the sponsor -- the non-sponsor directors have approved and the Creditors Committee claims as well, have to be

considered against that backdrop.

With that background of process, just a few words today on the substance of the settlement. What is it that the E side estates are releasing and what is it that the sponsors are releasing in exchange? And to illustrate this point, with Your Honor's permission, I just want to hand up a -- an excerpt from the declaration of Michael Carter, and put it on the screen as well.

THE COURT: All right.

MR. KLEINHAUS: May I approach?

THE COURT: Yes.

MR. KLEINHAUS: Thank you.

THE COURT: Thank you.

MR. KLEINHAUS: So this page, Your Honor, is taken from the declaration of Michael Carter. It is a summary of all fees paid to the sponsor starting in 2007 under the management agreement, and the reason I'm putting this in front of the Court is because I'm going to make a few adjustments to this summary which show what the fraudulent transfer claims here really boil down to, as asserted by the E side estate.

And the first adjustment is, as Your Honor heard before, the E side Creditors Committee has conceded in the context of their objection that there is no viable challenge to the 2007 LBO. Instead, their position is that the E

side, EFH in particular, actually only, was insolvent on a balance sheet basis as of 2009. So the first adjustment, and this brings me to the second page, if you could go to the next screen please, is to take away everything before 2009.

The next adjustment I'm going to make to the schedule is to take away all the payments that are made by Debtors whose Creditors are not represented by the EFH Committee, and that's TCEH and EFH Corporate Services. It's axiomatic that a Debtor could only seek to recover transfers that it made, and if the TCEH and EFH Corporate Services transfers are taken off this list, we get to the third page, or the next slide, which is fees paid by the E side Debtors.

We're down to the fees paid by EFIH and EFH Corp. Now the next adjustment I'm going to make is to take off the EFIH transfers, and that's because nobody has claimed, and in fact, the EFH Committee's expert has refuted the claim, that EFIH as an estate was ever insolvent.

So you take off EFIH, you get to the next slide, or the next page, and this is just EFH. We're down to two transfers. We have a -- an advisory fee paid in 2009, we have a financing fee paid in 2010. Now, what those two fees have in common is they are both outside of the statute of limitations that the EFH Committee has stated in its brief would apply to avoidance claims here.

The EFH Committee says in its brief that Texas law, or Delaware law would apply. Those are both UFTA states, that's a four year statute of repose.

So, if you take out transfers outside the four years, we get to the last page, fees within the four-year period. It's a null set.

Now, if any of those assumptions are wrong, so for example, if somebody were to claim the statute of limitations could be extended, we could have a whole litigation about value and a whole litigation about solvency and Your Honor's going to hear some evidence as to solvency, you're going to hear evidence including an expert, you're going to hear a lot of contemporaneous evidence that goes against what that expert says.

As to value, I think Your Honor is going to hear overwhelming evidence of value provided by the sponsors, but that whole litigation only occurs once they identify claims that were actually made by the relevant estates -- excuse me, transfers made by the relevant estates that are recoverable.

So that's the fraudulent transfer piece of this. The only other claim that is identified in the EFH Committee's briefing, and the EFH Committee's briefing from about two weeks ago was the first time that we've heard of claims on the E side against the sponsors, is a fiduciary

duty claim, and the crux of that fiduciary duty claim is that the sponsor directors were required, back in 2009 or 2010, to file the company EFH for bankruptcy. And the predicate for that claim is that, according to the Committee's expert, EFH Core was insolvent on a balance sheet basis back in 2009 or 2010.

Now, our clients strongly dispute that point about insolvency, but it doesn't matter. As we showed in our reply brief, as a matter of fiduciary law, and Texas law in this case, there is no duty to file for bankruptcy. Delaware case law, venerable Delaware authority from Judge Gross, from Judge Walsh, from Judge Strine, all of which we've cited in our brief, thoroughly rejects the notion that, if a company is insolvent on a balance sheet basis, there is some obligation on the part of fiduciaries to put it into bankruptcy.

So we don't believe this claim gets to square one legally, but what the facts are going to show at this trial is that the narrative of what's happened with EFH over the last four years is totally inconsistent with the notion that the company should have been put into bankruptcy in 2009. The value of the Oncor business, and EFH's stake in Oncor, has increased substantially. EFIH and EFH have paid billions of dollars to their Creditors that are owed. We're now in a position where the E side estates are proposing a

plan to pay their Creditors in full. So the arc of what's happened on the E side, putting aside all the legal protections that the directors had, are completely inconsistent with this last minute claim that the company was -- that the directors were obligated to put the company into bankruptcy back in 2009 or 2010.

So these are the two categories of claims that are being given up against the sponsors. The flipside is what the sponsors are giving up. I won't take a lot of time on that. Mr. Kieselstein already mentioned the give up of the equity upside in the settlement agreement, which means that after the settlement agreement is approved, if it's approved, the T side unsecured will have access to that upside.

The sponsors are also giving up the claims that I mentioned earlier, that's an $80 million dollar claim, and I note that that's not just a claim against EFH, which itself would be a 100 percent claim under the plan, it's also a claim against EFIH under the management agreement.

So indemnities are being given up, there's an $80 million dollar give up of advisory fees, and then finally, the sponsors have agreed that Texas Holdings, which is a direct equity holder of EFH, would not take a worthless stock deduction during this case if it would effectuate a change of control for tax purposes.

So with all that, Your Honor, I respectfully submit that this settlement agreement is completely fair to the Debtors as it regards the sponsors. The sponsors fully support the settlement agreement and the plan, and we respectfully ask the Court to overrule objections. Thank you.

THE COURT: Thank you.

MR. LOWENTHAL: Good afternoon, Your Honor. Dan Lowenthal of Patterson Bellknap Webb & Tyler, and I'm here with Steve Miller of the Morris James firm, our Delaware counsel. And as you know, Your Honor, we represent Law Debenture Trust Company of New York, Law Debenture, the indentured Trustee on the more than $5 billion dollars' worth of TCEH unsecured notes, and as a reminder, Your Honor, Law Debenture is the co-chair of the T side Creditor's Committee, and the TCEH unsecured ad hocs represented by White & Case and Fox Rothschild holder of the majority of the debt.

And Your Honor, throughout this case we've worked both closely with the professionals for the TCEH ad hocs and the Committee professionals as well. And from the outset of the case, Your Honor, we heard repeatedly that the TCEH, the T side unsecured creditors were out of the money. But fortunately, over the course of these cases, through the hard work effort of a lot of parties, that has changed. And

on behalf of Law Debenture, we submitted a statement in support of the plan and the settlement agreement. We submit that the evidence will show, as others have already indicated, that the requirements of the Bankruptcy Code and the rules would be satisfied, and accordingly, we join with the other proponents in urging the Court, and we will later, in closing and post-trial briefing, as necessary to confirm the plan and approve the settlement agreement.

In our statement, Your Honor, also responds specifically to the objections of the United States Trustee with respect the fees under the plan and the settlement agreement. That objection addresses a legal issue, whether those fees should be paid in accordance with the Bankruptcy Code, certain sections in Bankruptcy Rule 9019.

Our statement, the one we submitted as well as some others, indicates why and explains why what the Debtors propose is appropriate, and I won't repeat those arguments here, but again, to the extent necessary, in closing and in post-trial briefing, we will do so. Thank you.

THE COURT: Thank you.

MR. KIESELSTEIN: I think that's it from this side of the room.

MAN: One more.

MR. KIESELSTEIN: Sorry, apologies, Your Honor.

MR. KANOWSKY: Arie Kanowsky on behalf of the

United States, Your Honor. Now, overall, the United States as a unitary Creditor has objected to the plan but I'm here today to talk about the taxes. The Debtors have proposed a plan that they contend is going to lead to a tax-free reorganization. They've asked for a private letter ruling, or PLR, from the IRS. The IRS is diligently working on that PLR process, working with the Debtors. We have not reached a resolution yet. We have not raised an objection to confirmation at this time, because the plan currently as filed, purports to have a tax-free reorganization.

To the extent the Debtors revise their plan, amend their plan, to have a large taxable sale where there's an unfunded liability, we've reached a resolution, and reservation of rights, where we would be allowed to later object to the plan -- to that subsequently amended plan, in addition to the extent that the PLR process or for whatever reason, the Debtors wind up with a large taxable liability, we've reached language to resolve which Debtor specifically would be -- Debtors specifically would be liable.

With that being said, we have no objection as to the tax claims on behalf of the United States at this time.

THE COURT: Thank you.

MR. KANOWSKY: Thank you, Your Honor.

THE COURT: Thank you very much. Anyone else wish to be heard in favor of the plan? Okay, I hear and see no

one. We'll take a recess for lunch and we will try very hard to stick to an hour for our lunch recesses, so we will reconvene at 1:55. Thank you very much.

(Recess)

CLERK: All rise.

THE COURT: Please be seated. Thank you for returning so timely. I appreciate it. It'll help keep us on schedule. Mr. Dietderich?

MR. DIETDERICH: Good afternoon, Your Honor. Andy Dietrich for the official committee, with my colleagues Brian Glueckstein and John Hardiman. I do have some slides for the Court, if I can pass those up.

THE COURT: Yes, of course.

MR. DIETDERICH: Thanks.

THE COURT: (Indiscernible) busy misspelling your name. Okay.

MR. DIETDERICH: May it please the Court. For the EFH unsecured creditors committee, these proceedings are not about being paid in full. They're about risk. And there's an opportunity to be paid in full. But it's not the estate's opportunity. It's not the opportunity of anybody in this courtroom. It's the opportunity of a handful of institutional investors. They will decide whether this plan becomes effective. No one in this courtroom will. Not even the Hunts will. It will be these investors.

They have no fiduciary duties to the estate. In fact, they have contrary fiduciary duties to the investors that gave them money. They are economically rational actors. They will look at a spreadsheet months from now, based on market prices, and make their decision. And no one in this courtroom will have any rights to do anything about it if their answer is no, which is why there's a settlement. The settlement is binding.

The settlement is permanent. The settlement is meaningful. The settlement is final. The plan? Not so much. This will be a rare confirmation hearing where two-thirds of the time is spent discussing what happens if the plan does not become effective.

What does the committee want? We have no objection to selling Oncor to the Hunts. We have no objection to selling Oncor to the Hunts and the T-side creditors. We have no objection to selling Oncor to Nextera. We've asked only for three things.

First, if Oncor is to be sold, there should be an enforceable contract against the buyer so the estate can have appropriate assurances the deal will close. Second, the estate should not permanently compromise all claims by it or against it now, outside of a plan of reorganization, but only effective upon the future plan of reorganization, on this record, on these terms. We have no problem with the

settlement being moved later, closer to the plan. But not now, and not on these terms. Third, insiders should not be released until the effectiveness of a plan of reorganization.

That's it. Those are not unreasonable requests. There's no ulterior motive. It isn't particularly difficult. These are right down the middle of the fairway.

But we have no line-item veto. And we have no practical ability to require the Debtors and the plan proponents to make these changes. They've taken the position that the consent of my client and its constituency is unnecessary, because that consent can be manufactured as a matter of law.

So, they bring to the Court a package deal, designed by everybody but the EFH creditors, in the best interests of everybody but the EFH creditors. And we object.

Now, they try to buy creditors off individually to resolve those objections, outside of a plan. That's a kind of progress. It's consensus. But the payments are made to large investors, particularly the investors who an direct a trustee, but also the investors with the money and the resources to have played an active part in the case. And the treatment is disparate. And it's happening outside of a plan.

The committee is the fiduciary for all creditors, large and small. And it may be consensus, but it's not consensus achieved in the rules set down by Congress.

What's coming to trial? Putting aside all the rhetoric in the brief, the most important facts for Your Honor to find are not even in dispute. There's no deals to work through. There's no details to work through. The parties characterize the main facts very, very differently. But most of the facts themselves are pretty clear.

What will be left for you to decide, after evidence, is a disagreement about how bankruptcy is supposed to work. The EFH unsecured creditors, chiefly bondholders and retirees, are the fulcrum creditors at EFH. All one has to do is listen to the threats of doom and destruction visited on the EFH unsecured creditor if the REIT deal is not confirmed to know who's at risk if the decision to pursue the REIT deal doesn't play out, and of course who bears the cost of the settlement when it doesn't.

So, this case will raise important questions for you to decide about how much can be taken from the EFH creditors by the package of a preplanned settlement they object to and a plan they haven't been given the opportunity to approve. You will have to decide three primary questions.

First: what is the standard of review? And

what's the relevance of creditor objections and insider participation to that standard of review? Second: should the settlement be approved now for the alternative plan? And is it fair and equitable, and not prejudicial, to do so? Third: are the confirmation standards satisfied? The parties have briefed these matters, and they are the heart of the dispute, the law.

From the committee's perspective, all we will say now is that you have been asked to sail into uncharted waters. The unimpaired fulcrum creditor is a pretty rare occurrence. And we will argue, after evidence, that the Court should keep it that way if the Bankruptcy Code is to work as Congress intended it to. We have no problem with consensus. It's a question of how consensus is achieved.

As to the factual record, we thought it would assist Your Honor to divide the facts now into three related groups. The first group relates to the standard of review, the second to the objective merits of the settlement, and the third to the test for confirmation.

With respect to the standard of review, here's what we know. First, the decision-makers -- do we have a slide? -- the decision-makers for the Debtors were conflicted. This is a legal conclusion, Your Honor. It is not a personal attack. What we allege is that they were put in a position where they were conflicted on the decisions

they were making. That's the fact.

As indicated on the slide, 10 of the 13 EFH directors had a conflict, because they were directors of TCEH. Or they were affiliated with the directors of TCEH, in the case of the controlling owners' designees. And six of the seven TCEH directors were directors of EFH.

Board overlap is not unusual in multi-Debtor cases. However, unlike most multi-Debtor cases, these were two distinct credit silos, with creditors at war. And the central issue in the case was and is the allocation of value among the silos. Witness the fact of two separate statutory committees. In addition, the two co-CROS, with primary responsibility for restructuring decisions, also served both EFH and TCEH.

So, what is the standard of review? The answer under applicable law is heightened in one form or another. Now, (indiscernible) mitigate the heightened standard of review under corporate law, although, as we'll argue after evidence, it may not be as effective in bankruptcy, is the effective delegation of decision-making to disinterested directors.

Here, the facts will show that the disinterested directors at EFH were delegated only limited authority. Their job was to approve the sale of Oncor under the bidding procedures, which never happened, and to fill in the blank

on a global settlement proposed by the CROs.

This slide shows the actual delegated authority of the disinterested directors with respect to the intercompany claim settlement, and I'll read it: "All prepetition interDebtor claims, causes of action, and disputes, including avoidance actions, including, without limitation, the intercompany claims and the step-up matters or conflict matters."

Now, for these delegated matters, Your Honor, the EFH disinterested directors had external advisors only. They had no management team. There was no attempt to have an E-side CRO. All management input for the delegated decisions came from conflicted officers with fiduciary duties to TCEH.

With respect to all other meaningful decisions, where the interest of EFH and TCEH diverged, the disinterested directors have no delegated authority. Instead, they approve the package, negotiated by others, at the end of the process.

The next slide shows these non-conflict matters. And I'll read them: "Determining for EFH the architecture of the settlement with TCEH, determining for EFH to include insider releases in the intercompany settlement, negotiating for EFH a joint plan with TCEH, negotiating for -- with -- for EFH tax matters with TCEH and the IRS, negotiating for

EFH the sale of Oncor by EFH to TCEH creditors, and negotiating for EFH a PSA between EFH and TCEH and insiders."

For these corporate actions by EFH, EFH was represented by officers with a duty to TCEH. The officers were advised by advisors with duties to TCEH. And they reported to a board, the majority of whom had duties to TCEH. We call these insiders conflicted insiders because that is what they are as a factual matter. Again, it isn't a personal attack. It's the position they were put in.

They may have tried their best to consider EFH interests as well as other interest. But as dual fiduciaries, the best they could possibly do was balance the interests of EFH with the interests of TCEH. They had a clear and obvious conflict. And that requires heightened scrutiny by the Court.

The second set of facts relevant to the standard of review is the lack of approval by EFH creditors. Now, the absence of creditor approval, Your Honor, is a factor relevant to many legal and equitable issues to be decided by you after trial, as the Debtors concede.

As you consider the evidence, we ask Your Honor to note in particular the statements in the record from the Debtors and others that EFH has no other way to pay its creditors in full, that EFH creditors are at risk now and in

the future, and that the business decision being made on behalf of creditors is meaningful and important.

Without evidence of creditor approval, other than E-side creditors with crossover claims that are actually participating in the T-side transaction, the Court will hear evidence from the Debtors about how the E-side creditors are to blame because they could not come up with a better approach themselves. This is of course irrelevant to your standard of review.

