Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4

5   In re:                    :

                              :      Chapter 11

6   ENERGY FUTURE HOLDINGS    :

    CORP.,  et al.,           :    Case No. 14-10979(CSS)

7                             :

            Debtors.          :    (Jointly Administered)

8   _____:

9

10

11                              United States Bankruptcy Court

12                              824 North Market Street

13                              Wilmington, Delaware

14                              November 4, 2015

15                              10:22 a.m. - 5:13 p.m.

16

17

18

19  B E F O R E :

20  HON CHRISTOPHER S. SONTCHI

21  U.S. BANKRUPTCY JUDGE

22

23

24  ECRO OPERATOR:  LESLIE MURIN

25

1    HEARING re: Confirmation Hearing

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:    Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    BIELLI & KLAUDER, LLC

4         Attorneys for EFH Corp. Disinterested Directors

5

6    BY:  CORY P. STEPHENSON

7

8    COLE SCHOTZ P.C.

9         Attorney for DTC Company as Indenture Trustee

10

11   BY:  THERESE A. SCHEUER

12

13   CROSS & SIMON, LLC

14        Attorneys for Fidelity

15

16   BY:  MICHAEL J. JOYCE

17

18   CROSS & SIMON, LLC

19        Attorneys for American Stock Transfer

20

21   BY:  CHRISTOPHER P. SIMON

22

23

24

25

1    DRINKER BIDDLE & REATH LLP

2         Counsel to Citibank Na, TCEH DIP Agent

3

4    BY:  HOWARD A. COHEN

5

6    FOLEY & LARDNER LLP

7         Attorney for UMB Bank, NA as Indenture Trustee

8

9    BY:  HAROLD L. KAPLAN

10

11   FOX ROTHSCHILD LLP

12        Attorney for Counsel to Ad Hoc Group

13        of TCEH Unsecured Noteholders

14

15   BY:  L. JOHN BIRD

16

17   FOX ROTHSCHILD LLP

18        Attorney to Ad Hoc Committee of EFIH

19        Unsecured Noteholders and EFIH Second

20        Lien DIP Commitment

21

22   BY:  JEFFREY M. SCHLERF

23

24

25

```
1   FRIED FRANK

2        Attorneys for Fidelity

3

4   BY:  GARY L. KAPLAN

5        MATTHEW M. ROOSE

6

7   HOGAN MCDANIEL

8        Attorneys for Fenicle & Fahy

9

10  BY:  DANIEL K. HOGAN

11

12  JENNER & BLOCK

13       Attorneys for EFIH

14

15  BY:  VINCENT E. LAZAR

16

17  KIRKLAND & ELLIS LLP

18       Co-Counsel to the Debtors

19

20  BY:  ANDREW R. MCGAAN

21

22  KLEHR HARRISON HARVEY BRANZBURG LLP

23       Counsel to UMB Bank N.A. Indenture Trustee

24

25  BY:  RAYMOND H. LEMISCH
```

1   KRAMER LEVIN NAFTALIS & FRANKEL LLP

2        Attorneys for Second Lien Indenture Trustee

3

4   BY:  GREGORY A. HOROWITZ

5

6   MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

7        Co-Counsel to the TCEH Debtors

8

9   BY:  DAVID P. PRIMACK

10

11  MONTGOMERY MCCRACKEN WALKER & RHOADS LLP

12       Co-Counsel to the EFH Creditors' Committee

13

14  BY:  DAVID DORMONT

15       SIDNEY S. LIEBESMAN

16

17  MORRIS JAMES LLP

18       Attorney for Law Debenture of New York, Indenture

19       Trustee

20

21  BY:  STEPHEN M. MILLER

22

23

24

25

1   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

2         Attorneys for Equity Sponsors

3

4   BY:  DEREK C. ABBOTT

5

6   MORRISON & FOERSTER LLP

7         Attorneys to TCEH Official Committee

8

9   BY:  CHARLES L. KERR

10        BRETT H. MILLER

11        TODD M. GOREN

12

13  MUNGER, TOLLES & OLSON LLP

14        Co-Counsel to the TCEH Debtors

15

16  BY:  THOMAS B. WALPER

17

18  NIXON PEABODY LLP

19        Attorneys for AST as EFH Indenture Trustee

20

21  BY:  GEORGE J. SKELLY

22        MORGAN C. NIGHAN

23

24

25

1   PACHULSKI STANG ZIEHL & JONES

2        Attorney for Second Lien Indenture Trustee

3

4   BY:  LAURA DAVIS JONES

5

6   PATTERSON BELKNAP WEBB & TYLER LLP

7        Attorney for Law Debenture of New York, Indenture

8        Trustee

9

10  BY:  DANIEL A. LOWENTHAL

11

12  PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

13        Counsel to Ad Hoc Committee of TCEJ First Liens

14

15  BY:  ALAN W. KORNBERG

16        ANDREW BERNSTEIN

17        JACOB A. ADLERSTEIN

18

19  POTTER ANDERSON & CORROON LLP

20        Attorneys for Deutsche Bank, Agent to DIP Financing

21

22  BY:  JEREMY W. RYAN

23        R. STEPHEN MCNEILL

24

25

1  PROSKAUER ROSE LLP

2       Attorneys for EFH Corp. Disinterested Directors

3

4  BY:  MARK K. THOMAS

5       MICHAEL A. FIRESTEIN

6

7  SHEARMAN & STERLING LLP

8       Counsel to Deutsche Bank, Agent to DIP Financing

9

10  BY:  NED S. SCHODEK

11

12  STEVENS & LEE

13       Attorney for EFIH

14

15  BY:  JOHN D. DEMMY

16

17  U.S. DEPARTMENT OF JUSTICE

18       Attorney for the U.S. Trustee

19

20  BY:  ANDREA B. SCHWARTZ

21       RICHARD L. SCHEPACARTER

22

23

24

25

1    WACHTELL, LIPTON, ROSEN & KATZ

2         Attorneys for Equity Sponsors

3

4    BY:  EMIL A. KLEINHAUS

5

6    WHITE & CASE LLP

7         Attorney to Ad Hoc Committee of EFIH

8         Unsecured Noteholders and EFIH Second

9         Lien DIP Commitment

10

11   BY:  J. CHRISTOPHER SHORE

12        THOMAS E. LAURIA

13

14   WILMER CUTLER PICKERING HALE & DORR LLP

15        Attorneys to Marathon Asset Management

16

17   BY:  ISLEY M. GOSTIN

18        PHILIP D. ANKER

19

20   YOUNG CONAWAY STARGATT & TAYLOR, LLP

21        Counsel to Ad Hoc Group of TCEH Unsecured Noteholders

22

23   BY:  PAULINE K. MORGAN

24

25

1   APPEARING TELEPHONICALLY:

2   SCOTT L. ALBERINO

3   ABID QURESHI

4   ROBERT K. MALONE

5   MARK F. HEBBEIN

6   APARNA YENAMANDRA

7   RACHAEL RINGER

8   CHRISTOPHER HAHM

9   MARK A. FINK

10  RICHARD PEDONE

11  ASHLEY F. BARTRAM

12  PEG A. BRICKLEY

13  EMILY A BUSSIGEL

14  MARK A. CODY

15  KENT COLLIER

16  LOUIS A. CURCIO

17  ADAM M. DENHOFF

18  BARRY FELDER

19  MARK FLANNAGAN

20  JULIA FROST-DAVIES

21  MEGGIE GILSTRAP

22  DAVID GRINGER

23  XIAOYU GU

24  BRIAN GUINEY

25  PATRICK HOLOHAN

```
 1   NATASHA HWANGPO

 2   ANNA KALENCHITS

 3   MATTHEW W. KINSKEY

 4   CHARLES KOSTER

 5   STUART KOVENSKY

 6   PHILIP G. LAROCHE

 7   RICHARD G. MASON

 8   BRIAN MORGAN

 9   HAL F. MORRIS

10   TINA MOSS

11   MEREDITH S. PARKINSON

12   LARS A PETERSON

13   MEREDITH PFISTER

14   MARC B. ROITMAN

15   FREDRIC SOSNICK

16   RICHARD A. STEIGLITZ

17   AMER TIWANA

18   BRIAN TONG

19   CARL TULLSON

20   MICHAEL TURKEL

21   MATTHEW UNDERWOOD

22   KEVIN M. VAN DAM

23   JULIA M. WINTERS

24   DANIELE ZAZOVE

25   DAVID ZYLBERBERG
```

```
 1                    P R O C E E D I N G S

 2              CLERK:  All rise.

 3              THE COURT:  Please be seated.  We are going to try

 4     to start as promptly as possible at 10:00, so please, if

 5     you're going to sign in to appear in Court, you need to do

 6     it sooner rather than later.  Go ahead.

 7              MR. MCKANE:  Thank you, Your Honor.  For the

 8     record, Mark McKane of Kirkland & Ellis on behalf of the

 9     Debtors.  And, Your Honor, if I may, continue my examination

10     of Mr. Keglevic.

11              THE COURT:  Yes.

12              MR. MCKANE:  Mr. Keglevic, in your testimony

13     yesterday, you referred to disarmament and drag.  Do you

14     recall that?

15              MR. KEGLEVIC:  I do.

16              MR. MCKANE:  And, sir, can you explain to the

17     Court what you mean by disarmament?

18              MR. KEGLEVIC:  Yes, that basically we -- the

19     settlement agreement would eliminate the need to litigate

20     any inter-estate claims, and also would cover the intra-

21     estate claims and the T-side of the house.

22              MR. MCKANE:  And, sir, does their disarmament also

23     pick up any litigation involving sponsors, directors, and

24     officers?

25              MR. KEGLEVIC: Yes, and it also is -- the
```

1   settlements do provide for releases of sponsors, directors,

2   and officers any litigation associated with alleged acts

3   that they may have undertaken would also be covered by

4   disarmament.  So disarmament was basically just a shorthand

5   way for me to say everybody puts down their pencils, no more

6   costs, no more litigation risks, no more cost to litigate,

7   and no more time associated with the trials to litigate all

8   of those issues.

9             MR. MCKANE:  And, sir, what is -- what is the drag

10  you refer to?

11            MR. KEGLEVIC:  The drag is an agreement that was

12  embodied that effectively provides that the TCEH unsecured

13  and, in that, I mean the entire group below the first lien.

14  So it's the second lien, the TCEH unsecured who are

15  signators, and I guess now, the PCRBs, would agree to not

16  propose an alternative plan; and, in fact, would have to

17  agree to support any plan filed by the TCEH first liens.

18            MR. MCKANE:  And, in fact, did they agree to not

19  just support, but agree to support a proposed schedule or a

20  limit between filing and trial of that claim?

21            MR. KEGLEVIC:  Yes.  Another important element of

22  the agreement was the 90 days, that effectively we would,

23  you know, effectively get an accelerated court schedule.

24  Because, as you can imagine and I think I testified

25  yesterday, of the harm that's taken place that the TCEH

1    first lien estate, with all the external market pressures

2    they have on them and the inability to transform the company

3    and react to those market pressures, it was very important

4    for the TCEH first lien to get speed and exit bankruptcy as

5    soon as possible.  So a disarmament and drag both accomplish

6    and are supportive of the speed objective.

7              MR. MCKANE:  Sir, are you aware that the EFH

8    committee has challenged the merger transaction because it

9    does not contain what they view as traditional remedies?

10             MR. KEGLEVIC:  Yes.

11             MR. MCKANE:  And, sir, are you -- when I use the

12   phrase, traditional remedies, do you know what I'm referring

13   to?

14             MR. KEGLEVIC:  I would ask you to -- to make sure,

15   please articulate what you mean.

16             MR. MCKANE:  Are you familiar with a remedy

17   available in a merger transaction were for a specific

18   performance?

19             MR. KEGLEVIC:  Yes.

20             MR. MCKANE:  Did you seek -- I'm sorry -- specific

21   performance remedy in your negotiations with potential

22   purchasers?

23             MR. KEGLEVIC:  We did.

24             MR. MCKANE:  And did you seek additional remedies

25   beyond specific performance with the potential purchasers in

1    this merger transaction?

2            MR. KEGLEVIC:  Yes.  We also sought a reverse

3    break fee.

4            MR. MCKANE:  Okay.  And, sir, did you -- in

5    evaluating this negotiation, why don't you describe for the

6    Court -- strike that.  Please could you describe for the

7    Court your efforts to obtain some type of recourse, whether

8    it be a remedy or a result, that would -- for the Debtors in

9    the event that the merger transaction didn't close?

10           MR. KEGLEVIC:  Sure.  So like any negotiation, you

11   try to get everything you possibly can get in a transaction.

12   So we sought initially specific performance.  That is not a

13   market-based term really available in deals as we sit here

14   today, unless you're dealing with a strategic.  And I should

15   point out the specific performance in and of itself is not a

16   panacea to execution of a transaction.

17           Specific performance typically comes with it many

18   terms and conditions, material adverse events-type clauses

19   that if they are triggered, even though you have a specific

20   performance, there is an ability for the purchaser not to

21   close the transaction.

22           But it is the strongest contractual language you

23   can get that's available in the marketplace.  But generally

24   speaking, only available is strategic with MA, material

25   adverse event clauses, and generally not available and has

1    not been available for the last several years from any

2    financial buyers.

3             So with financial buyers, the market standard is

4    typically to get a reverse break fee, which is simply a

5    monetary amount, to the extent that the purchaser does not

6    transact, does not close for whatever reason.

7             Even the reverse break fee is burdened with some

8    clauses that render it not payable.  And, of course, you

9    negotiate the clauses, together with the specific

10   performance or the reverse break fees, simultaneously to get

11   the strength you can.

12            So once we realized that absent the NextEra bid --

13   and, as I said, NextEra, we were on the verge of getting

14   specific performance -- it came with substantial clauses and

15   material adverse event clauses.

16            But once their bid was such that it would have

17   impaired the E-side, as I testified to yesterday, they were

18   no longer an option.  So now we were left with financial

19   buyers.

20            And with financial buyers, the best we were able

21   to negotiate was reverse break fees, and that was simply

22   dollar amounts with clauses that under certain events they

23   would not have to even pay those dollar amounts.

24            And that's really where we were with the Hunts --

25   and I think if you look at the material that I covered

1    yesterday, we had gotten -- I think the amount -- the

2    highest amount we were able to get in those negotiations was

3    $225,000 of cash.

4              MR. MCKANE:  Well then, sir, if I could ask that--

5              THE COURT:  I'm sorry, $225,000 or million?

6              MR. KEGLEVIC:  Excuse me, thank you, Your Honor.

7    We did better than $225,000 -- $225 million.

8              MR. MCKANE:  Yeah.  And if we could just put up

9    the Keglevic demonstrative number 4, which is something you

10   got this yesterday in your testimony, I believe, that will

11   help you with the discussion of the break fees.

12             MR. KEGLEVIC:  Yes.  I think --

13             THE COURT:  Go ahead.  Oh, I'm sorry.  I thought

14   you were waiting for me.

15             MR. KEGLEVIC:  Yes.  I think I'm -- what's

16   presented is Keglevic 4 in my demonstrative, and you'll see

17   in the left-hand column at the bottom, with respect to the

18   Hunts, that we had a $225 million break fee at that point.

19   And with NextEra, we had not gotten fully to specific

20   performance, but they were willing to put $110 million

21   deposit that would have been non-refundable in the event

22   they didn't close for reasons other than material adverse

23   events.

24             But I should also point out at this time, and it's

25   an interesting element of our thought process, is you see a

1    topping fee up above as well.  And so, even though we would

2    have gotten -- as an example from the Hunts $225 million --

3    we also, through exercise our fiduciary out, would have had

4    to pay $175 million, which is an important point before I

5    compare to what we got in the deal that embodies the plan

6    that we filed.

7                MR. MCKANE:  So in evaluating this transaction --

8    and this is your summary as of April 17th of this year.

9    While there were traditional remedies being offered, you

10   would have to pay these potential buyers to exercise your

11   fiduciary out?

12               MR. KEGLEVIC:  Yes.  That's the so-called topping

13   fee that's listed there.  So, you know, that was a

14   consideration that does not exist in the plan that we

15   ultimately adopted.

16               MR. MCKANE:  And, sir, you mentioned that specific

17   performance was just -- is, you know, currently in the

18   marketplace, typically not available for financial buyers.

19   Did you nonetheless ask for specific performance from these

20   potential purchasers?

21               MR. KEGLEVIC:  We did.

22               MR. MCKANE:  And what was the feedback you got?

23               MR. KEGLEVIC:  The kindly rejected the notion in

24   its entirety, and that's the nicest way I can phrase the

25   response.

1          MR. MCKANE:  Sir, did you evaluate for the board

2     the benefits, as you viewed them, of disarmament and drag

3     versus an alternative reverse break-up fee or refundable

4     deposit?

5          MR. KEGLEVIC:  Yeah.  So as I said, we -- the $225

6     million, we could have gotten -- if this was the package we

7     chose from, this was the best package available.  We would

8     have paid a topping fee of $175 to exercise fiduciary out,

9     but receive $225 million break fee with various material

10    adverse conditions that would have caused the break fee not

11    to be paid.  When we compared that to disarmament and drag,

12    and looked at the $35 million a month that's being, you

13    know, the rate of expenses in this case, when we looked at

14    the time associated with litigating the issues associated

15    with the interstate claims, when we looked at the cost of

16    the interest -- the above market interest -- just using one

17    example of the EFIH second lien, which is ticking away at 12

18    percent and that, frankly, we could refinance today at 7

19    percent, so it's 5 percent on almost $2 billion that

20    continues to tick.

21          We thought it was clear that -- and, by the way, T

22    side consensus, which is a substantial benefit in this case,

23    and an accelerated time schedule if we have to pursue an

24    alternative path.  We put all those together and put the

25    cost to defend, the probability of -- you know, the

1   timeframe to do an alternative plan, the time frame to

2   defend, the cost of the interest-- all of those clearly

3   exceeded the net benefit of $225 million in cash, which I

4   said would have been subject to conditions.

5          It's also -- it's interesting to note that if, you

6   know, there are no conditions under which -- we don't get

7   disarmament and drag if we do not propose a plan that -- we

8   have to do two things.  We have to propose a plan that meets

9   the alternative restructuring terms, and they have to get

10  paid the $550 million.  If we do that, there are no outs.

11  There would have been outs with the $225 beyond that -- for

12  example, if the PUCT didn't approve, we wouldn't have gotten

13  the $225 million; if the IRS gave us a bad order, we would

14  not have gotten the $225 million -- with many additional

15  clauses.

16          So we thought probability adjusted that that was

17  substantially more benefit.  And then also, the ability to

18  exercise our fiduciary out without having to pay anything

19  for that fiduciary out.  The entire package, I think,

20  overwhelmed the alternative in my eyes and I think the eyes

21  of -- well, I don't think, I know -- the eyes of our board,

22  including disinterested directors.

23          MR. MCKANE:  Thank you, sir.  You mentioned a

24  number of the variables that you thought diminished the

25  value, the break fee.  Was -- is a break fee with a club

1    deal or a consortium deal like this, joint and several in

2    nature, or is it -- was the one that was offered several in

3    nature?

4          MR. KEGLEVIC:  I think it was offered severally.

5          MR. MCKANE:  Did that have an impact in terms of

6    whether you thought that was a --

7          MR. KEGLEVIC:  It's another chink in the armor of

8    the $225 million because you have to go to collectability.

9    We felt we had more assurance of collectability of

10   disarmament and the drag because we have creditors in the

11   case and that agreement did not have -- like I said, they

12   had very limited provisions, which were under our control to

13   execute, to hold them to the bargain.

14         MR. MCKANE:  All right.  Thank you, Mr. Keglevic.

15   At this time, I'd like to transition to another topic.  And

16   you may recall at the start of your examination, I mentioned

17   we want to cover the feasibility of the plan, focusing on

18   the E-side.

19         MR. KEGLEVIC:  Sure.

20         MR. MCKANE:  Sir, you're aware that certain

21   objectors contend that the plan is not feasible because they

22   believe it's unlikely to close.  You're aware of that?

23         MR. KEGLEVIC:  I've heard them say that, yes.

24         MR. MCKANE:  Sir, have you evaluated in your own

25   mind, based on the facts that are available to you, whether

1    you think that the transaction is likely to close?

2              MR. KEGLEVIC:  Yes.  Not only have I done it, but

3    we've had our financial advisors and all of the advisors to

4    the Debtors, as well as the disinterested directors and our

5    board take a hard look at feasibility.  And many of the

6    discussions that we had at the board meetings we talked

7    about yesterday, were built around the feasibility and the

8    key elements associated with the execution of this plan, you

9    know, including a private ruling from the IRS for PUCT

10   approval, and, obviously, you know, the quality of the

11   equities and, you know, support, the amount of debt raised

12   in the marketplace, et cetera.

13             So, you know, we looked at all of that, including

14   the, you know, counter-party reputation, you know, quality,

15   financial acumen, et cetera, in making that determination.

16             MR. MCKANE:  And, sir, let's break it down.  What

17   indicators do you have that you will seek -- not suggesting

18   in any way you could put yourself in the minds of the

19   regulators.  But recognizing that you need multiple layers

20   of regulatory approval, what steps have been taken to seek

21   that approval?

22             MR. KEGLEVIC:  Well, we've had continuous dialogue

23   and discussion with the PUCTT commissioners.  You know,

24   obviously, they do not commit to any position, and we

25   understand they have a regulatory responsibility to look at

1   the evidence at the time to make determinations.  But just

2   from a logical standpoint from discussions we've had, you

3   have to start with where they are.

4           Right now, they're in a situation where the

5   holding company above their regulated company has been in

6   bankruptcy since April, 2014.  That company was in distress,

7   and always a concern as to the quality of the ring fence,

8   you know, and what it may do to the customers in the State

9   of Texas.

10          So for years -- and it's not an exaggeration to

11  say years -- they had been looking for a solution that would

12  get the owner of Oncor to be an investment-grade company so

13  they would not have to worry about ring fencing or impacts

14  of the parent on the customers of the northern part of

15  Texas, which is the Oncor service territory.

16          So when you start with the premise that they're

17  very motivated to find a solution to this bankruptcy, the

18  solution we're providing, which can be executed in a timely

19  fashion, with somebody who has experience in the State of

20  Texas -- the Hunt family -- would operate the company, who

21  also operates another utility in Texas, who is the only

22  utility that I'm aware of in the United States that has

23  converted to REIT status.  That is as good a partner or

24  reputation for the PUC to look at.  And then you look at the

25  quality or the bel- -- you know, the substance of the other

1    equity owners and their ability to fund the equity

2    commitments that they have made, and you have, you know,

3    some marquee names on, you know, Wall Street.

4              And I think when you look at a -- you know, a

5    company that has a good history in Texas with a good

6    reputation that's specific to the transaction we're doing

7    with sufficient equity to bring the new company to the

8    investment grade, you know, it's hard -- at least as I sit

9    here -- for the, you know, state to find that that is not a

10   substantial improvement, and not consistent with the

11   objectives they have to make sure that no harm comes to the

12   customers as a result of this transaction.  In fact, there

13   should be substantial benefits and improvements over the

14   current state.

15             MR. GLUECKSTEIN:  Your Honor, I would object to

16   Mr. Keglevic's testimony.  Instead, he's offering evidence -

17   - hearsay evidence to the extent of what the PUCT has and

18   has not been seeking to do in the midst of that answer.

19             MR. MCKANE:  All right.  Your Honor, I can

20   respond.  I don't believe there's any hearsay.  He's stating

21   his -- what his beliefs are based on his interactions with

22   the PUCT, what's been presented to their board, what they've

23   evaluated for their years.  As you can imagine, Mr.

24   Keglevic, Ms. Dore', and the EF agent in general, have

25   interactions with their regulator on a regular basis.  And

1  they have certainly been aware of, you know, that these

2  issues, they're in writing, they've been stated, and there

3  are more materials as well.

4          I think properly characterized, what Mr. Keglevic

5  has done is present to Your Honor the analysis that he

6  presented to the board, together with Ms. Dore', as to why

7  they thought this was feasible.

8          THE COURT:  I think it's -- I think it's

9  permissible.  I'll overrule the objection.  It might be

10  characterized as lay testimony or -- excuse me -- lay

11  opinion testimony based on perceptions that he's gathered to

12  come to that opinion in his position as CRO of the company

13  and his other positions with the company prior to the

14  bankruptcy.  So overruled.

15          MR. MCKANE:  Thank you, Your Honor.  Mr. Keglevic,

16  could you also touch on the -- one of the other major

17  regulators that you have to seek approval from, you've also

18  filed a private letter ruling with the IRS.  And can you

19  touch on the status of that with the court?

20          MR. KEGLEVIC:  Yes.  The -- obviously, this

21  transaction has multiple elements that are sensitive from a

22  tax standpoint, and have been structured very carefully not

23  to trigger any tax, as best we could.  So we have been in

24  dialogue with the Internal Revenue Service, and that has

25  been the tax department which reports to me at Energy Future

1   Holdings, as well as our advisors, and including many

2   advisors of creditors to this case, and have exchanged

3   several versions of the private letter ruling.  Our request,

4   in fact, and have responded to questions from the IRS.

5           And, in fact, I think as we sit here today, it's

6   fair to say we have provided everything that the IRS needs

7   to make its determination, at least as their thinking goes

8   today.  And we have -- our opinion based on those

9   interactions is that we are, you know, highly confident that

10  this transaction works and that we'll get the required

11  rulings.

12          MR. MCKANE:  And, sir, can you also touch on

13  additional steps that the merger purchasers have taken to

14  advance their efforts to close since entering the agreement?

15          MR. KEGLEVIC:  Yes.  And, you know, the first one

16  that comes to mind, and there have been -- or there are a

17  couple that come to mind, and I'm sure there might be some

18  I'm not thinking about -- is there has been an application

19  by Oncor filed with the PUCT.  That application was -- been

20  for preliminary review by the staff.  It has been reissued

21  with some addendums and adjustments that the staff has

22  required.

23          We have also -- they have also -- and this is the

24  Hunt entity ovation has filed its public registration

25  statement with the Securities and Exchange Commission.  It

1    is the initial, you know, public offering, the statement

2    that's going to give them the right to do the -- raise the

3    equity that's called for in the plan and to register that

4    equity.  That is an over 400-page document with historical

5    financial statements from our standpoint, the statements of

6    the entity that will house the new transaction, and

7    includes, as you can expect, consensus from our auditors, et

8    cetera, associated with those historical statements.

9              MR. MCKANE:  And, Mr. Keglevic, and as your role

10   as CRO and advising the board, did you also assess whether

11   the purchasers would be economically incentivized to close

12   the transaction?

13             MR. KEGLEVIC:  Yes.  The -- you know, in the

14   bargain -- and it was certainly a bargain that was struck in

15   the negotiation -- the creditors, the TCEH unsecured group,

16   understands that if it does not close the transaction that

17   they get what they referred to multiple times in

18   negotiations as the booby prize -- $550 million.

19             Looking at the value -- the potential value --

20   that Oncor, as a REIT, holds, that has been written about in

21   various financial analysis report, that my financial advisor

22   believes is certainly in the range of reasonableness --

23   there's substantially more upside associated with the value

24   of Oncor that they can get than they could get through the

25   alternative restructuring.

1            And that creates a substantial economic incentive

2    for the buyers, as we sit here today -- and I would say

3    today's economic conditions are no different than they were

4    when we struck the bargain in August -- that we still

5    believe there is substantial upside in multiples of the $550

6    available to that group.  So when they look at a six cent

7    recovery, which is I think is what the $550 does, versus the

8    recovery they can get here, it is a substantial improvement.

9    And one of the reasons why the time, energy, effort, and

10   reputation that this group is putting on the line indicates

11   to you the seriousness of closing.

12            Because, you know, the Hunts, as a, you know,

13   landmark Texas company, who has been trying to buy Oncor for

14   at least a decade, who operates in the state, who raises

15   money in the state for its ventures, who runs a Texas REIT -

16   - the cornerstone of their strategy going forward is this

17   transaction.  And the Hunts, if you talk about reputation

18   and a brand name, it's as -- probably as protected and as

19   important to them as any, you know, family-owned business in

20   the United States.

21            And, similarly, we're talking about sophisticated

22   big brand financial, you know, equity buyers, you know,

23   hedge funds that represent the TCEH equity.  And, obviously,

24   this transaction is one that, you know, in many ways,

25   creates a brand for them, and if it doesn't close, could

1    have reputational harm as well for them because they're in

2    the business of raising money, you know, closing complex

3    transactions, and earning above-market returns for their

4    customers.  And I think they believe all those things to be

5    true.

6            And as I said, we did not come to this conclusion

7    easily.  We took months and months and months to kick the

8    tires on this deal before we believed all the stars aligned

9    and that this deal, in fact, had the likelihood of closing.

10           MR. MCKANE:  Sir, you mentioned that if the deal

11   did not close, the TCEH unsecured would receive a potential

12   six cents recovery on their claims.  It may have been -- do

13   you recall that?

14           MR. KEGLEVIC:  Yes.

15           MR. MCKANE:  What do the Hunts get if this

16   transaction doesn't close?

17           MR. KEGLEVIC:  Hunts get zero.

18           MR. MCKANE:  And, sir, you mentioned a number of

19   factors that you looked to, including -- I think we have

20   research reports and your financial advisors.  Did the level

21   of the bids that came in through the bidding process, was

22   that also a factor you took into consideration as well?

23           MR. KEGLEVIC:  Of course.  Ultimately, you make a

24   decision to do a transaction, but alternatives are very,

25   very important in that analysis.  And as I said, we did not

1    have an alternative.  The E-side deal, the equity was never

2    raised.  There was no consensus among the E-side to come

3    together and do a self-equitization, even though we provided

4    for that in the plan, included equity splits in the plan

5    that was determined by our disinterested directors.  We

6    still could not get them over the finish line.

7            And the Hunts had withdrawn the bid, and entered

8    into this transaction because they believe this transaction

9    had a -- you know, with the equity support and, you know,

10   the financial acumen of the TCEH unsecured groups

11   principles, they believe that was their best chance to

12   close.  So really represents the only alternative the board

13   had.  That being said, we still think even if we were

14   looking at it all by itself, it was a good alternative.

15           MR. MCKANE:  Sir, with that, let's transition to

16   my sixth topic, which was the settlement.  Sir, you're aware

17   that approval of the settlement as a condition precedent the

18   plan, right?

19           MR. KEGLEVIC:  I am.

20           MR. MCKANE:  And you're also aware, sir, that --

21   let me ask this.  Why seek approval of the settlement

22   agreement now; why is it a condition precedent?

23           MR. KEGLEVIC:  The settlement agreement is an

24   integral part of the plan, as I said, and I'll start with

25   the TCEH first lien parties.  The TCEH first lien probably

1    are the party whose assets have been the most diminished in

2    value through the length of this case, at no fault of their

3    own or our management team in terms of operating the assets,

4    but simply because of external or exogenous economic impacts

5    that are just battering the entire sector.  And by not being

6    able to transform the company and consider mergers or other

7    things of that type, the value of that company has taken a

8    significant beating.

9              So the TCEH first have been, you know, zealots

10   about the point that they need to get out as soon as

11   possible, and I certainly understand that point of view, as

12   would Mr. Sawyer who hears it repeatedly from the TCEH first

13   liens.

14             So for them, the assurance that this transaction

15   was the fastest way out, a key element to why this is

16   fastest is to assure that there was no litigation, which I

17   believe -- I know they believe, and I think the parties who

18   have signed the agreement all believe, could take years and

19   years to conduct.  And the value of their estate in that

20   time would, you know, potentially take a significant

21   beating.

22             And so, a settlement agreement, which I have

23   referred to as disarmament, effectively gives them a quick

24   exit with a fresh start where they don't have to worry about

25   legacy litigation, and that has substantial value to them.

1    In our opinion, we join in that, you know, belief because

2    the effect on the estate also would be negative associated

3    with the litigation of all of the claims, many of which have

4    substantial history.  And if you look around the room, you

5    can see only but some of the pages that would be needed to

6    litigate those matters.

7              MR. MCKANE:  And, sir, did the sponsors who are

8    seeking a release and the -- when I say the sponsors, you

9    know who I'm referring to, right, the equity sponsors?

10             MR. KEGLEVIC:  Yes.

11             MR. MCKANE:  All right.  Are the sponsors

12   conveying consideration as part of the settlement agreement

13   that also supports why you're seeking this relief now?

14             MR. KEGLEVIC:  Yes.  The -- you know, one of the

15   key things they had to make -- you know, their trade

16   effectively and their negotiation part in this was there are

17   many that belief the upside associated with Oncor was

18   substantial.  And the sponsors had to make the determination

19   as to whether they would give up that upside in return for

20   releases.  They also had some claims associated with fees,

21   which approximately $80 million.

22             They also had -- you know, I guess the old saying

23   goes -- the only good thing about a losing investment is you

24   get to deduct it for tax.  You know, they forego the ability

25   to deduct their worthless tax deduction in a way that could

1    hamper or eliminate some of the NOLs that our company would

2    have that are a basis of providing consideration to the TCEH

3    first liens.  And, you know, also -- you know, there --

4    that's what they were giving up.

5              And certainly what they were contributing has

6    been, you know, serious commitment to moving this process

7    forward, lending their expertise, in many ways, to the

8    companies in reorganization and out that, you know, have

9    been benefited all the estates that I'm happy to talk about.

10              MR. MCKANE:  Well, and based on the negotiations

11    that you participated in, do you have a view as to whether

12    the sponsors granting of that economic interest -- that

13    potential upside -- to the buyer group was an important

14    piece of the consideration to give as the buyers were going

15    out with their equity raise?

16              MR. KEGLEVIC:  Absolutely.  If you go back in the

17    history of this case -- and we only started in January,

18    2015.  I don't know that the Court would be able to stay

19    conscious if I went through the whole course of the case.

20    But we started -- the first offer we made on March 18, 2013

21    to the groups was to keep the company together and the

22    sponsors would retain a 15 percent ownership in the combined

23    company.  Through all the transactions, I think you can see

24    that there has been an element of consideration for the

25    sponsors for -- you know, to give up the upside and to

1    cooperate in the fashion that I talked about.

2            So it is not only in connection with this

3    transaction, but it has been something that they have, you

4    know, though about and bargained and considered throughout

5    the case.

6            MR. MCKANE:  And, sir, earlier when you referred

7    to the settlement agreement as an integral part of the plan,

8    did you mean that's a key driver to getting to a plan?

9            MR. KEGLEVIC:  Well, obviously, yes.  Not only is

10   it a key driver to getting the plan, if we didn't have that,

11   I don't know that we'd have a plan.  So, you know, I

12   certainly understand that parties to the case would love to

13   change elements of the plan.  But when you negotiate a plan,

14   it has various elements that are integral to each other.  I

15   just described why that one is so integral to the plan.  And

16   separating that one, you know, I think, you know, would be -

17   - you know, could put us back to square one.

18           But it also, obviously, is a condition to the

19   plan.  So it wasn't only an important part of the bargain,

20   but it obviously is technically now built in as a condition

21   of the plan.

22           MR. MCKANE:  And, sir, let's talk about another

23   part of the plan, specifically that this transaction

24   contemplates a TCEH tax free spin.  You know that, right?

25           MR. KEGLEVIC:  Yes, sir, I know that.

1            MR. MCKANE:  Okay.  And, sir, they -- a TCEH tax

2    free spin, an essential building block of this plan?

3            MR. KEGLEVIC:  Yes.  You know, I was pleased to

4    see the (indiscernible) was here and a representative of the

5    IRS.  We certainly understand their stance and we did not

6    think that a stranded tax at any of the estates -- you know,

7    and the litigation of that issue and who would pay and under

8    what agreement and in what fashion -- benefited anyone.  It,

9    in fact, would have assured economic harm to all estates.

10            So we have been consistent, even though criticized

11    often in this case, that that had to be a key element

12    because ultimately, we didn't see that any estate would

13    have, you know, would be immune to the cost or the potential

14    outcomes associated with a taxable transaction.  And, in

15    fact, put out to much criticism in, I think it was November

16    of 2014 -- October, 2014, somewhere in that time frame -- a

17    substantial memo that outlined all of our facts that,

18    frankly, I've not heard anybody disagree with the

19    conclusions we reached or the issues that we outlined that

20    suggested that those weren't appropriate issues.  And I

21    think that was a 40-odd page brief.

22            MR. MCKANE:  Well, sir, under what circumstances

23    would there be a cash tax liable -- liability at EFH in a

24    TCEH tax to the transaction?

25            MR. KEGLEVIC:  Well, EFH is the taxpayer, so they

1   are joint and several associated with any tax created by any

2   part of the EFH organization, including TCEH.  And TCEH is a

3   disregarded entity, so as a result of a taxable spin, that

4   tax would -- absent any other considerations -- flow to the

5   parent.  The parent may seek recovery under a tax sharing

6   agreement with the subsidiary, but, you know, that is not

7   the initial impact of a tax free -- or a taxable

8   transaction.

9           MR. MCKANE:  And, sir, is there -- can you explain

10   to the Court kind of your understanding of the ability to

11   use EFH tax attributes, like NOLs, to offset that cash tax

12   liability?

13           MR. KEGLEVIC:  Yes.  Obviously, the net operating

14   losses, NOLs, are available at EFH to offset the tax.  And

15   generally speaking, just -- I'm sure this may come up -- but

16   generally speaking, we have approximately $7 billion of tax

17   bases at TCEH.  So to the extent there is a spin, and the

18   value is determined after the spin, that the entity is worth

19   more than $7 billion on a dollar-for-dollar basis, any value

20   above $7 billion is a taxable gain, and that taxable gain

21   dollar-for-dollar could be offset by NOLs at EFH.  If EFH

22   does not have enough NOL attributes, then there is a cash

23   tax due that either has to be paid by EFH or it would be

24   stranded.

25           MR. MCKANE:  And, sir, you mentioned based on the

1    value of TCEH, when is that valuation determined and who

2    determines it?

3            MR. KEGLEVIC:   That valuation is determined after

4    the spin, typically within the 90 days, based on trading

5    values; or if it is a private company, other valuation

6    concepts as to what the value of the company is.  And, you

7    know, therein lies the -- one of the many, many issues

8    associated with this matter is, you know, the ability to

9    predict what the -- in a highly volatile business such as

10   TCEH.  And, you know, we've talked about the fact that TCEH

11   value is driving by power prices, and power prices in Texas

12   are driven largely by the cost of natural gas.  They're also

13   driven by an element called heat rate, which is a more

14   macroeconomic supply demand and scarcity issue.

15           But generally speaking, the cause of power prices,

16   the decline from the date the LVO was done of $64.00 to

17   today, believe it or not, there are some $25.00, $26.00

18   prices in Texas, have largely been driven by declines in

19   natural gas.  But natural gas is volatile, and at our

20   company, a dollar impact of natural gas -- $1.00 -- change

21   can cause $500 million of change in EBITDA in a single year

22   and add an eight multiple, which is somewhat consistent

23   across the industry, for value.  That's a $4 billion change

24   if we get $1.00 change in gas.

25           And, you know, so this investment is highly

1    anchored to a very volatile commodity, and it is a high risk

2    game to assume that today's value will be tomorrow's value -

3    - up or down.  And I think as somebody eloquently said, that

4    if we knew -- if we were able to predict those prices and

5    those outcomes, we wouldn't be here today.

6              MR. MCKANE:  Yeah.  And, sir, with regard recently

7    to this company, and what you're referring to with the

8    changes in natural gas prices and the impact on power

9    prices.  Just to be more specific, that's the T side of the

10   house and not the E-side of the house?

11             MR. KEGLEVIC:  Yes.  Thank you for bringing that

12   up because the T side of the house is competitive and

13   volatile; the E-side of the house would be 180 degrees in

14   the different direction.  It is a regulated company with a

15   monopoly service territory that is allowed a rate of return

16   -- some would say it's guaranteed.  It's not guaranteed, but

17   it's as close to guaranteed as you can get.  And that

18   basically, the way that their rates change is primarily as a

19   result of investing more capital into the business and

20   earning the return on that capital, as well as the recovery

21   of.  Obviously, operating expense changes can also impact

22   the rates.

23             But if you look at Oncor, they have not been in a

24   rate case four or five years.  And if you look at their

25   EBITDA and their spending because they continue to invest in

1     the business, you see a nice ramped up and very predictable

2     pattern.  If you tell me what the capital spend will be at

3     Oncor, I can predict very quickly what EBITDA will be.  That

4     is extremely different at TCEH because you need to know what

5     the value -- what power prices will be in the market, which

6     are driven by commodities that we can't control.

7              MR. MCKANE:  And Mr. Keglevic, you've touched on

8     the tax issues as it relates generally to the transaction.

9     What impact, if any, does a taxable TCEH spin have on the

10    ability for the EFH to pursue a REIT version?

11             MR. KEGLEVIC:  Yeah.  That's another very

12    important point, and I don't know that it's been discussed

13    in front of the Court as much as the prior point.  Because

14    we were -- when we first came to the Court with the RSA, we

15    had, at that point, the concern that the value of TCEH --

16    because gas prices were higher -- would substantially exceed

17    the amount of NOLs available to offset the gain on TCEH if

18    it was a taxable transaction.

19             While that has -- while that gain has potentially

20    declined as a result of lower gas prices, in January, we

21    started to hear about that the E-side had a consistent

22    belief that the highest value for Oncor was through a REIT,

23    and that was held by the fidelity TCEH -- oh, I'm sorry --

24    fidelity EFI second lien group, the PIK group, as well as

25    the Hunt bid, as well as ultimately, the TCEH Hunt plan

1    sponsored transaction, so it was universally held.

2            And as we did the due diligence associated with

3    becoming a REIT, there is this concept called a purging

4    dividend.  And basically, if you think about it, it's one of

5    the areas of tax that actually makes some common sense.  It

6    is the government granting you the ability in the future not

7    to pay federal income taxes.  But before you do that, you

8    have to historically go back to the earnings and profits

9    that the company made that it has not paid taxes on, and

10   effectively purge those to the new owners and make the new

11   owners pay taxes on that.  So it's kind of a catch up, you

12   know, and it's a trade.  In exchange for no taxes in the

13   future, you have to do this purging dividend.

14           The earnings and profits at are company are

15   roughly $25 billion and could grow to $30.  You have to do

16   an E&P study.  We haven't done one up to date, but we know

17   it's at least $25 billion; may grow to $30 billion when

18   we're done with the test.

19           That entire amount has to be -- today, you can

20   allocate it between TCEH and EFH.  And, in fact, as part of

21   our private letter ruling, we have asked for agreement to an

22   allocation methodology that under a tax free spin that the

23   vast majority of that earnings and profit would go with

24   TCEH, meaning we do not leave a significant burden behind

25   for the E-side to have to do a purging dividend.  A purging

1    dividend is really bad on two fronts: one, is it generally

2    has to be at least 20 percent paid in cash; and then

3    secondly, the entire thing is taxable to its owners. So $25

4    billion times a 35 percent tax rate is going to ruin your

5    day.  The 20 percent of that $25 billion -- and I should

6    stop.

7           If you do a taxable transaction of TCEH, the E&P

8    does not go with TCEH.  It remains home with EFH.  So

9    effectively, that whole $25 billion now is a barrier -- an

10   economic barrier -- to doing a REIT because the whole thing

11   would have to be purged -- 20 percent in cash/80 percent in

12   stock -- all of which would cause a tax to the individual

13   owners of the REIT.  So economically, it renders a REIT

14   impossible, or somebody -- there might be some financial

15   expert that would explain to me why anybody would agree to

16   those terms, but I can't imagine that is an economic term,

17   as I indicated in my direct testimony.

18           So that is why we have held that it is in -- you

19   know, there are two issues associated with taxable T

20   transaction that the E-side needs to seriously consider:

21   one, the one we have talked about before -- just a straight

22   tax sale where there's not enough NOLs to offset the gain

23   because of the risk in the future of the value of what TCEH

24   might be; and secondly, associated with the E&P that would

25   remain at E.

1          And I think Mr. Anker suggested, and I was

2     surprised that he suggested that there might be a way to

3     change the timing of that -- and I will tell you that I

4     would love to see that transaction and have his experts

5     testify -- because we had looked at this transaction, and we

6     do not believe there is a viable transaction as we sit here

7     today that changes that outcome.  That if T is spun off in a

8     taxable transaction, the E&P is going to make the formation

9     of a REIT economically unviable on the E-side.

10          MR. MCKANE:  All right, sir, let me just break

11     some of that down.

12          THE COURT:  I think, by the way, for the record, I

13     don't think that was Mr. Anker.  I think that was Mr.

14     Dietderich.

15          MR. KEGLEVIC:  Excuse me, Mr. Anker.  It was Mr.

16     Dietderich.

17          MR. MCKANE:  All right, let's break some of that

18     down.  You talked about purging dividend, and the fact that

19     this is a purging dividends per earnings and profits.  So

20     the extent that the reference is to what's called a E&P

21     purge, is that the same thing?

22          MR. KEGLEVIC:  It is the same thing.

23          MR. MCKANE:  All right.  And you mentioned that

24     there's $20 to $25 -- I'm sorry -- $25 to $30 billion of

25     earnings and profits that have been built up in the company;

1    is that right?

2              MR. KEGLEVIC:   That's correct.

3              MR. MCKANE:   And that amount has to be divided out

4    to the new owners, and there will be some allocation of that

5    responsibility between the T side and the E-side; is that

6    right?

7              MR. KEGLEVIC:   Yes.   In the private letter -- so

8    today, the entire company, which is EFH, has that purging

9    dividend.   If we're going to do a tax free spin of TCEH, we

10   have asked the IRS to accept an allocation methodology,

11   which would allocate the vast majority of the amount to the

12   T side as part of the tax free spin.

13             Interestingly, the T side, because they don't have

14   to do a purging dividend, it really becomes a non-event to

15   their holders, but is a significant event if it's not done

16   in that fashion because now you have nobody else to allocate

17   the E&P to except the remaining taxpayer, which is EFH.   And

18   that's -- that was why in a REIT -- after a TCEH taxable

19   spin, the entire $25 would have to be purged to the EFH, or

20   the reorganized REIT holders, 20 percent in cash and 80

21   percent in stock.

22             MR. MCKANE:   So there's a -- there is an actual 20

23   percent cash tax payment that would have to be made if the

24   entire amount were allocated to EFH.

25             MR. KEGLEVIC:   Yes, roughly $5 billion at the low

1    end.

2              MR. MCKANE:  And, sir, this issue, the E&P purge

3    or the purging dividend, this is an issue with all REITs; is

4    that right?

5              MR. KEGLEVIC:  Yes.  It render -- regardless of

6    this transaction close, if, in fact, we believe -- and I

7    thought it was a universal belief among E -- that the

8    greatest value to the estates and for recovery to their

9    creditors is the formation of a REIT.  This would render the

10   REIT economically not viable.

11             MR. MCKANE:  And, sir, this is something you

12   worked with creditors with when they were going through the

13   bidding process to evaluate REIT opportunities?

14             MR. KEGLEVIC:  Yes, both the fidelity and the

15   second lien group and their advisors, I believe, are aware

16   of this because they participated in the PLR, and it was

17   there while during negotiations, it wasn't an explicit

18   condition.  It was implicit that they would seek the

19   opportunity to become a REIT, so they were aware of the

20   issue.  And I believe the same applies to the PIKs who

21   always had thought that that was associated with the upside.

22   But, you know, I can't specifically speak for all the

23   holders that they know this, but this should not be a

24   surprise to any of the people because their advisors were

25   involved in the PLR process.

1            MR. MCKANE:  Sir, you mentioned Mr. Dietderich's

2   comment that this was a simple fix, and somehow if you just

3   change the sequence of the transaction -- that you did the

4   REIT first and then the T side spin -- that that would be a

5   solution to the problem.  Sir, has any creditor in your

6   discussions with them who looked at a REIT -- anyone suggest

7   that is a solution too?

8            MR. KEGLEVIC:  No.  The first time I heard of it

9   was yesterday, but I also went back to our tax team and our

10  tax advisors.

11           THE COURT:  Hang on.

12           MR. MCKANE:  Let me just ask you, like, do not

13  disclose tax information.  We'll brief this issue in

14  closing, right?  If we could just -- Your Honor, I'm sorry,

15  I hate to instruct my own witness, but probably not -- I

16  want to divulge the attorney-client communications.

17           MR. KEGLEVIC: You have a point.

18           THE COURT:  And it's hearsay.

19           MR. MCKANE:  Thank you.  So let's go -- let's just

20  focus on the creditor negotiation.  We'll brief it as it

21  relates to the analysis, sir.  Has any creditor, any

22  potential purchaser, or the committee ever suggested that

23  there's an easy solution to this E&P purge?

24           MR. KEGLEVIC:  No one has brought any solution or

25  any proposed change to the transaction of -- to us, and the

1    first time I heard about it was yesterday during the opening

2    comments of Mr. Dietderich.

3              MR. MCKANE:  Thank you, sir.  Let's touch on

4    another tax issue.  Let's talk about the tax sharing

5    agreement for a minute.  Sir, can you describe your goals as

6    you -- when you asked that there be a tax sharing agreement

7    implemented on the creditor's side of the house?

8              MR. KEGLEVIC:  Sure.  When I got to the company

9    after a year or so and understood all the policies and

10   principles that we had, I realized that we had a tax sharing

11   agreement on the E-side of the house, but we did not have a

12   tax sharing agreement governing the T side of the house.

13   Now, you're not required to have a tax sharing agreement,

14   but generally, I think most would be believe it's good

15   corporate governance.

16             And as the person who signs the quarterly and

17   annual financial statements, I wanted as much discipline

18   around how we recorded the amounts in the financial

19   statements as possible, so I asked for one to be created

20   that would be consistent with the one on the E-side of the

21   house or that we would understand differences, if any,

22   because of potential differences in the businesses, that

23   would be consistent with IRS regulations, that would embody

24   historical practices that we had used on the books and

25   records of the company, and that would comply with generally

1     accepted, you know, accounting principles as a result.

2              MR. MCKANE:  And, sir, are you familiar with the

3     agreement, just generally, though, that resulted in

4     competitive tax sharing agreement?

5              MR. KEGLEVIC:  I am.

6              MR. MCKANE:  And, sir, are you aware of what has

7     been referred to as the inter-company tax sharing agreement

8     payables and receivables?

9              MR. KEGLEVIC:  Yes, I am.  But I always like to

10    make sure we're talking about the same thing because I think

11    sometimes the attorneys have used terms interchangeably.

12    But I am aware with the inter-creditor amounts recorded that

13    were provided in the SOFAs in the early days of this case,

14    and that remain on our books and records.

15             MR. MCKANE:  All right.  And, sir, those are --

16    it's those inter-company payables and receivables that are

17    recorded between EFH, TCEH, and Luminant Generation I'm

18    referring to, okay?  Sir, are you aware that the EFH

19    committee has alleged that that entire issue and those

20    payables is essentially been manufactured for litigation

21    purposes?

22             MR. KEGLEVIC:  Yes, I am aware of that.

23             MR. MCKANE:  And, sir, when did you first become

24    aware of those payables and receivables as they were

25    recorded on any books and records?

1          MR. KEGLEVIC:  I was generally aware of the

2    transactions that created those.  But my primary focus, and

3    most of the economic decisions we made at the company, were

4    at the registrant level for financial purposes.  In

5    financial purposes, there's a lot of netting that goes on,

6    so the individual recording between Luminant Generation and

7    EFH, and EFH and TCEH, those absolute amounts, I would say

8    that I wasn't perfectly familiar with.  And then on day one

9    of the case, I think it was Mr. Shore raised the issue --

10   and I thought he must be mistaken, and then I realized oh,

11   he's only picking up the receivable that Luminant Generation

12   has from EFH and he's not picking up the payable that EFH

13   has to TCEH.

14          And from my standpoint, those were netted in the

15   financial statements and, you know, that's -- but that was

16   the first time that I focused on which entities had the

17   receivables and payables, and how they had been recorded in

18   the sub-ledgers of the company.

19          MR. MCKANE:  And, sir, are you aware of a -- the

20   phrase, a triangular offset?

21          MR. KEGLEVIC:  I am now.  You know, certainly, as

22   I said, since the focus -- my focus has been on the

23   financial statements, that offset occurred in the financial

24   statements of TCEH and EFH, so there was a net amount in

25   both of their financial statements on the face of the

1     financial statements.  And I was not aware of the

2     prohibition in bankruptcy, as I understand it, to do

3     triangular offsets.

4            MR. MCKANE:  And, sir, you mentioned that you were

5     also familiar with the transactions that gave rise to the

6     recording of these payables and receivables.  Could you just

7     briefly explain to the Court what those are?

8            MR. KEGLEVIC:  Yeah.  It was the closing out of

9     old audit years, I think -- and I'll forget exactly the

10    years -- but years before the merger, before the LBO took

11    place.  And effectively, we had -- there was one major tax

12    issue that the company carried with it into its future after

13    the L Your Honor.  And that was there was a significant

14    contract -- in fact, I think I heard Your Honor reference it

15    the other day, the Alcoa contract -- back pre-LBO, was out

16    of the money.

17           And the company back then -- the old TXU -- took

18    the position that that was a derivative for tax purposes and

19    that they could take the mark-to-market loss associated with

20    that out of the money at that point in time.  So they got a

21    significant deduction and cash refund to prior taxes paid.

22    In subsequent years, they took the position that they

23    changed the accounting basis for mark to market to accrual.

24    So effectively, the big tax benefit would have turned around

25    over the length of the Alcoa contract, more than 40 years.

1    And you can imagine the IRS doesn't like an accounting

2    method where you get a big deduction in year one, and then

3    pay it back over a long period of time as a result of

4    changing the accounting methods.

5            We knew we had that exposure.  It was in our

6    financial statements.  It was part of the due diligence

7    associated with the LBO.  The IRS raised it in audit.  One

8    of the issues we had is even at that point, we were

9    generating some NOLs, which you cannot use NOLs created

10   post-merger to carry back pre-merger to offset a pre-merger

11   liability.  We worked with the IRS to settle that amount,

12   and agree we would pay it if they would let us use NOLs

13   created in years after the merge.

14           So effectively what it was, it was a settlement of

15   that liability using tax attributes of EFH and TCEH that

16   resulted in a very, very small tax payment, versus the

17   potential tax payment, which was almost, I think if I

18   remember correctly, a couple of million dollars.

19           MR. MCKANE:  And so this is one global settlement

20   with the IRS for all of these years that gave rise to these

21   payables and receivables?

22           MR. KEGLEVIC:  Yes.  It was a global settlement of

23   many years and many issues.  This was the centerpiece issue,

24   and it's the only one that drove material, accounting using

25   NOLs in the amounts we're talking about between the three

1    entities that are now potentially subject to the triangular

2    offset.

3                MR. MCKANE:  Thank you, sir.  I'd like to

4    transition to a few other topics to close out your

5    examination.  Sir, are you aware that the EFH committee has

6    alleged that EFH -- not TCEH, but EFH -- was insolvent as of

7    12-31-08?

8                MR. KEGLEVIC:  Yes, I am.

9                MR. MCKANE:  And, sir, can you describe what

10   analysis the company has done for EFH-related insolvency,

11   you know, during your time as CFO?

12               MR. KEGLEVIC:  I don't recall that we did a

13   specific solvency analysis of EFH until there was a reason

14   to do it, and that was in 2013.  We had some other negative

15   attributes.  We had at TCEH related to a -- what they call

16   an excess loss account, and ELA, and a deferred inter-

17   company gain, a DIG.

18               In total, those were $20 billion approximately of

19   negative tax attributes that we had to eliminate or we

20   couldn't do a tax re-spin.  If we had done a spin, it would

21   have triggered proportionately those amounts.

22               We -- the IRS changed its regulations, and gave us

23   an opportunity that if we did a slight reorganization of

24   TCEH -- in fact, EFCH, we effectively eliminated guarantees

25   it had of the subsequent debt and could claim that EFH was

1    solvent, we could eliminate those negative tax attributes.

2    We did that, and we filed that information with the IRS.

3    The IRS accepted our conclusions and the procedures we took,

4    and it eliminated that negative tax deficiency which was

5    substantial to all of the estates because ultimately that

6    also could have caused a large stranded tax that you get

7    into the issue of whose tax it is and who ultimately has to

8    pay it.

9              And that was a critical point when we were just

10   beginning discussions with the creditors, that effectively

11   provided the runway to do the other taxable -- non-taxable

12   transactions that we've discussed earlier.

13             MR. MCKANE:  So, sir, in connection with your

14   efforts with the IRS regarding the ELA and the DIG.  Also,

15   you had solvency work done at EFH; is that correct?

16             MR. KEGLEVIC:  Correct.

17             MR. MCKANE:  Sir, if you could turn to your -- in

18   your binders to DX Exhibit 706, if you could put that up on

19   the screen, please.  Sir, do you recognize DX 706?  It's an

20   email of yours.

21             MR. KEGLEVIC:  Oh, I'm sorry, I looked at 076.

22   Got it.  Yes.

23             MR. MCKANE:  All right.  Can you explain to the --

24   is this the work -- an email describing the work that was

25   done at that time as it relates to the ELA and the DIG

1    negotiations with the IRS?

2            MR. KEGLEVIC:  Yeah, just a very brief summary of

3    the work that I sent.

4            MR. MCKANE:  And is Exhibit 707 that

5    (indiscernible) analysis?

6            MR. KEGLEVIC:  Yes, it appears like it is.

7            MR. MCKANE:  And, sir, if you could turn to 708,

8    and could you describe for the Court what 708 is.

9            MR. KEGLEVIC:  708 looks like it's some other

10   supporting work on the same topic.

11           MR. MCKANE:  All right, thank you.  So the

12   insolvency work in 2013 in connection with the ELA and the

13   DIG efforts, other than that work, did you have a view as,

14   at your time as CFO, as to the general direction and value

15   of Oncor and EFH; was it rising or falling from your time as

16   a --

17           MR. KEGLEVIC:  Oh, it was without question EBITDA,

18   net rate base, cash flow, you know, every financial

19   indicator you can look at of value, it was growing for

20   Oncor.

21           And that made perfect sense because we were

22   investing substantial amount of capital consistent with

23   programs that the TPUC enacted.  One was automated metering.

24   That was about an $800 million investment in the State of

25   Texas and our service territory for Oncor to put in

1    automatic meters.

2              And then also a project that was referred to as

3    CREZ, which was a -- effectively a transmission reliability

4    project that went to the Panhandle and the west part of

5    Texas, where it was pretty much described to me, nobody

6    lives.  But the wind blows really hard, and so there's a lot

7    of windmills.  In fact, there's probably about 12,000

8    megawatts of wind, and I think most in the United States of

9    any state of wind.

10             But the problem was there was no bridge connecting

11   the output of that wind, which is obviously very low cost,

12   to the population centers which are really in Dallas and

13   south, kind of, you know, the middle east of the state.  So

14   what that project did, it was a statewide $6 billion

15   project, which Oncor spent about $2 to construct the

16   bridges, the transmission lines that brought that power in.

17             Now, unfortunately, while that was terrific for

18   Oncor because it made investment and increased their rate

19   base and increased their rate of return, it put competitive

20   pressures on the power prices that our generation could get

21   in an open market because now we had to compete with, you

22   know, lower cost power.  Although the good news is wind

23   doesn't usually blow when it's really hot in Texas; it's

24   mostly at night when the peak is low.

25             MR. MCKANE:  And, sir, just to close out this

1    discussion on solvency.  In your interactions with the

2    equity sponsors, did you ever have discussions about ever

3    declaring a potential dividend at EFH?

4            MR. KEGLEVIC:  Yes.  The -- I think the very first

5    year I was with the company, under one of the indentures,

6    there was an opportunity to pay a small dividend to the

7    sponsors.  I think it was around $100 million bucks.  We did

8    some preliminary work and, you know, raised it -- the

9    possibility to the sponsors.  We were concerned at that

10   point in time because some of the power prices, you know,

11   were declining a little bit for the competitive business,

12   and one of the beliefs was that that would -- you know, that

13   maybe TCEH would need the support of EFH in terms extending

14   the runway and allowing those power prices to normalize.

15           If you remember, 2008 was also too big to fail.

16   And, you know, kind of the economic collapse around that

17   effectively reduced a lot of output or a lot of demand in

18   our service territory.  So we were concerned, as the

19   sponsors were, that, you know, how that would look if they

20   took a dividend in a period where, you know, the company

21   was, you know, confronting some potential future challenges,

22   and would it be better just to leave that money within the

23   company to deal with those challenges.  And that was the

24   very quick decision that the sponsors made when they heard

25   this opportunity.

1              MR. MCKANE:  And so did you make a recommendation

2     not to take the dividend?

3              MR. KEGLEVIC:  Yeah.  I thought it was in their

4     best interest, and in the company's best interest for them

5     not to do so, and they concurred.

6              MR. MCKANE:  And sir, if I could direct you to the

7     last exhibit in your binder, I believe it's EFH Committee

8     Exhibit 270.  And if I could direct your attention to the

9     third to last paragraph of that e-mail.  Mr. Keglevic, is

10    that your recommendation with regards to whether to pursue a

11    sponsor dividend in 2009?

12             MR. KEGLEVIC:  You're referring to the line that

13    says my recommendation would not be to pursue -- would be to

14    not pursue this option?

15             MR. MCKANE:  Yes, I am.

16             MR. KEGLEVIC:  Yes.

17             MR. MCKANE:  Sir, the EFH committee's conflicts

18    council has raised a serious of challenges regarding

19    sponsors' activities with the company, including with

20    regards to the liability management program.  Do you -- are

21    you aware of that?

22             MR. KEGLEVIC:  Yes, generally.

23             MR. MCKANE:  Sir, can you just describe for the

24    Court the liability management program and what its

25    objectives were at a high level?

1          MR. KEGLEVIC:  Yeah, in fact their object -- the

2     objectives were very high level.  The -- and it's

3     interesting.  Everybody has to put in perspective what the

4     world was like in 2008, 2009, and 2010.  We had the too-big-

5     to-fail.  We had the economy take a hit.  Demand went way

6     down, which obviously negatively impacted power prices we

7     could charge customers and industry.

8          And this thing called shale gas started to become

9     popular, and we start -- people started to hear about the,

10    you know, Marcellus and Barnett and other shale gas

11    holdings.  And -- but there were big questions about shale

12    gas and its impact on the future of natural gas because

13    before that point, natural gas was really a link to oil and

14    was more almost of a, you know, international commodity, not

15    so much a delinked U.S. only commodity.

16          So when -- natural gas has had periods of high

17    volatility up and down, so when we started to experience

18    some down, it wasn't uncommon that some of that was driven

19    by the economy, but there was the beginnings of shale gas

20    and talk about shale gas.  But there were questions.  How

21    much really is there?  How dependable is the supply?  What's

22    it going to take to extract the shale gas?  Are there any

23    environmental consequences associated with that extraction?

24          And so, you know, at that point, we clearly

25    believed that the dip we saw in gas prices, which was

1    pressuring the company, was temporary, and that that would

2    recover, and that even if shale gas came on the market, the

3    cost to extract it wouldn't be significant -- wouldn't

4    affect the power markets substantially.  In retrospect, that

5    was an unforced error.  It turned out to be exactly the

6    opposite.  There's a lot of shale gas, the cost to extract

7    has gotten very efficient, and it's had a profound effect on

8    the natural gas markets in the United States.

9              But at that point, the -- those pressures were

10   causing our debt to trade below par, and I don't think

11   there's any CFO that's probably ever been in this court that

12   indicated that their intention was not to try to pay your

13   creditors par.  So in the interest of the estate, we said,

14   well, okay, so this is a timing issue.  How can we extend

15   the runway?

16             And what we did in the liability management

17   program was we looked for three objectives.  One was to

18   extend maturities, captor discount because obviously if we

19   reduced the debt load, it provided the ability for creditors

20   to get better payments, and either keep interest expense

21   neutral or in fact reduce interest expense, which would

22   increase cash flow.

23             So it was not uncommon in companies that are

24   impacted by volatile markets to buy time when markets are

25   down.  In fact, you'll see in the oil and gas markets today,

1    what they try to do, they, you know, cut people, they pull

2    rigs out; they'll buy back some of their debt for the exact

3    same reasons and wait until there's a better time when the

4    commodities improve to effectively realize the value.

5            So you're really betting in yourself and betting

6    that when those prices come back, everything you did will

7    have a positive economic benefit.  So those were the

8    objectives of the liability management program.

9            MR. MCKANE:  And sir, was this something the

10   equity sponsors instructed you to do?

11           MR. KEGLEVIC:  No.  You know, I was -- it -- I

12   brought the idea to the equity sponsors.  They obviously

13   have a lot of expertise and financial acumen.  They've seen

14   companies that had done this, so they said -- you know, I

15   said do you have an appetite?  And they said, you know,

16   sure.  You know, we'll work with -- you know, find some

17   bankers you like and work with them and see if we can pull

18   it together and how you'd structure it.

19           So we, you know, started off on that path, and in

20   fact, you know, the sponsors helped direct me to some of the

21   bankers that had the best reputation for doing these

22   liability management programs, and in fact in at least three

23   -- well, I would say virtually every deal, the resources of

24   their, you know, bond operations or expertise they had in

25   the company were available to me to help in the design and

1    construction.  And obviously, you know, Mr. Horton, who is

2    going to testify in this case was my right hand and, and,

3    you know, was also actively involved in the design how to do

4    this.

5              MR. MCKANE:  Let's just touch on one of those

6    transactions.  Are you familiar with what has been referred

7    to as the 2011 amend and expend?

8              MR. KEGLEVIC:  Yes, sir.

9              MR. MCKANE:  Can you just describe for the Court

10   what the '11 amend and extend was?

11             MR. KEGLEVIC:  The '11 amend and extend was

12   related to the TCEH first lien debt, and it had a 2000 and -

13   - October 2014 maturity, and it also contained some debt

14   coverage clauses that if we didn't meet, we would've gone

15   into default.  So --

16             MR. MCKANE:  And so the -- there's some -- that

17   debt coverage clause, that's sometimes referred to as the

18   maintenance covenant?

19             MR. KEGLEVIC:  Yes, it was maintenance covenant.

20             MR. MCKANE:  Okay.  Thank you, sir.  Please

21   continue.

22             MR. KEGLEVIC:  When we -- as gas prices continued

23   to decline and we started forecasting what those maintenance

24   covenants would look like, we're concerned that, you know,

25   as early, depending on sensitivity analysis, as '13 and

1    potentially even '12, we could trip a maintenance covenant

2    and be forced into bankruptcy.  At that point, the first

3    Lien that was probably trading at 80 or 85 cents on the

4    dollar, so we went into extensive and exhaustive

5    negotiations.

6            I mean this was a at least three- or four-month

7    negotiation with primary holders and to effectively revise

8    the maintenance covenant to give us substantially more room

9    than we had for more years, and then to -- we ultimately had

10   80% of that group agree to extend, which I think is still

11   the biggest amend and extend that's been done in the United

12   States.

13           MR. MCKANE:  Sir, let me just ask you; were you

14   instructed or directed in any way by the sponsors that you

15   must do the '11 amend and extend?

16           MR. KEGLEVIC:  No.  I'm trying not to be insulted

17   by those questions because my role as a financial officer,

18   chief financial officer, is to forecast what's best for the

19   estate going forward and how to operate to create the most

20   value for the estate, and this was something that I had to

21   pin on all of those forecasts.  So I was the first one to

22   see, and they, as any other board, expected me to bring to

23   them, you know, an analysis of the current situation and

24   recommendations on what to do about it.

25           Now, that being said, do they certainly have the

1    expertise, and were they quick studies, and were they

2    helpful and un-, you know, did they get the picture?

3    Absolutely, which I think is one of the values to having

4    that kind of talent on your board.  But they were not -- I

5    don't know what's being suggested, but they were not pushing

6    the buttons or calling the shots.  They had -- as 100%

7    ownership of the equity, they have to make the decisions,

8    but I made the recommendations and I determined where to

9    spend my time and my team's time.

10           MR. MCKANE:  And sir, just one question on at that

11   time.  Was there ever a consideration in 2011 that there was

12   a risk that EFH would need to file bankruptcy as opposed to

13   TCEH?

14           MR. KEGLEVIC:  There was none.  In fact, you will

15   see that, you know, even as late as, you know, when we

16   presented this Project Olympus, keep the company together,

17   get the equity owners -- you know, have the sponsors keep

18   15% and divide the ownership among the rest of the

19   creditors.  But that was March 18th, 2013.  I remember the

20   date specifically, and we at that point were -- the plan was

21   to keep EFH out of bankruptcy because we thought, you know,

22   that the value of the company was substantial, and we did

23   not need to go there.

24           MR. MCKANE:  Okay.  Sir, just a few other

25   questions.  There have been some allegations made regarding

1    the type of fees that the sponsor received for either

2    advisory work or financial fees during their time as owners.

3    Can you describe the types of work that they did both in the

4    advisory management area and in the financing area?

5              MR. KEGLEVIC:  Sure.  So the management area

6    straightforward as a contractual obligation was roughly $35

7    million a year with a 2% escalator.  That was a deal cut

8    before I got to the company.  It was part of the LBO, and,

9    you know, it's not uncommon for financial sponsors to have

10   some kind of management fee and structural organization.

11   But I would tell you that the -- you know, the -- I think

12   it's been characterized that they just got that for being

13   board members.

14             The -- you know, one of the benefits of being with

15   at least the financial sponsors that I had to deal with is

16   they have -- not only do they give you access to a lot of

17   inside information and what's going on in the markets.  They

18   give you the ability to negotiate better with investment

19   bankers because investment bankers want to continue to even

20   deal with these guys.  And if you're a portfolio company,

21   you typically would get some pretty good rates, expertise,

22   training.

23             KKR specifically has a captive consulting company

24   called Capstone that we were able to talk to and that came

25   in and helped us do some things in the supply chain.  They

1    all have other back -- I shouldn't call them back office

2    because that tends to denigrate their importance, but since

3    I work in the back office, please forgive me and let me use

4    that term.

5            They also have, I think, you know both KKR and TBG

6    have up to 80 or 90 portfolio companies.  We joined with

7    them in their e-commerce area to effectively get, you know,

8    better deals from vendors on common products that all their

9    portfolio companies consume and, you know, effectively, we

10   had bigger bargaining power as a group of 90 companies that

11   we did as -- on our own.

12           So we got those inherent benefits.  So they also

13   helped us, you know, with our insurance company or insurance

14   policies and reviews and, you know, premium versus

15   deductible versus coverage, you know, kind of analysis.

16   They had a lot of ben --, experience.  So -- and I'm sure

17   I'm forgetting a bunch, but the -- it was much more than

18   just sitting on the board.

19           And, you know, we also -- as I said, I picked

20   their brain a bunch on -- you know, they were making

21   investment in oil and gas and, you know, shale gas, you

22   know, and helping us understand really how bad the, you

23   know, impacts could be just to name a few on -- and that's

24   kind of the management side.

25           MR. MCKANE:  Yeah.  All right, so let me ask you.

1    On the financing side, were there payments made to

2    affiliates of the equity sponsors for services provided and

3    with regards to some of the liability management program

4    transactions?

5              MR. KEGLEVIC:  Yeah, that -- when I saw that sheet

6    yesterday, I was a little taken aback because the numbers on

7    the finance-side looked pretty big.  And, you know, the

8    reason -- the vast majority of the amounts paid on the

9    financing side were paid to Goldman Sachs for their

10   investment banking services as part of the liability

11   management program, or as I raised the money for the EFIH

12   first lien debt, the FIH second lien debt, the PIK debt.

13             I mean, we did over $40 billion of financial

14   transactions in my time as CFO either raising money,

15   exchanges, amend and extend, etc., and we picked Goldman

16   Sachs, and by the way -- and Citi, and they were the two

17   front, you know, runners on the books.  So, you know, I

18   wasn't told to that because Goldman was an affiliate.  I

19   picked them, Tony Horton picked them, and the vast majority

20   of those fees were for the same services if I had -- Citi

21   would have the exact same amount of fees that Goldman did,

22   so I think that's 50 of the 59.

23             And then there were three -- I think there were

24   three other transactions where I paid KKR and TPG fees that,

25   in total, for those three transactions, I think were seven

1    and a half million dollars.  And they were effectively

2    structure fees and in one -- at least one or two of the

3    cases, they also were on the front cover of the book.  So it

4    was -- it's not as inside baseball as it seems from a

5    cursory review of the document we went over yesterday.

6              MR. MCKANE:  And then, sir, did you become aware

7    that there were potential claims that could be asserted

8    against the sponsors pre-petition?

9              MR. KEGLEVIC:  Well, I certainly was aware that

10   somebody could argue that, but we had Sidley Austin,

11   Kirkland & Ellis, and in fact, you know, I think it was

12   notable that a meeting of the directors that did not include

13   the sponsors basically, I think, at -- with Ms. Dore came to

14   the conclusion that they'd bring Sidley Austin and look at

15   potential claims against the sponsors.  And Sidley did an

16   exhaustive and expensive review of the potential claims, and

17   I sat in and heard those.

18              And we were not aware of substantial, meaningful

19   claims against the sponsors, directors or officers as a

20   result of that review or Kirkland's review.  And then

21   obviously, the disinterested directors' advisors came in and

22   looked at it and creditors came in and looked at it.  And we

23   saw -- you know, which I was -- I think the TCEH unsecured

24   group probably did the most exhaustive review and to date

25   has come up with the biggest amount of claim on a piece of

1    paper associated with fees for the sponsors and a -- but

2    obviously, as part of this deal, has waived that.

3              MR. MCKANE:  And sir, did you also serve on a

4    special committee of the TCEH board in April of this year?

5              MR. KEGLEVIC:  I did.

6              MR. MCKANE:  And what is that -- what was that

7    special committee formed for?

8              MR. KEGLEVIC:  For the reason to consider

9    potential causes of action against the sponsors, and to --

10   summary of the prior work that was done, rules of releases

11   and education around all that and to make a recommendation,

12   you know, to -- was it appropriate to release the sponsors.

13   And our special committee, at least the one I attended, made

14   that -- concluded the same as apparently the other

15   committees did.

16             MR. MCKANE:  All right.

17             MR. MCKANE:  Your Honor, with that, if I can just

18   have one moment to confer with my co-counsel.

19             MR. MCKANE:  Mr. Keglevic, I apologize.  One more

20   question.  At any point in time as you served as CFO, did

21   you ever conclude pre-petition that EFH was insolvent?

22             MR. KEGLEVIC:  I did not.

23             MR. MCKANE:  Thank you.

24             MR. MCKANE:  Your Honor, with that before I

25   release the witness, we do have a number of written -- a

1   number of exhibits we'd like to move in.  I don't believe

2   there's any objection, but there is a statement that I've

3   been asked to read.

4              THE COURT:  Okay.

5              MR. MCKANE:  And this relates -- and I'll identify

6   which documents this relates to, but there's a series of

7   pleadings that we're moving into evidence, and the pleadings

8   attach business records of EFH.  And so this is an agreement

9   we've worked out with the EFH official committee with

10  regards to the pleadings as opposed to the business records

11  attached to the pleadings.

12             Your Honor, several of the exhibits being offered

13  into evidence are filings from this case that feature

14  multiple attached exhibits, including board minutes,

15  presentations, and other business records.  Pursuant to an

16  agreement with the EFH committee resolving their objections

17  to those exhibits, the actual pleadings included in these

18  exhibits are only offered for the fact that they were filed,

19  not for the truth of the matter asserted or the legal

20  arguments contained therein, but we have agreed that -- to

21  put into evidence the exhibits that were attached to those

22  pleadings for all purposes.

23             THE COURT:  Okay.

24             MR. MCKANE:  And with that -- and that applies to

25  DX, Defendant's Exhibit 2, 5, 12, 13, 14, and 965.  And at

1    this time, I would like to move those documents into

2    evidence as well as DX 1, 7, 17, 38, 50, 85, 87, 91 through

3    94, 96, 97, 202, 247, 255 through 256, 267, 278, 279, 281,

4    285, 288, 289, 290, 296, 301, 356, 358, 369, 397, 398, 557,

5    559, 648, 703, 954, 957, 959, 961, as well as with -- I will

6    submit in writing all of this, Your Honor.  Please don't

7    write this down.

8            THE COURT:  Don't worry.

9            MR. MCKANE:  I will also submit at this time those

10   doc -- those were all documents used -- sorry, let me just

11   back up.  Those were all exhibits used in reference in Mr.

12   Keglevic's written direct testimony that's already been

13   written into evidence.  With his live direct testimony, we'd

14   also like to move into evidence at this time Debtor's

15   Exhibits 76, 89, 245, 706 through 708, 954, and we'd also

16   like to move in evidence what has previously been marked as

17   EFH -- ECC Exhibit 270.

18           THE COURT:  Okay, thank you.  And if you could get

19   Ms. Werkheiser a written list of that information, I would

20   appreciate it.  Does anyone wish to be heard?

21           MR. MCKANE:  Your Honor, I apologize.  I misspoke.

22   I would also move in 959 as well.  I apologize.

23           THE COURT:  In connection with the written direct

24   or --

25           MR. MCKANE:  In connection with the live direct.

1           THE COURT:  With the live direct, okay.  All

2     right.  I hear -- I hear no one, so those -- all those

3     exhibits are admitted into evidence without objection.

4           MR. MCKANE:  And Your Honor, I have no further

5     witnesses -- no further questions for this witness at this

6     time.

7           THE COURT:  Okay.  We're going to take a very

8     short recess, and then we'll open up Mr. Keglevic for cross-

9     examination.  Mr. Keglevic, now that you're on cross, you

10    may not discuss the substance of your testimony with any

11    person until your examination is finished.  Okay?

12          MR. KEGLEVIC:  Yes, sir.

13          THE COURT:  All right, very good.  We'll take five

14    minutes.

15       (Recess)

16          CLERK:  All rise.

17          THE COURT:  Please be seated.

18          MR. MCKANE:  Good morning, Your Honor.

19          THE COURT:  Just -- please be seated.  Sorry.

20    Good morning.  Just giving everybody a chance to settle.

21    All right.  Yes, Mr. Glueckstein?

22          MR. GLUECKSTEIN:  Your Honor, for the record,

23    Brian Glueckstein, Sullivan & Cromwell, for the E-side

24    creditors committee.  I have copies of this binder, if I

25    could hand up to the witness and to Your Honor and your

1    clerk.

2              THE COURT:  Yes.  Okay.  And you have a set for --

3              MR. GLUECKSTEIN:  Yeah, I'm going to --

4              THE COURT:  Okay.  Thank you.  Do you have room up

5    there, Mr. Keglevic?

6              MR. KEGLEVIC:  Sure.

7              THE COURT:  Okay.

8              MR. KEGLEVIC:  I'll make it work.

9              THE COURT:  All right.

10             MR. GLUECKSTEIN:  Good morning, Mr. Keglevic.

11             MR. KEGLEVIC:  Good morning.

12             MR. GLUECKSTEIN:  Mr. Keglevic, in your written

13   direct testimony, you stated that your written direct was

14   based in part on your personal knowledge and in part on

15   information supplied to you by members of the Debtors'

16   management team and advisors, correct?

17             MR. KEGLEVIC:  Yes.

18             MR. GLUECKSTEIN:  And, for those portions of your

19   testimony that are not based on personal knowledge, you

20   relied on the accuracy of the information that the Debtors'

21   advisors provided to you, correct?

22             MR. KEGLEVIC:  Debtors' advisors or management

23   team, it depends on the information.

24             MR. GLUECKSTEIN:  Your testimony in Court

25   yesterday and this morning was based on your personal

1     knowledge, correct?

2              MR. KEGLEVIC:  Largely, yes, but some was also

3     based on information I've gotten from management team or my

4     participation in board meetings, et cetera.

5              MR. GLUECKSTEIN:  Mr. Keglevic, since 2008, you

6     have been the chief financial officer of EFH, correct?

7              MR. KEGLEVIC:  Since July 1st, yes.

8              MR. GLUECKSTEIN:  And you're also the co-chief

9     restructuring officer of EFH, correct?

10             MR. KEGLEVIC:  Correct.

11             MR. GLUECKSTEIN:  And, as CFO and CRO, you owe

12    fiduciary duties to EFH, correct?

13             MR. KEGLEVIC:  Correct.

14             MR. GLUECKSTEIN:  And your testimony is that, as

15    CFO or CRO of EFH, you have fulfilled your duties to EFH,

16    correct?

17             MR. KEGLEVIC:  I don't know that I specifically

18    testified to that, but I believe I have fulfilled my duties.

19    I have not heard anybody claim to the -- otherwise.

20             MR. GLUECKSTEIN:  And, as CFO of EFH, you have

21    signed contracts from time to time on behalf of EFH,

22    correct?

23             MR. KEGLEVIC:  Yes, but probably very few.

24             MR. GLUECKSTEIN:  And when you signed contracts on

25    behalf of EFH, you did so intending to legally bind EFH,

1      correct?

2              MR. KEGLEVIC:  Well, can you refer to the

3      contract?  Are you talking about a specific contract?

4              MR. GLUECKSTEIN:  I'm asking just generally in

5      your role as CFO.

6              MR. KEGLEVIC:  I don't typically sign contracts.

7      So, that's why, unless you're referring to something

8      specific, I generally don't execute contracts.

9              MR. GLUECKSTEIN:  I think you testified a moment

10     ago there are at least some contracts you have signed.

11             MR. KEGLEVIC:  I may have.  I don't have a

12     recollection as I sit here today of contracts that I've

13     executed.  Generally speaking, I authorize execution of

14     contracts, or the board does, or it's under our delegation

15     of authority principle.  But I don't typically sign

16     contracts.

17             MR. GLUECKSTEIN:  And, as CFO of EFH, you believe

18     that you've acted in good faith at all times, correct?

19             MR. KEGLEVIC:  Best of my knowledge, yes.

20             MR. GLUECKSTEIN:  You are also the chief financial

21     officer and chief restructuring officer of TCEH, correct,

22     Mr. Keglevic?

23             MR. KEGLEVIC:  Correct.

24             MR. GLUECKSTEIN:  And you're also on the board of

25     managers of TCEH, correct?

1             MR. KEGLEVIC:  I am

2             MR. GLUECKSTEIN:  And you owe duties to TCEH in

3     your capacities as CFO and CRO of TCEH, correct?

4             MR. KEGLEVIC:  Correct.

5             MR. GLUECKSTEIN:  As an officer of TCEH, have you

6     signed contracts from time to time on behalf of TCEH?

7             MR. KEGLEVIC:  None that I can think of today.

8     Basically the same operating principles as with EFH.

9             MR. GLUECKSTEIN:  And, as CFO and CRO of TCEH, you

10    believe you acted in good faith at all times, correct?

11            MR. KEGLEVIC:  I did my best to do so.

12            MR. GLUECKSTEIN:  And you understand, Mr.

13    Keglevic, that the duties that you owe are owed to each of

14    the companies individually, correct?

15            MR. KEGLEVIC:  Yes, or to the estates

16    individually.

17            MR. GLUECKSTEIN:  And you testified, Mr. Keglevic,

18    that you are co-CROs with Ms. Dore, correct?

19            MR. KEGLEVIC:  Correct.

20            MR. GLUECKSTEIN:  And, in your role as co-CRO for

21    the Debtors, you have responsibility, along with Ms. Dore,

22    for supervising the Debtors' jointly retained professionals,

23    correct?

24            MR. KEGLEVIC:  Correct.

25            MR. GLUECKSTEIN:  Mr. Keglevic, you testify on

1    page -- I'm sorry, in paragraph eight of your direct

2    testimony, I think which is the first tab in your binder

3    that I handed up to you, sir?  On page six, sir.  Do you --

4    have you found that page?

5              MR. KEGLEVIC:  I have.

6              MR. GLUECKSTEIN:  Okay, thank you.  In paragraph

7    eight, your testimony, sir, is that the Debtors -- at the

8    August 13th, 2014, this hearing, the Debtors announced that

9    they would undertake a comprehensive marketing effort of the

10   Debtors' equity interests in Oncor.  See that, sir?

11             MR. KEGLEVIC:  Yes.

12             MR. GLUECKSTEIN:  And that is your testimony?

13             MR. KEGLEVIC:  It is.

14             MR. GLUECKSTEIN:  Mr. Keglevic, the equity

15   interest in Oncor is owned directly by EFIH, correct?

16             MR. KEGLEVIC:  Well, I -- "directly" is an

17   interesting -- is a term of art, because there's some

18   ownership above Oncor before it gets to EFIH.  But

19   ultimately, Oncor's most significant asset is its ownership

20   of a subsidiary that owns Oncor's equity interest, yes.

21             THE COURT:  You said -- I'm sorry, you said

22   Oncor's principal asset.  You meant EFIH's?

23             MR. KEGLEVIC:  EFIH.  Thank you, Your Honor.

24   EFIH's principal asset is its -- the value of its ownership

25   in an entity that owns Oncor.

1           MR. GLUECKSTEIN:  And that interest, EFIH's

2     interest, is indirectly owned by EFH, as the equity owner of

3     EFIH, correct?

4           MR. KEGLEVIC:  Well, I don't know if it's

5     indirectly.  I think it's directly owned.

6           MR. GLUECKSTEIN:  TCEH has no ownership interest

7     in the Oncor interest, does it, sir?

8           MR. KEGLEVIC:  Does not.

9           MR. GLUECKSTEIN:  And Oncor is not an asset of the

10    TCEH estate, correct?

11          MR. KEGLEVIC:  Correct.

12          MR. GLUECKSTEIN:  Mr. Keglevic, you testified --

13    in the course of your review of the negotiation history with

14    Mr. McKane, you testified that, in April of 2015, the

15    Debtors were considering creditor proposals outside of the

16    ongoing bidding process, correct?

17          MR. KEGLEVIC:  Yes.

18          MR. GLUECKSTEIN:  And at that time, in April of

19    2015, the bidders in the bidding process were aware that

20    they were competing with a potential TCEH creditor claim,

21    correct?

22          MR. KEGLEVIC:  It depends on when, but sometime in

23    April that's probably true.  I think, after the second-round

24    bids were received, the Hunts and TCEH unsecureds certainly

25    had discussions.  But in April; I'm not sure it was before

1    the bids or -- second-round bids or not.

2            MR. GLUECKSTEIN:  And the Debtors agreed, Mr.

3    Keglevic, to permit the Hunt group and TCEH unsecured

4    creditors to pursue a plan outside the bidding procedures,

5    correct?

6            MR. KEGLEVIC:  They did that, and we considered

7    their proposal, yes.  But we didn't authorize them to do

8    that.  They told us they made a determination to team and

9    develop a plan support agreement.

10            MR. GLUECKSTEIN:  The Debtors never told the T-

11    unsecured creditors that its proposal needed to be submitted

12    as a bid pursuant to the bidding procedures, correct?

13            MR. KEGLEVIC:  We asked if they would submit it as

14    a bid, and they said that they thought it was sufficiently

15    different that it was more of a plan sponsor arrangement,

16    not a bid.  But I -- as I testified to, we scrutinized what

17    they submitted with the exact same criteria that we did with

18    every bid.

19            MR. GLUECKSTEIN:  Mr. Keglevic, are you aware that

20    the EFH committee requested that language be included in the

21    draft bid agreements that the bid would apply to either a

22    joint plan or an E-side standalone plan?

23            MR. KEGLEVIC:  I was not specifically aware of

24    that.

25            MR. GLUECKSTEIN:  So, you have no recollection

1    that was ever brought to your attention in your role as CRO

2    during the bidding process?

3              MR. KEGLEVIC:  That's correct.

4              MR. GLUECKSTEIN:  Mr. Keglevic, it was you and Ms.

5    Dore, as co-CROs, who led plan negotiations on behalf of the

6    Debtors, correct?

7              MR. KEGLEVIC:  Or people under our supervision.

8              MR. GLUECKSTEIN:  Internal folks at the company?

9              MR. KEGLEVIC:  Internal folks at the company, or

10   our advisors.

11             MR. GLUECKSTEIN:  Mr. Keglevic, it's true that the

12   Debtors never would have seriously considered pursuit of a

13   plan that did not resolve legacy litigation, correct?

14             MR. KEGLEVIC:  No, I -- the E proposal of Fidelity

15   and the second-lien group that I referred to did not resolve

16   all litigation.  We certainly considered that.  We

17   considered the bids; they didn't resolve litigation.

18             MR. GLUECKSTEIN:  Well, let's unpack that for a

19   second.  The Fidelity bid that was alluded to, I believe,

20   was referenced in slide four of your demonstratives that Mr.

21   McKane gave you.  The Fidelity bid contemplated -- and it

22   was your testimony, I believe, in paragraph 20, sir, of your

23   direct testimony -- that the Fidelity bid included the $700

24   million disinterested director settlement, correct?

25             MR. KEGLEVIC:  It did, but it didn't contemplate

1    settlement between the T-firsts and the T-unsecureds.  So,

2    it didn't resolve all legacy litigation, but it resolved

3    inter-estate TCEH and EFH litigation, but not -- I think you

4    said "all" legacy litigation.  So, importantly, it did not

5    deal with how the T-firsts would settle with the T-

6    unsecureds for their lien issues and other issues they had.

7            MR. GLUECKSTEIN:  Okay.  Mr. Keglevic, you recall

8    you were deposed -- among the many times you were deposed,

9    you were deposed specifically in connection with the plan

10   support agreement and the plan transactions that are before

11   the Court, correct?

12           MR. KEGLEVIC:  Yes.

13           MR. GLUECKSTEIN:  And if we could just turn, I

14   gave -- there's a copy of your deposition from September

15   10th.  It's one of the two copies there, sir.  You have

16   that?

17           MR. KEGLEVIC:  I have it.

18           MR. GLUECKSTEIN:  And if you could turn, sir, to

19   page 36 of your deposition transcript?  At line 19, I asked

20   you a question at your deposition, considering to enter into

21   the PSA to pursue these plans, if you'd consider a structure

22   where the settlement was not linked to confirmation -- was

23   not linked to approval of the settlement.

24           And your answer to my question there was, "There

25   may have been a version.  I wouldn't say we -- it was always

1    fundamentally an objective of ours to make sure that any --

2    that a settlement was part of any plan, that we got a fresh

3    start and didn't have any litigation post-emergence.  So,

4    no, I don't think we ever seriously would have considered

5    pursuit of a plan that did not have those elements in it."

6    Was that your testimony at the time, sir?

7             MR. KEGLEVIC:  Yes.  And I think it's still my

8    testimony that it was always a key element of any plan.  But

9    I think you asked me did we ever consider any plan that

10   didn't have full settlement.  And we certainly considered,

11   you know, the E proposal, but then ultimately we would have

12   liked to have taken the Fidelity bid and gotten to a, you

13   know, point where we had full settlement.

14             But it's just a question of degree.  I stand by

15   what that said, that fundamentally the objective with the

16   RSA and with all the plans is ultimately we would have full

17   consensus and settlement as part of a filed plan, if we

18   could get it.

19             And I think, the lead-in to this paragraph, we

20   were talking specifically about the PSA.  Certainly when we

21   got to the PSA point and we had the opportunity to have a

22   global settlement, that was a very key element of the plan

23   and something we seriously considered.

24             MR. GLUECKSTEIN:  Okay.  We -- Mr. Keglevic, you

25   testified earlier today, in connection with Mr. McKane's

1    questions, regarding the purchase agreement related to this

2    transaction.  You remember that, sir?

3              MR. KEGLEVIC:  Yes.

4              MR. GLUECKSTEIN:  The purchase agreement does not

5    provide the Debtors a right of specific performance,

6    correct?

7              MR. KEGLEVIC:  Correct.

8              MR. GLUECKSTEIN:  And, as discussed with Mr.

9    McKane, the final purchase agreement does not provide a

10   reverse break fee of any sort in favor of the Debtors,

11   correct?

12             MR. KEGLEVIC:  It does not.

13             MR. GLUECKSTEIN:  And your testimony, sir, is

14   that, by April 17th, 2015, you had met with a member of the

15   TCEH unsecured group about their proposed REIT plan

16   transaction, correct?

17             MR. KEGLEVIC:  Can you refer me -- it's just the

18   dates that I'm questioning with.

19             MR. GLUECKSTEIN:  Sure.

20             MR. KEGLEVIC:  At one point, I did.

21             MR. GLUECKSTEIN:  You testified in paragraph 16 of

22   your direct testimony.

23             MR. KEGLEVIC:  Yes, thank you.  That's helpful.

24             MR. GLUECKSTEIN:  And you further testified that,

25   in June, the Debtors received the term sheet from the TCEH

1    unsecured group and the Hunts, correct?

2              MR. KEGLEVIC:  Yes, that sounds right.

3              MR. GLUECKSTEIN:  And the term sheet that the

4    Debtors received in June already contemplated releases and

5    indemnification of the Debtors and the EFH equity holders,

6    correct?

7              THE COURT:  I didn't understand that question.

8    The releases of whom?

9              MR. GLUECKSTEIN:  Contemplated releases of the

10   Debtors and the EFH equity holders.  Is that correct, Mr.

11   Keglevic?

12             MR. KEGLEVIC:  I'd have to refresh my memory.  Are

13   you referring to the sponsors as the EFH equity holders?

14             MR. GLUECKSTEIN:  Yes.

15             MR. KEGLEVIC:  Yeah, I believe the initial draft

16   did have releases among and between the three groups, T-

17   first, T-unsecured, and the equity holders.

18             MR. GLUECKSTEIN:  And we can take a look to

19   refresh.  Defendant DX959 in your binder, sir, if you take a

20   look at page three of the deck there.

21             THE COURT:  You have a Bates number?

22             MR. GLUECKSTEIN:  Yeah, it's Bates number eight --

23   ending in 833.

24             MR. KEGLEVIC:  And --

25             MR. GLUECKSTEIN:  Middle of the page there,

1    Subsection F, Mr. Keglevic.  Is that the term you're

2    referring to?

3            MR. KEGLEVIC:  Yes.

4            MR. GLUECKSTEIN:  Thank you.  And the -- that

5    initial proposal in June from the T-unsecured group and the

6    Hunts, for this transaction, initially contemplated a

7    reverse break fee, correct, sir?  And we can point you to

8    page six of the document, Bates ending 836.

9            MR. KEGLEVIC:  Yeah, I -- it certainly has a

10   provision.  It doesn't have an amount.  It doesn't talk

11   about any conditions.  So, it was an early thought.

12           MR. GLUECKSTEIN:  But that initial proposal to you

13   from the other side contained a concept of a reverse break

14   fee at that time?

15           MR. KEGLEVIC:  Right.  I don't believe you can

16   find that it has a concept of disarmament or drag, though.

17           MR. GLUECKSTEIN:  The inclusion of the reverse

18   break fee as a concept in this proposal in June was

19   consistent with the terms of the bid that the Hunt group had

20   submitted in the auction process, correct?

21           MR. KEGLEVIC:  No, because the Hunt bid had a

22   specific dollar amount and a topping fee.  This has no

23   dollar amount, no terms, and no topping fee.  So, I wouldn't

24   consider those consistent, other than this early draft,

25   first draft, of the term sheet does talk about a break-up

1    fee but doesn't specify terms or amounts.

2            MR. GLUECKSTEIN:  Okay.  And, Mr. Keglevic, if we

3    could turn to Defendant's Exhibit 91 in your binder?

4            THE COURT:  I'm sorry, I missed the number.

5            MR. GLUECKSTEIN:  91, Your Honor.  And slide nine,

6    Bates ending 1462, this is the slide I think Mr. McKane

7    excerpted in your demonstratives.  Or, sorry, it's the same

8    presentation that Mr. McKane excerpted in your

9    demonstratives.  I'm sorry.  Sorry, sir, I have the wrong

10   page.  Page four of the deck, if you can turn back, Bates

11   ending 1457.  And this was the slide we looked at earlier

12   where the board of directors was informed about the $225

13   million reverse break fee provided in the Hunt bid proposal,

14   correct?

15           MR. KEGLEVIC:  That's right, and the topping fee

16   that I just referenced is there as well.

17           MR. GLUECKSTEIN:  Yeah.  Mr. Keglevic, the Hunt

18   bid submitted in the bid process also contained the concept

19   of specific performance, did it not?

20           MR. KEGLEVIC:  Can you reference me to what you're

21   referring to?

22           MR. GLUECKSTEIN:  Okay.  If you could turn, sir,

23   to what is page nine of the same deck, or ending Bates

24   number 1462?  And, again, this is -- this document, it is

25   your understanding, Mr. Keglevic, is materials that were

1    presented to the board of directors, summarizing the terms

2    of the bids that were received, correct?

3              MR. KEGLEVIC:  Correct.

4              MR. GLUECKSTEIN:  Okay.  And you see on slide nine

5    there is a summary of the two bids, the Hunt bid on the left

6    and the NextEra bid on the right.  You see that, sir?

7              MR. KEGLEVIC:  I do.

8              MR. GLUECKSTEIN:  Okay.  And there's a column -- a

9    row there entitled, "Specific Performance Remedies."  And do

10   you see that there is a description there of specific

11   performance being offered by the Hunt consortium?

12             MR. KEGLEVIC:  Right, qualified by debt financing,

13   which wouldn't have been available if they didn't have the

14   equity, which I told you is an issue about getting the

15   equity.

16             MR. GLUECKSTEIN:  Mm hmm.

17             MR. KEGLEVIC:  And, you know, when -- this is a

18   summary of a bid; it was not -- every time we had the bid,

19   we recognized and we explained to our board that we would

20   then have to, if they made it to the next round, enter into

21   definitive documentation.  So, while the concept, with that

22   qualification, was alive at that point in time, there was a

23   long road to hoe before we knew whether we had specific

24   performance or not in this bid.

25             But at that point, at least, they had not fully

1    rejected it, subject at least to that first description

2    about the debt.  And as I said, the fallacy with the -- you

3    know, the ability to say that with the debt, at the time

4    when we knew they were short of the equity, it didn't mean

5    much to me.

6              MR. GLUECKSTEIN:  And, Mr. Keglevic, NextEra did

7    offer, as well, a specific performance remedy in their bid.

8              MR. KEGLEVIC:  Yes.  NextEra was a little more --

9    further along.  It was still subject to material adverse

10   events, and a definition of what those events and other

11   conditions were.  As I said, specific performance isn't a

12   guarantee.

13             In fact, with NextEra, some of the issues that

14   people point to in this case about, you know, execution of

15   the transaction that we filed as part of our plan -- PUC

16   approval, IRS approval -- so, there would have been a long

17   list that went even with NextEra's.  But I think we were

18   further along with NextEra.  Theirs was not subject to

19   financing.  And certainly we knew they had enough equity.

20             So, I think theirs was a little more solid, as I

21   would expect with a strategic, than a financial buyer.  You

22   know, although Hunt's kind of have the attributes of both.

23   But I don't think they had enough money to consummate the

24   deal as a strategic, which is why they had to incorporate

25   financial buyers into the equity process.

1            MR. GLUECKSTEIN:  Understanding that, in April,

2    the Hunts had an issue of having the financing available, it

3    was a significant issue at that time, obviously.  But they

4    were open to the concept of specific performance in their

5    transaction, correct?

6            MR. KEGLEVIC:  Well, but only to -- I mean, but

7    they had a qualification here.  And, as I said, we had not

8    negotiated the rest of the qualifications.  Our belief is we

9    would never have got to the finish line with the Hunts on

10   specific performance.

11           MR. GLUECKSTEIN:  And --

12           MR. KEGLEVIC:  Based on all the discussions we had

13   with them.

14           MR. GLUECKSTEIN:  And those were based on your

15   recollection of discussions at the time of the auction

16   process, or subsequent?

17           MR. KEGLEVIC:  The bid process.

18           MR. GLUECKSTEIN:  Coming back to the June 12th

19   proposal, Mr. Keglevic, the concept of the reverse break fee

20   that, as you observed, did not have a number on it at the

21   time, was that number ever filled in or progressed during

22   the course of your negotiations?

23           MR. KEGLEVIC:  I don't recall.  Of course, we --

24   you know, we had the Hunt -- we knew what the Hunt number

25   was at 225.  But I don't recall if we ever got to a -- so, I

1    think we basically tried to import that same number over to

2    the second -- you know, to the T-uns deal, in terms of an

3    ask.  But I don't recall any other number.  And I'd have to

4    check with some of my team specifically about those

5    negotiations.  But I -- if we did, I think that's how we did

6    it.

7                    MR. GLUECKSTEIN:  As you testified, as

8    negotiations progressed, the Debtors prioritized resolution

9    of litigation through disarmament over any other remedy,

10   including specific performance or a break fee, correct?

11                   MR. KEGLEVIC:  We certainly believe the value of

12   disarmament and drag, not just disarmament, but drag, which

13   is, you know, T-side consensus, accelerated alternative plan

14   schedule, were also key parts.  And, you know, obviously,

15   you know, agreement to bring the T-side juniors over with

16   the firsts on any future plan.  But together, both of those,

17   that's a true statement.

18                   MR. GLUECKSTEIN:  And, Mr. Keglevic, later in

19   June, the Debtors made a proposal on the concept of

20   disarmament and drag to the T-side/Hunt group, correct?

21                   MR. KEGLEVIC:  You want to refer me to something

22   so I can, you know, see exactly what you're referencing and

23   the timeframe?  I know, generally, in that timeframe, we

24   were exchanging proposals back and forth.  So, I don't

25   disagree in substance.  I just don't recall the date, or, if

1   you're going to ask me something specifically, I'd like to

2   see it.

3            MR. GLUECKSTEIN:  Okay.  And happy to do so, sir.

4   D -- if you turn to, in your binder, DX557?  There's an

5   email from your counsel at Kirkland & Ellis attaching a term

6   sheet.

7            MR. KEGLEVIC:  I'm sorry, DX557?

8            MR. GLUECKSTEIN:  557.

9            THE COURT:  About a third of the way in.

10            MR. KEGLEVIC:  I go from 297 --

11            MR. GLUECKSTEIN:  Mr. Keglevic, I know you have

12   multiple binders up there, I know.  But is that the binder I

13   handed you or Mr. McKane handed you?

14            MR. KEGLEVIC:  Oh, that might help.  DX557, thank

15   you.

16            MR. GLUECKSTEIN:  And are you familiar with the

17   term sheet that's attached to that email?

18            MR. KEGLEVIC:  I'm trying to see if I was copied

19   on this email.  I --

20            MR. GLUECKSTEIN:  I don't believe you were copied

21   on this particular email, sir.  That was transmitted --

22            MR. KEGLEVIC:  So, I --

23            MR. GLUECKSTEIN:  But have you seen the attached

24   document before?

25            MR. KEGLEVIC:  I may have.  There's been a lot of

1    documents exchanged.  But --

2              MR. GLUECKSTEIN:  Okay.

3              MR. KEGLEVIC:  I don't recall this email.

4              MR. GLUECKSTEIN:  Okay.  I think you testified

5    this morning that, in your negotiations, you requested from

6    the other side, in addition to disarmament and drag,

7    specific performance and a break-up fee, correct?

8              MR. KEGLEVIC:  Yes, at one point in the

9    discussions we asked, yes.

10             MR. GLUECKSTEIN:  And did you ever become aware

11   that the Hunt group was open to providing specific

12   performance and/or a reverse break fee, along with

13   disarmament?

14             MR. KEGLEVIC:  No, not specifically.

15             MR. GLUECKSTEIN:  Had you ever seen a mark-up of

16   this term sheet that so reflected their agreement to those

17   concepts?

18             MR. KEGLEVIC:  No.  But I'm struggling with why --

19   you know, the Hunts couldn't bring disarmament.  So, it

20   seems like a non sequitur to me.  We either had a deal with

21   the entire group, which was Hunts and the TCEH unsecured,

22   because disarmament and drag were really what was -- this

23   side of the group giving up.  So, if there was a difference

24   of opinion among the Hunts and the TCEH unsecured, I'm not

25   aware of it, because ultimately they came together with the

1    terms that we agreed on.  And I'm not aware that they had

2    that disagreement during the negotiations.

3              MR. GLUECKSTEIN:  Is it fair, then -- is it your

4    understanding that it was the T-unsecured group who refused

5    to include specific performance or reverse break fee along

6    with disarmament?

7              MR. KEGLEVIC:  We were negotiating with the group,

8    not with the individual parties.  Both parties had to agree

9    to the deal.  So, I never tried to parse out which side of

10   the group liked which part of the deal.  I was negotiating

11   with one party, both of which had to perform and agree to

12   the deal.  And that's the deal we ended up with.

13             MR. GLUECKSTEIN:  And, in your negotiations with

14   the other side, who led the negotiations on behalf of the

15   purchaser?

16             MR. KEGLEVIC:  When you're referring to purchaser,

17   you're talking about the Hunts and the T-uns?

18             MR. GLUECKSTEIN:  The Hunts and the T-groups.

19             MR. KEGLEVIC:  You know, who led, I don't know.

20   There was a group of -- we had a group of people; they had a

21   group of people.

22             MR. GLUECKSTEIN:  And the group of people on their

23   side, did they represent the T-uns, the Hunts?

24             MR. KEGLEVIC:  The group.

25             MR. GLUECKSTEIN:  Were there particular

1    individuals or particular advisors who you recall being in

2    the lead of the negotiations for the other side?

3            MR. KEGLEVIC:  I wasn't generally in the room

4    during those negotiations.  So, I don't remember

5    specifically.  You know, I wouldn't have the names of who

6    was doing what.  But we had multiple people, and I know they

7    had multiple people representing their constituents.

8            MR. GLUECKSTEIN:  Mr. Keglevic, in paragraph 35 of

9    your direct testimony, your testimony is that disarmament

10   was intended as the key price for the Debtors' agreement to

11   pursue the TCEH unsecured group and Hunt course -- Hunt

12   consortium's proposals, and goes on from there.  You see

13   that, sir?

14           MR. KEGLEVIC:  Yes.

15           MR. GLUECKSTEIN:  You recognized and informed the

16   boards of directors that the proposed transaction had a

17   significant amount of conditionality, correct?

18           MR. KEGLEVIC:  Yes.

19           MR. GLUECKSTEIN:  In fact, the board was informed

20   that the transaction had been effectively structured as an

21   option for the purchasers, right?

22           MR. KEGLEVIC:  Somebody might have used those

23   terms.

24           MR. GLUECKSTEIN:  All right.  If we could look at

25   Exhibit 296 in the binder I handed you, sir?  And if we

1   could -- if you could turn your attention to slide 12 in

2   that deck, which ends in Bates 2855?

3          MR. KEGLEVIC:  Yeah.

4          MR. GLUECKSTEIN:  And I'll ask you first -- this

5   is a document titled, "Restructuring Update, July 30th."

6   This was a presentation, sir, that was given to the joint

7   boards of directors on July 30th, 2015, correct?

8          MR. KEGLEVIC:  Yes.

9          MR. GLUECKSTEIN:  Okay.  And, on slide 12, the

10  board of directors was informed that, in exchange for the

11  TCEH union creditors agreeing to disarmament, the merger

12  agreement and related definitive documents have effectively

13  been structured as an option with out-of-the- market

14  conditions related to PUCT approvals, IRS rulings, and

15  market factors.  You see that, sir?

16         MR. KEGLEVIC:  Yeah.  But I think --

17         MR. GLUECKSTEIN:  Well, my question was whether

18  you saw that, sir, there on page 12.

19         MR. KEGLEVIC:  Yes.  I see that.  But --

20         MR. GLUECKSTEIN:  All right.  Okay.  And that was

21  what the board was informed on July 30th, with respect to

22  the nature of this transaction, correct?

23         MR. KEGLEVIC:  That's right.  And we had similarly

24  informed the board about -- that specific performance and

25  MAEs typically would include IRS and PUCT closing, too.  You

1   obviously can't close a transaction of a REIT if the IRS

2   doesn't allow it or the PUCT doesn't allow it.  So, that

3   would have been true of the Hunt bid on a standalone.  So,

4   my point is only that, you know, while option is fair, those

5   two conditions and significant conditionality existed in the

6   Hunt bid as well.

7          MR. GLUECKSTEIN:  Okay.  Okay.  In the second

8   bullet point there, the board is informed, with respect to

9   the conditionality, the significant and -- significant

10  conditionality effectively creates an option for the

11  investors.  And then, in the second bullet point -- I'm

12  sorry, it goes on and says, "There is significant risk that

13  the merger will not close if, among other things" -- and the

14  second sub-bullet there is, "Market conditions shift in a

15  manner that would adversely affect the transaction."  You

16  see --

17         MR. KEGLEVIC:  That's right.

18         MR. GLUECKSTEIN:  And so, the conditionality of

19  this proposed transaction goes beyond regulatory approvals

20  and includes market conditions that shift in a manner that

21  would adversely affect the transaction.  That's what the

22  board was informed, correct, sir?

23         MR. KEGLEVIC:  That's correct.

24         MR. GLUECKSTEIN:  Okay.  And, in return, the

25  Debtors receive disarmament and drag.  That's -- that was

1    your testimony, correct?

2             MR. KEGLEVIC:  That is my testimony, correct.

3             MR. GLUECKSTEIN:  Okay.  And the disarmament

4    concept is contained in the settlement agreement, and not in

5    the purchase contract, correct?

6             MR. KEGLEVIC:  Correct.

7             MR. GLUECKSTEIN:  Okay. And the disarmament

8    concept is contained in the settlement agreement, and not in

9    the purchase contract, correct?

10            MR. KEGLEVIC:  Correct.

11            MR. GLEUCKSTEIN:  And the Debtors sort of have

12   requested that the Court approve the terms of the settlement

13   agreement on its own merit, outside the plan, correct?

14            MR. KEGLEVIC:  Correct.

15            MR. GLEUCKSTEIN:  And I think it was your

16   testimony this morning that the Debtors believe that

17   resolution of legacy litigation is worth more to the Debtors

18   than a reverse breakthrough, correct?

19            MR. KEGLEVIC:  Correct.

20            MR. GLEUCKSTEIN:  The Debtors also believe that

21   disarmament is worth more than a specific performance

22   remedy, to be able to force the closing of the re-

23   transaction, correct?

24            MR. KEGLEVIC:  Well, I think my testimony is we

25   didn't believe we could get specific performance from the

1    consortium, or ultimately from the Hunts that had any

2    ability to be meaningful.  But even specific performance

3    with MAEs, I would still take disarmament and drag.

4              MR. GLEUCKSTEIN:  But Mr. Keglevic, you never

5    sought to negotiate specific performance in connection with

6    this transaction, in lieu of disarmament, correct?

7              MR. KEGLEVIC:  We asked for in addition to

8    disarmament and drag.

9              MR. GLEUCKSTEIN:  Okay, but my question was you

10   never asked for it instead of disarmament and drag?

11             MR. KEGLEVIC:  No, we asked for it in addition to,

12   not instead of.

13             MR. GLEUCKSTEIN:  Now, a reverse break fee, if

14   paid, would be paid to the seller in the transaction,

15   correct?

16             MR. KEGLEVIC:  Yes.

17             MR. GLEUCKSTEIN:  Okay.  And as we talked about

18   earlier, the sellers here are EFIH and EFH, correct?

19             MR. KEGLEVIC:  Yeah, there have -- I assume

20   there'd have to be a discussion of who would share in the

21   break fee.  We never got to that point.  That would probably

22   be subject to its own litigation.

23             MR. GLEUCKSTEIN:  It's fair to assume as the

24   seller, wouldn't it, Mr. Keglevic, that the E-side Debtors'

25   estates, EFIH and EFH would directly benefit from a reverse

1    break fee, correct?

2             MR. KEGLEVIC:  The E-side of the house would

3    directly benefit from a break fee.

4             MR. GLEUCKSTEIN:  And I think as, as you went,

5    walked through with Mr. McKane, the disarmament that you

6    have obtained benefits multiple parties, correct?

7             MR. KEGLEVIC:  We believe it benefits all of the

8    estates.

9             MR. GLEUCKSTEIN:  Okay.  It benefits, in addition

10   to all the estates, disarmament benefits the TCEH first lien

11   creditors, right, Mr. Keglevic?

12            MR. KEGLEVIC:  Yeah, I think the TCEH first lien

13   creditors, hopefully, if approved, get their assets sooner

14   than they would have in an alternative scenario.  So it

15   benefits them in that way, and also reduces their cost and

16   risk associated with litigation.

17            MR. GLEUCKSTEIN:  Okay, and disarmament also

18   benefits the current equity owners, correct?

19            MR. KEGLEVIC:  The current equity owners get

20   releases, but they also give, have consideration that

21   they've given up, as I've testified, associated with upside,

22   their fees and the stock deduction.  So whether there's a

23   net benefit or not, that's for somebody else to determine,

24   but it was a give and take.

25            MR. GLEUCKSTEIN:  Okay, and the --

1            MR. KEGLEVIC:  As it was with all the parties.

2            MR. GLEUCKSTEIN:  Sorry, sorry to interrupt.  The

3    directors and officers of the company who were receiving a

4    release, were also a beneficiary of disarmament, correct?

5            MR. KEGLEVIC:  You know, I expect in most cases,

6    directors and officers get releases, and it's pretty common,

7    and it was in the RSA, it was in every day proposed.  So I

8    don't know that there was a significant net benefit to us

9    than we would have gotten in any other transaction,

10   especially given that we, not aware of significant claims

11   against directors and officers, but the releases are part of

12   the deals yet.

13           MR. GLEUCKSTEIN:  Mr. Keglevic, the Debtors never

14   attempted to quantify in dollars the value of disarmament,

15   correct?

16           MR. KEGLEVIC:  No, I think that's incorrect.  We

17   presented multiple times to our board where we stood on

18   fees.  We got multiple advice from Sibley and Austin,

19   Kirkland and Ellis, and disinterested director counsel what

20   the cost of litigating these items may be.  We presented

21   substantial evidence to -- about the capital structure and

22   the ongoing cost of bankruptcy associated with the interest

23   that was ticking away.  So I think we were all aware of what

24   the cost of litigation and delay mean to each of the

25   estates.  I think there's multiple examples of those

1   presentations to our boards.

2          MR. GLEUCKSTEIN:  In connection with that, did you

3   ever actually review cost of litigation specific to the

4   litigation of the underlying claims that would need to be

5   litigated?

6          MR. KEGLEVIC:  I think we had -- you mean, was a

7   dollar amount put on a piece of paper?  We had input from

8   our lawyers what the cost of, how long it would take, given

9   the run rate of the case, and how much the litigation might

10  cost, yes, generally, and all of them, universally, so that

11  it would be substantially in excess of the break fee.

12          MR. GLEUCKSTEIN:  And your conclusion that it was

13  substantially in excess with the break fee is based on your

14  analysis or understanding of the burn rate and interest

15  expense, as opposed to specific claims of litigation,

16  correct?

17          MR. KEGLEVIC:  No, specific -- what it would take

18  to litigate the identified intercompany claims was part of

19  the discussion as well.  And, you know, the length of time -

20  - not only the cost of the litigation, but the length of

21  time to litigate it was described as multi-year, and

22  substantial amounts.  But I don't know if anybody put a

23  specific number, but I think all the lawyers agreed it would

24  be substantial amounts of money and substantial time to

25  litigate these claims, because many of them went back

1    multiple years.

2              MR. GLEUCKSTEIN:  Did you ever review an actual

3    litigation budget or analysis with respect to the underlying

4    claims of (indiscernible)?

5              MR. KEGLEVIC:  I don't know that there was a

6    specific litigation budget prepared, but in estimating what

7    the costs of this case would be for our board, we did ask

8    for, I think what we called is global nuclear war would

9    cost.  I can't remember if we had something like that, and

10   it was a lot of money.

11             MR. GLEUCKSTEIN:  And is your testimony, do you

12   recall that the board was presented with a number, aside

13   from general case expenses, with respect to the cost of that

14   litigation?

15             MR. KEGLEVIC:  In the number estimates we have for

16   the case was, we did inform that would including numbers, if

17   we went to a litigation approach.

18             MR. GLEUCKSTEIN:  Okay, so there was no numbers

19   broken out for the board as to the cost of litigation.

20             MR. KEGLEVIC:  We didn't break it out by just that

21   one number, we had it in the entire number.

22             MR. GLEUCKSTEIN:  The Debtor's reliance on current

23   case expense, as part of that calculation, assumes that the

24   legacy litigation must occur prior to emergence from

25   bankruptcy in considering that total, correct?

1          MR. KEGLEVIC:  I would say that's generally fair.

2          MR. GLEUCKSTEIN:  Mr. Keglevic, you testified this

3     morning, in response to Mr. McKane, that -- he asked you

4     some questions respect to feasibility, of the plan of your

5     organization.  Do you remember that, sir?

6          MR. KEGLEVIC:  I do.

7          MR. GLEUCKSTEIN:  Okay.  And you testified in your

8     direct examination, in Paragraph 64, that you believed the

9     plant, and then the line transactions remain highly likely

10    to close.  Do you recall that testimony?

11         MR. KEGLEVIC:  I do.

12         MR. GLEUCKSTEIN:  Now Mr. Keglevic, you would

13    agree that the purchase agreement reflects the terms of the

14    merger transaction agreed to amongst the parties, correct?

15         MR. KEGLEVIC:  Yes, generally.

16         MR. GLEUCKSTEIN:  Mr. Keglevic, are you aware that

17    Anchorage Capital is a significant backstop party in the

18    merger transaction?

19         MR. KEGLEVIC:  I am.

20         MR. GLEUCKSTEIN:  Are you aware that the Debtors

21    have any agreement with Anchorage Capital respect to this

22    transition, other than what is reflected in the transaction

23    documents before the Court?

24         MR. KEGLEVIC:  Not aware of any side agreements we

25    have with any of the backstop parties.

1          MR. GLEUCKSTEIN:  Okay.  So with respect to each

2     of the backstop parties, the terms of the agreement that's

3     been negotiated are the terms reflected in the merger

4     agreement, correct?

5          MR. KEGLEVIC:  Yes.

6          MR. GLEUCKSTEIN:  If we could look at what is in

7     your binder labeled as ECX Exhibit 240.  And if you could

8     look, and put the focus of your attentions for -- this is a

9     copy of the purchase agreement, an agreement and plan of

10    merger.  Have you seen this document before, sir?

11         MR. KEGLEVIC:  Yes.

12         MR. GLEUCKSTEIN:  Okay.  If I could focus your

13    attention on what is Page 88 of the agreement, Section 9.9.

14         MR. KEGLEVIC:  Okay.

15         MR. GLEUCKSTEIN:  And it is your understanding

16    that in Subsection A of Section 9.9, the Debtors agreed that

17    they would not be entitled, affirmatively not be entitled to

18    seek specific performance in connection with this

19    transaction?

20         MR. KEGLEVIC:  Yes, I am.

21         MR. GLEUCKSTEIN:  Subsection B of Section 9.9, if

22    I could focus on your attention there, is it your

23    understanding that in Section 9.B, the Debtors agree to

24    waive all remedies whatsoever, in any form, against the

25    purchasers in connection with this transaction?

1              MR. KEGLEVIC:  That's correct.

2              MR. GLEUCKSTEIN:  You testified this morning, Mr.

3    Keglevic, about the reputation of the investors involved in

4    this transaction.  Do you recall that testimony?

5              MR. KEGLEVIC:  I do.

6              MR. GLEUCKSTEIN:  And I believe as part of your

7    testimony, Mr. Keglevic, you testified that those investors

8    have an obligation to seek or a desire to seek above-market

9    returns for their investors.  IS that generally consistent

10   with anything you testified this morning?

11             MR. KEGLEVIC:  Well, I think they certainly have

12   an objective to maximize their financial performance, sure.

13             MR. GLEUCKSTEIN:  So you would agree, Mr.

14   Keglevic, that ultimately, the purchasers will make a

15   decision, at the time of closing, as to whether it is in

16   their financial interest to close this transaction, correct?

17             MR. KEGLEVIC:  That's correct.

18             MR. GLEUCKSTEIN:  Mr. Keglevic, we talked a bit

19   earlier about the, what you referred to as the Fidelity

20   proposal.  And in paragraph 20 of your direct testimony, you

21   write that the May 19th Fidelity proposal also contemplated

22   a $703 million TCEH settlement claim.  That is your

23   testimony, correct, sir?

24             MR. KEGLEVIC:  Yes, it adopted the disinterested

25   director findings.

1          MR. GLEUCKSTEIN:  And the Fidelity proposal that

2     you considered at the time had a total enterprise value

3     associated with it in excess of $19 billion dollars,

4     correct?

5          MR. KEGLEVIC:  Correct.

6          MR. GLEUCKSTEIN:  And at that value, there would

7     have been enough value to satisfy all undisputed E-side

8     claims, correct?

9          MR. KEGLEVIC:  Correct, and the $704 million claim

10    to the T side.

11         MR. GLEUCKSTEIN:  And so Mr. Keglevic, Fidelity

12    never proposed a $700 million settlement claim to TCEH

13    outside of the context of the specific plan of

14    reorganization that paid EFH creditors in full, correct?

15         MR. KEGLEVIC:  No, as part and parcel to a plan to

16    acquire the E-side.

17         MR. GLEUCKSTEIN:  Okay, but that plan, the only

18    time they agreed to that term was in the context of the May

19    19 proposal that would pay all creditors in full, correct?

20         MR. KEGLEVIC:  Yeah, consistent with our plan.

21         MR. GLEUCKSTEIN:  Mr. Keglevic, in Paragraph 89 of

22    your direct testimony, you talk about the fact that Kirkland

23    & Ellis was retained --

24         THE COURT:  Do you have a page number for me?

25         MR. GLEUCKSTEIN:  I'm sorry, page 31, Your Honor.

```
 1              THE COURT:  Thank you.

 2              MR. GLEUCKSTEIN:  You testified that Kirkland &

 3    Ellis was retained as restricting counsel in July 2012,

 4    correct?

 5              MR. KEGLEVIC:  Correct.

 6              MR. GLEUCKSTEIN:  And on the following page, on

 7    Page 32, in the next paragraph, you testify that as part of

 8    their overall diligence efforts, Kirkland investigated

 9    historical transactions, including intercompany, and inter-

10    creditor claims.  That's your testimony, correct?

11              MR. KEGLEVIC:  That's correct.

12              MR. GLEUCKSTEIN:  The Debtors had the results of

13    that investigation prior to the petition day, correct?

14              MR. KEGLEVIC:  Yes.

15              MR. GLEUCKSTEIN:  And in Paragraph 92 of your

16    direct, Mr. Keglevic, you testified that in 2014, the

17    Debtors negotiated and executed the RSA, correct?

18              MR. KEGLEVIC:  Yes.

19              MR. GLEUCKSTEIN:  And at the time the Debtors

20    entered into the RSA, the Debtors had Kirkland's analysis

21    regarding the historical transactions that was conducted

22    pre-petition, correct?

23              MR. KEGLEVIC:  And as well as Sidley & Austin's,

24    correct.

25              MR. GLEUCKSTEIN:  As we talked about earlier, you
```

1    are a member of the board of managers of TCEH, right, Mr.

2    Keglevic?

3              MR. KEGLEVIC:  I am.

4              MR. GLEUCKSTEIN:  And you were a member of the

5    board of managers at the time of the RSA 2014, correct?

6              MR. KEGLEVIC:  I was, as well as EFIH.

7              MR. GLEUCKSTEIN:  Yep, and the RSA transaction was

8    approved by the board of managers of TCEH, correct?

9              MR. KEGLEVIC:  correct.

10             MR. GLEUCKSTEIN:  And the RSA contained releases

11   of all intercompany claims for no consideration, correct?

12             MR. KEGLEVIC:  Correct.

13             MR. GLEUCKSTEIN:  And settling intercompany claims

14   for no consideration was supported by TCEH, and approved by

15   the board of managers, correct?

16             MR. KEGLEVIC:  It was supported by the board of

17   managers, but when you say by TCEH, certainly not the

18   creditors, other than the creditors that signed on to the

19   deal.  So we had -- we took note of the fact that EFIH PIKs,

20   the EFH unsecureds, supported by Fidelity, and the TCEH

21   first liens all agreed to that release.

22             MR. GLEUCKSTEIN:  Thank you for the qualification.

23   To be precise, the TCEH board of managers supported entering

24   into the RSA with an intercompany settlement at zero,

25   correct?

1           MR. KEGLEVIC:  We did.

2           MR. GLEUCKSTEIN:  You talked, Mr. Keglevic, in

3    your testimony yesterday, with Mr. McKane, with respect to

4    the CRO terms sheet.  Do you remember that testimony?

5           MR. KEGLEVIC:  I do.

6           MR. GLEUCKSTEIN:  The terms of -- as you

7    testified, paragraph 100 on page 34 of your direct

8    testimony, that the terms of the proposed CRO terms sheet

9    were initially provided to the Debtor's boards on January

10   30th of 2015, correct?

11          MR. KEGLEVIC:  Yes.

12          MR. GLEUCKSTEIN:  And that proposed CRO term sheet

13   provided there would be settlement in some to-be-determined

14   amount of an allowed claim against EFH in favor of TCEH,

15   correct?

16          MR. KEGLEVIC:  There was, yes.

17          MR. GLEUCKSTEIN:  And the CRO term sheet provided

18   to the board in January also included global releases of all

19   insiders, correct?

20          MR. KEGLEVIC:  It did.

21          MR. GLEUCKSTEIN:  And is your testimony in

22   Paragraph 102 that you included releases because you

23   believed that only a global resolution of all major

24   litigation claims would prove a true, fresh start, correct?

25          MR. KEGLEVIC:  Yes.

1          MR. GLEUCKSTEIN:  And at the time that the

2    disinterested director -- I'm sorry, at the time that the

3    CRO term sheet was provided to the board in January, the

4    disinterested directors had been delegated authority with

5    regards to the intercompany claims, correct?

6          MR. KEGLEVIC:  They certainly had.

7          MR. GLEUCKSTEIN:  And in March of 2015, Mr.

8    Keglevic, the CROs filled in the claim amount into the CRO

9    term sheet as a $450 million claim, correct?

10          MR. KEGLEVIC:  Well, there was also intra-T, but

11    if you're talking about the EFH payable to TCEH, yes.

12          MR. GLEUCKSTEIN:  And that term sheet was

13    circulated to stakeholders in the case by the CROs in March

14    of 2015, correct?

15          MR. KEGLEVIC:  Excuse me for one moment, I want to

16    make sure.  We had two versions of the term sheet.  One had

17    blanks, and one had numbers in it.  If I go back to my

18    demonstrative, I'll make sure which one -- you've now caused

19    me to believe I might have misspoken.

20          So on the January 30th term sheet, you asked me

21    about and I answered, as the one with, at that time there

22    were no number in that term sheet.  In March, the revised

23    term sheet had the 450 in it.

24          MR. GLEUCKSTEIN:  And that revised 450 in March

25    was circulated to stakeholders, correct?

1            MR. KEGLEVIC:  They were.  I just wanted to make

2    sure you understood that the original one did not have the

3    450 in it.

4            MR. GLEUCKSTEIN:  Understood, thank you.

5            MR. KEGLEVIC:  Okay.

6            MR. GLEUCKSTEIN:  Were you aware, prior to the

7    circulation of the term sheet with the $450 million number

8    included, that the EFH committee expressed concern that

9    circulation of a number in that term sheet would taint the

10   process?

11           MR. KEGLEVIC:  I don't know if that was

12   specifically communicated to me.  I don't know who that

13   communication took place with.

14           MR. GLEUCKSTEIN:  You don't have a recollection of

15   receiving that communication directly, yourself?

16           MR. KEGLEVIC:  I don't.

17           MR. GLEUCKSTEIN:  And at the time that the CRO

18   term sheet with the $450 million TCEH claim was circulated

19   to the Debtor's stakeholders, the disinterested directors

20   were continuing to consider the potential intercompany

21   claims, correct?

22           MR. KEGLEVIC:  Yes, they had been working on that

23   prior to the January 30th date, and through the date we

24   issued our term sheet that we just referred, with the 450,

25   and I think ultimately a couple weeks after that, came up

1    with their own independent conclusions.

2              THE COURT:  Yeah, I'm confused now.  Where did the

3    450 figure come from?

4              MR. KEGLEVIC:  The 450 was the CRO's.  It

5    basically came from me and Mrs.  Doré.  And it was, as I

6    mentioned yesterday, we were aware of the negotiations, and

7    the discussion going on among the creditor groups.  And I

8    knew what the bid-ask spread was between what the T was

9    asking from E, and what E was willing to pay T.  And we just

10   put a number in there to try to split the baby a little bit,

11   and see if we couldn't get to a consensus.

12             THE COURT:  All right, thank you.

13             MR. GLEUCKSTEIN:  And Mr. Keglevic, is it your

14   testimony that you did not consider anything beyond the bid-

15   ask spread in putting that $450 million number out to

16   creditors?

17             MR. KEGLEVIC:  I had certainly been aware of

18   arguments, and the claims, and the dialogue behind the

19   claims, but it was not my responsibility, and I did not want

20   to get in the middle of the disinterested director process,

21   so I did not attempt to do probability analysis, or any

22   other analysis associated with actual claims.  It was

23   strictly the bid-ask spread.

24             THE COURT:  How were you aware of that spread?

25             MR. KEGLEVIC:  The creditors were -- individual

1   discussions with the creditors at that time, and then there

2   were also some term sheets going back and forth.

3            THE COURT:  Among creditors?

4            MR. KEGLEVIC:  Among creditors.

5            MR. GLEUCKSTEIN:  And you believed, Mr. Keglevic,

6   that the 450 that you included was some reasonable

7   compromise between the bid-ask spread at that time, correct?

8            MR. KEGLEVIC:  Yes, at that time, I thought it

9   was, you know, it was certainly in the range of

10  reasonableness, and it was substantially, you know,

11  different than what the creditors were asking of each other.

12           MR. GLEUCKSTEIN:  Mr. Keglevic, as CFO, you're

13  familiar with the TCEH intercompany notes with EFH that

14  existed between 2007 and 2013, correct?

15           MR. KEGLEVIC:  Yes.

16           MR. GLEUCKSTEIN:  And you're aware, Mr. Keglevic,

17  that in 2011, Aurelius Capital Management claimed that the

18  board of TCEH had breached its fiduciary duties, and made

19  fraudulent transfers in connection with the TCEH

20  intercompany notes, correct?

21           MR. KEGLEVIC:  Correct.

22           MR. GLEUCKSTEIN:  And you were involved in

23  investigating those allegations, along with others at the

24  company, including Mr. Andrew Wright, correct?

25           MR. KEGLEVIC:  I certainly was aware of the facts

1     and circumstances surrounding it.  I don't know if I would

2     say I was investigating it.

3               MR. GLEUCKSTEIN:  You concluded that the claims

4     asserted at that time were unfounded, correct?

5               MR. KEGLEVIC:  We believe that the terms of the

6     note represented appropriately arm-length terms, which were

7     acceptable in connection with the -- and specified in the

8     indenture at that time.

9               MR. GLEUCKSTEIN:  If you could turn, Mr. Keglevic,

10    to what is ECX 311, in your binder.  I apologize, there's a

11    series of exhibits there.  But if you could look at the top

12    of the page, it was page 53 of 112, at the very top, in the

13    header.

14              MR. KEGLEVIC:  Got it.

15              MR. GLEUCKSTEIN:  You see there's a letter there,

16    dated November 15, 2011, from Andrew Wright, at Energy

17    Future Holdings, to Mr. Lawrence Robbins, do you see that,

18    sir?

19              MR. KEGLEVIC:  I do.

20              MR. GLEUCKSTEIN:  Okay, and do you see, Mr.

21    Keglevic, on Page 55 of this document, third page of the

22    letter, you're copied on this letter.

23              MR. KEGLEVIC:  Yeah, I'm familiar with this

24    letter.

25              MR. GLEUCKSTEIN:  You're -- and that's my next

1    question, you're familiar with this letter?

2              MR. KEGLEVIC:  I certainly am.

3              MR. GLEUCKSTEIN:  Now this letter was sent in

4    response to a demand made on the board of TCEH, correct?

5              MR. KEGLEVIC:  Yes.

6              MR. GLEUCKSTEIN:  And in this letter, in the

7    second paragraph, Mr. Wright writes that, "As to your

8    fraudulent transfer allegations, it is clear that the

9    benefits provided to TCEH under the terms and conditions of

10   the upstream loans, including interest rates, guarantees,

11   and payable on demand feature reflect reasonably equivalent

12   value."  Do you see that, sir?

13             MR. KEGLEVIC:  I do.

14             MR. GLEUCKSTEIN:  And when TC -- sorry, when this

15   letter was sent, in response to Aurelius, TCEH and EFCH were

16   making an accurate representation at the time, correct?

17             MR. KEGLEVIC:  Well, I'll let the lawyers decide

18   what we were doing, but certainly the letter says what it

19   says.

20             MR. GLEUCKSTEIN:  And you agreed with the letter,

21   at the time it was sent, in 2011, correct?

22             MR. KEGLEVIC:  Yeah, I -- certainly, like any

23   litigation, there are two sides to every story, but we

24   believe what we wrote in this letter.

25             MR. GLEUCKSTEIN:  And Mr. Keglevic, you are

1    familiar, in your capacity as CFO, with both EFH's and

2    TCEH's SEC filings, correct?

3              MR. KEGLEVIC:  Yes.

4              MR. GLEUCKSTEIN:  And do you have responsibility

5    for those filings?

6              MR. KEGLEVIC:  I do.

7              MR. GLEUCKSTEIN:  And certainly the Debtors intend

8    for their SEC filings to be accurate when they're submitted,

9    correct?

10             MR. KEGLEVIC:  Yes.

11             MR. GLEUCKSTEIN:  And Mr. Keglevic, EFH has

12   described the TCEH notes as demand notes in its SEC filings,

13   correct?

14             MR. KEGLEVIC:  Yes, they have a demand feature.

15             MR. GLEUCKSTEIN:  And EFCH has similarly described

16   the notes as demand notes in its SEC filings, correct?

17             MR. KEGLEVIC:  Because similarly, it has a demand

18   feature.

19             MR. GLEUCKSTEIN:  I'm sorry, give me one moment.

20   If you could turn in your binder -- before we do, you were

21   on the board of TCEH in 2012, correct?

22             MR. KEGLEVIC:  I was, I was on TCEH and EFIH since

23   I joined the company.

24             MR. GLEUCKSTEIN:  If you could turn in your

25   binders, sorry, to Tab DX80.

1          MR. KEGLEVIC:  I'm sorry, can you -- I'm not

2     finding that, E?

3          MR. GLEUCKSTEIN:  I'm sorry, it's DX --

4          MR. KEGLEVIC:  DX --

5          MR. GLEUCKSTEIN:  080.

6          MR. KEGLEVIC:  Okay, got it.

7          MR. GLEUCKSTEIN:  Mr. Keglevic, this is a board

8     agenda and presentation dated April 26, 2012.  Are you

9     familiar with this document, sir?

10          MR. KEGLEVIC:  I can read what it says.  I don't

11     particularly remember it.

12          MR. GLEUCKSTEIN:  And on the first page of this

13     document, it lists you as an attendee of this board meeting

14     on April 26, 2012.  Do you have any reason to believe that

15     that's inaccurate?

16          MR. KEGLEVIC:  I'm sorry, where?  I see at the top

17     of this, on Page 9033, it says February 15th.

18          MR. GLEUCKSTEIN:  Sorry, the prior page, the very

19     first page is the board agenda, April 26, 2012.

20          MR. KEGLEVIC:  Oh, okay.

21          MR. GLEUCKSTEIN:  And it lists TCEH, EFCH board

22     members.  Your name is listed there, right?

23          MR. KEGLEVIC:  Sure.

24          MR. GLEUCKSTEIN:  Ad you have no reason to believe

25     that you did not attend this meeting?

1             MR. KEGLEVIC:  No, I don't.

2             MR. GLEUCKSTEIN:  Okay.  The 2012 finance update

3    that is reflected in the slides beginning on page, I think,

4    page number 9035, is that a presentation that you would have

5    given to the board, or somebody else at the company?

6             MR. KEGLEVIC:  I think I probably gave it.

7             MR. GLEUCKSTEIN:  If you could turn, sir, to page,

8    what is it, it's slide five, but it's in the bottom of the

9    page, I think Bates number 9037?

10             MR. KEGLEVIC:  Got it.

11             MR. GLEUCKSTEIN:  And there's a slide there

12    entitled "Intercompany Note Repayment Criteria."  Do you see

13    that?

14             MR. KEGLEVIC:  Mm hmm, yes.

15             MR. GLEUCKSTEIN:  And this slide provides reasons

16    why TCEH decided not to demand repayment of the remaining

17    $671 million balance of the intercompany notes, in 2012,

18    correct?

19             MR. KEGLEVIC:  Correct.

20             MR. GLEUCKSTEIN:  And you were aware at the time

21    these were some of the reasons TCEH had not demanded

22    repayment of the notes at that time, correct?

23             MR. KEGLEVIC:  That's right.

24             MR. GLEUCKSTEIN:  And among the facts that are

25    listed here and presented to the board, in the fourth bullet

1    point, it references the fact that under TCEH revolver, it

2    goes on to say that TCEH has no revolver balance, so

3    additional payment would cause TCEH to have a negative

4    arbitrage.  Do you see that, sir?

5              MR. KEGLEVIC:  I do.

6              MR. GLEUCKSTEIN:  And that was one of the reasons,

7    negative arbitrage, that would result, that was presented to

8    the board as to why the demand was not made on the notes in

9    2012, correct?

10             MR. KEGLEVIC:  Right, that the borrowing

11   arrangement, effectively, we were making one percent more on

12   the borrowings than our cost of borrowings, one percent more

13   on the loan to EFH than the cost to TCEH of the borrowings.

14   So there was positive arbitrage to TCEH during the period

15   that the loans were outstanding.

16             MR. GLEUCKSTEIN:  And so, and in the next bullet

17   point there, it talks about excess cash flow sweep, and

18   states that additional intercompany note repayment may

19   trigger excess cash flow sweep.  Do you see that, sir?

20             MR. KEGLEVIC:  I do.

21             MR. GLEUCKSTEIN:  And so the possibility of taking

22   additional liquidity out of the system was another reason

23   why TCEH did not demand repayment of the notes in 2012,

24   correct?

25             MR. KEGLEVIC:  Yeah, at that date, of course, you

1    don't know what excess cash flow sweep is under the end of

2    the year, but that was a forecasted potential risk.

3              MR. GLEUCKSTEIN:  And so TCEH made the decision

4    that it was in its interest not to demand repayment of the

5    notes in 2012, correct?

6              MR. KEGLEVIC:  That's correct.

7              MR. GLEUCKSTEIN:  And when the TCEH board

8    considered demanding repayment of the notes in 2012, it did

9    so because the notes contained a (indiscernible) payable on

10   demand feature, correct?

11             MR. KEGLEVIC:  That's correct.

12             MR. GLEUCKSTEIN:  Mr. Keglevic, you talked this

13   morning in your testimony with Mr. McKane about the -- I

14   think it was described as a simple fix that was suggested

15   yesterday by Mr. Dietderich in connection with the tax-free

16   transaction issue related to the REIT.  Remember that

17   testimony?

18             MR. KEGLEVIC:  I do.

19             MR. GLEUCKSTEIN:  And your testimony was the first

20   time you had heard a suggestion about that issue having a

21   workaround was in Mr. Dietderich comments yesterday, that

22   was your testimony?

23             MR. KEGLEVIC:  My testimony was the first time

24   that I heard that that workaround could be successful, or

25   easy.

1          MR. GLEUCKSTEIN:  Is the company -- has the

2    Debtors -- I'm sorry, strike that.  Have the Debtors done

3    tax planning to determine whether or not there's a way to

4    structure the retransaction, and a way to preserve the

5    economics of the retransaction?

6          MR. KEGLEVIC:  We looked at alternatives available

7    to us, including the one Mr. Dietderich -- and I apologize

8    to Mr. Anker, Mr. Dietderich mentioned, and determined it

9    wasn't feasible.

10          MR. GLEUCKSTEIN:  Your testimony is that the

11    Debtors have determined definitively that it is not feasible

12    to preserve the economics of the REIT in a taxable

13    transaction?

14          MR. KEGLEVIC:  We're not aware -- well, yeah, I

15    think you just broadened by answer a bunch.  We specifically

16    looked at re-timing the transaction, and reading EFH before

17    we spun off TCEH, which was Mr. Dietderich's summary.  We

18    looked specifically at the ability to do that, found that

19    not to be feasible.

20          We are also unaware of any other tax planning

21    idea, and certainly no tax plan ideas have been brought to

22    us which gives us any other ability to avoid the ENP issue

23    that I testified.  It's impossible to say that every

24    brilliant idea has been considered, but we're certainly not

25    aware of it, and it's not without a lot of diligence and

1    interaction with all the creditors in this case.

2            We're not aware of anything, and specifically, we

3    have determined that one is not feasible.

4            MR. GLEUCKSTEIN:  And that analysis, that led to

5    the determination that that particular suggested structure

6    is not feasible, when, if you recall, did that analysis take

7    place?

8            MR. KEGLEVIC:  Six months ago.

9            MR. GLEUCKSTEIN:  And you talked with Mr. McKane

10   this morning about the basis step-up issue, and the

11   potential stranded tax from the taxable transaction.  Do you

12   remember that testimony?

13           MR. KEGLEVIC:  I do.

14           MR. GLEUCKSTEIN:  Mr. Keglevic, you don't have any

15   reason to believe that at today's current valuation of TCEH,

16   that there would be any stranded tax liability at EFH, do

17   you?

18           MR. KEGLEVIC:  Today's value of TCEH does not

19   dictate if there's going to be any stranded cost, is the

20   issue.

21           MR. GLEUCKSTEIN:  I understand.  My question was,

22   as of today, based on the current valuation, Debtor's

23   current valuation, would such an issue exist?

24           MR. KEGLEVIC:  But that's a hypothetical that

25   can't happen.  Today's value does not dictate what stranded

1    tax may be.

2            MR. GLEUCKSTEIN:  So your testimony is, Mr.

3    Keglevic, is that due to the certainty of this issue at some

4    date in the future, that uncertainty justifies the need to

5    pay for a tax-free transaction today?

6            MR. KEGLEVIC:  I didn't testify to that.  I just

7    testified that the determination of whether there will be a

8    stranded tax will be made at the date that the spin-off, or

9    90 days after the spin-off occurs.

10           MR. GLEUCKSTEIN:  Okay.  And my question, Mr.

11   Keglevic, is based on your testimony, due to the uncertainty

12   of this issue, does that justify for the Debtors the need

13   for a tax-free transaction as part of this deal today?

14           MR. KEGLEVIC:  It one of the considerations.  The

15   other one is ENP.

16           MR. GLEUCKSTEIN:  Do you know, Mr. Keglevic,

17   whether the ENP issue was considered by the disinterested

18   directors at the time they considered the tax issues, in

19   connection with the disinterested director settlement?

20           MR. KEGLEVIC:  I know I presented the issue to

21   them.  That's in board minutes that you have access to, that

22   talk specifically about the purging divided.  But I was not

23   in the room when they made their determinations and how they

24   came up with their numbers, so you'd have to ask them.

25           MR. GLEUCKSTEIN:  But it's your testimony that

1    they were armed with the information that you provided them

2    on the ENP issue, prior to reaching the disinterested

3    director settlement date.

4              MR. KEGLEVIC:  Yeah, I had made presentations to

5    the board before that date.

6              MR. GLEUCKSTEIN:  On that specific issue?

7              MR. KEGLEVIC:  On specific issues associated with

8    ENP purging dividends.

9              THE COURT:  Let's break for lunch.  Let's shoot to

10   reconvene at 1:55, as promptly as possible.

11       (Recess)

12             CLERK:  All rise.

13             THE COURT:  Please be seated.  Good afternoon.

14   Mr. Glueckstein, if you don't mind, before we start, I'm

15   going to rule on the Alcoa discovery dispute.

16             MR. GLUECKSTEIN:  Sure.

17             THE COURT:  This won't take very long.  This

18   arises in connection with the litigation between the Debtors

19   and Alcoa in connection with their contract.  And the issue

20   that has arisen is whether to make highly confidential

21   documents or documents that have been designated as highly

22   confidential by the Debtors available to business persons at

23   Alcoa.  And the dispute at this point rests on two people, a

24   -- I want to get their names right -- Mr. Smith and Mr.

25   Hodges and also a request by the Debtors to limit the number

1    of hack depositions.

2              So in connection with the documents, my ruling is

3    that Mr. Tommy Hodges, Mr. William Smith shall have access

4    to the highly confidential documents.  They are essential to

5    Alcoa's ability to prepare for and participate meaningfully

6    in discovery and trial.

7              In addition, I understand the parties have agreed

8    that four specifically named Alcoa inside council may have

9    access to those documents and that that's not controversial.

10   No other Alcoa employees will have access to highly

11   confidential documents.

12             The form of protective order that's been used

13   throughout this case, in particular with the legacy

14   discovery, is appropriate and should be entered in

15   connection with the Alcoa dispute, which I don't think is

16   controversial now that I've designated who can receive

17   highly confidential documents.

18             I agree with the Debtor's position that the

19   depositions should be limited to four six-hour fact

20   depositions and one 30(b)(6) deposition of up to 12 hours

21   per side.  That adds up to 10 depositions.  That does not

22   include the depositions of experts.  If it turns out that

23   that's not adequate, either party can seek to have

24   additional depositions taken by a showing of cause.

25             The Alcoa took the position that it was too early

1    to decide whether or not there should be a limitation on

2    fact depositions because they're refused to accept document

3    discovery productions that the Debtors have repeatedly tried

4    to make to them over the last several weeks based on this

5    dispute about who can look at highly confidential documents.

6    I certainly don't see why those documents couldn't have been

7    accepted and looked at much earlier than they have.  I'm not

8    going to hold up this kind of decision based on Alcoa's

9    refusal to participate in discovery.

10              I think it's an appropriate deposition limit.

11   It's in line with the federal rules of civil procedure

12   presumption of no more than 10 depositions to be taken

13   without a ruling otherwise and I think it's appropriate.  So

14   those are my findings on and rulings in connection with the

15   discovery dispute.

16              MR. MCKANE:  Sir, Mark McKane of Kirkland & Ellis

17   on behalf of the Debtors.  We will communicate this to the

18   team, make certain that they're not on the phone right now,

19   that they get word both directly and indirectly of your

20   ruling and obviously we'll see the transcript as well.

21              THE COURT:  Okay, very good.  I wasn't planning on

22   entering a formal order.  If the parties believe they need a

23   formal order, submit one under certification.  But I think

24   my ruling should do.

25              MR. MCKANE:  Will do.  We don't expect there to be

1    -- for there to be that need and transcript is fine.  Thank

2    you.

3            THE COURT:  Okay.  Thank you.  All right, Mr.

4    Glueckstein.  Thank you for your patience.

5            MR. GLUECKSTEIN:  Oh, thank you, Your Honor.  Good

6    afternoon MR. Keglevic.

7            MR. KEGLEVIC:  Good afternoon.

8            MR. GLUECKSTEIN:  Mr. Keglevic, in your testimony

9    this morning with respect to most of the topics on the tax

10   issues, you testified that you put the tax allocation

11   agreement into place as a matter of good corporate

12   governance, correct?

13           MR. KEGLEVIC:  That's why I directed it to be

14   prepared, correct.

15           MR. GLUECKSTEIN:  And Mr. Keglevic, you intended

16   for the tax allocation agreement to be clear at the time it

17   was prepared and signed on behalf of the company, correct?

18           MR. KEGLEVIC:  I did.

19           MR. GLUECKSTEIN:  We talked this morning, Mr.

20   Keglevic, about the fact that it's your testimony that a

21   tax-free transaction on the T-side was a key element of the

22   plan.  That was your testimony, correct?

23           MR. KEGLEVIC:  Correct.

24           MR. GLUECKSTEIN:  And, Mr. Keglevic, the

25   settlement agreement and the plan support agreement related

1    to these transactions provide terms to both facilitate an

2    alternative transaction should one of be necessary, correct?

3              MR. KEGLEVIC:  The plan contains alternative

4    restructuring terms, correct.

5              MR. GLUECKSTEIN:  And, Mr. Keglevic, it's your

6    understanding, correct, that the Debtors did not obtain a

7    commitment from the TCEH first lien creditors to agree to a

8    tax-free transaction as one of those alternative

9    restructuring terms, correct?

10             MR. KEGLEVIC:  That's correct.

11             MR. GLUECKSTEIN:  So in an alternative

12   restructuring scenario, there is still the possibility of a

13   taxable transaction being filed by the T first lien

14   creditors, correct?

15             MR. KEGLEVIC:  There remains that possibility.

16   That's correct.

17             MR. GLUECKSTEIN:  Mr. Keglevic, we were talking

18   this morning about the likelihood of the current plan, the

19   REIT plan that's closed.  Mr. Keglevic, if the Hunts are

20   willing to close the transaction, uh, and the financial

21   investors do not want to close, can the Hunts force T

22   unsecured creditor investors to close the transaction?

23             MR. KEGLEVIC:  No.

24             MR. GLUECKSTEIN:  And did the Debtors seek to

25   negotiate the requirement that the Hunts would in fact be

able to force those investors to close?

MR. KEGLEVIC: We negotiated our ability to force our investors to close.

MR. GLUECKSTEIN: And if the investors wanted to close the transaction and the Hunts do not want to close, can the investors force the Hunts to close?

MR. KEGLEVIC: No.

MR. GLUECKSTEIN: So when you testified this morning about your views as to whether or not the Hunts would in fact want to close the transaction, what assumptions did you make with respect to their ability to convince the T unsecured creditors to close?

MR. KEGLEVIC: I assumed that they would be aligned in terms of their willingness in the reason why they would close.

MR. GLUECKSTEIN: So if there is a divergence of views between the investors and the Hunts on whether or not to close, the Hunts would not be able to force that transaction -- force closing the transaction. That's your testimony, correct?

MR. KEGLEVIC: I think I answered that. Yes.

MR. GLUECKSTEIN: Your Honor, that's all the questions I have for Mr. Keglevic. I'd conference counsel for the committee. I have some additional questions for Mr. Keglevic. Would you like me to address exhibits now or at

1    the end on behalf of all the committee testimony?

2              THE COURT:  Yeah.  Let's finish cross and then we

3    can do the opponent's exhibits.

4              MR. GLUECKSTEIN:  Happy to do so.  Thank you.

5              MR. LIEBESMAN:  Good afternoon, Your Honor.  I

6    also have some exhibits, if it's acceptable to the Court to

7    provide the witness and Your Honor and your clerk a subset

8    of the committee's exhibits.  It would make it a lot easier

9    to get through this.  May I approach, Your Honor?

10             THE COURT:  Yes.  Let's relieve Mr. Keglevic of

11   some of these binders.  Thank you.

12             MR. KEGLEVIC:  I can just put them to the E-side,

13   Your Honor.

14             THE COURT:  Are you sure?

15             MR. KEGLEVIC:  I'm okay.  Yes, sir.

16             THE COURT:  Okay.  All right.

17             MR. LIEBESMAN:  Your Honor, may I have 30 seconds

18   to allow our tech person to -- I apologize, Your Honor.

19   Good afternoon, Your Honor, Sid Liebesman from Montgomery

20   McCracken Walker and Rhoads.  For the record, we are

21   conflicts counsel for the E-side creditors committee.  Good

22   afternoon, Mr. Keglevic.

23             MR. KEGLEVIC:  Good afternoon.

24             MR. LIEBESMAN:  Mr. Keglevic, you testified on

25   direct examination about the importance of the effect of

1    heat rates and natural gas prices, correct?

2              MR. KEGLEVIC:  Yes, to TCEH financial results.

3              MR. LIEBESMAN:  Isn't it true that by mid-2008,

4    low wholesale electricity prices in the Texas electricity

5    market made it impossible for TCEH to meet its debt

6    obligations?

7              MR. KEGLEVIC:  No, it's not true.

8              MR. LIEBESMAN:  Not true.  Could you please turn

9    to Exhibit 355, please, in the binder that you have in front

10   of you?  And Paragraph 11, please.

11             MR. KEGLEVIC:  I'm there.

12             MR. LIEBESMAN:  Okay.  Isn't it true -- well, this

13   exhibit is the -- your declaration in the first day filings,

14   correct?

15             MR. KEGLEVIC:  Yes.

16             MR. LIEBESMAN:  And in Paragraph 11 on Page 6 it

17   reads, "Although the Debtor's operations are strong and TCEH

18   and EFIH have historically been and will continue to be cash

19   flow positive before debt service, low wholesale electricity

20   prices in the Texas electricity market since mid-2008 have

21   made it impossible for the TCEH Debtors to support their

22   current debt load."  Is it not what that says?

23             MR. KEGLEVIC:  That's what that says but you're

24   interpreting it incorrectly.  We were able to pay, as

25   evidenced in our financial statements, all of our debt

1    service that was due through the date that we filed and that

2    was the first date that we missed an interest payment on May

3    1st, 2014.

4              So you asked me, you know, were we able to, you

5    know, pay for our, you know, our debt obligations as they

6    came due and through that date we were.

7              This indicates that there was a decline since that

8    date, but it wasn't intended to say at those dat -- we would

9    have been in default and in bankruptcy well before that if

10   what your statement was was true.

11             MR. LIEBESMAN:  Well, you testified also on direct

12   examination about the effect of a $1 drop in the price of

13   natural gas on EFH's enterprise value, correct?

14             MR. KEGLEVIC:  Yes.

15             MR. LIEBESMAN:  And I believe that you testified

16   on your direct this morning that the effect of that $1 drop

17   was about $4 billion, correct?

18             MR. KEGLEVIC:  Yes, with the assumptions

19   underlying my calculation, correct.

20             MR. LIEBESMAN:  Okay.  You gave a deposition in

21   this case back in October 1st, about a month ago, correct?

22             MR. KEGLEVIC:  I've given many depositions.

23             MR. LIEBESMAN:  Okay.  Do you recall giving a

24   deposition about five weeks ago discussing that very topic,

25   the effect of a dollar drop or increase in the price of

1    natural gas --

2            MR. KEGLEVIC:  If you refer me to it I'll be happy

3    to do it.

4            MR. LIEBESMAN:  I'll be happy to do that.  Please

5    turn to Exhibit 692, which is a deposition transcript from

6    October 1, 2005 on Page 226.

7            MR. KEGLEVIC:  I'm sorry, there's some -- EX692?

8            MR. LIEBESMAN:  No, it's just Exhibit 692.  It may

9    be in the front of your binder.

10           THE COURT:  It's at the front of your binder --

11           MR. LIEBESMAN:  It's the front just because it's -

12   - I figured we'd be referring to it frequently.  I put it in

13   the front.

14           THE COURT:  What page, sir?

15           MR. LIEBESMAN:  Page 226, Your Honor.

16           THE COURT:  Thank you.

17           MR. KEGLEVIC:  Okay, got it.

18           MR. LIEBESMAN:  Okay.  Do you see where the

19   paragraph in the middle that begins "for example"?  It's

20   also on the screen in front of you, if you'd like, but...

21           MR. KEGLEVIC:  Yes.

22           MR. LIEBESMAN:  All right.  And if you flip to the

23   page before, your -- this is, you testified and you're

24   answering a question that's been posed to you, correct?

25           MR. KEGLEVIC: Yes.

1          MR. LIEBESMAN:  All right.  So you say on Page

2     226, "For example, a $1 change in gas price for our fleet at

3     any multiple usually is about a $6.4 billion improvement in

4     value," correct?

5          MR. KEGLEVIC:  Correct.

6          MR. LIEBESMAN:  Now, does this --

7          MR. MCKANE:  Objection, Your Honor.  Under the

8     rule of completeness rule of Federal Civil Procedure

9     32(b)(4).

10         THE COURT:  Very good.

11         (Laughter)

12         MR. MCKANE:  Thank you.  I do this a lot.  I'd ask

13    that the question be read because I think it's incomplete as

14    it relates to time.  Specifically if you look to the prior

15    page, the question that he was answering at that time

16    related to 2012.  And so with the discussion on heat rate

17    and value, it varies over time because I believe that the

18    earlier testimony today heat rate and while gas may move a

19    dollar every time, another component of the EBITDA and,

20    therefore, the enterprise value is heat rate--

21         THE COURT:  Okay.

22         MR. MCKANE:  --and heat rate varies.

23         THE COURT:  Okay.  All right.  The question was,

24    "At the time that they engaged TCEH, engaged in that

25    transaction, did you have an opinion as to whether TCEH was

1    insolvent" and then the answer follows.  And the previous

2    question indicates they're talking about April 2012.  So the

3    Court takes note of that.

4              MR. MCKANE:  Thank you, Your Honor.

5              THE COURT:  You may continue.

6              MR. LIEBESMAN:  Mr. Keglevic, so do you see the

7    paragraph that I just read?

8              MR. KEGLEVIC:  I do.

9              MR. LIEBESMAN:  And keeping in mind the objection

10   that was just raised, can you articulate the difference

11   between the $6.4 billion number used at the deposition,

12   which was relating to a 2012 transaction versus your

13   testimony this morning on direct where you used a number

14   substantially lower?

15             MR. KEGLEVIC:  Yes.  And here I also qualified

16   that I said our fleet.  Our fleet has the potential output

17   of about 80 terawatt hours.  In 2012, the entire fleet was

18   operating and producing that amount of electricity.  Now, in

19   a lower price environment, our fleet is not expected because

20   of seasonal operations, because we're not producing the same

21   level of power, to produce 80 terawatt hours.  It's more

22   likely going to be 50 to 55 terawatt hours.

23             So I effectively -- the math was exactly the same,

24   80 terawatt hours times a dollar with an assumed heat rate

25   of $10, it was a $10 power price.  Eighty times 10 is $800

1    million times an eight, multiple of 6.4.

2            If you apply the same math to a 50 terawatt hours

3    with a dollar of gas, $10 heat rate, $10 power price, you

4    get $500 million cash flow effect for a year, and times the

5    same multiple, eight, 500 times 800 is $4.8 billion times

6    eight is 64.  So it's just simply a question of what the

7    fleet was expected to produce at that point in time.  The

8    fleet is producing less, so the dollar impacts of change in

9    volatile gas is less.

10           But until a certain point because at a certain gas

11   price those terawatt hours come back in and it's a potential

12   of having, going back to the 6.4.  So our current projection

13   for next year is 55 terawatt hours based on current date.

14   Back then it was 80 terawatt hours.

15           MR. LIEBESMAN:  All right.  Thank you.  Well,

16   you'd agree as a matter of principle, though, that the price

17   of natural gas has a potential significant effect on EFH's

18   valuation.

19           MR. KEGLEVIC:  Of TCEH's valuation.

20           MR. LIEBESMAN:  Of TCEH, fine.

21           MR. KEGLEVIC:  That's an important distinction.

22           MR. LIEBESMAN:  Understood.  On the consolidated

23   basis, Mr. Keglevic, would you agree that EFH was insolvent

24   as of December 31, 2008?

25           MR. KEGLEVIC:  No, I would not.

1        MR. LIEBESMAN:  Is there any point in time that

2   you believe EFH on a consolidated basis was insolvent?

3        MR. KEGLEVIC:  I don't know what the premise of

4   the question is because on a consolidated basis, EFH was

5   never responsible to fund the debt of TCEH.  There were no

6   parent guarantees associated with the debt.  So to the

7   extent TCEH became insolvent at any point in time, and as we

8   know it's deeply insolvent now, I mean, the creditors are

9   going to get substantially less than what they bargain for.

10  That shortfall does not need to be made up on a consolidated

11  basis at EFH.

12        So the fact that EFH -- for consolidated financial

13  reporting purposes, we do consolidate those.  But in terms

14  of responsibilities of the parent to pick that up, you would

15  ignore that shortfall associated with TCEH because, as we

16  all know, EFH is not responsible and does not -- TCEH is not

17  claiming that proceeds in the EFH class would be shared with

18  the shortfall of the deficiency claim of TCEH.  It's

19  basically the same calculation.

20        MR. LIEBESMAN:  So then, just to be clear, yes or

21  no, is it your testimony that EFH on a consolidated basis

22  has never been insolvent?

23        MR. KEGLEVIC:  I never -- EFH on a consolidated

24  basis, solvency was never a test or an important issue that

25  I've looked at.  In fact, it is a misnomer and it has no

1    meaning from any standpoint that I can think of.  EFH on a

2    standalone basis was not insolvent.

3           EFH on a consolidated basis because it did not

4    have to pick up the shortfall associated with TCEH, it is

5    not insolvent but the -- if you're referring to the EFH

6    financial statements, which show consolidated results, those

7    don't have an impact on a solvency determination of EFH.

8           MR. LIEBESMAN:  You never took it upon yourself to

9    have a solvency opinion performed on EFH on a consolidated

10   basis during your 10 years as CFO.

11          MR. KEGLEVIC:  I can't imagine why I would.

12          MR. LIEBESMAN:  Okay.  Could you please turn to

13   Exhibit 758?  Now, for purposes of saving a few trees, this

14   is a 2010 10K for EFH.  If you'd like to see the entire 10K,

15   it'll be in the binders to your right.  But what we've done

16   is put the pages that we're going to be asking you about in

17   this binder.

18          MR. KEGLEVIC:  That's fine.

19          MR. LIEBESMAN:  Okay.  You signed this 10K

20   correct?

21          MR. KEGLEVIC:  I did.

22          MR. LIEBESMAN:  And in doing so you certified that

23   the information contained in the 10K fairly presented in all

24   material respects the financial condition and results of the

25   operation of the company, correct?

1          MR. KEGLEVIC:  Correct.

2          MR. LIEBESMAN:  And can you agree that EFH

3    reported its financial data on a consolidated basis?

4          MR. KEGLEVIC:  It does.

5          MR. LIEBESMAN:  If you turn to Page 46 of this

6    exhibit, which is two pages in --

7          MR. KEGLEVIC:  Yes.

8          MR. LIEBESMAN:  -- on Page 46 of the 10K it lists

9    EFH shareholder equity, correct?  Under capitalization?

10   It's highlighted if you like on the monitor.

11         MR. KEGLEVIC:  We're on Page 46?  Yes.

12         MR. LIEBESMAN:  EFH quarterly common stock equity?

13         MR. KEGLEVIC:  Yes.

14         MR. LIEBESMAN:  Isn't it true that EFH reported

15   negative shareholder equity of $3.673 billion as of December

16   31, 2008?

17         MR. KEGLEVIC:  That's correct, on a GAAP basis,

18   not on a solvency basis.

19         MR. LIEBESMAN:  Okay.  (Indiscernible) your

20   shareholder equity means that a company's liabilities

21   succeed the book value of its assets, correct?

22         MR. KEGLEVIC:  It does.

23         MR. LIEBESMAN:  Okay.  So still on this page, can

24   we agree that EFH reported negative shareholder equity of

25   $3.247 billion as of December 31, 2009?

1          MR. KEGLEVIC:  Yes.

2          MR. LIEBESMAN:  EFH reported negative shareholder

3   equity of $5.99 billion as of December 31, 2010, correct?

4          MR. KEGLEVIC:  I think you might have said the

5   number wrong, $5.990.  I think you said nine.  I might have

6   misheard you.

7          MR. LIEBESMAN:  Well, $5.99 billion.

8          MR. KEGLEVIC:  Yes.  That number I agreed to.

9          MR. LIEBESMAN:  Okay.  I'm sorry if I misspoke.

10  Please turn to Exhibit 761.  This is (indiscernible) 10K for

11  the fiscal year ending December 31, 2013, correct?

12         MR. KEGLEVIC:  Yes.

13         MR. LIEBESMAN:  If you turn to Page 45 of this

14  exhibit.

15         MR. KEGLEVIC:  I'm there.

16         MR. LIEBESMAN:  You see where it says shareholder

17  equity again under capitalization?

18         MR. KEGLEVIC:  Yes.

19         MR. LIEBESMAN:  Isn't it true that EFH reported

20  negative shareholder equity for every year from 2010 through

21  December 31, 2013?

22         MR. KEGLEVIC:  It did.

23         MR. LIEBESMAN:  And (indiscernible) EFH's negative

24  shareholder equity increased each and every year from 2010

25  to 2013, correct?

1           MR. KEGLEVIC:  Yes, as the value of TCEH declined,

2     the consolidated results reflected that decline.

3           MR. LIEBESMAN:  Isn't it true that according to

4     EFH's 2013 10K that EFH lost roughly $10.3 billion between

5     2010 and 2013?  If you -- the net income loss on the, just

6     above on that same chart?

7           MR. KEGLEVIC:  Yeah, this one's in red so it's

8     harder to read, but that looks about right.

9           MR. LIEBESMAN:  Oh, I'm sorry.

10           MR. KEGLEVIC:  That's okay.

11           MR. LIEBESMAN:  Please turn to Exhibit 466.

12           THE COURT:  You lost me.  What line item am I

13     looking at for net income loss?  Right under impairment of

14     goodwill?

15           MR. LIEBESMAN:  It says it, the net income loss,

16     it's just above it.  It's on the monitor, if Your Honor

17     would like.  It's highlighted in red, so it is a little --

18           THE COURT:  Oh, I see it.  Okay, I have it.  Thank

19     you.

20           MR. LIEBESMAN:  Sure.  So Mr. Keglevic, let's go

21     to Exhibit 466.  And we put a tab.  There are several

22     documents attached to the email that's the cover page.  So

23     I'll direct your attention to what you should have tabbed.

24     A few pages in, it's a PowerPoint presentation entitled

25     Board Strategy Session.

1                MR. KEGLEVIC:  I'm there.

2                MR. LIEBESMAN:  Okay.  It's dated October 27,

3      2011, correct?

4                MR. KEGLEVIC:  Correct.

5                MR. LIEBESMAN:  In this presentation it's prepared

6      for EFH's board of directors meeting that occurred on that

7      day, October 27, 2011, correct?

8                MR. KEGLEVIC:  Yes.  It was a joint board session,

9      I believe, but certainly EFH members were there.

10               MR. LIEBESMAN:  Okay.  And you personally

11     presented the valuation materials that are contained in this

12     PowerPoint to the board, correct?

13               MR. KEGLEVIC:  What page?  Can you reference just

14     so I can --

15               MR. LIEBESMAN:  If you look at the next page, Page

16     2, there's a view of the long range plan that has your name

17     as being the presenter.

18               MR. KEGLEVIC:  Yes.  I presented the long range

19     plan and it says I presented the valuation.  I just like to

20     see the --

21               MR. LIEBESMAN:  And the valuation just below,

22     correct?

23               MR. KEGLEVIC:  That's what the index says,

24     correct.

25               MR. LIEBESMAN:  So if you could then turn to Page

Page 142

1    110 of this presentation.

2              MR. KEGLEVIC:  Yes.

3              MR. LIEBESMAN:  In this slide, you addressed EFH's

4    estimated enterprise value as of 2011, correct?

5              MR. KEGLEVIC:  Correct.

6              MR. LIEBESMAN:  And according to this

7    presentation, EFH determined that its estimated enterprise

8    value as of 2011 was between $28 billion to $34 billion,

9    correct?

10             MR. KEGLEVIC:  Yes.

11             MR. LIEBESMAN:  Okay.  So you see the box with the

12   estimated TEV of 2011.

13             MR. KEGLEVIC:  Yes.

14             MR. LIEBESMAN:  All right.  So the range there is

15   $28 billion to $34 billion, correct?

16             MR. KEGLEVIC:  Correct.

17             MR. LIEBESMAN:  And EFH's total debt at that time

18   was $31.3 billion, correct?

19             MR. KEGLEVIC:  That's correct.

20             MR. LIEBESMAN:  So EFH concluded that its

21   estimated enterprise value for 2011 was below the value of

22   its debt, correct?

23             MR. KEGLEVIC:  We did in total, correct.

24             MR. LIEBESMAN:  Also as part of this presentation

25   to the board, you advised them on the long range projections

1    for EFH's enterprise value, correct?  The chart, the next

2    chart, Page 111?

3              MR. KEGLEVIC:  Yes.

4              MR. LIEBESMAN:  Can we agree that you concluded

5    that in 2017 EFH's enterprise value would remain below the

6    face value of its consolidated debt?

7              MR. KEGLEVIC:  Yes, absent any other actions

8    associated with the debt.  But at this time I think we were

9    also talking about various things we could do in the

10   liability management program to capture discount and to

11   remediate that situation.

12             MR. LIEBESMAN:  Okay.  And just for the record,

13   LRP means long range plan, correct?

14             MR. KEGLEVIC:  It does.

15             MR. LIEBESMAN:  All right.  I would like to talk

16   to you a little bit about EFH on a standalone basis.  Could

17   you please turn to Exhibit 289 and I'd ask that this not be

18   broadcast, please, 289.

19             MR. KEGLEVIC:  I'm there.

20             MR. LIEBESMAN:  All right.  So this is an email

21   exchange.  This is from Jonathan Smidt and Henry Kravis and

22   George Roberts dated April 1, 2010, correct?

23             MR. KEGLEVIC:  I don't know where you're --

24             THE COURT:  No, that's not what I have here.

25             MR. KEGLEVIC:  I have a board update.

1            MR. LIEBESMAN:  Well, so this -- can this be

2    broadcast on the monitors up on this -- for the judge and

3    the witness only?

4            THE COURT:  No.

5            MR. LIEBESMAN:  No.

6            THE COURT:  (Indiscernible).  Is it -- it's in one

7    of the big binders.

8            MR. LIEBESMAN:  Yeah.

9            THE COURT:  Just bring it to him.  Which exhibit

10   are we talking about?

11           MR. LIEBESMAN:  It's Exhibit 289.

12           THE COURT:  Which committee?

13           MR. LIEBESMAN:  EFH committee.

14           MR. KEGLEVIC:  Isn't it this one, 273?

15           MR. LIEBESMAN:  On your (indiscernible) on the

16   blue ones.  All right, we're good.

17           MR. KEGLEVIC:  I think it's 273 is where it is in

18   my book.

19           MR. LIEBESMAN:  It's (indiscernible).

20           MR. MCKANE:  Your Honor, I'm just going to lodge

21   one objection that he lay a foundation with this witness

22   before asking questions about it.  So, the objection is lack

23   of foundation for him to examine this witness with the

24   documents.

25           THE COURT:  I'm not sure I understand what you

1    mean by lack of foundation in this instance.

2            MC. MCKANE:  In this instance, well, I'll just

3    flag the (indiscernible) take it as it comes.  So I

4    apologize.

5            THE COURT:  Okay.

6            MR. LIEBESMAN:  Mr. Keglevic, you have in front of

7    you a document that's been marked Exhibit 289, correct,

8    finally?

9            MR. KEGLEVIC:  Are you talking about this one?

10   Yes.  This one here is 273.  That's the same thing, but

11   okay.  Got it.

12           MR. LIEBESMAN:  Do you have it there in front of

13   you?

14           MR. KEGLEVIC:  I do.

15           MR. LIEBESMAN:  All right.  This is an email

16   exchange between Jonathan Smidt and Henry Kravis and George

17   Roberts dated April 1, 2010, correct?

18           MR. KEGLEVIC:  That's what it appears to be.

19           MR. LIEBESMAN:  And Mr. (indiscernible) is an EFH

20   board member representing KKR, correct?

21           MR. KEGLEVIC:  He is.

22           MR. LIEBESMAN:  And Mr. Kravis and Mr. Roberts are

23   two of the three main partners of KKR, correct?

24           MR. KEGLEVIC:  They are.

25           MR. LIEBESMAN:  The subject of the email is EFH

1    sum of the parts evaluation.  Do you see that?

2              MR. KEGLEVIC:  I do.

3              MR. LIEBESMAN:  And are you familiar with sum of

4    the parts valuations, generally?

5              MR. KEGLEVIC:  Generally, but I think I was shown

6    this email at my deposition but I have not spent any time

7    understanding what they were doing or what the purpose of

8    this was, so.

9              MR. LIEBESMAN:  Okay.  Well, if you turn to the

10   second page of the email, there's a header for Oncor

11   evaluation.  Mr. (indiscernible) writes in that email, "Here

12   we show the value of the equity stake EFH owns in Oncor and

13   the debt that sits between us and the equity value.  At the

14   current time, there is $1.5 billion to $2.5 billion of debt

15   in excess of an equity value."  Do you see that?

16             MR. KEGLEVIC:  Yes.

17             MR. LIEBESMAN:  In the text?

18             MR. KEGLEVIC:  Yes.

19             MR. LIEBESMAN:  If you look at the next page,

20   there was an attachment, which is the next page.  It's a

21   spreadsheet with EFH core sum of the parts valuation at the

22   top.  Do you see that?

23             MR. KEGLEVIC:  I do.

24             MR. LIEBESMAN:  And do you see that there's a

25   calculation of the Oncor's valuation at the bottom of that

1    chart?

2            MR. KEGLEVIC:  I -- it says Oncor illustrative

3    valuation, yes.

4            MR. LIEBESMAN:  Right.  Do you see that?  And so

5    KKR, as part of their valuation of Oncor starts with Oncor's

6    enterprise value, correct?

7            MR. KEGLEVIC:  Well, I don't know how KKR does

8    their valuation, but.

9            MR. LIEBESMAN:  Right.  But the question is on

10   this valuation that you're looking at, they begin the

11   valuation by having the enterprise value of Oncor.

12           THE COURT:  We don't know what they begin with.  I

13   mean, are you asking him what the paper says?

14           MR. LIEBESMAN:  Yes.

15           THE COURT:  Okay, well.  All right.  But he can't

16   testify as to their methodology.

17           MR. LIEBESMAN:  No, I'm not going to ask him about

18   their methodology, Your Honor.

19           THE COURT:  All right.  You seem to be because you

20   were saying they begin with as if --

21           MR. LIEBESMAN:  I'm sorry.  I mean like underneath

22   the header, the very next thing is, not that they -- not

23   from speaking of a methodology, just the way it's set forth

24   in this document.

25           THE COURT:  Understood.

1          MR. LIEBESMAN:  Underneath the header of Oncor

2     illustrative valuation, the next line item says enterprise

3     value, correct?

4          MR. KEGLEVIC:  The top line under that section

5     says enterprise value.

6          MR. LIEBESMAN:  Right.  And the valuation

7     determines the net debt on the E-side, correct, if you look

8     at the very bottom, the last line item?

9          MR. KEGLEVIC:  Yes.

10          MR. LIEBESMAN:  And can we agree that according to

11     this document, the E-side's net debt exceeds EFH's equity

12     value in Oncor by $1.5 billion to $2.5 billion?

13          MR. KLEINHAUS:  Your Honor, I object on that KKR.

14     We're going to have a KKR witness here on Friday and that

15     witness can discuss this document.  But I don't see how Mr.

16     Keglevic can draw a conclusion like that.

17          MR. LIEBESMAN:  Your Honor, I'm just asking Mr.

18     Keglevic as --

19          THE COURT:  I don't see the point of having him

20     read.  He didn't do this.  The document says what it says.

21     I assume it's going to be put into evidence but what's the

22     point of having Mr. Keglevic read it and agree with your

23     reading of it?

24          MR. LIEBESMAN:  To ask Mr. Keglevic if he agrees

25     that as of April 2010 --

1          THE COURT:  Fair enough.  Okay.  Go ahead and ask

2     that question.

3          MR. LIEBESMAN:  All right.  Mr. Keglevic, isn't it

4     true then that as of April 2010, EFH Corp was insolvent by

5     at least $1.5 billion?

6          MR. KEGLEVIC:  I would have to do my own

7     valuation.  I note as I look at this that there is no

8     replacement cost view associated with Oncor and the above.

9     I don't know where Mr. (indiscernible) got the numbers or

10    what his assumptions were in the calculation.  He certain

11    hasn't taken into consideration any tax attributes of the

12    reason, you know, or other things.  I just can't answer it.

13    I did not do the valuation.  I know the conclusion of KKR's

14    methodology at that point in time was that EFH had a

15    positive stock value and they are a public registrant and

16    they filed that with the Securities and Exchange Commission.

17         So net in total for EFH there was still value at

18    EFH as reported by KKR and I think that since we went

19    through the financial statements I filed, they filed similar

20    financial statements, I know that to be the case.  I don't

21    know how to relate this to that contrary evidence.  I know

22    that we never did a calculation independently that came to

23    the conclusion that EFH on a standalone basis, ignoring

24    TCEH, which I think is the right way to do it from an EFH

25    insolvency standpoint, was insolvent, if that's the

1   question.

2            MR. LIEBESMAN:  Okay.  And you mentioned in your

3   answer about KKR reporting that its shareholder value was

4   positive at this time, April 2010.  You'd agree with me that

5   that's entirely inconsistent with EFH's 10Ks that we just

6   went through

7            MR. KEGLEVIC:  EFH, there's a difference between

8   valuation and historical cost accounting, which is what the

9   10Ks reflect.  Historical cost accountings do not have fair

10  value of the assets and many other infirmities associated

11  with trying to use GAAP financials.

12            If we were using GAAP financials, the E committee

13  would be subject to the shortfall that the T-side has as a

14  claim against EFH and I don't -- I think that would be a

15  very different bankruptcy case if we used the GAAP financial

16  statements.

17            MR. LIEBESMAN:  Please turn to Exhibit 408, Mr.

18  Keglevic.  And here, again, we have a few --

19            MR. KEGLEVIC:  Am I in this book now or?

20            THE COURT:  No, you have --

21            MR. LIEBESMAN:  I'm sorry.

22            THE COURT:  Get rid of that book.

23            MR. LIEBESMAN:  Let me get that out of your way.

24            MR. KEGLEVIC:  Thank you.  I'm happy to keep it

25  here if --

1          THE COURT:  No, no.

2          MR. KEGLEVIC:  Exhibit 408?

3          MR. LIEBESMAN:  Yeah.  So there are several

4     presentations.  If you go in to a presentation about halfway

5     through the exhibit, it's called Preliminary TCEH Valuation.

6          MR. KEGLEVIC:  Yes, sir.  I'm there.

7          MR. LIEBESMAN:  Your Honor, it's like halfway in.

8          THE COURT:  The tab?

9          MR. LIEBESMAN:  Yes, it's hallway in the -- oh,

10    there should be a tab for Your Honor on that page.

11         THE COURT:  Yeah, I got it.  Page 69?

12         MR. LIEBESMAN:  That's correct.

13         THE COURT:  Okay.

14         MR. LIEBESMAN:  So Mr. Keglevic, this is a

15    presentation called Preliminary TCEH Valuation.  It's dated

16    May 10, 2010, correct?

17         MR. KEGLEVIC:  Yes.

18         MR. LIEBESMAN:  In this PowerPoint presentation

19    it's a little bit more than a month after the email from Mr.

20    (indiscernible) that we were just reviewing, correct,

21    Exhibit 289, which was April 2010?

22         MR. KEGLEVIC:  Yes.

23         MR. LIEBESMAN:  All right.  So please turn to the

24    last page of the PowerPoint presentation.  It's a short one.

25    It's Page 5.

1            MR. KEGLEVIC:  I'm there.

2            MR. LIEBESMAN:  Right.  This page is entitled EFH

3    Consolidated Equity Value Sum of the Parts, correct?

4            MR. KEGLEVIC:  Yes.

5            MR. LIEBESMAN:  And can we agree that this

6    PowerPoint shows that on a consolidated basis EFH had a

7    negative equity value in 2010?

8            MR. KEGLEVIC:  That's what that line says but

9    there's also a line that says Oncor equity value is positive

10   in 2010.

11           MR. LIEBESMAN:  That's fine.  But I'm referring to

12   the very last line that's highlighted that says net equity

13   value of EFH --

14           MR. KEGLEVIC:  Yes.

15           MR. LIEBESMAN:  -- $5.877 billion in 2010,

16   correct?

17           MR. KEGLEVIC:  Yes.  That's what it says.

18           MR. LIEBESMAN:  All right.  Thank you.  And can we

19   also agree that the PowerPoint shows that EFH would continue

20   to have a negative equity value through 2014, if you were to

21   follow that line across?  For 2010, 2011, 2012, 2013, 2014

22   for each of those years, would you agree that there's a

23   negative equity value reflected in this chart?

24           MR. KEGLEVIC:  Yes, there is, as there is a

25   positive growing Oncor equity value to EFH on this chart for

1    all years.

2              MR. LIEBESMAN:  I understand.  That's a separate

3    question, Mr. Keglevic.  If the negative TCEH equity value,

4    which is the very first line item on that chart, was removed

5    from the calculations, would you agree that the E-side would

6    still have a negative equity value from every year from 2010

7    through 2014?

8              MR. KEGLEVIC:  I'm sorry, what math do you want me

9    to do?

10             MR. LIEBESMAN:  So you take the very first line,

11   the TCEH equity value to EFH, very first line item.

12             MR. KEGLEVIC:  Yes.

13             MR. LIEBESMAN:  And it's highlighted there on the

14   monitor.  If you were to remove that from the net equity

15   value from the total number at the bottom for each year from

16   2010 to 2014, would you agree that the E-side would still

17   have a negative equity value for every year between 2010 and

18   2014?

19             MR. KEGLEVIC:  I would say the math would show it

20   was negative.

21             MR. LIEBESMAN:  So since for 2010 there is a total

22   negative equity value for EFH, the $5.877 billion and the

23   $1.261 billion of that so negative equity value from TCEH --

24   I'm just basically doing the math -- EFH on a standalone

25   basis has negative equity of $4.616 billion, correct, for

1    2010?

2              MR. KEGLEVIC:  I didn't -- I'll trust your math.

3    I haven't done the math.

4              MR. LIEBESMAN:  Okay.  Please turn to Exhibit 268.

5    Hopefully this is an email dated November 18, 2010.

6              MR. KEGLEVIC:  I'm sorry, what exhibit?

7              MR. LIEBESMAN:  268.

8              THE COURT:  The type on it's real tiny.  It's at

9    the bottom.

10             MR. KEGLEVIC:  Oh, there it is.  It's in a

11   different font.  I have it.

12             MR. LIEBESMAN:  Are you there, Mr. Keglevic?

13             MR. KEGLEVIC:  I am.

14             MR. LIEBESMAN:  So on the second page of this

15   exhibit -- this is a series of emails, correct, in this

16   exhibit?

17             MR. KEGLEVIC:  Appears to be, yes.

18             MR. LIEBESMAN:  And then on the second page in the

19   middle, there's an email from you dated November 18, 2010,

20   correct?

21             MR. KEGLEVIC:  Yes.

22             MR. LIEBESMAN:  And your email concerns Oncor's

23   valuations and EFIH's capacity to take on additional debt

24   generally, correct?  Among other things.

25             MR. KEGLEVIC:  Yes.

1          MR. LIEBESMAN:  All right.  Can we agree that you

2   confirmed in your email that "any TCEH default would cross

3   default EFIH"?

4          MR. KEGLEVIC:  That's what it says, yes.

5          MR. LIEBESMAN:  All right.  That means that a

6   default by the T-side could cause a default on the E-side,

7   correct?

8          MR. KEGLEVIC:  Correct.

9          MR. LIEBESMAN:  And according to your email, EFH's

10  spin analysis indicated that "there won't be equity value at

11  Oncor to be spun until 2017", correct?  It's the next

12  sentence down.

13         MR. KEGLEVIC:  Yes.  I -- it says that but in a

14  spin analysis there's also additional amounts you have to

15  consider like tax and tax that would go with the spin and

16  other assumptions.  So that isn't, to me, dispositive at

17  that point that I believe there was no equity value.  This

18  is talking only equity value under a spin transaction, which

19  I'd have to look at the assumptions under that transaction.

20         MR. LIEBESMAN:  Okay.

21         MR. KEGLEVIC:  So, you know, that's an important

22  describer there that I'd have to look back at what that

23  transaction entailed.

24         MR. LIEBESMAN:  And in the email that we're

25  talking about from you, was sent to certain representatives

1    of the sponsors and some individuals that work underneath

2    you to EFH, correct?

3            MR. KEGLEVIC:  Mm hmm.

4            MR. LIEBESMAN:  And then if you turn to the bottom

5    --

6            THE COURT:  Sorry.  Mr. Keglevic, yes or no, not

7    mm hmm.

8            MR. KEGLEVIC:  I'm sorry.  Can you -- I was trying

9    to read.  He's going quick.

10           MR. LIEBESMAN:  I'm sorry.  The question was to

11   have you confirm that your email that we just talked about

12   is from you to a number of representatives of the sponsors

13   and certain individuals within EFH who report to you,

14   correct?

15           MR. KEGLEVIC:  Yes.

16           MR. LIEBESMAN:  All right.  And among the

17   recipients of your email is Fred Goltz, correct?  It's

18   forwarded to him from Johnathan (indiscernible), right?

19           MR. KEGLEVIC:  Yes.

20           MR. LIEBESMAN:  All right.  So then if you turn to

21   the bottom of the first page of this chain, you see Mr.

22   Goltz responded to Mr. MacDougall?

23           MR. KEGLEVIC:  Yes.

24           MR. LIEBESMAN:  Okay.  Have you ever seen this

25   before?

1            MR. KEGLEVIC:  I don't know if I did.  If I did it

2    might have been shown to me in the deposition but not before

3    that.

4            MR. LIEBESMAN:  Okay.

5            MR. KEGLEVIC:  Obviously it's not addressed to me,

6    so I --

7            MR. LIEBESMAN:  That's right.  So you were cut out

8    of the chain and it's an email from Mr. Goltz at KKR to Mr.

9    MacDougall of TPG, correct?

10           MR. KEGLEVIC:  Yes.

11           MR. LIEBESMAN:  It's the same day of your email,

12   correct?

13           MR. KEGLEVIC:  Yes.

14           MR. LIEBESMAN:  And Mr. Goltz at KKR tells Mr.

15   MacDougall of TPG "We need to put a stop to this now",

16   correct?

17           MR. KEGLEVIC:  Yes, that's what it says.

18           MR. LIEBESMAN:  And then right above that Mr.

19   MacDougall responds the same day, right, "The Full TPG team

20   agrees.  I'm pretty sure that GS agrees.  I don't know why

21   he writes emails like this."  Do you see that?

22           MR. KEGLEVIC:  Yes.

23           MR. LIEBESMAN:  Can we agree that GS in that email

24   refers to Goldman Sachs?

25           MR. KEGLEVIC:  I didn't write it but I would guess

1    that's right, but.

2              MR. LIEBESMAN:  Okay.  After this email exchange

3    between the sponsors on November 18, 2010, were you ever

4    instructed by the sponsors that you should stop writing in

5    emails that EFH had no equity value in Oncor?

6              MR. KEGLEVIC:  No.

7              MR. LIEBESMAN:  Can we agree that in EFH's 2010

8    10K EFH disclosed that TCEH had not passed the solvency

9    test, that the fair value of its assets did not exceed its

10   book value of its liabilities?

11             MR. KEGLEVIC:  I'm sorry.  You're going pretty

12   quick.  Can you reference -- TCEH --?

13             MR. LIEBESMAN:  Turn to Exhibit 758.  We'll do it

14   that way.

15             MR. KEGLEVIC:  Is this the blue tab?

16             MR. LIEBESMAN:  No, there shouldn't be a tab.

17   This is the 10K for 2010.  I'm sorry?  Oh, navy tab.  I'm

18   sorry.  But it is -- the first page shows that it's the Form

19   10K for 2010.

20             MR. KEGLEVIC:  Yeah, just -- I'm looking for the

21   footnote that you're referencing.

22             MR. LIEBESMAN:  Page 20 -- page --

23             THE COURT:  Go ahead, sorry.

24             MR. KEGLEVIC:  Sorry.  I don't see the footnote in

25   this.

1           THE COURT:  Hang on, Mr. Keglevic.  Let him do the

2    work.  He'll find it for you.

3           MR. LIEBESMAN:  I'll tell you, Mr. Keglevic, why

4    don't you turn to the very first exhibit in your book?  It's

5    your deposition.  It's Exhibit 692 of Page 201.  At the

6    bottom of Page 201, let me know when you're here.

7           MR. KEGLEVIC:  Yes.

8           MR. LIEBESMAN:  All right.  Can -- if you look at

9    the testimony at the bottom of Page 201 to the top of Page

10   202, does that refresh your recollection bout the question

11   that I had asked about disclosures in EFH's 2010 10K about

12   TCEH not passing the solvency test?

13          MR. KEGLEVIC:  Yeah, on a balance sheet basis, I

14   believe that to be correct.  I was just hoping to see the

15   words that you were -- if you're going to reference me

16   there.  But, yes, that is my recollection.

17          MR. LIEBESMAN:  Okay.  Let me ask you a few

18   questions about Oncor, Mr. Keglevic.  Oncor is a really

19   fenced entity, correct?

20          MR. KEGLEVIC:  It is.

21          MR. LIEBESMAN:  And the majority of Oncor's

22   directors are independent from EFH Corp and TCEH, correct?

23          MR. KEGLEVIC:  They are.

24          MR. LIEBESMAN:  Isn't it true that EFH did not

25   have the power to control the activities deemed most

Page 160

1    significant to Oncor's economic performance?

2            MR. KEGLEVIC:  I don't want to debate most

3    significant but there were many significant Oncor activities

4    that we could not control.  You know, we had some control

5    and I guess, you know -- but, yeah, in many significant

6    fashions we could not dictate to Oncor what their operating

7    performance certainly would be.

8            MR. LIEBESMAN:  All right.  Please turn to Exhibit

9    758.  It's the 2010 10K that we were looking at a little bit

10   earlier on Page 130.

11           MR. KEGLEVIC:  Okay.

12           MR. LIEBESMAN:  And it's on the screen if you

13   like, but if you look at Page 130, at the end of the third

14   full paragraph, it says "We concluded for purposes of

15   applying the amended accounting standards that EFH Corp does

16   not have the power to control the activities deemed most

17   significant to Oncor Holdings' economic performance."  Do

18   you see that?

19           MR. KEGLEVIC:  Yes.

20           MR. LIEBESMAN:  Sir, and you have no reason to

21   dispute what is in this 10K, correct?

22           MR. KEGLEVIC:  No.  The only question I was having

23   was the use of the word most.  Certainly it could be most.

24   There could be a transaction that could cause the most to be

25   modified.  But I'm comfortable from the accounting

1    standpoint, it's more of an operational standpoint in terms

2    of when to file rate cases, et cetera.  So they're certainly

3    substantial and probably most.  Most is just a strong word.

4            MR. LIEBESMAN:  But it's a word that EFH put in --

5            MR. KEGLEVIC:  We did.

6            MR. LIEBESMAN:  Okay.

7            MR. KEGLEVIC:  We did.

8            MR. LIEBESMAN:  Okay.  If you stay on that page

9    and look at the next paragraph, isn't it true that EFH

10   concluded that it could not unilaterally dissolve, liquidate

11   or force Oncor into bankruptcy?

12           MR. KEGLEVIC:  Yes.

13           MR. LIEBESMAN:  Isn't it true that EFH concluded

14   that it could not amend Oncor's ring-fencing measures

15   contained in the underlying governing documents?

16           MR. KEGLEVIC:  Yes.

17           MR. LIEBESMAN:  And finally, isn't it also true

18   that EFH concluded that it could not control Oncor's ability

19   to pay dividends to EFIH?

20           MR. KEGLEVIC:  That's true

21           MR. LIEBESMAN:  And you discussed a little bit in

22   your direct examination a submission that was made to the

23   Internal Revenue Service, correct, relating to solvency?

24           MR. KEGLEVIC:  Yes.

25           MR. LIEBESMAN:  Can we agree that your declaration

1    in support of a motion of the Debtors to approve the

2    settlement, which is dated October 30, 2015 and it was in

3    your written direct in the binder that Mr. McKane gave you

4    yesterday, there was only one substantive paragraph relating

5    to EFH's solvency?

6              MR. KEGLEVIC:  Can you reference me to it?

7              MR. LIEBESMAN:  Would you like to look at it?

8              MR. KEGLEVIC:  Yes.

9              MR. LIEBESMAN:  Yeah.  Your Honor, do you have

10   that binder in front of you?  It's the --

11             THE COURT:  I lost track.  I'm sorry.

12             MR. LIEBESMAN:  Yeah, I know.  There are so many

13   binders.

14             THE COURT:  What am I looking at?

15             MR. LIEBERMAN:  We're looking at Mr. Keglevic's

16   written direct, basically, that was in the binder that was

17   provided by Mr. McKane yesterday.

18             THE COURT:  Ah, yes.

19             MR. LIEBERMAN:  It's on the screen, too, Your

20   Honor.  It's all going to be one question, one paragraph,

21   so.

22             THE COURT:  I'll just look at the screen, go

23   ahead.

24             MR. LIEBERMAN:  Do you have it there in front of

25   you, Mr. Keglevic?

1           MR. KEGLEVIC:  Yes.

2           MR. LIEBERMAN:  So directing your attention to

3   Paragraph 130--

4           THE COURT:  Five.

5           MR. LIEBERMAN:  135, I'm sorry, yes.

6           MR. KEGLEVIC:  I'm there.

7           MR. LIEBERMAN:  Can we agree that this is this

8   only paragraph in this entire declaration that deals with

9   EFH's solvency?

10           MR. KEGLEVIC:  Yes, I believe that to be the case.

11           MR. LIEBERMAN:  All right.  In your declaration,

12   you wrote that you understand that EFH, and "understand" I'm

13   putting in quotes.  You understand that EFH represented to

14   the IRS that in 2012 it was insolvent, correct?  I'm sorry,

15   that it was solvent.

16           MR. KEGLEVIC:  Yes, that it was solvent.

17           MR. LIEBERMAN:  And can we agree that you

18   personally did not make any representations to the IRS in

19   2012 that EFH was solvent.

20           MR. KEGLEVIC:  I did not personally, but people

21   under my supervision did.

22           MR. LIEBERMAN:  And can we agree that the document

23   that you cited in Paragraph 135 in the footnote does not

24   contain any calculations of EFH's alleged solvency?

25           MR. KEGLEVIC:  No, it does not.

1          MR. LIEBERMAN:  All right.  And can we agree that

2     in making representations to the IRS in connection with

3     seeking a private letter ruling, EFH did not retain any

4     third-party valuation firm to prepare a solvency analysis of

5     EFH's alleged solvency in 2012?

6          MR. KEGLEVIC:  I'd have to refresh my memory as to

7     whether or not we were supported by outside first.  Also, I

8     don't think was a private letter ruling.  I think actually

9     it was -- we filed forms with the IRS.

10          MR. LIEBERMAN:  You mentioned earlier in your

11     direct, Duff & Phelps, correct?

12          MR. KEGLEVIC:  I may have.  I don't recall if I

13     did this morning or not.

14          MR. LIEBERMAN:  Duff & Phelps did not perform

15     insolvency analysis for EFH in connection with his

16     application to the IRS, correct?

17          MR. KEGLEVIC:  I indicated that I can't recall if

18     we had them do that or not.  This certainly says EFH's

19     internal analysis, I just can't recall.

20          MR. LIEBERMAN:  You were sure in your direct

21     examination, exhibit DX707, it's in your witness binder.

22          MR. KEGLEVIC:  Yes.

23          MR. LIEBERMAN:  Was this a solvency analysis that

24     was performed by Duff & Phelps for EFH as of December 1,

25     2012?

1              MR. KEGLEVIC:  No, this is not a solvency

2     analysis.

3              MR. LIEBERMAN:  Going back to the binder that I

4     gave you -- actually you know what, let's stick with Mr.

5     McKane's binder that he gave you, the Paul Keglevic witness

6     binder, and go to exhibit DX708.  So, PowerPoint

7     presentation.

8              MR. KEGLEVIC:  I'm there.

9              MR. LIEBERMAN:  That they did February 8, 2013,

10    correct?

11             MR. KEGLEVIC:  Yes.

12             MR. LIEBERMAN:  And it's entitled "EFH Net Value."

13             MR. KEGLEVIC:  Yes.

14             MR. LIEBERMAN:  This document was provided to the

15    IRS, correct?

16             MR. KEGLEVIC:  I don't know what went to the IRS

17    in the submission.

18             MR. LIEBERMAN:  Okay.  If you turn the second page

19    of the presentation, it says, "Oncor Net Value" at the top.

20             MR. KEGLEVIC:  Yes.

21             MR. LIEBERMAN:  Isn't it correct that the Oncor

22    Enterprise Value, the first line item, includes a 10 percent

23    control premium?

24             MR. KEGLEVIC:  I'd have to look back into the

25    buildup of that number.

1          MR. LIEBERMAN:  (Indiscernible) fully agree that

2     this presentation is certainly not a full-fledged solvency

3     analyses, correct?

4          MR. KEGLEVIC:  No, this not a full -- I wouldn't

5     characterize it as such.

6          MR. LIEBERMAN:  All right.  Now let's talk a

7     little bit about the amend and extend transactions.  You

8     talked about it in your direct this morning.  As a result of

9     the 2007 LBO, the Debtors had approximately $36 billion in

10    debt, correct?

11         MR. KEGLEVIC:  It was slightly more than that, but

12    okay.

13         MR. LIEBERMAN:  Well, so let's go back to --

14         MR. KEGLEVIC:  I didn't come on board until '08.

15    It might have been lower before the end of the year, but

16    somewhere in that area code.

17         MR. LIEBERMAN:  Why don't you turn to Exhibit 355,

18    Mr. Keglevic, in the binder that I gave you.

19         MR. KEGLEVIC:  Yes, I see it on the screen.

20         MR. LIEBERMAN:  All right, this is your

21    declaration as part of the first-day filings, correct?

22         MR. KEGLEVIC:  Okay, I see it.

23         MR. LIEBERMAN:  Can you go to Paragraph 10?

24         MR. KEGLEVIC:  Yes, I see it.

25         MR. LIEBERMAN:  Can we agree that the Debtors had

1    approximately $36 billion in debt as a result of the LBL.

2             MR. KEGLEVIC:  Yes, that's what it says,

3    immediately following the transaction.

4             MR. LIEBERMAN:  Correct.  And 7.2 billion of that

5    debt was on the E side, correct?

6             MR. KEGLEVIC:  That's what it says, yes.

7             MR. LIEBERMAN:  And none of the original E side

8    debt was secured, correct?

9             MR. KEGLEVIC:  None of it had lien.  Some of it

10   was guaranteed.

11            MR. LIEBERMAN:  In October 2009, EFH initiated a

12   liability management program to deal with EFH's debt burden,

13   correct?

14            MR. KEGLEVIC:  Correct.

15            MR. LIEBERMAN:  And through that liability

16   management program, EFH (indiscernible) extended over 25

17   billion of its debt securities, right?

18            MR. KEGLEVIC:  Sounds right.

19            MR. LIEBERMAN:  Well, let's turn to Page 148,

20   Paragraph 148 of that same document.

21            MR. KEGLEVIC:  That's what it says?

22            MR. LIEBERMAN:  First sentence, EFH was amended

23   and extended partially 25.7 billion of debt maturities, so

24   2017 to 2021.  Isn't that what it says?

25            MR. KEGLEVIC:  That's what it says.

1              MR. LIEBERMAN:  EFH undertook at least some of

2      these transactions to avoid triggering an event of default,

3      correct?

4              MR. KEGLEVIC:  Yes, the majority of that number

5      would be the TCEH first lien debt extension.

6              MR. LIEBERMAN:  And EFH paid the sponsors more

7      than 66 million in fees in connection with the various

8      amended and extended transactions, correct?

9              MR. SHORE:  Objection to form.  Now we got a

10     problem, because the witness is referring to EFH, then, as

11     TCEH debt, and so I think we need to be specific about who's

12     paying.  So I think there's a problem, you either have to

13     say the Debtor's, or EFH corporation, because I think the

14     transcript's going to get muddled, otherwise.

15             THE COURT:  All right, let's try to be specific.

16             MR. LIEBERMAN:  Well, let's say that first of all,

17     the Debtors collectively, over the course of the liability

18     management program, paid the sponsors approximately $66

19     million in fees, correct?

20             MR. KEGLEVIC:  There was an exhibit to the case

21     that outlined the fees.  I don't have it in front of me.

22     I'm happy to look at it.

23             MR. LIEBERMAN:  Are you referring to the Carter

24     Declaration?

25             MR. KEGLEVIC:  I was referring the demonstrative,

1    as part--

2              THE COURT:  What is this?  Yeah, this is sort of -

3    - what is this?  Is it from an exhibit?

4              MR. LIEBERMAN:  Yeah, it is, Your Honor.  It's

5    attached to the declaration of Mr. Lee's, at Exhibit Q,

6    filed October 30, 2015.  And it's exhibit 329 in our book.

7              THE COURT:  All right, so we're E side Exhibit

8    329?

9              MR. LIEBERMAN:  Yes.

10             THE COURT:  Got it, now I know what it is.  Fair

11   enough.  I just -- all right, just I wanted the record to be

12   clear.  So we're looking at E Exhibit 329.

13             MR. LIEBERMAN:  Yes, yes Your Honor.

14             THE COURT:  All right, do you want to ask him

15   about it?

16             MR. LIEBERMAN:  So the question, Mr. Keglevic,

17   was, isn't it true that the EFH, collectively, paid the

18   sponsors more than 66 million in fees in connection with the

19   various amend and extend transactions from 2009 to 2013.

20             MR. KEGLEVIC:  I've not seen this exhibit before.

21   The numbers seem in the ballpark.  I know that there was a

22   demonstrative that was used yesterday, that listed payments

23   by year, also who paid it.  I'd be comfortable answering off

24   of that, but I've never seen this exhibit, it's not our

25   exhibit.

1              MR. LIEBERMAN:  Okay.  You may put this exhibit

2       aside, then, Mr. Keglevic.  Can we agree that EFH paid in

3       excess of $100 million in incentive fees to bondholders to

4       close on various liability management transactions?

5              MR. KEGLEVIC:  I'm sorry, what was the number?

6       100 million?

7              MR. LIEBERMAN:  In excess of 100 million.

8              MR. KEGLEVIC:  We paid -- yes, we paid in excess

9       of 100 million to bondholders in connection with the

10      liability management program.

11             MR. LIEBERMAN:  Okay.  And for example, EFH paid

12      400 basis points to noteholders in connection with the April

13      2011 amend and extend, correct?

14             Mr. SHORE:  Objection.  Now we got the same

15      problem.  I think the witness and the questioning attorney

16      are talking differently.  He said EFH, and then the witness

17      came back and said "We paid."  I think there needs to be

18      some specificity, particular with respect to the 2011 amend

19      and extend, which is going on down at TCEH.

20             THE COURT:  All right, let's try to be specific.

21      So when you say we, you mean the Debtors?

22             MR. LIEBERMAN:  The Debtors, yes.

23             THE COURT:  I was asking Mr. Keglevic.

24             MR. KEGLEVIC:  The question was general, and it

25      included all extensions, and was about EFH, so I said yes to

1    all Debtors that paid more than $100 million in connection

2    with the liability management program.

3              So I was taking the view of all Debtors.  If it's

4    the 2011 amend and extend, that was paid specifically by

5    TCEH, and I'm sorry, I just don't have the absolute numbers

6    we paid, but we did pay a fee to the holders who consented

7    to extend their maturities at that date.  I just don't have

8    the exact numbers in front of me.

9              MR. LIEBERMAN:  Okay, thank you.  Isn't it true

10   that the liability management program, the E side of the EFH

11   spent in excess of $200 million to purchase TCEH debt?

12             MR. KEGLEVIC:  They bought face value of TCEH

13   unsecured debt of 267, and I think 19 million face value of

14   TCEH first lien.  But I don't believe that our purchase

15   price was -- that we bought it on the market at whatever the

16   market value was, which was substantially less than face.

17             MR. LIEBERMAN:  But in excess of 200 million,

18   correct?

19             MR. KEGLEVIC:  I don't have those numbers in front

20   of me, that was a transaction we did a long time ago.

21             MR. LIEBERMAN:  Okay.  And as of the petition

22   date, the E Side owned approximately 363 million worth of

23   TCEH debt, correct?

24             MR. KEGLEVIC:  That sounds about right.

25             MR. LIEBERMAN:  And as of the petition date, EFH

1    Corp held approximately 284 million of TCEH unsecured debt,

2    correct?

3              MR. KEGLEVIC:  Yes.

4              MR. LIEBERMAN:  And can we agree that as of the

5    petition date, EFIH held approximately 79 million of TCEH

6    unsecured debt?

7              MR. KEGLEVIC:  Yes, that's correct.

8              MR. LIEBERMAN:  All right, and can we also agree

9    that as part of the liability management program, the E Side

10   exchanged unsecured T Side debt for secured E Side debt?

11             MR. KEGLEVIC:  I'd have to see the specific

12   transaction and amounts to remember.  We did -- like I said,

13   $40 million of transactions over this timeframe.

14             MR. LIEBERMAN:  But without regard to an amount,

15   Mr. Keglevic, do you know that as a part of the liability

16   management program, the E Side exchanged unsecured T Side

17   debt for secured E Side debt?

18             MR. KEGLEVIC:  I think we did.  I think it was a

19   relatively small amount.

20             MR. LIEBERMAN:  All right.  Can we agree that

21   despite the liability management program, EFH's total debt

22   grew to approximately 49.7 billion by the petition date --?

23             THE COURT:  You mean the Debtors?

24             MR. LIEBERMAN:  The Debtors.

25             MR. KEGLEVIC:  The amount of debt grew from the

Page 173

1   LBO, yes.

2           MR. LIEBERMAN:  And it grew to approximately 49.7

3   billion, correct, by the petition date?

4           MR. KEGLEVIC:  Grossed out, that's probably right

5   correct?

6           MR. LIEBERMAN:  And can we also agree that despite

7   the liability management program, and all of the fees paid

8   to the sponsors, the E Side's liabilities increased as well?

9           MR. KEGLEVIC:  I'd have to look back exactly at

10  the E Side debt.  We did capture discount on the E Side, but

11  we also added debt, so I'd have to look at the numbers.  I

12  don't recall the relationship.

13          MR. LIEBERMAN:  Could you turn to Exhibit 355,

14  please?  It's your declaration, and Paragraph 82, which is

15  on Page 37?

16          MR. KEGLEVIC:  I'm sorry, once again?  Turn to

17  page?

18          MR. LIEBERMAN:  Page 37, it's Paragraph 82.  It's

19  also highlighted on the monitor in front of you.

20          MR. KEGLEVIC:  Yes, got it.

21          MR. LIEBERMAN:  And in your declaration there, was

22  filed Aril 29th, 2014, you wrote, "As of the petition date,

23  EFH Corp and EFIH had an outstanding funded indebtedness of

24  approximately 1.929 billion at EFH Corp and approximately

25  7.7 billion at EFIH, as summarized in the following table."

1    And then there's a table that follows, correct?

2              MR. KEGLEVIC:  Yes.

3              MR. LIEBERMAN:  Would you agree that without the

4    amend and extend transactions, the Debtors would have

5    defaulted on their obligations?

6              MR. KEGLEVIC:  Yes, I think the maintenance

7    covenant, we would have violated that had we not done the

8    amend and extend.

9              MR. LIEBERMAN:  One of the purposes of the amend

10   and extend transactions was to deal with the claims of

11   Aurelius Capital Management that EFH was in default,

12   correct?

13             MR. KEGLEVIC:  It was a side benefit of doing the

14   deal, but the driving part of the deal was the risk

15   associated with the maintenance covenant, and buying time

16   for gas prices to recover.

17             But as part of that, and once we got consent, and

18   the Aurelius situation came up, at that point we were

19   claiming that the intercompany loans were not done at arm's

20   length transaction, so we took the opportunity to throw that

21   in, but it was certainly not a driving element of the

22   transaction.

23             MR. LIEBERMAN:  All right.  Well on your direct

24   examination this morning, Mr. Keglevic, you testified about

25   the impact of shale, the national gas prices, correct?

1              MR. KEGLEVIC:  Correct.

2              MR. LIEBERMAN:  All right.  And you testified that

3     you thought the dip in the national gas prices was going to

4     be temporary, correct?

5              MR. KEGLEVIC:  I think that's a

6     mischaracterization of the testimony.  I said we expected

7     power prices to recover, and we did not have a full

8     understanding of the impact of shale gas, and what shale gas

9     could do to those prices.

10             So there was uncertainty associated with the

11    amount of the supply, the cost to extract the supply,

12    environmental impacts, et cetera.  So until we knew shale

13    gas was real supply and what the cost was, we still thought

14    power prices had a chance to recover.  That's about best I

15    can do to re-characterize what I attempted to say this

16    morning.

17             MR. LIEBERMAN:  That's fine.  I don't see much of

18    a difference, but that's fine.  The sponsors have vast

19    knowledge and expertise in the oil and gas industry,

20    correct?

21             MR. KEGLEVIC:  Correct.

22             MR. LIEBERMAN:  And the sponsors had access to

23    vast research concerning the oil and gas industry, correct?

24             MR. KEGLEVIC:  Well, I don't know if I'd

25    characterize it as vast, but they certainly had industry

1     expertise and points of view.  And in fact, were making

2     investments at that point in time.

3               MR. LIEBERMAN:  The sponsors were.

4               MR. KEGLEVIC:  The sponsors were.

5               MR. LIEBERMAN:  Absolutely right.  And that they

6     were making investments in shale companies, correct?

7               MR. KEGLEVIC:  You'd have to talk to them

8     specifically, but I think there were some investments in

9     shale companies that they were making.

10              MR. LIEBERMAN:  And one of them is before Judge

11    Sontchi from just a few months ago, correct?

12              MR. KEGLEVIC:  I--

13              MR. LIEBERMAN:  You don't know?

14              MR. KEGLEVIC:  What are you referring to?

15              MR. LIEBERMAN:  You ever heard of a company called

16    Samson resources?

17              MR. KEGLEVIC:  I've heard of them.

18              MR. LIEBERMAN:  Are you aware that that's also a

19    KKR-led LBO?

20              MR. KEGLEVIC:  That's my understanding, yes.

21              MR. LIEBERMAN:  You understood that that company

22    is bankruptcy in this court as of --

23              THE COURT:  What is the relevancy of Samson

24    Resources?

25              MR. LIEBERMAN:  Right, Your Honor, that's fine,

1    Your Honor, that's fine.  Mr. Keglevic brought up the fact

2    the sponsors were invested in other companies, so.

3              THE COURT:  Actually you did.

4              MR. KEGLEVIC:  You did.

5              THE COURT:  To be fair.

6              MR. LIEBERMAN:  Your Honor, the question was

7    whether they had vast research concerning oil and gas

8    industry.

9              MR. KEGLEVIC:  I believe they have expertise, I

10   just don't know if vast is a description I don't want to put

11   on it.

12             MR. LIEBERMAN:  Well, the sponsors also thought

13   that the national gas prices were going to rise at some

14   point.

15             MR. MCKANE:  I object.  I'm going to object that

16   he's not in a position to illustrate or lay a substantial

17   foundation as to say what any one of the sponsors would say,

18   let alone all of them.  And with two of them coming to

19   testify, I'm not sure of the relevance of having Mr.

20   Keglevic to try to get into their heads.

21             MR. LIEBERMAN:  Well, Your Honor, the sponsors and

22   Mr. Keglevic were having regular discussions.  I'm happy to

23   rephrase this to refer solely to the sponsor directors, so

24   we're talking about board members having an opinion, if that

25   would be better.

1          So Mr. Keglevic, limit this to the sponsor

2   directors on the EFH board of directors.  Did those sponsor

3   directors have an opinion about whether about the natural

4   gas prices was going to rise at some point?

5          MR. KLEINHAUS:  Your Honor, I object.  It's one

6   thing to ask him if it was conveyed, or an objective fact

7   about what happened at a meeting, but I think these

8   questions are still in the realm of what was in their head.

9          THE COURT:  Yeah, limit yourself to what they

10  expressed to your, whether in writing, or orally, if any,

11  about their belie, you can testify to that.

12          MR. KEGLEVIC:  Well, certainly the forward power

13  curves at that point in time dictated that power prices

14  would improve.  Those were the external factors.

15          Now, it doesn't have to be only on gas, but I

16  believe at that point in time natural gas prices, the

17  forecast had indicated they would improve, as did heat rate,

18  and there was also the opportunity in Texas, for a long

19  time, there was discussion about capacity markets, which

20  would have given a fixed element of revenue that were not

21  energy-related, based on the availability of our capacity to

22  perform.

23          So I don't think we ever looked at any individual

24  element.  We looked at all the elements in total, and at the

25  end of the day what drives revenue and cash flow is overall

1    power prices.  But I believe at that point in time,

2    generally speaking, the market and all the forward curves

3    for all the elements indicated they were likely to recover.

4              MR. LIEBERMAN:  That was speculative, correct?

5              MR. KEGLEVIC:  That was the power markets, the

6    quotes that were out and available to trade upon.  You can

7    transact on them?

8              MR. LIEBERMAN:  So it's all speculative, isn't it?

9              MR. KEGLEVIC:  Well, I could buy one today, so

10   it's not speculative, it's a transaction you can buy.  You

11   can buy a future gas price, you can buy a future power

12   price.  They could absolutely be wrong, and you have risk

13   and reward associated with that, but they were translatable.

14             MR. LIEBERMAN:  Do you recall using the word

15   "vetting" during your direct examination?

16             MR. KEGLEVIC:  I don't know if I did or not.

17             MR. LIEBERMAN:  Do you remember using the phrase

18   "unforced error"?

19             MR. KEGLEVIC:  That's a term that I know Warren

20   Buffet used with respect to his investment in EFH, and

21   that's why I used it.

22             MR. LIEBERMAN:  That why you use it?  Do you

23   agree?

24             MR. KEGLEVIC:  Well, I think any of us wish we had

25   more foresight than we had, and it's very easy to look back

1    now, in hindsight, and understand that that was not

2    something that would transpire.  But at the point, I think

3    there are a bunch of very sophisticated financial investors

4    that believed what we believed.

5              MR. LIEBERMAN:  The amend and extends were

6    approved by the board, correct?

7              MR. KEGLEVIC:  They were.

8              THE COURT:  Let's be specific.

9              MR. KEGLEVIC:  The TCEH board.

10             MR. LIEBERMAN:  The EFH corporate board.

11             MR. KEGLEVIC:  I think they were approved by both.

12             MR. LIEBERMAN:  And the EFH corporate board was

13    controlled by the sponsors, correct?

14             MR. KEGLEVIC:  The sponsors are members of the

15    board.  They had the majority membership, and they

16    represented vast majority of the equity.  So in that

17    respect, I guess you could say they controlled, but they

18    certainly did not dictate votes, or control the independent

19    members, or their votes.  I just don't know how you mean

20    control.

21             MR. LIEBERMAN:  Were you a party to every

22    conversation the sponsor directors had with the other

23    directors?

24             MR. KEGLEVIC:  To the extent in the meetings, and

25    behind the scenes, I've had many discussions, but not every

1    one.

2              MR. LIEBERMAN:  And isn't it true that the sponsor

3    directors had meetings about EFH's financials, the EFH, the

4    Debtor's financials, without including you.

5              MR. KEGLEVIC:  I don't know if they did or not.

6    If I wasn't included, how would I know that?

7              MR. LIEBERMAN:  Well, you'd hear somebody say,

8    "Hey, Mr. Keglevic, we had a meeting and we decided this."

9              MR. KEGLEVIC:  I actually can't recall a situation

10   where they told me they had a meeting about EFH financials

11   and I wasn't included.

12             MR. LIEBERMAN:  Can we agree that EFH retained

13   Kirkland & Ellis in June 2012 for the purposes of evaluating

14   a potential bankruptcy for the Debtors?

15             MR. KEGLEVIC:  yes.

16             MR. LIEBERMAN:  All right.  And can we agree that

17   EFH also retained other restructuring professionals at the

18   same time?

19             THE COURT:  You mean the Debtors.

20             MR. LIEBERMAN:  The Debtors, I'm sorry, Your

21   Honor.

22             MR. KEGLEVIC:  The Debtors engaged Kirkland and

23   Evercore, I believe, almost contemporaneously.

24             MR. LIEBERMAN:  And can we agree that the Debtors

25   called the bankruptcy planning project, Project Olympus?

1            MR. KEGLEVIC:  Yes, that was the initial name.

2            MR. LIEBERMAN:  Can you turn to Exhibit 474,

3      please?  And Exhibit 474 is a PowerPoint presentation

4      entitled, "Project Olympus Restructuring Issues and Status

5      Update", correct?

6            MR. KEGLEVIC:  Yes.

7            MR. LIEBERMAN:  And is dated July 27, 2012?

8            MR. KEGLEVIC:  Yes.

9            MR. LIEBERMAN:  Could you turn to Page 48 and 49

10     of the presentation?  I believe they're tabbed for you.

11           MR. KEGLEVIC:  I'm there.

12           MR. LIEBERMAN:  So on page 48, the presentation

13     includes slides considered T Side-only bankruptcies.  That's

14     scenarios 1A and 1B, which is on the next page, isn't that

15     correct?

16           MR. KEGLEVIC:  Yes.

17           MR. LIEBERMAN:  And on the next two pages, pages

18     50 and 51, shows the consideration of a bankruptcy by the T

19     Side and E Side entities, except Oncor.  That's 2A and 2B,

20     correct?

21           MR. KEGLEVIC:  Yes.

22           MR. LIEBERMAN:  Okay.  You can put that aside.

23     I'd like to ask you a few questions about D&O insurance, Mr.

24     Keglevic.  Can we agree that prior to the Debtors filing

25     bankruptcy the board ensured that D&O insurance would exist

1    to cover the directors and officers in case of a claim being

2    brought against them?

3              MR. KEGLEVIC:  We've had, since I've been with the

4    company D&O policy that covered all directors and officers,

5    including the sponsors.

6              MR. LIEBERMAN:  Okay.  Do you recall what the

7    amount of the coverage was for the officers, the directors

8    and the Debtors as of the filing of the petition?

9              MR. KEGLEVIC:  I believe in total it was $200 and

10   -- I can't recall if it was $220 or $250 in total.  And the

11   (indiscernible) piece I think was about half of that.

12             MR. LIEBERMAN:  Is it your understanding that the

13   officers and directors as of today remain covered for claims

14   brought against them in their official capacity?

15             MR. KEGLEVIC:  Yes.

16             MR. LIEBERMAN:  I'm sorry.

17             MR. KEGLEVIC:  Yes.

18             THE COURT:  And I'm sorry, just so the record's

19   clear, you said $250.  You meant million, correct?

20             MR. KEGLEVIC:  I did mean million, yes sir.

21             THE COURT:  Okay.

22             MR. LIEBERMAN:  Mr. Keglevic, can we agree that

23   you attended board meetings of EFH Corp. where the board

24   discussed the statute of limitations in connections with the

25   potential bankruptcy filing?

1          MR. MCKANE:  Objection, vague.  I think what he's

2     asking about is whether to file for bankruptcy so as to

3     preserve the statute of limitations as it relates to

4     (indiscernible).  But there is no statute of limitations for

5     (indiscernible) bankruptcy.

6          MR. LIEBERMAN:  That's not what I'm referring to,

7     Your Honor.  That's not what I'm referring to but the

8     question was simply were you -- did you attend any board

9     meetings where there was a discussion about the statute of

10    limitations in connection to the filing of the bankruptcy?

11         THE COURT:  I don't know what that means.

12         MR. LIEBERMAN:  Well, was there any discussion of

13    the statute of limitations about anything in connection with

14    the filing of the bankruptcy petition?  That's what the

15    question is.

16         THE COURT:  So in the context of -- I still don't

17    understand.  I'm not trying to be stupid but it's who I am.

18    I -- do you mean in the context of deciding whether or not

19    to file bankruptcy did people talk about the expiration of

20    statute of limitations?  Is that what you mean?

21         MR. LIEBERMAN:  Yes.

22         THE COURT:  Okay.  Mr. Keglevic?

23         MR. KEGLEVIC:  The -- I leave most of that stuff

24    to Ms. Dore since it's largely a legal matter.  But the only

25    one I can think of was the one Mr. McKane referenced, the

1    discussion around the LBO and the potential statue or

2    limitations there.

3              MR. LIEBERMAN:  Okay.  Please turn to Exhibit 633.

4    This is a presentation of the board of directors of EFH

5    Corp, correct?

6              MR. KEGLEVIC:  Yes.

7              MR. LIEBERMAN:  And it's dated February 27, 2014?

8              MR. KEGLEVIC:  Yes.

9              MR. LIEBERMAN:  And turning to the second page,

10   can we agree that this presentation relates to EFH Corp's

11   preparation for the filing of bankruptcy if you look at

12   their presentation outline, what topics are to be discussed?

13             MR. KEGLEVIC:  I think related to the Debtor's

14   preparedness, yes.

15             MR. LIEBERMAN:  Yeah, okay.  Now if you turn to

16   Page 5 of the presentation, it's a page entitled Situation

17   Overview.

18             MR. KEGLEVIC:  Yes.

19             MR. LIEBERMAN:  And just below that it says, "Each

20   of TCEH, EFCH, EFH and EFIH, collectively The Company, will

21   have to consider whether to file for Chapter 11 at the end

22   of the first quarter of 2014".  Isn't that what that says?

23             MR. KEGLEVIC:  Yes.

24             MR. LIEBERMAN:  And can we agree that the board of

25   EFH Corp was concerned that a filing for bankruptcy by the

1    company as defined in what we just read in the first quarter

2    of 2014 could expose a certain debt exchange transaction to

3    a litigation?

4             MR. KEGLEVIC:  I do not recall that.  I don't know

5    what debt exchange transaction you're talking about.

6             MR. LIEBERMAN:  Let's turn back to Page 2 of the

7    presentation.

8             MR. KEGLEVIC:  The reason the end of the quarter

9    in my mind recollection was relevant is because we had some

10   interest payments on April 1st and so every -- we actually

11   started this process in November 2013 or October 31st, 2013

12   because we had an interest payment due on November 1st and

13   so the board was in a routine before we made an interest

14   payment to make a determination whether we should file

15   before we made that interest payment or, in the case of the

16   November 1st, which I remember we did pay the TCEH unsecured

17   interest because we thought it was valuable and it was okay

18   to pay that because we thought that was an opportunity to

19   get a consensual deal that we had value for the estate.

20            So that's in my mind the reason for that date.  I

21   don't recall any other, any specific transaction tied to

22   that date.

23            MR. LIEBERMAN:  Okay.  Just do me a favor, Mr.

24   Keglevic, and turn back to Page 2 of this exhibit, the

25   presentation outline.

1              MR. KEGLEVIC:  Sure.

2              MR. LIEBERMAN:  Doesn't the fifth bullet point

3      there say March 2010 EFH, EFIH debt exchange - statute of

4      limitations expiration?

5              MR. KEGLEVIC:  It sure does.  I don't recall the

6      discussion around that item.

7              MR. LIEBERMAN:  Can we agree that the statute of

8      limitations bullet point that I just read refers to the

9      impact of the filing date on a potential claim arising out

10     of the transaction referenced in that bullet point?

11             MR. KEGLEVIC:  I don't have any recollection of

12     that specific bullet, so I can't answer that question.

13             MR. LIEBERMAN:  You testified under direct

14     examination about all the investigations that were performed

15     on whether or not there are any breaches of fiduciary duty

16     and that there's a determination apparently that there was

17     no such concern of there being any type of liability.  Do

18     you recall that testimony?

19             MR. KEGLEVIC:  Yes.

20             MR. LIEBERMAN:  If after all the supposed

21     investigations into potential claims against the Ds and So,

22     and you were so confident that there were no valuable claims

23     to be asserted, why would the board consider a statute of

24     limitations with respect to the filing of the bankruptcy

25     petition?

1          MR. KEGLEVIC:  Once again, I don't recall the

2     discussion of that item at the board meeting.

3          MR. LIEBERMAN:  Can we agree that the Debtors have

4     significant net operating losses?

5          MR. KEGLEVIC:  Can you be more specific, which

6     Debtors?

7          MR. LIEBERMAN:  EFH.

8          THE COURT:  EFH Corp?

9          MR. LIEBERMAN:  Corp, EFH Corp?

10          MR. KEGLEVIC:  Are you talking about on a GAAP

11     basis?  On a cash flow basis, EFH Corp is accumulating cash

12     and it doesn't have operations, so the question EFH Corp

13     only doesn't make sense that we have net operating losses

14     because we have no operations at EFH due to the

15     consolidation of other --

16          MR. LIEBERMAN:  On a consolidated basis.

17          MR. KEGLEVIC:  On a consolidated basis -- and I'm

18     sorry, now, over what period or currently are you asking

19     that?

20          MR. LIEBERMAN:  Currently.

21          MR. KEGLEVIC:  Currently we still are incurring

22     operating losses, although for the quarter we would have

23     been pretty close to breakeven at TCEH.  It's our highest

24     value quarter.  But we had an impairment of some assets.  So

25     in a total, it was a loss then, too.  But, yes, on an annual

1    basis, we would expect to have, at TCEH, would still

2    continue to have operating losses.

3            Oncor does not have operating losses and the

4    amount of dividends and taxes they pay up are, therefore,

5    positive.  We no longer consolidate Oncor at EFH, which we

6    did in the past.  So I'm sorry to be that specific but

7    there's different answers depending on which entities you're

8    talking about.

9            MR. LIEBERMAN:  Can we agree that regardless of

10   which of the Debtors we're talking about, net operating

11   losses are a property of the Debtor's estate, correct?

12           MR. MCKANE:  Objection, which Debtor?

13           THE COURT:  And it's a legal conclusion.  I mean,

14   I can write an opinion about whether that's true or not.  I

15   don't want to, but.  That's a legal conclusion.  Objection

16   sustained.

17           MR. LIEBERMAN:  Your Honor, this is in response to

18   Mr. Keglevic's testimony on direct.  He spoke about the net

19   operating losses.  I think --

20           THE COURT:  He didn't speak about whether it was

21   property of the estate or not.

22           MR. LIEBERMAN:  Well, so as the chief

23   restructuring officer, I think I have a right to probe

24   whether he knows that NOLs are assets of the estate or not

25   or if he had an opinion on that.

1          THE COURT:  You can probe.  But you have to be

2     specific.

3          MR. LIEBERMAN:  Mr. Keglevic, you are the co-chief

4     restructuring officer, in addition to being the CFO of EFH

5     Corp, correct?

6          MR. KEGLEVIC:  Correct.

7          MR. LIEBERMAN:  You know what net operating losses

8     are generally, correct?

9          MR. KEGLEVIC:  Well, I do but I thought you were -

10    - are you asking about the tax attributes that you referred

11    to as an NOL or are you talking about the actual occurrence

12    of expenses exceeding revenues?

13         MR. LIEBERMAN:  Why don't we use the definition

14    that you had in your mind when you testified on direct

15    examination, Mr. Keglevic?  Which definition did you have in

16    your mind when you were testifying about NOLs this morning?

17         MR. KEGLEVIC:  When it was testifying about NOLs I

18    was testifying on the tax attributes, not the operating

19    performance of the companies.

20         MR. LIEBERMAN:  Do you have an understanding as a

21    co-chief restructuring officer whether or not net operating

22    losses are property of the Debtor's estate?

23         MR. MCKANE:  Objection.

24         MR. LIEBERMAN:  Generally.

25         MR. MCKANE:  Objection, legal conclusion.

1           THE COURT:  To the extent you have -- to the

2     extent you know.

3           MR. KEGLEVIC:  I would consult legal counsel

4     before I make that determination.  I do know -- I've been

5     advised that there, you know, could be debate because of

6     some uncertainties under the tax sharing agreement as to

7     which estate has the benefit of the NOLs.

8           Do the NOLs belong to the person generating it or

9     does it belong to the taxpayer?  And that is one of the

10    complications associated with the uncertainties under the

11    tax allocation agreement.  But I've never been posed that

12    question and I would have to consult with counsel to answer

13    it.

14          MR. LIEBERMAN:  That's fine.  I'll move on.  Let's

15    talk about releases.  The Debtors started to negotiate term

16    sheets with respect to bankruptcy --

17          THE COURT:  I'm sorry.  Do you have an estimate of

18    how much longer you're going to be?

19          MR. LIEBERMAN:  Not much longer, Your Honor.

20          THE COURT:  That's lawyer talk.

21          MR. MCKANE:  We just need a 10-minute recess.

22          THE COURT:  Yeah.

23          MR. MCKANE:  Then I can coordinate with the other

24    objectors to find out the total estimate of time.

25          THE COURT:  All right.  Yes, we'll take a recess.

1    And I know this is taking longer.  It's going to take as

2    long as it takes but, you know, I think you're all aware we

3    are on the clock.  So every minute you take with this

4    witness is a minute you lose with other witnesses.  I'll

5    just remind you of that.  We're adjourned.

6              THE CLERK:  We're in recess.

7    (Recess)

8              CLERK:  All rise.

9              THE COURT:  Please be seated.  Sorry about that.

10   That took longer on my side than I thought it would.  I

11   apologize.

12             MR. LIEBESMAN:  That's fine, Your Honor.  I have

13   no further questions, Your Honor.

14             THE COURT:  Okay.  Mr. Anker?  Or, Mr. McKane.

15             MR. MCKANE:  Well, Your Honor, I have been able to

16   poll the objection community and I believe I have a report.

17             Mr. Anker believes he'll be 45 minutes, Mr. Pedone

18   believes no more than 15 minutes.  The Debtors have been

19   able to work out an arrangement with the United States

20   Trustee that they will be submitting additional DEP

21   designations that will be contained in the materials that we

22   provide to you on Friday, and in lieu of that, they have no

23   questions for Mr. Keglevic.

24             I've also been in touch with the United States

25   Department of Justice for the EPA, and at this time, they do

1    not expect to have questions for Mr. Keglevic.  As a result,

2    we're forecasting an hour remaining--

3              THE COURT:  What about Mr. Hogan?

4              MR. MCKANE:  Oh, (indiscernible).

5              MR. HOGAN:  No more than 15 minutes, Your Honor.

6              THE COURT:  Okay.

7              MR. MCKANE:  Thank you, and I apologize.

8              MR. HOGAN:  You're fine.

9              THE COURT:  An hour and fifteen minutes, okay.

10             MR. MCKANE:  An hour and fifteen, and on redirect

11   between Mr. Shore and I, we will be very effective and we're

12   probably about ten minutes each.

13             THE COURT:  All right.  We'll see how it plays

14   out.  Okay.

15             MR. ANKER:  I hope to be -- Philip Anker, Wilmer

16   Cutler Pickering Hale and Dorr.  I hope to be good to my

17   word, although I'm going to start with a few questions just

18   to set the stage that everyone in this room knows the answer

19   to, so I apologize for that.

20             Mr. Keglevic, I want to compare the corporate

21   structure on the E-side today, to what it will be, assuming

22   the plan is confirmed and goes effective.  And let's start

23   with what everyone does know.

24             EFH is the ultimate parent, it owns EFIH, right?

25             MR. KEGLEVIC:  Correct.

1           MR. ANKER:  And EFIH in turn owns 80 percent of

2    Oncor Holdings, correct?

3           MR. KEGLEVIC:  Correct.

4           MR. ANKER:  And Oncor Holdings in turn owns 100

5    percent of Oncor, the operating entity, right?

6           MR. KEGLEVIC:  Correct.

7           MR. ANKER:  Okay, and as of today, my clients have

8    a first lien position, subordinate to the DIP, at EFIH,

9    right?

10          MR. KEGLEVIC:  Right.

11          MR. ANKER:  Okay, and so they are structurally

12   senior to the EFH Creditors, right?

13          MR. KEGLEVIC:  Yes.

14          MR. ANKER:  And they are senior by way of lien and

15   priority to all other EFIH Creditors, right?

16          MR. KEGLEVIC:  Yes, Mr. Anker, but just the one

17   thing, and I'm not a lawyer.  I know your clients have been

18   paid, and I'm not sure what, effectively, that does to the

19   discharge of the liens.  I think that's a legal matter, so I

20   can't respond to that, but I know -- I understand exactly

21   the outstanding issues you have on appeal, I'm just not sure

22   of that interpretation, so I want to make sure I make that

23   point to do.

24          MR. ANKER:  Subject to that one qualifier, and I

25   appreciate you're not a lawyer, the answer to my question is

1    yes, correct?

2              MR. KEGLEVIC:  It is.

3              MR. ANKER:  Okay, and I understand you've not done

4    and commissioned a formal valuation of Oncor, but it's safe,

5    is it not, to say that my clients, even if they are owed the

6    full make whole they've claimed, are over-secured, right?

7              MR. KEGLEVIC:  Not under the next era bid.  Under

8    the proposed transaction, they would be.

9              MR. ANKER:  That's what I'm asking.  Now, let's

10   talk about the propose structure.  If I understood you

11   correctly at deposition, it's your understand that EFIH and

12   EFH will be merged together and the surviving entity will be

13   New EFH, is that right?

14             MR. KEGLEVIC:  Yes, effectively.

15             MR. ANKER:  Okay.  And new EFH will be the

16   successor -- and again, you're not a lawyer, I'm not asking

17   for legal interpretation.  As a businessman, your

18   understanding is that new EFH will be the successor to what

19   is today EFIH and also of EFH, right?

20             MR. KEGLEVIC:  Yes.  It'll be a reorganized EFH,

21   which will encompass both.

22             MR. ANKER:  Okay, and be the successor, as best as

23   you understand that term, right?

24             MR. KEGLEVIC:  From a layman's standpoint,

25   correct.

1          MR. ANKER:  Okay.  Now, you also understand -- let

2     me not ask it that way.  Currently, you said that EFIH owns

3     80 percent of Oncor Holdings, which owns 100 percent of

4     Oncor.  If the transaction goes through, new EFH will own

5     100 percent of Oncor, right?

6          MR. KEGLEVIC:  That's right.  Part of the

7     transaction is to acquire the 20 percent minority interest

8     in TTA.

9          MR. ANKER:  And that's going to be funded through

10    the equity that is coming in from the investors and the

11    Hunts, right?

12         MR. KEGLEVIC:  That's correct.

13         MR. ANKER:  Okay.  Now, I want to talk about the

14    capital structure and again, I want to do a comparison

15    between what exists today and what will exist.

16         The -- my client has been paid, other than its

17    claims to make wholes and fees and interest, so let's put

18    that aside.  The EFIH DIP is about $5.4 billion?

19         MR. KEGLEVIC:  It is.

20         MR. ANKER:  Okay, and if I understand it

21    correctly, the Debtors project that the outstanding second

22    lien debt at EFIH, assuming the plan goes effective June 30,

23    2016, would be about $1.8 billion?

24         MR. KEGLEVIC:  Correct.

25         MR. ANKER:  Okay, and the outstanding PIK debt,

1    let's put aside the settlement.  Let's just assume there was

2    no settlement.  The outstanding EFIH PIK debt as of that

3    date would also be about $1.8 billion?

4             MR. KEGLEVIC:  That's correct.

5             MR. ANKER:  Okay, so generally about $9 billion of

6    debt in EFIH, right?

7             MR. KEGLEVIC:  That's right.

8             MR. ANKER:  And then let's exclude the notes

9    issued by EFH that EFIH owns, so just the third party notes

10   at EFH are about $600 million projected as of June 30, 2016?

11            MR. KEGLEVIC:  That's correct.

12            MR. ANKER:  Okay, so about $9.6 billion total

13   debt, EFIH and EFH combined, right?

14            MR. KEGLEVIC:  Fair number.

15            MR. ANKER:  Okay.  The plan, if it occurs, will

16   delever the E-side, right?

17            MR. KEGLEVIC:  Yes.

18            MR. ANKER:  That $9.6 billion will go down to

19   about $5.4 billion, give or take?

20            MR. KEGLEVIC:  Yes, it'll be approximately similar

21   to what the DIP loan is today.

22            MR. ANKER:  Okay, and so we've got an increase on

23   the asset side.  You're going from 80 percent ownership of

24   Oncor to 100 percent ownership of Oncor, right?

25            MR. KEGLEVIC:  Yes.

1                MR. ANKER:  And on the debt side, you're

2        delevering by $4.2 billion, give or take?

3                MR. KEGLEVIC:  That's about right.

4                MR. ANKER:  Okay, and the $5.4 billion could even

5        be less, because, in fact, if I understand correctly,

6        correct me if I'm wrong, but if the rights offering is

7        oversubscribed, there will be greater equity, and because

8        there will be greater equity, there will be less debt,

9        right?

10               MR. KEGLEVIC:  Correct, and also, I think the TCEH

11       first step, $700 million -- the ability to invest $700

12       million dollars which could also be used for delevering,

13       even if the rest of the offer isn't oversubscribed.

14               MR. ANKER:  So they could put $700 million dollars

15       equity in, which in turn could reduce the debt from $5.4 to

16       $4.7, give or take.

17               MR. KEGLEVIC:  That's correct.

18               MR. ANKER:  Okay.  Now, in addition, you've talked

19       about a REIT, and again, this is -- my apologies for asking

20       a question that we all know.  EFIH and EFH are not today

21       REITs, are they?

22               MR. KEGLEVIC:  They are not.

23               MR. ANKER:  Okay, and so, a REIT is a tax

24       advantage transac -- structure for its owners, which doesn't

25       exist today, right?

1              MR. KEGLEVIC:  That's correct.

2              MR. ANKER:  So we're increasing assets of the E-

3      side of the balance sheet, we're decreasing, materially, the

4      liability side and we're going to a tax advantage structure,

5      right?

6              MR. KEGLEVIC:  That's correct.  That's the

7      proposed entity.

8              MR. ANKER:  And indeed, you said, I think in

9      direct, that the regulators, and again, Mr. Keglevic, I

10     don't want to put words in your mouth, I don't have a

11     transcript.  I think you said this morning, the regulators

12     would like EFIH to be an investment-grade company.

13             MR. KEGLEVIC:  That's correct, and the regulators,

14     the TPUC specifically, would like all of the things you're

15     talking about.  Effectively, higher value, less debt --

16             MR. ANKER:  Okay.

17             MR. KEGLEVIC:  -- more investment grade.

18             MR. ANKER:  EFIH in bankruptcy and EFH in

19     bankruptcy are not investment-grade issuers, are they?

20             MR. KEGLEVIC:  They are not close.

21             MR. ANKER:  And they were not investment-grade

22     issuers immediately prior to the petition date, were they?

23             MR. KEGLEVIC:  They have never been investment-

24     grade issuers from the date of the LBO forward.

25             MR. ANKER:  And so, if they become, as is the --

1   and it is the expectation that reorganizing--I should use

2   the term New EFH, I think that's the term in the plan, if

3   new EFH is investment-grade, that is the expectation, is it

4   not?

5           MR. KEGLEVIC:  It's certainly one of the -- yes,

6   one of the goals of the new company.

7           MR. ANKER:  And you think it's a reasonable goal,

8   right?

9           MR. KEGLEVIC:  Yes. For the reasons you stated.

10          MR. ANKER:  Okay, and so, that would be a change,

11  and also a change to the good, a change the positive, right?

12          MR. KEGLEVIC:  It would increase the amount of

13  equity available at that entity.

14          MR. ANKER:  Okay.  Because an investment-grade

15  company, all things being equal, has a lower cost of

16  borrowing than a non-investment-grade or high yield --

17          MR. KEGLEVIC:  Lower cost borrowing, higher cash

18  flow, which should ultimately increase value.

19          MR. ANKER:  Okay.  Mr. Keglevic, I want to talk to

20  you about something you talked about in your direct

21  testimony that's written, and I'm happy to refer it to you,

22  but let me try to take it through you a little bit orally.

23          You have analyzed, have you not, based on your

24  experience as a Chief Financial Officer and as an

25  accountant, the ability of New EFH to repay all the make

1    whole claim of my clients and the other disputed claims on

2    the E-side, right?

3              MR. KEGLEVIC:  Yes, if, upon appeal, that was the

4    outcome, yes, I have looked at that.

5              MR. ANKER:  Okay.  And you looked, if I understand

6    it correct, that a totally worst case scenario from the --

7    maybe not worst case from my perspective, worst case from

8    New EFH's perspective, right?

9              MR. KEGLEVIC:  Yes. A 100 percent loss on appeal,

10   given the claim amounts as of June 30th, which approximate

11   $2 billion dollars for all entities, including EFH.

12             MR. ANKER:  Let me just unpackage that quickly for

13   the record.  You said as of June 30, you mean June 30, 2016,

14   right?

15             MR. KEGLEVIC:  2016, correct.

16             MR. ANKER:  And you mean a loss of -- to my

17   client, that is, my client is entitled to -- gets a full

18   victory on its make whole claim, right?

19             MR. KEGLEVIC:  Correct.

20             MR. ANKER:  Okay, plus it wins interest thereon,

21   right?

22             MR. KEGLEVIC:  Correct.

23             MR. ANKER:  Plus Mr. Horowitz, the EFIH second

24   liens, win their make whole, right?

25             MR. KEGLEVIC:  Correct.

1           MR. ANKER:  And they get interested thereon,

2    right?

3           MR. KEGLEVIC:  That's correct.

4           MR. ANKER:  Plus there's no PIK settlement, and

5    the PIKs win both post-petition interest, and their make

6    whole right?

7           MR. KEGLEVIC:  That's correct.

8           MR. ANKER:  And interest thereon, right?

9           MR. KEGLEVIC:  Correct.

10          MR. ANKER:  And the EFH notes are not reinstated

11   and they win on appeal their make whole, right?

12          MR. KEGLEVIC:  Yes, my analysis indicates that,

13   but obviously I, you know, to the extent we would lose the

14   make whole at EFH, there might be a compelling economic

15   reason to reinstate --

16          MR. ANKER:  Okay.  But the two --

17          MR. KEGLEVIC:  -- but that being said, yes, the $2

18   billion dollars incorporates full payment, including

19   interest, of all those elements.

20          MR. ANKER:  Okay.  And my apologies for over --

21   speaking over you.  And interest on that make whole claim at

22   EFH, right?

23          MR. KEGLEVIC:  Yes.

24          MR. ANKER:  Okay, and even with all of those

25   liabilities, it's your view that New EFH can afford to pay

1    all of those liabilities, right?

2              MR. KEGLEVIC:  Certainly, that they would have

3    equity value that would have -- give them the ability to

4    make those payments if, upon appeal, that was the judgment

5    of the Court.

6              MR. ANKER:  And indeed, I think, in deposition --

7    I'm happy to show it to you but let me use my terms and just

8    tell me whether you agree.  I think you said you don't have

9    any material doubt on that question, right?

10             MR. KEGLEVIC:  I think in deposition, what I tried

11   to paint is a picture of a company that would have at least

12   $7 billion dollars of equity value, and when confronted with

13   the choice of having either to pay $2 billion dollars, which

14   is the worst case in all the scenarios we talked about, or

15   effectively walk away from the equity value, they would find

16   some way to finance that $2 billion dollars and effectively

17   still retain $5 billion dollars in equity value that they

18   had left in the company.  I think the only other alternative

19   being they would file bankruptcy and give up that $5 billion

20   dollars.

21             So I did not see that happening, and that's why I

22   thought that they would clearly have the ability, worst case

23   scenario, to pay, if necessary.

24             MR. ANKER:  And indeed, in your direct testimony,

25   in writing, you said it would be "highly unlikely" that the

1    company would file for bankruptcy in that circumstance,

2    right?

3              MR. KEGLEVIC:  I -- that would be my expectation,

4    correct.

5              MR. ANKER:  Okay.  Now I want to just unpackage

6    both sides of the equation.  You're comparing $7 billion in

7    equity value to $2 billion in total liabilities, right?

8              MR. KEGLEVIC:  Correct.

9              MR. ANKER:  Okay.  Now, again, I apologize for

10   asking questions that are obvious, but I just want to lay it

11   out.  If, all things being equal, if the equity value were

12   even greater than $7 billion, this would even be an easier

13   analysis, right?

14             MR. KEGLEVIC:  That would hold.

15             MR. ANKER:  Okay, and all things being equal, if

16   the $2 billion in liabilities was less than $2 billion, that

17   would be an even easier analysis, right?

18             MR. KEGLEVIC:  Correct.

19             MR. ANKER:  Okay.  So let's talk about both sides

20   of that equation, briefly.  On the $7 billion in equity

21   value, how did you get to that number?

22             MR. KEGLEVIC:  Simply, that was the amount of

23   money being raised and put in the company to delever.  The

24   $5.4 billion is the amount of debt being raised, so just

25   using that as a stated factor, that's the amount of equity

1    infusion would be the company in remaining debt.  That would

2    imply an enterprise value, but I just simply used the amount

3    of equity that was being raised and used to capitalize the

4    new company.

5              MR. ANKER:  There's debt at Oncor, is there not?

6              MR. KEGLEVIC:  There is.

7              MR. ANKER:  About $6 billion?

8              MR. KEGLEVIC:  Over -- it should be a little over

9    $6 billion dollars.  I think it was $6.3, $6.4 at June 30,

10   2016.

11             MR. ANKER:  Okay.  And so, if you assume a $7

12   billion dollar equity value, what does that imply for the

13   enterprise value for Oncor?

14             MR. KEGLEVIC:  Well, using those numbers, if you

15   have $7.1 billion dollars of equity value, $5.4 billion

16   dollars of debt above and $6.4 billion dollars of debt

17   below, I think that -- sorry, I have to do my own math in my

18   head here, but that's $12.1 billion dollars in debt and $7

19   billion dollars in equity, so roughly $19 billion dollars of

20   enterprise value.

21             MR. ANKER:  Okay, I think I asked of Oncor.  You

22   mean of New EFH, right?

23             MR. KEGLEVIC:  I'm talking about New EFH.

24             MR. ANKER:  Right, well, I asked the question

25   incorrectly.  You answered exactly what I meant to ask, and

1    I apologize for asking it incorrectly.  Okay.  You do --

2    let's talk about equity, the -- that side of the equation,

3    that side of the balance sheet or -- if we would -- if we

4    can.

5              First, isn't it right that we know that the

6    investors were willing to put at least $7.6 not $7.5 billion

7    in because, isn't it right that they were prepared to fund a

8    reserve for post-petition interests for the EFIH PIKs of

9    about $500 million dollars?

10             MR. KEGLEVIC:  There was a provision if they lost

11   the agreement on post-petition interest that they would fund

12   it through additional equity, correct.

13             MR. ANKER:  Through additional equity, not through

14   additional debt, right?

15             MR. KEGLEVIC:  Correct.

16             MR. ANKER:  So, that suggests that they think the

17   equity they're getting is worth not $7.1 but at least $7.6

18   in your view, right, sir?

19             MR. KEGLEVIC:  It at least means that they would

20   finance that cost directly.

21             MR. ANKER:  Okay.  And we heard yesterday that

22   there is a tentative settlement with the PCRBs where the

23   PCRBs are going to get more than they would have otherwise

24   gotten.  I take it that's not being funded by the Debtors,

25   right?

1          MR. KEGLEVIC:  That's correct.

2          MR. ANKER:  It's going to be funded by a reduction

3    in the percentage of equity received by the investors,

4    right, the T-uns and the Hunts, right?

5          MR. KEGLEVIC:  It's -- it was an inter-creditor

6    settlement.

7          MR. ANKER:  Right, so the cost of that settlement

8    is being borne by the T unsecureds, right?

9          MR. KEGLEVIC:  Effectively, there's -- I guess

10   there's a small dilution of the ownership that they will

11   get, associated with the 2 percent of the entity and the

12   ability to invest as a result of increasing the PCRB's

13   recovery, yes.

14          MR. ANKER:  Okay, and by the way, the $7.1 billion

15   that you think they -- you know, you've testified they're

16   investing.  That's a dollar amount that was sufficient to

17   cover all of the undisputed debt on the E-side of the

18   Debtor's capital structure, right?

19          MR. KEGLEVIC:  Yes.

20          MR. ANKER:  It wasn't that it was negotiated as a

21   specific price, right?

22          MR. KEGLEVIC:  Well, it was negotiated that the

23   plan provided the payment in full of those Creditors.

24          MR. ANKER:  But you don't know, as you sit here,

25   whether they would have paid $8.1 or $9.1 or $10.1 or $11.1

1    billion, right?

2           MR. KEGLEVIC:  We negotiated that they would pay

3    that amount, and obviously implied in that, as any upside in

4    value beyond that would accrue to the benefit of those

5    investors who are putting up the money, and that is why they

6    -- I believe that they're more likely to settle.  They see

7    the upside being greater than the alternative of the 550

8    Settlement, yes.

9           MR. ANKER:  And --

10          MR. KEGLEVIC:  I think they believe there's

11   upside.

12          MR. ANKER:  My apologies, I keep talking over you.

13   And in negotiating to that price, the driver, from your

14   perspective, was not to get the highest possible price but

15   rather to clear the E stack, so that then the investors, the

16   T-uns, would receive the best deal they could, right?

17          MR. KEGLEVIC:  Yes, and it also represented in

18   total the best value, even at that number, that we had been

19   offered by anybody.

20          MR. ANKER:  Okay.  Now -- and I'm happy to show

21   you the document, Mr. Keglevic.  I'm just going to try to

22   move it along.  If you need me to show it to you, let me

23   know, I'll mark it.  You're obviously aware there's a

24   disclosure statement in this case, right?

25          MR. KEGLEVIC:  Correct.

1            MR. ANKER:  Okay, and you're aware, are you not,

2     that there's a chart that projects what the recovery will be

3     to the T unsecureds at a different projected values for

4     EFIH?

5            MR. KEGLEVIC:  Yes, I generally remember that.

6            MR. ANKER:  And do you recall that the range was

7     $19 billion to $24 billion?

8            MR. KEGLEVIC:  That sounds right.

9            MR. ANKER:  Okay, so the midpoint of that range,

10     $19 to $24, is $21.5, right?

11            MR. KEGLEVIC:  Yes, it is.

12            MR. ANKER:  Okay, and $21.5 is $2.5 more than the

13     $19 billion that's implied by the $7.1 billion equity

14     investment, right?

15            MR. KEGLEVIC:  Yes, roughly, because I think that

16     implies closer to $19.

17            MR. ANKER:  And Mr. Keglevic, I don't mean this at

18     all as an insulting question.  You wouldn't have put in your

19     disclosure statement a range of $19 to $24 billion if you

20     thought that that range was not within the ballpark, fair?

21            MR. KEGLEVIC:  Certainly we relied on our

22     financial expert to help us come to that conclusion, and the

23     views of the Creditors, but yes, we thought that was a

24     reasonable range for, you know, highs and lows can vary

25     greatly.

1           MR. ANKER:  And your financial expert here being

2     Mr. Yang?

3           MR. KEGLEVIC:  Yes.

4           MR. ANKER:  Okay.  So, if it was at $21.5 billion,

5     there would be an extra $2.5 billion in equity value beyond

6     the $7.1 billion you've assumed for your analysis, right?

7           MR. KEGLEVIC:  That would be the math on a fair

8     value basis, yes.

9           MR. ANKER:  Okay.  And of course, as we said

10    earlier, I think this is right, if the oversubscription

11    occurs, or if the T first liens invest, that will lead to

12    greater equity value as well, right?

13          MR. KEGLEVIC:  Well, you're moving between fair

14    value and original cost, so effectively, if the -- if the

15    fair value stays the same and new money comes in to take out

16    debt, it doesn't change that $21 billion dollars.  You --

17    fair value is fair value and it doesn't matter how it's

18    capitalized.  So you can't add it to those numbers.  Those

19    are -- you're mixing metaphors a little bit there.

20          MR. ANKER:  My question was in a light form.  I

21    want to now focus not on the $21 billion, but the $7 billion

22    in equity value that causes you to say there's enough equity

23    value to cover the $2 billion in potential worst case

24    liabilities.

25          MR. KEGLEVIC:  Okay.

1          MR. ANKER:  If there's an oversubscription, or if

2     the T firsts invest more than the $7 billion in equity value

3     goes up dollar for dollar, right?

4          MR. KEGLEVIC:  Yes.  If equity is raised to pay

5     down debt, it increases the total amount of equity.

6          MR. ANKER:  And I take it, by the way, you talked

7     earlier this morning about how it's pretty easy to predict

8     EBITDA at -- on the E-side, at EFIH, and Oncor, just tell me

9     how much capital there is.  The more equity there is, the

10    more capital there is, right?

11         MR. KEGLEVIC:  No.  I was referring to the current

12    structure as a regulated company.  Oncor is -- ultimately,

13    the revenues produced will be based on the rate-making

14    formula, and then the question is whether the TPUC, what

15    amount of equity they put in to set rates.  It's unlikely

16    that the -- it's against, in fact, regulatory principles to

17    use fair value.  They use original cost.

18         MR. ANKER:  Okay.

19         MR. KEGLEVIC:  So, that remains to be seen.  I

20    would not expect there to be a write-up associated with

21    Oncor's revenues as a result of the new transaction.

22         MR. ANKER:  Okay.  All right.  We have focused now

23    on a variety of ways in which the $7 billion dollars in

24    equity value may well be substantially higher.  Now, let's

25    focus on the $2 billion in worst-case liabilities.

1          At the risk of again asking an obvious question,

2     change the hypothetical and imagine that Mr. Horowitz's

3     clients don't prevail, the PIKs don't prevail, the EFH notes

4     don't prevail and the only liability is to my client, that's

5     about $430 million plus interest for a couple of years,

6     right?

7          MR. KEGLEVIC:  I'm sorry, can you just repeat

8     that?  I was just thinking how ironic the example was that

9     you came up with.

10         MR. ANKER:  Well, we'll see how ironic it is.

11         MR. ANKER:  If -- my client's make whole, your

12    understanding, is about $430 million, right?

13         MR. KEGLEVIC:  Yes, sir.

14         MR. ANKER:  And assuming the June 30 emergence

15    from bankruptcy, they were paid down the principal on their

16    notes in June of 2014, right?

17         MR. KEGLEVIC:  Yes.

18         MR. ANKER:  So that would be about two years of

19    interest, right?

20         MR. KEGLEVIC:  Correct.

21         MR. ANKER:  And for -- putting compounding aside

22    and putting out any bump up in interest, it's about 10

23    percent interest, right?

24         MR. KEGLEVIC:  Yes.

25         MR. ANKER:  And 10 percent per years is $43

Page 213

1   million, right?

2            MR. KEGLEVIC:  Right.

3            MR. ANKER:  So the $430 would grow over two years

4   to $510 --

5            MR. KEGLEVIC:  $520, yeah.

6            MR. ANKER:  -- $520, something like that, right?

7            MR. KEGLEVIC:  Correct.

8            MR. ANKER:  So, if the liability side was $520

9   million, not $2 billion, that -- your conclusion remains the

10  same, indeed it's even a stronger conclusion, right?

11           MR. KEGLEVIC:  Correct.

12           MR. ANKER:  Okay.  And in fact, we know some

13  things now, don't we?  We know that there's been a

14  settlement announced on the PIK side, right?

15           MR. KEGLEVIC:  We do.

16           MR. ANKER:  Okay, and that's settle --

17           MR. KEGLEVIC:  With respect to the post-petition

18  interest.

19           MR. ANKER:  Right.  Well, with respect to the make

20  whole, the settlement on --

21           MR. KEGLEVIC:  Yeah, that's true too.  The amount

22  due is related to post-petition interest.

23           MR. ANKER:  Okay.  And that settlement covers

24  slightly over 50 percent of the noteholders who own the PIK

25  debt, right?

1           MR. KEGLEVIC:  That's my understanding.

2           MR. ANKER:  Okay, let's just use 50 percent.

3    We'll round down.  The post-petition interest claim for the

4    entire class was $500 million, right?

5           MR. KEGLEVIC:  That sounds right.

6           MR. ANKER:  Okay, so 50 percent of that's going to

7    be wiped out because the settlement is going to be funded,

8    not by reorganized EFIH or EFH, but rather by the investors,

9    right?

10          MR. KEGLEVIC:  Right.

11          MR. ANKER:  And so, that's taking $250 million in

12   potential liability, $250 million of your $2 billion off the

13   table, right?

14          MR. KEGLEVIC:  Right.

15          MR. ANKER:  And the make whole, if I understand it

16   correctly, projected out to June 30, 2016 of the whole PIKs,

17   all the PIKs, was about $120 million, right?

18          MR. KEGLEVIC:  That sounds right.

19          MR. ANKER:  Okay, so you're taking 50 percent of

20   that off the table, right?

21          MR. KEGLEVIC:  Right.

22          MR. ANKER:  So we've now taken $310 million of the

23   $2 billion off the table, right?

24          MR. KEGLEVIC:  Correct.

25          MR. ANKER:  Okay, and we also know that one

1    possibility on the EFH notes is that they would be

2    reinstated, right?

3              MR. KEGLEVIC:  That is correct.

4              MR. ANKER:  And if they were reinstated, then we

5    would take the post-petition interest and make whole

6    potentially owed to the EFH holders off the table as well,

7    right?

8              MR. KEGLEVIC:  Correct.

9              MR. ANKER:  And how much is that projected to June

10   30, 2016?

11             MR. KEGLEVIC:  I don't remember the exact number.

12   I want to say roughly $300 million in total.

13             MR. ANKER:  Okay, so we're taking another $300

14   million off, potentially, an addition of $310 we've already

15   taken off, right?

16             MR. KEGLEVIC:  That's correct.

17             MR. ANKER:  So that's down to about $1.4 billion,

18   right?  Okay.

19             MR. KEGLEVIC:  That's the math.

20             MR. ANKER:  And just to be clear, to establish the

21   -- if there was a reinstatement, the reinstatement would not

22   be as proposed by the Debtors, and New EFH, but rather at

23   TCEH, right?

24             MR. KEGLEVIC:  That's right, but the --

25             MR. ANKER:  And -- and the notion, if I understand

1    it correctly, is that, not that reorganized EFH would make

2    TCEH whole from that, but rather the investors would, right?

3              MR. KEGLEVIC:  Well, I -- the final agreement as

4    to how the reinstatement would work and how the parties

5    would fund the reinstatement, I don't think has been

6    finalized, but if the New EFH, instead of paying principal

7    of the $600 million and the make whole, would instead pay

8    the $600 million to TCEH to take on that debt.  That

9    effectively would be funded through the transaction in that

10   fashion, but that has not been negotiated, and nor has the -

11   - the treatment of the post-petition interest, because of

12   course, if the debt is reinstated, the post-petition

13   interest becomes no longer subject to dispute, it becomes

14   accrued interest and would have to also be picked up by the

15   T side as unsecured debt, including that amount.

16             So, exactly how that transaction there is the

17   opportunity to reinstate, but the two parties, I don't

18   believe, have negotiated the final terms of that

19   reinstatement, and both have to agree, obviously, to make

20   that happen.

21             MR. ANKER:  And the two sides being the T

22   Creditors, Mr. Kornberg, the T first lien Creditors, who

23   will own TCEH, and -- on one hand, and on the other hand,

24   the T unsecured creditors who will be the future owners of

25   New EFH, along with the Hunts, right?

1          MR. KEGLEVIC:  Yes, I think it would be New EFH

2     would negotiate that with New TCEH, with New TCEH being

3     owned, presumably, by the TCEH first lien Creditors.

4          MR. ANKER:  Okay.  But to be clear, and I

5     understand it hasn't been finally negotiated, is it your

6     understanding that the investors will absorb the cost if

7     there is any indemnification or consideration given to the T

8     side?

9          MR. KEGLEVIC:  It will come from the new money

10    that will be raised.

11         MR. ANKER:  Okay, that's fine.

12         MR. PEDONE:  Objection, move to strike.  There's

13    no foundation to his knowledge.

14         THE COURT:  Overruled.

15         MR. ANKER:  Okay.  And just one last thing, and I

16    think you testified somewhat to this effect this morning,

17    Mr. Keglevic -- I say one more thing, there's two more

18    things, my apologies.  You testified this morning, I think

19    you described the -- you described parties as among the

20    marquee names on Wall Street.  You were talking about the T

21    unsecured creditors who were going to invest into this

22    transaction, right?

23         MR. KEGLEVIC:  Yes.

24         MR. ANKER:  And they're investors, who you

25    understand, expect to obtain, on their investments, outsized

1    rates of returns, right?

2         MR. KEGLEVIC:  Well, I don't know if outsized, but

3    they certainly try to make maximized returns on their

4    investments.

5         MR. ANKER:  Well, more than the average person who

6    puts their money in the bank, right?

7         MR. KEGLEVIC:  They make more than I do, that's

8    for sure.

9         (LAUGHTER IN COURTROOM)

10        MR. ANKER:  And I'll stipulate they make a hell of

11   a lot more than I do.  Indeed, you -- and I want to make

12   sure I got who you were describing correctly, you said that

13   they had financial acumen, right?  And you were referring to

14   the TCEH unsecureds as well as the Hunts, right?

15        MR. KEGLEVIC:  I was.

16        MR. ANKER:  And you accept as a truism, I mean --

17   that's the wrong way to put it.  You accept as true, that --

18   you've heard them say, "if this transaction doesn't close,

19   and we simply get paid $550 million in cash, that will be a

20   booby prize," and put aside the colorful language, you

21   accept that that is genuinely how they feel, right?

22        MR. KEGLEVIC:  Yes, I absolutely believe that's

23   how they feel, and let me just put a little color to it.

24   It's because I think, as they think about it, the $550

25   million dollars is, in comparison to where they started the

1    case, which was, you know, probably looking to get at a

2    minimum worst case under every scenario, the unencumbered

3    cash, so really, it's only $400 incremental, and then out of

4    that $400, they have to pay the -- you know, at least the

5    $50 million, the $49.75 of the fees incurred to date would

6    come out of that in an alternative.  So when you really

7    unpack the alternative, it -- it is not even $550 as

8    compared to the incremental amount that all their work and

9    negotiation has led them to.

10            MR. ANKER:  Well, is it another reason why you

11   take at -- you take at face value their assertion that it's

12   a booby prize because, as you put it this morning, you've

13   done analyses that suggest that the upside to them of owning

14   Oncor could be many multiples of that $500 million, right?

15            MR. GLUECKSTEIN:  Objection, Your Honor.  Mr.

16   Anker keeps referring to "they" and I think we need clarity

17   as to --

18            MR. ANKER:  Sure.

19            MR. GLUECKSTEIN:  -- as to who Mr. Keglevic is

20   referring his understanding to.

21            MR. ANKER:  Sure.  Sure, sure.  Let me clarify,

22   happy to do so, Your Honor, and happy to do so, Mr.

23   Glueckstein.  When you said earlier that someone has

24   described getting the alternative plan structure, and

25   getting $550 million in cash as a booby prize, were you

1    referring to the T unsecureds?

2              MR. KEGLEVIC:  I was.

3              MR. ANKER:  Okay.  And when you said this morning

4    that you had done analyses that suggested that the value of

5    Oncor, with a reorganization and ownership through a REIT,

6    could be worth many multiples of that, were you referring to

7    the value to the same T unsecureds?

8              MR. KEGLEVIC:  I was.  Obviously, they share that

9    value with the Hunts and other -- you know, they don't get

10   100 percent of the upside, and, let's not forget that they

11   are putting a lot of new money to work that would, you know,

12   would expect a return of its own.  So you've got that type

13   of calculation you'd have to make.

14             MR. ANKER:  Okay.  Mr. Keglevic, hopefully these

15   won't be words I live to have to eat, but I think I'm on my

16   final subject now.

17             You testified, I think, this morning, about a co-

18   CRO term sheet.  Do you recall that?

19             MR. KEGLEVIC:  I certainly do.

20             MR. ANKER:  Okay, and that was a term sheet that,

21   as I understand it, you and Ms. Dore prepared to try to set

22   forth the parameters for a possible reorganization

23   structure, right?

24             MR. KEGLEVIC:  Yes, a possible settlement scenario

25   that would also -- that encompassed the reorganization plan

1    that would be tax-free, and a -- several options under the

2    E-side.

3            MR. ANKER:  Okay.  I don't believe that you

4    actually were shown the term sheet itself, and I'd like to -

5    - I think I'm only going to have one exhibit with you today,

6    so rather than give you a big binder, may I approach the

7    witness and Your Honor with a copy?

8            THE COURT:  Yes.

9            MR. ANKER:  Your Honor, I believe this is DTC

10   Exhibit 22, so Delaware Trust Company Exhibit 22.

11           THE COURT:  Thank you.

12           MR. ANKER:  Mr. Keglevic, can I ask you first, and

13   take as much time as you need, to identify this document if

14   you would?

15           MR. KEGLEVIC:  This is a presentation to our board

16   on January 30th about where we stood at that point in time

17   in the case in terms of settlement and bid term sheets, it

18   looks like.

19           MR. ANKER:  Okay, and it's an overview, isn't it?

20   Entitled Overview of Proposed Global Term Sheet and Creditor

21   Plan Proposals?

22           MR. KEGLEVIC:  Yes.

23           MR. ANKER:  Okay, and so, it's describing, at

24   least in part, the proposed global term sheet, about which

25   you testified this morning, right?

1          MR. KEGLEVIC:  Yes.

2          MR. ANKER:  Okay, and can I ask you to turn to

3   Page 11?  I believe it bears the Bates stamp ending

4   EFH05546985? 6965?

5          MR. KEGLEVIC:  I'm there.

6          MR. ANKER:  Okay.  I apologize, I need my glasses

7   to read that.  This is entitled, that page, Treatment EFIH

8   and EFH Stakeholders, right?

9          MR. KEGLEVIC:  Correct.

10          MR. ANKER:  And this is, just to be -- set the

11   stage, this page is describing what the treatment would be

12   for those stakeholders under the proposed global term sheet,

13   right?

14          MR. KEGLEVIC:  Correct.

15          MR. ANKER:  Okay, and I want you to look at the

16   very -- it provides basically that the EFIH first liens

17   would be offered a settlement of a percentage in our make

18   whole to bed -- TBD, meaning to be determined, right?

19          MR. KEGLEVIC:  Right.

20          MR. ANKER:  And they either would accept it or

21   some might accept it and some might not, right?

22          MR. KEGLEVIC:  Correct.

23          MR. ANKER:  And as to those who didn't, I want you

24   to look at the very bottom sub-bullet point, do you see

25   that, sir?

1          MR. KEGLEVIC:  I do.

2          MR. ANKER:  And it says, "With respect to EFIH

3     first lien noteholders that do not opt into the settlement,

4     to the extent that the Court does not rule on the claims or

5     they are under the appeal as of the effective date, the

6     Debtors will escrow the disputed amounts to obtain a lien

7     release."  Did I read that correctly?

8          MR. KEGLEVIC:  That's what this says.

9          MR. ANKER:  And by "lien release" you mean a

10    release of a lien held by the EFIH first liens, right?

11         MR. KEGLEVIC:  Yeah, I assume that's what it

12    means.

13         MR. ANKER:  Okay, and under the current plan, the

14    plan that is before Your Honor, before His Honor, for

15    confirmation, that plan provides for a release of the EFIH

16    first liens, but no escrow of any amount, pending appeal, on

17    the make whole appeal, right?

18         MR. KEGLEVIC:  That's correct.

19         MR. ANKER:  No further questions, Your Honor.

20         THE COURT:  Thank you, Mr. Anker.

21         MR. ANKER:  I think I was less than 45 minutes and

22    I hope I get extra time from others around the table

23    (indiscernible).

24         MAN:  Just give me a second.

25         MR. ANKER:  Oh, I'm sorry, I did not move that

1    document into evidence.  We're just going to do exhibits at

2    the end, Your Honor?

3              THE COURT:  Yes.

4              MR. ANKER:  Okay, thank you, Your Honor.

5              THE COURT:  Well, unless there's -- I mean, we can

6    do it now.  Is there any objection to the admission of TTC

7    Exhibit 22?

8              MR. MCKANE:  No, Your Honor.

9              THE COURT:  It's admitted.

10             MR. HOROWITZ:  I apologize to Your Honor.

11             (COUNSEL DISCUSSING DOCUMENTS OFF THE RECORD)

12             MR. HOROWITZ:  Your Honor, Gregory Horowitz from

13   Kramer Levin on behalf of the EFIH second lien note Trustee

14   and I actually do have to ask one question.

15             THE COURT:  Okay.

16             MR. HOROWITZ:  I promise it's just one question.

17   Mr. Keglevic, do you still have the exhibit that Mr. Anker

18   was just taking you through?

19             MR. KEGLEVIC:  I have turned to Page 12 in

20   anticipation.

21             MR. HOROWITZ:  Okay, I'll just ask you, does it

22   have exactly the --

23             (Laughter)

24             MR. PEDONE:  That's a good question, Your Honor.

25             MR. HOROWITZ:  I think you're ready to answer it

1    anyway.  So, sir, it's true, is it not, that the -- that the

2    CRO term sheet has exactly the same language with regard to

3    the EFIH second lien notes that Mr. Anker just read with

4    regard to the first lien notes?

5              MR. KEGLEVIC:  It does indeed.

6              MR. HOROWITZ:  Thank you.

7              THE COURT:  Thank you, Mr. Horowitz.  Mr. Pedone?

8              MR. PEDONE:  Mr. Keglevic, I'm Richard Pedone,

9    counsel for American Stock Transfer, the indenture Trustee

10   for the EFH bond debt.

11             MR. KEGLEVIC:  Good afternoon, Mr. Pedone.

12             MR. PEDONE:  You're aware of the fact that the

13   current plan on file contains a condition precedent that

14   requires either that the legacy notes at EFH and their QR

15   make whole -- the make whole for the legacy QR notes, be

16   either disallowed or that such debt be reinstated?  You're

17   aware of that condition precedent?

18             MR. KEGLEVIC:  Yes.

19             MR. PEDONE:  And as of today, those make whole

20   claims have not been disallowed, they're currently set for a

21   future hearing, correct?

22             MR. KEGLEVIC:  That's correct.

23             MR. PEDONE:  And as of the date that the fifth

24   amended plan was filed, no party had agreed to waive

25   condition precedent number nine, that's correct, as well?

1          MR. KEGLEVIC:  That's my understanding.

2          MR. PEDONE:  And as we sit here today, no party

3     has agreed in writing to waive condition precedent number

4     nine, have they?

5          MR. KEGLEVIC:  Not that I'm aware of.

6          MR. PEDONE:  And it's also true as we sit here

7     today that no provision has been made to pay the EFH make

8     whole claims under series QR, if in fact they do become DIP?

9          MR. KEGLEVIC:  That's correct.

10         MR. PEDONE:  Thank you.  No further questions,

11    Your Honor.

12         THE COURT:  Thank you, Mr. Pedone.  Mr. Hogan.

13         MR. HOGAN:  Thank you, Your Honor.  Mr. Keglevic,

14    how are you today?

15         MR. KEGLEVIC:  Super, how are you?

16         (LAUGHTER IN COURTROOM AND FROM JUDGE)

17         THE COURT:  Now, Mr. Keglevic, you're under oath.

18         (LAUGHTER IN COURTROOM)

19         MR. KEGLEVIC:  I can't go back, though, can I?

20         THE COURT:  No.  No.

21         MR. HOGAN:  Mr. Keglevic, I represent certain

22    asbestos Claimants, Fenicle and Fahy, as we've referred to

23    them in pleadings, and I want to direct your attention to

24    what we've referred to in our pleadings as four -- the four

25    asbestos Debtors, and just for clarity, so that there's no

1    confusion, I refer to those as LSGT Gas Company, LLC., EEC

2    Holdings, Inc., EECI Inc., and then LSGT SACROC, Inc.  Are

3    you familiar with those four Debtors?

4              MR. KEGLEVIC:  I am, and that's how I refer to

5    them as well.

6              MR. HOGAN:  Thank you.  If I could, I want to

7    direct your attention to your declaration, specifically Page

8    29, I believe, in one of the binders you have up there.

9              MR. KEGLEVIC:  I have it.  I was ready for that.

10             MR. HOGAN:  Yeah, Page 29 of that, sir, thank you.

11   Starting in Paragraph 82, you testified, effectively, about

12   the asbestos-related entities and the liabilities that those

13   entities have, as of the time of fi --

14             THE COURT:  Mr. Hogan, I apologize.  You lost me

15   while I was looking, so could you direct me to the page?

16             MR. HOGAN:  Certainly, Your Honor.  Page 29 of his

17   declaration, Paragraph 82.

18             THE COURT:  Thank you, I apologize.

19             MR. HOGAN:  No problem.

20             THE COURT:  Go ahead.

21             MR. HOGAN:  If I could, let's turn to Page 30.

22   It'll help because you have the structure laid out there,

23   and that's really what I want to get to, specifically.  Here

24   you list EFH Corp being at the top with LSGT Gas Company

25   directly underneath it as what, a wholly-owned subsidiary?

Page 228

1        MR. KEGLEVIC:  It is.

2        MR. HOGAN:  Thank you. And then below that, there

3    are, I believe, three pertinent wholly-owned subsidiaries,

4    those being EEC Holding, Inc., with EECI below it, and then

5    on the other side, the LSGT SACROC, Inc., is that correct?

6        MR. KEGLEVIC:  That is correct.

7        MR. HOGAN:  Okay.  And then there's these arrows,

8    which delineate what, exactly?

9        MR. KEGLEVIC:  Those are intercompany receivables,

10   or payables, as the case may be, depending on the entity,

11   but the important thing with respect to the LSGT and all of

12   the entities is, all of those are owed money by EFH Corp.,

13   ultimately.  As you can see by the arrows, there's different

14   relationships between the entities, but ultimately, all of

15   these entities are the -- are owed monies by EFH Corp.

16        MR. HOGAN:  And so, with specificity, just so I'm

17   clear, as to the three lower entities, EEC Holdings, Inc.,

18   EECI and LSGT SACROC, all of those obligations passed

19   through LSGT Gas Company before they ultimately get to EFH,

20   is that correct?

21        MR. KEGLEVIC:  That's correct.  So ultimately, EFH

22   owes $550 to the LSGT Gas Company, and then LSGT has its own

23   liabilities, if you will, do the -- their subsidiaries.

24        MR. HOGAN:  Okay.  Now, are all -- of the three

25   sub-entities, the bottom three that I've discussed, that

1    being EECI, Inc., EEC Holding and LSGT SACROC, are those

2    historically asbestos companies?

3            MR. KEGLEVIC:  Well, those are the entities that

4    have has the asbestos claims on the -- so I don't know if

5    I'd call them historic asbestos companies.  I guess I would.

6    Those are the entities on the E-side that have had the

7    claims associated with asbestos.

8            MR. HOGAN:  And so the dark arrows indicate claims

9    that those entities have against, ultimately, EFH,

10   ultimately?

11           MR. KEGLEVIC:  They do.  Those claims aren't

12   related to asbestos.  Those claims are, generally speaking,

13   all of these are discontinued operations and when they

14   operation was wound down, the remaining money from those

15   entities was sent up the chain, as indicated here, but the

16   individual boxes retained liabilities associated with

17   asbestos.

18           MR. HOGAN:  Okay.  So let's focus on what you said

19   there.  These are discontinued entities.  When were they

20   discontinued, if you can tell me?

21           MR. KEGLEVIC:  I can't.  Well before I came to the

22   company.

23           MR. HOGAN:  In your capacity --

24           MR. KEGLEVIC:  As CFO.

25           MR. HOGAN:  In any capacity -- as CFO?

1              MR. KEGLEVIC:  I was only at the company as CFO,

2      so -- but I know it's -- they were discontinued before I

3      arrived in 2008.  I'm not sure exactly when they were

4      discontinued.  I'm sure we can get you that information.

5              MR. HOGAN:  But as a result of those entities

6      being discontinued, they were discontinued, presumably, by

7      some form of sale?

8              MR. KEGLEVIC:  I don't know the exact form, but

9      generally speaking, they were monetized in some fashion that

10     ended up with cash holdings that those entities -- that was

11     passed up to its parent, since there were no longer any

12     operations, and that is why, in fact, there is a receivable

13     from those entities from the parent, and that is why the

14     parent has supported liabilities that those entities -- or

15     costs that those entities have had since that period of

16     time, in settlement of that intercompany claim.

17             MR. HOGAN:  I believe during your deposition

18     testimony on October 1st, you referred to the fact that

19     those proceeds from those discontinued entities were in fact

20     "upstreamed," I believe the term was that you used.  Do you

21     recall that?

22             MR. KEGLEVIC:  Yeah, I'm comfortable with that.

23             MR. HOGAN:  And what does that mean, "upstreamed,"

24     if you could be specific?

25             MR. KEGLEVIC:  Basically, the net assets were

1    monetized and in this case, I think it was largely cash was

2    sent up to the ultimate parent, EFH Corp, or the predecessor

3    of EFH Corp.

4           MR. HOGAN:  And were there promissory notes put in

5    place to evidence that upstreaming?

6           MR. KEGLEVIC:  I'm sorry, I'm forgetting if there

7    are or there are not.  I think there are some promissory

8    notes.  I don't know if all of these are backed by a

9    promissory note.  I can certainly have somebody -- Mr.

10   Carter, who is going to follow my cross-examination, will

11   know exactly that.  I just don't recall.

12          MR. HOGAN:  Regardless of whether there were

13   promissory notes, was any interest rate attributed to those

14   upstreamed assets?

15          MR. KEGLEVIC:  Yes, there was an interest rate

16   that was associated with those intercompany claims, that was

17   based on the capital structure at EFH at the time of the

18   LBO.

19          MR. HOGAN:  And when was that LBO?

20          MR. KEGLEVIC:  2007.

21          MR. HOGAN:  And that was, again, before your time?

22          MR. KEGLEVIC:  It was before my time.

23          MR. HOGAN:  And do you know what that interest

24   rate would have been at that them?

25          MR. KEGLEVIC:  I think it was 10.875.  I think we

1    covered it on my deposition but I'm not as smart today as I

2    was then.

3            MR. HOGAN:  You're fine, thank you.  With regard

4    to the specific claim amounts that the dark arrows represent

5    in each instance, one being $84 million dollar claim from

6    EECI that goes up to LSGT Gas Co., another being $404

7    million dollars from EEC Holdings up to LSGT Gas Co., and

8    then the $502, it appears, from LSGT SACROC to LSGT Gas Co.,

9    where do those numbers come from?

10           MR. KEGLEVIC:  Our books and records, and I think

11   they're also reflected on our general ledger, ultimately,

12   and then the -- I think -- I believe they're also reflected

13   on the SOFFAs that we provided.

14           MR. HOGAN:  Thank you, and so, those would be

15   numbers that would be accurate as of the time of the filing

16   of the bankruptcies?

17           MR. KEGLEVIC:  To the best of our knowledge and

18   ability, yes.

19           MR. HOGAN:  Can you tell me if the four asbestos

20   subsidiaries, these entities that we've just been

21   discussing, are solvent?

22           MR. KEGLEVIC:  It depends on what value you put on

23   the intercompany claim.  Obviously, they have no assets

24   other than that claim, and then they had some liabilities

25   recorded, associated with asbestos, but since the parent is

1    supporting -- you'd have to then believe the parent is

2    supporting the claims and the parent is solvent, which would

3    then allow that solvency to be counted down at the

4    subsidiary level.

5            MR. HOGAN:  But they're -- they're not my numbers.

6    They're the Debtor's numbers, correct?

7            MR. KEGLEVIC:  They are, but we don't calculate

8    those numbers based on a solvency test.  That's a very

9    specific, legal test under law.  Those are the numbers that

10   represent the borrowing activities and the upstreaming of

11   cash that we referred to, not intended to be anything beyond

12   that.

13           MR. HOGAN:  Okay.  I believe, in response to the

14   objection that Fenicle and Fahy filed, that the Debtors

15   proposed an omnibus response, and in it, they recited, and I

16   understand this isn't necessarily testimony that's

17   attributable to you or testimony in any sense, but it is a

18   filed pleading, where -- in Paragraph 172 of the omnibus

19   response, it's recited that: "Fenicle and Fahy raised

20   concern about intercompany claims that the asbestos Debtors,

21   including EECI, Inc., may have against EFH Corp."  It says,

22   "The Debtors will amend the plan to clarify that all EFH

23   Debtor intercompany claims of EFH Corp, LSGT Gas Company,

24   LLC., EECI, Inc., and EEC Holdings Inc., and LSG SACROC

25   against one or more of the EFH Corp, LSG Gas Company, EECI

1    Inc., and EEC Holding, LSG SACROC Inc., shall be

2    reinstated."  Does that mean anything -- what does that mean

3    to you?

4              MR. KEGLEVIC:  That means to me that there was

5    never any intention to not have New EFH fund any asbestos

6    liability claims that come out of those entities, to

7    effectively continue to support those entitles to the extent

8    they have costs to defend or settlements against them

9    related to asbestos.

10             MR. HOGAN:  So, let me make sure I understand what

11   you mean by that.  So, to the extent that claims are filed

12   in this bankruptcy for asbestos claims, and the plan is

13   confirmed, those claims will just continue through against

14   those entities, and that money will be set aside to pay

15   those claims?

16             MR. KEGLEVIC:  I didn't say set aside, but the

17   intention would be that those claims would continue to exist

18   and would be paid by the successor entity, the New EFH.

19             MR. HOGAN:  The claims being the intercompany

20   claims that we just saw on the chart?

21             MR. KEGLEVIC:  No, those intercompany claims don't

22   necessarily have to be settled, because effectively, the

23   parent owns those subsidiaries 100 percent, so they could be

24   forgiven.  But to the extent that those entities have costs

25   associated with defending or judgments associated with

1    asbestos, the cost of both the defense and the ultimate

2    claims as adjudicated, would be an obligation of the New

3    EFH.  That's my understanding.

4              MR. HOGAN:  Of the New EFH?

5              MR. KEGLEVIC:  That's my understanding.

6              MR. HOGAN:  And so, how can we be sure as

7    attorneys for asbestos Claimants that enough money is going

8    to be reserved under that architecture?

9              MR. KEGLEVIC:  Well, you've used the reserved

10   again.  I'm not aware that there's going to be a specific

11   reserve set aside.  The way I got comfortable from a

12   layman's perspective, or from a finance person's

13   perspective, is when we've looked at the historical costs

14   that we've incurred to date, the amount of the liability on

15   our books and the amount of the equity that'll exist in the

16   new company, there should be a significant over-

17   securitization of any potential asbestos claims.  That being

18   said, nobody can forecast what those future claims would be,

19   but we do have -- historically, we have a liability of $14

20   million, we've been incurring $2 million dollars a year, I

21   think we've only paid $28 million dollars in total, and New

22   EFH will be substantially capitalized, as we just went

23   through with Mr. Anker, so I think there is a fairly clear

24   path to payment, if payment was needed, for the asbestos

25   claims.

1          MR. HOGAN:  You understand, of course, that a bar

2    date has been set for filing asbestos claims against these

3    Debtors?

4          MR. KEGLEVIC:  I do.  I am aware of that.

5          MR. HOGAN:   And if I told you that date was

6    December 14th of this year, would that comport with your

7    understanding?

8          MR. KEGLEVIC:  It would.

9          MR. HOGAN:  And is it also your understanding

10   that, by virtue of setting a bar date, that there's an

11   acceleration of what would otherwise be normal statute of

12   limitations with regard to those claims?

13         MR. KEGLEVIC:  You're getting into more of the

14   legal area that I don't want to -- I don't know if there's

15   quote, unquote, "an acceleration," but I imagine that, you

16   know, we will know the claims that are filed as of the bar

17   date.  We still won't know what ultimately will have to be

18   paid, but we will know the total amount of the claims that

19   have been presented as of that date.

20         MR. HOGAN:  So, as we sit here today, you don't

21   know whether or not any money will be reserved for those

22   claims?

23         MR. KEGLEVIC:  I don't recall what that element of

24   the plan agreed to with respect to that one single item.  I

25   just don't recall.

1          MR. HOGAN:  Okay.

2          MR. KEGLEVIC:  I do know the intention is to pay

3     those claims, and to have sufficient equity to pay any

4     potential asbestos claims that come up as a result of these

5     entities.

6          MR. HOGAN:  Thank you, I have no further

7     questions.  Thank you, Your Honor

8          THE COURT:  Thank you, Mr. Hogan.  All right,

9     shall we move the objector exhibits into evidence and then

10    we'll hear redirect? (Indiscernible).  And if you could --

11    I know you're going to probably read something off.  If you

12    could provide something in writing to Ms. Werkheiser at your

13    convenience, I would appreciate that.

14         MR. GLUECKSTEIN:  Absolutely, Your Honor, and

15    we'll undertake to coordinate that effort.  But just for the

16    exhibit that the Debtor has not yet moved in, on our list

17    with Mr. Keglevic today, it's EFH Committee Exhibit 240, EFH

18    Exhibit 311, Debtor's Exhibit 80, EFH Committee 184, EFH

19    Committee 759 and EFH Committee 734.

20         THE COURT:  Any objection?

21         MR. MCKANE:  No objection.  What was the last one?

22         MR. GLUECKSTEIN:  734.

23         THE COURT:  It's admitted.  They're admitted

24    without objection.

25         MR. GLUECKSTEIN:  And I don't know --

1           THE COURT:  Is there anyone else?

2           MR. GLUECKSTEIN:  -- if anyone else has exhibits

3    for today --

4           MR. ANKER:  Your Honor, the one exhibit we --

5    Philip Anker, for the record, the one exhibit we --

6           THE COURT:  It's admitted.

7           MR. ANKER:  It's already admitted?  If you want us

8    to give a list, I mean, there may be more than one by the

9    end, but --

10          THE COURT:  All right, I'm not sure we're going to

11   pick you up on the microphone.  You got him?  All right, you

12   can project, that's great.

13          (Laughter)

14          MR. ANKER:  I've never been known (indiscernible).

15          THE COURT:  Well, the exhibit you moved in today

16   has been admitted.  If there are other exhibits that you

17   want to have admitted, you can work with counsel and submit

18   something.

19          MR. ANKER:  Thank you, Your Honor.

20          THE COURT:  You're welcome.

21          MR. GLUECKSTEIN:  And Your Honor, there might be a

22   few additional exhibits that (indiscernible) counsel has.

23   If they go beyond my list, we'll coordinate with the Debtors

24   and put them on the record tomorrow.

25          THE COURT:  Tomorrow?  Any objection?

1             MR. MCKANE:  Your Honor, there is no objection to

2     that process.

3             THE COURT:  Very good.  All right, redirect.

4             MR. MCKANE:  Thank you, Your Honor, and we thank

5     the objectors for their late afternoon efficiency.

6             Can we put DX 91 on the screen?  Mr. Keglevic,

7     during the course of your cross-examination, you were asked

8     about the specific performance that was available in, I

9     believe, a proposal you received from the Hunts in April.

10    Do you recall that?

11            MR. KEGLEVIC:  Yes.

12            MR. MCKANE:  Can you go to Page 6, please?  Shoot,

13    Page 9.  All right, go back to 7, I apologize.  Sorry.  No?

14    Go to 9.  I apologize.

15            MR. KEGLEVIC:  I was on that one.

16            MR. MCKANE:  All right.  Do you -- specifically,

17    you were shown the positive aspects of the bid.  Do you see

18    that on the top of the page?  The positive aspects of the

19    bid between the Hunt consortium and NextEra?

20            MR. KEGLEVIC:  Yes.

21            MR. MCKANE:  And specifically, there was

22    highlighted that, with the Hunt-led consortium on the left-

23    hand side of the screen, there was specific performance

24    available, but it only applies if debt financing is

25    available, is that correct?

1          MR. KEGLEVIC:  Correct.

2          MR. MCKANE:  All right, can we go forward a few

3    more slides to the negative aspects of the bid?  One more.

4    Okay, let's -- sir, do you see in the board presentation

5    that you gave, there was also a discussion of negative

6    aspects of the bid, right?

7          MR. KEGLEVIC:  There were.

8          MR. MCKANE:  And in particular, there was

9    discussion of the specific performance issues with the Hunt-

10   led consortium, that had some downsides as well.  Do you see

11   those?

12         MR. KEGLEVIC:  Yes.

13         MR. MCKANE:  Sir, can you explain to the Court

14   some of the limitations of the specific performance remedy

15   that was available in the Hunt-led consortium bid in April?

16         MR. KEGLEVIC:  Yes.  As I said, that -- I think

17   the one I testified to was that the debt financing was at

18   risk because we didn't have enough equity, but if you see

19   the specific performance, one of the ones I had forgotten

20   during questioning was, it wasn't joint and several, so

21   effectively, it could be specific performance to an entity

22   that didn't have any capital.  And in fact, the structure

23   that's being set up is being set up effectively with new

24   entities, so specific performance against an entity with no

25   capital isn't much of a remedy.

1           MR. MCKANE:  Okay, and with regard to the merger

2     transaction that is embedded in the plan that's currently

3     before the Court, is there a sale entity?

4           MR. KEGLEVIC:  There is.

5           MR. MCKANE:  Is that because that was often

6     referred to as Ovation?

7           MR. KEGLEVIC:  Yes, and that was the entity with

8     which the registration statement that I referred to in my

9     testimony, I think I summarized this on direct by saying

10    that we didn't think we'd get there with the Hunts, this

11    specific performance, and I should have been more clear,

12    meaning any meaningful remedy associated with specific

13    performance because of this, and the fact that it was

14    dependent on getting debt when they had issues associated

15    with their equity.

16           MR. MCKANE:  So when Mr. Glueckstein asked you the

17    question of whether the Hunts could force the T-uns to close

18    in this deal, is it also true that the Hunts could not have

19    forced their partners to have closed in their earlier offers

20    as well?

21           MR. KEGLEVIC:  That's correct.

22           MR. MCKANE:  Sir, (indiscernible) counsel for the

23    EFH Committee asked you a series of questions about, quote,

24    "EFH Consolidated," as it relates to solvency.  Do you

25    recall that series of questions?

1          MR. KEGLEVIC:  I do.

2          MR. MCKANE:  And at one point during your answers,

3   you referred to this as a misnomer, and something that had

4   no meaning.  Do you recall that?

5          MR. KEGLEVIC:  Yes.

6          MR. MCKANE:  Can you explain to the Court in your

7   own words why you thought the reference to "EFH

8   Consolidated" was a misnomer that had no meaning as it

9   relates to a solvency analysis?

10          MR. KEGLEVIC:  Yes, so the solvency analysis only

11   includes -- well, first, GAP financial statements are based

12   on original cost asset value.  So they don't purport to be

13   what the fair value of the enterprise is. So you can have a

14   GAP statement that shows negative equity that, when you in

15   fact apply fair value standards, has positive equity.  I

16   don't know necessarily that would have been the case here,

17   but it just points out one of the infirmities associated

18   with using GAP financial statements to do a solvency

19   analysis.

20          Probably more importantly in our case, and I tried

21   to describe this, is the fact that, to the extent we all --

22   I think there's been a lot of testimony today that TCEH had

23   significant operating losses and in fact was creating

24   negative shareholder equity.  We also know that all of the

25   debt on the TCEH side was trading down.

1           So effectively, even on a fair value basis, and we

2     put this in the financial statements as of the 10K for 2010,

3     that even on a fair value basis, the fair value of TCEH was

4     less than the face value of the debt obligations.

5           That shortfall between fair value and face value,

6     which we referred to here as a -- you know, the first lien

7     deficiency claim and in fact, the claims of the unsecured,

8     as compared to what value they'll receive, is not an

9     obligation of EFH.  That debt was never the responsibility

10    of EFH as a standalone entity.  So in fact, that deficiency

11    is not, in this Court, as a claim against the EFH box.

12          Similarly, in a solvency test, just looking at EFH

13    Corp on a standalone basis, you would not include those

14    liabilities or that shortfall associated with the fact that

15    fair value was less than debt on the TCEH side, and that

16    what was driving in the financial statements a substantial

17    portion, if not all, of the negative equity that was

18    reflected in the financial statements.

19          So, it's not a good indicator or an appropriate

20    measure of solvency to reflect consolidated liabilities for

21    which the parent had no responsibility, and that's what that

22    -- the deduct was effectively incorporated into those

23    negative numbers.

24          MR. MCKANE:  And sir, this deduct that you're

25    referring to, it -- is it fair to say that if you're doing a

1    solvency analysis, bottoms up from the subsidiaries up to

2    the parent, if TCEH were insolvent on a balance sheet basis,

3    am I right, that at most, the number that would then flow up

4    to EFH would be zero?  It wouldn't be a negative number?

5              MR. KEGLEVIC:  It cannot exceed zero.

6              MR. MCKANE:  And when you present EFH Consolidated

7    financials as they flow up, because not a solvency analysis,

8    you're flowing up a negative number?

9              MR. KEGLEVIC:  Flowing up, absolutely, a negative

10   number associated with the negative equity associated with

11   TCEH.

12             MR. MCKANE:  And so, when you were presented the

13   10Ks from 2010 to 2013, fair to say those were presented on

14   a GAP basis?

15             MR. KEGLEVIC:  Those are based on GAP and had the

16   infirmity that I just testified to and testified before,

17   associated with using those as representations of solvency

18   of an entity.

19             MR. MCKANE:  And if -- could we put up EFH

20   Committee Exhibit 466 at 111, internal page 111?  All right,

21   sir, you were shown a presentation, an internal

22   presentation, where you discussed ELRP and enterprise value,

23   do you recall that?

24             MR. KEGLEVIC:  I do.

25             MR. MCKANE:  And do you recall -- you were

1    presented two slides, the one preceding this and this slide.

2    Sir, can you explain the issue as it relates to consolidated

3    debt as it's discussed at the header, where it says, "Based

4    on the LRP forecast, the enterprise value is forecasted to

5    remain below the face value of the consolidated debts?"

6              MR. KEGLEVIC:  So, this has the same issue that --

7    the issue we described in the financial statements.  All

8    we're doing is taking the face value of all the debt and

9    comparing it to the fair value of all the assets.  To do it

10   by entity, you would have to strip out the face value of the

11   debt on the T side that exceeded the fair value on the T

12   side, because that's an obligation that would not be borne

13   by EFH.

14             So you'd have to do the same allocations.  You'd

15   have to take fair value of the assets minus the face value

16   of the debt, for those individual entities and consolidated

17   does not give you their appropriate rights and

18   responsibilities, obligations or support of the debt that

19   that exercise would.

20             MR. MCKANE:  All right, thank you, sir.  You were

21   also asked a series of questions about the liability

22   management program by (indiscernible) counsel for the

23   Committee.  I just had a few follow-ups in that area.  With

24   regard to the 2011 amend and extend transaction, that was a

25   TCEH-based transaction, is that correct?

1          MR. KEGLEVIC:  Yes, it was 100 percent TCEH.

2          MR. MCKANE:  Did you have Creditor support on both

3     the T side and the E-side for the 2011 TCEH amend and extend

4     transaction?

5          MR. KEGLEVIC:  Certainly we got 80 percent of the

6     vote from the TCEH first to do the transaction, and there

7     were some cross holders on the E-side that also were part of

8     that group that supported it.

9          MR. MCKANE:  And sir, you were also asked about

10    certain fees that were paid to bondholders to incentivize

11    them to do exchanges.  Do you recall that, sir?

12         MR. KEGLEVIC:  Yes.

13         MR. MCKANE:  Why were those fees paid to

14    bondholders in connection with those exchanges?

15         MR. KEGLEVIC:  A large portion of the fee was

16    effectively the increase in market interest rate that the

17    holders demanded in exchange for the covenant relief, the

18    maintenance covenant relief that we talked about, and the

19    extension of the debt.  We just chose, rather than pay that

20    over a period of time in terms of a higher coupon, which is

21    normal in that kind of deal, to effectively prepay it, and

22    that's why the numbers are as big as they are in that

23    transaction.

24         MR. MCKANE:  And did the payment of that fee, is a

25    fee in lieu -- instead of interest over time, assist the

1    Debtors in executing that transaction?

2         MR. KEGLEVIC:  It was an integral part of the

3    agreement of the 80 percent to do that transaction.

4         MR. MCKANE:  Okay.  Your Honor, I have no further

5    questions.  I understand Mr. Shore had a few questions.

6         THE COURT:  All right.  Mr. Shore.

7         MR. GLUECKSTEIN:  Your Honor, just an objection, I

8    guess, and a clarification.  Mr. Shore didn't have any

9    direct examination --

10        MR. SHORE:  This is cross on the directs that were

11   given by other people.

12        THE COURT:  Okay.

13        MR. GLUECKSTEIN:  But to the extent that if this

14   is cross, will we have an opportunity for a redirect on the

15   cross portion?

16        THE COURT:  Yes.

17        MR. GLUECKSTEIN:  Thank you.

18        MR. SHORE:  I just couldn't resist, sorry.

19        Good afternoon, Mr. Keglevic, Chris Shore from

20   White & Case.  Mr. Glueckstein asked you a series of

21   questions about EFH and EFIH being the, quote, "sellers" in

22   the process.  To be clear, with respect to all bids that

23   were received, weren't they to acquire EFH reorganized

24   equity with a tax-free deconsolidation of TCEH?

25        MR. KEGLEVIC:  Yes, that was the -- the form of

1    the transaction did not change between the plan we filed and

2    the bids.

3              MR. SHORE:  Did anybody bid for -- to acquire just

4    the Oncor interests that were owned below EFIH?

5              MR. KEGLEVIC:  No.  In fact, we did not offer the

6    opportunity to do so.  It was always reorganized EFH.

7              MR. SHORE:  And did anybody bid for reorganized

8    EFH stock without a tax-free deconsolidation of the T side?

9              MR. KEGLEVIC:  We -- as you remember, that was a

10   point of contention in the case, and we agreed in the bid

11   procedures to send out instructions that we would receive

12   either form of bid.  We never received a taxable form of

13   bid.

14             MR. SHORE:  Okay, so is it fair to say that with

15   respect to all bids, they were all premised on a conform

16   plan of -- sorry, a confirmed plan of reorganization of both

17   the E-side Debtors and the T side Debtors, right?

18             MR. KEGLEVIC:  There was no difference in the bids

19   and the ultimate plan we filed in terms of form.

20             MR. SHORE:  All right, so if the asset was going

21   to be sold, that Mr. Glueckstein was talking about, that

22   would require an affirmative vote of TCEH Creditors in the

23   requisite number and amount for that sale even to occur?

24             MR. KEGLEVIC:  Yes.

25             MR. SHORE:  Okay.  In your view, if TCEH -- and it

1    would also require that TCEH Debtors, while exclusivity was

2    extant, to propose a plan that would allow for the

3    transaction to close in which the Oncor assets were disposed

4    of?

5            MR. KEGLEVIC:  That's right.

6            MR. SHORE:  Okay.  In your view, if TCEH Debtors

7    and TCEH Creditors had to consent to the sale by voting,

8    proposing and voting on a plan, did you believe it was fair

9    that TCEH Debtors and TCEH Creditors should have a say in

10   how those assets were disposed of?

11           MR. KEGLEVIC:  Yes, I was not troubled by that

12   conclusion.

13           MR. SHORE:  And in your view, was it fair to have

14   -- would it have been fair to have structured a transaction

15   in which, if it didn't close, the only estates that would be

16   compensated would be the E-side?

17           MR. KEGLEVIC:  No, because at that point, we had

18   in fact a disinterested director settlement that showed that

19   there was a claim of T2E.

20           MR. SHORE:  Based on Mr. Glueckstein's

21   assumptions, though, assume for the sake of argument that

22   you did get somebody to agree to a break fee, $250 million

23   dollars, and it would only go to EFH and EFIH and we'd leave

24   the whole T side uncompensated for a break.  In that event,

25   wouldn't it be fair to say that -- that what would happen

1    instead of (indiscernible) is everyone would just go back to

2    the status quo?

3              MR. KEGLEVIC:  Yeah, the -- our big concern is we

4    would have given up exclusivity, wasted the time and expense

5    to pursue one transaction and be exactly where we were the

6    day before we filed the new plan.

7              MR. SHORE:  Right, and among other things that

8    would be going on, you'd go back to a T side litigation

9    between the firsts and the unsecured creditors, which was

10   blocking any plan there, right?

11             MR. KEGLEVIC:  Yeah, in fact, one of the

12   concessions that we got as part of this is the T unsecured

13   stopped the standing proceeding, and the costs associated

14   with pursuing standing while we were pursuing this plan,

15   which we also saw as value to the estate.

16             MR. SHORE:  Okay, I'm going to come to the T side

17   in just a sec, let's just focus on the E-side.  You get $250

18   million dollars in cash into EFIH and EFH in a broken

19   transaction.  Let's talk -- I just want you to put a little

20   more detail on the expenses going forward.  You'd have to

21   continue to pay the fees of the EFH Committee, right?

22             MR. KEGLEVIC:  Correct.

23             MR. SHORE:  You'd have to pay the interest on the

24   EFIH DIP, right?

25             MR. KEGLEVIC:  That's correct.

1          MR. SHORE:  The fees of the EFIH first and second

2     lien trustees?

3          MR. KEGLEVIC:  Correct.

4          MR. SHORE:  You'd have to pay second lien interest

5     on that $2 billion dollars?

6          MR. KEGLEVIC:  Correct, even -- even if we could

7     refinance it, there would still be interest we would have to

8     pay, but it --

9          MR. SHORE:  You'd be -- we're still talking about

10    refinancing it within bankruptcy and doing some kind of in-

11    bankruptcy new DIP.

12          MR. KEGLEVIC:  That's correct.

13          MR. SHORE:  All right.  You'd have -- EFIH and EFH

14    would continue to have to pay reorganization expenses.

15          MR. KEGLEVIC:  They would.

16          MR. SHORE:  Okay, and except for -- let's talk

17    about what's going to happen when we get out, there will be

18    new debt that's going to be essentially, as you said,

19    commensurate with the existing DIP, right?

20          MR. KEGLEVIC:  That's right.

21          MR. SHORE:  But other than all those -- with

22    respect to all those other expenses that you just testified

23    to, all of them will go away if the plan is consummated.

24          MR. KEGLEVIC:  Yes, they all go away.

25          MR. SHORE:  All right.  Now, let's talk about how

1    long the burn lasts, that is, how we get to exit.  You've

2    got $250 in cash in the bank and you're going to continue to

3    spend all those expenses until you get out.  One way to get

4    out is to get the global piece, right?

5             MR. KEGLEVIC:  Right.

6             MR. SHORE:  Now, I just want you to put your head

7    -- hat on as an EFH and EFIH officer.  Do you have any

8    ability to compel a resolution of the dispute between the T

9    first and the T-uns?

10            MR. KEGLEVIC:  I think I have proven completely

11   that I have no ability to do that as we sit here today.

12            MR. SHORE:  Okay.  And you have no ability as an

13   E-side officer or director to settle claims of T side

14   Creditors if you respect corporate separateness?

15            MR. KEGLEVIC:  No, it was only through consensus

16   or litigation.

17            MR. SHORE:  So is it fair to say that if you

18   wanted global piece worth $250 in the bank, you're still

19   held hostage to a resolution of claims over which you have

20   no control?

21            MR. KEGLEVIC:  That's correct.

22            MR. SHORE:  All right.  Now let's talk about

23   another scenario which has been posited here, that is where

24   EFH and EFIH just leave TCEH behind and exit.  Did Debtors

25   ever seriously consider that possibility?

1          MR. KEGLEVIC:  Yes, we -- I mean we looked at

2     every opportunity we could associated with the corporate

3     family to spin E, spin T, keep it together, what could we do

4     in a way that we can get consensus and that we could do in a

5     tax efficient manner.  And as I stated, we found no ability

6     to do that, and optimize the value of the estates.

7          MR. SHORE:  All right, so let's focus on the two

8     things that have to happen when you have E -- these guys

9     come out before anybody else.  There's still going to be the

10    T side and E-side litigation, right?

11         MR. KEGLEVIC:  That doesn't go away.

12         MR. SHORE:  Right, and in that instance, do you

13    that the T Creditors were alleging that there were billions

14    of dollars' worth of claims against the E-side?

15         MR. KEGLEVIC:  The number of the bid-ask spread

16    that I used when we did the zero term sheet was north of $2

17    billion dollars and -- that was alleged.

18         MR. SHORE:  So, do you enough about the bankruptcy

19    process now that, with disputed claims, there might have to

20    be a reserve that was set up to make sure that there was

21    enough value to pay claims if they get allowed at a later

22    date?

23         MR. KEGLEVIC:  I don't know that I've gotten much

24    smarter, but I'm sure Ms. Dore does know that.

25         MR. SHORE:  All right.  And let's talk about --

1    talk about the tax consequences of going forward.  If you

2    took EFH and EFIH out and left TCEH behind, one consequence

3    might be a giant tax, right?

4            MR. KEGLEVIC:  It would be -- yes, we -- early in

5    this case, we talked about double deconsolidation, which

6    basically would be about -- if I recall correctly, $3 to $3

7    billion dollars on each side of the house.

8            MR. SHORE:  Right, and you would also still run

9    the risk that the resolution of the T side would be a

10   Chapter 7 or some other taxable disposition of the T side

11   assets, which also might result in liability to EFH, right?

12           MR. KEGLEVIC:  Oh, that's right, because EFH is

13   joint and several to any tax liability and you'd have to

14   litigate that. So, and you had mentioned that we would have

15   to, I believe, litigate who gets the 225 and how that would

16   be split among the parties, and probably wouldn't know those

17   splits until we litigated all the claims.

18           MR. SHORE:  Mm hmm.  And in that scenario, what

19   the EFH Creditors you decided to exit would be risking would

20   be some form of tax that can either be a post-emergence tax,

21   an administrative expense, or a pre-petition claim in the

22   EFH bankruptcy case, right?

23           MR. KEGLEVIC:  Yes, we could never find a way that

24   that didn't completely impair the E-side in a substantial

25   manner.

1          MR. SHORE:  All right.  I'm going to ask you to

2    separate in your mind the shepherd from the flock.  The EFH

3    Committee has posited this.  Has any EFH Creditor, to your

4    knowledge, ever proposed that they wanted to do a

5    transaction in which they risked a deconsolidation tax?

6          MR. KEGLEVIC:  None.

7          MR. SHORE:  Okay.  As they suggested, in any way

8    that that they would support a transaction in which EFH and

9    EFIH came out of bankruptcy before the T side with a

10   resolution of all inner Debtor and tax issues?

11         MR. KEGLEVIC:  No, in fact the largest EFH

12   Creditor, represented by Fidelity, has been very conscious

13   of that amount, and in fact, you know, has always been

14   willing to support the tax-free for exactly that reason, and

15   in fact as part of their deal, even accept the disinterested

16   director settlement to that effect.

17         MR. SHORE:  Okay, and let's go back to the

18   shepherd.  Has the EFH Committee ever proposed a plan to the

19   Debtors which would have EFIH and EFH coming out before

20   TCEH?

21         MR. KEGLEVIC:  No, the closest was today when -- I

22   forget now who mentioned it again, but -- talked about

23   retiming the transaction and forming the REITs and then

24   spinning off, and as I said, we studied that, we don't

25   believe it's feasible.  I've never seen that on a piece of

1  paper.  I'm still not sure I understand fully, but I think I

2  do enough to know that that, as far as we're concerned, is

3  not plausible or executable.

4          MR. SHORE:  So, just to be fair, the $250 in the

5  scenario we're talking about has come in the bank, but do

6  you have any belief that the Debtors will be able to get to

7  the hoped for global piece before that $250 is spent, even

8  if it's just allocated to the E-side?

9          MR. KEGLEVIC:  No, it would just be $225 million

10  that would be more than exhausted through a lengthy, multi-

11  year bankruptcy practice -- or case, and we -- that's why we

12  devalued it considerably, as compared to the alternative we

13  selected.

14          MR. SHORE:  And given that testimony, is it your

15  view that disarmament and drag is a better option?

16          MR. KEGLEVIC:  It is.  We valued it as a multiple

17  of the potential cash, considering all the costs of delay in

18  the case, the effect on the estates and the costs to defend.

19          MR. SHORE:  At the time the merger contract --

20  just to move subjects, but at the time the merger contract

21  was entered into, is it a fair summary of your testimony

22  that the Debtors concluded that the investors intended to

23  close when they signed it?

24          MR. KEGLEVIC:  Yes, absolutely, and I -- you know,

25  I'm of the same opinion today, based on discussions I've had

1    with the investors.

2              MR. SHORE:  Well, let's give you another fact,

3    too.  And since that day, are you aware the TCEH unsecured

4    creditors have been solicited and asked to vote on the plan?

5              MR. KEGLEVIC:  Yes.

6              MR. SHORE:  And do you understand that the TCEH

7    creditors, unsecured creditors, being solicited were asked

8    to vote on a plan in which their sole source of recovery is

9    either the booby prize or the rights to purchase the EFH

10   reorganized equity?

11             MR. KEGLEVIC:  I am aware of it.

12             MR. SHORE:  And do you know how the voting came

13   out at the TCEH unsecured class?

14             MR. KEGLEVIC:  I don't remember the exact

15   percentage but almost unanimous.

16             MR. SHORE:  All right, if I told you that it was

17   96.3 percent in amount, would that be consistent with your

18   view?

19             MR. KEGLEVIC:  That is close to my recollection.

20             MR. SHORE:  So is it your understanding as the CFO

21   of the TCEH Debtors that 96.73 percent of your unsecured

22   creditors are willing to take their sole source of recovery

23   being the rights to purchase reorganized EFH equity?

24             MR. KEGLEVIC:  Yes, with respect to the TCEH

25   unsecured, that is correct.

1            MR. SHORE:   Okay.   Now, part of the questioning

2     seemed to insinuate between now and the effective date,

3     there's going to be a radical devaluation of Oncor and the

4     deal might not close.   As you sit here today, have you or

5     any of your advisors come to the view that there is a

6     tangible risk that such a devaluation will occur?

7            MR. KEGLEVIC:   No, we're not -- in fact, the

8     economic conditions as they existed in August when we filed

9     and today are not remarkably different and we are not

10    forecasting, especially with a rate regulated enterprise

11    that has a very steady revenue stream and rate regulated

12    policies, we just do not see the volatility between now and

13    then.

14            MR. SHORE:   And given your prior testimony,

15    regarding utility volatility, is it fair to say that you

16    think the risk of a material downward Oncor value is

17    outweighed by the likelihood of a consummated deal that pays

18    all the E-side creditors in full?

19            MR. KEGLEVIC:   That was certainly our conclusion

20    when we signed the deal and it remains our conclusion today.

21            MR. SHORE:   And to be clear, is there any

22    alternative, as you sit here today, that anybody has

23    presented that says they'll do the deal that's on the table

24    with a break fee or specific performance?

25            MR. KEGLEVIC:   No, there's no alternative.   The

1    only thing I'm hearing is people want to change certain

2    elements of the deal, but nobody has proposed any

3    alternative.

4            MR. SHORE:  All right, now I have a fun question

5    with you because it's late.  Let me tell you that it costs a

6    thousand dollars to buy an armadillo, okay?  How many

7    armadillos can you buy with $2 billion dollars?

8            MR. KEGLEVIC:  It --

9            MR. SHORE:  (WHISPERS) Two million.

10           MR. KEGLEVIC:  I have to do the zeros, but that's

11   right, I need --

12           MR. SHORE:  Two million.

13           MR. KEGLEVIC:  Two million.

14           MR. SHORE:  Is it fair to say that, in your view,

15   reorganized EFH would have the wherewithal to buy two

16   million armadillos in 2016?

17           MR. KEGLEVIC:  Yes.

18           MR. SHORE:  Okay.  Mr. Anker didn't ask you the

19   question, but you agree with me, there's a difference

20   between whether New EFH can pay for something and whether

21   New EFH should pay for something.  Now, let me ask you this.

22   Can you think of any business reason, other than the Court

23   tells you that New EFH or EFH or any other Debtor should

24   waive any of the appellate rights it has right now to defend

25   the Court's decisions with respect to the make wholes?

Page 260

```
 1              MR. ANKER:  Objection, Your Honor.  It calls for a

 2     legal conclusion, it's leading, among other things.

 3              MR. SHORE:  It doesn't call for -- I asked for a

 4     business decision --

 5              THE COURT:  First of all, it's cross, so it can be

 6     leading.  He's crossing based on --

 7              MR. ANKER:  But he's -- but he was --

 8              THE COURT:  -- on your direct.

 9              MR. ANKER:  But he was a hostile witness for me.

10     I was (indiscernible).

11              MR. SHORE:  I would like to argue whether or not I

12     could treat Mr. Keglevic as a hostile witness.

13              (Laughter)

14              MR. SHORE:  And whether he could treat me as a

15     hostile questioner, but I can rephrase.

16              THE COURT:  All right, you can.

17              MR. SHORE:  First of all, I'm only asking for a

18     business reason.  Can you think of any business reason why

19     any of the Debtors should give up any appellate rights they

20     have to defend this Court's decisions with respect to the

21     make wholes?

22              MR. KEGLEVIC:  First, my answers about the $2

23     billion dollars were clearly ability to pay, not should they

24     pay, and I can't think of any reason if I was counseling the

25     investors, whey they would give up their opportunity to
```

1    defend against a settlement that would substantially dilute

2    their equity.

3            MR. SHORE:  And can you think of any reason why

4    the Debtors would have to give up any rights?

5            MR. KEGLEVIC:  I can't imagine if that was part of

6    the deal we negotiated that we would have gotten it signed.

7            MR. SHORE:  Thank you.

8            THE COURT:  All right, Mr. Glueckstein?

9            MR. GLUECKSTEIN:  Very briefly, Your Honor.  Mr.

10   Keglevic, Mr. Shore pointed out the voting results in

11   connection with the plan confirmation, do you recall that?

12           MR. KEGLEVIC:  I do.

13           MR. GLUECKSTEIN:  The Debtors did not receive any

14   color as to why creditors voted in favor of the plan, did

15   they?

16           MR. KEGLEVIC:  I've had personal discussions with

17   some of the principals, and I believe -- as I stated before,

18   I think I testified to this, they, as we sit here today,

19   still believe there is more upside in the closing of this

20   transaction and the execution of this plan than there is to

21   the alternative, but I did not specifically ask if that was

22   the basis behind their vote.

23           MR. GLUECKSTEIN:  Okay, and Mr. Shore put the

24   statistics off of 96-odd percent.  I'm assuming you have not

25   spoken to 96 percent of creditors at TCEH, correct?

1          MR. KEGLEVIC:  No, I've spoken primarily to the

2     back (indiscernible) parties who are going to put up the

3     money and take the risk of the investment.

4          MR. GLUECKSTEIN:  Okay.  So, but you -- but the

5     Debtors do not know whether the 96 percent support is -- has

6     anything to do with closing of the transaction or the

7     overall economic package, including the 550 in the downside

8     case, correct?

9          MR. KEGLEVIC:  It's -- I can speculate, but I

10    would be speculating.  I have not had that discussion with

11    the individual voters.

12         MR. GLUECKSTEIN:  Okay, thank you.  No further

13    questions.

14         THE COURT:  Thank you.  Mr. Anker.

15         MR. ANKER:  Thank you, Your Honor, I'll be very

16    brief.  Mr. Keglevic, you're not a lawyer, right?

17         MR. KEGLEVIC:  Correct.

18         MR. ANKER:  And you're not offering any view on

19    what it means to unimpair a creditor, right?

20         MR. KEGLEVIC:  I would not think to do so.

21         MR. ANKER:  Okay, thank you, Your Honor.

22         THE COURT:  Thank you.  And Mr. Keglevic, thank

23    you very much for your time.

24         MR. KEGLEVIC:  Thank you, Your Honor.

25         MR. MCKANE:  Your Honor, I'm -- I recognize we did

```
 1    not make as much progress through our witnesses as we had

 2    hoped today.

 3              (Laughter)

 4              THE COURT:  I thought you were optimistic.

 5              MR. MCKANE:  Well, we're always optimistic, we're

 6    Debtors.  You said yesterday, I believe, that you had some

 7    concerns as to whether you might be able to start at 12:30.

 8              THE COURT:  I'm going to try very hard.  I'm

 9    presiding over a naturalization ceremony across the street

10    tomorrow at 11:00.  They generally run an hour but it's a

11    little hard to predict.  It's a very important event.  I

12    don't -- I take time to meet with the people afterwards and

13    I'm not going to rush that.

14              MR. MCKANE:  Not at all.

15              THE COURT:  So, my hope is to start at 12:30.  It

16    certainly -- I can't imagine starting any later than 1:00,

17    but I am hopeful to be able to start at 12:30 and I --

18    because of that, I thought we would not have our sort of

19    little planning meeting that we've been -- that we're

20    generally going to have before we start, we can just get

21    right into court.

22              MR. MCKANE:  Very good, Your Honor.  We will be

23    very short with Mr. Carter and Mr. Horton tomorrow and it is

24    our hope that we're able to get both of them up and off the

25    stand.
```

1          THE COURT:  Okay.  And it -- is there -- do we
2    know who the -- the person after them would be if we were so
3    lucky?  I know we only have half the day, so I can't imagine
4    --
5          MR. MCKANE:  Yeah, I have concerns, but we have
6    witnesses in Wilmington, available, and then we will have a
7    -- have to talk about taking Mr. Smith Friday morning.
8          THE COURT:  Right.
9          MR. MCKANE:  And so, we will be ready to play it
10   by ear and we will not, hopefully, lose any time --
11         THE COURT:  Okay.
12         MR. MCKANE:  -- tomorrow.
13         THE COURT:  Very good.
14         MR. MCKANE:  Thank you for your patience with us.
15         THE COURT:  Anybody have anything before we leave
16   for the day?  Mr. Anker?
17         MR. ANKER:  I presume that, even though we won't
18   be resuming tomorrow morning, since you will be across the
19   street, we can leave our stuff here?
20         THE COURT:  Yes, yes.  You have the court for the
21   balance of the week.  You need to clean up Friday
22   afternoon/evening, but yes, you can leave all your packages,
23   et cetera.  Anything else?  Very good.  We're adjourned,
24   I'll see you tomorrow at 12:30.
25         MR. ANKER:  Thank you, Your Honor.

Page 265

1                    C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5    Sonya Ledanski       Digitally signed by Sonya Ledanski Hyde
                          DN: cn=Sonya Ledanski Hyde, o=Veritext,
6    Hyde                 ou, email=digital@veritext.com, c=US
                          Date: 2015.11.05 14:51:59 -05'00'
7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  November 5, 2015