1  UNITED STATES BANKRUPTCY COURT

2  DISTRICT OF DELAWARE

3

4

5  In re:                    :

                            :      Chapter 11

6  ENERGY FUTURE HOLDINGS    :

   CORP., et al.,      :    :    Case No. 14-10979(CSS)

7                            :

         Debtors.      :    (Jointly Administered)

8  _____:

9

10

11                            United States Bankruptcy Court

12                            824 North Market Street

13                            Wilmington, Delaware

14                            November 5, 2015

15                            12:36 p.m. - 4:41 p.m.

16

17

18

19

20

21  B E F O R E :

22  HON CHRISTOPHER S. SONTCHI

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO OPERATOR:  LESLIE MURIN

1    HEARING re: Confirmation Hearing

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:    Sonya Ledanski Hyde

Page 3

1   A P P E A R A N C E S :

2

3   ASHBY & GEDDES PA

4       Attorneys for WSFS Second Lien Trustee

5

6   BY:  GREGORY A. TAYLOR

7

8   BROWN RUDNICK LLP

9       Attorneys for WSFS Second Lien Trustee

10

11  BY:  JONATHAN D. MARSHALL

12

13  CROSS & SIMON

14       Attorneys for Fidelity

15

16  BY:  MICHAEL J. JOYCE

17

18  DRINKER BIDDLE & REATH LLP

19       Counsel to Citibank NA, TCEH DIP Agent

20

21  BY:  HOWARD A. COHEN

22

23

24

25

1    FOLEY & LARDNER LLP

2         Attorney for UMB Bank, NA as Indenture Trustee

3

4    BY:  HAROLD L. KAPLAN

5

6    FOX ROTHSCHILD LLP

7         Attorney to Ad Hoc Committee of EFIH Unsecured

8         Noteholders and EFIH Second Lien DIP Commitment

9

10   BY:  JEFFREY M. SCHLERF

11

12   FRIED FRANK

13        Attorneys for Fidelity

14

15   BY:  GARY L. KAPLAN

16        MATTHEW M. ROOSE

17

18   JENNER & BLOCK LLP

19        Attorneys for EFIH

20

21   BY:  VINCENT E. LAZAR

22

23

24

25

1    KLEHR HARRISON HARVEY BRANZBURG LLP

2          Counsel to UMB Bank N.A. Indenture Trustee

3

4    BY:  RAYMOND H. LEMISCH

5

6    KRAMER LEVIN NAFTALIS & FRANKEL LLP

7          Attorneys for Second Lien Indenture Trustee

8

9    BY:  GREGORY A. HOROWITZ

10

11   MCELROY, DEUTSCH, MULVANEY, & CARPENTER, LLP

12          Co-Counsel to the TCEH Debtors

13

14   BY:  DAVID P. PRIMACK

15

16   MONTGOMERY, MCCRACKEN, WALKER & RHOADS

17          Co-Counsel to the EFH Creditors' Committee

18

19   BY:  DAVID DORMONT

20          MARK B. SHEPPARD

21

22

23

24

25

1  MORRIS JAMES LLP

2       Attorney for Law Debenture of New York, Indenture

3       Trustee

4

5  BY:  STEPHEN M. MILLER

6

7  MORRISON & FOERSTER LLP

8       Attorneys to TCEH Official Committee

9

10  BY:  CHARLES L. KERR

11       TODD M. GOREN

12       BRETT H. MILLER

13

14  MUNGER, TOLLES & OLSON LLP

15       Co-Counsel to the TCEH Debtors

16

17  BY:  THOMAS B. WALPER

18

19  NIXON PEABODY LLP

20       Attorneys for AST as EFH Indenture Trustee

21

22  BY:  MORGAN C. NIGHAN

23       RICHARD C. PEDONE

24

25

1   O'KELLY, ERNST & BIELLI LLP

2       Co-Counsel to Energy Future Holdings Corp.

3

4   BY:  DAVID M. KLAUDER

5

6   PACHULSKI STANG ZIEL & JONES

7       Attorney for Second Lien Indenture Trustee

8

9   BY:  LAURA DAVIS JONES

10

11   PATTERSON BELKNAP

12       Attorney for Law Debenture of New York, Indenture

13       Trustee

14

15   BY:  BRIAN P. GUINEY

16

17   PAUL WEISS RIFKIND WHARTON & GARRISON LLP

18       Counsel to Ad Hoc Committee Of TCEJ First Liens

19

20   BY:  JACOB A. ADLERSTEIN

21       ANDREW BERNSTEIN

22       BRIAN S. HERMANN

23

24

25

1    POLSINELLI PC

2         Co-Counsel to the TCEH Creditors' Committee

3

4    BY:  JARRETT K. VINE

5         CHRISTOPHER A. WARD

6

7    POTTER ANDERSON & CORROON LLP

8         Attorneys for Deutsche Bank, Agent to DIP Financing

9

10   BY:  R. STEPHEN MCNEILL

11        JEREMY W. RYAN

12

13   PROSKAUER ROSE LLP

14        Attorneys for EFH Corp. Disinterested Directors

15

16   BY:  MICHAEL A. FIRESTEIN

17        MARK K. THOMAS

18

19   SEWARD & KISSEL LLP

20        Attorneys to Wilmington Trust NA-First Lien Agent

21

22   BY:  ARLENE R. ALVES

23

24

25

1    SHEARMAN & STERLING LLP

2        Attorneys to Deutsche Bank, Agent to DIP Financing

3

4    BY:  NED S. SCHODEK

5

6    STEVENS & LEE PC

7        Co-Counsel to Energy Future Intermediate Holding

8        Company LLC

9

10   BY:  JOSEPH H. HUTSON, JR.

11

12   U.S. DEPARTMENT OF JUSTICE

13       U.S. Trustee

14

15   BY:  DAVID GERARDI

16

17   WACHTELL, LIPTON, ROSEN & KATZ

18       Attorneys for Equity Sponsors

19

20   BY:  EMIL A. KLEINHAUS

21       ALEXANDER B. LEES

22

23

24

25

```
 1   WHITE & CASE LLP

 2        Attorney to Ad Hoc Committee of EFIH Unsecured

 3        Noteholders and EFIH Second Lien DIP Commitment

 4

 5   BY:  THOMAS LAURIA

 6        J. CHRISTOPHER SHORE

 7

 8   WILMER CUTLER PICKERING HALE & DORR LLP

 9        Attorneys for Marathon Asset Management

10

11   BY:  DAVID GRINGER

12

13   YOUNG CONAWAY

14        Counsel to Ad Hoc Group of TCEH Unsecured Noteholders

15

16   BY:  PAULINE K. MORGAN

17

18   ALSO APPEARING TELEPHONICALLY:

19   SCOTT L. ALBERINO

20   ASHLEY F. BARTRAM

21   PEG A. BRICKLEY

22   EMILY A BUSSIGEL

23   STEVEN H. CHURCH

24   MARIA CHUTCHIAN

25   MARK A. CODY
```

1   KENT COLLIER

2   LOUIS A. CURCIO

3   ADAM M. DENHOFF

4   EPHRAIM DIAMOND

5   BENJHAMIN D. FEDER

6   BARRY FELDER

7   MARK A. FINK

8   JULIA FROST-DAVIES

9   XIAOYU GU

10   CHRISTOPHER HAHM

11   MARK F. HEBBEIN

12   ANGELA K. HERRING

13   NATASHA HWANGPO

14   SAF JOSHI

15   ANNA KALENCHITS

16   MATTHEW W. KINSKEY

17   CHARLES KOSTER

18   ROBERT K. MALONE

19   RICHARD G. MASON

20   ANDERS J. MAXWELL

21   BRIAN P. MORGAN

22   HAL F. MORRIS

23   TINA MOSS

24   MEREDITH S. PARKINSON

25   LARS A PETERSON

1   BRIAN PFEFFER

2   MEREDITH PFISTER

3   MEREDITH QUICK

4   ERICA RICHARDS

5   RACHAEL RINGER

6   MARC B. ROITMAN

7   RICHARD SCHEPACARTER

8   ANDREA B. SCHWARTZ

9   FREDRIC SOSNICK

10   RICHARD A. STEIGLITZ

11   ANDREW M. THAU

12   AMER TIWANA

13   BRIAN TONG

14   CARL TULLSON

15   MICHAEL TURKEL

16   MATTHEW UNDERWOOD

17   KEVIN M. VAN DAM

18   JULIA M. WINTERS

19   APARNA YENAMANDRA

20   DANIELE ZAZOVE

21   DAVID ZYLBERBERG

22

23

24

25

1              P R O C E E D I N G S

2              MR. MCKANE:  -- realize that we were only able to

3      complete Mr. Keglevic's testimony yesterday, but we are

4      optimistic, and we're going to be able to pick up the pace

5      today, and with that, we'd like to start with three

6      witnesses whose testimony we believe is uncontested.

7              THE COURT:  Okay.

8              MR. MCKANE:  All right, the first is Ms. Jane

9      Sullivan.  Ms. Sullivan is -- filed a written declaration on

10     October 31st, Docket No. 6826, and I have copies for Your

11     Honor and for the Courtroom.

12             It was also served on the parties in accordance

13     with the scheduling order.  Ms. Sullivan is the Executive

14     Vice President and Director of Restructuring Services at

15     Epiq Bankruptcy Solutions.  Her declaration set forth the

16     following information with respect to the solicitation and

17     voting process of the Debtor's plan of reorganization.

18             First, the Creditor classes who are entitled to

19     vote, second, Epiq's process for receiving and reviewing the

20     ballots, and the tabulation of the ballots cast by holders

21     of claims in the voting classes.

22             Ms. Sullivan's declaration also includes as

23     exhibits, a schedule of the voting classes, the results of

24     the votes by voting class, a report of the ballots that were

25     excluded and the reasons therein, and a separate tabulation

1    report of the PCRB claims, that is TCEH claims Class 4.

2            And our understanding that no party -- sorry, it

3    is our understanding that no party has questions for this

4    witness.  Ms. Sullivan is in the Courtroom today and Your

5    Honor, unless you have any questions, the Debtors move into

6    evidence the declaration of Jane Sullivan.

7            THE COURT:  All right, thank you.  Can you

8    approach with the binder?

9            MR. MCKANE:  Thank you.

10           THE COURT:  Does anyone wish to cross-examine the

11   witness?  All right, I hear none.  Any objection to the

12   admission of the declaration?  Again, I hear none, so Ms.

13   Sullivan's declaration, Docket 2826 is admitted without

14   objection.  I had no questions for the witness and she may

15   be excused if she wishes.

16           MR. MCKANE:  Thank you, Your Honor.  Our next

17   witness is Mr. David Herr.  Mr. Herr is the Managing

18   Director at Duff & Phelps and has provided valuation and

19   property tax consulting services to the Debtors in these

20   cases.  Mr. Herr's declaration provides a liquidation

21   valuation on an asset-by-asset basis for the TCEH assets.

22   Those include TCEH Debtors and their subsidiaries, Your

23   Honor.

24           Those include Comanche Peak Station and the

25   related nuclear fuel inventory and supply contracts; the Oak

1    Grove Station, including related lignite coal mineral

2    rights; the Sandow Station, including its related lignite

3    coal mineral rights; the Monticello Power Plant and its

4    lignite coal mineral rights; Martin Lake and its lignite

5    coal mineral rights; the Big Brown Power Plant and its

6    related coal supply contract and lignite coal mineral

7    rights, and the gas peaking plants, which are combustion

8    turbines and other types as well as TSU Energy as the

9    operating retail business.

10           Mr. Herr used the income approach of valuation to

11   give each of these assets a low, mid, and high value, and

12   for each asset, he took into account many factors that could

13   impact their value, including the age of the facilities,

14   environment compliance costs, the ERCOT power prices, and

15   favorable or unfavorable contract positions.

16           He also evaluated several potential buyers for

17   each asset, including the independent power producers,

18   financial buyers, and other strategic buyers.

19           Your Honor, pursuant to Paragraph 9 of the

20   Scheduling Order, we previously served Mr. Herr's written

21   direct testimony on all parties who are objecting, and it is

22   our understanding that no party has questions for this

23   witness.

24           Mr. Herr, again, is available here in the

25   Courtroom, and unless Your Honor has any questions, the

1    Debtors' move Mr. Herr's written direct testimony into

2    evidence.

3              THE COURT:  Okay, please approach.  Now, this has

4    not been docketed, correct?

5              MR. MCKANE:  It has not been docketed.

6              THE COURT:  Very good.  All right, does anyone

7    have any questions for Mr. Herr?  The Court hears none.  Is

8    there any objection to the admission of the declaration?

9    Again, I hear none.  I have no questions for the witness.

10   The declaration of Mr. Herr is admitted without objection.

11             MR. MCKANE:  Thank you, Your Honor.  One

12   additional witness.  Our third witness today is Mr. John

13   Stuart.  Mr. Stuart is a Managing Director at Alvarez &

14   Marsal.  He is also the Chief Restructuring Officer of

15   another Debtor in front of Your Honor.  He has assisted the

16   Debtors in these cases with the preparation of financial

17   disclosures, cash flow and DIP financing forecasts, and has

18   served as the principal contact of the Debtor's key

19   constituencies regarding certain financial matters.

20             Mr. Stuart has provided a T-side liquidation

21   analysis that shows the implied recoveries for all classes

22   under the plan are significantly greater than the estimated

23   recoveries for all classes if these cases were converted

24   into a Chapter 7, and specifically these cases we're

25   referring to, the TCEH Debtor's cases and the Debtors below

1    TCEH.

2            Mr. Stuart's written direct testimony details the

3    assumptions and limitations underlying the liquidation

4    analysis as well as his methodology, the results of the

5    liquidation analysis are attached as Figure 1 to his written

6    direct testimony, and, Your Honor, consistent with Paragraph

7    9 of the scheduling order we previously served Mr. Stuart's

8    written direct testimony on all objectors.  Our

9    understanding is no one has questions for this witness.

10           Again, Mr. Stuart is here in the courtroom and

11   unless Your Honor has any questions, the Debtor moves Mr.

12   John Stuart's written direct testimony into evidence.

13           THE COURT:  All right, please approach.  Does

14   anyone wish to cross-examine the witness?  I hear none.

15   Does anyone object to the admission of the declaration into

16   evidence?  Again, the Court hears no comment.  I have no

17   questions for Mr. Stuart, so John L. Stuart's declaration is

18   admitted into evidence without objection.

19           MR. MCKANE:  Thank you, Your Honor.  Your Honor,

20   in addition, the Debtors have been able to work out a

21   stipulation of facts with the official Committee, the EFH

22   official Committee, regarding certain facts that neither

23   party believes are in dispute.  These cover a number of

24   topics, including interest paid as reflected in the Debtor's

25   SEC filings, the use of the DIP facility at EFIH, certain

1    intercompany payable amounts at various points in time, and

2    certain calculations of the sponsor and financing fees that

3    were paid to the sponsors and their affiliates.

4            In addition, with this stipulation, the Debtors

5    and the EFH Committee have agreed not to call the following

6    witnesses at the confirmation hearing:  Arcilia C. Acosta;

7    Donald L. Evans; Kristopher Moldovan, and Kenneth

8    Pontarelli.

9            THE COURT:  Okay.

10            MR. MCKANE:  Your Honor, the stipulation of facts

11   has been signed by the Debtors as well as Sullivan &

12   Cromwell and counsel for Montgomery McCracken as well for

13   the EFH Committee.

14            THE COURT:  Okay, please approach.

15            MR. MCKANE:  Thank you.

16            MR. PEDONE:  Your Honor, may I be briefly heard?

17            THE COURT:  Yes.  Yes, Mr. Pedone?

18            MR. PEDONE:  Your Honor, Richard Pedone for

19   American Stock Transfers, indenture trustee.  We have no

20   issues with the fact stipulation, nor with the committee

21   reaching agreement with regard to witnesses to be called to

22   confirmation in phase 1.  We want to be clear, however, that

23   American Stock Transfers' rights to recall these witnesses

24   or to call them at phase 2 have fully been reserved, and we

25   have not agreed to limit witnesses that might be needed in

1    phase 2.  Thank you.

2                THE COURT:  Comment, Mr. McKane?

3                MR. MCKANE:  Your Honor, we understand and

4    recognize that the EFH indenture trustee is a party separate

5    and distinct from the EFH committee.  We will work with Mr.

6    Pedone.  We reserve all rights to object to the attempt to

7    call any of these witnesses in phase 2 based on multiple

8    reasons including relevance to the --

9                THE COURT:  Of course.

10               MR. MCKANE:  -- you know -- but so we're not

11   conceding that, and we'll address that at that time as

12   needed.

13               THE COURT:  Okay, thank you.

14               MR. SCHEPACARTER:  Good afternoon, Your Honor, can

15   I be heard for a second?

16               THE COURT:  Who are you?  Yes, please identify

17   yourself for the record.

18               MR. SCHEPACARTER:  Yes.  I just wanted to make

19   sure I would be able to be heard.  Mr. Richard Schepacarter,

20   from the United States Trustee's office.

21               With respect to the -- calling Mr. Evans as a

22   witness, we haven't signed onto any stipulations, I haven't

23   seen any stipulations, and as of right now, it is still our

24   intention to have Mr. Evans testify.  However, we're also

25   willing to work with the Debtor's resolution of that.  But I

1    just wanted to make sure that the record is clear that it is

2    still the United States Trustee's intention to call Mr.

3    Evans for this hearing.

4              THE COURT:  All right.  Thank you, Mr.

5    Schepacarter.  Mr. McKane, comment?

6              MR. MCKANE:  Your Honor, our stipulation is what

7    the official Committee.  We are having separate discussions

8    with the United States Trustee.  We've been doing that on an

9    ongoing basis throughout the case, including with regards to

10   this issue, even before the trial started, and we'll

11   continue this discussions.

12             THE COURT:  Very good, thank you.  All right,

13   unless there's an objection, obviously based on the --

14   subject to the reservations of all parties on the rights and

15   full of knowledge been that this is a stipulation between

16   the E-side Committee and the Debtors and doesn't bind anyone

17   else obviously, the Court will admit the stipulation of

18   facts into evidence.

19             MR. MCKANE:  Thank you, Your Honor.  And with

20   that, we'd like to call our fourth witness of the day, Mr.

21   Michael Carter.

22             THE COURT:  Very good.  I like how you put that

23   in, fourth witness of the day.  That's gonna look really

24   good on the transcript.

25             CLERK:  Raise your right hand.  Do you affirm

1    you're ready to tell the truth, the whole truth, and nothing

2    but the truth to the best of your knowledge and belief?

3              MR. CARTER:  Yes, I do.

4              CLERK:  Please state and spell your name for the

5    record.  Michael Carter, M-I-C-H-A-E-L, Carter, C-A-R-T-E-R.

6              CLERK:  Thank you.

7              THE COURT:  All right.  I'm sorry, just before we

8    start, I wanted to make it clear for everyone in the

9    courtroom.  I think it's obvious, but we obviously will not

10   be breaking for lunch today since it -- because of the late

11   start.  We'll go straight through to 5:00.

12             MR. MCKANE:  Very good, Your Honor.  Your Honor,

13   to assist with Mr. Carter's examination, we do have witness

14   binders, and we have decided to label those Debtor's witness

15   binder from Michael Carter, recognizing that the Committee

16   will have one as well.  May I approach?

17             THE COURT:  Okay.  Yeah, I thought I had one, but

18   go ahead.  Oh, this is the Committee one?

19                         DIRECT-EXAMINATION

20   BY MR. MCKANE:

21   Q    Good afternoon, Mr. Carter.  Can you introduce yourself

22   to the Court?

23   A    Yes, I'm Michael Carter.  I'm the Senior Vice President

24   of Corporate Planning for EFH Corp. and its subsidiaries.

25   Q    And Mr. Carter, how long have you worked for EFH and

1    its predecessors?

2    A    I've worked for them for 10 years.  And sir, how long

3    have you served in your current position as Senior Vice

4    President of Corporate Planning?  Since February of 2012.

5    Q    And sir, prior to that, what was your role at EFH?

6    A    From May of 2008 through February of 2012, I was the

7    CFO and Senior Vice President of Customer Operations and IT

8    for TXU Energy.

9    Q    And sir, TXU Energy, that's the retail business?

10   A    That is correct.

11   Q    And sir, prior to your position as the CFO and Senior

12   Vice President of Operations for TXU Energy, what position

13   did you hold at EFH?

14   A    I was previously, for about nine months, I was

15   previously the controller for Luminant, which is the

16   competitive generation arm.  And before that, from 2005 to

17   2007, I was the Assistant Controller for Business

18   Development for TXU Corp.

19   Q    And sir, TXU Corp at that time, that was the parent?

20   A    That is correct.  That's now EFH.

21   Q    And sir, for just briefly prior to your employment at

22   TXU and EFH, what did you do?

23   A    I was the manager and director for KPMG in transaction

24   services.

25   Q    Sir, have you been involved in the EFH restructuring

1    efforts?

2    A    Yes, I have, since, you know, 2012 when we started the

3    restructuring, kind of looking at the restructuring.  I've

4    been involved in all aspects of the restructuring from doing

5    due diligence for all the different creditor groups to

6    legacy discovery, the Oncor sales process, the original RSA,

7    all aspects of the restructuring.

8    Q    And sir, it was one role that you played in the

9    restructuring overseeing the preparation of the Debtor's

10   SOFAs and schedules?

11   A    That is correct.  I signed all the SOFAs and schedules

12   that for all the Debtors accept three, which were signed by

13   another gentleman.

14   Q    And Mr. Carter, are you a direct report to Mr.

15   Keglevic?

16   A    Yes, I report directly to Paul.

17   Q    And sir, did you prepare a declaration in support the

18   Debtor's motion for approval of the settlement agreement and

19   confirmation?

20   A    Yes, I did.

21   Q    And sir, in your witness binder, if you could look at

22   the tab that's labeled written direct.

23   A    Okay.

24   Q    Sir, do you recognize that document?

25   A    Yes, I do.

1    Q     What is it?

2    A     This is my written direct testimony that you just

3    previously referenced.

4    Q     And is there anything in this declaration that you'd

5    like to clarify are correct?

6    A     There were two corrections to the testimony.  The

7    paragraph is approximately 53 or so.  The sponsor financing

8    fees on page 19, it's paragraph 52, the $36 million in 2011

9    was actually overstated by 900,000, approximately 900,000.

10   So that would be closer to 35,800,000.  And then the -- in

11   paragraph 80, the total amount should be 342 instead of 345.

12   Q     All right.  And sir, in the stipulation of facts that

13   the Debtors worked out with EFH, there was a --

14             THE COURT:  I'm sorry.  It should be 352?

15             MR. CARTER:  342.

16             THE COURT:  342.  Thank you, I apologize.

17             MR. MCKANE:  No, I apologize, Your Honor.

18             THE COURT:  Go ahead.

19   Q     And with regards to the calculation of the financing

20   fees paid to the sponsors, is it your understanding that the

21   stipulation of facts worked out between the Debtors and the

22   EFH Committee has that correct information.

23   A     That is correct.

24             MR. MCKANE:  All right.  Your Honor, to address a

25   potential evidentiary issue -- and there's only one --

```
 1    that's been identified with regards to the declaration, I'm

 2    gonna lay some additional foundation during the examination

 3    and move the written direct into evidence at the end.

 4              THE COURT:  Okay.

 5    Q    All right.  Mr. Carter, there are three topics I'd like

 6    to cover with you today.  First, the payment to the sponsors

 7    of a certain management fees and financial fees, the second

 8    is the shared services effort of EFH Corporate services, and

 9    third, certain intercompany balances that are reflected on

10    this SOFAs and schedules, okay?

11              All right, first with regards to the payments to

12    the sponsors, let's start with the 2007 management

13    agreement.

14    A    Okay.

15    Q    And sir, if you'd -- you please turn to Exhibit DX 339

16    that's in your binder.

17    A    Okay.  And sir, do you recognize Debtor's Exhibit 339?

18    A    Yes, I do.  This as the agreement that was signed at

19    the closing of the LBO that obligated the company to pay

20    approximately $300 million related to the LBO and then on a

21    ongoing basis, $35 million a year for certain management and

22    financial services provided by the sponsors.

23    Q    Yeah.  And so the annual payments of management

24    advisory fees to the sponsors, are those sometimes referred

25    to as monitoring fees?
```

1    A    That is correct.

2    Q    Okay.  And are they sometimes referred to as advisory

3    fees?

