1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                    :

                              :      Chapter 11

6    ENERGY FUTURE HOLDINGS    :

     CORP., et al.,      :    :    Case No. 14-10979(CSS)

7                              :

            Debtors.      :    (Jointly Administered)

8    _____:

9

10

11                            United States Bankruptcy Court

12                            824 North Market Street

13                            Wilmington, Delaware

14                            November 6, 2015

15                            10:17 a.m. - 4:46 p.m.

16

17

18

19

20

21    B E F O R E :

22    HON CHRISTOPHER S. SONTCHI

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO OPERATOR:  LESLIE MURIN

1   HEARING re: Confirmation Hearing

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:   Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    PAUL WEISS RIFKIND WHARTON & GARRISON LLP

4        Counsel to Ad Hoc Group of TCEH First Lien Creditors

5

6    BY:  JACOB A. ADLERSTEIN

7         ANDREW BERNSTEIN

8         BRIAN S. HERMANN

9

10   YOUNG CONAWAY

11       Counsel to Ad Hoc Group of TCEH First Lien Creditors

12

13   BY:  PAULINE K. MORGAN

14

15   MORRISON & FOERSTER LLP

16       Attorneys to TCEH Official Committee

17

18   BY:  CHARLES L. KERR

19        TODD M. GOREN

20        BRETT H. MILLER

21

22   O'KELLY, ERNST & BIELLI LLP

23       Co-Counsel to Energy Future Holdings Corp.

24

25   BY:  DAVID M. KLAUDER

```
1    PROSKAUER ROSE LLP

2         Attorneys for EFH Corp. Disinterested Directors

3

4    BY:  MICHAEL A. FIRESTEIN

5         MARK K. THOMAS

6

7    MORRIS JAMES LLP

8         Attorney for Law Debenture of New York, Indenture

9         Trustee

10

11   BY:  STEPHEN M. MILLER

12

13   PATTERSON BELKNAP

14        Attorney for Law Debenture of New York, Indenture

15        Trustee

16

17   BY:  BRIAN P. GUINEY

18

19   BROWN RUDNICK LLP

20        Attorneys for WSFS Second Lien Trustee

21

22   BY:  JONATHAN D. MARSHALL

23

24

25
```

Page 5

1   ASHBY & GEDDES PA

2        Attorneys for WSFS Second Lien Trustee

3

4   BY:  GREGORY A. TAYLOR

5

6   WILMER CUTLER PICKERING HALE & DORR LLP

7        Attorneys for Delaware Trust, EFIH Trustee

8

9   BY:  PHILIP D. ANKER

10

11  COLE SCHOTZ

12          Attorneys for Delaware Trust, EFIH Trustee

13

14  BY:  NORMAN L. PERNICK

15

16  SHEARMAN & STERLING LLP

17        Attorneys to Deutsche Bank, Agent to DIP Financing

18

19  BY:  NED S. SCHODEK

20

21  POTTER ANDERSON & CORROON LLP

22        Attorneys for Deutsche Bank, Agent to DIP Financing

23

24  BY:  R. STEPHEN MCNEILL

25        JEREMY W. RYAN

1  KIRKLAND & ELLIS

2        Attorney for the Debtors

3

4  BY:  ANDREW R. MCGAAN

5

6  WACHTELL, LIPTON, ROSEN & KATZ

7        Attorneys for Equity Sponsors

8

9  BY:  EMIL A. KLEINHAUS

10

11 PACHULSKI STANG ZIEL & JONES

12        Attorney for Second Lien Indenture Trustee

13

14 BY:  COLIN K. ROBINSON

15

16 KRAMER LEVIN NAFTALIS & FRANKEL LLP

17        Attorneys for Second Lien Indenture Trustee

18

19 BY:  GREGORY A. HOROWITZ

20        TUVIA PERETZ

21

22

23

24

25

Page 7

1    FOX ROTHSCHILD LLP

2         Attorney to Ad Hoc Committee of EFIH Unsecured

3         Noteholders and EFIH Second Lien DIP Commitment

4

5    BY:  JEFFREY M. SCHLERF

6         L. JOHN BIRD

7

8    WHITE & CASE LLP

9         Attorney to Ad Hoc Committee of EFIH Unsecured

10        Noteholders and EFIH Second Lien DIP Commitment

11

12   BY:  THOMAS LAURIA

13        J. CHRISTOPHER SHORE

14

15   SEWARD & KISSEL LLP

16        Attorneys to Wilmington Trust NA-First Lien Agent

17

18   BY:  ARLENE R. ALVES

19

20   MCELROY, DEUTSCH, MULVANEY, & CARPENTER, LLP

21        Co-Counsel to the TCEH Debtors

22

23   BY:  DAVID P. PRIMACK

24

25

1    MUNGER, TOLLES & OLSON LLP

2         Co-Counsel to the TCEH Debtors

3

4    BY:  THOMAS B. WALPER

5

6    STEVENS & LEE PC

7         Co-Counsel to Energy Future Intermediate Holding

8         Company LLC

9

10   BY:  JOSEPH H. HUTSON, JR.

11

12   JENNER & BLOCK LLP

13        Attorneys for EFIH

14

15   BY:  VINCENT E. LAZAR

16

17   DRINKER BIDDLE & REATH LLP

18        Counsel to Citibank NA, TCEH DIP Agent

19

20   BY:  HOWARD A. COHEN

21

22

23

24

25

1    NIXON PEABODY LLP

2         Attorneys for AST as EFH Indenture Trustee

3

4    BY:  MORGAN C. NIGHAN

5         RICHARD C. PEDONE

6

7    CROSS & SIMON

8         Attorneys for Fidelity

9

10   BY:  CHRISTOPHER P. SIMON

11        MICHAEL J. JOYCE

12

13   MONTGOMERY MCCRACKEN WALKER & RHOADS LLP

14        Co-Counsel to the EFH Creditors' Committee

15

16   BY:  SIDNEY S. LIEBESMAN

17

18   REED SMIDT

19        Attorney for Bank of America

20

21   BY:  EMILY K. DEVAN

22

23

24

25

```
1   VENABLE

2         Attorney for PIMCO

3

4   BY:  JAMIE L. EDMONSON

5         JEFFREY S. SABIN

6

7   MORGAN LEWIS

8         Attorney for PIMCO

9

10  BY:  DAVID B. SALMONS

11        CHRISTOPHER L. CARTER

12

13  FRIED FRANK

14        Attorneys for Fidelity

15

16  BY:  GARY L. KAPLAN

17        MATTHEW M. ROOSE

18        ALYSA AIN

19

20  U.S. DEPARTMENT OF JUSTICE

21        Attorney for the U.S. Trustee

22

23  BY:  RICHARD L. SCHEPACARTER

24

25
```

1    ALSO APPEARING TELEPHONICALLY:

2    SCOTT L. ALBERINO

3    ASHLEY F. BARTRAM

4    PEG A. BRICKLEY

5    EMILY A BUSSIGEL

6    STEVEN H. CHURCH

7    MARK A. CODY

8    KENT COLLIER

9    LOUIS A. CURCIO

10   ADAM M. DENHOFF

11   BENJHAMIN D. FEDER

12   BARRY FELDER

13   MARK A. FINK

14   MARK FLANNAGAN

15   JULIA FROST-DAVIES

16   DAVID GRINGER

17   CHRISTOPHER HAHM

18   MARK F. HEBBEIN

19   ANGELA K. HERRING

20   NATASHA HWANGPO

21   ANNA KALENCHITS

22   HAROLD KAPLAN

23   MATTHEW W. KINSKEY

24   CHARLES KOSTER

25   PHILLIP G. LAROCHE

1    DANIEL A. LOWENTHAL

2    ROBERT K. MALONE

3    RICHARD G. MASON

4    ANDERS J. MAXWELL

5    HAL F. MORRIS

6    TINA MOSS

7    MORGAN NIGHAN

8    MEREDITH S. PARKINSON

9    RICHARD PEDONE

10   LARS A PETERSON

11   BRIAN PFEFFER

12   MEREDITH PFISTER

13   MEREDITH QUICK

14   ABID QURESHI

15   ERICA RICHARDS

16   RACHAEL RINGER

17   MARC B. ROITMAN

18   JASON SATSKY

19   ANDREA B. SCHWARTZ

20   FREDRIC SOSNICK

21   RICHARD A. STEIGLITZ

22   AMER TIWANA

23   BRIAN TONG

24   CARL TULLSON

25   MICHAEL TURKEL

1    MATTHEW UNDERWOOD

2    APARNA YENAMANDRA

3    DANIELE ZAZOVE

4    DAVID ZYLBERBERG

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 P R O C E E D I N G S

2           THE COURT:  Please be seated.  Good morning --

3      it's still morning.  Good morning.

4           MR. MCGANN:  Good morning, Your Honor.

5           THE COURT:  I apologize for the delay.

6           MR. MCGANN:  Oh, no problem.  Andrew McGann for

7      the Debtors.  Uh, I have a couple housekeeping matters, if

8      it's all right, Your Honor, before we call our first witness

9      this morning.

10          THE COURT:  Yes.

11          MR. MCGANN:  We spoke with you at the pretrial

12     conference about an objection that had been lodged to a

13     portion of Mr. Mendelson's written direct.

14          THE COURT:  Right.

15          MR. MCGANN:  And, Your Honor had asked whether you

16     should be looking at the written objections -- and I

17     understand that there's been a request, at least argue it

18     briefly before Mr. Mendelson takes the stand.  So, if you

19     have an opportunity to look at the written objections, that

20     would be great.

21          THE COURT:  I will do so.

22          MR. MCGANN:  And if it works for you, the parties

23     that are raising and opposing that objection would like to

24     do it at the outset of his testimony.

25          THE COURT:  Of his testimony?

1          MR. MCGANN:  Yeah.

2          THE COURT:  Okay, that's fine.  I'll read the

3    documents during lunch.

4          MR. MCGANN:  Okay, thank you, sir.  And then Mr.

5    Husnick and Mr. Shartz from our office have been in

6    conversation with Ms. Schwartz from the U.S. Trustee's

7    Office and they've reached an agreement that the U.S.

8    Trustee does not intend to call Don Evans in this

9    proceeding.  We had a discussion about that the other day.

10   So, he will not be a witness in this trial and they're going

11   to rely on deposition designations of his testimony.

12         THE COURT:  Very good.  And I've received those,

13   thank you.

14         MR. MCGANN:  Okay.  And we have handed to your

15   clerks this morning revised Paul Keglevic witness binders.

16   They contain designated deposition excerpts in them.  So

17   there's one that we left with them for you.

18         THE COURT:  I have it here.

19         MR. MCGANN:  Okay.

20         THE COURT:  So, I'm giving back the old one.  When

21   you get a chance.  Thank you.

22         MR. MCGANN:  I will come get it right now if it's

23   all right with Your Honor, and I'll bring to you the

24   Jonathan Smidt witness binder.

25         THE COURT:  Very good.  That's the old one.  Yes.

1    Thank you.  Go ahead.

2              MR. MCGANN:  Thank you, Your Honor.  With that,

3    the Debtors and the equity owners of EFH call to the stand

4    Mr. Jonathan Smidt.

5              THE COURT:  Very good.  Please remain standing

6    while you give your declaration.

7              CLERK:  Please raise your right hand.  Do you

8    affirm you're willing to tell the truth, the whole truth,

9    and nothing but the truth, to the best of your knowledge and

10   ability?

11             MR. SMIDT:  I do.

12             CLERK:  Please state and spell your name for the

13   record.

14             MR. SMIDT:  Jonathan David Smidt.  S-M-I-D for

15   David-T for Thomas.

16             CLERK:  Thank you.

17             THE COURT:  Thank you, Mr. Smidt.

18             MR. SMIDT:  May I sit down?

19             THE COURT:  Yes, please.  Just make sure you're

20   close to the microphone.  Thank you.

21                      DIRECT EXAMINATION

22   BY MR. MCGANN:

23   Q    Good morning, Mr. Smidt.  How are you today?

24   A    Good, thanks.  How are you?

25   Q    Good.  I have put up there on the bench on the rail

1    there, a binder, and you'll find inside of it your written

2    direct and then the exhibits cited therein in your

3    deposition transcript, if we need to refer to that.  Would

4    you please tell the Court your name and where you work?

5    A    Jonathan Smidt and I work at KKR.

6    Q    What is your title at KKR?

7    A    My official title is Member, which is a partner.

8    Q    What is your role within KKR?

9    A    I'm an investor in the Energy Industry Team focused on

10   private equity investments.

11   Q    And, in general, what does the Energy Industry Team at

12   KKR do and focus on?

13   A    We look to make investments in the broad energy sector,

14   which can be anything from the wellhead to the wall socket.

15   And so we're looking to invest in businesses, acquire

16   businesses, and make generally equity investments across the

17   broad energy spectrum.

18   Q    Okay.  And how long have you been at KKR doing that

19   sort of work?

20   A    A little over 15 years.

21   Q    All right.  And before KKR, where were you working?

22   A    Goldman Sachs.

23   Q    I'm going to turn to EFH, obviously, but before I do,

24   let me ask you to turn in your binder to what's labeled "The

25   Declaration of Jonathan D. Smidt".  Do you see that?

1   A    I do.

2   Q    And is this declaration that you prepared and signed in

3   anticipation of coming here to testify?

4   A    Well, my lawyers helped prepare it with my comments,

5   and I am comfortable with it, finely reviewed it and did

6   sign it.

7   Q    Okay.  So you've reviewed it carefully and approved all

8   of it as if it's your own testimony in court here today.  Is

9   that right?

10  A    Yes.  That's all of my comments and it's based on my

11  statements today.

12  Q    All right.  Now, are you offering this -- in addition

13  to your testimony in court today, are you offering this in

14  support of the motion for approval of the settlement and for

15  confirmation of the plan?

16  A    Yes.

17  Q    All right.  And that's marked, Your Honor, D -- DIR

18  Smidt, and we'll offer it at the end.  How long, Mr. Smidt,

19  have you been involved in KKR's investment in EFH?

20  A    From the very beginning.

21  Q    And when was that?

22  A    That was the year before we actually signed up on the

23  transactions.  So, if I recall correctly, we started in

24  2006, the end of 2006, discussions with the company and

25  starting to perform due diligence.

1    Q    All right.  You refer to the year before the

2    transaction -- you're referring to the leveraged buyout in

3    2007?

4    A    Correct.

5    Q    What was your role on behalf of KKR in that

6    transaction?

7    A    I was involved in performing due diligence on EFH and

8    its various subsidiaries, as well as helping to negotiate

9    the purchase and sale agreement and the other documents

10   required to execute the transaction, including raising the

11   financing and executing the hedges with the banks that were

12   put in place at the time of the transaction.

13   Q    Do you serve today on the boards of directors of any of

14   the Debtor entities?

15   A    Yes.

16   Q    Which ones?

17   A    Energy Future Holdings, Energy Future Competitive

18   Holdings, and TCEH.

19   Q    All right.  And you've served on the board of one or

20   more of the Debtor entities since the time of the leveraged

21   buyout?

22   A    Yes.

23   Q    All right.  And have you helped us prepare a

24   demonstrative to illustrate not only the boards you've

25   served on but the meetings you've attended?

1   A    Yes, I have.

2   Q    All right.  With your permission, Your Honor, I'd like

3   to display Smidt Demonstrative Number 1.

4            THE COURT:  Okay.

5   Q    All right, Mr. Smidt, you see up on the screen there

6   this demonstrative.  Will you please tell the Court what

7   this shows?

8   A    This shows the number of formal board meetings that I

9   attended for each of the respective boards for each of 2012,

10  2013, 2014, and year to date 2015.

11  Q    Okay.  And in a number of places there's a reference --

12  you see the word "joint".  What does that refer to?  Is that

13  joint board meetings?

14  A    Yeah, those are joint board meetings where we would

15  have a meeting of multiple boards meeting at the same time

16  in the same meeting.

17           THE COURT:  Mr. Smidt, is your monitor on?

18           MR. SMIDT:  Yes, it's got a glare so it's hard to

19  see from this angle.  Sorry.

20           THE COURT:  Oh, okay, that's fine.  Okay.  Very

21  good.  That's all right, I was just trying to make it easier

22  for you.

23           MR. SMIDT:  Yeah, thank you.

24           MAN 1:  I'll hand it over.

25           MR. SMIDT:  Thank you.

1  Q    There's also a reference to an NOAB.  What is that?

2  A    It's the Nuclear Oversight Advisory Board.

3  Q    In brief, Mr. Smidt, what does the Nuclear Oversight

4  Advisory Board do and what was your role when you served on

5  it?

6  A    It's a board that's set up to oversee the safety and

7  reliability of their nuclear plant at Comanche Peak.  It's

8  headed by the ex-head of the Nuclear Regulatory Commission,

9  Dr. Dick Meserve, and it has additional members on that

10  board.  And our role is to oversee the nuclear power plant

11  and make sure that it's operating safely and reliably.  We

12  do not review anything that's related to the financial

13  performance of that plant.  It's purely to make sure that

14  that plant is doing everything it should and can do to,

15  again, operate safely and reliably.

16           And we bring in outside consultants who will come

17  in and do reviews of the safety of the plant.  And there are

18  industry-wide groups that actually review each other and

19  will report to us.  And we act upon those advisements to

20  make sure that the plant is doing everything it should and

21  can to be safe and reliable.

22  Q    Thank you.  Now, looking back at the demonstrative, you

23  mention that this details the number of formal board

24  meetings you attended.  Is that right?

25  A    Correct.

1  Q    Does this represent by any means the full scope of the

2  time that you've spent on KKR's investment in EFH since the

3  LBO?

4  A    Not even close.

5  Q    And can you describe what you mean by that?

6  A    We, and I specifically have spent a significant amount

7  of time on this investment.  I'd say, more than I have on

8  any other investment that we've made -- and I think as far

9  as KKR goes, just given the level of complexity of this

10 business and some of the issues its faced, we have spent

11 more time here than I know of at any other company.  I

12 specifically have served on the boards -- initially we had -

13 - sponsors served on the boards of the subsidiaries of TCEH,

14 so I actually served on the board of TXU Energy Retail and I

15 spent a significant amount of time, as did my counterpart

16 from Goldman Sachs, Ken Pontarelli, meeting with Jim Burke,

17 the CEO of TXU Energy Retail, thinking through their retail

18 pricing strategy, thinking through the ways that they should

19 look to arrest the decline in the number of customers that

20 they have, the attrition that they were experiencing, the

21 investment -- that they were putting in new information

22 systems to provide better service to their customers; and

23 also, thinking about the bad debts that they experienced

24 through the various customer classes that they were taking

25 on.  So that's an example of one of the things I spent time

1   on over time.  But I've spent time meeting with the company

2   on areas like thinking through hedging their exposure to

3   power prices and natural gas prices, thinking through the

4   transfer pricing and how to transfer the risk from Luminant,

5   the generation business, to the retail business, TXU Energy

6   Retail.  We spent time at Oncor over the years helping them

7   think through how did they create incremental value over and

8   above what they have in Texas today?  KKR has had a very

9   successful investment in a company called International

10  Transmission Company and we spent a lot of time with Oncor

11  trying to see if there was an opportunity for them to go

12  outside of their service area and achieve the type of value

13  that ITC has achieved in the past.

14          So outside of these meetings, and those are just

15  some examples, we have and continue to spend a lot of time

16  with the company thinking through how to maximize the value

17  of their business and think through their strategy.  And in

18  addition to these formal board meetings, these boards do

19  meet from time to time and get updated without having a

20  formal board meeting taking place where we have to have a

21  quorum.  So this is just representative of very formal board

22  meetings where specific actions were taken or where there

23  was a specific quorum.

24  Q    You weren't the only representative of KKR to serve on

25  the boards of EFH and its affiliates.  Is that right?

1    A     That's right.

2    Q     And there were how many other folks from KKR that

3    served in that role alongside you?

4    A     Well, in terms of board members, KKR had three official

5    board members at all times on the EFH entities boards.  But

6    in addition to that, we had a larger team that at times

7    could be as many as six people from KKR that were spending

8    time on the investment, as well as people who came from KKR

9    Capital Markets who were spending time on this as well.

10   Q     You say a team of six people.  You're talking about

11   folks within KKR that weren't serving as board members but

12   spent time on this investment?

13   A     Well, I'm counting the three that were board members

14   and three additional that were not board members.

15   Q     Okay.  and what sort of expertise or experience did the

16   rest of the KKR team bring to bear with respect to the time

17   they spent with management at EFH?

18   A     Okay, well, just one thing to...  In what I'm speaking

19   about here I'm carving out KKR Capstone, because that's not

20   an affiliate of Capstone's.  That entity had a significant

21   number of people that spent time on this investment as well,

22   but I'm not mentioning that group specifically, again,

23   because they're not -- while they have the name KKR Capstone

24   and they work from KKR companies, we don't own them so

25   they're not an affiliate of ours.

1    Q    All right, well, I'll talk about that separately.

2    A    Okay.

3    Q    And you can break them --

4    A    So, with respect to the six people that spent time on

5    this, we have experience making investments in the energy

6    sector.  We've made previous investments in the electric

7    sector and specifically in the State of Texas we had an

8    investment called Texas Genco, which had a generation

9    business similar to the Luminant business, which was a

10   successful investment for us in the south of Texas.  That

11   business was ultimately sold to NRG and is owned by NRG

12   today.  We also have experience, as I mentioned, making

13   investments in the electric transmission sector, which is

14   very similar to Oncor's business.  So, and we have

15   investments in the oil and gas sector.  So we have insights

16   into the factors that are impacting supply and demand for

17   natural gas.

18            So, we bring a number of those elements to the

19   table, the insights from those investments, but I think

20   mostly we bring experience making financial investments and

21   thinking through business strategies.

22   Q    You've talked about -- that at a summary level here

23   you've described some of the time and expertise that KKR

24   personnel brought to bear with respect to operations, and as

25   you say, "maximizing value".  What about with respect to

1   financing and managing the balance sheet?  Did KKR

2   contribute its skills in that area?  And, if so, would you

3   describe to the Court how?

4   A    Yeah, absolutely.  So we were involved in initial

5   financing to raise the capital to do the transaction.  It

6   ultimately, between the time we signed up that transaction

7   and had to close that transaction, we had the financial

8   crisis.  So there was significant work required to actually

9   get the banks comfortable with closing on their commitments

10  to actually fund the original transaction because the

11  commitments the had signed up to were impaired, just given

12  the way that market had moved -- not the basis of the

13  business.  The business was actually performing very well

14  between signing and closing.  But just the fact there was

15  this financial crisis and where (indiscernible) was trading,

16  it was very hard for the banks to syndicate -- to actually

17  syndicate their risk.  So we spent a lot of time making sure

18  this transaction ultimately closed, and felt very good about

19  it for the first period of time.

20         We spent time thereafter working with the company

21  on things like doing interest rate swaps related to their

22  financings, and thinking through how they should be

23  financing the various businesses.  And we started to

24  undertake things like exchanges, we spent a lot of time

25  speaking with the company about strategies to both capture

1    discounts and extend the maturities associated with the

2    financing of these three entities.

3    Q    You're aware of the fact that some of the objecting

4    parties here have alleged that the sponsor-affiliated

5    directors control the management of EFH.  Have you in

6    general become familiar with that allegation?

7    A    Yes.

8    Q    Is that true?

9    A    No.

10   Q    Would you describe the role management played, based on

11   your experience interacting with them, when it came to

12   making decisions and running this company?

13   A    They ran the company.  We were directors, we got to

14   spend time with them and had a very good relationship and a

15   dialogue with them.  They were very open and solicitous

16   about points of view.  They respect our points of view.  But

17   at the end of the day, they were the people who run this

18   business.  I wouldn't know how to run a business.  I haven't

19   ever run a business.  They run this business day to day and

20   have since the buyout and they've taken their respective

21   roles if they joined after the buyout.  So, our role is to

22   approve things that they brought to us at the board.

23   Q    And would you speak to the Court about your

24   observations about the level of experience the principal

25   management personnel had, whether in the financing realm or

1    the operations realm at EFH?

2    A    Say it again?

3    Q    Just in general.

4    A    Well, we have a deep and experienced team, a very well-

5    qualified team.  At the end of the day, I mean, Paul

6    Keglevic did an exceptional job in being the person who

7    interacted with the banks on coming up with the various

8    strategies, and he solicited and we provided him different

9    ways to think about exchanges.  But he was the one who

10   worked with the banks ultimately on coming up with the

11   various exchanges, and he was the one who was having the

12   primary dialogue and interactions with the various creditor

13   groups to understand what they would be prepared to accept

14   and what they wouldn't be prepared to accept.

15            So, we were not running this at all.  He was the

16   one who was coming up with the recommendations on the

17   different ways to structure the exchanges, he sought our

18   input, and ultimately sought the board's approval to execute

19   on those various exchanges.  And with respect to the day-to-

20   day management, we have an exceptional team -- that if you

21   just look at the ultimate...  While this investment has not

22   done well for us, the equity investors, if you look at the

23   performance of the generation plants, the safety record of

24   the mines, if you look at the TXU Energy retail and the

25   custom accounts that they have, the bad debt experience that

1  they have that's come down -- I mean, this business has

2  performed exceptionally well.  And even while it's been in

3  bankruptcy it's been able to perform extremely well, and

4  that goes to the management.

5  Q    I want to come back to the manner in which the board

6  operated in your experience.  Was there an executive

7  committee of the EFH board?

8  A    Yes, there was.

9  Q    Did you serve on it?

10  A    I did.

11  Q    What role did the Executive Committee play?

12  A    The Executive Committee was, like any board, it was a

13  committee of the board that was given some authority to

14  execute on certain transactions that fell below a certain

15  threshold or certain transactions that fell below a certain

16  threshold that were above the approval threshold of the CEO.

17  So, rather than the CEO -- the CEO had authority to execute,

18  John Young -- to execute on a broad range of items.  But if

19  something was above his approval threshold, rather than come

20  all the way up to the board, if it was something that was

21  below another threshold, it would be -- the Executive

22  Committee would have authority or the ability to approve or

23  review those transactions.  And it allowed John Young to

24  have a forum where he could interact with a subset of the

25  board on a more regular basis around anything that may be

1    impacting the company strategically.

2    Q    In your experience do you find a board which has an

3    executive committee to be a common or an unusual feature?

4    A    I think it's very common for boards to have committees.

5    They may not be called executive committees, although a

6    number of the boards I'm on do have executive committees or

7    lead directors who help provide that guidance to the CEO.

8    But there are definitely, you know, committees like

9    compensation committees, audit committees.  It's very common

10   in my experience for boards to designate committees to

11   handle certain issues and to give them the authority to do

12   so, to have a more efficient and involved board structure.

13   Q    Did you find in your experience at EFH whether the

14   existence of an executive committee of the board limited in

15   any way the information available to the full board when it

16   took actions?

17   A    No.

18   Q    Were there occasions when the sponsor affiliated

19   directors would talk with one another about EFH's business

20   outside of board meetings?

21   A    Yes.

22   Q    And would you describe just generally how often that

23   would occur and why?

24   A    I don't know exactly how often but it occurred.  We

25   were big investors in this investment and there strategic

1    things that we were facing from time to time where we had to

2    make decisions and -- look, I respect my fellow sponsors.

3    They're very smart, they're very thoughtful.  We don't

4    always think the same way.  And it's helpful to discuss with

5    them their points of view and share our points of view and

6    be able to in many instances share a common point of view to

7    the management rather than get into a room and have the

8    management have to hear three opposing views.  I think it

9    can be confusing for management at times when they're

10   seeking out the direction of their equity investors.  It's

11   helpful for us to have discussed with each other and try to

12   come to a common point of view if we can as to how we're

13   thinking about various issues and share them as guidance if

14   they're seeking that from us.

15   Q    Did you find that because you had occasion to have

16   those conversations with other non-sponsor affiliated

17   directors and talk about EFH's business that it ever in any

18   way deprived non-sponsor affiliated directors of any

19   information that they needed in improving transactions at

20   the board level?

