# BNY MELLON

111 Sanders Creek Parkway
2nd Floor
East Syracuse, NY 13057

August 28, 2015

Kenneth S Stewart
2028 Sandy Lane
Irving, TX 75060

**Re: Holding(s) Registered to Kenneth S Stewart**

Dear Mr. Stewart,

Thank you for your recent correspondence regarding the captioned issue.

BNY Mellon has concluded the requested research into your inquiry. Our records indicate no holdings registered under the above referenced name. However, our research did indicate that BNY Mellon is the agent for the TXU Energy LLC issue.

Unfortunately, the only registered holder, in our systems, for that specific issue is Cede & Co. Therefore, for specific information pertaining to that issue, you will need to obtain the services of a brokerage to contact DTCC, directly.

If you have any questions, please contact our Bondholder Relations Department at (800) 254-2826, Monday through Friday, 9:00 a.m. – 6:00 p.m. (EST)

Sincerely,

Client Service Specialist
Corporate Trust-Bondholder Relations
Case # 2015-0827-51746



This is your TRW consumer identification number. Please refer to this number when you call or write TRW.

ID# 9997772410931653

1. Allstate owns TRW c
2. Issued before my father passed

KENNETH ROBERT STEWART, JR
2028 SANDY LN
IRVING, TX   75060

OTHER ADDRESSES      1928 POMAR WAY            YEAR OF BIRTH       1970
                     WALNUT CREEK CA 94598

## IDENTIFICATION INFORMATION:

THE FOLLOWING ADDITIONAL INFORMATION HAS BEEN PROVIDED TO US BY ORGANIZATIONS THAT REPORT INFORMATION TO US.

ADDRESS          2028 SANDY LN
                 IRVING TX 75060              110 SMALL HILL DR
                 REPORTED 03/89 BY A TRW MEMBER    GRAND PRAIRIE TX 75050
                                              REPORTED 09/92 BY A TRW MEMBER

                 2028 SANDY LANE
                 IRVING TX 75060
                 REPORTED 08/94 BY A TRW MEMBER

OTHER

                 MIDDLE INITIAL     S

                 AKA NAME        ROBERT

FROM 9/1/94 THE NUMBER OF INQUIRIES WITH THIS SOCIAL SECURITY # = 0

FACS+ BUSINESS ON FACS+ FILE/CPI MANAGEMENT/2028 SANDY LN/IRVING
75060/214.255.1133                                                   TX

Social Security Number You Gave Was Issued: 1977 - 1979

CONSUMER CREDIT REPORT (CDI)      A09M12        12 09 94 16:34   PAGE 5

I Kenneth R Stewart Jr aka Kenneth S Stewart. do attest records of Txu, Edison International Inc; The Allstate Corp, KKR, Cede, Dtcc, etal.

   A. Fraud, securities

     1. Improper proxy statement & Board dirictors

     2. Improper shareholders, representative, reprisentation of annual board meeting

     3. owner shares being manipulated now & past

     4. False notifaction on board meetings and account numbers

Kenneth R Stewart aka      K S.    October 3, 2015
Kenneth S Stewart
Po Box 151645
Irving TX 75015

Statement of illegal security
Violations by TXU, Edison Int'l,
And others Noted.

REVOCATION OF POWER OF ATTORNEY

I, the undersigned KENNNETH ROBERT STEWART JR. AKA KENNETH S STEWART

SS_ _ _-_ _-5438 residing at 2028 SANDY LN. IRVING, TEXAS.

Hereby revoke the Power of Attorney dated prior to OCTOBER 12, 2015 and granted to

BUSINESS ENTITIES, ATTORNEYS,: Edison International, TXU and its subsidiaries, ᐧ. . . . . . . Stewart
Information Corp, CT Corp the registered agent of record at Dallas Texas.

I hereby give notice to EVERYONE   and all other interested parties that I withdraw every power and
authority thereby given and declare the above referenced Power of Attorney null and void and of no
further force or effect.

Executed this 12th day of October 20 15

at 5353 Maple Ave #100 Dallas Tx 75225

Signature: _K. Stewart_

in the presence of the unde:

Witness 1.

Name: _____

Address: _____

Signature: _____

Witness 2.

Name: _____

Address: _____

Signature: _____

Letter to TXU, Associates Commercial
Corp., Stewart Information, And
Allstate Corp.

Acknowledgment

This document was acknowledged before me on this _1__day of __Oct_____20__by
Kenneth R. Stewart (Principal's Full legal name)

Signature of Notary Public _Marie Ce_____

Full legal Name _Marlene Garza_____

My commission expires _1 - 6 - 19_

State of _TX_____County of _Dallas_____

MARLENE GARZA
Notary Public, State of Texas
My Commission Expires
January 06, 2019



**BNY MELLON**

111 Sanders Creek Parkway
2nd Floor
East Syracuse, NY 13057

August 28, 2015

Kenneth S Stewart
2028 Sandy Lane
Irving, TX 75060

**Re: Holding(s) Registered to Kenneth S Stewart**

Dear Mr. Stewart,

Thank you for your recent correspondence regarding the captioned issue.

BNY Mellon has concluded the requested research into your inquiry. Our records indicate no holdings registered under the above referenced name. However, our research did indicate that BNY Mellon is the agent for the TXU Energy LLC issue.

Unfortunately, the only registered holder, in our systems, for that specific issue is Cede & Co. Therefore, for specific information pertaining to that issue, you will need to obtain the services of a brokerage to contact DTCC, directly.

If you have any questions, please contact our Bondholder Relations Department at (800) 254-2826, Monday through Friday, 9:00 a.m. – 6:00 p.m. (EST)

Sincerely,

Client Service Specialist
Corporate Trust-Bondholder Relations
Case # 2015-0827-517

*Cede & Co. is suspect in fraud and owned by AS A clearinghouse and depository trust with DTCC which transferred my funds and shares. by, and of, TXU.*

UNITED STATES BANKRUPTCY COURT for the SOUTHERN DISTRICT OF TEXAS

KENNETH STEWART        ~Debtor~
ASSOCIATES COMMERCIAL CORPORATION

                       ~Movant~

**Bankruptcy Case Number**

**97-24405-B-7**

**FILED**

OCT 27 97

*Kenneth Stewart is*
*Associates Commercial Corpor...*

**RELIEF FROM STAY**

...was filed, seeking relief from the automatic stay of
on the motion for:

**WILL BE HELD PRIOR TO HEARING DAYS. CALL
(512) ___-3452 BY 1:00 P.M. ON NOVEMBER
___ OR YOUR TELEPHONIC ANNOUNCEMENT MAY
RESULT IN NOT BEING HEARD!**

___, Brownsville, TX 78520.

...working days before the hearing you must:

1. File with the Clerk an exhibit supporting same.

   a. You have conferred with the movant in a good faith effort to reach an agreement, with the dates and times of the conferences.
   b. The efforts were unsuccessful, and
   c. A hearing is required.

2. File with the Clerk your written answer opposing the motion; include:

   a. The particular grounds for the opposition under Federal Rules 8(b) and 11;
   b. The identity of your interest in the property;
   c. The provable value of the property and the equity after deduction of all encumbrances; and
   d. Attach copies of your affidavit of confirmation and the motion to your answer.

3. Serve a copy of your written answer on the movant at:

   **MIKE RIDULFO**
   **1200 AMERICAN BANK PLAZA**
   **CORPUS CHRISTI, TX  78475**

Your written answer will be your request for hearing.  No hearing will be held on the request of the movant or on an answer received within five days before the hearing.

**MICHAEL N. MILBY, Clerk**

Date Issued:   **OCTOBER 27, 1997**      By: _____
                                   Deputy Clerk

*To the Movant:* A copy of this notice with ...

*LOCAL FORM NO. 6*

(16)

Kenneth Stears   Director

The Allstate Corp

2005   Kennett $100,000,000 secured   2007   KKR

Mrs McGinn   TXU AKA Edison International
Due 500,000,000 2008
1.2 Billion

Kennett Stewart
Bio Diesel   Associates Corp (merger) Peoples Bank, Citi
100,000,000
Secured by Mrs McGinn
merger
Dallas Freightliner   Aurora Gas

merger

3-7-2008 PG&E   Atc Freightliner, ATC, Traders,
Stewart Info, Stewart Corp

1-10-2008 General Electric,
Edison International

Kennoco
Lone Star Gas

Allstate
Subsidiary

Trucker   K&K = KK

K&K Transportation Inc

K&K Trucking

K&K Concrete

K&K Construction

K&K Development

K&K Realty

Some of Allstate and TXU's families of companies which I hold interests therein.

DATA PROVIDED ~~you~~ Judge IN COURT

ON August 18, 2015.

