Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3    In re:                        :

                                   :    Chapter 11

4    ENERGY FUTURE HOLDINGS        :

     CORP., et al.,                :    Case No. 14-10979(CSS)

5                                  :

            Debtors.               :    (Joint Administration

6    _____:    Requested)

7

8

9

10                                 United States Bankruptcy Court

11                                 824 North Market Street

12                                 Wilmington, Delaware

13

14                                 November 12, 2015

15                                 10:01 a.m. - 4:52 p.m.

16

17

18

19

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTCHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECR OPERATOR:  LESLIE MURIN

1    HEARING re Confirmation Hearing

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    COLE SCHOTZ MEISEL FORMAN & LEONARD PA

4        Attorney for DTC Company as Indenture Trustee

5

6    BY:  NORMAN L. PERNICK

7

8    CROSS & SIMON

9        Attorneys for Fidelity

10

11    BY:  MICHAEL J. JOYCE

12

13    DRINKER BIDDLE & REATH LLP

14        Counsel to Citibank NA, TCEH DIP Agent

15

16    BY:  HOWARD A. COHEN

17

18    FOX ROTHSCHILD LLP

19        Attorney for Counsel to Ad Hoc Group of TCEH Unsecured

20        Noteholders

21

22    BY:  L. JOHN BIRD

23        KASEY DESANTIS

24

25

```
 1   FRIED FRANK

 2        Attorneys for Fidelity

 3

 4   BY:  GARY L. KAPLAN

 5        MATTHEW M. ROOSE

 6

 7   JENNER & BLOCK LLP

 8        Attorneys for EFIH

 9

10   BY:  VINCENT E. LAZAR

11

12   KIRKLAND & ELLIS LLP

13        Co-Counsel to the Debtors

14

15   BY:  BRIAN M. STEPHANY

16

17   KLEHR HARRISON HARVEY BRANZBURG LLP

18        Counsel to UMB Bank N.A. Indenture Trustee

19

20   BY:  RAYMOND H. LEMISCH

21

22   MCELROY, DEUTSCH, MULVANEY, & CARPENTER, LLP

23        Co-Counsel to the TCEH Debtors

24

25   BY:  DAVID P. PRIMACK
```

1   MONTGOMERY, MCCRACKEN, WALKER & RHOADS

2        Co-Counsel to the EFH Creditors' Committee

3

4   BY:  NATALIE D. RAMSEY

5        MARK B. SHEPPARD

6

7   MORGAN LEWIS & BOCKIUS LLP

8        Attorneys for PIMCO

9

10  BY:  AMY L. KYLE

11

12  MORRIS JAMES LLP

13        Attorney for Law Debenture of New York, Indenture

14        Trustee

15

16  BY:  STEPHEN M. MILLER

17

18  MORRIS NICHOLS ARSHT & TUNNELL LLP

19        Attorneys for Equity Sponsors

20

21  BY:  DEREK C. ABBOTT

22

23

24

25

```
 1   MORRISON & FOERSTER LLP

 2        Co-Counsel to the TCEH Creditors' Committee

 3

 4   BY:  TODD M. GOREN

 5        CHARLES L. KERR

 6        BRETT H. MILLER

 7

 8   MUNGER, TOLLES & OLSON LLP

 9        Co-Counsel to the TCEH Debtors

10

11   BY:  THOMAS B. WALPER

12

13   NIXON PEABODY LLP

14        Attorneys for AST as EFH Indentireu Trustee

15

16   BY:  MORGAN C. NIGHAN

17        RICHARD C. PEDONE

18

19   O'KELLY, ERNST & BIELLI LLP

20        Co-Counsel to Energy Future Holdings Corp.

21

22   BY:  DAVID M. KLAUDER

23

24

25
```

1    O'MELVENY & MYERS LLP

2         Attorneys for Apollo, Brookfield, Angelo Gordon

3

4    By:  ANDREW SORKIN

5

6    PACHULSKI STANG ZIEL & JONES

7         Attorney for Second Lien Indenture Trustee

8

9    By:  LAURA DAVIS JONES

10

11   PATTERSON BELKNAP

12        Attorney for Law Debenture of New York, Indenture

13        Trustee

14

15   BY:  DANIEL A. LOWENTHAL

16

17   PAUL WEISS RIFKIND WHARTON & GARRISON LLP

18        Counsel to Ad Hoc Committee Of TCEH First Lien

19        Creditors

20

21   BY:  JACOB A. ADLERSTEIN

22        ANDREW BERNSTEIN

23        ALAN W. KORNBERG

24

25

```
1   POLSINELLI PC

2        Co-Counsel to the TCEH Creditors' Committee

3

4   BY:  JUSTIN K. EDELSON

5        CHRISTOPHER A. WARD

6

7   POTTER ANDERSON & CORROON LLP

8        Attorney for Deutsche Bank New York

9

10  BY:  R. STEPHEN MCNEILL

11       JEREMY W. RYAN

12

13  PROSKAUER ROSE LLP

14       Attorneys for EFH Corp. Disinterested Directors

15

16  BY:  MICHAEL A. FIRESTEIN

17       MARK K. THOMAS

18       PETER J. YOUNG

19

20  SEWARD & KISSEL LLP

21       Wilmington Trust as Successor of First Lien

22       Administrative Agent and Collateral Agent

23

24  BY:  MARK D. KOTWICK

25       ARLENE R. ALVES
```

1    SHEARMAN & STERLING LLP

2         Counsel to Deutsche Bank, Agent to DIP Financing

3

4    BY:  NED S. SCHODEK

5

6    STEVENS & LEE PC

7         Co-Counsel to Energy Future Intermediate Holding

8         Company LLC

9

10   BY:  JOSEPH H. HUSTON, JR.

11

12   SULLIVAN & CROMWELL, LLP

13        Co-Counsel to the EFH Creditors' Committee

14

15   BY:  ANDREW G. DIETDERICH

16        BRIAN D. GLUECKSTEIN

17

18   U.S. DEPARTMENT OF JUSTICE

19        Attorney for the U.S. Trustee

20

21   BY:  RICHARD L. SCHEPACARTER

22        ANDREA B. SCHWARTZ

23

24

25

1   VENABLE LLP

2        Attorney for PIMCO

3

4   BY:  JAMIE L. EDMONSON

5

6   WACHTELL, LIPTON, ROSEN & KATZ

7        Attorneys for Equity Sponsors

8

9   BY:  EMIL A. KLEINHAUS

10        ALEXANDER B. LEES

11

12   WHITE & CASE LLP

13        Attorney to Ad Hoc Committee of EFIH Unsecured

14        Noteholders and EFIH Second Lien DIP Commitment

15

16   BY:  THOMAS LAURIA

17        J. CHRISTOPHER SHORE

18

19   WILMER CUTLER PICKERING HALE & DORR LLP

20        Attorneys for Marathon Asset Management

21

22   BY:  PHILIP D. ANKER

23        ISLEY M. GOSTIN

24

25

1    YOUNG CONAWAY STARGATT & TAYLOR, LLP

2         Counsel to Ad Hoc Group of TCEH Unsecured Noteholders

3

4    BY:  JOEL A. WAITE

5

6    AKIN GUMP STRAUSS HAUER & FELD LLP

7         Attorney to Ad Hoc Committee of EFIH Unsecured

8         Noteholders and EFIH Second Lien DIP Commitment

9

10   BY:  SCOTT L. ALBERINO

11        ABID QURESHI

12

13   DRINKER BIDDLE & REATH LLP

14        Counsel to Citibank NA, TCEH DIP Agent

15

16   BY:  ROBERT K. MALONE

17

18   FOLEY & LARDNER LLP

19        Attorney for UMB Bank, NA as Indenture Trustee

20

21   BY:  MARK F. HEBBEIN

22        HAROLD L. KAPLAN

23

24

25

```
 1   FOX ROTHSCHILD LLP

 2        Attorney to Ad Hoc Committee of EFIH Unsecured

 3        Noteholders and EFIH Second Lien DIP Commitment

 4

 5   BY:  JEFFREY M. SCHLERF

 6

 7   KIRKLAND & ELLIS LLP

 8        Co-Counsel to the Debtors

 9

10   BY:  APARNA YENAMANDRA

11

12   KRAMER LEVIN

13        Second Lien Indenture Trustee

14

15   BY:  RACHAEL L. RINGER

16

17   MILBANK, TWEED, HADLEY & MCCLOY

18        Counsel to Citibank NA, TCEH DIP Agent

19

20   BY:  CHRISTOPHER HAHM

21

22   MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP

23        Co-Counsel to the EFH Creditors' Committee

24

25   BY:  MARK A. FINK
```

1   OFFICE OF THE TEXAS ATTORNEY GENERAL

2

3   BY:  ASHLEY F. BARTRAM

4

5   PATTERSON BELKNAP

6        Attorney for Law Debenture of New York, Indenture

7        Trustee

8

9   BY:  BRIAN P. GUINEY

10

11  WILMER CUTLER PICKERING HALE & DORR LLP

12       Attorneys for Marathon Asset Management

13

14  BY:  DAVID GRINGER

15

16  ALSO APPEARING TELEPHONICALLY:

17

18  PEG A. BRICKLEY

19  MABEL BROWN

20  EMILY A BUSSIGEL

21  STEVEN H. CHURCH

22  MARIA CHUTCHIAN

23  MARK A. CODY

24  KENT COLLIER

25  LOUIS A. CURCIO

1    ADAM M. DENHOFF

2    BARRY FELDER

3    MARK FLANNAGAN

4    NATASHA HWANGPO

5    ANNA KALENCHITS

6    MATTHEW W. KINSKEY

7    CHARLES KOSTER

8    PHILIP G. LAROCHE

9    CAROL W. LEVY

10   HAL F. MORRIS

11   TINA MOSS

12   BRIAN PFEFFER

13   MEREDITH PFISTER

14   MEREDITH QUICK

15   ERICA RICHARDS

16   MARC B. ROITMAN

17   DAVID SALMONS

18   JASON SATSKY

19   FREDRIC SOSNICK

20   RICHARD A. STEIGLITZ

21   AMER TIWANA

22   BRIAN TONG

23   CARL TULLSON

24   MICHAEL TURKEL

25   MATTHEW UNDERWOOD

1   KEVIN M. VAN DAM

2   BRADY C. WILLIAMSON

3   JULIA M. WINTERS

4   DANIELE ZAZOVE

5   STEVEN ZELIN

6   DAVID ZYLBERBERG

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              CLERK: All rise.

3              THE COURT: Please be seated.  Good morning.

4              MAN: Good morning, Your Honor.

5              MR. HUSNICK:  Good morning, Judge Sontchi.  Chad

6    Husnick from Kirkland & Ellis on behalf of the Debtors.

7    Before we get back into the confirmation trial, if I may,

8    I'd like to give the Court just a quick update on

9    developments on the settlement front.

10             THE COURT:  Okay.  Happy to hear that.

11             MR. HUSNICK:  Your Honor, first, with respect to

12   the EFIH PIK note settlement, which I believe Your Honor is

13   scheduled to hear next Thursday, I just wanted to let you

14   know that we have filed that settlement agreement and that

15   my understanding is that the EFIH PIK indenture trustee has

16   accepted the direction and will stand down from confirmation

17   objections pending entry of that settlement order, which,

18   again, we'll present next Thursday if we're otherwise unable

19   to reach agreement with the other holders in the interim.

20             The only other update, Your Honor, is to advise

21   that we continue to negotiate with some of the other

22   objecting parties, including the EFIH first lien and second

23   lien indenture trustees.

24             Your Honor, as you know, we engaged in discussions

25   yesterday and I'm hopeful that we can resolve those

1    objections with words.  We're still working on it.  We're

2    not there yet.  But that's the update on that front.  Unless

3    you have any questions, Your Honor, I'll turn it over to Mr.

4    McGaan for the trial.

5              THE COURT:  Sorry, just give me a minute.  Okay,

6    I'm good.  Thank you.

7              Thank you for your announcement.  And as always, I

8    encourage the parties to continue to talk and to reach as

9    many settlements as possible.  And I know you're more than

10   aware of the advantage of that.

11             MR. MCGAAN:  Good morning, Your Honor, Andrew

12   McGaan for the Debtors.

13             Before we call our first witness today, just a

14   small housekeeping matter.  We have -- our team has gone to

15   the binders throughout the Courtroom, including yours and

16   your clerk's binders and swapped out two mistaken exhibits.

17   DX955R has been swapped out.  So, it was just a matter of

18   the wrong document being in that place.  And DX74R was an

19   incomplete version of the exhibit.  So those have been

20   fixed.  And I think all the binders are -- yes, all the

21   binders have been updated.

22             THE COURT:  Excellent.  Thank you.

23             MR. MCGAAN:  With that, Your Honor, the Debtors

24   call the co-chief restructuring officer, Stacy Doré.

25             THE COURT:  Very good.  Thank you.  Ms. Doré?

1    Please take the stand and remain standing for your

2    declaration.

3              CLERK:  Please raise your right hand.  Do you

4    affirm you're willing to tell the truth, the whole truth,

5    and nothing but the truth, to the best of your knowledge and

6    ability?

7              MS. DORÉ:  I do.

8              CLERK:  Please state and spell your name for the

9    record.

10             MS. DORÉ:  Stacy, S-T-A-C-E-Y, Doré, D-O-R-E.

11             CLERK:  Thank you.

12                       DIRECT EXAMINATION

13   BY MR. MCGAAN:

14   Q    Good morning, Ms. Doré.

15   A    Good morning.

16   Q    You should have a binder. Do you have your witness

17   binder up there?

18   A    I do.

19   Q    And, Your Honor, what we have, and one's been placed on

20   your bench, is a binder provided in connection with Ms.

21   Doré's testimony.  It should contain a copy of her written

22   direct, which was provided to Your Honor and opposing

23   counsel earlier, along with the exhibits cited there in the

24   highlighted deposition designations.

25             Mr. Doré, the last time -- you've been in the

1    Court for many -- most of all the hearings.  Is that right?

2    A    Yes, most of them.

3    Q    The last time and the only other time you testified

4    here was by video, right?

5    A    That's right.

6    Q    Over a year ago?

7    A    Yes.

8    Q    All right.  So you're here in the flesh today.

9    A    I am.

10   Q    Would you please tell the Court the positions you hold

11   with the Debtors?

12   A    I am the general counsel and co-chief restructuring

13   officer for EFH, EFIH, TCEH.

14   Q    In general, what are your responsibilities as general

15   counsel in that role?

16   A    So, as general counsel I manage the Legal Department

17   for the company.  We have about 20 lawyers and about 40 non-

18   lawyer professionals on the team.  I have responsibility

19   for, in addition to Legal, I have responsibility for

20   Compliance, Corporate Security, which is physical security

21   for our company, as well as the Corporate Secretary's

22   Office.

23   Q    And earlier in your career at EFH you supervised

24   litigation?  Is that right?

25   A    I did.

1   Q     Would you tell the Court about that in general?

2   A     So, I joined the company in 2008 as associate general

3   counsel in charge of litigation for all of the companies,

4   excluding Oncor.

5   Q     And before joining EFH, you were a trial attorney?

6   A     I was.  With Vinson & Elkins.  I was there for 11 years

7   before going in house.

8   Q     All right.  The Debtors have called you here today in

9   your capacity as the co-chief restructuring officer.  Would

10  you tell the Court what your responsibilities are in that

11  regard?

12  A     So, along with Paul Keglevic -- Paul and I just manage

13  the day to day process of the restructuring from the

14  company's perspective.  So we interact with all of the

15  advisors, both the Debtor's advisors and some of the non-

16  Debtor advisors.  And we keep the board informed and we

17  essentially make sure the trains run on time as it relates

18  to the bankruptcy.

19  Q     Okay.  And that's something you're doing in addition to

20  and alongside your general counsel responsibilities?

21  A     Yes.

22  Q     And does the title co-chief restructuring officer

23  suggest you share that responsibility, the CRO

24  responsibility with Mr. Keglevic?

25  A     I do.

1    Q    And how is it, if there's a way that you formally or

2    informally divide up the role?  Can you describe that for

3    the Court?

4    A    So, it's not a formal division of labor.  The board

5    appointed both of us as co-chief restructuring officers in

6    late 2013 and didn't divide up the responsibility

7    specifically.  But in practice, the financial issues

8    naturally fall within Paul's bailiwick and I tend to focus

9    more on the legal and regulatory issues.

10   Q    All right.  Did you prepare in anticipation of coming

11   here to testify live, did you prepare a declaration

12   containing part of your testimony in these proceedings?

13   A    I did.

14   Q    And, Your Honor, that's marked as DDIR Doré.  And

15   you've reviewed and approved that declaration?

16   A    I did.

17   Q    All right.  And is it submitted in support of the

18   Debtor's motion for approval of the proposed settlement and

19   for confirmation of the plan?

20   A    Yes, it is.

21   Q    All right, Ms. Doré, I'd like to turn to your

22   experience with the regulation of EFH's energy business.

23   Would you describe for the Court your experience and

24   familiarity with the regulation of the energy business?

25   A    Sure.  Well, as I said, my group has responsibility for

1    compliance and that includes regulatory compliance both at

2    Luminant and at TXU Energy.  So, even prior to the

3    bankruptcy, I was involved on a number of occasions with the

4    regulators who regulate our business, which include both

5    state and federal regulators.

6          At the state level it's primarily the Public

7    Utility Commission of Texas as well as the Railroad

8    Commission of Texas, which, by the way, does not regulate

9    railroads.  It's a misnomer.  But they do regulate mining

10   operations, and we have the largest coalmining operation in

11   Texas.  And some other state regulatory agencies that we

12   interact with.

13         And then at the federal level it's primarily the

14   Nuclear Regulatory Commission for our nuclear plant, the

15   Environmental Protection Agency, and some of the other

16   federal agencies that regulate the energy industry,

17   including FERC.

18   Q    And with regard to the PUCT, there's been testimony

19   about it, in these proceedings the Court has heard about it

20   a number of times throughout these cases.  Would you

21   describe for the Court what PUCT's responsibility is vis-à-

22   vis EFH and its businesses?

23   A    Well, the PUC broadly regulates the electric utility

24   industry in Texas.  With respect to Oncor, which is a

25   regulated transmission distribution provider, the PUC sets

1    rates for Oncor's customers and generally regulates that

2    business.

3             With respect to the T-side of the house, the

4    wholesale and retail markets in Texas are deregulated but

5    the PUC still has oversight of the competitive markets.  And

6    so we like to say we're the most regulated deregulated

7    company that there is on the T-side because we're still

8    subject to a lot of regulation, even though the wholesale

9    and retail markets are deregulated.

10   Q    With respect to the PUCT, would you describe generally

11   the degree and depth of interaction you've had throughout

12   your time at EFH with representatives of the PUCT, including

13   their outside counsel?

14   A    So, I'd had some interaction with the PUC even prior to

15   becoming general counsel of EFH, when I was formerly the

16   general counsel of Luminant, related to environmental

17   matters.

18            We have a lot of environmental litigation at our

19   company, and so there were interactions with the PUC as well

20   as the TCEQ, which is the Texas Commission on Environmental

21   Quality.

22            Starting in 2012, when I became general counsel of

23   the company, I began to have a lot of interaction with the

24   PUC and their counsel in the Attorney General's Office of

25   Texas regarding possible restructuring options for the

1    company.  Obviously, the PUC has always been and continues

2    to be focused on making sure that it can do whatever it can

3    to assist the company in making our way through this

4    process.  And they're very interested in seeing the

5    companies get out of bankruptcy, obviously.

6    Q    You refer to the Texas Attorney General's Office.  That

7    office represents the PUC?

8    A    Yes, the Texas Attorney General's Office has a

9    bankruptcy division and Hal Morris in that office is counsel

10   to the PUC in this case.

11   Q    Okay.  I was going to say, he's appeared in this case.

12   I think Judge Sontchi's heard his voice at some earlier

13   hearings?

14   A    Yes.

15   Q    In general, what role will the PUCT play with respect

16   to the proposed plan and merger agreement here?

17   A    So, the PUC has to approve any change of control,

18   indirect even, which this one is -- change of control in

19   Oncor.

20          And so the PUC has to approve that in order for

21   the plan to be effective.  In addition to that there will be

22   notice documents that we have to file, even on the T-side of

23   the house.  It's not a contested approval case the way that

24   the Oncor side is.

25          But there are notice documents that we have to

1   file with the PUC regarding change of control on the T-side

2   as well.  So they have an active role in approving the

3   transactions in this case.

4   Q    In your capacity as the co-CRO have you become aware of

5   any proposals to reorganize EFH that would bypass any

6   approval or oversight by the PUCT?

7   A    No.

8   Q    I want you to, for this next question, set aside any

9   legal advice you may have given, if any, to the joint boards

10  of directors.  But in your capacity as the co-CRO, did you

11  at any time tell the joint boards of directors in these

12  cases your views about the likelihood of the PUCT approving

13  the proposed transaction?

14  A    Yes, I did.

15  Q    What is it you told the board?

16  A    I told the board that I thought it was likely that the

17  PUC would approve the change of control application for

18  Oncor.  It's not without its challenges but any change of

19  control case that we would have to file for transfer and

20  control of Oncor would have similar challenges.

21          And I told the board that I thought that -- while

22  no one can predict what the PUC will do, and certainly I

23  don't profess to try to predict that, I thought that the PUC

24  was very focused on doing what it could, again, to not be

25  the reason that the company's stayed in bankruptcy.  And

1    that I thought that the plan we were presenting presented a

2    great opportunity for the PUC to assist the Debtors in

3    getting out of bankruptcy and assist Oncor in getting out

4    from other our parent company who is in restructuring.

5    Q    And how is it, if it's the case, when you describe how

6    the plan may assist getting Oncor out from under the

7    proceedings here -- how is that, if it is, consist with your

8    observation about the PUCT's mission?

9    A    Well, the PUC is very focused on customers in Texas, as

10   it should be, and they simply want to make sure that any

11   customers who have a regulated utility like Oncor are not

12   subject to the risks of the financial markets as much as

13   they can do that.  And that's the reason, for example, for

14   the ring-fencing measures that are in place today.  And so I

15   think that the PUC, based on my interactions with them, has

16   always been focused on trying to make sure that Oncor's

17   customers are protected from any financial restructuring.

18   And they have been in this case, and I think they would see

19   the next step as approving a change of control as even

20   further protecting those customers.

21   Q    Is there anything about the investor group itself that

22   contributes or contributed to your view regarding the

23   likelihood of the PUCT approving a proposed plan?

24   A    Well, only that in the sense that the Hunts, who are

25   part of the investment group, certainly have experience in

1    operating a utility in Texas.  They operate the Sharyland

2    utility.  They also had experience in getting the PUC to

3    approve Sharyland becoming a REIT -- structured as a REIT,

4    which is the intent for Oncor.  And although there are

5    differences between Sharyland and Oncor for sure, so the

6    PUC's made it clear they don't view Sharyland as a direct

7    precedent -- it certainly gave us and myself some comfort

8    that the Hunts had experiencing in navigating the regulatory

9    process and in operating a utility, which is important I

10   think for the customers in Texas.

11   Q    With respect to the concerns that have been expressed

12   about the likelihood of closing the transaction with this

13   investor group in particular, is there anything about Oncor

14   itself, the asset, that makes it attractive, if it does, and

15   contributes to your view about the likelihood of approval

16   here?

17   A    Yes.  Well, it's well-known I think that the Hunts have

18   been interested in acquiring Oncor since 2005 or 2006.  In

19   fact, they were a competitor, so to speak, of the sponsor,

20   our current sponsors, in trying to buy Oncor back in that

21   time period.

22          And it's an attractive asset I think for anyone

23   but particularly the Hunts, who have wanted to expand their

24   utility presence in Texas.  And Oncor is the largest TNB

25   utility in Texas, and so it just fits very nicely with their

1    platform and I think gives them a strong incentive to close

2    this transaction.

3    Q    Have you observed the level of activity that the

4    investor group is engaged in to pursue a closing of this

5    transaction, at least to date?  And, if so, would you

6    describe that to the judge and how it factors into your

7    views about the likelihood of the transaction closing?

8    A    Sure, yes.  There's been a very high level of activity

9    since we announced the deal on August 9th by filing a merger

10   agreement in the plan.  We have weekly calls with the

11   professionals for the investor group, which include White &

12   Case and Baker Botts, who represents the Hunts, to walk

13   through a very extensive checklist of items to close this

14   transaction.

15          Obviously the investors have filed the PUC

16   application.  They filed it on September 29th, I believe,

17   and are actively prosecuting that case.  There are daily

18   discovery requests and responses that are occurring in the

19   PUC.  It's an entirely parallel and separate proceeding to

20   what's going on here and it's very busy and active.

21          In addition to that the investors filed recently,

22   I believe last week, an S11 Form to register with the SEC

23   the rights offering that is underpinning the deal here.

24   That is a very extensive document and they are asking for

25   SEC review of that document.  That's just to name a few of

1    the things.  There are numerous transactional processes

2    going on behind the scenes to try to close this transaction.

3            And it's apparent to me that -- I don't know why

4    anyone would choose to invest the time and money, frankly,

5    that it takes to do all of those things if there was not a

6    serious intent to close the transaction.

7    Q    I know in your role as a general counsel you obviously

8    interact with lawyers on a daily basis, true?

9    A    Yes.

10   Q    And you're in a position on a daily basis to provide

11   legal advice to your client, true?

12   A    Yes.

13   Q    All right, so I want to be careful as I go through this

14   examination and ask you to work with me and set aside

15   knowledge you may have from those privileged communications.

16   And in your travels -- so with that in mind and in your

17   travels interacting with people familiar in Texas with the

18   regulatory environment and PUCT and its activities

19   specifically, has anyone told you that the PUCT is unlikely

20   to approve this transaction?

21   A    No.

22   Q    How about whether -- has anyone told you whether the

23   PUCT is likely to condition this deal to death?  Have you

24   heard that from any knowledgeable person, setting aside

25   privileged conversations -- any knowledgeable persons in the

1    regulatory environment in Texas?

2    A    No.  I think everyone understands that part of the PUC

3    application process typically involves a conversation about

4    measures that the PUC may want the investors to take, again,

5    with an eye towards making sure that the transaction is good

6    for consumers in Texas.  And so it's certainly possible that

7    the PUC could ask for certain concessions or impose

8    conditions on the deal.

9            But, again, that's part of any change of control

10   application involving Oncor, and I don't think in this case

11   there's any particular reason to be concerned about that

12   being a reason that the deal doesn't close.  Certainly no

13   one has suggested to me that that would be a reason the deal

14   wouldn't close.

15   Q   You made a reference to "that would be the case with

16   any transaction involving Oncor".  What do you mean by that?

17   A    Well, even if, for example, NextEra, who I think is

18   well-known in this Courtroom as one of the previous bidders

19   for Oncor -- even in that situation we would have to file a

20   similar change of control application.  And to the extent

21   that the PUC thought that there were things that they needed

22   to approve the application to ensure that it was good for

23   customers, they would've asked for those conditions and

24   concessions from NextEra as well.

25            So, it doesn't really matter at this point who the

1    buyer is, the PUC is going to view it as what's good for

2    customers in Texas and they will do what they need to do to

3    make sure the transaction benefits customers.

4    Q    Prior to the petition being filed in these cases in

5    April of 2014, did you supervise and direct the

6    investigation of potential claims between companies here,

7    Debtors now?

8    A    Yes, in some cases, with respect to some claims, yes, I

9    did.

10   Q    And did you supervise and direct the investigation of

11   potential claims against the equity owners of EFH who we're

12   referring to as the Sponsors here?

13   A    Yes, I did.

14   Q    After the petitions were filed, did those

15   investigations continue and indeed ramp up?

16   A    Yes, they did.  At that point, the creditors and their

17   counsel got involved in pursuing investigation of many of

18   the claims that we had looked at prepetition.

19   Q    Did you help us prepare a demonstrative to summarize

20   those activities at a high level for use in your testimony

21   today?

22   A    Yes.

23   Q    Your Honor, with your permission we'd like to display

24   Debtor's Demonstrative Doré Number 1.

25            THE COURT:  Okay.

1    Q    All right, what's up on the screen then, Ms. Doré, is a

2    demonstrative entitled, "Claims Investigations".  This is

3    intended to provide, again, a high-level summary of the

4    activity with respect to both prepetition and post-petition

5    to investigating potential claims?

6    A    Yes, it is.

7    Q    All right, let me ask you to take a look at it and walk

8    the Court through the -- beginning in the upper left,

9    February 20, 2013 non-sponsor director board meetings begin.

10   Let me set the stage here.  We're talking slightly more than

11   a year before these cases were filed, right?

12   A    That's right.  And I would --

13   Q    Yeah, go ahead.  I was going to say, what was going on

14   at that time?

15   A    Well, I would start back even a little bit before this

16   timeline just as a point of reference.  One of the first

17   things that I actually did as general counsel when I was

18   promoted in March of 2012, was to look into hiring

19   restructuring counsel.  And I hired Kirkland in June of

20   2012.

21          So, from the latter part -- the last six months of

22   2012 was a process of just having the company and the board

23   be educated about restructuring options, both in court and

24   out of court.  It was not necessarily a foregone conclusion

25   at that point that we would have to file for Chapter 11, but

1    we were looking at all possible options.  So, all of the

2    latter part of 2012 we were basically getting educated about

3    the possible restructuring process.

4              In early 2013, we decided that because we knew

5    that certain people may challenge the LBO in particular and

6    argue that there were fraudulent conveyances rising out of

7    the LBO transaction in 2007 --

8    Q    I'm sorry to interrupt.  You say "certain people".

9    You're referring to the company's lenders?

10   A    Yes.

11   Q    Okay.

12   A    Yes.  As we became educated about the process it became

13   apparent to us that just based on looking at other cases of

14   this type and size, that there may be creditors who would

15   assert that the LBO had been a fraudulent conveyance as a

16   means of undoing liens, for example, or getting additional

17   recoveries.

18             And so we knew that those allegations might also

19   involve potential claims against our equity owners.  So we

20   decided in early 2013 as this chart shows, the first one was

21   held on February 20th, to start to have separate meetings of

22   all of the directors on all three boards who were not

23   sponsor-affiliated.

24             So we called those the non-sponsor director

25   meetings.  And so almost after every regular board meeting

1    we would have a non-sponsor director session so that we

2    would have an opportunity to discuss potential sponsor

3    claims with the non-sponsors, and also just allow those non-

4    sponsor directors to ask questions and raise issues that may

5    relate to the sponsors and that they might not feel as

6    comfortable raising in a full board meeting.

7    Q    I'm going to come back to that and what followed from

8    it, but before I do would you move forward and across the

9    top line of this demonstrative and describe for the Court,

10   some of which the Court will be well-familiar with, the

11   changes in the board process over time and why those changes

12   occurred?

