Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3    In re:                          :

                                     :    Chapter 11

4    ENERGY FUTURE HOLDINGS          :

     CORP., et al.,                  :    Case No. 14-10979(CSS)

5                                    :

            Debtors.                 :    (Joint Administration

6    _____:    Requested)

7

8

9

10                              United States Bankruptcy Court

11                              824 North Market Street

12                              Wilmington, Delaware

13

14                              November 13, 2015

15                              10:08 AM - 6:05 PM

16

17

18

19

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTCHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECR OPERATOR:  LESLIE MURIN

1    HEARING re Confirmation Hearing

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

Page 3

1   A P P E A R A N C E S :

2

3   ASHBY & GEDDES PA

4        Attorneys for WSFS Second Lien Trustee

5

6   BY:  GREGORY A. TAYLOR

7

8   BROWN  RUDNICK LLP

9        Attorneys for WSFS Second Lien Trustee

10

11  BY:  JONATHAN D. MARSHALL

12

13  DRINKER BIDDLE & REATH LLP

14        Counsel to Citibank NA, TCEH DIP Agent

15

16  BY:  HOWARD A. COHEN

17

18  FOLEY & LARDNER LLP

19        Attorney for UMB Bank, NA as Indenture Trustee

20

21  BY:  HAROLD L. KAPLAN

22

23

24

25

1   FOX ROTHSCHILD LLP

2        Attorney for Counsel to Ad Hoc Group of TCEH Unsecured

3        Noteholders

4

5   BY:  L. JOHN BIRD

6

7   JENNER & BLOCK LLP

8        Attorneys for EFIH

9

10  BY:  VINCENT E. LAZAR

11

12  KLEHR HARRISON HARVEY BRANZBURG LLP

13       Counsel to UMB Bank N.A. Indenture Trustee

14

15  BY:  RAYMOND H. LEMISCH

16

17  KRAMER LEVIN NAFTALIS & FRANKEL LLP

18       Attorneys for Second Lien Indenture Trustee

19

20  BY:  GREGORY A. HOROWITZ

21

22  MCELROY, DEUTSCH, MULVANEY, & CARPENTER, LLP

23       Co-Counsel to the TCEH Debtors

24

25  BY:  DAVID H. PRIMACK

1   MONTGOMERY, MCCRACKEN, WALKER & RHOADS

2        Co-Counsel to the EFH Creditors' Committee

3

4   BY:  NATALIE D. RAMSEY

5        MARK B. SHEPPARD

6

7   MORRIS JAMES LLP

8        Attorney for Law Debenture of New York, Indenture

9        Trustee

10

11  BY:  STEPHEN M. MILLER

12

13  MORRISON & FOERSTER LLP

14        Co-Counsel to the TCEH Creditors' Committee

15

16  BY:  TODD M. GOREN

17        CHARLES L. KERR

18        BRETT H. MILLER

19

20  MUNGER, TOLLES & OLSON LLP

21        Co-Counsel to the TCEH Debtors

22

23  BY:  THOMAS B. WALPER

24

25

1   O'KELLY, ERNST & BIELLI LLP

2        Co-Counsel to Energy Future Holdings Corp.

3

4   BY:  DAVID M. KLAUDER

5

6   O'MELVENY & MYERS LLP

7        Attorneys for Apollo, Brookfield, Angelo Gordon

8

9   BY:  ANDREW SORKIN

10

11  PATTERSON BELKNAP

12        Attorney for Law Debenture of New York, Indenture

13        Trustee

14

15  BY:  DANIEL A. LOWENTHAL

16

17  PAUL WEISS RIFKIND WHARTON & GARRISON LLP

18        Counsel to Ad Hoc Committee of TCEH First Lien

19        Creditors

20

21  BY:  JACOB A. ADLERSTEIN

22        ANDREW BERNSTEIN

23        BRIAN S. HERMANN

24

25

1    POLSINELLI PC

2         Co-Counsel to the TCEH Creditors' Committee

3

4    BY:  JARRETT VINE

5         CHRISTOPHER A. WARD

6

7    POTTER ANDERSON & CORROON LLP

8         Attorneys for Deutsche Bank, Agent to DIP Financing

9

10   BY:  R. STEPHEN MCNEILL

11        JEREMY W. RYAN

12

13   PROSKAUER ROSE LLP

14        Attorneys for EFH Corp. Disinterested Directors

15

16   BY:  MICHAEL A. FIRESTEIN

17        MARK K. THOMAS

18        PETER J. YOUNG

19

20   SHEARMAN & STERLING LLP

21        Counsel to Deutsche Bank, agent to DIP Financing

22

23   BY:  NED S. SCHODEK

24

25

1    STEVENS & LEE PC

2         Co-Counsel to Energy Future Intermediate Holding

3         Company LLC

4

5    BY:  JOSEPH H. HUSTON, JR.

6

7    U.S. DEPARTMENT OF JUSTICE

8         U.S. Trustee

9

10   BY:  RICHARD L. SCHEPACARTER

11

12   VENABLE LLP

13        Attorney for PIMCO

14

15   BY:  JAMIE L. EDMONSON

16        JEFFREY S. SABIN

17

18   WACHTELL, LIPTON, ROSEN & KATZ

19        Attorneys for Equity Sponsors

20

21   BY:  EMIL A. KLEINHAUS

22

23

24

25

```
1   WHITE & CASE LLP

2        Attorney to Ad Hoc Committee of EFIH Unsecured

3        Noteholders and EFIH Second Lien DIP Commitment

4

5   BY:  THOMAS LAURIA

6        J. CHRISTOPHER SHORE

7

8   WILMER CUTLER PICKERING HALE & DORR LLP

9        Attorneys for Marathon Asset Management

10

11  BY:  PHILIP D. ANKER

12

13  YOUNG CONAWAY STARGATT & TAYLOR, LLP

14        Counsel to Ad Hoc Group of TCEH Unsecured Noteholders

15

16  BY:  PAULINE K. MORGAN

17

18  APPEARING TELEPHONICALLY:

19  SCOTT L. ALBERINO

20  NII-AMAR AMAMOO

21  ASHLEY F. BARTRAM

22  PEG A. BRICKLEY

23  MABEL BROWN

24  EMILY A BUSSIGEL

25  MARIA CHUTCHIAN
```

1   MARK A. CODY

2   KENT COLLIER

3   LOUIS A. CURCIO

4   ADAM M. DENHOFF

5   BENJHAMIN D. FEDER

6   BARRY FELDER

7   MARK A. FINK

8   MARK FLANNAGAN

9   DAVID GRINGER

10  BRIAN P. GUINEY

11  CHRISTOPHER HAHM

12  MARK F. HEBBEIN

13  NATASHA HWANGPO

14  SAF JOSHI

15  ANNA KALENCHITS

16  MATTHEW W. KINSKEY

17  CHARLES KOSTER

18  PHILIP G. LAROCHE

19  ALEXANDER B. LEES

20  ROBERT K. MALONE

21  HAL F. MORRIS

22  TINA MOSS

23  MORGAN C. NIGHAN

24  LARS A PETERSON

25  BRIAN PFEFFER

1    MEREDITH PFISTER

2    MEREDITH QUICK

3    ABID QURESHI

4    ERICA RICHARDS

5    RACHAEL L. RINGER

6    MARC B. ROITMAN

7    MATTHEW M. ROOSE

8    DAVID SALMONS

9    GABRIEL SASSON

10    JASON SATSKY

11    JEFFREY M. SCHLERF

12    ANDREA B. SCHWARTZ

13    FREDRIC SOSNICK

14    RICHARD A. STEIGLITZ

15    AMER TIWANA

16    BRIAN TONG

17    CARL TULLSON

18    MICHAEL TURKEL

19    MATTHEW UNDERWOOD

20    JULIA M. WINTERS

21    APARNA YENAMANDRA

22    DANIELE ZAZOVE

23    STEVEN ZELIN

24

25

1                    P R O C E E D I N G S

2            CLERK:  All rise.

3            THE COURT:  Please be seated.  Before we get

4    started, just a couple items.  In connection with the

5    Fidelity settlement that was read into the record yesterday,

6    and I understand was docketed late last night, there had

7    been a request that that matter be heard at the same time I

8    have set aside to hear the PIK noteholders' settlement,

9    which is Thursday, November 19th, at 10:00 a.m., or sometime

10   on the 19th.

11           So, I have decided, thinking about it over the

12   evening, to schedule the Fidelity settlement for the 19th.

13   Whether it's at 10:00 or later in the day, I don't know. I

14   have a -- that will depend on how the trial plays out.  But

15   it'll be on the 19th.

16           And objections to that will be due -- written

17   objections will be due the 18th, the day before, by 12:00

18   noon.  And if you could both file and deliver a copy to

19   Chambers, that would be helpful, to make sure I have them as

20   quickly as possible.  I may even be able to read them during

21   the lunch break -- oh, no, I don't have trial with you that

22   day.  I have other matters.  So, I will fit it in as best I

23   can there.  Mr. Pedone?

24           MR. PEDONE:  Your Honor, Richard Pedone on behalf

25   of American Stock Transfer, as Indenture Trustee for the EFH

1    bonds.

2            Your Honor, we're Indenture Trustee for all of the

3    holders at the EFH level.  And while Fidelity holds a

4    majority on two of the issuances at EFH, they do not hold

5    across all issuances.

6            The stipulation that was filed, and the order to

7    seek approval of it, indicates that a motion would be filed.

8    The actual amendments to the PSA contemplate that there

9    would be a motion to seek approval of the arrangement.  No

10   motion is filed.  This is filed accordingly, seeking

11   authority under Rule 9019, which we also believe requires a

12   motion.

13           We believe that it's of utmost importance that

14   notice of any hearing on this be able to get out in a

15   meaningful and practicable way to all affected holders, and

16   we do not believe that that concur with the hearing on the

17   19th.  So, I'd ask the Court to reconsider and move it to a

18   date after meaningful notice can be provided.

19           THE COURT:  Okay.

20           MR. PEDONE:  We'll include other responses in

21   connection with any deadline the Court may set.  Thank you.

22           THE COURT:  Thank you, Mr. Pedone.  Mr. Husnick?

23           MR. HUSNICK:  Your Honor, I'm not familiar with

24   what Mr. Pedone's referencing in terms of a motion.  There

25   is no intention of filing a motion.  We are -- the nature of

1    the modifications to the PSA do not require a motion

2    pursuant to the terms of the PSA order.  And the nature of

3    the stipulation is a claims settlement, similar to what

4    we're doing with the PIK noteholders, as Mr. Lauria

5    represented yesterday.

6             So, we would plan to present that settlement in

7    connection with resolving objections, pending objections, to

8    a claims objection and confirmation.  So, that's our

9    position, Your Honor.  To the extent there's any ambiguity

10   in the notice or the order, we can clear that up with Mr.

11   Pedone.

12            THE COURT:  Yeah.

13            MR. HUSNICK:  But we are not planning to file a

14   separate motion.

15            THE COURT:  There may be, because I do note that

16   the initial order submitted in connection with the PIK

17   settlement referenced a motion.

18            MR. HUSNICK:  Exactly.  That's where I suspect

19   there might be the ambiguity.  So, I can clean that up.  We

20   can re-file the notice to clear that up.

21            THE COURT:  Okay.  Please do.  I'm going to

22   overrule the objection and continue to hear the matter on

23   the 19th.  But thank you.

24            MR. PEDONE:  Thank you.

25            MR. HUSNICK:  Thank you.

1          THE COURT:  Related to the PIK noteholders'

2    issues, I received two motions to shorten morning in

3    connection with a motion to, in effect, bifurcate my order

4    sustaining the PIK noteholders' objection -- excuse me, the

5    Debtors' objection to the PIK noteholders' claim.  I don't

6    know if the Indenture Trustee or Trustees are present or

7    not.  But they've asked to have that heard at the omnibus on

8    the 25th.

9          And I am told by the movents that the Debtors

10   don't object.  So, I'm just asking that in open court to see

11   whether or not I can sign those motions to shorten or not.

12   The appeal was filed either yesterday or today.

13          MR. MCKANE:  Yeah.

14          THE COURT:  I don't know if that divests me of

15   jurisdiction to alter the order or not.  I don't think it

16   does, but I haven't thought through that issue.  Mr. McKane?

17          MR. MCKANE:  Yeah.  Your Honor, Mark McKane,

18   Kirkland & Ellis, for the Debtors.

19          We do not oppose the motions to shorten.  They did

20   ask us in advance our views.  And so, we're supportive with

21   moving forward and hope to be able to address any opposition

22   to the merits of that before the 25th.

23          THE COURT:  Okay.  All right.  Then I will sign

24   the order shortening notice.  And I think they've asked for

25   an objection deadline of the 19th.  I'll probably set it for

1    the 20th.

2         MR. HUSNICK:  That's fine with us, Your Honor.

3    Thank you.

4         THE COURT:  The agenda's not -- the agenda won't

5    be due till Monday anyway, so.  Now, Mr. Husnick, I was told

6    -- you promised me there'd be no omnibus objection --

7    there'd be no omnibus hearing on the 25th.  So, I'm going to

8    --

9         MR. HUSNICK:  Your Honor, I was just talking to

10   Mr. McKane about that.  I was ramping up the pressure on me,

11   so.  I'll deliver.

12        THE COURT:  Oh.  That's good to hear.  Okay.  All

13   right, I'll sign those orders.

14        MR. HUSNICK:  Thank you.

15        THE COURT:  And I believe we need a statement on

16   the record in connection with Ms. Doré's cross-examination.

17   Mr. Anker?

18        MR. ANKER:  Good morning, Your Honor.  Philip

19   Anker, Wilmer Cutler Pickering Hale & Dorr, for Delaware

20   Trust Company as the EFIH First Lien Indenture Trustee.

21   Your Honor, it's slightly different from what was discussed

22   in the pre-hearing scheduling session in chambers.

23        My understanding is that there is one issue that

24   the plan sponsors are trying to work through with respect to

25   the plan language that otherwise has been agreed to with,

1    by, and among the Debtors, the plan sponsors, the Trustee

2    for the EFIH first liens, and the Trustee for the second

3    liens.

4            I was literally on a call with Mr. Lauria five

5    minutes ago.  He is hopeful that the banks and others who

6    are financing the exit financing, or the exit loan, will be

7    comfortable with the language.  But he's asked that he have

8    this morning to try to work that issue through.

9            I am more than cautiously optimistic that it will

10   be worked through, in which case we will be happy to excuse

11   Ms. Doré, with my apologies, and ask for indulgence of the

12   Court and Ms. Doré.  We would simply ask that she remain

13   available for examination this afternoon.

14           I will say we have no objection to waiving -- and

15   indeed have said this -- the normal rule that she not be

16   able to consult with counsel because she remains pending on

17   cross, as she's obviously the general counsel to the

18   company.  And if she needs to consult with counsel on any

19   matter, including her testimony, we are fine with that in

20   the interim.  And I'm hopeful that we will not need to

21   examine her at all.

22           THE COURT:  All right. Mr. Horowitz?

23           MR. HOROWITZ:  Thank you, Your Honor.  Gregory

24   Horowitz from Kramer Levin on behalf of the EFIH Second Lien

25   Indenture Trustee.  And I have nothing to add.  I -- me,

1    too.

2            THE COURT:  All right.  All right, very good.  Any

3    objection to holding Ms. Doré's testimony out until the

4    afternoon?

5            MR. MCKANE:  Your Honor, it's Mark McKane for the

6    Debtors.  The outstanding issue is so untethered to what Ms.

7    Doré could add, and any additional testimony, that we think

8    this is all form over substance.  But she is probably going

9    to be here for the majority of the day.  She will be leaving

10   midafternoon.  So, I'd like to have them resolve this issue,

11   because it just doesn't address her at all.  But

12   nonetheless, she will be here.  And so, we don't --

13           THE COURT:  All right.

14           MR. MCKANE:  We don't oppose the issue.

15           THE COURT:  All right.  Well, if the issue becomes

16   live, and we need to cross-examine Ms. Doré, we will -- we

17   may even interrupt what we're doing otherwise to make sure

18   that we can finish that before she has to depart.

19           MR. MCKANE:  Thank you, Your Honor.

20           MR. HOROWITZ:  Thank you.

21           MR. ANKER:  Thank you.

22           THE COURT:  Okay, so we won't delay any further.

23   Anything further, before we turn to the next witness?  All

24   right, Mr. Thomas, I believe?  No.

25           MR. FIRESTEIN:  Actually, no, Your Honor, a new

1   face.

2              THE COURT:  Okay.  Welcome.

3              MR. FIRESTEIN:  Thank you.  Good morning, Your

4   Honor.  We'd like to call Ms. Billie Williamson.  And then

5   I'll introduce myself with the witness.

6              THE COURT:  Okay.  Very good.  Ms. Williamson,

7   hello.

8              MS. WILLIAMSON:  How are you today?

9              THE COURT:  Very well, thank you.  If you would

10  just take the stand, stand up there, and remain standing for

11  your affidavit?

12             MS. WILLIAMSON:  Yes, sir.

13             CLERK: Please raise your right hand.  Do you

14  affirm you're willing to tell the truth, the whole truth,

15  and nothing but the truth, to the best of your knowledge and

16  ability?

17             MS. WILLIAMSON:  I do.

18             CLERK:  Please state and spell your name for the

19  record.

20             MS. WILLIAMSON:  Billie Williamson, B-I-L-L-I-E,

21  W-I-L-L-I-A-M-S-O-N.

22             CLERK:  Thank you.

23             THE COURT:  Thank you.  Please be seated.

24             MS. WILLIAMSON:  Thank you.

25             THE COURT:  And if you could move yourself up to

1    the microphone?

2              MS. WILLIAMSON:  Yes, sir.

3              THE COURT:  Thank you. Proceed.

4              MR. FIRESTEIN:  Thank you, Your Honor.  Good

5    morning.  My name is Michael Firestein of Proskauer.  I

6    represent EFH Corp., acting on behalf of and at the

7    direction of the disinterested directors, Mr. Donald Evans,

8    and Ms. Billie Williamson, who's the witness this morning.

9              In connection with Ms. Williamson's direct

10   examination, I think, prior to Court, we have provided

11   binders that contain the various exhibits that are pertinent

12   to her examination, including those that are referenced in

13   her written examination.  I assure Your Honor we will not be

14   referencing all of these exhibits in her live direct.

15             THE COURT:  Okay.

16             MR. FIRESTEIN:  May I proceed?

17             THE COURT:  Yes.

18             MR. FIRESTEIN:  Thank you, Your Honor.

19                        DIRECT EXAMINATION

20   BY MR. FIRESTEIN:

21   Q    Good morning, Ms. Williamson.

22   A    Good morning.

23   Q    Could you please introduce yourself to the Court and

24   who you are?

25   A    I'm Billie Williamson, and I am a director of Energy

1    Future Holdings.  I'm also one of the disinterested

2    directors for the EFH estate.

3    Q    And could you briefly describe for the Court your

4    professional background?

5    A    Yes, sir.  I am a certified public accountant.  I spent

6    33 years with Ernst & Young, in the audit area and the

7    mergers and acquisitions area.  And then I also have five

8    years in industry, where I was CFO of a high-tech company

9    that we took public.  I was also the senior vice-president

10   of finance of Marriott International.  And subsequent to my

11   retirement from Ernst & Young in 2011, I have served on

12   corporate boards.

13   Q    Could you describe for the Court the corporate boards

14   on which you currently serve?

15   A    Yes.  I currently sit on the boards of Pentair PLC,

16   which is a New York Stock Exchange company, and Janus

17   Capital Group, which is also a New York Stock Exchange

18   company.  Prior to that, I served also on the boards of

19   Annie's Inc. and Exelis Inc., up until the time those

20   companies were sold.

21   Q    And you noted earlier that you currently sit on the

22   board of ETF; is that right?

23   A    Yes.

24   Q    When did you join the board of EFH?

25   A    In early 2013.

1    Q    And, in addition to sitting on the board of EFH, do you

2    occupy a position on the audit committee?

3    A    Yes.  I am the chairman of the audit committee.

4    Q    And for how long have you been the chair of the audit

5    committee?

6    A    Since I joined the board.

7    Q    And could you briefly describe for the Court generally

8    your responsibilities in that role?

9    A    Yes.  I oversee the responsibilities of the audit

10   committee, and that includes being responsible for the risks

11   associated with financial matters of the company.  We

12   appoint the independent public accountant.  I -- we oversee

13   the internal control process within the company, which means

14   which controls are in place, how they're monitored, how

15   they're checked, that type of thing.  We also oversee the

16   work of the external auditor and the internal auditor, and

17   we're responsible for the financial statements that are

18   published to the SEC.

19   Q    Are you familiar with a committee at EFH known as the

20   "special committee"?

21   A    Yes, sir.

22   Q    And have you served as a member of that special

23   committee?

24   A    Yes, sir.

25   Q    Do you recall when that special committee was

1    officially formed?

2    A    In April of 2015.

3    Q    And what did you understand the role of the special

4    committee to be?

5    A    The role of the special committee was to look at the

6    releases that were to be granted to the sponsors in the plan

7    of reorganization that we were filing.

8    Q    And while there's been a lot of testimony on the record

9    with respect to those sponsors, from your perspective, do

10   you have an understanding as to who they are?

11   A    Yes.  Goldman Sachs, KKR, and TPG.

12   Q    Now, we'll come back to that committee and the other

13   work that you did regarding those releases a little bit

14   later.  But first I want to enquire whether you're familiar

15   with the term "disinterested director" in connection with

16   this bankruptcy.

17   A    Yes, sir.

18   Q    And what do you understand that to be?

19   A    Well, Chairman Evans and I fill that role for the EFH

20   estate.  And we were selected, or got that duty, because we

21   are not on the boards of any of the other estates or

22   companies of EFH.

23   Q    So that we're clear on the record, do you sit on any

24   other boards within the EFH family of companies besides EFH

25   Corp.?

1   A    No, sir.

2   Q    Now, before we get too far, there's a binder that's

3   sitting in front of you.

4   A    Yes.

5   Q    If you would turn to the first tab in that binder,

6   you'll see a document that's entitled, "Declaration of

7   Billie Ida Williamson," and then it goes on to list the

8   settlement motion and the plan of reorganization.  Do you

9   see that?

10  A    Yes.

11  Q    All right.  Did you ask us to prepare a written

12  declaration for you to submit in connection with this

13  proceeding?

14  A    I did.

15  Q    And have you reviewed and edited this declaration?

16  A    Several times.

17  Q    In the form that you see it in the binder, is that your

18  truthful and accurate testimony?

19  A    Yes, sir, it is.

20  Q    If you would do me a favor and turn to the last page of

21  that declaration?

22  A    Yes.

23  Q    Is that your signature there?

24  A    It is.

25          MR. FIRESTEIN:  Your Honor, I don't know what the

1    custom is with respect to this.  I'm happy to move the

2    declaration into evidence now, or we can save it until the

3    end.

4                THE COURT:  Let's move it now.  Any objection?

5                MR. SHEPPARD:  Yes, Your Honor.  Conference

6    Counsel on behalf of the Committee.  Your Honor, in the

7    declaration, particularly with regard to Paragraphs 56

8    through 62, we believe, Your Honor, that this witness has

9    injected the advice of counsel into these proceedings

10   sufficient to constitute -- and the grounds for the motion

11   that we made earlier to preclude that testimony.  And we

12   would object to the admission of Paragraphs 56 to 62, based

13   upon the reasons that are set forth in the previous motion.

14                And that now, Your Honor, we believe this witness

15   has gone over that line, gone past Capmark, and has

16   injected, Your Honor, her -- the advice of counsel into

17   these proceedings.  And we rely, Your Honor, on the case In

18   Re:  Converse Inc., which was cited in our papers earlier.

19   And, Your Honor, we would renew that motion and move to

20   strike that testimony.

21                THE COURT:  Mr. McKane?

22                MR. MCKANE:  Thank you, Your Honor.  I'll just --

23   I can do this in two minutes.  First, Your Honor's ruling on

24   the motion in limine, specifically as it relates to Capmark,

25   stands.  I mean, it's absolutely appropriate.

1             What Ms. Williamson does in this section of the

2      declaration is no different than what you hear from Ms. Doré

3      yesterday:  an articulation of what was presented and what

4      was the issue, right, and nothing further.  I think, if

5      there was -- for the same reasons that there was no

6      objection yesterday to Ms. Doré's testimony, specifically

7      about what work was done by Sidley Austin, when were they

8      retained, and, frankly, the issue that was presented, that

9      is the exact same position we stand today.

10             It's not a communication of what -- of the

11      contents of the advice, but simply that advice was given,

12      and that the -- and what decision was made.  Therefore, it's

13      a reflection of what was part of the board record at the

14      time.  There -- and so, therefore, we think, consistent with

15      what you -- your ruling on the motion in limine, there's no

16      change in substance here.

17             THE COURT:  Mr. Sheppard?

18             MR. SHEPPARD:  Yes, thank you, Your Honor.  I

19      believe, Your Honor, that there clearly is a change in

20      substance.  Mr. McGaan yesterday was quite careful in going

21      up to the line but not crossing the line, and we agreed that

22      he didn't; that's why we didn't object.  This declaration,

23      Your Honor, goes well beyond that line.

24             And particularly, Your Honor, the language at the

25      end of Paragraph 56, which says, "Based upon Sidley Austin's

1    investigation, EFH, EFIH, and TCEH determined not to pursue

2    any claims against the sponsors."  We believe, Your Honor,

3    that is a clear implication that that advice that was relied

4    upon by this witness in making her decision as a board

5    member has now been injected into these proceedings.

6              And given their prior invocation of the

7    attorney/client privilege, we believe they're using this as

8    a sword and a shield.  And this testimony ought to be

9    precluded.

10             MR. MCKANE:  Let me just confer with Ms. Doré for

11   one minute.  If the only issue is the last sentence in

12   Paragraph 56, you know, we may be able to resolve this

13   issue.

14             THE COURT:  Well, let's do this, because I don't

15   want to make this decision in a vacuum, and I have read this

16   declaration but certainly not have it memorized enough to

17   know what's in Paragraphs 56 to 62.  So, when we take an

18   appropriate time for a recess, I will review the language so

19   I can make an informed judgment on whether to allow the

20   testimony or not.  And, during that break, you can -- or

21   now, however it works, you can confer with each other to

22   perhaps narrow the issue or eliminate it, if you wish.  But

23   after that break, I'll make a ruling.

24             MR. MCKANE:  All right, very good.

25             MR. SHEPPARD:  Thank you, Your Honor.

1          THE COURT:  You're welcome.  So, the bulk is -- of

2     the declaration is admitted into evidence.  Paragraphs 56

3     through 62 are not admitted at this time.  And the Court is

4     considering the objection and will rule on its merits in the

5     future.

6          MR. FIRESTEIN:  Thank you, Your Honor

7          THE COURT:  You're welcome.

8     Q    Ms. Williamson, in connection with your testimony here

9     today, I want to go over several subjects with you,

10    including your role as a disinterested director, the

11    processes that you employ in that role, the disinterested

12    director settlement that was reached, the continued

13    evaluation of the disinterested director settlement, your

14    work on the special committee and your consideration of

15    sponsor releases and director and officer releases, the

16    settlement agreement that's before the Court for approval,

17    as well as the plan, which is before the Court for

18    confirmation.  All right?

19    A    Yes, sir.

20    Q    All right.  Well, focusing on your role as a

21    disinterested director, you explained a few moments ago that

22    you are one.  And I think you testified that Mr. Evans

23    shares that responsibility with you?

24    A    Yes.

25    Q    Did you share responsibility with Mr. Evans, or was one

1    of you the leader in that group?

2    A    No, we shared the responsibility.

3    Q    And, as a disinterested director of EFH, did you

4    believe that you owed any duties to EFH?

5    A    Yes.  It was my -- our responsibility to maximize the

6    value of EFH.

7    Q    Okay.  And was that the same duty that you understood

8    you possessed as a director of EFH as well?

9    A    Well, certainly, but there's the EFH estate.  And as a

10   director of EFH the company, I'm responsible for the entire

11   company.  But as a disinterested director, I was focused on

12   the EFH estate.

13   Q    Okay.  And, as a disinterested director, what did you

14   understand that you were specifically charged with the

15   responsibility to accomplish?

16   A    We were to deal with any matters of conflict --

17   conflict matters that involved interdebtor type conflict

18   matters, so any items where there was a debtor on both sides

19   of a conflict.

20   Q    Okay.  So, a conflict matter would be a dispute that

21   existed between two of the debtor estates?

22   A    Yes.

23   Q    And can you give an example of the kinds of conflict

24   matters that you determined to exist and for which you

25   endeavored to resolve?

1    A    Yes.  The first one that we dealt with was the bidding

2    procedures associated with the sale of Oncor.  Then the --

3    one of the next items that we dealt with was the

4    disinterested director settlement, trying to resolve

5    interdebtor claims for the company.

6    Q    And by "interdebtor claims," just so that we're clear,

7    for example, does that include claims that TCEH might have

8    against EFH?

9    A    Yes.

10   Q    And vice-versa?

11   A    Yes.

12   Q    Ms. Williamson, did you ask us to prepare certain

13   demonstrative exhibits to help you in your testimony here

14   today?

15   A    Yes.  Mm hmm.

16   Q    If you would turn to the second tab in your binder, is

17   that a series of demonstratives that you asked us to

18   prepare?

19   A    Yes, sir.

20        MR. FIRESTEIN:  Your Honor, I'd like to show

21   Williamson Demonstrative Number 1, if I could, to put it on

22   the screen.

23        THE COURT:  Yeah.

24   Q    Ms. Williamson, I've -- I mean, you can certainly look

25   at the paper in the binder; it's probably easier to read.

1    Do you know what that is?

2    A    Yes.

3    Q    What is it, Ms. Williamson?

4    A    It's a listing of the matters that Chairman Evans and I

5    determined to be conflict matters.

6    Q    And were there other conflict matters besides the

7    interdebtor claims and the bid procedures that you and Mr.

8    Evans determined to have a need to address in your capacity

9    as disinterested directors?

10   A    No, we were really just charged with the responsibility

11   of resolving conflict matters as they related to interdebtor

12   situations.

13   Q    Right, but were there other conflict matters besides

14   just the disinterested director settlement, for example,

15   that you were asked to resolve?

16   A    Oh, yes, there's a listing here.

17   Q    Okay.  Now, a couple of these items -- say, for

18   example, the one that's identified at Number 5 for August

19   9th -- reference it insofar as it relates to conflict

20   matters.  Can you explain what you mean by "insofar as it

21   relates to conflict matters"?

22   A    Well, in this circumstance, the joint plan of

23   reorganization does incorporate the disinterested director

24   settlement.  And so, because these items included other

25   disinterested director settlements, we certainly looked at

1    those, insofar as they related to conflict matters.  But

2    also, just out of a great commitment, we -- and to

3    governance processes, we wanted to ensure that we followed

4    the same process in these major items.  And so, we discussed

5    them with our counsel, Chairman Evans and I met on them, and

6    that sort of thing, to deal with items like this.

7    Q    Okay.  And did you run through that governance protocol

8    with respect to matters in addition to those that are

9    identified in Demonstrative Number 1?

10   A    Yes, sir, because we had to review everything to

11   determine if there was a conflict matter to begin with.  And

12   so, we discussed each item that the -- that we were doing as

13   it related to the bankruptcy, as we -- you know, from the

14   point that we were appointed as disinterested directors.

15   So, we were to -- one of our responsibilities was to

16   determine whether there was a conflict matter.  And there

17   were times where there was, and those were listed here.  And

18   then there were times where we determined that items were

19   not conflict matters.

20   Q    Now, you mentioned disinterested director protocols and

21   procedures.  Can you explain to the Court, after you were

22   appointed, how did you undertake carrying out your

23   responsibilities?

24   A    Well, we were appointed as disinterested directors in

25   November.  And in November, we then moved to hire our own

1    law firm, which is your firm, Proskauer.  And that was done

2    because we were authorized by the Court to get our own law

3    firm, as well as our own financial advisor.  And so, we went

4    through a selection process where we interviewed different

5    law firms, and we selected Proskauer Rose.

6        And then we met with Proskauer right after that, and

7    asked that the -- your firm go through all of the data in

8    the data room, review all of the information that was

9    available, go through and consult with Kirkland & Ellis,

10   talk with whomever you felt was appropriate or the Proskauer

11   attorneys felt was appropriate, and to come back to us with

12   items -- for example, intercompany claims or matters that

13   you were concerned about.

14       Also during that process, in December, we moved to hire

15   our own financial advisor.  Again, we did a process where we

16   talked with several firms and then selected SOLIC.

17   Q    We'll get to some of the specific meetings and issues

18   shortly.  But you mentioned overall that you had -- did you

19   have formal meetings of disinterested directors?

20   A    Yes.

21   Q    If you would turn to Demonstrative Number 2, do you

22   have that before you?

23   A    Yes.

24   Q    What is Demonstrative Number 2?

25   A    This is a timeline, starting with when the

1    disinterested directors were appointed and running up until

2    the time that we actually filed the third amended plan.

3    Q    Okay.  Now, down around the bottom of the page, there

4    are a series of numbers.  Do you understand what those

5    numbers relate to?

6    A    Yes.  They represent the number of formal EFH

7    disinterested director meetings that were held.

8    Q    Now, I see approximately 15 meetings or so identified

9    there.  Were those all of the meetings or conversations that

10   you as disinterested directors for EFH participated in?

11   A    Absolutely not.  Those were the formal meetings that we

12   had.  We had numerous informal discussions.  We talked with

13   our attorneys frequently.  We would ask advice on different

14   things that were occurring in the case at that point in

15   time.  We met with SOLIC.  We met with members of management

16   if we had questions about different items or wanted to

17   research our plan.  So, there were a substantial number of

18   meetings outside of these 15.

19   Q    When you say "substantial," can you just any -- give

20   any rough approximation as to how many such informal

21   meetings or calls you had like that, as a disinterested

22   director?

23   A    You know, I'm sorry; I don't know the number.  But it

24   was certainly a lot of them.  I would say it's probably -- I

25   mean, I feel like I probably talked with or communicated

1    with Proskauer every week, several times, from November

2    forward.

3    Q    Okay.  And was this in addition to your participation

4    in regular EFH board or joint board meetings that you

5    attended?

6    A    Yes, sir.

7    Q    And how many of those -- and when I say "those," I'm

8    referring to EFH board meetings independent of disinterested

9    director meetings -- were there, say, in 2014-15?

10   A    Well, we meet every Friday morning.  There is a joint

11   call of all of the boards.  And I would say it probably

12   occurs 85 percent of the Fridays throughout the year,

13   regardless of whether it's a holiday or that sort of thing.

14            Secondly, it is the board's practice, the EFH

15   board's practice, to meet four times a year in formal

16   meetings there in Dallas that include our committee

17   meetings, as well as two days' worth of the board meetings.

18   Q    Now, one of the items that you mentioned when you were

19   discussing Williamson Demonstrative Number 1 was the bidding

20   procedures that related to Oncor.  Did you discuss the Oncor

21   bid process at disinterested director meetings?

22   A    Yes.

23   Q    And could you just explain to the Court what your level

24   of involvement was with respect to the bidding process?

25   A    Just as a disinterested director, or as a director

1    also?

2    Q    Yes, ma'am.  We'll start with the disinterested

3    director.

4    A    Okay.  As a disinterested director, first, as you

5    stated, it was our responsibility to look at the bidding

6    procedures and make sure that we felt that those were

7    appropriate bidding procedures that we should use as a

8    company.  We looked at that -- our primary responsibility

9    was to look at that from the EFH estate.

