## EXHIBIT A

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: D.I. 6764** |

## ORDER GRANTING THE MOTION OF ENERGY FUTURE
## HOLDINGS CORP., *ET AL.*, FOR SUBSTITUTION OF EXHIBIT

This matter having come before the Court on the *Motion of Energy Future Holdings Corp., et al., for Withdrawal and Substitution of Confidential Exhibit*, dated October 29, 2015 [D.I. 6764] (the "Motion"),[2] and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before the Court (the "Hearing"); and

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2] Capitalized terms used, but not otherwise defined, herein shall have the same meanings given to them in the Motion.

the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      The Clerk of the Court is hereby authorized and directed to withdraw from the public docket the previously filed "Exhibit B" to the *Debtors' Memorandum in Support of its Motion In Limine to Limit the Expert Report and Testimony of Michael Henkin* [D.I. 6743] (the "Memorandum").

3.      The Clerk of the Court is hereby authorized and directed to substitute as "Exhibit B" to the Memorandum the Henkin Deposition Transcript Excerpts, which are collectively attached hereto as **Exhibit 1**.

4.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: November _____, 2015
       Wilmington, Delaware

                                         _____
                                         THE HONORABLE CHRISTOPHER S. SONTCHI
                                         UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1

Page 1

1          MICHAEL HENKIN
2  UNITED STATES BANKRUPTCY COURT
3  FOR THE DISTRICT OF DELAWARE
--------------------------------------------x
4  In Re:
5  Energy Future Holdings Corporation, et al.,
6           Debtors.
7  Chapter 11
8  Case No. 14-10979
9  Jointly Administered
10 --------------------------------------------x
11      DEPOSITION OF MICHAEL HENKIN
12         New York, New York
13          October 21, 2015
14
15
16
17
18
19
20
21
22
23  Reported by:
24  KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25  JOB NO. 99258

Page 2

1          MICHAEL HENKIN
2         October 21, 2015
3
4      Deposition of MICHAEL HENKIN, held
5  at Kirkland & Ellis, LLP, 601 Lexington
6  Avenue, New York, New York, before Kathy
7  S. Klepfer, a Registered Professional
8  Reporter, Registered Merit Reporter,
9  Certified Realtime Reporter, Certified
10  Livenote Reporter, and Notary Public of
11  the State of New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1          MICHAEL HENKIN
2          A P P E A R A N C E S:
3
4  SULLIVAN & CROMWELL
5  Attorneys for E-side Official Creditors
6      125 Broad Street
7      New York, New York  10004
8  BY:  JOHN HARDIMAN, ESQ.
9       NICHOLAS MENILLO, ESQ.
10
11  KIRKLAND & ELLIS
12  Attorneys for the Debtors
13      300 North LaSalle
14      Chicago, Illinois  60654
15  BY:  JEFFREY LULA, ESQ.
16       MARK McKANE, ESQ.
17
18  MUNGER TOLLES & OLSON
19  Attorneys for the TCH Debtors
20      355 South Grand Avenue
21      Los Angeles, California  90071
22  BY:  BRADLEY SCHNEIDER, ESQ.
23       KEVIN ALLRED, ESQ.
24       THOMAS WALPER, ESQ.
25       ALEX TEREPKA, ESQ.

Page 4

1          MICHAEL HENKIN
2
3      A P P E A R A N C E S:  (Cont'd.)
4
5  PAUL WEISS RIFKIND WHARTON & GARRISON
6  Attorneys for Ad Hoc Committee of TCEH First Lien
7  Creditors
8      1285 Avenue of the Americas
9      New York, New York  10019
10  BY:  KIMBERLY FRANCIS, ESQ.
11
12  NIXON PEABODY
13  Attorneys for American Stock Transfer as Indenture
14  Trustee at EFH
15      100 Summer Street
16      Boston, Massachusetts  02110
17  BY:  PAUL WILLIAMSON, ESQ.
18       RICHARD PEDONE, ESQ. (Telephonically)
19
20  AKIN GUMP STRAUSS HAUER & FELD
21  Attorneys for UMB Bank, As Indenture Trustee for the
22  Unsecured 11.25 Percent/12.25 Percent Senior Toggle
23  Notes Due 2018
24      One Bryant Park
         New York, New York  10036
25  BY:  RICHARD WILLIAMS, JR., ESQ.

1       MICHAEL HENKIN
2  transposed, which was an error.  It was just a
3  clerical error.
4       Q.  Were you being literal when you said
5  there was a typographical error?
6       A.  I'm being literal.
7       Q.  Like a spelling error?
8       A.  No, I think we said "the yields was"
9  instead of "the yields were."  There were two
10 instances of that.
11      Q.  I'm not going to judge a banker on
12 subject/verb agreement.
13      A.  These are changes that I would say are
14 immaterial to the conclusions.  And then, again,
15 footnote 63, I believe, is where the 3.5 and 8.5
16 years should be reversed.  They were transposed.
17      Q.  Got it.
18      A.  And so it should say 5.8, 2.6, 8.5 and
19 3.5, but other than that, I don't believe
20 there's any errors in the report.
21      Q.  Does the report reflect all of your
22 opinions that you are offering in this case?
23      A.  Yes.
24      Q.  And you provide a summary of those
25 opinions on paragraphs 11 through 16 of your

1       MICHAEL HENKIN
2  report?
3       A.  I do, with one exception:  The
4  reinstatement issues I think are still being
5  discussed.
6       Q.  You may issue a secondary report on
7  reinstatement?
8       A.  I don't know.
9       Q.  You haven't been asked to do so at
10 this time?
11      A.  I haven't been asked to do so at this
12 time.
13      Q.  In paragraph 8, you state that you
14 reserve the right to respond to the report or
15 testimony of any of the debtors' experts.
16          Do you see that?
17      A.  I'm sorry, paragraph 8?  Yes.  Yes, I
18 do.
19      Q.  Have you reviewed the expert reports
20 of the debtors, other than Mr. Mendelsohn's
21 report?
22      A.  I have reviewed the Ying Report and a
23 couple of the others.  I glanced through, the
24 Phil Singer.
25      Q.  Have you formed any opinions as

1       MICHAEL HENKIN
2  regards to the expert reports of the debtors
3  other than Mr. Mendelsohn?
4       A.  Opinions in the form of expert
5  opinions or --
6       Q.  Yes.
7       A.  No.
8       Q.  Have you been asked to form any
9  opinions?
10      A.  No.
11      Q.  Have you been asked to comment in any
12 way on those expert reports?
13      A.  To my own team?
14          MR. HARDIMAN:  I'm going to instruct
15 him not to answer with respect to the
16 reinstatement.
17      Q.  So let's table reinstatement.
18      A.  Setting aside reinstatement, we've had
19 a discussion as a team, including S&C, about the
20 reports, but I haven't offered any new opinions.
21      Q.  Have you prepared any analysis
22 regarding the reports?
23      A.  No.
24      Q.  Have you been asked to prepare a
25 rebuttal report?

1       MICHAEL HENKIN
2       A.  No.
3       Q.  Are you prepared to provide any
4  commentary, expert or otherwise, on the expert
5  reports or the analysis of the debtors contained
6  in those reports?
7          MR. HARDIMAN:  What do you mean,
8  prepared at the hearing?
9          MR. McKANE:  Yes.
10         MR. HARDIMAN:  Other than Mendelsohn?
11         THE WITNESS:  Other than Mendelsohn?
12 BY MR. McKANE:
13      Q.  Yes.
14      A.  I don't think so.
15      Q.  And are you prepared today to identify
16 any commentary, expert or otherwise, you have
17 with regards to the reports of the experts other
18 than Mendelsohn?
19      A.  We did find an error in the Ying
20 Report that we alerted the Phil Singer Team and
21 one of the K&E attorneys about a week ago.
22      Q.  And what is that error?
23      A.  He improperly weighted the
24 environmental case by one-third instead of 50
25 percent in his TCEH terminal year valuation in

1         MICHAEL HENKIN
2 his TCEH valuation report.
3    Q.   Was that addressed with Mr. Ying
4 during his deposition yesterday -- Monday?
5 Excuse me.
6    A.   I don't know if it was.  But again, we
7 did inform the debtors.
8         MR. HARDIMAN:  It goes to
9 reinstatement, so I don't believe it was.
10   Q.   And when was the last time you were
11 deposed?
12   A.   In October of last year.
13   Q.   And what was that case?
14   A.   Exide Technologies.
15   Q.   And the disclosure that you made in
16 your expert report regarding Exide, that
17 testimony was in the form of a deposition?
18   A.   It was both a deposition, a
19 declaration, and an in-court testimony.
20   Q.   And the testimony that was listed on
21 Halloween of last year, was that the trial
22 testimony?
23   A.   That was the trial testimony.
24   Q.   What was the topic?
25   A.   It was appropriateness of a DIP

1         MICHAEL HENKIN
2 deposition and the trial testimony?
3    A.   There is.
4         MR. McKANE:  I would request a copy.
5         MR. HARDIMAN:  We will take that under
6 advisement.
7         MR. McKANE:  Absolutely.
8 BY MR. McKANE:
9    Q.   Prior to your testimony in Exide, have
10 you previously testified in court or in the form
11 of deposition?
12   A.   Yes.
13   Q.   And when was that?
14   A.   The prior time before Exide in Federal
15 Bankruptcy Court would have been DBSD.
16   Q.   And what about other than Bankruptcy
17 Court?
18   A.   I provided a report in a tax dispute
19 with respect to Federal Mogul.  I don't know if
20 that would qualify as an expert opinion or not.
21   Q.   Were you deposed on it?
22   A.   No.
23   Q.   Have you ever had the scope of your
24 testimony limited by a court?
25   A.   Not to my knowledge.

1         MICHAEL HENKIN
2 financing process and the criticisms that I had
3 with respect to the debtors' managing of a
4 financing and M&A process in the case.
5    Q.   So you reviewed the process that the
6 debtors used in attempting to secure financing
7 and provided expert opinions as it relates to
8 whether it was appropriate?
9    A.   Correct.
10   Q.   Were you certified as an expert by the
11 court in that case?
12   A.   Yes, I believe so.
13   Q.   And what was the scope of the
14 certification?
15   A.   I think it was a general investment
16 banking expertise and expertise in financings,
17 and there may have been something related to
18 sale processes.  So there was a simultaneous
19 sale process as well, so it may have included
20 M&A.
21   Q.   It may have included M&A?
22   A.   It may have included M&A.  I don't
23 recall the exact language of the expert
24 certification.
25   Q.   So is there a transcript of both the

