**Exhibit 1**

Page 1

MICHAEL HENKIN

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
-----------------------------------x
In Re:
Energy Future Holdings Corporation, et al.,
Debtors.
Chapter 11
Case No. 14-10979
Jointly Administered
-----------------------------------x

DEPOSITION OF MICHAEL HENKIN
New York, New York
October 21, 2015

Reported by:
KATHY S. KLEPFER, RMR, RPR, CRR, CLR
JOB NO. 99258

Page 2

MICHAEL HENKIN

October 21, 2015

Deposition of MICHAEL HENKIN, held at Kirkland & Ellis, LLP, 601 Lexington Avenue, New York, New York, before Kathy S. Klepfer, a Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter, Certified Livenote Reporter, and Notary Public of the State of New York.

Page 3

MICHAEL HENKIN

A P P E A R A N C E S:

SULLIVAN & CROMWELL
Attorneys for E-side Official Creditors
125 Broad Street
New York, New York 10004
BY: JOHN HARDIMAN, ESQ.
NICHOLAS MENILLO, ESQ.

KIRKLAND & ELLIS
Attorneys for the Debtors
300 North LaSalle
Chicago, Illinois 60654
BY: JEFFREY LULA, ESQ.
MARK McKANE, ESQ.

MUNGER TOLLES & OLSON
Attorneys for the TCH Debtors
355 South Grand Avenue
Los Angeles, California 90071
BY: BRADLEY SCHNEIDER, ESQ.
KEVIN ALLRED, ESQ.
THOMAS WALPER, ESQ.
ALEX TEREPKA, ESQ.

Page 4

MICHAEL HENKIN

A P P E A R A N C E S: (Cont'd.)

PAUL WEISS RIFKIND WHARTON & GARRISON
Attorneys for Ad Hoc Committee of TCEH First Lien Creditors
1285 Avenue of the Americas
New York, New York 10019
BY: KIMBERLY FRANCIS, ESQ.

NIXON PEABODY
Attorneys for American Stock Transfer as Indenture Trustee at EFH
100 Summer Street
Boston, Massachusetts 02110
BY: PAUL WILLIAMSON, ESQ.
RICHARD PEDONE, ESQ. (Telephonically)

AKIN GUMP STRAUSS HAUER & FELD
Attorneys for UMB Bank, As Indenture Trustee for the Unsecured 11.25 Percent/12.25 Percent Senior Toggle Notes Due 2018
One Bryant Park
New York, New York 10036
BY: RICHARD WILLIAMS, JR., ESQ.

MICHAEL HENKIN

transposed, which was an error. It was just a clerical error.

Q. Were you being literal when you said there was a typographical error?

A. I'm being literal.

Q. Like a spelling error?

A. No, I think we said "the yields was" instead of "the yields were." There were two instances of that.

Q. I'm not going to judge a banker on subject/verb agreement.

A. These are changes that I would say are immaterial to the conclusions. And then, again, footnote 63, I believe, is where the 3.5 and 8.5 years should be reversed. They were transposed.

Q. Got it.

A. And so it should say 5.8, 2.6, 8.5 and 3.5, but other than that, I don't believe there's any errors in the report.

Q. Does the report reflect all of your opinions that you are offering in this case?

A. Yes.

Q. And you provide a summary of those opinions on paragraphs 11 through 16 of your

MICHAEL HENKIN

report?

A. I do, with one exception: The reinstatement issues I think are still being discussed.

Q. You may issue a secondary report on reinstatement?

A. I don't know.

Q. You haven't been asked to do so at this time?

A. I haven't been asked to do so at this time.

Q. In paragraph 8, you state that you reserve to the right to respond to the report or testimony of any of the debtors' experts.

Do you see that?

A. I'm sorry, paragraph 8? Yes. Yes, I do.

Q. Have you reviewed the expert reports of the debtors, other than Mr. Mendelsohn's report?

A. I have reviewed the Ying Report and a couple of the others. I glanced through, the Phil Singer.

Q. Have you formed any opinions as

MICHAEL HENKIN

regards to the expert reports of the debtors other than Mr. Mendelsohn?

A. Opinions in the form of expert opinions or --

Q. Yes.

A. No.

Q. Have you been asked to form any opinions?

A. No.

Q. Have you been asked to comment in any way on those expert reports?

A. To my own team?

MR. HARDIMAN: I'm going to instruct him not to answer with respect to the reinstatement.

Q. So let's table reinstatement.

A. Setting aside reinstatement, we've had a discussion as a team, including S&C, about the reports, but I haven't offered any new opinions.

Q. Have you prepared any analysis regarding the reports?

A. No.

Q. Have you been asked to prepare a rebuttal report?

MICHAEL HENKIN

A. No.

Q. Are you prepared to provide any commentary, expert or otherwise, on the expert reports or the analysis of the debtors contained in those reports?

MR. HARDIMAN: What do you mean, prepared at the hearing?

MR. McKANE: Yes.

MR. HARDIMAN: Other than Mendelsohn?

THE WITNESS: Other than Mendelsohn?

BY MR. McKANE:

Q. Yes.

A. I don't think so.

Q. And are you prepared today to identify any commentary, expert or otherwise, you have with regards to the reports of the experts other than Mendelsohn?

A. We did find an error in the Ying Report that we alerted the Phil Singer Team and one of the K&E attorneys about a week ago.

Q. And what is that error?

A. He improperly weighted the environmental case by one-third instead of 50 percent in his TCEH terminal year valuation in

Page 89

MICHAEL HENKIN

his TCEH valuation report.
Q. Was that addressed with Mr. Ying during his deposition yesterday -- Monday? Excuse me.
A. I don't know if it was. But again, we did inform the debtors.
MR. HARDIMAN: It goes to reinstatement, so I don't believe it was.
Q. And when was the last time you were deposed?
A. In October of last year.
Q. And what was that case?
A. Exide Technologies.
Q. And the disclosure that you made in your expert report regarding Exide, that testimony was in the form of a deposition?
A. It was both a deposition, a declaration, and an in-court testimony.
Q. And the testimony that was listed on Halloween of last year, was that the trial testimony?
A. That was the trial testimony.
Q. What was the topic?
A. It was appropriateness of a DIP

Page 90

MICHAEL HENKIN

financing process and the criticisms that I had with respect to the debtors' managing of a financing and M&A process in the case.
Q. So you reviewed the process that the debtors used in attempting to secure financing and provided expert opinions as it relates to whether it was appropriate?
A. Correct.
Q. Were you certified as an expert by the court in that case?
A. Yes, I believe so.
Q. And what was the scope of the certification?
A. I think it was a general investment banking expertise and expertise in financings, and there may have been something related to sale processes. So there was a simultaneous sale process as well, so it may have included M&A.
Q. It may have included M&A?
A. It may have included M&A. I don't recall the exact language of the expert certification.
Q. So is there a transcript of both the

Page 91

MICHAEL HENKIN

deposition and the trial testimony?
A. There is.
MR. McKANE: I would request a copy.
MR. HARDIMAN: We will take that under advisement.
MR. McKANE: Absolutely.
BY MR. McKANE:
Q. Prior to your testimony in Exide, have you previously testified in court or in the form of deposition?
A. Yes.
Q. And when was that?
A. The prior time before Exide in Federal Bankruptcy Court would have been DBSD.
Q. And what about other than Bankruptcy Court?
A. I provided a report in a tax dispute with respect to Federal Mogul. I don't know if that would qualify as an expert opinion or not.
Q. Were you deposed on it?
A. No.
Q. Have you ever had the scope of your testimony limited by a court?
A. Not to my knowledge.

Page 92

MICHAEL HENKIN

Q. Page 51 of your report contains a copy of your CV, correct?
A. Yes.
Q. Is it accurate?
A. Yes.
Q. Is there anything you need to update regarding that report -- in your CV?
A. No.
Q. Do you have any training that's not listed on this CV?
A. No.
Q. Any certifications you received that are not listed on the CV?
A. Not related to finance or investment banking.
Q. Any peer-reviewed publications?
A. No.
Q. Have you ever published at all in a peer-reviewed setting?
A. Not in a peer-reviewed setting, no.
Q. And have you had any of your writings accepted in a scholarly journal or publication?
A. No.
Q. In the documents you reviewed, you

Page 97

MICHAEL HENKIN

Q. And you're not providing -- to use your words, you're not providing a full valuation analysis of TCEH, correct?
A. That's correct.
Q. And sir, you're not providing any opinions regarding the sales process that the debtors performed?
A. No.
Q. And sir, you're not opining on any aspect of the bidding procedures or the auction that was canceled, correct?
A. That's correct.
Q. So the merger agreement contemplates certain regulatory approvals, and you note that in your report?
A. Correct. Yes.
Q. But you're not providing any opinion regarding whether the debtors and the proposed buyers will achieve regulatory approval?
A. Not with respect to any individual component of the conditionality, which would include the regulatory, correct.
Q. Let's be more precise about that. You're not providing an opinion regarding the

Page 98

MICHAEL HENKIN

likelihood of receiving an acceptable PLR ruling from the IRS, correct?
A. That's correct.
Q. You're not providing an opinion on whether the debtors will receive an acceptable change of control ruling from the Public Utility Commission of Texas, correct?
A. That's correct.
Q. And you're not providing an opinion on whether the debtors will achieve an acceptable ruling approving the chain of control from the Nuclear Regulatory Commission, correct?
A. Correct.
Q. And you're not providing an opinion about whether the debtors will achieve an acceptable regulatory approval from any regulator that governs any of the debtors, correct?
A. That's correct.
Q. And sir, what formal training do you have regarding tax?
A. I don't have any formal tax training.
Q. Have you ever been accepted by a court as an expert in tax?

