## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |

## MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, FOR
## ENTRY OF AN ORDER APPROVING THE 2016 COMPENSATION PROGRAMS

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, approving the 2016 Compensation Programs (as defined herein). In support of this Motion, the Debtors respectfully submit the declarations of Todd Filsinger, Senior Managing Director at Filsinger Energy Partners (the "Filsinger Declaration"), and Douglas Friske, Senior Managing Director at Towers Watson (the "Friske Declaration"). In further support of this Motion, the Debtors respectfully state as follows.

### Preliminary Statement

1.    This Motion seeks approval of the Debtors' eight employee compensation programs for 2016, all of which are substantially similar (and in many cases exactly identical) to

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

the compensation programs previously approved by this Court for 2014 and 2015.[2]  Specifically, the Motion seeks the approval for 2016 of (a) discretionary incentive compensation programs that will encourage and reward exceptional performance by all employees and (b) certain retention bonus programs for non-insiders.  As with the 2014 and 2015 programs, the Debtors' senior employees are eligible to earn market-based bonuses if—and only if—the Debtors meet challenging financial and operational targets that will generate substantial value for the Debtors and all of their stakeholders.

2.       The Debtors file this Motion now and are seeking approval of the Motion before the end of 2015 because the Debtors believe it is important to provide direction and incentive goals to employees in advance of the start of each of the various 2016 compensation programs. This timing will permit all of their employees to know, from the outset of the performance period, their Court-approved performance targets and compensation opportunities—similar to the approval process for 2015.

3.       As the Court likely recalls, the Debtors previously sought approval of their 2014 and 2015 incentive-based employee compensation programs (for insiders and non-insiders) and 2014 and 2015 retention-based employee compensation programs (for non-insiders).[3]  The Court

---

[2]    The "Insider Programs" comprise the Executive Annual Incentive Plan (as applicable to 23 employees) (together with the program as applicable to non-insiders, the "EAIP"), the Key Leader Performance Program (the "Key Leader Performance Program"), the Luminant Commercial Incentive Plan (as applicable to one insider) (together with the program as applicable to the non-insiders, the "Luminant CIP"), and the SPC Supplemental Incentive Award (the "SPC Supplemental Incentive Award").  The "Non-Insider Programs" comprise the Annual Incentive Plan (the "AIP"), the Executive Annual Incentive Plan (as applicable to non-insiders), the Key Leader Plan (the "Key Leader Plan"), the Luminant Commercial Incentive Plan (as applicable to non-insiders), the Luminant Developer Incentive Plan (the "Luminant DIP"), and certain individual bonus payments (the "Individual Bonus Payments").  The Insider Programs and the Non-Insider Programs together constitute the "2016 Compensation Programs."

[3]    See Motion of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing the Debtors to (A) Pay Certain Prepetition Amounts on Account of Non-Insider Compensation Programs and (B) Continue the Non-Insider Compensation Programs in the Ordinary Course of Business on a Postpetition Basis [D.I. 468] (the "2014 Non-Insider Motion"); the declarations submitted by Douglas Friske in support thereof [Docket Nos. 469 and 1232]; the declaration of Paul Keglevic in support thereof [D.I. 471]; the declaration of Carrie Kirby in support thereof [D.I. 1231]; Motion of Energy Future Holdings Corp., et al., for Entry of an

approved all of the Debtors' 2014 and 2015 employee compensation programs.[4]  The Debtors'

compensation programs for 2015 were substantially similar to the compensation structure and

programs from the Debtors' prepetition practices and as previously approved by the Court for

2014, but with the addition of the SPC Supplemental Incentive Award as a successor to the

2014 SPC Long Term Incentive Plan ("SPC LTIP").    The Debtor's 2016 Compensation

Programs similarly represent a carry forward of the same compensation structure and programs

from the Debtors' prepetition practices and as previously approved by the Court for 2015

(including the SPC Supplemental Incentive Award).

4.    The Debtors believe that, for the same reasons applied to the 2014 and

2015 compensation programs, the 2016 employee compensation programs satisfy the applicable

standards of the Bankruptcy Code.    As in past years, the Debtors have expended significant

efforts in developing and preparing their 2016 compensation programs, including the Debtors'

---

Order Authorizing the Debtors to (A) Pay Certain Prepetition Amounts on Account of the Insider Compensation Programs and (B) Continue the Insider Compensation Programs in the Ordinary Course of Business on a Postpetition Basis [D.I. 1792] (the "2014 Insider Motion"); the declaration of Douglas Friske in support thereof [D.I. 1794]; the declaration of Todd W. Filsinger in support thereof [D.I. 1793] (the "2014 Filsinger Declaration"); and the Debtors' Reply in Support of Motion for Entry of an Order Authorizing the Debtors to (A) Pay Certain Prepetition Amounts on Account of the Insider Compensation Programs and (B) Continue the Insider Compensation Programs in the Ordinary Course of Business on a Postpetition Basis [D.I. 2321] (all of the foregoing pleadings together, the "2014 Compensation Pleadings"); Motion of Energy Future Holdings Corp., et al., for Entry of an Order Approving the 2015 Compensation Programs [D.I. 2852] (the "2015 Compensation Motion"); the declaration of Douglas Friske in support thereof [D.I. 2854]; the declaration of Todd W. Filsinger in support thereof [D.I. 2853]; the supplemental declaration of Douglas Friske in support thereof (the "2015 Supplemental Friske Declaration") [D.I. 3019-1]; the declaration of Carrie Kirby in support thereof (the "2015 Kirby Declaration") [D.I. 3019-2] (all of the foregoing pleadings together, the "2015 Compensation Pleadings").

[4]    See First Order Authorizing the Debtors to (A) Pay Certain Prepetition Amounts on Account of Non-Insider Compensation Programs and (B) Continue the Non-Insider Compensation Programs in the Ordinary Course of Business on a Postpetition Basis [D.I. 761]; Second Final Order Authorizing the Debtors to (A) Pay Certain Prepetition Amounts on Account of Non-Insider Compensation Programs and (B) Continue the Non-Insider Compensation Programs in the Ordinary Course of Business on a Postpetition Basis [D.I. 1420] (together, the "2014 Non-Insider Order"); the Order Authorizing the Debtors to (A) Pay Certain Prepetition Amounts on Account of the Insider Compensation Programs and (B) Continue the Insider Compensation Programs on a Postpetition Basis [D.I. 2595]; Tr. of Hr'g, October 15, 2014; and the Order Authorizing the Debtors to Honor Obligations to One Insider Pursuant to the 2014 Luminant Commercial Incentive Plan [D.I. 2597] (together, the "2014 Insider Order"); and Order Approving The 2015 Compensation Programs [D.I. 3052] (the "2015 Compensation Order").

annual comprehensive review and evaluation of the previous year's programs as well as a thorough and rigorous process to develop the performance metrics that will be used in the 2016 plans.    Consistent with the Debtors' historical practices, the Debtors' Organization & Compensation Committee (the "O&C Committee"), a subset of the EFH Board of Directors, undertook a thorough process including discussions and a review of the plans and metrics for the Debtors' 2016 compensation structure.    The Debtors' efforts also incorporated the input and expertise of Todd Filsinger, a Senior Managing Partner of the firm Filsinger Energy Partners, the Debtors' independent energy advisor, and Douglas Friske, an executive compensation expert from the firm of Towers Watson.    As Mr. Filsinger explains in considerable detail in his declaration, the Debtors recalibrated certain metrics for the 2016 scorecards to better tailor the incentive metrics to the key financial and operational performance drivers applicable to the corresponding business units, and continued the Debtors' historical practices of making the metrics difficult to meet and appropriately incentivizing.    On October 28, 2015, the O&C Committee approved the new metrics for the 2016 performance period.

5.    In addition, on November 11, 2015, before filing this Motion, the Debtors provided each of their primary creditor constituencies and the U.S. Trustee with significant information and detail regarding the 2016 Compensation Programs, including the applicable metrics and estimated costs, and offered to meet with each of them.    The Debtors and their advisors have also had follow-up discussions with several of their primary creditor constituencies regarding the details of the 2016 Compensation Programs, and the Debtors will continue to engage in additional discussions with their primary creditor constituencies, as well as with the U.S. Trustee, prior to the hearing on this Motion.

6.     For the reasons described below, the 2016 Compensation Programs are reasonable in cost, will generate substantial additional value in these chapter 11 cases, and comply with all applicable provisions of the Bankruptcy Code.   The Debtors accordingly ask that the Court approve the relief requested in the Motion.

### Relief Requested

7.     By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A**, approving the 2016 Compensation Programs.

### Jurisdiction and Venue

8.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.   This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10.    The bases for the relief requested in this Motion are sections 105(a), 363, and 503(c) of title 11 of the United States Code (the "Bankruptcy Code") and rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**Background**

11.     On April 29, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Court has entered a final order for joint administration of these chapter 11 cases.  The Court has not appointed a trustee.  The Office of the United States Trustee (the "U.S. Trustee") formed an official committee of unsecured creditors of Energy Future Competitive Holdings Company LLC ("EFCH"), Texas Competitive Electric Holdings Company LLC ("TCEH"), the direct and indirect Debtor subsidiaries of EFCH and TCEH, and EFH Corporate Services Company ("EFH Corporate Services") (the "TCEH Creditors' Committee") on May 13, 2014 [D.I. 420] and an official committee of unsecured creditors of Energy Future Holdings Corp., Energy Future Intermediate Holding Company, LLC, EFIH Finance, Inc., and EECI, Inc. (the "EFH Creditors' Committee") on October 27, 2014 [D.I. 2570].  Further information regarding the Debtors' business operations and capital structure is set forth in the declaration of Paul Keglevic in support of the Debtors' first day motions [D.I. 98].

**The Debtors' 2016 Compensation Programs**

**I.      Development of the 2016 Compensation Programs.**

12.     As described in detail in the 2014 and 2015 Compensation Pleadings, in addition to base salary, the Debtors have historically compensated their workforce with a combination of incentive-based programs to facilitate the Debtors' achievement of superior financial and operational results as well as retention-based programs to encourage non-insider employees to remain employed with the Debtors.  No employees who are considered insiders participate in any

of the Debtors' 2016 retention-based programs (the Key Leader Plan and the Individual Bonus Payments).

13.    Consistent with past practices, beginning in mid-2015, the Debtors focused on fine-tuning their compensation structure to confirm that the Debtors provided appropriate and market compensation at all levels of the Debtors' workforce.  After undertaking their exhaustive top-down approach to budgeting and forecasting their business models, the Debtors calibrated their compensation plans and compensation scorecard metrics for 2016 to confirm that they are appropriately incentivizing and in accordance with the Bankruptcy Code (as described in the Filsinger Declaration).    Attached as **Exhibit B** is a high-level summary of each of the 2016 Compensation Programs, the structure of which are substantially similar (and in many cases identical) to the 2014 and 2015 compensation programs, and further described herein.

