**EXHIBIT G**

Form of Pension and Backstop Agreement

<u>FORM OF</u>
<u>PENSION BACKSTOP AGREEMENT</u>

This Pension Backstop Agreement (this "**Agreement**") is entered into on [●] (the "**Effective Date**"), by and among [Oncor T&D AssetCo], a Delaware limited liability company ("**Seller Parent**"), Oncor Electric Delivery Company LLC, a Texas limited liability company ("**Buyer**"), Reorganized TCEH (as defined below), and the Pension Benefit Guaranty Corporation, a wholly owned United States government corporation ("**PBGC**" and, together with Seller Parent, Buyer and Reorganized TCEH, the "**Parties**").

<u>RECITALS</u>

**WHEREAS**, Energy Future Holdings Corp. ("**EFH**") and substantially all of its subsidiaries, other than (a) Seller Parent (f/k/a Oncor Electric Delivery Company LLC, the "**Predecessor Utility**") and (b) Oncor Electric Delivery Holdings Company LLC, are currently debtors under voluntary cases commenced under Chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware, which cases are currently pending before the Honorable Christopher S. Sontchi and jointly administered for procedural purposes only under Case No. 14-10979 (collectively, together with any proceedings relating thereto, the "**Bankruptcy Case**");

**WHEREAS**, in connection with the Plan of Reorganization confirmed in connection with the Bankruptcy Case (the "**Plan of Reorganization**"), (a) equity interests in a new subsidiary of EFH ("**Reorganized TCEH**") holding the competitive electricity businesses currently owned by Texas Competitive Electric Holdings Company LLC ("**TCEH**", and together with Seller Parent, Buyer, and Reorganized TCEH, the "**Obligors**") will be distributed to certain creditors of TCEH (the "**TCEH Spin-Off**") and (b) new investors will indirectly acquire the Predecessor Utility and restructure it (the "**REIT Restructuring**", and collectively with the TCEH Spin-Off, the "**Transactions**");

**WHEREAS**, the Predecessor Utility is currently the sponsor of the Oncor Retirement Plan, effective as of January 1, 2013, as amended (the "**Oncor Plan**");

**WHEREAS**, EFH is currently the sponsor of the EFH Retirement Plan, as amended to date;

**WHEREAS**, sponsorship of the EFH Retirement Plan will be assumed by Reorganized TCEH (the "**TCEH Plan**", and together with the Oncor Plan, the "**Pension Plans**") (along with the related trust agreement with The Bank of New York Mellon) in connection with the TCEH Spin-Off;

**WHEREAS**, the Predecessor Utility has historically funded a portion of the pension costs for participants in the EFH Retirement Plan that are related to those participants' employment by the formerly integrated utility businesses of TCEH and the Predecessor Utility and Buyer is expected to continue those funding obligations with respect to the TCEH Plan pursuant to that certain arrangement that is or will be substantially in the form of the Amended

and Restated Split-Participant Agreement (the "**Split Participant Agreement**") attached hereto as Exhibit 1;

WHEREAS, Seller Parent and Buyer have entered or will enter into the Joint Survivor Merger Agreement substantially in the form attached hereto as Exhibit 2, under which assets and liabilities of the Predecessor Utility are allocated by operation of law between Seller Parent and Buyer (the "**Joint Survivor Merger Agreement**");

WHEREAS, the Joint Survivor Merger Agreement provides that (i) substantially all employees of the Predecessor Utility, the Oncor Plan (along with the related trust agreement with The Bank of New York Mellon) and the Split Participant Agreement will be allocated to Buyer, (ii) Buyer will enter into the Split Participant Agreement, and (iii) Buyer will assume all primary obligations under the Oncor Plan, with Seller Parent retaining only the backstop and related obligations set forth in this Agreement; and

WHEREAS, the Parties desire to enter into this Agreement where Seller Parent will backstop Buyer's obligations with respect to the Oncor Plan and/or the TCEH Plan pursuant to Title IV of the Employee Retirement Security Act of 1974, as amended ("**ERISA**"), in order to have PBGC agree to forbear from taking certain actions with respect to the Oncor Plan and the TCEH Plan on the terms and conditions stated below.

NOW, THEREFORE, in consideration of the promises and mutual agreements in this Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are acknowledged, the Parties agree as follows:

**ARTICLE 1**
**DEFINITIONS, CONSTRUCTION AND CONDITION PRECEDENT**

**1.1** **Definitions**.  Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to them in this Section 1.1.

    a.    "**Allocable Share**" means, with respect to the TCEH Plan, the method for allocating pension liabilities, costs and expenses defined in Schedule II to the Split Participant Agreement as the "Aon Calculation Method".

    b.    "**Applicable Law**" means any law, statute (including without limitation, ERISA and the Internal Revenue Code), regulation, rule, code, executive order, injunction, judgment, decree, writ, order or guidance promulgated by the Internal Revenue Service, Department of Labor, PBGC or any other United States or non-United States federal, national, supranational, state, provincial, local or similar government, governmental, regulatory or administrative authority, branch, agency or commission or any court, tribunal, or arbitral or judicial body (including any grand jury) or any other similar entity.

    c.    "**Audit Period**" means the period beginning on the date on which PBGC receives a Form 501 Post-Distribution Certification for a Pension Plan indicating that such Pension Plan has terminated in a standard termination under Section 4041(b) of ERISA and ending on the later of (1) the 180th day after such receipt, and (2) if

2

PBGC has, by such 180th day, issued audit findings or a notice of noncompliance with respect to such standard termination, the date on which such audit findings have been complied with or rescinded or on which such notice of noncompliance has been rescinded.

d.     "**Backstop Payment**" means any payment made by Seller Parent under Section 4.1(a), (b) or (c) below.

e.     "**Contribution Payment**" has the meaning provided in Section 430(k)(6)(A) of the Internal Revenue Code.

f.     "**Controlled Group**" means the "controlled group" as defined in Section 4001(a)(14) of ERISA.

g.     "**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended.

h.     "**Plan Administrator**" means, with respect to the Oncor Plan or the TCEH Plan, as applicable, the administrator of such plan pursuant to Sections 3(16) and 4001(a)(l) of ERISA.

i.     "**Plan of Reorganization**" has the meaning provided in the recitals.

j.     "**Plan Year**" means, with respect to the Oncor Plan or the TCEH Plan, as applicable, the "plan year" as defined in Section 3(39) of ERISA; *provided, however,* that for purposes hereof, any "Plan Year'' must equal twelve (12) months.

k.     "**Projected Termination Premium**" means, with respect to the Oncor Plan or the TCEH Plan, as applicable, the aggregate amount of any and all premiums payable to PBGC under Section 4006(a)(7) of ERISA (whether or not fully matured thereunder).

l.     "**Termination Liability**" means, in connection with the termination pursuant to Title IV of ERISA of the Oncor Plan or the TCEH Plan, as applicable, (i) with respect to the Oncor Plan, an amount not to exceed the sum of such plan's Unfunded Benefit Liabilities and such plan's Projected Termination Premium, and (ii) with respect to the TCEH Plan, an amount not to exceed Oncor's "Allocable Share of the Unfunded Benefit Liabilities" as defined in Schedule II to the Split Participant Agreement.

m.      "**Unfunded Benefit Liabilities**" means, with respect to the Oncor Plan or the TCEH Plan, as applicable, the "amount of unfunded benefit liabilities" as defined in Section 4001(a)(18) of ERISA.

**1.2     Construction**.   The language used in this Agreement is deemed to be the language chosen by the Parties to express their mutual intent.   No rule of strict construction will be applied against any Party hereto and no deference will be provided to any Party with respect to the

interpretation of this Agreement. The section headings contained in this Agreement are inserted for convenience only and will not affect in any way the meaning or interpretation of this Agreement.

**1.3** **Condition Precedent**. Final execution of this Agreement shall also be a condition precedent to the Plan of Reorganization becoming effective in consideration of PBGC's obligations under this Agreement.

**ARTICLE 2**
**PBGC UNDERTAKINGS**

So long as no "**Obligor Breach**" (as defined below), has occurred with respect to one of the Pension Plans, PBGC will forbear from taking any action under Section 4042(a)(4) of ERISA to initiate termination with respect to the applicable Pension Plan on account of either or both of the Transactions (the "**Forbearance Obligations**"). Each of the following, occurring after the Transactions, shall constitute an Obligor Breach under this Agreement: the failure to pay any amounts due and payable in breach of either (i) the Split Participant Agreement (solely with respect to the ongoing pension funding payments concerning the EFH Retirement Plan) or (ii) this Agreement, and the failure to cure such breach under either (i) or (ii) within 30 days after receipt of notice of the failure from PBGC. For avoidance of doubt, the Parties clarify that an Obligor Breach with respect to one Pension Plan does not constitute an Obligor Breach with respect to the other Pension Plan. The Parties further clarify that the Forbearance Obligations shall remain in full force and effect with respect to the Pension Plan that has not experienced an Obligor Breach.

**ARTICLE 3**
**BUYER UNDERTAKINGS**

**3.1** **Plan Obligations**.

a.      Buyer represents that it has assumed the Oncor Plan (pursuant to the Joint Survivor Merger Agreement) and acknowledges that it has primary liability with respect to the Oncor Plan and the obligations to Reorganized TCEH based on the Allocable Share with respect to the TCEH Plan under the Split Participant Agreement. Buyer acknowledges that nothing herein shall limit, restrict, or impair the rights of Reorganized TCEH under the Split Participant Agreement.

b.      Except to the extent Buyer's applicable funding obligation in respect of the Oncor Plan and/or TCEH Plan is satisfied by a Backstop Payment that is made by Seller Parent under Section 4.1(b) and/or (c), Buyer shall continue to timely make all Contribution Payments to the Oncor Plan as required pursuant to Section 303 of ERISA and Section 430 of the Internal Revenue Code and shall make payments in respect of the TCEH Plan based on the Allocable Share pursuant to the Split Participant Agreement. To the extent such payments relate to the TCEH Plan, Buyer shall make such payments to Reorganized TCEH or, in the event that either (i) the TCEH Plan is in "at-risk" status under Section 430(i) of the Internal Revenue Code (and the regulations promulgated thereunder), (ii) Reorganized

4

TCEH is in bankruptcy on the date a payment is due, or (iii) Reorganized TCEH is unable to pay its debts as they become due, Buyer shall make such payments to an appropriate third-party escrow agent (an "**Escrow Agent**") on behalf of the TCEH Plan; provided that, Buyer shall remain liable for any payments that are made to Reorganized TCEH to the extent Reorganized TCEH fails to contribute such amounts to the TCEH Plan, and any such liability may be enforced by PBGC; provided further that, Buyer shall make such payment directly to the TCEH Plan in the event the applicable agreement with an Escrow Agent is not consummated by the date the applicable payment is due.

c. Except to the extent Buyer's applicable funding obligation in respect of the Oncor Plan and/or TCEH Plan is satisfied by a Backstop Payment that is made by Seller Parent under Section 4.1(a), Buyer also covenants to PBGC, Seller Parent or Reorganized TCEH, as applicable, to make any Termination Liability payments, including any required payments to PBGC, with respect to the Oncor Plan and/or TCEH Plan. For the avoidance of doubt, the Parties agree that any Termination Liability payments due as a result of a "distress termination" or an "involuntary termination" of the Oncor Plan and/or TCEH Plan, under Sections 4041(c) and 4042 of ERISA, shall be paid directly to PBGC.

d. To the extent that Seller Parent makes any Backstop Payments pursuant to Section 4.1, Buyer agrees to reimburse Seller Parent for the amount of such Backstop Payments that are not otherwise reimbursed pursuant to Section 5.1(f), including (i) over time and with reasonable interest using amounts recovered for such purposes through rates (to the extent such amounts, including any interest with respect thereto, are so recovered) that are established by the Public Utilities Commission of Texas or (ii) as a credit against overhead charges to Seller Parent relating to capital expenditures of Buyer that are reimbursed by Seller Parent or as a credit against any other amount that Seller Parent owes or would owe Buyer, except to the extent such credit (or a portion thereof) would materially jeopardize the ability of the Controlled Group of Buyer to continue, in all material respects, as a going concern as determined in accordance with the second sentence of Section 4.1(a) ("**Going Concern Risk**"), in which case, (x) the application of such credit (or portion thereof) will be delayed until such time, and to the extent that, the Going Concern Risk is no longer applicable and (y) the amount of such credit (or portion thereof) that is delayed will accrue a reasonable rate of interest during such delay.

e. To the extent the sum of (i) Backstop Payments made by Seller Parent and (ii) any additional pension funding obligations under the Oncor Plan and the TCEH Plan exceed the amount allowed to be recovered by Buyer in rates that are established by the Public Utilities Commission of Texas, Buyer agrees to seek recovery of such excess in good faith in its next rate proceeding with the Public Utilities Commission of Texas.

f.    Buyer acknowledges to Seller Parent that Buyer's liabilities and obligations under this Section 3.1 apply to the Controlled Group of Buyer, which Controlled Group will not include Seller Parent or any member of Seller Parent's Controlled Group.

g.    Buyer agrees that in the event of a transaction involving the sale of a majority of the assets of the Controlled Group of Buyer, Buyer shall either (i) ensure that the purchaser in such transaction shall assume Buyer's obligations under this Agreement (including its obligations to the Oncor Plan and Reorganized TCEH under this Section 3.1) or (ii) provide Seller Parent and Reorganized TCEH, as applicable, with an indemnity for any liabilities incurred following such sale, with respect to, as applicable, the termination of the Oncor Plan or the termination of the TCEH Plan to the extent such liabilities are based on Buyer's "Allocable Share of the Unfunded Benefit Liabilities" as defined in Schedule II to the Split Participant Agreement and are not otherwise satisfied pursuant to the Backstop Payments.    For avoidance of doubt, PBGC reserves any and all rights that it has under Applicable Law, in connection with any such transaction.

**3.2    Notice and Information Requirements**.

a.    Buyer shall provide Seller Parent, Reorganized TCEH and PBGC with written notice at least thirty (30) days prior to any sale, transfer or any other disposition of assets of the Controlled Group of Buyer, where such assets represent more than ten percent (10%) of the book value of all assets, or generated more than ten percent (10%) of Buyer's consolidated revenues or operating income during its immediately preceding fiscal year.

b.    Buyer shall provide Seller Parent and Reorganized TCEH a copy of any reportable events notice pertaining to the Oncor Plan, at the same time such notice is filed in accordance with Section 4043 of ERISA.

c.    Buyer shall provide Seller Parent, Reorganized TCEH and PBGC a copy of any amendments materially increasing the cost of the Oncor Plan at least thirty (30) days prior to adoption.

d.    Buyer shall provide notice to Seller Parent and Reorganized TCEH at least ninety (90) days prior to the "proposed termination date" (within the meaning of 29 C.F.R. Section 4041.2) in respect of a standard termination of the Oncor Plan under Section 4041(b) of ERISA and agrees to provide Seller Parent with periodic updates on the termination process.    Buyer agrees to effect such standard termination in full compliance with Applicable Law and in a manner that will not result in any liability or obligation to Seller Parent under this Agreement without Seller Parent's consent to incurring any such liability or obligation.

## ARTICLE 4
## SELLER PARENT UNDERTAKINGS

**4.1    Backstop Obligations**.

6

a.   Seller Parent hereby agrees to backstop, and to make payment with respect to, Buyer's obligation to fund any Termination Liability, including any required payments to PBGC, under the Oncor Plan and/or the TCEH Plan to the extent (i) Buyer's payment thereof pursuant to Section 3.1 would materially jeopardize the ability of the Controlled Group of Buyer to continue, in all material respects, as a going concern or (ii) the Controlled Group of Buyer ceases to continue, in all material respects, as a going concern.  The determination of whether the payment of Termination Liability would materially jeopardize the ability of the Controlled Group of Buyer to continue, in all material respects, as a going concern will be mutually determined in good faith as soon as practicable by Buyer and Seller Parent, provided that if such parties, despite their best efforts, are not in agreement with respect to such determination, they will promptly subject the determination of such issue to an independent arbitrator mutually agreed to by Buyer and Seller Parent. In the event the determination described above is not made within thirty (30) days after the relevant Termination Liability is incurred and Buyer does not otherwise fund such Termination Liability pursuant to Section 3.1(a) or (c), as applicable, within such thirty (30) day period, Seller Parent shall make the relevant Backstop Payment.  For the avoidance of doubt, the Parties agree that any Termination Liability payments due as a result of a "distress termination" or an "involuntary termination" of the Oncor Plan and/or TCEH Plan, under Sections 4041(c) and 4042 of ERISA, shall be paid directly to PBGC.

b.   Seller Parent hereby agrees to backstop, and to make payment to Reorganized TCEH (or, in the event that (i) the TCEH Plan is in "at-risk" status under Section 430(i) of the Internal Revenue Code (and the regulations promulgated thereunder), (ii) Reorganized TCEH is in bankruptcy on the date a payment is due, (iii) Reorganized TCEH has received an auditor opinion, which has not since been rescinded, indicating that such auditor has doubts about Reorganized TCEH's ability to remain in business (and Reorganized TCEH has not, after the date of the initial auditor opinion, received an audit unqualified by such opinion), (iv) Reorganized TCEH (or a direct or indirect subsidiary) has filed a Form 8-K with the Securities and Exchange Commission pursuant to Item 2.04 of Form 8-K reporting that Reorganized TCEH (or a direct or indirect subsidiary) is in default under a material contract (and the default has not been cured), or (v) Seller Parent reasonably believes in good faith that Reorganized TCEH would be unable to pay its debts as they become due on the date a Backstop Payment is due and informs Reorganized TCEH of such belief during such period that is no earlier than thirty (30) days before, and no later than seven (7) days before, such due date (and, within seven (7) days after being informed of such belief, Reorganized TCEH fails to tender a payment to the TCEH Plan in an amount equal to the Backstop Payment (provided that, if Reorganized TCEH does, in fact, tender such payment to the TCEH Plan during such seven (7) day period,  Seller Parent shall be required to reimburse Reorganized TCEH for such payment within seven (7) days of  Reorganized TCEH's payment)), Seller Parent may make payment to an Escrow Agent on behalf of the TCEH Plan; provided that, Seller Parent shall make such payment directly to the TCEH Plan in the event the applicable agreement with an Escrow Agent is not consummated by the date the applicable

7

payment is due), with respect to, Buyer's obligation to fund any ongoing pension funding payments in respect of the TCEH Plan pursuant to the Split Participation Agreement in the event Buyer fails to fund any such payments under the Split Participation Agreement (x) after Buyer's exhaustion of all available liquidity, and (y) because (A) Buyer's payment thereof would materially jeopardize the ability of the Controlled Group of Buyer to continue, in all material respects, as a going concern or (B) the Controlled Group of Buyer ceases to continue, in all material respects, as a going concern, in each case, as determined pursuant to Section 4.1(a) above. For the avoidance of doubt, it is understood that while the Buyer is subject to a voluntary proceeding under the Bankruptcy Code or an involuntary case thereunder (but only if the petition commencing such involuntary case is not dismissed), Buyer shall be deemed to have ceased to continue as a "going concern" with any "available liquidity" for purposes of this Section 4.1(b) with respect to any ongoing pension funding payments not timely paid in respect of the TCEH Plan. In the event the determination described above is not made within thirty (30) days after Buyer fails to fund the relevant ongoing pension funding payments pursuant to Section 3.1(b) and Buyer does not otherwise fund such ongoing pension funding payment pursuant to Section 3.1(b) within such thirty (30) day period, Seller Parent shall make the relevant Backstop Payment for the sole benefit of the TCEH Plan.

c.    Seller Parent hereby agrees to backstop, and to make payment to Buyer (or, in the event that (i) the Oncor Plan is in "at-risk" status under Section 430(i) of the Internal Revenue Code (and the regulations promulgated thereunder), (ii) Buyer is in bankruptcy on the date a payment is due, (iii) Buyer has received an auditor opinion, which has not since been rescinded, indicating that such auditor has doubts about Buyer's ability to remain in business (and Buyer has not, after the date of the initial auditor opinion, received an audit unqualified by such opinion), (iv) Buyer (or a direct or indirect subsidiary) has filed a Form 8-K with the Securities and Exchange Commission pursuant to Item 2.04 of Form 8-K reporting that Buyer (or a direct or indirect subsidiary) is in default under a material contract (and the default has not been cured), or (v) Seller Parent reasonably believes in good faith that Buyer would be unable to pay its debts as they become due on the date a Backstop Payment is due and informs Buyer of such belief during such period that is no earlier than thirty (30) days before, and no later than seven (7) days before, such due date (and, within seven (7) days after being informed of such belief, Buyer fails to tender a payment to the Oncor Plan in an amount equal to the Backstop Payment (provided that, if Buyer does, in fact, tender such payment to the Oncor Plan during such seven (7) day period, Seller Parent shall be required to reimburse Buyer for such payment within seven (7) days of Buyer's payment)), Seller Parent may make payment to an Escrow Agent on behalf of the Oncor Plan; provided that, Seller Parent shall make such payment directly to the Oncor Plan in the event the applicable agreement with an Escrow Agent is not consummated by the date the applicable payment is due) with respect to, Buyer's obligation to make Contribution Payments in respect of the Oncor Plan in the event Buyer fails to make any such Contribution Payment (x) after Buyer's exhaustion of all available liquidity, and (y) because (A) Buyer's

payment thereof would materially jeopardize the ability of the Controlled Group of Buyer to continue, in all material respects, as a going concern or (B) the Controlled Group of Buyer ceases to continue, in all material respects, as a going concern, in each case, as determined pursuant to Section 4.1(a) above. For the avoidance of doubt, it is understood that while the Buyer is subject to a voluntary proceeding under the Bankruptcy Code or an involuntary case thereunder (but only if the petition commencing such involuntary case is not dismissed), Buyer shall be deemed to have ceased to continue as a "going concern" with any "available liquidity" for purposes of this Section 4.1(c) with respect to any Contribution Payments not timely paid in respect of the Oncor Plan.  In the event the determination described above is not made within thirty (30) days after Buyer fails to fund the relevant Contribution Payment pursuant to Section 3.1(b) and Buyer does not otherwise fund such Contribution Payment pursuant to Section 3.1(b) within such thirty (30) day period, Seller Parent shall make the relevant Backstop Payment for the benefit of the Oncor Plan.

d.      Seller Parent acknowledges that nothing herein shall limit, restrict, or impair the rights of Reorganized TCEH under the Split Participant Agreement.

e.      For the avoidance of doubt, the Parties acknowledge and agree that PBGC shall have an unconditional right to enforce this Section 4.1 and require Seller Parent's payment of Backstop Payments as directed by PBGC to the extent Buyer fails, for purposes of Section 4.1(a), (b) or (c), as applicable, to fund any Termination Liability or ongoing pension funding payments under the Oncor Plan and/or any Termination Liability or ongoing pension funding payments under the TCEH Plan, it being understood that any such PBGC enforcement of this Section 4.1 shall not constitute a waiver of any obligations of Buyer in respect of Seller Parent under this Agreement.

f.      Seller Parent acknowledges that its liabilities and obligations under this Section 4.1 apply to the Controlled Group of Seller Parent, which Controlled Group will not include Buyer or any member of Buyer's Controlled Group.

g.      Seller Parent agrees that in the event of a transaction involving the sale of a majority of the assets of the Controlled Group of Seller Parent, Seller Parent shall ensure that the purchaser in such transaction shall assume Seller Parent's obligations under this Agreement.

**4.2    Notice and Information Requirements**.  Seller Parent shall provide Buyer, Reorganized TCEH and PBGC with written notice at least thirty (30) days prior to any sale, transfer or any other disposition of assets of the Controlled Group of Seller Parent, where such assets represent more than ten percent (10%) of the book value of all assets, or generated more than ten percent (10%) of Seller Parent's consolidated revenues or operating income during its immediately preceding fiscal year.  For avoidance of doubt, PBGC reserves any and all rights that it has under Applicable Law, in connection with any such sale, transfer or any other disposition of assets.

**ARTICLE 5**
**REORGANIZED TCEH UNDERTAKINGS**

5.1     **Plan Obligations**.

a.      Reorganized TCEH acknowledges to the other Obligors that it shall retain primary liability with respect to the TCEH Plan and that the obligations of Buyer with respect to the TCEH Plan are based on the Allocable Share under the Split Participant Agreement

b.      Reorganized TCEH shall continue to timely make all Contribution Payments to the TCEH Plan as required pursuant to Section 303 of ERISA and Section 430 of the Internal Revenue Code and agrees that Buyer shall make payments with respect to the TCEH Plan based on the Allocable Share pursuant to the Split Participant Agreement.

c.      To the extent Reorganized TCEH receives any payment described in the second sentence of Section 3.1(b) or the first sentence of Section 4.1(b), Reorganized TCEH agrees that it shall use its best efforts to contribute such amounts to the TCEH Plan, and not use such amounts for any other purpose, and Reorganized TCEH will notify Buyer or Seller Parent, as applicable, and PBGC in the event such amounts are not contributed by Reorganized TCEH to the TCEH Plan within five (5) business days after such payment is received by Reorganized TCEH.

d.      Reorganized TCEH acknowledges that its liabilities and obligations under the TCEH Plan apply to the Controlled Group of Reorganized TCEH.

e.      Reorganized TCEH agrees that in the event of a transaction involving the change of the plan sponsor of the TCEH Plan, Reorganized TCEH shall contractually require that the entity designated to be the plan sponsor following the transaction will assume Reorganized TCEH's obligations under this Agreement (including its obligations to the TCEH Plan under this Section 5.1). For avoidance of doubt, PBGC reserves any and all rights that it has under Applicable Law, in connection with any such transaction.

f.      Reorganized TCEH agrees to reimburse Seller Parent or otherwise credit Seller Parent (in connection with Seller Parent's future obligations under this Agreement) for all Backstop Payments (or any portion thereof) made to Reorganized TCEH under this Agreement that Reorganized TCEH fails to contribute to the TCEH Plan, as soon as practicable thereafter, to the extent, and during any such time, such payments may not be reimbursed to Seller Parent by Buyer pursuant to Section 3.1(d) due to Buyer's Going Concern Risk.

5.2     **Notice and Information Requirements**.

a.      Reorganized TCEH shall provide Buyer, Seller Parent and PBGC with written notice at least thirty (30) days prior to any sale, transfer or any other disposition of assets of the Controlled Group of Reorganized TCEH, where such assets represent

10

more than ten percent (10%) of the book value of all assets, or generated more than ten percent (10%) of Reorganized TCEH's consolidated revenues or operating income during its immediately preceding fiscal year.

b.    Reorganized TCEH shall provide Buyer and Seller Parent a copy of any reportable events notice pertaining to the TCEH Plan, at the same time such notice is filed in accordance with Section 4043 of ERISA.

c.    Reorganized TCEH shall provide Buyer, Seller Parent and PBGC a copy of any amendments materially increasing the cost of the TCEH Plan at least thirty (30) days prior to adoption.

d.    Reorganized TCEH shall provide notice to Buyer and Seller Parent at least ninety (90) days prior to the "proposed termination date" (within the meaning of 29 C.F.R. Section 4041.2) in respect of a "standard termination" of the TCEH Plan under Section 4041(b) of ERISA and agrees to provide Buyer and Seller Parent with periodic updates on the termination process.  Reorganized TCEH agrees to effect such standard termination in full compliance with Applicable Law.

## ARTICLE 6
## TERMINATION

**6.1    Termination With Respect to the Oncor Plan**.  This Agreement shall terminate with respect to the Oncor Plan upon the earliest to occur of (a) and (b) below:

a.    Payment of all benefit liabilities, including, without limitation, benefit liabilities following Buyer's completion of a "standard termination" of the Oncor Plan under Section 4041(b) of ERISA.  Any such standard termination will be deemed completed for purposes of this Agreement upon the expiration of the Audit Period.

b.    The first day after December 31, 2031, on which the Oncor Plan's sponsor demonstrates that the Oncor Plan has no Unfunded Benefit Liabilities as of the last day of the Plan Year for any two consecutive Plan Years.

**6.2    Termination With Respect to the TCEH Plan**.  This Agreement shall terminate with respect to the TCEH Plan upon the earliest to occur of (a) and (b) below:

a.    Payment of all benefit liabilities, including, without limitation, benefit liabilities following the TCEH Plan's sponsor completion of a "standard termination" of the TCEH Plan under Section 4041(b) of ERISA.  Any such standard termination will be deemed completed for purposes of this Agreement upon the expiration of the Audit Period.

b.    The first day after December 31, 2031, on which the TCEH Plan's sponsor demonstrates that the TCEH Plan has no Unfunded Benefit Liabilities as of the last day of the Plan Year for any two consecutive Plan Years.

2044575.3

**6.3**    **Termination of the Agreement**.  Upon the termination of this Agreement with respect to either the Oncor Plan or the TCEH Plan in accordance with Sections 6.1 and 6.2 above, respectively, all rights and obligations of the Parties in respect of the Oncor Plan or the TCEH Plan, as applicable, arising under this Agreement shall terminate.

**6.4**    **Written Notification; Distribution of Assets**.  The Parties shall jointly provide (and cooperate in good faith with each other in so providing) PBGC with written notification of the occurrence of the events set forth in Sections 6.1 and 6.2 above for the termination of this Agreement with respect to the relevant Pension Plan.  Upon receiving written notification, PBGC shall respond promptly in writing as to whether it concurs with the notification, such concurrence not to be unreasonably conditioned or withheld.

## ARTICLE 7
## REPRESENTATIONS AND WARRANTIES OF SELLER PARENT, BUYER AND REORGANIZED TCEH

Seller Parent, Buyer and Reorganized TCEH each hereby represents and warrants, severally and not jointly, that:

**7.1**    **Organization and Qualification**.  It is a limited liability company, corporation or other valid form of entity, duly formed and validly existing under the laws of its state of formation and has all requisite limited liability company, corporate or other powers and all material governmental licenses, authorizations, consents and approvals necessary to own its assets and carry on its business as now being, or as proposed to be, conducted, except where the failure to have any of the foregoing would not result in a material adverse effect on its business.

**7.2**    **No Conflicts; Consents**.  The execution and delivery of this Agreement shall not conflict with nor result in a breach of or require any consent under, its limited liability company agreement, governing corporate documents or other equivalent organizational documents, Applicable Law, or any material agreement or instrument to which it or a subsidiary is a party or by which it is bound or to which it is subject, or constitute a default under any such agreement or instrument, except in each case where such conflict, breach or failure to obtain such consent could not reasonably be expected to result in a material adverse effect on its ability to meet its obligations under this Agreement.

**7.3**    **Authority**.  It has all necessary limited liability company, corporate or other power and authority to execute, deliver and perform its obligations under this Agreement; the execution, delivery and performance of this Agreement have been duly authorized by all necessary limited liability company action, corporate action or equivalent action on its part; and this Agreement has been duly executed and delivered and constitutes a legal, valid and binding obligation enforceable against it in accordance with its terms.

## ARTICLE 8
## REPRESENTATIONS AND WARRANTIES OF PBGC

PBGC represents and warrants that:

**8.1**     **Organization and Qualification**.  PBGC is a wholly owned United States government corporation established under Title IV of ERISA, and has all requisite corporate and other power and all material governmental licenses, authorizations, consents and approvals required to carry on its activities as now conducted, except where the failure to have any of the foregoing could not reasonably be expected to result in a material adverse effect on its ability to meet its obligations under this Agreement.

**8.2**     **Authority**.  The execution, delivery and performance by PBGC of this Agreement and the consummation of the transactions contemplated by this Agreement are within the powers of PBGC and have been duly authorized by all necessary action on the part of PBGC.  This Agreement constitutes a legal, valid and binding agreement of PBGC enforceable against PBGC in accordance with its terms.

## ARTICLE 9
## BREACHES AND REMEDIES

In the event of a material breach of any provision of this Agreement by any Party that explicitly applies to any other Party, the aggrieved Party may apply for an order requiring performance whether for the specific performance of any term or provision hereof, or for an injunction against the violation of any of the terms or provisions hereof, or for an appropriate show cause order in addition to other remedies that may be available to it at law or in equity, it being agreed that a remedy of money damages will be inadequate because the failure of the breaching Party to comply strictly with the terms hereof would reasonably be expected to cause irreparable injury to the aggrieved Party; *provided, however*, that the aggrieved Party may proceed to enforce its rights by any other action, suit, remedy, or proceeding authorized or permitted by this Agreement, by law or in equity.  Any failure, other than a bad faith failure, to provide notice under Sections 3.2, 4.2, and 5.2 shall not be a material breach.  All rights, remedies, and powers granted to the aggrieved Party under the terms of this Agreement or Applicable Law shall be cumulative and may be exercised singly or concurrently.  Failure to exercise any remedy shall not be considered a waiver of such remedy or of any breach giving rise to such remedy.   No breach of any provision of this Agreement by any Party will relieve any other Party from any of its obligations hereunder, except that PBGC's Forbearance Obligations will cease upon any Obligor Breach as provided in Article 2.

## ARTICLE 10
## GENERAL PROVISIONS

**10.1**     **Amendment and Modification; Waiver**.  This Agreement may be amended, modified or supplemented only by written instrument executed by each of the Parties hereto.  Except as provided in the preceding sentence, no action taken pursuant to this Agreement, including, without limitation, any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representations, warranties, covenants or agreements contained herein.  The waiver by any Party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

**10.2** **Entire Agreement**.  This Agreement contains the complete and exclusive statement of the agreement and understanding by and among the Parties hereto and supersedes all prior agreements, understandings, commitment, representations, communications, and proposals, oral or written, among the Parties relating to the subject matter of this Agreement.  Except as expressly set forth herein, nothing in this Agreement shall create, or be deemed or construed to create, any liability or obligation of any Obligor or affiliate thereof that it or they would not otherwise have in the absence of this Agreement.

**10.3** **Counterparts**.  This Agreement may be executed in one or more counterparts and by different parties on separate counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

**10.4** **No Third-Party Beneficiaries**.  No provision of this Agreement shall create any third-party beneficiary rights in any person including, without limitation, any participant, or beneficiary of a participant, in any employee benefit plan sponsored by Reorganized TCEH or Buyer.

**10.5** **Interpretation**.  Any reference in this Agreement to any provision of ERISA or the Internal Revenue Code will be deemed also to refer to all rules and regulations promulgated under such provision.  Reference to any provision of ERISA or the Internal Revenue Code and regulations promulgated thereunder refer to the provision of ERISA, the Internal Revenue Code or the regulations as of the Effective Date, and to any modified and successor provision thereof after the effective date of any amendment, renumbering or other modification thereto occurring after the Effective Date provided that such modified and successor provision has substantially the same effect as the provision that it is amending, renumbering or otherwise modifying.

**10.6** Notwithstanding anything to the contrary in this Agreement:

    a.    in the event of any inconsistency between this Agreement and the Joint Survivor Merger Agreement, or this Agreement and the Split Participant Agreement, with respect to the obligation to (i) tender any payment to PBGC, or (ii) tender any Backstop Payment, the terms of this Agreement shall control,

    b.    except to the extent expressly provided in Article 2 with respect to PBGC's Forbearance Obligations, nothing in this Agreement impairs PBGC's ability to exercise any right, seek any remedy, or enforce any provision under Applicable Law in connection with any contemplated or consummated transaction or other event, and

    c.    nothing herein impairs any obligation of any Obligor or any other person or entity under Applicable Law, or otherwise, with respect to any Pension Plan.

    d.    Seller Parent hereby subordinates the payment of all obligations under Section 3.1(d) of Buyer or other member of the Controlled Group of Buyer to Seller Parent as PBGC's subrogee (or otherwise) resulting from Seller Parent's payment of Backstop Payments under this Agreement, whether such obligations are now existing or hereafter arise (each such obligation, a "**Subordinated Obligation**"), to the indefeasible payment in full in cash of all liabilities under this Agreement

of Buyer or other member of the Controlled Group of Buyer to PBGC under Title IV of ERISA with respect to the Pension Plans (the "**Title IV Liabilities**"), and during such time that a Going Concern Risk exists with respect to the Controlled Group of Buyer, Seller Parent agrees not to exercise any rights of subrogation, reimbursement, exoneration, contribution, indemnification or similar rights against, or accept payment from, Buyer or other member of the Controlled Group of Buyer with respect to such Subordinated Obligations until the indefeasible payment in full in cash of all Title IV Liabilities to PBGC; provided that, Seller Parent shall be permitted to take any action to otherwise evidence the existence of the above rights during such time that a Going Concern Risk exists with respect to the Controlled Group of Buyer.

e.    Except, with respect to Seller Parent, as provided in Section 5.1(f), or, with respect to Buyer, as limited to the adjustment of Buyer's "Allocable Share of the Unfunded Benefit Liabilities" as defined in, and under, the Split Participant Agreement to take into account any payments made by Buyer to Reorganized TCEH but not contributed to the TCEH Plan (the "Credit Requirement"), Seller Parent, Buyer, and the members of their respective Controlled Groups agree not to exercise any rights of subrogation, reimbursement, exoneration, contribution, indemnification or similar rights against, or accept payment from Reorganized TCEH or any member of its Controlled Group in respect of any payment made by Seller Parent, Buyer or any member of their respective Controlled Groups under this Agreement, it being understood that during such time that Reorganized TCEH is in bankruptcy or is unable to pay its debts as they become due, Seller Parent, Buyer and the members of their respective Controlled Groups agree to subordinate their rights in respect of the Credit Requirement to PBGC to the indefeasible payment in full in cash of all liabilities under this Agreement of Reorganized TCEH or other member of the Controlled Group of Reorganized TCEH to PBGC and not exercise the above rights in respect of the Credit Requirement.

**10.7**    Each of Seller Parent and Buyer hereby, for itself and on behalf of its respective Controlled Group, waives any and all defenses based on suretyship or impairment of collateral under Applicable Law with respect to its obligations hereunder including, without limitation, (i) all such defenses arising under Texas law or ERISA and (ii) all defenses described in Sections 37 through 45 of the Restatement (Third) of the Law of Suretyship and Guaranty (collectively, the "Suretyship Defenses").   Reorganized TCEH agrees that such waiver will not apply to any Suretyship Defense arising with respect to an "Exempted Amendment" (as defined below); provided that any Suretyship Defense with respect to such Exempted Amendment may be effective, if at all, in the case of Seller Parent, only with respect to the increase in Seller Parent's obligations attributable to such Exempted Amendment, or in the case of Buyer, only with respect to the increase in Buyer's obligations attributable to such Exempted Amendment to the extent such increase is not recovered by Buyer in rates that are established by the Public Utilities Commission of Texas, and, provided further, that Seller Parent's and Buyer's waiver of the Suretyship Defenses shall remain in effect with respect to all obligations hereunder other than the increased obligations under such Exempted Amendment.   The term "Exempted Amendment" shall mean any amendment to the TCEH Plan adopted after the date hereof that materially

15

increases, as applicable, Seller Parent's or Buyer's reasonably estimated potential cost of performance under this Agreement, unless such amendment has been approved in writing by Seller Parent or Buyer, as applicable; provided that the term "Exempted Amendment" shall not include: (i) any amendment required by Applicable Law, or (ii) any amendment or action to terminate the TCEH Plan, or other action to accelerate the distribution of liabilities under the TCEH Plan.

Except as otherwise required by Applicable Law, Buyer agrees that it shall not alter its obligations under the Oncor Plan in a manner that, individually or in the aggregate with any or all prior or contemporaneous alterations, materially (i) increases Seller Parent's risk of loss or potential cost of performance under this Agreement, (ii) decreases Seller Parent's ability to cause the Oncor Plan sponsor to bear the cost of performance, or (iii) impairs Seller Parent's recourse against the Oncor Plan sponsor, absent the prior written consent of Seller Parent.

**10.8**   **Notices**.  All notices, requests, demands to or upon any Party hereto to be effective shall be in writing (or by telex, facsimile or similar electronic transfer confirmed promptly in a printed media) and shall be deemed to have been duly given or made (a) when delivered by hand or (b) if given by mail, when deposited in the mail by certified mail, return receipt requested or (c) if by telex, facsimile or similar electronic transfer, when sent, with receipt confirmed, addressed as follows:

To Buyer:

[To Come]

To Seller Parent:

[To Come]

To Reorganized TCEH:

[To Come]

To PBGC:

[To Come]

The Parties hereto may change their address and transmission numbers for notices by giving notice in the manner provided in this Section 10.8.

**10.9**   **Waivers**.  No failure of any Party to enforce at any time any provision of this Agreement, and no course of dealing among the Parties, will be a waiver of any such provision, or will in any way affect the validity of this Agreement or the right of any Party to enforce any provision, to the extent permitted in this Agreement.  Nor will anything in this Agreement constitute or reflect a waiver or modification by Buyer, Seller Parent, Reorganized TCEH or PBGC of any claim, right or defense that it has under law, except as expressly provided herein.

2044575.3

**10.10   Governing Law**.   This Agreement shall be governed by and construed in accordance with the laws of the State of Texas (without regard to its conflicts of law principles), and by ERISA, the Internal Revenue Code and other laws of the United States to the extent they preempt Texas law.

**10.11   Multiple Employer Plan Matters**.   The Parties have no intent to create a multiple employer plan (within the meaning of Section 210 of ERISA) pursuant to this Agreement or the transactions contemplated thereunder, and this Agreement shall be interpreted and construed, and the transactions thereunder shall be effected, in such a manner to reflect such intent.   The Parties acknowledge and agree that Seller Parent is not intended to constitute a contributing employer under the Oncor Plan or TCEH Plan, as applicable, and that Seller Parent is not intended to be treated as having maintained the Oncor Plan or TCEH Plan, as applicable, because of the obligation to provide, or the provision of, any Backstop Payments.   The Parties acknowledge and agree that Buyer is not intended to constitute a contributing employer under the TCEH Plan and that Buyer is not intended to be treated as having maintained the TCEH Plan as a result of this Agreement or the Split Participant Agreement.

**10.12   Assignment**.   This Agreement may not be assigned without the written consent of the signatories hereto and any such assignment will be void ab initio.   Notwithstanding the foregoing, Seller Parent may, subject to prior written notice to PBGC, (i) assign any or all of its rights and obligations hereunder to one or more taxable REIT subsidiaries (within the meaning of Section 856(l) of the Internal Revenue Code) or (ii) designate one or more such taxable REIT subsidiaries to perform its obligations hereunder; *provided*, *however*, that in either case, Seller Parent shall remain responsible for the performance of all of its obligations hereunder.

**10.13   Escrow Matters.**   In the event it is determined that an agreement with an Escrow Agent is necessary, Buyer or Seller Parent, as applicable, shall notify PBGC in writing and provide a reasonably detailed explanation regarding the need for the Escrow Agent and the proposed terms of the applicable agreement with such Escrow Agent. PBGC shall be a party to the applicable agreement with such Escrow Agent. Notwithstanding anything contained in this Agreement to the contrary, in all events the terms of the applicable agreement(s) with the Escrow Agent shall provide that any amounts used to fund the escrow account(s) shall be distributed, respectively, from such account(s) directly to the TCEH Plan or the Oncor Plan and for the sole benefit of the corresponding plan.

17

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date as follows:

**SELLER PARENT**

By:_____

**BUYER**

By:_____

**REORGANIZED TCEH**

By:_____

**PBGC**

By:_____

2044575.3

**<u>EXHIBIT 1</u>**

**<u>EXHIBIT 2</u>**