**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER GRANTING THE MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, TO APPROVE A SETTLEMENT OF LITIGATION CLAIMS AND AUTHORIZE THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE SETTLEMENT AGREEMENT**

Upon the Motion of Energy Future Holdings Corp., *et al.*, to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter into and Perform Under the Settlement Agreement (the "Settlement Motion")[2] seeking entry of an order (this "Settlement Order"), (a) approving the Amended and Restated Settlement Agreement, attached hereto as Exhibit A, by and among (i) the Debtors; (ii) Texas Energy Future Holdings Limited Partnership ("Texas Holdings"), which holds approximately 99.26% of the outstanding EFH Interests, and Texas Energy Future Capital Holdings LLC ("TEF"); (iii) Kohlberg Kravis Roberts & Co. L.P., TPG Capital, L.P. and Goldman, Sachs & Co. (collectively, the "Sponsor Managers"), on their own behalf and on behalf of funds or accounts managed or advised by the Sponsor Managers that hold direct or indirect interests in Texas Holdings, TEF or EFH (collectively,  the "Sponsors" and, together with Texas Holdings and TEF, the "Settling Interest Holders"); (iv) holders of

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2]    All capitalized terms used but not otherwise defined in this Settlement Order shall have the meanings ascribed to them in the Amended and Restated Settlement Agreement.

more than 56% of the aggregate outstanding principal amount of the TCEH First Lien Claims (determined without regard to any claims held by any Debtor) (the "Settling TCEH First Lien Creditors"); (v) holders of more than 71% of the aggregate outstanding principal amount of the TCEH Second Lien Note Claims (determined without regard to any claims held by any Debtor) (the "Settling TCEH Second Lien Noteholders"); (vi) holders of more than 77% of the aggregate outstanding principal amount of the TCEH Unsecured Note Claims (determined without regard to any claims held by any Debtor) (the "Settling TCEH Unsecured Noteholders," and together with the Settling TCEH First Lien Creditors and the Settling TCEH Second Lien Noteholders, the "Settling Creditors"); and (vii) the statutory committee of unsecured creditors of the TCEH Debtors and EFH Corporate Services appointed in the Chapter 11 Cases (the "TCEH Official Committee," and together with the Debtors, the Settling Interest Holders, the TCEH First Lien Agent, and the Settling Creditors, the "Settlement Parties"); and (b) authorizing the Debtors to take any and all actions reasonably necessary to consummate, and to perform any and all obligations contemplated by, the Settlement Agreement, all as more fully set forth in the Settlement Motion; and the Court having found that it has jurisdiction to consider the Settlement Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that consideration of the Settlement Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b); and the Court having found that venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that due and proper notice of the Settlement Motion was adequate and appropriate under the particular circumstances; and a hearing having been held to consider the relief requested in the Settlement Motion (the "Hearing"); and upon consideration of the record of the Hearing and all proceedings had before the Court; and the Court having found and determined that the relief sought in the

Settlement Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest; and that the legal and factual bases set forth in the Settlement Motion establish just cause for the relief granted herein; and any objections to the requested relief have been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor, and pursuant to Federal Rule of Civil Procedure 52(a), as incorporated by Federal Rule of Bankruptcy Procedure 7052, the Court enters these Findings of Fact and Conclusions of Law. If any finding is in truth a conclusion of law, or if any conclusion stated is in truth a finding of fact, it shall be deemed so and adopted as such.

## I.    <u>Findings of Fact Related to the Settlement</u>

1.    From the outset of these Chapter 11 cases, various parties in interest, including the ad hoc group of holders of TCEH Unsecured Note Claims (the "<u>TCEH Unsecured Group</u>"), the ad hoc consortium of holders of TCEH Second Lien Note Claims (the "<u>TCEH Second Lien Group</u>"), and the TCEH Official Committee, have alleged that various inter-Debtor and affiliate claims and causes of action exist, as well as estate claims and causes of action against holders of TCEH First Lien Claims.[3]

2.    Long before the Petition Date, however, and at least as early as 2012, the Debtors had already initiated investigations of historical transactions that could potentially give rise to claims in bankruptcy.[4]

### a.    Prepetition Claims Investigation

3.    In 2012, the Debtors retained Kirkland & Ellis LLP to provide restructuring advice, including a review of transactions that could give rise to claims if the Debtors filed for

---

[3]    *See* D-DIR Doré at ¶¶ 25-28.

[4]    D-DIR Doré ¶ 17.

bankruptcy.[5]  In June 2013, additional outside counsel, Sidley Austin LLP ("Sidley"), was retained for the specific purpose of performing an independent review of potential claims against the Sponsors, including claims related to the 2007 leveraged buy-out (the "LBO") of TXU Corp.[6]

4.    Beginning in January 2013, more than a year before filing for bankruptcy, the Debtors provided a number of creditors with access to data rooms in order to facilitate the creditors' diligence related to a possible Chapter 11 filing and potential claims, including intercompany claims.  At least 450 non-debtor professionals had access to these diligence materials.[7]

5.    Sidley reviewed hundreds of thousands of pages of documents in evaluating these potential claims, including a large volume of public filings by TXU Corp., EFH, and TCEH; board minutes; the entirety of the due diligence materials that TXU Corp. made available to the Sponsors in connection with the LBO; more than 650,000 electronic documents provided by EFH; and documents provided by the Sponsors.  Sidley also conducted over 20 interviews with current and former EFH employees and legal and financial advisors.[8]

6.    The results of Sidley's investigation were presented to directors and managers unaffiliated with the Sponsors (the "Non-Sponsor Directors") at EFH, EFIH, TCEH, and EFCH on September 11 and 20, and October 3, 2013.[9]  On April 24–25, 2014, Sidley made separate presentations to the disinterested directors or managers of EFH, EFIH, and TCEH (the

---

[5]    D-DIR Doré ¶¶ 17-18; 11/12/2015 Hr'g Tr. at 73:9-17 (Doré).

[6]    D-DIR Doré ¶ 18; D-DIR Williamson_R ¶¶ 7, 56.

[7]    11/12/2015 Hr'g Tr. at 37:5-38:8 (Doré).

[8]    *See* D-DIR Doré ¶¶ 17-19.

[9]    D-DIR Doré ¶ 20; D-DIR Williamson_R ¶ 7; DX 101 Minutes of a Meeting of the Non-Sponsor Directors, dated Sept. 11, 2013 [EFH04293387]; DX102 Minutes of a Meeting of the Non-Sponsor Directors, dated Sept. 11, 2013 [EFH03932555]; DX 103 Minutes of a Meeting of the Non-Sponsor Directors, dated Sept. 20, 2013 [EFH04293389]; DX 118 Minutes of a Meeting of the Non-Sponsor Directors, dated Sept. 20, 2013 [EFH03932557]; DX 105 Minutes of a Meeting of the Non-Sponsor Directors, dated Oct. 3, 2013 [EFH04293390].

"Disinterested Directors") in order to advise them on potential claims against the Sponsors that would be released in a proposed plan of reorganization that would be filed consistent with the proposed Restructuring Support Agreement (the "RSA").[10]

7.    On April 28, 2014, the board members and managers of TCEH, EFCH, EFIH, and EFH—including the Disinterested Directors— unanimously approved a resolution empowering officers of each organization to enter into the RSA, which included the release of claims against the Sponsors.[11]    Significant E-Side creditors, including Pacific Management Investment Company, LLC ("PIMCO"), Western Asset Management Company ("WAMCO"), Fidelity Management and Research Company on behalf of funds and accounts under management ("Fidelity"), and the EFIH PIK creditor group joined the RSA, reflecting their apparent conclusion, based on their own internal due diligence, that the release of potential claims against the Sponsors was appropriate.[12]

### b.    Postpetition Claims Investigation

8.    The Debtors filed for bankruptcy on April 29, 2014.    Almost immediately, creditors alleged the existence of various claims, including inter-Debtor and affiliate claims and causes of action.    As a result, parties in interest were afforded multiple avenues of formal discovery and informal diligence throughout these Chapter 11 cases, all of which amounted to a robust and comprehensive investigation of potential claims.[13]

---

[10]    D-DIR Doré ¶ 20; D-DIR Sawyer ¶ 65; DX 540 Sidley Deck, dated Apr. 24, 2014 [EFH2D10048901_R]; DX 541 Sidley Deck, dated Apr. 24, 2014 [EFH2D10049038_R]; DX 047 Minutes of a Meeting of the Disinterested Managers, dated Apr. 24, 2014 [EFH2D10073664]; DX 048 Minutes of a Meeting of the Disinterested Managers, dated Apr. 25, 2014 [EFH2D00090301].

[11]    D-DIR Doré ¶ 21.

[12]    D-DIR Doré ¶ 21; D-DIR Cremens ¶ 37; D-DIR Williamson_R ¶ 58; DX 71 Minutes of a Joint Board Meeting date April 28, 2014 [EFH2D00090303 at EFH2D00090304, EFH2d0090305, EFH2d0090311, EFH2d00090342, EFH2d00090343].

[13]    D-DIR Doré ¶¶ 25-28; 11/12/2015 Hr'g Tr. at 39:8-13, 39:19-25, 40:4-14, 42:15-43:18 (Doré).

9.      On June 6, 2014, the Court entered the *Final Order (A) Authorizing Use of Cash Collateral for Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates, (B) Granting Adequate Protection, and (C) Modifying the Automatic Stay* [D.I. 855] (as amended from time to time, the "Final Cash Collateral Order"), pursuant to which the Debtors stipulated to the validity, nature, and priority of the claims and liens of the TCEH First Lien Creditors and established a deadline for parties in interest to file motions seeking standing to challenge the stipulations of the Debtors.  That deadline was extended consensually several times[14] and allowed for thorough investigation and formal discovery into potential litigation claims, including more than 100 document requests, as well as informal diligence.

10.      In the months following the Final Cash Collateral Order, the Settlement Parties and other parties in interest in these Chapter 11 cases negotiated procedures and parameters regarding discovery in connection with the alleged inter-Debtor and affiliate claims and causes of action ("Legacy Discovery").  The Court approved these procedures through entry of the *Order Establishing Discovery Procedures in Connection with Legacy Discovery* [D.I. 1832] (the "Legacy Discovery Order") on August 13, 2014.

11.      Pursuant to the Legacy Discovery Order, the Settlement Parties and other parties in interest in the Chapter 11 cases engaged in far-reaching discovery efforts over a period of several months.[15]  Creditors served the Debtors with 217 document requests on a wide range of topics typically spanning at least 7 years, and in some cases, going back more than 15 years.[16]  In response, the Debtors produced over 800,000 documents comprising more than 5.6 million

---

[14]      *See e.g.*, D.I. 4858.

[15]      *See, e.g.*, 11/12/2015 Hr'g Tr. at 41:10-42:5 (Doré).

[16]      *See, e.g.*, D-DIR Doré ¶ 26.

pages.[17]   The equity Sponsors and other parties-in-interest were also served with Legacy Discovery requests and made voluminous productions.[18]   In addition to the formal discovery process, the Debtors also provided informal diligence, facilitating interviews with company personnel, providing information, explaining the Debtors' business and background and purposes of legacy transactions, and answering questions from creditors and their advisors.[19]   The informal diligence also included regularly scheduled bi-weekly calls with creditor representatives, including representatives of the official committee of unsecured creditors of EFH, EFIH, EFIH Finance Inc., and EECI, Inc. (the "EFH Official Committee") and representatives of TCEH creditors.[20]   The Legacy Discovery process was thorough and comprehensive, involving more than a dozen law firms, and effectively leaving "no stone unturned."[21]

12.   On September 16, 2014, the parties executed, and the Bankruptcy Court so-ordered, the *Stipulation and Agreed Order Regarding a Protocol for Certain Case Matters* [D.I. 2051].  This Stipulation and Agreed Order was amended several times (as amended, the "Case Matters Protocol").[22]   The Case Matters Protocol reflected the Debtors' agreement to facilitate the investigation of certain potential claims and causes of action, and established a process to govern the filing by parties in interest of motions seeking standing regarding the same.

13.   In December 2014, Debtors' counsel, Kirkland & Ellis LLP, compiled and supplemented a list of potential litigation claims based on direct input from creditors, including

---

[17]   *See, e.g.*, D-DIR Doré ¶ 26.

[18]   *See* 11/12/2015 Hr'g Tr. at 54:1-4 (Doré).

[19]   11/12/2015 Hr'g Tr. at 39:11-40:23 (Doré).

[20]   11/12/2015 Hr'g Tr. at 40:4-14 (Doré).

[21]   11/12/2015 Hr'g Tr. at 43:4-18 (Doré).

[22]   *See, e.g.*, D.I. 5057.

the TCEH and EFH Official Committees, in an effort to identify the universe of such potential claims.[23] The complete potential claims list was then discussed at E-side and T-side creditor meetings and, as discussed below, was also provided to the Disinterested Directors as part of their diligence efforts.[24]

14.    On February 19, 2015, the TCEH Official Committee, TCEH Unsecured Group, and the EFH Official Committee filed motions for standing to, among other things, challenge, on behalf of the TCEH Debtors' estates, the validity, nature, and priority of the claims and liens of, and obligations owed to, the TCEH First Lien Creditors (collectively, the "Standing Motions").[25]

15.    On March 3, 2015, the Debtors and certain parties in interest filed objections to the Standing Motions.[26] On April 1, the TCEH and EFH Official Committees and the TCEH Unsecured Group filed replies in support of their Standing Motions.[27]

16.    In accordance with the Case Matters Protocol, on April 30, 2015, the TCEH Official Committee and TCEH Unsecured Group sent letters to the Debtors identifying general categories of alleged claims and causes of action, including against certain Debtors, certain of the Debtors' directors and officers, and the Sponsors, belonging to the TCEH Debtors' estates, including claims and causes of action for fraudulent transfers under state law and sections 544 and 548 of the Bankruptcy Code, preferential transfers under section 547 of the Bankruptcy

---

[23]    *See, e.g.*, D-DIR Doré ¶ 27; DX 955_R, Dec. 30, 2014 Email with attachment from T. Atwood to M. Carter [EFH06151828-32]; DX 559, Dec. 11, 2014 Email with attachment from A. Kranzley to E. Sassower, et al [EFIH_DD00003421-22].

[24]    *See, e.g.*, D-DIR Doré ¶ 27; D-DIR Williamson ¶ 17, 20; D-DIR Cremens ¶¶ 18-19; D-DIR Sawyer ¶ 15.

[25]    D.I. 3593, TCEH Committee Standing Motion; D.I. 3603, TCEH Unsecured Group Standing Motion; D.I. 3605, EFH Committee Standing Motion.

[26]    D.I. 3725, 3726, 3729, 3731, 3732, 3733, 3734, 3741.

[27]    D.I. 4031, 4034, 4044.

Code, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of contract, and/or unjust enrichment (the "TCEH Creditor Litigation Letters").[28]

### c.    Disinterested Directors' Claims Investigation

17.    At the same time that other parties in interest were investigating potential claims and causes of action concerning legacy transactions, the Debtors' Disinterested Directors were, in parallel, pursuing their own investigation into potential inter-Debtor claims.

18.    The EFH, EFIH, and EFCH/TCEH Disinterested Directors were all in place by early 2014.[29]   In November and December 2014, the boards of each entity adopted resolutions formally delegating authority to the Disinterested Directors, to identify and act upon matters for which there is an actual conflict of interest between any such Debtor and another Debtor (defined as "Conflict Matters" in the respective board resolutions).[30]

19.    Shortly thereafter, each of EFH, EFIH, and EFCH/TCEH, at the direction of their Disinterested Directors, retained separate counsel and financial advisors to advise and represent the applicable Debtor or Debtors with respect to such actual conflict matters, including potential inter-Debtor Claims.[31]

20.    The Disinterested Director of EFCH and TCEH engaged Munger, Tolles & Olson LLP and Greenhill & Co. (the "TCEH Disinterested Director Advisors").[32]   The Disinterested Director of EFIH engaged Cravath, Swaine & Moore LLP and Goldin Associates (the "EFIH

---

[28]       DX 598, Letter from C. Kerr to M. McKane and T. Walper, dated Apr. 30, 2015; DX 599 Letter from C. Shore to M. McKane, dated Apr. 30, 2015.

[29]       D-DIR Doré ¶ 22; D-DIR Williamson_R ¶¶ 11-12; D-DIR Sawyer ¶¶ 9-11; D-DIR Cremens ¶ 7.

[30]       DX128 EFH Board Resolutions, dated Nov. 7, 2014 [EFH06002484]; DX 129 EFIH Board Resolutions, dated Nov. 7, 2014 [EFH06002486]; DX131 EFCH Board Resolutions, dated Nov. 7, 2014 [EFH06002514]; DX132 TCEH Board Resolutions, dated Nov. 7, 2014 [EFH06002515].

[31]       See, e.g., D-DIR Sawyer ¶ 11; 11/19/2015 Hr'g Tr. at 27:5-10 (Sawyer); D-DIR Doré ¶ 23.

[32]       D-DIR Sawyer ¶11; 11/19/2015 Hr'g Tr. at 25:25-27:10, 117:9-19 (Sawyer).

Disinterested Director Advisors").[33]  The Disinterested Directors of EFH engaged Proskauer Rose LLP and SOLIC Capital Advisors (the "EFH Disinterested Director Advisors"), and together with the EFCH/TCEH and EFIH Disinterested Director Advisors, collectively, the "Disinterested Director Advisors").[34]

21.    Beginning almost immediately after their retention in mid-November 2014, the Disinterested Director Advisors, at the direction of the Disinterested Directors, conducted extensive investigation and diligence on inter-Debtor transactions and relationships.[35]  This diligence, which was facilitated by the Debtors and their counsel, included searching and reviewing thousands of documents, reviewing prior work product prepared by the Debtors' advisors, and conducting multiple interviews of the Debtors' personnel with knowledge of the facts relating to potential claims.[36]  The Disinterested Director Advisors regularly consulted with their respective Disinterested Directors on their diligence and analysis, supplementing each Disinterested Director's own knowledge and experience, including knowledge and experience gained from serving on the board of his or her respective Debtor.[37]

22.    For example, Mr. Donald L. Evans and Ms. Billie Ida Williamson (the "EFH Disinterested Directors") and their Disinterested Director Advisors, expended significant time and resources investigating and analyzing Conflict Matters and asserted inter-Debtor claims.[38]

---

[33]    D-DIR Cremens ¶ 11.

[34]    D-DIR Doré ¶ 23.

[35]    *See, e.g.,* D-DIR Sawyer ¶ 15; 11/19/2015 Hr'g Tr. at 32:14-19 (Sawyer).

[36]    *See, e.g.,* D-DIR Doré ¶ 29; 11/12/2015 Hr'g Tr. 56:11-56:21 (Doré); D-DIR Sawyer ¶ 15.

[37]    *See, e.g.,* D-DIR Sawyer ¶ 16.

[38]    *See, e.g.,* D-DIR Williamson_R ¶¶ 13-14, 17-24, 29, 38, 62, 64, 69; DX 012, EFCH & TCEH Statement in Support of Intercompany Settlement in the Plan, dated Apr. 14, 2015 [D.I. 4145]; DX 160, Minutes of a Meeting of the Disinterested Directors of EFH Corp., dated Dec. 12, 2014 [EFH_DD00004547-50]; DX 189, Minutes of a Meeting of the Disinterested Directors of EFH Corp., dated Feb. 10, 2015 [EH_DD00004561-62]; DX 215, Minutes of a Meeting of the Disinterested Directors of EFH Corp., dated Apr. 1, 2015 [EFH_DD00004572-90]; 11/13/2015 Hr'g Tr. at 32:20-33:16, 38:21-40:9, 40:20-42:9 (Williamson).

These diligence and investigation efforts included attending numerous meetings and engaging in extensive written and verbal communications with: (a) other Debtor estate representatives including EFH retained professionals Kirkland & Ellis LLP and Evercore, members of the Debtors' management team, the Debtors' co-chief restructuring officers (EFH General Counsel Stacey Doré and EFH Chief Financial Officer Paul Keglevic), the TCEH and EFIH Disinterested Directors and their respective advisors;[39] and (b) E-side creditor constituencies and representatives, including the EFIH PIK lenders, the EFIH second-lien lenders, Fidelity (the largest holder of EFH 2004 legacy notes besides EFIH) and the EFH Official Committee.[40]

23.      Additionally, the EFH Disinterested Directors and their advisors met with Sidley and Zolfo Cooper, interviewed EFH personnel,[41] and reviewed multiple databases of documents relating to inter-Debtor claims and the transactions underlying those claims, including the legacy database and data rooms maintained by the Debtors, and other materials, documents and information produced or provided by the Debtors and creditor constituencies.[42]  These efforts commenced in late November 2014 and through execution of the Settlement Agreement.[43]  That diligence revealed that EFH potentially was subject to at least the following inter-Debtor claims: (a) claims by EFIH against EFH of approximately $2 billion; and, (b) claims by TCEH against EFH of approximately $1.8 to $2.5 billion, exclusive of LBO claims in excess of $20 billion.[44]

---

[39]        *See, e.g.,* D-DIR Williamson_R ¶¶ 17-18, 20, 29, 38; DX 189, Minutes of a Meeting of the Disinterested Directors of EFH Corp., dated Feb. 10, 2015 [EH_DD00004561-62]; DX 215, Minutes of a Meeting of the Disinterested Directors of EFH Corp., dated Apr. 1 ,2015 [EFH_DD00004572-90]; 11/13/2015 Hr'g Tr. at 32:20-33:16, 38:21-40:9, 40:20-42:9 (Williamson).

[40]        *See, e.g.,* D-DIR Williamson_R ¶¶ 17-18, 20, 38; DX 215, Minutes of a Meeting of the Disinterested Directors of EFH Corp., dated Apr. 1, 2015 [EFH_DD00004572-90]; 11/13/2015 Hr'g Tr. at 32:20-33:16, 38:21-40:9, 40:20-42:9 (Williamson).

[41]        *See, e.g.,* D-DIR Williamson_R ¶ 17.

[42]        *See, e.g.,* D-DIR Williamson_R ¶ 17; 11/12/2015 Hr'g Tr. at 32:20-33:13 (Williamson).

[43]        *See, e.g.,* D-DIR Williamson_R ¶¶ 18, 62, 64, 69.

[44]        *See, e.g.,* D-DIR Williamson_R ¶¶ 32, 67.

24.     Similarly, EFIH conducted a thorough investigation into potential claims among EFIH, EFH, and TCEH. The EFIH Disinterested Director Advisors participated in due diligence sessions with Debtors' counsel and company employees and reviewed relevant underlying documents such as offering memoranda, indenture agreements, board meeting minutes, underlying transaction documents and agreements, payment schedules, and company-prepared transaction summaries and deal memoranda.[45] Mr. Charles Cremens, EFIH's Disinterested Director, consulted with the EFIH Disinterested Director Advisors and—to ensure that he received the necessary information to make an informed decision about claims—reviewed with them a detailed outline containing all of EFIH's material intercompany claims and defenses, which included financial analyses of the claims, and carefully considered the material information and analyses reasonably available to him.[46] The EFIH Disinterested Director then met separately with the EFH and TCEH Disinterested Directors to discuss potential intercompany claims and defenses.[47] The EFIH and TCEH Disinterested Directors also exchanged written position papers on the claims and defenses against the EFIH and TCEH estates, respectively.[48]

25.     Similarly, the TCEH Disinterested Director Advisors engaged in extensive due diligence from November 2014 through February 2015 at the direction of the TCEH Disinterested Director, Mr. Hugh Sawyer, relating to potential inter-Debtor Claims between TCEH Debtors, on the one hand, and the EFH and EFIH Debtors and their affiliates on the other hand. This diligence included review of prior work performed by financial and legal advisors to

---

[45]     *See, e.g.,* D-DIR Cremens ¶¶ 18-19; *see also* 11/19/2015 Hr'g Tr. at 105:20-106:2 (Cremens).

[46]     *See, e.g.,* D-DIR Cremens ¶¶ 22-26.

[47]     *See, e.g.,* D-DIR Cremens ¶¶ 26-27.

[48]     *See, e.g.,* D-DIR Cremens ¶ 27.

the Debtors and meetings with those advisors, interviews of company personnel, and review and analysis of voluminous documents.[49]   The TCEH Disinterested Director Advisors also held more than 25 telephonic and in person meetings with TCEH creditor constituencies.[50] Upon the completion of the diligence, the TCEH Disinterested Director reached the conclusion that any fair settlement of the intercompany claims required substantial net compensation to TCEH.[51]

###   d.   Disinterested Directors Settlement

26.   Having consulted with their respective Disinterested Director Advisors and reviewed the analyses and materials presented in order to identify the various inter-Debtor claims at their respective estates,[52] the Disinterested Directors entered an intensive period of negotiation over inter-Debtor claims that were identified through their discovery and diligence.[53]

27.   As detailed in the statements filed by each of the Disinterested Directors in support of their settlement, the settlement negotiations addressed a broad range of potential inter-Debtor claims,[54] including:

Claims by TCEH against other Debtors relating to:

- intercompany tax sharing, including unpaid tax sharing obligations for TCEH-generated NOLs, audit statements, and avoidable transfers;

- allocation of shared services and related transfers, including letters of credit, use of unencumbered cash, allocation of restructuring fees, allocations of

---

[49]   *See, e.g.,* 11/19/2015 Hr'g Tr. at 34:2-10, 35:4-13, 35:24-36:6 (Sawyer); D-DIR Sawyer ¶¶ 15-16; DX 012, Exh. F to Exh. 1 to D.I. 4145-1 at 171-184.

[50]   *See, e.g.,* D-DIR Sawyer ¶¶ 15-16; DX 012, EFCH and TCEH Statement in Support of Intercompany Settlement in the Plan, dated Apr. 14, 2015 [D.I. 4145] Exh. F to Exh. 1 at 171-184; 11/19/2015 Hr'g Tr. at 35:14-23 (Sawyer).

[51]   *See, e.g.,* D-DIR Sawyer ¶¶ 15-16, 30; 11/19/2015 Hr'g Tr. at 37:1-38:1 (Sawyer).

[52]   *See, e.g.,* 11/13/2015 Hr'g Tr. at 39:3-5 (Williamson) ("Q:  Did you and Mr. Evans participate in meetings to try and understand what those [inter-Debtor] claims were?  A:  In excruciating detail."), 59:14-25; 11/19/2015 Hr'g Tr. at 35:19-20 (Sawyer) ("I took the emphasis on acting vigorously very seriously"), 39:3-8.

[53]   *See e.g.,* D-DIR Williamson_R ¶¶ 32–41; D-DIR Cremens ¶¶ 26–30; D-DIR Sawyer ¶¶ 32–45.

[54]   *See e.g.,* D-DIR Williamson_R ¶¶ 21, 23, 29-34, 36-38, 42, 44, 46-51; D-DIR Cremens ¶¶ 22, 25, 35-36; D-DIR Sawyer ¶¶ 19-28, 35-36, 41-44.

pension and OPEB obligations, and rabbi trust funds held in an account at EFH;

- Sponsor fees and other payments to Sponsors;

- underpayment of interest by EFH on TCEH Intercompany Notes;

- entry into the TCEH Credit Agreement and amendments and extensions of that agreement;

- the 2007 LBO, including claims related to the use and transfer of TCEH borrowings;

- TCEH-issued debt held by EFH and EFIH, including subordination and recharacterization, and avoidance of interest payments;

- allocation of value resulting from a tax-free spinoff of TCEH and reduced step-up in tax basis of TCEH assets;

- transfer of EFCH's ownership interest in dividend of shares of Oncor Electric Delivery Co. ("Oncor") to EFH;

- transfers related to the Reimbursement (Make-whole) Agreements between Luminant and Oncor;

- payments by TCEH retail businesses to Oncor for transmission and delivery services; and

- TCEH's repayment of the joint credit facility with Oncor in 2007.

Claims by EFH and EFIH against TCEH relating to:

- debt issued by TCEH and the potential setoff of those holdings against claims asserted by TCEH;

- dividends from EFIH to EFH that EFH used to repay the TCEH Intercompany Notes in February 2012 and January 2013; and

- intercompany tax sharing.

Claims by EFIH against EFH relating to:

- dividends from EFIH to EFH that EFH used to repay the TCEH Intercompany Notes in February 2012 and January 2013;

- dividends of EFH Notes from EFIH to EFH in December 2012 and January 2013; and

- EFIH's holdings of EFH Legacy Notes.[55]

28.     As this list suggests, EFH faced the greatest litigation exposure.[56] From TCEH alone, EFH faced at least $2.5 billion in claims, not counting approximately $20 billion in potential claims associated with the 2007 LBO.[57]

29.     From March 5–20, 2015, the Disinterested Directors engaged in extensive, good faith, and independent negotiations on behalf of their respective Debtors.[58] Those efforts included numerous telephone conferences, meetings and written communications, discussing and exchanging presentations regarding the nature, scope, merits and defenses of each inter-Debtor claim, as well as exchanging settlement proposals and counterproposals.[59]

30.     As reflected by the Disinterested Directors' negotiations, the TCEH estate held the greatest number of litigation claims with the highest values. On March 16, 2015, the TCEH Disinterested Director made an initial demand to the EFH Disinterested Directors that included an allowed $1.2 billion unsecured claim in favor of TCEH (including a $200 million claim in favor of TCEH against EFIH), plus all NOLs, plus 100% of any excess Oncor sale value after

---

[55]     DX 012 EFCH and TCEH Statement in Support of Intercompany Settlement in the Plan, dated Apr. 14, 2015 [D.I. 4145]; DX 013, Statement of EFH in Support of Intercompany Settlement in the Plan, dated Apr. 14, 2015 [D.I. 4146]; DX 014, Statement of Disinterested Directors of EFH Regarding Proposed Settlement of Conflict Matters as Part of Proposed Plan of Reorganization, dated Apr. 14, 2015 [D.I. 4147].

[56]     *See, e.g.,* D-DIR Sawyer ¶ 43; D-DIR Williamson ¶ 53.

[57]     *See, e.g.,* D-DIR Williamson_R ¶ 32; 11/13/2015 Hr'g Tr. at 58:8-13(Williamson).

[58]     *See, e.g.,* D-DIR Sawyer ¶¶ 32-34; DX 12 EFCH and TCEH Statement in Support of Intercompany Settlement in the Plan, dated Apr. 14, 2015 [D.I. 4145], Exhs. B, C, D & E to Exh. 1 at 10-166; 11/19/2015 Hr'g Tr. at 41:13-23, 47:6-22 (Sawyer).

[59]     DX 012 EFCH and TCEH Statement in Support of Intercompany Settlement in the Plan, dated Apr. 14, 2015 [D.I. 4145]; DX 208, Minutes of a Meeting of the Disinterested Directors of EFH Corp., dated Mar. 16, 2015 [EFH_DD00004567-69]; DX 209, Minutes of a Meeting of the Disinterested Directors of EFH Corp., dates Mar. 17, 2015 [EFH_DD00004570-71]; DX 215, Minutes of a Meeting of the Disinterested Directors of EFH Corp., dates Apr. 1, 2015 [EFH_DD00004572-90]; D-DIR Williamson_R ¶¶ 18, 29-38; 11/13/2015 Hr'g Tr. at 38:21-42:9, 46:23-50:9 (Williamson); D-DIR Sawyer ¶¶ 30, 35; 11/19/2015 Hr'g Tr. at 48:2-49:20 (Sawyer).

payment in full to EFH creditors, plus a $10 million payment to the Sponsors along with releases for the Sponsors and the Debtors' directors and officers.[60]   On March 18, 2015, the EFH Disinterested Directors made a counteroffer that included a $100 million unsecured claim in favor of TCEH, plus all NOLs, plus a share of any excess consideration from the Oncor sale, and releases for the Sponsors and the Debtors' directors and officers.[61]

31.     These exchanges culminated in three days of face-to-face meetings among the Disinterested Directors and their Disinterested Director Advisors in Dallas starting on March 24, 2015 and ending on March 26, 2015, during which the terms of the Disinterested Director Settlement (as defined below) were reached.[62]   During these meetings in Dallas, the Disinterested Directors met separately without their respective Disinterested Director Advisors and together with Disinterested Director Advisors.[63]

32.     The negotiations that led to the Disinterested Director Settlement were blunt, contentious, at arm's length and without influence by the Sponsors or other potentially conflicted third parties.[64]   Settlement was not a foregone conclusion.[65]

---

[60]     *See, e.g., id.* at ¶ 33; D-DIR Sawyer ¶ 35; 11/19/2015 Hr'g Tr. at 48:13-49:20 (Sawyer).

[61]     *See, e.g.,* D-DIR Sawyer ¶ 36; 11/19/2015 Hearing Tr. at 49:21-50:22 (Sawyer).

[62]     *See, e.g.,* DX 215 Minutes of a Meeting of the Disinterested Directors of EFH Corp., dated Apr. 1, 2015 [EFH_DD00004572-90]; D-DIR Williamson_R ¶¶ 39-55; 11/13/2015 Hr'g Tr. at 46:23-54:9, 54:19-55:25, 56:1-6, 56:16-72:6, 73:6-74:4 (Williamson).

[63]     D-DIR Sawyer ¶ 37.

[64]     *See, e.g.,* 11/12/2015 Hr'g Tr. at 56:4-60:25 (Doré); D-DIR Williamson_R ¶¶ 40-43, 62; 11/13/15 Hr'g Tr. (Williamson) at 53:2-6 ("But quite honestly, it was a grueling process.  We worked hard all three of those days. There were times where those discussions were very contentious.  They were very blunt.  And, quite honestly, sometimes they were angry discussions."), 46:23-54:9, 54:19-55:25, 56:1-6, 56:16-72:6, 73:6-74:4; 11/19/15 Hr'g Tr. (Sawyer) at 58:16-19 ("Mr. Evans, Ms. Williamson and I had what is best described as a very heated conversation about the approach I take to negotiations and the offer that I'd made.  They expressed their anger in very clear terms."), 54:19-21, 55:5-9; D-DIR Sawyer ¶¶ 39, 45.

[65]     D-DIR Williamson_R ¶ 40 ("It was an arduous and exhausting process, with an uncertain outcome.  We did not know if our efforts would be successful, and there were times during the process that we believed the negotiations would end without an agreement. . . . [W]e never ruled out the litigation option if a fair and reasonable settlement could not be achieved."); D-DIR Sawyer ¶ 42; 11/19/15 Hr'g Tr. (Sawyer) at 44:25-45:6.

33.     At the conclusion of these in-person meetings, on March 26, 2015, the Disinterested Directors reached a settlement in principle of all prepetition inter-Debtor claims (the "Disinterested Director Settlement").[66]    Under the terms of the Disinterested Director Settlement, the EFH, EFIH, and TCEH Debtors agreed to release inter-Debtor claims in exchange for an allowed $700 million general unsecured claim by TCEH against EFH and certain additional potential recoveries by TCEH against EFH described below.    The Disinterested Directors agreed that after full satisfaction of all allowed administrative, priority, and secured claims against EFH, the next $1.41 billion of distributable value of the EFH estate would be distributed as follows:  (a) EFH would retain 49.645% for distribution on account of allowed unsecured claims and interests (other than the TCEH claim); (b) TCEH would receive 49.645% on account of its claim; and (c) the Sponsors would receive 0.709%.  Distributable value from the EFH estate in excess of $1.41 billion would be distributed as follows:  (a) TCEH would receive 50%, until TCEH received an additional $105 million, for a total distribution to TCEH of $805 million; and (b) EFH would retain 50% for distribution on account of allowed unsecured claims and interests (other than the TCEH claim).[67]

e.     **Sponsor Releases in the Initial Plan**

34.     In addition to considering potential inter-Debtor claims, the Disinterested Directors and other non-Sponsor directors considered potential claims against the Sponsors, in connection with then proposed Plan.[68]  Because certain members of the EFH and TCEH/EFCH boards of directors were also designees of the Sponsors, on April 3, 2015, the EFH and TCEH/EFCH boards appointed Special Committees of the EFH and TCEH/EFCH boards to

---

[66]     *See, e.g.,* D-DIR Williamson_R ¶ 32; D-DIR Sawyer ¶ 44; 11/19/2015 Hr'g Tr. at 59:23-60:5 (Sawyer).

[67]     *See, e.g.,* D-DIR Williamson_R ¶ 32; D-DIR Sawyer ¶ 44.

[68]     D-DIR Doré ¶ 37.

consider potential Sponsor releases, made up of directors not affiliated with the Sponsors.[69]  On

April 7, 2015, the EFH Special Committee, comprised of Billie Williamson, Donald Evans, John

Young, and Arcilia Acosta, met by teleconference to consider the Sponsor releases.[70]  The EFH

special committee approved the Sponsor releases, resolving that "in the judgment of the Special

Committee, it is desirable and in the best interests of the Company, its creditors, and other parties

in interest, that the Company, within the terms of the Plan and related documents, include the

Sponsor Releases."[71]  The TCEH/EFCH Special Committee, comprised of John Young, Arcilia

Acosta, Paul Keglevic, and Hugh Sawyer, convened on April 9, 2015.[72]  The TCEH/EFCH

special committee similarly approved the Sponsor releases.[73]

35.     On April 13, 2015, the Debtors, with the approval of the Disinterested Directors,

filed in the Chapter 11 Cases the *Joint Plan of Reorganization of Energy Future Holdings Corp.,

et al., Pursuant to Chapter 11 of the United States Bankruptcy Code* [D.I. 4142] (the "Initial

Plan") and a related disclosure statement.  The Initial Plan incorporated the Disinterested

Director Settlement and proposed global releases of potential claims against the Sponsors and the

Debtors' affiliates, including directors and officers.

**f.      Settlement Agreement**

36.     On May 18, 2015, the Court entered the *Order (A) Scheduling Certain Hearing

Dates and Deadlines, (B) Establishing Certain Protocols in Connection with the Approval of the*

---

[69]     D-DIR Doré ¶ 38; D-DIR Williamson_R ¶ 8; 11/13/2015 Hr'g Tr. at 74:9-17, 18-20 (Williamson).

[70]     D-DIR Doré ¶ 39; D-DIR Williamson_R ¶¶ 8, 59.

[71]     D-DIR Doré ¶ 39; DX 240 Minutes of the Meeting of the Special Committee of the Board of Directors, dated Apr. 7, 2015 [EFH06004369]; DX 257, Minutes of a Meeting of the EFH Corp. Special Committee, dated Apr. 10, 2015 [EFH06004366-EFH06004367].

[72]     D-DIR Doré ¶ 41; D-DIR Sawyer ¶ 65.

[73]     D-DIR Sawyer ¶ 65; DX 245 TCEH/EFCH Minutes of the Joint Meeting of the Special Committees of the Boards of Managers dated Apr. 9, 2015 [EFH06004372 at EFH06004372-75]; 11/19/2015 Hr'g Tr. at 61:15-62:7 (Sawyer).

*Debtors' Disclosure Statement, and (C) Establishing the Terms Governing Mediation* [D.I. 4497], pursuant to which the Court approved a proposed stipulation between the Debtors, the TCEH Official Committee, and certain of the Settling Creditors to participate in mediation regarding terms of a plan of reorganization for the TCEH Debtors and with respect to certain claims.

37.     On July 14, 2015, the TCEH First Lien Creditors and TCEH Unsecured Noteholders provided the Debtors with a proposed plan of reorganization term sheet reflecting their agreement in principle to settle all T-side litigation and support the settlement of inter-Debtor claims and Sponsor releases.[74]

38.     On August 9, 2015, the Debtors entered into the Settlement Agreement with the Settlement Parties, including significant creditors at all levels of the TCEH capital structure, and the TCEH Official Committee.  The Settlement Agreement resolves three general categories of prepetition claims: (1) inter-Debtor claims;[75] (2) claims against the TCEH First Lien Creditors;[76] and (3) claims against the Sponsors and against the Debtors' directors and officers.[77]  In addition, the Settlement Agreement provides for payment of the "reasonable and documented out-of-pocket fees, expenses and reimbursements" (collectively, the "Professional Fees") of: (A) the members of the ad hoc committee of TCEH First Lien Creditors and (B)(1) the TCEH Unsecured Group (but not the individual members thereof); (2) the TCEH Unsecured Notes Trustee; (3) the TCEH Second Lien Group (but not individual members thereof); (4) the TCEH Second Lien Trustee; and (5) Bank of New York Mellon Trust Company, N.A. as collateral agent under the

---

[74]     *See, e.g.,* D-DIR Keglevic ¶¶ 36–39; DX 290, Presentation to Board: Restructuring Update, dated July 17, 2015 [EFH05552010-25].

[75]     Settlement Agreeement ("SA") § 2.1.

[76]     SA § 2.2.

[77]     SA §§ 2.3, 2.4.

TCEH Second Lien Notes Indenture (collectively, the "Professionals").[78]   The aggregate

Professional Fees payable to the parties listed in clauses (B)(1) through (5) under the Settlement

Agreement for the period before and including June 30, 2015 shall not exceed $49.75 million.[79]

The Settlement Agreement further provides that the Sponsors will, among other things, assign

any recoveries on EFH equity interests and waive claims against the Debtors, except EFH and

the Settlement Parties agreed that, upon the Effective Date of the Plan, it would pay Texas

Holdings up to $15 million to cover fees and expenses.[80]

      39.    The Settlement Parties agreed to the releases of claims in the Settlement

Agreement in consideration of the mutual releases, payment of the Professional Fees, and the

opportunity to benefit from the transactions contemplated by the Plan Support Agreement

("PSA"),[81] including under the Plan or, as described further below, an Alternative Restructuring.

Accordingly, if the transactions contemplated by the Plan are consummated, no additional

consideration will change hands under the Settlement Agreement.

      40.    If the transactions contemplated by the Plan are not consummated, the PSA

provides that the PSA Parties agree that they will support an Alternative Restructuring.[82]   In that

scenario, the PSA provides for an agreed-upon treatment of TCEH junior creditors that "shall be

materially consistent" with the Settlement Agreement.[83]   The Settlement Agreement provides

that TCEH will receive the entirety of the TCEH Settlement Claim, which is an allowed, non-

priority, unsecured claim against EFH Corp. of $700 million, and any proceeds thereof shall

---

[78]      SA § 2.7(a).

[79]      SA § 2.7(a).

[80]      SA § 2.3(e), 2.7(b); D-DIR MacDougall ¶¶ 23, 35-36; D-DIR Smidt ¶¶ 23, 27, 37-38.

[81]      Order Authorizing the Debtors to Enter into and Perform under Plan Support Agreement (dated 9/18/15) [D.I. 6097].

[82]      *See* PSA § 6

[83]      PSA § 5.6.

constitute the Prepetition Collateral (as defined in the Final Cash Collateral Order) of the TCEH First Lien Creditors.[84]  Holders of Allowed TCEH First Lien Deficiency Claims (subject to section 2.2(b) of the Settlement Agreement), Allowed TCEH Unsecured Note Claims, Allowed TCEH Second Lien Note Claims, Allowed PCRB Claims, and Allowed General Unsecured Claims Against the TCEH Debtors Other Than EFCH (each as defined in the Plan) will receive, in the aggregate, a $550 million TCEH Cash Payment (subject to reduction in certain circumstances as set forth in the Settlement Agreement), paid from the TCEH Debtors' estates, or as a carve out of the TCEH First Lien Creditors' Prepetition Collateral, and subordinate to the RCT Reclamation Support Carve Out, the Carve Out, and the Permitted Liens (each as defined in the Cash Collateral Order, D.I. 855).[85]

41.   Before the Debtors' boards met to consider the Settlement Agreement, each of the Disinterested Directors met separately to review and consider the Settlement Agreement insofar as it was a Conflict Matter.[86]  Each of the Disinterested Directors considered the Settlement Agreement and its benefits, and determined that based on their business judgment, and in accordance with their fiduciary duties, entry into the Settlement Agreement was in the best interest of their respective estates.[87]  On August 9, 2015, the Disinterested Directors delivered

---

[84]   SA § 2.1(b).

[85]   SA § 2.2(a).

[86]   D-DIR Cremens ¶ 33 (citing DX 046, Minutes of EFIH Independent Manager Board Meeting dated Aug. 9, 2015 [EFIH_DD0028055 at EFIH_DD0028057]); D-DIR Williamson_R ¶ 15(e) (citing DX 302, Minutes of a Meeting of the Disinterested Directors of EFH Corp. dated August 9, 2015 [EFH_DD00035222-EFH_DD00035226]; D-DIR Sawyer ¶ 52; DX 074_R Minutes of Joint Meeting of Disinterested Manager of the Boards of EFCH and TCEH dated August 9, 2015 [EFCH00034820 at EFCH0034822].

[87]   *See e.g.,* D-DIR Cremens ¶¶ 4-5; 15, 37; D-DIR Williamson_R ¶¶ 22, 37, 69; D-DIR Sawyer ¶¶ 54-55, 66.

their recommendations to the Debtors' Boards at EFH, EFIH and TCEH, who unanimously agreed to approve the Settlement Agreement.[88]

42.    The Settlement Agreement and the PSA, embody what the Debtors refer to as "Disarmament"—that is, an end to all potential litigation related to Legacy transactions regardless of whether the Plan is consummated.[89]    As described above, the Settlement Agreement contains a broad set of mutual releases that become effective with its approval.[90] Even prior to Court approval of the Settlement Agreement, the Debtors achieved partial Disarmament under the PSA, as the PSA parties committed to (among other things) support the inclusion of releases of Legacy claims—including claims against the TCEH First Lien Creditors, the Sponsors, EFH and EFIH and their affiliates, and the Debtors' directors and officers, in an Alternative Plan, and to support approval of the Settlement Agreement.[91]    Notably, settlement of claims against the TCEH First Lien Creditors was unopposed, other than allocation of proceeds.

43.    The Professional Fees provision was negotiated along with the rest of the settlement on an arm's-length, good faith basis, and as bargained-for consideration.[92]    The Professional Fees are supported by the T-side creditors who will own reorganized TCEH, the payor of the fees.[93]    In return for the Professional Fees, the parties have agreed to provide valuable support for the Debtors in their ability to consummate the Plan, and any Alternative

---

[88]    D-DIR Williamson_R ¶ 74; DX 075, Minutes of a Joint Board Meeting dated August 9, 2015 [EFH06004432 at EFH06004432-33]; DX 301, Presentation to Boards: Approval of Amended Plan and Merger Transaction Documents dated August 9, 2015 [EFH06002898 - EFH06002941].

[89]    D-DIR Keglevic ¶ 60; 11/12/2015 Hr'g Tr. at 63:23-64:17 (Doré).

[90]    D-DIR Keglevic ¶ 61.

[91]    Id. at ¶ 60.

[92]    See SA § 2.7(a) ("In exchange for the applicable Parties' agreements contained in the Plan Support Agreement, as well as their agreement to the settlements and releases set forth herein . . ..").

[93]    11/12/2015 Hr'g Tr. at 135:15-136:5 (Doré).

Restructuring Transaction, should that scenario arise.[94]   The parties are also consenting to releases of inter-Debtor and legacy claims to achieve complete Disarmament.[95]   In doing so, the parties are helping to prevent the Debtors from incurring additional fees and expenses and suffering further depletion of the Debtors' resources through protracted litigation.[96]   The parties participated in the Legacy Discovery process, and eventually agreed to settle their inter-creditor claims in mediation.[97]

44.    On August 10, 2015, the Debtors filed the Settlement Motion.[98]   Certain parties objected to the Debtors' Settlement Motion, including (i) the United States, on behalf of the Environmental Protection Agency, (ii) Shirley Fenicle, as successor-in-interest to the Estate of George Fenicle, and David William Fahy ("Fenicle and Fahy"), (iii) the EFH Official Committee, (iv) the United States Trustee, (v) UMB Bank, N.A. as EFIH PIK Notes Indenture Trustee, (vi) Fidelity, (vii) the EFIH Second Lien Trustee, and (viii) the PCRB Indenture Trustee.[99]

45.    The Court held a hearing on approval of the Settlement Agreement and Plan (the "Hearing") on November 3, 4, 5, 6, 12, 13, 19, and 25, 2015.   At the Hearing, the Debtors offered extensive testimony and documentary evidence regarding the transactions and issues underlying the claims to be resolved by the Settlement Agreement.

---

[94]    *See* PSA § 4.1(c); 4.2(b); 11/4/2015 Hr'g Tr. at 20:21-24 (Keglevic).

[95]    *See* 11/3/2015 Hr'g Tr. at 192:13-15 (Keglevic).

[96]    *See* 11/4/2015 Hr'g Tr. at 89:11-17 (Keglevic); 11/13/2015 Hr'g Tr. at 144:22-25, 151:4-9 (Williamson).

[97]    11/12/2015 Hr'g Tr. at 53:17-54:12; 55:8-14; 94:10-95:2 (Doré).

[98]    D.I. 5249.

[99]    D.I. 6601, 6610, 6616, 6623, 6627, 6641, 6642, 6643, 6645, 6705.

g.    **Specific Transactions and Claims**

46.    The evidence presented at the Hearing confirmed, reinforced, and expanded upon the overview of claims set forth in the Debtors' Settlement Motion.[100]  The Court makes the following findings related to those key transactions:

i.    <u>2007 LBO</u>

47.    The Settlement Agreement resolves claims related to the 2007 LBO. [101]   On October 10, 2007, an investor group led by Kohlberg Kravis Roberts & Co., L.P., TPG Capital, L.P., and Goldman Sachs & Co. (the "<u>Investor Group</u>") acquired TXU Energy Co. ("<u>TXU</u>") in a leveraged buyout, which valued TXU at approximately $48.6 billion.[102]  Texas Holdings and Texas Energy Future Merger Sub Corp. ("<u>Merger Sub</u>"), a wholly owned subsidiary of Texas Energy LP, were formed so the Investor Group could acquire all outstanding shares of TXU through Merger Sub at $69.25 per share.[103]  As a result of the LBO, TXU became a private corporation and was renamed EFH.[104]

48.    The 2007 LBO was financed, in part, by $8.3 billion in equity funding through Texas Energy LP and by $27.3 billion in new funded debt at TCEH—primarily under a new credit agreement providing for up to $24.5 billion in TCEH senior secured facilities (the "<u>TCEH</u>

---

[100]    *See* D.I. 5249 ¶¶ 74–224; *see, also e.g.,* D-DIR Keglevic ¶¶ 121–35 (2011 Amend & Extend; 2013 Revolver Extension; Tax Sharing Claims; IRS or State Taxing Authorities as "Golden Creditors"; EFH solvency); D-DIR Carter ¶¶ 6–99 (2005 Oncor Transfer; 2007 LBO; Payments to Sponsors; Upstream Guarantee and Dividends by Luminant Generation; Luminant Makewhole Payments; Shared Services; Tax Sharing Claims; IRS or State Taxing Authorities as "Golden Creditors"); D-DIR Horton ¶¶ 15-100 (2007 LBO; Liability Management Program; 2011 Amend & Extend; 2013 Revolver Extension; TCEH Intercompany Notes; EFH and EFIH Holdings of TCEH and EFCH Debt; Debtors use of unencumbered cash); D-DIR Ashby ¶¶ 7–76 (Tax Sharing).

[101]    *See* SA §§ 2.1-2.4.

[102]    D-DIR Horton ¶¶ 16, 18; D-DIR Carter ¶¶ 16, 18; DX 334 Funds Transfer Memorandum in Connection with the Acquisition of TXU Corp. dated Oct. 10, 2007 [EFH00916712 at EFH00916726].

[103]    *See* D-DIR Horton ¶ 17; D-DIR Carter ¶ 17; DX 334 [EFH00916712 at EFH00043508, EFH00916726]; DX322 TXU Corp. SEC Schedule 14A Proxy Statement dated July 24, 2007 [EFH00043496 at EFH00043526].

[104]    D-DIR Horton ¶ 18; D-DIR Carter ¶ 18; DX 334 [EFH00916712 at EFH00916752].

Credit Agreement").[105]    TCEH also entered into a Security Agreement that granted to the collateral agent liens on and security interests in the property of certain TCEH subsidiaries.[106] The Settlement Agreement resolves all claims of any party that any of the TCEH Debtors fraudulently incurred these obligations or transferred these liens on its assets to the TCEH First Lien Creditors in connection with the LBO, without receiving reasonably equivalent value. [107] As part of the LBO, TCEH also made a $21 billion cash distribution to Merger Sub on the day of the merger for use, at least in part if not in full, to pay a portion of the merger consideration.[108] This transfer itself could be challenged as a constructive fraudulent transfer and has been alleged to show that the TCEH Debtors did not receive reasonably equivalent value in exchange for the first priority liens and security interests they granted in connection with the TCEH Credit Agreement.  In addition, the TCEH Debtors considered potential claims that TCEH's use of the TCEH Credit Agreement proceeds to retire debt owed under joint TCEH/Oncor credit facilities should be avoided on the theory that TCEH improperly repaid Oncor's liabilities; however, the evidence showed that TCEH and Oncor repaid only their respective liabilities under the joint credit facilities.[109]

---

[105]    D-DIR Horton ¶¶ 19-20; D-DIR Carter ¶¶ 19-20; DX 334 [EFH00916712 at EFH00916720-22]; DX 324, TCEH Credit Agreement dated Oct. 10, 2007 [EFH00556100].

[106]    D-DIR Horton ¶ 22; D-DIR Carter ¶ 22; DX 937 Security Agreement dated Oct. 10, 2007 [EFH00047948 at EFH00047949]; DX 933 TCEH 2007 Credit Agreement Guarantee dated Oct. 10, 2007 [EFH00047250 at EFH00047250-51].

[107]    *See* SA §§ 2.1-2.4.

[108]    D-DIR Horton ¶¶ 23-24; D-DIR Carter ¶¶ 23-24; DX 334 Funds Transfer Memorandum in Connection with the Acquisition of TXU Corp. dated Oct. 10, 2007 [EFH00916712 at EFH00916741]; DX 030 Unanimous Written Consent of the Board of Directors of EFCH dated Oct. 10, 2007 [EFH04290664]; DX 031 Unanimous Written Consent of the Managers of TCEH dated Oct. 10, 2007 [EFH04291200].

[109]    *See* D-DIR Horton ¶¶ 25-27; D-DIR Carter ¶¶ 25-27; DX334 Funds Transfer Memorandum in Connection with the Acquisition of TXU Corp. dated Oct. 10, 2007 [EFH00916712 at EFH00916722, EFH00916746, EFH00916748]; DX 332 Debt Facility Payoff Letters [EFH00050160 at EFH00050161-65, EFH00050173-78]; DX 333 Schedule of Borrowings and Repayments Credit Facility (native xls at "Summary" tab, lines FF11, FB11-FD11, FC10, FF10) [EFH00602911].

49.    In addition to other hurdles,[110] a constructive fraudulent transfer claim arising out of the 2007 LBO would have to survive the complete defense of solvency.    Duff & Phelps Securities, LLC ("Duff & Phelps") provided a solvency opinion, and two other financial firms provided fairness opinions in connection with the 2007 LBO.[111]    Additionally, at the time of the closing of the merger on October 10, 2007, David Campbell, then Executive Vice President and Chief Financial Officer of TXU prepared a Solvency Certificate representing that the financial prospects post-Merger were within a range of reasonableness and affirmed that the company was solvent under various measures of solvency.[112]    In its objection to the Settlement Agreement, the EFH Committee stated that "there is no colorable basis" to challenge the 2007 LBO.[113]

ii.    2007 Management Agreement

50.    The Settlement Agreement resolves potential claims arising out of the October 10, 2007 Management Agreement (the "Management Agreement") between EFH Corp., on the one hand, and the Sponsors and Lehman Brothers, on the other, which was entered into immediately following the 2007 LBO.[114]    Pursuant to the Management Agreement, EFH Corp. paid a one-time merger fee of $300 million for services provided in connection with the LBO.[115]

---

[110]    The parties might dispute whether the 2007 LBO falls outside the statute of limitations period, or whether elements of the 2007 LBO are protected by the safe harbor of section 546(e) of the Bankruptcy Code.

[111]    *See* D-DIR Horton ¶¶ 28-32; D-DIR Carter ¶¶ 28-32; DX 334 Funds Transfer Memorandum in Connection with the Acquisition of TXU Corp. dated Oct. 10, 2007 [EFH00916712 at EFH00916752]; DX 314 Credit Suisse Fairness Opinion dated Feb. 25, 2007 [EFH00040463-64]; DX 321 Lazard Fairness Opinion dated July 12, 2007 [EFH00040467 at EFH00040468]; DX 691 Duff & Phelps Solvency Opinion dated Oct. 10, 2007 [EFH00924069 at EFH00924073-74].

[112]    *See* D-DIR Horton ¶ 33; D-DIR Carter ¶ 33; DX 327 Officer's Certificate of Texas Energy Future Holdings Limited Partnership dated Oct. 10, 2007 [EFH00043807 at EFH00043810].

[113]    *See* D.I. 6627, ¶ 144 ("A central premise of the Intersilo Settlement is that the 2007 LBO is not being challenged. The EFH Committee agrees there is no colorable basis to do so.").

[114]    D-DIR Carter ¶ 38. *See* DX 339 Management Agreement dated Oct. 10, 2007 [EFH04173219]; SA §§ 2.1-2.4.

[115]    *See* DX 334, Funds Transfer Memorandum in Connection with the Acquisition of TXU Corp. by Texas Energy Future Holdings Limited Partnership, Closing Date: October 10, 2007 [EFH00916712 at EFH00916762].

Additionally, EFH agreed to pay the Sponsor managers annual advisory fees, starting at $35 million and increasing by 2% each year.[116] While EFH is the only Debtor signatory to the Management Agreement, and while the Debtors internally allocated fee expenses among themselves, the Management Agreement provides that all Debtors are jointly and severally liable for the amounts owed to the Sponsors under the Management Agreement.[117]

51. The Management Agreement provided that, in exchange for the fees, the Sponsors would provide customary "management, consulting and financial services" to EFH and its subsidiaries.[118] A February 2009 EFH tax memorandum, based on interviews with senior EFH executives, described the services the Sponsors provided to EFH and evaluated whether those services warranted the advisory fees payable under the Management Agreement.[119] The memorandum concluded that: (a) the Sponsors provided, among other things, services related to commodity risk management, public affairs, business strategy, and investment opportunities; (b) the services warranted the advisory fees; and (c) the fees paid to the Sponsors on account of their services were comparable to the fees that would have been paid for the same services to an unrelated party.[120] Michael Carter, the Senior Vice President of Corporate Planning for EFH, testified that the memorandum's conclusion that the services merited payment was "very much consistent" with his own experience with the Sponsors.[121]

---

[116] D-DIR Carter ¶ 39; *See* DX 339 Management Agreement dated Oct. 10, 2007 [EFH04173219]. Although the Sponsors reserved the right to demand and receive the advisory fees pursuant to the Management Agreement, they suspended collection of the fees after September 30, 2013. *See e.g.,* DX 343, E-mail from V. Gadiyar dated Dec. 30, 2013 [EFH04420544]; D-DIR Smidt ¶ 27. The allocation of Sponsor advisory fees between EFH and its subsidiaries is enumerated in Mr. Carter's written declaration, D-DIR Carter, directly below ¶ 42.

[117] *See* DX 339 Management Agreement dated Oct. 10, 2007 [EFH04173219]; D-DIR MacDougall ¶ 20; 11/5/2015 Hr'g Tr. at 84:22-85:13 (Carter).

[118] *See* DX 339 Management Agreement dated Oct. 10, 2007 [EFH04173219].

[119] DX 341, Email with attachments from K. Ashby dated Mar. 5, 2013 [EFH05343928].

[120] DX 341, Email with attachments from K. Ashby dated Mar. 5, 2013 [EFH05343928 at EFH0534329-30].

[121] 11/5/2015 Hr'g Tr. at 31:20-22 (Carter).

     iii.    TCEH Intercompany Notes

    52.    The Settlement Agreement resolves potential claims relating to intercompany loans that TCEH made to EFH between October 2007 and January 2013 pursuant to two promissory notes, which were amended and restated over time.[122] In connection with the 2007 LBO, TCEH entered into promissory notes with EFH through which TCEH lent funds to EFH in order for EFH to cover its selling, general, and administrative expenses (the "SG&A Note") and its principal and interest expenses (the "P&I Note") (together, the "TCEH Intercompany Notes").[123] The TCEH Intercompany Notes stated that they were payable on demand to TCEH and carried an interest rate of LIBOR plus 500 basis points.[124] EFH made certain payments on the TCEH Intercompany Notes over time.[125] On November 6, 2008, EFH repaid the P&I Note in full, with a $253 million payment to TCEH.[126]

    53.    The original P&I Note was restated on May 1, 2009 so that EFIH and EFCH guaranteed EFH's obligations to TCEH under the P&I Note, as required by certain of TCEH's debt documents.[127] The P&I Note was also amended to introduce an aggregate borrowing limit of $2.0 billion.[128] The SG&A Note was amended in April 2011 to include similar EFIH and

---

[122]    SA §§ 2.1-2.4.

[123]    D-DIR Horton ¶ 48; DX 899 SG&A Note dated Oct 10, 2007 [EFH04947131]; DX 898 P&I Note dated Oct. 10, 2007 [EFH00897135].

[124]    D-DIR Horton ¶ 79; 11/5/2015 Hr'g Tr. at 104:13-18 (Horton); DX 899 SG&A Note dated Oct 10, 2007 [EFH04947131]; DX 898 P&I Note dated Oct. 10, 2007 [EFH00897135].

[125]    D-DIR Horton ¶ 82; 11/5/2015 Hr'g Tr. at 105:17-18, 111:4-9 (Horton); DX 904 EFH Board of Directors Financing Plan Analysis Presentation dated Feb. 16, 2012 [EFH04987725 at EFH04987726].

[126]    D-DIR Horton ¶ 82; 11/5/2015 Hr'g Tr. at 105:10-16 (Horton); DX 898 P&I Note, dated Oct. 10, 2007 [EFH0897135 at EFH00897139].

[127]    D-DIR Horton ¶ 49; 11/5/2015 Hr'g Tr. at 111:24-112:6 (Horton); DX 607 P&I Note, dated May 1, 2009 [EFH04947125].

[128]    D-DIR Horton ¶ 86; 11/5/2015 Hr'g Tr. at 113:4-7 (Horton); DX 608 Supplement to TCEH Credit Agreement with Restated SG&A and P&I Notes, dated April 8, 2011 [EFH04677790 at EFH04677797-800]; DX 905 EFH SEC Form 10-K, dated Feb. 21, 2012 at pg. 138.

EFCH guarantees, and to fix the face amount of the note at $233 million.[129]  At the same time,

EFH also repaid TCEH $770 million owed under the SG&A Note, using proceeds from TCEH's

repayment of the EFH Downstream Note, which the parties had entered into in February 2010.[130]

The interest rates of the TCEH Intercompany Notes were not changed.[131]  In April 2011,

TCEH's senior lenders acknowledged in an amendment to the TCEH Credit Agreement that the

terms of the TCEH Intercompany Notes were made on an arm's-length basis.[132]

     54.    In February, August, and October 2012, EFIH issued new debt to raise

approximately $2.25 billion, of which $1.63 billion was distributed to EFH in February 2012 and

January 2013.[133]  EFH used these payments to repay the TCEH Intercompany Notes.[134]  At no

point did TCEH demand a repayment on EFH for the TCEH Intercompany Notes.  In 2012, the

TCEH Board of Directors considered whether to demand repayment of the TCEH Intercompany

Notes and decided not to, based on the facts that TCEH had sufficient liquidity, EFH/EFIH had

sufficient cash to repay the TCEH Intercompany Notes, EFIH had collateral value to support the

---

[129]    D-DIR Horton ¶¶ 49, 86; 11/5/2015 Hr'g Tr. at 112:13-18 (Horton); DX 608 Amended SG&A Note, dated April 8, 2011 [EFH04677790 at EFH04677798].

[130]    D-DIR Horton ¶¶ 85, 87; 11/5/15 Hearing Tr. 112:13-18; DX 901 EFH Downstream Note, dated Feb. 2010 [EFH00897162]; DX 905 EFH SEC Form 10-K, dated Feb. 21, 2012 at pg. 138.

[131]    11/5/2015 Hr'g Tr. at 112:7-9 (Horton).

[132]    D-DIR Horton ¶ 87; 11/5/2015 Hr'g Tr. at 113:19-115:11 (Horton); DX 359 Amendment to TCEH Credit Agreement, dated April 7, 2011 [EFH00046556 at EFH00046561]; DX371 EFH, EFCH, EFIH SEC Form 8-K, dated April 19, 2011 [EFH00053271 at EFH00053272].

[133]    D-DIR Horton ¶ 52; 11/5/2015 Hr'g Tr. at 113:19-115:1 (Horton); DX 056 Unanimous Written Consent of EFIH Distribution Committee, dated Feb. 6, 2012 [EFH04286316 at EFH04286316-17]; DX 057 Unanimous Written Consent of EFIH Distribution Committee, dated Feb. 28, 2012 [EFH04286331]; DX 060 Unanimous Written Consent of EFIH Distribution Committee, dated Jan. 29, 2013 [EFH04287289 at EFH04287289-90]; *see also* DX 602 EFIH Cash Flows Spreadsheet [EFH00571478]; DX 605 EFH Borrowings_2013_Final Spreadsheet [EFH02722137]; DX 604 EFCH and TCEH Borrowings_2013_Final Spreadsheet [EFH02720817].

[134]    *See supra*, n.139.

ability to repay the notes and had demonstrated the ability to raise proceeds as needed by TCEH, and repayment could exacerbate the liquidity situation of the Debtors.[135]

55.    The various loans made under the TCEH Intercompany Notes could be challenged as fraudulent transfers.  The TCEH Disinterested Director and various TCEH creditor constituencies alleged that the interest on the TCEH Intercompany Notes was inadequate for the credit risk that TCEH was exposed to, based on the interest rate of certain third-party notes that EFH had issued on the public markets.[136]  That interest rate was never adjusted over time, even as EFH's credit risk increased.[137]

56.    Mr. Eric R. Mendelsohn testified as an expert for the TCEH Debtors regarding the TCEH Intercompany Notes.[138]  Mr. Mendelsohn testified that between 2007 and 2013, TCEH made hundreds of loans to EFH under the TCEH Intercompany Notes.[139]  For much of the time period, the total outstanding balance under the TCEH Intercompany Notes exceeded $1 billion dollars.[140]  Mr. Mendelsohn analyzed the interest rate and other terms of the TCEH Intercompany Notes, including the language "payable on demand," to determine the rate a third party would require as fair compensation to provide the loans to EFH, given its credit risk profile.[141]  In the opinion of Mr. Mendelsohn, the interest payments made by EFH

---

[135]    D-DIR Horton ¶ 82; 11/5/2015 Hr'g Tr. 116:3-121:2 (Horton); DX 80, ECH/TCEH Board of Directors Meeting 2012 Finance Update Presentation [EFH03509032_R at EFH03509037_R].

[136]    D-DIR Mendelsohn_R ¶ 24, 54; 11/13/15 Hearing Tr. 204:3-18 (Mendelsohn).

[137]    D-DIR Horton ¶ 83.

[138]    D-DIR Mendelsohn; 11/13/2015 Hr'g Tr. at 200:17-259:19 (Mendelsohn).

[139]    D-DIR Horton ¶ 48; *see also* DX 605 EFH Borrowings_2013_Final Spreadsheet (native xls at tabs "EFH_P&I" and "EFH_SG&A Other").

[140]    D-DIR Horton ¶ 48; *see also* DX 605 EFH Borrowings_2013_Final Spreadsheet (native xls at tabs "EFH_P&I" and "EFH_SG&A Other").

[141]    D-DIR Mendelsohn ¶¶ 14-54.

undercompensated TCEH in the range of $425 million to $834 million.[142]  To reach his opinion, Mr. Mendelsohn computed the difference between the interest rate EFH paid under the TCEH Intercompany Notes and the yields on EFH public notes, which he concluded are the best market-tested metric for the rates third parties required to loan money to EFH on similar terms.[143]  The Court finds that the testimony of Mr. Mendelsohn is credible and provides substantial evidence for the claim that EFH underpaid interest to TCEH.

iv.    <u>Liability Management Program</u>

57.    The Settlement Agreement also resolves potential claims arising out of inter-Debtor transactions relating to the Company's Liability Management Program ("the LMP"), a three-year effort that captured approximately $2.5 billion of debt discount, approximately $800 million of debt discount at TCEH and approximately $1.7 billion of debt discount at EFH—by acquiring approximately $12.57 billion in debt in exchange for approximately $10.04 billion of new debt and/or cash (including cash funded by debt issuances).[144]  The LMP can be categorized into six broad transaction groups.

58.    *First*, through seven transactions between November 2009 and January 2013, EFIH exchanged newly issued EFIH debt for existing EFH debt.[145]  Some, but not all, of the

---

[142]    D-DIR Mendelsohn ¶ 54; *see also* 11/13/2015 Hr'g Tr. at 204:4-9 (Mendelsohn).

[143]    D-DIR Mendelsohn ¶¶ 21-26; *see also* D-DIR Mendelsohn at Table (iii) (comparing terms of TCEH Intercompany Notes and the EFH public notes used as benchmarks); DX 900 EFH Indenture for Senior Notes due 2017 (reflecting 10 year maturity and guarantees identical to those in DX 607 P&I Note dated May 1, 2009, DX 608 P&I Note dated April 7, 2011 [EFH04677790 at EFH04677802-805], and DX 608 SG&A Note dated April 7, 2011) [EFH04677790 at EFH04677797-800]; DX 895_R EFH Indenture Unsecured Debt Securities Series P due 2014 (reflecting 7 year maturity and no guarantees, as in DX 898 P&I Note dated Oct. 10, 2007 and DX 899 SG&A Note dated Oct. 10, 2007).

[144]    D-DIR Horton ¶ 38; *see also* D-DIR Horton ¶¶ 41-42; 11/4/2015 Hr'g Tr. at 59:16-60:8 (Keglevic).

[145]    D-DIR Horton ¶¶ 42-43, Figure 2 (citing DX 562 Revised Settlement Report for 11-16-2009 Debt-for-Debt Exchange (native xls at "Summary" sheet) [EFH02360176], DX 581 Settlement Report - Energy Future Holdings Corp. dated Aug. 17, 2010 (native xls at "Summary" tab) [EFH03244584], DX 941 Oaktree Letter Agreement for April 25 ,2011 Exchange dated Apr. 25, 2011 [EFH00644415 at EFH00644420], DX 942 Fidelity Letter Agreement for Apr. 25, 2011 Exchange dated Apr. 25, 2011 [EFH00644422 at EFH00644446], DX 596 Exchange Agreement

EFH debt acquired by EFIH in the exchanges had been guaranteed by EFIH at the time of issuance.[146]

59.    *Second*, through five sets of distributions (in November 2009, October 2011, and December 2012 through February 2013), EFIH distributed to EFH notes acquired in the debt exchanges.[147]  EFIH had guaranteed some of the EFH notes at the time of issuance. EFH cancelled and retired all of the EFH notes, eliminating EFIH's exposure on the guarantees.[148]

60.    *Third*, through debt issuances in February, August and October 2012, EFIH issued new secured debt to raise approximately $2.25 billion in the aggregate ($1.15 billion in February, $850 million in August, and $253 million in October).[149]  EFIH made distributions to EFH ($950 million in February, following the February issuances, and $680 million in January 2013, following the August and October 2012 issuances).[150]

---

for Dec. 5, 2012 Exchange dated Nov. 27, 2012 [EFH02432782 at EFH02432806], DX 597 Exchange Agreement for Dec. 19, 2012 Exchange dated Dec. 18, 2012 [EFH00843143 at EFH00843160], DX 600 Offering Memorandum for Jan. 2013 First Lien Exchange dated Dec. 21, 2012 [EFH00809781], DX 601 Offering Memorandum for Jan. 2013 Unsecured Exchange dated Dec. 21, 2012 [EFH02950426]).

[146]    D-DIR Horton ¶¶ 42, 47.

[147]    D-DIR Horton ¶¶ 42, 46. Figure 3 (citing DX 562 Revised Settlement Report for 11-16-2009 Debt-for-Debt Exchange (native xls at "Summary" sheet) [EFH02360176], DX 055 Oct. 18, 2011 Unanimous COnsent of EFIH Distribution Committee [EFH04286307 at EFH04286307-08], DX 602 Custody Accts-Interest Calculations (native xls at "Interest" sheet, Lines 64-65) [EFH00571478], DX 606 EFIH SEC Form 10-Q dated Oct. 28, 2011 [EFH01427568 at EFH01427581], DX 951 Email from T. Horton to P. Keglevic and M. Carter re Debt distributed [sic] to EFH from EFIH dated Apr. 15, 2014 [EFH04276015 at EFH04276016], DX 400 EFIH SEC Form 8-K dated Dec. 21, 2012 [EFH02078113 at EFH02078114], DX 060 Jan. 29, 2013 Wrtten Consent of EFIH Distrobution Committee [EFH04287289 at EFH04287290], DX 602 Custody Acct-Interests Calculations (native xls at "Interest" sheets, lines 54, 70)[EFH00571478]).

[148]    D-DIR Horton ¶¶ 42, 46 (citing DX 951 Email from T. Horton to P. Keglevic and M. Carter re Debt distributed [sic] to EFH from EFIH dated Apr. 15, 2014 [EFH04276015 at EFH04276016]).

[149]    D-DIR Horton ¶¶ 42, 50 (citing DX 590 Offering Memorandum for EFIH 11.75% Senior Secured Second Lien Notes due 2022 dated Feb. 1, 2012 [EFH00814361], DX 592 Offering Memorandum for EFIH 11.75% Senior Secured Second Lien Notes due 2022 dated Feb. 23, 2012 [EFH00008381], DX 594 Offering Memorandum for EFIH 6.875% Senior Secured Second Lien Notes due 2022 dated Aug. 9, 2012 [EFH05516396]).

[150]    D-DIR Horton ¶¶ 42, 51 (citing DX 56 Unanimous Written Consent of EFIH Distribution Committee dated Feb. 6, 2012 [EFH00814361], DX 57 Unanimous Written Consent of EFIH Distribution Committee dated Feb. 28, 2012 [EFH04286331], DX 60 Unanimous Written Consent of EFIH Distribution Committee dated Jan. 29, 2013 [EFH04287289 at EFH04287289-90], DX 602 EFIH Cash Flows (native xls) [EFH00571478]); *see also* Figure 4.

61.    *Fourth*, after receiving the distributions from EFIH (in February 2012 and January 2013, as described above), EFH repaid $1.65 billion in the aggregate to TCEH.[151]   These payments satisfied EFH's obligations under the TCEH Intercompany Notes, both of which had been guaranteed by EFIH.[152]

62.    *Fifth*, in January 2010, EFH issued new debt, guaranteed by EFIH on a secured basis, to raise $500 million in cash.[153]   EFH used some of the proceeds to purchase old EFH debt in a series of eight purchase transactions between April 2010 and July 2011.[154]

63.    *Sixth*, in a series of nine transactions between November 2009 and October 2011, EFH exchanged new debt, guaranteed by EFIH, for old EFH and TCEH debt.[155]   EFH cancelled

---

[151]    D-DIR Horton ¶¶ 42, 52 (citing DX 605 EFH Borrowings_2013_Final (native xls at tabs "EFH_P&I" [EFH02722137], DX 604 EFCH and TCEH Borrowings_2013_Final (native xls) [EFH02720817]).

[152]    D-DIR Horton ¶¶ 42, 52, 48-49; *see also* Figure 5 (citing DX 605 EFH Borrowings_2013_Final (native xls at tabs "EFH_P&I" [EFH02722137], DX 562 Revised Settlement Report for 11-16-2009 Debt-for-Debt Exchange, dated Nov. 16, 2009 [EFH02360176]).

[153]    D-DIR Horton ¶¶ 42, 54 (citing DX 563 EFH, EFCH, EFIH Form 8-K, dated Jan. 1, 2010).

[154]    D-DIR Horton ¶¶ 42, 54, Figure 2 (citing DX 565 Purchase Agreement dated Mar. 31, 2010 [EFH02847498-512], DX 568 Purchase Agreement dated May 13, 2010 [EFH0284322-29], DX 569 Purchase Agreement dated May 20, 2010 [EFH02845330-37], DX 571 Purchase Agreement dated May 27, 2010 [EFH02845338-45], DX 572 Purchase Agreement dated June 3, 2010 [EFH02845346-53], DX 573 Purchase Agreement dated June 10, 2010 [EFH02845354-61], DX 574 Purchase Agreement dated June 17, 2010 [EFH02845362-69], DX 579 Purchase Agreement dated July 8, 2010 [EFH-2844967-74], DX 582 Purchase Agreement dated Sept. 28, 2010 [EFH02844975-82], DX 583 Purchase Agreement dated Oct. 8, 2010 [EFH02844983-90], DX 587 Purchase Agreement dated Dec. 1, 2011 [EFH02844991-98], DX 588 Purchase Agreement dated Dec. 9, 2011 [EFH02844999-5005], DX 589 Purchase Agreement dated Dec. 15, 2011 [EFH02845006-12]).

[155]    D-DIR Horton ¶¶ 42, 53, Figure 1 (citing DX 562 Revised Settlement Report for 11-16-2009 Debt-for-Debt Exchange dated Nov. 16, 2009 (native xls at "Summary" tab [EFH02360176], DX 564 Exchange Agreement for the Mar. 16, 2010 Exchange [EFH02847498-512], DX 566 Exchange Agreement for Apr. 13, 2010 Exchange [EFH02845713-31], DX 567 Exchange Agreement for Apr. 16, 2010 [EFH02847532-46], DX 570 Exchange Agreement for May 21, 2010 Exchange [EFH02847547-59], DX 575 Exchange Agreement for July 2, 2010 Exchange [EFH02847560-81], DX 578 Exchange Agreementfor July 6, 2010 Exchange [EFH02847582-96], DX 577 Exchange Agreement for July 7, 2010 Exchange [EFH028475378-91], DX 586 Exchange Agreement for Oct.18, 2011 Exchange EFH02845392-613]).

and retired the old EFH debt tendered in the exchanges.[156]  Some of the old EFH notes had been

guaranteed by EFIH at the time of issuance.[157]

v.    <u>2011 Amend & Extend</u>

64.    In April 2011, TCEH negotiated a maturity extension of its first lien loan facilities

as well amendments to the TCEH Credit Agreement ("<u>2011 Amend & Extend Transactions</u>").[158]

Before entering into the Settlement Agreement, TCEH Debtors' unsecured creditors had sought

standing to challenge these transactions as constructive fraudulent transfers, asserting that TCEH

was insolvent in April 2011 and did not receive reasonably equivalent value for the benefits

provided to participating lenders, and alleging claims of approximately $2 billion.[159]  These

creditors further sought standing to avoid the liens, security interests, and obligations arising out

of an issuance of TCEH First Lien Senior Secured Notes due 2020 that was executed in

connection with the 2011 Amend & Extend Transactions.[160]

65.    The 2011 Amend & Extend Transactions were executed after careful

consideration by senior management of multiple potential transaction structures,[161] and extensive

negotiations with the TCEH Debtors' key creditors,[162] as well as examination and approval by

---

[156]        D-DIR Horton ¶ 42.

[157]        D-DIR Horton ¶ 42.

[158]        *See* DX 356 EFH, EFCH, EFIH Form 8-K dated April 1, 2011 [EFH00053243]; *See* DX 358 EFH, EFCH, EFIH Form 8-K dated April 7, 2011 [EFH00053248]; DX 360 EFH, EFCH Form 8-K dated April 12, 2011 [EFH00053252] (describing details of executed Amend & Extend Transaction); 11/4/2015 Hr'g Tr. at 174:14-16 (Keglevic)(indicating that the "driving part of the [Amend & Extend Transactions] was the risk associated with the maintenance covenant, and buying time for gas prices to recover").

[159]        Exhibit A to Motion of the Ad Hoc Group of TCEH Unsecured Noteholders for Entry of an Order Granting Standing and Authority To Commence, Prosecute, and Settle Certain Claims for Declaratory Judgment, Avoidance and Recovery of Liens, Security Interests, Obligations, Fees, and Interest Payments, and Disallowance of Claims ¶¶ 117-25 (Dkt. 3596).

[160]        *Id.* ¶¶ 126-35.

[161]        *See* DX 346 Project Magellan Update Presentation [EFH04364680 at EFH04364682-94] (summarizing multiple comprehensive and incremental credit facility extension approaches).

[162]        *See* DX 350 Email from T. Horton to P. Keglevic re Oaktree's demands dated Mar. 9, 2011

34

the boards of EFH, TCEH, and EFCH.[163]   Through these efforts, approximately 80.1% of the

TCEH term loans and 96.0% of the TCEH deposit letter of credit loans were extended from 2014

to 2017, and approximately 68.6% of the TCEH revolving credit facility loans were extended

from 2013 to 2016.[164]   All participating lenders received certain interest rate increases on the

extended debt,[165] as well as cash fees.[166]

66.     In addition, the TCEH Credit Agreement's maintenance covenant was adjusted to

avoid any near term default risk, and certain acknowledgements were made to respond to a

TCEH term loan lender's allegations of default.[167]   EFH. and TCEH also agreed to certain

restrictions on the amounts that could be borrowed under two intercompany notes.[168]

67.     In connection with the 2011 Amend & Extend Transactions, TCEH issued $1.75

billion of new 11.5% senior secured first lien notes due 2020.  It used the proceeds to make an

approximately $1.6 billion par pay-down of term loans, deposit letter of credit loans, and

revolving credit loans, as well as to pay associated fees and expenses.[169]   TCEH paid

approximately $845 million in total fees in the 2011 Amend & Extend Transactions: a $110

[EFH02797371]; DX 351 Annotated term sheet from Oaktree dated Mar. 15, 2011 [EFH04540035]; DX 379 Email from P. Keglevic to J. Weingart summarizing negotiations with Oaktree [EFH03502965]; DX 361 Email from F. Goltz to J. Weingart et al. dated Apr. 12, 2011 [EFH-SP00058693] (describing as "disingenuous" an ultimately rejected proposal by Oaktree to extend its TCEH term loans under certain conditions); 11/4/2015 Hr'g Tr. at 62:6-12 (Keglevic) ("[T]his was . . . at least three- or four-month negotiation with primary holders . . . .").

[163]     *See* DX 032 Joint Board Meeting Minutes dated Mar. 11, 2011 [EFH00056864]; *See* DX 033 Joint Board Meeting Minutes dated Mar. 15, 2011 [EFH00056865].

[164]     DX 360 EFH, EFCH Form 8-K dated April 12, 2011 [EFH00053252 at EFH00053253].

[165]     *Id.*

[166]     *See* DX 356 EFH, EFCH, EFIH Form 8-K dated April 1, 2011 [EFH00053243 at EFH00053245] (referencing payment of 350 basis point up-front extension fee).

[167]     *See id.*; *see also* DX 349 Brilliant letter re alleged default dated Feb 24, 2011 [EFH00050500 at EFH00050503]; 11/4/2015 Hr'g Tr. at 174:9-16 (Keglevic) (indicating that "a side benefit" of the Amend & Extend Transactions was to address a creditor's allegations of default).

[168]     *See* DX 358 EFH, EFCH, EFIH Form 8-K dated April 7, 2011 [EFH00053248 at EFH00053250].

[169]     DX 369 Press Release re TCEH Notes Issuance [EFH00053269].

million fee relating to the amendment of the TCEH Credit Agreement; $584 million of upfront fees for extending lenders; and $152 million in various third-party fees, including bank fees, legal fees, trade fees, and fees paid to the Sponsors.[170]

vi.    <u>2013 Revolver Extension</u>

68.    In January 2013, TCEH extended the maturity of certain of its revolving credit loans from 2013 to 2016 ("<u>Revolver Extension</u>").[171]  Before entering into the Settlement Agreement, TCEH Debtors' unsecured creditors had sought standing to challenge the Revolver Extension as an actual and constructive transfer, asserting that TCEH was insolvent in January 2013 and did not receive reasonably equivalent value in the transaction.[172]  These creditors also sought standing to avoid any liens, security interests, or obligations granted in connection with the $340 million of additional TCEH incremental term loans issued as part of the Revolver Extension.[173]

69.    TCEH negotiated and executed the Revolver Extension after it was informed by its auditors in late 2012 that a $450 million liquidity shortfall projected through September 2014 could cause the company to receive a qualified audit opinion.  A qualified audit opinion would constitute an event of default under the TCEH Credit Agreement and would have likely propelled TCEH into a freefall bankruptcy.[174]  After appropriate consideration and approval by

---

[170]    DX 377 Analysis re Amend & Extend Fees [EFH04639787 at EFH04639788]; 11/4/2015 Hr'g Tr. at 246:15-23 (Keglevic) (describing the nature of amendment and extension fees paid to lenders participating in the Amend & Extend Transactions).

[171]    *See* DX 398 EFH SEC Form 8-K dated Jan. 4, 2013.

[172]    Exhibit A to Motion of the Ad Hoc Group of TCEH Unsecured Noteholders for Entry of an Order Granting Standing and Authority To Commence, Prosecute, and Settle Certain Claims for Declaratory Judgment, Avoidance and Recovery of Liens, Security Interests, Obligations, Fees, and Interest Payments, and Disallowance of Claims ¶¶ 135-54 (Dkt. 3596).

[173]    *Id.* ¶¶ 155-73.

[174]    *See* D-DIR Horton ¶¶ 70-71; DX 385 Email from P. Keglevic to J. Young dated Dec. 14, 2012 [EFH05232953].

the EFH Board of Directors,[175] the executed Revolver Extension avoided this shortfall by extending $646 million of TCEH revolving credit facility obligations from 2013 to 2016.[176] Participating lenders received a 13.5 cent premium for every dollar of their extended loans.[177] They also received payments that compensated them for the lost market value they incurred in the exchange of 2013 revolving loans for 2016 revolving loans.[178]

70.    As a result of the Revolver Extension, TCEH avoided a bankruptcy filing in March 2013 and instead received more than twelve months of additional time to negotiate with its creditors before filing its bankruptcy petition.[179]

71.    Overall, the LMP Transactions, including the 2011 Amend & Extend and the 2013 Revolver Extension allowed the Debtors time to try to weather the effects of cyclical commodity prices and obtain sufficient liquidity to continue operations.[180]  Because of economic pressures starting in late 2008 and the impact of a decrease in natural gas prices on the T-side businesses, the LMP and related transactions served as a means to keep interest expense neutral, or reduce interest expense and otherwise increase cash flow.[181]

72.    In connection with certain of the LMP Transactions, the Sponsors or affiliates provided financial advisory services and investment banking services to the Debtors, and received fees in exchange.[182]  As reflected in the relevant meeting minutes, the Debtors' non-

---

[175]    DX 038 EFH BOD Board Minutes dated Dec. 20, 2012 [EFH00057002]; DX 037 Unanimous Written Consent dated Dec. 19, 2012 [EFH00053695].

[176]    See DX 398 EFH SEC Form 8-K dated January 4, 2013.

[177]    DX 397 Revolver Extension Economics Summary dated Dec. 21, 2012 [EFH00083792].

[178]    See id.; see DX 398 EFH SEC Form 8-K dated January 4, 2013.

[179]    See D-DIR Horton ¶ 77.

[180]    See e.g., 11/6/15 Hr'g Tr. at 57:2-59:3 (Smidt).

[181]    11/4/2015 Hr'g Tr. at 59:17-22 (Keglevic).

[182]    D-DIR Carter ¶¶ 49-52.

Sponsor directors were informed of, or otherwise were aware of, potential conflicts in connection with the transactions; and the non-Sponsor directors approved the transactions and authorized the payment of fees to the Sponsors or their affiliates.[183]

### vii.   Tax Sharing Claims

73.    On May 15, 2012, in order to follow general best practices in the industry and to try to memorialize the EFH tax group's past practices with regard to tax sharing, EFH Corp. and many of its non-Oncor subsidiaries executed "Federal and State Income Tax Allocation Agreement Among the Members of the Energy Future Holdings Corp. Consolidated Group" (the "Competitive TSA").[184]  A variety of complex disputes that are subject to the settlement arise in connection with the Competitive TSA.

### (1)    SOFAs and Schedules Tax Sharing Claim

74.    As of the Petition Date, the Debtors' books and records, as well as the Statement of Financial Affairs ("SOFAs") and Schedules, included intercompany tax payables of approximately $1.29 billion owed from Luminant Generation Company LLC ("Luminant Generation") to EFH and $754 million owed from EFH to TCEH.[185]  These payables were based on highly complex tax sharing calculations related to highly complex settlements of open audits with the IRS, spanning multiple tax years (both before and after 2010).[186]  The resolution of

---

[183]    *See, e.g.*, DX76 EFH Executive Comm. Minutes dated Sep. 30, 2009 [EFH00056655] (approval of "management's proposal to delever and restructure the Company's debt obligations"); DX33 Joint BOD Minutes dated March 15, 2011 [EFH00056865] (approval of 2011 Amend and Extend).

[184]    11/4/2015 Hr'g Tr. at 47:8-48:1 (Keglevic); 11/6/2015 Hr'g Tr. at 134:22-135:3 (Ashby); *see also* DX 648 Federal and State Income Tax Allocation Agreement Among the Members of the Energy Future Holdings Corp. Consolidated Group, dated May 15, 2012 [EFH02028964-84].

[185]    11/6/2015 Hr'g Tr. at 135:16-18, 135:25-136:2 (Ashby); DX 892 Reclass Interco Tax Liab (native xls) [EFH02410092].

[186]    11/6/2015 Hr'g Tr. at 136:3-11 (Ashby); D-DIR Ashby ¶¶ 40-58; *see also* 11/4/2015 Hr'g Tr. at 47:8-48:1 (Keglevic).

disputes regarding these payables would have been based on, among other things, disputed interpretations of the Competitive TSA.[187]

75.     A major component of the intercompany tax dispute is whether those two payables should net to a single payable from TCEH to EFH in the amount of $535 million.[188] One of the primary interpretative issues underlying the "netting" dispute is the definition of "members" under the Competitive TSA.   Under one view, disregarded entities would be considered to be "members."[189]   Several provisions and applications of the Competitive TSA, as well as a variety of parol evidence, arguably support this view.   For example, disregarded entities signed joinders to the Competitive TSA after it was executed and those joinders provide that each disregarded entity is a "new Member [that] has become a member of the Group."[190]   The use of the term "member" in the first Recital clause and in Section 3 of the Competitive TSA also arguably supports an inclusive interpretation of "member," one that would include disregarded entities.[191]   An extensive report by Grant Thornton confirmed that the EFH tax group generally treated disregarded entities the same as corporations for tax sharing purposes.[192]   Tax personnel confirmed that they did not intend to treat disregarded entities differently from corporations.[193]   Additionally, a transaction decision paper drafted in connection with the

---

[187]     11/6/2015 Hr'g Tr. at 141:6-11, 150:7-163:3 (Ashby); D-DIR Ashby ¶¶ 61-62.

[188]     11/4/2015 Hr'g Tr. at 49:19-50:3 (Keglevic); 11/6/2015 Hr'g Tr. at 146:6-16 (Ashby); D-DIR Ashby ¶ 61.

[189]     11/6/2015 Hr'g Tr. at 151:18-19 (Ashby).

[190]     11/6/2015 Hr'g Tr. at 152:5-23 (Ashby); DX 651 TAA Annex: Greenway, dated Nov. 27, 2012 [EFH04414833]; DX 653 TAA Annex: Decordova, dated Jan. 4, 2013 [EFH0441832], DX 654 TAA Annex: TXU Energy Receivables Company LLC, dated Jan. 4, 2013 [EFH04414834]; D-DIR Ashby ¶ 16.

[191]     D-DIR Ashby ¶¶ 13-14; 11/6/2015 Hr'g Tr. at 135:4-7 (Ashby).

[192]     D-DIR Ashby ¶ 34; DX 445 Grant Thornton Report dated April 2, 2015 [EFH05524580 at EFH05524598-EFH05524614].

[193]     11/6/2015 Hr'g Tr. at 151:5-152:4, 167:19-168:8 (Ashby); D-DIR Ashby ¶¶ 15, 20, 34, 68.

Competitive TSA arguably indicates that corporations and disregarded entities should be treated the same.[194]

76.    On the other hand, other applications of the term "member" in the Competitive TSA, and other sources of parol evidence, support a view that the term "member" should not include disregarded entities. For example, the provisions that allocate tax sharing obligations in section 1.2 consistently distinguish between "members" and disregarded entities. Other provisions in the Competitive TSA, including the first Recital, also appear to make such a distinction.[195] The term "member" under the applicable consolidated return tax regulations, which many of the provisions of the Competitive TSA appear to be modeled from and incorporate, does not include disregarded entities.[196] Additionally, historically, the tax sharing obligations of TCEH and TCEH's subsidiaries were aggregated to result in an overall net payable or receivable and a single cash payable or receivable was made directly between EFH and TCEH to settle these balances.[197]

77.    Another interpretative issue is whether the Competitive TSA even applies to the relevant tax years that were the subject of the IRS settlements. Section 6.4 of the Competitive TSA could be construed to apply to all tax years that were "open" (i.e., subject to assessment as a result of the ongoing audits that were settled) as of January 1, 2010, even years before 2010.[198] As pertinent here, this construction would apply the Competitive TSA to IRS audits of tax years

---

[194]    Hr'g Tr. Nov. 6, 2015 at 154:4-18 (Ashby); D-DIR Ashby ¶¶ 11, 18-20; DX 424 Competitive TSA Transaction Decision Paper dated Oct. 10, 2011, § 1 [EFH03344498 at EFH03344499].

[195]    *See generally* Hr'g Tr. Nov. 6, 2015 at 168:20-171:1 (Ashby); DX 648 Competitive TSA dated May 15, 2012 [EFH02028964 at EFH02028964-EFH02028965].

[196]    11/6/2015 Hr'g Tr. at 176:23-177:17 (Ashby) (responding to cross-examination questions about application of "Treasury Regulation sections 1.1521(a)(1) and 1.1502-33(d)(3)" to the term "member").

[197]    11/6/2015 Hr'g Tr. at 178:11-179:12 (Ashby); DX 445 Grant Thornton Report, dated April 2, 2015 [EFH05524580 at EFH05524618, EFH055246].

[198]    11/6/2015 Hr'g Tr. at 160:24-161:3; 162:11-17 (Ashby); DX 648 Competitive TSA, dated May 15, 2012 [EFH02028964 at.EFH02028973].

from 1997 to 2006, which resulted in settlements that were booked in 2013 with impacts spanning all of these years.[199]  Although EFH management concluded that the Competitive TSA should apply to both "pre-2010 tax years, as well as post-2010 tax years" when it analyzed and accounted for tax adjustments resulting from these IRS settlements,[200] there is a reasonable dispute regarding the interpretation of the language of the Competitive TSA on this point.

78.    Yet another interpretative issue is whether parties to the Competitive TSA are entitled to compensation for the reduction of alternative minimum tax ("AMT") credits. Reduction of AMT credits as a result of the settlement of the 1997-2002 tax years accounts for a significant portion of the scheduled claim from TCEH against EFH.[201]    Although the Competitive TSA does not explicitly provide for reimbursement for use of AMT credits, EFH's historical practices include actions that demonstrate that AMT credits have been treated as "currency."[202]  In 2011, for example, TCEH owed a tax sharing payment to EFH that was mostly attributable to a significant amount of cancellation of debt income and when TCEH's 2011 tax sharing liability was calculated, it was significantly reduced by AMT credits attributed to TCEH at the time.[203]  This view is further supported by a contemporaneous document that "walks forward" tax attributes on a business unit-by-business unit basis, showing significant historical movement of AMT credits between business units, and a wire transfer document from TCEH to EFH.[204]

---

[199]    11/6/2015 Hr'g Tr. at 160:24-161:3; 162:11-17 (Ashby); D-DIR Ashby ¶¶ 21-22.

[200]    11/6/2015 Hr'g Tr. at 161:23-162:17 (Ashby); DX 657 Transaction Decision Paper: Mark-to-Market Settlement and Tax Sharing Considerations, dated Sept. 5, 2013 [EFH0464536-37].

[201]    D-DIR Ashby ¶¶ 51-55.

[202]    D-DIR Ashby ¶¶ 69-70; 11/6/2015 Hr'g Tr. at 157:7-11 (Ashby).

[203]    D-DIR Ashby ¶ 71.

[204]    11/6/2015 Hr'g Tr. at 157:12-160:7 (Ashby); D-DIR Ashby ¶ 71; *see also* DX 975 AMT 2011 Return Workbook (native xls at "A – Output" tab [EFH02029800] (described at D-DIR Ashby ¶ 71); DX 974 Wire/ACH

### (2)     Other Potential Tax Sharing Claims

79.     If tax sharing issues were to be litigated, the claims would not be limited to the claims on the SOFAs and Schedules.  Other potential challenges to EFH's historical tax sharing procedures (both before and after the Competitive TSA was executed) include: (i) whether EFH memorialized historical tax practices with this Competitive TSA; (ii) whether the Competitive TSA was applied consistently across tax years; (iii) whether tax attributes have been handled appropriately; (iv) whether payments made under the agreement should have been made, or whether there were payments not made that should have been made; and (iv) whether the Competitive TSA should be invalidated completely (which would, in turn, subject all payments made under the agreement to further challenge, and raise the question of whether an implied-in-fact tax sharing agreement exists).[205]

### (3)     Claims for 2013 Payment.

80.     In addition to the claims discussed above, in 2013, TCEH made a cash tax sharing payment of approximately $101.7 million to EFH for both federal and state taxes related to issues addressed by the settlement of the 1997-2002 tax years.[206]  In particular, this payment was related to the adjustments to years 1997-2002; the portions of this settlement that impacted later years were reflected in the SOFAs and Schedules claim.[207]  This payment could be challenged as an avoidable preference under section 547(b) Bankruptcy Code, or as a fraudulent transfer under section 544(b) and applicable state law.

81.     Litigation of the various claims described above would require resolution of the many tax sharing issues described above and would require a thorough analysis and potential

---

Transfer, dated Sept. 21, 2012 [EFH05511093] (described at 11/6/2015 Hr'g Tr. at 157:12 - 160:7 (Ashby)).

[205]     11/6/2015 Hr'g Tr. at 163:11-18 (Ashby).

[206]     D-DIR Ashby ¶ 74.

[207]     D-DIR Ashby ¶ 74-75.

reconstruction of the tax sharing history of the Debtors, going back more than a decade.[208]  Such an analysis would require a very significant effort and would be extremely time and resource-intensive.[209]

viii.    Tax-Free Spin of TCEH

82.    The Settlement Agreement resolves issues relating to compensating TCEH creditors for consenting to a tax-free spinoff under the current Plan.  A taxable sale of TCEH could result in a significant tax liability at EFH.[210]  The amount of the tax liability at EFH depends on the fair market value of TCEH's assets as of the closing date and the NOLs available as of that date to offset any taxable gain from the separation.[211]  Given the fluctuating value of TCEH—it has declined significantly since the Petition Date, but could easily turn the other direction—TCEH is entitled to consideration for immunizing EFH from this tax risk under the current Plan.[212]

83.    In addition, a taxable sale of TCEH would make an EFH REIT transaction economically impossible.[213]  If a corporation like EFH wants to convert to a REIT, it must "purge" all of its historic earnings and profits through a distribution to its shareholders.  This distribution is commonly made 80% in stock with the rest in cash.[214]  EFH's earnings and profits will be very large at the time of emergence—in the range of $25–30 billion.[215]  In a tax-free transaction, the Debtors have requested and may obtain an IRS ruling on an allocation of a

---

[208]    D-DIR Ashby ¶ 60; 11/6/2015 Hr'g Tr. at 163:23-164:15 (Ashby).

[209]    D-DIR Ashby ¶ 60; 11/6/2015 Hr'g Tr. at 163:23-164:15 (Ashby).

[210]    D-DIR Sawyer ¶ 28.

[211]    11/19/2015 Hr'g Tr. 46:7-14 (Sawyer).

[212]    D-DIR Keglevic ¶¶ 51–55; 11/4/2015 Hr'g Tr. at 38:25-39:5 (Keglevic); D-DIR Sawyer ¶ 28.

[213]    D-DIR Sawyer ¶ 28; 11/19/2015 Hr'g Tr. 72:18-23 (Sawyer).

[214]    D-DIR Keglevic ¶ 57.

[215]    D-DIR Keglevic ¶ 58; 11/4/2015 Hr'g Tr. at 40:2-41:25 (Keglevic).

significant majority of the earnings and profits to TCEH, preventing these untenable purging results.[216]   In a taxable transaction, by contrast, no such allocation could occur, and EFH would be required to pay a $5–6 billion cash dividend, and its new shareholders would receive a taxable dividend of $25–30 billion.[217]   EFH will not be able to pay and its stakeholders would not be willing to receive such dividends.[218]

### ix.    Shared Services

84.    EFH and its business units share certain business services, including Finance, IT, Human Resources, Public and Governmental Affairs, and Legal services.   Prior to 2009, there were certain redundancies and inefficiencies within these shared services departments.[219] Business services costs were not categorized, and there were redundancies across the Company, both in terms of services provided and expenses incurred.[220]

85.    In 2009, the Debtors engaged Huron Consulting Group ("Huron") to "review and assess the structure and cost allocation methodologies of [EFH]'s corporate and shared services arrangements, and to develop recommendations for EFH's shared services organization, practices, and allocation methodologies.[221]   Consistent with Huron's recommendations, the Debtors aggregated numerous independent departments of each of the business units and shifted them to the EFH Corporate Services Company level, which provided global business services to

---

[216]    11/4/2015 Hr'g Tr. at 41:2-42:25 (Keglevic).

[217]    D-DIR Keglevic ¶ 58; 11/4/2015 Hr'g Tr. at 44:22-45:1 (Keglevic).

[218]    D-DIR Keglevic ¶ 58.

[219]    D-DIR Carter ¶ 74; *see also* DX 685 Huron Consulting Group Shared Services Review Report dated June 8, 2009, at 7 [EFH04404842 at EFH04404848].

[220]    D-DIR Carter ¶ 74; *see also* DX 684 Business Services GOSP Functions Presentation at 3 [EFH02371913 at EFH02371916]

[221]    D-DIR Carter ¶ 45; 11/5/2015 Hr'g Tr. at 38:8-39:13 (Carter); DX 685 Energy Future Holdings Corp. Shared Services Review by Huron Consulting Group, dated June 8, 2009 [EFH04404842 at EFH04404843].

the different business units as necessary[222] and pushed down costs previously allocated to the EFH holding company to the different business units, including Sponsor fees, Board of Directors expenses, and certain financing fees.[223]

86.    From 2010 to 2013, EFH implemented non-binding Service Level Agreements ("SLAs") for the allocation of shared services costs, which were drafted by Business Services and presented to EFH and its subsidiaries for approval.[224]  The SLAs detailed the different categories of business services costs, the method by which those costs were allocated to the different business units, and the percentage of costs allocated to different business units based on those methodologies.[225]  On October 23, 2013, EFH Corporate Services and TCEH entered into a binding Shared Services Agreement (the "2013 TCEH SSA") which memorialized the allocation of shared services costs and similarly detailed the different categories of business services, allocation methodologies, and percentage allocations.[226]  On April 1, 2014, EFH Corporate Services and TCEH executed an Amended and Restated Shared Services Agreement (the "2014 TCEH SSA"), which updated the cost allocation percentages between different business units.[227] Contemporaneously, EFH Corporate Services and EFIH executed a Shared Services Agreement

---

[222]    D-DIR Carter ¶ 77; DX 340 Business Services Fall Pass Budget Presentation, dated Sept. 20, 2009 [EFH01698666 at EFH01698669].

[223]    D-DIR Carter ¶ 77; DX 340, Business Services Fall Pass Budget Presentation, dated September 20, 2009 [EFH01698666 at EFH01698668].

[224]    D-DIR Carter ¶ 78; 11/5/15 Hearing Tr. 39:14-40:10; DX674, 2011 Business Services Service Level Agreements Presentation dated Aug. 25, 2010 [EFH02404110]; DX675, Business Services 2012 Service Level Agreements Presentation dated Sept. 22, 2011 [EFH04441910]; DX676, Business Services Fall Pass Budget Business Services 2013 Service Level Agreements Presentation dated June 29, 2012 [EFH00002805]; DX677, Business Services 2013 Service Level Agreements Presentation dated Aug. 30, 2012 [EFH04440352].

[225]    *See supra* n.188.

[226]    D-DIR Carter ¶ 78; 11/5/2015 Hr'g Tr. at 40:16-23 (Carter); DX 678, Shared Services Agreement between EFH Corporate Services Co. and TCEH, dated October 23, 2013 [EFH04566809].

[227]    D-DIR Carter ¶ 79; DX 681, Amended and Restated Shared Services Agreement between EFH Corporate Services Co. and TCEH, dated April 1, 2014 [EFH04269629].

that detailed the same cost allocation methodologies as the 2014 TCEH SSA and increased EFIH's allocation of shared services costs.[228]

87.     The TCEH Disinterested Director has alleged that TCEH's shared services payments could be challenged as constructive fraudulent transfers to or for the benefit of EFH or EFIH on the grounds that TCEH overpaid for its share of the services while EFH and EFIH received the benefits of those services without making payments.[229]   The amount of alleged under-allocation to EFIH from 2010 to 2013 was $69 million to $138 million.[230]   Moreover, litigating the allocation of shared services would be time consuming and expensive, as the allocation of shared services costs reflected tens of thousands of underlying transactions and services and the methodologies and allocations have changed over time.[231]

x.     Upstream Guarantee and Dividends by Luminant Generation

88.     The Settlement Agreement resolves potential claims arising out of Luminant Generation guarantees of TCEH First Lien debt as well as dividends Luminant Generation allegedly paid to TCEH between 2009 and 2012.[232]   The 2007 LBO was partially financed with approximately $24 billion in TCEH First Lien debt, guaranteed by Luminant Generation and its subsidiaries.[233]   This upstream guarantee was subject to a "savings clause," which limited the amount of the guarantee to the maximum amount that would not render Luminant Generation

---

[228]     D-DIR Carter ¶ 79; 11/5/2015 Hr'g Tr. at 40:24-41:9 (Carter); DX 682, Shared Services Agreement between EFH Corporate Services Co. and EFIH, dated April 1, 2014 [EFH04801624].

[229]     D-DIR Sawyer ¶ 23; DX 12 TCEH/EFCH Statement in Support of Intercompany Settlement dated Apr. 14, 2015, Exhs. B & D to Exh. 1 [D.I. 4145-1 at 41, 123-27].

[230]     DX012 TCEH/EFCH Statement in Support of Intercompany Settlement dated Apr. 14, 2015, Exh. D to Exh. 1 [D.I. 4145-1 at 126].

[231]     D-DIR Carter ¶ 81; *see also* 11/5/2015 Hr'g Tr. at 66:2-22 (Carter).

[232]     *See* SA §§ 2.1-2.4.

[233]     11/5/2015 Hr'g Tr.at 94:2–8 (Carter).

insolvent.[234]  At issue in the potential claim is whether the LBO rendered Luminant Generation insolvent, whether the savings clause is enforceable in bankruptcy, and whether Luminant Generation made dividends to TCEH while insolvent.  As for the dividends, the evidence reflects that Luminant Generation did not make debt service payments on behalf of TCEH or any dividends or distribution to TCEH, EFCH or EFH.[235]

xi.      EFH and EFIH Holdings of TCEH Debt

89.     The Settlement Agreement resolves potential disputes arising from EFH and EFIH holdings of debt issued by TCEH, including whether EFH or EFIH would be able to use those holdings to set off liabilities, if any, to TCEH.  EFH and EFIH own TCEH debt, and EFH also owns EFCH debt.[236]  The terms of certain TCEH first lien debt may place limitations on set offs and the terms of certain TCEH unsecured debt may limit remedies.[237]

xii.      Luminant Makewhole Payments

90.     The Settlement Agreement resolves potential claims arising out of the settlement in 2012 of certain contractual obligations that Luminant Generation owed to Oncor pursuant to three reimbursement (or "make-whole") agreements[238] entered into in connection with the deregulation of the electric utility industry in Texas in 2002.[239]  The claims resolved by the

---

[234]     D-DIR Carter ¶ 54.

[235]     *Id.*

[236]     D-DIR Horton ¶ 90.  *See* DX 603 Custody Accts-Interest Calculations (native xls at TL-Cons 4-19-11 sheet, line B80) [EFH02501905]; *id.* (native xls at Sr Notes sheet, line D102, D118) [EFH02501905]; SA §§ 2.1-2.4.

[237]     D-DIR Horton ¶¶ 91-93. *See* DX 638 Section 6.07 Indenture to the TCEH Unsecured Notes dated Oct. 31, 20117 [EFH02954343 at EFH02954443]; DX 897 TCEH Credit Agreement § 13.8(a) dated Oct 10, 2007 [EFH01725063 at EFH01725244-45].

[238]     *See* SA §§ 2.1-2.4.

[239]     The Texas Legislature passed a law in 1999 requiring electric utilities in Texas, including TXU Electric to separate, or "unbundle," their business activities into a power generation company, a retail electricity provider, and a transmission and redistribution ("T&D") utility (or separate T&D utilities) by January 1, 2002 (the "Restructuring Legislation").  D-DIR Carter ¶¶ 58-59; *see* Texas Public Utility Regulatory Act ("PURA") § Ch. 39.301 *et seq.*

Settlement Agreement are those that could be asserted on behalf of EFIH against Oncor and on behalf of Luminant Generation against Oncor and/or EFIH challenging the agreements themselves as well as the payments made thereunder.[240]

91.    In connection with deregulation, Oncor[241] became the collection agent for $1.3 billion in transition bonds (the "Transition Bonds") that the PUCT authorized TXU Electric to issue to securitize roughly $1.8 billion of its generation-related assets.[242]  The principal and interest on the Transition Bonds were recoverable through a taxable delivery fee surcharge to retail electricity providers.[243]  To mitigate the impact to Oncor's capital structure, and to comply with an indemnification provisions of the December 2001 Master Separation Agreement that effectuated the unbundling of TXU Electric,[244] Oncor and TXU Generation Co. LP (the predecessor to Luminant Generation) entered into certain reimbursement agreements under which Luminant Generation agreed to reimburse Oncor for incremental income taxes related to the surcharges and interest expenses related to the bonds on Oncor's books (the "Make-Whole Agreements").[245]

---

[240]    *See* Exhibit A to Motion of the Ad Hoc Group of TCEH Unsecured Noteholders for Entry of an Order Granting Standing and Authority To Commence, Prosecute, and Settle Certain Claims for Declaratory Judgment, Avoidance and Recovery of Liens, Security Interests, Obligations, Fees, and Interest Payments, and Disallowance of Claims ¶¶ 175  (Dkt. 3596).

[241]    In accordance with the Restructuring Legislation, US Holdings (formerly TXU Electric Co.) separated its business functions as of January 1, 2002 into two new businesses: Oncor, a regulated T&D utility; and TXU Energy Co. LLC (a competitive business known today as Luminant Generation).  D-DIR Carter ¶ 61 and Figure 2; *see* DX 618 Order Approving Joint Application for Approval of Stipulation Regarding TXU Electric Company Transition to Competition Issues ("Stipulation Order") dated June 26, 2002 at 5 [PUCT Dkt. # 25230-208].

[242]    D-DIR Carter ¶ 63; *see* DX 618, Stipulation Order dated June 26, 2002 at 7 [PUCT Dkt. #25230-208]; DX 619, Financing Order dated Aug. 5, 2002 at 2 [PUCT Dkt. # 25230-216].

[243]    D-DIR Carter ¶ 65; DX 619, Financing Order dated Aug. 5, 2002 at 45-47 [PUCT Dkt. # 25230-216].

[244]    DX 615, Master Separation Agreement by and among TXU Electric Delivery Company, TXU Generation Holdings Company, LLC, TXU Merger Energy Trading Company, LP, TXU SESCO Energy Services Company, TXU Energy Retail Company LP, and TXU Electric Company, dated Dec. 14, 2001 ("Master Separation Agreement") ¶ 3.1, ¶ 4.2(c)-(d) [EFH03935721 at EFH03935741, EFH03935752].

[245]    D-DIR Carter ¶¶ 67-68, ¶ 70; *see* DX 616, Reimbursement Agreement dated Jan. 1, 2002 ("Tax Make-Whole Agreement") [EFH01354946]; DX 617, Reimbursement Agreement dated Jan. 1, 2002 ("2002 Interest

92.    During the spring of 2012, Oncor initiated discussions regarding settling Luminant Generation's obligations under these agreements to reduce Oncor's financial exposure to TCEH.[246]    Following these discussions, EFIH agreed, pursuant to an Assignment and Assumption Agreement on August 8, 2012, to purchase Oncor's right, title, and interest in the Make-Whole Agreements for $158,829,000.[247]    Then on September 28, 2012, Luminant Generation made a one-time payment of that same amount to EFIH to settle all outstanding obligations under the Make-Whole Agreements and terminate the Make-Whole Agreements.[248] The payment represented a 20.5% discount to the approximately $212 million outstanding under the Make-Whole Agreements.[249]

xiii.    2005 Oncor Transfer

93.    In 2005, TXU Corp. (which would later become EFH Corp.) managed a portfolio of competitive and regulatory energy businesses as a holding company, conducting its operations primarily through its wholly owned subsidiaries, TXU Energy Company LLC, which is now Texas Competitive Electric Holdings LLC and TXU Electric Delivery Company, which is now Oncor.[250]    In the spring of 2005, TXU Corp. began an initiative called "Project Jewel,"[251] which would have established Oncor as a separate, publicly-owned entity from TXU Corp. and its

---

Make-Whole Agreement") [EFH02650908]; DX 622, 2004 Interest Make-Whole Agreement at 2 [EFH02650910].

[246]    D-DIR Carter ¶ 71; *see* DX 624, Transaction Decision Paper: Settlement of Tax Make-Whole Agreement and Interest Make-Whole Agreement between Oncor Electric Delivery Company LLC and Luminant Generation Company LLC, dated Sept. 21, 2012 ("Luminant Make-Whole Settlement TDP") § 2 [EFH00078288 at EFH00078289].

[247]    D-DIR Carter ¶ 72; *see* DX 623, Assignment and Assumption Agreement dated Aug. 8, 2012 [EFH00927236]; *see also* DX 66, Unanimous Written Consent of the Board of Managers of EFIH, dated Aug. 8, 2012 at 1-2 [EFH00078307 at EFH0078307-08].

[248]    DX 625, Termination Agreement, dated Sept. 28, 2012 at 1 [EFH05032964].

[249]    *See* DX 624, Luminant Make-Whole Settlement TDP § 2 [EFH00078288 at EFH00078289].

[250]    D-DIR Carter ¶ 8 (citing DX 309, TXU Corp. Notice of Annual Meeting of Shareholders and Proxy Statement (July 24, 2007) at 2).

[251]    D-DIR Carter ¶ 9.

remaining competitive electric activities of TXU Energy Company LLC (TCEH).[252] Project Jewel was never fully completed, but TXU Corp. executed the first step of Project Jewel, in preparation for the separation, completing the internal spin of TXU Electric Delivery, (the "Oncor Transfer").[253]

94.    In an effort to satisfy IRS requirements to obtain a private letter ruling related to Project Jewel, 100% of the stock of TXU Electric Delivery was distributed (as a dividend) to its ultimate parent TXU Corp. from TXU US Holdings Company.[254] Thereafter, TXU Electric Delivery Company operated as a separate wholly-owned subsidiary of TXU Corp. (EFH).[255]

95.    Questions were raised in the claims investigation process about whether the Oncor Transfer occurred in 2007, instead of 2005.[256] Specifically, if the Oncor Transfer occurred in 2007, TCEH creditors or the TCEH estate could claim that this transaction should be collapsed into the 2007 LBO and challenged as a constructive fraudulent transfer.[257] To support this theory, the TCEH Unsecured Group identified a schedule to TXU's Form 10-K for the fiscal year ending December 31, 2006, which appears to reflect TXU Electric Delivery Company (Oncor) as a direct subsidiary of TXU US Holdings (EFCH).[258] Mr. Carter, the current Senior Vice President of Corporate Planning for EFH Corp. and former Assistant Controller for TXU Corp. from February 2005 to November 2007 testified that he believed the 10-K contained a

---

[252]    D-DIR Carter ¶ 9.

[253]    D-DIR Carter ¶ 9.

[254]    D-DIR Carter ¶¶ 10-12 (citing DX 307, Transaction Decision Document ("TDD") for TXU Corp./TXU US Holdings Company, Project Jewel-Initial Steps, dated Dec. 14, 2005 [EFH02020100 at EFH02020102]).

[255]    D-DIR Carter ¶ 11.

[256]    D-DIR Carter ¶ 13; DX 13 Statement of EFH in Support of Intercompany Settlement in the Plan, dated Apr. 4, 2015 [D.I. 4146].

[257]    See DX 13 Statement of EFH in Support of Intercompany Settlement in the Plan, dated Apr. 4, 2015 [D.I. 4146].

[258]    D-DIR Carter ¶ 13 (citing DX 560, TXU Corp. SEC Form 10-K, dated Dec. 31, 2006 at Ex. 21, pgs. 1 and 3 of 7).

typographical error,[259] as Deloitte & Touche LLP's 2006 Year-End Financial Statements and Independent Auditors' Report dated September 12, 2007 showed that "[o]n December 29, 2005, US Holdings distributed its ownership of Oncor Electric Delivery to TXU Corp. as a dividend."[260]

xiv.   Debtors' Use of Unencumbered Cash

96.    The Settlement Agreement resolves potential claims arising out of the Debtors' use of unencumbered cash, specifically unencumbered funds resulting from the 2013 wind down of TXU Receivables Company LLC's accounts receivable securitization program.[261]  Prior to the Settlement Agreement, certain TCEH creditors sought standing to avoid certain transfers and interest payments made with the unencumbered funds as impermissible preferences.[262]

97.    In October 2013, as part of the wind down of the accounts receivable securitization program, TXU Receivables Company LLC distributed approximately $335 million to a segregated, unencumbered account held by TCEH.[263]  In February 2014, TCEH made transfers totaling approximately $188 million from the unencumbered account to an encumbered account.[264]  Thereafter, TCEH made payments from the encumbered account, including an approximately $204 million interest payment to TCEH First Lien Creditors.[265]  Both the $188 million transfer and the $204 million payment were made within 90 days of EFH's filing for bankruptcy on April 29, 2014.

---

[259]    D-DIR Carter ¶ 13.

[260]    D-DIR Carter ¶¶ 3, 13-14.

[261]    *See* SA §§ 2.1-2.4.

[262]    *See* DX 8 Official Committee of Unsecured Creditors' Standing Motion, dated Mar. 10, 2015 [D.I. 3862], Exh. A at ¶¶ 86-93, Exh. B at ¶¶ 99-107, 195-210.

[263]    D-DIR Horton ¶ 96. *See* DX 928 TCEH Bank Statement, dated Oct. 1, 2013 [EFH05608700].

[264]    D-DIR Horton ¶ 97; *see* DX931 Unencumbered Cash Transfer Analysis, dated Oct. 20, 2014 [EFH02964691].

[265]    D-DIR Horton ¶ 98.

xv.    Perfection of Liens

98.    The Settlement Agreement resolves potential claims relating to the perfection of liens on or security interests in certain of the Debtors' property.  Prior to the Settlement Agreement, certain TCEH creditors sought standing to avoid the TCEH First Lien Creditors' liens on and security interests in certain property, which such TCEH creditors alleged was unperfected.

xvi.    Equitable Subordination Claims

99.    The Settlement Agreement resolves potential claims relating to the equitable subordination of the TCEH First Lien Creditors' claims.  Prior to the Settlement Agreement, certain TCEH creditors sought standing to equitably subordinate the TCEH First Lien Creditors' Claims.

xvii.    Potential Claims against the Sponsors

100.    In addition to inter-Debtor and inter-creditor claims predicated on the transactions outlined above, certain creditors have stated that there may be colorable claims against the Sponsors.

101.    On April 30, 2015, the TCEH Official Committee identified several purported claims against the Sponsors in the TCEH Litigation Letters sent to the Debtors, specifically:[266]

- Claims to avoid and/or recover advisory fees, transaction fees, and/or other monies paid to the Sponsors and/or their affiliates or representatives, including but not limited to in connection with the 2007 Management Agreement;

- Claims to avoid and/or recover the merger fee paid to the Sponsors and/or their affiliates or representatives pursuant to the Management Agreement upon the close of the 2007 LBO;

- Claims against Sponsors relating to the 2011 and 2013 amendments and extensions; and

---

[266]    *See* DX 598 Letter from C. Kerr to M. McKane and T. Walper, dated Apr. 30, 2015.

- Claims for allowing statutes of limitations to lapse with respect to various claims.[267]

102.     The TCEH Unsecured Group identified substantially identical claims.[268]   In their correspondence, neither the TCEH Official Committee nor the TCEH Unsecured Group identified any facts supporting Sponsor claims.[269]

103.     In its *Supplement to Trial Brief and Omnibus Objection of the EFH Official Committee to (I) Motion of Energy Future Holdings Corp., et al., to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter Into and Perform Under the Settlement Agreement and (II) Confirmation of the Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code Regarding S/D/O Releases* ("EFH Committee Supplemental Objection"), the EFH Official Committee alleged that the Sponsor Directors and the Sponsors were liable for breaches of fiduciary duty.[270] Specifically, the EFH Official Committee alleged that: (i) EFH was insolvent on a balance sheet basis beginning on December 31, 2008; (ii) the Sponsor Directors were "required" as fiduciaries to file EFH for bankruptcy "long before" April 2014; and (iii) the Sponsor Directors face liability for breach of fiduciary duty in connection with fees and interest paid after 2008.[271]   The EFH Official Committee also alleged that payment of advisory and financing fees to the Sponsors

---

[267]     DX 598 at 5, Letter from C. Kerr to M. McKane and T. Walper, dated Apr. 30, 2015.

[268]     DX 599 Letter from C. Shore to M. McKane, dated Apr. 30, 2015.

[269]     *See* DX 598 Letter from C. Kerr to M. McKane and T. Walper, dated Apr. 30, 2015; DX 599 Letter from C. Shore to M. McKane, dated Apr. 30, 2015.

[270]     D.I. 6643 ¶¶ 57-73 (Sponsor Directors); ¶¶ 74-86 (Sponsors).

[271]     *Id.* ¶¶ 57, 73.

constituted constructive fraudulent transfers.[272]  The EFH Official Committee did not assert any claims related to the merger fees.[273]

104.    Evidence presented at the Hearing showed that the advisory fees paid to the Sponsors were allocated to EFH Corp. in 2007, 2008, and 2009.[274]  All other advisory fees were allocated to TCEH.[275]  One financing fee payment was made by EFH Corp. on January 30, 2010, for $3,375,000.[276]  All other financing fees were paid by TCEH or by EFIH, which the EFH Committee did not claim was ever insolvent.[277]

105.    The EFH Official Committee Objection further alleged that the Sponsors were liable for aiding and abetting the Sponsor Directors' breaches of fiduciary duty, because, "[a]s a matter of course, KKR and TPG regularly discussed their investment in and the financial condition of EFH" and "strategies for dealing with EFH."[278]  The EFH Official Committee alleged that these discussions "involved high level representatives of KKR and TPG," and that "it was during those discussions that the Controlling Owners decided what actions the Sponsor Directors were to take respecting EFH."[279]

xviii.    Potential Claims against the Debtors' Directors and Officers

106.    Certain creditors have also alleged that there are potential claims against the Debtors' directors and officers in connection with nearly every challenged transaction and

---

[272]    *Id.* ¶¶ 90-104.

[273]    *See* D.I. 6627 at ¶ 144.

[274]    D-DIR Carter ¶ 42; 11/5/2015 Hr'g Tr. at 33:21-13 (Carter).

[275]    *Id.*

[276]    D-DIR Carter ¶ 52; 11/5/2015 Hr'g Tr. at 36:6-11 (Carter); DX 345 Summary of Sponsor Fees [EFH02964319].

[277]    *Id.*

[278]    D.I. 6643 ¶ 88.

[279]    *Id.*

identified litigation claim.[280]   No objecting party, however, presented any evidence at the Hearing of any substantive claim against any of the Debtors' directors or officers.

### h.    Hearing and Remaining Objections

107.    After seven Hearing days, on November 19, 2015, the Debtors closed their case-in-chief.  The Debtors' case in chief included over 1,100 pages of trial testimony, 375 pages of written declarations, and 478 exhibits.  Either before the Debtors closed their case or shortly thereafter, all but two objectors reached terms with the Debtors and withdrew their objections.[281] In addition to the support of the Settling Parties, the Settlement Agreement is also supported by Fidelity with respect to the EFH Legacy Note Claims; EFH LBO Note Claims, and EFIH Second Lien Note claims held by Fidelity; the Settling PIK Noteholders,[282] and the EFH Official Committee.  The United States Trustee has not resolved its objections to certain fees paid through the Settlement Agreement ("UST Objection")[283] and Fenicle and Fahy, asbestos plaintiffs, object that the settlement is not fair and equitable ("Asbestos Objection").[284]

108.    Relevant to the Asbestos Objection, on December 1, 2015, the Debtors filed their *Sixth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al. Pursuant to Chapter 11 of the Bankruptcy Code*.[285]   The Sixth Amended Plan contains several provisions

---

[280]    *See* DX 598 Letter from C. Kerr to M. McKane and T. Walper, dated Apr. 30, 2015 (identifying claims against directors and officers in connection with the Luminant make whole settlement, Intercompany Notes, the Competitive TSA, shared services, and the TCEH credit agreement); DX 599 Letter from C. Shore to M. McKane, dated Apr. 30, 2015 (identifying claims against directors and officers in connection with TCEH intercompany notes, the Competitive TSA, shared services, upstreaming of 2007 LBO funds, and the April 2001 amendment to the TCEH credit agreement).

[281]    *See* D.I. 7142; D.I. 7143; D.I. 7145.

[282]    "Settling PIK Noteholders" refers to holders of EFIH PIK Note Claims that are party to either of the stipulations attached as **Exhibit 1** and **Exhibit 2** to the *Order Approving Settlement of Certain EFIH PIK Noteholder Claims and Authorizing Debtors to Enter Into and Perform Under Stipulations* [D.I. 7145].

[283]    D.I. 6705.

[284]    D.I. 6610.

[285]    D.I. 7188

relevant to the treatment of asbestos-related claims. Specifically, the Sixth Amended Plan provides that asbestos-related Class A3 Legacy General Unsecured Claims Against the EFH Debtors shall be reinstated. Furthermore, the Sixth Amended Plan provides that Class A14 claims, Interests in the EFH Debtors Other than EFH Corp., held by Debtors LSGT Gas Company LLC, EECI, Inc., EEC Holdings, Inc., and LSGT SACROC, Inc., shall be reinstated.

109.    EECI, Inc., EEC Holdings, Inc., and LSGT SACROC, Inc. are all subsidiaries of LSGT Gas Company, Inc.[286] LSGT Gas Company, LLC is a subsidiary of EFH Corp.[287] Furthermore, EECI, Inc., EEC Holdings, Inc., and LSGT SACROC, Inc. possess intercompany claims against LSGT Gas Company, LLC totaling approximately $990 million.[288] LSGT Gas Company, LLC, in turn, possesses an intercompany claim against EFH Corp. totaling approximately $560 million.[289] All of these claims are being reinstated under the Sixth Amended Plan. Since 1992, the Debtors have incurred approximately $26.4 million in total asbestos expenses.[290] Given the historical rate of the Debtors' asbestos-related expenses, reinstatement of the above-described claims insures that reorganized EFH will continue to fund asbestos-related expenses that may arise at the subsidiaries discussed above.

110.    The Debtors called fifteen witnesses.[291] All submitted written direct testimony in the form of sworn declarations admitted into evidence largely without objection. Ten of the witnesses also testified live and were cross-examined. They included the Debtors' co-Chief

---

[286]    D-DIR Keglevic ¶ 84(a).

[287]    D-DIR Keglevic ¶ 84(b).

[288]    D-DIR Keglevic ¶ 84(c).

[289]    D-DIR Keglevic ¶ 84(d).

[290]    D-DIR Keglevic ¶ 82.

[291]    Three witnesses, Mr. Herr, Mr. Stuart, and Ms. Sullivan were called for Plan-related testimony. In addition, the TCEH Debtors called Eric Mendelsohn who testified on the TCEH Intercompany Notes interest rate. *See supra*, para. 56.

Restructuring Officers, CFO Paul Keglevic and General Counsel Stacey Doré, two members of the Debtors' senior finance team, Senior Vice President of Corporate Planning Michael Carter and Senior Vice President, Treasurer and Assistant Secretary Anthony Horton, and the Senior Tax Director, Kevin Ashby. The Debtors also called Jonathan Smidt, an EFH director affiliated with KKR, one of EFH's equity sponsors, and a disinterested director from each of EFH (Billie Williamson), EFIH (Charles Cremens) and TCEH (Hugh Sawyer). Written direct testimony only was submitted from Michael MacDougall, another sponsor-affiliated director at EFH, and David Ying of Evercore, Debtors' retained financial advisor. The objecting parties declined to cross-examine Mr. MacDougall and Mr. Ying. The Court finds each of these witnesses to be credible. The Debtors' management team was well acquainted with the Debtors' businesses, the Debtors' pursuit of various restructuring alternatives, and the proposed Settlement and Plan. The testimony of Mr. Smidt and Mr. MacDougall, both of whom have served as EFH directors since its creation in the 2007 LBO, explained the equity Sponsors' contributions to the Debtors' business and the consideration the Sponsors gave to facilitate the resolution of both settlement and plan negotiations. The disinterested directors, Ms. Williamson, Mr. Sawyer, and Mr. Cremens, testified convincingly about their investigation and sometimes heated and contentious negotiation of the proposed settlement of inter-Debtor claims identified by various creditor constituencies. Based on this testimony, along with other evidence presented during the trial, the Court is satisfied that Debtors' directors and management exercised sound business judgment in negotiating and recommending the proposed Settlement and Plan, and fully satisfied their fiduciary duties to their respective Debtors.

## II.    Conclusions of Law

111.    Bankruptcy Rule 9019 permits the Court to approve a proposed compromise or settlement after notice and a hearing. Fed. R. Bankr. P. 9019(a). Additionally, section 105(a) of

the Bankruptcy Code allows the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

### a.      The *Martin* Factors Are Satisfied

112.    To be approved under Rule 9019, a settlement need only be "fair and equitable," falling "above the lowest point in the range of reasonableness." *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 475-76 (Bankr. D. Del. 2010).  To make this assessment, courts in the Third Circuit apply the *Martin* factors, considering: "'(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors.'" *Id.* at 515 (quoting *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d. Cir. 1996)).

113.    In applying the *Martin* factors, courts in this Circuit "canvass" the issues and may approve a settlement only when supplied with information sufficient to form an "intelligent and objective opinion" on the claims being settled.  *See In re Capmark*, 438 B.R. at 514 (internal quotations and citation omitted).  Courts do not require a full evidentiary hearing or "mini trial" on the merits of the claims being settled.  *Id.* at 515; *In re Jasmine, Ltd.*, 258 B.R. 119, 123 (D. N.J. 2000) (stating that when deciding whether to approve a proposed compromise in a bankruptcy, the court is not to conduct a "'mini-trial' on the merits") (citations omitted); *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) (noting that the court "need not conduct a 'mini-trial' to determine the merits of the underlying litigation" being settled*)*.  Not only is a full evidentiary hearing not required before approving a settlement, but "the avoidance of litigating the issues is one of the main advantages of settlement." *In re ID Liquidation One, LLC*, 555 F. Appx 202, 207 (3d Cir. 2014) (citing *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994) and *In re Martin*, 212 B.R. 316, 319 (8th Cir. BAP 1997)

(noting that "it is not necessary for a bankruptcy court to conclusively determine claims subject to a compromise, nor must the court have all of the information necessary to resolve the factual dispute, for by so doing, there would be no need of settlement")).

114.    The parties have provided the Court with hundreds of pages of briefing on every aspect of the Settlement Agreement, and the Court received and heard extensive testimony from 14 of the Debtors' witnesses over seven days about the relative merits of the matters being settled, including the Debtors' business judgment for entering into the Settlement Agreement. The Court therefore has sufficient information to canvass the issues and assess whether the Settlement Agreement can and should be approved under Rule 9019. Having done so, the Court concludes that it can and should approve the Settlement Agreement: the settlement was negotiated at arm's length and in good faith, is in the best interests of each of the Debtors' estates, and is easily above the lowest point in the range of reasonableness, satisfying each of the *Martin* factors.

115.    The Settlement Agreement is properly analyzed under the ordinary Rule 9019 review and is not subject to any increased scrutiny. In its now-withdrawn objection, the EFH Official Committee argued that the "entire fairness" standard should apply based on an allegation that the EFH directors breached their duty of care in agreeing to the settlement. The evidence presented at the Hearing refuted that argument. The EFH Disinterested Directors were fully informed about the claims being settled and exercised their reasonable and independent judgment about the best interests of the EFH estate in negotiating and settling the claims. The EFH Official Committee also argued that "enhanced scrutiny" should apply because (1) the Settlement Agreement is part of a change-of-control transaction or (2) because it provides financial benefits for insiders. As to the first point, the Settlement Agreement is independent of the transactions

contemplated by the Plan and will stand on its own even if they are not consummated. To the second point, there is no evidence that the Settlement Agreement provides financial benefits for insiders. If simply releasing directors and officers triggered that standard of review, all global settlements would be subject to heightened scrutiny. That is not the law. *See, e.g., H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 149-50 (Del. Ch. 2003) (holding that negotiated releases for directors and officers in a settlement agreement do not make the settlement an "interested party transaction" because such releases are more or less "universal"). But even if the Court were to apply "entire fairness" or "heightened scrutiny," the Court would still approve the Settlement Agreement. It is the product of a thorough investigation of the claims being settled and extensive good faith and arm's-length negotiations that culminated in a fair and equitable settlement.

>        i.      Inter-Debtor Claims

>                (1)      Probability of Success in Litigation

116.    The $700 million Settlement Claim in favor of TCEH is easily within the range of reasonableness and is fully supported by the evidence presented at the Hearing. The Court received evidence on a broad range of potential claims, most favoring TCEH, as summarized above. A review of only a handful of the issues settled is sufficient to show that the Settlement Claim is justified by TCEH's probability of success in litigation against EFH and that the first *Martin* factor therefore supports the Settlement Agreement as an appropriate exercise of the Debtors' business judgment.

117.    First, the evidence presented at the Hearing demonstrated that it was reasonable for the Debtors to settle the allegation that TCEH is entitled to consideration for forgoing a taxable sale under the current Plan. As discussed above, a taxable sale of TCEH could result in a

significant tax liability at EFH.[292]   The amount of that tax liability at EFH depends on the fair

market value of TCEH's assets at the time of closing and other factors that cannot be known with

certainty many months in advance, especially given the substantial fluctuations in the value of

TCEH's assets since the Petition Date.[293]

118.    Furthermore, a taxable sale of TCEH would make an EFH REIT transaction

economically impossible.[294]   In a taxable sale, EFH would be required to "purge" $25–30 billion

of its historic earnings and profits through a distribution to its shareholders.[295]   This untenable

result can be avoided in a tax-free transaction if the Debtors can obtain an IRS ruling on the

allocation of the earnings and profits.[296]   Thus, without TCEH's consent to a tax-free spinoff

under the current Plan, the value-maximizing REIT transaction would be practically

impossible.[297]   Even setting aside the risk of a significant tax liability at EFH based on the value

of TCEH's assets at closing, it was reasonable for the Debtors to settle the allegation that TCEH

should be compensated for its consent to a tax-free structure, for the tax-free structure is a

necessary to the REIT conversion at the heart of the Debtors' reorganization, which, if

consummated, will pay E-side creditors in full.[298]

119.    Second, there was substantial evidence presented at the Hearing that TCEH could

have prevailed on at least a significant portion of its $754 million tax claim against EFH.[299]   The

---

[292]    *See, supra,* section I.g.viii.

[293]    D-DIR Keglevic ¶¶ 51–55; 11/4/2015 Hr'g Tr. at 38:25-39:5 (Keglevic); D-DIR Sawyer ¶ 28.

[294]    *See, supra,* section I.g.viii.

[295]    D-DIR Keglevic ¶ 58; 11/4/2015 Hr'g Tr. at 40:2-41:25 (Keglevic).

[296]    *See, supra,* section I.g.viii.

[297]    D-DIR Sawyer ¶ 28.

[298]    11/4/2015 Hr'g Tr. at 36:1-3 (Keglevic); 11/4/2015 Hr'g Tr. at 46:19-47:2 (Keglevic).

[299]    D-DIR Sawyer ¶ 19; D-DIR Williamson ¶ 47; 11/19/2015 Hearing Tr. 42:24-43:4 (Sawyer); 11/13/2015 Hr'g Tr. at 60:15-61:25 (Williamson); DX 12 EFCH and TCEH Statement in Support of Intercompany Settlement in the Plan, dated Apr. 14, 2015 [D.I. 4145].

evidence established that separately recording EFH's payable to TCEH and Luminant Generation's payable to EFH on the Debtors' SOFAs and Schedules was consistent with the Debtors' historical bookkeeping practices and application of the Competitive TSA.[300]  While alternative interpretations of the Competitive TSA are possible, the testimony at the Hearing was consistent with that application of that agreement.  For example, while the terms of the Competitive TSA were perhaps "ambiguous,"[301] the evidence demonstrated that EFH tax personnel always intended for disregarded entities to be treated as "members" of the tax sharing group under the Competitive TSA,[302] and that the Competitive TSA applied to the audit settlements giving rise to the relevant intercompany payables.[303]  The evidence further supported the inclusion of payable amounts attributable to the reduction of AMT credits at TCEH.[304]

120.  Where, as here, two payables are recorded against separate entities, the bankruptcy code will not permit a "triangular offset," as there is no mutuality of the claims.[305]  As a result, EFH faced substantial risk of liability for the $754 million payable to TCEH without a potential offset, and it was a reasonable exercise of the Debtors' business judgment to incorporate that claim into the global settlement.[306]  Moreover, the settlement of

---

[300]    11/6/2015 Hr'g Tr. at 139:3-141:20 (Ashby); DX 659 Email from K. Ashby to C. Dobry, K. Sullivan, W. Li dated June 22, 2014 [EFH06005612]; *see also* DX 892 Journal Entry Workbook dated May 31, 2014 (native xls) [EFH02410092].

[301]    11/6/2015 Hr'g Tr. at 172:5-11; 197:7-23 (Ashby).

[302]    D-DIR Ashby ¶¶ 13–20, 34; DX 424 Final EFH Transaction Decision Paper to Tax Sharing Agreement, dated Oct. 10, 2011 [EFH03344498-508]; DX 454 NOL 2010 Return Workbook (native xls) [EFH02029993]; DX 651 TAA Annex: Greenway, dated Nov. 27, 2012 [EFH04414833]; 11/6/2015 Hr'g Tr. at 151:17-152:4 (Ashby).

[303]    11/6/2015 Hr'g Tr. at 161:23-162:17 (Ashby); DX 657 Transaction Decision Paper: Mark-to-Market Settlement and Tax Sharing Considerations, dated Sept. 5, 2013 [EFH04634531 at EFH04634536-EFH04634537].

[304]    D-DIR Ashby ¶¶ 69-73; 11/6/2015 Hr'g Tr. at 157:12 - 160:7 (Ashby); *see also* DX450 AMT Credit Carryforward Workbook (native xls) [EFH02029826]; DX 974 Wire/ACH Transfer, dated Sept. 21, 2012 [EFH05511093].

[305]    11/4/2015 Hr'g Tr. at 50:1-3 (Keglevic); *see also In re Am. Home Mortg., Holdings, Inc.*, 501 B.R. 44, 56-57 (Bankr. D. Del. 2013).

[306]    D-DIR Sawyer ¶ 19; D-DIR Williamson ¶ 47.

other potential tax sharing claims, including preference and fraudulent transfer claims related to the 2013 tax sharing payment, is a reasonable exercise of the Debtors' business judgment in light of the significant uncertainty regarding such claims.

121.    Finally, TCEH holds a sizable potential claim against EFH for underpayment on the Intercompany Notes.[307]  The interest rate that EFH paid to TCEH for borrowings on certain Intercompany Notes—LIBOR plus 5%—was only a small fraction of the yield that third parties demanded on EFH's unsecured public debt securities.  The evidence presented at the Hearing showed that TCEH has a solid argument that the low rate was not justified by the notes' demand feature.  Anthony Horton, the Debtors' Treasurer, who signed the notes for both EFH and TCEH, testified that EFH intended the notes to remain outstanding for at least 7 to 10 years.[308]  Indeed, TCEH did not make a demand on the notes and continued to make substantial new advances under the notes even as EFH's credit profile deteriorated.[309]  In short, TCEH had a likelihood of a substantial claim for underpayment on these notes.[310]

122.    As the testimony presented at the Hearing, including testimony about the long course of investigation and negotiation of these claims, and the overview of claims provided by the Debtors' in their Settlement Motion demonstrate, the Settlement Agreement resolves a broad array of claims, most favoring the T-side.[311]  Even considering only three of the most prominent issues, just discussed, the resolution of these claims for a $700 million unsecured claim in favor of TCEH is easily within the range of reasonableness and a proper exercise of the Debtors'

---

[307]    D-DIR Sawyer ¶ 21; DX 12 EFCH and TCEH Statement in Support of Intercompany Settlement in the Plan, dated Apr. 14, 2015 [D.I. 4145].

[308]    D-DIR Horton ¶ 79.

[309]    D-DIR Horton ¶ 83.

[310]    *See* D-DIR Williamson ¶ 46; D-DIR Sawyer ¶ 21; D-DIR Horton ¶ 81.

[311]    *See* SA §§ 2.1-2.4.

business judgment.[312]  Given the overwhelming evidence supporting the Settlement Agreement, and the importance of the settlement to the overall reorganization, it is unsurprising that all major objections to the Settlement Agreement have been withdrawn.

(2)    Difficulties in Collection

123.    A litigation claim is only as valuable as it is collectible.  *See, e.g., In re Washington Mut., Inc.*, 442 B.R. 314, 344 (Bankr. D. Del. 2011).  Here, if any one of the Debtors were to obtain a large net judgment (accounting for setoff) on the inter-Debtor claims against another Debtor, it likely would face considerable difficulty in collecting on that judgment.  Any net judgment on account of the inter-Debtor Claims would result in an unsecured claim by the prevailing Debtor against the defendant Debtor(s).  Depending on the overall valuation of the defendant Debtor at the time of emergence, even a large unsecured claim may have little value.

124.    For example, as the EFH and EFIH Disinterested Directors testified, EFH's and EFIH's claims against the TCEH Debtors had very low likelihood of being collected because even if those claims were litigated and won, they would be among the approximately $20 billion of unsecured TCEH claims, and would be worth only a small fraction of their face value.[313] Similarly, it is unlikely that EFIH's $1.3 billion claim on the EFH Legacy Notes against EFH would be collectible for significant value, given the small amount of distributable value available at EFH and the likelihood that such value would be further depleted absent the proposed

---

[312]    D-DIR Sawyer ¶ 73.

[313]    *See* 11/13/2015 Hr'g Tr. at 70:5-9 (Williamson) ("So even if we had won all of those claims, and had a billion dollars of claim against the T-side, we would have gone into this lovely bucket of $20 billion of unsecured claims, so we would have only receive pennies on the dollar."), 71:5-19 ("And so I didn't feel like spending that money on litigating those kinds of claims would make a lot of sense, when I wasn't going to collect much in return, because those would be mostly unsecured claims, and therefore they would go in that bucket."), 144:17-145:2; 11/19/2015 Hr'g Tr. at 106:22-25 (Cremens) ("[A]s it relates to TCEH, TCEH was insolvent by billions of dollars. And we looked at those claims both on the merits, and what would be the be[ne]fit of pursuing those claims.  And it would be little benefit of opportunity for value."); D-DIR Cremens ¶¶ 24 ("[T]he effort needed to establish a claim [against TCEH] would likely be wasted, because EFIH would not be able to collect.").

settlement.[314]  Consequently, if EFIH were unable to satisfy all allowed claims against it, its claim against EFH would be diluted among the unsecured claims against EFH and therefore would be worth only a fraction of its face value; alternatively, if EFIH were able to satisfy all allowed claims against it, any value from the $1.3 billion claim against EFH would flow back up to EFH.[315]

(3)    Complexity, Expense, and Delay of Litigation

125.    Litigation of the claims being settled could drag on for many months or even years and would cost the estates tens, if not hundreds, of millions of dollars in attorneys' and other professional fees.[316]  Complicated factual and legal questions concerning the timeliness of many of these claims would be litigated on motions to dismiss and summary judgment, adding significant expense and uncertainty before even getting to trial.[317]  And even after trial, there is the possibility that losing parties would appeal the judgment and cause further delay and expense. *See In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 242-43 (Bankr. S.D.N.Y. 2007). Extensive expert work would be required for most claims, ensuring that discovery would be protracted, complex, and costly.[318]  In addition to these direct litigation costs, litigation would materially delay the Debtors' emergence from bankruptcy, causing additional post-petition interest to accrue on claims against EFIH and EFH.[319]  Litigation would also continue to distract the Debtors' key management personnel from their primary responsibility—running those

---

[314]    *See* D-DIR Cremens ¶¶ 25, 35-36; 11/19/2015 Hr'g Tr. at 105:13-106:21 (Cremens); 11/3/2015 Hr'g Tr. at 142:6-16 (Williamson).

[315]    D-DIR Cremens ¶¶ 26, 36; 11/19/2015 Hr'g Tr. at 106:5-21 (Cremens) ("[W]e realized that pursuing claims against EFH, the parent, would just be a circular situation, if in fact, we won on any claims against EFH").

[316]    *See, e.g.,* D-DIR Doré ¶¶ 31-32; 11/12/2015 Hr'g Tr. at 64:20-71:10 (Doré); D-DIR Sawyer ¶¶ 30, 42.

[317]    D-DIR Sawyer ¶¶ 30, 42; 9/24/2015 Sawyer Dep. Tr. 722:6-18; 822:11-12, 822:20-823:2.

[318]    D-DIR Sawyer ¶¶ 30, 42.

[319]    D-DIR Sawyer ¶ 63.

businesses—as they would be forced to respond to the many demands for their time and attention that litigation would inevitably entail.[320]  In short, it would be unnecessarily wasteful to pursue judicial resolution of each of these claims when a consensual resolution is possible, making this "the precise type of multi-faceted litigation that cries out for settlement." *In re Washington Mut., Inc.*, 442 B.R. at 345.[321]

(4)    <u>Paramount Interests of the Creditors</u>

126.    After a long and highly contentious process up to and through the Hearing, the Settlement Agreement now has the overwhelming support of creditors at every level of the Debtors' capital structure, across each of the estates, E-side and T-side.  The EFH and TCEH Official Committees support the Settlement Agreement and the vast majority of objections have been withdrawn.[322]  This wide-ranging support reinforces that the Settlement Agreement is in the best interests of the creditors and avoids draining estate resources through massive litigation.[323] Given the breadth and complexity of the settled claims, litigation would likely remove millions of dollars from the Debtors' estates that could otherwise be used to satisfy creditor claims.  *See In re Kaiser Aluminum Corp.*, 339 B.R. 91, 96 (D. Del. 2006) (approving a settlement that "serves the best interest of the estate and the creditors by arranging for a global settlement which will facilitate a plan of reorganization that will ultimately benefit all creditors and reduce the fees, costs and expenses that the estate would have had to bear in order to litigate the extensive, complex and uncertain issues raised by [the] claim").  Professional expenses in this case average approximately $30 to $35 million per month.[324]  Beyond that, the Debtors are required to pay

---

[320]     D-DIR Sawyer ¶ 30.

[321]     *See* D-DIR Doré ¶¶ 31-34, 47.

[322]     D.I. 7142; D.I. 7143; D.I. 7145.

[323]     *See* D-DIR Doré ¶¶ 31-34.

[324]     *See* D-DIR Keglevic at ¶73.

approximately $100 million per month in adequate protection payments.[325]  In addition to these

basic costs, the Debtors are paying above-market interest rates on outstanding debt, such as the

EFIH Second Lien debt.[326]  Absent a settlement, all of these expenses would continue to accrue,

potentially for years, to the detriment of Debtors and their creditors.  Of course, prolonging

litigation and restructuring process would also continue to distract the Debtors' management and

employees from their primary responsibilities—running the day-to-day business of the company.

Finally, in addition to the benefit the settlement brings in terms of reduction of costs, resolution

of these claims is in the creditors' best interest because it provides them with some certainty

about their recoveries and hastens the Debtors' emergence from bankruptcy.

     ii.  Inter-Creditor Claims

   127.  Similarly, the settlement of all claims and causes of action against the TCEH First

Lien Creditors on the terms set forth in the Settlement Agreement satisfies the *Martin* factors and

is well above the lowest point in the range of reasonableness.  Notably, settlement of claims

against the TCEH First Lien Creditors was unopposed, other than allocation of proceeds.  As set

forth in the Standing Motions and the objections thereto, any litigation involving claims against

the TCEH First Lien Creditors would implicate numerous contested issues of fact and law,

including, among others, issues regarding solvency, reasonably equivalent value, the applicable

statute of limitations, and the scope of certain affirmative defenses, such as section 546(e) of the

Bankruptcy Code.  The settlement of all claims and causes of action against the TCEH First Lien

Creditors was the product of extensive arm's-length and good faith negotiations conducted

pursuant to a Court-ordered mediation process, and its approval is in the best interest of the

Debtors' estates.

---

[325]  *See* D-DIR Kelgevic at ¶73.

[326]  *See* 11/4/15 Hr'g Tr. at 20:5-20 (Keglevic).

### iii.    **Sponsor/Director/Officer Releases**

128.    The vast majority of the objections have now been withdrawn, and this includes the objections once raised by the EFH Committee with respect to the Settlement Agreement's releases of the Sponsors and the Debtors' directors and officers ("S/D/O Releases").  Regardless, the S/D/O Releases were plainly reasonable.  Because the S/D/O Releases are part of a pre-Plan settlement, they are properly analyzed under the same Rule 9019 standard, *i.e.,* the *Martin* factors.  The parties have also analyzed the S/D/O Releases under the standard set out by *In re Zenith Electronics Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999), for releases in a plan of reorganization.  Regardless of the standard applied—*Martin* or *Zenith*—the S/D/O Releases are an appropriate part of the Settlement Agreement and will be approved.

129.    Although certain creditors identified possible claims against the Sponsors and the Debtors' directors and officers, none of them presented evidence at trial adequate to substantiate those claims.  There was no evidence that the Sponsors, for instance, did not provide reasonably equivalent value in exchange for the advisory fees they received.  To the contrary, the evidence reflected the Sponsors' valuable contributions to the management of the Debtors over time.[327] There likewise was no evidence introduced at trial from which a trier of fact could conclude that the Debtors' directors or officers, including the Sponsor directors, breached any fiduciary duties they owed to their respective companies.  In terms of dollars at issue, the most significant potential S/D/O claims relate to the 2007 LBO and Management Agreement.[328]  There is no dispute, however, that these claims have no colorable basis.[329]  Despite years of investigation and

---

[327]    *See, e.g.*, D-DIR Doré ¶ 44; D-DIR Keglevic ¶ 113.

[328]    D.I. 5249 at ¶¶ 86–110.

[329]    *See, e.g.*, EFH Committee Obj. at ¶ 144 (conceding that there is "no colorable basis" to challenge the 2007 LBO).

their (now-withdrawn) objections, creditors struggled to identify any viable S/D/O claims.[330] Under *Martin*, the Debtors' release of these ill-defined and valueless S/D/O claims is reasonable and appropriate.

130.    Further, there was no evidence presented at the Hearing supporting creditor allegations that the Disinterested Directors were dominated or coopted to support the Sponsor releases.    The potential claims against the Sponsors were investigated prepetition by an independent law firm, Sidley Austin, the results of which were presented to the non-Sponsor Directors.[331]  The releases of those claims were supported by the board and management of the Debtors, as well as by key E-Side creditors, who corroborated that the releases were appropriate with their own due diligence.[332]   The Sponsor releases were again approved post-petition by independent Special Committees, comprised of directors not affiliated with the Sponsors.[333]

131.    Even ignoring the failure of the extensive Debtor and creditor investigations to substantiate or factually support any claims related to the S/D/O Releases, the releases are plainly "above the lowest point in the range of reasonableness" in light of the substantial contributions made by the Sponsors and the Debtors' directors and officers to the Debtors'

---

[330]    11/4/2015 Hr'g Tr. at 67:15-68:15 (Keglevic); D-DIR Doré ¶ 45.

[331]    D-DIR Doré ¶¶ 18, 20; D-DIR Williamson_R ¶¶ 7, 56; DX 101 Minutes of a Meeting of the Non-Sponsor Directors, dated Sept. 11, 2013 [EFH04293387]; DX102 Minutes of a Meeting of the Non-Sponsor Directors, dated Sept. 11, 2013 [EFH03932555]; DX 103 Minutes of a Meeting of the Non-Sponsor Directors, dated Sept. 20, 2013 [EFH04293389]; DX118 Minutes of a Meeting of the Non-Sponsor Directors, dated Sept. 20, 2013 [EFH03932557]; DX 105 Minutes of a Meeting of the Non-Sponsor Directors, dated Oct. 3, 2013 [EFH04293390].

[332]    D-DIR Doré ¶ 21; D-DIR Cremens ¶ 37; D-DIR Williamson_R ¶ 58; DX 71, Minutes of a Joint Board Meeting, dated Apr. 28, 2014 [EFH2D00090303].

[333]    D-DIR Doré ¶¶ 38, 39, 41; D-DIR Williamson_R ¶ 8; D-DIR Sawyer ¶ 65; 11/13/2015 Hr'g Tr. at 74:9-17, 18-20 (Williamson); 11/19/2015 Hr'g Tr. at 61:15-62:7(Sawyer); DX 240 Minutes of the Meeting of the Special Committee of the Board of Directors, dated Apr. 7, 2015 [EFH06004369]; DX 257, Minutes of a Meeting of the EFH Corp. Special Committee, dated Apr. 10, 2015 [EFH06004366-EFH06004367]; DX 245 TCEH/EFCH Minutes of the Joint Meeting of the Special Committees of the Boards of Managers dated Apr. 9, 2015 [EFH06004372 at EFH06004372-75].

reorganization efforts.[334]   *See Zenith*, 241 B.R. at 110.   The Sponsors gave up significant consideration in exchange for their releases.   Texas Holdings, despite owning 99% of EFH equity, has agreed that, once the Settlement Agreement is approved and regardless of whether the Plan is consummated, it will assign any recovery on account of its equity interest to the T-Side unsecured creditors.[335]   The Sponsors have further agreed to waive all prepetition claims against the Debtors, including indemnity claims and claims for approximately $80 million in advisory fees,[336] with the exception of a claim for up to $15 million in fees and expenses, which EFH has agreed to pay Texas Holdings only on the Effective Date of the Plan.[337]   Finally, Texas Holdings has agreed not to take a worthless stock deduction with respect to its equity interest in EFH before the consummation of the Plan, if doing so would give rise to a change of ownership for tax purposes.[338]   The Sponsors made these concessions as part of a global resolution with the understanding that they will receive releases from the Debtors under the Settlement Agreement.[339]

---

[334]   11/4/2015 Hr'g Tr. at 64:14-65:18 (Keglevic).

[335]   D-DIR MacDougall ¶¶ 32-33; D-DIR Smidt ¶ 39; DX 967, 9/17/2015 Revised Settlement Agreement, § 2.3(a); 11/6/2015 Hr'g Tr. at 67:19-69:4 (Smidt); 11/4/2015 Hr'g Tr. at 33:11-20 (Keglevic); 11/13/2015 Hr'g Tr. at 84:22-85:2, 185:1-4 (Williamson); D-DIR Sawyer ¶ 64; D-DIR Cremens ¶ 37; D-DIR Williamson ¶ 76; D-DIR Keglevic ¶¶ 112, 120.

[336]   D-DIR MacDougall ¶¶ 23, 34; D-DIR Smidt ¶ 37; DX339, 10/10/2007 Management Agreement, § 1; 11/4/2015 Hr'g Tr. at 33:20-21 (Keglevic); 11/13/2015 Hr'g Tr. at 85:3-11, 185:14-15 (Williamson); D-DIR Cremens ¶ 37; D-DIR Williamson ¶ 76; D-DIR Keglevic ¶ 112.

[337]   D-DIR MacDougall ¶ 35; D-DIR Smidt ¶ 38; 9/17/2015 Revised Settlement Agreement, § 2.7(d); 11/13/2015 Hr'g Tr. at 85:15-18 (Williamson); D-DIR Sawyer ¶¶ 64, 66.

[338]   D-DIR MacDougall ¶ 36; D-DIR Smidt ¶ 40; 9/17/2015 Revised Settlement Agreement, § 2.3(b); 11/4/2015 Hr'g Tr. at 33:22-34:4 (Keglevic); 11/13/2015 Hr'g Tr. at 85:11-15, 185:4-7 (Williamson); D-DIR Sawyer ¶ 64; D-DIR Cremens ¶ 37; D-DIR Williamson ¶ 76; D-DIR Keglevic ¶ 112.

[339]   D-DIR MacDougall ¶ 37; D-DIR Smidt ¶¶ 36-40; 11/6/2015 Hr'g Tr. at 67:19-69:4 (Smidt) ("And in return for giving that [upside] up, we wanted something in return and those were our releases, in addition to the other two, you know, elements we're giving up, so why would we give those up without getting anything in return."); 11/4/2015 Hr'g Tr. at 98:19-24 (Keglevic); 11/12/2015 Hr'g Tr. at 72:3-16 (Doré); 11/13/2015 Hr'g Tr. at 83:21-85:18 (Williamson); D-DIR Sawyer ¶ 64; D-DIR Cremens ¶ 37; D-DIR Keglevic ¶¶ 111-113, 116, 120; 10/7/2015 Siegert Dep. Tr. 60:9-23.

132.   These contributions are critical to the success of the Debtors reorganization efforts.[340] In particular, the Texas Holdings' agreement to assign the proceeds of any recovery on account of its equity interest in EFH to the TCEH Unsecured Group—before consummation of the Plan—was required by the TCEH Unsecured Group in order to disarm and undertake the Plan transactions.[341]

133.   Absent the assignment, the TCEH Unsecured Group would face the risk of expending substantial time and resources in pursuing the transactions contemplated by the Plan, including to obtain regulatory approvals, and not receiving compensation for that effort in the event the Debtors exercise their "fiduciary out" and pursue an alternative transaction.[342] In addition, the Sponsors' agreement to waive all claims against the EFH estate—except a claim for up to $15 million that would be payable only if other EFH creditors are paid in full upon consummation of the Plan—eliminates significant liabilities for EFH, including claims for approximately $80 million in advisory fees.[343]

134.   Although not necessary for approval of the releases, the Court may also take into account the Sponsors' substantial non-monetary contributions. Representatives of the Sponsors devoted massive time and effort to this restructuring, beyond what would be required of directors.[344] During these cases, Sponsor Directors have attended board meetings on a weekly basis or more, in addition to many other meetings and calls.[345] The Sponsors and their advisors have also been heavily involved in discussions and negotiations with creditors, both before and

---

[340]   11/4/2015 Hr'g Tr. at 33:14-34:9, 34:20-35:1 (Keglevic).

[341]   D-DIR MacDougall ¶¶ 32-33 (describing the Sponsors' assigning of proceeds)

[342]   D-DIR MacDougall ¶¶ 32-33; 11/6/2015 Hr'g Tr. at 67:25-69:4.

[343]   *See e.g.,* 11/5/2015 Hr'g Tr. at 84:22-85:13 (Michael Carter testifying that EFH Corp. would be "on the hook" for all unpaid management fees under the management agreement).

[344]   11/12/2015 Tr. at 78:3-20 (Doré).

[345]   D-DIR Smidt ¶ 34; D-DIR MacDougall ¶ 28; ECX 149, ECX 641,

after the Petition Date.[346]  In 2015, the Sponsors (through their advisors) were directly involved in exploring the REIT transaction that became the basis for the Plan.[347]

135.    Before withdrawing their objections, certain E-side creditors objected to the independence of the Settlement Agreement from the Plan.[348]  That is, they contended that the settlement should only be operative if the Plan goes effective.  These objections were not well-founded in light of the Rule 9019 standard.  *See, e.g., Capmark*, 438 B.R. at 475-76.  The question for the Court is whether the particular compromises in the Settlement Agreement fall above the lowest point in the range of reasonableness.  This test does not change merely because in the future the settled claims *may* have some hold-up value with respect to a different transaction (i.e., the transactions contemplated by any alternative plan of reorganization). Eliminating the risk of a hold-up from future negotiations is simply another reason to settle these claims reasonably and remove the cloud of complex and costly litigation from the Debtors' restructuring.

136.    Moreover, the independence of the Settlement Agreement is a central component of the Debtors' overall reorganization.  Parties, such as the Sponsors, are providing crucial consideration *now*—including waiving claims and agreeing to assign the proceeds of any recovery on account of their equity interest in EFH to the TCEH Unsecured Group—in exchange for releases *now*.  If the releases for those parties were contingent on the Plan's consummation, it is highly unlikely that this fundamental support for the Debtors' reorganization could have been obtained at all.[349]  In addition, there was overwhelming evidence that Disarmament, which rests

---

[346]    D-DIR Smidt ¶¶ 32-33; D-DIR MacDougall ¶¶ 26-27.

[347]    D-DIR Smidt ¶ 34; D-DIR MacDougall ¶ 29; ECX 149, ECX 537, ECX 641

[348]    EFH Committee Obj. ¶ 197; *see also* PIK Settlement Obj. ¶ 31.

[349]    *See e.g.*, 11/6/15 Hearing Tr. 67:19-68:4 (Smidt); MacDougall Dep. Tr. 114:2-117:9.

on the independence of the Settlement Agreement, was the Debtors' essential price for pursuit of the value-maximizing REIT reorganization.[350]  The Debtors could not reasonably pursue this Plan while risking a return to square one in six or eight months if the transactions contemplated by the Plan fail to close.[351]

137.    To the extent that *Zenith* requires the non-Sponsor directors and officers to earn their releases beyond garnering the support of over 95% of their creditors, they have done so through their efforts in support of the Debtors' restructuring—a complex process that has required years of work and hundreds of board meetings to produce the desired, almost entirely consensual result.[352]

138.    Finally, it would have been ill-advised for the Debtors to pursue S/D/O claims given the identity of interest between the Sponsors and the Debtors' directors and officers and the Debtors.  As part of the 2007 leveraged buyout, EFH agreed to pay fees and indemnify the Sponsors for any and all claims, obligations, liabilities, causes of action, judgments, attorney's fees and costs incurred by the Sponsors in connection with certain acts, failures to act, and events.[353]  In addition, the Debtors' corporate charters contain indemnification obligations for the directors/members.[354]  Accordingly, if the Sponsors or directors or officers were sued, they would be able to request indemnification from the Debtors.[355]

---

[350]    D-DIR Keglevic at ¶¶ 35, 63; 11/12/2015 Hr'g Tr. 93:10-13 (Doré).

[351]    D-DIR Keglevic at ¶¶ 35, 63.

[352]    D-DIR Doré ¶ 46; D-DIR Keglevic ¶ 115.

[353]    DX 339, 10/10/2007 Management Agreement, § 5; DX 338, 10/10/2007 Indemnification Agreement, § 2.

[354]    DX 979, 9/15/2011 Second Amended and Restated Limited Liability Company Agreement of Energy Future Holding Company LLC, § 5.1; DX 983, 10/5/2007 Second Amended and Restated Articles of Incorporation of TXU US Holdings Company, Art. IX; DX 984, 10/10/2007 Office of the Secretary of State Letter to Little enclosing certificate of Filing of Restated Certificate of Formation (EFH Corp.), Art. IX; DX 987, 4/11/2013 Amended and Restated Certificate of Formation of EFH2 Corp., Art. VIII;  DX 989, 4/23/2013 Office of the Secretary of State Certificate of Filing of Energy Future Holdings Corp. re Restated Certificate of Formation (EFH Corp.), Art. VIII; DX 990, 9/29/2006, Third Amended and Restated Limited Liability Company Agreement of TXU

139.    In short, it was plainly reasonable for the Debtors to include S/D/O Releases in the Settlement Agreement. The releases of the Sponsors and the Debtors' directors and officers are essential to the Settlement Agreement and have yielded significant and important benefits to the Debtors. The releases achieved Disarmament, which litigation against the Sponsors or the Debtors' directors and officers would have prevented.[356] Litigation of any claims against the Sponsors or the Debtors' directors and officers would have been costly and potentially delayed emergence, which would have in turn forced management to focus on restructuring rather than critical business operations.[357] Further, any proposed litigation against the Sponsors and the Debtors' directors and officers would have exposed the Debtors to further indemnification costs and damages and reduced creditor recovery.[358] Moreover, both the Sponsors and the Debtors' directors and officers have made measurable contributions to the Debtors' restructuring, and the claims against them were speculative at best.[359] Even ignoring the failure of the extensive Debtor and creditor investigations to provide evidentiary support for any of their S/D/O claims, the releases are plainly "above the lowest point in the range of reasonableness" in light of the

---

Energy Company LLC, § 12.01; DX 992, 7/8/2008 Amended and Restated LLC Agreement of EFIH, § 5.1; DX 991, 10/5/2007 Amended and Restated Limited Liability Company Agreement of Energy Future Intermediate Holding Company LLC, § 5.1; DX 993, 4/15/2013 Limited Liability Company Agreement of Energy Future Competitive Holdings Company LLC, § 5.1.

[355]    *See* DX 338, 10/10/2007 Indemnification Agreement, § 2; 11/13/2015 Hr'g Tr. at 64:14-24 (Williamson) ("if anyone won a judgment against the sponsors, the sponsors could put that back to the company and we would have to reimburse for that"), 176:3-11; 11/19/2015 Hr'g Tr. at 49:18-20 (Sawyer) ("These D's and O's and the sponsors were all indemnified by EFH and should that indemnification be invoked it would dilute the recovery to my estates."); D-DIR Williamson ¶¶ 49, 60; D-DIR Cremens ¶ 37; D-DIR Sawyer ¶¶ 35, 66; D-DIR MacDougall ¶ 35 (identifying the Sponsors waiver of indemnification rights as a reason for their release); D-DIR Sawyer ¶ 64.

[356]    D-DIR Doré ¶¶ 42, 47; D-DIR Cremens ¶ 37; 11/4/2015 Hr'g Tr. 13:22-14:8 (Keglevic); 11/6/2015 Hr'g Tr. 67:19-69:4 (Smidt); 11/12/2015 Hr'g Tr. 72:3-16 (Doré).

[357]    D-DIR Doré ¶¶ 42, 47; D-DIR Sawyer ¶ 66; D-DIR Williamson_R ¶ 60; D-DIR Keglevic ¶ 111.

[358]    D-DIR Sawyer ¶ 35; D-DIR Williamson_R ¶ 60; D-DIR Keglevic ¶ 114; 11/19/2015 Hr'g Tr. at 49:12-20 (Sawyer); DX 255, Presentation to Board: Bases for Sponsor Releases Under the Plan of Reorganization, dated Apr. 10, 2015 [EFH05549280 at EFH05549293].

[359]    D-DIR Sawyer ¶ 64; D-DIR MacDougall ¶¶ 27-29; D-DIR Smidt ¶¶ 33-34; 11/6/2015 Hr'g Tr. 64:4-65:17 (Smidt); 11/12/2015 Hr'g Tr. 77:25-78:20 (Doré).

substantial contributions made by the Sponsors and the Debtor's directors and officers.[360]  *See*

*Zenith*, 241 B.R. at 110.

### b.    Remaining Objections

140.    Only two objections to the Settlement Agreement have not been withdrawn—the

UST Objection and the Asbestos Objection.  The Asbestos Objection is overruled and the UST

Objection is sustained in part and overruled in part.

141.    On its face, the UST Objection does not dispute that the Settlement Agreement is

fair, equitable, in the best interests of the Debtors' estates and falls above the lowest point in the

range of reasonableness.  To the extent that the UST Objection purports to do so, it is overruled

for the reasons stated above.

142.    In its Objection, the United States Trustee asks the Court to apply the standards of

section 503(b) to the payment of certain creditors' professional fees under section 2.7(a) of the

Settlement Agreement.  As set forth in the the Court's ruling on the record on December 3, 2015

(the "Confirmation Ruling"), the Court believes that, in this case, it is appropriate to apply the

standards of section 503(b) of the Bankruptcy Code to the Settlement Agreement. Accordingly,

the Court concludes that all of the parties being paid through section 2.7(a) of the Settlement

Agreement (the "Section 2.7(a) Parties") have made substantial contributions in this Chapter 11

case and are entitled to their actual and necessary expenses under 503(b)(3)(D) of the

Bankruptcy Code and compensation under section 503(b)(5) of the Bankruptcy Code and their

professionals are entitled to compensation and reimbursement of actual, necessary expenses

incurred by such professionals under section 503(b)(4) of the Bankruptcy Code.  The Section

2.7(a) Parties and their professionals were active contributors to the architecture of the Plan,

---

[360]    11/4/2015 Hr'g Tr. at 64:14-65:18 (Keglevic).

arranged the billions of dollars in new debt and equity financing necessary to propose and consummate that Plan, and have provided their consent to releases of inter-Debtor and Legacy Claims—the key to complete Disarmament and a centerpiece of the Debtors' reorganization.[361]

143.    Section 2.7(b) of the Settlement Agreement provides that on the Effective Date of the Plan, EFH shall pay up to $15 million to Texas Holdings to cover fees and expenses. Section 2.7(b) is part of an overall settlement that includes a waiver of pre-petition claims: the Sponsors have broad indemnity rights against the Debtors, as well as claims for approximately $80 million in unpaid advisory fees. They have agreed to forgo those claims and other recoveries, other than as provided in section 2.7(b). The payment to Texas Holdings, moreover, will be made only if the Plan is consummated. In that case, all other creditors of EFH will be paid in full as a result of the new investments being made in connection with the Plan. In any event, the Court concludes that the standards of section 503(b) were again satisfied based on the substantial contributions made by the Sponsors and their professionals to the Debtors' restructuring.

144.    The Asbestos Objection raises concerns about intercompany claims held by EECI, Inc., EEC Holdings, Inc., LSGT SACROC, Inc., and LSGT Gas Company, Inc. The Asbestos Objection is also premised on the assertion that the Debtors' Settlement Agreement and Plan does not adequately provide for satisfaction of claims held by Shirley Fenicle and David William Fahy relating to the operations of EECI, Inc., EEC Holdings, Inc., LSGT SACROC, Inc., and LSGT Gas Company, Inc. The Settlement Agreement is clear on its face that the intercompany claims held by EECI and other EFH Debtors against EFH Corp. are not released.[362]

---

[361]    *See e.g.*, 11/12/2015 Hr'g Tr. at 64:6-17; 143:2-9 (Doré); Settlement Agreement § 2.7(a) ("In exchange for the applicable Parties' agreements contained in the Plan Support Agreement, as well as their agreement to the settlements and releases set forth herein . . ..").

[362]    SA § 2.1(a) (releasing only "Non-EFH Debtor Intercompany Claims" against the EFH Debtors).

145.    Moreover, the Sixth Amended Plan provides that Class A14 Claims held by EECI, Inc., EEC Holdings, Inc., LSGT SACROC, Inc., and LSGT Gas Company, Inc. shall be reinstated, and similarly provides for reinstatement of asbestos-related Class A3 Legacy Unsecured Claims Against the EFH Debtors.  As the Court already found, reinstatement ensures that reorganized EFH will continue to fund asbestos-related expenses that may arise at the subsidiaries.

146.    Because the Settlement Agreement does not release the claims of EECI, Inc., EEC Holdings, Inc., LSGT SACROC, Inc., and LSGT Gas Company, Inc. against other EFH Debtors, and because the Sixth Amended Plan provides for the Reinstatement of Claims held by EECI, Inc., EEC Holdings, Inc., LSGT SACROC, Inc., and LSGT Gas Company, Inc., as well as asbestos-related Class A3 Legacy Unsecured Claims Against the EFH Debtors, the Asbestos Objection is unfounded and is overruled.

**c.    Summary**

147.    Given the facts and circumstances of these Chapter 11 Cases, and the nature of the claims and causes of action that have been alleged and asserted in the Standing Motions and the Litigation Letters, the compromises contained in the Settlement Agreement are fair, reasonable, and adequate, in the best interests of the Debtors' estates and their creditors, and represent a valid and proper exercise of the Debtors' business judgment.[363]

148.    The settlement and compromises set forth in the Settlement Agreement are the product of arm's-length and good faith negotiations between sophisticated parties, represented by counsel and other advisors.

---

[363]    D-DIR Sawyer ¶ 73.

149.    The Settlement Agreement confers substantial benefits upon the Debtors' estates, by, among other things, providing for:  (a) the resolution of the Standing Motions and the Litigation Letters, and the alleged claims and causes of action the Debtors may have against each other and certain major stakeholders, on a negotiated basis, and on terms negotiated at arm's length; (b) the resolution and immediate elimination of certain contested issues in these Chapter 11 Cases; and (c) the elimination of the substantial expense, delay, and risk of loss associated with litigation of the foregoing matters.[364]

150.    The compromise and settlement of claims and causes of action set forth in the Settlement Agreement substantially exceeds the lowest point in the range of reasonableness.  The benefits and consideration that the Settlement Parties are providing or have provided to each other under the Settlement Agreement, including the allowance of certain claims, the release of certain claims and causes of action, and entry into the Plan Support Agreement, are fair, equitable, and for adequate consideration and constitute reasonably equivalent value, and are not subject to avoidance under any applicable law or in equity.

151.    The settlement and compromises described in the Settlement Motion, as more fully set forth in the Settlement Agreement, are fair and reasonable and supported by sound business justifications, and there is no *bona fide* basis for any claims or actions against the Debtors or any other Settlement Party arising out of their participation in the negotiation and implementation of the relief requested in the Settlement Motion.

152.    The settlement and compromises set forth in the Settlement Agreement are fair and reasonable to, and are in the best interests of, the Debtors and their estates, the other Settlement Parties, and the Debtors' other creditors, and in entering into the Settlement

---

[364]     *See, e.g.,* D-DIR Sawyer ¶¶ 53-57.

Agreement, the Settlement Parties have exercised their respective rights and powers, and used the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances.

153.    Upon entry of this Settlement Order, and subject to the terms of the Court's order set forth in the lettered paragraphs below, each of the Debtors and each of the other Settlement Parties (1) has full power and authority to enter into and perform all of their obligations under the Settlement Agreement and all other documents contemplated thereby, (2) has full power and authority to take any and all action necessary to authorize and approve the Settlement Agreement and the transactions contemplated thereby and has requested and obtained all necessary approvals required to do so, and (3) is legally authorized to enter into and perform the Settlement Agreement and to take any and all actions necessary to authorize, approve and implement the Settlement Agreement and the transactions contemplated thereby.

154.    Based on the findings set forth above, the Court's Confirmation Ruling, as well as the extensive record before the Court, the Court hereby concludes as a matter of law that the Settlement Agreement satisfies the legal requirements for approval of a settlement under Fed. R. Bankr. P. 9019(a) in this jurisdiction, and that the Debtors' entry into and performance under the Settlement Agreement is an appropriate exercise of the Debtors' business judgment and satisfies the legal requirements for approval in this jurisdiction.

155.    Even if the Court were to apply "entire fairness" or "heightened scrutiny," the Settlement Agreement would still pass muster.  The process by which the Settlement Agreement was negotiated was a protracted, arm's-length, good faith, and entirely fair one.  Likewise, the result reached, and the distribution on the TCEH Settlement Claim only in the event of an

alternative restructuring, is entirely fair and equitable. Accordingly, the Court would approve the Settlement Agreement even if an "entire fairness" or "heightened scrutiny" standard applied.

**ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT**:

A.     The Settlement Motion is **GRANTED** as set forth herein and in the Court's Confirmation Ruling, and any objections to the Settlement Motion not previously withdrawn, waived, or settled, and all reservations of rights included therein, are hereby overruled with prejudice.

B.     Pursuant to Fed. R. Bankr. P. 9019(a), the Settlement Agreement, a true and correct copy of which is attached hereto as Exhibit A, is hereby approved as set forth herein. Subject to paragraph K below, all of its terms are incorporated herein by reference (and the failure to specifically describe or include herein any particular provision of the Settlement Agreement shall not diminish or impair the effectiveness of any such provision) and upon entry of this Settlement Order is fully binding, effective, and enforceable as to each and all of the Settlement Parties, and shall remain binding on all Parties regardless of whether the Plan is confirmed or consummated.

C.     The settlement and compromises set forth in the Settlement Agreement and the execution and delivery of the Settlement Agreement by the Settlement Parties, including the Debtors and TCEH Official Committee, are hereby approved.

D.     The Debtors and each of the Settlement Parties are authorized and directed to execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers and to take any and all actions reasonably necessary or appropriate to consummate, complete, execute, and implement the Settlement Agreement in accordance with the terms and conditions thereof.

E.     This Settlement Order (including the Settlement Agreement attached hereto and incorporated herein by reference), together with all of the findings of fact and conclusions of law contained herein and as set forth on the record of the Hearing on the Settlement Motion, is and shall be final, binding, and effective on all parties in interest in the Debtors' Chapter 11 Cases (including any subsequently appointed chapter 11 or chapter 7 trustee or any representative of any of the Debtors' estates appointed pursuant to 11 U.S.C. § 1123), as well as on each of the Settlement Parties and each of their present and former parents, affiliates, direct and indirect subsidiaries, directors, shareholders, members, partners, officers, managers, predecessors, successors, and assigns.  To the extent any of the Settlement Parties subsequently files for bankruptcy (or is otherwise subject to bankruptcy proceedings), this Settlement Order shall be binding upon them, each of their present and former parents, affiliates, direct and indirect subsidiaries, directors, shareholders, members, partners, officers, managers, predecessors, successors and assigns, and on any trustee appointed in such bankruptcy cases (if any), and may not be modified or amended by virtue of any actions in such proceedings.

F.     The releases contained in Sections 2.1, 2.2, 2.3, and 2.4 of the Settlement Agreement (the "Releases") are hereby approved and incorporated by reference into this paragraph F of this Settlement Order and shall be immediately effective upon entry of this Settlement Order, and each Settlement Party, TCEH First Lien Releasor Party, TCEH Creditor Releasor Party, EFH Interest Holder Releasor Party, Settling Interest Holder Releasor Party, Debtor Releasor Party, and Debtor Party Releasor Party shall be deemed fully and forever to have released any and all Claims and Causes of Action released pursuant to the Settlement Agreement.  Notwithstanding anything to the contrary herein, nothing in this Settlement Order shall (a) release the Settlement Parties from any obligations they may have under the Settlement

Agreement, the Plan Support Agreement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, or for, upon or by reason of any cause whatsoever from and after the Settlement Effective Date, or (b) release or be deemed to release any Claims for any of the EFH Debtors' or EFIH Debtors' funded indebtedness or swap obligations or TCEH First Lien Claims held by any of the Settling Creditors.

G.     Upon entry of this Settlement Order, TCEH shall have an Allowed, non-priority, unsecured Claim against EFH in the amount of $700 million, which Claim, except as otherwise set forth in the Order Approving Settlement Among Debtors, EFH Committee, EFH Notes Trustee, and Certain Other Parties [D.I. 7143], shall not be subject to subordination or recharacterization under section 105 or section 510 of the Bankruptcy Code or otherwise and, unless otherwise agreed by the Required TCEH First Lien Creditors, shall be treated on a pari passu basis with the EFH Legacy Note Claims in any EFH Restructuring.

H.     Except as otherwise agreed in writing by the Debtors, the Required TCEH Creditor Parties, and the TCEH Official Committee (including pursuant to the Plan Support Agreement), upon consummation of an Alternative Restructuring of any or all of the TCEH Debtors (other than any TCEH Debtor whose total assets are less than 2.5% of the consolidated total assets, or whose total revenues are less than 2.5% of the consolidated revenues, of the TCEH Debtors as of the date of such Alternative Restructuring), holders of Allowed TCEH First Lien Deficiency Claims, Allowed TCEH Unsecured Note Claims, Allowed TCEH Second Lien Note Claims, Allowed PCRB Claims, and Allowed General Unsecured Claims Against the TCEH Debtors Other Than EFCH shall receive, in the aggregate, $550 million in Cash (which shall be subject to reduction only (A) pursuant to (i) Section 11 of the Plan Support Agreement, (ii) Section 2.7 of the Settlement Agreement, and (iii) Section 5 of that certain Settlement &

Support Agreement, dated as of November 23, 2015, by and among EFH, EFIH, EFIH Finance, EECI, Inc., EEC Holdings, Inc., LSGT Gas Company LLC, LSGT SACROC, Inc., TCEH, the EFH/EFIH Committee, the EFH Notes Trustee, the Settling TCEH First Lien Creditors signatory thereto, the Plan Sponsors and the TCEH Official Committee, and (B) by $1 million in connection with the Stipulation and Settlement Agreement, dated as of December 1, 2015, by and among EFH, TCEH, EFCH, the United States on behalf of the U.S. Environmental Protection Agency, the Settling TCEH First Lien Creditors signatory thereto, the Plan Sponsors, and the TCEH Official Committee, and shall not otherwise be subject to dilution or reduction as a consequence of any claim or liability incurred as a result of any act, event or transaction) (the "TCEH Cash Payment"). The TCEH Cash Payment shall be made (a) from the Cash on hand at the TCEH Debtors and, if none (or if Cash on hand is insufficient to make the full amount of the TCEH Cash Payment), the first proceeds of any sale, transfer, or other disposition of the Prepetition Collateral (as defined in the Final Cash Collateral Order) (including the first proceeds of any financing or similar transaction secured or supported by the Prepetition Collateral) (the "TCEH Cash Payment Carve Out") and (b) before any payment or other distribution (including transfer) is made in connection with such an Alternative Restructuring to the holders of Allowed TCEH First Lien Claims; *provided*, *however*, that the TCEH Cash Payment Carve Out shall be subordinate in all respects to: (x) the RCT Reclamation Support Carve Out (as defined in the Final Cash Collateral Order); (y) the Carve Out (as defined in the Final Cash Collateral Order); and (z) the Permitted Liens (as defined in the Final Cash Collateral Order). For the avoidance of doubt, any distribution of the TCEH Cash Payment that would otherwise be made to or received by holders of Allowed TCEH First Lien Deficiency Claims pursuant to this paragraph H, if applicable, shall be subject to the terms of the Settlement Agreement.

I.      Upon entry of this Settlement Order, the TCEH First Lien Claims and the Prepetition Collateral (as defined in the Final Cash Collateral Order), as applicable, shall not be subject to avoidance, reduction, surcharge (except as expressly provided for in Section 2.2(a) of the Settlement Agreement), set-off, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross-claim, defense, disallowance, impairment, objection, or any other challenge under applicable law or regulation, and shall be Allowed for all purposes in the Chapter 11 Cases (and any successor cases), including with respect to any distributions that may be made under the Plan or any other plan of reorganization filed in the Chapter 11 Cases, in the following amounts:  (a) $22,863,271,257 of TCEH Credit Agreement Claims; (b) $1,815,965,278 of TCEH First Lien Note Claims; and (c) no less than $1,235,249,136 of TCEH First Lien Interest Rate Swap Claims and TCEH First Lien Commodity Hedge Claims.  For the avoidance of doubt, however, nothing herein shall affect: (i) the allocation of distributions among holders of Allowed TCEH First Lien Secured Claims arising from or in connection with the TCEH First Lien Creditor Allocation Disputes (as defined in the Plan) as provided for in the Plan or (ii) any claims or Causes of Action by the Holders of TCEH First Lien Claims, the TCEH First Lien Agent or the TCEH First Lien Notes Trustee against one or more Holders of the TCEH First Lien Claims, the TCEH First Lien Agent or the TCEH First Lien Notes Trustee arising from or in connection with the TCEH First Lien Creditor Allocation Disputes (as defined in the Plan).

J.      All Entities that have held, hold, or may hold Claims or Causes of Action released by the Releases or otherwise under the Settlement Agreement or that are subject to exculpation pursuant to this Settlement Order are permanently enjoined, from and after the entry of this Settlement Order, from taking any of the following actions against, as applicable, the Debtors,

the TCEH First Lien Released Parties, TCEH Creditor Released Parties, the EFH Interest Holder Released Parties, the Settling Interest Holder Released Parties, and the Debtor Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Causes of Action; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Causes of Action; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Causes of Action; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Causes of Action unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Causes of Action released or settled pursuant to the Releases or otherwise under the Settlement Agreement.

K.     The Court believes that, in this context, it is appropriate to apply the standards of section 503(b) to the Settlement Agreement. Accordingly, the Court concludes that the Section 2.7(a) Parties and their professionals have made substantial contributions to the Debtors' restructuring and are entitled to reimbursement. The Section 2.7(a) Parties and their professionals were active contributors to the architecture of the Plan, arranged the billions of

dollars in new debt and equity financing necessary to propose and consummate that Plan, and have provided their consent to releases of inter-Debtor and Legacy Claims—the key to complete Disarmament and a centerpiece of the Debtors' reorganization.

L.      Notwithstanding anything in the Settlement Agreement to the contrary, in accordance with paragraph 142 above, any professionals and certain parties representing parties receiving payment of fees, expenses, or reimbursements pursuant to section 2.7(a) or section 2.7(b) of the Settlement Agreement (a "Requesting Party"), with the exception of members of the TCEH first lien ad hoc committee, shall submit to the Debtors a short-form invoice setting forth such amounts and the period(s) during which such amounts were incurred.  No later than five business days after the Debtors' receipt of each such short-form invoice, the Debtors shall pay to the applicable Requesting Party 80% of the requested fees and 100% of the requested expenses, which amounts shall be subject to disgorgement if and to the extent the Court determines that such requested fees and expenses are not reasonable; *provided*, that the Sponsor fees will not be paid before the Effective Date of the Plan.  Within 45 days of receipt of payment, the applicable Requesting Party shall submit full invoices and LEDES data (a "Fee Request") to the Debtors, the U.S. Trustee, and the Fee Committee appointed in these chapter 11 cases (the "Fee Committee") in LEDES format (or, in the absence thereof, such other format as is mutually agreed among the applicable Requesting Party, the Debtors, the U.S. Trustee and the Fee Committee).  Professionals representing members of the TCEH first lien ad hoc committee shall submit invoices, and TCEH shall make payments on account of such invoices, in a manner consistent with the procedures set forth under the Final Cash Collateral Order.

M.    Following the Fee Committee's receipt of a Fee Request, within reasonable time periods, to be determined either by the Fee Committee and the relevant professionals or by the Court:

    i)   the Fee Committee shall send a confidential letter to the applicable Requesting Party regarding the Fee Committee's initial report and recommendation with respect to the applicable Fee Request;

    ii)  the Fee Committee shall file with the Court a final report and recommendation ("Fee Committee Recommendation") with respect to such Fee Request and (b) the U.S. Trustee shall file with the Court any objection or comments it may have with respect to such Fee Request ("U.S. Trustee Objection");

    iii) the applicable Requesting Party may file with the Court a response ("Fee Response") to such Fee Committee Recommendation or U.S. Trustee Objection; and

    iv)  The Court shall consider each Fee Request at the next omnibus hearing or at a scheduled Fee Committee hearing on Retained Professional fee applications.

N.    No later than 10 days following the Court's ruling with respect to a Fee Request, the applicable Reorganized Debtor shall pay any unpaid amounts with respect to such Fee Request as ordered by the Court, or the Requesting Party shall disgorge to the applicable Reorganized Debtor such amounts ordered by the Court, as applicable.

O.    For the avoidance of doubt, the Requesting Parties and the Fee Requests shall not be required to comply with (a) The Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware or other orders in these Cases with respect to fee applications, including the Stipulation and Order Appointing a Fee Committee

[D.I. 1896], or (b) Appendix B Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under United States Code by Attorneys in Larger Chapter 11 Cases, 78 Fed. Reg. No 116, page 36248 (June 17, 2013).

P.    Subject to paragraph L above, TCEH shall pay the reasonable and documented out-of-pocket fees, expenses, and reimbursements of: (a) the members of the ad hoc committee of TCEH First Lien Creditors; and (b)(i) the TCEH Unsecured Group (but not the individual members thereof), (ii) the TCEH Unsecured Notes Trustee, (iii) the TCEH Second Lien Group (but not the individual members thereof), (iv) the TCEH Second Lien Trustee, and (v) The Bank of New York Mellon Trust Company, N.A., as collateral agent under the TCEH Second Lien Notes Indenture (the foregoing fees, expenses, and reimbursements in clause (b), collectively, the "Professional Fees"); *provided*, *however*, that the aggregate Professional Fees paid pursuant to this paragraph P for the period before and including June 30, 2015, shall not exceed $49,750,000.

Q.    On the Effective Date of the Plan (or with respect to any Professional Fees paid by TCEH or Reorganized TCEH after the Effective Date, promptly after payment thereof), EFH or Reorganized EFH, as applicable, shall reimburse TCEH or Reorganized TCEH, as applicable in cash for the Professional Fees paid pursuant to this Settlement Order, *provided*, *however*, that EFH shall have no obligation to reimburse TCEH for the Professional Fees paid pursuant to this Settlement Order in the event that the Effective Date of the Plan does not occur. If the Effective Date of the Plan does not occur, under any Alternative Restructuring, the TCEH Cash Payment shall be reduced by the amount of the Professional Fees actually paid pursuant to this Settlement Order.

R.    The Settling TCEH Unsecured Noteholders, Settling TCEH Second Lien Noteholders and TCEH Official Committee agree that, solely for purposes of allocating the

TCEH Cash Payment among the holders of Allowed TCEH Unsecured Note Claims, Allowed TCEH Second Lien Note Claims, Allowed PCRB Claims, and Allowed General Unsecured Claims Against the TCEH Debtors Other Than EFCH:  (a) the Professional Fees of the TCEH Unsecured Group and TCEH Second Lien Group that (i) are actually paid pursuant to paragraph P and (ii) are not subject to or covered by the TCEH Unsecured Notes Trustee's and TCEH Second Lien Notes Trustee's "charging liens," respectively, shall reduce pro rata the distributions to all holders of Allowed TCEH Unsecured Note Claims, Allowed TCEH Second Lien Note Claims, Allowed PCRB Claims, and Allowed General Unsecured Claims Against the TCEH Debtors Other Than EFCH based on the amounts of the respective distributions such holders would otherwise have received but for such reduction and taking into account the effect of the Limited Waiver; (b) the Professional Fees of the TCEH Unsecured Group and TCEH Unsecured Notes Trustee that (i) are actually paid pursuant to paragraph P and (ii) are subject to or covered by the TCEH Unsecured Notes Trustee's "charging-lien" shall reduce pro rata the distributions to holders of Allowed TCEH Unsecured Notes Claims based on the amounts of their Allowed Claims; and (c) the Professional Fees of the TCEH Second Lien Group and TCEH Second Lien Notes Trustee that (i) are actually paid pursuant to paragraph P and (ii) are subject to or covered by the TCEH Second Lien Notes Trustee's "charging lien," shall reduce pro rata the distributions to holders of Allowed TCEH Second Lien Note Claims based on the amounts of their Allowed Claims.

S.     On the Effective Date of the Plan, EFH shall pay to Texas Holdings an amount equal to the fees and expenses of Texas Holdings up to $15,000,000, and Texas Holdings shall use such amount exclusively to pay such fees and expenses.

T.      The Standing Motions and the EFH Official Committee Intercompany Tax Claim Objection are hereby denied and overruled, with prejudice, as moot.

U.      Any termination of the Settlement Agreement shall not alter or limit the Court's *Stipulation and Agreed Order Regarding Certain Confirmation Scheduling Matters* [D.I. 4918] or the Court's *Third Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code* [D.I. 4634] with respect to the Debtors' exclusive right to propose and solicit votes with respect to a chapter 11 plan.

V.      The Settlement Agreement and this Settlement Order shall bind the Settlement Parties, their   respective successors, assigns, heirs, executors, administrators, and representatives, including, for the avoidance of doubt, any future transferees of the Settling TCEH First Lien Creditors, the Settling TCEH Unsecured Noteholders, and the Settling TCEH Second Lien Noteholders, as well as (a) counsel to the Settling TCEH Unsecured Noteholders, White & Case LLP, (b) counsel to the Settling TCEH First Lien Creditors, Paul, Weiss, Rifkind, Wharton & Garrison LLP, and (c) counsel to the Settling TCEH Second Lien Noteholders, Brown Rudnick LLP; and (d) any group presently or later identified in a statement filed under Bankruptcy Rule 2019 as being represented by such counsel identified in clause (a), (b), or (c).

W.      All applicable stays under the Bankruptcy Code or the Federal Rules of Bankruptcy Procedures are hereby waived, and the terms and conditions of this Settlement Order shall be immediately effective and enforceable upon its entry.

X.    The Court shall retain jurisdiction to hear and determine all matters arising from or related to the construction, performance, enforcement, and implementation of the terms of this Settlement Order.

Dated: _December 7_, 2015

_____
The Honorable Christopher S. Sontchi
United States Bankruptcy Judge