Page 1

1    UNITED STATES BANKRUPTCY COURT

     DISTRICT OF DELAWARE

2

3    In re:                    :

                               :    Chapter 11

4    ENERGY FUTURE HOLDINGS    :

     CORP., et al.,      :    :    Case No. 14-10979(CSS)

5                               :

           Debtors.       :    (Jointly Administered)

6    _____:

7

8

9

10

11

12

13                            United States Bankruptcy Court

14                            824 North Market Street

15                            Wilmington, Delaware

16                            December 4, 2015

17                            10:12 AM - 10:52 AM

18

19

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTCHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO OPERATOR:  MICHAEL MILLER

1   HEARING re Pretrial Conference

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    ASHBY & GEDDES PA

4        Attorney for WSFS Second Lien Indenture Trustee

5

6    BY:  WILLIAM BOWDEN

7

8    BAKER BOTTS

9        Attorneys for Ovation

10

11   BY:  VAN H. BECKWITH

12

13   BROWN  RUDNICK LLP

14       Attorneys for WSFS Second Lien Trustee

15

16   BY:  JONATHAN D. MARSHALL

17

18   FOX ROTHSCHILD LLP

19       Attorney to Ad Hoc Committee of EFIH Unsecured

20       Noteholders and EFIH Second Lien DIP Commitment

21

22   BY:  JEFFREY M. SCHLERF

23

24

25

```
                                              Page 4
1    KIRKLAND & ELLIS, LLP

2    Co-Counsel to the Debtors

3

4    BY:  CORMAC T. CONNOR

5         WARREN HASKEL

6

7    KLEHR HARRISON HARVEY BRANZBURG LLP

8         Counsel to UMB Bank N.A. Indenture Trustee

9

10   BY:  RAYMOND H. LEMISCH

11

12   MORRIS JAMES LLP

13        Attorney for Law Debenture of New York, Indenture

14        Trustee

15

16   BY:  STEPHEN M. MILLER

17

18   NIXON PEABODY LLP

19        Attorneys for AST as EFH Indenture Trustee

20

21   BY:  GEORGE L. SHELLY

22

23

24

25
```

```
1   PACHULSKI STANG ZIEL & JONES
2        Attorney for Second Lien Indenture Trustee
3
4   BY:  LAURA DAVIS JONES
5
6   POLSINELLI
7        Attorney for T Committee
8
9   BY:  JARRETT VINE
10
11  POTTER ANDERSON & CORROON LLP
12       Attorney for Deutsche Bank New York
13
14  BY:  R. STEPHEN MCNEILL
15
16  RICHARDS, LAYTON & FINGER, P.A.
17       Co-Counsel to the Debtors
18
19  BY:  MARCUS A. RAMOS
20
21
22
23
24
25
```

1   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

2        Attorneys for Texas Transmission

3

4   BY:  DAIN A. DE SOUZA

5        GEORGE N. PANAGAKIS

6        CARL T. TULLSON

7        JASON C. VIGNA

8        GEORGE ZIMMERMAN

9

10   VENABLE, LLP

11        Attorneys for PIMCO

12

13   BY:  DANIEL A. O'BRIEN

14

15   WHITE & CASE LLP

16        Attorneys for Ovation

17

18   BY:  J. CHRISTOPHER SHORE

19

20   YOUNG CONAWAY STARGATT & TAYLOR, LLP

21        Counsel to Ad Hoc Group of TCEH Unsecured Noteholders

22

23   BY:  RYAN BARTLEY

24

25

```
 1   MORRISON & FOERSTER

 2        Attorneys for Ovation

 3

 4   BY:  ERICA RICHARDS

 5

 6   APPEARING TELEPHONICALLY:

 7   SCOTT L. ALBERINO

 8   ABID QURESHI

 9   APARNA YENAMANDRA

10   RACHAEL L. RINGER

11   CHRISTOPHER HAHM

12   ASHLEY F. BARTRAM

13   MARIA CHUTCHIAN

14   MARY B. CIULLO

15   MARK A. CODY

16   KENT COLLIER

17   LOUIS A. CURCIO

18   ADAM M. DENHOFF

19   STACEY DORE

20   BARRY FELDER

21   MARK A. FINK

22   MEGGIE GILSTRAP

23   BRIAN D. GLUECKSTEIN

24   TODD M. GOREN

25   BRIAN P. GUINEY
```

1   NATASHA HWANGPO

2   ANNA KALENCHITS

3   MATTHEW W. KINSKEY

4   CHARLES KOSTER

5   STUART KOVENSKY

6   CATHERINE LO TEMPIO

7   DANIEL A. LOWENTHAL

8   RICHARD C. PEDONE

9   MEREDITH PFISTER

10  MARC B. ROITMAN

11  JEFFREY S. SABIN

12  NED S. SCHODEK

13  RICHARD A. STEIGLITZ

14  AMER TIWANA

15  MICHAEL TURKEL

16  MATTHEW UNDERWOOD

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  Please be seated.

3              MR. RAMOS:  Good morning, Your Honor.

4              THE COURT:  Good morning.

5              MR. RAMOS:  Marcos Ramos, Richards Layton & Finger

6    on behalf of the Debtor.  Your Honor, we are here today on

7    an agenda filed on December 2nd, hopefully Your Honor has a

8    copy.

9              THE COURT:  Yes.

10             MR. RAMOS:  There are two matters scheduled to go

11   forward both in the adversary proceeding reflected on the

12   agenda, and with Your Honor's permission, I will hand over

13   the podium to our co-Counsel, Mr. Warren Haskel of Kirkland

14   & Ellis, who will further address the Court with regard to

15   the agenda matters.

16             THE COURT:  All right, thank you, Mr. Ramos.

17             MR. RAMOS:  Thank you.

18             THE COURT:  Wait a minute.  Can you hear me?

19   Okay.  Sorry, I'm having trouble with the mic.  Good

20   morning.

21             MR. HASKEL:  Good morning, Your Honor.  Warren

22   Haskel of Kirkland & Ellis.

23             There are two items noticed for the agenda today,

24   both the preliminary pre-trial conference and the adversary

25   proceeding as well as the motion to intervene.  If Your

1    Honor has a preference on the agenda--

2              THE COURT:  Well, let's take the motion to

3    intervene first.

4              MR. HASKEL:  Sure.  So let me then pass the mic --

5    the podium to Mr. Shore.

6              THE COURT:  Okay, thank you.  Good morning, Mr.

7    Shore.

8              MR. SHORE:  Good morning, Your Honor, Chris Shore

9    from White & Case on behalf of Ovation.  Well, the

10   honeymoon's over and we're all back to work now, so.

11             I'm here with Van Beckwith of Baker Botts, who's

12   co-counsel for Ovation.  They've been handling a lot of the

13   PUC work that's going on and we're both trying to vector

14   everything towards the close.

15             Ovation is the now-approved purchaser of the Oncor

16   stake.  Under the merger, OV1 has the direct obligation to

17   purchase the minority shares held by TTI, and 20 percent of

18   the economics in the deal are tied up in those shares.  So,

19   consequently, 20 percent of the recoveries of any T-side

20   Creditor is tied to the results in this lawsuit.

21             The current schedule right now for the rights to

22   take down has them -- has them done about mid-March, so we'd

23   obviously--Ovation and all the parties need to know pretty

24   quickly whether -- to what extent the drag can occur, and if

25   we get intervened, I'll come back and deal with that on the

1    schedule.

2           I'll remind the Court that we've got a drop dead

3    date in the merger agreement of May 9th to get the

4    transaction closed.  It can be extended, but we don't want

5    to be in a position of having to seek to extend.  As Your

6    Honor heard extensively at confirmation, there's some people

7    who are very sensitive about the timing of the closing and

8    have been reluctant to let any date slip.

9           And then let me start there and just talk about

10   why intervention is a practical matter we think is critical.

11   The Debtors have proposed a schedule that gets everything

12   done by March.  TTI has proposed a schedule that gets

13   everything done in June, and those months are -- are

14   critical.

15          One is obviously, while the rights offerings are

16   open, one is after that close and would put us in a very

17   difficult position of having to take down rights to buy 20

18   percent, essentially $2 billion dollars of equity and then

19   not know how that's going to be deployed and whether we can

20   close and ready the securities issues that get addressed if

21   we close with cash that hasn't been funded into the shares.

22          What does that mean for intervention, then?  Under

23   24(a), we believe we have a direct right to intervene here.

24   Ovation, as I said, is the direct purchaser of the TTI units

25   if the drag can occur, and its specific performance is

1    granted as the Debtors have requested in their complaint,

2    the Court's going to be writing an order which requires the

3    delivery of shares to Ovation, and Ovation would need to be

4    heard as to the how, when, why, that -- that specific

5    performance obligation would be performed.

6           And Ovation is not fully aligned with the Debtors

7    on this.  As TTI has said repeatedly to the Court now in

8    both a letter and in a motion to dismiss and in their

9    opposition, there is no obligation to take down the rights

10   to close.

11          In other words, the Debtors can still get out of

12   bankruptcy if they lose the lawsuit and they are agnostic,

13   economically, to whether or not they -- whether they win or

14   lose.  Ovation and the unsecured creditors who are going to

15   be funding in are the economic parties in interest in the

16   dispute because they, if the drag doesn't occur, as I said,

17   20 percent of the economics goes away.

18          And we believe then, under both Stone & Webster

19   and Mountaintop, that provides a direct right of

20   intervention of Ovation into the dispute.

21          We also believe that if there is no direct right

22   of intervention, the Court can permissively grant, it is a

23   timely motion, practically speaking, if the drag is not done

24   before the close, Ovation is going to be the party pursuing

25   the drag rights at that point.

1          So we need to be in on the litigation and we've

2     made it clear we're not going to duplicate any of the work.

3     We'll file need to briefs, we will speak only when we need

4     to and we'll piggyback off of the discovery that's going on,

5     but we need to be in this lawsuit.

6          THE COURT:  Okay.  Thank you, Mr. Shore.

7     Response?  Mr. De Souza, good morning.

8          MR. DE SOUZA:  Good morning, Your Honor.  Dan De

9     Souza of Skadden, Arps, Slate, Meagher & Flom on behalf of

10    Texas Transmission Investments, LLC.

11          With me today are George Zimmerman, George

12    Panagakis, Jason Vigna and Carl Tullson from our Chicago and

13    New York offices, and unless Your Honor has any questions,

14    I'll turn it over to them.

15          THE COURT:  Okay, thank you.  Mr. Zimmerman, good

16    morning.

17          MR. ZIMMERMAN:  good morning, Your Honor.  Let's

18    stipulate as to what the parties agree to.  We absolutely

19    agree that OV1 has an economic interest in this litigation,

20    no question about it.

21          The two cases that both sides heavily rely on,

22    Stone & Webster, Judge Walsh's decision, and Mountaintop,

23    Judge Walsh said an economic int -- and the Third Circuit

24    has said this in Mountaintop, an economic interest by itself

25    as a matter of law does not give you a right to intervene

1   and does not get you intervention by permission.  What you

2   need is a legal interest in the dispute.

3           There was a mixed argument about scheduling and

4   the merits of intervention.  On scheduling, if Your Honor's

5   okay, I'm going to defer to my colleague, Mr. Vigna.  Let me

6   just focus on intervention.

7           There's no question that they have no legal

8   interest in this agreement.  The agreement in issue is not

9   the merger agreement.  That's done.  There's no

10  interpretation, there's no dispute.  That's -- we're not a

11  party to that.

12          The agreement that Your Honor's going to have to

13  interpret is the Investors' Rights Agreement, which I'll

14  call the IRA.  That agreement a) OV1 is not a party to and

15  b) specifically says there are no third-party beneficiary

16  interests, which is a factor that led Judge Walsh in Stone &

17  Webster to say there's no intervention either under 1109 or

18  by permission, and Stone & Webster actually is a fortiori

19  here and I'll tell you why.

20          There, like here, there was a bankruptcy and there

21  was a contract by -- OV1's counterpart was Shaw, to buy up

22  the assets of the Debtor, and they already closed on that.

23  OV1 hasn't closed.

24          And there were two underlying contract disputes

25  that they wanted to intervene in, and Judge Walsh said, you

1    can't, even though you clearly have an economic interest,

2    and you (indiscernible) were a guarantor under one of them,

3    which is clearly economic interest.

4         The problem you have is, you don't have a legal

5    interest, because when you guaranteed the contract, the

6    guarantee document specifically carved out the underlying

7    contract, so you took the guarantee but the underlying

8    contract did not go with you, and since it had a non-third-

9    party beneficiary, you have no legal rights under those

10   contracts.  So that case is a fortiori because they haven't

11   even closed on the merger yet.

12        There is no answer to Mountaintop, which is the

13   Third Circuit case that says that economic interest is not

14   enough, so as a matter of law, you have to have a legal

15   interest, they don't have any.  We don't deny the economic

16   interest.  That's just not enough.

17        As far as -- the only other point I'll make, both

18   under (a)2 as a right, and under 24(b) as a permission, one

19   of the common elements is you don't get to intervene if your

20   interests, and again, they have to be legal interests, but

21   let's assume for the moment they had it, you don't get to

22   intervene unless those legal interests are not adequately

23   represented.

24        I heard OV1 say they need to be in this litigation

25   because of their economic interests.  They need to be able

1    to brief -- submit briefs or whatever.  The merger

2    agreement, which they have, already contemplates that.  You

3    know, it's interesting, the merger agreement says that if

4    there's a dispute with TTI, it's EFH that has to bring the

5    enforcement action under the IRA because they recognized

6    that only EFH has a legal right and standing to enforce that

7    contract.

8              And because they knew they wouldn't -- OV1 knew it

9    had no legal standing, they wanted to make sure they were

10   adequately represented when EFH brought the lawsuit, so they

11   contracted for it.  The merger agreement under Section

12   622(d) and (e) specifically requires EFH to coordinate with

13   OV1, specifically requires EFH to submit their proposed

14   pleadings, any briefing, to OV1 in advance.

15             OV1 can write the brief and it specifically

16   requires that OV1 dictate when a summary judgment motion is

17   to be made.  And OV1 is identified as paying the legal fees,

18   so the notion that OV1 somehow doesn't have a voice through

19   EFH, it directly contradicts the merger agreement.  They

20   specifically contracted for it because they undoubtedly knew

21   they had no legal standing to intervene.

22             So, the burden is this.  They say they don't want

23   to duplicate.  They've already duplicated.  They filed a

24   complaint which is basically in haec verba with EFH.  I

25   think there's one or two non-substantive differences, what

1    we would consider non-substantive.  They both want the same

2    thing, they've both got the same complaint.

3              Their interests are identical.  The notion that

4    EFH, its entire plan is conditioned or in consummation of

5    the merger.  It's not conditioned on the drag, so this

6    litigation will not impact, legally, EFH's interests in

7    closing the merger.  It may have an economic impact on OV1,

8    but as far as EFH, they're dying to get this merger

9    agreement done.

10             They're going to -- of course they're going to be

11   consistent and hand-in-hand with OV1.  The notion that

12   there's some kind of adversity between the two, let them

13   identify what that adversity is.

14             Because when the ultimate objective is the same,

15   and their ultimate objective is the same, to force TTI to

16   tender its shares under the drag at the price they want.

17   The Third Circuit in the Community Bank case, which we

18   cited, says if the ultimate objectives are the same, there's

19   a presumption that the existing party adequately represents

20   the proposed intervener's interests, and in order to buck

21   that presumption, they have to show collusion, which they

22   clearly can't show here, adversity of interest, which they

23   haven't identified, or complete nonfeasance in prosecuting

24   the case.

25             They can't make that showing.  It's a controlling

1    law, so Judge, we respectfully request that the motion to

2    intervene be denied.

3              THE COURT:  Okay, thank you.

4              MR. DE SOUZA:  Thank you.

5              THE COURT:  Mr. Shore, a reply?

6              MR. SHORE:  Just three quick points, Your Honor.

7    First, let me read Stone & Webster, which counsel has made

8    clear they think is controlling here in some way.  This is -

9    - oh, boy -- at Page 362.

10             "In order to show that it has standing (and in

11   order to show grounds for intervention under Rule 24), Shaw

12   must show that it has an interest in the dispute between the

13   Trust and Saudi Aramco.

14             If Shaw is entitled to the proceeds of the Trust's

15   breach of contract claim, then Shaw has an alleged injury,"

16   and it goes on, and then says, but because they have no

17   interest in the -- the property coming out, there is no

18   standing there.  Here, OV1 is the purchaser.  There is a

19   direct right under the now-approved merger agreement to

20   purchase the TTI shares coming out of the -- coming out of

21   the drag litigation.

22             Second, with respect to the rights under the

23   merger agreement, 6.22(c) clearly contemplates that one of

24   the things that's going to happen is, there is going to be a

25   motion to intervene sought hat OV1 can protect the interest,

1   which is divergent.  The Debtors are economically agnostic

2   to whether they win this lawsuit or not.  They just, as we

3   know, want to get to closing.

4          And then finally, on the duplication, point, the

5   only reason we filed a complaint is because the rules

6   require us --

7          THE COURT:  Right.

8          MR. SHORE:  -- to file a complaint.

9          THE COURT:  Right.

10         MR. SHORE:  So I have nothing further unless Your

11  Honor has questions.

12         THE COURT:  I have none.  Mr. Zimmerman, yes?

13         MR. ZIMMERMAN:  Thank you.  Two points.  On the

14  fact that the -- EFH is economically agnostic, that's

15  exactly the case in Pierson against the United States.  The

16  intervener said I have to indemnify the Plaintiff so they're

17  economically agnostic, and Judge Schwartz said it doesn't

18  matter because -- and it makes sense, because again,

19  agnosticism under the controlling Third Circuit law does not

20  give you intervention rights if the ultimate objective is

21  the same.  So, economic agnosticism is completely

22  irrelevant.

23         Second, with respect to Stone & Webster, you can -

24  - you can -- you can read whatever -- you can parse out

25  whatever sense you want.  If you study the case, Judge, it

1    is crystal clear that what Judge Walsh was saying was, if

2    you have a legal right to the proceeds, then yes, not an

3    economic right.  And in that case, they claimed a legal

4    right because of the guarantee, which I've already

5    discussed, and the guarantee did not cover it, so it wasn't

6    a legal right, and therefore, they found no standing.  Thank

7    you.

8              THE COURT:  You're welcome.  Yes, Mr. Shore?

9              MR. SHORE:  I don't know why we're just focusing

10   on Third Circuit precedent on this point of the adversity.

11   The Supreme Court, in a name I cannot pronounce, TRB --

12   Trbovich, which we cite in our papers, you just have to make

13   a minimal showing that the interests are divergent.

14             THE COURT:  All right, thank you.  I'm going to

15   grant the motion and overrule the objection.  I don't think

16   it's really, frankly, a very close issue at all.  I think

17   there's both a right -- there's -- intervention can be

18   granted both as a matter of right as well as a matter of

19   discretion, and I believe there is a cognizable legal right

20   here related to the merger agreement, and the fact that this

21   lawsuit is successful is ultimately going to require a sale

22   to Ovation.  I -- I don't see how it could be less clear

23   that there's a legal right involved here.

24             That legal right arises from the merger agreement,

25   not the IRA per se, but you can't ignore the fact that it's

1    just not the IRA here.  It's the fact that the rights and

2    obligations or defenses under the IRA are triggered by the

3    merger agreement itself, so I think you can't look at the

4    issue of legal right solely in connection with the IRA.

5    Clearly, there's an economic right as well.

6           I think you can distinguish them in Webster and

7    I'm painfully aware of the facts of that case because I

8    represented Shaw throughout that entire transaction, and a

9    critical component there is the fact that the Saudi Aramco

10   contract had been left behind.

11          There was the guarantee but it was a thin read,

12   and I think the result of that case really rests on the

13   thinness of the legal position of my ably represented former

14   client.

15          We did the best we could, but there's a much

16   stronger case here, not on the merits of the IRA, I'm not

17   getting into that, but on the merits of Ovation's interest

18   in the legal issue here, which goes to the rights under the

19   IRA.

20          Also, I think that the minimal showing of

21   divergence that needs to be met is clearly met here.  I

22   think that the economic agnosticism goes well beyond an

23   indemnification right.

24          It goes to, you know, the Debtors will do their

25   best, they are highly motivated, they are ably represented,

1    but ultimately, at the end of the day, they close their

2    merger one way or the other, and the unsecured creditors who

3    are the parties behind the Ovation deal under the now

4    confirmed -- although I haven't signed the order, but the

5    now confirmed plan, have a different, more motivated

6    interest.  There are direct impacts related to the plan on

7    the rights offering.

8            So, I think that there is a divergence of opinion

9    here.  And, you know, frankly, from my standpoint as the

10   Judge who's going to have to make the factual legal findings

11   here, I welcome the participation of Ovation as having a say

12   in this process because I think they're critical to the

13   Court being able to understand the facts and law that are

14   going to arise in this case and that I'm going to have to

15   decide, and even, you know, we can get into the scheduling

16   details, but I think it's important, and you know, as it's

17   been laid out to the Court, they're going to do that without

18   overly -- overly burdening the estate with duplication.

19           You know, the fact they had to file a complaint,

20   like Mr. Shore says, they had to file a complaint, and you

21   know, the fact that it's virtually identical actually

22   supports their position that the adverse effect of having

23   them participate as an additional party here will -- will

24   be, I think, ultimately -- there'll be some burden but I

25   think I'll be minimal.

```
1              So, I'm going to overrule the objection and grant
2      the motion.  Do we have an order?
3              MR. SHORE:  I -- I can send the (indiscernible)
4      over.
5              THE COURT:  Well, you may have included one.  Let
6      me --
7              MR. SHORE:  May I approach, Your Honor?
8              THE COURT:  Yeah, oh, yeah.  Thank you.  Oh, good,
9      it's nice and -- well, it's double-sided.  Can you submit
10     one under certification?
11             MR. SHORE:  Yes, Your Honor.
12             THE COURT:  Thank you.  It also has that caption
13     at the top I don't --
14             MR. SHORE:  Caption, right.
15             THE COURT:  -- or whatever, that line at the top.
16     Okay.  Well, we'll just -- you know what, we'll -- we'll
17     just print it from -- we'll print it from the docket.  You
18     don't need to waste the time and money of a certification.
19     So the Court will enter the order, which was attached to the
20     motion, which is plain vanilla and just simply says that the
21     motion is granted.  There are no findings.
22             Okay, let's talk about the pre-trial.
23             MR. HASKEL:  Your Honor --
24             THE COURT:  You're the Plaintiff, so --
25             MR. HASKEL:  Yeah.
```

1           THE COURT:  I did read -- I did read the letters

2    that were submitted.  So I'm sort of up to speed on what the

3    disputes are, so it really comes -- looks like you've agreed

4    on everything except the trial schedule.

5           MR. HASKEL:  That's right, Your Honor.  There's an

6    open question about the confidentiality order.  I don't

7    think that there's going to be, ultimately, a dispute on

8    that, so really, what this comes down to is a difference of

9    opinion as to how quickly this adversary proceeding should

10   proceed.

11          As we noted in my letter to Your Honor, we believe

12   that there are two reasons why this schedule that EFH has

13   proposed is the appropriate one.  There is both a narrow

14   scope of discovery, we believe it really focuses on two time

15   periods in this contractual dispute.

16          One, the negotiation of the IRA and then -- as

17   well as the time period surrounding the offer to purchase

18   Oncor, which, you know, in the given amount of time, that

19   should be more than enough time, especially considering

20   that, as the record shows, TTI has known about this lawsuit

21   since -- for months now.  The lawsuit was laid out in the

22   merger agreement on August 9th, and we've had several

23   letters back and forth, a settlement period, where these

24   issues have been discussed.  So this has not come as news to

25   TTI.

1              The second reason, as laid out in the letter that

2     we submitted to the Court on the 1st, that why this schedule

3     is important in terms of having trial by the end of March is

4     to give clarity to the parties involved in these proceedings

5     and the Chapter 11 proceedings about what is going to

6     ultimately happen with this drag, including investors to

7     Ovation and obviously, they could speak to that as well, and

8     also, in terms of some of the arguments that we've seen in

9     the motion to dismiss, whether or not the IPO conversion

10    rights have been triggered.

11             That's going to come up in this issue -- this

12    adversary proceeding as well, and given that TTI has now

13    taken the position that the IPO conversion plan does not

14    trigger any of the IPO conversion rights under the IRA, it's

15    going to be important to have that resolution in this

16    lawsuit as well, as soon as possible, in terms of the

17    closing of the merger.

18             THE COURT:  Okay, thank you.  Mr. Shore, do you

19    wish to be heard?

20             MR. SHORE:  Yeah.

21             THE COURT:  You're now an intervener.

22             MR. SHORE:  Having said I'll be really brief, I'm

23    going to be really brief.  I just want to address one point,

24    this notion that we can't get it done in that time.  We just

25    did -- in four months, we did a $40 billion dollars

1    reorganization, which, one way or the other, is going to be

2    benefitting TTI.  I mean, they are cleaning up the entire

3    balance sheet above them.  So I think -- I actually think we

4    can get this done significantly quicker than the end of

5    March.

6                    THE COURT:  Thank you.

7                    MR. SHORE:  It's a contract.

8                    MR. VIGNA:  Thank you, Your Honor, Jason Vigna

9    from Skadden Arps on behalf of TTI.

10                   I'll start with Mr. Shore's point first, saying

11   that he just had a trial in four months.  What he ignored is

12   that there was over a year and a half of litigation, and

13   when I've had conversations with Mr. Haskel, he's made this

14   point as well that his clients are ready to go.  Of course

15   they are, there have been over a million pages of documents

16   produced in the trial.  Our clients were just sued in

17   October.  We are --

18                   THE COURT:  Well --

19                   MR. VIGNA:  No, that's absolutely true, Your

20   Honor.

21                   THE COURT:  Yes, it's true.  The transaction was

22   filed on August 10th, a demand letter was sent in late

23   August, which you responded to in early September.  You knew

24   this was coming.

25                   MR. VIGNA:  Well, you -- you have the dates

1    slightly off, Your Honor.  Of course we knew this was

2    coming, but these are not entities that have been gearing up

3    for this fight.  We had actually hoped that this thing might

4    be able to be resolved, but nonetheless, we're here in

5    litigation.  It's a multi-billion dollar dispute.

6            THE COURT:  Yeah, it's $4 billion, I think, maybe.

7    I'm back in the envelope, 20 percent of $20 billion.

8            MR. VIGNA:  And our clients actually had a very

9    strong interest in litigating this thoughtfully, and they

10   are actually seeking expedition.

11           For example, if you look at their schedule, their

12   first deadline is this Monday.  They want initial

13   productions this Monday.  Our Rule 26(f) conference didn't

14   conclude until this Tuesday.

15           Under the Federal rules of Civil Procedure, we

16   have at least 14 days to make that time.  They are seeking

17   expedited procedures and they have to show good cause for

18   that, and they just haven't.

19           What I've heard so far is that none of these

20   proceedings are going to affect the bankruptcy stay.  What

21   it may affect is information provided to investors in

22   Ovation.  The affirmation has already been out there.  As

23   you pointed out on August 9th, this deal was announced.

24           In the public disclosure with the FCC, that they -

25   - this -- the possibility of litigation was disclosed, as

1   were the possibility that it might not succeed.  There's

2   actually no additional disclosure that's going to need to go

3   to the investors in Ovation.  There's actually no

4   complication at all that I can see from the letter of Mr.

5   Haskel that requires this to get done by March.

6           In the schedule that Your Honor has -- form of

7   scheduling order proposes is not a lackadaisical schedule by

8   any means.  It's actually a pretty -- a pretty quick

9   schedule.

10          We propose to have documents produced by February

11  5th, which is not crazy.  We propose to have the entirety of

12  factual discovery done some time in April, and that is

13  actually a relatively quick schedule but it's not -- the

14  schedule that's been proposed by Mr. Haskel really is an

15  onerous schedule and they have not met the burdens of good

16  cause shown to expedite the normal discovery schedules

17  permitted by the Federal rules of civil procedure.

18          Oh, and further, I did want to point one other

19  thing out.  We've been hearing today about March and April

20  deadlines.  That's actually inconsistent with the deadlines

21  that were discussed, or the timetable that was discussed

22  with Your Honor during the trial itself.

23          When counsel for EFH said that this plan, if

24  approved, will likely not consummate for six to nine months,

25  the schedule that we have proposed would provide for a trial

1   well within that time period.

2            THE COURT:  All right, thank you.  Can you address

3   that issue?  Once -- the -- the timing.

4            MR. SHORE:  Let me address it because it's -- the

5   current contemplation for the rights offering is to be open

6   through mid-March.  We need that done because then we have

7   cooling off periods and other things that have to get done

8   in order to hit that May closing.  It is our belief this

9   thing will be ready to go at the end of March.  We expect --

10  PUC hearings start at the beginning of January --

11           THE COURT:  Beginning of January.

12           MR. SHORE:  --the drop dead date for the PUC under

13  their -- their rule would be March 27th or something like

14  that.  We are trying to get this thing done as quickly as

15  possible, and as I said, there are consequences if we don't

16  get it done and closed by May 9th.

17           THE COURT:  Okay.

18           MR. SHORE:  But that means that this issue has to

19  be resolved in March in order for us to do the rights

20  offering to take down the rights, then have the appropriate

21  time left, and then use the money drawn down in the rights

22  to take out the minority.

23           THE COURT:  Okay.

24           MR. VIGNA:  And Your Honor, just to address that

25  briefly, I still am not clear on what exactly the

1   consequences are.   What I've been hearing is it would be

2   more convenient for OV1, a non-Debtor, in their

3   communications with their investors.   This is a normal

4   breach of contract dispute between --

5               THE COURT:   Exactly.

6               MR. VIGNA:   -- involving our non-Debtor's

7   investment --

8               THE COURT:   All right, I've heard enough.   Thank

9   you.

10              MR. VIGNA:   Thank you, Your Honor.

11              THE COURT:   All right, we're going to have trial

12  at the end of March.   We can go back and forth on some of

13  the details about dates, about whether they need to be, you

14  know, this Monday or next Monday or flip them, but I think

15  when I give you a trial date, you should be able to work

16  back and come up with dates that work.

17              So, let me give you a trial date.   All right, I'm

18  going to give you -- we may -- it's too early to know

19  exactly how many days we're going to need.   It may be,

20  although you've given me a -- you've given me a tight frame

21  on summary judgment.

22              It may be it's resolved in summary judgment, so

23  I'm going to give you trial dates.   I'm going to give you

24  five trial dates with three tentative dates, partly because

25  some of those trial dates will not be -- at least one of

1   them will be a half day, probably two of them, actually,

2   will be half days.

3           So we may need to split this off, and also, I'm

4   not sure if it'll take five days or it'll take a little bit

5   more, and I'm not sure whether we'll do a timed trial.

6   Again, we very well might.

7           My colleagues at District Court have told me that

8   I should never, ever do a trial that's not timed, and it

9   worked out very well in connection with confirmation.  The

10  problem with timed trials is that you need to have enough

11  lead time in order to, you know, be able to put your case

12  together in order to have the organization in order to meet

13  some sort of timing kind of issue, and there's no question

14  that this will be a very compressed schedule that will put a

15  lot of pressure on both Plaintiffs and Defendants, and I am

16  aware of that, so I will be as flexible as I can.

17          But I am going to stick, as I did with

18  confirmation, with the trial dates that I'm going to give

19  you as much as possible, and I'll be reluctant to move them

20  without a showing of a real problem.  So, let me write these

21  down.

22          So, we'll do the week of March 21 as requested.

23  It'll be 3/21 and 3/22, which are Monday and Tuesday of that

24  week, will be half days.  We'll go from 12:30 to 5:00 on

25  those days.  Yeah.

1        We'll do all day on the 23rd and 24th, which will

2    be 10:00 to 5:00.

3        We'll continue the next week -- oh, I'm sorry.

4    We'll do the 25th, but that is Good Friday, so we're --

5    we'll actually probably go -- this is a little tentative,

6    but we'll probably go, say, 10:00 to 3:00 to make sure that

7    people have an opportunity, to the extent they're observant

8    of the holiday, to get where they need to go to be prepared

9    for the weekend.

10        And then the tentative dates will be 3/28, 10:00

11   to 5:00 and 3/29 will be 12:30 to 5:00 because I have a

12   morning commitment, and then 3/30 will be 10:00 to 5:00 and

13   that'll be the end of the trial time.  Again, those last

14   three days are tentative.

15        I assume one of those days will probably, at the

16   very least, be used for closing arguments so that I can, if

17   appropriate, make a ruling as quickly as possible.

18   Hopefully, I don't have to take the matter under advisement.

19   So, that -- those will be the trial dates.

20        Mediation, I think is always helpful, but I think

21   in this case, we'll -- it may be particularly helpful and I

22   know you contemplate mediators.  I don't know if -- I think

23   we should address who that mediator is, not necessarily

24   today, but sooner rather than later, and I don't know if

25   you're going to ask for a judicial mediator or not.  If I go

1    to that Judge Grosswell again, I'm going to have to buy him

2    a vacation home.

3         But there are other colleagues that might be

4    willing to do it, might be able to do it, but the sooner I

5    know, you know, the timeframe of that and whether you're

6    interested, the more likely I can actually produce someone

7    who's willing to perform that mediation.  No promises on

8    whether I can deliver that or not.  I don't know.

9         But you know, as usual, I could send you to

10   mediation tomorrow but this litigation needs to mature, I

11   think, a little bit before people will be in a place where

12   they're willing to have a constructive mediation.  That's

13   not pejorative, that's just the way litigation is.  If you

14   were able to mediate this thing between August and today,

15   you would have -- you would have done it.

16        So, you need a little time to spend in conference

17   rooms with each other and -- before that'll -- that'll work

18   out.  But generally speaking, I'm okay with the schedule.

19   You should work amongst yourselves to tweak it, you know,

20   Monday seems a little tight to have to respond to discovery,

21   you might be able to push that back a little bit.

22        And you know, I'd love more time on summary

23   judgment.  You can't give me a reply brief the first day of

24   trial and expect to get a ruling on summary judgment, so if

25   you can push that back a little bit, I mean, you can't push

1   it too much because they have to be done discovery but if

2   you can push that back a little bit to give me some room to

3   actually read the briefs and decide whether I can make a

4   decision, I'm not -- I'm not saying I could or I couldn't,

5   but if I -- if I can grant summary judgment, we don't have

6   to have a trial.  Obviously if I did -- and I could grant it

7   for either side.  If I deny it, you know, we'll have a

8   trial, so maybe you can push back a little bit on that.

9          MR. SHORE:  Your Honor, I think one thing, because

10  we don't have it on the list, it's going to affect summary

11  judgment and everything else.  There is a motion to dismiss

12  that's been filed.  The Debtors filed a response last night.

13  We would get a reply but we need a second for a date on

14  that.

15         THE COURT:  Well, when will briefing be done on

16  that?

17         MR. SHORE:  Seven days.

18         THE COURT:  All right.  Are you -- are you going

19  to file -- they haven't--

20         MR. SHORE:  I'll file a one-page joinder.

21         THE COURT:  Okay.  So, the reply is due the 10th?

22  Seven business days or seven days?

23         MR. VIGNA:  Yes, Your Honor, it's seven days.

24         THE COURT:  Seven days.  See, I thought I was

25  going to have a break from EFH.  My deputy said, "So they're

1    not coming back?" I said, mm, they'll be back.

2              MR. VIGNA:  Last night?

3              THE COURT:  They'll be back.  I can -- I can have

4    argument on that on the 18th at 10:00 AM.  12/18 at 10:00.

5    Does that work?

6              MR. SHORE:  I may have a --

7              THE COURT:  I mean, nobody's pleased.

8              MR. SHORE:  I may have an appellate argument but I

9    can get someone else to argue it.

10             THE COURT:  All right.

11             MR. SHORE:  I'm trying to figure that out.

12             THE COURT:  Okay.  I can -- we can do the 17th and

13   I would move something else.  Does that work better for you,

14   Mr. Shore?

15             MR. SHORE:  I'm trying to figure that out.

16             THE COURT:  Oh, wait, I got two people bothering

17   me here.

18             MR. SHORE:  The 16th -- the 17th or the 18th will

19   work.

20             THE COURT:  When --

21             MR. SHORE:  My arguments are the 15th and the

22   16th.

23             THE COURT:  Wait a minute, sorry.  I'm sorry, the

24   17th or the 18th will work?

25             MR. SHORE:  Yes.

1          THE COURT:  Okay, I'm sorry, I just -- hang on.

2     There's something that I -- unfortunately, for reasons you

3     don't care about, I have to keep two different calendars and

4     I -- one of them was showing me the 18th wide open and the

5     other, that is not true.  Okay, so we are going to do the

6     17th.  And this will be just for the motion to dismiss, this

7     is not for any other EFH-related purposes.

8          MR. ZIMMERMAN:  Your Honor, one of the

9     indispensable members of the team can't be here on the 17th.

10          THE COURT:  Okay.

11          MR. ZIMMERMAN:  Can we do the --

12          THE COURT:  Yes.  We'll do it -- we'll do it the

13     18th.  I won't be able to give you, perhaps -- well, I'll

14     give you the time we need.  It might be a little -- it might

15     be a little touch and go there.  We better start with you,

16     because the other matter I have for the 18th might linger,

17     so we'll do -- and I'm sorry for the people that are coming

18     from New York, but can we do 9:30?

19          MAN:  Sure.

20          THE COURT:  All right.  We'll do 9:30 and we'll

21     give you two hours, I think should be sufficient.  I can't

22     imagine it taking any longer than that.  So, 9:30 to 11:30

23     for oral argument on the 18th, on the motions to dismiss,

24     and as soon as Mr. De Souza, as soon as that briefing's

25     done, if you could get me the certification of completion of

1    briefing binder, I'd appreciate it.

2              MR. DE SOUZA:  Will do.

3              THE COURT:  Okay.  Anything else for today?  I'll

4    await -- you can file the scheduling order under

5    certification of counsel, work out, you know, any dinks or

6    you know, whatever, move something here, move something

7    there.

8              The schedule is generally fine, a little more time

9    on summary judgment would be great, but we're going to stick

10   with that trial date, so you're going to have to work around

11   that, which means some people are going to be working really

12   hard over the next few months, but that's what we all signed

13   up for when we went to law school.  All right?  Anything

14   else?  All right, thank you, we're adjourned.

15             MR. HASKEL:  No, Your Honor, thank you.

16             MR. SHORE:  Thank you, Your Honor.

17

18                          * * * * *

19

20

21

22

23

24

25

Page 38

1                    C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya
     Ledanski Hyde

     Digitally signed by Sonya Ledanski
     Hyde
     DN: cn=Sonya Ledanski Hyde, o, ou,
     email=digital1@veritext.com, c=US
     Date: 2015.12.07 14:23:57 -05'00'

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  December 7, 2015