Page 1

1   UNITED STATES BANKRUPTCY COURT

    DISTRICT OF DELAWARE

2

3   In re:                    :

                              :      Chapter 11

4   ENERGY FUTURE HOLDINGS    :

    CORP., et al.,     :    :   Case No. 14-10979(CSS)

5                             :

            Debtors.       :    (Jointly Administered)

6   _____:

7

8

9

10                              United States Bankruptcy Court

11                              824 North Market Street

12                              Wilmington, Delaware

13                              December 2, 2015

14                              10:11 AM - 4:00 PM

15

16

17

18

19

20   B E F O R E :

21   HON CHRISTOPHER S. SONTCHI

22   U.S. BANKRUPTCY JUDGE

23

24   ECRO OPERATOR:  LESLIE MURIN

25   Transcribed by:  Sonya Ledanski Hyde

1   A P P E A R A N C E S :

2

3   ASHBY & GEDDES PA

4       Attorney for WSFS Second Lien Indenture Trustee

5

6   BY:  WILLIAM BOWDEN

7

8   BROWN RUDNICK LLP

9       Attorneys for WSFS Second Lien Trustee

10

11  BY:  JEFFREY L. JONAS

12       JONATHAN D. MARSHALL

13

14  DRINKER BIDDLE & REATH LLP

15       Counsel to Citibank NA, TCEH DIP Agent

16

17  BY:  HOWARD A. COHEN

18

19  FOLEY & LARDNER LLP

20       Attorney for UMB Bank, NA as Indenture Trustee

21

22  BY:  MARK F. HEBBEIN

23

24

25

1    FOX ROTHSCHILD LLP

2        Attorney for Counsel to Ad Hoc Group of TCEH Unsecured

3        Noteholders

4

5    BY:  L. JOHN BIRD

6        JEFFREY M. SCHLERF

7

8    HOGAN MCDANIEL

9        Attorneys for Fenicle & Fahy

10

11   BY:  DANIEL K HOGAN

12

13   KIRKLAND & ELLIS LLP

14       Co-Counsel to the Debtors

15

16   BY:  MARK E. MCKANE

17       CHAD J. HUSNICK

18       MARC KIESELSTEIN

19       JULIA M. WINTERS

20

21   KLEHR HARRISON HARVEY BRANZBURG LLP

22       Counsel to UMB Bank N.A. Indenture Trustee

23

24   BY:  RAYMOND H. LEMISCH

25

```
                                                    Page 4
 1   KRAMER LEVIN NAFTALIS & FRANKEL LLP
 2        Attorneys for Second Lien Indenture Trustee
 3
 4   BY:  JOSHUA BRODY
 5
 6   MCELROY, DEUTSCH, MULVANEY, & CARPENTER, LLP
 7        Co-Counsel to the TCEH Debtors
 8
 9   BY:  DAVID H. PRIMACK
10
11   MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP
12        Co-Counsel to the EFH Creditors' Committee
13
14   BY:  MARK A. FINK
15
16   MORRIS JAMES LLP
17        Attorney for Law Debenture of New York, Indenture
18        Trustee
19
20   BY:  STEPHEN M. MILLER
21
22   MUNGER, TOLLES & OLSON LLP
23        Co-Counsel to the TCEH Debtors
24
25   BY:  THOMAS B. WALPER
```

1   NIXON PEABODY LLP

2       Attorneys for AST as EFH Indenture Trustee

3

4   BY:  RICHARD C. PEDONE

5

6   O'KELLY, ERNST & BIELLI LLP

7       Co-Counsel to Energy Future Holdings Corp.

8

9   BY:  DAVID M. KLAUDER

10

11  PACHULSKI STANG ZIEL & JONES

12      Attorney for Second Lien Indenture Trustee

13

14  BY:  LAURA DAVIS JONES

15

16  PATTERSON BELKNAP

17      Attorney for Law Debenture of New York, Indenture

18      Trustee

19

20  BY:  DANIEL A. LOWENTHAL

21

22

23

24

25

1   PAUL WEISS RIFKIND WHARTON & GARRISON LLP

2        Counsel to Ad Hoc Committee Of TCEH First Lien

3        Creditors

4

5   BY:  JACOB A. ADLERSTEIN

6        ALAN W. KORNBERG

7

8   POTTER ANDERSON & CORROON LLP

9        Attorneys for Deutsche Bank New York

10

11  BY:  R. STEPHEN MCNEILL

12       JEREMY W. RYAN

13

14  PROSKAUER ROSE LLP

15       Attorneys for EFH Corp. Disinterested Directors

16

17  BY:  MARK K. THOMAS

18       PETER J. YOUNG

19

20  RICHARDS, LAYTON & FINGER, P.A.

21       Co-Counsel to the Debtors

22

23  BY:  DANIEL DEFRANCHESCHI

24       JASON M. MADRON

25

1   SEWARD & KISSEL LLP

2        Wilmington Trust as Successor of First Lien

3        Administrative Agent and Collateral Agent

4

5   BY:  MARK D. KOTWICK

6        ARLENE R. ALVES

7

8   SHEARMAN & STERLING LLP

9        Counsel to Deutsche Bank, agent to DIP Financing

10

11  BY:  NED S. SCHODEK

12

13  STEVENS & LEE PC

14       Co-Counsel to Energy Future Intermediate Holding

15       Company LLC

16

17  BY:  JOSEPH H. HUSTON, JR.

18

19  SULLIVAN & CROMWELL, LLP

20       Co-Counsel to the EFH Creditors' Committee

21

22  BY:  BRIAN D. GLUECKSTEIN

23

24

25

```
 1   U.S. DEPARTMENT OF JUSTICE

 2        U.S. Trustee

 3

 4   BY:  RICHARD L. SCHEPACARTER

 5

 6   WACHTELL, LIPTON, ROSEN & KATZ

 7        Attorneys for Equity Sponsors

 8

 9   BY:  EMIL A. KLEINHAUS

10

11   WHITE & CASE LLP

12        Attorney to Ad Hoc Committee of EFIH Unsecured

13        Noteholders and EFIH Second Lien DIP Commitment

14

15   BY:  THOMAS LAURIA

16        J. CHRISTOPHER SHORE

17

18   YOUNG CONAWAY STARGATT & TAYLOR, LLP

19        Counsel to Ad Hoc Group of TCEH Unsecured Noteholders

20

21   BY:  RYAN BARTLEY

22        PAULINE K. MORGAN

23

24

25
```

1   GITLIN & COMPANY LLC

2        Attorneys for Fee Committee

3

4   BY:  RICHARD GITLIN

5

6   APPEARING TELEPHONICALLY:

7   SCOTT L. ALBERINO

8   PHILIP D. ANKER

9   ASHLEY F. BARTRAM

10  PEG A. BRICKLEY

11  CHRISTOPHER L. CARTER

12  BROOKE CHADEAYNE

13  MARIA CHUTCHIAN

14  MARY D. CLULLO

15  MARK A. CODY

16  KENT COLLIER

17  LOUIS A. CURCIO

18  ADAM M. DENHOFF

19  STACEY DORÉ

20  BENJHAMIN D. FEDER

21  MICHAEL A. FIRESTEIN

22  MARK FLANNAGAN

23  PHILLIP A. GELSTON

24  MEGGIE GILSTRAP

25  SETH GOLDMAN

1    ISLEY M. GOSTIN

2    DAVID GRINGER

3    BRIAN P. GUINEY

4    CHRISTOPHER HAHM

5    ANGELA K. HERRING

6    NATASHA HWANGPO

7    HAROLD L. KAPLAN

8    MATTHEW W. KINSKEY

9    CHARLES KOSTER

10    STUART KOVENSKY

11    ARI D. KUNOFSKY

12    KENNETH MAIMAN

13    ROBERT K. MALONE

14    RICHARD G. MASON

15    LUCKEY MCDOWELL

16    BRIAN P. MORGAN

17    LARS A PETERSON

18    BRIAN PFEFFER

19    MEREDITH PFISTER

20    ABID QURESHI

21    RACHAEL L. RINGER

22    MARC B. ROITMAN

23    MATTHEW M. ROOSE

24    JEFFREY S. SABIN

25    ANDREA B. SCHWARTZ

1    FREDRIC SOSNICK

2    RICHARD A. STEIGLITZ

3    AMER TIWANA

4    BRIAN TONG

5    MICHAEL TURKEL

6    KEVIN M. VAN DAM

7    APARNA YENAMANDRA

8    DANIELE ZAZOVE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            CLERK:  All rise.

3            THE COURT:  Please be seated.  Excuse me.  Good

4    morning.  I apologize for the delay, I'm running a little

5    late today.

6            MR. KIESELSTEIN:  No worries.  Good morning, Your

7    Honor.  Mark Kieselstein, Edward Sassower, Mark McKane, Chad

8    Husnick, Kirkland & Ellis on behalf of the Debtors.

9            Your Honor, before we launch into closing, just a

10   few brief items.  First and most importantly, I have to

11   correct the record from a couple of hearings ago where I

12   failed to introduce Mr. Husnick, for which I've gotten

13   unrelenting grief ever since, Your Honor.  So --

14           MAN:  Who's he?

15           MR. KIESELSTEIN:  He's here and he's counted.  And

16   that segues into the next item, which is an update on the

17   EPA settlement status, which Mr. Husnick will provide.

18           THE COURT:  Thank you.

19           MR. HUSNICK:  Good morning, Your Honor.

20           THE COURT:  Good morning.

21           MR. HUSNICK:  Chad Husnick from Kirkland & Ellis,

22   on behalf of the Debtors.

23           Your Honor, we filed, late last night, a

24   settlement with -- or not late last night, but it was after

25   close of business last night.

1            THE COURT:  That's late.

2            MR. HUSNICK:  A settlement with --

3            THE COURT:  Not for you guys, for me that's late.

4            MR. HUSNICK:  -- with the Environmental Protection

5    Agency.  That settlement, Your Honor, is very similar to

6    what I had summarized, I think, in chambers, not on the

7    record.  So I'll do a brief summary here this morning.  It's

8    at Docket Item Number 7189.

9            Your Honor, it's a settlement that was entered

10   into not just with the Debtors, the three Debtor entities

11   that are party to that, but also with the TCEH official

12   creditors committee, the TCEH ad hoc first lien creditors,

13   the plan sponsors and then the Environmental Protection

14   Agency.  The key aspect of that is that anyone who is really

15   affected by the terms of the settlement agreement, that I'll

16   lay out in a second, were in effect signing on to the

17   settlement agreement.

18           The terms, Your Honor, basically are very simple.

19   It contemplates, in the proposed plan, for the Plan A

20   scenario, a $2 million cash payment, which will be

21   distributed to the EPA on account of a claim into the Class

22   C-5 claim of TCEH unsecured creditors.

23           In an alternative restructuring scenario, that is

24   in the unlikely event that Plan A does not close, the EPA

25   would get a $1 million cash settlement payment, and that

1    would come out of the $550,000 TCEH cash payment that's the

2    so-called booby prize.

3              THE COURT:  Which gets smaller every time there's

4    a settlement.

5              MR. HUSNICK:  Correct, Your Honor.

6              The covenant not to sue is set forth in the

7    agreement. I won't summarize that for lack of getting it

8    wrong, but suffice it to say that's an important term of the

9    agreement for the benefit of the Debtors' estates.  Upon

10   entry of the order authorizing the Debtor to enter into this

11   agreement, it's my understanding that the Environmental

12   Protection Agency and the Department of Justice is here

13   today, will withdraw its plan objection and settlement

14   agreement objection.

15             The EPA settlement will remain subject to a notice

16   and comment period for public comment, as required under the

17   regulations.  Although, if following the public comment

18   period the EPA were to opt not to consummate the settlement,

19   that withdrawal from the settlement will not affect the

20   EPA's withdrawal of the plan and settlement agreement

21   objections that would happen once the Debtors are authorized

22   to enter into it.  So it's kind of a one way option.

23             Your Honor, unless you have any questions, I do

24   have a copy of the order here for signature today.  And I do

25   know the EPA is in the room, if they'd like to make a

1    statement.

2              THE COURT:  Please approach.

3              Does anyone wish to be heard?  Yes, ma'am.

4              MS. GRACE:  Good morning, Your Honor.  Anna Grace

5    on behalf of the United States -- I'm sorry, with the United

6    States Department of Justice on behalf of the Environmental

7    Protection Agency.

8              I raise, really to say that as set forth in the

9    settlement agreement, the Environmental Protection

10   Agency withdraws its objection to the plan and the

11   settlement agreement.  That withdrawal is subject to the

12   Court's approval of the settlement agreement.  And if for

13   some reason the Court does not approve the settlement

14   agreement we will revisit the issue at that time, Your

15   Honor.

16             THE COURT:  Okay.  Thank you.

17             MS. GRACE:  Thank you.

18             MR. HUSNICK:  May I approach?

19             THE COURT:  Yes.  Ms. Werkheiser informed when

20   this was filed last night, and I actually did take an

21   opportunity to read it, at least the proposed order, a light

22   read of the actual stipulation.

23             So unless anyone has any objection, I'm prepared

24   to sign the order approving the settlement agreement.  All

25   right, I hear none.  All right, I've signed it.

1          MR. HUSNICK:  Thank you, Your Honor.

2          MR. MCKANE:  Good morning, Your Honor.  Mark

3     McKane, Kirkland & Ellis on behalf of the Debtors.  Just one

4     quick housekeeping matter.  And you had asked to have a

5     compilation of the materials contained in the joint record,

6     compiled and we have done that for you.  Your Honor, I

7     believe you've been provided as a -- two copies for your

8     staff.  I have an additional copy, if necessary.

9          This has been reviewed, and I believe signed off

10    by all of the previously objecting parties and all those

11    people who continue to object.  And they do include all of

12    the exhibits that were admitted on Wednesday the 25th, as

13    well.  So it's a comprehensive list of the deposition

14    designations, the trial transcripts, the written directs,

15    the demonstratives and the exhibits with and without

16    limitation.

17          THE COURT:  All right.  Thank you.  This is very

18    helpful.  Because I make sure that we have a complete copy

19    of everything that's in the record for posterity and more

20    importantly appellate record, if necessary.  Thank you.

21          MR. KIESELSTEIN:  Good morning, again, Your Honor.

22    Mark Kieselstein on behalf of the Debtors.

23          Your Honor, before I launch into the closing, just

24    I wanted to say, and I think I speak on behalf of everyone

25    facing this direction in the courtroom, you said some very

1   kind things about those who put on the trial last week and I

2   think we need to return the compliment, Your Honor.  The

3   efforts of the Court, your staff, have been unstinting in

4   this matter.

5         We know what a burden it has been with respect,

6   not just to this case but the impositions on your other

7   cases.  And so it would be inappropriate if we didn't note

8   that, and that is something on which I know there is a

9   hundred percent agreement.  So thank you, Your Honor.

10         THE COURT:  Well thank you on behalf of my staff.

11   They have worked very hard and I appreciate how much they've

12   done.  So, me, I just sit here.  I got the easy job.

13         MR. KIESELSTEIN:  Okay, sure.  Let me also say we

14   hope that you and your staff had a wonderful and EFH-free

15   Thanksgiving weekend, Your Honor.  It was a brief respite,

16   we're back, but we bring good tidings, Your Honor.

17         With respect to the settlements that were entered

18   last week, you know, we now have virtually unanimous support

19   for the settlement agreement and the plan.  Notwithstanding,

20   it's, I think, only proper that we do a fairly thorough

21   review of the trial evidence that we've put before Your

22   Honor, for posterity's sake, if nothing else.

23         And Your Honor, when the trial opened a month ago

24   now, we said we would inundate the Court with evidence that

25   would support the entry of orders approving the 9019 on the

1   confirmation order and we think we've made good on that

2   commitment.  Now our opening was very high level by design,

3   but this closing will dive head-first into the record, not

4   to engage in a marathon swim, but to splash around in the

5   key facts for a bit of time to demonstrate that we've met

6   our burden.

7            In one sense, this is a simple and straightforward

8   exercise, to coin a phrase, but it also involves a little

9   bit of shadow boxing.  Given all the settlements, Your

10  Honor, the large majority of objections have fallen away.

11  So in a sense we are grappling with the ghosts of objections

12  past, but nonetheless we have an independent burden to

13  demonstrate that we have met the requirements for entry of

14  the orders that we seek, and we believe, indeed, that the

15  evidentiary record in this case, not only facilitated the

16  settlements, but will demonstrate, again, that we have met

17  that burden.

18           So I propose to summarize, at a relatively high

19  level, the key evidence.  Obviously Your Honor observed it

20  as it went in, and observed the demeanor of the live

21  witnesses.  And we also filed a detailed digest of the

22  record evidence in our proposed orders --

23           THE COURT:  Yes.

24           MR. KIESELSTEIN:  -- on confirmation and

25  settlement.

1          THE COURT:  And I did read those as we'll.  So

2     thank you.

3          MR. KIESELSTEIN:  Great.  Your Honor, first I'm

4     going to address the settlement and the Martin factors

5     governing the Court's review.  You know, in my opening I

6     noted that some of the objections could be characterized, to

7     the settlement agreement, as too much, too broad and too

8     soon.  The settlements reached during the trial have

9     obviated some of those concerns, but even so, I'm going to

10    point to the multiplicity of testimony and other evidence

11    that demonstrates the independent satisfaction of each of

12    the Martin factors.  And again, I'm going to try and do it

13    without rebutting point for point objections that no longer

14    are extant.

15          We'll also, obviously, spend a fair amount of time

16    on the remaining unresolved objections to the settlement

17    agreement, which I believe at this point are the asbestos

18    claimants only, and I'll talk about our status with the U.S.

19    Trustee, a little later in the deck.  We've narrowed some

20    issues and some issues remain.

21          And again with respect to the plan, an identical

22    tact, talk about the record evidence on things like good

23    faith and feasibility and then deal with the remaining

24    objections on asbestos fees and releases, to the extent they

25    are still out there.

1          So Your Honor, we do have a deck, can't seem to

2     function without one.  So we've got a deck.  If I can

3     approach?

4          THE COURT:  Yes.  Thank you.

5          MR. KIESELSTEIN:  Okay, Your Honor.  Just as an

6     overview, back when we made the opening arguments, we noted

7     the progress we had made since April, 2015 when we had zero

8     dollars out of 42 billion in support of our plan.  When we

9     opened the trial we had the T-side lined up in support and

10    we had gotten some traction on the E-side with a slight

11    majority of the PIK holders.  Obviously since that date,

12    we've made enormous additional progress.

13         So where we are today, just to level set things,

14    is that we have support for the settlement agreement and the

15    plan from both official committees, from Fidelity, from each

16    of the ad hoc groups on both sides of the capital structure,

17    all of the indentured trustees and all of the equity

18    holders.  This group represents a hundred percent of the

19    Debtors' funded debt.  So from April to November we've gone

20    from zero percent to a hundred percent.

21         At trial, Your Honor, we presented a great deal of

22    evidence, ten live witnesses, 15 directs and close to 500

23    exhibits.  Let's get into that record now.  Your Honor, the

24    settlement agreement resolves a whole bunch of claims, very

25    complicated claims and I just want to touch on what those

1    are again.  All the inter-debtor claims in the billions of

2    dollars, the inter-creditor claims between the T-first and

3    the T-juniors, some $25 billion of lien and claim avoidance

4    and subordination, as well as more inchoate, but nonetheless

5    asserted claims against Debtors, sponsors, officers and

6    directors.

7              With respect to the intercompany claims and the

8    intra T-side claims, again, the evidence showed that these

9    claims are neither simple nor straightforward.  The evidence

10   also showed that the settlement agreement is essential to

11   the plan, in that it creates a safe harbor to which the

12   Debtors can peacefully return, in the unlikely event that

13   the merger plan does not close.

14             And the evidence also showed that the settlement

15   agreement was a very carefully constructed package that

16   cannot be picked apart without losing its integrity.

17             Your Honor, the claims that were dealt with in the

18   intercompany settlement were legion.  There's record

19   evidence on all of these claims, although obviously the

20   primary focus was on a handful, this is just to remind the

21   Court of what ran from T to E and then on the next slide,

22   other claims that ran the other direction, or ran from EFIH

23   to EFH.  Each of these claims could support a good, midsized

24   bankruptcy case in and of itself, collectively they are the

25   massive universe we know as the legacy liabilities.

1          In a T silo, Your Honor, again, $24 billion of

2    liens, security interests and obligations, billions of fees

3    related to amend and extend and other transactions, a

4    hundred million inadequate protection payments that have

5    continuously run during the case and approximately 200

6    million of preferential transfers at issue.  And those were

7    the matters that were mediated with the able help of Mr.

8    Horowitz.

9          Your Honor, I want to talk for a few minutes about

10   governance, because -- and I know this again goes to

11   objections that are no longer out there, but there was quite

12   a bit of discussion about whether the settlement agreement

13   was in essence the fruit of a poisonous tree, that is a

14   byproduct of bad governance, incomplete governance,

15   incomplete diligence, or sponsored domination.  And I think

16   the evidence suggests otherwise.

17         Your Honor, I'm going to have some record cites in

18   here, I'll try not read them word for word, some I think

19   merit it.  Ms. Doré testified about the evolving nature of

20   the governance of these Debtors, both pre and post-petition,

21   and I think it's very correct what she said, that over time

22   as scrutiny increased, and some of the claims from creditors

23   became clear, we just continued, our governance process

24   continued to evolve and we continued to try and think of

25   ways to improve it.

1           And that started, again, pre-petition, all the way

2      back in February 13, when non-sponsor director meetings

3      started to occur.  Later on in 2013 truly disinterested

4      directors, not merely non-sponsored directors, were

5      appointed for TCEH and EFIH and regular meetings of the

6      disinterested directors, including Mr. Evans and Ms.

7      Williamson at EFH started to occur.

8           Post-petition things continued to evolve.  Your

9      Honor, the -- obviously the DDAs were retained, pursuant to

10     orders of this Court, to advise the disinterested directors.

11     They were given clear authority to determine what was a

12     conflict matter and how to handle a conflict matter.  That

13     was a hundred percent control as to those issues rested with

14     the disinterested directors and obviously the intercompany

15     settlement was the most prominent invocation of a conflict

16     matter and led to the -- ultimately to the settlement that's

17     before us.

18          You also heard testimony, Your Honor, on how

19     disinterested directors would meet with their specific

20     advisors, even in advance of declaring something a conflict

21     matter or deciding not to, so they could assess whether to

22     invoke that provision.  And I think they used their

23     discretion quite wisely and the evidence supports that.

24          Your Honor, once the DDAs were in place, they

25     investigated and negotiated the inter-debtor claims, and

Page 24

1    we'll talk about that at some length.  A special committee

2    was formed with respect to the issue of sponsor releases,

3    and that committee made its decisions on the granting of

4    sponsor releases and there will be much discussed about that

5    topic as well.  And ultimately in April the disinterested

6    director intercompany settlement was reached and was

7    included in the initial plan filing.

8              Your Honor, I want to segue from governance to the

9    investigation of the claims at issue here, and I'm going to

10   harken back to a couple of demonstratives that were utilized

11   at the trial that I think are helpful.

12             This Slide 10 is meant to demonstrate the breadth

13   and depth and variety of investigations that were done with

14   respect to the legacy liability claims, beginning in early

15   2013 with the non-sponsor director meetings, the hiring of

16   Sidley and Austin to review claims against sponsors related

17   to the LBO.  The disinterested -- or the legacy discovery

18   process which we know ran for the better part of a year, as

19   did the investigation of the first lien claims, again, all

20   pursuant to open processes that were well described and with

21   which the Court is well familiar, culminating, again, in

22   litigation letters, identification of claims by the various

23   parties, et cetera.

24             To drill down on that a bit, Your Honor, there

25   were a number of diligent processes that ran in parallel at

1    no small expenses.  The EFH restructuring data room was

2    visited by some 450 non-debtor professionals so the

3    restructuring world literally beat a path to our door and

4    our data room.  There was also a data room for those

5    interested in investing or in purchasing aspects of the

6    company.  That also was well traveled.

7              Your Honor, all during the due diligence period,

8    that covered the better part of three years, there were both

9    pre and post-petition meetings with company personnel, lots

10   of bankruptcy professionals, maybe most bankruptcy

11   professionals it seems.  There were bi-weekly meetings with

12   the TCH creditors, starting shortly after the petition was

13   filed, the same with EFH and EFIH.  And then there were the

14   special bi-weekly tax meetings which the restructuring

15   lawyers tended to avoid, for good and obvious reasons, Your

16   Honor.

17             The next slide talks and zeros in on the lien

18   investigation and the legacy discovery.  Your Honor, you've

19   heard these numbers before, 800,000 documents, almost 6

20   million pages of documents, millions and millions of dollars

21   spent investigating the claims that are ultimately the

22   subject of the settlement motion before Your Honor.

23             Your Honor, I want to segue to the work that was

24   done by the disinterested directors to assess, identify and

25   investigate and negotiate the intercompany claims.  And here

1    a lot of evidence in the record, and again, this is just a

2    sample.

3              So each of the independent directors, Ms.

4    Williamson, Mr. Cremens and Mr. Sawyer directed their DDAs

5    to get to work as soon as they were brought in and to do as

6    thorough a job as possible to assess the claims that were

7    going to be the subject of a negotiation down the road.  And

8    the evidence is uncontroverted that each of the DDAs

9    engaged, in fact, in that process and we all have the bills

10   to prove it.

11             Again, on Slide 14, the DDAs didn't just do this

12   work in a bubble.  They got out, they went out on the

13   various hustings, and they talked to the various creditor

14   groups to get input and their views on the weaknesses and

15   strengths of these various claims.  And again, you've got

16   testimony from Mr. Cremens, Mr. Sawyer and Ms. Williamson

17   that this outreach was done.  I think the disinterested

18   directors wanted the benefit of the thoughts of all of the

19   major stakeholders in the case as they were formulating

20   their views and their negotiation strategies.

21             On Slide 15, the next step, each of the

22   disinterested directors rolled up their individual sleeves

23   and got down to work.  As Ms. Williamson said, she

24   investigated and understood, or tried to understand the

25   claims in excruciating detail, similarly with Mr. Cremens

1    and Mr. Sawyer.  So having been -- gotten the benefit of the

2    views of their own advisors, the views of other

3    professionals, they started to formulate their own views.

4              And that, of course, led to what we talk about on

5    Slide 16, the negotiations.  And just to remind the Court,

6    while it culminated in an almost week long face-to-face

7    negotiation, there was exchange of proposals and back and

8    forth and presentations well before that.  But I think the

9    testimony about the ultimate negotiation is that it was

10   painful, that it was arm's length, that it actually got

11   rather exercised from time to time.

12             And those of us who were there in Dallas, as a

13   resource in case we were needed, witnessed firsthand, the

14   tension that was up on the 35th floor or 43rd floor, sorry,

15   at Energy Plaza.  And you hear -- have the testimony of Ms.

16   Williamson and on Slide 17, Mr. Sawyer and Mr. Evans, about

17   the heated nature of those discussions and in fact the

18   repairs to relationships that needed to occur when those

19   negotiations concluded.

20             So that's all the prelude, and again, that's meant

21   to rebut the idea that this settlement was not thought

22   through, was not the product of the independent thinking and

23   byproduct of the integrity of each of the disinterested

24   directors, who we think testified very credibly about their

25   process.

1        So that takes us, Your Honor, to a little bit of

2    law and that is the Martin factors.  And as we lay it on 19,

3    what a settlement have to be, it has to be fair and

4    equitable, as Your Honor has described it in Capmark, and

5    analyzed under the Martin factors, to make sure it falls

6    above the lowest point in the range of reasonableness.  And

7    obviously this has to be viewed from the perspective here of

8    three separate stand-alone bankruptcy estates.

9        The Martin factors, it's well-trodden ground:

10    probability of success, difficulty in collection,

11    complexity, expense, et cetera and the paramount interest of

12    Creditors, and we would submit the evidence is overwhelming

13    that the robust governance and diligence process that

14    proceeded the settlement agreement, and that would undercut

15    any notion that there should be any sort of heightened

16    scrutiny attached to this, and I'll also touch on this

17    briefly when we talk about the so-called sponsor-domination

18    of the Debtor and of these negotiations specifically.

19        We don't believe a heightened scrutiny standard is

20    appropriate, notwithstanding the fact that there are

21    releases contained in the settlement agreement, or in the

22    plan, however, whatever standard the Court chooses to apply,

23    we think we easily satisfy it, but again, we think there's

24    no basis for heightened scrutiny.

25        With regard to the first Martin element,

1    probability of success, there was lots of testimony about

2    the risky nature of the claims. When I say "risky," risky, I

3    mean for the moment from the EFH perspective.  Ms.

4    Williamson talked, for instance, about the intercompany loan

5    situation, and the fact that there had been some $600

6    million dollars of value asserted to that claim alone by

7    TCEH and that Ms. Williamson saw the risks involved in that

8    intercompany loan, which as Your Honor knows, the assertion

9    was at a below-market interest rate, given the credit

10   profile of EFH.  And obviously, and it's not in the dec,

11   there was the testimony of Mr. Mendelsohn on those topics

12   that we think was quite compelling.

13           Your Honor, also on this slide, we talk about some

14   of the other kind of key claims, including the claim under

15   the tax-sharing agreement, and as Mr. Sawyer testified,

16   there was a claim of $754 million dollars scheduled by the

17   Debtors, and in his view, there were strong arguments in

18   favor of TCEH's interpretation of the TAA and the validity

19   of that claim, and as Ms. Williamson acknowledged, there was

20   a great deal of ambiguity in the tax allocation agreement

21   and she felt that it was a risky claim from the perspective

22   of EFH.

23           Your Honor, with respect to the LBO claim itself,

24   obviously, that's the one with the biggest denominator.

25   There's no dispute there was a $20 billion dollar dividend

1    paid in connection with a 2007 LBO, and while I think

2    everyone believes there were strong defenses with respect to

3    the issues of solvency, et cetera, nonetheless as Ms.

4    Williamson and Mr. Evans both testified, a number that big

5    creates risk and as Mr. Evans said, anything can happen when

6    you litigate and issue and certainly, it would be an

7    expensive one to litigate.

8           Your Honor, on Slide 22, we talk about the -- the

9    issue of the tax-free spin and the factors that led the EFH

10   disinterested directors to believe it was appropriate that

11   some amount of money be paid to the T-side to enable that

12   tax-free spin to occur.

13          First, let's talk about the REIT transaction.  I

14   think they testimony was very powerful from Mr. Keglevic

15   that if you had a taxable transaction, the ability to pursue

16   the REIT would be severely undermined if not entirely

17   destroyed.  Mr. Sawyer, through his advisors, was well aware

18   that that was, in fact, the case, and indeed, that was an

19   important piece of leverage, if you will, in the

20   negotiations.

21          And I just want to note in passing, there was a

22   statement made by the EFH Committee in its opening that you

23   could simply change the sequencing, do the REIT first and

24   emerge later and avoid the bad per diem dividend outcome and

25   Mr. Keglevic is, at the bottom of 22, identifies that they

1    had looked at that very scenario and they had come to the

2    conclusion, in consultation with their tax advisors, that it

3    simply didn't work and we heard no more about it at trial.

4           Then again, Your Honor, there is also the issue of

5    what the value of the tax-free spin or the -- the cost of

6    the partial versus the full step-up.  You heard a bunch of

7    testimony on that, and while I think people acknowledge that

8    under current TCEH values, that may not be a big tax bill

9    coming due, nevertheless, no one could predict, as I said in

10   my opening, as Mr. Keglevic echoed in his testimony and as

11   Mr. Sawyer noted in his testimony, no one knows that that

12   number is going to be in a volatile market some six months

13   down the road.

14          And so there are, again, numerous reasons why

15   there ought to be, for lack of a better term, a consent fee

16   paid from the E-side to the T-side for enabling that tax-

17   free spin to occur.

18          I think when you take all those things into

19   account and as well as all the other record evidence, I

20   think it's overwhelmingly clear that the $700 million dollar

21   outcome is within the range of reasonable litigation

22   outcomes from the perspective of both EFH and TCEH, Your

23   Honor.

24          Your Honor, I want to segue, briefly, to the

25   claims against the sponsors, because as we know, those are

1    getting released under the settlement agreement.  Bottom

2    line, the claims against the sponsors were articulated

3    vaguely, they were never fleshed out, in our opinion.  The

4    record shows that those claims were weak.  On 24, we talk

5    about the management fees in particular, and I think the

6    testimony was pretty clear that very valuable services that

7    would have to have been obtained otherwise from third-party

8    providers were provided by the sponsors continuously,

9    including, without compensation from 2013 forward, and

10   further, although there were assertions and objections about

11   waste as a cause of action under Texas law and other

12   breaches or aiding and abetting of breaches of fiduciary

13   liability, there was no evidence adduced, no specific

14   evidence, no evidence at all, as I recall, of claims against

15   the sponsors having any legs.

16           In Slide 25, again, this goes to the notion that

17   there was sponsor domination that marked the entire case and

18   marked the negotiation of the disinterested director

19   settlement, and I think Mr. Smith's testimony was very

20   compelling, and the fact that there was complete

21   independence exercised by the management team, Mr. Keglevic,

22   Ms. Doré, in terms of restructuring strategy and decisions,

23   and with regard to the DD settlement, Ms. Williamson made it

24   very clear that she didn't take marching orders from the

25   sponsors, and you've heard Ms. Williamson, and I'm quite

1     confident that it's very credible, she didn't take marching

2     orders from anybody but herself, Judge.

3                  Likewise, Your Honor, the CROs acted

4     independently, for instance, sticking their necks out and

5     drafting the CRO term sheet to kick start the process back

6     in early 2015.  Again, those numbers in those term sheets

7     related to the CROs, not anybody else's dictated view of the

8     world.

9                  Your Honor, similarly, the D&O claims, which are

10    also released, pursuant to the settlement agreement.  Again,

11    there were litigation letters at the end of the diligence

12    process, which, as I noted, was exhaustive, which very

13    vaguely tacked on kind of boilerplate sounding claims

14    against the directors and officers, but without really

15    laying out any rationale, and I think as we say, it's very

16    fair to conclude that no party has ever identified truly

17    specific claims against the directors and officers and

18    that's, again, consistent with Ms. Doré's testimony, who

19    obviously keeps her ear to the ground on things of this

20    nature.

21                  And Ms. Doré also pointed out that a variety of

22    proposals we received from a variety of sources throughout

23    the length of the cases and even before, always contemplated

24    releases for directors and officers, and frankly, that's

25    what you would expect to see in a case that nobody is

1    alleging involves any sort of fraud or wrongdoing or cooking

2    the books or the like.

3           So, really, standard operating procedure in our

4    view, yes, in the settlement agreement, but again, complete

5    paucity of claims asserted.

6           Your Honor, turning briefly to the next Martin

7    element, difficulties in collection, and this really goes to

8    the question of, well, weren't there large claims running

9    from TCEH in favor of EFH and if Ms. Williamson and Mr.

10   Cremens both testified that a good sized claim against the

11   TCEH of the capital structure wasn't worth much, we know the

12   first lien lenders were unsecured by many billions of

13   dollars, and that any recovery on those claims running the

14   other direction would have been, as Ms. Williamson noted,

15   pennies on the dollar.

16          Similarly, Mr. Cremens in giving up the EFIH note

17   claims against EFH recognized quite rightly that, in a

18   downside scenario, that cash was likely to be consumed by

19   further litigation and in any event, was not nearly enough

20   to pay that claim in full or remotely like it, and that the

21   trade that he made with respect to allowing Plan A to go

22   forward by virtue of the settlement agreement going forward,

23   as well worth -- well worth the trade, and I think Mr.

24   Cremens noted that he had his fiduciary out and reassess the

25   situation as the months passed by, and his conclusion has

1    not changed, that it is a good settlement from the

2    perspective of the EFIH estate.

3           And again, Your Honor, even to the extent that

4    there is minimal collection ability on those claims, there

5    is the issue of potential setoff and wouldn't that reduce,

6    dollar-for-dollar, the claims of TCEH against EFH, and as we

7    noted, and I don't think it's really disputed, the

8    triangular setoff simply doesn't work in bankruptcy, and

9    it's black letter law, even if there were contractual setoff

10   rights, which there are not, under SemCrude and other cases,

11   that would not be an available avenue.

12          And so, the fact that there are large, alleged,

13   big-number claims from EFH against Luminant Gen doesn't

14   really change the calculus.

15          Your Honor, the next Martin element, complexity,

16   expense and delay, again, I think the record here is

17   particularly compelling that the continued litigation of

18   these claims would be both expensive, uncertain, complex.

19   Mr. Keglevic and Ms. Williamson spent a lot of time

20   considering, even without the false precision of a rigid

21   litigation budget, the likely cost of the continued burn of

22   these cases.

23          The additional burn if these claims were actually

24   put to litigation as opposed to just being investigated, and

25   I think they concluded that that would be a very expensive,

 1     very time-consuming exercise.

 2               And to zero in on that a bit --

 3               THE COURT:  Is -- I just -- the $35 million -- go

 4     back a slide if you would.

 5               MR. KIESELSTEIN:  Sure.

 6               THE COURT:  $35 million per month in professional

 7     fees.

 8               MR. KIESELSTEIN:  Yes.

 9               THE COURT:  At the -- is that all fees or is that

10     just a --

11               MR. KIESELSTEIN:  I believe that was -- that was

12     all fees that we felt we were going to ultimately be

13     responsible for.

14               THE COURT:  Okay, so for example, the fees of the

15     first lien lenders.

16               MR. KIESELSTEIN:  I believe that's right.

17               THE COURT:  Because it seems higher than what I

18     had seen in connection with the fee application.

19               MR. KIESELSTEIN:  Yeah, no, this is -- this is us

20     and other trustees and --

21               THE COURT:  Okay.

22               MR. KIESELSTEIN:  -- first -- EFIH first lien and

23     second lien and all the rest.

24               Your Honor, zeroing in on the complexity point a

25     tad, I'm sure you spent the Thanksgiving weekend waxing

```
 1    nostalgically about Mr. Ashby's testimony on the tax sharing

 2    agreement but --

 3              MR. KIESELSTEIN:  -- I think as he laid out --

 4              THE COURT:  The only thing --

 5              MR. KIESELSTEIN:  Yeah?

 6              THE COURT:  You know, normal lawyers fear

 7    "bankruptcy," bankruptcy lawyers fear "tax".

 8              MR. KIESELSTEIN:  We do.

 9              THE COURT:  A rate that's even higher than normal

10    people do, so.

11              MR. KIESELSTEIN:  Yes, I think a collective case

12    of the heebie-jeebies broke out while Mr. Ashby was on the

13    stand, but I think the point -- the point is, as he lays

14    out, that if you actually had to go back and forensically

15    dissect what had gone on here, which is what you would need

16    to do to really get to the bottom of the tax sharing

17    agreement as he put it, it would be a monumental and

18    undoubtedly expensive and uncertain effort.

19              And even thinking about something that was still

20    significant dollars in absolute terms but much smaller

21    dollars in relative terms, the shared services issues and

22    the question of over-allocation to the -- to the T-side.  As

23    Mr. Carter testified, if you wanted to get to the bottom of

24    that, that would require a tremendous amount of effort and

25    investigation and archeology.
```

```
 1              And again, I think Mr. Keglevic made a very
 2     important point: it's not merely continued professional run
 3     rate, it's not merely complexity, it's actually on the
 4     business, and in particular on the TCEH side, and we know
 5     TCEH has suffered the most as an estate and its Creditors
 6     have suffered the most in terms of the degradation of the
 7     market and the exogenous factors, which the company, under
 8     no circumstances, can fully control, but out of bankruptcy
 9     without this millstone around its neck would be a in much
10     better position to adapt and prosper in.  And his testimony
11     there, I think, speaks for itself, that the company has
12     taken a significant beating from this process and is not
13     able to transform itself as it needs to do, not fully in any
14     event, while it's inside of Chapter 11.  That alone, putting
15     everything else aside, would in my view, justify the
16     settlement.
17              And again, on Slide 33, again, Ms. Doré making a
18     similar point about the continued distraction to the
19     company.
20              And then paramount interest of Creditors, Your
21     Honor, this is not something I could have said in such a
22     full-throated fashion on November 3rd, but right now,
23     Creditors overwhelmingly support the settlement.  All the
24     funded debt in the capital structure either has
25     affirmatively voted for a plan that contemplates the
```

1    settlement, have signed onto PSAs or stipulations to jump on

2    the bandwagon for the settlement, or has not objected.  So

3    that's -- we've gone from zero to a hundred.

4              I think that speaks volumes to the appropriateness

5    of the settlement, with the modifications that the E-

6    Committee negotiated for its stakeholders.

7              Your Honor, I do want to talk about the settlement

8    releases and the sponsor releases, and some of this, I

9    apologize for, is a bit redundant or cuts across the plan

10   issues as well, but just as a factual matter, the sponsors,

11   what did they give up and, you may hear a bit more about

12   this from -- from Mr. Kleinhaus later, what did they give up

13   in order to receive the releases?

14             They gave up the $80 million dollars in fees for

15   services, as I noted the record demonstrates were real and

16   tangible and valuable.

17             Second, they gave up their indemnification rights

18   under those same agreements.

19             Third, and this is, I think, quite important, they

20   agreed to give up any upside related to the REIT, and we

21   know that the plan sponsors are buying EFH or seeking to, in

22   order to make a profit.  That's not a revolutionary concept.

23   They're paying the E-side Creditors in full and they expect

24   there'll be significant value on top of that.

25             On an absolute priority basis, the next I the food

1    chain, the next party up that could partake in that, maybe

2    by having to write a check, but in any event, certainly next

3    at bat would be the sponsors, and they gave that up.

4    Without that give-up, we know there would not have been a

5    merger transaction, there would not have been a Plan A.

6              And fourth, and again, you know, in absolute

7    terms, probably significant value, in relative terms, not as

8    much, they're deferring the worthless stock deduction with

9    respect to their EFH equity interest.  I think that is a

10   very full and compelling package of consideration for

11   sponsors, particularly ones against whom no tangible causes

12   of action were identified.

13             With regard, again, to that give-up, and this is

14   Slide 37, you know, Mr. Ying, in his work, imputed a

15   valuation north of $20 billion dollars.  That in and of

16   itself is hundreds of millions of dollars above what is

17   necessary to pay off the entire E-side, so it's rough

18   justice, it's back of the envelope, but it's still a

19   quantification of a very material and significant give-up by

20   the sponsors.

21             And as Mr. Smidt testified, as a rational actor,

22   giving that up now and forever in Plan A and in any other

23   plan, is -- was in return for closure and for releases.  And

24   again, nothing inappropriate about that, it makes all the

25   sense in the world.

1           Your Honor, let me move to Slide 40, and that was

2     a question of, you know, at one point, although again, it's

3     not a live objection, there were assertions that the

4     settlements should be rolled into the plan and should only

5     kick in if Plan A actually consummated, but as we note on

6     Slide 40, parties are giving consideration now in exchange

7     for consideration now, and I won't go through, again, the

8     whole list, but again, the way this was constructed, we have

9     disarmament in exchange for the 550, we have the TCEH first

10    lien lenders agreeing to the 550 only if they get the $700

11    million allowed claim that they control and that they can

12    drag the junior lenders with respect to a future plan, and

13    the first lien lenders also agreeing that, notwithstanding

14    that we will be post-exclusivity in a matter of weeks, that

15    they will keep their powder dry and allow Plan A to proceed,

16    and again, as I'll get to later, we believe very likely to

17    consummate.

18           Again, without that groundwork being laid by the

19    settlement being implemented now and by the parties'

20    promises to each other becoming enforceable now, we would

21    not have the opportunity to pursue the REIT transaction.

22           And in particular, obviously, I want to focus on

23    disarmament, and this also cuts across, you know, plan

24    issues and feasibility issues, but as I think the testimony

25    came in from almost everyone, disarmament was critically

1    important to the Debtor in order to allow us to safely

2    pursue the REIT merger transaction, and as Mr. Keglevic

3    said, the Debtors refused to accept the prospect of being

4    back at square one should the deal fail.

5             And we had talked, obviously, earlier on, you

6    heard from me, Your Honor, about toggle and things of that

7    nature.  We didn't get the toggle and I've returned Mr.

8    Lauria his firstborn and it didn't work out, sorry.  But the

9    -- we did insist on the disarmament, and again, that needs

10   to be put in place separate and independent from the plan

11   itself.

12            And Your Honor again, quotes from Ms. Williamson

13   and Ms. Doré on the importance, the critical importance of

14   disarmament as a remedy here to give us the comfort, the

15   security to go forward with the merger transaction.

16            So Your Honor, in summary, we think the settlement

17   ought to be approved and that the record is overwhelmingly -

18   - points in that direction.

19            Again, we think TCEH possessed large and

20   potentially valid claims against EFH, the claims against the

21   sponsors and directors and officers were weak or non-

22   existent, likely difficulty in collection of E versus T

23   claims, obvious complexity, expense and damage to the

24   business of future litigation, and complete -- almost

25   complete support.

1          We believe the settlement's a valid exercise of

2     the Debtor's business judgment and satisfies that standard

3     or any other standard the Court might choose to apply.

4          Now, Your Honor, the only remaining objections to

5     the settlement agreement, I think, go -- on the firm -- from

6     the U.S. Trustee, there was an objection to the releases and

7     the settlement agreement.  My understanding is, they are not

8     pressing that objection.  They are pressing portions of that

9     objection with respect to the plan releases, and I confirmed

10    that with Mr. Schepacarter this morning.

11         There obviously are issues with respect to fees,

12    and I'm going to backload my discussion on payment of fees

13    and 503(b)4 and just do it just one time in connection with

14    the plan.

15         There were objections from the asbestos claimants.

16    They were concerned that what was being released were the

17    intercompany claims, not between silos but within the E

18    silo, there was going to take away their ability to have

19    someone credit-worthy to collect on asbestos liabilities if

20    and when they were liquidated or the check came due.

21         We clarified, and this is both settlement

22    agreement and plan, that those intra-E claims are being

23    reinstated under our plan, and there will be -- and I'll

24    deal with this in feasibility as well, there will be

25    someone, i.e. EFH, that will be on the hook for those future

1    asbestos claims -- I shouldn't say future -- I should say

2    the manifested and un-manifested claims that come due and

3    any future asbestos claims as well.

4              So we thought that that resolved the asbestos

5    claims objection.  They also raised a fair and equitable

6    objection but for the life of us, we haven't been able to

7    divine or been told what exactly the nature of that

8    objection is.  So, I guess we'll rest on our papers or on

9    reply, I'll address anything the asbestos Claimants have to

10   say.

11             So, with your permission, Your Honor, I would move

12   on to plan matters.

13             THE COURT:  Okay.

14             MR. KIESELSTEIN:  Your Honor, as to the plan,

15   again, most of the elements of the plan are now uncontested.

16   Many elements of the plan were never contested.  I don't

17   plan to address any of the never contested items, we will

18   rest on our papers and or declarations with respect to

19   those, but I am going to speak briefly to good faith, to

20   feasibility, very briefly to impairment, and then the issues

21   of the remaining objections on releases and fees.

22             Your Honor, with respect to good faith, again, I

23   think the legal standard is quite clear under PWS.  What

24   does this plan do?  $30 billion of deleveraging, going

25   concern transactions on both sides, payment of E-side

1    Creditors in full and compromising all the litigation I just

2    tortured Your Honor with for the last half hour.

3            This is completely consistent, in our view, with

4    good faith as it's meant in Section 1129 of the plan, and we

5    don't believe there's any evidence in the record to support

6    any contrary conclusion.

7            We would note that, to the extent the good faith

8    of this plan is somehow impacted by our ardent pursuit of

9    other plans, the record is quite clear.  We did not pursue

10   this plan to the exclusion of all others, quite the

11   contrary.  We aggressively continually sought out an E-side

12   investment and equitization plan.  Had one come together,

13   the toggle discussion might have gone in a different

14   direction, but it never happened.

15           We went so far as to file, through the

16   disinterested directors, our own E-side equitization plan,

17   something analogous to the CRO term sheet, you might say,

18   but that didn't catch on either.

19           And with respect to allegations that we somehow

20   undermined our own marketing process for Oncor, again, the

21   evidence from Mr. Ying and Mr. Keglevic, it is clear that

22   that was a professionally run, independent process, but

23   ultimately did not yield a bid that would be remotely

24   acceptable or remotely comparable to what is on the table

25   today.

1        So -- and again, when we talk about our sponsor

2    process and our governance process, again, I don't believe

3    there's really any argument to make against the good faith

4    of the plan.

5        So let's talk about feasibility for a bit.  And

6    Your Honor, there were two aspects to the controversy on

7    feasibility and again, there's no live objection on

8    feasibility except I think the asbestos Claimants, and I'll

9    get to that a little further on.  But with regard to our

10   independent burden to demonstrate feasibility, we think we

11   have carried that burden.

12       We acknowledge the regulatory uncertainty, but we

13   point to Indianapolis Downs and other cases that note that

14   regulatory uncertainty is not a basis for a finding of lack

15   of feasibility, and although again, it's impossible to

16   predict with precision, we have put on considerable amounts

17   of testimony as to our reasonable -- our belief that it's

18   reasonably likely the PUC will ultimately approve the change

19   of control application and the REIT conversion.

20       We have the testimony of Ms. Doré, who spends a

21   great deal of time focused on the regulatory aspects of the

22   business, who has long-standing relationships in Austin with

23   the staff and the Commissioners, again, no one is purporting

24   to say that is a guarantee, but as she has lots of insight,

25   I think that's un-rebutted.

```
 1              We also know that the Hunts were obtained by the T
 2    unsecured as a partner for their group and they paid a fair
 3    price to get the Hunts on board, and they, I think, were
 4    wise to do it as Mr. Keglevic noted, the Hunt family is
 5    obviously very experience in this area, very well-known in
 6    Texas, very reputable and I think further augments the
 7    notion that this transaction is likely to be approved in
 8    March of 2016, when a decision is slated to occur.
 9              With respect to the other issue on feasibility,
10    and this goes to the, you know, a really old phrase in this
11    case, the so-called "free option," close quote, again, Your
12    Honor, we believe that disarmament creates a powerful
13    incentive for these Creditors, these plan sponsors to
14    actually close.
15              We think the evidence is clear that disarmament
16    and drag far surpass a breakup fee, that would be, I think,
17    consumed in relatively short order.  As we say, disarmament
18    cuts this run rate off at its source and again, creates a
19    substantial incentive.
20              I think Mr. Keglevic put it well when he said the
21    entire package, I think, "overwhelmed the alternative in my
22    eyes," and I think the eyes of our board, including
23    disinterested directors.  And on Slide 52, again, Mr.
24    Keglevic, Ms. Williamson, Ms. Doré, all saying that this is
25    better than any traditional M&A remedy that could be
```

1   obtained, and again, the six cents on the dollar that would

2   be attached to the so-called "booby prize," close quote, I

3   don't think anyone in this room believes that's what this

4   group of investors is playing for.

5           Again, with respect to the Hunts, Mr. Keglevic

6   noted that they've been seeking this asset for a decade.

7   It's been an odyssey for them to try and get control of this

8   very important franchise, and I think they have been very

9   ardent in their pursuit.  And obviously, if the deal doesn't

10  close, they don't get any of the 550.  It will just have

11  been a failed effort, and that's not what they're in this

12  for.

13          Your Honor, the clients of Mr. Laurie and Mr.

14  Shore and again, as Mr. Keglevic testified, sophisticated,

15  big brand financial equity buyers, I think he said this

16  would be a flagship transaction for them in many ways, and

17  they are not in the business of not closing transactions.

18  Is it true that if something incredible happens in the

19  market or something wildly better comes along as

20  economically rational actors they may choose to pursue that?

21  That's possible, but the standard is not -- for feasibility,

22  not what is possible, what is likely.

23          We think their actions, their words, demonstrate a

24  commitment to this deal and a strong desire to close it as

25  quickly as possible.

1            Your Honor, feasibility with respect to New EFH,

2     this was an issue that had been raised by the EFIH first and

3     seconds who we have obviously since settled with, it's also

4     been raised by the asbestos Plaintiffs.

5            The testimony I think is very clear that the

6     capitalization of New EFH is going to be very strong.  They

7     will likely get a strong rating at emergence, per Mr. Ying,

8     and Mr. Keglevic's deposition was -- I'm sorry, testimony

9     was quite clear, that even if the full make whole bill came

10    due someday, and we think that's unlikely, but if it

11    happened that, in his view, the only economically rational

12    thing to do would be to pay that, and thereby keep the

13    remaining billions of dollars of equity in EFH.

14            And if it's true for the EFIH first and second

15    lien, for that bill coming due, it's that much more true for

16    the asbestos liabilities, which as I said, will be

17    reinstated and will ultimately be due and payable from EFH

18    as I'll try and -- momentarily, the historical asbestos

19    payouts on an annual basis have been small.

20            If this -- if you took all the funded debt and

21    made a map of the world out of it and then you took the

22    asbestos, it would be Vatican City or Luxembourg.  It's just

23    not a material number, Judge.  It's a couple of million

24    dollars a year.

25            So we think feasibility is clearly established --

1          THE COURT:  You might see an uptick in asbestos

2     cases.

3          MR. KIESELSTEIN:  We might, and we'll talk about

4     what's come in per the bar date notice, that's true.

5          THE COURT:  You've -- yeah, you've jabbed the

6     dragon, so.  But again, the evidence clearly indicates what

7     you said, which is correct, was it's about $2 million a

8     year.

9          MR. KIESELSTEIN:  Right, and I'll talk about

10    what's come in since the bar date and most of that is un-

11    manifested, frankly.  So there may be an uptick in

12    litigation.  Whether it's going to be a material uptick in

13    payouts is another question, Your Honor.

14          Impairment, Slide 56, mercifully short, Your

15    Honor.  We obviously reached a deal with the EFIH firsts and

16    seconds, thanks in no small part to the good offices of

17    Judge Gross.  We thank him again for his work on that matter

18    and on the PIK matter, but we have put in language,

19    painfully negotiated over a number of days, into the plan,

20    and some of it's working its way into the confirmation order

21    as well.

22          God help me if I try to recite it verbatim.

23    Essentially, it provides for the continuation of the

24    existing liens and the continuation of the debt documents

25    for certain purposes, obviously contemplates payment by the

1    reorganized companies of certain potential claims that are

2    currently on appeal, and preserves certain indemnity and fee

3    claims after the effective date.  So I don't think we have

4    any outstanding objections on the impairment front.

5         So that takes us to the contested issues, what's

6    still contested.  And, again, I think we want to talk about

7    the US Trustee' issue first and, in particular, releases.

8         Here's my understanding of where the US Trustee

9    sits today and, again, I have to recognize the work of Mr.

10   Schepacarter and Ms. Schwartz.  This case has been as much

11   of a hardship on them as it has been on anyone else.  They

12   have lots of other cases, too, and we take up an inordinate

13   amount of their time.

14        That said, again the US Trustee is not objecting

15   or pressing its objection to the releases in the settlement

16   agreement.  The US Trustee is not objecting to the debtor

17   releases in the plan, that is the releases given by the

18   debtor, except for third-party release -- oh, I'm sorry,

19   except to the extent that they believe there ought to be or

20   needs to be a carve out for gross negligence and willful

21   misconduct.  We disagree and I'll speak about that in a

22   moment.

23        The US Trustee does not object to the third-party

24   releases in the plan, except for third-party releases of

25   directors and officers and, again, to the extent that the

1   releases cover gross negligence and willful misconduct, they

2   think that should be carved back as well with respect to the

3   third-party releases, so.

4           THE COURT:  I thought there was a -- oh, as it the

5   exculpation provision that has a carve out?

6           MR. KIESELSTEIN:  Yes, as the law in this circuit

7   requires, Your Honor.  We don't believe that's the law with

8   respect to releases.

9           THE COURT:  So no objection to plan releases other

10  the Ds and Os?

11          MR. KIESELSTEIN:  And the lack of the carve out.

12          THE COURT:  Okay.

13          MR. KIESELSTEIN:  So I'm going to skip over the

14  slides that talk about the zenith factors insofar as they

15  relate to debtor releases, unless Your Honor would like me

16  to spend the time --

17          THE COURT:  It's fine.

18          MR. KIESELSTEIN:  -- in doing that.  Let's see.

19  Okay.  I am going to go all the way to Slide 70, Your Honor,

20  the gross negligence carve out.

21          As Your Honor correctly noted, these carve outs

22  are required in the 3rd Circuit for exculpation but, to our

23  knowledge, the 3rd Circuit, no lower Delaware cases require

24  that carve out.  And, in fact, there have been a number of

25  confirmed plans in this district that don't include that

1    carve out.  Sometimes they're in there.  Sometimes it's just

2    a way of resolving objections on the courthouse steps.  I

3    don't know that it's necessarily heavily litigated.  We

4    actually think it's quite important.  We think the gross

5    negligence -- I'll use that as shorthand -- carve out

6    creates a substantial loophole that would actually undermine

7    the fresh start that's fundamental to the settlement.

8            Again, we point to the overwhelming creditor

9    consensus for releases that do not, in fact, contain this

10    carve out, either in the debtor or the third-party release.

11    We think that's very meaningful and I think that's done by

12    people who are well aware in large measure of what it is

13    that they are giving up.

14            This is not a theoretical discussion, Your Honor.

15    In both the supplemental objection filed by conflict counsel

16    for the committee, there were specific allegations of causes

17    of action that sound in gross negligence, for instance, the

18    Texas law claims of waste had built into them or are built

19    upon a finding of gross negligence.  Seemingly in the TCH

20    proposed standing complaint, if I'm remembering correctly,

21    there are assertions of actual fraud, as in actually, you

22    know, not constructive fraudulent transfer but actual

23    fraudulent transfer.

24            And to the extent that what we are talking about

25    here is, in essence, a large settlement with sophisticated

1    creditors, people who have asserted those claims can give up

2    those claims.  And it's not merely we're seeing phantoms in

3    the night.  There are claims that have been trotted out and

4    it's important that those claims go away in the context of a

5    global settlement, a full payout on the E-side and

6    overwhelming support on the T-side.  There may be other

7    cases where that carve out may not be appropriate but we

8    certainly think this is a case where it's entirely

9    appropriate.

10            And let's just remember what the sinkhole is that

11   if there are claims that are brought on this basis, you then

12   have claims back against the company under indemnification

13   agreements, under bylaws, under Delaware law.  You know,

14   maybe they're not covered.  Maybe they are.  But you're

15   going to have a lot of litigation that flows.  So this

16   threat unraveling actually can cause a lot of damage to the

17   fresh start which this company so desperately needs.

18            So we think under the circumstances of this case,

19   it's perfectly appropriate for this carve out not to be

20   required.

21            I want to talk about exculpated parties for a

22   minute because I didn't cover that and Mr. Schepacarter and

23   I, frankly, haven't had the chance to catch up in the last

24   24 hours on this issue.  But it is a very important issue.

25            We have exculpation language in the plan that

1    covers the waterfront but we think this doesn't go beyond

2    what our plan fiduciaries or what could be asserted in

3    claims are as state fiduciaries.  So we don't think we've

4    run afoul of Your Honor's bright line.

5           We note the case law where equity holders are

6    found to have fiduciary duties.  That's a longstanding law.

7    We cite law where employees were found to be appropriately

8    within the scope of exculpation because they have duties to

9    their employers and we think those can sound in fiduciary

10   law and have.

11          With regard to affiliates, Your Honor, the US

12   Trustee I think is of the view that that is too attenuated.

13   We think that we have a number of non-debtor affiliates that

14   if not -- our fiduciaries are, again, could be accused of

15   having breached the fiduciary duty and we're not trying to

16   protect people from claims that are asserted against them

17   that don't sound in fiduciary duty.  It's the ones that do

18   where we think they are entitled to protection.  And I want

19   to take a minute and talk about Oncor because it's a bit of

20   a unique fact patter.

21          As you know, Your Honor, the debtor owns 80% of

22   Oncor.  Typically shareholder -- I'm sorry, subsidiaries owe

23   duties to their majority parents because of the regulatory

24   constraints here.  We have the rain fencing in place, which

25   puts a different gloss on the relationship.  But most

1    fundamentally and most importantly, I think the record is

2    clear that Oncor has played an absolutely indispensable role

3    in getting us to where we are today and making a plan

4    possible.

5            And we list on Slide 74 some of the many ways in

6    which they have bestowed their very meaningful cooperation

7    on the debtors and on this process.  And that's cooperation

8    in facilitating the merger.

9            As you know, EFH holds but does not operate Oncor.

10   It has its own management team and its own board.  Those

11   managers and those directors at that entity were heavily

12   involved in helping educate the plan sponsors as to the

13   business, as to the potential for splitting the business

14   through a REIT structure, all manner of education that we

15   could provide sort of second hand but they were the only

16   ones that could provide first hand.  And I think you

17   hopefully will hear form others that they played a crucial

18   role.

19           They also executed the Oncor side letter which

20   basically governed how the business was going to be run

21   between now and whenever a change of control occurred.

22   That, as you know, was a precondition, a condition precedent

23   I believe to the plan, perhaps to the settlement agreement

24   and the PSA as well.  I'm not remembering that.  But it was

25   a critical step to cross and there was heavy negotiation

1    that Oncor was involved in.

2            They also obviously submitted the joint regulatory

3    application as they must.  They own the asset directly.  And

4    so they have been intimately involved in the process with

5    the PUC and that needs to continue.  And, again, that's at

6    the heart of the plan that's before Your Honor.  And they've

7    agreed to take steps necessary to help implement the

8    conversation plan, which is, again, no small matter.

9            So we think it's -- the record's overwhelming that

10   the Oncor folks have earned themselves the limited

11   protection that exculpation provides.

12           Your Honor, I want to turn to fees, if I might and

13   I know that's a bit of a thorny issue.  But as I step back

14   for a minute I just want to man the court that breaking the

15   fees down into buckets is probably a helpful exercise.

16           We have the E-side that's unimpaired and going to

17   be paid in full.  We have fees for professionals on that

18   side that would get paid but only upon payment -- closing,

19   I'm sorry, of the merger and we've listed on 75, you know,

20   who the various parties are, when they get paid, under what

21   document they are being paid.

22           So I think for the bulk of the fees we're talking

23   about, they will effectively be paid by the plan sponsors,

24   perhaps not technically paid by the plan sponsors but we all

25   know the plan sponsors are bringing $12 billion to the table

1    to close this deal and at the closing table, there would be

2    a series of payments made.  Maybe they passed through the

3    reorganized debtor.  Maybe they're made directly.

4            But in any event, they are funds that are

5    ultimately sourced from the plan sponsors.  And we think

6    that puts this on a different footing from someone coming in

7    on a 503(b)(4) claim and seeking to dilute recoveries for --

8    of an estate that would directly impact creditors.

9            Remember, the E-side's going to be paid in full,

10   Your Honor.  So nobody's getting diluted by the payment of

11   the fees.

12           THE COURT:  There's nothing in 503 that talks

13   about dilution or talks about impairment of creditors being

14   relevant for the administrative expense analysis.

15           MR. KIESELSTEIN:  And that I think -- well, I

16   think that some of the case law talks about the impact of

17   granting a 503(b)(4) on the estate and here there would be

18   no impact on the estate in our view.

19           I would also note, you know, it's our view that

20   503(b)(4) is not the exclusive means for an unsecured

21   creditor to get paid in a bankruptcy case.  And, you know,

22   we look to Judge Gerber's opinion in Adelphia.  We recognize

23   the district court in Lehman came out the other way and

24   suggested that was the sole inexclusive method.  We don't

25   think that's actually the right answer.  We think there are

1   a number of paths by which unsecured creditor professionals

2   can get paid in a case, particularly in the context of

3   settlements.

4          And, Your Honor, we note, for instance, that when

5   you talk about PSAs -- and Your Honor has obviously had a

6   lot to say about PSAs.  And you've noted that what's a PSA

7   from the debtor's perspective because presumably they have a

8   robust fiduciary out.  It's just an opportunity or an

9   obligation to pay fees of some of the parties that you've

10  reached a certain level of consensus regarding what a future

11  plan would look like.

12         And what we have under the settlement agreement,

13  obviously, is something even better than a PSA.  It's a PSA

14  plus and the notion of paying professional fees pursuant to

15  a settlement agreement I think takes it outside the plan

16  context altogether for at least a number of the parties we

17  identified on Slide 75.

18         So for instance, the T-unsecured group, the T-

19  seconds, the T-side indentured trustees, that $49.75

20  million, that would be paid prior to emergence, that's

21  pursuant to the settlement agreement that was reached.  And

22  in our view, that takes it outside of the plan ambit and,

23  again, puts it in a more common place position of a

24  settlement with an unsecured creditor where fees are part of

25  the deal.

1          I don't think unless it's a -- and maybe it is a

2    new initiative, a new policy of the US Trustee that those

3    sorts of settlements where fees are included or incorporated

4    run afoul of 503(b)(4).  That may be the new kind of bright

5    line approach.  I don't think that's the practice and I

6    don't think that's appropriately the law, either.

7          So, Your Honor, you know, we think that we can do

8    what Judge Gerber did on stuff that's paid through the plan

9    and look at 503(b)(1).  You can look at 1123a of the code.

10   You can look at 363, all as means to accommodate the fee of

11   professionals for unsecured creditors who are onboard with

12   what the debtor is trying to do.

13         I think if you look at the fact patterns for most

14   of the substantial contribution claims, it's somebody who

15   comes in and claims to the both sometimes, you know,

16   confusion and wonderment of the other parties in the case

17   that they actually did something to alter the trajectory of

18   the case or they were a helpful gadfly or whatever the case

19   may be and should get paid for it where the debtor and most

20   of the consenting creditors say, no, we don't agree.  We

21   absolutely don't think what you did was helpful.

22         Here we think what was done by the various parties

23   whenever they got onboard the train were helpful in shaping

24   the deal that's before Your Honor.  So I guess, you know, I

25   would conclude by saying if Your Honor felt -- and we don't

1    think it's the right conclusion -- that there had to be a

2    showing of substantial contribution on the record you have

3    today, Your Honor, rather than making people jump through a

4    variety of hoops, at least for any number of the parties

5    here, you could find that they've made a substantial

6    contribution to these cases.  And then it's just a question

7    of the reasonableness of the fees.  And we are not trying to

8    take the reasonableness of the fees off the table for

9    anybody that is --

10             THE COURT:  Well, doesn't the question come down

11   to who decides whether they're reasonable or not?  And under

12   your structure, the debtors decide what's reasonable.

13             MR. KIESELSTEIN:  That is true --

14             THE COURT:  And the trustee believes that the

15   court has to decide what's reasonable.

16             MR. KIESELSTEIN:  Right.  And, again, but I think

17   we often have situations with secured creditors and we're

18   not really talking about secured creditors here even though

19   506(b) talks about reasonable fees where that issue is

20   resolved between debtors and secured creditors all the time

21   and it only comes to Your Honor if there is a dispute.  Then

22   it's brought to the court to make a determination.  But if

23   there's an agreement and, again, on the E-side there's no

24   dilution.  On the T-side there's overwhelming support.  You

25   know, whose ox is being gored here?  I don't think

1    anybody's, which is why I think 503(b)(4), again, which his

2    usually someone on a mission to prove that they to the,

3    again, against the opinion of other people in the case,

4    provided substantial contribution.

5              Here, everyone in this room, every stakeholder

6    agrees that we're all here today because of the collective

7    effort and that everyone should get paid their reasonable

8    fees for bringing us to where I think is a really amazing

9    result.  But I understand the US Trustee's arguments on that

10   point.

11             You know, the one additional argument, Your Honor,

12   is that the transaction fees, the fees that are going to be

13   paid on an ongoing basis pursuant to the merger document and

14   the equity commitment documents, those have not been

15   objected to, so those are, I think, not subject to dispute.

16             Your Honor, let me turn to the asbestos parties

17   briefly.

18             THE COURT:  Give me just a second, please.

19             MR. KIESELSTEIN:  Sure.

20             THE COURT:  Could you go back to the last slide,

21   please?  Thank you.  Go ahead.

22             MR. KIESELSTEIN:  Yeah, I think actually I skipped

23   over one thing which was the objection of the US Trustee to

24   the third-party releases for the directors and officers for

25   them altogether.

1                THE COURT:  Yes, you did.  Yes.

2                MR. KIESELSTEIN:  And so, you know, again, Your

3     Honor, in our view, the record is overwhelming that the

4     directors and officers in this case went above and beyond

5     the call of duty.  I've never in a mega case or non-mega

6     case seen the amount of process and attention.

7                I think the record is clear there've been

8     literally hundreds of board meetings and board updates,

9     sometimes on a moment's notice, total intense engagement by

10    the board.  I know people say that's their job but they --

11    we hear that in keep arguments too -- it's their job.  But

12    the people here have really gone above and beyond and I

13    would couple that with the fact that nobody has identified

14    claims against the Ds and Os that the debtors hold, let

15    alone any non-derivative direct claims against the directors

16    and officers.  But this is America and people file all sorts

17    of stuff.  I think the Ds and Os here have fully earned the

18    third-party releases through their constant attention and

19    vigilance in these cases and we would ask that that

20    objection be overruled.

21                And, again, we have overwhelming consent and it's

22    sort of a philosophical question whether when you have a

23    plan that says we're going to give releases whether you like

24    it or not to certain people, we're going to extra releases

25    whether you like it or not in favor of certain people and

1   people say, okay, then is that a non-consensual release?  I

2   guess if you're consenting to a non-consensual release it's

3   consensual and that's the case with the vast majority of the

4   parties in this case.

5           With that, Your Honor, let me turn to the asbestos

6   issues, and this is Slide 85.  So the asbestos plan is

7   subject on a number of bases.  First, the lack of a 524(g)

8   channeling objection, second, alleged unequal treatment of

9   manifested and unmanifested claims, third, release of

10  certain inter-debtor claims and I talked about that in the

11  context of feasibility, et cetera.  Again, they assert the

12  claim's infeasible because of the amount of liabilities and

13  they also assert that the unmanifested plaintiffs had not

14  received due process and we believe each of these

15  subjections should fail.

16          Your Honor, just to remind you, these are not

17  asbestos-driven mass tort cases.  The asbestos liabilities

18  are limited.  The debtor never manufactured a product with

19  asbestos.  They never sold a product with asbestos into the

20  stream of commerce.  There was asbestos at a number of

21  identified plants.  Everyone knows what those plants are and

22  where they are.

23          Historically, there have been a small number of

24  asbestos cases and low historical spend.  As Your Honor

25  noted, we may have poked at a sleeping bear a little bit and

1    I'll talk about that in a minute.

2              There are fewer than 400 scheduled asbestos cases

3    now.  Compare that to the typical case with a 524(g)

4    injunction where it's in the tens of thousands.  The total

5    spend in history on asbestos claims is $26 million and

6    change.  The yearly spend is $2 million.  The book liability

7    is $14 million.

8              Again, to remind the court, the liabilities fall

9    into two buckets.  You've got discontinued operations on the

10   E-side and then you've got plan generation liabilities on

11   the T-side.

12             Your Honor established over the objection of

13   asbestos plaintiffs a bare date of December 17th for the

14   holders of current and unmanifested asbestos claims.  Those

15   claims are in Class A3 on the E-side.  And to the extent

16   they're filed, they will be reinstated against the

17   applicable debtor.  And to the extent they're filed on the

18   T-side, they will participate in the cash out pool pro rata

19   with other general unsecured creditors.

20             We're not doing anything with regard to future

21   asbestos liabilities, and by which I mean liabilities that -

22   - exposure that has not happened yet as opposed to

23   unmanifested where the exposure has occurred but the disease

24   has not yet shown itself.  Those are not being treated at

25   all.  They're not claims under the bankruptcy code, so

1     there's no issue or discharge there.

2              With regard to the 524(g) injunction, Your Honor,

3     that's been asked and answered in this case.  Your Honor

4     ruled that that's a permissive step, not a mandatory step

5     and that it was appropriate for the debtor not to go down

6     the 524(g) route here.  No facts have changed that we are

7     aware of that would make a 524(g) injunction appropriate

8     now.  So we think that objection should be overruled.

9              With regard to unequal treatment, not really sure

10    what's being asserted here but what we can say is that on E-

11    side of the capital structure, the manifested and

12    unmanifested claims receive the same treatment.  On the E-

13    side reinstatement, on the T-side the ability to participate

14    in the cash out pool, however that is calculated.

15             With regard to the intercompany claims, again, I

16    touched on this briefly before.  There were concerns that

17    were expressed that these companies in the yellow lower

18    boxes were going to be stranded and without recourse to

19    their intercompany claims against gas company and EFH.  We

20    have clarified that as best we know how.  But those claims

21    will, in fact, be reinstated and, again, as the next slide

22    talks about, there should be no issue with regard to

23    feasibility.  Mr. Keglovic's statement on that I think

24    speaks for itself.

25             He said, you know, I think there's a fairly clear

1    path to payment if payment were needed for the asbestos

2    claims and based on the $2 million, the $14 million and the

3    $28 million that seems like a stunningly obvious conclusion

4    that's hard to argue with.

5            With regard to notice to unmanifested claims, Your

6    Honor, we came to you with a set of notice and solicitation

7    procedures with respect to the bar date and the plan, which

8    contemplated publication in various national and regional

9    newspapers.

10           The asbestos claimants did not object to the

11   notice and solicitation procedures.  I think it's a little

12   late for them to say now that there was some lack of notice

13   with regard to unmanifested.  We tracked very expensively to

14   a large degree the plan that was put in place with respect

15   to the bar date so that we reached those folks that we could

16   reach.

17           Again, let me speak to what's happened since the

18   claims date has been filed.  Approximately 4500 claims have

19   been filed, I think the bulk of them unmanifested.  I can't

20   say all of them unmanifested but that's the number that have

21   come in and while that's a significant number, again, these

22   are all unmanifested claims that may or may not actually

23   translate into something down the road.

24           THE COURT:  You've got a class action filed as

25   well.

1          MR. KIESELSTEIN:  We're aware of the class action

2   being filed.  I know that's not before Your Honor today.  We

3   have some views on that, but I won't burden the Court with

4   them right now.

5          We think our notice under the classic Malane v.

6   Central Hanover formulation was more than adequate to

7   satisfy all due process concerns and so that objection

8   should be overruled as well.

9          And last but not least, Your Honor, just a few

10  other objections, FL Smidt, they basically assert that they

11  have to be paid in full and it's a violation of absolute

12  priority for them not to be.  We think that just betrays,

13  with respect, a fundamental misunderstanding of how the code

14  and how the plan works.

15         I did want to correct one thing on the record.  We

16  had said in our reply brief that we had no retained our

17  claims against FL Smidt but, in fact, that was an error.  We

18  have, Honor, retained causes of action lists, kept our

19  claims against FL Smidt, which is, of course, within a

20  debtor's prerogative to do.

21         As to the absent priority objection, again, the

22  class within FL Smidt sits within and I don't believe

23  there's been any classification objection.  They voted

24  overwhelmingly in support of a plan.  Obviously there is no

25  absolute priority issue if we're not cramming the plan on

1    that class and we are not.

2            And the best interest objection is simply belied

3    by the plain words and numbers of the liquidation analysis

4    that came into evidence through Mr. Stewart's testimony.  So

5    we think that objection should be overruled and we have two

6    pro se objectors who we attempted to reach in the run up to

7    today.  I don't think we were successful.

8            With regard to Ms. Robinson, her claim is

9    currently the subject of an objection, which is why she

10   didn't receive a ballot.  But even if it wasn't, her claim's

11   against EFH and is unimpaired, so no issue there.

12           And then Mr. Hacker asserts that he's looking for

13   payment of principle on the EFIH first lien notes but, of

14   course, those were, in fact, repaid in June of 2014.

15           So, Your Honor, unless you have any questions,

16   I've burdened you for a long time.  I'm finished with my

17   presentation.

18           THE COURT:  Okay.  Thank you.

19           MR. KIESELSTEIN:  Thank you.

20           THE COURT:  I'm sure others wish to be heard in

21   favor of the confirmation and settlement.  Before we do

22   that, let's take a short recess and just a few minutes we'll

23   reconvene.

24      (Recess)

25           THE COURT: Please be seated.  All right, who's

1    next?

2              MR. THOMAS: Good morning, Your Honor.

3              THE COURT: Mr. Thomas.

4              MR. THOMAS: Mark Thomas, Proskauer Rose, counsel

5    to Energy Future Holdings Corp, acting on behalf of and at

6    the direction of Mr. Donald Evans and Ms. Billie Williamson.

7              Your Honor, I will be brief.  Mr. Kieselstein was

8    able to remove half of what I was planning on saying, but

9    I'm going to address certain of the accusations and

10   allegations that have been made prior to today, regarding

11   the disinterested directors of EFH.  And those allegations

12   and accusations reflected on their integrity, their motives,

13   whether they were fully informed, and they're bona fide.

14             And Your Honor, the record of this trial is clear,

15   and there was no evidence whatsoever that the disinterested

16   directors of EFH were improperly influenced by the sponsors,

17   or anybody else, that they acted in their own self-interest,

18   or that they were otherwise unfit.

19             There's no evidence that their role was limited.

20   There's no evidence that they were anything other than fully

21   informed.  And there's no evidence that there was any faulty

22   process here, or that the settlement that is incorporated in

23   the settlement agreement was the result of stealth, or

24   anything that was not transparent.

25             Your Honor, when a joint administration motion is

1    met with a 40-plus page objection, it's clear that there are

2    inter-Debtor claims that have to be resolved.  Everyone's

3    known that.

4              And Your Honor, from the moment of the

5    restructuring support agreement, and NextEra showing up, it

6    was clear that these estates were in play.  And Your Honor's

7    November 2014 ruling on the bid procedures in effect,

8    implemented a disinterested director governance system, that

9    the debtors and the various disinterested directors and

10   managers seized upon, and took advantage of, and worked to

11   the best interests of every individual estate.

12             Mr. Evans and Ms. Williamson were focused on the

13   EFH estate, solely.  They do not sit on any other estates,

14   and the evidence is clear, that's why they were chosen.

15             Your Honor, the November 2014 bid procedures

16   ruling was incorporated into the January 2015 bid procedures

17   order, and notwithstanding allegations and accusations, the

18   order, which was consented to by the EFH committee provided

19   the T-side disinterested manager, Mr. Sawyer, with certain

20   rights: the right to approve bidding procedures, the right

21   to approve the choice stalking horse, the right to approve

22   the choice of a winning bidder.

23             But Ms. Williamson testified live that she

24   believed that if there was ever an impasse reached, in

25   connection with the Oncor marketing process that we would be

1    before Your Honor -- we being the EFH disinterested

2    directors -- seeking relief from whatever the impasse was.

3            Your Honor, the testimony, as Mr. Kieselstein

4    said, is overwhelming and it supports, we believe, entry of

5    an order approving of a settlement agreement, and confirming

6    the plan.  But to step back for a moment, I just want to

7    reflect, Your Honor, on the quality of the witnesses that

8    were presented at this hearing -- the co-CROs, Ms. Doré, Mr.

9    Keglevic, the key management personnel, Mr. Horton, Mr.

10   Carter, Mr. Ashby, the sponsor representative, Mr. Smidt,

11   the disinterested director, Ms. Williamson, Mr. Cremens,

12   their credibility, their knowledge, and their integrity

13   shone through their testimony.

14           Your Honor, the Oncor sale process really started

15   with the RSA, but when Your Honor approved the bidding

16   procedures in January 2015, there was a robust process that

17   was undertaken, and it was something that the EFH

18   disinterested directors were keenly focused on, and keenly

19   aware of.

20           And when we think from the EFH estate, what does

21   EFH get as part of this settlement agreement, there was

22   focus by certain objectors on a "premise" that EFIH claims

23   would be paid in full.  And the disinterested directors

24   settlement, which is incorporated into the settlement

25   agreement, provided that EFH is settling much more than

1    merely claims that the T-side asserts against EFH.  The

2    evidence is undisputed that EFIH holds almost $1.3 billion

3    of EFH legacy notes.

4              Ms. Williamson testified, additionally, EFIH could

5    assert a claim for in excess of $600 million for a dividend

6    that it paid to EFH within 14 months of the petition date.

7              So EFH was faced with $2 billion of claims from

8    EFIH, as well as asserted litigations claims, principally

9    avoidance action claims from the T-side.  Those claims were

10   asserted at somewhere between $1.8 billion and $2.5 billion,

11   exclusive of the LDO claim.

12             And the testimony was clear from both Mr. Sawyer

13   and Ms. Williamson that that LBO claim was on the table, but

14   it was such an enormous amount that to try to affix an

15   amount to that $20 billion-plus claim would have skewed the

16   entire settlement dynamic and negotiation.

17             So from the EFH's stake, settling all those claims

18   for one $700 million allowed unsecured claim was a very

19   positive thing.  And if I could, I'd like to put onto the

20   screen, Your Honor, a chart.  This chart was in Paragraph 30

21   of Mr. Keglevic's written direct testimony.  And there has

22   been a little confusion in the record about what the impact

23   was when NextEra lowered its bid by almost $1 billion in

24   June of 2015, as part of the Oncor sale process.

25             And Your Honor, what this chart will show is if

1    you could highlight the line that says "plus cash available

2    from EFIH, EFH as of 3/31/16", that's a $601 million number.

3    And if you could highlight Footnote 2, which is referenced

4    in there, that $601 million number consists of $312 million

5    of EFH cash, projected as of March 31.  And then if you

6    could exit out of that, and go back to the original screen,

7    please.

8              So Your Honor, when NextEra, as part of the

9    marketing process, dropped its bid, as reflected in this

10   chart, this chart shows that the distributable value, total

11   value to EFIH and EFH, was $9,179,000,000, but that included

12   EFH cash.

13             If the EFH cash was taken out, if the $312 million

14   was taken out, what this chart reflects is that the EFIH

15   creditors would not get paid in full, with zero make-wholes,

16   and zero post-petition interest, there would be a shortfall

17   of about $182 million.  So at that point -- you can take the

18   screen down, thanks.

19             At that point, in June, the EFH disinterested

20   directors were consistently considering their fiduciary out,

21   and whether or not they should change the disinterested

22   directors settlement, leading up to August, whether or not

23   they should approve the inter-Debtor settlement set forth in

24   the settlement agreement.  And Ms. Williamson testified that

25   based upon that drop in the NextEra bid, there was a very

1    material risk that in the absence of the inter-Debtor

2    settlement, EFH would be on the hook to $1.3 billion to $2

3    billion of EFIH claims, as well as the litigation claims at

4    TCEH.

5            So Your Honor, the evidence is overwhelming that

6    the EFH disinterested directors had thorough and exhaustive

7    diligence.  They were independent, they were fully informed.

8    They obtained, discussed, and considered stakeholder input.

9    They obtained professional, independent advice, and they

10   worked diligently on behalf of their estate only, and that

11   they completely fulfilled their duty of care, their duty of

12   loyalty, and all their fiduciary duties.  Thank you, Your

13   Honor.

14           THE COURT:  Thank you, Mr. Thomas.

15           MR. WALPER:  Good afternoon, Your Honor.  Thomas

16   Walper, Munger, Tolles & Olson, counsel to EFCH and TCEH as

17   directed, actually manager, Mr. Hugh Sawyer.

18           Your Honor, you heard a great deal at trial and

19   from Mr. Kieselstein as well as Mr. Thomas about the

20   employment of the disinterested directors, their rendition

21   of independent advisors, as well as the negotiations.  I

22   would just like to spend a few minutes from the perspective

23   of Mr. Sawyer, and the TCEH and EFCH estates, talking about

24   particular issues that relate to the settlement.  And I'll

25   summarize a bit of evidence.

1         Mr. Sawyer testified he is a disinterested

2    director at EFCH, and TCEH.  He has over 35 years of

3    business experience.  He's been the CEO of a number of

4    companies.  He's been a CRO, and he's acted as director of a

5    number of private and public companies.  He has no

6    relationships with any of the sponsors, nor does he have any

7    relationships with Debtors, other than those on the T-side,

8    TCEH and EFCH.

9         Very significantly, and after the November 14th

10   ruling of Your Honor, the TCEH and EFCH boards approved

11   resolutions that empowered disinterested directors to

12   determine whether matters were conflict matters, to solely

13   deicide, to make decision with relation to the conflict

14   matters.

15        And as necessarily, implement those decisions in

16   connection with the Debtors' officers.  Mr. Sawyer testified

17   then, during his 35-year career, that he had never seen such

18   a broad delegation of authority to a disinterested director.

19   And in fact, very significantly, and to the extent that

20   there is any question whatsoever, there was absolutely no

21   pushback by any of the officers, directors, or the sponsors

22   with respect to the adoptions of those resolutions.

23        Just after the resolution was adopted, Mr. Sawyer,

24   in consultation with the various T-side constituents,

25   declared a number of matters to be conflict matters.  Those

1    included, as this Court has heard, the intercompany claims

2    that are held by TCEH.

3            After that time, Mr. Sawyer engaged in extensive

4    diligence, concerning the intercompany claims. He reviewed

5    the prior work by other advisors, he met with those

6    advisors.  He met with the various creditor constituents.

7    He met with company personnel, and reviewed voluminous

8    documents that were both in the Legacy database, as well as

9    other documents that were produced through his independent

10   advisors.

11           There were literally dozens of meetings that

12   occurred, as he testified with other professionals, in

13   connection with the evaluation of those claims.

14           At the conclusion of the due diligence, Mr.

15   Sawyer, through his independent advisors, presented

16   potential claims of approximately $1.8 billion to $2.5

17   billion to the EFH and EFIH professionals, as well as a

18   claim of approximately $2.1 billion, relating to the

19   leveraged buyout transaction.

20           Settlement proposals were exchanged during March -

21   - during March, and from March 24th to March 26th, there

22   were meetings in the Dallas headquarters of EFH between the

23   disinterested directors and their advisors to attempt to

24   negotiate a settlement.  Mr. Sawyer's testimony brought to

25   this Court really a blow-by-blow discussion of those

1    negotiations.

2         That was, of course, just figuratively, not

3    literally, and there were three days of the adversarial and

4    sometimes very heated negotiations between the disinterested

5    directors.  On March 26th, the evidence shows that the

6    disinterested directors reached an agreement in principle,

7    and that agreement in principle is essentially what is

8    incorporated as part of the settlement in connection with

9    the matter before this court.

10         Over the past few weeks, the court has been

11    literally barraged with testimony about the merits of the

12    intercompany claims.  The testimony has demonstrated that

13    the settlement of the intercompany claims is well within the

14    range of reasonableness and is an appropriate exercise of

15    the business judgment of the T-side and the E-side debtors.

16    I'm just going to take a minute and summarize some of those,

17    and it'll appear duplicative, but it is really part of the

18    independence of this process.

19         So first, with respect to the tax sharing claim,

20    which was scheduled claim by EFH and TCEH, you heard the

21    testimony of Mr. Ashby, a senior tax director at EFH.  He

22    testified that the recording of the scheduled $754 million

23    claim was consistent with the company's past practice in his

24    interpretation of the tax sharing agreement.  He did

25    acknowledge that the tax sharing agreement may be, quote,

1    ambiguous, unquote, but there was no question that this

2    issue would be one that would be disputed and litigated

3    because there was no clear answer.

4            He also testified that there was a payment of

5    approximately $100 million by TCEH to EFH under the tax

6    sharing agreement in the one year before the bankruptcy

7    filing, which would be preferential.  And one of the

8    arguments against that claim has been that it was the

9    ordinary course of business.  Mr. Ashby testified that it is

10   a relatively rare occurrence under the tax sharing

11   agreement.

12           I another very significant claim was the evidence

13   of the underpayment of interest to TCEH by EFCH over a

14   number of years in accordance with intercompany notes; notes

15   that could be challenged as fraudulent transfers.  You know,

16   essentially, the underpayment of interest could not

17   constitute reasonable equivalent value because of the great

18   credit risk associated with lending money to EFH at that

19   time.

20           You heard the testimony, your honor, of Mr.

21   Mendelsohn, who had analyzed the interest rate and other

22   terms of the notes and concluded that it was not fair

23   compensation.  And in his opinion, based upon his analysis

24   of EFH, he felt that TCEH was under compensated in the range

25   of $425 million to $834 million.  It seems like the

1    resolution of that claim at all justifies -- that claim

2    alone justifies a $700 million settlement.

3            Third, the settlement agreement resolves

4    fraudulent transfer claims based upon the over allocation of

5    shared services and sponsor fees.  You heard the testimony

6    of both Mr. Sawyer and Mr. Carter that from 2010 to 2013,

7    100 percent of the sponsor fees were allocated to TCEH, and

8    virtually no shared services costs were allocated to the

9    EFIH.  Based upon historical -- older allocation, it is

10   believed that TCEH has claims against EFIH and EFH from

11   approximately $69 million to $138 million and -- for shared

12   services, and for sponsor fees an amount ranging -- or in

13   the range of $141 million for 2010 to 2013.

14           Finally, although there was not hugely detailed

15   evidence because of the many complexities associated with

16   the claim, the Court heard evidence about certain aspects of

17   the 2007 leveraged buyout claim and the potential challenge

18   of the dividend and otherwise that could be made.  There

19   are, of course, significant defenses to that claim including

20   solvency, statute of limitations, 546E, but the -- but it's

21   very clear that the litigation of that claim would be hugely

22   costly and time consuming.  And of course there is some risk

23   of liability.

24           You know, all in all, as Mr. Sawyer testified, the

25   settlement and these claims it is reasonable.  It's fair and

Page 81

1    in the best interest of the TCEH creditors.  And in

2    relinquishing those claims under the settlement agreement,

3    its constituents reflected on the settlement with varying

4    degrees of consternation and acceptance.

5              But what is very, very clear is that the

6    settlement itself, or what Mr. Lauria has referred to as the

7    booby prize, is not something that their constituents would

8    accept, absent the opportunity to achieve the upside under

9    the plan of reorganization which is before Your Honor today,

10   making them virtually integrated and have to be read

11   together.

12             So Mr. Sawyer, of course, also testified about the

13   sponsor and officer-director releases.  The process in which

14   those releases were analyzed and approved is in the record,

15   and he testified that he believed that they were appropriate

16   under the circumstances.  And the global peace that was

17   achieved as a result of them was very important to his

18   supporting of the plan of reorganization.

19             It's clear today that this settlement agreement

20   and the plan should be approved.  It has the support of all

21   the parties -- virtually all the parties in interest in the

22   bankruptcy case, and it's a real testimony -- a testament to

23   a very, very hard work of the debtors, their professionals,

24   the management, the directors, and all of the creditor

25   groups in bringing about this result.  Thank you, Your

1   Honor.

2           THE COURT:  Thank you, Mr. Walper.

3           MR. KLEINHAUS:  Good afternoon, Your Honor, Emil

4   Kleinhaus from Wachtell, Lipton.  I thought we were going in

5   the order of the absolute priority role, but I was told

6   that's not the case.

7           THE COURT:  You're not last.

8           MR. KLEINHAUS:  But my clients are also creditors,

9   so it's fair.  I have just a few slides if Your Honor

10  wouldn't mind if I hand them up, please.

11          THE COURT:  That's fine, of course.  While you're

12  doing that, I have a quick question for Mr. Kieselstein.

13  How many asbestos claims were filed?  Because it was

14  unclear.  Is it 4500?  Or is it 4.5 million?

15          MR. KIESELSTEIN:  No--four--

16          THE COURT:  Because you said 4500.

17          MR. KIESELSTEIN:  Yeah, it's 4500 pursuant to the

18  proof of claim notice unmanifested, 900 manifested, 5400

19  total.

20          THE COURT:  Okay.  Okay.

21          MR. KIESELSTEIN:  Okay.  Sorry for any confusion.

22          THE COURT:  That's okay.

23          MR. KLEINHAUS:  For the record, Emil Kleinhaus,

24  Wachtell, Lipton, Rosen & Katz.  I represent Kohlberg Kravis

25  Roberts & Co., LLP, TPG Capital, LLP, and Goldman Sachs and

1    Co., along with the funds as well as Texas Energy Future

2    Holdings Limited Partnership, which is the direct equity

3    owner of EFH.  I'll refer to that entity as Texas Holdings,

4    and like others, I'll refer to the clients generally as the

5    sponsors.

6          I'd like to do two things today in my closing.

7    One is I want to address the one issue that was really

8    contested at this trial that's specific to the sponsors, and

9    that is the settlement between the debtors and the sponsors,

10   and in particular the releases by the debtors of the

11   sponsors.  I'm going to do that in a streamlined way as a

12   result of the resolution of the UCC objection, as well as

13   Mr. Kieselstein's comments, but I do want to make a few

14   discreet points.

15          And then second, I want to say a few words about

16   the vision of the settlement agreement under which EFH and

17   the plan investors have agreed that in the event the plan is

18   consummated, in which case all their EFH creditors will be

19   paid in full, EFH will pay up to $15 million to Texas

20   Holdings to cover fees and expenses.

21          There's been an overwhelming record put forward at

22   this trial that the settlement between the debtors and the

23   sponsors, which is imbibing the settlement agreement, is

24   fair and reasonable both in terms of process and in terms of

25   substance.  One thing that's very clear in terms of process

1    is that the claims against the sponsors have been vetted and

2    were vetted to an extraordinary, maybe an unprecedented

3    extent.  That vetting began in 2013, when EFH retained

4    Sidley & Austin to report to the non-sponsor directors and

5    conduct an independent investigations of potential clients.

6             And the words of Ms. Doré, and this is Slide 1,

7    Sidley undertook an exhaustive analysis of potential claims

8    against the sponsors, resulting in an 800-page memorandum

9    analyzing those claims.  That's about -- I don't think I've

10   ever read an 800-page memorandum, but it gives a sense of

11   the--

12            THE COURT:  You didn't read the briefs in this

13   case?

14            (Laughter)

15            MR. KLEINHAUS:  Well, some of them.  Ms. Doré also

16   testified her deposition in a piece that's an evidence that

17   no stone was left unturned in connection with the

18   investigation of a potential claims against the sponsors.

19   As both Ms. Doré and Ms. Williamson testified, Sidley's work

20   continued over an extended period.  It began in 2013 before

21   the passing of a potential six-year statute of limitations

22   for LBO related claims.  It continued into 2014, and it

23   covered ultimately not only the LBO, but as both Williamson

24   and Ms. Doré made clear, it covered all potential pre-

25   petition claims against the sponsors, including, both Ms.

1    Williamson and Ms. Doré testified, claims relating to the

2    liability management program.

3           That was before the petition day.  After the

4    petition day, all the creditors in this case have the

5    opportunity to conduct their own broad investigation of

6    potential sponsor claims.  That was the legacy discovery of

7    the 2004 process.  Both the debtors and the sponsors

8    cooperated fully in that investigation and produced massive

9    volumes of documents.  Ms. Doré testified about this as

10   well, and she said that in her experience as a litigator,

11   this is one of the most thorough discovery processes I've

12   ever experienced.  There was really no stone unturned, no

13   document that wasn't uncovered.

14          Beyond all the vetting of clients on the issue of

15   process, we've heard already from others, so I'll be brief.

16   We heard that before the bankruptcy was even filed, the non-

17   sponsor directors had their own meetings, you there was in

18   that context that the Sidley analysis was presented.  And

19   then in April 2015, special committees were organized at

20   both TCEH and EFH, and it was those special committees who

21   received advice not only from Sidley, but from Kirkland &

22   Ellis, and in the case of the disinterested directors, from

23   Proskauer and Monger Tolles, and only after receiving all

24   that advice, as Ms. Williamson testified, did the

25   disinterested directors and the other non-sponsor directors

Page 86

1     agreed to release the sponsors.

2              So that's the process.  It's the record of a very

3     thorough deliberate process that's untainted by conflicts.

4     As to the substance of the settlement, what are the sponsors

5     giving up, and what are the sponsors getting?  What are the

6     debtors giving up?  And starting with what the sponsors are

7     giving up, I'm just going to elaborate a little bit on what

8     Mr. Kieselstein said.

9              First of all, the sponsors are waiving substantial

10    creditor claims.  People think of the sponsors of equity as

11    equity holders, but what the evidence shows, as reflected by

12    testimony from Mr. Smidt and Mr. MacDougall along with

13    others, is that the sponsor entities have claims against EFH

14    and the other debtors that approach $100 million, and one

15    piece of those claims is $80 million in management fees that

16    have accrued that not been paid.  And as Mr. Carter

17    testified, and this is Slide 4, EFH Corp. would be on the

18    hook for the entire amount of the $80 million, as would

19    EFIH.

20             And that's because as shown by the language of the

21    management agreement, EFH is the party to this agreement,

22    and it's the company defined only as EFH that has the

23    obligation to pay advisory fees.  And then Paragraph 6 of

24    the management agreement says that the obligation of the

25    management agreement shall be jointly -- shall be borne

1    jointly and severally by each member of the company groups.

2    So this is an $80 million claim against EFH; it's an $80

3    million claim against EFIH, and it's being given up under

4    the settlement.

5            The other category of claims is indemnity claims,

6    and there are at least three exhibits and evidence which

7    provide bases for indemnity claims.  There's DX 338, which

8    is the indemnification agreement, DX 339, which is the

9    management agreement which has its own indemnity provision,

10   and then there's DX 984, which is the restated certificate

11   of formation.

12           Just focusing on the on the indemnification

13   agreement, Section 2 of that agreement provides very broad

14   indemnification to sponsor entities and affiliates for,

15   among other things, all, quote, fees and expenses arising in

16   connection with any action or failure to act by any of the

17   debtors.  So that's a very broad indemnification provision.

18   And with one exception, that claim -- claims under that

19   provision are being given up.

20           The one exception is 2.7B of the settlement

21   agreement, which provides that if the plan is consummated,

22   which means that EFH would be a solvent debtor paying all

23   creditors in full, EFH will pay up to $15 million to Texas

24   Holdings to pay fees and expenses.  I'll come back to the

25   provision at the end, but the point I wanted to emphasize

1   upfront is that it's part of a settlement of a much larger

2   claim which is being substantially compromised, either in a

3   context where other EFH creditors are being paid in full and

4   it's only coming into play in a world where all EFH

5   creditors are being paid in full.

6           The sponsors have also agreed, as Mr. Kieselstein

7   pointed out, to assign their equity upside.  I think Mr.

8   Kieselstein articulately explained why that was necessary to

9   this deal and why it was a substantial give-up, so I won't

10  elaborate on that.  Mr. Kieselstein also pointed out the

11  agreement to defer the -- by Texas Holdings to defer the tax

12  write-off, so those are two other significant pieces of

13  consideration, in particular the agreement to give up the

14  upside.

15          So that's one side of the ledger.  It's a

16  significant record of give-ups on the part of the sponsors

17  in return for the consideration that they're getting under

18  the settlement agreement.  In contrast to all of that

19  evidence, there's a striking lack of evidence after weeks of

20  trial other any viable claims against the sponsors.  At the

21  beginning of the trial, we heard that there would be

22  evidence of breaches of fiduciary duty by senior members of

23  KKR, TPG, and Goldman Sachs that sit on EFH's board.  In

24  particular, we heard that there would be evidence of

25  colorable claims against the sponsor directors as a result

1    of transactions encompassed in the liability management

2    program.

3             I would submit that there's not a shred of

4    evidence of any of that.  In fact, there's a vast amount of

5    evidence, including in the plan itself, that would refute

6    any such claim.  If not for the settlement with the EFH

7    committee, I'd have a lot more to say about those

8    allegations, but instead, I'm just going to make a few

9    discreet points.

10            First, strictly legal points.  Texas, like

11   Delaware and other states, has a statute that governs breach

12   of fiduciary duty claims.  It's the Texas Business

13   Organizations Code.  EFH is a Texas corporation.  And it

14   deals with claims for breach of the duty of loyalty.  It

15   deals with claims for breach of the duty of care.

16            Here's what it says about transactions involving

17   interested directors:  An otherwise valid and enforceable

18   contract or transaction in which a debtor has an interest --

19   director has an interest is valid and enforceable and is not

20   void or voidable, notwithstanding any relationship or

21   interest if any one of the following conditions is

22   satisfied.  And the first condition is the material facts as

23   to the relationship or interest and as to the contract or

24   transaction are disclosed to or known by the corporation's

25   board of directors or a committee of the board of directors,

1     and a board of directors or committee in good faith

2     authorizes the contract or transaction by the approval of

3     the majority of the disinterested directors or committee

4     members.  Go to the next page.

5              Subsection E of the same statute -- this is Texas

6     Business Organizations Code 21.41(a) -- says if at least one

7     of the conditions of Subsection B is satisfied, neither the

8     corporation nor any of the corporation's shareholders would

9     have a cause of action against any of the interested

10    directors for breach of duty with respect to the making

11    authorization or performance of the contract or transaction

12    because the person had the relationship interest.

13             So what does the trial record show?  There are a

14    number of exhibits in evidence, and I'll point to two of

15    them -- DX 33 and DX 76 -- which deal with the disclosures

16    that were made in connection with the liability management

17    program and fees in connection with that program.  And what

18    DX 76 is, is board minutes from the time the -- at the EFH

19    level when the liability management program was first

20    initiated.  And the board minutes could not be more clear in

21    disclosing potential conflicts, in authorizing payments of

22    fees, including to sponsor affiliates, and in appointing

23    sponsor directors to do particular work in connection with

24    the liability management program.

25             Likewise in 2011, when TCEH ended up conducting a

1    very large amend and extend transaction, utterly clear

2    disclosure.  So Texas law deals with breach of loyalty

3    claims through disclosure and then approval by the remainder

4    of the board.  EFH, TCH, they did that by the book.  So

5    there's no basis here for breach of loyalty claim.  If the

6    issue were fairness and there were a trial on that, we think

7    there wouldn't be an issue either, but Texas law deals with

8    this in a much clearer way that doesn't require that kind of

9    trial.

10            The other category of a breach of fiduciary duty

11   claim, breach of the duty of care.  Texas law, like Delaware

12   law and the laws of other states, permits exculpation.  And

13   section 7.001 of the statute says, "The certificate of

14   formation may provide that a governing person of the

15   organization is not liable or is liable only to the extent

16   provided by the certificate of formation or a similar

17   instrument to the organization or to its owners or members

18   for monetary damages for an act or omission by the person in

19   the person's capacity as a governing person."

20            And then the next section of the same statute has

21   exceptions to what can be exculpated, and you have the

22   typical expected exceptions for bad faith, willful

23   misconduct, or a violation of a statute, putting aside these

24   exceptions, we don't believe there's any claim that's been

25   stated here or evidence of a claim duty or care, but there's

1    certainly no claim when you take into account the

2    exculpation, because as the next slide shows, EFH has put in

3    place a standard exculpation clause in its certificate, and

4    it matches Texas law exactly.  And this trial record is

5    completely devoid of evidence that would fit within any of

6    the exceptions to exculpation.  So that's the law.

7            A few words on the facts; the only theory that's

8    been articulated as to how the sponsor directors could've

9    breached their fiduciary duty here is that EFH was insolvent

10   on a balance sheet basis at some point in time after the

11   LBO, and as a result, the directors should not have

12   undertaken a liability management program, but instead

13   should've filed for bankruptcy.

14           Putting aside all legal obstacles to that claim

15   and putting aside whether EFH Corp. was ever insolvent, and

16   here I would just note that the evidence that the court

17   heard from the sponsor directors from the sponsors own files

18   suggests that it wasn't, but putting all that aside, all of

19   the evidence at trial that was presented refutes the notion

20   that the liability management program harmed EFH or its

21   creditors.

22           First of all, there's an uncontested record --

23   this is on slides 13 and 14 as examples -- as to the

24   benefits of the liability managed program.  Those included

25   reducing debt obligations, capturing discount, and

1      preserving liquidity.  The testimony on this from Mr.

2      Carter, Mr. Horton, Mr. Smidt, and Mr. MacDougall was

3      completely consistent, and it was uniform.

4              It is also uncontested that the value of the Oncor

5      business massively increased during the years leading up to

6      the EFH bankruptcy, so much so that under the plan before

7      the court, we now have a full payment plan for EFH creditors

8      based solely on the value of Oncor.  So the current plan is

9      itself a refutation of any claim that the EFH directors

10     breached their fiduciary duty by taking action to preserve

11     liquidity and go through the liability management program.

12             There was also a hint at the beginning of this

13     case that there are fraudulent transfer claims against the

14     sponsors.  There was really no attempt to build a record of

15     such claims.  As my -- as I stated in my opening statement,

16     and Mr. Carter confirmed it in his testimony, there are

17     virtually no transfers out of all the transfers over the

18     years that Mr. Carter identified from EFH Corp.  Those

19     transfers were all the way back in 2009 and 2010.

20             As Mr. Kieselstein pointed out, there's very

21     strong evidence in the trial record as to the value that was

22     provided for those transfers, including a 2009 memorandum

23     from the tax manager of EFH that describes in detail the

24     services and the value that was provided for them.  The

25     declarations of Mr. Smidt and Mr. MacDougall quoted on slide

1    19 -- excuse me, on slide 18, likewise confirm the extensive

2    services that the sponsors provided to the debtors, and the

3    extraordinary amount of time over a period of years that

4    sponsor employees devoted to EFH in connection with the

5    management agreement and as directors.

6         So putting aside solvency, there's really no

7    predicate here for a fraudulent transfer claim, let alone by

8    EFH, and with that, Your Honor, and especially in light of

9    the lack of outstanding objections to the releases under the

10   settlement agreement, unless the court has questions for me

11   about those releases, I'll rest on the submissions and move

12   on to one other topic.

13         THE COURT:  Okay.

14         MR. KLEINHAUS:  So Slide 19 has Section 2.7(b) of

15   the settlement agreement, and it says that on the effective

16   date of the plan, EFH shall pay to Texas Holdings, which is

17   the sponsor ownership vehicle, an amount equal to the fees

18   and expenses of Texas Holdings up to $15 million, and Texas

19   Holdings shall use such amount exclusively to pay such fees

20   and expenses.

21         At the outset, I want to emphasize that nobody has

22   objected to this provision.  The United States trustee filed

23   an objection, and we credit from beginning to end several

24   times.  There's not a word about Section 2.7(b).  Now, why

25   would the U.S. trustee object to 2.7(a) but not 2.7(b)?  The

1   U.S. trustee's office will speak for itself, but I think

2   there's a very clear reason.  And what that reason is, is

3   that this provision is part of a much broader settlement of

4   pre-petition claims.

5            As I noted earlier, the sponsors have claims for

6   least $80 million under the management agreement.  That's a

7   pre-petition claim.  They also have broad indemnification

8   claims that uses language that exactly tracks this

9   provision.  What section 2.7(b) of the settlement agreement

10  does is it says that in a world where all other EFH

11  creditors are paid at 100 cents on the dollar, in a solvent

12  case, the sponsors will receive cents on the dollar on their

13  pre-petition claims.  They'll receive up to $15 million only

14  for fees and expenses, and they'll otherwise waive their

15  claims.

16           So what we're talking about here is a settlement

17  of a pre-petition claim in addition to the agreement to walk

18  away from all of the equity of this company.  That kind of

19  settlement does not implicate Section 503.  We don't need

20  administrative priority.  This is in a 100-cent case for

21  unsecured creditors.  The sponsors are taking a lot less

22  than 100 cents on the dollar in connection with their pre-

23  petition claims.  They're taking short of -- up to $15

24  million on claims approaching $100 million.

25           We've heard no theory, and the U.S. trustee didn't

1    object to this provision and thus has presented no theory,

2    as to why a claim of this kind, in a context where it's only

3    getting paid if all creditors of EFH are getting paid in

4    full, old equity is agreeing by definition, and new equity

5    was a counterpart in the negotiations.  So they agreed to

6    this, and they agreed to this number.

7              So nobody's being prejudiced.  It's on account of

8    not only walking away from equity, but also valid,

9    uncontested, pre-petition claims, including indemnification

10   claims.  In all of the discovery in this whole trial,

11   there's been no objecting to the reasonableness of the

12   overall settlement, and therefore, Your Honor, I submit that

13   this provision is part of a fair and reasonable overall

14   settlement and should be approved and has not been objected

15   to.  So with that, Your Honor, unless you have questions, I

16   think I'll--

17             THE COURT:  Well, isn't any distribution on amount

18   of any claims to the equity sponsors being transferred to

19   TCEH as part of the settlement?

20             MR. KLEINHAUS:  Except this.

21             THE COURT:  It's a carve-out.

22             MR. KLEINHAUS:  Yes.

23             THE COURT:  Okay.  Okay.

24             MR. KLEINHAUS:  Okay.

25             THE COURT:  Thank you.

1           MR. KLEINHAUS:  Thank you.  Oh, I just have one

2    more point, Your Honor, actually.  I apologize.  If Your

3    Honor is inclined to consider a 503 analysis at this stage,

4    we do believe that there's overwhelming evidence in the

5    record as to the 503 contributions of the sponsors, and if

6    that's what Your Honor's inclined to do, I'm happy to walk

7    through that evidence.

8           But I think Mr. Smidt's testimony, Mr.

9    MacDougall's testimony, both about their pre-petition

10   activities in negotiating extensively with creditors across

11   the capital structure, the sponsor's post-petition

12   involvement in the REIT transaction, and the absolutely

13   massive amount of effort that the sponsors and their

14   directors and their employees put into this case as

15   evidenced by both those two declarations and the

16   declarations of Ms. Doré, Mr. Keglevic, and others, there's

17   an overwhelming record of substantial contribution.

18           For the reasons I said, I don't think the Court

19   has to get there as to 2.7(b), but I just wanted to make the

20   point that that record is there.

21           THE COURT:  Thank you.

22           MR. KLEINHAUS:  Thank you.

23           THE COURT:  Mr. Kornberg.  This is where you tell

24   me of the largest creditor of the estate.

25           (Laughter)

1              MR. KORNBERG:  No, Your Honor.  That's actually

2     not it.  Alan Kornberg, Paul Weiss Rifkind Wharton &

3     Garrison with Jake Adlerstein for the ad hoc committee of

4     TCEH first lien debtholders. Given the contentious nature of

5     these very complex cases, it's pretty remarkable that we've

6     arrived at where we are today, Your Honor.  You've heard, I

7     think in great detail, about the arduous good faith

8     negotiations, in many instances, in the context of court

9     ordered mediation, through which we have achieved, I think

10    something that was almost unimaginable earlier in this case,

11    and that is virtually complete creditor consensus on the

12    only value maximizing restructuring transaction available

13    today to the company and its stakeholders.

14              And Your Honor, the record supporting that

15    conclusion is vast and it's unequivocal.  I want to speak a

16    little bit just about the settlement agreement.  The

17    settlement agreement is in many ways the bedrock of the plan

18    and the path forward in these cases, and it is critically

19    important that it be approved.  While we collectively have

20    achieved a lot, the fact remains that consummation of this

21    plan is not a certainty.  It's not a certainty because it

22    hinges upon the actions of third parties, include --

23    including various regulatory authorities.  And no one in

24    this court room can control that -- the outcome.

25              The processes to obtain the regulatory approvals

1    are well underway.  The parties are working cooperatively to

2    obtain them.  But, and we remain confident, that the REIT

3    transaction will ultimately close, and you heard a lot of

4    evidence about why people are optimistic on that front.  But

5    again, no one can be absolutely sure that that will happen.

6            The settlement agreement dramatically mitigates

7    the consequences of failure, and it ensures that the party's

8    tireless efforts over the past six months will not be in

9    vain.  Specifically, the settlement agreement, as you heard,

10   resolves two of the most complicated and important pillars

11   of any restructuring transaction for these debtors.  The

12   allocation of value amongst the T-side creditors and

13   resolution of the most complicated and substantial T-side

14   intercreditor disputes.  And second, settlement of the very

15   complex and large number of claims between the T-side and

16   the E-side debtors.

17           We hope never to be back before this Court,

18   telling you how large our claims are, and discussing an

19   alternative restructuring transaction.  But if that day ever

20   comes with the settlement agreement in place, the remaining

21   process will be streamlined and the issues, substantially

22   narrowed.

23           So the settlement agreement benefits all of the

24   debtor's stakeholders and is the basis upon which it is

25   impossible to achieve near unanimous support for the current

1     plan.  Certainly, without the settlement agreement in place,

2     the TCEH First Lien Ad Hoc Committee would not be in a

3     position to support the current plan.  For all of these

4     reasons, Your Honor, we join in the requests to ask you to

5     confirm the plan, approve the settlement agreement, and we,

6     too, express our gratitude to the Court for its patience,

7     wisdom and extraordinary efforts over the past 18 months.

8     Thank you, Your Honor.

9             THE COURT:  You're welcome.  Thank you.  Mr.

10    Jonas?

11            MR. JONAS:  Thank you, Your Honor, Jeff Jonas from

12    Brown Rudnick with Bill Bowden for the T-side Second Lien Ad

13    Hoc Consortium.  I'll be very brief, Your Honor, I won't

14    repeat, I hope not, any of the arguments already made, which

15    have been well made.  But for the record, I wanted to be

16    clear.  A number of issues, and really just discuss one

17    issue.

18            First of all, Your Honor, the Second Liens fully

19    support approval of the settlement agreement in confirmation

20    of the plan.  I -- and I also wanted to say that payment of

21    the professional fees for us, at least, was a very essential

22    part of reaching the settlement agreement and it's very

23    important to us.

24            That being said, Your Honor, as to the arguments

25    that have already been made, which we agreed with, I really

1    wanted to just focus on one, which is the following.  Unlike

2    a number of the settlement agreements before you, our

3    settlement agreement provides for a large part, that is the

4    $449.75 million of fees, which in our case, would be a

5    majority of the fees due, ultimately due to us, provides

6    that that would be paid not as effectively as part of the

7    plan.  It gets paid on approval of the settlement agreement.

8    That's in Section 2.7A, the reference, of course, is the

9    settlement effective date.

10           The reason that's important, Your Honor, is

11   because I think that makes at least that amount of the fees

12   payable, if you will, under a 9019 standard of review.  It

13   doesn't implicate 503B.  And to go to your comment earlier,

14   Your Honor, when you said, "Who decides the reasonableness?"

15   at least that's to that portion of the fees, it's you, Your

16   Honor.  That's what's before you today.  It is part of a

17   settlement agreement and if you approve the settlement

18   agreement or part of approving the settlement agreement,

19   it's for you to consider that part of the settlement

20   agreement.

21           So I rose, because I wanted to make it clear, that

22   I think at least as to that portion, it's very distinct.

23   It's separate and it's part of a 9019 standard.  And I

24   think, Your Honor, that if, to go to the U.S. Trustee's

25   objection, that is, that in some way 503B is implicated.  If

Page 102

1    that's true, I think it's a very slippery slope, because I

2    think what it means is, then any time -- well, let me back

3    up.

4              I think you know, Your Honor, that many times it

5    is practice, it's embedded in the case law, that settlement

6    agreements are encouraged and approved under a 9019

7    standard.  And I think the slippery slope of implicating

8    503B now, as to our settlement agreement, and at least that

9    portion of the settlement agreement, is that what that

10   means, if you were to find that in fact 503B is implicated,

11   that any time a Debtor has reached a settlement with a

12   Creditor, in which as part of the settlement the Debtor

13   wishes, and is asking the Court to approve payment of the

14   Creditor's attorney's fees or professional fees, that in

15   that case, there's going to have to be a whole separate

16   layer of review.

17             There's going to have to be a substantial

18   contribution argument, perhaps papers, perhaps separate

19   consideration for the Court -- by the Court.  And I don't

20   think that's the -- I don't think that should be the case,

21   Your Honor.  I think that would be contrary to long

22   precedent and the case law, and I think that would be the

23   result of your finding today, if you were to find that 503B

24   is implicated.

25             I won't go over the rest of the arguments, because

Page 103

1    we do believe that notwithstanding what I just said, as to

2    the rest of the fees that are due, they are proper and can

3    be permitted outside of 503B, obviously, under 1123B6 and

4    1129A4, and the case has cited AMR, Adelphia, etc.  So in

5    all respects, Your Honor, we think that the fees can be

6    approved, both those due, if you will, on approval of the

7    settlement agreement and otherwise, and should be approved.

8             And lastly, I'll just say, Your Honor, I think the

9    point of the settlement agreement, and I think the Debtors

10   have already gotten the benefit of the bargain, if you will,

11   when yes, we've had battles during the case, and we've been

12   here arguing about from day one of the case on numerous

13   issues.  But when the time was right and we were satisfied

14   and we reached a settlement, we largely stepped back.  You

15   didn't see us have an active presence in the confirmation

16   trial, in a number of the other issues that have come up

17   during the case.  And I think that worked to, if you will,

18   the case as an advantage.  We tried to manage, at least on

19   behalf of our clients, the professional fees, reasonably,

20   and I think it did work, and I think the cases and the

21   debtors have gotten the benefit of the bargain, and I think

22   we should get the benefit of our bargain in terms of

23   approval of settlement agreement, and ultimately, payment of

24   the fees.  Thank you, Your Honor.

25            THE COURT:  I just have to add, did anyone ever

1    invite Mr. Weisfelner to dinner?  Never?

2              MAN:  It was expensive.

3              MR. JONAS:  And if you need a record on that, I

4    can find out, Your Honor.

5              THE COURT:  All right.

6              MR. JONAS:  Thank you very much.

7              THE COURT:  Mr. Miller?

8              MR. MILLER:  Good afternoon, Your Honor, Brett

9    Miller, with Todd Goren and Erica Richards here for Morrison

10   & Foerster on behalf of the Official Committee of Unsecured

11   Creditors on the T-side.  As the representative of the T-

12   side Fiduciary, I'm happy to report a few things.  One, Mr.

13   Weisfelner and Mr. Jonas are satisfied that the venue was

14   appropriate.  Mr. Shore is okay that -- with joint

15   administration of these estates.  Mr. Kornberg's clients

16   are--

17             THE COURT:  All right, now we're on like day --

18   week two--

19             MR. MILLER:  Exactly.

20             THE COURT:  --of the case.

21             MR. MILLER:  I'm going to speed it up.

22             THE COURT:  This is going to be a long list.

23             MR. MILLER:  Mr. Kornberg's clients are finally

24   getting their collateral, something he might've mentioned

25   one or 100 times during the case.  And for the benefit of

1     Mr. Walper, no one wants to depose Hugh Sawyer today.  So

2     we're happy that the T-side is unified, and finally, the E-

3     side came around and joined us, and there are actually two

4     seats left open on this side of the court room for Mr.

5     Pedone and Mr. Gluckstein, but they decided to keep company

6     with the U.S. Trustee.  But in spirit, I believe they're on

7     our side of the court room.

8            But seriously, I'd like to spend a minute to give

9     credit where credit is due.  About a year ago, there was a

10    video conference setup between the T-side Unsecured Ad Hoc

11    Group and the T-side Official Committee.  It was between

12    Lazard Chicago office and MoFo's New York office.  And we

13    had the professionals from both teams on.  As both of the Ad

14    Hoc Unsecured Group and the Official Committee were noodling

15    with a REIT plan.  There were many hurdles that each side

16    came up with, but in the end, they looked at the value, and

17    Mr. Lauria, together with Mr. Shore and Mr. Seager walked us

18    through a sketch, very much a back of the envelope sketch of

19    what a REIT plan would look like to get value to the T-side

20    Unsecured Creditors, and that really was the seedling that

21    became this plan that we're here confirming today.

22           And we never would've gotten there without many

23    other people joining in those efforts to get to this plan.

24    I think that the plan that's before the Court shows one

25    thing, bankruptcy works.  The process works.  With Your

1    Honor's help, with the Debtor's help, with Ms. Doré's help,

2    Mr. Keglevich's help, the entire Disinterested Director

3    team, and especially Kirkland.  We would not have been here

4    without all of these parties and whereas the seed that Mr.

5    Lauria planted, it needed a lot of watering from all the

6    parties.

7              And that sort of gets to Mr. Jonas' point that Mr.

8    Kieselstein also mentioned the fees.  I agree, the T-side

9    Committee agrees with the arguments made by Mr. Kieselstein

10   and Mr. Jonas, regarding the fees here.  It takes more than

11   a village, and as part of getting to this day, there were

12   significant fees by all different parties, ad hoc groups,

13   and obviously, the official groups.  The official groups

14   will be subject to fee applications and the process set

15   forth in the Bankruptcy Code, and we believe that the

16   settlement agreement, as Mr. Jonas dated, should cover a

17   majority of the Ad Hoc Group fees as they were the bargain

18   that was made as part of the deal.

19             The last month has been an absolute whirlwind.  To

20   think that when we started this confirmation hearing, a good

21   portion of the capital structure was objecting, and hats off

22   to Mr. Lauria, who showed us what his next job is, once this

23   case is done, which is to take over "Let's Make a Deal" and

24   be the next Monty Hall, because there was nothing cheap

25   about any of the deals made, and it really was -- it's

1    incredible to be standing here with 100 percent of the

2    capital structure on board to this miracle plan that finally

3    gets us to the goal line un-impairing the E-side and getting

4    the T-side to satisfactory resolution in these cases.

5            And besides, Mr. Lauria, his team, it's obviously

6    the plan sponsors.  It's the parties with the money that

7    came forward putting their monies where their mouth is, and

8    getting us to this plan, which we are all very optimistic

9    will go effective in four, six, eight months.  But as Mr.

10   Kornberg said, if it doesn't, we have set the table for a

11   plan B, and this is all worth it to know that we're not

12   going to start off from scratch if something goes off the

13   rails.  We've got the plan, got the tracks laid down if

14   we've got to go down that path.  And for that reason, the T-

15   side Committee supports the plan, and more importantly

16   perhaps, the settlement agreement, which is the bedrock of

17   the plan and believes that the remaining objections should

18   be overruled.

19           THE COURT:  Thank you, Mr. Miller.

20           MR. MILLER:  Thank you, and your staff, Your

21   Honor.  You are extremely helpful in getting this done.

22           THE COURT:  Thank you, Mr. Miller.  Anyone else?

23   Mr. Shore?

24           MR. SHORE:  Good afternoon, Your Honor, Chris

25   Shore from White & Case on behalf of the Ad Hoc Group of

1    TCEH Unsecured Noteholders.  I'm here with my partner Tom

2    Lauria.  I hope the Court knows just how much we wanted to

3    show up today with a fully consensual plan.  You know, our

4    team has been working since August really to try to put that

5    together at great odds, and maybe more so than any deal I've

6    worked on in the last 20 years, tried to get to the point

7    where we'd show up today with nobody objecting.  And

8    frankly, it's been pretty uncomfortable for me as a

9    litigator.

10          There is one objection I want to address, which is

11   just the U.S. Trustee objection to the fees.  I'm not going

12   to go over and -- the reasons why the plan can and should be

13   confirmed, but I do want to address that objection.  The

14   irony here is that after all of the three months of

15   negotiating deal terms and plan treatments, the only

16   treatment that is up in the air right now is the payment of

17   our fees.  And we now have a $40 billion restructuring

18   that's being held up on what is really a claim objection to

19   the payment of fees as cash as part of a settlement

20   agreement, and then, that's backstopped by a plan.

21          And I'm not even sure the U.S. Trustee has an

22   objection to the payment of the Ad Hoc Group's fees,

23   provided that it's done under 503(b), their position seems

24   to be that other people haven't demonstrated that they've

25   made a substantial contribution, and therefore, the Court

1    should just pencil their fees out of the settlement

2    agreement.

3        It's tempting to say, "Well, okay, just allow our

4    fees and let other people fend for themselves," but having

5    done monster deals like this and monster cases like this

6    that seem like they're never going to get anywhere, they

7    really do never get anywhere until you come up with a circle

8    of trust.  People who say, at the beginning of the case,

9    "Let's put aside our differences in priority, in place in

10   the capital structure," and say, "We're going to form a deal

11   and we're going to get a deal done."

12       The people whose fees are at issues right now, the

13   second lien trustee in the Ad Hoc Group, that the -- the

14   TCEH Unsecured Trustee, our group, and all of our advisors

15   have been working that are of the circle of trust, and we're

16   here for all of our fees, not one group's fees, everybody's

17   fees should be paid, and every penny of the fees that the

18   Debtor's have committed to pay should be paid.

19       Under this settlement agreement, under the merger

20   agreement, under the backstop agreement.  And let me pause

21   there.  As Mr. Kieselstein pointed out, the Court's being

22   asked to approve the merger agreement and the backstop

23   agreement.  Both of those agreements have requirements that

24   the pays -- the payment of reasonable documented fees, those

25   are the fees that are being run up right now, doing all the

1    securities work, the merger work, the HSR file.  It's the

2    PUC approvals, the IRS approvals.  It's the life blood and

3    the deal getting done.  There is no objection, as far as I

4    know, to the payment of those fees and the approval of those

5    agreements.  And leaving all else aside, we've got to get

6    the approval to get the debtors to start paying those

7    invoices under the agreements.

8           But let's talk about the fees prior to July 1,

9    because basically, everything has transitioned since we

10   moved to this deal into transaction fees under the terms of

11   those agreements.  The pre-July 1 fees are what I like to

12   call the getting to the transaction fees.  The terms of the

13   plan which provide for the payment of those fees have been

14   overwhelmingly supportive by the people who were paying

15   those fees.  Obviously, the TCEH Unsecured class, and the

16   record before the Court on the merits of the settlement

17   agreement and why that settlement agreement has to be

18   approved as it is, could hardly be more exhaustive.  But the

19   U.S. Trustee is still objecting, so we need to address that.

20          To be clear, it does not appear that they're doing

21   so for any economic reason.  By way of contrast, the E-side,

22   by our calculation, will pay out about $200 million in fees

23   to creditors, either because they are secured creditors or

24   estate fiduciaries.  Without fanfare from anybody, for

25   essentially what is happening under this plan is collecting

1    checks.  By contrast, all of the work in all of the value

2    creation in the case that allowed those fees to be paid came

3    out of the work of the TCEH Unsecured Group.  That $49

4    million in fees, which allowed a transaction to take place.

5           And the reason we couldn't bridge the consensus

6    is, as you can imagine, trying to come to an economic

7    solution in the plan with someone who was agnostic to

8    economics and is more concerned about pressing a policy

9    point makes it very difficult to do so.  Fundamentally,

10   there's one objection that the U.S. Trustee is making,

11   503(b) is the exclusive means by which an unsecured creditor

12   can get a distribution on account of a fee claim.  It's

13   wrong, flatly wrong.  It all comes, I think, from a U.S.

14   Trustee policy piece that was published after Adelphia,

15   which is provocatively entitled, "You Support My Plan, I'll

16   Pay Your Fees," Adelphia's troubling precedent.

17          And going back a decade, the U.S. Trustee has

18   attacked what Tom and I were able to get done in Adelphia,

19   which is in a very difficult case, use the payment of fees

20   in cash as a plan treatment, as a means of bridging a gap

21   between warring factions.  And since 2007, in some cases

22   cannot others, United States trustee has pressed their

23   503(b) as an exclusive remedy agenda.  503(b), according to

24   its terms, is not exclusive.  504(a) says, "An entity may

25   timely file a request for payment of admin expense."  I'll

1    get to how we've done that here, even if 503(b) applies.

2    503(b) says, "After notice and hearing, there shall be

3    allowed an administrative expenses including," and it lists

4    various items.

5           In a decade since Adelphia, I still haven't seen

6    an explanation from the U.S. trustee as to how the word

7    "including" becomes "only," other than that there is a

8    provision which addresses fees paid for a substantial

9    contribution, but does nothing about the fees I'm going to

10   talk about, which is dealing with free rider problems.

11          As we lay out in our paper, there are a lot of

12   ways to skin the cat and find statutory authority for the

13   allowance of payment -- cash pay -- of fees incurred in a

14   case.  Mr. Jonas addressed one, but as we lay out in our

15   papers, 1129(a)3 clearly permits a plan to include a

16   provision and not inconsistent with the applicable

17   provisions of this title.

18          We have claims for fees under our documents.

19   Those claims are being treated in the plan.  The payment of

20   those fees in cash is part of a plan treatment is not

21   inconsistent with anything in the code.  You'd have to say

22   503(b) is exclusive to say that payment of fees under

23   1129(a)4 is inconsistent with that.

24          Let me stop on 1129(a)4 because I think Your Honor

25   raised it.  It does require reasonableness of plan paid

1  fees, and obviously Your Honor is not going to sit down line

2  by line and look at anybody's fees to see whether they're

3  reasonable.  The question is who is going to be the

4  gatekeeper for the payment of those fees?  The way this is

5  setup, the debtors are the gatekeeper.  That sounds kind of

6  weird because the debtors are never the gatekeeper on paying

7  their own lawyers, but Ms. Doré and her team are the right

8  gatekeepers here.

9          She's willing.  She signed -- there's an agreement

10  that says the debtors will be reviewing for reasonableness.

11  She's adverse still.  She's a fiduciary to the estate.

12  She's up to speed on all issues in the case so knows what is

13  and is not attributable to casework.  She's free, or at

14  least she's already being compensated for the review that's

15  being done, and she's maybe more qualified to do this than

16  other fee review people.  This is not an estate fiduciary

17  review fee.  We're not going to be reviewing fees for

18  lumping or improper coding or lunches that are too expensive

19  or dinners that are -- had too much wine.

20          That's not what's being done.  What's being done

21  under a review here would be a general counsel and her staff

22  looking at the bills to determine whether or not those bills

23  are reasonable.  If she doesn't want to pay them, then the

24  Court will ultimately have to sign off.  So there is a

25  process that's set up with a -- fees that only get paid that

1   documented, out of pocket, and reasonable as determined by

2   the debtors, as ultimately reviewed by the Court, and Your

3   Honor would essentially be ordering that no reasonable fees

4   can be paid.

5          To be clear, and let's talk about why this is a

6   plan issue and not a 503(b) issue.  What we're doing -- and

7   this is the free rider point.  What we're doing is directly

8   related to the distributions of value within the TCEH

9   unsecured class in the plan, and that's a point that the

10  U.S. trustee consistently (indiscernible) over.

11         As Mr. Kieselstein noted, 503(b) is an extra plan

12  provision directed at creditors who do something that

13  provides a substantial contribution to the case and allows

14  them to get an administrative expense paid outside of the

15  plan, and at a time where it's not clear whose ox is being

16  gored by administrative payments.  It could be the secured

17  creditors.  It could be the unsecured creditors.  It could

18  be the subordinated creditors.  It could be the equity, who

19  ultimately is going to have to bear the administrative

20  expense in the case.

21         With the plan on file, and with the payment of

22  those fees, we know under that plan whose ox is getting

23  gored.  It is the TCEH unsecured group.  Those fees will be

24  borne as part of the plan treatment of TCEH unsecured

25  creditors, and those creditors have overwhelmingly supported

1    -- and there's not a single creditor who objects to a plan

2    treatment which provides for cash pay of fees off the top

3    and then the distribution of rights and the resulting equity

4    value.

5              In fact, if we don't do this here, we've got the

6    opposite problem, which is that the parties who took a risk,

7    hired White & Case, and said go do what you do, are going to

8    end up having a net worse recovery than the people who never

9    did that.  That is the free riders.  So when you include a

10   plan provision which has the cash payment of fees as part of

11   the treatment, what you end up doing is just avoiding that

12   situation.

13             On full disclosure to everybody, we're going to

14   prove disclosure statement that says these fees are going to

15   be paid, and having done that, nobody came forward and

16   objected to that.  We simply don't understand why the U.S.

17   trustee, particularly where we are in this case right now,

18   can legitimately claim that what we should be doing is

19   rewarding people who don't come forward and seek to protect

20   their rights, and punish the people who do, who ultimately,

21   as we all know, led to the result it's here.

22             I'll remind the Court that that the U.S. trustee

23   has, as they have another cases, expressed views on ad hoc

24   groups, was what -- which is what we're really talking

25   about.

1            The June 30th, 2014, hearing transcript -- these

2     now because I can't see otherwise -- at Page 72, Mr.

3     Schepacarter.  With respect to the ad hoc committees, to the

4     extent that they want to infuse themselves into the process

5     in certain areas, they don't have standing, and they don't

6     have the ability to sort of veto different aspects of the

7     relief that's sought in this case.

8            You'll probably see -- you may see it in other

9     that may become before the Court in July or August of this

10    year -- and we did -- but I -- this, I think, is one of

11    those instances where I think the committee, the ad hoc

12    committee in this case has tried to infuse itself into a

13    process where I don't believe it belongs.  That's their view

14    of ad hoc groups, and so I guess it's not surprising that

15    they would take the position that the ad hoc group should do

16    worse and then the people who didn't do anything in the

17    case.  It's a wrong position then, and it's a wrong position

18    now.

19            I'll address further in the context of 503(b)

20    because I think we can deal with that fairly.  But let's be

21    clear.  The U.S. trustee exacerbated the problem in this

22    case.  If you look at the makeup -- and this came up early

23    in the case -- if you look at the makeup of the unsecured

24    creditors committee at TCEH, there's $31 billion of funded

25    debt.  There's not a single bond holder on that committee,

1     and in fact, included on that committee are E-side creditors

2     at EFH Corporate Services that was the entity through which

3     all of the value -- when you saw all that evidence of cash

4     flowing the other way, it all went through EFH Corporate

5     Services.

6            You look at the -- then we had the EFH committee.

7     The EFH committee has on it T-side asbestos creditors.  So

8     if you set up a process in which you don't put anybody on --

9     this is not a slight to the people who sat on the committee

10    or their claims or their efforts in the case or counsel.

11           They all did a fantastic job, but if you create

12    committees that don't actually have people with big money at

13    risk, you can't get the result which requires big money.

14    How do you go about raising $12 billion in consideration if

15    the people who are doing it have tiny amounts owed in the

16    case?

17           But let me turn to 503(b).  Even if the Court were

18    to make it applicable here, and we don't think it should, I

19    think it's been met here.  503(a) requires a party -- here

20    the debtors -- to have made a request.  There is a

21    settlement a motion on file in the plan on file which has

22    been prosecuted which requests the payment of those fees as

23    administrate -- or as -- sorry, as to be paid in cash.

24           There has been notice and a hearing to cover the

25    intro to 503(b).  The only question then is whether, if

1    applicable, 503(b)(3)(d) is met; that is actual, necessary,

2    and reasonable, with a substantial contribution.

3                I'm not going to start on day one and go through

4    substantial contribution.  I'm going to 'stead refer the

5    Court back to one of the early transcripts, which is the

6    second -- literally the second day hearings.  It's got

7    everything in it.  It's got conflicts and disinterested

8    directors and catalysts and a couple of great Weisfelner

9    one-liners, but it is perfect encapsulation of what the

10   creditors on the T-side are about and what they did.

11               At Page 26 of that transcript, I said -- and if

12   you can look past how incredibly inarticulate I am in

13   points, I said what are our goals?  We have only one:  to

14   maximize the recovery on unsecured claims in each of the

15   TCEH debtors.

16               It's a simple and pure motivation, and you will

17   not see us stray from that, even though the debtors want to

18   say we're doing something other than trying to maximize

19   value of TCEH unsecured claims.  We're not naïve.  There's

20   no utility impeding progress for the sake of shaking our a

21   recovery.  You know we don't do that.

22               We trust the Court, having seen our actions and in

23   the past, will understand that we have a legitimate,

24   defined, and comprehensive plan to drive value in these

25   cases to the payment of TCEH unsecured claims, which the

1    debtors say will receive as little as a pro rata share of

2    $150 million.

3              That was our mission statement.  I said very

4    clearly what our strategy was going to be in doing that,

5    which was a was going to require a lot of money.  On Page

6    28, one, as I said to you on the first days, maintaining a

7    level playing field for the big confirmation and valuation

8    dispute that this balance sheet restructuring portends; two,

9    ensuring parity of treatment of all unsecured creditors will

10   we get to the end of the process; three, establishing known

11   processes at the beginning of the case so that everybody

12   knows what the rules are going to be a confirmation; four,

13   maintaining maximum flexibility for settlement strategies

14   that Mr. Lauria might be cooking up as we proceed to

15   confirmation; and five, putting an end to past practices

16   where we believe that the debtors were running the TCEH

17   debtors in a manner that was prejudicial to those the

18   states.

19             We said we were going to do that, and we did it.

20   And the U.S. trustee stood and watched us do that and

21   watched us spend those fees and never had any concern that

22   what we were doing after the -- the initial comments was in

23   any way inappropriate or outside the bounds of what we said

24   we were going to do.

25             That strategy from the second day played out in a

1    highly coordinated effort between us, the seconds, the UCC,

2    and our trustees.  If you look at the cash collateral order,

3    just focus on that one hearing in the case.  The committee

4    played good cop.  They went out.  The cut a deal.  They did

5    the best they could with the first of the debtors to get

6    what they could, and then we got to be bad cop.  We fought

7    the 506(c) waiver, and we fought the liens on unencumbered

8    assets, and we won.

9           Had we lost of that, it would've been game over.

10   Any of the unencumbered value which is being used to Foster

11   this plan coming over from the E-side would've been sucked

12   up under the liens, and all of the payments in this case

13   would have been chargeable to the unencumbered value and not

14   to the maintenance of the collateral.  Our deal what have

15   died and then, and it happened over and over and over again

16   were we had the various strategies that were done by the

17   circle of trust to get this done.

18          We had some great strategies.  Lawyer up Sawyer

19   was one.  We had the REIT, not REIT.  We had the bid

20   procedure head fake.  We had good cop, bad cop, bad cop,

21   worse cop, worse cop, Weisfelner.  It all played out -- no,

22   but it all -- it all played out in a manner there is no way

23   this deal gets done without that group of people doing

24   exactly what they did.  We got a lot of luck along the

25   process, but there was also a lot of hard work which

1    deserves to be compensated.

2            And as reflected in the public record of these

3    cases, where we are today as a direct product of that.

4    Showing up at the meetings, attacking recovery threats,

5    developing claims strategy, strategizing the endgame, coming

6    up with the innumerable deal diagrams where people tried to

7    figure out what it was.  Making of the deal possible was the

8    substantial contribution that's being sought if the Court

9    finds that the substantial contribution needs to be shown.

10   As such, I think the Court has a record on which to approve

11   if 503(b) applies.

12           The question then is actual, necessary, and

13   reasonable.  Again, the settlement agreement and the plan

14   both provide that the only thing that is being authorized

15   are reasonable and documented out-of-pocket fees and

16   expenses and reimbursements.  So anything outside of that

17   rubric, the Court is not authorizing.  As its last ditch

18   attack, the U.S. trustee expresses reservations about the

19   nature and extent of our fees, and they want a

20   reasonableness review.

21           Again, I think that the way this is set up is

22   appropriate, but -- and we've offered -- to be clear, we've

23   offered to make a public -- make public a detailed schedule

24   of exactly who's getting what and when under the settlement

25   agreement.  But the fee provision has been out there for

1    months, and the number has been out there for months.  We

2    haven't received a single request from the United States

3    trustee to review any of the fees.

4         We had a discovery process.  This is all

5    encapsulated in the plan, in the settlement agreement.  They

6    weren't coming in and saying, show me that your fees are

7    reasonable.  This isn't about the reasonableness of the

8    fees.  This is about the standard on which the fees get

9    paid.  This is not an evidentiary point.  This is a legal

10   policy point that they are pressing.

11        In our view, it's too late for attacking the fees

12   and setting up some kind of post confirmation process by

13   which the U.S. trustee now says they want to see the bills

14   and they want to review them.  I think if they wanted that,

15   that had to be done in the context of the plan confirmation.

16   So let me end here, and also with thanks to the Court.

17        I've been in front of Your Honor a lot lately in a

18   lot of cases over the years.  We know how hard Your Honor

19   works to create the right environment, how carefully you

20   curate it, how often you think about it, and how often you

21   struggle with it on making sure that this courtroom presents

22   an environment in which deals like this can get done.  This

23   wouldn't happen in many courtrooms.  This would've been over

24   in December in some courtrooms, and we thank the Court for

25   providing the space to let Tom cook up this crazy deal and

1    get something through that, you know, we think is truly

2    remarkable.

3            THE COURT:  Thank you, Mr. Shore.  I'll hear from

4    Mr. Pedone.

5            MR. PEDONE:  Your Honor, very briefly, Richard

6    Pedone on behalf of the EFH indenture trustee.  Your Honor,

7    we obviously support the agreement in accordance with the

8    settlement we reached last week and are thankful for the

9    Court's assistance in getting the parties here to this

10   point.  I'm not certain if the U.S. trustee is objecting to

11   the provision providing for the payment of the EFH

12   indentured trustee fees in accordance with the settlement or

13   not.

14           A provision was included preserving rights on that

15   issue, so I prefer to wait until the end of their

16   presentation to address any concerns they have for the

17   allowance of our fees -- part of our fees as part of our

18   claim, unless the Court would prefer that I address the

19   issue now.

20           THE COURT:  No, that's fine.

21           MR. PEDONE:  Thank you.

22           THE COURT:  You're welcome.  Yes?

23           MR. LOWENTHAL:  Your Honor, good afternoon, Dan

24   Lowenthal from Patterson Belknap Webb & Tyler for Law

25   Debenture Trust Company in New York.  As you know, we

Page 124

1    represent the TCEH unsecured trustee, the $5 billion trustee

2    on the unsecured notes as well as being the co-chair of the

3    T-side UCC.  We fully support confirmation of the plan

4    approval of the settlement agreement.

5             I will be brief.  I'm a mindful we're running up

6    against the three-hour plan support a deadline.  This'll

7    probably take about two minutes because we agree

8    wholeheartedly on the fee issue, and that's all I'm going to

9    address with Mr. Kieselstein, Mr. Jonas, and Mr. Shore.  I

10   just want to emphasize three points to wrap all of this up

11   with respect to the U.S. trustee's objection.

12            First, couple of key facts here in this case.

13   Others of them intended, but they really are the key facts

14   with respect to the statutory authority that I'll mention in

15   a minute, that the cost is not ultimately going to be borne

16   by the debtors' estates and that the creditors have

17   overwhelmingly approved this plan that has been out there as

18   well as the settlement agreement which is part and parcel of

19   it, as Mr. Kornberg mentioned.

20            Second, the statutory authority that others have

21   already addressed, but this really is crucial in this case

22   considering how it's structured.  1129(a)(4) and 1123(b)(6)

23   permit what is being proposed and as Mr. Shore just drove

24   home with reasonableness ultimately approved by Your Honor.

25   At the outset -- and I'm not going to parse the sections.

1   Everybody's briefed of this, and I'm mindful Your Honor said

2   you don't want any more briefing.

3          But Your Honor, at the opening argument, the

4   opening statements in this proceeding, I mentioned to you

5   that throughout the early part of the case, I heard time and

6   the time again how the T-side unsecured creditors were out

7   of the money.  But as Mr. Shore just walked us through and

8   Mr. Kieselstein did earlier and the fine witnesses did over

9   the past few weeks, peace and consensus have been met and

10  achieved with all the hard work of so many in this most

11  complicated, large, difficult case, including the support of

12  many, which includes my client.

13         And as result, litigation, delay, additional fees

14  have all been avoided.  And that's exactly what the code

15  contemplates with 1124(a)(9) and 1123(b)(6).

16         Finally, my the final point is in response to the

17  U.S. trustee, and my remarks in this regard dovetail some of

18  the exact words I just heard from Mr. Shore, which is the

19  trustee's position with respect 503(b) is just wrong.  He

20  said it.  I have it right here.

21         The U.S. trustee fails to distinguish between plan

22  treatment and claims adjudication.  503(b) is not -- again,

23  as Mr. Shore said, restrictive.  The language is not

24  restricted, and other well respected judges that have really

25  parsed through this and have written on this -- Mr.

1    Kieselstein Adelphia.  Somebody else did as well.  Judge

2    Gerber, always thorough, always thoughtful, goes right

3    through and explains why 1129(a)(4) and 1123(b)(6) work

4    here, and you don't have to go to a 503(b).

5            Judge Peck in Lehman also got it right.  We know

6    what happened on appeal, but his decision's the right

7    decision.  Judge Lane and AMR also goes through the exact

8    same analysis.  Now 503(b) can be satisfied whether you have

9    to apply a substantial contribution standard or not.  Others

10   have gone through it.  I'm not going to take the time to do

11   it.

12           All of those who support this plan have done what

13   they needed to do to get this Court to where it is today,

14   and that can be satisfied, but the Court need not go there,

15   and it's time in this Court under these circumstances that

16   this Court send that message to the U.S. trustee.  And

17   therefore, we respect the Court as others have done and

18   respectfully request that Your Honor confirm the plan and

19   approve the settlement agreement as they are proposed.

20   Thank you.

21           THE COURT:  Thank you.

22           MR. KAPLAN:  Good afternoon, Your Honor, Gary

23   Kaplan from Fried Frank on behalf of Fidelity.  Your Honor,

24   like Mr. Pedone, Fidelity's settlement also included -- as

25   the debtor said, it had payment of fees that was reserved

1    for -- to deal with in confirmation.  I don't know whether

2    the U.S. trustee is continuing to the press the issue with

3    respect to the settlement.  I'm happy to address the fees

4    right now or wait and see whether the U.S. trustee is going

5    to continue to press vis-à-vis the settlement.

6              THE COURT:  However you prefer.

7              MR. KAPLAN:  Well, you know what, I'll just --

8    I'll be very brief since I'm sure you're tired of -- Your

9    Honor's getting tired of hearing about the fees.  I'll be

10   brief, and I'll just hit a few very brief points.  First

11   joining the arguments that were raised, I will not belabor

12   the point about not needing to go through the 503(b).

13             Just a couple of points that -- just to make sure

14   that the record is clear -- settlement -- obviously, there

15   are a lot of settlements coming before Your Honor recently.

16   Just a reminder as to what was being settled in the Fidelity

17   settlement.  There are a number of different pieces to that,

18   so when we're looking at the fees, as part of Fidelity's

19   settlement, Fidelity was committing to put in $500 million

20   of equity into the deal without commitment fees or anything

21   else.  So that's part and parcel of the deal was putting in

22   $500 million.

23             It was also settling its secured claims.  It's the

24   largest holder of the second liens.  You know, the second

25   liens are out there continuing to pursue their make-whole.

1    Fidelity agreed to accept the debtor's plan treatment waive

2    on their secured claim.  We're also settling reinstatement,

3    potential reinstatement of EFH claims.  Whether that would

4    mean continued obligations, pay fees, or not was going to be

5    an open issue.  All of that came off of the table.

6            We were settling on impairment.  Our claims were

7    on -- unimpaired.  As part of the plan settlement, there's

8    lists of contracts that are being rejected.  Among those

9    contracts being rejected are not only the agreements with

10   Fidelity's professionals but a lot of the other

11   professionals whose fees are being paid.

12           To the extent that we were going to continue

13   litigating what does unimpairment mean for all the EFH

14   creditors, we would've had to deal with what's happening to

15   the treatment of all of those various engagement letters and

16   reimbursement letters that were now being rejected.

17           We're settling equitable arguments as to equitable

18   entitlement to post-petition interests.  When we get to

19   treatment of unsecured claims for unimpaired, frankly, I'm

20   not sure intellectually how there's a difference between

21   post-petition interests, which is ordinarily disallowed for

22   an unsecured creditor; however, we know under Your Honor's

23   decision if it's a solvent estate, then at least we have an

24   equitable claim for their post-petition interest even though

25   it'd otherwise be disallowed.

1          I'm not sure why that would be any different if

2     Your Honor were to file a decision that says an unsecured

3     creditor is generally not permitted to get their

4     professional fees on a post-petition basis in a solvent

5     debtor case.  I don't know why you wouldn't be looking at

6     the same equitable principles as you would for interest,

7     which would ordinarily be disallowed.

8          And lastly in terms of substantial contribution,

9     as everybody has I think, articulated, I don't think you

10    need to go there, but to the extent that Your Honor does, I

11    think the record is very clear.  While counsel hasn't been

12    standing up here a lot, there was a lot of testimony about

13    all the different proposals that Fidelity was constantly

14    putting in place, things that were important to the debtor.

15         And there was a lot of testimony from Ms. Doré,

16    Mr. Keglevic, and a number of the different -- of the

17    different witnesses as to the role that was being played

18    throughout the case while, again, maybe not in front of the

19    Court all the time, but all the work that was being done

20    behind the scenes.  And that's all I have, Your Honor.

21              THE COURT:  Thank you.

22              MR. KAPLAN:  Thank you.  Any other supporters?

23    Okay.  I hear none.  I'll hear from the -- we'll take a

24    short recess.  Then I'll hear from the objectors.  We do

25    have to break at approximately 2:00.  I have to hear one

1    very discreet matter on my chapter seven calendar which is -

2    - otherwise, there's nothing else on that.  So we'll have to

3    take a break, but hopefully we'll fit it in at an

4    appropriate time during the argument process.  So we can

5    take a short recess.  Then we'll come back, and I'll hear

6    from Mr. Hogan in Mr. Schepacarter.

7              (Recess)

8              CLERK:  All rise.

9              THE COURT:  Please be seated.

10             MR. SCHEPACARTER:  Good afternoon, Your Honor.  I

11   think what we're going to do is -- our game plan is to just

12   -- it's going to be Mr. Hogan and myself are going to be

13   arguing.  Mr. Hogan's going to go first.  I think his will

14   fit in by the 2:00 o'clock deadline.  And then as soon as

15   court reconvenes after 2:00 o'clock, then I'll be able to go

16   --

17             THE COURT:  Okay.

18             MR. SCHEPACARTER:  Because I think I would end up

19   going past 2:00 o'clock, so --

20             THE COURT:  Okay.

21             MR. SCHEPACARTER:  I think that's a better way to

22   do it.  Thank you, Your Honor.

23             THE COURT:  That's fine.  Thank you.

24             Mr. Hogan.  Good afternoon.

25             MR. HOGAN:  Good afternoon, Your Honor.  Thank you

Page 131

1   for allowing me to be heard.

2           THE COURT:  Of course.

3           MR. HOGAN:  I was going to start by making some

4   objections to attorney's fees, but I thought that might not

5   be in my best interest.

6           Your Honor, Shirley Fenicle, a successor-in-

7   interest to the estate of George Fenicle and David William

8   Fahy, both members of the EFH committee of unsecured

9   creditors, but acting in their own individual capacities,

10  have objected to both the settlement motion of EFH and the

11  affiliated Debtors, as well as the confirmation of what was

12  then the fifth amended plan of reorganization and what I

13  understand now is the sixth.

14          Fenicle and Fahy have also joined in and adopted

15  all the pertinent arguments made by the EFH official

16  committee in its trial brief and omnibus objection to both

17  the motion to approve the settlement agreement and the

18  confirmation of the plan.

19          Mrs. Shirley Fenicle, as successor-in-interest to

20  the estate of George Fenicle, her husband, has asserted a

21  claim for her husband's death as a result of exposure to

22  asbestos.  Mrs. Fenicle was appointed to the E-side

23  committee in a representative capacity only, but she is also

24  an unmanifested future claimant as she lived with her

25  husband during his Ebasco exposure, and was exposed to

1    asbestos on a take-home basis, as was her son.  They're both

2    at risk of developing asbestos-related disease and should

3    they do so in the future, would be exactly the kind of claim

4    that the Debtors' plan now seeks to preclude.

5          In addition, should Mrs. Fenicle herself become

6    sick and suffer a terminal illness, her children would then

7    have a cognizable claim for her wrongful death, and thus

8    they too would be unmanifested claimants.  This is the

9    typical context in which asbestos claims arise and are

10   asserted.

11         Mr. Fahy, David William Fahy, has asserted a claim

12   for damages resulting from his asbestos-caused mesothelioma.

13   His family members have unmanifested asbestos claims, either

14   because of take-home exposure or as potential heirs in the

15   event he should die of that disease.  The family members may

16   file unmanifested claims, but at this point have not.

17         Fenicle and Fahy have each filed timely proof of

18   claims against the asbestos Debtors.  Each claim filed will

19   be an unliquidated, general, unsecured claim arising from

20   asbestos through exposure.  Fenicle and Fahy appear in

21   opposition to the settlement agreement and the plan with

22   respect to the four of the 70-odd Debtors whose individual

23   bankruptcy cases have been ordered to be jointly

24   administered, under Local Rule 1015-1 for procedural

25   purposes only.

Page 133

1          Those four Debtors entities, as you've heard from

2   me before, are EECI, Inc., EEC Holdings, LSGT Gas Co., LLC

3   and LSGT SACROC, Inc.  Those entities we've referred to

4   before as the Asbestos Debtors.  EECI's only -- is the only

5   one of these four Debtors whose interest has, in theory,

6   been protected by the committee exercising fiduciary

7   obligations to E-side creditors committee, who has advised

8   this Court, on a number of occasions, that with respect to

9   unmanifested claimants, it has an irreconcilable conflict

10  which prevents that representation.

11          Now before I make the arguments that I need to

12  make to create a record, Your Honor, a little bit of

13  background from the asbestos -- the unmanifested asbestos

14  claimants' perspective is necessary.  In July of 2014, as

15  you are well aware, the Debtors filed a motion seeking a bar

16  date for pre-petition claims.  Included in the bar date

17  motion was a request to set a bar date for unmanifested

18  asbestos claims.  Various interested parties objected to the

19  creation of a bar date for unmanifested asbestos claims.

20          On January 7th of this year, the Court issued the

21  bar date opinion, granting the Debtors' request to establish

22  a bar date for unmanifested claimants.  As the Court

23  explained in the bar date opinion, unmanifested claimants

24  are, quote, people who have been exposed to asbestos, pre-

25  petition, but have not yet manifested any sign of illness.

1    These are claimants that do not know they have an asbestos-

2    related injury.  And indeed they are unknown to themselves,

3    let alone to the Debtors, end quote.

4            Pursuant to the terms of the bar date order, all

5    asbestos claimants, including claimants with both manifested

6    and unmanifested asbestos illnesses, are essentially

7    foreclosed from bringing claims unless they file a claim by

8    the bar date, which is December 14th of this year, 12 days

9    from today.

10            This is confirmed by the Debtors' notice of the

11   bar date, which states, and I quote, "If you do not file the

12   claim now, you will lose your right to bring an asbestos

13   injury claim against the Debtors and receive money, even if

14   you develop an asbestos-related illness in the future.  This

15   means you will not be able to have a say in the voting and

16   share monies provided for asbestos claimants under any

17   bankruptcy plan of reorganization in EFH bankruptcy cases"

18   end quote.

19            A little more history.  On July 22nd of this year,

20   Charlotte Liberda and Curtis Liberda filed a motion for the

21   entry of an order appointing a legal representative to

22   represent future asbestos claimants on all issues before the

23   Court, including unmanifested asbestos claims.  Fenicle and

24   Fahy filed a joinder to that motion to appoint.  After

25   briefing and argument the Court entered an order denying the

1    motion to appoint.

2           The plan, the Debtors, including the asbestos

3    Debtors had proposed their plan of reorganization, by which

4    they seek to resolve all pending asbestos-related

5    liabilities, including liabilities to claimants who have

6    been exposed to asbestos, for which one or more of the

7    Debtors are responsible, but who have not yet developed an

8    illness or manifestation related to that asbestos exposure.

9           And in Class 3-A of the plan, legacy, general

10   unsecured claims against EFH Debtors includes holders of any

11   allowed claim against EFH Debtors derived from or based upon

12   liabilities based on asbestos or qualified post-employment

13   benefits relating to the discontinued operations of EFH

14   Debtors, end quote.

15          The plan provides that all these claims, based on

16   asbestos liabilities relating to the discontinued

17   operations, will be unimpaired under the plan.  Quote, at

18   the option of the applicable EFH Debtor, either one, payment

19   in full in cash; two, reinstatement of such claim; or three,

20   other treatment rendering such claim unimpaired, end quote.

21   The plan does not provide any information regarding this

22   other treatment.

23          It's our position, Your Honor, that the Debtors'

24   proposed plan is unconfirmable, because with respect to

25   these four asbestos Debtors, the plan fails to comply with

1    524(g).  I know you've heard those arguments before, you

2    heard those arguments within the context of the bar date

3    motion.

4         Now 524 governs treatment of future asbestos

5    claims under a Chapter 11 plan of reorganization, in part

6    because of the long legacy period with regard to certain

7    asbestos-related illnesses, Congress enacted 524(g) to

8    protect individuals who have not yet manifested, post-

9    petition, regardless of any pre-petition exposure, so

10   essentially to create a fund, Your Honor, to -- so that

11   there will be equivalent recovery for people who get ill at

12   a later date.

13        Section 524 thus removes the risk that the size of

14   the payment in compensation of injuries, will depend on how

15   quickly a victim gets sick or manifests an injury.  In In

16   Re: Combustion Engineering, the Third Circuit found that a

17   plan that proposes to resolve unmanifested asbestos claims

18   must comply with the requirements of 11 U.S.C. 524(g).

19        THE COURT:  No it doesn't.  It doesn't say that.

20        MR. HOGAN:  Okay.

21        THE COURT:  It does not use the word

22   "unmanifested."

23        MR. HOGAN:  Providing protections contemplated by

24   that section.  As explained in Combustion Engineering, this

25   type of debtor cannot reorganize, except in compliance with

Page 137

1    524(g).  That's how we read it, Your Honor.  This is

2    particularly the case given that the Debtors seek to address

3    and resolve unmanifested claims.

4            Combustion lays out a definitive, unambiguous way

5    on how to -- how an asbestos bankruptcy must proceed in the

6    Third Circuit.  Here, the defects in the plan, particularly

7    with respect to unmanifested claimants, whose rights the

8    Debtors seek to address in the reorganization, cannot be

9    overcome by credit avoiding results and are not subject to

10   specific factual disputes.  Specifically, although the plan

11   purports to protect -- to provide protective treatment of

12   claims of individuals who have been exposed to asbestos, but

13   who have not manifested an illness, the plan essentially

14   forecloses the ability of those claimants to bring claims

15   following the manifestation of their illness, unless they

16   file a proof of claim by the 14th of December, the bar date.

17           The Debtors' plan characterizes the treatment of

18   unmanifested asbestos claims as unimpaired, with either

19   reinstatement or payment in full.  In reality, the existence

20   of the bar date unjustly mandates the accelerated assertion

21   of these unmanifested asbestos claims, rendering the claim

22   functionally and practically impaired.

23           Those claimants who are unaware of both their

24   latent illness and the pending bar date, are simply cut off

25   from any recovery under the plan, and without the

1    protections of 524(g), are subject to the broad injunctions

2    set forth in Article 8(f) of the plan.  These flaws are

3    exacerbated by the overly broad releases and exculpations

4    given to non-debtors under Article 8(d) and (e) to the plan,

5    which failed to satisfy the standards established by the

6    courts in this circuit.

7               Fenicle and Fahy concede that the Debtors' plan

8    does not necessarily need to utilize the provisions of

9    524(g) for unmanifested liabilities that will pass through

10   without injunctions or limitation.  But when the pass

11   through plan is used in conjunction with the bar date,

12   wherein the Debtors seek to foreclose all unmanifested and

13   future claims, 524(g) is mandatory.

14              Congress enacted 524(g) to protect this specific

15   class of asbestos victims because these individuals have no

16   reason to know that they even have a convincible claim or

17   would be required to complete a claim form.

18              Judge Fitzgerald in Finco rejected arguments that

19   would vitiate the purpose of the statute by removing the

20   protections for yet -- exposed, yet unimpaired asbestos

21   claimants and deriving them of just compensation for their

22   future injuries and illness, which is the primary goal

23   behind 524(g).

24              In fact, the very argument raised by the Debtor

25   that individuals who were exposed to the Debtors' produced

1    pre-petition could be discharged outside of 524(g)(2)(b)(2)

2    was rejected by Judge Fitzgerald, after the entry of the In

3    Re: Grossman decision.

4           Your Honor, the purpose of 524 is to provide that

5    those illnesses that manifest post-petition, regardless of

6    pre or post-petition exposure, with a fund for recovery so

7    that currently ill claimants will be paid.  524(g) thus

8    removes the risk that the size of the payment in

9    compensation for injuries will depend on how quickly a

10   victim gets sick or manifests an injury.  It is impossible

11   to include all individuals who are asymptomatic in the

12   unknown exposed category, because those individuals

13   themselves don't even know.

14          To enter the confirmation order in its current

15   form would impair individuals whose disease will not

16   manifest for potentially decades and leave them without

17   recourse when their diseases manifest, unless they file a

18   proof of claim within the next 12 days.  Future claimants or

19   unmanifested claimants, I should say, would be left to

20   suffer and die from asbestos-related diseases without

21   compensation.  This is not only manifestly unfair to those

22   individuals, but is contrary to the bankruptcy code's

23   principle of equal distribution for similarly situated

24   creditors.

25          The Debtors, of course, read In Re: Grossman

1    differently.  They argue Grossman requires that the due

2    process analysis, in the context of a barred claim, is a

3    retrospective, case by case, analysis.  While it's true that

4    the Third Circuit articulated an ad hoc determination of

5    whether a particular claim has been discharged, the Court

6    specifically included as a factor whether it was reasonable

7    or possible for the Debtor to establish the trust for future

8    claimants under 524(g).  Quote, Congress created the 524(g)

9    trust mechanism in order to protect the due process rights

10   of persons who have been exposed but not yet affected and

11   might not manifest injury until some time when all available

12   compensation has been paid out to people who got sick

13   faster.

14          Due process, Your Honor, is another issue that the

15   unmanifested asbestos claimants have issue with.  It is

16   obviously a threshold issue in these bankruptcy cases.  An

17   elementary and fundamental requirement of due process in any

18   proceeding which is to be afforded finality is noticed,

19   reasonably calculated under all circumstances to apprise

20   interested parties of the pendency of an action and to

21   afford them an opportunity to present their objections.

22   The Debtors' plan fails to satisfy this constitutionally

23   mandated due process rights for these unmanifested asbestos

24   claimants.

25          They cannot be treated similarly to other personal

1    injury tort claims.  Congress recognized this important

2    distinction when it passed 524(g).  Because asbestos-related

3    injuries may not be diagnosed for up to 50 years after

4    exposure, the plan violates the due process of unmanifested

5    claimants by cutting off their rights before they even know

6    they have a claim.

7              Fenicle and Fahy will concede that publication

8    notice is a widely accepted form of notice with regard to

9    unknown claimants, but in those instances it's where the

10   claimant is unknown to the Debtor.  While parts of accepted

11   as providing constructive notice to creditors unknown to a

12   debtor, publication does not and cannot satisfy the

13   requirements of due process for an entire class of claimants

14   who are unknown, so unknown as to be unknown even to

15   themselves.

16             The Court established the bar date expressly and

17   specifically intending the cut off the claims of persons who

18   had not yet manifested any asbestos-related injury, persons

19   who some day may suffer a loss when family members in the

20   future develop an asbestos-related disease, and even those

21   who have not had -- who do not yet have relationships that

22   will -- which will result in a claim against the Debtor.

23             These unmanifested claimants cannot recognize that

24   they have a claim in this bankruptcy case, and therefore

25   they cannot make a decision about whether to assert their

Page 142

1    claim.  They are functionally or constructively incompetent

2    for the purposes of this bankruptcy case.

3              Yet the Debtors' plan, the interest of

4    unmanifested claimants are afforded no protection, separate

5    and distinct, from those of manifested asbestos claimants.

6    They are merely lumped together with the manifested claims,

7    even though their interests are different.

8              The combination of the Debtors' pass through plan

9    and the bar date serve no legitimate reorganizational

10   purpose in this case.  In addition to the impossibility of

11   providing due process notice to unmanifested claimants, the

12   expenses and futility associated with providing notice to

13   those with diagnosed illnesses but who have not yet brought

14   suit is an expensive and difficult endeavor.

15             Indeed, the Debtors' pass through plan will result

16   in potentially hundreds of district court jury trials of

17   asbestos claims with years of uncertainty on the magnitude

18   of those asbestos liabilities.

19             The Court will face an impossible claims allowance

20   process with hundreds of individual estimation proceedings

21   and a high number of claims that can -- it cannot liquidate,

22   filed by a multitude of individuals who may be entitled to a

23   jury trial.  The Court does not have core jurisdiction to

24   make threshold determinations as to the validity of asbestos

25   personal injury claims.

1          THE COURT:  I'm not going to.  It's not called

2     for.

3          MR. HOGAN:  Okay.  The timing of the bar date,

4     relative to plan confirmation, does not inform the process

5     for which the bar date was intended.  The bar date is

6     typically utilized to inform the Debtor as to the breadth

7     and scope of claims asserts against it.  Yet here we are at

8     closing arguments on Debtors' plan of reorganization and the

9     bar date is, yet again, still 12 days away.

10          Debtors have repeatedly articulated their mantra,

11     and I heard it again today, this is not an asbestos case.

12     That remains to be seen, as the bar date has not passed.  I

13     can tell you, from the perspective of the unmanifested

14     claimants who have been exposed to asbestos, that it is very

15     much an asbestos case.

16          Finally, Your Honor, with regard to the

17     intercompany claims.  The asbestos Debtors that I mentioned

18     at the beginning of my remarks are not really debtors but

19     rather creditors holding, as we've learned, claims in excess

20     of $1 billion intercompany receivables that are inner-E silo

21     claims.

22          The Debtors initially intended to restate these

23     receivable claims, use them to secure the credit support of

24     all present and future asbestos claims and then cancel them

25     for the benefit of the EFH parent with the consent of the

Page 144

1    plan supporters.  That comes from the Debtors' trial brief.

2           The plan of reorganization now provides that thee

3    E-side creditors are unimpaired and will be paid in full,

4    and that the asbestos debtor company -- intercompany claims

5    will be paid in full, as the Debtors have amended the plan

6    to so clarify that all EFH Debtor intercompany claims of

7    asbestos Debtors will be reinstated.

8           The Court may recall the testimony of Mr. Keglevic

9    where he testified, quote, the claims of those entities --

10   the claims that those entities have against EFH are not

11   released as part of any of the bankruptcy and therefore will

12   continue, will travel, as I like to call it, with the

13   reorganized EFH.  And therefore that would be the source of

14   any required funding of the $50 million or so, or whatever

15   the liability -- whatever those liabilities turn out to be,

16   no matter how large those liabilities turn out to be,

17   unquote.

18          The plan makes no provision for the continued

19   preservation of all EFH Debtor intercompany claims of

20   asbestos Debtors or of adequate cash or equity in the

21   asbestos Debtors.  The plan provides no safeguards to

22   prevent the purchaser from creating additional priming debt

23   at either the parent or asbestos subsidiary level, which

24   could eviscerate any equity to pay asbestos claims, either

25   manifested or unmanifested as they arise.

1          The NextEra Energy deal, announced last week, to

2    sell to large natural case turbines to Luminant for $1.5

3    million, is a prime example of equity can be repurposed away

4    from the payment of potential asbestos claims.  The plan

5    does not provide any safeguards if the purchaser decides,

6    next year or in the following years, to sell or dissolve

7    EECI or the three other asbestos Debtor subsidiaries.

8          Without regard to the unimpaired characterized of

9    allowed asbestos claims, without a mechanism to earmark

10   funds or safeguard funds for these asbestos claims, the

11   characterization that these funds are unimpaired is

12   meaningless.  The plan is inadequate because the Debtor

13   fails to address these fatal omissions which prevent

14   asbestos creditors from carefully evaluating the

15   appropriateness of the plan of reorganization.

16          Thank you, Your Honor.

17          THE COURT:  Thank you, Mr. Hogan.  All right.

18   We're going to take a recess so I can hear my 2:00 o'clock

19   matter, although I don't see counsel in Court, but he may be

20   in the hallway.  It should be a short issue.  Let's

21   reconvene at -- promptly at 2:45.  I would ask you to exit

22   the courtroom, if you don't mind.  Or if you're going to

23   stay for the Chapter 7 calendar, please be cognizant of the

24   fact that there's a court hearing going on and be

25   respectful.  I would appreciate that.  You don't need to

Page 146

1      clear your tables, it's just one matter.  It's fine.

2              We're in recess until 2:45.

3              MAN:  Thank you, Your Honor.

4          (Recess)

5          (The Court attends other unrelated matters)

6              CLERK:  All right.

7              THE COURT:  Please be seated.  Mr. Schepacarter.

8              MR. SCHEPACARTER:  Thank you, Your Honor.

9              THE COURT:  (OFF RECORD)

10             MR. SCHEPACARTER:  Good afternoon, Your Honor.

11     May it please the court, Richard Schepacarter for the United

12     States Trustee.  Before I actually do my opening I just

13     wanted to give a couple of preliminary comments.  One is

14     which I want to echo Mr. Kieselstein's commendation and

15     appreciation to you and your court and to your staff.  It's

16     been -- this has been an exceptional case.  It's probably

17     the hardest and I've been practicing bankruptcy law now

18     almost 30 years and it's probably been the most exceptional

19     case that I have dealt with and I want to express that same

20     gratitude to Your Honor and to your staff for working with

21     all the parties as well as with our office.

22             I also wanted to relay Ms. Schwartz's regrets that

23     she couldn't be here today but she's also grateful to your

24     staff and to Your Honor for allowing her to appear before

25     you.

1              Your Honor, I want to take it in little bits and

2      chunks and what I'm going to do is I'm going to make some

3      sort of preliminary comment and then I'm going to go into

4      the three portions that we have objected to, which is the

5      exculpation of the release and I'll save the fee issue for

6      last.

7              The primary role of the United States Trustee

8      program is sort of a watchdog over the bankruptcy process.

9      That's stated in the United States Trustee's mission

10     statement.  The mission of the United States Trustee program

11     is to promote the integrity and the efficiency of the

12     bankruptcy system for the benefit of all stakeholders,

13     debtors, creditors and the public.

14             It's been stated that the United States Trustee

15     has no economic interest and it's basically the system is

16     designed that way so that the United States Trustee doesn't

17     have an economic interest that drives any of its decisions.

18             The bankruptcy judge, however, holds a special

19     place in the bankruptcy process.  He is the gatekeeper of

20     the law and the impartial arbiter of disputes and, as such,

21     only acts upon evidence brought before him.

22             The bankruptcy code is meant to be a comprehensive

23     federal scheme to govern the entirety of the bankruptcy

24     process and although flexibility is necessary, the federal

25     scheme cannot remain comprehensive if interested parties are

1   free to rewrite the law to fit their preferences.

2           Although the bankruptcy process has inherent

3   flexibility, that elasticity is not without bounds and the

4   structure of the bankruptcy code because many provisions

5   cannot give way to create interpretation that eviscerate the

6   principles and procedures underlying it no matter how large

7   the case, no matter how much money is at stake and no matter

8   how many professionals are involved.

9           The only way adherence to the bankruptcy code is

10  not far from what is both near and dear to my heart, which

11  is firefighting.  To properly fight and extinguish a fire,

12  firefighters need to maintain crew integrity and each

13  firefighting crew, whether they are the engine company, the

14  truck or the ladder company or the rescue company, not only

15  must they maintain the integrity of their crews, they must

16  perform each of the prescribed tasks and work together in

17  order to accomplish the main goals of life safety and fire

18  extinguishment.

19          If the engine company does not establish a water

20  supply and does not deploy the hose line properly or the

21  truck company doesn't properly vent the structure from the

22  outside, or the rescue company doesn't properly vent and/or

23  search, the firefighting effort will not only be compromised

24  but the structure may be lost and, more importantly, the

25  health, safety and lives of the occupants, as well as the

1    firefighters may be severely and adversely affected.

2           A recent investigation of a commercial structure

3    fire in a major American city that claimed the lives of two

4    firemen revealed that during the incident the firefighters

5    lost track of crewmembers.  The lieutenant, who was the crew

6    leader, entered the structure without realizing that his two

7    crewmembers were not following behind him.  He fell through

8    the floor and although he radioed a mayday, he was -- he

9    perished.

10          The other firefighter who was assigned to the

11   (indiscernible) team or the response team that goes to see

12   full on firefighters, grabbed a tool, went on air, rushed

13   into the structure on his own and he also perished.

14          During the interviews, the fire department

15   commented on increased freelancing during the mayday.  The

16   bottom line is that the failure to maintain crew integrity

17   and to follow the prescribed procedures integral to the

18   firefighting effort and system proved costly.

19          Although the failure to maintain the integrity of

20   the bankruptcy code's comprehensive scheme has far less

21   dramatic and drastic results, the premise is the same.  The

22   failure to adhere to the prescriptions of the bankruptcy

23   code compromises and weakens the integrity and faith of the

24   bankruptcy system and is detrimental the parties and

25   interests and the public at large.

1          Now, with respect to the exculpation provision,

2     under the plan, the exculpated parties are sought to be a

3     number of parties who are estate fiduciaries but there are

4     some who are questionable.  Those are the former affiliates

5     and the current former affiliates, current and former equity

6     holders.

7          The only parties who may be exculpated for post-

8     petition actions are estate fiduciaries.  As Judge Walrath

9     stated in Washington Mutual, "an exculpation cause must be

10    limited to fiduciaries who have served damage after 11

11    proceeding."  That is estate professionals, the committees

12    and the members and the debtors, directors and officers.

13         Judge Carey in Tribune agreed with the holding of

14    Washington Mutual relating to exculpated parties and held

15    that the exculpation clause in Tribune must exclude non-

16    fiduciaries.

17         In PPC Holdings, Judge Shannon sustained the

18    United States Trustee's objection to the exculpation clause

19    stating that such clause must be reeled into and including

20    those parties who have acted as estate fiduciaries and their

21    professionals.  In reaching that conclusion, Judge Shannon

22    reviewed Washington Mutual decision as well as the decision

23    in PWS Holdings, one which Washington Mutual relied, and the

24    issue in PWS was whether an official committee member of the

25    unsecured creditors could receive exculpation.

1          Judge Shannon described the PWS holding decision

2    in his PTC Holdings case and state that in reaching its

3    conclusion, the PWS court examined Section 1103 and noted

4    that the section hadn't been interpreted to imply both a

5    fiduciary duty to committee constituents and a limited grant

6    of immunity to committee members.  This immunity, the court

7    found, covers committee members for actions within the scope

8    of their duties.

9          The PWS court's reasoning thus implies that a

10   party's exculpation is based upon its role or status as a

11   fiduciary.  That is why the Washington Mutual court pointed

12   out courts have permitted exculpation clauses insofar as

13   they merely state the standard to which estate fiduciaries

14   are held in a Chapter 11 case.  That fiduciary standard,

15   however, applies only to estate fiduciaries and no one else.

16         Likewise, in the Indianapolis Downs case, Judge

17   Shannon stated that the exculpations under the plan as

18   ratified and filed with the court were limited so as to

19   apply to only estate fiduciaries.  And as Your Honor

20   recently stated in the ASHINC case with respect to

21   exculpation, to the extent that my clause in Southern Air

22   can be read by negative implication to call that exculpation

23   provisions can be extended in necessary circumstances beyond

24   estate fiduciaries, I disavow that position.

25         In the present case, the plan proponents want to

1    go beyond only estate fiduciaries and allow for exculpation

2    for former affiliates of the debtors as well as current and

3    former indirect equity holders.

4         The debtors maintain that there are circumstances

5    in which shareholders may owe fiduciary duties to a

6    corporation and that since the EFH committee had asserted in

7    its objection breached the fiduciary claims against the

8    debtors, equity holders, they should be entitled to

9    exculpation.  However, there is nothing in the record with

10   respect to what fiduciary duties, if any, such shareholders

11   or equity holders may have discharged with respect to these

12   debtors or in what context the equity holders may be

13   considered estate fiduciaries.

14        For example, the indentured trustees owe fiduciary

15   duties to their various constituents but they are not

16   necessary estate fiduciaries entitled to exculpation.

17        T committee has cited legal argument to Texas law.

18   I think it was in their supplemental trial brief that

19   shareholders may exercise control over a corporation,

20   including control and influence over the corporation's

21   officers and directors are generally held to be corporate

22   fiduciaries and owe a fiduciary duty to the corporation.

23        However, the allegations made by the E committee

24   that could possibly be viewed as breaches of any such

25   fiduciary duties appear to relate in part to prepetition

1    conduct and there appears to be no evidence as to which

2    equity holders, in these cases are controlling equity

3    holders, that might even be subject to such a standard that

4    such equity holders are or may have acted as estate

5    fiduciaries here and that such equity holders exercised any

6    control over the Chapter 11 debtors that would garner such

7    relief.

8            Here, the debtors seek to turn the exculpation and

9    estate fiduciary analysis on its head.  Because the E

10   committee asserted breach of fiduciary claims against

11   certain parties does not necessarily make those parties

12   estate fiduciaries.

13           Taken a step further, any party who may be sued,

14   identified or named in a suit or merely alleged to have

15   breached a fiduciary duty, valid or not, should be granted

16   exculpation on the possibility that such party may be so

17   sued.  However, to be an estate fiduciary, the party needs

18   to exhibit the facts that it actually acted as an estate

19   fiduciary in this case.  Just by virtue of having the

20   potential of being an estate fiduciary doesn't make it so.

21           As Mr. Kieselstein had pointed out that the claims

22   against the fiduciary, or I should say the sponsors, that

23   there were no tangible causes of action to be found and I

24   think as Mr. Kleinhaus indicated in his closing argument

25   that there was not a shred of evidence of these claims.

1          Likewise, the debtors need to include employees

2     and other categorized parties as exculpated parties under

3     the plan.  However, without more, the debtor's employees owe

4     no fiduciary duty to any parties and are not estate

5     fiduciaries as well as the actions of the debtor's

6     affiliates, such as Oncor, do not appear to rise to the

7     level of an estate fiduciary.

8          There's no evidence that any key personnel would

9     have abandoned their efforts to help the reorganized debtor

10    entities follow through on the Chapter 11 plan.  And to the

11    extent that the debtor's employees perform their jobs from

12    an operation perspective, these employees performed in

13    accordance with their job requirements, for which they are

14    compensated.

15         Likewise, Oncor's cooperation in facilitating the

16    merger and the plan sponsor's diligence efforts is not

17    sufficient to catapult Oncor to the level of an estate

18    fiduciary and such effort may be guided by other

19    requirements.

20         As we stated in our opening statement with respect

21    to exculpation provisions, as it stands today, the debtors

22    continue to seek exculpation for non-estate fiduciaries

23    including shareholders and non-debtor affiliates.  Simply

24    because a party asserts claims or brings an action against a

25    shareholder or a non-debtor affiliate and one of those claim

1    asserted is a breach of fiduciary duty does not make that

2    party an estate fiduciary entitled to exculpation.

3            Accordingly, the non-estate fiduciary such as the

4    reorganized debtor -- strike that -- the non-debtor

5    affiliates and the current former shareholders should be

6    removed from the list of parties entitled to exculpation.

7            Let me turn briefly to the release provisions.

8    Third-party releases in the plan are permissible only in

9    rare and exceptional circumstances in which key factors are

10   present.  Courts in this district have routinely determined

11   that releases given by non-debtors to other non-debtors

12   should be allowed only if they are consensual.

13           To the extent that the court considers approving

14   non-consensual third-party releases, they must be reviewed

15   under the rigorous standards of Continental Airlines as well

16   -- and well established case law within the District of

17   Delaware where the hallmarks of permissible non-consensual

18   release are fairness, necessity to the reorganization and

19   special factual findings to support these conclusions.

20           However, even in the -- to the extent that

21   releases are consensual, certain parties seeking releases

22   may not be entitled to such relief under a plan.  In

23   Washington Mutual, the third-party releases of the non-

24   debtor directors was not approved because there was no

25   evidence of a substantial contribution to the reorganization

1    by these parties.  Accordingly, the court recognized that

2    the directors and officers were actually being exculpated

3    under the plan.

4            Like Continental Airlines, Genesis Health and

5    Washington Mutual where the courts rejected third-party

6    releases for directors and officers, here there is little or

7    no evidence that non-debtor directors and officers provided

8    a critical financial contribution to the debtor's plan that

9    was necessary to make the plan feasible in exchange for

10   receiving a release of liability.

11           The debtor's officers and directors and employees

12   have been otherwise compensated for their contributions and

13   the various management and operational functions that

14   otherwise were performed during the Chapter 11 cases do not

15   constitute contributions of assets to the reorganization.

16           There has been testimony from several witnesses,

17   including Mr. Keglevic, Ms. Doré and the disinterested

18   director, Ms. Williamson, Mr. Cremens and Mr. Sawyer that

19   the releases were all part of a global settlement and

20   resolution in order to effectuate the disarmament in these

21   cases.

22           Mr. Keglevic testified at an October 1st

23   deposition that the purpose for the full releases were to

24   give the new entity a fresh start and to reduce the tail of

25   litigation as well as the cost, potential delay and

1    distraction such litigation might engender.

2            A good portion of Ms. Doré 's written testimony

3    focuses on the overall propriety of the releases, especially

4    for the sponsors.  However, Ms. Doré testified at her

5    deposition that with respect to the releases it is important

6    that the plan provide for a global resolution of all issues

7    and that there is no opportunity for anyone to assert

8    lingering claims after the case is over.

9            However, as part of her written direct testimony,

10   Ms. Doré testified that the consideration for the director

11   and officer's releases is that they worked tirelessly to

12   advance the restructuring.  For example, there have been

13   more than 75 joint board meetings and 16 committee meetings

14   in the year 2015.

15           Likewise, Mr. Keglevic's written direct testimony

16   dovetailed Ms. Doré's testimony on that point.  Mr. Keglevic

17   also testified at his deposition that, although the officer

18   releases are less tangible, the officers are performing in a

19   way so that they are contributing to the case and providing

20   value to support the releases.

21           More importantly, as do certain of these parties,

22   and in particular the directors and officers and other

23   estate fiduciaries, the release provisions have no carve out

24   for actual fraud, willful misconduct or gross negligence,

25   which the exculpation provisions do, in fact, include.

1          These exceptions to the release provisions was not

2     present in the release provisions in the Washington Mutual,

3     Tribune, Indianapolis Downs or the ASHINC case.

4          In ASHINC the plan had carved out from the

5     releases "other than for fraud, willful misconduct, criminal

6     conduct and/or gross negligence".  Not counting these carve

7     outs in the release provisions it's extraordinary and

8     permits exculpated parties to receive relief under the

9     release provisions beyond what they are entitled to under

10    the exculpation provisions.  And such a result should not be

11    allowed as a matter of public policy.

12          Finally, as a result of the lack of gross and

13    willful carve out that I mentioned, the release provisions

14    allow counsel to do the release for actual fraud and willful

15    misconduct and gross negligence, which under the applicable

16    law rules of professional conduct may not be permitted.

17          I should note that when questioned on this point

18    Ms. Doré testified that there was never any discussion about

19    any carve out from the release claims for malpractice

20    against counsel.

21          Accordingly, the release provisions should be

22    revised to include a carve out for actual fraud, gross

23    negligence and willful misconduct and the debtors and

24    officers should be removed from the list of these parties as

25    the post-petition conduct as they are receiving exculpation

1    under the plan.

2            With respect to the payment of the fees under the

3    plan and settlement agreement, in particular, the second

4    paragraph of the Article 4R of the plan provides for the

5    payment of fees and expenses and reimbursements including

6    the professional fees of the TCEH unsecured notes trustee,

7    the TCEH second liens note trustee, the TCEH second lien

8    notes collateral agent and members of the TCEH unsecured ad

9    hoc group as well as members of the TCEH second lien

10   consortium.

11           Recent settlements with Fidelity and the EFH notes

12   trustee also encompass the payments of fees and expenses

13   incurred by Fidelity and those others in connection with

14   these Chapter 11 cases and now those payments have been made

15   part of the plan and I'll address those issues momentarily.

16           In order to obtain confirmation of a plan, the

17   plan proponent has the burden to establish compliance of all

18   the requirements of Section 1129 of the bankruptcy code and

19   that is the plan proponent's burden of proof with respect to

20   each and every element of 1129.

21           Together, Article 4R of the plan in Section 2.7A

22   of the settlement agreement obligate the debtors to pay

23   professional fees without further notice to or action, order

24   or approval of the bankruptcy court, the certain

25   professionals retained by creditor parties in connection

1    with these bankruptcy cases.

2            These fee payments are to be made with no

3    opportunity to object, with no specific disclosure as to the

4    amounts to be paid to each particular recipient and, most

5    importantly, with no legal basis supporting such payments.

6    The court should not and cannot advocate its oversight of

7    professional fees and administrative expenses as these plan

8    and settlement provisions seek to avoid the procedural and

9    substantive requirements imposed by the code.

10           In particular, the proposed third-party

11   professional fee payments related to professionals whose

12   compensation is specifically governed by Sections

13   503(b)(3)(d) and (b)(4) of the code, including the

14   professionals of indentured trustees, ad hoc groups,

15   unofficial committees and individual creditors.

16           Although such professionals may be eligible to be

17   compensated from the bankruptcy estate, Section 503 imposes

18   detailed requirements that must be met before approval and

19   payment, including the timely filing of requests for payment

20   by the professional under 503(a), notice and a hearing

21   before the court under Section 503(b), a showing that such

22   expenses were actual and necessary as required by 503(b)(3),

23   a showing that the creditor, unofficial committee or

24   indentured trustee has made a substantial contribution to

25   the bankruptcy case under Section 503(b)(3)(d) and, finally,

1   a finding by the court that any compensation paid to an

2   attorney is reasonable under Section 503(b)(4).

3          Likewise, it also appears that the proposed

4   payments to Fidelity and the EFH notice trustee and

5   presumably they're a third party, associated third-party

6   professionals relate to fee payments to professionals whose

7   compensation is also governed by Sections 503(b)(3)(d) and

8   (b)(4) of the bankruptcy code, which includes the

9   professionals and indentured trustees.

10          The 3rd Circuit was unequivocable when it stated

11   in O'Brien that a party's right to payment under Section

12   503(b) is not automatic, but depends upon the requesting

13   party's ability to show that the fees were actual, necessary

14   to preserve the value of the estate.

15          Although it is not clear where the payment

16   provisions under the plan and settlement agreement limit

17   payments to professionals who can and will satisfy Section

18   503(b), those plan and settlement provisions do not provide

19   the court, the United States Trustee and parties and

20   interests with any effective ability, opportunity to review

21   or contest whether those requirements have been met.

22          The fact that the payments of professional fees as

23   proposed as part of the Chapter 11 plan and settlement

24   agreement do not relieve the third-party professionals of

25   their obligation to comply with the requirements of Section

Page 162

1    503 which is the sole source of authority to pay post-

2    petition professional fees on administrative basis.

3            In Lehman, which is cited in our papers, the court

4    rejected an attempt by certain committee members to

5    circumvent Section 503(b) by seeking payment under a

6    permissive plan provision which purported to pay third-party

7    professional fees without regard to whether they could be

8    authorized under Section 503.

9            As the Lehman court explained, plans only pay --

10   plans pay only claims and expense -- and administrative

11   expenses.  As the court -- and I'll just read this cite or

12   this quote -- "Although the bankruptcy court does not

13   explicitly forbid payments of professional fees that are not

14   administrative expenses, no such explicit prohibition is

15   necessary.  Reorganization plans exist to pay claims and

16   expenses.  Therefore, the individual members of these

17   expenses and are either administrative expenses or not.  And

18   if the latter, they cannot be paid under plan."

19           Indeed the Lehman court recognized that any

20   contrary result could lead to serious mischief since it

21   would allow plan proponents to distribute estate assets

22   without regard to the bankruptcy court's priority scheme.

23   The Lehman court's reasoning applies equally here.

24           Like the fees at issue in Lehman, the third-party

25   professional fees are either administrative expenses or not.

1    The third-party professionals seek to enjoy the benefits of

2    administrative priority under Section 503 with some possible

3    source of statutory authorization permitting them to be paid

4    by the debtors in full on the effective date but they must

5    also comply with the disclosure obligations and substantive

6    limitations imposed on that section.

7            No matter how creative the attorneys and advisors

8    have been, it can't -- with respect to the deal -- it cannot

9    undercut the law.  Even apart from Section 503(b), the plan

10   cannot be approved because it violates Section 1129(a)(4) of

11   the code.  That section provides that the court may approve

12   a Chapter 11 plan only if among other things the court finds

13   that any payment made by the debtor preserves his or her

14   costs and expenses in connection with the case that's either

15   been approved by or subject to the approval of the court as

16   reasonable.

17           The plan violates this requirement because it

18   gives the reorganized debtors but not the court sole

19   discretion to determine whether a particular fee or expense

20   is reasonable.  It provides no disclosure whatsoever of the

21   actual fees to be paid other than an overall cap and now

22   some additional amounts that were recently included.  But

23   consequently, there is no basis on which the court can make

24   a reasonableness finding required by Section 1129.

25           To be clear, the United States Trustee does not

1    suggest that Section 1129 may be used as a substitute for

2    review under Section 503.  But even assuming that any of the

3    proposed fees did fall outside the scope of Section 503(b),

4    they would nevertheless remain subject to the more general

5    disclosure and court approval requirements of 1129.

6              In a large part, this fee issue is legal in

7    nature.  However, there are a few salient facts that shed

8    some light on how these payment provisions came to be.

9              At her September 28th deposition, Ms. Doré

10   testified that the debtors agreed to pay these fees as it

11   was part of the negotiations and that the debtors ultimately

12   agreed to this as part of a package of a lot of give and

13   takes.

14             More striking is Ms. Doré's written direct

15   testimony where she testified that the debtors heavily

16   negotiated these fee provisions but ultimately the merger

17   and settlement parties refused to enter into the

18   transactions without the fee provisions.

19             Notwithstanding the incorrect legal standard being

20   invoked by the debtors, the premise that the debtors will

21   review the reasonableness of the professional fees to be

22   paid under the plan and related documents may not be as

23   effective as Ms. Doré explained in her deposition and I

24   think as Mr. Kieselstein also explained today.  But

25   technically it is the reorganized debtors making the

1    payments.

2             But the relevant of that is overstated because

3    despite who cuts the checks, the people who are going to own

4    the companies are taking the companies less that money.  In

5    Ms. Doré's view, it is the new owner's money to spend at

6    that point.

7             Ms. Doré's testimony can be distilled down to the

8    following; the new owners are ultimately the ones who are

9    bearing the responsibility for payment.  The money is coming

10   out of the companies before the new owners take control of

11   those companies.  The new owners are taking the companies

12   less the cash used for the fee payments and then the debtors

13   feel it is those parties' decision to do so.

14            However, despite who ultimately pays the fees,

15   under the plan and settlement agreement, the plan proponents

16   are seeking court approval of a scheme today that allows for

17   unfettered discretion to pay these professional fees

18   removing any review of these fees from the court's oversight

19   and the US Trustee's review.

20            The problem that the plan proponent faces that

21   there are specific code sections that directly address the

22   allowance and payment of those fees and the parties cannot

23   use either Rule 9019 or Section 105 to circumvent Section

24   503(b).

25            The law is very clear that when there is a

1    specific code section that address an issue like it does

2    here regarding administrative expenses, the court cannot use

3    the more general code section, whether it be Section 105(a),

4    1129(a), or in this instance, Rule 9019 to fashion relief.

5              As the Supreme Court in RadLAX recognized and

6    relied upon, there is well-established canon of statutory

7    interpretation -- the specific governs the general.  So as

8    has been established, the debtors agreed to these provisions

9    in the plan settlement agreement based upon a business

10   decision and as part of the negotiations to reach a global

11   settlement.  Moreover, the debtors have agreed to be the

12   review of the fees even though they determined in the end

13   the money to be paid was really the purchasers and investors

14   in any event.

15             If I might, Your Honor, I have a decision that was

16   recently handed down in the Tribune case.  I'm not sure if

17   Your Honor's aware of it but I sort of want to cite, though.

18   It was only recently handed down on November 19th and I have

19   a copy for Your Honor if I might approach.  I also have a

20   copy for the other parties.

21             THE COURT:  Judge Carey?

22             MR. SCHEPACARTER:  Yeah, it's the Judge Carey

23   decision, Your Honor.

24             THE COURT:  Okay.

25             MR. SCHEPACARTER:  Actually, I have two copies,

1    one for you and Ms. Werkheiser.

2              THE COURT:  Thank you.

3              MR. SILVERSTEIN:  May I approach?

4              THE COURT:  Yes.  Thanks.  Oh yes.  Okay.

5              MR. SCHEPACARTER:  Okay, thank you, Your Honor.

6    In this recent decision by Judge Carey in the Tribune Media

7    Company cases, Wilmington Trust Company sought to include as

8    part of its unsecured claim in excess of $3 million dollars

9    of post-petition attorney's fees and costs, which unsecured

10   claims -- unsecured claim was only entitled to receive a

11   partial distribution under the confirmed plan.

12             The reorganized Debtors objected to this portion

13   of Wilmington Trust's claims, arguing that unsecured

14   creditors cannot include post-petition attorney's fees in

15   their claims against the estate.  Wilmington Trust argued

16   that under the Traveler's Casualty case, the Supreme Court

17   rejected that position and determined that post-petition

18   attorney's fees may be included in an unsecured claim if

19   recovery of the fees are permitted by an enforceable, pre-

20   petition contract, in this case, the indenture.

21             Judge Carey, after an analysis of the Supreme

22   Court's decision in Traveler's and Sections 502(b), 506(1)

23   and 506(b) sustained the Debtor's objection and have

24   disallowed Wilmington Trust's claim for post-petition fees

25   and costs.

1          In particular, Judge Carey stated that: "Courts

2    are divided over the issue of whether an unsecured Creditor

3    can recover post-petition attorney's fees and costs as part

4    of its allowed claim against the bankruptcy estate.

5    Although the Third Circuit has not decided the issue, lower

6    courts than the Third Circuit have determined that post-

7    petition attorney's fees are not so recoverable.

8          Judge Carey agreed with the reasoning in the

9    Global Industries case, where the Bankruptcy Court found

10   that Section 506(b) only provides for attorney's fees for

11   over-secured Creditors.  The U.S. Supreme Court in Timbers

12   decided that Section 506(b) permitted only over-secured

13   Creditors to recover post-petition interest on their claims

14   and likewise, Courts apply this reasoning to restrict

15   allowance of post-petition fees only to over-secured

16   Creditors.

17         Section 502(b) requires a Court to determine the

18   amount of a claim as of the date the petition was filed and

19   Section 506(b) adds post-petition interest and fees to the

20   extent a Creditor is over-secured, and it is inequitable to

21   allow certain unsecured creditors to recover post-petition

22   attorney's fees at the expense of similarly situated

23   Claimants in a pro rata distribution.

24         Lastly, Judge Carey stated that denying post-

25   petition attorney's fees to unsecured creditors does not

1    leave those Claimants without recourse, as they may seek

2    payment of post-petition fees and expenses under Sections

3    503(d) and 503(b)4 of the Code.

4           The relevance of the decision is that -- here is

5    that, similar to the situation in this case, we have

6    unsecured creditors who sought fees under a contract such as

7    the indentured trustees in Fidelity and AST, but it does not

8    -- but the Bankruptcy Code does not allow for the payment of

9    such fees, absent the Creditor filing an application under

10   503(b)3(d) and (b)4.

11          If I might, in closing, Your Honor, I just want to

12   address some of the arguments to some of the points that

13   were raised on the closings of some of the other parties.

14          In Mr. Kleinhaus's closing, he had indicated that

15   the U.S. Trustee had not objected to the $15 million dollars

16   in fees under the settlement agreement.  And oddly enough,

17   for the first time, he sort of raised that issue for me, as

18   we had understood, or at least I have understood that that

19   was part of the transaction fees that we were not objecting

20   to, so that is why you did not see an objection from us on

21   that.  However, if that fee --

22          THE COURT:  What -- what's your -- what's your

23   distinction between not objecting to the transaction fees

24   and objecting to the fee -- the professional fees under

25   Section 2.7?

1         MR. SCHEPACARTER:  I think we sort of saw those

2    fees as not the Section 503(b) type fees, those are not fees

3    being paid to Creditors.

4         THE COURT:  Well, they're --

5         MR. SCHEPACARTER:  Creditor parties.

6         THE COURT:  They're being paid to the

7    professionals as part of the process of --

8         MR. SCHEPACARTER:  As part of the deal, I guess

9    you want to call it.

10        THE COURT:  Why isn't -- why isn't the two -- then

11   why aren't the professional fees that we're discussing part

12   of the deal?

13        MR. SCHEPACARTER:  Well, I think --

14        THE COURT:  I'm trying to -- I'm trying to figure

15   out --

16        MR. SCHEPACARTER:  Yeah.

17        THE COURT:  -- you know, I mean, professional fees

18   are getting paid without Court review, I mean, whether they

19   be, you know, as part of the transaction process of going

20   through the process actually making this all happen, those

21   are lawyers doing that work --

22        MR. SCHEPACARTER:  Mm hmm.

23        THE COURT:  -- as opposed to the lawyers that

24   you're objecting to getting paid both under the settlement

25   agreement and under the plan, right?

1          MR. SCHEPACARTER:  I think it's my fault that --

2     that those fees are not the -- the type of fees that fit

3     under 503 or that are required to be approved under

4     503(b)3(d) and (b)4 --

5          THE COURT:  Mm hmm.

6          MR. SCHEPACARTER:  -- that they're -- they're

7     transactional fees --

8          THE COURT:  Uh huh.

9          MR. SCHEPACARTER:  -- that are part of the deal or

10    part of the transaction, and those parties, I think, that

11    are getting paid aren't necessarily credit -- they're not

12    Creditors of the case, at least the way I understand it,

13    they're not Creditors, so they don't fit under the 503

14    statutory scheme.

15         THE COURT:  Okay.

16         MR. SCHEPACARTER:  I think Mr. Jonas had indicated

17    that -- that the Court can review the fees of their section

18    -- or, I'm sorry, Rule 9019 and that they can review them

19    for reasonableness now, but I think that avoids the -- the

20    Section 503(b) clear -- statutory requirement, that that's

21    required.

22         His indication was that there was sort of a

23    slippery slope that was going to be garnered if everybody

24    had to file 503(b) applications and I think it actually cuts

25    the other way, that the slippery slope would be if parties

1    can settle out of being required to make the substantial

2    contributions showing under 503(b)3(d) and (b)4 that that's

3    actually the slippery slope that -- that I think that we

4    would be weary of.

5              THE COURT:  Well, if I were to find that these

6    parties had made a substantial contribution to this -- the

7    estate --

8              MR. SCHEPACARTER:  Mm hmm?

9              THE COURT:  -- and that their professionals thus

10   were -- the professional fees could be paid because they

11   made a substantial contribution, assuming I make that

12   finding, what's your position on who makes the

13   reasonableness finding?  Is that something I have to do or

14   is that something where I can rely -- I think I know your

15   answer to this question but -- where I can rely on Ms. Doré

16   to blue pencil the fees for reasonableness?

17             MR. SCHEPACARTER:  It's something that we can do,

18   you and I can do together.

19             THE COURT:  That's terrific.  All right, here's

20   what I'm not going to do with you.

21             THE COURT:  I am not fighting any fires.  That is

22   not happening.

23             MR. SCHEPACARTER:  I would be more than happy to

24   bring Your Honor on a ride along, it would be fun, to a

25   certain extent, it's fun for me.

1      THE COURT:  All right, so -- so -- right, so -- so

2  you're -- to be serious again --

3      MR. SCHEPACARTER:  Mm hmm?

4      THE COURT:  -- you're looking at -- to fulfill the

5  job you do in connection with professional fees in general

6  under 330, which is have an opportunity to review and

7  comment on them.  And I think, you know, usually, if a

8  secured lender is getting paid, like under a DIP loan, they

9  -- they have to run those fees by you as well?

10      MR. SCHEPACARTER:  Five -- that's -- and that's

11  506(b), and they do, and they review those fee -- or sorry,

12  they send those fee requests to us and to the extent we have

13  a very short window to review them --

14      THE COURT:  Ten days, usually.

15      MR. SCHEPACARTER:  -- but we do, we look at them

16  and there's times where we call people and we want more

17  information and --

18      THE COURT:  Right, right, right.  Right.  Now,

19  would you -- would you be wanting the Fee Committee to be

20  involved in this process?  Is that where you're going with

21  this?

22      MR. SCHEPACARTER:  No, actually, it isn't where

23  I'm going with this.

24      THE COURT:  Okay.

25      MR. SCHEPACARTER:  No, it would be -- it's our

1    position that it's our review, that the U.S. Trustee takes

2    that -- all the parties, they can file their 503(b)

3    applications and the applications, you know, can be filed

4    and, to a large extent, there's a lot of evidence already in

5    the record that I think would support those applications.  I

6    don't think that's -- that's really the issue.  So, once

7    they file them, then we would review them for

8    reasonableness.

9           I don't know that it's necessarily a straight 330

10   review process, but it's very similar to that.  The statute

11   actually goes a little bit farther under (b)4 and it talks

12   about some standards for review.  So that we would review

13   them, and if we had an objection to them, we would bring the

14   objection for that portion of the fee.  So we -- we may

15   object to the substantial contribution.

16            So, if somebody makes an application and we say,

17   well you didn't make a substantial contribution, then we

18   would have that issue hashed out.  And then, if the Court

19   either rules -- well, the Court would have to rule that the

20   substantial contribution was made, and once it rules that

21   way, then we also look at the fee to see that the fee is

22   reasonable.

23           Many times, when we have objected to 503(b)

24   applications, to the extent that we have an objection to the

25   substantive -- substantial contribution, we object to that.

But we would also throw in an objection to the fee, so we actually review the fee at the same time.

THE COURT: Okay.

MR. SCHEPACARTER: In a situation where we wouldn't necessarily have an objection to the contribution that was made by the party, well, we would only review the fee for reasonableness, and if we didn’t have an objection to the reasonableness or were able to work it out with the party, then we wouldn't object at all.

But it -- but the bottom line is, it’s basically our job to review the fees and then bring that before the Court, whatever our objection is, or because the applications have not been filed.

Just a couple other things that I want to address. Mr. Shore made a number of statements, and I just sort of want to address a couple of them. One is, and I think he said this, that somehow, and I don't want to spend much time on it, but somehow the committee structure that was -- was in this case somehow hampered the process of some sort, and even though that issue is not before the Court and it’s not subject to any discussion or anything else, anything more than that, the Committee -- the way committees are formed, there’s a number of reasons, one of which could be who wants to serve on a committee, or who’s willing to serve, or things of that nature, who’s eligible to serve. So you

1    can't really go by that.

2         I think that the statement that he made with

3    respect to, and calling the transcript from way back when

4    with respect to the U.S. Trustee's position on ad hoc

5    committees is -- I just wouldn't rely on that.  I just don't

6    see how that statement was made in any context whatsoever,

7    and may have been taken out of context.  He had indicated

8    that I had made it, I don't recall making it, but maybe I

9    did, and I'm not even sure what context I made.  So I just

10   wanted to discuss that -- that, sort of briefly.

11        With respect to whether the U.S. Trustee should

12   have, either on Day One or somehow during the plan process,

13   should have done some type of -- excuse me -- I'm fighting a

14   cold -- should have somehow done a -- some type of discovery

15   during the process of the case, I think that, at least on --

16   excuse me --

17        THE COURT:  Have some water.  Yeah.

18        MR. SCHEPACARTER:  I might need a cough drop, too.

19   See what happens.  Oh, there he is.

20        THE COURT:  What are you giving out?

21        MAN:  It's from our private stash, Your Honor.

22        MAN 2:  This is improper!

23        MAN 3:  Should we approach, Your Honor?

24        THE COURT:  No!  No.

25        MR. SCHEPACARTER:  No, I appreciate it, Mr.

1   Kieselstein.

2           Last, I just want to sort of indicate that --

3   somehow that we should have retroactively on the first day,

4   sort of taken note -- or second day, taken note of what the

5   parties were doing and somehow, with respect to their fees,

6   I'm not sure that that's even, frankly, relevant or it makes

7   any -- kind of any sense, because I'm not sure that we would

8   even be in a position to do that.

9           Somehow, during the discovery process of the plan,

10  somehow that we should have done some type of discovery with

11  respect to the fees.  I don't know that that's also relevant

12  because we're talking really about a legal standard here,

13  with respect to Section 503(b) and not so much trying to

14  find out what -- you know, who's -- who's at -- sort of,

15  who's at play here.  So I just wanted to address those.

16          Other than that, Your Honor, and since I can't

17  talk anymore, I will conclude, thank you.

18          THE COURT:  You're welcome, thank you.

19          Mr. Kieselstein, would you like to reply?  And

20  we're going to go about 20 minutes.  That's about all I got

21  left.

22          MR. KIESELSTEIN:  I hope to do better than that,

23  Your Honor, and with respect to the asbestos stuff, when the

24  going gets tough, Your Honor, I call on Mr. Husnick, who's

25  been up to his neck -- maybe that's bad phrasing -- in

1    asbestos in this matter.

2              THE COURT:   I hope not.  That's serious.

3              MR. KIESELSTEIN:  Yes.

4              THE COURT:  That stuff -- that stuff is serious.

5    Mr. Husnick?

6              MR. HUSNICK:  Thank you, Your Honor.  I expect to

7    be very brief.  Your Honor, in regards to the asbestos

8    objections, I do want to begin with just two quick

9    procedural issues.

10             First, I want to make an oral motion to strike Mr.

11   Hogan's objection to the extent that it purports to be on

12   behalf of any unrepresented parties who didn't file a proof

13   of claim.  Mr. Hogan has two clients, they both filed proofs

14   of claim, and they are therefore not aggrieved parties, and

15   he does not have standing to stand here today and object on

16   the basis that the notice provided to parties who have

17   actually filed proofs -- and received proofs of claim and

18   acted upon them.  He does not have standing to stand here as

19   an aggrieved party and assert an objection to the level of

20   notice to this plan.

21             Moving beyond that, the second issue I'd ask you

22   to address from a procedural standpoint is that if you are

23   going to hear the objections, Your Honor, to the extent that

24   they extend to challenges to the bar date, and I would

25   submit that many of those arguments are recycled arguments

1      to the Court's previous ruling in connection, the January

2      opinion, which was then entered in July in the bar date

3      order.

4              What these are is an impermissible attempt to

5      resurrect a time barred appeal, and he's trying to create,

6      in a lengthy record, all of the issues that should have been

7      raised in an appeal from the Court's previous bar date

8      order.  So I'd ask Your Honor to the extent that you deny --

9      or address these issues on the merits, that you deny it not

10     just as a plan objection but as an impermissible Rule 60(b)

11     or as incorporated, a 9024 of the Bankruptcy rules, motion

12     to -- for relief from the bar date order.

13             Moving into the objections, unless you have

14     anything in particular on that, I'll be very quickly on the

15     specific issues that were raised.

16             First, the sixth amended plan that was filed

17     yesterday, Your Honor, and I don't fault Mr. Hogan for that

18     because, like most of the world, he was -- may have been in

19     in bed by the time that we filed the sixth amended plan, but

20     as we promised in our brief and in the objection charts that

21     we've filed periodically throughout the confirmation order,

22     we did amend the plan to make clear that the claims of

23     asbestos Plaintiffs against the EFH Debtors, are in fact,

24     being reinstated, and you can see that, Your Honor, on Page

25     49 of the redline that was filed last night at Docket ID

1    7188.

2           Your Honor, moving onto another point, one of the

3    critical mistakes that has been made, in the first instance,

4    by the asbestos Plaintiffs' lawyers when they objected to

5    the bar date, later, I believe, but the EFH Committee

6    ultimately renegotiated the resolution and still here today,

7    is conflating the term "unmanifested claim" with "future

8    claims," and I caught my -- you caught -- Your Honor caught

9    me doing it when I was making my bar date argument, and I

10   have since taken that very carefully when I talk about these

11   issues.  Because when you conflate those two terms, it leads

12   to a lot of confusion on the record and then it leads to a

13   lot of confusion in interpretation of the case law.

14          Because what the case law in the -- from the Third

15   Circuit, both the Grossman's decision and the later progeny,

16   they say that -- and it's very clear that they're addressing

17   situations where it's future liabilities, and the Grossman's

18   decisions was very clear to make -- to specify that

19   unmanifested claims are not future liabilities.

20          Instead, they're unmanifested claims within the

21   definition of claim.  Therefore, Your Honor, when you go to

22   the Combustion Engineering case, which I think is about 100-

23   page, maybe 100-plus-page opinion, nowhere in that opinion

24   does it ever say that 524(g) is the only way to address

25   unmanifested claims.  It simply does not say that, Your

1    Honor was correct when you interrupted Mr. Hogan in his --

2    his statement.

3            Your Honor, third, the unmanifested claims are

4    not, quote, "precluded" under this plan.  The unmanifested

5    claims against the EFH Debtors are being reinstated under

6    this plan.  Those are the claims that Mr. Hogan actually

7    does have clients to represent here, those claims are

8    against the EFH Debtors and they're being reinstated.  So,

9    to use the term "preclusion" is incorrect.

10           That leads me to the next point.  Reinstatement,

11   Your Honor, renders all the other objections that Mr. Hogan

12   raised about the nature and needing a trust, needing a pool

13   of assets, setting up a channeling injunction, it renders

14   all of those objections irrelevant and moot.

15           Your Honor, finally, I must address -- oh, finally

16   -- there was one other statement he asked -- he talked about

17   estimation of the reinstated claims.  It's simply not

18   relevant.  At the EFH Debtors, there will not be any

19   estimation of claims that are being reinstated.  Those will

20   be reinstated and litigated, pursuant to the agreement that

21   we cut with the EFH Committee, where we got very specific

22   about it.  They're going to be addressed, in all likelihood,

23   in a non-bankruptcy forum and not in front of Your Honor.

24           That leads me to the call for safeguards.  We

25   heard about, it could be layered, we heard about a

1    completely irrelevant transaction down at TCEH, and how

2    there could be debt put in place, there could be equity

3    transactions.  Your Honor, these are not -- this is not

4    funded debt, they don't get through the plan covenants that

5    they don't have under their -- under their state law rights,

6    but what they do get, Your Honor, and what they do have, are

7    state law remedies and bankruptcy remedies for subsequent

8    transfers that are potential fraudulent conveyances, and

9    there are fiduciary duties when this entity emerges from

10   bankruptcy, it will continue to have whatever fiduciary

11   duties it has under the applicable law.  And as a result,

12   the call for safeguards is simply inappropriate for a

13   Creditor who's being reinstated.

14          In sum, Your Honor, the objections here are

15   fundamentally flawed on their merits, and that's despite

16   their procedural infirmities, so Your Honor, I would

17   reiterate my request to strike the objection to the extent

18   that it extends to Plaintiffs who are not represented by Mr.

19   Hogan, second, to ask that Your Honor style this as a denial

20   of a motion for relief from an order under 60(b).

21          THE COURT:  Thank you.

22          MR. PEDONE:  Your Honor, Richard Pedone on behalf

23   of the EFH indentured Trustee.  Your Honor, the U.S.

24   Trustee's objection to our fees, I think, was a bit confused

25   on the facts, so I'd like to just specify the facts that

1    relate to us.

2            First, the EFH indentured Trustee filed a proof of

3    claim.  Part of the claim was for fees and expenses.  We now

4    understand Judge Carey's decision creates a grey area that

5    may have always been there, but it wasn't clarified, and it

6    was a distinct part of the discussions concerning what would

7    create an unimpairment of the EFH indentured Trustee's

8    claim.

9            In the context of discussion of what was required

10   for unimpairment, a compromise was reached.  $5.5 million of

11   the fees would be paid as part of the unsecured claim by the

12   Debtors, subject to review for reasonableness, and that was

13   -- that $5.5- portion was based upon an invoice for expenses

14   and fees submitted to the Debtors at the beginning of

15   October, so they had it when the bargain was struck.

16           The balance of the fees and expenses incurred by

17   the EFH indentured Trustee will be taken out through the

18   charging lien and its relationship with the holders.  And

19   that was a compromise struck under 9019 put into a

20   settlement.  That is a different scenario than many of the

21   other fees that are at stake.  It was a compromise avoiding

22   litigation over what unimpairment would mean.  It was part

23   of the discussion over interest, it was part of a variety of

24   discussions, and it was the -- leading to the treatment of

25   the claim.

1        Today, the EFH indentured Trustee is not seeking

2    any finding by this Court that it made a substantial

3    contribution.  Whether we made a substantial contribution

4    under 503(b) or, quite separately, and as detailed in our

5    confirmation objection, indentured Trustees are actual and

6    necessary, as you heard Mr. Horton testify, they went and

7    they needed to find a Trustee because one must be in place

8    during a case, and that's a service you need and you pay

9    for.  Those issues, and whether they might ever need to be

10   litigated, are explicitly reserved in our settlement.

11       So, for purposes of this Court's ruling on the

12   permissibility of the Debtor's payment of the EFH indentured

13   Trustee's fees and expenses, we believe it needs to be

14   analyzed under a 9019 settlement, a resolution between the

15   Debtor and a Claimant of the proof of claim, and we don't --

16   a claim objection that was made and then resolved.  And we

17   don't believe that that's a process that needs to be blown

18   wide open for independent Court review of every part of it.

19   It's the Debtor's business judgment under 9019 after a full

20   analysis.  Thank you, Your Honor.

21       MR. KIESELSTEIN:  Your Honor, Marc Kieselstein

22   again on behalf of the Debtors, thank you for your patience.

23   I'll be very brief.  You're obviously well familiar with all

24   the issues, they've been thoroughly briefed.  Just a few

25   quick points.

1          You know, first of all, we have the greatest

2     respect for the Office of the United States Trustee and the

3     role that they play, and the fact they don't have an

4     economic stake is sort of beside the point in our view.  But

5     Mr. Schepacarter did refer to promoting efficiency, and we

6     think, frankly, on all the subjects he's raised, where we

7     don't believe there's a bright line rule in the Code or the

8     law, actually, what he's espousing would promote

9     inefficiency, and we don't think would further the integrity

10     of the bankruptcy process.

11          Let me start with exculpation, Your Honor.  We are

12     not seeking to extend exculpation beyond estate fiduciaries,

13     Your Honor.  First of all, with respect to Oncor, I won't

14     repeat what I said.  We believe, notwithstanding the ring

15     fencing, they owe a duty to their 80 percent owner to try to

16     maximize value.

17          They've been working assiduously throughout this

18     case to do so, even though we can't force them to do

19     anything.  So we think they're squarely within the circle of

20     trust, to use Mr. Shore's phrase, and are entitled to that

21     exculpation.

22          With regard to some of the others, the former

23     affiliates and former shareholders, Your Honor, really, our

24     point is that we are aware that people can and could and in

25     some cases have asserted that those parties owe fiduciary

1    duties.  Whether Mr. Schepacarter agrees with that, whether

2    I agree with that, the issue is whether a court finds that

3    they're an estate fiduciary, they should be entitled to the

4    benefit of the exculpation.  And I suspect there's language

5    we can work out to cover that eventuality, rather than us

6    trying to make a determination under Delaware or Texas law

7    today, whether somebody is on one side of the line or

8    another.

9             If someone is sued in a capacity other than as an

10   estate fiduciary, they're not entitled to the exculpation,

11   but if there's an assertion made that they fall within that

12   ambit, and a Court so holds, they should have the protection

13   of the exculpation.  That's really the only point we're

14   making there.

15            With regard to the releases for Ds and Os, Your

16   Honor, other cases Mr. Schepacarter cited to, I believe,

17   involved highly contentious plans where there were

18   allegations of misconduct, not something consensual, which

19   is what we have today, and I don't think it offends the

20   integrity of the process here for the parties to get

21   together and agree on a universal basis, that the Directors

22   and Officers should have the benefit of those third-party

23   releases.

24            With respect to the carve-out for intentional

25   misconduct, Your Honor, again, I'm not going to repeat what

1    I said earlier.  We think, again, this is something that can

2    be solved or is solved by the fact that the people who are

3    giving the release without the carve-out are perfectly

4    content to do it, and that those claims have been vetted up

5    one side and down the other.  So again, we think that's a

6    perfectly appropriate carve-out.  The fact that it's not --

7    that it can't be done in exculpation, exculpation covers

8    when people are mostly under Chapter 11 in front of a Court

9    and their conduct within the Court structure -- now frankly,

10   it's appropriate to have those sorts of carve-outs in our

11   view.

12           In the world of pre -- the pre-petition universe

13   where people make all sorts of allegations, et cetera, we

14   think it's perfectly appropriate for that carve-out to be

15   not required, and we don't think it should be here.

16           One other point on releases, Your Honor.  It was

17   mentioned by Mr. Schepacarter about legal malpractice claims

18   not being carved out, and he read a fragment of Ms. Doré's

19   testimony, but if you read a little further, and I don't

20   have it front of me, in fact, Ms. Doré acknowledges that she

21   was aware that the releases were broad enough such that

22   those sorts of claims would also be released, and she said

23   she was perfectly content with that, and she's looking not

24   to have any follow-on litigation.

25           Obviously, she's well familiar with what we've

1   done and I'm quite confident that she thought there was a --

2   a large claim of that sort.  She might take a different

3   attitude, but she wants the closure and is willing to give

4   it.

5           And under the ethical rules, you can -- a lawyer

6   can, as long as it's not prospective, which this isn't,

7   negotiate that sort of release with a client that's

8   represented by in-house counsel, and there's not a more

9   competent in-house counsel anywhere than Ms. Doré, in my

10  view.

11          Finally, Your Honor, with regard to the fees, and

12  again, this is where I think what Mr. Schepacarter counsels

13  is inefficiency.  You know, if we were back in the midway at

14  the University of Chicago, we could invoke Ronald Coase, and

15  he would say that we were -- what we were doing was really

16  just going to cause people to try to find another way around

17  it in terms of, you know, having different settlement

18  structures, et cetera, et cetera.

19          But the idea that you cannot settle whatever the

20  dispute might be with an unsecured Creditor during the case,

21  either on account of pre-petition or post-petition matters,

22  and not have an element of that settlement be the payment of

23  professional fees without going through all the rigmarole of

24  a 503(b)4 substantial contribution proceeding, that's not

25  real world.  That's not how we operate.  I don't think

1    that's how the Code operates.

2          And Your Honor, I would also just say, even for

3    stuff that's being paid under the plan, again, we read the

4    Code the way Judge Gerber does, that that including language

5    in 503(b) and the provisions of 1129 provide ample

6    flexibility for there to be payment without having to go

7    that's right the 503(b)4 hoops.

8          Which again, if you look at those cases, and

9    Tribune as an example, it's someone coming in who people

10   view as not having actually been all that constructive in

11   the case, they didn't get on board any sort of settlement or

12   consensual wagon, and they're in there looking for a claim.

13   When we have consensus, when we have agreement, which is

14   what the Code favors, Your Honor, there is flexibility built

15   into the Code to allow those sorts of fees to be paid.  And

16   again, I think it would be a counsel of inefficiency to

17   adopt a bright line rule that Mr. Schepacarter suggests.

18   I'd also note that Tribune was a -- said if there was a

19   solvent case, you might be looking at a different type of

20   situation.  Obviously, on the EFH side, we're talking about

21   a solvent case.  So again, we think the fees would be

22   appropriate for that reason as well.

23          Your Honor, I'm two minutes short, so --

24          MR. SHORE:  I have one minute.

25          MR. KIESELSTEIN:  I'm -- may I cede the balance of

1    my time to Mr. Shore?

2              THE COURT:  Yes.

3              MR. KIESELSTEIN:  Thank you, Your Honor.

4              MR. SHORE:  Your Honor, Chris Shore from White &

5    Case on behalf of the ad hoc group of --

6              THE COURT:  Take -- take the time you need, I just

7    --

8              MR. SHORE:  -- TCEH -- no, no.  It's not going to

9    surprise Your Honor that we've been talking about ways to

10   conduct the reasonableness review or have something done.

11   Your Honor telegraphed that a long time ago.  Our main

12   concern throughout this, and where we haven't been able to

13   reach consensus is, how do we come up with a structure that

14   allows people to get paid by year-end without further

15   pleadings?

16             The record is there to making -- if we could make

17   the whole issue go away with a finding of substantial

18   contribution by my circle of trust, then the question really

19   is, how do you go through the fees?  There are many ways to

20   do it, but if what we were talking about is a -- submit them

21   to the U.S. Trustee on two weeks' negative notice, the same

22   way they do with a DIP lender, and that any fees that aren't

23   specifically objected to get a CNO and they can get paid, we

24   don't have a problem with that, but I don't want to start

25   the process of filing new motions, putting forward the same

1    record that counsel said was already in there, then having a

2    hearing, bringing everyone back for that.  That just doesn't

3    meet the two goals we've been trying to meet.

4             THE COURT:  Yeah.  Anyone else?  I'm sorry, I

5    don't want to -- yes?

6             MR. GITLIN:  Your Honor, may I be heard?

7             THE COURT:  Yes, Mr. Gitlin?  Good afternoon.

8             MR. GITLIN:  Richard Gitlin, Chairman of the Fee

9    Committee.  Your Honor, our Committee meets next week, so

10   please treat these as my comments, Your Honor.

11            THE COURT:  Okay.

12            MR. GITLIN:  I'm hopefully not pro or con.  I

13   think the laws have been adequately argued.  What I do

14   suggest, Your Honor, is there's been outstanding work done

15   by all the professionals here, there is no question.

16   They've been done by the retained professionals, they've

17   been done by the non-retained professionals.  Our Committee

18   has laid out fairly stiff standards for the non -- for the

19   retained professionals, Your Honor, in terms of what

20   expenses, what they could do with airfare, what they could

21   do with other things, in terms of people at meetings.

22            My concern, Your Honor, is it seems unfair if the

23   result of this is similar standards are not applied to the

24   non-retained professionals as well.  Not to create a very

25   complicated process, Your Honor, but something that could be

1    designed to create fairness in the process, and I suspect,

2    we have to deal with the reasonable standard with the

3    retained professionals.  I think probably a similar retained

4    standard should be for the non-retained, and -- and whether

5    the U.S. Trustee does it or we do it is irrelevant, Your

6    Honor.  The U.S. Trustee is very competent to do this.  But

7    I would suggest that maybe the same standard would be fair.

8              THE COURT:  Thank you, Mr. Gitlin.  Are there any

9    final comments?  All right, well, thank you all very, very

10   much.  We will recess and reconvene tomorrow at 10:00 AM,

11   and I will render my decision on the settlement motion and

12   confirmation.  I intend to read -- read it into the record

13   and it will take a little time, so wear something

14   comfortable.

15             I've been listening to you for several weeks now,

16   you -- are going to listen to me.  Which I know you do all

17   the time.  All right, so we'll reconvene tomorrow at 10:00

18   AM.  Thank you very much.

19             ALL:  Thank you, Your Honor.

20

21                         * * * * *

22

23

24

25

Page 193

CERTIFICATION

1

2

3    I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya Ledanski Hyde

Digitally signed by Sonya Ledanski Hyde
DN: cn=Sonya Ledanski Hyde, o=Veritext,
ou, email=digital@veritext.com, c=US
Date: 2015.12.03 14:27:02 -05'00'

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  December 3, 2015

| & |
| --- |
| **&** 2:3,14,19 3:9,13 4:1,6,11,22 5:6,11 6:1,8,20 7:1,8,13,19 8:6,11,18 9:1 12:8 12:21 16:3 75:16 82:24,25 84:4 85:21 98:2 104:10 107:25 115:7 123:24 190:4 |

| 1 |
| --- |
| **1** 13:25 60:9 73:23 84:6 110:8,11 143:20 167:22 |
| **1.3** 73:2 75:2 |
| **1.5** 145:2 |
| **1.8** 73:10 77:16 |
| **10** 24:12 |
| **100** 79:5 80:7 86:14 95:11,20,22,24 104:25 107:1 180:22,23 |
| **1015-1** 132:24 |
| **105** 165:23 166:3 |
| **10:11** 1:14 |
| **11** 1:3 38:14 136:5 136:18 150:10 151:14 153:6 154:10 156:14 159:14 161:23 163:12 187:8 |
| **1103** 151:3 |
| **1123** 124:22 125:15 126:3 |
| **1123a** 60:9 |
| **1123b6** 103:3 |
| **1124** 125:15 |
| **1129** 45:4 112:15,23 112:24 124:22 126:3 159:18,20 163:10,24 164:1,5 166:4 189:5 |
| **1129a4** 103:4 |
| **11501** 193:23 |
| **12** 57:25 117:14 134:8 139:18 143:9 |

**13** 23:2 92:23
**138** 80:11
**14** 26:11 65:7 67:2 73:6 92:23
**14-10979** 1:4
**141** 80:13
**14th** 76:9 134:8 137:16
**15** 20:22 26:21 83:19 87:23 94:18 95:13,23 169:15
**150** 119:2
**16** 27:5 157:13
**17** 27:16
**17th** 65:13
**18** 94:1 100:7
**182** 74:17
**19** 28:2 94:1,14
**19th** 166:18
**1st** 156:22

| 2 |
| --- |
| **2** 1:13 13:20 50:7 65:6 67:2 73:7 74:3 75:2 87:13 139:1,1 176:22 |
| **2.1** 77:18 |
| **2.5** 73:10 77:16 |
| **2.7** 94:14,24,25,25 95:9 97:19 169:25 |
| **2.7a** 101:8 159:21 |
| **2.7b** 87:20 |
| **20** 29:25 40:15 73:15 108:6 177:20 |
| **200** 22:5 110:22 |
| **2004** 85:7 |
| **2007** 30:1 80:17 111:21 |
| **2009** 93:19,22 |
| **2010** 80:6,13 93:19 |
| **2011** 90:25 |
| **2013** 23:3 24:15 32:9 80:6,13 84:3 84:20 |
| **2014** 69:14 71:7,15 84:22 116:1 133:14 |
| **2015** 1:13 20:7 33:6 71:16 72:16 73:24 |

85:19 157:14 193:25
**2016** 47:8
**21.41** 90:6
**22** 30:8,25
**22nd** 134:19
**24** 22:1 32:4 54:24
**24th** 77:21
**25** 21:3 32:16
**25th** 16:12
**26** 65:5 118:11
**26th** 77:21 78:5
**28** 67:3 119:6
**28th** 164:9
**2:00** 129:25 130:14 130:15,19 145:18
**2:45** 145:21 146:2

| 3 |
| --- |
| **3** 112:15 118:1 135:9 160:13,22,25 161:7 167:8 169:10 171:4 172:2 176:23 193:25 |
| **3/31/16** 74:2 |
| **30** 44:24 73:20 146:18 |
| **300** 193:22 |
| **30th** 116:1 |
| **31** 74:5 116:24 |
| **312** 74:4,13 |
| **33** 38:17 90:15 |
| **330** 173:6 174:9 193:21 |
| **338** 87:7 |
| **339** 87:8 |
| **35** 36:3,6 76:2,17 |
| **35th** 27:14 |
| **363** 60:10 |
| **37** 40:14 |
| **3rd** 38:22 52:22,23 161:10 |

| 4 |
| --- |
| **4** 43:13 58:7,17,20 60:4 62:1 86:17 112:23,24 124:22 126:3 160:13 161:2 |

161:8 163:10 169:3
169:10 171:4 172:2
174:11 188:24
189:7
**4.5** 82:14
**40** 41:1,6 71:1
108:17
**400** 65:2
**42** 20:8
**425** 79:25
**43rd** 27:14
**449.75** 101:4
**450** 25:2
**4500** 67:18 82:14,16
82:17
**49** 111:3 179:25
**49.75** 59:19
**4:00** 1:14
**4r** 159:4,21

| 5 |
| --- |
| **5** 13:22 124:1 |
| **5.5** 183:10,13 |
| **50** 141:3 144:14 |
| **500** 20:22 127:19,22 |
| **502** 167:22 168:17 |
| **503** 43:13 58:7,12 58:17,20 60:4,9 62:1 95:19 97:3,5 108:23 111:11,23 111:23 112:1,2,22 114:6,11 116:19 117:17,19,25 118:1 121:11 125:19,22 126:4,8 127:12 160:13,17,20,21,22 160:25 161:2,7,12 161:18 162:1,5,8 163:2,9 164:2,3 165:24 169:3,3,10 170:2 171:3,4,13,20 171:24 172:2 174:2 174:23 177:13 184:4 188:24 189:5 189:7 |
| **503b** 101:13,25 102:8,10,23 103:3 |

**504**  111:24
**506**  61:19 120:7
167:22,23 168:10
168:12,19 173:11
**52**  47:23
**524**  64:7 65:3 66:2,6
66:7 136:1,4,7,13
136:18 137:1 138:1
138:9,13,14,23
139:1,4,7 140:8,8
141:2 180:24
**5400**  82:18
**546e**  80:20
**550**  41:9,10 48:10
**550,000**  14:1
**56**  50:14

**6**

**6**  25:19 86:23
124:22 125:15
126:3
**60**  179:10 182:20
**600**  29:5 73:5
**601**  74:2,4
**69**  80:11

**7**

**7**  145:23
**7.001**  91:13
**70**  52:19 132:22
**700**  31:20 41:10
73:18 80:2
**7188**  180:1
**7189**  13:8
**72**  116:2
**74**  56:5
**75**  57:19 59:17
157:13
**754**  29:16 78:22
**76**  90:15,18
**7th**  133:20

**8**

**8**  138:2,4
**80**  39:14 55:21
86:15,18 87:2,2
95:6 185:15
**800**  84:8,10

**800,000**  25:19
**824**  1:11
**834**  79:25
**85**  64:6

**9**

**9**  125:15
**9,179,000,000**  74:11
**900**  82:18
**9019**  17:25 101:12
101:23 102:6
165:23 166:4
171:18 183:19
184:14,19
**9024**  179:11
**984**  87:10

**a**

**a3**  65:15
**abandoned**  154:9
**abetting**  32:12
**abid**  10:20
**ability**  30:15 35:4
43:18 66:13 116:6
137:14 161:13,20
**able**  22:7 38:13
44:6 70:8 111:18
130:15 134:15
175:8 190:12
**absence**  75:1
**absent**  68:21 81:8
169:9
**absolute**  37:20
39:25 40:6 68:11,25
82:5 106:19
**absolutely**  56:2
60:21 76:20 97:12
99:5
**accelerated**  137:20
**accept**  42:3 81:8
128:1
**acceptable**  45:24
**acceptance**  81:4
**accepted**  141:8,10
**accommodate**
60:10
**accomplish**  148:17

**account**  13:21
31:19 92:1 96:7
111:12 188:21
**accrued**  86:16
**accurate**  193:4
**accusations**  70:9,12
71:17
**accused**  55:14
**achieve**  81:8 99:25
**achieved**  81:17 98:9
98:20 125:10
**acknowledge**  31:7
46:12 78:25
**acknowledged**
29:19
**acknowledges**
187:20
**act**  87:16 91:18
**acted**  33:3 70:17
76:4 150:20 153:4
153:18 178:18
**acting**  70:5 131:9
**action**  32:11 40:12
53:17 67:24 68:1,18
73:9 87:16 90:9
93:10 140:20
153:23 154:24
159:23
**actions**  48:23 98:22
118:22 150:8 151:7
154:5
**active**  103:15
**activities**  97:10
**actor**  40:21
**actors**  48:20
**acts**  147:21
**actual**  15:22 53:21
53:22 118:1 121:12
157:24 158:14,22
160:22 161:13
163:21 184:5
**ad**  3:2 6:2 8:12,19
13:12 20:16 98:3
100:2,12 105:10,13
106:12,17 107:25
108:22 109:13
115:23 116:3,11,14

116:15 140:4 159:8
160:14 176:4 190:5
**adam**  9:18
**adapt**  38:10
**add**  103:25
**addition**  95:17
132:5 142:10
**additional**  16:8
20:12 35:23 62:11
125:13 144:22
163:22
**additionally**  73:4
**address**  19:4 44:9
44:17 70:9 83:7
108:10,13 110:19
116:19 123:16,18
124:9 127:3 137:2,8
145:13 159:15
165:21 166:1
169:12 175:14,16
177:15 178:22
179:9 180:24
181:15
**addressed**  112:14
124:21 181:22
**addresses**  112:8
**addressing**  180:16
**adds**  168:19
**adduced**  32:13
**adelphia**  58:22
103:4 111:14,18
112:5 126:1
**adelphia's**  111:16
**adequate**  68:6
144:20
**adequately**  191:13
**adhere**  149:22
**adherence**  148:9
**adjudication**
125:22
**adlerstein**  6:5 98:3
**admin**  111:25
**administered**  1:5
132:24
**administrate**
117:23

**administration**
  70:25 104:15
**administrative** 7:3
  58:14 95:20 112:3
  114:14,16,19 160:7
  162:2,10,14,17,25
  163:2 166:2
**admitted** 16:12
**adopt** 189:17
**adopted** 76:23
  131:14
**adoptions** 76:22
**advance** 23:20
  157:12
**advantage** 71:10
  103:18
**adversarial** 78:3
**adverse** 113:11
**adversely** 149:1
**advice** 75:9 85:21
  85:24
**advise** 23:10
**advised** 133:7
**advisors** 23:20 27:2
  30:17 31:2 75:21
  77:5,6,10,15,23
  109:14 163:7
**advisory** 86:23
**advocate** 160:6
**affect** 14:19
**affiliate** 154:25
**affiliated** 131:11
**affiliates** 55:11,13
  87:14 90:22 150:4,5
  152:2 154:6,23
  155:5 185:23
**affirmatively** 38:25
**affix** 73:14
**afford** 140:21
**afforded** 140:18
  142:4
**afoul** 55:4 60:4
**afternoon** 75:15
  82:3 104:8 107:24
  123:23 126:22
  130:10,24,25
  146:10 191:7

**agency** 13:5,14
  14:12 15:7,10
**agenda** 111:23
**agent** 2:15 7:3,3,9
  159:8
**aggressively** 45:11
**aggrieved** 178:14
  178:19
**agnostic** 111:7
**ago** 12:11 17:23
  105:9 190:11
**agree** 60:20 106:8
  124:7 186:2,21
**agreed** 39:20 57:7
  83:17 86:1 88:6
  96:5,6 100:25 128:1
  150:13 164:10,12
  166:8,11 168:8
**agreeing** 41:10,13
  96:4
**agreement** 13:15,17
  14:7,9,11,14,20
  15:9,11,12,14,24
  17:9,19 19:7,17
  20:14,24 21:10,15
  22:12 28:14,21
  29:15,20 32:1 33:10
  34:4,22 37:2,17
  43:5,7,22 51:16
  56:23 59:12,15,21
  61:23 70:23 71:5
  72:5,21,25 74:24
  78:6,7,24,25 79:6
  79:11 80:3 81:2,19
  83:16,23 86:21,21
  86:24,25 87:8,9,13
  87:13,21 88:11,13
  88:18 94:5,10,15
  95:6,9,17 98:16,17
  99:6,9,20,23 100:1
  100:5,19,22 101:3,7
  101:17,18,18,20
  102:8,9 103:7,9,23
  106:16 107:16
  108:20 109:2,19,20
  109:20,22,23
  110:17,17 113:9

  121:13,25 122:5
  123:7 124:4,18
  126:19 131:17
  132:21 159:3,22
  161:16,24 165:15
  166:9 169:16
  170:25 181:20
  189:13
**agreements** 39:18
  54:13 101:2 102:6
  109:23 110:5,7,11
  128:9
**agrees** 62:6 106:9
  186:1
**ahead** 62:21
**aiding** 32:12
**air** 108:16 149:12
  151:21
**airfare** 191:20
**airlines** 155:15
  156:4
**al** 1:4
**alan** 6:6 98:2
**alberino** 9:7
**allegations** 45:19
  53:16 70:10,11
  71:17 89:8 152:23
  186:18 187:13
**alleged** 35:12 64:8
  153:14
**alleging** 34:1
**allocated** 80:7,8
**allocation** 29:20
  37:22 80:4,9 99:12
**allow** 41:15 42:1
  109:3 152:1 158:14
  162:21 168:21
  169:8 189:15
**allowance** 112:13
  123:17 142:19
  165:22 168:15
**allowed** 41:11 73:18
  111:2,4 112:3
  135:11 145:9
  155:12 158:11
  168:4

**allowing** 34:21
  131:1 146:24
**allows** 114:13
  165:16 190:14
**alter** 60:17
**alternative** 13:23
  47:21 99:19
**altogether** 59:16
  62:25
**alves** 7:6
**amazing** 62:8
**ambiguity** 29:20
**ambiguous** 79:1
**ambit** 59:22 186:12
**amend** 22:3 91:1
  179:22
**amended** 131:12
  144:5 179:16,19
**amer** 11:3
**america** 63:16
**american** 149:3
**amount** 19:15 30:11
  37:24 51:13 63:6
  64:12 73:14,15
  80:12 86:18 89:4
  94:3,17,19 96:17
  97:13 101:11
  168:18
**amounts** 46:16
  117:15 160:4
  163:22
**ample** 189:5
**amr** 103:4 126:7
**analogous** 45:17
**analysis** 58:14 69:3
  79:23 84:7 85:18
  97:3 126:8 140:2,3
  153:9 167:21
  184:20
**analyzed** 28:5 79:21
  81:14 184:14
**analyzing** 84:9
**anderson** 6:8
**andrea** 10:25
**angela** 10:5
**anker** 9:8

anna  15:4
announced  145:1
annual  49:19
answer  58:25 79:3
  172:15
answered  66:3
anybody  33:2,7
  61:9 70:17 110:24
  117:8
anybody's  62:1
  113:2
anymore  177:17
aparna  11:7
apart  21:16 163:9
apologize  12:4 39:9
  97:2
appeal  51:2 126:6
  179:5,7
appear  78:17
  110:20 132:20
  146:24 152:25
  154:6
appearing  9:6
appears  153:1
  161:3
appellate  16:20
applicable  65:17
  112:16 117:18
  118:1 135:18
  158:15 182:11
application  36:18
  46:19 57:3 169:9
  174:16
applications  106:14
  171:24 174:3,3,5,24
  175:13
applied  191:23
applies  112:1
  121:11 151:15
  162:23
apply  28:22 43:3
  126:9 151:19
  168:14
appoint  134:24
  135:1
appointed  23:5
  131:22

appointing  90:22
  134:21
appreciate  17:11
  145:25 176:25
appreciation
  146:15
apprise  140:19
approach  15:2,18
  20:3 60:5 86:14
  166:19 167:3
  176:23
approaching  95:24
appropriate  28:20
  30:10 54:7,9,19
  66:5,7 78:14 81:15
  104:14 121:22
  130:4 187:6,10,14
  189:22
appropriately  55:7
  60:6
appropriateness
  39:4 145:15
approval  15:12
  90:2 91:3 100:19
  101:7 103:6,23
  110:4,6 124:4
  159:24 160:18
  163:15 164:5
  165:16
approvals  98:25
  110:2,2
approve  15:13
  46:18 71:20,21,21
  74:23 100:5 101:17
  102:13 109:22
  121:10 126:19
  131:17 163:11
approved  42:17
  47:7 72:15 76:10
  81:14,20 96:14
  98:19 102:6 103:6,7
  110:18 124:17,24
  155:24 163:10,15
  171:3
approving  15:24
  17:25 72:5 101:18
  155:13

approximately  22:5
  67:18 77:16,18 79:5
  80:11 129:25
april  20:7,19 24:5
  85:19
arbiter  147:20
archeology  37:25
ardent  45:8 48:9
arduous  98:7
area  47:5 183:4
areas  116:5
aren't  170:11
  171:11 190:22
argue  67:4 140:1
argued  167:15
  191:13
arguing  103:12
  130:13 167:13
argument  46:3
  62:11 102:18 125:3
  130:4 134:25
  138:24 152:17
  153:24 180:9
arguments  20:6
  29:17 62:9 63:11
  79:8 100:14,24
  102:25 106:9
  127:11 128:17
  131:15 133:11
  136:1,2 138:18
  143:8 169:12
  178:25,25
ari  10:11
arising  87:15
  132:19
arlene  7:6
arm's  27:10
arrived  98:6
article  138:2,4
  159:4,21
articulated  32:2
  92:8 129:9 140:4
  143:10
articulately  88:8
asbestos  19:17,24
  43:15,19 44:1,3,4,9
  46:8 49:4,16,18,22

50:1 62:16 64:5,6
  64:17,17,19,19,20
  64:24 65:2,5,13,14
  65:21 67:1,10 82:13
  117:7 131:22 132:1
  132:2,9,12,13,18,20
  133:4,13,13,18,19
  133:24 134:1,5,6,12
  134:14,16,22,23
  135:2,4,6,8,12,16
  135:25 136:4,7,17
  137:5,12,18,21
  138:15,20 139:20
  140:15,23 141:2,18
  141:20 142:5,17,18
  142:24 143:11,14
  143:15,17,24 144:4
  144:7,20,21,23,24
  145:4,7,9,10,14
  177:23 178:1,7
  179:23 180:4
ashby  2:3 37:12
  72:10 78:21 79:9
ashby's  37:1
ashinc  151:20 158:3
  158:4
ashley  9:9
aside  38:15 91:23
  92:14,15,18 94:6
  109:9 110:5
asked  16:4 66:3
  109:22 181:16
asking  102:13
aspect  13:14
aspects  25:5 46:6
  46:21 80:16 116:6
assert  64:11,13
  68:10 73:5 141:25
  157:7 178:19
asserted  21:5 29:6
  34:5 54:1 55:2,16
  66:10 73:8,10
  131:20 132:10,11
  152:6 153:10 155:1
  185:25
assertion  29:8
  137:20 186:11

**assertions** 32:10
41:3 53:21
**asserts** 69:12 73:1
143:7 154:24
**assess** 23:21 25:24
26:6
**asset** 48:6 57:3
**assets** 120:8 156:15
162:21 181:13
**assiduously** 185:17
**assign** 88:7
**assigned** 149:10
**assistance** 123:9
**associated** 79:18
80:15 142:12 161:5
**assuming** 164:2
172:11
**ast** 5:2 169:7
**asymptomatic**
139:11
**attached** 28:16 48:2
**attack** 121:18
**attacked** 111:18
**attacking** 121:4
122:11
**attempt** 77:23
93:14 162:4 179:4
**attempted** 69:6
**attends** 146:5
**attention** 63:6,18
**attenuated** 55:12
**attitude** 188:3
**attorney** 2:4,20 3:2
4:17 5:12,17 8:12
161:2
**attorney's** 131:4
**attorneys** 2:9 3:9
4:2 5:2 6:9,15 8:7
9:2 163:7
**attorney's** 102:14
167:9,14,18 168:3,7
168:10,22,25
**attributable** 113:13
**augments** 47:6
**august** 74:22 108:4
116:9

**austin** 24:16 46:22
84:4
**authorities** 98:23
**authority** 23:11
76:18 112:12
124:14,20 162:1
**authorization** 90:11
163:3
**authorized** 14:21
121:14 162:8
**authorizes** 90:2
**authorizing** 14:10
90:21 121:17
**automatic** 161:12
**available** 35:11
74:1 98:12 140:11
**avenue** 35:11
**avoid** 25:15 30:24
160:8
**avoidance** 21:3 73:9
**avoided** 125:14
**avoiding** 115:11
137:9 183:21
**avoids** 171:19
**aware** 30:17 53:12
66:7 68:1 72:19
133:15 166:17
185:24 187:21

**b**

**b** 1:20 4:25 10:22
10:25 43:13 58:7,17
58:20 60:4,9 61:19
62:1 90:7 94:14,24
94:25 95:9 97:19
107:11 108:23
111:11,23,23 112:1
112:2,22 114:6,11
116:19 117:17,25
118:1 121:11
124:22 125:15,19
125:22 126:3,4,8
127:12 139:1
160:13,13,21,22,25
161:2,7,8,12,18
162:5 163:9 164:3
165:24 167:22,23
168:10,12,17,19

169:3,10,10 170:2
171:4,4,20,24 172:2
172:2 173:11 174:2
174:11,23 177:13
179:10 182:20
184:4 188:24 189:5
189:7
**back** 17:16 20:6
23:2 24:10 27:7
33:5 36:4 37:14
40:18 42:4 52:2
54:12 57:13 62:20
72:6 74:6 87:24
93:19 99:17 102:2
103:14 105:18
111:17 118:5 130:5
176:3 188:13 191:2
**background** 133:13
**backload** 43:12
**backstop** 109:20,22
**backstopped**
108:20
**bad** 22:14 30:24
91:22 120:6,20,20
177:25
**balance** 92:10 119:8
183:16 189:25
**ballot** 69:10
**bandwagon** 39:2
**bank** 2:20 3:22 6:9
7:9
**bankruptcy** 1:1,10
1:22 21:24 25:10,10
28:8 35:8 37:7,7
38:8 58:21 65:25
79:6 81:22 85:16
92:13 93:6 105:25
106:15 132:23
134:17,17 137:5
139:22 140:16
141:24 142:2
144:11 146:17
147:8,12,18,19,22
147:23 148:2,4,9
149:20,22,24
159:18,24 160:1,17
160:25 161:8

**bar** 50:4,10 67:7,15
133:15,16,17,19,21
133:22,23 134:4,8
134:11 136:2
137:16,20,24
138:11 141:16
142:9 143:3,5,5,9
143:12 178:24
179:2,7,12 180:5,9
**bare** 65:13
**bargain** 103:10,21
103:22 106:17
183:15
**barraged** 78:11
**barred** 140:2 179:5
**bartley** 8:21
**bartram** 9:9
**based** 67:2 74:25
79:23 80:4,9 93:8
135:11,12,15
151:10 166:9
183:13
**bases** 64:7 87:7
**basically** 13:18
56:20 68:10 110:9
147:15 175:10
**basis** 28:24 39:25
46:14 49:19 54:11
62:13 91:5 92:10
99:24 129:4 132:1
160:5 162:2 163:23
178:16 186:21
**bat** 40:3
**battles** 103:11
**bear** 64:25 114:19
**bearing** 165:9
**beat** 25:3
**beating** 38:12
**becoming** 41:20
**bed** 179:19
**bedrock** 98:17
107:16

**began** 84:3,20
**beginning** 24:14
 88:21 93:12 94:23
 109:8 119:11
 143:18 183:14
**behalf** 12:8,22 15:5
 15:6 16:3,22,24
 17:10 70:5 75:10
 103:19 104:10
 107:25 123:6
 126:23 178:12
 182:22 184:22
 190:5
**belabor** 127:11
**belied** 69:2
**belief** 46:17
**believe** 16:7,9 18:14
 19:17 28:19 30:10
 36:11,16 41:16 43:1
 45:5 46:2 47:12
 51:19 52:7 56:23
 64:14 68:22 72:4
 91:24 97:4 103:1
 105:6 106:15
 116:13 119:16
 180:5 184:13,17
 185:7,14 186:16
**believed** 71:24
 80:10 81:15
**believes** 30:2 48:3
 61:14 107:17
**belknap** 5:16
 123:24
**belongs** 116:13
**benefit** 14:9 26:18
 27:1 103:10,21,22
 104:25 143:25
 147:12 186:4,22
**benefits** 92:24
 99:23 135:13 163:1
**benjhamin** 9:20
**best** 66:20 69:2
 71:11 81:1 120:5
 131:5
**bestowed** 56:6
**betrays** 68:12

**better** 24:18 25:8
 31:15 38:10 47:25
 48:19 59:13 130:21
 177:22
**beyond** 55:1 63:4
 63:12 85:14 151:23
 152:1 158:9 178:21
 185:12
**bi** 25:11,14
**bid** 45:23 71:7,15
 71:16 73:23 74:9,25
 120:19
**bidder** 71:22
**bidding** 71:20
 72:15
**biddle** 2:14
**bielli** 5:6
**big** 30:4 31:8 35:13
 48:15 117:12,13
 119:7
**biggest** 29:24
**bill** 31:8 49:9,15
 100:12
**billie** 70:6
**billion** 20:8 21:3
 22:1 29:25 40:15
 44:24 57:25 73:2,7
 73:10,10,15,23 75:2
 75:3 77:16,17,18
 108:17 116:24
 117:14 124:1
 143:20
**billions** 21:1 22:2
 34:12 49:13
**bills** 26:9 113:22,22
 122:13
**bird** 3:5
**bit** 18:5,9 22:12
 24:24 28:1 36:2
 39:9,11 46:5 55:19
 57:13 64:25 75:25
 86:7 98:16 133:12
 174:11 182:24
**bits** 147:1
**black** 35:9
**blood** 110:2

**blow** 77:25,25
**blown** 184:17
**blue** 172:16
**board** 47:3,22
 56:10 63:8,8,10
 88:23 89:25,25 90:1
 90:18,20 91:4 107:2
 157:13 189:11
**boards** 76:10
**boilerplate** 33:13
**bona** 70:13
**bond** 116:25
**booby** 14:2 48:2
 81:7
**book** 65:6 91:4
**books** 34:2
**borne** 86:25 114:24
 124:15
**bottom** 30:25 32:1
 37:16,23 149:16
 175:10
**bounds** 119:23
 148:3
**bowden** 2:6 100:12
**boxes** 66:18
**boxing** 18:9
**brand** 48:15
**branzburg** 3:21
**breach** 89:11,14,15
 90:10 91:2,5,10,11
 153:10 155:1
**breached** 55:15
 92:9 93:10 152:7
 153:15
**breaches** 32:12,12
 88:22 152:24
**breadth** 24:12
 143:6
**break** 129:25 130:3
**breaking** 57:14
**breakup** 47:16
**brett** 104:8
**brian** 7:22 10:3,16
 10:18 11:4
**brickley** 9:10
**bridge** 111:5

**bridging** 111:20
**brief** 12:10 13:7
 17:15 68:16 70:7
 85:15 100:13 124:5
 127:8,10,10 131:16
 144:1 152:18 178:7
 179:20 184:23
**briefed** 125:1
 184:24
**briefing** 125:2
 134:25
**briefly** 28:17 31:24
 34:6 44:19,20 62:17
 66:16 123:5 155:7
 176:10
**briefs** 84:12
**bright** 55:4 60:4
 185:7 189:17
**bring** 17:16 134:12
 137:14 172:24
 174:13 175:11
**bringing** 57:25 62:8
 81:25 134:7 191:2
**brings** 154:24
**broad** 19:7 76:18
 85:5 87:13,17 95:7
 138:1,3 187:21
**broader** 95:3
**brody** 4:4
**broke** 37:12
**brooke** 9:12
**brought** 26:5 54:11
 61:22 77:24 142:13
 147:21
**brown** 2:8 100:12
**bubble** 26:12
**buckets** 57:15 65:9
**budget** 35:21
**build** 93:14
**built** 53:18,18
 189:14
**bulk** 57:22 67:19
**bunch** 20:24 31:6
**burden** 17:5 18:6
 18:12,17 46:10,11
 68:3 159:17,19

**burdened** 69:16
**burn** 35:21,23
**business** 12:25 38:4
  42:24 43:2 46:22
  48:17 56:13,13,20
  76:3 78:15 79:9
  89:12 90:6 93:5
  166:9 184:19
**buyers** 48:15
**buying** 39:21
**buyout** 77:19 80:17
**bylaws** 54:13
**byproduct** 22:14
  27:23

**c**

**c** 2:1 5:4 12:1 13:22
  120:7 193:1,1
**calculated** 66:14
  140:19
**calculation** 110:22
**calculus** 35:14
**calendar** 130:1
  145:23
**call** 63:5 110:12
  144:12 151:22
  170:9 173:16
  177:24 181:24
  182:12
**called** 14:2 28:17
  47:11 48:2 143:1
**calling** 176:3
**cancel** 143:24
**canon** 166:6
**can't** 176:1 177:16
  185:18 187:7
**cap** 163:21
**capacities** 131:9
**capacity** 91:19
  131:23 186:9
**capital** 20:16 34:11
  38:24 66:11 82:25
  97:11 106:21 107:2
  109:10
**capitalization** 49:6
**capmark** 28:4
**capturing** 92:25

**care** 75:11 89:15
  91:11,25
**career** 76:17
**carefully** 21:15
  122:19 145:14
  180:10
**carey** 150:13
  166:21,22 167:6,21
  168:1,8,24
**carey's** 183:4
**carpenter** 4:6
**carried** 46:11
**carter** 9:11 37:23
  72:10 80:6 86:16
  93:2,16,18
**carve** 51:20 52:5,11
  52:20,21,24 53:1,5
  53:10 54:7,19 96:21
  157:23 158:6,13,19
  158:22 186:24
  187:3,6,10,14
**carved** 52:2 158:4
  187:18
**case** 1:4 8:11 17:6
  18:15 21:24 22:5
  26:19 27:13 30:18
  32:17 33:25 37:11
  47:11 51:10 54:8,18
  55:5 58:16,21 59:2
  60:16,18,18 62:3
  63:4,5,6 64:3,4 65:3
  66:3 81:22 82:6
  83:18 84:13 85:4,22
  93:13 95:12,20
  97:14 98:10 101:4
  102:5,15,20,22
  103:4,11,12,17,18
  104:20,25 106:23
  107:25 109:8 111:2
  111:19 112:14
  113:12 114:13,20
  115:7,17 116:7,12
  116:17,22,23
  117:10,16 119:11
  120:3,12 124:12,21
  125:5,11 129:5,18
  137:2 140:3,3

**care** 141:24 142:2,10
  143:11,15 145:2
  146:16,19 148:7
  151:2,14,16,20,25
  153:19 155:16
  157:8,19 158:3
  160:25 163:14
  166:16 167:16,20
  168:9 169:5 171:12
  175:19 176:15
  180:13,14,22 184:8
  185:18 188:20
  189:11,19,21 190:5
**cases** 17:7 33:23
  35:10,22 46:13 50:2
  51:12 52:23 54:7
  61:6 63:19 64:17,24
  65:2 98:5,18 103:20
  107:4 109:5 111:21
  115:23 118:25
  121:3 122:18
  132:23 134:17
  140:16 153:2
  156:14,21 159:14
  160:1 167:7 185:25
  186:16 189:8
**casework** 113:13
**cash** 13:20,25 14:1
  34:18 65:18 66:14
  74:1,5,12,13 108:19
  111:20 112:13,20
  115:2,10 117:3,23
  120:2 135:19
  144:20 165:12
**casualty** 167:16
**cat** 112:12
**catalysts** 118:8
**catapult** 154:17
**catch** 45:18 54:23
**categorized** 154:2
**category** 87:5 91:10
  139:12
**caught** 180:8,8,8
**cause** 32:11 54:16
  90:9 150:9 188:16
**caused** 132:12

**causes** 40:11 53:16
  68:18 153:23
**cede** 189:25
**cent** 95:20
**central** 68:6
**cents** 48:1 95:11,12
  95:22
**ceo** 76:3
**certain** 50:25 51:1,2
  59:10 63:24,25
  64:10 70:9 71:19
  72:22 80:16 116:5
  123:10 136:6
  153:11 155:21
  157:21 159:24
  162:4 168:21
  172:25
**certainly** 30:6 40:2
  54:8 92:1 100:1
**certainty** 98:21,21
**certificate** 87:10
  91:13,16 92:3
**certified** 193:3
**cetera** 24:23 28:11
  30:3 64:11 187:13
  188:18,18
**chad** 3:17 12:7,21
**chadeayne** 9:12
**chain** 40:1
**chair** 124:2
**chairman** 191:8
**challenge** 80:17
**challenged** 79:15
**challenges** 178:24
**chambers** 13:6
**chance** 54:23
**change** 30:23 35:14
  46:18 56:21 65:6
  74:21
**changed** 35:1 66:6
**channeling** 64:8
  181:13
**chapter** 1:3 38:14
  130:1 136:5 145:23
  151:14 153:6
  154:10 156:14
  159:14 161:23

163:12 187:8
**characterization**
  145:11
**characterized** 19:6
  145:8
**characterizes**
  137:17
**chargeable** 120:13
**charging** 183:18
**charles** 10:9
**charlotte** 134:20
**chart** 73:20,20,25
  74:10,10,14
**charts** 179:20
**cheap** 106:24
**check** 40:2 43:20
**checks** 111:1 165:3
**chicago** 105:12
  188:14
**children** 132:6
**choice** 71:21,22
**choose** 43:3 48:20
**chooses** 28:22
**chosen** 71:14
**chris** 107:24 190:4
**christopher** 1:21
  8:16 9:11 10:4
**chunks** 147:2
**chutchian** 9:13
**circle** 109:7,15
  120:17 185:19
  190:18
**circuit** 52:6,22,23
  136:16 137:6 138:6
  140:4 161:10 168:5
  168:6 180:15
**circumstances** 38:8
  54:18 81:16 126:15
  140:19 151:23
  152:4 155:9
**circumvent** 162:5
  165:23
**cite** 55:7 162:11
  166:17
**cited** 103:4 152:17
  162:3 186:16

**cites** 22:17
**citibank** 2:15
**city** 49:22 149:3
**claim** 13:21,22 21:3
  29:6,14,16,19,21,23
  34:10,20 41:11 58:7
  69:8 73:5,11,13,15
  73:18 77:18 78:19
  78:20,23 79:8,12
  80:1,1,16,17,19,21
  82:18 87:2,3,18
  88:2 89:6 91:5,11
  91:24,25 92:1,14
  93:9 94:7 95:7,17
  96:2 108:18 111:12
  115:18 123:18
  128:2,24 131:21
  132:3,7,11,18,19
  134:7,12,13 135:11
  135:19,20 137:16
  137:21 138:16,17
  139:18 140:2,5
  141:6,22,24 142:1
  154:25 167:8,10,18
  167:24 168:4,18
  178:13,14,17 180:7
  180:21 183:3,3,8,11
  183:25 184:15,16
  188:2 189:12
**claim's** 64:12 69:10
**claimant** 131:24
  141:10 184:15
**claimants** 19:18
  43:15 44:9 46:8
  67:10 132:8 133:9
  133:14,22,23 134:1
  134:5,5,16,22 135:5
  137:7,14,23 138:21
  139:7,18,19 140:8
  140:15,24 141:5,9
  141:13,23 142:4,5
  142:11 143:14
  168:23 169:1
**claimed** 149:3
**claims** 20:24,25
  21:1,2,5,7,8,9,17,19
  21:22,23 22:22

23:25 24:9,14,16,19
  24:22 25:21,25 26:6
  26:15,25 29:2,14
  31:25 32:2,4,14
  33:9,13,17 34:5,8
  34:13,17 35:4,6,13
  35:18,23 42:20,20
  42:23 43:17,22 44:1
  44:2,3,5 51:1,3
  53:18 54:1,2,3,4,11
  54:12 55:3,16 60:14
  60:15 63:14,15 64:9
  64:10 65:5,14,15,25
  66:12,15,19,20 67:2
  67:5,18,18,22 68:17
  68:19 71:2 72:22
  73:1,7,8,9,9,17 75:3
  75:3 77:1,4,13,16
  78:12,13 80:4,10,25
  81:2 82:13 84:1,7,9
  84:18,22,25 85:1,6
  86:10,13,15 87:5,5
  87:7,18 88:20,25
  89:12,14,15 91:3
  93:13,15 95:4,5,8
  95:13,15,23,24 96:9
  96:10,18 99:15,18
  112:18,19 117:10
  118:14,19,25 121:5
  125:22 127:23
  128:3,6,19 132:9,13
  132:16,18 133:16
  133:18,19 134:7,23
  135:10,15 136:5,17
  137:3,12,14,18,21
  138:13 141:1,17
  142:6,17,19,21,25
  143:7,17,19,21,23
  143:24 144:4,6,9,10
  144:19,24 145:4,9
  145:10 152:7
  153:10,21,25
  154:24 157:8
  158:19 162:10,15
  167:10,13,15
  168:13 179:22
  180:8,19,20,25

181:3,5,6,7,17,19
  187:4,17,22
**clarified** 43:21
  66:20 183:5
**clarify** 144:6
**class** 13:21 65:15
  67:24 68:1,22 69:1
  110:15 114:9 135:9
  138:15 141:13
**classic** 68:5
**classification** 68:23
**clause** 92:3 150:15
  150:18,19 151:21
**clauses** 151:12
**clear** 22:23 23:11
  31:20 32:6,24 44:23
  45:9,21 47:15 49:5
  49:9 56:2 63:7
  66:25 70:14 71:1,6
  71:14 73:12 79:3
  80:21 81:5,19 83:25
  84:24 90:20 91:1
  95:2 100:16 101:21
  110:20 114:5,15
  116:21 121:22
  127:14 129:11
  146:1 161:15
  163:25 165:25
  171:20 179:22
  180:16,18
**clearer** 91:8
**clearly** 49:25 50:6
  112:15 119:4
**clerk** 12:2 130:8
  146:6
**client** 125:12 188:7
**clients** 48:13 82:8
  83:4 84:5 85:14
  103:19 104:15,23
  178:13 181:7
**close** 12:25 13:24
  20:22 21:13 47:11
  47:14 48:2,10,24
  58:1 99:3
**closing** 12:9 16:23
  18:3 48:17 57:18
  58:1 83:6 143:8

153:24 169:11,14
closings 169:13
closure 40:23 188:3
clullo 9:14
cno 190:23
coase 188:14
code 60:9 65:25
68:13 89:13 90:6
106:15 112:21
125:14 147:22
148:4,9 149:23
159:18 160:9,13
161:8 163:11
165:21 166:1,3
169:3,8 185:7 189:1
189:4,14,15
code's 139:22
149:20
coding 113:18
cody 9:15
cognizable 132:7
cognizant 145:23
cohen 2:17
coin 18:8
cold 176:14
collateral 7:3
104:24 120:2,14
159:8
collect 43:19
collecting 110:25
collection 28:10
34:7 35:4 42:22
collective 37:11
62:6
collectively 21:24
98:19
collier 9:16
colorable 88:25
combination 142:8
combustion 136:16
136:24 137:4
180:22
come 14:1 31:1 44:2
45:12 50:4,10 61:10
67:21 87:24 103:16
109:7 111:6 115:19
130:5 190:13

comes 48:19 60:15
61:21 99:20 111:13
144:1
comfort 42:14
comfortable 192:14
coming 31:9 49:15
58:6 88:4 120:11
121:5 122:6 127:15
165:9 189:9
commendation
146:14
comment 14:16,16
14:17 101:13 147:3
173:7
commented 149:15
comments 83:13
119:22 146:13
191:10 192:9
commerce 64:20
commercial 149:2
commissioners
46:23
commitment 8:13
18:2 48:24 62:14
127:20
committed 109:18
committee 4:12 6:2
7:20 8:12 9:2 13:12
24:1,3 30:22 39:6
53:16 71:18 89:7,25
90:1,3 98:3 100:2
104:10 105:11,14
106:9 107:15
116:11,12,24,25
117:1,6,7,9 120:3
131:8,16,23 133:6,7
150:24 151:5,6,7
152:6,17,23 153:10
157:13 160:23
162:4 173:19
175:18,22,24 180:5
181:21 191:9,9,17
committees 20:15
85:19,20 116:3
117:12 150:11
160:15 175:22
176:5

committing 127:19
common 59:23
companies 51:1
66:17 76:4,5 165:4
165:4,10,11,11
company 7:15 9:1
25:6,9 38:7,11,19
54:12,17 66:19 77:7
86:22 87:1 95:18
98:13 105:5 123:25
144:4 148:13,14,14
148:19,21,22 167:7
167:7
company's 78:23
comparable 45:24
compare 65:3
compelling 29:12
32:20 35:17 40:10
compensated 79:24
113:14 121:1
154:14 156:12
160:17
compensation 32:9
79:23 136:14
138:21 139:9,21
140:12 160:12
161:1,7
competent 188:9
192:6
compilation 16:5
compiled 16:6
complaint 53:20
complete 16:18
32:20 34:4 42:24,25
98:11 138:17
completely 45:3
75:11 92:5 93:3
182:1
complex 35:18 98:5
99:15
complexities 80:15
complexity 28:11
35:15 36:24 38:3
42:23
compliance 136:25
159:17

complicated 20:25
99:10,13 125:11
191:25
compliment 17:2
comply 135:25
136:18 161:25
163:5
comprehensive
16:13 118:24
147:22,25 149:20
compromise 183:10
183:19,21
compromised 88:2
148:23
compromises
149:23
compromising 45:1
con 191:12
conaway 8:18
concede 138:7
141:7
concept 39:22
concern 44:25
119:21 190:12
191:22
concerned 43:16
111:8
concerning 77:4
183:6
concerns 19:9 66:16
68:7 123:16
conclude 33:16
60:25 177:17
concluded 27:19
35:25 79:22
conclusion 31:2
34:25 45:6 61:1
67:3 77:14 98:15
150:21 151:3
conclusions 155:19
condition 56:22
89:22
conditions 89:21
90:7
conduct 84:5 85:5
153:1 158:6,16,25
187:9 190:10

**conducting** 90:25
**conference** 105:10
**confident** 33:1 99:2
    188:1
**confirm** 94:1 100:5
    126:18
**confirmation** 18:1
    18:24 50:20 69:21
    100:19 103:15
    106:20 119:7,12,15
    122:12,15 124:3
    127:1 131:11,18
    139:14 143:4
    159:16 179:21
    184:5 192:12
**confirmed** 43:9
    52:25 93:16 108:13
    134:10 167:11
**confirming** 72:5
    105:21
**conflate** 180:11
**conflating** 180:7
**conflict** 23:12,12,15
    23:20 53:15 76:12
    76:13,25 133:9
**conflicts** 86:3 90:21
    118:7
**confused** 182:24
**confusion** 60:16
    73:22 82:21 180:12
    180:13
**congress** 136:7
    138:14 140:8 141:1
**conjunction** 138:11
**connection** 30:1
    36:18 43:13 71:25
    76:16 77:13 78:8
    84:17 87:16 90:16
    90:17,23 94:4 95:22
    159:13,25 163:14
    173:5 179:1
**consensual** 64:1,2,3
    108:3 155:12,14,17
    155:21 186:18
    189:12
**consensus** 53:9
    59:10 98:11 111:5

125:9 189:13
    190:13
**consent** 31:15 63:21
    143:25
**consented** 71:18
**consenting** 60:20
    64:2
**consequences** 99:7
**consequently**
    163:23
**consider** 97:3
    101:19
**considerable** 46:16
**consideration** 40:10
    41:6,7 88:13,17
    102:19 117:14
    157:10
**considered** 75:8
    152:13
**considering** 35:20
    74:20 124:22
**considers** 155:13
**consistent** 33:18
    45:3 78:23 93:3
**consistently** 74:20
    114:10
**consists** 74:4
**consortium** 100:13
    159:10
**constant** 63:18
**constantly** 129:13
**consternation** 81:4
**constituents** 76:24
    77:6 81:3,7 151:5
    152:15
**constitute** 79:17
    156:15
**constitutionally**
    140:22
**constraints** 55:24
**constructed** 21:15
    41:8
**constructive** 53:22
    141:11 189:10
**constructively**
    142:1

**consultation** 31:2
    76:24
**consumed** 34:18
    47:17
**consuming** 36:1
    80:22
**consummate** 14:18
    41:17
**consummated** 41:5
    83:18 87:21
**consummation**
    98:20
**contain** 53:9
**contained** 16:5
    28:21
**contemplated** 33:23
    67:8 136:23
**contemplates** 13:19
    38:25 50:25 125:15
**content** 187:4,23
**contentious** 98:4
    186:17
**contest** 161:21
**contested** 44:16,17
    51:5,6 83:8
**context** 54:4 59:2
    59:16 64:11 85:18
    88:3 96:2 98:8
    116:19 122:15
    132:9 136:2 140:2
    152:12 176:6,7,9
    183:9
**continental** 155:15
    156:4
**continually** 45:11
**continuation** 50:23
    50:24
**continue** 16:11 57:5
    127:5 128:12
    144:12 154:22
    182:10
**continued** 22:23,24
    22:24 23:8 35:17,21
    38:2,18 84:20,22
    128:4 144:18
**continuing** 127:2,25

**continuously** 22:5
    32:8
**contract** 89:18,23
    90:2,11 167:20
    169:6
**contracts** 128:8,9
**contractual** 35:9
**contrary** 45:6,11
    102:21 139:22
    162:20
**contrast** 88:18
    110:21 111:1
**contributing**
    157:19
**contribution** 60:14
    61:2,6 62:4 97:17
    102:18 108:25
    112:9 114:13 118:2
    118:4 121:8,9 126:9
    129:8 155:25 156:8
    160:24 172:6,11
    174:15,17,20,25
    175:5 184:3,3
    188:24 190:18
**contributions** 97:5
    156:12,15 172:2
**control** 23:13 38:8
    41:11 46:19 48:7
    56:21 98:24 152:19
    152:20 153:6
    165:10
**controlling** 153:2
**controversy** 46:6
**conversation** 57:8
**conversion** 46:19
**conveyances** 182:8
**convincible** 138:16
**cook** 122:25
**cooking** 34:1
    119:14
**cooperated** 85:8
**cooperation** 56:6,7
    154:15
**cooperatively** 99:1
**coordinated** 120:1
**cop** 120:4,6,20,20
    120:20,21,21

copies 16:7 166:25
copy 14:24 16:8,18
  166:19,20
core 142:23
corp 1:4 5:7 6:15
  70:5 86:17 92:15
  93:18
corporate 117:2,4
  152:21
corporation 89:13
  90:8 152:6,19,22
corporation's 89:24
  90:8 152:20
correct 12:11 14:5
  22:21 50:7 68:15
  181:1
correctly 52:21
  53:20
corroon 6:8
cost 31:5 35:21
  124:15 156:25
costly 80:22 149:18
costs 80:8 163:14
  167:9,25 168:3
cough 176:18
could've 92:8
couldn't 111:5
counsel 2:15 3:2,14
  3:22 4:7,12,23 5:7
  6:2,21 7:9,14,20
  8:19 53:15 70:4
  75:16 113:21
  117:10 129:11
  145:19 158:14,20
  188:8,9 189:16
  191:1
counsels 188:12
counted 12:15
counterpart 96:5
counting 158:6
country 193:21
couple 12:11 24:10
  49:23 63:13 118:8
  124:12 127:13
  146:13 175:14,16
course 27:4 68:19
  69:14 78:2 79:9

80:19,22 81:12
82:11 101:8 131:2
  139:25
court 1:1,10 12:3,18
  12:20 13:1,3 14:3
  15:2,13,16,19 16:17
  17:3,10,24 18:23
  19:1 20:4 21:21
  23:10 24:21 27:5
  28:22 36:3,6,9,14
  36:17,21 37:4,6,9
  43:3 44:13 50:1,5
  52:4,9,12,17 57:14
  58:12,23 61:10,14
  61:15,22 62:18,20
  63:1 65:8 67:24
  68:3 69:18,20,25
  70:3 75:14 77:1,25
  78:9,10 80:16 82:2
  82:7,11,16,20,22
  84:12 92:16 93:7
  94:10,13 96:17,21
  96:23,25 97:18,21
  97:23 98:8,24 99:17
  100:6,9 102:13,19
  102:19 103:25
  104:5,7,17,20,22
  105:4,7,24 107:19
  107:22 108:2,25
  110:16 113:24
  114:2 115:22 116:9
  117:17 118:5,22
  121:8,10,17 122:16
  122:24 123:3,18,20
  123:22 126:13,14
  126:15,16,17,21
  127:6 129:19,21
  130:9,15,17,20,23
  131:2 133:8,20,22
  134:23,25 136:19
  136:21 140:5
  141:16 142:16,19
  142:23 143:1 144:8
  145:17,19,24 146:5
  146:7,9,11,15 151:3
  151:6,11,18 155:13
  156:1 159:24 160:6

160:21 161:1,19
162:3,9,11,12,19
  163:11,12,15,18,23
  164:5 165:16 166:2
  166:5,21,24 167:2,4
  167:16 168:9,11,17
  169:22 170:4,6,10
  170:14,17,18,23
  171:5,8,15,17 172:5
  172:9,19,21 173:1,4
  173:14,18,24
  174:18,19 175:3,12
  175:20 176:17,20
  176:24 177:18
  178:2,4 182:21
  184:2,18 186:2,12
  187:8,9 190:2,6
  191:4,7,11 192:8
court's 15:12 19:5
  123:9 151:9 162:22
  162:23 165:18
courthouse 53:2
courtroom 16:25
  122:21 145:22
courtrooms 122:23
  122:24
courts 138:6 151:12
  155:10 156:5 168:1
  168:6,14
court's 109:21
  167:22 179:1,7
  184:11
covenant 14:6
covenants 182:4
cover 52:1 54:22
  83:20 106:16
  117:24 186:5
covered 25:8 54:14
  84:23,24
covers 55:1 151:7
  187:7
cramming 68:25
crazy 122:25
create 117:11
  122:19 133:12
  136:10 148:5 179:5
  183:7 191:24 192:1

created 140:8
creates 21:11 30:5
  47:12,18 53:6 183:4
creating 144:22
creation 111:2
  133:19
creative 163:7
credibility 72:12
credible 33:1
credibly 27:24
credit 29:9 43:19
  79:18 94:23 105:9,9
  137:9 143:23
  171:11
creditor 21:2 26:13
  53:8 58:21 59:1,24
  77:6 81:24 86:10
  97:24 98:11 102:12
  111:11 115:1
  128:22 129:3
  159:25 160:23
  168:2,20 169:9
  170:5 182:13
  188:20
creditors 6:3 13:12
  13:12,22 22:22
  25:12 28:12 38:5,20
  38:23 39:23 45:1
  47:13 54:1 58:8,13
  60:11,20 61:17,18
  61:20 65:19 74:15
  81:1 82:8 83:18
  85:4 87:23 88:3,5
  92:21 93:7 95:11,21
  96:3 97:10 99:12
  104:11 105:20
  110:23,23 114:12
  114:17,17,18,25,25
  116:24 117:1,7
  118:10 119:9
  124:16 125:6
  128:14 131:9 133:7
  139:24 141:11
  143:19 144:3
  145:14 147:13
  150:25 160:15
  167:14 168:11,13

168:16,21,25 169:6
170:3 171:12,13
**creditors'** 4:12 7:20
**creditor's** 102:14
**cremens** 26:4,16,25
34:10,16,24 72:11
156:18
**crew** 148:12,13
149:5,16
**crewmembers**
149:5,7
**crews** 148:15
**criminal** 158:5
**critical** 42:13 56:25
156:8 180:3
**critically** 41:25
98:18
**cro** 33:5 45:17 76:4
**cromwell** 7:19
**cros** 33:3,7 72:8
**cross** 56:25
**crucial** 56:17
124:21
**css** 1:4
**culminated** 27:6
**culminating** 24:21
**curate** 122:20
**curcio** 9:17
**current** 31:8 65:14
93:8 99:25 100:3
139:14 150:5,5
152:2 155:5
**currently** 51:2 69:9
139:7
**curtis** 134:20
**cut** 120:4 137:24
141:17 181:21
**cuts** 39:9 41:23
47:18 165:3 171:24
**cutting** 141:5

**d**

**d** 2:12 7:5,22 9:8,14
9:20 10:11 12:1
118:1 138:4 160:13
160:25 161:7 169:3
169:10 171:4 172:2

**d&o** 33:9
**dallas** 27:12 77:22
**dam** 11:6
**damage** 42:23
54:16 150:10
**damages** 91:18
132:12
**dan** 123:23
**daniel** 3:11 5:20
6:23
**daniele** 11:8
**data** 25:1,4,4
**database** 77:8
**date** 20:11 50:4,10
51:3 65:13 67:7,15
67:18 73:6 94:16
101:9 133:16,16,17
133:19,21,22,23
134:4,8,11 136:2,12
137:16,20,24
138:11 141:16
142:9 143:3,5,5,9
143:12 163:4
168:18 178:24
179:2,7,12 180:5,9
193:25
**dated** 106:16
**david** 4:9 5:9 10:2
131:7 132:11
**davis** 5:14
**day** 85:3,4 99:19
103:12 104:17
106:11 118:3,6
119:25 141:19
176:12 177:3,4
**days** 50:19 78:3
119:6 134:8 139:18
143:9 173:14
**dd** 32:23
**ddas** 23:9,24 26:4,8
26:11
**deadline** 124:6
130:14
**deal** 19:23 20:21
29:20 42:4 43:24
46:21 48:9,24 50:15
58:1 59:25 60:24

75:18 88:9 90:15
106:18,23 108:5,15
109:10,11 110:3,10
116:20 120:4,14,23
121:6,7 122:25
127:1,20,21 128:14
145:1 163:8 170:8
170:12 171:9 192:2
**dealing** 112:10
**deals** 89:14,15 91:2
91:7 106:25 109:5
122:22
**dealt** 21:17 146:19
**dear** 148:10
**death** 131:21 132:7
**debenture** 4:17
5:17 123:25
**debt** 20:19 38:24
49:20 50:24 92:25
116:25 144:22
182:2,4
**debtholders** 98:4
**debtor** 13:10 14:10
21:1 23:25 25:2
28:18 42:1 51:16,18
52:15 53:10 55:13
55:21 58:3 60:12,19
64:10,18 65:17 66:5
71:2 74:23 75:1
87:22 89:18 102:11
102:12 126:25
129:5,14 135:18
136:25 138:24
140:7 141:10,12,22
143:6 144:4,6,19
145:7,12 154:9,23
154:25 155:4,4,24
156:7 163:13
184:15
**debtor's** 59:7 68:20
128:1 154:3,5,11
156:8,11
**debtors** 1:5 3:14 4:7
4:23 6:21 12:8,22
13:10 14:9,21 16:3
16:22 20:19 21:5,12
22:20 29:17 42:3

56:7 61:12,20 63:14
71:9 76:7,16 78:15
81:23 83:9,10,22
85:7 86:6,14 87:17
94:2 99:11,16 103:9
103:21 110:6 113:5
113:6,10 114:2
117:20 118:15,17
119:1,16,17 120:5
124:16 131:11
132:4,18,22 133:1,4
133:5,15,21 134:3
134:10,13 135:2,3,7
135:10,11,14,23,25
137:2,8,17 138:4,7
138:12,25 139:25
140:22 142:3,8,15
143:8,10,17,18,22
144:1,5,7,20,21
147:13 150:12
152:2,4,8,12 153:6
153:8 154:1,21
155:11,11 158:23
159:22 163:4,18
164:10,11,15,20,20
164:25 165:12
166:8,11 167:12
179:23 181:5,8,18
183:12,14 184:22
**debtor's** 43:2 99:24
106:1 109:18
167:23 184:12,19
**dec** 29:10
**decade** 48:6 111:17
112:5
**decades** 139:16
**december** 1:13
65:13 122:24 134:8
137:16 193:25
**decide** 61:12,15
**decided** 105:5 168:5
168:12
**decides** 61:11
101:14 145:5
**deciding** 23:21
**decision** 47:8 76:13
126:7 128:23 129:2

139:3 141:25 150:22,22 151:1 165:13 166:10,15 166:23 167:6,22 169:4 180:15 183:4 192:11
decision's 126:6
decisions 24:3 32:22 76:15 147:17 180:18
deck 19:19 20:1,2
declarations 44:18 93:25 97:15,16
declared 76:25
declaring 23:20
deduction 40:8
defects 137:6
defenses 30:2 80:19
defer 88:11,11
deferring 40:8
defined 86:22 118:24
definition 96:4 180:21
definitive 137:4
defrancheschi 6:23
degradation 38:6
degree 67:14
degrees 81:4
deicide 76:13
delaware 1:1,12 52:23 54:13 89:11 91:11 155:17 186:6
delay 12:4 35:16 125:13 156:25
delegation 76:18
deleveraging 44:24
deliberate 86:3
demeanor 18:20
demonstrate 18:5 18:13,16 24:12 46:10 48:23
demonstrated 78:12 108:24
demonstrates 19:11 39:15

demonstratives 16:15 24:10
denhoff 9:18
denial 182:19
denominator 29:24
deny 179:8,9
denying 134:25 168:24
department 8:1 14:12 15:6 149:14
depend 136:14 139:9
depends 161:12
deploy 148:20
depose 105:1
deposition 16:13 49:8 84:16 156:23 157:5,17 164:9,23
depth 24:13
derivative 63:15
derived 135:11
deriving 138:21
described 24:20 28:4 151:1
describes 93:23
deserves 121:1
design 18:2
designations 16:14
designed 147:16 192:1
desire 48:24
desperately 54:17
despite 165:3,14 182:15
destroyed 30:17
detail 26:25 93:23 98:7
detailed 18:21 80:14 121:23 160:18 184:4
determination 61:22 140:4 186:6
determinations 142:24
determine 23:11 76:12 113:22 163:19 168:17

determined 114:1 155:10 166:12 167:17 168:6
detrimental 149:24
deutsch 4:6
deutsche 6:9 7:9
develop 134:14 141:20
developed 135:7
developing 121:5 132:2
devoid 92:5
devoted 94:4
diagnosed 141:3 142:13
diagrams 121:6
dictated 33:7
didn't 31:3 32:24 33:1 42:7,8 45:18 103:15 174:17 175:7 178:12 189:11
die 132:15 139:20
died 120:15
diem 30:24
difference 128:20
differences 109:9
different 45:13 55:25 58:6 106:12 116:6 127:17 129:1 129:13,16,17 142:7 183:20 188:2,17 189:19
differently 140:1
difficult 111:9,19 125:11 142:14
difficulties 34:7
difficulty 28:10 42:22
digest 18:21
diligence 22:15 25:7 28:13 33:11 75:7 77:4,14 154:16
diligent 24:25
diligently 75:10
dilute 58:7

diluted 58:10
dilution 58:13 61:24
dinner 104:1
dinners 113:19
dip 2:15 7:9 8:13 173:8 190:22
direct 63:15 73:21 83:2 121:3 157:9,15 164:14
directed 26:4 75:17 114:12
direction 16:25 21:22 34:14 42:18 45:14 70:6
directly 57:3 58:3,8 114:7 165:21
director 23:2 24:6 24:15 32:18 71:8 72:11 76:2,4,18 78:21 81:13 89:19 106:2 156:18 157:10
directors 6:15 21:6 23:4,4,6,10,14,19 25:24 26:3,18,22 27:24 30:10 33:14 33:17,24 42:21 45:16 47:23 51:25 56:11 62:24 63:4,15 70:11,16 71:9 72:2 72:18,23 74:20,22 75:6,20 76:11,21 77:23 78:5,6 81:24 84:4 85:17,22,25,25 88:25 89:17,25,25 90:1,3,10,23 92:8 92:11,17 93:9 94:5 97:14 118:8 150:12 152:21 155:24 156:2,6,7,11 157:22 186:21
directs 16:14 20:22
disagree 51:21
disallowed 128:21 128:25 129:7 167:24

disarmament 41:9
41:23,25 42:9,14
47:12,15,17 156:20
disavow 151:24
discharge 66:1
discharged 139:1
140:5 152:11
disclosed 89:24
disclosing 90:21
disclosure 91:2,3
115:13,14 160:3
163:5,20 164:5
disclosures 90:15
discontinued 65:9
135:13,16
discount 92:25
discovery 24:17
25:18 85:6,11 96:10
122:4 176:14 177:9
177:10
discreet 83:14 89:9
130:1
discretion 23:23
163:19 165:17
discuss 100:16
176:10
discussed 24:4 75:8
discussing 99:18
170:11
discussion 22:12
43:12 45:13 53:14
77:25 158:18
175:21 183:9,23
discussions 27:17
183:6,24
disease 65:23 132:2
132:15 139:15
141:20
diseases 139:17,20
disinterested 6:15
23:3,6,10,14,19
24:5,17 25:24 26:17
26:22 27:23 30:10
32:18 45:16 47:23
70:11,15 71:8,9,19
72:1,11,18,23 74:19
74:21 75:6,20 76:1

76:11,18 77:23 78:4
78:6 85:22,25 90:3
106:2 118:7 156:17
dispute 29:25 61:21
62:15 119:8 188:20
disputed 35:7 79:2
disputes 99:14
137:10 147:20
dissect 37:15
dissolve 145:6
distilled 165:7
distinct 101:22
142:5 183:6
distinction 141:2
169:23
distinguish 125:21
distraction 38:18
157:1
distributable 74:10
distribute 162:21
distributed 13:21
distribution 96:17
111:12 115:3
139:23 167:11
168:23
distributions 114:8
district 1:1 52:25
58:23 142:16
155:10,16
ditch 121:17
dive 18:3
divided 168:2
dividend 29:25
30:24 73:5 80:18
divine 44:7
docket 13:8 179:25
document 57:21
62:13 85:13
documented 109:24
114:1 121:15
documents 25:19
25:20 50:24 62:14
77:8,9 85:9 112:18
164:22
doesn't 35:8,13
48:9 55:1 101:13
107:10 147:16

148:22 191:2
doing 52:18 65:20
82:12 109:25
110:20 114:6,7
115:11,18 117:15
118:18 119:4,22
120:23 170:21
177:5 180:9 188:15
dollar 29:25 31:20
34:15 35:6,6 48:1
95:11,12,22
dollars 20:8 21:2
25:20 29:6,16 34:13
37:20,21 39:14
40:15,16 49:13,24
167:8 169:15
domination 22:15
28:17 32:17
donald 70:6
don't 28:19 44:16
45:5 48:10 61:25
102:19,20 171:13
176:5 179:17 182:4
182:5 184:15,17
185:3,7,9 186:19
187:15,19 190:24
190:24
door 25:3
doré 9:19 22:19
32:22 33:21 38:17
42:13 46:20 47:24
72:8 84:6,15,19,24
85:1,9 97:16 113:7
129:15 156:17
157:2,4,10 158:18
164:9,23 172:15
187:20 188:9
doré's 157:16
164:14 165:5,7
doré's 33:18 106:1
187:18
dovetail 125:17
dovetailed 157:16
downs 46:13 151:16
158:3
downside 34:18

dozens 77:11
drafting 33:5
drag 41:12 47:16
dragon 50:6
dramatic 149:21
dramatically 99:6
drastic 149:21
drill 24:24
drinker 2:14
drive 118:24
driven 64:17
drives 147:17
drop 74:25 176:18
dropped 74:9
drove 124:23
dry 41:15
ds 52:10 63:14,17
186:15
due 25:7 31:9 43:20
44:2 49:10,15,17
64:14 68:7 77:14
101:5,5 103:2,6
105:9 140:1,9,14,17
140:23 141:4,13
142:11
duplicative 78:17
duties 55:6,8,23
75:12 151:8 152:7
152:10,15,25 182:9
182:11 186:1
duty 55:15,17 63:5
75:11,11 88:22
89:12,14,15 90:10
91:10,11,25 92:9
93:10 151:5 152:22
153:15 154:4 155:1
185:15
dx 87:7,8,10 90:15
90:15,18
dynamic 73:16

**e**

e 1:20,20 2:1,1 3:16
12:1,1 20:10 21:21
31:16 39:5,23 40:17
42:22 43:17,22
44:25 45:11,16 54:5
57:16 58:9 61:23

65:10,15 66:10,12
78:15 90:5 99:16
105:2 107:3 110:21
117:1 120:11
131:22 133:7 138:4
143:20 144:3
152:23 153:9 193:1
**ear** 33:19
**earlier** 42:5 95:5
98:10 101:13 125:8
187:1
**early** 24:14 33:6
116:22 118:5 125:5
**earmark** 145:9
**earned** 57:10 63:17
**easily** 28:23
**easy** 17:12
**ebasco** 131:25
**echo** 146:14
**echoed** 31:10
**economic** 110:21
111:6 147:15,17
185:4
**economically** 48:20
49:11
**economics** 111:8
**ecro** 1:24
**educate** 56:12
**education** 56:14
**edward** 12:7
**eec** 133:2
**eeci** 133:2 145:7
**eeci's** 133:4
**efch** 75:16,23 76:2,8
76:10 79:13
**effect** 13:16 71:7
**effective** 51:3 94:15
101:9 107:9 161:20
163:4 164:23
**effectively** 57:23
101:6
**effectuate** 156:20
**efficiency** 147:11
185:5
**effort** 37:18,24
48:11 62:7 97:13
120:1 148:23

149:18 154:18
**efforts** 17:3 99:8
100:7 105:23
117:10 154:9,16
**efh** 4:12 5:2 6:15
7:20 17:14 21:23
23:7 25:1,13 29:3
29:10,22 30:9,22
31:22 34:9,17 35:6
35:13 39:21 40:9
42:20 43:25 49:1,6
49:13,17 56:9 66:19
69:11 70:11,16
71:13,18 72:1,17,20
72:21,25 73:1,3,6,7
74:2,5,11,12,13,19
75:2,6 77:17,22
78:20,21 79:5,18,24
80:10 83:3,16,18,19
84:3 85:20 86:13,17
86:21,22 87:2,22,23
88:3,4 89:6,13
90:18 91:4 92:2,9
92:15,20 93:6,7,9
93:18,23 94:4,8,16
95:10 96:3 117:2,4
117:6,7 123:6,11
128:3,13 131:8,10
131:15 134:17
135:10,11,13,18
143:25 144:6,10,13
144:19 152:6
159:11 161:4
179:23 180:5 181:5
181:8,18,21 182:23
183:2,7,17 184:1,12
189:20
**efh's** 73:17 88:23
**efih** 8:12,13 21:22
23:5 25:13 34:16
35:2 36:22 49:2,14
50:15 69:13 72:22
73:2,4,8 74:2,11,14
75:3 77:17 80:9,10
86:19 87:3
**eight** 107:9

**either** 38:24 45:18
53:10 60:6 88:2
91:7 110:23 132:13
135:18 137:18
144:23,24 162:17
162:25 163:14
165:23 174:19
176:12 188:21
**elaborate** 86:7
88:10
**elasticity** 148:3
**element** 28:25 34:7
35:15 159:20
188:22
**elementary** 140:17
**elements** 44:15,16
**eligible** 160:16
175:25
**ellis** 3:13 12:8,21
16:3 85:22
**else's** 33:7
**embedded** 102:5
**emerge** 30:24
**emergence** 49:7
59:20
**emerges** 182:9
**emil** 8:9 82:3,23
**emphasize** 87:25
94:21 124:10
**employees** 55:7
94:4 97:14 154:1,3
154:11,12 156:11
**employers** 55:9
**employment** 75:20
135:12
**empowered** 76:11
**enable** 30:11
**enabling** 31:16
**enacted** 136:7
138:14
**encapsulated** 122:5
**encapsulation**
118:9
**encompass** 159:12
**encompassed** 89:1
**encouraged** 102:6

**endeavor** 142:14
**ended** 90:25
**endgame** 121:5
**energy** 1:4 5:7 7:14
27:15 70:5 83:1
145:1
**enforceable** 41:20
89:17,19 167:19
**engage** 18:4
**engaged** 26:9 77:3
**engagement** 63:9
128:15
**engender** 157:1
**engine** 148:13,19
**engineering** 136:16
136:24 180:22
**enjoy** 163:1
**enormous** 20:12
73:14
**ensures** 99:7
**ensuring** 119:9
**enter** 14:10,22
139:14 164:17
**entered** 13:9 17:17
134:25 149:6 179:2
**entire** 32:17 40:17
47:21 73:16 86:18
106:2 141:13
**entirely** 30:16 54:8
**entirety** 147:23
**entities** 13:10 86:13
87:14 133:1,3 144:9
144:10 154:10
**entitled** 55:18
111:15 142:22
152:8,16 155:2,6,22
158:9 167:10
185:20 186:3,10
**entitlement** 128:18
**entity** 56:11 83:3
111:24 117:2
156:24 182:9
**entry** 14:10 17:25
18:13 72:4 134:21
139:2
**envelope** 40:18
105:18

environment
122:19,22
environmental 13:4
13:13 14:11 15:6,9
epa 12:17 13:21,24
14:15,18,25
epa's 14:20
equal 94:17 139:23
equally 162:23
equitable 28:4 44:5
128:17,17,24 129:6
equitization 45:12
45:16
equity 8:7 20:17
40:9 48:15 49:13
55:5 62:14 83:2
86:10,11 88:7 95:18
96:4,4,8,18 114:18
115:3 127:20
144:20,24 145:3
150:5 152:3,8,11,12
153:2,2,4,5 182:2
equivalent 79:17
136:11
erica 104:9
ernst 5:6
error 68:17
especially 94:8
106:3 157:3
espousing 185:8
essence 22:13 53:25
essential 21:10
100:21
essentially 50:23
78:7 79:16 110:25
114:3 134:6 136:10
137:13
establish 133:21
140:7 148:19
159:17
established 49:25
65:12 138:5 141:16
155:16 166:6,8
establishing 119:10
estate 35:2 38:5
58:8,17,18 71:11,13
72:20 75:10 97:24

110:24 113:11,16
128:23 131:7,20
150:3,8,11,20
151:13,15,19,24
152:1,13,16 153:4,9
153:12,17,18,20
154:4,7,17,22 155:2
155:3 157:23
160:17 161:14
162:21 167:15
168:4 172:7 185:12
186:3,10
estates 14:9 28:8
71:6,13 75:23
104:15 124:16
estimation 142:20
181:17,19
et 1:4 24:23 28:11
30:3 64:11 187:13
188:18,18
ethical 188:5
evaluating 145:14
evaluation 77:13
evans 23:6 27:16
30:4,5 70:6 71:12
event 13:24 21:12
34:19 38:14 40:2
58:4 83:17 132:15
166:14
eventuality 186:5
everybody 115:13
119:11 129:9
171:23
everybody's 125:1
everybody's 109:16
everyone's 71:2
evidence 17:21,24
18:19,22 19:10,22
20:22 21:8,9,14,19
22:16 23:23 26:1,8
28:12 31:19 32:13
32:14,14 45:5,21
47:15 50:6 69:4
70:15,19,20,21
71:14 73:2 75:5,25
78:5 79:12 80:15,16
84:16 86:11 87:6

88:19,19,22,24 89:4
89:5 90:14 91:25
92:5,16,19 93:21
97:4,7 99:4 117:3
147:21 153:1,25
154:8 155:25 156:7
174:4
evidenced 97:15
evidentiary 18:15
122:9
eviscerate 144:24
148:5
evolve 22:24 23:8
evolving 22:19
exacerbated 116:21
138:3
exact 125:18 126:7
exactly 44:7 92:4
95:8 104:19 120:24
121:24 125:14
132:3
examined 151:3
example 36:14
145:3 152:14
157:12 189:9
examples 92:23
exception 87:18,20
exceptional 146:16
146:18 155:9
exceptions 91:21,22
91:24 92:6 158:1
excess 73:5 143:19
167:8
exchange 27:7 41:6
41:9 156:9
exchanged 77:20
exclude 150:15
exclusion 45:10
exclusive 58:20
73:11 111:11,23,24
112:22
exclusively 94:19
exclusivity 41:14
excruciating 26:25
exculpated 54:21
91:21 150:2,7,14
154:2 156:2 158:8

exculpation 52:5,22
54:25 55:8 57:11
91:12 92:2,3,6
147:5 150:1,9,15,18
150:25 151:10,12
151:21,22 152:1,9
152:16 153:8,16
154:21,22 155:2,6
157:25 158:10,25
185:11,12,21 186:4
186:10,13 187:7,7
exculpations 138:3
151:17
excuse 12:3 94:1
176:13,16
executed 56:19
exercise 18:8 36:1
43:1 57:15 78:14
152:19
exercised 27:11
32:21 153:5
exercising 133:6
exhaustive 33:12
75:6 84:7 110:18
exhibit 153:18
exhibits 16:12,15
20:23 87:6 90:14
exist 162:15
existence 137:19
existent 42:22
existing 50:24
exit 74:6 145:21
exogenous 38:7
expect 33:25 39:23
178:6
expected 91:22
expense 28:11
35:16 42:23 58:14
111:25 114:14,20
162:10 163:19
168:22
expenses 25:1 83:20
87:15,24 94:18,20
95:14 112:3 121:16
142:12 159:5,12
160:7,22 162:11,14
162:16,17,17,25

163:14 166:2 169:2
183:3,13,16 184:13
191:20
**expensive** 30:7
35:18,25 37:18
104:2 113:18
142:14
**expensively** 67:13
**experience** 47:5
76:3 85:10
**experienced** 85:12
**explained** 88:8
133:23 136:24
162:9 164:23,24
**explains** 126:3
**explanation** 112:6
**explicit** 162:14
**explicitly** 162:13
184:10
**exposed** 131:25
133:24 135:6
137:12 138:20,25
139:12 140:10
143:14
**exposure** 65:22,23
131:21,25 132:14
132:20 135:8 136:9
139:6 141:4
**express** 100:6
146:19
**expressed** 66:17
115:23
**expresses** 121:18
**expressly** 141:16
**extant** 19:14
**extend** 22:3 91:1
178:24 185:12
**extended** 84:20
151:23
**extends** 182:18
**extensive** 77:3 94:1
**extensively** 97:10
**extent** 19:24 35:3
45:7 51:19,25 53:24
65:15,17 76:19 84:3
91:15 116:4 121:19
128:12 129:10

151:21 154:11
155:13,20 168:20
172:25 173:12
174:4,24 178:11,23
179:8 182:17
**extinguish** 148:11
**extinguishment**
148:18
**extra** 63:24 114:11
**extraordinary** 84:2
94:3 100:7 158:7
**extremely** 107:21
**eyes** 47:22,22

**f**

**f** 1:20 2:22 9:9
138:2 193:1
**face** 27:6,6 142:19
**faced** 73:7
**faces** 165:20
**facilitated** 18:15
**facilitating** 56:8
154:15
**facing** 16:25
**fact** 26:9 27:17
28:20 29:5 30:18
32:20 35:12 52:24
53:9 55:20 60:13
63:13 66:21 68:17
69:14 76:19 89:4
98:20 102:10 115:5
117:1 138:24
145:24 157:25
161:22 179:23
185:3 187:2,6,20
**factions** 111:21
**factor** 140:6
**factors** 19:4,12 28:2
28:5,9 30:9 38:7
52:14 155:9
**facts** 18:5 66:6
89:22 92:7 124:12
124:13 153:18
164:7 182:25,25
**factual** 39:10
137:10 155:19
**fahy** 3:9 131:8,14
132:11,11,17,20

134:24 138:7 141:7
**fail** 42:4 64:15
**failed** 12:12 48:11
138:5
**fails** 125:21 135:25
140:22 145:13
**failure** 87:16 99:7
149:16,19,22
**fair** 19:15 28:3
33:16 44:5 47:2
79:22 80:25 82:9
83:24 96:13 192:7
**fairly** 17:20 66:25
116:20 191:18
**fairness** 91:6
155:18 192:1
**faith** 19:23 44:19,22
45:4,7 46:3 90:1
91:22 98:7 149:23
**fake** 120:20
**fall** 65:8 164:3
186:11
**fallen** 18:10
**falls** 28:5
**false** 35:20
**familiar** 24:21
184:23 187:25
**family** 47:4 132:13
132:15 141:19
**fanfare** 110:24
**fantastic** 117:11
**far** 45:15 47:16
110:3 148:10
149:20
**farther** 174:11
**fashion** 38:22 166:4
**faster** 140:13
**fatal** 145:13
**fault** 171:1 179:17
**faulty** 70:21
**favor** 29:18 34:9
63:25 69:21
**favors** 189:14
**fear** 37:6,7
**feasibility** 19:23
41:24 43:24 44:20
46:5,7,8,10,15 47:9

48:21 49:1,25 64:11
66:23
**feasible** 156:9
**february** 23:2
**feder** 9:20
**federal** 147:23,24
**fee** 9:2 31:15 36:18
47:16 51:2 60:10
106:14 111:12
113:16,17 121:25
124:8 147:5 160:2
160:11 161:6
163:19 164:6,16,18
165:12 169:21,24
173:11,12,19
174:14,21,21 175:1
175:2,7 191:8
**feel** 165:13
**fees** 19:24 22:2 32:5
36:7,9,12,14 39:14
43:11,12 44:21
57:12,15,17,22
58:11 59:9,14,24
60:3 61:7,8,19 62:8
62:12,12 80:5,7,12
83:20 86:15,23
87:15,24 90:17,22
94:17,19 95:14
100:21 101:4,5,11
101:15 102:14,14
103:2,5,19,24 106:8
106:10,12,17
108:11,17,19,22
109:1,4,12,16,16,17
109:17,24,25 110:4
110:8,10,11,12,13
110:15,22 111:2,4
111:16,19 112:8,9
112:13,18,20,22
113:1,2,4,17,25
114:3,22,23 115:2
115:10,14 117:22
119:21 121:15,19
122:3,6,8,8,11
123:12,17,17
125:13 126:25
127:3,9,18,20 128:4

128:11 129:4 131:4
159:2,5,6,12,23
160:7 161:13,22
162:2,7,13,24,25
163:21 164:3,10,21
165:14,17,18,22
166:12 167:9,14,18
167:19,24 168:3,7
168:10,15,19,22,25
169:2,6,9,16,19,23
169:24 170:2,2,2,11
170:17 171:2,2,7,17
172:10,16 173:5,9
175:11 177:5,11
182:24 183:3,11,14
183:16,21 184:13
188:11,23 189:15
189:21 190:19,22
fell  149:7
felt  29:21 36:12
60:25 79:24
fencing  55:24
185:15
fend  109:4
fenicle  3:9 131:6,7
131:14,19,20,22
132:5,17,20 134:23
138:7 141:7
fewer  65:2
fide  70:13
fidelity  20:15
126:23 127:16,19
128:1 129:13
159:11,13 161:4
169:7
fidelity's  126:24
127:18 128:10
fiduciaries  55:2,3
55:14 110:24 150:3
150:8,10,16,20
151:13,15,19,24
152:1,13,16,22
153:5,12 154:5,22
157:23 185:12
fiduciary  32:12
34:24 55:6,9,15,17
59:8 74:20 75:12

88:22 89:12 91:10
92:9 93:10 104:12
113:11,16 133:6
151:5,11,14 152:5,7
152:10,14,22,25
153:9,10,15,17,19
153:20,22 154:4,7
154:18 155:1,2,3
182:9,10 185:25
186:3,10
field  119:7
fifth  131:12
fight  148:11
fighting  172:21
176:13
figuratively  78:2
figure  121:7 170:14
file  45:15 63:16
110:1 111:25
114:21 117:21,21
129:2 132:16 134:7
134:11 137:16
139:17 171:24
174:2,7 178:12
filed  12:23 15:20
18:21 25:13 53:15
65:16,17 67:18,19
67:24 68:2 82:13
85:16 92:13 94:22
132:17,18 133:15
134:20,24 142:22
151:18 168:18
174:3 175:13
178:13,17 179:16
179:19,21,25 183:2
files  92:17
filing  24:7 79:7
160:19 169:9
190:25
final  125:16 192:9
finality  140:18
finally  80:14 104:23
105:2 107:2 125:16
143:16 158:12
160:25 181:15,15
188:11

financial  48:15
156:8
financing  7:9
finco  138:18
find  61:5 102:10,23
104:4 112:12 172:5
177:14 184:7
188:16
finding  46:14 53:19
102:23 161:1
163:24 172:12,13
184:2 190:17
findings  155:19
finds  121:9 163:12
186:2
fine  52:17 82:11
123:20 125:8
130:23 146:1
finger  6:20
finished  69:16
fink  4:14
fire  148:11,17 149:3
149:14
firefighter  149:10
firefighters  148:12
149:1,4,12
firefighting  148:11
148:13,23 149:18
firemen  149:4
fires  172:21
firestein  9:21
firm  43:5
first  6:2 7:2 12:10
13:12 18:3 19:3
21:2 24:19 28:25
30:13,23 34:12
36:15,22,22 41:9,13
49:2,14 51:7 56:16
64:7 69:13 78:19
86:9 89:10,22 90:19
92:22 98:4 100:2,18
119:6 120:5 124:12
127:10 130:13
169:17 177:3
178:10 179:16
180:3 183:2 185:1
185:13

firstborn  42:8
firsthand  27:13
firsts  50:15
fit  92:5 130:3,14
148:1 171:2,13
fitzgerald  138:18
139:2
five  119:15 173:10
fl  68:10,17,19,22
flagship  48:16
flannagan  9:22
flatly  111:13
flawed  182:15
flaws  138:2
fleshed  32:3
flexibility  119:13
147:24 148:3 189:6
189:14
floor  27:14,14
149:8
flowing  117:4
flows  54:15
focus  21:20 41:22
72:22 101:1 120:3
focused  46:21 71:12
72:18
focuses  157:3
focusing  87:12
foerster  104:10
foley  2:19
folks  57:10 67:15
follow  149:17
154:10 187:24
following  14:17
89:21 101:1 137:15
145:6 149:7 165:8
food  39:25
footing  58:6
footnote  74:3
forbid  162:13
force  185:18
foreclose  138:12
foreclosed  134:7
forecloses  137:14
foregoing  193:3
forensically  37:14

**forever** 40:22
**form** 56:17 109:10
138:17 139:15
141:8
**formation** 87:11
91:14,16
**formed** 24:2 175:22
**former** 150:4,5,5
152:2,3 155:5
185:22,23
**formulate** 27:3
**formulating** 26:19
**formulation** 68:6
**forth** 14:6 15:8 27:8
74:23 106:15 138:2
**forum** 181:23
**forward** 32:9 34:22
34:22 42:15 83:21
98:18 107:7 115:15
115:19 190:25
**foster** 120:10
**fought** 120:6,7
**found** 55:6,7 136:16
151:7 153:23 168:9
**four** 82:15 107:9
119:12 132:22
133:1,5 135:25
**fourth** 40:6
**fox** 3:1
**fragment** 187:18
**franchise** 48:8
**frank** 126:23
**frankel** 4:1
**frankly** 33:24 50:11
54:23 108:8 128:19
177:6 185:6 187:9
**fraud** 34:1 53:21
157:24 158:5,14,22
**fraudulent** 53:22,23
79:15 80:4 93:13
94:7 182:8
**fredric** 11:1
**free** 17:14 30:9,12
31:5,17 47:11
112:10 113:13
114:7 115:9 148:1

**freelancing** 149:15
**fresh** 53:7 54:17
156:24
**fried** 126:23
**front** 51:4 99:4
122:17 129:18
181:23 187:8,20
**fruit** 22:13
**fulfill** 173:4
**fulfilled** 75:11
**full** 31:6 34:20
38:22 39:23 40:10
45:1 49:9 54:5
57:17 58:9 68:11
72:23 74:15 83:19
87:23 88:3,5 93:7
96:4 115:13 135:19
137:19 144:3,5
149:12 156:23
163:4 184:19
**fully** 38:8,13 63:17
70:13,20 75:7 85:8
100:18 108:3 124:3
**fun** 172:24,25
**function** 20:2
**functionally** 137:22
142:1
**functions** 156:13
**fund** 136:10 139:6
**fundamental** 53:7
68:13 140:17
**fundamentally** 56:1
111:9 182:15
**funded** 20:19 38:24
49:20 116:24 182:4
**funding** 144:14
**funds** 58:4 83:1
145:10,10,11
**further** 32:10 34:19
46:9 47:6 116:19
153:13 159:23
185:9 187:19
190:14
**futility** 142:12
**future** 1:4 5:7 7:14
41:12 42:24 43:25
44:1,3 59:10 65:20

70:5 83:1 131:24
132:3 134:14,22
136:4 138:13,22
139:18 140:7
141:20 143:24
180:7,17,19

**g**

**g** 10:14 12:1 64:7
65:3 66:2,6,7 136:1
136:7,18 137:1
138:1,9,13,14,23
139:1,7 140:8,8
141:2 180:24
**gadfly** 60:18
**game** 120:9 130:11
**gap** 111:20
**garner** 153:6
**garnered** 171:23
**garrison** 6:1 98:3
**gary** 126:22
**gas** 66:19 133:2
**gatekeeper** 113:4,5
113:6 147:19
**gatekeepers** 113:8
**geddes** 2:3
**gelston** 9:23
**gen** 35:13
**general** 65:19
113:21 132:19
135:9 164:4 166:3,7
173:5
**generally** 83:4
129:3 152:21
**generation** 65:10
**genesis** 156:4
**george** 131:7,20
**gerber** 60:8 126:2
189:4
**gerber's** 58:22
**getting** 14:7 32:1
56:3 58:10 86:5
88:17 96:3,3 104:24
106:11 107:3,8,21
110:3,12 114:22
121:24 123:9 127:9
170:18,24 171:11
173:8

**ghosts** 18:11
**gilstrap** 9:24
**gitlin** 9:1,4 191:6,7
191:8,8,12 192:8
**give** 39:11,12,20
40:4,13,19 42:14
54:1 62:18 63:23
88:9,13,16 105:8
146:13 148:5
156:24 164:12
188:3
**given** 18:9 23:11
29:9 51:17 87:3,19
98:4 137:2 138:4
155:11
**gives** 84:10 163:18
**giving** 34:16 40:22
41:6 53:13 86:5,6,7
176:20 187:3
**global** 54:5 81:16
156:19 157:6
166:10 168:9
**gloss** 55:25
**gluckstein** 105:5
**glueckstein** 7:22
**go** 34:21 36:3 37:14
41:7 42:15 43:5
52:19 54:4 55:1
62:20,21 66:5 74:6
90:4 93:11 101:13
101:24 102:25
107:9,14 108:12
115:7 117:14 118:3
126:4,14 127:12
129:10 130:13,15
147:3 152:1 176:1
177:20 180:21
189:6 190:17,19
**goal** 107:3 138:22
**goals** 118:13 148:17
191:3
**god** 50:22
**goes** 22:10 32:16
34:7 47:10 107:12
126:2,7 149:11
174:11

**going** 19:4,9,12
 22:17 24:9 26:7
 31:12 34:22 36:12
 43:12,18 44:19,24
 49:6 50:12 52:13,19
 54:15 56:20 57:16
 58:9 62:12 63:23,24
 66:18 70:9 78:16
 82:4 83:11 86:7
 89:8 102:15,17
 104:21,22 107:12
 108:11 109:6,10,11
 111:17 112:9 113:1
 113:3,17 114:19
 115:7,13,14 118:3,4
 119:4,5,12,19,24
 124:8,15,25 126:10
 127:4 128:4,12
 130:11,12,12,13,19
 131:3 143:1 145:18
 145:22,24 147:2,2,3
 165:3 170:19
 171:23 172:20
 173:20,23 177:20
 177:24 178:23
 181:22 186:25
 188:16,23 190:8
 192:16
**goldman** 9:25 82:25
 88:23
**good** 12:3,6,19,20
 15:4 16:2,21 17:16
 18:1 19:22 21:23
 25:15 34:10 35:1
 44:19,22 45:4,7
 46:3 50:16 70:2
 75:15 82:3 90:1
 98:7 104:8 106:20
 107:24 120:4,20
 123:23 126:22
 130:10,24,25
 146:10 157:2 191:7
**gored** 61:25 114:16
 114:23
**goren** 104:9
**gostin** 10:1

**gotten** 12:12 20:10
 27:1 103:10,21
 105:22
**govern** 147:23
**governance** 22:10
 22:14,14,20,23 24:8
 28:13 46:2 71:8
**governed** 56:20
 160:12 161:7
**governing** 19:5
 91:14,19
**governs** 89:11
 136:4 166:7
**grabbed** 149:12
**grace** 15:4,4,17
**grant** 151:5
**granted** 153:15
**granting** 24:3 58:17
 133:21
**grappling** 18:11
**grateful** 146:23
**gratitude** 100:6
 146:20
**great** 19:3 20:21
 29:20 46:21 75:18
 79:17 98:7 108:5
 118:8 120:18
**greatest** 185:1
**grey** 183:4
**grief** 12:13
**gringer** 10:2
**gross** 50:17 51:20
 52:1,20 53:4,17,19
 157:24 158:6,12,15
 158:22
**grossman** 139:3,25
 140:1
**grossman's** 180:15
 180:17
**ground** 28:9 33:19
**groundwork** 41:18
**group** 3:2 8:19
 20:18 47:2 48:4
 59:18 105:11,14
 106:17 107:25
 109:13,14 111:3
 114:23 116:15

 120:23 159:9 190:5
**groups** 20:16 26:14
 81:25 87:1 106:12
 106:13,13 115:24
 116:14 160:14
**group's** 108:22
 109:16
**guarantee** 46:24
**guess** 44:8 60:24
 64:2 116:14 170:8
**guided** 154:18
**guiney** 10:3
**guys** 13:3

**h**

**h** 3:24 4:9 7:17
**hacker** 69:12
**hahm** 10:4
**half** 45:2 70:8
**hall** 106:24
**hallmarks** 155:17
**hallway** 145:20
**hampered** 175:19
**hand** 56:15,16
 82:10
**handed** 166:16,18
**handful** 21:20
**handle** 23:12
**hanover** 68:6
**happen** 14:21 30:5
 99:5 122:23 170:20
**happened** 45:14
 49:11 65:22 67:17
 120:15 126:6
**happening** 110:25
 128:14 172:22
**happens** 48:18
 176:19
**happy** 97:6 104:12
 105:2 127:3 172:23
**harbor** 21:11
**hard** 17:11 67:4
 81:23 120:25
 122:18 125:10
**hardest** 146:17
**hardship** 51:11
**harken** 24:10

**harmed** 92:20
**harold** 10:7
**harrison** 3:21
**harvey** 3:21
**hashed** 174:18
**hats** 106:21
**haven't** 44:6 108:24
 190:12
**head** 18:3 120:20
 153:9
**headquarters** 77:22
**health** 148:25 156:4
**hear** 15:25 27:15
 39:11 56:17 63:11
 123:3 129:23,23,24
 129:25 130:5
 145:18 178:23
**heard** 15:3 23:18
 25:19 31:3,6 32:25
 42:6 69:20 75:18
 77:1 78:20 79:20
 80:5,16 85:15,16
 88:21,24 92:17
 95:25 98:6 99:3,9
 125:5,18 131:1
 133:1 136:1,2
 143:11 181:25,25
 184:6 191:6
**hearing** 72:8 106:20
 112:2 116:1 117:24
 120:3 127:9 145:24
 160:20 191:2
**hearings** 12:11
 118:6
**heart** 57:6 148:10
**heated** 27:17 78:4
**heavily** 53:3 56:11
 164:15
**heavy** 56:25
**hebbein** 2:22
**heebie** 37:12
**heightened** 28:15
 28:19,24
**heirs** 132:14
**held** 77:2 108:18
 150:14 151:14
 152:21

**help** 22:7 50:22
57:7 106:1,1,1,2
154:9
**helpful** 16:18 24:11
57:15 60:18,21,23
107:21
**helping** 56:12
**here's** 172:19
**herring** 10:5
**he's** 179:5 185:6,8
**high** 18:2,18 142:21
**higher** 36:17 37:9
**highlight** 74:1,3
**highly** 120:1 186:17
**hinges** 98:22
**hint** 93:12
**hired** 115:7
**hiring** 24:15
**historical** 49:18
64:24 80:9
**historically** 64:23
**history** 65:5 134:19
**hit** 127:10
**hmm** 170:22 171:5
172:8 173:3
**hoc** 3:2 6:2 8:12,19
13:12 20:16 98:3
100:2,13 105:10,14
106:12,17 107:25
108:22 109:13
115:23 116:3,11,14
116:15 140:4 159:9
160:14 176:4 190:5
**hogan** 3:8,11 130:6
130:12,24,25 131:3
136:20,23 143:3
145:17 178:13
179:17 181:1,6,11
182:19
**hogan's** 130:13
**hogan's** 178:11
**hold** 63:14
**holder** 116:25
127:24
**holders** 20:11,18
55:5 65:14 86:11
135:10 150:6 152:3

152:8,11,12 153:2,3
153:4,5 183:18
**holding** 7:14 143:19
150:13 151:1
**holdings** 1:4 5:7
70:5 83:2,3,20
87:24 88:11 94:16
94:18,19 133:2
150:17,23 151:2
**holds** 56:9 73:2
147:18 186:12
**home** 124:24 132:1
132:14
**hon** 1:21
**honor** 12:7,9,13,19
12:23 13:5,9,18
14:5,23 15:4,15
16:1,2,6,21,23 17:2
17:9,15,16,22,23
18:10,19 19:3 20:1
20:5,21,23 21:17
22:1,9,17 23:9,18
23:24 24:8,24 25:7
25:16,18,22,23 28:1
28:4 29:8,13,23
30:8 31:4,23,24
33:3,9 34:6 35:3,15
36:24 38:21 39:7
41:1 42:6,12,16
43:4 44:11,14,22
45:2 46:6 47:12
48:13 49:1 50:13,15
52:7,15,19,21 53:14
55:11,21 57:6,12
58:10 59:4,5 60:7
60:24,25 61:3,21
62:11,16 63:3 64:5
64:16,24 65:12 66:2
66:3 67:6 68:2,9,18
69:15 70:2,7,14,25
71:4,15 72:1,3,7,14
72:15 73:20,25 74:8
75:5,13,15,18 76:10
79:20 81:9 82:1,3,9
94:8 96:12,15 97:2
97:3 98:1,6,14
100:4,8,11,13,18,24

101:10,14,16,24
102:4,21 103:5,8,24
104:4,8 107:21,24
112:24 113:1 114:3
122:17,18 123:5,6
123:23 124:24
125:1,3 126:18,22
126:23 127:15
129:2,10,20 130:10
130:22,25 131:6
133:12 135:23
136:10 137:1 139:4
140:14 143:16
145:16 146:3,8,10
146:20,24 147:1
151:19 166:15,19
166:23 167:5
169:11 172:24
176:21,23 177:16
177:23,24 178:6,7
178:23 179:8,17,24
180:2,8,21 181:1,3
181:11,15,23 182:3
182:6,14,16,19,22
182:23 184:20,21
185:11,13,23
186:16,25 187:16
188:11 189:2,14,23
190:3,4,9,11 191:6
191:9,10,14,19,22
191:25 192:6,19
**honor's** 55:4 71:6
97:6 127:9 128:22
166:17
**honor's** 106:1
**hook** 43:25 75:2
86:18
**hoops** 61:4 189:7
**hope** 17:14 99:17
100:14 108:2
177:22 178:2
**hopefully** 56:17
130:3 191:12
**horowitz** 22:8
**horse** 71:21
**horton** 72:9 93:2
184:6

**hose** 148:20
**hour** 45:2 124:6
**hours** 54:24
**house** 188:8,9
**housekeeping** 16:4
**howard** 2:17
**hsr** 110:1
**hugely** 80:14,21
**hugh** 75:17 105:1
**huh** 171:8
**hundred** 17:9 20:18
20:20 22:4 23:13
39:3
**hundreds** 40:16
63:8 142:16,20
**hunt** 47:4
**hunts** 47:1,3 48:5
**hurdles** 105:15
**husband** 131:20,25
**husband's** 131:21
**husnick** 3:17 12:8
12:12,17,19,21,21
13:2,4 14:5 15:18
16:1 177:24 178:5,6
**hustings** 26:13
**huston** 7:17
**hwangpo** 10:6
**hyde** 1:25 193:3,8

**i**

**i.e.** 43:25
**idea** 27:21 188:19
**identical** 19:21
**identification** 24:22
**identified** 33:16
40:12 59:17 63:13
64:21 93:18 153:14
**identifies** 30:25
**identify** 25:24
**illness** 132:6 133:25
134:14 135:8
137:13,15,24
138:22
**illnesses** 134:6
136:7 139:5 142:13
**imagine** 111:6
**imbibing** 83:23

immunity 151:6,6
impact 58:8,16,18
73:22
impacted 45:8
impair 139:15
impaired 137:22
impairing 107:3
impairment 44:20
50:14 51:4 58:13
128:6
impartial 147:20
impasse 71:24 72:2
impeding 118:20
impermissible
179:4,10
implement 57:7
76:15
implemented 41:19
71:8
implicate 95:19
101:13
implicated 101:25
102:10,24
implicating 102:7
implication 151:22
implies 151:9
imply 151:4
importance 42:13
42:13
important 14:8
30:19 38:2 39:19
42:1 48:8 53:4 54:4
54:24 81:17 98:19
99:10 100:23
101:10 129:14
141:1 157:5
importantly 12:10
16:20 56:1 107:15
148:24 157:21
160:5
imposed 160:9
163:6
imposes 160:17
impositions 17:6
impossibility
142:10

impossible 46:15
99:25 139:10
142:19
improper 113:18
176:22
improperly 70:16
improve 22:25
imputed 40:14
inadequate 22:4
145:12
inappropriate 17:7
40:24 119:23
182:12
inarticulate 118:12
incentive 47:13,19
inchoate 21:4
incident 149:4
inclined 97:3,6
include 16:11 52:25
98:22 112:15 115:9
139:11 154:1
157:25 158:22
167:7,14
included 24:7 60:3
74:11 77:1 92:24
117:1 123:14
126:24 133:16
140:6 163:22
167:18
includes 125:12
135:10 161:8
including 23:6
29:14 32:9 47:22
80:19 84:25 89:5
90:22 93:22 96:9
98:23 112:3,7
125:11 134:5,23
135:2,5 150:19
152:20 154:23
156:17 159:5
160:13,19 189:4
incompetent 142:1
incomplete 22:14
22:15
inconsistent 112:16
112:21,23

incorporated 60:3
70:22 71:16 72:24
78:8 179:11
incorrect 164:19
181:9
increased 22:22
93:5 149:15
incredible 48:18
107:1
incredibly 118:12
incurred 112:13
159:13 183:16
indemnification
39:1 54:12 87:8,12
87:14,17 95:7 96:9
indemnity 51:2
87:5,7,9
indenture 2:4,20
3:22 4:2,17 5:2,12
5:17 123:6 167:20
indentured 20:17
59:19 123:12
152:14 160:14,24
161:9 169:7 182:23
183:2,7,17 184:1,5
184:12
independence
32:21 78:18
independent 18:12
19:11 26:3 27:22
42:10 45:22 46:10
75:7,9,21 77:9,15
84:5 184:18
independently 33:4
indianapolis 46:13
151:16 158:3
indicate 177:2
indicated 153:24
169:14 171:16
176:7
indicates 50:6
indication 171:22
indirect 152:3
indiscernible
114:10 149:11
indispensable 56:2

individual 26:22
71:11 131:9 132:22
142:20 160:15
162:16
individuals 136:8
137:12 138:15,25
139:11,12,15,22
142:22
industries 168:9
inefficiency 185:9
188:13 189:16
inequitable 168:20
inexclusive 58:24
infeasible 64:12
infirmities 182:16
influence 152:20
influenced 70:16
inform 143:4,6
information 135:21
173:17
informed 15:19
70:13,21 75:7
infuse 116:4,12
inherent 148:2
initial 24:7 119:22
initially 143:22
initiated 90:20
initiative 60:2
injunction 65:4
66:2,7 181:13
injunctions 138:1
138:10
injuries 136:14
138:22 139:9 141:3
injury 134:2,13
136:15 139:10
140:11 141:1,18
142:25
inner 143:20
innumerable 121:6
inordinate 51:12
input 26:14 75:8
inside 38:14
insight 46:24
insist 42:9
insofar 52:14
151:12

**insolvent** 92:9,15
**instance** 29:4 33:4
  53:17 59:4,18 166:4
  180:3
**instances** 98:8
  116:11 141:9
**instrument** 91:17
**integral** 149:17
**integrated** 81:10
**integrity** 21:16
  27:23 70:12 72:12
  147:11 148:12,15
  149:16,19,23 185:9
  186:20
**intellectually**
  128:20
**intend** 192:12
**intended** 124:13
  143:5,22
**intending** 141:17
**intense** 63:9
**intentional** 186:24
**inter** 21:1,2 23:25
  64:10 71:2 74:23
  75:1
**intercompany** 21:7
  21:18 23:14 24:6
  25:25 29:4,8 43:17
  66:15,19 77:1,4
  78:12,13 79:14
  143:17,20 144:4,6
  144:19
**intercreditor** 99:14
**interest** 28:11 29:9
  38:20 40:9 69:2
  70:17 74:16 79:13
  79:16,21 81:1,21
  89:18,19,21,23
  90:12 128:24 129:6
  131:5,7,19 133:5
  142:3 147:15,17
  168:13,19 183:23
**interested** 25:5
  89:17 90:9 133:18
  140:20 147:25
**interests** 22:2 71:11
  128:18,21 142:7

149:25 161:20
**intermediate** 7:14
**interpretation**
  29:18 78:24 148:5
  166:7 180:13
**interpreted** 151:4
**interrupted** 181:1
**interviews** 149:14
**intimately** 57:4
**intra** 21:8 43:22
**intro** 117:25
**introduce** 12:12
**inundate** 17:24
**investigate** 25:25
**investigated** 23:25
  26:24 35:24
**investigating** 25:21
**investigation** 24:9
  24:19 25:18 37:25
  84:18 85:5,8 149:2
**investigations**
  24:13 84:5
**investing** 25:5
**investment** 45:12
**investors** 48:4
  83:17 166:13
**invite** 104:1
**invocation** 23:15
**invoice** 183:13
**invoices** 110:7
**invoke** 23:22
  188:14
**invoked** 164:20
**involved** 29:7 56:12
  57:1,4 148:8 173:20
  186:17
**involvement** 97:12
**involves** 18:8 34:1
**involving** 89:16
**irony** 108:14
**irreconcilable**
  133:9
**irrelevant** 181:14
  182:1 192:5
**irs** 110:2
**isley** 10:1

**isn't** 170:10,10
  173:22 188:6
**issue** 15:14 22:6
  24:2,9 30:6,9 31:4
  35:5 47:9 49:2 51:7
  54:24,24 57:13
  61:19 66:1,22 68:25
  69:11 79:2 83:7
  85:14 91:6,7 100:17
  114:6,6 123:15,19
  124:8 127:2 128:5
  140:14,15,16
  145:20 147:5
  150:24 162:24
  164:6 166:1 168:2,5
  169:17 174:6,18
  175:20 178:21
  186:2 190:17
**issued** 133:20
**issues** 19:20,20
  23:13 30:3 37:21
  39:10 41:24,24
  43:11 44:20 51:5
  64:6 75:24 99:21
  100:16 103:13,16
  109:12 113:12
  134:22 157:6
  159:15 178:9 179:6
  179:9,15 180:11
  184:9,24
**it'd** 128:25
**it'll** 78:17
**item** 12:16 13:8
**items** 12:10 44:17
  112:4
**it's** 28:9 29:10
  31:20 33:1,15 35:7
  35:9 38:2,3,3,14
  40:17,18,18 41:2
  45:4 46:15,17 48:7
  49:3,14,15,22,23
  50:7,12,20 98:5,15
  98:21 100:22
  101:15,19,22,23,23
  102:1,5 106:25
  107:5,6 108:8,23
  109:3 110:1,2

111:12 171:1
  172:17,25 173:25
  174:1,9,10 175:10
  175:20 176:21
  180:16,17 181:17
  184:19 187:6,10,14
  188:6 189:9 190:8
**i'd** 105:8 178:21
  179:8 182:25
  189:18
**i'll** 28:16 41:16
  43:23 44:9 46:8
  49:18 50:9 100:13
  103:8 111:15
  179:14 184:23
**i'm** 32:25 36:25
  43:12 49:8 69:20
  104:12,21 108:1,11
  108:21 170:14,14
  171:18 172:20
  173:23 176:9,13
  177:6,7 186:25
  188:1 189:23,25
  191:4,12
**i've** 42:7 108:5
  192:15

**j**

**j** 3:17 6:18 8:16
**jabbed** 50:5
**jacob** 6:5
**jake** 98:3
**james** 4:16
**january** 71:16
  72:16 133:20 179:1
**jason** 6:24
**jeebies** 37:12
**jeff** 100:11
**jeffrey** 2:11 3:6
  10:24
**jeremy** 6:12
**job** 17:12 26:6
  63:10,11 106:22
  117:11 154:13
  173:5 175:11
**jobs** 154:11
**john** 3:5

**join** 100:4
**joinder** 134:24
**joined** 105:3 131:14
**joining** 105:23
127:11
**joint** 16:5 57:2
70:25 104:14
157:13
**jointly** 1:5 86:25
87:1 132:23
**jonas** 2:11 100:10
100:11,11 104:3,6
104:13 106:10,16
112:14 124:9
171:16
**jonas'** 106:7
**jonathan** 2:12
**jones** 5:11,14
**joseph** 7:17
**joshua** 4:4
**jr** 7:17
**judge** 1:22 33:2
49:23 50:17 58:22
60:8 126:1,5,7
138:18 139:2
147:18 150:8,13,17
150:21 151:1,16
166:21,22 167:6,21
168:1,8,24 183:4
189:4
**judges** 125:24
**judgment** 43:2
78:15 184:19
**julia** 3:19
**july** 110:8,11 116:9
133:14 134:19
179:2
**jump** 39:1 61:3
**june** 69:14 73:24
74:19 116:1
**junior** 41:12
**juniors** 21:3
**jurisdiction** 142:23
**jury** 142:16,23
**justice** 8:1 14:12
15:6 40:18

**justifies** 80:1,2
**justify** 38:15

**k**

**k** 3:11 6:17 8:22
10:5,13
**kaplan** 10:7 126:22
126:23 127:7
129:22
**katz** 8:6 82:24
**keenly** 72:18,18
**keep** 41:15 49:12
63:11 105:5
**keeps** 33:19
**keglevic** 30:14,25
31:10 32:21 35:19
38:1 42:2 45:21
47:4,20,24 48:5,14
72:9 97:16 129:16
144:8 156:17,22
157:16
**keglevic's** 73:21
157:15
**keglevich's** 106:2
**keglevic's** 49:8
**keglovic's** 66:23
**kenneth** 10:12
**kent** 9:16
**kept** 68:18
**kevin** 11:6
**key** 13:14 18:5,19
29:14 72:9 124:12
124:13 154:8 155:9
**kick** 33:5 41:5
**kieselstein** 3:18
12:6,7,15 16:21,22
17:13 18:24 19:3
20:5 36:5,8,11,16
36:19,22 37:3,5,8
37:11 44:14 50:3,9
52:6,11,13,18 58:15
61:13,16 62:19,22
63:2 68:1 69:19
70:7 72:3 75:19
82:12,15,17,21 86:8
88:6,8,10 93:20
106:8,9 109:21
114:11 124:9 125:8

126:1 153:21
164:24 177:1,19,22
178:3 184:21,21
189:25 190:3
**kieselstein's** 83:13
146:14
**kind** 14:22 17:1
29:14 33:13 60:4
91:8 95:18 96:2
113:5 122:12 132:3
177:7
**kinskey** 10:8
**kirkland** 3:13 12:8
12:21 16:3 85:21
106:3
**kissel** 7:1
**kkr** 88:23
**klauder** 5:9
**klehr** 3:21
**kleinhaus** 8:9 39:12
82:3,4,8,23,23
84:15 94:14 96:20
96:22,24 97:1,21
153:24
**kleinhaus's** 169:14
**know** 14:25 17:5,8
17:18 19:5 21:25
22:10 24:18 31:25
34:11 37:6 38:4
39:21 40:4,6,14
41:2,23 47:1,10
53:3,22 54:13 55:21
56:9,22 57:13,19,25
58:19,21 60:7,15,24
61:25 62:11 63:2,10
66:20,25 68:2 79:15
80:24 102:4 107:11
108:3 110:4 114:22
115:21 118:21
122:18 123:1,25
126:5 127:1,7,24
128:22 129:5 134:1
136:1 138:16
139:13 141:5
170:17,19 172:14
173:7 174:3,9
177:11,14 185:1

188:13,17 192:16
**knowledge** 52:23
72:12
**known** 47:5 71:3
89:24 119:10
**knows** 29:8 31:11
64:21 108:2 113:12
119:12
**kohlberg** 82:24
**kornberg** 6:6 97:23
98:1,2 107:10
124:19
**kornberg's** 104:15
104:23
**koster** 10:9
**kotwick** 7:5
**kovensky** 10:10
**kramer** 4:1
**kravis** 82:24
**kunofsky** 10:11

**l**

**l** 2:11 3:5 8:4 9:7,11
10:7,21
**lack** 14:7 31:15
46:14 52:11 64:7
67:12 88:19 94:9
158:12
**ladder** 148:14
**laid** 37:3 41:18
107:13 191:18
**lane** 126:7
**language** 50:18
54:25 86:20 95:8
125:23 186:4 189:4
**lardner** 2:19
**large** 18:10 34:8
35:12 42:19 53:12
53:25 67:14 91:1
99:15,18 101:3
125:11 144:16
145:2 148:6 149:25
164:6 174:4 188:2
**largely** 103:14
**larger** 88:1
**largest** 97:24
127:24

lars 10:17
lastly 103:8 129:8
  168:24
late 12:5,23,24 13:1
  13:3 67:12 122:11
lately 122:17
latent 137:24
laughter 84:14
  97:25
launch 12:9 16:23
laura 5:14
lauria 8:15 42:8
  81:6 105:17 106:5
  106:22 107:5 108:2
  119:14
laurie 48:13
law 4:17 5:17 28:2
  32:11 35:9 52:6,7
  53:18 54:13 55:5,6
  55:7,10 58:16 60:6
  91:2,7,11,12 92:4,6
  102:5,22 123:24
  146:17 147:20
  148:1 152:17
  155:16 158:16
  163:9 165:25
  180:13,14 182:5,7
  182:11 185:8 186:6
laws 91:12 191:13
lawyer 120:18
  188:5
lawyers 25:15 37:6
  37:7 113:7 170:21
  170:23 180:4
lay 13:16 28:2
  112:11,14
layer 102:16
layered 181:25
laying 33:15
lays 37:13 137:4
layton 6:20
lazard 105:12
lbo 24:17 29:23
  30:1 73:13 84:22,23
  92:11
ldo 73:11

lead 162:20
leader 149:6
leading 74:22 93:5
  183:24
leads 180:11,12
  181:10,24
learned 143:19
leave 139:16 169:1
leaving 110:5
led 23:16 27:4 30:9
  115:21
ledanski 1:25 193:3
  193:8
ledger 88:15
lee 7:13
left 84:17 105:4
  139:19 177:21
legacy 21:25 24:14
  24:17 25:18 73:3
  77:8 85:6 135:9
  136:6
legal 44:23 89:10
  92:14 122:9 134:21
  152:17 160:5 164:6
  164:19 177:12
  187:17 193:20
legion 21:18
legitimate 118:23
  142:9
legitimately 115:18
legs 32:15
lehman 58:23 126:5
  162:3,9,19,23,24
lemisch 3:24
lender 173:8 190:22
lenders 34:12 36:15
  41:10,12,13
lending 79:18
length 24:1 27:10
  33:23
lengthy 179:6
leslie 1:24
letter 35:9 56:19
letters 24:22 33:11
  128:15,16
let's 30:13 46:5
  106:23 109:9 110:8

level 18:2,19 20:13
  59:10 90:19 119:7
  144:23 154:7,17
  178:19
leverage 30:19
leveraged 77:19
  80:17
levin 4:1
liabilities 21:25
  43:19 49:16 64:12
  64:17 65:8,10,21,21
  135:5,5,12,16 138:9
  142:18 144:15,16
  180:17,19
liability 24:14 32:13
  65:6 80:23 85:2
  89:1 90:16,19,24
  92:12,20,24 93:11
  144:15 156:10
liable 91:15,15
liberda 134:20,20
lien 2:4,9 4:2 5:12
  6:2 7:2 8:13 13:12
  21:3 24:19 25:17
  34:12 36:15,22,23
  41:10,13 49:15
  69:13 98:4 100:2,12
  109:13 159:7,9
  183:18
liens 22:2 50:24
  100:18 120:7,12
  127:24,25 159:7
lieutenant 149:5
life 44:6 110:2
  148:17
light 15:21 94:8
  164:8
likelihood 181:22
likewise 33:3 90:25
  94:1 151:16 154:1
  154:15 157:15
  161:3 168:14
limit 161:16
limitation 16:16
  138:10
limitations 80:20
  84:21 163:6

limited 57:10 64:18
  70:19 83:2 150:10
  151:5,18
line 32:2 55:4 60:5
  74:1 107:3 113:1,2
  148:20 149:16
  175:10 185:7 186:7
  189:17
lined 20:9
liners 118:9
lingering 157:8
lipton 8:6 82:4,24
liquidate 142:21
liquidated 43:20
liquidation 69:3
liquidity 93:1,11
list 16:13 41:8 56:5
  104:22 155:6
  158:24
listed 57:19
listen 192:16
listening 192:15
lists 68:18 112:3
  128:8
literally 25:3 63:8
  77:11 78:3,11 118:6
litigate 30:6,7
litigated 53:3 79:2
  181:20 184:10
litigating 128:13
litigation 24:22
  31:21 33:11 34:19
  35:17,21,24 42:24
  45:1 50:12 54:15
  75:3 80:21 125:13
  156:25 157:1
  183:22 187:24
litigations 73:8
litigator 85:10
  108:9
little 12:4 18:8
  19:19 28:1 46:9
  64:25 67:11 73:22
  86:7 98:16 119:1
  133:12 134:19
  147:1 156:6 174:11
  187:19 192:13

**live**  18:20 20:22
    41:3 46:7 71:23
**lived**  131:24
**lives**  148:25 149:3
**llc**  7:15 9:1 133:2
**llp**  2:8,14,19 3:1,13
    3:21 4:1,6,11,16,22
    5:1,6 6:1,8,14 7:1,8
    7:19 8:11,18 82:25
    82:25
**loan**  29:4,8 173:8
**local**  132:24
**long**  27:6 46:22
    69:16 102:21
    104:22 136:6 188:6
    190:11
**longer**  19:13 22:11
**longstanding**  55:6
**look**  58:22 59:11
    60:9,9,10,13 105:19
    113:2 116:22,23
    117:6 118:12 120:2
    173:15 174:21
    189:8
**looked**  31:1 105:16
**looking**  69:12
    113:22 127:18
    129:5 173:4 187:23
    189:12,19
**loophole**  53:6
**lose**  134:12
**losing**  21:16
**loss**  141:19
**lost**  120:9 148:24
    149:5
**lot**  26:1 35:19 54:15
    54:16 59:6 89:7
    95:21 98:20 99:3
    106:5 112:11 119:5
    120:24,25 122:17
    122:18 127:15
    128:10 129:12,12
    129:15 164:12
    174:4 180:12,13
**lots**  25:9 29:1 46:24
    51:12

**louis**  9:17
**low**  64:24
**lowenthal**  5:20
    123:23,24
**lower**  52:23 66:17
    168:5
**lowered**  73:23
**lowest**  28:6
**loyalty**  75:12 89:14
    91:2,5
**lsgt**  133:2,3
**luck**  120:24
**luckey**  10:15
**luminant**  35:13
    145:2
**lumped**  142:6
**lumping**  113:18
**lunches**  113:18
**luxembourg**  49:22

**m**

**m**  3:6,19 4:20 5:9
    6:24 9:18 10:1,23
    11:6
**m&a**  47:25
**ma'am**  15:3
**macdougall**  86:12
    93:2,25
**macdougall's**  97:9
**madron**  6:24
**magnitude**  142:17
**maiman**  10:12
**main**  148:17 190:11
**maintain**  148:12,15
    149:16,19 152:4
**maintaining**  119:6
    119:13
**maintenance**
    120:14
**major**  26:19 149:3
**majority**  18:10
    20:11 55:23 64:3
    90:3 101:5 106:17
**makeup**  116:22,23
**making**  38:17 56:3
    61:3 81:10 90:10
    111:10 121:7
    122:21 131:3

    164:25 170:20
    176:8 180:9 186:14
    190:16
**malane**  68:5
**malone**  10:13
**malpractice**  158:19
    187:17
**man**  12:14 57:14
    104:2 146:3 176:21
    176:22,23
**manage**  103:18
**managed**  92:24
**management**  32:5
    32:21 56:10 72:9
    81:24 85:2 86:15,21
    86:24,25 87:9 89:1
    90:16,19,24 92:12
    92:20 93:11 94:5
    95:6 156:13
**manager**  71:19
    75:17 93:23
**managers**  56:11
    71:10
**mandated**  140:23
**mandates**  137:20
**mandatory**  66:4
    138:13
**manifest**  139:5,16
    139:17 140:11
**manifestation**
    135:8 137:15
**manifested**  44:2,2
    50:11 64:9 66:11
    82:18 133:25 134:5
    136:8 137:13
    141:18 142:5,6
    144:25
**manifestly**  139:21
**manifests**  136:15
    139:10
**manner**  56:14
    119:17 120:22
**mantra**  143:10
**manufactured**
    64:18
**map**  49:21

**marathon**  18:4
**marc**  3:18 10:22
    184:21
**march**  47:8 74:5
    77:20,21,21,21 78:5
**marching**  32:24
    33:1
**maria**  9:13
**mark**  2:22 3:16
    4:14 6:17 7:5 9:15
    9:22 12:7,7 16:2,22
    70:4
**marked**  32:17,18
**market**  1:11 29:9
    31:12 38:7 48:19
**marketing**  45:20
    71:25 74:9
**marshall**  2:12
**martin**  19:4,12 28:2
    28:5,9,25 34:6
    35:15
**mary**  9:14
**mason**  10:14
**mass**  64:17
**massive**  21:25 85:8
    97:13
**massively**  93:5
**matches**  92:4
**material**  40:19
    49:23 50:12 75:1
    89:22
**materials**  16:5
**matter**  16:4 17:4
    23:12,12,16,21
    39:10 41:14 50:17
    50:18 57:8 78:9
    130:1 144:16
    145:19 146:1 148:6
    148:7,7 158:11
    163:7 178:1
**matters**  22:7 44:12
    76:12,12,14,25,25
    146:5 188:21
**matthew**  10:8,23
**maximize**  118:14
    118:18 185:16

maximizing 98:12
maximum 119:13
mayday 149:8,15
mccracken 4:11
mcdaniel 3:8
mcdowell 10:15
mcelroy 4:6
mckane 3:16 12:7
  16:2,3
mcneill 6:11
mean 29:3 65:21
  128:4,13 170:17,18
  183:22
meaningful 53:11
  56:6
meaningless 145:12
means 58:20 60:10
  87:22 102:2,10
  111:11,20 134:15
meant 24:12 27:20
  45:4 147:22
measure 53:12
mechanism 140:9
  145:9
media 167:6
mediated 22:7
mediation 98:9
meet 23:19 191:3,3
meetings 23:2,5
  24:15 25:9,11,14
  63:8 77:11,22 85:17
  121:4 157:13,13
  191:21
meets 191:9
mega 63:5,5
meggie 9:24
member 87:1
  150:24
members 88:22
  90:4 91:17 131:8
  132:13,15 141:19
  150:12 151:6,7
  159:8,9 162:4,16
memorandum 84:8
  84:10 93:22
mendelsohn 29:11
  79:21

mention 124:14
mentioned 104:24
  106:8 124:19 125:4
  143:17 158:13
  187:17
mercifully 50:14
meredith 10:19
merely 23:4 38:2,3
  54:2 73:1 142:6
  151:13 153:14
merger 21:13 40:5
  42:2,15 56:8 57:19
  62:13 109:19,22
  110:1 154:16
  164:16
merit 22:19
merits 78:11 110:16
  179:9 182:15
mesothelioma
  132:12
message 126:16
met 18:5,13,16 71:1
  77:5,6,7 117:19
  118:1 125:9 160:18
  161:21
method 58:24
michael 9:21 11:5
midsized 21:23
midway 188:13
might've 104:24
miller 4:20 104:7,8
  104:9,19,21,23
  107:19,20,22
million 13:20,25
  22:4,6 25:20 29:6
  29:16 31:20 36:3,6
  39:14 41:11 49:23
  50:7 59:20 65:5,6,7
  67:2,2,3 73:5,18
  74:2,4,4,13,17
  78:22 79:5,25,25
  80:2,11,11,13 82:14
  83:19 86:14,15,18
  87:2,3,23 94:18
  95:6,13,24,24 101:4
  110:22 111:4 119:2
  127:19,22 144:14

145:3 167:8 169:15
  183:10
millions 25:20,20
  40:16
millstone 38:9
mind 82:10 145:22
mindful 124:5
  125:1
mineola 193:23
minimal 35:4
minute 54:22 55:19
  57:14 65:1 78:16
  105:8 124:15
  189:24
minutes 22:9 69:22
  75:22 90:18,20
  124:7 177:20
  189:23
miracle 107:2
mischief 162:20
misconduct 51:21
  52:1 91:23 157:24
  158:5,15,23 186:18
  186:25
mission 62:2 119:3
  147:9,10
mistakes 180:3
misunderstanding
  68:13
mitigates 99:6
mm 170:22 171:5
  172:8 173:3
modifications 39:5
mofo's 105:12
moment 29:3 51:22
  71:4 72:6
moment's 63:9
momentarily 49:18
  159:15
monetary 91:18
money 30:11 79:18
  107:6 117:12,13
  119:5 125:7 134:13
  148:7 165:4,5,9
  166:13
monger 85:23

monies 107:7
  134:16
monster 109:5,5
montgomery 4:11
month 17:23 36:6
  106:19
months 31:12 34:25
  73:6 99:8 100:7
  107:9 108:14 122:1
  122:1
monty 106:24
monumental 37:17
moot 181:14
morgan 8:22 10:16
morning 12:4,6,19
  12:20 13:7 15:4
  16:2,21 43:10 70:2
morris 4:16
morrison 104:9
motion 25:22 70:25
  117:21 131:10,17
  133:15,17 134:20
  134:24 135:1 136:3
  178:10 179:11
  182:20 192:11
motions 190:25
motivation 118:16
motives 70:12
mouth 107:7
move 41:1 44:11
  94:11
moved 110:10
moving 178:21
  179:13 180:2
multiplicity 19:10
multitude 142:22
mulvaney 4:6
munger 4:22 75:16
murin 1:24
mutual 150:9,14,22
  150:23 151:11
  155:23 156:5 158:2

**n**

n 2:1 12:1 193:1
n.a. 3:22
naftalis 4:1

**named** 153:14
**narrowed** 19:19
99:22
**natasha** 10:6
**national** 67:8
**natural** 145:2
**nature** 22:19 27:17
29:2 33:20 42:7
44:7 98:4 121:19
164:7 175:25
181:12
**naïve** 118:19
**near** 99:25 148:10
**nearly** 34:19
**necessarily** 53:3
76:15 138:8 153:11
171:11 174:9 175:5
**necessary** 16:8,20
40:17 57:7 88:8
118:1 121:12
133:14 147:24
151:23 152:16
156:9 160:22
161:13 162:15
184:6
**necessity** 155:18
**neck** 38:9 177:25
**necks** 33:4
**ned** 7:11
**need** 17:2 37:15
95:19 104:3 110:19
126:14 129:10
133:11 138:8
145:25 148:12
154:1 176:18 184:8
184:9 190:6
**needed** 27:13,18
67:1 106:5 126:13
184:7
**needing** 127:12
181:12,12
**needs** 38:13 42:9
51:20 54:17 57:5
121:9 153:17
184:13,17
**negative** 151:22
190:21

**negligence** 51:20
52:1,20 53:5,17,19
157:24 158:6,15,23
**negotiate** 25:25
77:24 188:7
**negotiated** 23:25
39:6 50:19 164:16
**negotiating** 97:10
108:15
**negotiation** 26:7,20
27:7,9 32:18 56:25
73:16
**negotiations** 27:5
27:19 28:18 30:20
75:21 78:1,4 96:5
98:8 164:11 166:10
**neither** 21:9 90:7
**net** 115:8
**never** 32:3 44:16,17
45:14 63:5 64:18,19
76:17 99:17 104:1
105:22 109:6,7
113:6 115:8 119:21
158:18
**nevertheless** 31:9
164:4
**new** 4:17 5:17 6:9
49:1,6 60:2,2,4 96:4
105:12 123:25
156:24 165:5,8,10
165:11 190:25
**newspapers** 67:9
**nextera** 71:5 73:23
74:8,25 145:1
**night** 12:23,24,25
15:20 54:3 179:25
**nixon** 5:1
**nobody's** 58:10
96:7
**non** 23:2,4 24:15
25:2 42:21 55:13
63:5,15 64:1,2 84:4
85:16,25 138:4
150:15 154:22,23
154:25 155:3,4,11
155:11,14,17,23
156:7 181:23

191:17,18,24 192:4
**noodling** 105:14
**normal** 37:6,9
**north** 1:11 40:15
**nostalgically** 37:1
**note** 17:7 30:21
34:16 41:5 45:7
46:13 55:5 58:19
59:4 92:16 158:17
159:7 177:4,4
189:18
**noted** 19:6 20:6
31:11 33:12 34:14
34:24 35:7 39:15
47:4 48:6 52:21
59:6 64:25 95:5
114:11 151:3
**noteholders** 3:3
8:13,19 108:1
**notes** 69:13 73:3
79:14,14,22 124:2
159:6,8,11
**notice** 14:15 50:4
63:9 67:5,6,11,12
68:5 82:18 112:2
117:24 134:10
141:8,8,11 142:11
142:12 159:23
160:20 161:4
178:16,20 190:21
**noticed** 140:18
**notion** 28:15 32:16
47:7 59:14 92:19
**notwithstanding**
17:19 28:20 41:13
71:17 89:20 103:1
164:19 185:14
**november** 20:19
38:22 71:7,15 76:9
166:18
**number** 13:8 24:25
30:4 31:12 35:13
49:23 50:19 52:24
55:13 59:1,16 61:4
64:7,20,23 67:20,21
74:2,4 76:3,5,25
79:14 90:14 96:6

99:15 100:16 101:2
103:16 122:1
127:17 129:16
133:8 142:21 150:3
175:15,23
**numbers** 25:19 33:6
69:3
**numerous** 31:14
103:12
**ny** 193:23

**o**

**o** 1:20 12:1 193:1
**o'brien** 161:11
**o'clock** 130:14,15
130:19 145:18
**object** 16:11 51:23
67:10 94:25 96:1
160:3 174:15,25
175:9 178:15
**objected** 39:2 62:15
94:22 96:14 115:16
131:10 133:18
147:4 167:12
169:15 174:23
180:4 190:23
**objecting** 16:10
51:14,16 96:11
106:21 108:7
110:19 123:10
169:19,23,24
170:24
**objection** 14:13,14
15:10,23 41:3 43:6
43:8,9 44:5,6,8 46:7
51:15 52:9 53:15
62:23 63:20 64:8
65:12 66:8 68:7,21
68:23 69:2,5,9 71:1
83:12 94:23 101:25
108:10,11,13,18,22
110:3 111:10
124:11 131:16
150:18 152:7
167:23 169:20
174:13,14,24 175:1
175:5,7,12 178:11
178:19 179:10,20

182:17,24 184:5,16
objections  14:21
  18:10,11 19:6,13,16
  19:24 22:11 32:10
  43:4,15 44:21 51:4
  53:2 68:10 94:9
  107:17 131:4
  140:21 178:8,23
  179:13 181:11,14
  182:14
objectors  69:6
  72:22 129:24
objects  115:1
obligate  159:22
obligation  59:9
  86:23,24 161:25
obligations  22:2
  92:25 128:4 133:7
  163:5
observed  18:19,20
obstacles  92:14
obtain  98:25 99:2
  159:16
obtained  32:7 47:1
  48:1 75:8,9
obviated  19:9
obvious  25:15 42:23
  67:3
obviously  18:19
  19:15 20:11 21:19
  23:9,14 28:7 29:10
  29:24 33:19 41:22
  42:5 43:11 47:5
  48:9 49:3 50:15,25
  57:2 59:5,13 68:24
  103:3 106:13 107:5
  110:15 113:1 123:7
  127:14 140:16
  184:23 187:25
  189:20
occasions  133:8
occupants  148:25
occur  23:3,7 27:18
  30:12 31:17 47:8
occurred  56:21
  65:23 77:12

occurrence  79:10
october  156:22
  183:15
odd  132:22
oddly  169:16
odds  108:5
odyssey  48:7
offends  186:19
offered  121:22,23
office  95:1 105:12
  105:12 146:21
  185:2
officer  81:13 157:17
officer's  157:11
officers  21:5 33:14
  33:17,24 42:21
  51:25 62:24 63:4,16
  76:16,21 150:12
  152:21 156:2,6,7,11
  157:18,22 158:24
  186:22
offices  50:16
official  13:11 20:15
  104:10 105:11,14
  106:13,13 131:15
  150:24
oh  51:18 52:4 97:1
  167:4 176:19
  181:15
okay  15:16 17:13
  20:5 36:14,21 44:13
  52:12,19 64:1 69:18
  82:20,20,21,22
  94:13 96:23,23,24
  104:14 109:3
  129:23 130:17,20
  136:20 143:3
  166:24 167:4,5
  171:15 173:24
  175:3 191:11
old  47:10 96:4
  193:21
older  80:9
olson  4:22 75:16
omission  91:18
omissions  145:13

omnibus  131:16
onboard  60:11,23
once  14:21 23:24
  106:22 174:6,20
oncor  45:20 55:19
  55:22 56:2,9,19
  57:1,10 71:25 72:14
  73:24 93:4,8 154:6
  154:17 185:13
oncor's  154:15
ones  40:11 55:17
  56:16 165:8
ongoing  62:13
open  24:20 105:4
  128:5 184:18
opened  17:23 20:9
opening  18:2 19:5
  20:6 30:22 31:10
  93:15 125:3,4
  146:12 154:20
operate  56:9 188:25
operates  189:1
operating  34:3
operation  154:12
operational  156:13
operations  65:9
  135:13,17
operator  1:24
opinion  32:3 58:22
  62:3 79:23 133:21
  133:23 179:2
  180:23,23
opportunity  15:21
  41:21 59:8 81:8
  85:5 140:21 157:7
  160:3 161:20 173:6
opposed  35:24
  65:22 170:23
opposite  115:6
opposition  132:21
opt  14:18
optimistic  99:4
  107:8
option  14:22 47:11
  135:18
oral  178:10

order  14:10,24
  15:21,24 18:1 39:13
  39:22 42:1 47:17
  50:20 71:17,18 72:5
  82:5 120:2 134:4,21
  134:25 139:14
  140:9 148:17
  156:20 159:16,23
  179:3,8,12,21
  182:20
ordered  98:9
  132:23
ordering  114:3
orders  17:25 18:14
  18:22 23:10 32:24
  33:2
ordinarily  128:21
  129:7
ordinary  79:9
organization  91:15
  91:17
organizations  89:13
  90:6
organized  85:19
original  74:6
os  52:10 63:14,17
  186:15
ought  31:15 42:17
  51:19
outcome  30:24
  31:21 98:24
outcomes  31:22
outreach  26:17
outs  52:21 158:7
  187:10
outset  94:21 124:25
outside  59:15,22
  103:3 114:14
  119:23 121:16
  139:1 148:22 164:3
outstanding  51:4
  94:9 191:14
overall  96:12,13
  157:3 163:21
overcome  137:9
overly  138:3

**overruled** 63:20
66:8 68:8 69:5
107:18
**oversight** 160:6
165:18
**overstated** 165:2
**overview** 20:6
**overwhelmed** 47:21
**overwhelming**
28:12 53:8 54:6
57:9 61:24 63:3,21
72:4 75:5 83:21
97:4,17
**overwhelmingly**
31:20 38:23 42:17
68:24 110:14
114:25 124:17
**owe** 55:22 152:5,14
152:22 154:3
185:15,25
**owed** 117:15
**owner** 83:3 185:15
**owner's** 165:5
**owners** 91:17 165:8
165:10,11
**ownership** 94:17
**owns** 55:21
**ox** 61:25 114:15,22
**o'kelly** 5:6

**p**

**p** 2:1,1 10:3,16 12:1
**p.a.** 6:20
**pa** 2:3
**pachulski** 5:11
**package** 21:15
40:10 47:21 164:12
**page** 71:1 84:8,10
90:4 116:2 118:11
119:5 179:24
180:23,23
**pages** 25:20
**paid** 30:1,11 31:16
47:2 57:17,18,20,21
57:23,24 58:9,21
59:2,20 60:8,19
62:7,13 68:11 72:23
73:6 74:15 83:19

86:16 88:3,5 95:11
96:3,3 101:6,7
109:17,18 111:2
112:8,25 113:25
114:4,14 115:15
117:23 122:9
128:11 139:7
140:12 144:3,5
160:4 161:1 162:18
163:3,21 164:22
166:13 170:3,6,18
170:24 171:11
172:10 173:8
183:11 189:3,15
190:14,23
**painful** 27:10
**painfully** 50:19
**paper** 112:11
**papers** 44:8,18
102:18 112:15
162:3
**paragraph** 73:20
86:23 159:4
**parallel** 24:25
**paramount** 28:11
38:20
**parcel** 124:18
127:21
**parent** 143:25
144:23
**parents** 55:23
**parity** 119:9
**parse** 124:25
**parsed** 125:25
**part** 24:18 25:8
50:16 59:24 72:21
73:24 74:8 78:8,17
88:1,16 95:3 96:13
96:19 100:22 101:3
101:6,16,18,19,23
102:12 106:11,18
108:19 112:20
114:24 115:10
123:17,17 124:18
125:5 127:18,21
128:7 136:5 144:11
152:25 156:19

157:9 159:15
161:23 164:6,11,12
166:10 167:8 168:3
169:19 170:7,8,11
170:19 171:9,10
183:3,6,11,22,23
184:18
**partake** 40:1
**partial** 31:6 167:11
**participate** 65:18
66:13
**particular** 32:5
38:4 41:22 51:7
75:24 83:10 88:13
88:24 90:23 140:5
157:22 159:3 160:4
160:10 163:19
168:1 179:14
**particularly** 35:17
40:11 59:2 115:17
137:2,6
**parties** 16:10 24:23
41:6 54:21 57:20
59:9,16 60:16,22
61:4 62:16 64:4
81:21,21 98:22 99:1
106:4,6,12 107:6
115:6 123:9 133:18
140:20 146:21
147:25 149:24
150:2,3,7,14,20
153:11,11 154:2,2,4
155:6,21 156:1
157:21 158:8,24
159:25 161:19
164:17 165:13,22
166:20 169:13
170:5 171:10,25
172:6 174:2 177:5
178:12,14,16
185:25 186:20
**parties'** 41:19
**partner** 47:2 108:1
**partnership** 83:2
**parts** 141:10
**party** 13:11 32:7
33:16 40:1 51:18,23

51:24 52:3 53:10
62:24 63:18 86:21
117:19 153:13,16
153:17 154:24
155:2,8,14,23 156:5
160:10 161:5,5,24
162:6,24 163:1
175:6,9 178:19
186:22
**party's** 151:10
161:11,13
**party's** 99:7
**pass** 138:9,10 142:8
142:15
**passed** 34:25 58:2
141:2 143:12
**passing** 30:21 84:21
**path** 25:3 67:1
98:18 107:14
**paths** 59:1
**patience** 100:6
184:22
**patter** 55:20
**patterns** 60:13
**patterson** 5:16
123:24
**paucity** 34:5
**paul** 6:1 98:2
**pauline** 8:22
**pause** 109:12
**pay** 34:20 40:17
49:12 59:9 83:19
86:23 87:23,24
94:16,19 109:18
110:22 111:16
112:13 113:23
115:2 128:4 144:24
159:22 162:1,6,9,10
162:15 164:10
165:17 184:8
**payable** 49:17
101:12
**paying** 39:23 59:14
87:22 110:6,14
113:6
**payment** 13:20,25
14:1 43:12 44:25

50:25 57:18 58:10
67:1,1 69:13 79:4
93:7 100:20 102:13
103:23 108:16,19
108:22 109:24
110:4,13 111:19,25
112:13,19,22 113:4
114:21 115:10
117:22 118:25
123:11 126:25
135:18 136:14
137:19 139:8 145:4
159:2,5 160:19,19
161:11,15 162:5
163:13 164:8 165:9
165:22 169:2,8
184:12 188:22
189:6
payments  22:4 58:2
90:21 114:16
120:12 159:12,14
160:2,5,11 161:4,6
161:17,22 162:13
165:1,12
payout  54:5
payouts  49:19
50:13
pays  109:24 165:14
pc  7:13
peabody  5:1
peace  81:16 125:9
peacefully  21:12
peck  126:5
pedone  5:4 105:5
123:4,5,6,21 126:24
182:22,22
peg  9:10
pencil  109:1 172:16
pendency  140:20
pending  135:4
137:24
pennies  34:15
penny  109:17
people  16:11 31:7
37:10 53:12 54:1
55:16 61:3 62:3
63:10,12,16,24,25

64:1 86:10 99:4
105:23 108:24
109:4,8,12 110:14
113:16 115:8,19,20
116:16 117:9,12,15
120:23 121:6
133:24 136:11
140:12 165:3
173:16 185:24
187:2,8,13 188:16
189:9 190:14
191:21
percent  17:9 20:18
20:20,20 23:13 80:7
107:1 185:15
perfect  118:9
perfectly  54:19
187:3,6,14,23
perform  148:16
154:11
performance  90:11
performed  154:12
156:14
performing  157:18
period  14:16,18
25:7 84:20 94:3
136:6
periodically  179:21
perished  149:9,13
permissibility
184:12
permissible  155:8
155:17
permission  44:11
permissive  66:4
162:6
permit  124:23
permits  91:12
112:15 158:8
permitted  103:3
129:3 151:12
158:16 167:19
168:12
permitting  163:3
person  90:12 91:14
91:18,19

person's  91:19
personal  140:25
142:25
personnel  25:9 72:9
77:7 154:8
persons  140:10
141:17,18
perspective  28:7
29:3,21 31:22 35:2
59:7 75:22 133:14
143:13 154:12
pertinent  131:15
peter  6:18
peterson  10:17
petition  22:20 23:1
23:8 25:9,12 73:6
74:16 84:25 85:3,4
95:4,7,13,17,23
96:9 97:9,11 128:18
128:21,24 129:4
133:16,25 136:9,9
139:1,5,6 150:8
158:25 162:2 167:9
167:14,17,20,24
168:3,7,13,15,18,19
168:21,25 169:2
187:12 188:21,21
pfeffer  10:18
pfister  10:19
phantoms  54:2
philip  9:8
phillip  9:23
philosophical  63:22
phrase  18:8 47:10
185:20
phrasing  177:25
picked  21:16
piece  30:19 84:16
86:15 111:14
pieces  88:12 127:17
pik  20:11 50:18
pillars  99:10
place  23:24 42:10
55:24 59:23 67:14
92:3 99:20 100:1
109:9 111:4 129:14
147:19 182:2 184:7

plain  69:3
plaintiffs  49:4
64:13 65:13 179:23
182:18
plaintiffs'  180:4
plan  13:13,19,19,24
14:13,20 15:10
17:19 19:21 20:8,15
21:11,13 24:7 28:22
34:21 38:25 39:9,21
40:5,22,23 41:4,5
41:12,15,23 42:10
43:9,14,22,23 44:12
44:14,15,16,17,24
45:4,8,10,12,16
46:4 47:13 50:19
51:17,24 52:9 54:25
55:2 56:3,12,23
57:6,8,23,24,25
58:5 59:11,15,22
60:8 63:23 64:6
65:10 67:7,14 68:14
68:24,25 72:6 81:9
81:18,20 83:17,17
87:21 89:5 93:6,7,8
94:16 98:17,21
100:1,3,5,20 101:7
105:15,19,21,23,24
107:2,6,8,11,13,15
107:17 108:3,12,15
108:20 110:13,25
111:7,15,20 112:15
112:19,20,25 114:6
114:9,11,15,21,22
114:24 115:1,10
117:21 118:24
120:11 121:13
122:5,15 124:3,6,17
125:21 126:12,18
128:1,7 130:11
131:12,18 132:4,21
134:17 135:2,3,9,15
135:17,21,24,25
136:5,17 137:6,6,10
137:13,17,25 138:2
138:4,7,11 140:22
141:4 142:3,8,15

143:4,8 144:1,2,5
144:18,21 145:4,12
145:15 150:2
151:17,25 154:3,10
154:16 155:8,22
156:3,8,9 157:6
158:4 159:1,3,4,15
159:16,17,19,21
160:7 161:16,18,23
162:6,18,21 163:9
163:12,17 164:22
165:15,15,20 166:9
167:11 170:25
176:12 177:9
178:20 179:10,16
179:19,22 181:4,6
182:4 189:3
**planning**   70:8
**plans**   45:9 52:25
162:9,10,15 186:17
**planted**   106:5
**plants**   64:21,21
**play**   71:6 88:4
177:15 185:3
**played**   56:2,17
119:25 120:4,21,22
129:17
**playing**   48:4 119:7
**plaza**   27:15
**pleadings**   190:15
**please**   12:3 15:2
62:18,21 69:25 74:7
82:10 130:9 145:23
146:7,11 191:10
**plus**   59:14 71:1
73:15 74:1 180:23
**pm**   1:14
**pocket**   114:1
121:15
**point**   19:10,13,13
19:17 28:6 36:24
37:13,13 38:2,18
41:2 46:13 53:8
62:10 74:17,19
87:25 90:14 92:10
97:2,20 103:9 106:7
108:6 111:9 114:7,9

122:9,10 123:10
125:16 127:12
132:16 157:16
158:17 165:6 180:2
181:10 185:4,24
186:13 187:16
**pointed**   33:21 88:7
88:10 93:20 109:21
151:11 153:21
**points**   42:18 83:14
89:9,10 118:13
124:10 127:10,13
169:12 184:25
**poisonous**   22:13
**poked**   64:25
**policy**   60:2 111:8
111:14 122:10
158:11
**pool**   65:18 66:14
181:12
**portends**   119:8
**portion**   101:15,22
102:9 106:21 157:2
167:12 174:14
183:13
**portions**   43:8 147:4
**position**   38:10
59:23 100:3 108:23
116:15,17,17
125:19 135:23
151:24 167:17
172:12 174:1 176:4
177:8
**positive**   73:19
**possessed**   42:19
**possibility**   153:16
**possible**   26:6 48:21
48:22,25 56:4 121:7
140:7 163:2
**possibly**   152:24
**post**   22:20 23:8
25:9 41:14 74:16
97:11 122:12
128:18,21,24 129:4
135:12 136:8 139:5
139:6 150:7 158:25
162:1 167:9,14,17

167:24 168:3,6,13
168:15,19,21,24
169:2 188:21
**posterity**   16:19
**posterity's**   17:22
**potential**   35:5 51:1
56:13 77:16 80:17
84:5,7,18,21,24
85:6 90:21 128:3
132:14 145:4
153:20 156:25
182:8
**potentially**   42:20
139:16 142:16
**potter**   6:8
**powder**   41:15
**powerful**   30:14
47:12
**ppc**   150:17
**practically**   137:22
**practice**   60:5 78:23
102:5
**practices**   119:15
**practicing**   146:17
**pre**   22:20 23:1 25:9
84:24 95:4,7,13,17
95:22 96:9 97:9
110:11 133:16,24
136:9 139:1,6
167:19 187:12,12
188:21
**precedent**   56:22
102:22 111:16
**precision**   35:20
46:16
**preclude**   132:4
**precluded**   181:4
**preclusion**   181:9
**precondition**   56:22
**predicate**   94:7
**predict**   31:9 46:16
**prefer**   123:15,18
127:6
**preferences**   148:1
**preferential**   22:6
79:7

**prejudiced**   96:7
**prejudicial**   119:17
**preliminary**   146:13
147:3
**prelude**   27:20
**premise**   72:22
149:21 164:20
**prepared**   15:23
**prepetition**   152:25
**prerogative**   68:20
**prescribed**   148:16
149:17
**prescriptions**
149:22
**presence**   103:15
**present**   140:21
143:24 151:25
155:10 158:2
**presentation**   69:17
123:16
**presentations**   27:8
**presented**   20:21
72:8 77:15 85:18
92:19 96:1
**presents**   122:21
**preservation**
144:19
**preserve**   93:10
161:14
**preserves**   51:2
163:13
**preserving**   93:1
123:14
**press**   127:2,5
**pressed**   111:22
**pressing**   43:8,8
51:15 111:8 122:10
**presumably**   59:7
161:5
**pretty**   32:6 98:5
108:8
**prevent**   144:22
145:13
**prevents**   133:10
**previous**   179:1,7
**previously**   16:10

**price** 47:3
**primack** 4:9
**primary** 21:20
  138:22 147:7
**prime** 145:3
**priming** 144:22
**principally** 73:8
**principle** 69:13
  78:6,7 139:23
**principles** 129:6
  148:6
**prior** 59:20 70:10
  77:5 110:8
**priority** 39:25
  68:12,21,25 82:5
  95:20 109:9 162:22
  163:2
**private** 76:5 176:21
**prize** 14:2 48:2 81:7
**pro** 65:18 69:6
  119:1 168:23
  191:12
**probability** 28:10
  29:1
**probably** 40:7
  57:15 116:8 124:7
  146:16,18 192:3
**problem** 115:6
  116:21 165:20
  190:24
**problems** 112:10
**procedural** 132:24
  160:8 178:9,22
  182:16
**procedure** 34:3
  120:20
**procedures** 67:7,11
  71:7,15,16,20 72:16
  148:6 149:17
**proceed** 41:15
  119:14 137:5
**proceeded** 28:14
**proceeding** 125:4
  140:18 150:11
  188:24
**proceedings** 142:20
  193:4

**process** 22:23 24:18
  26:9 27:25 28:13
  33:5,12 38:12 45:20
  45:22 46:2,2 56:7
  57:4 63:6 64:14
  68:7 70:22 71:25
  72:14,16 73:24 74:9
  78:18 81:13 83:24
  83:25 85:7,15 86:2
  86:3 99:21 105:25
  106:14 113:25
  116:4,13 117:8
  119:10 120:25
  122:4,12 130:4
  140:2,9,14,17,23
  141:4,13 142:11,20
  143:4 147:8,19,24
  148:2 170:7,19,20
  173:20 174:10
  175:19 176:12,15
  177:9 184:17
  185:10 186:20
  190:25 191:25
  192:1
**processes** 24:20,25
  85:11 98:25 119:11
**produced** 77:9 85:8
  138:25
**product** 27:22
  64:18,19 121:3
**professional** 36:6
  38:2 59:14 75:9
  100:21 102:14
  103:19 129:4
  158:16 159:6,23
  160:7,11,20 161:22
  162:2,7,13,25
  164:21 165:17
  169:24 170:11,17
  172:10 173:5
  188:23
**professionally**
  45:22
**professionals** 25:2
  25:10,11 27:3 57:17
  59:1 60:11 77:12,17
  81:23 105:13

**128**:10,11 148:8
  150:11,21 159:25
  160:11,14,16 161:6
  161:6,9,17,24 163:1
  170:7 172:9 191:15
  191:16,17,19,24
  192:3
**profile** 29:10
**profit** 39:22
**progeny** 180:15
**program** 85:2 89:2
  90:17,17,19,24
  92:12,20,24 93:11
  147:8,10
**progress** 20:7,12
  118:20
**prohibition** 162:14
**projected** 74:5
**prominent** 23:15
**promised** 179:20
**promises** 41:20
**promote** 147:11
  185:8
**promoting** 185:5
**promptly** 145:21
**proof** 82:18 132:17
  137:16 139:18
  159:19 178:12
  183:2 184:15
**proofs** 178:13,17,17
**proper** 17:20 103:2
**properly** 148:11,20
  148:21,22
**proponent** 159:17
  165:20
**proponent's** 159:19
**proponents** 151:25
  162:21 165:15
**proposals** 27:7
  33:22 77:20 129:13
**propose** 18:18
**proposed** 13:19
  15:21 18:22 53:20
  124:23 126:19
  135:3,24 160:10
  161:3,23 164:3

**proposes** 136:17
**propriety** 157:3
**prosecuted** 117:22
**proskauer** 6:14
  70:4 85:23
**prospect** 42:3
**prospective** 188:6
**prosper** 38:10
**protect** 55:16
  115:19 136:8
  137:11 138:14
  140:9
**protected** 133:6
**protection** 13:4,13
  14:12 15:7,9 22:4
  55:18 57:11 142:4
  186:12
**protections** 136:23
  138:1,20
**protective** 137:11
**prove** 26:10 62:2
  115:14
**proved** 149:18
**provide** 12:17 56:15
  56:16 87:7 91:14
  110:13 121:14
  135:21 137:11
  139:4 145:5 157:6
  161:18 189:5
**provided** 16:7 32:8
  62:4 71:18 72:25
  91:16 93:22,24 94:2
  108:23 134:16
  156:7 178:16
**providers** 32:8
**provides** 50:23
  57:11 87:13,21
  101:3,5 114:13
  115:2 135:15 144:2
  144:21 159:4
  163:11,20 168:10
**providing** 122:25
  123:11 136:23
  141:11 142:11,12
  157:19
**provision** 23:22
  52:5 87:9,17,19,25

94:22 95:3,9 96:1
96:13 112:8,16
114:12 115:10
121:25 123:11,14
144:18 150:1 162:6
**provisions**  112:17
138:8 148:4 151:23
154:21 155:7
157:23,25 158:1,2,7
158:9,10,13,21
160:8 161:16,18
164:8,16,18 166:8
189:5
**provocatively**
111:15
**psa**  56:24 59:6,13
59:13
**psas**  39:1 59:5,6
**ptc**  151:2
**public**  14:16,17
76:5 121:2,23,23
147:13 149:25
158:11
**publication**  67:8
141:7,12
**published**  111:14
**puc**  46:18 57:5
110:2
**punish**  115:20
**purchaser**  144:22
145:5
**purchasers**  166:13
**purchasing**  25:5
**pure**  118:16
**purported**  162:6
**purporting**  46:23
**purports**  137:11
178:11
**purpose**  138:19
139:4 142:10
156:23
**purposes**  50:25
132:25 142:2
184:11
**pursuant**  23:9
24:20 33:10 59:14
59:21 62:13 82:17

134:4 181:20
**pursue**  30:15 41:21
42:2 45:9 48:20
127:25
**pursuit**  45:8 48:9
**pushback**  76:21
**put**  17:1,21 35:24
37:17 42:10 46:16
47:20 50:18 67:14
73:19 83:21 92:2
97:14 108:4 109:9
117:8 127:19 182:2
183:19
**puts**  55:25 58:6
59:23
**putting**  38:14 91:23
92:14,15,18 94:6
107:7 119:15
127:21 129:14
190:25
**pws**  44:23 150:23
150:24 151:1,3,9

**q**

**qualified**  113:15
135:12
**quality**  72:7
**quantification**
40:19
**question**  34:8 37:22
41:2 50:13 61:6,10
63:22 76:20 79:1
82:12 113:3 117:25
121:12 172:15
190:18 191:15
**questionable**  150:4
**questioned**  158:17
**questions**  14:23
69:15 94:10 96:15
**quick**  16:4 82:12
178:8 184:25
**quickly**  48:25
136:15 139:9
179:14
**quite**  22:11 23:23
29:12 32:25 34:17
39:19 44:23 45:9,10
49:9 53:4 184:4

188:1
**quote**  47:11 48:2
78:25 87:15 133:24
134:3,11,18 135:14
135:17,20 140:8
144:9 162:12 181:4
**quoted**  93:25
**quotes**  42:12
**qureshi**  10:20

**r**

**r**  1:20 2:1 6:11 7:6
12:1 193:1
**rachael**  10:21
**radioed**  149:8
**radlax**  166:5
**rails**  107:13
**rain**  55:24
**raise**  15:8
**raised**  44:5 49:2,4
112:25 127:11
138:24 169:13,17
179:7,15 181:12
185:6
**raising**  117:14
**ran**  21:21,22,22
24:18,25
**range**  28:6 31:21
78:14 79:24 80:13
**ranging**  80:12
**rare**  79:10 155:9
**rata**  65:18 119:1
168:23
**rate**  29:9 37:9 38:3
47:18 79:21
**ratified**  151:18
**rating**  49:7
**rational**  40:21
48:20 49:11
**rationale**  33:15
**raymond**  3:24
**reach**  67:16 69:6
166:10 190:13
**reached**  19:8 24:6
50:15 59:10,21
67:15 71:24 78:6
102:11 103:14
123:8 183:10

**reaching**  100:22
150:21 151:2
**read**  15:21,22 19:1
22:18 81:10 84:10
84:12 137:1 139:25
151:22 162:11
187:18,19 189:3
192:12,12
**real**  39:15 81:22
188:25
**reality**  137:19
**realizing**  149:6
**really**  13:14 15:8
33:14 34:3,7 35:7
35:14 37:16 46:3
47:10 61:18 62:8
63:12 66:9 72:14
77:25 78:17 83:7
85:12 93:14 94:6
100:16,25 105:20
106:25 108:4,18
109:7 115:24
124:13,21 125:24
143:18 166:13
174:6 176:1 177:12
185:23 186:13
188:15 190:18
**reason**  15:13 95:2,2
101:10 107:14
110:21 111:5
138:16 189:22
**reasonable**  31:21
46:17 61:11,12,15
61:19 62:7 79:17
80:25 83:24 96:13
109:24 113:3,23
114:1,3 118:2
121:13,15 122:7
140:6 161:2 163:16
163:20 174:22
192:2
**reasonableness**
28:6 61:7,8 78:14
96:11 101:14
112:25 113:10
121:20 122:7
124:24 163:24

164:21 171:19
172:13,16 174:8
175:7,8 183:12
190:10
**reasonably** 46:18
103:19 140:19
**reasoning** 151:9
162:23 168:8,14
**reasons** 25:15 31:14
97:18 100:4 108:12
175:23
**reassess** 34:24
**reath** 2:14
**rebut** 27:21
**rebutted** 46:25
**rebutting** 19:13
**recall** 32:14 144:8
176:8
**receivable** 143:23
**receivables** 143:20
**receive** 39:13 66:12
69:10 95:12,13
119:1 134:13
150:25 158:8
167:10
**received** 33:22
64:14 85:21 122:2
178:17
**receiving** 85:23
156:10 158:25
**recess** 69:22,24
129:24 130:5,7
145:18 146:2,4
192:10
**recipient** 160:4
**recite** 50:22
**recognize** 51:9
58:22 141:23
**recognized** 34:17
141:1 156:1 162:19
166:5
**reconvene** 69:23
145:21 192:10,17
**reconvenes** 130:15
**record** 12:11 13:7
16:5,19,20 18:3,15
18:22 19:22 20:23

21:18 22:17 26:1
31:19 32:4 35:16
39:15 42:17 45:5,9
56:1 61:2 63:3,7
68:15 70:14 73:22
81:14 82:23 83:21
86:2 88:16 90:13
92:4,22 93:14,21
97:5,17,20 98:14
100:15 104:3
110:16 121:2,10
127:14 129:11
133:12 146:9 152:9
174:5 179:6 180:12
190:16 191:1
192:12 193:4
**record's** 57:9
**recording** 78:22
**recourse** 66:18
139:17 169:1
**recover** 168:3,13,21
**recoverable** 168:7
**recoveries** 58:7
**recovery** 34:13
115:8 118:14,21
121:4 136:11
137:25 139:6
167:19
**recycled** 178:25
**redline** 179:25
**reduce** 35:5 156:24
**reducing** 92:25
**redundant** 39:9
**reeled** 150:19
**refer** 83:3,4 118:4
185:5
**reference** 101:8
**referenced** 74:3
**referred** 81:6 133:3
**reflect** 72:7
**reflected** 70:12 74:9
81:3 86:11 121:2
**reflects** 74:14
**refused** 42:3 164:17
**refutation** 93:9
**refute** 89:5

**refutes** 92:19
**regard** 28:25 32:23
40:13 46:9 55:11
65:20 66:2,9,15,22
67:5,13 69:8 125:17
136:6 141:8 143:16
145:8 162:7,22
185:22 186:15
188:11
**regarding** 59:10
70:10 106:10
135:21 166:2
**regardless** 136:9
139:5
**regards** 178:7
**regional** 67:8
**regrets** 146:22
**regular** 23:5
**regulations** 14:17
**regulatory** 46:12,14
46:21 55:23 57:2
98:23,25
**reimbursement**
128:16
**reimbursements**
121:16 159:5
**reinstated** 43:23
49:17 65:16 66:21
144:7 179:24 181:5
181:8,17,19,20
182:13
**reinstatement**
66:13 128:2,3
135:19 137:19
181:10
**reit** 30:13,16,23
39:20 41:21 42:2
46:19 56:14 97:12
99:2 105:15,19
120:19,19
**reiterate** 182:17
**rejected** 128:8,9,16
138:18 139:2 156:5
162:4 167:17
**relate** 52:15 75:24
152:25 161:6 183:1

**related** 22:3 24:16
33:7 39:20 84:22
114:8 132:2 134:2
134:14 135:4,8
136:7 139:20 141:2
141:18,20 160:11
164:22
**relating** 77:18 85:1
135:13,16 150:14
**relation** 76:13
**relationship** 55:25
89:20,23 90:12
183:18
**relationships** 27:18
46:22 76:6,7 141:21
**relative** 37:21 40:7
143:4
**relatively** 18:18
47:17 79:10
**relay** 146:22
**release** 51:18 53:10
64:1,2,9 86:1 147:5
155:7,18 156:10
157:23 158:1,2,7,9
158:13,14,19,21
187:3 188:7
**released** 32:1 33:10
43:16 144:11
187:22
**releases** 19:24 24:2
24:4 28:21 33:24
39:8,8,13 40:23
43:6,9 44:21 51:7
51:15,17,17,24,24
52:1,3,8,9,15 53:9
62:24 63:18,23,24
81:13,14 83:10 94:9
94:11 138:3 155:8
155:11,14,21,21,23
156:6,19,23 157:3,5
157:11,18,20 158:5
186:15,23 187:16
187:21
**relevance** 169:4
**relevant** 58:14
165:2 177:6,11
181:18

**relied** 150:23 166:6
**relief** 72:2 116:7
153:7 155:22 158:8
166:4 179:12
182:20
**relieve** 161:24
**relinquishing** 81:2
**rely** 172:14,15
176:5
**remain** 14:15 19:20
99:2 147:25 164:4
**remainder** 91:3
**remaining** 19:16,23
43:4 44:21 49:13
99:20 107:17
**remains** 98:20
143:12
**remarkable** 98:5
123:2
**remarks** 125:17
143:18
**remedies** 182:7,7
**remedy** 42:14 47:25
111:23
**remember** 54:10
58:9
**remembering** 53:20
56:24
**remind** 21:20 27:5
64:16 65:8 115:22
**reminder** 127:16
**remotely** 34:20
45:23,24
**remove** 70:8
**removed** 155:6
158:24
**removes** 136:13
139:8
**removing** 138:19
165:18
**render** 192:11
**rendering** 135:20
137:21
**renders** 181:11,13
**rendition** 75:20
**renegotiated** 180:6

**reorganization** 81:9
81:18 131:12
134:17 135:3 136:5
137:8 143:8 144:2
145:15 155:18,25
156:15 162:15
**reorganizational**
142:9
**reorganize** 136:25
**reorganized** 51:1
58:3 144:13 154:9
155:4 163:18
164:25 167:12
**repaid** 69:14
**repairs** 27:18
**repeat** 100:14
185:14 186:25
**repeatedly** 143:10
**reply** 44:9 68:16
177:19
**report** 84:4 104:12
**represent** 82:24
124:1 134:22 181:7
**representation**
133:10
**representative**
72:10 104:11
131:23 134:21
**represented** 182:18
188:8
**represents** 20:18
**repurposed** 145:3
**reputable** 47:6
**request** 111:25
117:20 122:2
126:18 133:17,21
182:17
**requesting** 161:12
**requests** 100:4
117:22 160:19
173:12
**require** 37:24 52:23
91:8 112:25 119:5
**required** 14:16
52:22 54:20 138:17
144:14 160:22
163:24 171:3,21

172:1 183:9 187:15
**requirement** 140:17
163:17 171:20
**requirements** 18:13
109:23 136:18
141:13 154:13,19
159:18 160:9,18
161:21,25 164:5
**requires** 52:7
117:13,19 140:1
168:17
**rescue** 148:14,22
**reservations** 121:18
**reserved** 126:25
184:10
**resolution** 76:23
80:1 83:12 99:13
107:4 156:20 157:6
180:6 184:14
**resolutions** 76:11
76:22
**resolve** 135:4
136:17 137:3
**resolved** 44:4 61:20
71:2 184:10
**resolves** 20:24 80:3
99:10
**resolving** 53:2
**resource** 27:13
**respect** 17:5,17
19:21 21:7 24:2,14
29:23 30:2 34:21
40:9 41:12 43:9,11
44:18,22 45:19 47:9
48:5 49:1 52:2,8
67:7,14 68:13 76:22
78:19 90:10 116:3
124:11,14 125:19
126:17 127:3
132:22 133:8
135:24 137:7 150:1
151:20 152:10,11
154:20 157:5 159:2
159:19 163:8 176:3
176:4,11 177:5,11
177:13,23 185:2,13
186:24

**respected** 125:24
**respectful** 145:25
**respectfully** 126:18
**respects** 103:5
**respite** 17:15
**response** 125:16
149:11
**responsibility** 165:9
**responsible** 36:13
135:7
**rest** 36:23 44:8,18
94:11 102:25 103:2
**restate** 143:22
**restated** 87:10
**rested** 23:13
**restrict** 168:14
**restricted** 125:24
**restrictive** 125:23
**restructuring** 13:23
25:1,3,14 32:22
71:5 98:12 99:11,19
108:17 119:8
157:12
**result** 62:9 70:23
81:17,25 83:12
88:25 92:11 102:23
115:21 117:13
125:13 131:21
141:22 142:15
158:10,12 162:20
182:11 191:23
**resulting** 84:8 115:3
132:12
**results** 137:9
149:21
**resurrect** 179:5
**retained** 23:9 68:16
68:18 84:3 159:25
191:16,17,19,24
192:3,3,4
**retroactively** 177:3
**retrospective** 140:3
**return** 17:2 21:12
40:23 88:17
**returned** 42:7
**revealed** 149:4

**review** 17:21 19:5
24:16 101:12
102:16 113:14,16
113:17,21 121:20
122:3,14 161:20
164:2,21 165:18,19
166:12 170:18
171:17,18 173:6,11
173:13 174:1,7,10
174:12,12 175:2,6
175:11 183:12
184:18 190:10
**reviewed** 16:9 77:4
77:7 114:2 150:22
155:14
**reviewing** 113:10
113:17
**revised** 158:22
**revisit** 15:14
**revolutionary**
39:22
**rewarding** 115:19
**rewrite** 148:1
**rhoads** 4:11
**richard** 5:4 8:4 9:4
10:14 11:2 123:5
146:11 182:22
191:8
**richards** 6:20 104:9
**ride** 172:24
**rider** 112:10 114:7
**riders** 115:9
**rifkind** 6:1 98:2
**right** 15:25,25
16:17 36:16 38:22
50:9 58:25 61:1,16
68:4 69:25 71:20,20
71:21 103:13 104:5
104:17 108:16
109:12,25 113:7
115:17 122:19
125:20 126:2,5,6
127:4 134:12
145:17 146:6
161:11 170:25
172:19 173:1,1,18
173:18,18,18 189:7

192:9,17
**rightly** 34:17
**rights** 35:10 39:17
71:20 115:3,20
123:14 137:7 140:9
140:23 141:5 182:5
**rigid** 35:20
**rigmarole** 188:23
**rigorous** 155:15
**ring** 185:14
**ringer** 10:21
**rise** 12:2 130:8
154:6
**risk** 30:5 75:1 79:18
80:22 115:6 117:13
132:2 136:13 139:8
**risks** 29:7
**risky** 29:2,2,2,21
**road** 26:7 31:13
67:23 193:21
**robert** 10:13
**roberts** 82:25
**robinson** 69:8
**robust** 28:13 59:8
72:16
**roitman** 10:22
**role** 56:2,18 70:19
82:5 129:17 147:7
151:10 185:3
**rolled** 26:22 41:4
**ronald** 188:14
**room** 14:25 25:1,4,4
48:3 62:5 98:24
105:4,7
**roose** 10:23
**rose** 6:14 70:4
101:21
**rosen** 8:6 82:24
**rothschild** 3:1
**rough** 40:17
**route** 66:6
**routinely** 155:10
**rsa** 72:15
**rubric** 121:17
**rudnick** 2:8 100:12
**rule** 132:24 165:23
166:4 171:18

174:19 179:10
185:7 189:17
**ruled** 66:4
**rules** 119:12 158:16
174:19,20 179:11
188:5
**ruling** 71:7,16
76:10 179:1 184:11
**run** 25:5 38:2 45:22
47:18 55:4 56:20
60:4 69:6 109:25
173:9
**running** 12:4 34:8
34:13 119:16 124:5
**rushed** 149:12
**ryan** 6:12 8:21

**s**

**s** 1:21 2:1 7:11
10:24 12:1 157:2
**sabin** 10:24
**sachs** 82:25 88:23
**sacroc** 133:3
**safe** 21:11
**safeguard** 145:10
**safeguards** 144:21
145:5 181:24
182:12
**safely** 42:1
**safety** 148:17,25
**sake** 17:22 118:20
**sale** 72:14 73:24
**salient** 164:7
**sample** 26:2
**sassower** 12:7
**sat** 117:9
**satisfaction** 19:11
**satisfactory** 107:4
**satisfied** 89:22 90:7
103:13 104:13
126:8,14
**satisfies** 43:2
**satisfy** 28:23 68:7
138:5 140:22
141:12 161:17
**save** 147:5
**saw** 29:7 117:3
170:1

**sawyer** 26:4,16 27:1
27:16 29:15 30:17
31:11 71:19 73:12
75:17,23 76:1,16,23
77:3,15 80:6,24
81:12 105:1 120:18
156:18
**sawyer's** 77:24
**saying** 47:24 60:25
70:8 122:6
**says** 63:23 74:1
86:24 89:16 90:6
91:13 94:15 95:10
111:24 112:2
113:10 115:14
122:13 129:2
**scenario** 13:20,23
31:1 34:18 183:20
**scenes** 129:20
**schedule** 121:23
**scheduled** 29:16
65:2 78:20,22
**scheme** 147:23,25
149:20 162:22
165:16 171:14
**schepacarter** 8:4
43:10 51:10 54:22
116:3 130:6,10,18
130:21 146:7,8,10
146:11 166:22,25
167:5 170:1,5,8,13
170:16,22 171:1,6,9
171:16 172:8,17,23
173:3,10,15,22,25
175:4 176:18,25
185:5 186:1,16
187:17 188:12
189:17
**schlerf** 3:6
**schodek** 7:11
**schwartz** 10:25
51:10
**schwartz's** 146:22
**scope** 55:8 143:7
151:7 164:3
**scott** 9:7

**scratch** 107:12
**screen** 73:20 74:6
　74:18
**scrutiny** 22:22
　28:16,19,24
**se** 69:6
**seager** 105:17
**search** 148:23
**seated** 12:3 69:25
　130:9 146:7
**seats** 105:4
**second** 2:4,9 4:2
　5:12 8:13 13:16
　36:23 39:17 49:14
　56:15 62:18 64:8
　83:15 99:14 100:12
　100:18 109:13
　118:6,6 119:25
　124:20 127:24,24
　159:3,7,7,9 177:4
　178:21 182:19
**seconds** 49:3 50:16
　59:19 120:1
**section** 45:4 87:13
　91:13,20 94:14,24
　95:9,19 101:8
　136:13,24 151:3,4
　159:18,21 160:17
　160:21,25 161:2,11
　161:17,25 162:5,8
　163:2,6,9,10,11,24
　164:1,2,3 165:23,23
　166:1,3,3 168:10,12
　168:17,19 169:25
　170:2 171:17,20
　177:13
**sections** 124:25
　160:12 161:7
　165:21 167:22
　169:2
**secure** 143:23
**secured** 61:17,18,20
　110:23 114:16
　127:23 128:2
　168:11,12,15,20
　173:8

**securities** 110:1
**security** 22:2 42:15
**see** 33:25 50:1
　52:18 103:15 113:2
　116:2,8,8 118:17
　122:13 127:4
　145:19 149:11
　169:20 174:21
　176:6,19 179:24
**seed** 106:4
**seedling** 105:20
**seeing** 54:2
**seek** 18:14 115:19
　135:4 137:2,8
　138:12 153:8
　154:22 160:8 163:1
　169:1
**seeking** 39:21 48:6
　58:7 72:2 133:15
　155:21 162:5
　165:16 184:1
　185:12
**seeks** 132:4
**seemingly** 53:19
**seen** 36:18 63:6
　76:17 112:5 118:22
　143:12
**segue** 24:8 25:23
　31:24
**segues** 12:16
**seized** 71:10
**self** 70:17
**sell** 145:2,6
**semcrude** 35:10
**send** 126:16 173:12
**senior** 78:21 88:22
**sense** 18:7,11 40:25
　84:10 177:7
**separate** 28:8 42:10
　101:23 102:15,18
　142:4
**separately** 184:4
**september** 164:9
**sequencing** 30:23
**series** 58:2
**serious** 162:20
　173:2 178:2,4

**seriously** 105:8
**serve** 142:9 175:24
　175:24,25
**served** 150:10
**service** 184:8
**services** 32:6 37:21
　39:15 80:5,8,12
　93:24 94:2 117:2,5
**set** 14:6 15:8 20:13
　67:6 74:23 106:14
　107:10 113:25
　117:8 121:21
　133:17 138:2
**seth** 9:25
**setoff** 35:5,8,9
**setting** 122:12
　181:13
**settle** 172:1 188:19
**settled** 49:3 127:16
**settlement** 12:17,24
　13:2,5,9,15,17,25
　14:4,13,15,18,19,20
　15:9,11,12,13,24
　17:19 18:25 19:4,7
　19:16 20:14,24
　21:10,14,18 22:12
　23:15,16 24:6 25:22
　27:21 28:3,14,21
　32:1,19,23 33:10
　34:4,22 35:1 38:16
　38:23 39:1,2,5,7
　41:19 42:16 43:5,7
　43:21 51:15 53:7,25
　54:5 56:23 59:12,15
　59:21,24 69:21
　70:22,23 72:5,21,24
　72:24 73:16 74:22
　74:23,24 75:2,24
　77:20,24 78:8,13
　80:2,3,25 81:2,3,6
　81:19 83:9,16,22,23
　86:4 87:4,20 88:1
　88:18 89:6 94:10,15
　95:3,9,16,19 96:12
　96:14,19 98:16,17
　99:6,9,14,20,23
　100:1,5,19,22 101:2

　101:3,7,9,17,17,18
　101:19 102:5,8,9,11
　102:12 103:7,9,14
　103:23 106:16
　107:16 108:19
　109:1,19 110:16,17
　117:21 119:13
　121:13,24 122:5
　123:8,12 124:4,18
　126:19,24 127:3,5
　127:14,17,19 128:7
　131:10,17 132:21
　156:19 159:3,22
　160:8 161:16,18,23
　164:17 165:15
　166:9,11 169:16
　170:24 183:20
　184:10,14 188:17
　188:22 189:11
　192:11
**settlements** 17:17
　18:9,16 19:8 41:4
　59:3 60:3 127:15
　159:11
**settlement's** 43:1
**settling** 72:25 73:17
　127:23 128:2,6,17
**setup** 105:10 113:5
**seven** 130:1
**severally** 87:1
**severely** 30:16
　149:1
**seward** 7:1
**shadow** 18:9
**shaking** 118:20
**shannon** 150:17,21
　151:1,17
**shaping** 60:23
**share** 119:1 134:16
**shared** 37:21 80:5,8
　80:11
**shareholder** 55:22
　154:25
**shareholders** 90:8
　152:5,10,19 154:23
　155:5 185:23

**sharing** 29:15 37:1
37:16 78:19,24,25
79:6,10
**shearman** 7:8
**shed** 164:7
**sheet** 33:5 45:17
92:10 119:8
**sheets** 33:6
**she's** 187:23,25
**shirley** 131:6,19
**shone** 72:13
**shore** 8:16 48:14
104:14 105:17
107:23,24,25 123:3
124:9,23 125:7,18
125:23 175:15
189:24 190:1,4,4,8
**shore's** 185:20
**short** 47:17 50:14
69:22 95:23 129:24
130:5 145:20
173:13 189:23
**shortfall** 74:16
**shorthand** 53:5
**shortly** 25:12
**should've** 92:13
**show** 73:25 90:13
108:3,7 122:6
161:13
**showed** 21:8,10,14
106:22
**showing** 61:2 71:5
121:4 160:21,23
172:2
**shown** 65:24 86:20
121:9
**shows** 32:4 74:10
78:5 86:11 92:2
105:24
**shred** 89:3 153:25
**sick** 132:6 136:15
139:10 140:12
**side** 20:9,10 21:8
30:11 31:16,16
37:22 38:4 39:23
40:17 44:25 45:11
45:16 54:5,6 56:19

57:16,18 59:19
61:23,24 65:10,11
65:15,18 66:11,13
66:13 71:19 73:1,9
76:7,24 78:15,15
88:15 99:12,13,15
99:16 100:12
104:11,12 105:2,3,4
105:7,10,11,15,19
106:8 107:3,4,15
110:21 117:1,7
118:10 120:11
124:3 125:6 131:22
133:7 144:3 186:7
187:5 189:20
**side's** 58:9
**sides** 20:16 44:25
**sidley** 24:16 84:4,7
85:18,21
**sidley's** 84:19
**sign** 15:24 113:24
133:25
**signature** 14:24
**signed** 15:25 16:9
39:1 113:9
**significant** 37:20
38:12 39:24 40:7,19
67:21 79:12 80:19
88:12,16 106:12
**significantly** 76:9
76:19
**signing** 13:16
**silo** 22:1 43:18
143:20
**silos** 43:17
**silverstein** 167:3
**similar** 13:5 38:18
91:16 169:5 174:10
191:23 192:3
**similarly** 26:25 33:9
34:16 139:23
140:25 168:22
**simple** 13:18 18:7
21:9 118:16
**simply** 30:23 31:3
35:8 69:2 115:16
137:24 154:23

180:25 181:17
182:12
**single** 115:1 116:25
122:2
**sinkhole** 54:10
**sit** 17:12 71:13
88:23 113:1
**sits** 51:9 68:22
**situated** 139:23
168:22
**situation** 29:5 34:25
115:12 169:5 175:4
189:20
**situations** 61:17
180:17
**six** 31:12 48:1 84:21
99:8 107:9
**sixth** 131:13 179:16
179:19
**size** 136:13 139:8
**sized** 34:10
**sketch** 105:18,18
**skewed** 73:15
**skin** 112:12
**skip** 52:13
**skipped** 62:22
**slated** 47:8
**sleeping** 64:25
**sleeves** 26:22
**slide** 21:21 24:12
25:17 26:11,21 27:5
27:16 29:13 30:8
32:16 36:4 38:17
40:14 41:1,6 47:23
50:14 52:19 56:5
59:17 62:20 64:6
66:21 84:6 86:17
92:2 93:25 94:1,14
**slides** 52:14 82:9
92:23
**slight** 20:10 117:9
**slippery** 102:1,7
171:23,25 172:3
**slope** 102:1,7
171:23,25 172:3
**small** 25:1 49:19
50:16 57:8 64:23

**smaller** 14:3 37:20
**smidt** 40:21 68:10
68:17,19,22 72:10
86:12 93:2,25
**smidt's** 97:8
**smith's** 32:19
**sold** 64:19
**sole** 58:24 162:1
163:18
**solely** 71:13 76:12
93:8
**solicitation** 67:6,11
**solution** 111:7
**solutions** 193:20
**solved** 187:2,2
**solvency** 30:3 80:20
94:6
**solvent** 87:22 95:11
128:23 129:4
189:19,21
**somebody** 60:14
126:1 174:16 186:7
**someday** 49:10
**son** 132:1
**sontchi** 1:21
**sonya** 1:25 193:3,8
**soon** 19:8 26:5
130:14
**sophisticated** 48:14
53:25
**sorry** 15:5 27:14
42:8 49:8 51:18
55:22 57:19 82:21
117:23 171:18
173:11 191:4
**sort** 28:15 34:1
56:15 63:22 106:7
116:6 147:3,8
166:17 169:17
170:1 171:22
175:15,19 176:10
177:2,4,14 185:4
188:2,7 189:11
**sorts** 60:3 63:16
187:10,13,22
189:15

**sosnick** 11:1
**sought** 45:11 116:7
  121:8 150:2 167:7
  169:6
**sound** 53:17 55:9
  55:17
**sounding** 33:13
**sounds** 113:5
**source** 47:18 144:13
  162:1 163:3
**sourced** 58:5
**sources** 33:22
**southern** 151:21
**space** 122:25
**speak** 16:24 44:19
  51:21 67:17 95:1
  98:15
**speaks** 38:11 39:4
  66:24
**special** 24:1 25:14
  85:19,20 147:18
  155:19
**specific** 23:19 32:13
  33:17 53:16 83:8
  137:10 138:14
  160:3 165:21 166:1
  166:7 179:15
  181:21
**specifically** 28:18
  99:9 137:10 140:6
  141:17 160:12
  190:23
**specify** 180:18
  182:25
**speed** 104:21
  113:12
**spend** 19:15 52:16
  64:24 65:5,6 75:22
  105:8 119:21 165:5
  175:17
**spends** 46:20
**spent** 25:21 35:19
  36:25
**spin** 30:9,12 31:5
  31:17
**spirit** 105:6

**splash** 18:4
**splitting** 56:13
**sponsor** 23:2 24:2,4
  24:15 28:17 32:17
  39:8 46:1 72:10
  80:5,7,12 81:13
  84:4 85:6,17,25
  86:13 87:14 88:25
  90:22,23 92:8,17
  94:4,17
**sponsor's** 97:11
  154:16
**sponsored** 22:15
  23:4
**sponsors** 8:7 13:13
  21:5 24:16 31:25
  32:2,8,15,25 39:10
  39:21 40:3,11,20
  42:21 47:13 56:12
  57:23,24,25 58:5
  70:16 76:6,21 83:5
  83:8,9,11,23 84:1,8
  84:18,25 85:7 86:1
  86:4,5,6,9,10 88:6
  88:16,20 92:17
  93:14 94:2 95:5,12
  95:21 96:18 97:5,13
  107:6 153:22 157:4
**square** 42:4
**squarely** 185:19
**stacey** 9:19
**staff** 16:8 17:3,10
  17:14 46:23 107:20
  113:21 146:15,20
  146:24
**stage** 97:3
**stake** 73:17 148:7
  183:21 185:4
**stakeholder** 62:5
  75:8
**stakeholders** 26:19
  39:6 98:13 99:24
  147:12
**stalking** 71:21
**stand** 28:8 37:13
  178:15,18

**standard** 28:19,22
  34:3 43:2,3 44:23
  48:21 92:3 101:12
  101:23 102:7 122:8
  126:9 151:13,14
  153:3 164:19
  177:12 192:2,4,7
**standards** 138:5
  155:15 174:12
  191:18,23
**standing** 46:22
  53:20 107:1 116:5
  129:12 178:15,18
**standpoint** 178:22
**stands** 154:21
**stang** 5:11
**stargatt** 8:18
**start** 33:5 53:7
  54:17 107:12 110:6
  118:3 131:3 156:24
  185:11 190:24
**started** 23:1,3,7
  27:3 72:14 106:20
**starting** 25:12 86:6
**stash** 176:21
**state** 55:3 151:2,13
  182:5,7
**stated** 91:25 93:15
  147:9,14 150:9
  151:17,20 154:20
  161:10 168:1,24
**statement** 15:1
  30:22 66:23 93:15
  115:14 119:3
  147:10 154:20
  176:2,6 181:2,16
**statements** 125:4
  175:15
**states** 1:1,10 15:5,6
  89:11 91:12 94:22
  111:22 119:18
  122:2 134:11
  146:12 147:7,9,10
  147:14,16 150:18
  161:19 163:25
  185:2

**stating** 150:19
**status** 12:17 19:18
  151:10
**statute** 80:20 84:21
  89:11 90:5 91:13,20
  91:23 138:19
  174:10
**statutory** 112:12
  124:14,20 163:3
  166:6 171:14,20
**stay** 145:23
**stead** 118:4
**stealth** 70:23
**steiglitz** 11:2
**step** 26:21 31:6
  56:25 57:13 66:4,4
  72:6 153:13
**stephen** 4:20 6:11
**stepped** 103:14
**steps** 53:2 57:7
**sterling** 7:8
**stevens** 7:13
**stewart's** 69:4
**sticking** 33:4
**stiff** 191:18
**stipulation** 15:22
**stipulations** 39:1
**stock** 40:8
**stone** 84:17 85:12
**stood** 119:20
**stop** 112:24
**straight** 174:9
**straightforward**
  18:7 21:9
**stranded** 66:18
**strategies** 26:20
  119:13 120:16,18
**strategizing** 121:5
**strategy** 33:22
  119:4,25 121:5
**stray** 118:17
**stream** 64:20
**streamlined** 83:11
  99:21
**street** 1:11
**strengths** 26:15

strictly 89:10
strike 155:4 178:10
  182:17
striking 88:19
  164:14
strong 29:17 30:2
  48:24 49:6,7 93:21
struck 183:15,19
structure 20:16
  34:11 38:24 56:14
  61:12 66:11 97:11
  106:21 107:2
  109:10 148:4,21,24
  149:2,6,13 175:18
  187:9 190:13
structured 124:22
structures 188:18
struggle 122:21
stuart 10:10
stuff 60:8 63:17
  177:23 178:4,4
  189:3
stunningly 67:3
style 182:19
subject 14:15 15:11
  25:22 26:7 62:15
  64:7 69:9 106:14
  137:9 138:1 153:3
  163:15 164:4
  175:21 183:12
subjections 64:15
subjects 185:6
submissions 94:11
submit 28:12 89:3
  96:12 178:25
  190:20
submitted 57:2
  183:14
subordinated
  114:18
subordination 21:4
subsection 90:5,7
subsequent 182:7
subsidiaries 55:22
  145:7
subsidiary 144:23

substance 83:25
  86:4
substantial 47:19
  53:6 60:14 61:2,5
  62:4 86:9 88:9
  97:17 99:13 102:17
  108:25 112:8
  114:13 118:2,4
  121:8,9 126:9 129:8
  155:25 160:24
  172:1,6,11 174:15
  174:17,20,25 184:2
  184:3 188:24
  190:17
substantially 88:2
  99:21
substantive 160:9
  163:5 174:25
substitute 164:1
success 28:10 29:1
successful 69:7
successor 7:2 131:6
  131:19
sucked 120:11
sue 14:6
sued 153:13,17
  186:9
suffer 132:6 139:20
  141:19
suffered 38:5,6
suffice 14:8
sufficient 154:17
suggest 164:1
  191:14 192:7
suggested 58:24
suggests 22:16
  92:18 189:17
suit 142:14 153:14
suite 193:22
sullivan 7:19
sum 182:14
summarize 14:7
  18:18 75:25 78:16
summarized 13:6
summary 13:7
  42:16

supplemental 53:15
  152:18
supply 148:20
support 17:18,25
  20:8,9,14 21:23
  38:23 42:25 45:5
  54:6 61:24 68:24
  71:5 81:20 99:25
  100:3,19 111:15
  123:7 124:3,6
  125:11 126:12
  143:23 155:19
  157:20 174:5
supported 114:25
supporters 129:22
  144:1
supporting 81:18
  98:14 160:5
supportive 110:14
supports 23:23 72:4
  107:15
supreme 166:5
  167:16,21 168:11
sure 16:18 17:13
  28:5 36:5,25 62:19
  66:9 69:20 99:5
  108:21 122:21
  127:8,13 128:20
  129:1 166:16 176:9
  177:6,7
surpass 47:16
surprise 190:9
surprising 116:14
suspect 186:4 192:1
sustained 150:17
  167:23
swim 18:4
system 71:8 147:12
  147:15 149:18,24

t

t 20:9 21:2,3,8,21
  22:1 30:11 31:16
  37:22 42:22 47:1
  54:6 59:18,18,19
  61:24 65:11,18
  66:13 71:19 73:1,9
  76:7,24 78:15 99:12

99:13,15 100:12
  104:11,11 105:2,10
  105:11,19 106:8
  107:4,14 117:7
  118:10 124:3 125:6
  152:17 193:1,1
taa 29:18
table 45:24 57:25
  58:1 61:8 73:13
  107:10 128:5
tables 146:1
tacked 33:13
tact 19:22
tad 36:25
tail 156:24
take 15:20 31:18
  32:24 33:1 43:18
  51:12 55:19 57:7
  61:8 69:22 74:17
  78:16 92:1 106:23
  111:4 116:15 124:7
  126:10 129:23
  130:3,5 132:1,14
  145:18 147:1
  165:10 188:2 190:6
  190:6 192:13
taken 38:12 74:13
  74:14 153:13 176:7
  177:4,4 180:10
  183:17
takes 28:1 51:5
  59:15,22 106:10
  164:13 174:1
talk 19:18,22 22:9
  24:1 27:4 28:17
  29:13 30:8,13 32:4
  39:7 46:1,5 50:3,9
  51:6 52:14 54:21
  55:19 59:5 65:1
  110:8 112:10 114:5
  177:17 180:10
talked 26:13 29:4
  42:5 64:10 181:16
talking 53:24 57:22
  61:18 75:23 95:16
  115:24 177:12
  189:20 190:9,20

**talks** 25:17 58:12
58:13,16 61:19
66:22 174:11
**tangible** 39:16
40:11 153:23
157:18
**tasks** 148:16
**tax** 25:14 29:15,20
30:9,12 31:2,5,8,16
37:1,7,16 78:19,21
78:24,25 79:5,10
88:11 93:23
**taxable** 30:15
**taylor** 8:18
**tceh** 2:15 3:2 4:7,23
6:2 8:19 13:11,12
13:22 14:1 23:5
29:7 31:8,22 34:9
34:11 35:6 38:4,5
41:9 42:19 75:4,16
75:23 76:2,8,10
77:2 78:20 79:5,13
79:24 80:7,10 81:1
85:20 90:25 96:19
98:4 100:2 108:1
109:14 110:15
111:3 114:8,23,24
116:24 118:15,19
118:25 119:16
124:1 159:6,7,7,8,9
182:1 190:8
**tceh's** 29:18
**tch** 25:12 53:19
91:4
**team** 32:21 56:10
106:3 107:5 108:4
113:7 149:11,11
**teams** 105:13
**technically** 57:24
164:25
**telegraphed** 190:11
**telephonically** 9:6
**tell** 97:23 143:13
**telling** 99:18
**tempting** 109:3
**ten** 20:22 173:14

**tended** 25:15
**tens** 65:4
**tension** 27:14
**term** 14:8 31:15
33:5,6 45:17 180:7
181:9
**terminal** 132:6
**terms** 13:15,18
32:22 37:20,21 38:6
40:7,7 79:22 83:24
83:24,25 103:22
108:15 110:10,12
111:24 129:8 134:4
180:11 188:17
191:19,21
**terrific** 172:19
**testament** 81:22
**testified** 22:19
27:24 29:15 30:4
34:10 37:23 40:21
48:14 71:23 73:4
74:24 76:1,16 77:12
78:22 79:4,9 80:24
81:12,15 84:16,19
85:1,9,24 86:17
144:9 156:22 157:4
157:10,17 158:18
164:10,15
**testify** 184:6
**testimony** 19:10
23:18 26:16 27:9,15
29:1,11 30:14 31:7
31:10,11 32:6,19
33:18 37:1 38:10
41:24 46:17,20 49:5
49:8 69:4 72:3,13
73:12,21 77:24
78:11,12,21 79:20
80:5 81:22 86:12
93:1,16 97:8,9
129:12,15 144:8
156:16 157:2,9,15
157:16 164:15
165:7 187:19
**texas** 32:11 47:6
53:18 83:1,3,19
87:23 88:11 89:10

89:12,13 90:5 91:2
91:7,11 92:4 94:16
94:18,18 152:17
186:6
**thank** 12:18 15:16
15:17 16:1,17,20
17:9,10 19:2 20:4
50:17 62:21 69:18
69:19 75:12,14
81:25 82:2 96:25
97:1,21,22 100:8,9
100:11 103:24
104:6 107:19,20,22
122:24 123:3,21
126:20,21 129:21
129:22 130:22,23
130:25 145:16,17
146:3,8 167:2,5
177:17,18 178:6
182:21 184:20,22
190:3 192:8,9,18,19
**thankful** 123:8
**thanks** 50:16 74:18
122:16 167:4
**thanksgiving** 17:15
36:25
**that's** 29:24 33:18
33:24 36:16 37:9
39:3,22 46:25 48:3
48:11,21 49:10 50:4
60:6 101:8,10,15,16
102:1,20 105:24
108:18,20 171:20
172:2,19 173:10,10
174:6,6 177:6,11,20
177:25 178:2
182:15 184:8,17
186:13 187:5 188:7
188:24,25 189:1,3
**thee** 144:2
**theoretical** 53:14
**theory** 92:7 95:25
96:1 133:5
**there'll** 39:24
**there's** 28:23 29:25
45:5 46:3,7 102:15
102:17 111:10

173:16 174:4
175:23 185:7 186:4
186:11 188:8
191:14
**they're** 39:23 40:8
48:11 105:6 109:6
110:20 170:4,6
171:6,6,11,13
180:16,20 181:8,22
185:19 186:3,10
189:12
**they've** 48:6 108:24
184:24 185:17
191:16,16
**thing** 37:4 49:12
62:23 68:15 73:19
83:25 105:25
121:14
**things** 17:1 19:22
20:13 23:8 31:18
33:19 42:6 83:6
87:15 104:12
129:14 163:12
175:14,25 191:21
**think** 13:6 16:24
17:2,20 18:1 22:15
22:18,21,24 23:22
28:23,23 29:12 30:1
30:14 31:7,18,20
32:5,19 33:15 34:23
35:7,16,25 37:3,11
37:13 38:1,11 39:4
39:19 40:9 41:24
42:16,19 43:5 44:23
46:8,10,25 47:3,6
47:15,16,20,21,22
48:3,8,15,23 49:5
49:10,25 51:3,6
52:2 53:4,4,11,11
54:8,18 55:1,3,9,12
55:13,18 56:1,16
57:9,22 58:5,15,16
58:25,25 59:15 60:1
60:5,6,7,13,21,22
61:1,16,25 62:1,8
62:15,22 63:7,17

66:8,23,25 67:11,19
68:5,12 69:5,7
72:20 84:9 86:10
88:7 91:6 95:1
96:16 97:8,18 98:7
98:9 101:11,22,24
102:1,2,4,7,20,20
102:21,22 103:5,8,9
103:17,20,20,21
105:24 106:20
111:13 112:24
116:10,11,20
117:18,19 121:10
121:21 122:14,20
123:1 129:9,9,11
130:11,13,18,21
152:18 153:24
164:24 170:1,13
171:1,10,16,19,24
172:3,14 173:7
174:5,6 175:16
176:2,15 180:22
182:24 185:6,9,19
186:19 187:1,5,14
187:15 188:12,25
189:16,21 191:13
192:3
**thinking** 27:22
37:19
**third** 32:7 39:19
51:18,23,24 52:3
53:10 62:24 63:18
64:9 80:3 98:22
136:16 137:6 140:4
155:8,14,23 156:5
160:10 161:5,5,24
162:6,24 163:1
168:5,6 180:14
181:3 186:22
**this'll** 124:6
**thomas** 4:25 6:17
8:15 70:2,3,4,4
75:14,15,19
**thorny** 57:13
**thorough** 17:20
26:6 75:6 85:11
86:3 126:2

**thoroughly** 184:24
**thought** 27:21 44:4
52:4 82:4 131:4
188:1
**thoughtful** 126:2
**thoughts** 26:18
**thousands** 65:4
**threat** 54:16
**threats** 121:4
**three** 13:10 25:8
28:8 78:3 87:6
108:14 119:10
124:6,10 135:19
145:7 147:4
**threshold** 140:16
142:24
**throated** 38:22
**throw** 175:1
**tidings** 17:16
**timbers** 168:11
**time** 14:3 15:14
18:5 19:15 22:21
27:11,11 35:19 36:1
43:13 46:21 51:13
52:16 61:20 69:16
77:3 79:19 80:22
90:18 92:10 94:3
102:2,11 103:13
114:15 125:5,6
126:10,15 129:19
130:4 140:11
169:17 175:2,17
179:5,19 190:1,6,11
192:13,17
**timely** 111:25
132:17 160:19
**times** 94:24 102:4
104:25 173:16
174:23
**timing** 143:3
**tiny** 117:15
**tired** 127:8,9
**tireless** 99:8
**tirelessly** 157:11
**title** 112:17
**tiwana** 11:3

**today** 12:5 14:13,24
20:13 45:25 51:9
56:3 61:3 62:6 68:2
69:7 70:10 81:9,19
83:6 98:6,13 101:16
102:23 105:1,21
108:3,7 121:3
126:13 134:9
143:11 146:23
154:21 164:24
165:16 178:15
180:6 184:1 186:7
186:19
**todd** 104:9
**toggle** 42:6,7 45:13
**told** 44:7 82:5
**tolles** 4:22 75:16
85:23
**tom** 108:1 111:18
122:25
**tomorrow** 192:10
192:17
**tong** 11:4
**tool** 149:12
**top** 39:24 115:2
**topic** 24:5 94:12
**topics** 29:11
**tort** 64:17 141:1
**tortured** 45:2
**total** 63:9 65:4
74:10 82:19
**touch** 20:25 28:16
**touched** 66:16
**tough** 177:24
**tpg** 82:25 88:23
**track** 149:5
**tracked** 67:13
**tracks** 95:8 107:13
**traction** 20:10
**trade** 34:21,23
**traditional** 47:25
**train** 60:23
**trajectory** 60:17
**transaction** 30:13
30:15 40:5 41:21
42:2,15 47:7 48:16
62:12 77:19 89:18

89:24 90:2,11 91:1
97:12 98:12 99:3,11
99:19 110:10,12
111:4 169:19,23
170:19 171:10
182:1
**transactional** 171:7
**transactions** 22:3
44:25 48:17 89:1,16
164:18 182:3
**transcribed** 1:25
**transcript** 116:1
118:11 176:3 193:4
**transcripts** 16:14
118:5
**transfer** 53:22,23
80:4 93:13 94:7
**transferred** 96:18
**transfers** 22:6
79:15 93:17,17,19
93:22 182:8
**transform** 38:13
**transitioned** 110:9
**translate** 67:23
**transparent** 70:24
**travel** 144:12
**traveled** 25:6
**traveler's** 167:16
167:22
**treat** 191:10
**treated** 65:24
112:19 140:25
**treatment** 64:8 66:9
66:12 108:16
111:20 112:20
114:24 115:2,11
119:9 125:22 128:1
128:15,19 135:20
135:22 136:4
137:11,17 183:24
**treatments** 108:15
**tree** 22:13
**tremendous** 37:24
**trial** 16:14 17:1,21
17:23 19:8 20:9,21
24:11 31:3 70:14
75:18 83:8,22 88:20

88:21 90:13 91:6,9
92:4,19 93:21 96:10
103:16 131:16
142:23 144:1
152:18
**trials** 142:16
**triangular** 35:8
**tribune** 150:13,15
158:3 166:16 167:6
189:9,18
**tried** 26:24 103:18
108:6 116:12 121:6
**trodden** 28:9
**trotted** 54:3
**troubling** 111:16
**truck** 148:14,21
**true** 48:18 49:14,15
50:4 61:13 102:1
140:3 193:4
**truly** 23:3 33:16
123:1
**trust** 7:2 109:8,15
118:22 120:17
123:25 140:7,9
167:7,15 181:12
185:20 190:18
**trustee** 2:4,9,20
3:22 4:2,18 5:2,12
5:18 8:2 19:19 43:6
51:7,8,14,16,23
55:12 60:2 61:14
62:23 94:22,25
95:25 105:6 108:11
108:21 109:13,14
110:19 111:10,14
111:17,22 112:6
114:10 115:17,22
116:21 119:20
121:18 122:3,13
123:6,10,12 124:1,1
125:17,21 126:16
127:2,4 146:12
147:7,10,14,16
159:6,7,12 160:24
161:4,19 163:25
169:15 174:1
176:11 182:23

183:2,17 184:1,7
185:2 190:21 192:5
192:6
**trustee's** 62:9 95:1
124:11 125:19
147:9 150:18
165:19
**trustees** 20:17
36:20 59:19 120:2
152:14 160:14
161:9 169:7 184:5
**trustee's** 101:24
176:4 182:24 183:7
184:13
**trust's** 167:13,24
**try** 19:12 22:18,24
48:7 49:18 50:22
73:14 108:4 185:15
188:16
**trying** 55:15 60:12
61:7 111:6 118:18
170:14,14 177:13
179:5 186:6 191:3
**turbines** 145:2
**turkel** 11:5
**turn** 57:12 62:16
64:5 117:17 144:15
144:16 153:8 155:7
**turning** 34:6
**two** 16:7 46:6 65:9
69:5 83:6 88:12
90:14 97:15 99:10
104:18 105:3 119:8
124:7 135:19 149:3
149:6 166:25
170:10 178:8,13
180:11 189:23
190:21 191:3
**tyler** 123:24
**type** 136:25 170:2
171:2 176:13,14
177:10 189:19
**typical** 65:3 91:22
132:9
**typically** 55:22
143:6

**u**

**u.s.** 1:22 8:1,2 19:18
43:6 94:25 95:1,25
101:24 105:6
108:11,21 110:19
111:10,13,17 112:6
114:10 115:16,22
116:21 119:20
121:18 122:13
123:10 124:11
125:17,21 126:16
127:2,4 168:11
169:15 174:1 176:4
176:11 182:23
190:21 192:5,6
**u.s.c.** 136:18
**ucc** 83:12 120:1
124:3
**uh** 171:8
**ultimate** 27:9
**ultimately** 23:16
24:5 25:21 36:12
45:23 46:18 49:17
58:5 84:23 99:3
101:5 103:23
113:24 114:2,19
115:20 124:15,24
164:11,16 165:8,14
180:6
**umb** 2:20 3:22
**un** 44:2 46:25 50:10
107:3
**unambiguous** 137:4
**unanimous** 17:18
99:25
**unaware** 137:23
**uncertain** 35:18
37:18
**uncertainty** 46:12
46:14 142:17
**unclear** 82:14
**uncomfortable**
108:8
**unconfirmable**
135:24
**uncontested** 44:15
92:22 93:4 96:9

**uncontroverted**
26:8
**uncovered** 85:13
**undercut** 28:14
163:9
**underlying** 148:6
**undermine** 53:6
**undermined** 30:16
45:20
**underpayment**
79:13,16
**understand** 26:24
62:9 115:16 118:23
131:13 171:12
183:4
**understanding**
14:11 43:7 51:8
**understood** 26:24
169:18,18
**undertaken** 72:17
92:12
**undertook** 84:7
**underway** 99:1
**undisputed** 73:2
**undoubtedly** 37:18
**unencumbered**
120:7,10,13
**unequal** 64:8 66:9
**unequivocable**
161:10
**unequivocal** 98:15
**unfair** 139:21
191:22
**unfettered** 165:17
**unfit** 70:18
**unified** 105:2
**uniform** 93:3
**unimaginable**
98:10
**unimpaired** 57:16
69:11 128:7,19
135:17,20 137:18
138:20 144:3 145:8
145:11
**unimpairment**
128:13 183:7,10,22

**unique** 55:20
**united** 1:1,10 15:5,5
   94:22 111:22 122:2
   146:11 147:7,9,10
   147:14,16 150:18
   161:19 163:25
   185:2
**universal** 186:21
**universe** 21:25
   187:12
**university** 188:14
**unjustly** 137:20
**unknown** 134:2
   139:12 141:9,10,11
   141:14,14,14
**unliquidated**
   132:19
**unmanifested** 64:9
   64:13 65:14,23
   66:12 67:5,13,19,20
   67:22 82:18 131:24
   132:8,13,16 133:9
   133:13,17,19,22,23
   134:6,23 136:17,22
   137:3,7,18,21 138:9
   138:12 139:19
   140:15,23 141:4,23
   142:4,11 143:13
   144:25 180:7,19,20
   180:25 181:3,4
**unofficial** 160:15
   160:23
**unprecedented**
   84:2
**unquote** 79:1
   144:17
**unraveling** 54:16
**unrelated** 146:5
**unrelenting** 12:13
**unrepresented**
   178:12
**unresolved** 19:16
**unsecured** 3:2 8:12
   8:19 13:22 34:12
   47:2 58:20 59:1,18
   59:24 60:11 65:19
   73:18 95:21 104:10

105:10,14,20 108:1
109:14 110:15
111:3,11 114:9,17
114:23,24 116:23
118:14,19,25 119:9
124:1,2 125:6
128:19,22 129:2
131:8 132:19
135:10 150:25
159:6,8 167:8,9,10
167:13,18 168:2,21
168:25 169:6
183:11 188:20
**unstinting** 17:3
**untainted** 86:3
**unturned** 84:17
   85:12
**update** 12:16
**updates** 63:8
**upfront** 88:1
**ups** 88:16
**upside** 39:20 81:8
   88:7,14
**uptick** 50:1,11,12
**use** 53:5 94:19
   111:19 136:21
   143:23 165:23
   166:2 181:9 185:20
**uses** 95:8
**usually** 62:2 173:7
   173:14
**utility** 118:20
**utilize** 138:8
**utilized** 24:10 143:6
**utterly** 91:1

**v**

**v** 68:5
**vaguely** 32:3 33:13
**vain** 99:9
**valid** 42:20 43:1
   89:17,19 96:8
   153:15
**validity** 29:18
   142:24
**valuable** 32:6 39:16
**valuation** 40:15
   119:7

**value** 29:6 31:5
   39:24 40:7 74:10,11
   79:17 93:4,8,21,24
   98:12 99:12 105:16
   105:19 111:1 114:8
   115:4 117:3 118:19
   118:24 120:10,13
   157:20 161:14
   185:16
**values** 31:8
**van** 11:6
**variety** 24:13 33:21
   33:22 61:4 183:23
**various** 24:22 26:13
   26:13,15 57:20
   60:22 67:8 71:9
   76:24 77:6 98:23
   112:4 120:16
   128:15 133:18
   152:15 156:13
**varying** 81:3
**vast** 64:3 89:4 98:15
**vatican** 49:22
**vehicle** 94:17
**vent** 148:21,22
**venue** 104:13
**verbatim** 50:22
**veritext** 193:20
**versus** 16:3 42:22
**veto** 116:6
**vetted** 84:1,2 187:4
**vetting** 84:3 85:14
**viable** 88:20
**victim** 136:15
   139:10
**victims** 138:15
**video** 105:10
**view** 29:17 33:7
   34:4 38:15 45:3
   49:11 55:12 58:18
   58:19 59:22 63:3
   116:13 122:11
   165:5 185:4 187:11
   188:10 189:10
**viewed** 28:7 152:24
**views** 26:14,20 27:2
   27:2,3 68:3 115:23

**vigilance** 63:19
**village** 106:11
**violates** 141:4
   163:10,17
**violation** 68:11
   91:23
**virtually** 17:18 80:8
   81:10,21 93:17
   98:11
**virtue** 34:22 153:19
**vis** 127:5,5
**vision** 83:16
**visited** 25:2
**vitiate** 138:19
**void** 89:20
**voidable** 89:20
**volatile** 31:12
**volumes** 39:4 85:9
**voluminous** 77:7
**voted** 38:25 68:23
**voting** 134:15

**w**

**w** 6:6,12 10:8
**wachtell** 8:6 82:4
   82:24
**wagon** 189:12
**wait** 123:15 127:4
**waive** 95:14 128:1
**waiver** 120:7
**waiving** 86:9
**walk** 95:17 97:6
**walked** 105:17
   125:7
**walker** 4:11
**walking** 96:8
**walper** 4:25 75:15
   75:16 82:2 105:1
**walrath** 150:8
**want** 20:25 22:9
   24:8 25:23 30:21
   31:24 39:7 41:22
   51:6 54:21 55:18
   57:12,14 68:15 72:6
   83:7,13,15 94:21
   98:15 108:10,13
   113:23 116:4
   118:17 121:19

122:13,14 124:10
125:2 146:14,19
147:1 151:25
166:17 169:11
170:9 173:16
175:14,16,17 177:2
178:8,10 190:24
191:5
**wanted** 16:24 26:18
37:23 87:25 97:19
100:15,20 101:1,21
108:2 122:14
146:13,22 176:10
177:15
**wanting** 173:19
**wants** 105:1 175:23
188:3
**warring** 111:21
**washington** 150:9
150:14,22,23
151:11 155:23
156:5 158:2
**wasn't** 34:11 183:5
**waste** 32:11 53:18
**watchdog** 147:8
**watched** 119:20,21
**water** 148:19
176:17
**waterfront** 55:1
**watering** 106:5
**waxing** 36:25
**way** 14:22 23:1 41:8
50:20 52:19 53:2
58:23 83:11 91:8
93:19 101:25
110:21 113:4 117:4
119:23 120:22
121:21 130:21
137:4 147:16 148:5
148:9 157:19
171:12,25 174:21
175:22 176:3
180:24 188:16
189:4 190:22
**ways** 22:25 48:16
56:5 98:17 112:12
190:9,19

**we've** 17:21 18:1,5
19:19 20:2,12,19
55:3 57:19 85:15
95:25 112:1 115:5
121:22,22 133:3
143:19
**weak** 32:4 42:21
**weakens** 149:23
**weaknesses** 26:14
**wear** 192:13
**weary** 172:4
**webb** 123:24
**wednesday** 16:12
**week** 17:1,18 27:6
104:18 123:8 145:1
191:9
**weekend** 17:15
36:25
**weekly** 25:11,14
**weeks** 41:14 78:10
88:19 125:9 192:15
**weeks'** 190:21
**weird** 113:6
**weisfelner** 104:1,13
118:8 120:21
**weiss** 6:1 98:2
**welcome** 100:9
123:22 177:18
**went** 18:20 26:12
45:15 63:4 117:4
120:4 149:12 184:6
**weren't** 34:8
**werkheiser** 15:19
167:1
**we'd** 108:7
**we'll** 44:8 50:3
192:17
**we're** 104:17 105:2
105:21 107:11
109:10,11,15
170:11 177:12,20
186:13 189:20
**we've** 39:3 98:5
103:11,11 107:13
107:14 110:5
179:21 187:25
190:9 191:3

**wharton** 6:1 98:2
**whatsoever** 70:15
76:20 163:20 176:6
**what's** 50:4,10
101:16 169:22,22
172:12
**whirlwind** 106:19
**white** 8:11 107:25
115:7 190:4
**wholeheartedly**
124:8
**wholes** 74:15
**who's** 175:24,25
177:14,14,15,24
182:13
**wide** 184:18
**widely** 141:8
**wildly** 48:19
**willful** 51:20 52:1
91:22 157:24 158:5
158:13,14,23
**william** 2:6 131:7
132:11
**williamson** 23:7
26:4,16,23 27:16
29:4,7,19 30:4
32:23,25 34:9,14
35:19 42:12 47:24
70:6 71:12,23 72:11
73:4,13 74:24 84:19
84:23 85:1,24
156:18
**willing** 113:9
175:24 188:3
**wilmington** 1:12
7:2 167:7,13,15,24
**window** 173:13
**wine** 113:19
**winning** 71:22
**winters** 3:19
**wisdom** 100:7
**wise** 47:4
**wisely** 23:23
**wish** 15:3 69:20
**wishes** 102:13
**withdraw** 14:13

**withdrawal** 14:19
14:20 15:11
**withdraws** 15:10
**witnessed** 27:13
**witnesses** 18:21
20:22 72:7 125:8
129:17 156:16
**won** 120:8
**wonderful** 17:14
**wonderment** 60:16
**won't** 41:7 100:13
102:25 185:13
**word** 22:18,18
94:24 112:6 136:21
**words** 48:23 69:3
83:15 84:6 92:7
125:18
**work** 25:23 26:5,12
26:23 31:3 35:8
40:14 42:8 50:17
51:9 77:5 81:23
84:19 90:23 103:20
110:1,1 111:1,3
120:25 125:10
126:3 129:19
148:16 170:21
175:8 186:5 191:14
**worked** 17:11 71:10
75:10 103:17 108:6
157:11
**working** 50:20 99:1
108:4 109:15
146:20 185:17
**works** 68:14 105:25
105:25 122:19
**world** 25:3 33:8
40:25 49:21 88:4
95:10 179:18
187:12 188:25
**worries** 12:6
**worse** 115:8 116:16
120:21,21
**worth** 34:11,23,23
107:11
**worthless** 40:8
**worthy** 43:19

**would've** 120:9,11
  122:23 128:14
**would've** 105:22
**wrap** 124:10
**write** 40:2 88:12
**written** 16:14 73:21
  125:25 157:2,9,15
  164:14
**wrong** 14:8 111:13
  111:13 116:17,17
  125:19
**wrongdoing** 34:1
**wrongful** 132:7
**wsfs** 2:4,9

### y

**yeah** 36:19 37:5
  50:5 62:22 82:17
  166:22 170:16
  176:17 191:4
**year** 24:18 49:24
  50:8 76:17 79:6
  84:21 105:9 116:10
  133:20 134:8,19
  145:6 157:14
  190:14
**yearly** 65:6
**years** 25:8 76:2
  79:14 93:5,18 94:3
  108:6 122:18 141:3
  142:17 145:6
  146:18
**yellow** 66:17
**yenamandra** 11:7
**yesterday** 179:17
**yield** 45:23
**ying** 40:14 45:21
  49:7
**york** 4:17 5:17 6:9
  105:12 123:25
**young** 6:18 8:18
**you're** 100:9 170:24
  173:2,4,20 184:23
**you've** 32:25 50:5,5
  98:6

### z

**zazove** 11:8
**zenith** 52:14
**zero** 20:7,20 36:2
  39:3 74:15,16
**zeroing** 36:24
**zeros** 25:17
**ziel** 5:11

### à

**à** 127:5