Page 1

1   UNITED STATES BANKRUPTCY COURT

    DISTRICT OF DELAWARE

2

3   In re:                    :

                              :     Chapter 11

4   ENERGY FUTURE HOLDINGS    :

    CORP., et al.,     :     :   Case No. 14-10979(CSS)

5                             :

            Debtors.      :    (Jointly Administered)

6   _____:

7

8

9

10                          United States Bankruptcy Court

11                          824 North Market Street

12                          Wilmington, Delaware

13                          December 3, 2015

14                          10:24 AM - 12:39 PM

15

16

17

18

19

20   B E F O R E :

21   HON CHRISTOPHER S. SONTCHI

22   U.S. BANKRUPTCY JUDGE

23

24   ECRO OPERATOR:  LESLIE MURIN

25   Transcribed by:  Sonya Ledanski Hyde

Page 2

1    A P P E A R A N C E S :

2

3    FOLEY & LARDNER LLP

4        Attorney for UMB Bank, NA as Indenture Trustee

5

6    BY:  MARK F. HEBBEIN

7        HAROLD KAPLAN

8

9    MORRIS JAMES LLP

10       Attorney for Law Debenture of New York, Indenture

11       Trustee

12

13    BY:  STEPHEN M. MILLER

14

15    PATTERSON BELKNAP

16       Attorney for Law Debenture of New York, Indenture

17       Trustee

18

19    BY:  DANIEL A. LOWENTHAL

20

21

22

23

24

25

1    FOX ROTHSCHILD LLP

2        Attorney for Counsel to Ad Hoc Group of TCEH Unsecured

3        Noteholders

4

5    BY:  L. JOHN BIRD

6        JEFFREY M. SCHLERF

7

8    WHITE & CASE LLP

9        Attorney to Ad Hoc Committee of EFIH Unsecured

10       Noteholders and EFIH Second Lien DIP Commitment

11

12   BY:  THOMAS LAURIA

13       J. CHRISTOPHER SHORE

14

15   U.S. DEPARTMENT OF JUSTICE

16       Attorney for the U.S. Trustee

17

18   BY:  RICHARD L. SCHEPACARTER

19

20   MCELROY, DEUTSCH, MULVANEY, & CARPENTER, LLP

21       Co-Counsel to the TCEH Debtors

22

23   BY:  DAVID H. PRIMACK

24

25

```
 1   MUNGER, TOLLES & OLSON LLP

 2        Co-Counsel to the TCEH Debtors

 3

 4   BY:  THOMAS B. WALPER

 5

 6   KLEHR HARRISON HARVEY BRANZBURG LLP

 7        Counsel to UMB Bank N.A. Indenture Trustee

 8

 9   BY:  RAYMOND H. LEMISCH

10

11   AKIN GUMP

12        Counsel to UMB Bank N.A. Indenture Trustee

13

14   BY:  SCOTT L. ALBERINO

15

16   SHEARMAN & STERLING LLP

17        Counsel to Deutsche Bank, agent to DIP Financing

18

19   BY:  NED S. SCHODEK

20

21   POTTER ANDERSON & CORROON LLP

22        Attorneys for Deutsche Bank New York

23

24   BY:  R. STEPHEN MCNEILL

25
```

1   MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP

2        Co-Counsel to the EFH Creditors' Committee

3

4   BY:  MARK A. FINK

5

6   SULLIVAN & CROMWELL, LLP

7        Co-Counsel to the EFH Creditors' Committee

8

9   BY:  BRIAN D. GLUECKSTEIN

10

11  VENABLE LLP

12       Attorney for PIMCO

13

14  BY:  JAMIE L. EDMONSON

15

16  DRINKER BIDDLE & REATH LLP

17       Counsel to Citibank NA, TCEH DIP Agent

18

19  BY:  HOWARD A. COHEN

20

21

22

23

24

25

1   PAUL WEISS RIFKIND WHARTON & GARRISON LLP

2        Counsel to Ad Hoc Committee Of TCEH First Lien

3        Creditors

4

5   BY:  JACOB A. ADLERSTEIN

6        BRIAN HERMANN

7

8   YOUNG CONAWAY STARGATT & TAYLOR, LLP

9        Counsel to Ad Hoc Group of TCEH Unsecured Noteholders

10

11  BY:  PAULINE K. MORGAN

12

13  GODFREY & KAHN S.C.

14       Counsel to Fee Committee

15

16  BY:  BRADY C. WILLIAMSON

17

18  GITLIN & COMPANY LLC

19       Chairman of the Fee Committee

20

21  BY:  RICHARD GITLIN

22

23

24

25

1    NIXON PEABODY LLP

2         Attorneys for AST as EFH Indenture Trustee

3

4    BY:  RICHARD C. PEDONE

5

6    O'KELLY, ERNST & BIELLI LLP

7         Co-Counsel to Energy Future Holdings Corp.

8

9    BY:  DAVID M. KLAUDER

10

11   PROSKAUER ROSE LLP

12        Attorneys for EFH Corp. Disinterested Directors

13

14   BY:  MARK K. THOMAS

15        PETER J. YOUNG

16

17   SEWARD & KISSEL LLP

18        Wilmington Trust as Successor of First Lien

19        Administrative Agent and Collateral Agent

20

21   BY:  MARK D. KOTWICK

22        ARLENE R. ALVES

23

24

25

1   WACHTELL, LIPTON, ROSEN & KATZ

2        Attorneys for Equity Sponsors

3

4   BY:  EMIL A. KLEINHAUS

5        RICHARD MASON

6

7   KIRKLAND & ELLIS LLP

8        Co-Counsel to the Debtors

9

10  BY:  MARC KIESELSTEIN

11       EDWARD O. SASSOWER

12       CHAD J. HUSNICK

13       STEVEN N. SERAJEDDINI

14

15  RICHARDS, LAYTON & FINGER, P.A.

16       Co-Counsel to the Debtors

17

18  BY:  DANIEL DEFRANCHESCHI

19

20  HOGAN MCDANIEL

21       Attorneys for Fenicle & Fahy

22

23  BY:  DANIEL K. HOGAN

24

25

1   BROWN RUDNICK LLP

2        Attorneys for WSFS Second Lien Trustee

3

4   BY:  JEFFREY L. JONAS

5        JONATHAN D. MARSHALL

6

7   ASHBY & GEDDES PA

8        Attorney for WSFS Second Lien Indenture Trustee

9

10  BY:  WILLIAM BOWDEN

11

12  PACHULSKI STANG ZIEL & JONES

13       Attorney for Computershare

14

15  BY:  LAURA DAVIS JONES

16

17  KRAMER LEVIN

18       Attorney for Computershare

19

20  BY:  RACHAEL L. RINGER

21

22  CIARDI CIARDI & ASTIN

23       Attorney for TXUZER7-1 RML CM

24

25  BY:  JOHN D. MCLAUGHLIN, JR.

1    STEVENS & LEE PC

2         Co-Counsel to Energy Future Intermediate Holding

3         Company LLC

4

5    BY:  JOSEPH H. HUSTON, JR.

6

7    CROSS & SIMON

8         Attorney for American Stock Transfer

9

10   BY:  CHRISTOPHER P. SIMON

11

12   MORRISON & FOESTER LLP

13        Attorney for TCEM Official Committee

14

15   BY:  BRETT H. MILLER

16        TODD M. GOREN

17        ERICA J. RICHARDS

18

19   APPEARING TELEPHONICALLY:

20   SCOTT L. ALBERINO

21   PHILIP D. ANKER

22   ASHLEY F. BARTRAM

23   PEG A. BRICKLEY

24   CHRISTOPHER L. CARTER

25   BROOKE CHADEAYNE

1    MARIA CHUTCHIAN

2    MARY E. CIULLO

3    MARK A. CODY

4    KENT COLLIER

5    LOUIS A. CURCIO

6    ADAM M. DENHOFF

7    STACEY DORÉ

8    MICHELLE DREYER

9    BENJAMIN D. FEDER

10   BARRY FELDER

11   MARK A. FINK

12   MICHAEL A. FIRESTEIN

13   MARK FLANNAGAN

14   PHILLIP A. GELSTON

15   SETH GOLDMAN

16   ISLEY M. GOSTIN

17   DAVID GRINGER

18   BRIAN P. GUINEY

19   CHRISTOPHER HAHM

20   PAUL HEATH

21   ANGELA K. HERRING

22   NATASHA HWANGPO

23   HANNA KALENCHITS

24   MATTHEW W. KINSKEY

25   CHARLES KOSTER

1    STUART KOVENSKY

2    ALEXA J. KRANZLEY

3    MICHAEL LEE

4    RICHARD LEVIN

5    KEVIN A. LIPPMAN

6    JASON M. MADRON

7    ROBERT K. MALONE

8    TINA MOSS

9    LARS A PETERSON

10   BRIAN PFEIFFER

11   ABID QURESHI

12   MARC B. ROITMAN

13   ANDREA B. SCHWARTZ

14   RICHARD A. STEIGLITZ

15   AMER TIWANA

16   BRIAN TONG

17   MICHAEL TURKEL

18   MATTHEW UNDERWOOD

19   JULIA M. WINTERS

20   APARNA YENAMANDRA

21   ALAN ZIMMERMAN

22

23

24

25

1                    P R O C E E D I N G S

2            CLERK:  All rise.

3            THE COURT:  Please be seated.  All right.  Good

4    morning.  I am going to read into the record my rulings on

5    the settlement motion first.  Then we'll take a recess and

6    come back on due confirmation.  I apologize.  They're

7    somewhat lengthy but I felt it important to address several

8    issues that are no longer live but were raised both in the

9    objections and throughout trial to clarify sort of where I

10   come out and what I think the record shows.  And I try not

11   to bury the lead.  I'll tell you early on what I'm doing, so

12   you can relax and listen.  And like Mr. Shore, I need these

13   to read, like lots of us I expect.  Okay.

14           Before the Court is the motion of Energy Future

15   Holdings Corp, et al, to approve a settlement of litigation

16   claims and authorize the Debtors to enter into and perform

17   under the Settlement Agreement in which the Debtors seek

18   approval of the settlement that the parties refer to as

19   disarmament.

20           Disarmament involves all inter-Debtor litigation

21   and includes global releases of the Debtors, directors and

22   officers and the equity sponsors.  The Settlement Agreement

23   also provides for the payment of the professional fees of

24   certain creditor constituency.

25           Importantly, while approval of the Settlement

1    Agreement is a condition and confirmation of the plan before

2    the Court, the Settlement Agreement is independent of the

3    plan and will be binding even if the current plan is not

4    confirmed or consummated.

5           The Debtors submitted extensive evidence in

6    support of approval of the Settlement Agreement in the form

7    of admitted documents, deposition designations, written

8    direct testimony and live testimony in a multi-week trial.

9           The evidence overwhelmingly supports approval of

10   the Settlement Agreement with an exception as to the

11   mechanism for payment of professional fees.

12          There were a number of objections to the

13   Settlement Agreement, although all but two of them have been

14   resolved.  The Court will review the factual record,

15   establish a trial and then the legal standard governing the

16   motion.  The Court will then turn to the outstanding

17   objections.

18          In considering the factual basis for the

19   Settlement Agreement, the Court will focus on three areas --

20   excuse me -- the process by which the settlement was

21   reached, the substance of the settlement and the timing and

22   form of the settlement.

23          First as to process, the resolution of the inter-

24   Debtor claims and the release of the directors and officers

25   has its genesis in the disinterested director or DD

1    settlement that was reissued in April 2015 and was

2    incorporated into the Debtor's first plan of reorganization

3    which was filed shortly after the DD settlement was reached.

4           Indeed, the current inter-Debtor settlement is

5    substantially identical to the DD settlement.  The DD

6    settlement was the result of an extensive process and

7    contentious arm-length negotiations.

8           Since early 2014, disinterested directors have

9    been in place at the three major Debtor entities, Don Evans

10   and Billie Williamson at EFH Corp, Hugh Sawyer at EFCH and

11   TCEH and Charles Cremens at EFIH.  In each instance, those

12   directors or managers served solely on the board of one

13   Debtor and did not owe any fiduciary duties to any other

14   Debtor entity.

15          In response to the Court's comments at the hearing

16   on the Oncor bid procedures in November 2014, each of the

17   boards passed resolutions appointing its respective

18   disinterested directors with sole authority to identify and

19   to resolve conflict matters, i.e. matters in which a

20   conflict might exist between affiliated Debtors.

21          In addition, each disinterested director was given

22   authority to hire independent legal and financial advisors

23   known as the DDAs, which they did.  The disinterested

24   directors then tasked the DDAs with educating themselves as

25   to the facts and issues relating to the potential conflict

1   matters.  The DBAs conducted an intensive review of the

2   facts, including the 5 million plus pages of legacy

3   discovery.

4          The disinterested directors and DDAs also held

5   numerous meetings with Debtor and creditor representatives.

6   The DDAs made numerous presentations to their respective

7   disinterested directors.

8          Based on their due diligence and the advice of the

9   DDAs, the disinterested directors identified a list of

10  conflict matters and reached conclusions as to the

11  litigation risk, litigation costs, potential recoveries and

12  general value of the claims constituting conflict matters.

13  While the disinterested directors did not review litigation

14  specific budgets, they were aware of the general cost of

15  litigation in these cases, the complexity of the issues and,

16  thus, the length and expense of any litigation and the

17  extensive carrying cost and adverse effects on the Debtor's

18  business related to remaining in bankruptcy.

19         During this process, the disinterested directors

20  kept their respective boards informed of the process but did

21  not share their independent conclusions as to risk and

22  value.  That information was incorporated in part into what

23  became known as the CRO term sheet, which was created by Mr.

24  Keglevic and Ms. Doré in early 2015.  The CRO term sheet was

25  designed to spur plan negotiations among the creditor

1    constituencies that had not yet occurred in any meaningful

2    way.

3            Incorporated in the CRO term sheet was an allowed

4    claim of TCEH against EFH Corp in the amount of $450

5    million.  The disinterested directors were aware of the CRO

6    term sheet and the allowed claim contained therein but

7    specifically did not endorse the term sheet or the claim

8    amount.

9            In February 2015, the disinterested directors

10   instructed their DDAs to open communications with the DDAs

11   for the other Debtors which included presentations among the

12   professionals as to their respective determinations as to

13   the value of the inter-Debtor claims.  These communications

14   ultimately led to three days of in-person meetings and

15   negotiations between the disinterested directors in late

16   March 2015 at the Debtor's corporate headquarters in Dallas.

17   Those meetings and negotiations were extensive, contentious

18   and certainly arms-length.

19           The disinterested directors acted independently

20   during the entire process and in no way were influenced by

21   outside forces.  While there were assertions at trial that

22   the disinterested directors were influenced by the CRO term

23   sheet during negotiations, there was no evidence to support

24   that assertion.  Indeed, the evidence strongly supported the

25   opposite conclusion.  Moreover, each of the disinterested

1    directors remained ready, willing and able to institute

2    litigation if the negotiations were unsuccessful.

3           At the conclusion of these negotiations, the

4    disinterested directors reached a global settlement of

5    intercompany claims related to conflict matters known as the

6    DD settlement.  The DD settlement provided for an allowed

7    unsecured claim on behalf of TCEH against EFH Corp in the

8    amount of $700 million, the transfer 100% of EFH Corp's NOLs

9    to TCEH, a $10 million claim against EFH Corp in favor of

10   the equity sponsors and the sharing of excess consideration

11   at EFH Corp to increase TCEH's allowed claim up to a total

12   of $805 million.  All intercompany claims in favor of

13   against EFIH including debt claims in excess of $1 billion

14   were released.  In addition, the DD called for a full

15   release of all the Debtors, directors and officers.

16          The disinterested directors finalized the DD in

17   April of 2015 and was incorporated in the Debtor's first

18   plan to reorganization.

19          Over the summer, the Debtors engaged in intensive

20   negotiations with various parties that ultimately led to the

21   Settlement Agreement and plan before the Court which was

22   filed on August 10, 2015.  Throughout this timeframe, the

23   disinterested directors were kept apprised of developments.

24   At board meetings on August 9th, the disinterested directors

25   each approved the Settlement Agreement as it pertained to

1   conflict matters.  They also approved the Settlement

2   Agreement as a whole.  The full boards then approved the

3   Settlement Agreement.

4           The settlement before the Court is similar to the

5   DD settlement with a couple key differences, the

6   distribution to the equity sponsors and the sharing

7   arrangement between EFH Corp and TCEH have been dropped, the

8   amount of TCEH's allowed claim against EFH Corp is $700

9   million.

10          To borrow a theme from earlier hearings in this

11  case, commencing in November 2014, the disinterested

12  director process as it related to conflict matters was gold-

13  plated.  The DD settlement as modified in the Settlement

14  Agreement before the Court was a model of corporate

15  governance.  The record overwhelmingly establishes that the

16  disinterested directors acted prudently, were fully

17  informed, took their fiduciary duties seriously, advocated

18  and negotiated hard on behalf of their estates and acted at

19  all times with complete integrity.

20          Another critical element of the Settlement

21  Agreement before the Court is the release of claims against

22  the equity sponsors and the payment of up to $15 million of

23  their reasonable professional fees.  The process related to

24  the equity sponsors was somewhat different.

25          Issues with regard to the equity sponsors were not

1    designated as conflict matters by the disinterested

2    directors.  Rather, each of the Debtor entities acted

3    through a special committee that did not include any equity

4    sponsor affiliated directors that otherwise served as a

5    majority of each of the boards.

6            Those special committees were delegated with

7    authority to act on matters related to the equity sponsors

8    and conducted extensive due diligence including a review of

9    the results of an extensive investigation by Sidley Austin

10   in 2013 relating to potential claims against the equity

11   sponsors.

12           The special committees approved a release of the

13   equity sponsors in April 2015 in connection with the

14   Debtor's first plan of reorganization.  Special committees

15   did not act again in August 2015 with regard to the

16   Settlement Agreement before the Court.

17           Although that would have been preferable, it was

18   not fatal to the process as there have been no further

19   developments relating to potential claims against the equity

20   sponsors and the August settlement was actually less

21   favorable to the equity sponsors than that approved in April

22   2015.

23           While not gold-plated, the process relating to the

24   equity sponsors was more than sufficient to satisfy the

25   principles of good corporate governance.  It's important to

1   note here that the evidence clearly established that the

2   equity sponsors and their affiliated directors acted in all

3   times in a manner consistent with their fiduciary duties and

4   had the good of the Debtors as a whole as their primary

5   motivation.

6           Second as to substance, there are three separate

7   settlements that must be considered, one, the inter-Debtor

8   settlement of conflict matters resulting in a $700 million

9   claim in favor of TCEH against EFH Corp; two, the release of

10  the Debtors, directors and officers; and, three, the release

11  of the equity sponsors and the payment of up to $15 million

12  of their reasonable professional fees.

13          The inter-creditor settlement TCE -- excuse me,

14  the inter-creditor settlement at TCEH is not contested and

15  need not be discussed here.

16          With regard to the inter-Debtor claims, there were

17  numerous claims by and against each of the Debtor groups,

18  EFH, EFIH and TCEH.  These involved, among other things,

19  claims related to the 2007 LBO, intercompany tax liability,

20  payment of interest under the SG&A and P&I notes, the 2011

21  amend and extend transactions, the allocation of equity

22  sponsor fees and shared services, EFIH's holding of

23  intercompany debt, EFIH avoidance actions against EFIH and

24  the value of the tax-free spend to EFH Corp.

25          Excluding TCEH's $21 billion in LBO claims against

1    EFH Corp, the various estates faced gross claims in excess

2    of $8 billion.  The disinterested directors each have their

3    own conclusions as to the value of these claims.  They did

4    not negotiate on a claim-by-claim basis but rather sought to

5    reach a global agreement on the claims.  This was

6    appropriate given how difficult it would have been to reach

7    agreement on a claim-by-claim basis.

8              The evidence clearly establishes, however, that

9    the bulk of the claims ran against EFH Corp.  The

10   intercompany tax claims and the underpayment of interest on

11   the SG&A and P&I notes, which alone gross approximately $1.5

12   billion, were particularly strong claims against EFH Corp.

13   Nonetheless, there was litigation risk on all sides of the

14   equation.

15             Another factor to consider is the merits of the

16   settlement relates to the cost and risk of litigation.  The

17   evidence supports a finding that litigating the intercompany

18   claims would have taken anywhere from many months to several

19   years and the litigation cost would have been in the tens of

20   millions of dollars and could easily have reached into the

21   hundreds of millions.

22             In addition, the carrying cost of the case as a

23   whole are extraordinarily high.  Adequate protection alone

24   cost the Debtors $100 million per month and professional

25   fees run $35 million per month with those subject to court

1    approval exceeding $200 million in the first full year of

2    the case.  Litigation would have been hugely expensive both

3    in terms of the litigation itself and the cost of continuing

4    the case in bankruptcy while the litigation ran its course.

5            Moreover, the resolution of the intercompany

6    claims was necessary in order for the Debtors to be able to

7    reorganize.  This cannot be overstated.  There is simply no

8    way to reorganize these Debtors without a resolution of the

9    intercompany claims.  The capital structure and the flow of

10   the claims is too complicated.  Even a sale either as a

11   going concern or liquidation of the portion of the Debtor's

12   assets such as Oncor is immensely more complicated without a

13   resolution of the intercompany claims.

14           For example, any disposition of Oncor would have

15   raised tax implications that were integrally a part of

16   intercompany claims.  Settlement was vitally necessary to

17   move the cases and these Debtors forward.

18           As to the release of the directors and officers,

19   the record establishes that any claims against the D&Os are

20   inextricably intertwined with the inter-Debtor claims.  Any

21   claims against the D&Os would give rise to indemnification

22   claims against the various Debtor entities which would

23   render an intercompany settlement moot.  You simply cannot

24   resolve the inter-Debtor claims without resolving the claims

25   against the directors and officers.

1          Moreover, most of the inter-Debtor claims do not

2      involve any valid claim against the D&Os.  The D&Os claims

3      are few and dwarf and in the context of all the claims as a

4      whole.  In short, preserving the D&O claims would have

5      little upside for the Debtors and huge downside as it would

6      be impossible to settle the intercompany claims as a

7      practical matter without inclusion of the settlement of the

8      D&O claims.

9          As to the release of the equity sponsors, the

10     record establishes that other than possible D&O claims

11     against the sponsor affiliated directors in their capacity

12     as directors, the release of which was just discussed, no

13     valid claims have been identified against the equity

14     sponsors.

15         Indeed, a thorough investigation of potential

16     claims against the equity sponsors was conducted by Sidley

17     Austin and the special committee decided to release claims

18     against the equity sponsors after review of the results of

19     that investigation.

20         Moreover, the equity sponsors are providing

21     significant value in exchange for their release in the

22     payment of up to $15 million and their reasonable

23     professional fees.  The equity sponsors have, one, agreed to

24     forego their $10 million distribution under the DD

25     settlement; two, agreed to forego up to $80 million in

1    sponsor fees; three, agreed to delay taking a worthless

2    stock deduction to preserve the Debtor's tax attributes;

3    and, four, provided substantial value to the Debtor's

4    reorganization above and beyond the performance of the

5    duties of their affiliated directors.

6            Finally, as with the D&O releases, releasing the

7    equity sponsors is necessary to protect the integrity of the

8    inter-Debtor settlement.

9            In short, the record clearly establishes that the

10   settlement of the intercompany claims, the release of the

11   D&Os and the release of the equity sponsors are imminently

12   reasonable.

13           Third, as to the timing and form of the

14   settlement, as mentioned at the outset, while approval of

15   the Settlement Agreement is a condition that confirmation of

16   the plan before the Court, the Settlement Agreement is

17   independent of the plan and will be binding even if the

18   current plan is not confirmed or consummated.

19           This is important and unusual as the current plan

20   leaves the E-side creditors unimpaired, the claim of $700

21   million against EFH Corp is a matter of no moment to these

22   creditors.

23           But if the plan is not consummated and EFH Corp

24   creditors are ultimately impaired, that $700 million claim

25   would substantially dilute the recovery of those creditors.

1          I would point out, though, that that has been

2     somewhat lessened by the EFH committee settlement that was

3     reached at the end of confirmation.

4          Notwithstanding that risk, evidence supports a

5     finding that approval of the Settlement Agreement

6     independent of the plan is appropriate.  As discussed

7     previously, it is simply impossible to reorganize these

8     Debtors without resolving the inter-Debtor claims which

9     includes the D&O and equity sponsor releases.

10          While it is certainly possible to resolve claims

11     such as these outside a plan of reorganization, it is

12     unusual. Nonetheless, the record clearly establishes that it

13     is appropriate and would be necessary in this case.

14          Turning to the law, to be approved under Rule

15     9019, a settlement need only be "fair and equitable" falling

16     "above the lowest point in the range of reasonableness" In

17     Re: 438BR471 and 475 to 476 bankruptcy District of Delaware

18     2010.

19          To make this assessment, courts in the 3rd Circuit

20     apply the Martin factors considering "One, the probability

21     of success in litigation; two, the likely difficulties in

22     collection; three, the complexity of the litigation involved

23     and the expense and convenience in delaying necessarily

24     attending it; and, four, the paramount interest of

25     creditors" In Re: Martin 91 F3d 389 at 393, 3rd Circuit

1    1996.

2           In applying the Martin factors, courts in this

3    district -- excuse me, courts in this circuit canvas the

4    issues and may approve the settlement only when supplied

5    with sufficient information to form a "intelligent and

6    objective opinion" on the claims being settlement.  See

7    Capmark 438 B.R. and 514.

8           Courts do not require a full evidentiary hearing

9    or a mini trial on the merits of the claims being settled,

10   Id at 515.  That said, the Court just held a multi-week

11   trial focused in large part on the inter-Debtor claims and

12   the Settlement Agreement that could fairly be characterized

13   as a mini trial on the merits of the settlement claims.

14          The record establishes that each of the Martin

15   factors are easily satisfied.  As to the probability of

16   success in litigation, there are approximately 10 categories

17   of intercompany disputes, each of which could give rise to

18   numerous legal claims.

19          Potential liability flows different directions

20   within the capital structure raising complicated issues of

21   set off.  The claims are highly fact intensive.  The claims

22   vary in probability from fairly low such as the LBO claims,

23   to fairly high such as the payment of inadequate interest on

24   the SG&A and P&I loans and the face amount of the claims are

25   in the billions of dollars, but except for the LBO claims,

1   are relatively low in comparison to the overall capital

2   structure.

3         In short, while a potential payout in litigation

4   may seem high, there is substantial uncertainty as to

5   whether such litigation would be successful and it is

6   unclear which estate will ultimately benefit from

7   litigation.  As to the likely difficulties in collection,

8   there are several issues.

9         As just mentioned, potential liability flows

10  different directions within the capital structure raising

11  complicated issues of set off.  Moreover, the value of the

12  assets at the various estates vary as does the debt load.

13  For example, there is over $25 billion of debt at TCEH with

14  its secured creditor under secured by billions of dollars.

15        A large claim against the TCEH estate is of

16  limited value and might return pennies on the dollar.  The

17  value of the claim against TCEH has declined during the life

18  of this case because of the drop in commodity prices which

19  have a direct impact on Luminant and TSU's businesses.

20        Even a claim against EFIH or EFH Corp may not

21  generate a substantial return as the value of those estates

22  is tied to the value of Oncor, which may prove difficult to

23  unlock.  And the debt load on the E-side of the Debtors is

24  significant.  While the claims might be in the face amount

25  of billions, the actual value may be much lower.

1              As to the complexity of the litigation involved

2      and the expense inconvenience in delaying necessarily

3      attending it, the cost of litigating these claims would be

4      mammoth.

5              Even though document discovery might be truncated

6      by the fact that the 5 million page legacy discovery has

7      already been completed, that is just one element of the cost

8      of discovery for these claims.  Depositions and expert

9      discovery would be extensive.

10             Also, motion practice on both motions to dismiss

11     and motions for summary judgment would be extensive and time

12     consuming.  There would also be multiple, lengthy,

13     complicated trials which would lead to numerous appeals at

14     both the district court and the 3rd Circuit.

15             The professional fees would be easily in the tens

16     of millions of dollars and could be in the hundreds of

17     millions.  Meanwhile, the Debtors would be stuck in Chapter

18     11 where adequate protection costs $100 million per month

19     and the Debtor's business would suffer from, among other

20     things, the lack of funds for capital expenditures.  It is

21     hard to imagine a more complicated and expensive process

22     that would be required to litigate these claims.

23             Finally, as to the paramount interest of

24     creditors, this settlement benefits every Debtor and every

25     creditor of every Debtor.  It is simply impossible to

1    reorganize these Debtors without resolving the inter-Debtor

2    claims either independently or through a plan.  It can't be

3    done.

4              A settlement of these claims allows for the value

5    of the Debtor's assets to be unlocked for the benefit of the

6    creditors.  Even the creditors of those Debtors that have

7    limited or no potential liability benefit from the

8    settlement because it allows those Debtors to reorganize.

9              Every dollar saved through settlement is at least

10   a dollar of value that is made available to the creditors.

11   Thus, all four Martin factors overwhelmingly support

12   approval of the Settlement Agreement.

13             Turning now to the two remaining objections to the

14   settlement, one objection was filed by two asbestos

15   claimants, the Estate of George Fenicle and David William

16   Fahy.

17             The second remaining objection was filed by the

18   Office of the United States Trustee.  Both Fenicle and Fahy

19   and the UST objected confirmation of the Debtor's plan but I

20   will address those objections later.

21             Four Debtors referred to as the asbestos Debtors,

22   EECI Inc, case number 14-10992, EEC Holdings, case number

23   14-10990, LSGT Gas Company, case number 14-11039 and LSGT

24   SACROC -- that's S-A-C-R-O-C -- Inc, case number 14-11012,

25   used asbestos products in their normal course of business

1      which exposed workers like Mr. Fahy and Ms. Fenicle's

2      diseased husband to dangerous asbestos fibers.  The asbestos

3      Debtors have all ceased operations and have no ongoing

4      business.

5              Fenicle and Fahy argue that the settlement is not

6      fair and equitable to the asbestos Debtors because, one, the

7      asbestos Debtors are solvent; two, the asbestos Debtors hold

8      substantial intercompany claims; and, three, the asbestos

9      Debtors have no intercompany obligations.

10              As discussed just a few moments ago, however, this

11      settlement benefits every Debtor and every creditor of every

12      Debtor.  Even the creditors of those Debtors that have

13      little or no potential liability benefit from the settlement

14      because it allows those Debtors to reorganize.

15              The asbestos Debtors, like all other Debtors, are

16      being held captive by the dispute over the intercompany

17      claims.  Moreover, the Settlement Agreement is an all or

18      nothing deal.  It is impossible to carve out the asbestos

19      Debtors from the Settlement Agreement.

20              And in addition, the Debtor's sixth amended plan

21      contains several provisions relevant to the treatment of

22      asbestos-related claims.  Specifically the sixth amended

23      plan provides that asbestos-related Class A3 legacy general

24      unsecured claims against the EFH Debtors shall be

25      reinstated.  Furthermore, the sixth amended plan provides

1    the Class A14 claims interest in the EFH Debtors other than

2    EFH Corp held by the asbestos Debtors shall be reinstated.

3              EECI, EEC Holdings and LSGT SACROC are all

4    subsidiaries of LSGT Gas Company.  LSGT Gas Company is a

5    subsidiary of EFH Corp.  Furthermore, EECI, EEC Holdings and

6    LSGT SACROC possess intercompany claims against LSGT Gas

7    Company totaling approximately $990 million.  LSGT Gas

8    Company in turn possesses an intercompany claim against EFH

9    Corp totaling approximately $560 million.  All of these

10   claims are being reinstated under the sixth amended plan.

11             Since 1992 the Debtors have incurred approximately

12   $26.4 million in total asbestos expenses.  Given the

13   historical rate of the Debtor's asbestos-related expenses,

14   reinstatement of the above described claims ensures that

15   reorganized EFH will continue to fund asbestos-related

16   expenses that may arise at the asbestos Debtors.  All four

17   Martin factors are in favor of the asbestos Debtors

18   participating in the settlement and the Fenicle and Fahy

19   objection is overruled.

20             The UST objects to the Settlement Agreement

21   because it seeks to pay professional fees to non-estate

22   retained professionals without adequate disclosure or legal

23   justification and the payment of those professional fees

24   requires compliance with Section 503(b) of the bankruptcy

25   code.  The Court will sustain in part the UST's objection.

1              Section 2.7A of the Settlement Agreement obligates

2     the Debtors to pay fees "without further notice to or

3     action, order or approval of the bankruptcy court" to

4     undisclosed professionals retained by multiple parties.

5     More specifically, the day after the settlement effective

6     date, TCEH shall pay fees, expenses and reimbursements for

7     the period before and including June 30, 2015 up to $49.75

8     million of, one, members of the ad hoc committee of TCEH

9     first lien creditors; and 2A, the TCEH unsecured group but

10    not the individual members thereof; B, the TCEH unsecured

11    notes trustee; C, the TCEH second lien group but not the

12    individual members thereof; D, the TCEH second lien trustee;

13    and, E, the Bank of New York Mellon Trust Company; and, A,

14    as collateral agent under the TCEH second lien notes

15    indenture.  Upon the effective date of the plan, EFH shall

16    reimburse TCEH in cash for these professional fees.

17             As to the almost $50 million of fees payable

18    pursuant to the Settlement Agreement, the UST argues that it

19    cannot review the propriety of these fees.  The Debtors

20    replied that such fees are being sought under Bankruptcy

21    Rule 9019 and the UST has not contested that the settlement

22    is fair, equitable and in the best interest of the Debtor's

23    estates and falls above the lowest point in the range of

24    reasonableness.

25             The Debtors argue that the payment of the

1   professional fees was negotiated on an arms-length good

2   faith basis and is bargained for consideration.

3   Professional fee payment is supported by the TCEH creditors.

4   Furthermore, the professionals have agreed to provide

5   valuable support for the Debtors in their ability to

6   consummate the plan and any alternative restructuring

7   transaction if necessary.  The Debtors also argue that these

8   professional fees should be approved in light of the

9   professionals' and creditors' substantial contribution to

10  these cases.

11          While it is true that the payment of the

12  professional fees is a negotiated part of the settlement,

13  the parties cannot contract around the bankruptcy code, even

14  under Rule 9019.  Importantly, these claims are not being

15  paid in connection with an allowed claim such as that of a

16  secured creditor, nor out of the charging lien asserted by

17  an indentured trustee from the allowed claim of its

18  noteholders.

19          Rather, the professional fees are being paid to ad

20  hoc committees and creditors and indentured trustees by the

21  Debtor, TCEH, as an independent allowed administrative

22  expense.  As such, it must be authorized by the bankruptcy

23  code.

24          Section 503(b)(4) of the code provides that "There

25  shall be allowed administrative expenses including

1   reasonable compensation for professional services rendered

2   by an attorney or an accountant of an entity whose expense

3   is allowable under Subparagraph A, B, C, D or E of Paragraph

4   3 in this subsection based on the time, the nature, the

5   extent and the value of such services and the cost of

6   comparable services other than in a case under this title

7   and reimbursement for actual necessary expenses incurred by

8   such attorney or accountant."

9           Section 503(b)(3)(d) of the code, in turn,

10  provides that an administrative expense is allowable for "a

11  creditor, an indentured trustee, an equity security holder

12  or a committee representing creditors or equity security

13  holders other than a committee appointed under Section 1102

14  of this title in making a substantial contribution in a case

15  under Chapter 9 or 11 of this title".

16          Thus, courts have found that a creditor or ad hoc

17  committee of creditors is entitled to payment of its

18  professional fees and expenses by virtue of making a

19  substantial contribution to the bankruptcy case, see Davis

20  v. Elliot Management Corp In Re: Lehman Brothers Holding Inc

21  508 BR 283 of 296 Southern District New York 2014.

22          But the Court must make an independent

23  determination as to the existence of the substantial

24  contribution and whether the fees and expenses are

25  reasonable.  It cannot defer to the Debtor's business

1    judgment.

2            There is an argument to be made that the Court

3    could authorize these fees outside of Section 503 and

4    without court review as to reasonableness.  See, for

5    example, In Re: Adelphia Communications Corp 441 B.R. 6,

6    Bankruptcy Southern District of New York.

7            The Court is not rejecting the reasoning of those

8    cases but believes in this case it is appropriate and more

9    prudent to require compliance with Section 503 of the

10   bankruptcy code.  In this case, the record clearly supports

11   a finding that the parties covered by Section 2.7A of the

12   Settlement Agreement have provided a substantial

13   contribution to the case justifying the payment of their

14   professional reasonable fees and expenses.

15           For example, the collection of creditors and

16   trustees acting through their professionals, A, were

17   instrumental in providing billions of dollars in new debt

18   and equity financing allowing the Debtors to render

19   unimpaired the entire E-side of the balance sheet; B, agreed

20   to waive billions of dollars in valuable deficiency claims

21   for the benefit of unsecured creditors who would have

22   otherwise received nothing in liquidation; and, C, a

23   foregoing intra T-side litigation.

24           More specifically, with respect to the new debt

25   and equity financing, the terms of such financing are set

1    forth in the equity commitment letter as amended and

2    restated in the plan supplement.  The backstop agreement

3    and, of course, the merger and purchase agreement, all of

4    which were subject to intense negotiation over a very short

5    time period amongst the creditors and professionals.

6          Similarly, the TCEH first lien deficiency waiver

7    was the product of significant negotiations for the TCEH

8    junior creditors and TCEH first lien creditors.

9          Finally, the intra T-side litigation involved

10   review of millions of pages of legacy discovery materials,

11   negotiations regarding the challenge deadline under the TCEH

12   cash collateral order and the drafting of hundreds of pages

13   of pleadings which served as an impetus for mediation and

14   ultimately settlement.

15         What the Court cannot do at this time is make a

16   finding that the professional fees to be paid under Section

17   2.7A of the Settlement Agreement are reasonable because the

18   invoices have not been made available to the Court and

19   parties and interests.

20         In order for the fees and expenses to be paid,

21   each professional firm must submit its invoice as to the fee

22   committee established in this case for the fee committee to

23   review and comment with the fee committee ultimately issuing

24   a written recommendation or report to this Court.

25         The UST may also review and comment on the fees

1    and make a written submission to the Court in his individual

2    capacity as opposed to as a member of the fee committee if

3    he so desires.  The Court would then approve those fees and

4    expenses it determines to be reasonable.

5              The Court does not require that the professional

6    firm file a formal implication and does not expect the

7    submissions to satisfy the rules governing formal fee

8    applications or the UST fee guidelines.  The invoices need

9    not be filed on the docket, although the recommendation of

10   the fee committee and any objection or comment by the UST

11   should be docketed.

12             The parties should work with the fee committee and

13   the UST to establish the timing and parameters of this

14   process including the level of review by the fee committee.

15             That said, the Court is fully cognoscente that

16   proceeding in this manner will require additional expense

17   and result in significant delay.  Because the payment of

18   professional fees and the cap on those fees under Section

19   2.7A is an integral part of the negotiated Settlement

20   Agreement, the Court is reluctant to insert itself into the

21   process but it must adhere to the bankruptcy code.

22             In order to accommodate as much as possible the

23   spirit of the Settlement Agreement, the Court will authorize

24   the payment on the settlement effective date of 80% of fees

25   and 100% of expenses of the professionals seeking payment

1    under Section 2.7A of the Settlement Agreement.  Those fees

2    and expenses would remain subject to disgorgement in the

3    event the Court ultimately found a lesser amount to be

4    reasonable.

5              There is an exception, however, to this ruling.

6    Under Section 2.7B of the Settlement Agreement on the

7    effective date of the plan, EFH shall pay the professional

8    and expenses and the equity sponsors up to $15 million.  As

9    this payment will not be paid until the effective date of

10   the plan, it will be discussed on the ruling of

11   confirmation.

12             In addition, this ruling does not apply to the

13   transaction-related fees payable by EFH and EFIH to the plan

14   sponsors under the merger backstop and equity commitment

15   agreements to which no object has been made.  Those fees and

16   expenses may be paid without further court review.

17             Thus for the reasons articulated and based upon

18   the extensive evidentiary record in this case, subject to

19   the ruling on the mechanism for payment of professional

20   fees, the Court will approve the Settlement Agreement and

21   grant the Debtor's motion.

22             We'll take a very short recess now and the Court

23   will render its likely longer decision on confirmation of

24   the Debtor's sixth amended plan of reorganization.  So take

25   a short recess.

1          (Recess)

2                  CLERK:  All rise.

3                  THE COURT:  Please be seated.  Do we have everyone

4     we need?  I think.  Okay.  All right.

5                  So I'll now turn to my ruling on confirmation.  I

6     will apologize ahead of time that some of this will be a

7     little repetitive in a couple of places of what I just

8     ruled, but as they are two different motions and possibly

9     one will be appealed and one won't, I don't know, I want to

10    make sure I have a complete record for the Court.

11                 So we'll get right to it.  Before the Court is

12    confirmation of the Debtors' sixth amended plan of

13    reorganization.  The Debtors submitted extensive evidence in

14    support of confirmation in the form of admitted documents,

15    deposition designations, written direct testimony and live

16    testimony at a multi-week trial.  The evidence

17    overwhelmingly supports confirmation of the plan, with an

18    exception as to the mechanism for payment of professional

19    fees.

20                 There were a number of objections to confirmation,

21    although most of them have been resolved.

22                 The Court will not recite every element of Section

23    1129 in making its ruling, most of the elements that must be

24    established in order for the Court to confirm the plan are

25    either not applicable or uncontested.

1        For a more fulsome discussion of the Debtors'

2   uncontested satisfaction of the confirmation requirements,

3   the Court refers to the Debtors' memorandum of law in

4   support of confirmation and joint plan of reorganization,

5   Docket Number 6647, which the Court incorporates by

6   reference and adopts, except to the extent it is

7   inconsistent with this ruling.

8        The Court will briefly discuss good faith and

9   feasibility and will then turn to the outstanding

10  objections.

11       Section 1129(a)(3) of the bankruptcy code requires

12  that the proponent of a plan of reorganization propose the

13  plan, quote, in good faith and not by any means forbidden by

14  law, end quote.

15       In assessing the good faith standard, Courts

16  consider whether the plan, one, fosters a result consistent

17  with the objections of the -- objectives of the bankruptcy

18  code; two, has been proposed with honesty, good intentions

19  and a basis for expecting that the organization can be

20  effectuated; and three, exhibits a fundamental fairness in

21  dealing with creditors.  W.R. Grace, 475 B.R. 34 at 87, 88,

22  Bankruptcy District of Delaware 2012.

23       The touchstone of the good faith inquiry is

24  whether the plan itself is designed to effectuate results

25  that are consistent with Chapter 11 policy goals, In Re:

1    PWS Holding Corp, 228 F.3d 224 at 242, Third Circuit, 2000.

2            The Debtors' plan easily meets this standard.  The

3    plan sheds over $30 billion in debt and is contingent on a

4    settlement that resolves billions of dollars of intercompany

5    claims.  It is based on a merger transaction that infuses

6    billions of dollars in new equity and debt into the capital

7    structure and allows for the spinoff of the Oncor business

8    from the TXU and Luminant businesses in transactions that

9    will leave all three businesses in a much stronger financial

10   situation.

11           It unimpairs the E-side of the capital structure.

12   And after the settlements of objections approved by the

13   Court, has support of a hundred percent of the Debtors'

14   immense and varied capital structure.

15           There were assertions in the objections and at

16   trial that the plan is not in good faith because there was

17   no business justification for the merger and/or the insider

18   releases in the inter-Debtor settlement were the primary

19   motivation behind the Debtors' plan.  The record

20   overwhelmingly debunks these theories.

21           The plan is, at heart, a business transaction

22   involving tens of billions of dollars negotiated amongst

23   sophisticated parties.  This is exactly the type of

24   practical business solution to insolvency that Chapter 11 is

25   designed to foster and showcases the benefits of the

1    flexible, if often expensive, Chapter 11 process.  The

2    record clearly establishes that the plan was filed in good

3    faith.

4            Section 1129(a)(11) requires the, quote,

5    confirmation of the plan is not likely to be followed by the

6    liquidation or the need for further financial reorganization

7    of the Debtor or any successor to the Debtor under the plan,

8    end quote.  The plan is considered feasible if there is a

9    reasonable likelihood of the plan's success, In Re: W. R.

10   Grace, 729 F.3d 332, 349, Third Circuit 2013.

11           The plan proponent's burden of proof is relatively

12   low so long as adequate evidence supports a finding of

13   feasibility, In Re: Washington Mutual 461 B.R. 200, 252,

14   Bankruptcy D. Del., 2011.

15           A number of objections were filed to the plan's

16   feasibility based upon a number of theories.  As those

17   objections have been resolved, they need not be addressed.

18   Nonetheless, there are two issues relating to whether the

19   merger agreement will be consummated that merit further

20   discussion.

21           The first is whether the plan is not feasible

22   because the underlying merger against is a quote, free

23   option, end quote, that allows the merger parties to go

24   through the expensive, time consuming process of obtaining

25   the required regulatory approvals necessary to consummate

1    the agreement but allows them to re-evaluate the transaction

2    in four to six months and walk away on a cost-free basis if

3    they decide it is no longer a good business opportunity.

4           The second is whether the plan is not feasible

5    because the merger is conditioned on receiving regulatory

6    approval from the Public Utilities Commission of Texas,

7    FERC, the NRC and the IRS.

8           Turning first to the free option argument.  This

9    theory is based on the fact that the merger agreement does

10   not contact a specific performance nor a liquidated damages

11   provision.  While that is true, it is not significant in

12   this instance, for a number of reasons.  The evidence

13   establishes that given the immense cost of running these

14   Chapter 11 cases and the size of the transaction, any

15   reasonable liquidated damage provision of say, $200 million

16   would be a drop in the bucket in these cases.

17          Also, the evidence establishes that a specific

18   performance remedy in this transaction would be extremely

19   limited and virtually impossible to enforce.  In other

20   words, the existence of liquidated damages and specific

21   performance provisions in the merger agreement would not

22   make it materially more likely the merger would close.

23          This theory ignores that there is another element,

24   namely what the parties refer to as disarmament and drag

25   that serves as a potent incentive for the parties to close

1    the transaction.

2         Under the Settlement Agreement the TCEH junior

3    creditors have agreed to figuratively lay down their arms,

4    even if, for any reason, the merger does not close.  This

5    completely nullifies the substantial asserted upside of the

6    litigation claims.

7         In place of this potential upside under the

8    previously approved plan support agreement, they must

9    accept, without objection a $550 million recover, less 50

10   million in professional fees as well as subordination under

11   the recent EFH committee settlement.  In other words, they

12   agreed to lock in a recovery in the downside scenario of

13   approximately six cents on the dollar.

14        It also ignores the enormous financial and

15   business commitment the merger parties have made to the

16   transaction.  The Debtors and the plan sponsors have signed

17   agreements for up to $12.6 billion of debt equity financing

18   to fund the payments contemplated by the plan.

19        This includes the merger agreement, the equity

20   commitment letter and the backstop agreement, as well as the

21   Fidelity settlement for up to $7.6 billion of equity

22   financing necessary to finance the merger.  It also includes

23   the debt commitment letter which commits the syndicated

24   banks, led by Morgan Stanley, to lend up to 5.5 billion to

25   the purchasers.

1           Finally, the evidence establishes that the utility

2    transmission business of Oncor is stable, it is unlikely

3    there will be a sufficiently dramatic decrease in value of

4    Oncor between now and the consummation of the merger,

5    sufficient to render the transaction no longer viable.

6           That said, it could happen.  The merger parties

7    could walk away from the deal, even if all the conditions to

8    consummation are met.  But that remote possibility could

9    never be eliminated and is not sufficient to remedy the plan

10   infeasible.

11          Turning to the argument that the plan is not

12   feasible because the merger is conditioned on receiving

13   regulatory approval.  Significant regulatory contingencies

14   do not render a plan infeasible.  As Judge Shannon explained

15   in Indianapolis Downs, quote, "It is not at all unusual for

16   consummation of a Chapter 11 plan to be conditioned upon the

17   expectation of approval by regulatory authorities.  And

18   Courts have not typically held up confirmation of a plan to

19   wait for issuance of such approvals", end quote.  In Re:

20   Indianapolis Downs, LLC, 486 B.R. 286, 298, Bankruptcy D.

21   Del., 2013.

22          There can be no doubt that the merger is subject

23   to significant regulatory approval, and this Court cannot,

24   nor would it presume to dictate the results of that

25   regulatory process.  Nonetheless, there is ample evidence

1    before the Court to support a finding that there is a

2    reasonable likelihood the regulators will approve the

3    transaction.

4           For example, the Hunt parties are well known and

5    respected business persons in Texas.  They are already

6    owners of a utility transmission business and they have

7    sought and obtained approval of a REIT transaction

8    previously, albeit on a smaller scale.

9           In addition, there can be no question that Oncor's

10   ownership would be substantially more stable after the

11   merger than it is now.

12          Moreover, it is impossible to avoid the

13   uncertainty of regulatory approval of reorganizing these

14   businesses.  Any proposed plan would most likely require

15   approval of one or more regulatory agencies.  It is simply

16   the nature of the Debtors' business, which includes

17   operating a nuclear power plant and providing electricity to

18   millions of consumers.  The regulatory approvals required to

19   consummate the merger here do not render the plan not

20   feasible.

21          Having addressed good faith and feasibility, I

22   will turn to the objections.  As mentioned earlier, there

23   are numerous -- were there numerous objections to the plan,

24   the majority of which have been resolved.  There are five

25   remaining objectors; one, Christopher Hayker, two, Joann

1    Robinson, three, FLSmidth, USA, Inc., four, Ms. Fenicle and

2    Mr. Fahy and five, the United States Trustee.  They will be

3    addressed seriatim.

4           First is Christopher Hayker.  Mr. Hayker who was

5    appearing pro se objects to confirmation because the plan

6    does not provide for the payment of his EFIH first lien

7    notes.  The plan does not provide for the payment of the

8    EFIH first lien notes because they were previously paid, in

9    full, by the Debtors, in 2014.  The objection is overruled.

10          Second is Joann Robinson, Ms. Robinson, who was

11   appearing pro se objects to confirmation because, as a

12   creditor of EFH Corp, she claims that she was entitled to

13   vote on the plan.  Ms. Robinson has asserted a claim against

14   EFH Corp which is subject to a pending objection.  In any

15   event, the creditors of EFH Corp are unimpaired under the

16   plan and thus are deemed to accept the plan and are not

17   entitled to vote.  The objection is overruled.

18          Third is FLSmidth, USA, Inc.  Smidth objects to

19   the plan for a variety of reasons.  Smidth argues that the

20   treatment of its claims violates Section 1129(a)(7)(a) of

21   the code, also known as the best interest of creditors test.

22          As Former Judge Walsh explained, Section

23   1129(a)(7) quote, is an individual guarantee to each

24   creditor or interest holder that it will receive at least as

25   much in reorganization as it would in liquidation, end

1   quote, In Re:  Stone and Webster, Inc. 286 B.R. 532, 545,

2   Bankruptcy District of Delaware 2012.

3           Smidth has a claim against a TCEH subsidiary which

4   is in Class C-5.  Class C-5 is impaired, and Smidth voted to

5   reject the plan, thus the Debtors are required to show that

6   the plan fulfills Section 1129(a)(7)(a)(2) for the members

7   of Class 5 that did not vote in favor of the plan.

8           The evidence establishes that the TCEH

9   subsidiaries are all guarantors of the TCEH first lien

10  notes.  Therefore, under Chapter 7 Smidth's claim would be

11  subordinate to the TCEH first lien notes.  The written

12  testimony of John L. Stewart shows that if TCEH and its

13  subsidiaries were liquidated the first lien note holders

14  would receive no more than 37 percent of the value of their

15  claims.  Thus, in a Chapter 7 proceeding, Smidth would

16  receive no distribution on account of its unsecured claims.

17  The plan, therefore, complies with Section 1129(a)(7)(a)(2).

18          Smidth also objects that the plan does not provide

19  for assumption or rejection of its executory contract with

20  the Debtors.  On October 27, 2015 the Debtors issued a

21  notice of rejection of Smidth's contract with Luminant upon

22  entry of the confirmation order.

23          Smidth also complains that the plan violates the

24  absolute priority rule, but Smidth's claims is in Class C-5

25  that voted overwhelmingly in favor of the plan, meaning that

1    Section 1129(b) and the absolute priority rule are

2    inapplicable.

3              Finally, Smidth objects that the Debtors claims

4    against it are being retained under the plan.  This is

5    correct, but there is nothing in the law that prohibits the

6    Debtors from retaining these claims.  Thus, Smidth's

7    objection is overruled.

8              Fourth is Ms. Fenicle and Mr. Fahy.  Fenicle and

9    Fahy raised four objections to confirmation.  They also

10   objected to the Settlement Agreement which the Court

11   addressed separately.  the confirmation objections are one,

12   the plan cannot be confirmed because Section 524(g) of the

13   code requires a fund for the claims of unmanifested

14   claimants; two, that by establishing a bar date for the

15   claims of unmanifested claimants, the plan violates Section

16   1124(a)(4) of the code, which requires that the claims

17   within a class receive the same treatment; three, the plan

18   is not feasible because asbestos claims are not yet

19   liquidated, the bar date has not yet passed and therefore

20   the plan cannot forecast for potentially significant

21   asbestos liability; and four, the plan violates due process

22   by barring the claims of unmanifested claimants and because

23   the asbestos bar date notice did not include notice of the

24   confirmation hearing.

25              Fenicle and Fahy are individuals with claims

1    arising from asbestos-related illnesses.  Four Debtors,

2    known as the Asbestos Debtors, EECI, Inc., Case Number 14-

3    10992; EEC Holdings, Case Number 14-10990; LSGT Gas Company,

4    Case Number 14-11039; and LSGT SACROCK, Inc., Case Number

5    14-11012 used asbestos products in their normal course of

6    business, which exposed workers, like Mr. Fahy and Ms.

7    Fenicle's deceased husband, to dangerous asbestos fibers.

8         Asbestos claimants fall into three groups.  One,

9    those who have developed illnesses or injury from exposure

10   to asbestos, referred to as manifested claimants.  Two,

11   those who have been exposed to asbestos but have not yet

12   suffered a cognizable injury from exposure, referred to as

13   unmanifested claimants.  And three, those who have not yet

14   been exposed to products of the Asbestos Debtors, but may be

15   exposed in the future, referred to as future claimants.

16        Asbestos exposure can directly cause illnesses

17   long after an individual's last exposure to an asbestos

18   product.  The discharge of asbestos claims in a bankruptcy

19   proceeding, therefore, carries with it significant due

20   process concerns.

21        In the past the Asbestos Debtors built and

22   operated power plants, these plants used asbestos insulation

23   products to mitigate the immense heat produced by the power

24   plants.  Asbestos was also often used in plant safety

25   products, such as gloves, goggles and masks.

1          The Asbestos Debtors wound down all operations by

2     1990 at the latest.  Ceasing operations does not mean that

3     the Asbestos Debtors have ceased exposing new individuals to

4     asbestos, but it is likely that the Asbestos Debtors are the

5     cause of far less asbestos exposure today than they were

6     with -- than when they were operating entities.  More

7     importantly, asbestos-related diseases are caused by

8     inhalation of loose fibers of asbestos and result from a

9     long duration or high intensity of exposure.  Because the

10    Asbestos Debtors did not sell asbestos products, but used

11    them in their course of business, it is likely that a

12    substantial majority of asbestos claims against them are

13    held by former employees and the employees of contactors.

14          Although the Third Circuit has not specifically

15    elaborated the prospective due process requirements for a

16    plan to be confirmed, In Re: Grossman's, Inc. laid out the

17    factors to be considered in determining whether discharge of

18    an asbestos claim as constitutional is applied to that

19    specific claim, 607 F.3d, 114, 127 and 128, Third Circuit,

20    2010.

21          Some of those factors can be analyzed

22    prospectively, and all of them indicate that the Debtors'

23    plan for giving notice to unmanifested claimants comports

24    with due process.

25          Fenicle and Fahy argue that the plan may not be

1    confirmed, because Section 524(g) of the bankruptcy code

2    requires a fund for unmanifested claimants.  This argument

3    was raised by Fencile and Fahy previously and the Court

4    rejected it in a published decision that Fenicle and Fahy

5    did not appeal, In Re:  Energy Future Holdings, Corp, 522

6    B.R. 520, Bankruptcy District of Delaware, 2015.

7              In that decision the Court found that formation of

8    a trust and issuance of a channeling injunction, under

9    Section 524(g) is permissive, but not mandatory.  On the

10   other hand, the Court is required, under Federal Rule of

11   Bankruptcy Procedure 3003, to set a bar date for all claims.

12   Thus, the Court set a bar date for unmanifested claims.

13             Despite this Court's previous ruling, Fenicle and

14   Fahy offered Third Circuit cases that they interpret as

15   requiring a trust to be formed for the benefit of

16   unmanifested claims.  Fenicle and Fahy cite In Re:

17   Combustion Engineering, 391 F.3d 190, Third Circuit, 2004

18   and In Re: Amatex Corp, 755 F.3d 1034, Third Circuit, 1985.

19             But their proposed interpretation of these cases

20   is incorrect.  Combustion discussed the prerequisites of

21   Section 524(g) and found that because the Debtor could not

22   meet those prerequisites, the Court could not grant a

23   Section 524(g) injunction.  Combustion, 391 F.3d at 233,

24   234.  It did not find that establishment of a 524(g) trust

25   was mandatory, in fact the Court held that while the Debtor

1    was not entitled to a channeling injunction under Section

2    524(g), it was entitled to the general discharge of asbestos

3    claims.

4             Amatex only discussed the permissive appointment

5    of a representative for certain asbestos claimants and more

6    specifically, whether a specific individual, Peter John

7    Robinson, could claim this mantel.  Amatex, 755 F.2d at

8    1042, 1044.  The Court specifically stated that, quote,

9    Court's must determine, on a case by case basis, whether the

10   prospective party in interest has a sufficient stake so as

11   to require representation, end quote, id. at 1042.  It did

12   not hold that appointment of a representative was mandatory.

13            Moreover, the text of Section 524(g) clearly

14   contradicts Fencile and Fahy's argument.  Section

15   524(g)(5)(a) states that a demand, as used within Section

16   524(g), is a demand for payment, quote, that was not a claim

17   during the proceedings leading to confirmation, end quote.

18   But unmanifested claims are pre-confirmation claims, as that

19   term is defined by the code.

20            The Third Circuit, in In Re:  Grossman's, Inc.

21   held that, quote, a claim arises when an individual is

22   exposed, pre-petition to a product or other conduct giving

23   rise to an injury which underlies a right to payment under

24   the bankruptcy code, end quote, 607 F.3d at 125.

25            This holding embraced the definition used by a

1    majority of the circuit courts and overturned the Third

2    Circuit's much criticized decision in Friendsville, which it

3    held that a claim arises only when an injury arises.

4              Under applicable law, therefore, unmanifested

5    claims are pre-petition claims that are specifically

6    excluded from the purview of Section 524(g).  See Section

7    524(g)(2)(b)(1) and (2).

8              Fenicle and Fahy's section objection to

9    confirmation is that due to the establishment of a bar date

10   for unmanifested claims, the plan violates Section

11   1124(a)(4) of the code, which requires that the claims

12   within a class receive the same treatment.  This contention

13   fundamentally misunderstands the Section 1124(a)(4) in two

14   ways.

15             First, the plan provides for payment in full of

16   all asbestos claims.  Even if the bar date were

17   discriminatory against unmanifested claimants, this would be

18   -- not be a violation of Section 1124(a)(4) because the bar

19   date is separate from the plan.

20             Second, the bar date is not discriminatory.  All

21   claims are barred, unless brought before the bar date.

22   Manifested and unmanifested claims are therefore treated

23   identically.  Fenicle and Fahy argue that as a factual

24   matter more unmanifested claimants, as opposed to manifested

25   claimants will have their claims barred.  They have not

1    introduced evidence in support of this contention.  Even if

2    true, however, this contention is irrelevant to Section

3    1124(a)(4) which is only concerned with the legal treatment

4    of claims and not the outcome that results from equal legal

5    treatment.

6            Fenicle and Fahy's third objection to confirmation

7    is that the plan is not feasible because asbestos claims are

8    not yet liquidated, the bar date has not yet passed and

9    therefore the plan cannot forecast for potentially

10   significant asbestos liability.  The evidence, however, has

11   demonstrated the plan is feasible as it stands now and that

12   even if reorganized EFH has forced to shoulder hundreds of

13   millions of dollars of additional liability, the reorganized

14   Debtors would still be viable.  Because asbestos claims will

15   be reinstated against reorganized EFH, there is no need for

16   these claims to be liquidated prior to confirmation.

17           In addition, it's mentioned in the context of the

18   Settlement Agreement the Debtor's sixth amended plan

19   contains several provisions relevant to the treatment of

20   asbestos-related claims.  Specifically, the sixth amended

21   plan provides that asbestos-related Class A-3 legacy general

22   unsecured claims against the EFH Debtors shall be

23   reinstated.

24           Furthermore, the sixth amended plan provides the

25   Class A-14 claims, interest in the EFH Debtors' other than

1   EFH Corp, held by the Asbestos Debtors, shall be reinstated.

2           EECI, EEC Holdings and LSGT SACROCK are all

3   subsidiaries of LSGT Gas Company.  LSGT Gas Company is a

4   subsidiary of EFH Corp.  Furthermore, EECI, EEC Holdings and

5   LSGT SACROCK poses intercompany claims against LSGT Gas

6   Company totaling approximately $990 million.  LSGT Gas

7   Company, in turn, possessed an intercompany claim against

8   EFH Corp totaling approximately 560 million.  All of these

9   claims are being reinstated under the sixth amended plan.

10          Since 1992 the Debtors incurred approximately 26.4

11  million in total asbestos expenses.  Given the historical

12  rate of the Debtors asbestos-related expenses, reinstatement

13  of the above described claims ensures that a reorganized EFH

14  will continue to fund asbestos-related expenses that may

15  arise at the Asbestos Debtor.

16          Fenicle and Fahy's fourth and final objection to

17  confirmation is that by barring the claims of unmanifested

18  claims that fail to file a timely proof of claim the bar

19  date and the plan violate due process.  Once again, the

20  proper time and place to raise this objection was to appeal

21  the Court's order setting the bar date.  This objection is

22  inappropriate collateral attack on a final order.  Although

23  the Court could dismiss this objection on grounds of

24  finality, it will clarify due process as it applies to this

25  reorganization under Chapter 11.

1          In order to comply with due process the Debtors

2    must make, quote, notice reasonably calculated under all

3    circumstances to appraise interested parties of the pendency

4    of the action and afford them an opportunity to present

5    their objections, end quote, Mullane v. Central Hanover Bank

6    and Trust Company, 339 U.S. 306, 314, 1950.

7          Fenicle and Fahy argue that because it may be

8    impossible to give sufficient notice to some unmanifested

9    claimants, the plan is not confirmable.  See Jones v.

10   Chemetron Corp, 214 F.3d 199 at 209, 210, Third Circuit,

11   1990, finding that notice of bar date was unconstitutional

12   is applied to a specific plan for when the time of the bar

13   date had not yet been born.

14          Fenicle and Fahy's reasoning is flawed.  The

15   Court's bar date would not bar the claim of an unborn

16   individual like the plaintiff in Chemetron.  That plaintiff

17   is a future claimant, in this case, an individual who has

18   not yet been exposed to asbestos, but who may be injured by

19   the exposure after the bar date.  Unmanifested claimants

20   under the plan are those that have already been exposed to

21   the Debtors' asbestos, but have not developed injury.

22          Even if the Court were to hold that Chemetron

23   requires the appointment of a class representative for the

24   claims of future claimants to be discharged, Fenicle and

25   Fahy's objection fails.  The Debtors do not seek to

1    discharge the claims of future claimants, so Chemetron is

2    not applicable.

3           The applicable standard here is clear.  The

4    Debtors do not need to give actual or constructive notice to

5    all current claimants.  Central Hanover requires only that

6    their attempt to give notice be reasonably calculated.  The

7    fact that there may be unmanifested claimants for whom the

8    bar date, as applied to their specific case may not comport

9    with due process, is simply irrelevant.  As long as the

10   notice given by the Debtors is reasonably calculated, the

11   bar date is facially constitutional.

12          This conclusion is made clear by the Third

13   Circuit's decision in Grossman, which laid out seven factors

14   relevant to whether discharge comports with due process as

15   applied to a specific individual.  One, the circumstances of

16   initial exposure; two, when the claimants became aware of

17   their vulnerability to asbestos; three, whether notice of

18   the claim's bar date came to their attention; four, whether

19   the claimants were known or unknown creditors; five, whether

20   the claimants had a colorable claim at the time of the bar

21   date; six, whether it was reasonable or possible for the

22   Debtors to establish a trust under Section 524(g); and

23   seven, other circumstances specific to the parties.

24   Grossman, 607 F.3d at 127, 128.

25          Only a subset of these factors can be examined

1    prospectively.  And on those factors the Debtors' attempts

2    to give notice are more than sufficient.  First, the Court

3    can infer that the Debtors will be providing direct notice

4    to a vast majority of unmanifested claimants.  The Debtors

5    -- Asbestos Debtors did not sell asbestos, they used it as

6    insulation within their plants.

7            Given that power plants are not open to the

8    general public, the Court can infer that the vast majority

9    of potential claimants are current and former employees and

10   contractors, and their family members.  To the extent these

11   people can be identified by the Debtors' records, the

12   Debtors are providing all of them with direct notice.  See

13   bar date order, Docket Item 5175, Pages 9 to 13, Paragraphs

14   7 to 17.

15           Additionally, the Debtors are providing direct

16   notice to all unions associated with its workers and

17   contractors.  Therefore the Court can logically infer that

18   at a minimum a substantial majority of potential claimants

19   will receive direct news from the Debtors.

20           Second, it would be unreasonable for a significant

21   number of unmanifested claimants not to be aware of their

22   exposure to asbestos at this point in time.  It is not a new

23   revelation that the Debtors used asbestos insulation in

24   their power plants, and as Fenicle and Fahy themselves

25   explained, this entire industry used asbestos insulation

1   until the 1980's and therefore, quote, asbestos exposure was

2   virtually unavoidable.  That's at the Fenicle and Fahy

3   objection brief at Page 2, Note 5.  The Debtors, quote, have

4   a long history of asbestos litigation, Fenicle and Fahy

5   objection brief at Page 11, Paragraph 20.  Individuals with

6   long careers at power plants should, by now, be aware of

7   their exposure.

8           Third, as the Court previously explained, Section

9   524(g) on its own terms applies only to future claimants,

10   not unmanifested claimants.  The bar date here does not

11   apply to future claimants.

12           Fourth, the Court notes that the primary reason

13   for appointing a class representative is not present here.

14   If the Debtors had proposed the creation of a trust to pay

15   all current and future asbestos claims, this Court likely

16   would have found it necessary to appoint a class

17   representative.

18           In that scenario, manifested claimants would have

19   an incentive to seek high payouts for claims on the trust,

20   because they would not bear the risk of the trust running

21   out of funds.

22           In this case, however, all claims are being

23   reinstated and reorganized EFH will be a solvent entity with

24   a predictable rate of return and low risk.  Thus, unlike

25   many asbestos cases, the interest of manifested claimants do

1    not diverge from unmanifested claimants.

2          Fenicle and Fahy's objections are ultimately easy

3    to answer.  Is the Debtors' two and a half million dollars

4    plan reasonably calculated to provide notice to unmanifested

5    claimants?  Yes.  The Court fails to see a better plan to

6    give notice to these individuals that does not massively

7    increase the cost of giving that notice.

8          Second, is there any substantial reason to appoint

9    a class representative for unmanifested claims?  No.  The

10   interests of manifested claimants and unmanifested claimants

11   are not adverse here.  And reinstated against a solvent and

12   economically viable reorganized EFH means that funds will be

13   available to pay the claims of unmanifested claimants once

14   their injuries develop.

15         Finally, the Court wishes to make clear that the

16   standard of due process here is prospective.  It is entirely

17   possible that an unmanifested claimant may bring a claim

18   after the bar date, argue the Debtors' notice scheme was

19   unconstitutional, as applied to her, and be correct in that

20   argument.  She would have her claim reinstated and the

21   Debtors would then be free to dispute its validity and/or

22   her damages.  But that is a retrospective determination, an

23   unconstitutional, as applied, determination.

24         That determination is irrelevant to whether the

25   Debtor's notice scheme prospectively satisfies due process.

1    Because the Debtors' scheme was for giving bar date is

2    reasonably calculated to give notice to all known and

3    unknown asbestos claimants, the Court overrules Fenicle and

4    Fahy's objection on this point.

5              Indeed, for the reasons just articulated, the

6    Court overrules the entirety of the Fenicle and Fahy

7    objection.

8              Fifth and last is the United States Trustee.  The

9    UST raises three objections to confirmation.  The UST also

10   objected to the Settlement Agreement which the Court

11   addressed separately.

12             Confirmation objections are one, the plan grants

13   inappropriate releases in favor of the Debtors' directors

14   and officers; two, the plan unlawfully extends exculpation

15   to non-estate fiduciaries, including non-Debtor affiliates

16   and shareholders; three, the plan pays the fees and expenses

17   of non-estate retained professionals without adequate

18   disclosure or legal justification.

19             The objection to the releases and exculpation

20   provision are overruled.  The objection to the payment of

21   professional fees and expenses will be sustained, solely as

22   it relates to the mechanism for the payment of those fees,

23   otherwise it is overruled.

24             Article 8, Section D of the plan provides for

25   third party releases.  The full list of releasing parties is

1    found in Article 1, Section A, Paragraph 248 of the fifth

2    amended plan.

3            The numbering on that may have changed in the

4    sixth amended plan.  The releases are given by claims and

5    interests who vote to accept the plan, all holders of claims

6    and interests that are deemed to accept the plan and all

7    holders in voting classes who abstained from voting on the

8    plan and did not opt out of the releases provided by the

9    plan.

10           As to the release of the Debtor's claims,

11   including derivative claims of the Debtors that others may

12   assert, the Court reviews the Debtor releases based on the

13   Zenith or Master Mortgage factors which are: one, an

14   indemnity of interest between the Debtor and the third

15   party, such that a suit against the non-Debtor is in essence

16   a suit against the Debtor or will deplete assets of the

17   estate; two, substantial contribution by the non-Debtor of

18   assets to the reorganization; three, the essential nature of

19   the release to the reorganization to the extent that without

20   the release, there's little likelihood of success; four, an

21   agreement by a substantial majority of creditors to support

22   the release, specifically if the impacted class or classes

23   overwhelmingly votes to accept the plan; and five, provision

24   in the plan for payment of all or substantially all of the

25   claims of the class or classes affected by the release.  In

1   RE: Zenith Electronics Corp., 241 B.R. 92 at 110, Bankruptcy

2   District of Delaware, 1999.

3          These factors are neither exclusive nor

4   conjunctive requirements, but rather serve as guidance to

5   Courts in determining fairness of the Debtor's releases.

6   Washington Mutual, 442 B.R. at 346.

7          The evidence clearly supports a finding that all

8   five of the Zenith factors support proving the Debtor's

9   releases.  As to indemnity of interests, the Debtors are

10  required to indemnity the equity sponsors and the directors

11  and officers for any liability incurred as a result of these

12  claims.

13         As to substantial contribution, the equity

14  sponsors (a) consented to allowance of $700 million TCEH

15  settlement claim, which primes their equity interest, and

16  they transferred the residual interest to the TCEH unsecured

17  creditors; (b) waive their claims for unpaid management fees

18  and expenses of approximately $80 million; and (c) agree

19  that they will not take a worthless stock deduction with

20  respect to a TFH equity prior to consummation of the plan.

21  Doing so, would give rise to an ownership change for tax

22  purposes.

23         The directors participated in over 200 board and

24  committee meetings or integrally involved in the

25  reorganization.  The officers worked tirelessly, especially

Page 66

1    Mr. Keglevic and Ms. Doré, on both their day jobs and in the

2    reorganization.  The demands of this case on directors and

3    officers went well beyond those normally associated with a

4    Chapter 11 case.

5            As to the essential nature of the releases to the

6    reorganization, the releases allow the Debtors to move

7    forward without complex litigation against the equity

8    sponsors or with directors and officers.  As discussed in

9    the context of the Settlement Agreement, the release of

10   inter-Debtor claims against all parties is necessary to

11   preserve the integrity of the settlement, which is a

12   condition of confirmation.

13           As to an agreement by a substantial majority of

14   creditors to support the release, the overwhelming number of

15   parties who have identified claims against the sponsors

16   and/or directors and officers support the plan.  As to

17   whether the plan provides for payment of all or

18   substantially all the claims of the class or classes

19   affected by the release, the plan provides for payment of

20   all allowed claims against the EFH Debtors and the EFIH

21   Debtors in cash.

22           Without regard to the releases that extend --

23   excuse me -- with regard to the releases that extend beyond

24   Debtor claims, third-party releases are generally only

25   effective with respect to those who affirmably consent to it

1    by voting in favor of the plan and not opting out of the

2    third-party release.  Washington Mutual, 442 B.R. at 355.

3    In Continental Airlines, the Third Circuit identified the

4    factors necessary to approve non-consensual third-party

5    releases.  Fairness, necessity to reorganization, and

6    specific factual findings to support the conclusions, 203

7    F.3rd 203 at 214, Third Circuit, 2000.

8              The Delaware courts that have ruled on the issue

9    have looked at, among other things, whether (a) the release

10   has provided a critical contribution to the Debtor's plan;

11   and (b) whether the release is geared to the non-consenting

12   creditors, i.e., whether the non-consenting creditors were

13   compensated for their contributions.

14             Although discussed by the UST as related to

15   confirmation, the majority of the releases are contained in

16   the Settlement Agreement.  Confirmation is conditioned on

17   approval of the Settlement Agreement, although, again, the

18   Settlement Agreement will survive regardless of confirmation

19   of the plan.  Based on the evidence, the releases are part

20   and parcel of the Settlement Agreement, which settles all

21   inter-Debtor litigation and paves the way to confirmation.

22             The evidence at trial established that these

23   releases were an integral part of the negotiations and a

24   critical component to the supporting parties.  The Court has

25   already discussed at length the critical importance of the

1      settlement, and based on the evidence, has approved the

2      Settlement Agreement.

3              Furthermore, the released parties provided

4      critical financial contribution to the plan: one, the plan

5      sponsors are providing $12 billion debt and equity

6      financing; two, the holders of TCEH first lien debt waived

7      billions of dollars in deficiency claims for the benefit of

8      TCEH junior creditors; three, the equity sponsors agreed to,

9      again, (a) to assign any recovery interest to TCEH, (b) to

10     forego $80 million in fees, and (c) to delay claiming a

11     worthless stock deduction with respect to EFH stock until

12     after the effective date; four, the boards have participated

13     in over 260 board and committee meetings, plus the Debtors

14     would have been required to indemnify the directors and

15     officers under various indemnification agreements, and have

16     released certain potential claims, other than claims arising

17     from violation of good faith or fair dealing under the

18     operative LLC agreements.

19              These contributions have led to a confirmable

20     plan, an unimpairment of dozens of classes of claims.  The

21     releases are fair with respect to non-consenting creditors.

22     All allowed E-side claims are being paid in full, and as a

23     result, such non-consenting releases do not affect the E-

24     side creditors who cannot get paid more than 100 percent on

25     their allowed claims, even if they would like otherwise.

1          Furthermore, the evidence establishes that the

2     bulk of the inter-Debtor claims are in favor of the T-side;

3     yet, a majority of T-side creditors support the plan and the

4     releases.  T-side creditors are receiving all the value of

5     reorganized TCEH, including all cash on hand that the TCEH

6     Debtors, $150 million of reorganized EFH common stock, and

7     rights to purchase up to $5.1 billion of new EFH equity.

8     This is substantially more than the T-side creditors would

9     get in a Chapter 7 liquidation.

10          The UST objects that the D&O releases do not

11     contain a carve out for actual fraud, willful misconduct, or

12     gross negligence.  While such carve outs are necessary in

13     connection with exculpation, and are common in releases,

14     they're not actually required for the Court to approve a

15     release.  Requiring this carve out would weaken the

16     settlement that is at the heart of this plan.  While no

17     stone was left unturned in the claim investigation, no

18     crack, no matter how minute, can be left in the settlement.

19          Thus, based on the evidence and satisfaction of

20     the legal tests of Zenith and Continental Airlines, the

21     Court will approve the Debtor releases and any third-party

22     releases, respectively, in the plan and the Settlement

23     Agreement, and overrule the UST's objection to those

24     releases.

25          Turning to exculpation, Article 1(a) 179 -- and,

1    again, the number on that may have changed -- and 8(e) of

2    the plan, provides for exculpation of the following parties,

3    (a) the Debtors and reorganized Debtors, (b) the committees,

4    and (c) with respect to each of the foregoing, such entity

5    and its current and former affiliates, and such entities and

6    its current and former affiliates, current and former equity

7    holders, regardless of whether such interests are held

8    directly or indirectly, subsidiaries, officers, directors,

9    managers, principals, members, employees, agents, advisory

10   board members, financial advisors, partners, attorneys,

11   accountants, investment bankers, consultants,

12   representatives, and other professionals each in their

13   capacity as such.

14          Third Circuit has held that a creditor's

15   committee, its members and estate professionals may be

16   exculpated under a plan for their action in the bankruptcy

17   case, except for willful misconduct or gross negligence.  In

18   Re PWS Holding Corp., 228 F3d 224 at 246, Third Circuit,

19   2000.  The Third Circuit reasoned that such a provision

20   merely stated the standard to which such estate fiduciaries

21   were held in a Chapter 11 case.

22          The standard, however, applies only to estate

23   fiduciaries.  Judge Shannon, in considering this issue

24   recently, reasoned, quote:  That a party's exculpation is

25   based upon its role or status as a fiduciary.  That is why,

1   as the Washington Mutual Corp. pointed out, Courts have

2   permitted exculpation clauses insofar as they merely state

3   the standard to which estate fiduciaries are held in the

4   Chapter 11 case.  That fiduciary standard, however, applies

5   only to estate fiduciaries--no one else.  Accordingly, the

6   exculpation clause here must be reeled in to include only

7   those parties who have acted as estate fiduciaries and their

8   professionals.  In RE: PTL"  End quote.  In RE: PTL

9   Holdings, LLC, No. 11-12676(BLS) 2011, Westlaw 550 9031 at

10  12, Bankruptcy District of Delaware, November 10, 2011.

11           This Court recently endorsed the holdings on this

12  issue of Judge Walrath in Washington Mutual and Judge

13  Shannon and in PTL Holdings.  The UST argues that one, it is

14  unclear whether the committees refers to the officials

15  committees entitled to protections, or whether or non-

16  fiduciary ad hoc groups are also included; two, current and

17  former affiliates may include various non-Debtor parties;

18  three, current and former equity holders and the Debtor are

19  not considered estate fiduciaries based upon ownership

20  status alone; four, rank-and-file employees are not bound as

21  estate fiduciaries in the same way as corporate management;

22  and five, any of the covered parties in Clause C are not

23  fiduciaries, and their connection to the estate is through

24  any source other than the Debtors or the official

25  committees.

1                In their reply, the Debtors state that the

2       exculpation provision applies only to estate fiduciaries,

3       and does not include any ad hoc committees.  The Debtors

4       argue that exculpation should be extended to some who may

5       not technically be fiduciaries for the estate, but in effect

6       are acting as such.

7                In addition, the Debtors argued that there are

8       some circumstances, such as in these cases, where

9       shareholders may owe fiduciary duties to a corporation.  The

10      Debtors point out that in this case, the EFH committee in

11      its objection, asserted breach of fiduciary duty claims

12      against the Debtor's equity owners.  As such, the Debtors

13      believe that it is appropriate for current and former equity

14      holders to be exculpated under the plan.

15               The Debtors further argue that the exculpation

16      should be extended to employees because without the efforts

17      of the Debtor's personnel, more than just officers and

18      directors, in developing, reviewing, negotiating, and

19      discussing the Debtor's key restructuring documents, as well

20      as accommodating intensive due diligence efforts across the

21      capital structure, the Debtors would not have been able to

22      reach confirmation.

23               The Debtors also assert that exculpation is

24      appropriate for affiliates, which are, in effect,

25      fiduciaries of the Debtor's estates.  The Debtors assert

1    that the clearest example of such an affiliate is Oncor, a

2    non-Debtor affiliate that owns and operates the EFH Debtors

3    largest asset.

4            Because all of the value in EFIH is directly tied

5    to the value of Oncor, Oncor is effectively serving as

6    fiduciary for the Debtor's estate -- assets.  Oncor also has

7    been responsive to due diligence process in order to prepare

8    for the potential reorganization.  Oncor's management team

9    and its advisors were key to developing the value maximizing

10   transaction.

11           The Court agrees with the Debtor's position that

12   while the exculpation provision pushes the envelope, it is

13   limited to those entities and persons that arguably have

14   fiduciary duties to the Debtors, and, in this case, it is

15   appropriate to provide relief up front through exculpation,

16   rather than waiting for a lawsuit to be filed or a judgment

17   to be entered.

18           More specifically, as to the rank-and-file

19   employees that are being included in the exculpation

20   provision, it is unclear whether there could be any case --

21   it is unclear whether there could be any cause of action

22   against these employees.  Nonetheless, exculpation here is

23   appropriate.

24           As the District Court stated in Enron, exculpation

25   was appropriate for those who were, quote, "necessary for

1   the negotiation of the plan and appropriate under the

2   circumstances.  Parties participated in the created of the

3   plan under the guarantee that they would receive some

4   limited protection for participating in one of the largest

5   and most complex bankruptcy filings in history.

6           Key employees remained with Enron as a result of

7   being promised some indemnification for their post-petition

8   acts, an offer made by Enron with the Bankruptcy Court's

9   approval", end quote.  In RE: Enron Corp., 326 B.R. 497 at

10  503 Southern District of New York, 2005.

11          As to the direct and indirect equity holders,

12  which includes the equity sponsors, shareholders may have

13  fiduciary duties to corporations.  See, Odyssey Partners, LP

14  v. Odyssey-ABC Limited Partnership, Civil Number Action --

15  sorry -- Civil Action Number 14770, 1996 Westlaw 422377 at

16  3, Delaware Chancery, July 24, 1996.

17          However, a controlling shareholder has been found

18  not to have breached any duty to the corporation merely by

19  acting in its self-interest.  Odyssey Partners, LP v.

20  Fleming Companies, Inc., 735 A.2d 386 at 410, Delaware

21  Chancery, 1999.

22          Here, there is no evidence that the equity

23  sponsors enacted in their sole interest, and (d) as noted in

24  the ruling on the Settlement Agreement, (e) the evidence

25  clearly establish that the equity sponsors and their

1    affiliated directors acted at all times in a manner

2    consistent with their fiduciary duties, and had the good of

3    the Debtors, as a whole, as their primary motivation.  Thus,

4    the Court finds that the equity holders, including the

5    equity sponsors, may be included in the exculpation

6    provision of the plan.

7           Lastly, unlike with the releases, the exculpated

8    parties are expressly not released from willful misconduct,

9    nor gross negligence.

10          As a result, based on the facts and circumstances

11   of this case established by a thorough evidentiary record,

12   the Court will approve the somewhat broad exculpation

13   provision, and overrule the UST's objection to the same.

14          Turning finally to professional fees.  Article

15   4(r) of the plan provides that, quote: "The EFH Debtors

16   shall pay in cash in full on the effective date, the

17   reasonable and documented fees and expenses, including

18   professional and other advisory fees and expenses incurred

19   through the effective date of the TCEH unsecured notes

20   trustee, the TCEH second lien notes trustee, the TCEH second

21   lien notes collateral agent, the members of the TCEH

22   unsecured ad hoc group, and the members of the TCEH second

23   lien consortium", end quote.

24          In addition, the professional fees of certain

25   other parties will be paid under the plan on the effective

1   date.  More specifically, under Section 2.7(b) of the

2   Settlement Agreement, up to $15 million for the equity

3   sponsors; under 2.4 of the Fidelity settlement in Article

4   4(r) of the plan, up to $12 million for Fidelity; under

5   Section 2(c)(6) of the EFH committee settlement and Article

6   4(r) of the plan, up to $5.5 million for the EFH notes

7   indenture trustee; and under Article 4(r) of the plan, up to

8   a million dollars for the PCRP trustee.

9           The UST argues that the Debtors failed to provide

10  sufficient information to allow interested parties to

11  evaluate the propriety of the proposed professional fee

12  payments whose compensation is specifically governed by

13  Section 503(3)(b), (3)(d), and (4) of the Bankruptcy Code.

14  The UST further argues that Article 4 of the plan cannot be

15  approved because it violates Section 1129(a)(4) of the

16  Bankruptcy Code, which provides that the Court may approve a

17  Chapter 11 plan only if, among other things, the Court finds

18  that any payment made by the Debtor, quote, "for services or

19  for costs and expenses", end quote, in connection with the

20  case that's either, quote, "been approved by or is subject

21  to the approval of the Court as reasonable", end quote.

22          As these contemplate a payment of professional

23  fees is to occur on the effective date, the Debtors respond

24  that the supporting parties, not the Debtors, will be

25  satisfying payment obligations under the plan.

1          Furthermore, the creditors or the entities

2     responsible for the payments, the EFH Debtors, are

3     unimpaired and, thus, these payments do not affect any

4     creditors whose recovery might otherwise have been increased

5     in the absence of such payment obligation.

6          The Debtors further assert that Section 503(3)(b)

7     of the Bankruptcy Code has been met, based on the record in

8     these cases, because of the pivotal role played by the plan

9     sponsors and the necessity of their support in confirming

10    the plan.

11         When the estate does not pay for various fees that

12    are routine in the negotiation, creation and confirmation of

13    a plan, the Fifth Circuit has held that the Bankruptcy Court

14    need not mandate an expensive and unnecessary inquiry.

15    Mabey v. Southwestern Electric Power, 150 F.3d 503 at 517,

16    Fifth Circuit, 1998.

17         Nonetheless, Section 1129(a)(4) provides that,

18    quote, "any payment made or to be made by the proponent by

19    the Debtor or by a person issuing securities or acquiring

20    property under the plan, for services or for costs and

21    expenses in or in connection with the case, or in connection

22    with the plan and incident to the case, must be approved by

23    or subject to the approval of the Court as reasonable", end

24    quote.

25         Here, the fees are being paid by the reorganized

1    Debtor and are being fronted by the plan sponsors.  In both

2    instances, the code requires that these fees be reviewed and

3    approved by the Court as to reasonableness.  And, as with

4    the Settlement Agreement, there is an argument to be made

5    that the Court could authorize these fees outside of Section

6    503 and 1120 9(a)(4) without Court review as to

7    reasonableness.  See, for example, In RE: Adelphia

8    Communications Corp., 411 B.R. 6 Bankruptcy, Southern

9    District of New York.

10           Once again, the Court is not rejecting the

11   reasoning of those cases, but believes in this case, it is

12   appropriate and more prudent to require compliance to

13   Sections 1129(a)(4) and 503 of the Bankruptcy Code.  The

14   professional fees may be evaluated as a substantial

15   contribution claim under Sections 503(b)(3)(d) and (4) of

16   the Code.

17           As with the payment of professional fees under the

18   Settlement Agreement, the record clearly supports a finding

19   that the parties covered by Article 4(r) of the plan,

20   Section 2.7(b) of the Settlement Agreement, Section 2.4 of

21   the Fidelity settlement, and Section 2(c)(6) of the EFH

22   committee settlement, that all provided a substantial

23   contribution to the case, justifying the payment of their

24   professional's reasonable fees and expenses, but the Court

25   cannot at this time make a finding of reasonableness.

1          Again, in order for the professional fees and

2     expenses to be paid under the plan, the Settlement

3     Agreement, Fidelity settlement, and the EFH committee

4     settlement, each professional firm must submit its invoices

5     to the fee committee established in this case for the fee

6     committee's review and comment, with the fee committee

7     ultimately issuing a written recommendation or a report to

8     the Court.

9          The UST may also review and comment on the fees,

10    and may make a written submission to the Court in his

11    individual capacity, as opposed to as a member of the fee

12    committee, if he so desires.  The Court would then approve

13    those fees and expenses it determines to be reasonable.

14         The Court does not require that the professional

15    firm file a formal application, and does not expect the

16    submissions to satisfy the rules governing formal fee

17    applications or the UST fee guidelines.  The invoices need

18    not be filed on the docket, although the recommendation of

19    the fee committee and any objection or comment by the UST

20    should be docketed.

21         The parties should work with the fee committee and

22    the UST to establish the timing and parameters of this

23    process, including the level of review by the fee committee.

24    But, as with the Settlement Agreement, the Court will

25    authorize the payment on the effective date of up to 80

1    percent of fees and 100 percent of expenses of the

2    professional seeking payment under Article 4(r) of the plan

3    and the Settlement Agreements.  Those fees and expenses

4    would remain subject to discouragement in the event the

5    Court ultimately found a lesser amount to be reasonable.

6            This ruling does not apply to the payment of

7    professional fees of the PIK noteholders indenture trustee,

8    as the Court understands that the PIK noteholders settlement

9    provides that those fees will be fronted by the Debtors, but

10   actually paid from the charging lien.

11           If the Court's understanding is incorrect, and the

12   professional fees of the PIK noteholders indenture trustee

13   are being paid by the estate, then this ruling would apply

14   to that payment.

15           The Court will sustain in part and overall in part

16   the UST's objection, and will approve the payment of

17   professional fees under Article 4(r) of the plan and the

18   settlements as a substantial contribution to the Debtor's

19   estate under Section 503(b)(3)(d) and (4) of the Code,

20   subject to a review for reasonableness, after compliance

21   with the fee committee review process.

22           Thus, in conclusion, for the reasons articulated

23   and based upon the extensive evidentiary record in this

24   case, subject to the ruling on professional fees, the Court

25   will confirm the Debtor's sixth amended plan of

1    reorganization.

2             Before we recess, I want to make a personal

3    comment with regard to Debtor's management.  I have been

4    impressed throughout this case with the professionalism and

5    competence of the Debtor's management team, including Ms.

6    Doré and Messrs. Keglevic, Horton, McFarland, and Burke, as

7    well as the other employees that have appeared in Court,

8    including Mr. Carter and Mr. Ashby.

9             In my 20 plus years of experience in

10   restructuring, this is the best management team I have run

11   across.  They have faced extreme difficulties in managing

12   the leverage that was put on these businesses by the 2007

13   LBO.  But as far as I've seen in Court, they have managed

14   the actual business of the Debtors extremely well.

15            The Debtors have not had an easy path in this

16   case, and have had to face several adverse rulings by the

17   Court.  But, again, as far as I have seen in Court, they

18   have faced these rulings, adapted their actions in light of

19   them, and moved forward.  I offer my congratulations to

20   management for the result they have achieved.

21            I'd like to broaden my congratulations to include

22   all the creditors and their professionals that worked so

23   hard to put together the deal that made this plan possible

24   and to turn it into a confirmable plan.  The efforts have

25   been at the highest caliber.

1          I would not have believed in April of this year

2     that barely six months later the Court would be considering

3     a consensual plan supported by the entirety of the capital

4     structure.  That is an extraordinary achievement, and the

5     parties and professionals are to be heartily congratulated.

6          Now, for the easy part.  Go forth and consummate

7     the transaction.  I wish the Debtors, the plan sponsors, and

8     the other parties all the best in achieving that feasible,

9     but challenging, result.

10         Let's take another recess, and then we can come

11    back and we'll discuss how to move forward in light of the

12    Court's rulings, and whether it's appropriate to talk about

13    the Orders as well.  Thank you.

14       (Recess)

15         CLERK:  All rise.

16         THE COURT:  Please be seated.

17         MR. SASSOWER:  Your Honor.

18         THE COURT:  Where'd everybody go?  I guess all the

19    action's over, right?  Yes, Mr. Sassower.

20         MR. SASSOWER:  Before I yield the podium to Mr.

21    Husnick to work through the orders, I just wanted to say a

22    few words.  We've just all experienced a historic moment in

23    these historic cases, and I would be remiss if I didn't

24    extend a few additional words of gratitude on behalf of my

25    firm, the Debtors, and myself.

1          I watched yesterday, as you deflected praise every

2    time a compliment came in your direction, so I apologize in

3    advance for making you take out your shield one last time.

4    But you and your tireless staff, 18 months ago, worked to

5    have presiding over one of the largest and most complicated

6    cases in history, and arguably, the toughest case in

7    history.  And you've expertly guided this massive ship

8    across rocky seas to port.

9          Yesterday, you said something to the effect of,

10   that everyone else does all the work and you're just the guy

11   who sits there.  But I think we both know that's not true.

12   What you have accomplished here requires wisdom and skill.

13   And throughout these cases, you and your staff have had to

14   instantly absorb, and then apply, massive amounts of

15   information.  And throughout that, you never lost sight of

16   the larger goal.  You always knew when to apply pressure and

17   when to ease up.

18          So in short, Your Honor, I believe I speak on

19   behalf of all the professionals when I say that it's truly

20   been an honor and a privilege to appear before you over

21   these past 18 months.

22          THE COURT:  Well, thank you.  I'd like you to come

23   to the house tonight (Laughter) and talk to my wife and my

24   17-and-14-year-old children.

25          MAN:  They can read the transcript.

1          (Laughter)

2          THE COURT:  Yeah.  I don't think it'd help.

3     (Laughter) I really don't.  Anyway, thank you very much.

4     And on behalf of my staff, in particular, thank you.

5          MR. SASSOWER:  You're welcome, Your Honor.  I do

6     have a few additional words of gratitude.  One of the cool

7     things that happens when you work on these mega-cases is the

8     accumulation of -- the awesome accumulation of talent.  And

9     I think never has that been more the case then it is here.

10    Just to name a few of the individuals, we had the privilege

11    of working with two incredible mediators, Peter Borowitz and

12    Judge Gross.  We had the DDAs, Monger, Proskauer, Cravath,

13    and Jenner.  Of course, we had the plan sponsor

14    professionals in White & Case and Houlihan, and the T-first

15    professionals and Paul Weiss and Milstein, and the T-

16    official committee was represented by Mofo and Lazard and

17    the sponsors represented by Wachtell and PJT, and Fidelity

18    represented by Fried Frank and Perella, and the PIKs

19    represented by Akin and Centerview, and the E-committee

20    represented by (indiscernible) Center & Guggenheim, and, of

21    course, the debtors represented by Evercore and Alvarez &

22    Marsal, and my dear friends and partners at Kirkland, and

23    there's so many others.  The list would -- I'd be here all

24    day and people would miss the 1:00 train if I kept going.

25          But it's really the accumulation of that talent

1    and the creativity that those professionals have brought to

2    bear that have helped to achieve this incredible results.

3    So I just want to say to each of you what a thrill it has

4    been to work by your side over the course of these cases,

5    and to thank you for your incredible efforts here.

6              I also want to thank the United States Trustee and

7    the fee committee for their incredibly important

8    contributions to these cases.  They've been quite

9    meaningful.

10             And, lastly, I want to thank the management and

11    the boards of the Debtors.  Your Honor mentioned so many of

12    them already, Mr. Keglevic, Ms. Doré, Mr. McFarland, Mr.

13    Burke, Mr. Carter, Ms. Howard, Mr. Horton, Mr. Ashby.  The

14    CEO of EFH is here today in the courtroom, John Young.

15             THE COURT: Mr. Young, welcome.

16             MR. SASSOWER:  And you've got the opportunity to

17    meet many of our board members as well, Mr. Evans, Miss

18    Williamson, Mr. Kremins, Mr. Sawyer, Mr. Smidt, and there's

19    so many others that you didn't get a chance to meet.

20             And like you, Your Honor, over the course of my

21    career, I've never had an opportunity to work with a finer

22    management team and finer board members than I have in this

23    instance.  And I just wanted to thank them for always,

24    without fail, going above and beyond every step of the way.

25             Your Honor, some of us started this journey three

1   and a half years ago; others joined 18 months ago, and we're

2   not quite done yet.  It'll be close to or maybe four years

3   until we're completely done, and it's been a long and very

4   interesting ride, looking forward to pushing forward, as you

5   said, to conclusion and consummation, and look forward to

6   seeing you tomorrow because we've got more work to be done.

7            So with that, Your Honor, thank you again, and I

8   will yield the podium to Mr. Husnick.

9            THE COURT:  Okay, thank you.

10           MR. HUSNICK:  Good afternoon -- yeah, it is

11  afternoon, Your Honor.  Chad Husnick from Kirkland & Ellis

12  on behalf of the Debtors.  Your Honor, we have filed

13  periodically updated plans and confirmation orders and

14  settlement orders; of course, none of those as drafted

15  reflect the ruling from today.  I guess my idea for today

16  was to invite Your Honor to give us any additional comments

17  you might have to the orders if you're prepared to do that,

18  and we can take those comments down and then go back, redo

19  the orders, and then submit it under certification of

20  counsel once we've negotiated language with the United

21  States Trustee on the fee issues.  That was going to be my

22  proposal.

23           THE COURT:  That's fine.  Actually, I don't have

24  any substantive comments to the settlement order or the

25  confirmation order, other than it needs to incorporate the

1    changes obviously that would result from my ruling.  I'm

2    looking quickly.  I think the settlement order needs more

3    footnotes.

4         (Laughter)

5              MR. HUSNICK:  I'll pass that along to Mr. McGaan.

6              THE COURT:  I'm just looking at some of my

7    comments.  I think all of my -- I'm just glancing -- I think

8    all of my markups basically had to do with the fact that

9    these provisions are going to disagree with my ruling on the

10   fees.  Oh, I did have a question on the settlement order,

11   which on page 85, paragraph A.  Where am I looking?  Oh,

12   yeah, line 4, there's an exculpation provision you snuck in

13   there.

14             MR. HUSNICK:  I'm just reading it, Your Honor.

15   I'm not entirely sure that's necessary.  Does that appear in

16   this -- I'm not sure that appears in the settlement

17   agreement either.  Very impressive.

18             THE COURT:  I did read it.  I did read it.  So

19   just have a look at that.

20             MR. HUSNICK:  Okay, will do.  Thank you, Your

21   Honor.

22             THE COURT:  So that was it for the settlement

23   agreement.  Oh, on the confirmation order, page 57.

24             MR. HUSNICK:  I'm sorry, Your Honor, 57?

25             THE COURT:  Yes, 57, sorry.  There are two pieces

```
 1    -- sort of, the very last, in addition, Debtors are
 2    authorized to pay the professional fees as contemplative
 3    plan, et cetera, et cetera.  That just needs obviously to be
 4    changed or massaged to incorporate my other ruling on fees.
 5    Yeah, this proviso that with respect to 327(e) professionals
 6    and the ordinary course professionals, any requirements to
 7    comply with Sections 327 through 331, 363 and 1103 in the
 8    ordinary course professional order for applications through
 9    the confirmation date shall terminate as of the confirmation
10    date, and you may thereafter pay without any further notice,
11    except for approval of the bankruptcy.  I think that needs
12    to be the effective date.
13              MR. HUSNICK:  The thought process there, Your
14    Honor, is there's a very limited subset of professionals
15    that none of the professionals that you see appear in court.
16    These are the 327(e) ordinary courses.
17              THE COURT:  Yeah, but this plan may not
18    consummate.  I mean, we may be back with an alternative
19    restructuring transaction.  And in the meantime, the
20    ordinary course professional order of 327(e) et cetera is
21    not being complied with.
22              MR. HUSNICK: Okay.
23              THE COURT:  So I would make that the effective
24    date.
25              MR. HUSNICK: Okay.  We will make that change.
```

1      THE COURT:  Okay.  There was also, I'm looking for

2   -- unfortunately, I did this at home, so I didn't have any

3   way to tab the pages.  There was a typo I was looking for.

4      MR. HUSNICK:  As Mr. Kieselstein says, heads will

5   roll.

6      THE COURT:  Yeah, I'm sorry.  Page 20 of the

7   settlement order, Paragraph 40.  I just -- I think the

8   sentence got turned around a little bit.  It says, if the

9   transactions contemplated by the plan are not consummated,

10  the PSA provides that parties through the PSA parties agree.

11     MR. HUSNICK:  I believe it should just be the PSA

12  parties.

13     THE COURT:  Yeah.  It just needs to be...

14     MR. HUSNICK:  Thank you.

15     THE COURT:  Just a typo, heads will roll.

16     (Laughter)

17     MR. HUSNICK:  My head, unfortunately.  (Laughter)

18  Thank you, Your Honor.

19     THE COURT:  So I'll await those orders under

20  certification.  We are in court tomorrow at 10:00, so if

21  anything arises in the interim, you can certainly give me a

22  report tomorrow or let me know if there are any issues I

23  need to decide.  And if you can't reach agreement on

24  language that takes care of my rulings and you need to be in

25  front of the Court, you can do that whenever -- by phone, if

1   necessary, or by dueling orders or something along those

2   lines.  I don't anticipate that will be an issue.

3           MR. HUSNICK:  I don't either, Your Honor.  We've

4   actually, just to give you where we stand.  As of the moment

5   of me standing here this moment, all the parties had signed

6   off on the order.  We need to go back and we'll rework a few

7   things, but I don't anticipate it'll be any problem.

8           THE COURT:  All right, very good.  Okay.

9           MR. HUSNICK:  Thank you very much.

10          THE COURT:  Anything else for today?  Very good.

11  We're adjourned.  Have a good day.

12

13

14                        * * * * *

15

16

17

18

19

20

21

22

23

24

25

1                         I N D E X

2

3                         RULINGS

4    DESCRIPTION                              PAGE        LINE

5

6    Approval of the Settlement Agreement      39         20-21

7

8    Christopher Hayker motion Overruled       48         9

9

10   Joann Robinson motion Overruled           48         17

11

12   FLSmidth, USA, Inc. motion Overruled      50         7

13

14   Ms. Fenicle and Mr. Fahy motion Overruled  63        5-7

15

16   United States Trustee Motion Overruled    63         22

17

18   Exculpation Provision Approved            75         12-13

19   US Trustee's Objection Overruled

20

21   Debtor's Sixth Amended Plan of            80         25

22   Reorganization Confirmed

23

24

25

Page 92

1                    C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4      transcript is a true and accurate record of the proceedings.

5
       Sonya Ledanski          Digitally signed by Sonya Ledanski Hyde
6                              DN: cn=Sonya Ledanski Hyde, o=Veritext,
                               ou, email=digital@veritext.com, c=US
       Hyde                    Date: 2015.12.04 14:42:18 -05'00'
7

8      Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  December 4, 2015