IN RE: ENERGY FUTURE HOLDINGS CORP., et al.
CASE NO. 14-10979 (CSS)

DESIGNATION # 79 TO D.I. 7324

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) Case No. 14-10979 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DECLARATION OF DAVID YING IN SUPPORT
OF THE MOTION OF ENERGY FUTURE HOLDINGS CORP., ET AL., TO APPROVE
A SETTLEMENT OF LITIGATION CLAIMS AND AUTHORIZE THE DEBTORS TO
ENTER INTO AND PERFORM UNDER THE SETTLEMENT AGREEMENT AND
CONFIRMATION OF THE FIFTH AMENDED PLAN OF REORGANIZATION**

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

# TABLE OF CONTENTS

Page

I. The Stalking Horse Process and Development of the Fifth Amended Plan. ................ 2
    A. Bidding Procedures. ........................................................................................... 2
    B. The Auction Produced No Viable Bid, But Prompted Creditor Proposals. ............. 3
    C. Negotiation of Creditor Proposals. ...................................................................... 5

II. E-Side Feasibility and Reorganized EFH's Ability to Pay Make Whole and Post-Petition Interest Claims. ........................................................................................ 5
    A. Assumptions ...................................................................................................... 6
    B. Analysis ............................................................................................................. 7

III. Energy Future Competitive Holdings ........................................................................ 10

IV. Comments on the Expert Opinions of Mark Rule. .................................................... 11
    A. Calculation of EFH Corp. Solvency Under the Balance Sheet Test. .................... 12
    B. Solvency of "Consolidated EFH." ..................................................................... 12
    C. Solvency of the E Side. ..................................................................................... 13
    D. Duff & Phelps's Inclusion of Oncor Control Premium. ..................................... 14

Pursuant to 28 U.S.C. § 1746, I, David Ying, hereby declare as follows under penalty of perjury:

1. I make this Declaration in support of the *Motion of Energy Future Holdings Corp., et al., to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter Into and Perform Under the Settlement Agreement* (D.I. 5249) (the "Settlement Motion")[2] and confirmation of the Debtors' Fifth Amended Joint Plan of Reorganization (the "Plan").

2. I am a Senior Managing Director and the Head of the Restructuring and Debt Advisory Group at Evercore Group L.L.C. Evercore was retained in 2012 to serve as financial advisor to Energy Future Holdings Corp. ("EFH") in connection with a potential Chapter 11 restructuring. Evercore was retained to, among other things, evaluate EFH's future cash flows, evaluate the value of EFH and its subsidiary entities, and to advise the management team and the Board of Directors as to what financial alternatives existed for alleviating EFH's debt load.

3. I have over 30 years of experience in restructuring advisory services. Prior to joining Evercore in 2005 as co-founder of the firm's Restructuring and Debt Advisory Group, I worked at Smith Barney and Miller Buckfire Ying & Co, in leveraged finance at Drexel Burnham Lambert and Donaldson, Lufkin & Jenrette, and in private equity investing, at JLL Partners. I have advised on numerous corporate restructurings, including exchange offers, exit consents, rescue financings, prepackaged bankruptcies and Section 363 sales. I have a bachelor of science from the Massachusetts Institute of Technology and an M.B.A. from the Wharton School at the University of Pennsylvania.

---

[2] Capitalized terms used but not defined herein have the meanings assigned to them in the Settlement Motion.

4. I have been the lead Evercore professional, with a team of investment bankers reporting to me, advising the Debtors on the Debtors' restructuring. As the Debtors' financial advisor, I have worked closely with the Debtors' finance team and legal department over the last three years, and have made numerous presentations to the Board of Directors. I personally attended most meetings of the EFH Board of Directors held since Evercore's retention.

## I. The Stalking Horse Process and Development of the Fifth Amended Plan.

### A. Bidding Procedures.

5. In summer of 2014, as the Debtors considered a sale of their stake in Oncor, the Debtors asked Evercore to assess the market for Oncor and to devise a sale process to maximize the value of Oncor and provide the most distributable value to creditors.

6. Evercore met with the Debtors' management team to discuss the appropriate sales process and to identify a transaction structure to maximize Oncor's value. Drawing upon our industry experience, Evercore compiled a comprehensive list of potential acquirers. Beginning in August and September 2014, Evercore made preliminary contact with 52 potential purchasers to inform them that the Debtors intended to market their economic interest in Oncor.

7. On January 14, 2015, the Court entered the *Order (A) Approving Revised Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C) Approving the Form and Manner of Notice Thereof* (the "Bidding Procedures Order") [D.I. 3295]. As of entry of the Bidding Procedures Order, 28 prospective acquirers had requested non-disclosure agreements, and 15 had signed one.

8.     Under the Bidding Procedures Order, prospective purchasers would first submit Round 1 bids. The Debtors, in consultation with Evercore and professional representatives of the creditors' committees, would then select acceptable bidders to proceed to Round 2 of bidding.[3]

**B.     The Auction Produced No Viable Bid, But Prompted Creditor Proposals.**

9.     The Debtors received three Round 1 bids: one from NextEra Energy ("NextEra"), one from the Hunt Group, and one from an ad hoc group of EFIH PIK note holders. The Debtors invited each of these three bidders to participate in Round 2. Evercore and the Debtors met with each bidder individually in the ensuing weeks to emphasize the need to increase total and distributable value.

10.    The Debtors received two Round 2 bids: one from NextEra and one from a consortium of investors led by the Hunt Group (the "Hunt Consortium"), which now included the holders of EFIH PIK notes. Evercore evaluated the Round 2 bids and determined that the distributable value available to creditors, particularly EFH's creditors, remained too low to garner significant creditor support.

11.    There followed several weeks of negotiation with both NextEra and the Hunt Consortium. Evercore participated in numerous conversations with the Company, K&E, and with both bidders and creditors, and repeatedly urged the bidders to increase the value of their offers.

12.    While negotiations with the stalking horse bidders were ongoing, a group of junior TCEH creditors approached the Debtors with their own proposal to acquire the Debtors' economic interests in Oncor, to convert Oncor to a REIT under federal tax law, and to pay all

---

[3]    DX007 Revised Bidding Procedures [D.I. 3295-1] at ¶ G.

EFH and EFIH creditors in full. Then, in May 2015, a consortium of creditors including Fidelity and an ad hoc group of EFIH second lien note holders emerged with a restructuring proposal of their own. This E-Side proposal envisioned a tax-free spinoff of TCEH, a conversion of Oncor to a REIT (though not as a condition to closing), and conversion of E-Side claims to reorganized EFH equity.

13. Each of the Hunt Consortium, Fidelity, and junior TCEH creditor proposals contemplated conversion of Oncor to a REIT. Only NextEra's bid did not. The Debtors had considered the possibility of a REIT conversion of Oncor for some time, and I gave a preliminary presentation to the Board of Directors in February 2015 regarding the potential impact to Oncor's value that could be effected by a REIT conversion.[4] I believed that a REIT conversion could have a material positive impact on Oncor's value, and Evercore continued to evaluate the effect of a REIT conversion while negotiations continued with the two stalking horse bidders and the two creditor consortiums.

14. By early June, transaction documents with NextEra were nearly final and NextEra's selection as stalking horse was still under serious consideration.[5] However, the amount of distributable value available from NextEra's bid—particularly to EFH—remained troublingly low.[6] Unfortunately, rather than increase their bid price, on June 11, 2015 NextEra informed the Debtors that it was reducing its offer by over $900 million.[7] By this point, the Hunt Consortium had also withdrawn their bid with the holders of the EFIH PIK notes, and announced

---

[4] DX200 Minutes of Joint Board Meeting dated Feb. 26, 2015 [EFH05551550 at EFH05551551].

[5] DX093 Presentation to Board: Update Regarding Stalking Horse Marketing Process dated June 9, 2015 [EFH05551711 at EFH05551715].

[6] *See Id.* at EFH05551726.

[7] *See* DX094 Presentation to Board: Restructuring Update dated June 17, 2015 [EFH05551778 at EFH05551779].

their intention to participate as a co-investor in the TCEH junior creditor proposal,[8] after engaging in active dialogue with both E-Side creditors (including Fidelity), on the one hand, and TCEH creditors on the other hand, to become partners in the acquisition of the Debtors' economic interests in Oncor.

### C. Negotiation of Creditor Proposals.

15. Evercore and the Debtors turned their attention to negotiating the two competing creditor proposals, which unfolded over the course of July and August 2015.

16. While the E-Side proposal was initially the more promising one, inter-creditor disputes amongst the E-Side constituencies proved impossible to overcome. On August 9, 2015, E-Side negotiations having failed, the Debtors presented the T-Side proposal, which included the Hunt Consortium, to the Board for approval. Because the T-Side proposal provides an opportunity to pay all allowed E-Side claims in full in cash, permanently resolves inter-Debtor and inter-creditor litigation, and provides for an accelerated path to confirmation for an alternative plan if the current deal is not consummated—and features an implied Oncor terminal enterprise value that exceeded NextEra's highest bid by over a billion dollars[9]—Evercore recommended that the Board approve the merger and Plan.

## II. E-Side Feasibility and Reorganized EFH's Ability to Pay Make Whole and Post-Petition Interest Claims.

17. In connection with confirmation of the Plan, I was asked by the Debtors to provide my opinion as to whether Reorganized EFH should reasonably have the financial wherewithal to satisfy an adverse final judgment with respect to all alleged post-petition interest

---

[8] *Id.*

[9] DX 301 Presentation to Boards: Approval of Amended Plan and Merger Transaction Documents dated Aug. 9, 2015 [EFH06002898 at EFH06002923].

5

and make whole claims, if all of Reorganized EFH's arguments are rejected and a final order and judgment are entered.

18. I concluded that, if 12 months after emerging from bankruptcy, all of Reorganized EFH's arguments are rejected and a final order and judgment were entered requiring full amounts of make whole payments and post-petition interest to be paid, Reorganized EFH should have the financial capability of funding an adverse judgement with a combination of new debt and equity financing. Because of Reorganizaed EFH's strong credit ratings and credit profile, Reorganized EFH could finance a significant portion of these obligations with newly issued debt.

19. Because of Reorganized EFH's significant equity market capitalization, and based on my analysis of comparable follow-on equity raises in the market, Reorganized EFH will have the flexibility to raise a significant portion of these obligations through a follow-on equity offering. The combination of Reorganized EFH's strong credit ratings and ability to raise follow-on equity should enable Reorganized EFH to meet the funding obligation should it arise.

### A.  Assumptions

20. In performing this analysis, I assumed an emergence date of June 30, 2016. I assumed that the merger transaction contemplated in the Plan closes, and the associated equity and debt commitments are funded at emergence. I also assumed a pro forma equity value at emergence equal to the total equity commitments issued in accordance with the Plan, and that equity value at emergence will grow at an assumed cost of equity of 8.5%.

21. I relied on prospective capital structure assumptions provided by the Debtors.

22. I assumed that the entire $5.5 billion of emergence debt will remain outstanding through the time the obligations are paid, which I assumed would occur on June 30, 2017.

23. Finally, I make the conservative assumption that Oncor will remain "ring-fenced" at least for this initial period and that any make whole or post-petition interest obligations will be liabilities of Reorganized EFH, and not Oncor.

**B.    Analysis**

24. Under the Plan, Reorganized EFH will be capitalized at emergence with $7 billion of equity and $5.5 billion of debt. The equity component consists of:

- $7.1 billion total new money commitments, less an approximately $500 million litigation reserve for post-petition interest (assumed to be refunded to the investors at emergence);

- Approximately $0.33 billion of equity for the fee allocated to the equity backstop parties for providing the new money commitment; and

- Approximately $0.2 billion allocated to TCEH junior creditors on account of their pre-petition claims.

25. The debt component consists of committed financing from third party lending institutions.

26. Based on these figures, I calculated an implied terminal equity value of Oncor at emergence of $19.139 billion.

27. Next, I calculated the value of all disputed make whole and post-petition interest claims at emergence, and then 6 and 12 months following emergence. I calculated the total value of all disputed make whole and post-petition interest claims as $1.769 billion at emergence, $1.994 billion as of December 31, 2016, and $2.229 billion as of June 30, 2017. These calculations are illustrated below in **Figure 1**.

7

| Potential Disputed Claims | | | |
|---|---|---|---|
| | 6/30/16 | 12/31/16 | 6/30/17 |
| Time From Emergence | At Emergence | 6 Months | 12 Months |
| Time From September 30, 2015 | 9 Months | 15 Months | 21 Months |
| EFIH 1st Lien Claim | $521 | $548 | $575 |
| *Make Whole* | *426* | *426* | *426* |
| *Accrued Interest on MW* | *95* | *122* | *150* |
| EFIH 2nd Lien Notes | $328 | $348 | $369 |
| *Make Whole* [1] | *310* | *310* | *310* |
| *Accrued Interest on MW* | *18* | *38* | *59* |
| EFIH Unsecured Notes | $623 | $768 | $921 |
| *Post-Petition Accrued Interest - Incremental @ Contract* [2] | *503* | *641* | *785* |
| *Call Premium* | *120* | *120* | *120* |
| *Accrued Interest on Call Premium* | *--* | *8* | *16* |
| EFH LBO Notes | $17 | $20 | $26 |
| *Post-Petition Accrued Interest - Incremental @ Contract* [2] | *17* | *20* | *26* |
| EFH Unsecured Notes | $280 | $310 | $338 |
| *Post-Petition Accrued Interest - Incremental @ Contract* [2] | *87* | *111* | *132* |
| *Make Whole* [1] | *193* | *193* | *193* |
| *Accrued Interest on MW* | *--* | *6* | *13* |
| **Total PPI and All Make Wholes** | **$1,769** | **$1,994** | **$2,229** |
| Memo: | | | |
| Total PPI and All Make Wholes (excl. 1L) | 1,248 | 1,447 | 1,654 |
| Total PPI | 608 | 772 | 943 |
| All Make Wholes (excl. 1L) | 640 | 675 | 710 |

*Figure 1: Value of Disputed Make Whole and Post-Petition Interest Claims*

28. Next, I projected the total enterprise value of Oncor as of June 30, 2017, assuming Reorganized EFH's equity grows by its cost of equity, which using the Capital Asset Pricing Model, I estimated to be 8.5%. Based on these calculations, I determined that Oncor's total enterprise value on June 30, 2017, will be $20.094 billion. My calculations are illustrated below in **Figure 2**.

| Oncor TEV Build | | | | | |
|---|---|---|---|---|---|
| | 6/30/16 Emergence | Adjustment[1] | 6/30/2017 Before Obligation | Adjustment[2] | After Obligation Before Funding |
| EFH Equity | $7,012 | $596 | $7,608 | ($2,250) | $5,358 |
| EFH / EFIH Debt | | | | | |
| Pro Forma Debt[3] | 5,500 | | 5,500 | | 5,500 |
| EFH / EFIH Debt | $5,500 | | $5,500 | | $5,500 |
| Obligations (PPI & MW) | -- | | -- | 2,250 | 2,250 |
| Plus: Oncor Net Debt | 6,627 | 359 | 6,986 | | 6,986 |
| Implied Oncor TEV | $19,139 | $955 | $20,094 | $-- | $20,094 |

*Figure 2: Oncor Total Enterprise Value Build as of 6/30/2017*

8

29.     At emergence, Reorganized EFH and Oncor, based upon their respective credit metrics, will be rated a Strong BB and Strong BBB credit rating, respectively. Funding these obligations entirely through $2.25 billion in new equity would have no impact on either Reorganized EFH or Oncor's credit rating. Funding through $1.125 billion in equity and $1.125 billion in debt could cause Reorganized EFH's rating to change to Weak BB and Oncor's to BBB. And funding entirely through $2.25 billion in debt would likely leave Reorganized EFH with a Strong B rating, and may threaten the loss of Oncor's BBB rating. To protect Oncor's credit rating, should the full $2.25 billion in disputed claims become an obligation of Reorganized EFH, at least 50% of the funding could be financed with debt and the balance would likely need to come from a new equity raise.

30.     To determine whether Reorganized EFH could raise sufficient equity in a public offering, I first calculated the required amount of new equity financing as a percentage of Reorganized EFH's pre-financing equity market capitalization. Depending on which claims needed to be paid, and whether they are paid entirely with new equity or with a combination of equity and debt, I identified scenarios where the new equity raise as a percentage of pre-financing equity market capitalization ranged from 8.8% to 42.0%. These scenarios are captured by the below chart, **Figure 3**.

| | | Illustrative Scenario: Assuming 6/30/16 Emergence | |
|---|---|---|---|
| Total Equity at Emergence (6/30/16) | | | $7,012 |
| Total Equity at 6/30/17 before Obligations[1] | | | 7,608 |
| Total Equity, at 6/30/17 pro forma for Obligations but before New Financing | | | 5,358 |
| | | 6/30/17 Investment Date | |
| | | +$1.125bn Equity +$1.125bn Debt | +$2.25bn Equity +$0 Debt |
| Total PPI and MW | PPI and MW | $2,250 | $2,250 |
| | New Equity Financing[2] | $1,125 | $2,250 |
| | New Equity Financing as a % of Pre-financing Equity Market Capitalization | 21.0% | 42.0% |
| | New Debt | $1,125 | $ - |
| | | +$0.83bn Equity +$0.83bn Debt | +$1.65bn Equity +$0 Debt |
| Total PPI and MW (excluding 1L) | PPI and MW (excl. 1L) | $1,654 | $1,654 |
| | New Equity Financing[2] | $827 | $1,654 |
| | New Equity Financing as a % of Pre-financing Equity Market Capitalization | 15.4% | 30.9% |
| | New Debt | $827 | $ - |
| | | +$0.47bn Equity +$0.47bn Debt | +$0.94bn Equity +$0 Debt |
| Total PPI | PPI | $943 | $943 |
| | New Equity Financing[2] | $472 | $943 |
| | New Equity Financing as a % of Pre-financing Equity Market Capitalization | 8.8% | 17.6% |
| | New Debt | $472 | $ - |

(1) The equity value at emergence is assumed to grow at an 8.5% cost of equity
(2) Analysis excludes impact of any gross spread paid to equity underwriters in connection with equity issuance, which would not materially impact the analysis or conclusions drawn herein

*Figure 3: Illustrative Scenarios of New Equity as a Percentage of Pre-Financing Equity Market Capitalization*

31. Finally, I reviewed instances of follow-on equity offerings of between $1 billion and $5 billion over the last three years to determine the size range of equity offerings expressed as a percentage of pre-financing market capitalization that would be feasible. I concluded that a large number of comparable follow-on equity raises have been successfully achieved in a size range that suggests Reorganized EFH will have the flexibility to raise at least 50% of the post-petition interest and make whole obligations with a follow-on equity offering.

### III.   Energy Future Competitive Holdings

32. Energy Future Competitive Holdings Company LLC ("EFCH") is the direct parent of Texas Competitive Electric Holdings Company LLC ("TCEH"). To my knowledge, EFCH holds no material assets other than its 100% equity interest in TCEH. The approximately $9 million of EFCH notes due 2037 are obligations of EFCH alone and are not guaranteed by TCEH or any other entity. The EFCH notes are thus "structurally subordinate" to TCEH

10

unsecured claims, such that they only recover from the assets of TCEH when the equity interests in TCEH receive a recovery.

## IV. Comments on the Expert Opinions of Mark Rule.

33. I understand the EFH Committee has retained Mark F. Rule of Alix Partners to provide opinions regarding the historical solvency of EFH and certain of its subsidiaries. I have reviewed Mr. Rule's expert report and have been asked by the Debtors to review and respond to certain opinions rendered by Mr. Rule.

34. In rendering his opinions, Mr. Rule applies the balance sheet test for solvency to (a) "Consolidated EFH" and (b) the "E Side" alone (EFH Corp. and EFIH). Under the balance sheet test, the value of an entity's liabilities (including the face value of debt held by third parties) are subtracted from the value of its assets (calculated at fair value). If the result is a positive equity value, then the entity is solvent. Otherwise the entity is insolvent.

35. In performing these calculations, Mr. Rule does not conduct his own valuation of EFH Corp. or any of its subsidiaries. Rather, in calculating the equity value of "Consolidated EFH" and the E Side, Mr. Rule relies on enterprise valuations conducted by Duff & Phelps, which were not performed for purposes of a solvency analysis.

36. Mr. Rule's opinions are flawed in at least three ways:

- *First*, Mr. Rule improperly consolidates E-Side and T-Side debt in his evaluation of the historical solvency of "Consolidated EFH."

- *Second*, Mr. Rule incorrectly treats EFH Corp. debt held by EFIH in his analysis of historical E-Side solvency.

- *Third*, Mr. Rule incorrectly subtracts the control premium for Oncor that Duff & Phelps included in its valuations.

37. Each of these flaws has the effect of understating the equity value of EFH Corp. in Mr. Rule's analyses.

### A. Calculation of EFH Corp. Solvency Under the Balance Sheet Test.

38. EFH Corp.'s primary assets consist of its equity interests in EFIH and in TCEH.[10] Accordingly, as a general matter, the proper way to calculate EFH Corp.'s solvency under the balance sheet test is to add the value of EFH Corp.'s interest in EFIH to the value of its interest in TCEH, and then subtract the value of any EFH Corp. debt held by third parties. The proper way to determine the value of EFH Corp.'s interest in EFIH and TCEH is to subtract the value of each of those entities' third-party liabilities from each of their enterprise values.

39. Neither EFH Corp. nor EFIH ever guaranteed TCEH debt. The E-side and T-side debt "silos" were always separate. Thus, the value of EFH Corp.'s interest in TCEH could never fall below zero. If TCEH's assets exceeded its liabilities, then EFH Corp.'s interest in TCEH had a positive value. If TCEH's liabilities exceeded its assets, then EFH Corp.'s interest in TCEH had no value. Under no circumstances could EFH Corp.'s interest in TCEH have a negative value.

### B. Solvency of "Consolidated EFH."

40. Mr. Rule's analysis of "Consolidated EFH" is incorrect. Instead of the proper methodology described above, which respects the separateness of the E-side and T-side debt silos, Mr. Rule calculates the equity value of EFH Corp. by subtracting the *consolidated* debt of all EFH entities—including the value of *all* TCEH debt—from their *consolidated* enterprise value.

41. By consolidating all debt, including TCEH debt to which EFH has no obligation, Mr. Rule effectively allows the value of EFH Corp.'s interest in TCEH to fall below zero. Put another way, under Mr. Rule's analysis, to the extent that the value of TCEH's debt exceeded its

---

[10] EFH Corp. owns 100% of EFCH, which in turn owns 100% of TCEH.

12

enterprise value, the difference reduced the equity value of EFH Corp. That is inappropriate, and results in a substantial underestimate of EFH Corp.'s equity value.

### C. Solvency of the E Side.

42. Mr. Rule performs an alternative analysis of E-Side solvency only. While this analysis properly treats TCEH debt—to the extent it exceeded TCEH's enterprise value—as having no impact on EFH Corp.'s equity value, it is flawed in another way.

43. Specifically, Mr. Rule incorrectly handles debt issued by EFH Corp. that was held by EFIH. First, Mr. Rule unnecessarily includes debt of EFH held by EFIH as a liability of EFH and an asset of EFIH even though EFIH is solvent. Mr. Rule then values EFH debt held by EFIH at a discounted value based on market prices, but values those same liabilities at EFH at full principal amount. The net effect of these two calculations incorrectly biases downwards the equity value of EFH by the discount that EFH traded in the market

44. By Mr. Rule's own calculations, EFIH was solvent at all times, even without attributing any value to intercompany debt of EFH Corp. held by EFIH. Because EFIH was at all times a wholly-owned, solvent subsidiary of EFH Corp., EFH Corp. could at any time have required EFIH to dividend its holdings of EFH Corp. debt to EFH Corp. for cancelation. Indeed, in the first quarter of 2013, EFH Corp. did exactly that, when EFIH dividended more than $6 billion of EFH Corp. debt to EFH Corp., which EFH Corp. then cancelled.

45. Including EFH Corp. debt held by EFIH as an asset of EFIH and a liability of EFH Corp. is unnecessary in calculating EFH Corp. solvency. Instead, Mr. Rule should have excluded debt held within the E-side debt silo from the analysis.

46. If Mr. Rule calculated the value of EFH debt held by EFIH as an asset equal to the value of that very same debt of EFH as a liability there would be no net impact on the calculation

13

of EFH solvency. But by taking the second step of valuing the former at a lower valuation than the latter he introduces an incorrect downward bias in his calculation of EFH solvency.

47. Mr. Rule's improper methodology in his E-side analysis incorrectly reduces the equity value of EFH Corp.

### D. Duff & Phelps's Inclusion of Oncor Control Premium.

48. As discussed above, Mr. Rule uses Duff & Phelps's quarterly valuation reports as the starting point for his solvency calculations. He makes certain improper adjustments to Duff & Phelps's figures, however, including by subtracting the control premium Duff & Phelps included in its valuation of Oncor.

49. A control premium is the value above the public share price of a company that purchasers would be willing to pay to obtain a controlling stake in that company. Duff & Phelps's valuation reports correctly apply a control premium to EFH's 80.03% ownership stake in Oncor. Mr. Rule opines that including this control premium is inappropriate because Oncor is a "ring-fenced" entity, meaning that EFH Corp. does not have "control" of Oncor.

50. The Oncor ring fence is the result of certain regulatory requirements, and was put in place to insulate Oncor from EFH's increased credit risk at the time of the 2007 LBO. In the event that EFH's stake in Oncor was sold to an investment-grade purchaser, the rationale for the ring fence would disappear. Ring-fencing measures would no longer be necessary to protect Oncor.

51. As a result, an investment-grade purchaser would not consider the current ring-fencing measures to be a barrier to control of Oncor. Thus, an investment-grade purchaser would be willing to pay a control premium, and Duff & Phelps's inclusion of a control premium is appropriate. Mr. Rule's elimination of the control premium leads to an understatement of the equity value of EFH Corp.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

Dated: November 17, 2015

David Ying

Senior Managing Director
Evercore Group L.L.C.