```
 1   UNITED STATES BANKRUPTCY COURT
 2   DISTRICT OF DELAWARE
 3
 4   In re:                    :
                               :    Chapter 11
 5   ENERGY FUTURE HOLDINGS     :
     CORP.,  et al.,           :    Case No. 14-10979(CSS)
 6                             :
              Debtors.         :    (Jointly Administered)
 7   _____:
                               :
 8   ENERGY FUTURE HOLDINGS,   :
     CORP.,                    :
 9                             :    Adv. Pro No. 15-51386 (CSS)
              Plaintiff.       :
10                             :
     v.                        :
11                             :
     TEXAS TRANSMISSION        :
12   INVESTMENT LLC,           :
                               :
13            Defendant.       :
     _____:
14                             :
     OVATION ACQUISITION I,    :
15   L.L.C. and                :
     OVATION ACQUISITION II,   :
16   L.L.C.,                   :
                               :
17            Intervenor       :
              Plaintiffs,      :
18                             :
     v.                        :
19                             :
     TEXAS TRANSMISSION        :
20   INVESTMENT LLC,           :
              Defendant.       :
21   _____:
22
23
24
25
```

1                    United States Bankruptcy Court

2                    824 North Market Street

3                    Wilmington, Delaware

4                    December 18, 2015

5                    9:38 AM - 10:51 AM

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTCHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO OPERATOR:  LESLIE MURIN

1   HEARING re Texas Transmission Investments LLC's Motion to

2   Dismiss the Complaint [Adv. D.I. 12; filed November 19,

3   2015]

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    POTTER ANDERSON CORROON LLP

4        Attorney for Deutsche Bank New York

5

6    BY:  R. STEPHEN MCNEILL

7

8    FOX ROTHSCHILD

9        Attorney for Ovation

10

11   BY:  JEFFREY M. SCHLERF

12

13   BAKER BOTTS

14       Attorney for Ovation

15

16   BY:  VAN H. BECKWITH

17       TOM O'BRIEN

18

19   WHITE & CASE LLP

20       Attorney for TCEH Ad Hoc Group of Unsecured Noteholders

21

22   BY:  CHRIS SHORE

23

24

25

1    MORRISON & FOERSTER

2         Attorney for the TCEH Committee

3

4    BY:  ERICA J. RICHARDS

5

6    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

7         Attorney for TTI

8

9    BY:  GEORGE A. ZIMMERMAN

10        GEORGE N. PANAGAKIS

11        JASON C. VIGNA

12        CARL T. TULLSON

13        DAIN A. DE SOUZA

14

15   BIELLI & KLAUDER, LLC

16        Attorney for EFH Corp.

17

18   BY:  CORY P. STEPHENSON

19

20   MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

21        Attorney for TCEH Debtors

22

23   BY:  JASON ANGELO

24

25

1   KIRKLAND & ELLIS

2        Attorney for the Debtors

3

4   BY:  WARREN HASKEL

5

6   MORRIS JAMES LLP

7        Attorney for Law Debenture of New York,

8        Indenture Trustee

9

10  BY:  STEPHEN MILLER

11

12  POLSINELLI

13       Attorney for TCEH Creditor's Committee

14

15  BY:  SHANTI M. KATONA

16

17  RICHARDS LAYTON & FINGER

18       Attorney for the Debtors

19

20  BY:  MARCOS A. RAMONS

21       JASON M. MADSON

22

23  ALSO PRESENT TELEPHONICALLY:

24  SCOTT L. ALBERINO

25  MARIA CHUTCHIAN

1   MARK A. CODY

2   KENT COLLIER

3   STACY DORÉ

4   CATHERINE EISENHUT

5   MICHAEL FIRESTEIN

6   SETH GOLDMAN

7   NATASHA HWANGPO

8   ALEXA J. KRANZLEY

9   DANIEL A. LOWENTHAL

10   HAL F. MALONE

11   MEREDITH PFISTER

12   ABID QURESHI

13   RACHAEL RINGER

14   MARC B. ROITMAN

15   JEFFREY S. SABIN

16   NED S. SCHODEK

17   FREDRIC SOSNICK

18   MICHAEL TURKEL

19   MATTHEW UNDERWOOD

20   THOMAS WALPER

21   TODD M. GOREN

22   CHARLES KOSTER

23   JONATHAN D. MARSHALL

24   ERIN SMITH

25   AMER TIWANA

1                   P R O C E E D I N G S

2               CLERK:  All rise.  Please be seated.

3               THE COURT:  You know, it's a shame when a couple

4     billion dollars can't draw a crowd.

5          (Laughter)

6               MAN:  We were commenting on that.

7               THE COURT:  Like where'd everybody go?  Okay.

8     Excuse me.  Just give me a moment.

9               All right.  We're here on the oral argument on the

10    motion to dismiss, so unless there are any preliminary

11    matters we need to discuss, we can get right to it.  It's

12    the Debtor's motion joined by Ovation.

13              MR. HASKEL:  It's TTI's motion.

14              THE COURT:  Oh, it's TTI's motion.  I'm sorry.

15    All right.  I did read the papers, I promise.  It may not be

16    early for you, but it's early for me, so I'll turn it over

17    to TTI.  I apologize.

18              MR. ZIMMERMAN:  Good morning, Your Honor.  It's

19    early for me, too, so I'll apologize in advance.  George

20    Zimmerman of Skadden Arps representing TTI.

21              This is, in fact, TTI's motion to dismiss the

22    complaint on the grounds that it fails to state a cause of

23    action, specifically that the transaction described in the

24    complaint does not trigger either the drag-right under

25    Section 3.3 of the Investor's Rights Agreement or the duty

1    to cooperate.

2              You issued your opinion the middle of October in

3    the Computershare case, so we know and you certainly know

4    what the rules of contract construction are under New York

5    laws, so we don't have to dwell on that.  Let's apply that

6    analysis to the contract here because the language I think,

7    from our position certainly, is unambiguous and therefore,

8    the intent of the parties is conclusively determined by that

9    language.  It's only if there's an ambiguity that you go to

10   intrinsic evidence.

11             Two things have to happen.  Oh, if I may, we have

12   just a little packet of --

13             THE COURT:  Yes.

14             MR. ZIMMERMAN:  Can we just hand it up?

15             THE COURT:  Yeah, of course.  Thank you, Mr. De

16   Souza.

17             MR. ZIMMERMAN:  Okay.  Since you've been living

18   with this case for a year and a half, you certainly know the

19   organizational chart.  But just to set it out because that

20   has a lot to do with the language, you've got EFH which own

21   100 percent of the equity of EFIH, which in turn owns 100

22   percent of the equity of Oncor Holdings and Oncor Holdings

23   owns 80 percent of the LLC units of Oncor and TTI, the

24   minority member owns about 20 percent.  Okay.

25             Two things have to happen before the drag is

1    triggered and just because I'm going to refer both to the

2    drag and to the tagalong, which is a relevant provision, let

3    me just set -- just state what you know.  The drag means

4    that EFH or a buyer can compel TTI to transfer or sell its

5    LLC units.  The tagalong is actually the opposite.

6    Depending on the nature of the transaction, TTI can compel

7    EFH with a buyer to take its units.

8              So while the drag is the issue in the case, the

9    interpretation of the drag that favors our position is very

10   -- is not only plain from the language of the drag but it's

11   also plain when you distinguish it from the language in the

12   tagalong, which I'll get to.

13             The drag.  The drag is -- two things have to

14   happen to trigger the drag.  First, there has to be an offer

15   to purchase -- this is a quote -- "offer to purchase the

16   LLCs units directly or indirectly held by EFH".  Second,

17   there has to be that purchase results in a change of

18   control.  So those are the two things that have to happen.

19             Your Honor, if you would turn to -- it's the

20   second page of text.  I'm sorry, it's the first page of

21   text.  That's the drag language.  And just to confirm what I

22   just said, it says 3.3A, notwithstanding anything contained

23   in this Article 3, to the contrary, but subject to Section

24   3.3F, "If parent EFH or its subsidiaries other than the

25   initial member," -- the initial member is defined as Oncor

1    Holdings -- "or its permitted transferees receives an offer

2    to purchase a number of LLC units held directly or

3    indirectly by such entities."

4              On this chart, and as a matter of corporate law,

5    the LLC units on the EFH side of the ledger, the 80 percent

6    of those units are owned by Oncor Holdings.  There has been

7    no offer to purchase those units.  Those units are never

8    going to leave Oncor Holdings.  At the end -- Oncor Holdings

9    now has 80 percent.  That's Oncor Holdings' asset is its 80

10   percent LLC interest units in Oncor.

11             After the transaction, when you have the new

12   owners of IPL Corporation and all that stuff, Oncor Holdings

13   is going to own and hold that 80 percent -- those 80 percent

14   of LLC units.  So by definition, if Oncor Holdings has it

15   now and if Oncor Holdings owns it afterwards, nobody's

16   buying those units.  Nobody's "purchasing" those units --

17   whether directly or indirectly is a sideshow.  Those units

18   are not being transferred.  They're not being sold.  They're

19   not being disposed of.  They're not being any other word you

20   want to use.  So by definition, they can't be -- there is no

21   offer to purchase.

22             There's a reason -- and I obviously don't know all

23   of the reasons why this transaction was structured this way

24   but I do know one of the reasons because -- and so do you --

25   because during the course of these proceedings, you will

1    recall the Debtor submitted to you an omnibus memorandum of

2    tax because there was a huge issue, a huge potential tax

3    liability depending on how the structure, whatever

4    transaction they were ultimately going to do.

5            And in that memo -- and they made it clear that if

6    the Oncor Holdings LLC units were sold that would trigger a

7    multibillion dollar tax liability at the EFH level.  And

8    they say on Page 8 of that submission, Footnote 6, "If Oncor

9    Holdings sold its interest in Oncor for only $1, EFH would

10   recognize gain of approximately $1.7 billion on such a

11   sale."  Obviously this transaction involves a heck of a lot

12   more than a dollar, so I don't remember the number but I

13   remember it's a multibillion dollar tax liability.

14           So they had a choice.  They could buy those units

15   and incur that tax liability and when and if they bought the

16   units property and triggered the drag properly, the new

17   owners would have the benefits of 100 percent ownership of

18   Oncor and all that income, all those profits, all those

19   revenues could be upstream.  It's 100 percent.  The downside

20   was they had to pay that tax.

21           Alternatively, they can avoid that tax entirely

22   but then they can't buy the units.  They can still structure

23   transaction so that they get the economic benefit of the 80

24   percent because TTI wouldn't be dragged.  They get 80

25   percent of that revenue, 80 percent of those profits, which

1    is still conservative money, and they would have saved --

2    paid nothing for the tax liability.

3              They obviously came to the economic conclusion

4    that the benefits of 80 percent with no tax liability is

5    better than the benefits of 100 percent with this huge tax

6    liability.

7              THE COURT:  This is all very interesting.

8              MR. ZIMMERMAN:  Thank you.

9              THE COURT:  However, we're here on a motion to

10   dismiss and we're -- we have to look at the four corners of

11   the complaint.

12             MR. ZIMMERMAN:  Yes.

13             THE COURT:  A lot of what you're telling me is

14   very interesting and might be interesting in a summary

15   judgment motion.  We're at trial.

16             MR. ZIMMERMAN:  Fair enough.  The reason I -- and

17   fair enough.  The only reason I made is that the distinction

18   between purchase and non-purchase, there's a reason to it.

19   It's not a language issue.  It's not, well, the parties

20   really intended it to be the same thing.  No, because they

21   say the parties intended -- we agree with you -- four

22   corners, four corners of the contract.

23             Is there an offer to purchase the LLC units or

24   not?  If Oncor -- and the answer is clearly no.  There

25   clearly is an offer to acquire the equity interests upstairs

1    above Oncor Holdings.  EFH's equity is going to be retired.

2    There's going to be new equity issued.  For sure there's

3    that.  There's no purchase of the LLC units.  Oncor Holdings

4    owns them now.  Oncor Holdings will forever own them.  Now -

5    -

6              THE COURT:  Let me ask you this.  Looking at your

7    textual reading --

8              MR. ZIMMERMAN:  Yes.

9              THE COURT:  -- "receives an offer to purchase a

10   number of LLC units held directly or indirectly by such

11   entities and LLC units as the case may be owned directly by

12   members."

13             MR. ZIMMERMAN:  Yes?

14             THE COURT:  Why isn't the question of directly or

15   indirectly by such entities, why doesn't that modify or

16   relate to purchase?  In other words, an indirect purchase of

17   the LLC units?

18             MR. ZIMMERMAN:  Here's why.  It actually -- well,

19   the answer is it does.  But the key phrase in your question,

20   which is perfectly consistent with our position is it has to

21   modify the purchase of LLC units.

22             So, for example, if the way it was structured was

23   EFH got an offer to purchase the LLC units it indirectly

24   holds -- let's assume it indirectly holds -- they could do

25   the following; because they control 100 percent of EFIH and

1    they indirectly control 100 percent of Oncor Holdings, they

2    can direct EFIH to direct Oncor Holdings either, A, to

3    transfer the 80 percent LLC units upstream so that they can

4    turn it over to the buyer.  Alternatively, they can instruct

5    EFIH to instruct Oncor Holdings to turn the 80 percent LLC

6    units over to the buyer, OV1.  That's the direct-indirect.

7            Neither of those is happening.  Whether -- you can

8    modify purchase any way you want, Judge.  There has to be a

9    purchase at the end of the day.  That's what we're modifying

10   by directly or indirectly.  And the LLC units are never

11   moving.  They are staying in our (indiscernible).  So that's

12   what the direct-indirect modification is.

13           As a matter of -- and we brief this -- the reason

14   this transaction doesn't work is because it's a matter of

15   corporate law.  When you own the shares of a corporation,

16   you do not own its underlying assets.  We cite those cases.

17   In fact, it's literally hard book law and I don't think

18   there's any dispute about that.

19           The final point that I want to make on this --

20           THE COURT:  I'm sorry.  Can you say that point

21   again?

22           MR. ZIMMERMAN:  Sure.  The -- as a matter of corp

23   -- state common law, corporate law, the owner of the shares

24   of a corporation does not own the underlying assets of the

25   corporation.  There is a division between ownership of

1    equity and ownership of assets.

2              The LLC -- there's no question that EFH owns all

3    of the equity of EFIH, which in turn owns all of the equity

4    of Oncor Holdings, no question.  But the underlying assets

5    of Oncor Holdings, which are the LLC units, are not owned by

6    the equity owners.

7              THE COURT:  Right.  So you want to substitute --

8    you don't want to substitute, but for your argument,

9    substitute LLC units to assets.

10             MR. ZIMMERMAN:  No, I'm not because LLC -- it's

11   actually defined.  First of all, there's no -- I'm not

12   defining -- I'm not changing anything.  The assets of LLC

13   units --

14             THE COURT:  No, no, my point being that what's

15   being -- Oncor Holdings owns LLC units of Oncor.

16             MR. ZIMMERMAN:  Correct.

17             THE COURT:  And your argument is, I think, that's

18   not what's being sold here, okay.  So the "asset" is an

19   asset of Oncor Holdings, the LLC units.

20             MR. ZIMMERMAN:  Yes.

21             THE COURT:  And what you're saying is what they're

22   really doing is selling, in effect, the stock of Oncor

23   Holdings, not the assets of Oncor Holdings.  Only the sale

24   of the Oncor Holdings that triggers the drag.

25             MR. ZIMMERMAN:  Precisely.  There will be new

```
1    owners of the equity interest of Oncor Holdings, not of

2    Oncor Holdings.

3              THE COURT:  Right.

4              MR. ZIMMERMAN:  And then -- that's the -- that's

5    Corporate Law 101 but let me give you the textual support

6    for that.  If they wanted the drag to be triggered by the

7    acquisition of the equity, the exercise you and I just went

8    through, they know precisely how to do that because now if

9    you look at the tagalong provision, which would allow --

10   which would (indiscernible) -- which would enable TTI to

11   force the buyer to take its units, that's triggered by what

12   you and I just discussed.  And if you turn to Page --

13             THE COURT:  It's the next page, right?

14             MR. ZIMMERMAN:  It's the next page.  It's actually

15   two pages, Section 3.2H.

16             THE COURT:  Oh H.

17             MR. ZIMMERMAN:  We included the first page just to

18   let you know that it's the tagalong agreement.

19             THE COURT:  All right.

20             MR. ZIMMERMAN:  In the event that EFH or any of

21   its subsidiaries proposed to transfer LLC units indirectly

22   through a transfer of equity interests in a subsidiary of

23   EFH, the sole or principle asset of which is such LLC units,

24   full stop.  That's what's happening here.  The subsidiary,

25   the sole and principle asset of which is such LLC units is
```

1    Oncor Holdings.

2         If they wanted to trigger the event, which we're

3    litigating, by acquisition of the equity, which would be

4    indirectly, they say, therefore, transferring the asset,

5    that's how you say it.  This is actually -- this expired,

6    right, per some date. Had this not expired, this deal

7    triggers the tagalong.  It's exactly what they're doing.

8         The language, as you now can see, is completely

9    different from what the drag is.  That's -- no transfer, no

10   equity, direct purchase of LLC units.  And the case law is

11   clear and you know this.  Different language means different

12   things.  You can't say they mean the same thing.  There's a

13   formula for how to say it.  They haven't said it.

14        I'm going to move quickly to my -- so full stop.

15   The drag hasn't been triggered, therefore, their duty to

16   cooperate kind of is at this point, if I were judge, it's

17   moot, but obviously I'm not, so I'm going to -- let me just

18   address the second issue.

19        The duty to cooperate is the duty to cooperate

20   with the IPO conversion, which is a defined term.  And the

21   allegation of the complaint is that TTI's not going to be --

22   comply with its duty to cooperate.  If you look at Section

23   3.7A, which is in the packet, it's the last page, let's see

24   what triggers the duty to cooperate, 3.7A.

25        Subject to the terms of the LLC agreement, blah,

1   blah, blah, "EFH may develop and implement an IPO conversion

2   as defined," so it hasn't been defined yet, "And each member

3   shall cooperate in respect thereof."  Here comes the

4   definition.  "In connection therewith but subject to the

5   revisions of 3.7C, the board," and the board is the Oncor

6   board, it's defined as the Oncor board, "May, at the request

7   of EFH, take any and all actions to create and implement an

8   IPO conversion including," and then it lists six or seven

9   actions that the board takes.

10             If you go down about 10 lines, at the end of all

11   those actions, "(any such action and IPO conversion)".  So

12   let's stop a minute.  The IPO conversion is defined as those

13   series of actions taken by the Oncor board.  The Oncor board

14   hasn't done anything.  They've taken no actions.  As far as

15   I know, they've taken no position with the deal.  I think

16   publicly somebody told me they've taken no position.  So

17   right now, there is no IPO conversion.

18             Number one. Number two, let's assume for the

19   moment that the Oncor board had taken some steps.  Here's

20   what we have to cooperate.  Next sentence, 10 lines down,

21   "In connection therewith but subject to the provisions" of

22   something else, "the company and each member agree to

23   cooperate with the other members in good faith," to do what?

24   "To effectuate the IPO conversion and ensure that each

25   member," which includes TTI, "receives shares of common

1    stock or other equity securities or the right to shares of

2    common stock and other rights in connection with such IPO

3    conversion substantially equivalent to and in exchange for

4    its economic interest, governance, priority and other rights

5    and privileges such member had with respect to its LLC units

6    prior to the IPO conversion and to ensure that such rights

7    and privileges are reflected in the organizational and other

8    documents of the IPO corporation."

9              So what the parties bargained for is, A, there is

10   no IPO conversion, only if the Oncor board acts.  They

11   haven't acted.  B, it's a package duty to cooperate.  It's

12   the duty to cooperate with the IPO conversion and to ensure

13   in connection therewith all these rights that TTI's supposed

14   to have.  Nobody disputes that at the end of the day TTI's

15   not going to participate in the IPO.  TTI's not going to

16   have its governance rights.  TTI's not going to have

17   anything.

18             The IPO corporation certainly in its organization

19   documents are not going to provide for any of these rights.

20   So you have two fundamental -- they have two fundamental

21   problems.  Number one, as a textual matter, we haven't

22   started an IPO conversion.  Unless and until Oncor's board

23   takes those six or seven step actions that you just read

24   about, there isn't an IPO conversion, so this isn't even a

25   for today issue.  But even if there is --

1          THE COURT:  But including can -- including is not

2     exhaustive.

3          MR. ZIMMERMAN:  Correct, or they can take whatever

4     actions.  At the end of the day, somebody needs to pay.  But

5     if and when they do, the duty to cooperate that the parties

6     bargained for is that TTI maintained those rights or get

7     equivalence of those rights in the new IPO corporation and

8     those rights need to be codified in the organizational

9     documents.  Since that's never going to happen, if you step

10    -- sometimes I get lost in the weeds.

11         When I step back, so their position is TTI has a

12    duty to cooperate and to effectuate a transaction that on

13    its face will breach the contract.  That can't possibly be

14    right.  No judge is going to compel somebody to participate

15    and cooperate in breach of contract.

16         There's a bargain for duty here.  They're not

17    getting those rights.  That's undeniable.  And that's fine.

18    But there can't be a duty, even as a logical matter there

19    can't be a duty to cooperate and, therefore, not

20    surprisingly, when you look at the language, they're not

21    remotely close to a duty to cooperate.

22         I've got an hour, but unless you've got questions,

23    I can save -- I'd like to save my time for any rebuttal.

24         THE COURT:  Can you talk to me about the change of

25    control point?

1          MR. ZIMMERMAN:  Yes.  Sorry, thank you.

2          THE COURT:  It's okay.

3          MR. ZIMMERMAN:  If there were a purchase of LLC

4     units, which there aren't, if there were, the drag right is

5     only triggered if that purchase results in change of

6     control.

7          Their argument, which is at Page 17 of the EFH

8     breach -- brief, sorry -- argues obviously that there is a

9     change of control.  This is what they say.  "There will be a

10    "change of control" because buyers will own, albeit directly

11    or indirectly, more of the equity interests of Oncor after

12    the consummation of the proposed transaction than any person

13    or entity."

14          That's just factually and demonstrably wrong

15    because, as I've said before, Oncor has owned 80 percent.

16    The LLC units are the ownership interest in Oncor.  Oncor

17    Holdings owns 80 percent of that today.  They're going to

18    own 80 percent of that after the transaction.

19          Mathematically speaking, by definition, nobody --

20    the buyers cannot possibly own more of the equity interest

21    of Oncor than 80 percent, so Oncor Holdings never moves from

22    that position, so there is no change of control.

23          THE COURT:  Okay.

24          MR. ZIMMERMAN:  Thank you.

25          THE COURT:  Thank you.  Sorry, taking some notes.

1    Go ahead, sir.

2              MR. HASKEL:  Good morning, Your Honor.

3              THE COURT:  Good morning.

4              MR. HASKEL:  Warren Haskel of Kirkland & Ellis on

5    behalf of plaintiff EFH.  With me today is Chris Shore of

6    White & Case and Van Beckwith of Baker Botts on behalf of

7    intervener plaintiff's Ovation.

8              So given that both EFH and Ovation oppose TTI's

9    motion, Mr. Shore and I have divided the argument between

10   us.

11             THE COURT:  Fine.

12             MR. HASKEL:  I would like to set the stage for The

13   Court with a brief story of this case, a high level overview

14   of the complaint and an explanation of why this case is

15   necessary.  Mr. Shore will then explain why the complaint

16   states a viable claim for breach of contract and specific

17   performance such that the motion to dismiss should be

18   denied.

19             THE COURT:  Okay.

20             MR. HASKEL:  So this case is about whether TTI has

21   breached its contractual obligation to EFH under the party

22   Investor's Rights Agreement by refusing to sell its minority

23   interest in Oncor to Ovation.

24             When negotiating the IRA in 2008, EHF and its

25   current equity owners wanted to make sure that if TTI was

1    coming into this investment with EFH, EFH could force it to

2    come out of the investment, too.  In other words, in with

3    the sponsors, out with the sponsors.

4         In particular, EFH was concerned that having a

5    minority investor with corporate governance rights, as TTI

6    has, would have a chilling -- could have a chilling effect

7    on the future sale of the company.  It's a typical concern

8    for joint ventures with minority partners.  We didn't want

9    the tail to wag the dog in any future transaction of note.

10        EFH also didn't want to worry about a minority

11   investor interfering with an IPO if that's the route that

12   EFH decided it wanted to take.  EFH, therefore, insisted on

13   having terms in the IRA that, one, enabled it to compel TTI

14   to sell its minority interests to a buyer that wanted to own

15   the company and, two, to force TTI to cooperate in a plan

16   for an IPO conversion.  And those terms became Sections 3.3

17   and 3.7 of the IRA.

18        Now fast forward to the Debtor's Chapter 11

19   proceedings, EFH indeed received an offer to purchase its

20   Oncor stake as part of a plan to take reorganized EFH's

21   successor public, which as this court knows is the

22   touchstone of the Debtor's plan to emerge from Chapter 11.

23        Just as EFH and TTI contemplated in 2008, Ovation

24   wanted to have control of all of Oncor, not just EFH's

25   stake, so Ovation also offered to purchase TTI's minority

1    interest.  Preparing for the worst, EFH and Ovation agreed

2    through the merger agreement that EFH would -- if TTI

3    refused to honor its obligations to sell with EFH or assist

4    with the IPO conversion, that EFH would pursue litigation

5    against TTI to enforce those rights and obligations and

6    that's precisely what has happened.

7            Pursuant to the IRA, EFH notified TTI of its

8    intent to sell its interest in Oncor to Ovation as well as

9    Ovation's offer to sell -- to purchase TTI's interest.  EFH

10   also informed TTI about the IPO conversion, contemplated in

11   the merger agreement, sought TTI's assurance that it would

12   comply with its obligations under 3.7 of the IRA.

13           In response, as detailed in the complaint, TTI has

14   repeatedly stated, several occasions, that it not only does

15   not believe that EFH cannot invoke any of its drag along

16   rights but that it has no IPO conversion rights and

17   obligations in connection with Ovation's offer.  TTI has

18   thus breached the IRA and EFH's only option to force TTI to

19   comply with its contractual promises was to bring this

20   lawsuit, as it agreed to do, in a merger agreement.

21           EFH accordingly asked this court to order TTI to

22   specifically perform its drag along and IPO conversion

23   obligations under the IRA.

24           Now, as you just heard, TTI has responded to EFH's

25   complaint by arguing that as a matter of law TTI did not

1    breach the IRA when it refused to comply with its

2    obligations under Section 3.3 and 3.7.  This is a breach of

3    contract case and TTI cannot ignore EFH's well-pled

4    allegations at the 12(b)(6) stage.

5              For instance, Paragraphs 50 to 53 of the complaint

6    describe how and why EFH's notice of Ovation's offer to

7    purchase Oncor and the IPO conversion plan triggered EFH's

8    drag along rights and TTI's IPO obligations and the

9    Paragraphs 54 to 58 describe how TTI breached and repudiated

10   those rights and obligations.

11             That's more than enough to stay a claim under

12   Third Circuit standards.  These allegations must be taken as

13   true.  The Court recognized this is a case about the four

14   corners of the complaint and those four corners, the

15   allegations therein must be construed in the light most

16   favorable to EFH to determine whether under any reasonable

17   reading of that complaint EFH may be entitled to relief.

18             So in light of the standard, Mr. Shore will now

19   explain why each of the TTI's interpretive arguments that

20   you've just heard under the IRA, about the IRA, fails.  So

21   unless Your Honor has any questions, I'll turn the podium

22   over to Mr. Shore.

23             THE COURT:  I do not.  Thank you.

24             MR. SHORE:  Good morning, Your Honor.  Chris Shore

25   from White & Case on behalf of Ovation.

1                    Let me start with a couple of preliminary points.

2       Obviously it's a motion to dismiss.  And in our view what we

3       really need is a developed record in discovery to give you

4       everything you need to do to interpret this agreement.  The

5       discovery started.  We've agreed on the summary judgment

6       briefing schedule that's going to have this up for

7       consideration at the beginning of March.

8                    TTI is taking the position that using the tools of

9       interpretation of New York contracts, the contract is so

10      clear, there's no set of circumstances under which they can

11      get dragged consistent with the terms of the plan and the

12      merger agreement.  And I was trying to come up with the

13      right metaphor.  I had tried to settle on, you know, that

14      The Court's digging the Rosetta Stone out of the desert and

15      trying to figure out what it means just by looking at that.

16      But I kind of settled on the image of an old Swiss

17      watchmaker, sitting down at a table with all the tools laid

18      out, with a jeweler's loupe on, looking down not at a Swiss

19      watch but a big block of Swiss cheese.

20                   Because we all have tools of interpretation and we

21      can all use tools of interpretation, and we can sit down and

22      beat our heads against the wall trying to use all of them

23      and come up with a consistent reading.

24                   But this agreement is complicated and not in the

25      Swiss watch way.  We can't even get through the first

1    preamble of the agreement without coming to a dispute over

2    whether EFH is a member or not as defined in the agreement.

3    And we can sit down for hours and talk about what does it

4    mean that there's a missed comma after EFH in parens, and

5    that does that mean...?

6               So we're going to have to use our tools at the end

7    of the day to come up with a comprehensive reading of the

8    contract that takes into consideration what the parties were

9    trying to do and how they set it -- not to vary the terms of

10   the agreement, but come up with a way to come up with a real

11   reading of the contract.

12              And so, at this stage, I don't think the Court

13   should be taking TTI's bait and say, well, what we need to

14   do right now is attack this agreement and try to come up

15   with a comprehensive view of what it says and means.  And

16   I'll show you -- there are going to be just parts of the

17   contract where it doesn't necessarily work.

18              But what we can't do -- and I'll just state this

19   at the beginning -- what we can't do is the kind of

20   selective quoting that goes on.  It's never helpful for the

21   Court when they quote something and then don't continue the

22   quote.  And I'll point that out in a couple of instances

23   where they either just ignore language or don't quote the

24   language.

25              But let me turn to context, and I'm going to

1    disagree with Your Honor for one second on the notion that a

2    lot of what's going on outside the agreement isn't within

3    the four corners of the complaint.  The Debtor's cited view

4    of the Newmont Mining case, which is a Second Circuit case,

5    which actually says how you interpret insurance agreements -

6    - I'm going to give you a better cite.

7            There's a Banco Espirito Santo case from the First

8    Department in 2012.  I thought I had the cite here -- I'm

9    going to have to get that to you -- where the parties got

10   into a dispute over an ISDA agreement which said, "Capital C

11   close dash out amount" and the agreement said, "Capital C

12   close no dash but a capital O amount." And the parties got

13   into a dispute over what the Court was supposed to do there.

14   And the Court said very clearly, the existence of ambiguity

15   is determined by examining the entire contract and

16   considering the relation of the parties and the

17   circumstances under which it was executed.

18           The Rosetta Stone approach is not New York law.

19   You have to look to see what the parties were trying to do

20   here.  And Mr. Haskel laid that out, which in fact alleged

21   in the complaint, which are assumed to be true for the

22   purposes of this motion.  This was a marriage of convenience

23   where the minority member was going to be in for a period of

24   time and had a fantastic backend protection of a 10 percent

25   year over year IRR in its investment in a utility in the

1    lowest yield environment in history.

2           But also the Court can take judicial notice, as

3    they point out in Footnote 3 of their brief, of what

4    happened in the bankruptcy case.  Obviously, there were dire

5    circumstances for Oncor.

6           The Court need look no further than the fact that

7    the head of Jones Day bankruptcy practice as here for Oncor

8    basically virtually every hearing in the case.  But this

9    case was vectoring towards a 363 sale if we couldn't get a

10   plan done, and a nonconsensual disposition of the Oncor

11   stake to whoever came in and offered the highest and best

12   amount that they could get the PUC to approve.

13          The one thing that saved it and the only feasible

14   alternative was the tax-free spin -- that is a nontaxable

15   disposition of the shares.  That was 20 percent of our

16   economics and that's why I'm out here.  This is a nontaxable

17   disposition in which we are seeking to acquire the 20

18   percent interest.

19          So, recognize what Mr. Zimmerman's saying there

20   when he says there has to be a direct purchase.  You know,

21   they called it in their opening brief -- I thought it was a

22   great phrase: "We must realize the negative basis." No, what

23   they're saying is there must be a taxable transaction in

24   order to drag them out.  Really?

25          Let's look at that in context.  A taxable

1   transaction gives them nothing more.  In fact, it would

2   probably give them less.  There's nothing in the merger

3   agreement or the plan, I guess, which would prevent the 17

4   billion from going in at the top, being pushed down, paying

5   off the debt, and doing a direct purchase down at Oncor

6   Holdings.

7          That's going to result in less money getting into

8   Oncor Holdings and less money going to the minority member,

9   and the IRR is going to be blown through in this case, as

10  you'll see.  So, they're going to get less money, and it's

11  going to be punitive to TTI -- Oh, sorry, to Oncor Holdings

12  and to the whole structure because then the money's going to

13  be going out to the IRS.

14         Now, this contract, you can see from its face, was

15  done by sophisticated parties who were very attuned to tax

16  consequences.  And their provisions throughout this

17  agreement, and you'll see in summary judgment in the LLC

18  agreement, which are all directed towards highly managing

19  the tax situation of the investment structure.

20         So what they're asking you to do is interpret the

21  agreement in an economically irrational way -- that

22  notwithstanding the fact that a taxable disposition only

23  hurts EFH and doesn't help the minority member, you should

24  interpret the agreement as saying the only way a tax -- a

25  drag can occur is if there's a taxable disposition.

1            No.  Taxable disposition -- and maybe just turn to

2    the oil well company argument -- taxable disposition is a

3    3A2 purchase.  That is where Oncor Holdings and the minority

4    member get the cash infused down at the bottom.  A 3A1

5    transaction is where the cash comes in at the top at EFH or

6    somewhere else in the capital structure, and the parties

7    structure it in a manner to take the best consequences and

8    the most tax advantageous position with respect to the

9    structure.

10           So, what's happening here is a tax efficient

11   structure, a 3A1 structure that is giving TTI their business

12   deal.  They are going to be getting, as I said, a 10 percent

13   year over year return on their investment -- actually, more

14   than that -- in the lowest yield environment in history,

15   investing in a utility.

16           So there's nothing untoward about their taking

17   them out, and this is not a windfall to anybody, which is a

18   lot of what they seem to be saying.  This is just

19   effectuating the purpose of the deal.

20           We break down the argument into the four sections,

21   which I think we've kind of ended up with.  Is there an

22   offer to purchase LLC units or IPO units, that 3A1 and 2

23   section, resulting in a change of control with equal

24   treatment of each member?

25           And then, fourth, what do we do about TTI's

1    performance obligation once the required sale notice and the

2    IPO conversion is ongoing?  With respect to all, unless the

3    Court agrees that the IRA unambiguously blocks all

4    conceivable transactions consistent with the merger

5    agreement in the plan, then the Court should deny the

6    motion.

7              But let me pause there.  There's an awful lot of

8    what goes on in the brief and a little bit of today, of

9    busywork that TTI seems to think is required here.  Going

10   through the IPO conversion is maybe the best example.  They

11   concede that if there is a valid IPO conversion they can get

12   dragged out.  Their only defense is we should be sending the

13   securities lawyers out to draft up a whole bunch of

14   documents that give TTI rights in the IPO conversion, offer

15   it to them, and then drag it right out.

16             Now, I'll show you there's a good faith obligation

17   with respect to this.  I don't think that if the whole point

18   is that they're going to get dragged out, they have an

19   ability to require all the work to get done that doesn't

20   need to happen.

21             But as we've repeatedly told TTI and we'll make

22   clear, they're getting dragged.  If we get the structure of

23   the transaction in a manner that does all that busywork,

24   we're going to do it but this is the opportunity to address

25   the issue of does the busywork really need to get done?  The

1   only thing we're not going to do is a taxable disposition of

2   the shares, but whatever we need to do to comply with

3   Section 3.3 consistent with the Court's view of the

4   contract, we're going to do that.

5            So, why don't we start with 3.3A and it may help

6   for you just to pull out the contract because I'm going to

7   be jumping back and forth.  I've got a clean copy if you

8   want one.

9            THE COURT:  Please.  I don't have it handy.  Thank

10  you.

11           MR. SHORE:  All right, if we start at 3.3A...

12  3.3A is broken into two sections, all right?  There's a

13  3.3A...

14           THE COURT:  Hang on.  Okay.

15           MR. SHORE:  There's a 3.3A transaction and there's

16  a 3.3B transaction.  Everything you've heard Mr. Zimmerman

17  talk about is a...  I'm sorry, 3.3A1 and 3.3A2.  Everything

18  you heard Mr. Zimmerman talk about is an A2 transaction.  If

19  the initial member, which is Oncor Holdings, receives an

20  offer to purchase a number of LLC units, then other members,

21  that is the minority, gets the same offer.  That's that

22  transaction.  That is a direct purchase of the shares.

23           So what does A1 mean?  It broadly describes some

24  other structure with cash coming in at some insertion point

25  other than Oncor Holdings.  That's the only way that the

1    Court can provide meaning to -- it doesn't say owned

2    directly; it says held directly or indirectly.  And that's

3    what the merger agreement contemplates -- that the cash

4    insertion will go in at EFH, which is an entity which

5    indirectly holds the units in Oncor Holdings or, ultimately,

6    the LLC units.

7             In determining the validity of the structure we

8    keep hearing about the term purchase, and I'm not sure the

9    Debtors or TTI got it right.  It doesn't say purchase, it

10   says offer to purchase.  And what Mr. Zimmerman, in effect,

11   said to you was what it should say is offer to transfer.

12   Right?  The transfer is more broad because it says direct

13   and indirect.  The problem with that is transfer means a lot

14   of things other than purchase.  It means gift, it means

15   hypothecate, if you go back to the definition at the back.

16   The only thing that's going to qualify within the subset of

17   transfer is going to be an offer to purchase.

18             Had we offered that the company gift us the

19   shares, I don't think that would qualify as a drag.  So

20   there is an offer to purchase.  And offer to purchase is the

21   relevant phrase, but if you look down at the bottom of

22   Section 3.3 when they say that we're not focusing on

23   transfer, look at the section that says -- at the end.  The

24   whole thing is the required sale requiring them to sell or

25   otherwise transfer their drag units to the proposed

1    transferee.

2            THE COURT:  Right.

3            MR. SHORE:  So, in both instances what we're

4    really talking about -- in an A1 and an A2 transaction we're

5    really talking about a -- it's really just where does the

6    cash come in in the structure?  And consistent with the

7    context of the agreement, as alleged in the complaint, EFH

8    was trying to maintain maximum flexibility in trying to

9    figure out how to monetize the Oncor stake, including

10   through an initial public offering at any stage within the

11   Oncor change up to EFH.

12           So, nonetheless, notwithstanding 3.3A, TTI

13   continues to contend that the only thing that can be done is

14   an insertion point at Oncor Holdings, that is a taxable

15   disposition of the shares.  That interpretation we can point

16   out breaks a number of other provisions in the contract.  Go

17   to Section 3.2H.  My page numbers are not matching up to

18   yours, so that's why I'm having a problem.

19           But it's just on the page -- I guess it's on Page

20   10.  Page 8, sorry.  This is the language that we were just

21   told about, where they say, what you should've used is --

22   when you're talking about an indirect, you should've used

23   transfer rather than offer to purchase.  But continue on

24   with the quote.  It says, "In the event that EFH or any of

25   its subsidiaries proposes to transfer LLC units or IPO

1    units, as the case may be, indirectly through a transfer of

2    equity." That is an indirect purchase, not a direct purchase

3    of shares.  Then it says, "Other than why in a transaction

4    pursuant to Section 3.3." If 3.3 didn't contemplate an

5    indirect transfer, then that language is surplusage.

6    There's no reason to qualify it with the "other than" if the

7    only way you can do a Section 3.3 transfer is through a

8    direct taxable disposition of the shares.

9         In addition, if you go to Section 3.3F, which is

10   the appraisal right... 14.  Maybe my pages are matching up.

11   On Page 14, the language -- again, their argument is the

12   only required sale is a taxable disposition.  It says,

13   "Notwithstanding any other provision in Section 3.3, in the

14   event that the required sale is conditional upon or includes

15   the sale by parent or sub..."

16        If a required sale can never include cash coming

17   in except at Oncor Holdings, then they could've just left

18   out "includes" and made it "conditional upon".  And I'm

19   going to come back to it when I get to the change of

20   control, but when you look at the breadth of the change of

21   control it makes no sense to have the breadth of the change

22   of control when all they really needed to say was -- in the

23   event of that, "in the event that the owner now owns the

24   drag units and the LLC units." You don't need a complicated

25   change of control that talks about mergers and

1    recapitalizations if the only thing you can do in a drag is

2    take out the two sets of units and put it in a new entity.

3           Now, TTI, when it works for them, does appeal to

4    the Court's sense of commercial reasonability and says,

5    "Well, wait a minute.  We would never agree to sell units

6    indirectly, to get dragged out in an indirect sale because

7    the consideration would bear no relation to the value of our

8    units." And they do that both in their opening papers and

9    the reply and highlight that point.  Your Honor has to read

10   the contract in terms of economic rationality.  Well, I've

11   made that point.  But they do have protections in the

12   agreement.  They do have the IRR hurdle, which protects them

13   on any price, right?  Even if it is a fair market price

14   that's come in, they can't be dragged unless the IRR hurdle

15   is met.

16          Two, they had a right to seek an appraisal

17   pursuant to Section 3.3F.  They have protections in the

18   event that there is an indirect sale.  They've chosen not to

19   exercise them here, but they have protections for an

20   indirect sale.  So you can't -- even reading within the

21   contract you can answer the question of their point of

22   economic irrationality.

23          Now, all that's with respect to LLC units.  3.3A1

24   also references IPO units and the required sale notice that

25   was sent references the drag out of the IPO units.  Clearly

1    there's an IPO conversion going on here within the breadth

2    of Section 3.7.

3           It's basically any suitable structure to do this,

4    and obviously the parties to determine that suitable

5    structure is to do the IPO up at merged EFH Ovation to

6    maintain the tax benefits.  And, in fact, an IPO conversion

7    letter was sent to them last night and Oncor, EFH, and

8    Ovation are moving forward on getting the IPO ready -- as

9    the suitable vehicle.

10          But I want to point out one thing they keep coming

11   back to.  It's not a condition of the plan.  A successful

12   IPO conversion is a condition to the merger agreement.  It's

13   Section 7.2J.

14          So we are moving forward and we need to get the

15   IPO conversion done to meet the conditions of the merger

16   agreement.  But it seems like, as I said before, their only

17   argument is that as long as they're offered the shares and

18   the shares are issued to them, they can be dragged

19   instantaneously.

20          But I think they've got two problems with that

21   argument: First, their rights to do that, as you'll see in

22   Section 3.7B, are only upon the sending of an option notice.

23   In other words, we can't force them to take IPO shares.

24   They can opt in to the rights on that.  But more

25   fundamentally, that lead in to 3.3A, which I don't know that

1    people really focused on -- it says, "Notwithstanding any

2    other provision of this Article 3..."

3              THE COURT:  Right.

4              MR. SHORE:  To the contrary.  And 3.3F, which

5    deals with indirect purchases, has the same lead in.  From a

6    supremacy point, the drag, the ability to drag out the IPO

7    units is superior to their rights to insist on all the

8    busywork to get done to create a structure and then

9    immediately drag them out of it.  So, from our perspective,

10   whether you focus on the required sale notice going out as

11   either offering to purchase the LLC units or if they're

12   going to force us to do it, the IPO units, the complaint

13   describes a valid structure for getting that done, which is

14   the indirect acquisition through the combined Ovation-EFH

15   entity.

16             Next up is change of control.  I'm not sure what

17   they're arguing about on change of control other than to say

18   that the definition of change of control means

19   notwithstanding that you can do an indirect purchase at the

20   beginning of the paragraph.  The requirement that there's a

21   change of control takes that all away because the only thing

22   you can do is a direct sale with a new entity owning 100

23   percent of the shares.  I don't think that's a valid reading

24   of the contract.

25             So, focus on what the change of control really

1   means here in the context of Section 3.3A.  If you didn't

2   have the change of control provision in there and offer to

3   purchase .01 percent of the LLC units of Oncor Holdings

4   coupled with an offer to purchase the full 19 percent from

5   TTI at the price would be a valid drag.  The change of

6   control means is a mechanism to make sure that what's really

7   happening here is a fundamental change in the ownership and

8   is not a means to manipulate TTI out of the capital

9   structure.

10          So, what really has to happen in the context of a

11   change of control is the 80 percent owner has to -- in this

12   instance because it's still held with in the 80 percent; it

13   could've been fractionalized among different entities -- but

14   that 80 percent has to be sold off by 31 percent so that the

15   resulting entity taking into consideration the drag units,

16   another phrase they just totally ignore in the context of

17   this -- the change of control in Section 3.3 specifically

18   references the taking into account all LLC units or IPO

19   units being dragged.

20          What you do is the calculation at the end of the

21   day.  EFH is going to own indirectly 100 percent of the

22   shares, which is the 80 percent of TTI indirectly and the 20

23   percent of the minority members who are all getting dragged

24   out, such that it will then own 100 percent of Oncor.  This

25   is not a manipulation of the drag rights; this is a full-on

1    change of control of the entire capital structure.

2            Again, all TTI is arguing about in this instance

3    is that it's just got to be a taxable transaction.  The only

4    thing that can be done is that -- the only way you can

5    interpret the agreement is that the sophisticated parties

6    who are all clearly interested in tax situations just put in

7    a poison pill in this structure because, as Your Honor

8    knows, they cited the memorandum.

9            The Oncor stake has a negative basis.  They go

10   then to same consideration.  There are a number of

11   conditions that have to be met, which I guess are going to

12   be addressed in the context of summary judgment but --

13   assuming we get past the Motion to Dismiss -- but TTI has

14   said as a matter of law, one condition fails, and that's

15   Section 3.3D on Page 12.  D1.  "Subject to Section 3.3F,

16   each of the members shall receive the same hype and amount

17   of consideration." And they argue that what that means is

18   every member must get cash in the transaction.

19            As we pointed out in the papers, and as I alluded

20   at the beginning, if you go to the preamble of the Investor

21   Rights Agreement, Page 1, EFH is defined as a member.

22            THE COURT:  Where are we here?

23            MR. SHORE:  Page 1.

24            THE COURT:  Right at the top?

25            MR. SHORE:  Right at the top.  And as I said, this

1    is where we've got the missing comma.  What they want to do

2    is read members as being only the initial member, the

3    minority member, and the persons that may hereafter become a

4    party hereto.  In other words, they want you to take Energy

5    Future Holding Corp., a Texas Corporation EFH, and move it

6    to the end of the sentence and treat EFH not as a member at

7    all, which as I said, now you've got a problem because

8    there's no comma after EFH.

9              THE COURT:  Right.

10             MR. SHORE:  So now you've got -- EFH is linked to

11   any other persons that may hereafter become a party hereto.

12   And throughout the agreement -- they point to one instance

13   in which it says members or EFH, and there are instances in

14   the agreement where it says, members, (including EFH).

15             THE COURT:  We're back to the tax memorandum when

16   we couldn't figure out what member meant.

17             MR. SHORE:  Well, let's be clear about this.

18   There is a very defined term in the LLC agreement as to who

19   a member is, capital M member, and that's the holder of the

20   units.  But Section -- I think it's 2.5 of the IRA on Page 4

21   overrides and makes clear that to the extent it's

22   inconsistent with the LLC agreement, this agreement

23   controls.

24             And the lead in to the 3.3D1 is subject to Section

25   3.3F.  3.3F is dealing with the indirect purchase, where

1   you've got to sort out what assets are being sold that

2   aren't attributable to the units and what are.

3            So I think what you're going to have to do at the

4   end of the day is read this agreement consistently with

5   everything else -- is to say subject to 3.3F -- in other

6   words, if you have an indirect purchase, the members who are

7   involved in the transaction on one side are getting the same

8   as the members who are involved in the transaction on the

9   other side, who are getting dragged out.

10           That's not inconsistent with anything in the

11   agreement and it's fully consistent with both the express

12   terms of the agreement, which permit indirect sales, and the

13   purpose of the agreement here, which is that they weren't

14   going to be prejudiced.  That they were going to be treated

15   on a heads-up basis if they were getting dragged out with

16   the EFH capital structure.

17           All right.  So let me talk, finally, about

18   the consequences of the required sale notice.  The agreement

19   clearly contemplates in 3.3A a gap period between the time

20   that the offer is made and the closing of the transaction

21   and requires certain time periods -- 10 days for that and 60

22   days for the IPO conversion.  Those notices have been given

23   and obviously they're long enough given when we're

24   contemplating closing the transaction.  And the agreement

25   very clearly covers what TTI's obligations are in the

1    interim.

2              In Section 3.3C, it says, "Upon receipt of the

3    required sale notice." Their obligations -- if we can to

4    3.3C -- "Each member upon receipt of the required sale

5    notice" has to do a number of different things.  And if you

6    go down to essentially right before "the underlying

7    provided" -- they've got to "take or cause to be taken all

8    other actions as may be reasonably necessary to consummate

9    the required sale." That's a self-effectuating provision.

10   It doesn't say that they have the option to do what they're

11   doing here.  In our view, what they're doing here is a

12   breach of the agreement.  Their sending the notices, which

13   are attached to the complaint of the correspondence that

14   says, "We're not going to perform" is not taking an action

15   reasonably necessary to consummate the required sale.

16             The same thing comes true with respect to the IPO

17   conversion in Section 3.7.  "Once the IPO conversion is out,

18   subject to the provisions of Section 3.7, the company and

19   each member agree to cooperate with the other members in

20   good faith in order to effectuate the IPO conversion." With

21   an IPO conversion going on, right, and they've gotten all

22   the material with respect to this, they have a good faith

23   obligation to cooperate with that going forward.

24             They shouldn't be coming into court talking about

25   why the IPO conversion isn't good; they should be with the

1    board of Oncor doing that and moving forward with this plan.

2              So, from a notice pleading perspective, we've

3    alleged that they have breached those provisions of the

4    agreement.  Now, let's make one point clear.  The remedies

5    are not exclusive here.

6              Clearly, the remedy in the demand is that there be

7    an order of this Court for a specific performance.  There's

8    some briefing on that...  Look, if there's a breach of the

9    agreement, specific performance is an appropriate remedy and

10   that's going to be the only remedy that allows us to drag

11   out the LLC units as an order of the Court, which requires

12   them to deliver them in accordance with a required sale

13   notice.

14             But that's not exclusive of any damage claim.  I

15   know they've come in and they've protested we haven't done

16   anything.  That's a factual matter.  And, look, we're going

17   to take discovery.

18             If they've been talking to the PUC, we'll find

19   that out; if they've been talking to NextEra, we'll find

20   that out; if they've been talking to the Oncor management

21   and saying things that are not consistent with moving

22   forward with the required sale notice in the IPO

23   conversation that may lead to a damages claim but their

24   simple assertion in a brief, we're not doing anything wrong,

25   we're in breach of the agreement isn't sufficient to

1    withstand a Motion for Summary Judgment.  Sorry, a Motion to

2    Dismiss.

3           So, I think from the perspective of the four

4    corners of the agreement, taking into consideration that the

5    Court's not supposed to be looking at this in a vacuum, I

6    think that the complaint fairly states that there is a

7    required sale notice in place, there is an IPO conversion

8    ongoing, that TTI is required to move forward with both

9    those transactions, and that we'll get the summary judgment

10   -- and to the extent there are any provisions in the

11   contract you're going to want parol evidence on or other

12   forms of extrinsic evidence, then we're going to provide it

13   to Your Honor in the context of summary judgment.

14           THE COURT:  Thank you, Mr. Shore.  Mr. Zimmerman?

15           MR. ZIMMERMAN:  I'm going to try to do this my

16   way.  This is a pen.  It's the LLC unit.  I have this pen.

17   There's going to be a transaction.  After the transaction

18   I'm going to stand before you and I'm going to still have

19   this pen.  You can call it transfer, you can call it

20   indirect, you can call it whatever you want -- and purchase

21   is a substantive transfer.

22           To transfer any disposition -- an ambiguous

23   pledge, hypothecation, liens, mortgages or any other

24   disposition, there is no conceivable disposition of this

25   pen.  It's staying right where it is in my hand, just like

1    the gun, you'll take it when I die.  They're never moving

2    out of Oncor Holdings.  There is no purchase.

3              Second, I heard that -- with respect to the IPO

4    conversion, I had made the argument that it's defined as the

5    Oncor board taking those steps we talked about.  I heard

6    that -- you know, that process is going forward -- Oncor is

7    going forward with that.  They got the letter last night,

8    Oncor, to cooperate.  Unless they pulled an all-nighter,

9    there's nothing in the record, and we are unaware of any

10   steps they've taken to do that.

11             Second, there's no question that a well-pleaded

12   allegation of fact and a Motion to Dismiss is assumed to be

13   true, for sure.  There's a contract that's part of the

14   record.  It's incorporated into the complaint and it's

15   before you.  You can't assume to be true -- and this is

16   fundamental -- an assertion that the contract says X.

17             When you have the contract, it says Y.  A

18   characterization of what a contract says is an allegation of

19   law.  Now, in fact, you don't get credit for that, you don't

20   get to assume it to be true if the contract is just the

21   opposite.  And the notion that "Well, I plead they breached

22   their duty to cooperate." Full stop.  That's notice

23   pleading.  No.

24             If you look at the definition of duty to

25   cooperate, we've discussed that at length.  There is no IPO

1    conversion, there is no duty to cooperate, and they're not

2    getting any of the rights.  So the fact that I alleged

3    there's no duty -- that they haven't cooperated when the

4    contract defines what cooperation means in a different way,

5    it doesn't get any presumptive truth whatsoever.  Bear with

6    me one second.

7             THE COURT:  Mm hmm.

8             MR. ZIMMERMAN:  Yeah.  What I don't understand is

9    I keep hearing that there is an offer to purchase that is

10   addressed to EFH.  What exactly are they purchasing?  I

11   never heard what it is they're offering and whether the

12   purchase has been consummated or not.  They say it doesn't

13   have to actually be...  It has to be an offer to purchase.

14            What is being offered to purchase from EFH?  The

15   LLC units?  Absolutely not.  Absolutely not.  It's the

16   equity, all above Oncor Holdings.  There is no way that

17   offer to purchase is an offer to purchase the LLC units.

18   You just can't get around it.

19            And the notion that the sophisticated parties with

20   which we agree sat there and used completely different terms

21   to trigger the tab as opposed to the draft but they really

22   meant the same thing.  That not only doesn't make sense on

23   its face as a factual matter, it contradicts every known

24   contract interpretation.  Different language means different

25   things.

1          Now, I took heed when you gently informed me

2    before not to go outside the record, not to go outside the

3    contract what the parties intended and what not.  Because is

4    it a complicated contact, as they said?  Absolutely.  A

5    complicated contract doesn't mean it's an ambiguous

6    contract.

7          Courts construe contracts as a matter of law all

8    the time -- complicated ones, if it's not ambiguous on

9    motion practice, and it doesn't have to go to summary

10   judgment unless you find an ambiguity.

11         Last point:  Is EFH a Member, capital M, or not?

12   Well, in this one I think I can go either way because I

13   think they lose either way.  If they're our member, the drag

14   specifically requires, quote, "each member has to get the

15   same consideration and form an amount." Oncor Holdings isn't

16   getting anything, so this transaction violates that.  They

17   are unquestionably a member.  There may be debate about EFH;

18   there's no question Oncor Holdings is a member.  Their

19   client is the initial member.  They're getting nothing.

20         So, if EFH -- if they're all members, and it

21   doesn't say, as you heard before, each member who's being

22   dragged or each member who's selling.  That's not what it

23   says.  It doesn't say each selling member; it says each

24   member.  Because everybody knew the only two members who

25   could dispose of their LLC units were Oncor Holdings and

1    TTI.

2            Last point. We're agreed that you have to read the

3    contract as a whole, but only the contract.  Let's not go

4    outside the contract.  An owner of LLC units can transfer it

5    to certain entities.  They're defined as a permitted

6    transferee.  And the definition of permitted transferee

7    means, "(indiscernible) with respect to any member or EFH."

8    If EFH were a member, it wouldn't say, "any member or EFH."

9    Whether or not at the end of the day the only way you can

10   trigger the drag leads to a taxable event or not, I don't

11   know.  That's way beyond my ken.

12           What I do know is this:  As sophisticated as they

13   were, they used specific language, they used purchase.  But

14   you can broaden that if you want.  They say you can include

15   transfer.  Okay.  But the tagalong -- when you said that I

16   said the tagalong has to be a drag -- no.  It's not just a

17   transfer.  The tagalong explained a transfer through getting

18   rid of the equity -- the indirect transfer.

19           There is no purchase, there is no transfer.  For

20   whatever reason they use that language -- and it's not

21   economically nonsensical.  The fact that the language

22   restricts you maybe, I don't know as a corporate matter,

23   from getting the best possible deal in the world -- that may

24   be, that may be.

25           But that doesn't render these specific languages

1    economically nonsensical; that's just not right.  This

2    language means something.  Contracts mean something.  And

3    your tentative parties has to be defined unless there's an

4    ambiguity from the language of the contract.  Thank you.

5              THE COURT:  Thank you.

6              MR. SHORE:  Let me just kind of -- fine, we'll use

7    the pen.  The only thing that's happening here is -- what's

8    being done is EFH is selling the rights to the office in

9    which all the pens are done, right?  Clearly, 3A1 read

10   consistently with the change of control is talking about

11   some structure that the parties would come up with, in this

12   case, to make it a tax advantageous transaction.

13             Let me clear up the IPO conversion point.  No,

14   there was an IPO conversion plan, which was attached to the

15   complaint -- attached to the merger agreement.  All that

16   happened is one was updated.  But, again, let's be clear on

17   the self-effectuating point.

18             Even if we never get to an IPO conversion and even

19   if we never get to a required sale, their obligation is to

20   move forward with it.  We may not be able to get the PUC

21   approval, we may not be able to do any other thing.  We get

22   all that.  But they have an obligation contractually that

23   once those notices come across their doorstep, they have to

24   act in good faith and cooperate with that.

25             And then, finally, one important concession, which

1    you should know.  We just heard that you can go either way

2    on the definition of member.  At a Motion to Dismiss stage,

3    if there is one reasonable reading of the contract that

4    supports the Plaintiff's view, then you've got to dismiss on

5    that.  So I think that takes out the question.

6            Because let's realize what he just said.  He said,

7    "Well, each member could be EFH." Then you can't drag

8    anything.  His interpretation that says that each member has

9    to get it, when you do the 3A2 drag, in that instance, EFH

10   is not getting any consideration.  So you could do exactly

11   what he says is the appropriate drag for all the cash in

12   down there and do a taxable disposition, but then there

13   still would be a fail in the contract.

14           So you're going to have to, as I said at the end

15   of the day, remember in a manner which effectuates the

16   party's intent, which is that the minority is not going to

17   be held disadvantageously to the treatment that the

18   majority's getting.

19           THE COURT:  Thank you.  Mr. Zimmerman?

20           MR. ZIMMERMAN:  Thank you.  That was actually

21   precisely my point.  Because considering EFH as a member

22   means the whole thing doesn't -- not work.  That's why I

23   said you can go either way.  For argument purposes, and let

24   me be clear -- what my point was for rhetorical argument

25   purposes, I can go either way on this.  Because if they're a

1     member, you just heard, the whole thing doesn't work.  So,

2     by definition, that means that they're not a member.  Thank

3     you.

4              THE COURT:  All right.  Thank you very much.  I am

5     going to deny the Motion to Dismiss and send this case into

6     discovery where it's already started to be.  I don't know

7     what the answer might be after summary judgment.  I don't

8     know what the answer might be after trial.  I'm sitting here

9     on a Motion to Dismiss and I have to do a couple things:

10    One, I have to take all the well-pleaded allegations of the

11    complaint as true.  Two, I have to look at the contract.

12    And when looking at a contract and interpreting the contract

13    as a matter of law, I have to look at the contract as a

14    whole.  And at least on a Motion to Dismiss, if there's any

15    argument of an ambiguity, I can't resolve that ambiguity

16    without looking at perhaps extrinsic evidence.

17             The defendant's argument, I believe, rests on a

18    narrow interpretation of the contract based on specific

19    provisions that ignore difficulties that arise -- if not

20    ambiguities, but difficulties that arise in interpreting

21    that contract if you look at all the provisions as a whole.

22             It may be that they have an argument that

23    incorporates an interpretation of all the provisions of the

24    contract as a whole, still giving them the relief that

25    they're looking for here, which is that they win.  But their

1    argument at least as presented in the Motion to Dismiss

2    isn't that argument.  The argument in the Motion to Dismiss

3    is much narrower, and I think ignores the difficulties in

4    interpreting the contract as a whole.

5              I think it also ignores some real potential

6    ambiguities.  And I can, at least on the Motion to Dismiss

7    record, assume, based on the pleadings, that there are

8    ambiguities.  Ultimately, whether or not based on a perhaps

9    more careful reading of the contract at a summary judgment

10   stage or intrinsic evidence I find there aren't ambiguities,

11   I think that the at least contractual provisions that have

12   been pointed out in the Motion to Dismiss and the factual

13   allegations in the Motion -- not the Motion -- excuse me --

14   the contractual obligations that -- the contractual

15   provisions that have been referenced in the complaint and

16   the factual allegations in the complaint give rise to a

17   sufficient possibility of ambiguity.

18              And if there is an ambiguity, a possibility that

19   the plaintiffs are correct in how that ambiguity should be

20   resolved that make it impossible for the Court to dispose of

21   this on a Motion to Dismiss standard.

22              This is a complicated contract and the problem

23   with looking at a complicated contract is looking at all the

24   provisions as a whole and coming up with a reasonable

25   interpretation.  And it may be that at the end of the day,

1    to repeat myself, that when I do that, I may rule on behalf

2    of the defendants.

3                But their argument at least as it sits in front me

4    today, I believe, is narrower than that and I don't believe

5    on this contract and this complaint I can rule in

6    defendant's favor on their Motion to Dismiss.  So I am going

7    to deny the Motion to Dismiss and I'll enter a one-line

8    order saying that it's denied for the reasons set forth on

9    the record at the hearing.  All right?  And I thank you very

10   much.  I hope everyone has a pleasant holiday --

11               MR. SHORE:  You as well, Your Honor.

12               THE COURT:  -- and at least spend some time with

13   family.  I know you're going to be very busy with the

14   schedule I've given you but -- okay.  I'm okay with that.

15   We're adjourned.

16

17                           *  *  *  *  *

18

19

20

21

22

23

24

25

1                           I N D E X

2

3                          RULINGS

4     DESCRIPTION                        PAGE        LINE

5     Texas Transmission Investments LLC's    54          5

6     Motion to Dismiss the Complaint Denied

7     [Adv. D.I. 12; filed November 19, 2015]

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 58

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4        transcript is a true and accurate record of the proceedings.

5        Sonya                  Digitally signed by Sonya
                                Ledanski Hyde
6        Ledanski Hyde          DN: cn=Sonya Ledanski Hyde, o,
                                ou, email=digital1@veritext.com,
                                c=US
7                               Date: 2015.12.21 11:49:45 -05'00'

8        Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20       Veritext Legal Solutions

21       330 Old Country Road

22       Suite 300

23       Mineola, NY 11501

24

25       Date:  December 21, 2015