# IN RE: ENERGY FUTURE HOLDINGS CORP., et al.
## CASE NO. 14-10979 (CSS)

## DESIGNATION # 250 TO D.I. 7325

1                          DAVID YING

2    UNITED STATES BANKRUPTCY COURT

3    FOR THE DISTRICT OF DELAWARE

     -------------------------------------------x

4    In Re:

5    Energy Future Holdings Corporation, et al.,

6                        Debtors.

7    Chapter 11

8    Case No. 14-10979

9    Jointly Administered

10   -------------------------------------------x

11                DEPOSITION OF DAVID YING

12                   New York, New York

13                   October 19, 2015

14

15

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 99137

Page 2

```
 1              DAVID YING
 2           October 19, 2015
 3
 4        Deposition of DAVID YING, held
 5    at Kirkland & Ellis LLP, 601 Lexington
 6    Avenue, New York, New York, before Kathy
 7    S. Klepfer, a Registered Professional
 8    Reporter, Registered Merit Reporter,
 9    Certified Realtime Reporter, Certified
10    Livenote Reporter, and Notary Public of
11    the State of New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              DAVID YING
 2           A P P E A R A N C E S:
 3
 4        SULLIVAN & CROMWELL
 5    Attorneys for E-side Official Creditors
 6        125 Broad Street
 7        New York, New York  10004
 8    BY: JOHN HARDIMAN, ESQ.
 9        JOHN LIOLOS, ESQ.
10
11    KIRKLAND & ELLIS
12    Attorneys for the Debtors
13        300 North LaSalle
14        Chicago, Illinois  60654
15    BY: BRENTON ROGERS, ESQ.
16        601 Lexington Avenue
17        New York, New York  10022
18    BY: JUSTIN SOWA, ESQ.
19
20
21
22
23
24
25
```

Page 4

```
 1              DAVID YING
 2        A P P E A R A N C E S: (Cont'd.)
 3
 4    KRAMER LEVIN NAFTALIS & FRANKEL
 5    Attorneys for EFIH 2nd Lien Note Trustee
 6        1177 Avenue of the Americas
 7        New York, New York  10036
 8    BY: P. BRADLEY O'NEILL, ESQ.
 9
10    MONTGOMERY McCRACKEN WALKER & RHOADS
11    Attorneys for EFH Committee
12        123 South Broad Street
13        Philadelphia, Pennsylvania  19109
14    BY: LATHROP NELSON, III, ESQ.
15
16
17    SHEARMAN & STERLING
18    Attorneys for EFIH, First Lien DIP Agent
19        599 Lexington Avenue
20        New York, New York  10022
21    BY: FOTEINI TELONI, ESQ.
22
23
24
25
```

Page 5

```
 1              DAVID YING
 2        A P P E A R A N C E S: (Cont'd.)
 3
 4    PAUL, WEISS, RIFKIND, WHARTON & GARRISON
 5    Attorneys for Ad Hoc Committee of First Lien Lenders
 6        1285 Avenue of the Americas
 7        New York, New York  10019
 8    BY: NOAH MAMIS, ESQ.
 9
10    NIXON PEABODY
11    Attorneys for American Stock Transfer as Indenture
12    Trustee at EFH
13        100 Summer Street
14        Boston, Massachusetts  02110
15    BY: RICHARD PEDONE, ESQ.
16
17    AKIN GUMP STRAUSS HAUER & FELD
18    Attorneys for UMB Bank, As Indenture Trustee for the
19    Unsecured 11.25 Percent/12.25 Percent Senior Toggle
20    Notes Due 2018
21        One Bryant Park
22        New York, New York  10036
23    BY: CHRISTOPHER CARTY, ESQ.
24
25
```

Page 6

1            DAVID YING
2
3      A P P E A R A N C E S :  (Cont'd.)
4
5   MORRISON & FOERSTER
6   Attorneys for Official Committee of Unsecured
7   Creditors for TCEH
8       250 West 55th Street
9       New York, New York  10019
10  BY:  ERICA RICHARDS, ESQ.
11
12  MUNGER TOLLES & OLSON
13  Attorneys for the TCH Debtors
14      355 South Grand Avenue
15      Los Angeles, California  90071
16  BY:  EMILY BUSSIGEL, ESQ. (Telephonic)
17
18  WACHTELL, LIPTON, ROSEN & KATZ
19  Attorneys for EFH Equity Owners
20      51 West 52nd Street
21      New York, New York  10019
22  BY:  ALEXANDER LEES, ESQ.
23
24
25

Page 7

1            DAVID YING
2      A P P E A R A N C E S :  (Cont'd.)
3
4   WHITE & CASE
5   Attorneys for the Ad Hoc Group of
6   TCEH Unsecured Notes
7       1155 Avenue of the Americas
8       New York, New York  10036
9   BY:  DANIELLE AUDETTE, ESQ.
10
11  FRIED, FRANK, HARRIS, SHRIVER & JACOBSON
12  Attorneys for Fidelity
13      One New York Plaza
14      New York, New York  10004
15  BY:  JOCELYN RYAN, ESQ.
16      ALYSA AIN
17
18  WILMERHALE
19  Attorneys for Delaware Trust Co. as Indenture
20  Trustee
21      7 World Trade Center
22      New York, New York  10007
23  BY:  PHILIP ANKER, ESQ.
24      DAVID GRINGER, ESQ.
25

Page 8

1            DAVID YING
2      A P P E A R A N C E S :  (Cont'd.)
3
4   REED SMITH
5   Attorneys for The Bank of New York Mellon, as
6   PCRB Trustee, and The Bank of New York Mellon
7   Trust Company, as EFCH 2037 Notes Trustee
8       599 Lexington Avenue
9       New York, New York  10022
10  BY:  SARAH KAM, ESQ.
11
12  PATTERSON BELKNAP WEBB & TYLER
13  Attorneys for the Law Debenture
14      1133 Avenue of the Americas
15      New York, New York  10036
16  BY:  BRIAN GUINEY, ESQ. (Telephonic)
17
18  PROSKAUER ROSE
19  Attorneys for EFH at the direction of the
20  Disinterested Directors
21      Three First National Plaza
22      Chicago, Illinois  60602
23  BY:  PAUL POSSINGER, ESQ. (Telephonic)
24
25

Page 9

1            DAVID YING
2
3      A P P E A R A N C E S :  (Cont'd.)
4
5   BROWN RUDNICK
6   Attorneys for Wilmington Savings Fund
7   Society as Successor Trustee
8       One Financial Center
9       Boston, Massachusetts  62111
10  BY:  JONATHAN MARSHALL, ESQ. (Telephonic)
11
12  VENABLE
13  Attorneys for Pimco
14      Rockefeller Center
15      1270 Avenue of the Americas
16      New York, New York  10020
17  BY:  JEFFREY SABIN, ESQ.
18
19
20  ALSO PRESENT:
21      MARK RULE, AlixPartners
22
23
24
25

Page 10

1          DAVID YING
2    DAVID YING, called as a
3        witness, having been duly sworn by a Notary
4        Public, was examined and testified as
5        follows:
6    EXAMINATION BY
7    MR. ANKER:
8        Q.   Good morning, Mr. Ying. My name is
9    Philip Anker. I'm with Wilmer Cutler Pickering
10   Hale & Dorr. We are counsel to Delaware Trust
11   Company as Indenture Trustee for the EFIH First
12   Lien Bonds.
13       Before I begin questioning you, I
14   believe counsel for the EFH Official Committee
15   wanted to make a statement on the record.
16       MR. HARDIMAN:  I just want to state on
17       the record that, on behalf of the EFH
18       Official Committee, we reserve the right to
19       recall Mr. Ying in the reinstatement phase
20       of discovery, and to the extent he is being
21       offered today only once, we object to that;
22       we don't think that is consistent with the
23       court's ruling.
24       MR. ROGERS:  Obviously, we disagree
25   with the EFH Committee's position and

Page 11

1          DAVID YING
2    believe you should ask your questions about
3    feasibility today.
4        MR. PEDONE:  And on behalf of American
5        Stock Transfer, as Indenture Trustee, we
6    join in the Committee's comments, and we
7    note that the documents requested have not
8    yet been produced. We can deal with this
9    later.
10       MR. ROGERS:  All documents responsive
11   to the requests have been produced.
12   EXAMINATION BY
13   MR. ANKER:
14       Q.   Mr. Ying, with that, let me begin.
15   You have been deposed a number of times, so I
16   don't propose to waste your time or the time of
17   any other counsel around the room by going over
18   the ground rules, but obviously if at any time
19   any question I ask you you don't understand,
20   please just let me know and I'll rephrase it.
21       If at any time you want to take a
22   break, just let me know. If there's a pending
23   question, I will ask you to answer it before the
24   break, but otherwise, happy to accommodate you.
25       Mr. Ying, I'm just going to spend a

Page 12

1          DAVID YING
2    couple of minutes on background. By whom are
3    you employed, sir?
4        A.   Evercore.
5        Q.   What has Evercore's role been in
6    this -- these Chapter 11 cases?
7        A.   We're the financial advisor to the
8    debtors.
9        Q.   And how long has Evercore been
10   involved in these restructuring efforts?
11       A.   We were retained by EFH back in the
12   middle of 2012.
13       Q.   You say you were retained by EFH. I
14   take it you have done work as a financial
15   advisor with respect to the restructuring of not
16   only EFH, the parent, but also of its myriad
17   subsidiaries, including EFIH; is that right,
18   sir?
19       A.   Yes.
20       Q.   And I take it given the amount of time
21   you have been, that is, Evercore has been
22   involved with these restructuring efforts, it
23   has become familiar with the financial condition
24   of each of the debtors?
25       A.   Yes.

Page 13

1          DAVID YING
2        Q.   What role have you, Mr. Ying,
3    personally had in these efforts?
4        A.   I'm the senior partner at Evercore who
5    is responsible for this project, and I have at
6    any point in time, you know, half a dozen
7    bankers reporting to me, analyzing and working
8    on various aspects of the assignment.
9        Q.   So it's fair to say that you
10   personally are -- have become familiar with the
11   financial condition of each of the debtors,
12   correct?
13       A.   Yes.
14       Q.   Mr. Ying, you are here to testify
15   today, am I right, regarding an expert report
16   that you have furnished in connection with plan
17   confirmation proceedings?
18       A.   Yes.
19       MR. ANKER:  I'm going to mark as an
20       exhibit that report. I think we've been
21       marking exhibits, at least in the
22       depositions I've been at, with reference to
23       the witness. So this is marked as Ying 1.
24       Let me hand a copy to the court
25       reporter and to Mr. Ying and his counsel.

Page 14

DAVID YING

BY MR. ANKER:

Q.   Mr. Ying, you're obviously free to look at it, but my first question is can you identify the document that I have handed you?

A.   This is the expert --

MR. PEDONE:   Can I suggest we call it Ying Confirmation 1 since he's been deposed?

MR. ANKER:   Sure.  Let me correct what I said earlier.  The document that I have handed to Mr. Ying, which is a deck entitled David Ying's Expert Report, October 12, 2015, Evercore, will be described for purposes of this deposition and marked as Ying Confirmation Exhibit No. 1.

(Ying Confirmation Exhibit 1, David Ying's Expert Report, October 12, 2015, marked for identification, as of this date.)

BY MR. ANKER:

Q.   Can you identify the document that has been marked as Ying Confirmation Exhibit No. 1?

A.   This is an expert report that I have prepared and filed in connection with issues raised with the confirmation of the plan.

Q.   And am I correct that this report

Page 15

DAVID YING

addresses a number of different opinions that you propose to provide at the confirmation hearing?

A.   Yes, that's correct.

Q.   I want to focus you in my questioning on what I think is your third opinion C. EFIH Feasibility Analysis.

Mr. Ying, it appears to me to begin right after the numbered page 32, although I don't think it is itself the first page numbered.

A.   No, it begins on C. EFIH Feasibility Analysis, which follows page 32.

Q.   Immediately follows page 32?

A.   Yes.

Q.   I will do my best not to do what I just did, which is to talk over you, and my apologies, and if you could do the same, I would appreciate it.

Mr. Ying, can you describe in your words the assignment you were given with respect to the opinion that you are rendering as to the EFIH feasibility analysis?

A.   The report was prepared in response to

Page 16

DAVID YING

a question that has been raised, and the question that was raised is if, post-confirmation, through appeal, various creditors of EFIH and EFH were to succeed on all of the alleged payment disputes -- and the alleged payment disputes include make-whole payment disputes and disputes with respect to the payment of post-petition interest at full contract rate -- that if all of those appeals were to be finally determined in favor of the various plaintiffs, what would be the liability and could the restructured post-confirmation EFH, as contemplated in the plan, have the financial wherewithal to make all of those payments.

Q.   Mr. Ying, I think when I asked the question, I may have misspoken.  I described it as the EFIH Feasibility Analysis.  In fact, the report is entitled EFH Feasibility Analysis; is that right, sir?

A.   That's correct.

Q.   And is that because the restructuring, as you understand it, contemplates that what is now EFIH and EFH, what is now EFH, will be

Page 17

DAVID YING

merged into a single restructured entity termed "new EFH" or "reorganized EFH"?

A.   Well, I don't know if EFIH and EFH will -- I believe EFIH and EFH will still exist.  My understanding is that they will both have debt outs or they will both be still consolidated with one another, and therefore, when we address feasibility, we're addressing feasibility of both.

Q.   You say they will still be consolidated with each other.  You understand, do you not, that EFIH is a separate company today from EFH?

A.   Well, EFH owns 100 percent of EFIH and, I believe, post-reorganization will continue to do so.

Q.   And so your understanding is that, post-reorganization, Oncor will be owned by EFIH and EFIH in turn will be owned by EFH?

A.   I believe that's the economic substance of the transaction, yes.

Q.   You describe the assignment you were given.  Who gave you that assignment?

A.   I was told that was the question by

Page 18

DAVID YING

company counsel, Kirkland & Ellis.

Q.   Did company counsel give you any assumptions to make for purposes of your analysis?

A.   No; we made them ourselves.

Q.   And the "we" in that sentence is Evercore?

A.   Evercore and the colleagues who work for me on this assignment.

Q.   At Evercore?

A.   At Evercore.

Q.   And can you briefly describe in your own words the opinion or opinions that you reached with respect to the assignment you have described, period?

A.   Well, not to restate the opinion itself, because it's several pages, but we think that EFH should be able to raise enough capital to address an adverse judgment on every and all of the alleged claims.

Q.   And by "address," if we were to use simple English, is it fair to say your opinion is that if every single disputed claim is allowed in full with interest post-emergence,

Page 19

DAVID YING

EFH will be able to raise debt and/or equity capital to pay those liabilities in full, correct?

A.   That's correct.

Q.   And therefore, it is your opinion, is it not, sir, that reorganized EFH is not likely to have to refile for bankruptcy in the event that all of the liabilities are deemed valid in the full amount sought, right?

A.   That's correct.

Q.   Can you briefly describe the work you did to reach that conclusion or conclusions?

A.   We looked at the pro forma financial statements for EFH as we understand them; we calculated, to the best of our ability, the maximum amount of the alleged claims; and we looked at both the debt capacity of post-confirmation EFH -- and when I say EFH, I'm referring to both EFH and EFIH as a consolidated entity -- we looked at the debt capacity of EFH and we also looked at EFH from the perspective of the equity capital markets and looked at its standing in the capital markets and whether it would have the ability to raise additional

Page 20

DAVID YING

equity capital.

Q.   What documents did you review in doing your analysis?

A.   We used, obviously, the plan of reorganization and we used what pro forma financial information we had with respect to what EFH might look like as of an assumed confirmation date of June 30, 2016.

Q.   Mr. Ying, you just stated that you used what pro forma financial information you had with respect to what EFH might look like as an assumed confirmation date of June 30, 2016.

Do you believe you had adequate information to render the opinions you were rendering?

A.   I believe we do, yes.

Q.   Mr. Ying, I don't want to -- obviously you're not a lawyer, and I don't mean to use lawyer-speak, but have you heard the term "a fortiori"?

A.   Actually, I have not.

Q.   I think -- I'm not a Latin scholar, but I think "a fortiori" means if A is true, then B follows like day follows night. If A is

Page 21

DAVID YING

true, B absolutely must be true. Let me try to not use Latin and I'll try to ask the question differently.

Your opinion is that, am I correct, that if, after confirmation, the EFIH first liens win their appeal and are entitled to both the full amount of the make-whole they seek and all the interest they seek, and the EFIH second liens prevail and also are entitled to the full amount of the make-whole and interest they seek, and the EFIH PIKs are entitled to the full amount of the make-whole and interest they seek, and all post-petition interest at the contract rate they seek, and the various EFH notes also prevail and are entitled to the full amount of both make-whole and post-petition interest that they seek, even if all of that happens, reorganized EFH should be able to raise the capital to pay all of those liabilities in full, right?

A.   That's correct.

Q.   Okay. I want to change the hypothetical.

Assume for a minute that there are

Page 22

1                   DAVID YING
2    settlements with everyone junior in the capital
3    structure to the EFIH first liens and, as a
4    result, reorganized EFH does not have to pay the
5    full amount of the make-wholes and the full
6    amount of the post-petition interest being
7    sought, but only a portion thereof.
8          Is it fair to say your opinion would
9    remain the same in those circumstances, that new
10   EFH should be able to pay the full amount of the
11   make-whole sought by the EFIH first liens and
12   interest thereon?
13         MR. ROGERS:  Objection to the form.
14    A.   Well, to fully answer your question, I
15   would like to know a little bit more about the
16   exact timing of the settlements.  I would like
17   to know exactly how those settlements are being
18   assumed to be met.
19         But based on your general question, I
20   think it's fair to say that if settlements are
21   reached with the junior constituencies in the
22   EFH/EFIH capital structure, post-reorganization,
23   EFH should still have the financial wherewithal
24   to access the capital markets to fund a
25   settlement with the EFIH first liens on their

Page 23

1                   DAVID YING
2    specific make-whole claims.
3     Q.   Let me ask a slightly different
4    question.  Imagine that post-emergence from
5    bankruptcy, on or about June 13, 2017, there is
6    a final judgment requiring payment of the full
7    make-whole and interest thereon sought by the
8    EFIH first liens, but also assume that courts
9    hold that the EFIH second liens are not entitled
10   to any make-whole and the EFIH PIKs are not
11   entitled to make-whole or contract rate of
12   interest, and the EFH notes are not entitled to
13   their make-whole or interest.
14         I take it your opinion is that the
15   EFIH -- that reorganized EFH will have the
16   financial capacity to raise capital to pay the
17   EFIH first lien debt itself?
18    A.   That's correct.
19    Q.   That is an even easier opinion to
20   reach than if you assume the worst case
21   scenario, that all of the liabilities of all of
22   the creditors are allowed in full, right?
23    A.   That's correct.
24    Q.   That's the notion of "a fortiori" that
25   I was trying to get to.

Page 24

1                   DAVID YING
2          Now, let's turn to page 33, if you
3    would, of your report, sir.  And if at any point
4    I'm asking you questions you want to look at
5    your report, just please do so.
6          Page 33 sets forth various
7    assumptions, am I right, that you have made in
8    rendering your opinion?
9     A.   Yes.
10    Q.   Okay.  You assume, first, an emergence
11   date of June 30, 2016; is that right?
12    A.   Yes.
13    Q.   Why did you assume that the debtors
14   would emerge from Chapter 11, that is, the plan
15   would go effective on June 30 of next year?
16    A.   It's the current best guess that the
17   company and we and K&E have established to
18   estimate all the financial impacts of the plan
19   of reorganization.
20    Q.   Is it the best guess that the company
21   and we and K&E have as to when the debtors will
22   emerge from Chapter 11?
23    A.   Yes.
24    Q.   You second -- not second.  You also
25   assumed that, and I'm reading from your report,

Page 25

1                   DAVID YING
2    "The pro forma equity value at emergence is
3    assumed to equal the total equity commitments
4    issued in accordance with the plan of
5    reorganization."
6          I read that correctly, did I not?
7     A.   Yes.
8     Q.   So let me see if I understand that.
9    Under the plan of reorganization, various T-side
10   unsecured creditors as well as the Hunts are
11   making an equity contribution, right?
12    A.   Yes.
13    Q.   And that is approximately, plus or
14   minus, $7 billion?
15    A.   Yes.
16    Q.   What you are assuming for these
17   purposes is that the value of the equity that
18   they are acquiring on the effective date will be
19   precisely the amount of cash they put in, that
20   is, given or take $7 billion, right?
21    A.   Yes.
22    Q.   Now, you would agree with me, would
23   you not, that the Hunts are financially
24   sophisticated actors?
25    A.   Yes.

Page 26

DAVID YING

1  Q.   And the TCEH unsecured creditors -- a
2
3  court may some day look at this -- we're not
4  talking about trade creditors here who are doing
5  this financing, are we?
6      A.   No.
7      Q.   We're not talking about employees,
8  right?
9      A.   No.
10     Q.   We're not talking about mom and pops,
11 if we can use the generic term, right?
12     A.   No.
13     Q.   We're talking about hedge funds,
14 private equity firms, and other sophisticated,
15 highly sophisticated financial actors, right?
16     A.   Yes.
17     Q.   Some of the nation's largest hedge
18 funds, in fact, right?
19     A.   Yes.
20     Q.   Okay.  And it's fair to say they are
21 financially sophisticated, right?
22     A.   Yes.
23     Q.   And it's fair to assume they are not
24 paying $7 billion if they really think what
25 they're acquiring is equity worth no more than

Page 27

DAVID YING

1  $7 billion, right?
2
3      A.   Yes.
4      Q.   And so let's assume that in fact the
5  equity they are acquiring is worth more than $7
6  billion.  Would that change your ultimate
7  opinion?
8      A.   No.
9      Q.   In fact, it would make the ultimate
10 opinion easier to reach, right?
11     A.   Yes.
12     Q.   Okay.  Have you ever heard the term,
13 when used in relation to a hedge fund or a
14 private equity firm, that they have a "hurdle
15 rate"?
16     A.   Yes.
17     Q.   Can you describe what a hurdle rate
18 is?
19     A.   Well, typically, when hedge funds or
20 private equity firms raise a limited partnership
21 pool of capital from institutional investors,
22 they enter into a fee agreement with respect to
23 those monies, and it's very often that, to
24 manage those monies and earn a rate of return,
25 the manager will get a management fee of an

Page 28

DAVID YING

1  annual amount -- usually it's, you know, 1 or 2
2
3  percent per year -- and they will get a carried
4  interest on the appreciation in those
5  investments above a hurdle rate.  And so,
6  typically, the hurdle rate is set at a 7 or 8
7  percent hurdle rate, but above 7 or 8 percent
8  annual return on the investment, the manager
9  gets an override of, you know, it would depend
10 on the manager, anywhere between 15 and 30
11 percent of the profits above the hurdle rate.
12     Q.   So the hurdle rate is a target, if you
13 will, of an internal -- of a rate of return on
14 an annualized basis, right?
15     A.   Well, it's more than a target.  It's a
16 threshold above which the manager gets his
17 carried interest, and below that threshold, the
18 manager doesn't get a carried interest.
19     Q.   Have you also heard of the term an
20 "internal rate of return"?
21     A.   I certainly have.
22     Q.   What is that, sir?
23     A.   Internal rate of return is a
24 calculation one makes when you look at a set of
25 future cash flows and you calculate what is the

Page 29

DAVID YING

1  implied rate of return associated with those
2
3  future cash flows as they relate to a particular
4  investment.
5      Q.   Now, I know, Mr. Ying, that you don't
6  work for the various hedge funds that are T-side
7  creditors and are helping to fund this plan, but
8  do you have a general understanding of what
9  their hurdle rates are?
10     A.   Well, there are so many different
11 funds here, I don't know what their hurdle rates
12 are.
13     Q.   You have no approximate ballpark
14 figure you can give me?
15     A.   I wouldn't want to guess.  Some of the
16 investors -- a firm called BlackRock.  They run
17 mutual funds.  I have no idea what their hurdle
18 rates are.
19     Q.   Okay.  Do you have any idea what their
20 or any of the other T-side internal creditor's
21 internal rate of returns are?
22     A.   No, I don't.
23     Q.   Okay.  Now, you also state on page 33
24 that you have made the assumption that the
25 equity value at emergence grows at an assumed

Page 30

1      DAVID YING
2  cost of equity of 8.5 percent; is that right,
3  sir?
4      A.   That's correct.
5      Q.   And is that 8.5 percent annually?
6      A.   Yes.
7      Q.   Why did you make that assumption?
8      A.   Well, the presumption -- not just an
9  presumption, pardon me.  The plan of
10  reorganization is conditioned on converting
11  Oncor or EFH to a C -- from a C Corp. to a REIT,
12  and we've looked at comparable entities to try
13  to calculate a weighted average cost -- or, a
14  cost of equity capital for EFH as a REIT, and
15  based on those calculations, using the capital
16  asset pricing model, we've derived at an
17  expected equity cost of capital of 8.5 percent.
18      Q.   Do I understand correctly that you
19  have looked at other REITs and that those REITs,
20  on average, the cost to them of raising equity
21  capital has been 8.5 percent per annum?
22      A.   We have looked at other comparable
23  entities.  Some of them are not REITs.  Some of
24  them are actually UPREITs or C corps.  They all
25  have different forms, but we have looked for a

Page 31

1  universe of companies that are publicly traded;
2  that are, from a business standpoint and a
3  structural standpoint, are as similar as
4  possible to what people had planned to convert
5  EFH to; and using typical investment banker
6  valuation technology, which is looking at betas
7  for the comps, we have come up with an equity
8  cost of capital.
9      Q.   Of 8.5 percent per annum?
10      A.   Yes, sir.
11      Q.   And that would suggest, as translated
12  to New EFH, that the investors expect to make at
13  least 8.5 percent per annum, right?
14      A.   That's correct.
15      Q.   So, in the first year on their $7
16  billion in equity, they're assuming that that
17  equity will increase by some $600 million?
18      A.   I believe there's a number in the
19  charts here, but yes, I think that's the right
20  number.
21      Q.   I'm doing the math in my head and I
22  won't hold you to it to the penny.
23          Mr. Ying, the assumption that
24  reorganized EFH, that its equity will be worth

Page 32

1      DAVID YING
2  exactly what the investors are willing to
3  invest, can you translate that into an assumed
4  total enterprise value, or TEV, for EFH?
5      A.   Yes.
6      Q.   I'm happy to direct you to where I
7  think it appears in your report.  I think it
8  appears page 35.
9      A.   I would place it at page 37, but if
10  you want to look at page 35, I'm happy to.
11      Q.   No, let's do where you're comfortable.
12  You're right, 37.
13          Can you answer my question, what is
14  the implied total enterprise value for
15  reorganized EFH assuming that the equity is
16  worth no more at emergence than what the
17  investors are paying for it?
18      A.   The number on page 37 is $19.139
19  billion.
20      Q.   Now, you were deposed a few weeks ago?
21      A.   Yes.
22      Q.   And I'm happy to show you your
23  testimony, but I believe you testified that you
24  had done an analysis where you looked at the
25  time at what the T-side unsecured debt was

Page 33

1      DAVID YING
2  trading at and what that might imply the TEV, or
3  total enterprise value, of Oncor is on a pro
4  forma basis assuming the reorganization goes
5  forward, correct?
6          MR. ROGERS:  Objection to form.
7      A.   I recall making that statement, yes.
8      Q.   Okay.  And do you recall what that
9  analysis showed?
10      A.   You would have to refresh my memory as
11  to the number I used.
12      Q.   Okay.
13          MR. ANKER:  We'll be marking as Ying
14  Confirmation Deposition Exhibit No. 2 a
15  transcript of Mr. Ying's deposition that
16  occurred on September 23, 2015.
17          (Ying Confirmation Exhibit 2,
18  Deposition of David Ying dated September 25,
19  2015, marked for identification, as of this
20  date.)
21  BY MR. ANKER:
22      Q.   Mr. Ying, first, can you identify what
23  has been marked as Ying Confirmation Exhibit No.
24  2?
25      A.   This is a transcript of my deposition

Page 34

DAVID YING

1  on September 23, 2015.
2
3      Q.   And I don't mean this at all
4  pejoratively:  You testified truthfully, to the
5  best of your ability, right?
6      A.   Yes.
7      Q.   Okay.  Can I direct your attention to
8  page 88, sir.
9      A.   Yes.
10     Q.   And Mr. Ying, let me direct you
11 particularly to lines 4 through 14 on page 88.
12     A.   Yes.
13     Q.   And I'm happy to do the talking, but
14 tell me whether I'm reading it correctly.
15     "Q   Have you offered any views on that
16 valuation to the debtors at any point?
17     "A   We have looked at the trading prices
18 for the claims that the T-unsecureds have as
19 well as the T second liens, and based on that
20 trading price and the terms of the merger
21 agreement, we have imputed a valuation for
22 Oncor as a REIT pro forma for the closing of
23 the merger.  That number currently, I think,
24 the last time we looked, was a little north of
25 $20 billion."

Page 35

DAVID YING

1
2      Q.   Did I read that correctly?
3      A.   Yes.
4      Q.   And you testified truthfully and
5  accurately when you gave that testimony, did you
6  not, sir?
7      A.   Yes.
8      Q.   And so if instead you did your
9  analysis for purposes of your expert report that
10 has been marked as Exhibit 1 using a $20 billion
11 rather than a 19 -- slightly more than $19
12 billion total enterprise value assumed for
13 Oncor, it would even be easier, would it not,
14 for New EFH to finance the payment of all the
15 disputed claims?
16     A.   Yes.
17     Q.   Mr. Ying, are you familiar, generally,
18 with the disclosure statement?  Let me rephrase
19 that.
20     You're probably not familiar with the
21 entirety of the disclosure statement.  No one
22 probably is.
23     Are you familiar, generally, with the
24 financial parts of the disclosure statement for
25 the debtors here?

Page 36

DAVID YING

1
2      MR. ROGERS:  Objection to form.
3      A.   Yes.
4      Q.   Okay.
5      A.   I believe so, yes.
6      Q.   Did you understand my last question?
7      A.   Yes.
8      Q.   Are you aware -- and I'm happy to show
9  it to you -- that there are charts in the
10 disclosure statement that project the recovery
11 to T-side unsecured creditors based on a range
12 of enterprise values for Oncor?
13     A.   I believe I recall those charts, yes.
14     Q.   I don't want this to be a memory test.
15 This will be Ying Confirmation Exhibit
16 No. 3.
17     (Ying Confirmation Exhibit 3,
18 Disclosure Statement for the Fifth Amended
19 Joint Plan of Reorganization of Energy
20 Future Holdings Corp., et al., Pursuant to
21 Chapter 11 of the Bankruptcy Code, marked
22 for identification, as of this date.)
23 BY MR. ANKER:
24     Q.   Mr. Ying, my first question is can you
25 identify Ying Confirmation Exhibit No. 3?

Page 37

DAVID YING

1
2      A.   This is the disclosure statement for
3  the plan of reorganization.
4      Q.   Okay.  And can I ask you to turn to
5  what is on the bottom page 23.  On the top it's
6  page 32 of 253.
7      A.   Yes, I'm looking at it.
8      Q.   Okay.  First, Mr. Ying, were you and
9  your colleagues involved in the preparation of
10 the chart that appears on the bottom of page 23
11 entitled Range of Illustrative Estimated
12 Recoveries?
13     A.   I believe some of the people that work
14 for me were involved with this, but I did not
15 have any direct involvement.
16     Q.   Was Evercore involved in the decision
17 for purposes of this chart to assume a range of
18 enterprise value of between 19 and 24 billion?
19     A.   I assume that we were, but I don't
20 have any direct knowledge of the decisions with
21 respect to selection of this range.
22     Q.   Mr. Ying, at the top it says
23 Illustrative Reorganized EFH Enterprise Value.
24     Do you understand the 19 to 24 billion
25 to be EFH TEV or Oncor projected TEV?

Page 38

DAVID YING

A.   Well, pursuant to the plan of reorganization, EFH will, at confirmation, own 100 percent of Oncor.  So this is a consolidated enterprise value for EFH and all of its subsidiaries.

Q.   But it's not calculated after deducting the Oncor debt, right?

A.   It's a total enterprise value, so it's the total value of only the left-hand side of the balance sheet in its totality.

Q.   Okay.  Do you know how it came about that a range of $19-24 billion for the enterprise value was chosen for purposes of the disclosure statement?

A.   I don't have a specific recollection of my having a discussion about this particular range.  It's a nice, big, broad range.

Q.   You certainly never expressed the view that that's deceptive, right?

A.   I think it's just being fully disclosive of the possibilities.

Q.   Okay.  And so the possibilities, as disclosed in the disclosure statement, range from a low of $19 billion to a high of $24

Page 39

DAVID YING

billion, right?

A.   That is correct.

Q.   Okay.  And for purposes of your analysis in the expert report that's Exhibit 1, you applied the low end of that range, $19 billion, right?

A.   That's correct.

Q.   Which is a conservative assumption for purposes of your opinion, right?

A.   That is correct.

Q.   A less conservative assumption would be to choose the opposite end of the range, $24 billion, right?

A.   That is correct.

Q.   And if you chose $24 billion, not only would the total enterprise value be approximately $5 billion higher, but so, too, would the equity value, right?

A.   That's correct.

Q.   Because the liabilities are fixed, right?

A.   That's correct.

Q.   So for every dollar in increased enterprise value, there is a dollar-for-dollar

Page 40

DAVID YING

corresponding increase in equity value, right?

A.   That's correct.

Q.   Mr. Ying, let me take you back to your report, which I believe was marked as Exhibit No. 1, and could I turn you to page 30 -- I'm sorry, page 33, which is the assumptions.

Are you there, sir?

A.   Yes.

Q.   Mr. Ying, were you by any chance in court or listening telephonically to the hearing that occurred in these Chapter 11 cases on this past Friday?

A.   I was not.

Q.   Are you familiar with an individual named Christopher Shore?

A.   Yes.

Q.   Mr. Shore is at White & Case, which is counsel for the T-unsecureds and the investors who are on the T-side investing in this transaction?

A.   Yes, he is.

Q.   Are you aware that he announced that a tentative settlement has been reached with 40 percent in dollar amount of the EFIH PIKs?

Page 41

DAVID YING

A.   I read an excerpt of the hearing in one of the various news services that reports on bankruptcy proceedings, and I do recall reading that he made such an announcement in court.

Q.   And are you aware that he announced that that settlement would provide for the payment of no make-whole to the settling EFIH PIK holders?

A.   I don't recall any specifics that he gave with respect to the terms of the settlement.

Q.   Assume that there is a settlement with 40 percent or more of the EFIH PIKs that provides for no payment of any make-whole to them and a payment of less than 100 percent of the contract rate of post-petition interest they are seeking.

With me so far?

A.   Yes.

Q.   Those assumptions are less conservative than the assumptions you made in issuing your report, right?

A.   I'm not sure about the word "less conservative," but if Mr. Shore's settlement

Page 42

DAVID YING

1  
2  becomes part of the plan, the financial
3  wherewithal of EFH to make all of the other
4  unsettled payments become easier.
5      Q.    Much more articulately stated than my
6  inarticulate question. Thank you.
7      A.    You're welcome.
8      Q.    Let's turn now to page 34 of your
9  expert report, which is Exhibit No. 1, and I
10  want to ask you about a couple of the bullet
11  points on this page, which is entitled Overview;
12  correct, sir?
13      A.    Yes.
14      Q.    Okay.  Now, if you look to the second
15  full bullet and then indenting, there is a
16  sub-bullet that says, "$0.5 billion related to
17  PPI litigation reserve which is assumed to be
18  refunded to the investors at emergence."
19          Did I read that correctly?
20      A.    Yes.
21      Q.    Can you explain what you are trying to
22  state there in the report?
23      A.    Yes.  One of the provisions of the
24  merger agreement with the investor group is that
25  they will overfund the merger at confirmation by

Page 43

DAVID YING

1  
2  investing an additional, approximately, $500
3  million, the use of proceeds of which is
4  earmarked for the payment of post-petition
5  interest, at full contract rate, to all of the
6  unsecured creditors who are alleging that
7  they're entitled to those payments.
8          Under the assumptions that we used for
9  this feasibility analysis, we assumed the most
10  conservative possible position, which would be
11  that, at confirmation, those post-petition
12  interest obligations had been denied, that the
13  post-litigation claims were being appealed
14  outside the Bankruptcy Court, and that pursuant
15  to the terms of the merger agreement, those
16  funds would be returned to the investors, and
17  therefore, EFH, post-confirmation, would not
18  have access to them, but would still have to
19  have the financial wherewithal to make those
20  payments if they suddenly, at some point in the
21  future, it was determined that EFH was obligated
22  to make those payments.
23          Again, it was a conservative
24  assumption.
25      Q.    And even with that conservative

Page 44

DAVID YING

1  
2  assumption, you reached the opinion that
3  reorganized EFH would be able to pay all of the
4  liabilities that are in dispute, right?
5      A.    That's correct.
6      Q.    Now, you said that one of the
7  provisions of the merger agreement with the
8  investor group is that they will overfund the
9  merger by investing an additional approximately
10  $500 million, right?
11      A.    Yes.
12      Q.    And that additional investment would
13  be in the form of equity, not debt, right?
14      A.    That's correct.
15      Q.    And it wouldn't buy them any
16  additional shares beyond what they would
17  otherwise receive, right?
18      A.    That's correct.
19      Q.    Doesn't that suggest to you, Mr. Ying,
20  that the investors believe that the equity they
21  are receiving at confirmation is worth at least
22  $500 million more than the $7 billion you are
23  assuming?
24      A.    It's possible.  I really don't want to
25  speculate.  I don't know what their mind-set is.

Page 45

DAVID YING

1  
2      Q.    It is fair to say that -- you are an
3  investment banker, right?
4      A.    Yes, I am.
5      Q.    And it is fair to say that investment
6  bankers in doing valuation analyses look to
7  market indicia of value, right?
8      A.    Yes.
9      Q.    And one market indicia of value is
10  what sophisticated investors will pay for a
11  particular asset, right?
12      A.    That is correct.
13      Q.    And so it's fair to say for this
14  particular asset highly sophisticated investors
15  are willing to pay at least $500 million more
16  than the $7 billion you are assuming at
17  emergence is the equity value of New EFH, right?
18      A.    I think that's correct.
19      Q.    You also note on page 34, "$0.2
20  billion allocated to TCEH junior creditors on
21  account of their pre-petition claims."
22          Do you see that, sir?
23      A.    Yes.
24      Q.    Can you explain what you mean by that
25  statement?

Page 46

DAVID YING

1    A.   As part of the plan of reorganization,
2    the T-side is being given a claim against EFH in
3    settlement of their alleged causes of action and
4    they are being allocated $0.2 billion of equity
5    in the reorganized EFH as a result of that.
6    Q.   So let me see if I can put it in my
7    words, but obviously I want to make sure I'm
8    right, so tell me if I'm right or wrong.
9            T-side creditors are both receiving
10   some stock directly without putting in any
11   equity investment at all and, in addition,
12   receiving the right to invest and acquire
13   additional equity in New EFH, right?
14   A.   That's correct.
15   Q.   And as to the first part, the equity
16   that T-side creditors are receiving without
17   putting in any equity investment, that's
18   approximately $200 million in value, right?
19   A.   That's correct.
20   Q.   Using your very conservative
21   assumptions on value, right?
22   A.   That's the amount that they're being
23   allocated relative to the new money being
24   invested.  Whether that allocation is worth more

Page 47

DAVID YING

1    or less in the marketplace, that's subject to
2    opinion.
3    Q.   Well, they're receiving 2 percent of
4    the equity, right?
5    A.   Well, it's $200 million out of $7
6    billion, so it's -- I can't do that math in my
7    head.
8    Q.   1.6, 1.5 billion, right?  1.5 percent?
9    A.   It's -- well, actually, it's really
10   $152 million.  I think, actually, the exact
11   number should be on page 35.
12   Q.   You show it there as $151 million.
13   A.   $151 million out of $7 billion, so
14   it's about 2 percent.
15   Q.   Okay.
16   A.   Thank you.  Your math was correct.
17   Q.   Okay.  And just to be clear, they're
18   not receiving $151 million in cash, right?
19   A.   No, they're receiving $151 million of
20   equity based on the $7 billion equity account
21   that's being created.
22   Q.   So if in fact what you, for purposes
23   of your conservative analysis, have assumed is
24   $7 billion of equity is really worth 10 or 11 or

Page 48

DAVID YING

1    12 billion, then what the T-side unsecureds are
2    receiving at confirmation, without putting a
3    penny in, is worth more than $151 million,
4    right?
5    A.   That's correct.
6    Q.   Mr. Ying, one other question on page
7    34.  You say, "If 12 months after emerging from
8    bankruptcy, all of Reorganized EFH's arguments
9    are rejected, and a final order and judgment are
10   entered requiring full amounts of PPI and MW to
11   be paid, Reorganized EFH will need to raise
12   additional capital to pay such obligations."
13          Did I read that correctly?
14   A.   Yes, you did.
15   Q.   And just so we have a clear record,
16   "PPI" is post-petition interest?
17   A.   That's correct.
18   Q.   And "MW" is make-whole?
19   A.   That's correct.
20   Q.   Two sets of questions on that bullet.
21          First, I understand you had to make an
22   assumption of a date as to which the payment
23   obligations would have to be made, and
24   therefore, you assumed 12 months after

Page 49

DAVID YING

1    emergence, or June 30, 2017, right?
2    A.   That's correct.
3    Q.   But if it turns out that all of your
4    assumptions are right except the payment has to
5    be made or payments have to be made July 15,
6    2017, 15 days later, are you still comfortable
7    with your opinion?
8    A.   Yes.
9    Q.   Are you still comfortable with your
10   opinion if it's six months later?
11   A.   I believe I would be.  I would have to
12   run the numbers to take a look at them
13   specifically, but my -- my general sense, given
14   the fact that the value of the equity account
15   should be rising because that's the basic
16   definition of the valuation of the company, that
17   there's a positive rate of return on the equity,
18   as the size of the company grows, even though
19   the size of the claim would grow, that they
20   would be growing proportionately.
21   Q.   And I said six months.  I take it we
22   can generalize that.  I understand you haven't
23   run the numbers, but it's not as if you are
24   trying to offer an opinion that is specific to

Page 50

DAVID YING

1
2  one day, right?
3      A.   That's correct.
4      Q.   Because the debtors can't today
5  represent to Judge Sontchi that if they lose all
6  of these appeals, the loss is going to be
7  realized on June 30, 2017, right?
8      A.   That's correct.
9      Q.   And so what you are offering is a more
10  general opinion that whenever it turns out that
11  all of these losses occur, if they occur in the
12  litigation, reorganized EFH will be able to pay
13  all those liabilities, right?
14      A.   That's correct.
15      Q.   Okay. The other question I had to you
16  about the last point is you say, if after
17  emerging EFH loses all of these appeals,
18  reorganized EFH will need to raise additional
19  capital to pay such obligations, right?
20      A.   Yes.
21      Q.   Now, you're an investment banker and
22  you have looked at lots of companies over your
23  career, right?
24      A.   Yes.
25      Q.   And you have advised lots of

Page 51

DAVID YING

1
2  companies, right?
3      A.   Yes.
4      Q.   And there are many, many healthy
5  companies, Fortune 100 companies, that don't
6  have a billion or $2 billion in cash just
7  sitting around liquid to pay liabilities, right?
8      A.   That's correct.
9      Q.   So the fact that reorganized EFH would
10  need to raise capital to pay these liabilities
11  is not at all suggestive that its financial
12  condition would be anything less than healthy,
13  right?
14      A.   That's correct.
15      Q.   Because it has assets; it just doesn't
16  have liquidity to pay that amount of liability
17  as you project it, right?
18      A.   That's correct.
19      Q.   Okay. And you say it will need to
20  raise capital. I take it you believe it could
21  raise debt capital, right?
22      A.   Yes.
23      Q.   And it could raise equity capital,
24  right?
25      A.   Yes.

Page 52

DAVID YING

1
2      Q.   Or a combination thereof, right?
3      A.   Yes.
4      Q.   Okay. Let's turn to -- we're going to
5  skip 35 -- page 36. And Mr. Ying, really all I
6  want to do on 36 is make sure I understand this
7  chart.
8          At the top of the page -- I use the
9  term "column" to use what's on the top and
10  "rows" to refer to what's on the left. Is that
11  the way you refer to it as well?
12      A.   Yes.
13      Q.   Okay. The first column is 6/30/16, so
14  that's the projected emergence date, right?
15      A.   Yes.
16      Q.   The second column is six months later,
17  December 31, 2016, right?
18      A.   Yes.
19      Q.   And the right-hand column is June 30,
20  '17, which is the one year after the projected
21  emergence, right?
22      A.   Yes.
23      Q.   And let me make sure I understand it.
24  The first set of rows is my client's claim,
25  which you project, as of June 30, as a

Page 53

DAVID YING

1
2  make-whole of $426 million and accrued interest
3  on the make-whole of $95 million, right?
4      A.   Yes.
5      Q.   Mr. Ying, you're not -- this isn't --
6  hopefully, some day we'll have this discussion
7  because we will have prevailed on appeal, but my
8  clients think their make-whole as of -- the
9  principal amount of the make-whole is not $426
10  million, but $431 million.
11          Assume we're right. Would that $5
12  million difference, plus interest thereon, cause
13  you to change your opinions?
14      A.   No.
15      Q.   It's trivial in the bigger picture of
16  things in terms of reorganized EFH's ability to
17  raise the necessary capital to pay the
18  liabilities, right?
19      A.   Yes.
20      Q.   Okay. And so if you now look over at
21  the next two columns, the make-whole amount, the
22  principal stays constant, but the interest is
23  increasing at a rate of approximately 10 percent
24  compounded, right, annually?
25      A.   That's correct.

Page 54

DAVID YING

Q.   And then you have below it the EFIH second lien notes, right?

A.   That's correct.

Q.   And so there, as well as on the EFH first lien notes, you are making the worst case scenario, which is that the company loses on appeal the make-whole and it also owes all accrued interest, right?

A.   Correct.

Q.   And there as well the make-whole remains constant over time, but the accrued interest increases, right?

A.   That's correct.

Q.   And then the third set of creditor bodies with disputed claims is the EFIH unsecured notes, which we often refer to as the PIKs, right?

A.   Yes.

Q.   For "payment in kind," right?

A.   Yes.

Q.   And there you show both a make-whole called a call premium, right?

A.   Yes.

Q.   And interest thereon increasing over

Page 55

DAVID YING

time, right?

A.   That's correct.

Q.   As well as post-petition accrued interest, right?

A.   Yes.

Q.   And by "incremental," you mean the delta between the contract rate of interest on the one hand and the federal judgment rate on the other hand, right?

A.   Yes.

Q.   And that's increasing over time, right?

A.   Yes.

Q.   Okay.  And then the fourth set of creditor bodies is the EFH LBO notes, right?

A.   Yes.

Q.   And there their claim is just post-petition interest, and you're showing the incremental amount at the contract rate as compared to the federal judgment rate, right?

A.   Yes.

Q.   And that increases over time, right?

A.   Yes.

Q.   And then the EFH unsecured notes is

Page 56

DAVID YING

the third category, and they have both the make-whole and a claim for post-petition accrued interest, right?

A.   Yes.

Q.   And the post-petition accrued interest increases over time, right?

A.   Yes.

Q.   And while the principal amount of the make-whole doesn't, the accrued interest -- there's interest that builds up on the make-whole, right?

A.   That's correct.

Q.   And then if you assume every one of those losses occurs, there is an additional $2,229,000,000 in liabilities to be paid on June 30, 2017, right?

A.   Yes.

Q.   But if you then turn to page 37, the equity value assumed as of that time, using all your very conservative assumptions on equity value, is far greater than $2,229,000,000, right?

A.   Yes.

Q.   It's 5,350 -- I'm sorry, it's

Page 57

DAVID YING

$7,608,000,000 before taking account of that liability, those liabilities, right?

A.   That's correct.

Q.   And so those liabilities, even if the company had to pay every penny of it, there would still be $5,358,000,000 in equity value, right?

A.   Yes.

Q.   Let's go to page 38.  Tell me when you're there.

A.   I'm there.

Q.   Now, you have a box up at the top, and I'll again, just to make it easier on you, I will end up stopping speaking in a few minutes, you will have to go longer today, so let me be courteous to you.

It says, "In the event of an adverse judgment, EFH's strong ratings and credit profile should position EFH to finance a significant portion of the Obligations with newly issued debt at EFH/EFIH.  If an adverse judgment requires payment of all disputed PPI and MW, a portion of such Obligations will likely require funding with new equity."

Page 58

1            DAVID YING
2     Did I read that correctly?
3   A.  Yes.
4   Q.  Okay.  What do you mean by "EFH's
5 strong ratings and credit profile"?
6   A.  Well, we know right now that EFIH has
7 a -- pardon me.  Excuse me.  We start with the
8 fact we know that Oncor has an investment grade
9 credit rating, and we think that,
10 post-confirmation, the credit rating at EFIH,
11 with the pro forma capital structure that we
12 think EFIH and EFH will emerge with, will have a
13 very strong BB credit rating.
14   Q.  Which would be investment grade,
15 right?
16   A.  "Strong BB" means just below
17 investment grade, but nonetheless, it's a very
18 strong credit rating and means that they would
19 have ample access to the debt capital markets if
20 they needed to raise incremental debt.
21   Q.  Okay.  Today, before the
22 restructuring, EFH and EFIH are not investment
23 grade, right?
24   A.  No, they're in bankruptcy.  They have
25 defaulted.

Page 59

1            DAVID YING
2   Q.  Okay.  Bad question on my part.
3     The companies filed for bankruptcy on
4 April 29, 2014, right?
5   A.  Correct.
6   Q.  Okay.  On April 28, 2014, the day
7 before they filed for bankruptcy, they were not
8 investment grade issuers, were they?
9   A.  Absolutely not.
10   Q.  And the result of this restructuring
11 is a material deleveraging of the balance sheet
12 for EFIH and EFH, right?
13   A.  Yes.
14   Q.  A material improvement in their credit
15 rating, in all likelihood, right?
16   A.  Yes.
17   Q.  Okay.  Now, at the bottom of page 38,
18 you have various -- strike that.  Let me go back
19 and ask a different question.
20     The second sentence in the box at the
21 top of the page says, "If an adverse judgment
22 requires payment of all disputed PPI and
23 make-whole, a portion of such obligations will
24 likely require funding with new equity," right?
25   A.  Yes.

Page 60

1            DAVID YING
2   Q.  Imagine, again, that the only --
3 strike that.
4     Do you believe that New EFH would be
5 able to fund the liability just owed to my
6 client, potentially, the 426 to 431 million of
7 make-whole and accrued interest which you
8 calculate is another 150 to June 30, 2017,
9 entirely with debt?
10   A.  Yes.
11   Q.  Okay.  Let's now go to the bottom of
12 the page where I was going to take you a minute
13 ago.
14     You see it says PF Credit Metrics?
15   A.  Yes.
16   Q.  "PF" stands for pro forma?
17   A.  Yes.
18   Q.  There's a couple of other
19 abbreviations.  You have "CY."  That's calendar
20 year?
21   A.  Calendar year, yes.
22   Q.  And we all know what EBITDA is, and we
23 have already gone over TEV, so I'm not going to
24 take you back through it.
25     How does the projected various ratios,

Page 61

1            DAVID YING
2 debt to calendar year 2017 EBITDA or debt to
3 calendar year 2018 EBITDA or debt to Oncor TEV,
4 before any of these liabilities -- so the first
5 column on the left -- compare to comparable
6 companies?
7   A.  Well, there aren't a lot of comparable
8 companies to how EFH is structured, but from a
9 credit metrics standpoint, those are some of the
10 metrics we look at to say that EFH and IH would
11 probably emerge with a very strong BB credit
12 rating, and from that we derive that it would
13 have very significant access to incremental debt
14 capital if it chose to raise capital by issuing
15 new debt at EFH and IH.
16   Q.  There are a lot of financially healthy
17 companies that have far greater -- far higher
18 debt to EBITDA or debt to enterprise value
19 ratios than what you show here before judgment,
20 right?
21   A.  Well, again, this is a regulated
22 utility as the underlying asset, so these credit
23 metrics are a little unusual for a regulated
24 utility, but nonetheless, we know the capital
25 markets would look at these ratios and look at

Page 62

DAVID YING

1
2  the enterprise value of the business and say
3  they would be delighted to lend to the company
4  with this credit -- these credit metrics.
5      Q.   Okay. And I take it the capital
6  markets would also be delighted to lend or
7  provide equity financing if all the judgments
8  occurred, and let's look at the third column
9  from the left, the $1.125 billion equity and
10 $1.125 billion debt, right?
11     A.   That's correct, yes.
12     Q.   And while you believe that if all of
13 these liabilities in full have to come due, a
14 portion would have to be financed with new
15 equity, you believe that New EFH should be able
16 to raise that new equity, right?
17     A.   Yes.
18     Q.   The equity markets would be delighted
19 to lend -- not delighted to lend -- delighted to
20 invest, right?
21     A.   That's correct.
22     Q.   Okay. I'm trying to move this along,
23 Mr. Ying, in both fairness to you and other
24 people.
25         This is an open-ended question. Page

Page 63

DAVID YING

1
2  39, as I read it, was simply a different way of
3  stating what you have already stated on page 38
4  and earlier.
5         Is there anything -- and again, I
6  don't mean that critically. Is there anything
7  I'm missing, anything new or different on this
8  page?
9      A.   On page 39?
10     Q.   Yes.
11     A.   No, other than we tried to estimate
12 how much equity would or could the company
13 reasonably expect to issue relative to a
14 starting point of about $5 billion of equity.
15     Q.   And what was your conclusion?
16     A.   The conclusion was that the company
17 should be able to raise, you know, at least a
18 billion, billion and a half of incremental
19 equity; that that size of public offering would
20 not be unusual or would certainly be acceptable
21 and well-absorbed by the equity capital markets.
22     Q.   Okay. And let's then turn to page 40,
23 the last page of this portion of your expert
24 report, right?
25     A.   Yes.

Page 64

DAVID YING

1
2      Q.   Okay. Now, why don't you explain to
3  me page 40. I think I understand it, but I
4  would like to hear it out of your words.
5      A.   Sure. Again, we were trying to look
6  at what's precedent for a company -- a public
7  company doing a public offering to raise
8  incremental equity capital and how big an
9  offering could they do and how big an offering
10 does that represent as a percentage of its
11 pre-offering public equity market
12 capitalization.
13         So you see, based on this chart, that
14 there are many public offerings in this general
15 size category; that you see offerings that do
16 range as high as about 35 percent of the
17 pre-offering capitalization, and that gives us
18 an indication that, yes, the equity capital
19 markets should be willing to raise at least 35
20 percent of the pre-offering capitalization of
21 this company, which is a little over $5 billion,
22 in a big public offering.
23     Q.   Okay. So let me make sure I
24 understand the chart fully. You have got a left
25 axis -- you have a vertical axis and a

Page 65

DAVID YING

1
2  horizontal axis, right?
3      A.   Correct.
4      Q.   In the vertical axis, it says Pre-Deal
5  Market Capitalization, right?
6      A.   Correct.
7      Q.   So what you're representing there is
8  the equity value of the company before the
9  secondary equity raise, right?
10     A.   That's correct.
11     Q.   And so the low end is $5 billion, and
12 it ranges from 5 to 35; just the numbers you
13 show there, right?
14     A.   Correct.
15     Q.   Okay. And then in the horizontal
16 axis, you range there from 0 percent, the
17 numbers you showed, to 40 percent, right?
18     A.   That's correct.
19     Q.   And what that means is the deal size,
20 that is, the amount of new equity that's raised
21 as a percentage of the pre-deal capitalization,
22 right?
23     A.   That's correct.
24     Q.   So if you had a company whose pre-deal
25 capitalization was $5 billion, by way of

Page 66

DAVID YING

1  example, and a billion in new equity was raised,
2  that would be 20 percent, right?
3     A.   That's correct.
4     Q.   And if I understand it correctly here,
5  you're saying on the prior page that,
6  comfortably, New EFH should be able to raise
7  north a billion to a billion and a half of
8  equity with a preexisting about $7 billion,
9  right, in equity value?
10    A.   Well, we reduced the size of the
11 equity count to 5 because we have to deduct from
12 equity value the fact that they have to raise --
13 that there's been a judgment of $2 billion.  If
14 the company announced tomorrow that they owed an
15 extra 2 and a half or 2 and a quarter billion --
16    Q.   Got it.
17    A.   -- to the world, you would infer that
18 the value of the presettlement stock would go
19 down by that amount, and the decision would be
20 does the company fund that 2 and a quarter with
21 debt, equity, and what combination thereof.
22    Q.   Okay.  And so you've got, assuming the
23 loss of all the litigation in full, about 5.3 to
24 5.4 in equity value as of 6/30/17, right, using

Page 67

DAVID YING

1  your conservative assumptions, right?
2     A.   That's correct.
3     Q.   Okay.  And the company, you're saying,
4  would be able to then raise a billion or more in
5  debt and a billion to a billion and a half in
6  equity, right?
7     A.   That's correct.
8     Q.   Okay.  And you show here on page 40
9  that a whole bunch of companies were able to
10 raise between -- a new -- let me start again.
11 Talking too quickly.
12          A whole bunch of companies were able
13 to raise, in secondary equity offerings, around
14 as much as $5 billion -- I'm sorry.  I'm being
15 inarticulate again.
16          A whole bunch of companies were able
17 to do secondary offerings in which they raised
18 20 to 30 percent or more of their pre-deal
19 market capitalization, right?
20    A.   That's correct.
21    Q.   And they were able to do so where that
22 pre-deal market capitalization was also in the
23 range of $5 billion, right?
24    A.   That's correct.

Page 68

DAVID YING

1     Q.   And they were able to do that in the
2  last three years, right?
3     A.   That's correct.
4     Q.   Okay.  Mr. Ying, let me ask you -- I
5  think I know where it is.  Let's mark as Exhibit
6  No. 4.  I'm just taking page 40 of your report,
7  and what I would ask you to do is just circle
8  for me the balls that represent the companies
9  that were able to raise 20 to 30 percent of
10 their pre-deal market capitalization in a
11 secondary offering where that pre-deal market
12 capitalization was, ballpark, $5 billion?
13          MR. ANKER:  Let's mark this as Ying
14 Confirmation Deposition Exhibit No. 4.
15          (Ying Confirmation Exhibit 4, a chart
16 labeled EFH Feasibility Analysis, marked for
17 identification, as of this date.)
18          THE WITNESS:  Does someone have a
19 writing implement?
20 BY MR. ANKER:
21    Q.   A blue pen is probably not the
22 greatest.
23          Yes, it's fine.  Use blue.
24    A.   Sure.  So this is 20 to 30 percent in

Page 69

DAVID YING

1  the $5 billion equity market cap range.
2     Q.   Right.
3     A.   (Witness complies.)
4     Q.   Mr. Ying, just so we have a clear
5  record, you have marked in a rectangular box the
6  balls that represent actual offerings that got
7  done, capital raises that got done that meet the
8  criteria I just mentioned, correct, sir?
9     A.   Yes.
10    Q.   And just to be clear, the reason I
11 asked 20 to 30 billion -- can we turn back to
12 page 39 of your report, Exhibit No. 1.
13    A.   Yes.
14    Q.   If you look at the top, Total PPI and
15 Make-Whole?
16    A.   Yes.
17    Q.   You see that box?  So that assumes a
18 loss on everything, right, sir?
19    A.   Yes.
20    Q.   And if you look at the second line,
21 New Equity Financing As a Percentage of
22 Prefinancing Equity Market Capitalization?
23    A.   Yes.
24    Q.   If in fact the company raised the

Page 70

DAVID YING

1
2  necessary $2.5 billion, $2.25 billion, $1.125
3  equity, $1.125 debt, the equity raise as a
4  percentage of the capitalization would be 21
5  percent, right?
6  A.  Yes.
7  Q.  That's your calculation, right?
8  A.  Yes.
9  Q.  Okay.  Mr. Ying, I just have a couple
10  of more questions.
11  Are you familiar with the deposition
12  that Mr. Keglevic gave in -- a week or two ago
13  in connection with the plan confirmation
14  proceedings?
15  A.  I have not seen it or read it.
16  Q.  Okay.  Why don't we mark then as
17  Exhibit Ying Confirmation Deposition Exhibit No.
18  5 a copy of Mr. Keglevic's deposition, which
19  occurred on October 1, 2015.
20  (Ying Confirmation Exhibit 5,
21  Deposition of Paul Keglevic dated October 1,
22  2015, marked for identification, as of this
23  date.)
24  BY MR. ANKER:
25  Q.  Mr. Ying, I'm not going to ask you to

Page 71

DAVID YING

1
2  identify the document.  I will represent to you
3  it is what I just told you it is, but you can
4  see on the first page it so indicates.
5  Let me ask you to turn specifically to
6  two places.  First is page 20, that is, by "page
7  20," I mean deposition transcript page 20.
8  You will see there's four pages per
9  page.
10  A.  Yes.
11  Q.  Okay.  And if you're on page 20, I was
12  questioning Mr. Keglevic, and look at starting
13  on line 3, sir.
14  A.  Of which of these sub-pages?
15  Q.  Page 20 of the transcript.
16  A.  Yes.
17  Q.  At the bottom it says page 6, but on
18  the transcript it says page 20.  There's four
19  pages reprinted per page of paper.
20  Tell me when you're there then.
21  A.  So is it page 6, pages 18 to 21?
22  Q.  Correct, sir.
23  A.  Thank you.  Sorry.
24  Q.  So on deposition transcript page 20,
25  line 3, I asked the following:

Page 72

DAVID YING

1
2  "Q  Assume that after the effective date,
3  an appellate court enters an order allowing the
4  claim of the EFIH first liens to the
5  make-whole, the EFIH second liens to the
6  make-whole, and the EFIH PIKs to the
7  make-whole.  Do the debtors believe that
8  reorganized EFH will be able to satisfy all of
9  those claims in full?
10  "A  Yes."
11  Mr. Shore then objected to form.
12  "Q  Is there any material doubt that the
13  debtors have about that?
14  "A  No."
15  Did I read that accurately?
16  A.  Yes.
17  Q.  You agree with Mr. Keglevic in that
18  respect?
19  A.  Yes, I do.
20  Q.  Okay.  Now turn to -- again, I'm
21  referring to the deposition page, so there's
22  four pages per page -- page 61, lines -- let's
23  first go to page 61.  Just to make it easier for
24  you in terms of the numbered page on the bottom
25  of the page, it's page 16.

Page 73

DAVID YING

1
2  A.  I have it.
3  Q.  Okay.  I don't want to -- well, I'll
4  read it in the record.  Starting with line 6,
5  and again, I'm questioning just to give you
6  context.
7  "Q  I just want to make sure -- no
8  criticism on Mr. Horowitz on my left, it's
9  really a criticism of myself for not asking the
10  question earlier.  I just want to make sure.
11  It is a clean-up question.
12  "I want you to make the worst-case
13  assumption.  Assume that after the effective
14  date, the EFIH first liens win on appeal their
15  make-whole and interest thereon.  The EFIH
16  second liens win their make-whole and interest
17  thereon, the EFH PIKs win their make-whole and
18  interest thereon, the EFH bonds win their
19  make-whole and interest thereon.  And after the
20  effective date, there is a determination that
21  the EFIH PIKs are entitled to interest at their
22  contract rate, rather than at the federal judgment
23  rate.
24  Does it remain the debtors' belief" --
25  And Mr. McKane from Kirkland interrupte

Page 74

DAVID YING

1
2  "With no risk probability discounting for the
3  amounts?"
4       And I responded, "With no risk probability
5  discounting for the amounts. I will adopt you
6  counsel's qualification.
7       "Does it remain the debtors' belief that
8  reorganized EFH would be able to satisfy all of
9  those liabilities after the effective date?"
10      Mr. Shore objected to form.
11      "A  It does."
12      You agree with Mr. Keglevic, what he
13 stated on those lines?
14      A.  Yes.
15      Q.  And I went on to ask him, starting on
16 line 15 on page 62:
17      "Q  And for the reasons that you
18 previously provided?"
19      Mr. Shore -- he doesn't seem to like
20 my questions -- again objected to form.
21      And Mr. Keglevic responded:
22      "A  The primary basis for my conclusion
23 is the, as we calculated it, the substantial
24 amount of equity that reorganized EFH would
25 be -- that would exist at reorganized EFH. An

Page 75

DAVID YING

1
2  I think we had calculated that amount at $8.5
3  billion, which should be substantial coverage
4  even under a worst-case scenario for all the
5  disputed contingent, unliquidated amounts
6  associated with the make-whole and
7  post-petition interest."
8       Did I read that accurately?
9       A.  Yes.
10      Q.  And do you agree with what Mr.
11 Keglevic stated at those lines?
12      A.  I don't understand his reference to
13 $8.5 billion, but I agree with his conclusion.
14      Q.  I think we did some math and came up
15 with a slightly higher number using $20
16 billion --
17      A.  Okay.
18      Q.  -- as the assumed value rather than
19 19, but the transcript will speak for itself.
20      Bottom line is you agree with his
21 conclusion?
22      A.  I agree with his conclusion.
23      Q.  And so the bottom line, Mr. Ying, is
24 it is your opinion that if everything -- with
25 all the conservative assumptions you made on

Page 76

DAVID YING

1
2  value and if every liability that is in dispute
3  has to be paid in full by New EFH, New EFH will
4  be able to pay those liabilities and should not
5  have to go back into bankruptcy, right?
6       A.  That's correct.
7       MR. ANKER:  I'll pass the witness.
8       MR. ROGERS:  Can we take a break --
9       MR. ANKER:  Yes.
10      MR. ROGERS:  -- while we're switching?
11      MR. ANKER:  Yes.
12      (Recess; Time Noted:  9:35 a.m.)
13      (Time Noted:  9:42 a.m.)
14 EXAMINATION BY
15 MR. HARDIMAN:
16      Q.  Mr. Ying, John Hardiman again for the
17 EFH Official Committee of Unsecured Creditors.
18      I want to return to something that you
19 discussed with Mr. Anker.  You might recall you
20 gave some testimony that both the Hunt Group and
21 the investors who make up the T-unsecured
22 creditors are sophisticated financial players;
23 do you recall that testimony?
24      A.  Yes.
25      Q.  And I think you testified that you

Page 77

DAVID YING

1
2  would not expect those sophisticated financial
3  players to invest $7 billion of equity in the
4  New EFH unless they believed it was worth more
5  than $7 billion?
6       A.  I recall saying that it's quite
7  possible, but I don't know their investment
8  hurdle rates; so it's more speculation than it
9  is based in fact.
10      Q.  Would you expect sophisticated
11 investors such as the T-unsecureds and the Hunts
12 to invest $7 billion of equity into the
13 reemerged Oncor if they believe it is worth less
14 than $7 billion?
15      A.  No.
16      Q.  Does your feasibility analysis of EFH
17 address that scenario, a scenario where the
18 equity of the reemerged entity will be less than
19 the amount that is currently expected to be
20 funded?
21      A.  No, it does not.
22      Q.  Am I correct you also do not, in your
23 opinion, provide an independent valuation of
24 Oncor post-emergence; is that correct?
25      A.  Yes.

Page 78

DAVID YING

Q.   Why didn't you provide a valuation of the -- of Oncor post-emergence or address a situation where the equity was worth less than the contemplated funded amount in your report?

MR. ROGERS:  Objection to form.

A.   Well, in response to the second half of your question, if Oncor is worth less than the purchase price, the odds of the investors closing the merger are low; and in response to the first half of your question, I don't have access to the projections that the investor group and the Hunts are using and so it's very difficult for me to assess valuation without their projections.

Q.   With respect to the first part of the question -- I'm not going to ask you anything about your TCEH feasibility analysis which is in the first part of your report.  However, there is a valuation there of TCEH, am I correct?

A.   Yes.

Q.   And am I correct that Evercore, in performing that valuation, had access to certain raw material that was necessary to perform that valuation?

Page 79

DAVID YING

A.   That's correct.

Q.   And that included projections from the company, correct?

A.   Projections of TCEH, yes, that's correct.

Q.   Anything else, any other raw material you were provided by the company to perform that valuation?

A.   Only access to management and significant due diligence around those numbers.

Q.   Did you have access to the same type of raw material in order to perform an evaluation of Oncor post-emergence?

A.   We have projections from Oncor.  We have had access to Oncor and EFH management regarding those projections, and we have even spent a great deal of time with Oncor management and, in particular, EFH management discussing how would you transform Oncor and EFH and EFIH into a REIT?

Q.   So you had the raw material to perform a valuation of Oncor, had you chosen to do so?

A.   But to finish my comments --

Q.   Oh, I'm sorry.

Page 80

DAVID YING

A.   That's all right.

Q.   I thought you had finished since you paused there.

A.   I was pausing.

Again, we have had extensive discussion and analysis of what it would take to convert EFH, EFIH and Oncor into a REIT.  There are many decisions that have to be made as to how that would actually look economically, and we have done some analysis around what that might look like, and we have done a fair amount of analysis and shared it with the company in terms of what a valuation might be, but we do not have the projections that the Hunts and the investor group are using.

They, in all likelihood, have made different assumptions from what we have made, so it's very difficult for us to value what they are thinking without being privy to their analysis of all of the myriad of decisions that have to be made in terms of what Oncor would look like as a REIT.

Q.   Just turning to what you have, at your previous deposition -- I'm happy to turn you to

Page 81

DAVID YING

the page if you want to, I think it's on page 87 -- you were asked whether or not you had been asked by the company as of the date of your deposition to do a valuation of Oncor at the time of emergence, and you answered no; do you recall that testimony?

A.   I do.

Q.   Subsequent to that deposition, which was --

A.   I believe it was September 23.

Q.   September 23.

Have you been asked by the company to do a valuation of Oncor at the time of emergence?

A.   No.

Q.   And therefore, I take it you have not done a valuation of Oncor at the time of emergence?

A.   We have not.

Q.   And you are not planning to offer an opinion at the hearing in this proceeding as to the value of Oncor at the time of emergence?

A.   We are not.

Q.   Do you not believe that that is

Page 82

DAVID YING

relevant to your conclusions regarding
feasibility of EFH?

MR. ROGERS: Objection to form.

A. I think the feasibility report that we
submitted at the very beginning of it says that
the feasibility report is designed to address a
very specific question, which is, as it states,
if all the alleged post-petition interest and
make-whole claims are finally determined to be
valid claims, would the post-reorganized EFH be
able to reasonably expect it to make all those
payments.

Q. And that's the only issue you are
addressing with respect to EFH feasibility in
your opinion?

A. That is correct.

Q. And just so the record is clear, you
are referring to, I believe, that
is in the highlighted box on page 33 of your
report, "your report" being Ying Confirmation
Exhibit 1?

A. That's correct.

Q. And for purposes of that opinion, you
have assumed that the funding will take place as

Page 83

DAVID YING

contemplated by the plan?

A. That is correct.

Q. Yet there are no assurances that that
will in fact happen, correct?

A. I'm certainly not making those
assurances, no.

Q. Well, in fact, in your report you
state specifically that there is no assurance
that that funding will occur or that the merger
transaction will be completed; isn't that
correct?

A. I don't recall that particular
reference, but I think that's a fair
representation.

Q. Okay. Just to make the record clear,
if you go to the beginning of your section in
your report, it's unnumbered but it comes after
the page that says C. EFH Feasibility Analysis.
There is then a page that says Disclaimer?

A. I see it.

Q. Okay. And if you go to the second
page of the Disclaimer, the very first
paragraph, and I'm looking now one, two,
three -- six lines down in that paragraph, am I

Page 84

DAVID YING

reading correctly there is a sentence that
reads, "No assurance is or can be provided that
any transaction can be successfully concluded or
successfully concluded at levels indicated
herein, that a market will develop for any
security or other asset discussed herein, or
that any such security or other asset will
perform in accordance with its terms."

Am I correct; that sentence says?

A. Yes.

Q. And you stand by that sentence?

A. Yes, I do.

Q. Stepping back for a second, Mr. Ying,
what did you do to prepare for today's
deposition?

A. I met with counsel at K&E. We
discussed the contents of my expert report. I
don't recall much else that was discussed.

Q. About how long did you meet?

A. Under two hours.

Q. Did you review any documents during
that meeting?

A. The only documents I recall reviewing
is the Rule Report.

Page 85

DAVID YING

Q. Did you review a report put in by
Michael Henkin from Guggenheim?

A. I recall reading Mr. Henkin's report
after the report was filed.

Q. But you did not review it in the
preparation session?

A. No. Not for this, no.

Q. Did you, when you did your review, did
you review it in preparation for today's
deposition?

A. No, I just read it because I thought I
should read it.

Q. Okay. Are you intending to offer in
this proceeding any opinions that are not
contained in Ying Confirmation Exhibit 1?

A. I'm certainly prepared to speak to
everything that I've prepared. If asked
opinions on other reports, I'm certainly
prepared to respond if I think I can be additive
or have a point of view.

Q. Okay. Have you been asked to prepare
a rebuttal report to any of the expert reports
submitted by any of the other parties in this
proceeding?

Page 86

DAVID YING

1
2    A.   No, I have not.
3    Q.   Is it possible that you will submit a
4  rebuttal report in response to any of the other
5  reports submitted by other experts in this
6  proceeding?
7         MR. ROGERS: Objection to form.
8    A.   That all depends on whether counsel
9  asks that I do so.
10    Q.   So it is possible that you may do so?
11         MR. ROGERS: Objection to form.
12    A.   At this point, I'm not planning to
13  make any rebuttal reports.
14    Q.   I'm asking something slightly
15  different.  Is it possible that you could put in
16  a rebuttal report with respect to any of the
17  other expert reports?
18         MR. ROGERS: Objection to form.
19    A.   I think almost anything is possible.
20    Q.   So you have not definitively ruled out
21  submitting a rebuttal report in response to any
22  of the other expert reports?
23    A.   That's true.
24    Q.   And do you intend to respond at the
25  hearing to any of the opinions contained in any

---

Page 87

DAVID YING

1
2  of the other expert reports?
3    A.   I don't know because counsel hasn't
4  asked me those questions and we haven't
5  discussed it.
6    Q.   So, again, it's possible that you
7  might at the hearing respond to the points made
8  in the other expert reports?
9         MR. ROGERS: Objection to form.
10    A.   It's possible.
11         MR. ROGERS: Objection to form.
12    Q.   Is there anything you would like to
13  change in your expert report that you have
14  submitted, Ying Confirmation Exhibit 1?
15    A.   No.
16    Q.   Something else you said in response to
17  Mr. Anker -- and I apologize if I got this
18  wrong.  I was scribbling it down as you were
19  talking.  He asked you a question about other
20  comparable companies to EFH, and I think you
21  said that there aren't a lot of comparables as
22  EFH is structured.
23         Do you recall that testimony?
24    A.   Yes.
25    Q.   Did I remember it correctly?

---

Page 88

DAVID YING

1
2    Are there any comparables as EFH is
3  structured?
4    A.   The only one actually that is close is
5  a company called InfraREIT, which is also
6  managed by the Hunts.
7    Q.   And that's much smaller than the
8  contemplated Oncor REIT after emergence; is that
9  correct?
10    A.   Yes.
11    Q.   So there really isn't any real
12  comparable in terms of -- in terms of what EFH
13  will look like after emergence?
14         MR. ROGERS: Objection to form.
15    A.   I'm struggling with the terms "real
16  comparable."
17    Q.   Well, if you were doing a valuation of
18  EFH, something that you would be comfortable
19  relying on in terms of, let's say, a comparable
20  company analysis or a comparable company trading
21  analysis?
22         MR. ROGERS: Objection to form.
23    A.   Well, we have thought about a
24  comparable company universe, and we have come up
25  with various formulations of what might serve as

---

Page 89

DAVID YING

1
2  one.
3    Q.   And what are those formulations?
4    A.   Well, we've looked at the world of
5  energy MLPs, which are primarily pipeline-driven
6  and, therefore, heavily regulated with long-term
7  contracts.  That's one possible universe one
8  might look to for valuation guidance.  It's
9  certainly something you see in the literature
10  that the sell-side analysts who work for the big
11  investment banks have used.
12         There's another universe of companies
13  one might look at which are the energy companies
14  or the power companies who formed what are
15  termed Yield Co's, and there are a number of
16  those.  I was referring to them in my prior
17  testimony today.  Some of them are C corps. with
18  lots of tax attributes.  They don't pay material
19  taxes.  Others are structured in other
20  tax-advantaged forms like an UPREIT, and that's
21  another universe of companies one could look to.
22  And obviously there is InfraREIT, which is
23  smaller, but it happens to be a T&D-regulated
24  utility in the State of Texas.
25    Q.   Have you actually done a valuation of

Page 90

DAVID YING

Oncor post-emergence based on the type of
comparables you just laid out -- or, I should
say has Evercore done that?

A.   We have done much of the elemental
work that goes into doing a valuation, but we
have not produced a valuation report.

Q.   Now, I asked you a question before as
to whether or not you believed doing a valuation
of Oncor post-emergence was relevant to
feasibility, and I think you answered that you
weren't asked to do that; you were asked to do a
specific question.

But getting away from what you were
asked to do, I'm just asking you now the general
question: Do you think an Oncor's
valuation at emergence is something relevant to
whether -- to a feasibility analysis of EFH?

A.   I'm having a problem responding --

Q.   Sure.

A.   -- and being helpful to you because
you need to be more specific as to some of the
definitions in your question.

So let's start with a feasibility
analysis.

Page 91

DAVID YING

Q.   Right.

A.   What exactly do you want to measure
with respect to feasibility?

Q.   In the sense that you used it with
respect to your report.

A.   Okay.  With respect to the specific
objectives of my report, the presumption is that
if the deal closes, sophisticated investors that
have invested upwards of $7 billion under the
belief that the asset is worth at least what
they paid for it, if not more, and that the
rates of return that they expect to earn, having
paid that valuation, will meet their respective
risk-adjusted rate of return criteria.

And based on that premise -- I think
it's a conservative premise, by the way -- the
company has a big equity market cap and then
we've gone through a quantitative analysis of
could the company raise incremental debt and
equity to meet the incremental obligations.

And so I'm trying to say that I think
that's a sufficient premise to present a
thorough and thoughtful feasibility analysis
given the question posed, and I don't think you

Page 92

DAVID YING

have to go into another very elaborate analysis
of what would be an investment banker's
valuation of Oncor as a REIT.

Q.   But your opinion is totally dependent
on that premise, correct?  You have prepared no
opinions regarding feasibility that are not
based on the premise that the transaction will
close?

A.   That's correct.

Q.   And you have done no analysis of the
likelihood that the transaction will close?

A.   I think that's a completely different
question than the one that we addressed in our
feasibility report.

Q.   Right.  And so you have not done that,
you have not done an analysis of the likelihood
that the transaction will close?

A.   That's correct.

Q.   And you are not offering an opinion as
to the likelihood that the transaction will
close?

A.   That is correct.

Q.   Let's talk a minute about the Henkin
report.  I think you said you've read it?

Page 93

DAVID YING

A.   I have.

Q.   Did you read the opinions that he lays
out in the report?

A.   I don't remember the report, but I do
remember reading it; so you'll have to refresh
my memory.

Q.   Do you recall if you disagreed with
any of his opinions?

A.   If you walk me through his opinions,
I'll attempt to recall if I did or did not
agree.

Q.   Will do.

A.   I just don't have a photographic
memory.

Q.   Yes.  Understood.

MR. HARDIMAN:  Let me mark as Ying
Confirmation Exhibit 6 the Expert Report of
Michael Henkin.

(Ying Confirmation Exhibit 6, Expert
Report of Michael Henkin, marked for
identification, as of this date.)

BY MR. HARDIMAN:

Q.   And feel free to look at any part of
it you want, but there is a summary of his

DAVID YING

1  opinions on pages 5 and 6 of the report.
2  (Document review.)
3  A.  I have read his Summary of Opinion
4  section, Roman numeral IV.
5  Q.  Right.  Okay.  Let me just ask one
6  preliminary question.  I asked you before
7  questions about what you intended to do at the
8  hearing and about rebuttals.
9  Have you asked anybody at Evercore to
10  do any work in terms of preparing a response to
11  any of Mr. Henkin's opinions?
12  A.  No.
13  Q.  All right.  The first opinion that Mr.
14  Henkin gives, Opinion 1, which is paragraph 11
15  on page 5, is "the lack of remedies in the
16  Merger and Purchase Agreement is inconsistent
17  with both large utility M&A transactions and
18  large bankruptcy sale transactions."
19  Do you agree with that?
20  MR. ROGERS:  Objection to form.
21  A.  Well, I agree with his summary of the
22  M&A deals that he identified, both public
23  utility -- the public utility mergers and the
24  select group of in-bankruptcy M&A transactions

DAVID YING

1  and his assessment of what sort of remedies
2  there were with respect to a situation where the
3  purchaser decided not to close.
4  I think the context in which he states
5  those is different from this one, but as a
6  factual matter, I think his survey of those
7  transactions was accurate.
8  Q.  So you don't agree with his underlying
9  research he did to support this opinion?
10  MR. ROGERS:  Objection to form.
11  A.  Again, I think the factual comparable
12  company sets that he looked at were -- are
13  appropriate.  I think the context of this
14  transaction is different from those.
15  Q.  Okay.  Could you explain what you mean
16  by that, that the context is different?
17  A.  Sure.  We obviously ran an M&A
18  process.  We canvassed a lot of big companies
19  and financial buyers, and your committee was
20  privy to I think every step of the way in terms
21  of how we conducted that process.
22  I think your committee is well aware
23  of the fact that we had one strategic buyer who
24  actually submitted a marked-up contract with all

DAVID YING

1  the appropriate customary breakup provisions
2  that the current merger agreement does not have.
3  The auction process that we ran
4  evolved towards the Hunt bid with the
5  T-unsecureds because the Hunts basically stopped
6  pursuing their second-round bid, which was tied
7  in with the PIKs, and they decided they would be
8  more advantaged in the auction process to align
9  themselves with the T-unsecureds.
10  And in fact, they came up with a far
11  superior offer from a price standpoint, and the
12  challenge for us was do we pick a deal that has
13  a billion dollars or more higher price without
14  the customary protections that you would like to
15  see associated with a failed -- or, the buyer
16  pulling out, or would we rather go with a buyer
17  who has at least a billion-dollar lower price,
18  but we could have a specific performance at a
19  low price or a breakup fee of a couple hundred
20  million dollars.
21  So we chose to go with the purchaser
22  who had a substantially higher price even though
23  they don't have the customary breakup fees that
24  one would also like to have, and obviously

DAVID YING

1  breakup fees are a function of a negotiation
2  with a buyer along with other dimensions, like
3  price and terms and conditions, and clearly the
4  T-unsecureds in the Hunt deal has lots of terms
5  and conditions associated with it, but given the
6  predilection of the creditors who are doing the
7  selling of their claims, we viewed the Hunt's
8  T-unsecured consortium deal met most of the
9  requisite criteria that we needed to actually
10  have a transaction that most people would
11  support.  And obviously, it has the fact that it
12  doesn't have the customary breakup provisions
13  one would ordinarily like to have.  And the
14  problem is the auction wasn't competitive.  They
15  were a billion dollars higher in price.  And
16  which would you rather have?
17  Q.  Are you asking me?
18  A.  That was a rhetorical question.
19  Q.  Okay.  Because, you know, I would
20  always like a billion dollars if you can get it
21  for me.
22  A.  And hopefully, we will.
23  Q.  But in addition to the contract not
24  having any of the customary remedies, there's

Page 98

DAVID YING

1  actually also a provision in the contract that
2  expressly says that the debtors cannot pursue
3  any remedies against the prospective purchasers,
4  am I correct?
5  A.   Yes.
6  Q.   In your career, do you recall being
7  involved in any other transaction that had that
8  kind of express term in the contract?
9  A.   There are lots of terms of this deal
10  that are unique to this deal that I don't recall
11  in other transactions.
12  Q.   But with respect to this particular
13  one, do you recall this particular type of term,
14  a term that says that the debtors cannot pursue
15  any remedies; do you recall that being in any
16  other transaction you've been involved in?
17  A.   I don't.
18  Q.   In fact, do you recall any other
19  transaction you have been involved in where
20  there was not some express remedy actually laid
21  out in the contract of some nature?
22  A.   Well, I have to admit, as a banker, I
23  don't tend to remember and focus on some of the
24  remedies that would go into a purchase contract.

Page 99

DAVID YING

1  All I can say is I think there are many
2  provisions of this agreement that are bespoke to
3  the situation.
4  Q.   If I can just ask you about the
5  preamble you just made to that question.
6  As a banker advising companies in
7  these circumstances, do you view your role
8  simply to come up with a transaction for the
9  company to consider, or do you also view as part
10  of your role to try to come up with a
11  transaction that will actually close?
12  MR. ROGERS:  Objection to the form.
13  A.   Oh, we certainly try to come up with
14  transactions that should be feasible.
15  Q.   And in considering whether a
16  transaction should be feasible, is it your
17  testimony that you as a banker do not consider
18  at all what sort of remedies may or may not
19  exist to cause that transaction to occur?
20  MR. ROGERS:  Objection to form.
21  A.   Well, we try to look at the pluses and
22  minuses of the transaction in their totality.
23  Q.   And in looking at those pluses and
24  minuses in their totality, one thing you would

Page 100

DAVID YING

1  try to be conscious of is what sort of
2  incentives and disincentives the purchaser had
3  to close the transaction, correct?
4  MR. ROGERS:  Objection to form.  And
5  let me just state for the record, counsel,
6  Mr. Ying has been deposed in his individual
7  capacity already on these issues.  He has
8  not been disclosed as an expert offering an
9  opinion on these issues, so I would ask that
10  you move the subject of the examination to
11  Mr. Ying's expert opinions in this
12  deposition.
13  Q.   Can you answer my question, Mr. Ying?
14  A.   Would you please restate it?  I was
15  distracted.
16  Q.   Sure.  Well, here, I can read it to
17  you again.
18  And in looking at those pluses and
19  minuses in their totality, one thing you would
20  try to be conscious of is what sort of
21  incentives and disincentives the purchaser had
22  to close the transaction, correct?
23  MR. ROGERS:  Same objections.
24  A.   Certainly we looked at the incentives

Page 101

DAVID YING

1  for the purchasers to close a transaction.
2  Q.   And that's something you would
3  generally do when you were advising a company in
4  connection with a transaction, correct?
5  A.   Yes.
6  Q.   And I take it this is not the first
7  time that you've been involved in an auction
8  process for a company where one party's bid was
9  much better than anybody else's bid?
10  MR. ROGERS:  Objection to form.
11  And can you explain what this has to
12  do with his expert opinions?
13  MR. HARDIMAN:  I'm following up on the
14  statement he made when I asked him questions
15  about the Henkin opinion.
16  MR. ROGERS:  Which is not something
17  that he's been disclosed as offering an
18  expert opinion on.  So I ask the question
19  again:  What does this have to do with his
20  expert opinions?
21  MR. HARDIMAN:  Well, I have asked the
22  witness a question about this opinion, he
23  answered, and I followed up.
24  Now, if you are going to instruct him

Page 102

DAVID YING

1  not to answer, instruct him not to answer,
2  but if not, I would like to get an answer to
3  the question.
4      MR. ROGERS: I think during the
5  limited time we have today, we should talk
6  about his expert opinions.
7  BY MR. HARDIMAN:
8      Q.  Can you answer my question?
9      MR. ROGERS: You can answer.
10     A.  I'm sorry, I have lost track of your
11 question.
12     Q.  Sure. I know.
13     A.  I apologize.
14     Q.  And I take it this is not the first
15 time that you've been involved in an auction
16 process for a company where one party's bid was
17 much better than every other party's bid?
18     MR. ROGERS: Objection to form.
19 Beyond the scope.
20     A.  Actually, I don't recall a situation
21 where there's been this big a discrepancy in one
22 party's offer price.
23     Q.  Do you recall other situations where
24 there was a clear winner in the auction?

Page 103

DAVID YING

1      MR. ROGERS: Objection to form.
2  Beyond the scope.
3      A.  I'm trying to think hard about the
4  definition of what a clear winner is given my
5  history in auction processes. They tend to be
6  pretty competitive.
7      Q.  Let's go to Opinion Number 2 from Mr.
8  Henkin, which is that, "The agreement by the
9  Purchasers to buy Oncor as a REIT is akin to an
10 option."
11         Do you disagree with that opinion?
12     MR. ROGERS: Objection to form.
13 Beyond the scope. This has been covered in
14 his individual deposition.
15         You can answer the question.
16     A.  Well, it's a complicated contract. I
17 think you can use the term "option," but you
18 have to qualify it by all the provisions of the
19 contract involved.
20     Q.  Well, my question here is simply do
21 you disagree with this conclusion, this opinion
22 by Mr. Henkin that the agreement by the
23 purchasers to buy Oncor as a REIT is akin to an
24 option?

Page 104

DAVID YING

1      MR. ROGERS: Objection to the form.
2  Beyond the scope. This was covered in his
3  individual deposition.
4      A.  Again, I actually take issue to his
5  definition of American versus European option
6  and some of the language that I recall that he
7  uses in his report. I think you could vary at
8  50,000 feet describe it as an option, but I
9  think it's a very complicated option with many
10 terms and conditions not typically associated
11 with the terminology of an option in the world
12 of securities.
13     Q.  With respect to the decision at the
14 end of the day of the purchaser group to fund
15 this transaction, what are the complications
16 that affect whether that decision will be an
17 option or not?
18     MR. ROGERS: Objection to the form.
19 It's beyond the scope. This was covered in
20 detail in his individual capacity
21 deposition.
22         You can answer the question.
23     A.  I recall in my last deposition I said
24 that, although people have said, gosh, if the

Page 105

DAVID YING

1  trading price of the stock the day after we
2  closed is not higher than the purchase price,
3  that no one's going to fund, I actually wonder
4  if that's really the correct assertion.
5         We're talking about a massive
6  investment that's been diligenced and researched
7  and considered very carefully by the investor
8  group. Like all good investors, they're not
9  looking at the price tomorrow and it's going to
10 be up by a dollar-57 as to why they should write
11 a check at $20.
12         This is a much longer
13 time-horizon-type investment, and I think that,
14 assuming that I can project my brain into those
15 of the people who are making the investment
16 decision, I think they should be making a
17 decision of this nature based on, you know,
18 long-term fundamentals and long-term
19 appreciation and not just the trading price of
20 securities on the day of close.
21     Q.  But if they don't think those
22 long-term fundamentals or long-term appreciation
23 favor them, they won't make the funding
24 decision, will they?

Page 106

DAVID YING

MR. ROGERS: Objection to form.

A. I think the observation that if -- I think the observation that the investors have the ability to decide whether they wish to fund or not at the closing date is correct.

Q. Well, that brings us right to Opinion 3 of Mr. Henkin, which is that, "The Purchasers and Plan Sponsors can be expected to make their decision to close the Merger based on whether the perceived value of the common stock of New EFH exceeds the sum of the purchase price plus additional payments to be received by certain Plan Sponsors in the event the Merger does not close."

Do you agree with that opinion of Mr. Henkin?

MR. ROGERS: Objection to form.

A. I think, in general, that's the right observation.

Q. Let's go to Opinion 4, which is, "There are no reasonable assurances that the Merger will close."

Do you agree with that opinion of Mr. Henkin?

Page 107

DAVID YING

MR. ROGERS: Objection to form.

A. I would have to read again exactly what he wrote. On the face of it, it sounds reasonable, but I don't remember exactly what he said.

Q. If you want to take a minute to look at that section of his report --

A. Sure.

Q. -- feel free.

A. Where would I find it?

Q. I'm going tell that you in a minute. Opinion 4 begins on page 27, paragraph 62.

MR. ROGERS: And I'll again state an objection to this entire line of questioning, which is beyond the scope of his expert report and was covered in his individual capacity deposition.

I'll also object to the extent you're asking him to opine on four or five pages worth of text in Mr. Henkin's report on the spot at this deposition.

A. I perused it. I haven't read every word. Obviously, I participate in the board

Page 108

DAVID YING

meetings that the company holds where they inform the directors of how we're progressing and the terms of the transaction. I think we were being fully disclosive to the directors that, quote, there is no assurance that the merger will close, just like there's no assurance that you will wake up in the morning. Something may happen to you at night. Sorry for the analogy, but I'm just saying generally.

I think the only issue I have with this statement is that you have to evaluate it in the context of the bankruptcy and how do we resolve the bankruptcy. There was no other alternative to resolving the bankruptcy in the foreseeable future other than this transaction, and as your committee knows, we implored your committee and the other E-side creditors to give us a viable alternative, and your committee, despite its best efforts of its professionals and the actual principals involved who own the securities, I think I used the word "failed" in a very visible fashion to come up with an alternative.

Q. So is it fair to say that your

Page 109

DAVID YING

testimony is that you agree there are no reasonable assurances the merger will close, but it's the best you believe that the company could do under the circumstances?

MR. ROGERS: Objection to form.

A. And to elaborate on that response, I believe there are very meritorious and good reasons to pursue the closing of this transaction.

Q. But if you could answer my question, which is, is it fair to say that your testimony is that you agree there are no reasonable assurances the merger will close, but it's the best you believe the company could do under the circumstances?

MR. ROGERS: Objection to form and asked and answered.

Q. Is that fair to say?

A. Yes, it is.

Q. Going to Opinion 5, and that has --

A. I'm sorry, I lost the page.

Q. I'm sorry, it's page 6, paragraph 15.

A. Thank you.

Q. And that has to do with the interest

1        DAVID YING
2    rate paid by EFH to TCEH in connection with the
3    intercompany promissory notes.
4        Do you agree with that opinion by Mr.
5    Henkin?
6        MR. ROGERS: Objection to the form.
7    Beyond the scope.
8        A.    Actually, I don't recall reading that
9    section at all carefully.
10       Q.    And is this an issue that you have
11   analyzed at all, whether or not the interest
12   rate paid by EFH to TCEH in connection with the
13   intercompany notes was reasonable or not?
14       A.    I'm well-aware of the question. I'm
15   well-aware that the company thinks the rates
16   were appropriate. I'm well-aware that others
17   have asserted over the past several years that
18   it's not. I don't have an opinion.
19       Q.    And finally, the last opinion, which
20   is, "Based on the implied market value of TCEH
21   today" -- and this is Opinion 6, paragraph 16 --
22   "there will be no tax liability EFH upon a
23   disposition of TCEH in a transaction utilizing
24   EFH's NOLs."
25       Do you agree with that opinion --

1        DAVID YING
2        MR. ROGERS: Objection to form.
3    Beyond the scope.
4        Q.    -- of Mr. Henkin?
5        A.    Well, I think if the question is
6    narrowly defined as if TCEH were to separate
7    from EFH in a taxable fashion, would EFH have
8    sufficient tax attributes to shelter the taxable
9    gain that would occur, based on our current
10   valuation of TCEH and its tax basis, I believe
11   the answer to that question is yes.
12       I would, however, wish to point out
13   and qualify the conclusions that one might draw
14   from that statement, and the qualification is
15   that if TCEH were to taxably deconsolidate from
16   EFH, there would not be a tax due upon that
17   taxable de-consolidation.
18       However, EFH would no longer have the
19   ability to, in a tax-efficient fashion, convert
20   to a REIT, and I think that's an important
21   consideration that the EFH UCC and all of the
22   creditors in the company should understand.
23   With the presumption that conversion to a REIT
24   is an attractive alternative, a taxable
25   de-consolidation eliminates any possibility of

1        DAVID YING
2    doing that.
3        Q.    And why does it eliminate any
4    possibility of doing that?
5        A.    Well, this is based on conversations
6    with the company, who obviously has the benefit
7    of tax advice. The problem of -- or, one of the
8    things that a company has to do when it converts
9    from a C Corp. to a REIT is that they have to
10   declare a purging dividend equal to all excess
11   of earnings and profits sitting inside the
12   company, and since this company has been around
13   a long time, it has a very substantial amount of
14   earnings and profits.
15       Again, I don't know the exact figure,
16   but I've heard from the company that their rough
17   calculation is that E&P could be as much as $20
18   billion. Part of the private letter ruling and
19   the discussion with the IRS has been that, as
20   part of the tax-free spin of TCEH, the IRS will
21   allow the allocation of EFH's earnings and
22   profits to be largely allocated to TCEH prior to
23   the spin, and therefore, when EFH elects to
24   convert to a REIT post the TCEH spin, they will
25   have very modest earnings and profits, and

1        DAVID YING
2    therefore, that enables EFH to convert from a C
3    Corp. to a REIT without incurring a large tax
4    obligation on the part of its shareholders.
5        Q.    Okay. And just so I'm clear -- and I
6    appreciate that -- will you be offering an
7    opinion on this topic?
8        A.    Well, I'm not --
9        MR. ROGERS: Objection to form.
10       A.    -- a tax expert, but that is what I
11   understand the situation to be, and I know that
12   when we have thought about what are the values
13   of EFH as a REIT, we have worked closely with
14   the company and their tax counsel as to ways to
15   minimize a large taxable event to the EFH
16   shareholders that, if we are not able to
17   eliminate it, would make the conversion of EFH
18   to a REIT not feasible.
19       Q.    And again, just so I can understand,
20   is what you're saying is you may offer testimony
21   regarding this topic as a fact witness, but it's
22   not part of your expert opinion?
23       MR. ROGERS: Objection to form.
24       A.    We have not at all discussed
25   internally what role I might play in describing

Page 114

DAVID YING

1
2  this aspect of the considerations going into the
3  plan that's been proposed.
4      Q.  But you may have a role?
5          MR. ROGERS:  Objection to form.
6      A.  I just don't know.  It's possible.
7  Like in many other things, it is possible.
8      Q.  It is possible.
9          And just to make clear, do you
10  anticipate offering an expert opinion on this
11  topic?
12          MR. ROGERS:  Objection.
13      Q.  As opposed to factual testimony?
14          MR. ROGERS:  Objection to form.
15      A.  Well, I couldn't present myself as a
16  tax expert.
17      Q.  So the answer is no?
18          MR. ROGERS:  Objection to form.
19      A.  If the question is if the company
20  needs an expert witness with respect to tax
21  issues, I'm not the person.
22      Q.  Well, the question is whether or not
23  you would be providing an expert opinion with
24  respect to -- excuse me, in response to Opinion
25  6 of Mr. Henkin?

Page 115

DAVID YING

1
2          MR. ROGERS:  Objection to form.  I
3  think I have answered that question for you.
4      A.  I don't know the answer to the
5  question.  You'll have to -- we'll have to talk
6  it out with K&E and the company as to what we
7  do.
8          MR. HARDIMAN:  I have nothing else at
9  this time, subject to the reservation I made
10  at the beginning of the deposition that we
11  reserve the right to call you back on the
12  reinstatement issues, which we don't think
13  are ripe for discovery yet.
14          Number two, were you to put in a
15  rebuttal report, we would certainly reserve
16  the right to call you back to discuss the
17  rebuttal report; and, third, I reserve the
18  right, to the extent we receive any
19  information that you're providing any
20  additional expert testimony at the hearing,
21  to depose you with respect to that.
22          Other than that, I'm finished for the
23  day.
24      Thank you.
25          MR. ROGERS:  And just to follow up on

Page 116

DAVID YING

1
2  your last reservation of rights, Mr. Ying
3  has been disclosed as providing expert
4  opinions in response to Mr. Rule's report.
5  I note that you have not asked him any
6  questions about that.
7          MR. HARDIMAN:  That's because the next
8  questioner is going to cover that.
9          MR. ROGERS:  Fair enough.  Okay.
10          MR. PEDONE:  Let's take a two or
11  three-minute break, and then I'll have a few
12  questions, which won't be very long.
13          (Recess; Time Noted: 10:28 a.m.)
14          (Time Noted: 10:36 a.m.)
15  EXAMINATION BY
16  MR. NELSON:
17      Q.  Mr. Ying, my name is Lathrop Nelson.
18  I am conflicts counsel for the Official E-Side
19  Committee, and I have a couple of followup
20  questions for you.
21      A.  What firm are you with?
22      Q.  Montgomery McCracken.
23      A.  Okay.
24          MR. NELSON:  First, before we start, I
25  just want to put on the record that to the

Page 117

DAVID YING

1
2  extent that the debtors intend to call Mr.
3  Ying to testify in rebuttal to the expert
4  report of Mark Rule, we object.  Mr. Ying
5  has not provided an expert report that's
6  required by the rules.  We have made a
7  request for an expert report, which debtors
8  have denied.  We'll go forward today but
9  reserve all of our rights.
10          MR. ROGERS:  I don't believe there's
11  been a request for an expert report, but the
12  point that we have not provided one is
13  correct; and as we said, you are free to ask
14  him any questions you like today about his
15  opinions on Rule.
16          MR. NELSON:  We have in fact provided
17  and requested an expert report, if it
18  intends -- if debtors intend to call him to
19  testify.  Given the lack --
20          MR. ROGERS:  Sure.  You will have to
21  point me to that, but...
22          MR. NELSON:  Given the lack of an
23  expert report, we'll treat this deposition
24  as a discovery deposition, taken without the
25  discovery which we're entitled under Rule

Page 118

1              DAVID YING
2      26, and object to the debtors' designating
3      any portion of this testimony at the
4      November 3 hearing.
5   BY MR. NELSON:
6      Q.   Mr. Ying, you have testified that you
7   reviewed the expert report of Mark Rule; is that
8   correct?
9      A.   Yes.
10     Q.   And you, as you sit here today, you
11  are prepared to answer questions about it?
12     A.   Yes.
13     Q.   But counsel has not asked you to
14  testify at the upcoming hearing regarding this
15  report; is that correct?
16     A.   No, they have not.
17     Q.   Do you understand that you have been
18  noticed as providing review and commentary on
19  any analysis of EFH's solvency conducted by Mark
20  F. Rule as an expert witness for the EFH
21  committee?
22     A.   Yes.
23     Q.   And have you been given any assignment
24  in connection with the Rule report?
25     A.   I have spoken to counsel at K&E about

Page 119

1              DAVID YING
2   my reactions to the contents of Mr. Rule's
3   report.
4      Q.   And have you formed any opinions
5   regarding the Rule report?
6      A.   Well, I'm still reviewing it because
7   parts of it I can't figure out, but I do have
8   some reactions and thoughts after having read
9   it.
10     Q.   And we'll get to that.
11          Your current report that you have
12  provided and is an exhibit today has nothing to
13  do with pre-petition solvency of EFH or the
14  E-side; is that correct?
15     A.   That's correct.
16     Q.   And in fact, in your expert report you
17  disclaim any analysis, solvency analysis; is
18  that correct?
19     A.   That is correct.
20     Q.   You have said that you have reviewed
21  the report and have developed opinions, is that
22  correct, regarding Mr. Rule's report?
23     A.   That is what I said.
24     Q.   What opinions have you developed in
25  connection with this report?

Page 120

1              DAVID YING
2      A.   Well, it's a long report, but let me
3   see if I can remember a couple of reactions that
4   I had.
5          I think at the beginning of his
6   report, he critiques one of the Duff & Phelps'
7   valuation methodologies, and I think it
8   specifically relates to Oncor, where he says
9   that a control premium, which is shorthand for
10  saying, you know, what would Oncor trade for as
11  a -- in a sale process, should not be taken into
12  account because Oncor has a ringfence, and I
13  don't think that is correct.
14          We obviously have been running an
15  extensive M&A process.  We approached many large
16  corporate strategic acquirers in those
17  discussions.  Not a single one of them raised
18  the ringfence as an obstacle to their interest
19  in acquiring Oncor, and in the one corporate bid
20  that we did get -- and the, again, the EFH UCC
21  was privy to all of the documentation and
22  process around that bid -- there was no
23  reservation or discount that they applied
24  because of the ringfence that exists at Oncor.
25     Q.   Let's do this.  Why don't I provide to

Page 121

1              DAVID YING
2   you -- I'm going to hand it to the court
3   reporter, and this is Ying Confirmation Exhibit
4   No. 7.
5          (Ying Confirmation Exhibit 7, Expert
6      Report of Mark F. Rule, CFA, October 12,
7      2015, marked for identification, as of this
8      date.)
9   BY MR. NELSON:
10     Q.   The expert report of Mark F. Rule.
11          Do you recognize this document?
12     A.   Yes.
13     Q.   And this is the expert report which
14  you have reviewed in advance of today's
15  deposition?
16     A.   Yes.
17     Q.   And if I can take you to page 11 --
18          MR. ROGERS:  Before you ask any
19     questions, counsel, can you wait until I
20     have a copy?
21          MR. NELSON:  Sure.
22          (Document handed.)
23  BY MR. NELSON:
24     Q.   So direct you to page 11.
25     A.   I have it.

Page 122

DAVID YING

1  Q.   And halfway down the page, there is a
2  reference to "Duff & Phelps' analyses
3  incorporating at least one significant
4  assumption which, in my opinion, is
5  unwarranted -- namely, the application of a
6  control premium in valuing Oncor."
7       Is that the issue you just testified?
8  A.   Yes.
9  Q.   And you do not agree with the opinion
10 as it's stated here; is that correct?
11 A.   Yes.
12 Q.   And are you aware of the SEC's -- EFH
13 Corporation's SEC filing that discusses the
14 control of the Oncor Holdings board of directors
15 regarding the management of day-to-day
16 operations of Oncor?
17 A.   Yes.
18 Q.   And have you taken that into
19 consideration in connection with your opinion?
20 A.   Yes.
21 Q.   And what -- have you taken an opinion
22 of what is the effect of the disclosures
23 regarding Oncor Holdings' ultimate
24 responsibility in connection with your opinion?

Page 123

DAVID YING

1  A.   I'm sorry.  Please ask the question
2  again.
3  Q.   You have stated that you have taken
4  the SEC -- EFH Corporation's SEC filing in
5  connection with your opinion regarding the use
6  of a control premium, correct?
7  A.   Yes.
8  Q.   Okay.  And how have you taken that
9  into consideration?
10 A.   Well, I'm fully aware of the corporate
11 governance implications of the ringfence and I'm
12 aware of the company's disclosure in its filings
13 with the Securities and Exchange Commission
14 describing that corporate governance
15 arrangement, but I know that, in practice and
16 speaking to strategic acquirers, none of them
17 saw that as a major impediment in making or
18 considering an offer to acquire Oncor.
19      And to repeat what I said a minute or
20 two ago, we have evidence from a strategic
21 acquirer that the EFH UCC is fully aware of
22 where they made an offer that had a control
23 premium in it and didn't raise the ringfence
24 arrangement as an impediment to them making

Page 124

DAVID YING

1  their bid.
2  Q.   But that was not done in connection
3  with a solvency analysis, was it?
4       MR. ROGERS:  Objection to form.
5  A.   Was what?  I'm sorry.  Please ask the
6  question again.
7  Q.   Was the bid that was offered and the
8  use of a control premium in connection with
9  that, that was not in connection with providing
10 a solvency analysis of EFH; is that correct?
11 A.   I'm talking about a completely
12 different process at a completely different
13 point in time, but I'm just saying, in the real
14 world, control premiums would exist for Oncor,
15 and the assertion that there shouldn't be a
16 control premium I think is incorrect.
17 Q.   But what we're talking about what --
18 excuse me.  What the Rule report discusses is a
19 solvency analysis of EFH Corp.; is that correct?
20 A.   I think, in this context, he's
21 referring to the analysis that Duff & Phelps
22 did.
23 Q.   And whether or not Duff & Phelps
24 appropriately included a control premium in

Page 125

DAVID YING

1  connection with that solvency analysis?
2  A.   Well, actually, I think Duff & Phelps'
3  report is a valuation analysis for GAAP purposes
4  for determining impairment of goodwill.  I don't
5  recall that report addressing the issue of
6  solvency.
7  Q.   Do you understand in connection with
8  the report how Mr. Rule uses the Duff & Phelps
9  solvency opinion?
10      MR. ROGERS:  Objection to form.  He
11 just said it wasn't a solvency opinion.
12 Q.   Do you understand how -- well, answer
13 the question.
14      MR. ROGERS:  No.  Objection to form.
15 A.   Would you please ask the question
16 again?
17 Q.   You understand how Mr. Rule uses the
18 Duff & Phelps report in connection with his
19 solvency opinion?
20 A.   I do understand how Mr. Rule tries to
21 use the Duff & Phelps report to write his
22 report, yes.
23 Q.   And how do you understand that?
24 A.   Well, he says that the valuation that

Page 126

DAVID YING

Duff & Phelps uses for Oncor includes a control premium, and Mr. Rule asserts that that should not be used; and I don't think that that is a correct assertion.

Q.    If you take a step back to page 5 of the report, there is listed a Summary of Opinions.  Do you see that?

A.    Yes.

Q.    And in connection with that Summary of Opinions, have you formed -- the first one is, "Consolidated EFH Corp. was insolvent between December 31, 2008 and December 31, 2012." Do you see that?

A.    Yes.

Q.    Have you formed an opinion in connection with that opinion?

A.    Well, I did look at -- I believe it's page 14, which I think is the chart at the top of the page where he's, under Roman numeral VI, Analysis of Consolidated EFH Corp. Solvency from 2008 to 2012.

Q.    Yes.

A.    I did look at that chart, and I was perplexed by the financial picture of Oncor that I saw;

Page 127

DAVID YING

and the reason I was perplexed is that I think everybody in this room understands the corporate structure of EFH, so I won't belabor the -- a recitation of the corporate structure, but clearly when you have a holding company parent that owns the stock of two sister subsidiaries, I think the right way to look at the solvency of the parent is to look at whether its equity ownership of each of the sister subsidiaries standing separately has equity value or not.

And clearly the chart on the top of page 14 takes a consolidated view, and as a result of that, I don't think that that's an appropriate analysis to make in this context. So I was very confused by his analytical approach.

Q.    And can you explain what you mean by "his analytical approach"?

A.    I would not take a consolidated view. I don't think it's an appropriate way to analyze the solvency of EFH.

Q.    But do you have any opinions regarding how he calculates the consolidated EFH solvency?

A.    Well, do I have a dispute with his

Page 128

DAVID YING

ability to add and subtract numbers?  No, but I don't think he's doing the analysis correctly.

To be more explicit, I think he has to look at the assets and liabilities of TCEH to calculate whether his equity value in EFH's ownership of TCEH, and then I think he needs to look at the assets and liabilities of EFIH to determine whether there is equity value in EFH's ownership of the equity of EFIH, and looking at a consolidated view I think is inappropriate, if not misleading.

Q.    You understand that this opinion is being conducted using a balance sheet test, correct?

A.    I understand that.

Q.    And you are familiar with what the balance sheet test is?

A.    I believe I am.

Q.    And if you were to conduct an analysis of a consolidated EFH Corporation, how would you conduct that under the balance sheet test?

A.    I just described it.

Q.    You would --

A.    Would you like me to repeat it?

Page 129

DAVID YING

Q.    No.  You would take the -- isn't it correct you would take the enterprise value of the consolidated entity?

A.    That's incorrect.

Q.    How is that incorrect?

A.    I just described it.  Would you like me to repeat it?

Q.    You can answer my question.  How is it incorrect?

A.    You have to look at the two subsidiaries separately and look at the equity value that EFH has in each of its primary subsidiaries.

Q.    And so you take issue with the Rule report because it does not do that and, instead, deducts the liabilities from the enterprise value?

MR. ROGERS:  Objection to form.

A.    To help you along, again, I don't think you can look at EFH as a consolidated entity.  You must look at the structural differences between where the assets and the liabilities sit in its two primary subsidiaries.

Now, to Mr. Rule's credit, he attempts

DAVID YING

1    to do the correct analysis on a subsequent page
2    where he tries to look at just what is the
3    assets minus liabilities at EFIH and how they
4    flow up to EFH.
5        Q.    Have you conducted a solvency analysis
6    of EFH Corp. on a consolidated basis?
7        A.    No.
8        Q.    Have you asked any of your staff to
9    conduct that analysis?
10       A.    No.
11       Q.    Sitting here today, do you have an
12   opinion regarding the solvency of EFH on an
13   consolidated basis?
14          MR. ROGERS:  Objection to form.
15          MR. PEDONE:  Objection.
16       A.    You would have to be more specific.
17   And I haven't formed any opinions, but it's a
18   very vague question.
19       Q.    Sitting here today, have you conducted
20   a solvency analysis of consolidated EFH
21   Corporation from 2008 to 2012?
22          MR. ROGERS:  Objection to form.
23       A.    No.
24       Q.    If you take a look at that Section VI,

DAVID YING

1    which we have just been talking about, Analysis
2    of Consolidated EFH Corporation Solvency from
3    2008 to 2012, you have reviewed this section,
4    correct?
5        A.    Yes.
6        Q.    And have you developed any other
7    opinions beyond those that you have just
8    testified to in connection with this section?
9        A.    No.
10       Q.    Are you prepared to offer any opinions
11   at the hearing starting November 3 in connection
12   with this section other than what you have just
13   testified to?
14       A.    I have no idea because I have not
15   discussed with counsel whether I will be asked
16   or whether I need to be an expert witness or
17   rebuttal to Mr. Rule's report.
18       Q.    If you take a look at Section VII,
19   Other Indicia of Consolidated EFH Corp.
20   Insolvency from 2008 to 2012, have you reviewed
21   that section?
22       A.    I have.  I have to refresh my memory
23   as to what it says.
24       Q.    Please do.

DAVID YING

1        (Document review.)
2        A.    I have.
3        Q.    Have you formed any opinions in
4    connection with this section of the Rule report?
5        A.    I have one reaction.
6        Q.    What is that reaction?
7        A.    Well, if I looked at every company in
8    the high yield universe at these dates, I would
9    have said that 80 percent of the high yield
10   market would have gone bankrupt.
11       Q.    And why do you say that?
12       A.    Because 80 percent of the market was
13   trading at a discount.  Obviously that never
14   happened, much to the disappointment of most of
15   the people in this room.
16          I don't think you can use market value
17   of debt as a definitive indicator of solvency or
18   insolvency.  It's a time-proven test, and market
19   value of debt is not an indicator.
20       Q.    Earlier in response to some questions
21   from Mr. Anker, you testified that investment
22   bankers will look to the market to determine an
23   indicia of value; is that correct?
24       A.    That is correct.

DAVID YING

1        Q.    And that what an investor might pay
2    for a particular asset may be relevant to value;
3    is that correct?
4        A.    That is correct.
5        Q.    And does not what's depicted in Figure
6    4 in the analysis of EFH Corp.'s debt in 2008 to
7    2012 reflect what the market is valuing the
8    asset?
9           MR. ROGERS:  Objection to form.
10          Which asset?
11       Q.    Does that not reflect -- I'll repeat
12   that so the record is clear.
13          Does not Figure 4 depict the -- excuse
14   me.  Does not the debt that's reflected in
15   Figure 4 regarding EFH Corporation's debt
16   between 2008 and 2012 reflect what the market is
17   valuing EFH Corp.?
18       A.    I don't think the chart at the top of
19   page 17 is useful or relevant or helpful, and I
20   think your reference to an earlier statement is
21   being taken out of context.
22          Investment bankers obviously look to
23   comparable companies and look at their valuation
24   multiples as an indicator of valuation.  It's,

Page 134

DAVID YING

again, a time-proven methodology looking at comparable company analysis.

Obviously one has to be careful as to what comparables you look at. Obviously there's been lots of dispute over whether you can look at a company whose debt trades at big discounts to par as a valuation comparable, and so that when I said that you do look at comparable companies for their trading values, we generally only look at companies where their debt is trading at a -- not at a distressed level, as a measure of valuation.

So I just want to make that reference very clear. Again, I don't think you can really look at how EFH or EFIH or TCEH's debt was trading in the marketplace in this time period. Obviously, that time period was marked by what we now refer to as the Great Recession. A substantial portion of the high yield bond market was trading at significant discounts, in fact, at distressed trading levels.

Most of the companies' debt came back to trade close to par. Most of those companies accessed the capital markets and refinanced

Page 135

DAVID YING

their indebtedness, and I think picking a point in time like that and saying debt trades at discounts is a measure of insolvency is an interesting observation, but I don't think there is a substantive, educated, well-founded body of literature, let alone in practice, methodology that says that, therefore, these companies were all insolvent.

Q.  I'll dissect that in a second, but first, you mentioned distressed level. How would you define debt trading at a distressed level?

A.  Again, I think that you often see reference in the literature to debt trading at distressed levels when it trades at a yield to maturity that is a thousand basis points higher than the relevant maturity of United States Treasury notes.

Q.  And you testified regarding most of the companies' debt came back to trade close to par.

Did EFH debt ever come back to trade close to par?

A.  Some of it had. Some of it has. Some

Page 136

DAVID YING

of it is now.

Q.  For instance, the Q Series senior notes, the 6.5 percent fixed Series Q senior notes due November 15, 2024, have those ever returned to par?

A.  I believe the last I saw, they were trading at around 98, and I think a couple months ago they were trading above par.

Q.  Do you have any other opinions in connection with this section of Mr. Rule's report?

A.  No.

Q.  The next section of Mr. Rule's report, Analysis of EFH Corp. and the E-Side Solvency from December 2008 to 2012.  See that?

A.  This is starting on page 19?

Q.  That's correct.

A.  I'm looking at it, yes.

Q.  Have you formed an opinion in connection with this section of the report?

A.  Well, I've spent some time looking at, in particular, at the chart on page 21.

Q.  Right.

A.  A couple minutes ago, I actually said

Page 137

DAVID YING

to you that, in lieu of looking at EFH's solvency on a consolidated basis, it's probably more appropriate to look at whether EFH has equity value in its primary two subsidiaries, TCEH and EFIH.

I think on page 21 he's attempting to do that by looking at whether there is -- whether EFH has equity value in EFIH.  So I think he's tried to disaggregate from the consolidated results TCEH, which again I think is the right way to look at it.

I must say I am completely befuddled by some of the numbers that he's producing. For example, if you look at the far right-hand columns on page 21, he looks at, at the end of the year 2012, the value of Oncor per the Duff & Phelps report, and then he attempts to add and subtract assets and liabilities in addition to the economic ownership in Oncor, the assets and liabilities at EFIH, and then he does the same thing at EFH.

And the thing that I just can't understand is exactly where he came up with these numbers.  They don't resemble any numbers

Page 138

DAVID YING

that I have seen. Again, I had a lot of problem
and I've asked my colleagues to try to figure
out what his adjustments were.

I do recall back then that, at the end
of 2012, I thought there was approximately $6
billion of third-party debt at EFIH and
approximately a billion-8 of third-party debt at
EFH, and that you could calculate the solvency
of EFH based on those third-party debt amounts
and an imputed value for the 80 percent interest
that EFIH owns in Oncor, but obviously those
numbers are radically different than the net
debt numbers included in his report, and I just
can't figure out where he came up with them.

Q.    You see that on the far right it has a
citation, the very last column has a series of
citations incorporated into the chart; do you
see that?

A.    Yes, I do.

Q.    And have you analyzed the citations
and the documents referenced therein?

A.    I have asked my colleagues, who work
for me, to look at those, and they have, but
they can't explain to me what he did.

Page 139

DAVID YING

Q.    Have you looked at them?

A.    I have not read the citations and the
specific schedules, but the people who work for
me are very good at this and they can't figure
out what he did.

Q.    And you said you had questions of --
there were other calculations you had questions
about?

A.    I was just laying -- excuse me.
Pardon me.  What I said was that I was talking
specifically about the year 2012.  I believe --
I haven't carefully examined the other preceding
years, but I suspect we have a similar problem
in terms of understanding exactly what
adjustments he made to come up with these
numbers.

They are not readily apparent from the
public disclosures of the company and what we
know about the capital structure.

Q.    Do you have any other opinions in
connection with Figure 5 on E-side solvency?

A.    I have no other observations to make
with regard to the chart on page 21 other than
those that I just gave you.

Page 140

DAVID YING

Q.    Have you conducted any analysis
regarding E-side solvency from 2008 to 2012?

A.    No, I have not.

Q.    Have you asked anyone under your
direction to do so?

A.    No, I have not.

Q.    Do you have an opinion regarding
E-side solvency from 2008 to 2012?

A.    I do not.

Q.    Do you intend to provide an opinion at
the hearing on November -- starting commencing
November 3 in connection with E-side solvency
between 2008 and 2012?

A.    I don't know.  Again, you have asked
me that question in prior forms, and I just
don't know the answer to that.

Q.    No one's asked you to do so?

A.    No.

Q.    If you turn to Section X, Analysis of
E-Side Solvency Indicia after December 2012,
have you reviewed this section of the report?

A.    No, I think my prior comments cover
this section as well.

Q.    Have you developed an opinion

Page 141

DAVID YING

regarding E-side solvency after December 2012 to
the petition date?

A.    Didn't you just ask me that question?
I'm happy to answer it.

Q.    I asked you between 2008 and 2012.  My
question to you now is have you developed an
opinion regarding solvency of E-side solvency
between December 2012 and the petition date?

A.    Oh, I'm sorry.  I wasn't listening
carefully enough.

No, I have not.

Q.    And you have not asked anyone to
conduct that analysis, have you?

A.    No, I have not.

Q.    Turn to Section XI, SG&A Costs,
Corporate Services and Allocations.  Have you
reviewed this section of the report?

A.    I have looked at it, yes.

Q.    Have you formed any opinions in
connection with this section?

A.    Not as of yet.

Q.    Do you intend to form any opinions in
connection with this section of the report?

A.    I haven't spent much time researching

DAVID YING

1
2  SG&A allocations, so I suspect I won't, but I
3  haven't really delved into this very much.
4      Q.  So sitting here today you have no
5  opinions in connection with this section?
6      A.  That is correct.
7      Q.  Turn your attention to Section XII,
8  Exchanges and Repurchases of TCEH Debt by EFH
9  Corp. and EFIH, do you see that?
10     A.  Yes.
11     Q.  Have you reviewed this section of the
12 report?
13     A.  Yes.
14     Q.  Have you formed any opinions in
15 connection with this section of the report?
16     A.  I don't think so, no.
17     Q.  Has anyone asked you to evaluate this
18 section of the report?
19     A.  Counsel had asked me to read through
20 the entire report and give them my thoughts.
21     Q.  Have you provided thoughts in
22 connection with this section of the report?
23     A.  No, I don't think so.
24        I'm sorry, I'm a little perplexed.
25 There is a section in here that I do remember

DAVID YING

1
2  reading.  I just can't find it now.
3      Q.  In connection with this particular
4  section or in --
5      A.  No, I just found it.  I'm sorry.  I
6  misspoke.  In Section X, entitled Analysis of
7  E-Side Solvency Indicia after December 2012,
8  there is a section that I actually had formed an
9  opinion on and would be happy to share with you.
10     Q.  What in that section have you formed
11 an opinion on?
12     A.  Mr. Rule decides that his focus on the
13 make-whole payment, make-whole payments are
14 things that are triggered when the company
15 decides to proactively trigger the make-whole,
16 and until the company decides to proactively
17 trigger a make-whole, it's not a liability that
18 I think should enter into the calculus of
19 solvency.
20     Q.  But once it's triggered --
21     A.  And I think because it's an obligation
22 that's triggered only if the company takes
23 certain acts, so long as the company doesn't
24 take those acts, I see no reason to calculate a
25 liability that hasn't been crystallized.

DAVID YING

1
2      Q.  But in fact, if they take the act, it
3  will become crystalized?
4      A.  If they choose to do so, and under
5  what circumstances they would do so I don't
6  understand.  For example, if you're doing a
7  calculation of how much is the company worth,
8  what would someone pay for it, as you all know,
9  the buyer can assume the obligations under these
10 agreements.
11        At most, there's a change in control
12 provision which requires that the issuer make an
13 offer to purchase all these notes at -- I
14 believe the price is 101 percent of par, and
15 otherwise, the buyer can assume the obligations
16 and never crystalize the make-whole.
17        So I see no reason to assume the worst
18 when a rational purchaser would ever trigger an
19 obligation greater than that they would
20 otherwise want to pay.
21     Q.  Are there any circumstances in which
22 potential E-side liabilities related to
23 make-whole payments should be considered as part
24 of a solvency analysis?
25     MR. ROGERS:  Objection to form.

DAVID YING

1
2      A.  I would have to think long and hard
3  about why in a solvency analysis a make-whole
4  premium has to be incorporated, because I always
5  think there's a way for a buyer to buy a company
6  without incurring the make-wholes.
7      Q.  Is there anything else in connection
8  with this section of the report --
9      A.  No.
10     Q.  -- that you have reviewed and have an
11 opinion on?
12     A.  No.  I'm sorry I didn't remember it
13 when we passed through it, but, no, I don't
14 remember anything else.
15     Q.  At the bottom of that section on page
16 23, there is a statement regarding "that the
17 current bid to purchase 80.03 percent interest
18 in Oncor by the TCEH Unsecured Ad Hoc Group and
19 Hunt Consolidated, Inc. (the 'Hunt Bid') is not
20 a reliable basis upon which to evaluate the
21 pre-petition solvency of the E-side."  Do you
22 see that?
23     A.  Yes, I do.
24     Q.  Do you have an opinion in connection
25 with that statement?

Page 146

DAVID YING

1               DAVID YING
2    A.   I think that's a fair assertion for
3 him to make. Here we are in 2015. It's a
4 unique set of circumstances. He's evaluating
5 solvency in 2008 through 2012.
6       People have been talking about
7 converting Oncor to a REIT for many years, but
8 no one had, up until most recently, figured out
9 the technology to do it, and so I think it's --
10 I think it's fair for him to not incorporate
11 REIT valuations into attempts to put a valuation
12 on Oncor.
13    Q.   Do you have any other opinions in
14 connection with the Rule report that we haven't
15 discussed already?
16    A.   No.
17       MR. NELSON: Can I just take a short
18 break for a second?
19       THE WITNESS: Sure.
20       MR. ROGERS: Sure.
21       (Recess; Time Noted: 11:15 a.m.)
22       (Time Noted: 11:21a.m.)
23 BY MR. NELSON:
24    Q.   Mr. Ying, you had testified regarding
25 how the make-whole claims should not be booked

Page 147

1               DAVID YING
2 as a liability because no one would book them
3 that way; do you recall that?
4    A.   Yes.
5       MR. ROGERS: Objection to form.
6       MR. LEES: Object to form.
7    Q.   What experience do you have on how a
8 company should book certain liabilities?
9       MR. ROGERS: Objection to form.
10    A.   Well, I was really speaking from my
11 experience as a banker in terms of how companies
12 acquire other companies and whether they worry
13 about make-whole claims. I'm not a expert on
14 booking things because I'm not an accountant.
15    Q.   Right, you're not -- you don't have an
16 accounting background?
17    A.   That is correct.
18       MR. NELSON: With that, I'll pass the
19 chair, although I'll reserve our right to
20 call you back as a rebuttal witness and
21 renew my objection earlier at the start of
22 the questioning.
23 EXAMINATION BY
24 MR. PEDONE:
25    Q.   Mr. Ying, I'm Richard Pedone, counsel

Page 148

1               DAVID YING
2 for American Stock Transfer, the Indenture
3 Trustee of the holding company.
4       Has Evercore ever prepared a
5 liquidation analysis for EFH Corp.?
6    A.   No.
7    Q.   And that would include your staff as
8 well as you personally, correct?
9    A.   Yes.
10    Q.   Do you know whether or not anyone has
11 prepared a liquidation analysis for EFH Corp.,
12 draft or otherwise?
13    A.   I think some analysis has been
14 prepared of a liquidation analysis in the
15 context of the disclosure statement.
16    Q.   For EFH?
17    A.   Under the requirements of the best
18 interests test, but I don't think anyone has
19 done any liquidation analysis with regard to
20 solvency.
21    Q.   And have you personally ever seen a
22 liquidation analysis for EFH Corp.?
23    A.   In what context?
24    Q.   In any context at all.
25    A.   I think we have, again, a liquidation

Page 149

1               DAVID YING
2 analysis as required by the best interests test
3 in the disclosure statement, but I don't think
4 we've done -- I've never seen a solvency
5 analysis or a liquidation analysis in the
6 context of any solvency analysis.
7    Q.   Could you take a moment and point me
8 to -- the disclosure statement was marked as an
9 exhibit today. Could you point me to the
10 section you are referring to?
11    A.   I'm afraid it would take a long time
12 for me to find it.
13    Q.   Why don't we go off the record for a
14 minute while you review it and perhaps counsel
15 can help you find it.
16       (Whereupon, there was a pause in the
17 proceedings and a discussion off the record.)
18 BY MR. PEDONE:
19    Q.   Mr. Ying, we were off the record and
20 you had a chance to look through the disclosure
21 statement. Sitting here today, you're not aware
22 of any liquidation analysis actually being
23 included in this disclosure statement that was
24 marked as an exhibit today, are you?
25    A.   That's correct.

Page 150

DAVID YING

1        DAVID YING
2        MR. ROGERS: For EFH Corp.
3    Q.   For EFH Corp.
4    A.   That's correct. I was reminded that
5  there is none in the disclosure statement, even
6  though we've had internal discussions about the
7  possibility of having to provide one.
8    Q.   Okay. And in connection with those
9  internal discussions or otherwise, have you ever
10  seen a draft liquidation analysis for EFH Corp.?
11    A.   I'm sorry, I lost my train of thought.
12  Would you please ask the question again?
13    Q.   Sure. In connection with those
14  internal discussions or otherwise, have you ever
15  seen a draft of a liquidation analysis for EFH
16  Corp.?
17    A.   No, I haven't seen a draft. I've only
18  had oral communication with counsel on the
19  subject.
20    Q.   And other than your expert report
21  which has been marked as an exhibit today and
22  the opinions therein and the possibility that
23  you will offer rebuttal testimony concerning Mr.
24  Rule's report, has anyone asked you to consider
25  providing any other opinions in connection with

Page 151

1        DAVID YING
2  the trial, confirmation trial?
3    A.   No.
4    Q.   In connection with the feasibility
5  analysis contained in your report -- and you
6  should feel free to refer to it -- you indicated
7  that you evaluated the ability of EFH Corp. to
8  pay the make-wholes and pre-petition -- and PPI,
9  post-petition interest, as of I believe it was
10  mid 2017; is that correct?
11    A.   Yes.
12    Q.   And in connection with your analysis,
13  did you evaluate what would happen if appeals or
14  other events took longer and the payments or
15  judgment did not occur until 2018 or later?
16    A.   I have not run the math for 2018 or
17  later.
18    Q.   And you would agree that, separate
19  from running the math, an analysis of whether or
20  not the company would be able to pay in 2018
21  would also involve a valuation of market
22  circumstances, correct?
23    A.   Well, I think that our analysis
24  assumes normal capital markets in any event,
25  whether it's '17, '18 or whatever timeframe you

Page 152

1        DAVID YING
2  wish to propose.
3    Q.   And do you have an opinion with regard
4  to whether or not the company would be able to
5  make the payments in mid 2018?
6    A.   Well, as you can see --
7    MR. ANKER: Object to the form of the
8  question.
9    A.   As you can see, I have not run the
10  mathematics for 2018; only for 2017.
11    Q.   And aside from the mathematics, do you
12  have an opinion with regard to the other
13  circumstances that might affect the company's
14  ability to pay in 2018 as opposed to 2017?
15    A.   What other circumstances are you
16  thinking about?
17    Q.   Built into your analysis of whether
18  the company can pay in 2017 are assumptions
19  concerning the market and the value -- and the
20  profitability of the company, correct?
21    A.   Built into our analysis are
22  assumptions with regard to the leverage levels
23  and the value of the equity account of the
24  company. We are not making any predictions as
25  to market conditions at those dates.

Page 153

1        DAVID YING
2    Q.   In your earlier testimony, you made a
3  comment to the effect that, until now, no one
4  had figured out the, quote, technology to
5  convert to a REIT.
6    Do you recall a statement to that
7  effect?
8    A.   Yes.
9    Q.   What did you mean by that? Would you
10  explain more fully?
11    A.   Well, no one had figured out how to
12  extract EFH from -- or, pardon me, no one had
13  figured out how to extracts Oncor from its
14  current corporate structure and convert it into
15  a REIT.
16    Q.   And is that something that you believe
17  has been figured out during the pendency of
18  these cases?
19    A.   Yes.
20    Q.   And that's something that contributes
21  significantly to the value of EFH, correct?
22    A.   Yes, I believe it does.
23    Q.   Have you calculated the increase in
24  value attributable to that, figuring out that
25  technology or coming to terms with that

Page 154

DAVID YING

1  conversion?
2      A.   Well, I think a reflection of the
3  valuation difference is the value proposal we
4  got from a strategic acquirer to buy EFH -- they
5  certainly were going to keep it as a C Corp. and
6  they themselves are a C Corp. -- relative to the
7  valuation that's being preposed by the investor
8  group, and as I indicated earlier, it's at least
9  a billion dollars higher.
10         MR. PEDONE:  I have no further
11     questions today.  Again, to reiterate, we
12     believe that we have the right to have you
13     come back to talk about reinstatement issues
14     at a later point.
15         Thank you.
16         MS. KAM:  Can I have ten minutes while
17     we switch seats?
18         MR. PEDONE:  Sure.
19  EXAMINATION BY
20  MS. KAM:
21     Q.   My name is Sarah Kam, and I'm from
22  ReedSmith and we're counsel for the Bank of New
23  York Mellon as Indenture Trustee for the
24  Pollution Control Revenue Bonds and the

Page 155

DAVID YING

1  Pollution Control Revenue Refunding Bonds, which
2  are referred to together as the PCRB claims.
3  Okay?
4      A.   Yes.
5      Q.   During negotiations regarding the
6  plan, do you recall forming a view as to whether
7  the PCRB claims should be treated pari passu
8  with other T-side unsecured creditors?
9          MR. ROGERS:  Objection to the form.
10     Beyond the scope.
11     A.   Well, I know the PCRBs don't have
12  guarantees from the subsidiaries of TCEH, so I
13  believe that their claims on assets differ from
14  the unsecured notes and the other unsecured
15  creditors, but I didn't form any views as to
16  what the treatment of the PCRBs in the plan was
17  to be.
18     Q.   And you're aware that the TCEH
19  unsecured Ad Hoc Group also became unwilling to
20  treat the PCRB claims pari passu with other
21  T-side unsecured creditors?
22         MR. ROGERS:  Objection to form.
23     A.   Yes, I am aware that -- of the
24  position that the T-unsecured committee has

Page 156

DAVID YING

1  taken.
2      Q.   And do you have a view as to why the
3  Ad Hoc Group was not willing to treat the PCRB
4  claims pari passu with other T-side unsecured
5  creditors?
6      A.   They haven't told me their innermost
7  thinking.  All I know is their position.
8      Q.   So under the plan, the debtors did in
9  fact agree that the PCRB claims not be treated
10  pari passu with other T-side unsecured
11  creditors?
12     A.   That is correct.
13     Q.   And you are aware that under the plan,
14  the PCRB claims are not sharing in the waiver of
15  the TCEH first lien deficiency claim?
16     A.   I am aware of that, yes.
17     Q.   Do you have a view as to the basis for
18  the PCRB claims not sharing in the waiver of the
19  TCEH first lien deficiency claim?
20         MR. ROGERS:  Objection to the form.
21     A.   I do not.
22     Q.   Do you have a view as to why the Class
23  C5 general unsecured claims against the TCEH
24  debtors other than EFCH are entitled to share in

Page 157

DAVID YING

1  the waiver of the TCEH first lien deficiency
2  claim but the PCRB claims are not?
3          MR. ROGERS:  Objection to form.
4      A.   I don't have a point of view on that.
5      Q.   Are you aware that the Class C5
6  general unsecured claims against the TCEH
7  debtors other than EFCH includes creditors with
8  trade claims against TCEH alone?
9          MR. ROGERS:  Objection to form.
10     A.   I am aware of that, yes.
11     Q.   Do you recall anyone preparing an
12  analysis regarding the financial impact on the
13  holders of the PCRB claims resulting from the
14  proposed exclusion of the PCRB claims from
15  participation in the waiver of the TCEH first
16  lien deficiency claim?
17         MR. ROGERS:  Objection to form.
18     A.   I'm not aware of any analysis.
19     Q.   Do you recall anyone preparing an
20  analysis of the distribution to creditors of the
21  TCEH subsidiaries versus the creditors only of
22  TCEH?
23         MR. ROGERS:  Objection to form.
24     A.   I'm not aware of any such analysis.

40

DAVID YING

1
2  Q.  And do you recall anyone preparing an
3  analysis to determine whether the discount on
4  the distribution that the PCRB claims are
5  receiving under the plan is appropriate?
6      MR. ROGERS:  Objection to form.
7  A.  No, I do not.
8      MS. KAM:  Thank you.
9      MR. ROGERS:  Anyone else?
10     I'll have some questions for the
11  witness.  It should be very short, but let's
12  take a break.
13     (Recess; Time Noted:  11:36 a.m.)
14     (Time noted:  11:41 a.m.)
15  EXAMINATION BY
16  MR. ROGERS:
17  Q.  Good morning, Mr. Ying.  My name is
18  Brent Rogers, and I represent the debtors in
19  this matter.
20     You were asked some questions by
21  counsel today about an opinion in Mr. Henkin's
22  report, Opinion No. 4, which is that there are
23  no reasonable assurances that the merger will
24  close.
25     Do you recall those questions

DAVID YING

1
2  generally?
3  A.  Yes.
4  Q.  I want to ask you about a few concepts
5  that have come up in the course of this
6  bankruptcy.  One of them is the concept of
7  disarmament.
8      Are you familiar with that?
9  A.  Yes.
10  Q.  What is your understanding of
11  disarmament in this case?
12  A.  I think it refers, in general, to the
13  settlement agreement that's being proposed as
14  part of the confirmation hearing, and the
15  settlement basically says that there will be, in
16  effect, global releases by all the parties
17  against all other parties with respect to causes
18  of action, and it also, I believe, endorses and
19  memorializes the intercreditor settlement that
20  the disinterested directors reached back in
21  March of this year.
22     And I think a settling of all those
23  alleged claims is a very beneficial, important
24  effect of this transaction, and my understanding
25  is that disarmament would survive even if for

DAVID YING

1
2  some reason the merger does not close.
3  Q.  Do you have a view on whether this
4  disarmament concept has an impact on the
5  likelihood that the transaction will close?
6      MR. HARDIMAN:  Object to the form.
7      MR. ANKER:  Mr. Rogers, can we have a
8  stipulation that an objection to form by one
9  objector will apply to all so that we don't
10  all have to speak up?
11     MR. ROGERS:  Certainly.
12     THE WITNESS:  Well, I think it is
13  actually a price that the T-unsecureds who
14  have claims -- who have alleged claims
15  against all the various estates is giving up
16  in return for the right to merge with EFH
17  and convert Oncor to a REIT.
18     So I think in fact it's part of the
19  bargain and it's actually part of the price
20  of their so-called option.
21  BY MR. ROGERS:
22  Q.  And do you have a view of whether that
23  price increases or decreases or has any impact
24  on the likelihood that the transaction will
25  close?

DAVID YING

1
2  A.  Well, I think --
3      MR. HARDIMAN:  Object to the form.
4  A.  I think the fact that they are trading
5  their alleged litigation claims against the
6  estates for the right to invest indicates that
7  they are serious about closing.
8  Q.  Another concept that has been -- that
9  has arisen in the context of this transaction is
10  the concept of drag, drag rights.
11     Are you familiar with that?
12  A.  Yes.
13  Q.  What is your understanding of that
14  concept of drag rights?
15  A.  Well, the concept emanates from the
16  settlement and the concept that what happens if
17  the merger doesn't happen, and what the drag
18  settlement or the drag provisions of the
19  settlement say is that if the merger doesn't
20  happen, the T-unsecureds are agreeing not to
21  object to any subsequent plan of reorganization
22  discussions; that the T-firsts will make
23  determinations as to the resolution of the
24  T-first claim against EFH.
25     It greatly simplifies the possibility

Page 162

DAVID YING

of how EFH might reorganize itself if the merger
doesn't close because the T-firsts have a very
strong vested interest in reaching an E-side
recapitalization or equitization as quickly as
possible. They have said time and again they
want to extract themselves from the bankruptcy
and take their assets and go home. And
eliminating another class of creditors in the
form of the T-uns, who have constantly been
asking for value any way they can and not having
them part of an E-side equitization plan, which
again would be what we have over the months,
many months referred to as a Plan B, would
greatly simplify that negotiation.

So I think the drag concept again was
an important aspect of the overall transaction
and, again, represents a foregone opportunity
that the T-unsecureds have agreed to as part of
the price of the transaction and, again, is
another implicit part of the option price that
they are paying for the right to attempt to
merge with Oncor.

Q.   Do you have Exhibit 2 in front of you,
Mr. Ying? This is your deposition from

Page 163

DAVID YING

September 23, 2015.
A.   Yes, I do in this pile.
Yes, I have it.
Q.   Would you turn to page 150 of the
deposition. At the bottom of the page, it'll be
page 39.
A.   I have it.
Q.   Okay. And I'm going to direct you
first to line 12 on page 150. Are you with me?
A.   Yes.
Q.   You were asked this question and you
gave this answer:
"Q   Do you have any reason to believe
that the purchase commitments made by the
investor group are not legitimate?
"A   No."
Do you see that?
A.   Yes.
Q.   Do you stand by that testimony as you
sit here today?
A.   Yes.
Q.   And the next question and answer were:
"Q   Do you have any reason to believe
that the commitments were made in anything

Page 164

DAVID YING

other than good faith?
"A   No."
Do you see that?
A.   Yes.
Q.   And do you stand by that testimony as
you sit here today?
A.   Yes.
Q.   The next question and answer were:
"Q   Do you have any reason to believe
that the commitments that have been made are
not fully executable?
"A   No."
Do you see that?
A.   Yes.
Q.   Do you stand by that testimony as you
sit here today?
A.   Yes.
Q.   The next question and answer were:
"Q   Do you have any reason to believe as
you sit here today that the transaction will
not close on its terms?
"A   No."
Do you stand by that testimony as you
sit here today?

Page 165

DAVID YING

A.   Yes.
Q.   As you sit here today, Mr. Ying, do
you believe that there is reasonable assurance
that the transaction will close?
A.   Yes.
MR. ROGERS:  I have no more questions.
MR. PEDONE:  One question.
EXAMINATION BY
MR. PEDONE:
Q.   Mr. Ying, during the break did you and
your counsel confer?
A.   He told me he was going to ask me some
questions, but that was all.
Q.   Were the subject of any of those
questions discussed?
A.   No.
MR. PEDONE:  No further questions.
MR. HARDIMAN:  I've got a couple
questions.
EXAMINATION BY
MR. HARDIMAN:
Q.   If I understand how this whole
arrangement works, Mr. Ying, the settlement
agreement will be approved first, is that

Page 166

1              DAVID YING
2  correct, and then there will be execution of the
3  rest of the plan?
4        MR. ROGERS: Objection to form.
5     A.  I must say I don't even know what the
6  sequencing of how judge is going to run the
7  trial.
8     Q.  Okay. Let me strike the --
9     A.  So you'll have to --
10     Q.  Do you understand that the settlement
11  being approved is a precondition to the plan
12  going forward?
13     A.  Yes, I understand that it is a
14  condition of the plan.
15     Q.  So all these things that you testified
16  about that the T-unsecureds allegedly be
17  giving up, they would have given up by the time
18  the decision has to be made as to whether or not
19  to fund the merger agreement, correct?
20        MR. ROGERS: Objection to form.
21     A.  Yes.
22     Q.  All right. So is it your testimony
23  that the T-unsecured sophisticated investors, if
24  they get to the point of time of closing,
25  believe that funding will be throwing good money

Page 167

1              DAVID YING
2  after bad, will do it anyhow because they have
3  agreed to the settlement agreement?
4        MR. ROGERS: Objection to form.
5     A.  I didn't say that they would, at the
6  moment of truth, do anything that is diseconomic
7  or improvident from their point of view.
8       What I was trying to say was that, in
9  entering into this contract, it is not a
10  costless contract for them to enter into; that
11  they are making sacrifices, at least from their
12  point of view, to have the right to make that
13  decision at the moment of truth.
14     Q.  Right. And the sacrifice is giving up
15  the claims if any they have against the T-first
16  liens?
17     A.  And against the E-estate, yes.
18     Q.  Have you done anything to assess
19  whether those claims had any merit or not?
20     A.  I have not, no.
21     Q.  You have been told by people that they
22  do, but you have no idea one way or another, do
23  you?
24        MR. ROGERS: Objection to form.
25     A.  I have no opinion as to the validity

Page 168

1              DAVID YING
2  of the asserted claims -- any of the asserted
3  claims. I have no point of view as to any of
4  the asserted claims.
5     Q.  And so if those claims weren't worth
6  much, then there wasn't really much of a
7  sacrifice given up by the T-unsecureds, were
8  there?
9        MR. ROGERS: Objection to form.
10     A.  As I said, I don't have a point of
11  view as to the validity of those claims. What I
12  can say is that certainly my observations of the
13  time in court that it could take for the T-uns
14  to prosecute their cases against the various
15  estates could be very, very lengthy and very,
16  very costly, notwithstanding the merits or the
17  potential outcomes.
18     Q.  Are you suggesting that the mere time
19  that would be expended on litigating claims that
20  might not be meritorious was worth the
21  settlement agreement?
22        MR. ROGERS: Objection to form.
23     A.  Well, I must say that the
24  disinterested directors certainly had lots of
25  discussions with respect to the intercreditor

Page 169

1              DAVID YING
2  claims, not the intracreditor claims that we're
3  talking about that the T-uns have, and they
4  certainly came up with dollar claims that, in
5  their best judgment, with the benefit of true,
6  independent negotiation were not insignificant.
7     Q.  Were you involved in those
8  negotiations?
9     A.  I was aware of them.
10     Q.  Were you involved in them?
11        MR. ROGERS: No. No. No. No. You
12  got to let the witness answer the question.
13        MR. HARDIMAN: Well, he wasn't
14  answering the question.
15        MR. ROGERS: No, you don't get to
16  interrupt the witness.
17        MR. HARDIMAN: I think if he's not
18  answering my question, I get to interrupt.
19        MR. LEES: You don't know what he's
20  going to say.
21        MR. ROGERS: I completely disagree.
22  BY MR. HARDIMAN:
23     Q.  I'll withdraw the question.
24       Were you a participant in those
25  negotiations?

Page 170

1 DAVID YING
2 A. No, I was not.
3 Q. With respect to whether or not the
4 decision at the time of closing by the T-uns
5 will be -- I think I used the word diseconomic?
6 MR. ROGERS: I think you used the
7 word.
8 MR. HARDIMAN: No, I didn't. I think
9 the witness used the term "diseconomic."
10 BY MR. HARDIMAN:
11 Q. Did you not?
12 A. If you say I did, I think that's
13 correct, yes.
14 Q. Do I understand correctly that if the
15 plan goes through and the T-uns and the Hunts
16 decide to fund it, that the T-uns will no longer
17 have the ability to obtain $550 million cash
18 payment that is part of the settlement?
19 A. That's correct.
20 Q. Will that play a role, in your view,
21 as to their decision as to whether or not to
22 fund the transaction will be, to use your term,
23 diseconomic?
24 MR. ROGERS: Objection to form.
25 A. I think that is a consideration, yes.

Page 171

1 DAVID YING
2 Q. You have said before -- you were just
3 asked to reconfirm some questions from your
4 previous deposition, and one of them was whether
5 or not you thought the -- I think the interest
6 of the T-uns was legitimate; do you remember
7 that question?
8 MR. ROGERS: Objection to form.
9 A. I think the question was do you have
10 any reason to think that they're not being
11 genuine in their interest in doing -- completing
12 the merger.
13 Q. Let me just go to that.
14 A. But if you would like to re-read the
15 transcript, that would be great.
16 Q. Let me see if I can find it in here.
17 Here it is: "Do you have any reason
18 to believe that the purchase commitments made by
19 the investor group are not legitimate?" And you
20 answered, "No."
21 A. I did.
22 Q. Right.
23 What did you understand the word
24 "legitimate" to mean in that?
25 A. That is there some big joke or farce

Page 172

1 DAVID YING
2 or is the talk in the marketplace that,
3 ah-ha-ha, we did this to get our booby prize,
4 which is a term that their counsel has used, and
5 the answer is no. People have invested in a
6 tremendous amount of time and effort in the
7 attempt to make money.
8 Q. And I think you testified you see no
9 reason to believe it won't close? I think it
10 was you said a serious commitment, right?
11 A. I think it's a very serious
12 commitment.
13 Q. Right. If they are so serious about
14 it, why would they insist that there will be a
15 provision in the agreement not only -- not only
16 not have a provision that there are no remedies,
17 but have a provision in the agreement saying you
18 can't come after us if we don't fund this
19 transaction?
20 MR. ROGERS: Objection.
21 Q. If they're so sorry serious?
22 MR. ROGERS: Objection to form.
23 Foundation. It's argumentative.
24 MR. HARDIMAN: It is argumentative.
25 That's why it's called cross-examination.

Page 173

1 DAVID YING
2 MR. ROGERS: And I object on that
3 basis.
4 THE WITNESS: I don't know the answer
5 why.
6 MR. HARDIMAN: Okay. I have nothing
7 more.
8 MR. ROGERS: We're done.
9 (Time Noted: 11:55 a.m.)
10
11
12
13
14
_____
DAVID YING
15
16 Subscribed and sworn to
before me this    day
17 of        2015.
18
_____
19
20
21
22
23
24
25

## Page 174

1          DAVID YING
2
3          CERTIFICATE
4    STATE OF NEW YORK )
           : ss
5    COUNTY OF NEW YORK)
6          I, Kathy S. Klepfer, a Registered
7    Merit Reporter and Notary Public within and
8    for the State of New York, do hereby
9    certify:
10         That DAVID YING, the witness whose
11   deposition is herein before set forth, was
12   duly sworn by me and that such deposition is
13   a true record of the testimony given by such
14   witness.
15         I further certify that I am not
16   related to any of the parties to this action
17   by blood or marriage and that I am in no way
18   interested in the outcome of this matter.
19         In witness whereof, I have hereunto
20   set my hand this 19th day of October 2015.
21
22         ------------------------------
           KATHY S. KLEPFER, RPR, RMR, CRR, CLR
23
24
25

## Page 175

1          DAVID YING
2          INDEX
3    TESTIMONY OF D. YING:              PAGE
4    Examination by Mr. Anker           11
5    Examination by Mr. Hardiman        76, 165
6    Examination by Mr. Nelson          116
7    Examination by Mr. Pedone          147, 165
8    Examination by Ms. Kam             154
9    Examination by Mr. Rogers          158
10   YING CONFIRMATION EXHIBITS:               PAGE
11   Exhibit 1, David Ying's Expert Report,     14
12   October 12, 2015
13   Exhibit 2, Deposition of David Ying dated     33
14   September 25, 2015
15   Exhibit 3, Disclosure Statement for the       36
16   Fifth Amended Joint Plan of Reorganization
17   of Energy Future Holdings Corp., et al.,
18   Pursuant to Chapter 11 of the Bankruptcy Code
19   Exhibit 4, a chart labeled EFH Feasibility     68
20   Analysis
21   Exhibit 5, Deposition of Paul Keglevic dated     70
22   October 1, 2015
23   Exhibit 6, Expert Report of Michael Henkin      93
24   Exhibit 7, Expert Report of Mark F. Rule,      121
25   CFA, October 12, 2015

## Page 176

1          DAVID YING
2    NAME OF CASE:  In re EFH
3    DATE OF DEPOSITION:  October 19, 2015
4    NAME OF WITNESS:  David Ying
5    Reason Codes:
6        1. To clarify the record.
         2. To conform to the facts.
7        3. To correct transcription errors.
8    Page _____ Line _____ Reason _____
     From _____ to _____
9
     Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12
     Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15
     Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
     From _____ to _____
18
     Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
     From _____ to _____
21
     Page _____ Line _____ Reason _____
22   From _____ to _____
23   Page _____ Line _____ Reason _____
     From _____ to _____
24
25   _____

**A**

**$0.2 (2)**
45:19 46:5
**$0.5 (1)**
42:16
**$1.125 (4)**
62:9,10 70:2,3
**$151 (5)**
47:13,14,19,20 48:4
**$152 (1)**
47:11
**$19 (3)**
35:11 38:25 39:6
**$19-24 (1)**
38:13
**$19.139 (1)**
32:18
**$2 (2)**
51:6 66:14
**$2,229,000,000 (2)**
56:16,22
**$2.25 (1)**
70:2
**$2.5 (1)**
70:2
**$20 (5)**
34:25 35:10 75:15
105:12 112:17
**$200 (2)**
46:19 47:6
**$24 (3)**
38:25 39:13,16
**$426 (2)**
53:2,9
**$431 (1)**
53:10
**$5 (10)**
39:18 53:11 63:14
64:21 65:11,25
67:15,24 68:13 69:2
**$5,358,000,000 (1)**
57:7
**$500 (4)**
43:2 44:10,22 45:15
**$550 (1)**
170:17
**$6 (1)**
138:6
**$600 (1)**
31:18
**$7 (18)**
25:14,20 26:24 27:2,5
31:16 44:22 45:16
47:6,14,21,25 66:9
77:3,5,12,14 91:10
**$7,608,000,000 (1)**

57:2
**$8.5 (2)**
75:2,13
**$95 (1)**
53:3
**a.m (8)**
76:12,13 116:13,14
146:21 158:13,14
173:9
**abbreviations (1)**
60:19
**ability (10)**
19:16,25 34:5 53:16
106:5 111:19 128:2
151:7 152:14
170:17
**able (24)**
18:19 19:2 21:19
22:10 44:3 50:12
60:5 62:15 63:17
66:7 67:5,10,13,17
67:22 68:2,10 72:8
74:8 76:4 82:12
113:16 151:20
152:4
**absolutely (2)**
21:2 59:9
**acceptable (1)**
63:20
**access (9)**
22:24 43:18 58:19
61:13 78:12,23
79:10,12,16
**accessed (1)**
134:25
**accommodate (1)**
11:24
**account (6)**
45:21 47:21 49:15
57:2 120:12 152:23
**accountant (1)**
147:14
**accounting (1)**
147:16
**accrued (8)**
53:2 54:9,12 55:4
56:3,6,10 60:7
**accurate (1)**
95:8
**accurately (3)**
35:5 72:15 75:8
**acquire (3)**
46:13 123:19 147:12
**acquirer (2)**
123:22 154:5
**acquirers (2)**

120:16 123:17
**acquiring (4)**
25:18 26:25 27:5
120:19
**act (1)**
144:2
**action (3)**
46:4 159:18 174:16
**actors (2)**
25:24 26:15
**acts (2)**
143:23,24
**actual (2)**
69:7 108:21
**Ad (5)**
5:5 7:5 145:18 155:20
156:4
**add (2)**
128:2 137:18
**addition (3)**
46:12 97:24 137:19
**additional (11)**
19:25 43:2 44:9,12,16
46:14 48:13 50:18
56:15 106:13
115:20
**additive (1)**
85:20
**address (6)**
17:9 18:20,22 77:17
78:3 82:7
**addressed (1)**
92:14
**addresses (1)**
15:2
**addressing (3)**
17:9 82:15 125:6
**adequate (1)**
20:14
**adjustments (2)**
138:4 139:16
**Administered (1)**
1:9
**admit (1)**
98:23
**adopt (1)**
74:5
**advance (1)**
121:14
**advantaged (1)**
96:9
**adverse (4)**
18:20 57:18,22 59:21
**advice (1)**
112:7
**advised (1)**

50:25
**advising (2)**
99:7 101:4
**advisor (2)**
12:7,15
**affect (2)**
104:17 152:13
**afraid (1)**
149:11
**Agent (1)**
4:18
**ago (6)**
32:20 60:13 70:12
123:21 136:9,25
**agree (20)**
25:22 72:17 74:12
75:10,13,20,22
93:12 94:20,22 95:9
106:16,24 109:2,13
110:4,25 122:10
151:18 156:10
**agreed (2)**
162:19 167:3
**agreeing (1)**
161:20
**agreement (17)**
27:22 34:21 42:24
43:15 44:7 94:17
96:3 99:3 103:9,23
159:13 165:25
166:19 167:3
168:21 172:15,17
**agreements (1)**
144:10
**ah-ha-ha (1)**
172:3
**AIN (1)**
7:16
**akin (3)**
5:17 103:10,24
**al (3)**
1:5 36:20 175:17
**ALEXANDER (1)**
6:22
**align (1)**
96:9
**AlixPartners (1)**
9:21
**alleged (9)**
16:6,7 18:21 19:17
46:4 82:9 159:23
160:14 161:5
**allegedly (1)**
166:16
**alleging (1)**
43:6

**allocated (4)**
45:20 46:5,24 112:22
**allocation (2)**
46:25 112:21
**allocations (2)**
141:17 142:2
**allow (1)**
112:21
**allowed (2)**
18:25 23:22
**allowing (1)**
72:3
**alternative (4)**
108:15,19,24 111:24
**ALYSA (1)**
7:16
**Amended (2)**
36:18 175:16
**American (4)**
5:11 11:4 104:6 148:2
**Americas (5)**
4:6 5:6 7:7 8:14 9:15
**amount (28)**
12:20 19:10,17 21:8
21:11,13,16 22:5,6
22:10 25:19 28:2
40:25 46:23 51:16
53:9,21 55:20 56:9
65:20 66:20 74:24
75:2 77:19 78:5
80:12 112:13 172:6
**amounts (5)**
48:11 74:3,5 75:5
138:10
**ample (1)**
58:19
**analogy (1)**
108:10
**analyses (2)**
45:6 122:3
**analysis (83)**
15:8,14,24 16:19,20
18:5 20:4 32:24
33:9 35:9 39:5 43:9
47:24 68:17 77:16
78:18 80:7,11,13,21
83:19 88:20,21
90:16,18,25 91:19
91:24 92:2,11,17
118:19 119:17,17
124:11,20,22 125:2
125:4 126:21,25
127:15 128:3,20
130:2,6,10,21 131:2
133:7 134:3 136:15
140:2,20 141:14

143:6 144:24 145:3
148:5,11,13,14,19
148:22 149:2,5,5,6
149:22 150:10,15
151:5,12,19,23
152:17,21 157:13
157:19,21,25 158:3
175:20
**analysts (1)**
89:10
**analytical (2)**
127:16,19
**analyze (1)**
127:21
**analyzed (2)**
110:11 138:21
**analyzing (1)**
13:7
**and/or (1)**
19:2
**Angeles (1)**
6:15
**Anker (23)**
7:23 10:7,9 11:13
13:19 14:2,9,19
33:13,21 36:23
68:14,21 70:24 76:7
76:9,11,19 87:17
132:22 152:7 160:7
175:4
**announced (3)**
40:23 41:6 66:15
**announcement (1)**
41:5
**annual (2)**
28:2,8
**annualized (1)**
28:14
**annually (2)**
30:5 53:24
**annum (3)**
30:21 31:10,14
**answer (27)**
11:23 22:14 32:13
100:14 102:2,2,3,9
102:10 103:16
104:23 109:11
111:11 114:17
115:4 118:11
125:13 129:9
140:17 141:5
163:13,23 164:9,19
169:12 172:5 173:4
**answered (6)**
81:6 90:11 101:24
109:18 115:3

171:20
**answering (2)**
169:14,18
**anticipate (1)**
114:10
**anybody (2)**
94:10 101:10
**apologies (1)**
15:19
**apologize (2)**
87:17 102:14
**apparent (1)**
139:18
**appeal (5)**
16:4 21:7 53:7 54:8
73:14
**appealed (1)**
43:13
**appeals (4)**
16:10 50:6,17 151:13
**appears (4)**
15:9 32:7,8 37:10
**appellate (1)**
72:3
**application (1)**
122:6
**applied (2)**
39:6 120:23
**apply (1)**
160:9
**appreciate (2)**
15:20 113:6
**appreciation (3)**
28:4 105:20,23
**approach (2)**
127:17,19
**approached (1)**
120:15
**appropriate (7)**
95:14 96:2 110:16
127:15,21 137:4
158:5
**appropriately (1)**
124:25
**approved (2)**
165:25 166:11
**approximate (1)**
29:13
**approximately (8)**
25:13 39:18 43:2 44:9
46:19 53:23 138:6,8
**April (2)**
59:4,6
**argumentative (2)**
172:23,24
**arguments (1)**

48:9
**arisen (1)**
161:9
**arrangement (3)**
123:16,25 165:24
**articulately (1)**
42:5
**aside (1)**
152:11
**asked (36)**
16:17 69:12 71:25
81:3,4,13 85:18,22
87:4,19 90:8,12,12
90:15 94:7,10
101:15,22 109:18
116:5 118:13 130:9
131:16 138:3,23
140:5,15,18 141:6
141:13 142:17,19
150:24 158:20
163:12 171:3
**asking (7)**
24:4 73:9 86:14 90:15
97:18 107:21
162:11
**asks (1)**
86:9
**aspect (2)**
114:2 162:17
**aspects (1)**
13:8
**asserted (4)**
110:17 168:2,2,4
**assertion (4)**
105:5 124:16 126:5
146:2
**asserts (1)**
126:3
**assess (2)**
78:14 167:18
**assessment (1)**
95:2
**asset (10)**
30:16 45:11,14 61:22
84:7,8 91:11 133:3
133:9,11
**assets (9)**
51:11 128:5,8 129:23
130:4 137:19,20
155:14 162:8
**assignment (7)**
13:8 15:22 17:23,24
18:10,15 118:23
**associated (5)**
29:2 75:6 96:16 97:6
104:11

**assume (17)**
21:25 23:8,20 24:10
24:13 26:23 27:4
37:17,19 41:13
53:11 56:14 72:2
73:13 144:9,15,17
**assumed (15)**
20:8,13 22:18 24:25
25:3 29:25 32:3
35:12 42:17 43:9
47:24 48:25 56:20
75:18 82:25
**assumes (2)**
69:18 151:24
**assuming (8)**
25:16 31:17 32:15
33:4 44:23 45:16
66:23 105:15
**assumption (10)**
29:24 30:7 31:24 39:9
39:12 43:24 44:2
48:23 73:13 122:5
**assumptions (14)**
18:4 24:7 40:7 41:21
41:22 43:8 46:22
49:5 56:21 67:2
75:25 80:18 152:18
152:22
**assurance (5)**
83:9 84:3 108:6,8
165:4
**assurances (6)**
83:4,7 106:22 109:3
109:14 158:23
**attempt (3)**
93:11 162:22 172:7
**attempting (1)**
137:7
**attempts (3)**
129:25 137:18 146:11
**attention (2)**
34:7 142:7
**Attorneys (19)**
3:5,12 4:5,11,18 5:5
5:11,18 6:6,13,19
7:5,12,19 8:5,13,19
9:6,13
**attractive (1)**
111:24
**attributable (1)**
153:24
**attributes (2)**
89:18 111:8
**auction (7)**
96:4,9 97:15 101:8
102:16,25 103:6

**AUDETTE (1)**
7:9
**Avenue (10)**
2:6 3:16 4:6,19 5:6
6:14 7:7 8:8,14 9:15
**average (2)**
30:13,20
**aware (18)**
36:8 40:23 41:6 95:23
122:13 123:11,13
123:22 149:21
155:19,24 156:14
156:17 157:6,11,19
157:25 169:9
**axis (5)**
64:25,25 65:2,4,16

**B**

**B (3)**
20:25 21:2 162:14
**back (17)**
12:11 40:4 59:18
60:24 69:12 76:5
84:14 115:11,16
126:6 134:23
135:21,23 138:5
147:20 154:14
159:20
**background (2)**
12:2 147:16
**bad (2)**
59:2 167:2
**balance (5)**
38:11 59:11 128:14
128:18,22
**ballpark (2)**
29:13 68:13
**balls (2)**
68:9 69:7
**Bank (4)**
5:18 8:5,6 154:23
**banker (7)**
31:6 45:3 50:21 98:23
99:7,18 147:11
**banker's (1)**
92:3
**bankers (4)**
13:7 45:6 132:23
133:23
**bankrupt (1)**
132:11
**bankruptcy (18)**
1:2 19:8 23:5 36:21
41:4 43:14 48:9
58:24 59:3,7 76:5
94:19 108:13,14,15

159:6 162:7 175:18
banks (1)
89:11
bargain (1)
160:19
based (16)
22:19 30:15 34:19
36:11 47:21 64:13
77:9 90:2 91:16
92:8 105:18 106:10
110:20 111:9 112:5
138:10
basic (1)
49:16
basically (2)
96:6 159:15
basis (11)
28:14 33:4 74:22
111:10 130:7,14
135:17 137:3
145:20 156:18
173:3
BB (3)
58:13,16 61:11
befuddled (1)
137:13
beginning (4)
82:6 83:17 115:10
120:5
begins (2)
15:13 107:13
behalf (2)
10:17 11:4
belabor (1)
127:4
belief (3)
73:24 74:7 91:11
believe (48)
10:14 11:2 17:5,16,21
20:14,17 31:19
32:23 36:5,13 37:13
40:5 44:20 49:12
51:20 60:4 62:12,15
72:7 77:13 81:11,25
82:19 109:4,8,15
111:10 117:10
126:18 128:19
136:7 139:12
144:14 151:9
153:16,22 154:13
155:14 159:18
163:14,24 164:10
164:20 165:4
166:25 171:18
172:9
believed (2)

77:4 90:9
BELKNAP (1)
8:12
beneficial (1)
159:23
benefit (2)
112:6 169:5
bespoke (1)
99:3
best (11)
15:17 19:16 24:16,20
34:5 108:20 109:4
109:15 148:17
149:2 169:5
betas (1)
31:7
better (2)
101:10 102:18
beyond (11)
44:16 102:20 103:3
103:14 104:3,20
107:17 110:7 111:3
131:8 155:11
bid (12)
96:5,7 101:9,10
102:17,18 120:19
120:22 124:2,8
145:17,19
big (10)
38:18 64:8,9,22 89:10
91:18 95:19 102:22
134:7 171:25
bigger (1)
53:15
billion (70)
25:14,20 26:24 27:2,6
31:17 32:19 34:25
35:10,12 37:18,24
38:13,25 39:2,7,14
39:16,18 42:16
44:22 45:16,20 46:5
47:7,9,14,21,25
48:2 51:6,6 62:9,10
63:14,18,18 64:21
65:11,25 66:2,8,8,9
66:14,16 67:5,6,6
67:15,24 68:13 69:2
69:12 70:2,2 75:3
75:13,16 77:3,5,12
77:14 91:10 96:14
97:16,21 112:18
138:7 154:10
billion-8 (1)
138:8
billion-dollar (1)
96:18

bit (1)
22:15
BlackRock (1)
29:16
blood (1)
174:17
blue (2)
68:22,24
board (2)
107:25 122:15
bodies (2)
54:16 55:16
body (1)
135:6
bond (1)
134:20
bonds (4)
10:12 73:18 154:25
155:2
booby (1)
172:3
book (2)
147:2,8
booked (1)
146:25
booking (1)
147:14
Boston (2)
5:14 9:9
bottom (10)
37:5,10 59:17 60:11
71:17 72:24 75:20
75:23 145:15 163:6
box (5)
57:13 59:20 69:6,18
82:20
BRADLEY (1)
4:8
brain (1)
105:15
break (7)
11:22,24 76:8 116:11
146:18 158:12
165:11
breakup (5)
96:2,20,24 97:2,13
Brent (1)
158:18
BRENTON (1)
3:15
BRIAN (1)
8:16
briefly (2)
18:13 19:12
brings (1)
106:7

broad (3)
3:6 4:12 38:18
BROWN (1)
9:5
Bryant (1)
5:21
builds (1)
56:11
Built (2)
152:17,21
bullet (3)
42:10,15 48:21
bunch (3)
67:10,13,17
business (2)
31:3 62:2
BUSSIGEL (1)
6:16
buy (5)
44:15 103:10,24
145:5 154:5
buyer (7)
95:24 96:16,17 97:3
144:9,15 145:5
buyers (1)
95:20

---
**C**
---

C (18)
3:2 4:2 5:2 6:3 7:2 8:2
9:3 15:7,13 30:11
30:11,24 83:19
89:17 112:9 113:2
154:6,7
C5 (2)
156:24 157:6
calculate (6)
28:25 30:13 60:8
128:6 138:9 143:24
calculated (5)
19:16 38:7 74:23 75:2
153:23
calculates (1)
127:24
calculation (4)
28:24 70:7 112:17
144:7
calculations (2)
30:15 139:8
calculus (1)
143:18
calendar (4)
60:19,21 61:2,3
California (1)
6:15
call (7)

14:7 54:23 115:11,16
117:2,18 147:20
called (5)
10:2 29:16 54:23 88:5
172:25
canvassed (1)
95:19
cap (2)
69:2 91:18
capacity (6)
19:18,21 23:16 100:8
104:21 107:19
capital (36)
18:19 19:3,23,24 20:2
21:20 22:2,22,24
23:16 27:21 30:14
30:15,17,21 31:9
48:13 50:19 51:10
51:20,21,23 53:17
58:11,19 61:14,14
61:24 62:5 63:21
64:8,18 69:8 134:25
139:20 151:24
capitalization (12)
64:12,17,20 65:5,21
65:25 67:20,23
68:11,13 69:23 70:4
career (2)
50:23 98:7
careful (1)
134:4
carefully (4)
105:8 110:9 139:13
141:11
carried (3)
28:3,17,18
CARTY (1)
5:23
case (7)
1:8 7:4 23:20 40:18
54:6 159:11 176:2
cases (4)
12:6 40:12 153:18
168:14
cash (6)
25:19 28:25 29:3
47:19 51:6 170:17
category (2)
56:2 64:15
cause (2)
53:12 99:20
causes (2)
46:4 159:17
Center (3)
7:21 9:8,14
certain (4)

78:23 106:13
143:23 147:8
certainly (15)
28:21 38:19 63:20
83:6 85:17,19 89:9
99:14 100:25
115:15 154:6
160:11 168:12,24
169:4
CERTIFICATE (1)
174:3
Certified (2)
2:9,9
certify (2)
174:9,15
CFA (2)
121:6 175:25
chair (1)
147:19
challenge (1)
96:13
chance (2)
40:10 149:20
change (5)
21:23 27:6 53:13
87:13 144:11
Chapter (7)
1:7 12:6 24:14,22
36:21 40:12 175:18
chart (14)
37:10,17 52:7 64:13
64:24 68:16 126:19
126:24 127:12
133:19 136:23
138:18 139:24
175:19
charts (3)
31:20 36:9,13
check (1)
105:12
Chicago (2)
3:14 8:22
choose (2)
39:13 144:4
chose (3)
39:16 61:14 96:22
chosen (2)
38:14 79:23
Christopher (2)
5:23 40:16
circle (1)
68:8
circumstances (10)
22:9 99:8 109:5,16
144:5,21 146:4
151:22 152:13,15

citation (1)
138:17
citations (3)
138:18,21 139:3
claim (12)
18:24 46:3 49:20
52:24 55:18 56:3
72:4 156:16,20
157:3,17 161:24
claims (44)
18:21 19:17 23:2
34:18 35:15 43:13
45:21 54:16 72:9
82:10,11 97:8
146:25 147:13
155:3,8,14,21 156:5
156:10,15,19,24
157:3,7,9,14,15
158:4 159:23
160:14,14 161:5
167:15,19 168:2,3,4
168:5,11,19 169:2,2
169:4
clarify (1)
176:6
class (3)
156:23 157:6 162:9
clean-up (1)
73:11
clear (12)
47:18 48:16 69:5,11
82:18 83:16 102:25
103:5 113:5 114:9
133:13 134:15
clearly (3)
97:4 127:6,12
client (1)
60:6
client's (1)
52:24
clients (1)
53:8
close (28)
88:4 92:9,12,18,22
95:4 99:12 100:4,23
101:2 105:21
106:10,15,23 108:7
109:3,14 134:24
135:21,24 158:24
160:2,5,25 162:3
164:22 165:5 172:9
closed (1)
105:3
closely (1)
113:13
closes (1)

91:9
closing (7)
34:22 78:10 106:6
109:9 161:7 166:24
170:4
CLR (2)
1:24 174:22
Co's (1)
89:15
Code (2)
36:21 175:18
Codes (1)
176:5
colleagues (4)
18:9 37:9 138:3,23
column (7)
52:9,13,16,19 61:5
62:8 138:17
columns (2)
53:21 137:16
combination (2)
52:2 66:22
come (12)
31:8 62:13 88:24 99:9
99:11,14 108:23
135:23 139:16
154:14 159:5
172:18
comes (1)
83:18
comfortable (4)
32:11 49:7,10 88:18
comfortably (1)
66:7
coming (1)
153:25
commencing (1)
140:12
comment (1)
153:3
commentary (1)
118:18
comments (3)
11:6 79:24 140:23
Commission (1)
123:14
commitment (2)
172:10,12
commitments (5)
25:3 163:15,25
164:11 171:18
committee (14)
4:11 5:5 6:6 10:14,18
76:17 95:20,23
108:17,18,19
116:19 118:21

155:25
Committee's (2)
10:25 11:6
common (1)
106:11
communication (1)
150:18
companies (29)
31:2 50:22 51:2,5,5
59:3 61:6,8,17
67:10,13,17 68:9
87:20 89:12,13,14
89:21 95:19 99:7
133:24 134:10,11
134:23,24 135:8,21
147:11,12
company (70)
8:7 10:11 17:13 18:2
18:3 24:17,20 49:17
49:19 54:7 57:6
62:3 63:12,16 64:6
64:7,21 65:8,24
66:15,21 67:4 69:25
79:4,8 80:13 81:4
81:13 88:5,20,20,24
91:18,20 95:13
99:10 101:4,9
102:17 108:2 109:4
109:15 110:15
111:22 112:6,8,12
112:12,16 113:14
114:19 115:6 127:6
132:8 134:3,7
139:19 143:14,16
143:22,23 144:7
145:5 147:8 148:3
151:20 152:4,18,20
152:24
company's (2)
123:13 152:13
comparable (15)
30:12,22 61:5,7 87:20
88:12,16,19,20,24
95:12 133:24 134:3
134:8,9
comparables (4)
87:21 88:2 90:3 134:5
compare (1)
61:5
compared (1)
55:21
competitive (2)
97:15 103:7
completed (1)
83:11
completely (5)

92:13 124:12,13
137:13 169:21
completing (1)
171:11
complicated (2)
103:17 104:10
complications (1)
104:16
complies (1)
69:4
compounded (1)
53:24
comps (1)
31:8
concept (8)
159:6 160:4 161:8,10
161:14,15,16
162:16
concepts (1)
159:4
concerning (2)
150:23 152:19
concluded (2)
84:4,5
conclusion (8)
19:13 63:15,16 74:22
75:13,21,22 103:22
conclusions (3)
19:13 82:2 111:13
condition (4)
12:23 13:11 51:12
166:14
conditioned (1)
30:10
conditions (4)
97:4,6 104:11 152:25
conduct (4)
128:20,22 130:10
141:14
conducted (6)
95:22 118:19 128:14
130:6,20 140:2
confer (1)
165:12
confirmation (36)
13:17 14:8,15,16,21
14:24 15:3 20:9,13
21:6 33:14,17,23
36:15,17,25 38:3
42:25 43:11 44:21
48:3 68:15,16 70:13
70:17,20 82:21
85:16 87:14 93:18
93:20 121:3,5 151:2
159:14 175:10
conflicts (1)

116:18
**conform (1)**
176:6
**confused (1)**
127:16
**connection (40)**
13:16 14:23 70:13
101:5 110:2,12
118:24 119:25
122:20,25 123:6
124:3,9,10 125:2,8
125:19 126:10,17
131:9,12 132:5
136:11,21 139:22
140:13 141:21,24
142:5,15,22 143:3
145:7,24 146:14
150:8,13,25 151:4
151:12
**conscious (2)**
100:2,21
**conservative (13)**
39:9,12 41:22,25
43:10,23,25 46:21
47:24 56:21 67:2
75:25 91:17
**consider (3)**
99:10,18 150:24
**consideration (4)**
111:21 122:20 123:10
170:25
**considerations (1)**
114:2
**considered (2)**
105:8 144:23
**considering (2)**
99:16 123:19
**consistent (1)**
10:22
**consolidated (21)**
17:8,12 19:20 38:4
126:12,21 127:13
127:20,24 128:21
128:21 129:4,21
130:7,14,21 131:3
131:20 137:3,11
145:19
**consortium (1)**
97:9
**constant (1)**
53:22 54:12
**constantly (1)**
162:10
**constituencies (1)**
22:21
**Cont'd (6)**

4:2 5:2 6:3 7:2 8:2 9:3
**contained (3)**
148:11,22 150:2,3
85:16 86:25 151:5
**contemplated (4)**
16:14 78:5 83:2 88:8
**contemplates (1)**
16:24
**contents (2)**
84:18 119:2
**context (13)**
73:6 95:5,14,17
108:13 124:21
127:15 133:22
148:15,23,24 149:6
161:9
**contingent (1)**
75:5
**continue (1)**
17:17
**contract (18)**
16:10 21:14 23:11
41:17 43:5 55:8,20
73:22 95:25 97:24
98:2,9,22,25 103:17
103:20 167:9,10
**contracts (1)**
89:7
**contributes (1)**
153:20
**contribution (1)**
25:11
**control (13)**
120:9 122:7,15 123:7
123:23 124:9,15,17
124:25 126:2
144:11 154:25
155:2
**conversations (1)**
112:5
**conversion (3)**
111:23 113:17 154:2
**convert (8)**
31:5 80:8 111:19
112:24 113:2 153:5
153:14 160:17
**converting (2)**
30:10 146:7
**converts (1)**
112:8
**copy (3)**
13:24 70:18 121:20
**Corp (24)**
30:11 36:20 112:9
113:3 124:20
126:12,21 130:7
131:20 133:7,18

136:15 142:9 148:5
148:11,22 150:2,3
150:10,16 151:7
154:6,7 175:17
**corporate (8)**
120:16,19 123:11,15
127:3,5 141:17
153:14
**Corporation (4)**
1:5 128:21 130:22
131:3
**Corporation's (3)**
122:14 123:5 133:16
**corps (2)**
30:24 89:17
**correct (128)**
13:12 14:9,25 15:5
16:22 19:4,5,11
21:5,22 23:18,23
30:4 31:15 33:5
39:3,8,11,15,20,23
40:3 42:12 44:5,14
44:18 45:12,18
46:15,20 47:17 48:6
48:18,20 49:3 50:3
50:8,14 51:8,14,18
53:25 54:4,10,14
55:3 56:13 57:4
59:5 62:11,21 65:3
65:6,10,14,18,23
64:67:3,8,21,25
68:4 69:9 71:22
76:6 77:22,24 78:20
78:22 79:2,4,6
82:17,23 83:3,5,12
84:10 88:9 92:6,10
92:19,23 98:5 100:4
100:23 101:5 105:5
106:6 117:13 118:8
118:15 119:14,15
119:18,19,22
120:13 122:11
123:7 124:11,20
126:5 128:15 129:3
130:2 131:5 132:24
132:25 133:4,5
136:18 142:6
147:17 148:8
149:25 150:4
151:10,22 152:20
153:21 156:13
166:2,19 170:13,19
176:7
**correctly (12)**
25:6 30:18 34:14 35:2
42:19 48:14 58:2

66:5 84:2 87:25
128:3 170:14
**corresponding (1)**
40:2
**cost (6)**
30:2,13,14,17,20 31:9
**costless (1)**
167:10
**costly (1)**
168:16
**Costs (1)**
141:16
**counsel (25)**
10:10,14 11:17 13:25
18:2,3 40:19 84:17
86:8 87:3 100:6
113:14 116:18
118:13,25 121:19
131:16 142:19
147:25 149:14
150:18 154:23
158:21 165:12
172:4
**counsel's (1)**
74:6
**count (1)**
66:12
**COUNTY (1)**
174:5
**couple (10)**
12:2 42:10 60:18 70:9
96:20 116:19 120:3
136:8,25 165:19
**course (1)**
159:5
**court (9)**
1:2 13:24 26:3 40:11
41:5 43:14 72:3
121:2 168:13
**court's (1)**
10:23
**courteous (1)**
57:17
**courts (1)**
23:8
**cover (2)**
116:8 140:23
**coverage (1)**
75:3
**covered (4)**
103:14 104:3,20
107:18
**created (1)**
47:22
**credit (14)**
57:19 58:5,9,10,13,18

59:14 60:14 61:9,11
61:22 62:4,4 129:25
**creditor (2)**
54:15 55:16
**creditor's (1)**
29:20
**creditors (27)**
3:5 6:7 16:5 23:22
25:10 26:2,4 29:7
36:11 43:6 45:20
46:10,17 76:17,22
97:7 108:18 111:22
155:9,16,22 156:6
156:12 157:8,21,22
162:9
**criteria (3)**
69:9 91:15 97:10
**critically (1)**
63:6
**criticism (2)**
73:8,9
**critiques (1)**
120:6
**CROMWELL (1)**
3:4
**cross-examination (...**
172:25
**CRR (2)**
1:24 174:22
**crystalize (1)**
144:16
**crystalized (1)**
144:3
**crystallized (1)**
143:25
**current (6)**
24:16 96:3 111:9
119:11 145:17
153:14
**currently (2)**
34:23 77:19
**customary (5)**
96:2,15,24 97:13,25
**Cutler (1)**
10:9
**CY (1)**
60:19

___

**D**

**D (1)**
175:3
**DANIELLE (1)**
7:9
**date (22)**
14:18 20:9,13 24:11
25:18 33:20 36:22

48:23 52:14 68:18
70:23 72:2 73:14,20
74:9 81:4 93:22
106:6 121:8 141:3,9
176:3
**dated (4)**
33:18 70:21 175:13
175:21
**dates (2)**
132:9 152:25
**David (188)**
1:1,11 2:1,4 3:1 4:1
5:1 6:1 7:1,24 8:1
9:1 10:1,2 11:1 12:1
13:1 14:1,12,16
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1,18
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1

158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1,14 174:1,10
175:1,11,13 176:1,4
**day (11)**
20:25 26:3 50:2 53:6
59:6 104:15 105:2
105:21 115:23
173:16 174:20
**day-to-day (1)**
122:16
**days (1)**
49:7
**de-consolidation (2)**
111:17,25
**deal (9)**
11:8 65:19 79:18 91:9
96:13 97:5,9 98:10
98:11
**deals (1)**
94:23
**Debenture (1)**
8:13
**debt (44)**
17:7 19:2,18,21 23:17
32:25 38:8 44:13
51:21 57:22 58:19
58:20 60:9 61:2,2,3
61:13,15,18,18
62:10 66:22 67:6
70:3 91:20 132:18
132:20 133:7,15,16
134:7,11,16,23
135:3,12,15,21,23
138:7,8,10,14 142:8
**debtors (25)**
1:6 3:12 6:13 12:8,24
13:11 24:13,21
34:16 35:25 50:4
72:7,13 73:24 74:7
98:3,15 117:2,7,18
118:2 156:9,25
157:8 158:18
**December (8)**
52:17 126:13,13
136:16 140:21
141:2,9 143:7
**deceptive (1)**
38:20
**decide (2)**
106:5 170:16
**decided (2)**
95:4 96:8

**decides (3)**
143:12,15,16
**decision (12)**
37:16 66:20 104:14
104:17 105:17,18
105:25 106:10
166:18 167:13
170:4,21
**decisions (3)**
37:20 80:9,21
**deck (1)**
14:11
**declare (1)**
112:10
**deconsolidate (1)**
111:15
**decreases (1)**
160:23
**deduct (1)**
66:12
**deducting (1)**
38:8
**deducts (1)**
129:17
**deemed (1)**
19:9
**defaulted (1)**
58:25
**deficiency (4)**
156:16,20 157:2,17
**define (1)**
135:12
**defined (1)**
111:6
**definition (3)**
49:17 103:5 104:6
**definitions (1)**
90:23
**definitive (1)**
132:18
**definitively (1)**
86:20
**Delaware (3)**
1:3 7:19 10:10
**deleveraging (1)**
59:11
**delighted (5)**
62:3,6,18,19,19
**delta (1)**
55:8
**delved (1)**
142:3
**denied (2)**
43:12 117:8
**depend (1)**
28:9

**dependent (1)**
92:5
**depends (1)**
86:8
**depict (1)**
133:14
**depicted (1)**
133:6
**depose (1)**
115:21
**deposed (4)**
11:15 14:8 32:20
100:7
**deposition (39)**
1:11 2:4 14:14 33:14
33:15,18,25 68:15
70:11,17,18,21 71:7
71:24 72:21 80:25
81:5,9 84:16 85:11
100:13 103:15
104:4,22,24 107:19
107:23 115:10
117:23,24 121:15
162:25 163:6 171:4
174:11,12 175:13
175:21 176:3
**depositions (1)**
13:22
**derive (1)**
61:12
**derived (1)**
30:16
**describe (6)**
15:21 17:23 18:13
19:12 27:17 104:9
**described (5)**
14:13 16:18 18:16
128:23 129:7
**describing (2)**
113:25 123:15
**designating (1)**
118:2
**designed (1)**
82:7
**despite (1)**
108:20
**detail (1)**
104:21
**determination (1)**
73:20
**determinations (1)**
161:23
**determine (3)**
128:9 132:23 158:3
**determined (3)**
16:11 43:21 82:10

**determining (1)**
125:5
**develop (1)**
84:6
**developed (5)**
119:21,24 131:7
140:25 141:7
**differ (1)**
155:14
**difference (2)**
53:12 154:4
**differences (1)**
129:23
**different (16)**
15:2 23:3 29:10 30:25
59:19 63:2,7 80:18
86:15 92:13 95:6,15
95:17 124:13,13
138:13
**differently (1)**
21:4
**difficult (2)**
78:14 80:19
**diligence (1)**
79:11
**diligenced (1)**
105:7
**dimensions (1)**
97:3
**DIP (1)**
4:18
**direct (7)**
32:6 34:7,10 37:15,20
121:24 163:9
**direction (2)**
8:19 140:6
**directly (1)**
46:11
**directors (6)**
8:20 108:3,5 122:15
159:20 168:24
**disaggregate (1)**
137:10
**disagree (4)**
10:24 103:12,22
169:21
**disagreed (1)**
93:8
**disappointment (1)**
132:15
**disarmament (4)**
159:7,11,25 160:4
**disclaim (1)**
119:17
**Disclaimer (2)**
83:20,23

disclosed (4)
38:24 100:9 101:18
116:3
disclosive (2)
38:22 108:5
disclosure (16)
35:18,21,24 36:10,18
37:2 38:15,24
123:13 148:15
149:3,8,20,23 150:5
175:15
disclosures (2)
122:23 139:19
discount (3)
120:23 132:14 158:3
discounting (2)
74:2,5
discounts (3)
134:7,21 135:4
discovery (4)
10:20 115:13 117:24
117:25
discrepancy (1)
102:22
discuss (1)
115:16
discussed (9)
76:19 84:7,18,19 87:5
113:24 131:16
146:15 165:16
discusses (2)
122:14 124:19
discussing (1)
79:19
discussion (5)
38:17 53:6 80:7
112:19 149:17
discussions (6)
120:17 150:6,9,14
161:22 168:25
diseconomic (4)
167:6 170:5,9,23
disincentives (2)
100:3,22
disinterested (3)
8:20 159:20 168:24
disposition (1)
110:23
dispute (4)
44:4 76:2 127:25
134:6
disputed (6)
18:24 35:15 54:16
57:23 59:22 75:5
disputes (4)
16:6,7,8,8

dissect (1)
135:10
distracted (1)
100:16
distressed (5)
134:12,22 135:11,12
135:16
distribution (2)
157:21 158:4
DISTRICT (1)
1:3
dividend (1)
112:10
document (8)
14:5,10,20 71:2 94:3
121:11,22 132:2
documentation (1)
120:21
documents (6)
11:7,10 20:3 84:22,24
138:22
doing (14)
20:3 26:4 31:22 45:6
64:7 88:17 90:6,9
97:7 112:2,4 128:3
144:6 171:11
dollar (5)
39:24 40:25 169:4
dollar-57 (1)
105:11
dollar-for-dollar (1)
39:25
dollars (5)
96:14,21 97:16,21
154:10
Dorr (1)
10:10
doubt (1)
72:12
dozen (1)
13:6
draft (4)
148:12 150:10,15,17
drag (6)
161:10,10,14,17,18
162:16
draw (1)
111:13
due (5)
5:20 62:13 79:11
111:16 136:5
Duff (10)
120:6 122:3 124:22
124:24 125:3,9,19
125:22 126:2
137:17

duly (2)
10:3 174:12

—— E ——

E (14)
3:2,2 4:2,2 5:2,2 6:3,3
7:2,2 8:2,2 9:3,3
E-estate (1)
167:17
E-side (17)
3:5 108:18 116:18
119:14 136:15
139:22 140:3,9,13
140:21 141:2,8
143:7 144:22
145:21 162:4,12
E&P (2)
112:17
earlier (8)
14:10 63:4 73:10
132:21 133:21
147:21 153:2 154:9
earmarked (1)
43:4
earn (2)
27:24 91:13
earnings (2)
112:11,14,21,25
easier (6)
23:19 27:10 35:13
42:4 57:14 72:23
EBITDA (4)
60:22 61:2,3,18
economic (2)
17:21 137:20
economically (1)
80:10
educated (1)
135:6
EFCH (3)
8:7 156:25 157:8
effect (5)
122:23 153:3,7
159:16,24
effective (6)
24:15 25:18 72:2
73:13,20 74:9
effort (1)
172:6
efforts (4)
12:10,22 13:3 108:20
EFH (169)
4:11 5:12 6:19 8:19
10:14,17,25 12:11
12:13,16 16:5,14,20
16:25,25 17:3,3,4,5

17:14,15,20 18:19
19:2,7,15,19,19,20
19:21,22 20:8,12
21:15,19 22:4,10,23
23:12,15 30:11,14
31:6,13,25 32:4,15
35:14 37:23,25 38:3
38:5 42:3 43:17,21
44:3 45:17 46:3,6
46:14 48:12 50:12
50:17,18 51:9 54:5
55:16,25 57:20
58:12,22 59:12 60:4
61:8,10,15 62:15
66:7 68:17 72:8
73:17,18 74:8,24,25
76:3,3,17 77:4,16
79:16,19,20 80:8
82:3,11,15 83:19
87:20,22 88:2,12,18
90:18 106:12 110:22
110:12,22 111:7,7
111:16,18,21
112:23 113:2,13,15
113:17 118:20
119:13 120:20
122:13 123:5,22
124:11,20 126:12
126:21 127:4,22,24
128:21 129:13,21
130:5,7,13,21 131:3
131:20 133:7,16,18
134:16 135:23
136:15 137:4,9,22
138:9,10 142:8
148:5,11,16,22
150:2,3,10,15 151:7
153:12,21 154:5
160:16 161:24
162:2 175:19 176:2
EFH's (10)
48:9 53:16 57:19 58:4
110:24 112:21
118:19 128:6,9
137:2
EFH/EFIH (2)
22:22 57:22
EFIH (56)
4:5,18 10:11 12:17
15:7,13,24 16:5,19
16:25 17:4,5,13,15
17:19,20 19:20 21:6
21:9,12 22:3,11,25
23:8,9,10,15,17
40:25 41:8,14 54:2
54:16 58:6,10,12,22

59:12 72:4,5,6
73:14,15,21 79:20
80:8 128:8,10 130:4
134:16 137:6,9,21
138:7,12 142:9
elaborate (2)
92:2 109:7
elects (1)
112:23
elemental (1)
90:5
eliminate (2)
112:3 113:17
eliminates (1)
111:25
eliminating (1)
162:9
Ellis (3)
2:5 3:11 18:2
else's (1)
101:10
emanates (1)
161:15
emerge (4)
24:14,22 58:12 61:11
emergence (16)
24:10 25:2 29:25
32:16 42:18 45:17
49:2 52:14,21 81:6
81:15,19,23 88:8,13
90:17
emerging (2)
48:8 50:17
EMILY (1)
6:16
employed (1)
12:3
employees (1)
26:7
enables (1)
113:2
endorses (1)
159:18
energy (5)
1:5 36:19 89:5,13
175:17
English (1)
18:23
enter (3)
27:22 143:18 167:10
entered (1)
48:11
entering (1)
167:9
enterprise (16)
32:4,14 33:3 35:12

36:12 37:18,23 38:5
  38:9,14 39:17,25
  61:18 62:2 129:3,17
enters (1)
  72:3
entire (2)
  107:16 142:20
entirely (1)
  60:9
entirety (1)
  35:21
entities (2)
  30:12,23
entitled (16)
  14:11 16:20 21:7,10
  21:12,16 23:9,11,12
  37:11 42:11 43:7
  73:21 117:25 143:6
  156:25
entity (5)
  17:2 19:21 77:18
  129:4,22
equal (2)
  25:3 112:10
equitization (2)
  162:5,12
equity (90)
  6:19 19:2,23 20:2
  25:2,3,11,17 26:14
  26:25 27:5,14,20
  29:25 30:2,14,17,20
  31:8,17,18,25 32:15
  39:19 40:2 44:13,20
  45:17 46:5,12,14,16
  46:18 47:5,21,21,25
  49:15,18 51:23
  56:20,21 57:7,25
  59:24 62:7,9,15,16
  62:18 63:12,14,19
  63:21 64:8,11,18
  65:8,9,20 66:2,9,10
  66:12,13,22,25 67:7
  67:14 69:2,22,23
  70:3,3 74:24 77:3
  77:12,18 78:4 91:18
  91:21 127:9,11
  128:6,9,10 129:12
  137:5,9 152:23
ERICA (1)
  6:10
errors (1)
  176:7
ESQ (22)
  3:8,9,15,18 4:8,14,21
  5:8,15,23 6:10,16
  6:22 7:9,15,23,24

8:10,16,23 9:10,17
established (1)
  24:17
estates (3)
  160:15 161:6 168:15
estimate (2)
  24:18 63:11
Estimated (1)
  37:11
et (3)
  1:5 36:20 175:17
European (1)
  104:6
evaluate (4)
  108:12 142:17 145:20
  151:13
evaluated (1)
  151:7
evaluating (1)
  146:4
evaluation (1)
  79:14
event (5)
  19:8 57:18 106:14
  113:15 151:24
events (1)
  151:14
Evercore (14)
  12:4,9,21 13:4 14:13
  18:8,9,11,12 37:16
  78:22 90:4 94:10
  148:4
Evercore's (1)
  12:5
everybody (1)
  127:3
evidence (1)
  123:21
evolved (1)
  96:5
exact (3)
  22:16 47:11 112:15
exactly (1)
  22:17 32:2 91:3 107:3
  107:5 137:24
  139:15
examination (16)
  10:6 11:12 76:14
  100:11 116:15
  147:23 154:20
  158:15 165:9,21
  175:4,5,6,7,8,9
examined (2)
  10:4 139:13
example (3)
  66:2 137:15 144:6

exceeds (1)
  106:12
excerpt (1)
  41:2
excess (1)
  112:10
Exchange (1)
  123:14
Exchanges (1)
  142:8
exclusion (1)
  157:15
excuse (5)
  58:7 114:24 124:19
  133:14 139:10
executable (1)
  164:12
execution (1)
  166:2
exhibit (40)
  13:20 14:15,16,21
  33:14,17,23 35:10
  36:15,17,25 39:5
  40:5 42:9 68:6,15
  68:16 69:13 70:17
  70:17,20 82:22
  85:16 87:14 93:18
  93:20 119:12 121:3
  121:5 149:9,24
  150:21 162:24
  175:11,13,15,19,21
  175:23,24
exhibits (2)
  13:21 175:10
exist (4)
  17:5 74:25 99:20
  124:15
exists (1)
  120:24
expect (6)
  31:13 63:13 77:2,10
  82:12 91:13
expected (3)
  30:17 77:19 106:9
expended (1)
  168:19
experience (2)
  147:7,11
expert (51)
  13:15 14:6,12,17,22
  35:9 39:5 42:9
  63:23 84:18 85:23
  86:17,22 87:2,8,13
  93:18,20 100:9,12
  101:13,19,21 102:7
  107:18 113:10,22

114:10,16,20,23
  115:20 116:3 117:3
  117:5,7,11,17,23
  118:7,20 119:16
  121:5,10,13 131:17
  147:13 150:20
  175:11,23,24
experts (1)
  86:5
explain (8)
  42:21 45:24 64:2
  95:16 101:12
  127:18 138:25
  153:10
explicit (1)
  128:4
express (2)
  98:9,21
expressed (1)
  38:19
expressly (1)
  98:3
extensive (2)
  80:6 120:15
extent (4)
  10:20 107:20 115:18
  117:2
extra (1)
  66:16
extract (2)
  153:12 162:7
extracts (1)
  153:13

_____

F

F (4)
  118:20 121:6,10
  175:24
face (1)
  107:4
fact (25)
  16:19 26:18 27:4,9
  47:23 49:15 51:9
  58:8 66:13 69:25
  77:9 83:5,8 95:24
  96:11 97:12 98:19
  113:21 117:16
  119:16 134:22
  144:2 156:10
  160:18 161:4
facts (1)
  176:6
factual (3)
  95:7,12 114:13
failed (2)
  96:16 108:22

fair (17)
  13:9 18:23 22:8,20
  26:20,23 45:2,5,13
  80:12 83:14 108:25
  109:12,19 116:9
  146:2,10
fairness (1)
  62:23
faith (1)
  164:2
familiar (10)
  12:23 13:10 35:17,20
  35:23 40:15 70:11
  128:17 159:8
  161:11
far (7)
  41:19 56:22 61:17,17
  96:11 137:15
  138:16
farce (1)
  171:25
fashion (3)
  108:23 111:7,19
favor (2)
  16:11 105:24
feasibility (26)
  11:3 15:8,13,24 16:19
  16:20 17:9,10 43:9
  68:17 77:16 78:18
  82:3,5,7,15 83:19
  90:11,18,24 91:4,24
  92:7,15 151:4
  175:19
feasible (3)
  99:15,17 113:18
federal (3)
  55:9,21 73:22
fee (3)
  27:22,25 96:20
feel (3)
  93:24 107:10 151:6
fees (2)
  96:24 97:2
feet (1)
  104:9
FELD (1)
  5:17
Fidelity (1)
  7:12
Fifth (2)
  36:18 175:16
figure (10)
  29:14 112:15 119:7
  133:6,14,16 138:3
  138:15 139:5,22
figured (5)

146:8 153:4,11,13
153:17
**figuring (1)**
153:24
**filed (4)**
14:23 59:3,7 85:5
**filing (2)**
122:14 123:5
**filings (1)**
123:13
**final (2)**
23:6 48:10
**finally (3)**
16:11 82:10 110:19
**finance (2)**
35:14 57:20
**financed (1)**
62:14
**financial (22)**
9:8 12:7,14,23 13:11
16:15 19:14 20:7,11
22:23 23:16 24:18
26:15 35:24 42:2
43:19 51:11 76:22
77:2 95:20 126:25
157:13
**financially (3)**
25:23 26:21 61:16
**financing (3)**
26:5 62:7 69:22
**find (5)**
107:11 143:2 149:12
149:15 171:16
**fine (1)**
68:24
**finish (1)**
79:24
**finished (2)**
80:3 115:22
**firm (3)**
27:14 29:16 116:21
**firms (2)**
26:14 27:20
**first (44)**
4:18 5:5 8:21 10:11
14:4 15:11 21:6
22:3,11,25 23:8,17
24:10 31:16 33:22
36:24 37:8 46:16
48:22 52:13,24 54:6
61:4 71:4,6 72:4,23
73:14 78:11,16,19
83:23 94:14 101:7
102:15 116:24
126:11 135:11
156:16,20 157:2,16

163:10 165:25
**five (1)**
107:21
**fixed (2)**
39:21 136:4
**flow (1)**
130:5
**flows (2)**
28:25 29:3
**focus (3)**
15:6 98:24 143:12
**FOERSTER (1)**
6:5
**follow (1)**
115:25
**followed (1)**
101:24
**following (2)**
71:25 101:14
**follows (5)**
10:5 15:14,15 20:25
20:25
**followup (1)**
116:19
**foregone (1)**
162:18
**foreseeable (1)**
108:16
**form (75)**
22:13 33:6 36:2 44:13
72:11 74:10,20 78:6
82:4 86:7,11,18
87:9,11 88:14,22
94:21 95:11 99:13
99:21 100:5 101:11
102:19 103:2,13
104:2,19 106:2,18
107:2 109:6,17
110:6 111:2 113:9
113:23 114:5,14,18
115:2 124:5 125:11
125:15 129:19
130:15,23 133:10
141:23 144:25
147:5,6,9 152:7
155:10,16,23
156:21 157:4,10,18
157:24 158:6 160:6
160:8 161:3 162:10
161:4,20 167:4,24
168:9,22 170:24
171:8 172:22
**forma (8)**
19:14 20:6,11 25:2
33:4 34:22 58:11
60:16

**formed (11)**
89:14 119:4 126:11
126:16 130:18
132:4 136:20
141:20 142:14
143:8,10
**forming (1)**
155:7
**forms (3)**
30:25 89:20 140:16
**formulations (2)**
88:25 89:3
**forth (2)**
24:6 174:11
**fortiori (3)**
20:21,24 23:24
**Fortune (1)**
51:5
**forward (3)**
33:5 117:8 166:12
**FOTEINI (1)**
4:21
**found (1)**
143:5
**Foundation (1)**
172:23
**four (4)**
71:8,18 72:22 107:21
**fourth (1)**
55:15
**FRANK (1)**
7:11
**FRANKEL (1)**
4:4
**free (5)**
14:3 93:24 107:10
117:13 151:6
**Friday (1)**
40:13
**FRIED (1)**
7:11
**front (1)**
162:24
**full (21)**
16:9 18:25 19:3,10
21:8,10,12,16,20
22:5,5,10 23:6,22
42:15 43:5 48:11
62:13 66:24 72:9
76:3
**fully (8)**
22:14 38:21 64:24
108:5 123:11,22
153:10 164:12
**function (1)**
97:2

**fund (13)**
9:6 22:24 27:13 29:7
60:5 66:21 104:15
105:4 106:5 166:19
170:16,22 172:18
**fundamentals (2)**
105:19,23
**funded (2)**
77:20 78:5
**funding (6)**
57:25 59:24 82:25
83:10 105:24
166:25
**funds (7)**
26:13,18 27:19 29:6
29:11,17 43:16
**furnished (1)**
13:16
**further (3)**
154:11 165:18 174:15
**future (7)**
1:5 28:25 29:3 36:20
43:21 108:16
175:17

---

**G**

**GAAP (1)**
125:4
**gain (1)**
111:9
**GARRISON (1)**
5:4
**general (10)**
22:19 29:8 49:14
50:10 64:14 90:15
106:19 156:24
157:7 159:12
**generalize (1)**
49:23
**generally (6)**
35:17,23 101:4
108:10 134:10
159:2
**generic (1)**
26:11
**genuine (1)**
171:11
**getting (1)**
90:14
**give (5)**
18:3 29:14 73:5
108:18 142:20
**given (15)**
12:20 15:22 17:24
25:20 46:3 49:14
91:25 97:6 103:5

117:19,22 118:23
166:17 168:7
174:13
**gives (2)**
64:17 94:15
**giving (3)**
160:15 166:17 167:14
**global (1)**
159:16
**go (20)**
24:15 57:10,16 59:18
60:11 66:19 72:23
76:5 83:17,22 92:2
96:17,22 98:25
103:8 106:21 117:8
149:13 162:8
171:13
**goes (3)**
33:4 90:6 170:15
**going (23)**
11:17,25 13:19 50:6
52:4 60:12,23 70:25
78:17 101:25 105:4
105:10 107:12
109:21 114:2 116:8
121:2 154:6 163:9
165:13 166:6,12
169:20
**good (7)**
10:8 105:9 109:8
139:5 158:17 164:2
166:25
**goodwill (1)**
125:5
**gosh (1)**
104:25
**governance (2)**
123:12,15
**grade (5)**
58:8,14,17,23 59:8
**Grand (1)**
6:14
**great (3)**
79:18 134:19 171:15
**greater (3)**
56:22 61:17 144:19
**greatest (1)**
68:23
**greatly (2)**
161:25 162:15
**GRINGER (1)**
7:24
**ground (1)**
11:18
**group (15)**
7:5 42:24 44:8 76:20

104:15 105:9
145:18 154:9
155:20 156:4
163:16 171:19
grow (1)
49:20
growing (1)
49:21
grows (2)
29:25 49:19
guarantees (1)
155:13
guess (3)
24:16,20 29:15
Guggenheim (1)
85:3
guidance (1)
89:8
GUINEY (1)
8:16
GUMP (1)
5:17

_____ H _____

Hale (1)
10:10
half (7)
13:6 63:18 66:8,16
67:6 78:7,11
halfway (1)
122:2
hand (5)
13:24 55:9,10 121:2
174:20
handed (3)
14:5,11 121:22
happen (5)
83:5 108:9 151:13
161:17,20
happened (1)
132:15
happens (3)
21:18 89:23 161:16
happy (9)
11:24 32:6,10,22
34:13 36:8 80:25
141:5 143:9
hard (2)
103:4 145:2
Hardiman (23)
3:8 10:16 76:15,16
93:17,23 101:14,22
102:8 115:8 116:7
160:6 161:3 165:19
165:22 169:13,17
169:22 170:8,10

172:24 173:6 175:5
HARRIS (1)
7:11
HAUER (1)
5:17
head (2)
31:22 47:8
healthy (3)
51:4,12 61:16
hear (1)
64:4
heard (4)
20:20 27:12 28:19
112:16
hearing (13)
15:4 40:11 41:2 81:22
86:25 87:7 94:9
115:20 118:4,14
131:12 140:12
159:14
heavily (1)
89:6
hedge (5)
26:13,17 27:13,19
29:6
held (1)
2:4
help (2)
129:20 149:15
helpful (2)
90:21 133:20
helping (1)
29:7
Henkin (15)
85:3 92:24 93:19,21
94:15 101:16 103:9
103:23 106:8,17,25
110:5 111:4 114:25
175:23
Henkin's (4)
85:4 94:12 107:22
158:21
hereunto (1)
174:19
high (5)
38:25 64:16 132:9,10
134:20
higher (9)
39:18 61:17 75:15
96:14,23 97:16
105:3 135:17
154:10
highlighted (1)
82:20
highly (2)
26:15 45:14

history (1)
103:6
Hoc (5)
5:5 7:5 145:18 155:20
156:4
hold (2)
23:9 31:23
holders (2)
41:9 157:14
holding (2)
127:6 148:3
Holdings (5)
1:5 36:20 122:15,24
175:17
holds (1)
108:2
home (1)
162:8
hopefully (2)
53:6 97:23
horizontal (2)
65:2,15
Horowitz (1)
73:8
hours (1)
84:21
hundred (1)
96:20
Hunt (5)
76:20 96:5 97:5
145:19,19
Hunt's (1)
97:8
Hunts (8)
25:10,23 77:11 78:13
80:15 88:6 96:6
170:15
hurdle (11)
27:14,17 28:5,6,7,11
28:12 29:9,11,17
77:8
hypothetical (1)
21:24

_____ I _____

idea (4)
29:17,19 131:15
167:22
identification (7)
14:18 33:19 36:22
68:18 70:22 93:22
121:7
identified (1)
94:23
identify (5)
14:5,20 33:22 36:25

71:2
IH (2)
61:10,15
III (1)
4:14
Illinois (2)
3:14 8:22
Illustrative (2)
37:11,23
Imagine (2)
23:4 60:2
Immediately (1)
15:15
impact (3)
157:13 160:4,23
impacts (1)
24:18
impairment (1)
125:5
impediment (2)
123:18,25
implement (1)
68:20
implications (1)
123:12
implicit (1)
162:21
implied (3)
29:2 32:14 110:20
implored (1)
108:17
imply (1)
33:2
important (3)
111:20 159:23 162:17
improvement (1)
59:14
improvident (1)
167:7
imputed (2)
34:21 138:11
in-bankruptcy (1)
94:25
inappropriate (1)
128:11
inarticulate (1)
42:6 67:16
incentives (3)
100:3,22,25
include (2)
16:7 148:7
included (4)
79:3 124:25 138:14
149:23
includes (2)
126:2 157:8

including (1)
12:17
inconsistent (1)
94:17
incorporate (1)
146:10
incorporated (2)
138:18 145:4
incorporating (1)
122:4
incorrect (4)
124:17 129:5,6,10
increase (3)
31:18 40:2 153:23
increased (1)
39:24
increases (4)
54:13 55:23 56:7
160:23
increasing (3)
53:23 54:25 55:12
incremental (8)
55:7,20 58:20 61:13
63:18 64:8 91:20,21
incurring (2)
113:3 145:6
indebtedness (1)
135:2
indenting (1)
42:15
Indenture (7)
5:11,18 7:19 10:11
11:5 148:2 154:24
independent (2)
77:23 169:6
INDEX (1)
175:2
indicated (3)
84:5 151:6 154:9
indicates (2)
71:4 161:6
indication (1)
64:18
indicator (3)
132:18,20 133:25
indicia (6)
45:7,9 131:20 132:24
140:21 143:7
individual (6)
40:15 100:7 103:15
104:4,21 107:19
infer (1)
66:18
inform (1)
108:3
information (4)

20:7,11,15 115:19
**InfraREIT (2)**
88:5 89:22
**innermost (1)**
156:7
**inside (1)**
112:11
**insignificant (1)**
169:6
**insist (1)**
172:14
**insolvency (3)**
131:21 132:19 135:4
**insolvent (2)**
126:12 135:9
**instance (1)**
136:3
**institutional (1)**
27:21
**instruct (2)**
101:25 102:2
**intend (5)**
86:24 117:2,18
140:11 141:23
**intended (1)**
94:8
**intending (1)**
85:14
**intends (1)**
117:18
**intercompany (2)**
110:3,13
**intercreditor (2)**
159:19 168:25
**interest (49)**
16:9 18:25 21:9,11,13
21:14,17 22:6,12
23:7,12,13 28:4,17
28:18 41:17 43:5,12
54:9,13,25 55:5,8
55:19 56:4,6,10,11
60:7 73:15,16,18,19
73:21 75:7 82:9
109:25 110:11
120:18 138:11
145:17 151:9 162:4
171:5,11
**interested (1)**
174:18
**interesting (1)**
135:5
**interests (2)**
148:18 149:2
**internal (8)**
28:13,20,23 29:20,21

150:6,9,14
**internally (1)**
113:25
**interrupt (2)**
169:16,18
**interrupte (1)**
73:25
**intracreditor (1)**
169:2
**invest (6)**
32:3 46:13 62:20 77:3
77:12 161:6
**invested (3)**
46:25 91:10 172:5
**investing (3)**
40:20 43:2 44:9
**investment (22)**
28:8 29:4 31:6 44:12
45:3,5 46:12,18
50:21 58:8,14,17,22
59:8 77:7 89:11
92:3 105:7,14,16
132:22 133:23
**investments (1)**
28:5
**investor (9)**
42:24 44:8 78:12
80:16 105:8 133:2
154:8 163:16
171:19
**investors (18)**
27:21 29:16 31:13
32:2,17 40:19 42:18
43:16 44:20 45:10
45:14 76:21 77:11
78:9 91:9 105:9
106:4 166:23
**involve (1)**
151:21
**involved (14)**
12:10,22 37:9,14,16
98:8,17,20 101:8
108:21 169:7,10
**involvement (1)**
37:15
**IRS (2)**
112:19,20
**issue (8)**
63:13 82:14 104:5
108:11 110:10
122:8 125:6 129:15
**issued (2)**
25:4 57:22
**issuer (1)**
144:12

**issuers (1)**
59:8
**issues (6)**
14:23 100:8,10
114:21 115:12
154:14
**issuing (2)**
41:23 61:14
**it'll (1)**
163:6
**IV (1)**
94:5

———————
**J**
———————
**JACOBSON (1)**
7:11
**JEFFREY (1)**
9:17
**JOB (1)**
1:25
**JOCELYN (1)**
7:15
**John (3)**
3:8,9 76:16
**join (1)**
11:6
**Joint (2)**
36:19 175:16
**Jointly (1)**
1:9
**joke (1)**
171:25
**JONATHAN (1)**
9:10
**judge (2)**
50:5 166:6
**judgment (13)**
18:20 23:6 48:10 55:9
55:21 57:19,23
59:21 61:19 66:14
73:22 151:15 169:5
**judgments (1)**
62:7
**July (1)**
49:6
**June (11)**
20:9,13 23:5 24:11,15
49:2 50:7 52:19,25
56:16 60:8
**junior (3)**
22:2,21 45:20
**JUSTIN (1)**
3:18

———————
**K**
———————
**K&E (5)**

24:17,21 84:17 115:6
118:25
**Kam (6)**
8:10 154:17,21,22
158:8 175:8
**Kathy (4)**
1:24 2:6 174:6,22
**KATZ (1)**
6:18
**keep (1)**
154:6
**Keglevic (8)**
70:12,21 71:12 72:17
74:12,21 75:11
175:21
**Keglevic's (1)**
70:18
**kind (2)**
54:20 98:9
**Kirkland (4)**
2:5 3:11 18:2 73:25
**Klepfer (4)**
1:24 2:7 174:6,22
**know (39)**
11:20,22 13:6 17:4
22:15,17 28:2,9
29:5,11 38:12 44:25
58:6,8 60:22 61:24
63:17 68:6 77:7
87:3 97:20 102:13
105:18 112:15
113:11 114:6 115:4
120:10 123:16
139:20 140:15,17
144:8 148:10
155:12 156:8 166:5
169:19 173:4
**knowledge (1)**
37:20
**knows (1)**
108:17
**KRAMER (1)**
4:4

———————
**L**
———————
**labeled (2)**
68:17 175:19
**lack (3)**
94:16 117:19,22
**laid (2)**
90:3 98:21
**language (1)**
104:7
**large (5)**
94:18,19 113:3,15
120:15

**largely (1)**
112:22
**largest (1)**
26:17
**LaSalle (1)**
3:13
**Lathrop (2)**
4:14 116:17
**Latin (2)**
20:23 21:3
**Law (1)**
8:13
**lawyer (1)**
20:19
**lawyer-speak (1)**
20:20
**laying (1)**
139:10
**lays (1)**
93:3
**LBO (1)**
55:16
**LEES (3)**
6:22 147:6 169:19
**left (5)**
52:10 61:5 62:9 64:24
73:8
**left-hand (1)**
38:10
**legitimate (4)**
163:16 171:6,19,24
**lend (4)**
62:3,6,19,19
**Lenders (1)**
5:5
**lengthy (1)**
168:15
**let's (20)**
24:2 27:4 32:11 42:8
52:4 57:10 60:11
62:8 63:22 68:6,14
72:22 88:19 90:24
92:24 103:8 106:21
116:10 120:25
158:11
**letter (1)**
112:18
**level (3)**
134:12 135:11,13
**levels (4)**
84:5 134:22 135:16
152:22
**leverage (1)**
152:22
**LEVIN (1)**
4:4

**Lexington (4)**
2:5 3:16 4:19 8:8
**liabilities (26)**
19:3,9 21:20 23:21
39:21 44:4 50:13
51:7,10 53:18 56:16
57:3,5 61:4 62:13
74:9 76:4 128:5,8
129:17,24 130:4
137:19,21 144:22
147:8
**liability (9)**
16:12 51:16 57:3 60:5
76:2 110:22 143:17
143:25 147:2
**lien (11)**
4:5,18 5:5 10:12
23:17 54:3,6 156:16
156:20 157:2,17
**liens (13)**
21:7,10 22:3,11,25
23:8,9 34:19 72:4,5
73:14,16 167:16
**lieu (1)**
137:2
**likelihood (7)**
59:15 80:17 92:12,17
92:21 160:5,24
**limited (2)**
27:20 102:6
**line (20)**
69:21 71:13,25 73:4
74:16 75:20,23
107:16 163:10
176:8,9,11,12,14,15
176:17,18,20,21,23
**lines (5)**
34:11 72:22 74:13
75:11 83:25
**LIOLOS (1)**
3:9
**LIPTON (1)**
6:18
**liquid (1)**
51:7
**liquidation (10)**
148:5,11,14,19,22,25
149:5,22 150:10,15
**liquidity (1)**
51:16
**listed (1)**
126:7
**listening (2)**
40:11 141:10
**literature (3)**
89:9 135:7,15

**litigating (1)**
168:19
**litigation (4)**
42:17 50:12 66:24
161:5
**little (5)**
22:15 34:24 61:23
64:21 142:24
**Livenote (1)**
2:10
**LLP (1)**
2:5
**long (8)**
12:9 84:20 112:13
116:12 120:2
143:23 145:2
149:11
**long-term (5)**
89:6 105:19,19,23,23
**longer (5)**
57:16 105:13 111:18
151:14 170:16
**look (55)**
14:4 20:8,12 24:4
26:3 28:24 32:10
42:14 45:6 49:13
53:20 61:10,25,25
62:8 64:5 69:15,21
71:12 80:10,12,23
88:13 89:8,13,21
93:24 99:22 107:7
126:18,24 127:8,9
128:5,8 129:11,12
129:21,22 130:3,25
131:19 132:23
133:23,24 134:5,6,9
134:11,16 137:4,12
137:15 138:24
149:20
**looked (19)**
19:14,18,21,22,23
30:12,19,22,25
32:24 34:17,24
50:22 89:4 95:13
100:25 132:8 139:2
141:19
**looking (12)**
31:7 37:7 83:24 99:24
100:19 105:10
128:10 134:2
136:19,22 137:2,8
**looks (1)**
137:16
**Los (1)**
6:15
**lose (1)**

50:5
**loses (2)**
50:17 54:7
**loss (3)**
50:6 66:24 69:19
**losses (2)**
50:11 56:15
**lost (3)**
102:11 109:22 150:11
**lot (5)**
61:7,16 87:21 95:19
138:2
**lots (7)**
50:22,25 89:18 97:5
98:10 134:6 168:24
**low (5)**
38:25 39:6 65:11
78:10 96:20
**lower (1)**
96:18

_____
**M**
**M&A (5)**
94:18,23,25 95:18
120:15
**major (1)**
123:18
**make-whole (46)**
16:7 21:8,11,13,17
22:11 23:2,7,10,11
23:13 41:8,15 48:19
53:2,3,8,9,21 54:8
54:11,22 56:3,10,12
59:23 60:7 69:16
72:5,6,7 73:15,16
73:17,19 75:6 82:10
143:13,13,15,17
144:16,23 145:3
146:25 147:13
**make-wholes (3)**
22:5 145:6 151:8
**making (10)**
25:11 33:7 54:6 83:6
105:16,17 123:18
123:25 152:24
167:11
**MAMIS (1)**
5:8
**manage (1)**
27:24
**managed (1)**
88:6
**management (6)**
27:25 79:10,16,18,19
122:16
**manager (5)**

27:25 28:8,10,16,18
**March (1)**
159:21
**mark (12)**
9:21 13:19 68:6,14
70:16 93:17 117:4
118:7,19 121:6,10
175:24
**marked (18)**
13:23 14:14,18,21
33:19,23 35:10
36:21 40:5 68:17
69:6 70:22 93:21
121:7 134:18 149:8
149:24 150:21
**marked-up (1)**
95:25
**market (24)**
45:7,9 64:11 65:5
67:20,23 68:11,12
69:2,23 84:6 91:18
110:20 132:11,13
132:17,19,23 133:8
133:17 134:21
151:21 152:19,25
**marketplace (3)**
47:2 134:17 172:2
**markets (11)**
19:23,24 22:24 58:19
61:25 62:6,18 63:21
64:19 134:25
151:24
**marking (2)**
13:21 33:13
**marriage (1)**
174:17
**MARSHALL (1)**
9:10
**Massachusetts (2)**
5:14 9:9
**massive (1)**
105:6
**material (8)**
59:11,14 72:12 78:24
79:7,13,22 89:18
**math (6)**
31:22 47:7,17 75:14
151:16,19
**mathematics (2)**
152:10,11
**matter (3)**
95:7 158:19 174:18
**maturity (2)**
135:17,18
**maximum (1)**
19:17

**McCRACKEN (2)**
4:10 116:22
**McKane (1)**
73:25
**mean (11)**
20:19 34:3 45:24 55:7
58:4 63:6 71:7
95:16 127:18 153:9
171:24
**means (4)**
20:24 58:16,18 65:19
**measure (3)**
91:3 134:13 135:4
**meet (4)**
69:8 84:20 91:14,21
**meeting (1)**
84:23
**meetings (1)**
108:2
**Mellon (3)**
8:5,6 154:24
**memorializes (1)**
159:19
**memory (5)**
33:10 36:14 93:7,15
131:23
**mentioned (2)**
69:9 135:11
**mere (1)**
168:18
**merge (2)**
160:16 162:23
**merged (1)**
17:2
**merger (24)**
34:20,23 42:24,25
43:15 44:7,9 78:10
83:10 94:17 96:3
106:10,14,23 108:7
109:3,14 158:23
160:2 161:17,19
162:2 166:19
171:12
**mergers (1)**
94:24
**merit (3)**
2:8 167:19 174:7
**meritorious (2)**
109:8 168:20
**merits (1)**
168:16
**met (3)**
22:18 84:17 97:9
**methodologies (1)**
120:7
**methodology (2)**

134:2 135:7
**metrics (5)**
60:14 61:9,10,23 62:4
**Michael (4)**
85:3 93:19,21 175:23
**mid (2)**
151:10 152:5
**middle (1)**
12:12
**million (21)**
31:18 43:3 44:10,22
45:15 46:19 47:6,11
47:13,14,19,20 48:4
53:2,3,10,10,12
60:6 96:21 170:17
**mind-set (1)**
44:25
**minimize (1)**
113:15
**minus (2)**
25:14 130:4
**minuses (3)**
99:23,25 100:20
**minute (7)**
21:25 60:12 92:24
107:7,12 123:20
149:14
**minutes (4)**
12:2 57:15 136:25
154:17
**misleading (1)**
128:12
**missing (1)**
63:7
**misspoke (1)**
143:6
**misspoken (1)**
16:18
**MLPs (1)**
89:5
**model (1)**
30:16
**modest (1)**
112:25
**mom (1)**
26:10
**moment (3)**
149:7 167:6,13
**money (3)**
46:24 166:25 172:7
**monies (2)**
27:23,24
**Montgomery (2)**
4:10 116:22
**months (8)**
48:8,25 49:11,22

52:16 136:9 162:13
162:14
**morning (3)**
10:8 108:8 158:17
**MORRISON (1)**
6:5
**move (2)**
62:22 100:11
**multiples (1)**
133:25
**MUNGER (1)**
6:12
**mutual (1)**
29:17
**MW (3)**
48:11,19 57:24
**myriad (2)**
12:16 80:21

_____

**N**

**N (7)**
3:2 4:2 5:2 6:3 7:2 8:2
9:3
**NAFTALIS (1)**
4:4
**name (6)**
10:8 116:17 154:22
158:17 176:2,4
**named (1)**
40:16
**narrowly (1)**
111:6
**nation's (1)**
26:17
**National (1)**
8:21
**nature (2)**
98:22 105:18
**necessary (3)**
53:17 70:2 78:24
**need (6)**
48:12 50:18 51:10,19
90:22 131:17
**needed (2)**
58:20 97:10
**needs (2)**
114:20 128:7
**negotiation (2)**
97:2 162:15 169:6
**negotiations (3)**
155:6 169:8,25
**Nelson (14)**
4:14 116:16,17,24
117:16,22 118:5
121:9,21,23 146:17
146:23 147:18

175:6
**net (1)**
138:13
**never (4)**
38:19 132:14 144:16
149:4
**new (64)**
1:12,12 2:6,6,11 3:7,7
3:17,17 4:7,7,20,20
5:7,7,22,22 6:9,9,21
6:21 7:8,8,13,14,14
7:22,22 8:5,6,9,9,15
8:15 9:16,16 17:3
22:9 31:13 35:14
45:17 46:14,24
57:25 59:24 60:4
61:15 62:14,15,16
63:7 65:20 66:2,7
67:11 69:22 76:3,3
77:4 106:11 154:23
174:4,5,8
**newly (1)**
57:22
**news (1)**
41:3
**nice (1)**
38:18
**night (2)**
20:25 108:9
**NIXON (1)**
5:10
**NOAH (1)**
5:8
**NOLs (1)**
110:24
**normal (1)**
151:24
**north (3)**
3:13 34:24 66:8
**Notary (3)**
2:10 10:3 174:7
**note (4)**
4:5 11:7 45:19 116:5
**noted (9)**
76:12,13 116:13,14
146:21,22 158:13
158:14 173:9
**notes (17)**
5:20 7:6 8:7 21:15
23:12 54:3,6,17
55:16,25 110:3,13
135:19 136:4,5
144:13 155:15
**noticed (1)**
118:18
**notion (1)**

23:24
**notwithstanding (1)**
168:16
**November (5)**
118:4 131:12 136:5
140:12,13
**number (12)**
11:15 15:2 31:19,21
32:18 33:11 34:23
47:12 75:15 89:15
103:8 115:14
**numbered (3)**
15:10,12 72:24
**numbers (12)**
49:13,24 65:12,17
79:11 128:2 137:14
137:25,25 138:13
138:14 139:17
**numeral (2)**
94:5 126:20

_____

**O**

**O'NEILL (1)**
4:8
**object (10)**
10:21 107:20 117:4
118:2 147:6 152:7
160:6 161:3,21
173:2
**objected (3)**
72:11 74:10,20
**objection (69)**
22:13 33:6 36:2 78:6
82:4 86:7,11,18
87:9,11 88:14,22
94:21 95:11 99:13
99:21 100:5 101:11
102:19 103:2,13
104:2,19 106:2,18
107:2,16 109:6,17
110:6 111:2 113:9
113:23 114:5,12,14
114:18 115:2 124:5
125:11,15 129:19
130:15,16,23
133:10 144:25
147:5,9,21 155:10
155:23 156:21
157:4,10,18,24
158:6 160:8 166:4
166:20 167:4,24
168:9,22 170:24
171:8 172:20,22
**objections (1)**
100:24
**objectives (1)**

91:8
**objector (1)**
160:9
**obligated (1)**
43:21
**obligation (3)**
113:4 143:21 144:19
**obligations (10)**
43:12 48:13,24 50:19
57:21,24 59:23
91:21 144:9,15
**observation (4)**
106:3,4,20 135:5
**observations (2)**
139:23 168:12
**obstacle (1)**
120:18
**obtain (1)**
170:17
**obviously (19)**
10:24 11:18 14:3 20:5
20:18 46:8 89:22
95:18 96:25 97:12
107:25 112:6
120:14 132:14
133:23 134:4,5,18
138:12
**occur (6)**
50:11,11 83:10 99:20
111:9 151:15
**occurred (4)**
33:16 40:12 62:8
70:19
**occurs (1)**
56:15
**October (12)**
1:13 2:2 14:12,17
70:19,21 121:6
174:20 175:12,22
175:25 176:3
**odds (1)**
78:9
**offer (11)**
49:25 81:21 85:14
96:12 102:23
113:20 123:19,23
131:11 144:13
150:23
**offered (3)**
10:21 34:15 124:8
**offering (12)**
50:9 63:19 64:7,9,9
64:22 68:12 92:20
100:9 101:18 113:6
114:10
**offerings (5)**

**offerings (5)**
64:14,15 67:14,18
69:7
**Official (6)**
3:5 6:6 10:14,18
76:17 116:18
**Oh (3)**
79:25 99:14 141:10
**Okay (63)**
21:23 24:10 26:20
27:12 29:19,23 33:8
33:12 34:7 36:4
37:4,8 38:12,23
39:4 42:14 47:16,18
50:15 51:19 52:4,13
53:20 55:15 58:4,21
59:2,6,17 60:11
62:5,22 63:22 64:2
64:23 65:15 66:23
67:4,9 68:5 70:9,16
71:11 72:20 73:3
75:17 83:16,22
85:14,22 91:7 94:6
95:16 97:20 113:5
116:9,23 123:9
150:8 155:4 163:9
166:8 173:6
**OLSON (1)**
6:12
**once (2)**
10:21 143:20
**Oncor (54)**
17:19 30:11 33:3
34:22 35:13 36:12
37:25 38:4,8 58:8
61:3 77:13,24 78:3
78:8 79:14,15,16,18
79:20,23 80:8,22
81:5,14,18,23 88:8
90:2,10 92:4 103:10
103:24 120:8,10,12
120:19,24 122:7,15
122:17,24 123:19
124:15 126:2
137:17,20 138:12
145:18 146:7,12
153:13 160:17
162:23
**Oncor's (1)**
90:16
**one's (2)**
105:4 140:18
**open-ended (1)**
62:25
**operations (1)**
122:17

**opine (1)**
107:21
**opinion (82)**
15:7,23 18:14,17,23
19:6 21:5 22:8
23:14,19 24:8 27:7
27:10 39:10 44:2
47:3 49:8,11,25
50:10 75:24 77:23
81:22 82:16,24 92:5
92:20 94:4,14,15
95:10 100:10
101:16,19,23 103:8
103:12,22 106:7,16
106:21,24 107:13
109:21 110:4,18,19
110:21,25 113:7,22
114:10,23,24 122:5
122:10,20,22,25
123:6 124:4 125:10
125:12,20 126:16
126:17 128:13
130:13 136:20
140:8,11,25 141:8
143:9,11 145:11,24
152:3,12 158:21,22
167:25
**opinions (38)**
15:2 18:14 20:15
53:13 85:15,19
86:25 92:7 93:3,9
93:10 94:2,12
100:12 101:13,21
102:7 116:4 117:15
119:4,21,24 126:8
126:11 127:23
130:18 131:8,11
132:4 136:10
139:21 141:20,23
142:5,14 146:13
150:22,25
**opportunity (1)**
162:18
**opposed (2)**
114:13 152:14
**opposite (1)**
39:13
**option (10)**
103:11,18,25 104:6,9
104:10,12,18
160:20 162:21
**oral (1)**
150:18
**order (3)**
48:10 72:3 79:13
**ordinarily (1)**

97:14
**outcome (1)**
174:18
**outcomes (1)**
168:17
**outs (1)**
17:7
**outside (1)**
43:14
**overall (1)**
162:17
**overfund (2)**
42:25 44:8
**override (1)**
28:9
**Overview (1)**
42:11
**owed (2)**
60:5 66:15
**owes (1)**
54:8
**owned (2)**
17:19,20
**Owners (1)**
6:19
**ownership (4)**
127:10 128:7,10
137:20
**owns (3)**
17:15 127:7 138:12

**P**

**P (15)**
3:2,2 4:2,2,8 5:2,2 6:3
6:3 7:2,2 8:2,2 9:3,3
**page (103)**
15:10,11,14,15 24:2,6
29:23 32:8,9,10,18
34:8,11 37:5,6,10
40:6,7 42:8,11
45:19 47:12 48:7
52:5,8 56:19 57:10
59:17,21 60:12
62:25 63:3,8,9,22
63:23 64:3 66:6
67:9 68:7 69:13
71:4,6,6,7,9,11,15
71:17,18,19,21,24
72:21,22,22,23,24
72:25,25 74:16 81:2
81:2 82:20 83:19,20
83:23 94:16 107:13
109:22,23 121:17
121:24 122:2 126:6
126:19,20 127:13
130:2 133:20

136:17,23 137:7,16
139:24 145:15
163:5,6,7,10 175:3
175:10 176:8,9,11
176:12,14,15,17,18
176:20,21,23
**pages (7)**
18:18 71:8,19,21
72:22 94:2 107:21
**paid (7)**
48:12 56:16 76:3
91:12,14 110:2,12
**paper (1)**
71:19
**par (7)**
134:8,24 135:22,24
136:6,9 144:14
**paragraph (6)**
83:24,25 94:15
107:13 109:23
110:21
**pardon (4)**
30:9 58:7 139:11
153:12
**parent (3)**
12:16 127:6,9
**pari (4)**
155:8,21 156:5,11
**Park (1)**
5:21
**part (20)**
42:2 46:2,16 59:2
78:16,19 93:24
99:10 112:18,20
113:4,22 144:23
159:14 160:18,19
162:12,19,21
170:18
**participant (1)**
169:24
**participate (1)**
107:25
**participation (1)**
157:16
**particular (11)**
29:3 38:17 45:11,14
79:19 83:13 98:13
98:14 133:3 136:23
143:3
**particularly (1)**
34:11
**parties (4)**
85:24 159:16,17
174:16
**partner (1)**
13:4

**partnership (1)**
27:20
**parts (2)**
35:24 119:7
**party's (4)**
101:9 102:17,18,23
**pass (2)**
76:7 147:18
**passed (1)**
145:13
**passu (4)**
155:8,21 156:5,11
**PATTERSON (1)**
8:12
**Paul (4)**
5:4 8:23 70:21 175:21
**pause (1)**
149:16
**paused (1)**
80:4
**pausing (1)**
80:5
**pay (25)**
19:3 21:20 22:4,10
23:16 44:3 45:10,15
48:13 50:12,19 51:7
51:10,16 53:17 57:6
76:4 89:18 133:2
144:8,20 151:8,20
152:14,18
**paying (3)**
26:24 32:17 162:22
**payment (17)**
16:6,7,8,9 23:6 35:14
41:8,15,16 43:4
48:23 49:5 54:20
57:23 59:22 143:13
170:18
**payments (12)**
16:16 42:4 43:7,20,22
49:6 82:13 106:13
143:13 144:23
151:14 152:5
**PCRB (12)**
8:6 155:3,8,21 156:4
156:10,15,19 157:3
157:14,15 158:4
**PCRBs (2)**
155:12,17
**PEABODY (1)**
5:10
**Pedone (14)**
5:15 11:4 14:7 116:10
130:16 147:24,25
149:18 154:11,19
165:8,10,18 175:7

**pejoratively (1)**
34:4
**pen (1)**
68:22
**pendency (1)**
153:17
**pending (1)**
11:22
**Pennsylvania (1)**
4:13
**penny (3)**
31:23 48:4 57:6
**people (11)**
31:5 37:13 62:24
97:11 104:25
105:16 132:16
139:4 146:6 167:21
172:5
**perceived (1)**
106:11
**percent (35)**
5:19 17:15 28:3,7,7
28:11 30:2,5,17,21
31:10,14 38:4 40:25
41:14,16 47:4,9,15
53:23 64:16,20
65:16,17 66:3 67:19
68:10,25 70:5
132:10,13 136:4
138:11 144:14
145:17
**Percent/12.25 (1)**
5:19
**percentage (4)**
64:10 65:21 69:22
70:4
**perform (5)**
78:24 79:8,13,22 84:9
**performance (1)**
96:19
**performing (1)**
78:23
**period (3)**
18:16 134:17,18
**perplexed (3)**
126:25 127:2 142:24
**person (1)**
114:21
**personally (4)**
13:3,10 148:8,21
**perspective (1)**
19:22
**perused (1)**
107:24
**petition (2)**
141:3,9

**PF (2)**
60:14,16
**phase (1)**
10:19
**Phelps (10)**
120:6 122:3 124:22
124:24 125:3,9,19
125:22 126:2
137:18
**Philadelphia (1)**
4:13
**Philip (2)**
7:23 10:9
**photographic (1)**
93:14
**pick (1)**
96:13
**Pickering (1)**
10:9
**picking (1)**
135:2
**picture (1)**
53:15
**PIK (1)**
41:9
**PIKs (9)**
21:12 23:10 40:25
41:14 54:18 72:6
73:17,21 96:8
**pile (1)**
163:3
**Pimco (1)**
9:13
**pipeline-driven (1)**
89:5
**place (2)**
32:9 82:25
**places (1)**
71:6
**plaintiffs (1)**
16:12
**plan (33)**
13:16 14:24 16:14
20:5 24:14,18 25:4
25:9 29:7 30:9
36:19 37:3 38:2
42:2 46:2 70:13
83:2 106:9,14 114:3
155:7,17 156:9,14
158:5 161:21
162:12,14 166:3,11
166:14 170:15
175:16
**planned (1)**
31:5
**planning (2)**

81:21 86:12
**play (2)**
113:25 170:20
**players (2)**
76:22 77:3
**Plaza (2)**
7:13 8:21
**please (8)**
11:20 24:5 100:15
123:2 124:6 125:16
131:25 150:12
**plus (3)**
25:13 53:12 106:12
**pluses (3)**
99:22,24 100:19
**point (22)**
13:6 24:3 34:16 43:20
50:16 63:14 85:21
86:12 111:12
117:12,21 124:14
135:2 149:7,9
154:15 157:5
166:24 167:7,12
168:3,10
**points (3)**
42:11 87:7 135:17
**Pollution (2)**
154:25 155:2
**pool (1)**
27:21
**pops (1)**
26:10
**portion (8)**
22:7 57:21,24 59:23
62:14 63:23 118:3
134:20
**posed (1)**
91:25
**position (5)**
10:25 43:10 57:20
155:25 156:8
**positive (1)**
49:18
**possibilities (2)**
38:22,23
**possibility (5)**
111:25 112:4 150:7
150:22 161:25
**possible (15)**
31:5 43:10 44:24 77:7
86:3,10,15,19 87:6
87:10 89:7 114:6,7
114:8 162:6
**POSSINGER (1)**
8:23
**post (1)**

112:24
**post-confirmation (5)**
16:4,13 19:19 43:17
58:10
**post-emergence (7)**
18:25 23:4 77:24 78:3
79:14 90:2,10
**post-litigation (1)**
43:13
**post-petition (15)**
16:9 21:14,17 22:6
41:17 43:4,11 48:17
55:4,19 56:3,6 75:7
82:9 151:9
**post-reorganization...**
17:16,19 22:22
**post-reorganized (1)**
82:11
**potential (2)**
144:22 168:17
**potentially (1)**
60:6
**power (1)**
89:14
**PPI (7)**
42:17 48:11,17 57:23
59:22 69:15 151:8
**practice (2)**
123:16 135:7
**pre-deal (7)**
65:4,21,24 67:19,23
68:11,12
**pre-offering (3)**
64:11,17,20
**pre-petition (4)**
45:21 119:13 145:21
151:8
**preamble (1)**
99:6
**precedent (1)**
64:6
**preceding (1)**
139:13
**precisely (1)**
25:19
**precondition (1)**
166:11
**predictions (1)**
152:24
**predilection (1)**
97:7
**preexisting (1)**
66:9
**Prefinancing (1)**
69:23
**preliminary (1)**

94:7
**premise (5)**
91:16,17,23 92:6,8
**premium (10)**
54:23 120:9 122:7
123:7,24 124:9,17
124:25 126:3 145:4
**premiums (1)**
124:15
**preparation (3)**
37:9 85:7,10
**prepare (2)**
84:15 85:22
**prepared (11)**
14:23 15:25 85:17,18
85:20 92:6 118:11
131:11 148:4,11,14
**preparing (4)**
94:11 157:12,20
158:2
**preposed (1)**
154:8
**present (3)**
9:20 91:23 114:15
**presettlement (1)**
66:19
**presumption (4)**
30:8,9 91:8 111:23
**pretty (1)**
103:7
**prevail (2)**
21:10,16
**prevailed (1)**
53:7
**previous (2)**
80:25 171:4
**previously (1)**
74:18
**price (21)**
34:20 78:9 96:12,14
96:18,20,23 97:4,16
102:23 105:2,3,10
105:20 106:12
144:14 160:13,19
160:23 162:20,21
**prices (1)**
34:17
**pricing (1)**
30:16
**primarily (1)**
89:5
**primary (4)**
74:22 129:13,24
137:5
**principal (3)**
53:9,22 56:9

principals (1)
108:21
prior (5)
66:6 89:16 112:22
140:16,23
private (4)
26:14 27:14,20
112:18
privy (3)
80:20 95:21 120:21
prize (1)
172:3
pro (8)
19:14 20:6,11 25:2
33:3 34:22 58:11
60:16
proactively (2)
143:15,16
probability (2)
74:2,4
probably (5)
35:20,22 61:11 68:22
137:3
problem (5)
90:19 97:15 112:7
138:2 139:14
proceeding (4)
81:22 85:15,25 86:6
proceedings (4)
13:17 41:4 70:14
149:17
proceeds (1)
43:3
process (10)
95:19,22 96:4,9 101:9
102:17 120:11,15
120:22 124:13
processes (1)
103:6
produced (3)
11:8,11 90:7
producing (1)
137:14
Professional (1)
2:7
professionals (1)
108:20
profile (2)
57:20 58:5
profitability (1)
152:20
profits (5)
28:11 112:11,14,22
112:25
progressing (1)
108:3

project (5)
13:5 36:10 51:17
52:25 105:15
projected (4)
37:25 52:14,20 60:25
projections (7)
78:12,15 79:3,5,15,17
80:15
promissory (1)
110:3
proportionately (1)
49:21
proposal (1)
154:4
propose (3)
11:16 15:3 152:2
proposed (3)
114:3 157:15 159:13
prosecute (1)
168:14
PROSKAUER (1)
8:18
prospective (1)
98:4
protections (1)
96:15
provide (8)
15:3 41:7 62:7 77:23
78:2 120:25 140:11
150:7
provided (8)
74:18 79:8 84:3 117:5
117:12,16 119:12
142:21
provides (1)
41:15
providing (6)
114:23 115:19 116:3
118:18 124:10
150:25
provision (5)
98:2 144:12 172:15
172:16,17
provisions (7)
42:23 44:7 96:2 97:13
99:3 103:19 161:18
public (12)
2:10 10:4 63:19 64:6
64:7,11,14,22 94:23
94:24 139:19 174:7
publicly (1)
31:2
pulling (1)
96:17
purchase (9)
78:9 94:17 98:25

105:3 106:12
144:13 145:17
163:15 171:18
purchaser (6)
95:4 96:22 100:3,22
104:15 144:18
purchasers (5)
98:4 101:2 103:10,24
106:8
purging (1)
112:10
purposes (11)
14:14 18:4 25:17 35:9
37:17 38:14 39:4,10
47:23 82:24 125:4
pursuant (4)
36:20 38:2 43:14
175:18
pursue (3)
98:3,15 109:9
pursuing (1)
96:7
put (7)
25:19 46:7 85:2 86:15
115:14 116:25
146:11
putting (3)
46:11,18 48:3

Q

qualification (2)
74:6 111:14
qualify (2)
103:19 111:13
quantitative (1)
91:19
quarter (2)
66:16,21
question (76)
11:19,23 14:4 16:2,3
16:18 17:25 21:3
22:14,19 23:4 32:13
36:6,24 42:6 48:7
50:15 59:2,19 62:25
73:10,11 78:8,11,17
82:8,19 87:19 90:8
90:13,16,23 91:25
92:14 94:7 97:19
99:6 100:14 101:19
101:23 102:4,9,12
103:16,21 104:23
109:11 110:14
111:5,11 114:19,22
115:3,5 123:2 124:7
125:14,16 129:9
130:19 140:16

141:4,7 150:12
152:8 163:12,23
164:9,19 165:8
169:12,14,18,23
171:7,9
questioner (1)
116:8
questioning (6)
10:13 15:6 71:12 73:5
107:17 147:22
questions (27)
11:2 24:4 48:21 70:10
74:20 87:4 94:8
101:15 116:6,12,20
117:14 118:11
121:19 132:21
139:7,8 154:12
158:10,20,25 165:7
165:14,16,18,20
171:3
quickly (2)
67:12 162:5
quite (1)
77:6
quote (2)
108:6 153:4

R

R (7)
3:2 4:2 5:2 6:3 7:2 8:2
9:3
radically (1)
138:13
raise (29)
18:19 19:2,25 21:19
23:16 27:20 48:12
50:18 51:10,20,21
51:23 53:17 58:20
61:14 62:16 63:17
64:7,19 65:9 66:7
66:13 67:5,11,14
68:10 70:3 91:20
123:24
raised (8)
14:24 16:2,3 65:20
66:2 67:18 69:25
120:17
raises (1)
69:8
raising (1)
30:20
ran (2)
95:18 96:4
range (14)
36:11 37:11,17,21
38:13,18,18,24 39:6

39:13 64:16 65:16
67:24 69:2
ranges (1)
65:12
rate (29)
16:10 21:15 23:11
27:15,17,24 28:5,6
28:7,11,12,13,20,23
29:2,21 41:17 43:5
49:18 53:23 55:8,9
55:20,21 73:22,23
91:15 110:2,12
rates (6)
29:9,11,18 77:8 91:13
110:15
rating (6)
58:9,10,13,18 59:15
61:12
ratings (2)
57:19 58:5
rational (1)
144:18
ratios (3)
60:25 61:19,25
raw (4)
78:24 79:7,13,22
re-read (1)
171:14
reach (3)
19:13 23:20 27:10
reached (5)
18:15 22:21 40:24
44:2 159:20
reaching (1)
162:4
reaction (2)
132:6,7
reactions (3)
119:2,8 120:3
read (22)
25:6 35:2 41:2 42:19
48:14 58:2 63:2
70:15 72:15 73:4
75:8 85:12,13 92:25
93:3 94:4 100:17
107:3,24 119:8
139:3 142:19
readily (1)
139:18
reading (8)
24:25 34:14 41:4 84:2
85:4 93:6 110:8
143:2
reads (1)
84:3
real (3)

88:11,15 124:14
realized (1)
50:7
really (12)
26:24 44:24 47:10,25
52:5 73:9 88:11
105:5 134:15 142:3
147:10 168:6
Realtime (1)
2:9
reason (24)
69:11 127:2 143:24
144:17 160:2
163:14,24 164:10
164:20 171:10,17
172:9 176:5,8,9,11
176:12,14,15,17,18
176:20,21,23
reasonable (7)
106:22 107:5 109:3
109:13 110:13
158:23 165:4
reasonably (2)
63:13 82:12
reasons (2)
74:17 109:9
rebuttal (11)
85:23 86:4,13,16,21
115:15,17 117:3
131:18 147:20
150:23
rebuttals (1)
94:9
recall (36)
10:19 33:7,8 36:13
41:4,10 76:19,23
77:6 81:7 83:13
84:19,24 85:4 87:23
93:8,11 98:7,11,14
98:16,19 102:21,24
104:7,24 110:8
125:6 138:5 147:3
153:6 155:7 157:12
157:20 158:2,25
recapitalization (1)
162:5
receive (2)
44:17 115:18
received (1)
106:13
receiving (9)
44:21 46:10,13,17
47:4,19,20 48:3
158:5
Recess (4)
76:12 116:13 146:21

158:13
Recession (1)
134:19
recitation (1)
127:5
recognize (1)
121:11
recollection (1)
38:16
reconfirm (1)
171:3
record (15)
10:15,17 48:16 69:6
73:4 82:18 83:16
100:6 116:25
133:13 149:13,17
149:19 174:13
176:6
Recoveries (1)
37:12
recovery (1)
36:10
rectangular (1)
69:6
reduced (1)
66:11
REED (1)
8:4
ReedSmith (1)
154:23
reemerged (2)
77:13,18
refer (5)
52:10,11 54:17
134:19 151:6
reference (7)
13:22 75:12 83:14
122:3 133:21
134:14 135:15
referenced (1)
138:22
referred (2)
155:3 162:14
referring (6)
19:20 72:21 82:19
89:16 124:22
149:10
refers (1)
159:12
refile (1)
19:8
refinanced (1)
134:25
reflect (3)
133:8,12,17
reflected (1)

133:15
reflection (1)
154:3
refresh (1)
33:10 93:6 131:23
refunded (1)
42:18
Refunding (1)
155:2
regard (5)
139:24 148:19 152:3
152:12,22
regarding (23)
13:15 79:17 82:2 92:7
113:21 118:14
119:5,22 122:16,24
123:6 127:23
130:13 133:16
135:20 140:3,8
141:2,8 145:16
146:24 155:6
157:13
Registered (3)
2:7,8 174:6
regulated (3)
61:21,23 89:6
reinstatement (3)
10:19 115:12 154:14
REIT (22)
30:11,14 34:22 79:21
80:8,23 88:8 92:4
103:10,24 111:20
111:23 112:9,24
113:3,13,18 146:7
146:11 153:5,15
160:17
reiterate (1)
154:12
REITs (3)
30:19,19,23
rejected (1)
48:10
relate (1)
29:3
related (3)
42:16 144:22 174:16
relates (1)
120:8
relation (1)
27:13
relative (3)
46:24 63:13 154:7
releases (1)
159:16
relevant (6)
82:2 90:10,17 133:3

133:20 135:18
reliable (1)
145:20
relying (1)
88:19
remain (3)
22:9 73:24 74:7
remains (1)
54:12
remedies (8)
94:16 95:2 97:25 98:4
98:16,25 99:19
172:16
remedy (1)
98:21
remember (10)
87:25 93:5,6 98:24
107:5 120:3 142:25
145:12,14 171:6
reminded (1)
150:4
render (1)
20:15
rendering (3)
15:23 20:16 24:8
renew (1)
147:21
reorganization (12)
20:6 24:19 25:5,9
30:10 33:4 36:19
37:3 38:3 46:2
161:21 175:16
reorganize (1)
162:2
reorganized (20)
17:3 19:7 21:19 22:4
23:15 31:25 32:15
37:23 44:3 46:6
48:9,12 50:12,18
51:9 53:16 72:8
74:8,24,25
repeat (4)
123:20 128:25 129:8
133:12
rephrase (1)
11:20 35:18
report (110)
13:15,20 14:12,17,22
14:25 15:25 16:20
24:3,5,25 32:7 35:9
39:5 40:5 41:23
42:9,22 63:24 68:7
69:13 78:5,19 82:5
82:7,21,21 83:8,18
84:18,25 85:2,4,5
85:23 86:4,16,21

87:13 90:7 91:6,8
92:15,25 93:4,5,18
93:21 94:2 104:8
107:8,18,22 115:15
115:17 116:4 117:4
117:5,7,11,17,23
118:7,15,24 119:3,5
119:11,16,21,22,25
120:2,6 121:6,10,13
124:19 125:4,6,9,19
125:22,23 126:7
129:16 131:18
132:5 136:12,14,21
137:18 138:14
140:22 141:18,24
142:12,15,18,20,22
145:8 146:14
150:20,24 151:5
158:22 175:11,23
175:24
Reported (1)
1:23
reporter (7)
2:8,8,9,10 13:25
121:3 174:7
reporting (1)
13:7
reports (9)
41:3 85:19,23 86:5,13
86:17,22 87:2,8
represent (6)
50:5 64:10 68:9 69:7
71:2 158:18
representation (1)
83:15
representing (1)
65:7
represents (1)
162:18
reprinted (1)
71:19
Repurchases (1)
142:8
request (2)
117:7,11
requested (1)
11:7 117:17
requests (1)
11:11
require (2)
57:25 59:24
required (2)
117:6 149:2
requirements (1)
148:17
requires (3)

57:23 59:22 144:12
**requiring (2)**
23:6 48:11
**requisite (1)**
97:10
**research (1)**
95:10
**researched (1)**
105:7
**researching (1)**
141:25
**resemble (1)**
137:25
**reservation (3)**
115:9 116:2 120:23
**reserve (7)**
10:18 42:17 115:11
  115:15,17 117:9
  147:19
**resolution (1)**
161:23
**resolve (1)**
108:14
**resolving (1)**
108:15
**respect (25)**
12:15 15:22 16:8
  18:15 20:7,12 27:22
  37:21 41:11 72:18
  78:16 82:15 86:16
  91:4,6,7 95:3 98:13
  104:14 114:20,24
  115:21 159:17
  168:25 170:3
**respective (1)**
91:14
**respond (3)**
85:20 86:24 87:7
**responded (2)**
74:4,21
**responding (1)**
90:19
**response (11)**
15:25 78:7,10 86:4,21
  87:16 94:11 109:7
  114:24 116:4
  132:21
**responsibility (1)**
122:25
**responsible (1)**
13:5
**responsive (1)**
11:10
**rest (1)**
166:3
**restate (2)**

18:17 100:15
**restructured (2)**
16:13 17:2
**restructuring (6)**
12:10,15,22 16:23
  58:22 59:10
**result (4)**
22:4 46:6 59:10
  127:14
**resulting (1)**
157:14
**results (1)**
137:11
**retained (2)**
12:11,13
**return (11)**
27:24 28:8,13,20,23
  29:2 49:18 76:18
  91:13,15 160:16
**returned (2)**
43:16 136:6
**returns (1)**
29:21
**Revenue (2)**
154:25 155:2
**review (10)**
20:3 84:22 85:2,6,9
  85:10 94:3 118:18
  132:2 149:14
**reviewed (9)**
118:7 119:20 121:14
  131:4,21 140:22
  141:18 142:11
  145:10
**reviewing (2)**
84:24 119:6
**rhetorical (1)**
97:19
**RHOADS (1)**
4:10
**Richard (2)**
5:15 147:25
**RICHARDS (1)**
6:10
**RIFKIND (1)**
5:4
**right (151)**
10:18 12:17 13:15
  15:10 16:21 19:10
  21:21 23:22 24:7,11
  25:11,20 26:8,11,15
  26:18,21 27:2,10
  28:14 30:2 31:14,20
  32:12 34:5 38:8,20
  39:2,7,10,14,19,22
  40:2 41:23 44:4,10

44:13,17 45:3,7,11
45:17 46:9,9,13,14
46:19,22 47:5,9,19
48:5 49:2,5 50:2,7
50:13,19,23 51:2,7
51:13,17,21,24 52:2
52:14,17,21 53:3,11
53:18,24 54:3,9,13
54:18,20,23 55:2,5
55:10,13,16,21,23
56:4,7,12,17,23
57:3,8 58:6,15,23
59:4,12,15,24 61:20
62:10,16,20 63:24
65:2,5,9,13,17,22
66:3,10,25 67:2,7
67:20,24 68:3 69:3
69:19 70:5,7 76:5
80:2 91:2 92:16
94:6,14 106:7,19
115:11,16,18 127:8
136:24 137:12
138:16 147:15,19
154:13 160:16
161:6 162:22
166:22 167:12,14
171:22 172:10,13
**right-hand (2)**
52:19 137:15
**rights (4)**
116:2 117:9 161:10
  161:14
**ringfence (3)**
120:12,18,24 123:12
  123:24
**ripe (1)**
115:13
**rising (1)**
49:16
**risk (2)**
74:2,4
**risk-adjusted (1)**
91:15
**RMR (2)**
1:24 174:22
**Rockefeller (1)**
9:14
**Rogers (96)**
3:15 10:24 11:10
  22:13 33:6 36:2
  76:8,10 78:6 82:4
  86:7,11,18 87:9,11
  88:14,22 94:21
  95:11 99:13,21
  100:5,24 101:11,17
  102:5,10,19 103:2

103:13 104:2,19
106:2,18 107:2,15
109:6,17 110:6
111:2 113:9,23
114:5,12,14,18
115:2,25 116:9
117:10,20 121:18
124:5 125:11,15
129:19 130:15,23
133:10 144:25
146:20 147:5,9
150:2 155:10,23
156:21 157:4,10,18
157:24 158:6,9,16
158:18 160:7,11,21
165:7 166:4,20
167:4,24 168:9,22
169:11,15,21 170:6
170:24 171:8
172:20,22 173:2,8
175:9
**role (7)**
12:5 13:2 99:8,11
  113:25 114:4
  170:20
**Roman (2)**
94:5 126:20
**room (3)**
11:17 127:3 132:16
**ROSE (1)**
8:18
**ROSEN (1)**
6:18
**rough (1)**
112:16
**rows (2)**
52:10,24
**RPR (2)**
1:24 174:22
**RUDNICK (1)**
9:5
**Rule (21)**
9:21 84:25 117:4,15
  117:25 118:7,20,24
  119:5 121:6,10
  124:19 125:9,18,21
  126:3 129:15 132:5
  143:12 146:14
  175:24
**Rule's (8)**
116:4 119:2,22
  129:25 131:18
  136:11,14 150:24
**ruled (1)**
86:20
**rules (2)**

11:18 117:6
**ruling (2)**
10:23 112:18
**run (6)**
29:16 49:13,24
  151:16 152:9 166:6
**running (2)**
120:14 151:19
**RYAN (1)**
7:15

— S —

**s (12)**
1:24 2:7 3:2 4:2 5:2
  6:3 7:2 8:2 9:3
  133:7 174:6,22
**SABIN (1)**
9:17
**sacrifice (2)**
167:14 168:7
**sacrifices (1)**
167:11
**sale (2)**
94:19 120:11
**Sarah (2)**
8:10 154:22
**satisfy (2)**
72:8 74:8
**Savings (1)**
9:6
**saw (3)**
123:18 126:25 136:7
**saying (9)**
66:6 67:4 77:6 108:10
  113:20 120:10
  124:14 135:3
  172:17
**says (19)**
37:22 42:16 57:18
  59:21 60:14 65:4
  71:17,18 82:6 83:19
  83:20 84:10 98:3,15
  120:8 125:25
  131:24 135:8
  159:15
**scenario (5)**
23:21 54:7 75:4 77:17
  77:17
**schedules (1)**
139:4
**scholar (1)**
20:23
**scope (9)**
102:20 103:3,14
  104:3,20 107:17
  110:7 111:3 155:11

scribbling (1)
87:18
seats (1)
154:18
SEC (3)
122:14 123:5,5
SEC's (1)
122:13
second (17)
21:9 23:9 24:24,24
34:19 42:14 52:16
54:3 59:20 69:21
72:5 73:16 78:7
83:22 84:14 135:10
146:18
second-round (1)
96:7
secondary (4)
65:9 67:14,18 68:12
section (35)
83:17 94:5 107:8
110:9 130:25 131:4
131:9,13,19,22
132:5 136:11,14,21
140:20,22,24
141:16,18,21,24
142:5,7,11,15,18,22
142:25 143:4,6,8,10
145:8,15 149:10
securities (4)
104:13 105:21 108:22
123:14
security (2)
84:7,8
see (30)
25:8 45:22 46:7 60:14
64:13,15 69:18 71:4
71:8 83:21 89:9
96:16 120:3 126:8
126:14 135:14
136:16 138:16,19
142:9 143:24
144:17 145:22
152:6,9 163:18
164:4,14 171:16
172:8
seek (6)
21:8,9,11,13,15,18
seeking (1)
41:18
seen (7)
70:15 138:2 148:21
149:4 150:10,15,17
select (1)
94:25
selection (1)

37:21
sell-side (1)
89:10
selling (1)
97:8
senior (4)
5:19 13:4 136:3,4
sense (2)
49:14 91:5
sentence (5)
18:7 59:20 84:2,10,12
separate (3)
17:13 111:6 151:18
separately (2)
127:11 129:12
September (7)
33:16,18 34:2 81:11
81:12 163:2 175:14
sequencing (1)
166:6
series (3)
136:3,4 138:17
serious (5)
161:7 172:10,11,13
172:21
serve (1)
88:25
services (2)
41:3 141:17
session (1)
85:7
set (8)
28:6,24 52:24 54:15
55:15 146:4 174:11
174:20
sets (3)
24:6 48:21 95:13
settlement (18)
22:25 40:24 41:7,12
41:13,25 46:4
159:13,15,19
161:16,18,19
165:24 166:10
167:3 168:21
170:18
settlements (4)
22:2,16,17,20
settling (2)
41:8 159:22
SG&A (2)
141:16 142:2
share (2)
143:9 156:25
shared (1)
80:13
shareholders (2)

113:4,16
shares (1)
44:16
sharing (2)
156:15,19
SHEARMAN (1)
4:17
sheet (5)
38:11 59:11 128:14
128:18,22
shelter (1)
111:8
Shore (5)
40:16,18 72:11 74:10
74:19
Shore's (1)
41:25
short (2)
146:17 158:11
shorthand (1)
120:9
show (7)
32:22 36:8 47:13
54:22 61:19 65:13
67:9
showed (2)
33:9 65:17
showing (1)
55:19
SHRIVER (1)
7:11
side (1)
38:10
significant (5)
57:21 61:13 79:11
122:4 134:21
significantly (1)
153:21
similar (2)
31:4 139:14
simple (1)
18:23
simplifies (1)
161:25
simplify (1)
162:15
simply (3)
63:2 99:9 103:21
single (3)
17:2 18:24 120:17
sir (17)
12:3,18 16:21 19:7
24:3 28:22 30:3
31:11 34:8 35:6
40:8 42:12 45:22
69:9,19 71:13,22

sister (2)
127:7,10
sit (8)
118:10 129:24 163:21
164:7,17,21,25
165:3
sitting (6)
51:7 112:11 130:12
130:20 142:4
149:21
situation (5)
78:4 95:3 99:4 102:21
113:11
situations (1)
102:24
six (4)
49:11,22 52:16 83:25
size (6)
49:19,20 63:19 64:15
65:19 66:11
skip (1)
52:5
slightly (4)
23:3 35:11 75:15
86:14
smaller (2)
88:7 89:23
SMITH (1)
8:4
so-called (1)
160:20
Society (1)
9:7
solvency (40)
118:19 119:13,17
124:4,11,20 125:2,7
125:10,12,20
126:21 127:8,22,24
130:6,13,21 131:3
132:18 136:15
137:3 138:9 139:22
140:3,9,13,21 141:2
141:8,8 143:7,19
144:24 145:3,21
146:5 148:20 149:4
149:6
Sontchi (1)
50:5
sophisticated (11)
25:24 26:14,15,21
45:10,14 76:22 77:2
77:10 91:9 166:23
sorry (17)
40:7 56:25 67:15
71:23 79:25 102:11
108:9 109:22,23

123:2 124:6 141:10
142:14 143:5
145:12 150:11
172:21
sort (4)
95:2 99:19 100:2,21
sought (4)
19:10 22:7,11 23:7
sounds (1)
107:4
South (2)
4:12 6:14
SOWA (1)
3:18
speak (3)
75:19 85:17 160:10
speaking (3)
57:15 123:17 147:10
specific (10)
23:2 38:16 49:25 82:8
90:13,22 91:7 96:19
130:17 139:4
specifically (5)
49:14 71:5 83:9 120:8
139:12
specifics (1)
41:10
speculate (1)
44:25
speculation (1)
77:8
spend (1)
11:25
spent (3)
79:18 136:22 141:25
spin (3)
112:20,23,24
spoken (1)
118:25
Sponsors (2)
106:9,14
spot (1)
107:23
ss (1)
174:4
staff (2)
130:9 148:7
stand (5)
84:12 163:20 164:6
164:16,24
standing (2)
19:24 127:11
standpoint (4)
31:3,4 61:9 96:12
stands (1)
60:16

**start (5)**
58:7 67:11 90:24
116:24 147:21
**starting (7)**
63:14 71:12 73:4
74:15 131:12
136:17 140:12
**state (10)**
2:11 10:16 29:23
42:22 83:9 89:24
100:6 107:15 174:4
174:8
**stated (7)**
20:10 42:5 63:3 74:13
75:11 122:11 123:4
**statement (25)**
10:15 33:7 35:18,21
35:24 36:10,18 37:2
38:15,24 45:25
101:15 108:12
111:14 133:21
145:16,25 148:15
149:3,8,21,23 150:5
153:6 175:15
**statements (1)**
19:15
**states (4)**
1:2 82:8 95:5 135:18
**stating (1)**
63:3
**stays (1)**
53:22
**step (2)**
95:21 126:6
**Stepping (1)**
84:14
**STERLING (1)**
4:17
**stipulation (1)**
160:8
**stock (8)**
5:11 11:5 46:11 66:19
105:2 106:11 127:7
148:2
**stopped (1)**
96:6
**stopping (1)**
57:15
**strategic (5)**
95:24 120:16 123:17
123:21 154:5
**STRAUSS (1)**
5:17
**Street (5)**
3:6 4:12 5:13 6:8,20
**strike (3)**

**strong (7)**
57:19 58:5,13,16,18
61:11 162:4
**structural (2)**
31:4 129:22
**structure (7)**
22:3,22 58:11 127:4,5
139:20 153:14
**structured (4)**
61:8 87:22 88:3 89:19
**struggling (1)**
88:15
**sub-bullet (1)**
42:16
**sub-pages (1)**
71:14
**subject (5)**
47:2 100:11 115:9
150:19 165:15
**submit (1)**
86:3
**submitted (5)**
82:6 85:24 86:5 87:14
95:25
**submitting (1)**
86:21
**Subscribed (1)**
173:16
**subsequent (3)**
81:9 130:2 161:21
**subsidiaries (10)**
12:17 38:6 127:7,10
129:12,14,24 137:5
155:13 157:22
**substance (1)**
17:22
**substantial (4)**
74:23 75:3 112:13
134:20
**substantially (1)**
96:23
**substantive (1)**
135:6
**subtract (2)**
128:2 137:19
**succeed (1)**
16:5
**successfully (2)**
84:4,5
**Successor (1)**
9:7
**suddenly (1)**
43:20
**sufficient (2)**
91:23 111:8

**suggest (3)**
14:7 31:12 44:19
**suggesting (1)**
168:18
**suggestive (1)**
51:11
**SULLIVAN (1)**
3:4
**sum (1)**
106:12
**summary (5)**
93:25 94:4,22 126:7
126:10
**Summer (1)**
5:13
**superior (1)**
96:12
**support (2)**
95:10 97:12
**sure (21)**
14:9 41:24 46:8 52:6
52:23 64:5,23 68:25
73:7,10 90:20 95:18
100:17 102:13
107:9 117:20
121:21 146:19,20
150:13 154:19
**survey (1)**
95:7
**survive (1)**
159:25
**suspect (2)**
139:14 142:2
**switch (1)**
154:18
**switching (1)**
76:10
**sworn (5)**
10:3 173:16 174:12

_____
T
_____

**T (1)**
34:19
**T-first (2)**
161:24 167:15
**T-firsts (2)**
161:22 162:3
**T-side (14)**
25:9 29:6,20 32:25
36:11 40:20 46:3,10
46:17 48:2 155:9,22
156:5,11
**T-uns (7)**
162:10 168:13 169:3
170:4,15,16 171:6
**T-unsecured (4)**

**T-unsecureds (11)**
34:18 40:19 77:11
96:6,10 97:5 160:13
161:20 162:19
166:16 168:7
**T&D-regulated (1)**
89:23
**take (37)**
11:21 12:14,20 23:14
25:20 40:4 49:13,22
51:20 60:12,24 62:5
76:8 80:7 81:17
82:25 101:7 102:15
104:5 107:7 116:10
121:17 126:6
127:20 129:2,3,15
130:25 131:19
143:24 144:2
146:17 149:7,11
158:12 162:8
168:13
**taken (8)**
117:24 120:11 122:19
122:22 123:4,9
133:22 156:2
**takes (2)**
127:13 143:22
**talk (6)**
15:18 92:24 102:6
115:5 154:14 172:2
**talking (5)**
26:4,7,10,13 34:13
67:12 87:19 105:6
124:12,18 131:2
139:11 146:6 169:3
**target (2)**
28:12,15
**tax (11)**
89:18 110:22 111:8
111:10,16 112:7
113:3,10,14 114:16
114:20
**tax-advantaged (1)**
89:20
**tax-efficient (1)**
111:19
**tax-free (1)**
112:20
**taxable (5)**
111:7,8,17,24 113:15
**taxably (1)**
111:15
**taxes (1)**
89:19

**TCEH (34)**
6:7 7:6 26:2 45:20
78:18,20 79:5 110:2
110:12,20,23 111:6
111:10,15 112:20
112:22,24 128:5,7
137:6,11 142:8
145:18 155:13,19
156:16,20,24 157:2
157:7,9,16,22,23
**TCEH's (1)**
134:16
**TCH (1)**
6:13
**technology (4)**
31:7 146:9 153:4,25
**Telephonic (1)**
6:16 8:16,23 9:10
**telephonically (1)**
40:11
**tell (5)**
34:14 46:9 57:10
71:20 107:12
**TELONI (1)**
4:21
**ten (1)**
154:17
**tend (2)**
98:24 103:6
**tentative (1)**
40:24
**term (12)**
20:20 26:11 27:12
28:19 52:9 98:9,14
98:15 103:18 170:9
170:22 172:4
**termed (2)**
17:2 89:15
**terminology (1)**
104:12
**terms (23)**
34:20 41:11 43:15
53:16 72:24 80:14
80:22 84:9 88:12,12
88:15,19 94:11
95:21 97:4,5 98:10
104:11 108:4
139:15 147:11
153:25 164:22
**test (7)**
36:14 128:14,18,22
132:19 148:18
149:2
**testified (14)**
10:4 32:23 34:4 35:4
76:25 118:6 122:8

131:9,14 132:22
135:20 146:24
166:15 172:8
**testify (4)**
13:14 117:3,19
118:14
**testimony (23)**
32:23 35:5 76:20,23
81:7 87:23 89:17
99:18 109:2,12
113:20 114:13
115:20 118:3
150:23 153:2
163:20 164:6,16,24
166:22 174:13
175:3
**TEV (6)**
32:4 33:2 37:25,25
60:23 61:3
**Texas (1)**
89:24
**text (1)**
107:22
**Thank (7)**
42:6 47:17 71:23
109:24 115:24
154:16 158:8
**thereof (3)**
22:7 52:2 66:22
**thereon (8)**
22:12 23:7 53:12
54:25 73:15,17,18
73:19
**thing (4)**
99:25 100:20 137:22
137:23
**things (6)**
53:16 112:8 114:7
143:14 147:14
166:15
**think (126)**
10:22 13:20 15:7,11
16:17 18:18 20:23
20:24 22:20 26:24
31:20 32:7,7 34:23
38:21 45:18 47:11
53:8 58:9,12 64:3
68:6 75:2,14 76:25
81:2 82:5 83:14
85:20 86:19 87:20
90:11,16 91:16,22
91:25 92:13,25 95:5
95:7,12,14,21,23
99:2 102:5 103:4,18
104:8,10 105:14,17
105:22 106:3,4,19

108:4,11,22 111:5
111:20 115:3,12
120:5,7,13 124:17
124:21 125:3 126:4
126:19 127:2,8,14
127:21 128:3,4,7,11
129:21 132:17
133:19,21 134:15
135:2,5,14 136:8
137:7,10,11 140:23
142:16,23 143:18
143:21 145:2,5
146:2,9,10 148:13
148:18,25 149:3
151:23 154:3
159:12,22 160:12
160:18 161:2,4
162:16 169:17
170:5,6,8,12,25
171:5,9,10 172:8,9
172:11
**thinking (3)**
80:20 152:16 156:8
**thinks (1)**
110:15
**third (5)**
15:7 54:15 56:2 62:8
115:17
**third-party (3)**
138:7,8,10
**thorough (1)**
91:24
**thought (7)**
80:3 85:12 88:23
113:12 138:6
150:11 171:5
**thoughtful (1)**
91:24
**thoughts (3)**
119:8 142:20,21
**thousand (1)**
135:17
**three (3)**
8:21 68:3 83:25
**three-minute (1)**
116:11
**threshold (2)**
28:16,17
**throwing (1)**
166:25
**tied (1)**
96:7
**time (47)**
11:16,16,18,21 12:20
13:6 32:25 34:24
54:12 55:2,12,23

56:7,20 76:12,13
79:18 81:6,14,18,23
101:8 102:6,16
112:13 115:9
116:13,14 124:14
134:17,18 135:3
136:22 141:25
146:21,22 149:11
158:13,14 162:6
166:17,24 168:13
168:18 170:4 172:6
173:9
**time-horizon-type (1)**
105:14
**time-proven (2)**
132:19 134:2
**timeframe (1)**
151:25
**times (1)**
11:15
**timing (1)**
22:16
**today (29)**
10:21 11:3 13:15
17:14 50:4 57:16
58:21 89:17 102:6
110:21 117:8,14
118:10 119:12
130:12,20 142:4
149:9,21,24 150:21
154:12 158:21
163:21 164:7,17,21
164:25 165:3
**today's (3)**
84:15 85:10 121:14
**Toggle (1)**
5:19
**told (5)**
17:25 71:3 156:7
165:13 167:21
**TOLLES (1)**
6:12
**tomorrow (2)**
66:15 105:10
**top (10)**
37:5,22 52:8,9 57:13
59:21 69:15 126:19
127:12 133:19
**topic (3)**
113:7,21 114:11
**total (9)**
25:3 32:4,14 33:3
35:12 38:9,10 39:17
69:15
**totality (4)**
38:11 99:23,25

100:20
**totally (1)**
92:5
**track (1)**
102:11
**trade (7)**
7:21 26:4 120:10
134:24 135:21,23
157:9
**traded (1)**
31:2
**trades (3)**
134:7 135:3,16
**trading (17)**
33:2 34:17,20 88:20
105:2,22 133:12,14
134:10,12,17,21,22
135:12,15 136:8,9
161:4
**train (1)**
150:11
**transaction (37)**
17:22 40:21 83:11
84:4 92:8,12,18,21
95:15 97:11 98:8,17
98:20 99:9,12,17,20
99:23 100:4,23
101:2,5 104:16
108:4,16 109:10
110:23 159:24
160:5,24 161:9
162:17,20 164:21
165:5 170:22
172:19
**transactions (6)**
94:18,19,25 95:8
98:12 99:15
**transcript (8)**
33:15,25 71:7,15,18
71:24 75:19 171:15
**transcription (1)**
176:7
**Transfer (3)**
5:11 11:5 148:2
**transform (1)**
79:20
**translate (1)**
32:3
**translated (1)**
31:12
**Treasury (1)**
135:19
**treat (3)**
117:23 155:21 156:4
**treated (2)**
155:8 156:10

**treatment (1)**
155:17
**tremendous (1)**
172:6
**trial (3)**
151:2,2 166:7
**tried (2)**
63:11 137:10
**tries (2)**
125:21 130:3
**trigger (3)**
143:15,17 144:18
**triggered (3)**
143:14,20,22
**trivial (1)**
53:15
**true (6)**
20:24 21:2,2 86:23
169:5 174:13
**Trust (3)**
7:19 8:7 10:10
**Trustee (11)**
4:5 5:12,18 7:20 8:6,7
9:7 10:11 11:5
148:3 154:24
**truth (2)**
167:6,13
**truthfully (2)**
34:4 35:4
**try (9)**
21:2,3 30:12 99:11,14
99:22 100:2,21
138:3
**trying (8)**
23:25 42:21 49:25
62:22 64:5 91:22
103:4 167:8
**turn (16)**
17:20 24:2 37:4 40:6
42:8 52:4 56:19
63:22 69:12 71:5
72:20 80:25 140:20
141:16 142:7 163:5
**turning (1)**
80:24
**turns (2)**
49:4 50:10
**two (13)**
48:21 53:21 70:12
71:6 83:24 84:21
115:14 116:10
123:21 127:7
129:11,24 137:5
**TYLER (1)**
8:12
**type (3)**

79:12 90:2 98:14
typical (1)
31:6
typically (3)
27:19 28:6 104:11

_____ U _____

UCC (3)
111:21 120:20 123:22
ultimate (3)
27:6,9 122:24
UMB (1)
5:18
underlying (2)
61:22 95:9
understand (34)
11:19 16:24 17:12
19:15 25:8 30:18
36:6 37:24 48:22
49:23 52:6,23 64:3
64:24 66:5 75:12
111:22 113:11,19
118:17 125:8,13,18
125:21,24 128:13
128:16 137:24
144:6 165:23
166:10,13 170:14
171:23
understanding (7)
17:6,18 29:8 139:15
159:10,24 161:13
understands (1)
127:3
Understood (1)
93:16
unique (2)
98:11 146:4
United (2)
1:2 135:18
universe (6)
31:2 88:24 89:7,12,21
132:9
unliquidated (1)
75:5
unnumbered (1)
83:18
unsecured (21)
5:19 6:6 7:6 25:10
26:2 32:25 36:11
43:6 54:17 55:25
76:17 145:18 155:9
155:15,15,20,22
156:5,11,24 157:7
unsecureds (1)
48:2
unsettled (1)

42:4
unusual (2)
61:23 63:20
unwarranted (1)
122:6
unwilling (1)
155:20
upcoming (1)
118:14
UPREIT (1)
89:20
UPREITs (1)
30:24
upwards (1)
91:10
use (14)
18:22 20:19 21:3
26:11 43:3 52:8,9
68:24 103:18 123:6
124:9 125:22
132:17 170:22
useful (1)
133:20
uses (4)
104:8 125:9,18 126:2
usually (1)
28:2
utility (6)
61:22,24 89:24 94:18
94:24,24
utilizing (1)
110:23

_____ V _____

vague (1)
130:19
valid (2)
19:9 82:11
validity (2)
167:25 168:11
valuation (38)
31:7 34:16,21 45:6
49:17 77:23 78:2,14
78:20,23,25 79:9,23
80:14 81:5,14,18
88:17 89:8,25 90:6
90:7,9,17 91:14
92:4 111:10 120:7
125:4,25 133:24,25
134:8,13 146:11
151:21 154:4,8
valuations (1)
146:11
value (59)
25:2,17 29:25 32:4,14
33:13 35:12 37:18,23

38:5,9,10,14 39:17
39:19,25 40:2 45:7
45:9,17 46:19,22
49:15 56:20,22 57:7
61:18 62:2 65:8
66:10,13,19,25
75:18 76:2 80:19
81:23 106:11
110:20 127:11
128:6,9 129:3,13,18
132:17,20,24 133:3
137:5,9,17 138:11
152:19,23 153:21
153:24 154:4
162:11
values (3)
36:12 113:12 134:10
valuing (3)
122:7 133:8,18
various (13)
13:8 16:4,12 21:15
24:6 25:9 29:6 41:3
59:18 60:25 88:25
160:15 168:14
vary (1)
104:8
VENABLE (1)
9:12
versus (2)
104:6 157:22
vertical (2)
64:25 65:4
vested (1)
162:4
VI (2)
126:20 130:25
viable (1)
108:19
view (19)
38:19 85:21 99:8,10
127:13,20 128:11
155:7 156:3,18,23
157:5 160:3,22
167:7,12 168:3,11
170:20
viewed (1)
97:8
views (2)
34:15 155:16
VII (1)
131:19
visible (1)
108:23

_____ W _____

WACHTELL (1)

6:18
wait (1)
121:19
waiver (4)
156:15,19 157:2,16
wake (1)
108:8
walk (1)
93:10
WALKER (1)
4:10
want (27)
10:16 11:21 15:6
20:18 21:23 24:4
29:15 32:10 36:14
42:10 44:24 46:8
52:6 73:3,7,10,12
76:18 81:2 91:3
93:25 107:7 116:25
134:14 144:20
159:4 162:7
wanted (1)
10:15
wasn't (5)
97:15 125:12 141:10
168:6 169:13
waste (1)
11:16
way (13)
52:11 63:2 65:25
91:17 95:21 127:8
127:21 137:12
145:5 147:3 162:11
167:22 174:17
ways (1)
113:14
we'll (6)
33:13 53:6 115:5
117:8,23 119:10
we're (5)
12:7 17:9 26:3,7,10
26:13 52:4 53:11
76:10 105:6 108:3
117:25 124:18
154:23 169:2 173:8
we've (7)
13:20 30:12,16 89:4
91:19 149:4 150:6
WEBB (1)
8:12
week (1)
70:12
weeks (1)
32:20
weighted (1)
30:13

WEISS (1)
5:4
welcome (1)
42:7
well-absorbed (1)
63:21
well-aware (3)
110:14,15,16
well-founded (1)
135:6
went (1)
74:15
weren't (2)
90:12 168:5
West (2)
6:8,20
WHARTON (1)
5:4
whereof (1)
174:19
wherewithal (4)
16:15 22:23 42:3
43:19
White (2)
7:4 40:18
willing (4)
32:2 45:15 64:19
156:4
Wilmer (1)
10:9
WILMERHALE (1)
7:18
Wilmington (1)
9:6
win (5)
21:7 73:14,16,17,18
winner (2)
102:25 103:5
wish (3)
106:5 111:12 152:2
withdraw (1)
169:23
witness (22)
10:3 13:23 68:19 69:4
76:7 101:23 113:21
114:20 118:20
131:17 146:19
147:20 158:11
160:12 169:12,16
170:9 173:4 174:10
174:14,19 176:4
wonder (1)
105:4
word (6)
41:24 107:25 108:22
170:5,7 171:23

**words (4)**
15:22 18:14 46:8 64:4
**work (10)**
12:14 18:9 19:12 29:6
37:13 89:10 90:6
94:11 138:23 139:4
**worked (1)**
113:13
**working (1)**
13:7
**works (1)**
165:24
**world (5)**
7:21 66:18 89:4
104:12 124:15
**worry (1)**
147:12
**worst (3)**
23:20 54:6 144:17
**worst-case (2)**
73:12 75:4
**worth (17)**
26:25 27:5 31:25
32:16 44:21 46:25
47:25 48:4 77:4,13
78:4,8 91:11 107:22
144:7 168:5,20
**wouldn't (2)**
29:15 44:15
**write (2)**
105:11 125:22
**writing (1)**
68:20
**wrong (2)**
46:9 87:18
**wrote (1)**
107:4

**X**

**x (4)**
1:3,10 140:20 143:6
**XI (1)**
141:16
**XII (1)**
142:7

**Y**

**year (11)**
24:15 28:3 31:16
52:20 60:20,21 61:2
61:3 137:17 139:12
159:21
**years (4)**
68:3 110:17 139:14
146:7
**yield (5)**

89:15 132:9,10
134:20 135:16
**Ying (259)**
1:1,11 2:1,4 3:1 4:1
5:1 6:1 7:1 8:1 9:1
10:1,2,8,19 11:1,14
11:25 12:1 13:1,2
13:14,23,25 14:1,3
14:8,11,15,16,17
15:1,9,21 16:1,17
17:1 18:1 19:1 20:1
20:10,18 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1,5
30:1 31:1,24 32:1
33:1,13,17,18,22,23
34:1,10 35:1,17
36:1,15,17,24,25
37:1,8,22 38:1 39:1
40:1,4,10 41:1 42:1
43:1 44:1,19 45:1
46:1 47:1 48:1,7
49:1 50:1 51:1 52:1
52:5 53:1,5 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
62:23 63:1 64:1
65:1 66:1 67:1 68:1
68:5,14,16 69:1,5
70:1,9,17,20,25
71:1 72:1 73:1 74:1
75:1,23 76:1,16
77:1 78:1 79:1 80:1
81:1 82:1,21 83:1
86:1 87:1,14 88:1
89:1 90:1 91:1 92:1
93:1,17,20 94:1
95:1 96:1 97:1 98:1
99:1 100:1,7,14
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1,2,17 117:1,3
117:4 118:1,6 119:1
120:1 121:1,3,5
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1

146:1,24 147:1,25
148:1 149:1,19
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
158:17 159:1 160:1
161:1 162:1,25
163:1 164:1 165:1,3
165:11,24 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1,14 174:1,10
175:1,3,10,13 176:1
176:4
**Ying's (5)**
14:12,17 33:15
100:12 175:11
**York (40)**
1:12,12 2:6,6,11 3:7,7
3:17,17 4:7,7,20,20
5:7,7,22,22 6:9,9,21
6:21 7:8,8,13,14,14
7:22,22 8:5,6,9,9,15
8:15 9:16,16 154:24
174:4,5,8

**Z**

**0**

**0 (1)**
65:16
**02110 (1)**
5:14

**1**

**1 (20)**
13:23 14:8,15,16,21
28:2 35:10 39:5
40:6 42:9 69:13
70:19,21 82:22
85:16 87:14 94:15
175:11,22 176:6
**1.5 (2)**
47:9,9
**1.6 (1)**
47:9
**10 (2)**
47:25 53:23
**10:28 (1)**
116:13
**10:36 (1)**
116:14
**100 (5)**
5:13 17:15 38:4 41:16
51:5
**10004 (2)**

3:7 7:14
**10007 (1)**
7:22
**10019 (3)**
5:7 6:9,21
**10020 (1)**
9:16
**10022 (3)**
3:17 4:20 8:9
**10036 (4)**
4:7 5:22 7:8 8:15
**101 (1)**
144:14
**11 (12)**
1:7 12:6 24:14,22
36:21 40:12 47:25
94:15 121:17,24
175:4,18
**11.25 (1)**
5:19
**11:15 (1)**
146:21
**11:21a.m (1)**
146:22
**11:36 (1)**
158:13
**11:41 (1)**
158:14
**11:55 (1)**
173:9
**1133 (1)**
8:14
**1155 (1)**
7:7
**116 (1)**
175:6
**1177 (1)**
4:6
**12 (9)**
14:12,17 48:2,8,25
121:6 163:10
175:12,25
**121 (1)**
175:24
**123 (1)**
4:12
**125 (1)**
3:6
**1270 (1)**
9:15
**1285 (1)**
5:6
**13 (1)**
23:5
**14 (4)**
34:11 126:19 127:13

175:11
**14-10979 (1)**
1:8
**147 (1)**
175:7
**15 (6)**
28:10 49:6,7 74:16
109:23 136:5
**150 (3)**
60:8 163:5,10
**154 (1)**
175:8
**158 (1)**
175:9
**16 (2)**
72:25 110:21
**165 (2)**
175:5,7
**17 (3)**
52:20 133:20 151:25
**18 (2)**
71:21 151:25
**19 (8)**
1:13 2:2 35:11 37:18
37:24 75:19 136:17
176:3
**19109 (1)**
4:13
**19th (1)**
174:20

**2**

**2 (13)**
28:2 33:14,17,24 47:4
47:15 66:16,16,21
103:8 162:24
175:13 176:6
**20 (12)**
66:3 67:19 68:10,25
69:12 71:6,7,7,11
71:15,18,24
**2008 (13)**
126:13,22 130:22
131:4,21 133:7,17
136:16 140:3,9,14
141:6 146:5
**2012 (21)**
12:12 126:13,22
130:22 131:4,21
133:8,17 136:16
137:17 138:6
139:12 140:3,9,14
140:21 141:2,6,9
143:7 146:5
**2014 (2)**
59:4,6

**2015 (19)**
1:13 2:2 14:13,17
33:16,19 34:2 70:19
70:22 121:7 146:3
163:2 173:17
174:20 175:12,14
175:22,25 176:3
**2016 (4)**
20:9,13 24:11 52:17
**2017 (11)**
23:5 49:2,7 50:7
56:17 60:8 61:2
151:10 152:10,14
152:18
**2018 (8)**
5:20 61:3 151:15,16
151:20 152:5,10,14
**2024 (1)**
136:5
**2037 (1)**
8:7
**21 (6)**
70:4 71:21 136:23
137:7,16 139:24
**23 (8)**
33:16 34:2 37:5,10
81:11,12 145:16
163:2
**24 (2)**
37:18,24
**25 (2)**
33:18 175:14
**250 (1)**
6:8
**253 (1)**
37:6
**26 (1)**
118:2
**27 (1)**
107:13
**28 (1)**
59:6
**29 (1)**
59:4
**2nd (1)**
4:5

_____ 3 _____
**3 (11)**
36:16,17,25 71:13,25
106:8 118:4 131:12
140:13 175:15
176:7
**30 (16)**
20:9,13 24:11,15
28:10 40:6 49:2

50:7 52:19,25 56:17
60:8 67:19 68:10,25
69:12
**300 (1)**
3:13
**31 (3)**
52:17 126:13,13
**32 (4)**
15:10,14,15 37:6
**33 (6)**
24:2,6 29:23 40:7
82:20 175:13
**34 (3)**
42:8 45:19 48:8
**35 (7)**
32:8,10 47:12 52:5
64:16,19 65:12
**355 (1)**
6:14
**36 (3)**
52:5,6 175:15
**37 (4)**
32:9,12,18 56:19
**38 (3)**
57:10 59:17 63:3
**39 (4)**
63:2,9 69:13 163:7

_____ 4 _____
**4 (11)**
34:11 68:7,15,16
106:21 107:13
133:7,14,16 158:22
175:19
**40 (7)**
40:24 41:14 63:22
64:3 65:17 67:9
68:7
**426 (1)**
60:6
**431 (1)**
60:6

_____ 5 _____
**5 (10)**
65:12 66:12 70:18,20
94:2,16 109:21
126:6 139:22
175:21
**5,350 (1)**
56:25
**5.3 (1)**
66:24
**5.4 (1)**
66:25
**50,000 (1)**

104:9
**51 (1)**
6:20
**52nd (1)**
6:20
**55th (1)**
6:8
**599 (2)**
4:19 8:8

_____ 6 _____
**6 (10)**
71:17,21 73:4 93:18
93:20 94:2 109:23
110:21 114:25
175:23
**6.5 (1)**
136:4
**6/30/16 (1)**
52:13
**6/30/17 (1)**
66:25
**601 (2)**
2:5 3:16
**60602 (1)**
8:22
**60654 (1)**
3:14
**61 (2)**
72:22,23
**62 (2)**
74:16 107:14
**62111 (1)**
9:9
**68 (1)**
175:19

_____ 7 _____
**7 (6)**
7:21 28:6,7 121:4,5
175:24
**70 (1)**
175:21
**76 (1)**
175:5

_____ 8 _____
**8 (2)**
28:6,7
**8.5 (6)**
30:2,5,17,21 31:10,14
**80 (3)**
132:10,13 138:11
**80.03 (1)**
145:17
**87 (1)**

81:3
**88 (2)**
34:8,11

_____ 9 _____
**9:35 (1)**
76:12
**9:42 (1)**
76:13
**90071 (1)**
6:15
**93 (1)**
175:23
**98 (1)**
136:8
**99137 (1)**
1:25