```
 1   UNITED STATES BANKRUPTCY COURT
 2   DISTRICT OF DELAWARE
 3
 4   In re:                      :
                                 :    Chapter 11
 5   ENERGY FUTURE HOLDINGS       :
     CORP.,  et al.,             :    Case No. 14-10979(CSS)
 6                               :
               Debtors.          :    (Jointly Administered)
 7   _____:
                                 :
 8   ENERGY FUTURE HOLDINGS,      :
     CORP.,                       :
 9                               :    Adv. Pro No. 15-51386 (CSS)
               Plaintiff.        :
10                               :
     v.                           :
11                               :
     TEXAS TRANSMISSION           :
12   INVESTMENT LLC,              :
                                 :
13             Defendant.        :
     _____:
14
15
16                               United States Bankruptcy Court
17                               824 North Market Street
18                               Wilmington, Delaware
19                               January 15, 2016
20                               11:07 AM - 11:51 AM
21
22   B E F O R E :
23   HON CHRISTOPHER S. SONTCHI
24   U.S. BANKRUPTCY JUDGE
25   ECRO OPERATOR:  LESLIE MURIN
```

1   HEARING re Telephonic Hearing - Discovery Dispute

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    POTTER ANDERSON CORROON LLP

4        Attorney for Deutsche Bank New York

5

6    BY:  R. STEPHEN MCNEILL (TELEPHONICALLY)

7

8    FOX ROTHSCHILD

9        Attorney for Ovation

10

11   BY:  JEFFREY M. SCHLERF (TELEPHONICALLY)

12

13   BAKER BOTTS

14        Attorney for Ovation

15

16   BY:  VAN H. BECKWITH

17

18   WHITE & CASE LLP

19        Attorney for TCEH Ad Hoc Group of Unsecured Noteholders

20

21   BY:  J. CHRISTOPHER SHORE (TELEPHONICALLY)

22

23

24

25

1   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

2        Attorney for TTI

3

4   BY:  JASON C. VIGNA (TELEPHONICALLY)

5        CARL T. TULLSON (TELEPHONICALLY)

6

7   KIRKLAND & ELLIS

8        Attorney for the Debtors

9

10  BY:  WARREN HASKEL (TELEPHONICALLY)

11

12  SKADDEN ARPS SLATE MEAGHER & FLOM

13       Attorneys for Ovation

14

15  BY:  VAN BECKWITH (TELEPHONICALLY)

16

17  RICHARDS LAYTON & FINGER

18       Attorney for the Debtors

19

20  BY:  DAN DEFRANCESCHI (TELEPHONICALLY)

21       JASON M. MADSON (TELEPHONICALLY)

22

23

24

25

1    ALSO PRESENT TELEPHONICALLY:

2

3    PEG A. BRICKLEY

4    MARK A. CODY

5    KENT COLLIER

6    PAULINE K. MORGAN

7    MARC B. ROITMAN

8    FOTEINI TELLONI

9    JASON LIBERI

10   MEREDITH PFISTER

11   ERIN SMITH

12   GREGORY TAYLOR

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2            THE COURT:  Please be seated.  Good morning.  This

 3    is Judge Sontchi.

 4            MR. VIGNA:  (indiscernible) Texas Transmission

 5    Investment LLC.

 6            MR. SHORE:  Good morning, Your Honor.  Chris Shore

 7    from White & Case on behalf of Ovation.

 8            MR. HASKEL:  Good morning, Your Honor.  Warren

 9    Haskel, Kirkland & Ellis on behalf of plaintiff EFH.

10            THE COURT:  All right.

11            MR. DEFRANCESCHI:  Good morning, Your Honor.  Dan

12    DeFranceschi from Richards, Layton & Finger on behalf of

13    behalf of the plaintiff, EFH.

14            MR. BECKWITH:  And Van Beckwith and Todd O'Brien

15    on behalf of Ovation with Mr. Shore.

16            THE COURT:  Excellent.  All right.  This is Texas

17    Transmission's letter that started this process, so I'll

18    turn it over to them.

19            MR. VIGNA:  Thank you very much, Your Honor.

20    Again, this is Jason Vigna from Skadden Arps on behalf of

21    TTI.

22            We requested this conference because there is a

23    dispute between the parties on whether Ovation should

24    produce any documents in this case.

25            I'd first like to address the legal standard,
```

1   which is unchanged by the movement of the proportionality

2   (indiscernible) of Rule 26(b) to Rule 26(b)(1).  And the

3   advisor committee, and I'll partially quoting in an

4   Ovation's letter or brief makes clear: at least a half a

5   dozen courts have considered this issue, including Judge

6   Mehalchick and the Courts in the (indiscernible) district,

7   who concluded last month that the recent amendments to Rule

8   26 don't change any of the existing responsibilities of the

9   Court or the parties in considering proportionality issues

10  and that Rule 26 continues to reflect (indiscernible)

11  discovery policy where discovery is permitted on findings of

12  irrelevance or could lead to discovery of relevant

13  information.

14          The issue here is that Ovation has refused to

15  produce any relevant documents, which is unusual.  I don't

16  think I've seen a case where a party has successfully

17  contended it would be too burdensome to produce even one

18  document.  And that's really the issue here.

19          Well, in Ovation's brief, counsel states for the

20  first time that it might be burdensome to review and log

21  emails from Ovation's counsel, that's not really the issue.

22  In fact, it had never been raised before we received a

23  letter the other day.

24          EFH and TTI, for example, have readily agreed that

25  email between counsel or counsel and client need not be

1   reviewed or logged.  And we certainly would agree to the

2   same with Ovation.

3           The issue (indiscernible) that, unlike EFH,

4   Ovation hasn't made any proposal for producing documents in

5   this case.  It's simply standing on the objection that it

6   need not produce any based on a too burdensome

7   consideration.  And when the Court is faced with this issue

8   -- and I'm sure Your Honor is very well aware -- there are

9   six factors the Court should consider that are identified in

10  Rule 26 and that's the importance of the issues I stated in

11  the action, the amount of controversy, the relative access

12  to relevant information, the party's resources, the

13  importance of the discovery in resolving the issues and

14  whether the burden (indiscernible) of the proposed discovery

15  outweighs the benefit.

16          And actually unknown to the advisory committee

17  that the advisor committee included with the new amendments

18  to Rule 26 actually was important -- they pointed out that

19  the party's claiming undue burden or expense ordinarily has

20  far better information on those points.  And the Zubulake

21  case that counsel cited, actually points out that the

22  parties claiming a burden must perform a test search on

23  sample data so that the Court has sufficient and actual

24  basis to consider (indiscernible).

25          Ovation just hasn't done so in any discussions

1    with me and hasn't done so in its letter.  (indiscernible) I

2    will go through the different factors that the Court should

3    consider.

4            And the first one, of course, is the importance of

5    the issues.  And although Ovation says that discovery from

6    it is not important to resolve issues in the matter, that's

7    just not true.  And, again, in all relevance can't be

8    prejudged sight unseen at this time.

9            In fact, I think that when the Court permitted

10   Ovation (indiscernible) action, Your Honor stated I think

11   they're critical to the Court's being able to understand the

12   facts.  And that's actually really important.  We're not

13   just looking for Ovation's understanding of the meaning of

14   the investor rights agreement at issue in this case.  We're

15   looking for evidence on the facts that Ovation and EFH claim

16   trigger the drag-along right under the investor rights

17   agreement in this case.

18           And just to give an example, as we've discussed

19   actually before the Court when we were before Your Honor

20   previously, one of the requirements for an IPO conversion

21   that could potentially trigger the drag-along right is that

22   each Oncor member be offered an equity and rights in what is

23   the called the IPO corporation, which is actually Ovation or

24   Ovation 1.  And in the interrogatory responses we received

25   from Ovation on Wednesday, Ovation flatly stated that TTI

1    will be offered such equity and rights.  And that position

2    is actually irreconcilable in any public documents we've

3    seen so far.

4           If Ovation is actually going to take that position

5    as litigation, TTI certainly should be entitled to

6    (indiscernible) their proof by reviewing Ovation's

7    documents.  In fact, Ovation is the most obvious source for

8    all documents concerning any potential conversion of Ovation

9    into the IPO corporation.

10          And another key issue is whether a change of

11   control (indiscernible) as defined in the IRA as a drag

12   condition.  And I think, perhaps I'm (indiscernible), but I

13   think everyone agrees that no change of control or

14   (indiscernible) the Oncor level.  But in its opposition that

15   TTI's motion to dismiss EFH made a statement just

16   (indiscernible), but made a statement that the change

17   control might (indiscernible) an IPO corporation, again,

18   that's Ovation 1.

19          And Ovation 1 will have all the relevant documents

20   on that point, which might include whether Ovation's

21   investors are acting in concert.  Acting in concert is one

22   of the considerations under the definition of the change of

23   control.  And Ovation is refusing to produce any

24   communications with Ovation's investors on this topic.

25          And I think that that's actually kind of an

1    important point that Ovation claims the burden here will be

2    -- that it shouldn't be required to produce documents that

3    EFH is already producing.  And we don't disagree with that.

4    What our point is is that there are internal Ovation

5    documents and communications between Ovation and its

6    investors that we should be entitled to see.  And we

7    certainly would have agreed that Ovation need not search for

8    documents that were exchanged with EFH and that EFH is

9    already producing.

10           The issue is that Ovation has refused to produce

11   any documents, including internal documents and

12   (indiscernible) with its investors.  Those really are quite

13   relevant in this case.

14           And then even if we were considering Ovation's

15   interpretation of the contract at issue, well Ovation claims

16   that its views aren't probative because it didn't negotiate

17   that contract.  Their views actually are probative enough to

18   whether there's an actual dispute between the parties on the

19   meaning and we strongly believe that the investor rights

20   agreement can really only be read in one way and that

21   internally Ovation probably read it in the manner set out in

22   TTI's motion to dismiss.

23           If their discovery bears it out, we'll be entitled

24   to introduce that evidence at trial as a party admission.

25   So we really do think that the three categories discovery

1    that we've asked for here are likely to generate generally

2    relevant material and, in fact, very important material and

3    material that can't be obtained from any other source.

4            And that actually gets us to the next factors the

5    Court is supposed to consider, one of which is the amount of

6    controversy.  This dispute, of course, is involving a

7    holding worth over $2 billion.  The next one is relative

8    access to information.

9            The information that TTI is seeking in its

10   document request it can't get from EFH.  It really can't get

11   any interrogatories or depositions.  You know, as I

12   mentioned, in the interrogatory they've already answered.

13   They state flatly that TTI is going to have -- be offered

14   equity and rights in the IPO corporation.  They don't

15   explain that and they don't cite any documents.  And like I

16   said, I really think the documents that I've seen disprove

17   that and if they have other documents that would show this,

18   we're entitled to those documents.

19           The next issue is the party's resources.  Ovation

20   has more than enough resources to review and produce less

21   than nine months' worth of documents.  The next issue is the

22   importance of the issues, which I've actually already kind

23   of gotten to.  And this particular point, I think it might

24   be important to note that it's somewhat surprising to me

25   that Ovation is not agreeing to produce any documents

1    because that will hamstring both sides in presenting this

2    case.  And, in fact, if we're not entitled to get documents

3    in Ovation's custody on the change control and IPO

4    conversion issues, TTI (indiscernible) that will have

5    grounds for a motion to eliminate to preclude plaintiffs

6    from introducing evidence on those issues.  And I really

7    think it's in all parties' interests to get the

8    (indiscernible) out.

9            So that leads to the last issue, which is the

10   burden issue.  And while Ovation's counsel has repeatedly

11   told me that producing any documents in this case would be

12   burdensome, it's never once attempted to quantify that

13   burden.  We don't know what the search terms Ovation would

14   use to search for documents because it hasn't proposed any.

15   We don't know how many documents those terms would generate

16   because Ovation hasn't run a test.  We don't know how much

17   review and log would cost because Ovation hasn't even

18   offered a guestimate.

19           We think it's very clear that Ovation hasn't

20   satisfied its obligation under Rule 26 and all the relevant

21   cases to show that the burden to produce these documents is

22   so overwhelming that it outweighs the (indiscernible)

23   permitting the Court and all the parties to review the

24   relevant evidence at trial.

25           And for that reason, you know, we've submitted

1    this letter brief requesting that the Court direct Ovation

2    to produce documents responsive to requests 8, 11 and 12 and

3    TTI's first (indiscernible) Ovation.  And as I mentioned

4    earlier, if it would reduce the burden, any legitimate

5    burden concerns Ovation might have, we certainly would agree

6    that it need not produce documents exchanged with EFH except

7    such documents that EFH is not able to locate and produce.

8              THE COURT:  Thank you.

9              MR. SHORE:  Good morning, Your Honor.  Chris Shore

10   from White & Case.

11             We're here on what we see as essentially an

12   intervener tax which TTI wants to impose on us.  This is a

13   breach of contract dispute with one claim for relief for

14   breach of the drag provision brought by EFH and Ovation as

15   an intervener.

16             TTI's answer asserted very affirmative defenses,

17   but no counter claims.  So the sole issue in dispute is the

18   meaning and interpretation of the IRA drag provision.

19             Under New York law, the Court's function is to

20   determine the party's intent -- and that's the party's

21   intent -- first through the unambiguous language of the IRA

22   and then, if ambiguous, through admissible and intrinsic

23   evidence to assist in the interpretation.  That was be a

24   negotiation entry between the parties, the expressed

25   objective intent between the parties, the Court's dealing

1    between the parties and, if available, use the usage of

2    (indiscernible).

3           One thing that is not admissible are third party

4    readings of the contract.  That's why expert interpretations

5    of contracts are verboten in a contract dispute.

6           Here, TTI -- and he just said it -- is seeking

7    Ovation's documents regarding the interpretation of the drag

8    and whether Ovation believes it's met.  Some are

9    communications with the debtors, who are a contract party

10   and who will have evidence of intent, and the rest are

11   purely internal Ovation documents.

12          With respect to interpretations that the debtors

13   and Ovation share, those are being produced at great expense

14   by EFH up until the point the joint defense was clocked in

15   at the execution of the merger agreement.

16          As the purchaser, Ovation is effectively paying

17   for all that work that Kirkland is doing by reducing the

18   cash at close to pay the administrative expense.  We sought

19   a protective order for Ovation's documents and it sounds

20   like they just conceded to limit us to what we suggested in

21   a letter to the Court, that we wouldn't produce anything

22   unless there was a gap in the production that they couldn't

23   get the documents from the debtors.

24          What this (indiscernible) dispute I guess is now

25   really about are Ovation's interpretations that it recorded

1    that were not shared with the debtors -- that would be

2    either whether the structure comports with the drag or

3    whether the drag is otherwise triggering that here.  The --

4    we've refused to produce those documents on three grounds,

5    not just burdensomeness.

6            First, Ovation is defined in the RFP to include

7    the investors and it would fit in the equity consortium and

8    the TCEH ad hoc group.  Those documents in the possession of

9    the investors, the consortium or the ad hoc group or Hunt

10   for that matter, are not in the control of Ovation and under

11   no circumstances could the RFPs be properly read to require

12   the production of that material, it's just these documents

13   that Ovation controls.

14           Two, Ovation -- there is a lot in the letter about

15   a joint defense with the debtors in that we were adverse

16   with the debtors.  But there is no contention that the

17   investors, Hunt, the TCH ad hoc group and ultimately

18   Ovation, were in a joint defense arrangement.  So any

19   material shared within that group, even if they expressed

20   doubt about the ability to drag -- and I'll come to that in

21   a second -- would be privileged documents which would not

22   have to be produced.

23           Even if the Court were to require the production

24   of that, it's not helpful material.  If the Court's trying

25   to determine the intent of the parties, how would an email

1   from a junior associate at Baker Botts to Mr. Beckwith

2   expressing doubts of the ability to drag be helpful to the

3   Court in determining what EFH and TTI meant when they signed

4   the contract?  And the argument I guess was just posited,

5   but then you could dismiss the adverse area proceeding

6   brought by Ovation and not being a (indiscernible) or a

7   controversy because Ovation actually believed that the drag

8   was not triggered here.  I don't see how that solves

9   anything.  Still, EFH is -- it's still going to be a

10  question of what EFH and TTI intended.

11          We repeatedly asked Skadden on meet and confers

12  that question.  How is any of that stuff going to be helpful

13  here?  And I guess now the only explanation that is given,

14  and the one that was given after all these meet and confers,

15  is this one that maybe we really didn't believe the drag.

16  Really, we're going to do discovery here to find out whether

17  we actually believed that 20% of our consideration as

18  unsecured creditors of TCEH is even available?  That doesn't

19  make any sense.

20          What they really are talking about,

21  (indiscernible) the bar between evidence and argument.  When

22  Your Honor said we could intervene, I think what Your Honor

23  was saying was our arguments with respect to the drag would

24  be helpful to the Court in understanding what's going on.

25          Our argument is not evidence.  The -- TTI has

1   given us contention interrogatories.  We've responded to

2   those contention interrogatories.  How we responded is not

3   at issue today, but that's the right place to be getting

4   argument.  The right place to be getting evidence is in

5   discovery and we don't have evidence in the discovery.

6          Finally, once you take out the documents that they

7   really want, which are the communications within the

8   consortium, the TCEH ad hoc group and Ovation regarding the

9   drag, which would be privileged, you come to a small subset

10  of non-privileged documents concerning the IRA.  And as we

11  said, without -- to be fair, we haven't run searches, but

12  having lived through all of this, I can certainly represent

13  to Skadden and have represented to Skadden, there are going

14  to be a lot of scheduling emails -- can we hop on a call to

15  deal with the drag?

16          There's no dispute here that the drag was an issue

17  in the merger agreement.  It was negotiated in the merger

18  agreement.  There's no dispute that the investors cared

19  enough about the drag to have specific provisions in the

20  merger agreement addressing the drag.  And there's no

21  dispute that everybody understood this case was going to be

22  headed to litigation because some of the provisions in the

23  merger specifically addressed litigation with TTI.

24          But as we noted in our letter during meet and

25  confers, we could select custodians at law firms and

1    financial advisors and we could do privileged reviews and we

2    could do logs and we could produce evidence that in fact the

3    investors had calls and other meetings to discuss the drag.

4    So what?

5              That effort and cost is no -- whatever the cost

6    is, the effort and cost is in no way proportioned to the

7    benefit of the documents.  What they really want is to know

8    that we had meetings and on what days they had meetings,

9    rather than doing an electronic search -- and I don't think

10   what Skadden's proposing is people, a couple of people

11   should do a manual poll to see what we have -- in fact, I

12   think they said just now we would want to know what search

13   terms you're running, then there are other ways to get that.

14

15             If they want to send an interrogatory to us, list

16   the meetings and list who talked about it, okay, we can

17   consider that.  But in the end, is that really relevant to

18   anything when it's undisputed that Ovation had internal

19   communications regarding the drag that I expect the Court

20   would expect since part of the material portion of the

21   consideration for doing the deal is tied up in the drag?

22             Finally, if TTI insists that we produce, they

23   really want us to go do an electronic search, log all the

24   documents which, again, are going to be heavily --

25   attorneys' files, it's not that Ovation has a lot of

1    employees.  It's run through its advisors.  We've got to go

2    through the expense, do limited searches, pulling out the

3    documents, separating out what is non-responsive and might

4    be privileged in other matters, coming up with a privileged

5    document, logging all of those privileged documents and then

6    producing the non-privileged, essentially non-substantive

7    emails regarding meetings, then TTI should have to pay for

8    that.

9            They are certainly permitted to request discovery

10   from us and press for discovery.  No one's saying they

11   can't.  But the Court is now specifically authorized under

12   the rule to shift the burden of production onto the party

13   who is insisting that we go through this process, which is

14   going to lead to nothing, to get documents.

15           So with that, we'd ask the Court -- I think we've

16   addressed the issue with respect to the debtor's documents.

17   With respect to the purely internal Ovation documents, we

18   ask for a protective order requiring that we not produce it

19   at this time without prejudice.  If TTI really wants it,

20   wants to know when meetings occurred, just send an

21   interrogatory on that.

22           MR. VIGNA:  Your Honor, if I may respond.

23           THE COURT:  Let me ask if the debtor wants to be

24   heard first.

25           MR. VIGNA:  Of course, Your Honor.

1          MR. HASKEL:  Your Honor, Warren Haskel for the

2    debtor.  (indiscernible) dispute and the only reason we

3    wanted to just clarify our position on common interest,

4    which we did by letter, that we are not claiming any common

5    interest, not withholding any documents on that basis.

6          Our first communications with Ovation was prior to

7    August 10th.  So long as the Court does not have any

8    questions regarding that, that's all I wanted to clarify.

9          THE COURT:  Okay.  Thank you.  I'll hear a reply.

10         MR. VIGNA:  Thank you, Your Honor.  Again, this is

11   Jason Vigna with Skadden Arps on behalf of defendant TTI.

12         There are a couple of interesting things here.

13   First of all, Mr. Shore primarily focused on documents

14   concerning the meaning of the drag.  And I hope I was clear,

15   maybe I wasn't, that's why I'm repeating it, but that is

16   actually not entirely what we're looking or event primarily

17   what we're looking for.  We're actually looking for facts

18   that will be at issue concerning whether the language of the

19   (indiscernible), whatever that language is and whatever it

20   means, whether the language applies to the facts at issue in

21   this case, which in large part actually focused on what is

22   happening at Ovation 1.  It relates to the change of control

23   and it relates to an IPO conversion and we're entitled to

24   discover the facts and it's not simply the interpretations

25   of Ovation as to the meaning of the drag.

1          Second, I don't know why exactly the Court

2    permitted intervention here.  The Court said they wanted to

3    hear from Ovation, but that doesn't even really matter.

4    This is not an intervener attack by any means.  If Ovation

5    had not moved to intervene, I absolutely would have

6    subpoenaed it.  There's no question about it.  It has the

7    relevant documents on IPO conversion and change of control.

8    This is by no means an intervener attack.  This is a search

9    for legitimate discovery.

10          Further, the privilege issue, which has really

11   been raised I think in one sentence only in the letter that

12   was sent to your clerk, was never raised on any of the

13   discussion that I recall.  And the idea that there is a

14   common interest or a joint defense privilege between Ovation

15   and its investors I find very hard to believe.  That

16   certainly hasn't been briefed and that is going to be a

17   defining issue, we really should see a log and we should

18   fight about it in a proper way.  It shouldn't be just pre-

19   decided without an agreement, without actually knowing what

20   we're dealing with and knowing what the possible basis would

21   be for asserting a common interest defense between the

22   investors, who quite honestly, we've (indiscernible) need to

23   know if they're acting in concert and we need to know other

24   facts about them.  And we're entitled to the communications

25   between Ovation and the investors.

1              The idea that all of that stuff is privileged just

2     can't be accepted on face value.  I think it's false.  I've

3     seen absolutely no argument or evidence to that effect and I

4     don't think the Court can resolve that now.  The proper way

5     that discovery disputes like privileged disputes get

6     resolved is by people looking at the documents, creating a

7     privileged log that sets on their position and then there's

8     a challenge.  And the idea that we should just forego all

9     document discovery from Ovation because they assert a

10    dubious privilege, I really don't think it should be

11    credited.

12             Finally on the cost shifting issue, the Court that

13    -- or excuse me, the case that the plaintiffs or Ovation

14    itself has cited, Zubulake, in that case what was at issue

15    was retrieving materials from backup tapes.  The Court said

16    quite clearly that the cost of production and reviewing or,

17    excuse me, the cost of reviewing should and always should be

18    borne by the party that has that material.

19             What the cost shifting was considered in that case

20    was for the cost of restoring backup tapes that were more

21    than six years old.  Here, all of the evidence that we're

22    dealing with from Ovation is from February of 2015 forward.

23    I have never been told that any of that material is

24    inaccessible or the sort of material that could potentially

25    be subject to cost shifting under Zubulake.

1          And even Rule 26, the advisor committee notes

2     itself that the presumption is that the party who possesses

3     material should pay all the cost of producing it and there's

4     just absolutely no basis for cost shifting.  This is a

5     completely straightforward situation where TTI is seeking

6     relevant information from the party that (indiscernible) and

7     is entitled to that information in our view.  And, again, we

8     respectfully ask the Court to direct Ovation to produce that

9     material.

10          MR. SHORE:  Your Honor, may I be heard briefly on

11    two points?

12          THE COURT:  Yes.

13          MR. SHORE:  First, with respect to the new

14    category of documents they want, which are facts related to

15    the structure of the transaction, the only party under the

16    contract who has the right to drag is EFH.

17          The structuring of the transaction and what is

18    going on are documents that EFH has and EFH will produce and

19    EFH will explain in discovery why it believes that those

20    facts lead to a change of control or to an IPO conversion.

21    So they're not not getting that material.  All they're not

22    getting are Ovation's internal analysis of that material,

23    which, again, would be privileged.

24          Second, I don't know where this view of a joint

25    defense and how it should be handled is raised.  We had a

1    document response, which went back and said the materials

2    are privileged.  We had numerous meet and confers.  In those

3    meet and confers TTI expressed doubt that Ovation and the

4    debtors would have a joint defense arrangement prior to the

5    execution of the merger agreement.  We pointed out that just

6    because Ovation and the debtors were adverse on some issues

7    there would be a commonality of interest and that,

8    therefore, we wouldn't have to produce it.

9           In the end, Ovation and EFH agreed, you know what,

10   let's not fight that.  We'll produce that material.  At no

11   point did TTI challenge the assertion of a joint arrangement

12   within the investor group.  And, in fact, the letter sent to

13   the Court does not address that privilege issue at all.  So

14   the problem here is that if TTI wants to challenge the

15   assertion of a joint defense privilege within the investor

16   group, it should have done that in the letter and we would

17   have addressed it.

18          Now, I don't understand the lack of understanding

19   of how investors having discussions with Ovation, their

20   financial advisors and their attorneys regarding whether or

21   not 20% of their recoveries are or are not properly the

22   subject of a allowable drag wouldn't create a joint defense

23   arrangement between them.  And there have been no evidence

24   or even contention set forth by TTI as to why the parties

25   would be adverse to each other on that issue.  So I think

1    that the joint defense assertion which has been made and not

2    challenged in the motion brought by these letters sent by

3    TTI gives the Court the ability to get a protective order

4    with respect to purely internal Ovation documents regarding

5    the drag.

6              MR. VIGNA:  I'd like to just make one final point,

7    Your Honor, if I may.

8              THE COURT:  Yes.

9              MR. VIGNA:  Again, this is Jason Vigna from

10   Skadden Arps on behalf of the defendant, TTI.

11             As Mr. Shore just pointed out, during the

12   telephone calls we had, we had discussions on the common

13   interest privilege vis-à-vis the debtors.  And the reason we

14   had those discussions is because I actually participated in

15   all of those calls.  That was the only counter defense or

16   common interest privilege I understood that Ovation was

17   asserting.  And if I misunderstood, perhaps that was my

18   mistake.

19             But I think that it would be a little bit

20   implausible for Ovation to presume that I would waive any

21   argument concerning a common interest on really the one

22   issue that Ovation would most likely have evidence.  And I

23   would challenge the in some ways more obvious common

24   interest between the debtors and the party that the debtors

25   agreed to merge with.

1          The only reason we did not address the

2    possibility, which again I find entirely dubious, of a

3    common interest between Ovation and the investors is because

4    I did not understand that that was what Ovation was

5    asserting.  And, again, that may have been my mistake, but

6    that by no means is a waiver of -- should be interpreted as

7    a waiver of TTI's right to challenge that position in,

8    again, a multibillion dollar lawsuit.

9          THE COURT:  All right.  Thank you, gentlemen.  I

10   think that there is a narrow category of documents and

11   information and it would be appropriate for defendants to

12   request production by Ovation, that it is very narrow.

13         And as currently drafted, I believe that the

14   requests for production are way too broad to specify

15   sufficiently for the defendant to be able to respond

16   proportionately to that request without having to do way too

17   wide a search.

18         And that is not several things.  It is not

19   information about what Ovation thinks the contract means.

20   It is not -- Mr. Shore correctly states that in connection

21   with contract interpretation, what does the contract mean?

22   The Court looks first -- that the Court tries to determine

23   the party's intent, i.e. the parties to the contract, and

24   this contract was formed well before Ovation even existed.

25   And to figure out the party's intent we look first to the

1   terms of the document and then if there's ambiguity to

2   parole evidence but, again, focused on the party's intent,

3   not a third party's idea, certainly not an after-created

4   third party's idea as to what the contract means.

5             In addition, I think it would be overly burdensome

6   to require any review of, let alone production of a

7   privileged log on communications with client's counsel and

8   communications with EFH.

9             So the defendants here, to the extent they're

10  talking about negotiations between the consortium, which led

11  to Ovation, between the consortium and the ad hoc committee

12  of noteholders and EFH on the other hand, you're getting

13  those documents from EFH.  And I am confident that EFH is

14  going to be able to find, log and produce any documents that

15  are responsive.

16            They have shown their ability to respond to

17  discovery with spades, in spades in this case and I expect

18  they will do so here.

19            I think it would be duplicative and way out of

20  proportion and unduly burdensome to require the other side

21  of those negotiations and communications to perform the

22  exact same request.

23            Also, it's, you know, it's clear to me that

24  communications with counsel between the client and counsel

25  here are going to be privileged and to require a bunch of

1   attorneys from White & Case and Baker Botts to run

2   electronic search terms to try to figure out what was done,

3   you know, 99% of what's going to come up is going to be

4   privileged.  So it just doesn't make sense to require that

5   process to go forward.

6          That leaves open, I think, two things.  With

7   regard to communications, it leaves open this issue about

8   whether communications between members of the consortium and

9   Ovation are protected by the common interest privilege.

10          So let's assume Consortium Member A and Consortium

11  Member B are in an email exchange with Mr. Shore about the

12  IPO conversion.  That would be a appropriately discoverable

13  document and I'll get to the factual or the breadth of that

14  but they simply are under this concept of -- I apologize.

15  Assuming that that is responsive to a category I would have

16  documents produced then and we'll deal with that in a

17  minute.  That would be an appropriately producible document

18  if there was no common interest between Consortium Member A

19  and Consortium Member B.

20          So the fact that it's being communicated to

21  counsel, Mr. Shore, to counsel of Ovation and counsel to the

22  ad hoc committee, Mr. Shore, wearing several hats here, that

23  wouldn't protect it on a privileged basis to the extent the

24  two parties, Consortium Member A and Consortium Member B

25  didn't share some sort of common interest would be a waiver

1    of privilege obviously.

2           So the question of whether Consortium Member A and

3    Consortium Member B have the protection of common interest

4    doctrine or privilege I don't think is sufficiently in front

5    of me for me to make a decision based on what's been

6    submitted to me in the facts to make a decision on that.

7           Now, it has been the case -- and this was before

8    TTI's involvement or at least active involvement in the case

9    -- we went round and round on the issue of whether

10   communications internally among members of the ad hoc

11   committee that was represented by Mr. Shore were producible

12   and if memory serves, and I hope it does, I did not require

13   those communications.  But then at a later time, sort of

14   kind of flipped when the ad hoc committee wanted internal

15   documents at the EFH committee level, if I remember

16   correctly and I said no, what's good for the goose is good

17   for the gander and did not require production of those

18   internal communications.

19          So my background or experience and propensity in

20   this case would be to protect the term communications among

21   the consortium members as being in the common interest and

22   also not appropriate for discovery but I can't make that

23   decision on the arguments as they've been articulated to me

24   and I think -- and I take at face value TTI's position that

25   they didn't realize that this specifically was an issue for

1    today and haven't briefed it, so they should have an

2    opportunity to brief that.

3            However, so that preserves whatever of those

4    internal consortium communications might be including those

5    with counsel if it turns out they're not protected by a

6    common interest privilege as possible, the only possible

7    range of documents that would be appropriate for production.

8    So we're excluding EFH documents, or communications with EFH

9    and we're excluding communications with client's counsel

10   unless, again, the communication with that counsel was with

11   multiple parties on the phone or on the communication -- not

12   phone, excuse me -- on the communication or email to the

13   extent, again, they're not protected by the common interest

14   privilege and I need more information to figure out whether

15   they're protected by the common interest privilege.

16           Okay.  But what categories or documents are

17   relevant?  And this is narrow.  What I think would be

18   appropriate and is going to require much more detailed

19   requests of production by TTI in order to narrowly tailor

20   what I think is appropriate would be documents,

21   communications that relate, not to the interpretation of the

22   contract but, whether the facts of the deal fit into or

23   trigger the rights under those contracts.  So not the

24   interpretation of the contracts, but let's assume contract

25   means A, I figure that out and I figured out based on either

1   the plain meaning or on communications between TTI and the

2   debtors way back when the thing was done in 2008 or so, I

3   figure out contract means A.  Now I got to figure out I got

4   facts X, Y and Z on the ground, how do facts X, Y, Z figure

5   into Contract A?

6           That's where the discovery would be appropriate

7   limited to -- this is what I heard -- the IPO conversion and

8   the change of control, okay?  That is a narrow range of

9   documents that I would allow production on but, again, only

10  to the extent a common interest privilege doesn't exist.

11          So where are we here, then?  I think what we need

12  is more narrowly tailored and specific document requests

13  from TTI and once that's done, if it's going to be an issue

14  for dispute, not briefing but letter briefing on whether a

15  common interest privilege intra consortium exists here and

16  should be applied.

17          So I won't require -- I'll in effect grant a

18  protective order on requests for production that are

19  currently in play without prejudice to allow more narrowly

20  tailored document requests along the lines of what I just

21  articulated to be done in whatever time it takes to do it

22  and allow for a quick response and then you can pony this

23  thing up for a fight with me, which would include a fight as

24  to whether the common interest privilege is applicable here.

25  End of ruling.

1          MR. VIGNA:  All right.  Thank you, Your Honor.

2          MR. SHORE:  Thank you, Your Honor.  One bit of

3    update for Your Honor, after the appointment of Judge Gross,

4    we reached out to him to let him know, if you hadn't

5    already, and just started discussions when he wants to have

6    a preliminary comments with the parties and we'll keep you

7    apprised as mediations move forward.

8          THE COURT:  Okay.  Thank you.  I was going to ask

9    -- I appreciate that.  I was going to ask you whether you

10   had received my message which was delivered to debtor's

11   counsel, which I'm sure you had and whether you had reached

12   out to Judge Gross' chambers.

13         So it's good to hear you reached out to Judge

14   Gross' chambers.  And for some reason unknown to the gods,

15   he has agreed, yet again, to mediate a dispute for me.  So

16   I'm going to have to continue to shower him with gifts for

17   his service to the Court.  I truly appreciate it and so be

18   kind to him as I'm sure you will be and hopefully he'll be

19   relatively kind to you, although if appropriate, he won't.

20         So and I won't ask -- Mr. Shore, I won't ask you

21   to comment on what's going on down in Texas.  Hopefully that

22   will continue to move in an appropriate way that leads to a

23   good result for the debtor's estate, but that is certainly

24   out of your hands and my hands, so we'll have to see how

25   that goes forward.  So thank you very much.  Contact me as

1    appropriate when you've got something for me to decide in

2    the context of what I've just ruled and we'll figure it out.

3    Thank you very much.  We're adjourned.

4              MR. VIGNA:  Thank you, Your Honor.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5    **Sonya**

6    **Ledanski Hyde**

Digitally signed by Sonya Ledanski Hyde
DN: cn=Sonya Ledanski Hyde,
o=Veritext, ou,
email=digital@veritext.com, c=US
Date: 2016.01.18 13:25:28 -05'00'

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  January 18, 2016