**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Hearing Date:  February 18, 2016 at 11:00 a.m.** |
| | ) | **Objection Deadline:  February 11, 2016 at 4:00 p.m.** |

**MOTION OF ENERGY FUTURE HOLDINGS CORP.,**
***ET AL.*, FOR ENTRY OF AN ORDER GRANTING A**
**LIMITED WAIVER OF THE 2016 NON-PROPRIETARY TRADING**
**ORDER WITH RESPECT TO CERTAIN NON-PROPRIETARY HEDGING**
**AND TRADING ARRANGEMENTS SUBJECT TO THE DEBTORS'**
**RISK MANAGEMENT GUIDELINES**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this motion (this "Motion") seeking entry of an order, substantially in the form attached hereto

as **Exhibit A** (the "Order") waiving the tenor limitations set forth in the *Order Authorizing*

*Certain Debtors to Enter Into Non-Proprietary Hedging and Trading Arrangements With a*

*Tenor Beyond December 31, 2015 and Subject to Hedge and Tenor Limitations Consistent with*

*Historical Practice* (the "2016 Non-Proprietary Order")[2] solely with respect to the Non-

Proprietary Transferred Hedging Arrangements, which are defined and described in more detail

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2] *See also Motion of Energy Future Holdings Corp.*, et al., *Clarifying Certain Relief Granted in the Non-Proprietary Trading Order and Seeking Entry of an Order Authorizing Certain Debtors to Enter Into Non-Proprietary Hedging and Trading Arrangements With a Tenor Beyond December 31, 2015 and Subject to Hedge and Tenor Limitations Consistent with Historical Practice* [D.I. 2710] (the "2016 Non-Proprietary Trading Motion").

below.  In support of this Motion, the Debtors submit the *Declaration of Joseph Ho in Support of the Motion of Energy Future Holdings Corp.,* et al., *for Entry of an Order Granting a Limited Waiver of the 2016 Non-Proprietary Trading Order with Respect to Certain Non-Proprietary Hedging and Trading Arrangements Subject to the Debtors' Risk Management Guidelines* (the "Ho Declaration") and respectfully state as follows.

### Jurisdiction and Venue

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested in this Motion are section 363 title 11 of the United States Code (the "Bankruptcy Code") and rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### Relief Requested

4.      Pursuant to the 2016 Non-Proprietary Order, the TCEH Debtors are permitted to enter into Non-Proprietary Hedging and Trading Arrangements with a tenor beyond December 31, 2015 without further order of the Court, subject to certain limits established by the Audit

2

Committee.  In connection with discussions with various constituencies regarding the 2016 Non-Proprietary Order, the Debtors agreed to refrain from entering into Non-Proprietary Hedging and Trading Arrangements with a tenor that extended further than 27 calendar months past a particular Reference Date (as defined herein) without further relief from the Court.

5.    Pursuant to the Bidding Procedures Order, the TCEH Debtors were permitted to participate in a competitive bidding process for the acquisition of certain strategic business units (such business units, as defined and described in the Bidding Procedures Motion, the "Assets," such entities included in the Assets, the "Acquired Entities" and such transaction, the "Transaction") from a confidential seller (the "Seller")).[3]  If selected as the winning bidder, the TCEH Debtors were authorized to execute a purchase agreement and consummate the Transaction without further order of the Court.  The Assets to be acquired by the TCEH Debtors in connection with the Transaction will include certain Non-Proprietary Hedging and Trading Arrangements entered into by the Acquired Entities prior to the closing of the Transaction (the "Non-Proprietary Transferred Hedging Arrangements").

6.    The majority of the Non-Proprietary Transferred Hedging Arrangements are asset-backed hedges that are currently secured on a first lien basis by the Assets.  In order to induce the counterparties to the Non-Proprietary Transferred Hedging Arrangements to keep such hedges in place upon consummation of the Transaction, the TCEH Debtors are seeking to secure the Non-Proprietary Transferred Hedging Arrangements by the same collateral securing the TCEH DIP Facility (as defined in the TCEH DIP Order).  Consequently, the TCEH Debtors are in the process of discussing with the counterparties to such hedges that, upon the closing of

---

[3]    Additional information regarding the Assets, the Transaction, and the Seller is set forth in the *Motion of Energy Future Holdings Corp.*, et al., *for Entry of an Order Authorizing, but not Requiring, the TCEH Debtors (A) to Participate in a Competitive Bidding Process, and (B) if Selected as the Winning Bidder, to Consummate a Proposed Acquisition* [D.I. 6395] (the "Bidding Procedures Motion").

3

the Transaction, the Non-Proprietary Transferred Hedging Arrangements will be secured on a first lien basis by the same collateral that secures the TCEH DIP Facility.

7.     The TCEH Debtors believe it would be more administratively efficient to assign and/or novate the Non-Proprietary Transferred Hedging Arrangements to a TCEH Debtor.  As a result, and as described in more detail below, the Debtors seek authority, upon consummation of the Transaction, to assign and/or novate the Non-Proprietary Transferred Hedging Arrangements to any or all of the TCEH Debtors.  The Non-Proprietary Transferred Hedging Arrangements, however, include Non-Proprietary Hedging and Trading Arrangements with a tenor beyond 27 months from a particular Reference Date.

8.     For that reason, by this Motion, the Debtors seek entry of the Order waiving the tenor limitations established in connection with the 2016 Non-Proprietary Order solely with respect to the Non-Proprietary Transferred Hedging Arrangements as assigned or novated to the TCEH Debtors in connection with the Transaction.

**<u>Background</u>**

9.     On April 29, 2014 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Court has entered an order for joint administration of these chapter 11 cases.  The Court has not appointed a trustee.  On June 6, 2014, the Court entered a final order approving the use of cash collateral by Energy Future Competitive Holdings Company LLC ("<u>EFCH</u>"), its direct subsidiary, Texas Competitive Electric Holdings Company LLC ("<u>TCEH</u>") and the direct and indirect Debtor subsidiaries of EFCH and TCEH (together with EFCH and TCEH, the "<u>TCEH Debtors</u>") [D.I. 855] (the "<u>TCEH Cash Collateral Order</u>") and a final order approving postpetition financing by the TCEH

Debtors [D.I. 856] (the "TCEH DIP Order").

10.     The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") formed an official committee of unsecured creditors of the TCEH Debtors and EFH Corporate Services Company (the "TCEH Creditors' Committee") on May 13, 2014 [D.I. 420] and an official committee of unsecured creditors of Energy Future Holdings Corp., Energy Future Intermediate Holding Company, LLC, EFIH Finance, Inc., and EECI, Inc. (the "EFH Creditors' Committee") on October 27, 2014 [D.I. 2570].  Further information regarding the Debtors' business operations and capital structure is set forth in the declaration of Paul Keglevic in support of the Debtors' first day motions [D.I. 98] and the *Disclosure Statement For the Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp.*, et al., *Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 6124], approved by the Court on September 22, 2015 [D.I. 6131] (the "Disclosure Statement").  Additionally, on December 9, 2015, the Court entered the *Order (Amended) Confirming the Sixth Amended Joint Plan of Reorganization of Energy Future Holdings Corp.*, et al., *Pursuant to Chapter 11 of the Bankruptcy Code*, approving the Debtors' plan of reorganization [D.I. 7235].

## I.      Overview of Hedging and Trading Arrangements.

11.     As described in the hedging and trading motion filed on the Petition Date [D.I. 41] (the "First Hedging and Trading Motion"), the power generation, retail electricity businesses, and hedging activities of Texas Competitive Electric Holdings Company LLC and its direct and indirect subsidiaries (collectively, the "TCEH Debtors") are highly integrated.  In short, the TCEH Debtors' hedging activities allow the TCEH Debtors to utilize (a) physical commodity transactions to hedge price and delivery risk related to fuel inputs (including natural gas, coal, uranium, and fuel oil) to the TCEH Debtors' power generation and mining operations,

(b) physical transactions for electricity and related services produced or procured in their generation and retail operations, and (c) financial derivatives that hedge price risk for both fuels and electricity. These transactions are memorialized in hedging and trading contracts (such contracts, the "Non-Proprietary Hedging and Trading Arrangements").

12.    As a complement to the Non-Proprietary Hedging and Trading Arrangements, the TCEH Debtors, in a limited and highly controlled environment, also enter into and perform under trading contracts for the purpose of generating profits ("Proprietary Trades," the related contracts, the "Proprietary Trading Arrangements," and, together with the Non-Proprietary Hedging and Trading Arrangements, the "Hedging and Trading Arrangements").[4]    By this Motion, the Debtors do not seek any relief with respect to the Proprietary Trades or the Proprietary Trading Arrangements.

## II.    Scope of Existing Relief Regarding Non-Proprietary Hedging and Trading Arrangements.

13.    The Debtors seek through this Motion to modify certain of the relief granted in connection with the Non-Proprietary Hedging and Trading Arrangements. As described below, as of the date hereof, the Debtors have obtained three final Court orders governing Non-Proprietary Hedging and Trading Arrangements.

14.    *2015 Non-Proprietary Hedging and Trading Arrangements Relief*. On June 6, 2014, the Court entered a final order, granting the Debtors' authority to (a) continue performing under Non-Proprietary Hedging and Trading Arrangements and honoring related prepetition

---

[4]    Proprietary Trades may also be contracts entered into for the purpose of limiting losses or locking in profits from existing Proprietary Trades.

Nothing in this Motion, the Ho Declaration, or the Order shall affect the Proprietary Trading Arrangements, which shall be governed solely by the *Final Order (Re: Proprietary Trading Transactions That Do Not Involve the Debtors' Power Generation and Retail Operations) Authorizing the Debtors to (A) Continue Performing Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Proprietary Trading Transactions Subject to Internal Risk Management Guidelines* [D.I. 1309] (the "Proprietary Trading Order").

6

obligations (including collateral obligations) and (b) enter into new Non-Proprietary Hedging and Trading Arrangements in the ordinary course of business [D.I. 860], *provided*, *however*, that the Debtors were prohibited from entering into wholesale Hedging and Trading Arrangements with a tenor beyond December 31, 2015.[5]

15.    ***2016 Non-Proprietary Order***. On November 20, 2014, the Court entered the 2016 Non-Proprietary Order, clarifying certain relief granted in the 2015 Non-Proprietary Order and, under paragraph two of the order, providing that "the Hedging and Trading Entities are authorized, but not directed, to enter into Non-Proprietary Hedging and Trading Arrangements with a tenor beyond December 31, 2015 subject to the Approved Limits and in a manner consistent with the Risk Management Guidelines." 2016 Non-Proprietary Order, ¶ 2.

16.    Based on (a) discussions the Debtors had with various constituencies regarding the 2016 Non-Proprietary Order and (b) the limits established by the Audit Committee in place as of the filing of the 2016 Non-Proprietary Hedging Motion (defined therein as the "Approved Limits"), , the Debtors agreed to seek additional relief from the Court before entering into Non-Proprietary Hedging and Trading Arrangements with a tenor beyond 27 months from a particular Reference Date.[6]

17.    ***First Limited Waiver of 2016 Non-Proprietary Order***. On August 6, 2015 the

---

[5]    *See Final Order (Re: Non-Proprietary Trading and Hedging Transactions Involving the Debtors' Power Generation and Retail Operations) Authorizing the Debtors to (A) Continue Performing Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Trading Continuation Agreements and New Postpetition Hedging and Trading Arrangements* [D.I. 860]; *see also Motion of Energy Future Holdings Corp.,* et al., *for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Performing Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Trading Continuation Agreements and New Postpetition Hedging and Trading Arrangements* [D.I. 41] (the "First Hedging and Trading Motion").

[6]    Hedge limits are generally determined on a rolling-forward basis from a particular date from which an assessment regarding exposure is made and such particular dates are known as "Reference Dates." 2016 Non-Proprietary Hedging Motion, ¶ 9.

Court entered an order (a) waiving the tenor limitations set forth in the 2016 Non-Proprietary Order solely with respect to certain limited Non-Proprietary Hedging and Trading Arrangements entered into between certain TCEH Debtors and municipally-owned utilities or co-operatives and (b) authorizing, but not directing, certain TCEH Debtors to enter into Non-Proprietary Hedging and Trading Arrangements with such entities with a tenor that extends past 27 months from a particular Reference Date, in the ordinary course of business [D.I. 5224].

### III.    Consummation of the Transaction Authorized by the Bidding Procedures Order Requires Limited Relief from 2016 Non-Proprietary Order.

18.    Pursuant to the Bidding Procedures Order, the TCEH Debtors obtained authority to participate in a competitive bidding process for the acquisition of certain assets, and, if selected as the winning bidder, consummate the Transaction.  The TCEH Debtors ultimately emerged as the winning bidder in the auction and executed a purchase agreement with the Seller.  The TCEH Debtors are in the process of negotiating the necessary documents required under the DIP Documents to consummate the Transaction.

19.    The Assets to be acquired by the TCEH Debtors in connection with the Transaction will include the Non-Proprietary Transferred Hedging Arrangements.  The majority of the Non-Proprietary Transferred Hedging Arrangements are asset-backed hedges that are currently secured on a first lien basis by the Assets.  In order to induce the counterparties to the Non-Proprietary Transferred Hedging Arrangements to keep such hedges in place upon consummation of the Transaction, the TCEH Debtors are seeking to secure the Non-Proprietary Transferred Hedging Arrangements by the same collateral securing the TCEH DIP Facility. Consequently, the TCEH Debtors are in the process of discussing with the counterparties to such hedges that, upon the closing of the Transaction, the Non-Proprietary Transferred Hedging Arrangements be secured on a first lien basis by the same collateral that secures the TCEH DIP

8

Facility.

20.    Under the TCEH DIP Order, the TCEH Debtors cannot enter into the Non-Proprietary Transferred Hedging Arrangements if such Arrangements are not Secured Hedging Agreements or Secured Commodity Hedging Agreements (each as defined in the TCEH DIP Order).[7]    Secured Hedging Agreements are Non-Proprietary Hedging and Trading Arrangements that are entered into by and between a TCEH Debtor and a Hedge Bank (as defined in the TCEH DIP Order).[8]    Secured Commodity Hedging Agreements are Non-Proprietary Hedging and Trading Arrangements that are "structured such that, at the time it is first entered into, the net mark-to-market credit exposure calculated as of the date of entry into such Commodity Hedging Agreement of (x) the counterparties to such Commodity Hedging Agreements (taken as a whole) to (y) the Borrower or any other TCEH Debtor, is positively correlated with the price of the relevant commodity or positively correlated with changes in the

---

[7]    As defined in the TCEH DIP Order, (i) "Secured Commodity Hedging Agreement" shall mean (a) any Commodity Hedging Agreement that (i) is entered into by and between the Borrower or any Restricted Subsidiary and any Hedge Bank and (ii) individually or together with other Commodity Hedging Agreements (other than Commodity Hedging Agreements that are unsecured) entered into or being entered into with such Hedge Bank or its affiliates, is structured such that, at the time it is first entered into, the net mark-to-market credit exposure calculated as of the date of entry into such Commodity Hedging Agreement of (x) the counterparties to such Commodity Hedging Agreements (taken as a whole) to (y) the Borrower or any other TCEH Debtor, is positively correlated with the price of the relevant commodity or positively correlated with changes in the relevant spark spread and (b) any other Commodity Hedging Agreement that (i) is entered into by and between the Borrower or any Restricted Subsidiary and any Hedge Bank and (ii) is entered into to unwind or offset any existing Secured Commodity Hedging Agreement of the type described in clause (a) above; provided that any Commodity Hedging Agreement entered into prior to the Petition Date shall not constitute a "Secured Commodity Hedging Agreement" unless (x) as of the Petition Date, the Swap Termination Value in respect of such Commodity Hedging Agreement would be payable to the Borrower or the Restricted Subsidiary party to such Commodity Hedging Agreement if such Commodity Hedging Agreement were terminated as of the Petition Date and (y) such Commodity Hedging Agreement has not been terminated as of the Petition Date and the counterparty thereto has waived its right to terminate such Commodity Hedging Agreement. and (ii) "Secured Hedging Agreement" shall mean any Hedging Agreement that is entered into by and between the Borrower or any Restricted Subsidiary and any Hedge Bank.

[8]    As defined in the TCEH DIP Order, "Hedge Bank" shall mean any Person (other than Parent Guarantor, the Borrower or any other Subsidiary of the Borrower) that either (i) is a party to a Secured Commodity Hedging Agreement and has executed and delivered to the Collateral Agent an Accession Agreement, and become a party to the Security Agreement, pursuant to Section 14.2 or (ii) with respect to any other Hedging Agreement (other than a Commodity Hedging Agreement) either (x) at the time it enters into a Secured Hedging Agreement or (y) on the Closing Date, is a Lender or an Affiliate of a Lender, in its capacity as a party to a Secured Hedging Agreement.

relevant spark spread."

21.    Critically, counterparties to the Non-Proprietary Transferred Hedging Arrangements will likely only be incentivized into continuing to transact under the Non-Proprietary Transferred Hedging Arrangements—without requiring the TCEH Debtors to use cash or a letter of credit as collateral support for such Non-Proprietary Transferred Hedging Arrangements—if such Non-Proprietary Transferred Hedging Arrangements are, as far as possible, collateralized obligations under the TCEH DIP Order.

22.    In order to collateralize the obligations under the Non-Proprietary Transferred Hedging Arrangements, the Non-Proprietary Transferred Hedging Arrangements must be Secured Commodity Hedging Agreements which, in turn, requires that such Arrangements meet the mark-to-market requirement described above.    In order to meet the mark-to-market requirement described above and qualify as Secured Commodity Hedging Agreements, the Non-Proprietary Transferred Hedging Arrangements have to be assigned or novated to a TCEH Debtor upon consummation of the Transaction.

23.    The Non-Proprietary Transferred Hedging Arrangements, as Secured Hedging Agreements and Secured Commodity Hedging Agreements, as applicable, include Arrangements that contemplate a tenor beyond 27 months from a particular Reference Date.    As a result, without relief from the 2016 Non-Proprietary Order, the TCEH Debtors would not be able to enter into transactions under certain of the Non-Proprietary Transferred Hedging Arrangements.    In turn, the TCEH Debtors would not be able to maximize the value associated with consummating the Transaction, as contemplated by the Bidding Procedures Order.

## IV.    The Non-Proprietary Hedging Arrangements are Subject to the Approved Limits, Internal Hedging Policy, and Risk Management Guidelines.

24.    The Non-Proprietary Transferred Hedging Arrangements are, and will continue

to be, subject to a number of related risk reduction policies, including (a) the Debtors' rigorous Risk Management Guidelines; (b) the Approved Limits; and (c) the Internal Hedging Policy (each as defined and described below).  As described in the First Hedging and Trading Motion, the Debtors utilize risk management guidelines, which focus on governance and operational accountabilities surrounding transactions undertaken under the Non-Proprietary Hedging and Trading Arrangements, to ultimately ensure that hedging and trading transactions are closely monitored and in the best interests of all of the Debtors' stakeholders (the "Risk Management Guidelines").[9]

25.    In addition to the Risk Management Guidelines, the Debtors utilize an internal hedging policy, which is reviewed annually by the Audit Committee and which restricts the TCEH Debtors' ability to enter into Non-Proprietary Hedging and Trading Arrangements that would result in the Hedging and Trading Entities hedging more than 100% (in the aggregate) of the Debtors' projected exposure to certain commodities for a particular calendar year (the "Internal Hedging Policy").  The Internal Hedging Policy applies to certain commodities (which are contracted for under the Non-Proprietary Transferred Hedging Arrangements) and imposes hedge limits with respect to those commodities (i.e., the percent up to which the TCEH Debtors can hedge the Debtors' exposure with respect to such commodities) for specific periods (the "Approved Limits").  In addition, the Approved Limits and the Risk Management Guidelines require the TCEH Debtors to follow certain transaction procedures (and obtain certain internal approvals) before entering into transactions under the Non-Proprietary Transferred Hedging Arrangements. In short, the Non-Proprietary Transferred Hedging Arrangements, like all of the Debtors' Non-Proprietary Hedging and Trading Arrangements, are subject to various risk

---

[9]    For additional detail regarding the Risk Management Guidelines, *see* the 2016 Non-Proprietary Hedging and Trading Motion and the First Hedging and Trading Motion.

protocols.

26.     Without the relief requested herein, the TCEH Debtors will effectively have to seek termination of the Non-Proprietary Transferred Hedging Arrangements or, solely to the extent agreed to by the counterparties to such hedging arrangements, use cash or a letter of credit in order to provide credit support under such hedges.

27.     For these reasons, the Debtors seek entry of the Order, waiving the tenor limitations set forth in the 2016 Non-Proprietary Order solely with respect to the Non-Proprietary Transferred Hedging Arrangements.

**Basis for Relief**

**I.     Section 363(c) of the Bankruptcy Code Authorizes the Debtors to Enter Into Transactions Under the Non-Proprietary Hedging Arrangements with a Tenor Beyond 27 Months from a Reference Date.**

28.     Section 363(c) of the Bankruptcy Code provides, in relevant part, that a debtor in possession "may enter into transactions . . . in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(l).  To maximize the value of the Debtors' estates, the Hedging and Trading Entities should be permitted to enter into Hedging and Trading Arrangements with a tenor beyond 27 months from a particular Reference Date and utilize the Approved Limits.

29.     Section 363(c)(1)'s ordinary course of business standard was intended to allow a debtor in possession the flexibility to run its business.  *Moore v. Brewer (In re HMH Motor Servs., Inc.)*, 259 B.R. 440, 448–49 (Bankr. S.D. Ga. 2000).  A debtor in possession may therefore use, sell, or lease property of the estate without the need for prior court approval if the transaction is in the ordinary course of business.  *See Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616

(Bankr. S.D.N.Y. 1986) (holding that ordinary course of business use of estate property does not require a prior hearing); *James A. Phillips*, 29 B.R. at 394 (holding that where a debtor in possession is merely exercising the privileges of its status, there is no general right to notice and a hearing concerning particular transactions conducted in the ordinary course of business).

30.     The Bankruptcy Code does not define the "ordinary course of business." *In re Commercial Mortg. & Fin. Co.*, 414 B.R. 389, 393 (Bankr. N.D. Ill. 2009).   The two tests ordinarily applied by the courts to determine the ordinary course of business are the "horizontal" test and the "vertical" test.   *Denton Cnty. Elec. Co-Op., Inc. v. Eldorado Ranch (In re Denton Cnty. Elec. Coop., Inc.)*, 281 B.R. 876, 882 and n.12 (Bankr. N.D. Tex. 2002). "The 'horizontal test' focuses on the way businesses operate within a given industry. The 'vertical test' focuses on the expectations of creditors."   *Denton Cnty. Elec. Co-Op.*, 281 B.R. at 882 n.12.

31.     Under both the horizontal test and the vertical test, a waiver of tenor limitations solely with respect to Non-Proprietary Transferred Hedging Arrangements is in the Debtors' ordinary course.  *See Med. Malpractice Ins. Assoc. v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997) (finding that "ordinary course of business" is meant "to embrace the reasonable expectations of interested parties of the nature of transactions that the debtor would likely enter in the course of its normal, daily business") (quoting *In re Watford*, 159 B.R. 597, 599 (M.D. Ga. 1993)); *In re Roth American, Inc.*, 975 F.2d 949, 952 (3rd Cir. 1992) (stating that section 363 of the Bankruptcy Code is designed to allow a debtor in possession "flexibility to engage in ordinary transactions without unnecessary…oversight"); *In re Coordinated Apparel, Inc.*, 179 B.R. 40, 43 (Bankr. S.D.N.Y. 1995).

32.     Under the horizontal test, companies in the Debtors' industry routinely enter into

hedging and trading transactions similar to those contemplated by the Non-Proprietary Transferred Hedging Arrangements. *See, e.g.*, *In re Patriot Coal Corp.*, No. 12-12900 (Bankr. S.D.N.Y. July 10, 2012) (granting authority to enter into and perform under coal sales contracts); *In re Dynegy Holdings, LLC*, No. 11-38111 (Bankr. S.D.N.Y. Nov. 9, 2011) (granting authority to enter into and perform under derivative contracts); *In re Boston Generating, LLC*, No. 10-14419 (Bankr. S.D.N.Y. Sept. 23, 2010) (granting authority to enter into and perform under its hedging and purchase and sale contracts); *In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Dec. 21, 2005) (granting authority to enter into and perform under its derivative contracts, including forward, futures, and options contracts); *In re Mirant Corp.*, No. 03-46590 (Bankr. N.D. Tex. Aug. 28, 2003) (same); *In re NRG Energy, Inc.*, No. 03-13024 (Bankr. S.D.N.Y. June 30, 2003) (same).[10]  Indeed, this Court granted the Debtors authority to continue the TCEH Debtors' activities under Non-Proprietary Hedging and Trading Arrangements under the 2015 Non-Proprietary Order, the 2016 Non-Proprietary Order, and the First 2016 Non-Proprietary Waiver Order. The Non-Proprietary Transferred Hedging Arrangements with a tenor beyond 27 months from a particular Reference Date are similar to the Non-Proprietary Hedging and Trading Arrangements entered into by other energy companies, and are further regulated by a number of risk reduction protocols.

33.     Under the vertical test, creditors' reasonable expectations of a debtor's "ordinary course of business" are based on the debtor's specific prepetition business practices and norms, and the expectation that the debtor will conform to those practices and norms while operating as a debtor in possession. *In re Garofalo's Finer Foods, Inc.,* 185 B.R. 414, 425 (N.D. Ill. 1995). Thus, a fundamental characteristic of an "ordinary" postpetition business transaction is its

---

[10]   Because of the voluminous nature of the orders cited herein, such orders are not attached to this Motion. Copies of these orders are available upon request of the Debtors' counsel.

similarity to a prepetition business practice. *Marshack v. Orange Commercial Credit (In re Nat'l Lumber & Supply, Inc.)*, 184 B.R. 74, 79 (9th Cir. B.A.P. 1995); *James A. Phillips*, 29 B.R. at 394. The size, nature and type of business, and the size and nature of the transactions in question, are all relevant to determining whether the transactions at issue are ordinary. *U.S. ex rel. Harrison v. Estate of Deutscher*, 115 B.R. 592, 598 (M.D. Tenn. 1990); *Johns-Manville Corp.*, 60 B.R. at 617. "Accordingly, a postpetition transaction undertaken by the debtor that is similar in size and nature to prepetition transactions undertaken by the debtor would be within the ordinary course of business." *Garofalo's*, 186 B.R. at 426.

34.    Here, creditors are likely aware that the Debtors' hedging and trading operations represent a significant source of value to the Debtors' enterprise and expect the Debtors to stay competitive with their peers by continuing to capitalize on hedging and trading opportunities, including those presented by the Transaction. In addition, the Debtors' creditors are aware that the Debtors have obtained authority to participate in a competitive auction and, importantly, are aware that consummation of the Transaction is likely to require certain relief under the TCEH DIP Order. Given the intertwined relationship between the TCEH DIP Order and the Debtors' hedging and trading operations, creditors are aware that modifications to the relief provided under the TCEH DIP Order may require parallel hedging and trading relief.

35.    Accordingly, and under the authority provided by section 363(c)(1) of the Bankruptcy Code, the Debtors submit that a limited waiver of the tenor limitations set forth in the 2016 Non-Proprietary Order solely with respect to the Non-Proprietary Transferred Hedging Arrangements, authorizing the Debtors to enter into transactions under the Non-Proprietary Transferred Hedging Arrangements with a tenor that extends beyond 27 calendar months from a particular Reference Date is in the best interests of their estates and all parties in interest in these

chapter 11 cases.

## II. The Debtors' Have a Sound Business Purpose for Seeking a Limited Waiver of the Tenor Limitations Set Forth in the 2016 Non-Proprietary Order, Solely With Respect to the Non-Proprietary Transferred Hedging Arrangements.

36.    To the extent the relief sought herein is not within the Debtors' ordinary course of business, section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  In the Third Circuit, courts have authorized transactions outside the ordinary course of business when the transaction has a sound business purpose and is proposed in good faith.  See *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008).

37.    Here, a limited waiver of the tenor limitations in the 2016 Non-Proprietary Order, permitting the Debtors to enter into Non-Proprietary Transferred Hedging Arrangements with a tenor beyond 27 calendar months from a particular Reference Date will allow the Debtors to stay competitive and fully transact under the Non-Proprietary Transferred Hedging Arrangements, which have the capacity to return significant value to the Debtors' estates.

38.    Accordingly, the Debtors seek entry of the Order waiving the tenor limitations established in connection with the 2016 Non-Proprietary Order solely with respect to the Non-Proprietary Transferred Hedging Arrangements.

### Waiver of Bankruptcy Rules 6004(a) and 6004(h)

39.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

16

**Notice**

40.     The Debtors shall provide notice of this Motion on the date hereof via first class mail to: (a) the U.S. Trustee; (b) counsel to the TCEH Creditors' Committee; (c) counsel to the EFH Creditors' Committee; (d) Wilmington Trust, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (e) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under: (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (f) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under: (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (g) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under: (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (h) UMB Bank, N.A. in its capacity as indenture trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (i) Delaware Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; (ii) the 10.0% EFIH senior secured notes due 2020; and (iii), the 11.50% TCEH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington

Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (j); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to the Ad Hoc Committee of TCEH Unsecured Noteholders; (q) counsel to the Ad Hoc Committee of TCEH Second Lien Noteholders; (r) Oncor Electric Delivery Holdings Company LLC and counsel thereto; (s) Oncor Electric Delivery Company LLC and counsel thereto; (t) the Securities and Exchange Commission; (u) the Internal Revenue Service; (v) the Office of the United States Attorney for the District of Delaware; (w) the Office of the Texas Attorney General on behalf of the Public Utility Commission of Texas; (x) counsel to the Electric Reliability Council of Texas; and (y) those parties that have requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### **Prior Request**

41.     As described herein, the relief sought in this Motion and the Order seeks a limited modification of the relief granted by the Court pursuant to the 2016 Non-Proprietary Order.

[*Remainder of page intentionally left blank.*]

18

WHEREFORE, the Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Dated: January 28, 2016
       Wilmington, Delaware

/s/ Jason M. Madron

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701
Email:          collins@rlf.com
                defranceschi@rlf.com
                madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          edward.sassower@kirkland.com
                stephen.hessler@kirkland.com
                brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          james.sprayregen@kirkland.com
                marc.kieselstein@kirkland.com
                chad.husnick@kirkland.com
                steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession