Page 1

1    UNITED STATES BANKRUPTCY COURT
2    DISTRICT OF DELAWARE
3
4
5    In re:                          :
                                     :    Chapter 11
6    ENERGY FUTURE HOLDINGS CORP., :
     et. al.,                        :    Case No.
7                                    :
              Debtors.               :    (Jointly Administration
8    _____         :    Requested)
                                     :
9    ENERGY FUTURE HOLDINGS CORP., :
                                     :
10            Plaintiff,             :
                                     :
11        v.                         :    Adv. Proc. No. 15-51386
                                     :    Re: Adv. D.I. 82
12   TEXAS TRANSMISSION INVESTMENT :
     LLC                             :
13                                   :
                                     :
14            Defendants.            :
     _____:
15
     OVATION ACQUISITION I, LLC,     :
16   OVATION ACQUISITION II, LLC,    :
                                     :
17        Intervenor Plaintiffs,     :
                                     :
18        v.                         :
     TEXAS TRANSMISSION INVESTMENT :
19   LLC                             :
                                     :
20                                   :
              Defendant.             :
21   _____:
22
23
                          United States Bankruptcy Court
24
                          824 North Market Street
25

1                                  Wilmington, Delaware

2                                  February 8, 2016

3                                  3:11 PM - 3:46 PM

4

5

6

7

8    B E F O R E :

9    HON CHRISTOPHER S. SONTCHI

10   U.S. BANKRUPTCY JUDGE

11

12   ECRO OPERATOR:   LESLIE MURIN

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:   Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    APPEARING TELEPHONICALLY:

4    TOM O'BRIEN

5    PEG A. BRICKLEY

6    KENT COLLIER

7    DANIEL DEFRANCESCHI

8    DAVID M. DUNN

9    WARREN HASKEL

10   JASON M. MADRON

11   MARC B. ROITMAN

12   THOMAS WALPER

13   MARK A. CODY

14   JASON LIBERI

15   JONATHAN D. MARSHALL

16   R. STEPHEN MCNEILL

17   PAULINE K. MORGAN

18   ERICA RICHARDS

19   JEFFREY M. SCHLERF

20   J. CHRISTOPHER SHORE

21   ERIN SMITH

22   FOTEINI T ELONI

23   CARL TULLSON

24   JASON C. VIGNA

25

1               P R O C E E D I N G S

2          THE COURT:  Good afternoon, counsel.  This is

3     Judge Sontchi.

4          MR. VIGNA:  Good afternoon, Your Honor.  This is

5     Jason Vigna of Skadden Arps on behalf of the defendant and

6     movant, Texas Transmission Investment, LLC.

7          THE COURT:  All right.  Why don't you go ahead and

8     proceed?

9          MR. VIGNA:  Thank you very much, Your Honor.  We

10    were -- we had one of these conferences about three weeks

11    ago, during which we discussed this case is about two

12    things; one of which is the meaning of certain provisions in

13    the Oncor Investor Rights Agreement and the other is whether

14    certain plan transactions between EFH and the intervenor,

15    Ovation Acquisition I, trigger the rights and obligation

16    under that IRA.

17          And when we were before the Court, the Court ruled

18    that discovery from Ovation on the second point would be

19    appropriate to the extent that it's limited to what we've

20    been referring to as the IPO conversion, and also a change

21    of control issue, to the extent the common interest

22    privilege doesn't apply.

23          Ovation has refused to produce any documents on

24    those subjects, however, other than 41 publicly filed

25    transaction documents and three non-publicly filed

1    regulatory filings.  But it's TTI's position, at this point,

2    that those 44 documents are not the only materials in

3    Ovation's control that are relevant to the dispute.

4            Accordingly, we're again before the Court seeking

5    to compel production of some documents needed to fairly

6    apprise the factfinder of the claims and defenses at issue

7    in the litigation.  And the legal standard is a familiar

8    one, Rule 26(b)(1) provides the parties may obtain discovery

9    regarding any non-privileged matter that is relevant to the

10   party's claim or defense, and proportional to the needs of

11   the case.

12           And even after the amendments of that rule in

13   December of 2015, the cases cited in our brief show that it

14   remains a liberal discovery policy in which discovery is

15   generally permitted on any items that are relevant or could

16   lead to the discovery of relevant information.

17           And at this point the parties have had multiple

18   meet and confers and there are basically three areas in

19   which TTI is still seeking documents, and which Ovation is

20   still refusing to produce them.

21           The first is communications with the equity

22   investors and the backstop purchasers as defined in the

23   confirmed plan, which sometimes they'll refer to as the OV1

24   investors or with other potential investors, concerning the

25   eventually offering of shares in OV1 to the public.  The

1    second topic is communications with the OV1 investors

2    concerning the rights offering contemplated by the EFH

3    merger agreement.  And the third category is communications

4    with the OV1 investors concerning the issuance of what's

5    been called new EFH Merger Common Stock.

6             And those three categories of documents are

7    relevant to two legal issues in dispute in this case.

8    First, under Section 3.7(a) of the Oncor Investor Rights

9    Agreement, for there to be an IPO conversion, and that's one

10   of the topics we discussed three weeks ago, under the IPO --

11   the IRA, for there to be an IPO conversion with which TTI

12   could conceivably be required to cooperate, EFH must develop

13   a plan for and the Oncor Board must take steps to

14   effectuate, this plan for the expressed purpose -- and I'm

15   quoting from the IRA -- for the expressed purpose of an

16   initial offering of securities of an IPO corporation, for

17   sale to the public in an IPO.

18            And EFH has submitted two documents in this case

19   that they characterize as IPO conversion plans; there was

20   one back in August and then a new one in December.  But

21   tellingly, neither of those documents actually includes an

22   IPO or any other offering of shares to anyone, much less the

23   public.  Instead there was -- those documents really

24   describe some really technical aspects of a REIT, a

25   restructuring of Oncor.

1              So we took deposition testimony on the subject,

2      and Tony Horton, the treasurer of EFH, testified that it's

3      the rights offering that OV1 is separately doing that's the

4      relevant to IPO.  And the rights offering is not discussed

5      in the IPO conversion plan, but it's discussed in some other

6      documents.  And ultimately the Court might be called upon to

7      determine, as a matter of law, whether that rights offering

8      is an offering of securities for the sale to the public in

9      an IPO.

10             But even if it is, there's a factual dispute over

11     whether any other relevant actions have been taken for the

12     quote, expressed purpose of carrying out that offering.  And

13     purpose is a pretty subjective word, and communications

14     between OV1 and the various investor groups about the rights

15     offering or any other stock issuances, are very likely to

16     shed light on their purpose, including as was discussed at

17     some PUC testimony, whether the purpose of the transaction

18     was actually to deliver control of Oncor to the Hunt Group

19     rather than to a diffuse public more generally.

20             But perhaps more importantly, the documents could

21     also show whether a change of control will occur at either

22     the Oncor level or the OV1 level, which is a prerequisite to

23     the exercise of any drag rights under Section 3.3 of the

24     IRA.

25             I've had some discussions with opposing counsel on

1   this topic and I tried to get them to clarify what their

2   change of control theory is.  And perhaps understandingly,

3   they've decided to leave it open.  But if their theory

4   depends on a disperse group of investors becoming ultimately

5   owners of EFH or OV1 rather than a simple change of

6   ultimately indirect control over Oncor Holdings from EFH to

7   OV1, the Court will be required to determine if those

8   investors are, quote, acting in concert, which is a -- the

9   language used in the IRA, although it's not a defined term.

10   And the deal documents themselves just are not dispositive

11   on that issue.

12           The most common situation in which courts are

13   called upon to determine if investors are acting in concert

14   is in Section 16(b) short-swing profit cases, were

15   plaintiffs allege that various defendant, who individually

16   own less than ten percent of a company have actually acted

17   in concert and therefore should be considered ten percent

18   owners, subject to the trading prohibitions of the statute.

19           And not surprisingly, those cases often involve

20   agreements in which defendants purchase shares at the same

21   time.  And despite whatever language might exist in those

22   documents, courts routinely look beyond their contents to

23   determine whether the defendants did in fact act in concert.

24           And that should be true in this case as well.  And

25   in fact I'm fairly certain the investors would take the

1    position, if following Ovation's assertions here that

2    they're clearly acting in concert, I guarantee that the

3    investors would seek additional discovery if a plaintiff

4    actually did sue them under Section 16(b) for any profits

5    earned within six months.

6           And so the documents that we're looking for go to

7    the issue of a change of control, and they also go to the

8    expressed purpose of whatever securities offerings may

9    occur.

10          And of course once relevance has been established,

11   then the burden shifts to the objecting party to show that

12   the discovery is disproportionate to the needs of the case.

13   And I don't think that the letter that Ovation put in did

14   that.  The issues in which discovery has been requested

15   could be outcome determinative, the amount of controversy is

16   over $2 billion, Ovation is the single best source of

17   discovery on those topics, Ovation is well funded and

18   Ovation hasn't even attempted to quantify the burden that

19   producing the responsive materials would place on it.

20          In their letter they raise a couple issues talking

21   about producing documents held by attorneys or what not, but

22   if that was really the issue we would have gotten well

23   beyond that.  As I think I mentioned during our last

24   conversation, EFH and TTI themselves of course had some

25   burden issues and quickly agreed that the amount of

1    discovery sought from attorneys would be pretty narrow, and

2    of course we would have done the exact same thing with

3    Ovation, if they had been willing to produce any documents

4    at all, any communications at all.

5            Instead, what they have said is that it would be

6    overly burdensome to produce any communications, you know,

7    emails or other communication, because supposedly a large

8    number of them would be protected by the common interest

9    doctrine and would need to be logged.  But as we've shown in

10   our letter brief, the need to create a log can't excuse

11   failing to produce non-privileged documents.

12           And in fact that's what the Court did, back in

13   July 21st, 2014 where there was a dispute over whether

14   communications within the ad hoc group were protected by a

15   common interest doctrine.  The Court directed counsel to

16   produce a privilege log and that that would focus the issues

17   in dispute.  And I wasn't a part -- party to the case at

18   that point, but I understood that's exactly what happened.

19           Moreover, Ovation's assertion that the common

20   interest doctrine, or super broad assertion of the common

21   interest doctrine, it's just not supported by any law of

22   which I'm aware.  Ovation contends that the common interest

23   came into existence right when Ovation came into existence,

24   in February of 2015.  And they just haven't asserted any

25   basis or established any basis for taking that position.

1              Of course the common interest comes into

2      existence, you know, presuming you have the other -- the --

3      you satisfy the other standards of legal advice being

4      shared, et cetera, but the common interest comes into

5      existence when parties reach an agreement and start taking

6      steps in furtherance of that agreement.  And the letter

7      brief doesn't explain when the agreement, if any, was

8      reached between the investors and Ovation until August 9th,

9      2015 when the backstop agreement was signed.

10             And there's some citations, Your Honor, as the

11     decision in Leslie Controls, which is just (indiscernible).

12     There, a small group of 26 documents, containing a really

13     specific legal analysis, were shared between a debtor and

14     certain plan proponents setting out a legal approach they

15     both could use in discussions with debtor's insurers that

16     both would have had to pursue independently to protect their

17     pre-existing legal interest.  And the question is whether

18     those 26 documents were immune from production and not any

19     other independent business discussions.

20             Now here, neither Ovation nor the investors have

21     any pre-existing legal interest in TTI's Oncor, LLC units.

22     And it's entirely unclear that even their business interests

23     were aligned before August 9th, 2015.  There's been

24     absolutely no showing that any of the communications between

25     them contained legal analyses.  And we really don't think

1    that a common interest assertion could possibly excuse the

2    production of any communication in this case.

3              And for that reason, TTI respectfully requests

4    that the Court compel Ovation to produce the three

5    categories of documents discussed in our letter.

6              THE COURT:  Thank you.  Next?

7              MR. SHORE:  Good afternoon, Your Honor.  Chris

8    Shore from White & Case on behalf of Ovation.

9              THE COURT:  Go ahead.

10             MR. SHORE:  May I proceed?  Okay.  Fact discovery

11   closed on Friday and I actually think with the exception of

12   this and the letter we sent last week regarding the

13   assertion of the white knight privilege, I think the

14   remaining issue to be addressed, Ovation has responded to

15   the document requests, attached Exhibit D to Mr. Zimmerman's

16   letter, with the list of documents we've produced, some of

17   them publicly available, some of them private Ovation

18   documents which we believe represent the facts regarding the

19   change of control and IPO conversion, which is the subject

20   of the new request from TTI.

21             We've also produced two witnesses for deposition,

22   both of them answered everything that was out there.  I

23   don't think there were any questions as to whether or not

24   they fully responded.  I will note that almost none of the

25   questioning related to whether or not -- the facts of an IPO

1   conversion or a change of control.

2          The debtors have produced their witnesses as well,

3   again, little questioning on IPO conversion or change of

4   control.  And the debtors have produced a host of emails and

5   other communications regarding the facts of the deal.

6          The narrow issue is with respect to communications

7   between Ovation and its investors regarding the deal

8   structure.  Ovation does not control any communications,

9   investor to investor.  We've made that clear, and I don't

10  think there's a dispute about that.

11         So we are talking about one of two categories of

12  documents.  Communications between Ovation attorneys and

13  advisors and the investors about how to structure the deal,

14  whether to structure the deal, whether the deal complies

15  with the IRA and then communications from Ovation business

16  people to investors that would not contain any legal advice

17  or work product which would essentially be documents

18  concerning the scheduling of calls and other immaterial

19  matters regarding the transaction going forward.

20         I still, having heard -- having sat on the meet

21  and confers and having heard the presentation to Your Honor,

22  don't understand what documents are conceivably out there,

23  investor to Ovation, that would not be privileged, that shed

24  light on the meaning of change of control or IPO conversion

25  and whether the structure, as laid out in the documents that

1    have been produced comport with that.

2            Fundamentally it sounds like, again, what they're

3    asking for is communications with investors and Ovation

4    questioning whether or not there is an IPO conversion or

5    questioning whether or not the deal documents that have been

6    produced meet the definition of change of control.  I still

7    don't understand how a one-off email, one investor to

8    Ovation, to the extent it exists, regarding the rights

9    offering is going to be probative to the Court in

10   determining whether or not EFH has contractual rights to

11   drag, based upon the existence of an IPO conversion or a

12   change of control.

13           Quite frankly, I didn't understand why they were

14   still pressing for this kind of information, until we saw,

15   after they had submitted the letter to the Court, that they

16   were going to be asserting a blanket business strategy

17   privilege over a lot of their communications.  But I don't

18   need to point out to the Court that Ovation is not under a

19   duty to cooperate with the IPO conversion, we really are,

20   although a party to the suit and a party who is in

21   possession of deal documents regarding how to structure the

22   deal, we're not a party to the IRA.

23           So we have set forth three objections to producing

24   the Ovation investor communications that don't contain

25   attorney/client or work product material.  And let me deal

1   with that first, on privilege.

2           Leslie Controls, Your Honor, decision makes very

3   clear that we don't have to start at the execution of an

4   agreement to assert the common interest.  The purpose of

5   Ovation, as we've explained both to the Court, in the

6   context of the confirmation hearing, and TTI, in the context

7   of our meet and confers, was to purchase the EFH reorganized

8   equity and always contemplated that there would be a drag.

9           Communications between Ovation and its investors

10  then regarding whether or not a drag was possible or how to

11  structure a deal to ensure that a drag could be effectuated,

12  are going to be all around the common interest of increasing

13  the value of Ovation, which is a special purpose entity

14  created for the purpose of buying EFH and TTI's Oncor

15  Holding's interests.

16          So we get to -- unless Your Honor wants to hear

17  more about that, I really think it's around investor to

18  Ovation communications that don't contain any kind of legal

19  advice or work product regarding the deal structure.  Again,

20  relevance is very hard to see here, because at the -- at

21  trying to determine what's happening in the deal, referring

22  either to the actual documents that are structuring the

23  deal, the IPO conversion plan, or one investor's one-off

24  interpretation of what's going on there, I think the Court's

25  always going to have to default to the actual deal documents

1    that are running this.

2              And again, it would have been appropriate for them

3    to question the 30(b)(6) witness regarding what Ovation's

4    view as to IPO conversion or change of control, but they

5    didn't do that.  So I'm not really certain what the

6    relevance is going to be of a one-off communication, but

7    really this is about burden.

8              At the end of the day, substantially all of the

9    documents are going to be, in any Ovation custodian's files,

10   around the IPO conversion and around the change of control.

11   Other than materials that have been shared with EFH which

12   have been produced or the deal docs themselves, are going to

13   be privileged.  The work of going through those custodian's

14   files, pulling out all of the privileged material and

15   scheduling it just to be able to produce a handful of

16   documents that might refer, either directly or even

17   tangentially to the deal documents which have been produced,

18   seem to us to be just a waste of time.

19             So we have asked that Your Honor quash the

20   request, beyond what has already been produced and let us

21   move on to the issue of white knight, when we get the

22   response from them, and otherwise move on towards summary

23   judgment.

24             THE COURT:  Thank you, Mr. Shore.

25             Does the debtor wish to be heard?

1            MR. HASKEL:  Warren Haskel for the debtor.  Unless

2    Your Honor has any questions about EFH's discovery, we have

3    nothing to add.

4            THE COURT:  Thank you.  Reply?  Any reply?

5            MR. VIGNA:  I'm sorry, Your Honor, I was on mute

6    there for a second.

7            THE COURT:  That's fine.

8            MR. VIGNA:  This is Jason Vigna of Skadeen Arps on

9    behalf of the movant, TTI, once again.

10           I would like to reply to a couple points.  First

11   of all, Ovation is the most efficient source of

12   communications with the investors, and that's what we've

13   been seeking in this case.  And there are a couple of issues

14   that are what the investors are doing, what Ovation is

15   doing, is critical.  And that includes whether any of the

16   investors are acting in concert, and it also go -- also, the

17   -- what the purpose of various of transactions are and

18   you're not going to get that from the deal documents

19   themselves.  And it's the communications themselves that are

20   going to be very critical on those points.

21           I have tried to reduce the need for some of these

22   documents by asking for some clarification on their change

23   of control theories and what not, and it just hasn't

24   happened.  And to the extent that Ovation is continuing to

25   assert that a change of control might be affected because

1    the investors will eventually be the ultimate owners, for a

2    millisecond, of reorganized EFH, or for a longer period of

3    OV1, these issues are very, very relevant and in fact could

4    be dispositive.

5           And just because Mr. Shore doesn't think that the

6    documents ultimately will be important, that's entirely

7    presupposing the issue.  We're entitled to the discovery,

8    the discovery absolutely is relevant, and it could be very

9    important.  Ultimately on the other and it might not be, but

10   the way to find this out is actually to look at the

11   documents, to produce the documents.  And we've been

12   absolutely frustrated for weeks and weeks that there hasn't

13   been any movement at all.  There's been absolutely no

14   agreement to produce any documents besides the deal

15   documents themselves.  And we strongly believe that we are

16   entitled to communications with the investors on these

17   relevant issues.

18           And I continue to fail to understand this blanket

19   common interest assertion.  This is not a situation like

20   Leslie Controls where 26 very specific documents had legal

21   advice in it.  I'm presuming, and I've never been told

22   otherwise, that the vast majority of the communications with

23   the investors are going to be business communications,

24   they're not going to be legal communications.  I'm not

25   looking at -- for -- to the extent it would be properly

1    covered by a common interest, a legal analysis of the rights

2    under the drag provision.  What I'm looking for is business

3    discussions about the -- going to the change of control and

4    going to whether these investors are acting in concert and

5    what the ultimate purpose of their activities are, which I

6    think are more properly business discussions.

7              And even if there were legal discussions, again, I

8    don't think that there could be a blanket assertion of a

9    legal -- you know, protection of even legal advice, going

10   all the way back to February of 2015.

11             And for those reasons, Your Honor, again, we would

12   ask that the documents be produced.

13             THE COURT:  Mr. Shore, anything further?

14             MR. SHORE:  The only thing I would add, Your

15   Honor, is with respect to this focus on investors, you know,

16   they didn't subpoena any of the investors.  So the notion

17   that what's going to happen here is we're going to have some

18   investor saying something in a document, they -- we're not

19   even going to have a deposition on it, so I just -- I'm not

20   still struggling with how this is going to advance the ball,

21   Your Honor.

22             THE COURT:  All right.  Thank you.  All right.

23   Well, let me just start with a preliminary comment and that

24   deals with the common interest privilege.  The common

25   interest privilege, of course, is limited to documents or

1    communications, et cetera, that would otherwise be protected

2    from discovery, primarily under the attorney/client

3    privilege, but also would include attorney work product

4    immunity, if you will.  It's not an expansion of the

5    attorney/client privilege, but it allows for attorney/client

6    privileged, or attorney work product documents to continue

7    to be protected, even if they're shared among other parties

8    under this sort of common interest privilege.

9              I don't believe, in this case, there's any

10   question whatsoever that the common interest privilege

11   extends well prior to August 9th and really I would say

12   since the formation of Ovation, which was clearly always

13   created for the purpose of ultimately getting to the

14   transaction that's in play here.  And the communications

15   among the, for instance the debtors and -- well, not the

16   debtors, excuse me, the internal communications among the

17   various investors, the backstop parties, et cetera, and

18   Ovation and their attorneys, et cetera, I think are all

19   clearly covered by the common interest privilege.

20             Now, again, however, that doesn't stop the

21   analysis, it only sort of defines it a little more narrowly,

22   if you will.  So because there could be, and it sounds like

23   there's some acknowledgement that there will be, some

24   documents that are not covered by the common interest

25   privilege, even were it applicable for the time period

1    covered, and the question then becomes, I think, ultimately,

2    do I require combing through thousands of documents, held by

3    dozens of people, the majority of which are probably covered

4    by the common interest privilege, for the purposes of

5    pulling out those documents that might be responsive and

6    non-privileged, that relate to the expressed purpose of the

7    IPO or whether the investors are acting in concert, which I

8    view as the two open factual issues that would be subject to

9    the discovery.

10           And even prior to the change in the rule to sort

11   of move the proportionality test to sort of the top of the

12   list, and all discovery to be considered in connection with

13   proportionality, the Court has always had the authority to

14   limit or not require discovery if the burden of going

15   forward with that discovery was so great that it outweighed

16   any benefit that might be obtained through the discovery,

17   it's a classic sort of cost benefit analysis, and are the

18   costs so high that any benefits are outweighed.

19           I believe that there very well may be responsive,

20   non-privileged documents that go to the expressed purpose of

21   the IPO or the change in control issue about acting in

22   concert.  However, I also believe that it's clear, in this

23   case, that the vast amount of work that would have to be

24   done in order to cull through what would ultimately be

25   mostly privileged documents to come up with the responsive

1    non-privileged documents, outweigh, by quite a lot, the

2    benefit that would be had by allowing the discovery to

3    proceed and requiring the time and expense to be incurred to

4    have that done for discovery to proceed.

5              So I am also mindful of the fact that the

6    scheduling order is sort of at the end when it comes to fact

7    discovery.  Certainly I could expand the fact discovery

8    period, I could delay the trial in this case, I could push

9    everything back and I'm cognizant of that ability, and I'm

10   also cognizant of the large amount of money in play here.

11   But I think the issues are actually fairly narrow.

12             I continue to believe that a short trial schedule

13   here, a trial currently scheduled for late March, is

14   appropriate, given the transaction as a whole, the plan

15   that's in play, the process that has to go through to have

16   the plan be effective.  And I think it's appropriate to push

17   discovery, and perhaps limit discovery to meet that time

18   frame.

19             So in this instance, were I have to, you know, a

20   trial scheduled for April of 2017, I might be more inclined

21   to swallow the costs that's associated and require the

22   parties to go through this process of culling through the

23   materials to come up with whatever documents, however few

24   they may be, that might be non-privileged and responsive.

25   But under the facts of this case I don't think that's

1    appropriate.

2           So I am going to enter an oral protective order

3    excusing Ovation from responding any further to the

4    discovery being propounded by the debtors in this instance

5    -- excuse me, by TTI in this instance, and as being non-

6    proportional to whatever benefits might be had by having

7    that discovery go forward.

8           Now, having said that, first of all, are -- I have

9    something else to say, but are there any questions in

10   connection with the Court's ruling?

11          MR. VIGNA:  No, Your Honor.  This is Jason Vigna

12   from Skadden.

13          THE COURT:  Thank you.

14          All right.  Turning to the February 4 letter that

15   I received, and I read this morning, from Mr. Shore.  I

16   don't know when the response to that is due.

17          MR. VIGNA:  I believe it's due tomorrow evening,

18   Your Honor.

19          THE COURT:  Tomorrow.  All right.  I'd like to

20   schedule a time later this week, as early as Wednesday, in

21   order to discuss that issue, in order to get that battened

22   down as soon as possible.  I have time say at 4:00 on

23   Wednesday afternoon that I could hear you.  I also could see

24   you or hear you some time Thursday afternoon, and though I'm

25   reluctant to do it, to have it wait this long, I'm pretty

1    much wide open Friday.

2              And I think probably since we have everybody on

3    the call, we should get this nailed down while everybody's

4    on the phone.  Any preference?

5              MR. SHORE:  This is Christopher.  Wednesday -- the

6    Wednesday time works best for us.

7              MR. VIGNA:  This is Jason Vigna from Skadden on

8    behalf of TTI.  I'm available then as well, Your Honor.

9              THE COURT:  All right.  Four o'clock?

10             MR. HASKEL:  This is Warren Haskel for -- yeah,

11   (indiscernible) that works as well for us.

12             THE COURT:  Okay.  Very good.  Four o'clock

13   Wednesday then we'll have the call on the letter of February

14   4 and the response of TTI, which will be filed some time

15   tomorrow evening.  And if you could get that over to me that

16   Wednesday morning, that would be very helpful so I can read

17   it prior to having our conference call.

18             MR. SHORE:  Very good, Your Honor.  There was --

19             MR. VIGNA:  I'll make sure that happens, Your

20   Honor.

21             MR. SHORE:  -- there was one other open issue.  We

22   did close the briefing on the core/non-core issue with TTI's

23   reply filed.  I was going to suggest that rather than

24   scheduling that for a separate hearing, the parties are

25   contemplating motions for summary judgment, and it may make

1    sense, when that briefing's done, we set that hearing to

2    have the -- that matter heard at the same time, because it

3    really goes to the Court's ability to enter a final summary

4    judgment ruling in one party's favor or another at that

5    time.

6              THE COURT:  Is there any objection to doing that?

7              MR. VIGNA:  No, Your Honor.

8              THE COURT:  Okay.  That probably makes the sense.

9    We'll have one long, pleasant oral argument and we'll cover

10   both summary judgment and core/non-core issues to the extent

11   that -- well, to the extent they've been briefed.

12             Is there anything else kicking around?  What's the

13   status with the mediation?

14             MR. SHORE:  We have a -- we have two dates set

15   with Judge Gross, the first coming up in two weeks with a

16   session here in New York.

17             THE COURT:  Okay.  Good.  All right.  Excellent.

18   Anything else anyone would like to raise while I'm on the

19   phone?

20             MR. SHORE:  No, Your Honor.

21             MR. VIGNA:  Nothing on behalf of TTI, Your Honor.

22             THE COURT:  Okay.

23             MR. HASKEL:  Nothing on behalf of EFH, Your Honor.

24             THE COURT:  Okay.  Very good.  Thank you very

25   much.  We are adjourned.

1          MR. VIGNA:   Thank you, Your Honor.

2                        *  *  *  *  *

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 27

1                    C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4      transcript is a true and accurate record of the proceedings.

5
        Sonya                    Digitally signed by Sonya Ledanski
                                 Hyde
6       Ledanski Hyde            DN: cn=Sonya Ledanski Hyde, o, ou,
                                 email=digital1@veritext.com, c=US
7                                Date: 2016.02.09 17:37:55 -05'00'

8      Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  February 9, 2016