Page 1

```
 1   UNITED STATES BANKRUPTCY COURT

 2   FOR THE DISTRICT OF DELAWARE

 3   Case No. 14-10979-css

 4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 5   In the Matter of:

 6

 7   Energy Future Holdings, Corp.

 8

 9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11   Adv. Proc 15-51386

12   Energy Future Holdings Corp.

13        v.

14   Texas Transmission Investment LLC

15   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

16                          United States Bankruptcy Court

17                          824 N. Market Street

18                          Wilmington, DE  19805

19                          February 10, 2016

20                          4:26 PM

21

22   B E F O R E:

23   HON. CHRISTOPHER S. SONTCHI

24   U.S. BANKRUPTCY JUDGE

25   ECRO:  LESLIE MURIN
```

1    TELEPHONIC HEARING Re:   Discovery Dispute

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Theresa Pullan

1    A P P E A R A N C E S :

2

3    WHITE & CASE LLP

4    BY:    J. Christopher Shore

5         Attorneys for Ad Hoc Group of TCEH Unsecured Note Holders

6

7    KIRKLAND & ELLIS LLP

8    BY:    Warren Haskel

9         Attorneys for Debtor

10

11   SKADDEN ARPS

12   BY:    Jason C. Vigna

13        Attorneys for Texas Transmission Investment LLC

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2           THE COURT:   Good afternoon, everybody, this is Judge

3    Sontchi.  I really apologize for keeping you waiting for so

4    long; I got stuck on another call that just would not end.  So,

5    I do apologize very much.

6           We're here on the discovery dispute, hopefully the

7    last one, in connection with the Texas Transmission Investment

8    case.  And Mr. Shore, it was your letter, so I don't know if

9    you're on the phone or not because I didn't get a chance to

10   look at the roster, but whoever is going to speak for White &

11   Case, go ahead.

12          MR. SHORE:  It is Mr. Shore.  Thank you, Your Honor.

13   At the risk of holding the Court on the phone longer, having

14   been held on the phone longer than you thought, let me start

15   with the digression.

16          As you know, sometimes the toughest part of a

17   distressed hostile M&A deal is reigning in those insiders who

18   have a say in the process, but who nonetheless are outside the

19   deal.  As you know, it took us six months to get the debtors in

20   line with the prospect of the transaction that is in the merger

21   agreement and embodied in the plan.  And as I know you know

22   from this case and other cases, in handling that situation of

23   insiders who are outside the deal requires delicacy,

24   particularly where that particular insider has access to the

25   deal and has incentives to stand in front of the deal that are

1    not consistent with whatever duties they have to see a volume

2    maximizing deal get done.  TTI is in that respect an insider

3    here.

4           They have two seats on the Encore board, and they are

5    privy to all the delicate stuff that goes on within Encore both

6    at the, with the regulators, within the board itself and

7    everything else that those boards entail.  And as Your Honor

8    knows, they have pleaded in the complaint and as you've seen,

9    TTI has been outside the deal, they made it clear from the very

10   beginning they did not want to get dragged out of the

11   transaction.  And in that regard, there's always been the

12   possibility that as an insider they could try to gum things up

13   from the inside.

14          Ultimately, we got comfortable with that risk in the

15   transaction because of sections 3.3(c) and 3.7 of the IRR.

16   3.3(c) requires TTI to take all actions that may be reasonably

17   necessary to consummate a required sale.  3.7 is even more

18   explicit, it requires that once there is an IPO conversion on

19   the table, subject to some particular tax issues, TTI has to

20   cooperate with all the other members in good faith in order to

21   effectuate the IPO conversion.

22          So while we had concerns, we felt that once the

23   notice of required sale went out and once TTI was under a duty

24   to cooperate both under 3.3 and 3.7 to get this over the finish

25   line and through the regulatory process, that was an acceptable

1   risk.

2          Now from time to time we've heard rumblings about

3   TTI's aversion of the deal and maybe some behind the scenes

4   machinations.  In fact, I think I mentioned that at the motion

5   to dismiss hearing.  And to that end, we sent out discovery

6   asking who they were talking to and what they were doing

7   relative to the purchase or sale of the TTI units.  TTI

8   answered with formal responses on 12/17, those were attached as

9   exhibit A to my letter.  There was in paragraph 2 a general

10  invitation of privileges and immunities, no specific mention of

11  a business strategy privilege.  But they did commit to produce

12  documents, they got a January 13th cover letter which is cited

13  in their response, and it did raise the possibility of business

14  strategies a month after the formal notices were sent and

15  without, or formal responses, and without having amended the

16  formal responses.

17         Nine days later we got a claw back request and we've

18  been in the process of dealing with a moving target as the

19  documents have been clawed back, certain documents that were

20  designated only as being subject to a business strategies

21  privilege were then redesignated as being attorney work product

22  and we're trying to sort through that.  But there are right now

23  certain documents which I'll go through which are being

24  withheld solely on the basis of a business strategies

25  privilege. That is, they are otherwise relevant and non-

1    privileged but they are being claimed to being part of a

2    sensitive business strategy.

3         Also during the deposition of Mr. Ebbingdon

4    (phonetic) on January 28th, he was directed not to answer with

5    respect to specific meetings that were held with a potential

6    third party purchaser or, since it's a public call I'll try to

7    be very careful about this, unless TTI tells us that particular

8    information is not confidential.  I don't see why it would be

9    but I don't want to get sideways on the protective order.  And

10   as we noted in our excerpts attached to my letter, he was

11   instructed not to answer about meetings that occurred with that

12   party both before and after the plan was on file and the

13   required sale notice was sent.

14        So what you can see from the documents going on, let

15   me break it down into two pieces, the time before the plan was

16   put on file and the auction closed, and that which occurred

17   after the required sale notice went out.

18        For the period 2015 to the filing of the plan, I

19   think you can see from the documents that TTI and its two

20   respective investors have contemplated that there would be an

21   M&A transaction at EFH given its distress.  I don't think

22   there's anything secret about that.  There's no secret they

23   wanted to capitalize on that, and that's really you could see

24   that the big exhibit I gave you is exhibit C which lays out a

25   lot of what they were thinking along that regards.  All of

1    those documents leading up to the plan go to two issues, and

2    we've already seen it in the documents they have produced.  The

3    issue of whether an indirect sale can cause a drag and whether

4    or not the IRR hurdle has been met.

5              As you may remember from the motion to dismiss, the

6    position that TTI is taking is the only transaction that can be

7    done to drag them out would be a taxable disposition at Encore

8    Holdings and that no indirect transaction, nothing that happens

9    up at EFH can require a drag.  Those documents that they've

10   already produced go directly to that, that issue which is what

11   happens in a recapitalization up at EFH with respect to drag

12   rights.

13             Second, with respect to the IRR hurdle, and I don't

14   know if we have or have not discussed it with Your Honor, there

15   is a provision in the drag which requires that any drag be done

16   to give them a 10 percent year over year IRR on their

17   investment.  Documents that contain the valuations and other

18   financial metrics regarding the investment and there are

19   references to the IRR in the stuff that we've been produced, go

20   directly to whether or not how they've been calculating the IRR

21   and whether the IRR has been met.

22             So again, I don't think there's any dispute that what

23   they're withholding is relevant.  Their only point is that

24   because there is a possibility of a plan B at some point,

25   anything they have recently done or leading up to the filing of

1   the plan would be held on the business strategies privilege.

2   All that pre-plan filing stuff, though from our perspective is

3   completely stale.

4           There is no auction ongoing, Encore is not on the

5   block, and it may never be.  In fact, Your Honor found that the

6   plan is feasible, it's more likely than not that we are going

7   to close, we're in the process of trying to close.  The notion

8   of a hypothetical bid that they might make in a future case is

9   so far out of existing jurisprudence on the business strategies

10  privilege, it's hard to understand how they can make the

11  assertion.  It is certainly contrary to the view that's

12  expressed in the Delaware courts that it is to be read narrowly

13  and so as to avoid an unfair advantage being given to other

14  bidders with respect to what's going on.  We're not bidding

15  anymore.  Our bid is here, our bid is going through, our bid is

16  going to close.  So the fact that they might have had a

17  different view about what they might bid isn't going to provide

18  us with any advantage in a hypothetical future auction.  It

19  might provide an advantage in the litigation, but I'll come

20  back to that in a bit.

21          So focus on all this going forward, at the time when

22  they're under a direct duty under 3.3 and 3.7 to cooperate with

23  the transaction, either take reasonable steps or act in good

24  faith to do everything possible to get it done.  They've also

25  withheld documents during that period, we want them.  They've

1    also instructed witnesses, or Mr. Ebbingdon not to answer

2    questions with respect to a meeting during that period.

3          If you look at exhibit F as you may have to our

4    letter, which are an email chain with that third party.  It is

5    talking --

6          UNIDENTIFIED:  Chris, I don't want to interrupt you

7    at all, but exhibit F was clawed back on December 29th, or

8    excuse me, January 29th.  It was also discussed on the record

9    during the deposition where it talked about its being clawed

10   back, and I apologize, I hadn't noticed it when I put in my

11   letter yesterday, but I do think it's inappropriate to be, to

12   have submitted that to the Court or discussing the contents of

13   it at this time.  There are particular steps that go with claw

14   back documents and [indiscernible].

15         MR. SHORE:  Okay.  Look, I'll look into how it was

16   that it didn't get clawed back and we'll address that with you.

17   At the end of the day it would go to His Honor anyway for a

18   determination as to whether or not the documents are subject to

19   a business strategies privilege.  And quite frankly, by looking

20   at exhibit F, His Honor could probably see what it is about

21   those documents that are being claimed pursuant to a business

22   strategies privilege and whether it even applies to something

23   like that.  So I will be careful not to talk about it further

24   than that, but certainly His Honor could make a ruling with

25   respect to whether or not that is an appropriate assertion of

1    business strategies on that email.

2            But temporally, temporally, and this is what's got me

3    wanting the information, wanting not just to, not just to find

4    out what is going on in the lawsuit, but to try to fix what --

5    that meeting that the witness was instructed not to answer fits

6    temporally with another development that happened in the

7    bankruptcy case at or about the same time with respect to third

8    parties.

9            And we are entitled to know, not only to assess

10   whether or not there is a grounds for claiming a breach of the

11   contract, switching a specific performance claim to a damages

12   claim and whatnot, but also more practically to fix the

13   problem.  Who knows what TTI and that third party have been

14   doing individually or in concert to frustrate the merger

15   agreement.  But the starting point of all of that is getting

16   answers, finding out what they said, what they did or did not

17   decide to do, what one knew about what the other was going to

18   do be doing.

19           They can't just assert a business strategy privilege

20   and say that they are immune to any discovery into what they

21   might have been doing in violation of their duties to cooperate

22   in a properly pleaded claim that they are not cooperating as

23   they are required to under the IRA.  Then, once we find out

24   what the answers are, we may come back to the Court and seek

25   relief in this Court, we may just also just try to fix the

1   problems that the two have created.

2         Two final points on this.  One, TTI seeks to play off

3   what they've been doing as just keeping a bidder warm, we're

4   not inactively interfering, we're just keeping a bidder warm if

5   we get to plan B.  In our view, it may be, maybe factually

6   that's right, maybe it's not.  But in our view, keeping a

7   bidder warm is not consistent with a duty to cooperate in good

8   faith.  The mere possibility to a third party bidder having an

9   insider of Encore board members who are privy to information at

10  Encore, the mere possibility that that person with that access

11  would be supporting the deal that's created a mess.  In our

12  view, a duty to cooperate would have required them not to tell

13  us, actually not tell us in the context of a deposition, but

14  rather go to EFH and make full disclosure of exactly what's

15  going on in that process and exactly what they know about any

16  efforts that are being taken by that third party bidder to make

17  sure that plan B comes to fruition.  In other words, this whole

18  process of trying to keep the information away from EFH at a

19  time when it might be possible to fix any of the problems that

20  have been created, is in and of itself a breach of the duty to

21  cooperate.

22        Second, TTI seeks to raise a new objection that they

23  haven't raised before and that I've never seen before, which is

24  that if we got the information it's going to prejudice the

25  mediation.  In basic legal terms -- what?  I've never heard

1    that objection before.  None of the cases I've ever seen has

2    supported the notion that somebody can seek to withhold a

3    smoking gun document on the basis that it might make it harder

4    for them to prevail on the mediator that their case actually

5    has some merits to it.  The case they cite, Nysource (phonetic)

6    is not a mediation case, it is a white knight privilege case.

7            In our view, the existence of disclosure of smoking

8    gun evidence before the mediation occurs if so the mediator can

9    evaluate it is more likely to lead to resolution than keeping

10   it secret.  In other words, it might mean that they have to

11   settle for less, but that's not a basis for an objection any

12   more than objection, Your Honor, the answer to the question is

13   going to be highly prejudicial to my case.  It's not a valid

14   objection.  The documents are relevant, the documents are non-

15   privileged and the assertion of the business strategies

16   privilege in the case of both the pre and post-plan process is

17   unsupported by the law.

18           So in short, we'd ask Your Honor to: 1) require

19   immediate production of any documents withheld on the basis of

20   the business strategy privilege including the exhibit F to the

21   letter; 2) within a week after producing those documents,

22   requiring the deposition of Mr. Ebbingdon to discuss all of the

23   documents that have been produced, both the ones that were

24   withheld on the basis of his, of the business strategies

25   privilege and the ones that they bled out that were originally

1   withheld on the business strategies privilege but have been de-

2   designated, because all those documents were produced after his

3   deposition.

4           THE COURT:  Thank you.  Does the debtor wish to be

5   heard?

6           MR. HASKEL:  Your Honor, Warren Haskell for EFH.

7   I'll be brief.  EFH obviously shares Ovation's concerns

8   regarding the interactions TTI may have had with third parties,

9   and it's not just because as Mr. Shore said, TTI's obligations

10  under the IRR, but also because of the effect it may have on

11  the merger agreement which is why we joined this letter

12  request.

13          The only other point I wanted to clarify, in TTI's

14  letter they suggested that EFH has also or at least presumably

15  may have withheld documents on the basis of a business strategy

16  -- that's not the case.  To the extent that EFH withheld any

17  documents in this case, it was based on the attorney client

18  privilege or work product, to the extent it dealt with any of

19  these issues.  So I just wanted to clarify that on the record.

20          THE COURT:  Okay.  Thank you.  TTI?

21          MR. VIGNA:  Thank you, Your Honor.  Jason Vigna from

22  Skadden Arps on behalf of TTI.

23          I'd like to start out by clarifying a little bit what

24  exactly we're dealing with because I think there's been some

25  mischaracterization.  There have only been six documents that

1    have been withheld on business strategies grounds.  One of

2    which was inappropriately provided to Your Honor, but Your

3    Honor has it.  That is the only document that discusses, that

4    has been withheld on business strategies ground that contains

5    any discussion with a potential third party bidder.  The other

6    five documents are documents that contain TTI's own internal

7    valuation of Encore at issue here.  And those are relatively

8    recent documents that show basically what TTI might be willing

9    to sell its stake in Encore at in a voluntary transaction, not

10   in a [indiscernible] transaction.  There have been prior, prior

11   to December 14 we produced all of the documents that dealt with

12   valuation, and except for the one document that you have before

13   Your Honor, we produced all of the documents concerning

14   conversations with other potential bidders.  So those are the

15   documents.

16          The discussion, the deposition testimony, we are

17   dealing with a very limited aspect of one part of the

18   deposition of Mr. Ebbingdon.  Mr. Ebbingdon testified that he

19   had bene contacted by a third party.  He couldn't recall if it

20   was in the summer of 2015 or in the fall of 2015.  But he and

21   Mr. Suket (phonetic) of TTI had a conversation with that party

22   about a potential, basically what would happen if what they

23   might consider doing if the plan that's currently before Your

24   Honor is not consummated.  Ovation's counsel inquired properly

25   about the participants in that conversation, the date of that

1   conversation, the location of that conversation, the duration

2   of that conversation and the general contents of the

3   conversation.  All that was withheld was the specific

4   discussion of what the parties might want to do, the actual

5   details of their discussion about what they might want to do if

6   the plan before Your Honor is not consummated.  And that's

7   really the context, if it's not consummated and the, Ovation

8   properly inquired about that.

9          A couple of days later there was another deposition

10  of a Mr. Suket of TTI, another TTI witness, and he was asked

11  about the exact same meeting.  Mr. Suket's feeling was that the

12  conversation with the third party was over and done, that

13  there's not a likelihood of it being resumed.  And therefore I

14  did not make any objection to the contents of that meeting

15  begin explored at length and Ovation had every opportunity it

16  wished to explore the contents of that discussion.

17         There is one document, of course, that has been held

18  back that contains mostly TTI's internal ruminations about

19  leading up into that discussion, but the actual contents were

20  discussed at length without any objection from me at the

21  depositions.  We're dealing with a very, very narrow universe

22  of documents.  And the reason we're dealing with a very narrow

23  universe is because I'm very, very well aware of the narrowness

24  or the appropriate application of the business strategies

25  immunity.  I very much follow Chancellor [indiscernible]

1    dictating Computer Vision about its specific questions

2    concerning future alternative transactions that should not be

3    explored into, and that the immunity should be applied with an

4    artist's brush and not a housepainter's tool.  And we have

5    absolutely done that throughout this case.  And what we are

6    withholding falls right within the heart of the business

7    strategy immunity.

8              The valuation materials.  Although Mr. Shore believes

9    that Nysource is distinguishable, the facts really are

10   indistinguishable in my mind.  What happened there was a bidder

11   wanted to purchase assets from somebody, the person who owned

12   the assets had some internal views as to the value of those

13   assets and had been working on that with its internal

14   investment bankers and didn't want to disclose that because

15   doing so would in Chancellor Chandler's words effectively

16   remove the possibility of arm's length bargaining between the

17   parties.  And it isn't just the Nysource case where valuation

18   of material has been withheld.  We've also cited the Pfizer

19   case from, that was at that point Vice Chancellor Jacobs who

20   decided that case.  Valuation material is actually entirely

21   critical to not just our discussions with this potential

22   bidder, but with any potential party if this transaction

23   happens to fall apart.  We all know what the underlying data

24   is, everybody has access to that.  Everyone can create their

25   own valuation for conception of what the company is worth, but

1   when it's actually [indiscernible] to our clients, that's very

2   sensitive business information and that is properly protected

3   by the business strategies privilege, or the business

4   strategies immunity, excuse me.

5          With respect to the email you have before Your Honor

6   and specific content of Mr. Ebbingdon's recollection of that

7   conversation, that is also business strategy material, and it

8   falls right within the heart of what was discussed in the

9   computer vision case which Ovation has cited, the Pfizer case,

10  the Atlantic Research case, all of those cases discuss that

11  when you're dealing with potential future activity that's still

12  being contemplated, that is properly withholdable, and it's

13  completely appropriate in this particular case.

14         Mr. Shore has said he's interested to know whether

15  our clients have violated any duties under the IRR section 3.7.

16  We believe that under any fair reading of that clause, we're

17  nowhere close to it.  But getting even to a point that Mr.

18  Shore has made twice and our other conversations with the

19  court, what's relevant is the actual actions.  Internal

20  deliberations and considerations of contingency planning are

21  not actually relevant to whether there has or has not been a

22  breach.  And they have not especially having had the

23  opportunity to explore it in other ways, they have not shown

24  the need for this particular document that's before Your Honor

25  which you will see it's contingency planning, or evidence

1    specific recollection of that conversation.  And in fact, I was

2    actually kind of surprised to receive this particular discovery

3    motion considering just the narrowness of what we're talking

4    about and essentially the cumulative nature about of what we're

5    talking about.  Counsel has already built a record of the

6    discussions with other third parties, has already even built a

7    record about the discussion with a particular third party, and

8    has done so even with another witness.  And there is just

9    absolutely no reason to recall Mr. Ebbingdon for a deposition

10   at great expense at this time.  And we would respectfully

11   request that Your Honor deny the relief requested in the letter

12   brief.

13           THE COURT:  Thank you.  Mr. Shore?

14           MR. SHORE:  Very briefly, Your Honor.  First, I heard

15   a lot of objections in there that aren't preserved at this

16   point, I heard a relevant objection the documents are relevant,

17   they're just withholding them on the basis of business

18   strategy.  Sensitive business information, they can certainly

19   designate as highly confidential under the existing

20   confidentiality order.  Cumulative and burdensome, I don't, it

21   can't be cumulative, and even if it were that's not an

22   objection that they've raised.  And burdensome, they've already

23   got the documents, they just have to push the button on them.

24           With respect to the deposition, this was the choice

25   they made as every party does when they instruct someone not to

1     answer and then don't go to the court seeking a protective

2     order.  You know, they chose that, it doesn't do any good to

3     have them answer the questions before they produce the

4     documents.  We chose to do this route, we're going to get the

5     documents and then we're going to question the witness.

6              Finally, again with respect to the new mediation

7     privilege, Nysource, it says words and words can be applied,

8     but there's no underlying rationale given to why a decision

9     that says I'm going to protect a situation in which one party

10    might be given a competitive advantage over another to the

11    detriment of a company in play should be extended to a

12    mediation where the point of the mediation is to have everybody

13    take a frank assessment of their respective cases and decide

14    whether or not to settle.  The fact is that when you have bad

15    documents and a bad case it's hard to have an arm's length

16    negotiation.  But that' just because you live in the bed you

17    have with your documents and your witnesses.  So I haven't

18    heard anything that really responds to the reason why these

19    documents are properly withheld under the asserted business

20    strategies privilege.

21              THE COURT:  Thank you.

22              MR. VIGNA:  Your Honor, if I may respond to just two

23    points there.

24              THE COURT:  Yes.

25              MR. VIGNA:  To begin with, with injury, with the

1    valuation documents, I believe that the injury should be

2    entirely clear.  And Mr. Shore said, I'm raising some relevance

3    issues now, but of course the importance of the information to

4    the case at hand is of course one of the factors that the Court

5    should consider when evaluating a business strategy privilege.

6    And the valuation that Encore places, or excuse me, that TTI

7    places on its investment in Encore, simply is not relevant to

8    any of the issues in dispute.  All it could help Ovation do is

9    more precisely formulate the minimum amount of money to offer

10   my client, and that just is not appropriate and it's clearly

11   injurious.

12            And with respect to the other, you know, the other

13   document that's before the Court and the testimony of Mr.

14   Ebbingdon, the injury there is that disclosing the very

15   specific ruminations internally about how to react to an

16   overture and that even the discussions with a potential

17   counterparty could [indiscernible] any future discussions with

18   that counterparty if a confirmed plan is not consummated.  It

19   certainly could give Ovation a competitive advantage in not

20   just the mediation, but any future discussions with TTI or with

21   Encore, and it could affect the bargain positions of other

22   parties vis-à-vis TTI if the confirmed plan is not consummated.

23   And that's exactly what the business strategies privilege is

24   supposed to prevent.

25            THE COURT:  Okay.  Thank you.  Any final comments

1    from anyone?

2           All right.  This is I think a rare situation for me

3    when it comes to a discovery dispute because usually you can

4    make a decision based on the arguments and what's in the

5    letters, etc.  But I think in this situation in order to make a

6    decision here, I'm going to need to see the relevant or the

7    subject documents in camera in order to have an idea about

8    prejudice, also to have an idea about whether the business

9    strategy privilege is appropriate or not in this instance,

10   excuse me, immunity, not privilege.

11          So what I would like to do is have them sent to me

12   confidentially ex parte, in camera and I'll review them and

13   then make a decision about whether they need to be produced to

14   the other side.  I can say that if I'm going to require them to

15   be produced, I'm going to require the witness to reappear to be

16   deposed on the documents and also that would include the

17   documents as Mr. Shore said that have bled out since the

18   deposition occurred.  And it may be that even if I don't

19   require the production of these documents in camera, I may

20   nonetheless require a deposition to occur again on the

21   documents that have been produced subsequently.  But I haven't

22   decided that yet.  So what I'd like to do is have, I'd like to

23   get the documents, look at them and then have you guys on the

24   phone again and make a ruling.

25          Two questions.  How big a stack are we talking about,

1    and when can you get them to me?  And I interrupted you, so you

2    had another point.

3         MR. VIGNA:  Thank you, Your Honor.  Again, this is

4    Jason Vigna from Skadden Arps on behalf of TTI.  We can get

5    those documents to you very quickly.  There are only six that

6    were actually withheld and -- let's see I've got the stacks

7    somewhere on my desk -- it's less than a centimeter tall.

8         The question I was going to ask, Your Honor, however

9    is whether it might be useful for you to see the documents you

10   referred to as bled out.  We strongly believe that those

11   documents are cumulative, they contained information that is

12   very, very similar to lots of other documents that have been

13   produced, and counsel has already had an opportunity to examine

14   both Mr. Ebbingdon and Mr. Suket on lots of documents of those

15   exact nature.  And if it would be helpful to the Court, I would

16   be also happy to provide those to Your Honor if you think it

17   would assist the Court in determining whether to recall Mr.

18   Ebbingdon for a further deposition.

19        THE COURT:  I don't have an objection to that.  Are

20   we talking about, I'm trying to figure out how to fit this in,

21   so are we talking about a big stack or is it a --

22        MR. VIGNA:  I don't think so, Your Honor.  It's about

23   20 documents.

24        THE COURT:  Okay.  Well as long as --

25        MR. VIGNA:  I haven't had those reprinted but I'm

1    sure we can get them to you tomorrow as well if it would be

2    helpful to the Court.

3              THE COURT:  All right.  As long as you, that's fine,

4    as long as you are careful in what you give me delineating what

5    the difference between what's actually been produced and what

6    hasn't been produced so I don't get confused and then get them

7    mixed up.

8              MR. VIGNA:  Of course, Your Honor.

9              THE COURT:  Because I'm really based with documents.

10   So I want to make sure that I don't mess them up and get them

11   confused.  Is that okay, Mr. Shore?

12             MR. SHORE:  Indeed.

13             THE COURT:  Okay.  Trying to decide.  If you can get

14   them to me tomorrow morning say by 10:00, we can have a call at

15   12:00 if that works for everybody or 2:00.  Or 2:00?  We can do

16   this -- I'm trying to -- either time?

17             MR. SHORE:  Either time works for Ovation.

18             MR. VIGNA:  Those times are also available for TTI.

19             MR. HASKEL:  Fine for EFH.

20             THE COURT:  Okay.  Great.  Why don't we do 2:00 just

21   to make sure I have a chance to look at them, and I really

22   can't go later than 2:00; hopefully, I have a 1:00, but that

23   should be short, God willing.

24             So yes, if you give me those documents tomorrow

25   morning, so by 10:00 at the latest, have them hand-delivered

1     obviously confidential, in camera and ex parte and I will look

2     at them and we'll reconvene on the phone at 2:00 tomorrow and

3     I'll give you an answer.

4               MR. VIGNA:  Thank you, Your Honor.

5               MR. SHORE:  Thank you, Your Honor.

6               THE COURT:  All right.  Thank you everyone.  Have a

7     good evening.  We're adjourned.

8          (Proceedings concluded at 5:02 PM

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3

4                          RULINGS

5   DESCRIPTION                                              PAGE

6   TELEPHONIC HEARING Re:  Discovery Dispute (continued)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATION

2           I, Theresa Pullan, certify that the foregoing is a

3    correct transcript from the official electronic sound recording

4    of the proceedings in the above-entitled matter.

5    **Theresa Pullan**
     Digitally signed by Theresa Pullan
     DN: cn=Theresa Pullan, o=Veritext, ou,
     email=digital@veritext.com, c=US
     Date: 2016.02.12 15:03:29 -05'00'

6    AAERT Certified Electronic Transcriber CET**00650

7    Theresa Pullan

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22    Veritext

23    330 Old Country Road

24    Suite 300

25    Mineola, NY  11501