## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ENERGY FUTURE HOLDINGS CORP., *et al.*,[1]<br><br>Debtors. | ) Chapter 11<br>)<br>) Case No. 14-10979 (CSS)<br>)<br>) (Jointly Administered)<br>)<br>) **Hearing Date: Mar. 10, 2016 at 10:00 a.m. (ET)**<br>) **Obj. Deadline: Mar. 3, 2016 at 4:00 p.m. (ET)** |

## MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, FOR ENTRY OF AN ORDER (A) APPROVING AN INCREASE IN THE LIMIT ON THE DEBTORS' AUTHORITY TO PAY NON-INSIDER SEVERANCE AND (B) AUTHORIZING THE DEBTORS TO PAY INSIDER SEVERANCE IN ACCORDANCE WITH THE INSIDER SEVERANCE PROCEDURES

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion") seeking entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order") (a) approving an increase of the Non-Insider Severance Cap (defined herein), to total an amount not to exceed $35 million in the aggregate and (b) authorizing the Debtors to honor obligations to certain insiders ("Insiders")[2] on account of the Severance Program (as defined herein), in accordance with the Insider Severance Procedures (as defined herein). In support of this Motion, the Debtors submit the *Declaration of Carrie Kirby, Executive Vice President of Human Resources and Administration of Energy Future Holdings Corp., in Support of the Motion of Energy Future Holdings Corp.,* et al. *for Entry of*

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[2]    The relief sought in this Motion and Order will apply to all of the Debtors' "insiders" (as the term is defined in section 101(31) of the Bankruptcy Code), *except* the six members of the Debtors' Strategy & Policy Committee (the "SPC").

*an Order (A) Approving an Increase in the Limit on the Debtors' Authority to Pay Non-Insider Severance and (B) Authorizing the Debtors to Pay Insider Severance in Accordance with the Insider Severance Procedures* (the "Kirby Declaration") and respectfully state as follows.

## Jurisdiction and Venue

1.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The bases for the relief requested in this Motion are sections 105(a), 363(b) and 503(c) of title 11 of the United States Code (the "Bankruptcy Code") and rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Relief Requested

4.     By this Motion, the Debtors seek entry of an order (a) approving an increase to the Non-Insider Severance Cap (defined herein), in an amount not to exceed $35 million in the aggregate, to be commenced on or about April 2016 and (b) authorizing the Debtors to honor obligations to Insiders on account of the Severance Program (as defined herein) ("Insider Severance"), within the thresholds of Section 503(c) of the Bankruptcy Code and in accordance

2

with the proposed procedures to pay Insider Severance (the "<u>Insider Severance Procedures</u>").

## **Background**

5.     On April 29, 2014 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition with the Court under the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Court has entered a final order for joint administration of these chapter 11 cases [D.I. 849].  The Court has not appointed a trustee.  The Office of the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>") formed an official committee of unsecured creditors of Energy Future Competitive Holdings Company LLC ("<u>EFCH</u>"), Texas Competitive Electric Holdings Company LLC ("<u>TCEH</u>"), the direct and indirect Debtor subsidiaries of EFCH and TCEH, and EFH Corporate Services Company (the "<u>TCEH Creditors' Committee</u>") on May 13, 2014 [D.I. 420] and an official committee of unsecured creditors of Energy Future Holdings Corp., Energy Future Intermediate Holding Company, LLC, EFIH Finance, Inc., and EECI, Inc. (the "<u>EFH Creditors' Committee</u>") on October 27, 2014 [D.I. 2570].  Further information regarding the Debtors' business operations and capital structure is set forth in the declaration of Paul Keglevic in support of the Debtors' first day motions [D.I. 98] and the *Disclosure Statement For the Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp.*, et al., *Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 6124], approved by the Court on September 22, 2015 [D.I. 6131].  Additionally, on December 9, 2015, the Court entered the *Order (Amended) Confirming the Sixth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code*, approving the Debtors' plan of reorganization [D.I. 7285].

## I.    Severance Program.

6.    The Debtors have historically maintained a severance program on behalf of (a) non-executive, non-union employees, (b) union employees, and (c) certain key management personnel (together, the "Severance Program").[3] Employees that fall into the two categories of (a) non-executive, non-union employees and (b) union employees are entitled to a certain number of weeks of severance benefits based on their length of service with the Debtors, as well as post-employment benefits under the health benefit plans.  Payments under these plans are not due and payable until termination.  The Debtors have also historically maintained a severance plan on behalf of certain key management personnel at the level of vice president and above (the "Executive Severance Plan")—including all of the Debtors' "insiders" (as the term is defined in section 101(31) of the Bankruptcy Code) *except* the six members of the SPC. Severance obligations to the Executive Severance Plan participants become due and payable upon termination, and consist of a one-time lump sum cash severance payment in an amount equal to the sum of: (a) one times the participant's annualized base salary based on the position immediately prior to participation and (b) the participant's target annual incentive award for the year, prorated for the portion of the year prior to termination, as well as post-employment benefits under the health benefit plans.

---

[3]    The Severance Program as applicable to non-insiders is further detailed in the *Motion of Energy Future Holdings Corp.*, et al., *for Entry of Interim and Final Order Authorizing (A) the Debtors to (I) Pay Certain Prepetition Compensation and Reimbursable Employee Expenses, (II) Pay and Honor Employee and Retiree Medical and Similar Benefits and (III) Continue Employee and Retiree Benefit Programs, and (B) Modifying the Automatic Stay* (the "Wages Motion") [D.I. 25] and the *Declaration of Carrie Kirby, Executive Vice President of Human Resources and Administration of Energy Future Holdings Corp.*, et al., *in Support of the Non-Insider Compensation Programs Motion and the Severance Relief Requested in the Wages Motion* (the "2014 Non-Insider Compensation Kirby Declaration") [D.I. 1231].  *See also* Tr. of Hr'g, 22:15-20, *In re Energy Future Holdings Corp., et al.*, No. 14 10979 (CSS) (Bankr. D. Del. June 30, 2014) ("Very quickly with respect to severance the debtors initially sought authority to continue their severance programs in ordinary course, and there are three severance programs.  One is for rank and file employees, the second is for union employees, . . . and the third is for -- it's called the executive severance plan.").

7.      The Debtors continue to honor severance obligations to non-insiders under the approved Severance Program—including the Executive Severance Plan—in accordance with the existing Non-Insider Severance Cap.  The Debtors did not seek in the Wages Motion or subsequent compensation-related pleadings to pay to any "insider" (as the term is defined in section 101(31) of the Bankruptcy Code) obligations under the Severance Program, and have not paid any such insider payments.  The Debtors do ***not*** seek authority in this Motion to pay any obligations under the Severance Program to any members of the SPC.

8.      In light of the continued depression in the energy industry, causing increased pressures on the Debtors' workforce, the Debtors now seek (a) a $20 million increase in the Non-Insider Severance Cap, which would provide Debtors the authority to honor up to $35 million in postpetition obligations to non-insiders under the Severance Program in the aggregate, and (b) authority to honor obligations to Insiders under the Severance Program on a postpetition basis, in accordance with the Insider Severance Procedures.  By allowing the Debtors to honor their severance obligations to non-insiders and Insiders alike—obligations which are immaterial in relative amount—the Debtors' businesses and estates will benefit from long-term cost reduction that far exceeds the short term cash outlay, as well as the flexibility to respond to the challenging business climate.  Furthermore, by honoring commitments to severed employees on account of the Severance Program, the Debtors' will incentivize and motivate their remaining employees—non-insiders as well as Insiders—to maximize performance despite the challenging business climate, and thus confer an additional and important benefit on the Debtors' businesses and estates.

## II.    Non-Insider Severance Cap.

9.    At the outset of these chapter 11 cases, the Debtors—in an effort to reach consensus with important TCEH creditors—delayed relief for non-insiders under the Severance Program, and did not seek any relief for related insiders.[4]

10.    Following the introduction of the Severance Program as applied to non-insiders in the Wages Motion, the Debtors engaged in significant conversations with the TCEH Creditors' Committee and following such discussions, the Debtors agreed to limit non-insider severance relief by not honoring postpetition obligations to non-insiders under the Severance Program in excess of $15 million in the aggregate (the "Non-Insider Severance Cap")[5] (without prejudice to the Debtor's right to seek additional relief with respect to the Severance Program pursuant to a separate Court order[6]).    However, the Debtors anticipated the potential need to increase the Non-Insider Severance Cap in response to changes in the market and the Debtors' businesses, and previewed the same with the Court.[7]

---

[4]    The Debtors were not authorized to make any payments under the Severance Program under the *Interim Order (A) Authorizing the Debtors to (I) Pay Certain Prepetition Compensation and Reimbursable Employee Expenses, (II) Pay and Honor Employee and Retiree Medical and Similar Benefits, and (III) Continue Employee and Retiree Benefit Programs, and (B) Modifying the Automatic Stay* [D.I. 322] and *Final Order A) Authorizing the Debtors to (I) Pay Certain Prepetition Compensation and Reimbursable Employee Expenses, (II) Pay and Honor Employee and Retiree Medical and Similar Benefits, and (III) Continue Employee and Retiree Benefit Programs, and (B) Modifying the Automatic Stay* [D.I. 786].

[5]    *See Second Final Order (A) Authorizing the Debtors to (I) Pay Certain Prepetition Compensation and Reimbursable Employee Expenses, (II) Pay and Honor Employee and Retiree Medical and Similar Benefits, and (III) Continue Employee and Retiree Benefit Programs, and (B) Modifying the Automatic Stay* [D.I. 1311] (the "Second Final Wages Order").

[6]    *See* 2014 Non-Insider Compensation Kirby Declaration ¶ 29.

[7]    Tr. of Hr'g, 22:24-23:7, *In re Energy Future Holdings Corp., et al.*, No. 14 10979 (CSS) (Bankr. D. Del. June 30, 2014) ("Following a number of discussions with Morrison & Forester, counsel for the committee, we agreed that as to non-insiders the debtors would have authority to continue sever[ance] in the ordinary course up to aggregate cap of $15 million, with the understanding that the Debtors could always come back to the Court for additional relief if they still needed it, and this is something that we've also reflected in Ms. Kirby's declaration.")

6

11.     ***Drivers For an Increased Non-Insider Severance Cap.***   Due to the current business and market climate, it is important that the Debtors possess the flexibility and authority to be able to make difficult employment decisions and further streamline their workforce.  In addition to a rise in ordinary course severance activity related to the current business climate, the Debtors are also planning for the necessary closure of two mines (and the ceasing of productive mining activities) at the Monticello 4 Power Company LLC ("Monticello") Mining Complex, to be effective on or about April 2016.   Originally these mines powered the Monticello Power Plant but the economically recoverable lignite at both mines has been exhausted, making further mining activities unproductive.  To continue lignite production at both locations would require excessive capital expenditures in an environment where power prices are at an all-time low and new mine expansion would be cost prohibitive.  Throughout the decision making process, the Debtors have worked to communicate to employees and provide Monticello mining employees opportunities in other parts of the business as applicable. Nevertheless, the Debtors anticipate that new severance obligations to non-insiders will arise for mine personnel on account of, or relating to, the Monticello mine closure—in addition to the other increased ordinary course severance activity.

12.     The Monticello mine closures were not known at the time the Debtors originally sought relief with respect to non-insiders under the Severance Program in the Wages Motion and, as a result, the associated rise in severance obligations was unforeseen.  To date, the Debtors have honored approximately $10.5 million—of the $15 million available under the existing Non-Insider Severance Cap—in postpetition obligations to non-insiders under the Severance Program.  Primarily due to the pending wind-down of the Monticello mines in April, as well as the challenging current market and business climate, the Debtors seek authority to

7

honor up to $35 million in postpetition obligations to non-insiders under the Severance Program in the aggregate—an increase of $20 million from the existing Non-Insider Severance Cap.

### III.    Insider Severance.

13.    As of the Petition Date, no obligations were due and owing to any Insiders on account of the Severance Program.  And as stated previously, the Debtors did not seek to pay obligations under the Severance Program to any Insider in the Wages Motion or any subsequent compensation pleading.  As a result, no prior request has been made for the relief sought herein relating to Insider Severance payments.

14.    Due to the challenging business and market climate, as well as the contemplated reductions in Debtors' non-insider workforce referenced above, the Debtors may also be obliged to sever Insiders.  Honoring obligations to Insiders under the Severance Program will yield positive results for the Debtors including by providing Debtors with the flexibility to respond to the challenging business climate, while also alleviating remaining employees' concern for career prospects and the ability to support themselves and/or their families.  The Debtors believe it is important they fulfill their obligations to Insiders under the Severance Program, including the Executive Severance Plan, to reassure remaining employees that the Debtors intend to honor their obligations to all employees—both during and after their tenure with the Debtors.

15.    ***Insider Severance Procedures.***  The Debtors seek authority pursuant to section 503(c) of the Bankruptcy Code to honor severance obligations to any non-SPC "insider" (as the term is defined in section 101(31) of the Bankruptcy Code) without further order of the Court in accordance with the following procedures:

> a.    the Debtors shall, at least fourteen (14) calendar days prior to such payment, give notice (each notice, an "<u>Insider Severance Notice</u>") of such

payment to (i) the U.S. Trustee, (ii) counsel to the ad hoc committee of TCEH first lien creditors, and (iii) counsel to TCEH Creditors' Committee (collectively, the "<u>Insider Severance Notice Parties</u>");

b.      the Insider Severance Notice shall: (i) identify the Insider being severed, (ii) set forth the Insider Severance payment calculation, and (iii) set forth the mean severance payment made to non-management employees in the twelve-month period preceding the date on which severance is to be paid;

c.      if no written objection by any Insider Severance Notice Party is received by Debtors' counsel or filed with this Court within fourteen (14) calendar days of service of such Insider Severance Notice (the "<u>Insider Severance Objection Deadline</u>"), the Debtors may immediately proceed with the Insider Severance payment; and

d.      if a written objection by an Insider Severance Notice Party is received by Debtors' counsel by the Insider Severance Objection Deadline and such objection cannot be resolved prior to the Insider Severance Objection Deadline, (i) the Insider Severance Notice Party shall file the objection with this Court, (ii) from the date the objection is filed, the Debtors shall have seven (7) calendar days to file a reply, and (iii) the relevant payments shall only be paid upon withdrawal of such written objection or further order of the Court.

## <u>Basis for Relief</u>

### I.    The Debtors Have a Sound Business Purpose for Seeking an Increase in the Non-Insider Severance Cap.

16.    Section 363(b)(1) provides that a debtor "may use, sell or lease, other than in the ordinary course of business, property of the estate" if the debtor demonstrates a sound business justification for such uses.  *In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 WL 6090194, at *5 (Bankr. D. Del. Nov. 20, 2012) (noting that it is "well-settled" that a debtor may use its assets outside the ordinary course where such use "represents the sound exercise of business judgment"); *Computer Sales Int'l, Inc. v. Fed. Mogul Global (In re Fed. Mogul Global, Inc.)*, 293 B.R. 124, 126 (D. Del. 2003) (bankruptcy court "should approve a debtor's use of assets outside the ordinary course of business" upon a showing of "a sound business justification").  Accordingly, once a debtor articulates a valid business justification for the

proposed use of estate property, the bankruptcy court shall give great weight to that judgment. *See In re Commercial Mortg. and Fin., Co.*, 414 B.R. 389, 394 (Bankr. N.D. Ill. 2009) (noting that a debtor in possession "has the discretionary authority to exercise his business judgment in operating the debtor's business similar to the discretionary authority to exercise business judgment given to an officer or director of a corporation").

17.   In the Third Circuit, courts have authorized transactions outside the ordinary course of business when the transaction has a sound business purpose and is proposed in good faith.   See *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008).

18.   Here, the Debtors seek an increase in the Non-Insider Severance Cap primarily on account of two unexpected mine closures.  The contemplated Monticello mine closures will undoubtedly raise concerns with the Debtors' employees regarding their future employment, post-employment benefits, and the general stability of the Debtors' ongoing businesses.  Such uncertainty may cause current employees to leave their jobs or prevent new employees from seeking employment with the Debtors.  Moreover, if the Debtors' current employees leave their jobs, there is no guarantee that the Debtors could attract new employees of comparable quality or experience.  Increasing the Non-Insider Severance Cap will allow the Debtors to reassure their remaining employees of their commitment to honor their severance obligations.

II.   **The Severance Obligations to Insiders are Postpetition Claims, Entitled to Administrative Expense Priority.**

19.   With respect to honoring obligations to Insiders under the Severance Program, the Debtors believe these payments are postpetition amounts, entitled to administrative expense status.  Bankruptcy courts have divided severance obligations into two categories: (a) severance

based on employee tenure; and (b) severance in lieu of notice. *See In re Hechinger Inv. Co. of Delaware*, 298 F.3d 219, 227 (3d Cir. 2002) (distinguishing severance between "(i) pay at termination in lieu of notice; and (ii) pay at termination based on length of employment" (internal quotations omitted)). Specifically, severance in lieu of notice gives rise to a fully postpetition claim. *See, e.g.*, *In re Powermate Holding Corp.*, 394 B.R. 765, 775 ([P]ayment at termination in lieu of notice[] vests at the time of termination because it is based solely on lack of notice. Therefore, the entirety of such a claim becomes an administrative expense claim in a post petition discharge."). As detailed above, the Debtors' severance obligations to Insiders on account of the Severance Program are calculated according to the Executive Severance Plan, under which such obligations become due and payable upon termination, and consist of a one-time lump sum cash severance payment in an amount equal to the sum of: (a) one times the participant's annualized base salary based on the position immediately prior to participation and (b) the participant's target annual incentive award for the year, prorated for the portion of the year prior to termination. Accordingly, the contemplated severance payments to the Debtors' Insiders are not based on length of service, but rather will be paid in lieu of notice, and thus give rise to wholly postpetition amounts.

20.    The Debtors believe that the Insider Severance payments have a sound business purpose of maximizing the Debtors' estates through the ability to reduce long term costs and respond to the challenging business and market climate, while also and motivating employees at important, decision-making levels to perform productively and remain focused on a timely emergence from reorganization. The Debtors also believe that honoring payments due to Insiders on account of the Severance Program will increase morale and loyalty, and incentivize

the Debtors' critical and talented Insiders to maximize performance in the face of potential job elimination.

III.    **Insider Severance Payments, in Accordance with the Insider Severance Procedures, Meet the Requirements of Section 503(c)(2) of the Bankruptcy Code.**

21.     The Debtors submit that the contemplated payments to Insiders on account of the Severance Program, in accordance with the Insider Severance Procedures, will comply fully with the limitations set forth in section 503(c)(2) of the Bankruptcy Code.  First, as required by section 503(c)(2)(A), the Severance Program is a broad-based program that is offered to all full-time employees without employment agreements. And second, the contemplated severance payments to Insiders, under the Severance Program and in accordance with the Insider Severance Procedures, will not exceed the thresholds outlined in section 503(c)(2)(B) of the Bankruptcy Code—that is, the aggregate payment to an insider during any calendar year will not exceed ten times the mean severance payment made to non-management employees in the same calendar year.

22.     ***Section 503(c)(2)(A).***   Section 503(c)(2)(A) provides that in order for a severance payment to an insider to be allowed, it must be part of a severance program that applies simultaneously to both insiders and non-management employees.   This does not necessarily mean that the insiders and non-management employees must be part of the same severance *policy*.   At least one bankruptcy court has suggested that two or more separate severance policies for insiders and non-management employees may constitute a single severance "program," provided that there are severance policies in place for all full-time employees.  *See In re Forum Health*, 427 B.R. 650, 655 (N.D. Ohio 2010) (noting that a severance policy "itself does not have to be generally applicable to all full-time employees, as long as [the debtors] have a *program* that so applies").  This reading of the statute comports

with the underlying policy of section 503(c); namely, that section 503(c) limits insider severance but is "not intended to foreclose a chapter 11 debtor from reasonably compensating employees, including 'insiders,' for their contribution to the debtors' reorganization." *See In re Dana Corp.*, 358 B.R. 567 (S.D.N.Y. 2006).  Here, the Debtors' Executive Severance Plan is encompassed within the Debtors' larger Severance Program and the Debtors' Severance Program is a continuation of a long-standing, prepetition program, provided to the Debtors' employees.  Moreover, in the contemplated workforce reductions due to industry decline and Monticello mine closures, the Debtors' seek to pay severance to both non-insiders and Insiders alike.

23.    *Section 503(c)(2)(B).* In order to gauge compliance with section 503(c)(2)(B), the Debtors endeavored to classify their employees based on their duties and responsibilities, the corporate charter, and other relevant documents.  Based upon the diligence and analysis performed, the Debtors in an exercise of their business judgement, determined that employees holding a title below vice president should be classified as "non-management employees" within the meaning of section 503(c)(2)(B).[8]  The employees below the levels of vice president do not exercise broad managerial powers, set policy, or hold large-scale decision-making authority.[9]  Based on their day-to-day duties and responsibilities, the Debtors believe that the employees below the vice president level, are appropriately classified as "non-management employees" within the meaning of section 503(c)(2)(B).  And as required under section 503(c)(2)(B), in calculating the mean severance payments made to "non-management

---

[8]    *See* Kirby Declaration ¶ 12.

[9]    *See* Kirby Declaration n. 4.

RLF1 13930609v.1

employees," the Debtors understand the term "calendar year" to refer to the twelve-month period preceding the date on which severance is to be paid.[10]

24.    ***Insider Severance Procedures***.  The Insider Severance Procedures will ensure that any Insider Severance payments are reviewed and discussed with the U.S. Trustee and relevant creditor parties, here the Insider Severance Notice Parties.  Additionally, the Insider Severance Notice is required to include the contemplated Insider Severance payment calculations and the mean severance payment made to non-management employees in the same calendar year, as contemplated under section 503(c)(2)(B).  By establishing a set of procedures in which to pay Insider Severance, the Debtors will have the flexibility to honor Insider Severance obligations as they come due without sacrificing oversight into the compliance with section 503(c) of the Bankruptcy Code.  With the Insider Severance Procedures, the Debtors commit to providing the necessary documentation to support each contemplated Insider payment and respond to corresponding inquiries from the U.S. Trustee and creditors.  Moreover, the Insider Severance Procedures allow for an efficient avenue in which to respond to potential objections.  By way of the Insider Severance Procedures, the Debtors will be able to honor their important employee obligations without having to seek court authority on a case-by-case basis but with the full effect of pertinent creditor review.

**IV.    The Increase in the Non-Insider Severance Cap and Payment of Insider Severance are Justified by the Facts and Circumstances of these Chapter 11 Cases.**

25.    In addition to section 363(c) of the Bankruptcy Code, section 503(c)(3) of the Bankruptcy Code may apply.  Section 503(c)(3) provides, in relevant part:

---

[10]    With respect to the meaning of "calendar year" under section 503(c)(2), no court has directly addressed the issue, but at least one court has recognized that there is an open question as to how to calculate the "calendar year."  *See In re Pilgrim's Pride Corp.*, 401 B.R. 229, 235, n.9 (Bankr. N.D. Tex. 2009) ("[T]he difference between Debtors' and the UST's calculation of the permitted severance depends on how 'a calendar year' is determined . . . [t]he court need not address this issue at this time.").

14

> [T]here shall neither be allowed, nor paid ... transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. §503(c)(3).

26.     The relevant inquiry under section 503(c)(3) is whether an increase in the Non-Insider Severance Cap and payment of Insider Severance are "justified by the facts and circumstances of the case." *Id.* Many courts have held that this standard is essentially the same as the business judgment standard that is applied under Section 363(b) of the Bankruptcy Code. *See In re Velo Holdings, Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) ("Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."); *Dana Corp.*, 358 B.R. at 576; *Global Home Prods.*, 369 B.R. 778, 783 (Bankr. D. Del. 2007) ("If [the proposed plans are] intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363."); *In re Mesa Air Grp.*, No. 10-10018, 2010 WL 3810899, at *4 (Bankr. S.D.N.Y. Sept. 24, 2010); *In re Nobex Corp.*, No. 05-20050, 2006 WL 4063024, at *2 (Bankr. D. Del. Jan. 19, 2006). Other courts, however, have determined that section 503(c)(3) is intended to give the court a greater role, requiring that the court make its own determination that the transaction will serve the interests of creditors and the debtor's estate. *See In re Pilgrim's Pride Corp.*, 401 B.R. 229 (Bankr. N.D. Tex. 2009).

27.     Increasing the Non-Insider Severance Cap and granting the Debtors the authority to honor severance obligations to Insiders on account of the Severance Program will provide direct and long-term benefits to the Debtors' businesses and estates, as the Debtors will be able to lower their overall cost structure in exchange for short term cash outlays and acquire the

15

flexibility to respond to changing conditions in the market, while also honoring existing obligations under the Severance Program.  As a result, the Debtors will avoid irreparable harm to their relationships with remaining employees and further, harm to their businesses.  Any delay or disruption in the payments and benefits provided to severed employees is sure to hamper morale and cooperation among remaining employees.  Given the current state of play, it is imperative that the Debtors and their employees concentrate their energies and focus on effectuating the plan of reorganization and emerging from chapter 11.  The Debtors therefore require the flexibility to make difficult business decisions that could impact their employees without sacrificing such relationships.  Increasing the Non-Insider Severance Cap and honoring severance payments to Insiders, in accordance with the Insider Severance Procedures, thereby funding payments to employees let go on account of the current business and market climate— or specifically the Monticello mine closures—will ensure employee expectations are met and honor the Debtors' employee relationships.

28.    The $20 million increase on the Non-Insider Severance Cap was formulated after significant diligence by the Debtors' human resources department, taking account of changed economic circumstances and industry prospects.   Similarly, the Debtors will continue to carefully calculate the metrics of Insider Severance payments to remain in compliance with section 503(c)(2)(B).  The Debtors have discussed with counsel and advisors and respectfully submit that the scope is fair and reasonable.  The Debtors believe that the increase in the Non-Insider Severance Cap and authorization to pay severance to Insiders in accordance with the Insider Severance Procedures, will allow the Debtors to protect against future attrition and preserve employee morale and confidence in the face of industry decline.

29.    The importance of honoring obligations related to severance has been recognized

by courts in this district and others in granting relief similar to the relief requested in this Motion. *See, e.g.*, *Advanta Corp.*, No. 09-13931 (KJC) (Bankr. D. Del June 15, 2010) [D.I. 620] (approving plan providing for 26 to 39 week maximum severance, average of 20 weeks, and individual payout capped at $275,000); *Accredited Home Lenders Holding Co.*, No. 09-11516 (MFW) (Bankr. D. Del. July 7, 2009) [D.I. 325] (approving plan providing for two or three months' severance depending upon position); *In re Fairfield Residential LLC,* No. 09-14378 (BLS) (Bankr. D. Del. May 27, 2010) [D.I. 808] (authorizing an increase the cap on severance payments from $160,000 to $390,000 in the aggregate); *In re Sharper Image Corporation*, No. 08-10322 (KG) (Bankr. D. Del. May 14, 2008) [D.I. 578] (approving the debtors' amended severance program); *In re Buffets Holdings, Inc.*, No. 08-10141 (MFW) (Bankr. D. Del. Mar. 28, 2008) [D.I. 593] (same); *In re Mervyn's Holdings, LLC*, No. 08-11586 (KG) (Bankr. D. Del. Aug. 26, 2008) [D.I. 325] (approving the amended severance program for non-insider employees in connection with store closings); *In re Calpine Corporation*, No. 05-60200 (BRL) (Bankr. S.D.N.Y. Oct. 25, 2006) (authorizing the debtors to add participants to the severance program, increasing the total cost by $100,000); *In re Meridian Auto. Sys. Composite Operations, Inc.*, No. 05-11168 (MFW) (Bankr. D. Del. Aug. 24, 2005) [D.I. 500] (approving plans including severance benefits ranging from 50% to 200% of participant's annual salary).

30.    Accordingly, for these reasons set forth herein, the Debtors seek entry of the Order (a) approving an increase in the Non-Insider Severance Cap to total an amount not to exceed $35 million in the aggregate and (b) authorizing payments to Insiders on account of the Severance Program, as calculated under the Executive Severance Plan, in accordance with the Insider Severance Procedures.

RLF1 13930609v.1

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

31.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Reservation of Rights

32.     The Debtors reserve the right to seek future relief with respect to the Severance Program, the Executive Severance Plan, Insider Severance payments, or the Insider Severance Procedures.

## Notice

33.     The Debtors shall provide notice of this Motion on the date hereof via first class mail to:  (a) the U.S. Trustee; (b) counsel to the TCEH Creditors' Committee; (c) counsel to the EFH Creditors' Committee; (d) Wilmington Trust, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (e) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under:  (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (f) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under:  (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (g) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under:  (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes

due 2022, and counsel thereto; (h) UMB Bank, N.A. in its capacity as indenture trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (i) Delaware Trust Company of Delaware in its capacity as indenture trustee under:  (i) the 6.875% EFIH senior secured notes due 2017; (ii) the 10.0% EFIH senior secured notes due 2020; and (iii), the 11.50% TCEH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under:  (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (j); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to the Ad Hoc Committee of TCEH Unsecured Noteholders; (q) counsel to the Ad Hoc Committee of TCEH Second Lien Noteholders; (r) Oncor Electric Delivery Holdings Company LLC and counsel thereto; (s) Oncor Electric Delivery Company LLC and counsel thereto; (t) the Securities and Exchange Commission; (u) the Internal Revenue Service; (v) the Office of the United States Attorney for the District of Delaware; (w) the Office of the Texas Attorney General on behalf of the Public Utility Commission of Texas; (x) counsel to the Electric Reliability Council of Texas; and (y) those parties that have requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **Prior Request**

34.    As described herein, the relief sought in this Motion and the Order seeks a limited modification of the relief granted by the Court pursuant to the Second Final Wages Order.

[*Remainder of page intentionally left blank*.]

RLF1 13930609v.1

WHEREFORE, the Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Wilmington, Delaware
Dated:  February 18, 2016

*/s/ Joseph C. Barsalona II*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
Joseph C. Barsalona II (No. 6102)
920 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701
Email:      collins@rlf.com
             defranceschi@rlf.com
             madron@rlf.com
             barsalona@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:      edward.sassower@kirkland.com
             stephen.hessler@kirkland.com
             brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:      james.sprayregen@kirkland.com
             marc.kieselstein@kirkland.com
             chad.husnick@kirkland.com
             steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession