**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) ) ) | Case No. 14-10979 (CSS) |
| Debtors. | ) ) ) | (Jointly Administered) |

**DECLARATION OF CARRIE KIRBY, EXECUTIVE VICE
PRESIDENT OF HUMAN RESOURCES AND ADMINISTRATION
OF ENERGY FUTURE HOLDINGS CORP., IN SUPPORT OF
THE MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*,
FOR ENTRY OF AN ORDER (A) APPROVING AN INCREASE IN
THE LIMIT ON THE DEBTORS' AUTHORITY TO PAY NON-INSIDER
SEVERANCE AND (B) AUTHORIZING THE DEBTORS TO PAY INSIDER
SEVERANCE IN ACCORDANCE WITH THE INSIDER SEVERANCE PROCEDURES**

Pursuant to 28 U.S.C. § 1746, I, Carrie Kirby, declare as follows:

1. I am the Executive Vice President of Human Resources for Energy Future Holdings Corp. ("EFH Corp."). I have been with EFH Corp. since 2006, and have served as Vice President of Human Resources for TXU Energy Retail Company, LLC, and before that as Human Resources Director. I am generally familiar with EFH Corp.'s day-to-day operations, staffing, organizational development, employee activities, employee-related policies and standards, and related information from my review of records, relevant documents, and information supplied to me by EFH Corp.'s human resources and legal team. I am over the age of 18 and duly authorized to execute this declaration (this "Declaration") on behalf of the

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

Debtors in support of the *Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Approving an Increase in the Limit on the Debtors' Authority to Pay Non-Insider Severance and (B) Authorizing the Debtors to Pay Insider Severance on in Accordance with the Insider Severance Procedures* (the "Motion").[2]

2. The facts in this Declaration are based on my personal knowledge and review of information and my experience with the Debtors' operations and transactions relating to human resources. If called to testify, I would testify to the facts set forth herein.

**I.    Severance Program**.

3. The Debtors have historically maintained a Severance Program on behalf of (a) non-executive, non-union employees, (b) union employees, and (c) certain key management personnel. Employees that fall into the two categories of (a) non-executive, non-union employees and (b) union employees are entitled to a certain number of weeks of severance benefits based on their length of service with the Debtors, as well as post-employment benefits under the health benefit plans. Payments under these plans are not due and payable until termination. The Debtors have also historically maintained an Executive Severance Plan on behalf of certain key management personnel at the level of vice president and above—including all of the Debtors' insiders *except* the six members of the SPC.[3] Severance obligations to Executive Severance Plan participants become due and payable upon termination, and consist of a one-time lump sum cash severance payment in an amount equal to the sum of: (a) one times the participant's annualized base salary based on the position immediately prior to participation and (b) the participant's target annual incentive award for the year, prorated for the portion of

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

[3]    The relief sought in the Motion and Order will apply to all of the Debtors' "insiders" (as the term is defined in section 101(31) of the Bankruptcy Code), *except* the six members of the Debtors' SPC ("Insiders").

the year prior to termination, as well as post-employment benefits under the health benefits plans.

4. The Debtors continue to honor severance obligations to non-insiders under the Severance Program—including the Executive Severance Plan—in accordance with the existing Non-Insider Severance Cap. The Debtors did not seek in the Wages Motion or subsequent compensation-related pleadings to pay to any "insider" (as the term is defined in section 101(31) of the Bankruptcy Code) obligations under the Severance Program, and have not paid any such insider payments. The Debtors do ***not*** seek authority in the Motion to pay any obligations under the Severance Program to any members of the SPC.

5. In light of the continued depression in the energy industry, causing increased pressures on the Debtors' workforce, the Debtors now seek (a) a $20 million increase in the Non-Insider Severance Cap, which would provide Debtors the authority to honor up to $35 million in postpetition obligations to non-insiders under the Severance Program in the aggregate, and (b) authority to honor obligations to Insiders under the Severance Program on a postpetition basis, in accordance with the Insider Severance Procedures. By allowing the Debtors to honor their severance obligations to non-insiders and Insiders alike—obligations which are immaterial in relative amount—the Debtors' businesses and estates will benefit from long-term cost reduction that far exceeds the short term cash outlay, as well as the flexibility to respond to the challenging business climate. Furthermore, by honoring commitments to severed employees on account of the Severance Program, the Debtors' will incentivize and motivate their remaining employees—non-insiders as well as Insiders—to maximize performance despite the challenging business climate, and thus confer an additional and important benefit on the Debtors' businesses and estates.

RLF1 13930612v.1

**II.     Drivers For an Increased Non-Insider Severance Cap**.

6.     Due to the current business and market climate, it is important that the Debtors possess the flexibility and authority to be able to make difficult employment decisions and further streamline their workforce.  In addition to a rise in ordinary course severance activity related to the current business climate, the Debtors are also planning for the necessary closure of two mines (and the ceasing of productive mining activities) at the Monticello Mining Complex, to be effective on or about April 2016.  Originally these mines powered the Monticello Power Plant but the economically recoverable lignite at both mines has been exhausted, making further mining activities unproductive.  To continue lignite production at both locations would require excessive capital expenditures in an environment where power prices are at an all-time low and new mine expansion would be cost prohibitive.  Throughout the decision making process, the Debtors have worked to communicate to employees and provide Monticello mining employees opportunities in other parts of the business as applicable.  Nevertheless, the Debtors anticipate that new severance obligations to non-insiders will arise for mine personnel on account of, or relating to, the Monticello mine closure—in addition to the other increased ordinary course severance activity.

7.     The Monticello mine closures were not known at the time of the Wages Motion and, as a result, the associated rise in severance obligations was unforeseen.  To date, the Debtors have honored approximately $10.5 million—of the $15 million available under the existing Non-Insider Severance Cap—in postpetition obligations to non-insiders under the Severance Program. Primarily due to the pending wind-down of the Monticello mines in April, as well as the challenging current market and business climate, the Debtors require an increase in the Non-Insider Severance Cap.  To that end, Debtors seek authority to honor up to

$35 million in postpetition obligations to non-insiders under the Severance Program in the aggregate—an increase of $20 million from the existing Non-Insider Severance Cap.

**III.     Insider Severance Payments**.

8.     The Severance Program is a broad-based program offered to all full-time employees without employment agreements. Importantly, the Severance Program is a continuation of a long-standing, prepetition program, provided to the Debtors' employees. The Executive Severance Plan—which Debtors have historically maintained on behalf of certain key management personnel at the level of vice president and above, including Insiders—is encompassed within the larger Severance Program.

9.     As of the Petition Date, no obligations were due and owing to any Insiders on account of the Severance Program. And as stated previously, the Debtors did not seek to pay obligations under the Severance Program to any Insider in the Wages Motion or any subsequent compensation pleading. As a result, no prior request has been made for the relief sought herein relating to Insider Severance payments.

10.    Due to the challenging business and market climate, as well as the contemplated reductions in Debtors' non-insider workforce referenced above, the Debtors may also be obliged to sever Insiders. Honoring obligations to Insiders under the Severance Program will yield positive results for the Debtors including by providing Debtors with the flexibility to respond to the challenging business climate, while also alleviating remaining employees' concerns for career prospects and the ability to support themselves and/or their families. Additionally, the Debtors believe it is important they fulfill their obligations to Insiders under the Severance Program, including the Executive Severance Plan, to reassure remaining

employees that the Debtors intend to honor their obligations to all employees—both during and after their tenure with the Debtors.

11.  The Debtors believe that the Insider Severance payments have a sound business purpose of maximizing the Debtors' estates through cost reductions and added flexibility, while also and motivating employees at important, decision-making levels to perform productively and remain focused on a timely emergence from reorganization.  The Debtors also believe that honoring payments due to Insiders on account of the Severance Program will increase morale and loyalty, and incentivize the Debtors' critical and talented Insiders to maximize performance in the face of potential job elimination.

### IV. Insider Severance Procedures.

12.  As stated previously, the Severance Program is a broad-based program that is offered to all full-time employees without employment agreements—including the Debtors' Insiders.  By establishing a set of procedures by which to pay severance to Insiders on account of the Severance Program, the Debtors will have the flexibility to honor Insider Severance obligations as they come due without sacrificing oversight into the compliance with section 503(c) of the Bankruptcy Code.

13.  With the Insider Severance Procedures, the Debtors commit to providing the necessary documentation to support each contemplated Insider Severance payment and respond to corresponding inquiries from the U.S. Trustee, the counsel to the ad hoc committee of TCEH first lien creditors, and counsel to the TCEH Creditors' Committee.  Specifically, the Debtors will provide the U.S. Trustee and other Insider Severance Notice Parties with information sufficient to demonstrate that any contemplated Insider Severance payment on account of the Severance Program complies with the thresholds outlined in section 503(c)(2)(B) of the

Bankruptcy Code—that is, information to establish that the contemplated Insider Severance payment will not exceed ten times the mean severance payment made to Debtors' employees below the level of vice president (i.e. the Debtors' "non-management employees")[4] in the preceding twelve months.

14. The Insider Severance Procedures also allow for an efficient avenue in which to respond to potential objections. By way of the Insider Severance Procedures, the Debtors will be able to honor their important employee obligations without having to seek court authority on a case-by-case basis but with the full effect of review by the U.S. Trustee and pertinent creditors.

## Conclusion

15. The $20 million increase on the Non-Insider Severance Cap was formulated after significant diligence by the Debtors' human resources department, taking account of changed economic circumstances and industry prospects. Similarly, the Debtors will continue to carefully calculate the metrics of Insider severance payments to remain in compliance with section 503(c)(2)(B). The Debtors have discussed with counsel and advisors and respectfully submit that the scope is fair and reasonable. The Debtors believe that the increase in the Non-Insider Severance Cap and authorization to pay severance to Insiders in accordance with the Insider Severance Procedures, will allow the Debtors to protect against future attrition and preserve employee morale and confidence in the face of industry decline.

---

[4] The Debtors based upon the diligence and analysis performed, in an exercise of their business judgement, determined that employees holding a title below vice president warrant classification as "non-management employees," because they do not exercise broad managerial powers, set policy, or hold large-scale decision-making authority. Based on their day-to-day duties and responsibilities, the Debtors believe that the employees below the vice president level are appropriately classified as "non-management employees" for purposes of calculating the threshold imposed by section 503(c)(2)(B).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: February 18, 2016

*/s/ Carrie Kirby*
Carrie Kirby
Executive Vice President, Human Resources
Energy Future Holdings Corp.

RLF1 13930612v.1