Exhibit A

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**
Energy Future Holdings Corp. Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
Grand Central Station, P.O. Box 4613
New York, NY 10163-4613

# PROOF OF CLAIM

## COURT USE ONLY

| Name of Debtor: Luminant Mining Company LLC | Case Number: 14-11042 (CSS) |
|---|---|

Filed: USBC - District of Delaware
Energy Future Holdings Corp., et al., Et Al.
14-10979 (CSS)          0000002614

**NOTE:** Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.

Name and address where notices should be sent:
c/o Stephen Sakonchick, II
Stephen Sakonchick II, P.C.
6502 Canon Wren Drive
Austin, Texas 78746

Telephone number:        Email: sakon@flash.net
512-329-0375                  ssakon@gmail.com

Name and address where payment should be sent (if different from above):
Ranger Excavating LP  Attn: Brad McKenzie
5222 Thunder Creek Road, Suite 81
Austin, Texas 78759
Telephone number:        Email:
512-331-5551       brad.mckenzie@rangerexcavating.com

☐ Check this box if this claim amends a previously filed claim.

**Court Claim Number:**
_____
(If known)        _____

Filed on: _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**FILED / RECEIVED**

**JUN 26 2014**

**Epiq Bankruptcy Solutions, LLC**

**COURT USE ONLY**

**1.    Amount of Claim as of Date Case Filed:** $ 890,333.45
If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
If all or part of the claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete item 6.
☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest charges.

**2.    Basis for Claim:** labor and materials provided for construction
(See instruction #2)

**3.    Last four digits of any number by which creditor identifies debtor:** 3 0 1 3
**3a. Debtor may have scheduled account as:** _____
(See instruction #3a)

**4.    Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff:
☑ Real Estate    ☐ Motor Vehicle    ☐ Other
Describe: real property
Value of Property: $ exceeds debt
Annual Interest Rate _____% ☐ Fixed or ☐ Variable
(when case was filed)

**Amount of arrearage and other charges, as of time case was filed, included in secured claim, if any:**
$ 890,333.45
Basis for perfection: mechanic's lien
**Amount of Secured Claim:** $ 890,333.45
**Amount Unsecured:** $ _____

**5.    Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $12,475), earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

☐ Up to $2,775 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**Amount entitled to priority:**

$ _____

**6.    Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $ _____        (See instruction #6)
**7.    Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)
**8.    Documents:** Attach **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8 and definition of "redacted".)*
DO NOT SEND ORIGINAL DOCUMENTS.  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**9.    Signature:** (See instruction #9)    Check the appropriate box.
☑ I am the creditor.  ☐ I am the creditor's authorized agent.    ☐ I am the trustee, or the debtor, or their    ☐ I am a guarantor, surety, indorser, or other codebtor.
            (Attached a copy of power of attorney, if any.)        authorized agent. (See Bankruptcy Rule 3004.)    (See Bankruptcy Rule 3005.)
I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name:  Brad McKenzie
Title:  Vice President
Company:  McKenzie Interests Inc., GP
for Ranger Excavating LP

(Signature)
6/20/14
(Date)

Address, telephone number, and email
(if different from notice address above):

Telephone number: 512-331-5551
Email: brad.mckenzie@rangerexcavating.com

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

*In re Luminant Mining Company LLC*
Bankruptcy No. 14-11042(CSS)
Chapter 11

**Attachment to Proof of Claim of Ranger Excavating L.P.**

Ranger Excavating LP Job 13013-Liberty South Construction Projects
    Liberty Mine Location

Luminant Mining Company LLC Contract C0780562C

|  |  |
|---|---|
| Application for Payment 11 | $ 68,781.64 |
| Application for Payment 12 |  |
|   Retainage | $821,551.81 |
| **Total Secured Claim** | **$890,333.45*** |

    *together with all post petition interest, attorneys fees and expenses allowable under 11 U.S.C. §506(b).  Creditor claims to be secured as a result of the filing of a Lien claim affidavit in the real property records of Rusk County, Texas.

| | |
|---|---|
| Exhibit A | Letter to Luminant Mining Company LLC dated June 9, 2014 |
| Exhibit B | Lien Claim Affidavit filed June 10, 2014 |
| Exhibit C | Application and Certificate for Payment No.11 Liberty South Construction Projects-Liberty Mine Location |
| Exhibit D | Application and Certificate for Payment No.12 for Retainage-Liberty South Construction Projects-Liberty Mine Location |
| Exhibit E | Contract between Ranger Excavating LP and Luminant Mining Company LLC, dated March 1, 2013, for the construction of the Liberty South Construction Projects-Liberty Mine Location |
| Exhibit F | Notice of Completion and Final Acceptance signed by Luminant Mining Company LLC on May 2, 2014 |

Exhibit A

**STEPHEN SAKONCHICK II, P.C.**
6502 Canon Wren Drive
Austin, Texas 78746
-----
Telephone (512) 329-0375
Facsimile (512) 697-2859
email sakon@flash.net

June 9, 2014

**Via Certified Mail, Return Receipt Requested**

Luminant Mining Company, LLC
Attn: Randy Randolph
1601 Bryan Street-21st Floor
Dallas, Texas 75201

> Re: Lien Claim of Ranger Excavating LP for unpaid sums for
> materials and labor provided to the Liberty South
> Construction Projects for the Liberty Mine owned by
> Luminant Mining Company, LLC in Rusk County Texas

Dear Mr. Randolph:

I represent Ranger Excavating, LP ("Ranger") regarding the above referenced project ("Project"). Ranger is owed $68,781.64 for Application No. 11 (the final application), and retainage of $821,551.81, for a total of $890,333.45 ("Claim"), for work on the Project. This indebtedness has accrued under section 53.053 of the Texas Property Code and is to be paid to Ranger according to the agreement between Luminant Mining Company, LLC ("Luminant") and Ranger.

This notice is not an attempt to collect the Claim, which is stayed by the automatic stay of 11 U.S.C. 362, as a result of Luminant's filing for bankruptcy under Chapter 11 of the Bankruptcy Code. Instead, this is notice of Ranger's filing of the enclosed lien claim affidavit, which is being filed in accordance with 11 U.S.C. Sections 362(b)(3) and 546(b), for the purpose of perfecting its lien claim under Texas law, and as a result of Luminant's filing for bankruptcy relief. In accordance with Section 53.124 of the Texas Property Code, the time of the inception of this lien claim began with the commencement of construction which was prior to the filing of Luminant's Chapter 11 bankruptcy.

Very truly yours,

Stephen Sakonchick, II

**EXHIBIT A**

**NOTICE:**

**THIS IS NOT A LIEN. THIS IS ONLY AN
AFFIDAVIT CLAIMING A LIEN**

STATE OF TEXAS          §

COUNTY OF TRAVIS        §

    BEFORE ME, the undersigned authority, personally appeared Brad McKenzie, who upon his oath, deposed and stated:

    1.   My name is Brad McKenzie and I am the Vice President of McKenzie Interests, Inc., the general partner of Ranger Excavating LP ("Claimant"). I have personal knowledge of the facts set forth below and am competent and authorized to make this affidavit.

    2.   Claimant's business address is 5222 Thunder Creek Road, Suite 81, Austin, Texas 78759.

    3.   Pursuant to a contract by and between Claimant, and Luminant Mining Company, LLC ("Luminant") dated March 1, 2013, Claimant provided labor and materials for improvements to the following real property owned by Luminant:

        The general location of the property is southeast of the intersection of Farm to Market Road ("FM") 2138 and FM 2144 in Rusk County, Texas, and consisting of approximately 1,611 acres, more or less, in 46 parcels in the D. Cortinas Survey-Abstract A-160, the T.J. Walling Survey-Abstract A-810, the E. Allred Survey- Abstract 53 and the T. Williams Survey-Abstract 833, in Rusk County, Texas ("Property"). The Property is more fully described in the attached Exhibit A.

    4.   Such labor and materials may be generally described as constructing access roads, Liberty Dragline Walkway, Liberty Haul Road, sediment ponds, diversion facilities and terracing on the Property, certified completed by Luminant on May 2, 2014 ("Work").

    5.   The owner or reputed owner of the Property is Luminant Mining Company, LLC, whose address is 1601 Bryan Street-21st Floor, Dallas, Texas 75201.

    6.   Luminant is being sent a notice of the claim, along with a copy of this lien claim affidavit prior to June 15, 2014, by certified mail to the address above.

7.    Claimant has acted as a general contractor to Luminant for the improvements on which the Claimant asserts a lien.

8.    After allowing all just credits, offsets, and payments, the amount of $68,781.64 for Application No. 11 (the final application), and retainage of $821,551.81, for a total of $890,333.45, remains unpaid by Luminant for the Work on the Property, and Claimant asserts a lien on said Property and the improvements thereon, to secure the payment of the amount claimed. Claimant asserts both a statutory and constitutional lien.

9.    This lien claim affidavit is being filed in accordance with 11 U.S.C. Sections 362(b)(3) and 546(b) for the purpose of perfecting its lien claim under Texas law, and as a result of Luminant's filing a petition in bankruptcy under Chapter 11 of the Bankruptcy Code (11 U.S.C. Section 1101, et seq.). In accordance with Section 53.124 of the Texas Property Code, the time of the inception of this lien claim began with the commencement of construction which was prior to the filing of Luminant's bankruptcy petition.

_____
Brad McKenzie, Vice President
McKenzie Interests Inc, general
partner of Ranger Excavating LP


SWORN AND SUBSCRIBED TO BEFORE ME on this 9th day of June 2014.

_____
Notary Public, State of Texas


After filing return to:

Stephen Sakonchick, II
6502 Canon Wren Drive
Austin, Texas 78746

LINDA GOETZ
My Commission Expires
June 02, 2017

## Rusk County Property

|  | Rusk CAD Prop ID | Total Acres | Abstract/Survey | Track/Area | Deed Date | Volume | Page |
|---|---|---|---|---|---|---|---|
| | | | **West Roadway and Construction Area** | | | | |
| 1 | 35521 | 19.032 | AB-160/D Cortinas | 1223/271 | 2/23/2010 | 2990 | 714 |
| 2 | 35522 | 1.880 | AB-160/D Cortinas | 1222/271 | 2/23/2010 | 2990 | 714 |
| 3 | 9537 | 18.773 | AB-160/D Cortinas | 1219/361 | 1/5/2011 | 3057 | 377 |
| 4 | 9538 | 27.685 | AB-160/D Cortinas | 1221/271 | 2/23/2010 | 2990 | 714 |
| 5 | 45707 | 26.618 | AB-160/D Cortinas | 1224/271 | 2/23/2010 | 2990 | 714 |
| 6 | 32880 | 102.382 | AB-160/D Cortinas | 1239/361 | 11/30/2010 | 3050 | 439 |
| 7 | 9219 | 5.00 | AB-160/D Cortinas | 1248/361 | 9/15/2010 | 3036 | 7001 |
| 8 | 63947 | 0.999 | AB-160/D Cortinas | 1249/361 | 9/15/2010 | 3036 | 7001 |
| 9 | 64431 | 2.109 | AB-160/D Cortinas | 1252 | 8/2/2010 | 3028 | 184 |
| 10 | 3684 | 29.257 | AB-160/D Cortinas | 1251 | 8/2/2010 | 3028 | 184 |
| 11 | 54445 | 100.419 | AB-160/D Cortinas | 1214/361 | 12/20/2010 | 3054 | 211 |
| 12 | 26605 | 41.189 | AB-160/D Cortinas | 1215/361 | 12/20/2010 | 3054 | 211 |
| 13 | 11345 | 24.925 | AB-160/D Cortinas | 1216/361 | 11/2/2010 | 3046 | 413 |
| 14 | 49363 | 25.131 | AB-160/D Cortinas | 1236/361 | 11/2/2010 | 3046 | 413 |
| 15 | 10628 | 49.845 | AB-160/D Cortinas | 1237/361 | 10/28/2010 | 3045 | 457 |
| 16 | 34032 | 55.452 | AB-160/D Cortinas | 1238/361 | 11/2/2010 | 3046 | 403 |
| 17 | 24838 | 275.856 | AB-160/D Cortinas | 1204/361 | 5/19/2010 | 3010 | 756 |
| 18 | 17339 | 66.706 | AB-810/TJ Walling | 1255/361 | 8/17/2011 | 3096 | 704 |
| 19 | 7247 | 27.130 | AB-810/TJ Walling | 1273/361 | 12/2/2010 | 3051 | 213 |
| 20 | 7245 | 16.451 | AB-810/TJ Walling | 1345/361 | 12/2/2010 | 3051 | 213 |
| 21 | 21049 | 30.196 | AB-810/TJ Walling | 590/361 | 8/18/2011 | 3097 | 78 |
| 22 | 11346 | 4.966 | AB-810/TJ Walling | 1348/361 | 1/5/2011 | 3057 | 407 |
| 23 | 49366 | 15.844 | AB-810/TJ Walling | 1349/361 | 11/18/2010 | 3049 | 336 |
| 24 | 39213 | 25.319 | AB-833/T Williams | 592/361 | 8/18/2011 | 3097 | 78 |
| 25 | 11358 | 7.466 | AB-833/T Williams | 592A/361 | 10/19/2010 | 3043 | 377 |
| 26 | 11357 | 24.917 | AB-810/TJ Walling | 1351/361 | 11/2/2010 | 3046 | 403 |
| 27 | 32161 | 3.870 | AB-53/E Allred | 1352/361 | 10/1/2010 | 3040 | 665 |
| 28 | 7959 | 6.054 | AB-53/E Allred | 1355/361 | 4/5/2011 | 3073 | 584 |
| 29 | 11344 | 5.376 | AB-810/TJ Walling | 1357/361 | 4/12/2011 | 3075 | 91 |
| 30 | 11343 | 27.574 | AB-53/E Allred | 1356/361 | 4/12/2011 | 3075 | 91 |
| 31 | 24836 | 61.663 | AB-53/E Allred and AB-810/TJ Walling | 1358/361 | 12/20/2010 | 3054 | 172 |
| 32 | 3687 | 43.756 | AB-53/E Allred | 594/361 | 3/26/2012 | 3133 | 12 |
| 33 | 48006 | 9.315 | AB-53/EK Allred | 594/361 | 6/14/2011 | 3085 | 714 |
| 34 | 26572 | 0.994 | AB-53/E Allred | 1372/361 | 7/24/2012 | 3153 | 437 |
| | | | **East Roadway and Construction Area** | | | | |
| 35 | 32217 | 11.292 | AB-810/TJ Walling | 545A/361 | 2/27/2013 | 3199 | 371 |
| 36 | 49312 | 11.023 | AB-810/TJ Walling | 545C/361 | 11/9/2010 | 3047 | 626 |
| 37 | 32223 | 9.930 | AB-810/TJ Walling | 545/361 | 10/19/2010 | 3043 | 383 |
| 38 | 17339 | 66.706 | AB-810/TJ Walling | 1255/361 | 8/17/2011 | 3096 | 704 |
| 39 | 7246 | 41.292 | AB-160/D Cortinas | 1271/361 | 12/2/2010 | 3051 | 213 |
| 40 | 1834 | 25.326 | AB-160/D Cortinas | 1262/361 | 12/21/2010 | 3054 | 395 |
| 41 | 24841 | 33.082 | AB-160/D Cortinas | 1264/361 | 9/21/2010 | 3038 | 186 |
| 42 | 21048 | 23.441 | AB-833/T Williams | 596/361 | 8/18/2011 | 3097 | 78 |
| 43 | 12431 | 3.029 | AB-833/T Williams | 1334/361 | 9/14/2011 | 3101 | 817 |
| 44 | 35276 | 109.819 | AB-53/E Allred | 1361/361 | 10/18/2011 | 3106 | 510 |
| 45 | 35279 | 68.129 | AB-53/E Allred | 1367/361 | 11/2/2010 | 3046 | 422 |
| 46 | 45232 | 24.756 | AB-53/E Allred | 572/361 | 7/21/2011 | 3092 | 405 |

Total Acres    1,611.974

## Exhibit A

## Notice of Completion and Final Acceptance

| | |
|---|---|
| **Contractor** | RANGER EXCAVATING, L.P. |
| **Owner** | LUMINANT MINING COMPANY, LLC |
| **Project** | LIBERTY SOUTH CONSTRUCTION PROJECTS LIBERTY MINE |

**Contractor Representative:**
Name: MARK McKENZIE
Cell: 512-695-7602
Email: MARK.McKENZIE@RANGEREXCAVATING.COM

**Owner Representative:**
Name: MIKE NUTT
Cell: 903-371-2009
Email: MNUTT@LUMINANT.COM

**Project Description:**

EXCAVATION, SITE WORK

**Work is accepted by Owner as final and complete:**   [X] **YES**   [ ] **NO (Critical Defects Remain)**

**Comments:**

WORK COMPLETED AS PER
CONTRACT REQUIREMENTS.

**Work is accepted/rejected as follows:** (also see attached punchlist or list of critical defects)
**Comments:** Contractor is hereby instructed to submit a correction and completion scheduled immediately.

NO PUNCHLIST. WORK ACCEPTED "AS IS".

The undersigned customer representative acknowledges that the above described equipment furnished and installed by Contractor meets the contract specifications regarding materials, workmanship and performance as indicated. This Notice of Final Acceptance constitutes assumption of care, custody, and control for the portion of work specified above. This notice does not relieve the Contractor of any responsibilities surviving the completion and acceptance of the work (i.e. warranty, confidentiality, service obligations, etc.) as specified in the contract terms

**Owner Representative Signature**

**Print Name**  MICHAEL G NUTT

**Date**  5/2/14

**Title**  PROJECT MGR. SR.

**Contractor Representative Signature**

**Print Name**  Mark McKenzie, President
of McKenzie Interests, Inc.
G.P. of Ranger Excavating, L.P.

**Date**  4.29.14

**Title**

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

~~OFFICIAL USE~~

DALLAS TX 75201

| | | |
|---|---|---|
| Postage | $ | $0.70 |
| Certified Fee | | $3.30 |
| Return Receipt Fee (Endorsement Required) | | $2.70 |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 |
| Total Postage & Fees | $ | $6.70 |

*Postmark: WESTLAKE STATION AUSTIN, TX USPS*

7012 1010 0001 1381 2994

Sent To *Luminant Mining Company LLC*
*Attn: Randy Rudolph*
Street, Apt. No.; or PO Box No. *1601 Bryan Street - 21st Flr*
City, State, ZIP+4 *Dallas, Texas 75201*

PS Form 3800, August 2006          See Reverse for Instructions

---

**SENDER:** *COMPLETE THIS SECTION*

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

*Luminant Mining Company LLC*
*Attn: Randy Rudolph*
*1601 Bryan Street - 21st Flr*
*Dallas, Texas 75201*

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X *Randy Alexander J.*    ☑ Agent    ☐ Addressee

B. Received by (Printed Name) *Randy Alexander J.*    C. Date of Delivery *6-13-14*

D. Is delivery address different from item 1?    ☐ Yes
If YES, enter delivery address below:    ☐ No

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)    7012 1010 0001 1381 2994

PS Form **3811**, February 2004          Domestic Return Receipt          102595-02-M-1540

Exhibit B

00143405 VOL: 3300 PG:    79

**NOTICE:**

**THIS IS NOT A LIEN.  THIS IS ONLY AN
AFFIDAVIT CLAIMING A LIEN**

STATE OF TEXAS        §

COUNTY OF TRAVIS      §

BEFORE ME, the undersigned authority, personally appeared Brad McKenzie, who upon his oath, deposed and stated:

1.    My name is Brad McKenzie and I am the Vice President of McKenzie Interests, Inc., the general partner of Ranger Excavating LP ("Claimant").  I have personal knowledge of the facts set forth below and am competent and authorized to make this affidavit.

2.    Claimant's business address is 5222 Thunder Creek Road, Suite 81, Austin, Texas 78759.

3.    Pursuant to a contract by and between Claimant, and Luminant Mining Company, LLC ("Luminant") dated March 1, 2013, Claimant provided labor and materials for improvements to the following real property owned by Luminant:

> The general location of the property is southeast of the intersection of Farm to Market Road ("FM") 2138 and FM 2144 in Rusk County, Texas, and consisting of approximately 1,611 acres, more or less, in 46 parcels in the D. Cortinas Survey-Abstract A-160, the T.J. Walling Survey-Abstract A-810, the E. Allred Survey- Abstract 53 and the T. Williams Survey-Abstract 833, in Rusk County, Texas ("Property").  The Property is more fully described in the attached Exhibit A.

4.    Such labor and materials may be generally described as constructing access roads, Liberty Dragline Walkway, Liberty Haul Road, sediment ponds, diversion facilities and terracing on the Property, certified completed by Luminant on May 2, 2014 ("Work").

5.    The owner or reputed owner of the Property is Luminant Mining Company, LLC, whose address is 1601 Bryan Street-21st Floor, Dallas, Texas 75201.

6.    Luminant is being sent a notice of the claim, along with a copy of this lien claim affidavit prior to June 15, 2014, by certified mail to the address above.

# EXHIBIT B

00143405 VOL: 3300 PG: 80

7.    Claimant has acted as a general contractor to Luminant for the improvements on which the Claimant asserts a lien.

8.    After allowing all just credits, offsets, and payments, the amount of $68,781.64 for Application No. 11 (the final application), and retainage of $821,551.81, for a total of $890,333.45, remains unpaid by Luminant for the Work on the Property, and Claimant asserts a lien on said Property and the improvements thereon, to secure the payment of the amount claimed. Claimant asserts both a statutory and constitutional lien.

9.    This lien claim affidavit is being filed in accordance with 11 U.S.C. Sections 362(b)(3) and 546(b) for the purpose of perfecting its lien claim under Texas law, and as a result of Luminant's filing a petition in bankruptcy under Chapter 11 of the Bankruptcy Code (11 U.S.C. Section 1101, *et seq.*).  In accordance with Section 53.124 of the Texas Property Code, the time of the inception of this lien claim began with the commencement of construction which was prior to the filing of Luminant's bankruptcy petition.

_____

Brad McKenzie, Vice President
McKenzie Interests Inc, general
partner of Ranger Excavating LP


SWORN AND SUBSCRIBED TO BEFORE ME on this 9+h day of June 2014.

_____
Notary Public, State of Texas

After filing return to:

Stephen Sakonchick, II
6502 Canon Wren Drive
Austin, Texas 78746

LINDA GOETZ
My Commission Expires
June 02, 2017

00143405 VOL: 3300 PG:    81

### Rusk County Property

| | Rusk CAD Prop ID | Total Acres | Abstract/Survey | Track/Area | Deed Date | Volume | Page |
|---|---|---|---|---|---|---|---|
| | | | **West Roadway and Construction Area** | | | | |
| 1 | 35521 | 19.032 | AB-160/D Cortinas | 1223/271 | 2/23/2010 | 2990 | 714 |
| 2 | 35522 | 1.880 | AB-160/D Cortinas | 1222/271 | 2/23/2010 | 2990 | 714 |
| 3 | 9537 | 18.773 | AB-160/D Cortinas | 1219/361 | 1/5/2011 | 3057 | 377 |
| 4 | 9538 | 27.685 | AB-160/D Cortinas | 1221/271 | 2/23/2010 | 2990 | 714 |
| 5 | 45707 | 26.618 | AB-160/D Cortinas | 1224/271 | 2/23/2010 | 2990 | 714 |
| 6 | 32880 | 102.382 | AB-160/D Cortinas | 1239/361 | 11/30/2010 | 3050 | 439 |
| 7 | 9219 | 5.00 | AB-160/D Cortinas | 1248/361 | 9/15/2010 | 3036 | 7001 |
| 8 | 63947 | 0.999 | AB-160/D Cortinas | 1249/361 | 9/15/2010 | 3036 | 7001 |
| 9 | 64431 | 2.109 | AB-160/D Cortinas | 1252 | 8/2/2010 | 3028 | 184 |
| 10 | 3684 | 29.257 | AB-160/D Cortinas | 1251 | 8/2/2010 | 3028 | 184 |
| 11 | 54445 | 100.419 | AB-160/D Cortinas | 1214/361 | 12/20/2010 | 3054 | 211 |
| 12 | 26605 | 41.189 | AB-160/D Cortinas | 1215/361 | 12/20/2010 | 3054 | 211 |
| 13 | 11345 | 24.925 | AB-160/D Cortinas | 1216/361 | 11/2/2010 | 3046 | 413 |
| 14 | 49363 | 25.131 | AB-160/D Cortinas | 1236/361 | 11/2/2010 | 3046 | 413 |
| 15 | 10628 | 49.845 | AB-160/D Cortinas | 1237/361 | 10/28/2010 | 3045 | 457 |
| 16 | 34032 | 55.452 | AB-160/D Cortinas | 1238/361 | 11/2/2010 | 3046 | 403 |
| 17 | 24838 | 275.856 | AB-160/D Cortinas | 1204/361 | 5/19/2010 | 3010 | 756 |
| 18 | 17339 | 66.706 | AB-810/TJ Walling | 1255/361 | 8/17/2011 | 3096 | 704 |
| 19 | 7247 | 27.130 | AB-810/TJ Walling | 1273/361 | 12/2/2010 | 3051 | 213 |
| 20 | 7245 | 16.451 | AB-810/TJ Walling | 1345/361 | 12/2/2010 | 3051 | 213 |
| 21 | 21049 | 30.196 | AB-810/TJ Walling | 590/361 | 8/18/2011 | 3097 | 78 |
| 22 | 11346 | 4.966 | AB-810/TJ Walling | 1348/361 | 1/5/2011 | 3057 | 407 |
| 23 | 49366 | 15.844 | AB-810/TJ Walling | 1349/361 | 11/18/2010 | 3049 | 336 |
| 24 | 39213 | 25.319 | AB-833/T Williams | 592/361 | 8/18/2011 | 3097 | 78 |
| 25 | 11358 | 7.466 | AB-833/T Williams | 592A/361 | 10/19/2010 | 3043 | 377 |
| 26 | 11357 | 24.917 | AB-810/TJ Walling | 1351/361 | 11/2/2010 | 3046 | 403 |
| 27 | 32161 | 3.870 | AB-53/E Allred | 1352/361 | 10/1/2010 | 3040 | 665 |
| 28 | 7959 | 6.054 | AB-53/E Allred | 1355/361 | 4/5/2011 | 3073 | 584 |
| 29 | 11344 | 5.376 | AB-810/TJ Walling | 1357/361 | 4/12/2011 | 3075 | 91 |
| 30 | 11343 | 27.574 | AB-53/E Allred | 1356/361 | 4/12/2011 | 3075 | 91 |
| 31 | 24836 | 61.663 | AB-53/E Allred and AB-810/TJ Walling | 1358/361 | 12/20/2010 | 3054 | 172 |
| 32 | 3687 | 43.756 | AB-53/E Allred | 594/361 | 3/26/2012 | 3133 | 12 |
| 33 | 48006 | 9.315 | AB-53/EK Allred | 594/361 | 6/14/2011 | 3085 | 714 |
| 34 | 26572 | 0.994 | AB-53/E Allred | 1372/361 | 7/24/2012 | 3153 | 437 |
| | | | **East Roadway and Construction Area** | | | | |
| 35 | 32217 | 11.292 | AB-810/TJ Walling | 545A/361 | 2/27/2013 | 3199 | 371 |
| 36 | 49312 | 11.023 | AB-810/TJ Walling | 545C/361 | 11/9/2010 | 3047 | 626 |
| 37 | 32223 | 9.930 | AB-810/TJ Walling | 545/361 | 10/19/2010 | 3043 | 383 |
| 38 | 17339 | 66.706 | AB-810/TJ Walling | 1255/361 | 8/17/2011 | 3096 | 704 |
| 39 | 7246 | 41.292 | AB-160/D Cortinas | 1271/361 | 12/2/2010 | 3051 | 213 |
| 40 | 1834 | 25.326 | AB-160/D Cortinas | 1262/361 | 12/21/2010 | 3054 | 395 |
| 41 | 24841 | 33.082 | AB-160/D Cortinas | 1264/361 | 9/21/2010 | 3038 | 186 |
| 42 | 21048 | 23.441 | AB-833/T Williams | 596/361 | 8/18/2011 | 3097 | 78 |
| 43 | 12431 | 3.029 | AB-833/T Williams | 1334/361 | 9/14/2011 | 3101 | 817 |
| 44 | 35276 | 109.819 | AB-53/E Allred | 1361/361 | 10/18/2011 | 3106 | 510 |
| 45 | 35279 | 68.129 | AB-53/E Allred | 1367/361 | 11/2/2010 | 3046 | 422 |
| 46 | 45232 | 24.756 | AB-53/E Allred | 572/361 | 7/21/2011 | 3092 | 405 |

Total Acres    1,611.974

## Exhibit A

00143405 VOL: 3300 PG: 82

## Notice of Completion and Final Acceptance

| Contractor | RANGER EXCAVATING, L.P. |
|---|---|
| Owner | LUMINANT MINING COMPANY, LLC |
| Project | LIBERTY SOUTH CONSTRUCTION PROJECTS LIBERTY MINE |

**Contractor Representative:**
Name: MARK McKENZIE
Cell: 512-695-7602
Email: MARK.McKENZIE@RANGEREXCAVATING.COM

**Owner Representative:**
Name: MIKE NUTT
Cell: 903-371-2009
Email: MNUTT@LUMINANT.COM

**Project Description:**

EXCAVATION, SITE WORK

Work is accepted by Owner as final and complete:    [ X ] YES    [ ] NO (Critical Defects Remain)

**Comments:**

WORK COMPLETED AS PER CONTRACT REQUIREMENTS.

Work is accepted/rejected as follows: (also see attached punchlist or list of critical defects)
**Comments:** Contractor is hereby instructed to submit a correction and completion scheduled immediately.

NO PUNCHLIST. WORK ACCEPTED "AS IS".

The undersigned customer representative acknowledges that the above described equipment furnished and installed by Contractor meets the contract specifications regarding materials, workmanship and performance as indicated. This Notice of Final Acceptance constitutes assumption of care, custody, and control for the portion of work specified above. This notice does not relieve the Contractor of any responsibilities surviving the completion and acceptance of the work (i.e. warranty, confidentiality, service obligations, etc.) as specified in the contract terms

| Owner Representative Signature | Date: 5/2/14 |
|---|---|
| Print Name: MICHAEL G NUTT | Title: PROJECT MGR, SR. |
| Contractor Representative Signature | Date: 4.29.14 |
| Print Name: Mark McKenzie, President of McKenzie Interests, Inc. G.P. of Ranger Excavating, L.P. | Title: |

00143405 VOL: 3300 PG: 83

STATE OF TEXAS                    COUNTY OF RUSK    FILED FOR RECORD
I hereby certify that this instrument was filed on
the date and time stamped hereon by me and      Jun 10,2014 02:01P
was duly recorded in the volume and page of the
named records of Rusk County, Texas as stamped   JOYCE LEWIS-KUGLE,
hereon by me.            OFFICIAL PUBLIC RECORDS   COUNTY CLERK
                                                  RUSK COUNTY, TEXAS

         Jun 10,2014 02:01P                       By:

JOYCE LEWIS-KUGLE, COUNTY CLERK                   Joyce Mills
                                                  DEPUTY
  RUSK COUNTY, TEXAS

Exhibit C

**EXHIBIT C**

# APPLICATION AND CERTIFICATE FOR PAYMENT AIA DOCUMENT G702 (Instructions on reverse side) PAGE 1 OF 3 PAGES

TO OWNER: LINCHART

FROM CONTRACTOR: RANGER EXCAVATING, L.P.
5222 THUNDERCREEK, B-1
AUSTIN, TEXAS 78759

VENDOR #002987550

PROJECT: LINCHART-LIBERTY SOUTH

VIA ARCHITECT:

JOB NUMBER: 130130
APPLICATION NO: 11
PERIOD TO: 02/28/2014

ARCHITECTS
PROJECT NO: CONTRACT #C07805620

CONTRACT DATE:

Distribution to:
☒ OWNER
☐ ARCHITECT
☐ CONTRACTOR

CONTRACT FOR:

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.
Continuation Sheet, AIA Document G703, is attached.

1. ORIGINAL CONTRACT SUM ............................ $ 9,583,959.8
2. Net change by Change Orders ...................... $ -675,816.1
3. CONTRACT SUM TO DATE (Line 1 +/- 2) ..... $ 8,908,143.7
4. TOTAL COMPLETED & STORED TO DATE ...... $ 8,215,518.1
   (Column G on G703)
5. RETAINAGE:
   a. 0.000 % of Completed Work $ 0.00
      (Columns D + E on G703)
   b. 0.000 % of Stored Material $
      (Columns F on G703)
   Total Retainage (Line 5a + 5b or
   Total in Column I of G703) ...................... $ 821,551.8
6. TOTAL EARNED LESS RETAINAGE ............ $ 7,393,966.5
   (Line 4 less Line 5 Total)
7. LESS PREVIOUS CERTIFICATES FOR PAYMENT
   (Line 6 from prior Certificate) ................. $ 7,325,184.8
8. CURRENT PAYMENT DUE ........................... $ 68,781.6
9. BALANCE TO FINISH, INCLUDING RETAINAGE $ 1,514,177.0
   (Line 3 less Line 6)

### CHANGE ORDER SUMMARY

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Changes approved in previous months by Owner | 60,805.75 | -736,621.90 |
| Approved this Month | | |
| Number / Date Approved | | |
| TOTALS | 0.00 | 0.00 |
| NET CHANGES by Change Order | | -675,816.15 |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR: RANGER EXCAVATING, L.P.

By: Bobbie Holsinn, Vice President-Operations   Date: 2.28.14
of BlinKenzie Interests, Inc.

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED .................................. $
Attach explanation if amount certified differs from the amount applied for.)

ARCHITECT:

By:                                    Date:

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment without prejudice to any rights of the Owner or Contractor under this Contract.

State of: TX   County of: TRAVIS
Subscribed and sworn to before me this 28 day of FEBRUARY 2014

Notary Public

My commission expires:
MY COMMISSION EXPIRES
September 28, 2014

**SCHEDULE OF VALUES - N-2 Sedimentation Pond**

| | | | | | | Previous | | | | Current | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| # | Description | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Mobilization/Demobilization | LS | | | | | | | | | | | | | |
| 2 | SSECP (BMPRP) Initial Installation - Approx 7,650 ft | LS | | | | | | | | | | | | | |
| 3 | SSECP (BMPRP) install, remove & replace maintenance | LF | | | | | | | | | | | | | |
| 4 | Clearing | AC | | | | | | | | | | | | | |
| | **N-2 Sedimentation Pond** | | | | | | | | | | | | | | |
| 1 | Topsoil Strip (6") | CY | | | | | | | | | | | | | |
| 2 | Key Trench Excavation | CY | | | | | | | | | | | | | |
| 3 | Key Trench Backfill | CY | | | | | | | | | | | | | |
| 4 | Excavation | CY | | | | | | | | | | | | | |
| 5 | Embankment | CY | | | | | | | | | | | | | |
| 6 | Dewatering | LS | | | | | | | | | | | | | |
| 7 | Pond liner | LS | | | | | | | | | | | | | |
| 8 | Pond Spillway, Underdrain, Valve, Culverts | LS | | | | | | | | | | | | | |
| 9 | Berm | LF | | | | | | | | | | | | | |
| 10 | Topsoil Replace (6") | CY | | | | | | | | | | | | | |
| | **N-2 Diversion No. 1** | | | | | | | | | | | | | | |
| 11 | Topsoil Strip (6") | CY | | | | | | | | | | | | | |
| 12 | Excavation | CY | | | | | | | | | | | | | |
| 13 | Embankment | CY | | | | | | | | | | | | | |
| 14 | Topsoil Replace (6") | CY | | | | | | | | | | | | | |
| 15 | Rip-Rap (2 locations) | TN | | | | | | | | | | | | | |
| | **N-2 Diversion No. 2** | | | | | | | | | | | | | | |
| 11 | Topsoil Strip (6") | CY | | | | | | | | | | | | | |
| 12 | Excavation | CY | | | | | | | | | | | | | |
| 13 | Embankment | CY | | | | | | | | | | | | | |
| 14 | Topsoil Replace (6") | CY | | | | | | | | | | | | | |
| | **N-2 Access Road No. 1** | | | | | | | | | | | | | | |
| 11 | Topsoil Strip (6") | CY | | | | | | | | | | | | | |
| 12 | Excavation | CY | | | | | | | | | | | | | |
| 13 | Embankment | CY | | | | | | | | | | | | | |
| 14 | Topsoil Replace (6") | CY | | | | | | | | | | | | | |
| 15 | Crushed Rock Surface | SY | | | | | | | | | | | | | |
| | **N-2 Access Road No. 2 & Facility Pad** | | | | | | | | | | | | | | |
| 11 | Topsoil Strip (6") | CY | | | | | | | | | | | | | |
| 12 | Excavation | CY | | | | | | | | | | | | | |
| 13 | Embankment | CY | | | | | | | | | | | | | |
| 14 | Topsoil Replace (6") | SY | | | | | | | | | | | | | |
| 15 | Drainage Structure 48" DIAXXXXX | LF | | | | | | | | | | | | | |

Subtotal: N-3 Pond Items $

**CHANGE ORDER #1**

| 1.1 | CO#01 - Demobilize | LS | | | | | | | | | | | | | |

**CHANGE ORDER #4**

| 5.1 | Remove N-3 Key Trench Excavation | CY | | | | | | | | | | | | | |
| 5.2 | Restore N-3 Key Trench Enforcement | CY | | | | | | | | | | | | | |

**CHANGE ORDER #5**

| 2.1 | Remove Rip Rip | TN | | | | | | | | | | | | | |

Revised Total $706,143.67

## SCHEDULE OF VALUES – Liberty Walkway

| | | | | | | | Previous | | | | | Current | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Material | Material | % comp | Labor | Labor | Total | Material | % comp | Labor | Labor | Total | Retention |
| 1.1 | | LS | 1 | 1 | | | | $50,000.00 | $50,000.00 | $50,000.00 | | 100% | $50,000.00 | $50,000.00 | $50,000.00 | |
| 1.2 | SSBCP | LS | 1 | 1 | | | | $80,000.00 | $80,000.00 | $80,000.00 | | 100% | $80,000.00 | $80,000.00 | $80,000.00 | |
| 1.3 | SSBCP | LS | 1 | 1 | | | | | | | | | | | | |
| 1.4 | Closing | AC | 122 | 122 | | | $1,360.00 | $194,700.00 | $194,700.00 | $194,700.00 | | 100% | $194,700.00 | $194,700.00 | $194,700.00 | |

### Liberty Walkway

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2.1 | Total Eng @? | CY | 29,000 | 29,000 | | | $58,000.00 | 90% | $31,900.00 | $31,900.00 | | 50% | $31,900.00 | $31,900.00 | |
| 2.2 | Excavation | CY | 11,000 | 11,000 | | | $22,000.00 | 100% | $22,000.00 | $22,000.00 | | 100% | $22,000.00 | $22,000.00 | |
| 2.3 | Influenced | CY | 248,000 | 248,000 | | | $47,000.00 | 100% | $17,000.00 | $17,000.00 | | 100% | $17,000.00 | $17,000.00 | |
| 2.4 | Underd & Backfill - Pay quantity surveyed | CY | | | | | | | | | | | | | | |
| 2.5 | Structure #1 (4'x4") .48" CMP | LF | 650 | 650 | $51.00 | $51,000.00 | $33,200.00 | | $5,120.00 | $5,120.00 | 100% | $5,120.00 | $5,120.00 | |
| 2.6 | Structure #2 4'x4" .48" CMP | LF | 120 | 120 | $44.00 | $38,200.00 | | $5,120.00 | $5,120.00 | 100% | $5,120.00 | $5,120.00 | |
| 2.7 | Structure #1 (4'x4") .48" CMP | LF | 270 | 270 | $73.00 | $21,060.00 | $11,360.00 | | $21,060.00 | $21,060.00 | 100% | $21,060.00 | $21,060.00 | |

Subtotal Walkway Items $ $1,233,500.00

### Contract Amendment #1

| 3.1 | Remediation | LS | 1 | 1 | $0.00 | | $55,180.75 | $55,180.75 | | | | | | | |

### CHANGE ORDER #2

| 2.1 | Remove Extension | CY | 11,000 | 11,000 | $6.00 | $66,000.00 | $22,000.00 | 100% | ($22,000.00) | $22,000.00 | 100% | ($22,000.00) | $22,000.00 | |
| 2.2 | Remove Embankment | CY | 248,000 | 248,000 | $0.63 | $147,000.00 | $17,000.00 | 100% | ($17,000.00) | $17,000.00 | 100% | ($17,000.00) | $17,000.00 | |
| 2.3 | Reinforced Concrete | CY | 41,000 | 41,000 | $2.00 | $83,000.00 | 50% | $41,000.00 | $41,000.00 | 50% | $41,000.00 | $41,000.00 | |
| 2.4 | Reinforcement Embankment | CY | 124,000 | 124,000 | $3.93 | $486,000.00 | 39.7% | $157,708.00 | $192,708.00 | 39.7% | $157,708.00 | $192,708.00 | |

### CHANGE ORDER #7

| C.1 | Remove SSBCP | LB | 0.45 | 0.45 | | | $160,000.00 | $134,000.00 | 100% | ($36,000.00) | ($36,000.00) | 100% | ($36,000.00) | ($36,000.00) | |
| C.2 | Remove Casing | AC | 71 | 71 | | | ($1,260.00) | $85,528.00 | 100% | ($55,528.00) | ($85,528.00) | 100% | ($85,528.00) | ($85,528.00) | |

Revised Tot $1,064,754.75

$       454,280.00
40%
$075,474.75

Invoice total       $
10 % retention $

Net due           $

SCHEDULE OF VALUES - Liberty Haul Road

Part A:
Part B:
Part C:

## SCHEDULE OF VALUES - N-2 Sedimentation Pond

Previous / Current

| Item | Description | Unit | [illegible] | [illegible] | UNIT COST | SUB-TOTAL | UNIT COST | SUB-TOTAL | TOTAL | % comp | [illegible] | % comp | [illegible] | [illegible] | % comp | [illegible] | % comp | [illegible] | Total | [illegible] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.1 | Mobilization/Demobilization | LS | 1 | 1 | | $ - | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | | $ - | 100% | $ 50,000.00 | $ 50,000.00 | | $ - | 100% | $ 50,000.00 | $50,000.00 | $0.00 | $ - |
| 1.2 | SSECP (SWPPP) initial installation - Approx 8,400 ft | LS | 1 | 1 | | $ - | $ 40,000.00 | $ 40,000.00 | $ 40,000.00 | | $ - | 100% | $ 40,000.00 | $ 40,000.00 | | $ - | 100% | $ 40,000.00 | $40,000.00 | $0.00 | $ - |
| 1.3 | SSECP (SWPPP) clean, remove & replace maintenance | LF | 0 | 0 | | $ - | $ 1.50 | $ - | $ - | | $ - | | $ - | $ - | | $ - | | $ - | $0.00 | $0.00 | $ - |
| 1.4 | Clearing | AC | 7 | 7 | | $ - | $ 1,350.00 | $ 9,450.00 | $ 9,450.00 | | $ - | 100% | $ 9,450.00 | $ 9,450.00 | | $ - | 100% | $ 9,450.00 | $9,450.00 | $0.00 | $ - |
| | **N-2 Sedimentation Pond** | | | | | $ - | | $ - | $ - | | | | | | | | | | | | |
| 2.1 | Topsoil Strip (8") | CY | 6,600 | 6,600 | | $ - | $ 2.00 | $ 13,200.00 | $ 13,200.00 | | $ - | 100% | $ 13,200.00 | $ 13,200.00 | | $ - | 100% | $ 13,200.00 | $13,200.00 | $0.00 | $ - |
| 2.2 | Key Trench Excavation | CY | 1,422 | 1,422 | | $ - | $ 5.00 | $ 7,111.11 | $ 7,111.11 | | $ - | 100% | $ 7,111.11 | $ 7,111.11 | | $ - | 100% | $ 7,111.11 | $7,111.11 | $0.00 | $ - |
| 2.3 | Key Trench Backfill | CY | 1,422 | 1,422 | | $ - | $ 8.00 | $ 11,377.78 | $ 11,377.78 | | $ - | 100% | $ 11,377.78 | $ 11,377.78 | | $ - | 100% | $ 11,377.78 | $11,377.78 | $0.00 | $ - |
| 2.4 | Excavation | CY | 202,800 | 202,800 | | $ - | $ 2.00 | $ 405,600.00 | $ 405,600.00 | | $ - | 100% | $405,600.00 | $405,600.00 | | $ - | 100% | $405,600.00 | $405,600.00 | $0.00 | $ - |
| 2.5 | Embankment | CY | 4,800 | 4,800 | | $ - | $ 1.00 | $ 4,800.00 | $ 4,800.00 | | $ - | 100% | $ 4,800.00 | $ 4,800.00 | | $ - | 100% | $ 4,800.00 | $4,800.00 | $0.00 | $ - |
| 2.6 | Dewatering | LS | 1 | 1 | | $ - | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | | $ - | 100% | $ 10,000.00 | $ 10,000.00 | | $ - | 100% | $ 10,000.00 | $10,000.00 | $0.00 | $ - |
| 2.7 | Pond Inlet | LS | 1 | 1 | $ 6,000.00 | $ 6,000.00 | $ 9,000.00 | $ 9,000.00 | $ 15,000.00 | 100% | $ 6,000.00 | 100% | $ 9,000.00 | $ 15,000.00 | 100% | $ 6,000.00 | 100% | $ 9,000.00 | $15,000.00 | $0.00 | $ - |
| 2.8 | Pond Spillway, Underdrain, Valve, Catwalk | LS | 1 | 1 | $ 12,000.00 | $ 12,000.00 | $ 18,000.00 | $ 18,000.00 | $ 30,000.00 | 100% | $ 12,000.00 | 100% | $ 18,000.00 | $ 30,000.00 | 100% | $ 12,000.00 | 100% | $ 18,000.00 | $30,000.00 | $0.00 | $ - |
| 2.10 | Coffer Dams (Sheet Piling) | LF | 225 | 225 | $ 56.00 | $ 12,600.00 | $ 64.00 | $ 14,400.00 | $ 27,000.00 | 100% | $ 12,600.00 | 100% | $ 14,400.00 | $ 27,000.00 | 100% | $ 12,600.00 | 100% | $ 14,400.00 | $27,000.00 | $0.00 | $ - |
| 2.11 | Topsoil Replace (6") | CY | 1,969 | 1,969 | | $ - | $ 3.00 | $ 5,907.00 | $ 5,907.00 | | $ - | 100% | $ 5,907.00 | $ 5,907.00 | | $ - | 100% | $ 5,907.00 | $5,907.00 | $0.00 | $ - |
| | **N-2 Diversion No. 1, Access Road No. 1, Facility Pad** | | | | | $ - | | $ - | $ - | | | | | | | | | | | | |
| 3.1 | Topsoil Strip (6") | CY | 5,500 | 5,500 | | $ - | $ 2.00 | $ 11,000.00 | $ 11,000.00 | | $ - | 100% | $ 11,000.00 | $ 11,000.00 | | $ - | 100% | $ 11,000.00 | $11,000.00 | $0.00 | $ - |
| 3.2 | Excavation | CY | 18,600 | 18,600 | | $ - | $ 2.00 | $ 37,200.00 | $ 37,200.00 | | $ - | 100% | $ 37,200.00 | $ 37,200.00 | | $ - | 100% | $ 37,200.00 | $37,200.00 | $0.00 | $ - |
| 3.3 | Embankment | CY | 11,200 | 11,200 | | $ - | $ 1.00 | $ 11,200.00 | $ 11,200.00 | | $ - | 100% | $ 11,200.00 | $ 11,200.00 | | $ - | 100% | $ 11,200.00 | $11,200.00 | $0.00 | $ - |
| 3.4 | Topsoil Replace (6") | CY | 4,409 | 4,409 | | $ - | $ 3.00 | $ 13,227.00 | $ 13,227.00 | | $ - | 100% | $ 13,227.00 | $ 13,227.00 | | $ - | 100% | $ 13,227.00 | $13,227.00 | $0.00 | $ - |
| 3.5 | Crushed Rock Surface (4") | SY | 5,800 | 5,800 | $ 5.30 | $ 30,740.00 | $ 2.70 | $ 15,660.00 | $ 46,400.00 | 100% | $ 30,740.00 | 100% | $ 15,660.00 | $ 46,400.00 | 100% | $ 30,740.00 | 100% | $ 15,660.00 | $46,400.00 | $0.00 | $ - |
| | **N-2 Diversion No. 2, Access Road No. 2** | | | | | $ - | | $ - | $ - | | | | | | | | | | | | |
| 4.1 | Topsoil Strip (6") | CY | 8,400 | 8,400 | | $ - | $ 2.00 | $ 16,800.00 | $ 16,800.00 | | $ - | 100% | $ 16,800.00 | $ 16,800.00 | | $ - | 100% | $ 16,800.00 | $16,800.00 | $0.00 | $ - |
| 4.2 | Excavation | CY | 24,700 | 24,700 | | $ - | $ 2.00 | $ 49,400.00 | $ 49,400.00 | | $ - | 100% | $ 49,400.00 | $ 49,400.00 | | $ - | 100% | $ 49,400.00 | $49,400.00 | $0.00 | $ - |
| 4.3 | Embankment | CY | 34,100 | 34,100 | | $ - | $ 1.00 | $ 34,100.00 | $ 34,100.00 | | $ - | 100% | $ 34,100.00 | $ 34,100.00 | | $ - | 100% | $ 34,100.00 | $34,100.00 | $0.00 | $ - |
| 4.4 | Topsoil Replace (6") | CY | 7,156 | 7,156 | | $ - | $ 3.00 | $ 21,468.00 | $ 21,468.00 | | $ - | 100% | $ 21,468.00 | $ 21,468.00 | | $ - | 100% | $ 21,468.00 | $21,468.00 | $0.00 | $ - |
| 4.6 | Crushed Rock Surface (4") | SY | 7,400 | 7,400 | $ 5.30 | $ 39,220.00 | $ 2.70 | $ 19,980.00 | $ 59,200.00 | 100% | $ 39,220.00 | 100% | $ 19,980.00 | $ 59,200.00 | 100% | $ 39,220.00 | 100% | $ 19,980.00 | $59,200.00 | $0.00 | $ - |

**Subtotal: N-2 Pond Items $ $929,540.89** $ -

**CHANGE ORDER #4**

| Item | Description | Unit | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2.2 | Remove Key Trench Excavation | CY | 1,422 | 1,422 | | $0.00 | -$5.00 | -$7,111.11 | -$7,111.11 | | $ - | 100% | $ (7,111.11) | $ (7,111.11) | | $ - | 100% | $ (7,111.11) | -$7,111.11 | $0.00 | $ - |
| 2.3 | Remove Key Trench Backfill | CY | 1,422 | 1,422 | | $0.00 | -$8.00 | -$11,377.78 | -$11,377.78 | | $ - | 100% | $ (11,377.78) | $ (11,377.78) | | $ - | 100% | $ (11,377.78) | -$11,377.78 | $0.00 | $ - |
| 2.2 | Replace Key Trench Excavation | CY | 5,886 | 5,886 | | $0.00 | $3.50 | $20,601.00 | $20,601.00 | | $ - | 100% | $ 20,601.00 | $ 20,601.00 | | $ - | 100% | $ 20,601.00 | $20,601.00 | $0.00 | $ - |
| 2.3 | Replace Key Trench Backfill | CY | 5,886 | 5,886 | | $0.00 | $6.00 | $35,196.00 | $35,316.00 | | $ - | 100% | $ 35,316.00 | $ 35,316.00 | | $ - | 100% | $ 35,316.00 | $35,316.00 | $0.00 | $ - |
| 2.10 | Remove Sheet Piling/Coffer Dams | LF | 225 | 225 | -$56.00 | -$12,600.00 | -$64.00 | -$14,400.00 | -$27,000.00 | 100% | $(12,600.00) | 100% | $ (14,400.00) | $ (27,000.00) | 100% | $(12,600.00) | 100% | $ (14,400.00) | -$27,000.00 | $0.00 | $ - |

**Revised Total $939,969.00**

$939,969.00

Invoice total $ -
10 % retention $ -
Net due $ -

SCHEDULE OF VALUES - IV-4 Sedimentation Pond

| No. | Item | Unit | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.1 | Additional Consolidation | LS | | | | | | | | | |
| 1.2 | BMSCP (BMPPP) Initial installation - Approx 3,050 ft | LS | | | | | | | | | |
| 1.3 | BMSCP (BMPPP) audit, remove & replace maintenance | LF | | | | | | | | | |
| 1.4 | Clearing | AC | | | | | | | | | |
| 2 | IV-4 Sedimentation Pond | | | | | | | | | | |
| 2.1 | Topsoil Strip (ft³) | CY | | | | | | | | | |
| 2.2 | Key Trench Excavation | CY | | | | | | | | | |
| 2.3 | Key Trench Backfill | CY | | | | | | | | | |
| 2.4 | Embankment | CY | | | | | | | | | |
| 2.5 | Dewatering | LS | | | | | | | | | |
| 2.6 | Pond Liner | LS | | | | | | | | | |
| 2.7 | Pond Subbase, Underdrain, Vent, Catwalk | LS | | | | | | | | | |
| 2.8 | Trench Ripstrip (ft²) | CY | | | | | | | | | |
| 3 | IV-4 Diversion No. 1, Access Road No. 1 | | | | | | | | | | |
| 3.1 | Topsoil Strip (ft²) | CY | | | | | | | | | |
| 3.2 | Excavation | CY | | | | | | | | | |
| 3.3 | Embankment | CY | | | | | | | | | |
| 3.4 | Topsoil Replace (ft²) | CY | | | | | | | | | |
| 3.5 | Crushed Rock Surface (ft²) | SY | | | | | | | | | |
| 3.6 | Drainage Structure (= OP SURCHARGE) | LF | | | | | | | | | |
| 4 | IV-4 Diversion No. 2, Access Road No. 2, Facility Pad | | | | | | | | | | |
| 4.1 | Topsoil Strip (ft²) | CY | | | | | | | | | |
| 4.2 | Excavation | CY | | | | | | | | | |
| 4.3 | Embankment | CY | | | | | | | | | |
| 4.4 | Topsoil Replace (ft²) | CY | | | | | | | | | |
| 4.5 | Crushed Rock Surface (ft²) | SY | | | | | | | | | |
| 4.6 | Drainage Structure (DMF SURCHARGE) | LF | | | | | | | | | |
| | CHANGE ORDER #4 | | | | | | | | | | |
| 2.2 | Remove Key Trench Excavation | CY | | | | | | | | | |
| 2.2 | Replace Key Trench Excavation | CY | | | | | | | | | |
| 2.3 | Replace Key Trench Backfill | CY | | | | | | | | | |
| 2.3 | Replace Key Trench Backfill | CY | | | | | | | | | |
| | CHANGE ORDER #6 | | | | | | | | | | |
| 2.2 | Remove School Installation Cost | LF | | | | | | | | | |

Revised Total   $1,289,858.33

## SCHEDULE OF VALUES - P-1 Sedimentation Pond

| | | | | | | | | | | Premium | | | | Current | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**P-1 Sedimentation Pond**

**P-1 Diversion No. 1, Access Road No. 1, Facility Pad**

**P-1 Diversion No. 2, Access Road No. 2**

**P-1 Diversion No. 3**

**CHANGE ORDER #4**
2.9 Remove Coffer Dam/Divert Ring

Subtotal: P-1 Pond Items $ $914,735.87

Invoice total $ 34,032.00
10% retention $ 3,470.00
Net due $ 31,275.00

Total $ 10,250.00

## SCHEDULE OF VALUES - P-2 Sedimentation Pond

| Item | Description | Unit | Owner's Estimated Quantity | Contractor's Estimated Quantity | Material Unit Cost | Material Sub-Total | Labor Unit Cost | Labor Sub-Total | TOTAL | Prev Mat % | Prev Labor % | Prev Labor | Prev Total | Cur Mat % | Cur Material | Cur Labor % | Cur Labor | Total | Net Invoice |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.1 | Mobilization/Demobilization | LS | 1 | 1 | | | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | | 100% | $ 50,000.00 | $ 50,000.00 | | | 100% | $ 50,000.00 | $ 50,000.00 | $ - |
| 1.2 | SBECP (BMPRP) initial installation + Approx | LS | 1 | 1 | | | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | | 100% | $ 10,000.00 | $ 10,000.00 | | | 100% | $ 10,000.00 | $ 10,000.00 | $ - |
| 1.3 | SBECP (BMPRP) maint, remove & replace | LF | 0 | 0 | | | $ 1.00 | $ - | $ - | | | $ - | $ - | | | | $ - | $ - | $ - |
| 1.4 | SBECP (BMPRP) maint, remove & replace | AC | 10 | 10 | | | $ 1,350.00 | $ 13,500.00 | $ 13,500.00 | | 100% | $ 13,500.00 | $ 13,500.00 | | | 100% | $ 13,500.00 | $ 13,500.00 | $ - |
| | **P-2 Sedimentation Pond** | | | | | | | | | | | | | | | | | | |
| 2.1 | Topsoil Strip (6") | CY | 5,400 | 5,400 | | | $ 2.10 | $ 10,800.00 | $ 10,800.00 | | 100% | $ 10,800.00 | $ 10,800.00 | | | 100% | $ 10,800.00 | $ 10,800.00 | $ - |
| 2.2 | Key Trench Excavation | CY | 1,185 | 1,185 | | | $ 5.50 | $ 6,435.63 | $ 6,435.63 | | 100% | $ 5,205.93 | $ 5,205.93 | | | 100% | $ 6,435.93 | $ 6,435.93 | $ - |
| 2.3 | Key Trench Backfill | CY | 1,185 | 1,185 | | | $ 8.00 | $ 9,481.48 | $ 9,481.48 | | 100% | $ 9,481.48 | $ 9,481.48 | | | 100% | $ 9,481.48 | $ 9,481.48 | $ - |
| 2.4 | Excavation | CY | 163,500 | 163,500 | | | $ 2.00 | $ 327,000.00 | $ 327,000.00 | | 80% | $ 281,600.00 | $ 281,600.00 | | | 80% | $ 281,600.00 | $ 291,600.00 | $ 95,400.00 |
| 2.5 | Embankment | CY | 2,100 | 2,100 | | | $ 1.00 | $ 2,100.00 | $ 2,100.00 | | 100% | $ 2,100.00 | $ 2,100.00 | | | 100% | $ 2,100.00 | $ 2,100.00 | $ - |
| 2.6 | Dewatering | LS | 1 | 1 | | | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | | 100% | $ 10,000.00 | $ 10,000.00 | | | 100% | $ 10,000.00 | $ 10,000.00 | $ - |
| 2.7 | Pond Liner | LS | 1 | 1 | $ 8,000.00 | $ 8,000.00 | $ 12,000.00 | $ 12,000.00 | $ 20,000.00 | 100% | 100% | $ 12,000.00 | $ 20,000.00 | 100% | $ 8,000.00 | 100% | $ 12,000.00 | $ 20,000.00 | $ - |
| 2.8 | Pond Spillway, Underdrain, Valves, Culverts | LS | 1 | 1 | $ 14,000.00 | $ 14,000.00 | $ 18,000.00 | $ 18,000.00 | $ 36,000.00 | 85% | 85% | $ 12,900.00 | $ 30,600.00 | 100% | $ 14,000.00 | 100% | $ 18,000.00 | $ 36,000.00 | $ 4,500.00 |
| 2.9 | Seeding | LS | 1 | 1 | | | $ 4,450.00 | $ 4,450.00 | $ 4,450.00 | | | $ - | $ - | | | 100% | $ 4,450.00 | $ 4,450.00 | $ 4,450.00 |
| 2.10 | Coffer Dam (Sheet Piling) | LF | 80 | 80 | $ 58.00 | $ 4,450.00 | $ 64.00 | $ 5,120.00 | $ 8,950.00 | 100% | 100% | $ 5,120.00 | $ 9,850.01 | 100% | $ 4,450.00 | 100% | $ 5,120.00 | $ 8,950.00 | $ - |
| 2.11 | Topsoil Replace (6") | CY | 1,875 | 1,875 | | | $ 3.00 | $ 5,028.00 | $ 5,028.00 | | | $ - | $ - | | | 100% | $ 5,025.03 | $ 5,028.00 | $ 5,025.00 |
| | **P-2 Access Road No.1 & Facility Pad** | | | | | | | | | | | | | | | | | | |
| 3.1 | Topsoil Strip (6") | CY | 1,400 | 1,400 | | | $ 2.00 | $ 2,800.00 | $ 2,800.00 | | 100% | $ 2,800.00 | $ 2,800.00 | | | 100% | $ 2,800.00 | $ 2,800.00 | $ - |
| 3.2 | Excavation | CY | 9,100 | 9,100 | | | $ 2.00 | $ 18,200.00 | $ 18,200.00 | | 100% | $ 18,200.00 | $ 18,200.00 | | | 100% | $ 18,200.00 | $ 18,200.00 | $ - |
| 3.3 | Embankment | CY | 500 | 500 | | | $ 1.00 | $ 500.00 | $ 500.00 | | 100% | $ 500.00 | $ 500.00 | | | 100% | $ 500.00 | $ 500.00 | $ - |
| 3.4 | Clearing | CY | | | | | | | | | | | | | | | | | |
| 3.5 | Topsoil Replace (6") | CY | | | | | | | | | | | | | | | | | |
| | **P-2 Access Road No. 2** | | | | | | | | | | | | | | | | | | |
| 4.1 | Topsoil Strip (6") | CY | 250 | 250 | | | $ 2.00 | $ 500.00 | $ 500.00 | | 100% | $ 500.00 | $ 500.00 | | 50% | | 50% | $ 500.00 | $ 500.00 | $ - |
| 4.2 | Excavation | CY | 0 | 0 | | | $ 2.00 | $ - | $ - | | | $ - | $ - | | | | $ - | $ - | $ - |
| 4.3 | Embankment | CY | 2,200 | 2,200 | | | $ 1.00 | $ 2,200.00 | $ 2,200.00 | | 100% | $ 2,200.00 | $ 2,200.00 | | | 100% | $ 2,200.00 | $ 2,200.00 | $ - |
| 4.4 | Topsoil Replace (6") | CY | 250 | 250 | | | $ 3.00 | $ 750.00 | $ 750.00 | | | $ - | $ - | | | 100% | $ 750.00 | $ 750.00 | $ 750.00 |
| | **P-2 Terrace No. 1** | | | | | | | | | | | | | | | | | | |
| 5.1 | Topsoil Strip (6") | CY | 300 | 300 | | | $ 2.00 | $ 600.00 | $ 600.00 | | 100% | $ 600.00 | $ 600.00 | | | 100% | $ 600.00 | $ 600.00 | $ - |
| 5.2 | Excavation | CY | 0 | 0 | | | $ 2.00 | $ - | $ - | | | $ - | $ - | | | | $ - | $ - | $ - |
| 5.3 | Topsoil Replace (6") | CY | 660 | 660 | | | $ 3.00 | $ 1,980.00 | $ 1,980.00 | | 100% | $ 1,980.00 | $ 1,980.00 | | | 100% | $ 1,980.00 | $ 1,980.00 | $ - |
| | **P-2 Terrace No. 2** | | | | | | | | | | | | | | | | | | |
| 6.1 | Topsoil Strip (6") | CY | 300 | 300 | | | $ 2.00 | $ 600.00 | $ 600.00 | | 100% | $ 600.00 | $ 600.00 | | | 100% | $ 600.00 | $ 600.00 | $ - |
| 6.2 | Excavation | CY | 1,050 | 1,050 | | | $ 1.00 | $ 1,050.00 | $ 1,050.00 | | 50% | $ 525.00 | $ 525.00 | | | 100% | $ 1,050.00 | $ 1,050.00 | $ 525.00 |
| 6.3 | Topsoil Replace (6") | CY | 250 | 250 | | | $ 3.00 | $ 750.00 | $ 750.00 | | | $ - | $ - | | | 100% | $ 750.00 | $ 750.00 | $ 750.00 |

### CHANGE ORDER #8

| Item | Description | Unit | Owner's Qty | Contractor's Qty | Material Unit | Material Sub | Labor Unit | Labor Sub | TOTAL | | | | | | | | | | Net Invoice |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2.7 | Additional Key Trench Excavation | CY | 1,124 | 1,124 | | | $ 6.00 | $ 6,620.00 | $ 6,620.00 | | 100% | $ 6,620.00 | $ 6,620.00 | | | 100% | $ 6,620.00 | $ 6,620.00 | $0.00 |
| 2.8 | Additional Key Trench Embankment | CY | 1,124 | 1,124 | | | $ 8.00 | $ 8,992.05 | $ 8,992.05 | | 100% | $ 8,992.00 | $ 8,992.00 | | | 100% | $ 8,992.00 | $ 8,992.00 | $0.00 |
| 2.10 | Remove Coffer Dam/Sheet Piling | LF | 80 | 80 | $ 650.00 | $ 44,400.00 | $ 804.00 | $ 43,120.00 | $ 88,520.00 | 100% | 100% | $ 43,120.00 | $ 88,520.00 | 100% | $ 44,400.00 | 100% | $ 43,120.00 | $ 88,520.00 | $0.00 |

Subtotal: P-2 Pond Items $ 672,384.07

Invoice total    $ 22,287.00
10% retention     $ 2,228.96

Net due     $ 20,054.76

Exhibit D

**EXHIBIT D**

# APPLICATION AND CERTIFICATE FOR PAYMENT AIA DOCUMENT G702 (Instructions on reverse side)

PAGE 1 OF 1 PAGES

TO OWNER: LUMINANT

PROJECT: LUMINANT - LIBERTY SOUTH

FROM CONTRACTOR: RANGER EXCAVATING, L.P.
5222 THUNDERCREEK, B-1
AUSTIN, TEXAS 78759

VENDOR #0029987550

VIA ARCHITECT:

JOB NUMBER: 130130
APPLICATION NO: 12 RETAINAGE
PERIOD TO: 03/31/2014

ARCHITECT'S
PROJECT NO: CONTRACT #G07080562C

CONTRACT DATE:

Distribution to:
[X] OWNER
[ ] ARCHITECT
[ ] CONTRACTOR

CONTRACTOR:

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.
Continuation Sheet, AIA Document G703, is attached.

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Changes approved in previous months by Owner | 60,805.75 | -1,434,235.49 |
| Approved this Month | | |

| Number | Date Approved | | |
|---|---|---|---|
| | | | |

| TOTALS | 0.00 | -1,373,429.74 |
|---|---|---|

NET CHANGES by Change Order          -1,373,429.74

1. ORIGINAL CONTRACT SUM . . . . . . . . . . . . . . . $ 9,588,947.81
2. Net change by Change Orders . . . . . . . . . . . . . $ -1,373,429.74
3. CONTRACT SUM TO DATE (Line 1 +/- 2) . . . . . . $ 8,215,518.1
4. TOTAL COMPLETED & STORED TO DATE . . . . . . $ 8,215,518.1
   (Column G on G703)
5. RETAINAGE:
   a. _____ 0.000____ % of Completed Work        $       0.00
      (Columns D + E on G703)
   b. _____ 0.000____ % of Stored Material        $       0.00
      (Columns F on G703)
   Total Retainage (Line 5a + 5b or
   Total in Column I of G703) . . . . . . . . . . . . . . $           0.0
6. TOTAL EARNED LESS RETAINAGE . . . . . . . . . $ 8,215,518.1
   (Line 4 less Line 5 Total)
7. LESS PREVIOUS CERTIFICATES FOR PAYMENT $ 7,393,966.2
   (Line 6 from prior Certificate)
8. CURRENT PAYMENT DUE . . . . . . . . . . . . . . $ 821,551.8
9. BALANCE TO FINISH, INCLUDING RETAINAGE $ 0.0
   (Line 3 less Line 6)

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR: RANGER EXCAVATING, L.P.
of McKenzie Interests, Inc.

By: _____ Date: 3/31/14
Robbie Hoksar, Vice President - Operations

State of: TX                        County of:  TRAVIS
Subscribed and sworn to before me this ___ 31 ___

Notary Public: _____   My commission expires:

## ARCHITECT'S CERTIFICATE FOR PAYMENT

AMOUNT CERTIFIED . . . . . . . . . . . . . . . . . $
(Attach explanation if amount certified differs from the amount applied for.)

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

ARCHITECT:

By: _____ Date: _____

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment without prejudice to any rights of the Owner or Contractor under this Contract.

**SCHEDULE OF VALUES - N-3 Sedimentation Pond**

| Item | Description | Unit | | | | |
|---|---|---|---|---|---|---|
| 1.1 | Modification/Demolition | LS | | | | |
| 1.2 | SECCP (SWPPP) inlet installation - Augers 7.00 ft | LS | | | | |
| 1.3 | SECCP (SWPPP) devic, centers & replace maintenance | LF | | | | |
| 1.4 | Clearing | AC | | | | |
| | **N-3 Sedimentation Pond** | | | | | |
| 2.1 | Topsoil Strip (8") | CY | | | | |
| 2.2 | Key Trench Excavation | CY | | | | |
| 2.3 | Key Trench Backfill | CY | | | | |
| 2.4 | Excavation | CY | | | | |
| 2.5 | Embankment | CY | | | | |
| 2.6 | Dewatering | LS | | | | |
| 2.7 | Pond Inlet | LS | | | | |
| 2.8 | Pond Spillway, Underdrain, Valves, Catwalk | LS | | | | |
| 2.9 | Concrete | LF | | | | |
| 2.10 | Topsoil Replace (8") | CY | | | | |
| | **N-3 Diversion No. 1** | | | | | |
| 3.1 | Topsoil Strip (8") | CY | | | | |
| 3.2 | Excavation | CY | | | | |
| 3.3 | Embankment | CY | | | | |
| 3.4 | Topsoil Replace (8") | CY | | | | |
| 3.5 | Rip-Rap (3 locations) | TN | | | | |
| | **N-3 Diversion No. 2** | | | | | |
| 4.1 | Topsoil Strip (8") | CY | | | | |
| 4.2 | Excavation | CY | | | | |
| 4.3 | Embankment | CY | | | | |
| 4.4 | Topsoil Replace (8") | CY | | | | |
| | **N-3 Access Road No. 1** | | | | | |
| 5.1 | Topsoil Strip (8") | CY | | | | |
| 5.2 | Excavation | CY | | | | |
| 5.3 | Embankment | CY | | | | |
| 5.4 | Topsoil Replace (8") | CY | | | | |
| 5.5 | Crushed Rock Surface (4") | SY | | | | |
| | **N-3 Access Road No. 2 & Facility Pad** | | | | | |
| 6.1 | Topsoil Strip (8") | CY | | | | |
| 6.2 | Excavation | CY | | | | |
| 6.3 | Embankment | CY | | | | |
| 6.4 | Topsoil Replace (8") | SY | | | | |
| 6.5 | Crushed Rock Surface (4") | LF | | | | |
| 6.6 | Drainage Structure 48" CCP/NAACC | LF | | | | |
| | **Subtotal: N-3 Pond Items $** | | | | | |
| | **CHANGE ORDER #1** | | | | | |
| 1.1 | ICO4001 - Demolition | LS | | | | |
| | **CHANGE ORDER #4** | | | | | |
| 1.1 | Remove N-3 Key Trench Excavation | CY | | | | |
| 1.1 | Remove N-3 Key Trench Embankment | CY | | | | |
| | **CHANGE ORDER #6** | | | | | |
| 1.1 | Remove Rip Strip | TN | | | | |
| | **CHANGE ORDER #9** | | | | | |
| 1.1 | ICO4001 - Demolition | LS | | | | |

**Revised Total    $784,018.67**

N-3

LIBERTY-S - SOV - March 2014 - w Matt Separate - Final

4/16/2014

## SCHEDULE OF VALUES - Liberty Walkway



The page contains a rotated landscape spreadsheet titled "SCHEDULE OF VALUES – Liberty Walkway" with sections including "Liberty Walkway", "Contract Amendment #1", "CHANGE ORDER #2", "CHANGE ORDER #7", and "CHANGE ORDER #8". The table is too faint and low-resolution to transcribe reliably.

Subtotal: Walkway Items $ 1,335,400.00

Revised Total $454,280.60

UB307-6: 62V: March 2011 — in Mid Selavers - Final

SCHEDULE OF VALUES - Liberty Haul Road

Revised Total  $3,420,677.47

CHANGE ORDER #3

CHANGE ORDER #9

EXCEPTION FOR BRIDGE STA. 40+48 TO 42+90

## SCHEDULE OF VALUES - N-2 Sedimentation Pond

| Item | Description | Unit | Qty | | | |
|---|---|---|---|---|---|---|
| 1.1 | Mobilization/Demobilization | LS | | | | |
| 1.2 | SWPPP (SWPPP) Initial Installation – Approx 8,400 ft | LS | | | | |
| 1.3 | SWPPP (SWPPP) dust, erosion & active maintenance | LF | | | | |
| 1.4 | | AC | | | | |
| | **N-2 Sedimentation Pond** | | | | | |
| 2.1 | Topsoil Strip (6") | CY | 8,500 | | | |
| 2.2 | Key Trench Excavation | CY | 1,422 | | | |
| 2.3 | Key Trench Backfill | CY | 1,422 | | | |
| 2.4 | Excavation | CY | 202,800 | | | |
| 2.5 | Embankment | CY | 4,000 | | | |
| 2.6 | Dewatering | LS | | | | |
| 2.7 | Pond Use | LS | | | | |
| 2.8 | Pond Outflow, Underdrain, Vent, Cleanth | LS | | | | |
| 2.9 | Curve Inlet (Steel Rng) | LF | 105 | | | |
| 2.10 | Topsoil Replace (6") | CY | 1,998 | | | |
| 2.11 | | | | | | |
| | **N-2/Diversion No. 1, Access Road No. 1 Facility Pad** | | | | | |
| 3.1 | Topsoil Strip (6") | CY | 5,500 | | | |
| 3.2 | Excavation | CY | 18,800 | | | |
| 3.3 | Embankment | CY | 11,200 | | | |
| 3.4 | Topsoil Replace (6") | CY | 4,400 | | | |
| 3.5 | Crushed Rock Surface (4") | SY | 5,600 | | | |
| | **N-2/Diversion No. 2, Access Road No. 2** | | | | | |
| 4.1 | Topsoil Strip (6") | CY | 6,400 | | | |
| 4.2 | Excavation | CY | 24,700 | | | |
| 4.3 | Embankment | CY | 34,100 | | | |
| 4.4 | Topsoil Replace (6") | CY | 7,100 | | | |
| 4.5 | Crushed Rock Surface (4") | SY | 7,400 | | | |

**Subtotal: N-2 Road Items $  $939,640.89**

**CHANGE ORDER #4**

| 2.2 | Remove Key Trench Excavation | CY | 1,422 | | | |
| 2.3 | Remove Key Trench Backfill | CY | 1,422 | | | |
| 2.4 | Remove Excavation | CY | 9,988 | | | |
| 2.5 | Remove Embankment | CY | 1,400 | | | |
| 2.10 | Remove Topsoil Chng/Core Items | CY | 225 | | | |

**Revised Total $939,869.60**

**Revised Total $939,869.60**

## SCHEDULE OF VALUES - N-4 Sedimentation Pond

Subtotal: N-4 Pond Items $    $1,262,570.74

**Revised Total   $1,299,658.33**

SCHEDULE OF VALUES - P-1 Sedimentation Pond

| | | | | | | | | | Previous | | | | | | Current | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Item | Material/Commodity/Description | Unit | Qty | | | | Total | Net Invoice | Material % comp | Material | Labor % comp | Labor | Total | Material % comp | Material | % comp | Labor | Material | Labor | Total | Net Invoice |

Subtotal: P-1 Pond Items $  $804,485.57

Invoice Total  $  $10,920.00
10 % retention  $
Net due  $

SCHEDULE OF VALUES - P-2 Sedimentation Pond

| | Unit | Owners Estimated Quantity | Contractor's Estimated Quantity | MATERIAL UNIT COST | LABOR UNIT COST | SUBTOTAL | Previous Material %comp | Previous Material | Previous Labor %comp | Previous Labor | Previous Total | Current Material %comp | Current Material | Current Labor %comp | Current Labor | Current Total | Net Invoice |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.1 | Mobilization/Demobilization | LS | | 1 | | $ 50,000.00 | $ 50,000.00 | | $ - | 100% | $ 50,000.00 | $ 50,000.00 | | $ - | 100% | $ 50,000.00 | $ 50,000.00 | $ - |
| 1.2 | SSECP (SWPPP) Initial Installation - Approx | LS | | 1 | | $ 10,000.00 | $ 10,000.00 | | $ - | 100% | $ 10,000.00 | $ 10,000.00 | | $ - | 100% | $ 10,000.00 | $ 10,000.00 | $ - |
| 1.3 | SSECP (SWPPP) dewit, remove & replace | LF | 0 | 0 | | $ 1.90 | $ - | | $ - | | $ - | $ - | | $ - | | $ - | $ - | $ - |
| 1.4 | Clearing | AC | 10 | 10 | | $ 1,350.00 | $ 13,500.00 | | $ - | 100% | $ 13,500.00 | $ 13,500.00 | | $ - | 100% | $ 13,500.00 | $ 13,500.00 | $ - |

P-2 Sedimentation Pond

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2.1 | Topsoil Strip (6") | CY | 5,400 | 5,400 | | $ 2.00 | $ 10,800.00 | | $ - | 100% | $ 10,800.00 | $ 10,800.00 | | $ - | 100% | $ 10,800.00 | $ 10,800.00 | $ - |
| 2.2 | Key Trench Excavation | CY | 1,185 | 1,185 | | $ 5.00 | $ 5,925.83 | | $ - | 100% | $ 5,925.83 | $ 5,925.83 | | $ - | 100% | $ 5,925.83 | $ 5,925.83 | $ - |
| 2.3 | Key Trench Backfill | CY | 1,185 | 1,185 | | $ 8.00 | $ 9,481.48 | | $ - | 100% | $ 9,481.48 | $ 9,481.48 | | $ - | 100% | $ 9,481.48 | $ 9,481.48 | $ - |
| 2.4 | Embankment | CY | 163,500 | 163,500 | | $ 2.00 | $ 327,000.00 | 80% | $ 261,600.00 | 100% | $ 327,000.00 | $ 261,600.00 | 20% | $ 65,400.00 | 100% | $ 327,000.00 | $ 327,000.00 | $ 65,400.00 |
| 2.6 | Dewatering | CY | 2,100 | 2,100 | | $ 1.00 | $ 2,100.00 | | $ - | 100% | $ 2,100.00 | $ 2,100.00 | | $ - | 100% | $ 2,100.00 | $ 2,100.00 | $ - |
| 2.6 | Embankment | CY | | | $ 8,960.00 | $ 10,500.00 | $ 19,500.00 | 100% | $ 8,960.00 | 100% | $ 10,500.00 | $ 19,500.00 | | $ - | | $ - | $ - | $ - |
| 2.7 | Pond | LS | | 1 | $ 8,960.00 | $ 12,000.00 | $ 20,960.00 | 100% | $ 8,960.00 | 100% | $ 12,000.00 | $ 20,960.00 | | $ - | | $ - | $ - | $ - |
| 2.8 | Pond Spillway, Underdrain, Valve, Catwalk | LS | 1 | 1 | $ 14,000.00 | $ 18,000.00 | $ 32,000.00 | 100% | $ 14,000.00 | 100% | $ 18,000.00 | $ 32,000.00 | | $ - | 100% | $ 16,000.00 | $ 30,000.00 | $ - |
| 2.9 | Berm | LF | 880 | 880 | | $ 5.00 | $ 4,400.00 | | $ - | 100% | $ 4,400.00 | $ 4,400.00 | | $ - | 100% | $ 4,400.00 | $ 4,400.00 | $ - |
| 2.10 | Coffer Dams (Sheet Piling) | LF | | | $ 4,480.00 | | $ 4,480.00 | 100% | $ 4,480.00 | | $ - | $ 4,480.00 | | $ - | 100% | $ 4,480.00 | $ 8,960.00 | $ - |
| 2.11 | Topsoil Replace (6") | CY | 1,875 | 1,875 | | $ 3.00 | $ 5,625.00 | | $ - | 100% | $ 5,625.00 | $ 5,625.00 | | $ - | 100% | $ 5,625.00 | $ 5,625.00 | $ - |

P-2 Access Road No.1 & Facility Pad

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.1 | Topsoil Strip (6") | CY | 1,400 | 1,400 | | $ 2.00 | $ 2,800.00 | | $ - | 100% | $ 2,800.00 | $ 2,800.00 | | $ - | 100% | $ 2,800.00 | $ 2,800.00 | $ - |
| 3.2 | Excavation | CY | 9,100 | 9,100 | | $ 2.00 | $ 18,200.00 | | $ - | 100% | $ 18,200.00 | $ 18,200.00 | | $ - | 100% | $ 18,200.00 | $ 18,200.00 | $ - |
| 3.3 | Embankment | CY | 800 | 800 | | $ 1.00 | $ 800.00 | | $ - | 100% | $ 800.00 | $ 800.00 | | $ - | 100% | $ 800.00 | $ 800.00 | $ - |
| 3.4 | Topsoil Replace (6") | CY | 1,451 | 1,451 | | $ 3.00 | $ 4,353.00 | | $ - | 100% | $ 4,353.00 | $ 4,353.00 | | $ - | 100% | $ 4,353.00 | $ 4,353.00 | $ - |
| 3.5 | Crushed Rock Surface (4") | SY | 1,998 | 1,998 | $ 8.30 | $ 2.70 | $ 15,999.97 | | $ - | | $ - | $ - | 100% | $ 16,379.97 | 100% | $ 5,287.50 | $ 15,999.97 | $ 15,999.97 |

P-2 Access Road No. 2

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4.1 | Topsoil Strip (6") | CY | 250 | 250 | | $ 2.00 | $ 500.00 | | $ - | 100% | $ 500.00 | $ 500.00 | | $ - | 100% | $ 500.00 | $ 500.00 | $ - |
| 4.2 | Excavation | CY | 0 | 0 | | $ 2.00 | $ - | | $ - | 50% | $ - | $ - | | $ - | 50% | $ - | $ - | $ - |
| 4.3 | Embankment | CY | 2,200 | 2,200 | | $ 1.00 | $ 2,200.00 | | $ - | 100% | $ 2,200.00 | $ 2,200.00 | | $ - | 100% | $ 2,200.00 | $ 2,200.00 | $ - |
| 4.4 | Topsoil Replace (6") | CY | 250 | 250 | | $ 3.00 | $ 750.00 | | $ - | 100% | $ 750.00 | $ 750.00 | | $ - | 100% | $ 750.00 | $ 750.00 | $ - |
| 4.5 | Crushed Rock Surface (4") | SY | 975 | 975 | $ 5.30 | $ 2.70 | $ 2,632.50 | | $ - | | $ - | $ - | 100% | $ 5,167.50 | 100% | $ 2,632.50 | $ 7,800.00 | $ 7,800.00 |

P-2 Terrace No. 1

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5.1 | Topsoil Strip (6") | CY | 300 | 300 | | $ 2.00 | $ 600.00 | | $ - | 100% | $ 600.00 | $ 600.00 | | $ - | 100% | $ 600.00 | $ 600.00 | $ - |
| 5.2 | Embankment | CY | 1,600 | 1,600 | | $ 1.00 | $ 1,600.00 | | $ - | 100% | $ 1,600.00 | $ 1,600.00 | | $ - | 100% | $ 1,600.00 | $ 1,600.00 | $ - |
| 5.3 | Topsoil Replace (6") | CY | 660 | 660 | | $ 3.00 | $ 1,980.00 | | $ - | 100% | $ 1,980.00 | $ 1,980.00 | | $ - | 100% | $ 1,980.00 | $ 1,980.00 | $ - |

P-2 Terrace No. 2

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6.1 | Topsoil Strip (6") | CY | 250 | 250 | | $ 2.00 | $ 500.00 | | $ - | 100% | $ 500.00 | $ 500.00 | | $ - | 100% | $ 500.00 | $ 500.00 | $ - |
| 6.2 | Embankment | CY | 1,050 | 1,050 | | $ 1.00 | $ 1,050.00 | | $ - | 100% | $ 1,050.00 | $ 1,050.00 | | $ - | 100% | $ 1,050.00 | $ 1,050.00 | $ - |
| 6.3 | Topsoil Replace (6") | CY | 250 | 250 | | $ 3.00 | $ 750.00 | | $ - | 100% | $ 750.00 | $ 750.00 | | $ - | 100% | $ 750.00 | $ 750.00 | $ - |

Subtotal: P-2 Pond Items $ 483,537.40

CHANGE ORDER #8

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2.2 | Additional Key Trench Excavation | CY | 1,124 | 1,124 | | $5.00 | $5,620.00 | | $ - | 100% | $5,620.00 | $5,620.00 | | $ - | 100% | $5,620.00 | $5,620.00 | $0.00 |
| 2.3 | Additional Key Trench Embankment | CY | 1,124 | 1,124 | | $8.00 | $8,992.00 | | $ - | 100% | $8,992.00 | $8,992.00 | | $ - | 100% | $8,992.00 | $8,992.00 | $0.00 |
| 2.10 | Remove Coffer Dam/Sheet Piling | LF | 80 | 80 | $56.00 | | $4,480.00 | 100% | $4,480.00 | | $ - | $4,480.00 | | $ - | | $ - | $0.00 | $0.00 |

CHANGE ORDER #9

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2.4 | Excavation | CY | -32,700 | -32,700 | | $2.00 | -$65,400.00 | | $ - | 1% | $ - | $0.00 | | $ - | 1% | $ - | -$65,400.00 | -$65,400.00 |
| 3.5 | Access Road #1 - Crushed Rock Surface | SY | 1,998 | 1,998 | $5.30 | | $10,379.17 | | $ - | 0% | $ - | $0.00 | | $ - | 0% | $ - | $10,379.17 | $10,379.17 |
| 4.50 | Access Road #2 - Crushed Rock Surface | SY | -975 | -975 | $5.30 | | -$5,167.50 | | $ - | 0% | $ - | $0.00 | | $ - | 0% | $ - | -$5,167.50 | -$5,167.50 |

Subtotal: P-2 Pond Items $ 483,537.40

Invoice total $
10 % retention $
Net due $

Exhibit E

#130130

3.4.13 will

C 0780562 C

MAR 04 2013

Excavating

3/4/13

CONTRACT FOR SERVICES

FOR

LIBERTY SOUTH CONSTRUCTION PROJECTS
LIBERTY MINE LOCATION

BY AND BETWEEN

RANGER EXCAVATING LP

AND

LUMINANT MINING COMPANY LLC

DATED MARCH 01, 2013

NO. C0780562C

EXHIBIT E

C 0780562 C

## EFFECTIVE DATE

March 01, 2013

## PARTIES

COMPANY

Luminant Mining Company LLC, a Texas Limited Liability Company

CONTRACTOR

Ranger Excavating LP, a Texas Limited Partnership

## PURPOSE

The purpose of this Agreement is to provide for the performance of the Work described in the Scope of Work provision below, for and in consideration of the mutual obligations set forth in this Agreement.

## DEFINITIONS

COMPANY Group

The term "COMPANY Group" means COMPANY, its parent corporation, Energy Future Holdings Corp., and all subsidiaries and affiliates of Energy Future Holdings Corp., and all officers, directors, shareholders, associates, related firms and entities, employees, servants and agents of both COMPANY and each such subsidiary or affiliate.

CONTRACTOR Group

The term "CONTRACTOR Group" means CONTRACTOR, all subcontractors of any tier employed by CONTRACTOR, and all affiliated or related firms and entities, officers, directors, partners, limited partners, shareholders, associates, employees, servants and agents of each.

Work

The term "Work" means all labor, materials, equipment, transportation, facilities or services necessary to perform the Scope of Work described in this Agreement.

Work Site

The term "Work Site" means location(s) where the Work will be performed.

Contract Coordinator

The term "Contract Coordinator" means a representative of each party named in this Agreement to act in matters relating to performance of this Agreement as it is written. Action of the Contract Coordinators regarding the day-to-day interaction between the operations of the parties, the issuance and approval of invoices, the issuance and approval of procedures, drawings, schedules and documents of any type, and other decisions made in managing this Agreement will not operate as a waiver or compromise of any provision of this Agreement.

Contract Administrator

The term "Contract Administrator" means a representative(s) of each party named in this Agreement to act in matters relating to the revision of contract language, the adjustment of compensation or time, and the resolution of issues regarding the meaning of contract language. Actions of COMPANY's Contract Administrator include initiating, negotiating and issuing supplements or amendments to this Agreement, as required; receiving required notices; providing answers to CONTRACTOR concerning questions of contract interpretation and negotiating resolutions/settlements to disputes that may arise concerning this Agreement.

## SCOPE OF WORK

C 0780562 C

CONTRACTOR will be responsible for the supply of any and all materials, equipment, supervision and labor required for the full and complete performance of the following Work:

Construction of the P-1 Sediment Pond, P-1 Access Road Nos. 1 & 2, P-1 Diversion Nos. 1, 2, & 3; P-2 Sediment Pond, P-2 Access Road Nos. 1 & 2, P-2 Terrace Nos. 1 & 2; N-2 Sediment Pond, N-2 Access Road Nos. 1 & 2, N-2 Diversion Nos. 1 & 2; N-3 Sediment Pond, N-3 Access Road Nos. 1 & 2, N-3 Diversion Nos. 1 & 2; N-4 Sediment Pond, N-4 Access Road Nos. 1 & 2, N-4 Diversion Nos. 1 & 2; Liberty Dragline Walkway, and Liberty Haul Road including water tank approach and foundation. The work will be performed per the specifications and drawings provided by COMPANY on compact disc titled "Liberty South CD" and discussed at the pre bid meeting. The attached specifications titled "Haul Road Construction Specifications", "Sediment Pond Specifications" and the final geotechnical report will apply to the Work.

COMPANY key dates will include the following:
   a. N3 – 1/21/13 to 6/30/13
   b. N2 – 5/15/13 to 9/30/13
   c. N4 – 1/21/13 to 12/31/13
   d. P1 – 1/21/13 to 9/30/13
   e. P2 – 1/21/13 to 12/31/13
   f. Walkway – 1/21/13 to 8/31/13
   g. Haul road – 1/21/13 to 8/31/13

In addition to the Scope, the following clarifications are incorporated into this document:

- N2/P1/P2 earthen dam will not be used or should not be assumed due to permit reasons. If the lake is over elevation 305, the sheet piling will be required. Lake elevation is currently approximately 301 and has been below this level for the past 2 years. Normal lake elevation is 306.

- Culverts 1 and 3 by the N3 Pond not part of this bid package. They will be in the FM Road 2658 Relocation bid package.

- Sheet 6 of 9, P1 Pond, profile view provides the correct information for length of culvert.

- Soils and concrete testing will be provided by COMPANY.

- Liberty Earthwork South SOV Rev 1.xls – Bid item 3.5 Rip Rap for N-3 Pond has had the quantity corrected.

- Drawing 57262LB CG024.pdf provides for an updated plan sheet to reflect proposed typical haul road section.

- HR CONST PLANS v2 (12-6-12).pdf provide for updated Liberty South haul road plans showing rip rap upstream and downstream of all culvert structures.

- Mining Limestone Spec – Type A Grade 3.doc provides Specifications for 9" crushed rock

- Mining Limestone Spec – Type A Grade 2.doc provides Specifications for 6" crushed rock for access road

- Burns & McDonnell reference drawings are the Johnson & Pace drawings for the Haul Road and N-1 Pond. The correct drawings for the Haul Road and N-1 are included in the Liberty South package.

- Safety end treatments are not required for this project.

- Durromax pipe is not required on Diversion No. 2 Sheet 5 of 7 for N-3 Pond.

- N-4 Pond, Culvert No. 2 (18"x64') will require Durromax pipe as indicated on SOV.

C 0780562 C

- All haul road culverts should receive rip rap as indicated in the revised haul road plans.

- Obtaining water from Martin Lake will require a permit from the TCEQ. CONTRACTOR will be responsible for any permits required to obtain water from Martin Lake.

## NON-EXCLUSIVE

COMPANY reserves the right to obtain the types of services provided by CONTRACTOR from other sources without obligation or liability to CONTRACTOR.

## TERM OF AGREEMENT

This Agreement will commence on its Effective Date and will terminate on December 31, 2013, unless terminated earlier pursuant to its other provisions. This Agreement may only be extended or modified by written agreement signed by both parties.

## SCHEDULE

CONTRACTOR will begin the Work on or about March 01, 2013 and complete it by December 31, 2013. The work will be performed per the attached construction schedule. The Work will be scheduled through the direction of COMPANY's Contract Coordinator.

Construction for N-2 Pond is revised. Construction for N-2 Pond will be limited to July 1 to Sept 30, 2013.

Structures #1, #2 and #3 on the walkway will have a limited timeframe for installation. COMPANY's Contract Coordinator will provide direction.

Dragline Walkway south of FM 1251 cannot be built until after approval of Rev #1.

P-1 Temporary Impoundment cannot be built until after approval of Rev #1.

Bridge abutments must be completed as soon as possible. The Work will be scheduled through the direction of COMPANY's Contract Coordinator.

## COMPENSATION

As full compensation for the satisfactory performance by CONTRACTOR of this Agreement, COMPANY will compensate CONTRACTOR in accordance with the rates or prices contained in the attached Compensation Schedule "Part A (P-1 Sediment Pond), Part B (P-2 Sediment Pond), Part C (N-2 Sediment Pond), Part D (N-3 Sediment Pond), Part E (N-4 Sediment Pond), Part F (Liberty Dragline Walkway and Part G (Liberty Haul Road). The firm fixed price of this agreement based on the values and quantities shown on the attached compensation schedule is $9,588,648.00

The attached scorecard titled "Liberty Construction KPI Scorecard" is a part of this Agreement. CONTRACTOR and COMPANY agree that the amount at risk (as an incentive or deduction) is as shown in the scorecard. If CONTRACTOR is issued any citations from MSHA (Mine Safety & Hazard Administration) that result in a citation also being issued to COMPANY, CONTRACTOR will be responsible for paying for those citations.

No fuel clause is required and changes in fuel prices will not be the basis of any claims for additional compensation.

All compensation paid to CONTRACTOR excludes applicable State Sales and Use Tax.

## EXTRA WORK

COMPANY may, at any time, request CONTRACTOR to perform Work outside the specific scope authorized by this Agreement ("Extra Work"). Extra Work, except in the case of an emergency, will be initiated using an Extra Work Order Form that specifies the Extra Work requested. The request for Extra Work will be made by COMPANY and issued to CONTRACTOR by COMPANY's Contract Administrator. Within seven (7) days of receipt of the request for Extra Work, CONTRACTOR will submit to COMPANY's Contract Administrator, in

C 0780562 C

writing, a proposal for accomplishing the Extra Work, including the cost, start and completion date. Extra Work will be authorized to be performed only upon the execution of the Extra Work Order Form by the CONTRACTOR, COMPANY'S Contract Coordinator, and COMPANY'S Contract Administer. Compensation for Extra Work will be in accordance with the Extra Work Rates contained in the Compensation Schedule(s) attached to this Agreement. COMPANY's Contract Coordinator may, by oral request, ask CONTRACTOR to perform Extra Work, in the event of an emergency which threatens either life or property. In that event, CONTRACTOR agrees to perform the requested Extra Work based upon the Extra Work Rates contained in the Compensation Schedule(s) attached to this Agreement. Emergency Extra Work will be confirmed in a written Extra Work Order as soon as practical.

Individual requests for Extra Work shall not exceed $ 25,000.00 without being reviewed and approved by the COMPANY's Contract Administrator.

Extra Work Orders will periodically be incorporated by written amendment to this Agreement.

**INVOICES AND PAYMENT**

CONTRACTOR will, at the end of each calendar month in which the Work is performed, and prior to the third (3rd) day of the following month, submit to COMPANY invoices based on Work completed during the prior month. Invoices will reference this Agreement by number and contain sufficient detail, as may be requested by COMPANY, to support all charges and reimbursements of expenses.

Payment will be made within sixty (60) days of receipt and approval of each invoice.  Should a discrepancy or conflict arise, the disputed portion of the invoice will not be paid until the parties resolve.

Ten percent (10%) of each payment to CONTRACTOR will be retained by COMPANY toward the discharge of any claims or liens until sixty (60) days after CONTRACTOR has completed all Work and the following requirements have been met, as determined by COMPANY, in its sole discretion:

A.  Final Acceptance of all Work by COMPANY and cleanup of the Work Site; and

B.  Receipt by COMPANY from CONTRACTOR of the Contractor's Release and Indemnity Agreement attached hereto stating that CONTRACTOR has paid all taxes and has satisfied all claims against it, including, but not limited to, claims for labor, materials, equipment, services and supplies provided in connection with the Work.

Invoices and supporting documentation should be sent to:

Emailed (with soft copies of invoices and supporting documentation):
    Steven.Nickman@luminant.com or Dean.Borchelt@luminant.com

OR

Mailed (with paper invoices and supporting documentation):
    Luminant Mining Company LLC
    P.O. Box 20
    Dallas, Texas 75221-0020

Company strongly encourages all suppliers to submit invoices via email rather than paper-based invoices. Invoices received via email can be more timely compared to paper invoices received by U.S. mail.

Invoices submitted to locations other than PO Box 20, Dallas, TX 75221-0020 or AP.Invoicing@Luminant.com can result in invoices being misplaced, delayed invoice processing, and late payments.

Please submit invoices to Company within 24 to 48 hours of shipment of goods and/or delivery of services to ensure transactions are recorded in the proper accounting period.

**SALES / USE TAX**

COMPANY will provide CONTRACTOR with a Texas Direct Pay Exemption Certificate which will negate the necessity of CONTRACTOR's obligation to collect Texas sales and use taxes from the COMPANY.   A Luminant Mining Company LLC Texas Direct Pay Exemption Certificate No. 1-75-2967821-5 is attached and

C 0780562 C

made a part of this Agreement.

All incorporated materials purchased by CONTRACTOR which becomes part of the permanent realty of COMPANY shall be purchased on the basis of resale by CONTRACTOR.

## WORK SITE

Luminant Mining Company LLC
Liberty Mine
12006 County Road 2144 East
Tatum, Texas 75691

## WORK SITE SAFETY, SECURITY, ALCOHOL, DRUGS AND WEAPONS

CONTRACTOR will obtain from COMPANY's Contract Coordinator prior to commencing Work the specific Work Site Safety, Security and other related rules and procedures, if any, applicable to the particular job or Work Site. Those specific rules and procedures are incorporated fully into this Agreement by this reference.

In addition to complying with those specific rules and procedures CONTRACTOR agrees to comply with the rules and procedures contained in the attachment to this Agreement titled "Work Site Safety, Security, Alcohol, Drugs and Weapons."

## BROWZ

As a condition of this Contract, Contractor agrees to register with Browz and provide those necessary documents requested by Browz to be deemed in compliance with the Browz application. As a minimum, requested documents will be related to safety and health (i.e., regulatory required training, certifications, safety plans, safe and secure workplace practices, etc.), OSHA and MSHA injury rates and Experience Modification Rate (EMR) and other important business data requested by Browz through the registration process. Contractor agrees to maintain the identified documentation for the life of the contract.

Registration and compliance shall be completed within thirty (30) days of the effective date of the Contract. Noncompliance with these requirements shall be grounds for withholding payment of outstanding invoices or termination of the Contract.

**THE REVIEW OF THE FOREGOING INFORMATION BY BROWZ OR BY COMPANY OR THE APPROVAL OF CONTRACTOR'S REGISTRATION WITH BROWZ ARE NOT APPROVALS OF CONTRACTOR'S DOCUMENTS, DATA, SAFETY AND HEALTH TRAINING, CERTIFICATIONS, SAFETY PLANS, SAFE OR SECURE WORKPLACE PRACTICES OR OTHER MATTERS SUBMITTED TO BROWZ OR COMPANY. REVIEW OF CONTRACTOR'S INFORMATION OR APPROVAL OF CONTRACTOR'S REGISTRATION SHALL NOT DIMINISH CONTRACTOR'S RESPONSIBILITIES OR OBLIGATIONS OR WAIVE COMPANY'S RIGHTS WITH RESPECT TO SUCH MATTERS UNDER THE AGREEMENT. CONTRACTOR AGREES THAT IT SHALL NOT ASSERT THAT THE REVIEW AND APPROVAL OF CONTRACTOR'S INFORMATION OR THE APPROVAL OF CONTRACTOR'S REGISTRATION ARE OR WERE AN APPROVAL OF SUCH MATTERS BY COMPANY OR BROWZ.**

## SUPPLIER DIVERSITY MULTI-TIER REQUIREMENTS

It is COMPANY's policy that certified Small and Diverse businesses have the maximum practicable opportunity to participate in the performance of agreements. Therefore, CONTRACTOR agrees to use its best efforts to carry out COMPANY's policy to the fullest extent consistent with the efficient performance of this Agreement. CONTRACTOR agrees to conduct an internal initiative, which will enable small and diverse businesses to be considered fairly as subcontractors and suppliers under this Agreement. CONTRACTOR further agrees to participate in COMPANY's Multi-Tier (M-Tier) Initiative as outlined on www.energyfutureholdings.com/about/business/mwbe/secondtier/. CONTRACTOR understands that a Supplier Diversity Utilization plan must be developed and submitted and performance against Plan may be included as a Key Performance Indicator (KPI) under this AGREEMENT.

CONTRACTOR shall submit to COMPANY reports of transactions with certified Small and Diverse businesses in such manner and at such time as COMPANY may prescribe. Such periodic reports shall state separately for Small, Minority and Women Business Enterprises, the work, which is attributable to COMPANY as well as

C 0780562 C

overall spend with Small and Diverse businesses.

## INSURANCE

CONTRACTOR will, at its sole expense, purchase and maintain, and require its subcontractors to purchase and maintain, during the term of this Agreement, insurance policies with substantial and sound insurers, having coverage of the types and in the amounts specified in the attachment to this Agreement titled "Contractor's Insurance Requirements" submitted by CONTRACTOR prior to the execution of this Agreement.

## TERMS AND CONDITIONS

The parties will comply with the terms and conditions of this Agreement and the attachment to this Agreement titled "Standard Terms and Conditions PLST03."

## NOTICES

All notices from one party to the other will be deemed to have been delivered if hand delivered or sent by United States certified mail, return receipt requested, postage prepaid, as follows:

If to CONTRACTOR:
Ranger Excavating LP
5222 Thunder Creek, Suite 81
Austin, Texas 78759
Attention: Will Lyons
(512) 331-5551

If to COMPANY:
Luminant Mining Company LLC
1601 Bryan St. – 21st Floor
Dallas, Texas  75201
Attention: Randy Randolph

COMPANY's Contract Coordinator is Clint Roberts or his designated representative, phone (903) 646-1090.

CONTRACTOR's Contract Coordinator is Will Lyons or his designated representative, phone (512) 331-5551.

COMPANY's Contract Administrator is Randy Randolph, phone (214) 875-8667.

CONTRACTOR's Contract Administrator is Will Lyons or his designated representative, phone (512) 331-5551.

## ATTACHMENTS

The following attachments are incorporated into this Agreement:

1.  Direct Payment Exemption Certificate
2.  Work Site Safety, Security, Alcohol, Drugs and Weapons
3.  Contractor's Insurance Requirements
4.  Standard Terms & Conditions PLST03
5.  Browz Registration Requirement to Advance Workplace Compliance
6.  Luminant Mining Company Contractor's Safety Requirements
7.  High Visibility Clothing
8.  Independent Contractor Register
9.  Safety and Training Requirements for Pickup and Delivery Services
10. Luminant Contractor Incident Reporting Form
11. Luminant Mining Safety Policy Chocking
12. Safety Whip Antennas for Light Vehicles
13. Metal-to-Metal Contact Procedures
14. Contractors Truck Inspection (Prior to entering Mine) – Airbrake Equipped Trucks
15. Contractors Truck Inspection (Prior to entering Mine) – Pickups/Non Airbrake Equipped Trucks
16. Contractor's Release and Indemnity Agreement

C 0780562 C

17. Logging Equipment FOPS/ROPS and Operator Protection Guidelines
18. Haul Road Construction Specifications
19. Dragline Walkway Specifications
20. Sediment Pond Specifications
21. Construction Schedule
22. Compensation Schedule – Parts A through G
23. Ranger Excavating, LP - Equipment Cost per Hour – January 2013
24. Liberty Construction KPI Scorecard
25. Extra Work / Change Order Form
26. Specifications and drawings provided by COMPANY on a compact disc titled "Liberty South CD" and discussed at the pre bid meeting - NOT ATTACHED but included in contract per this reference. Table of Contents attached.

## AMENDMENTS

Except as otherwise provided in this Agreement, no changes, modifications, amendments, or supplements or any other provisions will be valid unless agreed to in writing and signed by the parties.

## ENTIRETY OF AGREEMENT

This Agreement constitutes the full, complete, and entire understanding, agreement, and arrangement of and between the parties hereto with respect to the subject matter hereof and supersedes any and all prior oral and written understandings, agreements and arrangements between them. The Parties hereto have entered into this Agreement voluntarily and for valuable consideration, and not by reasons of any fraud, duress, undue influence or mistakes. Each of the Parties acknowledges that it/he has read this Agreement and that it/he fully knows, understands, and appreciates this Agreement and executes this Agreement voluntarily and of its/his own free will and by executing this Agreement signifies its/his assent to and willingness to be bound by its terms. **IN SIGNING THIS AGREEMENT, EACH PARTY ACKNOWLEDGES THAT IT IS RELYING SOLELY ON ITS OWN JUDGMENT. NO PARTY IS RELYING ON, ON OR BEING INDUCED TO EXECUTE THIS AGREEMENT BY ANY STATEMENTS, REPRESENTATIONS, AGREEMENTS OR PROMISES, ORAL OR WRITTEN, MADE BY ANY OTHER PARTY, THEIR AGENTS, EMPLOYEES, SERVANTS OR ATTORNEYS, OR ANYONE ELSE, OTHER THAN THE STATEMENTS EXPRESSLY WRITTEN IN THIS AGREEMENT. EXCEPT AS TO THE STATEMENTS EXPRESSLY WRITTEN IN THIS AGREEMENT, THE PARTIES SPECIFICALLY AND INTENTIONALLY WAIVE ANY CLAIMS FOR FRAUDULENT INDUCEMENT AGAINST ANY OTHER PARTY, INCLUDING ITS AGENTS, EMPLOYEES, SERVANTS, OR ASSIGNS, TO THIS AGREEMENT.**

The parties have signed this Contract acknowledging their agreement to its provisions as of the Effective Date.

*Ranger Excavation Contractor's Name*                     *Luminant Mining Company LLC*

By: _____                     By: _____
    Signature                                        Signature

Name: _____                   Name: Phil Seidler
      Mark McKenzie, President
      of McKenzie Interests, Inc.
Title: _____                  Title: Director, Supply Chain - Mining
       Excavating, L.P.

Date: 3·6·13                                     Date: March 01, 2013

Page 8

C 0780562 C

**ATTACHMENT 01**
**DIRECT PAYMENT EXEMPTION CERTIFICATE**

State of Texas
Direct Payment Exemption Certificate
Limited Sales, Excise, and Use Tax

Direct Payment Authorization Number:    1-75-2967821-5 Luminant Mining Company LLC

Luminant Mining Company LLC hereby claims exemption from the payment of state, city, county, SPD, MTA and/or CTD sales and/or use taxes upon its purchase of taxable items and/or services from:

CONTRACTOR:    Ranger Excavating LP
Address:    5222 Thunder Creek Road, Suite 81
City, State, Zip:    Austin, Texas 78759

Description of items and/or services purchased under Contract C0780562C:

> The supply of any and all materials, equipment, supervision and labor required for the full and complete performance of Liberty Mine Construction projects

This certificate will remain in effect until the expiration date of the above contract. This certificate does not cover:

A.   Rurchase of taxable items and/or services to be resold.
B.   Sales or rental to any purchaser other than the permit holder.
C.   Sales or rental of motor vehicles subject to the motor vehicle sales and use tax (Chapter 152) and interstate motor carrier sales and use tax (Chapter 157).
D.   Nontaxable services or materials/supplies used or consumed by a provider of a nontaxable service.
E.   Lump-sum new construction projects to improve real property.

CONTRACTOR agrees not to permit others (including its contractors and repairmen) to use this direct payment authorization to purchase material tax free.

COMPANY agrees to accrue and pay the tax to the Comptroller of Public Accounts as required by statute.

Permit holder:   Luminant Mining Company LLC

Authorized Signature / Date: *Randy Randolph* / February 15, 2013

C 0780562 C

## ATTACHMENT 02
## POLICES REGARDING WORK SITE SAFETY, SECURITY, ALCOHOL, DRUGS, AND WEAPONS

**A. SAFETY**

1. CONTRACTOR agrees that any safety related assistance or initiatives undertaken by COMPANY will not relieve CONTRACTOR from responsibility for the implementation of, and compliance with, safe working practices, as developed from their own experience, or as imposed by law or regulation, and will not in any way, affect the responsibilities resting with CONTRACTOR under the provisions of any agreement to which these policies are attached and to meet all safety requirements as specified by the Occupational Safety & Health Administration (OSHA), the Mine Safety Health Administration (MSHA), the Department of Transportation (DOT) and any other applicable state or federal safety and health laws or regulations.

2. In the event that a material safety data sheet (hereinafter "**MSDS**"), warning label, or other documentation concerning the use of hazardous chemicals at the Work Site or any other property owned or controlled by COMPANY or any of its affiliates (collectively, together with the Work Site, "**COMPANY Properties**"), applies to any materials or equipment provided by CONTRACTOR as an aspect of the Work, such documentation will be provided by CONTRACTOR to COMPANY prior to the commencement of any such Work.

3. CONTRACTOR will provide information to COMPANY regarding hazardous chemicals and/or consumable products that contain constituents listed in 40 CFR 372.65 used at any COMPANY Property. CONTRACTOR will report the amount of such material carried on and off the site, the amount actually used and the manner of use. CONTRACTOR will provide the maximum quantity of the material stored on site at any one time and if a waste material was collected, where it was disposed of (location name and address). CONTRACTOR will provide information on the amount of material used for the previous calendar year by the first of February.

4. CONTRACTOR will provide for the duration of the term of any agreement to which these policies are attached, at its sole expense, adequate first-aid facilities for members of CONTRACTOR Group.

5. CONTRACTOR acknowledges and agrees that all members of CONTRACTOR Group performing Work at any COMPANY Property are required to view COMPANY's "CONTRACTOR/Visitor Safety Orientation" video, when applicable, and to read and adhere to COMPANY's "CONTRACTOR/Visitor Safety Booklet" prior to performing any Work any COMPANY Property.

6. CONTRACTOR acknowledges and agrees that all members of the CONTRACTORS Group performing Work at the Work Site have received the required safety, health and environmental training in accordance with appropriate state and federal laws and regulations, and CONTRACTOR shall have documentation of training for each member of such CONTRACTOR Group available for review at the Work Site.

7. Prior to entering the Work Site, CONTRACTOR is required to prepare a CONTRACTOR's Safety Health Program in accordance with state and federal laws and regulations and shall have a hard copy of such program in CONTRACTOR's possession and available for review when performing Work at the Work Site.

8. CONTRACTOR acknowledges and agrees that, except as otherwise expressly authorized in writing by COMPANY's designated safety representative, appropriate protective equipment will be worn by any member of CONTRACTOR Group while on any COMPANY Property. In addition, when any member of CONTRACTOR Group is performing Work which may expose that person to potential hazards, CONTRACTOR acknowledges and agrees that such person will wear appropriate clothing specific to and adequate for that exposure.

9. CONTRACTOR will take all reasonable precautions to prevent any accident in connection with the performance of Work, including, but not limited to, putting up and maintaining sufficient barriers and lights.

10. CONTRACTOR will report to COMPANY all accidents involving personal injuries (including death) and damage to property occurring directly or indirectly as a result of the Work performed by CONTRACTOR hereunder immediately, but in no event, no later than 24 hours after the occurrence of any such accident. Any accident or incident occurring directly or indirectly as a result of the Work which CONTRACTOR must report to a regulatory agency (e.g. OSHA, MSHA, or TCEQ) must also be reported to COMPANY immediately following notification to the regulatory agency.

**B. SECURITY**

1. COMPANY may supply such site security as it deems necessary and may specify to CONTRACTOR such additional security precautions and procedures at any COMPANY Property as, in COMPANY's opinion, are reasonably necessary for the safety and security of COMPANY's personnel and property.

2. Security by COMPANY at COMPANY Properties, if any, will not provide personal policing of the materials, tools and equipment of CONTRACTOR Group. CONTRACTOR will assume sole responsibility for safeguarding such materials, tools and equipment.

C 0780562 C

3.  It will be the affirmative duty of CONTRACTOR to ensure that CONTRACTOR Group assists in carrying out all security measures, to include reporting all information or knowledge of matters adversely affecting security to COMPANY's designated security personnel

4.  COMPANY reserves the right to exclude any of CONTRACTOR's employees from any COMPANY Property by denial of access, suspension or revocation of access authorization, preemptory expulsion, or by any other means, without notice or cause. Former COMPANY employees, and any of CONTRACTOR's employees who previously have been excluded from any COMPANY Property, may be brought onto COMPANY property or facilities only if prior approval from COMPANY is obtained

5.  COMPANY measures may also include investigations, whether by COMPANY or law enforcement officials. CONTRACTOR agrees to cooperate in such investigations and understands that COMPANY reserves the right to require anyone in CONTRACTOR Group to authorize appropriate agencies to release his or her criminal records to CONTRACTOR as a condition of either initial or continued permission for access to any COMPANY Property. Investigations may include searches of CONTRACTOR Group. Such searches may include searches of facilities assigned to CONTRACTOR Group, search of all COMPANY Property areas and property at such COMPANY Property areas, searches of including, but not limited to, offices, lockers, desks, lunch boxes, packages and motor vehicles (regardless of ownership). Without limiting the foregoing, CONTRACTOR acknowledges and agrees that all members of CONTRACTOR Group, to the extent that COMPANY reasonably determines that such members require security badge access prior to entering onto any COMPANY Property, shall be required to comply with COMPANY's standard security badge requirements, including without limitation a background check to be performed by COMPANY.

6.  CONTRACTOR agrees to instruct its employees in the details of COMPANY's work site security policies and measures, both as specified herein and as hereinafter provided by COMPANY to CONTRACTOR.

## C.  ALCOHOLIC BEVERAGES, DRUGS AND WEAPONS

CONTRACTOR will inform all members of CONTRACTOR Group, who may be involved in the performance of any Work, of the following COMPANY rules, relating to alcoholic beverages, drugs and weapons, with which all employees are expected to comply:

1.  Bringing, attempting to bring, possessing, using or being under the influence of intoxicants, drugs, or narcotics while on any COMPANY Property, including, but not limited to parking areas, is prohibited. Possessing alcoholic beverages in sealed containers is permitted, however, in designated parking areas owned or controlled by Oncor Electric Delivery Company LLC, Luminant Generation Company LLC, Oak Grove Management Company LLC, Generation Development Company LLC, Sandow Power Company LLC and EFH Corporate Services Company, but not parking areas owned or controlled by Luminant Mining Company LLC, Luminant Big Brown Mining Company LLC and Oak Grove Mining Company LLC.

2.  Drugs prescribed by a licensed physician, for an individual working on any COMPANY Property, which could affect the employee's job performance, or nonprescription drugs which could affect the employee's job performance, are allowed on any COMPANY Property only if they have been previously cleared by the employee's supervisor. Any employee taking such medication must inform his or her supervisor of the medication and dosage being taken.

3.  Bringing, attempting to bring, possessing or using firearms, whether classified as legal or illegal, while on any COMPANY Property, including but not limited to buildings, parking areas, recreation facilities, equipment and vehicles, is prohibited. Use or possession of firearms for specific situations is permitted if approved by function or higher level management of COMPANY.

4.  Off the job involvement with intoxicants, drugs, or narcotics, which adversely affects COMPANY's business, to include impairing the employee's ability to perform his job, or the public trust in the safe operation of COMPANY is prohibited.

5.  Any conduct on any COMPANY Property which is in violation of any state or federal law or regulation is considered a violation of these rules and a breach of any agreement to which these policies are attached.

6.  CONTRACTOR is responsible for the compliance of CONTRACTOR Group with the above specified rules.

7.  In order to enforce these rules, all individuals with access to any COMPANY Property as well as the vehicles, offices, lockers and any personal belongings of such individuals on any COMPANY Property are subject to search by COMPANY and its agents, to include security representatives appointed or employed by COMPANY. Individuals may be required to take a blood, urinalysis or Breathalyzer test, or submit to other recognized investigatory tests or procedures as are deemed appropriate or necessary by COMPANY in the investigation of a violation of these rules.

8.  The refusal, on the part of any of CONTRACTOR Group, to submit immediately to a search of his or her person and/or property, or to be tested, whether by blood test, urinalysis, Breathalyzer or other recognized investigatory test or procedure, after being requested to do so, will be considered a violation of COMPANY rules.

9.  Violations of these rules may be cause for denial of access to any COMPANY Property.

C 0780562 C

**ATTACHMENT 03**
**CONTRACTORS INSURANCE REQUIREMENTS**

CONTRACTOR will, at its own expense, maintain in force throughout the period of this document or agreement, or as otherwise specified, and until released by COMPANY the following minimum insurance coverage, with insurers acceptable to COMPANY.

1) <u>Workers' Compensation and Employers' Liability Insurance</u>, providing statutory benefits in accordance with the laws and regulations of the State of Texas or state of jurisdiction as applicable. The minimum limits for the employers' liability insurance will be five hundred thousand dollars ($500,000) bodily injury each accident, five hundred thousand dollars ($500,000) each employee bodily injury by disease, five hundred thousand dollars ($500,000) policy limit bodily injury by disease

2) <u>Commercial General Liability Insurance</u>, including bodily injury and property damage, personal and advertising injury, contractual liability, and including products and completed operations coverage continuing for three (3) years after Final Acceptance, or completion of the Work, whichever is later, with minimum limits of one million dollars ($1,000,000) per occurrence for bodily injury, including death and property damage.

3) <u>Automobile Liability Insurance</u> for coverage of owned, non-owned and hired autos, trailers or semi-trailers with a minimum combined single limit of one million dollars ($1,000,000) per accident for bodily injury, including death, and property damage.

4) <u>Excess Liability Insurance</u> over and above the employers' liability, commercial general liability and automobile liability insurance coverage, with a minimum limit of two million dollars ($2,000,000) per occurrence. Coverage must replace exhausted aggregate limits under the coverage referenced in #1 (employers' liability), and #2 above. Coverage must continue for three (3) years after Final Acceptance, or completion of the Work, whichever is later.

ADDITIONAL PROVISIONS:

A) The required limits of insurance can be satisfied by any combination of primary and excess coverage.
B) The commercial general liability insurance, automobile liability insurance and excess liability insurance policies will contain provisions that specify that the policies are primary as respects to COMPANY and will apply without consideration for other policies separately carried By COMPANY. The policies shall also include standard severability provisions that state each insured is provided coverage as though a separate policy had been issued to each, except with respects to limits of insurance, and that only one deductible (if applicable) will apply per occurrence regardless of the number of insured involved in the occurrence. CONTRACTOR will be responsible for any deductibles or retentions.
C) The commercial general liability insurance, automobile liability insurance and excess liability insurance policies, if written on a claims-made basis, will be maintained in full force and effect for three (3) years after Final Acceptance or completion of the Work, whichever is later.
D) All policies must be issued by carriers having an *A.M. Best's* rating of "A-" or better, and an *A.M. Best's* financial size category of "VIII" or better, or *Standard & Poor Insurance Solvency Review* of "A-" or better. If requested in writing by COMPANY, CONTRACTOR will make available to COMPANY a certified copy of any or all insurance policies or endorsements required of CONTRACTOR.
E) Prior to commencement of Work, CONTRACTOR will provide to COMPANY certificates of insurance evidencing the coverage required herein. COMPANY's review of certificates or policies will not be construed as accepting any deficiencies in CONTRACTOR's insurance or relieve CONTRACTOR of any obligations set forth herein. In addition, CONTRACTOR will require each of its subcontractors to provide adequate insurance. Any deficiencies in the insurance to be provided by subcontractors will be the responsibility of CONTRACTOR.
F) **Certificates of insurance must show Energy Future Holdings Corp. and its direct and indirect subsidiaries as the certificate holder, and as an additional insured (including completed operations) as respects all of the required coverage except workers' compensation. Workers' compensation shall include Energy Future Holdings Corp. and its direct and indirect subsidiaries as an alternate employer. All of the required coverage must provide a waiver of subrogation in favor of the certificate holder.**
G) CONTRACTOR agrees to report to the manager of the claims department of the COMPANY in writing as soon as practical all instances of damage to the Work and all accidents or occurrences which may result in injuries to any person, including death, and any property damage, arising out of the performance of the Work.
H) If the insurance obligations or coverage required in this Agreement exceed the maximum limits permitted by law or are determined to be invalid, illegal, unenforceable, or in conflict with the law of any court of competent jurisdiction, then this Agreement will be deemed amended so as to conform with the applicable law, including, if the coverage exceeds legal limits, to only require CONTRACTOR to provide insurance to the maximum extent allowed by law. The validity, legality, and enforceability of the remaining obligations and terms of coverage required in this Agreement shall not be affected or impaired, and will remain in full force and effect.
I) The requirements contained herein as to the types and limits of all insurance to be maintained by CONTRACTOR are not intended to and will not, in any manner, limit or qualify the liabilities and obligations assumed by CONTRACTOR under this Agreement.

C 0780562 C

## ATTACHMENT 4
## STANDARD TERMS & CONDITIONS-PLST03

### INDEPENDENT CONTRACTOR RELATIONSHIP

CONTRACTOR will act as and be deemed to be an independent contractor.  Neither CONTRACTOR nor any of its employees will act as, nor be deemed to be, an agent or employee of COMPANY.  CONTRACTOR will have the sole right to control and directly supervise the method, manner and details of the Work.

### MATERIALS, EQUIPMENT AND LABOR

CONTRACTOR will provide and furnish all material, labor, services, supervision, tools, apparatus, conveyances, equipment and incidental expenses required to complete the Work, except for those specifically mentioned in this Agreement to be provided by COMPANY.  All materials and equipment incorporated into any Work under this Agreement will be new and of the most suitable grade unless otherwise specified.

CONTRACTOR will be solely responsible for the proper storage, transportation and disposal of any product or waste, other than sandblasting waste, used or generated in connection with the Work in accordance with all applicable Environmental Laws. CONTRACTOR will dispose of all waste materials, other than sandblasting waste, at an off-site disposal facility approved for such waste materials pursuant to applicable Environmental Laws and will complete and sign all waste manifests as the generator of such waste.  COMPANY will be responsible for the storage, transportation and disposal of any sandblasting waste generated during the performance of the Work.

### ASSIGNMENT

CONTRACTOR will not assign, transfer or otherwise dispose of any of its obligations or duties without the prior written approval of COMPANY.  Any assignment or transfer made without the express written approval of COMPANY will be null and void.

### SUBCONTRACTING

CONTRACTOR will not subcontract for any of the Work without the prior approval of COMPANY and CONTRACTOR will not be relieved of any duty or liability relating to any Work by reason of subcontracting.  There will be no contractual relationship between COMPANY and any subcontractor by virtue of this Agreement.

### BINDING ON SUCCESSORS AND ASSIGNS

This Agreement will inure to the benefit of and be binding upon the undersigned parties and entities, and their respective legal representatives, successors and approved assigns.

### STANDARDS AND CODES

Whenever reference is made in this Agreement to standards or codes in accordance with which Work is to be performed or tested, the edition or revision of the standards of codes current on the Effective Date will apply, unless otherwise expressly stated.  In case of conflict between any referenced standards and codes and any documents attached to and incorporated into this Agreement, the Agreement documents will govern.

### CONDITIONS AFFECTING WORK

CONTRACTOR will investigate and acquaint itself with the conditions affecting the Work, including but not limited to those related to the transportation, disposal, handling and storage of materials and waste; availability of labor, water, electric power and roads; the uncertainties of weather, river stages or similar physical conditions at the site; the conformation and condition of the ground; and the character of equipment and facilities needed preliminary to and during prosecution of the Work. CONTRACTOR has satisfied itself as to the character, quality and quantity of surface and subsurface materials or obstacles to be encountered.  CONTRACTOR's failure to acquaint itself with any conditions affecting the Work or any available related information will not relieve it from responsibility for properly estimating the difficulty or cost of successfully performing the Work.

COMPANY is not responsible for any conclusions or interpretations made by CONTRACTOR from the information made available by COMPANY, other than information contained in or referenced in this Agreement. CONTRACTOR will draw its own conclusions from its review of any and all data and information provided by COMPANY.

CONTRACTOR assumes full responsibility for investigating conditions and determining the existence and magnitude of any hazards to the physical well-being of property of CONTRACTOR, the employees, agents, and servants of CONTRACTOR, or any other person or entity who is or may become involved in the performance of Work, and any and all other persons in the vicinity of the Work.  CONTRACTOR will advise all of the above-specified persons or entities of any hazards relating to Work, and will ensure that those persons or entities are advised of and fully understand the nature of the hazards and safety precautions that can be taken to eliminate or minimize dangers relating to the hazards.

C 0780562 C

CONTRACTOR will use its best efforts to ensure that the Work is performed so as to minimize any adverse impact upon natural resources and the environment and will use best industry practices in this regard at all times.

CONTRACTOR will immediately notify COMPANY as soon as CONTRACTOR has reason to believe that CONTRACTOR, or any employee or other person performing the Work, is not or may not be performing the Work in compliance with applicable Environmental Laws. CONTRACTOR will provide COMPANY with written notice to COMPANY of such actual or potential non-compliance within three (3) days following the discovery thereof. CONTRACTOR will take immediate steps to ensure compliance with all applicable Environmental Laws and will, if directed by COMPANY, cease all Work until authorized by COMPANY to resume the Work.

## CHANGES IN WORK

COMPANY may by written notice, make changes in, additions to, or deletions from the Work. If any change significantly increases the time required to perform the Work, an equitable adjustment will be made in the schedule for the performance and completion of the Work. If the Work is being performed on a fixed price basis, and if any change significantly increases or decreases the cost to CONTRACTOR of performing the Work, then an equitable adjustment will be made in the price. The compensation rates for the Work will not be changed.

In order to receive an equitable adjustment in price or schedule, CONTRACTOR must provide a written request for that adjustment within five (5) working days after receiving COMPANY's notice of a change in the Work. CONTRACTOR will continue to perform the changed Work prior to or pending Agreement on an equitable adjustment and will not halt or delay performance of the Work because of any failure to reach an Agreement on an adjustment.

## ENVIRONMENTAL

In the event that CONTRACTOR discovers during the performance of the Work any substance at the Work Site that is not the subject of the Work or has not otherwise been identified by COMPANY for CONTRACTOR, which substance CONTRACTOR has reason to believe is or may be a Hazardous Substance that (i) has been or may be released or spilled into the soil, surface water, or groundwater or in a building or structure, or (ii) consists of asbestos-containing materials, lead-based paint, batteries, thermostats, lighting equipment, or equipment containing polychlorinated biphenyls, CONTRACTOR will immediately stop Work and notify COMPANY of the discovery. CONTRACTOR will not resume the Work until receiving authorization from COMPANY to do so.

The term "Hazardous Substance" means any product, waste, emission or substance defined, listed or designated as a hazardous or toxic substance, hazardous waste, hazardous material or pollutant by or pursuant to any Environmental Law and includes, but is not limited to, any petroleum-based product, substance or waste, including any additives associated therewith, pesticides, fertilizers, solvents, polychlorinated biphenyls, mercury, lead, lead-based paint, asbestos-containing material or explosives.

CONTRACTOR will immediately notify COMPANY in the event of a spill or release of any material which CONTRACTOR knows or has reason to believe is a Hazardous Substance, whether onto the ground, into any body of water, a storm or sanitary sewer, or the air, or anywhere on property owned or controlled by COMPANY, including within any building or structure. CONTRACTOR will be solely responsible, as may be required by applicable Environmental Laws, for, in consultation with COMPANY, (i) notifying the appropriate governmental agencies of such spill or release caused or permitted by the acts or omissions of CONTRACTOR and (ii) for the cleanup and remediation of such spill or release.

## FORCE MAJEURE

If either party becomes unable, either wholly or in part, by an event of Force Majeure, to fulfill its obligations under this Agreement, the obligations affected by the event of Force Majeure will be suspended only during the continuance of that inability. The party so affected will give written notice of the existence, extent and nature of the Force Majeure to the other party within forty-eight (48) hours after the occurrence of the event. The party so affected will remedy its inability as soon as possible. Failure to give notice will result in the continuance of the affected party's obligation regardless of the extent of any existing Force Majeure.

The term "Force Majeure" as used in this Agreement means acts of God (except as excluded herein), strikes, lockouts, or other industrial disturbances, acts of public enemies, wars, blockades, insurrections, riots, epidemics, earthquakes, fires, priority allocations of pipe or other materials or orders, restraints or prohibitions by any court, board, department, commission or agency of the United States or of any States, any arrests and restraints, civil disturbances, explosions and inability despite reasonable diligence to obtain materials essential to the Work. Rain, snow, ice or other adverse weather conditions will not be considered events of Force Majeure.

## SUSPENSION FOR CAUSE

In addition to the other remedies provided COMPANY in this Agreement, COMPANY has the right to order the temporary suspension of any Work when it determines, in its sole discretion, that performance of the Work is not being conducted in a safe manner, the specified quality of the Work is not being met, or the Work is not otherwise being performed in accordance with the requirements of this Agreement.

Case 14-10979-CSS    Doc 7898-1    Filed 02/19/16    Page 50 of 58

C 0780562 C

If any unsatisfactory condition of a portion of any Work performed hereunder is brought to CONTRACTOR's attention, and is corrected by CONTRACTOR to COMPANY's complete satisfaction, COMPANY will authorize resumption of the Work. Should CONTRACTOR fail to promptly correct the unsatisfactory condition to COMPANY's complete satisfaction, CONTRACTOR will be considered in breach of this Agreement.

If circumstances are brought to COMPANY's attention that indicate CONTRACTOR's delay in performance of the Work, or any other fact giving COMPANY reasonable apprehension of CONTRACTOR's ability to perform the Work, COMPANY may, at its discretion, withhold payment which may be due CONTRACTOR until such time as CONTRACTOR demonstrates its willingness and ability to complete the Work in strict accordance with this Agreement.

If any suspension of Work significantly increases the time required for the performance of the Work, an equitable adjustment may, in COMPANY's sole discretion, be made in the performance obligations. In no event, however, will any suspension be the basis for any claim or cause of action by CONTRACTOR or CONTRACTOR's employees, agents, or subcontractors against COMPANY.

**TERMINATION**

COMPANY may terminate this Agreement, in whole or in part, at any time, at its sole discretion, by providing written notice of termination to CONTRACTOR. The notice of termination will specify the effective date of any termination, and the Work or any part of the Work to be terminated, or alternatively, that this Agreement is terminated in its entirety.

CONTRACTOR will discontinue Work in accordance with COMPANY's termination instructions. Upon receiving notice of termination, CONTRACTOR will place no further orders, or enter into further subcontracts for services, materials or equipment related to the terminated Work. In addition, CONTRACTOR will delay or terminate all existing orders and subcontracts, insofar as those orders and subcontracts relate to the performance of the Work terminated.

In the event this Agreement or the Work is terminated, COMPANY's only liability will be to pay CONTRACTOR the unpaid balance due CONTRACTOR for Work actually performed.

There will be deducted from any unpaid balance due CONTRACTOR the amounts of all claims of COMPANY against CONTRACTOR, including, but not limited to, claims on account of defect in materials and workmanship.

**TERMINATION FOR DEFAULT**

If a petition in bankruptcy should be filed by CONTRACTOR, or if CONTRACTOR should make a general assignment for the benefit of creditors, or if a receiver should be appointed due to the insolvency of CONTRACTOR, or if CONTRACTOR should refuse or fail to supply enough properly skilled workmen or proper equipment, materials or services or should fail to make prompt payment to subcontractors, or to pay promptly for materials or labor, or disregard laws, ordinances or the instruction of COMPANY's Contract Coordinator, or if CONTRACTOR should refuse or fail to abide by the Agreement Construction Schedule or otherwise violate any provisions of the Agreement, then COMPANY, upon a determination by COMPANY's Contract Coordinator that sufficient cause exists to justify such action, may, without prejudice to any other right or remedy available to it after giving CONTRACTOR seven (7) days' written notice, terminate the Agreement and take possession of the Work Site. In the event of such a termination, COMPANY may use all or part of CONTRACTOR's equipment and materials and may finish the Work by whatever method COMPANY may deem expedient. In such event, CONTRACTOR will not be entitled to receive any further payment hereunder until the Work is finished. If the unpaid balance of the Agreement Price will exceed the expense of finishing the Work, including compensation of COMPANY's Contract Coordinator, other COMPANY personnel, third party engineering companies, or other contractors for additional services, such excess will be paid to CONTRACTOR. If the expense of finishing the Work will exceed such unpaid balance, CONTRACTOR will pay the difference to COMPANY within fifteen (15) days of receiving an invoice for same. The expenses incurred by COMPANY herein, and the damage incurred through CONTRACTOR's default, will be determined by COMPANY's Contract Coordinator, in its sole discretion, and such determination will be binding as between the parties.

In the event of a termination under the provisions of this Article, CONTRACTOR will transfer and assign to COMPANY, in accordance with COMPANY's instructions, all Work, all construction records, reports, permits, data and information, other materials (including all COMPANY-supplied materials), supplies, Work in progress and other goods for which CONTRACTOR is entitled to receive reimbursement hereunder, and any and all plans, drawings, sketches, specifications, and information in connection with the Work, and will take such action as may be necessary to secure COMPANY, at COMPANY's sole election, the rights of CONTRACTOR under any or all orders and subcontracts made in connection with the Work.

In the event that COMPANY so directs or authorizes, CONTRACTOR will sell at a price approved by COMPANY, or retain at a mutually agreeable price, any such materials, supplies, Work in progress, or other goods as referred to in the preceding paragraph. In any event, COMPANY will receive any and all records, plans, drawings, data, permits, specifications, sketches, reports, or other information relating to the Work. The proceeds of any such sale or the agreed price will be paid or credited to COMPANY in such manner as COMPANY may direct so as to reduce the amount payable by COMPANY under this Article.

**INSPECTORS**

Page 15

C 0780562 C

A thorough inspection of all Work performed, including, but not limited to Work being performed at location(s) of subcontracted Work, and all materials furnished may be made by inspectors designated by COMPANY's Contract Coordinator to determine if the Work is being performed in strict compliance with this Agreement. Neither COMPANY's Contract Coordinator nor COMPANY's inspectors have any power or authority to waive any of the provisions of this Agreement or any obligations of CONTRACTOR under this Agreement.

## FINAL INSPECTION AND ACCEPTANCE

CONTRACTOR will notify COMPANY in writing when it considers all Work complete and ready for final acceptance. COMPANY, with CONTRACTOR's cooperation, may conduct such inspections and tests to satisfy itself that the Work conforms to all of the requirements of this Agreement. If the Work is acceptable, COMPANY will within a reasonable time, notify CONTRACTOR in writing of its Final Acceptance of the Work and authorize CONTRACTOR to issue its final invoice.

If all or part of the Work is not complete or is unacceptable, COMPANY will notify CONTRACTOR of the incomplete or unacceptable Work, and CONTRACTOR will, at its sole expense, complete or correct the Work so that the Work conforms to all of the requirements of this Agreement.

## WARRANTY

CONTRACTOR agrees and warrants that its employees, agents and subcontractors will perform the Work in a good and workmanlike manner, in accordance with high professional standards, with a level of care, skill, knowledge and judgment required or reasonably expected of firms or persons performing comparable services, and in strict accordance with this Agreement, including but not limited to, all specifications made a part of this Agreement. Further, CONTRACTOR warrants that all Work will be free from defects in design, materials and workmanship for a period of twelve (12) months from the date of Final Acceptance by COMPANY of all Work, except where specific Work items have been specified to have a longer warranty.

Upon oral or written notice from COMPANY that any of the Work performed by CONTRACTOR fails to conform to any of the above-specified warranties, CONTRACTOR will, at no additional cost to COMPANY, properly remedy the failure and reperform any Work necessary so that the Work conforms to those warranties. CONTRACTOR further warrants any and all corrected or reperformed Work to be free from defects in design, materials and workmanship for a period of twelve (12) months following acceptance by COMPANY of the corrected or reperformed Work. Nothing herein will limit the rights and remedies that may be available to COMPANY at law or in equity.

## BACKCHARGE

If COMPANY discovers defective or nonconforming Work, it may, after notifying CONTRACTOR to correct the defective or nonconforming Work and upon CONTRACTOR's refusal or failure to proceed with corrective action in a reasonable time, perform the redesign, repair, rework or replacement of the defective or nonconforming Work by the most expeditious means available and backcharge CONTRACTOR for all costs incurred.

COMPANY may either separately invoice, or deduct from any payments due CONTRACTOR, the costs for any backcharge. The performance of backcharge work by COMPANY or COMPANY's representative will not relieve CONTRACTOR of any of its responsibilities under this Agreement.

## RECORDS AND RIGHTS TO AUDIT

CONTRACTOR will keep accurate and complete books of accounts, records, documents and other evidence related to the charges for and performance of any Work, including CONTRACTOR's compliance with Environmental Laws related to the Work ("Records"), and of any change or modification to the charges. COMPANY or COMPANY's Contract Coordinator may inspect those records at any time during normal business hours.

All Records required for an audit and inspection will be made available at the offices of CONTRACTOR, at all reasonable times, for inspection, audit or reproduction, until three (3) years from date of final payment for any Work. COMPANY will bear the expenses incurred by it in supporting any such inspection or audit; provided, however, that should any audit or investigation produce evidence that CONTRACTOR has knowingly overstated charges or units of measure upon which charges are based, or provided gifts, gratuities or other benefits to employees of COMPANY in violation of the Business Ethics provisions of this Agreement, CONTRACTOR will be liable to COMPANY for actual damages, including cost of audit and investigation.

## BUSINESS ETHICS

CONTRACTOR represents and warrants that neither it nor any person or entity associated in any manner with CONTRACTOR will:

1) Provide or offer any compensation or benefit of any type, including any gift or gratuity, other than advertising mementos of nominal value or reasonable business meals and business entertainment, to any COMPANY employee;

2) To the best of CONTRACTOR's knowledge, maintain or establish any undisclosed business affiliation that could constitute or give the appearance of a conflict with the interests of COMPANY; or

C 0780562 C

3) Except to the extent expressly provided for in this Agreement, attempt to act on behalf of or, in any manner, seek to represent COMPANY.

If, during the term of this Agreement, CONTRACTOR knows or becomes aware of any facts or circumstances contrary to the representations and the warranties above, CONTRACTOR will immediately notify COMPANY and provide sufficient information for COMPANY to take appropriate protective or corrective actions. CONTRACTOR further agrees to cooperate fully in any investigation undertaken by COMPANY.

CONTRACTOR, if requested by COMPANY, agrees to require its employees to execute an ethics/nondisclosure agreement at any time.

**CONTRACTOR'S RESPONSIBILITY FOR WORK**

CONTRACTOR will care for and maintain both the partially completed and finished Work until final acceptance by COMPANY. Acceptance of portions of the Work made for the purpose of determining partial payments will not constitute Final Acceptance of any portion of the Work.

**WORK SITE PERMITS AND LICENSES**

Subject to the following two paragraphs, CONTRACTOR will obtain, prior to the commencement of the Work, and provide to COMPANY upon request, all permits, licenses and governmental authorizations, at its sole expense, required for the performance of the Work. CONTRACTOR will be solely responsible for maintaining compliance with such permits, licenses and governmental authorizations.

In the event that a storm water discharge permit is required for the performance of the Work, (i) CONTRACTOR will be responsible for filing a Notice of Intent with respect to the Work, in addition to any Notice of Intent that COMPANY may be required to file, and (ii) CONTRACTOR will coordinate with COMPANY in the preparation and execution of a Storm Water Pollution Prevention Plan for the Work Site.

In the event that the performance of the Work involves the handling or abatement of asbestos-containing materials, CONTRACTOR will coordinate with COMPANY in the preparation and filing of all required notification forms.

**ACCESS**

Should CONTRACTOR desire access to the Work Site over any land not controlled by COMPANY, it will, at its sole expense, obtain all proper permits or written permission necessary for that access.

**HAULING AND OPERATING PERMITS**

CONTRACTOR will obtain all hauling and other operating permits and licenses required for the performance of the Work and will pay all related charges and fees. CONTRACTOR will also give all notices (other than COMPANY's Notice of Intent) necessary and incidental to the lawful performance of the Work.

**COMPANY FACILITIES**

CONTRACTOR will not use COMPANY's sanitary facilities, changehouses, shops, parks, storage buildings, tools, equipment or other facilities unless so directed by COMPANY. CONTRACTOR will not discharge, without COMPANY's prior written authorization, any product or waste used or generated in connection with the Work through any (i) COMPANY-permitted outfall, (ii) COMPANY-owned or operated pollution control equipment, or (iii) storm or sanitary sewer located at or in the vicinity of the Work Site. Any request for authorization to discharge will include, at a minimum, either a copy of the Material Safety Data Sheet for the product or a written description of the waste, including a list of the constituents of the waste and the relative concentrations thereof.

**COLLATERAL WORK**

COMPANY and other contractors may be working at the Work Site. COMPANY reserves the right to coordinate the performance of CONTRACTOR's Work with the work of others. CONTRACTOR will cooperate with and will not delay, impede or otherwise impair the work of others. COMPANY does not guarantee CONTRACTOR continuous uninterrupted access to the Work Site, but will provide such access as good construction practices will allow, considering the other activities in the area.

**PROTECTION OF PROPERTY AND PERSONS**

CONTRACTOR will protect the Work (whether completed or in progress), materials, equipment, adjacent property, natural resources and the public from any damage or danger relating to the Work, and will be responsible for any damage, loss or injury due to its actions or neglect. CONTRACTOR will take reasonable precaution to prevent any accident in connection with the performance of the Work and will put up and maintain sufficient barriers, lights and/or other necessary precautions.

C 0780562 C

**PROTECTION OF HIGHWAYS AND RAILROADS**

CONTRACTOR will make suitable arrangements with governmental authorities and railroads for the construction of all structures, whether underneath or over roads, railroads or rights-of-way to protect the public from accident or delay. CONTRACTOR will repair, at its own expense, to the satisfaction of the governmental authorities or other owners, all roads, railroads and bridges that may be damaged by, or given undue wear due to the Work.

**CLEANING UP**

CONTRACTOR will at all times keep the Work Site free of waste materials or rubbish caused by the Work.  After completing the Work, CONTRACTOR will remove all its waste materials, rubbish, tools, supplies, equipment and surplus materials from and about the Work Site.

If CONTRACTOR fails to keep the Work Site clean or to clean up after completing the Work, COMPANY may do so and charge all costs of cleaning up to CONTRACTOR. Those costs may be deducted from the final payment to CONTRACTOR.

**CONFLICT OF INTEREST**

CONTRACTOR will not engage in any activity that will adversely affect or impair its ability to perform the Work in an independent and reliable manner.  CONTRACTOR warrants that it has no professional or contractual obligations that will conflict with its performance of any Work.

**PROTECTION AGAINST LIENS AND ENCUMBRANCES**

CONTRACTOR will not at any time permit any lien, attachment or other encumbrance ("Encumbrance") by any person or persons whosoever or by reason of any claim or demand against CONTRACTOR to be placed or remain on the property of COMPANY, including, but not limited to, the Work Site upon which Work is being performed or equipment and materials that are being furnished.  To prevent an Encumbrance from being placed on the property of COMPANY, CONTRACTOR will furnish during the progress of any Work, as requested from time to time, verified statements showing CONTRACTOR's total outstanding indebtedness in connection with the Work.

If CONTRACTOR allows any indebtedness to accrue to subcontractors or others and fails to pay or discharge that indebtedness within five (5) days after demand, then COMPANY may withhold any money due CONTRACTOR until that indebtedness is paid or pay the indebtedness and apply that amount against the money due CONTRACTOR.

If CONTRACTOR allows any Encumbrances, whether valid or invalid to be placed on the property of COMPANY, any and all claims or demands for payment to CONTRACTOR will be denied by COMPANY until the Encumbrance is removed.  If the Encumbrance is not removed immediately, COMPANY may pay that claim or demand and deduct the amount paid, together with all related expenses, including attorneys' fees, from any further payment due CONTRACTOR, or at COMPANY's election, CONTRACTOR will, upon demand, reimburse COMPANY for the amount paid and all related expenses.  Any payment made in good faith by COMPANY will be binding on CONTRACTOR.

**TAXES**

CONTRACTOR will comply with all federal, state, or municipal laws, rules and regulations regarding taxes and the payment of taxes, until the Work has been completed, including, without limitation, social security, state unemployment insurance, gross receipts taxes, withholding taxes, and income tax.  CONTRACTOR will furnish, upon request by COMPANY, satisfactory evidence of its compliance.

**WAIVER OF CONSEQUENTIAL DAMAGES**

Neither party will be liable to the other in contract, tort, or on any other basis, for any consequential damages of any nature, including, but not limited to, lost profits or revenues, loss of customer goodwill, business interruption costs, overhead costs, lost profits, costs of capital, or loss of use of money.  Consequential damage also includes attorneys' fees, except as otherwise specifically provided for, in this Agreement and it is expressly understood that this paragraph will be subjugated to, and will not limit or otherwise affect in any manner, CONTRACTOR's obligations to indemnify and hold harmless COMPANY as provided for in the Indemnity and Intellectual Property provisions of this Agreement or CONTRACTOR's obligation as provided for in the Warranty provision of this Agreement.

**INDEMNIFICATION**

CONTRACTOR agrees to and will defend, protect, indemnify and hold harmless COMPANY Group from and against all claims, losses, expenses, attorneys' fees, damages, demands, judgments, causes of action, suits, and liability in tort, contract, or any other basis and of every kind and character whatsoever (hereinafter in this and the following paragraphs collectively referred to as "CLAIMS"), for personal injury, death, or property damage of any member of CONTRACTOR Group, arising out of or incident to or related in any way to, directly or indirectly, this Agreement, or the Work, services, or materials to be performed or supplied there under, or to any activities of any member of CONTRACTOR Group while on any premises actually or allegedly owned, controlled, or operated by COMPANY, including, but not limited to, CLAIMS arising out of or resulting from (1) any condition of

C 0780562 C

the premises, (2) separate operations being conducted on the premises, or (3) the imperfection or defective condition, whether latent or patent, of any material or equipment sold, supplied, or furnished by COMPANY; and **further, IT IS THE EXPRESS INTENT OF THE PARTIES THAT, FOR THE PURPOSES OF THIS PARAGRAPH, CLAIMS, AND CONTRACTOR'S OBLIGATIONS TO DEFEND, PROTECT, INDEMNIFY, AND HOLD HARMLESS, WILL INCLUDE, BUT NOT BE LIMITED TO, CLAIMS ARISING OUT OF OR RESULTING FROM COMPANY GROUP'S SOLE OR CONCURRENT (1) NEGLIGENCE, (2) STRICT LIABILITY, OR (3) OTHER FAULT OF ANY NATURE.**

For all CLAIMS except those for personal injury, death, or property damage of any member of CONTRACTOR GROUP within the scope of the preceding paragraph, CONTRACTOR agrees to and will defend, protect, indemnify, and hold harmless COMPANY Group from and against any and all CLAIMS arising out of or incident to or related in any way to, directly or indirectly, this Agreement, or the Work, services, or materials to be performed or supplied there under, or to any activities of any member of CONTRACTOR Group while on any premises actually or allegedly owned, controlled, or operated by COMPANY, including, but not limited to, CLAIMS arising out of or resulting from (1) any condition of the premises, or (2) separate operations being conducted on the premises, or (3) the imperfection or defective condition, whether latent or patent, of any material or equipment sold, supplied, or furnished by COMPANY; and **further, IT IS THE EXPRESS INTENT OF THE PARTIES THAT, FOR THE PURPOSES OF THIS PARAGRAPH, CLAIMS, AND CONTRACTOR'S OBLIGATIONS TO DEFEND, PROTECT, INDEMNIFY, AND HOLD HARMLESS, WILL INCLUDE, BUT NOT BE LIMITED TO, CLAIMS ARISING OUT OF OR RESULTING FROM COMPANY GROUP'S CONCURRENT (1) NEGLIGENCE, (2) STRICT LIABILITY, OR (3) OTHER FAULT OF ANY NATURE.**

To the extent necessary to permit COMPANY to enforce any term, clause, or condition of this Agreement, CONTRACTOR agrees that with respect to any CLAIMS brought against COMPANY Group, CONTRACTOR will and does hereby waive as to COMPANY Group any defense it may have by virtue of the workers' compensation laws of any state.

**In the event that any of the terms or provisions of this INDEMNIFICATION section are determined to be invalid, illegal, unenforceable or in conflict with the law of any court of competition jurisdiction, the validity, legality and enforceability of the remaining terms and provisions shall not in any way be affected or impaired, and remain in full force and effect.**

## INTELLECTUAL PROPERTY

CONTRACTOR will obtain permission to use any and all intellectual property that may be required in order for CONTRACTOR to perform the Work.  This permission will include all necessary licenses and other governmental approvals.

CONTRACTOR will hold harmless and indemnify COMPANY Group from and against, and at COMPANY's option, defend COMPANY Group against, any and all fines, penalties, losses, liabilities, damages, claims and costs (including reasonable attorneys' fees and court costs), arising out of or incurred as a result, directly and indirectly, of any alleged or actual infringement or violation of any right, or alleged right, relating to intellectual property, including, but not limited to, patent, copyright or trade secret.

In addition, if any claim is brought alleging infringement or the violation of any intellectual property right, CONTRACTOR will avoid any further possible infringement of the intellectual property right, and will seek to resolve the claim in consultation with COMPANY, either by means of alternative arrangements for the Services, or by obtaining permission to use the intellectual property in question.

## COMPLIANCE WITH LAWS

CONTRACTOR represents that it is knowledgeable of and will comply with all federal, state, and local laws, rules, decrees, orders, regulations, by-laws, ordinances and codes that may, in any manner, affect the conduct of the Work, including all Environmental Laws.  In this regard, any conduct on the Work Site that is in violation of any federal, state, or local enactment, as specified above, is also a breach of this Agreement.

The term "Environmental Laws" will mean any and all laws, statutes, ordinances, rules, regulations, orders, interpretations, or guidance of any federal, state or local government or regulatory agency, as may now or hereafter be in effect, pertaining to human health, safety, or the environment, including, but not limited to, the following statutes and any applicable state or local equivalents thereof and any rules and regulations promulgated pursuant thereto: the Federal Clean Air Act, the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980 ("CERCLA"), the Federal Water Pollution Control Act, the Resource Conservation and Recovery Act of 1976, the Safe Drinking Water Act, the Toxic Substances Control Act, the Emergency Planning and Community Right-to-Know Act, the Oil Pollution Act of 1990, the National Environmental Policy Act, the Hazardous Materials Transportation Act, the Atomic Energy Act, the Federal Insecticide, Fungicide and Rodenticide Act, and the Occupational Safety and Health Act of 1990, all as have been or may be amended from time to time.

CONTRACTOR will promptly notify COMPANY in writing upon receipt of notice of any of the following matters, whether occurring during or subsequent to the performance of the Work; (i) any enforcement, cleanup, removal, Potentially Responsible Party (PRP) notice or other governmental or regulatory action or investigation instituted or threatened against CONTRACTOR pursuant to any Environmental Laws arising out of or related to the performance of the Work; (ii) any claim made or threatened by any person against COMPANY for damages, contribution, cost recovery, compensation, losses or injury arising out of the performance of the Work or the use, disposal or release of Hazardous Substances at the Work Site; or (iii) any report made by CONTRACTOR to a governmental agency with respect to Hazardous Substances spilled, released or deposited on or removed from the Work Site.

Page 19

C 0780562 C

CONTRACTOR will not enter into any settlement agreement, consent decree, or other compromise with respect to any claims relating to the performance of the Work without first notifying COMPANY of CONTRACTOR's intention to do so and affording COMPANY ample opportunity to appear, intervene, or otherwise appropriately assert and protect COMPANY's interests with respect thereto.

CONTRACTOR, with regard to its employees, assumes and retains sole and complete responsibility and liability for compliance with any and all federal, state, and local antidiscrimination statutes, including, but not limited to, Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; the Equal Pay Act of 1963; the Age Discrimination in Employment Act of 1967, as amended; the Energy Reorganization Act of 1974; the Texas Commission on Human Rights Act; the Americans with Disabilities Act; and the Older Workers Benefit Protection Act of 1990. CONTRACTOR will promptly advise COMPANY of any action required to be initiated by COMPANY in order to comply with those statutes.

CONTRACTOR, with regard to its employees, assumes and retains sole and complete responsibility and liability for compliance with any federal, state, or local statutes relating to compensation or wage and hour considerations, including, but not limited to, the Federal Fair Labor Standards Act, and the Texas Minimum Wage Act of 1970, and the Texas Pay Act, as well as any and all other federal statutes impacting, directly or indirectly, CONTRACTOR's employees.

If fines, penalties or legal costs are assessed against COMPANY by any court or governmental agency due to CONTRACTOR Group's failure to so comply, or if the Work of CONTRACTOR, or any part thereof, is delayed or stopped by any court or governmental agency, due to CONTRACTOR Group's failure to comply with its obligations, CONTRACTOR will indemnify and hold harmless COMPANY from and against any and all fines, penalties, losses, liabilities, damages, claims, and costs (including reasonable attorneys' fees and court costs) arising out of or incurred as a result, directly or indirectly, of that failure.

## PROPRIETARY INFORMATION

Without the written consent of COMPANY, CONTRACTOR will not divulge to any third party, including any affiliate of COMPANY (excepting, as appropriate, only EFH Corporate Services Company for purposes relating to this Agreement), any information obtained from or through COMPANY that relates to the technical or business activities of COMPANY (including, without limitation, information pertaining to any customer or COMPANY), or is otherwise developed by CONTRACTOR in connection with its performance of the Work, unless: (1) the information is known to CONTRACTOR prior to obtaining it from COMPANY; (2) the information is, at the time of disclosure by CONTRACTOR, then in the public domain; or (3) the information is obtained by CONTRACTOR from a third party who did not receive it directly or indirectly from COMPANY and who has no obligation of secrecy with respect to that information. THIS PROVISION WILL NOT RESTRICT IN ANY MANNER WHATSOEVER THE REPORTING OF ENVIRONMENTAL OR SAFETY-RELATED CONCERNS to the appropriate governmental authorities in accordance with applicable law.

If so requested by COMPANY, CONTRACTOR further agrees to require its employees to execute a nondisclosure agreement prior to performing any services under this Agreement.

## RIGHTS TO DATA

All designs, drawings, calculations, computer codes, plans, specifications, data and any and all other information developed, created or produced by employees, agents or subcontractors of CONTRACTOR, pursuant to or relating, directly or indirectly, to the Work, will become the property of COMPANY when so developed, created, or produced, and notwithstanding any property designations contained therein, COMPANY will have the right to use or sell that information without limitation. At COMPANY's request, those designs, drawings, calculations, computer codes, plans, specifications, data, and any and all other information, will be delivered to COMPANY.

## TITLE AND RIGHT

Nothing in this Agreement will vest CONTRACTOR with any right of property in materials used after they have been attached to or incorporated into the Work, nor materials for which CONTRACTOR has received full or partial payment. All those materials, upon being so attached, incorporated or paid for, will become the property of COMPANY. Any gravel, sand, stone, minerals, timber or other materials excavated, uncovered, developed or obtained in the Work, or on any land belonging to COMPANY may be used, in the performance of the Work, provided such materials meet the requirements of this Agreement. Any objects or natural materials or animals excavated or exposed that may have historical significance or constitute a threatened or endangered species must be brought to the attention of COMPANY.

## REMOVAL OF PERSONNEL

COMPANY may, at its sole discretion, and for whatever reason it deems appropriate, remove any person from the Work Site, and the person will not again be employed on the Work without the express written consent of COMPANY.

## GOVERNING LAW

THIS AGREEMENT IS GOVERNED BY AND WILL BE CONSTRUED IN ACCORDANCE WITH LAWS OF THE STATE OF TEXAS WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE

C 0780562 C

STATE OF TEXAS OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF TEXAS. THE PARTIES MUTUALLY CONSENT TO THE EXCLUSIVE JURISDICTION OF THE FEDERAL AND STATE COURTS IN DALLAS COUNTY, TEXAS AND AGREE THAT ANY ACTION, SUIT OR PROCEEDING CONCERNING, RELATED TO OR ARISING OUT OF THIS AGREEMENT AND THE NEGOTIATION OF THIS AGREEMENT WILL BE BROUGHT ONLY IN A FEDERAL OR STATE COURT IN DALLAS COUNTY, TEXAS AND THE PARTIES AGREE THAT THEY WILL NOT RAISE ANY DEFENSE OR OBJECTION OR FILE ANY MOTION BASED ON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE, INCONVENIENCE OF THE FORUM OR THE LIKE IN ANY CASE FILED IN A FEDERAL OR STATE COURT IN DALLAS COUNTY, TEXAS. THE PARTIES MUTUALLY AGREE THAT THIS AGREEMENT IS A "MAJOR TRANSACTION" WITHIN THE MEANING OF THE TEXAS CIVIL PRACTICE AND REMEDIES CODE § 15.020 AND AS SUCH AGREE THAT ANY ACTION OR SUIT ARISING FROM THIS AGREEMENT WILL BE BROUGHT IN DALLAS COUNTY, TEXAS, AND VENUE WILL BE IN DALLAS COUNTY, DALLAS, TEXAS.

THE PARTIES AGREE THAT THE PROVISIONS OF ARTICLE 2 OF THE UNIFORM COMMERCIAL CODE (AS CONTAINED IN THE TEXAS BUSINESS AND COMMERCE CODE) SHALL APPLY TO THE AGREEMENT AND ALL TRANSACTIONS THEREUNDER, IRRESPECTIVE OF WHETHER SUCH TRANSACTIONS ARE DEEMED TO BE A SALE OF GOODS OR THE PROVIDING OF A SERVICE; HOWEVER, IN THE EVENT OF A CONFLICT, THE TERMS AND PROVISIONS OF THE AGREEMENT SHALL CONTROL OVER THOSE CONTAINED IN THE UCC. NOTWITHSTANDING THE FOREGOING, THE PARTIES ACKNOWLEDGE AND AGREE THAT ALL IMPLIED RIGHTS RELATING TO FINANCIAL ASSURANCES ARISING FROM SECTION 2.609 OF THE UNIFORM COMMERCIAL CODE (AS CONTAINED IN THE TEXAS BUSINESS AND COMMERCE CODE) OR APPLICABLE CASE LAW APPLYING SIMILAR DOCTRINES, ARE HEREBY WAIVED.

**NON-WAIVER OF RIGHTS**

A waiver by either party of any breach of this Agreement or the failure of either party to enforce any of the articles or other provisions of this Agreement will not in any way affect, limit or waive that party's right to enforce and compel strict compliance with the same or other articles or provisions.

**SURVIVAL**

Neither the completion of any Work nor any termination or cancellation of this Agreement will relieve CONTRACTOR of any obligations under this Agreement that by their nature survive the completion of the Work, including, but not limited to, all warranties and obligations of indemnity.

**SEVERABILITY**

In the event any provision of this Agreement is held to be void, unlawful or otherwise unenforceable, that provision will be severed from the remainder of the Agreement and replaced automatically by a provision containing terms as nearly like the void, unlawful, or unenforceable provision as possible; and the Agreement, as so modified, will continue to be in full force and effect.

**PUBLICITY**

No information relating to this Agreement will be released for publication, advertising or any other purpose without the prior written approval of COMPANY. CONTRACTOR is expressly prohibited from using COMPANY's name in any publication, advertising, or promotion.

**SMALL BUSINESS CONCERNS**

If the value of any Work is Ten Thousand Dollars ($10,000.00) or more and CONTRACTOR intends to subcontract for the performance of any portion of that Work, CONTRACTOR will make every effort to ensure that small business concerns owned and controlled by socially and economically disadvantaged individuals will have the maximum practicable opportunity to participate in the performance of contracts, implementing Section 211 of Public Law 95-507.

If the value of any Work is Five-Hundred Thousand Dollars ($500,000) or more and CONTRACTOR intends to subcontract for the performance of any portion of that Work, CONTRACTOR (except small business concerns referred to in the preceding paragraph) will adopt a plan in accordance with the requirements of Section 637 of Title 15 of the United States Code.

**IMMIGRATION**

CONTRACTOR will fully comply with all applicable requirements of the Immigration Reform and Control Act of 1986 ("IRCA"), as well as all regulations issued pursuant to IRCA or otherwise enforced by the Immigration and Naturalization Service, for or with respect to any of CONTRACTOR's employees, or other persons, performing any portion of the Work. In particular but without limitation, CONTRACTOR acknowledges and represents that: (a) to the fullest extent required by IRCA or such regulations, it has properly completed (or, prior to their performance of any portion of the Work, will properly complete) the Employment Eligibility Verification Form, I-9, for each such employee or person; and (b) all such employees or persons are, and will remain while performing any portion of the Work, otherwise legally authorized to work in the United States.

C 0780562 C

**ATTACHMENT 5**
**BROWZ REGISTRATION REQUIREMENTS**

**Browz registration requirement to advance workplace compliance**

As part of Luminant's commitment of reducing jobsite risk through safety, health and environmental solutions, Luminant has partnered with Browz LLC (Browz), a leading provider of contractor compliance and risk management software and services.

Browz provides tools that reveal compliance, enabling its clients to shift their focus toward managing their contracts and contractors more effectively. Engaging Browz is yet another step in ensuring the operational and environmental excellence and safe performance of Luminant's extensive generating fleet and mining operations.

Browz completed registration is a requirement for conducting business with Luminant. Those vendors that are not currently registered in Browz will need to fill out the attached "Contractor Safety & Health Information Form" information and submit it along with any bid offerings.

**About Browz:**
Browz helps buyers and suppliers exchange critical compliance information by using technology that leads to risk reductions, cost savings, and more secure business relationships. Both buyers and suppliers want to do business in a responsible manner and safe environment. The Browz solution levels the playing field for suppliers while protecting all participants.
www.browz.com

**How to Register with Browz:**
1.  Access the Browz website at http://register.browz.com
2.  On this web page, enter your designated Key/Browz ID: <<Browz Id >> in the first box provided.
3.  Enter your designated Browz Code: <<Code>> in the second box provided.
4.  Click the blue "Submit" button.
5.  Click on "Begin Registration".
6.  Follow the instructions given in the next steps.
During the registration process, you will be prompted to create a unique Org ID, Username and Password. Please remember this information, as it will be required to access your company's information in the future.

There is a $695.00 annual registration fee payable directly to Browz.

For additional assistance or clarification concerning the Browz process, contact:

Browz Client Services (888) 276-9952

As a condition of this Contract, Contractor agrees to register with Browz and provide those necessary documents requested by Browz to be deemed in compliance with the Browz application.  As a minimum, requested documents will be related to safety and health (i.e., regulatory required training, certifications, safety plans, safe and secure workplace practices, etc.), OSHA and MSHA injury rates and Experience Modification Rate (EMR) and other important business data requested by Browz through the registration process.  Contractor agrees to maintain the identified documentation for the life of the contract.

Registration and compliance shall be completed within thirty (30) days of the effective date of the Contract.  Noncompliance with these requirements shall be grounds for withholding payment of outstanding invoices or termination of the Contract.

**THE REVIEW OF THE FOREGOING INFORMATION BY BROWZ OR BY COMPANY OR THE APPROVAL OF CONTRACTOR'S REGISTRATION WITH BROWZ ARE NOT APPROVALS OF CONTRACTOR'S DOCUMENTS, DATA, SAFETY AND HEALTH TRAINING, CERTIFICATIONS, SAFETY PLANS, SAFE OR SECURE WORKPLACE PRACTICES OR OTHER MATTERS SUBMITTED TO BROWZ OR COMPANY. REVIEW OF CONTRACTOR'S INFORMATION OR APPROVAL OF CONTRACTOR'S REGISTRATION SHALL NOT DIMINISH CONTRACTOR'S RESPONSIBILITIES OR OBLIGATIONS OR WAIVE COMPANY'S RIGHTS WITH RESPECT TO SUCH MATTERS UNDER THE AGREEMENT. CONTRACTOR AGREES THAT IT SHALL NOT ASSERT THAT THE REVIEW AND APPROVAL OF CONTRACTOR'S INFORMATION OR THE APPROVAL OF CONTRACTOR'S REGISTRATION ARE OR WERE AN APPROVAL OF SUCH MATTERS BY COMPANY OR BROWZ.**

C 0780562 C

## ATTACHMENT 6
## LUMINANT MINING COMPANY CONTRACTOR'S SAFETY REQUIREMENTS

1.  CONTRACTOR and CONTRACTOR's employees will comply with and function within all COMPANY, MSHA and CONTRACTOR safety and health regulations. The most restrictive of the three organizations' regulations will govern.

2.  All CONTRACTOR employees who work on site will complete the necessary approved training, outlined below, prior to beginning Work.

    a.  Part 48 Training Requirements (as outlined in CFR 30, Mineral Resources)

    b.  Part 62 Occupational Noise Exposure (as outlined in CFR 30, Mineral Resources)

    c.  Part 77 Training Requirements (as outlined in CFR 30, Mineral Resources)

3.  Records of all requisite training required by COMPANY or MSHA will be furnished prior to beginning Work.

4   Where applicable, CONTRACTOR will have MSHA certified safety and supervisory personnel on each shift. In addition and also where applicable, safety and on-shift inspections will be performed and recorded.

5.  All injuries and accidents will be reported to COMPANY immediately. MSHA CFR 30, Part 50 Accident reporting guidelines will be followed. Copies of all injury and accident reports will be sent to the site COMPANY safety representative. A COMPANY "Report of Property Damage or Injury" is required for each incident. Accidents involving blood and bodily fluids will be handled in accordance with the OSHA 1910.1030 Blood borne Pathogen Program.

6.  CONTRACTOR will maintain an up-to-date list (each shift) of all personnel on site. All CONTRACTOR employees will have names on hard hats. Names will be the same as on payroll; i.e., "John Doe".

7.  All Work areas will be maintained in a clean and safe condition at all times. Until proper housekeeping has been taken care of, the job is not complete.

8.  CONTRACTOR will furnish all required items listed below (where applicable):

    a.  Personal Protective Equipment
        (1) Steel-toed shoes or boots (ANSI Approved)
        (2) Safety glasses with attached side shields (ANSI Approved)
        (3) Hard hats (any color other than white for experienced miners [12 months or more mining experience] and the color yellow will be worn by inexperienced miners [less than 12 months mining experience])
        (4) Safety harnesses (where applicable)
        (5) Hearing protection (double hearing protection where required– such as air arcing use of impact wrenches, jackhammers, machinery house of operating draglines, etc.) Tools or equipment with employee exposure of 115 dba or greater is not allowed.
        (6) Face shields/impact goggles
        (7) Welding hoods/cutting goggles
        (8) Respirators
        (9) ANSI 107 Class 2 approved reflective clothing

    b.  MSHA First Aid Supplies (77.1707)

    c.  Fire Extinguishers

    d.  Ventilation Equipment shall be adequate to maintain compliance with TLVs in accordance with American Conference of Government Industrial Hygienists (ACGIH) standards.

    e.  Oxygen Deficiency/Flammable Gas Monitor (where applicable)

9.  All CONTRACTOR's employees will wear steel-toed protective shoes or boots, safety glasses with attached side shields, hard hats and reflective clothing any time they are out of the office or a vehicle while on mine property.

10. Safety harnesses will be worn by all personnel when required by COMPANY, CONTRACTOR or MSHA safety regulations. Safety belts no longer meet those regulations.

11. Fire Hazards. All areas will be inspected prior to beginning Work. The use of flammable (flashpoint <100°F) solvents is prohibited without special permission from COMPANY.

Page 23