Exhibit A

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**
Energy Future Holdings Corp. Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
Grand Central Station, P.O. Box 4613
New York, NY 10163-4613

# PROOF OF CLAIM

**COURT USE ONLY**

Filed: USBC - District of Delaware
Energy Future Holdings Corp., et al., EAi.
14-10979 (CSS)          0000002613

| Name of Debtor: Sandow Power Company LLC | Case Number: 14-11033(CSS) |
|---|---|

**NOTE:** Do not use this form to make a claim for an administrative expense that arises *after* the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.

Name and address where notices should be sent:
c/o Stephen Sakonchick, II
Stephen Sakonchick II, P.C.
6502 Canon Wren Drive
Austin, Texas 78746

Telephone number:  512-329-0375    Email:  sakon@flash.net

☐ Check this box if this claim amends a previously filed claim.

**Court Claim Number:**
_____
(*If known*)

Filed on: _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**FILED / RECEIVED**

**JUN 26 2014**

**Epiq Bankruptcy Solutions, LLC**

Name and address where payment should be sent (if different from above):
Ranger Excavating LP  Attn: Brad McKenzie
5222 Thunder Creek Road, Suite 81
Austin, Texas 78759
Telephone number:  512-331-5551    Email:  brad.mckenzie@rangerexcavating.com

**COURT USE ONLY**

**5.    Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $12,475), earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

☐ Up to $2,775 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

**Amount entitled to priority:**

$ _____

**1.    Amount of Claim as of Date Case Filed:**  $ 292,598.58
If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
If all or part of the claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete item 6.
☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest charges.

**2.    Basis for Claim:**  labor and materials provided for construction
(See instruction #2)

**3.    Last four digits of any number by which creditor identifies debtor:**  _2_ _1_ _3_ _8_
**3a. Debtor may have scheduled account as:** _____
(See instruction #3a)

**4.    Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:**
☑ Real Estate    ☐ Motor Vehicle    ☐ Other
**Describe:** real property lease
**Value of Property:** $ exceeds debt
**Annual Interest Rate** _____% ☐ Fixed or ☐ Variable
(when case was filed)

**Amount of arrearage and other charges, as of time case was filed, included in secured claim, if any:**
$ 292,598.58
**Basis for perfection:** mechanic's lien
**Amount of Secured Claim:** $ 292,598.58
**Amount Unsecured:** $ _____

**6.    Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $ _____          (See instruction #6)

**7.    Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8.    Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8 and definition of "redacted".)*
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**9.    Signature:** (See instruction #9)  Check the appropriate box.
☑ I am the creditor.  ☐ I am the creditor's authorized agent.  ☐ I am the trustee, or the debtor, or their  ☐ I am a guarantor, surety, indorser, or other codebtor.
(Attached a copy of power of attorney, if any.)  authorized agent. (See Bankruptcy Rule 3004.)  (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name:  Brad McKenzie
Title:  Vice President
Company:  McKenzie Interests Inc., GP
          for Ranger Excavating LP

(Signature)  6/20/14  (Date)

Address, telephone number, and email
(if different from notice address above):
_____
_____
Telephone number:  512-331-5551
Email:  brad.mckenzie@rangerexcavating.com

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

*In re Sandow Power Company LLC*
Bankruptcy No. 14-11033(CSS)
Chapter 11

**Attachment to Proof of Claim of Ranger Excavating L.P.**

Ranger Excavating LP Job 12138-Sandow Ax Landfill Cell 1

Sandow Power Company LLC Contract A1893710 (Work not yet complete)

 Retainage as of 4/29/14  $211,605.58*

Ranger Excavating LP Job 12138.1-Sandow Ax Haul Road

Sandow Power Company LLC Contract A1893756 (Work not yet complete)

 Retainage as of 4/29/14  $ 80,993.00*

 **Total Secured Claim   $292,598.58***


 *together with all post petition interest, attorneys fees and expenses allowable under 11 U.S.C. §506(b).  Creditor claims to be secured as a result of the filing of a Lien claim affidavit in the real property records of Milam County, Texas.

| | |
|---|---|
| Exhibit A | Letter to Sandow Power Company LLC dated June 9, 2014 |
| Exhibit B | Lien Claim Affidavit filed June 10, 2014 |
| Exhibit C | Application for Payment-Luminant Sandow Ax Landfill Cell 1 |
| Exhibit D | Application for Payment of Retainage-Luminant Sandow Ax Haul Road |
| Exhibit E | Contract between Ranger Excavating LP and Sandow Power Company LLC, dated November 30, 2012, for the construction of the Ax Fly Ash Disposal Pit Cell 1 |
| Exhibit F | Contract between Ranger Excavating LP and Sandow Power Company LLC, dated December 4, 2012, for the construction of the Ax Fly Ash Disposal Haul Road |

Exhibit A

### STEPHEN SAKONCHICK II, P.C.

6502 Canon Wren Drive
Austin, Texas 78746

-----

Telephone (512) 329-0375
Facsimile (512) 697-2859
email sakon@flash.net

June 9, 2014

**Via Certified Mail, Return Receipt Requested**

Sandow Power Company, LLC
Attn: Mark Jenkins
1601 Bryan Street-21st Floor
Dallas, Texas 75201

      Re:  Lien Claim of Ranger Excavating LP for unpaid sums for
materials and labor provided for the construction of the
AX Fly Ash Disposal Pit Cell 1 and AX Fly Ash Disposal
Haul Road in Milam County Texas

Dear Mr. Jenkins:

     I represent Ranger Excavating, LP ("Ranger") regarding the
above referenced project ("Project"). Ranger is owed $80,993.00 as
retainage on the contract for the construction of the AX Fly Ash
Disposal Haul Road and $211,605.58 as retainage on the contract for
the construction of the AX Fly Ash Disposal Pit Cell 1, for a total
of $292,598.58 ("Claim"). This indebtedness has accrued under
section 53.053 of the Texas Property Code and is to be paid to
Ranger according to the agreement between Sandow Power Company, LLC
("Sandow") and Ranger.

     This notice is not an attempt to collect the Claim, which is
stayed by the automatic stay of 11 U.S.C. 362, as a result of
Sandow's filing for bankruptcy under Chapter 11 of the Bankruptcy
Code. Instead, this is notice of Ranger's filing of the enclosed
lien claim affidavit as to Sandow's interest in the property
described therein. The lien claim affidavit is being filed in
accordance with 11 U.S.C. Sections 362(b)(3) and 546(b), for the
purpose of perfecting its lien claim under Texas law, and as a
result of Sandow's filing for bankruptcy relief. In accordance
with Section 53.124 of the Texas Property Code, the time of the
inception of this lien claim began with the commencement of
construction which was prior to the filing of Sandow's Chapter 11
bankruptcy.

     Very truly yours,

Stephen Sakonchick, II

**EXHIBIT A**

cc:  Alcoa, Inc.
     P.O. Box 472
     Rockdale, Texas 76567

     Via Certified Mail, Return Receipt Requested

**NOTICE:**

**THIS IS NOT A LIEN.  THIS IS ONLY AN
AFFIDAVIT CLAIMING A LIEN**

STATE OF TEXAS          §

COUNTY OF TRAVIS        §

BEFORE ME, the undersigned authority, personally appeared Brad McKenzie, who upon his oath, deposed and stated:

1.   My name is Brad McKenzie and I am the Vice President of McKenzie Interests, Inc., the general partner of Ranger Excavating LP ("Claimant").  I have personal knowledge of the facts set forth below and am competent and authorized to make this affidavit.

2.   Claimant's business address is 5222 Thunder Creek Road, Suite 81, Austin, Texas 78759.

3.   Pursuant to contracts by and between Claimant, and Sandow Power Company, LLC ("Sandow") dated November 30, 2012, for the construction of the AX Fly Ash Disposal Pit Cell 1 ("Disposal Pit Contract") and December 4, 2012, for the construction of the AX Fly Ash Disposal Haul Road ("Haul Road Contract"), Claimant provided labor and materials for improvements to the following real property:

The general location of the property is at the intersection of the W.H. Temple Surveys-Abstracts 362 and 358, the J.B. Harris Survey-Abstract 207, and the S.L. Johnson Survey-Abstract 228, in Milam County, Texas and consists of a lease area of approximately 420 acres surrounding the AX Fly Ash Disposal Pit Cell 1, which is 48.16 acres, and the AX Fly Ash Disposal Haul Road, which is 8.46 acres, in Milam County, Texas.  See attached 3 drawings and aerial photograph for more a precise location of the lease area and improvements.

4.   Such labor and materials may be generally described as the construction of the AX Fly Ash Disposal Pit Cell 1 and the AX Fly Ash Disposal Haul Road on the Property ("Work").  The Work is about 98% complete.  However, Claimant has not yet received a Notice of Completion and Final Acceptance from Sandow.

5.   The owner or reputed owner of the Property is Alcoa, Inc. ("Alcoa"), whose address is P.O. Box 472, Rockdale, Texas 76567. Sandow informed Claimant that Alcoa leased the Property to Sandow, and/or granted Sandow some other interest related to the Property.

6.    Sandow's address is 1601 Bryan Street-21st Floor, Dallas, Texas 75201.

7.    Alcoa and Sandow are being sent a notice of the claim, along with a copy of this lien claim affidavit prior to June 15, 2014, by certified mail to the addresses above.

8.    Claimant has acted as a general contractor to Sandow for the improvements on which the Claimant asserts a lien on Sandow's interest in the Property.

9.    After allowing all just credits, offsets, and payments, the amount of $80,993.00 is held as retainage by Sandow on the Haul Road Contract and $211,605.58 is held as retainage by Sandow on the Disposal Pit Contract, for a total of $292,598.58, which remains unpaid for the Work on the Property, and Claimant asserts a lien on Sandow's interest in the Property and the improvements thereon, to secure the payment of the amount claimed.  Claimant asserts both a statutory and constitutional lien, to the extent applicable.

10.    This lien claim affidavit is being filed in accordance with 11 U.S.C. Sections 362(b)(3) and 546(b) for the purpose of perfecting its lien claim under Texas law, and as a result of Sandow's filing a petition in bankruptcy under Chapter 11 of the Bankruptcy Code (11 U.S.C. Section 1101, *et seq.*).  In accordance with Section 53.124 of the Texas Property Code, the time of the inception of this lien claim began with the commencement of construction which was prior to the filing of Sandow's bankruptcy petition.

Brad McKenzie, Vice President
McKenzie Interests Inc, general
partner of Ranger Excavating LP


SWORN AND SUBSCRIBED TO BEFORE ME on this 4th day of June 2014.

Notary Public, State of Texas


After filing return to:

Stephen Sakonchick, II
6502 Canon Wren Drive
Austin, Texas 78746

LINDA GOETZ
My Commission Expires
June 02, 2017







**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Alcoa, Inc.
P.O. Box 472
Rockdale, Texas 76567

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____
☐ Agent
☐ Addressee

B. Received by (Printed Name)        C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☒ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)

7012 1010 0001 1361 2987

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Sandow Power Company LLC
Attn: Mark Jenkins
1601 Bryan Street - 21st Plz
Dallas, Texas 75201

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X Don Willcott
☐ Agent
☐ Addressee

B. Received by (Printed Name)        C. Date of Delivery
Don Wilcott Jr.    6-13-14

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☒ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)

7012 1010 0001 1361 3007

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

Postage        $        $0.70
Certified Fee            $3.30
Return Receipt Fee
(Endorsement Required)  $2.70
Restricted Delivery Fee
(Endorsement Required)  $0.00
Total Postage & Fees    $        $6.70

Sent to   Alcoa, Inc.
Street, Apt. No.;   P.O. Box 472
or PO Box No.
City, State, ZIP+4   Rockdale, Texas 76567

PS Form 3800, August 2006        See Reverse for Instructions

7012 1010 0001 1361 2987

ROCKDALE TX 76567

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

Postage        $        $0.70
Certified Fee            $3.30
Return Receipt Fee
(Endorsement Required)  $2.70
Restricted Delivery Fee
(Endorsement Required)  $0.00
Total Postage & Fees    $        $6.70

Sent to   Sandow Power Company LLC
Street, Apt. No.;   Attn: Mark Jenkins
or PO Box No.       1601 Bryan Street - 21st Plz
City, State, ZIP+4   Dallas, TX 75201

PS Form 3800, August 2006        See Reverse for Instructions

7012 1010 0001 1361 3007

DALLAS TX 75201

Exhibit B

16214

**NOTICE:**

**THIS IS NOT A LIEN.  THIS IS ONLY AN
AFFIDAVIT CLAIMING A LIEN**

STATE OF TEXAS          §

COUNTY OF TRAVIS        §

BEFORE ME, the undersigned authority, personally appeared Brad McKenzie, who upon his oath, deposed and stated:

1.    My name is Brad McKenzie and I am the Vice President of McKenzie Interests, Inc., the general partner of Ranger Excavating LP ("Claimant"). I have personal knowledge of the facts set forth below and am competent and authorized to make this affidavit.

2.    Claimant's business address is 5222 Thunder Creek Road, Suite 81, Austin, Texas 78759.

3.    Pursuant to contracts by and between Claimant, and Sandow Power Company, LLC ("Sandow") dated November 30, 2012, for the construction of the AX Fly Ash Disposal Pit Cell 1 ("Disposal Pit Contract") and December 4, 2012, for the construction of the AX Fly Ash Disposal Haul Road ("Haul Road Contract"), Claimant provided labor and materials for improvements to the following real property:

> The general location of the property is at the intersection of the W.H. Temple Surveys-Abstracts 362 and 358, the J.B. Harris Survey-Abstract 207, and the S.L. Johnson Survey-Abstract 228, in Milam County, Texas and consists of a lease area of approximately 420 acres surrounding the AX Fly Ash Disposal Pit Cell 1, which is 48.16 acres, and the AX Fly Ash Disposal Haul Road, which is 8.46 acres, in Milam County, Texas. See attached 3 drawings and aerial photograph for more a precise location of the lease area and improvements.

4.    Such labor and materials may be generally described as the construction of the AX Fly Ash Disposal Pit Cell 1 and the AX Fly Ash Disposal Haul Road on the Property ("Work"). The Work is about 98% complete. However, Claimant has not yet received a Notice of Completion and Final Acceptance from Sandow.

5.    The owner or reputed owner of the Property is Alcoa, Inc. ("Alcoa"), whose address is P.O. Box 472, Rockdale, Texas 76567. Sandow informed Claimant that Alcoa leased the Property to Sandow, and/or granted Sandow some other interest related to the Property.

**EXHIBIT B**

VOL. **1228** PAGE **626**
OFFICIAL RECORDS
MILAM COUNTY, TEXAS

6.    Sandow's address is 1601 Bryan Street-21st Floor, Dallas, Texas 75201.

7.    Alcoa and Sandow are being sent a notice of the claim, along with a copy of this lien claim affidavit prior to June 15, 2014, by certified mail to the addresses above.

8.    Claimant has acted as a general contractor to Sandow for the improvements on which the Claimant asserts a lien on Sandow's interest in the Property.

9.    After allowing all just credits, offsets, and payments, the amount of $80,993.00 is held as retainage by Sandow on the Haul Road Contract and $211,605.58 is held as retainage by Sandow on the Disposal Pit Contract, for a total of $292,598.58, which remains unpaid for the Work on the Property, and Claimant asserts a lien on Sandow's interest in the Property and the improvements thereon, to secure the payment of the amount claimed.  Claimant asserts both a statutory and constitutional lien, to the extent applicable.

10.   This lien claim affidavit is being filed in accordance with 11 U.S.C. Sections 362(b)(3) and 546(b) for the purpose of perfecting its lien claim under Texas law, and as a result of Sandow's filing a petition in bankruptcy under Chapter 11 of the Bankruptcy Code (11 U.S.C. Section 1101, *et seq.*).  In accordance with Section 53.124 of the Texas Property Code, the time of the inception of this lien claim began with the commencement of construction which was prior to the filing of Sandow's bankruptcy petition.

Brad McKenzie, Vice President
McKenzie Interests Inc, general
partner of Ranger Excavating LP


SWORN AND SUBSCRIBED TO BEFORE ME on this _9th_ day of June 2014.


Notary Public, State of Texas


After filing return to:

Stephen Sakonchick, II
6502 Canon Wren Drive
Austin, Texas 78746

LINDA GOETZ
My Commission Expires
June 02, 2017

VOL. **1228** PAGE **627**
OFFICIAL RECORDS
MILAM COUNTY, TEXAS





VOL. **1228** PAGE **629**
OFFICIAL RECORDS
MILAM COUNTY, TEXAS



VOL. 1228 PAGE 630
OFFICIAL RECORDS
MILAM COUNTY, TEXAS

CLERK'S NOTICE: ANY PROVISION HEREIN WHICH RESTRICTS THE SALE, RENTAL OR USE OF THE DESCRIBED
REAL PROPERTY BECAUSE OF COLOR OR RACE, IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW.

FILED

AT _2:35_ O'CLOCK _P._ M

ON THE _10_ DAY OF _June_

A.D., 20 _14_

_____

Barbara Vansa

COUNTY CLERK, MILAM COUNTY, TEXAS

BY _Linda Hall_ DEPUTY

42 K 5 Pg

**STATE OF TEXAS**
**COUNTY OF MILAM**
I hereby certify that this instrument was FILED on the date
and at the time stamped hereon by me and was duly
RECORDED in the Volume and Page of the Official Records
of Milam County, Texas.

Barbara Vansa
County Clerk, Milam County, Texas

VOL. _1228_ PAGE _626_

RECORDED _6-10-14 @ 5 P_

BY _Linda Hall_ DEPUTY

VOL. **1228** PAGE **631**
OFFICIAL RECORDS
MILAM COUNTY, TEXAS

Exhibit C

## APPLICATION FOR PAYMENT

| | | | | |
|---|---|---|---|---|
| **Date:** | August 31, 2013 | | | |
| **Project:** | Luminant Sandow AX Landfill Cell 1 CONTRACT #: A1893710 | | | |
| **Contractor:** | Ranger Excavating, LP<br>5222 Thunder Creek Rd Suite B1<br>Austin, Texas 78759 | **Owner:** | Luminant<br>Lincoln Plaza 500 N. Akard<br>Dallas, TX 75201 | |

| | | | | |
|---|---|---|---|---|
| **Monthly Estimate No.:** | #10 - RETAINAGE | **Estimate Period:** | | 8/1/2013-8/31/2013 |
| **Contract Amount:** | $3,345,300.00 | **Contract Date:** | | 12/1/2012 |
| **Plus Approved Change Orders:** | $99,496.20 | **Start Date:** | | TBD |
| **Total Contract Amount:** | $3,444,796.20 | **Contract Time:** | 275 | Days |
| **Amount Placed-To-Date:** | $3,409,555.80 | **Plus Approved Time Extensions:** | 0 | Days |
| **Material on Hand but Not In-Place:** | $0.00 | **Total Contract Time:** | 275 | Days |
| **Total:** | $3,409,555.80 | **Original Substantial Completion Date:** | | 9/2/2013 |
| **Less 10% Retainage** | $0.00 | **Original Final Completion Date:** | | 9/2/2013 |
| **Balance:** | $3,409,555.80 | **Revised Final Completion Date:** | | 9/2/2013 |
| **Less Amounts on Previous Estimates:** | $3,197,950.22 | **Days to Date:** | 0 Days | |
| | | **Percent Time Used:** | | 0.0% |
| **TOTAL AMOUNT DUE THIS ESTIMATE:** | **$211,605.58** | **Percent Complete:** | | 98.98% |

**SUBMITTED BY:**                                        **APPROVED:**

Ranger Excavating LP                                      Luminant

_____ 9/10/2013
Nathan Ziehr                    Date          Jacob Gonzales              Date
Project Manager                               Contract Coordinator

**RECOMMENDED FOR APPROVAL:**

Pastor, Behling & Wheeler, LLC                            Luminant

_____          _____
Patrick J. Behling, P.E.         Date          Mark Jenkins               Date
Project Manager & Engineer                     Contract Adminstrator

# EXHIBIT C

# CONTINUATION SHEET

RANGER EXCAVATING

AIA DOCUMENT G703

Page 1 of 2

RUATION (Range Excavating, L.P
XCUMENT G703 AMENDED
CATION AND CERTIFICATION FOR PAYMENT

Job Name: Luminant Sandow AX Landfill Cell 1

APPLICATION NO #16 RET#
APPLICATION DATE 9/1/2013-9C
PERIOD TO

| ITEM NO | DESCRIPTION OF WORK | UNIT | QTY & UNIT QUANTITY | UNIT PRICE | SCHEDULED VALUE | PREVIOUS QTY | WORK COMPLETED QTY THIS PERIOD | TOTAL THIS PERIOD | % THIS PERIOD | TOTAL COMPLETED TO DATE | % TO DATE | BAL/RETAI REMAI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | **Mobilization** | | | | | | | | | | | |
| A | TOTAL | LS | 1 | $ 120,000.00 | 120,000.00 | 1.00 | | $ | 0% $ | 120,000.00 | 100% | |
| B | **Site Preparation** | | | | | | | | | | | |
| B | TOTAL | LS | 1 | $ 50,000.00 | 50,000.00 | 1.00 | | $ | 0% $ | 50,000.00 | 100% | |
| | **Perimeter Ditch Construction** | | | | | | | | | | | |
| | Earthwork and Clearing | | | | | | | | | | | |
| C1 | **Excavation** | | | | | | | | | | | |
| C1 | TOTAL (Labor & Equipment Only) | CY | 70,000 | 1.00 | 70,000.00 | 57,196.00 | | $ | 0% $ | 57,196.00 | 82% | |
| | **Foundation Soil** | | | | | | | | | | | |
| C1 | TOTAL (Labor & Equipment Only) | CY | 430,000 | 1.75 | 792,500.00 | 444,674.00 | | $ | 0% $ | 778,178.50 | 103% | |
| C2 | **Foundation Soil Clearing** | | | | | | | | | | | |
| C2 | TOTAL (Labor & Equipment Only) | CY | 185,000 | 0.75 | 138,750.00 | 171,213.00 | | $ | 0% $ | 128,409.75 | 92% | |
| | Roadbase Placement | | | | | | | | | | | |
| C3 | **Stockpiling of Excess Foundation Soil** | | | | | | | | | | | |
| C3 | TOTAL (Labor & Equipment Only) | CY | 60,000 | 0.85 | 51,000.00 | 68,227.00 | | $ | 0% $ | 57,992.95 | 114% | |
| D1 | **Roadway Placement** | | | | | | | | | | | |
| D2 | Material | SY | 8,000 | 2.00 | 16,000.00 | 8,411.00 | | | | | | |
| D2 | Labor & Equipment | SY | 6,000 | 7.00 | 42,000.00 | 8,411.00 | | | | | | |
| | TOTAL | | | 9.25 | 74,000.00 | | | $ | 0% $ | 77,801.75 | 105% | |
| E | **Vegetative Soil Placement** | | | | | | | | | | | |
| E | **Vegetative Soil Placement** | | | | | | | | | | | |
| E | TOTAL (Labor & Equipment Only) | CY | 10,000 | 3.00 | 30,000.00 | 28,665.00 | | $ | 0% $ | 85,995.00 | 287% | |
| | Vegetation Establishment | | | | | | | | | | | |
| F1 | **Vegetation – Flat Surfaces and Slopes Less Than 4:1** | | | | | | | | | | | |
| | Material | AC | 5 | 758.00 | 3,790.00 | | | | | | | |
| | Labor & Equipment | AC | 5 | 1,742.00 | 8,710.00 | | | | | | | |
| | TOTAL | | | 2,500.00 | 12,500.00 | | | $ | 0% $ | - | 0% | |
| F2 | **Vegetation – Slope Greater Than or Equal to 4:1** | | | | | | | | | | | |
| | Material | AC | 5 | 2,800.00 | 14,000.00 | | | | | | | |
| | Labor & Equipment | AC | 5 | 4,700.00 | 23,500.00 | | | | | | | |
| | TOTAL | | | 7,500.00 | 37,500.00 | | | $ | 0% $ | - | 0% | |
| | **Access Ramp Construction** | | | | | | | | | | | |
| | Earthwork and Clearing | | | | | | | | | | | |
| G1 | **Excavation** | | | | | | | | | | | |
| G1 | TOTAL (Labor & Equipment Only) | CY | 25,000 | 0.90 | 22,500.00 | 25,000.00 | | $ | 0% $ | 22,500.00 | 100% | |
| | **Roadbase Placement** | | | | | | | | | | | |
| G2 | Material | SY | 3,000 | 2.00 | 6,000.00 | 2,875.00 | | | | | | |
| G2 | Labor & Equipment | SY | 3,000 | 7.25 | 21,750.00 | 2,875.00 | | | | | | |
| | TOTAL | | | 9.25 | 27,750.00 | | | $ | 0% $ | 27,518.75 | 99% | |
| G3 | **Culvert Crossing** | | | | | | | | | | | |
| G3 | Material | LS | 1 | 10,000.00 | 10,000.00 | 1.00 | | | | | | |
| G3 | Labor & Equipment | LS | 1 | 15,000.00 | 15,000.00 | 1.00 | | | | | | |
| | TOTAL | | | 25,000.00 | 25,000.00 | | | $ | 0% $ | 25,000.00 | 100% | |
| | **Liner System** | | | | | | | | | | | |
| | **Liner Subgrade** | | | | | | | | | | | |
| H1 | TOTAL (Labor & Equipment Only) | CY | 120,000 | 2.10 | 252,000.00 | 120,921.00 | | $ | 0% $ | 253,934.10 | 101% | |
| H2 | **GEOCL – Flat Surfaces and Slopes Less Than 4:1** | | | | | | | | | | | |
| H2 | Material | SF | 1,500,000 | 0.75 | 1,125,000.00 | 1,422,613.00 | | | | | | |
| H2 | Labor & Equipment | SF | 1,500,000 | 0.05 | 75,000.00 | 1,422,613.00 | | | | | | |
| | TOTAL | | | 0.80 | 1,200,000.00 | | | $ | 0% $ | 1,138,090.40 | 95% | |
| H3 | **GEOCL – Slopes Greater Than or Equal to 4:1** | | | | | | | | | | | |
| H3 | Material | SF | 70,000 | 0.95 | 66,500.00 | 71,545.00 | | | | | | |
| H3 | Labor & Equipment | SF | 70,000 | 0.05 | 3,500.00 | 71,545.00 | | | | | | |
| | TOTAL | | | 1.00 | 70,000.00 | | | $ | 0% $ | 71,545.00 | 102% | |
| H4 | **Anchor Trench Excavation and Backfill** | | | | | | | | | | | |

# CONTINUATION SHEET

UATION t Ranger Excavating, LP
CUMENT G703 AMENDED
ATION AND CERTIFICATION FOR PAYMENT

**Job Name: Lombardi Sandow AX Landfill Cell 1**

AIA DOCUMENT G703

APPLICATION NO    #10 - RETAI
APPLICATION DATE    8/31
PERIOD TO    
8/1/2013-8/31

Page 2 of 2

| A | C | D | | E | F | G | | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ITEM NO | DESCRIPTION OF WORK | QTY & UNIT | UNIT | UNIT PRICE | SCHEDULED VALUE | WORK COMPLETED | | | | TOTAL COMPLETED TO DATE | % TO DATE | BALAN REMAIN |
| | | QUANTITY | | | | PREVIOUS QTY | QTY THIS PERIOD | TOTAL THIS PERIOD | % THIS PERIOD | | | |
| | TOTAL Labor & Equipment Only | LF | 2,200 | $3.00 | $6,600.00 | 2,694.00 | - | - | 0% $ | 4,092.00 | 122% | |
| G | Temporary Site and Future GSGCL Trench | | | | | | | | | | | |
| | Material | LF | 3,400 | $30.00 | $102,000.00 | 3,035.00 | | | | | | |
| | Labor & Equipment | LF | 3,400 | $18.00 | $61,200.00 | 3,035.00 | | | | | | |
| | TOTAL | | | $48.00 | $163,200.00 | | - | - | 0% $ | 145,680.00 | 89% | |
| I | Protective Soil Placement | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 80,000 | $2.40 | $192,000.00 | 88,426.00 | - | - | 0% $ | 212,222.40 | 111% | |
| J | Demobilization and Site Decommissioning | | | | | | | | | | | |
| | TOTAL | LS | 1 | $5,000.00 | $5,000.00 | 1.00 | - | - | 0% $ | 5,000.00 | 100% | |
| K | Payment and Performance Bond | | | | | | | | | | | |
| | TOTAL | LS | 1 | $45,000.00 | $45,000.00 | 1.00 | - | - | 0% $ | 45,000.00 | 100% | |
| | CO#001 - E&A - Demucking of Unsuitable Material | LS | 1 | $9,205.00 | $9,205.00 | 1.00 | - | $ | 0% $ | 9,205.00 | 100% | |
| | CO#002 - Clay Borrow | LS | 1 | $90,491.20 | $90,491.20 | 1.00 | - | $ | 0% $ | 90,491.20 | 100% | |
| | | | | TOTAL | $3,444,796.20 | | | | 0% | $3,406,555.80 | 98.89% | $50.0 |

Exhibit D

APPLICATION FOR PAYMENT

OCT 2 3 2013

| | |
|---|---|
| **Date:** | August 31, 2013 |
| **Project:** | Luminant Sandow AX Haul Road |
| **Contractor:** | Ranger Excavating, LP<br>5222 Thunder Creek Rd Suite B1<br>Austin, Texas 78759 |

CONTRACT #: A1893758

| | |
|---|---|
| **Owner:** | Luminant<br>Lincoln Plaza 500 N. Akard<br>Dallas, TX 75201 |

| | | | | |
|---|---|---|---|---|
| **Monthly Estimate No.:** | #7 - RETAINAGE | **Estimate Period:** | | 8/1/2013-8/31/2013 |
| **Contract Amount:** | $858,050.00 | **Contract Date:** | | 12/1/2012 |
| **Plus Approved Change Orders:** | $11,882.50 | **Start Date:** | | TBD |
| **Total Contract Amount:** | $869,932.50 | **Contract Time:** | 275 | Days |
| **Amount Placed-To-Date:** | $809,930.05 | **Plus Approved Time Extensions:** | 0 | Days |
| **Material on Hand but Not In-Place:** | $0.00 | **Total Contract Time:** | 275 | Days |
| **Total:** | $809,930.05 | **Original Substantial Completion Date:** | | 9/2/2013 |
| **Less 10% Retainage** | $0.00 | **Original Final Completion Date:** | | 9/2/2013 |
| **Balance:** | $809,930.05 | **Revised Final Completion Date:** | | 9/2/2013 |
| **Less Amounts on Previous Estimates:** | $728,937.05 | **Days to Date:** | 0 Days | |
| | | **Percent Time Used:** | | 0.0% |
| **TOTAL AMOUNT DUE THIS ESTIMATE:** | $80,993.00 | **Percent Complete:** | | 93.10% |

**SUBMITTED BY:**

Ranger Excavating LP

_____  9/10/2013
Nathan Ziehr                Date
Project Manager

**RECOMMENDED FOR APPROVAL:**

Pastor, Behling & Wheeler, LLC

_____
Patrick J. Behling, P.E.          Date
Project Manager & Engineer

**APPROVED:**

Luminant

_____
Jacob Gonzales              Date
Contract Coordinator

Luminant

_____
Mark Jenkins                Date
Contract Adminstrator


EXHIBIT D

RANGER Excavating, L.P.

APPLICATION AND CERTIFICATION FOR PAYMENT

Job Name: Luminant Sandow XX Haul Road

APPLICATION NO: #7 RET
APPLICATION DATE: 8/1/2013-B

| ITEM NO | DESCRIPTION OF WORK | UNIT | QTY & UNIT QUANTITY | UNIT PRICE | SCHEDULED VALUE | PREVIOUS QTY | QTY THIS PERIOD | TOTAL THIS PERIOD | % THIS PERIOD | TOTAL COMPLETED TO DATE PERIOD TO | % TO DATE / BAL REM |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Mobilization** | | | | | | | | | | |
| L | TOTAL | LS | 1 | $16,000.00 | $16,000.00 | 1.00 | - | $- | 0% $- | $16,000.00 | 100% |
| | **Site Preparation** | | | | | | | | | | |
| M | TOTAL | LS | 1 | $12,000.00 | $12,000.00 | 1.00 | - | $- | 0% $- | $12,000.00 | 100% |
| | **Haul Road Improvements** | | | | | | | | | | |
| | Excavation | | | | | | | | | | |
| R1 | TOTAL (Labor & Equipment Only) | CY | 105,000 | $1.50 | $157,500.00 | 90,936.00 | - | $- | 0% $- | $136,404.00 | 87% |
| | Compacted Subgrade | | | | | | | | | | |
| H2 | TOTAL (Labor & Equipment Only) | CY | 5,000 | $1.75 | $8,750.00 | 588.00 | - | $- | 0% $- | $1,029.00 | 12% |
| | Stabilization | | | | | | | | | | |
| H3 | TOTAL (Labor & Equipment Only) | TON | 800 | $142.50 | $114,000.00 | 788.00 | - | $- | 0% $- | $112,290.00 | 99% |
| | Stabilized Base | | | | | | | | | | |
| H4 | TOTAL (Labor & Equipment Only) | CY | 11,000 | $5.00 | $55,000.00 | 10,375.00 | - | $- | 0% $- | $51,875.00 | 94% |
| | Roadbase Placement | | | | | | | | | | |
| H5 | Material | SY | 23,000 | $4.60 | $105,600.00 | 21,775.00 | - | - | | | |
| | Labor & Equipment | SY | 23,000 | $11.90 | $273,700.00 | 21,775.00 | - | $- | 0% $- | $358,247.50 | 95% |
| | TOTAL | | | | $379,300.00 | | | | | | |
| | Stockpiling of Excess from Haul Road | | | | | | | | | | |
| H6 | TOTAL (Labor & Equipment Only) | CY | 78,000 | $0.85 | $66,300.00 | 74,973.00 | - | $- | 0% $- | $63,727.00 | 96% |
| | Vegetative Soil Placement | | | | | | | | | | |
| O | TOTAL (Labor & Equipment Only) | CY | 5,000 | $3.00 | $15,000.00 | 5,895.00 | - | $- | 0% $- | $17,685.00 | 118% |
| | Vegetation - Flat Surfaces and Slopes Less Than 4:1 | | | | | | | | | | |
| P1 | Material | AC | 3 | $798.00 | $2,274.00 | | - | - | | | |
| | Labor & Equipment | AC | 3 | $1,742.00 | $5,226.00 | | - | $- | 0% $- | - | 0% |
| | TOTAL | | | | $7,500.00 | | | | | | |
| | Vegetation - Slopes Greater Than or Equal to 4:1 | | | | | | | | | | |
| P2 | Material | AC | 1 | $2,800.00 | $2,800.00 | | - | - | | | |
| | Labor & Equipment | AC | 1 | $4,700.00 | $4,700.00 | | - | $- | 0% $- | - | 0% |
| | TOTAL | | | | $7,500.00 | | | | | | |
| | Demolition and Site Decommissioning | | | | | | | | | | |
| Q | TOTAL | LS | 1 | $5,000.00 | $5,000.00 | 1.00 | - | $- | 0% $- | $5,000.00 | 100% |
| | Payment and Performance Bond | | | | | | | | | | |
| R | TOTAL | LS | 1 | $15,000.00 | $15,000.00 | 1.00 | - | $- | 0% $- | $15,000.00 | 100% |
| | CO#001 - T&M - Bottom Ash Removal from Haul Road | LS | 1 | $11,882.50 | $11,882.50 | 1.00 | - | $- | 0% $- | $11,882.50 | 100% |
| | TOTAL | | | | $969,832.50 | | | | 0% $- | $907,160.05 | 92.02% |

AIA DOCUMENT G703 CONTINUATION SHEET FOR G702    1992 EDITION    AIA    ©1992
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W. WASHINGTON, D.C. 20006-5292

Exhibit - LBAX Haulroad - 087 - RETAINAGE - 08August - Payment Application - G703-1992

Exhibit E

_ 1213.

Ranger
Received

DEC 17 2012

Excavating

CONTRACT FOR SERVICES

FOR

CONSTRUCT AX FLY ASH DISPOSAL PIT CELL 1

BY AND BETWEEN

RANGER EXCAVATING

AND

SANDOW POWER COMPANY LLC

DATED NOVEMBER 30, 2012

NO. A1893710

EXHIBIT E

Contract No. A1893710

**EFFECTIVE DATE**

December 1, 2012

**PARTIES**

COMPANY

Sandow Power Company LLC, a Texas Organization

CONTRACTOR

Ranger Excavating, L.P., a Texas Limited Partnership

**PURPOSE**

The purpose of this Agreement is to provide for the performance of the Work described in the Scope of Work provision below, for and in consideration of the mutual obligations set forth in this Agreement.

**DEFINITIONS**

COMPANY Group

The term "COMPANY Group" means COMPANY, its parent corporation, Energy Future Holdings Corp., and all subsidiaries and affiliates of Energy Future Holdings Corp., and all officers, directors, shareholders, associates, related firms and entities, employees, servants and agents of both COMPANY and each such subsidiary or affiliate.

CONTRACTOR GROUP

The term "CONTRACTOR Group" means CONTRACTOR, all subcontractors of any tier employed by CONTRACTOR, and all affiliated or related firms and entities, officers, directors, partners, limited partners, shareholders, associates, employees, servants and agents of each.

Work

The term "Work" means all labor, materials, equipment, transportation, facilities or services necessary to perform the Scope of Work described in this Agreement.

Work Site

The term "Work Site" means location(s) where the Work will be performed.

Contractor Coordinator

The term "Contract Coordinator" means a representative of each party named in this Agreement to act in matters relating to performance of this Agreement as it is written.  Actions of the Contract Coordinators regarding the day-to-day interaction between the operations of the parties, the issuance and approval of invoices, the issuance and approval of procedures, drawings, schedules and documents of any type, and other decisions made in managing this Agreement will not operate as a waiver or compromise of any provision of this Agreement.

Contract Administrator

2

Contract No. A1893710

The term "Contract Administrator" means a representative(s) of each party named in this Agreement to act in matters relating to the revision of contract language, the adjustment of compensation or time, and the resolution of issues regarding the meaning of contract language. Actions of COMPANY's Contract Administrator include initiating, negotiating and issuing supplements or amendments to this Agreement, as required; receiving required notices; providing answers to CONTRACTOR concerning questions of contract interpretation and negotiating resolutions/settlements to disputes that may arise concerning this Agreement.

**SCOPE OF WORK**

CONTRACTOR will be responsible for the supply of any and all materials, equipment, supervision and labor required for the full and complete performance of the following Work found as an attachment to this document titled "AX Area Landfill Cell No. 1 Scope of Work and Technical Specification" dated September 17, 2012, this contract is specific to the work referenced in Part 1 -- AX Landfill Cell No. 1 and made a part of the bid. All drawings referenced in this specification are also made a part of this agreement.

**TERMS OF AGREEMENT**

This Agreement will commence on its Effective Date and will terminate on September 2, 2013, unless terminated earlier pursuant to its other provisions. This Agreement may only be extended or modified by written agreement signed by both parties.

**SCHEDULE**

CONTRACTOR will begin the Work by December 1, 2012 and complete it by September 2, 2013. The Work will be scheduled through the direction of COMPANY's Contract Coordinator.

**COMPENSATION**

As full compensation for the satisfactory performance by CONTRACTOR of this Agreement, COMPANY will compensate CONTRACTOR in accordance with the rate(s) or price(s) contained in the attachment to this Agreement titled "CONTRACTOR Unit Price Sheet."

All compensation paid to CONTRACTOR excludes applicable State Sales and Use Tax.

**INVOICES AND PAYMENT**

CONTRACTOR will, at the end of each calendar month in which the Work is performed, and prior to the tenth (10th) day of the following month, submit to COMPANY invoices based on Work completed during the prior month. Invoices will reference this Agreement by number and contain sufficient detail, as may be requested by COMPANY, to support all charges and reimbursements of expenses.

Payment will be made within sixty (60) days of receipt and approval of each invoice. Should a discrepancy or conflict arise, the disputed portion of the invoice will not be paid until the parties resolve such discrepancy or conflict to their mutual satisfaction.

With the exception of invoice number 1 for the synthetic liner material (which retainage will not be held), ten percent (10%) of each payment to CONTRACTOR will be retained by COMPANY toward the discharge of any claims or liens until sixty (60) days after CONTRACTOR has completed all Work and the following requirements have been met, as determined by COMPANY, in its sole discretion:

3

Contract No. A1893710

A.      Final Acceptance of all Work by COMPANY and cleanup of the Work Site; and

B.      Receipt by COMPANY from CONTRACTOR of the Contractor's Release and Indemnity Agreement attached hereto stating that CONTRACTOR has paid all taxes and has satisfied all claims against it, including, but not limited to, claims for labor, materials, equipment, services and supplies provided in connection with the Work.

All invoices will be sent via email to ap.invoicing@luminant.com

**SALES/USE TAX**

COMPANY will provide CONTRACTOR with a Texas Direct Pay Exemption Certificate which will negate the necessity of CONTRACTOR's obligation to collect Texas sales and use taxes from the COMPANY. A Sandow Power Company LLC Texas Direct Pay Exemption Certificate No. 3-20-1997560-9 is attached and made a part of this Agreement.

"All incorporated materials purchased by CONTRACTOR which become part of the permanent realty of COMPANY shall be purchased on the basis of resale by CONTRACTOR."

**WORK SITE**

The Work will be performed at the following location(s):

Sandow Steam Electric Station, Rockdale, TX

**WORK SITE SAFETY, SECURITY, ALCOHOL, DRUGS AND WEAPONS**

CONTRACTOR will obtain from COMPANY's Contract Coordinator prior to commencing Work the specific Work Site Safety, Security and other related rules and procedures, if any, applicable to the particular job or Work Site.  Those specific rules and procedures are incorporated fully into this Agreement by this reference.

In addition to complying with those specific rules and procedures CONTRACTOR agrees to comply with the rules and procedures contained in the attachment to this Agreement titled "Work Site Safety, Security, Alcohol, Drugs and Weapons."

**BROWZ**

As a condition of this Contract, Contractor agrees to register with Browz and provide those necessary documents requested by Browz to be deemed in compliance with the Browz application.  As a minimum, requested documents will be related to safety and health (i.e., regulatory required training, certifications, safety plans, safe and secure workplace practices, etc.), OSHA and MSHA injury rates and Experience Modification Rate (EMR) and other important business data requested by Browz through the registration process.  Contractor agrees to maintain the identified documentation for the life of the contract.

Registration and compliance shall be completed within thirty (30) days of the effective date of the Contract.  Noncompliance with these requirements shall be grounds for withholding payment of outstanding invoices or termination of the Contract.

**THE REVIEW OF THE FOREGOING INFORMATION BY BROWZ OR BY COMPANY OR THE APPROVAL OF CONTRACTOR'S REGISTRATION WITH BROWZ ARE NOT APPROVALS OF**

4

Contract No. A1893710

CONTRACTOR'S DOCUMENTS, DATA, SAFETY AND HEALTH TRAINING, CERTIFICATIONS, SAFETY PLANS, SAFE OR SECURE WORKPLACE PRACTICES OR OTHER MATTERS SUBMITTED TO BROWZ OR COMPANY. REVIEW OF CONTRACTOR'S INFORMATION OR APPROVAL OF CONTRACTOR'S REGISTRATION SHALL NOT DIMINISH CONTRACTOR'S RESPONSIBILITIES OR OBLIGATIONS OR WAIVE COMPANY'S RIGHTS WITH RESPECT TO SUCH MATTERS UNDER THE AGREEMENT.  CONTRACTOR AGREES THAT IT SHALL NOT ASSERT THAT THE REVIEW AND APPROVAL OF CONTRACTOR'S INFORMATION OR THE APPROVAL OF CONTRACTOR'S REGISTRATION ARE OR WERE AN APPROVAL OF SUCH MATTERS BY COMPANY OR BROWZ.

**INSURANCE**

CONTRACTOR will, at its sole expense, purchase and maintain, and require its subcontractors to purchase and maintain, during the term of this Agreement, insurance policies with substantial and sound insurers, having coverage of the types and in the amounts specified in the attachment to this Agreement titled "Contractor's Insurance Requirements" submitted by CONTRACTOR prior to the execution of this Agreement.

**TERMS AND CONDITIONS**

The parties will comply with the terms and conditions of this Agreement and the attachment to this Agreement titled "Standard Terms and Conditions PLST03."

**NOTICES**

All notices from one party to the other will be deemed to have been delivered if hand delivered or sent by United States certified mail, return receipt requested, postage prepaid, as follows:

If to CONTRACTOR:

Ranger Excavating
5222 Thunder Creek Rd. Suite B1
Austin, TX 78759
Attention: Nathan Ziehr
(512) 331-5551

If to COMPANY:

Sandow Power Company LLC
1601 Bryan St. 21st Floor
Dallas, Texas  75201-3411
Attention: Mark Jenkins

COMPANY's Contract Coordinator is Jacob Gonzales, phone (214) 875-8057.

CONTRACTOR's Contract Coordinator is Nathan Ziehr, phone (512) 331-5551.

COMPANY's Contract Administrator is Mark Jenkins, phone (214) 875-8637.

CONTRACTOR's Contract Administrator is Nathan Ziehr, phone (512) 331-5551.

Contract No. A1893710

## ATTACHMENTS

The following attachments are incorporated into this Agreement:

1. Direct Payment Exemption Certificate
2. Work Site Safety, Security, Alcohol, Drugs and Weapons
3. Contractor's Insurance Requirements
4. Standard Terms & Conditions PLST03
5. Browz Registration Form
6. Technical Specification titled "AX Area Landfill Cell No. 1 Scope of Work and Technical Specification" dated September 17, 2012 specifically the work scope in Part 1 – AX Landfill Cell No. 1
   a. Associated Drawings
      i. Cell No. 1 Plans (C1) Revised 10/22/12
      ii. Miscellaneous Details (C2)
      iii. Miscellaneous Details (C3)
      iv. Haul Road Plan, Profile, and Section (C4)
      v. Cover Sheet and Index (G1)
      vi. Location Map (G2)
7. CONTRACTOR Unit Price Sheet
8. Post Pre-Bid Questions and Answers

## AMENDMENTS

Except as otherwise provided in this Agreement, no changes, modifications, amendments or supplements or any other provisions will be valid unless agreed to in writing and signed by the parties.

## ENTIRETY OF AGREEMENT

This Agreement constitutes the full, complete, and entire understanding, agreement, and arrangement of and between the parties hereto with respect to the subject matter hereof and supersedes any and all prior oral and written understandings, agreements and arrangements between them.  The Parties hereto have entered into this Agreement voluntarily and for valuable consideration, and not by reasons of any fraud, duress, undue influence or mistakes.  Each of the Parties acknowledges that it/he has read this Agreement and that it/he fully knows, understands, and appreciates this Agreement and executes this Agreement voluntarily and of its/his own free will and by executing this Agreement signifies its/his assent to and willingness to be bound by its terms. **IN SIGNING THIS AGREEMENT, EACH PARTY ACKNOWLEDGES THAT IT IS RELYING SOLELY ON ITS OWN JUDGMENT.  NO PARTY IS RELYING ON, ON OR BEING INDUCED TO EXECUTE THIS AGREEMENT BY ANY STATEMENTS, REPRESENTATIONS, AGREEMENTS OR PROMISES, ORAL OR WRITTEN, MADE BY ANY OTHER PARTY, THEIR AGENTS, EMPLOYEES, SERVANTS OR ATTORNEYS, OR ANYONE ELSE, OTHER THAN THE STATEMENTS EXPRESSLY WRITTEN IN THIS AGREEMENT. EXCEPT AS TO THE STATEMENTS EXPRESSLY WRITTEN IN THIS AGREEMENT, THE PARTIES SPECIFICALLY AND INTENTIONALLY WAIVE ANY CLAIMS FOR FRAUDULENT INDUCEMENT AGAINST ANY OTHER PARTY, INCLUDING ITS AGENTS, EMPLOYEES, SERVANTS, OR ASSIGNS, TO THIS AGREEMENT.**

Contract No. A1893710

The parties have signed this Contract acknowledging their agreement to its provisions as of the Effective Date.

Ranger Excavating

By: _____
Signature

Name: _____

Title: _____

Date: 12·17·12

Sandow Power Company LLC

By: _____
Signature

Name: Mark Jenkins

Title: Sr. Procurement Specialist

Date: November 30, 2012


By: _____
Signature

Name: John Berard:

Title: Sr Sourcing Manager

Date: 12/21/12


By: _____
Signature

Name: COLIN CARRELL

Title: DIRECTOR – SUPPLY CHAIN

Date: 12/21/12

7

Contract No. A1893710

**ATTACHMENT NO. 1**
**DIRECT PAYMENT EXEMPTION CERTIFICATE**
State of Texas
Direct Payment Exemption Certificate
Limited Sales, Excise, and Use Tax

Direct payment authorization number:    3-20-1997560-9 Sandow Power Company LLC

Sandow Power Company LLC hereby claim exemption from the payment of state, city, county, SPD, MTA and/or CTD sales and/or use taxes upon its purchase of taxable items and/or services from:

CONTRACTOR:        Ranger Excavating, LP
Address:                5222 Thunder Creek Rd. Suite B1
City, State, Zip:       Austin, TX 78759

Description of items and/or services purchased under Contract No. A1893710:

CONSTRUCT AX FLY ASH DISPOSAL PIT CELL 1

This certificate will remain in effect until the expiration date of the above contract.

This certificate does not cover:

A.    Purchase of taxable items and/or services to be resold.
B.    Sales or rental to any purchaser other than the permit holder.
C.    Sales or rental of motor vehicles subject to the motor vehicle sales and use tax (Chapter 152) and interstate motor carrier sales and use tax (Chapter 157).
D.    Nontaxable services or materials/supplies used or consumed by a provider of a nontaxable service.
E.    Lump-sum new construction projects to improve real property.

CONTRACTOR agrees not to permit others (including its contractors and repairmen) to use this direct payment authorization to purchase material tax free.

COMPANY agrees to accrue and pay the tax to the Comptroller of Public Accounts as required by statute.

Permit holder:   Sandow Power Company LLC

Authorized Signature/Date: _M. Jaul_   12/19/12

**BID FORM**
**LUMINANT POWER - AX AREA LANDFILL**
**PART 1 - AX LANDFILL CELL NO. 1**

| Bid Item | Description | Estimated Quantity | Units | Unit Price | Total Cost |
|---|---|---|---|---|---|
| A | Mobilization | 1 | LS | $ 120,000.00 | $120,000 |
| B | Site Preparation | 1 | LS | $ 50,000.00 | $50,000 |
| | **Foundation Soil** | | | | |
| C1 | Excavation | 430,000 | CY | $ 1.75 | $752,500 |
| C2 | Foundation Soil Grading | 185,000 | CY | $ 0.75 | $138,750 |
| C3 | Stockpiling of Excess Foundation Soil | 60,000 | CY | $ 0.85 | $51,000 |
| | **Perimeter Dike Construction** | | | | |
| D1 | Earthwork and Grading | 70,000 | CY | $ 1.00 | $70,000 |
| D2 | Roadbase | 8,000 | SY | $ 9.25 | $74,000 |
| E | Vegetative Soil Placement | 10,000 | CY | $ 3.00 | $30,000 |
| | **Vegetation Establishment** | | | | |
| F1 | Vegetation – Flat Surfaces and Slopes Less Than 4(H) to 1(V) | 5 | ACRE | $ 2,500.00 | $12,500 |
| F2 | Vegetation – Slopes Greater Than or Equal to 4(H) to 1(V) | 5 | ACRE | $ 7,500.00 | $37,500 |
| | **Access Ramp Construction** | | | | |
| G1 | Earthwork | 25,000 | CY | $ 0.90 | $22,500 |
| G2 | Roadbase | 3,000 | SY | $ 9.25 | $27,750 |
| G3 | Culvert Crossing | 1 | LS | $ 25,000.00 | $25,000 |
| | **Liner System** | | | | |
| H1 | Liner Subgrade | 120,000 | CY | $ 2.10 | $252,000 |
| H2 | GSGCL - Flat Surfaces and Slopes Less Than 4(H) to 1(V) | 1,500,000 | SF | $ 0.80 | $1,200,000 |
| H3 | GSGCL - Slopes Greater Than or Equal to 4(H) to 1(V) | 70,000 | SF | $ 1.00 | $70,000 |
| H4 | Anchor Trench Excavation and Backfill | 2,200 | LF | $ 3.00 | $6,600 |
| H5 | Temporary Dike and Future GSGCL Tie-in | 3,400 | LF | $ 48.00 | $163,200 |
| I | Protective Soil Placement | 80,000 | CY | $ 2.40 | $192,000 |
| J | Demobilization and Site Decommissioning | 1 | LS | $ 5,000.00 | $5,000 |
| | | | | **TOTAL CONTRACT PRICE:** | **$3,300,300** |

**OWNER'S OPTION AND ALTERNATE PAY ITEMS (DO NOT INCLUDE IN TOTAL)**

| Bid Item | Description | Estimated Quantity | Units | Unit Price | Total Cost |
|---|---|---|---|---|---|
| K | Payment and Performance Bond | 1 | LS | $ 45,000.00 | $45,000 |

Notes
1) LS - Lump Sum
2) CY - Cubic Yards
3) SF - Square Feet
4) NA - Not Applicable
5) SY - Square Yards
6) LF - Linear Foot

Contract No. A1893710

## ATTACHMENT NO. 2
## WORK SITE SAFETY, SECURITY, ALCOHOL DRUGS AND WEAPONS

A.    SAFETY

1.    CONTRACTOR agrees that any safety related assistance or initiatives undertaken by COMPANY will not relieve CONTRACTOR from responsibility for the implementation of, and compliance with, safe working practices, as developed from their own experience, or as imposed by law or regulation, and will not in any way, affect the responsibilities resting with CONTRACTOR under the provisions of any agreement to which these policies are attached and to meet all safety requirements as specified by the Occupational Safety & Health Administration (OSHA), the Mine Safety Health Administration (MSHA), the Department of Transportation (DOT) and any other applicable state or federal safety and health laws or regulations.

2.    In the event that a material safety data sheet (hereinafter "MSDS"), warning label, or other documentation concerning the use of hazardous chemicals at the Work Site or any other property owned or controlled by COMPANY or any of its affiliates (collectively, together with the Work Site, "COMPANY Properties"), applies to any materials or equipment provided by CONTRACTOR as an aspect of the Work, such documentation will be provided by CONTRACTOR to COMPANY prior to the commencement of any such Work.

3.    CONTRACTOR will provide information to COMPANY regarding hazardous chemicals and/or consumable products that contain constituents listed in 40 CFR 372.65 used at any COMPANY Property. CONTRACTOR will report the amount of such material carried on and off the site, the amount actually used and the manner of use. CONTRACTOR will provide the maximum quantity of the material stored on site at any one time and if a waste material was collected, where it was disposed of (location name and address). CONTRACTOR will provide information on the amount of material used for the previous calendar year by the first of February.

4.    CONTRACTOR will provide for the duration of the term of any agreement to which these policies are attached, at its sole expense, adequate first aid facilities for members of CONTRACTOR Group.

5.    CONTRACTOR acknowledges and agrees that all members of CONTRACTOR Group performing Work at any COMPANY Property are required to view COMPANY's "CONTRACTOR/Visitor Safety Orientation" video, when applicable, and to read and adhere to COMPANY's "CONTRACTOR/Visitor Safety Booklet" prior to performing any Work any COMPANY Property.

6.    CONTRACTOR acknowledges and agrees that all members of the CONTRACTORS Group performing Work at the Work Site have received the required safety, health and environmental training in accordance with appropriate state and federal laws and regulations, and CONTRACTOR shall have documentation of training for each member of such CONTRACTOR Group available for review at the Work Site.

7.    Prior to entering the Work Site, CONTRACTOR is required to prepare a CONTRACTOR's Safety Health Program in accordance with state and federal laws and regulations and shall have a hard copy of such program in CONTRACTOR's possession and available for review when performing Work at the Work Site.

8.    CONTRACTOR acknowledges and agrees that, except as otherwise expressly authorized in writing by COMPANY's designated safety representative, appropriate protective equipment will be worn by any member of CONTRACTOR Group while on any COMPANY Property. In addition, when any member of CONTRACTOR Group is performing Work which may expose that person to potential

9

hazards, CONTRACTOR acknowledges and agrees that such person will wear appropriate clothing specific to and adequate for that exposure.

9.      CONTRACTOR will take all reasonable precautions to prevent any accident in connection with the performance of Work, including, but not limited to, putting up and maintaining sufficient barriers and lights.

10.     CONTRACTOR will report to COMPANY all accidents involving personal injuries (including death) and damage to property occurring directly or indirectly as a result of the Work performed by CONTRACTOR hereunder immediately, but in no event, no later than 24 hours after the occurrence of any such accident. Any accident or incident occurring directly or indirectly as a result of the Work which CONTRACTOR must report to a regulatory agency (e.g. OSHA, MSHA, TCEQ) must also be reported to COMPANY immediately following notification to the regulatory agency.

B.      SECURITY

1.      COMPANY may supply such site security as it deems necessary and may specify to CONTRACTOR such additional security precautions and procedures at any COMPANY Property as, in COMPANY's opinion, are reasonably necessary for the safety and security of COMPANY's personnel and property.

2.      Security by COMPANY at COMPANY Properties, if any, will not provide personal policing of the materials, tools and equipment of CONTRACTOR Group. CONTRACTOR will assume sole responsibility for safeguarding such materials, tools and equipment.

3.      It will be the affirmative duty of CONTRACTOR to ensure that CONTRACTOR Group assists in carrying out all security measures, to include reporting all information or knowledge of matters adversely affecting security to COMPANY's designated security personnel.

4.      COMPANY reserves the right to exclude any of CONTRACTOR's employees from any COMPANY Property by denial of access, suspension or revocation of access authorization, preemptory expulsion, or by any other means, without notice or cause. Former COMPANY employees, and any of CONTRACTOR's employees who previously have been excluded from any COMPANY Property, may be brought onto COMPANY property or facilities only if prior approval from COMPANY is obtained.

5.      COMPANY measures may also include investigations, whether by COMPANY or law enforcement officials. CONTRACTOR agrees to cooperate in such investigations and understands that COMPANY reserves the right to require anyone in CONTRACTOR Group to authorize appropriate agencies to release his or her criminal records to CONTRACTOR as a condition of either initial or continued permission for access to any COMPANY Property. Investigations may include searches of CONTRACTOR Group. Such searches may include searches of facilities assigned to CONTRACTOR Group, search of all COMPANY Property areas and property at such COMPANY Property areas, searches of including, but not limited to, offices, lockers, desks, lunch boxes, packages and motor vehicles (regardless of ownership). Without limiting the foregoing, CONTRACTOR acknowledges and agrees that all members of CONTRACTOR Group, to the extent that COMPANY reasonably determines that such members require security badge access prior to entering onto any COMPANY Property, shall be required to comply with COMPANY's standard security badge requirements, including without limitation a background check to be performed by COMPANY.

6.      CONTRACTOR agrees to instruct its employees in the details of COMPANY's work site security policies and measures, both as specified herein and as hereinafter provided by COMPANY to CONTRACTOR.

C.      ALCOHOLIC BEVERAGES, DRUGS AND WEAPONS

CONTRACTOR will inform all members of CONTRACTOR Group, who may be involved in the performance of any Work, of the following COMPANY rules, relating to alcoholic beverages, drugs and weapons, with which all employees are expected to comply:

1.      Bringing, attempting to bring, possessing, using or being under the influence of intoxicants, drugs, or narcotics while on any COMPANY Property, including, but not limited to parking areas, is prohibited. Possessing alcoholic beverages in sealed containers is permitted, however, in designated parking areas owned or controlled by Oncor Electric Delivery Company LLC, Luminant Generation Company LLC, Oak Grove Management Company LLC, Generation Development Company LLC, Sandow Power Company LLC and EFH Corporate Services Company, but not parking areas owned or controlled by Luminant Mining Company LLC, Luminant Big Brown Mining Company LLC and Oak Grove Mining Company LLC.

2.      Drugs prescribed by a licensed physician, for an individual working on any COMPANY Property, which could affect the employee's job performance, or non prescription drugs which could affect the employee's job performance, are allowed on any COMPANY Property only if they have been previously cleared by the employee's supervisor.  Any employee taking such medication must inform his or her supervisor of the medication and dosage being taken.

3.      Bringing, attempting to bring, possessing or using firearms, whether classified as legal or illegal, while on any COMPANY Property, including but not limited to buildings, parking areas, recreation facilities, equipment and vehicles, is prohibited.  Use or possession of firearms for specific situations is permitted if approved by function or higher level management of COMPANY.

4.      Off the job involvement with intoxicants, drugs, or narcotics, which adversely affects COMPANY's business, to include impairing the employee's ability to perform his job, or the public trust in the safe operation of COMPANY is prohibited.

5.      Any conduct on any COMPANY Property which is in violation of any state or federal law or regulation is considered a violation of these rules and a breach of any agreement to which these policies are attached.

6.      CONTRACTOR is responsible for the compliance of CONTRACTOR Group with the above specified rules.

7.      In order to enforce these rules, all individuals with access to any COMPANY Property as well as the vehicles, offices, lockers and any personal belongings of such individuals on any COMPANY Property are subject to search by COMPANY and its agents, to include security representatives appointed or employed by COMPANY.  Individuals may be required to take a blood, urinalysis or Breathalyzer test, or submit to other recognized investigatory tests or procedures as are deemed appropriate or necessary by COMPANY in the investigation of a violation of these rules.

8.      The refusal, on the part of any of CONTRACTOR Group, to submit immediately to a search of his or her person and/or property, or to be tested, whether by blood test, urinalysis, Breathalyzer or other recognized investigatory test or procedure, after being requested to do so, will be considered a violation of COMPANY rules.

Contract No. A1893710

9.    Violations of these rules may be cause for denial of access to any COMPANY Property.

Contract No. A1893710

## ATTACHMENT NO. 3
## CONTRACTORS INSURANCE REQUIREMENTS
### Block D General Requirements ($3 Million Total Liability Limits)

CONTRACTOR will, at its own expense, maintain in force throughout the period of this document or agreement, or as otherwise specified, and until released by COMPANY the following minimum insurance coverages, with insurers acceptable to COMPANY.

1) Workers' Compensation and Employers' Liability Insurance, providing statutory benefits in accordance with the laws and regulations of the State of Texas or state of jurisdiction as applicable. The minimum limits for the employers' liability insurance will be five hundred thousand dollars ($500,000) bodily injury each accident, five hundred thousand dollars ($500,000) each employee bodily injury by disease, five hundred thousand dollars ($500,000) policy limit bodily injury by disease.

2) Commercial General Liability Insurance, including bodily injury and property damage, personal and advertising injury, contractual liability, and including products and completed operations coverage continuing for three (3) years after Final Acceptance, or completion of the Work, whichever is later, with minimum limits of one million dollars ($1,000,000) per occurrence for bodily injury, including death and property damage.

3) Automobile Liability Insurance for coverage of owned, non-owned and hired autos, trailers or semi-trailers with a minimum combined single limit of one million dollars ($1,000,000) per accident for bodily injury, including death, and property damage.

4) Excess Liability Insurance over and above the employers' liability, commercial general liability and automobile liability insurance coverage, with a minimum limit of two million dollars ($2,000,000) per occurrence. Coverage must replace exhausted aggregate limits under the coverages referenced in #1 (employers' liability), and #2 above. Coverage must continue for three (3) years after Final Acceptance, or completion of the Work, whichever is later.

ADDITIONAL PROVISIONS:

A) The required limits of insurance can be satisfied by any combination of primary and excess coverage.

B) The commercial general liability insurance, automobile liability insurance and excess liability insurance policies will contain provisions that specify that the policies are primary as respects to COMPANY and will apply without consideration for other policies separately carried By COMPANY. The policies shall also include standard severability provisions that state each insured is provided coverage as though a separate policy had been issued to each, except with respects to limits of insurance, and that only one deductible (if applicable) will apply per occurrence regardless of the number of insureds involved in the occurrence. CONTRACTOR will be responsible for any deductibles or retentions.

C) The commercial general liability insurance, automobile liability insurance and excess liability insurance policies, if written on a claims-made basis, will be maintained in full force and effect for three (3) years after Final Acceptance or completion of the Work, whichever is later.

D) All policies must be issued by carriers having an A.M. Best's rating of "A-" or better, and an A.M. Best's financial size category of "VIII" or better, or Standard & Poor Insurance Solvency Review of "A-" or better. If requested in writing by COMPANY, CONTRACTOR will make available to COMPANY a certified copy of any or all insurance policies or endorsements required of CONTRACTOR.

E) Prior to commencement of Work, CONTRACTOR will provide to COMPANY certificates of insurance evidencing the coverage required herein. COMPANY's review of certificates or policies

Contract No. A1893710

will not be construed as accepting any deficiencies in CONTRACTOR's insurance or relieve CONTRACTOR of any obligations set forth herein. In addition, CONTRACTOR will require each of its subcontractors to provide adequate insurance. Any deficiencies in the insurance to be provided by subcontractors will be the responsibility of CONTRACTOR.

F)  Certificates of insurance must show Energy Future Holdings Corp. and its direct and indirect subsidiaries as the certificate holder, and as an additional insured (including completed operations) as respects all of the required coverages except workers' compensation. Workers' compensation shall include Energy Future Holdings Corp. and its direct and indirect subsidiaries as an alternate employer. All of the required coverages must provide a waiver of subrogation in favor of the certificate holder.

G)  CONTRACTOR agrees to report to the manager of the claims department of the COMPANY in writing as soon as practical all instances of damage to the Work and all accidents or occurrences which may result in injuries to any person, including death, and any property damage, arising out of the performance of the Work.

H)  If the insurance obligations or coverage required in this Agreement exceed the maximum limits permitted by law or are determined to be invalid, illegal, unenforceable, or in conflict with the law of any court of competent jurisdiction, then this Agreement will be deemed amended so as to conform with the applicable law, including, if the coverage exceeds legal limits, to only require CONTRACTOR to provide insurance to the maximum extent allowed by law. The validity, legality, and enforceability of the remaining obligations and terms of coverage required in this Agreement shall not be affected or impaired, and will remain in full force and effect.

I)  The requirements contained herein as to the types and limits of all insurance to be maintained by CONTRACTOR are not intended to and will not, in any manner, limit or qualify the liabilities and obligations assumed by CONTRACTOR under this Agreement

**ATTACHMENT NO. 4**
**STANDARD TERMS AND CONDITIONS PLST03**
**STANDARD TERMS AND CONDITIONS**
**PLST03**

## INDEPENDENT CONTRACTOR RELATIONSHIP

CONTRACTOR will act as and be deemed to be an independent contractor. Neither CONTRACTOR nor any of its employees will act as, nor be deemed to be, an agent or employee of COMPANY. CONTRACTOR will have the sole right to control and directly supervise the method, manner and details of the Work.

## MATERIALS, EQUIPMENT AND LABOR

CONTRACTOR will provide and furnish all material, labor, services, supervision, tools, apparatus, conveyances, equipment and incidental expenses required to complete the Work, except for those specifically mentioned in this Agreement to be provided by COMPANY. All materials and equipment incorporated into any Work under this Agreement will be new and of the most suitable grade unless otherwise specified.

CONTRACTOR will be solely responsible for the proper storage, transportation and disposal of any product or waste, other than sandblasting waste, used or generated in connection with the Work in accordance with all applicable Environmental Laws. CONTRACTOR will dispose of all waste materials, other than sandblasting waste, at an off-site disposal facility approved for such waste materials pursuant to applicable Environmental Laws and will complete and sign all waste manifests as the generator of such waste. COMPANY will be responsible for the storage, transportation and disposal of any sandblasting waste generated during the performance of the Work.

## ASSIGNMENT

CONTRACTOR will not assign, transfer or otherwise dispose of any of its obligations or duties without the prior written approval of COMPANY. Any assignment or transfer made without the express written approval of COMPANY will be null and void.

## SUBCONTRACTING

CONTRACTOR will not subcontract for any of the Work without the prior approval of COMPANY and CONTRACTOR will not be relieved of any duty or liability relating to any Work by reason of subcontracting. There will be no contractual relationship between COMPANY and any subcontractor by virtue of this Agreement.

## BINDING ON SUCCESSORS AND ASSIGNS

This Agreement will inure to the benefit of and be binding upon the undersigned parties and entities, and their respective legal representatives, successors and approved assigns.

## STANDARDS AND CODES

Whenever reference is made in this Agreement to standards or codes in accordance with which Work is to be performed or tested, the edition or revision of the standards of codes current on the Effective Date will apply, unless otherwise expressly stated. In case of conflict between any referenced standards and codes and any documents attached to and incorporated into this Agreement, the Agreement documents will govern.

## CONDITIONS AFFECTING WORK

CONTRACTOR will investigate and acquaint itself with the conditions affecting the Work, including but not limited to those related to the transportation, disposal, handling and storage of materials and waste; availability of labor, water, electric power and roads; the uncertainties of weather, river stages or similar physical conditions at the site; the conformation and condition of the ground; and the character of equipment and facilities needed preliminary to and during prosecution of the Work. CONTRACTOR has

16

satisfied itself as to the character, quality and quantity of surface and subsurface materials or obstacles to be encountered. CONTRACTOR's failure to acquaint itself with any conditions affecting the Work or any available related information will not relieve it from responsibility for properly estimating the difficulty or cost of successfully performing the Work.

COMPANY is not responsible for any conclusions or interpretations made by CONTRACTOR from the information made available by COMPANY, other than information contained in or referenced in this Agreement. CONTRACTOR will draw its own conclusions from its review of any and all data and information provided by COMPANY.

CONTRACTOR assumes full responsibility for investigating conditions and determining the existence and magnitude of any hazards to the physical well-being of property of CONTRACTOR, the employees, agents, and servants of CONTRACTOR, or any other person or entity who is or may become involved in the performance of Work, and any and all other persons in the vicinity of the Work. CONTRACTOR will advise all of the above-specified persons or entities of any hazards relating to Work, and will ensure that those persons or entities are advised of and fully understand the nature of the hazards and safety precautions that can be taken to eliminate or minimize dangers relating to the hazards.

CONTRACTOR will use its best efforts to ensure that the Work is performed so as to minimize any adverse impact upon natural resources and the environment and will use best industry practices in this regard at all times.

CONTRACTOR will immediately notify COMPANY as soon as CONTRACTOR has reason to believe that CONTRACTOR, or any employee or other person performing the Work, is not or may not be performing the Work in compliance with applicable Environmental Laws. CONTRACTOR will provide COMPANY with written notice to COMPANY of such actual or potential non-compliance within three (3) days following the discovery thereof. CONTRACTOR will take immediate steps to ensure compliance with all applicable Environmental Laws and will, if directed by COMPANY, cease all Work until authorized by COMPANY to resume the Work.

## CHANGES IN WORK

COMPANY may by written notice, make changes in, additions to, or deletions from the Work. If any change significantly increases the time required to perform the Work, an equitable adjustment will be made in the schedule for the performance and completion of the Work. If the Work is being performed on a fixed price basis, and if any change significantly increases or decreases the cost to CONTRACTOR of performing the Work, then an equitable adjustment will be made in the price. The compensation rates for the Work will not be changed.

In order to receive an equitable adjustment in price or schedule, CONTRACTOR must provide a written request for that adjustment within five (5) working days after receiving COMPANY's notice of a change in the Work. CONTRACTOR will continue to perform the changed Work prior to or pending Agreement on an equitable adjustment and will not halt or delay performance of the Work because of any failure to reach an Agreement on an adjustment.

## ENVIRONMENTAL

In the event that CONTRACTOR discovers during the performance of the Work any substance at the Work Site that is not the subject of the Work or has not otherwise been identified by COMPANY for CONTRACTOR, which substance CONTRACTOR has reason to believe is or may be a Hazardous Substance that (i) has been or may be released or spilled into the soil, surface water, or groundwater or in a building or structure, or (ii) consists of asbestos-containing materials, lead-based paint, batteries, thermostats, lighting equipment, or equipment containing polychlorinated biphenyls, CONTRACTOR will immediately stop Work and notify COMPANY of the discovery. CONTRACTOR will not resume the Work until receiving authorization from COMPANY to do so.

The term "Hazardous Substance" means any product, waste, emission or substance defined, listed or designated as a hazardous or toxic substance, hazardous waste, hazardous material or pollutant by or pursuant to any Environmental Law and includes, but is not limited to, any petroleum-based product, substance or waste, including any additives associated therewith, pesticides, fertilizers, solvents, polychlorinated biphenyls, mercury, lead, lead-based paint, asbestos-containing material or explosives.

CONTRACTOR will immediately notify COMPANY in the event of a spill or release of any material which CONTRACTOR knows or has reason to believe is a Hazardous Substance, whether onto the ground, into any body of water, a storm or sanitary sewer, or the air, or anywhere on property owned or controlled by COMPANY, including within any building or structure. CONTRACTOR will be solely responsible, as may be required by applicable Environmental Laws, for, in consultation with COMPANY, (i) notifying the appropriate governmental agencies of such spill or release caused or permitted by the acts or omissions of CONTRACTOR and (ii) for the cleanup and remediation of such spill or release.

## FORCE MAJEURE

If either party becomes unable, either wholly or in part, by an event of Force Majeure, to fulfill its obligations under this Agreement, the obligations affected by the event of Force Majeure will be suspended only during the continuance of that inability. The party so affected will give written notice of the existence, extent and nature of the Force Majeure to the other party within forty-eight (48) hours after the occurrence of the event. The party so affected will remedy its inability as soon as possible. Failure to give notice will result in the continuance of the affected party's obligation regardless of the extent of any existing Force Majeure.

The term "Force Majeure" as used in this Agreement means acts of God (except as excluded herein), strikes, lockouts, or other industrial disturbances, acts of public enemies, wars, blockades, insurrections, riots, epidemics, earthquakes, fires, priority allocations of pipe or other materials or orders, restraints or prohibitions by any court, board, department, commission or agency of the United States or of any States, any arrests and restraints, civil disturbances, explosions and inability despite reasonable diligence to obtain materials essential to the Work. Rain, snow, ice or other adverse weather conditions will not be considered events of Force Majeure.

## SUSPENSION FOR CAUSE

In addition to the other remedies provided COMPANY in this Agreement, COMPANY has the right to order the temporary suspension of any Work when it determines, in its sole discretion, that performance of the Work is not being conducted in a safe manner, the specified quality of the Work is not being met, or the Work is not otherwise being performed in accordance with the requirements of this Agreement.

If any unsatisfactory condition of a portion of any Work performed hereunder is brought to CONTRACTOR's attention, and is corrected by CONTRACTOR to COMPANY's complete satisfaction, COMPANY will authorize resumption of the Work. Should CONTRACTOR fail to promptly correct the unsatisfactory condition to COMPANY's complete satisfaction, CONTRACTOR will be considered in breach of this Agreement.

If circumstances are brought to COMPANY's attention that indicate CONTRACTOR's delay in performance of the Work, or any other fact giving COMPANY reasonable apprehension of CONTRACTOR's ability to perform the Work, COMPANY may, at its discretion, withhold payment which may be due CONTRACTOR until such time as CONTRACTOR demonstrates its willingness and ability to complete the Work in strict accordance with this Agreement.

If any suspension of Work significantly increases the time required for the performance of the Work, an equitable adjustment may, in COMPANY's sole discretion, be made in the performance obligations. In no event, however, will any suspension be the basis for any claim or cause of action by CONTRACTOR or CONTRACTOR's employees, agents, or subcontractors against COMPANY.

## TERMINATION

COMPANY may terminate this Agreement, in whole or in part, at any time, at its sole discretion, by providing written notice of termination to CONTRACTOR.  The notice of termination will specify the effective date of any termination, and the Work or any part of the Work to be terminated, or alternatively, that this Agreement is terminated in its entirety.

CONTRACTOR will discontinue Work in accordance with COMPANY's termination instructions.  Upon receiving notice of termination, CONTRACTOR will place no further orders, or enter into further subcontracts for services, materials or equipment related to the terminated Work.  In addition, CONTRACTOR will delay or terminate all existing orders and subcontracts, insofar as those orders and subcontracts relate to the performance of the Work terminated.

In the event this Agreement or the Work is terminated, COMPANY's only liability will be to pay CONTRACTOR the unpaid balance due CONTRACTOR for Work actually performed.

There will be deducted from any unpaid balance due CONTRACTOR the amounts of all claims of COMPANY against CONTRACTOR, including, but not limited to, claims on account of defect in materials and workmanship.

## TERMINATION FOR DEFAULT

If a petition in bankruptcy should be filed by CONTRACTOR, or if CONTRACTOR should make a general assignment for the benefit of creditors, or if a receiver should be appointed due to the insolvency of CONTRACTOR, or if CONTRACTOR should refuse or fail to supply enough properly skilled workmen or proper equipment, materials or services or should fail to make prompt payment to subcontractors, or to pay promptly for materials or labor, or disregard laws, ordinances or the instruction of COMPANY's Contract Coordinator, or if CONTRACTOR should refuse or fail to abide by the Agreement Construction Schedule or otherwise violate any provisions of the Agreement, then COMPANY, upon a determination by COMPANY's Contract Coordinator that sufficient cause exists to justify such action, may, without prejudice to any other right or remedy available to it after giving CONTRACTOR seven (7) days' written notice, terminate the Agreement and take possession of the Work Site.  In the event of such a termination, COMPANY may use all or part of CONTRACTOR's equipment and materials and may finish the Work by whatever method COMPANY may deem expedient.  In such event, CONTRACTOR will not be entitled to receive any further payment hereunder until the Work is finished.  If the unpaid balance of the Agreement Price will exceed the expense of finishing the Work, including compensation of COMPANY's Contract Coordinator, other COMPANY personnel, third party engineering companies, or other contractors for additional services, such excess will be paid to CONTRACTOR.  If the expense of finishing the Work will exceed such unpaid balance, CONTRACTOR will pay the difference to COMPANY within fifteen (15) days of receiving an invoice for same.  The expenses incurred by COMPANY herein, and the damage incurred through CONTRACTOR's default, will be determined by COMPANY's Contract Coordinator, in its sole discretion, and such determination will be binding as between the parties.

In the event of a termination under the provisions of this Article, CONTRACTOR will transfer and assign to COMPANY, in accordance with COMPANY's instructions, all Work, all construction records, reports, permits, data and information, other materials (including all COMPANY-supplied materials), supplies, Work in progress and other goods for which CONTRACTOR is entitled to receive reimbursement hereunder, and any and all plans, drawings, sketches, specifications, and information in connection with the Work, and will take such action as may be necessary to secure COMPANY, at COMPANY's sole election, the rights of CONTRACTOR under any or all orders and subcontracts made in connection with the Work.

In the event that COMPANY so directs or authorizes, CONTRACTOR will sell at a price approved by COMPANY, or retain at a mutually agreeable price, any such materials, supplies, Work in progress, or other goods as referred to in the preceding paragraph.  In any event, COMPANY will receive any and all records, plans, drawings, data, permits, specifications, sketches, reports, or other information relating to

the Work.  The proceeds of any such sale or the agreed price will be paid or credited to COMPANY in such manner as COMPANY may direct so as to reduce the amount payable by COMPANY under this Article.

## INSPECTORS

A thorough inspection of all Work performed, including, but not limited to Work being performed at location(s) of subcontracted Work, and all materials furnished may be made by inspectors designated by COMPANY's Contract Coordinator to determine if the Work is being performed in strict compliance with this Agreement.  Neither COMPANY's Contract Coordinator nor COMPANY's inspectors have any power or authority to waive any of the provisions of this Agreement or any obligations of CONTRACTOR under this Agreement.

## FINAL INSPECTION AND ACCEPTANCE

CONTRACTOR will notify COMPANY in writing when it considers all Work complete and ready for final acceptance.  COMPANY, with CONTRACTOR's cooperation, may conduct such inspections and tests to satisfy itself that the Work conforms to all of the requirements of this Agreement.  If the Work is acceptable, COMPANY will within a reasonable time, notify CONTRACTOR in writing of its Final Acceptance of the Work and authorize CONTRACTOR to issue its final invoice.

If all or part of the Work is not complete or is unacceptable, COMPANY will notify CONTRACTOR of the incomplete or unacceptable Work, and CONTRACTOR will, at its sole expense, complete or correct the Work so that the Work conforms to all of the requirements of this Agreement.

## WARRANTY

CONTRACTOR agrees and warrants that its employees, agents and subcontractors will perform the Work in a good and workmanlike manner, in accordance with high professional standards, with a level of care, skill, knowledge and judgement required or reasonably expected of firms or persons performing comparable services, and in strict accordance with this Agreement, including but not limited to, all specifications made a part of this Agreement.  Further, CONTRACTOR warrants that all Work will be free from defects in design, materials and workmanship for a period of twelve (12) months from the date of Final Acceptance by COMPANY of all Work, except where specific Work items have been specified to have a longer warranty.

Upon oral or written notice from COMPANY that any of the Work performed by CONTRACTOR fails to conform to any of the above-specified warranties, CONTRACTOR will, at no additional cost to COMPANY, properly remedy the failure and reperform any Work necessary so that the Work conforms to those warranties.  CONTRACTOR further warrants any and all corrected or reperformed Work to be free from defects in design, materials and workmanship for a period of twelve (12) months following acceptance by COMPANY of the corrected or reperformed Work.  Nothing herein will limit the rights and remedies that may be available to COMPANY at law or in equity.

## BACKCHARGE

If COMPANY discovers defective or nonconforming Work, it may, after notifying CONTRACTOR to correct the defective or nonconforming Work and upon CONTRACTOR's refusal or failure to proceed with corrective action in a reasonable time, perform the  redesign, repair, rework or replacement of the defective or nonconforming Work by the most expeditious means available and backcharge CONTRACTOR for all costs incurred.

COMPANY may either separately invoice, or deduct from any payments due CONTRACTOR, the costs for any backcharge.  The performance of backcharge work by COMPANY or COMPANY's representative will not relieve CONTRACTOR of any of its responsibilities under this Agreement.

Contract No. A1893710

## RECORDS AND RIGHTS TO AUDIT

CONTRACTOR will keep accurate and complete books of accounts, records, documents and other evidence related to the charges for and performance of any Work, including CONTRACTOR's compliance with Environmental Laws related to the Work ("Records"), and of any change or modification to the charges. COMPANY or COMPANY's Contract Coordinator may inspect those records at any time during normal business hours.

All Records required for an audit and inspection will be made available at the offices of CONTRACTOR, at all reasonable times, for inspection, audit or reproduction, until three (3) years from date of final payment for any Work. COMPANY will bear the expenses incurred by it in supporting any such inspection or audit; provided, however, that should any audit or investigation produce evidence that CONTRACTOR has knowingly overstated charges or units of measure upon which charges are based, or provided gifts, gratuities or other benefits to employees of COMPANY in violation of the Business Ethics provisions of this Agreement, CONTRACTOR will be liable to COMPANY for actual damages, including cost of audit and investigation.

## BUSINESS ETHICS

CONTRACTOR represents and warrants that neither it nor any person or entity associated in any manner with CONTRACTOR will:

1)      Provide or offer any compensation or benefit of any type, including any gift or gratuity, other than advertising mementos of nominal value or reasonable business meals and business entertainment, to any COMPANY employee;

2)      To the best of CONTRACTOR's knowledge, maintain or establish any undisclosed business affiliation that could constitute or give the appearance of a conflict with the interests of COMPANY; or

3)      Except to the extent expressly provided for in this Agreement, attempt to act on behalf of or, in any manner, seek to represent COMPANY.

If, during the term of this Agreement, CONTRACTOR knows or becomes aware of any facts or circumstances contrary to the representations and the warranties above, CONTRACTOR will immediately notify COMPANY and provide sufficient information for COMPANY to take appropriate protective or corrective actions. CONTRACTOR further agrees to cooperate fully in any investigation undertaken by COMPANY.

CONTRACTOR, if requested by COMPANY, agrees to require its employees to execute an ethics/nondisclosure agreement at any time.

## CONTRACTOR'S RESPONSIBILITY FOR WORK

CONTRACTOR will care for and maintain both the partially completed and finished Work until final acceptance by COMPANY. Acceptance of portions of the Work made for the purpose of determining partial payments will not constitute Final Acceptance of any portion of the Work.

## WORK SITE PERMITS AND LICENSES

Subject to the following two paragraphs, CONTRACTOR will obtain, prior to the commencement of the Work, and provide to COMPANY upon request, all permits, licenses and governmental authorizations, at its sole expense, required for the performance of the Work. CONTRACTOR will be solely responsible for maintaining compliance with such permits, licenses and governmental authorizations.

In the event that a storm water discharge permit is required for the performance of the Work, (i)

CONTRACTOR will be responsible for filing a Notice of Intent with respect to the Work, in addition to any Notice of Intent that COMPANY may be required to file, and (ii) CONTRACTOR will coordinate with COMPANY in the preparation and execution of a Storm Water Pollution Prevention Plan for the Work Site.

In the event that the performance of the Work involves the handling or abatement of asbestos-containing materials, CONTRACTOR will coordinate with COMPANY in the preparation and filing of all required notification forms.

### ACCESS

Should CONTRACTOR desire access to the Work Site over any land not controlled by COMPANY, it will, at its sole expense, obtain all proper permits or written permission necessary for that access.

### HAULING AND OPERATING PERMITS

CONTRACTOR will obtain all hauling and other operating permits and licenses required for the performance of the Work and will pay all related charges and fees.  CONTRACTOR will also give all notices (other than COMPANY's Notice of Intent) necessary and incidental to the lawful performance of the Work.

### COMPANY FACILITIES

CONTRACTOR will not use COMPANY's sanitary facilities, changehouses, shops, parks, storage buildings, tools, equipment or other facilities unless so directed by COMPANY.  CONTRACTOR will not discharge, without COMPANY's prior written authorization, any product or waste used or generated in connection with the Work through any (i) COMPANY-permitted outfall, (ii) COMPANY-owned or operated pollution control equipment, or (iii) storm or sanitary sewer located at or in the vicinity of the Work Site. Any request for authorization to discharge will include, at a minimum, either a copy of the Material Safety Data Sheet for the product or a written description of the waste, including a list of the constituents of the waste and the relative concentrations thereof.

### COLLATERAL WORK

COMPANY and other contractors may be working at the Work Site.  COMPANY reserves the right to coordinate the performance of CONTRACTOR's Work with the work of others.  CONTRACTOR will cooperate with and will not delay, impede or otherwise impair the work of others.  COMPANY does not guarantee CONTRACTOR continuous uninterrupted access to the Work Site, but will provide such access as good construction practices will allow, considering the other activities in the area.

### PROTECTION OF PROPERTY AND PERSONS

CONTRACTOR will protect the Work (whether completed or in progress), materials, equipment, adjacent property, natural resources and the public from any damage or danger relating to the Work, and will be responsible for any damage, loss or injury due to its actions or neglect.  CONTRACTOR will take reasonable precaution to prevent any accident in connection with the performance of the Work and will put up and maintain sufficient barriers, lights and/or other necessary precautions.

### PROTECTION OF HIGHWAYS AND RAILROADS

CONTRACTOR will make suitable arrangements with governmental authorities and railroads for the construction of all structures, whether underneath or over roads, railroads or rights-of-way to protect the public from accident or delay.  CONTRACTOR will repair, at its own expense, to the satisfaction of the governmental authorities or other owners, all roads, railroads and bridges that may be damaged by, or given undue wear due to the Work.

## CLEANING UP

CONTRACTOR will at all times keep the Work Site free of waste materials or rubbish caused by the Work. After completing the Work, CONTRACTOR will remove all its waste materials, rubbish, tools, supplies, equipment and surplus materials from and about the Work Site.

If CONTRACTOR fails to keep the Work Site clean or to clean up after completing the Work, COMPANY may do so and charge all costs of cleaning up to CONTRACTOR. Those costs may be deducted from the final payment to CONTRACTOR.

## CONFLICT OF INTEREST

CONTRACTOR will not engage in any activity that will adversely affect or impair its ability to perform the Work in an independent and reliable manner. CONTRACTOR warrants that it has no professional or contractual obligations that will conflict with its performance of any Work.

## PROTECTION AGAINST LIENS AND ENCUMBRANCES

CONTRACTOR will not at any time permit any lien, attachment or other encumbrance ("Encumbrance") by any person or persons whosoever or by reason of any claim or demand against CONTRACTOR to be placed or remain on the property of COMPANY, including, but not limited to, the Work Site upon which Work is being performed or equipment and materials that are being furnished. To prevent an Encumbrance from being placed on the property of COMPANY, CONTRACTOR will furnish during the progress of any Work, as requested from time to time, verified statements showing CONTRACTOR's total outstanding indebtedness in connection with the Work.

If CONTRACTOR allows any indebtedness to accrue to subcontractors or others and fails to pay or discharge that indebtedness within five (5) days after demand, then COMPANY may withhold any money due CONTRACTOR until that indebtedness is paid or pay the indebtedness and apply that amount against the money due CONTRACTOR.

If CONTRACTOR allows any Encumbrances, whether valid or invalid to be placed on the property of COMPANY, any and all claims or demands for payment to CONTRACTOR will be denied by COMPANY until the Encumbrance is removed. If the Encumbrance is not removed immediately, COMPANY may pay that claim or demand and deduct the amount paid, together with all related expenses, including attorneys' fees, from any further payment due CONTRACTOR, or at COMPANY's election, CONTRACTOR will, upon demand, reimburse COMPANY for the amount paid and all related expenses. Any payment made in good faith by COMPANY will be binding on CONTRACTOR.

## TAXES

CONTRACTOR will comply with all federal, state, or municipal laws, rules and regulations regarding taxes and the payment of taxes, until the Work has been completed, including, without limitation, social security, state unemployment insurance, gross receipts taxes, withholding taxes, and income tax. CONTRACTOR will furnish, upon request by COMPANY, satisfactory evidence of its compliance.

## WAIVER OF CONSEQUENTIAL DAMAGES

Neither party will be liable to the other in contract, tort, or on any other basis, for any consequential damages of any nature, including, but not limited to, lost profits or revenues, loss of customer goodwill, business interruption costs, overhead costs, lost profits, costs of capital, or loss of use of money. Consequential damage also includes attorneys' fees, except as otherwise specifically provided for, in this Agreement and it is expressly understood that this paragraph will be subjugated to, and will not limit or otherwise affect in any manner, CONTRACTOR's obligations to indemnify and hold harmless COMPANY as provided for in the Indemnity and Intellectual Property provisions of this Agreement or CONTRACTOR's obligation as provided for in the Warranty provision of this Agreement.

23