The reason why there has been no plan from the E-side creditors is because the E-side creditors did not want to make a giant payment to the T-side for no reason. It is a commercial point. It is an intercreditor point. It's not complicated. And all the finger pointing by the EFH Debtors at their own creditors, whose interest they say they are protecting, as a legal matter, underscores the magnitude of the disagreement and the need for heightened scrutiny.

The third set of facts relevant to the standard of review relate to the nature of the entire transaction, settlement and plan, as a sale in which controlling owners participated, to some extent. And Your Honor can decide the extent of the participation and whether it's cognizable. But the evidence will be clear that this transaction was negotiated between the buyer and the controlling owners, and that the controlling owners have some economic interest in

its success.

The Debtors pretend this is somehow not unusual. But a change-of-control transaction, outside of the context of a Court-approved option, arranged with controlling owners, implemented through an unimpaired plan, over the objection of the fulcrum class, doesn't happen every day.

And the evidence will show, Your Honor, that this global settlement must be looked at as part and parcel of the M&A transaction, as a way to divide up the value of that transaction among parties other than the actual sellers of Oncor, EFH and EFIH. Oncor was treated as an asset of everybody's. The clearest example of this is the trade of contractual damages, which would be payable only to the seller, for disarmament, which is paid to everybody.

The second group of facts you will hear relate to the settlement. In a nutshell, the core settlement the committee is challenging is simple. EFH and TCEH give up all of their litigation claims against each other, now and forever, in the event the proposed plan does not close. EFH allows a $700 million general unsecured claim.

I would note, further on -- and this is critically important from the committee's perspective -- that the $700 million allowed claim is only paid by EFH. But TCEH gives up all of its own claims against directors, officers, controlling owners, and even TCEH's creditors. TCEH

releases many claims, not only against EFH. But only EFH pays.

The Debtors, however, Your Honor, are less complicated. They're asking the Court to justify the settlement on its own terms as a litigation settlement. It can't be justified by the opportunity to be paid in full under the plan, because the Debtors removed it from the plan and are seeking approval only on the narrow basis of 9019.

Nor can the Debtors justify the settlement with the T-side mediation settlement. Your Honor will not hear evidence that EFH's agreement to the settlement is necessary, or that TCEH's mediation settlement will somehow be lost. Of course not. It would defy belief that the T-side mediator would resolve a lien challenge at TCEH by awarding to the junior creditors the right to buy Oncor from EFH and the senior creditors a $700 million claim against EFH if they do not. That would be the easy way to resolve the TCEH lien challenge.

Instead, the settlement must live or die on its merits as a litigation settlement, now, pre-plan, as between EFH on the one hand and TCEH and all the insiders on the other hand. Does it?

Well, putting aside the standard of review and legal arguments, the important facts for assessing the merits of the settlement are those probative to how a

reasonable person at arms' length would settle the claims. Your Honor will operate under the mandate of TMT Trailer, which requires an independent judgment by the Court based on, quote, "facts, not allegations," close quote.

The Debtors' listing of claims and repetition of words like "complex" and "uncertain" is not probative evidence. And the choice of the Debtors to proceed with a multipart settlement all at once does not relieve them of their burden of proof. The Debtors will need to show admissible facts that support a $700 million allowed claim. And Your Honor will then need to consider the applicable principles of law on which they rely. It is the admissible facts and the applicable law that the Court must canvass under TMT Trailer, not the list of allegations.

The facts for you to canvass are narrowed after briefing. And there's now clarity into the main claims being settled. The starting point is the claims TCEH submitted to EFH on March 16th.

This is taken directly from the minutes of the meetings of the EFH disinterested directors describing the ask from TCEH, and it is a discrete list of claims: an intercompany tax claim, $754 million; an insider preference, 84 million; claims for an interest rate delta on the intercompany notes, 620 million; an amend and extend claim, 80 million; over-allocation of shared services, 125; sponsor

fees, 140; LBO claims, zero; and a basis step-up for 700.

And, Your Honor, all of these are listed at face, as the document says, without regard to the law or the facts. There are not five million pages of legacy documents to worry about. There are only these eight claims.

As to the legal claims to which material value is attributed, Your Honor, they fall into two types. And we've organized them very simply. There are contract claims, and there's avoidance claims.

The contract claims arise under the tax allocation agreement, consisting of an AMT credit claim and an NOL claim. Both can be dismissed under the four corners of the contract. As the AMT credit claim, the largest, the Debtors can barely find evidence for it, and already admit in their pleading that the contract does not cover AMT credits.

As to the NOL claim, the question is whether a Court will or will not follow the very specific principles for tax group allocation set forth in the tax allocation agreement, which happened to mirror those in the Internal Revenue Code. The Court can see, on its face, that the contract is not ambiguous.

The Debtor, in response, digs through years of papers to find pieces of parole evidence trying to turn this into a "he said/she said." But the parole evidence is consistent with the four corners, which is also irrelevant.

It is a Texas law contract. Under Texas law, the words of the contract govern.

Everything else is an avoidance action. And with respect to the avoidance actions by TCEH against EFH, Your Honor, we ask the Court, in listening to the evidence on these claims, to consider the question of reasonably equivalent value, from the perspective of TCEH.

For example, as to the underpayment of interest on the intercompany note, which appears to be one of the pillars of the settlement, (indiscernible) in their case where underperformance of interest on a performing loan is a fraudulent transfer in the first place, and have no evidence that TCEH did not receive reasonably equivalent value for its demand deposit at EFH, running LIBOR plus 550 basis points.

Similarly, the alleged overpayment of corporate services and sponsor fees by TCEH are accompanied by no evidence that TCEH did not have -- receive reasonably equivalent value for what it paid, or could have obtained similar services more cheaply somewhere else. This is a fatal lack of evidence under applicable law.

The LBO, Your Honor, requires special attention. TCEH listed at zero for good reason. We would like Your Honor to understand one fact about the EFH unsecured creditors, a trait shared by the legacy (indiscernible),

most of the retirees, and even the asbestos victims: they all have claims that predated the LBO. This stands in contrast to the TCEH creditors, who hold the debt that financed it.

If the statute of limitations or solvency issues are overcome to permit an LBO challenge, EFH and its pre-LBO unsecured creditors would never agree to a settlement where they paid TCEH creditors for LBO exposure and everyone involved in are benefiting from the LBOs released. The LBO is properly zero as a claim against EFH in any settlement where LBO claims are not also actively pursued in every direction.

The Court should also briefly consider EFH's claims against TCEH. All that is important for the Court to note now is that there will be no evidence that these claims are worthless. The undisputed claims have a market value today. The demand note is the only intercompany note, Your Honor, that was never repaid. At a minimum, these claims must be taken into account in the settlement math as defenses.

Your Honor also will have no evidence about EFH's DNO insurance. Your Honor should consider whether -- well, we'll have evidence about EFH's DNO insurance. Your Honor should consider whether some of TCEH's allegations were properly sound as breach of duty of loyalty claims, which

claims would be covered by insurance. That's it. That's the merits.

The Court also will hear testimony from the Debtors trying to justify this settlement with litigation expense. However, these again will be allegations and not the facts required by TMT Trailer. There will be no probative evidence of the cost of actual litigation of any of these limited, discrete claims. There's been no litigation budget, no litigation plan.

In the past, the Debtors have confused litigation expenses with case burn, which is chiefly interest expense. Debt service cost is not litigation expense. There will be no evidence that the settlement of these claims, as between EFH and TCEH, is necessary to emerge from bankruptcy.

Every one of the alleged claims is a general unsecured claim. There's no allegation of an administrative priority. There's no allegation of a right through property. They're general unsecured claims, subject to an orderly claims resolution process.

More fundamentally, the Court will hear no evidence that the alternative to settlement is litigation of these claims until the end of time. The question before the Court is whether the settlement should be entered now, globally, outside of a plan, applicable only to a future plan, for all claims simultaneously, as a package.

There's no evidence that this is a particularly good way or time to settle any of these claims. To the contrary, the evidence will suggest that EFH creditors are prejudiced by settlement as a package, especially before important information about the future effect of the settlement is known, including the relative value of the E and T estates. In short, the Court will not hear evidence to justify the settlement as a normal litigation settlement.

Now, the Court also will hear no evidence that EFH must pay TCEH because the Debtors need a tax-free deal and TCEH is losing 700 million in present value of a loss of business (indiscernible). And no matter how much the Debtors run from this, this is a very big change.

$700 million was initially attributed by TCEH to this alone. And it's now clear that the T-side today suffers no loss from a tax-free transaction that requires them to be compensated. Debtor cannot justify today's settlement on yesterday's facts, and it can't really justify today's settlement on speculation about future facts. The different tax landscape today, right now, alone destroys the basis for the equal disinterested director settlement.

Instead, the Debtors now try to justify the same 700 million with a new tax theory, that the T-side could threaten the taxable foreclosure and create issues for a subsequent REIT conversion. Allowance of the claim becomes

a sort of consent fee to the T-side for permitting a REIT.

Now, whether Your Honor chooses to analyze it under Rule 9019 or 363(b), Your Honor will not hear evidence that this fee is reasonable on today's facts. There's no agreement by the TCEH first-lien creditors to a REIT or to a tax-free reorganization in the future. The only tax-free reorganization they are facilitating is the current plan. And the current plan cannot be a justification for the settlement, because it was removed from the current plan, presented on its own merits, and applies only if the current plan fails.

I would like to talk for just a minute, though, about Mr. Kieselstein's tax accounting advice. The evidence will show there's been no tax planning advice for a future alternative plan. And Mr. Kieselstein's comments indicate the problem with this. The premise of his remarks is that it is impossible to do a REIT deal and a taxable deal. This is not correct.

Of course, if you were to sell TCEH in a taxable disposition, and then convert to a REIT, there may be a necessary E&P purge. But if you were to convert to a REIT first, and then do a taxable disposition, the problem disappears. Any tax lawyer actually asked to structure a transaction as opposed to come up with yet another way to justify a settlement would think of this.

It certainly is not necessary or appropriate for the Court to (indiscernible) tax structure now. Again, I don't know how it justifies a litigation claim settlement. But the Court should certainly be skeptical about tax planning in the future and hesitate before considering it probative evidence for the fairness of the litigation claim settlement.

I'd also like to take a moment, Your Honor, to address a comment from Mr. Thomas. Mr. Thomas stated to the Court that Your Honor extended to TCEH an approval right over the disposition of Oncor at the bidding procedures hearing. Your Honor will remember that this ruling was issued orally from the bench at a hearing, at which the newly formed committee was not yet represented by counsel.

We did not and certainly do not interpret the Court's statements from the bench as granting TCEH a veto over the sale of Oncor. Indeed, it's hard to figure out how that would be possible as a matter of law.

The Court's ruling was in the context of the bidding procedures. And it has always been the position of the committee that EFH and EFIH could sell Oncor on their own motion at any time. Again, there's been no allegation of a property interest in Oncor by the T-side. They are a general unsecured creditor.

The entire bidding procedures discussion arose

because the Debtors moved for relief to sell Oncor collectively, including TCEH in a motion for permission to sell Oncor. Your Honor correctly ruled that, to the extent TCEH is involved in the disposition, it's a conflict matter and requires Mr. Sawyer's approval. Your Honor, in our view, did not extend to TCEH as a corporate matter the right to approve any sale of Oncor for the duration of the case.

Mr. Thomas's comments underscore a fact that will be established at trial: the EFH disinterested directors thought there was a veto. So, the EFH disinterested directors thought they needed to pay TCEH whatever it took for consensus.

And last: the plan. The third set of facts relates to the plan. I'll focus on feasibility, although the other defects are also important. And there will be some evidence going to those as well, in particular impairment, discrimination, and the good faith elements of 1129(a)(3).

Let me speak about good and bad faith for just a second, Your Honor, because that was confusing this morning as well. We've not accused any individual of bad faith. We mentioned bad faith once in our complaint, and it's a point about bankruptcy policy under (indiscernible), and whether or not it's consistent with bankruptcy policy for a clearly fulcrum class to be stripped of its vote. It's a bankruptcy

policy argument. It's not an accusation.

But with respect to feasibility, the single most important piece of evidence is not disputed, that the purchasers bargained for and obtained, in their contract, a clear right to walk away from the M&A transaction with no remedy by the seller to stop them. And here's the contract.

The first highlighted provision, Your Honor, says that the seller has no right to specific performance. The second says that the seller has no other remedies. The third says that the seller has no damages remedy.

In addition, Your Honor, there's also no ability to enforce the buyer's equity commitments through a guarantee or otherwise, which is what makes specific performance against a shell vehicle meaningful in every other financial sponsor acquisition. This is unprecedented. And it is bargained for.

Now, rather than a contractual commitment, we expect the Debtors to offer the personal speculation of their witnesses that the buyers will want to close. Testimony about the assumed intent is contradicted by the express terms of the bargained-for agreement. The contract is the manifestation of intent. There's no deal outside of its four corners. People mean what they write in contracts. And the more sophisticated they are, Your Honor, the more they mean what they write in contracts.

The problem for the buyers is they do not know what the REIT is going to look like after it makes it through the regulatory process. They don't know what they're buying. The assets to be included in the Oncor REIT will be a subset of the assets occur in Oncor. Oncor must be divided into an operating company and an asset company, and only the asset company is the REIT.

Since there's neither a business nor a business plan, there's yet no evidence of the feasibility of splitting Oncor into an operating company and a REIT. And there's no evidence that the value of Oncor as a REIT. And there's no evidence of how much of that value, if it exists, regulators will demand to be returned to ratepayers as a condition of the REIT approval. It's all total speculation. And so, there's no remedy in the bargained-for terms of the contract to buy whatever exists in the future.

Now, we expect you will hear testimony, Your Honor, that the settlement works like a remedy in the merger agreement. So, the merger agreement doesn't actually need one. In effect, this testimony will say that the buyers will close because they would be disappointed to only receive 550 million in cash. You will not hear this testimony from the buyers, who are not in the courtroom. It also is speculation, not evidence.

You will hear no probative evidence, Your Honor,

that the $550 million cash payment is a disappointing outcome at all, especially in a downside case. The 550 million is a floor price on the bonds, Your Honor. And that floor price is more than double what was provided in the initial RSA.

The only objective evidence of the likelihood of closing is the bargained-for terms of the contract and the laws of economics. And with respect, Your Honor, I submit that the closing decision is a simple equation. Will the value of the REIT in the future exceed the price, which, by the way, is set at the amount of claims, plus $550 million? This, and this alone, will determine whether the plan becomes effective.

Assuming total overlap, which this does, between buyers and creditors, the first thing that will happen as closing approaches is that the buyers will decide whether to part with $550 million in cash, plus the purchase price, on their equity (indiscernible). And there's no evidence they will. The laws of economics are what they are. The contract is what it is. And the decision is entirely theirs.

For EFH, Your Honor, this is a disaster. If Oncor is valuable in the future, EFH should be able to sell it without the buyer paying a $550 million penalty. The Court's ruling on Friday added another gloss, because the

P/E would now be significantly inflated and create another disincentive for closing this particular plan. The economics are incontrovertible. And expert testimony will explain it more fully to the Court.

And I want to pause here, Your Honor, because I don't want to miss a particular point. This is not a question of this equation versus another equation for liquidated damages. The strange thing about the M&A contract is the absence of an ability to enforce the equity commitments themselves.

And, as testimony will show, the equity commitment letters are almost invariably specifically enforced. There can be regulatory conditions. There can be financing conditions. But this is the one deal with which we're familiar where the equity investors themselves do not have to fund, and the estate -- even if the conditions are satisfied, and the estate has no recourse.

So, on this record, there's no evidence a rational future commitment party will close. The Debtors' insistence that the TCEH junior creditors believe their claims are worth more than 550 million today is speculation. And it's irrelevant to the laws of economics.

If the Court approves the settlement and the plan, the TCEH junior creditors have converted their claim into an election to receive either REIT value minus price, and call

that the in-the-money-ness of the option, or 550 million. They will never get their claim back. And they will never, simply because they thought that claim was worth a lot of money, throw good money after bad.

The economics illustrate, more than anything, that the plan sale is a poorly conceived afterthought for the settlement. The Debtors were happy to trade contractual remedies, benefiting only EFH's seller, for a settlement benefiting everybody. In so doing, they come now to this Court with the objective, meaningful evidence -- without objective, meaningful evidence of feasibility. The plan is all about a settlement. The settlement is permanent, meaningful; the plan is speculative. That's what all of the documents say.

So, what do we have at the end of the day, from the standpoint of EFH? Here's how the committee sees the situation for creditors as a commercial matter. We believe that, in considering the total package from EFH's perspective, this is a useful illustration for the Court, to show you how we think.

In the upper left-hand quadrant, if Oncor has a high value in the future and the plan is confirmed, E-side creditors are paid in full. If the plan is not confirmed and Oncor has a high value, E-side creditors are paid in full. Confirmation of the plan doesn't change the

underlying economics. All it does is take away the ability of the EFH estate to control the disposition process for the asset.

And at a low Oncor value, E-side creditors allow, if the plan is confirmed, a $700 million claim. And they give up all their affirmative claims. If the plan is not confirmed, EFH and TCEH both reserve their rights on all affirmative claims, and a plan can be negotiated without artificial constraints of a settlement that contemplates that plan.

In both circumstances, the EFH estate is not better off. What we've done is we've lost rights, rights in the high-value case to control the disposition of the assets, and rights in the low-value case to have an influence in the formation of the future plan. And we've lost those rights, Your Honor, without a vote. Thank you.

THE COURT: You're welcome.

MS. RAMSEY: For the record, Natalie Ramsey, Montgomery McCracken Walker & Rhoads, conflicts counsel to the committee. Let me begin, Your Honor, where Mr. Dietderich began, because it's important.

The EFH committee has no objection to EFH's release of the controlling owners and their designated directors at the effective date of a current plan or another plan. Releases upon the effectiveness of a plan would

require that all EFH creditors are unimpaired, or that, if impaired, they vote to accept a plan that contains the releases, or that the plan would be subject to a voting impaired class, not including insiders, that was otherwise fair and equitable.

The committee's objection is to the Debtors' request to release the controlling owners and their designated directors now and forevermore, regardless and separate from whatever the treatment is that the E-side creditors might expect. We will argue, after trial, why this is unprecedented and wholly inappropriate. But for today, I want to highlight briefly the evidence that the Court will hear and what it won't hear with respect to the insider releases.

First, Your Honor, we'll hear no evidence of why a release now, as opposed to in a plan, is good for EFH. You will hear that the Debtors want peace. You'll hear arguments about the necessity of a global deal. But the desire for peace and global resolution cannot justify giving up a potentially valuable estate asset in the form of an outgoing claim for grossly inadequate consideration.

Second, we will hear evidence that the controlling owners have wanted to be, and at times have insisted on being, released from the time that the Debtors first began contemplating bankruptcy. They wanted it so much that they

inserted themselves into the current deal as the principals in the negotiations with the buyers, and made the release a central term of the sales transaction.

The releases are set forth in the contract, which is the settlement agreement, signed by the controlling owners on one side, the Debtors on the other, as adverse parties. And the controlling owners have agreed to one thing, which is: support the transaction. They get one thing, which is the releases. The evidence will show that the releases are being granted to the sponsors on a quid pro quo basis, on account of their interest within the meaning of PWS Holdings.

Third, you will not hear evidence that the bargain reflected is a fair process or a fair price. In respect of process, Your Honor will hear evidence that a special committee was convened in April of this year to evaluate the sponsor claims. We won't hear what happened at that meeting. We will not hear that there was an exhaustive review of claims, because we won't know what those claims are.

But you will hear evidence that the special committee agreed to release the sponsors and the directors as part of a plan that at that time contemplated that the E-side creditors would either be paid in full or would consent to the treatment in a plan. You will hear no evidence that

the special committee agreed to the releases outside a plan, and you'll hear no evidence, importantly, that they agreed to the releases when they migrated from a plan over into a standalone settlement.

The special committee never met again. Instead, you'll hear evidence that the releases became bargained-for terms in an overall plan transaction first negotiated with the sponsors, and that, when the Debtors considered the new structure of the transaction in connection with a PSA, that they didn't consider that the new structure changed materially the treatment to the E-side creditors.

They didn't ask for the special committee to be reconvened at that time. They didn't recognize the importance. But the TCEH ad hoc committee did. They indicated in correspondence to the sponsors' counsel that they were getting everything they could have ever dreamed of.

In respect of price, you'll hear from the settlement parties that the controlling owners are contributing value in the form of equity upside, taking -- not taking a worthless stock deduction, foregoing their claims for unpaid management fees, and foregoing a claim for indemnification.

Taking those one at a time, you will not hear compelling evidence that there is any upside in the REIT

plan to give away. But if there were, it wouldn't be coming to EFH, because it would only exist if EFH creditors had been paid in full. You will not hear that there's a realistic likelihood of a worthless stock deduction that would harm EFH's NOLs. You will not hear that the small portion of the management fees that would be allocable to EFH, even if they were enforceable as priority claims, have any value of significance.

And finally, with respect to the indemnification claim, to the extent that it is enforceable, it would be a prepetition claim treated as an unsecured claim along with all others in the bankruptcy. And there are certainly circumstances in which pursuing a claim that would be payable to the estate in 100-cent dollars and payable by the estate in less than 100-cent dollars would be a claim worth pursuing.

As regards the sponsor-designated directors, the Debtors will argue that their service during the reorganization justifies the release that they're receiving. You will not hear, however, that they have provided value outside of the scope of their regular responsibilities and existing fiduciary duties.

Fourth, you will certainly not hear evidence that the Debtors valued the release claims. And you will not hear evidence that the Debtors valued the cost of pursuing

any claims against the sponsors or their designated directors.

Fifth, and importantly, the EFH committee believes that the facts will support colorable claims as that terminology is used in Cybergenics, or, to use the terminology of TMT Trailer and Martin, that there are claims with a likelihood of success on the merit as to which there are no collection concerns.

These claims include claims against the conflicted directors for breach of their fiduciary duties of loyalty in connection with various of the amend and extend transactions that took place prepetition, as well as aiding and abetting claims against the sponsors related to those same transactions.

The corporate governance deficiencies that were recognized by this Court a year ago existed throughout the prepetition period. Your Honor will hear evidence, including the expert testimony of Mr. Rule from AlixPartners, supporting a finding that EFH has been continuously insolvent on both a consolidated and a standalone basis since the end of 2008. The evidence will show that the damages associated with a successful claim for waste, or, as termed in Texas, negligent mismanagement, could measure in the billions of dollars.

However, the claims are not on trial. The

releases are. And they must be evaluated separately and under a standard of entire fairness.

You heard -- you will near no one say that the releases are worthless. Notably, you did not hear anyone say today that the releases are worthless. We believe this fact alone should end the inquiry. The circumstantial evidence of the constancy of the releases throughout the period and the structure that's before this Court certainly suggest value.

But to the extent that the Court requires more, we believe the evidence will show that EFH has claims against the controlling owners and designated directors that have both merit and value. Thank you.

THE COURT: Thank you. Ms. Schwartz?

MS. SCHWARTZ: May it please the Court. Before the Court is a settlement agreement and plan by which the Debtors and the plan supporters seek to resolve extremely complicated legal and factual disputes, and stake out a path for restructuring the approximately $40 billion in debt that the Energy Future Debtors owed to their creditors when they sought Chapter 11 protection from this Court and our federal bankruptcy system.

Throughout these cases, the Debtors, their creditors, and other parties have asked the Court, through motions and filings, and conferred with the U.S. Trustee on

a multitude of issues that are way too many to count, to assist them in allowing the bankruptcy process to work. And that has been a consistent theme from the parties.

And although there are currently calls for reform of our system, the fact that the Debtors and their creditors have been able to ready a plan for confirmation in these highly litigious and factional Chapter 11 cases demonstrates the merits of our bankruptcy process that is predicated upon, in large part, the ability of the parties to reach consensus.

And, as a front-line observer, Your Honor, I can attest to and also wish to commend the many, many hard work and efforts of the parties here, despite the differing opinions and issues, including, Your Honor, the willingness of the Debtors to work with the U.S. Trustee on issues that are regular issues that come before the Court, as well as the Debtors' management, who has acted in a very professional and responsive manner throughout these cases.

Notwithstanding the Bankruptcy Code's flexibility, it is meant to be a comprehensive scheme to govern the bankruptcy process. And it cannot remain comprehensive if interested parties in each case are free to tweak or stretch the law to fit their preferences, no matter how big the case, no matter how much money is at stake, no matter how many boxes are in the courtroom, no matter how many lawyers

are in the courtroom.

The public has the right to be able to have faith in our system that there is a fair and consistent process in place, with appropriate parameters and boundaries that are upheld and protected through judicial oversight and transparency. And that same level of oversight that -- and scrutiny applies in all cases, whether they be small deli cases or huge enterprises with the restructuring and complicated transactions that you have before the Court.

In addition, Your Honor, I think the other part that's important is that, given the size and magnitude of this case, it is difficult to bring it all down, to relate to what's going on, particularly in light of the magnitude of dollars.

For example, Your Honor, at the deposition of Don Evans, chairman of the board of Energy Futures, he was asked questions regarding the sponsor releases. And in his view, he said, in his honest view, the sponsors were really getting, quote, "zippo." Well, they may be getting zippo in terms of what their investment was, but, as Your Honor is aware, this settlement agreement provides that the sponsors get a payment of $15 million if that settlement agreement is approved.

Now, $15 million might seem like a very small amount of money when compared to the $40 billion of debt

that the Debtors have walked in and sought to get the assistance of our laws. But it's still $15 million, Your Honor. And it's important for us and the Court to be cognizant of that.

In thinking about addressing the Court this morning, I was thinking very carefully about what was the most important thing to highlight for the Court on behalf of the U.S. Trustee program as part of the U.S. Department of Justice. And one of the things that has been asked of us many, many times is: why is what you say so important, when you don't have any money on the line in the case, when you don't have a financial stake in the outcome? And --

THE COURT: You've heard that before.

MS. SCHWARTZ: Yes. Yes. And that's why it was plaguing me this morning when we were coming. But therein lies the answer, Your Honor. It is that very fact that the U.S. Trustee and the Court, for that matter, are not hindered by financial considerations in the bankruptcy case and are, therefore, free. Whereas the Debtors may not be or other parties may not be. To point out provisions in a global settlement that they may not like but they go along with because they have bigger fish to fry. And, in fact, Your Honor, it's those types of provisions that cross the line, that extend past the boundary, that extend past the parameters and statutory limitations set by our Congress,

that the U.S. Trustee can raise to the Court so that we can protect and have a consistent system.

And I will say, Your Honor, that you will hear testimony from Stacey Dore, general counsel and co-restructuring officer, who was questioned at her deposition and asked in particular, as Your Honor knows, one of the issues that we have objected to are the fees that are proposed to be paid as part of the settlement agreement. And we asked the question and she said pretty much "The global settlement is a give and take process" and so the issues that were of greater paramount, commercial issues to the corporation, outweighed certain provisions that, as we will argue at our closing, do not comport with the Bankruptcy Code. But the point there, Your Honor, is that the beauty of the system is that there is an independent arm of the Justice Department that can present it to Your Honor, that can assist the Court in making sure that our system is intact, that our system is something that the public can have faith in, that works and is applied consistently across the board.

The U.S. Trustee's objection to confirmation and approval of the settlement is based on three provisions, and those provisions include the fee provisions under the settlement agreement, the releases, and the exculpation provision. As Your Honor noted at the hearing on the PSA

motion, the majority of the U.S. Trustee's objections are legal and, therefore, the greatest part of our participation in the trial will be today to set the table and during closing when we make our arguments. But I just want to highlight some of the facts that are in evidence and will weigh and factor into that, as well as the legal issues that the Court has already considered in other cases.

But specifically, in 2.7 of the settlement agreement and Article 4R of the plan provide for the payment of certain third party fees that either are not disclosed, are only available under Bankruptcy Code Provision Section 503B3D and 4 -- and in this case, what the Debtors are asking and the other parties supporting the plan is that they have unfettered discretion to pay these fees, removing that from the Bankruptcy Court's oversight, removing that form the public's knowledge as to who's getting paid what, and actually doing what is fair to say a workaround around the Bankruptcy Code.

The people, the attorneys in these cases are experienced practitioners. Many of them have addressed this issue with respect to the 503B claims and attempting through the creative processes of the bankruptcy system to devise a mechanism by which they wouldn't have come before the Court to demonstrate that those claims fit within the parameters of the Bankruptcy Code.

Here you've got somewhat of a new variation that will put a bulk of those fees in the settlement agreement. And we'll say, "Your Honor, that's a 9019 motion." We don't have to pay attention to the actual sections of the code that are the sole source for the payment of administrative claims -- but, rather, we'll put it in a settlement agreement and ask Your Honor to, in advance of approving confirmation, find that it falls above the lowest point in the range of reasonableness under 9019. I don't think that avails them the ability to circumvent the code, and I don't think the Court should allow them to do that. And one of the things that none of parties has mentioned today is that 9019 is a rule and the rules implement the statute. And the statutory section under which they seek approval of the plan is Section 105A. And the law is very clear, Your Honor, that when there's a specific section of the Bankruptcy Code that deals with administrative claims, priority of claims, the Court should not and cannot use the more general 105A as the basis for that decision.

So, I think that you're going to hear testimony that the reason why the Debtors agreed to allow the provision in the settlement agreement is because they had bigger fish to fry and they wanted a global settlement, and as far as they were concerned, in their own business judgment and in their own business sense, they would review

the fees, which made sense to them because they're a huge corporation and they have a process for reviewing fees. But the difference here is they're in Bankruptcy Court and the fees that they agreed to pay are subject to the provisions of the Bankruptcy Code, and that's the job of the Court to make sure that the parameters of the system remain intact.

The U.S. Trustee has also objected to the releases. Our objection is somewhat different. We've taken a different spin on it. Our objection is pretty much the standard objection with respect to releases, that the Debtors are going to have to establish and put in evidence that the consensual releases meet the statutory and the jurisprudence of the Third Circuit -- but that there are also nonconsensual releases and the Court should not approve those nonconsensual releases. And we submit and believe that the evidence will not establish that they can make a case to be able to get the Court to approve the nonconsensual releases.

And, finally, with respect to the exculpation, after Your Honor issued the Court's decision in Allied Systems, the Debtors modified the exculpation. The problem is it hasn't been fixed in its entirety. The exculpation as it stands today still seeks to provide exculpation for non-estate fiduciaries, including shareholders and non-Debtor affiliates. And, Your Honor, as we will emphasize in

closing at the appropriate time, it's our view that simply because a party brings an action against a shareholder or a non-Debtor affiliate and one of the claims in that action is fiduciary duty related does not make that party a fiduciary entitled to exculpation. Thank you very much for your time, Your Honor.

THE COURT: You're welcome. Mr. Anker?

MR. ANKER: Thank you, Your Honor. For the record, Philip Anker, Wilmer Cutler Pickering Hale & Dorr for Delaware Trust Company as EFIH first lien and trustee. From the moment we heard about this plan, the mantra we have heard from that side of the room has been that it will unimpair the E side. I think I heard that this morning eight times but I might be wrong on my count. The transcript will answer. Were it so, as much as I enjoy being in this courtroom, I'd be out enjoying the beautiful weather today or working on other matters. We do not -- I heard so much today in eloquence about the plan, about the settlement, about getting these companies out of bankruptcy. Those are lofty goals, they're goals we share, they're goals we applaud. We do not want this Court to deny confirmation. We want this Court to direct the Debtors and direct the plan proponent supporters to do what they have promised, to unimpair us.

We included with our plan objections specific

language -- language as to which, despite all these suggestions about all these negotiations, we have not received one phone call, one conversation, one email "Let's talk through them and work through the language". Not one. Never. We want a plan that unimpairs us and then I will gladly go and join this side of the room, notwithstanding how crowded it is. We want our rights to be preserved. That's all we want. Those rights include the right where a claim is disputed to litigate it. To litigate it to judgment before Your Honor and, yes, to invoke our appellate rights.

If we lose -- if there ultimately is a final non-appealable order that says we're not entitled to that claim, we're big boys, we know we won't get paid. But if there's a final non-appealable order that says we're entitled to the claim, whether entered by Your Honor or an Appellate Court, then the law entitles us to that claim and entitles us to be paid. And for us to be unimpaired we need to be paid.

I will also try not to mess up the words but I'll use Mr. Shore's shorthand acronym, WTFA. What is the feasible alternative? The feasible alternative is to be good to your word and unimpair us. What is unimpairment? You answered that last week. It's not a hard, complicated thought. It comes right out of the statute and you said it in your opinion. Unimpairment means, to quote the statute,

"that all the legal, equitable, and contractual rights of the holder of a claim are preserved or unaltered". The Third Circuit has said the statute means what it says. In PPI it said, and I quote, "If the plan does not leave creditor rights entirely unaltered, the creditor's claim is impaired".

Put simply, impairment requires you to take two snapshots in time -- pictures: What are our rights one minute before the plan is confirmed and consummated? What are our rights one minute after? And if there is any difference -- if the plan changes it at all, then we are impaired. That's what the statute says, that's what the Third Circuit said, that's what you said last week. And most assuredly this will happen.

We went through many, many points in our plan objection but let's just go through a few here. Let's focus first on the biggest dollar issue, the make-whole. Your Honor has denied that claim. Let's take the before shot. And, therefore, we do not have a right today to be paid. I acknowledge that. But we have a right to appeal and we have a right, if an Appellate Court holds that Your Honor erred, to then be paid, assuming that order becomes itself final and non-appealable. That just happened in a leading case in the Second Circuit Chesapeake, and their own plan acknowledges it. Because their plan says that if we prevail

on appeal prior to the effective date -- not that the plan will go forward and they won't pay us because they know that would be unlawful but, rather, a condition that confirmation fails.

So, our right is to appeal and if we win, to get paid. That's the before snapshot. What's the after snapshot? The plan actually enjoins our appeal. It explicitly provides in the injunction provisions that in satisfaction of all the claims no one can prosecute any other claim. Now, they're not serious about it, and that's why I expected a phone call that said, "This is a glitch. We'll fix it". We didn't get that call. I hope I get it tonight. What does it say about the more significant issue? If we do get the prosecutor appeal and we win, will we get paid? The plan says unequivocally the answer to that is no. The plan says no make-whole claims are allowed and we'll be paid, no ifs, no ands, no buts. And Ms. Dore, as the 30B6 witness for the Debtors -- and I commend her for her candor and honesty, confirmed that in deposition over and over again. And I will grant I and Mr. Horowitz were perhaps repetitive in our questioning, but we wanted no doubt about our understanding.

What is the Debtor's response? The Debtor's response is to say, "Well, look, as we said on the record, we reserve our right to argue that the plan entirely

disallows your claim and when an Appellate Court to rule your way it would be violating the plan". But if an Appellate Court disagrees and says it reorganized EFH's libel and that becomes a final order and the Court has jurisdiction, then I guess, you know what? We're going to see if EFH will be liable. That's a tautology. That's nothing. That's meaningless. They're not telling you and they're not putting it in the plan that if we win on appeal we will be paid. That's what the plan has to say.

They say, second, that we're not entitled to an Appellate remedy, we're not entitled to a reserve. I agree, we're not entitled to a reserve. We don't have a right to a reserve today -- that's the before picture, so we don't have a right to it as the after picture. Of course, if they want to take away our liens, they're going to have to do something and a reserve is a possibility. But if they maintain our liens, we're not entitled to a reserve. But what we are entitled to is to be paid if we prevail, and that's all we're asking for. Their whole point about a reserve is setting up a strawman and knocking it down. It also is supported entirely by cases, not one of which deals with unimpairment. Indeed, not one case they cite in response to our arguments, not one is an 1124 non-impairment case.

This is, Your Honor, plan impairment. It's not

statutory impairment. There's nothing in the Bankruptcy Code that says claims that are disallowed by a trial court but as to which an Appellate Court revives the claim or nevertheless disallowed -- there's no 502B6 equivalent or 502B2 equivalent for claims that prevail on appeal anywhere in the Bankruptcy Code. Indeed, if anything, it is exactly the contrary. Because 502J says that even after a claim (indiscernible) but it was final and non-appealable, it can be reconsidered for cause.

Let's go to a second set of issues, fees. Now, this is a much smaller dollar issue. But the plan says we're entitled under our indenture to be paid our fees and we're over-secured so we're entitled under 506B. The plan says that's right. All your reasonable fees incurred up until the effective date will be paid. But what about fees we incur after the effective date? And let me pause here. Mr. Thomas is right. It's 17 months and we are still in the District Court on our first brief. Why? Because we asked the Debtors to agree to certification directly to the Third Circuit of the make-whole appeal. They said no. We asked for (indiscernible) briefing. They said no. They've done everything they can to delay resolution, final resolution of our make-whole appeal.

So that's where we are today. And the consequence of having to go through all this process and this briefing

schedule is we're likely to still be litigating after this plan goes effective, assuming it goes effective. There's nothing in our indenture today... Let's do the before and after snapshot again. The before snapshot is we're entitled to get paid the fees. It doesn't say, "Upon confirmation of a plan we're not entitled to get paid fees". It doesn't say that. But the plan says we're no longer entitled to our fees. So, the before snapshot and the after snapshot are different. That is plan impairment caused by the plan.

Think of the simple date. Let's imagine this plan goes effective on June 1, 2016. On June 2, 2016 I happen to be writing my opening brief in the Third Circuit. If the plan hasn't been confirmed, I'm entitled to get the fees. If the plan has been confirmed and gone effective the day before, according to the plan, I'm not. It's entirely the plan that draws the distinction. It's entirely the plan that alters my rights. That's plan impairment.

Interest. I'll be brief. We're entitled to, under the terms of our indenture, not only interest on principal but interest on the premium. If we prevail on our make-whole argument, then we will be entitled to interest. At 10 percent, approximately, per year, that's $43 million a year. The plan has no provision. Even if we win the make-whole, it's the same analysis. So the plan again is disallowing a claim as to which we have the legal right

today.

Interesting accruing after the effective date -- again, if they would move the appeal forward, maybe we wouldn't have any litigation after the effective date. But they've declined to do that. And so, interest will continue to accrue but the plan explicitly says, "No, you're not entitled to get paid that," even though we have that right today -- assuming, again, we win on appeal.

Additional interest. The Debtors acknowledge in their own disclosure statement that they failed to register our notes, and as a result of failing to register our notes, the interest rate bumped up on one of the tranches from 10 percent to 10.25 percent originally and then 10.50, 50 basis points. They say that to the extent of that additional interest accruing after the petition date -- so, between the petition date and the effective date, you're entitled to be paid an interest on it. But when we look at the language -- and I was absolutely convinced it was a drafting glitch -- there's no provision for its payment with respect to the additional interest that accrued prepetition. But they've not fixed the glitch. We gave them language to fix the glitch. I'm not standing up here if they fixed these glitches, but they declined.

And, finally, interest on fees. They say we're not entitled to interest on the unpaid fees. If they're

right, then we're not entitled to get paid it. We say we are entitled. They've said, "We're not going to litigate every claim in plan confirmation." That's fine. But in that case, all we're asking is that the plan not alter our legal right if we're right to get paid.

Just a couple more points. The plan provides for the release of our liens. How is that not plan impairment? We're secure today. Having a lien is a legal right, it's a contractual right. After confirmation we're not. So if we prevail on the appeal we go from being a secured creditor to an unsecured creditor purely because the plan releases it. The plan terminates our indenture and indenture is what gives us the right to the fees and everything else. That's a contract. If I'm a party to a contract and someone says, "No, you're not, I'm ripping up the contract and I'm ripping it up pursuant to a plan," how is that not plan impairment?

Finally, nonconsensual releases. The definition of releasing parties includes the EFIH first lien trustee and the EFIH first lien noteholders. The definition of release parties includes the EFIH second lien trustee and the second liens where we have an inter-creditor action. It includes Mr. Shore and his clients, who most assuredly we will argue on appeal. If any court is unwilling to require the reorganized Debtors to pay, every one of his clients should have to disgorge everything they've received under

the plan if we prevail on appeal to make us whole. We have not consented to, we've not been asked to consent the grant of releases. Yet they're imposing nonconsensual releases on us.

I can't imagine -- I can't come up with a hypothetical of a more obvious impairment of a legal right than forcing a party against its will to give a release. How is that not altering the legal rights of a party? Your Honor, this isn't a close call. These aren't difficult issues. The law comes directly out of the statute and the Third Circuit's controlling decision in PPI. The fact are undisputed. They come right out of the plan and the admissions by the Debtors, their own 30B6 witnesses, in deposition. I will be silent for much of this hearing. For good or bad you won't hear a lot of me. I will cross-examine Mr. Keglevic, Ms. Dore, and Mr. Ying, but it'll be brief. Maybe Mr. Hordan, but it'll be brief. But please do not confuse my silence during the evidentiary part of this presentation, or relative silence, with either a lack of concern or a lack of importance of these issues to my client. They are vitally important.

I'm silent because, frankly, as far as our issues are concerned, we shouldn't have to stand up here today because the Debtor should simply correct the plan. And if the Debtor won't, frankly, our issues could be resolved with

an evidentiary record with the depositions supplemented by an hour of testimony, and we could be in final argument tomorrow. These are black and white issues and the bottom line is this: If the Debtors want their plan confirmed, they hold the key, at least as to us. They just have to truly unimpair us. They have to do what they've promised to do, and if they do, they will not hear from us further. We've provided language, I'm available to talk about that language, I know Mr. Horowitz and Mr. Brody, who share many of our interests, are available to talk. We want to resolve those issues and I'm serious in saying we want to be on my right hand side of this courtroom, Your Honor's left -- not on the left side. But as the plan stands today, when it fundamentally takes away all of our rights, we cannot be. Thank you, Your Honor.

THE COURT: Thank you. Mr. Brody?

MR. BRODY: Your Honor, good afternoon. For the record, Josh Brody from Kramer Levin Naftalis & Frankel on behalf of Computer Share as EFIH second lien indenture trustee. So, Your Honor, just to start, a lot of what Mr. Anker addressed are issues that I completely agree with him and I'm going to really do my best to avoid repeating the things that Mr. Anker has already argued in front of your court.

Now, to be clear, we are here to blow up the plan.

We think that the plan that the parties have negotiated and this grand bargain and disarmament and all the wonderful things that they've been telling the Court about for so many months -- great. That would be fantastic. I'm happy to sit on somebody's lap if I have to, and that's not important. But the reality is that that's not what's happened. What happens is the Debtors are using their plan to actually impair our rights. Now, the issues that we have in some respects compared to the objections that Your Honor has already heard, for example, from the EFH committee, are much smaller in scope and you're not going to hear a lot from us over the course of the trial, as Mr. Anker pointed out. But, unfortunately, as small as these issues may be in terms of the complexity, it's pretty significant for the Debtors. Because as Your Honor pointed out at the hearing a number of months ago, they chose to not solicit my clients, they chose to render us unimpaired. If they actually impair us, however, the plan necessarily fails, as Your Honor pointed out.

It's really unfortunate that all the hard work that we've heard about that's gone into this plan would actually flop because of the fact that they just decided to be a little bit cute with how they actually tried to unimpair us. And also, I think it's important, a little bit of history and context here. The first time that, Your

Honor, I think frankly most of us heard about the REIT plan was, I believe, some point in June. And when Mr. Schiff stood up here and told Your Honor about that plan that they were working on, there was a point in time when they were trying -- they were competing to be the plan sponsor along with a number of other parties, including some of the second lien holders who were trying to jockey for position to be the plan sponsor, as Your Honor may recall. Mr. Schiff stood up here and said, "Well, we have a plan that's going to render the E-side unimpaired and irrelevant" and that essentially gave them a leg up in helping them win that race. And more power to them. That's fantastic. Except that now at the point of the bait and switch -- and while they've been telling Your Honor all this time that they're going to render E-side creditors unimpaired, that's just not what they're doing.

Now, the Debtor's response, or I should say lack thereof, to our objections is pretty telling -- both in terms of what you did not hear this morning from Mr. Kieselstein and really their actual rely brief. They really don't do much. They kind of just shoved us to the side a little bit and focused all of their energy on the plan itself and how the REIT plan is just a fantastic thing and it's going to cure all the world's ill. In fact, Mr. Anker mentioned that they mentioned this morning -- I think you

said he said it eight times. We actually counted up more than 20 times somebody from the Debtors or the (indiscernible) of unsecured creditors stood at this podium and said, "Your Honor, our plan is fantastic. We're going to render the E-side creditors unimpaired and irrelevant." It seems like their basic approach is "We're just going to say it so many times, ultimately people will believe that it's true."

And in an example of what I can only call "the gentleman doth protest too much" they kind of say "No, no, no, they're unimpaired, Your Honor, they're really unimpaired" but they give no explanation as to how we're actually unimpaired. And, frankly, it's not even close and they know it. If you look at their reply brief, in Paragraph 6, they summarize a portion of our argument as follows: "The trustee effectively argues that indentures are instruments that survive post-bankruptcy until every avenue of appeals has been exhausted." Well, yeah, that's exactly right. If you're unimpairing us, all the rights I have under my indenture are going to survive. If the only thing that's changed, as Mr. Anker pointed out, between before and after is the plan, then it's the plan that's impairing me and clearly I'm impaired, and they can't satisfy 1124.

What I worry about a little bit -- it seems like the Debtor's approach here is really to sort of just, again,

ignore us and sort of distract Your Honor with all the wonderful things about the REIT plan and why the objections that are being plan by the EFH Committee among others shouldn't -- Your Honor, should be overruled. It's kind of sad. With apologies to Mr. Keiselstein, I kind of imagine him standing here this morning talking about our objection, how he'll get to it later as like an old vaudeville magician. "Look, we'll do this wonderful thing later and we'll get to this stuff at the end." And they're not going to. They're going to try to ignore us through the rest of this trial. And you're really not going to hear from us much, as Mr. Anker pointed out. The evidentiary issues that are going to be raised throughout the course of the trial are not things that impact us. Our issues are simple and straightforward and there's just no question that they actually do impair us.

Now, just to spend a couple of minutes on that issue, again, Mr. Anker did a very good job of laying out the issues and I'm really not going to retread over those specific items that he did. But I have a couple of additional points I want to raise. So, first, I think there's two general categories as to how you can look at how the plan impairs the second lien noteholders. One is they all have to pay certain amounts that are clearly due under the indenture, such as fees and the like. And in addition,

it strips our legal and equitable rights in a number of different manners. A couple of examples.

So, to start with on the make-whole litigation, the Debtors, again, I'm not going to retread what Mr. Anker raised -- but the Debtors seem to make this argument that "Well, the plan can't be held up because of the make-whole appeals. The Debtors are entitled to go forward with their plan and get finality that a plan (indiscernible) to provide." With all due respect to the Debtors, that is a complete red herring. They are entitled to all the finality the plan gives them. But the plan gives them unimpaired second lien creditors -- that means they're prepared to live with the fresh start of taking all rights with them post-reorganization. Anything else necessarily means the plan is impairing us.

Secondly, I have to be honest -- I have a hard time really following 100 percent what specifically the Debtors are arguing when it comes to our appeal rights. Now, on the one hand -- and, again, looking at their reply brief, they point out that "The Bankruptcy Code could not be clearer that the discharge upon confirmation as well as any order of the Bankruptcy Court unless (indiscernible) is immediately enforceable and, therefore, any ability or right to preserve our rights on appeal are our burden." Okay, but then they later say that "Our rights to appeal any order are

fully preserved." But the plan itself, as Mr. Anker pointed out, provides that after -- given Your Honor's ruling, after the effective date, our claim for a make-whole is disallowed regardless of what happens on appeal. And that means that --it's the plan itself and nothing else that's impacting our rights.

Your Honor, of course, again, this is not a surprise to the Debtor. One of the evidentiary issues Your Honor will see -- we put it in our brief and it'll come out during the course of the evidence -- is the Debtors advise their own boards that the second noteholders will be impaired unless the appeal of a make-whole is fully and finally decided, and in addition, that they could not release our liens and render us unimpaired unless they actually provided some sort of reserve. And as Mr. Anker pointed out, the release of the line points, again, this goes to the overall. We have a right under our indenture to all of our claims being secured until they've been finally resolved. Releasing those leans by the plan is necessarily impairment.

Litigation issues, Your Honor, I think also are important for other reasons as well aside from the make-whole. As Your Honor will recall, we were in front of Your Honor now on inter-creditor litigation with the first lien (indiscernible) that's currently in front of Your Honor. I

don't know what's going to happen in that litigation. How Your Honor's going to (indiscernible). I assume we're going to win but I don't know. And the reality is that depending on how that litigation turns out, there may be rights and issues that various parties have against the Debtors -- under our inter-creditor agreement, under our indenture. They can't just say, "Well, the plan's going to cut those off and too bad." And is there creditor litigation? You know, that's between creditors and is not a Debtor's problem. But that's, again, just incorrect. The documents themselves provide certain rights to the second lien indenture trustee and the second lien noteholders and they can't use the plan to cut that off.

To sum up, Your Honor, the Debtors and plan supporters made a conscious decision that they were going to render our claims unimpaired in order to give themselves a clear path towards confirmation of the plan. They want their benefits, they've got to live with the burdens too, and that means living with all of our legal, contractual and equitable rights. And, frankly, it would really be a shame, given all the hard work, if the plan fails because they couldn't get that right. Thank you.

THE COURT: Thank you, Mr. Brody. Mr. Pedone.

MR. PEDONE: Your Honor, Richard Pedone on behalf of the AFH indenture trustee. May approach with the chalk?

THE COURT: Yes.

MR. PEDONE: Your Honor, the last page of our brief slide deck contains a summary of necessary amendments to the plan and it serves as a guide on how the issues that I will briefly touch upon could be resolved. Of course, the committee has articulated a variety of other issues. Your Honor, consummation of this plan remains contingent on the disallowance of the EFH make-wholes or their reinstatement. Notably, even if Condition Precedent Number 9, "the effectiveness of a plan is waived," which we would welcome, "the plan on file does not contain a provision for the payment of the EFH make-wholes if they are, in fact, allowed or if they're not disallowed prior to the effective date."

Unlike other disputed claim amounts, there is no reserve for the payment of the EFH make-wholes. This is quite a simple amendment that needs to be made to the plan unless, in fact, they succeed on reinstatement, and if they want to preserve both options, the change needs to be made. But the last articulated position with the plan proponents on this issue was quite clear. As Mr. Lauria noted at the September 28th conference, we have always required from an investment standpoint that the make-wholes have to be disallowed or not paid, and we recognize that there's risk around that issue from an appellate perspective. There's no provision to pay the make-wholes because they are unwilling

to pay the make-wholes. We hope that that changes and that they can proceed with the option that they have, but it hasn't changed and the plan needs to be revised.

Further, Your Honor, every witness questioned in discovery on this topic has indicated that the subject -- mere subject of possibly waiving the make-wholes has not come up. In their reply brief the Debtors indicate that they will, in fact, now be presenting evidence of possibly waiving that condition and, again, we welcome the waiver of Condition Precedent Number 9 as long as it is accompanied by a provision to pay the make-wholes.

Your Honor, even if the Debtors offer new evidence regarding the possibility of the waivers, as they indicated they would, there needs to be a provision for payment. Accordingly, until that provision is made, the plan itself is not feasible. Of course, Your Honor, the real driving issue here and the reason that we believe the Debtors have not engaged in the merits of the EFH make-whole is they merit -- the EFH make-whole claims are different than others that have been considered by this Court to date. There's no acceleration provision. We summarize the law and the issue in our summary judgment motion and we believe that it should be heard.

In their reply papers in connection with Phase 1, the Debtors took pains to note that they believe that they

will establish a right to reinstatement that will be their cure-all on this issue. Your Honor, the EFH indenture trustee does not believe that reinstatement in form as contemplated in the plan is permitted under the indentures or under applicable law. For example, on the most basic level, the proposed movement of the debt at EFH Corp. to reorganize TCEH is not reinstatement as that term is used in 1124. The debt does not end up where it was before the petition date.

In addition, we do not even believe that the supplement on which the Debtors purport to rely was approved in compliance with the Trust Indenture Act. Your Honor, discovery on these Phase 2 issues is ongoing in all events. The Debtors conclusory statements in their Phase 1 brief that they believe they will succeed should not be credited. those issues are reserved.

Your Honor, turning briefly to the settlement -- this settlement should've been put into and it should live or die with a plan of reorganization. It should not be allowed to restrict future plan structures in the event that this innovative plan fails. While the laboratory experiment or the technology of creating the REIT structure may, in fact, generate tremendous value for all creditors, the suffering that could be inflicted on the EFH bondholders by the settlement does not need to stand alone. Most labs

carry insurance and we shouldn't suffer the loss if the plan fails.

I'm sure that all will agree and the evidence will certainly show that if approved, this will be the largest, most comprehensive, most multifaceted 9019 settlement in the history of Chapter 11. We are well outside the bounds of what anyone has ever tried to do with Rule 9019 outside of a plan. We do not believe that the rule again provides this Court with authority to approve such a large bucket, or more aptly, perhaps dump truck full of settlements. I was trying to add up the number of independent compromises that take place in the plan and I was getting to dozens. Mr. Kieselstein this morning actually said that his number brings it to tens of thousands of claims in one settlement motion. As we noted in our objection, this can't be done under the authority granted in a mere rule. The rule's enabling statute did not delegate substantive lawmaking to the Supreme Court. The complexity of what is being attempted in this settlement will permanently deprive holders of rights and recovery on a massive scale in connection with any future plan.

If this is permissible, what deal permanently revolving multiple issues in a Chapter 11 could not be pushed through in settlement as opposed to needing to be taken care of in a plan? Well, the code encourages

settlements. Such settlements are encouraged in connection with and ultimately tied to the plan process where all impacted parties have a say, a vote in the enumerated rights in Section 1129. This is why the plan process is discussed as a brilliant mechanism for compelling resolution of disputes. It's the plan process that forces the compromise, not the three-line Rule 9019. The evidence will show that this multi-billion dollar dump truck load full of settlements involving tens of thousands of claims insiders -- and these are insider claims; one estate against another by definition is insider, and that addresses issues with regard to the standard that apply -- sponsors, equity holders, competing Debtors' estates that never filed proofs of claim against each other. This crosses the line of settlements that can be implemented under the authority of a mere rule. The permanent restructuring of massive obligations that they are attempting to do with the settlement agreement in a settlement needs to be done with a plan. That's what the architects of the code and that's what Congress dictated.

Accordingly, Your Honor -- and this is our final suggestion in the outline that we provide at the end -- unless this settlement is made condition on the plan, which truly leaves all non-consenting creditors unimpaired and it dies and has no afterlife if this plan fails, approval of

the settlement must be denied. Thank you, Your Honor.

THE COURT: Thank you, Mr. Pedone.

MR. HOGAN: Good afternoon, Your Honor. Daniel Hogan of Hogan McDaniel on behalf of Fennacle and Fahey. Thank you for the time. Mr. Kazin sends his regards, Your Honor, he couldn't make it. He asked me to appear in his presence. We appear in opposition to the proposed plan of reorganization settlement agreement with respect to four of the 70-odd Debtors whose individual bankruptcy cases have been ordered to be jointly administered under Local Rule 1015-1 for procedural purposes only. The four companies in question, LSGT Gas Company and its wholly-owned subsidiaries, LSGT SACROC, Inc., and EEC Holdings, Inc., the latter of which owns EECI, Inc. EECI is only one of four Debtors whose interest have in theory been protected by the committee -- exercising fiduciary obligations, the E-side (indiscernible) committee, which has already advised the Court at least with respect to the un-manifested future claimants that it has an irreconcilable conflict of interest which prevents that representation.

The evidence to be presented here will demonstrate that the companies are, in fact, not really Debtors but rather creditors holding in excess of $1 billion and inter-company receivables that are intra-E-silo claims. If the plan of reorganization intends to proceed on the theory that

the E-side creditors are unimpaired and will be paid in full, then the gas group, as I'm referring to should be called, should be paid in full as well. The Debtor's intent -- to reinstate these receivable claims and then to secure the credit support for all present and future asbestos claims and then cancel them for the benefit of the EFH parent with the consent of the plan sponsors.

These four companies share common traits. They own no real property, they have no cash on hand -- checking account, savings account, or other financial accounts. They don't really have any assets other than the fact that they have receivables between themselves to and from the parent. None of them have been operating companies since the early 1990s and none have any real employees since that time. All funds they receive from selling off assets and operations were upstreamed, ultimately going to the parent, which created these receivables. The evidence will show that the funds were and always have been treated as contributions to the cash management money pools with respect to which interest was supposed to be credited on a multi basis at the rate of 10.875 percent annually at least since the leverage buyout in 2008. At a minimum, the assets of the gas group consist of a $560 million receivable, which has been in the books since 2009, with a current value of $1 billion due in payable.

The evidence will show that the gas group is perhaps the largest single E-side creditor in this case and its interest is (indiscernible) along with the other creditors. The evidence will show that EECI and EEC Holdings held at least $296 million in receivables in 1998. With interest that receivable should be worth in excess of $1.5 billion today. Yet EECI has zero assets until last year when EFH bookkeepers transferred $84 million from EEC Holdings to EECI balance sheet. All of this evidence exists in the SOVAs and related documents. We join with and adopt the objections and arguments of the E-side Creditors Committee (indiscernible) articulated and detailed the grounds of our various concerns and objections and pleadings filed heretofore, including objections to the disclosure statement and our trial brief and omnibus objection filed herein on October 23rd.

The main grounds for our objection to confirmation are as follows: One, the Debtor's plan is unconfirmable with respect to the four asbestos Debtors or the gas companies, as I've referred to them, in that the plan fails to comply with 11524G, which governs the treatment of future asbestos claims under a Chapter 11 plan of reorganization. Number 2. The settlement agreement releases claims by over 70 Debtors without evidence that the (indiscernible) settlement is fair and equitable with respect to the individual estates of the

four gas companies -- or gas Debtors, as I refer to them. Number 3. The plan fails to comply with 11USC-1123A4. The plan provides for unimpaired status of claims against the EHF Debtors arising from liabilities based on asbestos exposure, such as Fennacle, as the state representative, and Fahey, while denying such treatment for Mrs. Fennacle, her children and other unmanifested asbestos claimants whose claims will arise from asbestos exposure.

Finally, 4. It is our position that the plan is not feasible. The plain text at 1129A11 requires a determination that, quote, "Confirmation of the plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor under the plan unless such a liquidation or reorganization is proposed in the plan," end quote. It is entirely unclear how the Debtors can possibly address the feasibility requirement of their plan as it relates to manifested asbestos claimants and unmanifested asbestos claimants. Among other things, the deadline to file claims for those holders affected by the Court's prior orders will not pass for another six weeks until after the start of today.

These claims are not liquidated and can result in a significant liability for the Debtor that will not be determined over a fixed period of time, making forecasting

impossible. We will revisit these arguments during our closing argument. Thank you, Your Honor.

THE COURT: Thank you.

MR. GWYNNE: Good afternoon, Your Honor. Kurt Gwynne from Reed Smith. I address the Court on behalf of Bank of New York Mellon Trust Company and A, as indenture trustee for 9 million in EFCH 2037 notes. Of the 40 billion in debt, Your Honor, obviously, the $9 million is a relatively small amount. It is classified in Class C6 under the plan. The disclosure statement provides that because TCEH's creditors are not being paid in full, the creditors of EFCH, the parent of TCEH, will receive no distribution.

We filed the objection just to make sure, Your Honor, that as the Court knows, the Debtor has the burden of proving all the elements necessary to confirm a plan, including that the treatment of that class is appropriate. Thank you.

THE COURT: Thank you.

MS. GRACE: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MS. GRACE: Anna Grace from the Department of Justice for the United States on behalf of the Environmental Protection Agency. Your Honor, the United States objects to the settlement agreement and the plan that is premised on the settlement agreement because creditors of EFCH receive

zero payment. And a settlement that waives all causes of action that belong to EFCH in exchange for zero consideration is fundamentally unfair.

EPA's claim against EFCH as alleged in Proof of Claim Number 10059, concerns four abandoned uranium mines in Mexico that a former subsidiary of EFCH owned and/or operated in the 1970s and 1980s. These mines are located in a rural area; land at the sites and livestock wells near the sites are contaminated with uranium. People live within a mile radius of the sites and one mine site is next door to Navajo reservation land.

The radioactive material at these sites presents a real danger to the public health and to the environment. The radioactive soil, the contaminated soil needs to be consolidated and contained, and the groundwater needs to be monitored. EPA estimates that this will cost $23 million or more. The subsidiary that owned and operated the mine sites retained its liabilities relating to those sites until in 2007, on the very same day of the LBO, that subsidiary assigned its liabilities to EFCH and then it dissolved.

Under the LBO and related transactions, EFCH assumed its subsidiary liabilities but the many parties that profited from the LBO transaction provided EFCH with no assets to satisfy those assumed liabilities. That is to say, no assets other than the stock in the subsidiaries that

were themselves insolvent because of the enormous debt and fees that the LBO parties had burdened them with.

Focusing now on the United States' objection to the settlement agreement and that the settlement agreement is unfair, we understand that EFCH has substantial causes of action for fraudulent conveyance, including assigning the liability for the contaminated mine sites but failing to provide for those liabilities, as well as for breach of fiduciary duty, just to name two examples. And these causes of action arose from the way that the LBO was structured. These causes of action belong to the estate of EFCH. But the settlement agreement that resolves all claims of EFCH from the beginning of the world provides zero dollars to EFCH and its unsecured creditors, including EPA. Of the many questions before the Court, a critical question concerning the settlement agreement is, does the unfair treatment of creditors of EFCH under the settlement agreement, an agreement that wipes out all of these substantial causes of action without any consideration whatsoever -- is that settlement unfair and inequitable?

We believe that the answer to this question is obviously yes. The settlement agreement must not be approved unless the unfairness to creditors of EFCH is remedied. The burden, as others have pointed out, rests squarely on the Debtors to demonstrate that the settlement

agreement is fair and equitable, and the Debtors have not yet come anywhere close to meeting that burden. Indeed, the Debtors did not even respond in substance to the United States' objection to the settlement agreement. Specifically, the Debtors did not respond to the United States' objection raised on the grounds that the settlement agreement is unfair because it bargains away valid causes of action in exchange for zero consideration to EFCH.

In considering a settlement agreement on similar facts, Judge Walsh in the Bankruptcy Court here in Delaware recognized that the Bankruptcy Court has a duty to ensure that non-settling parties are not injured to the benefit of other creditors -- especially when the non-settling party was excluded from the settlement negotiations. And that's exactly like this case here. First, the record demonstrates that creditors of EFCH were inadequately represented in settlement negotiations. As discussed in the United States brief, the committee was comprised of seven members, three of which were purported to represent the interests of EFCH but these three all had claims against TCEH and in some cases, at least two cases, very, very valuable claims, placing them in a far different position under the plan than creditors like EPA. And, second, creditors of EFCH received zero value from the settlement agreement, a result that certainly benefits the creditors of TCEH.

To justify this, the Debtors would have to establish that all of the many causes of action being resolved, or in EFCH's case really just waived, by the settlement agreement -- that none of them belong to the estate of ECH and none would provide any value at all to EFCH if successfully litigated. This is precisely the kind of unfairness that has been recognized as something that the Bankruptcy Court should ensure against. And, in fact, we know that there are substantial claims that belong to the estate of EFCH. For example, part of what's being resolved by the settlement agreement is the assignment of a subsidiary's environment liabilities to EFCH on the day of the LBO without providing adequate assets to meet those liabilities. This is a quintessential fraudulent conveyance claim and it belongs to the estate of EFCH.

For another example, EFCH was similarly situated to the subsidiaries of TCEH with respect to the pledges and liens provided under the credit agreement. The lien should not be avoided in the same manner for each, so that EFCH's causes of action have value, just as the TCEH subsidiaries do. There's also insurance coverage for breaches of fiduciary duty by EFCH's directors and officers, and EFCH should not be required to waive those claims in exchange for zero consideration.

And for a final example, there is the $5.4 million

cause of action against EFCH arising from tax payables and receivables. EFCH should not have to give up valuable causes of action in exchange for no consideration. A settlement agreement that requires EFCH to do so is unfair, unless the Debtors establish that all of these claims either don't belong to EFCH or are worth nothing. And the Debtors have failed, at least thus far, to do that. The Debtors, the committee, the disinterested directors assert that they have fulfilled their fiduciary duties to EFCH but their briefs and declarations provide no valid explanation as to why these causes of action were waived in exchange for zero consideration. The results for unsecured creditors of EFCH is unfair and inequitable and should not be approved.

Finally, the creditors of EFCH who are shut out of the settlement agreement in the plan include the Environmental Protection Agency. If creditors of EFCH receive zero distribution and zero value from the plan and settlement agreement, then EFCH will walk away without ever paying its fair share of the costs of cleaning up pollution hazards at the New Mexico uranium mine sites and it will pay nothing to make these sites safe again. Meanwhile, the various parties to the LBO and the TCEH creditors will profit from the way in which the LBO and settlement agreement were structured, a structure that excludes and does not provide for EPA and other EFCH creditors. Instead,

EFCH's share of cleaning up the mine sites will fall on the public. This result would not take the public interest into account when applying bankruptcy law, as the case law requires, and it would be in direct contravention of the strict liability principles of CERCLA, requiring companies to pay the cost of cleaning up the pollution hazards that they create. Such a result is unfair and inequitable and should not be approved. Thank you, Your Honor.

THE COURT: Thank you. Is there anyone else that wishes to be heard? Okay, that'll close openings. Let's take a short recess and then we'll put Mr. Keglevic on the stand for direct. Five or ten minutes. Certainly no later than four.

(Recess)

CLERK: All rise.

THE COURT: Hello? Please be seated. Mr. Keglevic, yes? I’m sorry. Go ahead. Please remain standing, Mr. Keglevic, I apologize.

MR. KEGLEVIC: Your Honor--

CLERK: Raise your right hand. Do you affirm that you are telling the truth, the whole truth and nothing but the truth to the best of your knowledge and ability?

MR. KEGLEVIC: I do.

CLERK: Please state and spell your name for the record.

MR. KEGLEVIC: It's Paul Keglevic. K-e-g-l-e-v-i-c.

CLERK: Thank you.

THE COURT: All right, thank you. You may be seated. Mr. McGann?

MR. MCGANN: Your Honor, before I begin my examination, there is a somewhat -- I believe the (indiscernible) would like to announce. I apologize for--

THE COURT: That's okay.

MR. MCGANN: --placing the witness, but Mr. Laurie has something--

THE COURT: I'm sure Mr. Keglevic is more than happy to sit and listen to a settlement.

MR. LAURIE: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. LAURIE: Tom Laurie with White & Case. We have negotiated a resolution of the PCRB trustee's objection to confirmation, and I think that counsel's here to describe the terms on the record.

THE COURT: Very good. Thank you. Mr. Gwynne?

MR. GWYNNE: Good afternoon, Your Honor, Kurt Gwynne from Reed Smith on behalf of Bank of New York Mellon as indentured trustee for the PCRBs. Your Honor, we've reached a resolution of the PCRB trustee's objection to both the plan and the settlement agreement. And that effect to

the resolution is that the -- it will reduce the discount on distributions on account of the PCRB claims from the range of 50 to 55 percent in the plan to 30 percent. In other words, the discount on account of -- the distribution discount to the PCRB claims is reduced to 30 percent so that the holders of the PCRB claims will receive a distribution that's 70 percent of what the PCRB claimants would receive if they shared pari passu with the TCEH unsecured debt and the TCEH second lien debt, the other class C4 claimants.

The PCRBs will receive that distribution of 70 percent of pari passu treatment from both the stock that's being distributed to class C4 and the rights that are being distributed to class C4, but also, with respect to the distributions on account of the waiver of the TCEH first lien deficiency claim. The TCEH unsecured ad hoc group will cause the debtors to modify the fifth amended plan and the settlement agreement to provide, in language mutually acceptable to the PCRB trustee in the ad hoc group for that 70 percent pari passu treatment. And in addition, for the payment of up to one million dollars in Bank of New York Mellon's fees and expenses, which will be paid in addition to the distribution, to the PCRB claimants.

Any fees in excess of a million dollars would then be paid via a charging lien and priority of payment rights under the indenture. In exchange for the foregoing, the

PCRB trustee, combined with (indiscernible) objections to the plan and the settlement agreement, and will use good faith efforts to convince the eight holders of the PCR claims with who the PCRB trustee is in contact.

To change any of their votes against the fifth amended plan to votes in favor of the fifth amended plan, as modified by this settlement agreement. As Your Honor may know that of the 881 million in PCRBs that are not company owned, about 600 million voted on the plan, 70 percent in amount, 417 million voted against the plan, 30 percent an amount, about 183 million voted in favor of the plan.

The group of eight PCRB claimants that with whom the PCRB trustee is in contact comprise about 385 million. There was a ninth member, but that member of the group didn’t want to be restricted by learning information that was not confidential. But the $383 million worth of that group is in favor of this settlement, so we think that there is significant support, you know, well into a heavy majority of PCRB claimants that are now in favor of the plan, as modified by the settlement agreement.

With respect to the efforts to change the votes, the debtors are also going to seek authority from Your Honor, and maybe we can just do it now via an oral motion, ask the Court for authority to let the PCRB claimants change their votes in favor of the plan without filing a written

motion with the Court.

THE COURT: Isn't there something in the procedures that allows for that? I don't think we -- I'll only take that under advisement. I don't want to -- I think they can do it already, but--

MR. HUSNICK: I believe that's correct, Your Honor, but I'll take another look.

THE COURT: Yeah, yeah, we'll figure it out, one way or the other. So they're not going to stand in the way of them changing their votes, but I think they probably already have the authority to do that, and if not, we'll figure out a mechanism--

MR. GWYNNE: And if they--

THE COURT: --so they have the Court approve that.

MR. GWYNNE: Thank you, Your Honor. And those are the terms of the settlement agreement. And I would just ask Mr. Laurie or Mr. Shore to confirm that I accurately described it.

THE COURT: Very good. Mr. Laurie?

MR. LAURIE: Yes, the description on the record is accurate and reflects the deal of the parties and we'll work with counsel to get an appropriate amendment and a plan made in due course to implement the agreement. And I guess we'll have to sort out what parts of the confirmation hearing have now been eliminated.

THE COURT: Okay. Very good. Thank you.

MR. LAURIE: Great, thank you.

MR. GWYNNE: Thank you, Your Honor.

THE COURT: You're welcome.

MR. HUSNICK: Your Honor, Chad Husnick on behalf of the debtors, just to confirm that that's our understanding of the deal as well, and that the debtors are supportive of that resolution.

THE COURT: Very good. Thank you. All right.

MR. MCKANE: Your Honor, Mark McKane of Kirkland & Ellis for the debtors. Before I begin my examination of Mr. Keglevic, may I approach with two sets of binders? One is a binder containing demonstratives and potential exhibits that I'll be using with Mr. Keglevic. I've already provided one to the witness table. I have one for you and both of your law clerks. I believe I provided copies to opposing counsel as well. In addition to that, I have an index of all of the debtors' exhibits. We can also provide that electronically, to the extent that we use exhibits during the examination, we will do so, and electronically as well. But as you note, there are also hard copies available here in the courtroom.

THE COURT: Okay.

MR. MCKANE: Thank you.

THE COURT: Thank you.

MR. MCKANE: Good afternoon, Mr. Keglevic. Can

you introduce yourself to the court again, please?

MR. KEGLEVIC: Good afternoon, yes. I'm Paul Keglevic. I am the Executive Vice President, Chief Financial Officer of the debtors and Co-Chief Restructuring Officer.

MR. MCKANE: And sir, the binder in front of you contains a set of demonstrative aids, your written direct examination and a series of exhibits. If I could ask that you turn to the tab that is labeled your written direct?

MR. KEGLEVIC: Yes.

MR. MCKANE: Sir, do you recognize what has been labeled "Debtor's Direct Keglevic," or "DDIR Keglevic" up on the upper right hand side?

MR. KEGLEVIC: I do.

MR. MCKANE: And sir, is this your written direct testimony that you prepared and submitted to the court?

MR. KEGLEVIC: Yes, it is.

MR. MCKANE: And sir, is this in support of both the motion, summon motion as well as for (indiscernible) confirmation?

MR. KEGLEVIC: Yes, it is.

MR. MCKANE: Your Honor, I -- we move the debtor's written direct testimony from Mr. Paul Keglevic into evidence.

THE COURT: Any objection? Okay, it's admitted

without objection.

MR. MCKANE: Thank you, Your Honor. Mr. Keglevic, I'd like to cover a few topics with you today, and if possible, I'd like to complete your examination today by five o'clock. If not, it may roll over, Your Honor. I apologize.

THE COURT: That's fine.

MR. MCKANE: There are five topics I'd like to cover with you. First, I'd like to do an overview of how we got here. Then, I'd like to cover disarmament and drag. Then, feasibility of the plan, focusing on the E side. Fourth, I'd like to cover uncertain aspects of the settlement agreement. And then, finally, the sponsor releases, okay?

MR. KEGLEVIC: Yes.

MR. MCKANE: All right. And to do that, let's start with how we got here. And to do that, did you prepare or have us prepare a series of demonstrative aids that is labeled under "Keglevic Demonstratives?"

MR. KEGLEVIC: I did.

MR. MCKANE: And is the first of those Demonstrative A, Demonstrative Keglevic One, a timeline?

MR. KEGLEVIC: It is.

MR. MCKANE: And so, would using that demonstrative aid assist you in your testimony today?

MR. KEGLEVIC: I certainly hope so.

MR. MCKANE: All right. So using that timeline, sir, why don't we just start at the beginning of the year? Can you tell the Court, what were the drivers that the court was -- that you were -- that the debtors were focusing on in January of 2015, as you were trying to advance its restructuring efforts?

MR. KEGLEVIC: Certainly. I think Mr. Kieselstein started in November, but this starts with actually the big procedures being approved and the receipt of the order on January 15th. Obviously, we thought that was a critical part of the case, because ultimately, the construct that we had been exploring was a construct where the -- EFH's interest in Encore would be sold, and we would use the proceeds of that sale to, as best possible, pay all the E side creditors at par.

So effectively, the bidding procedures are the vehicle through which we attempted to determine how much value we would have to distribute to the E side creditors and any T creditors that might have claims against E. So that was the beginning of the procedures, and as I think we've testified to before Mr. Ying reached out to over 50 possible candidates for bid. I think we had 14 or so that signed non-disclosure agreements, and as we'll talk about in a bit, we ultimately ended up with three initial bids, but

that’s the beginning of the bid process.

Shortly after we got the bid procedure order, and because we knew the bids and the amount we were going to receive for the sale of Encore was only one piece of a plan. We knew we needed to get, and we certainly attempted to get creditor consensus around how to distribute those proceeds, and some agreement of what claims between estates may be.

MR. MCKANE: And sir, what approach did you all take in the December/January time period to try to develop some creditor consensus on how to allocate whatever proceeds you received from the Encore sale?

MR. KEGLEVIC: We certainly, at the end of the day, we knew it was going to be the disinterested directors’ determination of the settlement, but before we got to a disinterested director result, we were hopeful that we would have consensus among the estates and agreement and settlement of claims between the estates. So what we tried to do, and I think the Court, as Mr. Kieselstein pointed out earlier today, had encouraged us whether over at dinner or whatever, to continue that dialogue and look for consensus. We are using the time, even before and after the bid procedures were finalized, to talk to the various groups of creditors and get their points of view and beliefs on what claims were, how they would value them, their willingness to settle, etc., because we knew that was going to be a key

element of any plan that we would enter.

MR. MCKANE: And sir, how constructive were those conversations in December and January? Were you making progress?

MR. KEGLEVIC: We certainly had a lot of meetings and were having a dialogue, but the parties were substantially apart. The bid-ask spreads were wide and they -- I would characterize it as nobody was in the mood to settle at that point in time.

MR. MCKANE: Okay. Were you looking at any point for a catalyst or a means by which to advance that part of the (indiscernible)?

MR. KEGLEVIC: Yes, absolutely, because as I said, you know, we knew it was a critical point or a part of any plan we were to file, and we knew the clock was ticking on exclusivity. So you know, with a fundamental belief, the consensus was the best way for the estates to get out of bankruptcy, we tried to get that. We thought the bid procedures may -- might spur that consensus, but we soon realized that the bid procedures in and of themselves would not drive settlement discussions that we had to undertake different procedures or try something new. And that is what led us to, I think the next point here on this chart, is the January 30th so-called COR term sheet, that was--

MR. MCKANE: What is that team sheet?

MR. KEGLEVIC: That was a term sheet that Ms. Doré and I constructed, that basically would -- was without numbers, but that effectively talked -- looked at the estates and effectively had a schematic, if you will, about how settlements may flow between the estates. And we put that out and effectively, I would say at least initially, it was not very effective, because there were no numbers in there. We got a lot of complaints that this isn't that helpful. It's maybe directional in terms of, you know, which estate owns which estate, but until you guys start taking a position, you know, we don't know if we agree or disagree. And we were nowhere in terms of ENT settlements, big, big ask spreads.

The T side media (indiscernible) hadn't begun and they had big, big ask spreads of, you know, intra T. So this was our attempt with our board's approval, you know, to put something out there that would attempt to stimulate that exact conversation.

MR. MCKANE: Yeah, and let's touch on that board's approval for a minute. Can you just clarify for the Court that process? What did you ask the boards to approve before you put off the COR term sheet?

MR. KEGLEVIC: We basically explained exactly what I just explained, that the reason we wanted to do it, the benefit we saw of doing it, a drive toward consensus and

acceleration of the case. But the board and the specifically disinterested directors, we did not specifically ask them to vote on this issue, since they effectively just did not object to us going forward. So we informed them of our decision to make sure nobody was opposed to it, but we did it, and I think with a disclaimer that it was purely Ms. Doré and my attempt to drive consensus.

MR. MCKANE: All right. And once the COR term sheet's out there, you're still running the bidding process for -- the sales process for Encore. When did you receive first round bids?

MR. KEGLEVIC: We received first round bids on, I think as this indicates, I apologize, March 2nd. And as I mentioned before, we received three bids, and we've listed here, we've had one bid from a creditor, the EFIH PIK group, one bid from the HUC group, which we've talked about earlier today and I'm sure will again, and the third one, which is also talked about in the court, before we even issued bid procedures because they had put in an unsolicited bid earlier in the case was the NextEra group, a strategic.

MR. MCKANE: And sir, how would you just characterize the overall value of those bids versus what you were hoping for?

MR. KEGLEVIC: Slightly disappointed. NextEra, I

think it was public in the proceedings leading up to the bid procedure order that NextEra had thrown in an unsolicited bid that had topped $18 billion. When we received these bids, we did not get to that same level with NextEra. While the other two bids were slightly above that amount, they had other conditions and/or deductions that gave us less distributable value than I had hoped for. And of course, remember at this point in time, as it was throughout the entire case, we're trying to get as much distributable value as possible to pay the E side group at par, and to have them be unimpaired. So all of my thoughts with respect and my feelings with respect to the bids were with that objective in mind.

MR. MCKANE: And sir, if you could turn to page three of your demonstratives? And I ask that you not put this on the screen, thank you. Sir, page three of your demonstratives is a page out of a board presentation or a restructuring update from March 6th that's Debtor's Exhibit 85. Do you recognize it?

MR. KEGLEVIC: Yes.

MR. MCKANE: Sir, is this the recovered waterfall in comparison of bids that you presented to the Boards of Directors as you evaluated that first round bids?

MR. KEGLEVIC: Yes, it is. It -- and in fact, it took the same format as the format that we had provided on

the COR term sheet, because obviously, we took a position that it was important to show distributions to each party that were undisputed. Obviously, we have the make whole and the post-petition interest disputes. And then, there was -- I believe the next page would've then gone through this same exercise with respect to the EFH group, but the distributable value to EFH was based on undisputed claims and an estimated settlement amount that was what we were willing to settle those claims for, which would show how much would then be available to the EFH box to resolve the claims they had for all of their creditors, including inter creditor claims, if any, at this point.

MR. MCKANE: And sir, based on the management and the advisors' assessment of the bids, did the CORs make a recommendation to the boards as to whether the bidder should advance to a second round?

MR. KEGLEVIC: Yeah, at this point, especially since we only had three bidders, and that all of them were providing some distributable value to EFH, and also, with the background and belief that rarely do bidders give you their full, you know, their best and final in round one, that most of them are just trying to get to round two. We thought there was enough here for each of them, that we could explore and potentially optimize and maximize.

MR. MCKANE: All right. And as you move forward

into round two of the bid process, did you also move forward on the plan front with any tools to advance that process?

MR. KEGLEVIC: Yes. And if I go back to my timeline, I apologize if I'm making it hard to follow, but we -- upon receipt of this distributable value, and now, first round bids that drove that distributable value, and given the input we had gotten from the creditors, that a COR term sheet without numbers wasn't very helpful. We decided to put out a COR term sheet that actually, we didn't put in the actual bid numbers that we had received. We did not disclose that to the parties, but we put a hypothetical amount that we hoped to get, which showed the distribution through the waterfalls. And at that point, it was the first time I believe that we also put in some hypothetical settlement amounts between the estates, which then ultimately, you know, showed that the EFH estate would pay the TCEH estate based on the claims that they had, you know, brought at that point in time, or at least raised through the process at that point in time.

MR. MCKANE: And sir, what did you base the amounts that you allocated for intra to your recoveries and (indiscernible) your recoveries as you populated that COR term sheet?

MR. KEGLEVIC: Since we knew it was the -- we weren't trying to overstep our bounds with respect to the

disinterested directors. And obviously, we wanted to drive toward consensus. At that point, I would say it was more a financial exercise. I'll not kick this one to Ms. Doré, like I usually do, that I was really looking at bid-ask spreads that we had between what the T side was communicating to the E side, what the E side was communicating to the T side.

Frankly, at this point, EFIH and E were hopeful that the EFIH was going to get paid in par, so that claims of EFIH against E, you know, were kind of put to the side because they assume that they would get paid par on those claims, effectively would accrue to the benefit of EFH, and therefore, we didn't need to pursue them.

But as you indicated, we also then put the TCEH intra silo settlements, and probably not unlike the responses we've received throughout this case, everybody told us they hated the numbers. But they were simply, we took the bid-ask spread and I picked a number in between.

MR. MCKANE: And when you say--

MR. KEGLEVIC: And not exactly in between.

MR. MCKANE: And when you say the bid-ask spread, you're talking specific indicators of proposals that you received (indiscernible) underwriting from creditors?

MR. KEGLEVIC: Yes, we had received, at that point, from both EFIH and EFH creditors, their large

creditor in that box, that they were willing to pay something to the T side and settlement of the claims, and in recognition of the tax issues associated with the transaction that we had contemplated, the tax free spin. The T side had substantial amounts that they thought were due from the E side. So you know, we picked numbers that we, you know, thought were reasonable, somewhere in between, but frankly, were closer to the E side offer than they were to the T side at that point in time.

MR. MCKANE: And sir, you mentioned the disinterested directors and the work that they were doing in terms of evaluating claims. Did they, around this time, reach a resolution?

MR. KEGLEVIC: They reached a resolution approximately a couple of weeks after we did that. We knew they were engaged in that process. We certainly, you know, went through the same process we did with the prior term sheet. We brought it to our board. We didn't ask them to approve it or agree with it, but we notified them we were going to do it in the hopes of driving consensus. I think the disinterested directors' point of view is that if that drove more consensus and got people to -- and answer, then they wouldn't -- we'd have to rely on their own judgment. But ultimately, we did not get much movement in the bid-ask spread as a result of that. So the next step was the

disinterested directors spent the, I guess the next couple of weeks going through their negotiation process, which I'm sure will be part of the testimony that disinterested directors provide or have provided and came out with the settlement agreement on April 1st.

MR. MCKANE: Yeah, great. And sir, also in April, did you receive second round bids, as it relates to the Encore equity sale?

MR. KEGLEVIC: Yes. A couple of weeks after this -- disinterested director settlement, we received round two bids that the most notable thing of the round two bids is they didn't substantially enhance the value from round one. A lot of the issues we had with the round one bids remained, and notably the EFIH PIKs ceased to be a standalone bidder and teamed with the hunts. So we went from three bids down to two at that point in time, and we had a consolidated hunt PIK bid.

MR. MCKANE: And sir, did you do an assessment for the Board of Directors once you received those second round bids?

MR. KEGLEVIC: Yes, we did the same review with the board that we did, focused on enterprise value and distributable value to the creditors. And of course, this -- now, when the boards see these numbers, they have the disinterested director settlement numbers in their minds, so

they had another piece of the puzzle in terms of whether the -- what those bids would do to the creditors up at EFH, because I think at that point, we were, at least still at the point that ignoring the make wholes and the post-petition interests, that the recoveries through EFIH would be at par.

MR. MCKANE: Okay. And sir, does de -- taking a look at demonstrative four, sir, is that an extraction of one page out of the board presentation, which is Debtor's Exhibit 91, that provided at least a part of the assessment of the bids that you discussed with the joint boards?

MR. KEGLEVIC: Yes, and it had the, you know, the key financial numbers are the enterprise value, the distributable value, and then we talk a little bit about (indiscernible) fees, break fees, which were some of the key terms, but this is only one page, as you described. We went through the bid in good and complete detail.

MR. MCKANE: All right, yeah. Yeah, and around the same time that you received second round bids, did the debtors also file their first plan of reorganization?

MR. KEGLEVIC: Yes, we did, because at that point, we were getting, you know, close to where we thought we knew what the distributable value were. We had a basis upon which to allocate it, which was the disinterested director. So we want -- and we wanted to get a plan on file,

recognizing that we'd probably have to do some iterations of the plan, and you know, once again, this is to drive consensus and to push the creditors forward toward that consensus, so we filed a plan.

Notably, that plan gave us three options. And we kept -- I think throughout this process, we did our absolute best to be inclusive and transparent, so we -- the three options were that we had a self equitization opportunity, which could mean the E side creditors could come to a deal and effectively convert their claims into equity.

Secondly, we had a -- effectively, the provision for a NextEra type bid, a merger bid with a strategic. And then, third, we effectively had a sale to a, you know, like for example, to the Hunts, where it would've been a new money equity deal coming in. So our -- the plan we filed at that point left all three options open, and you know, was general, and you know, in that respect, in terms of what recoveries the creditors would get.

MR. MCKANE: Yeah, yeah. By the time you'd filed a plan, had there been discussions with creditors about the ability to convert Encore into a REIT?

MR. KEGLEVIC: Yes. I think I don't recall exactly when REIT came up, but certainly, it was as early as January, February timeframe. And the TCEH unsecured holders effectively brought up the idea. I would say that

underlying the EFIH bid and the Hunt bid, there clearly was evidence that they were contemplating a REIT. We hadn't worked out yet the conditionality around the REIT, but at that point, every bid and every creditor discussion other than NextEra was premised either explicitly or implicitly on a REIT based on the public information that had come out through "Debt Wire" and other publications, and just the market was very hot for REITs, yield co's. And there was a belief that if we were going to sell the company, that that could be the best way to advantage the estates and then ultimately, the distribution to the creditors is to go to a REIT.

So I think in -- we certainly were -- started a process of allowing people to do due diligence on the REIT. We had preliminary discussions with the IRS around the REIT. We did our internal homework about the Texas Public Utility Commission. Obviously, they -- there was an example in Texas, there is an example in Texas, Infrareit, where they did convert a distribution utility into a REIT. So REIT was clearly in the game and was front of mind for everybody except NextEra.

MR. MCKANE: Okay. When you filed the plan of reorganization, was -- there was also a request for a scheduling order to be entered at that time?

MR. KEGLEVIC: Yes, and obviously, filing a plan,

having a disinterested director settlement, and then, you know, ultimately getting a schedule REIT that were very important to get the scheduling in order, we didn’t want to go to the court without having filed a plan and asked for a schedule. So those were all steps contemplating that once we got a scheduling order, that would also put a timeframe in front of the creditors, and hopefully, drive consensus and agreement as well. So we looked at this as a kind of a three pronged approach -- the plan, which encompassed, you know, expected bids and the disinterested directors and a schedule with the court.

MR. MCKANE: The T uns’ interest in a REIT, was that part of the bid process or was that distinct from it?

MR. KEGLEVIC: It is distinct from it, and in fact, when the, the TCEH unsecured came up with this idea, you know, it took us a little by surprise. We did not anticipate that they would be a likely bidder for Encore. But they -- their owners had done their own homework and thought that the REIT might be worth pursuing. And I -- our position at that point in time was anything that would maximize the value for the estate, get us to a consensual plan and get us out of bankruptcy, was in the best interest of the estate. So we provided them with the due diligence information that they needed, and they started to begin their own homework.

Prior to that time, I would say the EFIH PIKs had talked to the TPUC, had done their own IRS research, et cetera, but this was the first time that the TCEH unsecureds kind of entered into the competition.

MR. MCKANE: Yeah. And you mentioned that the PIKs were evaluating potential, you know, plan options, the T uns were mentioning evaluating plan options. Were there other E side creditors that were evaluating a plan option at this time?

MR. KEGLEVIC: Yeah, well, shortly in, I think it shows up sometime after we got the second round bids, Fidelity, you know, which is the largest creditor of the EFIH estate, also suggested that they may have an interest in effectively putting together a E side solution, which would be valued on an assumption that they get to a REIT, but potentially not be conditioned on a REIT. So at that point, we had two bidders, the Hunts and the PIKs. We had NextEra and then we had two creditors effectively TCEH Uns and Fidelity, that were very, very clear that they wanted to be plan sponsors and not bidders, and because they believed they could bring other consensus and settlement and value to the estates outside of the bid process and they didn't want to be characterized as a bidder. So at that point, we continued on both fronts, with the two bidders and with the two potential new plan sponsors, so as not to exclude

anything that could bring value to the creditors and to the estates.

MR. MCKANE: And did the debtors' management team, the CROs and the advisors, evaluate all four of these options, the two within the plan proposal and the two that are more in the bidding process for the board?

MR. KEGLEVIC: Yes, we continually updated the board. And you know, while we recognize a distinction between a plan sponsor and a bidder, we continued to have dialogue with both the TCEH unsecured and the EFH Fidelity Group, that you know, we would, you know, apply the same kind of discipline to their proposed plan, as we would to the bidders, and there was not a, you know, we're not -- we weren't necessarily going to agree that there was an advantage to being a planned sponsor versus a bidder, that ultimately, we stick with the objectives of the process and that was to, you know, maximize the value to the estates and the distribution of the creditors.

MR. MCKANE: Yeah, and in that May, June time period, did you receive plan proposals separately from the T uns and from the Fidelity Group?

MR. KEGLEVIC: Yes, and I apologize. I should refer to my demonstrative that the Fidelity Group, Fidelity owns a, I think, well, I should just say, a relatively significant position in the EFIH second lien notes. So when

I say Fidelity, it was Fidelity and EFIH second lien group that joined together in that proposal. It wasn't Fidelity on its own.

MR. MCKANE: All right, thank you, sir. Now the second round bids, those are moving towards a stalking horse selection date. Do you recall that, sir?

MR. KEGLEVIC: Yes, we were under the court procedures and we were hoping to get a stalking horse filed with the court in June. And we were on pace to do that with the two bid proposals because we had been working with them longer. We consistently got feedback from the two potential plan sponsors, the EFH, EFIH second lien group, which I referred to as a Fidelity Group, previously, and the TCEH unsecured, that they needed more time. And so, effectively, what you see is we were pushing the stalking horse filing out and to give them as much chance as we possibly could, recognizing that we were getting to the point where we had a court hearing on June 25th and we did not want to go into that court hearing without an understanding of which direction we were taking it.

MR. MCKANE: And sir, did you give the creditors, the bidders, or/and the creditors (indiscernible) plan essentially a deadline of mid-July -- mid-June, excuse me?

MR. KEGLEVIC: You know, unfortunately, I failed because I gave them multiple deadlines that I kept

extending, because at the end of the day, they were somewhat artificial. But June 25th was the one date we didn't believe was artificial. We did not want to come back to the court and say, "You know, even though you approved these bid procedures, we still don't know who we want to do as a stalking horse." You know, and we wanted to have something more definitive, and recognizing that the court had just given us the schedule that required us to start getting specific about the plan, if we were going to use exclusivity wisely.

So ultimately, I think, you know, to their credit, both creditor groups recognize June 25th was not artificial. But as you see, we still weren't done on that date. And just to show you how the world changes, I think on that date, we said that, you know, we -- at that point, if we had to rank them, we thought the E side deal, with Fidelity in the seconds, would have been closer to our choice and was the TCEH unsecured deal. And obviously, we came to a different point of view on that. But I missed an important point that's, you know, you want me to go back? Okay.

MR. MCKANE: Well, actually, (indiscernible) -- yeah, let me do that. And first of all, do you need water? Would you like some? I recognize I didn't give you--

MR. KEGLEVIC: So far so good.

MR. MCKANE: Okay, let me know. I apologize. So-

-

THE COURT: We have some of Wilmington's finest right there.

MR. MCKANE: Outstanding. Sorry about that.

MR. KEGLEVIC: We don't need those expensive bottles.

MR. MCKANE: All right. Before the June 25th hearing, in mid-June, as you were approaching creditors to give their best before you selected a stalking horse, did you have an event with one of the bidders, regarding the value of their bid?

MR. KEGLEVIC: Yes, well, we got second round bids. Once again, we still were not satisfied. We didn't think we could get an amount. Well, we knew we did not have an amount, a high enough bid that would clear -- that would pay everybody in par, including the claim that the disinterested directors had assessed that EFH owned TCEH. So we were pushing behind the scenes to get a higher value from all of the bidders.

And we thought there was still some money that NextEra had that they could put on the table. Frankly, they had the -- you know, a clean bid with less conditionality. And if we could get the value up from them, they probably would've been our choice. And you know, they had proven currency. It was a strategic. We had no REIT

conditionality, you know? It was probably the easiest deal to execute from a tax standpoint. It was clean because it was a merger with existing stock.

But then, on -- and I'm sure the date is here -- on June 11th, not only did we not get the extra money that we wanted from NextEra, they substantially dropped their bid, which effect -- so deeply impaired EFH.

MR. MCKANE: Yeah, and to illustrate that--

MR. KEGLEVIC: And in fact, depending on what the outcomes may have been associated with make wholes and post-petition, that low bid could've even impaired EFIH, so it was a substantial decrease over where they were, and you know, that also explains why I was more willing to give extra time to the other two creditor groups, was I didn't have anything in my pocket that I could execute.

MR. MCKANE: All right. And sir, the drop in value of the NextEra bid, did you illustrate that for the Court, its impact on distributable value?

MR. KEGLEVIC: Basically, and I'm remembering these numbers because--

MR. MCKANE: Well, let me help you. Did you prepare a demonstrative aid on page five, which is an extra active, your presentation on June 17th to the board?

MR. KEGLEVIC: I--

MR. MCKANE: To help you with that?

MR. KEGLEVIC: I did, and this one, I remember. And as can be shown on the current bid on June 11, ’15, after undisputed claims, there was only $130 million of distributable value to pay all the disputed claims that EFIH and to pay any of the claims that EFH--

MR. MCKANE: And that’s focusing on the lefthand column, the -- where the current bid from 6/11?

MR. KEGLEVIC: It is. It’s basically taking you from where we were from the unsolicited bid, that is the far right hand column, original. Interestingly enough, round one, NextEra went below that, but then in round two, came back to where they were in July of ’14 at 18, 190. And then, basically dropped $900 million or roughly at that point.

So we had -- I had spent, personally, enough time with all the creditor groups to know that absolutely every creditor on the E side, and I would say TCEH, would have us rather file -- would not want us to file a stalking horse with a bid that locked in impairment on the E side. They would rather own the company and pursue the REIT. And you know, so that was -- this was a major shift in priority and strategy and focus for the company, and really eliminated an option that we thought we were going to be able to execute.

MR. MCKANE: Yeah. In this same time period, in advance of the June 25th hearing, was there also a movement

from the Hunts, previously in the round two, the Hunts had been with the PIKs. At some point, the Hunts team up with the T uns. When does that happen?

MR. KEGLEVIC: Yeah, so let me explain that. Round two, we did a bid from the Hunts with the PIKs, and there wasn't substantially more distributable value. And in fact, the Hunts had agreed as part of their bid or a provision or an element of their bid, was that some of the value would go to pay the PIKs, their post-petition interest claim, which meant that the headline value, the enterprise value was much higher than the distributable value would indicate.

And we did not think the post-petition interest claim was worth settling at 100 cents on the dollar. And as was our process throughout the bids, every time we received a round, we went to each bidder and we told them what we liked about their bid and we told them what we didn't like about their bid. And at that point, we went to the Hunts and said, "You know, why did you team up with the PIKs? You know, you're paying an expensive price in terms of post-petition interests." But they were struggling raising enough equity to make their deal go. And paying the PIKs the post-petition interest allowed them to get the PIKs to convert their debt into equity and effectively filled the shortfall that the Hunts had in equity at that point in

time.

Knowing that in -- and in fact, in forming the Hunts that they had a, you know, that we were worried about whether they had enough equity to make their deal go, even with the PIKs, and with the infirmity associated with the post-petition interest settlement, we -- I met with them and I informed them that we had the TCEH unsecured group, was kind of an almost a polar opposite situation, that they had sophisticated financial buyers who have a lot of access to the capital markets, who believed they had the equity circled up.

And they were looking for a partner that had the operating expertise, the Texas presence, the Texas PUC experience, et cetera. So they had informed me at that point, I suggested that maybe there was an opportunity to team. They said they had already had discussions with the TCEH unsecureds. I told them we were fine with them exploring that team, but I also encouraged them not to drop their standalone bid, because I wanted all the options I could get at that point in time.

MR. MCKANE: You mentioned that when you read -- you were discussing with the Hunts and the uns about potentially teaming, that they had already had that discussion. Was there, during this process, cross talk between the creditor groups about what each of them were

pursuing?

MR. KEGLEVIC: I believe everybody was speaking to everybody frequently. You know, Fidelity and the PIKs, Fidelity and the TCEH unsecured, the Hunts and the PIKs, the Hunts and the TCEH unsecureds. NextEra had several discussions with the creditor groups. I'm probably missing everybody, but it's only because I'm just not looking at a matrix because I -- everybody was trying to find the right combination. And I'll give them, you know, credit. I think everybody was trying to become the winning bidder and provide the most value to the estate, so we were encouraging that dialogue to take place.

MR. MCKANE: Okay. And sir, at that June 25 hearing, was that essentially the end of the stalking horse process?

MR. KEGLEVIC: Yes, we effectively indicated, you know, as I said, at that point in time, we effectively had no bidders. The Hunts had transformed of their bid into an agreement to partner with the TCEH unsecureds, which moved us to a plan sponsor approach. The NextEra had lowered the bid in an amount that we knew the E side would've objected to executing it. And importantly, the E side deal, it was still alive, but it was starting to show some stress. You know, we were intrigued with an E side deal at that point in time, because we knew that if all the E side creditors

agreed to convert into equity, you know, that would not only give us creditor consensus, but it could give us a full E side solution. And in fact, had been led to believe that that agreement or consortium was further along and in fact, that it was a, you know, a -- that anybody who wouldn't agree to the deal, they would raise enough money to take them out in cash. So it had the elements we were looking for, full payment of the E side at par, full consensus of the E, and that would've still left us with a cram down case on the T side, but at least it was a lot of consensus at that point in time. And notably, while the un, TCEH unsecured had teamed with the Hunts and had potentially created a better entity, one with operating experience and Texas presence and REIT know-how, with an entity that had access to a substantial amount of equity capital and great financial expertise, we still did not have T side consensus in doing that deal.

And as stated earlier, and I'm sure we're going to get into this, that the tax free spin under a REIT is a very important element of getting the value to the E side. So I think in June 25th, we were probably, and I almost kind of remember Mr. Kieselstein's comments. I don't remember which king he quoted or universe, but it was something that indicated that we had a long way to go with the TCEH unsecured group to get to a deal, where we would support

that approach.

MR. MCKANE: All right--

THE COURT: And I remember that Mr. Laurie kept shaking his head at why are you saying that.

MR. KEGLEVIC: I think they were on this side of the table, too.

THE COURT: Oh yeah, you're right.

MR. LAURIE: How quickly we forget.

MR. MCKANE: Well, at that time, without T first support, did you do that as a major hindrance to the T un, Hunt proposal?

MR. KEGLEVIC: Yes, because you know, the -- as we did the due diligence and started working through all the tax consequences associated with a deal that had a REIT at the centerpiece of it, all of a sudden, the issue of a tax free spin, there was another hook as to why a tax free spin was critical to getting that extra value to the E side. And the tax free spin, as we've said all along, has been, you know, something that was really controlled by the TCEH first liens.

MR. MCKANE: All right. We'll get to the details, on how the spin impacts the REIT in a little while, but you didn't hide that information from the uns, did you? You communicated, "You need to get the firsts on board?"

MR. KEGLEVIC: Oh absolutely. We, you know, our

not so friendly discussions, we had many of them, with the Mr. Laurie, you know, was the -- how critical that was, that if we were going to take them to the plan, that we needed, you know, or we certainly wanted T side consensus so we didn't have that tax issue. Also, we knew T side consensus could deliver what they were suggesting, and that is, you know, a faster case. We needed the TCEH first liens to sign up to this deal (indiscernible) speed. And I think one of the things, and I blame myself a little bit, that we've not gone on the record and really talked about, is the lack of speed in this case, the party that has been really the most disadvantaged has been the TCEH first liens.

You know, that is a company that is going through a tremendous number of challenges in terms of reduced power prices, increasing EPA regulations. And everybody in that space is transforming their company. Our company, the TCEH company, once its spun out, I have no understanding or belief that I'll be a part of that company, by the way. But that company needs to transform itself. It needs to get geographic diversity. It needs to get fuel diversity. It probably needs to retire its old co-assets. I think the Court is aware that we're looking at buying some gas assets, but that transformation can't be done in bankruptcy. It needs to be unfettered. And while we can do a few things, you know, time is of the essence to the T estate. And

anything that delays the case really has a substantial impact on their estate well beyond, you know, the cost of litigation.

MR. MCKANE: Well sir, within a few weeks after the -- that hearing, were the T uns able to strike a deal with the two firsts?

MR. KEGLEVIC: Yes. And we don't have this on here. I know the mediator was involved and, you know, success has many fathers, so I'm happy to give credit to whoever did whatever they did. But we were, you know, when that piece came together, that all of a sudden became -- it was twofold. One, that plan brought us some very intriguing developments to us, but T side consensus, the teaming of the Hunts and the T uns, the opportunity for disarmament and drag, you know, those things were very, very important and, you know, the other plans, as has been pointed out, have effectively fallen away.

MR. MCKANE: Well, let's, and let's touch on that.

MR. KEGLEVIC: So it was twofold, if I can just continue.

MR. MCKANE: Sorry.

MR. KEGLEVIC: I just think it is very important, one is, the plan that we picked, we believe, has the right elements that are very good for all of the estates, and I'll be cross examined on that tomorrow. But, we also did not

have the alternative because the Fidelity's second lien and the E side plan, they could not agree to a plan that we could file and was executable. The NextEra bid had fallen to a level that impaired substantially, potentially all the E side classes. So we were stuck with the TCEH unsecured plan. But happy to be stuck with it because we believe it had all the elements, and that our business judgment were the appropriate way out of bankruptcy.

MR. MCKANE: Let's talk about the E side efforts to put together their own plan. By June 25th, we're -- the debtors are vocal in their support for an E side equitization. And that requires two things, am I correct, both the raising of equity, if necessary, and an allocation of the (indiscernible), or of the assets?

MR. KEGLEVIC: Right. We -- interestingly enough, the E side plan that they proposed to us that they would raise enough equity to at that point, the PIKs were not on board to pay out the PIKs, to pay out the TCEH claims, and you know, effectively have consensus of among everybody else, so that the only classes that we wouldn't need the vote of anybody other than we'd have to go get TCEH first on board and do a cram down case on the T side. But effectively, the thought was, if they could pay the TCEH claim, which they agreed to do at the $700 million settlement value, in cash, and could pay the PIKs off in

cash, we thought that plan had a chance of going. And you know, unfortunately, they did not -- they could not come to a consensus about who would fund the equity raised we needed to take the PIKs out with cash. And when we went to a self equitization discussion among the three groups, all three groups had demands that none of the other two would agree to. And effectively, it fell under its own weight.

MR. MCKANE: Well, sir, even as it's falling under its own weight, did you leave the door open by filing a duel path plan in late July?

MR. KEGLEVIC: Yes, just like we did after the second round bids, where we had a three path plan. We did not -- you know, we wanted to encourage the T -- or the E side plan to get resurrected because you never know when consensus is going to come. You never know if somebody's going to change their point of view with respect to raising the money. So when we filed our plan at that point, it was a duel path plan in July. And then, only until we, I think got to -- well I'm sure you're going to ask me about the next steps, so I'll be quiet.

MR. MCKANE: Well, just to be clear, the duel paths were an E side equitization or the T un REIT approach, is that correct?

MR. KEGLEVIC: That's right. At this point, as I said, the bidders were gone, and all that were left were the

two potential plan sponsors, the TCEH uns, who had teamed with the Hunts, and the E side plan, which was still led by Fidelity and the second liens.

MR. MCKANE: And sir, when you filed that first amended plan with the duel path, there was a blank in there that you left. Why is there a blank, that blank in that plan?

MR. KEGLEVIC: You know, once again, we were encouraged by the creditors to keep the option open, which we were happy to do, but don't put in any specifics that might hinder the negotiations among the E side, when at -- but ultimately, they -- even in the next couple of weeks, could not come to closure, even with the blanks, which led us to, in the August plan, which is the second amended, to actually put equity splits that we thought the parties, you know, were in the middle of the bid-ask spreads, and they might be able to come to a consensus, even putting in the equity splits, they could not agree with what we put forth as a kind of a mediated solution on the E side.

MR. MCKANE: And sir, that mediated solution on the E side, was that handled by the disinterested directors on the E side?

MR. KEGLEVIC: They absolutely were involved and gave us their input into what those amounts should be. And you know, I should mention, and had a substantial number of

independent conversations among their constituencies at that point in time. So Mr. Cremens as well as Ms. Williamson and Mr. Evans met with their individual E side constituencies. And obviously, Ms. Doré and I were keeping him informed about what we were seeing and what we heard the bid-ask spreads were, et cetera.

MR. MCKANE: Okay. And then, sir, can you just bring us up to when we actually filed this plan in August 9th and the final negotiations.

MR. KEGLEVIC: So the final negotiations, as I said, I think we had, at that point, we had the teaming of the Hunts with the TCEH unsecured. We had the first liens on board, all critical elements. Really, the rest of the time was spent on two primary topics, disarmament and drag. And then, obviously, we, you know, also negotiated a merger agreement and the settlement agreement as part of that plan.

MR. MCKANE: Okay. Thank you, sir. Throughout all of this, your -- there's a whole governance process that's running along. Sir, can you just give the Court some sense of how you as -- or the CRO on how the advisors kept the boards apprised of this entire process in 2015?

MR. KEGLEVIC: You know, as you can see on the bottom of this demonstrative, those are the board meetings that we have. I can't recall any meeting where we didn't bring usually both Ms. Doré and I, as well as our advisors

and the disinterested directors themselves in individual meetings they had, bringing to all the boards exactly what was transpiring and what they were hearing, what the bid-ask spreads were, what the conditions of the deals were, how we evaluated the proposals against each other. It was expensive and exhaustive to go through everything, so I think our -- yeah, I feel very, very comfortable that our board was fully informed and that led them to the conclusion to file the plan.

MR. MCKANE: Yeah. And sir, was there a scheduled weekly joint board meeting every Friday morning?

MR. KEGLEVIC: Nine a.m. Central time every Friday morning.

MR. MCKANE: And are -- were the -- not just the disinterested directors, but all of their advisors invited and participated in on those calls?

MR. KEGLEVIC: Yes, I think it was probably 50 to 70 people on -- in every phone call, and Chairman Evans on every phone call after we made presentations of the debtor CROs, the debtor advisors, the debtor financial experts. Went around to each of the disinterested directors, all of their lawyers and all of their financial advisors, and asked them to, you know, agree, disagree, chime in, bring additional information to the, you know, to the core. So I think we had taken great note of what the Court said in

2014, and stepped up our governance process substantially.

MR. MCKANE: And sir, are Keglevic Demonstratives Six, Seven and Eight a summary of the restructuring update presentations that were made to the joint boards throughout 2015?

MR. KEGLEVIC: Yes, they appear to be.

MR. MCKANE: Okay. And sir, Keglevic Nine, Demonstrative Nine, in addition to that general restructuring update at the board meeting, were there separate updates, specifically focused on the plan negotiations that led up to this plan that was filed, with all the plan with the REIT plan, if you will, on August 9th?

MR. KEGLEVIC: Yes, as indicated here.

MR. MCKANE: Your Honor, I'm cognizant of the time, and this is actually an excellent point to break.

THE COURT: Okay, good.

MR. MCKANE: Can -- but I estimate probably --I've gone about 40 minutes, I probably have another 30 to 40 more. And then, if that's all right, in the morning.

THE COURT: Yeah, let's -- we'll break for the evening and take it up again tomorrow, starting promptly at 10 o'clock and we'll have our pre-informal, you know, plan of the day meeting at 9:30 in the conference room like we did this morning. And that'll do it for this. We were going to have a status conference on the PIKs. Mr. Pedone's

issues that with regard to arising from the opinion last Friday, and I think we were going to talk about Alcoa very briefly.

MR. MCKANE: Yeah, I can give you an update on that as well.

THE COURT: Okay.

MR. MCKANE: Your Honor, can I -- Mr. Keglevic being excused from the witness box?

THE COURT: Yes, of course. Yeah, I was going to suggest actually we take a recess. Some people may not want to stay, some people won't, I don't know, but we'll reconvene in 10 minutes and have that status conference and hopefully be done by 5:30.

MR. MCKANE: Very good. Thank you, Your Honor.

THE COURT: You're welcome.

CLERK: Counsel, if you would be seated, please. All rise.

THE COURT: Please be seated.

MR. HUSNICK: Good evening, Your Honor, Chad Husnick, Kirkland & Ellis on behalf of the debtors. The first I think of two issues you wanted to address this evening was a carryover from yesterday, regarding the EFIH PIK settlement discussions. We continue to make our progress, but we are not yet there with the form of the direction letter, but things are progressing in the right

direction.

So rather than waste Your Honor's time, tomorrow, we were going to ask if we could put it over to Thursday, perhaps either at the very beginning -- I know we're starting I think at 12:30 on Thursday -- or we could do it at the end. But if we wanted to start at the beginning, we may have something good to report.

THE COURT: Okay, that's -- does anyone wish to be heard? All right, let's -- that's fine. Let's do it at the end of the day. I -- I'm doing a -- I'm presiding over a naturalization ceremony that morning, which is why we're starting at 12:30, and across the street, and I don't know, you know, 12:30 might be optimistic, but I'm going to push it as best I can, so I don't want to waste any time at the beginning. So we'll probably take it at the end of the day.

MR. HUSNICK: Okay.

THE COURT: And we won't have one of our sort of planning meetings that day. We just won't have time.

MR. HUSNICK: Okay. Thank you, Your Honor. And I think the second item that you wanted to address was Mr. Pedone's letter. I think we talked briefly about it yesterday, but I don't know if there's something further to discuss. I'm not sure if Mr. Pedone was able to join yesterday, so I'll turn it over to--

THE COURT: No, well, we just -- we certainly

weren't trying to pressure this to anybody. I just raised the issue and I wasn't sure if you were on the phone and when no one responded. I assumed you weren't, which is fine, absolutely fine. So why don't you -- I did read your letter, so I know what your issues are.

MR. HUSNICK: So Your Honor, in short, having read the letter, which I think laid out the issue pretty well--

THE COURT: Right.

MR. HUSNICK: --we're looking some -- for some clarity on the timing of the introduction of the evidence on the equitable issues.

THE COURT: Well, what I -- I was thinking about it, and you know, there are a couple of things. First of all, of course you know, Friday's decision, as a technical matter, did involve your client and was the PIK note holders. And the finding was that in order to un-impair the PIK note holders, the plan had to provide for the ability of the Court to award post-petition interests based on equitable considerations because that was a solvent debtor case, i.e. equity was receiving a distribution.

So a couple of differences. First of all, you're not a PIK note holder, you're a holder at the EFH. Not sure. I know there's a fight over whether that's a solvent debtor case or not a solvent debtor case. And it depends on, you know, the fact that, you know, whether equity there

is receiving a distribution or not, so I'm not even sure that my holding on Friday would be applicable in your case. But having said all that, I think the issue really wasn't a evidence issue, it's a, what does the plan say issue? And I'm wondering if it seems to me that, you know, the fight -- not fight -- but the dispute or evidence about what the interests should be can be put with the other issues resolving your claim, which, you know, the entitlement to the make whole, et cetera, that we've sort of set for the different trap.

And the issue about whether or not you're impaired or not won't be, you know, whether -- what the amount of that interest will be. The issue about whether you're impaired or not will be whether you will get paid that interest, if I decide to award it. So I'm not sure we have to have evidence in this proceeding, with all these people, about what your post-petition -- you know, what the equitable award of your post-petition interests should or shouldn't be.

MR. PEDONE: Your Honor, I'm in complete agreement with not bogging down these proceedings with claimant specific or claim treatment specific type issues. So to the extent that we can be sure that we continue to press any objection that we have, that the plan does not provide for the payment and we don't think the reserve that exists for

post-petition interest is perfect. I actually think it could be worked with easily and hope that it is. But so long as we can press any impairment issues on that, that the funds are made available to pay it, and that the term allowed, actually means allowed by the court, not a tricky term that happens to be written into the plan, describing allowed in a different way, which I also think we can solve, then I am in complete agreement, if everyone else is, that any equitable evidence regarding solvency, regarding whether anything actually flows up or not, regardless of solvency, regarding value, could all be dealt with another day, and that would be our preference.

THE COURT: Okay.

MR. PEDONE: But I just don't want -- wrote the letter because we did not want to find that we were stuck with evidence coming in from the debtors, taking us by surprise unprepared.

THE COURT: All right.

MR. PEDONE: So if we could get to a stipulation or agreement on the record to that effect, I'd be very happy.

MR. HUSNICK: Chad Husnick for the debtors. Your Honor, I think we'll work with Mr. Pedone on the precise plan language and how it deals with this particular issue, but we agree that it -- with both the Court and Mr. Pedone,

that it should be addressed as a separate issue.

THE COURT: Okay.

MR. HUSNICK: After confirmation.

THE COURT: Okay. Good.

MR. PEDONE: Thank you, Your Honor.

THE COURT: You're welcome. What's going on with Alcoa?

MR. MCKANE: Your Honor, Mark McKane, Kirkland & Ellis on behalf of the debtors. With regard to Alcoa, I did check in with my partners who are handling that matter and that is a live discovery dispute. I believe the -- that the debtors' position was, there was no need for argument on that -- we thought it could be ruled on on the papers. I think in response, my understanding is that Alcoa didn't take up that issue one way or another. So that litigation is ongoing. And so, there is an ask that the -- that you rule on the discovery dispute. And if you want oral argument, we could schedule it, but when the letter was sent in, they were -- our -- obviously, we are very aware of our asks of your time is spent in November and December, and that's why we thought we did not need oral argument for you to rule.

THE COURT: Okay, I'll read the letters again and I will decide whether or not I want to have a conference call on it. And if I decide I won't, if I don't decide if I

don't need a conference on it, I'll probably rule during one of our meetings in the next day or two on the issue, unless you tell me that the dispute has gone away, at which point, I won't decide it.

MR. MCKANE: Very good, Your Honor. We are doing what we can to resolve the dispute. I think it's one of those situations where I think you've referenced a couple of times, does ruling help drive the settlement or does not ruling help drive the settlement? As of now, our ask is that we think ruling would help drive the negotiations.

THE COURT: Okay.

MR. MCKANE: Thank you, Your Honor.

THE COURT: I'll look at the letters again, then.

MR. MCKANE: Very good. Thank you, Your Honor.

THE COURT: Okay, very good. All right, anything else anyone wants to discuss? All right, very good. We'll see you tomorrow morning. Have a good evening.

* * * * *

C E R T I F I C A T I O N

I, Sonya Ledanski Hyde, certified that the foregoing transcript is a true and accurate record of the proceedings.

Sonya Ledanski Hyde

Digitally signed by Sonya Ledanski Hyde
DN: cn=Sonya Ledanski Hyde, o, ou, email=digital1@veritext.com, c=US
Date: 2015.11.04 15:49:31 -05'00'

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date: November 4, 2015