4    A    That is correct.

5    Q    And so we're -- so --

6    A    Monitoring, advisory, sponsor fees, all of those are --

7    Q    The same?

8    A    -- are the same.

9    Q    All right.  Mr. Carter, let's talk about the services

10   that the sponsors provided in exchange for those fees, okay?

11   A    Okay.

12   Q    Can you just generally describe the categories of

13   services that the sponsors provided?

14   A    Yeah, so they provide everything from financial, you

15   know, services, talking about the capital structure to

16   hedging and risk management, to general business advice, to

17   potential opportunities to invest in new assets like

18   renewables, those types of items along with public affairs

19   and other types of general services to the company.

20   Q    And sir, based in the positions you've held at the

21   company, do you have personal experience in interacting with

22   the sponsors regarding these services?

23   A    Yes.  What I was at TH Energy, we had monthly meetings

24   and even quarterly meetings with certain members of the

25   sponsor teams to talk about the general business of the

1    company.  And in my role as SVP of Corporate Planning, I've

2    had numerous meetings with the sponsors, included working on

3    this researcher.

4    Q    And just so there's no ambiguity in the record, when we

5    talk about the sponsors, who are we talking about?

6    A    We're talking about KKR, TPG, and Goldman Sachs.

7    Q    All right.  And sir, to your knowledge, has the company

8    ever done an analysis that provided the details of the

9    services that the sponsors give EFH and the other Debtors

10   under the 2007 management agreement?

11   A    Yes, we did.  In early 2009, we did a study or a memo

12   that reflected the services that were being provided.

13   Q    All right, sir.  I'd ask you to turn to Debtor's

14   Exhibit 341

15   A    Okay.

16   Q    And turn to the second page, the attachment to the e-

17   mail that is on Debtor's 341.

18   A    Okay.

19   Q    Do you recognize this, sir?

20   A    Yes, I do.

21   Q    What is it?

22   A    This is a tax memo that was written in February of 2009

23   that went through a process inside the company to determine

24   the tax deductibility of the sponsor fees.

25   Q    And so why was this document created?

1    A    As I said, it was for the determination of the tax

2    deductibility of the sponsor fees.

3    Q    And did you prepare a set of demonstratives that would

4    aid you in testifying today?

5    A    Yes, I did.

6    Q    All right, if you could turn to the demonstratives tab

7    in your binder.  Specifically, sir, let me direct your

8    attention to demonstrative number 3.

9    A    Okay.

10   Q    All right, sir.  Did you have an understanding of the

11   conclusion that the company reached regarding the scope of

12   services the sponsors provided under the management

13   agreement?

14   A    Yes, I did.

15   Q    And what is that?

16   A    These were services that were required and necessary

17   for the company, that we were getting the services as

18   required under the contract that we were obligated to pay

19   $35 million for those fees and that, you know, those were

20   valid expenses from a tax perspective.

21   Q    And sir, can you just briefly touch on some of the

22   categories that the -- of the services that were provided?

23   A    You know, we -- business advice, general corporate

24   advice, public affairs, business strategy, those types of

25   services.

1    Q    And sir, if we can put up demonstrative 341.5.1.  In

2    developing this memorandum and looking at this, the company

3    evaluated the services based on different perspectives.

4    A    That's correct.

5    Q    And one of those perspectives was from Mr. Keglevic as

6    the CFO?

7    A    Mr. Keglevic is the CFO.  The CEO of Luminant at the

8    time, David Campbell, the VP of corporate planning, Joe Ho,

9    along with the head of HR.

10   Q    All right.  And for -- and looking from the -- and what

11   were some of the services that were identified from the

12   finance team that were received by the sponsors?

13   A    So the sponsor -- they were helping with the interest

14   rate hedges.  They were helping with general commodity risk

15   management determinations as far as putting on more hedges,

16   which we did in July of 2008.  They were helping with the HR

17   processes and looking at our benefit plans to determine, you

18   know, if they were the right levels and other types of

19   activities.

20   Q    All right.  If we can put up -- call up 341.6.1.  And

21   Mr. Campbell, you -- who is Mr. Campbell?

22   A    He was the CFO -- he was the former CFO of EFH, and at

23   this time he was the CFO of Luminant.

24   Q    All right.  And so from the perspective of Luminant,

25   what services were being provided by the sponsor?

1    A    Well, one of the key things that he talked about in his

2    interview was the fact that they were very much like an

3    outside services consulting firm, which he would -- he was

4    from McKenzie.  He would've had a very detailed knowledge of

5    what kind of services those were.  He also -- they helped on

6    the public affairs and those types of aspects related to gas

7    plant mothballing strategies, those types of different

8    corporate activities.

9    Q    And did sponsors also advise on Ruminant's commodity of

10   risk management?

11   A    Yes, they did.  They were actually part of a hedging

12   committee, where all long-term hedging decisions had to be

13   approved by the sponsors.

14   Q    And did the sponsors also perform a wholesale strategic

15   review of the gas plants and their liquidity?

16   A    Yes, they did.

17   Q    Okay.  And what -- if we can put up demonstrative --

18   sorry, not demonstrative.  Call out 341.7.1.  All right.

19   Mr. Ho also weighed in from his perspective in terms of

20   additional services the sponsor provided.  What were those?

21   A    So he aided in the sales process in 2008 of Oncor to

22   Texas Transmission.  They also reviewed our ongoing pricing

23   obligations for TXU energy in determining not to raise

24   prices for, you know, the retail book at the time.

25   Q    And so the aid in the CGE transaction and the SAP

1    implementation, what's that, sir?

2    A    Uh, yes, at the time, we had a major outsourcing

3    arrangement with Capgemini Energy, which we entered into in

4    2004.   They were very much involved in the unwinding of that

5    outsourcing arrangement post ELU.

6    Q    And sir, Mr. Ho also notes input regarding the best way

7    to invest cap ex monies?

8    A    Yes, whether or not to invest those monies in Oncor or

9    to invest those cap ex monies in Luminant.

10   Q    And based on the review of the company at this time,

11   the services that were being provided, did the company which

12   conclusion regarding whether the sponsors merited payment of

13   the management fees under the management agreement?

14   A    Yes, we did.   We had a contractual obligation to pay

15   the 35 million and we made a determination that we were

16   receiving the services that were required under the

17   management agreement.

18   Q    And sir, is that reflected in the memorandum, and did

19   you also recommend that in demonstratives 4?

20   A    Yes, I did, and, you know, this was also not just the

21   interviews, but this was very much consistent with my own

22   interaction with the sponsors during my tenure at EFH.

23   Q    Okay.   And did the company conclude anything with

24   regards to whether the fees that were being paid were

25   comparable to what fees that they'd be paying an unrelated

1   party?

2   A    They -- at least that these would be comparable to what

3   we pay an unrelated third party and the fact that we

4   couldn't probably actually find one third party that could

5   provide these types of services.

6   Q    All right.  So Mr. Carter, beyond this study that was

7   performed, beyond your personal experience, did the company

8   ever do any additional market analysis regarding the

9   services the sponsor provided?

10  A    No we did not because we had a contractual obligation

11  to pay the $35 million a year so we didn't need to determine

12  whether or not we needed a market test.

13  Q    Alright.  Mr. Carter, I'd like to shift for a minute to

14  the allocation of those fees.

15  A    Okay.

16  Q    Sir, did you do any investigation into the company's

17  payment of fees to the sponsors over time?

18  A    Yes, in my role as part of the legacy discovery process

19  related to the restructuring, I had people prepare schedules

20  and review those schedules as part of my -- in my current

21  role.

22  Q    And did you prepare a demonstrative to assist you in

23  discussing those schedules?

24  A    Yes, I did.

25  Q    And is that reflected in demonstrative 5?

1    A    That is correct.  So demonstratives 5 here shows the

2    fees that we paid each year to the sponsors in total.  The -

3    - that's the second column.  The far right column is the

4    actual entity that paid the fees to the sponsors.  And as

5    you will note that the EFH corporate services paid those

6    fees in every year except for 2009, and in that year, EFH

7    Corp paid those fees directly.

8    Q    All right, and this is just for the management advisory

9    fees or the monitoring fees we've been talking about.

10   A    That is correct.  This is the annual fee.

11   Q    All right.  And so EFH Corporate Services is the payer

12   other than 2009, but then you have a column for an allocated

13   entity.  Can you explain that?

14   A    Yes.  So EFH Corporate Services is effectively not-for-

15   profit.  It bill -- any costs it incurs, it bills out to

16   some other subsidiary inside of EFH or TCEH.

17   Q    And they do that at cost.  That's your point, by not --

18   A    They do that at cost, including Oncor.

19   Q    And so EFH Corporate Services at cost then allocates

20   the cost down to another entity or up to another entity.

21   A    Or up to.  EFH Corp in 2007 and through 2009 reimbursed

22   EFH Corporate Services for those fees it had paid.  In 2010

23   to 2013, TCEH paid effectively 100% for those fees.

24   Q    And from 2008 to 2012, this is the application of the

25   35 million with the 2% escalator.

1    A    That is correct.  I will note in 2013 that those

2    payments were only made through the third quarter of 2013.

3    In the fourth quarter of 2013, the sponsors directed EFH

4    Corp and EFH Corporate Services not to continue to pay those

5    fees.

6    Q    All right.  All right.  Thank you, Mr. Carter.  Let's

7    move away from management advisory fees and move towards

8    financing fees, okay?

9    A    Okay.

10   Q    All right.  Now sir, you're familiar with the liability

11   management program?

12   A    I am.

13   Q    All right.  Were the sponsors involved at all with the

14   transactions that were contained in the liability management

15   program?

16   A    Goldman Sachs was very involved as they were one of the

17   investment banks that provided services, general investment

18   banking services to EFH, EFIH, or TCEH.  The other sponsors

19   were also very involved in just the overall strategy.  In

20   certain transactions, they were involved in helping

21   structure those transactions, like the amend and extend at

22   TCEH.

23   Q    All right.  And you said the sponsors themselves.  At

24   times, are the services that are being provided in

25   connection with these transactions being performed by

1    affiliates of the sponsors?

2    A    Yes, in particular Goldman Sachs, it was their

3    investment banking arm that were providing those services,

4    not the private equity armor.

5    Q    And so you said that their structuring advice, the

6    services being provided by the other sponsors, was that by

7    the sponsors or by an affiliate?

8    A    I believe they all have affiliates or they have arms

9    that provide those, you know, specialized services or people

10    that are involved just in the capital markets aspects of

11    transactions.

12    Q    And sir, consistent with the work you did in evaluating

13    the management fees over time, did you also evaluate the

14    financing fees paid to the sponsors and their affiliates

15    over time?

16    A    Yes, we did and for the same reasons as I previously

17    stated.

18    Q    And did you prepare a demonstrative aid to discuss

19    those services?

20    A    Yes, I did.

21    Q    And is that demonstrative aid number 6?

22    A    That is correct.

23    Q    All right.  Sir, can you walk the court through

24    demonstrative aid number 6, financing fees paid to sponsors

25    and/or affiliates.

1   A    Yes, these are the fees paid by year in total.  Coming

2   down the column, approximately $65 million worth of fees

3   from the period of 2009 through 2013.  The payor is the far

4   right column, and the allocated entity, which is the same in

5   all cases, is listed in the far right column.

6   Q    And sir, in 2010, the payor and the allocated entity

7   was EFH Corp, the parent.  Is that right?

8   A    That is correct.  That was a payment for a January of

9   2010 $500 million financing that was completed at EFH Corp.

10  Q    Okay.  And when was that completed?

11  A    January of 2010.

12  Q    And sir, you mentioned Goldman Sachs provided a number

13  of investment banking services.  Of the $65 million in

14  financing fees that's reflected on Carter 6, how much of

15  that was approximately for Goldman Sachs?

16  A    Approximately $50 million was for Goldman Sachs.  The

17  other $15 million was effectively split between KKR and TPG.

18  Q    Yeah.  And did those have any involvement in the

19  allocation or the role -- assignment of what fees to whom?

20  A    No, they did not.

21  Q    With regards to the $50 million that went to Goldman

22  Sachs, can you just be -- you said as investment banking

23  services.  Can you describe what they did?

24  A    Well, I mean they were joint book runners.  They may

25  have been -- they were underwriters.  They may have been an

1    exchange agent.  Typical investment banking.  If we wouldn't

2    have used Goldman Sachs, we'd have use, you know, Citi or

3    some other bank.  And we generally did have multiple banks

4    involved in these fees, and they received similar

5    compensation with the other investment banks.

6    Q    Mr. Carter, to your knowledge did Goldman Sachs receive

7    any above-market premium for the services they provided?

8    A    Not that I'm aware of.

9    Q    And to your knowledge, did the KKR and TPG affiliates

10   receive any above-market premium for the service that they

11   provided?

12   A    Not that I'm aware of.

13   Q    So other than this one in January 2010 payment by EFH

14   Corp and that was allocated to TF -- EFH Corp, are you aware

15   of any other financing payments made by EFH Corp?

16   A    No, I'm not.

17   Q    Okay.  Mr. Carter, let's transition to shared services,

18   okay?

19   A    Okay.

20   Q    And could you briefly describe?  When we talk about

21   shared services and the services provided EFH Corporate

22   Services, what are we talking about?

23   A    So is typical in this industry, especially in companies

24   that are integrated, or were integrated, or came out of a

25   regulated environment, a lot of companies had a shared

1    services company which provided or allowed for economies of

2    scale related to things like finance, IT, supply chain, HR.

3            A lot of times, you'll hear these called back-

4    office functions.  Legal is that way.  And it allows for us

5    to provide these services on an efficient basis to multiple

6    entities inside of the corporate family at a cheaper cost

7    than having each individual subsidiary do it on its own.

8    Q    If I could direct your attention to the last document

9    in your binder, DX, Debtor's Exhibit 685.

10   A    Okay.

11   Q    Sir, do you recognize Debtor's Exhibits 685 titled

12   Energy Future Holdings Corp Shared Services Review?

13   A    I do.

14   Q    What is it?

15   A    So this was a steady that we had, or that we

16   commissioned in 2009 related to coming up, making sure we

17   were following best practices in our shared services

18   organization.  One of the key things to remember, as part of

19   the LBO, one of the things we did initially as part of the

20   LBO was to have separate business use created at Oncor,

21   Luminant, and TXU Energy.

22           And at that point we kind of did some

23   decentralization that was also more extensive and

24   duplicative, so we went back to -- as we were underlining

25   the CGE outsourcing arrangement and said hey, we need to

1    take a better -- another look at this and bring some of

2    these service that house.  We need to make sure we put these

3    best practices into place.

4    Q    And did EFH Corp and the Debtors incorporate

5    recommendations rising out of this study after 2009?

6    A    Yes, we did.  One of the key things they asked --

7    that they recommended for us to do is to go to an annual

8    process were we actually documented the cost by activity,

9    such as different activities inside of information

10   technology, and determining the right places or go through a

11   process where we allocated those costs and had a methodology

12   for allocating those costs and to kind of do that on an

13   annual basis.

14   Q    And did the Debtors employ that recommendation?

15   A    Yes, we did, and we started in the summer of 2010 as

16   part of our long-range planning and budgeting process.  We

17   would go through coming up with the budgets for the year.

18   We'd go through coming up with the activities.

19            We'd review those activities with different parts

20   of the businesses, so we'd do that with -- in my role at TXU

21   energy, I would sit down with the business services folks

22   and go through that and determine, you know, were we getting

23   allocated for costs that we were needing.  So that was put

24   in place in the summer of 2010.

25   Q    And that exercise is an annual exercise?

1    A    That was an annual exercise, yes.

2    Q    And was that essentially a negotiation between the

3    different business units as to the allocation?

4    A    Yeah, there was definitely gives and takes.  So, you

5    know, if somebody asks and said hey, you should be allocated

6    this, and I didn't think they had a reasonable basis for

7    doing so, we would -- negotiate may be the wrong word, but

8    we would actually go back and forth on, you know, okay, what

9    is the appropriate allocation?  And making sure they got

10   that as right as we can knowing that it is an allocation.

11   Q    All right.  And how long did that -- that process ran

12   every year for how many years?

13   A    That process goes on today.  We just have completed it

14   as part of our 2016 budgeting process, so we continue to go

15   through the same process every year.

16   Q    Yeah.  And ultimately, did business services come

17   forward and say that there should be a shared services

18   agreement?

19   A    Yes, in 2013, we put a shared services agreement in

20   place between the EFH Corporate Services and TCEH, and then

21   in April of 2014, although we actually started that process

22   at the end of 2013, we put a similar agreement in place

23   between EFIH and EFH Corporate Services.

24   Q    And sir, if I could direct your attention to the second

25   to last document in your binder, Debtor's Exhibit 682.

1    A    Okay.

2    Q    Do you recognize it?

3    A    Yes, this is the agreement dated April 1st, 2014,

4    between EFH Corporate Services and EFIH.

5    Q    And sir, does this agreement govern the allocation of

6    services provided by business services?

7    A    Yes, this agreement managed, or was the agreement in

8    place that allocated the cost between EFH a Corporate

9    Services and EFIH.

10   Q    All right.  And sir, did you prepare a demonstrative

11   today to discuss that allegation of services?

12   A    Yes, I did.

13   Q    And if you could turn to Carter Demonstratives 8.

14   A    Okay.

15   Q    Alright.  Carter Demonstrative 8 is an allocation of

16   shared services to EFIH.

17   A    That is -- yes, that is correct.

18   Q    Can you explain this allocation and how it might have

19   been different than the prior allegations over time?

20   A    So in that the end 2013, what went through the process

21   of starting to allocate costs to EFIH, and we put this

22   agreement, the agreement I just referenced, in place.  These

23   were the different categories of costs that we determined

24   that EFIH needed in order to run its business.

25   Q    And are these allocations being followed by the company

1    today?

2    A    Something similar to this, yes, they are.

3    Q    All right.  And as part of your investigation of

4    efforts in terms of the allocation of services over time,

5    did you go back and look at the 2010 to 2013 time period

6    with regards to the costs there were allocated?

7    A    Yes, based off of questions we were receiving as part

8    of the -- you know, from the different committees and

9    creditor groups, we went back and looked at the cost in

10   similar categories that we're encouraged from 2010 to 2013.

11   Q    All right.  And did you prepare a demonstratives today

12   reflecting those costs?

13   A    Yes, I did.

14   Q    Is that Carter Exhibit 7?

15   A    That is --

16   Q    Demonstrative 7, excuse me.

17   A    Yes, it is.

18   Q    And as sir, can you just explain to the court what

19   Demonstrative 7 is.

20   A    So these are the costs for those same categories that

21   were on the previous demonstrative that shows the total cost

22   that we incurred in these different categories from 2010 to

23   2013.  So we incurred, you know, $11 million in the

24   corporate planning group, $62 million in external affairs,

25   141 million of sponsored fees that totaled $342 million.

1           THE COURT:  Those are cumulative numbers.

2           MR. CARTER:  Yes, those are cumulative numbers for

3    the four years.

4    Q    And sir, what was the allocation percentage to EFH for

5    those four years for those various categories.

6    A    For EFH or EFIH?

7    Q    EFIH, I apologize.

8    A    EFIH, we allocated zero cost to them other than -- the

9    only cost they were allocated were Deloitte & Touche audit

10   fees, which were directly allocated to them.

11   Q    Mr. Carter, I'd like to turn to another subject,

12   specifically certain intercompany claims that were reflected

13   on the statements of financial affairs and schedules.

14   A    Okay.

15   Q    Can you just remind everyone you what your role was in

16   preparing what we -- the SOFAs and schedules.

17   A    Yes, in my restructuring role, I was designated or

18   require to sign the SOFAs and schedules for EFH Corp and the

19   Debtors, other than for three of the entities.

20   Q    Right.  Lucky you.  Can you describe the work that you

21   went in and did, you and your team undertook to prepare the

22   SOFAs and schedules before you signed them?

23   A    Yes, because of my role as corporate planning and my

24   understanding of the company's business and operations both

25   at TXU and then Luminant and my history with the company, I

1    -- you know, I received this privilege of signing the SOFAs

2    and schedules.  And because of my accounting background and

3    my knowledge of the company, we went through a very

4    exhaustive due diligence process of them preparing those

5    schedules, me reviewing those schedules, hours and hours and

6    hours, asking a lot of questions about those schedules when

7    I saw something that didn't seem to be correct in my -- from

8    my understanding of the company.

9    Q    All right.  And sir, did you -- where did you get the

10   data?

11   A    The accounting team and A&M provided the data for us.

12   Q    And did that come from the books and records of the

13   company?

14   A    Yes, it did, directly from the books and records of the

15   company.

16        THE COURT:  I'm sorry, just for the record, A&M,

17   you're talking about Alvarez?

18        MR. CARTER:  Alvarez & Marsal, excuse me.

19        MR. MCKANE:  Apologize, Your Honor.

20   Q    So I'm gonna ask you about two particular entries on

21   the SOFAs and schedules.  Are you familiar with an entry

22   that's sometimes referred to as the TCEH intercompany

23   receivable?

24   A    I am.

25   Q    And what is the TCEH intercompany receivable?

1   A    So if you looked on the SOFAs and schedules, you would

2   see a receivable on TCEH's SOFAs and schedules and a payable

3   on EFH Corp's in the amount of $774 million.  That's made up

4   of two amounts.  Nineteen million of it was related to

5   payment into the pension plan in early 2014, and the other

6   754 million related to a tax receivable on TCEH's books from

7   EFH Corp.

8   Q    If we could put up -- you prepared a demonstrative of

9   this as well, Carter 9.

10  A    Yes, I did.

11  Q    And this is straight out of the SOFAs and schedules.

12  A    Yes, it is.

13  Q    All right.

14          THE COURT:  Nineteen million -- so you break -- I

15  lost you.  Can you just give me the answer again?  I

16  apologize.

17          MR. CARTER:  Yeah, so the 774 million, there's

18  approximately $19 million that's related to a pension

19  contribution that was made in early 2014.  So we were

20  finding up the pension plan so that it didn't have any

21  impacts from the bankruptcy.

22          So that was effectively $19 million that TCEH

23  funded into the plan.  And then the $754 million relates to

24  future tax payment that was due from EFH Corp to TCEH under

25  the competitive tax sharing agreement.

1          THE COURT:  Okay, thanks.  Sorry.

2          MR. MCKANE:  Not at all.

3     Q    Let's pause on this for a second.  When you were

4     undertaking the effort to prepare the SOFAs and schedules,

5     did you expect to see a $773 million intercompany receivable

6     from TCEH to EFH?

7     A    No, and because of my role of corporate planning where

8     I had to forecast liquidity for both TCEH and EFH and EFIH

9     on a separate basis, I was expecting to see a net payable

10    from TCEH up to EFH of approximately 500 and something

11    million dollars because that something that we would've had

12    into our financial forecast to happen sometime in the

13    future.  When I saw a $754 million receivable from TCEH at

14    TCEH, I immediately asked questions about the accounting and

15    tax groups about what the genesis of that receivable was.

16    Q    All right.  So if you see -- when you saw 754 going one

17    way, and you expected 535 coming the other way, did you find

18    out where the differential was?

19    A    Yes.  There's actually a payable on Luminant

20    Generation, which is also a subsidiary of TCEH, for

21    approximately $1.3 billion that was a payable from Luminant

22    Generation up to EFH.

23    Q    Alright.  If you could go to Carter 11, Demonstrative

24    11.

25    A    Okay.

1    Q    So what does Carter 11 show?

2    A    This is a Schedule B for EFH Corp that shows a $1.3

3    billion, which is the last line of an accounts receivable

4    from Luminant Generation, LLC.

5    Q    Okay, so this is a $1.29 billion receivable to Luminant

6    Gen from EFH?

7    A    It's a receivable at EFH from Luminant Generation.

8    Q    Apologize, I knew I said that backwards.  All right.

9    So tie it all together for me.  I apologize.  You've got

10   1.29 going one way, 754 going the other, right?

11   A    That is correct.  So you have about a 550 million, $535

12   million net number was what I was expecting, but they were

13   booked gross under the competitive tax sharing agreement.

14   And so I asked those questions about the tax and the

15   accounting group.

16            I knew that we had the market settlement that we

17   entered into in 2013, so once they said yes, this was under

18   the competitive tax sharing agreement and this is how we

19   booked it, that is -- I was okay with that and signed the

20   schedules.

21   Q    Buses take it in steps.  The origins of the 754 is

22   related to an IRS settlement?

23   A    The 754 and 1.3 are both related to a similar IRS

24   settlement for the years 2003 for 2006.  I think Mr. Keller

25   testified that this is called a mark to market settlement

1    related to a deduction we took at Luminant Generation

2    starting in 2005.

3    Q    And how does that settlement with the IRS get reflected

4    in these intercompany payables?

5    A    Well, once we entered into the settlement under

6    accounting principles, we entered into the settlement, we

7    needed to record that at the EFH level.  And then under the

8    competitive tax sharing agreement, those were allocated down

9    to the different subsidiaries.

10   Q    All right.  And just to the extent you know, TCEH, is

11   it a regarded or disregarded entity for tax purposes?

12   A    It is a disregarded entity.

13   Q    And at Luminant Generation, is it --

14   A    Disregarded entity.

15   Q    Thank you.  And sir, apart from bankruptcy, how have

16   these two accounts payables and receivables been treated by

17   the Debtors?

18   A    The way they handle all the payables and receivables

19   between the Debtors, the TCEH Debtors and EFH, is a net

20   payment made by the TCEH money pool from TCEH up to EFH.  So

21   it would've been a net 3 -- 535-type payment would've been

22   made.

23        MR. MCKANE:  Your Honor, those are the questions

24   we have at this time.  The Debtors would move into evidence

25   the declaration of Michael Carter as well as a number of

1    Exhibits.

2              THE COURT:  Any objection to the declaration?

3              MR. HARDIMAN:  Yes, Your Honor, John Hardiman,

4    Sullivan & Cromwell for the EFH unsecured creditors.

5              I have an objection to one piece of the written

6    direct.  It's the second sentence of paragraph 86, and I was

7    wondering if I could have a little voir dire on that because

8    our objection is that there's a lack of foundation for that

9    sentence.

10             It's the sentence that says, "In addition, I

11   understand the company has applied a competitive TSA to any

12   tax years that were open and not fully resolved with the IRS

13   at the time that we executed the competitive TSA."

14             THE COURT:  All right.  Any objection to voir dire

15   on that?

16             MR. MCKANE:  I do object, Your Honor, because I

17   believe I laid the foundation during the direct examination.

18   Specifically, in his testimony as it relates to the payable,

19   he testified that that payable was arising out of an IRS

20   settlement that covered the years that predated the tax

21   agreement.  And with regards to disregarded entities as it

22   related to that, let me be specific.

23             MR. MCKANE:  Mr. Hardiman is saying two things.

24   This witness doesn't know two issues as it relates to the

25   tax sharing agreement.  One, did it apply to years that

1    predated the introduction of the agreement, which was 2012,

2    and two, in its application was it applied to disregarded

3    entities?

4              In his direct testimony, Mr. Carter specifically

5    said with regards to these payables, which is what this

6    dispute's all about, it applied to an IRS settlement that

7    applied to years that predated the agreement and it applied

8    to entities that are disregarded entities specifically as it

9    relates to this exact dispute, the intercompany tax payable

10   and receivable dispute that's the genesis of the 754, he has

11   identified why he knows open years that predate the

12   agreement and disregarded entity.  He's established the

13   foundation.

14             MR. HARDIMAN:  Your Honor, what I'm focusing on in

15   this sentence is the reference to the fact that the company

16   has applied the competitive TSA in a -- to any timeshares

17   that were open and not fully resolved, which strikes me,

18   number one, as a more general comment than with respect to

19   this particular payable and receivable, but more importantly

20   if I heard the witness correctly just now in testimony, he

21   said that he understood this from being told his from people

22   in his tax department and that is hearsay and there's no

23   need for that hearsay to come in through this witness

24   because the Debtors have put on their witness list somebody

25   from the actual tax department to testify about the

1    competitive share -- the competitive tax agreement.

2          So that's our objection.  I think that they're

3    getting in through this witness something that he is

4    testifying was something that was told to him by other

5    people and those other people will be brought to the

6    Courtroom.

7          MR. MCKANE:  And Your Honor, specifically I think

8    he went way beyond just like he heard this, that he

9    specifically testified that he investigated this exact issue

10   given the magnitude of the amounts to have his own

11   understanding as it relates specifically, as it relates to

12   this account receivable and payable.

13         THE COURT:  All right. I'm going to allow the

14   admission of the direct testimony obviously subject to

15   cross-examination fully to explore the merit and the weight

16   of the statement.  But I think the foundation has been laid

17   and I don't believe it sufficiently constitutes just

18   hearsay.

19         I think it's based on the testimony that's put in

20   on at least some personal knowledge.  So, the -- excuse me,

21   I'm sorry -- the written direct testimony of Mr. Carter -- I

22   apologize -- is admitted over objection as ruled on the

23   record subject, of course, to cross-examination to the

24   weight or accuracy of that testimony.

25         MR. MCKANE:  Understood, Your Honor.  At this time

1    in addition to the dir -- the written declaration, we have a

2    number of exhibits that we would like to move in.  These are

3    all exhibits that we have identified previously to all of

4    the objectors.  They are all of the exhibits that are

5    referenced in Mr. Carter's written direct as well as those

6    that were covered in his live direct testimony.

7            All of the objections have been resolved with

8    regards to these exhibits and, while I could read them into

9    the record, it may be more efficient if I just provided the

10   Court with a list of those exhibits.

11           THE COURT:  Well then we have to mark that into

12   evidence so --

13           MR. MCKANE:  Right.  Then I'll read it.

14           THE COURT:  -- just read it into the record so we

15   have a clear record for whatever purpose we need a clear

16   record.

17           MR. MCKANE:  Very good, Your Honor.

18           THE COURT:  Have you provided Ms. Werkheiser with

19   the list that we had -- that I had asked for previously?

20   She's nodding yes.  Yes you did.  Thank you.

21           MR. MCKANE:   I'm so glad I did.  Your Honor, may

22   I approach with the list and then I will read it in the

23   record as well?

24           THE COURT:  Yes, very good.  Thank you.  I think -

25   - by the way, on the list that I just referenced from

1    yesterday and the day before I -- sounded like that we got

2    the Debtors, but we're still waiting to hear from the E

3    Committee so just make sure you close the loop on that.

4              MR. HARDIMAN:  We will, Your Honor.

5              THE COURT:  Okay, thanks.

6              MR. MCKANE:  Your Honor, at this time the Debtors

7    move into evidence Debtor's Exhibits 21, 22, 30, 31, 66,

8    305, 307, 308, 309, 310, 314 through 315, 321 through 324,

9    327, 332 through 334, 340, 343 through 345, 445, 560, 615

10   through 619, 622 through 628, 640, 665 and 666, 672, 675

11   through 677, 678, 681, 684, 691, 932, 933, 937.

12             Those are the exhibits referenced in Mr. Carter's

13   written direct.  With regards to his live direct we also

14   move in Debtor's Exhibits 338, 339, 341, 660, 674, 682 and

15   685.

16             THE COURT:  Any objection?

17             MR. HARDIMAN:  No objection, Your Honor.

18             THE COURT:  They're admitted without objection.

19             MR. MCKANE:  Your Honor, the unbelievably capable

20   team has told me that I also forgot to move in Debtor's

21   Exhibit 313.

22             THE COURT:  Okay.

23             MR. MCKANE:  And so we move that as well.

24             THE COURT:  Any objection?

25             MR. HARDIMAN:  What is it?  Which one?

```
 1              MR. MCKANE:  313.

 2              MR. HARDIMAN:  No objection.

 3              THE COURT:  All right, submitted without

 4     objection.  Okay?

 5              MR. MCKANE:  Thank you.

 6              THE COURT:  All right.  I haven't been on the

 7     bench -- I haven't been on the bench long, but let's take a

 8     very short recess and then we'll turn it over to cross.  Who

 9     is going to cross, the E-Committee?

10              MR. HARDIMAN:  I'm going to do it.

11              THE COURT:  Is anyone else going to cross?

12              MAN 1:  Conflicts counsel, Your Honor, briefly.

13              THE COURT:  Okay.  Any other party?  Okay good.

14     So we know what to expect.  All right.  A very short recess.

15     Sir, you may not discuss the substance of your testimony

16     with any person during the break.  Okay?

17         (Recess)

18              CLERK:  All rise.

19              THE COURT:  Please be seated.

20              MR. MCKANE:  Your Honor, Mark McKane.  One final

21     issue.  With regard to the stipulation of facts that was

22     submitted earlier today, we realized that we did not mark

23     that as an exhibit, and so we ask that it be marked as

24     Debtor's Exhibit 976.

25              THE COURT:  Very good.  And so the record is
```

1    clear, 976 is admitted.

2           MR. HARDIMAN:  Your Honor, thank you.  For the

3    record again, John Hardiman from Sullivan & Cromwell for the

4    EFH Unsecured Creditors Committee.

5           THE COURT:  Okay.

6                        CROSS-EXAMINATION

7    BY MR. HARDIMAN:

8    Q    Good afternoon, Mr. Carter.

9    A    Good afternoon.

10   Q    A few questions for you, not much.  On the shared

11   services issue, I think you say in your witness statement

12   that you understand that the shared services issue resulted

13   in a claim by TCEH that is covered by the proposed

14   settlement agreement.

15   A    That is my understanding, yes.

16   Q    And your understanding is that the TCEH claim is that

17   it was -- its side was over-allocated the shared services

18   costs in the period 2010 to 2013.

19   A    That is my understanding, yes.

20   Q    Meaning that they are -- their complaint is that the

21   costs were divided inappropriately by TCEH and EIFH?

22   A    That is my correct -- my understanding, yes.

23   Q    And you don't understand that they are alleging that

24   the services they received were at too high a price?

25   A    I haven't had that conversation with anybody but I know

1    that we did services for EFIH that they were not billed for.

2    Q    Yes, but the question is from TCEH's standpoint, is

3    TCEH complaining, to your understanding, that any of the

4    services they were provided were provided at too high a

5    price, that they could have gotten a better price for those

6    services somewhere else?

7    A    I don't understand whether or not -- I don't know

8    whether they made that determination or not.

9    Q    So, to your knowledge, they haven't made that

10   allegation?

11   A    Not to my knowledge.

12   Q    To your knowledge, have they made an allegation that

13   there was a specific mistake made in the allocation

14   methodology?  I know they complain about the result, but are

15   you aware of them pointing to a specific mistake?

16   A    My understanding is they were pointing at the mistake

17   that EFIH was not allocated any cost.

18   Q    Okay, but are they pointing to any mistake in the

19   methodology the way the people did the work to explain that?

20   It's just the result that EFIH didn't have any more costs?

21   A    Well, we did accounting, we did treasury services,

22   there was no cost billed to them, so that's why they're

23   complaining that those costs were misallocated, I would --

24   Q    Okay.  You testified in your written direct that Huron

25   gave a report in 2009, I think it was.

1    A    That's correct.

2    Q    And after that, there were some changes to the way that

3    EFH handled the shared services activity, is that correct?

4    A    That's correct.

5    Q    And one thing Huron had recommended was that the

6    business service activity be embedded in EFH Corporate

7    Services, which is a subsidiary of EFH, is that correct?

8    A    That's correct.

9    Q    And after the Huron report, am I correct, and based on

10   their recommendations that EFH implemented certain service-

11   specific methodologies to allocate costs to business units?

12   A    Yes, that's what -- that is my testimony from earlier.

13   Q    And as part of that, certain costs were, I think your

14   witness statement uses the term, "pushed down" to the

15   business units?

16   A    Pushed down, allocated, those would all be -- I think

17   that Huron may have said pushed down but all of it is pushed

18   down, allocates, well, it's effectively the same thing.

19   Q    All right.  And the -- just to refresh your

20   recollection, I think you have your witness statement up

21   there.  On Paragraph 27, I think I've written it correctly,

22   pardon me, Paragraph 77, you say "costs previously allocated

23   to EFH Holding Company were pushed down to the business

24   units," am I reading that correctly? "Including sponsor

25   fees, board of directors expenses and certain financing

1   fees."

2   A    That's correct.

3   Q    Okay, and by pushed down, we mean moved down to the

4   business units that incurred them.

5   A    Or allocated to those business units for the cost that

6   EFH Corporate Services was incurring on their behalf.

7   Q    Okay.  Now, do I understand that this was done, the

8   actual work was done, in a business unit called business

9   services?

10  A    EFH Corporate Services is a -- actual legal entity.

11  Q    Okay, and there are people, human beings who do this

12  and affect the methodology and do the allocations?

13  A    Yes, I'm -- as Head of Corporate Planning, one of the

14  groups that report to me actually does the Corporate

15  Services allocations.

16  Q    Oh, so the people who do the allocations actually

17  report to you?

18  A    Yes, they do.

19  Q    Okay, and did they report to you during the 2010 to

20  2013 time period?

21  A    From 2012, in February of 2012 through now, they

22  reported to me.  Before that --

23  Q    And did they report to you beforehand?

24  A    No, they did not.  I was TCEH Energy beforehand.

25  Q    Okay.  Now, are you testifying that these people who do

1    this at business services are incompetent?

2    A    No, I'm not.

3    Q    Or that they're corrupt?

4    A    No, I'm not.

5    Q    Or that they're under some undue influence?

6    A    No, I'm not.

7    Q    Okay.  Now, I think you testified that in 2013, TCEH

8    signed a contract regarding the allocation of the shared

9    services with EFH Corporate Services?

10   A    Yes, we put a contract in place that effectively put

11   into legal binding agreement that was effectively going --

12   following our practices that we had been doing since 2010.

13   Q    Am I correct that that contract memorialized the

14   allocation of the shared services cost to the CCH entities?

15   A    For that particular year it memorialized it, but it

16   could be updated every year, which it is today.

17   Q    And also in that contract, the actual methodologies for

18   each category of allocation were laid out?

19   A    Yeah, there's an exhibit that lays out all those

20   different things by different categories of costs.

21   Q    And you testified that, prior to that contract, there

22   was meeting every year, some back and forth and some

23   discussions with the people at business services as to how

24   the allocation should go?

25   A    Yeah, it was just -- not just between business services

1    but also between the business units, Luminant, TXU Energy,

2    Oncor.

3    Q    And I think you say in your witness statement that

4    there were actually service level agreements that were

5    implemented between EFH Corporate Services and the various

6    business units that would lay out the allocations and the

7    methodologies?

8    A    That is correct.

9    Q    All right.  So the allocation that the TCEH Debtors

10   complained about in the shared services claim that is part

11   of the settlement --

12   A    When you say the Debtors or the Creditors?  Or both?

13   Q    Did I misspeak?  I might have misspoke.  I'll start

14   again.  The allocation that the TCEH Debtors are complaining

15   about in the claim that is part of the settlement agreement

16   raised to shared services allocations that they had agreed

17   to by contract.

18   A    In 2013.  There was not a contract in place before

19   2013.

20   Q    But before 2013, there were the service level

21   agreements.

22   A    Well, it wasn't an actual agreement, it was a

23   PowerPoint document that documented the allocation by

24   different categories, so it wasn't a legal agreement.

25   Q    But if I understand correctly from your previous

1    testimony, it was the result of give-and-take and discussion

2    and negotiation between the parties.

3    A    There was definitely discussions and gives and takes on

4    the allocations between the three -- the business units.

5    Q    And are you aware, during that time period, when the

6    SLA process was used, that TCEH -- the TCEH side or the TCEH

7    business units complained about what their ultimate

8    allocation was?

9    A    The business units almost always complained about what

10   the allocations were.

11   Q    But at the end of the day, after negotiation, did they

12   complain that they were wronged or there was some sort of

13   mistake in the methodology?

14   A    Not that -- not to my knowledge.

15   Q    Okay.  Am I correct that over the period from 2010 to

16   2013, the T-side businesses in fact utilized more services

17   than the E-side?

18   A    No doubt.  I mean, the operating business units are TXU

19   Energy and Luminant.  EFIH is a holding company.  All it has

20   is debt, so it needs less services.

21   Q    Now, getting back to my question before about whether

22   or not the TCEH Debtors in connection with this claim as

23   part of the settlement had pointed to any specific mistake.

24   Are you aware of whether the TCEH Debtors as part of the

25   process of asserting these claims, have conducted any review

1   of the actual allocation work done by the business services

2   group?

3   A     Well, as part of the due diligence exercise and as part

4   of the legacy discovery, we provided a lot of different allo

5   -- cost numbers for the different categories of things and

6   asked questions about, well, whether or not, you know, "You

7   mean, no treasury cost was allocated to EFIH even though you

8   were issuing debt at EFIH?  No accounting cost was allocated

9   to EFIH even though you were an SEC registrant and had to

10   file a 10Q and 10K every year?"  So there were questions by

11   the different Creditor groups and the different Committees

12   as to what was the -- you know, why, whether or not costs

13   allocated to EFIH during this period of time.

14   Q    But the people who actually did the work, did the

15   allocation, the employees who worked for you, did you know,

16   were they interviewed --

17   A     Well, the people who did the allocations are not

18   necessarily the same people who do the work, so the treasury

19   group doesn't report to me.

20   Q    Okay.

21   A     Right, my group captures all the costs and then

22   allocates it out to the different --

23   Q    Okay.

24   A     -- business units.

25   Q    Well, the people who do the work, wherever they are,

1     were they interviewed by the TCEH Debtors as part of this

2     negotiation process?

3     A     The TCEH Debtors or the Creditors?  The TCEH --

4     Q     You're right, the TCEH Creditors.  I'm wrong now.

5     A     Okay.

6     Q     You're right.

7     A     We got --

8     Q     By the Creditors who are asserting this claim.

9     A     We definitely had conversations with the T Committee.

10    We also had conversations with the DEAs and their advisors

11    about the different types of work that were being done, and

12    we answered those questions and I included legal, that

13    included people from the treasury group, that included

14    myself, all answering questions on these issues.

15    Q     And the people -- did the people from business services

16    who actually did the work, were they included in this

17    process?

18    A     Well, Tony Horton, who was the treasurer for EFIH and

19    TCEH and EFH Corporate Services was part of that.  Andy

20    Wright, who's a legal general counsel -- deputy general

21    counsel, as part of that, and he's one of those people doing

22    that work, so yes, people that did the work actually were

23    interviewed.

24    Q     The people who actually did the allocations and applied

25    the allocation methodology?  The people at business

1    services, were they involved?

2    A    The people at business services that did the

3    allocation?  No, I do not believe they were involved.

4    Q    Okay, do you know whether their work papers were

5    reviewed as to how they got to their allocations?

6    A    We provided lots of details in the data room in the --

7    as part of the legacy discovery about the allocations and

8    what methodologies we were following.

9    Q    Do you know if the work papers of these people who did

10   the allocations was provided in the data room?  That

11   specific piece of document.

12   A    Well, I'm not sure what work paper -- what you're

13   determining -- what you're thinking of as work papers, but

14   the SLA documents and other things were produced for those

15   years.

16   Q    Okay, but I mean the material that would have been done

17   -- the raw material that would have been used by the people

18   that make the allocations to determine whether or not --

19   what the allocation should be and what the methodologies

20   are.  Do you know if that material was provided?

21   A    I do not know if that material was directly provided,

22   but like, on allocations, for instance, they asked questions

23   about, "How did you allocate it?  What were the underlying

24   things we--" they did samples of those and we provided

25   information that we had.

```
 1              THE COURT:  Don't interrupt him.  Don't interrupt
 2    him.
 3              MR. HARDIMAN:  I wasn't.
 4              THE COURT:  You tried three times.
 5              MR. HARDIMAN:  I wasn't.  The -- in --
 6              MR. CARTER:  So --
 7    Q    In -- in the course of that, going back to my question,
 8    has the TCEH Creditor Committee come to you and say, "We've
 9    looked at the methodologies, we've looked behind it and
10    here's a specific mistake that they made, this is why the
11    allocation ended up being wrong.  We see this is incorrect."
12    A    A specific --
13    Q    Yes.
14    A    I am not aware of the specifics.  I do know that they
15    generally made that as part of their lega -- different
16    discoveries and different questions and answer sessions that
17    we had with the T Committee.
18    Q    But they've made the general allegation that the
19    allocation was wrong because the allocation came out to
20    favor EFIH, but I'm asking whether or not they came and
21    said, "Okay, we've looked at this stuff and here's where it
22    went wrong, here's what the mistake was, here's what these
23    people did."
24    A    Not to me, they did not.
25    Q    Okay, are you aware of them doing that to anybody?
```

1    A    Not that I'm aware of.

2    Q    Okay, now, you state in Paragraph E1 of your report

3    that to conduct and audit or a forensic review of the

4    allocation of shared services cost among the Debtors would

5    require the collection and review of thousands of accounting

6    entries, line items, journal entries and related paperwork

7    or electronic records and require significant amounts of

8    time.  Do you see that?

9    A    Yes, I do.

10   Q    Okay, now, are you testifying that to determine whether

11   or not the allocations were set correctly every year,

12   pursuant to the methodology set out in the SLAs and

13   agreement, you would have to look at every allocation

14   relating really to the (indiscernible) entry?

15   A    Yes.  As an example, you would have to go and interview

16   and have them recall, as a person, every hour that they

17   worked for EFIH, EFH, for TCEH, for all those people to

18   determine a correct allocation of their costs, because most

19   of the cost is labor.  So most of the cost is labor, so you

20   have to go back an interview every employee that was at EFH

21   Corporate Services and say, "Did you work on EFIH or EFH?

22   What hours?  What did you do?" to do it correctly.

23   Q    Have you met with any sort of, like, forensic

24   accountant or auditor to ask them how they would review this

25   type of matter?

1    A    Most likely they would do an interview and the general

2    allocation process, but no, I have not.  I'm a -- as an

3    accountant and somebody who does this kind of stuff for a

4    living, that would be my own personal way I would go about

5    it.

6    Q    But you haven't met with anybody to sit down to say,

7    "How would we get to the bottom of this?" if you

8    (indiscernible)

9    A    No, I have not met with somebody to do that.

10   Q    And you don't think that you could probably perhaps get

11   to these answers more easily by just going to the people who

12   did the allocations and saying, "How did you do it?"

13   A    It wouldn't just be the allocation, it would be the

14   people that you would actually need to go interview that

15   actually did the work.

16   Q    So your point is, you would have to go back to see if

17   everybody actually did the work that was allocated?

18   A    Or -- (indiscernible) they cost, yes, you would have to

19   go back and see where -- what were they spending their time

20   on to allocate their costs.

21   Q    And is it your understanding that the TCEH Creditors

22   are complaining that the work wasn't actually done, that was

23   allocated, or just that the allocation isn't correct?

24   A    That they were allocated more costs than what was

25   actually needed for the TCEH business, would be the way I

1   would frame that.

2   Q    Right, so they're not -- they're not -- they're not

3   arguing that the services, wherever they should have been

4   allocated, didn't actually occur and take place?

5   A    Not that I'm aware of.

6   Q    Okay.  Let's talk a minute about the tax issue.

7   A    Okay.

8   Q    And you testified about, there's a dispute with respect

9   to the tax sharing claims.

10  A    That is correct.

11  Q    And those claims center around the proper

12  interpretation of the contract, specifically, and I'll give

13  you the full name, the Federal and State Income Tax

14  Allocation Agreement Among Members of the EFH Consolidated

15  Group?

16  A    That is correct.

17  Q    All right.  And you testified about certain schedules

18  that were filed under your supervision that are referred to

19  in Paragraph 89 of the report?

20  A    Yes, actually, not just my supervision but I actually

21  had to sign them.

22          MR. HARDIMAN:  Okay.  Now, in addition to those

23  schedules, isn't it also true -- and here I'm going to use

24  just two exhibits on cross-examination, Your Honor, which

25  I'll hand up, if you don't mind.  I don't have a binder,

1    it's just in a --

2              THE COURT:  Okay.

3              MR. HARDIMAN:  -- in a folder, and my colleague,

4    if you don't mind, will hand this up because --

5              THE COURT:  Yes.

6              MR. HARDIMAN:  -- I don't know if you noticed, I

7    have a little problem.

8              THE COURT:  Thank you.

9              MR. HARDIMAN:  With my foot.

10             THE COURT:  Let the record reflect he meant his

11   foot.

12             MR. HARDIMAN:  Thank you.

13             (Laughter)

14             MR. HARDIMAN:  At least that time I did.

15   Q:   In the first document -- sorry, I'm getting -- if you

16   take a look at EUCC351, there's only two documents in the

17   folder (indiscernible) Your Honor, and this is a notice of

18   amendments to schedules of assets and liabilities for Debtor

19   Energy Future Holdings, Corp., Case No. 14-4079.  Do you see

20   that?

21   A    Yes, I do.

22   Q    Okay, and you're aware of the fact that a notice of

23   amendment to the schedules was filed on or about February

24   18th, 2015?

25   A    Yes, I am.

1   Q    And am I correct that one of the amendments, perhaps

2   the only amendment, is that there is a footnote on Page 6,

3   if you -- the pages are up at the top, and the footnote says

4   -- do you have it?

5   A    I do.

6   Q    Okay.  "This call originally was set forth on Energy

7   Future Holding Corp.'s Schedule B Personal Property, Rider

8   B16, accounts receivable, filed on June 30th, 2014.  Energy

9   Future Holdings Corporation believes that the tax allocation

10  matters should result in Energy Future Holdings, Corp.,

11  owing nothing to Texas Competitive Electric Holdings

12  Company, LLC., and in Texas Competitive Electric Holdings

13  Company, LLC., owing not less than $500 million to Energy

14  Future Holdings Corp.," did I read that correctly?

15  A    You did.

16  Q    Okay, and am I also correct that this notice of

17  amendment was subsequently withdrawn by EFH on or about

18  February 23, 2015, and that is reflected on EUCC352?

19  A    Yes.

20  Q    And, referring you to the second page of the document,

21  am I correct that this was withdrawn without prejudice by

22  EFH Corp?  And I'm referring to --

23  A    Paragraph 3?

24  Q    I'm sorry?  No -- actually, yes, Paragraph 3.

25  A    Okay, that's what it seems to say.

1    Q    Right, and that it was withdrawn because an objection

2    filed by the ESCH Committee that the filing of the amendment

3    violated a stipulation and agreed order dated September 16,

4    2014?

5    A    That seems what Paragraph 2 says.

6    Q    All right.  Now, just going to the competitive shared -

7    - the -- can I call it the tax allocation agreement?

8    A    That's fine.

9    Q    Okay.  Are you testifying that the manner in which

10   these payables and receivables you testified before about

11   were correctly booked under the competitive -- pardon me,

12   under the tax allocation agreement?

13   A    I am -- what I'm saying is this is how they were booked

14   under the tax sharing agreement.  I'm not saying whether or

15   not it was correctly booked under the tax -- I know that is

16   subject to dispute.

17   Q    And the resolution of the dispute will depend on the

18   interpretation of the tax allocation agreement applied to

19   these bookings?

20   A    Yes, that would be my understanding.

21           MR. HARDIMAN:  Your Honor, I have completed my

22   questioning.

23           THE COURT:  Okay.

24           MR. SHEPPARD:  For the record, Your Honor, Mark

25   Sheppard, Montgomery McCracken, conflicts counsel for the

1    EFH Unofficial -- or Official Unsecured Creditors'

2    Committee.

3              THE COURT:  Yes.

4              MR. SHEPPARD:  Your Honor, I handed up a binder

5    with some exhibits which I may use.  I've also given a set

6    to the witness.

7              THE COURT:  Okay.

8                        CROSS-EXAMINATION

9    BY MR. SHEPPARD:

10   Q    Mr. Carter, good afternoon.

11   A    Good afternoon.

12   Q    I just have a few questions for you, to follow-up.

13        You testified, in response to some questions from

14   Mr. McKane about sponsor management fees, do you recall

15   that?

16   A    I do.

17   Q    Okay, and I think you testified that management fees

18   derived from a contract that came out of the LBO on October

19   of 2007, is that right?

20   A    That is correct.

21   Q    Okay, and you weren't at the company in 2007, is that

22   correct?

23   A    Yes.  Very much involved in the LBO transaction.

24   Q    Oh, you are?

25   A    Yes, I was.

1   Q    Okay.  Okay. Do you know, sir, who approved that

2   management contract?

3   A    I would assume the new EFH boards approved those

4   contracts.

5   Q    Okay, and did you know the makeup of the board at the

6   time that that management agreement was agreed to?

7   A    My recollection is the old board had resigned and it

8   was new board members that were in place at that time.

9   Q    Okay, and were -- were board members from the sponsors

10  the majority of the board as a result of the LBO?

11  A    I believe they were, but I don't completely recall.

12  Q    Okay.  And do you recall who signed the agreement on

13  behalf of EFH Corp?

14  A    I don't.  I think it was one of the exhibits from

15  earlier today, but I don't -- I don't know who exactly

16  signed it.

17  Q    All right, so let's -- can we turn to DX339, which is

18  in either one of the binders?  Whatever's more convenient,

19  Mr. Carter.

20  A    I'll use yours.

21  Q    It's a little thinner.  If you turn to the -- to the --

22  well, the pages aren't numbered, I apologize, but the end of

23  the agreement, the first signature block is for Energy

24  Futures Holdings, Corp., do you see that?

25  A    Yes.

1   Q     Okay, and Jeffrey -- I'm not sure how to pronounce it.

2   A     Lao. 00:22:44

3   Q     Okay.  Okay.  And at the time Mr. Lao was employed by

4   whom?

5   A     TPG.

6   Q     TPG Capital?

7   A     Yes.

8   Q     One of the sponsors?

9   A     Yes.

10  Q     He signed on behalf of Energy Future Holding, Corp.?

11  A     That's correct.

12  Q     Okay.  And then, if you go to the next signature line,

13  underneath that it says, "For Texas Energy Future Holdings

14  Limited Partnership, Jonathan Schmid," do you see that?

15  A     Correct.

16  Q     And Mr. Schmid was employed by whom, if it's on --

17  A     KKR.

18  Q     He was a partner at KKR?

19  A     I don't know if he was a partner, but he was an

20  employee.  He was at KKR.

21  Q     Okay, and Texas Energy Future Holdings Limited

22  Partnership is actually the holding entity for EFH Corp,

23  isn't that right?

24  A     That is my understanding, yes.

25  Q     Okay.  And was Mr. Schmid on the board of EFH Corp at

1    the time?

2    A    He be -- he was a board member, so I don't know if he -

3    - I'm assuming he was on the board at -- or immediately

4    after the LBO, but I'm not sure exactly when he came onto

5    the board.

6    Q    Okay, so when you signed this on behalf of Texas Energy

7    Future Holdings Capital -- or Capital Holdings, excuse me,

8    he was a board member of EFH Corp?

9    A    He could be.  I don't recall exactly the timing of when

10   he became a board member.

11   Q    Okay.  All right, now, you also testified in your

12   written declaration, I'm on Page 35, sir, or Paragraph 35 of

13   your written declaration.  You say there that, "the company

14   continued to operate successfully for over six years after

15   the LBO."  Did I read that correctly?

16   A    That is correct.

17   Q    Paragraph 35?  Okay.  I want to make sure, particularly

18   after yesterday, we know who we're talking about here when

19   we say "the Company".

20   A    Okay.

21   Q    It looks like it's a capital C.  Who are we talking

22   about there?

23   A    I would consider that to be TCEH, EFH or EFIH.

24   Q    Okay, I'm sorry, did you say "or"?

25   A    Or.  I would consider it to be all three.  I mean, EFH,

1    TCEH or EFIH.

2    Q    All right, well how about if I said the Debtors, would

3    that work for you?

4    A    Okay.

5    Q    Okay, good.  Now, if you go down to Paragraph 37, it

6    says there, "Eventually the economic downturn and the

7    fundamental changes in the natural gas market in the United

8    States, including through the increased ability to access

9    shell gas through fracking and horizontal drilling, reduced

10   natural gas prices to levels that were significantly lower

11   than at any -- than at the time of the LBO," is that

12   correct?

13   A    That's correct.

14   Q    Okay, now, "eventually," how long is "eventually"?

15   A    Originally, the gas prices went up after the LBO, and

16   they started coming back down in 2008, at the end of 2008,

17   and I think they stayed probably below that level after

18   2008.

19   Q    Okay, and the LBO was October of 2007, right?

20   A    That's correct.

21   Q    And so, by the end of November of 2008, gas prices were

22   actually below the price that they were at the time of the

23   LBO, is that right?

24   A    I don't know the exact time, but someplace in that

25   general area.

1    Q     Okay, so the one year is the "eventually"?

2    A     Well, we were hedged, we had significant hedges in

3    place that made sure we had hedged gas at $8, $7, $8, all

4    the way through 2013, so we were not dependent on a

5    commodity curve that could go up or go down in a short

6    period of time, so I think everybody would have assumed that

7    gas would have come back up from those levels.  Yes, it

8    stayed down, but that was -- yeah.  We weren't trying to

9    play a short-term game here.  It was -- we were long-term

10   hedged.

11   Q     Okay.  Now, you also talked a little bit about the

12   allocation of the management fees, and I want to make sure

13   that we're clear about which fees we're talking about, okay?

14   A     Okay.

15   Q     We talked about the management agreement, right, and

16   there are fees that -- the $35 million dollars a year that

17   was payable by the Debtors, correct?

18   A     Correct.

19   Q     To the sponsors, is that right?

20   A     Correct.

21   Q     And then I think Mr. McKane asked you about some

22   finance fees?

23   A     That is correct.

24   Q     Right?  Now, they weren't subject to the management

25   agreement, were they?

1   A     That -- that is my understanding, that is correct.

2   Q     Okay.  So, if a sponsor earned finance fees, that was

3   incident to a particular transaction like the amends and

4   extends that you talked about on direct, right?

5   A     That's correct.

6   Q     And somebody had to make a decision to hire that

7   sponsor for that particular transaction, isn't that true?

8   A     We would hire investment banks, different investment

9   banks but yes, we -- somebody had to make a decision to hire

10  a investment bank.

11  Q     But EFH certainly wasn't required under the management

12  agreement to hire Goldman Sachs or any of the sponsors for

13  any of those financing transactions, is that right?

14  A     That is my understanding.

15  Q     Okay, and do you know who at EFH made the decision as

16  to who to hire for any one of the amends and extends that

17  you talked about in term --

18  A     It would have been Paul Keglevic and Tony Horton.

19  Q     Okay, and did the board have to approve that?

20  A     I don't believe they actually had to approve the actual

21  engagement of the investment bank.  They had to approve the

22  overall financing transaction but not the actual hiring of

23  the investment bank.

24  Q     All right, so it's your testimony that the $51 million

25  dollars that went to Goldman Sachs was not approved by the

1   board?

2   A    That's not what I said.  I said the financing

3   transactions were approved by the board, and any fee -- I

4   mean, you pay fees when you do financing transactions, so by

5   virtue of approving the financing transaction, the board

6   would have said yes, we're going to end up paying some fees.

7   Q    Okay.  Thank you, Mr. Carter.

8   A    Okay.

9   Q    I appreciate your clarification.  Now, in terms of the

10  allocation of the management fees that we were talking about

11  before, Debtors Exhibit 341 was that memo and email that Mr.

12  McKane showed you, do you remember that?

13  A    Yes, I do.

14  Q    Now, the memo itself was created back in 2009, it looks

15  like, right?

16  A    That's correct.

17  Q    Okay, and then the email bringing that forward is up in

18  2013, correct?

19  A    Correct.

20  Q    Okay.  There aren't any other written memos regarding

21  these allocations of fees after 2009, are there?

22  A    This is not about an allocation of fees, but this --

23  but I'm not aware of any other memos.

24  Q    Okay.  And this -- I believe you testified on direct

25  but I want to make sure, that this was actually prepared for

1    purposes of giving to your accountant for tax purposes, is

2    that right?

3    A    Yeah, this was to determine the tax deductibility --

4    Q    Okay.

5    A    -- of these fees for EFH.

6    Q    And it wasn't prepared by any outside consultant, is

7    that right?  It was prepared internally?

8    A    Yeah, this was -- was from Amy Duke, so she was an

9    internal tax person.

10   Q    Okay.  Unlike the other consulting memo that you

11   testified to on direct, that was done by Huron, right?

12   A    That's correct.

13   Q    That was an outside consultant?

14   A    That was an outside consultant.

15   Q    Okay, but this allocation was done internally?

16   A    This memo was done internally.

17   Q    Okay.  Do you know, Mr. Carter, how the number $35

18   million was arrived at in the management agreement?

19   A    I do not know.

20   Q    Did you ever see any backup documentation to justify

21   the amount of $35 million?

22   A    I did not.

23   Q    Okay.  Would you in your position at EFH expected to

24   have seen such documents, if they existed?

25   A    No, I would not.

1  Q    Okay, well who would?

2  A    Who would?

3  Q    Who would be in a position to have seen such documents

4  if they did exist?

5  A    if they did exist?  I'd have to -- I don't know, that'd

6  be speculation on my part.

7  Q    Have you ever heard anyone at EFH discuss where the $35

8  million came from?

9  A    No, I have not.

10 Q    Okay.  Now, in connection with the LBO, you also

11 testified that EFH hired Duff & Phelps to do a fairness and

12 solvency analysis, is that right?

13 A    Yes, they did.

14 Q    Okay.  To your knowledge, did EFH ever hire Duff &

15 Phelps to prepare any additional solvency analysis after the

16 LBO?

17 A    No other solvency analysis after the LBO.

18 Q    Okay, so in connection with each one of the amends and

19 extends that were done here, there was no solvency analysis

20 done by Duff & Phelps, is that right?

21 A    That is my understanding, yes.

22 Q    Okay, and there was no solvency analysis done by any

23 other entity other than Duff & Phelps, is that correct?

24 A    I'm not aware of any.

25 Q    Okay.  Now, in Paragraph 48 of your declaration, you

1    testified about Texas Energy Future Holdings, LP, which is

2    the sponsor's entity, correct, Mr. Carter, "Taking a

3    worthless stock deduction under the settlement agreement,"

4    do you recall that?

5    A    Yes, I do.

6    Q    Okay.  And I believe you're testifying there that their

7    agreement to give that up is somehow consideration for their

8    release in this settlement agreement is that correct?

9    A    That's correct.

10   Q    Okay.  In your opinion -- well, strike that, Your

11   Honor.  Now, if TELP takes this worthless stock deduction,

12   that would obviously jeopardize the NOLs at EFH and its

13   subsidiaries, is that correct?

14   A    That is my understanding, yes.

15   Q    Okay.  Are you aware of anyone taking any action at all

16   at the Debtors, any of the Debtors, to try to preserve those

17   NOLs?

18   A    Trying to pre -- what do you -- I don't understand your

19   question.

20   Q    Okay.  Do you recall, or are you aware, of any action

21   taken by any of the Debtors to try to preserve those NOLs in

22   the event that the sponsors decided to take that action?

23   A    I am not -- I'm not sure I follow the question, as I'm

24   not a tax expert, but would be, just like with all tax

25   claims, we always try to keep the attributes of the estate

1   so that we can maximize value.

2   Q    I'm sorry, let me maybe try it a little differently.

3   A    Okay.

4   Q    The net operating losses are important to the

5   companies, to the Debtors, right?

6   A    Correct.  They're part of the plan, part of the

7   settlement.

8   Q    Are you -- okay, and are you aware of any discussions

9   at the Debtors --

10  A    At the Debtors.

11  Q    -- okay?  To take steps to try to preserve those NOLs,

12  in the event that the sponsors were to threaten to take that

13  stock deduction?

14  A    I am not -- I've -- don't have any knowledge of that.

15  Q    All right, just a couple more questions, Mr. Carter.

16  The shared services agreement that you talked about.

17  A    Sure.

18  Q    Right?  DX 682.  Now, I think you testified that the

19  purpose of this agreement was to correctly allocate the

20  costs, right?

21  A    Correct.

22  Q    And in your written direct, you testified that the

23  allocation to EFH Corp was 5 percent, is that correct?

24  A    That is effective -- yes, that is effectively, around 5

25  percent.

1    Q    Okay, and I think you testified that the reason it was

2    as low as 5 percent was because the operating entities, TCEH

3    and EFIH, obviously needed more services, is that correct?

4    A    That's correct, and you know, there's limited amounts

5    at EFH Corp.

6    Q    Okay, and in terms -- and I also believe you testified

7    about the sponsors instructing the company not to pay them

8    their management fees after a certain period of time, is

9    that correct?

10   A    Yes, they instructed us after the third quarter of 2013

11   not to -- for us to pay the management fees.

12   Q    Okay, and so the -- do you know how much those

13   management fees were accrued or?

14   A    They're approximately 9, 8, lower $9 million dollars a

15   quarter, so $9 million since then, it's somewhere around

16   $70, $80 million dollars.

17   Q    About $70 million dollars?  That sound about right?

18   A    That sounds about right.

19   Q    I think that's the number in the motion to approve the

20   settlement agreement, and some other testimony.

21   A    Okay.

22   Q    Okay.  And that -- and the portion that would be

23   attributable of that $70 million dollars to EFH is 5

24   percent?

25   A    Correct, under the current allocation methodologies,

1    yes.

2    Q    Okay, so my math isn't very good, but that's 70, that's

3    $7 million -- $3.5 million dollars?

4    A    That would be the math, yes.

5    Q    Okay, so -- so basically, EFH Corp would be on the hook

6    for $3.5 million dollars.

7    A    I think the agreement's with them, so I guess they

8    would be on the hook for the whole thing.

9    Q    Okay.  Okay, they would be on the hook for the whole

10   thing?

11   A    Yes, because the agreement's with --

12   Q    All the management fees?

13   A    -- EFH Corp.

14   Q    Okay.  Thank you.

15           MR. SHEPPARD:  I have nothing further, Your Honor.

16           MR. MCKANE:  Just a few questions, Your Honor.

17                          REDIRECT

18   BY MR. MCKANE:

19   Q:   Mr. Carter, Mr. Sheppard asked you about an amend and

20   extend.  What was being amended and extended at that time?

21   A    That was the 2011 amend and extend at TCEH, so we were

22   changing the maintenance covenant at TCEH and as well as we

23   were extending out the debt from the current maturities to

24   2017.

25   Q    All right, and sir, Mr. Sheppard asked you about the

1    memo that's Debtors Exhibit 341.  Is that memo a memo for an

2    allocation of the management services?

3    A    No, it's not.  It's just a memo about the actual

4    management agreement itself.

5    Q    Yeah.  Mr. Sheppard asked you questions about

6    basically, along the topic of the exposure of the Debtors to

7    fluctuations in natural gas prices, do you recall that?

8    A    Yes.

9    Q    And you mentioned the comprehensive hedging program

10   that the Debtors had in place at the time of the LBO, is

11   that right?

12   A    That is correct.

13   Q    Explain just a little bit to the Court the scope of

14   that hedging program.

15   A    So, as a general rule, we had hedged almost 80 to 90

16   percent of our exposure all the way from 2007 all the way

17   through 2012, I believe 2013 was about 63 percent of our

18   natural gas exposure, because in Texas, the price of power

19   is directly tied to natural gas, or highly correlated to

20   natural gas, so we hedge -- use gas hedges to lock in our

21   power prices for our generation fleet.  Just to give you an

22   example, in -- at the end of June of 2008, as disclosed in

23   our SEC financials, those hedges were $8 billion dollars in

24   the money in June of 2008.

25   Q    And was that hedging program one of the -- one of the

1    largest in the country?

2    A    It's the largest that we're aware of.

3    Q    And the hedges that were put in at the time of the LBO,

4    are they some of the longest hedges that were available in

5    the marketplace at that time?

6    A    Yes.

7              MR. SHEPPARD:  Your Honor, I want to object.  I

8    don't mind the leading questions as a preliminary matter,

9    but the testimony is getting big.

10             THE COURT:  I --

11             MR. SHEPPARD:  Objection, leading.

12             THE COURT:  Leading, okay.

13             MR. MCKANE:  All right, I'll rephrase.

14             THE COURT:  Don't lead the witness.

15             MR. MCKANE:  Thank you, Your Honor.  I'll

16   rephrase.

17   Q    Can you -- can you describe the length of that hedging

18   program, as compared to what was available in the

19   marketplace at that time?

20   A    Yes, we entered into hedges for 2011, '12 and '13, at

21   the time of the LBO, so we -- anything that wasn't hedged at

22   that point, we added on additional hedges.  We also, in July

23   of 2008, added hedges for 2014, very uncommon for hedges

24   that far out.

25   Q    And specifically, these are natural gas hedges,

1   correct?

2   A    These are natural gas hedges.

3   Q    Yeah.  You were asked about the parties who signed the

4   management agreement.

5   A    Yes, I was.

6   Q    And Mr. Lao signed for EFH?

7   A    Yes, he did.

8   Q    What does it mean to be an authorized signatory of EFH?

9   A    It means you've been authorized by the board to sign

10  contracts on its behalf, would be my understanding.

11  Q    And was Mr. Lao an authorized signatory of EFH?

12  A    According to this, he was.

13  Q    Okay.  Again, you were asked a series of questions

14  about the shared services agreement by Mr. Hardiman, do you

15  recall that?

16  A    Yes.

17  Q    And he asked you specifically about the work that you

18  would have to do to figure out if the allocation that was

19  provided to EFIH of zero was correct, and if not, what the

20  proper allocation would be.

21  A    Yes, if you wanted to do it accurately, yes.

22  Q    And sir, you mentioned that part of your training is as

23  an accountant?

24  A    Yes, I'm a CPA.

25  Q    All right, based on your experience in the company, and

1    your training, how would you go about doing it?

2    A    If you were doing it correctly, you would go back and

3    interview each individual employee.  Now, you could also do

4    it at a little bit higher level where you're interviewing

5    groups of employees at one time and trying to figure it out,

6    but it would all be based on their recall of exactly what

7    they were doing in those historical periods, it would be

8    very, very difficult.

9    Q    So you mentioned that one of the key drivers of the

10   services was labor costs.

11   A    That is correct.

12   Q    And one of the categories was legal.

13   A    Correct.

14   Q    Could you give an example how you do or are doing this,

15   for example, with Andy Wright?

16   A    Yeah, I mean, you would ask him exactly what types of -

17   - you know, what company he was doing work for, you would

18   ask him to, you know, was he working on EFIH financing

19   transaction, the EFIH 10Q, the 10K, all the different things

20   that are required for EFIH and when was he doing it and for

21   how long.

22   Q    And for the record, who is Andy Wright?

23   A    He is the Deputy General Counsel.

24   Q    Okay, and with regards to your involvement in the

25   diligence process, whether it be by Debtors or Creditors,

1    can you explain what role you play specifically as it

2    related to shared services?

3    A    I was the -- effectively, the person that answered any

4    of the due diligence questions or reviewed them and made

5    sure they were answered correctly to any of the Creditors

6    that asked questions about those, including the Committees.

7    Q    And in addition to being specifically questioned by the

8    Committees, were you also questioned by TCEH Debtors?

9    A    Yes, I was.  We participated in meetings with the

10   disinterested director's advisors, with very similar

11   questions to what the Committees were asking.

12   Q    And sir, previously in your cross-examination

13   testimony, you referred to the DDAs.  Who is that?

14   A    That would be Munger Tolles for TCEH and I think it's

15   Greenhill is their financial advisor.

16   Q    And in addition to being interviewed yourself, can you

17   describe what role you had in obtaining materials for the

18   data room and refining -- responding to the legacy discovery

19   requests?

20   A    Yeah, so, just about any of the financial type requests

21   that came through the company came through Alvarez & Marsel,

22   with Alvarez & Marsel, those would -- they would reach out

23   with me, we would determine the appropriate people inside

24   the company to get a response, and then I would review those

25   responses, and at that point in time, they'd be posted to

1    the data room.

2    Q    And in addition to the data room, did you assist

3    Kirkland & Ellis in responding to specific targeted document

4    requests as it relates to shared services?

5    A    Yes, I did.

6              MR. MCKANE:  Your Honor, I have no further

7    questions.  I understand Mr. Shore may have a few.

8              THE COURT:  All right.

9              MR. HARDIMAN:  May I object and perhaps get some

10   clarification as a matter of protocol?  The witness was put

11   on by the Debtors, there was a period for cross-examination

12   of the other parties, nobody stood up to cross other than

13   Mr. Sheppard and myself, there was then redirect.  Why would

14   other people who were part of the proponents of the plan now

15   have an opportunity to ask questions?

16             THE COURT:  Because they're proponents of the

17   plan.

18             MR. HARDIMAN:  But redirect has already been

19   concluded.

20             THE COURT:  He's continuing redirect on his --

21             MR. HARDIMAN:  We'll make --

22             MR. SHORE:  I can both continue redirect and I can

23   cross the material that was brought out by Mr. Hardiman in

24   his direct, which went beyond the scope, so I'm just -- I

25   have a few questions.

1          MR. HARDIMAN:  But this was not a witness of the T

2     unsecured Committee, this was a witness of the Debtors.

3          THE COURT:  Oh, we're not playing that game, all

4     right?

5          MR. HARDIMAN:  All right, Your Honor.

6          THE COURT:  You -- we negotiated a protocol.  We

7     negotiated time constraints.  We'll blow everything away if

8     that's what -- the game you want to play.

9          MR. HARDIMAN:  Well, it's not a game --

10         THE COURT:  Well, I can take him off the stand, he

11    can sit down and Mr. Shore can call him again, or we could

12    do this trial in a way that makes sense.

13         MR. HARDIMAN:  Well, Your Honor, my question

14    really related just in the order of how it was done.  May I

15    have an opportunity to redirect?

16         MR. SHORE:  Yeah.

17         THE COURT:  Of course.

18         MR. SHORE:  Right?  Yeah.

19         MR. HARDIMAN:  All right, thank you.

20         THE COURT:  It happened yesterday.

21         MR. SHORE:  All right, let's just -- I want to

22    focus just on the intercompany tax claims.

23                         REDIRECT

24    BY MR. SHORE:

25    Q    First, the $773 million that is scheduled as a

1   receivable from EFH on TCEH's books.  Are you aware of

2   whether the Committee or anybody else ever re-filed an

3   objection to that claim?

4   A    I'm not aware of anybody re-filing an objection.

5   Q    Okay.  Are you aware of a concept that a schedule claim

6   that is not objected to is an allowed claim under the

7   Bankruptcy Code?

8   A    I've heard things like that, but I'm not a lawyer -- a

9   bankruptcy lawyer.

10  Q    Okay, so as it stands, as far as you know, there's a

11  scheduled $773 million dollar claim on the books of TCEH and

12  EFH, respectively, right?

13  A    That is my understanding, yes.

14  Q    And the recovery on that claim, TCEH's recovery on that

15  claim, could be 100 cents on the dollar, or pennies on the

16  dollar, or no recovery at all, depending on what happens at

17  EFH, right?

18  A    It -- under your supposition, I -- yes, if -- if it's

19  an allowed claim by the Court, then yes, it would get 100

20  cents on the dollar, if there was enough recovery at EFIH --

21  EFH to do that.

22  Q    Okay, now Luminant Generation, the flipside of that

23  claim, the $1.29 billion dollar claim that EFH has into

24  Luminant Generation Company, has anybody objected to that

25  claim?

1    A    Not that I'm aware of.

2    Q    All right.  Now, based on your work in preparing the

3    schedules, are you aware that Luminant Generation Company,

4    LLC., is a guarantor of various TCEH debt?

5    A    Yes, it is.

6    Q    Okay, so it's a guarantor of approximately $24 billion

7    dollars in first lien claims?

8    A    Correct.

9    Q    And $5 billion dollars -- or $2 billion dollars in

10   second lien claims?

11   A    Correct.

12   Q    And $5 billion dollars of TCEH unsecured notes,

13   approximately?

14   A    Yes.

15   Q    So it adds up to about $30 billion dollars of other

16   debt at Luminant Generation?

17   A    I mean, I think they're guarantors.  I don't -- I'm not

18   sure how you framed whether it's the debt of Luminant

19   Generation.

20   Q    Okay.  Well, I'm just -- that they have claims into

21   Luminant Generation in the amount of $30 million armadillos,

22   right?

23   A    Yes.

24   Q    Right.  Okay.  Based on your understanding of the

25   assets of Luminant Generation, is there $30 billion dollars

1    of assets at Luminant Generation?

2    A    No, there's not.

3    Q    Okay.  Is there any way, in your mind, having worked on

4    the schedules of assets and liabilities, that Luminant

5    Generation will ever be able to pay its Creditors in full?

6    A    No, they would not.

7    Q    Okay.  Now, are you aware that the first liens have

8    claims, or have asserted claims, and the Court has allowed

9    claims under the cash collateral order, of the first liens

10   on all collateral at Luminant Generation?

11   A    Yes, they did.

12   Q    Okay, so are you aware whether there's $24 billion

13   dollars of collateral just in that box?

14   A    There is not.

15   Q    Okay, so if the waterfall was respected, all collateral

16   of Luminant Generation would go to the T firsts, right?

17   A    That is my understanding.

18   Q    All right.  Now, with respect to whatever's left, are

19   you aware of any unencumbered value sitting in the Luminant

20   Generation box that would be made available to the T

21   unsecureds, the T second liens, the T first deficiency and

22   the Luminant Generation -- or sorry, the EFH claim into

23   Luminant Generation?

24   A    There's probably some small unencumbered assets in the

25   Luminant Generation box but nothing of the size that you're

1   talking about.

2   Q    Okay, so I take it that, in your view, having prepared

3   these schedules of assets and liabilities, the Luminant

4   Generation claim would -- would recover pennies on the claim

5   in -- or EFH would recover pennies on the claim into

6   Luminant Generation, if it just got unencumbered value?

7   A    That is -- yes.

8           MR. SHORE:  Okay.  I have no further questions.

9           THE COURT:  Thank you.  Redirect, re-cross,

10  however you want to call it.

11          (Laughter)

12          THE COURT:  We're flexible here.

13                      RE-CROSS

14  BY MR. HARIMAN:

15  Q    With respect to Mr. Shore's question to you, which, if

16  heard properly, was whether you were aware of any party

17  submitting an objection to the tax sharing claim, do you

18  remember those questions?

19  A    Yes, I do.

20  Q    Are you aware that the EFH Unsecured Creditors'

21  Committee, my client, did file an objection --

22  A    I'm not --

23  Q    -- to that claim?

24  A    I'm not aware that you filed an objection, but I know

25  people were disputing these claims.

1              MR. HARDIMAN:  Yeah, no, we filed an official

2      objection which is EX349, Your Honor, and I don't know if we

3      have it here, up here.

4              THE COURT:  Okay.

5              MR. HARDIMAN:  I take it you haven't seen that.

6              THE COURT:  You filed that in June, right?

7              MR. CARTER:  I have not seen that.

8              MR. HARDIMAN:  What's that?

9              THE COURT:  Was that June or was that back in

10     April?

11             MR. HARDIMAN:  I don't think it was quite that

12     long ago.  I think it was August, but I could be wrong.

13             MAN: June.

14             MR. HARDIMAN:  It was June.

15             THE COURT:  June.  It was June.

16             MR. HARDIMAN:  There's too many documents in this

17     case, Your Honor.

18             THE COURT:  I remember.

19             MR. HARDIMAN:  Yeah.  That's all I've got, Your

20     Honor.

21             THE COURT:  Okay.  Very good.

22             MR. SHEPPARD:  Your Honor, no redirect.

23             THE COURT:  Okay, thank you.

24             MR. SHEPPARD:  Or re-cross.

25             THE COURT:  Thank you.

1           MR. MCKANE:  Your Honor, may Mr. Carter be

2    excused?

3           THE COURT:  Does anyone have any further

4    questions?  No?  Thank you, Mr. Carter.

5           MR. CARTER:  Thank you.

6           THE COURT:  Mr. Horton next?

7           MR. MCKANE:  He is, and I was just surveying the

8    Courtroom to make sure he's here.

9           THE COURT:  Okay.

10          MR. MCKANE:  He is here.

11          THE COURT:  All right, very good.  Well, we're

12   going to take, say, five minutes, and then we'll have Mr.

13   Horton on the stand.

14          MR. MCKANE:  Very good, Your Honor.  Thank you.

15      (Recess)

16          CLERK:  All rise.

17          THE COURT:  Please be seated.  Please, be seated.

18   Just real quick, I -- first of all, I apologize for being

19   short.  That was inappropriate, but I do want to, just so

20   everybody knows, we're going to have some flexibility here.

21   You know, we have a proponent side, we have an objection

22   side, we're not, you know, having the proponents call

23   someone -- you can sit down, sir, thank you.  We're not

24   having the proponents call someone and then having them sit

25   down and you know, that's the way we've worked it out.  So

1   there is going to be flexibility, but every -- it's also,

2   I'm going to be more flexible than I usually am, because I'm

3   usually very strict, direct, cross, re-direct, sit down.

4   I'm going to be more flexible.  Everybody will get a full

5   opportunity to ask the questions they want to ask, so I want

6   to make that clear.

7           MR. HARDIMAN:  Fully understood, thank you, Your

8   Honor.

9           THE COURT:  Very good.  And I -- again, I

10  apologize for my -- the shortness of my tone.  That was

11  inappropriate.  Now you've got to stand up again.  Just like

12  going to church, stand up, sit down, stand up.

13          MR. HORTON:  I'll be flexible as well.

14          THE COURT:  Okay, very good.

15          (Laughter)

16          CLERK:  Please raise your right hand.  Do you

17  affirm your word that you will tell the truth, the whole

18  truth and nothing but the truth to the best of your

19  knowledge and ability?

20          MR. HORTON:  I do.

21          CLERK:  Please state and spell your name for the

22  record.

23          MR. HORTON:  Anthony R. Horton, last name Horton,

24  H-O-R-T-O-N.

25          CLERK:  Thank you.

1          MR. HORTON:  Thank you.

2                       EXAMINATION

3     BY MR. MCKANE:

4     Q    Good afternoon, Mr. Horton.

5     A    Good afternoon, Mr. McKane.

6     Q    Sir, I believe in front of you is a binder, it says

7     Debtor's Witness Binder, Anthony Horton.  Do you have that?

8     A    I do indeed.

9          MR. MCKANE:  And I believe we provided a copy of -

10    - Your Honor, for you and your staff.

11         THE COURT:  Yes, thank you.

12         MR. MCKANE:  And we provided copies to everyone

13    else.

14    Q    Mr. Horton, can you introduce yourself to the Court and

15    state your position?

16    A    Anthony R. Horton, I am Senior Vice President and

17    Treasurer of EFH and the Treasurer of TCEH and EFIH.

18    Q    Okay, and sir, can you tell the Court a little bit

19    about your educational background and your employment

20    background?

21    A    Educational background, I have a Bachelor of Business

22    Administrator from the University of Texas In Arlington,

23    focused on Management and Economics.  I have a Masters

24    Degree in Finance and Accounting from the University of

25    Texas at Arlington.  I'm a Certified Public Accountant,

```
1     Chartered Financial Analyst, Certified Management Accountant

2     and Certified Financial Manager.

3     Q    And sir, how long have you been employed by the

4     Debtors?

5     A    30 years.

6     Q    And how long have you served --

7     A    That includes the bankruptcy.

8              (Laughter)

9     Q    All right.  And how long have you served as the

10    Treasurer of EFH?

11    A    Since 2004.

12    Q    And can you briefly describe the responsibilities --

13    your day-to-day responsibilities as the Treasurer of EFH,

14    EFIH and TCEH?

15    A    Yes, reporting to me is Investor Relations, Cash

16    Management, Debt Compliance.  I'm Chairman of the Retirement

17    Committee, I'm also responsible for raising capital for the

18    company debt, the debt loan markets, the debt capital

19    markets, haven't been in the equity markets for a little

20    while, as you understand.

21    Q    Okay.  And sir, did you prepare a declaration today in

22    support of the Debtor's motion for approval of the

23    settlement agreement and for confirmation?

24    A    Yes, sir, I did.

25    Q    And sir, can you turn to the tab of your binder that
```

1   says Written Direct?  Sir, do you recognize that document?

2   A    I do, indeed.

3   Q    Sir, what is it?

4   A    It's direct -- my declaration that was filed with the

5   Court.

6   Q    And is it -- is the information contained therein true

7   and correct to the best of your knowledge?

8   A    Yes, sir.

9        MR. MCKANE:  Your Honor, we move at this time for

10  the admission of the direct testimony, the declaration of

11  Tony Horton into evidence in support of both the motion and

12  plan confirmation.

13       THE COURT:  Any objection?

14       MAN:  No objections, Your Honor.

15       THE COURT:  All right, submitted without

16  objections.

17  Q    Mr. Horton, I'd like to cover one topic with you today.

18  A    Good.

19  Q    And that is the TCEH intercompany loans.

20  A    Yes, sir.

21  Q    All right.  Sir -- and actually, they're notes, right?

22  A    Yes, sir.

23  Q    And can you describe those notes as you use those terms

24  in your day-to-day practice?

25  A    There are two notes.  One note is the SG&A note, sales,

1    general and administrative expenses, and then there's

2    another note, is the P&I note, or principal and interest.

3    Q    And sir, when were the SG&A and P&I notes put into

4    place?

5    A    Those notes were implemented at the outset of the LBO

6    in 2007.  I think the date was October 10th, 2007.

7    Q    And why did EFH enter into an intercompany note with

8    TCEH?

9    A    First off, it was allowed and provided for in the TCEH

10   credit agreement, it was also provided for in the TCEH

11   unsecured indentures.  EFH is a holding company.  The only

12   source of funds to a holding company is it's from its

13   operating subs, so it'd been TCEH and Oncor at the time, and

14   typically that's in the form of dividends.  Realizing it was

15   a holding company, EFH had significant amount of debt at

16   EFH, it had debt that ran you know, 7, 10 years.  Some of it

17   was even beyond that.  So there was going to be a need for

18   being able to make principal and interest payments

19   throughout time, as well as paying for SG&A expenses at EFH

20   itself.

21   Q    Okay.  And sir, did you prepare some demonstratives to

22   aid you in testifying today?

23   A    I did.

24   Q    And sir, can you -- in the demonstratives tab, can you

25   turn to demonstrative number 1?  I believe it's the first

1    tab of your binder, sir?

2            THE COURT:  I have Keglevic demonstratives in

3    here.  Third page, oh.  Oh, I see it, thank you.

4            MR. MCKANE:  Yeah, I apologize, Judge.

5            THE COURT:  I got it.

6            MR. HORTON:  I'm there, Mr. McKane.

7    Q    All right, Mr. Horton, do you recognize Horton

8    Demonstrative No. 1?

9    A    I do.

10   Q    And what is it, sir?

11   A    It's a timeline, just outlining the sequence of certain

12   events related to the SG&A note and the P&I note.

13   Q    All right, let's leave that in front of Your Honor --

14   sorry, in front of you, Mr. Horton, as we go through the P&I

15   and SG&A note issues today.  But first, let's talk about

16   some of the features of the TCEH intercompany notes, okay?

17   A    Two important features.  One is, it was a demand note,

18   and secondly, it had a price.  It was LIBOR plus 500.  At

19   the time we priced the notes back in 2007, October of 2007,

20   LIBOR was roughly 5.25, and so, all in at that point in

21   time, the price of the notes was 10.25.

22   Q    So it was LIBOR plus 550, resulting in an interest rate

23   of 10.25?

24   A    LIBOR plus 500.  LIBOR was 5.25 at that point in time.

25   All in at that date it would have been 10.25.

1           THE COURT:  All right --

2           MR. MCKANE:  I apologize, your -- thank you.

3           THE COURT:  I want to interrupt for just a moment.

4   So, just so the record's clear, these are amounts -- these

5   are amounts TCEH is lending to EFH Corp.

6           MR. HORTON:  Yes, sir, I should have explained.

7           THE COURT:  And that -- okay, and they're payable

8   on demand by EFH Corp and the demand would be by TCEH.

9           MR. HORTON:  That is correct.

10          THE COURT:  Okay.

11  Q    All right, and specifically with -- well, we'll come

12  back to the interest rate.  Let's talk about the demand

13  feature, right, just for one second.  With regards to that

14  demand feature, as the Treasurer of TCEH, do you recall ever

15  making a formal demand of EFH to pay those funds?

16  A    No, sir.

17  Q    Were repayments made over time?

18  A    Yes, they were.

19  Q    All right, we'll cover those, you know, as we go

20  through the chronology.  With regards to the pricing of the

21  notes, the loans that TCEH were making to EFH, how did you

22  reach LIBOR plus 500 as the right price?

23  A    I -- one, it was an unsecured note to EFH, and so what

24  I did is I triangulated, and first off, you have to, I

25  think, take a step back.  Even though it had a demand

1    feature, from my perspective, we really (indiscernible) the

2    notes, and I worked with my Treasury team on this, we really

3    viewed that the notes would be outstanding for a seven to

4    ten year window, and in doing some work that's very common

5    for a note that is intercompany to have a demand feature

6    because there's typically not a maturity date, but from my

7    perspective, and realizing the length that I thought the LBO

8    in whole would be, you know, in operative -- in operation, I

9    felt like the notes would be outstanding seven to ten years.

10   Q    And so why is that -- why would the intercompany -- you

11   -- why would the intercompany notes be -- have a -- have

12   that length to them, of seven to ten years?

13   A    Well, if you look at EFH's debts -- excuse me -- if you

14   look at EFH's debt, it had 2014 maturity, so that was seven

15   years.  As part of the LBO, it had another ten years, it had

16   a 2017 maturity, which was ten years, so I kind of got to

17   that seven to ten year window.

18   Q    All right, so you looked to the existing loans with and

19   borrowings that TCEH had in the public markets as a factor?

20   A    And EFH.

21   Q    And EFH.

22   A    And TCEH.

23   Q    All right.  And sir, I apologize, you were also -- you

24   described the demand feature and you described the

25   anticipated maturity, how'd you set the price?  You were

1    explaining that to the Court.

2    A    Yeah, so it's an unsecured note and I look to EFH and

3    where its unsecured paper was trading.  I looked at the

4    seven-year piece of paper, which is the legacy debt.  It was

5    the 2014 piece of paper, matured in 2014.  The rate was

6    9.25.  Excuse me, the rate was 5.5.  It was trading at a

7    yield of 9.25.  I also looked at the 2017 notes, and they

8    were trading at roughly 10 7/8ths at EFH.  Now, that note

9    was guaranteed -- those notes or bonds were guaranteed by

10   EFCH and EFIH.  The legacy debt was not guaranteed by either

11   EFIH or EFCH.

12          Additionally, trying to triangulate into, you

13   know, what type of credit spread or what kind of rate we

14   should have on these notes, I looked at the seven-year

15   credit default swap for EFH and it was roughly 5 percent as

16   well.  By triangulating in that math, I got to a rate of

17   roughly 10.25.  It was a LIBOR-based note, so it was 5.25

18   plus a credit spread of 500, got us to the 10.25.

19   Q    All right, and sir, just to be specific for the record,

20   the 2014 legacy notes that were not guaranteed, that were

21   trading at 9.25, those were EFH legacy notes?

22   A    That is correct.

23   Q    And the 2017 LBO notes that were guaranteed, that were

24   trading at 10 and --

25   A    Seven --

1  Q    --seven eighths?

2  A    Yes, sir.

3  Q    Those were also EFH notes?

4  A    That's correct.

5  Q    All right.  When you put the intercompany notes into

6  place, did you consider utilizing any external lending

7  sources to cover EFH's SG&A and P&I expenses?

8  A    You know, we absolutely talked about it.  Clearly, we

9  had just closed the LBO.  We were the last large LBO that

10  came through the market.  The market was beginning to -- the

11  external market was beginning to -- really beginning to feel

12  the stress that we ultimately saw.  I describe it as the

13  beginning of the end that occurred in 2008.  So, we had

14  polled some of our banks and talked about providing, you

15  know, external financing.  The banks, the market in general,

16  was under extreme stress at that point in time, and quite

17  frnakly, we felt like, from those conversations and

18  indications, we would have actually had a loan that would

19  have been much higher, in terms of cost.

20  Q    All right, so setting aside outside sources, are you

21  familiar with what is referred to as the EFH money pool?

22  A    I am.

23  Q    What is the EFH money pool?

24  A    It's a centralized cash management process whereby we

25  try to make disbursements, when disbursements are made

1    outside the company or receipts are coming in, we try to

2    pool the capital so we can efficiently make those kind of

3    payments and make investments to the extent we have cash on

4    hand.

5            We are -- from that money pool, we will lend to

6    our subsidiaries or borrow from the subsidiaries, whether

7    it's -- that includes EFH.  EFH could have borrowings or

8    they could actually be lending into the money pool.

9    Q    All right, so a EFH subsidiary could be a lender or a

10   borrower at any point in time in the EFH money pool?

11   A    That's correct.

12   Q    All right.  Is there also a TCEH money pool for the

13   subsidiaries below TCEH in the capital structure?

14   A    Yes.

15   Q    All right, so who's -- who participates in the EFH

16   money pool?

17   A    It's EFH and its subsidiaries, excluding Oncor.  Oncor

18   had its own financing, its own revolver and money pool

19   itself.

20   Q    All right, so to the extent that EFH Corp is a lender

21   in the EFH money pool, what rate is -- does EFH receive for

22   that loan?

23   A    So, to borrow from the money pool, it's 10 7/8ths.

24   Q    All right.  Now, so let's cover how the --

25            THE COURT:  All right, all right.  So, the way the

```
1    money pool -- so EFIH needs to take a million dollars out of
2    the money pool, it's going to pay 10 3/4?
3              MR. HORTON:  10 7/8ths.
4              THE COURT:  10 7/8ths on that.
5              MR. HORTON:  10.875, yes, sir.
6              THE COURT:  Okay.  People put money in the money
7    pool too, right?
8              MR. HORTON:  That's correct.
9              THE COURT:  All right, do you get compensated for
10   when you put money in the pool?
11             MR. HORTON:  Yes, sir.
12             THE COURT:  Same rate?
13             MR. HORTON:  Yes, sir, that's my understanding.
14             THE COURT:  Okay.
15   Q    All right.  And when did the TC -- sorry, strike that.
16   When did the EFH money pool go into existence?
17   A    Which one?  I'm sorry, sir.
18   Q    The EFH money pool.
19   A    I believe, and I'd have to check, Mr. McKane, I think
20   it came into effect as part of the LBO, so we separated the
21   money pools at that point in time.  I could be mistaken on
22   that, but I think that was the point in time.
23   Q    All right.  All right, let's go through kind of a
24   history of the SG&A and P&I notes, okay?
25   A    Okay.
```

1    Q    All right, you said they were created as part of the

2    LBO, is that right?

3    A    That is correct.

4    Q    What was the first time EFH made a repayment of the --

5    of either the SG&A note or the P&I note?

6    A    Let me say that, from 2007 throughout 2010, there were

7    borrowings and repayments going on.  There were significant

8    payments along the way, more substantial payments along the

9    way, and I think that's what you're referring to.

10   Q    That is what I'm referring to.

11   A    Yeah, okay, so the first -- the first repayment would

12   have been in November of 2008.  I had completed the sell-

13   down of the minority interest in Oncor, and proceeds from

14   the minority sale, which were roughly $1.2 billion, $1.250

15   billion, proceeds from that sale, we used to pay down the

16   P&I note to zero.

17   Q    And sir, was that required under the TCEH credit

18   agreement?

19   A    It was required under the agreements, yes sir.

20   Q    And after the -- after that significant repayment in

21   2008, were either of the intercompany notes amended after

22   they were initially issued?

23   A    Yes they were.

24   Q    Okay and when was the first amendment to either of

25   those notes?

1   A    The first amendment was May 1st of 2009 and I would

2   characterize it as we restated the note.  As we found out

3   later from an administrative perspective, we had not

4   provided the guarantee as required under the credit

5   agreement and indenture for a guarantee from EFIH and EFCH

6   for the P&I portion of the note.

7   Q    All right.  And the -- with this restatement of the

8   note, was there any rate change?

9   A    No sir.

10  Q    All right.  And was the SG&A note ever amended?

11  A    Yes it was.

12  Q    And when was that?

13  A    It was in April of 2011 as part of the amend and

14  extend.  We agreed that we would provide a guarantee from

15  EFCH and from EFIH for the SG&A note itself.  We paid down

16  $770 million of that note at that point in time, as I

17  recall, and we capped the borrowings -- no more borrowings

18  under that SG&A note, from that point forward.

19  Q    All right, and when you say that TCEH added the

20  guarantors, at whose suggestion was -- did that occur?

21  A    It was a request of the Creditors.

22  Q    The TCEH Creditors?

23  A    The TCEH first lien Creditors.

24  Q    Mm hmm.  All right.  And was the interest rate of the

25  intercompany notes reset or renegotiated as part of the 2011

1    amendments?

2    A    No, sir.

3    Q    All right.

4    A    I should add one other amendment there at that same

5    point in time, which was, we capped the P&I note to provide

6    that we cannot borrow more than $2 billion dollars under the

7    P&I note as part of that amend and extend transaction.

8    Q    All right, and so, there were no additional borrowings

9    under the SG&A note and there's now a borrowing limit of up

10   to $2 billion dollars on the P&I note?

11   A    That's correct.

12   Q    Okay.  And were there additional borrowings that

13   occurred in 2011 after the T-side amend and extend?

14   A    I'm sorry, what --

15   Q    Were there additional bor -- did EFH -- let me restate.

16   Did EFH continue to borrow under the P&I note in 2012?

17   A    In 2012, I don't recall additional borrowings once we

18   began the repayment.

19   Q    Okay, and were there additional repayments in 2012?

20   A    Yes, there were.

21   Q    Okay, and when did those occur?

22   A    February of 2012, so we -- we had a offering at EFIH, a

23   second lien offering, $800 million in new notes, and we

24   repaid $650 million to the P&I and the SG&A note.

25   Q    So, 800 -- sorry, of the EFIH second lien offerings,

1    600 of the 800 was used to pay down --

2    A    650.

3    Q    $650 million of the $800 million in proceeds were used

4    to pay down the TCEH intercompany notes?

5    A    That's correct.

6    Q    All right, and were there any additional repayments?

7    A    Then later in February, we tapped that offering that we

8    made on February 6th of 2012.  We issued an additional $350

9    million in new second lien notes, and we repaid $300 million

10   to the P&I and SG&A notes.

11   Q    All right, and it's the same offering in addi -- it's a

12   secondary from EFIH second lien that raised --

13   A    Yeah, we just tap -- we opened the -- reopened the

14   offering and upsized it and took the proceeds and repaid

15   both the P&I and SG&A notes.

16   Q    Were there any additional raises that occurred on the

17   E-side that were used to repay the TCEH intercompany notes?

18   A    Yes, in August of 2012, we also raised additional

19   capital.  It was $850, I think.

20   Q    Yeah.

21   A    $850 in new notes, $250 million of first lien notes,

22   $600 million of second lien notes.  We took $680 million of

23   the proceeds and put them in escrow for the specific purpose

24   of repaying the intercompany note, at that point in time,

25   was probably right at that amount that was on --

1    Q    And you said that -- it says that, in your -- on the

2    demonstrative, EFIH issued $850, that's $850 million?

3    A    Yes, sir.

4    Q    Okay, and was there ever a point in time where EFH used

5    proceeds of issuances and -- on the E-side to repay the TCEH

6    intercompany notes in full?

7    A    Yes.  Well, we took the proceeds that we had in escrow,

8    the $680 million, plus a little cash, and in January of

9    2013, I know it says on the demonstrative $680 million, we

10   actually paid down $701 million, I think, was the number,

11   and fully paid down the P&I and SG&A notes.

12   Q    All right, and sir, if you could turn to Horton

13   Demonstrative 2, did you have a second demonstrative

14   prepared to reflect some of these larger repayments?

15   A    I am looking on Page 4, is that the --

16   Q    Yes, sir.

17   A    Yes. I think what we were showing here and

18   demonstrating just the frequency of the borrowings and the

19   repayments, just to give an idea of how it was working.

20   Q    All right, and to the extent that there are borrowings

21   and repayments, did you ever felt that there was a need to

22   make a formal demand for repayment by -- did TCEH ever make

23   a formal demand for repayment to EFH?

24   A    No.

25   Q    All right, but did the TCEH board evaluate whether to

1    make a demand?

2    A    Yes.

3    Q    All right, and sir, if you could turn to DXE, and if we

4    could put up Page 4 of DX80 on the screen.  All right.  In

5    your role as the Treasurer, were you involved in preparing

6    financial updates for the TCEH board?

7    A    Yes, I was.

8    Q    And were you involved in preparing presentations to the

9    TCEH board over time about whether to evaluate making a

10   demand for repayment for the intercompany notes?

11   A    Yes, indeed.

12   Q    And if we could put up page six on the screen and

13   highlight the lower slide labeled "Intercompany Note

14   Repayment Criteria".  Do you see that, Mr. Horton?

15   A    I do indeed.

16   Q    All right. Is this the type of criteria that the TCEH

17   management team would present to the TCEH board to evaluate

18   whether to make a demand on the note?

19   A    Yes, sir.

20   Q    can you walk the Court through the type of analysis

21   that was presented on this issue?

22   A    Let me orient ourselves to where we are at this point

23   in time.

24   Q    Sure.

25   A    So, this is in April of 2012.  We had made the issuance

1    -- issuances on February 6th and February 28th, raised the,

2    effectively, the $950 million -- excuse me, let me restate

3    that -- the $1.1 billion of capital and repaid the $300

4    million and the $650 million of the intercompany notes and

5    outstanding now at this point in time is $671 million.

6    Q    All right.  So you even with those substantial

7    repayments there's still an outstanding balance of $671

8    million?

9    A    Yes.

10   Q    And so at this point in time, this is the type of

11   analysis that the TCEH board went through in evaluating

12   whether to make a demand for that additional $671 million.

13   A    That's correct.

14   Q    And so what are the types of criteria that the board

15   would consider?

16   A    As you can see from the board presentation and from

17   this slide, the first criteria was where was TCEH in terms

18   of liquidity and you can see from the slide based on the

19   12/31 planning case, the pricing case, what we called it at

20   that point in time, TCEH had enough liquidity to meet its

21   stated objective of 18 months of free cash flow of

22   liquidity.  So that could have been in the form of cash or

23   revolver availability.

24   Q    Okay.

25   A    The second was did EFH and EFIH have enough cash on its

1    balance sheet on hand at that point in time to repay the

2    intercompany note and we check the box from that perspective

3    as well.

4              There was a view and analysis around what was the

5    valuation of EFIH in terms of its collateral to support the

6    ability to repay TCEH, so we're going to raise capital, like

7    I did before, on the first or second lien basis and set that

8    cash aside or immediately repay the intercompany note.  And

9    we did believe we had that value in that collateral to raise

10   capital to repay the intercompany note.

11   Q    So, is it fair to say that with regard to that

12   criteria, looking at EFIH's collateral value, that factor

13   was if we don't make the demand now, will we have the

14   ability, potentially based on the EFIH collateral, to make

15   the demand later instead of now? Is that a factor?

16   A    Yes.  Will we have the collateral?  Do we believe we'll

17   be able to raise capital to repay the intercompany note?

18   Q    All right.  And why was -- the next one is the TCEH

19   revolver.  Why is that a factor?

20   A    I think we were looking at it from a pure economic

21   perspective for TCEH, EFH and the entire estate and

22   effectively, TCEH had no borrowings under the revolver at

23   that point in time, so -- and they were earning LIBOR plus

24   500 on the notes that they had lent or the amounts they had

25   lent -- lended to EFH.  So if EFH repaid it, TCEH would have

1    put them on its balance sheet and effectively earned money

2    market rate, .01 percent or whatever it was at that point in

3    time.

4    Q    Okay.  And then finally, this last criteria, the excess

5    cash flow sweep.  What is that?

6    A    Under the credit agreement, to the extent TCEH has

7    excess flow in its calculation of ins and outs for TCEH --

8    so, if you have cash coming in and you have outflows then

9    you've got additions and deductions for the calculation of

10   the excess cash flow.

11            To the extent TCEH has excess cash flow, you take

12   50 percent of that excess cash flow and you pay -- you are

13   forced to pay down term loan B at par.

14            This repayment of -- and you make that calculation

15   at the end of the year, so we're -- we would be projecting

16   this forward.  But if we had -- TCEH had demanded that note

17   and demanded that repayment, that would have been an inflow

18   into that excess cash flow calculation and 50 percent of

19   that, to the extent you actually had excess cash flow from

20   the calculation, 50 percent of that would have had to go to

21   pay down term loan B at par.

22   Q    All right.  Let's just break that down for a second.

23   The term loan B that you're referring to is the TCEH term

24   loan B.

25   A    That's correct.

1    Q    And sir, is it fair to say that the TCEH term loan B

2    was not trading at par in this time period in the middle of

3    2012?

4    A    That would be my expectation.

5    Q    Yeah.  And so, there is an excess cash flow calculation

6    that is in one of the TCEH credit agreements.  Is that

7    right?

8    A    Yes, sir.

9    Q    And that's an end of the year excess cash flow

10   calculation.  One time, one snapshot, is that right?

11   A    That's correct.

12   Q    And to the extent that TCEH triggers the -- or you

13   know, trips the calculation for the excess cash flow, 50

14   percent of the excess must -- goes to paying down the TCEH

15   term loan B at par?

16   A    That's correct.

17   Q    All right.  And the calculation, not only just one

18   snapshot, one time, does not take into consideration the

19   ability of TCEH to borrow or to receive repayment from EFH

20   on the TCEH intercompany loans.

21   A    Would you restate that, please?  Sorry.

22   Q    Sure.  You explained to me that excess cash flow

23   calculation and how, if the amount's outstanding up at EFH,

24   is it in or in out of that calculation?

25   A    Oh.  If it is at EFH, you have not repaid the

1    intercompany note at that point in time.  It is not part of

2    the calculation.

3    Q    All right.  And sir, looking at that final repayment,

4    is that one of the reasons why the repayment of the EFH

5    notes occurred on January 29th 2013 and not earlier in time?

6    A    Yes, sir.

7    Q    All right.  Your Honor, at this point in time I have no

8    additional questions for Mr. Horton.  I would like to, if I

9    -- I apologize, I don't think I moved his written direct

10   into evidence, did I?

11             THE COURT:  I don't think -- I thought you did,

12   but if you didn't --

13             MR. MCKANE:  Well I'm --

14             THE COURT:  -- just so the letter is just --

15             MR. MCKANE:  Your Honor, I'm operating and I

16   apologize.  I just may have forgotten.

17             THE COURT:  No, that's all right.  Let's just do

18   it so the record's clear if we did it twice, so be it.  Any

19   objection?

20             MAN:  No objection.

21             THE COURT:  Yeah, I know we did this.  But it's

22   admitted again.

23             MR. MCKANE:  Yeah.  And, Your Honor, we do have

24   some Horton Exhibits that we'd like to move in, all that

25   were part of the written direct, all that have been

1    previously provided to the objectors, and our understanding

2    is their -- all objections have been resolved.

3              THE COURT:  Okay.

4              MR. MCKANE:  There is one issue, Your Honor, I've

5    called to your staff's attention.  We previously alerted the

6    objectors that the document that was DX -- that is Exhibit

7    895 --

8              THE COURT:  Right.

9              MR. MCKANE:  -- in the binders is not what we

10   intended 895 to be, and we have provided them with copies.

11   We've also now provided copies to the Court as well, and we

12   will replace those with what is going to be marked as

13   Debtor's 895-R for all the hard copies that are here in the

14   courtroom.

15             THE COURT:  Okay.

16             MR. MCKANE:  Your Honor, with that I'd like to

17   move the following documents into evidence, the Debtor's

18   exhibits into evidence; Debtor's Exhibit 8, 32, 33, 37, 39,

19   55 through 59, 60, 320, 329, 347, 349, 350, 351, 359, 360,

20   371, 376, 377, 378, 381, 385, 400, 517, 558, 562 through

21   579, 581 through 584, 586 through 590, 592, 594, 596 and

22   597, 600 through 608, 638, 895-R, 896 through 901, 904, 905,

23   928, 930, 931, 941, 942, 943 and 951.

24             And in addition, we'd like to move into -- those

25   are all documents and Debtor's exhibits that are referenced

1    in Mr. Horton's written direct.

2              THE COURT:  Any objection?

3              MR. MCKANE:  Your Honor, we'd also like to move

4    into evidence Debtor's Exhibit 54 and 379.

5              THE COURT:  Okay.  Any objection?

6              MAN:  No objection, Your Honor.

7              THE COURT:  And so, they're all admitted without

8    objection.  Do you have a copy of the list for Ms.

9    Werkheiser?

10             MR. MCKANE:  I do, Your Honor.  May I approach?

11             THE COURT:  Yeah, of course.

12             MS. WERKHESIER:  Thank you.

13             THE COURT:  Thank you.

14             MR. MCKANE:  Your Honor, the Debtors have no

15   further wit -- questions for Mr. Horton.

16             THE COURT:  Very good.  So, who from the objector

17   side is going to want to cross-examine Mr. Horton?

18             MR. BREBENER:  I am, Your Honor.

19             THE COURT:  Anyone else?

20             MAN 3:  Your Honor, I'll have a few questions.

21             THE COURT:  Okay.

22             MAN 4:  And just a few for the conflicts counsel,

23   Your Honor.

24             THE COURT:  All right, so that's the conflicts

25   counsel, okay.  Take -- we're going to take literally, like,

1    three minutes and then we'll return to cross.

2        (Recess)

3            THE COURT:  This is a silly thing, but it would

4    help me for the E-side committee and their co-objectors for

5    your witness binders if you could stick with the blue paper

6    that you used for the big ones for these witness binders.

7    It would help keep it separate for me because I have a state

8    court and witness binder and one of them is the Debtor and

9    one of them is the (indiscernible).  It's just a little

10   thing but it would be helpful going forward.

11           MAN:  No problem, Your Honor.

12           THE COURT:  Very good.  Thank you.  You may

13   proceed.

14           MR. BREBNER:  Thank you, Your Honor.  Adam Brebner

15   from Sullivan & Cromwell for the EFH Committee.

16           THE COURT:  Okay.

17           CROSS-EXAMINATION

18   BY MR. BREBNER:

19   Q    Good afternoon, Mr. Horton.

20   A    Good afternoon.

21   Q    I'm going to be asking you a few questions.  I'm going

22   to focus on the same issue that Mr. McKane focused on, the

23   intercompany notes.  I'm just going to ask you a few

24   background questions first.  Just to be clear, you've been

25   treasurer of TCEH since the LBO?

1   A    That's correct.

2   Q    And as treasurer of EFH, you're an officer of EFH,

3   correct?

4   A    That's correct.

5   Q    And as treasurer of TCEH, you're an officer of TCEH,

6   correct?

7   A    That's correct.

8   Q    And specifically as treasurer for TCEH you are

9   entrusted with the responsibility of caring for company

10  funds, correct?

11  A    Yes, sir.

12  Q    And the same for EFH.

13  A    That's correct.

14  Q    And both roles you report to the CFO of EFH and TCEH,

15  Paul Keglevic?

16  A    That's correct.

17  Q    And as treasurer of TCEH you fulfilled your duties to

18  TCEH during the period from 2007 to 2014 to the best of your

19  knowledge, correct?

20  A    That is correct.

21  Q    Same for EFH as treasurer of EFH.

22  A    That's correct.

23  Q    And there was never a time between 2007 and 2014 where

24  you did not think you were acting in good faith as treasurer

25  of TCEH or EFH, correct?

Page 126

1    A    That's correct.

2    Q    As treasurer of TCEH, you have never made a false

3    representation to see TCEH creditors to your knowledge, have

4    you?

5    A    No, sir.

6    Q    In your role as treasurer you sign contracts on behalf

7    of TCEH, correct?

8    A    I sign credit agreements and guarantees and so forth,

9    yes sir.

10   Q    And you also sign similar forms of agreement on behalf

11   of EFH, correct?

12   A    That's correct.

13   Q    And when you sign such agreements on behalf of TCEH or

14   EFH you did so in good faith attempting to legally bind the

15   entities for whom you were assigning, correct?

16   A    That's correct.

17   Q    And because you were treasurer of both EFH and TCEH,

18   you sometimes needed to sign agreements for both of those

19   companies at once, correct?

20   A    I have done that, yes sir.

21   Q    And that includes the promissory notes that you spoke

22   about on your direct, the P&I and SG&A notes, you signed

23   both of those for TCEH and EFH, correct?

24   A    That is correct.

25   Q    And you had the authority as treasurer of the EFH to

1   sign those notes on behalf of that entity, correct?

2   A    Those entities?

3   Q    Well, I was asking first about EFH but I'll ask you

4   about T --

5   A    I'm sorry.  I'm sorry.  I missed it.  I apologize.

6   Q    I apologize.  You had the authority of TCEH and EFH to

7   sign the promissory notes on behalf of each respective

8   entity, correct?

9   A    That is correct.

10  Q    And you intended and understood that the P&I and SG&A

11  notes contained binding obligations on EFH and were payable

12  according to their terms, correct?

13  A    That's correct.

14  Q    And when you signed an acknowledged these notes as

15  treasurer for TCEH, you expected that EFH would fulfill its

16  legal obligations under the notes according to their terms,

17  correct?

18  A    That was my expectation, yes.

19  Q    And one of the expressed written terms of the notes was

20  that they were payable on demand, right?

21  A    That is correct.

22  Q    And as treasurer of both EFH and TCEH you were careful

23  at all times not to comingle the funds of the two companies,

24  correct?

25  A    That is correct.

1    Q    At all times, you observed corporate formalities,

2    correct?

3    A    All times is a very broad -- we have processes and

4    procedures in place to make sure that that happens.  But we

5    are humans.

6    Q    All right.  In your duties as treasurer of TCEH and EFH

7    during the 2007 to 2013 time period, you maintained the

8    appropriate corporate separateness of TCEH and EFH, correct?

9    A    Again, I would say we have the processes and procedures

10   in place to do that.  To the best of my knowledge, I believe

11   we did that.  Could there have been a circumstance where

12   there was a mistake from now and then?  Yes.

13   Q    All right.  Well, let me ask you specifically in

14   connection with the promissory notes, the SG&A note and the

15   P&I note, was there ever a circumstance during the lifetime

16   of those notes where you did anything with respect to

17   observing corporate formalities, maintaining appropriate

18   corporate separateness, where you did anything incorrect

19   with respect to those notes?

20   A    I would have to look back.  I recall at one point in

21   time -- I can't tell you specifically what it was but we

22   were effectively -- we had SG&A payments coming up from TCEH

23   and we were being reimbursed for the SG&A expenses and

24   borrowing under the notes.  Once we realized that that was

25   an error, we made that correction and paid down the SG&A

1    portion.  I believe that's what it was.  But that was an

2    error in the process along the way.  That was the one

3    example that I can think of.  Other than that, I can't think

4    of anything specific.  We corrected it and it was, you know,

5    again, a breakdown in process and things like that happen.

6    Q    Can you tell me what the time period was that that

7    occurred?

8    A    I can't.  I don't have that in front of me.  I would

9    say it would be speculative for me to say when that was.  It

10   was, my guess, early part of, you know, the process as we

11   were developing the process.  I don't know precisely.

12   Q    2008, 2009 timeframe is what you're thinking?

13   A    Again, it would be -- I don't want to misspeak.  Again,

14   I think it was early in the process but I can't tell you the

15   exact year.  But I do recall that breakdown in the process

16   and we do remedy -- remedied it.

17   Q    You refer in your testimony, in your direct testimony,

18   you refer to the 2007 TCEH credit agreement.

19   A    Yes, sir.

20   Q    And you signed the agreement, the credit agreement on

21   behalf of EFCH and TCEH, correct?

22   A    I'd have to look back to see if I indeed did that.  At

23   that point in time, there was a lot of activity going on.

24   We were closing the LBO.  There were other authorized

25   signatories.  I can't recall if I signed those documents.

1    Q    All right.  But you're familiar with the credit

2    agreement in any event.

3    A    Yes.

4    Q    And why don't we take a quick look at the credit

5    agreement at DX324.

6              THE COURT:  This document?

7              MR. BREBNER:  It's in the binder, yeah.  It's

8    actually going to be on the screen, too.  It might be faster

9    if we looked.  Go to EFH00556293, the creditor agreement.

10   This is the creditor agreement, right?  That's your

11   signature there for EFCH?

12             THE COURT:  Can you blow that up?  Yeah, thank

13   you.

14             MR. HORTON:  Yes, sir.

15   Q:   You signed the credit agreement on behalf of EFCH and

16   TCEH.

17   A    Okay.

18   Q    Correct?

19   A    That's correct.

20   Q    And when you signed the credit agreement, you intended

21   that EFCH and TCEH would carry out their obligations under

22   the agreement, correct?

23   A    Yes, sir.

24   Q    And as it related from two loans from TCEH to its

25   parent EFH, the credit agreement permitted loans from TCEH

1    to EFH but required that they shall be made on an arm's

2    length basis, correct?

3    A    That's correct.

4    Q    And as treasurer of TCEH and signatory of the credit

5    agreement, you sought at all times to fulfill TCEH's

6    obligations to its creditors that loans from TCEH to EFH

7    would be at an arm's length basis, correct?

8    A    I believe at the time that I executed these notes,

9    which, again, I viewed them as being six to -- sorry, seven

10   to ten years in duration.  When we executed those notes, we

11   executed them on an arm's length basis and at market rates.

12   Q    And there were no side agreements or secret

13   understandings pertaining to the P&I and SG&A notes between

14   EFH and TCEH that were not disclosed or written down in the

15   notes, correct?

16   A    Not to my knowledge, sir.

17   Q    All the terms of the P&I and SG&A notes were written

18   down and contained in the notes, right?

19   A    That's correct.

20   Q    And in particular, there was no side agreement or

21   understanding that EFH would not need to pay the loans under

22   the notes including paying on demand if required.

23   A    To my knowledge, there was no such agreement.

24   Q    Let me show you -- if we can put it on the screen --

25   the document DX517.  It's a February 28th, 2011 public

1   lender presentation and it's a document that's cited in your

2   written direct testimony.  Are you familiar with this

3   document?

4   A    Yes, I am generally familiar with it.

5   Q    And when TCEH made this February 2011 presentation to

6   lenders, to your knowledge, it was honest and did not

7   misrepresent anything concerning the intercompany notes.  Is

8   that correct?

9   A    That would certainly be our intent, yes sir.

10  Q    Will you -- Page 3 of DX517?

11  A    Can we look -- can just we browse through the

12  presentation itself?

13  Q    It's in your binder as well right there, DX517.

14  A    I'm getting a snapshot here and I'd like --

15  Q    Sure, not that --

16          MR. HORTON:  Is that okay, Your Honor?

17          THE COURT:  Of course.  Take the time you need.

18  It's in your binder, 517.  And you're going to want to

19  direct him where?

20          MR. BREBNER:  To Page 3.

21          THE COURT:  Page 3.  Let us know when you're

22  ready, Mr. Horton.  Take your time.

23  A    Okay.  Thank you.  I just wanted to get a general

24  context.

25  Q    Of course, sir.  And I wanted to look first at Page 3

1    but this -- Page 1 has a general, a few bullets about the

2    effective dates of the notes, right?

3    A    Yes, sir.

4    Q    Page 2 mentions the notes under the credit agreement

5    are on arm's length terms, as we already talked about,

6    right?

7    A    That's correct.  You know, there was some -- on Page 1,

8    there was the note or the comment that I made that we did

9    restate the P&I note to ensure that it had indeed the

10   guarantees from EFIH and EFCH.

11   Q    All right.  And then going to Page 3 --

12   A    Yes, sir.

13   Q    -- the top bullet says the notes reflect arm's length

14   terms that are comparable to the terms that unrelated

15   parties would have negotiated in the market, such as market

16   interest rates, mandatory repayment terms, a payable-on-

17   demand feature, a default interest rate, the maximum rate

18   allowed by law and as to the P&I note, payment guarantees.

19   Do you see that?

20   A    I do.

21   Q    And that was all accurate, correct?

22   A    Yeah, that was our belief at that time, yes sir.

23   Q    And looking at the next bullet, the next bullet, the

24   second sentence says "the notes were contemplated and priced

25   on or about October 10th, 2007 at a rate of LIBOR plus 500

1    basis points based on several factors", correct?

2    A    That's correct.

3    Q    And it lists six factors, right?

4    A    Yes, sir.

5    Q    I think you mentioned in your direct testimony looking

6    at the yield on the 2014 notes and the 2017 notes, correct?

7    A    That's correct.

8    Q    And there's -- a fourth factor here is a large portion

9    of TCEH debt including its revolver was subject to a

10   floating interest rate and a floating rate loan to EFH

11   hedged a portion of TCEH's interest rate risk.  Do you see

12   that?

13   A    I do.

14   Q    And that's correct, isn't it?

15   A    Well, let's -- maybe we should unpack that a little

16   bit.  So my expectation was that TCEH to the extent it was

17   making loans to EFH would be borrowing from its revolver in

18   many cases, not in all cases but many cases borrowing at

19   LIBOR plus 350 under its credit agreement and loaning to EFH

20   at LIBOR plus 500.

21            In doing that, we were able to mask the LIBOR

22   interest rate risk for TCEH such that they were not exposed

23   to LIBOR and had a note that wasn't paying them LIBOR.  So

24   we were trying to hedge off the LIBOR risk so that you get a

25   little better context.

1    Q    So that -- let me see if I understand what you're

2    saying.  LIBOR could go up or down, right?

3    A    LIBOR is floating rate, yes sir.

4    Q    And because TCEH had an obligation with its revolving

5    credit facility that was spread over LIBOR, if it also

6    loaned money as a spread over LIBOR, that created a hedge,

7    correct?

8    A    The LIBOR cancelled out and effectively earning the

9    spread.

10   Q    So having the notes at a spread above LIBOR when the

11   notes were priced provided value to TCEH, correct, as

12   opposed to just doing a fixed rate because you got the

13   feature of the hedge that you wouldn't have with a fixed

14   rate, right?

15   A    Well, let's go through that.  So if the notes were

16   priced at a fixed rate and LIBOR had gone up substantially,

17   then that would not have been a benefit to TCEH.  So it

18   would have been a harm to TCEH.  So it depends on -- there's

19   no benefit to TCEH.  It was simply taking risk off the

20   table.

21   Q    Right.

22   A    And so TCEH was kept whole through that process, if you

23   will, by having a LIBOR-based borrowing and then a LIBOR-

24   based lending.  It didn't make them better off or worse off.

25   It just took risk off the table.

1   Q    Right.

2   A    It depends on what was going on with LIBOR in the

3   market in general.  I can't answer your question because --

4   if I knew what rates were going to do, I wouldn't be sitting

5   here.

6   Q    Exactly.  I apologize if my question wasn't clear.

7   What I was getting at was that taking risk off the table,

8   having a hedge itself is a benefit.  The company wants to

9   reduce risk if it can.  So that's why I'm talking about a

10  monetary benefit in terms of, you know, gambling and getting

11  less or more interest based on LIBOR but actually having a

12  hedge was something that the company wanted and benefitted

13  the company, correct?

14  A     I think it took the risk off the table to TCEH and I

15  think it was reasonable and, therefore, yeah, I guess I

16  would characterize it as a benefit.

17  Q    Thank you.  And looking at the sixth bullet here, the

18  sixth bullet says "Given alternative use of funds to pay

19  down TCEH's debt priced at LIBOR plus 350 basis points,

20  loaning funds to EFH at LIBOR plus 500 basis points was

21  unattractive investment option".  Do you see that?

22  A    I do.

23  Q    And that was correct.

24  A    I believe so, yes.

25  Q    And if you could turn to the next page, the next page

1    mentions, of this presentation, Page 4, DX517, mentions that

2    the notes were disclosed in EFCH's Form 10K for the years

3    ended December 31, 2008, 2009 and 2010, right?

4    A    That's correct.

5    Q    And it's also your understanding that the notes were

6    disclosed from time to time in EFH's 10K filings with the

7    SEC, correct?

8    A    That's my understanding, yes.

9    Q    And in the 10K disclosure that's reproduced on Page 4,

10   it states "After related party transactions, the notes

11   receivable from EFH Corp are payable to TCEH on demand".  Do

12   you see that?

13   A    I do see that.

14   Q    And TCEH or I guess in this case EFCH put that in its

15   10K disclosure and in doing so it wasn't saying anything

16   false or misleading, correct?

17   A    That's correct.

18   Q    Can you turn to the next page, please?  Looking at the

19   third bullet here, the third bullet says "TCEH continuously

20   evaluates its investment in the notes and has determined

21   that continuing to maintain its investment in the notes is

22   in the best interest of TCEH".  Do you see that?

23   A    I do.

24   Q    And that's somewhat similar to the sentiment on the

25   slide that Mr. McKane showed you about the board's

1    presentation in 2012, correct?

2    A    That's correct.

3    Q    And that's actually something that TCEH did was to

4    evaluate its investment to the notes to determine if

5    continuing to maintain that investment was in the best

6    interest of TCEH.

7    A    That's correct.

8    Q    And the reason that TCEH did that sort of continuous

9    evaluation with respect to these notes was that it could

10   demand repayment under the terms of the notes, correct?

11   A    They had that right in the notes.

12   Q    All right.  You can set that exhibit aside, Mr. Horton.

13   A    Thank you.

14   Q    I'm just going to turn very briefly to a different

15   promissory note that you mentioned in your written direct

16   testimony and that was a February 2010 note from TCEH as

17   borrower to EFH's lender.  Do you recall that note?

18   A    I do.

19   Q    And that note, just like the notes from EFH to TCEH was

20   payable on demand, right?

21   A    That's correct.

22   Q    And it had many similar terms to the demand notes from

23   EFH to TCEH, correct?

24   A    That is correct.

25   Q    One difference was that on the note where TCEH was the

1    borrower and EFH was the lender, the rate was LIBOR plus

2    350, right?

3    A    That's correct.

4    Q    And at the time this note was issued in February 2010,

5    TCEH was in a worse credit position that EFH, correct?

6    A    I would have to look back.  I do not know that.

7    Apologies, that's just a very broad statement.

8    Q    Sure.  Could you take a look at DX896 in your binder?

9    A    Okay, sir.

10   Q    This is a document that's also referenced in your

11   direct testimony.  Are you generally familiar with this

12   document?

13   A    Yes.

14   Q    And this is a decision document and that's relating to

15   the intercompany demand loan to TCEH from EFH, correct?

16   A    That's correct.

17   Q    So this is a document that sets forth some of the

18   considerations that went in to making that loan?

19   A    That's correct.

20   Q    And if you look at Page 2, the transaction impact

21   section, that says there's a box, a top box that has the

22   balance as of February 10, 2010 of EFH cash on hand and TCEH

23   cash on hand.  Do you see that?

24   A    I do.

25   Q    So certainly prior to making this demand loan, EFH had

1    greater liquidity than TCEH, correct?

2    A    Cash liquidity, yes.

3    Q    And if you look at key risks and mitigation strategies,

4    do you see that?  That's bullet number four on Page 2.

5    A    Yes, I do.

6    Q    And the first sentence there talks about potential

7    risks from the intercompany demand loan, right?

8    A    I'm still reading the --

9    Q    Sure, go ahead.

10   A    -- paragraph there.  Thank you.  Okay.

11   Q    The first sentence talks about potential risks from the

12   proposed loan, correct?

13   A    Of TCEH not having the capability to repay the note,

14   yes.

15   Q    The next sentence says "Structuring the intercompany

16   demand loan as a demand note partially mitigates the risk

17   that EFH Corp would not be repaid by TCEH as that structure

18   facilitates immediate repayment to EFH Corp upon request".

19   Do you see that?

20   A    I do.

21   Q    And that was a correct description of the structure of

22   the notes and the potential mitigation feature, correct?

23   A    Yeah.  And if you'll finish that paragraph, the concern

24   here was TCEH's ability to borrow under its revolver and

25   repay the intercompany note.  We weren't focused so much on

1   TCEH's credit risk.

2            We were focused on the banking system and their

3   ability to fund the revolver and we felt like the revolver,

4   the banking system had stabilized at that point in time and

5   the (indiscernible) suspenders was the demand feature from -

6   - excuse me, EFH to TCEH.  I just want to clarify why we

7   were focused on that.

8   Q    All right.  I appreciate that, sir.  And the P&I and

9   SG&A notes that we talked about, they had the same demand

10  feature, correct?

11  A    Yes, sir, they did.

12  Q    And so structuring the P&I and SG&A notes as demand

13  notes partially mitigated the risk that TCEH would not be

14  repaid by EFH because the structure facilitated immediately

15  repayment to TCEH upon request.

16  A    That's correct.

17  Q    All right.  You can set that document aside.  Thank

18  you.

19  A    Thank you.

20  Q    Very briefly, in April 2011, TCEH entered into what you

21  referred to in your direct testimony as the 2011 amend and

22  extend transactions, right?

23  A    That's correct.

24  Q    And as part of that -- those transactions, certain

25  modifications were made to the P&I and SG&A notes that you

1    talked about in your direct testimony, correct?

2    A    That is correct.

3    Q    And those modifications to the TCEH and EFH

4    intercompany note structure accrued to the benefit of TCEH

5    and its lenders, correct?

6    A    Those were beneficial to the lender.

7    Q    And TCEH as the -- because TCEH was the creditor under

8    the notes, so TCEH received the credit enhancement benefits

9    as well, correct?

10   A    TCEH as the legal entity by having limitations, more

11   limitations on the borrowing provided less exposure,

12   certainly credit exposure, as would be with any lending

13   document.

14   Q    Could you turn to DX608 in your binder?  Do you have

15   DX608?

16   A    I do now.

17   Q    And DX608, it's also a document that you refer to in

18   your written direct testimony and it's an amended and

19   restated pledge agreement and I think if you flip to Page 5

20   of that, do you see your signature there?

21   A    I do.  I do, excuse me.

22   Q    And then the next page is a chart with pledge shares

23   and pledge GAAP.  Do you see that?

24   A    I do.

25   Q    And the pledge GAAP under this agreement includes the

1    P&I and SG&A notes, correct?

2    A    That's correct.

3    Q    And what this agreement does, DX608, is pledge the

4    notes to TCEH's creditors, correct?

5    A    I'd have to look at it and read it in more detail, get

6    legal interpretation.  I don't know if that's specifically

7    what it's doing, so.

8    Q    At least on -- if you look at the face of DX608 --

9    A    On Page 1?

10   Q    On Page 1, yes.

11   A    Okay.

12   Q    The document is identified as a supplement dated as of

13   April 8th, 2011 to the amended and restated pledge

14   agreement, correct?

15   A    That's correct.

16   Q    And do you recall that in DX608 TCEH represented and

17   warranted to TCEH's creditors on behalf of TCEH that the

18   maturity of the SG&A note and the P&I note was on demand?

19   A    Again, I think it was already there but if you're

20   asking me if it's contained in this document, again, I'd

21   have to look but I'm certain that it is.

22   Q    All right.  Thank you.  And I think you said in your

23   direct testimony that you felt like the notes when they were

24   originally created, you felt like they might be outstanding

25   for about seven to ten years.  Is that right?

1   A     That's correct.

2   Q     And that would be not individual borrowings but the

3   existence of the facility, correct?

4   A     That's correct.

5   Q     Because borrowings -- amounts were borrowed and paid

6   back, correct?

7   A     That's right.  Amounts were borrowed and paid back

8   along the way, yes.

9   Q     And although you contemplated that the note facility

10  might be operational for seven to ten years when the notes

11  were signed, that was not written into the notes, was it?

12  A     No sir.

13  Q     The actual maturity of the notes as reflected in the

14  pledge was that they were payable on demand.

15  A     There was no maturity date.  It's payable on demand, so

16  and that's very standard in this type of intercompany type

17  notes where they don't have a maturity but they have a

18  demand feature so that the notes can be demanded and repaid.

19  Q     And the P&I and SG&A notes did not have a seven to ten

20  year maturity, correct?

21  A     No, not in the document, no sir.

22  Q     Outside of the document, they didn't have a seven to

23  ten year maturity, correct?  They didn't have -- that was

24  not their legal maturity.

25  A     You have a legal document and then you have the

1    practice of the seven to ten years, which is commonplace.

2    Q    Well, the note's facility in fact was only operational

3    for a little over five years, correct?

4    A    I don't know that I could -- I would characterize it as

5    that.  We paid the notes after five years.  I'm not sure

6    that we cancelled the notes after that five-year period.

7    I'd have to look back.

8    Q    There were no further borrowings after January 2013.

9    A    I thought you were asking me legally were there notes

10   outstanding and available.  Are you asking me if the

11   borrowings -- there were no more borrowings --

12   Q    After January 2013.

13   A    -- out of practice.  I'm not sure whether or not the

14   notes were cancelled.

15   Q    All right.  Set that document aside.

16   A    Yes sir.

17   Q    In connection with the 2011 amendment to the credit

18   agreement, $770 million was paid down on the SG&A note by

19   EFH, correct?

20   A    That is correct.

21   Q    And it was a condition to the amendment to the credit

22   agreement that TCEH would receive from EFH repayment of $770

23   million of the loan previously made under the existing SG&A

24   note, right?

25   A    As part of the amendment -- it was part of the

Page 146

1    amendment.  I don't know if it was a condition but I recall

2    that being part of the amendment.  Two parts of that

3    transaction, the amendment and the extension.

4    Q    And the reduction in balance on the SG&A note was

5    something that TCEH's creditors wanted, correct?

6    A    Yes, sir.

7    Q    It's something that you, as treasurer at TCEH, agreed

8    with having, correct?

9    A    I would say that that was done in -- through the

10   authority of our board and our management team, yes.

11   Q    TCEH agreed it would happen.

12   A    TCEH, yes, agreed I think as an entity through the

13   delegation of authority to me, yes.

14   Q    And at the behest of its creditors, TCEH had the $770

15   million repaid in April 2011, correct?

16   A    That is correct.

17   Q    And EFH duly paid that amount in April 2011, correct?

18   A    That is correct.  At that same time, TCEH repaid EFH

19   $770 million, the main note, so.

20   Q    Both sides, they made requests of each other and then

21   the payments cancelled out.

22   A    Yep.

23   Q    All right.  In your written direct testimony you

24   describe EFH's liability management program, right?

25   A    That's correct.

1    Q    And I think you said in your written direct, the one

2    goal of that program was to ensure that obligations of EFH

3    to TCEH were settled in an efficient and orderly manner

4    prior to TCEH needing cash for operations, correct?

5    A    That was one of the goals, yes sir.

6    Q    And if TCEH needed cash for operations, it could

7    potentially have issued a demand under the P&I or SG&A note,

8    correct?

9    A    That's correct.

10   Q    But before it needed to do that, TCEH was paid back

11   through a large payment in February 2012 of $950 million,

12   right?

13   A    That's correct.  And other payments along the way, but

14   yes.

15   Q    There was a large repayment in February 2012 of $950

16   million, correct?

17   A    Yes.  I'm just -- there was others.  You were saying

18   the way we did that was through that February payment.

19   There were other payments along the way including a $770

20   million that was done in 2011.

21   Q    And that in January 2013, EFH paid off in full the

22   remaining balance of approximately $701 million on both the

23   notes with all interest paid under the notes according to

24   their terms, correct?

25   A    That is correct.

1   Q    And all of the borrowings and repayments under the

2   notes were in accordance with the arm's length terms of the

3   notes to which EFH and TCEH had agreed, correct?

4   A    That's correct.

5              MR. BREBNER:  Nothing further.

6              THE COURT:  Thank you.

7              MR. HORTON:  Thank you

8              THE COURT:  Mr. Sheppard, correct?

9              MR. SHEPPARD:  Briefly, Your Honor, yes.  Thank

10  you.  Your Honor, I have a binder but it's not blue.

11             THE COURT:  That's all right.  Thank you.

12             MR. HORTON:  Thank you.

13                      CROSS-EXAMINATION

14  BY MR. SHEPPARD:

15  Q    Mr. Horton, good afternoon.

16  A    Good afternoon.

17  Q    I just have a couple of follow-up questions from things

18  that were covered by Mr. Brebner and Mr. McKane.  One

19  second, I think I left something back here.  There we go.

20  Thank you.  It's kind of tough to do this without the

21  (indiscernible).

22             I apologize if Mr. Brebner covered this but I want

23  to make sure I understood.  You're the treasurer of EFH

24  Corp?

25  A    That's correct.

1    Q    And the treasurer also of TCEH?

2    A    That's correct.

3    Q    And EFIH.

4    A    That's correct.

5    Q    Okay.  An officer of all three.

6    A    That's correct.

7    Q    Okay.  Now, in connection with the amends and extends

8    that you testified to with Mr. McKane -- do you recall that?

9    A    Yes.

10   Q    In your direct testimony you note that you were able to

11   exchange through that program $2.5 billion of debt at a

12   discount.  Is that right?

13   A    I'm sorry.  You were saying in the amend and extend

14   program or the liability management program?

15   Q    I'm sorry, the liability management program.

16   A    Okay.  Yes.

17   Q    And is that because the debt of TCEH had been

18   downgraded so much?

19   A    The program encompassed both EFH and TCEH.  There was

20   discount captured at both entities.  I think the better

21   breakout in terms of discount was $1.8 billion at EFH level,

22   the E-side of the house and TCEH might have captured up to

23   $700 million.

24   Q    Now, as part of that program, there also what you

25   noted as debt exchanges.  Is that right?

1    A    There were debt exchanges, yes.

2    Q    Okay.  And in those debt exchanges you were exchanging

3    as I understood it old EFH and TCEH debt for new EFH debt.

4    Is that right?

5    A    In some of the exchanges, very limited exchanges, we

6    exchanged some of the old TCEH debt for EFH/EFIH debt.  We

7    also did exchanges exclusively at TCEH for unsecured paper

8    at TCEH for second lien paper at TCEH.  So that's part of

9    that program.  So the vast majority of the discount would

10   have been captured through that exchange, if I recall, those

11   exchanges.

12            THE COURT:  Second lien --

13            MR. HORTON:  TCEH.

14            THE COURT: -- second lien debt at EFIH or second

15   lien debt at TCEH?

16            MR. HORTON:  TCEH, Your Honor.

17            THE COURT:  Okay.

18   Q    And in connection with that exchange, did that then

19   become secured on the E-side of the capital structure?

20   A    Yes, there was -- if you're talking about TCEH --

21   Q    Yes.

22   A    -- exchanging holders of TCEH, third-party holders of

23   TCEH exchanging debt into EFH or EFIH debt, yes, it was

24   secured debt.

25   Q    And the EFH securities that were issued, did that

1    reduce TCEH interest payments?

2            MR. MCKANE:  Objection, vague.  It's so broad.

3    A    I'm not sure I understood the question.

4            MR. MCKANE:  Objection, overbroad, Your Honor.

5    I'd like -- we've got to be a little more specific in

6    regards of these exchanges for the witness to be able to

7    identify which one.

8    Q    I'll rephrase.  In Paragraph 53 of your declaration --

9    do you have it there?  It says there "EFH acquired the EFH

10   and TCEH debt" --

11   A    I'm not quite there, sir.  I've got a lot of binders up

12   here.

13   Q    I apologize.

14   A    I don't mean to be rude.  What paragraph again, sir?

15   Q    Paragraph 53.

16   A    Okay.

17   Q    Okay.  And I guess what I was trying to get at is that

18   in that paragraph are you saying that the EFH Corp bought

19   hundreds of millions of dollars of TCEH securities between

20   November 2009 and October 2011?

21   A    Looks like they bought about $230 million.

22   Q    Okay

23   A    By exchanging EFH notes.  I think those are the facts.

24   Q    And do you know of that, sir, how much of that was

25   purchased within four years of the filing date of the

1    bankruptcy?

2    A    I'm sorry.  I'm also going back to the figure.  I'm

3    assuming you're referring to Figure 1.  Is that what you're

4    saying?  Is that where you're referring me?  I apologize.

5    Q    Yeah.  I'm referring to 53, the table in there, I

6    think.

7    A    Yeah, that table has face value of new EFH notes and

8    then face value aggregate of old EFH notes and TCEH notes,

9    so we would have to disaggregate that to figure out how much

10   was actually TCEH and how much was actually EFH.  And I

11   don't have those numbers in front of me.

12   Q    Okay.

13   A    I think it was a very small amount of TCEH if I recall.

14   Q    In your binder, Mr. Horton, let me ask you to turn to

15   what's tabbed as Exhibit 406.

16   A    I'm sorry, where is --

17   Q    In the skinny binder, Exhibit 406.

18   A    The one you gave me?

19   Q    Yes.

20   A    I'm sorry.

21   Q    406.

22   A    I'm in 406.

23   Q    Okay.  Would you take a look at that document and the

24   attachment, Mr. Horton, see if you recognize it?

25   A    Are you in the email, sir?

1    Q    Yes, email and then there's an attachment.  I'll ask

2    you to take a look at those.

3    A    I'm going to need a minute to read this email.

4    Q    Take your time.

5    A    Okay.  I see the email.  I see the deck.  I've read

6    through the deck.  But this is March 2010, sir?

7    Q    Yes, March 31st, 2010.  It appears to be an email chain

8    that starts with an email from Jeffrey Yingling to Mr.

9    Keglevic who then flips it to you with the note "have you

10   seen this", right?

11   A    Okay.  I see that.

12   Q    Okay.  And do you recall having seen it at that time?

13   A    It's difficult to read. Okay. A lot of detail.  I don't

14   recall specifically.  Do you have a specific question for

15   me?

16   Q    Sure.  Do you recall around this time, somebody from JP

17   Morgan reporting meeting with Henry Kravis at KKR regarding

18   the recapitalization of EFH?

19   A    I do not.  I don't recall the conversation, and then

20   though, that the banks talked, you know, directly with the,

21   you know, the sponsors from time to time, and then they

22   would direct them to us, have banks pitching ideas and

23   concepts based on their own analysis and views on a regular

24   basis.

25   Q    And at JP Morgan, were they retained by EFH?

1    A     Regained when, sir?

2    Q     In connection with the deck that's attached to this?

3    A     Not that I'm aware of.

4    Q     Okay.  Why don't you flip, then, to the third page of

5    the slide deck?  Has Executive Summary there, do you see

6    that?

7    A     Okay.

8              THE COURT:  Do you have date's number for me?

9              MR. SHEPPARD:  Yes, Your Honor, it's EFH --

10             THE COURT:  Oh, I see it.  654?

11             MR. SHEPPARD:  Yes, 654.

12             THE COURT:  Okay.

13   Q     The second bullet point down, Mr. Horton, current

14   valuations imply that existing equity's impaired at all

15   levels.  This was 2010, and I'll continue to read -- and

16   particularly at the TCEH level, do you see that?

17   A     Okay.

18   Q     Okay, do you agree, sir, that as of March 30 -- March

19   23rd, 2010, that the existing equity is impaired at all

20   levels?

21   A     This is a presentation from JP Morgan, who does not

22   have access to our internal models and projections.  I have

23   no idea how they make these calculations.  I can't agree

24   with that, sir.

25   Q     All right.  And then the second bullet point right

1    underneath that, residual Oncor value to EFH, five to seven

2    billion against 7.3 billion in funded debt.  Do you see

3    that?

4    A    I do.

5    Q    Okay.  Do you agree with that statement?

6    A    I have no basis for how they came to this conclusion,

7    this analysis.  We have our own analysis, our own models.

8    I'm not sure we were doing that type analysis at that, March

9    of 2010.  I'd have to look back, but I certainly wouldn't --

10   no offense to JP Morgan, but I certainly wouldn't rely on

11   their analysis for that kind of statement.

12   Q    Well, certainly, Mr. -- I'm sorry.

13   A    Unless I fully engaged them, and whether we had given

14   them -- signed an NDA, gave them a confidential model, and

15   spent months and months and months of analysis.  This is a

16   pitch to the company.

17            MR. MCKANE:  Your Honor, based on that answer, and

18   earlier, we object to this line of questioning.  There's no

19   foundation for any of this examination with this witness

20   that's been established.  And frankly, while they want to

21   admit the document, we'll consider the document on its

22   merits, but to use the treasurer as a human highlighter for

23   a deck he's never seen before or considered, I think is

24   inappropriate.

25            MR. SHEPPARD:  Well, Your Honor, I don't believe

1    the testimony was he's never seen it before.  I think he

2    acknowledged that it was an email sent to him by Mr.

3    Keglevic with the attachment.  But I understand that if the

4    Debtors are prepared to admit the document, then we'll stand

5    on it.  I just have two other questions about it, that's

6    all.

7              MR. MCKANE:  I stand on the objection that there's

8    no foundation for examining the witness about the contents

9    of this -- he did not prepare, and he's testified he doesn't

10   believe JP Morgan had access to the necessary information

11   from EFH to do the analysis.

12             THE COURT:  Was there -- is there -- just so I'm

13   clear, is there an objection to the admission of this

14   document into evidence?

15             MR. MCKANE:  No.

16             THE COURT:  All right, so we're resolved.  Right?

17   I think that's what I heard Mr. Sheppard saying.

18             MR. SHEPPARD:  Yes, thank you, Your Honor.

19             THE COURT:  Okay.

20   Q    So just one last question, Mr. Horton.  The bullet

21   point below the next bullet point that goes out to the end

22   starts with the sponsors, do you see that?

23             THE COURT:  I thought we just said we were done

24   with this.

25             MR. SHEPPARD:  Oh, I'm sorry Your Honor, I

1    misunderstood.  Okay, I thought that you were going to let

2    me cross-examine him.  All right.  I can move on.

3                THE COURT:  No, I'm not trying to force you.  Mr.

4    McKane made an objection about your examining Mr. Horton at

5    all on this, and -- for lack of foundation -- and you

6    responded, I thought that as long was the document was

7    admitted into evidence, you didn't have any more questions

8    in connection with the document.  So now you have more

9    questions.

10                MR. SHEPPARD:  Well --

11                THE COURT:  I can rule on the merits of the

12    objection.  I thought I had a -- I thought I was

13    incorporating what you had agreed to.  If I misunderstood, I

14    apologize.

15                MR. SHEPPARD:  Okay.  No, Your Honor, I think I

16    misunderstood the Court's ruling.  If the Court's going to -

17    - if it's going to be admitted, and the Debtor is not going

18    to object to the admission, then I'll move off the document.

19                THE COURT:  Okay.

20    Q    All right, Mr. Horton, then can we turn to Exhibit 426

21    please, in the skinny binder again?

22    A    I'm there, sir.

23    Q    Okay.  Why don't you take a second, and take a look at

24    that email chain, if you would.

25    A    Okay.

1    Q    Okay, and what I want to direct your attention to is in

2    the middle of the email chain there, it's an email from Mr.

3    Keglevic to you, Monday, September 20th, where Mr. Keglevic

4    writes, "We need to send message that we can't introduce

5    bankruptcy protection/acceleration."  And I believe that's

6    clues, but it says C-L-U-S-E-S.

7    Do you see that?  Clause?  Sorry, should be clause.  And

8    then you respond by saying, "Will do.  Yes, was fearful of

9    the precedent."  And then Mr. Keglevic responds to you,

10   "Just introducing the b-word in a public instrument is a

11   non-starter."  Do you recall that?

12   A    I recall parts of this email, yes.

13   Q    And so do you know why in 2010, Mr. Keglevic was

14   telling you that introducing the b-word in a public

15   instrument would be a non-starter?

16   A    Well one, I don't think we were either considering

17   bankruptcy.  This is very discreet, to a specific document,

18   and a specific term in the document, which had to do with

19   introducing this applicable premium in event of a

20   bankruptcy, was the context, although we don't have all the

21   e-mail chain here, just to let you know that was really very

22   specific to that particular clause.

23   Q    I understand, and I will represent to you that that is

24   the whole email chain that was produced to us.

25              MR. SHEPPARD:  I have no further questions, Your

1    Honor.

2              THE COURT:  All right, thank you.  Mr. Pedone.

3                      CROSS-EXAMINATION

4    BY MR. PEDONE:

5    Q    Good afternoon, Mr. Horton.  I'm Richard Pedone,

6    counsel to American Stock Transfer and Trust Company,

7    indenture trustee of the EFH debt.  I've just a few

8    questions related to EFH Corp's retention of my client as

9    indenture trustee.  In 2014, did Melinda Lefan work under

10   your supervision in the finance department?

11   A    She did.

12   Q    And were you familiar with the work that Miss Lefan was

13   doing in late March 2014, in preparation for the filing of

14   the bankruptcy cases?

15   A    I was generally aware.  I also have an assistant

16   treasurer that she reports to directly, that I delegate a

17   lot of responsibility to.

18   Q    And that person's name was?

19   A    Kris Moldovan.

20   Q    And were you aware that one of the projects that Miss

21   Lefan -- it's Mr. Moldovan, correct?

22   A    It's Mr. Moldovan and Miss Lefan.

23   Q    What Miss Lefan and Mr. Moldovan were working on was

24   identifying indenture trustees who could succeed to some of

25   the debt positions that B&Y was serving as trustee for?

1   A    Yes, I think that's generally true.

2   Q    And in particular, were you aware that she was spending

3   time searching for successor trustee would could assume

4   B&Y's position as indenture trustee for the public debt

5   issuances at EFH Corp?

6   A    I do recall that, vaguely.

7   Q    And were you also aware that my client, American Stock

8   Transfer, at the request of EFH Corp, succeeded to B&Y as

9   indenture trustee?

10  A    I'm again, aware, generally speaking, of the changes to

11  the indenture trustees.

12          MR. MCKANE:  Your Honor, I'm going to object to

13  the line of question, simply because I have no idea how this

14  fits into phase one.

15          THE COURT:  What's the relevancy, Mr. Pedone?

16          MR. PEDONE:  You honor, the Debtors have objected

17  to whether or not an indenture trustee in the cases is

18  actually necessary, and they've objected to the

19  administrative claim treatment, and no provision has been

20  made for the provisions of my client's fees.  If they'll

21  agree that they actually need indenture trustees in

22  bankruptcy, then I'll have no further questions.

23          MR. MCKANE:  Your Honor, I believe that this part

24  of the claim objection in the calculation of fees, costs,

25  expenses, that was removed out of phase one, and

1    specifically put on a separate track with those other case-

2    time objections.  With that understanding, consistent with

3    the scheduling order, that Your Honor, is the final pre-

4    trial order.  I believe this examination is improper.

5                  THE COURT:  Mr. Pedone?

6                  MR. PEDONE:  Your Honor, we believe that they've

7    objected to the payment of any trustee fees, and there's no

8    provision for the payment if it is an administrated expense,

9    in their --

10                 THE COURT:  All right, this is either phase two,

11   which I don't even think is phase two, but this is the

12   separate issue with your claim objection, so I don't think

13   it's relevant.

14                 MR. PEDONE:  Your Honor, I understand.  I just

15   state that the plan provides no provision for the fees, and

16   it's in our confirmation objection.  It wasn't responded to

17   as a grounds to objecting to confirmation.  My questioning

18   will last about three minutes, but if I'm --

19                 THE COURT:  All right, you can proceed.

20                 MR. PEDONE:  Thank you.

21   Q    At any point in time did the Debtors give consideration

22   to letting B&Y resign, and going through these proceedings

23   without an indenture trustee in place at EFH Corp?

24   A    You know, I wasn't that close to the specific detail,

25   of the change out of the indenture trustees, but I'm not

1    aware of that.

2    Q    And you're not aware of any provisions being made for

3    EFH Corp to make the distributions called for in the plan

4    without the use of an indenture trustee, are you?

5    A    Again, I have not focused on that, sir.

6    Q    But you're not aware of any plans being made for that

7    to occur, are you?

8    A    No.

9    Q    And at the time you signed the documents by which

10   American Stock Transfer succeed to B&Y as indenture trustee

11   to EFH Corp, didn't you?

12   A    I'd have to look back, but it's likely that I did, in

13   consultation with my team, my assistant treasurer, and my

14   director of debt compliance.

15   Q    At the time that you signed those documents, you had an

16   understanding that EFH Corp, in fact, needed an indenture

17   trustee in the bankruptcy proceedings, didn't you?

18   A    Generally speaking, yes.

19        MR. PEDONE:  Thank you.  No further questions.

20   Thank you, Your Honor.

21        THE COURT:  You're welcome, Mr. Pedone.  Mr.

22   McKane, or anyone else?

23        MR. MCKANE:  Your Honor, I may have one very

24   limited line of questions, just for clarification.

25        THE COURT.  All right.

```
 1                        RE-EXAMINATION

 2   BY MR. MCKANE:

 3   Q    MR. MCKANE:  Mr. Horton, you were asked about an email,

 4   I believe by Mr. Sheppard that is -- or a string of emails,

 5   EFH Committee Exhibit 426.  It was the one that referenced

 6   both bankruptcy protection/acceleration clause.

 7   A    MR. HORTON:  Which binder is that in?

 8   Q    MR. MCKANE:  That's a wonderful question.

 9            THE COURT:  It's the thinnest, it's the thinnest

10   one, yeah, that's the one you just got.  You were just in

11   there, I think.

12            MR. HORTON:  Which section?

13            MR. MCKANE:  EFH Exhibit 426, so EX426.

14            MR. HORTON:  Thank you, Your Honor.

15            THE COURT:  You're welcome.

16   Q    All right.  And specifically, sir, I want to talk about

17   that email that's about two-thirds of the way down the page,

18   from Mr. Keglevic to you, where it says, "Introduce

19   Bankruptcy Protection/Acceleration," and I believe he's

20   trying to say clause.  Do you see that?

21   A    I do.

22   Q    Sir, does that bankruptcy protection/acceleration

23   clause language remind you what clause Mr. Keglevic was

24   referring to?  Do you know what he's referring to?

25   A    He's referring to the application, the introduction of
```

1    applicable premium in the event of a bankruptcy, in the

2    indenture.

3    Q    And sir, and specifically we're talking about the

4    indentures on the E-side of the house?

5    A    That's correct.

6    Q    And sir, when you talk about Applicable Premium,

7    capital A, capital P --

8    A    Let me, let me back up.  This is actually in on the T

9    Side of the house.

10   Q    Right, and then it gets carried over to the E-side of

11   the house.

12   A    Yes.

13   Q    And to the extent that the Court has heard about

14   Applicable Premium, capital A, capital P, as it relates to

15   the E-side of the house, this is whether there's a make-

16   whole do, in the event there's a bankruptcy filing, and

17   triggering the acceleration of the debt.  Is that right?

18   A    That was my point, yes, sir.

19            MR. MCKANE:  All right, thank you.  No, further

20   questions.

21            THE COURT:  All right, thank you.  Anyone have any

22   further questions for Mr. Horton?  Very good, I hear none.

23   Thank you, Mr. Horton, you may step down.

24            MR. HORTON:  Thank you, Your Honor.

25            THE COURT:  You're welcome.  Any other witnesses

1    for today?  I assume we're done for the day.

2              MR. MCKANE:  Your Honor, given that we got through

3    five witnesses today, I think we feel pretty good about

4    stopping, at this point now.

5              THE COURT:  Okay, that's fine.  We are going to

6    have a quick noteholder settlement discussion update, I

7    thought.  Do we need to take a break, or Mr. Husnick, do you

8    want to --

9              MR. HUSNICK:  Your Honor, would it -- Chad

10   Husnick, on behalf of the Debtors -- would it be acceptable

11   to take that 30-minute break and come back at five?

12             THE COURT:  Yes, it would be, that's fine.

13   That'll finish the trial portion for today, and we'll be in

14   recess until tomorrow morning at 10:00.  We'll have our

15   normal pretrial day at 9:30.  We moved all the -- I don't

16   think we have the E-side exhibits in yet.

17             MR. HARDIMAN:  That's why I was standing up, Your

18   Honor.  I wanted to move in exhibits EUCC 351, and 352,

19   which would be amendment, and the withdrawal of the

20   amendment of the schedules that I used with Mr. Carter.

21             MR. MCKANE:  Your Honor, no objections, so long as

22   they are recognized as filings, and don't go in for the

23   truth of the matter asserted therein, regarding the actual

24   calculation.

25             MR. HARDIMAN:  That's acceptable to us.

1          THE COURT:  Very good.  It's admitted, with that

2    clarification.  Were there any exhibits in connections with

3    Mr. Horton's cross that the E-side wanted admitted?

4          MR. SHEPPARD:  Yes, Your Honor, we would also --

5    oh, I'm sorry go ahead.

6          THE COURT:  I don't have either.

7          MR. SHEPPARD:  Your Honor, we would also move

8    Exhibits 406 and 427.

9          MR. MCKANE:  Your Honor, with regards to 406, our

10   only ask is that it not be in for the truth of the matter

11   asserted, because it can't be a party admission of the

12   Debtor, since it's not anyone retained under our control.

13   So it's just -- we'll admit it, but not for the truth of the

14   matter asserted therein.

15         MR. SHEPPARD:  Your Honor, it's a business record

16   that they produced.  It was attached to an email that the

17   witness saw.  And I think Your Honor can (indiscernible) --

18         THE COURT:  When you mean truth of the matter,

19   sir, you mean the accuracy of the financial projections?

20         MR. MCKANE:  Correct, given that it was not

21   produced by the Debtors, not by anyone retained by the

22   Debtors.  To the extent that they want to argue that somehow

23   this gives rise to it -- that's not an admission of

24   insolvency, based on trading values that were provided --

25   that were presented as part of a pitch book by JP Morgan.

1    We think that goes too far.

2              MR. SHEPPARD:  No, Your Honor.  We're offering it

3    for the effect of the notice on the hearer.  So it's --

4    we're not offering it for the (indiscernible).

5              THE COURT:  All right.

6              MR. MCKANE:  And as long, with that on the record,

7    we're good with that.

8              THE COURT:  Okay, submitted.

9              MR. SHEPPARD:  I'm sorry, Your Honor, one more,

10   426.  426, Your Honor.

11             THE COURT:  That's the email chain that we were

12   just discussing.  It's admitted.

13             MR. SHEPPARD:  Thank you.

14             THE COURT:  You're welcome.

15             MR. BREBENER:  Your Honor, I just wanted to admit

16   -- DX359 is the amendment to the TCEH vetted agreement.  I'm

17   not actually sure whether or not I showed that to the

18   witness, but is there any objection to that?

19             MR. MCKANE:  There's no objection.

20             THE COURT:  All right, submitted.

21             MR. BREBENER:  And then DX608 is the supplement

22   TCEH credit agreement.

23             MR. MCKANE:  There's no objection.

24             THE COURT:  Submitted.

25             MR. BREBENER:  And then I also wanted to admit, to

1   the extent they're not already admitted, DX822, which is the

2   EFH 2010 10K, which was referred to in a document.

3            MR. MCKANE:  Yeah, no objection to the admission

4   of any of our 10Ks.

5            THE COURT:  Submitted.

6            MR. BREBENER:  All right, well in that case, Your

7   Honor, I'll move to admit DX833, which is EFH 2011 10K, and

8   DX835, which is the EFH 2011 10K.

9            THE COURT:  They're admitted.

10           MR. BREBENER:  Thank you, Your Honor.

11           THE COURT:  Can I get a list, an updated list at

12  the end of the -- tomorrow, of whatever has been admitted by

13  the objectors?

14           MR. GLUCKSTEIN:  We will coordinate with chambers,

15  and update our dependent parts of the --

16           THE COURT:  I appreciate it, thank you.

17           MR. MCKANE:  Your Honor, I apologize.  There was

18  one issue that we discussed yesterday morning in chambers,

19  which is the -- to the extent that the parties were not able

20  to dissolve any deposition designation disputes --

21           THE COURT:  Right.

22           MR. MCKANE:  We would just take a brief moment

23  here to argue out any remaining disputes.  I can update the

24  Court that since that point in time, there's been a series

25  of meetings conferred by Debtor's counsel with objectors,

1    including the committee, the indenture trustee, the United

2    States trustee.

3           And we have successfully resolved all but one

4    deposition designation, and at this point in time, I'd like

5    to ask that my colleague John Ganter address that issue.  It

6    relates to deposition designations made by the EFH indenture

7    trustee.

8           THE COURT:  Okay.

9           MR. GANTER:  Your Honor, John Ganter, from

10   Kirkland & Ellis, on behalf of the Debtors.  We can keep

11   this very brief for you.  As Mr. McKane just indicated,

12   we've managed to whittle down the number of objections on

13   the designations with the other parities, in the spirit of

14   compromise.  We'll start getting hard copies of these

15   designations tomorrow.

16          The last remaining issues are the EFH indenture

17   trustees.  They relate to designations made by the EFH

18   indenture trustee in the nine -- the September 25th, 2015

19   deposition of Mr. Evans, and then the September 30th, 2015

20   deposition of Billie Williamson.

21          The argument here is pretty straightforward.  All

22   of the objections that the plan supporters have noticed,

23   relate to lines of questioning that sought testimony on

24   issues pertaining to the potential reinstatement of EFH

25   legacy notes, TCEH, and the feasibility of reorganized TCEH,

```
 1    if they're reinstated.

 2            The Debtors have objected on the grounds that

 3    pursuant to the Court's current joint stipulated pre-trial

 4    order, that these lines of questioning, this testimony is

 5    appropriate for phase two of the trial, but not here, and

 6    therefore shouldn't be included in the deposition

 7    designations that are going to be going to you.

 8            THE COURT:  All right.  Mr. Pedone?

 9            MR. PEDONE:  Your Honor, at this time, our firm is

10    going to (indiscernible) this decision.

11            THE COURT:  Oh, that's fine, thank you.  Good

12    afternoon.

13            MS. NIGHAN:  Good afternoon, Your Honor.  Morgan

14    Nighan, from Nixon Peabody, on behalf of American Stock

15    Transfer, the EFH indenture trustee.

16            As you just heard, the Debtors have objected to

17    our designations that were made for the testimony of the

18    disinterested directors, Mr. Evans, and Miss Williamson, on

19    the grounds of relevance for phase one.

20            The reason we believe it's relevant to phase one

21    is because it has to do with whether or not the plan was

22    properly authorized and approved by the board.

23            The testimony that we designated, it shows that

24    neither director had even heard of the reinstatement option

25    being inserted into the plan until after the plan was
```

1    actually on file, and we believe that these types of cross-

2    silo issues are conflict matters, and they need to be

3    addressed and approved by the board.

4              And for the record, we did object to the plan on

5    that ground in our plan objection and pretrial brief, filed

6    at Docket Number 6609, Page 41, Paragraph 92 and 93.  And

7    I've reviewed the Debtor's reply, and didn't see a response

8    to our objection on that ground, and certainly didn't see an

9    argument that those issues are for phase two.  So the only

10   reasons that we're asking the Court admit that is just for

11   the board approval part, not for any issues regarding

12   feasibility of reinstatement.

13             THE COURT:  So your objection -- I read a lot of

14   objections, so I apologize if I'm not going to recall every

15   element.  Your objection is that the -- is this a good faith

16   objection?

17             MS. NIGHAN:  No, we're simply saying that the

18   board --

19             THE COURT:  The plan is unauthorized.

20             MS. NIGHAN:  Right, the disinterested directors,

21   particularly Director Evans didn't even -- he was not even

22   informed of the reinstatement issue until two days after it

23   had already been filed in the plan.  And that was elicited

24   through a line of questioning and testimony that we've

25   designated for this phase.

1            THE COURT:  So I'm trying to figure out -- got it,

2    trying to figure out what exactly the -- how that's an

3    objection to the plan, that's what I'm trying to --

4            MS. NIGHAN:  We think that, you know, the bank

5    decode requires that the Debtor operate under corporate law,

6    and we think that the fact that it wasn't approve is

7    violative of their bylaws and of Texas corporate law.

8            THE COURT:  All right, so the plan basically

9    wasn't approved by the proper people at the board.

10            MS. NIGHAN:  Correct.

11            THE COURT:  All right.  I understand.  Response?

12            MR. GANTER:  Your Honor, the fact of the matter

13    still is that this -- the argument that the EFH indenture

14    trustee just made, and pointed to, explicitly involves and

15    relates to the reinstatement option, the reinstatement

16    issue.

17            THE COURT:  No, the argument, you know -- couple

18    things.  The -- what's the word I'm looking for?

19    Bifurcation, there we go.  The bifurcation of the trial into

20    phase one and phase two was a result, really, I'll be

21    pejorative, of the bait and switch that the EFH trustee

22    feels occurred, and that he was being told, "It's cash, it's

23    cash, it's cash, oh, never mind, it's reinstatement."  And

24    by the time the "never mind, it's reinstatement" came, it

25    was too late to take proper discovery in connection with,

1    the confirmation was going to start on November 3rd.  So

2    that was his argument.

3            So we had a little back and forth on that, and I

4    said, "Okay, I think there's -- not totally buying into it,

5    but I think there's a reason that that might be an

6    appropriate way to think about it, and it's going to take

7    time, in order to do the discovery, to see whether the plan

8    at TCEH is feasible, and whether reinstatement can, in fact,

9    occur, and we're going to do that on a separate track, but I

10   don't want to lose the confirmation date, so we'll

11   bifurcate."  It wasn't that everything that had to do with

12   reinstatement, no matter what color it might be, was kicked

13   off to phase two.

14           And the argument here isn't that reinstatement is

15   improper, the argument isn't that, you know, there was a

16   bait and switch, the argument isn't that the T Side plan is

17   not feasible.  The argument is that the plan itself wasn't

18   properly approved, because the conflict directors were not

19   aware of all of its terms, including the reinstatement term.

20           So evidence about when -- and maybe this isn't the

21   evidence that designated -- but evidence about what Mr.

22   Evans and Miss Williamson knew about the terms of the plan

23   seems to be relevant to the objection they've raised to the

24   plan, regardless of whether reinstatement is a proper

25   alternative, or if the plan is feasible at the T Side.  So

1    what's your response to that?

2              MR. GANTER:  Your Honor, our response would still

3    be that the particular testimony, and the argument is

4    properly a part of phase two, the bifurcated trial has been

5    set up.  That's why it has been set up.  We've had discovery

6    ongoing, it relates to those issues, and this should be

7    properly -- these designations should go to you at the next

8    phase of the trial.

9              THE COURT:  All right.  Sounds like Mr. Thomas

10   wants to say something.

11             MR. THOMAS:  Thank you, Your Honor.  Mark Thomas,

12   of Proskauer, counsel to EFH, checking on behalf of the

13   disinterested directors, Mr. Evans and Miss Williamson.  If

14   I may, I would suggest that perhaps we put this issue off

15   for a day, and I'll explain why.  As Mr. Evans and Miss

16   Williamson were deposed, the issues that were raised in the

17   deposition were questions about reinstatement, which was in

18   the fourth and fifth amended plan.

19             They were shown resolutions of the board of

20   directors that were authorizing the third amended plan,

21   which was filed on August 10th.  Those board resolutions

22   provided that immaterial modifications to the plan could be

23   made and filed by the co-CROs, without further board

24   approval, and the position of the Debtors was that changing

25   the words "otherwise unimpaired" to "reinstated" was a

1    immaterial modification that could be approved by the co-

2    CROs.

3              Notwithstanding that, after the conclusion of the

4    depositions, the full boards and the disinterested directors

5    reconvened, and authorized and approved the filing of the

6    fourth and fifth amended plan, which is now before Your

7    Honor.  Those board resolutions, perhaps, were not produced

8    because discovery had closed, but perhaps we can resolve

9    this by providing those resolutions to counsel, and you

10   know, I don't know if you're going to move them into

11   evidence, but the plan has been authorized, the plan that's

12   before Your Honor.

13             THE COURT:  Well, that sounds like a very nice

14   evidentiary presentation to refute her evidentiary

15   presentation.  And what we're talking about is whether to

16   put her evidentiary presentation into the record.  So I'll

17   allow the deposition designations.  And you certainly have

18   every ability to make your case in rebuttal.

19             MR. THOMAS:  Thank you, Your Honor.

20             MS. NIGHAN:  Thank you, Your Honor.

21             THE COURT:  You're welcome.

22             MR. MCKANE:  Your Honor, with that, we will

23   provide to the Court full and complete copies of all the

24   deposition designations tomorrow morning, as well as inserts

25   for the existing binders from Mr. Keglevic, for his specific

1    dep designations.

2            The objectors never deposed Mr. Horton, or Mr.

3    Carter, or any of the other witnesses for today, so that's

4    the only individual supplement you'll receive.  But we'll

5    have those for you tomorrow morning, when Court starts.

6            THE COURT:  So you're talking about adding

7    supplements to the witness binder for Mr. Keglevic?  I'm

8    going to probably --

9            MR. MCKANE:  Yes, Your Honor.  It was acutely a

10   request of one of the objectors that going forward, as we

11   prepare the binders, for at least the Debtors, that as a

12   courtesy, we have not just the declarations and the written

13   direct, but also the dep designations that relate to that

14   individual as well, so that were Your Honor to be reviewing

15   that, you would have a complete set.

16           THE COURT:  Okay.  I'm probably going to need a

17   replacement binder, then.  I just don't have room in the one

18   I have for inserts.  It's just a practical matter, so.

19           MR. MCKANE:  We are happy to provide that.

20           THE COURT:  Yeah, let's kill a couple more trees.

21           MR. MCKANE:  We'll provide three copies, and a new

22   Keglevic binder as well.

23           THE COURT:  The carbon footprint of this trial is

24   large.  It is what it is.  All right.  Anything before we

25   break?

1                MR. MCKANE:  No, Your Honor.

2                THE COURT:  Okay, if you don't care about the

3      update, you're free to go, and see you tomorrow at 10:00

4      o'clock.  We'll reconvene at 5:00 for sort of a case status

5      update on the open issues.

6                            * * * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya                    Digitally signed by Sonya Ledanski Hyde
                              DN: cn=Sonya Ledanski Hyde,
                              o=Veritext, ou,
7    Ledanski Hyde            email=digital@veritext.com, c=US
                              Date: 2015.11.06 15:11:32 -05'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  November 6, 2015