21   A    No.  There's actually a very good process whereby we

22   would update them.  Different people had different

23   responsibilities for updating certain people.  Michael

24   MacDougall had a very good relationship with Arcilia Acosta

25   and Kneeland Youngblood, and he would take the time to call

```
 1    them up afterwards and make sure they were apprised of the
 2    various issues that we were thinking about or discussing, or
 3    that we were going to raise in a board meeting, so they had
 4    time to think about it or ask any questions they may have
 5    around those issues.
 6    Q    KKR received fees under a management agreement.  Is
 7    that right?
 8    A    Yes.
 9    Q    And the Court has heard testimony -- in fact, seen the
10    management agreement.  Can you describe generally the types
11    of fees that KKR received under the management or monitoring
12    agreement?
13    A    Well, the monitoring agreement provided for a $35
14    million a year fee that escalated at 2 percent per year.
15    So, I think at this current point, I think that's escalated
16    to $40 million a year.  That's all of the sponsors, not just
17    KKR.  And for that we provided -- we sat on the board; we
18    don't receive board compensation or a per diem for attending
19    meetings like some of the other board members do.  And we
20    spend a significant amount of time consulting with the
21    company and helping them on all of the different areas,
22    whether it is hedging again, thinking through the strategy
23    of the various businesses, helping them on acquisitions.
24    There are a vast set of things that we spend time on with
25    them, and that was to cover all of the time and effort that
```

1   we spend on the business.

2   Q    Did there come a time when the sponsors asked the

3   company to stop making payments under the management

4   agreement?

5   A    To stop making cash payments, yes.

6   Q    Yes, cash payments.  Thank you.  When was that?

7   A    If I recall correctly, it was October 2013.

8   Q    Why was that?

9   A    Because in October 2013, that was the first -- that was

10  when we started to contemplated whether we should be making

11  the interest payment on some of our debt.  And at that point

12  in time, given those deliberations, we felt it wasn't

13  appropriate for the sponsors to be taking cash out of the

14  business if we were contemplating -- and that was the first

15  time I recall us having a discussion with our advisors at

16  Kirkland & Ellis and have a cause to whether we should be

17  thinking about filing for bankruptcy or making an interest

18  payment.  And so at that point we did not think it was

19  appropriate for us to be taking cash out of the company.

20  Q    And the time period you're talking about now, Mr.

21  Smidt, is late 2013?

22  A    Correct.

23  Q    Now, you referred earlier in your testimony to KKR

24  Capital Markets.

25  A    Yes.

1    Q    What is that?

2    A    That's a broker dealer that we, KKR, own within our

3    business, and that consists of capital markets people with

4    expertise in capital markets that spend time advising both

5    KKR companies and third parties on capital markets

6    transactions.

7    Q    Is KKR Capital Markets separate in some fashion from

8    the part of KKR where you work?

9    A    Yes.

10   Q    And how is that separate and maintained and why?

11   A    It's a separate business.  It sets in a separate part

12   of KKR.  Their role is to provide specific services around,

13   again, capital markets.  That's their expertise.  And they

14   provide that not just to our portfolio companies or to KKR

15   when we're doing deals, but also to third parties.

16   Q    And KKR Capital Markets received fees in connection --

17   they received fees from EFH for what purpose?

18   A    For services they provided to EFH either in advising

19   them on transactions or helping them to facilitate capital

20   markets transactions.  It's a role that's similarly paid by

21   the investment banks very often.

22   Q    How are the fees determined?

23   A    Well, they're market fees.  Those were fees that were

24   negotiated by Paul Keglevic with KKR Capital Markets as far

25   as I know.  I don't recall all the details of how those were

1    determined.  The Capital Markets Team would have more

2    insight to that.

3    Q    You mention they were market fees.  To your knowledge,

4    Mr. Smidt, had EFH gone to broker-dealers and other advisors

5    in the same business as KKR Capital Markets but not

6    affiliated with any sponsor, would they have paid different

7    fees?

8    A    No.  Not that I know of.

9    Q    Was the board of EFH aware at all times when a sponsor

10   affiliated broker-dealer was retained and receiving a fee in

11   connection with a transaction?

12   A    Yes.

13   Q    And did the board in each instance approve that or, let

14   me put it this way, voice any objection to that?

15   A    No.  As far as I recall, there was unanimous approval

16   for engaging KKR Capital Markets, TPG, or Goldman Sachs'

17   financing group, and we did make the disinterested directors

18   aware of the conflict.

19   Q    You also mentioned something called -- was it KKR

20   Capstone or just Capstone?

21   A    KKR Capstone or Capstone is fine.

22   Q    What is that entity and what work did it do, if any,

23   for EFH or its affiliates?

24   A    It did a lot of work for EFH, which I can go into.

25   It's a separate entity, it's not affiliated with KKR.  What

1    we've done is we help them set up a company.  It's

2    independent consultants.  They own their own business.  All

3    they do is provide services to KKR portfolio companies, and

4    those portfolio companies negotiate rates when them, which

5    are similar to and often below the rates they would pay a

6    McKinsey consultant or a bank consultant.  But they're

7    available to just serve KKR portfolio companies.  And some

8    of the things they did at EFH, and I can go on for a long

9    time is, for example, they provided services to TCEH to try

10   to figure out how do you improve the performance of TCEH's

11   business?  And so, one of the things that they did is they

12   started to look at TCEH...  Went to the various plan

13   managers and said, "We'd like to benchmark the performance

14   of your power plants to the industry." And the plant

15   managers, which they'd said for many years to McKinsey, is

16   "You can't benchmark our plants.  No two plants are exactly

17   the same."

18          And Capstone came to them and said, "Well, you've

19   got a number of plants within your portfolio.  If we can

20   normalize for the fact that these plants are not the same,

21   let's do that and let's figure out which plants are more

22   efficient than the others, and perhaps we can learn from

23   each other." And that's exactly what they did.  And what

24   they started to figure out was certain plants did certain

25   things more efficiently than others.  But what they also

1    figured out was all the plants go down at exactly the same

2    time for their turnarounds or for when they do maintenance

3    ahead of the peak generation season.  And from the work that

4    Capstone did, they actually pointed out to the plant

5    managers that actually when you come up from a turnaround,

6    you actually don't run very well for the first few weeks.

7    You've taken this big machinery down.  It was running at

8    high temperatures, you've cooled down all this metal, you

9    take it back up to temperature and it has some teething

10   problems.

11            So where they thought they were taking it down

12   ahead of the summer and getting it prepared for the summer,

13   what they were doing was, they were doing that but when it

14   came back up it wasn't just reliable as if it had been

15   running for a few months beforehand.  So they actually

16   figured out that you'd be better off not taking the plants

17   down immediately before summer.  But also, all of our

18   plants, because they were run independently, would all go

19   down at exactly the same time for their pre-summer

20   maintenance.  Well, what were you doing?  You were bidding

21   up the market for independent contractors because you

22   couldn't get access to labor.  So if we staggered it, we

23   would pay less because we wouldn't be competing for the

24   labor in the market and have to pay so much overtime.

25            But also, all the plants were going down at the

1    same time.  So power prices in Texas were going up ever so

2    slightly because all of our plants were out.  Well that

3    meant that we weren't even there in the market to benefit

4    from that.  So we staggered the outages.  And those are the

5    types of things that through the analysis they would start

6    to determine.  So that's just a small example of one of the

7    many projects that they worked on.

8    Q    Thank you.  And I want to come back to the monitoring

9    fee that KKR was paid under the management agreement.

10   A    And, sorry, just to be clear...

11   Q    Yeah?

12   A    KKR Capstone wasn't paid under the monitoring fee.  It

13   had its own fee arrangement, which it negotiated with the

14   company.  We don't mandate that our companies use KKR

15   Capstone.  The CEOs and the management teams have to want to

16   do that and embrace it, and if they prefer to work with

17   McKinsey, they're welcome to.

18   Q    Okay.  And so the fees then that KKR Capstone charges

19   for the kinds of services that you gave an example of, they

20   don't provide any economic benefit to you and your

21   colleagues at KKR in the private equity business?

22   A    No.  The consultants who work at KKR Capstone own the

23   business.  They're the ones that benefit from that.

24   Q    Okay.  Now, with respect then to the monitoring fee

25   that you described earlier, how does that compare in your

1   experience to the magnitude of the monitoring fees that KKR

2   charges in other deals outside of EFH?

3   A    It's consistent with those deal fees.  And given the

4   size of this business and the amount of time that it took,

5   on a relative basis this is consistent with the types of

6   fees that we and others in the industry take for these types

7   of services.

8   Q    Did KKR perform valuations of its investment in EFH?

9   A    Yes.

10  Q    Why did it do that?

11  A    We have a requirement to report to our investors on a

12  quarterly basis the valuations of our portfolio and each of

13  the companies in that portfolio.  In addition to which KKR's

14  balance sheet for a public company -- we have a balance

15  sheet -- our balance sheet is an investor in EFH.  And so

16  we're required for SEC purposes to report that.

17  Q    Okay, so you make public reporting of the valuations of

18  your investment in EFH?

19  A    I don't know if we currently do, just given that it's

20  now being written off.  But we did.

21  Q    But prior to the bankruptcy filing you were doing that?

22  A    That's my understanding.  Correct.

23  Q    And how frequently were those public reports and

24  evaluations?

25  A    Quarterly.

1    Q    And what do you mean when you say KKR's balance sheet

2    invested in EFH?  What does that mean?

3    A    Well, originally KKR took an entity public called KKR

4    Private Equity Investors.  That entity made an investment

5    into EFH.  That entity ultimately merged into KKR.  So,

6    we're owned by shareholders today -- the employees are

7    shareholders in the business, but there's a balance sheet

8    there and that KKR -- that public company has an investment

9    in EFH in addition to the funds that we manage and some co-

10   investors who came in alongside that into EFH.

11   Q    I want to ask you about the way in which KKR does its

12   valuations internally.  You're familiar with the

13   methodologies employed and how it employs them?

14   A    Yes.

15   Q    Can you describe that generally for the benefit of the

16   Court?

17   A    The valuation methodology?

18   Q    Well, just what methodologies in general do you employ

19   and how are they put together, if they are internally,

20   before they're reported publically?

21   A    Yeah, so, KKR has a very formal valuation process that

22   was agreed to with Duff & Phelps and Deloitte.  Duff &

23   Phelps and Deloitte review all the valuations that we

24   provide.  Deloitte is KKR's auditor, and Duff & Phelps is a

25   valuation firm that we've engaged to help oversee all the

1    valuations that we do to make sure that they're appropriate

2    and consistent.  So we've agreed with them the right

3    methodologies that should be used for valuing private equity

4    investments, and we've agreed upon the fact that we should

5    be using a comparables-based approach blended with a

6    discounted cash flow to reflect both the comps in the market

7    as well as discounted cash flows related to the future

8    performance of the business.

9           With respect to EFH, it breaks down into really

10   three components.  We use a market-based, comp-based

11   approach where the comps are trading, and we look at the two

12   different component businesses of EFH, namely, Oncor, which

13   is a very different business from TCEH.  And we also use

14   discounted cash flows, and there are two types of discounted

15   cash flows we use.  One is what we call a market-based

16   approach where we look at the forward curve for power prices

17   to the extent that the forward curve is liquid, and use a

18   proxy for what the market thinks they're after.  And we use

19   the company's long-range plan projection as the operating

20   case that we use.

21          There's one discounted cash flow model that uses

22   those projections, and then we use another discounted cash

23   flow model which we call our "Fundamental View", which takes

24   a range of commodity prices that KKR feels are a reasonable

25   range, and it's informed by outside research analysts and

1    people who are experts in the various commodities.  And we

2    run that through a discounted cash flow model.  So it's a

3    combination of looking at those three valuation approaches

4    and weighting each of those three gives us our ultimate

5    valuation.

6              THE COURT:  I'm sorry.  When you do the comparable

7    companies on the TCEH level, do you do EFH versus TCEH, or

8    do you break TCEH down into TXU and Luminant?

9              MR. SMIDT:  There are not that many companies for

10   which there are perfect comps for a retail business because

11   there aren't any publically traded retail businesses.  There

12   was one called Reliant at one point in time, but it was a

13   very small universe.  So we've tended to try to look for

14   businesses that are deregulated and try -- deregulated

15   generation businesses or businesses that have a retail

16   component like NRG.  But it's quite hard to find a

17   reasonable universe of comparables if it was broken down

18   into the two constituents, Luminant and TXU Retail, so we

19   tended to look at TCEH as a whole.

20   Q    Once these different methodologies are employed for

21   your quarterly valuation, is there then a process within KKR

22   to bring them together and awry that, and approve for

23   dissemination a final valuation?

24   A    Yes.  So, the way the process works is first, the

25   team's responsible for preparing the valuation; we then

1   submit the valuation into what we call our "Valuation

2   Group".  Then there's a conference call or a meeting set up

3   with Duff & Phelps and Deloitte.  They've had time to review

4   the valuation prior to that.  We get on a conference call,

5   meet with them, and they go through their detailed questions

6   on the valuation.  We're then required to answer their

7   questions, and if they ask us to reflect a change, make the

8   change that they asked us to reflect.  That then gets

9   submitted to our Valuation Committee.  Our Valuation

10  Committee, which includes the head of our Portfolio

11  Management Committee, and our Portfolio Management Committee

12  monitors the performance of each of our portfolio companies.

13  And the reason he's on our Valuation Committee is to make

14  sure qualitatively that the things and the insights that

15  he's seeing around the performance of the business are

16  incorporated in what the valuation is ultimately reflecting.

17  And the Valuation Committee also includes our CFO.

18          Our Valuation Committee reviews the valuation.

19  That is sent to -- any comments they have may be sent back

20  to the team and asked for any changes to be reflected.  And

21  then ultimately we submit a final valuation that we're

22  comfortable with.  That ultimately then gets sent to the

23  Audit Committee.  And on EFH -- the head of our Audit

24  Committee is Joe Grundfest from Stanford.  And he has on

25  occasions actually asked to speak to the EFH team to

1    understand our valuation methodology and how we arrived at

2    the value to make sure that he was comfortable with the way

3    we were thinking about a commodity-exposed business and he

4    had some thoughts and insights as well.  So, hopefully, that

5    describes the process.

6    Q    So, after applying the methodologies that you describe,

7    knitting them together and going through the internal

8    vetting and approval process, KKR is then in a position on a

9    quarterly basis to report publically through the SEC process

10   and to your investors your valuation of your investment in

11   EFH.  Is that right?

12   A    Correct.

13   Q    Did that value, that is of your investment EFH, change

14   over time following the LBO?

15   A    Yes.

16   Q    Did it decline?

17   A    Yes.

18   Q    Why, in general?

19   A    There were a few things that impacted the business.

20   Out the gates, actually, natural gas prices increased and

21   that was looking very favorable; but then at the time, we

22   experienced a number of headwinds.  The first is the

23   technology associated with Shale gas.  We hadn't appreciated

24   at the time of our investment, and I think nor did the

25   market because your natural gas prices were high -- just the

1    impact that they would have and the ability to unlock a

2    natural gas resource in the United States.  As that started

3    to happen, we started to see natural gas prices decline.

4    And that decline in natural gas prices impacts the price of

5    power in Texas.

6            We also had the financial crisis and economic

7    recession in the United States, which impacted the demand

8    for power in Texas.  So with less demand, that impacted the

9    heat rate, which is the efficiency of the marginal plant, so

10   that impacted the price of power.  We also had a policy in

11   Texas to promote renewable power, namely, wind.  And while

12   wind was not on its own standalone economic at that point in

13   time, it was subsidized in two ways:  One by the tax credits

14   the federal government was providing, and then, secondly,

15   the fact that the regulator in Texas was allowing for

16   transmission to be built and put into rate base.  And all of

17   that wind that came on line that was subsidized effectively

18   brought in a significant amount of generation that had zero

19   marginal cost.

20           All of those things impacted the price of power in

21   Texas, and those were some significant headwinds that we

22   faced that drove down the value of TCEH.  On the side of

23   Oncor, the one benefit we got is with the Texas regulators

24   promoting all of this wind generation in West Texas, and the

25   construction of transmission.  That transmission

1    construction allowed Oncor to get increased rate base.  And

2    so the Oncor value increased over time, and the TCEH value

3    decreased over time.

4    Q    Did there come a point in time when you believed that

5    KKR would lose its investment in EFH entirely?

6    A    There started to become a time where they started to

7    look like there were outcomes where, yes, we could lose our

8    value.

9    Q    Let me go back then.  There's been testimony about

10   different transactions the company engaged in in the 2009

11   timeframe.  So let me go back to 2009, and during that

12   period of time, did you believe you were at a high risk of

13   losing the entirety of KKR's investment in EFH?

14   A    No.

15   Q    How about in 2010?

16   A    No.

17   Q    2011?

18   A    No.

19   Q    Did KKR ever mark down its investment in EFH to zero?

20   A    Yes, when we filed for bankruptcy.

21   Q    And that was April of 2014 or thereabouts?

22   A    Correct.

23   Q    When you did that?

24   A    Correct.

25   Q    Why did KKR not mark its investment in EFH down to zero

1    sooner than that?  At any point earlier?

2    A    Towards the very end, when we saw the issues with

3    respect to TCEH and the amount of debt on TCEH, the value of

4    Oncor had appreciated so significantly during this period of

5    time that there were instances where we, through our

6    ownership stake in EFH, could still get value in Oncor

7    because the value of Oncor exceeded the value of the

8    (indiscernible) EFIH and of EFH.  So it would've been

9    difficult to navigate all of that, given the impairment at

10   TCEH.  But there was an ability to realize that.

11   Q    Let me show you -- and can we pull up -- it's UCC

12   Exhibit 289, which is in evidence, Your Honor.  And if you

13   could blow up the to/from at the very top so we can see that

14   more clearly.

15             THE COURT:  Is this an exhibit?  Can you refer to

16   the exhibit--?

17   Q    It's toward the back, very back.  It should be in the

18   very back of your binder, Mr. Smidt.  289.

19   A    289, got it.  Thank you.

20   Q    Are you there?

21   A    Yes.

22   Q    Okay.  So the Court has seen this already but I'd like

23   to draw your attention there.  This exhibit reflects that

24   this is an email dated April 1, 2010 from you to Henry

25   Kravis and George Roberts, correct?

1    A    Yes.

2    Q    And who are Kravis and Roberts?

3    A    They're the co-CEOS and co-chairmen of KKR.

4    Q    Okay.  And so you recognize this as an email you sent

5    to them back at that time?

6    A    Yes.

7    Q    If you turn to the second page, the last full paragraph

8    headed "Oncor Valuation" -- you can pull that out.  Do you

9    see that?

10   A    Yes.

11   Q    And the Court's attention earlier in these proceedings

12   was drawn to the second sentence where you wrote "At the

13   current time there is 1.5 billion to 2.5 billion of debt in

14   excess of that equity value." Do you see that?

15   A    Yes.

16   Q    And that equity value is referring to what in your

17   email here?

18   A    In the equity value of Oncor.

19   Q    Okay.  In this email then are you telling your

20   colleagues at KKR that EFH is insolvent?

21   A    No.

22   Q    What was your view at the time?

23   A    EFH was not insolvent.

24   Q    And why is that, if you're reporting that there's some

25   amount of debt in excess of equity value -- how is it you

```
1    can say that EFH was not insolvent at that time?

2    A    Well, this email -- and I can't recall the specific

3    circumstances around this email -- but if I read the first

4    few lines of an email, it says, "Per your request, attached

5    please find the sum of the past valuation of EFH", and that

6    three methodologies that have been used for this.

7            I'm assuming or surmising that there was a request

8    made from George Roberts to actually see the specific

9    analysis.  But this was not the way, as I described to you,

10   that we valued EFH and the equity value in EFH; this is just

11   three different methodologies.

12           And this methodology is simply saying if you take

13   the equity value at Oncor and you look at the amount of debt

14   at EFH and you look at the amount of debt at EFIH, there

15   isn't enough equity value at Oncor to cover both of those.

16   But the important -- an important component is EFH has two

17   subsidiaries.  It has both effective subsidiaries.  It has

18   the Oncor side of the chain and the TCEH side of the chain.

19   So if TCEH contributed some equity value and Oncor

20   contributed some equity value together, they can exceed the

21   value of debt at EFH.  And so, this is just looking at one

22   specific side.

23           So this is not the right analysis to think about

24   it if you're focusing on whether there was equity value.

25   Q    Well, let's look at the -- briefly at the attachment to
```

1    the email, which is headed, EFH Corp. sum of the parts

2    valuation, and I want to take you to the bottom portion of

3    that table, which is headed Oncor illustrative valuation; do

4    you see that?

5    A    Yes.

6    Q    And do you see in particular that at the low and the

7    high range in bold, there is an EFH equity value in Oncor

8    number, and a total EFH/EFIH net debt number; do you see

9    that?

10   A    Yes.

11   Q    And in each instance, the high and the low, it appears

12   that the net debt exceeds the equity value in Oncor; is that

13   right?

14   A    Yes.

15   Q    Does this tell you anything about the solvency of EFH?

16   A    No.  As I said, this is how you get to the one and a

17   half to two and a half billion. But as I said previously,

18   this is only looking at the value of Oncor that's available

19   to cover the debt at EFH; it's not taking into account the

20   value at TCEH that's also available.  There are two sides

21   that actually contribute to the value at EFH.  And in this -

22   - at this point in time, you know, EF -- TCEH was

23   contributing value to EFH.

24   Q    Okay.  So we're in this -- this is, again, an email

25   from April of 2010, correct?

1  A    Yes.

2  Q    And at this time, KKR was routinely going through the

3  valuation process you described a few moments ago, and

4  publically reporting its view of the value of its investment

5  at EFH, correct?

6  A    Yes.

7  Q    And just to save time, can I draw your attention to

8  Paragraph 19 of your written direct -- which, I'm sorry to

9  say, is at the front of your book, so they need to flip back

10  -- and ask you what at year-end 2009, three months prior to

11  this email, take here a publically reported as the value of

12  its investment in EFH?

13          THE COURT:  I'm sorry, paragraph -- I'm sorry, I

14  lost you.

15          MR. MCGANN:  In Paragraph 19, Your Honor, which is

16  --

17          THE COURT:  Of the direct?

18          MR. MCGANN:  -- Page 7 of the written direct.

19  Yes, sir.

20          THE COURT:  Okay, thank you.

21  A    It was marked at 40 percent of cost.

22  Q    Okay.  And that valuation, that positive net equity

23  value, was a product of the valuation process that you

24  described on the record here.

25  A    Correct.

1    Q    And then at year end -- let's go nine months forward in

2    the time from the date of your emails, so year-end 2010,

3    what did KKR publically report as the value of its

4    investment in EFH?

5    A    Twenty percent of cost.

6    Q    Okay.  So to your recollection, Mr. Smidt, at any time

7    during the calendar year of 2010, did KKR come to the

8    conclusion, based on all of its analysis, that its

9    investment in EFH was a total loss or negative?

10   A    No.

11   Q    Let me, while we're at it, let me draw your attention

12   to Exhibit 268, UCC Exhibit 268, which is in the back of

13   your binder, and this is also in evidence, Your Honor.  Mr.

14   Smidt, this was shown to the Court earlier in these

15   proceedings.  Let me know when you get there and I have a

16   couple of questions for you.

17   A    Okay.

18           THE COURT:  I'm sorry, which exhibit?  I

19   apologize.

20           MR. MCGANN:  It's 268, UCC 268, and there's a copy

21   in the back of --

22           THE COURT:  I see it.  Thank you.  Sorry.

23           MR. MCGANN:  That's all right.

24   Q    And with this one, let's start with the second page,

25   about a third of the way down, the Keglevic email.

1    A    Okay.

2    Q    And if you would pull that out so we could look at it.

3    Yes, that's good.  All right, so there's a couple of emails

4    in this exhibit in the chain that's in this exhibit, Mr.

5    Smidt.  And you see this is an email from Paul Keglevic to

6    you and what appear to be -- well, who are these other

7    people that Mr. Keglevic is sending email to?

8    A    That's to me, Jack Weingart at TPG, Jason Ridloff who

9    used to work at KKR, Scott Lebovitz from Goldman, Jeffrey

10   Liaw who used to work at TPG, and Ken Pontarelli who is at

11   Goldman.

12   Q    All right.  So this is a Keglevic email dated November

13   18, 2010 to yourself and others affiliated with sponsors.

14   A    Correct.

15   Q    And take a look at what Mr. Keglevic writes in this

16   email, and tell us if you understood at the time what he was

17   proposing.

18   A    What he was proposing was to -- to do an exchange where

19   we use the debt capacity of EFIH to exchange debt from TCEH.

20   So base exchanged it from TCEH on the TCEH side of the chain

21   up into the debt baskets that were available at EFIH.

22   Q    All right.  And do you recall at the time what your

23   understanding was of why he would be proposing that?

24   A    Well, he was working on ways to extend the maturities

25   at TCEH and refinance the revolver at TCEH.

1   Q    All right.  What was your reaction to this proposal at

2   the time?

3   A    We were not in favor of this.  First of all, we weren't

4   in favor of exchanging debt from TCEH into EFIH, but we also

5   had the view that Oncor's value was going to appreciate over

6   time.  So we weren't looking to put more debt between our

7   equity and the value of Oncor.  We already had debt at EFH,

8   we already had debt at EFIH.  We weren't looking to take

9   debt from this side of the chain and move it in -- in over

10  here.  And so we had a back-and-forth discussion with Paul

11  where he would argue to us he didn't think that we were

12  going to get to have equity in Oncor in a reasonable

13  timeframe.

14          His view was outside of the current maturities of

15  the debt, so we should be more focused on extending the

16  maturities of debt, and we had a different point of view

17  that we -- that Oncor's was very valuable and there could be

18  instances where we do have value before then.  And so that

19  was the -- we had a different point of view, as you

20  mentioned.  He mentions here in his email that he doesn't

21  think there'd be value until 2017, and we had views that it

22  would be sooner than that.

23  Q    All right.  And if you then go to the next email in the

24  chain, it's an email from Fred Goltz to Michael MacDougall,

25  same day, November 18, 2010; do you see that?

1    A    Yes.

2    Q    You're not on this email, but who is Mr. Goltz and who

3    is Mr. MacDougall?

4    A    Michael MacDougall is from TPG, and Fred Goltz used to

5    be at KKR with me.

6    Q    All right.  And -- and Mr. Goltz writes in his one-line

7    email, "We need to put a stop to this now."  Right?

8    A    Correct.

9    Q    Do you have any idea what he's referring to?

10   A    I would be speculating, but I'm assuming that it's put

11   a stop to this chain of thought of trying to do an exchange

12   from TCEH into EFIH.

13   Q    At that time, do you recall whether any representatives

14   of the other sponsors favored more debt on the E-side and

15   reducing debt on the T-side in the way Mr. Keglevic proposed

16   at that time?

17   A    I recall that the other sponsors were likeminded with

18   KKR in the view that that was not a good idea.

19   Q    All right.  And if we go back -- and I'm sorry to do

20   this to you -- if you go back to the Keglevic email.  You

21   noted that one of the things Mr. Keglevic observed as his

22   opinion that there wouldn't be equity value at Oncor for

23   some time, right?

24   A    Correct.

25   Q    Do you -- was there ever an occasion where you

1    instructed or told Mr. Keglevic not to speak to the sponsors

2    or anyone else about equity value or solvency or anything of

3    that kind at EFH?

4    A    No.

5    Q    Do you recall whether any other sponsors, your

6    colleagues on the boards of directors or people that work

7    with you and the others at the sponsor companies, ever gave

8    any kind of instruction like that to Mr. Keglevic?

9    A    Not that I'm aware of.

10   Q    And in your experience over the years in dealing with

11   Mr. Keglevic, did he ever express any reluctance to share

12   his views about equity values, liquidity, solvency, whatever

13   the case may be with regard to the finances of the company?

14   A    Not at all.  He's -- he shares his views very openly.

15   Q    You're familiar with what's referred to as a liability

16   management program at EFH?

17   A    Yes.

18   Q    Can you just tell the Court, from your perspective,

19   what that was?

20   A    The liability management was a program to try and

21   reduce the debt at the company, to capture debt discount,

22   given the fact that certain of the debt was trading at a

23   discount and creditors were prepared to exchange that debt

24   into debt of a lower face amount at a different -- different

25   point in the capital structure, and also to extend

1    maturities.

2    Q    Did you, as a director at EFH, vote to approve the

3    transactions that made up the liability management program?

4    A    Yes.

5    Q    And some of those transactions were amends and extends?

6    A    Correct.

7    Q    The Court's heard some testimony about the amend and

8    extend transactions.  At the time that you voted to approve

9    them, presumably you believed they were good for the

10   Debtor's business to engage in those transactions?

11   A    Yes.

12   Q    Why is that?

13   A    Well, we have a business here that's exposed to

14   commodity prices.  And so, commodity prices are cyclical --

15   they go up, they go down -- and this business benefits when

16   commodity prices go up, it is hurt when commodity prices go

17   down, and time is very valuable to a business like that.  If

18   we can continue to operate this business and allow it to

19   exist during a period where commodity prices recover, or

20   even importantly, when the State of Texas reaches the point

21   where there isn't sufficient power generation in the market

22   and you have to have new power plants built.

23           In order to have new power plants built, you have

24   to have a power price in the market that draws new entrants

25   for building a power plant, and that power price would have

1    to be relatively high.  And if you could experience that

2    high power price, that would mean very good cash flows and

3    returns to the business.  So even getting to a point where

4    natural gas prices were higher, or alternatively, when the

5    market was short power and you needed to incent new entrants

6    to build new plants, both of those would create an

7    opportunity to earn significant cash flows and the business

8    would perform very well again.

9              As an energy investor, I've observed what happened

10   to Calpine.  It went into bankruptcy and it came out the

11   other side with a lot of equity value.  So that's an

12   illustration of or an example of a business that, you know,

13   at one point, had, you know, no equity value, and at the

14   next point had a lot of value.  And so, time and liquidity

15   are extremely valuable to a business like this.

16   Q    During the time when the board was reviewing and

17   ultimately approving proposals for the liability management

18   program transactions, did you come to the conclusion that

19   the company should instead file for bankruptcy?

20   A    No.

21   Q    And how about in 2009 specifically; did you ever come

22   to the conclusion that the company should file for

23   bankruptcy?

24   A    No.

25   Q    Same question for 2010.

1    A    No.

2    Q    2011?

3    A    No.

4    Q    Do you think today the company would have been better

5    off had you filed for bankruptcy in 2009?

6    A    No.

7    Q    Why not?

8    A    Well, always 20/20 hindsight is perfect vision.  But

9    from my standpoint, if you look, this business has been able

10   to continue to operate extremely well over the last several

11   years.  We've been able to service our debts, pay our

12   creditors, keep our employees in place.  I don't see any

13   benefit that would have accrued from filing for bankruptcy

14   then, other than potentially even more fees to all of the

15   various advisors that are involved in the process.

16   Q    And during the time period 2009 to 2011, during the

17   liability management program transactions, did you -- did

18   KKR conclude that its investment -- equity investment -- in

19   EFH was positive?

20   A    Yes.

21   Q    Are there -- are there situations where your interest

22   as a member of KKR and the interest of EFH, which you

23   represent as a member of the board, have diverged?

24   A    Yes.

25   Q    How often has that occurred?

1   A     Very seldom.

2   Q     When has it occurred?

3   A     Instances where I can think of are where the company is

4   employing KKR Capital Markets.  We -- KKR -- has an

5   investment in a human resource firm that provides human

6   resource services called Northgate.  And that was -- the

7   company had a relationship with Northgate and we excused

8   ourselves from being involved in those discussions.  So

9   there are, you know, instances where we have conflicts like

10  that.

11  Q     All right.  And did there come a time when the company

12  -- when management determined it should look at whether the

13  company had legal claims against the sponsors, including

14  KKR?

15  A     Yes.

16  Q     And is that an instance where interest diverged?

17  A     Yes.

18  Q     How did you -- process-wise, how did you handle that

19  when that arose?

20  A     There's a separate committee that was set up to review

21  that that didn't include the sponsors, and so we were not

22  involved in interacting with anyone -- well, I shouldn't say

23  that.  Sidley Austin, who was engaged to conduct the

24  interviews and the investigation -- I did interact with them

25  because they interviewed me.  Aside from that interaction, I

1    wasn't involved in any other deliberations about whether it

2    was appropriate to let the statute of limitations expire on

3    a number of the various claims that they were evaluating?

4    Q    Okay.  And this was a period prior to the time EFH

5    filed for bankruptcy, right?

6    A    Yeah.  This was something that the -- goes to Stacey

7    Dore' and the board.  They knew that there was some statute

8    of limitations that were expiring associated with certain

9    transactions related to the sponsors, and they did not want

10   to just passively let those statute of limitations expire so

11   they engaged Sidley Austin and set up a special committee to

12   view all of the different interactions with the sponsors to

13   see whether they needed to register any claims before that

14   statute of limitations expired.

15   Q    You said kudos to Stacey Dore'.  Does that mean you

16   were supported at the time of the decision to engage in that

17   investigation?

18   A    Yeah.  I think it was -- it was in the interest of the

19   -- she was serving the company and she's supposed to do, and

20   it was the company's duty to evaluate that.

21   Q    Did you or anyone -- any of the other directors

22   affiliated with sponsors -- do anything to impede or resist

23   the decision of management to retain Sidley & Austin and to

24   engage in the investigation about whether the company had

25   claims against KKR and Goldman Sachs and TPG?

1    A    No.  We offered our assistance in terms of making

2    myself and other people from KKR available and making that

3    document available.

4    Q    Okay.  And then other than being a source of

5    information when it came to questions that the lawyers at

6    Sidley & Austin had, did you play any other role in the

7    management at Sidley's investigation, the way it conducted

8    itself and how it reported to the company?

9    A    No.  I had no interactions with Sidley & Austin or any

10   discussions about them, other than the one time they

11   interviewed me.

12   Q    All right. When Sidley & Austin reached whatever

13   conclusions it did, did they report them to you or your

14   colleagues at KKR in any fashion?

15   A    I just remember being updated at a board meeting that

16   there was a decision made not to pursue the claims, so

17   nothing else.

18   Q    Okay.  And you received that report after Sidley &

19   Austin had consulted with non-sponsor directors outside your

20   presence; is that right?

21   A    Correct.

22   Q    Since the time of the bankruptcy filing, have you

23   remained engaged with the company; and if so, in what

24   fashion?

25   A    I've been extremely involved.  I continue to attend

1    board meetings, and I continue to spend a significant amount

2    of time with the company on their operations.  We're

3    currently reviewing -- there are strategic things that

4    they're looking at.  In fact, there's a board call this

5    morning that I'm missing to review one of the strategic

6    things that they're evaluating right now.  And we continue

7    to be very actively involved in helping them with the

8    bankruptcy, and trying to figure out a way to navigate this

9    in a consensual manner.

10   Q    I've put back up Smidt Demonstrative Number 1 that

11   reflects your attendance at board meetings, and it shows an

12   increase of formal board meeting activity in 2014-2015,

13   correct?

14   A    Correct.

15   Q    And that's a reflection of what you're discussing right

16   now?

17   A    Yes.

18   Q    And is the amount of time --

19   A    Oh, it's -- these are the formal board meetings where

20   we're asked to make decisions or -- on items.  There's a

21   significant amount of time that's just related to spending

22   time with the various advisors for the company on how to

23   navigate the various issues and a strategy around that.

24   Q    So outside of formal board meetings, is it the case

25   that the time you'd spent with the company and on

1    restructuring efforts has also gotten busier?

2    A    It's been busy for a long time, so I don't know about

3    busier.

4    Q    Did you personally negotiate with creditors during the

5    restructuring process?

6    A    Yes.

7    Q    In what fashion?

8    A    Before the -- well, there are a couple of times.

9    Before we ultimately filed, and when we made the interest

10   payment in October, 2013, I was involved with trying to

11   encourage the creditors at EFH and at TCEH to enter into

12   what was then called Project Olympus, which would have been

13   a consensual plan where we, the sponsors, would have given

14   our equity to the creditors both at EFH and at TCEH.  And

15   so, I spent quite a bit of time on conference calls with

16   Fidelity, and in face-to-face meetings and conference calls

17   with both Oaktree and Apollo.  I also met with Angelo Gordon

18   and I'm sure there are others, but we spent a lot of time

19   trying to broker that settlement.

20   Q    All right.

21   A    [Indiscernible] again, when we entered into the current

22   or the first RSA when we filed -- not this new plan -- there

23   was a point in time where the TCEH first lien creditors were

24   very set on taking their assets and causing there to be a

25   stranded tax at EFH.  And so, George Roberts and myself met

1   with senior members at Apollo to discuss with them the fact

2   that we did not think that was a good idea, and also had a

3   telephone call with the very senior members of Oaktree to

4   encourage them we didn't think that was a good idea.  And

5   that ultimately caused them to agree to not try and take the

6   TCEH -- their TCEH assets and get a tax step up and stranded

7   tax at EFH.

8   Q    Did you keep company management and fellow board

9   members apprised of these activities; were they aware as

10  they were happening?

11  A    Absolutely.  We had a process.  We agreed that Paul and

12  Stacey should be the point people on all of these. John

13  Young, given his personality, liked to be updated too.  But

14  after any meeting or call, we had a practice of giving Paul

15  Keglevic a call and making sure he was updated.  And in the

16  instance of some of those more material interactions, I did

17  call John Young to update him too.

18  Q    Were you personally involved in negotiating any aspects

19  of the plan that's currently before the Court for

20  confirmation?

21  A    I was not.

22  Q    Your advisors play any role -- when I say your

23  advisors, I'm referring to Blackstone and Wachtell -- that

24  KKR is and the other sponsors that are separately retained;

25  correct?

1    A    Yes.  They were -- they were actively involved in that.

2    Q    All right.  And they kept you apprised, I take it, on a

3    regular basis with regard to their activities?

4    A    They did, and we also encouraged them to make sure they

5    were keeping Kirkland & Ellis and Evercore updated too,

6    because obviously this was very important to the overall

7    scheme of things.

8    Q    Did ultimately you -- did you vote to approve the plan?

9    A    I did.

10   Q    One of the -- well, let me ask you -- why -- why did

11   you vote to approve the plan; why did you think this plan

12   was an appropriate plan to go to the Court and seek

13   confirmation?

14   A    Well, this plan was the only plan that we had in front

15   of us at the time.  And this plan -- one of the most vocal

16   and litigious constituents here, which is the TCEH

17   unsecureds -- this plan helps get their consent and

18   agreement to move forward, and so were able to get a number

19   of very key constituents on board that will reduce just the

20   complexity and ongoing litigation and cost associated with

21   this bankruptcy, in addition to which it pays off all the

22   creditors on the EFH/EFIH side of the house.

23        So this was the best plan, the only plan we had,

24   and a plan which achieved peace with a lot of the

25   constituents, which is important to help try to get this

1    company out of bankruptcy and reduce the significant cost

2    burden we're experiencing.

3    Q    Some of the constituents that achieve peace here are

4    the sponsors, right?

5    A    Yes.

6    Q    That part of the settlement that we're also here in

7    front of the Court on today would provide releases to KKR

8    and TPG and Goldman Sachs, correct?

9    A    Correct.

10   Q    Let me turn to -- turn your attention to -- let me just

11   do this in the interest of time here, Mr. Smidt -- in your

12   written direct at Paragraphs 37 through 40 -- I'll give you

13   a second to get there.

14   A    Okay.

15   Q    All right.  And you see there in general you set forth

16   some of the economic consideration that the sponsors are

17   providing in connection with the settlement; is that right?

18   A    Yes.

19   Q    Would you have recommended to KKR and, for that matter,

20   in your judgment, would KKR have agreed to provide any of

21   this consideration if it wasn't receiving a release in

22   exchange?

23   A    No.

24   Q    Why not?

25   A    Well, because this is real value that we have that we'd

1    be giving up with nothing in return.  So, you know, we're

2    entering into this agreement, and my understanding -- I

3    wasn't party -- I wasn't specifically there.  But from the

4    updates we got from Evercore and Kirkland & Ellis, who were

5    in negotiating with TCEH unsecured and their group that are

6    looking to acquire Oncor, they were fighting entering into

7    this agreement because the company has a fiduciary out and

8    requires the approval of the bankruptcy court.  So at the

9    end of the day, they were saying why would I sign up for

10   this?  It's one-sided, where you could go exercise your

11   fiduciary out.  I've agreed to cap what I'm entitled to.

12   And yet, the sponsors could end up getting meaningful equity

13   value.

14            And so, the way we got them comfortable with that

15   was that Kirkland & Ellis and Evercore came to the sponsors

16   and said, look, we can't agree to give up that fiduciary out

17   and we know it's going to have to be subject to the

18   bankruptcy court approval.  So one way we could get them

19   comfortable is, you know, you're never going to try take

20   that other alternative and capture that value because if you

21   give up that value to them, it gives them a sense of

22   security that should that ever play out in that way, they're

23   actually the party that's going to benefit from that.  So

24   we're giving up that upside should it ever come to be that

25   they're worried and they were worried about that risk.  We

1    gave that up.  And in return for giving that up, we wanted

2    something in return and those were our releases, in addition

3    to the other two, you know, elements we're giving up, so why

4    would we give those up without getting anything in return?

5         MR. MCGANN:  Thank you, Mr. Smidt.  That's all I have,

6    Your Honor.

7         THE COURT: Mr. Kleinhaus?

8         MR. KLEINHAUS:  Your Honor, we coordinated in advance,

9    so I may have redirect.  I'm not going to have more direct.

10   Thank you.

11        THE COURT:  Okay.  Thank you.  We'll take a short

12   recess before we start cross-examination.  Sir, you may not

13   discuss the substance of your testimony with any person

14   during the break.  Okay?  Five or 10 minutes.

15        (Recess)

16            CLERK:  All rise.

17            THE COURT:  Please be seated.  Give me just a

18   minute, please.

19            MR. LIEBESMAN:  Sure.

20            THE COURT:  Okay, thank you.

21            MR. LIEBESMAN: Good morning, Your Honor.  For the

22   record, Sid Liebesman from Montgomery McCracken on behalf of

23   conflicts counsel on the E-side Committee.  And the binder

24   that Your Honor just took off the ledge there has been

25   provided to your clerk, and the witness has it in front of

1    him as well.

2            THE COURT:  Okay.

3            MR. LIBESMAN:  Opposing counsel has it, as well.

4    And those are the exhibits, for the most part, that we will

5    be using on cross-examination this morning.

6                    CROSS-EXAMINATION

7    BY MR. LIEBESMAN:

8    Q        Good morning, Mr. Smidt, good to see you again.

9    A        Good morning.

10   Q        You are a member of KKR and have represented KKR

11   on the EFH Corp board since the LBO, correct?

12   A        Yes.

13   Q        And you are currently --

14           THE COURT: I'm sorry, can you see?  Is there a red

15   light at the --

16           MR. LIEBESMAN:  It's green. Sorry, maybe I wasn't

17   fast enough.  There we go.

18           THE COURT:  Okay, thank you.

19   Q    You are currently on the board of EFH Corp, correct?

20   A    Yes.

21   Q    And you testified about this a little bit on your

22   direct, but just to make it clear, you're also currently on

23   the board of TCEH, correct?

24   A    Correct.

25   Q    But you didn't join the board of TCEH until 2012,

1    correct?

2    A    Yes.

3    Q    And that's because you replaced Mr. Goltz, another

4    former KKR representative who was a board member on TCEH.

5    A    Yes.

6    Q    Isn't it true that KKR considered its investment in EFH

7    a very significant investment?

8    A    Yes.

9    Q    And you personally invested in EFH at the time of the

10   LBO, correct?

11   A    Yes.

12   Q    In an amount that was extremely --

13            MR. KLEINHAUS:  Objection.  I think asking

14   questions in open court about personal investments is

15   gratuitous and unnecessary. It's a deposition transcript, so

16   I would object to soliciting testimony on this topic.

17            MR. LIEBESMAN:  Well, Your Honor, he is a member

18   of the board.  All I'm getting out -- I had no intention of

19   getting into the amount, although I have a right to.  I just

20   wanted to get out the fact that he personally invested in

21   the company, as well.

22            THE COURT:  I think it's fair game.  Objection

23   overruled.

24   Q    Without getting into the amount, Mr. Smidt, would you

25   agree that the amount that you personally invested was

1    extremely material to you at the time?

2    A    Yes.

3    Q    And other members of KKR also personally invested in

4    EFH at the time of the LBO, correct?

5    A    Yes.

6    Q    So preserving KKR's equity interest in EFH is very

7    important to you, isn't it?

8    A    Both -- it's not just the fact that I had a personal

9    investment.  The fact, you know, the firm made an equity

10   investment and we're representing our investors, and the

11   firm's balance sheet's very important for us to look out for

12   the interests of our investors, yes.

13   Q    The managers on the board of TCEH owed certain

14   fiduciary duties to that entity, correct?

15   A    Yes.

16   Q    And at the time of the filing of this bankruptcy,

17   TCEH's board had a representative from each of the three

18   sponsors on that entity's board, correct?

19   A    Can you say the question again?

20   Q    Sure.  Each of the sponsors, and there are three

21   sponsors, right, KKR, Goldman Sachs, and TPG.

22   A    Yes.

23   Q    So each of those sponsors had one representative on the

24   TCEH board.

25   A    Yes.

1    Q    And as a manager of TCEH, you were aware of the amount

2    of debt that it had throughout your tenure as a manager of

3    TCEH, correct?

4    A    So yeah, I'm not sure technically I was manager.  I was

5    a board member of TCEH.  I wasn't a manager.

6    Q    Okay, that's fine.  We can refer to him as a board

7    member.  So as a member of the board of TCEH, you were aware

8    of the amount of debt that TCEH had through your tenure on

9    that board.

10   A    Yes.

11   Q    And isn't it true that TCEH was insolvent when you

12   joined that board in 2012?

13   A    I can't recall exactly, but if the question is did the

14   debt of TCEH exceed the enterprise value of TCEH in 2012, I

15   think the answer is yes.

16   Q    And in fact, that never changed to today, correct?

17   A    That's correct.

18   Q    There was more debt on the T-side than on the E-side of

19   EFH, correct?

20   A    Correct.

21   Q    And would you also agree that there was more debt at

22   TCEH than at EFH Corp?

23   A    Yeah, the quantum of debt was 30-something billion down

24   at TCEH, and it was less than that at EFH, yes.

25   Q    At the close of the LBO, a board of directors was

1    formed for EFH Corp, correct?

2    A    Yes.

3    Q    And each of the three sponsors had three

4    representatives on that board of directors, correct?

5    A    Yes.

6    Q    So there were a total of nine, correct?

7    A    From the sponsors, yes.

8    Q    Yes.  If we take KKR, at the time of the LBO, it was

9    you, Mr. Lipschultz, and Mr. Goltz representing KKR on the

10   EFH Corp board, correct?

11   A    Yes.

12   Q    So would you agree that, with nine members of the board

13   being sponsor directors, the sponsor directors controlled

14   the EFH board?

15   A    What were the total number of directors on the board at

16   that point in time?

17   Q    Let's put it this way:  The sponsors had a total of

18   nine directors representing the sponsors, correct?

19   A    Yes.

20   Q    Isn't it true that at no time did the board of

21   directors of EFH Corp comprise of more than 18 individuals,

22   correct?

23   A    That's correct.

24   Q    And you testified a little bit on direct, but you agree

25   that as a member of the EFH Corp board, you have divergent

1    (indiscernible), as a result of you also being a member of

2    KKR, correct?

3    A    Yes.

4    Q    You are the only representative from KKR that's been on

5    the EFH Corp board of directors from the time of the filing

6    of the LBO to today, correct?

7    A    Marc Lipschultz has been on the board from the time of

8    the LBO to today.  On the EFH board?

9    Q    The EFH board.

10   A    Marc Lipschultz has been on since the time of the

11   buyout until today.

12   Q    Mr. Lipschultz didn't resign from --

13   A    I'm sorry, he did resign. Sorry, you're correct.

14   Q    So he resigned in January of 2014, correct?

15   A    Correct, sorry.

16   Q    So you're the only one that has served continuously

17   from the LBO to today from KKR, correct?

18   A    Correct.

19   Q    Isn't it true that as a director of EFH Corp, you owed

20   fiduciary duties to that company?

21   A    Yes.

22   Q    Among those duties was to look out for the interests of

23   EFH Corp and maximize the value of the company, correct?

24   A    There were -- to maximize the value of the enterprise,

25   yes.

1    Q    Do you also agree that among those duties was to look

2    out for the interests of EFH?

3    A    Yes.

4    Q    Do you agree that as a director of EFH Corp, you must

5    also exercise independent judgment respecting EFH Corp

6    matters?

7    A    My understanding is to exercise, yes, independent

8    business judgment with respect to EFH.

9    Q    I want to talk a little bit about the LBO in 2007,

10   okay?

11   A    Okay.

12   Q    As a result of that LBO, isn't it true that the Debtors

13   had approximately $36 billion in debt?

14   A    Yes.

15   Q    Please turn to Exhibit 291 in the binder there in front

16   of you with the blue cover.  Exhibit 291, Mr. Smidt, is an

17   indemnification agreement dated as of October 10, 2007,

18   correct?

19   A    Yes.

20   Q    And that's about the time of the closing of the LBO,

21   correct?

22   A    Correct.

23   Q    And the parties signing this indemnification agreement

24   include EFH Corp and Texas Energy Future Holdings LP,

25   correct?

1   A    Yes.

2   Q    And the Texas Energy Future Holdings LP was an entity

3   formed by the sponsors to own EFH Corp, correct?

4   A    Yes.

5   Q    So those parties signed this document purporting to be

6   an indemnification agreement with the sponsors, correct?

7   A    Yes.

8   Q    It is your understanding, is it not, that you

9   personally, and KKR, are both indemnified under the terms of

10  this document?

11  A    Yes.

12  Q    And EFH Corp and Texas Energy Future Holdings are the

13  indemnifying parties, correct?

14  A    Yes.

15  Q    Isn't it true, Mr. Smidt, that you signed this

16  indemnification agreement on behalf of Texas Energy Future

17  Holdings LP as its vice president and treasurer?  I'd like

18  to direct your attention to the back of that document, Page

19  Number 130.  This is your signature page?

20  A    Yes.

21  Q    So you signed an indemnification agreement on behalf of

22  an indemnifying party, giving indemnification rights to you

23  and to KKR, isn't that true?

24  A    Yes.

25  Q    Mr. Lipschultz also signed this indemnification

1   agreement, correct?

2   A    Yes.

3   Q    And Mr. Lipschultz, at the time, was on the EFH board

4   of directors, correct?

5   A    Yes.

6   Q    He was also a sponsor director from KKR, correct?

7   A    Yes.

8   Q    And Mr. Liaw, Jeffrey Liaw, also signed this

9   indemnification agreement, correct?

10  A    Yes.

11  Q    And he signed the indemnification agreement on behalf

12  of EFH Corp, correct?

13  A    Yes.

14  Q    At the time, Mr. Liaw was an employee of TPG, was he

15  not?

16  A    Yes.

17  Q    And he was also a sponsor director representing TPG.

18  A    Yes.

19           THE COURT: I'm sorry, I'm going to interrupt.  I

20  have a process question.  This is marked 291.  Is this DX

21  291?

22           MR. LIEBESMAN:  No, this is the committee --

23           THE COURT:  Okay, I just --

24           MR. LIEBESMAN:  ECX 291, Your Honor.

25           THE COURT:  Okay, I'm just looking at the tabs you

1  gave me, and I've got some DX numbers, I've got just

2  numbers, and I've got some ECX numbers.  So I just want to

3  make sure --

4          MR. LIEBESMAN:  Your Honor, all of the exhibits in

5  the binder are Committee exhibits, ECX, except for those

6  that specifically state DX.

7          THE COURT:  Okay, thank you.

8          MR. LIEBESMAN:  I'm so sorry.

9          THE COURT:  That's okay.

10          MR. LIEBESMAN:  And they're all in numerical

11  order, just to make it easy, but the DX prefix identified

12  the Debtor's exhibits.

13          THE COURT:  Okay, and everything else is EUX,

14  correct?

15          MR. LIEBESMAN:  Or ECX, I believe.

16          THE COURT:  ECX.

17          MR. LIEBESMAN:  EUCC, Your Honor, I'm being told.

18          THE COURT:  EUCC, okay, very good.  Thank you.  I

19  apologize interrupting your train of thoughts.

20          MR. LIEBESMAN:  That's fine, Your Honor.

21  Q    So, Mr. Smidt, we were discussing Mr. Liaw signing this

22  purported indemnification agreement on behalf of EFH Corp,

23  correct?

24  A    Yes.

25  Q    And at the time, he was an employee of TPG and sat on

1    the EFH Corp board.

2    A    Correct.

3    Q    So similarly, Mr. Liaw signed on behalf of an

4    indemnifying party, indemnifying him personally and TPG,

5    correct?

6    A    Correct.

7    Q    And separately, you also approved this indemnification

8    agreement on behalf of EFH Corp by way of a written consent

9    on October 10th, 2007, correct, on behalf of the board?

10   A    Yes.

11   Q    And at the time EFH Corp and the sponsors signed this

12   purported indemnification agreement, the parties also signed

13   a management agreement, correct?

14   A    Yes.

15   Q    And that was discussed a little bit on your direct.

16   Could you turn, please, to the next exhibit there, DX 339?

17   A    Okay.

18   Q    The document, DX 339 is the management agreement,

19   correct?

20   A    Yes.

21   Q    And as you testified on direct, the management

22   agreement provides for the payment of $35 million in fees

23   per year to the sponsors, with 2 percent annual increases,

24   correct?

25   A    Yes.

1    Q    And you testified in direct that we're at about $40

2    million a year today.

3    A    Correct.

4    Q    The management agreement also provides for the

5    reimbursement of certain expenses of the sponsors' in

6    connection with the services they perform under this

7    agreement, correct?

8    A    Correct.

9    Q    The advisory fee, the management fee, was to be paid

10   quarterly under the terms of this agreement, correct?

11   A    Yes.

12   Q    And this management agreement also reflects the payment

13   of a merger fee to the sponsors in connection with the LBO,

14   correct?

15   A    I think it's referred to -- yeah, correct.

16   Q    I'm sorry, if you look at Paragraph 3 on Page 2, it's

17   also on your monitor if it helps.

18   A    Correct.

19   Q    So, this management agreement also provides for a one-

20   time transaction fee in the aggregate amount equal to $300

21   million as the merger fee, correct?

22   A    Yes.

23   Q    Payable to primarily the three sponsors, correct?

24   A    Yes.

25   Q    And it says there that the KKR manager shall receive a

1    portion of the merger fee equal to over $107 million,

2    correct?

3    A    Yes.

4    Q    You signed this management agreement as well, correct?

5    A    Yes.

6    Q    And if you look towards the back of that document at

7    Page Number 227, you'll see your signature, and it's there

8    on the screen.  So you signed on behalf of Texas Energy

9    Future Holdings Limited Partnership, just like you signed

10   the indemnification agreement, correct?

11   A    Correct.

12   Q    And the Texas Energy Future Holdings LP was one of the

13   parties obligated to make payments consistent with this

14   agreement, correct?

15   A    So, can you say the name of that entity again?

16   Q    Sure. Texas Energy Future Holdings LP is a party to the

17   management agreement, correct?

18   A    Correct.

19   Q    You didn't sign on behalf of KKR, correct?  Instead,

20   you signed on behalf of Texas Energy Future Capital

21   Holdings.

22   A    Correct.

23   Q    And you also approved the management agreement on

24   behalf of the EFH Corp board, by way of the same written

25   consent dated October 10, 2007, that you approved the

1    indemnification agreement, correct?

2    A    Correct.

3    Q    And the $35 million annual advisory fee reflected in

4    this management agreement was payable to the sponsors

5    without regard to the amount of advisory services that were

6    provided, correct?

7    A    Correct.

8    Q    But you discussed at length in your direct that the

9    sponsors did provide, or happened to later have to provide a

10   lot of advisory services, correct?

11   A    Yes, but the expectation was that we would be providing

12   those types of services, consistent with the way we monitor

13   -- we call it a monitoring agreement and monitoring fee at

14   KKR -- consistent with how we monitor all of our

15   investments, and how active we are in that process.

16   Q    Well, the sponsors were more involved in EFH than a

17   passive shareholder, correct?

18   A    Absolutely.

19   Q    And the sponsors were very involved in TCEH's financial

20   affairs, as well, correct?

21            MR. MCGAAN:  Objection, vague, Your Honor.

22            THE COURT:  Vague?

23            MR. MCGAAN:  Vague.  To be involved in their

24   financial risk.

25            THE COURT:  Can you be more specific, please?

1          MR. LIEBESMAN:  Sure, Your Honor.

2    Q    The sponsors discussed TCEH's financials among

3    themselves, correct?

4    A    Yes.

5    Q    And the sponsors discussed the restructuring efforts at

6    EFH, correct?

7    A    When you say restructuring efforts, are you talking

8    about the bankruptcy filing?

9    Q    Yes.

10   A    Yes.

11   Q    And then before the bankruptcy filing itself, there

12   were discussions about a restructuring, correct?

13   A    Yes.

14   Q    During the entire time of KKR's investment in EFH, KKR

15   had a portfolio management committee, correct?

16   A    Yes.

17   Q    And you mentioned it a little bit in your direct

18   examination.  Isn't it true that one of the purposes of the

19   portfolio management committee was to help provide oversight

20   of KKR's portfolio companies?

21   A    I'm not sure exactly what you mean by the term

22   oversight.  They were to help internally at KKR.  They

23   helped review our different investments and the performance

24   of investments, and provided guidance to the deal teams who

25   were actually on those investments and represented on the

1    board.  The portfolio management committee very rarely

2    interacted with the actual management of our portfolio

3    companies.

4    Q    Do you recall being deposed on September 25th of this

5    year in New York?

6    A    Yes.

7    Q    Do you recall my asking you what the purpose of the

8    portfolio management committee was?

9    A    Yes.

10   Q    Can you turn to Exhibit 688, which is the very first

11   exhibit in the document, since it's your deposition

12   transcript?  I figured we'd be referring to it frequently.

13   A    Okay.

14        MR. MCGAAN:  Object to that, Your Honor.

15        THE COURT:  Sustained.

16   Q    Page 27, if you look at line eight, could you look at

17   that question and answer and please tell me if that

18   refreshes your recollection about what the purpose of the

19   portfolio management committee is?

20   A    Sorry, Page 27.

21   Q    Page 27.

22   A    I'm on 27 on the bottom right, not where it says Page

23   27.

24   Q    Yeah, Page 27 of the actual transcript.  It's Page 8 of

25   -- on the very bottom.  Top right page.  Look at the

1    question on Line 8 and your answer on Line 10.  Tell me if

2    this refreshes your recollection.

3    A    Yes.  I think that's consistent with the way I answered

4    the question today, I hope.

5    Q    So, then it's true that one of the purposes of the

6    portfolio management committee was to help provide

7    oversight.

8    A    Correct, in the manner that I said, oversight through

9    the deal professionals, not representation on the board.

10   Q    Okay.  In-person presentations were made to the

11   portfolio management committee by the EFH deal team

12   respecting the EFH investment, correct?

13   A    Yes.

14   Q    And written reports respecting the EFH investment were

15   also provided to the portfolio management committee by the

16   EFH deal team, correct?

17   A    Yes.

18   Q    And you were a member of the EFH deal team at KKR,

19   correct?

20   A    Correct.

21   Q    You still are, right?

22   A    Yes.

23   Q    And you personally had a practice of reviewing each of

24   these reports before being sent to the portfolio management

25   committee, correct?

Page 87

1    A    Correct.

2    Q    Please turn to Exhibit 277.

3    A    Okay.

4    Q    The very first page of the exhibit is the e-mail

5    transmitting.  If you turn to the next page, it's

6    transmitting the EFH Corp 2009 annual report, correct?

7    A    Yes.

8    Q    And the date of this report is February 16, 2010,

9    correct?

10   A    Yes.

11   Q    So this is a typical report submitted by the EFH deal

12   team to the KKR portfolio management committee respecting

13   KKR's investment in EFH, correct?

14   A    Typical from the standpoint of yes, it's typical, but

15   this is an annual report, so it's only submitted once a year

16   for each company at the very beginning of the year, and it's

17   to answer very specific questions that the portfolio

18   management committee sets up that are the same for every

19   investment.

20   Q    Okay, thank you.  Please turn to Page 7 of that

21   exhibit.

22   A    Okay.

23   Q    Under capital structure, isn't it true that EFH's

24   balance sheet was a primary area of focus for the EFH team

25   in 2009?

1    A    Yes.

2    Q    And it was also going to be a primary focus, actually

3    the top priority for 2010, correct?

4    A    Correct.

5    Q    And in the same paragraph of this annual report, the

6    EFH deal team informs the portfolio monitoring committee of

7    certain actions that were pursued in 2009.  "In order to

8    attempt to capture debt discount and extend maturities,"

9    including a TCEH amendment, an EFH debt offer, and the

10   issuance of new notes by EFH, correct?

11   A    Correct.

12   Q    Please turn to Page 13 of this exhibit.  If you look at

13   the very top, there's a Section 5, correct?

14           MR. KLEINHAUS:  Your Honor, I have an objection to

15   this page.  Would you mind taking that off the screen,

16   please?  We had an agreement, I thought, with the Creditors

17   Committee that part of this exhibit would remain

18   confidential.

19           MR. LIEBESMAN:  All right, fair enough.  We'll

20   remove it from the screens, but I do have a right under the

21   agreement to question the witness about it.

22           THE COURT:  All right, well let's not broadcast it

23   to the world.

24           MR. KLEINHAUS:  Yeah, I'll take it question by

25   question on the questions.  Thanks.

```
1    Q    Mr. Smidt, please look at the top of Page 13.

2    A    Yes.

3    Q    There is a section of this annual report that asks the

4    EFH deal team for a specific assessment of key members of

5    the management team, correct?

6    A    Correct.

7    Q    And the annual report submitted to the portfolio

8    monitoring companies are important reports from the

9    perspective of KKR, correct?

10   A    Yes.

11   Q    And you, as a member of EFH deal team, make sure that

12   you provide the information requested in as much candor as

13   possible, correct?

14   A    Correct.

15   Q    You're not going to mislead the portfolio management

16   committee of KKR, correct?

17   A    No.

18   Q    All right.  So in this section, where you're asked to

19   provide an assessment of key members of the management team,

20   if you look at the bottom footnote, there's an assessment of

21   Paul Keglevic, the CFO of the company.

22             THE COURT:  What's the relevance, before we get

23   into this?

24             MR. KLEINHAUS:  I have the same objection.

25             MR. LIEBESMAN:  Your Honor, one of the primary
```

1    arguments being made by conference counsel for the Committee

2    is the control that the sponsor directors exerted, and the

3    sponsors exerted over management of EFH, goes to really the

4    heart of the claims being asserted.  And you heard on direct

5    examination with Mr. Smidt how the Debtors are trying to

6    make it appear as if the decisions were being made in house

7    by the respective management team, when there's certainly

8    evidence to the contrary, and that is the basis, an

9    important basis of the claims that we are asserting exist.

10              MR. KLEINHAUS:  Your Honor, this paragraph with

11   internal comments relating to management I don't think has

12   any bearing on that issue.  And if Your Honor were to review

13   the paragraph, it would be clear that it's a matter of

14   commentary regarding management and really doesn't speak to

15   this question of control as to which (indiscernible) Mr.

16   Smidt.

17              MR. LIEBESMAN:  Your Honor, Mr. Smidt was asked on

18   direct about Mr. Keglevic's role, especially vis-à-vis the

19   banks and negotiating these various (indiscernible)

20   transactions, and suggesting that Mr. Keglevic was

21   substantially involved, came up with some of these ideas,

22   and merely ran them by the sponsors, when that's not what

23   happened.  So Your Honor, what I was going to ask the

24   witness about was the sentence that begins on the bottom of

25   Page --

1          MR. KLEINHAUS:  Hold on for a --

2          MR. LIEBESMAN:  I'm not going to provide the

3  substance, but I'd like Your Honor to know what it is I was

4  going to ask.  I wasn't going to read the whole paragraph

5  for him.  It's the sentence that begins at the bottom of

6  Page 13 and runs to the top of Page 14.  That's the one

7  sentence, the sentence that was included in its annual

8  report by the EFH deal team, reviewed by Mr. Smidt in

9  advance.

10          THE COURT:  All right, I'll allow questioning on

11  that sentence.

12  Q    So Mr. Smidt, would you agree that the very bottom

13  bullet point under this section that refers to Paul

14  Keglevic, the CFO of EFH, correct?

15  A    Correct.

16  Q    Now, did you note the sentence that I just told the

17  judge that I wanted to ask you about?

18  A    Yes.

19  Q    So, isn't it true, then, that in this section of the

20  annual report, the deal team wrote we would also like to see

21  Paul communicate more openly and regularly with the sponsors

22  around the business, its performance, and the capital

23  structure discussions he has with investors and banks,

24  correct?

25  A    Correct.

1   Q    That was an accurate statement when made, correct?

2   A    Yes.

3   Q    Please turn to Exhibit 289.

4   A    Okay.

5   Q    I just ask that the attachment not be broadcast, but

6   the email was broadcast earlier.  Are you there, at Exhibit

7   289?

8   A    Yes.

9   Q    This is an email that you were shown on direct

10  examination, correct?

11  A    Yes.

12  Q    And isn't it true that any communication you made to

13  Henry Kravis and George Roberts of KKR, you're going to be

14  especially sure that you provide them with all relevant and

15  pertinent information they should have when they made a

16  request, correct?

17  A    If they make a request, I'm going to meet that request.

18  Any and all pertinent information, as you describe, could be

19  very exhaustive, so I'm also quite cognizant of the fact

20  they're very busy, and I need to be quite concise in terms

21  of answering their request, so.  In this case I would be --

22  again, I can't remember all of the circumstances, but they

23  need to take that into context, too.

24  Q    Well, you're certainly not going to mislead these

25  individuals.

1    A    Absolutely not.

2    Q    So you're going to make sure that they have enough

3    information, in response to a request that they made, so

4    that they can rely on that, not expecting there to be some

5    unknown information that hasn't been provided, correct?

6    A    Correct.

7    Q    So we went through the email on direct.  I'll just

8    direct your attention to Page 2, Section 3.  It says "Oncor

9    Valuation," correct?

10   A    Correct.

11   Q    In support of the valuations reflected in this email,

12   you also provided -- there's an attachment that has a

13   spreadsheet supporting the information in this email,

14   correct?

15   A    Correct.

16   Q    And isn't it true that you advised Mr.'s Kravis and

17   Roberts that "at the current time, there is a 1.5 billion to

18   2.5 billion of debt in excess of at equity value," right?

19   A    Correct.

20   Q    And you elaborated on what was behind this statement of

21   yours on direct examination, correct?

22   A    Yes.

23   Q    And you wrote this email yourself, correct?

24   A    Yes.

25   Q    And your explanation on direct examination, correct me

1    if I'm wrong, suggested that there was equity value at TCEH,

2    correct?

3    A    Correct.

4    Q    But at the time this email was written, in April 2010,

5    isn't it true that the T-side had no equity value?

6    A    No.

7    Q    Your Honor, I'd like to refer to an exhibit that's not

8    in the binder, because this issue came up on direct.  It's

9    Exhibit 408 of the Committee.  If you could pull it up on

10   the monitor, it's there in front of you.  Mr. Smidt --

11             THE COURT:  Well, wait.  Why don't we -- why don't

12   you pull the relevant book and put it in front of him.  408?

13             MR. LIEBESMAN:  408.

14             MR. SMIDT:  Luckily my screen's now working.  They

15   lifted it up so I can see.

16             THE COURT:  Oh, you can -- I just wanted to make

17   sure you have complete document.  If you think -- I'll tell

18   you what.  If you think you need more, let us know and we'll

19   give you a hard copy, because it's a big binder.  So it's

20   there if you need it.

21             MR. SMIDT:  Okay.  Thank you.

22             THE COURT:  What are you looking for?

23             MR. MCGANN:  Copy of 401.

24             THE COURT:  Do you have enough room up there, Mr.

25   Smidt?  I know it's always tight, it's tight quarters.  If

1    you still have the white-covered binder that Mr. McGann gave

2    you, you can get rid of that.  There you go, for now.  Very

3    good.  Go ahead.

4    Q    Thank you, Your Honor.  Thank you, Mr. Smidt.  I

5    apologize for that.  In this exhibit, there are several

6    PowerPoint presentations.  I'd like to direct your attention

7    to the PowerPoint presentation that begins on Bates Number

8    7629, and on the screen there you'll see the cover of the

9    presentation.

10   A    Okay.

11   Q    So this presentation is entitled "Preliminary TCEH

12   Valuation," correct?

13   A    Yes.

14   Q    And it's dated May 10, 2010, correct?

15   A    Yes.

16   Q    Which is a month after you sent the email that we were

17   just looking at, the sum of the parts email, correct?

18   A    Yes.

19   Q    Now please turn to Page 5 of that exhibit.

20   A    I'm sorry, excuse me, if I may.  Can you contextualize

21   this document for me?  Because I don't know what this

22   document is, or who prepared it, and on what basis.

23   Q    Well, I'll tell you what.  Let's look at the page I

24   want to refer you to, and then I'll ask you the question,

25   and if you have reason to doubt the information that's

1    there, I'll see to what extent I can do that for you.

2            THE COURT:  And this could also be subject to

3    redirect if you need to.  But only if you understand the

4    questions, Mr. Smidt.  If you don't understand a question,

5    say so.  I don't want you to guess, I don't want you to

6    speculate, okay?

7            MR. SMIDT:  Yeah, it's just, I'm looking at --

8    I've got numbers on a page, but I don't know the context of

9    who prepared them, and when, and how, and why.

10           MR. LIEBESMAN:  Your Honor, I can tell you that.

11   This was a document prepared by somebody at EFH, and

12   produced on discovery.

13           MR. MCGANN:  I object, Your Honor.  There's no

14   foundation for a stated account of --

15           THE COURT:  I can't year you, Mr. McGann, sorry.

16           MR. MCGANN:  Oh, I'm sorry.  I object to counsel's

17   statement.  There's no evidence in the record, and he cannot

18   testify as to who prepared it.

19           MR. LIEBESMAN:  But you have no problem with the

20   fact that EFH produced it, right?

21           MR. MCGANN:  No, we don't dispute that it was a

22   document produced by EFH.

23           MR: SMIDT:  I'm happy to try and answer

24   questions.  It's --

25           THE COURT:  Do the best you can.  If you want to

1    take some time to go through it, leaf through it, just

2    familiarize yourself with it before you answer questions,

3    that's fine, or we can take it as it goes.  However you want

4    to proceed.

5              MR. SMIDT:  Yeah, if you're okay with me -- it's a

6    big document, so it'll take me a while to familiarize

7    myself.  Maybe if you ask a question, I may take a little

8    while to familiarize myself, based on the question.

9              MR. LIEBESMAN:  That's fine, perfectly acceptable.

10             MR. SMIDT:  Okay.

11             MR. LIEBESMAN:  And there are multiple

12   presentations in this exhibit, so I'm only asking you about

13   the one that, the preliminary TCEH valuation, okay?

14             MR. SMIDT:  Got it.

15   Q    Okay.  So if you turn to Page 5, it's up on the screen,

16   isn't it true that this page is entitled "EFH Consolidated

17   Equity Value Sum of the Parts", correct?

18   A    Yes, that's the title.

19   Q    And the very first line item of that chart is "TCEH

20   Equity Value to EFH", correct?

21   A    That's what that line says, correct.

22   Q    And isn't it true that in this chart, it shows that the

23   equity value to EFH from TCEH was negative $1.2 billion,

24   correct?  According to this chart?

25   A    According to this chart, but as I stated, this is not

1    prepared by KKR, and I don't know what assumptions were used

2    to develop this chart.  KKR's valuations and our views with

3    respect to valuations were not consistent with this.  So I'm

4    reading off a presentation who I don't know who prepared it.

5    As you said, someone at EFH, and I don't know the

6    assumptions they used, but this chart, yes, it says on this

7    chart that there isn't.

8    Q    And the chart shows that the equity value of TCEH

9    remains negative through 2013, correct?

10              MR. MCGANN:  I object to the characterization of

11    the document.  I don't object to him reading it and asking

12    the witness that he's read it correctly, but what it shows,

13    or demonstrates, or means are different questions.

14              THE COURT:  Fair enough.  So to clarify, the

15    document has written on it negative equity values for TCEH

16    at EFH 3/20/13, as written on the document.

17              MR. SMIDT:  Correct.

18    Q    As you sit here today, Mr. Smidt, do you have any

19    reason to dispute the numbers, other than what you said, any

20    specific reason to dispute the numbers reflected in this

21    chart?

22              MR. MCGANN:  Objection.  I think the witness

23    testified he doesn't know where the chart came from.

24              MR. LIEBESMAN:  Your Honor, the question just goes

25    to if he, you know, if he has any reason to dispute what

1    information is on the chart, regardless of where it came

2    from.

3              THE COURT:  Well, there is no information on the

4    chart.   There's a number.

5              MR. LIEBESMAN:  Well, the numbers.

6    A    Yeah, I do have a reason to dispute it, because KKR's

7    valuation did not reflect that there was negative equity

8    value at TCEH based on the very process that we went

9    through.  So the conclusion, I dispute how they got there.

10   I don't know how they got there, so I can't dispute that,

11   yeah.

12   Q    Was there any point in time where KKR, through its own

13   valuations, determined that TCEH was insolvent?

14   A    I don't know what the definition of insolvency, and in

15   what capacity -- if your question relates to, was there a

16   point at which we viewed the debt at TCEH exceeding the

17   value of the assets at TCEH?  Yes, and that was in the 2013

18   period.

19              If you look at our valuation methodology, we went

20   away from the methodology that described previously, and

21   looked at valuation on a consolidated basis.  Because that

22   is only relevant to the extent that the debt of -- that the

23   asset value of one of the two entities exceeds the value of

24   the debt at that entity.

25              As soon as that stopped being the case, what you

```
1    have to do is you have to consider each silo separately.

2    And in that instance, in 2013, when we began doing that, it

3    so happened that the equity, the value of Oncor was such

4    that there was sufficient equity value at Oncor to cover the

5    debt at EFH.

6    Q    So as you sit here today, it is your testimony that

7    TCEH was not deemed to be insolvent by KKR under the

8    definition that you used, prior to 2013?

9    A    That's correct.

10   Q    Will you agree that KKR knew that EFH was insolvent,

11   using the definition that you used, on a consolidated basis,

12   from December 31, 2008, through the filing of the bankruptcy

13   in April 2014?

14   A    Was insolvent?

15   Q    Insolvent.

16            MR. KLEINHAUS:  Objection.

17            THE COURT:  Basis?

18            MR. KLEINHAUS:  I just think the question is

19   vague.  What's meant by a consolidated basis, you know?

20   Q    Mr. Smidt, you're a CPA, correct?

21   A    Not technically, no.  I studied accounting.  I didn't

22   qualify in the United States under the CPA.

23   Q    You have an accounting degree?

24   A    Yes.

25   Q    Okay.  You were an accountant before you worked at
```

1    Goldman-Sachs?

2    A     In South Africa.

3    Q     In South Africa.  All right.  Do you understand what it

4    means when someone refers to the term "consolidated basis"?

5    Is there any doubt in your mind what is meant by that?

6    A     No.  If you're consolidating all of the debt of the

7    entities -- so your question was, I thought that the company

8    was insolvent from December 31st, 2008?

9    Q     On a consolidated basis, yes.

10   A     No.  We did not reflect a negative equity value for our

11   valuation, through the valuation methodology that we went

12   on, off from December 31st, 2008.

13   Q     Mr. Smidt, can you --

14   A     And also --

15   Q     I'm sorry, go ahead.

16   A     Paul Keglevic, as recently as 2012, signed an

17   affidavit, if I remember correctly, as part of the tax

18   restructuring which we did, which the company did, to attest

19   that the company was solvent, EFH was solvent in 2012.

20   Q     Right, but there was no solvency test performed, in

21   connection with that representation to the IRS, correct?

22   A     I don't know what Paul did, but Paul is a CPA, and he's

23   the CFO of the organization, so he is even more qualified

24   than I to make that determination, and put his name against

25   that with the IRS.

1   Q    So if Mr. Keglevic also testified yesterday that those

2   numbers that we just went through with TCEH's negative

3   equity value was accurate --

4           THE COURT:  All right, first of all, Mr. Keglevic

5   didn't testify yesterday.

6           MR. LIEBESMAN:  The day before, right, the day

7   before yesterday.

8           THE COURT:  Okay, second of all, I don't recall

9   him testifying in connection with this document, but maybe

10  I'm incorrect.

11          MR. LIEBESMAN:  Your Honor, yeah, we went through

12  this document, I went through this document with Mr.

13  Keglevic myself.

14          MR. SMIDT:  And he said that?  I'd be surprised.

15          THE COURT:  Mr. Smidt, hang on.

16          MR. MCKANE:  Objection.  Your Honor, I believe the

17  record will reflect, and we can pull out the transcript at

18  the next break, but I do not believe that characterization

19  of Mr. Keglevic's testimony as placed in this document is

20  correct.

21          MR. LIEBESMAN:  We'll be happy to pull that Your

22  Honor, but we'll move on for you.  Mr. Smidt, please turn to

23  Exhibit 758.

24          THE COURT:  All right, you can put the big binder

25  away.

1    Q    758.  Are you there?

2    A    I am.

3    Q    Okay.  Mr. Smidt, this exhibit is the Form 10K for EFH

4    Corp for fiscal year ending 2010, correct?

5    A    Yes.

6    Q    And if you'd like to see the entire 10K, I can pull the

7    binder for you.

8    A    Good, thank you.

9    Q    I'll just, going to really refer you to, I think, to

10   one or two pages, and that's, in this.  Could you turn to

11   Page 46 of the 10K, which is the second page in?

12   A    Okay.

13   Q    Under Capitalization, do you see that, there's a chart,

14   and there's a line item for capitalization, do you see that?

15   A    Yes.

16   Q    Do you see a line below that, a line item for EFH Corp

17   Common Stock Equity?

18   A    Yes.

19   Q    Isn't it true that EFH Corp reported in its 10K

20   negative shareholder equity of 3.673 billion on a

21   consolidated basis, as of December 31, 2008?

22   A    Yes.

23   Q    All right, please turn to Exhibit 761, the next exhibit

24   in the book.

25   A    Okay.

1    Q    And this is the Form 10K for EFH Corp for the fiscal

2    year ending 2013, correct?

3    A    Yes.

4    Q    Now please turn to Page 45 of that exhibit, which is

5    also the second page in.

6    A    Okay.

7    Q    And do you see it -- there's basically, there are two

8    charts.  The bottom chart has a line item for

9    capitalization, do you see that?

10   A    Yes.

11   Q    And below that, there's a line item for EFH Corp Common

12   Stock Equity, correct?

13   A    Yes.

14   Q    Isn't it true, MR. Smidt, That EFH Corp reported

15   negative shareholder equity of 3.247 billion on a

16   consolidated basis, as of December 31, 2009?

17   A    Yes.

18   Q    Isn't it true that EFH Corp reported negative

19   shareholder equity of 5.99 billion, on a consolidated basis,

20   as of December 31, 2010?

21   A    Yes.

22   Q    And for fiscal year 2011, isn't it true that EFH Corp

23   reported negative shareholder equity of 7.852 billion, on a

24   consolidated basis?

25   A    Yes.

1    Q    And for fiscal year 2012, isn't it true that EFH

2    reported negative shareholder equity of $11 billion, on a

3    consolidated basis?

4    A    Yes.

5    Q    Finally, isn't it true that for fiscal year 2013, EFH

6    Corp reported negative shareholder equity of $13.25 billion,

7    on a consolidated basis?

8    A    Yes.

9    Q    And if you'll look on the chart just above that, do you

10   see a line item for net income loss?

11   A    Yes.

12   Q    Isn't it true that according to EFH's 2013 10K, EFH, on

13   a consolidated basis, lost approximately $10.3 billion

14   between 2010 and 2013?

15   A    I haven't added up the numbers, but that looks about

16   right.

17   Q    All right, let's turn to Exhibit 6 --

18   A    I'm sorry, Mr. Liebesman, sir, is there -- are you just

19   wanting me to enter those numbers into the record, or is

20   there an implication on what you're -- on that?

21   Q    I'm sorry, if you agree that those numbers add up to

22   approximately 10.3 billion, you're fine.  Otherwise we can

23   go through it, we can add them up together.

24   A    I don't know.  I'm just wondering if there's an

25   inference by reading those numbers.  Those are the numbers

1    that are stated, those are accounting numbers.  So I just

2    read some numbers -- confirmed some numbers that are in the

3    financial statements, but I don't think that reflects

4    anything.

5    Q     Do you sign the 10Ks, as a director of EFH?

6    A     Yes.

7    Q     Do you also affirm by singing the 10K, that the

8    information provided accurately reflects the company's

9    financial status?

10   A     Oh, yes.  This is correct, I'm just, I'm not sure if

11   you're wanting me to infer anything from reading -- I agree

12   with the numbers, the numbers are correct.  This is the

13   accounting -- this demonstrates the accounting results of

14   the company and the financial statements, as is required by

15   GAAP.  It doesn't necessarily demonstrate my view of the

16   value of the business, or the assets, or the net equity

17   values.  I just want to make -- I'm happy to confirm that

18   this is what the GAAP financials say.

19   Q     You understand that third parties rely on SEC filings,

20   correct, generally?

21            THE COURT:  You guys are, you're quibbling.  I get

22   this point.

23   Q     All right, all right, Your Honor, that's fine.  Let's

24   turn to Exhibit 609.  Exhibit 609 is the deal team's EFH

25   Corp 2010 annual report to the portfolio monitoring

1    agreement, correct?

2    A    Yes.

3    Q    And it's dated February 10, 2011, correct?

4    A    Yes.

5    Q    Please turn to Page 4 of this exhibit.

6    A    Okay.

7    Q    And there's a Part 4 at the bottom of that page.

8    A    Yes.

9    Q    And that Part 4 of the report begins and starts a

10   request for a discussion of EFH's 2010 performance, relative

11   to the deal team's expectations, correct?

12   A    Yes.

13   Q    And if you turn to Page 5, in the middle, there's a

14   heading for Capital Structure, do you see that?

15   A    Yes.

16   Q    And the very first bullet point, under Capital

17   Structure, the deal team wrote, "The balance sheet was the

18   deal team's primary area of focus in 2010, and will continue

19   to be its top priority for 2011", correct?

20   A    Yes.

21   Q    And that was true at the time, correct?

22   A    Yes.

23   Q    Could you please turn to Page 6?  At the bottom of Page

24   6, there's a Section 3, for that Part 4 that requests an

25   identification of key priorities and deliverables that the

1    EFH deal team had for EFH, correct?

2    A    Yes.

3    Q    And below that heading, there's a heading that says

4    balance sheet, at the very bottom of Page 6, correct?

5    A    Yes.

6    Q    And at that first bullet point, it says, "de-levering

7    the balance sheet and extending maturities remains the

8    single greatest priority for the deal team", correct?

9    A    Yes.

10   Q    And if you go to the top of the next page, the second

11   bullet point, under balance sheet, the EFH deal team advises

12   the portfolio management committee that in light of the

13   uncertain outlook for power prices and merchant valuations,

14   we continue to believe that these self-help solutions

15   represent our best path to addressing to the balance sheet,

16   as attracting equity into the structure continued to be

17   difficult, correct?

18   A    Yes.

19   Q    And the deal team's use of the phrase "self-help

20   solutions" referred to the amend and extend transactions,

21   correct?

22   A    Yes.

23   Q    But on Page 9 of this document, towards the bottom of

24   that page, there's a header for Key Opportunities, Upsides.

25   Do you see that?

1  A    Yes.

2  Q    And then the first bullet point underneath that header,

3  the KKR EFH deal team first wrote that the team remains

4  extremely focused on the company's balance sheet.  We will

5  continue to explore options to capture discount and extend

6  maturities.  The ability to capture additional discount

7  remains a key potential upside to out equity value.  Do you

8  see that?

9  A    Yes.

10  Q    And in the next bullet point, the deal team wrote,

11  "More importantly, we are focused on extending the

12  maturities to provide runway through the period when we

13  expect Texas power markets to tighten, and we identify that

14  time period to be 2015 to 2017, and when we expect our

15  assets to recover in value, correct?

16  A    Yes.

17  Q    And both of those were accurate at the time, when

18  presenting to the portfolio management committee, correct?

19  A    Yes.

20  Q    And like the prior annual report that we looked at, the

21  EFH deal team had to assess key members of EFH's management

22  team, right?

23  A    Correct.

24  Q    So don't broadcast this, please turn to Page 8.

25  A    Okay.

1    Q    I'll just read the last sentence.

2         MR. KLEINHAUS:  I do have the same objection on

3    relevance, but based on Your Honor's prior ruling, I don't

4    object to that sentence.

5         THE COURT:  Okay.

6    Q    So Mr. Smidt, the very last sentence, or the last

7    bullet point, that discusses Mr. Keglevic, isn't it true

8    that the deal team wrote, "Importantly, Paul needs to

9    communicate more openly and regularly with the sponsors

10   around the business, its performance, and the capital

11   structure discussions he has with investors and banks",

12   correct?

13   A    Yes.

14   Q    Please turn to Exhibit 611.  It's the next exhibit in

15   the binder.

16   A    Okay.

17   Q    Now, this exhibit has a series of emails.  Feel free to

18   read them all.  I'm going to ask you about the second email

19   from the top, which is an email from you, dated March 27,

20   2011, to Mark Lipschultz, and a Mike Calbert, both of whom

21   are employees of KKR as well, correct?

22   A    Mike was.  He's no longer with KKR, but he was, yes.

23   Q    Okay.  And this email was sent about a week before the

24   April 2011 amend and extend transactions, correct?

25   A    Yes.

Page 111

1   Q    In your email that I referenced, you disclose that KKR

2   had recently performed an analysis to check what natural gas

3   prices would be needed in 2014 for KKR to get back the

4   firm's equity, taking into account EFH's latest long-range

5   plan, correct?

6   A    Yes.

7   Q    And at -- the conclusion of that analysis was that the

8   natural gas prices had to be seven dollars, correct?

9   A    Seven dollars to get back our full equity of $8.3

10  billion, yes.

11  Q    Thank you.  At the time that you sent this email, in

12  March 2011, the price of natural gas was around four

13  dollars, correct?

14  A    I don't recall.  I don't dispute that, if you have the

15  facts.  But also the forward curve, as I recall, in 2011,

16  was showing gas going out to five-plus dollars, and the

17  seven dollars referenced here is to get back to full equity

18  value of $8.3 billion.  So to get back to have equity value

19  it wasn't seven, but the seven-dollar gas.

20  Q    Please turn to Exhibit 619.

21  A    Okay.

22  Q    This is the annual report from the EFH deal team to

23  KKR's portfolio management committee for 2011, correct?

24  A    Yes.

25  Q    And this report is dated February 13, 2012, correct?

1   A    Yes.

2   Q    So please turn to Page 5.

3   A    Okay.

4   Q    And you'll see in the middle there's a heading, capital

5   structure.  Do you see that?

6   A    Yes.

7   Q    And again, the deal team tells the portfolio management

8   committee that the balance sheet was the deal team's primary

9   area of focus in 2011, and will continue to be its top

10  priority for 2012, correct?

11  A    Yes.

12  Q    Then the deal team, in the very next bullet point,

13  notes the $24.5 billion amend and extend transaction that

14  occurred in April of 2011, correct?

15  A    Correct.

16  Q    Please turn to Page 6?  And at the bottom of that page,

17  again, there's a header that says Balance Sheet, do you see

18  that?

19  A    Yes.

20  Q    And in the second bullet point, under Balance Sheet,

21  the deal team informs the portfolio monitoring committee

22  that it continues to believe that the self-help solutions

23  represent our best path to addressing the balance sheet as

24  attracting equity into the structure continues to be

25  difficult, correct?

1    A    Yes.

2    Q    Mr. Smidt, you testified on direct that you had

3    discussions with other sponsor directors of EFH, correct?

4    A    Yes.

5    Q    To the exclusion of others, like management, or EFH

6    employees, correct?

7    A    Yes.

8    Q    Please turn to Exhibit 285.

9              THE COURT:  I'm trying to think of a good time to

10   take a lunch break.  It's getting a little late.

11             MR. LIEBESMAN:  Now would be perfect, Your Honor,

12   if you'd like.  This email's a little lengthy.

13             THE COURT:  Okay.  We're going to break for lunch,

14   then.  During the break, sir, you may not communicate

15   regarding the substance of your testimony with any person.

16   We will actually reconvene at 2:00.  I would like to meet

17   with the group I met with in chambers earlier this morning

18   at 1:45 in the mediation room, okay?

19             MR. MCKANE:  Thank you, Your Honor.  To be clear,

20   the 9:00 group, or the 9:30 group?

21             THE COURT:  9:00 group.  And what I was I going to

22   -- okay, I was supposed to read the papers about Mr.

23   Mendelson over the break.  Is there anything else I'm

24   supposed to be doing?  Mr. McKane, you're in charge.

25             MR. MCKANE:  And that's a frightening concept for

1    everyone, and I don't believe that's true.  No, Your Honor,

2    I believe that's it.  And as this is progressing, I think

3    there's a chance we -- I feel like there's going to be a

4    chance we start Mendelson.  I don't think we are going to

5    finish Mr. Mendelson today.

6              THE COURT:  Okay, very good, thanks.  Well, all

7    right, I hate to -- all right, we'll talk about that,

8    because we start him, and he can't communicate with counsel

9    for five days, that may be problematic.

10             MR. MCKANE:  And then that's why, you know,

11   consistent with our conversation at 9:30, I think we'd like

12   to see how things progress, you know, with our tax

13   discussion, and the tax witness, and then we can evaluate

14   where we are.  Thank you.

15             THE COURT:  Okay, very good.  All right.  We're in

16   recess.

17        (Recess)

18             CLERK:  All rise.

19             THE COURT:  Please be seated.

20                   CROSS-EXAMINATION

21   BY MR. LIEBESMAN:

22   Q    Mr. Smidt, long-range plans were prepared by EFH,

23   correct?

24   A    Yes.

25   Q    And long-range plans also referred to as LRPs are

1    protections by management of their best estimate of what the

2    performance of the business will be over the long term,

3    correct?

4    A    Yes.

5    Q    And the EFH Corp board approved the LRPs, correct?

6    A    Yes.

7    Q    Isn't it true that, prior to an LRP being presented to

8    the EFH Corp board for approval, the LRP was provided to the

9    sponsors for their review and input?

10   A    Yes.

11   Q    The Debtor's D&O insurance policy cover you in your

12   capacity as a Director of EFH Corp and on the board of TCEH,

13   correct?

14   A    That's my understanding.

15   Q    Isn't it true that KKR also has D&O coverage for you as

16   a sponsor director on the EFH Corp and TCEH boards for an

17   umbrella policy at KKR?

18   A    Yes.

19   Q    You testified earlier about there being debt at TCEH,

20   correct?

21   A    Yes.

22   Q    And I believe you testified that, from your

23   perspective, TCEH was insolvent at some point in 2013?

24   A    I don't think I used the word "insolvent," I think I

25   said that the value of the debt exceeded the value of the

1    assets, so there wasn't equity value.  Again, I'm not sure

2    the definition you want to use for "insolvent."

3    Q    You are aware of litigation threats made by TCEH

4    Creditor representatives against the sponsors, aren't you?

5    A    Are you referring to Aurelius?

6    Q    No, I'm referring to the TCEH Creditors, after the

7    filing of the bankruptcy petition, threating litigation

8    against the sponsors.

9    A    I know there was a bunch of litigation threatened.  I'm

10   not sure exactly, and to whom it was directed.

11   Q    Can you please look at Exhibit 539?

12          MAN:  Do we not -- I don't think we --

13          MR. LIEBESMAN:  I'm sorry, 537, I'm sorry.

14          MAN:  Oh, thanks.

15   Q    And if -- there's a page middle email that's about

16   three pages long, and you turn into the -- a letter from Mr.

17   Shore at White & Case dated April 30, 2015.  Do you see

18   that?

19   A    Yes.

20   Q    Have you ever seen this letter before?

21   A    I don't recall having seen it.  It doesn't mean I

22   haven't.

23   Q    I have no further questions, Your Honor.

24          THE COURT:   Thank you.  Mr. Pedone?

25          MR. PEDONE:  Good afternoon, I'm Richard Pedone,

1    counsel for American Stock Transfer, the indenture trustee

2    for EFH's bond debt.

3                        CROSS-EXAMINATION

4    BY MR. PEDONE:

5    Q    Would you agree with me that the value of Oncor has

6    increased during the pendency of these cases?

7    A    Yes.

8    Q    At his deposition, Mr. Ying described the ability to

9    convert Oncor into a REIT as a form of technology that he

10   believed had been mastered in these cases.  Would you agree

11   with that?

12            MR. MCGANN:  Objection, Your Honor.  Object to the

13   extent it characterizes other testimony.  No objection to if

14   he just wants to ask the question, the content of the

15   question, but I'm not sure the witness is familiar with Mr.

16   Ying's testimony and whether the question accurately

17   portrays it.

18            MR. PEDONE:  Your Honor, I'm happy to rephrase the

19   question.

20            THE COURT:  Please do.

21   Q    If these Debtors are able to covert Oncor into a REIT,

22   obtain the regulatory approvals, figure out the tax

23   structure, those pieces put together will result in an

24   increase in the value of Oncor, would you agree -- of EFH's

25   interest in Oncor.  Would you agree with that?

1    A    Yes.

2    Q    Okay.  Would you also agree that EFH today is solvent,

3    as we sit here on the eve of a plan, if in fact it does

4    succeed?

5              THE COURT:  Just so we're clear, you mean EFH

6    Corp?

7              MR. PEDONE:  EFH Corp.

8    A    Again, I'm -- the different definitions of solvency, so

9    if your question is, is there equity value for EFH?  Yes.

10   Q    Okay, and would you agree that, if EFH is capable of

11   converting its interest or converting itself into a REIT

12   with Oncor, on a balance sheet test, EFH would, in fact, be

13   solvent.

14             MR. MCGANN:  I object to "solvency".  The witness

15   has, on a number of occasions, indicated he doesn't know

16   what definition is being used.

17             THE COURT:  Well, he did clarify he meant balance

18   sheet insolvent.

19             MR. MCGANN:  I did hear that, Your Honor.  But Mr.

20   Pedone, I don't know that he's adopted that definition for

21   the purpose of his question.

22             MR. PEDONE:  I believe I used "balance sheet" in

23   the term, so, on the --

24   A    Can you clarify what you mean by "balance sheet"?

25   Sorry, I don't know -- when you say the word "balance sheet

1    solvent," is that the balance sheet assets exceeding the

2    balance sheet liabilities, or?

3    Q    Exactly, yes.

4    A    I haven't gone and looked at the latest GAAP financial,

5    so I'm not sure what the exact GAAP financials show at this

6    current point in time.

7    Q    But you would agree that if EFH is capable of pulling

8    off the transaction contemplated in the plan, it will be

9    able to pay off its liabilities?

10   A    Correct, the plan contemplates the liabilities being

11   paid off in -- in full.

12             MR. PEDONE:  Thank you, no further questions, Your

13   Honor.

14             THE COURT:  Thank you, Mr. Pedone.  Anyone else?

15   Okay, any redirect?

16             MR. MCGANN:  Yes, Your Honor.  Andrew McGann for

17   the Debtors, Your Honor.

18             THE COURT:  Yes.

19                      REDIRECT

20   BY MR. MCGANN:

21   Q    Good afternoon, Mr. Smidt,

22   A    Good afternoon.

23   Q    We're nearly done.  Do you recall that, during the

24   cross-examination by conflicts counsel, your attention was

25   drawn to two different SEC filings by EFH Corporation?

1    A    Yes.

2    Q    And specifically, Exhibit, I believe it's UCC Exhibit

3    758, which is EFH Corporation's 2010 10K?

4    A    Yes.

5    Q    In Exhibit 761, which is EFH Corporation's year-end

6    2013 10k.  Do you recall being shown that?

7    A    Yes.

8    Q    And in each instance -- and I should say, these are

9    excerpts from the SEC filings in these two exhibits, in each

10   instance, counsel drew your attention to a line in the

11   financial statements, again, reported in each of these two

12   exhibits, that reads: "EFH Corporation Common Stock Equity."

13   Do you recall that?

14   A    Yes.

15   Q    And for the years reported, it showed, at least as the

16   sum of them, negative common stock equity for EFH

17   Corporation, do you recall that?

18   A    Yes.

19   Q    And in those years, 2010 and in 2013, KKR conducted the

20   valuations that you described during your direct

21   examination, right?

22   A    Yes.

23   Q    And it did that quarterly?

24   A    Yes.

25   Q    And those are the valuations that KKR are reported to

1    its investors and reported publicly, pursuant to SEC rules,

2    correct?

3    A    Yes.

4    Q    And at any time during that period, did KKR's

5    valuations as it reported show anything but positive equity

6    for KKR with respect to its investment in EFH Corporation?

7    A    No.

8    Q    I made that a double negative there.  Tell me what it

9    reported with respect to KKR's --

10   A    They show that there was equity value.

11   Q    In each of those years?

12   A    Correct.

13   Q    Thank you.  Is that inconsistent with what you were

14   shown in your cross-examination from EFH Corporation's SEC

15   filings, in your view?

16   A    Well, I need to go back and review exactly what was

17   expensed through the income statement and written off on the

18   balance sheet in each of these instances, but this is a GAAP

19   accounting and there was a lot of goodwill that was put on

20   the business associated with our transaction that caused a

21   lot of assets to be written up at the time of our, you know,

22   $48 billion dollar buyout.  So a lot of assets over time got

23   impaired, and those impairment charges were put through the

24   income statement, and so that did deplete the capital

25   account quite meaningfully over time.

1         That impairment measured the value of the assets

2    on a historic basis, and at that point in time.  That

3    doesn't impact the earnings potential of the assets that are

4    available in a -- again, a volatile commodity exposed

5    business.  There was the opportunity for that business to

6    improve in terms of its performance over time.  And so,

7    someone valuing those assets, which is what a discounted

8    cash flow would reflect, and one of the mechanisms we used

9    for our valuation, that would show that there is more value

10   in the assets.

11        And so, this is just -- this is a different --

12   this is an accounting GAAP-based recording system that is --

13   has very stringent requirements around things like goodwill,

14   which have -- and it's backward-looking.  So it's not the

15   measure on which we would make a -- an investment decision,

16   or how we value things for true valuation purposes.

17   Obviously, this is a tool that will be employed and used,

18   but certain line items have more or less relevance,

19   depending on what they reflect, and accounting is a very

20   specific treatment for things like goodwill and when an

21   asset's impaired, you write the goodwill down.  When an

22   asset has more value, you don't write up the fair value of

23   that asset, so it's reflecting all the negatives and not

24   necessarily the positives, so.  It's a long way of saying

25   this -- I don't think this is the right mechanism, from my

1   perspective.

2   Q    What's "this"?  When you say "this" --

3   A    The GAAP financial measure of the capitalization, a

4   measure of whether there was equity value or not in EFH.

5   Q    And the GAAP financial measurement, again, you're

6   referring to, are those that appear in Exhibit 758 and 761

7   that you were shown on cross?

8   A    Yeah, yes, the line item it says: "EFH Corp Common

9   Stock Equity" that is a negative line item on these

10  financial statements.

11  Q    Thank you, Mr. Smidt, that's all I have.  Nothing

12  further, Your Honor.

13          THE COURT:  Okay, thank you, sir, you may step

14  down.

15          MR. SMIDT:  Thank you.

16          THE COURT:  You can just -- yeah, just leave it up

17  there, actually.  Can we -- yeah, could -- could someone

18  clear the witness binders so we have a fresh start with the

19  new witness?

20          MR. MCGANN:  We will.

21          THE COURT:  If someone could just clear the

22  witness binders away, that would be excellent.

23          MR. MCGANN:  We'll grab those and clear them out.

24          THE COURT:  Okay.  Yeah?

25          MR. MCGANN:  Your Honor, we've got some exhibits -

1    - the Debtors have exhibits to move into evidence in

2    connection with Mr. Smidt's testimony.  Shall we proceed?

3              THE COURT:  Yes, I -- what -- what is this?

4              CLERK:  (Indiscernible)

5              THE COURT:  Okay, I apologize.  I'm trying to keep

6    everything straight up here.  We can proceed.

7              MR. MCGANN:  Okay, thank you, Your Honor.  Debtors

8    and the equity sponsors of EFH move the following exhibits

9    into evidence: D-DIRSMIDT, which is the written direct of

10   Jonathan Smidt, DX685, DX722, DX723, DX725, DX726, DX729,

11   DX733, DX734, DX752 through DX755, DX758 through DX761,

12   DX786 and DX787, and we also move in for demonstrative

13   purposes, D-DEMSMIDT1.

14             THE COURT:  What did you just -- what was the last

15   item?  For demonstrative purposes?

16             MR. MCGANN:  Yes, the demonstrative that was used

17   during his direct examination.

18             THE COURT:  You're admitting that into evidence?

19             MR. MCGANN:  No, we're offering it solely for the

20   record for demonstrative purposes.

21             THE COURT:  Okay.

22             MR. MCGANN:  Not into evidence, Your Honor.

23             THE COURT:  Okay.  Very good.  Yes?

24             MR. LIEBESMAN:  Your Honor, for the Committee, we

25   would move the following exhibits:  DX033, DX339, EUCC276,

1    277, 285, 289, 291, 537, 586, 609, 611, 619, 623, 633, 758,

2    761, and finally, ECX764.

3            THE COURT:  All right, any objection to the

4    admission of the Debtor's or the E-Committee's documents

5    into evidence?

6            MR. LIEBESMAN:  From the E-Committee we have no

7    objection on the Debtors.

8            THE COURT:  Thank you.  Mr. McGann?

9            MR. MCGANN:  No objection to the admission of the

10   exhibits counsel identified.  With respect to 276, there's a

11   confidentiality issue that KKR has raised.  It doesn't go to

12   anything that was shown to the witness or Your Honor during

13   the cross-examination, and if it's all right with Your

14   Honor, it regards the identification of some client

15   information that we believe is utterly irrelevant to this

16   proceeding.  If we can, we don't need to hold up the

17   proceedings right now, but if we can talk with counsel about

18   maybe a redaction, it would be minor, to the extent these

19   exhibits are available at all to the public.  And I'm not

20   sure we can agree, I bet we can, but if I can put that on

21   the record and we can talk and if we have an issue, we can

22   come back to you about it?

23           THE COURT:  That's fine.  Thank you.

24           MR. SHEPPARD:  Your Honor, Mark Sheppard on behalf

25   of conflicts counsel.  I've spoken with counsel for the

1    sponsors and we have agreed to substitute that exhibit for a

2    redacted version that would alleviate that problem.

3              THE COURT:  Very good.  Thank you.

4              MR. SHEPPARD:  Thank you.

5              THE COURT:  Right.

6              MR. MCGANN:  We may have one other issue, Your

7    Honor, and we'll --

8              THE COURT:  While he's checking that, I -- we

9    still don't have any exhibit list from the E-side Committee,

10   so, please when you get an opportunity, we really need that

11   to keep track of what's been admitted into evidence.

12             MR. GLUECKSTEIN:  Your Honor, we have copies.

13   We'll file it before we leave today.

14             THE COURT:  Okay, thank you.

15             MR. MCGANN:  We need -- again, I don't want to

16   hold things up unnecessarily, and I think if we just march

17   forward, we have a couple questions that we'd confer with

18   counsel about Exhibit 537 and 408.  We just have to check a

19   few records, and I don't want to waste everyone's time, so

20   I'll just say that and reserve for a minute and we'll figure

21   it out.

22             THE COURT:  Okay.  Are we ready for the next

23   witness?

24             MR. ROGERS:  Yes, Your Honor.  Brent Rogers from

25   Kirkland & Ellis for the Debtors.  The Debtors call Mr.

1    Kevin Ashby.

2              THE COURT:  Okay, thank you, Mr. Ashby?

3              MR. ROGERS:  And I believe, as with other

4    witnesses, we have binders of the exhibits that I can hand

5    up to the witness and the Court and the clerks.

6              THE COURT:  Okay, very good.  Can we -- while

7    you're doing that, can we police the area there so he

8    doesn't have a lot of other people's binders?  Mr. Ashby,

9    welcome.  Please take the stand and remain standing, if you

10   would, please, sir.  Is it okay?

11             CLERK:  Please raise your right hand.  Do you

12   affirm your word that you will tell the truth, the whole

13   truth and nothing but the truth to the best of your

14   knowledge and ability?

15             MR. ASHBY:  I do.

16             CLERK:  Please state and spell your name for the

17   record.

18             MR. ASHBY:  Kevin Ashby, K-E-V-I-N, A-S-H-B-Y.

19             CLERK:  Thank you.

20             THE COURT:  Please be seated, sir.

21             MR. ROGERS:  Your Honor, in addition to the

22   binders of hard copy exhibits, we also have flash drives

23   that have -- we'll be referring to some Excel spreadsheets

24   today that are too voluminous to print out.  I'd like to

25   hand those out to the Court and the clerk as well.

1          THE COURT:  All right, are you expecting me to do

2    anything with that?

3          (Laughter)

4          MR. ROGERS:  You can take it home --

5          THE COURT:  Oh, no, no, no.  I -- you're going to

6    put it on the screen, right?

7          (Laughter)

8          MR. ROGERS:  Erase the flash drive and put

9    something more interesting on it.

10          THE COURT:  I'll give it to my kids, and they'll

11    be like, "Nobody uses these."

12          (Laughter)

13          THE COURT:  It's going to be on the screen?

14          MR. ROGERS:  It will be on the screen, Your Honor.

15          THE COURT:  Oh, okay, that's fine.  All right,

16    yes, please approach.  Thank you.  And Mr. Ashby, if you

17    could just move a little close to the microphone, that would

18    be -- or it closer to you, that would be terrific, thank

19    you.

20          MR. ASHBY:  How's that?

21          THE COURT:  Very good.

22          MR. ASHBY:  Okay.

23                    DIRECT

24    BY MR. ROGERS:

25    Q    Mr. Ashby, good afternoon.

Page 129

1   A     Good afternoon.

2   Q     Could you introduce yourself to the Court, please?

3   A     Sure. I'm Kevin Ashby.  I'm a Senior Tax Director with

4   EFH in Corporate Tax.

5   Q     And how long have you worked at EFH, sir?

6   A     Since April 2006.

7   Q     In a binder in front of you, there should be an exhibit

8   labeled D-DIRASHBY.  Do you have that?

9   A     I do.

10  Q     Do you recognize that document, sir?

11  A     Yes, I do.

12  Q     What is it?

13  A     This is my written declaration.

14  Q     Were you involved in the preparation of your written

15  declaration?

16  A     I was.

17  Q     Can you describe your involvement, please?

18  A     Sure, read and reviewed the document many times, made

19  edits to the document.

20  Q     Did you have an opportunity to review the final draft

21  before you signed it?

22  A     I did.

23  Q     Is it true and accurate to the best of your

24  understanding?

25  A     Yes.

1    Q    Your Honor, with that, I would move Exhibit D-DIRASHBY

2    into evidence.

3              THE COURT:  Any objection?  It's admitted without

4    objection.

5    Q    Mr. Ashby, you said you were in the Corporate Tax

6    Department, is that right?

7    A    That's right.

8    Q    Can you describe how the organizational structure of

9    the company existed when you started in 2006, with regard to

10   tax issues?

11   A    Sure.  I was in Corporate Tax, and our primary

12   responsibilities at that time included preparation of the

13   Federal and State income tax returns, management of Federal

14   and State audit and appeals, tax planning and forecasting,

15   among other things.

16   Q    And in 2006, were there other departments that handled

17   tax issues as well?

18   A    The Tax Accounting Group.

19   Q    And what was their responsibility?

20   A    Sure.  The Tax Accounting Group responsibilities

21   included primarily recording to the books and records what

22   are the subledgers of the company, the positions taken,

23   (indiscernible) tax returns or the impacts of settlements

24   from audits and appeals.  They also handle the SEC tax

25   disclosures, which could include calculations that have

1    affected tax rate, as well as maintenance of deferred tax

2    assets and liabilities, tax payables and receivables and tax

3    sharing as well.

4    Q    When you started at EFH, did you have any interaction

5    with the Tax Accounting Department?

6    A    When I started with EFH, relatively little interaction

7    with Tax Accounting at the time.

8    Q    And did that change over time?

9    A    It did, yes.  As I progressed in my career at EFH, I

10   became more involved in working with the Tax Accounting

11   Group.  We certainly were two separate groups but we worked

12   very closely together as we shared information back and

13   forth as necessary.

14   Q    Does the Tax Accounting Group still exist?

15   A    It does not.

16   Q    Can you tell me what happened to the Tax Accounting

17   Group?

18   A    Sure.  Late in 2013, the Tax Accounting Group merged

19   into the Corporate Tax Department.  And prior to that time,

20   over the course of six months to a year, all but one of the

21   individuals in the Tax Accounting Group had left the

22   company.

23   Q    Do you have any responsibilities for the activities

24   that used to be handled by the Tax Accounting Group today?

25   A    Yeah, so, when there was only one individual remaining,

1    (indiscernible) the tax accounting function came into the

2    Corporate Tax Group, and that is now part of my

3    responsibility, yes.

4    Q    Among the disputes that are proposed to be settled in

5    this bankruptcy are disputes related to the company's

6    historical tax practices, including tax sharing.  Are you

7    generally familiar with that?

8    A    Yes.

9    Q    Can you describe very briefly what tax sharing is?

10   A    Sure.  It's a common practice, intercompany practice,

11   to allocate tax liabilities among a group of entities.

12   Q    Before the two departments, Tax Accounting and

13   Corporate Tax were merged in 2013, can you describe their

14   relative responsibilities for tax sharing issues?

15   A    Yeah, sure.  Tax Accounting, they had the primary

16   responsibility of calculating tax sharing and recording it

17   into the subledgers.

18   Q    Have you had any role, either before or after the

19   bankruptcy was filed, in doing diligence or assessments of

20   potential claims relating to historical tax practices?

21   A    Yes, absolutely.  I've spent many, many hours, I would,

22   you know, roughly say a third of my time over the course of

23   the last year.  With respect to due diligence matters,

24   responding to voluminous questions, discussions with

25   advisors to Creditors, the Disinterested Directors,

1    Committees and working with Grant Thornton as well.

2    Q    What kinds of questions were you responding to in that

3    diligence process?

4    A    Well, in addition to tax sharing matters, we obviously

5    fielded questions on a number of different matters, you

6    know, past filed tax returns, the status of audit and

7    appeals, where that was, but heavy focus on intercompany tax

8    sharing matters.

9    Q    What kinds of things did you need to do to be in a

10   position to respond to that diligence?

11   A    Sure.  Yeah, I spent a lot of time, research,

12   investigation, collaboration with a number of individuals

13   within Corporate Tax, and in particular, Wendy Lee, who was

14   the lone remaining Tax Accounting professional.  I relied on

15   her knowledge heavily to respond to those due diligence

16   questions.

17   Q    Along the way today, I want to talk about some of the

18   documents that are cited in your written declaration, and

19   I'd like to start with what's behind the Tab DX648 in your

20   binder.  Can we call that up on the screen?  Do you

21   recognize Exhibit 648, Mr. Ashby?

22   A    Yes, I do.

23   Q    Can you tell us what that is?

24   A    This is the Competitive Tax Sharing Agreement.

25   Q    What is the Competitive Tax Sharing Agreement, in your

1    words?

2    A    Sure, it's a -- it's written agreement when we, you

3    know, refer to the competitive side of the business, that

4    excludes Oncor, but an agreement to memorialize past

5    historical tax sharing practices.

6    Q    When was it executed?

7    A    May of 2012

8    Q    Had the company been engaged in tax sharing practices

9    prior to that time?

10   A    Yes.

11   Q    Are you generally familiar with the contents of the Tax

12   Sharing Agreement?

13   A    I am.

14   Q    How did you become familiar with the Tax Sharing

15   Agreement?

16   A    Sure.  Primarily through a couple points.  While the

17   Tax Sharing Agreement was being drafted by, primarily, Boyd

18   Lovelace, an outside counsel at the time, so my work in

19   interaction with him during that period, as well as, after

20   filing for bankruptcy and working through all the due

21   diligence questions.

22   Q    Now, you said the company was engaged in tax sharing

23   practices before this document was executed.  Do you have an

24   understanding of why the company decided to put its Tax

25   Sharing Agreement in writing?

1    A    Sure.  We felt it was a best practice to have a written

2    agreement, but again, the goal and intent was to memorialize

3    our past practices with respect to tax sharing.

4    Q    And can -- as a general matter, who are the parties to

5    that Tax Sharing Agreement?

6    A    As the undersigned, so parties including both

7    corporations and disregarded entities.

8    Q    Among the claims that we're -- are proposing to settle

9    in this matter are claims relating to intercompany tax

10   sharing.  Do you understand that there have been disputes

11   about certain tax sharing payables that are reflected on the

12   company's SOFAs and schedules in the bankruptcy?

13   A    Yes, absolutely.

14   Q    Can you describe your understanding of what the

15   disputed items are?

16   A    Right, yeah, the SOFAs reflecting, in effect, a gross

17   payable in a -- from a TCEH subsidiary to the parent EFH

18   Corp, as well as a payable from EFH Corp to TCEH.

19   Q    And when you say "a payable from a TCEH subsidiary to

20   EFH," which TCEH subsidiary in particular are you referring

21   to?

22   A    Luminant Generation Company.

23   Q    Do you have a general understanding of the magnitude of

24   those two payables that you just mentioned?

25   A    Yes.  The Luminant Generation payable is in the amount

1    of $1.29 billion dollars, and the payable from EFH to TCEH

2    in the amount of $754 million.

3    Q    And do you have an understanding of how those two

4    payables arose?

5    A    Yes, I do.

6    Q    Can you describe that for us, please?

7    A    Sure.  Yeah, they came about as a result of two -- two

8    audit settlements that the company went through, the 1997 to

9    '02 audit settlement as well as the '03 to '06 audit

10   settlement, each of those settlements having impacts on tax

11   years after those cycles both ended.

12   Q    You mentioned Luminant Generation, is that a signatory

13   to the TSA?

14   A    It is.

15   Q    Now, on the SOFAs and schedules there are two payables,

16   as you just described.  Is that how you expected to see them

17   reflected on the SOFAs and schedules?

18   A    Not necessarily.

19   Q    Can you tell us why?

20   A    You know, the way we thought about the payables is that

21   it would be reflected on a net basis.  That's how we

22   typically thought about these payables and how they would

23   ultimately settle out.

24   Q    All right, so was the treatment on the SOFAs and

25   schedules a mistake, then?

Page 137

1   A    No, it wasn't necessarily a mistake.  So, I guess what

2   I've come to understand now is that the SOFAs and schedules

3   should reflect exactly how these balances are recorded to

4   the subledgers of the company.

5   Q    And how are the balances of these two payables recorded

6   to the subledgers of the company?

7   A    Yes, they recorded as a payable directly to or from EFH

8   Corp.

9   Q    Let's take a look at an exhibit that is a spreadsheet

10  and it's DX892.  Do you have that on the screen in front of

11  you, Mr. Ashby?

12  A    Yes.

13  Q    Can you describe -- are you familiar with Exhibit 892?

14  A    Yes, I am.

15  Q    And can you tell us what it is, please?

16  A    Sure.  This is a tax accounting entry to the subledger

17  that is related to the intercompany tax payables that we've

18  been discussing.

19  Q    And how is it related to the intercompany tax payables?

20  A    Well, in particular, by this time this particular entry

21  was recorded, the original entries to record and establish

22  those payables had already been made in 2013.  This

23  particular entry is post-bankruptcy filing, and it's simply

24  a re-class of those balances to a liability subject to

25  compromise, general ledger account.

```
 1   Q    And are there any particular balances on here that you

 2   would point us to as relating to the intercompany payables?

 3   A    Yeah, so the Luminant Generation payable that we've

 4   been discussing, you can see on Row 47 of the file.

 5              THE COURT:  I don't -- wait a minute.  There is no

 6   Row 47, or am I not seeing it right?

 7              MR. ASHBY:  Or is it 17?  I'm sorry, yes.

 8              THE COURT:  17, okay.

 9              MR. ASHBY:  Again, it's kind of cut off here, on

10   the screen.

11   Q    And can you tell us what's reflected in Row 17, sir?

12   A    Yes, this is -- this is reflective of the intercompany

13   tax payable that we've been talking about from Luminant

14   Generation, and it would appear to -- and it appears to have

15   payable to EFH Corp.

16   Q    So, what does this tell you about how the payable was

17   booked on the company's books and records?

18   A    Well, it's booked in that it's booked on a standalone

19   basis.

20   Q    Is this booking a mistake, in your mind?

21   A    No, it's not.

22   Q    Let's take a look at Exhibit 659, which should be in

23   your binder, Mr. Ashby.  Do you have that in front of you,

24   sir?

25   A    Yes.
```

1    Q    Do you recognize Exhibit 659?

2    A    Yes, I do.

3    Q    Can you tell us what Exhibit 659 is?

4    A    This is an email exchange originating from Christy

5    Dobry, who was a Director in the Corporate Accounting Group

6    to myself.

7    Q    I want to look at the third email down in the chain and

8    I see there are some numbers there in a little table in the

9    email.  Can you describe for us what that table represents?

10   A    Yeah, sure.  This -- this relates to the intercompany

11   tax payables we've been discussing, in addition to the

12   Luminant Generation payable of $1.9 billion.  There were

13   also just a few other much, much smaller payable balances

14   related to TCEH subsidiaries.  This one in particular

15   relates to the business unit TXU Energy, which is indicated

16   by the code ELRA.

17   Q    And what's the affiliate code mean?

18   A    The affiliate code, we generally mean, who is it

19   payable to.

20   Q    Okay, and in this instance, the affiliate code says

21   TXU, what does that mean?

22   A    That would indicate EFH Corp.

23   Q    Okay, so is this a journal entry reflecting a direct

24   payable from a TCEH subsidiary to EFH?

25   A    That's correct.

1   Q     Okay.  The next email up in the chain is the email from

2   Ms. Dobry to yourself, among others, and she asks you a

3   particular question, "Should we show the individual TCEH-

4   related items all as payables/receivables from EFH Corp or

5   are the BU payables/receivables with TCEH?"  Do you see that

6   question?

7   A     Yes.

8   Q     What did you understand her to be asking you there?

9   A     I think Christy here is getting towards, you know, how

10  -- how do these payables and receivables settle out?  Should

11  we have it directly to EFH Corp or would they settle within

12  TCEH, and I think she would mean within the TCEH money pool.

13  Q     And is she referring to the journal entry down below in

14  the prior email?

15  A     Yes, I believe she is.

16  Q     Okay, and your response in your email in the top of the

17  chain says, "I would keep it as shown," meaning by BU pays

18  or receives from EFH parent.  That is how a Tax Sharing

19  Agreement is intended to work."  Do you see that?

20  A     I do.

21  Q     Can you explain what you meant there?

22  A     Sure.  You know, given by this time, the original

23  payables had already been recorded to the books and records

24  and so, I just wanted to make clear to Christy, we weren't

25  intending to change how it was originally booked.

1   Q     And how it was originally booked, meaning what?

2   A     Payable directly to or from, to in this case, the

3   parent EFH Corp.

4   Q     And when you said, "That is how a Tax Sharing Agreement

5   is intended to work," what did you mean by that?

6   A     Sure.  You know, the plain reading of the Tax Sharing

7   Agreement really just addresses the origination of a tax

8   obligation and the ultimate destination of that tax

9   obligation, which is EFH Corp.  You know, it doesn't address

10  the intermediate steps that -- that could occur on how it

11  would settle out.

12  Q     Now, you told us earlier that you were -- you wouldn't

13  have expected to see a direct payable from Luminant

14  Generation to EFH on the company's SOFAs and schedules, so

15  how is that consistent with what you're telling us in this

16  email here?

17  A     Yes, I mean, just based on my understanding of how tax

18  payables have settled out in particular within the TCEH

19  registrant is that they would generally settle out within

20  that money pool process.

21  Q     Can you just -- you've mentioned the money pool and

22  settlement of these payables a couple of times.  Can you

23  describe for us what the money pool is and how it relates to

24  settlement of tax sharing payables?

25  A     Sure, yeah.  The money pool is really a -- it allows

1    for an aggregation of cash among a group of entities, in

2    this case, TCEH and its subsidiaries.  So, you know, it's

3    basically an internal settlement mechanism that can handle

4    the intercompany payables and receivables, whether tax-

5    related or not, within a group of entities.

6    Q    Does the TSA say anything about the money pool?

7    A    No, it does not.

8    Q    Does the TSA say anything about how payables that are

9    booked in accordance with the TSA should be settled?

10   A    No, it does not.

11   Q    I want to look at a document now that is not in -- is

12   not cited in your written direct, but was added to the E

13   Committee's exhibit list last night, and that's EUCC763.  Do

14   you have that in front of you, Mr. Ashby?

15   A    I do.

16   Q    Do you recognize EUCC763?

17   A    Yes.

18   Q    What is it?

19   A    This was a draft copy of a transaction decision paper.

20   Q    What's a transaction decision paper?

21   A    Sure, it's an internal document prepared on a summary

22   basis to inform other leaders of the company of a potential

23   transaction, give them an opportunity to provide feedback on

24   that transaction, and it ultimately asks for the approval to

25   execute that transaction.

1   Q    What transaction was this TDP -- what did it concern?

2   A    Sure, it -- this -- this was dealing with an issue or a

3   topic of deferred cancellation of indebtedness income.  So,

4   going back to 2009 and 2010, I know we have heard others

5   testify on this regarding the debt exchanged and debt

6   repurchases that the company went through at that time.  A

7   discount on certain debt exchanged or repurchased was

8   captured.  The IRS, just for these two years, 2009 and 2010,

9   put in a provision referred to as the 108(i) Provision,

10  which allowed taxpayers to defer the recognition of that

11  CODI or Cancellation of Indebtedness Income, to a future

12  year.

13          So in this case, 108(i) allowed for a deferral to

14  tax year 2014, and you'd recognize that it ratably over five

15  years, until 2018.

16  Q    Did the transaction as contemplated in this TDP end up

17  being executed?

18  A    No, it did not.

19  Q    You mentioned, I think, in your description of what

20  this document is that it's a draft?  How do you know what?

21  A    Well, certainly I prepared that draft and if we were to

22  see the other pages in this document, towards, you know,

23  starting maybe on Page 5 and then on Page 6, you'll see

24  there's a section for stakeholder reviews, which are

25  individuals not in the tax group, but we would ask for their

1    direct input or comments on this transaction, and you can

2    see there -- at the time, it was essentially blank, and then

3    there were no approvals, as shown here in this document.

4    Q    Had you yourself approved this draft?

5    A    No, I had not.

6    Q    Okay.  Let's take a look at Page 4 of the Exhibit,

7    UCC763.  There's a section near the bottom, a section

8    header, titled Tax Sharing Impacts, do you see that?

9    A    Yes.

10   Q    Can you describe for us what this section is intended

11   to accomplish?

12   A    Yeah, sure.  This -- this was to give the readers of

13   this document just a high-level overview of any potential

14   tax sharing impacts that may arise from this transaction.

15   Q    Okay, in the second paragraph under Tax Sharing

16   Impacts, I want to director your attention to the first two

17   sentences of that paragraph, and the first one reads:

18            "Under tax sharing methodology, both EFH and TCEH

19   would calculate its taxable income on a standalone basis.

20   For TCEH, this would include all of the activity of its

21   subsidiaries."

22            Can you explain to us what those two sentences

23   mean, please?

24   A    Sure.  You know, consistent with how, you know, we've -

25   - we've calculated and evaluated transactions, they

Page 145

1    certainly would be at a registrant level.  That's how, you

2    know, someone like myself or others in the company, my

3    superiors, generally look at transactions.  It's at a -- not

4    only a consolidated level, but also, more lower than a

5    registrant level.  So here, we're just -- we're stating that

6    we have looked at TCEH and its subsidiaries on a standalone

7    basis.

8    Q    And you said that you look at it at the registrant

9    level.  Why is it that that was your perspective?

10   A    You know, just -- just given my position, you know,

11   evaluating transactions, you know, reviewing documents, that

12   -- going lower than that level is not something that was

13   generally a part of my job description.

14   Q    And when you say, "going lower than that level," what

15   do you mean?

16   A    Going lower than the registrant level, so you know,

17   TCEH and its subsidiaries, you know, could comprise, you

18   know, at any point in time during these years, a hundred or

19   more business units, at least probably 50.

20   Q    So, you didn't dig down into the business unit level to

21   see how general entries were being booked at that level?

22   A    Right, so, you know, all accounting was recorded at the

23   lowest level allowed, which was a business unit, so we refer

24   to it as subledgers.

25   Q    If we could go to the next page Mr. Ashby, Page 5,

1    there's a continuation of the Tax Sharing Impact section,

2    and I want to direct your attention to the final paragraph

3    of that section, and specifically, let's take a look at the

4    third sentence.  It reads, and I think it's highlighted on

5    your screen:

6             "TCEH has recorded a long-term tax payable to EFH

7    of $535 million, representing the cumulative tax liability

8    for all open tax years through 2013."

9             Can you explain for us what that means?

10   A    Sure.  This, again, by this time, the intercompany tax

11   payables that we were speaking of earlier had already been

12   recorded.  But again, this goes to show our view on those

13   payables and that, you know generally, we viewed that

14   payable on a net basis, but the gross payable from Luminant

15   Generation and the receivable recorded at TCEH would settle

16   on a net basis.

17   Q    Is this inconsistent with the booking of, or recording

18   of the two separate payables on the SOFAs and schedules?

19   A    No, it's not inconsistent.  Again, the company's books

20   and records were always recorded at the lowest of levels, so

21   again, not unexpected that it's recorded -- was recorded in

22   such a manner, more of how we viewed it in the settlement

23   context.

24   Q    Okay, we've looked at some documents in the 2014 time

25   period that bear on the company's books and records.  I want

1   to look at an earlier document, and that's DX426.  Do you

2   have that in front of you, Mr. Ashby?

3   A    Yes, I do.

4   Q    Do you recognize it?

5   A    Yes, I do.

6   Q    Can you tell us what it is, please?

7   A    This is a short email exchange that includes myself,

8   originated from Mark Ramirez.

9   Q    And what's the date of the email?

10  A    November 1st, 2011.

11  Q    And had the TSA been signed by that time?

12  A    It had not.

13  Q    What was the -- what was going on with the TSA in

14  November of 2011?

15  A    It was still -- it was still under draft, it had not

16  been executed at that point.

17  Q    Mr. Ramirez's email to you at the bottom of the string,

18  the second sentence reads:

19          "Almost all business units have either a debit or

20  a credit accrued tax payable balance for 2010, even though

21  the consolidated balance is zero."

22          What does that mean?

23  A    Yes, this -- again, just reiterates that, while on a

24  consolidated basis, the company was in a loss position with

25  respect to the 2010 tax year, so, we have no liability to be

1    paid to the IRS.  On a standalone basis, each entity within

2    the group could have a standalone payable or receivable

3    balance.

4    Q    It goes on to say:

5            "We would normally settle these outstanding

6    balances through money pool entries within TCEH Corp/Other

7    and Oncor."

8            What did you understand that to mean?

9    A    Yes, this is, I think, reiterating, you know, his

10   understanding at the time that those payable and receivable

11   balances, certainly at TCEH and below, would settle within

12   the money pool process.

13   Q    He goes on to say:

14           "It is my understanding that, with the new Tax

15   Sharing Agreement, all business units that are members in

16   the agreement must settle with the corporate parent, TXU."

17           And then he asks a question:

18           "Can you help me understand how we are supposed to

19   accomplish this?" and there's a parenthetical: "(i.e. cash

20   settlement money pool)."

21           What did you understand that question to be?

22   A    Sure, I believe he's -- he's reading the literal words

23   of the agreement, right, which really only address payables

24   at a lower level entity directly to EFH Corp, so he's trying

25   to marry that concept together with how the historical

1    practice of settlements was, which went through the money

2    pool.

3    Q    And there's a response from Mr. Dillard.  Who is Mr.

4    Dillard?

5    A    Mr. Dillard, he was a manager in the Corporate Tax

6    Department.

7    Q    And Mr. Dillard responds:

8              "Based on my understanding, the TSA does not

9    stipulate how to settle outstanding balances, but more to

10   whom."

11             What did you understand that response to mean?

12   A    It's -- I believe he's -- he is simply stating that the

13   TSA doesn't address the interim steps of settlement that

14   occur, you know, within the money pool process, primarily.

15   Q    And what do you understand him to mean when he says

16   that the TSA stipulates "to whom"?  What does that mean?

17             THE COURT:  I'm sorry, we need a recess.  I

18   apologize.

19        (Recess)

20             THE COURT:  I apologize.  I had to deal with

21   something that came up.

22             MR. ROGERS:  No apology necessary, Your Honor.

23             THE COURT:  All right.

24   Q    Mr. Ashby, before the recess, we were talking about Mr.

25   Dillard's response email in DX426 where he said, "Based on

1    my understanding, the TSA does not stipulate how to settle

2    outstanding, but more to whom."  My question is about the

3    more to whom part of that statement.  Do you understand what

4    he means there?

5    A    Right.  He's making a statement that TSA addresses that

6    payments were made ultimately to EFH Corp.

7    Q    I want to talk about three disputes that have arisen

8    with respect to the application of the TSA, to the inter-

9    company tax payables that we've been discussing involved

10   Luminant Generation and TCEH and EFH.  The first one I'd

11   like to discuss is the definition of a member under the TSA.

12   Then I'd like to talk about the company's treatment of AMT

13   credits under tax sharing principles.  And then finally, I'd

14   like to talk about the time period in which the TSA applies.

15   Are you prepared to testify on those three topics?

16   A    Yes.

17   Q    Let's first talk about the definition of a member under

18   the TSA.  You mentioned that Luminant Generation is a

19   signatory of the TSA.  What kind of entity is Luminant

20   Generation?

21   A    It's a disregarded LLC.

22   Q    What does it mean to be a disregarded entity?

23   A    Well, in laymen's terms, in the eyes of the IRS, a

24   disregarded entity does not exist.  Its activity is reported

25   through a corporation.

1    Q    Do you understand that there's a dispute in the case

2    over whether disregarded entities can be members of the tax

3    sharing group under the TSA?

4    A    Yes.

5    Q    For purposes of the TSA, what difference does it make

6    whether disregarded entities are members or not?

7    A    It determines where a tax obligation should originate.

8    Q    So if members are -- members include disregarded

9    entities, what does that mean for where the tax sharing

10   obligations originate?

11   A    Right.  That a disregarded entity, in that case, a

12   member, would have a liability or an obligation related to

13   taxes.

14   Q    Do you have a view on that issue?

15   A    Yes, I do.

16   Q    What is your view?

17   A    My view is that certainly our intent, and the intent of

18   others with respect to the agreement, was that disregarded

19   entities would be considered a member or a party to the TSA.

20   Q    What do you base that view on?

21   A    Discussions had at the time and during the drafting of

22   the agreement, primarily Boyd Lovelace, my supervisor at the

23   time, as well as just through the due diligence process.

24   Q    In practice over the years in your experience with the

25   TSA, did the company apply it to disregarded entities as

1    members?

2    A    Yes, absolutely.  Accounting, like I've said before, in

3    particular tax and tax accounting, all these recorded tax

4    obligations and entries at the lowest levels.

5    Q    I want to take a look at another exhibit that's cited

6    in your written declaration, and that's Exhibit 651.  Can

7    you pull that up, please?  You recognize Exhibit 651?

8    A    Yes, I do.

9    Q    What is it?

10   A    This is an annex attached to the executed tax sharing

11   agreement that allows an admission of a new group member.

12   Q    And what's the new group member that was being admitted

13   in this particular annex?

14   A    This was Greenway Development Holdings Company, LLC.

15   Q    What kind of entity was Greenway Development Holdings,

16   LLC?

17   A    It's a disregarded entity.

18   Q    Is this the only example of an annex that you signed --

19   well, first, you signed this annex, right?

20   A    Yes, I did, yes.

21   Q    Is this the only example of an annex that you've signed

22   on behalf of a disregarded entity?

23   A    No, it is not.

24   Q    Let's take a look at another document bearing on this

25   question, and that's Exhibit 424.  You recognize Exhibit

1   424, Mr. Ashby?

2   A    Yes, I do.

3   Q    Can you tell us what it is, please?

4   A    Sure.  This is a transaction decision paper regarding

5   the tax sharing agreement.

6   Q    And it says sponsored by Kevin Ashby and Dirk Dillard;

7   what does that mean?

8   A    That simply means we were -- we prepared the document.

9   Q    And why was this particular transaction decision paper

10  prepared?

11  A    Again, like, you know, consistent with company's

12  practice with respect to any agreement or a transaction, the

13  TDP -- the purpose of the TDP is to, you know, gain

14  stakeholder input from others in the company, you know,

15  provide a high-level summary of that transaction, what it's

16  about, and ultimately ask for approval to execute that

17  transaction.

18  Q    Is there anything in this transaction decision paper

19  that bears on the question of whether disregarded entities

20  are members of the tax sharing agreement?

21  A    Yes.

22  Q    Can you direct us to that section of the tax -- the

23  transaction decision paper?

24  A    Sure.  So I believe you're referring to Section 3 on

25  Page 2?

1    Q    What language in Section 3 on Page 2 bears on this

2    issue?

3    A    Primarily the -- refer you to the second sentence.

4    Q    Okay.  So the second sentence reads: "The parties to

5    the executed agreement include SEC registrants, regular

6    corporate entities, i.e., EFH Holdings Company or EFH

7    Properties Company, and certain single member limited

8    liability companies, LLCs, that are typically disregarded

9    for federal income tax purposes, but which will be electing

10   members of this tax sharing agreement."  Is that the

11   language you're referring to?

12   A    Yes.

13   Q    What does this say about whether disregarded entities

14   are members of the group?

15   A    Yeah.  I think, you know, clearly, the TDP is not a

16   legal document, but certainly expresses our intent that, at

17   the time, disregarded LLCs would be considered a member for

18   purposes of a TSA.

19   Q    When we looked at the other TDP earlier, you pointed me

20   to some of the -- to the section on confirmations.  Can we

21   look at the confirmation section of this TDP?

22   A    Okay.

23   Q    What's reflected in the confirmation section of the TDP

24   that is Exhibit 424?

25   A    Sure.  On Page 6 and 7, you'll see a number of

1    different individuals within the company listed here, you

2    know, certain of which to provide their comments on the tax

3    sharing agreement, primarily those listed first.  And then

4    it goes on to list more high-level senior executives within

5    the company and their approval of the TDP.

6    Q    Do you recognize the signature on the last line on Page

7    7?

8    A    Yes, I do.

9    Q    Whose is that?

10   A    That's Paul Keglevic's signature.

11   Q    Did any of the folks who approved this TDP ever express

12   disagreement with the language you pointed to in Section 3

13   about treating disregarded entities as members of the group?

14   A    I'm not aware of that.

15   Q    One more exhibit on this topic, Mr. Ashby, that's

16   Exhibit 454, and it's an Excel spreadsheet.  If you could

17   call that up on the screen and go to tab 6.16.  Do you

18   recognize this Excel spreadsheet, Mr. Ashby?

19   A    Yes, I do.

20   Q    Can you tell us what this is?

21   A    Sure.  These were very high-level hypothetical examples

22   that myself and Dirk Dillard put together during the Summer

23   of 2011.

24   Q    And when you say high-level examples put together, who

25   are they put together -- who's the audience?

1   A    Sure, yeah.  This was intended to ultimately provide

2   and show with the tax accounting.

3   Q    When did you put these together?

4   A    So yes, May -- this file, I can see at the top left,

5   dated May 23, 2011.

6   Q    And the column B of this spreadsheet, there are --

7   there's a header, legal entity name, and there's some legal

8   entities listed below that.  Do you see that?

9   A    Yes.

10   Q    Can you tell me what's reflected there?

11   A    Sure.  These are just five of the entities within our

12   group.

13   Q    And are any of those entities disregarded entities?

14   A    Yes.

15   Q    In this example, are the disregarded entities treated

16   differently from regarded entities?

17   A    No, they're not.

18   Q    Okay.  Let's turn to the second dispute that I wanted

19   to discuss, which is the treatment of AMT credits under the

20   company's tax sharing practices.  First, can you give us a

21   general understanding of what AMT credits are?

22   A    Sure.  So the AMT credit is generated as the result of

23   having to pay alternative minimum tax in a prior tax year.

24   So like individuals, corporations are subject to both

25   regular tax rules, as well as the alternative minimum tax,

1    and energy companies are often subject to the alternative

2    minimum tax.  So at some point in time, EFH or its

3    predecessors, had paid on the alternative minimum tax.  And

4    when that happens, that tax becomes a credit or an asset of

5    the company that you can use to apply to a future regular

6    tax liability.

7    Q    How are -- how have AMT credits been treated by the

8    company historically for tax sharing purposes?

9    A    They've generally been treated like currency or an

10   asset and recorded on a stand-alone basis.  So we track them

11   on an entity-by-entity basis.

12   Q    In your written declaration, you cited a couple of

13   documents for the proposition that the AMT credits have been

14   treated as currency.  I want to take a look at a couple of

15   those.  The first one is going to be a spreadsheet titled

16   DX450.  Call that up in front of Mr. Ashby.  You recognize

17   this spreadsheet, Mr. Ashby?

18   A    Yes, I do.

19   Q    It's a rainbow of color.

20   A    It is.

21   Q    What is it?

22   A    This is a -- it's a workbook actually maintained by our

23   tax accounting group, that -- it's basically an inventory of

24   maintenance of where our deferred tax assets are recorded

25   within the company.

1   Q    And you cited this, as I said, as an example of a

2   document showing that AMT credits are treated as currency.

3   Can you explain that to us?

4   A    Yeah, sure.  So I'll call you to row 45 of the file,

5   and the first column listed there, TXU-en, which is the

6   business unit acronym or code for TCEH, the entity TCEH.

7   And you can see there in column U that there's a balance of

8   AMT credits provided for, which would mean it has balance of

9   these AMT credits on its books as a deferred tax asset.  If

10  you move over to column W two columns over, you'll see for

11  TCEH or TXU-en, a mobilization of AMT credits in the amount

12  of $115 million.

13  Q    And when you say a utilization of AMT credits, what do

14  you mean?

15  A    That would mean that it was utilized to reduce a tax

16  obligation.

17  Q    At the bottom of the screen -- I believe the tab is the

18  cons tab -- I just wanted to be clear for the record; do you

19  know what that means?

20  A    I would think it would mean consolidated.

21  Q    And you mentioned that this was a spreadsheet that was

22  maintained by the tax accounting group.  How is it that you

23  came to be familiar with it?

24  A    Yes, primarily through the due diligence process

25  working with Grant Thornton.

1    Q    Let's look at one more document on this subject.  It's

2    DX-974, which should be in your binder, Mr. Ashby.  Do you

3    recognize DX-974?

4    A    Yes, I do.

5    Q    Can you tell us what it is, please?

6    A    This is a wire transfer, a copy of a wire transfer,

7    from TCEH to EFH to settle its 2011 tax liability.

8    Q    This is another document that you cited in your written

9    declaration as supporting the view that AMT credits were

10   treated as currency by the company.  Can you explain that to

11   us?

12   A    Sure.  I'll direct you to the next page of the exhibit.

13   Yes, and there you'll see two columns, and it speaks to what

14   I was trying to describe earlier -- the federal or the

15   regular tax liability calculation, and there you have the

16   alternative minimum tax calculation that you have to go

17   through.  And this is a very high-level summary of the

18   calculation, but I'll point you to the row label tax.  And

19   there, you'll see that TCEH -- again, for this tax share --

20   had a regular tax liability of $256 million.

21          Again, in 2011, related to the amended and extend

22   transaction, for tax purposes, that was actually considered

23   a significant modification of the debt, and we had to

24   recognize income as a result of that.  So that's what

25   generated the income for this year.  But the regular tax

1    liability of $256 million, you'll see is greater than the

2    alternative minimum tax liability of $140 million.

3            And so, the difference in those two is effectively

4    the $115 million of credit that we saw on the previous file.

5    So TCEH, again, receiving a benefit, applying those tax

6    credits to reduce its liability to at least its minimum tax

7    liability of $140 million.

8    Q    Okay.  Let's turn to the third and final issue of

9    dispute with regard to the application of the TSA to the

10   payables reflected on the SOFAs and schedules, and that's

11   the issue of the timing -- the time period application of

12   the TSA.  Can you pull up Exhibit 648?  That's the TSA.  And

13   I want to direct your attention, Mr. Ashby, to article 6.4

14   of the TSA.  Are you with me?

15   A    Yes.

16   Q    The first sentence of 6.4 reads: "In order to reflect

17   the parties' course of dealings since January 1, 2010, this

18   agreement shall be effective for all open taxable years

19   beginning after December 31, 2009."  Do you see that?

20   A    I do.

21   Q    What is an open taxable year?

22   A    The open taxable year is a tax year in which the

23   statute of limitations with the IRS is not yet closed.

24   Q    As of December 31, 2009, were the taxable years that

25   were under audit and that were later settled and gave rise

1    to the inter-company payables, were those taxable years open

2    or closed?

3    A    They were still open.

4    Q    And when was the tax impact of the audit appeal

5    settlements recorded on the company's books and records?

6    A    2013.

7    Q    Did the company do any analysis of whether the TSA

8    would apply to the inter-company payables that arose from

9    those audit settlements?

10   A    Yes, it did.

11   Q    What did it do?

12   A    It also went through a transaction decision paper

13   process.

14   Q    Let's take a look at Exhibit 657 in your binder.  Do

15   you recognize Exhibit 657?

16   A    Yes, I do.

17   Q    What is it?

18   A    Yeah.  This is another transaction decision paper

19   discussing primarily the mark-to-market settlement and any

20   tax sharing implications.

21   Q    What is the mark-to-mark set- -- mark-to-market

22   settlement?

23   A    Sure.  Mark-to-market is the primary issue related to

24   the [indiscernible] of '06 IRS appeals.  Again, it related

25   to a long term power contract that was marked for tax

1   purposes, generated a large loss back in 2005.  The issue

2   was how that loss would be turned into income over time.

3   Q    Is this a transaction decision paper that you approved?

4   A    Yes, I believe it is.

5   Q    I want to direct your attention to Page 6 of the TDP.

6   There's a section there titled applicability of TSA to pre-

7   2010 tax years.  Are you with me?

8   A    Okay.

9   Q    What's the general discussion in this section of the

10  TDP about?

11  A    Yeah.  So, again, addressing whether this settlement

12  that, again, spans multiple tax years -- both pre-2010 tax

13  years, as well as post-2010 tax years -- whether the TSA

14  should apply to that settlement.

15  Q    And what was the conclusion?

16  A    Yes.  I believe the conclusion was that it should

17  apply.

18  Q    At the time this TDP was drafted, was this a provision

19  of the TSA that you were focused on?

20  A    No, not necessarily.

21  Q    Why not?

22  A    Certainly, while the TSA was being drafted and

23  executed, the timing or the effective date was not an issue

24  that came up for discussion.  So, again, the purpose of the

25  TSA and our understanding was that we were memorializing

1    past practice.  So whether you're applying the TSA or if

2    you're applying the methodology in the pre-TSA, pre-2010,

3    the same result is going to be reached.

4    Q    So we focused so far today on disputes over the

5    payables reflected on the SOFAs and schedules.  Are you

6    aware of any other challenges to the company's historical

7    tax sharing procedures that could be raised?

8    A    Yes, sir.

9    Q    Can you give us a sense of some examples of what those

10   would be?

11   A    Yeah, sure.  Yeah, again, whether -- whether we did, in

12   fact, memorialize our historical tax practice with this

13   agreement, whether the agreement's been applied consistently

14   across tax years, whether tax attributes have been handled

15   appropriately.  You know, again, whether payments made under

16   the agreement should have been made, or whether there were

17   payments not made that should have been made.  And, also,

18   just whether the agreement should be invalidated completely.

19   Q    And in the course of the diligence work that you've

20   done, both pre- and post-bankruptcy, have you gained a sense

21   of what it would take to get your arms around these

22   potential challenges?

23   A    Yes.  Yeah, I would -- in my mind, from my perspective,

24   there'd be a monumental effort.  If you take it back going -

25   - at least going back to 1997 when our first -- when this

1    first settlement -- the '97-'02 settlement governed.

2    Thinking about the hundreds of business units that the

3    company has had in place over that time, the different

4    changes in the structure that have occurred over those

5    years, the incredible volume of journal entries that happen

6    every month, every quarter, every year -- trying to

7    reconstruct that going back 15 plus years would be just a

8    monumental effort.

9              MR. ROGERS:  Your Honor, I will have some exhibits

10   to move into evidence at the conclusion of Mr. Ashby's

11   testimony, but I have no further questions at this time.

12             THE COURT:  Thank you.  Any questions from any

13   plan supporters?  All right.  I know the E-side committee

14   wants to cross.  We'll take a short recess and then

15   reconvene for cross-examination.  Sir, you may not discuss

16   the substance of your testimony during our break with

17   anyone.  And this will be, say, 5 to 10 minute break.

18        (Recess)

19             CLERK:  All rise.

20             THE COURT:  Please be seated.

21             MR. LITTLETON:  Good afternoon, Your --

22             THE COURT:  Sorry, I know there's been a lot of

23   back and forth.  I apologize.  For some reason, all my other

24   cases have decided that enough's enough, and they want --

25   they want some lovin'.  It's just not happening.  All right.

1    That's why I've been jumping up and down.  I apologize.

2    Okay.  Let's go.

3              MR. LITTLETON:  Okay.  Good afternoon, Your Honor.

4    Judson Littleton from Sullivan & Cromwell on behalf of the

5    EFH Committee.  I also have some witness binders if I could

6    have permission --

7              THE COURT:  Yes.

8              MR. LITTLETON:  -- to approach and hand --

9              THE COURT:  Thank you.

10                       DIRECT-EXAMINATION

11   BY MR. LITTLETON:

12   Q    Good afternoon, Mr. Ashby.

13   A    Good afternoon

14   Q    Good to see you again.  I'd like to talk to you a

15   little bit about the tax allocation agreement that was

16   executed in May 2012 that you talked about in your direct

17   testimony.  Okay?

18   A    Okay.

19   Q    It's including in your binder, 648, DX 648, and this is

20   a legal agreement, isn't it?

21   A    It's a legal, contractual agreement I would say, yes.

22   It's fair.

23   Q    All right.  It's a contract.  Right?

24   A    It's a contract.

25   Q    Okay.  And for the years that the contract is

1    effective, it determines the intercompany tax sharing

2    obligations among the EFH entities, correct?

3    A     I'm sorry, repeat the question.

4    Q     I'm sorry.  For the years that this contract is

5    effective, it determines the intercompany tax sharing

6    obligations for EFH entities.  Is that right?

7    A     Are you speaking specifically to the effective date,

8    2010 and forward only?

9    Q     Putting aside the --

10   A     Okay.

11   Q     -- issue of when it is effective --

12   A     All right.

13   Q     -- just for the years that it is effective for now --

14   A     Yes.

15   Q     -- for the years that it is effective, it determines

16   the intercompany tax sharing obligations among EFH entities,

17   right?

18   A     It does.

19   Q     And aside from the separate Oncor tax sharing

20   agreement, there aren't any other agreements that determine

21   the obligations of EFH age entities with respect to

22   intercompany tax sharing, right?

23   A     No, there's not.

24   Q     In your words, you discussed on your direct testimony

25   that the dispute between the parties -- one of the largest

1    disputes that we've talked about today turns on the

2    interpretation of this contract, correct?

3    A    Yes.

4    Q    And as you covered with counsel for the Debtors in

5    Paragraph 10 of your witness statement, you state that the

6    two goals of the tax allocation agreement were, one, to

7    follow industry best practices by having a written

8    agreement, and two, to memorialize the company's existing

9    tax sharing practices, right?

10   A    That's correct.

11   Q    And from your perspective, applying the terms of this

12   contract produced to the same results as the company's

13   historical practice.  Is that right?

14   A    That was our belief and understanding, yes.

15   Q    Now in Paragraph 20 of your witness statement, which if

16   you need to look at it, it's also in the front tab of your

17   binder.

18   A    Okay.

19   Q    You state that in general, you understood that all

20   signatories to the competitive TSA were to be treated in the

21   same way for tax sharing purposes without regard to their

22   status as corporation, partnership, or disregarded entity

23   for federal tax purposes, correct?

24   A    That's correct.

25   Q    Okay.  Do I correctly understand you be testifying that

1    the terms of this contract, the tax allocation agreement,

2    don't distinguish between members and disregarded entities

3    when providing how intercompany tax sharing liabilities

4    should be determined?

5    A    Yes, that's my understanding, that corporate entities

6    and disregarded entities would be treated the same.

7    Q    Treated the same way under the agreement, right?

8    A    Yes.

9    Q    Okay.  And I believe you testified in your direct

10   earlier that your view is that disregarded entities can be

11   members or parties to this agreement.  Is that right?

12   A    That's correct.

13   Q    Let's -- if you could flip back to the agreement --

14          THE COURT:  Which -- I'm sorry, which is it?

15          MR. LITTLETON:  Sorry, it's to DX 648, the tax

16   sharing agreement.

17          THE COURT:  Okay, thank -- I just didn't remember.

18   Thank you.

19          MR. LITTLETON:  Sure.

20   Q    And let's look first at the first recital in the

21   agreement.  It says, and I'll skip words that are not

22   directly relevant to the question I'm asking, but of course

23   you can feel free to read the whole thing.  "Whereas Energy

24   Future Holdings Corp is the common parent of an affiliated

25   group corporation, and the undersigned are members of such

1   affiliated group or entities that are, for federal income

2   tax purposes, disregarded as separate from a member of such

3   affiliated group."  You see that?

4   A    Yes.

5   Q    Okay.  Would you agree with me that that seems to draw

6   a distinction, that word "or" seems to draw a distinction

7   between members and disregarded entities?

8   A    It's certainly ambiguous.

9   Q    You interpret the "or" as ambiguous?

10  A    Yes.

11  Q    All right.  Let's look at the second recital.  Second

12  recital says, "Whereas it is the desire and intention of the

13  parties to provide for the method of allocation of the

14  consolidated United States income tax liability among them."

15  So that's a different word, parties, right?

16  A    Yes, it's different.

17  Q    Parties didn't appear in the first recital, did it?

18  A    No, it did not.

19  Q    All right, let's look at the third recital.  And the

20  third recital says, "Whereas it is the desire and intention

21  of the parties to provide for the method of allocation of

22  the consolidated or combined state income or Texas franchise

23  or margin tax among them."  Did I read that correctly?

24  A    Yes.

25  Q    Okay.

```
1    A    Yes.

2    Q    Again, parties is a different word from members, right?

3    A    Yes.

4    Q    And fair to say, would you agree with me that the

5    interpretation of the word "parties" means entities who

6    signed this agreement?

7    A    Yeah, the undersigned.  That's right.

8    Q    Okay.  And if you could turn the page, Paragraph 1.2,

9    this is the paragraph that governs how the intercompany tax

10   obligations are calculated under this contractual agreement.

11   Is that right?

12   A    Yes, that's right.

13   Q    Okay.  So let's look at step 1.  So step 1 says, "Each

14   member shall be allocated a portion of the consolidated tax

15   liability equal to the consolidated tax liability multiplied

16   by a proportion," that I won't read the entire language.  Do

17   you see that?

18   A    Yes.

19   Q    Okay.  And if you'll skip down to the last paragraph

20   under step 1, just before step 2 about midway down the page,

21   it says, "The additional amount allocated to a member under

22   this step 1 shall be further allocated under principles

23   similar to those in this step 1 to any entity that is, for

24   federal income tax purposes, disregarded as an entity

25   separate from such member."  Is that right?
```

1    A     That's correct.

2    Q     Okay.  Seems to be two different steps.  Allocate to a

3    member; further allocate to a disregarded entity, correct?

4    A     It would seem to say so, yes.

5    Q     So let's look at step 2.  "Pursuant to treasury

6    regulations, an additional amount shall be allocated to each

7    member equal to 100% of the excess of," a formula I won't

8    read.  Again, the word member, correct?

9    A     That's right.

10   Q     Okay.  And let's skip over to the next page, the end of

11   step 2, about midway down the next page.  The last paragraph

12   before step 3.  It says, "The additional amount allocated to

13   a member under this step 2 shall be further allocated under

14   principles similar to those in the step 2 to any entity that

15   is, for federal income tax purposes, disregarded as an

16   entity separate from such member."  Correct?

17   A     That's right.

18   Q     Okay.  Again, seems to reflect two different steps just

19   like step 1, right?

20   A     Yes.  Here again, the undersigned certainly included

21   corporate entities and disregarded entities, but not all

22   disregarded entities in the group were the undersigned, so

23   this could provide a further allocation to other entities in

24   the group that were not undersigned to this agreement.

25   Q     So you're saying that the -- an entity that is, for

1    federal income tax purposes, disregarded as an entity

2    separate from such member means only those disregarded

3    entities that are not parties to the contract.

4    A    Yes, that -- a member would include also a disregarded

5    entity.

6    Q    Okay.  That language doesn't appear in the contract,

7    does it?

8    A    It's certainly ambiguous in the contract, that's

9    (indiscernible).

10    Q    Okay.  You think the contract is ambiguous, yes?

11    A    Yes, I would acknowledge that, yes.

12    Q    Okay.  You would agree with me that there seems to be a

13    distinction between the step of initial allocation and then

14    further a location, correct?

15    A    Yes, like the example we looked at in my direct, the

16    2010 tax year having no tax liability owed to the IRS, yet

17    an allocation or an obligation recorded at different entity

18    levels.

19    Q    Okay.

20    A    Right.

21    Q    So an initial allocation and then a further allocation,

22    right?

23    A    Correct.

24    Q    Okay.  And let's look at the first sentence of step 3.

25    "The additional amount allocated to members or disregarded

1    entities pursuant to step 2 of this Paragraph 1.2 shall be

2    paid by such members or disregarded entities that are

3    parties hereto to the common parent on behalf of those other

4    members that had items of income, etc."  Do you see that?

5    A    Yes.

6    Q    So there it says expressly, "disregarded entities that

7    are parties hereto," right?

8    A    That's correct, yes.

9    Q    Okay.  And it doesn't say that in either step 1 or step

10   2, does it?

11   A    Yes.  No, I believe you're right.

12   Q    Now just putting aside the agreement for the moment, I

13   want to make sure that we're on the same page in terms of

14   what a disregarded entity is.  So I believe you testified on

15   your direct that a disregarded entity for federal tax

16   purposes is essentially invisible.  Right?

17   A    In the eyes of the IRS, yes.

18   Q    Right, right.  Correct.  Until 2013, EFH was a

19   corporation, correct?

20   A    EFH, it continued --

21   Q    Sorry, excuse me.  I said that wrong.  Thank you.

22   A    Yeah.

23   Q    Until 2013, EFCH was a corporation, correct?

24   A    That's correct.

25   Q    Okay.  Corporations are not invisible to the IRS,

1    right?

2    A     No, they're regarded.

3    Q     Right.  Okay.

4    A     Yes.

5    Q     Corporations are regarded entities.  Disregarded

6    entities are other forms that are not corporations.  Fair?

7    A     Yes, that's fair.

8    Q     Okay.  So again, there's a concept that's mentioned

9    instead in step 2, and just to be sure that we understand

10   how disregarded entities are typically accounted for in

11   income tax.  So there's a concept in step 2 that says

12   separate returned tax liability under the treasury

13   regulations.  Are you familiar with that concept in general?

14   A     Yes.

15   Q     Okay.  And again, putting aside the terms of this, the

16   calculation method set forth in the operative provisions in

17   Paragraph 1.2.  So during the years that EFCH was a

18   corporation, for purposes of federal tax law, it's EFCH's

19   separate returned tax liability would include all of the tax

20   attributes and liabilities of its disregarded entities'

21   subsidiaries, right?

22   A     Well, it would be reported on the federal income tax

23   return that way.  Again, I believe for internal accounting

24   recording purposes, standalone would also include, you know,

25   standalone disregarded LLCs below EFCH the corporation would

1   each have their own liability.

2   Q    Okay.  And here, we're talking about allocating, you

3   know, U.S. income tax liability, right?

4   A    Yes.

5   Q    Yes.  So we're talking about a tax, and then --

6   specifically in these sections, U.S. consolidated income

7   tax, right?

8   A    Correct.

9   Q    Okay.  So from the IRS's perspective, when it's

10  assessing U.S. income tax, disregarded entity subsidiaries

11  are invisible, right?

12  A    They're invisible.  Their activity is obviously

13  reported on the tax return.

14  Q    Right, their --

15  A    Right.

16  Q    -- tax attributes and liabilities as the case may be is

17  aggregated up through the corporate parent, correct?

18  A    Yes, through your corporation.

19  Q    Correct.  So for instance, just be sure we understand.

20  Under Federal tax law, if Luminant, which you've testified

21  is a disregarded entity, right?

22  A    Yes.

23  Q    Okay.  So Luminant, a disregarded entity, has $1000 in

24  separate return tax liability at the end of the year.  Okay?

25  And TCEH has -- can reduce that liability, its parent.  TCEH

1    is Luminant's parent, right?

2    A    Yes.

3    Q    Okay.  So TCEH can reduce that liability by $500 of

4    NOLs.  Okay?  Following me?

5    A    Of Luminant Generation, yes.

6    Q    Yes, okay.  So the result for EFCH and the result for

7    purposes of U.S. income tax is that EFCH has a separate -- a

8    net separate return tax liability of $500, right?

9    A    Again, in the eyes of the IRS, different for accounting

10   and tax sharing purposes obligations recorded to the books

11   and records of the company.

12   Q    Oh, but purposes of the U.S. consolidated income tax,

13   it's only reported from the corporate parent, and what the

14   corporate parent reports is just an aggregation of its

15   disregarded entities' subsidiaries, correct?

16   A    That's right.

17   Q    Okay.  The method of calculating intercompany tax

18   sharing obligations under the agreement, turning back to the

19   agreement, it's intended to be consistent with federal tax

20   law, right?

21   A    Yes, consistent with tax law, you know, as well as,

22   again, our historical practices.

23   Q    Right, okay.  But it expressly incorporates the methods

24   of allocation and treasury regulations, right?

25   A    Yes, treasury regulations do provide for different

1    methods of allocation.

2    Q    Okay.  And then so the last sentence is what I'm

3    referring to, the last sentence of 1.2, the operative

4    calculation provision, says, "The method of allocation

5    described in this Paragraph 1.2 is intended to be consistent

6    with Treasury Regulation sections 1.1521(a)(1) and 1.1502-

7    33(d)(3)," right?

8    A    Yes.

9    Q    Yeah.  Okay.  And under those Treasury Regulation

10   sections, is a member a disregarded entity?

11   A    Again, a disregarded entity is not regarded, you know,

12   in the eyes of the IRS or the internal revenue code.

13   Q    Okay.  So the treasury regulations would define a

14   member of a consolidated tax group as a corporation, right?

15   A    Yeah, distinguishing a member of a consolidated group

16   of companies must be a corporation, not necessarily, again,

17   the intent of this agreement.

18   Q    Okay.  And you talked about earlier this afternoon the

19   entry on the -- disputed entries, right?  The entry on the

20   SOFAs and schedules indicating a liability of EFH to TCEH in

21   the amount of $754 million for tax sharing obligations under

22   this agreement, right?

23   A    Yes, that's correct.

24   Q    Okay.  And you're also familiar with the separate entry

25   on the SOFAs and schedules indicating the liability of

1    Luminant to EFH in the amount of $1.29 billion for tax

2    sharing obligations under this agreement, right?

3    A    That's correct.

4    Q    Okay.  I believe you testified that you wouldn't have

5    expected Luminant the have a $1.29 billion liability

6    directly to EFH, right?

7    A    Well, again, I don't know if I would say I necessarily

8    didn't expect that.  They certainly would have a payable of

9    $1.29 billion on its books and records.  I would expect

10   that, yes.

11   Q    Okay.  You wouldn't have expected that liability, that

12   $1.29 billion liability to be from Luminant to EFH, right?

13   A    How it would actually settle, I wouldn't expect it to

14   settle directly with EFH.

15   Q    Okay.  And when you say settle, you mean the liability,

16   when you're actually on the hook for paying it, right.

17   A    Right, that's correct.

18   Q    Okay.  Instead you would have expected that $1.29

19   billion liability to be settled using your terminology,

20   internal to the TCEH registrant, right?

21   A    Yes, that's correct.

22   Q    And then after that, a single net liability of the TCEH

23   registrant of approximately $535 million, which accounts for

24   the use of the tax attributes to offset part of the 1.29

25   billion, that liability to EFH in the amount of $535

1    million, correct?  That's what you would've expected.

2    A    Yes.  I mean, the way I certainly viewed those payables

3    was generally on a net basis.

4    Q    Okay.  And you viewed it as a net liability from the

5    TCEH registrant to EFH.

6    A    Correct.

7    Q    Okay.  And that's because Luminant and TCEH, their tax

8    activities, their tax attributes, income tax liability are

9    aggregated under the same TCEH registrant, right?

10   A    Right.  I mean, yes, the settle of any payable of TCEH

11   or its subsidiaries would settle within the money pool

12   process.

13   Q    And that aggregation within the registrant is just like

14   the rules under federal tax law, right?

15   A    Just like the rules of the federal tax law?

16   Q    You're right.  Not a great question.  But that

17   aggregation within the TCEH registrant is consistent with

18   what's provided in the Treasury Regulations, right?

19   A    Well, then for many of these years, TCEH, actually

20   going back to 2002 or '3, TCEH has been a disregarded

21   entity.  And the money pool effectively stopped at TCEH and

22   anytime a net payable is owed to EFH, it's paid by TCEH,

23   which is a disregarded entity.

24   Q    Mm hmm.  But that -- during those years that you're

25   talking about, right, 2002 and all of the taxable years

1    prior to 2013, EFCH is the corporation, and it's the

2    corporate parent over TCEH, right?

3    A    That's right.

4    Q    Okay.  So for purposes of federal income tax law, the

5    corporation, EFCH, is liable for the tax payment to EFH,

6    correct?

7    A    Joint and severally liable?  You can make that

8    argument, but again, TCEH was the entity effectively cutting

9    the check or the wire -- making the wire transfer, not EFCH.

10   Q    Oh.  But you would agree that under federal tax law and

11   sort of the general rules of the consolidated tax groups

12   that EFCH is liable because EFCH is the corporation, right?

13   A    Yes, all corporations are joint and severally liable.

14   Q    Right, okay.  And joint and severally liable meaning

15   aggregating the, separate liabilities and tax attributes of

16   their disregarded entity subsidiaries, right?

17   A    Or, you know, the way I think about it is if a tax

18   liability is owed to the IRS, all corporations within the

19   group are effectively joint and severally liable for that

20   tax liability, that it be paid.

21   Q    Got it.  Okay.  And the way that we've been talking

22   about the way that you would've expected it to -- this net

23   liability to have been shown in the workbooks or in the

24   schedule, excuse me.

25   A    The SOFAs and schedules?

```
 1   Q    The SOFAs and schedules, right.  So the way you

 2   would've expected it to be shown is a net liability from

 3   TCEH registrant to EFH, right?

 4   A    Yeah, I mean, the way we've always thought about it,

 5   the payables that resulted from these settlements was again

 6   on a net basis.  Again, understanding that the way the

 7   accounting practice works is that they record it at the

 8   lowest levels in the company, so I wouldn't expect one

 9   payable recorded.  The fact that there are multiple payables

10   recorded it is not unsurprising, but the way it would settle

11   out again -- the way I viewed it and many others viewed it

12   was on a net basis.

13   Q    Okay.  And it -- so let's -- sorry about that.  Again,

14   let's put aside the terms of this contract, right, of the

15   tax allocation agreement.  Put that aside for a second.  If

16   there was no tax sharing allegation -- tax allocation

17   agreement in effect, all of the corporations and not the

18   disregarded entities would actually have to pay the taxes,

19   right?

20   A    Well, I don't think I would agree with that.

21   Consistent with how we've applied the tax sharing

22   historically is that disregarded LLCs are allocate taxes,

23   and they pay on their standalone tax liability, you know,

24   within the group.

25   Q    Okay.  Just for now, I'm being more general and not
```

1    talking about precisely the practice at EFH --

2    A    Okay.

3    Q    -- but in general, if there's no tax allocation

4    agreement, only to corporations have to pay tax, not the

5    DREs, right?

6    A    Pay tax to the IRS?

7    Q    Yes, correct.

8    A    Okay.  Well, again, the parent, being a corporation,

9    would pay that tax.

10   Q    Right.

11   A    And again, any corporation, joint and severally liable

12   for that tax liability.

13   Q    Right, okay.  But in this general -- speaking generally

14   again, you would expect the disregarded entities, whose tax

15   attributes and tax liabilities are being aggregated up to

16   the corporate parent level, you would expect those

17   disregarded entries reflecting what their standalone tax

18   liability is, right?

19   A    Yes.

20   Q    Okay.  And those journal entries would then be, you

21   know, aggregated and reconciled at the corporate parent

22   level, right?

23   A    Corporate parent or, you know, sub-consolidation

24   registrant level.

25   Q    Okay.  At a corporation level, right?

1    A    Yes.

2    Q    Yes, okay.  And that reconciliation would then net or

3    settle those tax attributes and liabilities of the DREs,

4    right?

5    A    Yes, that's fair.

6    Q    But absent a contract, right, those journal entries and

7    that reconciliation process doesn't create a legal

8    liability, does it?

9              MR. KERR:  Objection, Your Honor.

10   A    Well, yeah, I'm not an attorney, so --

11             MR. KERR:  He's not an attorney.

12             THE COURT:  Okay.  Everybody's talking over each

13   other.  Mr. Kerr?

14             MR. KERR:  I'm objecting.  He's asking him for a

15   legal opinion.  I object.

16             THE COURT:  Don't ask him for a legal opinion.

17             MR. LITTLETON:  I'll rephrase the question.

18   Q    So absent a contract, the process of making journal

19   entries that reflect standalone tax calculations and then

20   aggregating those up to the corporate level, that doesn't

21   create any obligation to pay according to those journal

22   entries, does it?

23             MR. ROGERS:  Your Honor, objection.  Calls for a

24   legal conclusion and it's irrelevant.

25             MR. LITTLETON:  He can testify as to what an

1    obligation -- it's not a legal conclusion.  His view of what

2    would oblige --

3              THE COURT:  Are you asking him from an accounting

4    perspective?  Or are you asking --

5              MR. LITTLETON:  From a tax sharing perspective,

6    right?  So it is internal tax sharing obligations.

7              THE COURT:  That's a legal question.  Sustained.

8    Q    So turning back to the practice at EFH, I believe you

9    testified that your focus was always kind of at the highest

10   level, at the registrant level.  Correct?

11   A    Yes, generally speaking.

12   Q    Okay.

13   A    That's correct.

14   Q    And you didn't sort of dig down and consider what the

15   particular business units were doing, right?

16   A    No, I mean, you know, given the volume of business

17   units at the company, in my position, what was required of

18   me, evaluating at a registrant level was appropriate.

19   Q    Okay.  That you've mentioned a couple of times in your

20   testimony today the Grant Thornton Report.  Are you familiar

21   with that document?

22   A    Yes.

23   Q    Okay.  It's in your binder at DX 445.  Turn to that.

24   You recognize that report, right?

25   A    Yeah.  Yes.

1    Q    And Grant Thornton did do a little bit of digging into

2    the business units, didn't it?

3    A    Yes, they did.

4    Q    And you helped prepare -- you helped Grant Thornton

5    prepare the report, right?

6    A    I did not help them prepare the report.  Again, my role

7    in this process was merely to answer questions, provide

8    information and documents, you know, as they request, so

9    just make myself available.  I didn't prepare this report.

10   Q    Fair enough, you didn't write the report, right?

11   A    No, this was --

12   Q    Okay.

13   A    -- their view.

14   Q    Right, but you provided them the information they used

15   to create --

16   A    Yeah, I helped them get the books and information that

17   they needed.

18   Q    Okay.  And you reviewed this report before it was

19   finalized, right?

20   A    Yes, I reviewed the report, sure.

21   Q    The Grant Thornton Report confirms that the separate

22   booking of the one tax sharing liability of Luminant to EFH

23   and a separate tax sharing liability of EFH to TCEH was a

24   departure from the company's historical practice, right?

25   A    The fact that it was made directly to the parent?

1    Q     Correct, that the liability ran from Luminant to EFH,

2    and then a separate liability from EFH to TCEH.

3    A     Implying that past practice would have settled not in

4    that manner?  Is that what you're asking?

5    Q     Right, so the Grant Thornton Report confirmed that past

6    practice was consistent with how you told me that you

7    would've expected these two payables to appear on the SOFAs

8    and schedules before you saw them, right?

9          MR. SHORE:  Objection to form, Your Honor, with

10   respect to practice.  It was done by the practice of booking

11   in the ledger or the practice of referring to a net

12   receivable in other forms.

13         THE COURT:  Can you be more precise, please?

14   Q     Let's turn to the paragraph that I'm referring to.  If

15   you can look at Page 53 of the report, which is Bates number

16   EFH5524634.  I'm looking at Paragraph 212.

17   A     Just a moment.

18   Q     Sure, sure.  Sorry about that.

19   A     Okay.

20   Q     Okay.  So it says, "We understand that the hypothetical

21   ad of these few transactions would be a payable due to EFH

22   Corp of approximately $535 million.  EFH Group tax personnel

23   have advised that there are no other instances they can

24   recall in which tax payables and receivables remained un-

25   netted as separate payables in opposite directions between a

1    subgroup parent and members and EFH Corp or the ultimate

2    parent in this manner."  I read that correctly?

3    A    Yes.

4    Q    Okay.  And so you understand that to mean that Grant

5    Thornton found that your view of how you would have expected

6    this, the settlement, the IRS settlement that gave rise to

7    these two payables that are on the SOFAs, your view of how

8    those would have appeared is actually consistent with the

9    company's practice, right?

10   A    They didn't settle on a net basis, yes.

11   Q    Okay.  Again, aggregating up to the corporate parent

12   member, right?

13   A    Or aggregating to some other registrant level.

14   Q    Right.  Right.

15   A    That's correct, whether a corporate entity or not.

16   Q    Okay.  And during your direct testimony you talked

17   about an email.  In your written testimony you talked about

18   the same email that's in your binder as DX659 if you could

19   turn to that.

20   A    Okay.

21   Q    So the first sentence, which you discussed with counsel

22   for the Debtors, the first couple of sentences, right, says,

23   "(indiscernible) has shown meaning by BU pays or receives

24   from EFH parent.  That is how a tax sharing agreement is

25   intended to work.  Although the TCEH registrant would never

1    pay EFH more than the net liability for the combined

2    registrant or $535 million, which is why it has a receivable

3    balance."  Do you see that there?

4    A    Yes

5    Q    That letter part is consistent with the consistent

6    historical practice that you've described, right?

7    A    Yes.  With regards to settlement that's how I would

8    expect it to settle out.

9    Q    (indiscernible) to the net liability of the combine

10   registrant, right?

11   A    Well, again, you know, tax sharing agreement, you know,

12   establishes the origination of an obligation and where that

13   obligation should go, which is EFH Corp.  It does not

14   address the interim steps of, you know, subgroup netting or

15   money pool process and how it would actually settle out.

16   Q    It's only concerned with the ultimate liability, right?

17   A    Correct.

18   Q    Now let's look at another more recent email that you

19   sent in September 2014.  It's the next tab in your binder

20   and it's Exhibit EUCC250.  The tab says ECX.  And if you

21   look down to the email that you sent, it's the fourth down

22   in this chain, on Thursday September 18th to Wendy Lee.  Do

23   you see that?

24   A    Yes I do.

25   Q    Okay. And you write here, "Had this flagged, but not

1    sure if we ever responded.  Could you look over and handle

2    if we haven't done so yet?  Pay close attention to

3    description on accrued taxes and how it's worded to ensure

4    it actually reflects our practice of standalone calcs, but

5    settlements occur within a registrant and not directly with

6    parent unless a direct subsidiary of EFH."  Did I read that

7    correctly?

8    A    Yes you did.

9    Q    Okay.  And again, that's consistent with the

10   aggregation net liability view of TCEH having a net

11   liability to EFH, right?

12   A    Yes, that's right.

13   Q    And you discussed with counsel for the Debtors a

14   transaction decision paper that was in November 2014, which

15   is the last exhibit in your binder, ECX763.  Do you recall

16   discussing that in your direct?

17   A    I do.

18   Q    Okay.  And you talked about the language on the bottom

19   of Page 4 of this document, the Bates Page 218, right?

20   A    Yes I did.  Sorry.

21   Q    Okay.  And again, that sentence says, "Under tax

22   sharing methodology, both EFH and TCEH would calculate its

23   taxable income on a standalone basis.  For TCEH, this would

24   include all of the activity of its subsidiaries."

25            That's consistent with the view that we've been

1    discussing, the view that you would have expected of

2    aggregating up to a net liability from TCEH, right?

3    A    That's correct.

4    Q    Okay.  And then turning over to the other paragraph

5    that you talked about Page 5, it starts "In this instance."

6              So, "In this instance EFH would use available NOL

7    generated by TCEH to offset its remaining taxable income.

8    However, no payment from EFH to TCEH would be made.  TCEH

9    has recorded a long-term tax payable to EFH of $535 million

10   representing the cumulative tax liability for all open tax

11   years through 2013."

12             So, bottom line, EFH doesn't have to pay TCEH

13   under this transaction that's being proposed because TCEH

14   already has a cumulative net tax liability of $535 million

15   to EFH, right?

16   A    Yes, and I will note this, again, was a draft document,

17   not executed.  But yes, again, whether it would pay on this

18   particular transaction, again, I'm speculating a bit, but

19   certainly establishing that TCEH, they viewed it as a net

20   payable up to EFH of $535 million.

21   Q    Okay.  And so this TDP does have your name on the

22   front, doesn't it?

23   A    Yes it does.

24   Q    Okay. And although it's a draft, you're saying that you

25   never had any involvement in reviewing this TDP?

1    A    No, I didn't say that.  Certainly was involved in the

2    preparation to this point, but, you know, again, this TDP

3    was not completed.  We had not received any stakeholder

4    review so this, again, is just a draft document at this

5    point.

6    Q    Okay.  You agree with me that the description in this

7    draft document with your name on it is consistent with how

8    we've been talking about that you would have expected the

9    result of the IRS settlement at issue to result in a net tax

10   liability of $535 million from TCEH to EFH, right?

11   A    Yes.  I mean, again, Lloyd, myself and leaders of the

12   company viewed those payables as on an aggregate registrant

13   level net basis.

14   Q    Okay.  And you also mentioned in your written direct

15   and on -- in your life direct earlier with counsel for

16   Debtors, these examples that you -- that you prepared and

17   that were -- that are discussed starting in Paragraph 28 of

18   your witness statement.  You recall that correctly?

19   A    Yes I do.

20   Q    Okay.  Those examples weren't actually followed by the

21   company practice, right?

22   A    Yeah, again, those were intended to be high-level

23   hypothetical type of examples.  You know, obviously we have

24   more than five entities within our group so purely

25   hypothetical.

1    Q    Right, kind of like --

2    A    For discussion purposes, yeah.

3    Q    Okay.  So in your written statement in 28C, just to

4    drill down on it, it's on Page 14.

5    A    Of my direct?

6    Q    Of your witness statement, yes, which is the first of

7    your written direct, excuse me.

8    A    Okay.  Page 20?

9    Q    Sorry, it's on Page 14.

10   A    Okay.

11   Q    Yeah, Page 14.  Do you see that?

12   A    Which section?  I'm sorry.

13   Q    It's the first tab, so the tab says --

14   A    No, no, but where on Page 14?

15   Q    Sorry, it's in C which is 28C.

16   A    Okay, yes.

17   Q    So NC8 says, "Notwithstanding what the examples showed,

18   it's my understanding that tax sharing payables and

19   receivables continue to be settled through the TCEH money

20   pool as I discuss further below."  Correct?

21   A    Right.  Again, when those examples were prepared it was

22   very early in the drafting process of the TSA and the TSA

23   really only on the face of it addressing payables directly

24   between EFH Corp -- to and from EFH Corp, but understanding

25   that the money pool process continued to operate as it had.

1    Yeah.

2    Q    Okay.  To follow up on that, on the drafting the TSA,

3    you talked with counsel for the Debtors about your

4    involvement in the drafting of the TSA, right?

5    A    Yes, I was not a drafter of the TSA.

6    Q    Right, right.  So you didn't draft the TSA, correct?

7    A    I did not.

8    Q    Okay.  And you don't recall hearing any -- hearing

9    about or being involved in any substantive discussions about

10   how the TSA should be interpreted during that drafting

11   process, do you?

12   A    No.  I mean, certainly, you know, Boyd Lovelace, my

13   supervisor at the time, he was responsible for drafting the

14   TSA.  We obviously had conversations about the agreement

15   while it was being drafted.

16   Q    Okay.  You remember conversations -- sorry.  You don't

17   remember any conversations about how the TSA should be

18   interpreted in those conversations with Boyd Lovelace, do

19   you?

20   A    Interpreted -- I think it was more about, you know,

21   what do we -- what is the intent here, right, with this

22   agreement.

23   Q    Okay.  Do you remember when you sat for a deposition on

24   October 2nd of this year?

25   A    Yes.

1   Q    Okay.  When we last talked, right?

2   A    Correct.

3   Q    Okay.  And do you remember me asking you whether you

4   recall being involved in or hearing about any discussions

5   about how the agreement should be interpreted during the

6   draft process?

7   A    Specifically generally maybe yes.  Sure.

8   Q    You generally recall.

9   A    I don't recall the specific question.

10   Q    You don't recall the specific question.

11   A    Yeah.

12   Q    Do you recall your answer to that question?

13          THE COURT:  All right.  This is not a guessing

14   game.

15          MR. LITTLETON:  Right.

16          THE COURT:  It's cross-examination.

17          MR. LITTLETON:  I'll just put it out.  That's

18   fair.  It's 87, top 10.

19          MR. ROGERS:  I'm sorry, what page?

20          MR. LITTLETON:  So if you could look at your

21   deposition, which I think should be in your binder, right?

22          THE COURT:  What page are we on, counselor?

23          MR. LITTLETON:  Yes, sir.  I'm about to tell you.

24   Q    So if you could turn to Page 87 beginning at line three

25   it says, Question: Do you recall being involved in or

1    hearing about any discussions about how the agreement should

2    be interpreted during the draft process?  Answer: No.  Is

3    that accurate?

4    A    Well, again, I was not involved in the drafting of the

5    words in the agreement.  Certainly aware of the work going

6    on and, you know, I'm sure I had discussions about that

7    because I, you know, was preparing the examples on behalf of

8    Boyd Lovelace who asked me to do that.  So, you know, in

9    order to do that I needed some level of understanding.

10   Q    Okay.

11   A    But I see that as a legal interpretation of the

12   agreement or the wor -- then no.

13   Q    I think you talked about, you know, until late 2013 it

14   was the tax accounting group that handled the calculations

15   and determinations of the intercompany tax sharing

16   obligations, not the corporate tax group where you worked,

17   right?

18   A    Yes, that's certainly the case.

19   Q    So, prior to late 2013 when those departments merged,

20   you personally had very little involvement in calculating or

21   booking intercompany tax sharing obligations during those

22   years, correct?

23   A    Yes.  Certainly with respect to journal entries or

24   recording to the subledgers, yes, no, not involved with that

25   process, but, you know, certainly aware of any registrant

1   level tax liability that may be due, you know, from a TCEH

2   registrant to an EFH Corp, yeah.

3   Q    And you only had limited knowledge of how intercompany

4   tax sharing obligations were actually calculated prior to

5   2013.  Is that right?

6   A    I mean limited to the sense as to the specific

7   calculations, yes, I did not review, sign off or supervise

8   any of those individuals handling those calculations, but,

9   you know, had a general understanding that the way our

10  practice worked it was that standalone calculations on an

11  entity by entity basis were being made.

12  Q    As we talked about earlier, you are aware that the

13  parties dispute about the results of the IRS settlement that

14  gave rise to these two payables that are booked on the SOFAs

15  and schedules turns on the interpretation of the TSA, right?

16  A    Sure.

17  Q    Okay.  And you said that you had some general awareness

18  of what that disagreement is, correct?

19  A    Yes.

20  Q    Okay.  But you don't have a view as to which party is

21  right in that dispute, do you?

22  A    No I don't.  I mean, the way we recorded it is the way

23  we recorded it which, again, we believe was consistent with

24  how we have always would have recorded a payable as such.

25  So, again, in the lens of the bankruptcy process this puts a

1    whole different eye on how these payables are recorded and I

2    have no opinion on who is correct on thaT-side of the issue.

3    Q    And you're saying how we recorded it -- when you said

4    how we recorded it is how we recorded it you're talking

5    about the journal entries, right?

6    A    Yes, that's right

7    Q    And you also don't have a view about whether the

8    competitive TSA actually applies to any years prior to 2010,

9    right?

10   A    I wouldn't characterize it as no view.  I don't

11   necessarily -- didn't have a strong view on that topic.

12   Q    Okay.  Just from your perspective, same result.

13   Whether the tax allocation agreement applies or doesn't

14   apply ends up the same way because the tax sharing agreement

15   is just memorializing past practice, right?

16   A    Yes, that's exactly right and certainly with respect to

17   the settlements that crossed pre-2010 tax years as well as

18   post-2010 tax years that, you know, it was reasonable to

19   expect a consistency there.

20   Q    Okay.  You don't have a view as to which is correct

21   under the terms of the agreement, right?

22   A    Again, reading the agreement it's a little ambiguous.

23   You can read it and have a different interpretation.

24   Q    And you talked about, with counsel for the Debtors, the

25   exhibit -- if you could turn back to their binder just to

1    refresh, it's the one with the white cover.  The Debtor's

2    witness binder.  Just to make sure we're on the same page

3    with what we're talking about.  The tab that is DX657.

4    That's a transaction decision paper marked to market

5    settlement and tax sharing considerations.  Do you recall

6    discussing that on your direct testimony?

7    A    Yes I do.

8    Q    All right.  You testified that these transaction

9    decision papers are not legal documents, right?

10   A    That's right.

11   Q    Okay.  So this transaction decision paper doesn't

12   control the meaning of the tax sharing agreement in your

13   view, right?

14   A    That's right.  It's not a legal document.

15   Q    And you also talked about DX424 in the Debtor's witness

16   binder.  Do you recall discussing this on your direct

17   testimony?

18   A    I do.

19   Q    Okay.  And so similarly, this transaction decision

20   paper is not a legal document, is it?

21   A    No, it is not.

22   Q    Okay.  And it doesn't describe all the details of the

23   competitive tax sharing agreement, does it?

24   A    No, no.  It says summarized level document.

25   Q    Right.  It's just a general description for senior

1    personnel at the company who may not be conversant in tax

2    matters, right?

3    A    Yes.  Again, the intent is to inform and be

4    informative, but you're not going to go into every detail of

5    a transaction, yes.

6    Q    And in drafting this TDP you relied on your former

7    supervisor Boyd Lovelace to describe for you how the

8    competitive -- to describe for you the terms of the

9    competitive TSA and how it was intended to work, right?

10   A    Yes, that's generally the case.  You know, he being a

11   drafter of the agreement I did need to rely upon him.  I

12   mean, I certainly read the agreement myself, but I did

13   consult with him.

14   Q    Okay.  Beginning at Paragraph 50 of your witness

15   statement, if I could have you turn back to that in your EFH

16   Committee's witness binder with the blue cover.  Beginning

17   at Paragraph 50, which is on Page 22 of that written direct

18   -- are you there?

19   A    Yes.

20   Q    Okay.  So in this section you're discussing the facts

21   surrounding the AMT credits portion of this $754 million

22   payable, correct?

23   A    That's correct.

24   Q    Okay.  And, as you note in the last sentence that

25   begins on the bottom of 22 that starts, "Because...", the

1    AMT credits at issue here were eliminated pursuant to tax

2    rules providing that cancellation of indebtedness income is

3    excluded from taxable income when the relevant Debtor is

4    insolvent, right?

5    A    That's right.

6    Q    Okay.  And so in the IRS settlement at issue here the

7    relevant Debtor was insolvent, correct?

8    A    Yes.  This was an entity that held operations in Europe

9    and that filed bankruptcy in Europe and so we had a huge

10   loss as a result of that -- of that bankruptcy in Europe.

11   On the other hand the company did have to recognize

12   cancellation of indebtedness income with respect to that.

13   Q    Okay.  And so the cancellation of indebtedness income

14   because the company was insolvent did not actually reduce or

15   equal taxable income, right?

16   A    Right.  It was excluded from taxable income under the

17   provisions of 108(a) insolvency.  That's correct.

18   Q    Right.  Okay.  And in connection with that cancellation

19   of indebtedness income, AMT credits belonging to TCEH were

20   eliminated pursuant to those same Treasury regulations,

21   right?

22   A    Yes, that's right.  So by excluding that income the IRS

23   then says you need to reduce your tax attributes.  The year

24   here, 2006, AMT credits were the primary tax attribute

25   reduced and TCEH did have a balance of those credits.

1    Q    Right.   Okay.   But the elimination of those credits

2    didn't actually reduce any taxable income of the Debtor

3    because the cancellation of indebtedness income wasn't

4    counted as taxable income in the first place, right?

5    A    Yes.   It did not reduce the tax liability.   There is no

6    taxable income there.   However, TCEH was foregoing the

7    future benefit of these AMT credits to reduce its own tax

8    liability so in a sense it was foregoing its benefit related

9    to its credits.

10   Q    I see.   But EFH -- fair to say that EFH didn't get any

11   benefit from the elimination of these AMT credits, right?

12   A    Well, the benefit, again, was the exclusion of the

13   income from taxable income, correct.

14   Q    But the exclusion of the income, right, from taxable

15   income was because the relevant Debtor was insolvent, not

16   because the AMT credits were eliminated, right?

17   A    The deduction of AMT credits was the result of the

18   exclusion of income, right.

19   Q    At the beginning of Paragraph 54 on the next page you

20   testify, "As part of my post-petition reconciliation

21   efforts, I learned that the company's tax accounting

22   personnel determined that a significant portion of those

23   eliminated AMT credits were attributable to TCEH and that

24   TCEH was entitled to compensation for the reduction of those

25   AMT credits."   Do you see that?

Page 202

1    A    Yes.

2    Q    Okay.  I notice you don't cite any documents or files

3    here.  Are you saying that someone told you that?

4    A    No, this was, again, post-petition spent a lot of time

5    with respect to due diligence process, responding to

6    questions about a number of different issues, but obviously

7    tax attributes and how those were accounted was included

8    there.  So, it's through those efforts and working with

9    others in the department, namely Wendy Lee, that I would

10   come to know this.

11   Q    Okay.  So even though you don't cite any here, are

12   there other documents that support that sentence?

13   A    Well sure, I mean, we, you know, we looked at the AMT

14   walk forward schedule previously, right, which tracked the

15   AMT credits on an entity by entity basis.  And again,

16   consistent with how tax sharing has been done historically

17   in the company is that these credits are an asset, they're a

18   deferred tax asset of that entity for use to offset a future

19   tax liability.

20        So again, TCEH was foregoing its future

21   utilization of these credits and I think it's consistent the

22   way we've historically done it is that they would get

23   reimbursed for their credits being used by another party.

24   Q    Okay.  And I'm just asking you about these particular

25   credits that your testimony says that the tax accounting

1   personnel determined were attributable to TCEH.  Did you see

2   any documents that were -- that reflected those specific AMT

3   credits that are discussed here?

4   A    Again, I point -- I guess I would point again to the

5   AMT walk forward schedule that we looked at earlier which is

6   a tax accounting workbook.  Yes, they track those on an

7   entity by entity basis.

8   Q    Okay.  So that walk forward book shows that these AMT

9   credits are attributable to TCEH.  Is that what you're

10  saying?

11  A    Yes, that's -- yes, that was an important document,

12  right, to substantiate where those credits were reported on

13  the books and records, yeah.

14  Q    Okay.  If you look down at Paragraph 55 it says, "Upon

15  subsequent diligence in 2013, personnel from tax account

16  determined --"

17           THE COURT:  Mr. Littleton, I'm sorry.  I'm getting

18  a little foggy frankly so I may need a little bit of a

19  break.

20           MR. LITTLETON:  Okay.  I --

21           THE COURT:  So --

22           MR. LITTLETON:  I'm almost -- I have maybe three

23  more questions.

24           THE COURT:  Oh okay.  I'm staying with you as best

25  I can.

1          MR. LITTLETON:  I don't like to hear that.  That's

2     not really a compliment.

3          THE COURT:  It is a compliment actually.  You're

4     doing a fine job.

5          MR. LITTLETON:  Thank you, Your Honor.  I

6     appreciate that.

7     Q     So, wrapping up, Mr. Ashby --

8     A     I'm glad to hear.

9     Q     I'm sure you won't mind either.  On Paragraph 55 it

10    says, "Upon subsequent diligence in 2013, personnel from tax

11    accounting determined that TCEH had already been given

12    credit for some of those AMT credits with respect to

13    previous years.  Tax accounting determined that the $319

14    million payable that was recorded in the second quarter of

15    2013 double counted the benefit of those other -- of those

16    AMT credits."  Right?

17    A     Yes.

18    Q     Okay.  And again, you don't cite any documents here.

19    Is this understanding from a document?

20    A     Yeah, so it's a little bit of a timing issue here.  So

21    again, the (indiscernible) resulting from the Europe

22    bankruptcy and the exclusion of that income was in our 2006

23    tax year, okay?  We obviously didn't reach that settlement

24    until 2013 where in between normal tax sharing had been

25    going on in the company, and like we looked at earlier with

1    that wire transfer and the AMT walk forward, that in 2011

2    TCEH had actually utilized over $100 million of their AMT

3    credits.  So it's kind of like do you go back to a point in

4    time, 2006, as -- they're comparing to what was actually on

5    the books in 2013 when this settlement occurred.

6    So, it wasn't until the end of the year and after bankruptcy

7    there was a more fulsome reconciliation done that this was

8    addressed.

9    Q    And so if I wanted to see in the documents where this

10   double counting that you talk about in Paragraph 55 was

11   reflected where would I look?

12   A    Well again, the $395 million and certainly the AMT

13   credits used in 2011 did reduce TCEH's liability.  We saw

14   that reflected in the wire transfer and that support as well

15   as the AMT credit walk forward.  Again, the AMT credit walk

16   forward may -- going back into the history would

17   substantiate that credit balance on its books.

18   Q    Okay.  I just have one more question.  You testified at

19   the end of your direct testimony about the monumental effort

20   and the, you know, thousands of journal entries and bookings

21   that you would have to look through to help sort through the

22   potential tax claims between the two companies, right?

23   A    Yes, that's right.

24   Q    Okay.  You wouldn't have to look at very many documents

25   to sort out this particular dispute about the $754 million

1    versus the $1.29 billion payables, would you?

2    A    No, I would disagree.  I mean, again, these settlements

3    spanned 15 plus tax years so, you know, to ensure your -- if

4    you're going to recompute tax sharing, again, that is a lot

5    of information that would encompass the as filed tax

6    returns, amended, you know, per the audit, so.

7    Q    Right.  But just to determine, not to recalculate the

8    numbers, but just to determine who's liable you wouldn't --

9    that wouldn't take a monumental effort through a bunch of

10   journal entries, would it?

11   A    Well that's -- I'm not an attorney.  I'm not, you know,

12   stating who is liable for the obligation.

13   Q    Okay.

14           MR. LITTLETON:  I have no further questions.

15           THE COURT:  Thank you.

16           MR. LITTLETON:  I do have a couple of exhibits,

17   but are we doing it at the end?

18           MR. ROGERS:  Your Honor, we don't have any

19   redirect for the witness so we can either do exhibits now or

20   we can take a break and do them after the break.

21           THE COURT:  Does anyone have any further questions

22   for the witness?  All right, thank you Mr. Ashby.  You can

23   step down.  Let's do the exhibits while we're on our feet.

24           MR. ROGERS:  Your Honor, the Debtors would move

25   into evidence the following exhibits from Mr. Ashby's

1    written declaration: DX445, DX453, DX653, DX654, DX671,

2    DX975.  In addition, we would move the following exhibits in

3    from Mr. Ashby's direct examination today: DX424, DX426,

4    DX450, DX454, DX651, DX657, DX659, DX892 and DX974.

5              THE COURT:  Thank you.  Any objection?

6              MR. LITTLETON:  No objection.

7              THE COURT:  They're admitted.

8              MR. LITTLETON:  And the EFH Official Committee

9    would move into evidence EUCC250 and EUCC763.

10             THE COURT:  Any objection?

11             MR. ROGERS:  No objection from the Debtors, Your

12   Honor.

13             THE COURT:  They're admitted.  Thank you.

14             MR. ROGERS:  Your Honor, we have been handing out

15   green sheets I understand with these.  May I approach?

16             THE COURT:  Yes, give them to Ms. Werkheiser.

17   Thank you very much.  Mr. McGaan, I think we had two open

18   issues you needed to discuss.

19             MR. MCGAAN:  Mr. Glueckstein has some exhibits.  I

20   can clean up the two I mentioned.  Do you want to go ahead?

21             MR. GLUECKSTEIN:  No, go ahead.

22             MR. MCGAAN:  All right. Interim again for the

23   Debtors, Your Honor, at the close of Mr. Smidt's testimony I

24   mentioned that there were two exhibits we needed to double

25   check on.  537 was offered by conflict's counsel.  We have

1    no objection to the admission of 537.  And then I mentioned

2    408 and we went back and checked and that wasn't offered so

3    there's not an issue with 408.

4              THE COURT:  Okay.  Thank you.  Mr. Glueckstein.

5              MR. GLUECKSTEIN:  Your Honor, I just wanted to

6    clean up on the Committee's exhibits from this week.  There

7    were a number of exhibits that were used with Mr. Keglevic,

8    primarily by conflicts counsel, were disclosed to Debtors

9    that were not moved into evidence earlier in the week.  We

10   didn't have that handy and I wanted to put that on the

11   record now.  And then we have the complete list of

12   everything we've moved in this week for your clerks and we

13   copied the Debtors as well.

14             THE COURT:  Okay.  Thank you.

15             MR. GLUECKSTEIN:  And so the additional exhibits I

16   believe that have not been moved in.  It related to Mr.

17   Keglevic in connection with Mr. Liebesman's testimony was

18   EUCC267, 269, 270, 272, 273, 329, 443, 447, 466, 471, 474,

19   475, 479, 503, 527 and 634.

20             THE COURT:  Any objection?

21             MR. MCGAAN:  One moment, Your Honor. Andrew McGaan

22   for the Debtors, Your Honor.  We don't know.  We don't have

23   the Keglevic materials here.  I doubt seriously we're going

24   to have a problem with it, but I'd just like the opportunity

25   to talk to our team and double check.

1           THE COURT:  All right.  We'll -- you can have the

2    break until we reconvene on Thursday and you can let me know

3    then if there are any issues.  Otherwise we'll hold it open

4    until then.

5           MR. MCGAAN:  Will do.

6           THE COURT:  Okay.  Anything else?  All right.

7           MR. MCGAAN:  Nothing further from the Debtors.

8           THE COURT:  Very good.  We will break and recess

9    until Thursday at 10:00 a.m.  We'll have our normal

10   premeeting at 9:30 in the mediation room.  I'm going to ask

11   you all to please be good stewards of the courtroom and

12   clean up your areas, remove water bottles, boxes, et cetera.

13   These over here that are next to, you know, the ones that

14   are sort of on carts, et cetera, can stay obviously, but

15   they counsel table needs to be completely cleared away and

16   anything in the -- in any of the boxes, in the pews, et

17   cetera, need to be cleared away until next week.

18           MR. MCGAAN:  Your Honor, Mark McGaan, Kirkland &

19   Ellis.  I recognize it's been a long day and there was a

20   suggestion at one point that you could take up the scope

21   dispute as related to Mr. Mendelsohn at this time.  We can

22   also start -- we can also address that next week as well.

23           THE COURT:  Well, I was plan -- I was planning on

24   doing that next week when we started him.

25           MR. MCGAAN:  Very good.

1           THE COURT:  Sorry if I didn't communicate that.

2           MR. MCGAAN:  No, no.  I think you had communicated

3    that, but we just wanted to clarify that.  Thank you, Your

4    Honor.

5           THE COURT:  That's all right.

6           MR. MCGAAN:  And given where we are with the time

7    now, we'll work with the Committee to figure out the best

8    sequencing of witnesses and we'll actually do the best we

9    can to work that out well in advance of the 9:30 so that we

10   -- and we'll let chambers know as well.

11          THE COURT:  Yeah, if you can communicate to

12   chambers that will be helpful so that I can make sure I read

13   the declarations ahead of time.

14          MR. MCGAAN:  Our goal would be to work that out on

15   Monday and tell you on Tuesday.

16          THE COURT:  Okay.  That's fine.

17          MR. MCGAAN:  Thank you.

18          THE COURT:  You're welcome.  Anything further?

19   All right, thank you all very much for what was an

20   incredibly well organized four days.  I truly appreciate all

21   your efforts and we are in recess until Thursday.

22                        * * * * *

23

24

25

Page 211

1              C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

Sonya          Digitally signed by Sonya
               Ledanski Hyde
6    Ledanski Hyde  DN: cn=Sonya Ledanski Hyde, o,
               ou, email=digital1@veritext.com,
               c=US
7              Date: 2015.11.09 12:32:12 -05'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  November 9, 2015