14-10979 (CCS)

cts

2015 AUG 18
US BANKRUPTCY
DISTRICT CLERK

AKA

~~for her~~

~~my claims~~

~~All claims is as follows~~

A) Edison International to support my claim
is TRW that states Kenneth S Stewalt
AKA Robert

D) Associates Commercial Corporation
documents to support Associates is United States
Bankruptcy filed in Southern District of Texas.
Associates has UCC Filings associated with K&K and
Citi, Peoples Sidney Financials Corporations, Kenneth Stewart
Aurora oil & gas is a subsidiary of Associates.
~~April 16, 1998    Case No. 3982518 (CIN-11)~~
~~for disbursement  authorization  of Kenneth Stewalt~~

September 28, 1998    Stewalt Associates ~~stat~~ formed
with  JSC Manufacturing Inc , which "TSC" ~~merged~~ 2005
Manufacturing" 75-291468 also JSC manufacturing
74-1729051, ~~is a subsidiary of TXU later on~~
TSC is subsidiary of TXU

C)    Allstate   Non Accessible Member
(Perferred Stock) supporting document is better from
allstate.  Mutuals.  Also after my father passing
in  January 25, 2004.  Ms Meginn Secured
100,000,000  under Kennett Stewart aka Kenneth
Stewart.  Form  8-K is attached.  Ms
Meginn signed of on the Non Accessible Member of
Allstate. on the "Capital Asset Program output policy
coverage part with commercial automobile, commercial
property, crime & fidelity, Farm, Liquor, medical
professional liability, owners & contractors protective
liability, POLLUTION  LIABILITY, Products/Completed
Railroad Protective


D)    Mineral   lease  Under   Clifford
Chance US LLP, 200 Park Avenue, New York 10166
which was supposed to pay the notes on  mortgage
Lone Star Park Grand prairie and other notes.


                A

Prayer

I Kenneth R Stewart Aka Kenneth
R Stewart have provided suffience evidence
to prove I am secured not holder for Edison
International, Preffered Stock holder


Kenneth R Stewart
2028 Sandy Ln
Irving TX 75060
817- 751-3280

002AAAAAAAAG01291101020203940405020202



**T. ROWE PRICE**

*4515 PAINTERS MILL RD.*
*OWINGS MILLS, MD 21117*

000179 SUMPRO030502G034DOM
**SM**
**KENNETH R STEWART**
**2028 SANDY LN**

**IRVING, TX 75060-5639**

SUMPRO030502G034DOM0000000179 02O

ENCLOSED YOU WILL FIND THE PROSPECTUS
REGARDING YOUR PURCHASE OF
**MATTHEWS ASIA DIVIDEND FUND
    CUSIP 577125107 A/C:***7769
    TRADE DT 04/03/14 TRANSMIT DT 03/04/14

ENCLOSED YOU WILL FIND THE PROSPECTUS
REGARDING YOUR PURCHASE OF
**PIMCO TOTAL RETURN FUND
INSTL CL
    CUSIP 693390700 A/C:***7769
    TRADE DT 04/03/14 TRANSMIT DT 03/04/14

ENCLOSED YOU WILL FIND THE PROSPECTUS
REGARDING YOUR PURCHASE OF
**RIDGEWORTH FDS
TOTAL RETURN BD FD CL I
    CUSIP 76628T512 A/C:***7769
    TRADE DT 04/03/14 TRANSMIT DT 03/04/14

ENCLOSED YOU WILL FIND THE PROSPECTUS
REGARDING YOUR PURCHASE OF
**T ROWE PRICE EQUITY INCOME
FUND-SBI
    CUSIP 779547108 A/C:***7769
    TRADE DT 04/03/14 TRANSMIT DT 03/04/14

ENCLOSED YOU WILL FIND THE PROSPECTUS
REGARDING YOUR PURCHASE OF
**COLUMBIA FDS SER TR I
SMALL CAP GROWTH FD I CL Z
    CUSIP 19765P596 A/C:***7769
    TRADE DT 04/03/14 TRANSMIT DT 03/04/14

ENCLOSED YOU WILL FIND THE PROSPECTUS
REGARDING YOUR PURCHASE OF
**T ROWE PRICE GROWTH STOCK
FUND INC
    CUSIP 741479109 A/C:***7769
    TRADE DT 04/03/14 TRANSMIT DT 03/04/14

ENCLOSED YOU WILL FIND THE PROSPECTUS
REGARDING YOUR PURCHASE OF
**THORNBURG INVT TR
INTL VALUE FD CL R 5
    CUSIP 885215368 A/C:***7769
    TRADE DT 04/03/14 TRANSMIT DT 03/04/14

ENCLOSED YOU WILL FIND THE PROSPECTUS
REGARDING YOUR PURCHASE OF
**ARTISAN FUNDS INC
MID CAP FUND
    CUSIP 04314H303 A/C:***7769
    TRADE DT 04/03/14 TRANSMIT DT 03/04/14

ENCLOSED YOU WILL FIND THE PROSPECTUS
REGARDING YOUR PURCHASE OF
**DREYFUS MIDCAP INDEX FUND
    CUSIP 712223106 A/C:***7769
    TRADE DT 04/03/14 TRANSMIT DT 03/04/14

ENCLOSED YOU WILL FIND THE PROSPECTUS
REGARDING YOUR PURCHASE OF
**EURO PAC GROWTH FD
CL R-5
    CUSIP 298706839 A/C:***7769
    TRADE DT 04/03/14 TRANSMIT DT 03/04/14

TRANSMISSION VERIFICATION REPORT

```
TIME    : 04/19/2011 22:44
NAME    :
FAX     :
TEL     :
SER.#   : U62700G1N733332
```

```
DATE,TIME              04/19  22:43
FAX NO./NAME           13015274717
DURATION               00:00:57
PAGE(S)                02
RESULT                 OK
MODE                   STANDARD
                       ECM
```

[Click here and type address]

To: **NICK**              Fax: **301 - 5274717**

From:                     Date: **10-20-2013**

Re:                       Pages: **2 (With Cover)**

CC:

☐ Urgent   ☑ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

*KEDneth R Steward Sr*

*Shares info*

*Case 1105419 FNOK1*

# LITTON LOAN SERVICING LP

*An Affiliate of C-BASS*

4828 Loop Central Drive
Houston, Texas 77081-2226

Telephone 713 960 9676
Fax 713 966 8906

Kuk Stewart
2028 Sandy Lane
Irving, TX 75060

*Gailey Taylor*   3/17/2004

*436.98-5495*

CERTIFIED MAIL RRR

RE:   Deed of Trust / Mortgage Dated: 2/22/2002
      Loan No.:10575761
      VA/FHA/PMI No.:

*was paid*

## NOTICE OF DEFAULT AND INTENT TO ACCELERATE

Litton Loan Servicing, LP ("Litton") on behalf of the owner and holder of your mortgage loan, and in accordance with the above referenced Deed of Trust/Mortgage and applicable state law, provides you with formal notice of the following:

The mortgage loan associated with the above Deed of Trust/Mortgage is in default for failure to pay amounts that are due and owing.

To cure this default, you must pay all amounts that are due and owing under the terms of your Note and Deed of Trust/Mortgage. As of the date of this letter, the total amount necessary to bring the loan current is $ 887.76. Additional amounts may become due and payable under your Note and Deed of Trust/Mortgage after the date of this letter. You may find out the exact amount that you must pay to bring the loan current by contacting Litton at 1-800-999-8501. Your payment must be made in certified funds, cashier's check or money order.

**If you have not cured the default within forty five (45) days of this notice, Litton will accelerate the maturity date of the Note and declare all amounts due under the Note immediately due and payable. Your property that is collateral for the Note may then be scheduled for foreclosure in accordance with the terms of the Deed of Trust/Mortgage and applicable state law.**

You have the right to reinstate your loan after acceleration and the right to bring a court action to claim that your loan is not in default or any other defense to acceleration and sale which you may have. This notice remains in effect until the default is cured.

Upon acceleration of your Note, Litton will refer the property for foreclosure. The time required for foreclosure in your state is approximately 60 days. In accordance with the terms of your Note and Deed of Trust/Mortgage and the applicable state law, if Litton prevails in its foreclosure action, you may incur costs of foreclosure, such as title documentation, filing fees for the complaint, service of process, publication, recording of judgment, and other required expenses. You may also incur attorney fees in an amount up to $550.00. The aforementioned foreclosure timeline as well as the fees and costs associated with a foreclosure action are estimates only and can be higher or lower dependant upon various factors.

*1*

According to Texas property code Doc 69,34-1 re entered 1/10/15 Loan 14 of 41 may administer the foreclosure of your property because Litton Loan Servicing LP is representing Wells Fargo Bank Minnesota, National Association, as Trustee for the registered holders of the Merril Lynch Mortgage Investors, Inc., Mortgage Loan Asset Backed Certificates, Series 2002-NC1, a mortgagee whose address is 9062 Old Anapolis Road Columbia, MD, 21045 under a ~~...~~ All inquiries, notices, payments, correspondence, and other communications concerning your loan must be directed to Litton Loan Servicing LP for resolution – not to Wells Fargo Bank Minnesota, National Association, as Trustee for the registered holders of the Merrill Lynch Mortgage Investors, Inc. ~~...~~ Litton's address is 4828 Loop Central Drive Houston, Texas 77081 – 2226. Litton's toll free number is 1-800-999-8501.

Litton is a debt collector attempting to collect the debt. This notice is sent to you in an attempt to collect the debt referred to in the foregoing paragraphs and any information obtained from you will be used for that purpose.

For your benefit and assistance, we would like to advise you of the availability of government approved home ownership counseling agencies, which are designed to help homeowners avoid losing their home. To obtain a list of approved counseling agencies for our area, please call 1-800-569-4287.

If you are not obligated on the debt, or if the debt has been discharged in a bankruptcy proceeding, the Servicer is not attempting to collect from you personally. You are being given this notice as a courtesy because your interest in the real estate may be affected

This matter is very important! Please give it your immediate attention!

Sincerely yours,

We paid this loan off, but did not get back our Asset backed securities.

2



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549-3010**

DIVISION OF
CORPORATION FINANCE

February 16, 2009

Lisette S. Willemsen
Assistant Counsel
Allstate Insurance Company
2775 Sanders Road, A3
Northbrook, IL 60062-6127

Re:   The Allstate Corporation
       Incoming letter dated January 2, 2009

Dear Ms. Willemsen:

    This is in response to your letter dated January 2, 2009 concerning the shareholder proposal submitted to Allstate by Chris Rossi. We also have received letters on the proponent's behalf dated January 19, 2009 and February 9, 2009. Our response is attached to the enclosed photocopy of your correspondence. By doing this, we avoid having to recite or summarize the facts set forth in the correspondence. Copies of all of the correspondence also will be provided to the proponent.

    In connection with this matter, your attention is directed to the enclosure, which sets forth a brief discussion of the Division's informal procedures regarding shareholder proposals.

Sincerely,

Heather L. Maples
Senior Special Counsel

Enclosures

cc:   John Chevedden   <   *These two are the Proxy Holder for my shares/interests*

     ***FISMA & OMB Memorandum M-07-16***

*See the next 7 pages.*
*Very Important*
*p 8*

Case 14-10979-CSS    Doc 6934-1    Filed 11/10/15    Page 16 of 41

2

**The Proposal may be excluded from Allstate's 2009 proxy materials pursuant to Rule 14a-8(i)(3) because it is vague and indefinite.**

The Proposal is vague and indefinite under Rule 14a-8(i)(3) because it does not adequately describe the CII independence standard and because it does not specify which version of the CII independence standard is applicable. Rule 14a-8(i)(3) provides that a company may omit a proposal from its proxy statement if the proposal is contrary to any of the Commission's proxy rules, including Rule 14a-9, which prohibits materially false or misleading statements in proxy soliciting materials. Staff Legal Bulletin No. 14B (September 15, 2004) confirms that Rule 14a-8(i)(3) permits a company to exclude a proposal if, among other things, it is so inherently vague and indefinite that neither the stockholders voting on it, nor the Company in implementing it (if adopted), would be able to determine with any reasonable certainty exactly what actions or measures the proposal requires. Moreover, the Staff has noted that a proposal may be materially misleading as vague and indefinite where "any action ultimately taken by the Company upon implementation could be significantly different from the actions envisioned by shareholders voting on the proposal." See Fuqua Industries, Inc. (March 12, 1991).

By way of background, Mr. Chevedden, as proxy for various stockholders, submitted a substantially similar proposal to various companies during the last proxy season. In at least three cases, the Staff concurred that this proposal could be omitted under Rule 14a-8(i)(3) as vague and indefinite because it specified the CII standard as the applicable standard of independence but failed to describe the CII standard or specify a particular version of it. See PG&E Corporation (March 7, 2008), Schering Plough Corporation (March 7, 2008), and JPMorgan Chase & Co. (March 5, 2008). This season, in an effort to provide a description of the CII independence standard, the Proponent has added to the Proposal the words "which is simply an independent director is a person whose directorship constitutes his or her only connection to the corporation." However, as discussed below, we do not believe that the addition of this language remedies the Proposal's defects.

The Proposal does not describe the CII standard adequately enough to allow stockholders to know what they are being asked to approve. As a company listed on the New York Stock Exchange ("NYSE"), Allstate applies the NYSE independence standard in determining whether its directors are independent, in addition to certain of its own independence standards. Because the Proposal would require Allstate to adopt the CII independence standard, it is important that stockholders be able to compare the two standards. However, the Proposal does not provide sufficient detail to allow Allstate's stockholders to do so. For example, although the general rule under the NYSE standard is that directors have no material relationship with the company other than their directorships, Rule 303A.02(b) of the NYSE Listed Company Manual contains five bright-line tests for determining independence, which allow for various immaterial relationships. The Proposal, however, does not provide sufficient detail to allow stockholders to determine whether the CII standard contains any bright-lines tests, or whether it permits immaterial relationships or imposes an absolute bar on relationships other than directorships. As a result, stockholders cannot determine whether the CII standard that they are being asked to approve is the same as Allstate's existing independence standard or different.

**Allstate Insurance Company**
2775 Sanders Road, A3    Northbrook, IL    60062-6127    T 847.402.7366    F 847.326.7524    E Lisette.Willemsen@allstate.com

P 9

**UNITED STATES**
## SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549-3010**

DIVISION OF
CORPORATION FINANCE

$\mathfrak{Z}$

March 7, 2008

Frances S. Chang
Senior Counsel
Law Department
PG&E Corporation
One Market, Spear Tower
Suite 400
San Francisco, CA 94105

Re:    PG&E Corporation
       Incoming letter dated January 10, 2008

Dear Ms. Chang:

This is in response to your letter dated January 10, 2008 concerning the shareholder proposal submitted to PG&E by Chris Rossi.  Our response is attached to the enclosed photocopy of your correspondence.  By doing this, we avoid having to recite or summarize the facts set forth in the correspondence.  Copies of all of the correspondence also will be provided to the proponent.

In connection with this matter, your attention is directed to the enclosure, which sets forth a brief discussion of the Division's informal procedures regarding shareholder proposals.

Sincerely,

Jonathan A. Ingram
Deputy Chief Counsel

Enclosures

cc:    John Chevedden

*** FISMA & OMB Memorandum M-07-16 ***

$\rho$ /0

4



U.S. Securities and Exchange Commission
January 10, 2008
Page 3

to exceed more than 25 times the average wage of hourly working employees"); *Proctor & Gamble Co.* (avail. Oct. 25, 2002) (proposal requesting that board create a fund that would provide lawyers, clerical help, witness protection and records protection for victims of retaliation, intimidation and troubles because they are stockholders of publicly owned companies).

The Staff has previously concurred that Rule 14a-8(i)(3) was grounds for a company to omit a proposal very similar to the one at issue in this No-Action Letter request. In *The Boeing Corporation*, the Staff agreed that a proposal requesting an independent chairman of the board was impermissibly vague and indefinite because it failed to disclose to shareholders the definition of "independent director" that applied. *The Boeing Corporation* (avail. Feb. 10, 2004) (where proposal sought to amend the bylaws to require that "an independent director, according to the 2003 Council of Institutional Investors definition, shall serve as chairman of the Board of Directors"). The Proposal at issue suffers from the same defect as the proposal in *Boeing Corporation;* they both include a reference to a definition of "independence" established by the Council of Institutional Investors, but do not adequately describe or delineate that definition.

This position also is consistent with other instances in which the Staff concurred that companies could rely on Rule 14a-8(i)(3) to omit proposals requesting that the company adopt a particular definition or set of guidelines, and the proposal or supporting statement failed to include a description of the substantive provisions of the definition or set of guidelines being recommended. *See, e.g., Smithfield Foods, Inc.* (avail. July 18, 2003) (proposal requested that management "prepare a report based upon the Global Reporting Initiative," but the proposal was devoid of any definition or description of the Global Reporting Initiative; *Johnson & Johnson* (avail. Feb. 7, 2003) (proposal requested adoption of Glass Ceiling Commission's business recommendations); *Kohl's Corp.* (Mar. 13, 2001) (proposal requested implementation of the "SA8000 Social Accountability Standards").

*TXU Energy & G.E. is subsidary of Edison International And I Am the Registrant.*

PG&E Corporation believes that the Proposal can be distinguished from the proposal in *General Electric Company,* in which the Staff did not grant no-action relief under Rule 14a-8(i)(3). In that letter the company argued that the proposal was vague and indefinite because it did not include or reference any definition of independence. *General Electric Company* (avail. Jan. 28, 2003) ("*General Electric*") (proposal requested amending the company's bylaws to require that the chairman of the board be an independent director who has not served as CEO of the company). In contrast, the Proposal (as well as the proposal in *Boeing*) incorporates a specific definition of independence, but does not adequately describe or delineate that specified definition.

The Proposal asks PG&E Corporation's shareholders to vote on matters relating to board and director independence—without providing shareholders with enough information for shareholders to understand the applicable definition of independence. PG&E Corporation's shareholders cannot be expected to make an informed decision on the merits of the Proposal without understanding what they are voting on. Accordingly, we believe the Proposal is impermissibly vague and indefinite and may be excluded pursuant to Rule 14a-8(i)(3). Such action would be consistent with Staff positions in prior No-Action Letters.

p 11

5

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): December 20, 2002

**EDISON INTERNATIONAL**
(Exact name of registrant as specified in its charter)

| CALIFORNIA | 001-9936 | 95-4137452 |
|---|---|---|
| (State or principal jurisdiction of incorporation or organization) | (Commission file number) | (I.R.S. employer identification no.) |

2244 Walnut Grove Avenue
(P.O. Box 800)
Rosemead, California 91770
(Address of principal executive offices, including zip code)

626-302-2222
(Registrant's telephone number, including area code)

Items 1 through 4 and 6 through 9 are not included because they are inapplicable.

*This current report includes forward-looking statements. These forward-looking statements are based on current expectations and projections about future events based upon knowledge of facts as of the date of this current report and assumptions about future events. These forward-looking statements are subject to various risks and uncertainties that may be outside the control of Edison International and its subsidiaries. Edison International has no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events, or otherwise.*

**Item 5.   Other Events**

**Lakeland Project Placed into Administrative Receivership in the United Kingdom**

p 12

Edison Mission Energy is a wholly-owned, indirect subsidiary of Edison International. Edison Mission Energy's Lakeland project operated a 220 MW combined cycle, natural gas-fired power plant located in the United Kingdom. Ownership of the project is held through Edison Mission Energy's indirect subsidiary, Lakeland Power Ltd., which

sold power generated from the plant pursuant to a power sales agreement with Norweb Energi Ltd, which is a direct subsidiary of TXU (UK) Holdings Limited (TXU UK) and an indirect subsidiary of TXU Europe Group plc (TXU Europe).

As previously reported, ~~TXU UK and TXU Europe~~, together with a related entity, ~~TXU Europe Energy Trading Limited~~ (TXU Energy), entered into formal administration proceedings in the United Kingdom (similar to bankruptcy proceedings in the United States) on November 19, 2002. As a result of these actions and their effect on Norweb Energi Ltd. and Edison Mission Energy's contractual arrangements with other parties, the Lakeland power plant currently is not operating. In December 2002, the directors of Norweb Energi Ltd. appointed a liquidator to wind up its contractual rights and obligations.

On December 4, 2002, Norweb Energi Ltd. provided a notice of disclaimer of the Power Sales Agreement dated October 20, 1989 (as amended from time to time) between Lakeland Power Ltd. and Norweb Energi Ltd. (as successor to North Western Electricity Board) under Section 178 of the Insolvency Act. The disclaimer is effectively a termination of the power sales agreement.

On December 19, 2002, the lenders to the Lakeland project accelerated the debt owing under the bank agreement that governs the project's indebtedness primarily as a result of the notice of disclaimer of the power sales agreement by Norweb Energi Ltd. The bank loans of Lakeland Power Ltd. are non-recourse to Edison Mission Energy. Furthermore, the defaults on these loans do not cross-default to any other indebtedness of Edison Mission Energy or its affiliates.

On December 20, 2002, the project's lenders exercised their right to appoint Michael Thomas Seery and Michael Vincent McLoughlin, partners with KPMG LLP, as administrative receiver over the assets of Lakeland Power Ltd. This followed discussions over the past several weeks regarding future operations of the power plant. The administrative receiver is

Page 2

appointed to take control of the affairs of Lakeland Power Ltd. and has a wide range of powers (specified in the Insolvency Act 1986), including authorizing the sale of the power plant. The appointment of the administrative receiver results in the treatment of Lakeland power plant as an asset held for sale under Statement of Financial Accounting Standards No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" (SFAS No. 144).

The events related to the Lakeland project will result in an impairment charge and a provision for bad debts of approximately $100 million ($70 million after tax) in the fourth quarter ended December 31, 2002, arising from the write-down by Edison Mission Energy of the Lakeland power plant and related claims under the power sales agreement (an asset group under SFAS No. 144) to their fair market value. Edison Mission Energy will account for the Lakeland project as a discontinued operation in its Annual Report on Form 10-K for the year ended December 31, 2002, and will no longer consolidate the activities of Lakeland Power Ltd. due to the loss of control arising from the appointment of the administrative receiver.

The Edison Mission Energy consolidated financial statements for the years ended 2001 and 2000 were subject to an audit by Arthur Andersen LLP which was presented in Edison Mission Energy's 2001 Annual Report on Form 10-K. Edison Mission Energy has appointed PricewaterhouseCoopers LLP as the auditor for its 2002 consolidated financial statements. Under Statement of Auditing Standards No. 58, Reports on Audited Financial Statements, a re-audit ordinarily is necessary for discontinued operations which require reclassification of prior years consolidated financial statements to conform to the separate presentation of discontinued operations in such financial statements in accordance with SFAS No. 144. Edison Mission Energy has been advised by PricewaterhouseCoopers LLP that a re-audit of its 2001 and 2000 consolidated financial statements is required as a result of the classification of the Lakeland project as a discontinued operation.

## Conditional Agreement by Contact Energy to Acquire Taranaki Power Station

On December 23, 2002, Contact Energy Ltd., a New Zealand publicly traded energy company 51% owned by Edison Mission Energy, announced that it has entered into a conditional agreement with NGC Holdings Ltd. to acquire the Taranaki Combined Cycle power station and related interests for NZ$500 million. The Taranaki station is a 357 MW combined cycle, natural gas-fired plant located near Stratford, New Zealand. The acquisition is conditioned on, among other things, Contact Energy gaining a clearance from the New Zealand Commerce Commission, approval by the shareholders of NGC, and the termination of a cross border leveraged lease currently in existence. Subject to satisfaction of the closing conditions, a closing is expected in February 2003. As a result of the proposed acquisition and the financing to be obtained by Contact Energy to finance such acquisition, Standard and Poor's lowered the long-term credit rating of Contact Energy from BBB+ to BBB.

## United Airlines Bankruptcy and Aircraft Leases

As previously reported, Edison International's wholly-owned, indirect subsidiary Edison Capital has leased two aircraft to United Airlines. United Airlines filed for United States bankruptcy court protection on December 9, 2002. United Airlines has proposed restructuring the leases for both of Edison Capital's aircraft, which would

Page 3

result in Edison Capital receiving no further rent payments. As a result, Edison Capital will take a write-down of $35 million against earnings for the fourth quarter ended December 31, 2002.

**SIGNATURES**

7

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

EDISON INTERNATIONAL
(Registrant)

/S/ KENNETH S. STEWART

--------------------------------------------------

KENNETH S. STEWART
Assistant General Counsel and Assistant Secretary

January 9, 2003

☆ That's me !

*These Attorneys will not give me Any records on me.*

# BROWN, DEAN, WISEMAN, LISER, PROCTOR & HART, L.L.P.
### Attorneys at Law

DALE DEAN
JAMES T. BLANTON
* GRANT LISER
RICHARD W. WISEMAN
JOHN W. PROCTOR
** JOHN C. HART
LARRY W. WILSHIRE
SANDRA LISER

OF COUNSEL
CATHERINE JANE ALDER, P.C.

\* Also licensed to practice in Louisiana
\*\* Also licensed to practice in Minnesota

306 WEST 7TH STREET, SUITE 200
FORT WORTH, TEXAS 76102-4905

TELEPHONE (817) 332-1391
METRO (817) 429-0851
FAX (817) 870-2427

Writer's Direct Dial - (817) 820-1110
Email Address - cmitchell@browndean.com

CHARLES B. MITCHELL, Jr.
MICHAEL L. PECK
BRUCE R. ROGERS
STERLING J. ELZA
JASON C. MOON
JENNIFER L. WILLINGHAM
ROBERT K. PIWETZ

JESSE M. BROWN (1883-1978)
WILLIAM M. BROWN (1912-1987)

January 3, 2006

Kenny Stewart
2705 Heather Hill Court, #917
Arlington, Texas 76006

Re:    JSC Manufacturing, Inc.
       File No.: 3204.22595

Dear Mr. Stewart:

   As requested, attached is a proposed form for a Non-Competition Agreement for your utilization regarding the subject matter.

   Should you have any questions after you have had a chance to review same, please do not hesitate to call.

   Thank you for your assistance.

Sincerely yours,

Charles B. Mitchell, Jr.

CBM:PR:mm
Enclosure

*Stewart Enterprise*
*↙*
*Stewart Corp*
*↙*
*Stewart incorp* — *crossed out by highlighter*
*↙*        *③  States : Stewart Corp.*

*Stewart*
*Corp*
*my highlighter*
*darkened*

*TO: Kenneth R. Stewart from AllState Insurance.*

*This policy covers so many industries, but nothing I am familiar with, 100+ pages.*

IL 00 03 09 08

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CALCULATION OF PREMIUM *Upon Reporting, They have Not Resent.*

This endorsement modifies insurance provided under the following:

~~CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART~~
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
~~COMMERCIAL INLAND MARINE COVERAGE PART~~
~~COMMERCIAL PROPERTY COVERAGE PART~~
~~CRIME AND FIDELITY COVERAGE PART~~
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
~~FARM COVERAGE PART~~
~~LIQUOR LIABILITY COVERAGE PART~~
~~MEDICAL PROFESSIONAL LIABILITY COVERAGE PART~~
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
~~POLLUTION LIABILITY COVERAGE PART~~
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
~~RAILROAD PROTECTIVE LIABILITY COVERAGE PART~~

The following is added:

The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation, or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.



Insured Full Copy

## TERRORISM RISK INSURANCE ACT ENDORSEMENT

This endorsement addresses requirements of the Terrorism Risk Insurance Act of 2002.

**Definitions**

The definitions provided in this endorsement are based on the definitions in the Act and are intended to have the same meaning. If words or phrases not defined in this endorsement are defined in the Act, the definitions in the Act will apply.

"Act" means the Terrorism Risk Insurance Act of 2002, which took effect on November 26, 2002, and any amendments.

"Act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States as meeting all of the following requirements:

a.   The act is an act of terrorism.

b.   The act is violent or dangerous to human life, property or infrastructure.

c.   The act resulted in damage within the United States, or outside of the United States in the case of United States missions or certain air carriers or vessels.

d.   The act has been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

"Insured terrorism or war loss" means any loss resulting from an act of terrorism (including an act of war, in the case of workers compensation) that is covered by primary or excess property and casualty insurance issued by an insurer if the loss occurs in the United States or at United States missions or to certain air carriers or vessels.

"Insurer deductible" means:

*The date of this Policy is 12/03/04*

a.   For the period beginning on November 26, 2002 and ending on December 31, 2002, an amount equal to 1% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding November 26, 2002.

b.   For the period beginning on January 1, 2003 and ending on December 31, 2003, an amount equal to 7% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding January 1, 2003.

c.   For the period beginning on January 1, 2004 and ending on December 31, 2004, an amount equal to 10% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding January 1, 2004.

d.   For the period beginning on January 1, 2005 and ending on December 31, 2005, an amount equal to 15% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding January 1, 2005.

**Limitation of Liability**

The Act may limit our liability to you under this policy. If annual aggregate insured terrorism or war losses of all insurers exceed $100,000,000,000 during the applicable period provided in the Act, and if we have met our insurer deductible, the amount we will pay for insured terrorism or war losses under this policy will be limited by the Act, as determined by the Secretary of the Treasury.

*There was a claim in 2002 for Associates?*

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY**

WC 00 04 20
(Ed. 12-02)

**Policyholder Disclosure Notice**

1.  Insured terrorism or war losses would be partially reimbursed by the United States Government under a formula established by the Act. Under this formula, the United States Government would pay 90% of our insured terrorism or war losses exceeding our insurer deductible.

2.  The additional premium charged for the coverage this policy provides for insured terrorism or war losses is shown in Item 4 of the Information Page or the Schedule below.

### Schedule

State                                                                 Rate per $100 of Remuneration

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement Effective                Policy No.                Endorsement No.
Insured                                                                  Premium $

Insurance Company                                          Countersigned by _____

**Page 2 of 2**

Copyright 2002 National Council on Compensation Insurance, Inc.

WC 00 04 20
(Ed. 12-02)



**COMMERCIAL AUTO**
**XA TX 27 10 11**

# ALLSTATE COUNTY MUTUAL INSURANCE COMPANY
## SPECIAL PROVISIONS

This Company is licensed to operate under chapter 17, Texas Insurance Code, 1951, as amended, and such statutes shall apply to and form a part of this policy the same as if written or printed upon, attached or appended hereto.

This policy is issued subject to the constitution and by-laws and all amendments thereto of the Company, which shall form a part of this policy.

### MUTUALS-MEMBERSHIP AND VOTING NOTICE

The insured is notified that by virtue of this policy, he is a member of the Allstate County Mutual Insurance Company of Irving, Texas, and is entitled, as is lawfully provided in the charter, constitution, or by-laws, to only one vote regardless of the number of policies owned either in person or by ~~████~~ in any or all meetings of said Company. The Annual Meetings are held in its Home Office in Irving, Texas, on the sixth day of ~~████, in each year, at 2:00 o'clock p.m.~~

### MUTUALS-PARTICIPATION CLAUSE WITHOUT CONTINGENT LIABILITY *Preferred*

No Contingent Liability: This policy ~~is non-assessable~~ The policyholder is a member of the Company and shall participate, to the extent and upon the conditions fixed and determined by the Board of Directors in accordance with the provisions of laws, in the distribution of ~~████~~ so ~~████~~ and ~~████~~

In Witness Whereof, the company has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned by a duly authorized representative of the company.



Mary Jovita McGinn
Secretary



Catherine S. Brune
President

1. Improper Proxy Statement

2. Not one person but me showed up to the meeting

3. Non - Assessable means Preferred Stock Holder

4. Only people who get dividends Are owners. 5. Double Signatures to me.

XA TX

*[Handwritten: 1-13]*

**ACHAOGEN, INC.**
7000 Shoreline Court, Suite 371
South San Francisco, California 94080

*[Handwritten: 13 Proxy Statements issued to me Accidently? in 2015. Never received before.]*

## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
## TO BE HELD ON JUNE 10, 2015

To the Stockholders of Achaogen, Inc.:

*[Handwritten: Revenues - 1rst Qua 4.9 m million]*

**NOTICE IS HEREBY GIVEN** that the Annual Meeting of Stockholders ("Annual Meeting") of Achaogen, Inc., a Delaware corporation (referred to herein as the "Company", "we" or "our"), will be held on June 10, 2015, at 11:30 a.m. local time, at the Company's headquarters located at 7000 Shoreline Court, South San Francisco, California 94080 for the following purposes:

1. To elect two directors to hold office until the 2018 annual meeting of stockholders or until their successors are elected;

2. To ratify the selection, by the audit committee of our board of directors, of Ernst & Young LLP as the Company's independent registered public accounting firm for the Company's fiscal year ending December 31, 2015; and

3. To transact such other business as may properly come before the Annual Meeting or any adjournment or postponement thereof.

The foregoing items of business are more fully described in the Proxy Statement. Only stockholders who owned our common stock at the close of business on April 13, 2015 (the "Record Date") can vote at this meeting or any adjournments that take place.

We have elected to use the Internet as our primary means of providing our proxy materials to stockholders. Consequently, stockholders will not receive paper copies of our proxy materials, unless they specifically request them. We will send a Notice of Internet Availability of Proxy Materials on or about April 23, 2015 to our stockholders of record as of the close of business on the Record Date. We are also providing access to our proxy materials over the Internet beginning on or about April 23, 2015. Electronic delivery of our proxy materials will significantly reduce our printing and mailing costs, and the environmental impact of the proxy materials.

The Notice of Internet Availability of Proxy Materials contains instructions for accessing the proxy materials, including
...vides information on how stockholders may obtain paper copies free of
...y Materials also provides the date, time and location of the Annual Meeting;
... recommendation from our board of directors with regard to each matter; and

...d and voted whether or not you plan to attend the Annual Meeting in person.
...ompleting and mailing a proxy card or the form forwarded by your bank,
...ternet, by telephone or by written proxy will ensure your shares are
...he instructions on the proxy card or the information forwarded by your bank,
...hese voting options.

...vote **FOR** the election of the director nominees named in Proposal No. 1 of
... selection, by the audit committee of our board of directors, of Ernst &
...counting firm as described in Proposal No. 2 of the Proxy Statement.

By Order of the Board of Directors
/s/ Kenneth J. Hillan, M.B., Ch.B.

Kenneth J. Hillan, M.B., Ch.B.
*President and Chief Executive Officer*

*[Handwritten vertical text along left margin: American Stock Treasurer & Trust Co. Accidently sent these in 2015, but never before ever. T. Rowe Price sent this example but now has NO record of it. 15 other companies to have similar copies on similar dates in 2015. Pfizer is not here, corrupt lawyer has it.]*



RIDGEWORTH
I N V E S T M E N T S®

RidgeWorth



# Total Return Bond Fund

### Class / Ticker Symbol

## A / CBPSX  R / SCBLX  I / SAMFX

Before you invest, you may want to review the Fund's Prospectus and Statement of Additional Information, which contain more information about the Fund and its risks. You can find the Fund's Prospectus, Statement of Additional Information and other information about the Fund online at http://www.ridgeworth.com/resources/regulatory-tax-info. You can also get this information at no cost by calling the Funds at 1-888-784-3863 or by sending an email request to info@ridgeworth.com. The current Prospectus and Statement of Additional Information, dated August 1, 2013, are incorporated by reference into this summary prospectus.

## Investment Objective

The Total Return Bond Fund (the "Fund") seeks total return (comprised of capital appreciation and income) that consistently exceeds the total return of the broad U.S. investment grade bond market.

## Fees and Expenses of the Fund

This table describes the fees and expenses that you may pay if you buy and hold shares of the Fund. You may qualify for sales charge discounts if you and your family invest, or agree to invest in the future, at least $50,000 in RidgeWorth Funds. More information about these and other discounts is available from your financial professional and in Sales Charges on page 91 of the Fund's prospectus and Rights of Accumulation on page 60 of the Fund's statement of additional information.

### Shareholder Fees (fees paid directly from your investment)

|  | A Shares | R Shares | I Shares |
|---|---|---|---|
| Maximum Sales Charge (load) Imposed on Purchases (as a % of offering price) | 4.75% | None | None |

## Annual Fund Operating Expenses (expenses that you pay each year as a percentage of the value of your investment)

|  | A Shares | R Shares | I Shares |
|---|---|---|---|
| Management Fees | 0.24% | 0.24% | 0.24% |
| Distribution (12b-1) Fees | 0.25% | 0.50% | None |
| Other Expenses[1] | 0.19% | 0.33% | 0.17% |
| Total Annual Fund Operating Expenses | 0.68% | 1.07% | 0.41% |
| Fee Waivers and/or Expense Reimbursements[2] | — | (0.02)% | — |
| Total Annual Fund Operating Expenses after Fee Waivers and/or Expense Reimbursements | 0.68% | 1.05% | 0.41% |

(1)   Restated to reflect current fees.

(2)   The Adviser has contractually agreed to waive fees and reimburse expenses until at least August 1, 2014, in order to keep Total Annual Fund Operating Expenses (excluding, as applicable, taxes, brokerage commissions, substitute dividend expenses on securities sold short, interest expense, extraordinary expenses and Acquired Fund Fees and Expenses) from exceeding 0.75%, 1.05% and 0.45% for the A, R and I Shares, respectively. This agreement shall terminate upon the termination of the Investment Advisory Agreement between RidgeWorth Funds and the Adviser, or it may be terminated upon written notice to the Adviser by RidgeWorth Funds.



## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS

To the Stockholders:

An annual meeting of stockholders (the "annual meeting") of TRI Pointe Homes, Inc. ("TRI Pointe") will be held at 10:00 a.m. local time, on Friday, May 8, 2015, at our corporate offices, located at 19540 Jamboree Road, Suite 300, Irvine, California 92612. The annual meeting will be held for the following purposes:

- to elect the nine nominees named in this proxy statement to serve on the board of directors until his or her successor is elected and qualified or until his or her earlier resignation or removal (Proposal No. 1);

- to ratify the appointment of Ernst & Young LLP as TRI Pointe's independent registered public accounting firm for 2015 (Proposal No. 2); and

- to transact any other business that may properly come before the annual meeting or any adjourned or postponed session of the annual meeting.

These items of business are more fully described in the proxy statement accompanying this notice. **The Board of Directors recommends stockholders vote FOR proposals (1) and (2).**

All TRI Pointe stockholders are cordially invited to attend the annual meeting, although only those stockholders of record at the close of business on March 13, 2015 are entitled to receive notice of the annual meeting and to vote at the annual meeting and any adjournments or postponements of the annual meeting.

**WHETHER OR NOT YOU PLAN TO ATTEND THE ANNUAL MEETING IN PERSON, PLEASE COMPLETE, DATE, SIGN AND RETURN THE ENCLOSED PROXY CARD IN THE ENCLOSED POSTAGE-PAID ENVELOPE OR VOTE YOUR SHARES OF TRI POINTE COMMON STOCK BY CALLING THE TOLL-FREE TELEPHONE NUMBER OR BY USING THE INTERNET AS DESCRIBED IN THE INSTRUCTIONS INCLUDED WITH YOUR PROXY CARD AT YOUR EARLIEST CONVENIENCE.**

We are pleased to take advantage of the rules that allow companies to furnish their proxy materials via the Internet. As a result, we mailed Notice of Internet Availability of Proxy Materials containing instructions on how to access our proxy statement and annual report on or about March 26, 2015. The Notice of Internet Availability of Proxy Materials also contains instructions on how to request a paper copy of our proxy statement and annual report. **TRI Pointe's proxy materials are available online at http://www.astproxyportal.com/ast/18094.**

By Order of the Board of Directors,

Bradley W. Blank
*Secretary*

Please vote your shares promptly. You can find instructions for voting on the enclosed proxy card.

March 26, 2015

UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549-1004

## Form 10-K

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2014

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number: 0-4408

# RESOURCE
AMERICA, INC.

# RESOURCE AMERICA, INC.
*(Exact name of registrant as specified in its charter)*

| Delaware | 72-0654145 |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

One Crescent Drive, Suite 203, Navy Yard Corporate Center, Philadelphia, PA  19112
*(Address of principal executive offices) (Zip Code)*

(215) 546-5005
*(Registrant's telephone number, including area code)*

Securities registered pursuant to Section 12(b) of the Act:

| Title of class | Name of exchange on which registered |
|---|---|
| Common stock, par value $.01 per share | NASDAQ Global Select Market |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☐ No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(a) of the Act.  Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company.  See definition of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | | Accelerated filer | ☑ |
|---|---|---|---|---|
| Non-accelerated filer | ☐ | (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☑

The aggregate market value of the voting common equity held by non-affiliates of the registrant, based on the closing price of such stock on the last business day of the registrant's most recently completed second quarter (June 30, 2014) was approximately $146,392,000.

The number of outstanding shares of the registrant's common stock on March 5, 2015 was 22,994,366 shares.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's proxy statement filed with the Commission in connection with the 2014 Annual Meeting of Stockholders are incorporated by reference in Part III of this Form 10-K.

**RESOURCE AMERICA, INC.**
One Crescent Drive, Suite 203, Navy Yard Corporate Center, Philadelphia, PA 19112

## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
### To be held on Wednesday, June 3, 2015

To the Stockholders of RESOURCE AMERICA, INC.:

Notice is hereby given that the annual meeting of stockholders of RESOURCE AMERICA, INC., a Delaware corporation, will be held at One Crescent Drive, Suite 203, Navy Yard Corporate Center, Philadelphia, Pennsylvania, on Wednesday, June 3, 2015, at 9:00 a.m. (the "Meeting"), for the following purposes:

1. To elect three directors to serve three-year terms expiring at the annual meeting of stockholders in 2018.

2. To approve a proposal to adopt the Resource America, Inc. Annual Incentive Plan for Senior Executives.

3. To ratify the appointment of Grant Thornton LLP as the independent registered public accounting firm for Resource America, Inc. for the fiscal year ending December 31, 2015.

4. To transact such other business as may properly be brought before the Meeting and any adjournment thereof.

Only stockholders of record on our books at the close of business on April 17, 2015, which we refer to as the record date, will be entitled to notice of and to vote at the Meeting or any adjournment thereof. A list of stockholders entitled to vote at the Meeting will be available for inspection at the Meeting and for 10 days before the Meeting at our offices at One Crescent Drive, Suite 203, Navy Yard Corporate Center, Philadelphia, Pennsylvania 19112. The stock transfer books will not be closed.

By order of the Board of Directors,
Michael S. Yecies, Secretary
April 24, 2015

## YOUR VOTE IS IMPORTANT

Instead of mailing a printed copy of our proxy materials to all of our stockholders, we provide access to these materials via the Internet. This reduces the amount of paper necessary to produce these materials as well as the costs associated with mailing these materials to all stockholders. Accordingly, on or about April 24, 2015, we will begin mailing a Notice of Internet Availability of Proxy Materials, or Notice, to all stockholders of record on our books at the close of business on April 17, 2015, the record date for the Meeting, and will post our proxy materials on the website referenced in the Notice. As more fully described in the Notice, stockholders may choose to access our proxy materials on the website referred to in the Notice or may request to receive a printed set of our proxy materials. In addition, the Notice and website provide information regarding how you may request to receive proxy materials in printed form by mail, or electronically by email, on an ongoing basis.

If you are a stockholder of record, you may vote in one of the following ways:

- **Vote over the Internet**, by going to www.voteproxy.com (have your Notice or proxy card in hand when you access the website);
- **Vote by Telephone**, by calling the toll-free number 1-800-PROXIES (1-800-776-9437) in the United States or 1-718-921-8500 from foreign countries (have your Notice or proxy card in hand when you call);
- **Vote by Mail**, if you received (or requested and received) a printed copy of the proxy materials, by returning the enclosed proxy card (signed and dated) in the envelope provided; or
- **Vote in person at the Meeting**.

*16614*
*17*
*1658*
*11457*
*11458*

*6*

*4524354*38
*45 360 78*16



**Creating Communities in Our Properties™**

**2600 S. GESSNER ROAD, SUITE 500
HOUSTON, TEXAS 77063**

March 30, 2015

Dear Shareholder:

You are cordially invited to attend the 2015 Annual Meeting of Shareholders to be held on Monday, May 11, 2015, at 10:00 a.m., Central Daylight Time, at the Houston Marriott Westchase Hotel, located at 2900 Briarpark Drive, Houston, Texas 77042.

The notice of Annual Meeting and proxy statement accompanying this letter provide an outline of the business to be conducted at the meeting. I will also report on our progress during the past year and answer shareholders' questions.

In accordance with the "e-proxy" rules promulgated by the Securities and Exchange Commission, we are pleased to take advantage of the practice of furnishing proxy materials to our shareholders over the Internet. Accordingly, on or about March 30, 2015, we are mailing to our shareholders (other than those shareholders who have previously requested electronic or paper delivery) a Notice of Internet Availability of Proxy Materials. On the date of the mailing of the Notice of Internet Availability of Proxy Materials, all shareholders of record and beneficial owners will have the ability to access all of our proxy materials referred to in the Notice of Internet Availability of Proxy Materials on the Internet website cited therein and in the accompanying Proxy Statement. These proxy materials will be available free of charge. The e-proxy rules afford us the opportunity to realize cost savings on the printing and distribution of our proxy materials, and we hope that, if possible and convenient, you will avail yourself of this option.

It is important that your shares be represented at the Annual Meeting. I urge you to authorize a proxy to vote your shares via the Internet, or by calling the toll-free telephone number, or, if you requested printed materials, by signing, dating and promptly returning your proxy card enclosed with the proxy materials. Your vote is important.

Sincerely yours,

*2015 lrst quarter
revenues - 21.3 million      up from
2014 lrst quartiv-  of 17.€ mllm*

James C. Mastandrea
Chairman and Chief Executive Officer

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Form 10-K

*438*

*2nd qual*

*5,370B*

*2014 2nd 5,180 B*

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### For the fiscal year ended December 31, 2014
### OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### Commission file number 000-12477

*Net Inc, 1,653B*

## Amgen Inc.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **95-3540776** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **One Amgen Center Drive, Thousand Oaks, California** | **91320-1799** |
| (Address of principal executive offices) | (Zip Code) |

### (805) 447-1000
### (Registrant's telephone number, including area code)

### Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common stock, $0.0001 par value | The NASDAQ Global Select Market |

### Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☒    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or Section 15 (d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☒    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒    Accelerated filer ☐    Non-accelerated filer ☐    Smaller reporting company ☐

(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act)    Yes ☐    No ☒



# 2014 ANNUAL REPORT



**Reminder: You can access your quarterly retirement account statement online at https://my.vanguardplan.com.**

You have easy and secure access to current and past statements online. Simply log on to the website, go to *Statements and Reports*, and choose *Statements* from the dropdown list.

We encourage you to make a habit of going online to check your account balance, get performance history, and review your quarterly statements. These are convenient ways to monitor your savings strategy and track your progress.

Note: At any time, you have the option to receive a free paper copy of your statement. To do so, either go to the **Your Profile** section of the above website and select paper statement delivery or contact Participant Services. If you have never logged on to the website, you will be required to complete a brief registration process before you are able to access your statements online.

Retirement plan recordkeeping and administrative services are provided by The Vanguard Group, Inc. (VGI). VGI has entered into an agreement with Ascensus, Inc., to provide certain plan recordkeeping and administrative services on its behalf. Ascensus is not affiliated with Vanguard Marketing Corporation, The Vanguard Group, Inc., or any of its affiliates. Ascensus is a registered trademark of Ascensus, Inc. ARET-PCD-00029_VANG (1/15)

16

T. Rowe Price listed on their computer
witnessed by me and 3 witnesses, that I had assets
exceeding one billion dollar but that I can't Acess.
TeTRA is A subsidiary of TXU. Below is my "401-K",
but I can't even Access these Funds.

105561-02867
KENNETH R STEWART
2028 SANDY LN
IRVING TX  75060-5639

# TETRA Technologies, Inc. 401(k) Retirement Plan

## A. Plan Information

This change notice gives you important information regarding changes to the TETRA Technologies, Inc. 401(k) Retirement Plan ("Plan"). This change notice should be considered an addendum to, and should be reviewed in conjunction with, the Plan's most recent Plan and Investment Disclosure. If you need help understanding this notice, please go to rps.troweprice.com/ParticipantNoticeHelp.

## Part I. General Information

**The following change(s) will be made to the Investments Available in the Plan, effective as of the date(s) set forth below:**

| Effective Date | Investments being added to the Plan |
| --- | --- |
| 1/5/2015 | MFS International Value R4 |
| 1/5/2015 | Pimco Income Inst |
| 1/5/2015 | Pimco Short-Term Inst |
| 1/5/2015 | Vanguard Growth Index Fund |
| 1/5/2015 | Vanguard Mid-Cap Index Fund |
| 1/5/2015 | Vanguard Sht Trm Inv Gr |
| 1/5/2015 | Vanguard Small Cap Index, Inv |
| 1/5/2015 | Vanguard Total Intl Stock Indx |

Call your Plan Account Line at 1-800-922-9945 or log in to the participant website at **rps.troweprice.com** to request investment fund prospectuses, financial statements and annual reports, and other information that is furnished to the Plan on the investment options. These materials include investment objectives, risks, fees, expenses, and other information that you should read and consider before investing.

# *Letter to Shareholders*



Robert A. Bradway, Chairman and Chief Executive Officer, Amgen Inc.

Dear Shareholders,

2014 was an extraordinary year for Amgen—financially, scientifically and organizationally. We moved markedly forward in growing our compelling portfolio of innovative and biosimilar medicines, and in transforming our company to deliver long-term, industry-leading innovation and financial returns.

### Delivering for Shareholders

In 2014, we grew revenues at Amgen by 7 percent, surpassing $20 billion for the first time. Consistent with our international expansion objectives, we grew sales outside of the U.S. by double digits. We grew adjusted operating income* by 22 percent, reflecting our commitment to expense discipline across the company. In addition, we grew free cash flow* 40 percent to $7.8 billion. This strong financial performance, and our confidence in the longer-term outlook, enabled us to increase our dividend by 30 percent in 2014 and increase our share repurchase authorization to $4 billion in total. We are on the path to meeting our commitment to return approximately 60 percent of adjusted net income* to shareholders annually through 2018, on average.

### Beginning a New Product Launch Cycle

We delivered an extraordinary flow of data from our late-stage pipeline in 2014 and entered an exciting new product launch cycle. We advanced eight innovative, late-stage molecules in five therapeutic areas, all addressing serious illness and high unmet medical need. Six late-stage molecules generated positive, registration-enabling data in 2014, and four were filed with regulators.

In December 2014, we received approval from the U.S. Food and Drug Administration (FDA) and began marketing our bispecific T-cell engager (BiTE®) immunotherapy **BLINCYTO™ (blinatumomab)** for a type of acute lymphoblastic leukemia less than three months after submission. BLINCYTO™ is an important new treatment option for patients and serves as proof of concept for our novel BiTE® technology platform in the potential treatment of other cancers.

In 2014, we advanced **talimogene laherparepvec**, an oncolytic immunotherapy designed to harness the body's immune system to fight melanoma and potentially other cancers. Following Phase 3 trials, we filed U.S. and European marketing applications for metastatic melanoma.

We received FDA approval in late 2014 for our **Neulasta® (pegfilgrastim) Delivery Kit**, which includes the **On-body Injector**, and we have already entered the market with this important innovation. This injection system allows cancer patients who are at high risk of infection undergoing chemotherapy to receive Neulasta® automatically, and at the appropriate time following chemotherapy, without having to return to the doctor's office.

Following Phase 3 data published in the *New England Journal of Medicine*, we submitted U.S. and European marketing applications in early 2015 for **Kyprolis® (carfilzomib)** in patients with relapsed multiple myeloma. In early 2015, we also received positive Phase 3 data that demonstrated the superiority of Kyprolis® over Velcade® in patients with relapsed multiple myeloma.

Following robust, positive data from five Phase 3 studies, in 2014 we submitted U.S. and European marketing applications for **Repatha™ (evolocumab)** for the treatment of high cholesterol.

The FDA is also reviewing our application for **Corlanor® (ivabradine)**, which was granted priority FDA review status in late 2014 for the

**IMPORTANT**

PANTONE®* Publications and the products of over 1,000 of Pantone's licensees provide a worldwide color language for the selection, presentation, specification, communication, matching, reproduction and control of color.

## *TRADEMARK AND COPYRIGHT NOTICE

PANTONE, PANTONE MATCHING SYSTEM, PANTONE Process Color System, PANTONE Hexachrome‡, Hexachrome, PANTONE TEXTILE Color System, PANTONE Professional Color System, PANTONE PLASTICS Color System and PMS† are Pantone, Inc.'s check-standard trademarks for color standards, color data, color reproduction and color reproduction materials, and other color-related products and services, meeting Pantone, Inc.'s specifications, control and quality requirements. Anyone wishing to reproduce a PANTONE Color with trademark identification or to use our trademarks for any color-related products or services, should first obtain a license or written permission from Pantone, Inc.'s Trademark Control Department.

Published materials of Pantone, Inc. are protected by copyrights and include, for example, graphic presentations, color references, PANTONE Colors, PANTONE Names, numbers, formulas and software. An unauthorized claim by third parties either as principals or agents, inferring that any referenced color or color system is the same as, or equivalent to, a color standard or color system of Pantone, Inc., may be a violation of Pantone, Inc.'s proprietary rights and is strictly prohibited. Similarly, any cross-referencing, in whole or in part, to any PANTONE Color System, including, but not limited to, the PANTONE Numbers and PANTONE Colors, by third parties, may be a violation of Pantone, Inc.'s proprietary rights and is strictly prohibited.

†PMS, the initials of the PANTONE MATCHING SYSTEM, are no longer used.
‡Six-color Process System Patent Pending - Pantone, Inc.

## CAUTION

Due to uncontrollable pigment fading, vehicle discoloration, tarnishing of printed materials or paper aging, the colors in the book may change. These color changes may be more apparent in the light colors. To help minimize these changes, avoid prolonged exposure of colors to light. Slight color variations may exist from previous editions due to raw materials availability. This book should be replaced periodically to maintain accurate color communication.

## WARRANTY

Pantone, Inc. warrants their publications during their lifetime against defective workmanship or materials. Pantone, Inc. will replace them, free of charge, if any are found to be defective.

PANTONE, INC. MAKES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, AND SHALL NOT BE HELD LIABLE FOR DAMAGES OF ANY KIND.

© Pantone, Inc., 1963, 1995
**AMERICA:** Pantone, Inc., 590 Commerce Blvd., Carlstadt, NJ 07072-3098 U.S.A.
Tel: (1) (201) 935-5500    Fax: (1) (201) 896-0242    Cust. Service Fax: (1) (201) 935-3338
www.pantone.com

**EUROPE:** Pantone U.K., Inc., 8 Stade Street, Hythe, Kent CT21 6BD England
Tel: (44) 1303 269666    Fax: (44) 1303 264464

**ASIA:** Pantone Asia, Inc., Unit A, 15/F, Southern Commercial Building, No. 11-13, Luard Road, Wanchai, Hong Kong
Tel: (852) 2724 8822    Fax: (852) 2724 8800

ISBN 1-881509-82-6    Printed in U.S.A. by Pantone, Inc.

# Thornburg International Value Fund

### February 1, 2014

Class R3: TGVRX    Class R4: THVRX    Class R5: TIVRX    Class R6: TGIRX

*Before you invest, you may want to review the Fund's Prospectus and Statement of Additional Information, which contain more information about the Fund and its risks. You can find the Fund's Prospectus, SAI and other information about the Fund online at www.thornburg.com/download. You can also get this information at no cost by calling 800.847.0200 or by sending an e-mail request to info@thornburg.com. The current Prospectus and SAI, dated February 1, 2014, are incorporated by reference into this Summary Prospectus.*

## Investment Goal

International Value Fund seeks long-term capital appreciation by investing in equity and debt securities of all types. The secondary, non-fundamental goal of the Fund is to seek some current income.

## Fees and Expenses of the Fund

This table describes the fees and expenses that you may pay if you buy and hold shares of the Fund.

**Shareholder Fees**

*(fees paid directly from your investment)*

|  | Class R3 | Class R4 | Class R5 | Class R6 |
|---|---|---|---|---|
| Maximum Sales Charge (Load) Imposed on Purchases *(as a percentage of offering price)* | none | none | none | none |
| Maximum Deferred Sales Charge (Load) *(as a percentage of redemption proceeds or original purchase price, whichever is lower)* | none | none | none | none |

**Annual Fund Operating Expenses**

*(expenses that you pay each year as a percentage of the value of your investment)*

|  | Class R3 | Class R4 | Class R5 | Class R6 |
|---|---|---|---|---|
| Management Fees | 0.68% | 0.68% | 0.68% | 0.68% |
| Distribution and Service (12b-1) Fees | 0.50% | 0.25% | 0.00% | 0.00% |
| Other Expenses | 0.39% | 0.45% | 0.32% | 0.06% |
| Total Annual Fund Operating Expenses | 1.57% | 1.38% | 1.00% | 0.74% |
| Fee Waiver/Expense Reimbursement[1] | (0.12)% | (0.13)% | (0.01)% | – |
| Total Annual Fund Operating Expenses After Fee Waiver/ Expense Reimbursement | 1.45% | 1.25% | 0.99% | 0.74% |

(1) Thornburg Investment Management, Inc. ("Thornburg") and/or Thornburg Securities Corporation ("TSC") have contractually agreed to waive fees and reimburse expenses incurred by the Fund so that actual Class R3, Class R4 and Class R5 expenses do not exceed 1.45%, 1.25% and 0.99%, respectively. The agreement to waive fees and reimburse expenses may be terminated by the Fund at any time, but may not be terminated by Thornburg or TSC before February 1, 2015, unless Thornburg or TSC ceases to be the investment advisor or distributor of the Fund prior to that date. Thornburg and TSC retain the ability to be repaid by the Fund for fee waivers and expense reimbursements during a fiscal year if Fund expenses fall below the relevant percentage threshold before the end of that fiscal year.

*Summary Prospectus*



# ARTISAN MID CAP FUND

ARTISAN

Investor – ARTMX          Institutional – APHMX

**Summary Prospectus**
**February 14, 2014**

Before you invest, you may want to review the Fund's prospectus, which contains more information about the Fund and its risks. You can find the Fund's prospectus and other information about the Fund, including the statement of additional information, online at http://hosted.rightprospectus.com/Artisan. You can also get this information at no cost by calling 1-800-344-1770 or by sending an e-mail request to artisanprospectus@rrd.com. The Fund's current prospectus and statement of additional information, both dated February 14, 2014, are incorporated by reference into this summary prospectus.

## INVESTMENT OBJECTIVE

Artisan Mid Cap Fund seeks maximum long-term capital growth.

## FEES AND EXPENSES OF THE FUND

This table describes the fees and expenses that you pay if you buy and hold shares of the Fund.

**Shareholder Fees (fees paid directly from your investment):**

|  | Investor | Institutional |
|---|---|---|
| Maximum Sales Charge (Load) Imposed on Purchases (as a percentage of offering price) | None | None |
| Exchange Fee | None | None |
| Redemption Fee | None | None |

**Annual Fund Operating Expenses (expenses that you pay each year as a percentage of the value of your investment):**

|  | Investor | Institutional |
|---|---|---|
| Management Fees | 0.93% | 0.93% |
| Distribution (12b-1) Fees | None | None |
| Other Expenses | 0.29 | 0.03 |
| Acquired Fund Fees and Expenses[1] | 0.07 | 0.07 |
| Total Annual Fund Operating Expenses | 1.29 | 1.03 |

[1] "Acquired Fund Fees and Expenses" shown are for the fiscal year ended September 30, 2013 and are indirect expenses the Fund may incur from investing in an investment company (acquired fund). To the extent that the Fund invests in acquired funds, Total Annual Fund Operating Expenses in the table above will not correlate to the ratio of expenses to average net assets shown in the "Financial Highlights" in the Fund's statutory prospectus, since the Financial Highlights reflect the operating expenses of the Fund and do not include fees and expenses of acquired funds.

## EXPENSE EXAMPLE

The example is intended to help you compare the cost of investing in the Fund with the cost of investing in other mutual funds. The example assumes that you invest $10,000 in the Fund for the time periods indicated and then redeem all of your shares at the end of those periods. The example also assumes a 5% return each year, and that the Fund's operating expenses remain the same. Although your actual costs may be higher or lower, based on these assumptions your costs would be:

|  | 1 Year | 3 Years | 5 Years | 10 Years |
|---|---|---|---|---|
| Investor | $131 | $409 | $708 | $1,556 |
| Institutional | $105 | $328 | $569 | $1,259 |

## PORTFOLIO TURNOVER

The Fund pays transaction costs, such as commissions, when it buys and sells securities (or "turns over" its portfolio). A higher portfolio turnover rate may indicate higher transaction costs and may result in higher taxes when Fund shares are held in a taxable account. These costs, which are not reflected in annual fund operating expenses or in the example, affect the Fund's performance. During the most recent fiscal year, the Fund's portfolio turnover rate was 43.72% of the average value of its portfolio.

## PRINCIPAL INVESTMENT STRATEGIES

Artisan employs a fundamental investment process to construct a diversified portfolio of U.S. mid-cap growth companies. The Fund's investment process focuses on two distinct areas – security selection and capital allocation.

**Security Selection**

Artisan's investment process attempts to identify companies that possess franchise characteristics that are selling at attractive valuations and benefiting from an accelerating profit cycle.

- **Franchise Characteristics.** These are characteristics that Artisan believes help to protect a company's stream of cash flow from the effects of competition. Artisan looks for companies with at least two of the following characteristics: low cost production capability, possession of a proprietary asset, dominant market share, or a defensible brand name.

- **Attractive Valuations.** Through its own fundamental research, Artisan estimates the amount a private market buyer would pay to buy the entire company (the company's "intrinsic value" or "private market value") and considers whether to purchase a stock if it sells at a discount to that estimate.

- **Accelerating Profit Cycle.** The Fund tries to invest in companies that are well positioned for long-term growth, at an early enough stage in their profit cycle to benefit from the increased cash flows produced by the emerging profit cycle. Companies that Artisan believes are well positioned for long-term growth typically have predictable streams of cash flow through real growth in demand for their products or services and appear to be well positioned to take advantage of opportunities in their markets.

# Affidavit

November 4, 2015

I, Kenneth R. Stewart, AKA Kenneth
Jr.
S. Stewart, do hereby submit that

my father, Kenneth J. Stewart, did/was

one of the original founders, along with Tom Wilson

from Sears-Roebuck, and another man I do not know,

but he was from Securities Exchange, where in

1995-1996 they created the prospectus and

company known as Allstate Corp. See page 10 in

said Prospectus. Also, his photo is in the entrance

at the Texas Department of Insurance.

Kenneth R. Stewart, Jr.