13   A    Sure.  So, those meetings of non-sponsor directors, and

14   there were dozens of them I think in 2013, they continued

15   throughout 2013.

16          Then in January of 2014, we decided at that point

17   -- we had made a significant interest payment in October of

18   2013, it was becoming apparent.  I think Mr. Keglevic

19   testified to this as well -- it was becoming apparent by

20   January of 2014 that the company was likely to get a going

21   concern opinion from his auditor, which would've been a

22   default under the debt document.

23          So, at this point it was becoming more apparent

24   that Chapter 11 was going to have to be an option for us,

25   and we had hired in late 2013 an additional director to

1    serve on the TCEH board, who was Hugh Sawyer.  He started

2    serving in October of 2013.

3           So, in January of 2014, we decided to further

4    refine the non-sponsor process by starting to have sessions

5    with only the disinterested directors at each estate --

6    meaning that we excluded directors who were -- they were not

7    sponsors but they served on overlapping boards.

8           So, for example, Paul Keglevic and John Young, our

9    CEO, serve on overlapping boards, so they were not

10   considered disinterested directors.  So we identified Don

11   Evans and Billy Williams at EFH as the disinterested

12   directors there because they were not serving on other

13   boards.  Hugh Sawyer was the disinterested director at TCEH,

14   and then in February of 2014, Chuck Cremens joined the EFIH

15   board and served as the disinterested director at EFIH.

16          So, in January of 2014, we started to have instead

17   of and in lieu of the non-sponsor meetings, we had the

18   separate disinterested director sessions after each of the

19   joint board sessions.

20   Q    Okay.  And then later in time, after these cases were

21   filed, there was a formal delegation of authority to the

22   disinterested directors that you just referred to, correct?

23   A    Yes.  So, as I said, from January to November we had

24   the separate disinterested director meetings, and then in

25   November of 2014, the boards, as a result of Your Honor's

1    ruling partially, the boards passed resolutions formally

2    designating those directors as disinterested directors and

3    authorizing them to determine conflict matters -- to resolve

4    conflict matters, which were defined as intercompany claims,

5    and to engage independent counsel.

6              And so in November of 2014, independent counsel

7    were retained for each of the sets of disinterested

8    directors and the resolutions, as you can see on the chart

9    here, were passed in December of 2014, authorizing them to

10   determine conflict matters.

11   Q    Okay.  And then the chart reflects on April 14, 2015

12   one of the results of that process, which is referred to as

13   the disinterested director's settlement, right?

14   A    Yes.  The first act actually that the disinterested

15   directors took after the formal designation was to approve

16   the bidding procedures.  And so they approved those

17   separately as disinterested directors.

18             Then once those were approved in January of 2015,

19   they began -- they had already been doing a lot of diligence

20   on the claims, but they began the settlement discussions in

21   earnest among each other.

22   Q    Okay.  We're going to come back to this, but I'd like

23   to go to the next demonstrative, and talk about what appears

24   here on the first -- if you go back to the first one -- what

25   appears here on the first one as ongoing due diligence.  Do

1    you see that long blue line?

2    A    Yes.

3    Q    And this is due diligence that pre-dates and post-dates

4    the petition?

5    A    Yes.  In 2013 -- in early 2013 -- we started direct

6    discussions with certain groups of creditors at TCEH, and

7    actually at EFIH.  We were talking at that time to the TCEH

8    first lien creditors, a subgroup of them.  We were also

9    speaking from time to time to the EFIH PIKs.

10             And so, really it was in early 2013 when we

11   started providing diligence to those groups of creditors

12   that we were talking to.  They were asking us lots of

13   questions about potential inter-company claims, just about

14   the business in general.  We gave them access to management,

15   that sort of thing.  So the diligence process here, although

16   it didn't involve all creditors at the outset, it really

17   started in 2013.

18   Q    All right.  So looking at Demonstrative Doré' Number 2,

19   which is up on the screen, this identifies at least three

20   major phases of what's referred to as the ongoing due

21   diligence, right?

22   A    Yes.

23   Q    And you've just described the first in the beginning of

24   the early phase, which began more than a year before these

25   cases were filed?

1   A     That's right.  And you can see here that we opened the

2   data room on January 24, 2013, which was more than a year

3   before we filed for bankruptcy.  Again, as a way of -- as we

4   brought more creditors into the discussions, it was a way of

5   us getting them easy access to diligence information

6   regarding the company and regarding investigations and

7   claims that we had done.  So that's the data room that you

8   see there starting in 2013.

9   Q     And it shows in round numbers, how many non-debtor

10  professionals had access over time to that data room?

11  A     Four hundred and fifty.

12  Q     Now does there's another box that's headed, EFH

13  Investment Diligence.  What is that referring to?

14  A     So that is the data room that pertains to disposing of

15  our interest in Oncor.  And you see there that was open on

16  July 29th, which is around the time that the RSA -- that was

17  shortly after the RSA was terminated and NextEra had come in

18  publically offering to purchase EFH essentially.  And so we

19  opened a data room there in connection with starting the

20  bidding process for Oncor.

21  Q     And now the numbers of non-debtor professionals with

22  access to the data rooms that are -- the company's providing

23  increased substantially.  What is it by this point in time?

24  A     So at this point, there's 900 people, non-debtor

25  professionals, with access to the investment diligence data

1   room.  And the reason that number is even higher than the

2   restructuring data room is because that would include, for

3   example, professionals representing parties that had

4   expressed interest in bidding on Oncor, not just parties in

5   the case -- in the bankruptcy case.

6   Q    And then the third box describing another aspect of the

7   due diligence; what is that intended to capture?

8   A    So that is intended to capture just basically the case-

9   related diligence process that began when we filed for

10  Chapter 11 in April of 2014.  So that consisted of, in

11  addition to the formal legacy discovery process that was

12  going on, it consisted of informal interviews and diligence

13  meetings with company personnel.

14  Q    And let me stop you there, if I could.  Who would be in

15  -- who, for example, was involved in conducting these

16  interviews and reaching out and getting information in this

17  aspect of the due diligence?

18  A    It would have been a wide range of creditor

19  constituents.  So the TCEH committee, the EFH committee when

20  it was formed had some of those meetings, as well as ad hoc

21  representatives.  So, you know, we tried to be -- I mean, I

22  can't represent that in every case we said yes, but we tried

23  to be very open when creditor representatives were asking us

24  for access to information.  I can't even tell you how many

25  of those informal interviews were done, but it was a lot.

1    Q    All right.  And then there's a reference to slightly

2    more formal regular meetings.  Can you just describe

3    generally what those were?

4    A    Right.  So we started having every-other-week meetings

5    with the TCEH creditor group.  So that included the

6    committee, counsel, White & Case, Brown Rudnick for the

7    second liens, and we also did a similar call on a bi-weekly

8    basis with the E-side creditor representatives.  And, in

9    fact, the weekly call that I mentioned earlier that we now

10   have with the investor group has really, on the T-side,

11   replaced that call.  But there were bi-weekly calls

12   basically just to check in on status, allow the

13   professionals to ask us questions, and generally keep people

14   up to speed.

15   Q    And then you broke out the tax diligence meetings?

16   A    Yes.  I think the non-tax lawyers would agree that it

17   wasn't always fun to get into tax issues on the bigger calls

18   because those of us who are not tax lawyers quickly got over

19   our skeeves in trying to talk about that.  So we broke out

20   the tax professionals into a separate work stream, and they

21   had biweekly diligence meeting on both -- with creditor

22   representatives on both sides, but just among tax

23   professionals.

24   Q    Okay.  Now if you could go back to number one, please.

25   In the -- this is Demonstrative Number 1 up on the screen

1    again, MS. DORÉ.  In the post-petition period, there's a

2    purple and gold box, which I was teasing you about because

3    those are LSU's colors, right?

4    A    Yes.  I'm glad you picked those.  Go tigers.

5         (Laughter)

6    Q    It's now on the record.  On the record under oath, go

7    tigers.  Would you describe for the Court what the purple

8    box refers to and the yellow box?  And then we'll talk a

9    little bit about that?

10   A    Sure. So the purple box is the TCEH committee first

11   lien claims investigation.  This was really the

12   investigation conducted by primarily the TCEH official

13   committee, but the other ad hoc groups participated as well.

14   And this was an investigation of all of the claims really

15   giving rise to their argument that the first liens' liens

16   were not valid.

17   Q    Okay.  And that process ran from when to when?

18   A    From June of 2014 to February of 2015.

19   Q    All right.  Then what is the gold legacy discovery box

20   encompass?

21   A    So the gold discovery box is indicating the formal

22   legacy discovery process that this Court put in place to

23   allow all of the parties to investigate and discover

24   potential claims, inter-company claims, you know, claims

25   related to the liability management program, sponsor claims,

1    D&O claims.  Pretty much any pre-petition claims that there

2    were to be discovered were part of this process.

3    Q    And that ran for eight months beginning in August of

4    2014.

5    A    Yes.

6    Q    All right.  And if we could, we'll turn to the last

7    Demonstrative Doré Number 3.  And would you -- and this

8    pulls out the legacy discovery window.  And would you

9    describe for the Court -- and it's detailed here, but

10   describe for the Court your observation of the volume and

11   depth of discovery and the potential inter-debtor claims and

12   claims against directors, officers, and sponsors were

13   available here, and the degree to which people participated

14   in?

15   A    Yes.  Well, I think the numbers, you know, speak

16   volumes.  So there were, you know, 5,600,000 pages of

17   documents produced by the Debtors in this process.  More

18   than 800 -- that included more than 800,000 documents.  And

19   lots of document requests, obviously, informal -- this

20   included informal meetings and interviews, as well.  And we

21   had a process -- Alvarez & Marsal helped us with this.  We

22   had a process of trying to respond, even outside of the

23   formal discovery process -- so if someone hadn't necessarily

24   sent a document request, but they had a question, and they

25   had a priority request because they were trying to, you

1    know, finish up a brief or something -- we had a process to

2    try to respond to those priority requests on a priority

3    basis.

4         I would say that this is one of the most thorough

5    discovery processes that I've ever experienced in my

6    litigation background.  There really was no stone unturned,

7    no document, you know, that wasn't uncovered.  And I think

8    at the end of it, you know, the standing motions were filed

9    in 2015, and those standing motions enumerated many of the

10   claims that we had anticipated pre-petition would be

11   asserted.

12        So I think if you look back at this process and

13   you look at what we had done pre-petition, it was clear that

14   numerous law firms -- dozens literally, maybe more of law

15   firms -- had all looked at the same information and had

16   largely come to the same conclusions about which potential

17   claims could be asserted.  And so it was basically a very

18   open kimono process.

19   Q    Did -- to be specific -- did the EFH committee, its

20   representatives, participate completely in this process?

21   A    Yes, they did.

22   Q    And representatives of creditors throughout the E-side

23   capital structure, did they participate in this process?

24   A    Yes, they did.

25   Q    And it may be obvious, but I'll ask it anyway.  Do

```
1    representatives of the company, DDA's company counsel and

2    the like, participate in this process and take advantage of

3    the information uncovered?

4    A     Absolutely, yes.

5    Q     If you go back to the first demonstrative then, and I

6    want to go back.  There were a couple of things that appear

7    below the timeline to the right.  December 11, 2014, in the

8    midst of legacy discovery, it says, EFH committee identifies

9    potential claims.  What is that referring to?

10   A     So a couple of weeks prior to that, Kirkland, on our

11   behalf, sent out a list of claims that we had sort of

12   identified ourselves, and also heard creditors talk about,

13   throw out in the courtroom, you know, however we came to

14   know about it.  We tried to put a list together of every

15   claim that we had heard might be asserted.  And that was --

16   I remember I personally kept, you know, pushing us to try to

17   get people to identify the specific claims so that we could

18   know what we were trying to settle if we could reach a

19   global settlement.

20             So that letter from Kirkland was an attempt to --

21   and they sent it out to all of the parties -- and it was an

22   attempt to say, these are the claims that we're aware of.

23   Please tell us if you have other claims that you've

24   uncovered in the investigation and that you would want to

25   assert.  So when Kirkland did that, this December 11th
```

1   letter, it was in response to that letter, and the EFH

2   committee attempted to identify some additional claims that

3   were not on the original Kirkland list.

4   Q    Okay.  Let me -- let's take a look at both the Kirkland

5   list and then the EFH committee's list briefly here.  If we

6   can pull up DX955R, and go to the second page.  That's an

7   email cover page -- no, I'm sorry, the third -- yeah, there

8   you go.  And if you pull up, please, the heading and the top

9   two paragraphs, pull that out.  Yeah, that's good, that's

10  good.  Yeah, yeah, thanks.  Okay.  Is this the -- what you

11  refer to as the Kirkland list of claims, the ones you just

12  described that were circulated in early December of 2014?

13  A    Yes.  This was -- as you can see in this first

14  paragraph, we made it very plain that the Debtors were

15  seeking a comprehensive settlement to resolve all claims and

16  potential claims that creditors have identified or could

17  assert.  So from very early on, almost a year ago now, we

18  made it very clear that our goal was to have a comprehensive

19  settlement if that were possible.  And so, we provided this

20  list as a way to say, here's the claims we know about.  Tell

21  us if you have any others.

22  Q    And it goes on to say in the second sentence in the

23  first paragraph some of the sources for identifying

24  potential claims, correct?

25  A    Yes, yes.  That was what I was referring to earlier

1    that in one way or another, these claims had been identified

2    by various creditor groups during the restructuring.

3    Q    In circulating this list, was -- did you intend to

4    comment at all on the validity or value of any of these

5    claims?

6    A    No.  Again, at this point, we were just simply trying

7    to identify, because sometimes you would hear, well, there's

8    all these inter- -- you know, there's all these inter-

9    company claims that have to get settled.  And so we said,

10   well, let's try to list those out and make sure we all are

11   talking from the same list, even if we all have very

12   different views of the merits of those claims.  So this was

13   just an attempt to identify and categorize the potential

14   claims that could be asserted.

15   Q    All right.  And then it's a list that runs from letter

16   A to just onto a third page, letter J, correct?

17   A    Correct.

18   Q    All right.  Now let's take a look at the EFH

19   committee's response or addendum to that, if you will, which

20   is Exhibit DX559 that you just started to describe a few

21   moments ago.

22   A    Yes.

23   Q    All right.  And let's start -- we'll come back to the

24   cover email, but let's just go to the second page and pull

25   up at least the top of it, a third of it if you could.

1    Okay.  So at some point after the Kirkland list that we just

2    looked at was circulated, the EFH committee sent this list,

3    which picks up with letter K and goes down to letter S,

4    correct?

5    A    Correct.

6    Q    And they describe it as additions to proposed claims

7    for comprehensive settlement, right?

8    A    Yes, they do.  I would say not all of them, in my view,

9    were additions.  A lot of them were just sub-categories of

10   claims that we had already identified.  So, for example, in

11   Kirkland's original list, we had recognized that inter-

12   company tax claims were one of the big ticket items, you

13   know, that people were disputing.  In the committee's

14   letter, they break out at K in the use of the FH-NOLs, they

15   break out at L -- I'm sorry, at -- yes, at L, they break out

16   the mark to market tax liability.

17        So, you know, they were attempting to specify more

18   granular claims.  But in our view, that was all encompassed

19   originally within the Kirkland initial category.  So I

20   didn't -- I saw this, and we were happy to get their view of

21   additional claims.  I personally didn't view there to be

22   anything groundbreaking here.  These were all claims that we

23   had been aware of and were really encompassed within the

24   broader categories that we had sent.

25   Q    And if you would go down to the last portion -- S --

1    and pull that out.  And so this is the last in their last

2    list at this time, and it refers to other claims against

3    sponsors and goes on from there.  What did this, if

4    anything, communicate to you at the time?

5    A    I mean, I viewed it as kind of a catchall placeholder.

6    They were not identifying, and no one, frankly, had

7    identified very specifically by that time claims against the

8    sponsors that were separate and apart from just the facts

9    underlying the LBO claim.  So I think they put this in here

10   to make sure that they were raising that they thought there

11   might be claims against the sponsors, but they didn't

12   specifically identify any of them.

13   Q    All right.  Now let's go to the cover email of this

14   exhibit.  Just pull up the paragraph, which is the contents

15   of the email there, single-spaced piece, right.  And here

16   representatives of the committee are telling you attached --

17   I'll just read it.  It says, attached are some additions to

18   the list of inter-company claims that merit attention,

19   right?

20   A    Right.

21   Q    And that's what you understood the purpose of this to

22   be.

23   A    Yes.

24   Q    And then they go on to talk about reserving the right

25   to amend your supplement, true?

1    A    Correct.

2    Q    And then what do they tell you after that about sponsor

3    claims?

4    A    They said they weren't in a position at that time to

5    enumerate specific claims against the sponsors and their

6    affiliates, or against Ds or Os or other insiders.

7    Q    All right.  So when you received this and that comment

8    that you just read, you were chronically you, the Debtors,

9    were in the -- and the other stakeholders were in the middle

10   of this legacy discovery period that you've described,

11   right?

12   A    Yes.  And if I'm not mistaken, the EFH committee was

13   formed maybe in October of 2014, somewhere around then.  And

14   so, I took this to mean they were still in the early stages

15   and they would do some additional work, but at this point in

16   time, they couldn't identify specific claims against the

17   sponsors or Ds & Os.

18   Q    All right.  So at the time when legacy discovery began

19   to wrap in April of 2015 as shown on Demonstrative Number 1,

20   did you get a supplement with an identification of actual

21   claims or theories or claim amounts against whom and for

22   what reason from the EFH committee?

23   A    No.  I personally never said another supplement to this

24   list from the EFH committee.  I wasn't aware that they had

25   ever identified specific claims against the sponsors until

1    we got a letter on October 7, just a little over a month

2    ago.  And even in that letter, they did not identify very

3    specific claims.  They just, again, said I think we might

4    have some claims against the sponsors.

5    Q    And in that letter -- what was the purpose of that

6    letter, the October 7, 2015 letter you're referring to?

7    A    In my deposition, they had asked me whether the company

8    had ever put our insurance carriers on notice of potential

9    D&O claims.  And I said, no, because we didn't -- other

10   than, you know, [indiscernible] claim that had actually

11   resulted in litigation, we had not received demands for

12   specific claims.  And so we had not put our carriers on

13   notice because we didn't have anything to notice in our

14   view.  Subsequent to that deposition and that testimony, the

15   EFH committee sent us a letter demanding that we notify our

16   insurance carriers of unspecified claims.

17   Q    All right, so let me go back to the chronology then.

18   The deposition you're referring to was the deposition taken

19   of you in connection with these proceedings that bring us

20   here today, right?

21   A    Yes.

22   Q    That was part of the discovery approved by the Court to

23   prepare for the confirmation proceedings and the motion to

24   approve the settlement, right?

25   A    Correct.

1  Q    All right.  Discovery ended October 2 on that discovery

2  period?

3  A    Yes.

4  Q    And so it's after that this letter arrived that you're

5  describing.

6  A    correct.

7  Q    In that letter, was there more specificity about who

8  ought to be sued, who ought to do the suing, what the --

9  what even the legal theory ought to be, what the value of

10  the claim might be; was there anything like that?

11  A    Do we have that letter?  I can't -- I don't think there

12  was a lot more specificity, but I would want to make sure I

13  was --

14  Q    We do.

15  A    -- looking at it.

16        MR. MCGAAN:  May I approach, Your Honor?

17        THE COURT:  Yes.  Thank you.

18  Q    MS. DORÉ, I've handed you the letter you were refer --

19  well, you tell me.  This is marked as DX968.  It's an

20  October 7, 2015 letter addressed to the EFH board from

21  Montgomery McCracken.  Is this the letter you were referring

22  to?

23  A    Yes, it is.  And they did attempt to add some more

24  specificity.  But they basically just said, we may -- the

25  committee intends to or may assert derivative claims against

1    certain or all members of the boards and certain executive

2    officers of EFH, and then they lay out breach of fiduciary

3    duty, aiding and abetting.

4              And, again, it goes back to all the transactions

5    that had been crawled all over by all the parties, the LBO

6    and amend and extend.  So we did provide this to our

7    carriers based on this demand, and the carriers did not

8    consider it to be a claim because there's not enough

9    specificity around it.  There's no damages amount.  There's

10   no specific parties named.  So, again, I viewed this as kind

11   of a preservation of rights on their part.

12   Q    Okay.  So if we can do back then to Demonstrative

13   Number 1.  And, again, focusing below the time line in the

14   legacy discovery period -- actually, just after the end of

15   the legacy discovery period, you received an articulation of

16   claims from other constituents, true?

17   A    Yes.  As I mentioned earlier, in February of 2015, the

18   standing motions were filed, and they were very voluminous

19   and very detailed about the claims that were potentially

20   going to be asserted against the first lien creditors.  And

21   even though those were specific to claims against the first

22   lien creditors, the facts underlying those claims were the

23   same for any claims that could have been asserted inter-

24   company or against sponsors and Ds & Os.  So it gave us a

25   really good feel for what the arguments were going to be on

1    both sides of the issues regarding those claims.

2    Q    So you received these letters -- and let's take a look

3    very, very quickly at each of them.  First, DX598.  What is

4    DX598, Miss Doré'?

5    A    So there had been, I think in early Fall of 2014, a

6    case matters protocol that had been negotiated with the T-

7    side creditors.  And pursuant to that protocol and

8    subsequent amendments to it, the committee and the ad hoc

9    group of TCEH unsecured creditors, had agreed by a date

10   certain to identify claims.  Again, this is in keeping with

11   our strong desire to get to a point where we were able to

12   say, here are all the claims that could be asserted, that no

13   one was going to come in with some surprise claim that we'd

14   never heard about, because we wanted to know exactly what we

15   were considering settling and we wanted to know if we had

16   failed to identify something that others might identify.

17          So this letter was served pursuant to that

18   protocol, and was an attempt by the TCEH official committee

19   to identify all of the claims that they might want to

20   assert.

21   Q    And this letter is dated April 30, 2015, right at the

22   close of legacy discovery?

23   A    That's right.

24   Q    And it comes from Mr. Shore, litigation counsel to the

25   T-side committee?

1    A    Correct.  And so this was after they had -- was that

2    eight months of access to all of the thousands of pages of

3    documents that had produced, and the sponsors had produced

4    their own documents as well.

5    Q    And did they articulate and set forth claims that you

6    hadn't -- you, the company, hadn't considered before?

7    A    No.  I remember receiving this letter and a similar

8    letter from White & Case, and nothing -- in fact, I remember

9    telling the board -- nothing in here surprised us.  I mean,

10   again, I feel like this was a process where we know before

11   we filed, and it was confirmed after we filed, what the

12   likely claims were going to be.

13   Q    And did they -- that is, the committee -- identify

14   potential claims against directors, officers, and sponsors

15   in their list?

16   A    Well, as many of the parties in this case, the way that

17   they dealt with that issue was to simply say there are

18   claims related to a series of transactions -- the LBO

19   transaction, the liability management program, sponsor fees.

20          And then they would just sort of throw in at the

21   end, and to the extent that there are valid claims based on

22   those facts, there may be break of fiduciary claims against

23   the Ds & Os and sponsors for participating in those

24   decisions.  So they didn't really -- there wasn't a heavy

25   focus really at any point in time, based on my knowledge, of

1    there being significant valuable claims against directors

2    and officers.  It was more of, here are the inter-company

3    claims that arise out of these various transactions, and to

4    the extent there's liability, there may be breach of

5    fiduciary duty claims there too.

6    Q    All right.  And let's look lastly at DX599.  Can you

7    tell the Court what this document is?

8    A    So this is a similar letter from White & Case, also

9    pursuant to the case matters protocol, and it's very similar

10   -- identical in some cases -- to the committee letter.

11   Q    Okay.  And this is an April 30, 2015 letter, same day.

12   A    Yes.

13   Q    And it's from the ad hoc group of T-unsecureds from Mr.

14   Shore, their litigation counsel, correct?

15   A    Correct.

16   Q    Okay.  I want to -- let's go back to Demonstrative

17   Number 1.  I'm going to turn our attention to something

18   else, or your attention, and that is the disinterested

19   directors settlement, April 14, 2015.  And what happened on

20   April 15, 2015 in connection with that settlement?

21   A    That was the date that the disinterested directors

22   filed statements explaining their settlement and explaining

23   their process.  The settlement, I think, had actually been

24   reached a couple of weeks before that and finalized, but

25   that was the day they filed statements explaining the

1   settlement.  And that was also -- I think it was the day

2   before, if I'm not mistaken, was the 13th that we filed our

3   first plan of reorganization.

4   Q    Okay.  And the Court is going to hear in these

5   proceedings from some of the disinterested directors that

6   were involved in this.  But can you describe -- you're

7   familiar with the process they engaged in leading up to that

8   settlement?

9   A    I am.

10  Q    Would you just describe it generally?

11  A    Well, it started really back in November, again, of

12  2014, when the disinterested director advisors, or the DDAs

13  as we call them, were engaged.  They immediately began

14  engaging in diligence activity to understand potential

15  claims that each estate might have against the others.  So

16  it was very, very busy in late November, December, January.

17  They consumed vast amounts of information in a short amount

18  of time, got all over the data room, interviewed a bunch of

19  company witnesses, reviewed a lot of board presentations,

20  and just began investigating generally what claims the

21  company's might have against each other.  That then led to a

22  process -- well, let me say.

23          In parallel to that -- in parallel to that

24  diligence process, Paul and I, along with Kirkland and the

25  Debtor's other advisors, were strongly encouraging the

1    parties to try to come to a consensus about a plan of

2    reorganization built around -- or not built around -- the

3    bidding process.  We just wanted the creditors to come to an

4    agreement.  That's what our great hope was.  And so, in

5    parallel, we were doing that and trying to spur on

6    negotiations.  And the disinterested directors at that time

7    in early 2015, decided that in the event that the creditors

8    could not come to an agreement, they wanted to start

9    discussing a settlement among the estates.

10             So they started a process in which the DDAs, and

11   ultimately, the DDs themselves, had a settlement

12   negotiation, which really lasted a couple of months if you

13   go back to the time of starting to identify and share claims

14   with one another.  But it culminated in a more intense two

15   week -- two or three week process where they were exchanging

16   offers with one another and counters, and then had an in-

17   person negotiation session in Dallas.

18   Q    You referred to the involvement of the DDAs, and we've

19   heard a lot about that.  The Court is likely well familiar,

20   but we're talking about lawyers and financial advisors here?

21   A    Yes.  At EFH, it was Proskaur and [indiscernible], and

22   at EFIH, it was [indiscernible] and Golden.  At TCEH, it's

23   Munger Tolles, and Greenhill as the financial advisor.  So

24   they each had their own legal counsel and financial advisor.

25   Q    And at EFIH, Jenner & Block as well.

1    A     Correct.

2    Q     Right.  And so did both the lawyers and the financial

3    advisors at each of these principal Debtors participate in

4    the review of legacy discovery materials and the due

5    diligence process that you describe?

6    A     Yes, they did.

7    Q     What role did you personally play, and then your fellow

8    senior managers at the company, in this settlement process,

9    if any?

10   A     We were just providing information.  We were trying to

11   help them get access to all the information -- they wanted

12   access to company employees -- helping them to understand

13   what claims had already been identified, and generally just

14   provide any information they needed to get the job done.

15   Q     You mentioned that the process began with a discussion

16   or exchange of claims as beginning of maybe a two month

17   process before it culminated to in-person negotiations; is

18   that fair?

19   A     Yes.  As I said, I think the diligence on their own --

20   each of them on their own -- started in November.  But I

21   think it was around February maybe, or early March, where

22   they started really interacting with one another and talking

23   about, okay, how are we going to try to set up this process

24   to have a settlement negotiation.

25   Q     And then you refer to in-person negotiations took

1    place.  That is between the disinterested directors or among

2    them themselves?

3    A    Yes.  That took place in Dallas.  I think it was in

4    late March, if I'm not mistaken, because it was around the

5    time of our normal quarterly board meetings, or we were

6    having some other board meetings going on.

7    Q    So they used space in your offices to do that.

8    A    They did.  They met at EFH in Dallas over a number of

9    days.

10   Q    Were you or other managing personnel from the companies

11   in the negotiations that they were conducting?

12   A    We were not.  I certainly was not.  I don't believe

13   other members of management were in any of the negotiating

14   sessions between the disinterested directors.  Again, we

15   were on the floor.  They met on the floor where Paul and I

16   both have our offices.  So we were on the floor to be

17   available as a resource.  They did different -- at different

18   times, different ones of the disinterested directors would

19   come and ask us questions, again, just in the sense of

20   trying to make sure they had accurate information.  But we

21   were not in the negotiating sessions.

22   Q    In its written objections, the EFH committee alleges

23   that those settlement negotiations that you're describing

24   were choreographed and they weren't at arm's length.  Is

25   that consistent with your observation?

1    A    Not at all.  It was -- I was on the floor during those

2    days.  And, to be honest, the tension was palpable, you

3    know, walking around -- not being in the room, but just sort

4    of walking around.  They were very difficult negotiations

5    among people who had served together on a board for a couple

6    of years, and now had to, you know, really argue with each

7    other and advocate for their own estate's interest.  And it

8    was a difficult process.

9              I think that, frankly, the directors who were

10   involved in that process needed a little bit of a cooling

11   off period after it was over, and they took that.  And

12   they're all professionals, so, you know, they were able to

13   kind of move on past that.  But it was a difficult, intense

14   process.

15   Q    How could you tell or observe that it was difficult and

16   there was this interpersonal issue going on if you weren't

17   in the negotiations themselves?

18   A    Well, because as I said, at different times, either the

19   DDAs or the DDs themselves would come and discuss

20   information with us, just ask questions.  I didn't know what

21   the bid ask was between them.  They weren't discussing that

22   with us.  But, you know, for example, Hugh Sawyer might come

23   into my office and ask a couple of questions.  At other

24   times, Chairman Evans would come in.  And so, I just knew

25   from talking to them that it was a difficult process.

1   Q    You were here when Mr. Keglevic testified?

2   A    Yes.

3   Q    And you recall he testified about something that's been

4   referred to as the co-CRO term sheet?

5   A    Yes.

6   Q    And that was something that was issued previous to

7   these negotiations and the announcement of the DD

8   settlement, right?

9   A    That's correct.

10  Q    And one of the things he described, and you'll be

11  familiar with it, is at one point a $450 million unsecured

12  claim by TCEH against EFH was plugged in in that co-CRO term

13  sheet; do I have that right?

14  A    You do.

15  Q    You were involved in that decision?

16  A    Yes.  We had started discussing as early as December

17  with our advisors, the Debtor's advisors, the possibility of

18  putting out a term sheet, again, to try to spur consensus.

19  Our interest was to try to move the settlement negotiations

20  forward.  And it seemed at times if we didn't take steps to

21  do that, nothing was happening.

22          THE COURT:  You said -- I'm sorry, I'm going to

23  interrupt.  You said settlement negotiations forward.  Are

24  you talking about the DD settlement negotiations, or are you

25  talking about broader plan settlement negotiations?

1          MS. DORÉ:  No, sorry, Your Honor.  I was talking

2     about plan settlement negotiations.  So we had talked about

3     putting out a plan term sheet based on essentially looking

4     at what the various offers back and forth between the

5     creditors had been.  And we had a number of those in our

6     possession, some of which had been shared with us real time;

7     others of which we had, you know, received after the fact.

8     But we looked at the numbers that were in those various

9     offers between -- it was primarily the EFIH PIKs, the TCEH

10    first liens, the TCEH committee, which was being -- which

11    was coordinating with the ad hoc group of TCEH unsecureds,

12    as well as there was an EFH committee offer during that time

13    that had numbers in it.

14          And we looked at all of those numbers and tried to

15    come up with what we thought was a proposal to put out to

16    creditors to say, based on what we've seen you guys

17    negotiating, this may be something you can all support.  And

18    we figured the measure of our success was going to be that

19    everybody would hate it, and they did.

20    Q    Did you view that --

21          THE COURT:  You brought people together.

22          (Laughter).

23          MS. DORÉ:  We tried.

24          MR. MCGAAN:  In a shared mission.

25    Q    Did you view that decision then to populate the co-CRO

1    term sheet with numbers as in some way choreographing what

2    became the disinterested director settlement?

3    A    No, not at all.  In fact, it was clear to us the entire

4    time that Paul and I, and with our advisors, were working on

5    this CRO term sheet.  The disinterested directors made it

6    very clear to us that they didn't support the numbers that

7    we were talking about.

8    Q    How and where did they make that clear to you?

9    A    In board meetings.  We had separate board meetings at

10   each entity.  We had joint board meetings.  And, of course,

11   we kept the board apprised of what we were trying to do to

12   bring creditors together.

13           Frankly, there was a reluctance on the part of the

14   disinterested directors for us to put out any numbers

15   because they didn't agree with the numbers that we were

16   banding about, or even the numbers that the creditors had

17   been banding about.  But we really -- ultimately, they

18   agreed that we could put out the term sheet with a very

19   clear legend -- I think it's probably this long -- that says

20   these numbers have not been approved by the board or any

21   disinterested director.  They are solely the view of the co-

22   CROs based on the negotiations that we had seen take place.

23   Q    I'm going to come now to the settlement that's before

24   the Court today, the proposed settlement.  And in

25   particular, the feature of the proposed settlement that's

1    been referred to as disarmament.  All right?

2    A    Yes.

3    Q    We've already had testimony about it.  So just to reset

4    where we are in brief, what is disarmament?  And then I have

5    a few questions about that.

6    A    Sure.  So disarmament became a key piece of the current

7    deal that we have with the investor group.  And what it

8    involves is pretty straightforward.  It's that the TCEH

9    junior creditors have agreed to lay down their arms, so to

10   speak, and not litigate the many, many claims that they had

11   identified and threatened along the way.  And they would --

12   that would become -- that disarmament, so to speak, would

13   become effective upon approval of the settlement agreement,

14   such that it would apply now in this plan context, and even

15   later if, for some reason, this plan didn't close.  So it's

16   a permanent disarmament if the settlement agreement is

17   approved.

18   Q    And you concluded that agreeing to that, obtaining that

19   concession, was of benefit to the Debtors.

20   A    Absolutely.  I mean, that was the -- all along, going

21   all the way back to the infamous RSA, you know, the specter

22   of litigating those claims, particularly with the TCEH

23   junior creditors because many of those claims really were

24   being asserted on behalf of TCEH -- most of them -- not as

25   many existed at EFH.  So the specter of litigating those

1    claims had always been something that we knew we had to

2    face; and if we had to litigate, we would have, and we were

3    prepared to do that.  But we knew that was going to be a

4    very expensive time-consuming process that would likely

5    damage the business in the end.

6    Q    What did you base that view on?  And, again, I want to

7    caution you, I'm not asking you for a legal analysis of

8    these claims.  And to whatever extent you have engaged in

9    that in your own head or in privileged discussions, I want

10   you to set it aside.  But when you talk about it being

11   potentially damaging to the estate, what observations

12   support that view?

13   A    Well, first of all, just my experience as a trial

14   lawyer, I knew what it costs to litigate big cases.  And, in

15   addition to that, just watching the burn rate of fees and

16   expenses in this case confirmed that it was going to cost a

17   lot of money to continue to litigate those claims.  And, in

18   fact, we really, at this point in time, were incurring about

19   $25 million a month in Debtor and non-debtor retained

20   professionals fees -- and non-retained actually.

21   Q    Let me stop you there with that observation.  How is it

22   then that you make some judgment about what litigation might

23   cost if that's the burn rate for being in the courtroom and

24   engaging in what we've engaged in thus far, but we're not

25   yet litigating these claims.

1    A     Right.  That was going to be my point, is that $25

2    million a month, and that's just for the ordinary, you know,

3    bankruptcy run rate, not that this case is ordinary.  But

4    that's for, you know, the professionals to do what they have

5    to do regarding a plan.  That doesn't include what it would

6    cost to actually be in trial litigating billions of dollars

7    of claims with a lot at stake for a lot of people.  And, you

8    know, other things that I looked at -- first of all, we

9    looked at quarter -- at least on a quarterly basis with our

10   board, we would make presentations to the board, and still

11   do, about the fees that have incurred in this case.

12             So the board was informed as to what it was

13   costing to run these cases.  They could certainly infer from

14   that the additional cost of litigating.  Even if you had a

15   steady state of $25 million a month for a longer period,

16   that's a lot of money.  But we knew that on top of that,

17   there was going to be additional costs from litigating.  And

18   then we looked at other things like how long it had taken to

19   litigate certain issues; for example, the EFI's first lien

20   make whole trial, which is still ongoing -- not in this

21   court, but in other courts -- and it had taken a long time

22   for a fairly straightforward contractual issue.

23             So we looked at all of those facts together, and

24   knew that it was going to take a long time and a lot of

25   money to try to litigate all of those claims to conclusion.

1   Q    One of the assertions made by the EFH committee in its

2   written objections is that these claims could be resolved on

3   pretrial motions efficiently and quickly.  Is that been your

4   personal experience in litigating complex commercial cases?

5   A    No.  I think if you read the standing motions in this

6   case, as well as our settlement motion, it becomes obvious

7   that a lot of these claims were very fact-bound.  I mean,

8   just the question of solvency at the time of the LBO, later

9   in time with respect to the liability management pogrom,

10  just that question alone would have probably taken weeks to

11  litigate, and that didn't even begin to touch on the

12  defenses.

13          And so, I don't think these claims would have been

14  susceptible to, in my own opinion, a lot of disposition at

15  the pretrial stage.  Maybe some issues could have been

16  narrowed, of course.  But I think there were a lot of facts

17  that would have had to be tried with lots of witnesses,

18  including witnesses from the company who would have been

19  distracted from doing their day jobs to have to come and

20  testify in those cases.

21  Q    You mentioned the first lien make whole litigation,

22  that it took place in these cases.  That was resolved on

23  summary judgment, correct?

24  A    Yes.

25  Q    How long did that take?

1    A    I think it was about a year just to get it resolved in

2    this court, and now it's on appeal.

3            THE COURT:  You're not blaming me, right?

4        (Laughter)

5            MS. DORÉ:  Not at all.

6            THE COURT:  Mr. Anker and I blame each other.

7    A    Well, that's actually -- I mean, that's actually my

8    point, though, is even before it ever got to Your Honor,

9    there's all the pretrial negotiations, scheduling

10   negotiations that goes on among the parties, negotiating

11   who's going to get how many depositions and is there going

12   to be a protective order, and how many documents are you

13   going to request.

14           So all of that has to happen before we ever even

15   get in front of the Court.  And that's really what took so

16   long, frankly, in the first lien situation and, again, on a

17   pretty discreet issue.  So there's no reason to think that

18   it wouldn't take the better part of a year just to get

19   organized for trial on these massive claims.

20   Q    Now with respect to time, you talked about the cost of

21   paying the lawyers' fees.  Is there a cost to the estates if

22   the cases are simply extended in order to make room for and

23   accommodate the litigation that would be entailed by

24   pursuing these claims in an adversarial contest?

25   A    Yes. I mean, there's the additional interest expense,

1    of course.  For the EFI second lien alone is $19 million a

2    month, almost as much as our restructuring fees.  And in

3    addition to that, you've got $100 million of adequate

4    protection payments that are being paid on the T-side --

5    Q     How frequently?

6    A     -- as well as other interest expense that I don't have

7    quantified.

8    Q     How frequently are those -- is the $100 million

9    adequate protection payment made?

10   A     Every month.

11   Q     Is the board kept on any regular basis apprised of

12   these burn rates; that is, the legal fees, interest

13   expenses, and adequate protection payments?  Is that

14   something the board is aware of and discusses?

15   A     Yes.  Several months into the case -- I can't remember

16   exactly when, but probably in late 2014 -- Chairman Evans

17   asked us to start updating the board regularly on those

18   amounts.  So we have basically a fee dashboard slide that

19   gets reports to the board at least on a quarterly basis;

20   more often, if board members ask for it.  And based on --

21   the board spends a lot of time focused on understanding what

22   this is costing all of the estates because that's a

23   motivator, obviously, in trying to get to a resolution.

24   Q     Did that -- those discussions, and that information

25   conveyed to the board in those discussions, contribute to

1    your observation and their decision in weighing the value of

2    disarmament and approving the settlement that's been

3    proposed to the Court?

4    A    Absolutely.  The board had many discussions about

5    avoiding -- stopping the bleeding, so to speak.

6    Q    What about, have you considered and what is your view

7    about carving out potential claims against directors,

8    officers, or sponsors; could you obtain these benefits and

9    carve out those claims?

10   A    No.  I mean, the discussion we always had about --

11   first of all, on the sponsor claims, we had looked at those

12   claims exhaustively pre-petition, and continued to look at

13   them and had other parties look at them.  So that was

14   something we had spent a lot of time analyzing.  And the

15   board compared the potential value, if any, of those claims

16   to the cost of delay.  But also, even if the claims for

17   sponsors and Ds & Os had been carved out, it would not have

18   avoided the time that the company personnel, and the expense

19   to the estates, would have taken to litigate those claims.

20   Q    Why is that?  What if the creditors were free to go off

21   and sue Goldman Sachs and KKR and TPG to their hearts'

22   content; how does not free you and your client from this?

23   A    Well, my understanding -- I'm not a bankruptcy lawyer,

24   but my understanding is first of all, if there was some sort

25   of litigation trust created for that litigation, the estates

1    still have to fund that, first of all, and fund the fees.

2    Secondly, all of the witnesses, other than the sponsors

3    themselves, all of the fact witnesses in those cases would

4    have been company personnel.  All of the people who worked

5    on the LBO who are still with the company, including Mr.

6    Carter, who testified, all of the people who were involved

7    in shared services, for example.  It would have all been

8    company people who would have had to spend their time no

9    differently than if the inter-company claims had been

10   litigated.

11   Q    I want to ask you about the process the company went

12   through from the very beginning to look at, and ultimately

13   conclude, that it should, as part of the proposed

14   transaction here, release claims against directors,

15   officers, and sponsors.  You mentioned --

16          THE COURT:  I'm sorry, Mr. McGaan.  Can I

17   interrupt?  Since you're sort of changing sub-topics, could

18   we take a short recess?  Take five minutes.

19       (Recess)

20          THE COURT:  Please be seated.  Thank you.

21          MR. MCGAAN:  Thank you, Your Honor.

22   Q    Ms. Doré, we were just finishing up a discussion about

23   the disarmament feature of this settlement and where we left

24   off is I was asking you questions about the decision to

25   approve releases of the sponsors in connection with that

1    settlement.  Do you recall that before we broke?

2    A    Yes.

3    Q    In your involvement around -- in and around the

4    negotiations that led up to the settlement, did you ever

5    have any reason to believe that the sponsors would have

6    given up the claims they had for the potential upside in the

7    equity in the proposed deal, had they not received releases,

8    or had they then sent off to a litigation trust to defend

9    themselves in that setting?

10            MAN:  Objection, Your Honor.  Calls for hearsay.

11            THE COURT:  I'll allow you to -- don't say what

12    they said to you, but if you have general impressions, you

13    can provide them.

14            MS. DORÉ:  Okay.  No, I have no reason to believe

15    that.  And I think Mr. Smidt testified last week that he

16    would not have.

17    Q    All right.  You mentioned that the potential for claims

18    by the companies against sponsors had been exhaustively

19    looked at.

20    A    Yes.

21    Q    And that began, as you described at the beginning of

22    your testimony, pre-petition, correct.

23    A    That's correct.

24            THE COURT:  Can you move -- I'm sorry, can you

25    move a little closer to the --

1         MS. DORÉ:  Sure.

2         THE COURT:  -- microphone?

3         MR. MCGAAN:  Number 1.

4         MS. DORÉ:  Sorry.

5    Q    So I'm going to put Demonstrative 1 back up and

6    something we skipped over, but I want to come back to,

7    there's a blue bar over 2013 that says Sidley Investigation,

8    what does that refer to?

9    A    So, in June of 2013 I engaged Sidley Austin to

10   investigate potential claims against the sponsors, for a

11   couple of reasons.  One, we knew, again, we knew at the time

12   that if TCEH filed for bankruptcy that there would be

13   creditors who might try to challenge the LBO and along with

14   it assert claims against the sponsors.  We wanted to make

15   sure that each of the companies had an understanding of

16   potential claims that the companies might assert against the

17   sponsors.

18             And also, it had come to our attention, at that

19   point, that there could be an argument that the LBO related

20   claims were subject to a six year statute of limitations as

21   opposed to a four year statute of limitations.  If it were a

22   six year statute of limitations, that would have been

23   expiring in October of 2013, because the LBO had been done

24   October of 2007.

25             So just given where we were in the process and

1    given that TCEH at least had been exploring the possibility

2    of a Chapter 11, and had been in discussion with creditors

3    about possibility filing Chapter 11, we wanted to make sure

4    that the boards had an understanding of the potential

5    expiration of that statute and specifically what claims

6    could be asserted against the sponsors.

7    Q    Okay.  Well, I am going to be very careful not to ask

8    you to testify to the content of anything Sidley and Austin

9    said or concluded or conveyed to you or your client.  But I

10   do want to know what it is you asked Sidley and Austin to

11   do.  What was their assignment?

12   A    Well, their engagement letter I think is -- actually

13   been filed with the Court, so I'll just speak to that,

14   because that really very precisely defines the scope of the

15   engagement.  And it -- what it says is that we're -- all of

16   the companies, EFH, TCEH and EFIH and EFCH engaged Sidley to

17   investigate and advise the companies, the boards, of claims

18   that could be asserted against the sponsors.

19         We then enumerate that that would include, but not

20   being limited to claims arising out of the LBO, the

21   liability management program, sponsor fees and other

22   financing fees that the sponsors might have received.

23   Q    What was the -- the demonstrative, I should say, shows

24   a period running from June to October of 2013, what happened

25   to your observation during that time?

1   A     Well, after I engaged Sidley, they undertook an

2   extensive investigation.  They interviewed more than 20

3   witnesses.  The company produced, to them for their review,

4   over 650,000 documents, including all of the diligence that

5   the sponsors had had access to from the old TXU Corp when

6   they decided to buy the company in the LBO.  And they did an

7   exhaustive analysis of potential claims against the

8   sponsors, resulting in a 800-page memorandum analyzing those

9   claims.

10  Q     Did they -- were they assisted by a financial advisor

11  that the company retained as well?

12  A     Yes.  Zolfo Cooper was their financial advisor who

13  assisted them in that investigation.  And they reported to,

14  it's important to note Sidley was directly reporting to the

15  non-sponsor directors.  The sponsor directors were never

16  involved in a meeting with Sidley during that investigation.

17  Q     So --

18  A     Other than being interviewed by them.

19  Q     So we go back to the demonstrative, and -- where we

20  started the day, February 20, 2013 the beginning of non-

21  sponsor director board meetings; are you there?

22  A     Yes.

23  Q     Is -- who originally approved the retention?  Well, I

24  should ask you this.  Did the board approve the retention of

25  Sidley to engage in this work?

1    A    The non-sponsor directors approved the retention of

2    Sidley.  The sponsors, of course we made them aware of it

3    but it -- they were -- and they were cooperative, but we

4    made it clear that Sidley would be engaged by and reporting

5    to the non-sponsor directors.

6    Q    To your observation, were the sponsors privy to any of

7    the conclusions or observations that Sidley and Zolfo Cooper

8    developed during the investigation?

9    A    Not to the detail of their presentations.  I -- I

10   believe that after the non-sponsor directors had had their

11   presentation from Sidley, and after October of 2013, there

12   was a board meeting at which the non-sponsor directors

13   simply reported to the full board that they had received the

14   presentation and had gotten that advice.

15   Q    All right.  And that took place fall of 2013.  That is

16   the conclusion of Sidley's work at that time in their report

17   to the non-sponsor directors?

18   A    Correct.

19   Q    Did Sidley come back in and report to the non -- or

20   consult with and report to non-sponsor directors at a later

21   time?

22   A    Well remember, in January of 2014 we went from non-

23   sponsor directors to just disinterested directors, which is

24   a smaller group.  And so in April of 2014, Sidley came back

25   and advised, at each of the estates, the disinterested

1    directors about the possibility of affording sponsor

2    releases as part of the RSA.

3            So based on all of the work that they had done in

4    2013, they basically said, based on this work, they -- they

5    were able to advise the disinterested directors about

6    sponsor releases in the RSA.

7    Q    Okay.  And that was in April of 2014?

8    A    Correct.

9    Q    Did the disinterested directors receive advice about

10   the issue of sponsor releases from other sources, other than

11   Sidley Austin?

12   A    Yes.  They received advice from me.  They received

13   advice from Kirkland.  And ultimately in connection with

14   both the original plan we filed, in April of 2015, and the

15   current live plan, they received advice from the

16   disinterested director advisors.

17   Q    The last thing I want to ask you about is the role the

18   sponsor affiliated directors played, if any, in the

19   management of the company.  And in particular, in Paragraph

20   44 of your written direct, you tell the Court that, and I'm

21   quoting, "In my view the sponsors devoted their time and

22   efforts beyond what was required of them as board members."

23   Is that your testimony from the written direct?

24   A    Yes.

25   Q    Can you elaborate on that for the Court.  What did you

1    mean by that, when you said that their time and efforts went

2    beyond what was required of them as board members?

3    A    Well, the sponsors, in my view, all of the directors,

4    as well as other members of the sponsor entities who don't

5    serve on our board, but who support this investment, have

6    gone far beyond what they're required to do as directors.

7    They don't just attend board meetings, they help the

8    company, the business people with strategy issues, they

9    continue to do that through today, even though they've

10   agreed to give up the value of their investment.

11            And they have provided consulting services, they

12   have always been a research for us in the restructuring,

13   just based on their experience with other investments and

14   other restructurings.  They've always made themselves

15   available, at all hours of the day, for us to consult.  And

16   I think they genuinely -- I mean, my experience with them is

17   that they genuinely care about the company and its employees

18   and they've done everything that I can observe they could

19   have done to try to make this process as smooth as possible

20   for the company.

21   Q    Did their activities, that is going beyond what you

22   say, going beyond what was required of them as board

23   members, did it compromise your independence and the

24   exercise of your own judgment in any way?

25   A    No.

```
1    Q     You attended board meetings and joint board meetings

2    regularly, correct?

3    A     Yes.

4    Q     Did the activities of the sponsor affiliated directors

5    curtail, to your observation, information available to or

6    shared with the full boards, at any time?

7    A     No.  In fact, as we've just discussed, on -- on some of

8    these issues I would say the non-sponsor directors and

9    ultimately the disinterested directors had more information

10   than the sponsor directors had.

11   Q     Ms. Doré, that's all I have.

12             THE COURT:  Thank you.  Any plan proponents wish

13   to cross examine the witness?

14             All right.  I'll turn it over to objectors.

15             MR. GLUECKSTEIN:  Your Honor, we have -- the

16   committee has some binders, if I may approach the witness

17   and Your Honor?

18             THE COURT:  Yep.

19             MR. GLUECKSTEIN:  If you could help Ms. Doré set

20   aside the Debtors' witness binder, please.  Yeah.

21             MS. DORÉ:  Okay.

22             MR. GLUECKSTEIN:  I'm a little worried about where

23   you put that.

24             MS. DORÉ:  Oh.

25             MR. GLUECKSTEIN:  Maybe you can --
```

```
1              MS. DORÉ:  Precarious.

2              MR. GLUECKSTEIN:  Precarious.

3              MS. DORÉ:  Precariously perched?

4              MR. GLUECKSTEIN:  Rachel, can you --

5              WOMAN:  So you might want to check

6     (indiscernible).

7              MR. GLUECKSTEIN:  Rachel -- (indiscernible) can

8     you help her out, Tracy?  Just put it on the floor

9     somewhere.

10             MS. DORÉ:  You want it?

11             MR. GLUECKSTEIN:  No, that's okay where it is.

12    Just -- that's just -- that's fine.

13             MS. DORÉ:  Okay.

14             MR. GLUECKSTEIN:  Yeah.  Do we have a problem,

15    Leslie?

16             CLERK:  I think it's (indiscernible).

17             MR. GLUECKSTEIN:  Okay.

18             MAN:  It's two (indiscernible) same thing.

19             MAN:  He has two of the same.

20             WOMAN:  (Indiscernible).

21                      CROSS-EXAMINATION

22    BY MR. GLUECKSTEIN:

23    Q    Good morning, Ms. Doré?

24    A    Good morning.

25    Q    For the record, Brian Glueckstein from Sullivan and
```

1    behalf of the EFH committee. Ms. Doré, in addition to the

2    testimony you gave this morning, you submitted written

3    direct testimony in advance of today, correct?

4    A    Yes, I did.

5    Q    And your written direct testimony is based on your

6    personal knowledge of the information obtained therein,

7    correct?

8    A    Yes.

9    Q    And Ms. Doré, since 2012, correct, you've been the

10   general counsel of EFH?

11   A    Correct.

12   Q    And as you testified with Mr. McGaan this morning,

13   you're also the co-chief restructuring officer of EFH,

14   correct?

15   A    I am.

16   Q    And as general counsel and CRO, you owe fiduciary

17   duties to EFH, correct?

18   A    I do.

19   Q    And you believe, as general counsel and CRO of EFH you

20   fulfilled those duties to EFH, correct?

21   A    Yes.

22   Q    And you also are the general counsel and co-CRO of

23   TCEH, correct?

24   A    That's right.

25   Q    And you owe duties to TCEH in your capacity as general

1     counsel and CRO as well, correct?

2     A     Yes.

3     Q     And your testimony is that as general counsel and CRO

4     of TCEH you fulfilled your duties to TCEH, correct?

5     A     Yes.

6     Q     And you understand,  Ms. Doré, that Mr. Keglevic is on

7     the board of managers of TCEH, correct?

8     A     Yes.

9     Q     And you understand that your duties are owed to each of

10    EFH and TCEH individually, correct?

11    A     Yes.

12    Q     And at no point the Debtors put in place a separate CRO

13    for the E-side debtors, separate from the T-side debtors,

14    correct?

15    A     We did not.

16    Q     And you testified, Ms. Doré, that as CRO, along with

17    Mr. Keglevic, you supervised and managed the restructuring

18    process of all of the debtors in these cases, correct?

19    A     That's right.

20    Q     And you testified in connection to your deposition,

21    that the disinterested director process that's been put in

22    place, that in the event conflicts of interest arise between

23    the estates, that the disinterested director process

24    protects you in that circumstance, correct?

25    A      I don't know if I said it protects me personally, but

1    it protects the process and each of the estates.

2    Q    And so when the conflicts of interest were to arise

3    between the estates in connection with the restructuring,

4    you would expect those to be funneled to the disinterested

5    directors, correct?

6    A    They had the authority to determine what was a conflict

7    matter, without any regard for what the rest of the board,

8    or the CROs thought and once they determined it was a

9    conflict matter, they had the authority to resolve it, and

10   to direct management to take any actions necessary to

11   resolve it.

12   Q    And Ms. Doré, I think you testified this morning,

13   you're not a bankruptcy lawyer, correct?

14   A    I am not.

15   Q    And you have no prior experience, prior to these cases,

16   of advising companies in Chapter 11, correct?

17   A    I do not.

18   Q    And I think you testified, in connection with your

19   discussion with Mr. McGaan, that the boards of directors

20   formally authorized the delegation of authority to the

21   disinterested directors for conflict matters, in November of

22   2014, correct?

23   A    Yes.

24   Q    And before then, there was no formal process in place

25   to address conflicts between the Debtors' estates that arose

1    in connection with the bankruptcy, correct?

2    A    Well, there was the process, again, starting in January

3    of 2014 at least, of having the disinterested directors at

4    each company meet separately, without members of any other

5    board present, to consider potential intercompany issues.

6    Q    But prior to the delegation in November of 2014, there

7    was no process by which disinterested directors had

8    authority to speak on behalf of the company on those

9    matters, correct?

10   A    They didn't have formally delegated authority by

11   resolution, but they essentially had de facto authority,

12   because they actually did meet and make decisions as early

13   as January of -- January and February of 2014, together.  So

14   they did not have formally delegated authority, but they

15   were meeting and considering intercompany issues without the

16   involvement of other board members.

17   Q    Right.  And in December of 2014 the individual boards

18   adopted resolutions providing that the disinterested

19   directors formally could identify what is a conflict matter

20   and then make, formally, all decisions with respect to

21   delegated conflict matters, correct?

22   A    That's correct.

23   Q    And as general counsel and CRO, you did not provide any

24   advice to disinterested directors as to what matters should

25   be a conflict matter after December of 2014; did you?

1    A    I don't think I provided advice to them.  I -- I mean,

2    I certainly had conversations with the disinterested

3    director advisors about their views of what was a conflict

4    matter, as they tried to explore the facts surrounding

5    certain issues and come to those determinations.  I had

6    conversations with them, but I was not the one advising the

7    disinterested directors about what was a conflict and what

8    wasn't.

9    Q    Did you provide input to the disinterested directors or

10   their advisors as to what you viewed to be a conflict matter

11   in this case?

12   A    I'm just trying to think.  There was only -- so the

13   bidding procedures was obviously deemed a conflict matter,

14   as a result of Your Honor's ruling.  So that one wasn't one

15   that I needed to provide input on.  And the intercompany

16   claims were specifically identified, in fact the conflict

17   matter was defined in the resolutions as claims between the

18   companies.  So that was also kind of an obvious conflict

19   matter.  And other than that, no, I did not provide input to

20   the disinterested directors or their advisors about other

21   issues that might be considered conflicts.

22   Q    And the disinterested directors did not deem

23   negotiation of a joint plan of reorganization to be a

24   conflict matter, correct?

25   A    Well, I think you'd have to ask them that.

1    Q    To the extent of your knowledge, are you are aware that

2    the -- whether the disinterested directors designated the

3    negotiation of the joint plan of reorganization as a

4    conflict?

5    A    They did not designate that as a conflict.

6    Q    And therefore negotiation of the current joint plan

7    that we're here today talking about, was not deemed to be a

8    conflict matter, in your understanding, correct?

9    A    Not the entire plan negotiation, but again the

10   settlement of intercompany claims was deemed to be a

11   conflict matter.  And so to the extent that's a key piece of

12   the entire plan architecture, then it encompassed conflict

13   matters, but negotiating plan provisions outside that didn't

14   relate to the intercompany settlement were not deemed to be

15   conflict matters.

16   Q    And --

17   A    Other than -- I'm sorry, other than equity splits on

18   the E-side, which were filled in, in the second amended plan

19   of reorganization.  The -- the disinterested directors on

20   the E-side determined those splits.

21   Q    So other than the equity splits, the bid procedures and

22   the intercompany claims settlement, you're not aware of

23   other formally identified conflict matters, correct?

24   A    I can't think of any others as I sit here.  No.

25   Q    Okay.  And along those lines then, the negotiation of,

1    and the structuring of the settlement agreement itself,

2    aside from the terms of the disinterested director

3    settlement, the terms and the structure of the settlement

4    agreement itself that's before the Court were not determined

5    to be a conflict matter for which authority was delegated,

6    correct?

7    A    Well, I'm not sure I understand what you mean by the

8    structure in terms, because a key piece of the term -- a key

9    term of the settlement agreement is the intercompany

10   settlement and clearly that was a conflict matter.  So to

11   the extent that it also involves, you know, resolution of

12   intrastate issues, then that's not a conflict matter.  So I

13   think it's -- it's hard to say that the entire settlement

14   agreement was determined not to be a conflict matter,

15   because such a key piece of it was.

16   Q    Okay.  Aside from the -- you know, what's been referred

17   to as the intercompany component of the settlement

18   agreement, the other pieces of the settlement agreement were

19   not deemed to be conflict matters, correct?

20   A    I think that's right.

21   Q    And similarly, the negotiation of the terms of the plan

22   support agreement that's been approved by this Court was

23   determined to not be a conflict matter for which authority

24   was delegated, correct?

25   A    Correct.

1    Q    Ms. Doré, you and Mr. Keglevic, along with the Debtors'

2    joint advisors at Kirkland and Evercore conducted plan

3    negotiations on behalf of all the Debtors in connection with

4    this plan, correct?

5    A    We did.

6    Q    And your testimony is that you personally handled the

7    legal and regulatory aspects of both the restructuring

8    process and the plan of settlement here, correct?

9    A    I certainly didn't solely handle it.  There were lots

10   of people involved.  But yes, I was personally involved in

11   the legal and regulatory aspects.

12   Q    But, I'm sorry, go ahead.  I didn't mean to cut you

13   off.  If the -- as co-chief restructuring officer, was -- it

14   was you at the company who was the primary point of contact

15   on the legal and regulatory aspects of restructuring.  Is

16   that fair?

17   A    Primary point of contact at the company, yes.

18   Q    And Ms. Doré, you were the person internally at the

19   Debtors' most involved with the document that has been

20   submitted and executed that's referred to as the settlement

21   agreement, correct?

22   A    Yes.

23   Q    And as co-CRO you recommended the approval of the

24   settlement agreement to the Debtors' boards of directors,

25   correct?

1   A    I did.

2   Q    And in discussion at our deposition, do you recall that

3   you testified that you viewed the settlement agreement as

4   the simplest of the documents that the Debtors negotiated in

5   connection with this transaction.

6   A    Yes.  The simplest in the sense that I think it's the

7   shortest and it's basically just a document that contains

8   releases and a few other provisions.

9   Q    And along those lines, you viewed that the issues

10  presented, from a drafting perspective of the settlement

11  agreement, was really simply to get the releases right.  Is

12  that fair?

13  A    I'm sorry, can you --

14  Q    To get the releases right in the settlement agreement.

15  A    Can you repeat the first part of your question.  I'm

16  sorry.

17  Q    That the reason that you viewed the settlement

18  agreement as the simplest of the documents is that the

19  issue, in drafting the settlement agreement was simply to

20  get the releases right.

21  A    Well, once it had been determined that the claims would

22  be released, which involved a whole lot of complex analysis

23  by many, many parties, then simply drafting the releases,

24  yes, became the important part of getting the settlement

25  agreement done to make sure that the releases reflected what

1    all the parties intent -- intents were.

2    Q    And you testified, both in your written direct and in

3    response to Mr. McGaan, that the -- in your view the

4    settlement agreement confers tremendous benefits to all of

5    the Debtors' estates, correct?

6    A    Correct.

7    Q    And that is because the settlement agreement

8    permanently resolves litigation over the legacy transactions

9    for the duration of the cases, correct?

10   A    Yes.

11   Q    The Debtors have requested that the Court approve the

12   settlement agreement outside of the plan, on its own merit,

13   correct?

14   A    Yes.

15   Q    The -- in fact the litigation releases contained in the

16   settlement agreement are designed, specifically, to survive

17   if the plan fails, correct?

18   A    Correct.

19   Q    And Ms. Doré, confirmation of the plan is in fact

20   conditioned on approval of the settlement, correct?

21   A    It is.

22   Q    With respect to this transaction, it's your view that

23   the most important thing, from the Debtors' perspective, is

24   to have the settlement agreement approved, correct?

25   A    Well, I think the whole transaction is important, but

```
1    yes, I mean, the settlement agreement was the key

2    consideration for the estates that the board considered in

3    entering into this plan.

4    Q    And so in fact the Debtors removed the terms of the

5    settlement agreement from the plan because you wanted to

6    ensure that the settlement agreement survived, even if the

7    plan ultimately is not consummated, correct?

8    A    Well, I think that was a mutual decision of all of the

9    plan support parties.  We certainly agreed with it, but the

10   TCEH first liens also wanted there to be a separate

11   settlement agreement.  I think everybody -- I mean, it's the

12   essence of the deal that there be a settlement that

13   withstands the plan succeeding or failing.

14   Q    And in a situation where the settlement's approved, but

15   this plan ultimately is not consummated, an alternative plan

16   would still need to be negotiated, correct?

17   A    It would, but the issues in that alternative plan

18   scenario would be much simpler as a result of -- if -- if

19   the settlement agreement had been approved, because at that

20   point the only T-side issue left to resolve would be the

21   TCEH first liens supporting a plan, the TCEH junior

22   creditors would have already agreed that as long as an

23   alternative plan contains the required minimum terms that

24   are defined, which include the 550, that they would not

25   object to the plan.
```

1              So essentially our view was, especially with the

2      90 day timeline that the parties have agreed to for an

3      alternative plan -- alternative confirmation trial schedule,

4      that all it takes in the alternative scenario is for the E-

5      creditors to finally come together on how -- what they're

6      going to get out of the plan.

7      Q    And you certainly, as you alluded to in the alternative

8      plan as currently contemplated, you still would have to deal

9      with and seek the consent of the TCEH first lien creditors,

10     right?

11     A    Yes.

12     Q    In the alternative (indiscernible).  So their agreement

13     to the alternative plan structure, including a tax-free

14     reorganization, is not guaranteed under the current set of

15     transactional papers, correct?

16     A    Their agreement to a tax-free spin is not guaranteed

17     under the alternative, but they have agreed, already, in the

18     alternative plan, to the consideration that the T-junior

19     creditors get.  So the intrastate estate issues at the TCEH

20     estate are resolved, even in the alternative scenario.

21     Q    And certainly in the alternative scenario you could

22     still have issues that have to be litigated on the E-side,

23     such as value splits or equity splits or otherwise, correct?

24     A    Well, we would hope that we wouldn't have to litigate

25     those issues and that we would have an agreement.  But that

1    -- whether or not litigation is required, that existed at

2    every moment since we filed this case, on the E-side.  So

3    that's not as a result of this plan, in fact we tried very

4    hard and -- and frankly wanted there to be an E-side plan

5    that resolved the equity splits on thaT-side, and we just

6    never could get to that agreement.

7    Q    Ms. Doré, the Debtors never seriously considered

8    proceeding with this plan without the global litigation

9    resolution contained in the settlement agreement, correct?

10   A    No.  I -- I would say -- I'm sorry, yes, you're

11   correct.  I mean, our -- again, our consideration, the

12   Debtors' consideration for doing this plan is primarily the

13   disarmament, that's the value we're getting.

14   Q    And for the Debtors the settlement agreement then is

15   part of what you've described as a package deal, that

16   includes the released and the litigation disarmament,

17   correct?

18   A    Yes.

19   Q    So in your view, the economic package that's set forth

20   in the settlement agreement was essential for the plan and

21   the settlement and the plan rise or fall together, correct?

22   A    The way that it's currently structured, the settlement

23   and the plan rise and fall -- well, the plan rises and falls

24   with the settlement.  If the settlement agreement's

25   approved, then the plan could fall and we would still have

1   the settlement agreement.  But they do -- essentially they

2   do rise and fall together, although conditions can always be

3   waived, but that's not the way the plan is set up.

4   Q   And have the Debtors had any discussions, that you're

5   aware of, at the board level, about waiving any of the

6   conditions --

7   A   No.

8   Q   -- associated with the settlement agreement?

9   A   No.

10  Q   As you -- I think you alluded to this a bit earlier,

11  Ms. Doré, part of the settlement agreement addresses the

12  settlement between the TCEH unsecured creditors and the TCEH

13  first lien creditors resolving the claims asserted in the

14  standing motions that were filed, correct?

15  A   Yes.

16  Q   And those claims were settled through the court-

17  approved mediation process, correct?

18  A   Yes.

19  Q   So those creditors have, in fact, settled those claims

20  in mediation, for the $550 million payment you alluded to,

21  in favor of the TCEH junior creditors, irrespective of

22  whether this global settlement is approved, correct?

23  A   I don't -- you'd have to ask them this question, but I

24  don't believe that their settlement is effective.  But yes,

25  they've reached a meeting of the minds in the mediation, but

1   their settlement is not effective, but for the plan support

2   agreement, the settlement and the settlement agreement here.

3   Q    Okay.  So Ms. Doré, as you sit here you do not know

4   whether the intra T-side settlement is binding outside of

5   this settlement agreement?

6   A    I don't think that it is.  I just said that.

7   Q    Is it your understanding then that the Debtors

8   permitted the T-side creditors to settle their lien

9   challenge on the T-side, contingent on the ability for the

10  TCEH junior creditors to pursue the sale of Oncor?

11  A    I'm sorry, ask that question again.

12  Q    So is it your understanding then, if the T-side

13  settlement is not binding outside of this transaction, that

14  in fact the settlement of the lien challenge, in mediation,

15  is contingent on the T-side creditors being able to pursue

16  Oncor?

17  A    Well that's how the deal is structured.  I mean, I

18  don't know what the discussions were, because I wasn't

19  involved in mediation.  I don't know what the discussions

20  were between the first liens and the unsecureds about

21  whether if they couldn't get a deal done with the Debtors,

22  that that settlement would hold.

23         But it was all simultaneous, I mean, essentially

24  the mediation concluded with an agreement in principle

25  between the first liens and the unsecureds and that

1   immediately was baked into this overall deal structure that

2   the Debtors agreed to.  So there wasn't really a need to

3   have a discussion about, well, does this still hold outside

4   of the plan, because it's baked into the plan and the

5   settlement agreement.

6   Q    And you never had a discussion about understanding

7   whether if this settlement agreement is not approved in its

8   current form, whether the terms of that settlement will

9   survive?

10  A    I never had a discussion about that.

11            THE COURT:  Mr. Glueckstein, I'm sorry.

12            MR. GLUECKSTEIN:  Yes.

13            THE COURT:  I'm going to interrupt.

14            MR. GLUECKSTEIN:  Sure.

15            THE COURT:  As I mentioned in our pre-hearing

16  meeting, I have an outside appointment that came up today,

17  so we have to break for lunch now.  We'll reconvene at 1:30.

18            MR. GLUECKSTEIN:  Yep.

19            THE COURT:  Ms. Doré, during the lunch break you

20  may not discuss the substance of your testimony with any

21  person.

22            MS. DORÉ:  Okay.

23            THE COURT:  So you get a peaceful lunch.

24            MS. DORÉ:  Thank you.

25            THE COURT:  Otherwise we're in recess till 1:30,

1    for lunch.

2              MR. GLUECKSTEIN:  Thank you, Your Honor.

3              MS. DORÉ:  Thank you.

4         (Recess)

5              THE COURT:  Please be seated.  You may proceed.

6              MR. GLUECKSTEIN:  Thank you, Your Honor.  Good

7    afternoon, Ms. Doré.

8              MS. DORÉ:  Good afternoon.

9              MR. GLUECKSTEIN:  Before the lunch break, we were

10   talking to you about the T-side, intra-T-side settlement and

11   the mediation in connection with those claims.

12   Q    It's true, right, Ms. Doré, that the Debtors

13   participated in that mediation, correct?

14   A    Can I just actually correct something I said before the

15   lunch break before I answer that question?  Do you mind, Mr.

16   Glueckstein?

17   Q    Because I -- I realized after I left the courtroom that

18   I wasn't listening carefully to your question when you asked

19   about whether the mediated settlement between the TCEH first

20   liens and the TCEH unsecureds is binding.  I was thinking

21   about whether it would have been binding if we'd never

22   entered into this whole package deal.

23             As you know, I view it as a package.  And you --

24   that's not the question you asked.  The question you asked

25   is, is it binding outside of the settlement agreement.  The

1  answer, of course, to that is yes, under the plan support

2  agreement, it is binding in an alternative scenario, even if

3  the settlement agreement is never approved, and that is made

4  clear in the second paragraph of Section 1 of the PSA.  I

5  went back and reviewed the PSA over the lunch break to make

6  sure I was right about that.

7            So I wanted to just correct the record because I

8  think I created confusion about that.

9            The question I'm not entirely clear on because we

10  never had to answer it is, if the Debtors had never agreed

11  to enter into the PSA and the settlement agreement and the

12  merger transaction, would the settlement that resulted from

13  mediation on the T-side have still been binding on those

14  parties?  We never confronted that question because shortly

15  after the mediation, we entered into the entire deal, which

16  made that settlement binding on the T-side Creditors through

17  the PSA.

18  Q    Okay, and I just --

19            THE COURT:  And the question -- oh, I don't know

20  if you want to --

21            MR. GLUECKSTEIN:  No, go ahead, Your Honor.

22            THE COURT:  Well, the question was pending.  I

23  don't know if you want to ask it again or?

24            MR. GLUECKSTEIN:  I want to -- I just want to --

25  if I could just follow-up and backup, I just want to -- I

1    just want to be clear for the record, Ms. Doré.

2    Q    Did you discuss your testimony and the discussion this

3    morning with anybody during the break?

4    A    No, I did not. I went straight back to an office by

5    myself at RLF on a different floor from the other parties

6    and read the PSA.

7    Q    Okay. And so, just with respect to your correction to

8    your answers this morning, it is your understanding that, if

9    the Court declines to approve this settlement agreement,

10   that's before it, that the terms of the T-side settlement

11   remain in effect.  Is that now your testimony?

12   A    Absent a plan support agreement termination event,

13   which is defined in Section 12 of the PSA, yes, it remains

14   binding.

15   Q    Okay.  And if the PSA in connection with this

16   transaction is terminated by one or more of the parties, do

17   you have an understanding as to whether or not the terms of

18   the settlement reached in the mediation would remain binding

19   on the T-side parties?

20   A    First of all, the PSA termination events that would

21   allow it to be terminated are very narrow and would require

22   a breach by the first lien Creditors that would result in a

23   material adverse event, so it's very difficult for the PSA

24   to be terminated.  If the PSA were terminated, then it's my

25   understanding that, at that point, the parties are no longer

1    bound to their obligations with respect to the party who

2    caused the termination.

3          So I think it's a complicated answer that involved

4    legal interpretation of the PSA because we structured the

5    PSA in a way that made it very difficult for the obligations

6    to be terminated, and so you'd have to walk through a lot of

7    different scenarios about whose conduct caused the breach,

8    whether the breach rose to the level that was required for a

9    termination event, whether other parties breached as well

10   and therefore didn't have clean hands.

11         It would just involve a pretty complicated

12   analysis, but what is clear is that, under the PSA, both the

13   TCEH first lien Creditors and the unsecured Creditors at

14   TCEH are bound to support an alternative restructuring plan

15   that has the required minimum terms, which -- the key point

16   of which is the $550 million dollars for the TCEH unsecured

17   Creditors.  The TCEH first liens can propose a plan that

18   does not have a tax-free spin, but it still has to have the

19   settle -- the $550- for the TCEH unsecureds.

20   Q    Okay, and back to my pending question, the Debtors did

21   participate in the mediation, correct?

22   A    I personally never participated in the mediation.  I

23   know that Kirkland certainly had conversations with the

24   mediator, a lot of them, and probably had joint sessions at

25   some point with the other parties, but I personally did not

1    participate in the mediation.

2    Q    Okay, so you didn't receive a report -- you didn't

3    receive reports from Kirkland about the mediation as it was

4    progressing, with results of the mediation?

5         MR. MCGAAN:  Objection, Your Honor.  To the extent

6    it's a yes or no question, no objection, but to the extent

7    it calls for the content of those communications, I would.

8    A    Yes, I received reports.

9    Q    Okay, and with respect to -- strike that.  Prior to

10   entering into the plan support agreement in connection with

11   this transaction, did the Debtor seek to ensure that the

12   outcome of the mediation with respect to the T-side

13   settlement was locked in permanently?

14   A    Did the Debtors try to ensure that?

15   Q    Yeah.

16   A    Well, I think we wanted any result of that mediation to

17   be locked in, and in fact, it is locked in, in the PSA, so

18   to the extent that we got it locked in in the PSA, we did

19   take actions to ensure that it was locked in.  Prior to

20   that, I don't know that we took any specific actions to that

21   effect.

22        Again, it all happened very close in time.  There

23   was a mediation that was ongoing, and the results of that

24   mediation basically occurred -- the fact that there was a

25   settlement occurred about the same time that we were

1   discussing the merger transaction with the TCEH unsecureds

2   and the Hunts, so it all just came together at the same

3   time.

4   Q    Do you have an understanding as to whether the merger

5   transaction, the sale of Oncor, was discussed as part of the

6   mediation?

7   A    I don't know.

8   Q    The PSA, of course, contains other, alternative

9   restructuring terms that require other terms to be included

10  in alternative restructuring, including the intercompany

11  claims settlement, correct?

12  A    Yes.

13  Q    So did -- did the Debtors consider whether there was an

14  opportunity to lock in the T-side mediation settlement on

15  its own, on a standalone basis?

16  A    Well, yes.  I mean, we were considering -- at the time

17  the mediation was going on, in fact, there had been a

18  fidelity proposal for an E-side equitization plan, and we

19  were strongly considering that plan.  In fact, I think at

20  one point, we stood up in Court and said that plan was ahead

21  of the -- the TCEH unsecured plan, in our view, and one of

22  the reasons that it was ahead was because the TCEH first

23  liens had told us they would support that plan.  We -- and

24  our hope at that time would be that if they supported that

25  equitization plan we could also build into that the

1    settlement that they had with the TCEH unsecureds.

2            Now, the TCEH unsecureds had not supported that

3    plan at that point because they had a competing plan, but

4    any plan that we would have proposed, we would have hoped

5    and tried to build that settlement into it, but of course,

6    that would have required the consent of the TCEH unsecured

7    creditors and they were pursuing their own plan, and they

8    wanted us to adopt that plan, and we ultimately did.

9    Q    Do you recall, Ms. Doré, that the T-side Creditors

10   actually wanted to have the terms of the T-side mediation

11   settlement approved separately from the intercompany

12   settlement and the other terms that are contained in the

13   plan document?

14   A    I think I do recall some early discussion about that,

15   but that's not the way we ended up structuring it.

16   Q    But you recall that that issue was an issue that was

17   reported to the board as to how -- whether or not the T-side

18   settlement would be approved by these Courts, separate from

19   the other components of the settlement agreement, correct?

20   A    Yes, I think we discussed that at our July board

21   meetings.

22   Q    And it was the Debtors who acquired and obtained,

23   ultimately, a single settlement agreement, because you

24   wanted to ensure that you retained global releases amongst

25   the parties all at once, correct?

1    A    Absolutely.

2    Q    And Ms. Doré, you never considered that by taking the

3    settlement terms out of the plan, the Creditors would be

4    unable to vote on the settlement as they might be able to if

5    it was contained in the plan, correct?

6    A    Well, it's a Rule 9019 settlement.  I don't -- I don't

7    think that involves voting Creditors.  The Creditors have

8    every opportunity to object to the settlement and in fact,

9    you are, so I didn't -- no, I didn't consider whether the

10   Creditors could vote on the settlement because I don't think

11   that's part of a 9019 settlement process.

12   Q    Okay, so you didn't consider that issue as to how

13   Creditor voting would be affected if the terms of the

14   settlement were presented to the Court in the plan versus

15   out of the plan?

16   A    How Creditor voting would be affected on the plan?

17   Q    Yeah, whether the Creditors would have a right to vote

18   if the terms of the settlement were presented with -- in the

19   plan of reorganization?

20   A    Well, I knew they didn't have a right to vote because

21   it was a 9019 settlement, but they had the right to object.

22          THE COURT:  I think -- I think you're -- I think

23   you're confusing the witness with your line of questioning.

24          MR. GLUECKSTEIN:  I'll move on.

25          THE COURT:  I think you need to be more precise.

1           MR. GLUECKSTEIN:  Well, we'll move on.

2    Q    Ms. Doré, is it your understanding whether that in fact

3    TCEH, the Debtor, would have proceeded with this plan of

4    reorganization without approving the terms of the

5    intercompany settlement now?

6    A    I'm sorry, you're asking only about TCEH?

7    Q    Correct.

8    A    Whether the Debtor TCEH would have --

9    Q    Would have been willing to proceed with the re -- plan

10   of reorganization without it being conditioned on approval

11   of the settlement?

12   A    Well, we were, I believe all of the Debtors were

13   considering seriously the Fidelity proposal, which also

14   contemplated a reorganization.  We had not come to a final

15   decision about that because that plan never came together.

16   Fidelity and the EFIH second liens could not get the funding

17   together.

18           That conversation, though, wasn't predicated on

19   the same type of settlement agreement.  It wasn't, of

20   course, predicated on settlements -- intercompany

21   settlements and global releases on a plan, so I don't know

22   if that answers your question, but I don't know that we were

23   ever confronted with a decision about whether TCEH or any

24   other Debtor was ever confronted with a decision about

25   whether to support a plan without the settlement, because we

1    never had any other viable plan to consider without a

2    settlement.

3    Q    But is it your testimony, Ms. Doré, that none of the

4    Debtors would have agreed to support this plan proposed by

5    the T unsecured creditors without it being conditioned on

6    the settlement agreement, correct?

7    A    Well, again, I'm ha -- I'm struggling with the question

8    because it's a hypothetical that we didn't have to deal

9    with.  We got the settlement, and that was a key part of the

10   deal for all of the Debtors, to achieve a global resolution

11   of all of the litigated issue in this case, and that -- that

12   was something we insisted on, and we got it from the T-side

13   Creditors, and the other plan support parties, which now

14   include, or will include some E-side Creditors.

15   Q    Ms. Doré, you agree that you never prepared a

16   litigation budget for litigating the specific intercompany

17   claims that you're now seeking settlement, correct?

18   A    I did not.

19   Q    And to this day, you've never seen such a claim by

20   claim litigation budget for litigating those claims,

21   correct?

22   A    No, I haven't.

23   Q    Now, in Paragraph 31 of your direct testimony, which I

24   think is in your binder that I handed you, which is on Page

25   16, you state that: "each of the estates has its own views

1    on the respective merits of the claims, but all agree that

2    they would be complex to litigate, taking months or years,

3    and none has a certain outcome."  That's your testimony,

4    correct?

5    A    That is correct.

6    Q    And the desire for the Debtors to settle these claims,

7    is driven by concerns about the cost and burden of that

8    litigation, correct?

9    A    The cost, the burden and the uncertainty of outcome.

10   Q    And you testified, you know, in your experience, Ms.

11   Doré, as a trial lawyer yourself, you agree that the cost

12   and duration of litigation depends on specific facts and

13   circumstances of that case, correct?

14   A    Sure.

15   Q    The intercompany claims that we've been talking about

16   here are all pre-petition, general unsecured claims, right?

17   A    Now you're testing my memory.  I definitely think

18   they're pre-petition.  Whether they're all general unsecured

19   claims, I'm not positive about that because, for example, I

20   remember there being a debate at some point about whether

21   the intercompany tax claim would go to the collateral

22   package of the TCEH first liens or be -- or go to the

23   unsecured, so I don't know the answer for sure to that

24   question.

25   Q    Okay.  And you understand that the Bankruptcy Code

1    provides for an orderly process for resolving claims into

2    bankruptcy, correct?

3    A    Yes.

4    Q    And your testimony this morning, in response to Mr.

5    McGaan about the cross and the ongoing burden of the case,

6    including case burn and expenses, assumes that the

7    intercompany claims must be resolved prior to the Debtor's

8    emergence from bankruptcy, correct?

9    A    No.  I think I testified that, even in the scenario

10   where you could somehow figure out a way, and I'm not really

11   sure whether there is a way, frankly, but let's assume for a

12   moment there is, to essentially preserve those claims for a

13   litigation trust, the cost and burden remain on the business

14   and on the estate.

15   Q    But certainly, to the extent you've been able to emerge

16   from bankruptcy, some of the costs that have been discussed

17   insofar as continuing interest and some of the professionals

18   involved in the case would fall away, correct?

19   A    I suppose the interest would.  I don't know if any of

20   the professionals would fall away if we were litigating

21   these claims because the -- the whole problem with these

22   claims is that they are multiparty claims involving cross-

23   issues at every estate, so I'm just -- I'm looking around

24   the Courtroom, I'm trying to think whether there's any set

25   of professionals that wouldn't be participating in that

1    litigation and I -- I don't think there is.

2    Q    You testified this morning, Ms. Doré, about -- in

3    response to Mr. McGaan, about the pre-trial work and all the

4    discovery that would be necessary to get ready for trial.

5    Do you remember that testimony?

6    A    Well, I think I said there would be a lot of pre-trial

7    negotiation about scheduling, about additional depositions,

8    so yes, some of -- the -- there would have to be a lot of

9    pre-trial work that goes on, but of course, some of the

10   discovery has also been done through the legacy discovery

11   process.

12   Q    Okay, but we -- we looked at -- we looked at in one of

13   the demonstratives you prepared, Demonstrative Exhibit 3,

14   which we can pull up, you outlined all of the legacy

15   discovery in here, including this 5.6 million pages of

16   documents that's often been discussed, that's been produced

17   with respect to these claims, correct?

18   A    Yes.

19   Q    And you testified, I think, this morning that, I think

20   your words were that no stone has been left unturned with

21   respect to the investigation of these claims, correct?

22   A    Yes.

23   Q    Okay, so the discovery, and much of the pre-trial work

24   that would normally be associated with this type of

25   litigation has already been completed, correct?

1    A     Well, I don't think anyone who would be -- if we

2    decided today to litigate all of these intercompany claims,

3    I can virtually guarantee you no one would be satisfied, for

4    example, with the depositions that have been taken to date.

5    They would ask for additional depositions, probably a lot of

6    them, and so, I think that would be additional pre-trial

7    work that had to be done.  They would probably also have

8    follow-up requests on the documents that have been produced,

9    there would be privilege log battles, I'm sure, that we

10   never had to get into.

11          I mean, all the sorts of things that we never had

12   to confront because we were in the investigation phase, not

13   the litigation phase.

14   Q    Okay.  And certainly there, you know, inevitably

15   there's be something, but your -- your testimony, I think,

16   this morning was that these 5.6 million pages of documents,

17   you weren't sure what other documents could be out there

18   related to these claims and everything had been produced,

19   correct?

20   A     Yes.

21   Q    So -- so a substantial part of litigation as far as

22   document production and preparation has been complete with

23   respect to these claims.  It's outlined in the slides you

24   prepared, correct?

25   A     The document production has been complete, but that's

1   only step one of the pre-trial phase of litigation.

2   Q    You also testified this morning that you understood

3   that the scope of the issues with respect to the

4   intercompany claims, perhaps, could be narrowed through

5   summary-type motions, correct?

6   A    Potentially.

7   Q    In your experience, Ms. Doré, aren't the parties

8   positions with respect to settlement often shaped after a

9   dispositive motion practice in litigation?

10  A    Sometimes.

11  Q    In Paragraph 32 of your written direct, Ms. Doré, you

12  reference the cost of fraudulent conveyance litigation in

13  Tronox bankruptcy in the Southern District of New York.

14  A    Yes.

15  Q    Do you recall that testimony?

16  A    I do.

17  Q    You include in that reference an example to show the

18  high cost of litigation if the intercompany claims here

19  needed to be litigated, correct?

20  A    The cost and the time.  I think that -- in that case,

21  the complaint was filed, if I'm not mistaken, in 2009, and

22  the decision is from 2013, so to also show that it was a

23  four-year gap between filing of the complaint and a final

24  decision from the Bankruptcy Court.

25  Q    Okay, and you were not involved in that bankruptcy

1    case, correct?

2    A    I was not.  I just read the opinion.

3    Q    Okay, in reviewing the opinion, you will recall that

4    the claims there involved actual fraud claims, correct?

5    A    Well, I think they involved both actual and

6    constructive fraudulent conveyance.  They involved a spinoff

7    of what the parties argued were the good assets of a

8    company, leaving behind the liabilities.

9    Q    And the claims in that case involve liabilities

10   relating to over 27,000 environmental sites.  They were

11   environmental and tort claims in that case, correct?

12   A    That's true, but I think the focus of the trial was on

13   the transaction itself, not so much all of the underlying

14   environmental liabilities, just as here, the focus of a

15   trial would be on the LBO transaction and what all happened

16   at the time of the LBO as well as subsequent transactions in

17   the liability management program when debt exchanges were

18   done.

19   Q    The Bankruptcy Court in that case did state in the

20   opinion that you testified you reviewed that the amount of -

21   - that the case was quote: "All about the amount of Tronox's

22   environmental and tort liabilities," correct?

23   A    Yeah, it was about leaving behind those liabilities and

24   whether the company at the time that was being sued had

25   effected a transaction for the purpose of leaving behind

1    those liabilities.

2    Q    And Ms. Doré, you understand that the result of the

3    litigation in that case was a judgment and subsequent

4    settlement in favor of the Creditors, correct?

5    A    Yes.

6    Q    And the result of that litigation, for all its time and

7    expense, resulted in all Creditor claims being paid in full,

8    correct?

9    A    Which is exactly the result of our plan in this case.

10   The E-side Creditors are being paid in full.

11   Q    But that is not guaranteed in your alternative plan

12   scenario in connection with the settlement agreement,

13   correct?

14   A    It is not guaranteed in the alternative plan scenario,

15   but in this case, we are attempting to get all of the E-side

16   Creditors paid in full without the cost, expense and delay

17   of litigation.

18   Q    That opportunity to be paid in full, as you've

19   characterized, exists in the plan, correct?

20   A    Correct.

21   Q    So you could pursue this plan of reorganization and the

22   opportunity to pay Creditors in full without conditioning it

23   on the settlement, (indiscernible)?

24   A    I do not believe the deal would have been done without

25   that condition, and the plan is expressly conditioned on the

1    settlement agreement, so hypothetically, could you have

2    structured it that way?  Yes, but that was not the deal that

3    was struck.

4    Q    But the Debtors has -- the Debtors are supportive of

5    including the condition of approving the settlement before a

6    confirmation of the plan, correct?

7    A    Yes, we are.

8    Q    Any -- the amount of fees that were incurred by the

9    plaintiffs in the Tronox case that you cite and you put in

10   your declaration was approximately $60 million dollars,

11   correct?

12   A    Correct.

13   Q    And that $60 million dollars is still less than 10

14   percent of the total amount of the claim that EFH is

15   agreeing to now in the settlement agreement, correct?

16   A    I believe that the fees in this case would be more than

17   $60 million dollars since we're running $25 million dollars

18   a month without any litigation, but the answer to your

19   question is yes, it is less than the claim.

20   Q    Ms. Doré, you testified this morning that the

21   resolution of the legacy litigation as we've been talking

22   about here is referred to as -- that we refer to as

23   disarmament, correct?

24   A    Yes.

25   Q    And I think you testified that disarmament is a benefit

1    to all of the Debtors, correct?

2    A    Yes.

3    Q    And in addition to all the Debtors, disarmament

4    benefits non-Debtor parties, correct?

5    A    Yes.

6    Q    The T first lien Creditors are a benefit of

7    disarmament, correct?

8    A    Yes.

9    Q    As is the current equity owners, correct?

10   A    Yes.

11   Q    As is the directors and officers of the company, who

12   are receiving release to the settlement, correct?

13   A    Yes.

14   Q    And Ms. Doré, EFH is the only Debtor estate providing

15   monetary consideration to the settlement agreement in the

16   form of the $700 million dollar settlement claim, correct?

17   A    Well, the settlement claim is in the alternative plan,

18   first of all, but yes, because that was the result of the --

19   originally the result of the disinterested director

20   settlement among the estates, and the -- at least on the

21   face value of the claims, going among the estates, the face

22   value of the claims TCEH had against EFH was much greater

23   than the claims that EFH would have against TCEH.

24   Q    Okay, and in your testimony, Ms. Doré, in Paragraph 34

25   of your declaration, you write that: "The settlement

1    agreement is a critical component of disarmament and makes

2    it possible for the Debtors to pursue the full pay merger

3    plan despite this conditionality," that's -- that's your

4    testimony, correct?

5    A    Yes.

6    Q    So as far as the Debtors are concerned, the plan cannot

7    exist without the settlement, correct?

8    A    Well, again, you're asking the art of the possible.

9    You know, could it have been negotiated that way?  Yes, but

10   that's not the deal we struck.  The -- the plan --

11   Q    And that's not a --

12   A    -- is conditioned on approval of the settlement

13   agreement.

14   Q    And the approval -- the condition on the approval of

15   the settlement agreement is -- is a term that advocated for,

16   correct?

17   A    Yes.

18   Q    The Debtors never attempted to quantify, in any

19   fashion, the actual value of disarmament, correct?

20   A    Other than general discussions about the cost, as I

21   testified this morning, the costs that the estates were

22   incurring, and being able to put a stop to those costs in a

23   -- at an earlier time than otherwise would be available, and

24   other than discussing, again, the face value of claims that

25   various parties had asserted, which all went into the

1    decision to advocate for disarmament, I wouldn't say we ever

2    came up with a number or a dollar figure and said, this is

3    what disarmament's worth.  I'm not sure that's possible.

4    Q    The Debtors always pursued the resolution of the legacy

5    litigation only on a global basis, correct?

6    A    Yes, I think that's generally correct.

7    Q    And you testified in Paragraph 47, and I think you

8    touched in this with Mr. McGaan this morning too, Paragraph

9    47 of your direct testimony, on Page 21, that in your view,

10   it would be antithetical to settlement to leave open the

11   possibility of litigation against directors or officers,

12   correct?

13   A    Yes.

14   Q    And Ms. Doré, you're -- you are aware, and you touched

15   on this this morning, that the TCEH junior Creditors did

16   send letters identifying claims for which they may seek

17   standing to pursue, and Mr. McGaan showed you those letters,

18   correct?

19   A    Yes.

20   Q    And those letters do contain the assertion of claims

21   against directors and officers, in connection with the

22   intercompany transactions that are -- are at issue, correct?

23   A    Yes, in the manner that I described this morning.

24   Q    And after receiving those letters from the T-side

25   Committee and the T unsecured group, you did not provide

1    notice of those potential claims against directors and

2    officers to your D&O insurance carriers, correct?

3    A    No, we did not.

4    Q    And you testified this morning, Ms. Doré, that your --

5    that you, at your direction, you decided to retain Kirkland

6    & Ellis in July of 2012, correct?

7    A    Yes.  I think it was actually June, but yes.

8    Q    And that after Kirkland was retained in 2012, and you

9    touch on this in Paragraph 17 of your direct testimony,

10   Kirkland gave significant attention to claims that might be

11   asserted if the Debtors sought protection under Chapter 11,

12   including intercompany claims, correct?

13   A    Yes.

14   Q    And the Debtors had the results of that investigation

15   prior to the petition date, correct?

16   A    Correct.

17   Q    And in fact -- you touched on this in Paragraph 21 of

18   your direct, but you've test -- as you testified the boards

19   of directors of each of the Debtors approved entry into the

20   RSA in 2014, correct?

21   A    Yes.

22   Q    And at the time the Debtors entered into the RSA, the

23   Debtors had Kirkland's analysis regarding those historical

24   transactions with respect to intercompany claims, correct?

25   A    Yes, as well as Sidley's analysis of the sponsor

1    claims.

2    Q    And the Debtors pursued for some period of time, the

3    RSA in these bankruptcy proceedings, correct?

4    A    Until July of 2014.

5    Q    The RSA itself contained releases of all the

6    intercompany claims for no consideration, correct?

7    A    Well, I -- I personally wouldn't characterize it that

8    way.  I mean, the consideration in the RSA, in our view at

9    the time, wrong -- it turned out to be wrong, was a

10   consensual -- largely consensual restructuring support

11   agreement that had -- held the promise of a quick exit from

12   bankruptcy, and had the support of major Creditors at each

13   of the estates, with the big exception of course being Mr.

14   Shore's clients, and so we -- we thought there was

15   consideration for all of the releases that went into the

16   RSA, not monetary consideration, however.

17   Q    There -- there was no payment between the estates on

18   behalf of the intercompany claims in connection with the

19   RSA, correct?

20   A    That is correct.

21   Q    And settling the intercompany claims in that matter was

22   supported by TCEH at that time, correct?

23   A    Yes.

24   Q    And as you testified earlier, in December of 2014,

25   Kirkland compiled a list of the potential intercompany

1    claims that you were aware of, correct?

2    A    Yes.

3    Q    And the disinterested directors were provided that

4    complete list of claims for their consideration, correct?

5    A    Yes.

6    Q    And you did not exclude any claims or otherwise edit

7    that list, based on the merits of claims, before providing

8    it to the disinterested directors, correct?

9    A    No.

10   Q    And the Debtors have similarly listed and described the

11   claims at issue in the settlement motion that's currently

12   before the Court, correct?

13   A    I'm sorry, repeat that question?

14   Q    The Debtors have -- the Debtors have -- have listed and

15   explained the intercompany claims that are at issue in their

16   settlement motion that's currently pending before the Court,

17   correct?

18   A    Yes.

19   Q    In January of 2015, you and Mr. Keglevic provided your

20   proposed plan term sheet to the Debtor's boards, what we

21   refer to as the CRO term sheet, correct?

22   A    I think that's the right date, yes.

23   Q    And that proposed CRO term sheet provided there would

24   be a settlement of some to-be-determined amount, as an

25   allowed claim against EFH in favor of TCEH, correct?

1    A    Yes.

2    Q    So you and Mr. Keglevic had determined at that point

3    that there would be, in your mind, a payment of some amount

4    to TCEH from EFH on account of intercompany claims, correct?

5    A    Yes, based on offers that had been exchanged among

6    various Creditor constituencies, including an offer from the

7    EFH Committee.

8    Q    Okay, but from -- from your perspective, you made that

9    determination that a claim should arise in favor of TCEH

10   based on your understanding of the analysis of the

11   intercompany claims as it then existed, correct?

12   A    It was based on a number of factors.  That was

13   certainly one of them, but it was also based on the fact

14   that the Creditors had all been exchanging offers and all of

15   them but one, I think, provided for some payment from the

16   EFH estate to the TCEH estate.

17   Q    Okay, but the bid ask, because I think it's been

18   described, between the Creditors at the time was not the

19   only factor that you considered in determining that a claim

20   should -- putting in the -- sorry, in putting in the January

21   term sheet that a claim should exist in favor of TCEH.

22   A    It was not the only factor I considered.

23   Q    In populating the term sheet, ultimately at $450

24   million dollars, you considered the amount necessary in your

25   mind to obtain a consensual joint plan with TCEH, correct?

1   A    We considered the amount necessary to obtain consensus

2   from all Creditors, not just TCEH.  That -- we were trying

3   to achieve a global settlement that had the support of all

4   Creditors, and there had been extensive discussions during

5   December and January -- December 2014 and January 2015,

6   among the various Creditor groups, and again, almost all of

7   them contemplated a payment of some sort from EFH to TCEH,

8   so we were attempting to do what other parties seemed

9   unwilling to do, which was to put a marker down and suggest

10  that parties attempt to come to an agreement around that,

11  even if they wanted to negotiate higher or lower.

12  Q    Okay, so part -- part of your analysis was in fact to

13  consider the amount that would be necessary to achieve a

14  consensual, joint plan, correct?

15  A    Yes.

16  Q    At the time that the CRO term sheet was presented to

17  the board in January, the disinterested directors had been

18  delegated authority with regards to the intercompany claims,

19  correct?

20  A    Yes, they had.

21  Q    Okay, and the $450 million dollars that you

22  contemplated in that term sheet, that claim was to be

23  included in a consensual joint plan of reorganization,

24  correct?

25  A    Well, I don't think the $450 was the number that we --

1   I mean, if everybody had agreed to it, that would have been

2   the number we included.  As it turned out, nobody agreed to

3   it and the disinterested directors came to a different

4   conclusion on their own.

5   Q    But the framework for you proposing a settlement claim

6   at that time was in the context of facilitating a joint plan

7   of reorganization that was supported by all the Debtors,

8   correct?

9   A    By all the Creditors and Debtors, yes.

10   Q    And similarly, when the disinterested directors

11   settlement was presented on April 14th, as you testified

12   this morning, the disinterested director settlement was

13   presented in the context of the Debtor's joint plan of

14   reorganization that was filed, correct?

15   A    That's true.

16   Q    And TCEH had consented to the filing of that joint plan

17   at the time, in April of 2015, correct?

18   A    Oh, TCEH as a Debtor, yes, had - had consented.

19   Q    Under the current settlement agreement, the terms of

20   the settlement and the $700 million dollar claim in favor of

21   TCEH exists outside of a particular plan of reorganization,

22   correct?

23   A    True.

24   Q    And Ms. Doré, do you recall in your role as CRO,

25   issues, concerns by the Debtors, with the TCEH unsecured

1   creditors negotiating the plan with other stakeholders

2   without the involvement of the Debtors?

3   A    Which plan are you talking about?

4   Q    The current REIT plan that's before the Court.

5           THE COURT:  Sorry, Ms. -- can you restate the

6   question?

7   Q    Do you recall, Ms. Doré, concerns of the Debtors, of

8   the Debtors, with respect to the TCEH unsecured creditors

9   negotiating the terms of the plan of reorganization with

10  other stakeholders, without the involvement of the Debtors?

11  A     I don't specifically recall concerns about them

12  negotiating plan terms.  I think generally speaking, all

13  throughout this process, we have at times been concerned,

14  and we voiced those concerns to Creditor groups, about

15  negotiations going on without our involvement, only because

16  we have simply advocated that, with our involvement, it's

17  more likely to come to a consensus deal because if they're

18  off negotiating with one another and we don't know about it

19  and then they bring a deal to us that we haven't had the

20  opportunity to weigh on in, it may or may not be successful,

21  and successfully baked into the plan.

22          So we've often said to various Creditor groups,

23  it's great that you're talking to each other.  Just please

24  keep us in the loop so that we can make sure we're sort of

25  acting as the hub of the information.

Page 125

1    Q    Okay.  And if you could turn, Ms. Doré, to the binder I

2    gave you, what is exhibit tabbed, middle of your binder EUCC

3    158.

4    A    Okay.

5    Q    Now, this is an email between Mr. Marc Kieselstein at

6    Kirkland & Ellis and Tom Lauria of White and Case, and Mr.

7    Kieselstein is your counsel to the Debtors, correct?

8    A    Yes, he is.

9    Q    Now, this email, an initial email, Mr. Kieselstein

10   talks about, I understand that you sent lockup agreements to

11   counsel for the sponsors in the first meeting, the ad hoc

12   committee.  It would have been nice to know, or heaven

13   forbid, discuss before you did."  Do you recall discussions

14   around this time, in April, about concerns that the T

15   unsecured creditors were out negotiating lockup agreements

16   with the sponsors and the T first lien parties?

17   A    Well, first of all, I've never seen this email before,

18   but I don't recall discussions about lockup agreements.

19   What I recall in this time period was -- were discussions

20   about giving the TCEH unsecured advisors at White and Case

21   permission, so to speak, to speak to counsel for the Hunts,

22   with frankly, I'm not sure they needed our permission, but

23   they -- they did seek it and we gave it.  So I recall that

24   in this period of time, but I don't recall a discussion

25   about lockup agreements.

1  Q    And do you recall discussions around that time,

2  concerns expressed by the Debtors, with respect to plan

3  terms being negotiated, with -- specifically with respect to

4  the T first lien Creditors without the involvement of the

5  Debtors?

6  A    No, I don't recall there being a discussion about plan

7  terms being negotiated without us.

8  Q    Ms. Doré, the final purchase agreement that you

9  negotiated with respect to the current plan and the REIT

10  merger contemplated by it, has not provided the Debtors any

11  right of specific performance, correct?

12  A    I'm sorry, did you ask specifically about the merger

13  agreement?

14  Q    The merger agreement, yes.

15  A    The merger agreement does not have a specific

16  performance remedy.

17  Q    And the merger agreement also does not provide a

18  reverse break fee in favor of any of the Debtors, correct/

19  A    It does not.

20  Q    And your testimony, in Paragraph 12 of your written

21  testimony is that: "disarmament is more valuable and more

22  punitive in a market-appropriate reverse break fee,"

23  correct?

24  A    Yes.

25  Q    And your testimony regarding costs, as we talked about

1   a bit earlier more generally, in this context, also includes

2   the costs of case burn and interest, correct?

3   A     Correct.

4   Q     And the Debtors will continue to incur those monthly

5   expenses between now and the merger plan closing date,

6   correct?

7   A     Yes.

8   Q     Which could be -- still be six months or more, correct?

9   A     Could be.

10  Q     And if the merger is not closed, the Debtors will have

11  to continue to pay monthly interest and case expense through

12  the termination date and beyond until an alternative plan is

13  confirmed by the Court, correct?

14  A     Yes, but we have an agreement to, from the plan

15  supportive parties at least -- plan support parties, for a

16  90-day confirmation schedule, subject to the Court's

17  availability, of course, and those costs, without any plan

18  in place, would have continued to be incurred.  So I think

19  what's important is to compare to what alternative, and if

20  we didn't have this plan, in my view, we wouldn't have any

21  plan right now.  I'm not quite sure what we would be doing,

22  but we wouldn't be pursuing a plan.

23  Q     And so, you -- as you sit here, if this plan did not

24  exist, you don't know what the Debtors would be doing, I

25  think is what you just testified to, correct?

1   A    I -- I suppose we would be proceeding with very

2   expensive and time-consuming litigation because that would

3   have been the only way to move the case forward, since we

4   had been unable to get the E-side Creditors to agree on any

5   type of equitization plan that could get the first lien

6   Creditors of TCEH's support.

7   Q    And so you -- you believe as co-CRO that there is no

8   alternative plan available to the Debtors.  This is it?

9   A    There was not an alternative plan available to us that

10  was viable at the time we adopted this one, and as I sit

11  here today, I'm not aware of an alternative plan available

12  to us, other than simply a cram-down fight, which we

13  contemplated when we filed the RSA, and that didn't go so

14  well.

15  Q    Now, and the Debtors proposed -- the Debtors proposed

16  the concept of disarmament to the purchaser group in June of

17  2015, correct?

18  A    That sounds about right, yes.

19  Q    Okay, and -- and we should just -- I don't want to make

20  it a memory test.  We can just turn in your binder to what

21  is DX 557.  557.

22  A    DX 557?  Oh, yes, I have it.

23  Q    Yes, there's a front portion of your binder?

24  A    I have it.

25  Q    There's a cover email there and behind there is a term

1    sheet.  Have you seen that term sheet before, Ms. Doré?

2    A    Yes.

3    Q    And this term sheet is the proposal by the Debtors that

4    set out an initial proposal with respect to the disarmament

5    concept, correct?

6    A    Yes.

7    Q    And in this term sheet, in Paragraph 5, the Debtors

8    propose, in addition to disarmament, the concept of a

9    reverse break fee, correct?

10   A    Yes.

11   Q    And if you turn the page to the next page, at the

12   bottom of the page in Paragraph 14, the Debtors also

13   proposed, in addition to the disarmament concept, a term of

14   specific performance to favor the Debtors, correct?

15   A    Yes.  This was clearly our wish list.

16   Q    Now, after this term sheet was circulated, the Debtors

17   never sought the purchase contract remedies of a break fee

18   or specific performance instead of disarmament, correct?

19   A    No, I don't think we did, because disarmament was the

20   bedrock principle of the construct, from our perspective.

21   So that would have been part, I think, of any discussion

22   that we were having at the time.

23   Q    So the Debtors prioritized disarmament over any other

24   potentially available remedy, correct?

25   A    Well, as this term sheet shows, we hoped to get it all,

1    but we didn't, and so we had to make some judgment calls,

2    and in our view, disarmament was worth more to all of the

3    Debtors than a reverse break fee or, especially, a specific

4    performance remedy that had limited value when you consider

5    the multiple equity commitment parties and how that works in

6    that deal context.  Specific performance is very difficult

7    to enforce and is not really worth all that much.

8    Q    Well, did you consider specific performance rights

9    against not only the purchasers but of the equity commitment

10   parties as well?  Did you con --

11   A    Yes, we did consider that.

12   Q    And di -- and did you -- did you attempt to pursue a

13   binding specific performance obligation with the purchasers

14   in lieu of disarmament?

15   A    Not in lieu of, but we did attempt to pursue it.

16   Q    You pursued it only in addition to disarmament,

17   correct?

18   A    We pursued all of it together, and when it became

19   apparent that we couldn't get specific performance and the

20   reverse break fee but they were willing to give us

21   disarmament, then that -- that ultimately was an acceptable

22   compromise to us because disarmament was a very important

23   part of the deal to all of the Debtors.

24   Q    But you only know that they would not provide specific

25   performance and reverse break fee in addition to

1    disarmament, correct?

2    A    I actually don't think these -- these parties, and I --

3    I can't remember now all the specific discussions, there

4    were many of them, but I don't think particularly on the

5    specific performance we could have ever gotten that, even

6    absent disarmament.  It just doesn't work that way in this

7    kind of deal with these kinds of parties.  Reverse break

8    fee, maybe, I don't know, but the disarmament was worth a

9    lot more to us than the break fee.

10   Q    Have you personally been involved in other transactions

11   with the financial parties who are providing the equity

12   commitments in connection with this transaction?

13   A    No, not personally.  That was based on the experience

14   and advice of our financial advisor.

15   Q    Okay.  So, with respect to this negotiation, you don't

16   know whether specific performance could have been achieved

17   if you had abandoned the disarmament concept?

18   A    I don't know that.

19   Q    All right, now, in Paragraph 49 of your declaration,

20   you address the issue of fees, and you testify in Paragraph

21   49, and feel free to turn to it if you'd like, it is your

22   understanding it is customary that Debtors pay the fees and

23   expenses of parties to post-petition sale agreements --

24   settlement agreements and support agreements, correct?

25   That's your testimony?

1    A    Yes, that's my testimony.

2    Q    And I think as we talked a bit earlier, you haven't

3    been personally involved in another Chapter 11 bankruptcy

4    case, correct?

5    A    That is correct.

6    Q    So your understanding with respect to the treatment of

7    fees is based not on your personal knowledge but on advice

8    you received, correct?

9    A    Yes.

10   Q    And you don't know, Ms. Doré, whether such fees, if in

11   fact typically paid, would be paid typically outside of a

12   plan or prior to effectiveness of a plan, do you?

13   A    I personally don't know.  My understanding is that it's

14   not unusual in a -- for transactional type fees like those

15   being paid under the merger agreement, to be paid while the

16   plan is being pursued.

17   Q    Okay, and you testified in Paragraph 50 that: "the

18   merger and settlement parties refused to enter into these

19   transactions without the fee provisions provided," correct?

20   A    Yes.

21   Q    And did the Debtors attempt to delay payment of those

22   fees until effectiveness of the plan?

23   A    Absolutely.

24   Q    If the plan sponsors insisted and refused to proceed

25   with the transactions without having fees paid at

1    confirmation, correct?

2    A    Well, I don't know which fees you're talking about, so

3    the settlement agreement has a fee provision in it that's

4    paid upon approval of the settlement agreement, the merger

5    and backstop agreements have fees payable under those

6    agreements, which essentially will be payable upon

7    confirmation, because confirmation would approve the merger

8    and backstop agreements.  Then there are additional fees,

9    which is, in my opinion, really just a stop-gap measure to -

10   - to catch anything that was not already paid, but there are

11   additional fees that get paid at the effective date under

12   the plan.

13   Q    Okay, now, you testified, Ms. Doré, in connection with

14   questions from Mr. McGaan, and it's also stated out in

15   Paragraph 10 of your declaration, that: "the plan sponsors

16   and advisors have devoted a tremendous amount of time and

17   resources to ensuring the best possible chance for the

18   mergers to succeed," and you go on to say that: "that too

19   informs my view that the parties are not pursuing the merger

20   as a (indiscernible) option."  That's your testimony in

21   Paragraph 10, correct?

22   A    I'm just looking for the language, "that's who informed

23   my view."  Did I --

24   Q    That's -- it's at the bottom of Page 6 of your

25   declaration.

1    A    Oh, "that too informs," okay, yes.  That is my

2    testimony.

3    Q    Ms. Doré, under the fee provisions provided, the plan

4    sponsors will be provided immediately a confirmation.  All

5    of the outstanding fees and expenses incurred from the time

6    and the resources spent in connection with this transaction,

7    correct?

8    A    Well, not necessarily.  Upon approval of the settlement

9    agreement, the TCEH junior Creditor advisors, so that

10   includes the ad hoc committee, as well as the second lien

11   group at TCEH, their advisors can submit bills to the

12   company for reasonable and documented fees up to a $50

13   million dollar amount, and through -- only through the date

14   of June 30th of 2015.

15             So, whether their fees through that period among

16   all those groups exceed that amount, I don't know.  That's

17   the cap they agreed to, and that we agreed to.  And under

18   the merger and backstop agreement, those fees would be

19   payable at confirmation and yes, starting with whatever fees

20   they've extended on the transaction itself.  But it is

21   limited to transactional fees, not other fees that might

22   have been incurred and are not paid under the $50 million

23   dollar cap.

24   Q    Okay, and you set some of this out in Paragraph 53 of

25   your declaration, but let's just break that down a bit.  The

1    $49-  up to $49.75 million in June incurred by the T-side

2    Creditor groups, those will be paid upon approval itself,

3    correct?

4    A    Correct.

5    Q    And that is paid irrespective of when or if the REIT

6    merger plan ever is consummated, correct?

7    A    That's true.

8    Q    So, this arrangement that they've negotiated

9    immediately removes the TCEH unsecured group's risk on the

10   $49.5 million dollars of historical fees that they've

11   included, up through June, as long as the settlement

12   agreement is approved, correct?

13   A    Well, it removes risk up to that amount, but in either

14   scenario, if the plan is confirmed, if the plan succeeds and

15   the merger closes, those fees are essentially borne by the

16   reorganized EFH estate, which are those counsel -- the

17   counsel you're referring to, their client.  So their clients

18   are basically bearing the costs of those fees.

19             In the scenario in which the plan doesn't close,

20   for whatever reason, or the transaction doesn't close for

21   whatever reason, those fees are taken out of the $550

22   million dollar consideration that is given to the junior

23   Creditors in the alternative plan scenario, so that is

24   effectively being borne by the TCEH first liens, because in

25   the $550- they pay to the unsecureds, they will deduct the

1    amount of the fees because they have to then reimburse EFH,

2    who will be the one -- no, actually, I'm sorry, it's

3    reverse.  TCEH pays the fees, EFH reimburses TCEH if the

4    plan closes.  If the plan doesn't close, the $50 million

5    comes out of the $550-.

6    Q    Okay, and absent the settlement agreement, the plan

7    support agreement, those fees would be due and owing in due

8    course by the purchaser clients themselves, correct?

9    A    Well, they would, but my understanding is that, as part

10   of any plan that we put forward, likely all of these

11   advisors would be coming forward at some point, asking for

12   the fees to be paid.

13   Q    Okay, and similarly, as you alluded to, the fees of the

14   Hunt party will be paid as well, under the terms of the

15   merger agreement and backstop agreement, correct?

16   A    Yes.

17   Q    So when you testified that the plan sponsors have

18   devoted a tremendous amount of time and resources, those out

19   of pocket costs are actually being borne by the Debtor's

20   estates in these cases, correct?

21   A    Well, the payment is being made by the Debtor's

22   estates, I agree with that, but ultimately, the way that it

23   is structured, the risk of those payments is ultimately

24   borne by the reorganized Debtors.

25   Q    Only if the plan closes.

1   A     Well, in the case of the plan not closing, the TCEH

2   first liens, who are entitled to the value of the TCEH

3   estate, are pay -- have agreed to deduct -- and the junior

4   Creditors have agreed to accept that deduction, from their

5   consideration.  So it's -- they're going to be the owners of

6   the company, the TCEH first liens, and they've made the

7   decision that they would pay $550 million dollars in an

8   alternative plan to the junior Creditors, minus those fees.

9   Q     Okay, and you testify in your direct, Paragraph 4, that

10  the merger plan is subject to certain conditions like many

11  proposed mergers.

12  A     Yes.

13  Q     If we could just turn, Ms. Doré, to your binder,

14  Exhibit DX 296.

15  A     Okay.

16  Q     This is July 30th restructuring update to -- to the

17  boards of directors, correct?

18  A     Correct.

19  Q     And these types of presentations were typically

20  prepared by some combination of people at the company and

21  your joint advisors at Kirkland and Evercore, correct?

22  A     Yes.

23  Q     And you personally always reviewed these presentations

24  to the boards before they were distributed, correct?

25  A     I did.

Page 138

1    Q    And you would offer comments if you identified things

2    that were incorrect in these presentations before they were

3    distributed to the board, correct?

4    A    Yes.

5    Q    With respect to the plan that's going before the Court,

6    you recognized and informed the board that the proposed

7    transactions had significant conditionality, correct?

8    A    Yes.

9    Q    And if we look at what is Slide 12 in this deck, which

10   we've talked about previously --

11          THE COURT:  Make that bigger.  Thank you.

12   Q    The discussion with the board on July 30th included

13   informing them that in the first bullet point, in exchange

14   for the TCEH junior creditors' parties agreeing to

15   disarmament, the merger agreement and related definitive

16   documents have effectively been structured as an option,

17   with out-of-market conditions related to PUCT approvals, IRS

18   rulings, and market factors.  That's what you informed the

19   boards on July 30th, correct?

20   A    Yes.

21   Q    And that description was an accurate representation of

22   the view of the transaction at the time, correct?

23   A    Yes.

24   Q    Despite this disclosure of significant conditionality,

25   your testimony today is that you nevertheless believe that

1    the PUCT is likely to approve the change of control

2    applications, correct?

3    A    Yes, the conditionality, primarily, that we were

4    discussing at the time, of course there's conditionality

5    around the PUC approval.  That exists in every transaction

6    that we have contemplated, to transfer control of Oncor.

7    But the conditionality, also, that we talked a lot about

8    related to just the purchaser's willingness and ability to

9    close at the time of the transaction.

10            What we were trying to convey to the board here,

11    who's also not been -- most of our board members have not

12    been through a restructuring before, but they had, many of

13    them, been through normal M&A, outside of bankruptcy, M&A

14    transactions.  And what we were trying to convey to them is

15    that this deal would not contain some of the remedies that

16    they would be accustomed to seeing in a out-of-restructuring

17    M&A transaction, like specific performance, or reverse break

18    fee.

19            But if you look at the prior two slides, what

20    we've explained there is that, but instead of that, we were

21    getting disarmament.  So we were trying to make sure that

22    our board was fully informed, that we were not able to

23    present a transaction that had both the very valuable

24    disarmament construct, and normal M&A market terms, like

25    specific performance, or reverse break fee.

1           And instead, that we were going to get

2    disarmament, and we believed that the parties had every

3    intention of closing, and could close, but we obviously

4    would always want to inform our board at the potential

5    downside, in the event that that didn't happen.  And I think

6    that's very clear, from the documents, the fact that we've

7    even negotiated the terms of an alternative restructuring

8    shows that we were contemplating the possibility that it

9    would close as any prudent Debtor would to, to contemplate

10   what happens if this doesn't close.

11   Q    Okay, but you went out of your way, on July 30th, to

12   inform the board that only was this structure was an option,

13   but that the deal contained out-of-market conditions related

14   to PUCT approvals, correct?

15   A    IRS rulings and market factors, yes.  And I just

16   explained that.

17   Q    And as you sit here today, you've received no

18   assurances from PUCT with respect to any approval process,

19   correct?

20   A    Absolutely not.

21   Q    In fact, you acknowledged this morning that no one

22   could predict what the PUCT will do, correct?

23   A    Correct.

24   Q    And you also testified that any transaction that you

25   would pursue contained the same challenges, correct?

1    A    Yes.  I mean, any -- most of the other transactions we

2    were considering would have contained many of these same

3    challenges.  I mean, for example, the Fidelity second lien

4    proposal also contemplated a RIET reorganization, which

5    would have involved the same PUC issues that this one does,

6    even the PIK proposal going way back to the RSA, although it

7    wasn't conditioned on a RIET approval, that's what the PIKs

8    were contemplating doing at the time.  So many of these same

9    issues would exist in any deal.  The NextEra deal didn't

10   involve a RIET.  That was the simplification there, but the

11   value of that bid was not enough to even cover EFIH's

12   creditors.

13   Q    Okay.  And you touched on NextEra, they're certainly

14   the introduction of the RIET conversion aspect of this is

15   unique, and raises the risk, correct?

16   A    It's different from the NextEra bid, if that's what

17   you're asking.  I'm not sure it raises the risk.

18   Q    The NextEra bid didn't require you to successfully

19   complete a RIET conversion to close the plane, correct?

20   A    It did not.  But it still required, for example, the

21   private letter ruling from the IRS about the tax-free spin

22   of TCEH.  So that risk was there.  It still required PUCT

23   approvals, and we don't know what concerns the PUC might

24   have had with respect to a NextEra bid, that were specific

25   to NextEra, and not to this deal.

1   Q     And even the creditor proposals that you are

2   referencing, from Fidelity, and the PIK, that contemplated a

3   RIET.  They were not required conditions for emergence from

4   bankruptcy, correct?

5   A     That is true, but those plans had other potential

6   regulatory challenges to them.

7   Q     And you personally have no prior experience in

8   converting utilities or RIET in your discussions with PUCT,

9   correct?

10  A     Well, that was -- I got the first part of your

11  question.  I have no prior experience converting a utility

12  to a RIET.  That is certainly true.  Have I had discussions

13  with representatives of the PUCT about converting a utility

14  to a RIET?  Yes.

15  Q     You've had those discussion in connection with this

16  transaction?

17  A     And prior transactions.

18  Q     You also testified that you believed that the plan

19  sponsors are likely to close the merger, correct?

20  A     Yes.

21  Q     And you based that conclusion on your perception, in

22  part, of the financial sophistication and reputation of the

23  counterparties, and the commitments they have made.  You say

24  that in Paragraph 6 of redirect.  That's your testimony?

25  Feel free to turn to Paragraph 6, and on Page

1    (indiscernible).

2    A    Well, I don't think I called it a perception.  I'm

3    trying to lay out there what are observable facts, that

4    inform my conclusion that the transaction is likely to

5    close.  And those observable facts include the financial

6    sophistication of the parties, the very public commitments

7    that they've made to this transaction, as well as all of the

8    activity that has occurred since we filed the plan --

9    activity on their part, to close the transaction.

10   Q    You talked about the equity commitments, or the

11   commitments that were made.  The equity commitments are not

12   binding in any way if the commitment part is not required to

13   fund, for any reason it so chooses, correct?

14   A    Well, I think the equity commitments show that they

15   have the money, and they've put the money aside for this

16   deal.  You're asking the separate question of whether they

17   can decide under the merger agreement, for any reason, not

18   to use that money to close.  And the answer is, yes, they

19   can.

20   Q    You further testify, Paragraph 6, or at least earlier

21   in Paragraph 6, that it's your view that it's not reasonable

22   to assume that a person will back out of this opportunity

23   because the PUCT might impose conditions that could result

24   in economic modifications.

25   A    I said it's not reasonable to assume that it will back

1    out of this opportunity, and it refers to the Hunts, in the

2    prior sentence.

3    Q    So your statement, with respect to the PUCT conditions,

4    you're referring only to the Hunts in that situation.

5    A    In that sentence, I'm referring only to the Hunts.

6    Q    Nonetheless, if the Hunts decide they do not like the

7    conditions that might be imposed by the PUCT, they do have a

8    contractual right to simply choose not to close, correct?

9    A    The Hunts alone, each party alone has the ability to

10   choose not to close.  I don't know what the agreements among

11   the parties are that might allow them -- the parties to

12   close without one party, for example, the Hunts, who decide

13   not to close.

14   Q    So you personally, as CRO, don't know one way or the

15   other whether or not the Hunts can force the plan supporters

16   to close -- the other financial investors to close the

17   transaction?

18   A    I don't know.  None of the documents we've negotiated

19   have allowed them to do that.  That's the most I can say.

20   Q    But you're not aware of any right that they would have

21   to force the financial investors to close?

22   A    I'm not aware of that.

23   Q    And you're similarly not aware of any rights that the

24   financial investors have to force the Hunts to close the

25   transaction, correct?

1    A    I'm not aware whether there are or aren't those rights.

2    Q    And you talk about -- this is what we just looked at,

3    in Paragraph 6, your view that the investors are -- you

4    describe them as sophisticated investors, correct?

5    A    Yes.

6    Q    And those sophisticated investors are managing

7    investments for their clients, correct?

8    A    Yes.

9    Q    And so those investors will not proceed with this

10   transaction if they know it will cause their clients to lose

11   money, correct?

12   A    Yes, I mean, the investors in this deal are going to

13   make the same calculus that any purchaser would make at the

14   time of closing.  Utility deals are notoriously difficult to

15   predict the outcome of, because they typically have long

16   closing periods as a result of the requirement of regulatory

17   approvals.  That's with or without a bankruptcy.  So you

18   could cite just as many utility deals that haven't closed as

19   ones that have closed, because there's a long period of time

20   between negotiating the definitive documents, and the

21   required closing conditions being met.

22           And in the intervening period, the regulatory

23   authorities can do things that upset the apple cart, the

24   parties can change their position.  So any party that's

25   purchasing a company like Oncor is going to make their own

1  calculus, at the time of closing, as to whether it is still

2  in their economic interest to close.  And in some cases,

3  that would involve comparing the value of the deal to a

4  reverse break fee.  In this case, it's going to involve

5  comparing the value of the deal, to the purchasers at the

6  time, to their alternative of giving $550 million, as

7  somebody I believe called it, the booby prize.

8  Q    And at the end of the day, those investors will make a

9  decision as to whether closing or not closing and take the

10  550 is in their financial interest, correct?

11  A    Absolutely.

12  Q    In fact, in the purchase agreement, and we can turn to

13  it, if we can look at Paragraph -- I'm sorry, Tab EUCC 240

14  in your binder.  And if you could look at Page 88, at the

15  bottom of that document.  Now, in Section 9.9 of the

16  purchase agreement, the purchasers expressly bargained for

17  express provisions if the Debtors waived any right, in

18  Subsection A, to specific performance, correct?

19  A    The agreement states that none of the company, EFIH or

20  any of their affiliates or stakeholders will be entitled to

21  seek or obtain specific performance of any of purchaser's

22  obligations under the agreement.

23  Q    Okay.  And in Section 9.9B, the Debtors expressly

24  included language, bargained for by the purchasers, that you

25  waive all rights to damages or any other remedy for breach

1   of the purchase agreement, correct?

2   A    Except with respect to any purchaser's obligation to

3   pay any amount guaranteed, pursuant to the guarantee, yes.

4   Q    Okay, thank you.  Ms. Doré, you haven't been provided

5   access to any internal analysis from the purchasers as to

6   the circumstances under which they would or would not close,

7   correct?

8   A    No, I have not.

9   Q    Okay, you can put that document aside, thank you.  Ms.

10  Doré, the equity interest in Oncor that's at issue is owned

11  by EFIH and EFH, correct?

12  A    Yes.  It's ultimately owned by EFH.

13  Q    And TCEH has no ownership interest in the Oncor estate,

14  correct?

15  A    TCEH does not own the equity of Oncor, indirectly or

16  directly.

17  Q    Oncor is not an asset of the TCEH estate, correct?

18  A    Oncor is not an asset of the TCEH estate, but TCEH has

19  long alleged that it is a creditor of the EFH estate, giving

20  it an interest in whatever proceeds might come up to EFH, a

21  sale of Oncor.

22  Q    That's the same interest that any other creditor of EFH

23  would have, as a creditor of the Debtor, correct?

24  A    Yeah.

25  Q    And you recall, Ms. Doré, that the Debtors filed a

1   motion of discord seeking approval of bidding procedures on

2   behalf of all of the Debtors, collectively, correct?

3   A    I do.

4   Q    And you approved the filing of that motion as the co-

5   chief restructuring officer, correct?

6   A    I did.

7   Q    And in filing that motion, it was not your intention to

8   provide TCEH a veto wipe over the disposition of Oncor to

9   approve the bidding procedures, correct?

10  A    I didn't intend to provide TCEH with a veto right.

11  again, the view was that at the time, it was in the interest

12  of all of the Debtors to attempt to determine whether we

13  could sell EFH's interest in Oncor, and use the proceeds to

14  settle the claims of the creditors.  And to the extent that

15  TCEH was a creditor of EFH, that would have included TCEH as

16  a creditor.

17  Q    And do you, as co-CRO, understand that this court's

18  ruling in November of 2014, will require TCEH to approve the

19  sale of Oncor?

20  A    Yes.

21  Q    Okay.  So since that time, your decision-making as CRO

22  has been with the understanding that TCEH's approval is

23  required for disposition of the stake in Oncor, correct?

24  A    Well, strictly speaking, I think without putting the

25  word's in the hedge's mouth, the order said that the TCEH

1  disinterested director should approve the bidding

2  procedures.  And that was consistent with our view that TCEH

3  had an interest, so to speak, in the outcome of that

4  process, because TCEH was alleging, and many of the E-side

5  creditors have accepted, in effect, that TCEH was a creditor

6  of EFH.  So when we have made decisions about the

7  disposition of Oncor, yes, the TCEH creditors and the TCEH

8  disinterested director have certainly taken the position

9  that they have an interest in the outcome of that

10  disposition.

11  Q    But as you see here, as the CRO of the Debtors, is it

12  your understanding that the consent of TCEH was, in fact,

13  required for any disposition?

14  A    Within this bankruptcy, yes.

15  Q    Thank you.  I have no further questions, Your Honor.

16         THE COURT:  All right.  Take a short recess, and

17  then we'll hear from conflict's counsel, I assume?  All

18  right, thank you, five minutes or so.

19     (Recess)

20         THE COURT:  Please be seated.

21         MR. HUSNICK:  Good afternoon, Your Honor.  Chad

22  Husnick, with the Debtors.  I apologize for interrupting the

23  cross.  We did speak with counsel beforehand, to give them a

24  preview, and ask for permission.  I'm happy to report the

25  other half of the report I wanted to give this morning has

1   now come to roost.

2          In the middle of cross, Your Honor, there was a

3   Debtwire release, or research release that announced half of

4   a deal, so we wanted to get it on the record as quickly as

5   possible, so everybody knew what was going on.  As Your

6   Honor may recall, we were in the process, and the plain

7   sponsors were in the process of negotiating a resolution

8   with the largest EFH creditor, and that is Fidelity, in

9   certain of its funds.  Fidelity has agreed to this terms of

10  this settlement agreement, subject to getting a court order

11  approving it.  And Your Honor, I'll allow Mr. Lauria here to

12  summarize the terms of that deal.

13         Before I turn the podium over, I also wanted to

14  mention that the Debtors have also reached an agreement in

15  principle with the EFIH first lien and second lien indenture

16  trustees.  We are working out the final language that

17  memorializes that agreement in principle, and we would just

18  like to thank Judge Gross for his help, and that we'll be

19  meeting with him to try to finalize that language.

20         Your Honor, as a result of that agreement, and

21  important to the cross here, we would ask that we defer

22  cross on Ms. Doré for the two constituents until tomorrow on

23  that particular issue, because it may eliminate the need for

24  any further cross from those two parties.  They are

25  agreeable to that, of course.

1           THE COURT:  Okay.

2           MR. HUSNICK:  Without -- unless you have any

3    questions, I'll turn it over to Mr. Lauria.

4           THE COURT:  No, no questions, thank you.  Mr.

5    Lauria.

6           MR. LAURIA:  Good afternoon, Your Honor.  Tom

7    Lauria, with White & Case for the ad hoc, T-unsecured

8    creditor group.  Before I go into the terms, I thought I

9    might ask Ms. Doré a few questions, as long as we're here.

10        (Laughter)

11          MS. DORÉ:  Go ahead.  They've apparently offered

12   me up tomorrow, too.

13          THE COURT:  Yeah, you're staying over, whether you

14   like it or not.  And I know they didn't ask you.

15          MS. DORÉ:  They did not.

16          MR. LAURIA:  It's true, Your Honor, we have

17   reached a complete agreement with Fidelity, that has been

18   signed up by all required parties.  The component of it that

19   requires court approval deals with the allowance of

20   Fidelity's claims. They have a total of about $1.6 billion

21   of claims on the E-side.  About 1.1 billion of those are

22   pre-petition claims. So with the Fidelity deal, which I'm

23   going to describe very briefly here, we will now have, of

24   the about $3.5 billion of funded debt on the E-side, we'll

25   get about 2.35 signed up and affirmatively supporting the

1   plan.

2           So, the terms. They hold approximately 474 million

3   of EFH, LBO, and Legacy notes, which together comprise

4   approximately 73 percent of the funded debt at EFH.  They

5   also hold 575 million, approximately, of EFIH second lien

6   notes, which comprise approximately 40 percent of the

7   outstanding EFH second lien debt.  The EFH legacy notes of

8   fidelity are agreeing to waive any entitlement to a make-

9   whole, and are agreeing to take a first petition interest at

10  the federal judgement rate, during the dependency of the

11  case, through to the effective date.

12          With respect to the EFH LBO notes, which are

13  guaranteed by EFIH, Fidelity holds approximately 47 million

14  of those notes, and they hold about 430 million of the EFH

15  legacy notes.  With respect to the LBO notes, they are

16  waiving their make-whole, and they're agreeing to take firs

17  petition interest at the rate of 60 percent of contact,

18  which is the same deal that we had made with the settling of

19  PIKs previously.

20          With respect to their second lien, EFIH notes,

21  which they hold approximately 575 million, they're waiting

22  all right to make-wholes, and they're agreeing to full

23  contract post-petition interest.  And of course, that

24  reflects the difference that these are secured notes, have

25  different rights than the unsecured claims.

1          We're also agreeing that up to $12 million of

2     Fidelity's fees will be paid at consummation of the E-side

3     plan.  In addition to the claim allowances, which are part

4     of a settlement agreement that we're going to submit to the

5     court, and would ask the court's approval of.  Fidelity is

6     also agreeing to instruct the EFH trustee to stand down from

7     its continued pursuit to objections to confirmation, and

8     approval of the settlement, and any other related

9     transactions between here and consummation of the plan, and

10    as a holder of 73 percent of the notes in that class, that

11    is above the required minimum for -- it is a required

12    majority for the instruction to be a good instruction.

13         They are also agreeing to join with other EFIH

14    second lien noteholders, if we can find them, who are

15    willing to also support the plan.  If we can get over 50

16    percent, they will join in instruction to the EFIH second

17    lien trustee to stand down as well.  In light of the

18    settlement that we think we have there, that second

19    instruction may not, at the end of the day, be material.

20         Fidelity has executed the plan support agreement

21    and is now a party to it, meaning that they affirmatively

22    support the plan, the settlement, and all related

23    transactions.  And Fidelity has also agreed to join the

24    investor consortium.  They are committing to purchase $500

25    million of EFH equity at the price that is being offered to

1   the T-unsecured creditors.

2           We view this as an important step for three

3   reasons.  Number one, as an employer of over 6000 people in

4   the state of Texas, we think it's important to have Fidelity

5   as a party to our deal.  Number two, as a well-known, a big-

6   time investor, it's good for the deal to have a party like

7   Fidelity stepping into invest.  And number three, the 500

8   will be used to reduce the debt that we have at exit, which

9   we think facilitates materially achieving our objective of

10  exciting Chapter 11 with investment-grade debt.

11          So that's the deal, and what we would like to do

12  is see if we can get this teed up for approval at the same

13  time as the PIK settlement is teed up, that's on the 19th.

14  All of the components that would be before the Court, which

15  are the allowance of the claims are encompassed by pending

16  objections, and are within, obviously, the positions that

17  could be staked out there.  In particular, with the

18  exception of the EFH LBO notes, which have the EFIH

19  guarantee, where they're getting 60 percent of their post-

20  petition interest.  What they've agreed to, in terms of

21  their allowed claim, is exactly what is contemplated by the

22  plan.  So we think it's a low hurdle to clear.

23          THE COURT:  Okay.  I will think about your timing

24  request, and listen to other people, if they have something

25  to say about it.  But I'll chew on that.

1           MR. LAURIA:  All right.

2           THE COURT:  Does anyone wish to be heard?  Hang

3     on, let's make sure Mr. Lauria is finished.

4           MR. LAURIA:  Yeah, that's it, Your Honor.  Thank

5     you.

6           THE COURT:  Very good, thank you.  Yes, sir?

7           MR. MCDANIEL:  Good afternoon, Your Honor.  Garvin

8     McDaniel, Hogan McDaniel for Centurion Capital Management.

9     Your Honor, we have filed a joinder to the objection of the

10    EFH indenture, and also Fidelity's objection.  This is

11    obviously the first time we're hearing about this

12    settlement.  We were not included in any negotiations.  So I

13    just want to stand up and reserve all our rights, and if

14    they're going to schedule something on short notice, we'd

15    like to see it scheduled, so I can go to my co-counsel and

16    get a response.

17          THE COURT:  All right, Mr. Dietderich?

18          MR. DIETDERICH:  Andy Dietderich, for the official

19    committee, Your Honor.  I just want to make clear, we were

20    not involved in the negotiation of this special deal for

21    Fidelity.  We haven't seen it.  We'll review it.  I think

22    the planned proponents have been transparent with us that

23    something like this might be coming today, and we appreciate

24    that transparency.  We are warily optimistic it will be a

25    step forward toward resolution of the case, consensually.

1    Consensus is great, and we welcome it.  We have fewer

2    creditors to represent.

3              This does not, however, resolve the concerns of

4    the creditors who have been left out of the deal, especially

5    when consideration being offered by participation on the buy

6    side is unequal.  Settlements have to be looked at from the

7    perspective on the third circuit of the creditors were not

8    offered the settlement, and not involved, and we need to

9    make sure we diligence this, in that capacity.

10             I think it's useful to note who's left at EFH, and

11   I wanted to make sure Your Honor had an accurate picture of

12   that.  The EFH unsecured creditors other than Fidelity

13   consist of retirees of the company, a relatively modest

14   amount of trade, tort claimants, tort victims, and legacy

15   bonds.  These are pre-LBO bonds.  They're of two flavors.

16   One flavor is EFA has recourse only to EFH.  And there's a

17   small series, called the LBO bonds, that have recourse to

18   EFH, and are guaranteed by EFIH.  In both, there's both

19   institutional investors, and a significant number of small,

20   individual holders.  And so that's the remaining

21   constituency, and we look forward to reviewing the

22   settlement to make sure their rights are protected.  Thank

23   you.

24             THE COURT:  Okay.  Thank you.  Mr. Pedone?  Hang

25   on -- oh, go ahead, Mr. Lauria again.

1          MR. LAURIA:  Your Honor, if I could, just to add

2     to the comments of Mr. Dietderich.  Going back to the $3.5

3     billion of funded debt on the E-side, with the first and

4     second lien deal coming in, as we expect, we'll be down to

5     about a grand total of $800 million of funded debt on the E-

6     side that is not in the deal, or agreeing not to object to

7     the deal.  And of that, we believe a substantial amount is

8     held by three or four creditors, and we're going to be

9     meeting with those folks tomorrow night and Saturday.

10          THE COURT:  Okay, thank you.  Mr. Pedone?

11          MR. PEDONE:  Your Honor, Richard Pedone, on behalf

12     of American Stock Transfer as indenture trustee for all of

13     the bonds at EFH Corp.  Your Honor, we were not included in

14     the settlement process.  We welcome it.  We understand that

15     the direction is going to be quite unorthodox, and that

16     there will be no indemnity coming with it.

17          Notwithstanding that, we look forward to working

18     with all the parties, after we see the documentation for the

19     first time, to work through a resolution to resolve the

20     issues.  But the claim were filed by the EFH indenture

21     trustee, and I believe that we have to be a part of the

22     settlement, and we look forward to working on it.  Thank

23     you.

24          THE COURT:  Mr. Anker?

25          MR. ANKER:  Good afternoon, Your Honor.  Philip

1    Anker, Wilmer, Cutler, Pickering, Hale & Dorr for Delaware

2    Trust Company as the EFIH first lien trustee.  I rise just

3    to make two points that I'm certain Your Honor is aware of,

4    but so that my email or iPhone doesn't get flooded.

5           When Mr. Husnick said that there is a deal in

6    principle, subject to documentation, with the EFIH first

7    lien trustee and second lien trustee, that is a deal with

8    respect to plan language that we believe addresses our

9    concerns that we be unimpaired, not a ultimate financial

10   deal with respect to our disputed claims, including our

11   make-whole claim.  But it is with respect to the matter that

12   is in front of Your Honor.  I just didn't want false press

13   reports out there, and I'm obviously -- Mr. Husnick didn't

14   mean to imply to the contrary, but before I got 85 phone

15   calls in the middle of a hearing, I wanted to be clear on

16   that.

17          Second, I just want to -- first, I appreciate very

18   much the Debtor's agreement, that in light of the likelihood

19   that we will get to final plan language, that our

20   opportunity to cross Ms. Doré will be postponed.  As much I

21   enjoyed meeting her, and taking her deposition, it's a more

22   efficient use of court time not to proceed that way.  And

23   third, I just want to echo both the thanks to Judge Gross,

24   and to Your Honor, for pointing us in the direction where

25   although we don't have a complete peace, we at least appear

1   to be headed toward an agreement on real plan language that

2   does not impair us, and preserves all of our rights.  Thank

3   you, Your Honor.

4            THE COURT:  Thank you, Mr. Anker.  Mr. Horowitz?

5            MR. HOROWITZ:  Thank you, Your Honor.  Gregory

6   Horowitz, from Kramer Levin, on behalf of the EFIH second

7   lien indenture trustee.  I'm getting tired of saying "Me,

8   too," after Mr. Anker gets up, but --

9            THE COURT:  You need to push him aside, and go

10  first.

11      (Laughter)

12           MR. HOROWITZ:  He does a good job, and substance,

13  I guess, is more important than podium time.  But yes, me

14  too, I echo Mr. Anker's comments, especially in giving

15  thanks to Judge Gross, and Your Honor, and in emphasizing

16  that the agreement we have in principle goes to our plan

17  objections.  We said at the outside that we would love to be

18  a position where we feel like we are unimpaired, and can

19  support in preserving our rights to appeal and pursue make-

20  whole claims, and I think we are going to be there.  But

21  this is not a settlement of make-whole claims.

22           And the other thing I do think I have to make

23  clear, Your Honor, just as a reservation, is that Mr. Lauria

24  gave some statistics as to the size of Fidelity's holdings

25  in our group, and the percentage that it represents.  And I

1    just have to say, we have been looking into that, and our

2    figures don't agree.  I don't know what the actual numbers

3    are.  I do want to reserve rights, because as it stands, we

4    don't believe Fidelity is as high as 40 percent of our

5    group.  But I don't know what the facts are, for sure, and I

6    want to make that clear, on the record.

7              THE COURT:  Okay.

8              MR. HOROWITZ:  Thank you, Your Honor.

9              THE COURT:  You're welcome.  Mr. Schepacarter?

10             MR. SCHEPACARTER:  Thank you, Your Honor.  Good

11   afternoon, Rich Schepacarter, with the United States

12   trustee.  I guess I have two things to say.  One is, I'll

13   say what everybody else has said, is we're going to reserve

14   our rights.  Two, I have a little bit of issue with the

15   timing.  I know that confirmation, this hearing is going on

16   through almost up until the day right before Thanksgiving,

17   and I know that this Court has been very flexible with the

18   time of having to hear things.

19             I'm not sure that having something heard on the

20   19th would give enough opportunity to review whatever's

21   going to be filed, because although we have representations

22   form counsel, we don't have any actual papers filed, and I

23   would love to be able to see those pleadings, and whatever

24   else is going to be filed with respect to the settlement,

25   the settlement agreement, or whatever else.  So I'm a little

1   concerned on the timing, or the ability to raise objections

2   with respect to issues that may arise with respect to that

3   settlement.  So, thank you.

4           THE COURT:  Mr. Lauria -- I'm sorry to interrupt.

5   Do you have an idea when things will be docketed, in

6   connection with the agreement you're entering into the

7   record?

8           MR. LAURIA:  I think we're working on that as we

9   speak, and I would expect that this afternoon, all the

10  papers will be filed.

11          THE COURT:  All right, thank you.  Anyone else?

12  All right, excellent.  Well, I continue to support

13  settlement in all its forms, so I'm glad to hear there's

14  been tremendous amount of progress.  And I know how good

15  Judge Gross is, and I thank him, as well, very, very much

16  for agreeing to mediate some disputes for me in connection

17  with this matter.  And hopefully we'll have some success the

18  next time he steps into the fray as well.  All right, Ms.

19  Doré, are you ready?

20          MS. DORÉ:  I'm ready.

21          THE COURT:  All right, let's continue.

22          MS. DORÉ:  Thank you.

23          Mr. SHEPPARD:  For the record, Your Honor, Mark

24  Sheppard, Montgomery McCracken, conflict's counsel for the

25  E-side official committee.  Well, that's kind of a tough act

Page 162

1    to follow.

2                         CROSS-EXAMINATION

3    BY MR. SHEPPARD:

4    Q    Ms. Doré, good afternoon.

5    A    Good afternoon.

6    Q    It's good to see you again.

7    A    It's good to see you, Mr. Sheppard.

8    Q    I want to start where Mr. McGaan left off, if I can.

9    And that was with an email and a letter.  First, there's an

10   email, and this is Exhibit DX 559, in the Debtor's binder.

11   A    Oh, in the Debtor's binder?

12              THE COURT:  Which number?

13              MR. SHEPPARD:  559, Your Honor.

14              THE COURT:  I think it's up on the screen, Ms.

15   Doré, as well.

16              MS. DORÉ:  Okay.

17   Q    And you (indiscernible), yeah, I'm going to get there,

18   but I'm just going to try to orient you.  You testified, in

19   response to some questions from Mr. McGaan, that as we sit

20   here today, that you had never heard articulated the claims

21   against the sponsors that the E committee had, is that

22   right?

23   A    That I said I think between this letter and some of the

24   pleadings that were filed in October, I didn't hear anything

25   further about an articulation of claims against the

1    sponsors.

2    Q    Okay, but you're aware that the EFH committee has fully

3    investigated these claims, isn't that right?

4    A    That's what I understand.

5    Q    And you're aware that there was a supplemental

6    objection that was filed, laying out what these claims are?

7    Isn't that true?

8    A    Yes.

9    Q    In fact, that including specifically breach of the duty

10   of loyalty, and a waste claim under Texas law, isn't that

11   correct?

12   A    Yes.

13   Q    Now going back to December, in Exhibit 559 that Mr.

14   McGaan showed you.  Do you take a look at that last sentence

15   of the email, if you would?

16   A    Yes.

17   Q    Can we get that blown up a little bit, please?  Because

18   I'm having a hard time seeing it.  Do you see that sentence

19   there, our preliminary view is that including settlement of

20   such matters at this time is not necessary to create a

21   confirmable plan, and has risks and complexity that could

22   prove, with time, to be harmful to creditors.  Do you see

23   that?

24   A    I do.

25   Q    And that was the position of the committee back in

1    December of 2014, correct?

2    A    According to this email, yes.

3    Q    And you were in court when Ms. Ramsey gave her opening,

4    isn't that true?

5    A    Yes, I was.

6    Q    And isn't it a fact that Ms. Ramsey told up here and

7    told this Court that it was the EFH committee's position,

8    that they had no objection to a release of the sponsors of

9    the directors and officers, provided that they were

10   contained within a plan of reorganization, isn't that right?

11   A    I have to say, I listened to so many openings I'm not

12   sure, but I'll take your word for it.

13   Q    Let me ask it this way.  Going back to the sentence on

14   DX 559.  To your knowledge, the committee's position has

15   never changed from that sentence, isn't that true?

16   A    Not that I'm aware of.

17   Q    Okay.  So the position that the committee had staked

18   out back in December is exactly the position that we have

19   today.  Isn't that true?

20   A    Yes, and I don't think I was trying to imply otherwise

21   this morning.  What I was explaining was that the claims

22   themselves were never really specified, between this email

23   and the October filings that you're speaking about.  So from

24   December to October, we didn't get any further information

25   about what the sponsor claims would be.  Not that there was

1    an inconsistent position about whether there should be

2    sponsor releases.

3    Q    Okay, I appreciate that.  And you also testified, in

4    connection with some questions from your counsel, that there

5    was this collaborative process in terms of investigating

6    these claims, including the creditors, right?

7    A    You're talking about post-petition?

8    Q    Yes.

9    A    The legacy discovered (indiscernible), yes.

10   Q    Okay.  And after you got this email, this DX 559, did

11   you ever go back to the committee and ask them to elaborate

12   any further on what their claims against the sponsors may

13   be?

14   A    I did not, personally.  I don't know if Kirkland did or

15   not.

16   Q    Okay, so you're not aware of whether your counsel did

17   or not?

18   A    I'm not aware.

19   Q    Okay.  And you testified that as the co-restructuring

20   officer, you were primarily involved in all aspects of the

21   legal part of the restructuring, right?

22   A    Yes.

23   Q    And so if Kirkland had done that, you would certainly

24   be aware of it, wouldn't you?

25   A    Probably --

1          MR. MCGAAN:  Object, Your Honor, speculation.

2          MS. DORÉ:  Yeah, I mean, I don't -- probably I

3    would be.

4          THE COURT:  Overruled, go ahead.

5          MS. DORÉ:  Sorry, Your Honor.

6          THE COURT:  It's all right.

7    Q    All right, now turning your attention, then, to DX 968,

8    which is the letter from Ms. Ramsey dated October 7th, 2015.

9    See that?

10   A    Now you're in another binder?

11         THE COURT:  No, this was the single sheet.

12   Q    No, this is the Debtor's binder, same binder.

13   A    I got it.  Okay.

14   Q    And I guess, I just want to clear up something that I

15   was unclear of.  You were aware, Ms. Doré, that the purpose

16   of this letter was to put EFH on notice, that the committee

17   expected them to put their carriers on notice, regarding

18   these potential claims against the sponsors, and the

19   directors and officers, isn't that right?

20   A    Yes.

21   Q    It wasn't intended to fully lay out anyone's claims,

22   was it?

23         MR. MCGAAN:  Object, Your Honor.  It calls for

24   speculation about counsel's intent.

25   Q    Well, let me ask -- I'll rephrase.  Was it your

1    understanding that the purpose of this letter was simply to

2    put the company on notice, that we wanted you to put your

3    carrier on it?

4    A    I don't know what the intent or purpose of the

5    committee was.  I just know the letter clearly states that

6    you wanted us to put our carrier on notice.

7    Q    And I believe you testified earlier that this letter

8    followed your deposition, where I specifically asked you the

9    question, had you put your carrier on notice?  Do you recall

10   that?

11   A    I do.

12   Q    And I believe your testimony was you couldn't recall.

13   Isn't that right?

14   A    I think I said I don't think we did, but I'm not

15   positive about that.  And then after my deposition, I

16   confirmed that I was correct, that we had not.

17   Q    Okay.  And so then this letter came immediately after

18   that deposition, isn't that right?

19   A    That is right.

20   Q    Okay.  Now the D&O insurance that we're talking about

21   here, Mr. Keglevic testified earlier, and I believe you were

22   in court, that there was approximately $210 million in D&O

23   coverage?

24   A    Yes.

25   Q    Is that coverage still available today?

1    A    It is.

2    Q    Okay.  And would it be available to cover any claims

3    that may be made, derivative claims that may be made on

4    behalf of EFH against the sponsored directors?

5    A    Well, that's a pretty broad question.  I mean, I'd have

6    to -- generally speaking, yes.  But of course, as you know,

7    there's lots of terms and conditions to D&O coverage.

8    Exclusions, what's covered, what's not.  So it's hard for me

9    to give a very definitive answer to that.

10   Q    And I guess, well, I just want to make sure is that

11   that coverage has not lapsed, has it?

12   A    It has not.  In fact, it's been renewed.

13   Q    In fact, the renewal was October 10th, right?

14   A    Correct.

15   Q    And that's why the letter dated October 7th was

16   somewhat urgent, isn't that true?

17   A    From your perspective, perhaps it was urgent.  I don't

18   know that it was from my perspective.

19   Q    Thank you, Ms. Doré.  Now, you testified that in

20   addition to your role as the senior counsel that you were

21   also the chief compliance officer.  Did I get that right?

22   A    I am not the chief compliance officer.  We actually

23   don't have a role with that title but I do -- my

24   organization, the legal organization's responsible for

25   compliance both (indiscernible) compliance through the

1  Luminant and (indiscernible) energy, legal organizations as

2  well as corporate compliance at the EFH level.

3  Q    Okay.  And when you say corporate compliance, does that

4  include board governance procedures?

5  A    No.  The corporate compliance program is your

6  traditional code of conduct compliance program that's based

7  on the federal (indiscernible) guidelines.

8  Q    Okay.

9  A    The board activity of the company is handled through

10 the corporate secretary's office, which I'm also, my team is

11 also responsible for.

12 Q    You testified that when you came onboard, one of the

13 first things you did was hire Kirkland & Ellis, right?

14 A    Correct.

15 Q    And the reason you did that was because you could see

16 at that time in 2012 as the gas prices were going in the

17 wrong direction, isn't that right?

18 A    Well, it was -- that was part of it, certainly.  We had

19 done the Odyssey amend and extend transaction in 2011 with

20 the hope that gas prices would start to recover.  And by

21 this time a year later in the spring of 2012, they had not

22 started to recover.  In fact, they were going the opposite

23 direction.  And in the addition to that, we had a debt

24 maturity of I think over $4 billion at TCEH, so TCEH had a

25 debt maturity in October of 2014.  And so there was

1    obviously a lot of thinking going on about how were we going

2    to deal with that debt maturity.

3    Q    Okay.  So one of the first things you do as a general

4    counsel is to hire a restructuring counsel and that's

5    Kirkland, right?

6    A    That is correct.

7    Q    And you can see that, you know, with this debt wall

8    coming up in October of 2014 that you're going to have to

9    make some decisions pretty quickly, right?

10    A    Well, I mean, we -- I actually think we prepared far in

11    advance of needing -- having the urgency of making

12    decisions, I think probably farther in advance than a lot of

13    companies in our situation.  We still had -- as I said, this

14    was June of 2012.  The maturity was October of '14, so we

15    still had over two years.  Lots of things could have

16    occurred during that two-year period, as you've heard a lot

17    of testimony in this court.  Gas prices are volatile.

18    Anything could have happened.  But we believed we were being

19    prudent by going ahead and seeking counsel on all of our

20    restructuring options in court and out of court.

21    Q    Okay.  How long after you hired Kirkland & Ellis did it

22    become clear to you, Ms. Doré, as general counsel that you

23    were going to have to engage in a restructuring either in or

24    out of court?

25    A    I would say that through, as I think I testified this

1   morning, through the last part of 2012 the company

2   management team and all the boards got smart about the

3   restructuring process and tried to look at all of our

4   options.  And in early 2013, we started to explore

5   restructuring -- TCEH in particular started to explore

6   restructuring possibilities with the TCEH first lien

7   creditors.  We had discussions in early 2013 about that.  So

8   I guess in early 2013 at that point, we wanted to at least

9   have a plan, have some sense of how we were going to deal

10  with the debt maturity in October of 2014 if gas prices

11  didn't recover.

12  Q   Okay.  So just let me try to break that down a little

13  bit.  I guess the latest you talked about was March of 2013,

14  right?

15  A   Yes.

16  Q   And at that point it was pretty clear to you and the

17  board at EFH that someone was going to have to file for

18  bankruptcy, some entity, if not all the entities, right?

19  A   Well, again, when you say pretty clear, I mean, we

20  certainly knew -- all the boards knew that it was a

21  possibility that TCEH would have to file for bankruptcy in

22  particular because -- I think Paul testified about this --

23  at the end of 2012, there was a risk that Deloitte, our

24  auditor, was going to give us a going concern opinion even

25  for 2013 based on projections for the end of 2013.  We dealt

1   with that issue through overriding means, did not get a

2   going concern opinion, so, you know, viewed ourselves as

3   having 2013 at least as a runway to figure out what our

4   options were.

5           And, again, all of 2013's discussions were focused

6   on the possibility but it wasn't an -- I would say it was a

7   possibility, not an inevitability that TCEH would file for

8   bankruptcy before October of 2014.

9   Q    Okay.  And when you say it was clear to you and clear

10  to the board, that would include these sponsor directors who

11  were on the board, right?

12  A    I don't think I said it was clear to --

13  Q    Okay.  Let me ask you that.  Was it also clear or did

14  you report to the board that you felt that it would be

15  necessary going forward to file for bankruptcy?

16          MR. MCGAAN:  Object, Your Honor, compound whether

17  it was clear other people and whether she reported

18  something.  It's two questions.

19          MR. SHEPPARD:  I'll rephrase, Your Honor.

20          THE COURT:  Be specific.

21  Q    Did you report, Ms. Doré, to the board in March of 2013

22  that you believe that the company should engage in at least

23  exchange of term sheets concerning a potential

24  restructuring?

25  A    Yes.  I mean, before March of 2013 because we had -- we

1    filed an 8K in April of 2013 disclosing that we had

2    restructuring discussions with the TCEH first lien

3    creditors.  So it was certainly the case that the board was

4    aware before March of 2013 or right around that time that

5    that was an option that TCEH needed to explore.

6              Again, the way I would put it is it wasn't that it

7    was clear we had to file, which is I think what you said.

8    It was this is a possible way to deal with the debt

9    maturity.  There could be other ways and other events could

10   intervene and change things but we wanted to be proactive

11   and looking at what our options were.

12   Q    And what was the genesis of this March 2013 term sheet?

13   Who prepared it?  Do you recall?

14   A    Now you're testing my memory.  I think it was probably

15   a combination of management, myself and Paul Keglevic.  At

16   that time, John Young, our CEO, was more actively involved

17   as well and board members and advisors.  I mean, I don't

18   think there was a single author of the term sheet.

19   Q    And would that include board members who were

20   affiliated with the sponsors?

21   A    I don't think any of the board members drafted the term

22   sheet but they certainly all saw it before we would share it

23   and that would have included sponsor board members.

24   Q    All right.  Let me -- can we pull up, please, the UCC

25   488?  It should be in the fat binder, the one that I put up

1    there.

2    A    Okay.

3    Q    Just let me know when you're there, Ms. Doré.

4    A    I'm there.

5    Q    You're ahead of me.  The UCC 488 is a restructuring

6    term sheet.  Do you recognize this document?

7    A    It's been a long time since I've seen it, but yes, I

8    recall seeing it at the time.

9    Q    Okay.  And to your recollection, is this really the

10   first term sheet to get circulated amongst the different

11   constituencies regarding a restructuring?

12   A    I'm really not sure.  There could have been earlier

13   ones.  I just don't recall.

14   Q    Pretty close to the beginning?

15   A    Should be pretty close to the beginning.

16   Q    Okay.  Good enough for me.  Why don't we turn then to

17   Page 5 of the document?  And if you look about 60% of the

18   way down of the page there's a box there, releases,

19   exculpations and injunctions.  Do you see that?

20   A    I do.

21   Q    Okay.  So one of the first term sheets, right, in this

22   case included a full release of the sponsors.  Isn't that

23   true?

24   A    Yes.

25   Q    Okay.  And this was in March of 2013?

1    A    Correct.

2    Q    Okay.  And you said that you didn't bring Sidley in to

3    do a review of the sponsor release issue until June of 2013.

4    Isn't that right?

5    A    That's correct.

6    Q    Okay.  You can take that one down.  And in each and

7    every iteration of any term sheet, Ms. Doré, that was

8    circulated from March of 2013 up until the current plan, was

9    there ever an iteration of it that did not include a full

10   release of the sponsors?

11   A    I am not aware of any restructuring proposal or term

12   sheet circulated by any constituent, debtors or otherwise,

13   that didn't have full global releases for the sponsors Ds

14   and Os and all of the creditors and estates.  So it wasn't

15   just the sponsors.  We always had, as I think any debtor

16   would, a goal of trying to achieve a plan that had global

17   consensus and also global resolution claims.

18   Q    I believe you testified on direct and I think it's also

19   in your written direct that you certainly were aware as you

20   approached the potential filing for bankruptcy that there

21   were likely to be claims made against the sponsors arising

22   out of the LBO and subsequent transactions.  Isn't that

23   true?

24   A    Yes.

25   Q    And you were aware specifically that those claims would

1  relate to not only the LBO but the amends and extends

2  transactions that you talked about earlier as well as the

3  management fees.  Isn't that right?

4  A    Yes.

5  Q    Okay.  So despite that awareness, every single term

6  sheet that EFH or that you were involved in as the co-CRO

7  had a full release of the sponsors, correct?

8  A    Yes, but I -- but awareness of claims doesn't have

9  anything to do with an evaluation of the merits of those

10  claims.

11  Q    Now, Mr. McGaan also showed you two litigation letters

12  that were served -- or not served, that were sent to your

13  counsel in April of 2015.  Do you recall that?

14  A    I do.

15  Q    And I believe they were Exhibits -- hang on a second --

16  558 and 559, DX 558 and 559.  I'm sorry, 598 and 599.

17            THE COURT:  Is there a question?

18            MR. SHEPPARD:  Yes, Your Honor, there is.

19  Q    Ms. Doré, these litigation letters laid out potential

20  claims by the T-side official committee and T unsecureds,

21  right -- the first one is the T official committee -- laid

22  out, specifically laid out the potential claims against the

23  sponsors.  Isn't that correct?  Can you go to Page 3,

24  please?

25  A    Yes.  I just want to clarify -- the only reason I

1    paused there is just I wanted to see exactly how they had

2    phrased it.  Again, this was part of our effort to have the

3    various parties, including the TCEH committee, the ad hoc

4    group and the EFH committee identify claims that they had

5    been investigating or had identified during the course of

6    their investigation.  It didn't necessarily say that they

7    were going to assert those claims.  It said these are the

8    claims that we may see standing to assert.

9            So in my view, that was an important distinction

10   because typically outside the restructuring context if a

11   party was going to assert a claim against us, you get a

12   demand letter.  It says this is our claim.  I viewed this as

13   we're trying to identify claims that might be asserted but

14   they had not yet brought these claims, other than the

15   standing complaint against the TCEH first liens.

16   Q    Okay.  Well, if you go to Page 5 of the letter, and

17   there's a section there called sponsor-oriented claims.  Do

18   you see that?

19   A    Yes.

20   Q    So these are claims that the committee was advising you

21   that it may seek standing (indiscernible).  Isn't that

22   right?

23   A    That's right.

24   Q    And I believe you testified earlier that you considered

25   these letters and these claims -- you had to take them

1    seriously, right?

2    A    Well, we -- of course.  We took seriously that they

3    might bring the claims.  I mean, ultimately, after their

4    entire investigation they didn't actually bring the claims.

5    They never sought standing to prosecute the sponsor claims

6    or tried to file an adversary complaint or anything of that

7    sort.  But we certainly took seriously all of the

8    allegations that the various parties were making and that's

9    why we spent so much time investing in both pre-petition and

10   post-petition investigating the claims ourselves and also

11   allowing full access by the creditors to do so.

12   Q    Okay.  In fact, that's why, Ms. Doré, that one of the

13   things that you did when you became general counsel was you

14   set up this group of non-sponsor directors, right?

15   A    Yes.

16   Q    And I believe you testified that that was made up of

17   those directors at EFH who were not affiliated with the

18   sponsors.  Is that correct?

19   A    At EFH, EFIH and TCEH who were not affiliated with

20   sponsors.

21   Q    Okay.  And up until that time, Ms. Doré, from October

22   of 2007 until I guess it was February of 2013 when you first

23   set up this ad hoc group of non-sponsor directors, there had

24   never been a group of non-sponsor directors that had met to

25   consider any issues that -- where there may have been

1    conflicts with the sponsors.  Isn't that true?

2    A    Well, I only became general counsel in March of 2012,

3    so I don't -- I can't really represent that beforehand.  I'm

4    not aware of any but I can't say for sure that something

5    wouldn't have occurred.  But certainly, yes, between March

6    of 2012 and February of 2013, I'm unaware of a meeting of

7    non-sponsor directors.

8    Q    If there had been such a meeting, would it have been

9    reflected in the minutes in 2007 forward?

10   A    If it were a formal meeting.  We did minute the non-

11   sponsor director meetings but we did also have various

12   update calls at different times with boards or subsets of

13   boards that were not minuted, so I can't really say for

14   sure.

15   Q    My question was more specific.  It was going back in

16   time.  And I understand it predates your ascension to

17   general counsel.  But you're unaware of any mechanism that

18   was in place at EFH to deal with conflicts that may arise

19   between the sponsors and EFH, isn't that true?

20   A    Well, that's a different question.  I mean, I think you

21   asked about non-sponsor meetings.  I'm unaware of any non-

22   sponsor meetings that took place prior to the ones that I

23   set up in February of 2013.  But there were mechanisms in

24   place before, during and after my -- well, my tenure's not

25   over yet but before and during my tenure to deal with

1     potential sponsor conflicts.  In fact, in our 10K every

2     year, we disclose affiliate transactions, which include

3     sometimes transactions with the sponsors.  I think you heard

4     Mr. Keglevic testify, for example, about financing fees.

5     And certainly those were presented to the board in a way

6     that allowed there to be full vetting of those potential

7     conflict issues.

8     Q     But you would agree with me that the sponsor directors

9     owe a fiduciary duty to EFH, right?

10    A     Absolutely.

11    Q     And they also owe a duty to their employers, you know,

12    the sponsors.  Isn't that true?

13    A     Yes.

14    Q     And apart from what you described that was revealed in

15    the 10K regarding the reporting of affiliated transactions,

16    you're unaware of any mechanism in place where the decision

17    making at EFH was separated if the sponsors had an interest

18    in any particular transaction.  Isn't that true?

19    A     When you say -- you mean where there were votes taken

20    that the sponsors didn't participate in?

21    Q     Yeah.  Let me give you a specific example.  A decision

22    to enter into a transaction in which Goldman Sachs was going

23    to receive transaction fees, right, there would be a

24    decision made at EFH whether to engage in that transaction.

25    Is that correct?

1          MR. MCGAAN:  Object, Your Honor.  Not clear if

2    it's a hypothetical or if he's referring to an actual event.

3          MR. SHEPPARD:  Well, I believe it's in the record,

4    Your Honor, that Goldman Sachs received transactional fees

5    but.

6          THE COURT:  Numerous times.  If you're going to

7    ask questions, I want you to be specific with the witness,

8    all right?  I mean, you're asking -- first of all, you're

9    asking her about stuff that happened before she was general

10   counsel, so.  If you're going to try to direct her to

11   something, I want you to be specific.

12         MR. SHEPPARD:  Yes, Your Honor.

13         THE COURT:  Or you can ask her a hypothetical if

14   you want.

15         MR. SHEPPARD:  Well, let's strike that last --

16   let's try as a hypothetical.

17   Q    Assuming that there were a transaction in which the

18   sponsor received transaction fees, was there any mechanism

19   in place prior to your setting up the non-sponsor director

20   meetings in place at EFH to address the issue of whether

21   that should be separately addressed by non-sponsor

22   directors?

23   A    Well, again, I can't speak prior to March of 2012 with

24   confidence.  I would be speculating.  What I do know is that

25   there were occasions in which sponsor transactions like a

1    financing fee were presented to the board of EFH and there

2    were certain sponsor directors who would recuse themselves.

3    So yes, I think there was a mechanism in place to ensure

4    that those decisions were made properly.

5    Q    Okay.  But there wasn't a mechanism where the sponsor,

6    where the non-sponsor directors met separately to make those

7    decisions.  Isn't that true?

8    A    I'm unaware between March of 2012 and February 2013 of

9    that taking place.

10   Q    And are you aware of it taking place prior to that

11   time?

12   A    I am not aware that it did and I'm not aware that it

13   didn't.  I mean, I just don't know.

14   Q    I understand.  And if you go back to the litigation

15   letters that we were talking about earlier, each and every

16   one of the transactions that were complained of in those

17   letters occurred prior to your setting up the non-sponsor

18   director meetings.  Isn't that true?

19   A    You're talking about the litigation letters from the T-

20   side?

21   Q    Yes.

22   A    Yes, I think that's right.  My only -- my hesitation is

23   there was a transaction which is really an intercreditor

24   issue on the T-side regarding a revolver extension that was

25   in early 2013 that had been the subject of some dispute.

1    And so that would have been right around the time we started

2    having non-sponsor.  But I don't know if that's mentioned in

3    the litigation letters.

4    Q    Okay.  Was that transaction put to the non-sponsor

5    director committee?

6    A    I can't remember.  The minutes would reflect if it was.

7    Q    Not, Ms. Doré, the non-sponsor director meetings that

8    you started in February 2013, there were minutes kept for

9    those meetings, right?

10   A    Yes.

11   Q    Okay.  But you testified that there was no formal

12   delegation of authority to this group.  Isn't that correct?

13   A    That's correct.

14   Q    Okay.  So that while they were meeting and considering

15   these various questions concerning potential conflicts with

16   the sponsors, they had no authority to act, did they?

17   A    Well, I think what I testified this morning is they

18   certainly had no formal delegation of authority but in my

19   view they had de facto authority because, in fact, they did

20   make a decision with respect to the Sidley presentation as a

21   body of non-sponsor directors even absent the formal

22   delegation authority.

23   Q    Okay.  And as the chief counsel and in connection with

24   your allegation for compliance, you believe that it's the

25   board governance that have de facto authority delegated to a

1   committee?

2   A     I did believe it was good board governance at that

3   time.

4   Q     But subsequent to that, when it came time to set up the

5   disinterested directors, there was a formal delegation,

6   wasn't there?

7   A     Yes.

8   Q     Okay.  All right.  So that was different than what you

9   did with the non-sponsor directors, right?

10  A     That's correct.

11  Q     Okay.  And then again, in April of 2015, when you set

12  up this special committee, there was a formal delegation by

13  the board.  Isn't that right?

14  A     Yes.  I think what happened over time is natural for it

15  to happen this way is as the scrutiny increased and, you

16  know, some of the claims from creditors became clear, we

17  just continued -- our governance process continued to evolve

18  and we continued to try to think of ways to improve it.  So,

19  you know, we started very early in the process separating

20  the non-sponsor directors.  Then we went to the measure of

21  separating even further into disinterested directors who

22  were not serving on overlapping boards.  Then we did the

23  delegation of authority for conflict matters and engagement

24  of independent counsel.  So we just continued to add more

25  and more process to the process, so to speak.

Page 185

1   Q    I'd say let's kind of just walk through that process

2   real quickly if we can.  The non-sponsor directors, the ad

3   hoc group, when they were considering releasing the

4   sponsors, they were considering that in connection with

5   releases that would be part of a plan of reorganization,

6   correct?

7   A    Well, I think you might be confused because --

8   Q    Wouldn't be the first time, Ms. Doré.

9   A    Sorry.  But I just want to make sure that the record is

10  clear.  So the non-sponsor directors didn't consider

11  releases.  The disinterested directors in April of 2014

12  considered sponsor releases as part of the RSA.  Then later

13  in 2015, in April of 2015, the special committees were

14  appointed, which consisted both of disinterested directors

15  and also non-sponsor directors and they considered releases

16  that went into the plan that we filed in April.  So I know

17  that's confusing because we kind of moved the process

18  around.  But there were different groups at different times

19  who were considering the sponsor releases.

20  Q    So the non-sponsor directors never formally considered

21  any release of the sponsors.  They just simply received the

22  information from the review by Sidley.

23  A    They received the information from the review by Sidley

24  and they made a decision as to whether or not to file for

25  bankruptcy in October of 2013.

1    Q    Okay.  Sidley -- you said the Sidley review began in

2    June and it continued until October.  Is that right?

3    A    Yes.

4    Q    And there were a couple of meetings between June and

5    October.  Isn't that correct?

6    A    Correct.

7    Q    There was, in fact, a board meeting on October 9th,

8    2013, I believe.  Isn't that correct?

9    A    I'm not sure.

10   Q    Okay.  Then why don't we turn to -- I'm sorry, Ms.

11   Doré.  I lost my space.  What's the October 9th joint

12   meeting?  I'm sorry, what number?  521?  Thank you.  It's

13   UCC 521.

14   A    Okay.  Give me just a second.

15   Q    Take your time.

16   A    521?  Yes, sorry.  I see it.

17   Q    All right.  And these are the minutes October 9th of

18   the joint board meeting of all the different EFH entities,

19   right?

20           THE COURT:  Mine's dated February 7th.

21           MR. SHEPPARD:  Did I get the number wrong?  Oh,

22   Page 2.  I'm sorry, Page 2.  I apologize.  I'm missing the

23   front page, Your Honor.

24           MS. DORÉ:  So just to explain, Your Honor, I think

25   what's happening here is these minutes were probably on the

1    board agenda for approval in February.

2            THE COURT:  I understand.  Okay.

3    Q    Yeah, so focusing on the board minutes of October 9th.

4    A    Yes.

5    Q    This is the meeting, right, where the joint boards of

6    all of the entities decide not to file for bankruptcy,

7    right?  Is that correct?

8    A    No.  This was the meeting at which the -- I and the

9    non-sponsor directors reported to the full board what they

10   had determined as a result of the Sidley review.

11   Q    And you brought in Sidley because, as you said, you

12   were concerned that the statute of limitations on a six-year

13   statute may run on October 10th, 2013 I guess, right?

14   A    Well, I personally wasn't concerned about the six-year

15   statute of limitations but we understood that there might be

16   parties who would argue that that statute applied and we

17   just wanted to, out of an abundance of caution, have the

18   board be informed about that.  And it also gave us a chance

19   to have the independent investigation of sponsor claims,

20   which was broader than just analyzing the statute of

21   limitations issue but was also intended to inform all of the

22   boards about potential claims they might have going forward

23   even against the sponsors.

24   Q    All right.  And this meeting involves all of the board

25   members including the sponsor board members, right?

1   A    Correct.

2   Q    Okay.  And at that meeting, though it's heavily

3   redacted, it appears that you're reporting to the board on

4   the review that was done by Sidley Austin.  Isn't that

5   correct?

6   A    It appears that way.  I mean, it's hard to tell from

7   the redaction but at least I know that I was reporting on

8   the results of the review and the non-sponsor directors'

9   decision as a result of that.

10  Q    Okay.  But here you're reporting it to all the

11  directors, including the sponsor directors, correct?

12  A    Yes.

13  Q    And you would agree with me that it would take the full

14  board to make a decision whether to file for bankruptcy.

15  Isn't that true?

16  A    At that point in time, it would have taken the full

17  board to make that decision but if there had been -- and we

18  had discusses this actually -- if there had been a

19  disagreement between the non-sponsor directors who had

20  considered the Sidley information and the full board as to

21  whether to file for bankruptcy, then there certainly would

22  have been a mechanism through setting up the special

23  committee and delegating that authority that we could have

24  used to resolve that disagreement.

25  Q    And that disagreement would have arisen at this October

Page 189

1    9th meeting, right?

2    A    If there were a --

3    Q    If there were, (indiscernible).

4    A    But there wasn't.

5    Q    Okay.  And the statute of limitations was going to run

6    the very next day.  Is that right?

7    A    That --

8    Q    Assuming there was a six-year statute.

9    A    I think that's right, yes.

10   Q    Right.  Now, let me get back then to the releases if I

11   can.  We talked about a term sheet back in March of 2013

12   that included full releases of the sponsors, correct?  And

13   then you testified that there was a release in connection

14   with the restructuring agreement, is that right, the RSA?

15   A    Correct.

16   Q    Okay.  And those releases were within a plan of

17   reorganization, were they not?

18   A    You know what?  I actually can't remember if we

19   actually filed a plan.  I don't think we did.  I think we

20   only filed the restructure and support agreement, so the

21   releases were in -- what it was was it was a restructure and

22   support agreement that essentially like the PSA we have now

23   that obligated the parties to support a plan that had

24   releases in it.  But I don't remember that we actually filed

25   a plan.  I don't think we did.

1    Q     Let me try it a little differently.  That the LSA

2    contemplate -- contemplated the filing of a plan that

3    included releases of the sponsors within the plan.  Is that

4    correct?

5    A     Correct.

6    Q     It didn't contemplate a separate set on an agreement on

7    a 9019, did it?

8    A     It did not.

9    Q     Okay.  And that to the extent you testified before that

10   the -- that this non-sponsor committee reviewed the releases

11   in the RSA -- or was that the special committee?

12   A     No, that was the disinterested directors.

13   Q     Okay.  The disinterested directors?

14   A     Yes.

15   Q     Okay, because I get confused, too.  So the

16   disinterested directors when they approved the release of

17   the sponsors, they were releases that were contemplated as

18   being within a plan of reorganization, right?

19   A     Yes.  Well, they were -- again, it was the Debtors were

20   being asked -- it was being proposed that the Debtors sign

21   up to a restructuring support agreement that bound all of

22   the parties to the RSA to support a plan with releases.  So

23   that was the question that the disinterested directors

24   received advice on and made a decision on prior to filing

25   for bankruptcy.

1    Q    Okay.  In your direct testimony, it looks like at

2    Paragraph 37, is that where you're talking about the

3    disinterested directors approving the settlement.  I'm

4    sorry, Paragraph 41, Ms. Doré.

5    A    Okay, no.  So this is the special committee, which is

6    in 2015.  The RSA was in 2014.  The RSA releases were

7    decided by the disinterested directors.  The special

8    committee decided the sponsors is in 2015 in connection with

9    the plan that we filed.

10   Q    All right, so just sticking with the RSA if we can, the

11   point I'm trying to get at is that the releases that they

12   approved were not separate as part of the settlement

13   agreement.  They were in a plan of reorganization, right, or

14   would have been had the RSA gone forward?

15   A    Yeah.  I don't want to quibble but they were in an RSA

16   that bound the parties to support a plan that had releases.

17   And the only reason I'm saying that's important is because

18   the RSA had to be approved by the court.  So and ultimately

19   it wasn't and we never did file a plan.  So certainly they

20   signed up to sponsor releases that would have been in a plan

21   of reorganization.  They agreed to file that kind of plan.

22   Q    And the plan itself, either the confirmation of the

23   plan or the consummation of the plan was not contingent upon

24   approval of those releases were they?

25   A    The plan was not contingent?  Well, we never filed the

1    plan.

2    Q    Right, if one had been filed.

3         MR. MCGAAN:  Your Honor, I'm not sure -- I think

4    that calls for speculation.  He hasn't established that the

5    RSA spelled that out.  Maybe it did; maybe it didn't.  But

6    she keeps correcting him about what was being approved in

7    the spring of 2014.

8         MR. SHEPPARD:  Your Honor, I'll move on.

9    Q    Let's move up to then April of 2015.

10   A    Okay.

11   Q    You testified that at this point you set up what was

12   called a special committee, right?

13   A    Correct.

14   Q    And that special committee was set up separate from the

15   non-sponsor directors group.  Is that right?

16   A    Yes, and separate from the disinterested directors.

17   Q    Okay.  And the reason for that was that you felt that

18   it was necessary at this point to have that formal

19   delegation to a special committee.  Isn't that true?

20   A    We thought that it was prudent.  Again, we continued to

21   try to take steps to make sure that our process was

22   unassailable.  And so anytime we could find a way out of an

23   abundance of caution to add process, we did.  We had a lot

24   of process.

25   Q    Okay.  And do you recall who suggested that perhaps

1   there should be a formal delegation?  Was that your idea?

2   A    I really don't remember.  I know it was a discussion

3   between myself and Kirkland.  I just don't remember who

4   first suggested it.

5   Q    Do you recall whether or not counsel for the sponsors

6   was involved in that conversation?

7   A    Yes.  I think we did discuss with them the process that

8   we planned to go through.

9   Q    Okay.  And in fact, it was the sponsors who preferred

10  that there be a specific delegation, correct?

11  A    Well, I just -- I think we probably recommended it and

12  they said, yes, that sounds good.

13  Q    Okay.  Why don't we go to UCC 146?

14  A    146?

15  Q    Yes, 146.  All right.  This is an email chain, Ms.

16  Doré.  I will represent to you you're not on it.  So let me

17  ask you first have you ever seen this document before?

18  A    No.

19  Q    Okay.  Though you are aware, I believe, that you

20  testified there were discussions between your counsel and

21  sponsors' counsel regarding this process, correct?

22  A    Yes.

23  Q    Okay.  And if you go down to the bottom of the first

24  page, there's an email from Mr. Kleinhaus to Mr. McKane with

25  a copy to Mr. Mason where Mr. Kleinhaus is saying that his

1    clients do prefer "delegating authority to approve the

2    sponsor releases (rather than having a court report

3    recommendation)".  Do you see that?

4    A    I do see it.

5    Q    Okay.  And is that consistent with your recollection

6    regarding counsel for the sponsors' involvement in this

7    process?

8    A    Well, if you read the first sentence it says from Emil

9    who is the sponsors' counsel.  I think you'll hear tomorrow

10   that our clients, who are the sponsors, are generally

11   comfortable with the thoughtful approach you outlined.  So I

12   think that's consistent with what I testified that we laid

13   out, Kirkland laid out an approach. Wachtell is responding

14   that they are comfortable with that and there's obviously

15   been a discussion of delegation versus report and

16   recommendation and I think Wachtell was saying we're fine

17   with the delegation approach you recommended.

18   Q    Can you tell me why counsel for the sponsors would be

19   involved in an internal governance question regarding how to

20   set up a subcommittee on the board of EFH?

21   A    Because they represented the sponsors and the sponsors

22   were being the subject of the release and we wanted to make

23   sure that we had a process in place that they didn't object

24   to or at least, you know, that we had the benefit of their

25   thoughts on if they might have had some suggestion about how

Page 195

1    to do it even better.

2    Q    So whatever process you came up with, the sponsors were

3    going to have to agree to?

4              MR. MCGAAN:  Objection, Your Honor.

5    Mischaracterization.

6              THE COURT:  That's not what -- that's not what she

7    said.  Don't be cute.

8    Q    When is the first time, Ms. Doré, that you recall

9    discussing releases outside of a plan of reorganization as a

10   plan of settlement agreement?

11   A    I think it would have been -- well, actually, in

12   connection with this transaction, I think it was July of

13   2015 but we had actually had discussions with the TCEH first

14   lien creditors very early in the process, sometime for sure

15   in 2014 regarding the concept of a 9019 settlement and there

16   was a lot of discussion around the benefits of trying to

17   settle both intercompany and interdebtor estates -- I'm

18   sorry, claims, through a 9019 process.  So that had really

19   been an ongoing discussion.  In the context of this specific

20   transaction I think we stated to discuss the separation of

21   the settlement agreement from the plan in July.

22   Q    Okay.  So if you look down, pull up the Demonstrative

23   Doré 1, which is the timeline.

24             THE COURT:  Ms. Doré, do you need a break?

25             MS. DORÉ:  No, I'm okay.

```
 1              THE COURT:  Okay.

 2              MS. DORÉ:  Thank you.

 3              MR. SHEPPARD:  I'm happy to take a short break,

 4   Your Honor.

 5              THE COURT:  She's fine.  Do you -- would you like

 6   one, Mr. Sheppard?

 7              MR. SHEPPARD:  No.

 8              THE COURT:  Okay.  We're good.  I'm good.

 9              MR. SHEPPARD:  If she wanted a break, I was happy

10   to take one.

11              THE COURT:  I understand.  That's very kind of

12   you.  Thank you.

13              MS. DORÉ:  Thank you.

14   Q    Okay, Ms. Doré, in terms of the timeline that Mr.

15   McGaan showed you, first time you said you were discussing

16   this particular plan with the releases outside of the plan.

17   And you said it was July.  Is that right?

18   A    That's the first time I recall, in this transaction,

19   discussion, yes.  But as I said, we've had discussions

20   before about the possibility of a 9019 settlement --

21   Q    Okay.

22   A    -- on various claims.

23   Q    All right.  And so just so that I'm clear, when the

24   special committee approved the releases and April of 2015,

25   they were approving releases that would -- were contemplated
```

1    to be part of a plan of reorganization, correct?

2    A    Yes.

3    Q    And in fact, that was the plan that was circulated.

4    That was the first amended plan.  Is that right?

5    A    I can't remember if it was the plan and then the first

6    amended, but yes.  I mean, it was the plan we circulated in

7    April.

8    Q    And this thoughtful process of delegating this

9    authority to the special committee, that was important,

10   right?

11   A    Yes.

12   Q    Okay.  So the special committee never met again after

13   April.  Isn't that true, Ms. Doré?

14   A    That's true.

15   Q    Okay.  And in fact when the current plan that's up for

16   confirmation -- or not this plan.  Actually, when the third

17   amended plan was put out, that was approved by the full

18   board.  Isn't that true?

19   A    Well, it was ultimately approved by the full board, but

20   the disinterested directors met prior to the board meeting

21   to consider the plan both in the context of -- to consider

22   the plan, the settlement agreement, and the merger

23   agreement, one reason being that the settlement agreement

24   incorporated the DD settlement or large parts of it, so they

25   considered that.

1    Q    Mm hmm.

2    A    And then they also considered the entire plan and deal

3    structure to the extent that it involved any conflicts, and

4    they approved it on that basis.  There are resolutions from

5    the disinterested directors approving it first.

6    Q    Yeah.

7    A    Then it went to the full board, and the disinterested

8    directors recommended that the full board approve it.

9    Q    Okay.  And the releases in that plan included releases

10   of the sponsors.  Isn't that true?

11   A    That is true.

12   Q    Okay.

13   A    Well, in the settlement agreement

14   Q    Right.  And so the special committee that you had set

15   up specifically and delegated the authority to back in April

16   never approved the releases that were approved in August.

17   Is that right?

18   A    That's true, but the releases that are contained in the

19   settlement agreement as they relate to the sponsor are the

20   same, releasing the same claims, so there were no new facts

21   between April of 2015 and August of 2015 that had given rise

22   to either additional sponsor claims or a change in the view

23   of those sponsor claims.  So the information that the

24   special committee had used in April of 2015 to approve

25   sponsor releases was the same in August.  There was no

1   reason for them to meet again.

2   Q    But the structure of the deal was completely different.

3   Isn't that true?

4   A    The releases had -- were now contained in the

5   settlement agreement as opposed to the plan.

6   Q    And that the plan itself was contingent upon approval

7   of those releases.  Isn't that correct?

8   A    The plan is contingent on the approval of the

9   settlement agreement, yes.

10  Q    And that was not with a special committee approved back

11  in April.  Isn't that true?

12  A    Well, but when the special committee approved the plan,

13  the releases in the plan in April, the plan had the releases

14  in it.  So if the plan wasn't confir-, was confirmed then

15  the releases were going to be in there.  So I don't really

16  understand that distinction.

17  Q    All right.  Ms. Doré, one last set of questions.  The

18  releases that were approved in April, they were approved

19  first by the special Committee for EFH, correct?

20  A    Yes, I think EFH's special committee met first, and

21  then TCEH's special committee met.

22  Q    Okay.  Okay.  And they each approved the releases of

23  the sponsors.  Isn't that true?

24  A    Correct.

25  Q    And they approved specific language.  Isn't that true?

1   A    Yes, I think they approved the release language.

2   Q    Okay.  But then you had to go back to the special

3   Committee for EFH on April 10th.  Isn't that true?

4   A    Yes.

5   Q    Okay.  And the reason you had to go back on April 10th

6   was because the release line was changed.  Isn't that true?

7   A    Yes.

8   Q    Okay.  It got broader, didn't it?

9   A    I actually don't remember what the change was.  If you

10  can point me to the different resolutions, that would help

11  me.

12  Q    Okay.

13  A    But there was a change.  I just don't remember exactly

14  what --

15  Q    Exhibit 153, please.  Page 21.

16         THE COURT:  Oh, I'm sorry.  We need to -- we need

17  -- we can wait?  Okay.  We're gonna need to take a break

18  after Mr. Sheppard's done.  We have a technical problem.

19         MR. SHEPPARD:  Your Honor, this is actually the

20  last two questions I've got.

21         THE COURT:   Okay.

22         MAN:  What page are we on?

23         MR. SHEPPARD:  Page 21.

24         MAN:  Right.

25         MR. SHEPPARD:  Hand it -- page 21?  I'm trying to

1    catch up to you, Ms. Doré.

2              MS. DORÉ:  Okay.  I'm with you.

3    Q    All right.  So is this the black line that was prepared

4    by Kirkland in connection with the change to their releases

5    that was approved on April 10th?

6    A    Yes.

7    Q    Okay.  And the change was to remove the language that's

8    stricken there.  Isn't that true?

9    A    Yes.

10   Q    Okay.  And that language that was stricken would have

11   carved out of any release, right, any actions that the

12   sponsors may have engaged in that constituted actual fraud,

13   willful misconduct, or gross negligence.  Isn't that

14   correct?

15   A    Yes.

16   Q    Okay.  So you had them approve the release on April

17   7th.  You had TCEH's special committee approval on April

18   9th, and then you come back on the 10th with a change where

19   you make it broader.  And, and exculping -- exculpating

20   fraud and willful misconduct.  Is that correct?

21   A    Yes, but the TCEH board had approved once and only once

22   the language that included the -- well, the language that

23   didn't include this stricken language.  So the TCEH board

24   had considered the language without the part that is

25   stricken and approved it that way.  And so we went back to

1    the EFH board and recommended that they approve language

2    that was consistent with what the TCEH board had already

3    approved.

4    Q    Okay.  And do you know who recommended that change, Ms.

5    Doré?

6    A    I think it was collectively Kirkland and myself

7    recommended it.

8    Q    Okay.  And you approved it.

9    A    Well, I'm not on the board, but I recommended --

10   Q    Oh, you recommended it?

11   A    -- that the board approve it.

12   Q    Okay.  Are such releases standard in these types of

13   cases, Ms. Doré, to your knowledge?

14   A    What kind of releases?

15   Q    Releases that exculpate willful misconduct, fraud, and

16   gross negligence.

17   A    I don't know.

18   Q    Okay.

19            MR. SHEPPARD:  I have nothing further, Your Honor.

20            THE COURT:  All right.  Thank you, Mr. Sheppard.

21   Is anyone else gonna want to cross-examine Ms. Doré?  Mr.

22   Schepacarter is.

23            MR. SCHEPACARTER:  Yes, Your Honor, I have, like,

24   five or six --

25            THE COURT:  Okay.

1          MR. SCHEPACARTER:  -- maybe seven questions.

2          THE COURT:  All right, we do need -- we do need to

3     take a recess.  We're having a technical problem.  So take a

4     short recess.  As soon as we have that resolved, we'll

5     reconvene.

6          (Recess)

7          CLERK:  All rise.

8          THE COURT:  Please be seated.  Excuse me.  Proceed

9     --

10          MR. SCHEPACARTER:  Thank you, Your Honor.

11          THE COURT:  -- Mr. Schepacarter.

12                    CROSS-EXAMINATION

13     BY MR. SCHEPACARTER:

14     Q    Good afternoon, Ms. Doré.  Richard Schepacarter for the

15     United States Trustee.

16     A    Good afternoon, Mr. Schepacarter.

17     Q    I am gonna -- I'm gonna make you happy 'cause I only

18     have a few questions, and hopefully we can resolve your

19     examination today.  I wanted -- I just want to direct you to

20     the written direct testimony that you had given today, and

21     that document starts with -- I guess it's Page 21, and it's

22     Section 4, Paragraph -- starts with Paragraph 48.  And on

23     Paragraph 50 -- are they -- are you --

24     A    Yes, I'm there.

25     Q    Okay, sorry.  I'm not trying to rush you.  In that

1    paragraph, it indicates that the Debtor has heavily

2    negotiated the fee provisions, correct?

3    A    Correct.

4    Q    Okay.  And the fee provisions that ended up either in -

5    - either/and in both the plan and the settlement agreement,

6    specifically Section 2.7 of the settlement agreement were as

7    a result of those negotiations, correct?

8    A    Yes.

9    Q    Okay.  And to turn you to, I think it's Paragraph 53,

10   the amount that's referenced there on -- and I know you know

11   this -- the $49.75 million.  That came from the other side

12   of the table.  Correct?

13   A    Yes, that came from the junior creditors at TCEH.

14   Q    Okay.  And the fee payments that are referenced in here

15   are a part of, like, the overall disarmament or overall deal

16   that's been struck, and that's reflected in both the plan

17   and the settlement agreement.

18   A    Yes.

19   Q    Correct?  Okay.  And today the Debtors have been

20   reviewing the fees in this case, specifically the fee

21   applications that have been filed.  You have a team that

22   reviews those fee applications, a member that's been

23   appointed to the fee review committee, and you review those

24   fees for reasonableness, correct, among other things?

25   A    We do, and I have a team of one who does that.

```
 1    Q    Oh.

 2    A    She's in the courtroom, and she works very hard on

 3    that.

 4    Q    And she is a -- she's a very admirable team of one too.

 5    I'll agree to that.

 6    A    Thank you.

 7    Q    I will stipulate to that.  And the fees are

 8    contemplated to be paid either under the plan or the

 9    settlement agreement.  They will be reviewed in the same

10    fashion that has been ongoing in this case, correct?

11    A    Yes.

12    Q    Okay.

13             MR. SCHEPACARTER:  Okay.  Your Honor, I don't have

14    any further questions.  Thank you.  Thank you, Ms. Doré.

15             MS. DORÉ:  Thank you.

16             THE COURT:  Thank you, Mr. Schepacarter.  Does

17    anyone else wish to cross-examine the witness?  Of course,

18    we've reserved Mr. Anker and Mr. Horowitz's rights till

19    tomorrow.  Okay.  Do you want to redirect before you've

20    finished cross?  I don't mind.  It's really your call.

21             MR. MCGAAN:  I would, Your Honor, because there

22    may not -- I'm not gonna be touching on issues that are of

23    interest to Mr. Anker and Mr. Horowitz.  So if the rest of

24    the cross is done, I'd like to do a brief redirect now --

25             THE COURT:  Okay.
```

1        MR. MCGAAN:  -- just to see whether we even need

2  to proceed.  And if it's all right with Your Honor, if we

3  get to tomorrow and they've got some cross on their issues,

4  and reserve the right simply to redirect on that if

5  necessary.

6        THE COURT:  Okay.

7        MR. MCGAAN:  All right.

8                  REDIRECT EXAMINATION

9  BY MR. MCGAAN:

10  Q    Andrew McGaan for the Debtors.  Good afternoon, Ms.

11  Doré.

12  A    Good afternoon.

13  Q    Almost through.  At a couple of points during your

14  cross-examination, you were asked about the disinterested

15  directors' approval of the third amended plan and the

16  settlement agreement and the other deal documents.  In fact

17  moments ago, with respect to Mr. Sheppard's question, I

18  think you were talking about that yet again.  Right?

19  A    Yes.

20  Q    And you mentioned that there were resolutions

21  documenting what steps and approvals the disinterested

22  directors took.

23  A    Yes.

24  Q    I'd like to show those to you.

25        MR. MCGAAN:  May I approach, Your Honor?

1           THE COURT:  Yes.  Thank you.

2    Q    I'd like to begin, Ms. Doré, if you turn to DX 302.

3    You there?

4    A    Yes.

5    Q    And this is a document entitled minutes of a meeting of

6    the disinterested directors of Energy Future Holdings

7    Corporation, correct?

8    A    Correct.

9    Q    August 9, 2015.

10   A    Yes.

11   Q    All right.  And it identifies the EFH disinterested

12   directors present at this meeting.

13   A    Yes.

14   Q    And representatives of Proskauer and Solic.

15   A    Yes.

16   Q    And those are among the DDAs you referred to earlier.

17   A    Correct.

18   Q    All right.  And if you look down on the bottom of the

19   first page continuing over to the second page, it reflects

20   the proposed deal documents, related plan documents that

21   were reviewed by this -- at this meeting.

22   A    Yes.

23   Q    All right.  Then I want to draw your attention on Page

24   2 to the paragraph at the bottom as the second order of

25   business.

1    A    Okay.

2    Q    And are you familiar with these resolutions?  You've

3    seen them?

4    A    I've seen them -- yes, I saw them after the fact, but -

5    -

6    Q    Right.

7    A    -- I have seen them before.

8    Q    And Mr. Thomas, do you know who that refers to?

9    A    Yes, that's Mark Thomas of Proskauer.

10   Q    All right.  And what is he -- what do these resolutions

11   reflect that he's reporting to the disinterested directors

12   at EFH?

13   A    He reported that the disinterested directors at EFIH

14   and TCEH had already approved all these plan documents

15   insofar as they relate to conflict matters at meetings that

16   had been held earlier in this day.

17   Q    All right.  And if you look then at -- what follows is

18   a series over the course of about three pages, a series of

19   whereas clauses.  And my question is just generally, do the

20   whereas clauses recount the appointment of the disinterested

21   directors, the retention of the DDAs, and the delegation of

22   authority to them that you've testified about in detail here

23   today?

24   A    Yes, they do.

25   Q    Okay.  And then let's go to Page 5.  And there is, at

1    the bottom, beginning, "Now therefore," those two

2    paragraphs, if you could pull those out.

3    A    Right.

4    Q    And this reflects the resolution in this case taken by

5    the disinterested directors at EFH with respect to these

6    referred amended plan and the related documents set forth in

7    the resolution, correct?

8    A    Yes, it shows, as I testified earlier, that they -- the

9    disinterested directors at EFH approved all of the plan

10   documents insofar as they relate to conflict matters.

11   Q    And what did you understand that to mean when you saw

12   that they had adopted -- the DDs at EFH had adopted a

13   resolution approving the plan documents as defined here in

14   this exhibit as they relate to conflict matters.  What did

15   you understand that to mean?

16   A    Well, what I understood that to mean was that it's

17   difficult when you're going through literally hundreds of

18   pages of plan settlement merger agreement documents to parse

19   very finely every specific issue that somebody might argue

20   is a conflict matter.  So out of an abundance of caution, I

21   believe the disinterested directors decided rather than do

22   that, they would simply approve the entire deal as if it

23   were a conflict matter without having to make that

24   determination with respect to every specific issue.  They'd

25   obviously already determined that the intercompany

Page 210

1    settlement was a conflict matter, but they also just went

2    ahead and approved the entire deal insofar as it might raise

3    other conflict matters.

4    Q    When in time did this approval occur with respect to

5    the full board considering and then voting to approve the

6    plan documents?

7    A    Prior to the full board meetings.

8    Q    And you testified on cross that there was a report made

9    at the full board meetings about what the disinterested

10   directors had done earlier.  True?

11   A    Yes.

12   Q    Okay.  And does this resolution in DX 302 reflect in

13   substance the report that was given to the full board about

14   the actions of the DDs?

15   A    Yes, each of the different disinterested directors and

16   their advisors reported to the three boards that the

17   disinterested directors had met earlier in the day and had

18   considered all of the deal documents, insofar as they

19   related to conflict matters, and had approved them and

20   recommended that the full board also approve them.

21   Q    And then very quickly, Ms. Doré, if you turn to DX 46,

22   another exhibit I've handed to you, are these the minutes

23   from the same day of a board meeting of the disinterested

24   director at EFIH?

25   A    Yes.

1    Q    If you turn to Page 3 of this exhibit, is the identical

2    or a substantially similar resolution adopted by the

3    disinterested director at EFIH?

4    A    Yes, it's somewhat longer resolution, but the key part

5    is in the first resolved clause that the company hereby

6    approves, meaning EFIH, and on behalf of EFIH, the

7    disinterested director approves --

8    Q    Okay.

9    A    -- the documents insofar as they relate to conflict

10   matters.

11   Q    All right.  And on the front of this resolution, it

12   shows that along with Mr. Cremens, the disinterested

13   director at EFIH, who was -- who in general is present there

14   at the meeting.

15   A    It was Mr. Cremens's counsel disinterested director

16   advisers from Jenner, Cravath, and the financial advisers

17   from Golden.

18   Q    And then lastly if you would turn to DX 74R from the

19   same day, August 9, 2015.  Is this a resolution document and

20   actions taken by the disinterested director at EFCH and

21   TCEH?

22   A    Yes.

23   Q    Who is -- that's Mr. Sawyer?

24   A    That is Mr. Sawyer.

25   Q    Who was present at this meeting with him?

1    A    The TCEH disinterested director advisers from Munger

2    Tolles and Greenhill.

3    Q    And then lastly with this exhibit, if you'll turn to

4    Page 4, will you confirm whether in the resolution reflected

5    here in the exhibit, EFCH and TCEH came to the same

6    conclusion as you described that the disinterested directors

7    at EFH came to that day?

8    A    Yes, Mr. Sawyer resolved that he would approve the

9    documents on behalf of EFCH and TCEH to the extent of any

10   conflict matters.

11   Q    Okay.  Thank you.  You can set that aside.  You were

12   asked a number of questions about whether the plan that's

13   now before the Court is dependent upon -- conditioned on

14   approval of the settlement agreement.  Do you recall the

15   generally?

16   A    Yes.

17   Q    Were you -- do you believe the Debtors are capable of

18   restructuring the E-side of the business under any scenario

19   that paid the E-side creditors in full without the support

20   of the TCEH first lien Creditors?

21   A    No.

22   Q    Why is that?

23   A    Because again, the -- all of the TCEH creditors had

24   long taken the position that -- on a couple of issues: one,

25   that they were a creditor at EFH, and so their claim had to

1    be resolved in some fashion in order for EFH to be

2    reorganized in EFIH.  And in addition to that, because of

3    the tax liabilities that could occur from a taxable

4    transaction, in order to reorganize EFH in a tax-free

5    manner, the consent of the TCEH first liens was required to

6    a tax-free spin at TCEH.

7             And as we've heard much about, there could be a

8    debate about the amount of tax liability, the level of risk,

9    but there was no debate that, you know, there was a risk to

10   EFH at all times of a tax liability from a taxable

11   transaction, and that a taxable transaction at TCEH made it

12   impossible -- practically impossible to do a REIT

13   transaction at EFH.

14   Q    Before the REIT transaction that we've been talking

15   about in these proceedings came together, had a plan been

16   put in front of you that would've offered the opportunity to

17   pay the E-side creditors in full?

18   A    No.  I think the -- even before NextEra dropped its

19   bid, I think the -- at EFH, there would've been impairment

20   under those bids, depending on your assumptions about the

21   make wholes and post-petition interests, but it was a razor

22   thin margin of error in those bids.

23   Q    You were asked questions about your testimony on direct

24   about the burn rate, the cost for paying professionals in

25   this case as well as interest and adequate protection

1    payments.  Remember that?

2    A    Yes.

3    Q    And you were asked then on cross about whether those

4    payments would continue for whatever time it took to find

5    out whether the proposed merger here closed, correct?

6    A    Yes.

7    Q    And if it failed to close, whether one moved to a plan

8    B or the alternate transaction, whether those payments would

9    continue for whatever time that would take, right?

10   A    Yes.

11   Q    Has the creditors from the E-side proposed to you a

12   quicker and faster way to get these companies out of

13   bankruptcy and cut off those expenses?

14   A    No, they haven't.  And in fact, we negotiated hard, and

15   it was a hard fought negotiation, but we did negotiate and

16   obtain the ability in the current plan to have negotiations

17   that about a backup plan with the E-side creditors.  And

18   once again, even during this period, we haven't received any

19   indications of interest from those creditors in negotiating

20   a backup plan.

21   Q    So under the plan documents that are now before the

22   court, specifically the plan of reorganization and the

23   settlement agreement, you're saying the Debtors have the

24   right to negotiate the terms of the plan B or the alternate

25   transaction right now.

1    A    Yes, that was very important to me personally because -

2    -

3    Q    Why?

4    A    -- I wanted the ability to pivot quickly if this plan

5    didn't close.  No one wants to spend another year in

6    bankruptcy if this plan fails to close, and I have every

7    confidence that it will close, but again, just from a

8    prudent planning standpoint, I wanted the ability for us to

9    be able to have discussions behind the scenes regarding a

10    potential backup plan in the event that this plan hit

11    roadblocks.

12            And originally, in fact, we tried to negotiate not

13    only the ability to negotiate that plan, but actually file a

14    backup plan at some point in time, and we weren't able to

15    get that provision, but we were able to get the ability to

16    negotiate.

17    Q    You just said a moment ago that you have every

18    confidence that this proposed plan merger will close.

19    A    Yes.

20    Q    One of the things you said on cross-examination -- I'm

21    not gonna get it exactly right 'cause I'm going from my

22    notes, but something to the effect that one could point to

23    as many utility deals or transactions that close as those

24    that don't close.  Do you remember generally saying

25    something like that?

1   A    Yes.

2   Q    In your experience in assessing the likelihood of the

3   closing of any particular deal, would you look at the facts

4   and circumstances involved in that deal before arriving at a

5   judgment about its likelihood to close?

6   A    Absolutely.

7   Q    And that's what you've done here in effect in this

8   courtroom and in your written testimony, true?

9   A    Yes.

10   Q    You were asked a question, and I think you corrected

11   the examiner.  You were asked a question about your

12   perception as to whether the deal would close.  You remember

13   that?

14   A    Yes.

15   Q    And you said, "No, I'm talking about observable facts."

16   Do you --

17   A    Yes.

18   Q    -- remember saying that?

19   A    I do.

20   Q    And in your testimony on direct this morning, your live

21   testimony and in the written direct that was submitted in

22   advance, did you set forth there be observable facts unique

23   to this deal that informed your judgment about whether it's

24   likely to close?

25   A    Yes, I did.

1   Q    You were asked some questions about how fees would pay

2   and who would be responsible for fees of certain advisers to

3   the TCEH ad hoc group, TCEH second lien lenders, and the

4   Hunt group.

5   A    Correct.

6   Q    Do you recall that?  Is there any scenario under which

7   EFH unsecured creditors would bear the cost for those

8   advisers?

9   A    Well, the fees that are paid under the merger and

10  backstop agreement to the Hunt's counsel and to the other

11  investor's counsel are not contingent on success of the

12  plan, so I believe the EFH estate in that case would bear

13  that expense.

14  Q    You were asked question with respect to the sponsor

15  releases and at the very end of your cross-examination by

16  Mr. Sheppard, towards the end, about whether -- about the

17  change in the language in the release, the scope of the

18  release.

19  A    Yes.

20  Q    Okay.  During the pendency of these cases, in fact all

21  the way up to today, has anyone, particularly creditors from

22  E-side, brought to your attention any claims for actual

23  fraud, willful misconduct, or willful misconduct on behalf

24  of any of the sponsors?

25  A    No.

1          MR. MCGAAN:  That's all I have, Your Honor.

2          THE COURT:  Thank you.  Any further questions?  No

3     --

4          MAN:  No, Your Honor.

5          THE COURT:  No, Mr. Shore.

6      (Laughter)

7          MS. DORÉ:  Thank you, Your Honor.

8          THE COURT:  That would be a termination event

9     under the PSA.  (Laughter)  All right.  Thank you very much,

10    Ms. Doré.

11         MS. DORÉ:  Thank you.

12         THE COURT:  Because you're still under cross, you

13    may not discuss the substance of your testimony.  However --

14    with any person.  However, if communications come from Mr.

15    Anker or Mr. Horowitz that they're not gonna cross-examine

16    you at some point this evening, you're free, released from

17    that bond.

18         MS. DORÉ:  Okay.

19         THE COURT:  But otherwise, you cannot discuss the

20    substance of the testimony.

21         MS. DORÉ:  I understand.

22         MR. MCGAAN:  All we have as exhibits, which happy

23    to do now with Ms. Doré here if we need to.  We can

24    certainly do it first thing in the morning, whatever Your

25    Honor's preference.

1          THE COURT:  Well, first of all, you may step down.

2          MS. DORÉ:  Thank you.

3          THE COURT:  Thank you very much.  Well, let's do

4     it now.  Let's save the time because we may be able to move

5     quickly to other matters tomorrow morning.  Obviously this

6     would be subject to expansion if necessary if Mr. Anker or

7     Mr. Horowitz cross-examine.

8          MR. MCGAAN:  Thank you, Your Honor.  So the

9     Debtors move into evidence in connection with Mr. Ray's

10    testimony -- I apologize it's a bit of a list -- but let me

11    go ahead and read it.  These are all DX numbers.  So with

12    that, I'll just read the numbers off, all DX numbers:  40,

13    42, 47, 48, 51, 71, 88, 101, 102, 103, 105, 118, 128, 129,

14    131, 132, 144, 145, 148, 149, 151, 152, 153, 161, 162, 164,

15    171, 176, 177, 183, 184, 188, 191, 193, 194, 201, 203, 204,

16    207, 210, 211, 217, 218, 221, 238, 240, 258, 265, 266, 270,

17    275, 282, 283, 284, 286, 287, 291 through 295 inclusive,

18    297, 298, 300, 303, 540, 541, 559, 598, 599, 955R, 968, 302,

19    46, 74R; we also move the admission of Ms. Doré's written

20    direct, D DIR DORÉ is how it's marked.  And then solely for

21    demonstrative purposes, we move -- the admission again is

22    demonstrative evidence -- Doré Demonstratives 1, 2, and 3.

23         THE COURT:  Very good.

24         MR. MCGAAN:  And I've got a list of these for

25    people who may need them, but that's the offer, Your Honor.

1          THE COURT:  Very good.  Thank you.  Any

2     objection?

3          MR. GLUECKSTEIN:  Your Honor, following along with

4     Mr. McGaan's list based on what they --

5          THE COURT:  I'm sorry, Mr. Gluecks --

6          MR. GLUECKSTEIN:  Following along with Mr.

7     McGaan's list based on what they previously disclosed to us

8     and we looked at --

9          THE COURT:  There we go.

10          MR. GLUECKSTEIN:  -- the only one that I don't see

11     on my list is 968.  So I -- we need to look at that one.

12     But otherwise, we have no objection.

13          THE COURT:  Well, I think that's the Montgomery &

14     McCracken letter.

15          MR. GLUECKSTEIN:  Okay.  If that's the exhibit,

16     then we have no objection.

17          THE COURT:  Okay.  Okay.  They're --

18          MR. MCGAAN:  Thank you.

19          THE COURT:  It is.  They're admitted then.

20          MAN:  (indiscernible) introduce (indiscernible).

21          MR. GLUECKSTEIN:  So I'm gonna take -- I took

22     those off --

23          MAN:  Okay.

24          MR. GLUECKSTEIN:  -- (indiscernible) and we can --

25     sorry, Your Honor.  Okay.  So we're aware of -- let me see

1    (indiscernible).  Yeah, we take those off.  Okay, Your

2    Honor, we have three outstanding exhibits that we're gonna

3    talk to Debtors about tonight put to the side, but just so

4    the record's complete on the exhibits, the committees intend

5    to move in.  We have -- these are all EUCC Exhibits that

6    have been previously shared, and we have no objections

7    pending from the plan supporters.  EUCC 18, 57, 157 -- I'm

8    sorry, 1 -- I'm sorry, let me start over.  18, 57, 137, 143,

9    148, 155, 156, 158, 159, 163, 168, 170, 175, 183, 186, 196,

10   198, 199, 200, 203 to 206, 246, 247, 249, 251, 256, 259,

11   262, 366, 533, 574, 639, 640, 644, 648, 7, 66.

12             MAN:  These are hers from your (indiscernible)?

13             MR. GLUECKSTEIN:  These are mine, yeah.

14             MAN:  Okay.

15             MR. GLUECKSTEIN:  And we have a few others --

16             MAN:  (indiscernible).

17             MR. GLUECKSTEIN:  And Your Honor, these are --

18   were also previously given notice.  Just defending

19   objection.  EUCC 533, 663, 245, 88, 100, 478, 577, 632, 559

20   -- I'm sorry, that was Debtor Exhibit, excuse me -- 488,

21   521, 146, and 153.  Those are all E Exhibits, Your Honor.

22             THE COURT:  Very good, thank you.  Any objection?

23             MR. MCGAAN:  No objection.

24             THE COURT:  No objection.  They're admitted

25   without objection.  Did I speak too quickly?

1          MR. MCGAAN:  No objection.  No objection, Your

2     Honor.  We had -- I'm sorry, I'm being reminded we -- the

3     Debtors have one additional exhibit to offer, and that DX

4     977.

5          MR. GLUECKSTEIN:  Yeah, Your Honor, this is just a

6     -- I understand these to be board minutes there were just

7     produced to us I think today of a recent board meeting

8     (indiscernible) records.  We offer no objection.

9          MR. MCGAAN:  All right, thank you.

10         THE COURT:  So no -- I'm sorry, so no objection?

11         MR. GLUECKSTEIN:  We don't have an objection.

12         THE COURT:  Okay, they're admitted.  Were we --

13         MR. MCGAAN:  Your Honor, could I (indiscernible).

14         THE COURT:  Sure.  Well, were we gonna discuss --

15    there were some of the issues we discussed in our pre-

16    meeting.  You want to wait till tomorrow?

17         MR. MCGAAN:  If we could because Mr. Glueckstein

18    and I need talk about 'em --

19         THE COURT:  That's fine.

20         MR. MCGAAN:  -- and maybe make 'em go away.  Maybe

21    not, but we're gonna try.

22         THE COURT:  Definitely okay to make 'em go away.

23    Mr. Pedone, you okay?

24         MR. PEDONE:  I'm okay, Your Honor, thank you.

25         THE COURT:  All right, very good.  All right,

1    anything else for tonight?  Obviously we won't do any more

2    witnesses.  So tomorrow morning, we will start at our normal

3    time.  We'll continue Ms. Doré to the extent necessary.

4    Hopefully, it won't be necessary, and then we'll do Ms.

5    Williamson, I assume.

6            MAN:  Yes.

7            MR. MCGAAN:  Yes.

8            THE COURT:  Okay.  And do we still have -- do I

9    still have to decide the open issue on the evidence was Mr.

10   Mendelsohn?

11           MAN:  Yes.

12           MAN:  Yes.

13           THE COURT:  Yes, okay.  I will take care of that

14   then.  I'll be ready to rule.  Very good.  We are adjourned

15   until tomorrow at 10:00 a.m.  I'll see the general early

16   morning meeting at 9:30 as usual.  Thank you.

17           MAN:  Thank you, Your Honor.

18           MAN:  Thank you, Your Honor.

19

20                        *  *  *  *  *

21

22

23

24

25

Page 224

1                    C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5    Sonya Ledanski

6    Hyde

7

Digitally signed by Sonya Ledanski Hyde
DN: cn=Sonya Ledanski Hyde,
o=Veritext, ou,
email=digital@veritext.com, c=US
Date: 2015.11.13 13:47:22 -05'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  November 13, 2015