10             And then, once the -- we had approved those, then

11   we reported to the full board that we were in agreement and

12   approved those bidding procedures, as did Mr. Cremens for

13   EFIH and Mr. Sawyer for TCEH.

14             And then, in terms of as that process moved along

15   -- so, as bids came in, or as we were contemplating things,

16   Proskauer was involved in all of those joint board meetings.

17   And if there was something that Don and I wanted to visit

18   about as it related to one of the offers that had come in or

19   one of the offers we were considering or the process or that

20   sort of thing, then we would set up time with Proskauer to

21   go through that.

22   Q    I gather, by the preamble of your answer, that you also

23   participated extensively at board meetings in the Oncor sale

24   process.

25   A    Absolutely.

1    Q    And can you just describe for the Court very generally

2    what your role was in that regard?

3    A    Well, again, I referenced those Friday meetings.  But

4    then, in certain time periods, there were more meetings

5    during the week, because we, as a board, would review every

6    offer that had come in.  So, every term sheet that came in,

7    we were apprised of.  Every suggestion or offer that came

8    in, we were apprised of that.

9            And then, on the Oncor bidding process, we would

10   get an update from Evercore, who was managing that process,

11   every Friday as to what status -- or where we were in the

12   process, what had occurred during the last week, who had

13   submitted information, who they had talked with.  So, a very

14   detailed analysis so that we could monitor that process.

15   And then, as we got down to the various offers that were

16   being made, they went through those in a financial analysis

17   and in a detail analysis.

18   Q    Are you aware, Ms. Williamson, that certain creditor

19   objectors claim that somehow the T-side had a veto power

20   over the bid process for Oncor, and that that was a concern?

21   A    I'm aware of that.

22   Q    Do you agree with that concern?

23   A    I don't.  First off, the T-side's involvement was

24   ordered by the Court.  And so, I -- we were certainly going

25   to follow everything that the Court had ordered.  But then,

1    secondly, we always knew that, if we had gone through that

2    process -- and, as you know, we were trying to settle the

3    entire bankruptcy.  We weren't trying to settle little

4    pieces of it and that sort of thing.  So, TCEH certainly had

5    input there.

6              But if we had ever gotten to an impasse where TCEH

7    didn't want to approve something but every -- all the other

8    estates wanted to approve something, I felt very confident

9    that we could come back to the Court and ask for guidance on

10   that.

11   Q    And, wrapping up your participation in these meetings,

12   both disinterested director-based as well as board meetings,

13   did you consider yourself to be well informed as to the

14   matters that required your attention?

15   A    Well, I worked very hard at it.  I read all of the

16   materials that came to me.  If there were things that I

17   didn't understand, I asked questions.  I consulted with my

18   attorneys, and I asked for -- I asked meetings in -- I mean,

19   I asked questions in the board meetings to ensure that I

20   understood what I was dealing with.

21   Q    Now, one of the matters that you indicated you

22   determined to be a conflict matter were these interdebtor

23   claims.  Is that right?

24   A    Yes. Mm hmm.

25   Q    And these were the claims that ended up leading to the

1    disinterested director settlement?

2    A    Yes.

3    Q    Did you and Mr. Evans participate in meetings to try

4    and understand what those claims were?

5    A    In excruciating detail.

6    Q    Could you just explain for the Court how you went about

7    doing that?

8    A    Well, first, there --

9    Q    And, by the way, without revealing the substance of

10   communications you may have had with counsel.

11   A    Yes, sir.  Okay.  So, first, you know, we talked about

12   the interdebtor claims that had been identified.  Kirkland

13   actually produced a listing after talking with all the

14   constituents in the case.  And I believe we received that

15   listing in December.  That is the listing that Proskauer

16   started with in that.

17        And then, we met periodically with Proskauer as they

18   were going through their due diligence process, the people

19   that they were talking with, the items that they were

20   finding.  They might show us pieces of evidence or different

21   things like that, or pieces of paper, or minutes, or a

22   presentation, or different things like that.  And we would

23   talk through that.

24            And we also were asking them to do that review

25   fairly quickly, because we wanted to get to a point where we

1    could resolve the interdebtor claims, because that was

2    holding up the bankruptcy.  And so, once we got to that

3    point, then we started into discussions -- once we had a

4    pretty good list, we started into discussions with TCEH and

5    EFIH.

6    Q    Did you direct your advisors -- or, frankly, did you

7    seek out information from creditor constituencies?

8    A    Oh, absolutely.  I don't know if I can refer to this,

9    but this listing, there, my Demonstrative Number 3 --

10            MR. FIRESTEIN:  Okay.  Well, Your Honor, with the

11   witness's lead --

12            MS. WILLIAMSON:  Oh, I'm sorry.

13            MR. FIRESTEIN:  Perhaps we can put Demonstrative

14   Number 3 --

15            THE COURT:  Of course.

16            MR. FIRESTEIN:  Which is the beginning of a list

17   of meetings.

18            MS. WILLIAMSON:  Sorry.

19   Q    That's all right.  Go for it.

20   A    In Demonstrative Number 3, it's very clear that our

21   advisors met on numerous occasions with various creditor

22   advisors.  There were numerous meetings.  They updated us on

23   those meetings.  And so, we had the input from our

24   creditors, and, you know, there were -- as you can see, this

25   is just a representative sample of all the meetings that

1    have occurred.  But it's very clear that we sought input

2    from our creditors.

3    Q    And the representative sampling, does that continue on

4    to Demonstrative Number 4 and Demonstrative Number 5 as

5    well?

6    A    Yes, sir.

7    Q    And in connection with your work to try to understand

8    what these interdebtor claims were, did you seek information

9    from company personnel?

10   A    We did.  There -- as we began to formulate around

11   certain of the claims, and as those were -- we actually got

12   a -- or had a discussion with Mr. Sawyer and his attorney

13   from Munger Tolles in late February, because we were there

14   at the board meeting.  It was one of those formal board

15   meetings that we had.  And they had asked for time to visit

16   with us.

17           So, Chairman Evans and myself, as well as

18   representatives from Proskauer, met with them.  And that's

19   the first time that we heard what claims they were going to

20   be claiming against EFH.  And we talked through that; that

21   was an informal meeting at that time.  And then, on March

22   the 5th --

23   Q    Well, before we get to --

24   A    Okay.

25   Q    Before we get to March the 5th, did you, as part of

1    this effort to understand the claims, did you seek out

2    information from the co-CROs of the company as well?

3    A    We did.  And, on some of the claims -- for example, on

4    the tax claim, I spoke with the senior vice-president of

5    tax, because I wanted to understand particular things.  I

6    know Don had conversations with other members of management.

7    We did talk with Ms. Doré and Mr. Keglevic about the various

8    items and what they thought about questions that we had,

9    issues that we were trying to resolve in our own minds.

10   Q    Did there come a time in early 2015 when you became

11   aware that the co-CROs, including Mr. Keglevic, desired to

12   circulate what was known as a CRO term sheet?

13   A    Yes.  That was discussed at a board level.  And the

14   reason for that was we weren't making very much progress in

15   getting to a plan that all the constituents could support.

16   So, first, Mr. Keglevic and Ms. Doré came forward with a

17   term sheet that took a lot of the concepts of different

18   groups, different creditor groups' term sheets, and put them

19   into one term sheet.  But it did not have any numbers in it.

20   It -- we called it the blank CRO term sheet.

21   Q    And was that blank CRO term sheet discussed at the

22   board level prior to its circulation?

23   A    Yes, it was.

24   Q    And did you ultimately agree or allow for it to be sent

25   out at the board level?

1   A    We were never asked to vote on it at the board level.

2   It was clear that it was a term sheet put together by the

3   co-CROs.  And, you know, we -- Mr. Keglevic and Ms. Doré

4   brought it forward because of the fact that they thought

5   that perhaps it would generate discussion; it would

6   generate, perhaps, compromise; it would generate the parties

7   moving closer together.  So, the board was in favor of that,

8   certainly.  And so, we didn't instruct them not to put that

9   term sheet out.  But it was not voted on by the board.

10  Q    Well, speaking from your own perspective, why did you

11  agree to allow the blank CRO term sheet to be sent out?

12  A    Well, I think there was just a huge frustration because

13  there were so many different offers or plans or different

14  ways of constructing this.  We were very hopeful of getting

15  to a resolution in bankruptcy.  We had been talking about

16  these items for a long period of time.  And so, we were

17  willing to try just about anything to get the constituents

18  to get together and to move toward, you know, a center place

19  that everyone could support.

20         And so, I was in favor of it because I thought it

21  might generate that conversation.  And, based on what Paul

22  and Stacy said, they felt like it might.  So, I thought it

23  was a good move for us to do.

24  Q    And, as a consequence of circulating the blank CRO term

25  sheet, what happened?

1    A    Not much.  We didn't get to a resolution.  The

2    constituents continued to argue back and forth and go back

3    and forth and that sort of thing.  So, actually, Mr.

4    Keglevic came back to the board and suggested that some

5    numbers be put into that term sheet.

6    Q    And do you recall what the number was that Mr. Keglevic

7    suggested be included in this now populate -- or to-be-

8    populated CRO term sheet?

9    A    450 million.

10   Q    450 million in what direction?

11   A    It was an allowed claim from EFH to TCEH.

12   Q    Okay.  An allowed claim in favor of TCEH?

13   A    Yes.

14   Q    Did the blank CRO term sheet that went out indicate

15   directionally which way an allowed claim might come out?

16   A    Yes.  It was in the same direction.

17   Q    All right.  And, again, when the populated CRO term

18   sheet came to the attention of the board, did you agree with

19   this number?

20   A    No, there was a very fulsome discussion at the board

21   level, because we were concerned that -- or questioned

22   whether putting that number in there would upset people.  We

23   were worried about whether some people might think it could

24   set a floor or different things like that.

25             So, the way that we ultimately resolved that was,

```
1    again, the board did not preclude or order Ms. Doré and Mr.

2    Keglevic not to put that term sheet out.  But it then had a

3    cover sheet on the front that made it very clear that it was

4    the terms sheet of the co-CROs, and that it had not been

5    approved by the board and the numbers had not been approved

6    in that term sheet.

7    Q    Did Mr. Keglevic explain to you at the board level how

8    it was that he came up with this 400 -- or that he and Ms.

9    Doré came up with the $450 million figure?

10   A    Yes.  He said it was kind of a midpoint between the bid

11   and ask term -- all the different term sheets that had come

12   in.  It was sort of a midpoint between the bid and ask on

13   that.

14   Q    And, after the -- well, again, from your own

15   perspective, why did you agree to allow this, now populated

16   with a $450 million figure, be circulated amongst the

17   creditor constituents?

18   A    Well, as I stated in the very beginning, it was my

19   responsibility to maximize the value of the EFH estate.  And

20   I was concerned that the longer we stayed in bankruptcy, and

21   people just sat and argued, that we would begin to destroy

22   value in the estate.  And so, I felt it was important to try

23   every remedy that we could try to try to get the

24   constituents to get on the same page and come up with a deal

25   that would work for everyone.
```

1  Q    And after the CRO term sheet, now populated with

2  numbers, was circulated, what happened?

3  A    It pretty much upset everybody out there.

4  Q    Did you continue to keep going with your disinterested

5  director work on the interdebtor claims?

6  A    Absolutely. The 450 wasn't the disinterested director

7  settlement, nor was it based on the kind of due diligence

8  that Chairman Evans and I were doing.

9  Q    Now, did the existence of the CRO term sheet and its

10  amount influence you in what ultimately became the

11  disinterested director settlement?

12  A    Absolutely not.

13  Q    Could you explain to the Court why not?

14  A    Well, first off, as I just stated, Mr. Keglevic came up

15  with that number as a midpoint of bid and ask.  And while I

16  had seen all those different sheet -- term sheets that had

17  come in and that sort of thing, we were going through a very

18  detailed process, because it was very important to Chairman

19  Evans and myself to go through and understand each claim, to

20  look at the legal arguments, both pro and con, on each

21  claim, and to generate a number that was fair to all of the

22  parties.

23  Q    So, eventually, did there come a time in late February

24  or early March 2015 when your advisors and those for TCEH

25  met to exchange merits-based discussions with respect to

1   these interdebtor claims?

2   A    Yes.  The first meeting was on March the 5th.  And

3   Munger Tolles presented its deck that went through the

4   individual claims that they were going to assert from TCEH

5   against EFH.  And in that presentation, it had the legal

6   arguments on which they based their position.

7   Q    And, prior to that meeting -- and we'll get to the

8   presentation in a moment -- you indicated earlier that you

9   had had an earlier meeting with Mr. Sawyer?

10  A    Yes.

11  Q    Describe generally what happened at that meeting.

12  A    Well, it was kind of an interesting meeting.  I felt

13  like it was a meeting where they were beginning to kind of

14  draw their lines in the sand about what their position was

15  going to be.  They were very -- they talked a lot about a

16  claim related to the LBO and how large that was, and that

17  sort of thing.  They talked about some of their other

18  claims.  And so, I think it was sort of kind of setting up

19  their lines.

20  Q    So, in connection with this March 5th meeting that

21  Proskauer and MTO had, were you -- did you become aware that

22  a written presentation was made?

23  A    Yes, Proskauer shared that with us.

24  Q    And, if you would -- and so, you've seen that

25  presentation?

1    A    Yes, sir.

2    Q    If you would turn in the binder in front of you, under

3    Tab 12, Letter B?

4    A    Yes.

5    Q    Do you recognize that document?

6    A    Yes.   That's the presentation that Munger Tolles made

7    to Proskauer on March the 5th.

8    Q    And after you reviewed this, or in connection with your

9    review of this presentation, what did you think about the

10   claims that were being asserted by TCEH and their strength?

11   A    Well, it became clear that there were two sides to each

12   claim.

13   Q    And after your review of this, what happened next?

14   A    Well, we discussed through this deck and the claims

15   that had been asserted, and what the legal basis from the

16   other side was, for Munger Tolles.  And then we also

17   discussed our position that we would be taking through

18   Proskauer Rose.

19   Q    Did you ask Proskauer to prepare a responsive deck

20   presentation?

21   A    We did.

22   Q    If you would turn to Tab C in the same exhibit?

23   A    Yes.

24   Q    Do you recognize that?

25   A    Yes.

1    Q    What do you understand Tab C to be?

2    A    That's the presentation that Proskauer Rose made back

3    to Munger Tolles on March the 11th in rebuttal to their

4    claims.

5    Q    Now, did your thinking change with respect to the

6    merits of the claims in question after your review of the

7    presentation that Proskauer had made to Munger Tolles?

8    A    Well, we had discussed these claims with Proskauer

9    before, and had talked about what our legal basis was.  But

10   we asked Munger -- I mean, we asked Proskauer to go back in

11   a very strong and aggressive way in this document.

12            So, again, we felt that the Munger Tolles deck

13   that had come against us had been strong, and so we wanted

14   to go back in a very strong and aggressive way on those

15   claims.

16   Q    Now, after this sort of presentation/counter-

17   presentation that we've discussed, were there proposals for

18   settlement that had been exchanged or that were exchanged

19   between TCEH on the one hand and EFH on the other?

20   A    Yes.

21   Q    Now, the details of those proposals are set forth in

22   your written direct and the exhibits that either are or are

23   going to be in evidence.  In order to advance this, was a

24   deal reached based upon those exchanges of proposals?

25   A    No.

1    Q    Can you explain to the Court then what happened next?

2    A    Well, I think, at that point, Chairman Evans and I

3    spoke, and then we also talked with Mr. Sawyer and Mr.

4    Cremens.  And we felt that, if the four of us could get

5    together, face-to-face, instead of just relying on things

6    going back and forth between our advisors, that perhaps we

7    could get to a resolution.  So, we all agreed, after much

8    discussion, that we would meet in Dallas and have face-to-

9    face negotiations.

10   Q    In having these discussions with Mr. Cremens and Mr.

11   Sawyer about the potential for meeting face-to-face, were

12   you unwilling to consider litigation on these claims?

13   A    Absolutely not.  But I think the thing that was

14   important to Chairman Evans and myself was, if we could get

15   to a consensual resolution of this, or a fair resolution,

16   then that would save us a great deal of delay in the

17   bankruptcy case, as well as saving us a lot of fees for

18   litigating.  But we never took litigation off the table.

19   And, in fact, in our discussions, it was threatened.

20   Q    Let me just ask the question directly this way:  why

21   didn't you just pursue litigation with respect to these

22   claims?

23   A    Well, first off, I thought that was going to be very

24   expensive.  And we have a limited amount of cash that we can

25   use to pay off our creditors.  And it was very important to

1    Chairman Evans and me to try to get as many of our creditors

2    paid off.  So, I felt like the legal fees would be

3    substantial.

4            There was also a delay.  I mean, it had to -- it

5    took, like, 17 months to just do the issue on the make-whole

6    so far.  So, if every one of these things had taken an

7    extended period of time, even if we'd run them concurrently,

8    we kind of figured that would take a substantial amount of

9    time, a year or two years.  And we didn't want -- did not

10   want to be in bankruptcy for that length of time.

11           So, we felt like, if we could move to a consensual

12   discussion and move to a consensual resolution, that it

13   would help the bankruptcy and we would be able to get out of

14   bankruptcy in a faster way and in a more efficient way.

15   Q    Are you aware that some of the creditor objectors claim

16   that your not having prepared some form of litigation budget

17   suggests that you never seriously considered litigation of

18   these claims?

19   A    I'm aware of that.

20   Q    Does the fact that you didn't prepare a litigation

21   budget mean that you never considered litigation?

22   A    No.  I think, after 40 years in business, and Chairman

23   Evans had been in business for longer than that, we kind of

24   knew what a lot of these type cases would take.  We also

25   knew what kind of fees were being incurred in this case by a

1    whole lot of law firms.  And so, the fact that I didn't have

2    a detailed budget -- I didn't need a detailed budget to tell

3    me that it was going to take a lot of money.

4    Q    So, moving along the timeline here, you indicated that

5    there came a point where you met in Dallas face-to-face with

6    the other disinterested directors or disinterested managers,

7    to try to resolve the interdebtor claims.

8    A    Yes.

9    Q    If you would turn, please, back to the Demonstrative

10   tab, and look at Demonstrative Number 2?  Do you see those

11   meetings reflected on Demonstrative Number 2?

12   A    Yes, sir.  They're at the very top, March 24 through

13   26.

14   Q    And this was three days of meetings?

15   A    Yes.

16   Q    Can you just describe for the Court, please, generally

17   what happened during those meetings?

18   A    Well, there were a whole lot of discussions.  There

19   were discussions that just involved Chairman Evans and

20   myself and either Mr. Sawyer or Mr. Cremens.  There were

21   discussions where we had only one representative from our

22   law firm in -- our respective law firms in the room with us,

23   and then there were times when we had all of the advisors

24   for everyone in the room with us.  There were times where we

25   asked the co-CROs to step into meetings to ask -- answer

1    questions for us, to clarify matters.

2             But quite honestly, it was a grueling process.  We

3    worked hard all three of those days.  There were times where

4    those discussions were very contentious.  They were very

5    blunt.  And, quite honestly, sometimes they were angry

6    discussions.

7    Q    You mentioned contentious, blunt and sometimes angry.

8    Can you give us a sense of what the tenor and tone was of

9    these meetings that you had?

10   A    Well, I'm not sure how to describe it differently than

11   that, but you know, the objective was for us to do the best

12   for our estate.  Each -- each group was trying to do the

13   best for their estate.  We were interested in trying to

14   reach a consensual deal, but if we couldn't, we knew what

15   the -- what we would have to go and do, and -- which would

16   be litigation.  But these were -- these were tough

17   discussions.  And in fact it -- it took a little while after

18   that time in Dallas for us to be able to kind of rebuild

19   those relationships with Mr. Cremens and Mr. Sawyer.

20   Q    Was it a foregone conclusion, Ms. Williamson, in your

21   mind, that a settlement would be reached in Dallas?

22   A    That was our hope.  It was not a foregone conclusion.

23   And in fact, there were times during the -- the three days

24   where I wasn't sure we would get to a settlement.

25   Q    Now, ultimately was a deal in principle reached?

1    A    It was.

2    Q    Okay.  If you would turn, please, to Tab 12 in the book

3    in front of you, under the Subtab Letter A.  Do you have

4    that before you?

5    A    Yes, sir.

6    Q    And, do you --

7              THE COURT:  I'm sorry, what?

8              MR. FIRESTEIN:  I'm sorry, Your Honor.  Tab 12 and

9    it's --

10             THE COURT:  All right, so -- yeah, I wanted to

11   mention that earlier.  So, you referenced, earlier with the

12   witness I think Tab B, Tab C, without identifying what they

13   were.  Those were exhibits to DX-12?

14             MR. FIRESTEIN:  Yes, Your Honor.

15             THE COURT:  Okay.  And that's what you're

16   referencing now?

17             MR. FIRESTEIN:  Yes, Your Honor.  My apologizes.

18             THE COURT:  That's all right.

19   Q    Do you recognize what is under Tab A of DX-12, Ms.

20   Williamson?

21   A    Yes.

22   Q    What is that?

23   A    That is the joint statement of summary of settlement of

24   the intercompany claims.

25   Q    Does that document accurately reflect the terms of the

1    disinterested director settlement that was reached in

2    Dallas?

3    A    It does.

4    Q    Now looking at the second page and the last bullet

5    point contained under Tab A of DX-12, do you see that?

6    A    Yes.

7    Q    Can you explain to the Court what you understood you

8    were agreeing to there?

9    A    Well, that's our fiduciary out.  And so what -- what we

10   had there was this was the settlement, it was based on, you

11   know, our negotiations and our knowledge of facts as of this

12   time.  And we had this fiduciary out that allowed us to

13   exercise our fiduciary duties for each of our estates.

14   Q    We'll return to consideration of the fiduciary out a

15   little bit later, but first I want to focus on the essence

16   of the disinterested director settlement.

17            And to advance this, there's really not been much

18   controversy about this, is it fair to state that one of the

19   key elements was granted an allowed unsecured claim in the

20   amount of $700 million in favor of TCEH and against EFH with

21   some possible ways for that to increase?

22   A    Yes.

23   Q    And the rest of the terms that were reached on that

24   agreement are identified under Tab A of DX-12?

25   A    Yes.

1    Q    Now, are you aware that certain creditor objectors

2    claim that this disinterested director deal was reached

3    somehow in stealth?

4    A    I'm --

5    Q    In secret?

6    A    -- I'm -- I'm aware of a claim.

7         MR. GLUECKSTEIN:  Objection, Your Honor to the

8    characterization of the nature of the objection.

9         MR. FIRESTEIN:  I think I'm just taking the words

10   right out of their brief, Your Honor, but nonetheless I'll

11   say in secret.

12        THE COURT:  Go ahead and answer.

13        MS. WILLIAMSON:  Yes.

14        THE COURT:  Are you aware of that?

15        MS. WILLIAMSON:  I'm aware of that.

16   Q    And do you agree?

17   A    No.  I think that, you know, this had been going on for

18   an -- an extended period of time.  Kirkland had gone out to

19   all of the creditors and all of the -- the committees and

20   that sort of thing and said, if you have any claims, please

21   let us know what they are.

22        And that's where they generated their list in

23   December.  There were numerous meetings, as we talked about,

24   and showed on the representative listing in my

25   demonstrative.  There were numerous meetings about these

1    claims.  There was all sorts of argument going on

2    continually.

3              The CRO term sheet showed an allowed claim from

4    EFH to TCEH.  It also put a number in there, not that that

5    was our number or was used as a basis for anything, but it

6    gave some indication of the magnitude of the midpoint that

7    other term sheets had come into.  And I think it was very

8    clear that we were having these meetings in Dallas, so I

9    don't know how people could say that it was secretive.

10   Q    In your approach to resolving the inter-debtor claims

11   and ultimately agreeing to the $700 million claim in favor

12   of TCEH, did you assign any particular value to any specific

13   claim or claims?

14   A    No.  We were very interested in doing a global

15   settlement of all of the -- the claims.  We didn't want to

16   have some of them settled and some of them litigated and

17   that sort of thing.  We were trying to get to a global

18   settlement.  And as you can see by the -- both the Munger

19   Tolles deck and the Proskauer deck there were legal

20   arguments on both sides, and so each side of us saw those

21   individual claims differently.

22             So to try to sit there and argue through and get a

23   specific number on each one of those claims, we did not

24   think that would be productive.

25   Q    Did you, nonetheless, assess, in your own mind, risk

1    associated with individualized claims?

2    A    Yes, we did.

3    Q    And we'll get to that discussion in a minute, but to

4    this end, did you also have an understanding of what the

5    face amount or par amount of the claims were that you were

6    considering as part of this contemplated resolution?

7    A    Yes.

8    Q    What did you understand the par value of the claims,

9    being asserted by TCEH, to be?

10   A    It was 1.8 billion to 2.5 billion.

11   Q    And did that include or exclude the LBO claims?

12   A    It excluded it, because it was so huge that it would

13   just have thrown the numbers off.

14   Q    And did you also have an understanding as to what the

15   par claims were for any claims that EFIH might assert

16   against EFH?

17   A    Yes.  Those were about 2 billion.

18   Q    And could you explain to the Court, generally, what the

19   nature of those EFIH claims were?

20   A    Yes.

21   Q    First there was $1.3 billion worth of debt, so that was

22   certainly a rather clear claim.  And then there was another

23   claim that dealt with dividends that had been made -- paid

24   from EFIH up to EFH that had been subsequently been used to

25   pay off some of the intercompany debt with TCEH.  And that

1   number ranged anywhere from 400 million up to 900 million.

2   I think in the deck that Munger Tolles brought forward they

3   put 600 million on that.

4   Q    And when you're talking about the dividend, that's a

5   dividend that came from EFIH to EFH and then was used to pay

6   off the intercompany notes at TCEH?

7   A    Yes.

8   Q    All right.  And did you believe that any of the -- when

9   you were evaluating these claims, did you believe that any

10  of them were riskier than say other claims?  And I'm

11  speaking of the ones now, principally, that were asserted by

12  TCEH against EFH?

13  A    Yes, I did.

14  Q    And what did you base your belief of riskiness on, as

15  it pertained to the inter-debtor claims you were trying to

16  resolve?

17  A    Well, it -- I based it on reading the -- the legal

18  arguments on both sides, submitted by Munger Tolles and

19  submitted by Proskauer.  I looked at some of the evidence

20  associated with each of those claims.  I discussed technical

21  matters in each of those claims, to make sure that I

22  understood them.  And then using my own business experience

23  over 40 years I could assess, in my own mind, which ones I

24  thought were a little riskier and that's how I made that

25  decision.

1    Q    If you would turn, please, to again, Tab B, under DX-12

2    and specifically to the second page of that.  This is the

3    Munger Tolls presentation.

4    A    Yes.

5    Q    We'll use this as a reference point.  Which of the

6    claims that are set forth on this page did you consider to

7    be riskier than others.

8    A    The top three, which were the intercompany tax claim,

9    the preferential tax payment, the TCEH intercompany notes

10   claim and then item number 6 which was the sponsor fees and

11   shared services.  And then of course we had the discussion

12   around the basis step up.

13   Q    Okay.  Well, let's talk about a few of those.  What did

14   you understand the intercompany tax claim to be?

15   A    Well, the intercompany tax claim related to entries

16   that are booked into our financial records in accordance

17   with our tax allocation agreement.  And so different

18   entities have a number that they book on their financial

19   statements and so there was a $754 million item from TCEH

20   against EFH.

21           Now EFH also had a net of all of the 754 plus a --

22   an item at Luminant that was about 1.3 billion.  So EFH had

23   a number on their books of receivable of 535 million.

24   Q    And why did you, in your mind, come to the conclusion

25   that the tax claim was riskier than some of the other

1    claims.

2    A    Well, under generally accepted accounting principles,

3    you could net those.  What I learned is under bankruptcy

4    there's a triangular offset and you can't necessarily offset

5    those.

6    Q    Did you believe that you had arguments to defend

7    against the claims?

8    A    Absolutely, we did.

9    Q    And why not just defend it?

10   A    Well, any time that you go into litigation you have a

11   -- a risk of losing -- you know, or an opportunity to win

12   and a risk of losing.  And if you looked at all of the

13   evidence that was associated with the tax claim, there were

14   some things, for example, there were SEC filings that

15   supported one side, and then there were SEC citings that

16   supported the other side.

17         There were some ambiguities in the tax allocation

18   agreement.  There were also some items that conflicted in

19   the decision paper that was brought in front of the board

20   for approval of the tax allocation agreement.

21         The tax allocation agreement only occurred in

22   around 2010.  So there was a whole lot of ambiguity, there

23   were a lot of different pieces of evidence on both sides and

24   so I -- I felt like that would make it more risky, that it

25   was not a certainty that we would win that claim.

1   Q    Let's shift to the intercompany notes, if we can.

2   A    Yes.

3   Q    What did you understand -- that's one of the other ones

4   that you identified as something you believed to be riskier.

5   A    Yes.

6   Q    What did you understand the intercompany notes claim to

7   be.

8   A    The intercompany notes claim related to the interest

9   rate that was charged there.  And when those notes were

10  originally entered into the interest rate was LIBOR plus

11  five percent, which was about a 10 percent rate, and that

12  seemed appropriate at that point in time.  They were demand

13  notes, there were different clauses in there.

14           But as we moved forward in the -- in time, and

15  interest rates fell, that LIBOR plus five was -- the

16  interest rate was about five, because the interest rates

17  were zero.  And there was a question as to whether that was

18  a fair interest rate for the creditworthiness or lack of

19  worthiness on -- on the debtor.  And the other thing is we

20  also had a conflicting fact in that in our money pool we

21  paid about, oh, 10.7 or 10.8 percent on those intercompany

22  balances.

23  Q    When you say your money pool, are you referring to the

24  EFH money pool?

25  A    I was -- yes.  The --

1    Q    All right.

2    A    -- EFH money pool.

3    Q    Now again, did you believe that you had arguments to

4    defend against this claim?

5    A    Yes, we did.

6    Q    By the way, are you aware of whether there has been any

7    creditor who's actually challenged this claim --

8    A    Yes, it was --

9    Q    -- or challenged this issue?

10   A    -- it -- it was challenged by Aurelius.

11   Q    Okay.  Moving on to the sponsor fee claim.  What did

12   you understand the sponsor fee claim to be?

13   A    It was the allocation of those sponsor fees and shared

14   service fees to the different entities within EFH.

15   Q    And why did you believe that the sponsor fee claim was

16   riskier, in your mind?

17   A    Well, starting in 2010 the sponsor fees were 100

18   percent assigned to TCEH and then on the shared service fees

19   those shared service fees were about 80 percent assigned to

20   TCEH.  And those were very large numbers, and there are

21   other entities within the organization.

22   Q    Well let's carve off the shared services for a moment

23   and stay focused on the sponsor fee claim.  Did -- was it

24   your testimony that about -- that post-2010 a hundred

25   percent of the sponsor fee claims -- excuse me, sponsor fee

1    payments were allocated to TCEH?

2    A    Yes.

3    Q    And what was it about that that you considered to be a

4    riskier position for EFH in a claim that might be made by

5    TCEH?

6    A    It was a hundred percent.

7    Q    And were you aware at the time that there was also

8    potential threatened claim by TCEH against the sponsors,

9    concerning that as well?

10   A    Well, their claim against the sponsors was whether

11   there should be fees at all and the -- the claim that we

12   were dealing with, as it related to this matter was the

13   allocation of those fees.

14   Q    Are you aware of the existence of an indemnity

15   agreement that exists between the sponsors and EFH?

16   A    I certainly am.

17   Q    Did the existence of that indemnity agreement play any

18   part in your determination of risk as it pertained to the

19   sponsor fee claim?

20   A    Certainly.  If someone was to bring a claim against the

21   sponsors, first EFH would have the opportunity to pay for

22   the legal fees, as well as if anyone won a judgment against

23   the sponsors, the sponsors could put that back to the

24   company and we would have to reimburse for that.

25   Q    Now returning to the shared services claim.  What did

1   you understand shared services to be, as distinguished from

2   the sponsor claim?

3   A    Okay.  Shared services are where we do a lot of our

4   accounting, our IT work, and so there were different --

5   purchasing, all of that was sort of centralized.  And then

6   the costs of that are allocated out to the individuals who

7   use that.

8   Q    And in this instance, the riskier aspect of this was

9   the percentage allocation to TCEH?

10  A    It was.

11  Q    Had that changed in recent years?

12  A    Well, yes.  I think, you know, part of the issue is

13  EFIH really didn't have any people or assets.  They owned

14  Oncor and Oncor was in a ring-fence.  So Oncor had its own

15  shared service center.  And then at EFH they -- we had very

16  few people and not a lot of operations there.  So the

17  company, and -- and management within the company, both from

18  TCEH and EFH and EFIH went through budgeting processes every

19  year and determined how those expenses were going to be

20  allocated.  But -- so -- but the -- the percentage had

21  raised on the amount that had been allocated to TCEH.

22  Q    Did the expense associate with litigating the shared

23  services claim play into your assessment of its risk?

24  A    Yeah.  The -- the way that those allocations are made

25  and, you know, we talk about three estates, but there's

1    hundreds of subsidiaries or affiliated companies underneath

2    that that make up the consolidated total of Energy Future

3    Holdings, and so this is a very detailed calculation of who

4    uses what expense, how that's allocated and that sort of

5    thing.

6            It's not just, okay, TCEH is this much of the

7    assets or this much of the revenue so they get that

8    percentage, and that type of thing.  So it's a very

9    intricate, detailed calculation that would have to be

10   completely reworked, and it would be very time consuming to

11   do that.

12   Q    The last item that you mentioned that is on the second

13   page of Tab B of DX-12 was the basis step up issue.  What

14   did you understand the basis step up matter to concern?

15   A    Well, TCEH or the TCEH creditors originally wanted a

16   taxable transaction, because in a taxable transaction they

17   could get a full step up in basis on their assets, which

18   would reduce their taxes on a go forward basis.

19           We were much more interested in a tax free

20   transaction with TCEH, because we did not want to leave

21   stranded taxes at the EFH level, because there would not be

22   funds to do that and there's a lot of complex stuff about

23   checking the box or, you know, disregarded entities and that

24   sort of thing.

25           So -- but under a tax free transaction, while we

1    could get some step up to the TCEH side, and we -- we could

2    do that through some of the NOLs that were sitting up at

3    EFH, we could not close the full gap.  And so it was

4    important to us, one, to have a tax free transaction, and so

5    you know, there's a consent fee kind of associated with

6    that, but then two, we couldn't close the full gap.

7    Q    Did the value or amount that you considered

8    attributing, either in the aggregate or in isolation, to the

9    step up matter, depend on the value of TCEH?

10   A    It did.

11   Q    And moving ahead a little bit, after the disinterested

12   director settlement was entered into, was there concern that

13   came into your mind with respect to the value of TCEH and

14   its impact on the deal?

15   A    Yes.  We -- we looked at that, because, you know, the

16   value of TCEH moves a bit with things like the price of

17   natural gas and different things, interest rates and -- and

18   EPA claims and different things like that.  And so there --

19   there was a decline in the value of TCEH.

20           However, you know, offsetting that, we were

21   looking at, again, the -- the consent fee associated with

22   that, but -- and also with the fact that the IRS would

23   participate in assigning what the valuation was.  And it was

24   not -- it was not easy for us to anticipate what the value

25   of TCEH might be at the -- the emergence.

1            But the other thing, at that same time that we

2    were having issues with the TCEH value, we also had received

3    the -- the final bid from NextEra on Oncor.  And it was a

4    billion dollars less than they originally had done, about

5    17.2 billion.

6            And if we were to use that Oncor -- I mean, take

7    that bid, it would have meant that the EFIH side would

8    likely not be fully paid.  And at that point, you know, we

9    were looking at that note of $1.3 billion being put back to

10   EFH, plus the other claims of 6 or 700 million.

11   Q    And when you speak of the potentiality of that note and

12   other claims by EFIH, under the disinterested director

13   settlement, how have those claims been resolved?

14   A    Well, we negotiated to completely do away with the

15   claims from EFIH up to EFH in the disinterested director,

16   even though, you know, part of the negotiation was the T-

17   side did want some of the claims sitting there.  But that

18   would have been structurally superior and would have hurt

19   our EFH estate, so therefore we negotiated that there would

20   be no claims at the EFIH level.

21   Q    When did this -- you mentioned the NextEra bid

22   dropping.  When were the -- this value decline in TCEH, I

23   mean, when did this all sort of come to your attention?

24   A    The summer of 2015.

25   Q    Okay.  And did you consider, at that time, whether to

1    exercise your fiduciary out, pursuant to the disinterested

2    director deal?

3    A    Yes.  Chairman Evans and I, on a -- a fairly -- every

4    time that there's a major event in the case, Chairman Evans

5    and I step back and look at is there something we should be

6    doing differently, have the facts changed enough that there

7    would be something that we should do differently as it

8    relates to the -- the disinterested director settlement.  So

9    we did, at that time, but we have done that on other

10   occasions also.

11   Q    Now we've been speaking about claims that existed

12   against EFH.

13   A    Um hmm.

14   Q    What about TCEH, did EFH have claims against TCEH?

15   A    We did.

16   Q    And do you have a recollection as to what those claims

17   were?

18   A    Well, as I mentioned earlier, we had this $535 million

19   tax receivable that we, you know, were going to argue and --

20   and that sort of thing.  But then we also held debt and that

21   debt was about $289 million of unsecured debt and about $20

22   million of secured debt.

23   Q    And how did the existence of those claims factor into

24   the context of the disinterested director settlement that

25   you approved pursuant to which a $700 million allowed claim

1   was permitted in favor of TCEH?

2   A    Well I've already talked about the challenges

3   associated with the $535 million tax claim.  But in addition

4   to winning something, you have to be able to collect

5   something.  So even if we had won all of those claims, and

6   had a billion dollars of claim against the T-side, we would

7   have gone into this lovely bucket of $20 billion of

8   unsecured claims, so we would have only receive pennies on

9   the dollar.

10  Q    Spent a lot of money to go after claims and get a

11  little bit in return?

12  A    Correct.

13  Q    All right.  Now are you aware of other claims that

14  certain creditor objectors suggest that EFH has against

15  TCEH?

16  A    Yes.

17  Q    Are those matters that you saw in the briefs that were

18  filed in this matter?

19  A    Yes.

20  Q    Does that change your view, with respect to the wisdom

21  or propriety of the disinterested director settlement?

22  A    It does not.

23  Q    Why not?

24  A    Well, first off, let's go back to this collectability

25  issue.  No matter how -- you know, we would have to win some

1    huge claims to make a big difference.  We're going to spend

2    a lot of money, and right now we have a precious amount of

3    cash that I personally want to use in paying off our

4    creditors.

5             And so I didn't feel like spending that money on

6    litigating those kinds of claims would make a lot of sense,

7    when I wasn't going to collect much in return, because those

8    would be mostly unsecured claims, and therefore they would

9    go in that bucket.  There's a lot of unsecured debt and

10   claims sitting on the T-side that will never be paid.

11   Q    Did the issue of EFH solvency or insolvency play into

12   your consideration or evaluation of some of the claims that

13   were suggested by creditor objectors in their briefs?

14   A    Well, we would certainly have had to consider that, and

15   -- and that sort of thing.  And those matters affected us,

16   but really the collectability issue was the -- the main

17   issue for us, as well as spending money to go after claims

18   that really, you know, there was no assurity, no certainty

19   that we were going to win.

20   Q    To tie this issue off, why, in your words, is the

21   disinterested director settlement in the best interest of

22   the EFH box?

23   A    I believe it's a fair settlement that gives certainty

24   to the case, certainty to know what that liability is going

25   to be.

1          It also takes a lot of litigation off the table.

2   It takes the delay out of what we are trying to do, in terms

3   of get this company out of bankruptcy.  And I think it's

4   absolutely critical that we get to an emergence so that

5   these companies can begin to operate without the

6   restrictions that they have in bankruptcy.

7   Q    Now as time went on, did -- were there changes that

8   were made to the disinterested director settlement, at least

9   in its form that it was reached in late March and early

10  April of 2015?

11  A    Yes.

12  Q    Do you know when those changes came into being?

13  A    Yes, as we were negotiating the plan support agreement,

14  the settlement agreement and the third amended plan.

15  Q    And explain to the Court, please, what the proposed

16  changes were to the disinterested director settlement that

17  you considered.

18  A    There were three changes.  First, the cap on the

19  liability was stopped at 700 million, versus being able to

20  go up to 805 million.  Secondly, there was a small amount of

21  settlement that was provided to the sponsors.  It was maybe

22  7, 8 or $9 million, I can't remember, in the original

23  settlement.  And that -- the sponsors gave that up, we took

24  that out.  And then finally, the -- the claims that we

25  resolved were up until the point that we filed for

1    bankruptcy and the change was made that when the -- it comes

2    up until these orders are entered.

3    Q    And did you consider these changes to be helpful or

4    beneficial to your box?

5    A    Yeah.  It reduced the amount I had to pay.

6    Q    Okay.  Now in talking about the sponsors that you just

7    mentioned a moment ago, and their not getting anything from

8    the revised version of the DD settlement, are you aware that

9    there are some creditor objectors, particularly the E

10   committee, who suggest that the sponsors controlled the

11   settlement process and that they were intimately involved

12   with the conclusion that was reached?

13   A    I'm aware of that.

14   Q    Okay.  How do you respond to that?

15   A    Well, there is nothing that can be farther from the

16   truth.  We did not discuss any of the claims with the

17   sponsors, they never gave us opinion as to what they thought

18   that should be, they never told us what they -- you know,

19   their equity is what sits up at EFH and they could have put

20   pressure on they wanted a certain amount of that equity or

21   that sort of thing, they never did that, never once.

22            And so I don't know how that claim can be made,

23   because we didn't discuss it with them, we didn't have any

24   pressure from them, we had no instructions from them.

25   Nothing.

```
1   Q    Did the -- to your knowledge, did the sponsors
2   communicate with you about your deliberative process with
3   respect to resolution of these inter-debtor claims?
4   A    No.
5   Q    All right.  Now I want to stay focused on the sponsors
6   for a minute, but shift to the concept of the releases that
7   are being afford to them.  You're familiar with that?
8   A    Yes, sir.
9   Q    Now, in the beginning of your testimony we talked about
10  this special committee, and I want to return to that.  And
11  that was the special committee in anticipation of the
12  original plan that was filed in April of 2015?
13  A    Yes.
14  Q    Do you have an understanding as to why it was that you
15  were selected to be on this special committee?
16  A    Because I'm not affiliated, in any way, with the
17  sponsors.
18  Q    And who else was on the EFH special committee?  And by
19  "EFH" I'm referring to EFH Corp.
20  A    Chairman Evans, John Young and Arcilia Acosta.
21  Q    Okay.  Now was this the first time that you, as a non-
22  sponsor director, had met to consider issues that were
23  important to the company?
24  A    No.
25  Q    When did you begin examining issues pertaining to the
```

1    company, without the presence of the sponsors, or their

2    related directors?

3    A    Well, as I mentioned, I joined the board in early 2013

4    and at that time we began, in early 2013 to have meetings of

5    the non-sponsor directors.  Just to address any matters that

6    had come up, to respond to any things that -- that the

7    sponsors might have said or discussed in a board meeting,

8    any matters of what they were doing as it related to the

9    company and that type of thing.

10            MR. FIRESTEIN:  Your Honor, this might be a good

11    time to just to take five, if we could?

12            THE COURT:  Yes.  That's fine.  We're going to

13    take a recess and during that recess I'm going to review

14    Paragraphs 56 through 62 and we'll address that objection

15    before we continue direct, because I think we may be headed

16    there, in any event.

17            MR. SHEPPARD:  That was going to be my suggestion,

18    Your Honor.  Thank you.

19            THE COURT:  Very good.  We're in recess.

20        (Recess)

21            CLERK:  All rise.

22            THE COURT:  Please be seated.  Sorry for the

23    delay.  Every time you get me off the bench, all my other

24    cases come crashing down on me, so I apologize.

25            MR. MCKANE:  Not at all, Your Honor.  Thank you

1    for all of your time.  For the record, Mark McKane of

2    Kirkland & Ellis on behalf of the Debtors.

3              Your Honor, we've been able to meet and confer

4    with counsel for the EFH committee and have resolved the

5    issue as it relates to the written declaration of Ms.

6    Williamson.  We will -- I'm going to explain what change

7    will be made.  And what we'll do, Your Honor, is prepare a

8    strike-through version of the declaration and delineations

9    for the official declaration when it will be admitted into

10   evidence.  Recognizing where we are in the day, we'll have

11   the lunch break opportunity to do that, and we'll obviously

12   republish to the world that as well so that all of our

13   people on the protective order can have the full revised

14   declaration.

15             THE COURT:  Okay.

16             MR. MCKANN:  Your Honor, just for the record,

17   specifically on paragraph -- we will strike the last

18   sentence of Paragraph 56.  And in Paragraph 58, there is a

19   request for an additional clarification in the second line,

20   where it says, "As of today, no entity has presented me with

21   specific valid or valuable claims."  The request from the

22   committee is to clarify that that entity is intended to be

23   third parties and, obviously, not to take into consideration

24   advice from counsel.  That was not the intent, and so we'll

25   make that clarification as well.

1            THE COURT: Okay.

2            MR. SHEPPARD:  That is accurate, Your Honor.

3            THE COURT:  Okay, very good.  And you'll adjust

4    your direct accordingly going forward.

5            MR. FIRESTEIN:  I beg your pardon?

6            THE COURT:  You'll adjust your direct with Ms.

7    Williamson accordingly, I assume?

8            MR. FIRESTEIN:  Yes.

9            THE COURT:  Okay, very good.

10           MR. FIRESTEIN:  Thank you, Your Honor.  May I

11   resume?

12           THE COURT: You may proceed.

13           MR. FIRESTEIN:  Thank you.  Well, it's a very

14   topical moment because we'll move directly into this.

15   Q    During 2013, Ms. Williamson, did there come a time in

16   which an outside law firm was hired to do a detailed

17   examination into matters pertaining to sponsor activity?

18   A    Yes.

19   Q    Who was that?

20           THE COURT:  Ms. Williamson, I'm sorry to

21   interrupt.  Can you move a little closer to the mic?

22           MS. WILLIAMSON:  Yeah, sorry.  I'm sorry.

23           THE COURT:  Thank you.  That's all right.

24   Q    Who was that?

25   A    Sidley Austin.

1    Q    Okay.  And in a general sense, what did you understand

2    Sidley's task to be?

3    A    They were asked to review certain matters associated

4    with the LBO, and the sponsors involvement in that.

5    Q    And did Sidley ever make a presentation that you heard

6    about their work?

7    A    They did.

8    Q    And when was that?

9    A    Let's see.  I think it was in September of 2013.

10   Q    Okay.  Now, I don't want you to disclose any of the

11   contents of what anybody from Sidley told you.  My question

12   is, were you satisfied with the work that Sidley had done?

13   A    We were.

14   Q    Thereafter, were any claims filed by EFH or anyone

15   else, to your knowledge, against the sponsors?

16   A    No, sir.  There were no claims filed.

17   Q    Moving ahead in time, did there come again an instance

18   in advance of filing the petitions in bankruptcy in this

19   matter in April of 2014, in which you were asked to review

20   potential sponsor claims again?

21   A    Yes.

22   Q    And this was before the special committee that you

23   identified earlier was formed in 2015; is that right?

24   A    Yes.

25   Q    And what happened in the early part of 2014 that caused

1    your further review of sponsor conduct?

2    A    We asked Sidley Austin to come back in, and to update

3    their work and look at any new factors that may have

4    occurred, and to report to us.

5    Q    Were any other law firms involved in that review

6    besides Sidley, to your knowledge?

7    A    Yes.  We heard from Kirkland & Ellis on that.

8    Q    Are you familiar with what's known as the RSA?

9    A    Yes, sir.

10   Q    And what is the RSA, to your understanding?

11   A    The RSA was the restructuring support agreement that we

12   had filed when we filed initially for bankruptcy, and it had

13   certain agreements from certain of our major creditors in

14   it.

15   Q    And what was your understanding as to the connection

16   between the review of sponsor conduct at that time as it

17   relates to the RSA?

18   A    The RSA included full releases for the sponsors, as

19   well as others, but certainly for the sponsors.

20   Q    And as a result of whatever information that you

21   received and the determination to enter into the RSA, what

22   conclusion did you reach with respect to whether releases

23   should be included in the RSA?

24          MR. SHEPPARD:  Objection, Your Honor.  I believe

25   that question goes over the line that we just thought we'd

1    established.  He's essentially asking her to --

2              THE COURT:  I agree.

3              MR. FIRESTEIN:  I'll withdraw the question, Your

4    Honor.

5    Q    Were you and those with whom you considered this with

6    at the company the only ones who believed, to your

7    knowledge, that a release for the sponsors were appropriate?

8              THE COURT:  Can you --

9    Q    Yeah.  Let me be more specific about this.  Had you

10   received any information from the EFH committee as to

11   whether releases for the sponsors and their affiliates were

12   appropriate at around this time?

13             THE COURT:  I'm sorry.  And we're talking about

14   April?

15             MR. FIRESTEIN:  The first portion of 2015, Your

16   Honor.

17             THE COURT:  Okay.

18   A    Of 2015?

19   Q    Fifteen -- excuse me, I'm sorry.  Oh, I'm sorry, we're

20   talk- -- let me press ahead.  Let me press ahead.  Let's go

21   to the time in which you were involved in the -- in your

22   work in connection with the special committee.  Okay?

23   A    Okay.  We're talking about the special committee that

24   was initiated in 2015.

25   Q    Right.

1    A    Okay.

2    Q    Prior to that point in time, had you been made aware of

3    any positions that the E-committee had taken regarding

4    whether sponsor releases were appropriate?

5    A    Yes, sir.  They had put forward a term sheet, a

6    suggested term sheet, a recommended term sheet, and that

7    term sheet included full releases for the sponsors.

8    Q    And in connection with your work at the special

9    committee, did you come to any conclusion regarding whether

10   sponsor releases were appropriate at that time?  And this is

11   in April of 2015.

12   A    We -- in April of 2015, when we filed the first plan of

13   reorganization, that plan, with the support of the special

14   committee, included releases for the sponsors.

15   Q    And do you believe that the releases that were approved

16   at that time were in the best interest of the EFH box?

17   A    I do.

18   Q    And why is that?

19   A    Well, the sponsors had given up several things.  First,

20   they had given up, as we talked about, that small amount

21   that was in the DD settlement.  But they'd also given up

22   their ability to share in any upside on the transaction.

23             THE COURT:  I think we're confused now.  I think

24   you're talking about what happened in the third amended

25   plan, but I think we're still back in April, 2015, with the

1    first plan.

2              MS. WILLIAMSON:  Oh, that's right.  I'm sorry,

3    you're correct.

4              MR. FIRESTEIN:  I think that's right, Your Honor.

5    Q    So if you could just focus on April of 2015.

6    A    Okay.

7    Q    Why did you believe that the granting of sponsor

8    releases was appropriate at that time?

9    A    Well, I believe that there had been three different law

10   firms that had looked at it.  That would have been Sidley

11   Austin, Kirkland, and Proskauer.  I considered that as

12   input.  I also had worked with the sponsors, and I knew that

13   we had talked about, with our law firm, that releases --

14   Q    No, no, no.  Don't -- I don't want you to discuss what

15   you -- or disclose what you discussed with your law firm.

16   I'm just asking for your judgment as to why it was that you

17   believed that the sponsor releases were appropriate in or

18   around April of 2015?

19   A    Okay.  All of it --

20             MR. SHEPPARD:  Your Honor, if I may, because it

21   went to the last question and not this question.  I would

22   move to strike the beginning of the answer that relates to

23   the statement about her relying on the three law firms who

24   looked at the issue.  Again, I think that's the implication.

25             THE COURT:  Overruled.

1            MR. SHEPPARD:  Thank you.

2            MS. WILLIAMSON:  Thank you.

3    A    All I was going to say was that we had been advised

4    that releases were often in --

5    Q    I don't want you to disclose what your advice was that

6    you received from your counsel.

7    A    Okay.

8    Q    I just want to get a sense of your judgment as to why

9    it was that you felt, based on the information you received,

10   that releases were appropriate?

11           THE COURT:  You're asking her an impossible

12   question to answer.  But to the extent you can, go ahead.

13   A    I'll give it my best shot.  Based on the information

14   that I had received, and my 30 -- 40 years of business

15   experience, plus my dealings with the sponsors, I felt that

16   the releases were appropriate.

17   Q    Now, were sponsor releases actually part of the

18   disinterested director settlement?

19   A    No, because disinterested directors only deal with

20   inter-debtor claims, and that is not an inter-debtor claim.

21   Q    Okay.  Now I want to move ahead and the -- to the

22   settlement agreement that exists in connection with what's

23   currently before the Court.

24   A    Okay.

25   Q    And you're aware that the sponsor releases are included

1    as part of that as well?

2    A    Yes.

3    Q    And did you have occasion to meet again as a special

4    committee with respect to consideration of the sponsor

5    releases?

6    A    The last meeting of the special committee was on April

7    the 10th.  And we did not meet again before we filed the

8    third amended plan in August because the potential claims

9    against the sponsors would have been prior to -- I mean,

10   associated with the LBO and -- in the past. And so, there

11   had been no changes in facts between April and August that

12   we felt we needed to reconsider.

13   Q    Now, as part of that consideration as well, did you

14   become aware of other matters of value that the sponsors

15   were giving up in connection with the settlement agreement?

16   A    Yes.

17   Q    And what were those?

18   A    Okay.  As we talked about, they had given up a small

19   amount of the disinterested directors' settlement that had

20   been allocated to them.  It was a few million dollars -- $7,

21   $8, $9 million dollars -- I don't remember the exact number.

22   But along with that, they gave up the opportunity to share

23   in any upside on the potential Hunt merger transaction and

24   the REIT.

25             So if that had come in at -- or if it does come in

1   at a very high number, say $20 billion or $25 billion, then

2   they would not have any potential for upside there.

3   Additionally, they had also gave up their right to collect

4   management fees.

5          We had continued to accrue their management fees

6   all throughout, and still accrue them, but are -- up until

7   the settlement agreement.  But we had not paid them since

8   the fourth quarter of 2013.

9          So there was $70 or $80 million dollars' worth of

10  fees that had been accrued, but not paid to them, and they

11  gave up that payment.  And then they also had agreed not to

12  file a worthless stock deduction because the worthless stock

13  deduction could have had a significant impact on the NOLs

14  that we were then going to use to assist the T-side in their

15  step up in bases.  And they also gave up their

16  indemnification rights that they had under the company's

17  bylaws and agreements, so that they no longer had those

18  indemnification rights.

19  Q    You're aware that as part of the settlement agreement

20  before the Court and, frankly, the plan as well, that there

21  are releases for directors and officers?

22  A    There are.

23  Q    And would you benefit as a consequence of that release

24  if it were approved by the Court?

25  A    Yes.

1   Q    Did this factor into your decision in supporting D&O

2   releases at all?

3   A    It did not.  My responsibility is to the EFH estate,

4   and every decision that I have made has been trying to

5   maximize the value of the EFH estate.  I would not put my

6   personal benefit ahead of the company in any way.  And also,

7   there have been no claims brought against me, so -- or any

8   of the other directors.  And so, I don't believe that self-

9   dealing is something that's appropriate.

10  Q    Now ultimately, you voted in favor of the settlement

11  that's before the Court?

12  A    I did.

13  Q    And do you believe it's in the best interest of the EFH

14  box?

15  A    I do.

16  Q    Why is that?

17  A    Well, first off, this is kind of like the first time

18  that we've had any peace in this case.  The settlement

19  agreement resolves the inter-debtor matters.  It resolves

20  inter-creditor matters.  It resolves, you know, it does give

21  the releases to the sponsors, and it gives the releases to

22  an awful lot of people, including the directors and officers

23  and management personnel.  And that settlement agreement

24  allows us to move forward.  We have spent the majority of

25  this case arguing about who gets what money, who gets what

1     claims, who wants to take something from someone else.  And

2     the settlement agreement puts all of that in writing.

3             It completes that, and we don't have to sit there

4     and have continued arguments over it or face litigation or

5     face delay in this case.  And I think that is hugely

6     beneficial to EFH because, again, we have a limited amount

7     of cash that we are trying to conserve so that we can pay

8     our creditors.  And so, if we take the litigation out and

9     that type of thing, I think that's beneficial for EFH.

10    Q    Are you aware of suggestions that perhaps the

11    settlement agreement being effective should depend on the

12    plan being consummated?

13    A    I understand that position, but I don't agree with

14    that.

15    Q    Why is that?

16    A    Well, the reason for that is, again, we need to move

17    these companies out of bankruptcy.  And so, if it's

18    conditioned on just this plan, you know, the settlement

19    agreement now fixes this for all plans.  And while I'm very

20    confident that the transaction before us has a high

21    probability of being consummated, if, for some reason, it

22    wasn't consummated, I don't want to go back to square one

23    and start all that arguing and fighting and litigation

24    again.

25            And so, this settlement agreement puts that in

1    place for the future.  So if we have to move to an

2    alternative plan, we have these things resolved.  We can

3    move much quicker.  We can get to a place that I think is

4    much better for the companies.

5    Q    To this date, other than the existence of this plan,

6    has any E-side constituent, to your knowledge, provided you

7    with an actionable alternative?

8    A    No, sir.  We do not have a valid or actionable

9    alternative in front of the company today.

10   Q    Have you read the plan that is before the Court for

11   confirmation?

12   A    Several times.

13   Q    Okay.  Did you vote in favor of the plan to be

14   confirmed?

15   A    I did.

16   Q    Do you believe it's in the best interest of your estate

17   for which you have responsibility as a disinterested

18   director?

19   A    I do.

20   Q    Why is that?

21   A    Well, first, it provides us a way out to emerge from

22   bankruptcy.  It gives us a timely, cost effective, and an

23   efficient way out.  Secondly, it provides full payment of

24   the E -- on the E-side, which I think is a very big

25   positive.

1        Secondly, with the settlement agreement, it has

2    the support, so it's a multi-creditor consensus.  And as I

3    just talked about, we've been having all these wars going

4    on, and now we have a point of peace where we can move

5    forward for the good of the company.  And then the

6    transaction that's before us is supported by some very

7    strong people in the industry.

8        Mr. Hunt and his organization have been in the

9    utility industry for a long time.  They're well known in the

10   State of Texas, and they are very good people in terms of

11   dealing with.  They have a lot of support.

12       There's $12.6 billion of new money coming into

13   this transaction, which I think is also very important.  And

14   we do have an alternative to move -- you know, we can move

15   to an alternative restructuring if we have to because we

16   have the agreement to do that in a shorter time period.  And

17   with the settlement agreement we have, we don't have to go

18   back to square one, which I think is particularly important.

19       So, overall, I think we have a very good

20   transaction that enables the entire E-side to be paid.  It

21   does the best and it preserves at EFH -- we don't have to

22   litigate, we don't have to spend more of the company's money

23   on that.  I just think that it's a good way to move forward.

24   And I think it compensates, as best we can with the

25   resources we have available, all of our creditors.

1    Q    No further questions, Your Honor.

2            THE COURT:  Thank you.  Mr. Glueckstein, let's

3    start and if we have to take a break for lunch, we can do

4    that, unless you would like to break for lunch before you

5    start cross.

6            MR. GLUECKSTEIN:  It's up to the Court, Your

7    Honor.

8            THE COURT:  Well, let's start then.  We got little

9    bit delayed there in our beginning today.  We'll break about

10   1:00 as usual.

11           MR. GLUECKSTEIN:  May I approach, Your Honor, with

12   binders for the witness and Your Honor?

13           THE COURT:  Yes.  Ms. Williamson, you can just put

14   that other one over to the side, if you don't mind.

15           MS. WILLIAMSON:  Okay.  Yes, sir.

16           MR. GLUECKSTEIN:  Good afternoon, Ms. Williamson.

17           MS. WILLIAMSON:  Good afternoon.

18           MR. GLUECKSTEIN:  For the record, Brian

19   Glueckstein from Sullivan & Cromwell on behalf of the E-side

20   Creditors committee.

21                        CROSS EXAMINATION

22   BY MR. GLUECKSTEIN:

23   Q    Ms. Williamson, your written direct testimony that you

24   submitted in connection with your testimony today, that was

25   based on your personal knowledge, correct?

1    A    Yes, sir.

2    Q    And Ms. Williamson, on November of 2014, you and Mr.

3    Evans were delegated authority to identify and act upon any

4    conflict matters by the EFH board, correct?

5    A    Yes.

6    Q    And you said in Paragraph 11 of your written direct

7    testimony, which, if you want to look at, is in the binder I

8    gave you at the beginning --

9            THE COURT:  It's on Page 5.

10           MS. WILLIAMSON:  Thank you.

11   Q    -- that conflict matters are defined as matters

12   pertaining to the Chapter 11 case on which a conflict exists

13   between EFH Corp and any other Debtor, correct?  That's your

14   understanding?

15   A    Yes.

16   Q    And on December 5th of 2014, the EFH board passed

17   another resolution delegating you and Mr. Evans further

18   authority specifically with respect to conflict matters,

19   correct?  We could take a look.

20           THE COURT:  Yeah, why don't you direct her?

21   Q    It's Exhibit 144 in the binder I just handed you.

22   A    Yes.

23   Q    And you recognize that as a resolution of the full EFH

24   Corp board on December 5, 2014, correct?

25   A    Yes.

1    Q    And at the bottom of Page 1 in that resolution, it

2    states, "The board hereby delegates the disinterested

3    directors the authority to investigate and determine whether

4    any matter constitutes a conflict matter in the exercise of

5    their business judgment."

6    A    Yes.

7    Q    It goes on from there.  Do you see that?

8    A    Yes.

9    Q    And the second page, if you look on the second

10   resolution on the next page, the board delegated to you and

11   Mr. Evans the authority to make all decision and to

12   implement and direct decisions with respect to conflict

13   matters, correct?

14   A    Yes.

15   Q    And all decisions with respect to conflict matters

16   would include the authority to conduct negotiations on

17   conflict matters on behalf of EFH, correct?

18   A    Yes.

19   Q    And that resolution passed by the board was meaningful,

20   correct?

21   A    Yes.

22   Q    The resolution in December meant that for formally

23   designated conflict matters that you and Mr. Evans, as

24   disinterested directors, handle all aspects of the matter to

25   the exclusion of the full board and the Debtor's joint

1   advisors, correct?

2   A    Could you state that again, please?

3   Q    Is it your understanding that the resolution for

4   anything that you designated as a formal conflict matter

5   pursuant to this resolution, that it would be you and Mr.

6   Evans handling all aspects of that matter to the exclusion

7   of the full board and the Debtor's joint advisors, correct?

8   A    I don't believe that it precluded me from consulting

9   with Kirkland & Ellis, and that's how I hear your statement

10  to me.

11  Q    You certainly could consult, but all the decision-

12  making authority would reside solely with you and Mr. Evans,

13  correct?

14  A    Oh, yes.

15  Q    And you and Mr. Evans would have that decision-making

16  authority, and the full board would not have any decision-

17  making authority, with respect to the formally designated

18  conflict matter, correct?

19  A    I'd like to say it a different way, if I might, because

20  there are different items, and each is handled in a somewhat

21  different way.  But, for example, on the disinterested

22  director settlement, that settlement was something that

23  Chairman Evans and I had the authority to make the decision.

24  We made the decision, and we informed the board.  The board

25  did not vote on that decision.

1          But if we look at some of the other items that are

2     listed -- so, for example, when we talk about the plan

3     insofar as it relates to the conflict matters, that is not

4     the same kind of thing.

5     Q    And that is because, using those two examples, with

6     respect to the disinterested director settlement matters and

7     the intercompany claims, you formally designated them as a

8     conflict matter and delegated authority pursuant to the

9     December 5th resolution, correct?

10    A    I think you could say that, yes.

11    Q    And with respect to consideration of the plan for which

12    you approved insofar as conflict matters, that was never

13    formally designated as a conflict matter pursuant to the

14    December 5th resolution, correct?

15    A    That's correct, but we were very focused on exercising

16    good governance and going through the process on all of

17    those major things.

18          So Chairman Evans and I did meet with Proskauer

19    separately.  We went through all of those documents.  We

20    looked at the things that we had determined, like the

21    disinterested director settlement, to determine how it was

22    reflected in those.

23          We talked about whether there should be other

24    items specified as conflict matters.  And then we made our

25    own determination at that point in time about what we would

1    be voting on in terms of the plans and the settlement

2    agreement and the other documents.

3    Q    Okay.  And Mr. Firestein showed you an exhibit.  It was

4    Williamson Demonstrative 1 that was an excerpt from what is

5    in Paragraph 15 of your written direct testimony --

6    A    Yes.

7    Q    -- I believe, Ms. Williamson, that outlines matters

8    determined to be conflict matters.  And that includes the

9    discussion we're talking about now about the third amended

10    plan and settlement, correct?

11    A    Yes.

12    Q    And with respect to the plan and the settlement

13    agreement, there was no formal delegation of authority

14    pursuant to the resolution passed in December, correct?

15    A    Well, first off, there were certain items that were

16    conflict matters that we had to ensure were in those

17    documents properly.  And then as we looked at them, you

18    know, those are very complex agreements.

19            And so we wanted to follow the same disinterested

20    director process so that if anyone came back later and said,

21    why didn't you consider this a conflict matter or did you

22    consider this a conflict matter, that sort of thing, we

23    would have already gone through the process, looked at all

24    of the items, and reached an independent -- or disinterested

25    director -- conclusion, and would have already followed that

1    process.

2    Q     With respect to the plan, the third amended plan and

3    the settlement agreement, you did not just inform the board

4    as to approval.  Those were actually considered by the full

5    board, correct?

6    A     They were, but what we did inform the board was that we

7    had reviewed those documents with our independent counsel

8    and our independent financial advisor, and that we were in

9    favor of those items.

10   Q     Okay.  And that review that took place with respect to

11   the third amended plan and settlement agreement, took place

12   at a formal meeting of the disinterested directors, correct?

13   A     Yes, it did.

14   Q     And that meeting took place on August 9th, a few hours

15   before the joint board meeting, correct?

16   A     Well, that's when the formal meeting was.  But we had

17   received the documents prior to that time.  I had gotten

18   drafts of documents before that and had been conferring with

19   Proskauer informally, asking questions, following up on

20   different items.  So yes, the formal meeting was that

21   morning before the regular board meeting.

22   Q     And Ms. Williamson, the negotiation of the terms of the

23   joint plan of reorganization that's before the Court were

24   negotiated jointly on behalf of all the Debtors by a team

25   led by the co-CROs and Kirkland & Ellis, correct?

1    A    Well, actually the co-CROs had the responsibility. They

2    chose to use Kirkland & Ellis, and we did as a company, but

3    we were holding the co-CROs responsible.

4    Q    And similarly, the document that was presented to the

5    Court that's before the Court that's referred to as the

6    settlement agreement, that document was not -- itself, was

7    not determined to be a conflict matter, correct?

8    A    The document?

9    Q    The negotiation and the terms of the settlement

10   agreement, other than the terms of the disinterested

11   director intercompany settlement, no other terms were

12   determined to be a conflict matter, correct?

13   A    That's correct.

14   Q    And negotiation of the terms of the settlement

15   agreement with the other parties to the transaction, aside

16   from the terms of the intercompany settlement, were not a

17   conflict matter either, correct?

18   A    We reviewed that with Proskauer -- Chairman Evans and I

19   did -- and we did not come to the conclusion that there were

20   any conflict matters there.  But, again, I want to emphasize

21   we did follow our disinterested director process and our

22   governance process and went through those, independent with

23   our own counsel and our own financial advisors, to reach a

24   conclusion about those documents, and then we reported that

25   to the board.

1    Q    And with respect to the intercompany claims settlement

2    for which you formally designated to be a conflict matter,

3    those negotiations you and Mr. Evans led yourself in

4    consultation with your advisors, correct?

5    A    Yes.

6    Q    And so that portion of your process as to how the deal

7    was negotiated was different with respect to the

8    intercompany settlement, as opposed to the plan of

9    reorganization, correct?

10   A    As it should be.

11   Q    And, in fact, you determined that there were no

12   elements with the plan of reorganization that were a

13   conflict matter requiring delegation pursuant to the

14   December resolution, correct?

15   A    We went through and I -- you can say that.  Yes, that's

16   correct.  But, again, we followed the same process that we

17   would have used as disinterested directors.

18   Q    And the plan and the settlement agreement there before

19   the Court were recommended to you and the full EFH board by

20   the co-CROs, correct?

21   A    I believe that's correct, yes.

22   Q    Similarly, on the list of items in Paragraph 15 of your

23   written direct, which is on Page 8 in Paragraph F, you note

24   that at a disinterested director meeting --

25   A    I'm sorry, Brian, I don't know where you are.

1    Q    I'm sorry, Page 8 of your direct testimony.

2    A    Oh, I'm sorry.  Yes, okay.  Okay.

3    Q    In Paragraph F, you reference the approval of what's

4    referred to as the Oncor side letter in Paragraph F there;

5    do you see that, ma'am?

6    A    I apologize.

7    Q    Top of Page 8.

8    A    On Page 8 of my declaration?

9    Q    Of your declaration, yes.

10   A    I'm sorry, one second.  Okay, Page 8, yes, and item F,

11   yes.

12   Q    And that references approval -- considering approval of

13   the Oncor side letter that was approved in connection with

14   this transaction, correct?

15   A    Yes.

16   Q    And that similarly notes that you reviewed that and

17   approved it as it related to conflict matters, correct?

18   A    Yes.

19   Q    So similar to the plan and settlement, that was not an

20   issue for which you delegated authority pursuant to the

21   December resolution, but you reviewed it in any event,

22   correct?

23   A    Yes.  We were not delegated, correct.

24   Q    Ms. Williamson, your testimony in Paragraph 16 there --

25   staying on the same page, the next paragraph of your written

1   declarations.

2   A     Yes.

3   Q     You testified that -- and I think you got into this a

4   bit earlier this morning -- that the insider releases

5   provided, in connection with this transaction, were not

6   determined to be conflict matters, correct?

7   A     Correct.

8   Q     You testified in response to counsel this morning that

9   releases were not part of the disinterested directors

10  settlement, correct?

11  A     That is correct insofar as it did not -- they were not

12  inter-debtor items.  However, when we were discussing and

13  negotiating and everything, we had talked about whether

14  releases would be included.  And that was not required -- it

15  shouldn't have been in our joint statement because it wasn't

16  inter-debtor, but the joint -- the settlement was going to

17  be in the first plan that we filed that did have releases.

18  Q     Okay.  And so, Ms. Williamson, if I understand, in

19  connection with the negotiations of the disinterested

20  directors settlement and the proposals that were made in

21  connection with that settlement, the disinterested directors

22  did discuss and propose releases be included as part of the

23  disinterested directors settlement, correct?

24  A     They were discussed.

25  Q     And you recall testifying at -- well, do you recall,

1    Ms. Williamson, that you sat for actually two depositions in

2    connection with this matter.

3    A    Yeah, I had a lot of fun.

4    Q    And do you recall, Ms. Williamson, that at that

5    deposition, I asked you whether or not releases were

6    included in the disinterested directors settlement, and you

7    testified at that time that they were; do you recall that?

8    A    Yes.  I was rather inarticulate that day, and I

9    apologize.  But if you take the full amount of my

10   deposition, I clearly stated in my deposition that conflict

11   matters were inter-debtor items.

12          At the time that we negotiated the disinterested

13   directors settlement, the releases were things that we were

14   discussing in that process, but it was not part of the

15   settlement.  So I did not articulate that well for you, and

16   I apologize.

17   Q    Okay.  And it was your -- it was your understanding

18   that releases were always going to be part of whatever plan

19   was filed containing the terms of the disinterested

20   directors settlement, correct?

21   A    Yes, sir.

22   Q    Now Ms. Williamson, you acknowledged in your testimony

23   this morning that -- and in your written direct -- that you

24   are a director only of EFH Corp, correct?

25   A    That's correct.

1    Q    And you're a fiduciary of EFH and owe a fiduciary duty

2    to EFH, correct?

3    A    Yes.

4    Q    I think you testified this morning that, in connection

5    with your role as a disinterested directors of EFH, you and

6    Mr. Evans had equal responsibility in that role, correct?

7    A    Yes.

8    Q    And you testified earlier that you and Mr. Evans

9    evaluated conflict matters solely from the perspective of

10   EFH, correct?

11   A    That was our charge.

12   Q    And you testified this morning, I believe on direct in

13   response to Mr. Firestein, that you viewed your duty in

14   connection with serving as an EFH board member more broadly

15   than that; is that accurate?

16   A    Well, for example, when we -- when my audit committee

17   looks at the financial statements of the company, those are

18   consolidated financial statements that incorporate TCEH and

19   EFIH.  And so, when I said more broadly, that's what I'm

20   talking about.  When we file financial information and

21   different things like that, I'm responsible for the total

22   company.

23   Q    And, in fact, when you're considering all matters in

24   connection with this bankruptcy, even as a member of the EFH

25   board, it's your duty to evaluate those matters solely from

1    EFH's perspective, correct?

2    A    It's my responsibility as an EFH disinterested

3    directors to try to maximize the value of EFH, but I also

4    have voted in our board meeting to file the plan of

5    reorganization and to -- and other documents.  And that is

6    correct, I vote there as a board member of EFH.

7    Q    And at the time you considered the plan or anything

8    else having to do with the restructuring, that duty is only

9    to EFH, and not the other debtors, correct?

10   A    I'm going to say it one more, and I don't know how to

11   articulate it any better, so I apologize for not

12   understanding how to help you here.  But first, I have, as a

13   disinterested director, I'm responsible for maximizing the

14   value of EFH, and I deal with EFH matters carefully there.

15   But on an overall company basis, our board is still

16   responsible for trying to get the companies out of

17   bankruptcy.

18            So when I looked at the plan, when I looked at

19   other documents, I felt that it was important to ensure that

20   I looked at them from the perspective of EFH, but I voted as

21   a member of the overall board, which is for the overall

22   company, filing that plan of reorganization.

23   Q    Now when you said the overall company, you're including

24   in that the other Debtors that are in these cases, correct?

25   A    Yes.

1    Q    Including TCEH, for example?

2    A    Yes.

3    Q    Now, Ms. Williamson, the interest in Oncor that was

4    proposed to be sold and is an issue in the plan, as an asset

5    of EFIH and EFH, correct?

6    A    Yes.

7    Q    And TCEH has no ownership interest in Oncor, correct?

8    A    Not to my knowledge.

9    Q    And Oncor is not an asset of the TCEH estate, correct?

10   A    It is not.

11   Q    In Paragraph 10 of your written declaration if you

12   could turn back there.  Are you there?

13   A    Yes, sir.

14   Q    Sorry, thank you.  In Paragraph 10 of your written

15   declaration, you testified that in connection with the

16   bidding procedures motion in November of 2014, it's your

17   understanding that the Court ruled that the disinterested

18   manager of TCEH and the TCEH board shall, in connection with

19   the sale process, approve the bidding procedures, the

20   stalking horse bidder, and the winning bidder, correct?

21   A    Yes.

22   Q    And it's your understanding that the Court required

23   approval of TCEH in order for EFH to sell its ownership

24   asset and interest -- it's interest -- ownership interest in

25   Oncor, correct?

1    A    Well, that's what the Court's ruling was, yes.

2    Q    And so purposes of your decision making, as the

3    director at EFH, you understood that EFH could not have

4    agreed to enter into an arrangement to sell Oncor without

5    approval of TCEH, correct?

6    A    Well --

7              MR. SHORE:  Objection, objection to form.  I've

8    let this go on a little bit.  What's being sold under the

9    plan is not ownership interest in Oncor.  It's reorganized

10   EFH stock, so I don't know where the -- the examination is

11   going.  So it's an objection to form.  If he's going to do

12   it, let's -- you can't just say Oncor, I think.

13             THE COURT:  Mr. Glueckstein?

14             MR. GLUECKSTEIN:  Well, I -- we're talking now

15   about the sale of the interest in Oncor and the bidding

16   procedures, so, I mean, that is what we're talking about.

17             THE COURT:  Okay.

18             MR. GLUECKSTEIN:  But I'll try to be more

19   specific.

20   Q    The -- in connection with EFH's efforts to market, sell

21   its interest in Oncor in November of 2014 and thereafter, it

22   was your understanding, Ms. Williamson, that TCEH approval

23   was necessary to dispose of that asset, correct?

24   A    As I stated earlier today, I did understand that

25   because it was part of the Court's ruling.  But I also felt

1    that if we got to some sort of an impasse or with a great

2    deal for the sale of Oncor, then we would have the

3    opportunity to come back and discuss that with the Court,

4    and perhaps seek approval from the Court.

5    Q    And you never did come back to the Court to seek any

6    modification of your interpretation of the order, correct?

7    A    No.

8    Q    Ms. Williamson, were you aware that in May of 2015, the

9    EFH committee sought to have language inserted into the

10   Oncor bid agreements that would have ensured that any bid

11   could work with a standalone E-side plan?

12   A    I'm sorry, I'm not familiar with that.

13   Q    Let's just take a look, if we could, in your binder.

14   It's Tab EUCC-765.  It's an email there.

15           THE COURT:  It's towards the very back.

16           MR. GLUECKSTEIN:  Towards the very back of the

17   binder.

18   Q    Now this is an email, Ms. Williamson, dated May 7, 2015

19   from Mr. Dietderich at my firm to a number of people,

20   including your advisors, Mr. Thomas and Mr. Marwil of

21   Proskauer; do you see that?

22   A    Yes.

23   Q    Okay.  And in this email, in the first paragraph of

24   this email, there is some discussion and towards the bottom

25   of that paragraph, Mr. Dietderich writes, "We'd like to

1    request the transaction documents for any potential stalking

2    horse transaction contemplate in the alternative to closing

3    upon confirmation of the joint plan, consummation of closing

4    free and clear, in connection with a separate E-side only

5    plan of reorganization."  Do you see that language?

6    A    I see the language.

7    Q    Do you recall being informed of that request from the

8    EFH committee by your counsel or anybody else in May of

9    2015?

10   A    Well, I'm not sure if it was in May of 2015.  But we

11   had discussed on other occasions whether we wanted a

12   standalone for one side or the other, and there were some

13   very negative tax ramifications that we felt could be put

14   forth there.

15          But in the bidding procedures, it was clear that

16   we were willing to take both a taxable or a non-taxable

17   transaction, which might have gotten you to the same kind of

18   a situation here.  So while I understand the issue -- the

19   issue was discussed at the board level -- but we did not

20   wish to move forward with a bankruptcy that just settled one

21   side of the house.

22   Q    Okay.  And just so the record's clear, Ms. Williamson.

23   With respect to the specific request of the committee to

24   include language in the bidding agreements that were

25   circulated to potential bidders, did that particular issue,

1    was that considered by you and Mr. Evans?

2    A    Not individually by me and Mr. Evans, no.

3    Q    Ms. Williamson, you, in fact, testified that it is your

4    view that EFH must have T-side consensus to get out of

5    bankruptcy, correct?

6    A    Well, I believe that there are other mechanisms --

7    there are different things like cram-downs that could be

8    used -- but I feel like it is important for us to have that

9    consensus because the litigation would go on forever.

10   Q    And the litigation you're referring to is the

11   intercompany litigation that we've talked about?

12   A    Well, the intercompany litigation and other matters

13   that would enable the T-unsecured creditors to have some

14   payment for their -- or payment under their debt.

15   Q    For purposes of your decision-making process as a

16   director at EFH, you believed that EFH needed the support of

17   the T-side so the Debtors could file the joint plan of

18   reorganization, correct?

19   A    Well, we had the T-first support in the original RSA,

20   and so we felt we could move forward there.  But certainly

21   at the point in time that we moved away, or terminated the

22   RSA, then that's when a substantial amount of time and

23   effort was expended by law firms on all sides related to

24   these claims so that, you know, more of the funds that were

25   available would be shared throughout the system, if you

1    will.

2            And so I -- while I know that there are ways that

3    we could do a bankruptcy without consensus, I did not feel

4    it was in the best interest of the company or EFH because,

5    again, I think we would have been caught up in litigation

6    for an extended period of time.  And so, the consensus that

7    we've reached now in the settlement agreement, I think is a

8    very big positive for the EFH estate.

9    Q    Okay.  And along the way, did you -- you never reviewed

10   a standalone plan of reorganization for EFH, would have been

11   non-consensual with the T-side, correct?

12   A    Well, we looked at a couple of things.  So, for

13   example, when we filed the very first plan of

14   reorganization, in there was a tax free spend of TCEH, and

15   then there was an equitization plan -- I mean, an

16   equitization for the E-side, which, in my mind, is very

17   similar to what you're asking.

18   Q    Well, the equitization plan that you're referring to

19   still was a plan that was premised on a joint plan of all

20   the debtors, correct?

21   A    Yes, but we were going to spend TCEH out.  And what was

22   left is the other side of the school.

23   Q    You never considered a standalone plan that only dealt

24   with a reorganization of EFH and EFIH, correct?

25   A    We considered, as I mentioned, a tax free spend of

1    TCEH, and then an equitization plan of EFH and EFIH.

2    Q    And prior to proceeding with the current plan, you

3    never seriously considered actually filing a plan only for

4    EFH, correct?

5    A    That's correct.  Because of the tax ramifications of

6    that, we did not feel that was appropriate.  We did consider

7    it, but we chose not to.

8    Q    Now, Ms. Williamson, you testified this morning with

9    respect to what's been referred to as the CRO term sheet; do

10   you recall that testimony?

11   A    Yes, I do.

12   Q    And you testified that you did not oppose the

13   circulation of either the version with the 450 in and the

14   version with the 450, correct?

15   A    The board did not preclude Ms. Doré and Mr. Keglevic

16   from circulating that.

17   Q    And that term sheet that was ultimately circulated that

18   was populated provided a $450 million claim in favor of

19   TCEH, correct?

20   A    It did.

21   Q    And at the time that that was circulated to

22   stakeholders with the $450 million claim, the disinterested

23   directors had been delegated authority with respect to the

24   intercompany claims, correct?

25   A    We did, we were.

1   Q    And your work on that matter was ongoing at the time

2   that the CRO term sheet was circulated, correct?

3   A    It was.

4   Q    Do you recall that in advance of circulation of the CRO

5   term sheet that the EFH committee had expressed concern

6   about how the circulation of that term sheet would influence

7   the process; do you recall that?

8   A    I'm sorry, I don't recall that.

9   Q    Ms. Williamson, if you turn to Exhibit 766 in your

10   binder.  It's the last item.

11   A    Yes.

12   Q    There's a letter attached there dated March 23rd.  It's

13   addressed to you, amongst other folks.  On the last page of

14   that letter at the top of the page is a discussion in

15   connection with CRO term sheet where EFH counsel to the EFH

16   committee -- actually I sent this letter -- sent --

17   discusses the fact that while negotiations are ongoing, that

18   circulation of this may taint the process.  Does that

19   refresh your recollection about it?

20   A    Yes.  I'm sorry that I didn't remember your letter.

21          THE COURT:  I don't see it.  Oh, the very first

22   full sentence?

23          MR. GLUECKSTEIN:  The first sentence on the page -

24   - last page of the letter, yes.

25          THE COURT:  Okay.

1    Q    And this letter was dated March 23rd of 2015, correct?

2    A    Yes.

3    Q    Okay.  And this was only a matter of days before we now

4    know that you reached a settlement in principle with the

5    other disinterested directors at the meeting in Dallas,

6    correct?

7    A    Yes.

8    Q    And neither you nor your counsel informed creditors or

9    the committee that you were going to agree to a $700 million

10   claim prior to reaching that agreement, correct?

11   A    That's correct.  But as you noted, there is a fiduciary

12   out.  I talked about it earlier today.  So we did notify you

13   very shortly after we reached that.  And had there been some

14   major issue or concern that you could raise, we had a

15   fiduciary out that would allow us to get out of that $700

16   million settlement.

17            But certainly as we pointed out, earlier in the

18   list of representative meetings, your firm and

19   representatives of your firm had been in a lot of

20   discussions related to this and knew that the process was

21   ongoing.

22   Q    Well, certainly while we knew the process was ongoing,

23   Ms. Williamson, there was no indication from you that you're

24   aware of to the committee as to the magnitude of the claim

25   that you were negotiating with the other directors, correct?

1    A    Brian, I didn't go into the negotiations with a number

2    in mind, so it would have been a little hard to have given

3    you notice of what that number was.

4              We went in there to do a fair, honest negotiation,

5    and there was no preconceived number or number that I could

6    discuss with anyone.

7    Q    And when you reached, in your mind, agreement on the

8    $700 million number, you never consulted with creditors or

9    the committee about that number before agreeing to it with

10   the other directors, correct?

11   A    I did not.

12   Q    Your Honor, maybe it makes sense to take a lunch break.

13   I'm going to turn to another topic now, if that makes sense.

14             THE COURT:  All right, that's fine.  We'll take a

15   break for lunch.  And during the break, Ms. Williamson --

16   sorry -- you may not discuss the substance of your testimony

17   with any person.

18             MS. WILLIAMSON:  Thank you very much.

19             THE COURT:  Mr. Anker, you wish to be heard? Hang

20   on for a moment, please, people.

21             MR. ANKER:  Thank you, Your Honor, and I apologize

22   for interrupting.  I have not heard back from Mr. Lauria.  I

23   continue to assume our deal on plan language is on track,

24   but if it falls apart over something, I need to be able to

25   have an opportunity to prosecute the objection.  I've

1    offered that I'd be happy to frankly examine Ms. Doré in the

2    event that this happened next week or even the week

3    thereafter.  I gather that may not work in terms of

4    scheduling, so I just wanted to raise it for the Court.

5              MR. MCKANE:  Mark McKane, Kirkland & Ellis.

6              We're not trying to play any games here.  Ms. Doré

7    has obligations in other states next week during our trial

8    days, and so she was not going to be here.  We don't want to

9    waste your time or anyone else's time, and nor are we trying

10   to impair Mr. Anker, but she is not -- she does not have an

11   ability.

12             THE COURT:  Well, look, all right.  Then we'll put

13   her on the stand after lunch.

14             MR. ANKER:  And she's not available the week after

15   Thanksgiving?

16             MR. MCKANE:  Same with the Thanksgiving week.

17             MR. ANKER:  I apologize, Your Honor.

18             THE COURT:  That's all right.  Hopefully, you can

19   narrow it down over lunch.  If you can't, Mr. Glueckstein,

20   I'm sorry, we're going to need to interrupt Ms. Williamson's

21   cross-examination to allow for Mr. Anker to cross-exam Ms.

22   Doré.

23             MR. GLUECKSTEIN:  Yeah, that's fine, obviously,

24   Your Honor.

25             THE COURT:  Okay, very good.  All right, more will

1    be revealed.  All right, we're in recess.

2              CLERK:  All rise.  Please be seated.

3              MR. MCKANE:  Good afternoon, Your Honor.  Mark

4    McKane, Kirkland & Ellis, just an update with regards to our

5    efforts to resolve issues with the EFIH first lien and the

6    indentured trustee.  There was a turn of the documents over

7    the lunchbreak.  I understand there is progress being made.

8              Also, I had an opportunity to confer with Ms. Dore

9    about her availability.  I had an opportunity to do that

10   over the lunchbreak.  Based on where we are on both things,

11   what we would suggest -- and we also recognize it may be

12   wholly unnecessary to put her on today and may be best if we

13   just continue forward Ms. Williamson, continue forward with

14   Mr. Mendelsohn, allow the documentation process to run its

15   course.  We are very confident that we'll get done.  But in

16   the unlikely event that it doesn't, as long as, you know,

17   Mr. Anker gives us notice by Tuesday end of business that he

18   needs Ms. Dore, she will be here on Thursday.

19             THE COURT:  Okay.

20             MR. MCKANE:  And with that, Your Honor, it's okay

21   that she excuse herself from the courtroom at around 3:30.

22             THE COURT:  That's fine.

23             MR. MCKANE:  Thank you, Your Honor.

24             THE COURT:  Anything else?  Good.

25             MR. ANKER:  I was simply going to say that's

1    perfectly acceptable, Your Honor.

2              THE COURT:  Okay.  Very good.

3    Q    Ms. Williamson, good afternoon.

4    A    Good afternoon.

5    Q    We were talking before the break the connection which

6    was drawn up to the disinterested director settlement in

7    March of this year.  Do you recall that?

8    A    Yes.

9    Q    Ms. Williamson, you understand that EFH committee is a

10   fiduciary for all unsecured creditors at EFH, correct?

11   A    Yes.

12   Q    And prior to agreeing to the $700 million settlement,

13   you never solicited or obtained the views of the committee

14   as to what a reasonable settlement term would be, correct?

15   A    I don't believe that's correct or my understanding is a

16   little different because our advisors spoke with you all and

17   we had also seen a term sheet that had had a number in it of

18   I think it was $300 million to $400 million if the price of

19   Oncor was at $18.5 million, so I believe we did take into

20   consideration your views and I believe we did try to

21   understand what your thoughts were.

22        But when we went into a negotiation with no pre-planned

23   number or anything like that, we have to carry that

24   negotiation out.

25   Q    And the term sheet that you're referring to, I think

1    Mr. Firestein showed it to you this morning, that was the

2    context of a particular terms of a particular plan post that

3    you're talking about, right?

4    A    Yes, I do know that.

5    Q    Mr. Williamson, if you can turn to in the binder that I

6    gave you this morning or it's Exhibit DX 208.

7    A    Okay.

8    Q    Ms. Williamson, these are March 16th, 2015 of the

9    disinterested directors for EFH, correct?

10   A    Yes.

11   Q    And these minutes are excerpted in your direct

12   testimony, correct?

13   A    Yes.

14   Q    Now, on the second page of the minutes, there's eight

15   claims listed there that were the subject of a proposal that

16   you received from Mr. Sawyer, correct?

17   A    Yes.

18   Q    And you agree that the maximum par value of all the

19   claims, except for the LBO claim is demanded by TCEH or

20   reflected in these minutes, correct?

21   A    Yes.

22   Q    And with respect to the LBO claims, your testimony is

23   that the claims were considered by the parties but they were

24   not independently valued in connection with these proposals,

25   correct?

1    A    They were considered, yes.

2    Q    The universal claims that TCEH pursued in connection

3    with attributing value during the negotiations did not

4    expand beyond the list that was included in this proposal on

5    March 16th, did it?

6    A    No.

7    Q    You testified in your direct testimony that the numbers

8    put in this proposal which included a $1.2 billion claim

9    from TCEH that you strongly disagreed with the magnitude of

10   that demand, correct?

11   A    I'm sorry, could you clarify the question?  Are you

12   talking about the offer that MTO made?

13   Q    Right.  So this is the offer that was made on behalf of

14   TCEH on March 16th including a $1.2 billion claim in favor

15   of TCEH, correct?

16   A    Yes.

17   Q    And your testimony in your direct was that at the time

18   you received that $1.2 billion claim demand that you

19   strongly disagreed with the magnitude of that demand,

20   correct?

21   A    We did.

22   Q    And you and Mr. Evans the next day on March 17th

23   authorized a counter proposal be made back to TCEH, correct?

24   A    Yes.

25   Q    And that counter proposal included a claim in favor of

```
1    TCEH only in the amount of $100 million, correct?

2    A    Yes.

3    Q    And then you testified that you had three days of in-

4    person meetings in late March, March 24th through March 26th

5    during which negotiations continued, correct?

6    A    Yes.

7    Q    And during the course of those three days, your

8    position and Mr. Evans' position shifted to the point that

9    you ended up coming out and agreeing to $700 million plan,

10   correct?

11   A    Yes.

12   Q    All right.  And in Paragraph 40 of your written direct

13   testimony, which appears on Page 19.

14   A    Yes, I have it.  I have it.

15   Q    And actually, going -- looking at towards the bottom of

16   that page and onto the top of Page 20, your testimony is

17   that you and Chairman Evans spoke and with the other

18   disinterested managers you all acknowledged that you would

19   only agree to a reasonable and defensible settlement.

20   That's your testimony, correct?

21   A    Yes.

22   Q    Okay.  And so as long as you believe the settlement

23   terms to be reasonable and defensible, you appear to proceed

24   with the settlement during that summit in March, correct?

25   A    Yes.
```

1  Q    And you wanted -- you desired, as you testified this

2  morning, to reach a settlement during that summit in late

3  March, correct?

4  A    We were hopeful that we could.

5  Q    And you were hoping to reach a settlement because the

6  disinterested directors knew that the Debtors intended to

7  file a plan of reorganization in early April, correct?

8  A    Yes.

9  Q    And it was the intention to reach a settlement in order

10 to be able to include the terms of the settlement in the

11 plan that was filed in April, correct?

12 A    No.

13 Q    You did not intend to include those terms in the

14 settlement in April?

15 A    Well, had we not reached a settlement at that point in

16 time, that plan as with other plans could have been filed

17 with a TBD number in it.  And so we didn't feel that we were

18 under pressure or that we had to get to a settlement by that

19 point in time.

20 Q    But you certainly desired to reach a settlement so that

21 the terms could be included in the plan that was filed in

22 April, correct?

23 A    That would have been helpful, yes.

24 Q    You testified this morning, Ms. Williamson, that you

25 utilized your business judgment to assess the risk of the

1    various intercompany claims at issue, correct?

2    A    Yes.

3    Q    And you walk through Mr. Firestein the reasons you

4    believed those claims posed risk to EFH, correct?

5    A    Yes.

6    Q    Now, based on your assessment of the risk, you

7    determined in your judgment that a $700 million settlement

8    was an appropriate amount, correct?

9    A    Yes.

10   Q    And your intention in agreeing to the settlement was

11   that the settlement would be based on the merits of those

12   claims, correct?

13   A    Yes.

14   Q    And you agreed to the terms of the settlement with the

15   other disinterested directors on March 26th, correct?

16   A    Yes.

17   Q    And you and Mr. Evans formally approved the terms at a

18   meeting of disinterested directors at EFH on April 1st.

19   A    Yes.

20   Q    Correct?  If you can turn, Ms. Williamson, to Exhibit

21   DX 215 in your binder.

22   A    Yes.

23   Q    And you recognize these as the minutes of the

24   disinterested directors in the EFH dated April 1st, 2015,

25   correct?

1   A     Yes.

2   Q     And if you can turn, Ms. Williamson, to Page 8 of the

3   minute ending in Base 4579 at the bottom.

4   A     Yes.

5   Q     Okay.  And in the second paragraph there in the

6   resolution section, it sets forth that the disinterested

7   directors exercise their business judgment determine that

8   the plan of reorganization to be filed by the Debtor shall

9   incorporate the following agreed upon terms of the

10  settlement of all pre-petition intercompany claims, cause of

11  action and disputes among the debtors and the step-up

12  matter.  Do you see that?

13  A     Yes.

14  Q     And then it sets forth the terms of the settlement that

15  you agreed to in the bullet point to follow, correct?

16  A     Yes.

17  Q     And to your understanding, that paragraph and the

18  bullet points that follow accurately reflects the action

19  taken by you and Mr. Evans with respect to the settlement,

20  correct?

21  A     Yes.

22  Q     And the first bullet point there includes the fact that

23  there's the base amount of the $700 million settlement in

24  favor of TCEH, correct?

25  A     Yes.

1   Q    And if you can flip a few pages further back or just

2   two pages further back, there's a schedule numbered, Base

3   number, at the bottom, 4582 entitled Schedule A.

4   A    Yes.

5   Q    This bullet point list, Ms. Williamson, includes all

6   the intercompany claims that you recall being the subject of

7   any discussion with respect to the intercompany claims

8   issues at any point, correct?

9   A    Could you state that again, please?

10  Q    This list is a complete list of the intercompany claims

11  that you are aware of having been discussed in connection

12  with the negotiation of the intercompany claims settlement.

13  A    Yes.  These were the claims that Munger Tolles brought

14  forward on behalf of TCEH.

15  Q    Okay.  In the paragraph below, the numbered list there

16  refers to the step-up number.  Do you see that?

17  A    Yes.

18  Q    And resolution of the step-up matter was part of the

19  disinterested directors settlement, correct, as reflected

20  here?

21  A    Yes.

22  Q    So in Paragraph 42 of your written direct testimony, if

23  you could flip back there.

24  A    Yes.

25  Q    It's on Page 20, where you outline the terms of the

1    settlement as you agree to, even though the basis step up is

2    not listed there, it was in fact a term of the settlement as

3    reflected in the minutes, correct?

4    A    Yes.

5    Q    The basis -- the step -- as referred to as the step-up

6    matter, that was not an intercompany claim, correct?

7    A    Yes, it was.

8    Q    It was, in fact -- it was an intercompany claim, the

9    nature of that claim?

10   A    Well, it was an issue because the TCEH side wanted a

11   taxable transaction and EFH wanted a tax-free transaction

12   and there was a difference in the value of each of those

13   items.

14   Q    All right. So it was an issue between the estates but

15   it wasn't a claim per se on account of a transaction the way

16   the other claims were, correct?

17   A    Well, I was certainly a matter that was being voiced

18   strongly in our discussions.

19   Q    And the issue was whether or not an consent payment

20   would need to be made in order for the T-side, TCEH to agree

21   to a tax-free transaction, correct?

22   A    That's part of it.  And then there is a difference

23   between the step-up in basis that TCEH could have gotten if

24   they had done a taxable transaction versus what we might be

25   able to afford them by allowing them to use some of the NOLs

Page 125

1   that EFH had.

2   Q    So in resolving the basis step-up matter you were

3   concerned both with ensuring a tax-free transaction and also

4   ensuring that there was no tax liability incurred in

5   connection with a taxable transaction, correct?

6   A    Could you state that one more time, please?

7   Q    In resolving this issue, you were concerned about EFH

8   both with ensuring that a tax-free transaction could be

9   achieved and that EFH would not be -- would not incur tax

10  liability in the event of a taxable deal, correct?

11  A    Yes.

12  Q    And the step-up matter was a significant item in the

13  disinterested directors negotiations, correct?

14  A    It was one of the significant items.  It was $700

15  million but the tax claim was larger than that, the

16  intercompany interest claim was larger than that, so there

17  were several items that were larger than that.

18  Q    But you agree that it was a significant item.

19  A    Yes.

20  Q    All right.  If you -- and I'm sorry to flip back and

21  forth -- if you could turn back to DX 215 which is the

22  minutes of the board disinterested directors meeting on

23  April 1st.

24  A    Yes, sir.

25  Q    If you could turn back to Page 8, the paragraph I

1    referenced to you a few minutes ago, the resolution above

2    the bullet points, that paragraph  and the language makes

3    clear that as reflected in the minutes that the plan of

4    reorganization that was to be filed would include the terms

5    of the disinterested directors settlement, correct?

6    A    Yes.

7    Q    And when you agreed to the terms of the disinterested

8    directors settlement, you understood that the terms were to

9    be included in the specific plan of reorganization that was

10   going to be filed by the Debtors in April, correct?

11   A    Yes.

12   Q    And that plan that was filed with the court was a tax-

13   free plan, right, as you had bargained for with TCEH in

14   resolving the step-up matter.

15   A    Yes.

16   Q    Now, in considering the potential for disinterested

17   directors' settlement, you considered various scenarios and

18   the resulting distributions to EFH creditors in considering

19   those terms, correct?

20   A    I'm sorry?

21   Q    In connection with your negotiation and consideration

22   of terms of the settlement --

23   A    Yes.

24   Q    -- as proposed, you considered what the effect would be

25   on distributions to creditors in connection with a plan of

1    reorganization, correct?

2    A    Yes.

3    Q    And attached to the minutes of the board on April 1st

4    in DX 215 as Exhibit C on Base 4587, there's a schedule.

5    A    Yes.

6    Q    And you're familiar with that schedule.

7    A    I am.

8    Q    And that schedule was a schedule that was prepared by

9    your financial advisors in connection with the terms of the

10   settlement agreement, correct?

11   A    Yes.

12   Q    And in approving the settlement, you considered the

13   scenarios that are outlined in this schedule and there, in

14   fact, on creditor recoveries in agreeing to the settlement,

15   correct?

16   A    Yes.

17   Q    And this schedule reflects that you considered a range

18   of different scenarios for Oncor's total enterprise value

19   starting with $18 billion and going up to $19.25 billion,

20   correct?

21   A    Yes.

22   Q    It was important to you what the terms of the

23   disinterested directors' settlement would mean for EFH

24   creditor recoveries in the plan, correct?

25   A    Yes.

1   Q     Under the scenarios set forth on the schedule in

2   Schedule C, EFH creditor would have been paid either in full

3   or substantially in full in almost all of those scenarios,

4   correct?

5   A     Yes.

6   Q     In fact, the scenarios that you looked at in April

7   included proposed settlement for certain disputed claims at

8   EFIH that has since been disallowed by the court, correct?

9   A     Which EFIH claims are you --

10   Q     If you look, Ms. Williamson, at the category middle of

11   the page that says EFIH Disputed Claims and there are

12   amounts attributed to those claims.  So the scenarios that

13   you looked at included providing some recovery on disputed

14   claims that has since been ruled on and disallowed by this

15   court, correct?

16   A     Yes.

17   Q     Ms. Williamson, you and Mr. Evans subsequently filed a

18   statement explaining publically the disinterested directors'

19   settlement and attaching the April 1st minutes, correct?

20   A     Well, it was actually filed by Chairman Evans, myself

21   Hugh Sawyer and Mr. Cremens.

22   Q     Okay.  If you can just turn quickly in your binder to

23   DX 014.

24   A     Yes.

25   Q     And this is a statement of the disinterested directors

1    of Debtor Energy Future Holdings Corp regarding the proposed

2    settlement.

3    A    I'm sorry.  I thought you meant the joint plan.

4    Q    No.  Does this reflect your recollection that you and

5    Chairman Evans authorized the filing of --

6    A    We did.

7    Q    -- a statement on behalf of EFH?  And you attached to

8    this statement the minutes that we've just been talking

9    about from April 1st, correct?

10   A    Yes.

11   Q    Now, in connection with resolution of the basis step-up

12   issue, you requested and received the information from Mr.

13   Keglevic, correct?

14   A    I did.

15   Q    And if you could turn in your binder, Ms. Williamson,

16   to what is towards the back titled EUCC 131.

17   A    Yes.

18   Q    Okay.  And you recognize this document as an email with

19   a scheduled attachment from Mr. Keglevic to you dated

20   February 20th, 2015, correct?

21   A    Yes, I do.

22   Q    And we discussed this document at your deposition but

23   this is information that was provided to you by Mr. Keglevic

24   in response to an inquiry in connection with the basis step-

25   up issue, correct?

1    A    Yes.

2    Q    If you can turn to the schedule attached, now this

3    schedule, Ms. Williamson, provided what you described as

4    book ends for at that time, for the potential valuation of

5    the T-side as a data point in your consideration of the

6    merits of the step-up issue, correct?

7    A    Yes.

8    Q    Okay.  And this reflects at the time in the schedule a

9    fair value amounts ranging from $19.5 billion down to $13.25

10   billion in the top line of that schedule, correct?

11   A    That's correct.

12   Q    Okay.  And you considered this information in

13   determining the merits of the step-up issue in considering

14   your negotiations, correct?

15   A    Yes.

16   Q    It is your testimony that no formal valuation of TCEH

17   per se was done prior to the agreement of the -- that you

18   are aware -- prior to the agreement of the disinterested

19   directors' settlement, correct?

20   A    Well, a valuation was filed, you know, with the court

21   and that valuation had not been changed since that time.

22   Q    At the time you were considering prior to the agreement

23   of the March settlement.  Prior to that time, you relied on

24   the information of Mr. Keglevic but you didn't have a formal

25   valuation from financial advisors with respect to the value

1    of the T-side assets, correct?

2    A    That would be correct.

3    Q    Okay.  So you relied on this type of information to

4    inform your judgment as to where you stood on the basis

5    step-up issue, correct?

6    A    I did.

7    Q    And if you can turn back, Ms. Williamson, to your

8    written direct testimony, which if you could look at

9    Paragraph 68, which is on Page 34.  And you note there as

10   part of your statement that you are aware that TCEH was

11   decreasing in value as you continued to evaluate the terms

12   of the settlement, correct?

13   A    In the summer of 2015.

14   Q    Okay.  And this is referencing after agreement to the

15   settlement in March through the course of the summer,

16   correct?

17   A    Yes.

18   Q    Ms. Williamson, have you ever used Mr. Yang's valuation

19   of TCEH that was submitted in connection with these

20   proceedings?

21   A    I have.

22   Q    And you're aware that the Debtor's valuation of TCEH

23   and its subsidiaries in that valuation submitted in

24   connection with these proceedings currently has value below

25   $10 billion, correct?

1    A    It has a range from $10 billion up to $12 billion, yes.

2    Q    The -- in connection with -- and Evercore's part

3    evaluation of TCEH put forth for the Debtors in connection

4    with these proceedings, the TCEH first lien lenders are not

5    forego any basis step-up by agreeing to attach for

6    reorganization, correct?

7    A    Well, not exactly because, first off, the basis for

8    TCEH that would be used for a step-up or any tax transaction

9    will not be effective until the points in time that they

10   emerge.  And so that valuation can change a great deal

11   between now and then.  That value also -- because Mr. Yang

12   did a value, the IRS will do their own value and participate

13   in establishing the value for a step-up.  So today, we don't

14   really know what the value is for TCEH and whether -- what

15   the amount of the step-up value will be.

16   Q    Well, I understand your testimony is that the value

17   could increase or further decrease.  It's an unknown as to

18   what will happen in the future, correct?

19   A    Correct.

20   Q    My question was as we sit here today and Mr. Yang's

21   valuation, there is no foregone basis step-up under that

22   valuation, correct?

23   A    Well, you have to go through all of the calculations to

24   get to that and this is one of the things that we considered

25   when we considered, as I've talked earlier, about a

1    fiduciary out.  So while we knew that the energy prices were

2    declining and that that could impact the value of the step-

3    up and basis, first off, the total settlement was $700

4    million, so the step-up and basis couldn't have been at its

5    full amount in there.

6        The other thing that we looked at is, as you mentioned

7    earlier, a consent fee so that we could get to a tax-free

8    transaction, which is particularly important to us.  And at

9    the same time that the value in the summer, that the value

10   of TCEH was coming in lower than we had hoped.

11       We also knew that on Oncor, that is when NextEra put

12   their bid in that was $1 billion less than what they had

13   originally said in their original value.  And so what that

14   contributed for us is the fact that EFH at that value

15   probably couldn't pay off its full stack and so, therefore,

16   we would be facing the $1.3 billion in notes back to EFH as

17   well as the other claims that could be $600 million or $700

18   million.

19       And so overall, we felt like the $700 million claim

20   that we had was half or even a third of the claims that

21   could come back and that's why we felt that the settlement

22   that we had continued to be reasonable at that time.

23   Q    Okay.  So as you sit here, your testimony is that you

24   did not exercise your fiduciary out because you believe that

25   paying the consent fee for reasons beyond the tax-free basis

1    step-up issue is still appropriate in the perspective of

2    EFH.

3    A    Yes.  Mr. Evans and I feel that the settlement that we

4    have made continues to be an appropriate settlement as of

5    today.

6    Q    Okay.  And so that's not -- as you sit here today,

7    that's no longer necessary on account of the basis step-up

8    issue.  It is, as you described, your term the consent fee

9    to the tax-free transaction, correct?

10   A    It is an overall settlement.  We did a global

11   settlement of all of the claims.  We did not do an item-by-

12   item assignment of that $700 million to any of the claims.

13   Q    Okay.  And if we could -- if you could just turn back,

14   Ms. Williamson, to DX 215, which is the minutes we were

15   looking at from April 1st on Schedule A.  Let me know when

16   you get there.

17   A    Schedule A?

18   Q    Schedule A, yes.

19   A    Okay.

20   Q    Okay, and other than the step-up matter that's

21   referenced that we talked about earlier, there's no other

22   discussion with respect to reasons for a tax-free

23   reorganization that are reflected in the minutes of April

24   1st as a reason for doing a disinterested director

25   settlement, correct?

1   A    I'm sorry.  I don't think I understand your question.

2   Q    In the discussion in Schedule A about a tax-free

3   reorganization, the only issue discussed in connection with

4   the tax-free reorganization is the step-up matter in these

5   minutes, correct?

6   A    That's listed here, yes.

7   Q    And your testimony as you alluded to and your testimony

8   talks expressly in Paragraph 68 of your written direct

9   testimony --

10  A    Yes.

11  Q    -- that another justification in tax-free spin is to

12  facilitate the E-side REIT restructuring that's proposed in

13  the current plan of reorganization, correct?

14  A    Yes.

15  Q    And that reason paying a consent payment to facilitate

16  a REIT transaction, that was -- that's not contained in the

17  April 1st minutes or in your April 14th statement, correct?

18  A    Correct, but it factors in to as we reconsider the

19  fiduciary out throughout the process or the pendency of this

20  bankruptcy.  It does factor into that.

21  Q    And you understand, Ms. Williamson, that the settlement

22  agreement and plan before the court do not guarantee a tax-

23  free plan if an alternative plan is required, correct?

24  A    Yes, I do understand that.  But that's not different

25  than what we've had all along.

1   Q    Okay.  But the plan that was filed in April, as we

2   talked about earlier that incorporates the disinterested

3   director settlement, that was a tax-free plan, correct?

4   A    It was.

5   Q    Okay.  And under the alternative restructuring terms,

6   you're not guaranteeing any tax-free plan under the

7   alternative scenario in this transaction, correct?

8   A    That's correct.

9   Q    So during the negotiations of this plan and settlement

10  the Debtors were unable to obtain agreement from the TCEH

11  first lien creditors that they would agree to a tax-free

12  transaction in any necessary alternative plan, correct?

13  A    I don't think it's correct.  I think that what the

14  discussion was was that we would pursue the current

15  transaction, which is a -- I'm sorry, if you're talking

16  about in April, there were three different transactions that

17  were laid out.

18      Because we had the sale of Oncor, we had the kind of

19  the hunt-pick kind of thing going on and then we also had

20  the situation where the -- there was an equitization plan,

21  so there were alternatives in that plan back in April.  And

22  so while we were working toward that tax-free type of an

23  arrangement and that's what our plan had, there was never --

24  I mean, the T-side would have always had the right to have

25  done a taxable transaction but we were negotiating with them

1    to not do a taxable transaction because of the tax impacts

2    that could come from that.  And those tax impacts would have

3    been left at EFH.

4        And in fact, in none of the deals that have come

5    forward from any creditor have there been anything other

6    than a tax-free spin because most of those people don't want

7    to take the risk on the tax situation.

8    Q    Ms. Williamson, I want to focus on you on the current

9    plan, settlement agreement and plan support agreement that's

10   -- those are the documents in front of --

11   A    In front of us today.

12   Q    In front of us today.

13   A    Okay.

14   Q    In connection with negotiation of those documents in

15   this economic transaction to the Debtors, do the Debtors --

16   the Debtors -- did the Debtors attempt to secure agreement

17   from the TCEH first lien creditors that if an alternative

18   plan was necessary under the construct of this arrangement

19   that it would be guaranteed to be a tax-free plan?

20   A    We don't have that today and we've never had that.  Any

21   plan -- the T-side has always had the ability to request and

22   fight for a taxable plan.

23   Q    But as you just testified, Ms. Williamson, you're

24   paying in connection with the $700 million, the consent

25   payment for the tax-free transaction, correct?

1    A    I am telling you that we took a variety of things into

2    consideration when we determined the $700 million number.

3    And right now from the plan that we're dealing with and the

4    plans that we've dealt with in the past, because no taxable

5    transaction has ever been put forward that we felt that that

6    was a point that we considered in determining that $700

7    million.

8    Q    And I think as you just testified, the result of the

9    negotiations here is that if an alternative plan is

10   necessary, the $700 million settlement payment is made but

11   the TCEH first lien creditors still have the option to file

12   a taxable plan should they choose to do so, correct?

13   A    They can put forth a taxable plan, yes.

14   Q    All right.  Now, with respect to the settlement

15   agreement itself that's before the court for approval, you

16   reviewed and approved that settlement agreement along with

17   the plan on August 9th, correct?

18   A    Yes.

19   Q    And as you testified this morning, the settlement

20   agreement incorporates a slightly modified version of the

21   disinterested director settlement that you agreed to back in

22   March, correct?

23   A    Yes.

24   Q    And those terms now of the disinterested director

25   settlement are no longer in a specific plan or

1    reorganization.  They're in the standalone settlement

2    agreement, correct?

3    A    Yes.

4    Q    In fact, as we were just talking about, the settlement

5    claim that's contemplated is actually only paid in

6    alternative plans if this REIT does not close, correct?

7    A    Yes.

8    Q    And as you sit here, you do not know what recoveries

9    EFH creditors will receive in an alternative plan because it

10   has not yet been negotiated, correct?

11   A    Well, if you're asking me to speculate -- is that what

12   you're asking?

13   Q    I'm asking the question as you sit here you do not know

14   what the recoveries will be to EFH creditors in an

15   alternative plan should one be necessary.

16   A    That's correct.

17   Q    And so you don't know the effect on creditor recoveries

18   by increasing the size of the EFH claims pool by $700

19   million in that alternative plan, correct?

20   A    I think that the thing that you're missing is that that

21   $700 million is very critical because to get to buy the

22   piece that we have on the T-side there is also a $550

23   million that is going to have to be made to the T

24   unsecureds.  And so to get that piece, I think that both of

25   those pieces are critical to that and that is what is in the

1    plan support agreement and certainly part of our overall

2    situation.

3    Q    I understand that you think that that's reasonable.

4    You don't know what the effect is because it's unknowable on

5    EFH creditors of permitting that $700 million claim to exist

6    in alternative plan, correct?

7    A    I agree with you that it's unknowable.

8    Q    And your testimony in Paragraph 76 of your direct

9    testimony, which is on Page 37, you state at the end of that

10   paragraph in connection with the suggestion that claims

11   should be litigated in a litigation trust, you believe that

12   the litigation of the intercompany claims would damage the

13   diminished value of EFH.  That's your testimony, correct?

14   A    It is.

15   Q    The cost and the outcome of the intercompany claims

16   litigation must exceed $700 million for the EFH estate to be

17   worse off than the current terms of the settlement, correct?

18   A    Yes.

19   Q    And if approved, the terms of the settlement agreement

20   are permanent irrespective of what happens next in the

21   bankruptcy, correct?

22   A    That's true.  But I think that you're overlooking the

23   fact that we have certainty in these numbers, so we know

24   what these numbers are.  If we were going to go to

25   litigation, we don't know whether we would win or lose

```
1    those.  We don't know -- and the cost of litigating that,

2    just the cost of the lawyers are fairly substantial because,

3    as you know, almost $50 million has been spent by the TCEH

4    unsecured lawyers in just identifying the claims.  And so

5    the cost of litigation would be very high and the delay

6    associated with that and the disruption to our people is

7    huge.

8        And at this point I think we're really to a point where

9    we would like to give these companies a fresh start where

10   they can go and operate without having to deal further with

11   all of these intercompany claims that we have been fighting

12   over for two years.

13   Q   Ms. Williamson, my question is simply that if the

14   settlement agreement is approved by the court, the terms of

15   the settlement are permanent irrespective of what happens

16   next, correct?

17   A   And that is so critical to us and that's what I said in

18   my statement here.  The concept of disarmament is very

19   critical because it resolves all of the squabbling and all

20   of the argument and all of the barbs that have been thrown

21   back and forth.  And I think it is a good settlement.  I

22   think it gives certainty to what we're trying to do and it

23   allows us to move forward, if we have to move forward with

24   an alternative transaction, to make that transaction a very

25   rapid emergence from bankruptcy.
```

1    Q    Ms. Williamson, if the settlement approved by the Court

2    is permanent, you'll no longer have the ability to exercise

3    a fiduciary (indiscernible) with respect to settlement,

4    correct?

5    A    That is correct.

6    Q    You indicated earlier, Ms. Williamson, concern about

7    the $1.3 billion EFIH notes claim against EFH, remember

8    that?

9    A    Yes, I do.

10   Q    Okay.  That claim only is relevant if EFIH is insolvent

11   and they need that value to pay creditors, correct?

12   A    Yes.

13   Q    And even then, the $1.3 billion claim is only relevant

14   to the extent of each dollar of solvency that's necessary to

15   pay creditors, correct?

16   A    Yes.

17   Q    And you're familiar, Ms. Williamson, with the court's

18   recent, which we talked about earlier, recent decision with

19   respect to post-petition interest that this allowed

20   approximately $450 million in disputed claims at EFIH,

21   correct?

22   A    Yes.

23   Q    So the risk of that $1.3 billion claim being relevant

24   is significantly less now than it was even a few weeks ago,

25   correct?

1    A    I don't really see it that way, but it depends on what

2    the value of Oncor comes in at.  And it if came in at $17.2

3    million, which is what NextEra's bid was, we would still be

4    in a problem even with the items that are not in the -- that

5    have been determined by the court.

6    Q    Okay.  But you would agree that with respect even just

7    with the post-petition interest issue at EFIH that's $450

8    million less of claims ahead of EFH creditors than were

9    there as disputed claims a few weeks ago, correct?

10   A    Yes.

11   Q    You talked, Ms. Williamson, in your testimony about the

12   concept of disarmament, correct?

13   A    Yes.

14   Q    And your view is that disarmament is both central and

15   the way out of bankruptcy.  I'm sorry, those are your words

16   in Paragraph 76 of your testimony, correct?

17   A    That is true.

18   Q    So in that regard, you view the plan and settlement

19   documents as being interrelated, correct?

20   A    Well, the plan is -- requires the settlement document

21   to be entered or settlement agreement to be entered.

22   Q    It's your view that EFH would not pursue the current

23   REIT plan if the settlement agreement is not pursued by the

24   court, correct?

25   A    I don't know what we would do.  We are very hopeful

1    that the REIT transaction will close.  We feel like there is

2    a very high probability that it will.  We have not gone back

3    and determined what we would do if it does not close.

4    Q    Okay.  In the downside case where an alternative plan

5    is necessary and the current REIT plan doesn't close, EFH

6    creditors could potentially face significant impairment,

7    correct?

8    A    I don't know whether they will or not because I don't

9    know the terms of an alternative plan.

10   Q    It's surely possible that creditors would be impaired

11   in the alternative plan scenario, correct?

12   A    In this case, pretty much anything is possible.

13   Q    In a scenario where EFH creditors were impaired, they

14   might be interested or would be interested in pursuing

15   available litigation assets as a source of recovery on their

16   claims, correct?

17   A    Well, they might be willing to do that but the problem

18   is going to be that if they pursued those claims that the

19   TCEH people have put together, the problem is going to be

20   even if they win on all of them, there isn't money to pay

21   that.  And so there's no collectability on those claims.  So

22   we're going to spend a lot of money, a lot of our precious

23   cash that we have left to fight claims and get -- even if we

24   won them, we wouldn't be able to collect them because

25   there's like $20 billion worth of unsecured claims sitting

1    over on the T-side.  We would go into that bucket with

2    everybody else and get paid cents on the dollar.

3    Q    Okay, let's talk about that.  You address this issue in

4    Paragraph 40 of your written statement, which is on Page 19.

5    A    I'm at Page 19.

6    Q    Sorry.  I think I have the wrong reference.

7    A    Oh.

8    Q    Let's just talk about it.  Ms. Williamson, in your

9    testimony you talk about both that litigation of the

10   intercompany claims would result in delaying the transaction

11   as well as this issue of the small amount that might be

12   recovered, correct?

13   A    Yes.

14   Q    And with respect to delays of the case in paragraph --

15   it is Paragraph, sorry, 52 of your direct testimony, you

16   state that litigating the interdebtor claims would

17   significantly delay EFH's emergence from bankruptcy,

18   correct?

19   A    Yes.

20   Q    Okay.  You assumed in that that in your testimony that

21   litigation of the intercompany claims must take place prior

22   to EFH's emergence from bankruptcy, correct?

23   A    Well, not that it would take -- I mean, I know there

24   are ways to do that but I'm not sure that we would move

25   forward without knowing, you know, what the situation was

1    going to be.  We haven't discussed that as a board and I

2    don't really know the answer to your question.

3    Q    Okay.  But your assumption in making the statement that

4    it would delay emergence assumes that you have to resolve

5    these claims prior to actually emerging from bankruptcy,

6    correct?

7    A    Yes.

8    Q    Now the intercompany claims that we've been talking

9    about that are at issue are all pre-petition bankruptcy

10   claims, correct, to your knowledge?

11   A    Yes.

12   Q    Okay.  And you understand that the bankruptcy code

13   provides for unorderly process for resolving creditor claims

14   in a bankruptcy, correct?

15   A    Yes.

16   Q    And so I think as you've testified, the board has not

17   considered whether EFH could emerge from bankruptcy and then

18   litigate the intercompany claims at a later date, correct?

19   A    We have not.  We know that is something that could be

20   considered but we have not considered that.

21   Q    Okay.  And you just testified a few moments ago with

22   respect to recoveries and the size of the claims pool at

23   TCEH, correct?

24   A    Yes.

25   Q    And irrespective of any affirmative recovery on EFH

1    claims at TCEH, claims that EFH has could be used to reduce

2    or eliminate claims asserted against EFH, correct?

3    A     Could you say that one more time?

4    Q     Is it your understanding that regardless of affirmative

5    recoveries, claims that EFH has against TCEH could be used

6    to reduce or eliminate claims that TCEH has back against

7    EFH, correct?

8    A     I understand that that is a very complex calculation

9    and that there are a lot of things that cover offsets and

10   things like avoidance claims have a different priority than

11   other claims and I am not a lawyer and I cannot answer that

12   more than I know that it is not a straight, clear cut

13   answer.

14   Q     Did the -- did you consider in connection -- with

15   respect to the intercompany claims, did you consider whether

16   the existence of EFH claims against TCEH legally protects

17   EFH from the allowance of claims that TCEH asserts against

18   EFH?

19   A     Okay.

20   Q     Let me rephrase.  Did you consider or receive advice on

21   the question of whether or not there is a legal -- and I

22   don't want you to reveal -- I know these guys are getting

23   ready to get up.  I don't want you to reveal --

24              THE COURT:  He's going to get up because you've

25   already asked this question and she's already answered it.

Page 148

```
 1    That's why he's about to get up.  Go ahead.

 2    Q    All right.  Well, let me at least say, I don't want you

 3    to reveal any communication with your lawyers.  My question

 4    is simply did you receive any advice in considering

 5    intercompany claims on a legal question of whether or not

 6    the existence of EFH's claims against TCEH provide a legal

 7    defense to TCEH?

 8    A    A legal defense?

 9    Q    Yes or no.

10         MR. FIRESTEIN:  Your Honor, objection.  I mean,

11    she's already discussed the issue and what she was

12    considering relative to this.  I mean, if we want to do it

13    as a yes or no on the point that -- I have no objection to

14    it, but.

15         THE COURT:  Okay.  I'll allow the question.  Did

16    you receive legal advice?

17    A    Yes.

18    Q    Ms. Williamson, you never considered settling only some

19    of the intercompany claims while litigating others in order

20    to reduce the universe of the material claims, correct?

21    A    We considered just about everything.  But to be real

22    honest, we wanted a global resolution of the claims.  We

23    felt that that was what was in the best interest of EFH.

24    Again, we were very concerned after seeing the fees just

25    associated with this bankruptcy that legal costs would have
```

1    been very high.  So we really wanted to have a global

2    resolution of the intercompany claims.

3    Q    All right.  Ms. Williamson, in your written direct,

4    changing topics a bit, on Paragraph 77, starts on the Page

5    37, on Page 38.

6    A    Yes.

7    Q    You talk on Page 38 in the middle of the paragraph, the

8    disarmament in your view was the price paid by the T-side

9    creditors for the opportunity to pay EFH creditors in full,

10   correct?

11   A    Yes.

12   Q    As we sit here today, there's uncertainty as to whether

13   the purchases will actually in fact pay EFH creditors in

14   full, correct?

15   A    I would say that the probability is pretty high but I

16   understand that it's not, as in every merger and acquisition

17   transaction, there are different reasons that they can or

18   cannot close.

19   Q    As we sit here today, there is an uncertainty as to

20   whether or not EFH creditors will be paid contingent on

21   whether this plan actually closes, correct?

22   A    Well, I think that I would rather say that there is

23   still some question as to whether the transaction will

24   close.  However, I am confident and feel pretty good about

25   the fact that I think it has a pretty high probability of

1    closing.

2    Q    Okay.  And the EFH Board of directors, as was the full

3    board, was advised that the merger plan that's now before

4    the court contained a significant amount of conditionality,

5    correct?

6    A    Yes.

7    Q    And the EFH board was informed in considering the

8    transaction by its advisors that the transaction, proposed

9    transaction contained out of market conditions related to

10   regulatory approvals and market factors, correct?

11              MR. SHORE:  Objection, cumulative.

12              THE COURT:  I can't hear you.

13              MR. SHORE:  Objection, cumulative at this point.

14              THE COURT:  Yeah, I mean, we've been -- I'll allow

15   it but we are beating this horse a little bit.

16              MR. GLUECKSTEIN:  Well, this is simply asking the

17   question if the board members, the first board member who

18   testified on this subject part of this trial.

19              THE COURT:  All right.

20   Q    Do you recall, Ms. Williamson, being advised of the

21   fact that the terms of the transaction contained out of

22   market conditions related to conditionality and other market

23   factors?  Do you recall that?

24   A    I remember us having a discussion of that, yes.

25   Q    And you agreed to the recommendation of the co-CROs and

1   joint advisors to accept disarmament instead of pursuing

2   traditional merger remedies in the purchase contract,

3   correct?

4   A    Yes, disarmament was much more valuable to us than

5   something like a break-up fee because the costs that we're

6   incurring right now, we have $100 million of adequate

7   protection payments, we've got $30 million of legal fees,

8   that's per month, so we would have blasted through those,

9   you know, a break-up fee fairly quickly.

10       But for us, the disarmament gives us the fact that we

11  are -- or now we have creditor consensus and that makes a

12  big difference because we can focus on selling the assets or

13  moving the assets so that we can get these businesses

14  established and operating without the restrictions of

15  bankruptcy.  We're not going to continue to spend our time

16  arguing over all these little claims if we get these orders

17  entered.

18  Q    Okay.  And the purchase contract in connection with

19  this transaction also does not provide any ability for the

20  debtors to see specific performance for the purchasers,

21  correct?

22  A    Yes.  But in my business career, there are often things

23  like the performance requirements in a contract and a lot of

24  times, you know, it's a matter of how much it's going to

25  cost you to not close that transaction.  So when I think

1    about the terms that are here, we don't force companies to

2    do things that they don't want to do.  They have to buy

3    their way out of it sometimes.

4        But I didn't feel that the fact that there was no way

5    to force the hunt on this was a show stopper in terms of the

6    transaction we had in front of us.

7    Q    Would you have preferred as director of EFH to have the

8    ability to force the purchasers to actually close this

9    transaction?

10   A    There are lots of things that I would have preferred to

11   have but we have a very complex situation with a lot of

12   creditors who have different views about the world and have

13   different views about what they want.  And so there are

14   gives and takes anytime that we negotiate a contract.  I

15   feel like we reached a reasonable contract.

16   Q    To your knowledge, did the debtors attempt to secure

17   specific performance of this deal in lieu of disarmament?

18   A    I think we asked for a whole lot of things like that.

19   It was a negotiation.  And anytime there's a negotiation

20   there are pluses and minuses.  There are things you get and

21   things you don't get.

22   Q    Do you know specifically though, Ms. Williamson,

23   whether you sought specific performance instead of

24   disarmament?

25   A    I know we sought things like break-up fee and the

1    traditional terms or specific performance.  But disarmament

2    was much more important to us.

3    Q    So those traditional remedies would have only been in

4    your mind in addition to disarmament, no instead of,

5    correct?

6    A    Well, the whole thing that we have here is we have

7    creditor consensus, which is not something we've had before

8    and that's very important to us.  So disarmament was very

9    important to us in considering this transaction.

10   Q    Okay.  Ms. Williamson, the disarmament that you're

11   talking about only effects the plan supporters who are

12   actually holding T-side claims, correct?

13   A    Well, no.  That's not correct, I don't think, because

14   the settlement agreement, if it's entered, gives releases

15   interdebtor, it gives releases intercreditor, it resolves --

16   it gives releases to the sponsors and it gives releases to

17   the officers and directors.  And what that means is that new

18   -- I mean, claims cannot continue to be brought forward.

19   Q    Okay.  But the other investors and the purchaser

20   groups, such as the Hunts, are not giving up claims against

21   the estate in the way that the T-side creditors are,

22   correct?

23   A    Well, I'm not aware of claims that they have against

24   our estate.

25   Q    You believe, Ms. Williamson, that the financial

1    investors who were in the purchaser group sophisticated

2    parties, correct?

3    A    I do.

4    Q    And those are sophisticated investors who are managing

5    investors for their clients, correct?

6    A    I do.

7    Q    And the purchasers, the investment purchasers will make

8    a decision at the time of closing, whether it's in their

9    financial interest to close this transaction, correct?

10   A    They will.

11   Q    And the Debtors have no remedies in the purchase

12   contract in the event that the purchasers determine it's in

13   their economic interests to not close the transaction,

14   right?

15   A    I really -- I agree with that but the thing that I

16   think is particularly important is that we do have, under

17   disarmament, we have the drag rights so we can move

18   immediately if that happens.  We've got a move where the T-

19   uns have to follow what the T firsts say on the next plan

20   that we can move to an alternative restructuring within 90

21   days and so I understand what you're asking me but I view it

22   differently than you do.

23   Q    Well, I understand.  And what you're referring to now,

24   disarming drag, those are the terms that you negotiated that

25   apply in the alternative plan scenario.

1    A    Yes.

2    Q    But with respect to the current REIT plan, there are no

3    remedies whatsoever for the Debtors in connection with this

4    purchase contract, correct?

5    A    Like I said, we believe that disarmament was paid

6    upfront and that's our remedy.  That's more important to us

7    than the types of traditional remedies you're referring to.

8    Q    Okay.  And but those remedies exist outside the

9    purchase contract, correct?

10   A    They do.

11   Q    Thank you.

12        MR. GLUECKSTEIN:  No further questions, Your

13   Honor.

14        THE COURT:  Let's -- Mr. Sheppard, are you going

15   to ask some questions?  All right.  We'll take a short

16   recess before Mr. Sheppard starts his cross, five or ten

17   minutes.

18      (Recess)

19        THE COURT:  Please be seated.

20        CLERK:  Thank you.

21        THE COURT:  You know, before she had kids, you

22   couldn't hear her.  And now?  Everybody knows when Ms.

23   Gadsen comes in.

24        MR. MCKANE:  Your Honor, Mark McKane, Kirkland &

25   Ellis, for the debtors.  Just a housekeeping matter:

1   consistent with the stipulation -- or the agreement we

2   worked out with conflicts counsel, in front of you is a

3   revised Williamson declaration, with a black line reflecting

4   the change.  And we provide it to you now, recognizing that

5   counsel for -- conflicts counsel may want to examine the

6   witness using the updated declaration.

7          THE COURT:  Okay.  Where are the changes?

8          MAN:  Paragraph 56.

9          MR. MCKANE:  Sorry, end of 56, in the black line

10  version, Your Honor.

11         THE COURT:  Yes.

12         MR. MCKANE:  The -- in the black line, you'll see

13  the last sentence of Paragraph 56 was struck.  And in

14  Paragraph 58, I believe it's the second or third line -- on

15  the following page, you'll see that there is a

16  clarification.  Previous it said "entities," and now it

17  clarifies that it was third parties.

18         THE COURT:  Okay.

19         MR. MCKANE:  Thank you, Your Honor.

20         THE COURT:  Okay.

21         MR. SHEPPARD:  And that's correct, Your Honor.

22         THE COURT:  All right.

23         MR. FIRESTEIN:  With that, Your Honor, just as a

24  matter of protocol, do you want to wait till the end, or

25  should have it be -- because I realize that, before we moved

Page 157

1    down this path, it was admitted, except for these

2    intervening paragraphs.  It's up to whatever the Court

3    prefers.

4              THE COURT:  Is there any objection to --

5              MR. SHEPPARD:  No objection to the revised

6    exhibit, Your Honor.

7              THE COURT:  All right. D-D-I-R Williamson R, the

8    revised declaration, is admitted.

9              MR. FIRESTEIN:  Thank you, Your Honor.

10             THE COURT:  Yes, sorry.

11             MR. SHEPPARD:  May I, Your Honor?

12             THE COURT:  Yes, I'm sorry.  I was just getting

13   organized.

14             MR. SHEPPARD:  No, no, thank you.

15                      CROSS EXAMINATION

16   BY MR. SHEPPARD:

17   Q    Ms. Williamson, good afternoon.

18   A    Good afternoon, Mr. Sheppard.

19   Q    Nice to see you again.

20   A    Thank you.

21   Q    You testified, in response to questions from your

22   counsel, regarding your evaluation of the sponsor claims.

23   Do you recall that?

24   A    Yes.

25   Q    Okay.  And directing your attention to the time period

1    when you were in the ad -- when you were a member of this ad

2    hoc committee of non-sponsor directors, do you recall that

3    testimony?

4    A    Could you specify a time period, to make sure we're on

5    the same page, please?

6    Q    From, like, February 2013 until the constitution of the

7    special committee that you testified about?

8    A    Yes, sir.

9    Q    Okay.  And you testified that you reviewed the sponsor

10   claims in connection with that committee, is that right?

11   A    we --

12            THE COURT:  Now I'm confused.

13            MS. WILLIAMSON:  Yeah.

14            THE COURT:  What committee?

15            MR. SHEPPARD:  Well, I believe she testified to a

16   committee of non-sponsor directors who met informally.

17   Q    Is that correct?

18   A    Yes.

19   Q    Okay.  And then I believe your testimony was that those

20   -- that committee reviewed the claims against the sponsors,

21   is that correct?

22   A    That's not my testimony.

23   Q    Okay.

24   A    My testimony was that the non-sponsor directors did

25   meet, starting in early 2013.  But in -- as it relates to

1     the claims and the work that was done by Sidley Austin, that

2     was a smaller committee.

3     Q     Okay.  And the claims that were reviewed at that time?

4     A     Yes.

5     Q     Included the claims arising out of the liability

6     management program, isn't that right?

7     A     Well, I thought that we weren't supposed to talk about

8     what Sidley reviewed.

9     Q     I'm not asking you for your advice; I'm asking you what

10    was reviewed.

11    A     Well, I'm glad you're not asking for my advice, because

12    I'm not a lawyer.  I didn't do very well.

13    Q     The advice that was given to you.

14    A     Okay.  I'm sorry.  The --

15    Q     All right, well, let me ask it this way, without

16    getting into the advice.

17    A     Okay, thanks.

18    Q     Do you have an understanding of what the claims against

19    the sponsors were?

20    A     Well, first off, there weren't claims against the

21    sponsors at that point in time.  What there were were some

22    items that we asked Sidley Austin to look at that involved

23    some transactions associated with the LBO that involved the

24    sponsors.

25    Q     Okay.  And all of these claims, Ms. Williamson, may --

1   to the extent that they would have arisen, would have arisen

2   prior to your tenure on the board, isn't that right?

3   A    Yes.

4   Q    Thank you.  Now, with regard to -- you recall

5   testifying about the RSA?

6   A    Yes.

7   Q    Okay.  And that was in February of 2014, isn't that

8   right?

9   A    Yes.

10  Q    Okay.  And if you could turn to Exhibit EUCC633, which

11  should be at the very back -- toward the very back?

12  A    I'm sorry, the number again, please?

13  Q    663.

14  A    I think there's two of those in my book.  Oh, I'm

15  sorry, no, I didn't look at that right.  Yes, I have it.

16          THE COURT:  I don't.

17          MR. SHEPPARD:  Wait a minute, that's not the right

18  number, Your Honor.  I'm sorry.  634, pardon me.

19          MAN:  Which book?

20          THE COURT:  I don't have that, either.

21          MS. WILLIAMSON:  I don't have that, either.

22          MR. SHEPPARD:  Are we in the right books?

23          MS. WILLIAMSON:  This is the book that your

24  assistant gave me.  It says, "Billie Ida Williamson Trial

25  Exhibits."

1           THE COURT:  Did you change books on us, Mr.

2    Sheppard?

3           MR. SHEPPARD:  Your Honor, I'm thinking somebody

4    might have changed books on me.  No, that's not the right

5    exhibit.  While we're trying to get that figured out, let me

6    go on to a different topic.  Okay?

7           MS. WILLIAMSON:  Yes, sir.

8           THE COURT:  Oh, I found it.  I -- there's a -- I

9    was given a thicker book.

10          MS. WILLIAMSON:  Yes, sir?

11          THE COURT:  The one -- not the one Mr. Glueckstein

12   was using, but a separate book.

13          MR. SHEPPARD:  That's a separate book, Your Honor.

14          THE COURT:  That has 633 in it.

15          MS. WILLIAMSON:  I have 633, but I saw -- thought

16   he said 634.  Which one do you want?

17          MR. SHEPPARD:  Your Honor, I'm not sure that my

18   numbers match up with the numbers in the book.

19          THE COURT:  All right.

20          MR. SHEPPARD:  So, let me just move on, if I can.

21          MS. WILLIAMSON:  Okay.

22   Q    Okay.  In connection with the consideration of the RSA?

23   A    Yes.

24   Q    The full board met and approved that restructuring

25   agreement, isn't that right?

Case 14-10979-CSS   Doc 7004   Filed 11/16/15   Page 162 of 261

Page 162

1    A    Yes.

2    Q    And that was in connection with the imminent filing for

3    bankruptcy, isn't that true?

4    A    Yes.

5    Q    And, in fact, you filed for bankruptcy in April of

6    2014, correct?

7    A    Yes.

8    Q    Okay.  Now, at that February 27th, 2014, board meeting,

9    you were considering a number of items, Ms. Williamson, in

10   anticipation of the filing for bankruptcy; is that correct?

11   A    I'm sorry, I don't recall all of that.  Is there

12   something we can look at together so that I can --

13   Q    I believe it's --

14   A    It is 633, I think.

15   Q    633?

16   A    Yes, sir.

17   Q    And I apologize, because I was looking at 663, and

18   that's why I got confused.  633.

19   A    See, if you were an accountant, you'd be good with

20   numbers.

21   Q    I'd have been a doctor if I was any good with numbers.

22   A    That's probable, yeah.

23   Q    Maybe I should be anyway.  Okay.  So, we are at 633,

24   correct?

25   A    Yes, sir.

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

1    Q     Okay.  And have you ever seen that document before?

2    A     Yes, sir.

3    Q     I don't know why I can't put my hands on it.

4    A     We can look at it together if you would like.

5    Q     And that was a presentation that was made to the board

6    on February 27th, correct?

7    A     Yes, sir.

8    Q     Okay.  And I believe you testified that this was a

9    presentation immediately before the bankruptcy, correct?

10   A     Yes.

11   Q     Okay.  All right.  Can I direct your attention to the

12   next page, please?

13   A     Yes.

14   Q     Okay.  That's a table of contents, a summary of

15   outline.  Do you see that?

16   A     Yes.

17   Q     Okay.  And this -- is it your recollection, Ms.

18   Williamson, that these are the matters that were covered in

19   that outline?

20   A     In that meeting?

21   Q     Yes.

22   A     Yes.

23   Q     Okay.  So, you were talking about the -- for example,

24   the potential venue of where to file these bankruptcy cases?

25   Do you see that down toward the bottom?

Page 164

1   A     Yes.

2   Q     There was a first-day analysis regarding what was going

3   to go on at the first-day hearing in any bankruptcy

4   proceeding; do you see that?

5   A     Yes.

6   Q     Okay.  Then, if you go to the middle of the page,

7   there's a bullet point that says, "March 10th, 2010,

8   EFH/EFIH Debt Exchange."  Do you see that?

9   A     Yes.

10  Q     Okay.  Do you recall, Ms. Williamson, why that was on

11  the agenda for that meeting?

12  A     What we were attempting to do was to determine whether

13  we should file earlier on bankruptcy to not -- there were --

14  I'm sorry.  I don't recall.

15  Q     Okay.  Okay.  Now, this was after the Sidley Austin

16  evaluation of potential sponsor claims, isn't that true?

17  A     Sidley came in in the summer of 2013, but they also

18  came back before we filed the RSA.

19  Q     Okay.  And do you recall that there was a -- or were

20  you aware of a transaction in March of 2010 where EFH and

21  EFIH engaged in a debt exchange?

22  A     Well, clearly I understand that, but I was not on the

23  board at that time, and did not participate in that.

24  Q     Okay.  And did you have an understanding as to the

25  statute of limitations in connection with a potential

1  avoidance claim here being four years?

2  A    I know that we looked at statute of limitations

3  matters.  But it was -- what we were -- in general, not in

4  specific to this, because my recollection of this is not as

5  clear.  But in general, when we would look at statute of

6  limitations matters, it was:  should we file earlier, so as

7  to toll the statute of limitations?

8  Q    Okay.  And, in fact, you did -- EFH didn't file for

9  bankruptcy, though, until April of 2014, correct?

10  A    That is correct.

11  Q    And that would have been more than four years after the

12  March 10th transaction, isn't that true?

13  A    Yes, if I calculate correctly on the calendar.

14  Q    And at that time, I think you testified before that you

15  were reviewing the RSA, correct?

16  A    I'm sorry?

17  Q    You were reviewing the RSA, correct?  The board?

18  A    At this meeting?

19  Q    Yes.  Or at around that time.

20  A    At around that time, but I don't see it on this agenda.

21  Q    Okay.  And in your direct testimony, I believe it's in

22  Paragraph 17, you testified that you served on a special

23  committee of non-sponsor directors that considered and

24  recommended the approval of releases for the sponsors as set

25  forth in the prepetition of restructuring and lockup

1    agreement.  Is that your testimony?

2    A    Paragraph 17?

3    Q    Oh, I'm sorry, 7, not 17.

4    A    Okay.  Yes, I served -- just as it says here, I served

5    on a special committee of non-sponsor directors that looked

6    at releases, not claims but releases, for the sponsors,

7    before we signed the RSA and then before we actually filed

8    for bankruptcy.

9    Q    Okay.  And so, the restructuring and lockup agreement?

10   A    Yes.

11   Q    Contemplated releases of the sponsors; that's why you

12   were reviewing it, right?

13   A    Yes, it did.

14   Q    Okay.  And it contemplated releases that were within a

15   plan of reorganization; isn't that true?

16   A    Yes.

17   Q    It didn't contemplate releases that would be set --

18   part of a separate settlement agreement; isn't that right?

19   A    Well, this is a restructuring support agreement.

20   Q    Right.

21   A    And you can have those kinds of agreements.  And then,

22   in -- when we got to the plan, the plan did have releases in

23   it, yes.

24   Q    And it didn't have a separate settlement agreement,

25   isn't that true?

1    A    Well, but I think it was a different set of

2    circumstances and a different context.  At that point in

3    time, we thought we were moving toward a consensual

4    bankruptcy.  We thought we would get in and out of

5    bankruptcy very quickly.  We had some of our major creditors

6    signed on here, including Fidelity and the T firsts and the

7    EFIH PIKs.  And so, we thought we were going to be able to

8    move in and out.  So, I think that's a very different

9    context than what we have today.

10   Q    And it's your -- is it your understanding that the

11   sponsors supported that plan of reorganization as filed?

12            THE COURT:  Which plan?

13            MR. SHEPPARD:  The first plan.

14            THE COURT:  Which? April 2014?

15            MR. SHEPPARD:  Yes, Your Honor.

16            THE COURT:  There was no plan filed.

17            MR. SHEPPARD:  Okay, I'm sorry.

18   Q    In connection with the restructuring and lockup

19   agreement, did the sponsors support that agreement?

20   A    Yes, I believe they did.

21   Q    Okay.  And wasn't their support, Ms. Williamson,

22   predicated upon there being releases of any potential claims

23   against them?

24   A    No, sir.

25   Q    Okay.  Okay, let me jump forward, then, to April of --

1    well, before I leave the non-sponsor director committee,

2    there was no formal delegation of authority by the board to

3    that committee, is that true?

4    A    I don't know that there was a formal resolution, but it

5    was discussed at the board and the committee was put

6    together, and then we were asked to look at and to work with

7    Sidley Austin.

8    Q    Okay.  And that committee, the prior committee, that

9    included all the, quote, "non-sponsor directors," is that

10   right?

11   A    Yes, I believe that's correct.

12   Q    Okay.  And did that include Mr. Reilly?

13   A    You know, I'd love for us to go back and look at that,

14   because there -- I don't believe Bill was included there.

15   Q    Okay.

16   A    But we can look at that together, if you would like.

17   Q    All right.  And I'm going to get to that in a second.

18   Actually, why don't we do it now?  We can turn to Exhibit

19   487.

20   A    In this big book that you gave me?

21   Q    Yeah.  And I do apologize for --

22   A    Is it DX?  Is that an exhibit?

23   Q    No, that's a --

24   A    Oh, I'm sorry, excuse me.  I see it.  I see it.  My

25   fault.

```
1    Q    ECC487.

2    A    Uh huh.  I've got it.

3    Q    Is there a -- well, I'll ask you, once you've gotten

4    there.

5    A    Yes, I'm here.

6    Q    Okay.  Have you ever seen that document before?

7    A    Yes, I have.

8    Q    Okay.  And this is the minutes of a non-sponsor

9    director meeting, March 1st, 2013, correct?

10   A    Yes. Mm hmm.

11   Q    And that's the time period that we were talking about;

12   isn't that correct, Ms. Williamson?

13   A    Yes.

14   Q    And if you look up at the top there, it has the persons

15   in attendance.  Do you see that?

16   A    Yes.  But we have non-sponsor director meetings.  We

17   did have non-sponsor director meetings.  And then we had

18   separate meetings of a small-letter special committee that

19   worked with Sidley.

20   Q    Right.  But Mr. Reilly was part of this non-sponsor

21   director committee; isn't that true?

22   A    He was.

23   Q    Okay.  And so, to the extent that this committee was

24   reviewing the sponsor releases, as you testified, Mr. Reilly

25   was involved in that; is that correct?
```

1    A    Well, the releases were reviewed with Sidley.  And I

2    believe that was a smaller committee.  But I'm sorry; my

3    memory's just not as good about who all was sitting in

4    there.  I know the sponsors were not.

5    Q    Okay.  But these -- this exhibit here, this is one set

6    of minutes from one non-sponsor director meeting, correct?

7    A    Yes.

8    Q    Okay.

9    A    But there were non-sponsor director meetings, and then

10   there were meetings of this special group that was working

11   with Sidley to address the sponsor issues.

12   Q    Okay.  And were there minutes of that special group?

13   A    I don't believe that there were minutes written on

14   that.

15   Q    And was that special group called something different

16   than the non-sponsor directors?

17   A    It was called the special committee.

18   Q    Wasn't that the special committee that was constituted

19   in April of 2015, Ms. Williamson?

20   A    It was a different special committee.

21   Q    Okay.  But there were no minutes of that special

22   committee's meeting?

23   A    I don't believe so.

24   Q    Okay.  So, then, jumping ahead, then, to April of 2015?

25   A    '15, okay.  Mm hmm.

1   Q     You were a member of a special committee that was

2   constituted in April of 2015, correct?

3   A     I was.

4   Q     Okay.  And that was constituted, was it not, pursuant

5   to a formal board resolution?

6   A     It was.

7   Q     Okay.  Can we pull up, please, DX238?  And at Page 11?

8   If you take a look at Page 11, Ms. Williamson?

9   A     Mm hmm.  Yes?

10  Q     There's a resolution there.

11  A     Yes.

12  Q     Do you see that?

13  A     Yes.

14  Q     Okay.  And that resolution, is that your understanding

15  of your charge, as the special committee?

16  A     Yes.

17  Q     I know; I'm just trying to catch up there.  So, if you

18  just take a look at that, it says, "To the fullest extent

19  permitted by applicable law, the board of directors have

20  delegated to the four directors" -- yourself, Mr. Evans, Mr.

21  Young, and Ms. Acosta -- "the special committee to review

22  and decide whether to release the company's alleged claims

23  against the sponsors, and any such determination shall be

24  binding on the company and the company's subsidiaries."  Do

25  you see that?

```
 1    A     Yes.

 2    Q     Okay.  To your knowledge, was that resolution ever

 3    rescinded?

 4    A     No.

 5    Q     Okay.  Was that resolution in effect in August of 2015,

 6    when the third plan of reorganization was approved?

 7    A     Yes.

 8    Q     Okay.  The special committee did not meet to approve

 9    the third amended plan, did it, Ms. Williamson?

10    A     Well, the members of that committee were part of the

11    board, and we approved the plan.  We did not meet again to

12    look at releases for the sponsors because nothing had

13    changed in the time from April through August.  There was no

14    new information that needed to be considered, because the

15    issues involving the sponsors were prepetition.

16    Q     Okay.  Well, there were some things that had changed

17    between the plan and a ball in the plan in August.  Isn't

18    that true?

19    A     As it relates to the claims against the sponsors?

20    Q     Yes, ma'am.

21    A     I'm sorry, help me out.

22    Q     Okay.  The releases in the plan and April --

23    A     Yes.

24    Q     -- okay, were contained solely in the plan of

25    reorganization.  Isn't that true?
```

1    A    Yes, they were.

2    Q    Okay.  And in fact under the plan, the E-side creditors

3    would either be paid in full, are they would've had the

4    right to vote.  Isn't that true?

5    A    Yes.

6    Q    And in the August plan, the releases were outside the

7    plan.  Isn't that true?

8    A    Yes.

9    Q    They were part of the settlement agreement.  Isn't that

10   right?

11   A    They are.

12   Q    Okay.  And the settlement agreement would become a fact

13   of whether or not the plan was consummated or not.  Isn't

14   that true?

15   A    Yes.

16   Q    Okay.  And the only way the E-side committee under the

17   plan gets paid is if the plan is confirmed and in fact

18   consummated.  Isn't that true?

19   A    The E-side committee?

20   Q    I mean the E-side creditors.  Excuse me.

21   A    Well no, that's not the only way.  That is a plan that

22   would fully pay all of the E-side creditors, but we're not

23   going to go to the next plan.  I don't know what that

24   would've been, and we would've certainly worked very hard to

25   have gotten to a situation where the E-side creditors were

1   fully paid.

2   Q    Okay.  And the E-side creditors in the plan in August

3   were not entitled to vote, right?  Because you claim they

4   were unimpaired.  Is that right?

5   A    That is correct.

6   Q    Okay.  Now, you testified, Ms. Williamson, that you

7   recognize that in evaluating me best interest of EFH that

8   you were taking into account the best interests of the

9   creditors, correct?

10  A    Yes.

11  Q    Okay.  And they said that that meant that it was your

12  charge to maximize the estate.

13  A    Yes.

14  Q    Right?  Okay.  Claims that EFH could make against

15  potential third parties can possibly maximize the estate.

16  Isn't that true?

17  A    Yes.

18  Q    And I believe you testified in your written direct that

19  in your business judgment, a large dollar claim, even one

20  that presents low risk, can't be ignored.  Isn't that true?

21  A    Could you show me where you want me to look?

22  Q    Paragraph 51 of your direct.

23  A    Okay, great.  Let's look at what context it was in.

24  Q    And there I believe you were talking about the LBO

25  claim asserted by the decide against EFH.

1    A    Yes, the LBO claim.  That is correct.

2    Q    Okay.  So going back to my question, Ms. Williamson, in

3    your business judgment, a large dollar claim, even one that

4    presents a low risk, can't be ignored.  Isn't that true?

5    A    That's right.

6    Q    Okay.  And you're aware that the committee contends

7    that the damages associated with claims against the sponsors

8    could exceed $1 billion.  Isn't that true?

9    A    Well, so far, you haven't made any specific claims.  So

10   if -- I would very carefully consider any claims that you

11   actually have made, but at this point, you've just alleged

12   that you have some claims, but we don't know what those

13   claims are.

14   Q    You're familiar with the objection that's been filed by

15   the E committee in this case?

16   A    I am.

17   Q    Okay.  And I believe you also testified, Ms.

18   Williamson, that the ability to collect was another

19   important factor that you used in assessing these different

20   claims that you were testifying about.  Isn't that right?

21   A    Well, as it relates to the claims that EFH had against

22   TCEH, yes.

23   Q    Okay.  And, and would you agree that to the extent that

24   the EFH creditors have a claim against the sponsors that

25   those claims would be subject to or collectible under EFH's

1    D&O insurance?

2    A    No, I don't know that.  I haven't analyzed the D&O

3    insurance.  But first, the sponsors would be coming back to

4    us through the indemnity provision unless a settlement

5    agreement is entered into.  So that indemnity agreement

6    stays in place.

7    Q    Mm-hmm.

8    A    And under that indemnity agreement, we get to pay the

9    legal fees for the sponsors to defend any claims, and we

10   then, if any claims are perfected against them, we would get

11   to pay those claims under that indemnity provision.

12   Q    Okay.  But those would be pre-petition claims, correct?

13   A    Well, I don't know what you're cleaning.  If you're

14   only claiming against the LBO, certainly, that would be one,

15   but the LBO claims that we're talking about, I think, deal

16   with insolvency and some different things like that that are

17   difficult.

18   Q    Now, and I'm going to be a little clearer.  The claims

19   I was referring to, Ms. Williamson, are the claims that you

20   said would be subject to the indemnification that you were

21   talking about.  And my questioned to you was wouldn't those

22   claims be pre-petition claims?

23   A    Well, I don't know what claims you're purporting, but I

24   believe that all claims, whether they're pre-petition or

25   post-petition, would be covered under the indemnity clause

1     until the sponsors give up that indemnity clause, which is

2     when the settlement agreement is injured.

3     Q     Okay.  You would agree with me, Ms. Williamson, that to

4     the extent that the E-side creditors were paid in full,

5     there would be no claims to be made against the sponsors,

6     correct?

7     A     I think there could be other people.  I mean, I suppose

8     TCEH--

9     Q     By the E-side creditors.

10    A     Okay.  Say that one more time.

11    Q     To the extent that the E-side creditors were paid in

12    full under this plan, there's not going to be any assertion

13    of the claim against the sponsors, correct?

14    A     I don't know what the E-side would do.  Anyone can

15    bring any claim.  We've certainly proven that.  And so --

16    Q     Okay.

17    A     -- any -- you know, I can't say that no claims could

18    come forward if the E-side was fully paid.  I would hope

19    that they wouldn't come forward because you're getting fully

20    paid.

21    Q     Okay.  Now, you testified in connection with --

22              THE COURT:  I was just going to say it's really

23    actually amazing how much people can complain even though

24    they're being fully paid.

25              MS. WILLIAMSON:  Thank you, sir.  I really

1   appreciate that.

2        THE COURT:  Not without reason, perhaps.  Go

3   ahead, Mr. Sheppard.

4        MR. SHEPPARD:  Okay.  Thank you, Your Honor.  I'm

5   not quite sure how to take that.

6        THE COURT:   Oh, I think you are.

7   Q    Okay, Ms. Williamson.  Let's try to wrap this up.

8   A    That would be great.

9   Q    You testified in connection with some questions from

10  Mr. Glueckstein about one of the intercompany claims between

11  EFIH and EFH.  Do you recall that?

12  A    I'm sorry?

13  Q    EFIH and EFH, the -- that there was a --

14  A    Yes.

15  Q    -- claim between the two.

16  A    Yes.

17  Q    That -- and they -- I believe you testified that you

18  were concerned, that one of the concerns you had was this

19  potential claim for those dividends or improper dividend

20  from EFIH to EFH, correct?

21  A    First off, I didn't call in an improper dividend.

22  Q    Okay.

23  A    I said that there had been issues that others had

24  claimed against the dividend that had been made from EFIH to

25  EFH.

1    Q    Okay.  Okay.  But you certainly considered that claim

2    as part of your due diligence as a disinterested director,

3    correct?

4    A    I did.

5    Q    Okay.  Now, they claim is only viable if EFIH is

6    insolvent.  Isn't that true?

7            MR. FIRESTEIN:  Your Honor, we've been over this.

8    I think Mr. Glueckstein talked about it.  Plus it's a legal

9    conclusion on the issue of insolvency.

10            MR. SHEPPARD:  I'm going a little different place,

11    Your Honor, if you --

12            THE COURT:  All right.

13            MR. SHEPPARD:  -- give me a minute.

14            THE COURT:  I will, but she is not a lawyer.  So

15    Ms. Williamson, to the extent you can answer if you have an

16    understanding, that's fine, but obviously, you're not being

17    asked to give legal interpretation of the law.

18    A    I'm sorry, I don't know the answer to your question.

19    Q    Okay.  You testified on direct that EFH was putting

20    aside cash.  Do you recall that?

21    A    We're not putting aside cash.  We have cash today --

22    Q    Okay.

23    A    -- that we're trying to conserve very carefully so that

24    we can pay our creditors.

25    Q    Do you know how much cash is there?

1    A    Today I'm going to say it's about $300 to $400 million.

2    Q    Okay.  Now the unsecured claims asserted against EFH

3    probably total about $650 million.  Isn't that correct?

4    A    The claims -- I'm sorry?

5    Q    The unsecured claims against EFH currently total about

6    $650 million.  Is that correct currently?

7    A    Are -- you're talking about the debt that we have at

8    EFH?

9    Q    Yes, the unsecured claims.

10   A    Yes, that's about right.

11   Q    Okay.  And if --

12   A    Could be a little less than that because I don't know

13   if that includes the pre-petition -- I mean the post-

14   petition interest and the make wholes.

15   Q    Okay.  So --

16   A    But it's 600 to 650.

17   Q    So you'd be comfortable with 600 to 650?

18   A    Yes, sir.

19   Q    Okay.  And if the disinterested director settlement is

20   implemented, that would be an additional $700 million claim

21   in favor of TCEH.  Isn't that correct?

22   A    That's correct.

23   Q    And so that would -- if my math is good and we all know

24   how good I am with numbers -- that would be a total of about

25   $1.3 billion, correct?

1    A    Yes.

2    Q    And those are the claims against EFH?

3    A    Yes.

4    Q    Okay.

5    A    Those would be allowed --

6    Q    All right.

7    A    -- claims.  Okay.

8    Q    So even without, if we were to take out the EFIH claim

9    for a second, right?  At those numbers, we're talking about

10   basically a $0.30 on the dollar recovery for the unsecured

11   E-side creditors.  Isn't that right?

12           THE COURT:  Ready -- based on what?  The cash

13   position?

14           MR. SHEPPARD:  Yes, the cash, Your Honor.

15   A    No because in the transaction that we're getting ready

16   to do, those are fully paid.  So the people -- the

17   investors, the plan sponsors that are coming in, they're

18   bringing in $12.6 billion to ensure that everything on the

19   E-side up through EFH that is allowed is paid.

20   Q    I understand that, Ms. Williamson, but you also

21   testified that you understood that there was conditionality

22   and then there was no guarantee that this plan would close.

23   Isn't that true?

24   A    That's true.

25   Q    And the settlement itself, including the disinterested

1   directors settlement, will go forward no matter what.  Isn't

2   that true?

3   A    It does.

4   Q    So under that circumstance, if the plan doesn't close,

5   if the plan doesn't consummate, then we're talking about a

6   $0.30 on the dollar cased based upon the cash that you said

7   was on hand.  Isn't that true?

8   A    Well, your --

9           MR. FIRESTEIN:  Objection.  That calls for

10  speculation, Your Honor.

11          THE COURT:  I'll allow it.

12          MR. SHEPPARD:  Thank you, Your Honor.

13  A    Okay, first off, cash is not the only asset that EFH

14  has, and so we would have to go through the whole string and

15  determine what the assets are.  So I cannot reach your same

16  conclusion.

17  Q    Okay.  And in that $0.30 case, what is --

18  A    I just told you I can't reach --

19  Q    Okay.

20  A    -- that conclusion.

21  Q    Okay.  Would you agree with me that it's less than 100

22  percent?

23  A    I don't know the answer to that.

24  Q    All right.  Based upon the scenario where the plan

25  doesn't close, what is the consideration that EFH is getting

1    for the release of the sponsors?

2    A    I'm sorry.  Would you repeat the question one more

3    time?

4    Q    Yeah, let me try it this way.

5    A    Okay.

6    Q    you testified in your written direct, and I believe

7    also earlier this morning --

8    A    Uh huh.

9    Q    -- that the sponsors were giving up their upside --

10   A    That's right.

11   Q    -- as part of the consideration for the releases.  Is

12   that correct?

13   A    Any potential upside, yes.

14   Q    Okay.  I believe you also testified earlier about there

15   were various bids that were given in connection with the

16   purchase of Oncor.  Isn't that true?

17   A    Yes.

18   Q    Okay.  I believe you testified that none of those bids

19   would provide sufficient money to pay off all of the

20   creditors of EFH.  Isn't that right?

21   A    None of the past bids --

22   Q    Okay.

23   A    -- that had been provided.  That's correct.

24   Q    Okay.  I believe you also testified that in connection

25   with a question from Mr. Glueckstein that the T-side

1    unsecureds, okay, if this plan doesn't close --

2    A    Mm-hmm.

3    Q    -- okay, they were helplessly insolvent.  Isn't that

4    right?

5    A    I don't believe I testified to that.

6    Q    Okay.

7    A    But certainly if you just look at the T unsecured debt,

8    I don't think they would be fully paid.

9    Q    Okay.  So under those scenarios if the plan doesn't

10   close, what is the upside but sponsors?

11   A    I gave you a variety of different things that the

12   sponsors had done.  First off --

13   Q    Okay.

14   A    -- the sponsors have contributed to the company and

15   very strong ways over the time that they've been involved.

16   Secondly, the sponsors in working with us to get to a place

17   that we all were comfortable, the sponsors have given up any

18   upside.  There are --

19   Q    Okay.

20   A    -- a lot of people today who believe that this

21   transaction as a REIT is going to be very, very successful.

22   And so even if this group doesn't succeed in their

23   transactions, there could be another group that comes in and

24   tries to do the REIT transaction.

25   Q    Okay.

1    A    So there's a positive side as well as a negative side.

2    And so the, the sponsors would not share in any of the

3    upside associated with any future transactions, regardless

4    of how they were structured.  They had also, as I mentioned,

5    given up their right to the worthless stock deduction at the

6    current time, which would have triggered an issue with the

7    NOLs that are sitting at EFH.

8    Q    Okay.

9    A    And quite honestly, you know, we want to keep some of

10   those for EFH because we have not settled all of our open

11   tax years as well as providing some to the T-side to help

12   them with their step up in basis.

13   Q    Mm hmm.

14   A    And the -- they also had given up their management fees

15   that had not been paid.  That's about $80 million.  And then

16   they had given up the amount that we had assigned them in

17   the disinterested director settlement.

18   Q    Mm hmm.

19   A    It was $7, $8, or $9 million.  I can't remember the

20   exact amount.

21   Q    Okay.

22   A    So there were a variety of different things that they

23   gave up, but the other thing is I understand that you have

24   alleged that there are some claims, but we had three law

25   firms look at the claims against the sponsors.  We had

1    Sidley look at them, we had Kirkland & Ellis look at them,

2    and we had Proskauer look at them.  And without telling you

3    what I was told that they are, that was one factor of

4    information that I took into consideration in authorizing

5    those releases.

6             MR. SHEPPARD:  Your Honor, I move to strike as

7    non-responsive.

8             THE COURT:  Overruled.

9             MR. SHEPPARD:  Okay.

10            THE COURT:  You asked her what the consideration

11   was for the releases.  She told you what she thought they

12   were.

13            MR. SHEPPARD:  Okay.

14   Q    All right, let's break that down.  On the management

15   fees, Ms. Williamson, you said it was $80 million, correct?

16   A    Yes.

17   Q    Okay.  You were aware that there was a consultant

18   brought in to allocate how much each of the companies should

19   be paying the management fees.  Do you recall that?

20   A    Yes.

21   Q    Okay.  And do you recall that EFH allocation was 5

22   percent?

23   A    Yes.

24   Q    Okay.  So 5% of $80 million is how much EFH would've

25   had to pay of those management fees.  Isn't that true?

1    A    Well, as you know, one of the claims here is whether

2    they were allocated properly or not.  So --

3    Q    Yeah.

4    A    -- based on the current allocations, that is correct,

5    but if you look at -- if we were to lose that item that you

6    wanted us to litigate, if we were to lose that, we could end

7    up with a higher number.

8    Q    Okay.  And if EFH had to pay those management fees,

9    right, that would mean that they could possibly pursue an

10   avoidance action against the sponsor.  Isn't that true?

11   A    You know, I'm sorry, but I don't understand exactly

12   what an avoidance action against the sponsors would be.  But

13   that same report, the reports that you allude to, is -- I

14   believe those reports indicated that those fees were not out

15   of line.

16   Q    Okay.  So the 5 percent was not out of line, correct?

17   A    No, not the 5 percent, the fees that we were paying to

18   the sponsors --

19   Q    Okay.

20   A    -- for what they were doing.

21   Q    All right.  And they also, you said, gave up $7 million

22   in -- as part of the disinterested directors settlement.

23   A    Correct.

24   Q    Okay.  So 5% of $80 million plus that is about -- that

25   is --

1    A    Ten?

2    Q    About $10 million.

3    A    Or 17, I guess.  I --

4            MR. FIRESTEIN:  Your Honor, that mischaracterizes

5    her testimony.  He's doing the math --

6            MR. SHEPPARD:  Okay.

7            MR. FIRESTEIN:  -- at his own calculation.  She's

8    already said that the 5%, that's not really a fair

9    characterization.

10            MR. SHEPPARD:  Your Honor, it's cross-examination.

11            MR. FIRESTEIN:  I understand that, but we can do

12    the math, right?  So to -- you know, we can probably

13    stipulate to what the multiplication product will be.

14    Q    Whatever the number is, under the current agreement,

15    under the current plan if it's confirmed and consummated,

16    the sponsors get $15 million to pay their legal fees.  Isn't

17    that true?

18    A    They do.

19    Q    Okay.

20    A    But that's only if the current plan closes.

21    Q    Right.  And then with regard to the worthless stock

22    deductions --

23    A    Yes.

24    Q    -- you said you wanted to keep those NOLs up at EFH,

25    right?

1    A    Yes.

2    Q    That's because they're assets of the estate, right?

3    A    Yes.

4    Q    Okay.  Did the sponsors ever threaten to take this

5    stock deduction, to your knowledge?

6    A    They didn't threaten.  The sponsors have never

7    threatened anything, but the consideration, I know, was

8    looked at about that worthless stock deduction and when was

9    the appropriate time to take it.

10   Q    Okay.  And in fact they could take it sometime well

11   into the future.  Isn't that true?

12   A    They can, mm hmm.

13   Q    Okay.  And to the extent that there are NOLs necessary

14   for this deal, they will have already been taken.  Isn't

15   that true?

16   A    I don't --

17   Q    A deduction for those NOLs?

18   A    Well, you don't get a deduction for NOLs.

19   Q    You get to apply the net operating losses, correct?

20   A    Yes.

21   Q    And that's part of this transaction.  Isn't that true?

22   A    A portion of that, but $500 million worth of NOLs are

23   being left up at EFH to cover open tax years, and then NOLs

24   over and above that, we are working to get those to the T-

25   side so that those can be used.

1   Q    And as a non-sponsored director, member of the special

2   committee, and disinterested director, did you ever

3   recommend to the board of EFH that they take any action to

4   try to preserve those NOLs?

5   A    I'm sorry.  I don't understand your question.

6   Q    My question is you testified that there was a concern

7   that if the sponsors took a worthless stock deduction, it

8   would impact the NOLs of EFH.  Correct?

9   A    Yes.

10  Q    My question to you was did you ever recommended to the

11  board to take any action to preserve those NOLs?

12  A    We did not consider that necessary.

13  Q    Okay.

14          MR. SHEPPARD:  I have nothing further, Your Honor.

15          THE COURT:  Thank you.  Any other cross-

16  examination?  All right, redirect?

17          MR. FIRESTEIN:  None, Your Honor.

18          THE COURT:  All right.  Thank you, Ms. Williamson.

19          MS. WILLIAMSON:  Thank you so much.

20          THE COURT:  So next we have Mr. Mendelsohn.  Are

21  we going to try to --

22          MR. MCKANE:  Your Honor, it's Mark McKane.  That's

23  right, we have a -- I believe an evidentiary issue that

24  needs to be argued with regards to Mr. Mendelsohn, and then

25  we'd be prepared to call Mr. Mendelsohn.  Can we excuse Ms.

1    Williamson from the courtroom?

2              THE COURT:  Yes, we can.

3              MR. MCKANE:  Thank you, Your Honor.

4              THE COURT:  Thank you.

5              MR. FIRESTEIN:  Oh, Your Honor, do we have to do

6    the exhibits at the end?

7              THE COURT:  Yes.  Just leave that there, Ms.

8    Williamson.

9              MR. FIRESTEIN:  Your Honor, in connection with the

10   -- moving the exhibits into evidence, I think we've already

11   dealt with her written declaration, but we'd like to move in

12   the following exhibits in the written direct that aren't

13   otherwise admitted into evidence; DX 3, 11, 15 and 16, 18,

14   75, 127, 160, 169, 189, 200, DX 206 -- these are all DX

15   numbers -- DX 208 and 209, 215, 250, 257, 294, 299, 301,

16   302, 338 and 339, 956, and 967.  And I guess I learned

17   something new.  To the extent that the demonstratives can be

18   entered into evidence solely for the recordkeeping purposes

19   as demonstratives, I'm happy to move those in as well, but

20   not for the -- not for anything other than that.

21             THE COURT:  I'm not sure they can, but they have

22   been.  But that's -- that's fine.  Are there any objections

23   to those exhibits?

24             MR. GLUECKSTEIN:  Those were all on the previously

25   disclosed list to us just for the record.

1             MR. FIRESTEIN:  Yes.  Yes.

2             MR. GLUECKSTEIN:  Okay. So no, we have no

3     objection to those.  We -- I actually don't think, Your

4     Honor, that we've been moving the demonstratives in.  I

5     think they've just been noted for the record which I think

6     is appropriate.

7             MR. FIRESTEIN:  Whatever the style is, Your Honor.

8     I've noticed it handled in different ways, but --

9             THE COURT:  All right.  Those documents are

10    admitted into evidence.  The Court will keep copies of the

11    demonstrative for the record, like we keep pretty much

12    everything you hand me for the record, and to the extent

13    anyone ever needs to raise that issue, a record will exist

14    of the demonstratives.

15            MR. GLUECKSTEIN:  Your Honor, just a few on the E-

16    side.  These are all exhibits we disclosed to the plan

17    supporters earlier this week, and I don't believe there are

18    any objections. My understanding is there are no objections.

19    DX 75, DX 208, DX 209, DX 215, EUCC 130, EUCC 131, EUCC 201,

20    EUCC 252, EUCC 671, EUCC 765, and then a couple others --

21    sorry, out of order -- EUCC 264, 47, 539, and to the extent,

22    and I apologize if they're duplicative, DX 238 and DX 952.

23            THE COURT:  Any objection?

24            MR. FIRESTEIN:  No, Your Honor.

25            THE COURT:  All right, they're admitted.

1          MAN:  Your Honor?

2          THE COURT:  Yes?

3          MAN:  Could I just have a moment?

4          THE COURT:  Yeah, actually we're going to take a

5     short recess because I don't have my Mendelsohn.  I left

6     them back in my chambers.  So we'll take a recess, allow

7     everyone to shift around, and then we'll take Mr. Mendelsohn

8     in.  If someone could clear the witness stand for the next

9     witness, I appreciate that.

10          MAN:  Will do, Your Honor.

11          MAN:  Yes.

12      (Recess)

13          THE COURT:  Please be seated.  Just give me a

14     minute, please.  All right.  Okay, you may proceed.

15          MR. ALLRED:  Good afternoon, Your Honor.  Kevin

16     Allred of Munger, Tolles, and Olson, counsel to the TCEH

17     Debtors, acting at the direction of their disinterested

18     manager, Hugh Sawyer.  We, I believe, before calling Mr.

19     Mendelsohn to the stand, we're going to discuss the

20     objections that have been posed to portions of his written

21     direct testimony.  I'm happy to address those now, if the

22     Court would like to hear our argument.

23          THE COURT:  Okay.

24          MR. ALLRED:  Your Honor, two basic points about

25     the portions of testimony that the committee seeks to

1    exclude.  First, it falls under the scope of opinions that

2    Mr. Mendelsohn already provided, and second, there's no

3    unfair prejudice to the committee.

4            I'll start with the Ford notes testimony, which is

5    the bulk of the objections, by volume.  At his deposition,

6    Mr. Mendelsohn addressed the very points that are now at

7    issue, especially at Pages 230 and 231.  The written direct

8    testimony simply adds slightly more precision and footnote

9    citations to source the points that he already addressed.

10           A few examples of that.  In the deposition, he

11   says that the Ford are different because Ford had

12   "significant amounts of liquid."  That's deposition Page

13   230, Line 12.  The testimony they seek to exclude says Ford

14   "had 17 billion to 28 billion of available liquidity."

15   That's testimony, Paragraph 50, Sub-Part 1.

16           Likewise, in Paragraph 50, Sub-Part 2, the

17   deposition says Ford had "almost $20 billion of government

18   backstop financing."  The testimony they seek exclude says -

19   - oh, and that was deposition Page 231, Lines 9 to 10.  The

20   testimony they seek to exclude says, "Ford received up to

21   $21 billion in government financial support."  Paragraph 50,

22   Sub-Part 2.

23           A further example, in the deposition, Mr.

24   Mendelson says Ford "had a very significant positive book

25   equity."  The testimony they seek to exclude now says "Ford

1    had a positive book equity of roughly $9 to $13 billion."

2    That's comparing deposition Page 231, Lines 7 and 8, to Sub-

3    Part 3 of Paragraph 50.

4         Further, another example, the deposition says on

5    the Ford notes, the amounts "dropped precipitously when the

6    credit profile deteriorated."  The testimony they seek to

7    exclude says "when Ford's credit quality deteriorated in

8    2007-08, the balance outstanding on its notes shrank

9    dramatically, from $5.4 billion to $2 billion."  That's

10   comparing deposition Page 230, Lines 20 to 22, to Paragraph

11   50, Sub-Part 5.  They were free to ask at deposition about

12   any of these statements, to say, "Well, why do you say

13   that?"  They didn't, and I'm sure that's because they knew

14   exactly why he said it.

15        Moreover, there's simply no undue prejudice to the

16   committee form this testimony.  There's no undue prejudice

17   from pointing to public SEC filings.  We're not talking

18   about hidden or obscure source material.  And these are very

19   simple, factual points, not some full-blown study.  So when

20   they scratch their head, and pretend puzzlement about, "Oh,

21   some undisclosed analysis," well, that's just ridiculous.

22   They can just look at the 10Ks, and see, and check the

23   points that are being raised here.

24        Moreover, as I noted, these citations are simply

25   being provided to support points that Mr. Mendelsohn

1    previously advanced.  They're not new opinions.  And

2    finally, their expert, familiar with, he relies on these

3    Ford notes, and if Mr. Mendelsohn got any of these facts

4    wrong, I'm sure he can and will say so when he gets on the

5    stand here in a week or two.  So for all these reasons,

6    there's simply no prejudice to the committee, even if they

7    were correct that this is new, and they're not correct on

8    that point.

9            Comparable points apply if Your Honor wants to

10   hear further on the other sentence they object to, which is

11   that Mr. Mendelsohn notes that for many of these periods,

12   EFH did not have significant cash on hand to pay the note

13   balance "on demand."  Now, Mr. Mendelsohn's report already

14   noted that if repayment demand had been made, EFH "likely

15   would have been forced to borrow from third-party sources to

16   pay the notes."  The testimony is simply spelling that out

17   slightly further.  It's well within the scope of his

18   disclosed opinion.  And again, there's no prejudice, for the

19   reasons I outlined on the Ford notes.  So for that reason,

20   we would respectfully submit the objection should be

21   overruled.

22           THE COURT:  Okay, thank you.

23           MR. BREVNER:  Your Honor, Adam Brebner, from

24   Sullivan & Cromwell, for the E-committee.  Very briefly,

25   I'll respond.  And I'm going to address first the testimony

1    regarding the analysis of the EFH public filings and

2    intercompany notes, because that actually is relatively more

3    significant to Mr. Mendelsohn's overall analysis.

4           And what Mr. Mendelsohn has added to his written

5    direct testimony is an additional bullet, and it's at the

6    bottom of Page 17, and a footnote to that bullet that's very

7    compendious.  It's in the footnote, Mr. Mendelsohn writes,

8    "I arrive at this conclusion, based on my review of quarter-

9    end and year-end financial information from EFH's

10   publically-filed 10Ks and 10Qs from 2007 to 2013."  So he's

11   purporting to have done an analysis of six years of public

12   filings, and is supporting a new point with that analysis, a

13   point that was note disclosed in his report.

14          And there's no dispute that this bullet was not in

15   his report, this footnote was not in his report, and it was

16   also not disclosed at deposition.  And I note that counsel

17   for the other side did not go through a series of things

18   that Mr. Mendelsohn said at deposition relating to this,

19   because he didn't say this at deposition.  The only thing

20   Mr. Mendelsohn disclosed before filing his written direct is

21   what counsel referred to, which is in the next bullet of his

22   written direct, and which we're not objecting to.

23          What counsel referred to is the very next bullet,

24   that if TCEH had demanded prepayment, EFH likely would have

25   been forced to borrow.  And that was the only conclusion

Page 198

1    that Mr. Mendelsohn reached in his deposition.  But then

2    after his deposition, Mr. Mendelsohn has attempted, in the

3    trial testimony, to submit this additional bullet in

4    Footnote 20.  And the same thing is cut and paste, and found

5    in Paragraph 42, in accompanying Note 38.

6           So that's really our primary objection here, is to

7    this new compendious analysis, that is only a couple of

8    sentences in footnotes, but purports to capture a very large

9    analysis that was not done, and not disclosed, prior to his

10   deposition, or at his deposition.

11          THE COURT:  I am going to sustain that objection.

12   I believe you are correct.  This goes beyond was discussed

13   in his expert reporting deposition.  So the Court will

14   strike from the direct testimony the last bullet on Page 17,

15   beginning "based on my review," et cetera, and Footnote 20,

16   as well as the first sentence of Paragraph 42, which begins,

17   "Third, the demand feature was not functional," et cetera,

18   as well as Footnote 38.  You may move on to the next item.

19          MR. BREVNER:  And the next item, Your Honor,

20   again, we're not objecting to the general discussion of Ford

21   that was disclosed at the deposition.  The concern here

22   really goes to what is footnoted in Footnote 41, on Page 32.

23   And Footnote 41 is a footnote that is dropped three times on

24   Page 32.  And Footnote 41 says, "Per Ford Motor Credit

25   Company 10K filed for the years 2012, 2011, 2010, 2009,

1    2008, and 2007."  So again, what is added here is a

2    compendious analysis of Ford 10Ks to make points that were

3    not disclosed at the deposition.

4            And I think as we pointed out in our short written

5    argument, we actually asked Mr. Mendelsohn at his deposition

6    if he had reviewed additional documents, and he said, "Not

7    that I can recall."  And then eight days after his

8    deposition, we received an Errata Sheet from the other side

9    saying, "Except for 10ks."  This wasn't disclosed in his

10   deposition, Your Honor, and that's why we're moving to

11   strike this.

12           THE COURT:  All right.  I am going to overrule the

13   objection on this.  I think this is fair -- the more fulsome

14   discussion of what was in the expert report, and in the

15   deposition, and I don't find the reference here to public

16   filings to be difficult, or prejudicial in any way to the

17   objectors.  So I'll overrule that objection, and allow that

18   testimony.

19           MR. BREVNER:  Thank you, Your Honor.

20           MR. ALLRED:  Your Honor, could we call to the

21   stand Mr. Eric Mendelsohn?

22           THE COURT:  Yes.  Please stand up, and then stand

23   there, and remain standing.

24           CLERK:  Please raise your right hand.  Do you

25   affirm you're willing to tell the truth, the whole truth,

Page 200

1    and nothing but the truth, to the best of your knowledge and

2    ability?

3                MR. MENDELSOHN:  Yes, I do.

4                CLERK:  Please state and spell your name for the

5    record.

6                MR. MENDELSOHN:  Eric Mendelsohn.  That's E-R-I-C,

7    M-E-N-D-E-L-S-O-H-N.

8                CLERK:  Thank you.

9                MR. MENDELSOHN:  Thank you.

10               THE COURT:  Thank you, Mr. Mendelsohn, you may be

11   seated.

12               MR. MENDELSOHN:  Thank you.

13               THE COURT:  Please make sure you're close to the

14   mic.

15               MR. MENDELSOHN:  Yes.

16               THE COURT:  Thank you.

17                         DIRECT EXAMINATION

18   BY MR. ALLRED:

19   Q    Good afternoon, Mr. Mendelsohn.  Could you please

20   introduce yourself to the Court?

21   A    Yes.  My name is Eric Mendelsohn, and I'm a managing

22   director at Green Hill & Company.

23   Q    And what's your role, in that capacity?

24   A    Yes, I'm a partner in a group that provides financing

25   and restructuring advice to companies.  It's a role I've

1    played for over 20 years, helping companies raise capital

2    and also restructure their obligations.

3    Q    And have you submitted written direct testimony by

4    declaration in this matter?

5    A    Yes, I have.

6    Q    And if you look at the notebook in front of you, behind

7    Tab 1.  Do you have that?

8    A    I don't see a notebook.

9    Q    Oh, I'm sorry, may I approach, Your Honor?

10          THE COURT:  Yes.

11   A    Thank you.

12   Q    Do you now have a notebook in front of you?

13   A    Yes.

14   Q    And look at Tab 1.

15   A    Yes.

16   Q    And after you've looked at, would you please let the

17   Court know if that's your written direct testimony?

18   A    Yes, it is.

19   Q    And I'd like to raise one housekeeping item, on Page 15

20   of your written direct, Footnote 17, there's a citation to

21   2014 Senior Notes that does not have any DX number.  Do you

22   see where I am?

23   A    Yes, I do.

24   Q    And if you'll look at the last tab in your binder, Tab

25   DX 895R?

1    A    Yes.

2    Q    Is that the referenced note indenture that is cited in

3    the footnote?

4    A    Yes, it is.

5    Q    So we could read that note as adding DX 895R to the end

6    of that Footnote 17 citation?

7    A    That's correct.

8    Q    Subject to that supplementation, does this remain your

9    sworn testimony in this matter?

10    A    Yes, it does.

11    Q    Your Honor, subject to the two sentences that Your

12    Honor has sustained the objection to, we would move this

13    into evidence.

14            THE COURT:  Okay, let's do this.  Submit next week

15    a revised declaration that excises what I have ruled as

16    objectionable, and supplements the footnote, and mark it, in

17    some way.  This one's not marked.  So mark it -- what have

18    we been doing, I forget?  There's a way to -- Mr. McKane

19    will help you out.

20            MR. MCKANE:  Your Honor, I'll work with Mr. Allred

21    to do that consistent with what we did with we did for Ms.

22    Williamson.

23            THE COURT:  Okay.  And then we'll have that record

24    in front of the Court, for record purposes.  But subject to

25    my previous rulings and the clarification on the record,

1    this is admitted.

2    Q    Thank you, Your Honor.  Mr. Mendelsohn, your written

3    direct declaration discusses the TCEH intercompany notes,

4    correct?

5    A    That is correct.

6    Q    And can you describe briefly for the Court, what are

7    the intercompany notes?

8    A    The intercompany notes were entered into at the time of

9    the LBO in 2007.  And as you know, EFH is a holding company

10   that relies on its subsidiaries in order to generate cash,

11   to fulfill its obligations.  And EFH has a lot of

12   obligations, including overheard expenses and interest in

13   principle on third-party indebtedness.

14           So at the time of the LBO, these intercompany

15   notes were entered into to allow TCEH to upstream cash to

16   EFH so it could pay these various expenses, and hence the

17   name of the two notes.  One is an SG&A note, the proceeds of

18   which are earmarked for overheard expenses, and the other,

19   P&I note, the proceeds of which are earmarked for principle

20   and interest on third-party debt.

21   Q    All right.  Have you done an analysis regarding the

22   interest that TCEH received on those intercompany notes?

23   A    Yes, I have.

24   Q    And based on your analysis and experience, have you

25   reached any conclusions regarding the adequacy of the

1    interest that TCEH received on those notes?

2    A    Yes, I have.

3    Q    And what are your opinions on that?

4    A    Yes, I've received the interest that was received on

5    the intercompany notes, and based on my review and analysis,

6    I believe that the interest was inadequate for the credit

7    risk that TCEH was exposed to.  And furthermore, I estimate

8    that underpayment of interest is in the range of $425 to

9    $834 million.

10   Q    Let's start with the first part of that, the

11   qualitative conclusion.  Without repeating in detail what's

12   in the written testimony, please summarize at a high level

13   the basis for your conclusion that TCEH was undercompensated

14   by the interest it received.

15   A    Yes, I compared the interest rate on the intercompany

16   notes to the interest rate on certain third-party proxy

17   notes that EFH had issued in the public markets, and we used

18   that comparison to draw my conclusion.

19   Q    And what debt instruments did you use are your primary

20   comparisons?

21   A    There were two primary debt instruments.  The first is

22   a 5.55 percent note that is issued just by EFH, that has a

23   maturity of 2014.  The second is a 10.875 percent note that

24   is issued by EFH, but has an EFIH guarantee.  And that has a

25   maturity date of 2017.  And the reason why we use two notes

1    is because if you look at the intercompany note program,

2    certain of the notes were issued by EFH and had no

3    guarantee, whereas other notes were issued by EFH and had it

4    guaranteed by EFIH.  So we're trying to match the credit

5    profile.

6    Q    Were there any other reasons why you selected those two

7    notes as proxies?

8    A    Sure.  First, the credit profile is the exact same,

9    which is critical, in terms of who the obligor is, and who

10   the guarantor is.  Second, all of these notes -- the third-

11   party notes and the intercompany notes are unsecured.

12   Third, these third-party notes actually trade in the public

13   markets, so you can observe the rates, the yields that the

14   third-party investors are requiring to have that exact same

15   credit risk.

16            And finally, the maturity of those two notes,

17   being 2014 and 2017, is approximately in the range of seven

18   to ten years from the time of the LBO, and the time in which

19   the TCEH intercompany note program was established.  And

20   that matches the intended life of the program, that has been

21   described actually in this courtroom, as being seven to ten-

22   year program life.

23   Q    Having selected those proxies, what did you then do

24   with them, in your analysis?

25   A    Yes.  So we looked at the interest rate -- excuse me,

1    the yields, the public market yields on a daily basis to see

2    what third parties were requiring in a return, in order to

3    extend credit, or have exposure to EFH credit risk, and then

4    compared them to the rates on the TCEH intercompany notes.

5    Q    And is there a graphic in your written testimony that

6    reflects that comparison?

7    A    Yes, there is.

8    Q    And I think there's a blowup of it in your notebook, if

9    you look at Notebook Tab 10.  There's a blowup of Chart 9

10   from your direct testimony.

11   A    Yes, that's it.

12   Q    Could you please explain to the Court what the top

13   lines on this chart show?

14   A    Sure.  The vertical axis is the yield for the various

15   instruments, and the top line is the yield for the third-

16   party public debt that I just described, which were our

17   proxy notes.  And as you will see, the yield on these third-

18   party instruments was approximately in the range of 10

19   percent for the first year that the TCEH intercompany note

20   program was outstanding.

21          And then thereafter they ranged roughly between 15

22   and 20 percent, with some variability.  And that's

23   important, because again, that demonstrates what yield a

24   third party would require to take the same credit profile

25   risk that the TCEH intercompany notes also have.

1    Q    And what does the bottom line on this chart represent?

2    A    The bottom line is the effective rate that TCEH

3    received on the intercompany note program.  It's set as

4    LIBOR plus 500 basis points.  And as you see, it starts at

5    approximately 10 percent, because LIBOR at the time was

6    close to 10 percent.  And as LIBOR fell over time, the

7    effective rate that TCEH received fell as well.

8    Q    And what was happening to the EFH credit risk during

9    that same period?

10   A    The EFH credit risk was deteriorating over this time

11   period, as you can see from the yields on the third-party

12   notes, and many credit downgrades from the ratings agencies.

13   Q    So in summary, from 2009 on, what do you observe in

14   terms of the difference between the TCEH intercompany notes,

15   interest rate, and the third-party yields?

16   A    I observe a difference of in excess of 1000 basis

17   points over that time period, for most of that time period.

18   Q    And have you looked at what periods EFH was most

19   heavily drawing on the intercompany notes?

20   A    Yes, I have.

21   Q    And do you have a chart in your written direct

22   testimony that reflects that?

23   A    I do.

24   Q    If you could look in the notebook in front of you, I

25   believe that's at Tab 3.  It contains Chart 2 from your

1    testimony.

2    A    Yes.

3    Q    When you have that open, could you tell the Court what

4    that chart shows?

5    A    Yes, this chart shows the balance on the two

6    intercompany notes.  The SG&A note in blue, and the P&I note

7    in red over the life of the intercompany note program.  And

8    it shows the balances increasing significantly over time,

9    through early 2011, and then until their ultimate repayment

10   date, in 2013.

11   Q    So speaking in general terms, during what time period

12   was EFH making the largest drawdowns under the intercompany

13   notes?

14   A    Yeah, the largest drawdowns are really from early 2009,

15   where the combined balance was roughly $500 million, until

16   early 2011, when the combined balance approached $2 billion.

17   There was then a repayment, but significant borrowings

18   thereafter, until early 2012.

19   Q    And roughly how many drawdowns did EFH make during

20   those time periods, from 2009 on?

21   A    From 2009 on, there were almost 600 different

22   drawdowns, and approximately 30 repayments.

23   Q    Now, let's take those two charts that we've just had

24   up, and compare them, one on top of another, if we could,

25   please.  And I'd like you to explain what was happening

1    during the heavy drawdown periods.  Looking at the charts

2    together, what do we observe?

3    A    Sure.  If you look at the early 2009 through the early

4    2011 period, where there was almost 1.5 billion of

5    borrowings.  If you look at the top graph, you see that that

6    corresponds with the time when the spread between TCEH's

7    effective rate on the intercompany notes versus the yield on

8    the third-party notes that EFH had issued, again, was in

9    excess of a thousand basis points.

10   Q    Now, have you received the report of the expert put

11   forth by the EFH committee, Mr. Henkin, regarding the

12   intercompany notes?

13   A    Yes, I have.

14   Q    And does he suggest a different proxy from the proxies

15   you've used for evaluating the interest rates on the notes?

16   A    Yes, he does.

17   Q    And what is that?

18   A    He compares the intercompany notes to corporate demand

19   notes that are issued by -- Mr. Henkin identifies four

20   different issuers.  It's an extraordinary small part of the

21   fixed income market.  I believe it's about one-tenth of one

22   percent of the corporate debt market.

23   Q    And do you have a view on the appropriateness of the

24   proxy that Mr. Henkin uses?

25   A    Yes, I don't believe it's an appropriate proxy.

1   Q    All right, and why is that?

2   A    For a number of reasons.  Mr. Henkin's report, in my

3   view, largely focuses on the demand feature as a critical

4   item that distinguishes his proxy, and when I look at the

5   demand clause in the TCEH intercompany notes, I don't

6   believe it is functional.  And there are a number of reasons

7   for that, which I'd like to describe.  First is this is an

8   intercompany note, and it is a related party transaction.

9   Not only is it related party, but the borrower is the parent

10  of a lender, and the borrower actually controls the lender.

11        Second, the balances that we just described

12  increase significantly over time, even during periods where

13  the credit profile's deteriorated significantly, and where

14  third-party investors required significantly greater returns

15  to have similar credit risk exposure.

16        Third, the life of the program was intended to be

17  seven to ten years, and in fact, the program lasted for over

18  five years, and no demand was ever made.  Next, as I pointed

19  out in my report, I believe that as a practical matter, RFH

20  would have been forced to borrow from substantially higher

21  crossed third-party sources, given the fact that it was a

22  distressed company, and a very low investment-grade company

23  at this time.

24        And then finally, I'd note that the financial

25  sponsors had put $8 billion of equity into this company.

1    And it just doesn't sound right to me that a sponsor put $8

2    billion into a company, and puts its primary source of

3    liquidity subject to a demand feature, whether it's from

4    TCEH or from a third party, that could pull that at any

5    time, and literally on a daily basis, potentially cause a

6    liquidity crisis for this company they put $8 billion into.

7    So when I take all of that into consideration, I don't

8    believe that this demand feature is truly functional.

9    Q    In your experience, do fixed income analysts and

10   investors assess the functionality of terms contained in

11   notes, and evaluating those notes?

12   A    Absolutely.  These are all part of a legal document.

13   They are part -- when a note has an indenture or a credit

14   agreement.  But there are a lot of fixed income -- and fixed

15   income investors will look at a lot of these terms and

16   consider whether or not they're functional.  Take two of the

17   most important terms, whether interest is going to be paid,

18   or principle is going to be repaid.  And as we all know,

19   when a company is in distress, even those sacrosanct

20   features sometimes are not honored, in fact, often aren't

21   honored when you're coming into a distressed situation.

22            I would also note that a lot of bonds have call

23   features and put features.  But just because they have those

24   features doesn't mean they're going to be used, or that the

25   price at which a company can call is necessarily going to be

1    paid.

2    Q    Putting aside the demand feature issues that you just

3    outlined, are there any other aspects of Mr. Henkin's

4    proxies that you find significant in evaluating them as

5    possible comparisons.

6    A    Yes, there are, and I can walk through those.  First,

7    the demand notes that Mr. Henkins references are between

8    third parties.  They are not between related parties.

9    That's very significant, as you think about whether or not a

10   demand feature has the capability to be exercised or not.

11   Next, the demand notes that I received, and there aren't

12   that many of them that are cited by Mr. Henkin, they're

13   issued checkbooks.  The investors are issued checkbooks.  So

14   this is, in many ways, is an alternative to a checking

15   account, or a money market account, and based on my review

16   of some of these documents, it looks like the balances went

17   up and down over time.  So the investors truly have a

18   mechanism to demand, and in fact, can do so just by writing

19   a check to a third party.

20          The amounts on these notes also fluctuate over

21   time, which is very different from what happened in TCEH, in

22   terms of if you look at -- and we'll talk about it in a

23   moment, but if you look at what happened in the Ford and the

24   Ally situation, the balances went down precipitously, when

25   the credit profile changed.

1          These are also largely sold to retail investors,

2     so if you think about from a risk perspective, the issuer is

3     not at risk of having one single counterparty demand this

4     note at any one time, there's probably a wide range, a large

5     group of retail investors that would have to be invested in

6     these notes to have a program the size of the TCEH

7     intercompany note program.

8          A lot of these companies also are -- most of them

9     are investment-grade, and most of them, or all of them have

10    substantial liquidity resources.  It's critical, if you have

11    something like a demand note, that you have access to

12    significant amounts of liquidity, not just to barely cover

13    the demand feature, but to cover it many times over, and to

14    have liquidity left for the rest of your other obligations

15    and expenses.  So if I take all those factors in

16    consideration, again, I think there's a lot of differences

17    between the proxies that Mr. Henkin used, versus ours.

18    Q    Are you aware the that the EFH committee particularly

19    focused on a Ford Credit Corporation demand note program?

20    A    Yes, I am.

21    Q    And are there any particular things about that program

22    that we haven't covered yet, that you find noteworthy as its

23    use as a potential analogue?

24    A    Yes, absolutely.  We talked about liquidity.  Ford had

25    in excess of $17 billion of liquidity over this period when

1    their demand note program was somewhere in the range of $2

2    to $5 billion.  So again, multiples of the size of the

3    demand program.  The government, the U.S.  government, as

4    you recall, back in '08 and '09, had a lot of financial

5    backstops to companies that were undergoing distress, and

6    Ford Motor Credit was a beneficiary of this.

7              I think that vote of confidence or support from

8    the government, multiple programs in the neighborhood of $20

9    billion of support, I think is important to the holder, or

10   the investor in these demand notes as a vote of confidence.

11   The balances on these notes drop precipitously.  You already

12   heard note that the Ford balance has dropped by 60 percent

13   from '07 to '08, given their credit deterioration.  And Ally

14   Financial, which also had a very difficult -- this is GM's

15   finance arm -- also had a very difficult time, and was in

16   distress, and their program dropped by 80%.

17   Q    Was there also a book equity distinction between Ford

18   and EFH?

19   A    Yeah, two other points I'd make.  One is that Ford

20   Motor Credit had a positive book equity value in excess of

21   $9 billion over this time period.  And for a financial

22   company, book value is a very critical measure of the value

23   of that company, their financial assets.  They're relatively

24   easier to quantify, and to value on a balance sheet.

25             And finally, the nature of the assets that Ford

1    Motor Credit invests in are, by their own description,

2    they're shorter-term in nature, their cash flow, their

3    leases -- there are a lot of cash flows coming into Ford

4    Motor Credit, on a periodic basis, which is very distinct

5    from EFH.

6    Q    Thanks.  Let's move to your quantification of the

7    undercompensation amount, in broad strokes, how did you

8    calculate the undercompensation amount?

9    A    All right.  Yes, so I compared the yields on the

10   intercompany notes to -- excuse me, the rate received on the

11   intercompany notes to the yields that I observed in the

12   market from these third-party notes.  And I, specifically

13   what we did is we took the balances on a daily basis, of the

14   intercompany note program, and we calculated what interest

15   would have been if TCEH had received the same rate that

16   third-party investors were expecting when they were

17   investing in the third-party notes at the same time.  And we

18   looked at that on a daily basis, and calculated what those

19   interest payment or accruals would have been, added them up,

20   and that was what we called our interest differential in the

21   direct.

22   Q    All right, and what was the undercompensation you

23   calculated based on that approach?

24   A    I estimated it was between $425 and $834 million.

25   Q    And can you please explain to the court the distinction

1   between the low and high end of that range?

2   A    Yes.  The low end of the range, at 425 million, there

3   are two factors that enter in to that.  One is we assume

4   zero percent prejudgment interest, and the second is the

5   time period.  And at the lower end of the range, we assume

6   the four-year lookback.

7   Q    And what about the high end?

8   A    The higher end of the range assumed a nine percent

9   prejudgment interest rate, and also assumed a lookback

10  period that went all the way back to the LBO.

11  Q    And are there other potential outcomes between your

12  low-end and high-end numbers?

13  A    There are.  Clearly, on the prejudgment interest rate,

14  you could have something in between.  And on a time period,

15  you could have something in between as well, and in my

16  direct, I note another time period we looked at was going

17  back to January 1st of 2009.  We picked that date because

18  that is roughly when EFH recognized an $8 billion-plus

19  goodwill impairment that took its book equity to a negative

20  territory.

21  Q    All right.  Moving on to another subject.  Are you

22  aware that in their October 23 objection brief regarding the

23  settlement motion, the EFH committee presented an

24  alternative calculation of the interest undercompensation?

25  A    Yes, I am.

1   Q    And in particular, if you look at Tab 22 in the

2   notebook, are you familiar with this Annex A to their

3   objection brief?

4   A    Yes, I am.

5   Q    Can you describe for the Court what calculation you

6   understand the EFH committee to be attempting here?

7   A    Yes.  They're using a similar methodology to the

8   methodology that I used.  But what they do is they reset the

9   balance in the intercompany notes at zero in April of 2010,

10  when they start their analysis, when in fact, the balance at

11  that period of time was in excess of a billion dollars.

12  Q    And do you have an opinion on their exclusion of any

13  interest calculation on balances that existed first from

14  advances more than four years before the lookback period?

15  A    I don't think that's the right way to look at it.

16  Q    And why is that?

17  A    Fundamentally, what we're reviewing are a series of

18  transactions between EFH and TCEH.  And those transactions

19  are interest payments, or interest accruals that took place

20  over -- whether it's a four-year period, or all the way back

21  to the LBO.  And those interest accruals and interest

22  payments reflect the total balance outstanding on the

23  intercompany notes, irrespective of whether that balance

24  occurred at a historical date a couple years back, or

25  whether it occurred just a month earlier.

1            That really isn't the point.  The point are the

2      transactions that occurred, which are the interest accruals

3      and the interest payments, and I believe my methodology

4      captures that.

5      Q    And putting aside the question you just addressed,

6      about excluding prior balances, have you evaluated the

7      details of how have they applied note repayments in

8      implementing their alternative evaluation?

9      A    Yes, I have.

10     Q    And is any aspect of their implementation there that

11     you take issue with?

12     A    With the repayments, you could think of them as sort of

13     a LIFO method of repayment the intercompany debt.  And there

14     are a lot of repayments -- well not a lot, there are 30

15     repayments that are made over this time, but what Mr. Henkin

16     does is apply those repayments only to the balances that

17     were advanced after April 2010.  He does not apply them to

18     the balance that existed in April of 2010, that this

19     schedule and this analysis ignores.

20     Q    And what effect is using Mr. Henkin's LIFO approach

21     have on the calculation?

22     A    Effectively, it reduces his estimate of the

23     underpayment of interest, because the total balances are

24     lower under his hypothetical.

25     Q    And have you seen any evidence that in fact, TCEH ever

1    used a LIFO approach on the repayments?

2    A    I have not.

3    Q    Is there an alternative approach to applying the

4    repayments that you would consider reasonable?

5    A    You could do it this way -- well, first let me say that

6    I don't agree with making the balances zero from the outset

7    in April '10.  I think that reflects reality.  Having said

8    that, you could also have taken the repayments that were

9    received after April, and applied that to that preexisting

10   balance, instead of applying them to advances that were made

11   after April.  And if you had done that, you would have had a

12   higher estimate than what Mr. Henkin came up with.

13   Q    And I believe we skipped over that.  The estimate on

14   this chart is $187 million?  That's the committee's

15   estimate?

16   A    Correct.  And I'd note that that includes a five

17   percent pre-judgement rate.

18   Q    And sticking with their alternative analysis, did they

19   have -- what did they do with balances at a point when under

20   their zeroed-out approach, the supposed outstanding balance

21   was paid off.  Can you explain what happened there?

22   A    Yes, I can.  It's sort of curious, because the

23   repayments that are coming in reflect the total balance that

24   is outstanding, you actually reach points in this analysis

25   where you would have a negative balance on these notes.  And

1    in fact if you took this chart further out beyond February

2    2012, you would have hundreds of millions dollars of

3    negative balances on these notes, which again, I think just

4    reflects that this analysis, in my view, is really not

5    valid.

6    Q    So taking all that together, what's your view about

7    whether their alternative approach causes you to have any

8    alternative conclusions about your calculations.

9                MR. BREVNER:  Your Honor, I just want to object to

10   the form of some of these questions, because they're

11   characterizing this as an alternative approach, and what

12   this really was something submitted, arguendo, that

13   basically took all of Mr. Mendelsohn's assumptions, and then

14   used them for a recalculation.  To be clear, the EFH

15   committee is not submitting this as an alternative approach,

16   and does not believe that this is the correct approach.

17   It's just an alternative that takes out one variable, and

18   otherwise used Mr. Mendelsohn's calculation.

19                THE COURT:  All right, well subject to that

20   clarification, I don't think we need to change the way the

21   questions are being asked.

22                MR. MENDELSOHN:  Yeah, I don't believe this is the

23   correct way to analyze this either, so we're in agreement in

24   that, and I believe that my official opinion is still valid.

25                MR. ALLRED:  Thank you, no further questions.

1          THE COURT:  All right.  Cross?

2          MR. BREVNER:  I'm not going to finish in a few

3    minutes, Your Honor, but we can hand out our binders, if

4    that's all right?

5          THE COURT:  How long do you think your cross is

6    going to take?

7          MR. BREVNER:  I would estimate 45 minutes to an

8    hour.  We've got a 33-page written direct, so although the

9    oral direct was relatively brief --

10          THE COURT:  All right.  I'm in no way of being

11    critical of how long it'll take.  It'll take as long as it

12    takes.  Is there anyone else that's going to want to cross-

13    examine this witness, other than the E-committee?  No, okay.

14    All right, well, we'll press forward.  Otherwise, we create

15    issues with leaving someone open for a week.  Do you have

16    notebooks you want to hand out?

17          MR. BREVNER:  Yeah, I do.

18          THE COURT:  Why don't you -- literally, I need to

19    call my wife.  Literally, we'll take a five-minute recess,

20    and then we'll come right back.

21       (Recess)

22          CLERK:  All rise.

23          THE COURT:  Please be seated.  Thank you for the

24    break.  You may proceed.

25                    CROSS-EXAMINATION

1   BY MR. BREVNER:

2   Q    Good afternoon, Mr. Mendolsohn.

3   A    Good afternoon.

4   Q    From mid-1997 until the present, your work has been in

5   the restructuring area, correct?

6   A    Restructuring and financing advisory.

7   Q    And you've previously testified as an expert regarding

8   valuations and confirmation issues, correct?

9   A    That is correct.

10  Q    You've never testified as an expert in another

11  proceeding regarding intercompany notes, correct?

12  A    I have not testified on intercompany notes before.

13  Q    And you've never testified as an expert in another

14  proceeding regarding bond yields, correct?

15  A    No, I have not testified regarding bond yields before.

16  Q    And you've never testified about demand notes, correct?

17  A    I certainly have not testified on demand notes.

18  Q    And at your deposition, you couldn't recall having

19  specific experience with demand features, correct?

20  A    Well, when you say "demand features," almost every note

21  has a put right upon a change of control, and most do have -

22  - often have call rights as well, and there's a very small

23  universe of notes that actually have demand features.

24  Q    If you could just focus on my question.

25        THE COURT:  He answered your question.

1    Q    All right, Your Honor.  You don't recall having

2    specific experience with demand features, correct?

3    A    Again, I have experience with lots of notes that have

4    change of control put options.  There aren't many notes that

5    have true demand features, so the demand features of the

6    type that Mr. Henkin has identified, I don't have

7    significant experience with those.

8    Q    In your work in this matter, you did not conduct any

9    analysis comparing the TCEH intercompany notes to any other

10   intercompany notes, correct?

11   A    I did not.

12   Q    Mr. Mendolsohn, did you listen to the trial testimony

13   of Mr. Keglevich and Mr. Horton last week pertaining to the

14   intercompany notes?

15   A    I did listen to portion of their testimony.  If there's

16   something you want me to respond to, just, maybe be

17   specific.

18   Q    Did you read the transcripts of their testimony?

19   A    No, I have not seen their transcripts.

20   Q    I'd like to talk a little bit more about what you call

21   the interest differential calculation that you referred to

22   on your direct.

23   A    Okay.

24   Q    And that calculation is your quantification of how you

25   say TCEH was undercompensated, correct?

1   A     That is correct.

2   Q     And you calculate the interest differential based on

3   the difference each day between the interest rate on the

4   demand notes and the implied yields to maturity on either

5   the 2014 or the 2017 bond, using the outstanding balance on

6   the intercompany notes for each day, correct?

7   A     Yes, I believe that's correct.

8   Q     And your calculation resets the rates used to calculate

9   your added interest on a daily basis, correct?

10  A     We use a daily observation of those third party yields,

11  that is correct.

12  Q     Each day, you reset the rate to the implied yield to

13  maturity, based on the trading price of the 2014 or the 2017

14  bonds, right?

15  A     Yes.  Each day, we apply the principal -- or to the

16  principal balance, the yield's maturity of -- that's

17  observed in the market of the third-party notes.

18  Q     And you're not aware of any actual intercompany note

19  that has a daily reset to a bond-trading yield, right?

20  A     Yeah, I -- I'm not implying that these notes have a

21  daily reset feature.  I'm just calculating a potential

22  claim.

23  Q     And you're not aware of anyone else who has ever

24  substituted the trading yield on ten-year bonds for an

25  agreed interest rate on intercompany notes with a demand

1    feature, correct?

2    A    I -- I'm aware -- it would be very standard practice

3    for fixed income investors and practitioners to compare

4    similar notes with similar terms to determine whether an

5    interest rate is appropriate.  I'm not aware -- I think you

6    said specifically with respect to intercompany notes, I have

7    not done that before.

8    Q    And your analysis treats the intercompany notes as if

9    they should have paid interest at a rate similar to the

10   yields on bonds with approximately six or seven years

11   remaining to maturity, right?

12   A    They're a proxy.  There's no perfect proxy, but they --

13   we believe they -- or I believe they're a good proxy.

14   Q    But because you've reset the rates every day in your

15   retrospective analysis, it is as if the notes were a

16   variable rate instrument, not fixed coupon bonds, right?

17   A    Well, it's true that the coupon on the third-party

18   notes is fixed, but there's a market after they're issued,

19   and they trade in a market, and when the price varies below

20   par, then the investor is getting a yield that's actually

21   substantially higher than the coupon.  For the dollar they

22   put in, they're getting a substantially larger return than

23   what the coupon would suggest.

24   Q    That's -- any investor who buys -- who buys a bond will

25   get that yield to maturity by holding the bond from the day

1  they buy it until maturity.  That's why it's an implied

2  yield to maturity, right?

3  A    The -- that yield to maturity does assume a time period

4  and that the bond is repaid on maturity, that is -- that is

5  correct.

6  Q    And your analysis makes no adjustment to the daily

7  interest rates you derive from the yields on the benchmark

8  bonds you use, based on the fact that you're resetting the

9  rates every day.

10  A    Sorry, I don't understand the question.

11  Q    Your analysis, the analysis that you did, you made not

12  adjustment to the daily interest rates you derive, based on

13  the fact that you're actually resetting the rates every day.

14  A    Okay, well, I think I already testified that I'm -- I'm

15  not actually resetting the rates.  I'm calculating a

16  potential claim or estimating a potential claim, and in

17  fact, those third-party notes do trade every day, so I can

18  look at any day in this period and assess what a third party

19  is paying, or what risk -- for the risk they're taking on,

20  what is the yield that they require.  So I -- I -- I'm still

21  -- maybe I'm missing your question but -- or maybe I just

22  answered it, I'm not sure.

23  Q    Close enough.  All right.  I -- I want to focus just

24  briefly on the -- you said you did calculations for three

25  periods, correct?  Three time periods.

1    A    That is correct.

2    Q    From the date of the first borrowing in November of

3    2007, from January 1st, 2009 and from April 29th, 2010, the

4    date -- four years prior to the petition date, right?

5    A    That's correct.

6    Q    And the reason you used three different periods is that

7    you were instructed to do so by Munger Tolles & Olson,

8    correct?

9    A    That is correct.

10   Q    You don't have an opinion that any one of those time

11   periods is correct or appropriate, right?

12   A    I think it would require some legal expertise, and I'm

13   not a lawyer.

14   Q    That was actually what I was wondering about because

15   you did, in your oral direct testimony just now, suggest

16   that you did have an opinion on the correctness of using

17   balances that were in existence prior to four years before

18   the petition date.  Do you recall that testimony when you

19   were commenting on --

20   A    I do.

21   Q    -- the Annex A to the brief of the Committee.

22   A    That's correct. They're balances that exist and there's

23   a balance that exists in April of 2010 and it's more than a

24   billion dollars.

25   Q    Right, and when you looked at the period from April

1    29th, 2010 going forward, in your calculation, the shortest

2    period you looked at that resulted in the lowest interest

3    differential included the balance starting on April 29th,

4    2010, the entire outstanding balance as of that date,

5    correct?

6    A    That's correct because we're looking at all the

7    transactions that take place after that date, and those

8    transactions are interest accruals and interest payments

9    that reflect the total balance, not the post-April balance,

10   but the total balance that exists during that period of

11   time.

12   Q    And -- but you're not offering a legal opinion that

13   it's appropriate to include added interest on amounts that

14   were borrowed or transferred by TCEH more than four years

15   prior to the petition date?

16   A    I'm not making any legal conclusions or offering any

17   legal opinions.

18   Q    And you don't know if that is -- what you're saying is

19   legally correct or the basis for a claim, correct?

20   A    I've looked at this from the perspec -- or, sorry,

21   excuse me.

22          MR. ALLRED:  Object to the form of the question,

23   Your Honor.

24          THE COURT:  Because of the "or"?

25          MR. ALLRED:  Yes.

1           THE COURT:  Why don't you break it down?

2    Q    In your report, you looked at three different periods

3    just because Munger Tolles told you to, right?

4    A    I was directed by counsel to use those three periods.

5    Q    Now, you're offering a view that advances, more than

6    four years prior to the petition, should be included in the

7    interest calculation because I -- you think there was a

8    transaction where interest was paid at -- during the four-

9    year period, is that right?

10   A    Yeah, I -- I don't see the inconsistency.  The -- the -

11   - the time -- the three time periods that I describe in my

12   direct are with respect to what time periods I'm reviewing

13   these transactions, which are either the accrual of interest

14   or the payment of interest.  You're -- you're taking those

15   three time periods and applying them to something that's

16   different, which is when the advances were made.  That's not

17   something that I've addressed.

18   Q    All right, so in your -- in your post -- because of the

19   way you did it, in your post-April 29th, 2010 analysis, you

20   included any amount that was outstanding, regardless of when

21   the transfer of principal occurred.

22   A    Correct, because I looked at the interest accruals and

23   interest payments that occurred on those dates.

24   Q    All right, I'd like to talk a bit about debt maturity.

25   You would agree that maturity is certainly one important

1    aspect in analyzing the credit risk of an instrument.

2    A    Yes, it is.

3    Q    And maturity is an important factor that is taken into

4    consideration in pricing a debt instrument because it

5    matches the price up with other instruments that mature at

6    the same time.

7    A    Yes.  It -- it is a factor that's taken into

8    consideration.

9    Q    And maturity is also important because it provides a

10   period of time that a holder will be subject to the credit

11   risk of the borrower.

12   A    That is correct.

13   Q    And the period of time that a lender is exposed to the

14   credit risk of a borrower will tend to increase the interest

15   rate to compensate for that risk, correct?

16   A    It usually does, yes.

17   Q    And all else equal, as you get closer to the maturity

18   of a bond, the yield falls because the time period to which

19   you're exposed to credit risk becomes smaller.

20   A    That depends on the condition of the company you're

21   talking about.

22   Q    All else equal, as you get closer to the maturity date

23   of a bond, the yield falls because the time period to which

24   you're exposed to the credit risk becomes smaller, all else

25   equal.

1    A    Okay, when you -- oh, when you say "all else equal,"

2    I'm -- I'm not sure what -- exactly what you mean.  If

3    you're -- if you're talking about a healthy company that's

4    close to a maturity date, then yes, I would expect the yield

5    to fall.  If you're talking about a distressed company, it

6    could vary wildly.

7    Q    All right.  Now, with a debt instrument -- well,

8    turning to debt instruments with a spread above LIBOR, it's

9    not unusual as a general matter for a debt instrument to

10   have a spread above LIBOR, correct?

11   A    The institutional loan market and the revolving credit

12   market do tend to have instruments that have a spread over

13   LIBOR.

14   Q    And in your view, when the notes were executed in 2007,

15   the effective interest rate that resulted from LIBOR plus

16   500 basis points of approximately ten percent was

17   reasonable.

18   A    At the time, in November of 2006, the third-party rates

19   were approximately ten percent, and the effective rate that

20   TCEH received was also approximately ten percent, so yes, I

21   believe that is reasonable.

22   Q    Tell me if I have this right.  In your view, though,

23   because the TCEH were structured as LIBOR plus 500 basis

24   points, that was unreasonable because you do not think it

25   was reasonable to have the interest rates set as a spread

1    over LIBOR in a loan to a single B credit on an unsecured

2    basis?

3    A    Yeah, let me respond to that.  The -- the LIBOR spread,

4    I think it's questionable that they -- that the company sat

5    the interest rate this way, and -- and what I described that

6    you're referring to in my deposition is that there is no

7    market for a single B or triple -- actually, at this time,

8    it was a triple C in 2007, the proxy credit rating, which

9    would be this -- this note, this 2014 note I referred to was

10   a triple C rated note.  So you take something with the same

11   credit risk and there is no market.  I've looked at 3,500

12   different issuances over this exact time period, and there

13   is not a single new issuance that's a triple C, LIBOR spread

14   note that is unsecured, much less sub near maturity, PIK

15   toggle, and all the other features.

16            MR. BREVNER:  Your Honor, I'm going to move to

17   strike the portion of that testimony relating to the survey

18   of 3,500 lenders or -- I'm not sure exactly what -- what Mr.

19   Mendolsohn said at the end, but I don't think that was

20   responsive and I think that went beyond anything he did and

21   disclosed in his report or at deposition.

22            MR. ALLRED:  I believe it was responsive, Your

23   Honor.  He was explaining the answer.

24            MR. BREVNER:  I -- you know, Your Honor, at

25   deposition, Mr. Mendolsohn was asked --

1          THE COURT:  Do you mind if I rule?

2          MR. BREVNER:  Yeah, go ahead and rule, please.

3          THE COURT:  Okay.  I'm going to overrule the

4     objection.

5          MR. BREVNER:  All right.

6     Q    Mr. Mendolsohn, you were asked at deposition what your

7     opinion on LIBOR plus 500 being unreasonable was, and you

8     were asked, was that based, or that was not based on any

9     survey of lenders, and you responded, that -- it's my

10    general opinion, right?

11    A    Yeah, I made -- I expressed the opinion twice in my

12    deposition that I didn't believe it existed, and I was

13    correct.

14    Q    That's something you did afterwards, right?  You didn't

15    --

16    A    I -- what I said in my deposition was based on my

17    knowledge and experience over 20 years, and maybe because I

18    thought you might ask me again, I went back and -- and

19    actually looked and I was correct.

20    Q    And you're aware from the documents you've reviewed and

21    Mr. Horton's trial testimony that TCEH set the interest rate

22    on the notes in part to hedge its LIBOR risk, right?

23    A    Yes, I did.  I do understand that.

24    Q    And you concluded that was irrelevant to your analysis,

25    right?

```
1    A    Yeah -- I think it's irrelevant for a number of

2    reasons.  One, it doesn't address whether the interest rate

3    is correct or is fair, and I think also, when companies

4    hedge -- this company had $10- to $20 billion dollars of --

5    of interest rate hedges already on its books, as it

6    disclosed in its public filings, and usually when people

7    hedge, they hedge with investment grade counterparties.  EFH

8    was not an investment grade counterparty.

9    Q    But in any event, you didn't take the benefit of the

10   hedge to TCEH into account in doing your analysis, correct?

11   A    I did not take into account any potential benefit that

12   they may have derived from that.

13   Q    After a company sells a bond, the implied yield to

14   maturity based on the trading price of the bond will vary

15   for a lot of reasons, right?

16   A    Yes, there are a number of factors that could influence

17   that.

18   Q    Those reasons include credit risk, interest rates,

19   supply and demand of credit and macroeconomic factors,

20   right?

21   A    Mm, yeah, those are some of the things I discussed in

22   the deposition.

23   Q    And the period of 2008 to 2012, there was a great deal

24   of volatility in the bond markets as a result of the global

25   financial crisis, right?
```

1    A    Certainly during 2008 and 2009 there was a lot of

2    volatility, but really, 2010 onwards, we had extremely

3    strong leveraged loan in high-yield markets or mostly high-

4    yield.

5    Q    And in the opinions that you disclosed prior to your

6    deposition, you did not try to understand or separate out

7    market factors from factors specific to EFH credit to

8    understand what was causing volatility in the yield of the

9    EFH bonds during the period from 2007 to 2013.

10   A    I think it's pretty difficult to isolate that and that

11   -- I'm not sure it's particularly relevant.  If you're -- if

12   you were asking yourself the question of what a third party

13   investor requires to take this credit risk, you can't look

14   at it in a vacuum.  You've got to look at it in the context

15   of what the market is and what alternative investments are

16   and what they're yielding at that point in time to determine

17   whether this is a reasonable return for the risk I'm taking.

18             So I think it's incorrect to state that this

19   should only reflect EFH credit risk.  It has to reflect the

20   market that was available at that time also.

21   Q    But you did not try to understand or separate out

22   market factors, correct?

23   A    We did not specifically attempt to do that, no.

24   Q    Turning to the notion of a demand feature, you

25   generally understand the concept of a payable-on-demand

1    feature, correct?

2    A    Yes, I understand the concept.

3    Q    A demand feature, or a put feature, if effective,

4    allows a noteholder to put its exposure back to the borrower

5    and be repaid, right?

6    A    All right, yes, if -- if -- I'd say if the lender --

7    excuse me, if the lender has the ability to actually make

8    that demand and if the borrower actually has the ability to

9    fulfill that demand, then yes.

10   Q    And a debt instrument with a functional demand feature,

11   you would view maturity as being shorter than the stated

12   maturity.

13   A    I'm not sure I'd view the maturity as being shorter.

14   The maturity is what the maturity is, but certainly there is

15   the potential that the -- the instrument could have a much

16   shorter life.

17   Q    The -- do you agree that you would view the maturity as

18   potentially being shorter than the stated maturity?

19   A    Yes, well -- the -- the amount of time during which

20   it's outstanding could be substantially shorter or could be

21   equal to maturity, depending on whether the demand feature

22   is exercised or whether it's honored.

23   Q    If a note could be demanded in one day, then there's a

24   potential that it would be demanded in one day, right?

25   A    If it could be, I imagine there's a chance it would be.

1    Q    And we can agree that a demand feature, if functional,

2    has value to a lender.

3    A    If functional, which again, requires both sides that

4    one, it can be exercised and two, it can be honored, then

5    yes, I would agree it has some value.

6    Q    With a demand feature, other things being equal, you

7    would expect a lower yield on the instrument?

8    A    If a note has a functional demand feature, as I just

9    described, then I would expect it have to -- have a lower

10   yield than a similar instrument that had a longer maturity

11   and no demand feature.

12   Q    And in preparing your report, you made no attempt to

13   put a range on the value of a functional demand feature,

14   correct?

15   A    I did not because I don't believe the demand feature in

16   this situation was functional.

17   Q    And you're not offering any opinion on the value of a

18   functional demand feature.

19   A    No, I am not.

20   Q    And you did not try to determine the value of the

21   demand feature in the TCEH intercompany notes because you

22   did not think it was functional.

23   A    Again, you -- when you look at these notes, there are a

24   lot of different features.  They have different interest

25   rates, different -- you know, all sorts of different aspects

1    you take into consideration.  As I described, no proxy is a

2    perfect proxy, but we gave little to no value to this demand

3    feature because I didn't think it was functional, as I

4    already described.

5    Q    Well, because you thought the demand feature was not

6    functional, you did not prescribe any value to it, right?

7    A    Again, we -- I -- I looked at these notes, I just

8    described there's -- there are a lot of features in the

9    proxy notes where they're actually better than the features

10   in the intercompany notes.  For example, they pay cash

11   interest, whereas the intercompany notes are -- can be

12   (indiscernible) can be accrued interest.

13            So there are some pluses and minuses across the

14   board.  I didn't ascribe value to any one specific feature,

15   I looked at it in totality and decided that these third

16   party proxies were appropriate, so I didn't pick apart and

17   give, you know, specific value to a demand feature.

18   Q    Because you thought the demand feature was not

19   functional, you did not prescribe any value to it, right?

20   A    I didn't pres --

21            MR. ALLRED:  Asked and answered.

22   A    I didn't prescribe specific value to anything.

23            THE COURT:  Overruled.

24   A    Any particular feature, excuse me.  Sorry.

25            THE COURT:  That's okay.  Is your mic on?  Because

1   I'm having a hard time hearing you.

2           MR. ALLRED:  I'm sorry, I was simply objecting it

3   was cumulative asked and answered but it's been answered

4   again, so no harm.

5           THE COURT:  Thank you.

6   Q    Do you have your deposition transcript in front of you?

7   And can we have --

8   A    Yes.

9   Q    Page 116, Line 25 through 117 Line 11.

10  A    Sorry, can you say that again?  All right, no, I see

11  it.

12  Q    Okay.  You were asked the question: "And have you

13  attempted in the course of your opinion in this matter to

14  determine what the value of the demand feature in the TCEH

15  intercompany notes was or would have been, assuming it was

16  functional."  Answer: "I believe that the feature is not

17  functional, so therefore, I did not prescribe any value to

18  it.  Were you asked that question and did you give that

19  answer?

20          MR. ALLRED:  Objection, that's not proper

21  impeachment.  It's not inconsistent, Your Honor.

22          THE COURT:  Hang on, let me deal with that.  You -

23  - you can deal with that on redirect, okay?  So, overruled.

24  Now you can answer.

25  A    Okay.  Yeah, what -- what I just said was that -- well,

1    first of all, we didn't give value to any specific aspect of

2    the note, and I also said I gave little to no value to this

3    -- I would prescribe little to no value to this feature.

4    Q    My question to you was, were you asked that question

5    and did you give that answer?

6    A    I -- assuming -- yes, I assume I gave that answer.

7    Q    You can take it down now, thank you.  One reason you

8    give in your written direct for the demand feature not being

9    functional is that you say EFH contemplated that the notes

10   would be outstanding for seven to ten years, right?

11   A    Yes.  That note program when it was established was

12   intended to remain outstanding for seven to ten years,

13   that's correct.

14   Q    And based on your view that the notes were supposed to

15   be seven to ten year -- a seven-to-ten-year program, you

16   used the daily implied yields on EFH seven-to-ten-year bonds

17   as your proxy for what you think the interest rate should

18   have been on the borrowings under the intercompany notes,

19   right?

20   A    That's correct.

21   Q    Now, none of the TCEH intercompany notes borrowings in

22   the case were outstanding for seven to ten years, right?

23   A    No, the program lasted for 5.2 years, and I would note

24   that a lot of notes are paid before their maturity, in fact,

25   most, probably, are paid before their maturity.

Page 241

1    Q    And in fact, just -- just so we're all clear for the

2    record, these notes were paid in full with the agreed

3    interest -- paid off in full with agreed interest by January

4    2013, correct?

5    A    Yes, that's correct.  It doesn't mean they received a

6    reasonable interest rate, though.

7    Q    You're going to be somebody who's going to complain

8    even though they were paid in full, right?  Sorry, strike

9    that, I'll withdraw the question.  I've got to -- I've got

10   to withdraw that question.

11           In any event, you know, from your review of

12   borrowings and the repayment schedule that the TCEH

13   intercompany notes had approximately 695 borrowings and

14   approximately 100 different payments over the life of the

15   two facilities, correct?

16   A    It sounds about right.

17   Q    And in preparing your report, you had exactly two

18   sources for your testimony that the intercompany notes were

19   intended to be outstanding for seven to ten years, right?

20   A    In prepa -- yes.

21   Q    One was a January or February 2015 -- what you refer to

22   as a diligence meeting with management and others, and the

23   other was a 2011 lender presentation, correct?

24   A    Correct.

25   Q    So I'd like to just talk about those two briefly.  The

1    diligence meeting was a large meeting attended by various

2    members of Debtor management along with various parties,

3    legal and financial advisors, and you don't remember

4    everybody who was there, correct?

5    A    No, I don't.

6    Q    You don't remember who was asking questions and who was

7    speaking?

8    A    I don't remember every single question that was asked

9    and every single -- you know, who -- who spoke for each

10   question, no.

11   Q    In that discussion, nobody told you that they had

12   determined that they would not -- that TCEH would not

13   exercise the demand feature of the intercompany notes in

14   appropriate circumstances?

15   A    I don't recall that specific comment.

16   Q    And you're not aware of any representation or agreement

17   that TCEH would not exercise the demand feature memorialized

18   in the intercompany notes?

19   A    I don't recall that being discussed in that meeting.

20   Q    And, prior to your deposition, your counsel produced

21   one page of your handwritten notes from that meeting, and we

22   looked at those notes when you were deposed, right?

23   A    That's correct.

24   Q    And what your notes of the meeting said relating to

25   seven to ten years was, quote: "Used notes as long dated

1   seven to ten year revolver as treasurer opinion."  Correct?

2   A    Yes.  Something like that.  I don't have it in front of

3   me but it sounds about right.

4   Q    And on your notes next to that remark, you wrote Andy

5   with an arrow, although you're not sure who actually made

6   the remark you rely on.

7   A    No, but -- and the reason why I went back and looked at

8   that page is because I -- I had a very clear memory that

9   someone from management had made that exact statement, and

10  that's why I went back and looked at it.  So I don't recall

11  which -- whether it was Andy or whether it was the treasurer

12  who had made that statement though.

13  Q    And your notes from the meeting also said "10.6 of CA

14  permitted," right?

15  A    It referenced -- yes, something to that effect.

16  Q    And the CA is the credit agreement, right?

17  A    Yes, that's correct.

18  Q    And from your review of the credit agreement in

19  preparation of your report and testimony, you know that

20  Section 10.6 of the credit agreement permitted EFH borrowing

21  from TCEH, provided it was done at an arm's length basis,

22  right?

23  A    Generally, I believe that's what it says.

24  Q    And in your handwritten notes from the meeting you had

25  in January, below the reference to the credit agreement, it

1    said: "Arm's length believe it's arm's length," right?

2    A    I don't recall exactly what the note said.

3    Q    Let me see if can refresh your recollection.  Can we

4    have Page 190, lines 4 to 22 of Mr. Mendolsohn's deposition?

5    I'm reading that, Mr. Mendolsohn, after the reference to the

6    credit agreement, question on Line 4, "And what does it say

7    underneath 10.6 of CA permitted?" Answer: "It says arm's

8    length, the next line says I'm not sure what it says."

9    Question: "It says believe it's arm's length, right?"

10   Answer: "No, it's either believe or below."

11   A    Right.

12   Q    "I think it's believe but it's possible it's below.

13   Sorry, I can't quite tell."  Question, "Let's see if I can

14   help you.  You see there is a little dot above the I similar

15   to the dot above the I just above the line at 'is'?"

16   Answer, "It looks like it says 'believe,' I haven't looked

17   at this in a long time."  Does that refresh your

18   recollection that your notes said, "believe is arm's

19   length?"

20   A    Thank you, that's very helpful.

21   Q    You can take that down, thank you.  And you didn't

22   consider the fact that somebody at the meeting said,

23   "believe is arm's length" when you prepared your report and

24   testimony, did you?

25   A    I -- I don't believe -- well, first of all, I'm -- I'm

1    looking at this from an independent perspective and it's --

2    for me it's not particularly relevant whether the management

3    of EFH, who is the management of TCEH, believed it was arm's

4    length.

5    Q    And you don't recall any discussion at this meeting

6    about the demand feature not being functional, right?

7    A    I don't recall any discussion of that.

8    Q    All right.  The second item you referenced for your

9    position that the notes are comparable to ten year bonds in

10   your report was a 2011 lender presentation that's been

11   identified here as DX 17.  Can we just have that on the

12   screen?  Sorry, DX 517, my apologies.  I referenced the

13   wrong number.  Can you see that on the screen, Mr.

14   Mendolsohn?

15   A    Yes, I do.

16   Q    And that -- that's the other source for your seven to

17   ten years, correct, that you cited in your report and direct

18   testimony?

19   A    Yes.  It references the seven year notes and the ten

20   year notes that were used as a proxy when they set the

21   pricing of this, and it also notes seven year credit default

22   swap spreads.  It doesn't reference a five year spread or a

23   three year spread or a one year spread.  It references a

24   seven year spread.

25   Q    Why don't -- why don't we take a quick look at Page 3

1    of this, which I think is what you were just referring to?

2    A    Okay.

3    Q    And I don't want to spend a lot of time on this because

4    we already discussed it with Mr. Horton.  But what you're

5    referring to is, in the second bullet, the notes were

6    contemplated and priced on or about October 10th, 2007 at a

7    rate of LIBOR plus 500 basis points, based on several

8    factors, right?  And then it lists six factors, right?

9    A    That's correct.

10   Q    And you talked about the senior notes and the CDS

11   spreads but you didn't take into account the fourth bullet

12   and the sixth bullet, right, that the notes provided a hedge

13   and that, given alternatives, the notes were an attractive

14   investment option.

15   A    I mean, I'd like to address those one by one.  I -- I

16   already described the hedge -- much of the TCEH was already

17   hedged, and hedging with a sub-investment grade company, I

18   think, is not particularly worth a lot of value.  If I look

19   at the bottom, the sixth point that you described, it -- it

20   talks about there being a positive spread between the cost

21   of TCEH's debt and the rate that they were receiving on this

22   investment and saying, hey, it's a positive spread, that

23   makes it attractive, and I -- I would argue that that's not

24   the case.

25          And you know, if I could use an example, Mr.

1    Brevner, if you had a mortgage that was LIBOR -- or that was

2    3.5 percent cost and my counsel Mr. Allred, who does not

3    have a great credit quality and has been struggling and he

4    says, please lend me money, I'll pay you 5 percent, just

5    because you're making a positive spread, does that mean that

6    that's a good thing?  Is it worth putting all that

7    principal, all your hard-earned savings at work -- or excuse

8    me, at risk, just to make 100, 150 basis points without

9    taking into consideration that Mr. Allred's credit, or in

10   this case, EFH's credit is of dubious quality.

11   Q    Mr. Mendolsohn, just to be clear, you told me at your

12   deposition, right, I'm not opining as to whether it was an

13   attractive investment option or not.  Do you recall saying

14   that you're not offering that opinion Mr. Mendolsohn?

15   A    I'm -- I'm not offering an opinion of whether it's an

16   attractive investment option.  What I'm offering an opinion

17   on is whether the rate that they received reflected the

18   risk, and I believe it did not.

19   Q    All right.  You can take that down.  And so we've

20   talked about DX 517 and the -- and the meeting, which were

21   the two bases disclosed in your report for your opinion

22   about the notes should be seven to ten years.

23          In your written direct, you also have referred to

24   Mr. Horton's written direct testimony, right?

25   A    That's correct.

1   Q    Now, you understand, though, that what Mr. Horton

2   clarified in his testimony in Court last week that although

3   he felt, when he created the notes, that the facility might

4   be open for seven to ten years, he wasn't talking about

5   individual borrowings.  Do you recall that testimony from

6   Mr. Horton?

7   A    Yeah, I don't -- I didn't memorize it, so I don't know

8   -- I don't recall exactly what he said, but he said

9   something to the effect that it was a seven to ten year

10  program.

11  Q    But individual borrowings were not, right?

12  A    I -- I don't think he's made that statement and, you

13  know, I'm not sure I have either.  I'm not requiring -- I'

14  not necessarily assuming that the entire balances are

15  outstanding for seven to ten years, and my proxy notes that

16  I used have a seven and ten year maturity from 2007, but as

17  I described earlier, most companies refinance their debt

18  before their maturities anyway.

19  Q    Do you -- do you recall Mr. Horton testifying that a

20  payable on demand feature is very standard in this type of

21  intercompany note?

22  A    I don't recall specifically.

23  Q    Well, do you have a reason to disagree that being

24  payable on demand is very standard in intercompany notes?

25  A    I don't have a reason to agree or disagree.

1    Q    And you're not aware of anything in Mr. Horton's

2    written testimony or oral testimony saying the demand

3    feature was not functional, right?

4    A    No, I don't recall that.

5    Q    And I think we've covered some of them in your oral

6    testimony.  In your written testimony, in response to the

7    opinion of Michael Henkin, you disagree with Mr. Henkin's

8    analysis on two principal bases.  One, that the demand

9    feature was not functional and two, that the other corporate

10   demand notes to which Mr. Henkin compared the TCEH

11   intercompany notes are not an appropriate basis for

12   comparison.

13   A    Yes.

14   Q    And taking number two first, and I think you elaborated

15   on this a bit in your oral testimony, one of the reasons you

16   think that looking at the other corporate demand notes is

17   not appropriate is that the balance went down in those

18   notes, as the credit deteriorated, whereas you say, with the

19   TCEH intercompany notes, and this is Paragraph 47 on Pages

20   30 to 31 of your written direct: "The total balance

21   continued to grow through its peak in April 2011," right?

22   A    I said something to that effect.  I actually can't find

23   the page.  Sorry, what -- where is the reference?

24   Q    It's Pages -- Pages 31, I think, Paragraph 47, but I --

25   I think -- I'll take, "I said something to that effect."

1   The April 2011 was the peak, right?  That was the -- the

2   high point of the balance, right?

3   A    That is correct.

4   Q    And after that, it went down in 2011 and further in

5   2012 and was paid off in full in January of 2013, right?

6   A    That's correct, but I think that's what I said in my

7   report, that it actually peaked in 2011, but there was a lot

8   of credit degradation between 2007 and 2011 while the

9   balances were growing, as I've testified to.

10  Q    But in any event, the balance went up and then it went

11  down and was paid in full, right?

12  A    It was paid in full.

13  Q    All right.  And going back to your response to Mr.

14  Henkin, do you recall that Mr. Henkin, in his report, has an

15  analysis based on the yield curve, right?

16  A    Yes, I do.

17  Q    And you don't separately address that in your rebuttal,

18  in your written direct or in your oral direct because your

19  disagreement with that really goes to the functionality of

20  the demand feature, right?

21  A    Primarily, that is correct, that it's a -- that demand

22  -- Mr. Henkin relies on the demand feature to make the

23  statement that they are short term in nature.

24  Q    And conversely, if the demand feature were functional,

25  you would give value to the demand feature, and that could

1    result in a lower rate than you used, right?

2    A    Again, as I -- I think I've already testified to that.

3    If the demand feature is functional, then it could have a

4    lower rate.  If it's not functional, then the notes still

5    have a maturity, which could make it even worse than the --

6    the public proxies.

7    Q    All right.  And on -- on the functionality point, to go

8    back to the notes themselves, first, you agree that you need

9    to look to the notes for a full description of the terms and

10   conditions, right?

11   A    Yeah, it's appropriate to look at the notes to

12   understand the terms, absolutely.

13   Q    And there's no dispute that the notes say they're

14   payable on demand, correct?

15   A    They do say that they're payable on demand, that's

16   correct.

17   Q    And although you say that this express written term of

18   the notes was not functional, you have conducted no analysis

19   of whether the demand feature was legally enforceable,

20   right?

21   A    I would not have an opinion on its legal

22   enforceability.

23   Q    And you give, instead, five reasons you say the demand

24   feature was not functional and you list five reasons in the

25   rebuttal section of your written direct and I think you gave

1    five similar, although perhaps not exactly the same reasons

2    in your -- in your oral direct, right?

3    A    Yes.

4    Q    And the first thing you say, at least in your written

5    direct, was that the loan is from a subsidiary to a parent,

6    and therefore, the borrower controls the lender and is

7    unlikely to demand repayment, absent other external factors,

8    right?

9    A    That's correct.

10   Q    And do such other external factors include pressure on

11   the subsidiary from its third party Creditors?

12   A    It could.

13   Q    And here, TCEH actually had third party Creditors to

14   whom it had pledged the notes, right?

15   A    I believe they were pledged.  I don't remember exactly

16   when they were pledged, but at one point I do know they were

17   pledged.

18   Q    And in your report and testimony, you offered no

19   opinion on whether EFH respected the corporate form in its

20   dealings with TCEH concerning the intercompany notes, right?

21   A    You're going to have -- can you just rephrase that

22   using different terminology?

23   Q    In your report and testimony, you offered no opinion on

24   whether EFH respected the corporate form in its dealings

25   with TCEH concerning the intercompany notes, right?

1   A    I think you used the same term in my deposition, I'm

2   just not sure what you mean by "respecting the corporate

3   form."

4   Q    Well, you offered no opinion on the corporate form, did

5   you?

6   A    I'm not sure what you're referring to.

7   Q    You're not offering an opinion that TCEH was a sham

8   entity and should be disregarded, right?

9   A    Disregarded for what?

10  Q    Are you offering an opinion that TCEH was a sham

11  entity?

12  A    No, I'm not offering that opinion.

13  Q    In your investigation of the TCEH intercompany notes,

14  you did not come to a view that any member of the TCEH board

15  had breached its fiduciary duties, correct?

16  A    Ah, I did not investigate whether any member of the

17  board had breached its fiduciary duties, and I believe

18  that's a legal issue.

19  Q    And one of the things you reference in your written

20  direct as a basis for your opinion that the demand is not

21  functional because a borrower controlled the lender, is that

22  Mr. Horton, the Treasurer of EFH and TCEH, signed the notes

23  for both EFH and TCEH, correct?

24  A    I did reference that.

25  Q    And that -- that wasn't actually in your report, but

1    you've added it to your written testimony, right?

2    A    I don't recall whether that was specifically added.  I

3    -- I do see it here.  I know I talked about it in the

4    deposition.

5    Q    And at your deposition, you testified that, whether

6    it's the same person or not, probably isn't that material

7    right?

8    A    No, I'm not sure it's a big deal whether it's the same

9    person but it's -- the point is that it's a related party

10   and in fact a controlled party, and it's EFH management team

11   signing on behalf of EFH and TCEH.

12   Q    Did you hear Mr. Horton testify that he was duly

13   authorized to sign on behalf of both EFH and TCEH?

14   A    I don't recall hearing that but I'll take your -- your

15   word for it.

16   Q    Well, if that was Mr. Horton's testimony, do you have

17   any reason to question that his signature bound both EFH and

18   TCEH?

19   A    No, I have no basis to question that.

20   Q    All right.  The second reason for saying that the

21   demand was not functional is that no demand was ever made,

22   correct?  That's the second reason you give?

23   A    Well, I think you summarized it without going through

24   the whole paragraph.  I did say that the demand was never

25   made and instead, hundreds of new loans were extended to

1    EFH, despite the fact that the credit risk hand increased

2    and the effective interest rate had declined, and I think

3    there's a juxtaposition there versus the demand notes that

4    Mr. Henkin had -- had identified.

5    Q    All right.  You're aware that in a 2011 amendment to

6    its credit agreement, TCEH agreed with its Creditors that

7    TCEH would obtain a $770 million dollar repayment, right, as

8    a condition of the amendment?

9    A    That -- that sounds approximately right.

10   Q    And you heard Mr. Horton testify that that payment, at

11   the behest of TCEH's Creditors, was actually made by EFH in

12   April 2011, right?

13   A    Yeah, I believe that's correct and my tables reflect

14   that.

15   Q    And there were additional large payments to the notes

16   in 2012 and they were fully paid, according to their terms,

17   in 2013 with all accrued principal and interest that was

18   outstanding, right?

19   A    That is correct.

20   Q    And you did not look at whether the repayments of the

21   notes that occurred in 2011, 2012 and finally full repayment

22   in 2013 were caused or brought about by TCEH seeking

23   repayment, did you?

24   A    I don't know what you mean by "seeking repayment."

25   What I know is that, based on my review of -- of documents

1    and discussions, I believe that no demand was ever made.

2    Q    Well, putting aside a formal demand, you didn't know,

3    when you formulated your opinions in this matter, whether or

4    not the repayments resulted from a request for repayment by

5    TCEH at the urging of its Creditors, or otherwise, right?

6    A    Well, certainly the 2011 repayment we already talked

7    about, was associated with an amendment from the Creditors.

8    I'm not aware of any other Creditor pressure with respect to

9    the other ones.

10   Q    But you don't know whether, if TCEH had a legal right

11   to demand repayment of the notes and TCEH and EFH both knew

12   that, and TCEH and EFH had discussions with each other, and

13   TCEH said, we would like you to repay a portion of the

14   notes.  You don't know if there's a reason why it is

15   necessary for TCEH to issue a formal demand in order to

16   obtain repayment, right?

17             MR. ALLRED:  Objection, compound.

18             THE COURT:  Overruled.

19   A    We're talking about mostly the same people here, so I'm

20   not quite sure how to answer that question.  If -- if the

21   Treasurer of -- you know, if -- if the Treasurer and CFO and

22   other managers from both entities are talking to each other,

23   talking to themselves, you know, I'm -- I'm not sure what

24   conversations took place.

25   Q    All right.  You're not offering an opinion that a

1    holder of an intercompany demand note must issue a formal

2    demand as opposed to simply asking for repayment for the

3    demand feature in the note to be functional, are you?

4    A    I don't think you necessarily have to rely on a demand

5    feature to be re -- to -- that's not the only feature by

6    which a payment occurs.  The demand is from the lender to

7    the borrower, the borrower can decide to repay, irrespective

8    of what the lender would like.  These are pre-payable at any

9    time.

10   Q    You don't have to make a formal demand, as a lender, in

11   order for a demand feature to be functional, right?

12   A    It is possible that someone has a demand feature in

13   their note that they just never exercise.  Given all the

14   facts and all the observations I've made, I think it's

15   highly unlikely that a third party that had a demand feature

16   would have allowed this -- this program to continue for as

17   long as it did, allow it to grow to the size that it did,

18   and allow it to do so with the rate that they were receiving

19   as compensation.

20   Q    All right, Mr. Mendolsohn, the next reason I believe

21   you gave -- well, we -- we talked about the seven to ten

22   years already.  I think the next reason you gave was that,

23   as a practical matter, the next reason you gave for it not

24   being functional was that, as a practical matter, if TCEH

25   had demanded repayment, EFH likely would have been forced to

1    borrow from higher cost third party sources, right?

2    A    That's correct.

3    Q    That's actually what happened, in part, when the notes

4    were repaid in 2012 and 2013, right?

5    A    Yeah.  EFIH had to go to the third -- excuse me, go to

6    the financial markets and borrow at an average rate of

7    almost 12 percent in order to get enough cash to be able to

8    repay these notes.  And that was in a more senior level

9    position than -- that was a secured financing, for the most

10    part, versus the TCEH unsecured notes, intercompany notes.

11    Q    And so, in fact, what happened is that, when there

12    needed to be a repayment, EFH was able to get the money and

13    make that repayment, right?

14    A    Yeah.  The fact that they had to go through multiple

15    high-yield offerings in order to repay a -- a note with a

16    demand feature, just as an investor, that's not particularly

17    comforting.  I would want my demand feature to be covered

18    many times over on that immediate basis.

19    Q    All right.  I'm going to get to the fifth and final

20    reason, and this will also be my last series of questions.

21          The fifth reason you think that the demand feature

22    is not functional and should be ascribed no value, which you

23    describe in your oral testimony and it's also on Page 30,

24    Paragraph 44 of your written direct, is that in your view,

25    it is extremely unlikely that EFH's private equity owners

1   would subject EFH access to the intercompany notes to a

2   single third party investor who truly had the independent

3   right to demand repayment, correct?

4   A    That's roughly what it says here.

5   Q    And in coming up with that theory, you didn't speak

6   with any of the equity owners, did you?

7   A    No, I did not.

8   Q    And you didn't identify any support for this theory in

9   any testimony, deposition or trial testimony, of

10  representatives of EFH's private equity owners, did you?

11  A    No, I'd say I was really relying on my 20 years'

12  experience in the fixed income markets.

13  Q    But there's no record or evidentiary support, in fact,

14  no citation at all for this point in your testimony, is

15  there?

16  A    It's my view.

17  Q    Nothing further, Your Honor.

18         THE COURT:  Thank you.

19         MR. ALLRED:  No redirect, Your Honor.

20         THE COURT:  Okay.  Let's do the exhibits.  Thank

21  you, sir.

22         MR. MENDOLSOHN:  Thank you, Judge.

23         MR. ALLRED:  Your Honor, in addition to moving the

24  revised version of the written direct, which we will take

25  care of for next week, we have moved the exhibits we

1    previously noticed, which are DX 639, DX 647, DX 895R.

2             MR. BREVNER:  No objection, Your Honor.

3             THE COURT:  All right, they're admitted without

4    objection.  Thank you.

5             MR. ALLRED:  Thank you, Your Honor.

6             THE COURT:  Does the Committee have any exhibits?

7             MR. BREVNER:  No, Your Honor.

8             THE COURT:  No exhibits, okay.  Very good.  All

9    right, do we need to discuss anything before we recess?

10   Everybody awake?  It's a little late, it's been a long day.

11   Thank you very much as always for your professionalism.  We

12   will be in recess until Thursday, November 19th, and if you

13   could, obviously, please police your area, pick up all your

14   notebooks, water bottles, et cetera, I would appreciate it.

15   Make it easier for the cleaning staff.  Thank you very much,

16   we are adjourned.

17

18                      * * * * *

19

20

21

22

23

24

25

1              C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5    Sonya Ledanski

6    Hyde

Digitally signed by Sonya Ledanski Hyde
DN: cn=Sonya Ledanski Hyde, o=Veritext,
ou, email=digital@veritext.com, c=US
Date: 2015.11.16 11:50:15 -05'00'

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  November 16, 2015