1         MICHAEL HENKIN
2    Q.   Page 51 of your report contains a copy
3 of your CV, correct?
4    A.   Yes.
5    Q.   Is it accurate?
6    A.   Yes.
7    Q.   Is there anything you need to update
8 regarding that report -- in your CV?
9    A.   No.
10   Q.   Do you have any training that's not
11 listed on this CV?
12   A.   No.
13   Q.   Any certifications you received that
14 are not listed on the CV?
15   A.   Not related to finance or investment
16 banking.
17   Q.   Any peer-reviewed publications?
18   A.   No.
19   Q.   Have you ever published at all in a
20 peer-reviewed setting?
21   A.   Not in a peer-reviewed setting, no.
22   Q.   And have you had any of your writings
23 accepted in a scholarly journal or publication?
24   A.   No.
25   Q.   In the documents you reviewed, you

| | |
|---|---|
| 1 | MICHAEL HENKIN |
| 2 | Q.   And you're not providing -- to use |
| 3 | your words, you're not providing a full |
| 4 | valuation analysis of TCEH, correct? |
| 5 | A.   That's correct. |
| 6 | Q.   And sir, you're not providing any |
| 7 | opinions regarding the sales process that the |
| 8 | debtors performed? |
| 9 | A.   No. |
| 10 | Q.   And sir, you're not opining on any |
| 11 | aspect of the bidding procedures or the auction |
| 12 | that was canceled, correct? |
| 13 | A.   That's correct. |
| 14 | Q.   So the merger agreement contemplates |
| 15 | certain regulatory approvals, and you note that |
| 16 | in your report? |
| 17 | A.   Correct. Yes. |
| 18 | Q.   But you're not providing any opinion |
| 19 | regarding whether the debtors and the proposed |
| 20 | buyers will achieve regulatory approval? |
| 21 | A.   Not with respect to any individual |
| 22 | component of the conditionality, which would |
| 23 | include the regulatory, correct. |
| 24 | Q.   Let's be more precise about that. |
| 25 | You're not providing an opinion regarding the |

| | |
|---|---|
| 1 | MICHAEL HENKIN |
| 2 | likelihood of receiving an acceptable PLR ruling |
| 3 | from the IRS, correct? |
| 4 | A.   That's correct. |
| 5 | Q.   You're not providing an opinion on |
| 6 | whether the debtors will receive an acceptable |
| 7 | change of control ruling from the Public Utility |
| 8 | Commission of Texas, correct? |
| 9 | A.   That's correct. |
| 10 | Q.   And you're not providing an opinion on |
| 11 | whether the debtors will achieve an acceptable |
| 12 | ruling approving the chain of control from the |
| 13 | Nuclear Regulatory Commission, correct? |
| 14 | A.   Correct. |
| 15 | Q.   And you're not providing an opinion |
| 16 | about whether the debtors will achieve an |
| 17 | acceptable regulatory approval from any |
| 18 | regulator that governs any of the debtors, |
| 19 | correct? |
| 20 | A.   That's correct. |
| 21 | Q.   And sir, what formal training do you |
| 22 | have regarding tax? |
| 23 | A.   I don't have any formal tax training. |
| 24 | Q.   Have you ever been accepted by a court |
| 25 | as an expert in tax? |

| | |
|---|---|
| 1 | MICHAEL HENKIN |
| 2 | A.   No. |
| 3 | Q.   Sir, do you consider yourself an |
| 4 | expert in the energy industry? |
| 5 | A.   No. |
| 6 | Q.   Do you consider yourself an expert on |
| 7 | the ability to forecast natural gas prices in |
| 8 | the future? |
| 9 | A.   No. |
| 10 | Q.   And do you consider yourself an expert |
| 11 | on the ability to forecast power prices in the |
| 12 | future? |
| 13 | A.   No. |
| 14 | Q.   And have you ever evaluated the |
| 15 | fundamental factors that go into projecting |
| 16 | prices for power in the ERCOT market? |
| 17 | MR. HARDIMAN: Object to the form. |
| 18 | A.   I have reviewed a lot of documents |
| 19 | that the debtors have generated with respect to |
| 20 | the forecasts, but your question was have I |
| 21 | looked at the underlying factors that go |
| 22 | underneath the forecasts, and I'm generally |
| 23 | aware what they are, but I haven't done an |
| 24 | analysis of that in this case. |
| 25 | Q.   And there are separate energy industry |

| | |
|---|---|
| 1 | MICHAEL HENKIN |
| 2 | bankers at Guggenheim that the committee relies |
| 3 | on to provide them expert opinions regarding |
| 4 | those issues? |
| 5 | A.   We do have a separate energy team. I |
| 6 | don't know if they have ever provided a formal |
| 7 | expert opinion to the committee, but they do |
| 8 | advise the committee and our clients on |
| 9 | industry-related issues. |
| 10 | Q.   And that separate energy team provides |
| 11 | advisory services to the committee regarding the |
| 12 | energy issues specific to this case, correct? |
| 13 | A.   Yes, in connection with my team as |
| 14 | well. We work together. |
| 15 | Q.   And did you rely on them in any way in |
| 16 | forming the opinions that are contained in your |
| 17 | expert report? |
| 18 | A.   Not in this report, no. |
| 19 | Q.   Let's talk about the opinions |
| 20 | contained in your report. |
| 21 | A.   Actually, I want to amend that answer. |
| 22 | I did rely on my energy team to help |
| 23 | put together the analysis of the utility M&A |
| 24 | transactions that are contained in Opinion 1. |
| 25 | Q.   They helped to identify those |

1          MICHAEL HENKIN
2 transactions?
3    A.   They helped to identify those
4 transactions and helped to pull some of the
5 information with respect to those, those deals.
6    Q.   So you relied on members of your
7 energy team to review the merger agreements that
8 are contained in Exhibit 2 of your expert
9 report?
10   A.   Actually, my team reviewed the merger
11 agreements.  Their team did a screening to
12 identify the last five years' billion and above
13 M&A transactions in the power and energy sector,
14 and then we took over the responsibility of
15 reviewing the -- my team, my restructuring team,
16 of reviewing the actual agreements.
17       MR. HARDIMAN:  Mr. Henkin, make sure
18   you let Mr. McKane finish his question
19   before you begin to answer.  I'm sure he'll
20   give you the same courtesy.
21 BY MR. McKANE:
22   Q.   The energy team helped cull the set
23 and then your team reviewed the merger
24 agreements themselves; is that fair?
25   A.   Yes.

1          MICHAEL HENKIN
2    Q.   Now, the merger agreement does not
3 contain a specific performance remedy; is that
4 correct?
5    A.   The merger agreement for?
6    Q.   So the merger agreement that is part
7 of the overall plan of reorganization that's
8 proposed for these debtors does not contain a
9 specific performance remedy, correct?
10   A.   In favor of the sellers, that is
11 correct.
12   Q.   In favor of the sellers.
13       What specific performance remedies
14 exist in the merger agreement and related
15 documents?
16   A.   I believe there are specific
17 performance provisions provided in favor of the
18 buyers or the purchasers but that there's a
19 specific clause that's referenced in my report,
20 I think it's paragraph 29, that disclaims any
21 specific performance obligations on behalf of
22 the sellers against the -- against the
23 purchasers.
24       MR. HARDIMAN:  Again, Mr. McKane, if
25   you would let him finish, too.

1          MICHAEL HENKIN
2       MR. McKANE:  My apologies.
3       MR. HARDIMAN:  I have already asked
4   the witness.
5    Q.   Against whom does the buyer have the
6 specific performance remedies?
7    A.   I believe they have them against the
8 seller, or the sellers, in this case.
9    Q.   And you believe that the fact that the
10 seller does not have a specific performance
11 remedy contradicts customary practice?
12   A.   For transactions of this type, yes.
13   Q.   And specifically for transactions of
14 this type, what type of transaction are you
15 referring to?
16   A.   I'm referring to large -- and that can
17 be defined as either above $500 million in value
18 or above a billion -- there's a couple different
19 screens -- some use the 500 and some use the
20 billion -- merger and acquisition transactions
21 within the last five years.
22   Q.   And that's the universe against which
23 you are comparing this transaction, correct?
24   A.   Yes.
25   Q.   Now, in paragraph 40, you say that,

1          MICHAEL HENKIN
2 typically, M&A agreements contain specific
3 performance provisions, correct?
4    A.   Yes.
5    Q.   And as your source for that statement,
6 you cite footnote 24, correct?
7    A.   Yes.
8    Q.   And footnote 24 is a Law Review
9 article from the Vanderbilt Law Review, correct?
10   A.   Yes.
11   Q.   And that Law Review article cites a
12 2008 study of large strategic acquisitions,
13 correct?
14   A.   Yes.
15   Q.   The universe that was the source of
16 that Law Review article were strategic
17 acquisitions, correct?
18   A.   I think so, yes.
19   Q.   What is a strategic acquisition?
20   A.   Generally, that is a transaction where
21 a corporation is purchasing a business rather
22 than a financial buyer.  So it's a company
23 that's usually in the same industry or related
24 industry.
25   Q.   So a strategic acquisition is when a

MICHAEL HENKIN

2 Q. And you would agree this is not a
3 strategic acquisition?
4 A. I wouldn't categorize it as a
5 strategic acquisition, no.
6 Q. Now, on page 20 of your report,
7 Exhibit 4, you have a series of pie charts,
8 correct?
9 A. Yes.
10 Q. And this comes from the April 2015
11 publication by Schulte Roth, correct?
12 A. Yes.
13 Q. And in fact, the pie chart on the
14 left-hand side under the labeling Specific
15 Performance Clauses is an extraction directly
16 out of that report, right?
17 A. Yes.
18 Q. This is not your work product?
19 A. No, we just reformatted the charts to
20 highlight 2 percent instead of the other types
21 of specific performance.
22 Q. And Schulte Roth drew a distinction
23 between full specific performance and limited
24 specific performance, do you see that?
25 A. I do.

MICHAEL HENKIN

2 Q. What's the difference?
3 A. I believe that the limited specific
4 performance had various limitations, as the name
5 would imply, where there were only certain
6 circumstances by which limited -- the specific
7 performance was available.
8 Q. Can you give me an example of a
9 limited specific performance provision?
10 A. That would be an example where only
11 under certain types of breaches could specific
12 performance be pursued and that others -- other
13 types of breaches would not have that remedy
14 available.
15 Q. And sir, you and your team performed
16 no analysis to differentiate between which
17 transactions contained full specific performance
18 provisions and those that provided limited
19 specific performance provisions?
20 A. No.
21 Q. You relied solely on the work by
22 Schulte Roth?
23 A. For this part of it, yes.
24 Q. And you had no visibility into how
25 they drew that distinction?

MICHAEL HENKIN

2 A. I did read the report, and I recall
3 that there were some description of the types of
4 circumstances that might arise. I also looked
5 at the specific performance for the acquisition
6 of the predecessor of EFH, TXU, and that was a
7 limited specific performance remedy, as I
8 recall.
9 Q. One example in which a limited
10 specific performance provision would not apply
11 is if the closing conditions are not met, right?
12 A. I think that's right.
13 Q. And another example where a limited
14 specific performance provision would not apply
15 is if the debt financing did not materialize?
16 MR. HARDIMAN: Object again to the
17 extent it's calling for a legal conclusion.
18 You can answer.
19 A. I don't recall if financing was carved
20 out of limited or not. It might have been.
21 Q. And your analysis doesn't different --
22 other than acknowledging the distinction drawn
23 by Schulte Roth, your analysis doesn't
24 distinguish between the two variations of
25 specific performance, right?

MICHAEL HENKIN

2 A. The analysis that we did on Exhibits 2
3 and 3 does not, correct.
4 Q. Let's look at Exhibit 2.
5 A. Okay.
6 Q. These are power and utility industry
7 M&A transactions, correct?
8 A. That's correct.
9 Q. None of these companies are in
10 bankruptcy, correct?
11 A. I don't think so.
12 Q. And you familiarized yourself with all
13 of these transactions to prepare this exhibit,
14 correct?
15 A. My team reviewed all of these merger
16 agreements. I'm familiar with the list, but I
17 couldn't give you details about each
18 transaction. It was a large universe.
19 Q. Isn't it all but two of them are
20 strategic transactions?
21 A. That may be true. I haven't done the
22 distinction between the strategic and the
23 financials for this analysis.
24 Q. You can't, looking at them, you can't
25 tell me which ones are strategic and which ones

Page 121

1          MICHAEL HENKIN
2  approvals, correct?
3          MR. HARDIMAN:  Object to form.
4      A.  I would need to check the agreements,
5  but that would sound reasonable.
6      Q.  And you would expect that to be true
7  for any remedy; that the seller would attempt to
8  assert regarding the buyer's obligation to close
9  regarding the need for the seller to obtain
10  regulatory approval, correct?
11         MR. HARDIMAN:  Object again.  I think
12  it calls for a legal conclusion, but you can
13  answer.
14     A.  That's what I would expect.
15     Q.  And Exhibit 3 provides an analysis of
16  restructuring transactions in the last few
17  years, correct?
18     A.  Yes, the last five years.
19     Q.  Did you evaluate which of those
20  transactions contained fiduciary outs and which
21  ones did not?
22     A.  Again, that wasn't one of the criteria
23  that we looked for, although I would expect that
24  many of them, if not most of them, would have a
25  fiduciary out.

Page 122

1          MICHAEL HENKIN
2      Q.  This concept of asymmetrical risk in a
3  merger transaction, would you think --
4          Let me step back.  You've been a
5  restructuring professional for how long?
6      A.  Twenty years.
7      Q.  How many transactions have you worked
8  on negotiating plans of reorganizations or sales
9  and mergers in the restructuring context?
10     A.  Over ten.
11     Q.  And in your experience, not just on
12  the deals you have worked on, but you have been
13  able to consult and inform yourself as to the
14  market trends in restructuring industry
15  regarding plans of reorganization, sales
16  agreements and merger agreements?
17         MR. HARDIMAN:  Object to the form.
18     A.  Yes.
19     Q.  Sir, based on all of your experience,
20  do you think it is difficult for a seller, who
21  is a debtor in a Chapter 11 reorganization, to
22  maintain a full fiduciary out for its protection
23  while at the same time attempting to get
24  specific performance from a buyer?
25     A.  I think it depends on the

Page 123

1          MICHAEL HENKIN
2  circumstances and the -- the specific
3  transaction.
4      Q.  Would you expect that to be an
5  imbalance of risk allocation between the seller
6  and the buyer to the extent that the seller in a
7  Chapter 11 restructuring is attempting to
8  maintain a full fiduciary out, while insisting
9  that the buyer commits a specific performance?
10     A.  Not necessarily, because I think it's
11  generally accepted that debtors in Chapter 11
12  need to preserve a fiduciary out because of the
13  court-overseeing nature of the process, and
14  buyers typically acknowledge that and may sign
15  up for specific performance obligations
16  notwithstanding the fiduciary out rights and
17  often negotiate a break fee or some other
18  protections to give them a compensation if that
19  happens.
20     Q.  Right.  So, to evaluate the
21  transaction, you have to look beyond just the
22  remedies available to the seller and look at all
23  of the terms of the transaction; do you agree
24  with that?
25     A.  To evaluate an entire transaction, you

Page 124

1          MICHAEL HENKIN
2  would want to look at all the terms, but the
3  purpose of this was to focus in on remedies as
4  the one, you know, missing element of the
5  transaction to try to understand what remedies
6  were available.
7      Q.  Right.  You're only providing an
8  opinion as to the one term in the merger
9  agreements, the remedies available to the seller
10  under certain conditions, correct?
11     A.  The opinion relates to the remedies,
12  yes.
13     Q.  You look to solely the remedies
14  available in the merger agreement, not other
15  benefits that the seller obtains that are
16  outside the merger agreement, correct?
17         MR. HARDIMAN:  Object to the form.
18  You're asking him whether his opinion goes
19  to whether there were other benefits
20  obtained?
21     Q.  You can answer.
22         MR. HARDIMAN:  Is that the question?
23     A.  We focused on the remedies in the
24  merger agreement, although I wasn't aware of any
25  other remedies that existed beyond the merger

Page 129

1              MICHAEL HENKIN
2     Q.    And the only club deals are the
3  Chatham Lodging acquisition of Inkeepers, right?
4  That was a Cerberus deal?
5     A.    I believe so, yes.
6     Q.    And the only other club deals were the
7  Fairholme Capital acquisition of GGP; that was a
8  club deal?
9     A.    I don't recall.
10    Q.    And do you know whether the CP ESH
11 Investors' acquisition of Extended Stay was a
12 club deal?
13    A.    I believe it was, yes.
14    Q.    In evaluating the financial
15 transactions, you identified specific
16 performance as not being obtained in the MSR
17 acquisition, correct?
18    A.    Yes.
19    Q.    And in the Inkeepers acquisition --
20    A.    Yes.
21    Q.    -- did you evaluate the whole period
22 for these restructuring transactions?
23    A.    You mean in the five years?
24    Q.    No, the period of time between the
25 announcement of the deal and the closing of the

Page 130

1              MICHAEL HENKIN
2  deal?
3     A.    We used the deals that had closed, so
4  my team tried to find the final documentation.
5  Many of these evolved through multiple rounds of
6  documents, and so we tried to get to the last
7  and final documentation in each of the cases.
8     Q.    What is the potential -- let me ask
9  you this: The ability of a buyer -- step back.
10         The willingness of a buyer to agree to
11 specific performance is -- you've evaluated that
12 in your experience, right?  You've had to
13 negotiate for specific performance in your
14 career, right?
15    A.    Yes.  As part of an overall deal, yes.
16    Q.    In your experience, is a buyer -- is
17 the duration of time between the commitment to
18 buy and the closing of the deal, that period of
19 time, a factor in the buyer's willingness to
20 commit to specific performance?
21    A.    I don't know if it -- if it's a factor
22 limited to specific performance.  It's certainly
23 a factor that a buyer will take into account as
24 far as the duration of their commitment, and it
25 will affect their willingness to sign up for

Page 131

1              MICHAEL HENKIN
2  multiple obligations.  But I don't know if
3  there's anything unique about specific
4  performance as far as the length of time the
5  deal might take to close.
6     Q.    So it's fair to say that the duration
7  of time that a transaction may take to close is
8  a factor in the buyer's willingness to commit to
9  certain provisions, including, potentially,
10 certain remedies?
11    A.    Yes.
12         MR. HARDIMAN:  Object to the form.
13    A.    Yes.
14    Q.    And sometimes that, you know, that
15 notion of the time, the duration of time between
16 announcing the deal and closing the deal, do you
17 understand what I'm referring to if I refer to
18 that as the "hold period"?
19    A.    Yes.
20    Q.    Because the buyer at that point has
21 announced a deal, they're out, they're exposed,
22 they have committed to the obligation, and then
23 they have to face whatever consequences can be
24 imposed upon them based on those remedies,
25 correct?

Page 132

1              MICHAEL HENKIN
2     A.    Correct.
3     Q.    And what is the potential hold period
4  between the announcement of this transaction and
5  the merger agreement and the outermost date in
6  which this transaction can close?
7     A.    I think it's about a year.
8     Q.    Well, it was announced on August 9,
9  correct?
10    A.    Correct.
11    Q.    And through extensions, it can close
12 November 1 of 2016, correct?
13    A.    That's my understanding, although I
14 know the debtors said that August 31 was the
15 outside date.  So there may be a difference in
16 between August 31 and November that we tried to
17 identify how to reconcile that, and we cite
18 November in our report.
19    Q.    Exactly right.  So let's just be
20 precise about that for the transcript.
21         Your report cites November 1 --
22    A.    Correct.
23    Q.    -- as the outer point in time, and the
24 debtors contend that it's August 31, right?
25    A.    Correct.

1          MICHAEL HENKIN
2 because of the disputed claims change.
3     Q.   And it's possible that the debtors can
4 emerge by March 31 if the plan is confirmed and
5 the regulatory approvals are obtained by then,
6 correct?
7     A.   I think it is theoretically possible
8 that they could emerge earlier, although I think
9 it's unlikely.
10    Q.   And you base that based on your
11 experience in obtaining regulatory approvals?
12    A.   Based on my review of the PUCT setting
13 some hearings the end of March and the knowledge
14 that there's going to be a series of steps even
15 after the regulatory approval is obtained to
16 actually emerge and get an emergence from
17 bankruptcy.
18    Q.   But with the 3/31 emergence date
19 assumption, you have no reason to believe that
20 the calculation of the implied enterprise value
21 is different than what the debtors presented to
22 their boards, correct?
23    A.   Correct.
24    Q.   And you said in reaching your opinions
25 contained in your expert report that you

1          MICHAEL HENKIN
2 evaluated the August 9 presentation to the
3 boards of directors?
4     A.   I did.
5     Q.   And in that August 9 presentation, the
6 debtors described the boards' consideration as
7 an essential tradeoff between the conditionality
8 of the merger agreement and the benefits to the
9 estate provided by the merger transaction,
10 correct?
11        MR. HARDIMAN:  Objection to form.
12    A.   I recall disarmament being used as the
13 benefits, but yes, I think that's the gist of
14 their presentation, the conditionality and risks
15 associated with the deal and the potential
16 benefits that the estate might have by virtue of
17 disarmament.
18    Q.   Well, and you have no opinion as to
19 whether that was appropriate or inappropriate
20 evaluation of the debtors to consider about the
21 benefits of the transaction versus the risks
22 associated with it?
23        MR. HARDIMAN:  Object to the form.
24    A.   I think, generally, that's a
25 reasonable way to analyze a transaction, but I

1          MICHAEL HENKIN
2 wasn't opining on the business judgment of the
3 board or anything of that nature.
4        MR. McKANE:  Let's mark this as Henkin
5 8.
6        (Henkin Exhibit 8, Presentation to the
7 Boards of Directors and Managers of Energy
8 Future Holdings Corp., Energy Future
9 Competitive Holdings Company LLC, Texas
10 Competitive Electric Holdings Company LLC,
11 TCEH Finance, Inc., Energy Future
12 Intermediate Holding Company LLC, and EFIH
13 Finance Inc., Approval of Amended Plan and
14 Merger Transaction Documents dated August 9,
15 2015, marked for identification, as of this
16 date.)
17 BY MR. McKANE:
18    Q.   Do you have Henkin 8 in front of you?
19    A.   I do.
20    Q.   For the record, Henkin 8 is a
21 presentation to the boards of directors of EFH
22 and its subsidiaries entitled Approval of
23 Amended Plan and Merger Transaction Documents.
24 Do you see that?
25    A.   Yes.

1          MICHAEL HENKIN
2     Q.   Sir, this is the presentation you
3 reviewed in forming your opinions?
4     A.   Yes.  One of the presentations I
5 reviewed, yes.
6     Q.   And let's go to the Recommendations
7 page, Bates number ending in 935.
8     A.   Okay.
9     Q.   The board of directors basically
10 evaluated the risks and benefits associated with
11 the merger transaction, do you agree with that?
12    A.   Yes.
13        MR. HARDIMAN:  Do you agree with what,
14 that that's what the document says?
15    Q.   Do you agree that that's what they
16 did?
17        MR. HARDIMAN:  How does he know what
18 they did?
19    A.   I agree that's what is contained in
20 this document that was presented to the board.
21    Q.   And you have no reason to believe that
22 the board considered anything else or did
23 anything different, right?
24    A.   I don't know.  I wasn't there.
25    Q.   So, in evaluating the transaction, all

1        MICHAEL HENKIN
2   asked about.
3        MR. McKANE:  It's very little that you
4   do not have.
5        MR. HARDIMAN:  But that was an
6   issue -- remember I asked that at the
7   depositions of certain people on your side,
8   and I asked --
9        MR. McKANE:  Do you really want to do
10  this on the record?
11       MR. HARDIMAN:  No, I don't.
12       (Discussion off the record.)
13       MR. McKANE:  On the record, I'm very
14  confident you have it, and in fact, it was
15  filed.  It's Docket No. 5248.
16       MR. HARDIMAN:  I accept your
17  representation.
18  BY MR. McKANE:
19   Q.   You just described the merger as akin
20  to an option, right?
21   A.   Yes.
22   Q.   What does "akin" mean?
23   A.   It means it is similar to or
24  structured in a manner that resembles an option.
25   Q.   What type of option?

1        MICHAEL HENKIN
2   A.   A real option.
3   Q.   And what does a "real option" mean?
4   A.   A real option is an analogy between
5   buying a company or buying a business or a
6   real-world transaction and an options contract
7   that is a contract to purchase a security that
8   we typically think of when we think of options
9   contracts.
10       So real options expands the concept of
11  an option to apply to real-world transactions,
12  and I think I cited a footnote and a definition
13  in the footnote in my report that this
14  acquisition agreement is akin to an option, but
15  it's more like a real option because it's an
16  agreement to buy a company.
17   Q.   All right.  So your analogy is not to
18  an option in the securities world, but to the
19  concept and the expansion of the idea of an
20  option to real-world scenarios beyond the
21  securities world; is that a fair statement?
22   A.   Yes.  Although you can still look at a
23  security and find parallels, the most similar
24  and analogous type of option is a real option.
25   Q.   When you say "the most similar and

1        MICHAEL HENKIN
2   analogous type of option is a real option," the
3   most similar and analogous to what?
4   A.   To the merger and purchase agreement.
5   Q.   All right.  So you're evaluating this
6   merger and purchase agreement to this definition
7   of a real option?
8   A.   Correct.
9   Q.   And where is this definition
10  contained?
11   A.   There are several academics that have
12  published papers around real options.  There's a
13  footnote in my report that I could find for you
14  that actually contains the definition.
15   Q.   Please do.
16       Is it page 21, paragraph 33?
17       MR. RUEGGER:  Footnote.
18   Q.   Sorry.  Page 21, footnote 33?
19   A.   Yes, it may be.  I think maybe the
20  definition is in the actual paragraph.  Let's
21  see.
22       It may be on footnote -- maybe in the
23  next paragraph.  Let's take a look.
24   Q.   Just let me know when you find the
25  definition of "real option" that's contained in

1        MICHAEL HENKIN
2   your expert report.
3   A.   It's footnote 36 on page 22.
4   Q.   Footnote 36 states, "A corporate
5   investment opportunity is like a call option
6   when it provides the right (but not the
7   obligation) to acquire, (buy or build or expand)
8   something, such as a business or asset."
9   A.   Correct, and that is a "real option"
10  definition right there in footnote 36.  It
11  references an article or a paper from Harvard
12  Business Review called "Real-World Way to Manage
13  Real Options."
14   Q.   In an option, the purchasers have the
15  exclusive right to acquire the asset, correct?
16   A.   There are non-exclusive options, but
17  generally when you're talking about options,
18  it's an exclusive right, correct.
19   Q.   And in fact, in paragraph 50, you
20  specifically state "the purchasers with a 'real'
21  option...have the exclusive right, but not the
22  obligation, to invest in the approved
23  transaction," right?
24   A.   That's correct.
25   Q.   And that's what you're relying on in

Page 173

1              MICHAEL HENKIN
2  terms of your definition of "real option,"
3  correct?
4      A.   Yes.
5      Q.   And you would agree with me that in an
6  option, a real option, the seller is obligated
7  to sell the asset?
8      A.   In a real option, again, there could
9  be other aspects to an investment opportunity,
10  such as a fiduciary out or other things, that
11  could impose some conditions or issues that
12  aren't hundred percent certainty that you have
13  the right to buy it.
14      Q.   So let's step back a second.  In the
15  security world, when you create an option, the
16  acquirer of the option owns the right and the
17  seller can't recall that right without buying
18  back the option, correct?
19      A.   That's generally the case, yes.
20      Q.   And in this expansion of the idea of
21  an option to this concept of a real option that
22  you're relying on --
23      A.   Yes.
24      Q.   -- you have tried to provide for the
25  ability to acquire the option but add the

Page 174

1              MICHAEL HENKIN
2  additional complexity of acquiring something
3  like a corporation as opposed to an underlying
4  security, correct?
5      A.   Yes.
6      Q.   And so when you say it's akin to it,
7  it's because the complexity and -- let me state
8  it again.
9          So when you say in your opinion that
10  this transaction is akin to a real-world option,
11  it's an attempt to incorporate the complexity
12  associated with this M&A transaction?
13      A.   That is correct.
14      Q.   And one of the complexities associated
15  with this M&A transaction is the debtors'
16  ability to exercise a fiduciary out to walk away
17  from the transaction at any time?
18      A.   That is correct.
19      Q.   And the debtors' ability to exercise
20  that fiduciary out is their ability to go get
21  higher and greater value for all of the debtors
22  and their creditors, right?
23      A.   Well, there are some limitations on
24  the fiduciary out in the alternative
25  structuring, as defined in the agreement, but

Page 175

1              MICHAEL HENKIN
2  yes, there are scenarios where the debtor could
3  extract itself from the merger and purchase
4  agreement.
5      Q.   But you agree with me that in the
6  definition of "option," as it relates to the
7  securities world, at least where this concept
8  started, the seller can't walk away from the
9  option if it sees a better opportunity?
10          MR. HARDIMAN:  Objection to form.
11      A.   That's generally the case, yes.
12      Q.   And even in the real-world option or
13  the real option expansion that you are relying
14  on, the real-world option provides an exclusive
15  right to the purchaser?
16      A.   Again, I think real-world options
17  could be non-exclusive as well.  We referenced
18  "exclusive" because the PSA basically gives the
19  purchasers the exclusive right to pursue this
20  acquisition for some period of time, subject to
21  all the terms and conditions that are contained
22  in those agreements.
23      Q.   Can you identify for me a real-world
24  option with a non-inclusive right that you have
25  experienced in your profession?

Page 176

1              MICHAEL HENKIN
2      A.   It's very rare to have a non-exclusive
3  option because it doesn't have that much value.
4  Other people can buy the same asset at the same
5  time.  You have to basically exercise it quickly
6  enough to get the asset.
7      Q.   Right.  So sitting here today, based
8  on your experience as an investment banker, you
9  can't identify a non-inclusive real-world option
10  because exactly for that reason:  There's
11  little, if any, value to a non-exclusive real
12  option?
13          MR. HARDIMAN:  Object to the form.
14          Maybe you want to break that question
15  down.
16      A.   I would need to think about examples
17  of non-exclusive real-world options, but I agree
18  with the premise that there's little value to a
19  non-exclusive option.
20      Q.   And sitting here today, you can't
21  identify a real-world non-exclusive option?
22      A.   I would need to think more about it,
23  but no.
24          (Recess; Time Noted:  11:22 a.m.)
25          (Time Noted:  11:34 a.m.)

Page 177

MICHAEL HENKIN

2 BY MR. McKANE:
3    Q.    Mr. Henkin, I apologize, I've got to
4 double-back on Exhibit 3.
5    A.    Okay.
6    Q.    That's your presentation of
7 restructuring transactions.
8    A.    Yes.
9    Q.    Are you there, sir?
10   A.    I am there.
11   Q.    When you and your team evaluated these
12 restructuring transactions, you did not
13 distinguish between full specific performance
14 provisions and limited specific performance
15 provisions, correct?
16   A.    That's correct.
17   Q.    And in evaluating these restructuring
18 transactions, you and your team did not evaluate
19 whether these restructuring transactions also
20 contained a full fiduciary out for the debtor?
21   A.    That wasn't part of the analysis, no.
22   Q.    Sir, with regards to the pending
23 merger agreement, if all else remained the same
24 and that merger agreement contained a reverse
25 termination fee, would that reverse -- would

Page 178

MICHAEL HENKIN

2 that merger agreement be consistent with large
3 bankruptcy sales to financial buyers?
4    A.    That would be the sole remedy?
5    Q.    That would be the sole remedy.
6    A.    Would it be consistent with all the
7 deals that we have analyzed here?
8    Q.    No, my question is -- if the merger
9 agreement -- I'll use the NextEra bid.
10        You said the NextEra reverse
11 termination fee was approximately 150 to 200
12 million dollars; something in that range?
13        MR. HARDIMAN:  I actually don't think
14 he ever accepted that.
15        MR. McKANE:  I thought that he did.
16   A.    I think I said it was around $200
17 million.
18   Q.    Around $200 million.  I'm going to use
19 your number.
20        So, assuming the merger agreement is
21 exactly the same but it contained a reverse
22 termination fee of $200 million --
23   A.    Okay.
24   Q.    -- available to the seller, with that
25 one change, would the merger agreement be

Page 179

MICHAEL HENKIN

2 consistent with large bankruptcy sale
3 transactions to financial buyers?
4    A.    It would be more consistent, although
5 I note that specific performance is in almost
6 all of these cases as well.  So it would still
7 have this lack of specific performance element
8 to it, but it would be more consistent.
9    Q.    And specifically with regards to the
10 lack of specific performance, if you evaluate
11 just the financial transactions, half of them
12 don't have specific performance?
13   A.    Okay.  I'll take your word for it
14 based on the categorization that we did earlier.
15   Q.    Right.  So specific performance is
16 less likely to be available to a seller to a
17 financial buyer than, based on your analysis,
18 than it would be against a strategic buyer?
19        MR. HARDIMAN:  Object to the form.
20   A.    Because the only two that don't have
21 specific performance are financial buyers in
22 these analyses, yes.
23   Q.    And in both of those circumstances,
24 you don't even evaluate against the party
25 against whom you can assert that specific

Page 180

MICHAEL HENKIN

2 performance, right?
3    A.    That's correct, we didn't.
4    Q.    And so even when there was specific
5 performance, there may be marginal value to that
6 specific performance because it's against the
7 shell entity?
8        MR. HARDIMAN:  Objection to the form.
9 I think it calls for a legal conclusion.
10   A.    To the extent that there is an
11 inability to collect on the specific
12 performance, it may have less value, but I would
13 need to look at the agreements to make an
14 opinion on it.
15   Q.    And sir, is it your understanding that
16 the debtors chose the value of disarmament and
17 drag over the value of a $200 million reverse
18 termination fee?
19   A.    I understand the debtors valued
20 disarmament significantly more than having a lot
21 of these protections; not simply those two, but
22 others as well, yes.
23   Q.    And what were those other protections?
24   A.    The various forms of damages that
25 we're talking about here.  Not only the reverse

MICHAEL HENKIN

1 MICHAEL HENKIN
2 the event that they were called upon to forfeit
3 it or they breached the agreement later.
4    Q.   Right. So it only arises in the
5 circumstance in which they don't close and the
6 other conditions are met?
7    A.   In the case of some of those remedies,
8 yes.
9    Q.   So let's do it -- let's break it down
10 one-by-one.
11       So the remedy for a reverse
12 termination fee would only arise if the buyers
13 don't close and the conditions to enforce that
14 remedy are met, correct?
15    A.   That's correct.
16    Q.   And a remedy of liquidated damages
17 would only arise in the buyers don't close and
18 the conditions necessary to enforce that remedy
19 are met, correct?
20    A.   Yes, that's correct, although I will
21 point out the circumstances by which those fees
22 are payable in these other transactions are
23 generally not controllable by the buyer as far
24 as -- the buyer can control whether they close
25 or not, but in this case, there's a fee that's

1 MICHAEL HENKIN
2 payable to the buyers and the buyers choose not
3 to close. So if we're talking about the 550
4 payment --
5    Q.   I'm not at the 550 payment yet. None
6 of my questions have anything to do with the
7 550.
8       MR. HARDIMAN: Are you finished answer
9 the question?
10       THE WITNESS: I wasn't because I was
11 going to go to the 550 as one of the
12 elements of the settlement agreement.
13       MR. HARDIMAN: Go ahead.
14       THE WITNESS: Which is you're talking
15 about the consideration that was provided as
16 part of the settlement agreement. The
17 consideration that goes in favor of the
18 purchasers or a subset of the purchasers,
19 which are the ones that are creditors that
20 are receiving the 550, they, as buyers, have
21 the right to say we're not going to close
22 and we're going to receive this payment.
23       Whereas, in a typical merger
24 agreement, if you had a reverse -- a break
25 fee, for instance, not a reverse break fee,

1 MICHAEL HENKIN
2 you wouldn't have the buyer being able to
3 trigger the break fee by saying, I'm not
4 going to close, pay me a break fee. So, in
5 that respect, there is a difference between
6 how you're describing these other merger
7 agreements and how you're describing this
8 merger and purchase agreement.
9 BY MR. McKANE:
10    Q.   So let's be precise. I'm asking you
11 about the remedies and liquidated damages -- not
12 in this transaction, right, because there are no
13 remedies or liquidated damages.
14    A.   Right.
15    Q.   I'm talking about, generally, when
16 those actually arise, and are they, you know,
17 are they committed to at the time of the merger
18 agreement. Right? They're committed to at that
19 time. The debtors -- strike that.
20       The buyer signs onto the obligation to
21 pay liquidated damages or a reverse termination
22 fee or forfeit the deposit at the time of entry
23 of the agreement, correct?
24    A.   That is correct.
25    Q.   And to the extent that they elect not

1 MICHAEL HENKIN
2 to close because they do not believe that
3 closing is in their economic interest, they
4 control whether they're going to have to pay any
5 one of those potential remedies, correct?
6    A.   That's generally true, yes.
7    Q.   Now, in your opinion you note that, in
8 an alternative restructuring, the junior
9 creditors of TCEH would receive a payment of
10 $550 million, right?
11    A.   Yes.
12    Q.   Now, that is true -- that is one piece
13 of the settlement consideration, correct?
14    A.   Yes.
15    Q.   There are other pieces of the
16 settlement consideration as well, correct?
17    A.   Yes.
18    Q.   And you did not account for those in
19 Opinion 3 of your report; is that right?
20    A.   Those other elements are non-financial
21 elements, such as the drag right. So we
22 incorporate here the financial calculus that a
23 purchaser is going to make to determine whether
24 it's in their interests to close or not.
25    Q.   So opinion 3 is limited to the

1          MICHAEL HENKIN
2 financial elements only of the alternative
3 restructuring?
4     A.   Yes.
5     Q.   And when you referred to disarmament
6 and drag as non-financial elements, are you
7 suggesting that they cannot be converted to
8 dollars?
9     A.   It's very difficult to convert the
10 concept of the drag right to a dollar value.
11    Q.   You couldn't determine the cost of
12 maintaining these cases for a month?  Isn't
13 there a burn rate just for the existence of the
14 EFH bankruptcy that is quantifiable?
15    A.   Yes.
16    Q.   And that would be, to the extent that
17 drag right would accelerate the final conclusion
18 of these cases, you could quantify that based on
19 the burn rate, correct?
20    A.   If you could draw a direct correlation
21 between an extension of the case or a shortening
22 of the case and having the drag right, yes.
23    Q.   Isn't it true in an alternative
24 restructuring the buyers, including the TCEH
25 junior creditors, are committed to a

1          MICHAEL HENKIN
2 file-to-trial time period of 90 days?
3     A.   Yes.
4     Q.   Is a 90-day time period between filing
5 a plan of reorganization and obtaining an order
6 confirming that plan of reorganization in a case
7 like EFH an extraordinarily short period of
8 time?
9          MR. HARDIMAN:  Object to the form.
10    A.   I wouldn't say extraordinarily because
11 of the fact that we're going to go through one
12 confirmation hearing already.  I think it will
13 be an accelerated process by virtue of having
14 gone through and failed one plan confirmation.
15 It's usually faster the second time around.
16    Q.   But in a case of this size and
17 complexity, including what could potentially be
18 a valuation fight on the E-side, is a 90-day
19 period between filing a plan and confirmation of
20 a plan short?
21    A.   It's relatively short, yes.
22    Q.   What methodology did you use to
23 determine whether the settlement consideration
24 was a sunk cost?
25    A.   I looked at some of the academic

1          MICHAEL HENKIN
2 literature around sunk costs and some of the --
3 my experience as a banker in knowing the
4 incentives that exist when a party has given
5 something up and then makes a subsequent
6 decision, does what they have given up affect
7 their subsequent decision, and that's really how
8 I based my opinion.
9     Q.   Right.  And so you based your opinion
10 based on your experience as a banker, your
11 understanding of what a concept of a sunk cost
12 was based on your general reading of literature
13 on economic decision-making?
14    A.   Yes.  And my experience, yes.
15    Q.   And did the fact that the perceived
16 sunk costs would not arise in a scenario other
17 than when the buyers refuse to close, was that a
18 factor in your evaluation in your use of that
19 language?
20    A.   I evaluated this transaction
21 specifically, which includes that concept, that
22 these costs are incurred regardless of whether
23 the transaction closes or not.  Your point, I
24 think you're making, is there is no cost if the
25 transaction closes because the claims that have

1          MICHAEL HENKIN
2 been given up are given up because you bought
3 the company.
4          We look at it a little differently,
5 where we say the settlement gives certain
6 releases and gives up certain claims, gives
7 certain benefits, and that happens irrespective
8 of whether the transaction closes; and if the
9 transaction closes, there happens to be no value
10 to those claims because the company is exiting
11 bankruptcy.
12          If the transaction doesn't close, then
13 those claims are also gone and there's a payment
14 and some additional provisions related to what
15 the TCEH junior creditors can or can't do as
16 part of the restructuring process.
17    Q.   So, as I understand what you have just
18 said, the way that you have evaluated the value
19 of the claims depends on whether the debtor
20 emerges from bankruptcy, because if the debtors
21 emerge under this transaction, there is no value
22 to those claims; is that correct?
23    A.   Because they're being given up,
24 correct.  I mean, whether they had value or not,
25 they are being given up when the settlement

Page 197

1   MICHAEL HENKIN
2 here.
3   Q.   In Opinion 3, you say it's a sunk
4 cost, and it's only a sunk cost based on -- even
5 if we adopt your analysis, it's only a sunk cost
6 at that point in time where the judge enters the
7 order?
8   A.   That is correct, yes.  And because
9 they're bifurcated, we look at it as a sunk
10 cost.
11   Q.   Right.
12       What closing conditions must the
13 debtors satisfy before they can assert
14 disarmament and drag?
15   A.   The closing conditions that the
16 debtors need?
17   Q.   Right.  Are there any obligations the
18 debtors have to satisfy before they can assert
19 disarmament and drag?
20   A.   I believe there is a definition of
21 alternative restructuring that needs to be
22 complied with in order to assert the disarmament
23 and drag -- or, in order to assert the drag
24 rights.
25       The disarmament, I think, again, is

Page 198

1   MICHAEL HENKIN
2 granted upon the settlement agreement, but the
3 drag has certain terms that need to be complied
4 with.
5   Q.   Right.  So, to the extent that
6 disarmament has value, the debtors obtain that
7 value regardless of the form of the alternative
8 restructuring?
9   A.   Yes.
10   Q.   And it's your, basically, your opinion
11 that the debtors obtain the value of the
12 disarmament even before the plan is confirmed
13 that, therefore, it's a sunk cost and it's
14 irrelevant, right?
15       MR. HARDIMAN:  Again, object to the
16   extent disarmament has value, which you said
17   in your previous question.
18   A.   My view is that disarmament, as
19 contained in the settlement agreement, is a sunk
20 cost and it would not affect the economic
21 decision of the purchasers to close.  It
22 shouldn't affect that decision.
23   Q.   Right.  But based on your own
24 testimony, drag is not a sunk cost; drag only
25 arises, based on what you have testified, in an

Page 199

1   MICHAEL HENKIN
2 alternative restructuring as long as we satisfy
3 the alternative restructuring conditions,
4 correct?
5   A.   The drag right is a contingent
6 obligation that triggers if the deal doesn't
7 close.
8   Q.   And you agree, therefore, it is not a
9 sunk cost even upon settlement agreement
10 approval?
11   A.   Yes, the drag right is a different
12 type of right than the consideration that's been
13 given up regardless under the settlement
14 agreement.
15   Q.   And both disarmament and drag apply in
16 all restructuring scenarios other than the
17 merger agreement so long as the debtors put
18 forward an alternative restructuring as defined
19 in the plan support agreement?
20   A.   Again, my understanding is
21 disarmament, meaning the release of claims,
22 happens regardless of whether they propose an
23 alternative restructuring.  The drag, as I
24 understand it, has some limitations, so that it
25 kind of constrains the value of the drag in that

Page 200

1   MICHAEL HENKIN
2 respect because it needs to comply with the
3 definition of alternative restructuring, capital
4 A, capital R.
5   Q.   And in evaluating the value of
6 disarmament and drag, the debtors don't have to
7 satisfy the type of closing conditions that they
8 would need to satisfy to enforce the remedies
9 that you have identified in your first opinion?
10   A.   That's true.  There is a different set
11 of circumstances that trigger those rights.
12   Q.   And in fact, the ability to assert
13 disarmament and drag is broader and applies in
14 more scenarios than the ability to assert the
15 remedies that you identified in Opinion 1?
16       MR. HARDIMAN:  Object to the form.
17   A.   I don't think they're necessarily
18 comparable as far as remedies in the merger and
19 purchase agreement, again, because of the fact
20 that it's bifurcated.  My view is that there's a
21 separate, independent approval of this
22 disarmament that has no ties to whether the
23 transaction closes or not, and then there are
24 some elements that are triggered if the
25 transaction doesn't close.

Page 205

1        MICHAEL HENKIN
2 a portion of it is going to non-participating.
3 Although there is a rights offering and that
4 might have a high participation rate.
5     Q.   Even if we were to assume that the 550
6 goes to the consortium as a whole, and it only
7 goes to the consortium as a whole after
8 satisfying professional fees, right?
9     A.   I think the 550 is a carve-out of
10 collateral and a first-out payment.  I'm not
11 sure that there is any deducts to the 550 with
12 respect to professional fees.
13    Q.   Isn't it true that in the settlement
14 agreement there is a providing that the parties
15 will be able to pay up to $49.75 million in
16 professional fees, and that in an alternative
17 restructuring scenario that $49.75 million comes
18 out of the 550?
19    A.   I would need to review the agreement
20 to confirm that.  Are you referring to the
21 expense reimbursement provision as far as the
22 purchase agreement?  Are you just talking about
23 the 550 as an expense reduction?
24    Q.   I'll show you the merger agreement and
25 let you look at it, but it's a straight deduct

Page 206

1        MICHAEL HENKIN
2 in an alternative restructuring scenario.
3     A.   Okay.
4         (Henkin Exhibit 9, a document entitled
5     Exhibit A (Revised Settlement Agreement),
6     marked for identification, as of this date.)
7 BY MR. McKANE:
8     Q.   Mr. Henkin, I'll do this as a
9 refreshing of recollection.  I'll direct you to
10 Section 2.7, Payment of Certain Fees and
11 Expenses, 2.7(a).
12    A.   Do you have a page number?
13        I think I'm there.  25.  Looks like
14 25.
15    Q.   That's right.  25 rolling to 26.
16    A.   Yes.
17    Q.   Let me direct your attention to the
18 top of 26, immediately after the language that
19 says "provided however" that's italicized.
20        See that in the third line?
21    A.   I do.
22    Q.   It says, "Provided, however, that EFH
23 shall have no obligation to reimburse TCEH for
24 the Professional Fees paid pursuant to this
25 Section 2.7 in the event the Effective Date of

Page 207

1        MICHAEL HENKIN
2 the Plan does not occur."
3     A.   I see it.
4     Q.   Do you see that, sir?
5     A.   I do.
6     Q.   And then just down below in that same
7 paragraph.
8     A.   Okay.
9     Q.   It's seven lines down.
10    A.   I see it.
11    Q.   It says, "The settling TCEH Unsecured
12 Noteholders, Settling TCEH Second Lien
13 Noteholders and the TCEH Official Committee
14 agreed that," and then you go down to (x), "the
15 Professional Fees of the TCEH Unsecured Group
16 and TCEH Second Lien Group," and then you go
17 down to number (2).
18    A.   Yes.
19    Q.   "Shall reduce pro rata the
20 distributions to all holders."  See that, sir?
21    A.   Yes, I do.
22    Q.   All right.  And then I see in (y),
23 "The Professional Fees of the TCEH Unsecured
24 Group and TCEH Unsecured Notes Trustee also
25 shall reduce pro rata the distribution to

Page 208

1        MICHAEL HENKIN
2 holders"?
3     A.   Right to the extent the debtor pays
4 them, then the debtor gets to deduct it from the
5 550.
6     Q.   Right.
7     A.   Right.
8     Q.   So, to the extent that the settlement
9 agreement is approved, and under your analysis,
10 therefore, creates a sunk cost?
11    A.   Correct.
12    Q.   The 550 is -- and therefore, the
13 debtors pay out the $49.75 million --
14    A.   Okay.
15    Q.   -- to the settling parties?
16    A.   To the professionals.
17    Q.   To the professionals?
18    A.   To the TCEH juniors.
19    Q.   The 550 is never actually going to
20 hit; it's going to be $500 million?
21        MR. HARDIMAN:  Object to the form.
22        Answer the question as best you can.
23        I'll just state for the record this is
24    a large agreement and he's been shown just a
25    few sections of it in a short period of

Page 221

MICHAEL HENKIN

1
2 would have both that intrinsic value and that
3 time value, right?
4     A.   Yes.  The same would hold true for the
5 claims that are against the T-side from the
6 E-side as well, but that's true.
7     Q.   In Opinion 3, you noted that -- let me
8 ask you this:  We have talked about, you know,
9 at that moment in time where the debtors
10 decide -- at that moment in time when the buyers
11 decide whether they're willing to close, they're
12 going to evaluate their investment based on
13 their perceived value and their cost, right?
14    A.   They're going to evaluate the value
15 and the purchase price.  When you say cost, I
16 assume you mean the cost to make the investment.
17    Q.   And I was using "cost" to be very
18 general.  Like let's be precise.  That cost is
19 the purchase price?
20    A.   Yes, for the exercise of the rights
21 offering or the ultimate funding of the
22 transaction, it is the purchase price inherent
23 in the merger and purchase agreements.
24    Q.   And we have seen that there is a
25 range, and that range is somewhere between 18.7

Page 222

MICHAEL HENKIN

1
2 and 19.3, depending on what emergence date, and
3 you believe 18.5 and 19.5 based on a later
4 emergence date, correct?
5     A.   Correct.
6     Q.   So that's their cost.  And they're
7 going to have greater visibility as to their
8 cost as well, right?
9     A.   Yes, they should have some additional
10 information onto the likelihood of these
11 disputed claims being allowed.
12    Q.   Right.  For example, the cost to the
13 purchase price goes down to the extent that
14 Judge Sontchi rules on Wednesday that the
15 federal judgment rate applies to post-petition
16 interest claims?
17    A.   Yes.
18    Q.   Is that the only driver between the
19 brackets of the range for the purchase price?
20    A.   There's also the make-whole claims,
21 although I think that depends on when those are
22 determined as to whether the deal has a right to
23 not close or not.
24    Q.   Is it your understanding that a
25 precondition to closing is that the -- that

Page 223

MICHAEL HENKIN

1
2 Judge Sontchi determines that there are no
3 make-wholes owed?
4     A.   That's my understanding, yes.
5     Q.   Right.  So the range in value should
6 not account for any payments for make-wholes,
7 correct?
8     A.   Correct, although my understanding is
9 that the purchaser could waive that condition
10 and close.  And the debtors have done an
11 analysis assuming all those make-whole claims
12 are allowed a year after the case closes, so
13 there is a possible worst case where that could
14 be -- those make-wholes could be incorporated
15 into the purchase price.
16    Q.   And in your understanding of the
17 economic rationale of a buyer, a buyer would
18 waive that condition and agree to pay the
19 make-wholes, to the extent that they were
20 ordered pre-closing, if they saw that the
21 transaction yielded greater value than the
22 purchase price with the additional payment of
23 the make-wholes, right?
24    A.   Yes.
25    Q.   In evaluating whether to close or not,

Page 224

MICHAEL HENKIN

1
2 the analysis that the buyers are going to
3 perform is this straight economic analysis that
4 is no different than the analysis that any buyer
5 will evaluate at the moment in time when they
6 are going to decide whether to close this
7 transaction?
8     A.   I think that's generally correct.
9     Q.   You used a phrase that there's no
10 "reasonable assurance" that the merger will
11 close, correct?
12    A.   Yes.
13    Q.   How do you define "reasonable
14 assurance"?
15    A.   I define it as a reasonable likelihood
16 that the transaction would close.
17    Q.   And what methodology did you employ to
18 evaluate whether there was a reasonable
19 likelihood that the transaction will close?
20    A.   We looked at four different
21 components.  One was the conditionality inherent
22 in the merger and purchase agreement; the second
23 was the remedies, or lack thereof, contained in
24 the merger and purchase agreement; the third was
25 the option-like nature of the agreement; and the

1        MICHAEL HENKIN
2 last was the record that was provided to the
3 board based on my review of the presentations
4 that were made to the board.
5    Q.   How is the record presented to the
6 board of directors relevant to evaluating
7 whether there is a reasonable likelihood that
8 the buyer will close the transaction? Has the
9 buyer seen the board or directors presentations?
10   A.   I don't believe so, but the opinion
11 was directed at whether there was reasonable
12 assurances to the seller, and therefore, the
13 opinion is does the seller and, in effect, the
14 seller's board have reasonable assurances.
15 That's my understanding of how the opinion was
16 framed.
17   Q.   All right. Let's be precise. You
18 just defined "reasonable assurance" as
19 reasonable likelihood the transaction will
20 close?
21   A.   Correct.
22   Q.   And the reasonable likelihood the
23 transaction will close is an objective
24 evaluation of whether you believe as a banker
25 that the transaction will close?

1        MICHAEL HENKIN
2    A.   That is correct, based on all the
3 information that I have analyzed whether it's
4 likely, reasonably likely to close.
5    Q.   Right. And your evaluation of
6 whether, objectively or not, it's going to close
7 is based on what you think the buyer is going to
8 do, right?
9    A.   That's correct.
10   Q.   And the buyer is going to be solely an
11 economic animal, right? And it's going
12 to evaluate the decision to close -- strike
13 that.
14        The buyers are economic animals that
15 will evaluate whether to close solely based on
16 their economics of what they think the value of
17 the deal is versus the purchase price, right?
18   A.   I think that's correct.
19   Q.   So what the board was told or not told
20 about -- what the board of EFH was told or not
21 told about the conditions for closing is
22 irrelevant to the buyer's decision on an
23 economic basis of the value of the transaction
24 versus the purchase price, right?
25   A.   The board informing doesn't

1        MICHAEL HENKIN
2 necessarily correlate with whether the buyer is
3 going to close or not, but the record that the
4 board got provides for whether there were
5 assurances that were made known to the board,
6 and I believe that the opinion was focused on,
7 from the buyer's perspective, whether there were
8 sufficient assurances that the transaction would
9 likely close.
10   Q.   So long as your definition of
11 "reasonable assurance" is reasonably likely to
12 close?
13   A.   Yes.
14   Q.   That's an evaluation of whether
15 they're going to close at the moment of time
16 when closing is required, right?
17   A.   Yes.
18   Q.   All right. Whatever assurance the
19 buyer gave prior to that, to use your term, is a
20 sunk cost, it's irrelevant, right?
21   A.   Well, if the buyer gave certain
22 remedies or reduced conditionality, it helps
23 inform the seller that there may be a higher
24 likelihood that the transaction would close to
25 the extent that the seller has an ability to

1        MICHAEL HENKIN
2 force certain things onto the buyer.
3    Q.   Right. So, to cut through it, the
4 prior commitment of a remedy is simply a
5 building block in the buyer's evaluation of what
6 the costs are, correct?
7    A.   The buyer's evaluation of cost.
8    Q.   Let me do it another way.
9    A.   Okay.
10   Q.   If they're going to close the deal,
11 they're going to evaluate the value of the deal
12 vis-a-vis the purchase price, right?
13   A.   Yes.
14   Q.   In the alternative world, they say if
15 I don't close, I'm going to have to pay a break?
16   A.   If there was a break fee, sure. A
17 reverse termination fee, right.
18   Q.   Let's use real numbers. In your
19 analysis, you're like if it's 19.1 is the value
20 of the transaction versus the purchase price of
21 19, they're going to close, assuming no hurdle
22 rates or an internal rate of return?
23   A.   Assuming 550 or any of that kind of
24 stuff, if the option was in the money, they
25 should economically want to close.

1            MICHAEL HENKIN
2    Q.   Right.  If the option is in the money,
3 they should want to close --
4    A.   General --
5    Q.   And if the option is in the money,
6 they're going to close, right?
7    A.   They should have an economic incentive
8 to close, yes.
9    Q.   Right.  And in evaluating whether
10 they're in the money, they have got to evaluate
11 their costs, right?  And the amount that they
12 may or may not be in the money is going to
13 depend on how much they have already -- they
14 will have to pay for the option.  And here,
15 using real -- you know, let me strike that
16 again.
17       If they're in the money, it's going to
18 depend to what they're going to have to pay,
19 right?
20    A.   Yes.
21    Q.   So if the costs are 19 and the option
22 is worth 19.1, they're in the money; they're
23 going to close, right?
24       MR. HARDIMAN:  Object to the form.
25    A.   Putting aside the 550, assuming that

1            MICHAEL HENKIN
2 that's not there, yes, they should close if the
3 option has positive value, in the money.
4    Q.   All right.  Now, because they have --
5 you know, in your scenario with the reverse
6 termination fee, they can't maintain the status
7 quo, right?  They either have got to close or
8 they have got to do something else, and to do
9 something else, they're going to have to pay a
10 reverse termination fee, right?
11    A.   Correct.
12    Q.   And that's going to cost them $200
13 million?
14    A.   Yes, if that was the number.
15    Q.   Right.  And so there is a scenario in
16 a real-world option, not the securities option
17 that you are describing, where even if they
18 were -- even if they could close and the asset
19 was worth 18.9, because it would -- and the cost
20 was 19, because the alternative scenario would
21 cost them $200 million, 18.9 is still greater
22 than 18.8 and they would close, right?
23    A.   Under your hypothetical, yes.
24    Q.   So, in evaluating the alternative
25 scenario whether it's these remedies or not, you

1            MICHAEL HENKIN
2 have to factor in those remedies to figure out
3 in the option in your world is in the money?
4    A.   That is correct.
5    Q.   And so in evaluating whether to close
6 this deal, they're going to look to the
7 alternative scenario and whether they think
8 that's more valuable than this option, right?
9    A.   Other than the scenario where there's
10 specific performance which could force someone
11 to close even if it was uneconomic to them,
12 that's another type of a remedy that's not just
13 a financial, you know, dollar that you can
14 adjust a price, yes.
15    Q.   And the problem with specific
16 performance is it's sometimes against a shell
17 entity that makes it illusory?
18       MR. HARDIMAN:  Objection to form.
19    Calls for a legal conclusion.
20    A.   Okay.
21    Q.   You agree with that, right?
22    A.   Sometimes.
23    Q.   Where did you get your definition for
24 "reasonable assurance"?
25    A.   Discussions with the team that helped

1            MICHAEL HENKIN
2 put the report together.
3    Q.   Right.  There is no, like,
4 peer-reviewed article that you cite, correct?
5    A.   No.
6    Q.   There's no industry treatise that you
7 cite, right?
8    A.   Not that I'm aware of.
9    Q.   This is discussions with your team,
10 including S&C, right?
11    A.   That's correct.
12    Q.   So you got some input from them on
13 what you thought the law was?
14       MR. HARDIMAN:  Object.  I think, I
15    could be wrong, I think that the rules are
16    that you can't answer ask that question.
17       MR. McKANE:  To the extent that you
18    instructed him as to the law and it became
19    an assumption in his analysis, I'm entitled
20    that.
21       MR. HARDIMAN:  You can ask him that,
22    the assumption in the analysis, but the
23    analysis says what it is.
24 BY MR. McKANE:
25    Q.   There's no definition of "reasonable

Page 233

MICHAEL HENKIN

1    MICHAEL HENKIN
2    assurance" in your report, right?
3        MR. HARDIMAN: You can answer the
4    question.
5    A.   No.
6    Q.   Right. And you gave me a definition
7    today, right?
8    A.   Yes, reasonable likelihood.
9    Q.   Right. And the reasonable likelihood
10   to close, was that informed based -- was that an
11   assumption given you as to what the law is?
12   A.   I wasn't making a legal opinion.
13   There is a place in the report where I'm asked
14   to answer certain questions as part of my
15   opinions, and the question was posed is are
16   there reasonable assurances that the transaction
17   would close. So that definition was determined
18   in consultation with the team that helped define
19   the scope of the opinions in the report.
20   Q.   Okay. And the team that helped define
21   the scope of the opinions included Sullivan &
22   Cromwell?
23   A.   Yes.
24   Q.   So they helped define the question
25   that you were answering?

Page 234

1    MICHAEL HENKIN
2    A.   Yes.
3    Q.   And just to close this area out,
4    there's no peer-reviewed approach to evaluating
5    whether there are reasonable assurances to a
6    merger, right?
7    A.   Not that I'm aware of.
8    Q.   There is no widely accepted
9    methodology for evaluating whether there are
10   reasonable assurances that a merger will close,
11   right?
12   A.   I think it's widely accepted that
13   remedies and conditionality are the underlying
14   metrics that companies evaluate in determining
15   the reasonable assurances of closure, because I
16   have looked at a lot of transactions where
17   boards rejected mergers or deals were not
18   consummated because of excess conditionality and
19   lack of reasonable likelihood of closing, and I
20   think that most of those refer to the lack of
21   remedies and the lack of sufficient certainty of
22   closure.
23       So those were the -- I don't think
24   there's peer-reviewed articles, necessarily, but
25   those were the underlying analyses that I used

Page 235

1    MICHAEL HENKIN
2    to inform my opinion.
3    Q.   And you did not identify any of those
4    transactions in your report, right?
5    A.   The other transactions where boards
6    rejected mergers? No, they weren't identified
7    in the report.
8    Q.   You don't have a table where you list
9    all the transactions that you evaluated that
10   were proposed and rejected by boards, right?
11   A.   No.
12   Q.   You didn't include any of the
13   materials for -- that you reviewed that were
14   presented to those boards that were factors in
15   evaluating whether to enter into those
16   transactions, right?
17   A.   No.
18   Q.   The description you just gave of what
19   you were basing that opinion on is neither
20   contained in your report nor in the materials
21   which you relied on in preparing the report?
22   A.   Well, it's contained in tables
23   Exhibits 2 and 3 in that I've identified these
24   factors -- specific performance, liquidated
25   damages, a reverse termination fee -- as the

Page 236

1    MICHAEL HENKIN
2    elements of remedies that would be available in
3    another type of a transaction. So I kind of
4    rely on Opinions 1 through 3 in order to inform
5    my Opinion 4.
6    Q.   Right. And to be clear, none of those
7    remedies are an assurance that the transaction
8    will close, right?
9    A.   They provide assurances that it's more
10   likely to close when the remedies are present.
11   So I do think they address the issue of
12   likelihood of closure.
13   Q.   Let's be more precise. What those
14   remedies do is that they change the cost side of
15   the equation?
16   A.   Some of them are purely financial and
17   do change --
18   Q.   And specific performance, you know, to
19   the extent that you think, you know, other than
20   the -- let's break this down.
21       The remedies that you identified,
22   other than specific performance, are money,
23   right? They're quantums of money?
24   A.   Other than the few examples that we
25   looked at where common law damages were

Page 249

MICHAEL HENKIN

1   MICHAEL HENKIN
2 preparation of your actual report, you only
3 relied on those three or four board
4 presentations?
5   A.   That's correct, with the exception
6 that there was some stuff on the intercompany
7 notes.  I don't know if it was a board
8 presentation or not, but --
9   Q.   The one-pager from 2011?
10   A.   Although I didn't look at that in
11 preparation of this report.  I looked at that
12 when I saw the Mendelsohn Report, but I don't
13 know if there were any -- I don't think there
14 were any board presentations as part of that
15 opinion.
16   Q.   All right.  Thank you.
17       Sir, you're familiar, based on your
18 experience as an investment banker and in your
19 work for preparing your expert report, you're
20 familiar with a MAC clause, right?
21   A.   Yes.
22   Q.   Material adverse change, material
23 adverse effect clause.
24   A.   Yes.
25   Q.   Do you prefer MAC or MAE?

Page 250

1   MICHAEL HENKIN
2   A.   MAC is fine.
3   Q.   So, in your experience and based on
4 your review of merger agreements in preparing to
5 provide your opinions today, did you conclude
6 that it is industry practice for there to be a
7 MAE or MAC clause when there is specific
8 performance that can be asserted against the
9 buyer?
10   A.   You know, I didn't look at the MAC
11 clauses as part of our survey, so I don't really
12 have an opinion on that.
13   Q.   So, setting aside the work you did
14 here -- so let's be precise.  In you preparing
15 to render your expert report, you did not
16 analyze whether there was a correlation between
17 the buyer committing to specific performance to
18 close the transaction and the buyer's ability to
19 have the ability not to close in the event that
20 there's a material adverse change or a material
21 adverse condition?
22   A.   That's correct.
23   Q.   Other than your work in preparing to
24 testify today on this opinion, based on your
25 experience as a restructuring professional for

Page 251

1   MICHAEL HENKIN
2 20 years, is it your general experience that a
3 material adverse change or a material adverse
4 conditions provision is common in merger
5 agreements?
6   A.   Yes.
7   Q.   And in your experience as a
8 restructuring professional for 20 years, am I
9 correct that if a -- if you represented a buyer
10 and the seller was demanding specific
11 performance, you would insist that there be a
12 material adverse change or a material adverse
13 conditions provision that limited the buyer's
14 requirement to close?
15   A.   You know, there's always a give and
16 take of negotiating leverage between a buyer and
17 a seller, and so it would depend on the
18 circumstances to whether I would advise my
19 client on those provisions, but I would advise
20 on relative negotiating strength to try to
21 protect the party that I was representing.
22   Q.   Right.  And in your experience, the
23 ability to get a provision like specific
24 performance against the buyer depends in large
25 part on the parties' negotiating position,

Page 252

1   MICHAEL HENKIN
2 right?
3   A.   Yes.
4   Q.   And that negotiating position depends
5 on the relative weight that the party
6 negotiating places on the value of the specific
7 performance as opposed to other provisions like
8 the value of a fiduciary out, right?
9   A.   True.
10       MR. HARDIMAN:  Object to form.
11   Q.   Am I correct that you have done no
12 analysis as to whether there could be an impact
13 on Oncor's business between the time of entry
14 into the merger agreement and closing?
15   A.   Not specifically as to the impact of
16 the merger agreement on Oncor's performance?
17   Q.   No.  No.  No.  I'm just talking about
18 the period of time between signing up the deal
19 and closing.  We've talked it's at least a year.
20 It could be a year?
21   A.   It could be a year or a little bit
22 more than a year, yes.
23   Q.   And during that year that the merger
24 is pending, there could be changes in market
25 conditions, right?

Page 253

MICHAEL HENKIN

1
2   A.   Yes.
3   Q.   Right.  There could be changes in the
4   economic conditions of Texas, right?
5   A.   Yes.
6   Q.   There could be changes in the
7   regulatory environment in Texas, right?
8   A.   Yes.  Sure.
9   Q.   And I keep saying Texas because Oncor
10  is a transmission and distribution facility
11  that's exclusive to Texas, right?
12  A.   That's right.
13  Q.   And so there is -- these changes in
14  market conditions can significantly impact the
15  buyer's decision whether or not to close, right?
16  A.   Yes.
17  Q.   And that impacts the, as you would
18  say, the conditionality of the deal, right?
19  A.   Yes, it adds to the conditionality
20  that there are potential changes in the market.
21  I think I even mention in my report that even
22  the financial condition of Oncor that could take
23  place between the signing and the closing.
24  Q.   Right.  The financial condition of
25  Oncor could change between signing and closing,

Page 254

MICHAEL HENKIN

1
2   right?
3   A.   It could.
4   Q.   The economic conditions in Texas could
5   change between signing and closing, right?
6   A.   Yes.
7   Q.   The overall United States economy
8   could change between signing and closing, right?
9   A.   Yes.
10  Q.   There's a variety of market conditions
11  that could change between signing and closing,
12  right?
13  A.   Yes.
14  Q.   And your opinion has done no analysis
15  as to whether those changes will or will not
16  happen, right?
17  A.   That's true.
18  Q.   In discussing the conditionality of
19  the transaction, you identified that as one of
20  the factors you considered in rendering an
21  Opinion 4.
22      When you talk about conditionality,
23  what do you mean?
24  A.   By conditionality, I refer to all of
25  the required conditions to closing that are in

Page 255

MICHAEL HENKIN

1
2   the transaction, which are significant.
3   Q.   Can you give me an example that you
4   recall?
5      MR. HARDIMAN:  Were you finished with
6   your answer?
7      THE WITNESS:  Yes.
8      Yes, you mentioned regulatory.  That's
9   one of them.  There are the tax rulings is
10  another one.  There's the make-whole
11  findings by the court, another one.  There
12  is all of the approvals of the documentation
13  by various timeframes.  So the January 15
14  confirmation order, the settlement agreement
15  by January 15.  So there's some milestones
16  that are conditions to the transaction that
17  provide a termination right if they're not
18  met.
19      I'm sure there are more.  Those are
20  some of the major ones.
21  BY MR. McKANE:
22  Q.   Let's break them down.  Have you done
23  any analysis regarding the likelihood of the
24  debtors to obtain the necessary regulatory
25  approvals?

Page 256

MICHAEL HENKIN

1
2   A.   As I said, I don't have an opinion on
3   the likelihood.  I just know that they are
4   significant conditions that need to be met, and
5   I highlighted a few of them in the report as far
6   as some of the risks of the PUCT, but I don't
7   have an opinion on the percentage likelihood or
8   whether they will or won't get the approvals.
9   Q.   And do you have an opinion on the
10  percentage likelihood of whether or not the
11  debtors will obtain the necessary tax rulings?
12      MR. HARDIMAN:  Object to form.  You
13  did cover this already.
14      MR. McKANE:  I'm trying to do it in a
15  condensed fashion.
16  A.   No, I don't on the probability, no.
17  Q.   Have you performed any analysis or
18  have an opinion on the percent likelihood of
19  whether or not the debtors will obtain the
20  necessary make-whole rulings?
21  A.   No.
22  Q.   Do you have an opinion on whether or
23  not the debtors will achieve the necessary
24  milestones in time?
25  A.   No.

MICHAEL HENKIN

1
2  Q.  So, to be fair, all the conditions
3  that you're identifying, right, are terms in the
4  agreement, right?
5  A.  Yes.
6  Q.  They're evidenced clearly in the
7  agreement?
8  A.  Yes, some of them are in the merger
9  and purchase agreement, some of them are in the
10  PSA, but they're in the combination of
11  agreements that form the basis of the purchase
12  of Oncor.
13  Q.  Right.  So all of the conditions that
14  you identify that comprise the conditionality on
15  which you are rendering your opinion are plainly
16  stated in the merger agreement or the plan
17  support agreement, right?
18  A.  I think that's right, yes.
19  Q.  And you're just compiling them and
20  highlighting them to the court?
21  A.  Yes, that there is significant number
22  of conditions and the deal is highly
23  conditional.  I think I quote the debtors in
24  some of the report as well that the debtors say
25  it's highly conditional, too.

MICHAEL HENKIN

1
2  Q.  And that's where I wanted to go next,
3  right?  The conditions exist in the report --
4  sorry, the conditions exist in the merger
5  agreement and the PSA, right?
6  A.  Yes.
7  Q.  And in addition to just relying on
8  those agreements, you then attempt to adopt or
9  rely upon the debtors' assessment that it's
10  presented to its board, right?
11       MR. HARDIMAN:  Object to the form.
12  A.  I use that as a reinforcement of my
13  observation and opinion that there is a lot of
14  conditionality in the deal.
15  Q.  So, said another way, you find it a
16  reaffirmation of your review of the agreement
17  that the debtors came -- the debtors'
18  professionals came to the same conclusion?
19  A.  Yes.
20  Q.  Let's talk about the last opinion,
21  Opinion 6.  Am I correct that Opinion 6 states
22  that the value of TCEH today suggests no tax
23  liability will exist for EFH if there is a
24  taxable sale using EFH's NOLs?
25  A.  Yes, other than the value -- I've

MICHAEL HENKIN

1
2  utilized implied market value.  It happens to
3  correlate with the Evercore valuation as well,
4  so that was validating the use of this metric.
5  Q.  So the opinion is based on the implied
6  market value, right?  And what you're being
7  precise about is you're using an implied market
8  value for TCEH, correct?
9  A.  Correct.
10  Q.  And that implied market value is
11  being -- is based on the trading value of
12  certain debt securities?
13  A.  That's correct.
14  Q.  And you're using the implied market
15  value as of today?
16  A.  As of October 8, yes.
17  Q.  October 8, okay.
18       What was the implied market value of
19  TCEH as of the date of the filing of the
20  disclosure statement?
21  A.  It's in Exhibit 13.  It looks like
22  $16.9 billion -- I'm sorry, it's $15.2 billion.
23  Q.  $15.2 billion.  And that's the
24  Evercore valuation, right?
25  A.  No.  No.  That's just the implied

MICHAEL HENKIN

1
2  market value.  Evercore did put a valuation on
3  TCEH with the disclosure statement that
4  encompassed that, this range.
5  Q.  But it had a different market value
6  because it had a different date?
7  A.  It was a different date, correct.
8  Q.  Right.  And so you've got a market
9  value as of March 24 of '15 that you believe
10  yields an implied value of what?
11  A.  $15.236 billion.
12  Q.  Okay.  That's based on trading values
13  of securities, right?
14  A.  That's correct.
15  Q.  And then based on trading values of
16  securities as of October 8, you have it as $9.6
17  billion, right?
18  A.  Correct.
19  Q.  What's it going to be November 8?
20  A.  We don't have -- I don't have a good
21  prediction as to the future value of the TCEH
22  securities.
23  Q.  Can anybody reasonably predict the
24  future market trading value of the TCEH
25  securities?

Page 261

1          MICHAEL HENKIN
2    A.    It's very hard to do.  I think it's
3  very difficult to predict the future value of a
4  company.
5    Q.    If they did that, you would be living
6  on a beach, right?
7    A.    Yes.
8    Q.    You would be retired?
9    A.    I would be a lot wealthier than I am
10  today, yes.
11    Q.    And the point is, for determining the
12  enterprise value of -- strike that.
13          What is the relevant point in time at
14  which you have to determine TCEH enterprise
15  value?
16    A.    Well, the purpose of the valuation as
17  part of the plan would be to predict or to try
18  to estimate the value as of the effective date
19  of the plan.  That's generally the date that the
20  valuations are geared towards.
21    Q.    Right.  The relevant date for
22  determining distributions under the plan is the
23  date of emergence, correct?
24    A.    Correct.
25    Q.    And we don't know what the date of

Page 262

1          MICHAEL HENKIN
2  emergence will be, right?
3    A.    That's right.  We have an estimate
4  from the debtors, but we don't know.
5    Q.    And that estimate is six or nine
6  months in the future, right?
7    A.    Yes.
8    Q.    Nobody can predict what the value of
9  TCEH will be six to nine months in the future,
10  right?
11    A.    No, not with precision.
12    Q.    In the past six to nine months, we
13  have seen an implied swing of that view based on
14  trading values of over $5 billion, correct?
15    A.    That is correct.
16    Q.    Based on representations made at the
17  first day hearing, the value in this case has
18  swung by over $9 billion, right?
19    A.    That is correct.  Well, approximately
20  $9 billion.
21    Q.    Approximate.
22    A.    Because $18 billion was the number
23  that the debtors used on the first day.  Now
24  we're down at 9.6.
25    Q.    To be precise that was the TCEH first

Page 263

1          MICHAEL HENKIN
2  liens on the first day, right?
3    A.    They did in their pretax submission
4  memo cite $18 billion for value of TCEH, yes.
5    Q.    Right.  So, using the initial tax memo
6  that was an illustration of $18 billion?
7    A.    Yes.
8    Q.    We have seen a $8.5 billion swing in
9  the value of TCEH, right?
10    A.    Yes.
11    Q.    Right.  And the one thing I think you
12  and I will undeniably agree on is we don't know
13  what the value is going to be on the emergence
14  date?
15    A.    That's fair.
16    Q.    And if the value returns to the value
17  that was included in the original expert report
18  that Mr. Ying submitted with the disclosure
19  statement, the NOLs of EFH could not shield all
20  of the tax liability that would be triggered by
21  a TCEH taxable sale?
22    A.    I believe his range started at $12
23  billion, and so if it returned to the lowest
24  point in his range, there may not be a
25  taxable -- a tax due, but if it was higher than

Page 264

1          MICHAEL HENKIN
2  that, it, as of 6/30, it may incur a tax.
3    Q.    So let's be a little more precise.  We
4  talked about hurdle rates before?
5    A.    Yes.
6    Q.    Right?
7          If I asked you what was the hurdle
8  valuation at which EFH would be able to shield
9  all of the cash tax obligation associated with
10  the TCEH taxable spin, what would that number
11  be?
12    A.    That number as of 6/30 is about $12
13  billion.
14    Q.    So, just so we're all level-set on
15  what we're talking about, EFH owns NOLs, right?
16    A.    Yes.
17    Q.    And EFH can use those NOLs during a
18  restructuring to shield certain amounts of tax
19  liability that are triggered within its
20  enterprise so long as they satisfy the proper
21  IRS regs. and they have enough NOLs, right?
22    A.    I believe that's correct, yes.
23    Q.    And there is -- to the extent that
24  TCEH does a taxable transaction as opposed to a
25  tax-free spin, it will trigger a tax, right?

Page 265

1         MICHAEL HENKIN
2     A.   It may trigger a tax if there is not
3 enough tax attributes to shield the potential
4 gain.
5     Q.   Right. So let me just break it down.
6         EFH is a taxpayer, right?
7     A.   That is correct. They own the stock
8 of TCEH.
9     Q.   TCEH is a disregarded entity for tax
10 purposes, right?
11     A.   That's correct.
12     Q.   In determining whether EFH owes a tax
13 liability for a transaction of TCEH, you have to
14 evaluate what the cost basis is of the TCEH
15 assets and what the value is for TCEH at the
16 time of the transaction closing, right?
17     A.   I think that's correct.
18     Q.   All right. And if the value of EFH at
19 the time the transaction closes is greater than
20 the cost basis, there is a tax owed if it's a
21 taxable transaction, right?
22     A.   Unless there are tax attributes that
23 would reduce the potential gain, that is
24 correct.
25     Q.   Let me take it in steps.

Page 266

1         MICHAEL HENKIN
2         There is a tax that would be
3 triggered, and then the question would be is a
4 cash tax actually going to be paid or could it
5 be offset with tax attributes?
6     A.   Okay.
7     Q.   Right?
8     A.   That's fair.
9     Q.   Is that fair?
10     A.   That's fair.
11     Q.   And EFH owns those tax attributes,
12 right?
13     A.   Yes.
14     Q.   And upon emergence, what happens to
15 EFH's NOLs?
16     A.   I believe that, under the plan,
17 they're going -- some of them are going to be
18 utilized for a partial step-up under the current
19 plan.
20     Q.   Let's step back away from this plan,
21 right? As a restructuring professional, you
22 know that NOLs are a valuable tax attribute,
23 right?
24     A.   Yes.
25     Q.   And you know that in a restructuring,

Page 267

1         MICHAEL HENKIN
2 almost all NOLs cannot be utilized by the new
3 reorganized entity?
4     A.   There are limitations put on the NOLs
5 after you go through a Chapter 11 restructuring,
6 yes.
7     Q.   Significant limitations; these are IRS
8 limitations on what NOLs can be used, right?
9         MR. HARDIMAN: Object to the form.
10     A.   Yes.
11     Q.   And you know as a restructuring
12 professional that -- in this case, have you
13 evaluated, you know, how many of EFH's NOLs, if
14 any, could survive a restructuring?
15     A.   I have not looked at that issue of the
16 post-reorganized entity's utilization of NOLs.
17     Q.   Okay. Is that relevant at all to your
18 evaluation as to whether EFH should use their
19 NOLs to shield taxes of EFH -- of TCEH? Excuse
20 me.
21     A.   It might have some relevance if you
22 were trying to evaluate what the alternatives of
23 paying the tax is and taking that value into
24 some reorganized entity, yes.
25     Q.   Right. So, in other words, if it's

Page 268

1         MICHAEL HENKIN
2 use it or lose it, right, it may not matter as
3 much to EFH to convey those tax attributes to
4 TCEH if they can get something else in return?
5     A.   That's correct.
6     Q.   And in a taxable scenario, we don't
7 know the amount of tax that would be triggered
8 by a TCEH taxable sale until at least a point in
9 time where they emerge, right?
10     A.   With any precision, that's correct.
11     Q.   And in fact, the IRS doesn't limit
12 itself to how the new securities trade
13 immediately post-emergence, correct?
14         MR. HARDIMAN: Object to the form.
15     A.   I've had some experience with the IRS
16 where they do a retrospective analysis and look
17 at some of the values that may have occurred
18 either prior to or right after the date of
19 emergence, yes.
20     Q.   So let me present a scenario, and
21 based on your experience, you tell me whether
22 this is accurate.
23         If TCEH is anticipated to emerge at
24 $12 billion enterprise value, but immediately
25 thereafter the securities of TCEH trade as if

1        MICHAEL HENKIN
2  the enterprise price value is $15 billion or
3  higher, does the IRS have the ability to
4  challenge the TCEH valuation upon emergence and
5  argue that a tax is owed?
6    A.   Yes.
7        MR. HARDIMAN:  Object to the form.
8    A.   Based on my experience, yes, they do.
9    Q.   So we won't know whether a TCEH
10 taxable transaction actually triggers a cash tax
11 obligation at EFH until some point in time after
12 new reorganized TCEH emerges and trades in
13 public securities and the IRS makes a
14 determination as to whether it wants to
15 challenge whether a tax is owed?
16   A.   You're assuming that it's going to be
17 a public company when it emerges, but the
18 presumption that there is a risk that the IRS
19 would evaluate the transaction afterwards when
20 it did a valuation, that is correct, that
21 exists.
22   Q.   And whether or not it's a public
23 company simply provides greater evidence to the
24 IRS as to what the actual value of the
25 reorganized TCEH will be?

1        MICHAEL HENKIN
2    A.   Right.  It may provide some additional
3  trading levels and some additional market
4  information.
5    Q.   So, at this point in time, we don't
6  know what TCEH will be valued at upon emergence
7  and we won't know -- we don't know what value
8  TCEH will trade at in any public markets for any
9  securities it issues, correct?
10       MR. HARDIMAN:  Object to the form.
11   A.   That's true.
12   Q.   So is it fair to say the current
13 trading price of TCEH would be viewed as not
14 relevant to the IRS in evaluating whether it
15 wanted to assert whether a cash tax is owed at
16 EFH for the value of post-reorganized TCEH?
17       MR. HARDIMAN:  Object to the form.
18   A.   I think that's generally correct.  The
19 IRS is going to likely not rely on the current
20 value.  It's going to rely on a later value at
21 or near the effective date.
22   Q.   It's not even going to be at or near
23 the effective date.  It will even look at after
24 the effective date?
25   A.   Right, I meant by me -- I meant a

1        MICHAEL HENKIN
2  little bit before and/or a little bit after is
3  my experience.
4    Q.   And we have no visibility right now as
5  restructuring professionals to say what that
6  value is going to be, right?
7    A.   We know where it's trading today, and
8  we understand the gap between where it's trading
9  today and where it needs to potentially trade up
10 to, so I think you can at least make some
11 predictions, but without any precision.
12   Q.   All right.
13   A.   Mr. Ying has done that, and he's made
14 a prediction in his own report based on where he
15 thinks the value will be, so obviously it's
16 done, but it doesn't have the level of precision
17 that you're asking about.
18   Q.   Right.  And so, to be precise, what
19 Mr. Ying has done is a full valuation of TCEH at
20 an anticipated point in time based on an
21 evaluation of discounted cash flows, forecasted
22 EBITDA, and comparable companies, right?
23   A.   That's correct.
24   Q.   And that's not the analysis that you
25 have done?

1        MICHAEL HENKIN
2    A.   No, that's not.  He's done a more of a
3  formal valuation report, and I've done a fairly
4  simplistic implied market value to get to a
5  representative number.
6    Q.   Right.  And even with Mr. Ying's
7  formal valuation report, the IRS is not bound to
8  accept his number?
9    A.   That's true.
10   Q.   The current plan of reorganization
11 contemplates a TCEH tax-free spin that occurs
12 before the merger, correct?
13   A.   Yes.
14   Q.   Is there value to EFH in having TCEH
15 go first in a tax-free spin?
16   A.   As far as the sequencing of utilizing
17 various tax attributes, is that what you're
18 asking about?
19   Q.   I am specifically highlighting the
20 sequencing, and specifically, is there value to
21 EFH in having a TCEH tax-free spin happen first?
22   A.   There may be.  I know there's a
23 complex analysis that was done by the debtors
24 and their tax advisors as to structuring a
25 number of sequences to try to optimize the