Page 99

MICHAEL HENKIN

A. No.
Q. Sir, do you consider yourself an expert in the energy industry?
A. No.
Q. Do you consider yourself an expert on the ability to forecast natural gas prices in the future?
A. No.
Q. And do you consider yourself an expert on the ability to forecast power prices in the future?
A. No.
Q. And have you ever evaluated the fundamental factors that go into projecting prices for power in the ERCOT market?
MR. HARDIMAN: Object to the form.
A. I have reviewed a lot of documents that the debtors have generated with respect to the forecasts, but your question was have I looked at the underlying factors that go underneath the forecasts, and I'm generally aware what they are, but I haven't done an analysis of that in this case.
Q. And there are separate energy industry

Page 100

MICHAEL HENKIN

bankers at Guggenheim that the committee relies on to provide them expert opinions regarding those issues?
A. We do have a separate energy team. I don't know if they have ever provided a formal expert opinion to the committee, but they do advise the committee and our clients on industry-related issues.
Q. And that separate energy team provides advisory services to the committee regarding the energy issues specific to this case, correct?
A. Yes, in connection with my team as well. We work together.
Q. And did you rely on them in any way in forming the opinions that are contained in your expert report?
A. Not in this report, no.
Q. Let's talk about the opinions contained in your report.
A. Actually, I want to amend that answer.
I did rely on my energy team to help put together the analysis of the utility M&A transactions that are contained in Opinion 1.
Q. They helped to identify those

Page 101

MICHAEL HENKIN

transactions?
A. They helped to identify those transactions and helped to pull some of the information with respect to those, those deals.
Q. So you relied on members of your energy team to review the merger agreements that are contained in Exhibit 2 of your expert report?
A. Actually, my team reviewed the merger agreements. Their team did a screening to identify the last five years' billion and above M&A transactions in the power and energy sector, and then we took over the responsibility of reviewing the -- my team, my restructuring team, of reviewing the actual agreements.
MR. HARDIMAN: Mr. Henkin, make sure you let Mr. McKane finish his question before you begin to answer. I'm sure he'll give you the same courtesy.
BY MR. McKANE:
Q. The energy team helped cull the set and then your team reviewed the merger agreements themselves; is that fair?
A. Yes.

Page 102

MICHAEL HENKIN

Q. Now, the merger agreement does not contain a specific performance remedy; is that correct?
A. The merger agreement for?
Q. So the merger agreement that is part of the overall plan of reorganization that's proposed for these debtors does not contain a specific performance remedy, correct?
A. In favor of the sellers, that is correct.
Q. In favor of the sellers.
What specific performance remedies exist in the merger agreement and related documents?
A. I believe there are specific performance provisions provided in favor of the buyers or the purchasers but that there's a specific clause that's referenced in my report, I think it's paragraph 29, that disclaims any specific performance obligations on behalf of the sellers against the -- against the purchasers.
MR. HARDIMAN: Again, Mr. McKane, if you would let him finish, too.

Page 103

MICHAEL HENKIN

MR. McKANE: My apologies.
MR. HARDIMAN: I have already asked the witness.
Q. Against whom does the buyer have the specific performance remedies?
A. I believe they have them against the seller, or the sellers, in this case.
Q. And you believe that the fact that the seller does not have a specific performance remedy contradicts customary practice?
A. For transactions of this type, yes.
Q. And specifically for transactions of this type, what type of transaction are you referring to?
A. I'm referring to large -- and that can be defined as either above $500 million in value or above a billion -- there's a couple different screens -- some use the 500 and some use the billion -- merger and acquisition transactions within the last five years.
Q. And that's the universe against which you are comparing this transaction, correct?
A. Yes.
Q. Now, in paragraph 40, you say that,

Page 104

MICHAEL HENKIN

typically, M&A agreements contain specific performance provisions, correct?
A. Yes.
Q. And as your source for that statement, you cite footnote 24, correct?
A. Yes.
Q. And footnote 24 is a Law Review article from the Vanderbilt Law Review, correct?
A. Yes.
Q. And that Law Review article cites a 2008 study of large strategic acquisitions, correct?
A. Yes.
Q. The universe that was the source of that Law Review article were strategic acquisitions, correct?
A. I think so, yes.
Q. What is a strategic acquisition?
A. Generally, that is a transaction where a corporation is purchasing a business rather than a financial buyer. So it's a company that's usually in the same industry or related industry.
Q. So a strategic acquisition is when a

MICHAEL HENKIN

Q. And you would agree this is not a strategic acquisition?

A. I wouldn't categorize it as a strategic acquisition, no.

Q. Now, on page 20 of your report, Exhibit 4, you have a series of pie charts, correct?

A. Yes.

Q. And this comes from the April 2015 publication by Schulte Roth, correct?

A. Yes.

Q. And in fact, the pie chart on the left-hand side under the labeling Specific Performance Clauses is an extraction directly out of that report, right?

A. Yes.

Q. This is not your work product?

A. No, we just reformatted the charts to highlight 2 percent instead of the other types of specific performance.

Q. And Schulte Roth drew a distinction between full specific performance and limited specific performance, do you see that?

A. I do.

MICHAEL HENKIN

Q. What's the difference?

A. I believe that the limited specific performance had various limitations, as the name would imply, where there were only certain circumstances by which limited -- the specific performance was available.

Q. Can you give me an example of a limited specific performance provision?

A. That would be an example where only under certain types of breaches could specific performance be pursued and that others -- other types of breaches would not have that remedy available.

Q. And sir, you and your team performed no analysis to differentiate between which transactions contained full specific performance provisions and those that provided limited specific performance provisions?

A. No.

Q. You relied solely on the work by Schulte Roth?

A. For this part of it, yes.

Q. And you had no visibility into how they drew that distinction?

MICHAEL HENKIN

A. I did read the report, and I recall that there were some description of the types of circumstances that might arise. I also looked at the specific performance for the acquisition of the predecessor of EFH, TXU, and that was a limited specific performance remedy, as I recall.

Q. One example in which a limited specific performance provision would not apply is if the closing conditions are not met, right?

A. I think that's right.

Q. And another example where a limited specific performance provision would not apply is if the debt financing did not materialize?

MR. HARDIMAN: Object again to the extent it's calling for a legal conclusion.

You can answer.

A. I don't recall if financing was carved out of limited or not. It might have been.

Q. And your analysis doesn't different -- other than acknowledging the distinction drawn by Schulte Roth, your analysis doesn't distinguish between the two variations of specific performance, right?

MICHAEL HENKIN

A. The analysis that we did on Exhibits 2 and 3 does not, correct.

Q. Let's look at Exhibit 2.

A. Okay.

Q. These are power and utility industry M&A transactions, correct?

A. That's correct.

Q. None of these companies are in bankruptcy, correct?

A. I don't think so.

Q. And you familiarized yourself with all of these transactions to prepare this exhibit, correct?

A. My team reviewed all of these merger agreements. I'm familiar with the list, but I couldn't give you details about each transaction. It was a large universe.

Q. Isn't it all but two of them are strategic transactions?

A. That may be true. I haven't done the distinction between the strategic and the financials for this analysis.

Q. You can't, looking at them, you can't tell me which ones are strategic and which ones

MICHAEL HENKIN

approvals, correct?

MR. HARDIMAN: Object to form.

A. I would need to check the agreements, but that would sound reasonable.

Q. And you would expect that to be true for any remedy; that the seller would attempt to assert regarding the buyer's obligation to close regarding the need for the seller to obtain regulatory approval, correct?

MR. HARDIMAN: Object again. I think it calls for a legal conclusion, but you can answer.

A. That's what I would expect.

Q. And Exhibit 3 provides an analysis of restructuring transactions in the last few years, correct?

A. Yes, the last five years.

Q. Did you evaluate which of those transactions contained fiduciary outs and which ones did not?

A. Again, that wasn't one of the criteria that we looked for, although I would expect that many of them, if not most of them, would have a fiduciary out.

MICHAEL HENKIN

Q. This concept of asymmetrical risk in a merger transaction, would you think --

Let me step back. You've been a restructuring professional for how long?

A. Twenty years.

Q. How many transactions have you worked on negotiating plans of reorganizations or sales and mergers in the restructuring context?

A. Over ten.

Q. And in your experience, not just on the deals you have worked on, but you have been able to consult and inform yourself as to the market trends in restructuring industry regarding plans of reorganization, sales agreements and merger agreements?

MR. HARDIMAN: Object to the form.

A. Yes.

Q. Sir, based on all of your experience, do you think it is difficult for a seller, who is a debtor in a Chapter 11 reorganization, to maintain a full fiduciary out for its protection while at the same time attempting to get specific performance from a buyer?

A. I think it depends on the

MICHAEL HENKIN

circumstances and the -- the specific transaction.

Q. Would you expect that to be an imbalance of risk allocation between the seller and the buyer to the extent that the seller in a Chapter 11 restructuring is attempting to maintain a full fiduciary out, while insisting that the buyer commits a specific performance?

A. Not necessarily, because I think it's generally accepted that debtors in Chapter 11 need to preserve a fiduciary out because of the court-overseeing nature of the process, and buyers typically acknowledge that and may sign up for specific performance obligations notwithstanding the fiduciary out rights and often negotiate a break fee or some other protections to give them a compensation if that happens.

Q. Right. So, to evaluate the transaction, you have to look beyond just the remedies available to the seller and look at all of the terms of the transaction; do you agree with that?

A. To evaluate an entire transaction, you

MICHAEL HENKIN

would want to look at all the terms, but the purpose of this was to focus in on remedies as the one, you know, missing element of the transaction to try to understand what remedies were available.

Q. Right. You're only providing an opinion as to the one term in the merger agreements, the remedies available to the seller under certain conditions, correct?

A. The opinion relates to the remedies, yes.

Q. You look to solely the remedies available in the merger agreement, not other benefits that the seller obtains that are outside the merger agreement, correct?

MR. HARDIMAN: Object to the form. You're asking him whether his opinion goes to whether there were other benefits obtained?

Q. You can answer.

MR. HARDIMAN: Is that the question?

A. We focused on the remedies in the merger agreement, although I wasn't aware of any other remedies that existed beyond the merger

Page 129

MICHAEL HENKIN

Q. And the only club deals are the Chatham Lodging acquisition of Inkeepers, right? That was a Cerberus deal?
A. I believe so, yes.
Q. And the only other club deals were the Fairholme Capital acquisition of GGP; that was a club deal?
A. I don't recall.
Q. And do you know whether the CP ESH Investors' acquisition of Extended Stay was a club deal?
A. I believe it was, yes.
Q. In evaluating the financial transactions, you identified specific performance as not being obtained in the MSR acquisition, correct?
A. Yes.
Q. And in the Inkeepers acquisition --
A. Yes.
Q. -- did you evaluate the whole period for these restructuring transactions?
A. You mean in the five years?
Q. No, the period of time between the announcement of the deal and the closing of the

Page 130

MICHAEL HENKIN

deal?
A. We used the deals that had closed, so my team tried to find the final documentation. Many of these evolved through multiple rounds of documents, and so we tried to get to the last and final documentation in each of the cases.
Q. What is the potential -- let me ask you this: The ability of a buyer -- step back.
The willingness of a buyer to agree to specific performance is -- you've evaluated that in your experience, right? You've had to negotiate for specific performance in your career, right?
A. Yes. As part of an overall deal, yes.
Q. In your experience, is a buyer -- is the duration of time between the commitment to buy and the closing of the deal, that period of time, a factor in the buyer's willingness to commit to specific performance?
A. I don't know if it -- if it's a factor limited to specific performance. It's certainly a factor that a buyer will take into account as far as the duration of their commitment, and it will affect their willingness to sign up for

Page 131

MICHAEL HENKIN

multiple obligations. But I don't know if there's anything unique about specific performance as far as the length of time the deal might take to close.
Q. So it's fair to say that the duration of time that a transaction may take to close is a factor in the buyer's willingness to commit to certain provisions, including, potentially, certain remedies?
A. Yes.
MR. HARDIMAN: Object to the form.
A. Yes.
Q. And sometimes that, you know, that notion of the time, the duration of time between announcing the deal and closing the deal, do you understand what I'm referring to if I refer to that as the "hold period"?
A. Yes.
Q. Because the buyer at that point has announced a deal, they're out, they're exposed, they have committed to the obligation, and then they have to face whatever consequences can be imposed upon them based on those remedies, correct?

Page 132

MICHAEL HENKIN

A. Correct.
Q. And what is the potential hold period between the announcement of this transaction and the merger agreement and the outermost date in which this transaction can close?
A. I think it's about a year.
Q. Well, it was announced on August 9, correct?
A. Correct.
Q. And through extensions, it can close November 1 of 2016, correct?
A. That's my understanding, although I know the debtors said that August 31 was the outside date. So there may be a difference in between August 31 and November that we tried to identify how to reconcile that, and we cite November in our report.
Q. Exactly right. So let's just be precise about that for the transcript.
Your report cites November 1 --
A. Correct.
Q. -- as the outer point in time, and the debtors contend that it's August 31, right?
A. Correct.

MICHAEL HENKIN

because of the disputed claims change.

Q. And it's possible that the debtors can emerge by March 31 if the plan is confirmed and the regulatory approvals are obtained by then, correct?

A. I think it is theoretically possible that they could emerge earlier, although I think it's unlikely.

Q. And you base that based on your experience in obtaining regulatory approvals?

A. Based on my review of the PUCT setting some hearings the end of March and the knowledge that there's going to be a series of steps even after the regulatory approval is obtained to actually emerge and get an emergence from bankruptcy.

Q. But with the 3/31 emergence date assumption, you have no reason to believe that the calculation of the implied enterprise value is different than what the debtors presented to their boards, correct?

A. Correct.

Q. And you said in reaching your opinions contained in your expert report that you

MICHAEL HENKIN

evaluated the August 9 presentation to the boards of directors?

A. I did.

Q. And in that August 9 presentation, the debtors described the boards' consideration as an essential tradeoff between the conditionality of the merger agreement and the benefits to the estate provided by the merger transaction, correct?

MR. HARDIMAN: Objection to form.

A. I recall disarmament being used as the benefits, but yes, I think that's the gist of their presentation, the conditionality and risks associated with the deal and the potential benefits that the estate might have by virtue of disarmament.

Q. Well, and you have no opinion as to whether that was appropriate or inappropriate evaluation of the debtors to consider about the benefits of the transaction versus the risks associated with it?

MR. HARDIMAN: Object to the form.

A. I think, generally, that's a reasonable way to analyze a transaction, but I

MICHAEL HENKIN

wasn't opining on the business judgment of the board or anything of that nature.

MR. McKANE: Let's mark this as Henkin 8.

(Henkin Exhibit 8, Presentation to the Boards of Directors and Managers of Energy Future Holdings Corp., Energy Future Competitive Holdings Company LLC, Texas Competitive Electric Holdings Company LLC, TCEH Finance, Inc., Energy Future Intermediate Holding Company LLC, and EFIH Finance Inc., Approval of Amended Plan and Merger Transaction Documents dated August 9, 2015, marked for identification, as of this date.)

BY MR. McKANE:

Q. Do you have Henkin 8 in front of you?

A. I do.

Q. For the record, Henkin 8 is a presentation to the boards of directors of EFH and its subsidiaries entitled Approval of Amended Plan and Merger Transaction Documents. Do you see that?

A. Yes.

MICHAEL HENKIN

Q. Sir, this is the presentation you reviewed in forming your opinions?

A. Yes. One of the presentations I reviewed, yes.

Q. And let's go to the Recommendations page, Bates number ending in 935.

A. Okay.

Q. The board of directors basically evaluated the risks and benefits associated with the merger transaction, do you agree with that?

A. Yes.

MR. HARDIMAN: Do you agree with what, that that's what the document says?

Q. Do you agree that that's what they did?

MR. HARDIMAN: How does he know what they did?

A. I agree that's what is contained in this document that was presented to the board.

Q. And you have no reason to believe that the board considered anything else or did anything different, right?

A. I don't know. I wasn't there.

Q. So, in evaluating the transaction, all

Page 169

MICHAEL HENKIN

asked about.

MR. McKANE: It's very little that you do not have.

MR. HARDIMAN: But that was an issue -- remember I asked that at the depositions of certain people on your side, and I asked --

MR. McKANE: Do you really want to do this on the record?

MR. HARDIMAN: No, I don't.

(Discussion off the record.)

MR. McKANE: On the record, I'm very confident you have it, and in fact, it was filed. It's Docket No. 5248.

MR. HARDIMAN: I accept your representation.

BY MR. McKANE:

Q. You just described the merger as akin to an option, right?

A. Yes.

Q. What does "akin" mean?

A. It means it is similar to or structured in a manner that resembles an option.

Q. What type of option?

Page 170

MICHAEL HENKIN

A. A real option.

Q. And what does a "real option" mean?

A. A real option is an analogy between buying a company or buying a business or a real-world transaction and an options contract that is a contract to purchase a security that we typically think of when we think of options contracts.

So real options expands the concept of an option to apply to real-world transactions, and I think I cited a footnote and a definition in the footnote in my report that this acquisition agreement is akin to an option, but it's more like a real option because it's an agreement to buy a company.

Q. All right. So your analogy is not to an option in the securities world, but to the concept and the expansion of the idea of an option to real-world scenarios beyond the securities world; is that a fair statement?

A. Yes. Although you can still look at a security and find parallels, the most similar and analogous type of option is a real option.

Q. When you say "the most similar and

Page 171

MICHAEL HENKIN

analogous type of option is a real option," the most similar and analogous to what?

A. To the merger and purchase agreement.

Q. All right. So you're evaluating this merger and purchase agreement to this definition of a real option?

A. Correct.

Q. And where is this definition contained?

A. There are several academics that have published papers around real options. There's a footnote in my report that I could find for you that actually contains the definition.

Q. Please do.

Is it page 21, paragraph 33?

MR. RUEGGER: Footnote.

Q. Sorry. Page 21, footnote 33?

A. Yes, it may be. I think maybe the definition is in the actual paragraph. Let's see.

It may be on footnote -- maybe in the next paragraph. Let's take a look.

Q. Just let me know when you find the definition of "real option" that's contained in

Page 172

MICHAEL HENKIN

your expert report.

A. It's footnote 36 on page 22.

Q. Footnote 36 states, "A corporate investment opportunity is like a call option when it provides the right (but not the obligation) to acquire, (buy or build or expand) something, such as a business or asset."

A. Correct, and that is a "real option" definition right there in footnote 36. It references an article or a paper from Harvard Business Review called "Real-World Way to Manage Real Options."

Q. In an option, the purchasers have the exclusive right to acquire the asset, correct?

A. There are non-exclusive options, but generally when you're talking about options, it's an exclusive right, correct.

Q. And in fact, in paragraph 50, you specifically state "the purchasers with a 'real' option...have the exclusive right, but not the obligation, to invest in the approved transaction," right?

A. That's correct.

Q. And that's what you're relying on in

MICHAEL HENKIN

terms of your definition of "real option," correct?

A. Yes.

Q. And you would agree with me that in an option, a real option, the seller is obligated to sell the asset?

A. In a real option, again, there could be other aspects to an investment opportunity, such as a fiduciary out or other things, that could impose some conditions or issues that aren't hundred percent certainty that you have the right to buy it.

Q. So let's step back a second. In the security world, when you create an option, the acquirer of the option owns the right and the seller can't recall that right without buying back the option, correct?

A. That's generally the case, yes.

Q. And in this expansion of the idea of an option to this concept of a real option that you're relying on --

A. Yes.

Q. -- you have tried to provide for the ability to acquire the option but add the

MICHAEL HENKIN

additional complexity of acquiring something like a corporation as opposed to an underlying security, correct?

A. Yes.

Q. And so when you say it's akin to it, it's because the complexity and -- let me state it again.

So when you say in your opinion that this transaction is akin to a real-world option, it's an attempt to incorporate the complexity associated with this M&A transaction?

A. That is correct.

Q. And one of the complexities associated with this M&A transaction is the debtors' ability to exercise a fiduciary out to walk away from the transaction at any time?

A. That is correct.

Q. And the debtors' ability to exercise that fiduciary out is their ability to go get higher and greater value for all of the debtors and their creditors, right?

A. Well, there are some limitations on the fiduciary out in the alternative structuring, as defined in the agreement, but

MICHAEL HENKIN

yes, there are scenarios where the debtor could extract itself from the merger and purchase agreement.

Q. But you agree with me that in the definition of "option," as it relates to the securities world, at least where this concept started, the seller can't walk away from the option if it sees a better opportunity?

MR. HARDIMAN: Objection to form.

A. That's generally the case, yes.

Q. And even in the real-world option or the real option expansion that you are relying on, the real-world option provides an exclusive right to the purchaser?

A. Again, I think real-world options could be non-exclusive as well. We referenced "exclusive" because the PSA basically gives the purchasers the exclusive right to pursue this acquisition for some period of time, subject to all the terms and conditions that are contained in those agreements.

Q. Can you identify for me a real-world option with a non-inclusive right that you have experienced in your profession?

MICHAEL HENKIN

A. It's very rare to have a non-exclusive option because it doesn't have that much value. Other people can buy the same asset at the same time. You have to basically exercise it quickly enough to get the asset.

Q. Right. So sitting here today, based on your experience as an investment banker, you can't identify a non-inclusive real-world option because exactly for that reason: There's little, if any, value to a non-exclusive real option?

MR. HARDIMAN: Object to the form.

Maybe you want to break that question down.

A. I would need to think about examples of non-exclusive real-world options, but I agree with the premise that there's little value to a non-exclusive option.

Q. And sitting here today, you can't identify a real-world non-exclusive option?

A. I would need to think more about it, but no.

(Recess; Time Noted: 11:22 a.m.)

(Time Noted: 11:34 a.m.)

MICHAEL HENKIN

BY MR. McKANE:

Q. Mr. Henkin, I apologize, I've got to double-back on Exhibit 3.

A. Okay.

Q. That's your presentation of restructuring transactions.

A. Yes.

Q. Are you there, sir?

A. I am there.

Q. When you and your team evaluated these restructuring transactions, you did not distinguish between full specific performance provisions and limited specific performance provisions, correct?

A. That's correct.

Q. And in evaluating these restructuring transactions, you and your team did not evaluate whether these restructuring transactions also contained a full fiduciary out for the debtor?

A. That wasn't part of the analysis, no.

Q. Sir, with regards to the pending merger agreement, if all else remained the same and that merger agreement contained a reverse termination fee, would that reverse -- would

MICHAEL HENKIN

that merger agreement be consistent with large bankruptcy sales to financial buyers?

A. That would be the sole remedy?

Q. That would be the sole remedy.

A. Would it be consistent with all the deals that we have analyzed here?

Q. No, my question is -- if the merger agreement -- I'll use the NextEra bid.

You said the NextEra reverse termination fee was approximately 150 to 200 million dollars; something in that range?

MR. HARDIMAN: I actually don't think he ever accepted that.

MR. McKANE: I thought that he did.

A. I think I said it was around $200 million.

Q. Around $200 million. I'm going to use your number.

So, assuming the merger agreement is exactly the same but it contained a reverse termination fee of $200 million --

A. Okay.

Q. -- available to the seller, with that one change, would the merger agreement be

MICHAEL HENKIN

consistent with large bankruptcy sale transactions to financial buyers?

A. It would be more consistent, although I note that specific performance is in almost all of these cases as well. So it would still have this lack of specific performance element to it, but it would be more consistent.

Q. And specifically with regards to the lack of specific performance, if you evaluate just the financial transactions, half of them don't have specific performance?

A. Okay. I'll take your word for it based on the categorization that we did earlier.

Q. Right. So specific performance is less likely to be available to a seller to a financial buyer than, based on your analysis, than it would be against a strategic buyer?

MR. HARDIMAN: Object to the form.

A. Because the only two that don't have specific performance are financial buyers in these analyses, yes.

Q. And in both of those circumstances, you don't even evaluate against the party against whom you can assert that specific

MICHAEL HENKIN

performance, right?

A. That's correct, we didn't.

Q. And so even when there was specific performance, there may be marginal value to that specific performance because it's against the shell entity?

MR. HARDIMAN: Objection to the form. I think it calls for a legal conclusion.

A. To the extent that there is an inability to collect on the specific performance, it may have less value, but I would need to look at the agreements to make an opinion on it.

Q. And sir, is it your understanding that the debtors chose the value of disarmament and drag over the value of a $200 million reverse termination fee?

A. I understand the debtors valued disarmament significantly more than having a lot of these protections; not simply those two, but others as well, yes.

Q. And what were those other protections?

A. The various forms of damages that we're talking about here. Not only the reverse

MICHAEL HENKIN

the event that they were called upon to forfeit it or they breached the agreement later.

Q. Right. So it only arises in the circumstance in which they don't close and the other conditions are met?

A. In the case of some of those remedies, yes.

Q. So let's do it -- let's break it down one-by-one.

So the remedy for a reverse termination fee would only arise if the buyers don't close and the conditions to enforce that remedy are met, correct?

A. That's correct.

Q. And a remedy of liquidated damages would only arise in the buyers don't close and the conditions necessary to enforce that remedy are met, correct?

A. Yes, that's correct, although I will point out the circumstances by which those fees are payable in these other transactions are generally not controllable by the buyer as far as -- the buyer can control whether they close or not, but in this case, there's a fee that's

MICHAEL HENKIN

payable to the buyers and the buyers choose not to close. So if we're talking about the 550 payment --

Q. I'm not at the 550 payment yet. None of my questions have anything to do with the 550.

MR. HARDIMAN: Are you finished answer the question?

THE WITNESS: I wasn't because I was going to go to the 550 as one of the elements of the settlement agreement.

MR. HARDIMAN: Go ahead.

THE WITNESS: Which is you're talking about the consideration that was provided as part of the settlement agreement. The consideration that goes in favor of the purchasers or a subset of the purchasers, which are the ones that are creditors that are receiving the 550, they, as buyers, have the right to say we're not going to close and we're going to receive this payment.

Whereas, in a typical merger agreement, if you had a reverse -- a break fee, for instance, not a reverse break fee,

MICHAEL HENKIN

you wouldn't have the buyer being able to trigger the break fee by saying, I'm not going to close, pay me a break fee. So, in that respect, there is a difference between how you're describing these other merger agreements and how you're describing this merger and purchase agreement.

BY MR. McKANE:

Q. So let's be precise. I'm asking you about the remedies and liquidated damages -- not in this transaction, right, because there are no remedies or liquidated damages.

A. Right.

Q. I'm talking about, generally, when those actually arise, and are they, you know, are they committed to at the time of the merger agreement. Right? They're committed to at that time. The debtors -- strike that.

The buyer signs onto the obligation to pay liquidated damages or a reverse termination fee or forfeit the deposit at the time of entry of the agreement, correct?

A. That is correct.

Q. And to the extent that they elect not

MICHAEL HENKIN

to close because they do not believe that closing is in their economic interest, they control whether they're going to have to pay any one of those potential remedies, correct?

A. That's generally true, yes.

Q. Now, in your opinion you note that, in an alternative restructuring, the junior creditors of TCEH would receive a payment of $550 million, right?

A. Yes.

Q. Now, that is true -- that is one piece of the settlement consideration, correct?

A. Yes.

Q. There are other pieces of the settlement consideration as well, correct?

A. Yes.

Q. And you did not account for those in Opinion 3 of your report; is that right?

A. Those other elements are non-financial elements, such as the drag right. So we incorporate here the financial calculus that a purchaser is going to make to determine whether it's in their interests to close or not.

Q. So opinion 3 is limited to the

MICHAEL HENKIN

financial elements only of the alternative restructuring?

A. Yes.

Q. And when you referred to disarmament and drag as non-financial elements, are you suggesting that they cannot be converted to dollars?

A. It's very difficult to convert the concept of the drag right to a dollar value.

Q. You couldn't determine the cost of maintaining these cases for a month? Isn't there a burn rate just for the existence of the EFH bankruptcy that is quantifiable?

A. Yes.

Q. And that would be, to the extent that drag right would accelerate the final conclusion of these cases, you could quantify that based on the burn rate, correct?

A. If you could draw a direct correlation between an extension of the case or a shortening of the case and having the drag right, yes.

Q. Isn't it true in an alternative restructuring the buyers, including the TCEH junior creditors, are committed to a

MICHAEL HENKIN

file-to-trial time period of 90 days?

A. Yes.

Q. Is a 90-day time period between filing a plan of reorganization and obtaining an order confirming that plan of reorganization in a case like EFH an extraordinarily short period of time?

MR. HARDIMAN: Object to the form.

A. I wouldn't say extraordinarily because of the fact that we're going to go through one confirmation hearing already. I think it will be an accelerated process by virtue of having gone through and failed one plan confirmation. It's usually faster the second time around.

Q. But in a case of this size and complexity, including what could potentially be a valuation fight on the E-side, is a 90-day period between filing a plan and confirmation of a plan short?

A. It's relatively short, yes.

Q. What methodology did you use to determine whether the settlement consideration was a sunk cost?

A. I looked at some of the academic

MICHAEL HENKIN

literature around sunk costs and some of the -- my experience as a banker in knowing the incentives that exist when a party has given something up and then makes a subsequent decision, does what they have given up affect their subsequent decision, and that's really how I based my opinion.

Q. Right. And so you based your opinion based on your experience as a banker, your understanding of what a concept of a sunk cost was based on your general reading of literature on economic decision-making?

A. Yes. And my experience, yes.

Q. And did the fact that the perceived sunk costs would not arise in a scenario other than when the buyers refuse to close, was that a factor in your evaluation in your use of that language?

A. I evaluated this transaction specifically, which includes that concept, that these costs are incurred regardless of whether the transaction closes or not. Your point, I think you're making, is there is no cost if the transaction closes because the claims that have

MICHAEL HENKIN

been given up are given up because you bought the company.

We look at it a little differently, where we say the settlement gives certain releases and gives up certain claims, gives certain benefits, and that happens irrespective of whether the transaction closes; and if the transaction closes, there happens to be no value to those claims because the company is exiting bankruptcy.

If the transaction doesn't close, then those claims are also gone and there's a payment and some additional provisions related to what the TCEH junior creditors can or can't do as part of the restructuring process.

Q. So, as I understand what you have just said, the way that you have evaluated the value of the claims depends on whether the debtor emerges from bankruptcy, because if the debtors emerge under this transaction, there is no value to those claims; is that correct?

A. Because they're being given up, correct. I mean, whether they had value or not, they are being given up when the settlement

Page 197

MICHAEL HENKIN

here.
Q. In Opinion 3, you say it's a sunk cost, and it's only a sunk cost based on -- even if we adopt your analysis, it's only a sunk cost at that point in time where the judge enters the order?
A. That is correct, yes. And because they're bifurcated, we look at it as a sunk cost.
Q. Right.
What closing conditions must the debtors satisfy before they can assert disarmament and drag?
A. The closing conditions that the debtors need?
Q. Right. Are there any obligations the debtors have to satisfy before they can assert disarmament and drag?
A. I believe there is a definition of alternative restructuring that needs to be complied with in order to assert the disarmament and drag -- or, in order to assert the drag rights.
The disarmament, I think, again, is

Page 198

MICHAEL HENKIN

granted upon the settlement agreement, but the drag has certain terms that need to be complied with.
Q. Right. So, to the extent that disarmament has value, the debtors obtain that value regardless of the form of the alternative restructuring?
A. Yes.
Q. And it's your, basically, your opinion that the debtors obtain the value of the disarmament even before the plan is confirmed that, therefore, it's a sunk cost and it's irrelevant, right?
MR. HARDIMAN: Again, object to the extent disarmament has value, which you said in your previous question.
A. My view is that disarmament, as contained in the settlement agreement, is a sunk cost and it would not affect the economic decision of the purchasers to close. It shouldn't affect that decision.
Q. Right. But based on your own testimony, drag is not a sunk cost; drag only arises, based on what you have testified, in an

Page 199

MICHAEL HENKIN

alternative restructuring as long as we satisfy the alternative restructuring conditions, correct?
A. The drag right is a contingent obligation that triggers if the deal doesn't close.
Q. And you agree, therefore, it is not a sunk cost even upon settlement agreement approval?
A. Yes, the drag right is a different type of right than the consideration that's been given up regardless under the settlement agreement.
Q. And both disarmament and drag apply in all restructuring scenarios other than the merger agreement so long as the debtors put forward an alternative restructuring as defined in the plan support agreement?
A. Again, my understanding is disarmament, meaning the release of claims, happens regardless of whether they propose an alternative restructuring. The drag, as I understand it, has some limitations, so that it kind of constrains the value of the drag in that

Page 200

MICHAEL HENKIN

respect because it needs to comply with the definition of alternative restructuring, capital A, capital R.
Q. And in evaluating the value of disarmament and drag, the debtors don't have to satisfy the type of closing conditions that they would need to satisfy to enforce the remedies that you have identified in your first opinion?
A. That's true. There is a different set of circumstances that trigger those rights.
Q. And in fact, the ability to assert disarmament and drag is broader and applies in more scenarios than the ability to assert the remedies that you identified in Opinion 1?
MR. HARDIMAN: Object to the form.
A. I don't think they're necessarily comparable as far as remedies in the merger and purchase agreement, again, because of the fact that it's bifurcated. My view is that there's a separate, independent approval of this disarmament that has no ties to whether the transaction closes or not, and then there are some elements that are triggered if the transaction doesn't close.

MICHAEL HENKIN

a portion of it is going to non-participating. Although there is a rights offering and that might have a high participation rate.

Q. Even if we were to assume that the 550 goes to the consortium as a whole, and it only goes to the consortium as a whole after satisfying professional fees, right?

A. I think the 550 is a carve-out of collateral and a first-out payment. I'm not sure that there is any deducts to the 550 with respect to professional fees.

Q. Isn't it true that in the settlement agreement there is a providing that the parties will be able to pay up to $49.75 million in professional fees, and that in an alternative restructuring scenario that $49.75 million comes out of the 550?

A. I would need to review the agreement to confirm that. Are you referring to the expense reimbursement provision as far as the purchase agreement? Are you just talking about the 550 as an expense reduction?

Q. I'll show you the merger agreement and let you look at it, but it's a straight deduct

MICHAEL HENKIN

in an alternative restructuring scenario.

A. Okay.

(Henkin Exhibit 9, a document entitled Exhibit A (Revised Settlement Agreement), marked for identification, as of this date.)

BY MR. McKANE:

Q. Mr. Henkin, I'll do this as a refreshing of recollection. I'll direct you to Section 2.7, Payment of Certain Fees and Expenses, 2.7(a).

A. Do you have a page number?

I think I'm there. 25. Looks like 25.

Q. That's right. 25 rolling to 26.

A. Yes.

Q. Let me direct your attention to the top of 26, immediately after the language that says "provided however" that's italicized.

See that in the third line?

A. I do.

Q. It says, "Provided, however, that EFH shall have no obligation to reimburse TCEH for the Professional Fees paid pursuant to this Section 2.7 in the event the Effective Date of

MICHAEL HENKIN

the Plan does not occur."

A. I see it.

Q. Do you see that, sir?

A. I do.

Q. And then just down below in that same paragraph.

A. Okay.

Q. It's seven lines down.

A. I see it.

Q. It says, "The settling TCEH Unsecured Noteholders, Settling TCEH Second Lien Noteholders and the TCEH Official Committee agreed that," and then you go down to (x), "the Professional Fees of the TCEH Unsecured Group and TCEH Second Lien Group," and then you go down to number (2).

A. Yes.

Q. "Shall reduce pro rata the distributions to all holders." See that, sir?

A. Yes, I do.

Q. All right. And then I see in (y), "The Professional Fees of the TCEH Unsecured Group and TCEH Unsecured Notes Trustee also shall reduce pro rata the distribution to

MICHAEL HENKIN

holders"?

A. Right to the extent the debtor pays them, then the debtor gets to deduct it from the 550.

Q. Right.

A. Right.

Q. So, to the extent that the settlement agreement is approved, and under your analysis, therefore, creates a sunk cost?

A. Correct.

Q. The 550 is -- and therefore, the debtors pay out the $49.75 million --

A. Okay.

Q. -- to the settling parties?

A. To the professionals.

Q. To the professionals?

A. To the TCEH juniors.

Q. The 550 is never actually going to hit; it's going to be $500 million?

MR. HARDIMAN: Object to the form.

Answer the question as best you can.

I'll just state for the record this is a large agreement and he's been shown just a few sections of it in a short period of

MICHAEL HENKIN

would have both that intrinsic value and that time value, right?

A. Yes. The same would hold true for the claims that are against the T-side from the E-side as well, but that's true.

Q. In Opinion 3, you noted that -- let me ask you this: We have talked about, you know, at that moment in time where the debtors decide -- at that moment in time when the buyers decide whether they're willing to close, they're going to evaluate their investment based on their perceived value and their cost, right?

A. They're going to evaluate the value and the purchase price. When you say cost, I assume you mean the cost to make the investment.

Q. And I was using "cost" to be very general. Like let's be precise. That cost is the purchase price?

A. Yes, for the exercise of the rights offering or the ultimate funding of the transaction, it is the purchase price inherent in the merger and purchase agreements.

Q. And we have seen that there is a range, and that range is somewhere between 18.7

MICHAEL HENKIN

and 19.3, depending on what emergence date, and you believe 18.5 and 19.5 based on a later emergence date, correct?

A. Correct.

Q. So that's their cost. And they're going to have greater visibility as to their cost as well, right?

A. Yes, they should have some additional information onto the likelihood of these disputed claims being allowed.

Q. Right. For example, the cost to the purchase price goes down to the extent that Judge Sontchi rules on Wednesday that the federal judgment rate applies to post-petition interest claims?

A. Yes.

Q. Is that the only driver between the brackets of the range for the purchase price?

A. There's also the make-whole claims, although I think that depends on when those are determined as to whether the deal has a right to not close or not.

Q. Is it your understanding that a precondition to closing is that the -- that

MICHAEL HENKIN

Judge Sontchi determines that there are no make-wholes owed?

A. That's my understanding, yes.

Q. Right. So the range in value should not account for any payments for make-wholes, correct?

A. Correct, although my understanding is that the purchaser could waive that condition and close. And the debtors have done an analysis assuming all those make-whole claims are allowed a year after the case closes, so there is a possible worst case where that could be -- those make-wholes could be incorporated into the purchase price.

Q. And in your understanding of the economic rationale of a buyer, a buyer would waive that condition and agree to pay the make-wholes, to the extent that they were ordered pre-closing, if they saw that the transaction yielded greater value than the purchase price with the additional payment of the make-wholes, right?

A. Yes.

Q. In evaluating whether to close or not,

MICHAEL HENKIN

the analysis that the buyers are going to perform is this straight economic analysis that is no different than the analysis that any buyer will evaluate at the moment in time when they are going to decide whether to close this transaction?

A. I think that's generally correct.

Q. You used a phrase that there's no "reasonable assurance" that the merger will close, correct?

A. Yes.

Q. How do you define "reasonable assurance"?

A. I define it as a reasonable likelihood that the transaction would close.

Q. And what methodology did you employ to evaluate whether there was a reasonable likelihood that the transaction will close?

A. We looked at four different components. One was the conditionality inherent in the merger and purchase agreement; the second was the remedies, or lack thereof, contained in the merger and purchase agreement; the third was the option-like nature of the agreement; and the

MICHAEL HENKIN

last was the record that was provided to the board based on my review of the presentations that were made to the board.

Q. How is the record presented to the board of directors relevant to evaluating whether there is a reasonable likelihood that the buyer will close the transaction? Has the buyer seen the board or directors presentations?

A. I don't believe so, but the opinion was directed at whether there was reasonable assurances to the seller, and therefore, the opinion is does the seller and, in effect, the seller's board have reasonable assurances. That's my understanding of how the opinion was framed.

Q. All right. Let's be precise. You just defined "reasonable assurance" as reasonable likelihood the transaction will close?

A. Correct.

Q. And the reasonable likelihood the transaction will close is an objective evaluation of whether you believe as a banker that the transaction will close?

MICHAEL HENKIN

A. That is correct, based on all the information that I have analyzed whether it's likely, reasonably likely to close.

Q. Right. And your evaluation of whether, objectively or not, it's going to close is based on what you think the buyer is going to do, right?

A. That's correct.

Q. And the buyer is going to be solely an economic animal, right? And it's going to evaluate the decision to close -- strike that.

The buyers are economic animals that will evaluate whether to close solely based on their economics of what they think the value of the deal is versus the purchase price, right?

A. I think that's correct.

Q. So what the board was told or not told about -- what the board of EFH was told or not told about the conditions for closing is irrelevant to the buyer's decision on an economic basis of the value of the transaction versus the purchase price, right?

A. The board informing doesn't

MICHAEL HENKIN

necessarily correlate with whether the buyer is going to close or not, but the record that the board got provides for whether there were assurances that were made known to the board, and I believe that the opinion was focused on, from the buyer's perspective, whether there were sufficient assurances that the transaction would likely close.

Q. So long as your definition of "reasonable assurance" is reasonably likely to close?

A. Yes.

Q. That's an evaluation of whether they're going to close at the moment of time when closing is required, right?

A. Yes.

Q. All right. Whatever assurance the buyer gave prior to that, to use your term, is a sunk cost, it's irrelevant, right?

A. Well, if the buyer gave certain remedies or reduced conditionality, it helps inform the seller that there may be a higher likelihood that the transaction would close to the extent that the seller has an ability to

MICHAEL HENKIN

force certain things onto the buyer.

Q. Right. So, to cut through it, the prior commitment of a remedy is simply a building block in the buyer's evaluation of what the costs are, correct?

A. The buyer's evaluation of cost.

Q. Let me do it another way.

A. Okay.

Q. If they're going to close the deal, they're going to evaluate the value of the deal vis-a-vis the purchase price, right?

A. Yes.

Q. In the alternative world, they say if I don't close, I'm going to have to pay a break?

A. If there was a break fee, sure. A reverse termination fee, right.

Q. Let's use real numbers. In your analysis, you're like if it's 19.1 is the value of the transaction versus the purchase price of 19, they're going to close, assuming no hurdle rates or an internal rate of return?

A. Assuming 550 or any of that kind of stuff, if the option was in the money, they should economically want to close.

MICHAEL HENKIN

Q. Right. If the option is in the money, they should want to close --

A. General --

Q. And if the option is in the money, they're going to close, right?

A. They should have an economic incentive to close, yes.

Q. Right. And in evaluating whether they're in the money, they have got to evaluate their costs, right? And the amount that they may or may not be in the money is going to depend on how much they have already -- they will have to pay for the option. And here, using real -- you know, let me strike that again.

If they're in the money, it's going to depend to what they're going to have to pay, right?

A. Yes.

Q. So if the costs are 19 and the option is worth 19.1, they're in the money; they're going to close, right?

MR. HARDIMAN: Object to the form.

A. Putting aside the 550, assuming that

MICHAEL HENKIN

that's not there, yes, they should close if the option has positive value, in the money.

Q. All right. Now, because they have -- you know, in your scenario with the reverse termination fee, they can't maintain the status quo, right? They either have got to close or they have got to do something else, and to do something else, they're going to have to pay a reverse termination fee, right?

A. Correct.

Q. And that's going to cost them $200 million?

A. Yes, if that was the number.

Q. Right. And so there is a scenario in a real-world option, not the securities option that you are describing, where even if they were -- even if they could close and the asset was worth 18.9, because it would -- and the cost was 19, because the alternative scenario would cost them $200 million, 18.9 is still greater than 18.8 and they would close, right?

A. Under your hypothetical, yes.

Q. So, in evaluating the alternative scenario whether it's these remedies or not, you

MICHAEL HENKIN

have to factor in those remedies to figure out in the option in your world is in the money?

A. That is correct.

Q. And so in evaluating whether to close this deal, they're going to look to the alternative scenario and whether they think that's more valuable than this option, right?

A. Other than the scenario where there's specific performance which could force someone to close even if it was uneconomic to them, that's another type of a remedy that's not just a financial, you know, dollar that you can adjust a price, yes.

Q. And the problem with specific performance is it's sometimes against a shell entity that makes it illusory?

MR. HARDIMAN: Objection to form. Calls for a legal conclusion.

A. Okay.

Q. You agree with that, right?

A. Sometimes.

Q. Where did you get your definition for "reasonable assurance"?

A. Discussions with the team that helped

MICHAEL HENKIN

put the report together.

Q. Right. There is no, like, peer-reviewed article that you cite, correct?

A. No.

Q. There's no industry treatise that you cite, right?

A. Not that I'm aware of.

Q. This is discussions with your team, including S&C, right?

A. That's correct.

Q. So you got some input from them on what you thought the law was?

MR. HARDIMAN: Object. I think, I could be wrong, I think that the rules are that you can't answer ask that question.

MR. McKANE: To the extent that you instructed him as to the law and it became an assumption in his analysis, I'm entitled that.

MR. HARDIMAN: You can ask him that, the assumption in the analysis, but the analysis says what it is.

BY MR. McKANE:

Q. There's no definition of "reasonable

MICHAEL HENKIN

assurance" in your report, right?
MR. HARDIMAN: You can answer the question.
A. No.
Q. Right. And you gave me a definition today, right?
A. Yes, reasonable likelihood.
Q. Right. And the reasonable likelihood to close, was that informed based -- was that an assumption given you as to what the law is?
A. I wasn't making a legal opinion. There is a place in the report where I'm asked to answer certain questions as part of my opinions, and the question was posed is are there reasonable assurances that the transaction would close. So that definition was determined in consultation with the team that helped define the scope of the opinions in the report.
Q. Okay. And the team that helped define the scope of the opinions included Sullivan & Cromwell?
A. Yes.
Q. So they helped define the question that you were answering?

MICHAEL HENKIN

A. Yes.
Q. And just to close this area out, there's no peer-reviewed approach to evaluating whether there are reasonable assurances to a merger, right?
A. Not that I'm aware of.
Q. There is no widely accepted methodology for evaluating whether there are reasonable assurances that a merger will close, right?
A. I think it's widely accepted that remedies and conditionality are the underlying metrics that companies evaluate in determining the reasonable assurances of closure, because I have looked at a lot of transactions where boards rejected mergers or deals were not consummated because of excess conditionality and lack of reasonable likelihood of closing, and I think that most of those refer to the lack of remedies and the lack of sufficient certainty of closure.
So those were the -- I don't think there's peer-reviewed articles, necessarily, but those were the underlying analyses that I used

MICHAEL HENKIN

to inform my opinion.
Q. And you did not identify any of those transactions in your report, right?
A. The other transactions where boards rejected mergers? No, they weren't identified in the report.
Q. You don't have a table where you list all the transactions that you evaluated that were proposed and rejected by boards, right?
A. No.
Q. You didn't include any of the materials for -- that you reviewed that were presented to those boards that were factors in evaluating whether to enter into those transactions, right?
A. No.
Q. The description you just gave of what you were basing that opinion on is neither contained in your report nor in the materials which you relied on in preparing the report?
A. Well, it's contained in tables Exhibits 2 and 3 in that I've identified these factors -- specific performance, liquidated damages, a reverse termination fee -- as the

MICHAEL HENKIN

elements of remedies that would be available in another type of a transaction. So I kind of rely on Opinions 1 through 3 in order to inform my Opinion 4.
Q. Right. And to be clear, none of those remedies are an assurance that the transaction will close, right?
A. They provide assurances that it's more likely to close when the remedies are present. So I do think they address the issue of likelihood of closure.
Q. Let's be more precise. What those remedies do is that they change the cost side of the equation?
A. Some of them are purely financial and do change --
Q. And specific performance, you know, to the extent that you think, you know, other than the -- let's break this down.
The remedies that you identified, other than specific performance, are money, right? They're quantums of money?
A. Other than the few examples that we looked at where common law damages were

MICHAEL HENKIN

preparation of your actual report, you only relied on those three or four board presentations?

A. That's correct, with the exception that there was some stuff on the intercompany notes. I don't know if it was a board presentation or not, but --

Q. The one-pager from 2011?

A. Although I didn't look at that in preparation of this report. I looked at that when I saw the Mendelsohn Report, but I don't know if there were any -- I don't think there were any board presentations as part of that opinion.

Q. All right. Thank you.

Sir, you're familiar, based on your experience as an investment banker and in your work for preparing your expert report, you're familiar with a MAC clause, right?

A. Yes.

Q. Material adverse change, material adverse effect clause.

A. Yes.

Q. Do you prefer MAC or MAE?

MICHAEL HENKIN

A. MAC is fine.

Q. So, in your experience and based on your review of merger agreements in preparing to provide your opinions today, did you conclude that it is industry practice for there to be a MAE or MAC clause when there is specific performance that can be asserted against the buyer?

A. You know, I didn't look at the MAC clauses as part of our survey, so I don't really have an opinion on that.

Q. So, setting aside the work you did here -- so let's be precise. In you preparing to render your expert report, you did not analyze whether there was a correlation between the buyer committing to specific performance to close the transaction and the buyer's ability to have the ability not to close in the event that there's a material adverse change or a material adverse condition?

A. That's correct.

Q. Other than your work in preparing to testify today on this opinion, based on your experience as a restructuring professional for

MICHAEL HENKIN

20 years, is it your general experience that a material adverse change or a material adverse conditions provision is common in merger agreements?

A. Yes.

Q. And in your experience as a restructuring professional for 20 years, am I correct that if a -- if you represented a buyer and the seller was demanding specific performance, you would insist that there be a material adverse change or a material adverse conditions provision that limited the buyer's requirement to close?

A. You know, there's always a give and take of negotiating leverage between a buyer and a seller, and so it would depend on the circumstances to whether I would advise my client on those provisions, but I would advise on relative negotiating strength to try to protect the party that I was representing.

Q. Right. And in your experience, the ability to get a provision like specific performance against the buyer depends in large part on the parties' negotiating position,

MICHAEL HENKIN

right?

A. Yes.

Q. And that negotiating position depends on the relative weight that the party negotiating places on the value of the specific performance as opposed to other provisions like the value of a fiduciary out, right?

A. True.

MR. HARDIMAN: Object to form.

Q. Am I correct that you have done no analysis as to whether there could be an impact on Oncor's business between the time of entry into the merger agreement and closing?

A. Not specifically as to the impact of the merger agreement on Oncor's performance?

Q. No. No. No. I'm just talking about the period of time between signing up the deal and closing. We've talked it's at least a year. It could be a year?

A. It could be a year or a little bit more than a year, yes.

Q. And during that year that the merger is pending, there could be changes in market conditions, right?

MICHAEL HENKIN

A. Yes.
Q. Right. There could be changes in the economic conditions of Texas, right?
A. Yes.
Q. There could be changes in the regulatory environment in Texas, right?
A. Yes. Sure.
Q. And I keep saying Texas because Oncor is a transmission and distribution facility that's exclusive to Texas, right?
A. That's right.
Q. And so there is -- these changes in market conditions can significantly impact the buyer's decision whether or not to close, right?
A. Yes.
Q. And that impacts the, as you would say, the conditionality of the deal, right?
A. Yes, it adds to the conditionality that there are potential changes in the market. I think I even mention in my report that even the financial condition of Oncor that could take place between the signing and the closing.
Q. Right. The financial condition of Oncor could change between signing and closing,

MICHAEL HENKIN

right?
A. It could.
Q. The economic conditions in Texas could change between signing and closing, right?
A. Yes.
Q. The overall United States economy could change between signing and closing, right?
A. Yes.
Q. There's a variety of market conditions that could change between signing and closing, right?
A. Yes.
Q. And your opinion has done no analysis as to whether those changes will or will not happen, right?
A. That's true.
Q. In discussing the conditionality of the transaction, you identified that as one of the factors you considered in rendering an Opinion 4.
When you talk about conditionality, what do you mean?
A. By conditionality, I refer to all of the required conditions to closing that are in

MICHAEL HENKIN

the transaction, which are significant.
Q. Can you give me an example that you recall?
MR. HARDIMAN: Were you finished with your answer?
THE WITNESS: Yes.
Yes, you mentioned regulatory. That's one of them. There are the tax rulings is another one. There's the make-whole findings by the court, another one. There is all of the approvals of the documentation by various timeframes. So the January 15 confirmation order, the settlement agreement by January 15. So there's some milestones that are conditions to the transaction that provide a termination right if they're not met.
I'm sure there are more. Those are some of the major ones.
BY MR. McKANE:
Q. Let's break them down. Have you done any analysis regarding the likelihood of the debtors to obtain the necessary regulatory approvals?

MICHAEL HENKIN

A. As I said, I don't have an opinion on the likelihood. I just know that they are significant conditions that need to be met, and I highlighted a few of them in the report as far as some of the risks of the PUCT, but I don't have an opinion on the percentage likelihood or whether they will or won't get the approvals.
Q. And do you have an opinion on the percentage likelihood of whether or not the debtors will obtain the necessary tax rulings?
MR. HARDIMAN: Object to form. You did cover this already.
MR. McKANE: I'm trying to do it in a condensed fashion.
A. No, I don't on the probability, no.
Q. Have you performed any analysis or have an opinion on the percent likelihood of whether or not the debtors will obtain the necessary make-whole rulings?
A. No.
Q. Do you have an opinion on whether or not the debtors will achieve the necessary milestones in time?
A. No.

Page 257

MICHAEL HENKIN

Q. So, to be fair, all the conditions that you're identifying, right, are terms in the agreement, right?
A. Yes.
Q. They're evidenced clearly in the agreement?
A. Yes, some of them are in the merger and purchase agreement, some of them are in the PSA, but they're in the combination of agreements that form the basis of the purchase of Oncor.
Q. Right. So all of the conditions that you identify that comprise the conditionality on which you are rendering your opinion are plainly stated in the merger agreement or the plan support agreement, right?
A. I think that's right, yes.
Q. And you're just compiling them and highlighting them to the court?
A. Yes, that there is significant number of conditions and the deal is highly conditional. I think I quote the debtors in some of the report as well that the debtors say it's highly conditional, too.

Page 258

MICHAEL HENKIN

Q. And that's where I wanted to go next, right? The conditions exist in the report -- sorry, the conditions exist in the merger agreement and the PSA, right?
A. Yes.
Q. And in addition to just relying on those agreements, you then attempt to adopt or rely upon the debtors' assessment that it's presented to its board, right?
MR. HARDIMAN: Object to the form.
A. I use that as a reinforcement of my observation and opinion that there is a lot of conditionality in the deal.
Q. So, said another way, you find it a reaffirmation of your review of the agreement that the debtors came -- the debtors' professionals came to the same conclusion?
A. Yes.
Q. Let's talk about the last opinion, Opinion 6. Am I correct that Opinion 6 states that the value of TCEH today suggests no tax liability will exist for EFH if there is a taxable sale using EFH's NOLs?
A. Yes, other than the value -- I've

Page 259

MICHAEL HENKIN

utilized implied market value. It happens to correlate with the Evercore valuation as well, so that was validating the use of this metric.
Q. So the opinion is based on the implied market value, right? And what you're being precise about is you're using an implied market value for TCEH, correct?
A. Correct.
Q. And that implied market value is being -- is based on the trading value of certain debt securities?
A. That's correct.
Q. And you're using the implied market value as of today?
A. As of October 8, yes.
Q. October 8, okay.
What was the implied market value of TCEH as of the date of the filing of the disclosure statement?
A. It's in Exhibit 13. It looks like $16.9 billion -- I'm sorry, it's $15.2 billion.
Q. $15.2 billion. And that's the Evercore valuation, right?
A. No. No. That's just the implied

Page 260

MICHAEL HENKIN

market value. Evercore did put a valuation on TCEH with the disclosure statement that encompassed that, this range.
Q. But it had a different market value because it had a different date?
A. It was a different date, correct.
Q. Right. And so you've got a market value as of March 24 of '15 that you believe yields an implied value of what?
A. $15.236 billion.
Q. Okay. That's based on trading values of securities, right?
A. That's correct.
Q. And then based on trading values of securities as of October 8, you have it as $9.6 billion, right?
A. Correct.
Q. What's it going to be November 8?
A. We don't have -- I don't have a good prediction as to the future value of the TCEH securities.
Q. Can anybody reasonably predict the future market trading value of the TCEH securities?

Page 261

MICHAEL HENKIN

A. It's very hard to do. I think it's very difficult to predict the future value of a company.
Q. If they did that, you would be living on a beach, right?
A. Yes.
Q. You would be retired?
A. I would be a lot wealthier than I am today, yes.
Q. And the point is, for determining the enterprise value of -- strike that.
What is the relevant point in time at which you have to determine TCEH enterprise value?
A. Well, the purpose of the valuation as part of the plan would be to predict or to try to estimate the value as of the effective date of the plan. That's generally the date that the valuations are geared towards.
Q. Right. The relevant date for determining distributions under the plan is the date of emergence, correct?
A. Correct.
Q. And we don't know what the date of

Page 262

MICHAEL HENKIN

emergence will be, right?
A. That's right. We have an estimate from the debtors, but we don't know.
Q. And that estimate is six or nine months in the future, right?
A. Yes.
Q. Nobody can predict what the value of TCEH will be six to nine months in the future, right?
A. No, not with precision.
Q. In the past six to nine months, we have seen an implied swing of that view based on trading values of over $5 billion, correct?
A. That is correct.
Q. Based on representations made at the first day hearing, the value in this case has swung by over $9 billion, right?
A. That is correct. Well, approximately $9 billion.
Q. Approximate.
A. Because $18 billion was the number that the debtors used on the first day. Now we're down at 9.6.
Q. To be precise that was the TCEH first

Page 263

MICHAEL HENKIN

liens on the first day, right?
A. They did in their pretax submission memo cite $18 billion for value of TCEH, yes.
Q. Right. So, using the initial tax memo that was an illustration of $18 billion?
A. Yes.
Q. We have seen a $8.5 billion swing in the value of TCEH, right?
A. Yes.
Q. Right. And the one thing I think you and I will undeniably agree on is we don't know what the value is going to be on the emergence date?
A. That's fair.
Q. And if the value returns to the value that was included in the original expert report that Mr. Ying submitted with the disclosure statement, the NOLs of EFH could not shield all of the tax liability that would be triggered by a TCEH taxable sale?
A. I believe his range started at $12 billion, and so if it returned to the lowest point in his range, there may not be a taxable -- a tax due, but if it was higher than

Page 264

MICHAEL HENKIN

that, it, as of 6/30, it may incur a tax.
Q. So let's be a little more precise. We talked about hurdle rates before?
A. Yes.
Q. Right?
If I asked you what was the hurdle valuation at which EFH would be able to shield all of the cash tax obligation associated with the TCEH taxable spin, what would that number be?
A. That number as of 6/30 is about $12 billion.
Q. So, just so we're all level-set on what we're talking about, EFH owns NOLs, right?
A. Yes.
Q. And EFH can use those NOLs during a restructuring to shield certain amounts of tax liability that are triggered within its enterprise so long as they satisfy the proper IRS regs. and they have enough NOLs, right?
A. I believe that's correct, yes.
Q. And there is -- to the extent that TCEH does a taxable transaction as opposed to a tax-free spin, it will trigger a tax, right?

MICHAEL HENKIN

A. It may trigger a tax if there is not enough tax attributes to shield the potential gain.

Q. Right. So let me just break it down. EFH is a taxpayer, right?

A. That is correct. They own the stock of TCEH.

Q. TCEH is a disregarded entity for tax purposes, right?

A. That's correct.

Q. In determining whether EFH owes a tax liability for a transaction of TCEH, you have to evaluate what the cost basis is of the TCEH assets and what the value is for TCEH at the time of the transaction closing, right?

A. I think that's correct.

Q. All right. And if the value of EFH at the time the transaction closes is greater than the cost basis, there is a tax owed if it's a taxable transaction, right?

A. Unless there are tax attributes that would reduce the potential gain, that is correct.

Q. Let me take it in steps.

MICHAEL HENKIN

There is a tax that would be triggered, and then the question would be is a cash tax actually going to be paid or could it be offset with tax attributes?

A. Okay.

Q. Right?

A. That's fair.

Q. Is that fair?

A. That's fair.

Q. And EFH owns those tax attributes, right?

A. Yes.

Q. And upon emergence, what happens to EFH's NOLs?

A. I believe that, under the plan, they're going -- some of them are going to be utilized for a partial step-up under the current plan.

Q. Let's step back away from this plan, right? As a restructuring professional, you know that NOLs are a valuable tax attribute, right?

A. Yes.

Q. And you know that in a restructuring,

MICHAEL HENKIN

almost all NOLs cannot be utilized by the new reorganized entity?

A. There are limitations put on the NOLs after you go through a Chapter 11 restructuring, yes.

Q. Significant limitations; these are IRS limitations on what NOLs can be used, right?

MR. HARDIMAN: Object to the form.

A. Yes.

Q. And you know as a restructuring professional that -- in this case, have you evaluated, you know, how many of EFH's NOLs, if any, could survive a restructuring?

A. I have not looked at that issue of the post-reorganized entity's utilization of NOLs.

Q. Okay. Is that relevant at all to your evaluation as to whether EFH should use their NOLs to shield taxes of EFH -- of TCEH? Excuse me.

A. It might have some relevance if you were trying to evaluate what the alternatives of paying the tax is and taking that value into some reorganized entity, yes.

Q. Right. So, in other words, if it's

MICHAEL HENKIN

use it or lose it, right, it may not matter as much to EFH to convey those tax attributes to TCEH if they can get something else in return?

A. That's correct.

Q. And in a taxable scenario, we don't know the amount of tax that would be triggered by a TCEH taxable sale until at least a point in time where they emerge, right?

A. With any precision, that's correct.

Q. And in fact, the IRS doesn't limit itself to how the new securities trade immediately post-emergence, correct?

MR. HARDIMAN: Object to the form.

A. I've had some experience with the IRS where they do a retrospective analysis and look at some of the values that may have occurred either prior to or right after the date of emergence, yes.

Q. So let me present a scenario, and based on your experience, you tell me whether this is accurate.

If TCEH is anticipated to emerge at $12 billion enterprise value, but immediately thereafter the securities of TCEH trade as if

Page 269

MICHAEL HENKIN

the enterprise price value is $15 billion or higher, does the IRS have the ability to challenge the TCEH valuation upon emergence and argue that a tax is owed?
A. Yes.
MR. HARDIMAN: Object to the form.
A. Based on my experience, yes, they do.
Q. So we won't know whether a TCEH taxable transaction actually triggers a cash tax obligation at EFH until some point in time after new reorganized TCEH emerges and trades in public securities and the IRS makes a determination as to whether it wants to challenge whether a tax is owed?
A. You're assuming that it's going to be a public company when it emerges, but the presumption that there is a risk that the IRS would evaluate the transaction afterwards when it did a valuation, that is correct, that exists.
Q. And whether or not it's a public company simply provides greater evidence to the IRS as to what the actual value of the reorganized TCEH will be?

Page 270

MICHAEL HENKIN

A. Right. It may provide some additional trading levels and some additional market information.
Q. So, at this point in time, we don't know what TCEH will be valued at upon emergence and we won't know -- we don't know what value TCEH will trade at in any public markets for any securities it issues, correct?
MR. HARDIMAN: Object to the form.
A. That's true.
Q. So is it fair to say the current trading price of TCEH would be viewed as not relevant to the IRS in evaluating whether it wanted to assert whether a cash tax is owed at EFH for the value of post-reorganized TCEH?
MR. HARDIMAN: Object to the form.
A. I think that's generally correct. The IRS is going to likely not rely on the current value. It's going to rely on a later value at or near the effective date.
Q. It's not even going to be at or near the effective date. It will even look at after the effective date?
A. Right, I meant by me -- I meant a

Page 271

MICHAEL HENKIN

little bit before and/or a little bit after is my experience.
Q. And we have no visibility right now as restructuring professionals to say what that value is going to be, right?
A. We know where it's trading today, and we understand the gap between where it's trading today and where it needs to potentially trade up to, so I think you can at least make some predictions, but without any precision.
Q. All right.
A. Mr. Ying has done that, and he's made a prediction in his own report based on where he thinks the value will be, so obviously it's done, but it doesn't have the level of precision that you're asking about.
Q. Right. And so, to be precise, what Mr. Ying has done is a full valuation of TCEH at an anticipated point in time based on an evaluation of discounted cash flows, forecasted EBITDA, and comparable companies, right?
A. That's correct.
Q. And that's not the analysis that you have done?

Page 272

MICHAEL HENKIN

A. No, that's not. He's done a more of a formal valuation report, and I've done a fairly simplistic implied market value to get to a representative number.
Q. Right. And even with Mr. Ying's formal valuation report, the IRS is not bound to accept his number?
A. That's true.
Q. The current plan of reorganization contemplates a TCEH tax-free spin that occurs before the merger, correct?
A. Yes.
Q. Is there value to EFH in having TCEH go first in a tax-free spin?
A. As far as the sequencing of utilizing various tax attributes, is that what you're asking about?
Q. I am specifically highlighting the sequencing, and specifically, is there value to EFH in having a TCEH tax-free spin happen first?
A. There may be. I know there's a complex analysis that was done by the debtors and their tax advisors as to structuring a number of sequences to try to optimize the