14.    The Debtors updated scorecards for 2016 are as follows:

### Table I-1: Insider Metrics

**2016 AIP & EAIP Metrics**

| Scorecard | Performance metric | % Weight | Threshold | Baseline | Superior |
|---|---|---|---|---|---|
| LUMINANT | Luminant Management EBITDA ($ mm) | 50 | ■ | | ■ |
| | Coal Available Generation (GWh) (Jun-Sep 15) | 12.5 | 18,710 | 19,319 | 19,937 |
| | Nuclear Available Generation (GWh) | 7.5 | 19,720 | 20,216 | 20,537 |
| | Luminant Total Spend ($ mm) | 30 | ■ | ■ | ■ |
| TXU ENERGY | TXU Energy Management EBITDA ($ mm) | 40 | ■ | ■ | ■ |
| | TXU Energy Total Costs ($ mm) | 20 | | ■ | ■ |
| | Contribution Margin ($/MWh) | 15 | ■ | ■ | ■ |
| | Residential Ending Customer Count (000's) | 10 | 1,374 | 1,416 | 1,459 |
| | TXUE Customer Satisfaction % | 3 | 83.70% | 85.70% | 87.70% |
| | Average Days Sales Outstanding | 3 | 41.6 | 40.0 | 38.4 |
| | TXUE Energizing Event Success (Issues) | 3 | 99.84% | 99.92% | 99.96% |
| | TXUE Customer Complaints | 3 | 690 | 575 | 460 |
| | TXUE System Availability % (Uptime) | 3 | 99.85% | 99.93% | 99.97% |
| BUSINESS SERVICES | Luminant Scorecard Multiplier (%) | 50 | 50% | 100% | 200% |
| | TXU Energy Scorecard Multiplier (%) | 50 | 50% | 100% | 200% |

**2016 SPC SIA & KLPP Metrics**

| Scorecard | Performance metric | Threshold | Baseline |
|---|---|---|---|
| TCEH | Competitive Management EBITDA ($ mm) | ■ | ■ |
| | Competitive Total Spend ($ mm) ** | ■ | ■ |

** NOTE: Competitive Total Spend metric applies to KLPP Metrics only.

7

**II.      2016 Insider Compensation Programs.**

15.      Consistent with the Debtors' pre- and post-petition practices, there are four 2016 Compensation Programs that include insiders and apply to the Debtors' senior management team—the EAIP, the Key Leader Performance Program, the Luminant CIP, and the SPC Supplemental Incentive Award.    The following chart describes the insider compensation programs year-over-year—detailing the number of participants and potential cost at baseline of the Debtors' 2016 Insider Compensation Programs as set forth herein,[5] as well as the number of participants and potential costs at baseline of the Debtors' 2014 and 2015 insider compensation programs, as approved by the Court for each respective year.[6]

---

[5]    The number of participants in the 2016 compensation programs and the costs of the 2016 AIP and EAIP as set forth in this Motion are subject to change.    The cost estimates for the 2016 AIP and EAIP are at baseline amount based on current headcount and salaries—actual costs will depend on application of the plan document formulas and scorecard results and therefore may vary from these estimates.    In addition, increases in base salary for select employees may be made as part of the Debtors' annual review and merit process, which will be completed in March of 2016.

[6]    The number of participants and potential costs at baseline of the 2014 and 2015 compensation programs correspond to the projected costs at baseline of the compensation programs as approved by the Court in the 2014 Non-Insider Order, the 2014 Insider Order, and the 2015 Compensation Order.

| Program | 2014 | | 2015 | | 2016 | | Payment Timing[7] |
|---|---|---|---|---|---|---|---|
| | # of Participants | Cost (at Baseline) | # of Participants | Cost (at Baseline) | # of Participants | Cost (at Baseline) | |
| Insider Executive Annual Incentive Plan | 26 | $8.0 million | 25 | $8.0 million | 23 | $7.4 million | Annual |
| Key Leader Performance Program | 19 | $3.4 million | 18 | $4.3 million | 17 | $3.5 million | Quarterly |
| Luminant Commercial Incentive Plan (insiders only)[8] | 1 | ■■■■ | 1 | ■■■■ | 1 | ■■■■ | Annual |
| SPC LTIP[9] | 7 | $7.7 million | | | | | Annual |
| SPC Supplemental Incentive Award | | | 7 | $7.6 million | 6 | $7.1 million | Semi-Annual |
| Total Potential Cost: | | ■■■■ | | ■■■■ | | ■■■■ | |

A.    **2016 Executive Annual Incentive Plan as Applicable to Insiders.**

16.    The Debtors have maintained their EAIP for over ten years for approximately 65 employees at or above the level of Vice President.[10]  In addition to non-insiders, this Motion seeks approval of the 2016 EAIP for 23 individuals whose 2015 EAIP payments were approved by the 2015 Compensation Order.[11]  The 2016 EAIP is substantially identical in structure to the 2014 and 2015 EAIP, which were approved pursuant to the 2014 Insider Order and 2015 Compensation Order, respectively.

17.    Each employee in the EAIP is eligible to receive an incentive compensation award equal to a target portion of his or her base salary if—and only if—the Debtors meet

---

[7]    For plans that pay out on an annual basis, payments to eligible participants will be made in February or March of 2017.  Plans that pay out on a semi-annual or quarterly basis make payments to eligible participants approximately 30 days post-quarter close.

[8]    Potential cost and payment amounts of the Luminant CIP are contingent on actual, incremental value generated by Luminant on commercial trading transactions, and therefore may vary from these estimates.

[9]    The SPC LTIP ended in 2014 and was replaced with the SPC Supplemental Incentive Award as set forth in Exhibit III to the March 31, 2014 Amended and Restated Employment Agreements of John Young, Paul Keglevic, James Burke, and Mac McFarland, and Exhibit IV to the March 31, 2014 Amended and Restated Employment Agreements of Stacey Dore and Carrie Kirby.

[10]   *See* 6/30/14 Hr'g Tr. at 30:22–41:12 ("Kirby Proffer"), at 34:25–35:2.

[11]   The Debtors also seek approval of the AIP for a single employee who may be an insider because the employee is married to a member of senior management.  The employee is included in the EAIP numbers, but participates only in the AIP.  Those two plans have basically identical terms, and the amounts for the EAIP set forth in this table include the employee's potential AIP award.

9

difficult-to-satisfy performance incentive metrics, which vary by business unit based on the employee's role.  (*See, e.g.*, Filsinger Declaration at §§ 1, 4.1, 5.1, 5.4, 5.5.)  Each year, in an iterative process, the Debtors' senior executives develop a set of metrics based on the following year's budget to incentivize and reward exceptional employee performance and safe operations.[12] The Debtors recently completed that process for the 2016 performance metrics.

18.    Actual payments are determined by calculating the EAIP target payments and modifying them based on comparing the Debtors' actual performance against the financial and operational metrics, including by way of example, EBITDA, customer retention, cost management, plant and mine safety and production levels, and other similar measures, and applying an individual performance modifier for each employee based on their individual contributions and performance.  The individual performance modifier, which may range from 0% to 150%, is recommended by the applicable business unit's leaders after an extensive performance review and calibration processes across the business units and is ultimately approved by the Debtors' six-member Strategy & Policy Committee (the "SPC").

19.    Although in no event can payments under the EAIP exceed the pool of available and accrued payment funds determined by the results of the Debtors' actual performance, the individual performance modifier allows for recognition of exceptional performers who may receive greater than 100% of their EAIP target payments, while less exceptional performers may receive less than 100% of their EAIP target payment.  Funds for payments under the EAIP accrue monthly and accruals are adjusted based on business results against the metrics calculated at periodic intervals during the calendar year and again after the close of the calendar year.  The O&C Committee certifies and approves scorecard results and overall payment rates across the

---

[12]    *See* Kirby Proffer at 38:20–24.

businesses.  The Debtors also accrue approximately $3 million over the course of the year in a "presidential pool" that allows the Debtors' Chief Executive Officer to authorize the Debtors to make EAIP and AIP payments to employees in addition to amounts accrued based on the Debtors' performance in accordance with the final individual performance modifiers. Importantly, the O&C Committee in its sole discretion determines and approves the individual performance modifiers and EAIP target payments for EFH Corp.'s Chief Executive Officer and the Debtors' Executive Vice Presidents (together constituting the SPC).

20.     As they did in 2014 and 2015, the Debtors augmented their budgeting process in 2016 by utilizing the services of independent power industry experts from Filsinger Energy Partners.  Consistent with the Debtors' pre- and post-petition practices, the Debtors updated their performance metrics applicable to the 2016 year to account for their latest business forecasts. The metrics used in the Debtors' 2016 EAIP scorecard (which are the same for all participants in the 2016 AIP/EAIP) incorporate the same concepts as the scorecards that have been used by the Company for at least the last seven years, and which the Court approved for 2014 and 2015.  The Debtors' 2016 EAIP scorecard metric categories and their respective weightings for TXU Energy are identical to the 2014 and 2015 AIP/EAIP metrics approved by the Court.  As detailed in Mr. Filsinger's declaration, the Debtors streamlined the performance metric categories on the 2016 AIP/EAIP scorecard for Luminant to better align Luminant with current corporate objectives within the current business environment.  As Mr. Filsinger further explains, the Debtors also streamlined the performance metric categories on the 2016 AIP/EAIP scorecard for Business Services to better align incentives with the performance of the operating subsidiaries.

21.     The 2016 AIP/EAIP metrics "constitute stretch goals that incentivize and reward exceptional employee performance."   (Filsinger Declaration at § 1-4.)   As set forth in

Mr. Filsinger's declaration, numerous risks affect the Debtors' business operations, and minor deviations from targeted performance can cause the Debtors to fall short of their business goals. (*Id.* at § 1.)  As Mr. Filsinger further details in his declaration, such risks include:   energy commodity price volatility; the unique structure of the ERCOT energy market; operating costs of the Company's nuclear and fossil fuel generation facilities; mine operating costs; existing generation assets and fuel mix; fuel, emission and other variable price inputs; the Company's ability to attract, retain, and service profitable retail customers; market heat rates in ERCOT; the Company's ability to effectively hedge against volatile commodity prices; and the Company's ability to profitably implement cost savings without sacrificing safety or the quality of the Company's products.  (*Id.* at § 1.)  These risk factors "affect each of the metrics in some way, especially EBITDA, the most heavily weighted metric at both Luminant 50% and TXU Energy 40%." (*Id.* at § 1-5.)  Based on Mr. Filsinger's modeling efforts and analysis of the Debtors' and third-party information, "the threshold EBITDA metrics that trigger a bonus require strong performance in a complex and highly interrelated power market environment that has exhibited considerable volatility." (*Id.* at § 1-5.)

22.    The number of participants and potential costs at baseline of the 2016 EAIP are based on current headcount and current salaries.  Based on current headcount, the 2016 EAIP applies to 23 of the Debtors' insider employees—two fewer than in 2015, because one insider retired from his position with the Debtors and thus will not participate in the 2016 EAIP, while another insider departed.  Like the 2014 EAIP and 2015 EAIP, the potential cost at baseline of the 2016 EAIP is subject to change based on multiple factors including (i) the typical fluctuation in the number of eligible employees by year-end as a result of ordinary-course employee

departures and new hires, and (ii) increases in base salary for employees that may be made as part of the Debtors' annual review and merit process.

23.     The estimated annual cost of the 2016 EAIP for the 23 employees if all baseline payments are earned would be approximately $7.4 million.  If the Debtors satisfy the "superior" targets under each applicable metric contained in the 2016 EAIP (*i.e.*, the highest possible targets), based on current headcount and salaries, the maximum amount payable under the EAIP to the 23 participants would be approximately $14.8 million.  Pursuant to this Motion, the Debtors seek authority to make payments under the 2016 EAIP to these 23 employees if they are earned and when they become due.

**B.    2016 Key Leader Performance Program.**

24.     The 2016 Key Leader Performance Program is substantially identical in structure to the Key Leader Performance Program that was approved in both the 2014 Insider Order and the 2015 Compensation Order.  The 2016 Key Leader Performance Program provides award opportunities for 17 senior employees.  The 2015 Key Leader Performance Program had 18 participants, one of whom retired from his position with the Debtors and thus will not participate in the 2016 Key Leader Performance Program.  Each eligible employee's annual target award is determined based on their peer employees, their role in, and contributions to, the organization, and competitive market data.  Just like the 2014 and 2015 Key Leader Performance Programs, the Debtors will make payments under the 2016 Key Leader Performance Program on a quarterly basis only if the Debtors achieve certain challenging performance goals based on EBITDA and cost metrics that are primarily driven by the Luminant and TXU Energy metrics found on the EAIP scorecard.  If the incentive metrics are hit for the relevant quarter, each participant will earn 25% of the applicable annual target if employed by the Debtors on the last day of each calendar quarter ending during the term.  If the metrics are not met for a given

quarter, the Key Leader Performance Program provides that the participants may still earn the full amount of the target payments from that quarter if the cumulative year-to-date performance for subsequent quarters results in the Debtors achieving the year-to-date EBITDA and cost metrics goals.

25.    The maximum cost of the 2016 Key Leader Performance Program is approximately $3.5 million.  A decrease in the potential target cost of the program from 2015 to 2016 of approximately $760,000 arises from several considerations: First, five insiders will receive an aggregate total of approximately $320,000 in increased compensation for the 2016 performance period due to increased responsibilities and job requirements, and the critical nature of their roles.  Second, in 2016 there are no comparable costs to $680,000 in aggregate award opportunities under the 2015 Key Leader Performance Program for four of the Debtors' insiders who had their potential award opportunities increase because they became ineligible to receive the retention-based Owner/Operator[13] payments that were contemplated as part of their respective total compensation packages for 2014.  Third, two former employees who were eligible to receive an aggregate of $400,000 under the 2015 Key Leader Performance Program retired.  The $320,000 in aggregate increased award opportunity for the five insiders due to either increased responsibilities or job requirements, the $680,000 in aggregate decreased award opportunities for the employees whose Owner/Operator plans concluded in 2014, and the $400,000 decrease attributable to the employees who retired, sum to a combined decrease of approximately $760,000—and thus account for the difference between the $4.3 million potential

---

[13]    The Owner/Operator Plan was the precursor to the Key Leader Performance Program, existing pre-petition, since 2010, terminating in 2013.  The performance period for the Owner/Operator Plan ended in 2013, with the final payments earned under the Owner/Operator Plan due to be paid in September 2014.  *See 2014 Non-Insider Motion* and *2015 Kirby Declaration* for additional background information on the Owner/Operator Plan.

cost at baseline of the 2015 Key Leader Performance Plan, and the $3.5 million potential cost at baseline of the 2016 Key Leader Performance Plan.

26.     Pursuant to this Motion, the Debtors seek authority to make payments under the 2016 Key Leader Performance Program if they are earned and when they become due.

#### C.     2016 Luminant Commercial Incentive Plan (As Applicable to One Insider).

27.     The Debtors also seek authority to make payments under the 2016 Luminant CIP to Luminant's Chief Commercial Officer, the sole insider participating under that plan. The Debtors historically have offered the Luminant CIP to approximately 50 full-time employees at Luminant who are instrumental to the Debtors' trading activities to provide for market-based performance incentives commensurate with commodity hedging and trading organizations. Each year the Debtors' risk management team establishes a pool of available funds based on the aggregate incremental value that Luminant achieves on all commercial trading transactions for that year.[14] An aggregate funding pool accrues throughout the year based on actual incremental value generated. Shortly after December 31 of each year, Luminant's financial planning and analysis team determines the pool of available funds. Luminant's Chief Commercial Officer then recommends individual payments for those eligible participants who have contributed to the creation of added value for that year under the Luminant CIP to an award committee (comprising Luminant's CFO, Luminant's CEO, and EFH's EVP of Human Resources), which evaluates the recommendations and approves or modifies payments as appropriate. The Luminant CEO then determines if a payment to the Chief Commercial Officer is warranted based on the year's

---

[14]  The discretionary incentive pool is generally tied to the incremental value that Luminant provides on its trading activities, as follows: (a) approximately ▮ of all incremental value between ▮; (b) approximately ▮ of all incremental value between ▮; and (c) approximately ▮ of all incremental value higher than ▮.

performance and makes a recommendation to the other members of the award committee for consideration.

28.     By rewarding participating employees if—and only if—they generate actual, additional incremental value for the Debtors, the Luminant CIP incentivizes the exact type of performance that contributes to the Debtors' bottom-line success.  Any individual payments in excess of ██████████ under the Luminant CIP must be submitted for approval to the O&C Committee.  Employees receive approved payments under the Luminant CIP no later than March 15th of each year.

29.     The Debtors expect the annual cost of the 2016 Luminant CIP for Luminant's Chief Commercial Officer to be up to approximately ██████████.[15]  Pursuant to this Motion, the Debtors seek authority to make payments under the 2016 Luminant CIP if they are earned and when they become due.

**D.     2016 SPC Supplemental Incentive Award.**

30.     The SPC Supplemental Incentive Award was introduced in 2015 as the successor to the SPC Long Term Incentive Plan—a three-year program that concluded at the end of 2014. The performance period for the SPC Supplemental Incentive Award approved as part of the 2015 Compensation Motion concludes on the last day of 2015.  Pursuant to this Motion, the Debtors are seeking to implement the 2016 SPC Supplemental Incentive Award, which is similar in structure, process, and plan design to its previous iteration, including the contemplation of semi-annual performance periods and payment.  The 2016 SPC Supplemental Incentive Award covers the six SPC members and is based on the achievement of EBITDA performance metrics during the 2016 calendar year.  The 2016 SPC Supplemental Incentive Award is designed to

---

[15]     Potential cost and payment amounts of the Luminant CIP are contingent on actual, incremental value generated by Luminant on commercial trading transactions, and therefore may vary from this estimate.

improve the Debtors' profitability by aligning management incentives with the Debtors' business objectives, while at the same time providing participants with competitive, market-based compensation.

31.    The 2016 SPC Supplemental Incentive Award contemplates semi-annual payments (if earned) to bridge the period between the Debtors' pre-bankruptcy long-term incentive program and the long-term incentive program that the Debtors anticipate implementing upon emergence.[16]  In the Debtors' best business judgment, the semi-annual SPC Supplemental Incentive Award payment structure represents a superior option to a structure involving annual payments, as it addresses the uncertainty of the on-going chapter 11 process and incentivizes the Debtors' key management personnel to focus on near term objectives.  The baseline EBITDA metric set forth in the 2016 SPC Supplemental Incentive Award is the same Competitive Management EBITDA baseline metric used for the Debtors' Key Leader Performance Program—which is primarily driven by the Luminant and TXU Energy metrics found on the EAIP scorecard for 2016.

32.    The maximum cost of the 2016 SPC Supplemental Incentive Award is $7.1 million—$500,000 less than the maximum cost of the 2015 SPC Supplemental Incentive Award due to the departure of one SPC member.  Pursuant to this Motion, the Debtors seek authority to make payments under the 2016 SPC Supplemental Incentive Award if they are earned and when they become due.

---

[16]   The Debtors' 2015 Compensation Motion contemplated a quarterly payment structure to address the uncertainty of the potential Chapter 11 process and incentivize the Debtors' key management personnel to focus on near term objectives.  *See* 2015 Compensation Motion at 28-29.  Subsequent to filing the 2015 Compensation Motion, the Debtors engaged in discussions regarding the structure of the SPC Supplemental Incentive Award with the United States Trustee, as well as the Debtors' various creditor constituencies.  2015 Kirby Declaration at ¶¶ 17-18.  As a result of those discussions, the Debtors agreed to modify the 2015 SPC Supplemental Incentive Award—along with the related provisions of the employment agreements for the members of the SPC—to make payments on a semi-annual basis (as opposed to quarterly) for 2015.  *Id.*  The 2016 SPC Supplemental Incentive Award follows the same semi-annual structure as the 2015 SPC Supplemental Incentive Award, as revised and set forth in the 2015 Kirby Declaration.

## III.    2016 Non-Insider Compensation Programs.

33.    The Debtors maintain six compensation programs that apply to the Debtors' non-insider workforce.  The following chart describes the non-insider compensation programs year-over-year—detailing the number of participants and potential cost at baseline of the Debtors' 2016 Non-Insider Compensation Programs as set forth herein,[17] as well as the number of participants and potential costs at baseline of the Debtors' 2014 and 2015 non-insider compensation programs which were previously approved by the Court:[18]

| Program | 2014 | | 2015 | | 2016 | | Payment Timing[19] |
|---|---|---|---|---|---|---|---|
| | # of Participants | Cost (at Baseline) | # of Participants | Cost (at Baseline) | # of Participants | Cost (at Baseline) | |
| Annual Incentive Plan | 5,425 | $56.1 million | 5,425 | $56.1 million | 5,206 | $55.3 million | Annual |
| Non-Insider Executive Annual Incentive Plan | 46 | $4.3 million | 45 | $4.3 million | 43 | $4.3 million | Annual |
| Key Leader Plan | 147 | $4.8 million | 153 | $6.3 million | 173 | $8.0 million | Quarterly |
| Luminant Commercial Incentive Plan (non-insiders only)[20] | 54 | $3.3 million | 54 | $4.1 million | 47 | $3.4 million | Annual |
| Luminant Developer Incentive Plan | 25 | $0.017 million | 25 | $0.21 million | 10 | $0.13 million | Annual |
| Individual Bonus Payments | 100 | $1.6 million | 192 | $1.6 million | 170 | $1.6 million | Annual |
| Total Potential Cost: | | $70.1 million | | $72.6 million | | $72.7 million | |

[17]    The number of participants in the 2016 compensation programs and the costs of the 2016 AIP and EAIP as set forth in this Motion are subject to change.  The cost estimates for the 2016 AIP and EAIP are at baseline amount based on current headcount and salaries—actual costs will depend on application of the plan document formulas and scorecard results and therefore may vary from these estimates.  In addition, increases in base salary for select employees may be made as part of the Debtors' annual review and merit process, which will be completed in March of 2016.

[18]    The number of participants and potential costs at baseline of the 2014 and 2015 compensation programs correspond to the projected costs at baseline of the compensation programs as approved by the Court in the 2014 Non-Insider Order, the 2014 Insider Order, and the 2015 Compensation Order.

[19]    For plans that pay out on an annual basis, payments to eligible participants will be made in February or March of 2017.  Plans that pay out on a quarterly basis make payments to eligible participants approximately 30 days post-quarter close.

[20]    Potential cost and payment amounts of the Luminant CIP are contingent on actual, incremental value generated by Luminant on commercial trading transactions, and therefore may vary from these estimates.

A.      **2016 Annual Incentive Plan.**

34.      The 2016 AIP is substantially identical in structure to the 2015 AIP that was approved in the 2015 Compensation Order, and the 2014 AIP that was approved in the 2014 Non-Insider Order.  Under the 2016 AIP, approximately 5,200 employees below the level of Vice President (none of whom are insiders) are eligible to receive an annual payment under the AIP if the eligible employee and the Debtors achieve certain performance goals and the eligible employee is employed at the time of the AIP payment.  Like the EAIP, employees may earn a bonus under the AIP equal to a target percentage of salary if—and only if—the Debtors meet difficult-to-satisfy incentive metrics, which vary by business unit based on the employee's role.  These metrics are based on targets in the annual budget that the Debtors developed from the ground-up in mid-year 2015.  The metrics, approvals, mechanics, and administration are identical to the EAIP, described above in II.A, which discusses the 2016 EAIP as applicable to insiders.  The Debtors will make approved AIP payments no later than March 15th of 2017.

35.      The number of participants and potential costs at baseline of the 2016 AIP are based on current headcount and salaries.  The potential cost at baseline of the 2016 AIP is subject to change based on multiple factors, including changes to headcount.  There is typically a fluctuation in the number of eligible employees by year-end as a result of ordinary-course employee departures and new hires.  The potential cost at baseline of the 2016 AIP is also subject to change based on increases in the base salaries of AIP participants that may be made as part of the Debtors' annual review and merit process, which will be completed by March of 2016.  The budgeted amount of annual merit pay increases for 2016 is 3% of total payroll. Furthermore, as discussed above, participants are eligible to earn enhanced awards if actual performance exceeds the baseline level for some portion or all of the scorecard metrics. Conversely, if actual performance does not meet baseline performance levels, participants will

19

earn a lower award.  Performance based participant eligibility could result in an aggregate AIP payout that exceeds or is less than the potential cost at baseline.

36.     The estimated annual cost of the 2016 AIP if all baseline payments are earned would be approximately $55.3 million—$800,000 less than 2015 due primarily to the decrease in participants from 5,425 in 2015 to 5,206 in 2016.  If the Debtors satisfy the "superior" targets under each applicable metric contained in the AIP (*i.e.*, the highest possible targets), based on current headcount, the maximum amount payable under the AIP would be approximately $110.6 million.  Pursuant to this Motion, the Debtors seek authority to make payments under the 2016 AIP if they are earned and when they become due.

**B.     2016 Executive Annual Incentive Plan as Applicable to Non-Insiders.**

37.     While the EAIP (discussed above in II.A) includes a number of insiders, the majority of participants (43 of the 66) are non-insiders.  Like the AIP, employees may earn a bonus under the EAIP equal to a target percentage of salary if—and only if—the Debtors meet difficult-to-satisfy incentive metrics, which vary by business unit based on the employee's role.  The metrics, approvals, mechanics, and administration of the EAIP are detailed above in II.A.

38.     The estimated annual cost of the 2016 EAIP (excluding the 23 insider employees) if all target payments are earned would be approximately $4.3 million—the same as 2015.  If the Debtors satisfy the "superior" targets under each applicable metric contained in the EAIP (*i.e.*, the highest possible targets), based on current headcount, the maximum amount payable under the EAIP to these 43 non-insider participants would be approximately $8.6 million.  Pursuant to this Motion, the Debtors seek authority to make payments under the 2016 EAIP if they are earned and when they become due.

C.    **2016 Key Leader Plan.**

39.    The 2016 Key Leader Plan is substantially identical in structure to the Key Leader Plan that was approved in the 2015 Compensation Order and the 2014 Non-Insider Order. The 2016 Key Leader Plan applies to approximately 173 non-insider employees, increased from 153 for the 2015 performance period. The Debtors will make payments under the Key Leader Plan on a quarterly basis so long as the eligible employee is employed by the Debtors at the end of the applicable quarter. In order to treat the Debtors' employees more consistently, a small number of non-insider employees was added to the 2016 Key Leader Plan that did not participate in the 2015 Key Leader Plan. These new participants were added in light of their promotion, date of hire, or changes in their responsibilities, or were moved into the 2016 Key Leader Plan from the 2015 Individual Bonus Payments. Adjustments to potential awards under the 2016 Key Leader Plan were also increased for some participants in light of their promotion or increases in their responsibilities. All of the new participants in the 2016 Key Leader Plan are at or below the level of Vice President.

40.    The maximum cost of the 2016 Key Leader Plan rose from approximately $6.3 million in 2015 to a target amount of approximately $8.0 million in 2016. The total potential cost of the Key Leader Plan increased because the Debtors determined that certain mission-critical, high-performing non-insider employees and other employees who will continue to be critical resources driving value creation, assume additional and/or more complex roles and assignments, and continue to focus the organization on safety and effectiveness—approximately 109 in total—warranted higher awards for 2016. Specifically, Debtors increased the Key Leader Plan awards for 81 individuals that participated in the 2015 Key Leader Plan by an average of $20,000, and added 28 new individuals to the 2016 Key Leader Plan who are eligible to receive an average of $25,000—an aggregate increase of approximately $2.3 million. These increases

21

were slightly offset by the departure of fifteen former employees who were eligible to receive an aggregate of approximately $500,000 under the 2015 Key Leader Plan as approved in the 2015 Compensation Motion.

41.      Pursuant to this Motion, the Debtors seek authority to make payments under the 2016 Key Leader Plan if they are earned and when they become due.

**D.      2016 Luminant Developer Incentive Plan.**

42.      The 2016 Luminant Developer Incentive Plan is substantially identical in structure to the Luminant Developer Incentive Plan that was approved in the 2015 Compensation Order and the 2014 Non-Insider Order.  The 2016 Luminant DIP provides award opportunities to approximately 10 non-insider, full-time employees at Luminant who are eligible based on their contributions to certain commercial transactions that have been designated by specified senior management as business development projects.  The payments are typically divided based on meeting two types of project goals, defined in writing and approved at the outset of the project start, for example:  (a) the Debtors' execution of an agreement and funding commitment letters for a qualifying business development project; or (b) when the project is commercially operational and generating revenue.

43.      The Luminant DIP calculates target awards based on the amount of additional economic value that the transactions create for the Debtors—*i.e.*, the net present value of the project.[21]  No eligible employee may receive more than $300,000 under the Luminant DIP during a calendar year.

---

[21]    Generally, eligible employees under the Luminant DIP may receive:  (a) 0-75% of their base salary, if the net present value of the associated project is between $0-49 million; (b) 25-150% of their base salary, if the net present value of the associated project is worth $50-149 million; or (c) 100-250% of their base salary, if the net present value of the associated project is over $150 million.

44.     The Debtors anticipate commercial projects to result in payment under the Luminant DIP in 2016, and expect the annual cost of the 2016 Luminant DIP to be up to approximately $130,000.  Pursuant to this Motion, the Debtors seek authority to make payments under the 2016 Luminant DIP if they are earned and when they become due.

### E.      2016 Luminant Commercial Incentive Plan as Applicable to Non-Insiders.

45.     The 2016 Luminant Commercial Incentive Plan is substantially identical in structure to the Luminant Commercial Incentive Plan that was approved pursuant to the 2015 Compensation Order and the 2014 Compensation Orders.  Based on current headcount, the 2016 Luminant CIP provides award opportunities for 47 non-insider employees.  As set forth above in II.C, the Debtors historically have offered the Luminant CIP to approximately 50 full-time employees at Luminant who are instrumental to the Debtors' hedging and trading activities to provide for market-based performance incentives commensurate with other commodity hedging and trading organizations.  One participant is an insider, but all other participants are non-insiders.  The mechanics and administration of the Luminant CIP as applicable to non-insiders are the same as the Luminant CIP as applicable to Luminant's Chief Commercial Officer.

46.     The Debtors expect the annual cost of the 2016 Luminant CIP (excluding potential payments to Luminant's Chief Commercial Officer) to be up to approximately $3.4 million.[22]   Pursuant to this Motion, the Debtors seek authority to make payments under the 2016 Luminant CIP if they are earned and when they become due.

---

[22]  Potential cost and payment amounts of the Luminant CIP are contingent on actual, incremental value generated by Luminant on commercial trading transactions, and therefore may vary from this estimate.

### F.       2016 Individual Bonus Payments.

47.      The Individual Bonus Payments remain substantially similar to the Individual Bonus Payments the Court approved for 2014 and 2015.  Consistent with the payments approved for 2014 and 2015, the 2016 Individual Bonus Payments apply exclusively to non-insider employees.  The 2016 Individual Bonus Payments apply to 170 employees—22 fewer than 2015, the decrease attributable to several factors, including: ineligibility of certain employees due to participation in the 2016 Key Leader Program, employee departures, and certain Individual Bonus Payments being tied to finite 2015 projects.   In the ordinary course of business and consistent with both its historic and industry-standard practice, in the past the Debtors have (a) made retention payments under individual agreements to non-insider employees so long as they remain with the Debtors for a specified period of time and continue to perform in a highly effective manner that contributes to the overall success of the Debtors, and (b) made bonus payments to non-insider employees for obtaining or maintaining critical certifications and licenses that are required to operate the Debtors' nuclear facility (collectively, the "Individual Bonus Payments").   The 2014 Non-Insider Order authorized the Debtors to pay Individual Bonus Payments that came due during 2014, and the 2015 Compensation Order authorized the Debtors to pay Individual Bonus Payments that came due during 2015.  Pursuant to this Motion, the Debtors request the authority to make Individual Bonus Payments that come due during 2016.

48.      The majority of the potential Individual Bonus Payments relate to 136 individual retention agreements, which provide for awards if the participating employees remain with the Debtors through a certain date and otherwise fulfill the requirements set forth in each respective agreement.  Awards under these agreements are calculated according to relevant market data and historical practice.  These types of individual retention agreements are common and consistent

with competitive industry practice.  The participating employees are critical to the Debtors' business, and most are not senior enough to participate in the Key Leader Plan.  The Debtors have determined that, in their business judgment, making payments under the individual retention agreements is essential to encouraging these critical non-insider employees to remain with the Debtors during the restructuring.  These employees are highly talented—and frequently sought after by the Debtors' competitors—and it would be difficult to replace them in short order given the Debtors' present circumstances if they were to seek employment elsewhere.  The average payment under the individual retention agreements is approximately $7,500.

49.    In addition to the potential retention payments, there also are potential certification and licensing bonuses that may come due in the future.  The certification bonuses ($3,000 each) and licensing bonuses ($6,000 each) are paid shortly after the certification or license is obtained/renewed by nuclear plant personnel.  Historically, only a small number of certification and licensing bonus payments have been made —for example, in 2015, the Debtors paid eight certification bonuses (totaling $24,000) and seven licensing bonuses (totaling $42,000).

50.    The Debtors expect the annual cost of the 2016 Individual Bonus Payments to be up to approximately $1.6 million—the same overall projected cost of the individual bonus payments the Court approved for 2014 and 2015.  Pursuant to this Motion, the Debtors seek authority to make payments under the 2016 Individual Bonus Payments if they are earned and when they become due.

## IV.    Year-Over-Year Changes in Potential Costs of Compensation Programs.

51.    The following table compares the potential costs at baseline of the 2016 Compensation Programs to the potential costs at baseline of the 2014 and 2015 compensation programs as approved by the Court:

| Program | 2014 Potential Cost (at Baseline) | 2014 % Annual Total | 2015 Potential Cost (at Baseline) | 2015 % Annual Total | 2016 Potential Cost (at Baseline) | 2016 % Annual Total |
|---|---|---|---|---|---|---|
| Non-Insider | $70.1 million | 78.5% | $72.6 million | 78.4% | $72.7 million | 80.0% |
| Insider | $19.2 million | 21.5% | $20.0 million | 21.6% | $18.1 million | 20.0% |
| **Total Combined:** | **$89.3 million** | **100%** | **$92.6 million** | **100%** | **$90.8 million** | **100%** |

52.    As shown above, the aggregate potential cost of the Debtors' 2014 compensation programs at baseline—as approved in the 2014 Non-Insider Order and 2014 Insider Order—was $89.3 million, the aggregate potential cost of the Debtors' 2015 compensation programs at baseline—as approved in the 2015 Compensation Order—was $92.6 million, and the aggregate potential cost of the Debtors' 2016 Compensation Programs at baseline is $90.8 million.  The $1.8 million decrease in the potential cost at baseline of the Debtors' 2016 Compensation Programs represents a 1.9% decrease over the potential cost at baseline of the 2015 compensation programs that the Court has already approved.  The year-over-year decrease in the potential cost at baseline is entirely attributable to a **9.5% decrease** in the costs of Debtors' insider programs for 2016 as compared to 2015.  Furthermore, as detailed in the table above, the split of insider compensation at baseline versus non-insider compensation at baseline decreased nearly 2%, year-over-year.

53.     As discussed above, participants in the Debtors' incentive compensation programs are eligible to earn enhanced awards for top-tier performance if performance exceeds the baseline level for some portion or all of the scorecard metrics. The following table compares the maximum potential costs of the Debtors' 2016 Compensation Programs to the maximum potential costs of the 2014 and 2015 compensation programs as approved by the Court in the 2014 Non-Insider Order, 2014 Insider Order, and 2015 Compensation Order:

| Program | 2014 | | 2015 | | 2016 | |
| --- | --- | --- | --- | --- | --- | --- |
| | Potential Cost (at Superior) | % Annual Total | Potential Cost (at Superior) | % Annual Total | Potential Cost (at Superior) | % Annual Total |
| Non-Insider | $130.4 million | 82.7% | $133.0 million | 82.7% | $132.3 million | 83.8% |
| Insider | $27.2 million | 17.3% | $27.9 million | 17.3% | $25.5 million | 16.2% |
| Total Combined: | $157.6 million | 100% | $160.9 million | 100% | $157.8 million | 100% |

54.     The maximum potential cost of the Debtors' 2014 compensation programs was $157.6 million, the maximum potential cost of the Debtors' 2015 compensation programs was $160.9 million, and the maximum potential cost of the Debtors' 2016 Compensation Programs is $157.8 million. This $3.1 million decrease from 2015 to 2016 represents a 1.9% decrease in total potential maximum cost of the compensation programs, year-over-year—the decrease is primarily attributable to a decrease in potential maximum payments to insiders of 8.6% ($2.4 million), as well as a decrease of 0.5% ($0.7 million) in the maximum potential cost of the Debtors 2016 compensation programs for non-insiders in 2016. To earn the maximum payouts under the 2016 Compensation Programs, the Debtors would need to reach the "superior" targets on all of the AIP/EAIP scorecard metrics—something the Debtors have never accomplished. If overall performance on metrics falls between the "baseline" and "superior" levels, the resulting

Case 14-10979-CSS    Doc 7137    Filed 11/25/15    Page 28 of 49


payout may fall somewhere between the "at Baseline" and "at Superior" amounts shown in the tables above. It is important to note that performance exceeding the baseline level adds more value to the enterprise—a small portion of which is added to the AIP and EAIP payout for recognition of this level of performance.

## V.    Potential Costs of 2016 Compensation Programs Are Subject to Change.

55.    The actual costs of the Debtors' 2016 Compensation Programs are subject to change based on a year's worth of performance, among numerous other factors. For example, as set forth in the table below, in 2013 and 2014—the most recent years for which the Debtors have finalized and administered payments related to the Debtors' compensation programs—the actual amounts paid at year-end varied from the projected costs at baseline of the Debtors' 2013 and 2014 compensation programs.

| Program | 2013 | | 2014 | |
| --- | --- | --- | --- | --- |
| | Potential Cost (at Baseline) | Actual Cost | Potential Cost (at Baseline) | Actual Cost[23] |
| Annual Incentive Plan | $52.0 million | $70.7 million | $56.1 million | $67.9 million |
| Executive Annual Incentive Plan | $11.9 million | $18.4 million | $12.3 million | $19.1 million |
| Key Leader Plan | - | - | $4.8 million | $4.9 million |
| Key Leader Performance Program | - | - | $3.4 million | $3.1 million |
| Luminant Commercial Incentive Plan | | $3.4 million | | $3.4 million |
| Luminant Developer Incentive Plan | | $.017 million | | $.017 million |
| SPC Long Term Incentive Plan | $7.1 million | $7.1 million | $7.6 million | $7.6 million |

---

[23]   The actual costs for the 2014 AIP and EAIP include payments for active and inactive employees.

56.     The AIP and EAIP are the only 2016 Compensation Programs that allow for payment above baseline—the remainder of the 2016 Compensation Programs only allow for payment at or below baseline.[24]   As a result, any payments above the projected cost at baseline for the 2016 Compensation Programs must be attributable to performance that exceeds the baseline level on the Debtors' 2016 AIP/EAIP scorecard.  This is consistent with the structure of the Debtors' 2014 and 2015 compensation programs that the Court has already approved.

## VI.     Post-2016 Compensation Programs.

57.     The Debtors have specifically limited the relief requested in this Motion to compensation programs that relate to the 2016 performance period.

### Basis for Relief

I.       **The AIP, the EAIP, the Luminant CIP, the Luminant DIP, and the Individual Bonus Payments Are a Continuation of the Debtors' Prepetition Practices and Thus Ordinary Course Transactions Under Section 363(c) of the Bankruptcy Code.**

58.     Section 363(c)(1) of the Bankruptcy Code allows a debtor in possession to "enter into transactions . . . in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).  Courts in this District follow a two-part test that analyzes the transaction on horizontal and vertical bases—the horizontal inquiry focusing on whether the transaction is common to the debtor's industry, and the vertical on comparing the proposed transaction to the debtor's prepetition practices.  10/15/14 Hr'g Tr. at 188:24-189:3; *In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992) (same); *see also In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 797 (Bankr. D. Del. 2007) (same).

---

[24]   The "maximum" amount of the LCIP applicable to 47 non-insiders and one insider is technically not calculable today as it is a share of net profits made.  Currently, the maximum amounts in this Motion capture the variability in AIP/EAIP payments, but not the <u>potential</u> that LCIP could also exceed baseline.

59.     The Debtors submit that the AIP, the EAIP, the Luminant CIP, the Luminant DIP, and the Individual Bonus Payments are ordinary course transactions:  the Debtors are carrying forward the same compensation structure and programs from the Debtors' prepetition practices and as previously approved by the Court.  The AIP, EAIP, Luminant DIP, Luminant CIP, and Individual Bonus Payments have each existed in substantially similar form for over seven years.[25]  Moreover, this Court specifically concluded that the 2014 EAIP was an ordinary course transaction (and the AIP, other than the participants, is identical in structure and history to the EAIP).  *See* 10/15/14 Hr'g Tr. at 170:16-19 ("In addition, the EAIP and LTIP were adopted in the ordinary course of business and are to be governed under the deferential standard applied to such actions.").

60.     The 2016 Compensation Programs continue compensation programs already approved by the Court.  Each program's respective hallmarks—the applicable challenging performance metrics, the participants in the programs, and the general levels of compensation— have remained substantially consistent on a year-to-year basis.  Importantly, the Debtors' continued use of performance metric categories that incorporate the same concepts as the scorecards that the Court approved for 2014 and 2015—albeit in a streamlined and updated form for Luminant and Business Services—as well as the Debtors' use of the programs for "many, many, years in virtually identical form," confirms that the majority of the 2016 Compensation Programs before the Court are in the ordinary course of business.  *See* Hr'g Tr. at 230:14; *In re Visteon Corp.*, No. 09-11786 (CSS) (Bankr. D. Del. Feb. 18, 2010); *See Nellson*, 368 B.R. at 803 (finding that compensation plans were in the ordinary course where "[c]onsistent with the Debtors' pre-petition practices…").

---

[25]   *See* Kirby Proffer at 34:25–35:2; 35:10–13.

61.     Accordingly, the 2016 AIP, EAIP, Luminant DIP, Luminant CIP, and Individual Bonus Payments continue prepetition and postpetition practices that take into account the Debtors' operational history, financial performance, and particular business objectives. (Friske Declaration at ¶¶ 10-14.); *see also In re Dana Corp.*, 358 B.R. 567, 571 (Bankr. S.D.N.Y. 2006) (finding that because a debtor's postpetition incentive program was a "refinement" of historical practices, the proposed program was within the ordinary course); *In re Global Home Prods.*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (finding that proposed compensation programs were "not 'new' compensation programs but, instead, [were] nearly identical to plans previously used, and approved by a compensation committee and board of directors."). At their core, the 2016 Compensation Programs are a carry-over of the Debtors' 2014 and 2015 compensation structures, the majority of which were previously approved by the Court as ordinary course, and are consistent with the Debtors' historical practices.

62.     In addition, the 2016 Compensation Programs are consistent with industry practice. The Debtors, in consultation with Towers Watson, examined the compensation practices and bonus programs of comparable companies, both in bankruptcy and in the power industry, in assessing and developing these programs. (Friske Declaration at ¶¶ 16-17.) The Debtors' Programs are similar in structure and number to those offered by peer firms (as discussed in more detail in the Friske Declaration), and their chosen performance metrics are similar to those of other power companies more generally, a majority of which use an earnings-based goal (earnings per share, EBITDA, net income, etc.) in their annual and/or long-term incentive plans. (Friske Declaration at ¶ 17.) Accordingly, the Debtors' 2016 Compensation Programs are in line with competitive practice and the general structure of the programs is consistent with the power industry and the Debtors' peer group. (Friske Declaration at ¶ 14.)

The 2016 Compensation Programs are thus consistent with industry practice. *Nellson*, 369 B.R. at 797-98; *In re Blitz U.S.A. Inc.*, 475 B.R. 209, 215 (Bankr. D. Del. 2012) (approving continued use of compensation programs as ordinary course where an incentive-based bonus plan was common to the industry).

63.     These programs satisfy the "relatively light evidentiary burden of establishing that [the Debtors] made a business judgment in good faith upon a reasonable basis." *Nellson*, 369 B.R. at 800.   These programs motivate the Debtors' senior executive team and general workforce will continue to strive for top-tier performance, and thus align management incentives with the Debtors' key stakeholders' focus on achieving important financial and operational goals.    The Debtors simply seek to carry forward and honor these or similar programs. Moreover, as explained in further detail below, the structure and cost of the 2016 Compensation Programs are consistent with market practice—including within the Debtors' industry. (Friske Declaration at ¶¶ 13, 26.)

## II.     Continuing the 2016 Compensation Programs Is Also Appropriate Under Section 363(b) of the Bankruptcy Code.

64.     Even if the Court concludes that any of the 2016 Compensation Programs are not ordinary course transactions, they are nonetheless an appropriate exercise of the Debtors' business judgment under section 363(b)(1) of the Bankruptcy Code.   Section 363(b)(1) provides that a debtor "may use, sell, or lease, other than in the ordinary course of business, property of the estate" if the debtor demonstrates a sound business justification for such uses. *In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 WL 6090194, at \*5 (Bankr. D. Del. Nov. 20, 2012) (noting that it is "well-settled" that a debtor may use its assets outside the ordinary course where such use "represents the sound exercise of business judgment"); *Computer Sales Int'l, Inc. v. Fed. Mogul Global (In re Fed. Mogul Global, Inc.)*, 293 B.R. 124, 126 (D. Del. 2003)

(bankruptcy court "should approve a debtor's use of assets outside the ordinary course of business" upon a showing of "a sound business justification").  Accordingly, once a debtor articulates a valid business justification for the proposed use of estate property, the bankruptcy court shall give great weight to that judgment.  *See In re Commercial Mortg. and Fin., Co.*, 414 B.R. 389, 394 (Bankr. N.D. Ill. 2009) (noting that a debtor in possession "has the discretionary authority to exercise his business judgment in operating the debtor's business similar to the discretionary authority to exercise business judgment given to an officer or director of a corporation" (internal quotations and citations omitted)).

65.    Implementing the 2016 Compensation Programs is a proper exercise of the Debtors' business judgment and is in the best interests of the Debtors and their stakeholders. The Debtors are asking to continue compensation structures that have historically been maintained and have achieved their intended purposes.

66.    As Mr. Friske, the Debtors' independent compensation expert, explains in his declaration, both the incentive structure and award levels of the Debtors' 2016 Compensation Programs are reasonable in light of market practice in the utilities and power industry.  The overall design and structure of the 2016 Compensation Programs are consistent with market practice, including their emphasis on achieving EBITDA and cost management targets. (Friske Declaration at ¶¶ 13, 16-17.); 10/15/14 Hr'g Tr. at 184:23-24 ("The Debtors' use of EBITDA…is supported by the record.").  And, critically, the total compensation awarded under these programs is well within market.  *First*, according to Towers Watson's benchmark analysis of the total compensation of the Debtors' senior executives, the target award levels under these programs are within a reasonable range of competitive practice in the power industry and the

Debtors' peer group.[26]  (Friske Declaration at ¶ 24.)  *Second*, the Key Leader Plan and Individual
Bonus Payments are meant to retain key, non-insider employees during a time of significant,
ongoing stress for the Debtors' rank-and-file workforce.  The participants in these programs are
intimately familiar with the Debtors' business and have the experience and knowledge that is
critical to maximizing the value of the Debtors through the completion of these chapter 11 cases.
(*Id.* at ¶ 18.)  *Third*, the total cost of the Debtors' 2016 Compensation Programs at baseline—as
a percentage of annual revenues, a common comparison point in the compensation industry—is
commensurate with the median cost of similar programs in both the power industry and the
broader general industry.  (*Id.* at ¶¶ 35-41.)  *Finally*, without the Insider Programs, the Debtors'
senior executives would be paid well below market:  assuming that these programs are not
approved, the Debtors' senior leadership team's compensation would lag *well below* the 25th
percentile of the Peer Group, on average.  (*Id.* at ¶ 23.)  Accordingly, the Debtors submit that the
costs of the Debtors' 2016 Compensation Programs (specifically, the Insider Programs) are well
within competitive practice for large companies competing for the top talent sought by the
Debtors in the power industry and are reasonable in light of all relevant circumstances.  (*Id.* at
¶ 42.)

67.     Moreover, and importantly, under the Debtors' incentive programs, participants
can earn payments if—and only if—the Debtors and their employees meet difficult-to-attain,
performance-based metrics.  (*See infra* and *see, e.g.*, Filsinger Declaration at §§ 1, 4.1, 5.1, 5.4,
5.5.)  These metrics, if met or exceeded, will increase the value of the Company's estates for the
benefit of the Debtor's creditors and other stakeholders, and they are consistent with respect to
other compensation programs, including insider compensation programs that courts have

---

[26]   *See* Kirby Proffer at 36:5–9.

repeatedly approved in other cases, as well as this one.  *See*, *e.g.*, *Global Home Prods.*, 369 B.R. 778, 784 ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment." (internal citation omitted)).[27]   The 2016 Compensation Programs should be approved as a consequence.

### III.  The Non-Insider Compensation Programs Do Not Implicate Section 503 of the Bankruptcy Code.

68.    The Non-Insider Programs are permissible under section 503(c) of the Bankruptcy Code.  Section 503(c)(1) of the Bankruptcy Code restricts payments made to "insiders of the debtor for the purpose of inducing such person to remain with the debtor's business"—*i.e.*, those insider plans that are essentially "pay to stay" plans—and section 503(c)(2) of the Bankruptcy Code restricts severance payments to insiders.  *In re Velo Holdings, Inc.*, 472 B.R. 201, 209 (Bankr. S.D.N.Y. 2012); *In re Borders Grp., Inc.*, 453 B.R. 459, 471 (Bankr. S.D.N.Y. 2011) (quoting *In re Dana Corp.*, 358 B.R. 567, 571 (Bankr. S.D.N.Y. 2006)).  Simply put, the Non-Insider Programs are permissible under section 503(c) of the Bankruptcy Code because the programs do not contemplate any payments to insiders.  All employees who were excluded from the 2015 retention-based plans approved as part of the 2015 Compensation Order have been similarly excluded from the 2016 retention-based plans.  Further, there are no new employees or newly-promoted employees at or above the level of those employees that were excluded from the 2015 Non-Insider Programs.  Accordingly, the restrictions of sections 503(c)(1)-(2) of the

---

[27]   *See also In re IPC Int'l Corp.*, No. 13-12050 (MFW) (Bankr. D. Del. Sept. 3, 2013) (D.I. 135) (approving debtors' key employee incentive plan); *In re Synagro Techs., Inc.*, No. 13-11041 (BLS) (Bankr. D. Del. May 13, 2013) (D.I. 132) (same); *In re Prommis Holdings*, No. 13-10551 (BLS) (Bankr. D. Del. Apr. 16, 2013) (D.I. 174) (same); *In re DDMG Estate (f/k/a Digital Domain Media Grp., Inc.)*, No. 12-12568 (BLS) (Bankr. D. Del. Oct. 22, 2012) (D.I. 462) (same); *In re Local Insight Media Holdings, Inc.*, No. 10-13677 (KG) (Bankr. D. Del. Mar. 29, 2011) (D.I. 319) (same).  Because of the voluminous nature of the orders cited herein, such orders have not been attached to the Motion.  Copies of these orders are available upon request of the Debtors' counsel.

Bankruptcy Code are not applicable to the relief requested by this Motion for the Non-Insider Programs.

69.     To the extent section 503(c)(3) does apply to any of the Non-Insider Programs,[28] because the Court concludes that one or more of the Non-Insider Programs is not an ordinary course transaction, the relief requested in this Motion with respect to the Non-Insider Programs is appropriate because it is "justified by the facts and circumstances of the case."  The Non-Insider Programs continue the Debtors' long-standing compensation plans that the Debtors implemented previously in these chapter 11 cases to encourage strong employee performance, and thus these programs should be approved.  *Blitz U.S.A. Inc.*, 475 B.R. at 215.  The Debtors quite reasonably are concerned that without these programs many of their talented non-insider employees would seek alternative employment.  The Debtors cannot afford to lose these essential employees, whose skills and knowledge of the Debtors' complex businesses are critical to safe and successful operations.   Moreover, significant non-insider employee attrition would undoubtedly cause the Debtors to incur increased recruiting costs to find and attract similarly qualified replacements.

70.     Recognizing these serious concerns, courts in this jurisdiction and elsewhere have regularly approved compensation programs for non-insiders, even programs that are primarily retention-based.  *See*, *e.g.*, *Second Final Order Authorizing the Debtors to (A) Pay Certain Prepetition Amounts on Account of Non-Insider Compensation Programs and (B) Continue the Non-Insider Compensation Programs in the Ordinary Course of Business on a Post-Petition Basis* (D.I. 142) (approving incentive and retention compensation plans for non-insiders); *In re*

---

[28]   Bankruptcy Code section 503(c)(3) provides: "[There shall neither be allowed, nor paid…] (3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition."

*Mervyn's Holdings, LLC*, No. 08-11586 (KG) (Bankr. D. Del. Oct 26, 2009) (D.I. 4160) (approving a retention plan for non-insiders); *In re KB Toys, Inc.*, No. 08-13269 (KJC) (Bankr. D. Del. Jan. 6, 2009) (D.I. 207) (same).   Accordingly, the facts and circumstances of these chapter 11 cases warrant approval of the Non-Insider Programs and the relief requested in this Motion is appropriate under section 503(c) of the Bankruptcy Code.

**IV.   The Insider Compensation Programs Are Consistent With Section 503 of the Bankruptcy Code as They Are Primarily Incentivizing Given the Difficult-to-Achieve Metrics That Trigger Payments.**

71.   The Insider Programs are permissible under section 503(c) of the Bankruptcy Code.   Section 503(c)(1) of the Bankruptcy Code restricts payments made to "insiders of the debtor for the purpose of inducing such person to remain with the debtor's business"—*i.e.*, those plans that are essentially "pay to stay" plans.   *In re Velo Holdings, Inc.*, 472 B.R. 201, 209 (Bankr. S.D.N.Y. 2012); *In re Borders Group, Inc.*, 453 B.R. 459, 471 (Bankr. S.D.N.Y. 2011) (quoting *Dana* ).   "Put another way, section 503(c)(1) is not applicable if the primary purpose of the payments . . . are primarily for motivating or incentivizing the employees covered under the plans."   10/15/14 Hr'g Tr. at 185:19-24.   Here, none of the Insider Programs—the EAIP, the Key Leader Performance Program, the Luminant CIP, or the SPC Supplemental Incentive Award— are retention-based.   All of the Insider Programs make awards to participating employees based upon their satisfaction of rigorous, difficult-to-attain performance targets.

72.   All of the programs at issue in this Motion that apply to insiders—the EAIP, the Key Leader Performance Program, the Luminant CIP, and the SPC Supplemental Incentive Award—are primarily incentivizing.   In this regard, the question is whether these plans are "designed to motivate insiders to rise to a challenge or merely report to work."   *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012).   As the Court found with respect to the 2014 Insider Compensation Programs, the Debtors' 2016 programs meet that standard.

*See* 10/15/14 Hr'g Tr. at 170:9-12 ("[T]he Court finds that the evidence overwhelmingly supports a finding that the EAIP, key leader performance plan and LTIP are incentive plans."). Here, the Debtors have offered market-competitive compensation if—and only if—the Debtors satisfy a series of operational and financial stretch goals. The Insider Programs do not contain either retention-based or severance components. Participants are not paid in the event their employment is terminated for cause, nor are they paid for merely maintaining their employment for a certain time period. Instead, awards under the Insider Programs are paid only if the Debtors achieve specific performance targets. Importantly, the structure of the 2016 Compensation Programs is substantially identical to the 2014 and 2015 compensation programs—programs that the Court determined were primarily incentivizing.

73.    As Mr. Filsinger explains in detail in his declaration, the Debtors performance incentive metrics have been benchmarked to industry or historical standards and are predicated on targets in their annual budget, which itself was developed over the course of several months through an iterative, ground-up process involving multiple rounds of management input, review, and calibration. (Filsinger Declaration at §§ 1, 4.1, 4.2.)[29] From there, the Debtors refined each of their 2016 performance thresholds so that each metric provided an appropriate stretch goal that was difficult to attain. (*Id.* at §§ 1, 4.1, 4.2, 5.1, 5.1.1, 5.4, 5.4.1, 5.5.1.) The Debtors ultimately developed scorecards for three business units—Luminant, TXU Energy, and Business Services—that focus on the key performance drivers for that particular entity. (*Id.* at §§ 1, 4.1,

---

[29] Mr. Filsinger testified with respect to the Debtors' 2014 Insider Programs, and was found by the Court to be "particularly competent and credible" in his capacity as the Debtors' industry expert. In addition to being significantly involved in the development of the Debtors' 2016 metric scorecards, over the past several decades, Mr. Filsinger has developed and evaluated cash flow, EBITDA, and cost projections similar to those found in the Debtors' compensation plans—including in the bankruptcies of Calpine, NRG Energy, Mirant, Entegra Power, and National Energy Group—as well as in his roles as former Chief Commercial Operations Officer of Calpine Corporation, an independent power producer that competes with Luminant, and as CEO and CFO of Hawkeye Growth, a major ethanol producer. (Filsinger Declaration at § 2.)

5.1, 5.1.1, 5.4, 5.4.1, 5.5.1.)   The performance metrics involve a mix of key financial and operational targets, and include a payout range based on varying levels of performance—Threshold, Baseline, and Superior.  (*Id.* at §§ 1, 4.1, 5.1, 5.1.1, 5.4, 5.4.1, 5.5.1).  These targets, which are especially difficult to attain in an industry as complicated and volatile as the power industry, were then incorporated directly into the 2016 Compensation Programs.  For 2016, the Debtors also streamlined the performance metric categories on the 2016 AIP/EAIP scorecards for Luminant and Business Services to better tailor the incentive metrics to current corporate objectives and to better align the metrics with the current environment in the power industry.

74.    Mr. Filsinger concluded that the Debtors' 2016 performance incentive metrics are subject to considerable uncertainty.  The Debtors face substantial risks that might affect the operations and profitability of Luminant and TXU Energy as well as the Debtors' enterprise as a whole—including, among other things, risks associated with ERCOT power market prices and structure; operating costs at the Debtors' nuclear, fossil-fuel, and mining facilities; supply and demand forces in the ERCOT power market; commodity price volatility; the unpredictability of the weather (which affects demand for electricity); and regulatory and emission costs and risks; and the list goes on.  (*See, e.g.*, Filsinger Declaration at §§ 1, 5.1.2.1, 5.1.2.2, 5.1.2.3, 5.1.2.4, 5.1.2.5, 5.4.2.1, 5.4.2.2, 5.4.2.3, 5.4.2.4, 5.4.2.5, 5.5.2.)  In light of these risks, the performance metrics "constitute stretch goals that incentivize and reward exceptional employee performance; there is no guarantee that the [Debtors] will meet any of the metrics." (*Id.* § 1-4.)

75.    Each of the metrics on the Luminant, TXU Energy, and Business Services scorecards, challenge the Debtors' key employees to perform at their highest levels.  Because participants will receive payments under the EAIP, the Key Leader Performance Program, the Luminant CIP, and the SPC Supplemental Incentive Award ***only*** upon the achievement of

challenging, value-maximizing performance targets, these programs easily constitute the kind of

incentive-based compensation programs that bankruptcy courts both in this district and

elsewhere have approved.[30]   The Debtors' programs, like those previously approved in these

chapter 11 cases, should be approved by this Court.

## V.   The 2016 Compensation Programs Are Justified by the Facts and Circumstances of these Chapter 11 Cases to the Extent Required by Section 503(c) of the Bankruptcy Code.

76.     The Debtors believe that the majority of the 2016 Compensation Programs are

ordinary course transactions and thus must merely constitute an exercise of the Debtors' business

judgment.  Any programs that are not in the ordinary course, however, only require the Debtors

to demonstrate that their approval is justified by the facts and circumstances of these chapter 11

cases under section 503(c) of the Bankruptcy Code.  Many courts have held that this standard is

essentially the same as the business judgment standard that is applied under Section 363(b) of the

Bankruptcy Code.  *See In re Velo Holdings, Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012)

("Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a

standard no different than the business judgment standard under section 363(b)."); *Dana Corp.*,

358 B.R. at 576; *Global Home Prods.*, 369 B.R. 778, 783 (Bankr. D. Del. 2007) ("If

[the proposed plans are] intended to incentivize management, the analysis utilizes the more

liberal business judgment review under § 363."); *In re Mesa Air Grp.*, No. 10-10018, 2010 WL

---

[30]   *See*, *e.g.*, 10/15/14 Hr'g Tr. at 186:1-3 ("[E]ach of the plans is primarily an incentive plan and any retentive effects, while present, are incidental."); *Dana*, 358 B.R. at 584 (approving management incentive plan); *In re The Great Atl. & Pac. Tea Co.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. May 2, 2011) (D.I. 1479) (approving key employee incentive plan based on financial performance); *In re Neff Corp.*, No. 10-12610 (SCC) (Bankr. S.D.N.Y. June 30, 2010) (D.I. 211) (approving key employee incentive plan based in part on financial performance); *In re Lear Corp.*, No. 09-14326 (ALG) (Bankr. S.D.N.Y. Aug. 28, 2009) (D.I. 530) (same); *In re Chemtura Corp.*, No. 09-11233 (REG) (Bankr. S.D.N.Y. July 28, 2009) (D.I. 847) (approving key employee incentive plan based in part on achievement of EBITDA targets); *In re Tronox Inc.*, No. 09-10156 (ALG) (Bankr. S.D.N.Y. June 9, 2009) (D.I. 492); *In re WCI Cmtys., Inc.*, No. 08-11643 (KJC) (Bankr. D. Del. Feb. 5, 2009) (D.I. 1134) (approving incentive plan based in part on financial performance); *In re Riverstone Networks, Inc.*, No. 06-10110 (CSS) (Bankr. D. Del. Mar. 28, 2006) (D.I. 224) (approving employee bonus program for successful completion of individual and company performance goals).

3810899, at *4 (Bankr. S.D.N.Y. Sept. 24, 2010); *In re Nobex Corp.*, No. 05-20050, 2006 WL 4063024, at *2 (Bankr. D. Del. Jan. 19, 2006).  Other courts, however, have determined that section 503(c)(3) is intended to give the court a greater role, requiring that the court make its own determination that the transaction will serve the interests of creditors and the debtor's estate. *See In re Pilgrim's Pride Corp.*, 401 B.R. 229 (Bankr. N.D. Tex. 2009).  The 2016 Compensation Programs—which are substantially identical in structure to the 2014 and 2015 compensation programs—are easily justified by the facts and circumstances of these chapter 11 cases, whether the Court examines the programs under the business judgment test under *Velo*, *Dana*, and *Global Home Prods.*, or the heightened standard mandated by *Pilgrim's Pride*.

      **A.**      **The Debtors Clearly Satisfy Each of the *Dana* Factors.**

      77.      In determining whether a compensation plan satisfies the "facts and circumstances" standard under section 503(c)(3) of the Bankruptcy Code, courts consider several factors, including whether:  (1)  the plan is calculated to achieve the desired performance; (2)  the cost of the plan is reasonable in the context of a debtor's assets, liabilities, and earning potential; (3)  the scope of the plan is fair and reasonable or discriminates unfairly among employees; (4)  the plan is consistent with industry standards; (5)  the debtor performed due diligence in investigating the need for the plan; and (6)  the debtor received independent counsel in performing due diligence, creating, and authorizing the plan.  *See* 10/15/14 Hr'g Tr. at 196:4-19; *Global Home Prods.*, 369 B.R. at 786; *Dana Corp.*, 358 B.R. at 576–77.  These factors are not exhaustive, but rather factors that the court may consider in evaluating the proposed plans. *See id.* at 576.  In this case, the facts and circumstances fully justify the 2016 Compensation Programs:

78.    ***The 2016 Compensation Programs are calculated to achieve the desired performance.***    As Mr. Filsinger explains in his declaration, most payments under the 2016 Compensation Programs—and all payments under the Insider Programs—are directly tied to financial, operational, and other business objectives, including EBITDA, cost management, customer retention, and availability of the power generation facilities.    (*See, e.g.*, Filsinger Declaration at §§ 1, 4.1, 5.1, 5.1.1, 5.4, 5.4.1, 5.5.1.)    These programs and the 2016 metrics were the result of a bottom up process developed to encourage and reward exceptional performance with compensation that is competitive within the power industry market.    *Id.* at §§ 1, 4.1, 4.2; *see* 10/15/14 Hr'g Tr. at 198:10-14 ("[T]he plans are the result of a bottom up process where performance metrics and targets for them were established that were designed to provide management with challenging but achievable goals, thus the plans are calculated to achieve the desired performance.").    In addition, the Non-Insider Programs' retention awards help the Debtors retain key non-insider employees during a time of significant and ongoing distractions. These employees are intimately familiar with the Debtors' business and have the experience and knowledge that are critical to the Debtors' ability to continue value-maximizing operations through the completion of these chapter 11 cases.

79.    ***The costs of the 2016 Compensation Programs are reasonable in the context of the Debtors' assets, liabilities, and earning potential.***    As Mr. Friske explains in his declaration, the costs of the 2016 Compensation Programs are market-appropriate given the size of the Debtors' operations, the Debtors' earning potential, and the complexity of the Debtors' businesses.    *See* Friske Declaration at ¶ 42; 10/15/14 Hr'g Tr. 198:17-19 ("Clearly, the cost of the plan is reasonable in the context of the debtors' assets, liabilities and earning potential.").    In particular, the total target cost of the Debtors' general incentive programs (the AIP, EAIP, Key

Leader Plan, Key Leader Performance Plan and SPC Supplemental Incentive Award) is approximately 0.76% of EFH's projected 2016 revenues of $11.264 billion and approximately 1.16% of TCEH's projected 2016 revenues of $7.365 billion.   (Friske Declaration at ¶ 34.) Based on these comparison points, the Debtors' anticipated costs are well within the range of observed market practice:   the median cost of annual incentive programs, based on energy industry data, as a percentage of revenues is 1.01% and the 75th percentile is 1.51%.

80.    ***The scope of the 2016 Compensation Programs is fair and reasonable and does not discriminate unfairly among employees.***   The 2016 Compensation Programs are reasonable in scope:   (a) the Insider Programs apply to the employees who are best positioned to drive the Debtors' financial and operational performance, and include the entirety of the Debtors' senior executive team, which is critical to maximizing the value of the Debtors' assets during these chapter 11 cases and beyond; and (b) the Debtors' other approximately 5,200 employees participate in one or more of the  Compensation Programs that are the subject of this Motion.

81.    ***The 2016 Compensation Programs are consistent with industry standards.***   The Debtors' compensation advisors at Towers Watson worked directly with the Debtors' executive team to confirm that the Debtors' existing compensation programs are similar in structure, number, and scope to other companies in the power industry.   (Friske Declaration at ¶ 13.)   The Insider Programs, like other programs in the industry, rely heavily on performance metrics like EBITDA and cost savings metrics—which bankruptcy courts, including this Court, have repeatedly approved in recent chapter 11 cases.   *Id.* at ¶ 14.   Importantly, the SPC members' target total direct compensation is 21% below the 50th percentile in the aggregate. (Friske Declaration at ¶ 27.)   In addition, the Non-Insider Programs are similar to others in the industry—the Non-Insider Programs' use of objective performance measures, including

EBITDA and cost performance targets, as well as retention-based awards, is consistent both with the power industry and other recent bankruptcy court-approved employee programs.

82.    ***The Debtors performed due diligence in developing the 2016 Compensation Programs.***  To verify that the 2016 Compensation Programs are competitive and market-based, the Debtors sought the advice of their advisors at Kirkland & Ellis, Towers Watson, and Filsinger Energy Partners.[31]  As a result of these efforts, the Debtors concluded that (a) it was appropriate—if not necessary—to continue their existing incentive programs (with certain modifications) to maintain the competitiveness of the Debtors' employee compensation packages; (b) the 2016 Compensation Programs are reasonable and consistent with market practice and industry standards; and (c) the 2016 Compensation Programs are appropriately tailored to incentivize financial and operational excellence and thus position the Debtors for long-term success.

83.    Moreover, the Debtors developed the metrics that trigger bonuses under these programs through their customary, iterative ground-up planning process.  Consistent with prior practice, including in these chapter 11 cases, the SPC and O&C Committee engaged in a comprehensive, iterative review process for these metrics and the programs more broadly.

84.    ***The Debtors received independent counsel in developing the 2016 Compensation Programs.***  As set forth above, the Debtors received independent counsel from Towers Watson, Filsinger Energy Partners, and other advisors in benchmarking and designing the 2016 Compensation Programs, including their financial and operational targets, and the

---

[31]    *See* Kirby Proffer at 35:21–36:1; 10/15/14 Hr'g Tr. at 199:2-6 ("[T]he debtors[] performed extensive due diligence, both internally and through consulting with advisors in investigating the need for the plans, analyzing which key employees need to be incentivized and how [and] what is generally applicable in the industry.").

O&C Committee (which includes a disinterested director) approved the 2016 Compensation Programs.  (Friske Declaration at ¶ 12.)

> **B.      The 2016 Compensation Programs Serve the Interests of Creditors and the Debtors' Estates and Satisfy the Standard Set Forth in *Pilgrim's Pride*.**

85.      The 2016 Compensation Programs also satisfy the more stringent standard set forth in *Pilgrim's Pride*.  Under *Pilgrim's Pride*, the Court must make "its own determination" that the proposed incentive program "serve[s] the interests of creditors and the debtor's estate." *Pilgrim's Pride*, 401 B.R. at 237; 10/15/14 Hr'g Tr. at 199:15–18.  At the heart of this inquiry is whether, "even if a good business reason can be articulated" for the proposed compensation programs, the Court believes that the proposed compensation programs will work—*i.e.*, that the incentive program will align the interests of the debtor's estate and its creditors along those of the debtor's management and employees.  *Pilgrim's Pride*, 401 B.R. at 237.  The Debtors have met that standard.  *See* 10/15/14 Hr'g Tr. at 199:20-23 ("[T]he economic stakeholders in this case, i.e., the creditors, as well as the estate, will be better off if management hits targets and is awarded its incentive bonuses.").

86.      As set forth in the Filsinger Declaration, the Debtors' incentive programs provide their employees and management with challenging yet achievable goals that if met, will benefit all parties in interest.  If the Debtors' employees and management work hard to deliver the top-tier performance necessary to meet the incentive metrics, the Debtors' creditors and estates will realize the benefits of these efforts.  Accordingly, even if this Court employs the independent inquiry under *Pilgrim's Pride*, the 2016 Compensation Programs nonetheless are justified by the facts and circumstances of these chapter 11 cases under section 503(c)(3) of the Bankruptcy Code.

87.     In short, these plans are necessary to encourage their participants to work toward the Debtors' ultimate goal:   maximizing value for the benefit of the Debtors' stakeholders. Accordingly, the plans are "justified by the facts and circumstances" of these chapter 11 cases and are properly approvable under section 503(c)(3), no matter what standard is applied.

### Waiver of Bankruptcy Rules 6004(a) and 6004(h)

88.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Notice

89.     The Debtors shall provide notice of this Motion on the date hereof via first class mail to:  (a) the U.S. Trustee; (b) counsel to the TCEH Creditors' Committee; (c) counsel to the EFH Creditors' Committee; (d) Wilmington Trust, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (e) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under:  (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (f) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under:  (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (g) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under:  (i) the 11.0% EFIH senior secured second

46

lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (h) UMB Bank, N.A. in its capacity as indenture trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (i) Delaware Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; (ii) the 10.0% EFIH senior secured notes due 2020; and (iii), the 11.50% TCEH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (j); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to the Ad Hoc Committee of TCEH Unsecured Noteholders; (q) counsel to the Ad Hoc Committee of TCEH Second Lien Noteholders; (r) Oncor Electric Delivery Holdings Company LLC and counsel thereto; (s) Oncor Electric Delivery Company LLC and counsel thereto; (t) the Securities and Exchange Commission; (u) the Internal Revenue Service; (v) the Office of the United States Attorney for the District of Delaware; (w) the Office of the Texas Attorney General on behalf of the Public Utility Commission of Texas; (x) counsel to the Electric Reliability Council of Texas; and (y) those parties that have requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### **No Prior Request**

90.    No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors respectfully request that the Court enter the order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Wilmington, Delaware
Dated: November 25, 2015

/s/ Jason M. Madron
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701
Email:          collins@rlf.com
                defranceschi@rlf.com
                madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          edward.sassower@kirkland.com
                stephen.hessler@kirkland.com
                brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          james.sprayregen@kirkland.com
                marc.kieselstein@kirkland.com
                chad.husnick@kirkland.com
                steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession