Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4    In re:                     :
                                 :      Chapter 11
5    ENERGY FUTURE HOLDINGS     :
     CORP.,  et al.,            :      Case No. 14-10979(CSS)
6                                :
             Debtors.           :      (Jointly Administered)
7    _____:
                                 :
8    DELAWARE TRUST COMPANY,     :
     As TCEH First Lien         :
9    Indenture Trustee,         :
                                 :
10           Plaintiffs,        :      Adv. Pro No. 15-51239(CSS)
                                 :
11      -against-               :
                                 :
12   WILMINGTON TRUST, N.A.,     :
     as First Lien Collateral   :
13   Agent and First Lien       :
     Administrative Agent       :
14   et al.,                    :
                                 :
15           Defendants.        :
     _____:

16

17                              United States Bankruptcy Court

18                              824 North Market Street

19                              Wilmington, Delaware

20                              March 4, 2016

21                              10:08 AM – 1:28 PM

22   B E F O R E :

23   HON CHRISTOPHER S. SONTCHI

24   U.S. BANKRUPTCY JUDGE

25   ECRO OPERATOR:  LESLIE MURIN

1    HEARING re Consideration of the Joint Motion for Judgment on

2    the Pleadings, filed by Morgan Stanley and J. Aron &

3    Company.

4

5    HEARING re Consideration of the Joint Motion for Judgment on

6    the Pleadings, filed by Titan Investment Holdings LP.

7

8    HEARING re Consideration of the Joint Motion for Judgment on

9    the Pleadings, or in the Alternative, Partial Summary

10   Judgment filed by Delaware Trust Company, as TCEH First Lien

11   Indenture Trustee.

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1  A P P E A R A N C E S :

2

3  COZEN O'CONNOR

4       Attorney for J. Aron

5

6  BY:  SIMON E. FRASER

7       TOM MOLONEY

8

9  CLEARY GOTTLIED STEEN & HAMILTON LLP

10       Attorney for J. Aron

11

12  BY:  HUMAYUN KHALID

13       ELSBETH BENNETT

14

15  CADWALADER, WICKERSHAM & TAFT LLP

16       Attorney for Morgan Stanley

17

18  BY:  MARK ELLENBERG

19       HOWARD HAWKINS

20

21  ROSS, ARONSTAM & MORITZ

22       Attorney for Titan Investment Holdings

23

24  BY:  BRAD ARONSTAM

25

1   WEIL GOTSHAL & MANGES LLP

2        Attorney for Titan Investment Holdings

3

4   BY:  SAL ROMANELLO

5        RONIT BERKOVICH

6

7   O'MELVENY & MYERS

8        Attorney for Wilmington Trust as Admin Agent

9

10  BY:  PETER FRIEDMAN

11

12  STEVENS & LEE

13       Attorney for Wilmington Trust as Admin Agent

14

15  BY:  JOSEPH H. HUSTON, JR.

16

17  SEWARD & KISSEL LLP

18       Attorney for Wilmington Trust AS Collateral Agent

19

20  BY:  MARK D. KOTWICK

21       THOMAS HOOPER

22

23

24

25

1   KOBRE & KIM LLP

2        Attorney for Delaware Trust Company

3

4   BY:  MICHAEL KIM

5        BENJAMIN SAUTER

6        JEREMY HOLLENBEAK

7

8   MCELROY, DEUTSCH, MULVANEY & CARPENTER LLP

9        Attorney for TCEH Debtors

10

11  BY:  DAVID PRIMACK

12

13  PERKINS COIE

14       Attorney for Delaware Trust Company

15

16  BY:  TINA MOSS

17

18  BAYARD

19       Attorney for Delaware Trust Company

20

21  BY:  GIAN CLAUDIO FINIZIO

22

23  DLH PIPER LLP

24       Attorney for Morgan Stanley

25

1  BY:  ASHLEY R. AHSCHULER

2

3  KLEHR HARRISON

4      Attorney for UMB Bank, N.A., Indentured Trustee

5

6  BY:  RAYMOND H. LEMISCH

7

8  ALSO PRESENT TELEPHONICALLY:

9

10  PEG A. BRICKLEY

11  EMILY A. BUSSIGEL

12  MARK A. CODY

13  KENT COLLIER

14  MICHAEL CUSTER

15  CATHERINE EISENHUT

16  MARK A. FINK

17  MARK W. HANCOCK

18  MARK F. HEBBELN

19  HAROLD KAPLAN

20  STUART KOVENSKY

21  JASON M. MADRON

22  MATTHEW I. RAPPOPORT

23  ELIZABETH RASSKAZOVA

24  STEVEN R. SCHWARTZ

25  AMER TIWANA

1   DANIEL J. HARRIS

2   JESSICA LIOU

3   MICHELE C. MAMAN-COHEN

4   RACHAEL RINGER

5   DANIEL S. SHAMAH

6   AMER TIWANA

7   TAMARA VAN HEEL

8   DANIEL HARRIS

9   MARK SINK

10  MICHAEL BUSTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  Good morning.

3              MR. FINIZIO:  Good morning, Your Honor.  Gian

4    Claudio Finizio with Bayard, on behalf of Delaware Trust

5    Company.  Your Honor, we're here today on the oral argument

6    in adversary proceeding 15-51239.  Thank you, Your Honor,

7    for setting aside four hours, which we think is more than

8    sufficient to cover the issues we have to present for Your

9    Honor today.  We'd just like to take a brief moment to

10   introduce my co-counsel, and then apprise Your Honor of how

11   we propose of going forward, subject to of course however

12   Your Honor wishes to proceed.  Your Honor, with me is

13   litigation co-counsel, of Kobre & Kim, Michael Kim.

14             MR. KIM:  Good morning, Your Honor.

15             THE COURT:  Good morning.

16             MR. FINIZIO:  Ben Sauter.

17             MR. SAUTER:  Good morning, Your Honor.

18             MR. FINIZIO:  Jeremy Hollembeak.

19             Jh Good morning, Your Honor.

20             MR. FINIZIO:  And co-counsel of Perkins Coie, Tina

21   Moss.

22             MS. MOSS:  Good morning, Your Honor.

23             THE COURT:  Good morning.

24             MR. FINIZIO:  Your Honor, we had agreed to a

25   logical split of time -- two hours for the plaintiff, two

```
 1    hours for defendants.  We also agreed that we would be the

 2    first to present, and as Your Honor may be aware, Wilmington

 3    Trust did not take an active role in the briefing.  However,

 4    their counsel in both the fixed capacity as first lien

 5    collateral agent and first lien administrative agent should

 6    Your Honor have any questions of Wilmington Trust.

 7              THE COURT:  Okay.

 8              MR. FINIZIO:  With that, Your Honor, unless you

 9    have any questions, I cede the podium to my co-counsel, Mr.

10    Kim.

11              THE COURT:  Does anybody else want to make

12    introductions before we begin?  It's totally up to you.

13              MR. MOLONEY:  We can, Your Honor.  Good morning,

14    Your Honor.  It's Tom Moloney on behalf of J.  Aron,

15    (Indiscernible), and I'm going to be speaking first on the

16    defense side, and I'm going to be dealing with one of the

17    issues.  And followed my comrade over there, Mark Ellenberg,

18    who's going to deal with another issue, and then followed by

19    Sal Romanello, who's going to back clean up.  I'll explain

20    to you the sequence when I get up first.

21              THE COURT:  Okay, very good.

22              MR. MOLONEY:  Thank you, Your Honor.

23              THE COURT:  Thank you, all right, yes.  Good

24    morning.

25              MR. ALTSCHULER:  Just for introductions, Your
```

1  Honor, good morning.  Ashley Altschuler from DLA Piper

2  representing Morgan Stanley Capital Group.  With me are my

3  colleagues from Cadawalader, Wickersham & Taft, Mark

4  Ellenberg, And Howard Hawkins, who will be arguing on behalf

5  of Morgan Stanley.  They've been an admitted pro hac vice to

6  this Court back in September.  Thank you.

7           THE COURT:  Okay, very good, thank you.  All

8  right, let's begin.

9           MR. KIM:  Good morning, Your Honor.

10           THE COURT:  Good morning.

11           MR. KIM:  Michael Kim, from Kobre & Kim, for

12  Delaware Trust.  With Your Honor's permission, although I'll

13  be addressing the bulk of the issues, I was hoping that my

14  co-counsel, Ben Sauter, could address the Court for at least

15  certain of the issues that would be coming up.

16           THE COURT:  That's fine.

17           MR. KIM:  As Your Honor knows, this dispute is a

18  dispute purely among creditors, and purely among creditors

19  that are parties to an inter-creditor agreement.  And the

20  core of the dispute arises from the fact that these

21  different creditors had different rates of interest

22  applicable to the debt outstanding for each of them, and not

23  to sort of go through it in more detail than necessary, but

24  fundamentally what is occurring here is that the first lien

25  notes, whose trustee I represent, have one rate of interest,

1    I think 11.5 percent, and the hedges and swaps have, at

2    least under their agreements, a rate of interest that can

3    change, and I guess in the current environment, you have a

4    situation where the Court is presented with two choices,

5    being advocated by each side.

6            The choice is whether to respect what I would

7    submit is the clear agreement among the parties to continue

8    the differing rates of interest that each of them had

9    negotiated, and whether to apply that in terms of the

10   division of assets coming to them out of this entire

11   situation, or whether instead, as advocated by the defense,

12   to ignore the different rates of interest, and allow them to

13   divide the assets in some manner that allegedly falls

14   outside of the inter-creditor agreement.

15           So that's really the core of the dispute.  And I

16   know that there's been a very large amount of briefing

17   already submitted to the Court, so I will try to make my

18   presentation as simple, and I don't know if entertaining's

19   the right word, but at least not as repetitive of the

20   briefing as I can.

21           So in terms of legal issues, there are really

22   three basic issue it boils down to.  I think the first issue

23   is whether under the payment provision, 4.1 of the inter-

24   creditor agreement.  And I'm sure to Your Honor's delight, I

25   will be putting some of the definitions up in the ELMO and

1    pointing to some of the relevant lines, because

2    unfortunately I think it is unavoidable, and I think the

3    clear language is actually quite important here.  The first

4    issue is whether under Section 4.1 of the inter-creditor

5    agreement, whether the parties had agreed, essentially, to

6    have their different rates of interest applied to the

7    division of assets, regardless of whether post-petition

8    interest is allowed or allowable in the bankruptcy, at least

9    vis-à-vis the Debtor.  So that's the first issue.

10            I think the second issue, which is a cluster of a

11   number of different questions raised in the briefing, but it

12   boils down to, for the value that is coming out of this

13   situation -- and you have a few different components, the

14   adequate protection payments, the plan distributions, et

15   cetera.  Whether those are really covered by the inter-

16   creditor agreement as collateral or proceeds of collateral,

17   as defined in the relevant security documents.  Okay, or

18   whether such value somehow falls outside of the inter-

19   creditor agreement, and the scheme that has been set out in

20   the sole provision of the inter-creditor agreement that

21   basically tells the reader how assets are supposed to be

22   divided, which is again, 4.1.

23            And the third, which is whether the amounts

24   received, the value received, or received upon the exercise

25   of remedies, under the securities documents, by the

1    collateral agent, a phrase that appears in 4.1, and that

2    talks about that that's the universe of the value that's

3    supposed to be divided, according to the payment provision

4    of the inter-creditor agreement.

5          So I think -- I know because right now the Court's

6    faced with two different motions, both arguing that the

7    documents are clear, and the Court can resolve the issues as

8    a matter of law.  There's been several rounds of, I think

9    opposition briefing, and rebuttals, and essentially what

10   functioned to serve all those, and I think as the briefing

11   went on, it just kept getting more and more complex as

12   people in the briefing started theorizing about what

13   different phrases could mean, and what people might have

14   been thinking when they wrote the phrases.

15         But I will submit, Your Honor, that the core of

16   the dispute can really be decided by reference to a few very

17   simple provisions, and I think the most important guiding

18   principle here is that the inter-creditor agreement exhibits

19   very clearly that the parties have explicitly stated that

20   their relations would be the same, regardless of whether

21   there were an insolvency or not, and that in the manner in

22   which their relations would say the same would include the

23   fact that they had differing rates of interest, regardless

24   of whether post-petition interest were allowed or allowable

25   as a matter of bankruptcy law, vis-à-vis the Debtor.  So to

1    reconstruct this, I would first ask the Court's permission

2    to turn on one of the electronics.

3              THE COURT:  Okay.

4              MR. KIM:  (indiscernible) happened, okay.  And put

5    up 4.1, which is the key and really the only prevision of

6    the inter-creditor agreement that tells us what to do with

7    the money, or the value that comes out of the situation.  I

8    think that's a little small to look at, so I'll try to zoom

9    in on things as I talk about them.

10             So I think the first thing one notices about 4.1,

11   at the very beginning, is in fact something that you see in

12   several places of the inter-creditor agreement, which is

13   that in talking about the application of proceeds, it talks

14   about the fact that regardless of any insolvency or

15   liquidation proceeding, and then it goes on.  And I think

16   this exhibits very clearly an intent of the parties that has

17   been expressed in clear language, in several portions of the

18   inter-creditor agreement, which is that they wanted their

19   relationship and their provisions to be the same, regardless

20   of whether there was a bankruptcy or not.

21             And I would also point Your Honor to 8.3 of the

22   agreement, which says "obligations unconditional".  And

23   again, the inter-creditor agreement repeats all rights,

24   interests, agreements, and obligations of various parties

25   shall remain in full force and effect, irrespective of --

1    and in Subsection D, the commencement of any insolvency or

2    liquidation proceeding.  And 9.2 basically says the same

3    thing for other purses.

4         Now, why is this important?  I think it's

5    important because the gateway issue that is raised in a lot

6    of the briefing is again, returning to 4.1, the construction

7    of the phrase "due and payable".  And that is because, I

8    think on the third provision of 4.1 that talks about, "Well,

9    what happens to all this value that comes out of the

10   situation?  How does the collateral agent know how much to

11   pay whom, among all of the different creditors?"  It says,

12   "Third, on a pro rata basis, to the payment of, without

13   duplication, all principle and other amounts then due and

14   payable in respect of the secured obligations."

15        And there's been a debate in the papers of certain

16   parties and the defense basically saying, "This must mean

17   that post-petition interests and the differing interest

18   rates should just be ignored by the Court, because post-

19   petition interest that is not allowed is not due and

20   payable, in some -- for the metaphysical legal sense.  And I

21   would submit, Your Honor, that just look --

22        THE COURT:  What do you mean "metaphysical legal

23   sense"?

24        MR. KIM:  I say metaphysical legal sense because

25   it really has no practical application to the construction

1    of this language here, because the creditors, in this

2    agreement, actually laid out explicitly what they wanted to

3    have happen to post-petition interests, as it governed their

4    relationships with each other.  And so whether a post-

5    petition interest is allowed or allowable in a bankruptcy is

6    a philosophical question completely separate from what is

7    explicitly stated in this agreement.  Because when one looks

8    at the phrase, it does not talk about only the amounts due

9    and payable by the Debtor, it basically talks about due and

10   payable in respect of the secured obligations, which is a

11   clearly-defined term.

12           And that term starts a couple of provisions that

13   lays out very explicitly, to guide persons in Your Honor's

14   position, as to what the parties agreed to, in terms of how

15   to treat their different rates of interest.  So you've got,

16   so as I just mentioned, 4.1 the third provision telling the

17   collateral agent what you have to do is you have to take the

18   amounts due and payable under the secured obligations, and

19   then calculate, on a pro rata basis, who's supposed to get

20   what.  And in the definition of what it means to say people

21   are paid based on secured obligations, it explicitly talks

22   about interest and fees that accrue after the commencement

23   of any bankruptcy.  And then it talks about the fact that

24   such interest and fees the accrue shall be regardless

25   whether such interest and fees are allowed claims in such

1    proceeding.

2         It further expands upon that principle bit saying,

3    "Without limiting the generality of the foregoing, the

4    secured obligations of the loan parties, et cetera, includes

5    all obligations of every nature, outstanding under any

6    additional obligation, in each case whether or not allowed

7    or allowable in any insolvency or liquidation proceeding."

8    It says, "Secured obligations shall include, without

9    limitation, interest accruing at the then-applicable rate

10   provided in the applicable financing documents, after the

11   maturity of the relevant secured obligations, and any post-

12   petition interest," which also is a defined term.

13        And then finally, we look at the definition of

14   "post-petition interest" which is referenced there.  And

15   this is also from the inter-creditor agreement.  And it says

16   post-petition interest, again, which feeds into secured

17   obligations, which is the basis by which the collateral

18   agent is to calculate how money is distributed.  It says,

19   "Any interest or entitlement to fees or expense, or other

20   charges that accrues after the commencement of any

21   insolvency or liquidation proceeding, whether or not allowed

22   or allowable in any such insolvency or liquidation

23   proceeding."

24        So Your Honor, I think on the question of what did

25   the parties intend would happen -- not vis-à-vis their

1    rights against the Debtor, which is not at issue in this

2    particular proceeding, but in terms of their rights and

3    obligations vis-à-vis each other, and about how the

4    collateral agent is supposed to divide value.  I would

5    submit that in several places, they have laid out very

6    clearly that the post-potion interest and their differing

7    rates of interest are in fact, taken into account in

8    determining secured obligations, which then gets divided pro

9    rata.

10              I think it's important to note that 4.1

11   essentially is the sole payments provision.  So when the

12   collateral agent is looking for guidance as to what to do

13   with value it receives, it really has just 4.1 to guide it.

14   And 4.1 does not wrap its guidance in any kind of mystery.

15   I would submit that the provisions I just pointed to are

16   actually fairly explicit, in terms of what is supposed to be

17   done with the differing rates of interest.

18              Now, I think what causes the debate to become more

19   complicated than it needs to be is the argument that you've

20   seen in some of the papers, that in fact -- ignoring the

21   fact that in the several places I've pointed out, the

22   parties have actually talked about what happens to the

23   differing rates of interest, and post-petition interest, et

24   cetera, the theory in some of the defense briefing is that

25   in fact, what the parties have intended is that all that

1    stuff would actually fit into the last provision, which

2    basically says the balance, after all of the secured

3    obligations have been indefinably paid in full, in cash, the

4    money goes to the loan parties, or as otherwise required by

5    applicable law.

6             So essentially, the way I read it, basically

7    saying, "After all the creditors under disagreement have

8    been paid in full, any money that's left over would just go

9    back to the owner of the money, which is in that case the

10   loan parties -- the Debtor, guarantors, et cetera."  What

11   the defense theory is is that that phrase, "or otherwise as

12   required by applicable law" means that this inter-creditor

13   agreement somehow contemplated that all this money that's

14   really attributable to coming out of the bankruptcy somehow

15   is put into that phrase, and just falls out of the inter-

16   creditor agreement entirely.

17            And I would say if the inter-creditor agreement

18   were not explicit on the issue, I suppose that would be a

19   debatable point.  But I would submit, Your Honor, that

20   taking that last phrase and somehow interpreting it to

21   override the very explicit provisions I just pointed out is

22   not a reasonable construction.  And, and that I think the

23   point here essentially resolves the vast majority, if not --

24   I would say the vast majority of the issues in the briefing.

25            Because if Your Honor accepts what I think is very

1    clear and explicit in the agreement, that the parties to the

2    inter-creditor agreement wrote explicitly that they wanted

3    their relationships to be the same regardless of bankruptcy,

4    and they explicitly contemplated the differing interest

5    rates that could apply, and that it applies regardless of

6    how post-petition interest is treated in the bankruptcy.  If

7    Your Honor accepted --

8            THE COURT:  So you would posit that due and

9    payable has to mean due and payable by somebody, right?  So

10   due and payable by the borrower, which is the Debtor.  You

11   would say due and payable by the Debtor, ignoring the effect

12   of bankruptcy law.

13           MR. KIM:  I would say due and payable to the

14   creditors --

15           THE COURT:  By whom?  I mean, if something's due

16   and payable, it's payable by a payor.

17           MR. KIM:  Correct.

18           THE COURT:  There has to be a payor and a payee.

19           MR. KIM:  Yes, it could --

20           THE COURT:  The payor is clearly the Debtor, or

21   Debtors.

22           MR. KIM:  It could be the Debtor.  It could be, I

23   believe there are also guarantors.

24           THE COURT:  All right.

25           MR. KIM:  And then it could be that the collateral

1    agent comes into possession of the value that is payable to

2    the creditors.  So I think what is important is that however

3    one construes the phrase due and payable, if Your Honor --

4             THE COURT:  But it falls away, right?  I think

5    your argument is that it falls away as to the source,

6    because even if it's due and payable by the Debtor, so being

7    a limitation, due and payable by the Debtor, irrespective

8    of, or regardless, or perhaps better, ignoring any

9    bankruptcy effect.

10            MR. KIM:  Yes, Your Honor, I think --

11            THE COURT:  And it's the bankruptcy effect that

12   limits the entitlement to the interest.

13            MR. KIM:  Correct, vis-à-vis the Debtor.

14            THE COURT:  Correct.

15            MR. KIM:  But here, the creditors are talking

16   purely about their relationships with each other, and at

17   least in the example of post-petition interest, I submit

18   that due and payable becomes not entirely necessary.  But

19   there are other circumstances in which it would be, I guess,

20   more of a necessity, in terms of having oblations that

21   matured, vis-à-vis their playability to the creditors.  But

22   as Your Honor just raised with respect to the post-petition

23   interest, I would submit that phrase, "due and payable" just

24   means any amounts that are mature, that are due and payable

25   to the creditors.

1          But it could not mean, for example, only post-

2    petition interest that is allowed, or a circumstance where

3    only interests and charges that are allowed in bankruptcy.

4    Because that would actually be completely contradictory to

5    all the different provisions that have been inserted into

6    creditor agreement.

7          THE COURT:  Well, that sort of raises an ancillary

8    point, which is due and payable, the definition of due and

9    payable, we can talk about that, I guess.  But if you look

10   at the English and legal definitions of payable, payable is

11   something that's due now, so it's due immediately.  But then

12   if you reference secured obligations, like you want me to

13   do, and you go through that, if talks about matured,

14   unmatured.  Well, unmatured oblations aren't payable.  So

15   there's some tension between due and payable, and secured

16   oblations.

17          So there has to be some limitations.  So even

18   though secure obligations might include un-matured interest,

19   that wouldn't be due and payable.  So due and payable can be

20   applied to anything that's listed as a secured oblation.  So

21   if we're going to carve back secured oblation to include

22   something less than the full breadth of the definition

23   because it's also modified by due and payable, don't we then

24   start to think about, "Well, why isn't it unmatured?"  Well,

25   maybe it's unmatured by operation of the Bankruptcy Code.

1          MR. KIM:  Your Honor, there's a way to -- I think

2    there's been a lot of torturing of words going on in the

3    briefing.  There is a way, I think, to reconcile what Your

4    Honor is saying with this language, which is that the

5    precise phraseology here is not secured obligations that are

6    due and payable, which I think if that's what it said, I

7    agree with Your Honor, there would be an inherent tension

8    between saying secured obligations that are due and payable,

9    and in the definition of secured obligations itself, it

10   includes amounts that are unmatured, for example.

11          But here, it basically talks about all principle

12   and other amounts that are due and payable in respect of the

13   secured obligations.  So what I would submit, Your Honor,

14   the way to harmonize this language with the potential

15   inherent tension and the definition of secured obligations

16   is that this is talking about all value that the collateral

17   agent comes into possession of that is due and payable to

18   the creditors.  And the way that the collateral agent

19   calculates how people are supposed to get how much, or who's

20   supposed to get how much, that it does so in respect of the

21   secured obligations.  And the definition of secured

22   obligations then gives very explicit guidance that differing

23   rates of interest shall be respected, essentially,

24   regardless of whether the particular rate of interest, or

25   the post-petition interest is allowed or not.

1          Because the fact is, the third provision doesn't

2    exist in a vacuum.  What you have is you have the first two

3    provisions, which basically says the collateral agent has to

4    pay off certain types of the debt first.  You got the

5    advanced expenses and sort of other special categories.  And

6    then the third priority really is actually the big vat of

7    all other money, other than the special categories.  And

8    it's trying to guide a collateral agent.  Well, how do you

9    calculate who gets how much?

10          And I would say, Your Honor, that when it talks

11   about all principal and other amounts than due and payable,

12   instead of saying "secure the obligations that are due and

13   payable," and then having some other category having to do

14   with other amounts that are not then due and payable, it

15   just really talks about all money on a pro rata basis in

16   respect of the secured oblations.  Because this is the last

17   pro rata basis provision, that when you pass that, it

18   basically just contemplates all the money left over that

19   nobody really has a claim to.  And there is no pro rata

20   division there, because what that is essentially, I think on

21   its face envisioning, is that the collateral agent is not

22   dividing this among creditors.

23          So I think this waterfall provision -- although it

24   could have been written more simply -- is really at the

25   third provision, just diving up all the money among

1    creditors.  And what I would submit, Your Honor, is the only

2    thing it could mean is that the definition of the secured

3    obligations is really used as a basis, in other words, it's

4    used in respect of that definition, in terms of dividing up

5    what pro rata means.  If Your Honor has other questions on

6    the due and payable issue, I wanted to make sure I address

7    those before I go on to a different point.

8              THE COURT:  It's okay.

9              MR. KIM:  So obviously if Your Honor thinks of

10   other questions on that, I'd be very happy to go back to

11   that, okay?

12             THE COURT:  I will, if I need to.

13             MR. KIM:  So once Your Honor, once one accepts

14   what I think is a non-controversial proposition, that these

15   creditors have explicitly talked about having the collateral

16   agent, after paying off the special category advanced

17   expenses, and so forth, taking all the money, before it goes

18   back the Debtors, taking all the money the creditors are

19   owed, and calculating it on a pro rata basis in respect of

20   the secured obligations.  And they built into a couple of

21   diff places, including the very definition of post-petition

22   interest, the different rates of interest being respected.

23             Then one turns to the issue, while all this money

24   that's coming out of the current situation -- and I use that

25   sort of very in-artful phrase, because I know if I use any

1   other phrase that includes the term sale, exchange,

2   distribution, it's going to get tied up in all of the,

3   debates that we're having.  But let's call it all the value

4   that's coming out of the current situation, is how it

5   falling outside of the inter-creditor agreement altogether,

6   such that we really have no agreement among creditors about

7   what is supposed to happen to that money, or is it in fact

8   captured by what I would submit is a very broadly-defined

9   set of terms that exhibited, again, the explicit -- language

10  shows that the explicit agreement of these creditors was to

11  capture all manner of value coming out of the situation, far

12  broader than what one would regard for, on commercial code

13  basis, or sort of on a late basis, and capture it, and

14  divide it according to 4.1.

15          And here I think we first talk about the

16  definition of collateral, and I would actually submit, Your

17  Honor, that's really al one needs to look at.  You don't

18  really even need to go to proceeds, and I'll explain why in

19  a minute.  But I'll go to proceeds anyway, because I know

20  it's covered in the briefing.  So, the definition of

21  collateral actually appears in two other agreements that are

22  kind of tied together with the inter-creditor agreement by a

23  series of defined terms, which I'll save Your Honor the

24  repetition of, but it's in all the briefings.

25          So this is first, I'm displaying in the security

1    agreement, Section 2, one of the two agreements that I'm

2    talking about.  And it talks about the grant of security

3    interests.  And here, it defines the assets that are defined

4    as Collateral, with a big C.  And what's important here is

5    not only that it includes a whole list of fairly

6    comprehensive lists of assets that are collateral, but also

7    that it includes everything that are Proceeds, with a big P,

8    which is actually specifically defined -- they're not just

9    relying upon, for either late definitions or UCC

10   definitions, as well as the fact that includes all of the

11   collateral that is after-acquired property of the Debtor.

12           So you've got anything that would fall into this

13   category, whether owned at the time of the agreement, or

14   acquired thereafter.  And here you just saw the term

15   "proceeds" -- I mentioned a minute ago, we probably, to get

16   to a decision, do not really even need to reach the

17   definition of proceeds, simply because, as I'll walk through

18   another definition of Collateral, the definition of

19   Collateral in this case essentially just covers, in and of

20   itself, all of the value that's coming out of the situation.

21   But because there's at least some debate as to whether

22   certain things are proceeds, as opposed to the original

23   collateral.

24           We'll just cover the definition of proceeds as

25   well.  Proceeds shall mean all proceeds, including the

1    Article 9 definition, and in any event -- and then lists the

2    number of things that are actually beyond just the Article 9

3    definition -- any consideration received from the sale,

4    exchange, license, lease, or other disposition of any asset

5    or property that constitutes collateral.  And then it goes

6    even further and broader.  Any value received as a

7    consequence of the possession of any collateral, and any

8    payment received from any other person or entity, as a

9    result of the, including among other things, involuntary

10   conversion of whatever nature, of any asset or preoptic that

11   constitutes collateral.  It also includes all cash and

12   negotiable instruments received by or on behalf of the

13   collateral agent, and any and all other amounts from time to

14   time, paid or payable under or in connection with any of the

15   collateral.

16          So you've got, in the security agreement, a

17   definition of collateral that is very broad, and also

18   includes all after-acquired property, and also a definition

19   of proceeds that really covers not just a concept of the

20   direct transmutation of proceeds, but rather whole number of

21   other categories of value one gets, that's really in

22   connection with the original collateral.  I referenced that

23   there were two agreements.  The other is the pledge

24   agreement.  The pledge agreement has a couple of relevant

25   provisions.  This is for the pledge of shares, and this has

1    particular relevance, because as Your Honor knows, in the

2    way that the plan conducts the reorganized TCEH transaction,

3    there's some shares coming out, and there's been debate in

4    the briefing as to whether that would be collateral or

5    proceeds of collateral.

6           Here in the pledge agreement, it talks about

7    collateral being the pledger's right, title, and interest to

8    any of the following, whether now owned or existing, or at

9    any time hereafter required -- and then again, it uses the

10   big term -- proceeds of any of the foregoing collateral.

11   And also includes pledged shares, which is also a defined

12   term.  And pledged shares includes all after-acquired

13   shares.

14          Now, when we look at what's actually happening in

15   terms of the value that's coming out of the situation,

16   again, I think similar to the previous issue, the Court

17   essentially has a choice to make, which is looking at these

18   provisions, deciding, did this inter-creditor agreement

19   basically leave a hole such that if value came out of the

20   situation, even though you've got these credits essentially

21   no longer having their collateral, and they get value,

22   essentially, out of the situation, after they've basically

23   lost their collateral?  Did this inter-creditor agreement

24   leave some hole, such that you've got all this value coming

25   out of the bankruptcy that is just not covered by the inter-

1    creditor agreement at all, or is it as we contend, that

2    these definitions of collateral, which include basically

3    everything that the Debtor owns, would acquire thereafter,

4    whether it's by dropping down and creating a subsidiary or

5    not.  And everything that essentially is received as a

6    result of, sort of the several ways of defining proceeds,

7    was that essentially intended to be distributed by these

8    creditors according to 4.1?

9           And I would submit, Your Honor, that before one

10   even gets to trying to sort of go through all of the kind of

11   linguistic somersaults that I think both parties, frankly,

12   end up in the briefing about, whether something is proceeds

13   in the UCC Article 9 sense or not, or something is proceeds

14   in the same way that Momentive, which was looking at Article

15   9, defined it as proceeds or not, I think you could actually

16   start and stop with these definitions, because the value

17   that's coming out of the reorganization just falls right

18   into these definitions, and for that, say, we can look at

19   just the language of the disclosure statements themselves.

20          On these, I think the type is actually fairly

21   small, so I will just try to just cite the page of the

22   disclosure statement, and just read certain excerpts.  If

23   Your Honor wants me to put any of the language up, I'd be

24   very happy to do that.  So in the disclosure statement, I

25   think this is the disclosure statement for the fifth

1    amendment joint plan of reorganization, on pages --

2             THE COURT:  I have to laugh, because I remember

3    saying at the disclosure statement hearing, no one would

4    read the disclosure statement.  So you made it all

5    worthwhile.

6             MR. KIM:  I'm the one guy who did, Your Honor.

7             THE COURT:  I'm glad we spent $12 million getting

8    one in place.

9             MR. KIM:  So on Pages 11 and 12, I think this is

10   Subsection A that starts on the bottom of Page 11, it

11   describes the TCEH spinoff, which essentially is the subject

12   of the discussion, and the briefings.  And it characterizes

13   what that spinoff is.  In a few minutes, I'll put up some

14   charts that we made, but I think the characterization and

15   disclosure statement essentially just captures it.

16             It basically says under the spinoff, TCEH will

17   form a new subsidiary, reorganized TCEH, to which a TCEH

18   will transfer all of its interest in its subsidiaries,

19   including the stock of TCEH financed, and it goes on at the

20   end.  It talks about the various things being received in

21   exchange for the consideration described in Article 4(b)(2)

22   of the plan, and 5(b)(2) of the disclosure statement,

23   entitled spinoff.  So I think in describing what is

24   happening, both in that section and also on Page 106, where

25   there's a description of the spinoff, it talks about the

1    formation of a new subsidiary that's owned by the Debtor.

2    It falls right into the definition of collateral, in terms

3    of all after-acquired property, which includes, Your Honor

4    saw, pledged shares, shares of any subsidiary owned in the

5    future.  And it also talks about the fact that TCEH is

6    transferring what is essentially just collateral, and in

7    exchange for the transfer, the creditors are receiving, in

8    exchange for the transferring of the collateral, the

9    consideration, and which is basically all of the categories

10   of value we're talking here.

11          Even though the transaction itself is complicated

12   on a number of levels, I would submit that very fact is

13   actually quite simple.  You've got secured creditors who no

14   longer have the collateral, because the collateral, which

15   again, is broadly defined to include all after-acquired

16   property of the Debtor, including a drop-down subsidiary

17   created after the original pledge and security agreements

18   were executed, being transferred, and in exchanged the

19   creditors, no longer having their collateral, are receiving

20   the various categories of value that we're arguing about.

21          And I think the phrase "transfer and exchange for

22   consideration" actually is exactly the phraseology that is

23   used in the security agreement, when it talks about what is

24   covered.  So I don't know if I can find it now, with all of

25   the different pages here, but in the security agreement,

1     when describing collateral, it used that exact same

2     phraseology, of any consideration received from the sale,

3     exchange, license, lease, or other disposition of the

4     collateral.  And so you've got basically, the way that the

5     disclosure statement characterizes the transaction, and the

6     way that the security agreement, in Section 2, defines

7     collateral essentially to be virtually mirror images of each

8     other.  And the definition in the pledge agreement I showed

9     you also describes, essentially paraphrasing, value received

10    when collateral or proceeds are sold, exchanged, collected,

11    or otherwise disposed of.

12            And so I know there's been at least several

13    descriptions in the briefings about exactly what is

14    happening in the transaction, and I think some of it is

15    probably a little more complicated than is necessary.  I'll

16    try to draw a fairly simple chart of what's happening here.

17    So let me start with before the spinoff.  So before the

18    spinoff, you've got the first lien creditors.  They have

19    claims and liens against TCEH, and there is first lien

20    collateral, which I just read you the definitions about.  A

21    reorganized TCEH didn't come into being yet.  But as Your

22    Honor saw, the definition of collateral proceeds captures

23    anything that the Debtors essentially possess in the future.

24            And then the spinoff itself, although there's a

25    bunch of complicated stuff going on, essentially this aspect

1    of it is actually quite simple, which is that their plan

2    distribution's going to the first lien creditors.  TCEH

3    itself is essentially -- I'm using just the disclosure

4    statement's language -- transferring what is defined as

5    collateral, from what I read before, to reorganized TCEH,

6    which it owns when it's created, which is captured by the

7    after-acquired clause.  And then reorganized TCEH transfers

8    value to TCEH, which then just goes to the creditors.

9    Essentially, what's happened is exactly, I would submit, the

10   same as if there had been a foreclosure outside of

11   bankruptcy.  You've got the creditors, they no longer have

12   the collateral.  The collateral doesn't exist in its sort of

13   original, legal sense of there is no more creditor, there's

14   no more collateral that they have a security interest on.

15           But what's happened is the very value of the

16   collateral has been transferred.  They've lost their

17   collateral.  It's been disposed of, just in the precise

18   language of the agreements I showed you.  And they end up

19   with plan distributions in exchange.  Again, that's just the

20   language of the disclosure statement, which mirrors the

21   language of the pledge agreement, of the security agreement.

22           So Your Honor, I think the base in the briefing as

23   to what came into being when, and whether certain types of

24   plan distributions are collateral or not, I think really can

25   start and end here, because what these parties did in the

1    inter-creditor agreement, and the associated agreements was

2    not leave to speculation what would constitute collateral,

3    and under what circumstances value received out of the

4    situation, essentially, I'll call it, would be covered in

5    the inter-creditor agreement.  They basically defined

6    collateral and proceeds such that there really was no way,

7    practically, to have value coming out of the Debtors that

8    would fall outside of the inter-creditor agreement, such

9    that the collateral agent wouldn't know how to distribute

10   it.

11          In fact, I'd say it's pretty clear on its face

12   they intended anything the Debtors have today, or would get

13   in the future, or anything that would be Proceeds with a big

14   P, which covered, as Your Honor saw, a whole number of

15   different categories of value received as a result of

16   various events, including involuntary conversion of the

17   collateral would be covered, and just fall right into 4.1,

18   and again, we saw that the third provision is really the

19   provision that talks about the distribution to creditors.

20          So Your Honor, I'll stop there, and see if Your

21   Honor has any questions about this aspect, before I turn it

22   over to my colleague, Ben Sauter, to cover the last of the

23   three issues that I mentioned in the beginning.

24          THE COURT:  Give me just a second.  Can you talk a

25   little bit about Momentive?

1          MR. KIM:  Yes, Your Honor.  So I actually have a

2    chart comparing what happened in Momentive to here.  So I

3    think what we just looked at here is that you've got the

4    creditors no longer having the collateral, and just getting

5    plan distributions again after a transfer and exchange, and

6    again, a definition of proceeds that is different from

7    simply a UCC Article 9 definition, because it's already

8    written into the contracts, and a definition of collateral

9    that includes reorganized TECH in its entirety.

10          And when one looks at what happened in Momentive,

11    what happened was that you've got two different groups of

12    creditors, with claims and liens, with old equity, and the

13    collateral.  And after the plan -- unlike in our situation,

14    where we essentially lost our collateral, and got the plan

15    distributions in exchange.  What happens in Momentive is

16    first of all, what the Court is construing is proceeds under

17    Article 9.  Because there was no definition of proceeds and

18    collateral like here, that captures all of this.  And in

19    looking at an Article 9 question, you've got a situation

20    where there's still first lien creditors after the

21    transaction, unlike in our situation.  The first lien

22    collateral is actually still the first lien collateral.

23          So then you've got an argument about when you've

24    got former second lien creditors replacing old equity, in

25    effect, whether under Article 9, that should be considered

1    proceeds of collateral.  Even though the first lien

2    creditors, in a sense, still have their collateral, and even

3    though the collateral has been transferred, or exchanged in

4    an Article 9 sense.

5              So I would submit, Your Honor, Momentive, while on

6    its face, I think the briefing -- there's certain ways of

7    characterizing it that would make it appear very similar, I

8    would say not only in substance is it very different, but

9    also you're dealing with an entirely different situation

10   here, where the parties have defined, through their

11   definitions or collateral and proceeds, what happens when

12   they lose their collateral, and they get something in

13   exchange, which is exactly what happened, and what the

14   disclosure statement describes as happening, and in

15   substance, what's happening.

16             THE COURT:  Thank you.  I may grab you in a

17   second.  Can you talk a little bit about -- oh, you

18   disappeared on me.  I was going to ask you to talk about the

19   TRA distribution, perhaps?  That's a little different,

20   right?

21             MR. KIM:  The TRA?  So I think the -- let me see

22   if I can just get that page back.  Let's just try to get

23   that definition of collateral back here.  I'm sorry, the

24   definition of proceeds.  Well, I could display it for Your

25   Honor later.  I think I've read the same phrases several

1    times, so I'm not sure it's necessary to put it up.

2         So the TRA distribution, I would say falls within

3    the definition of proceeds with a big P, because the

4    definition of proceeds includes a "value received as a

5    consequence of the possession of any collateral".  And by

6    definition, a TRA distribution includes the right to receive

7    payments from the reorganized TCEH, and I'm quoting from the

8    plan here, "irrespective of its subsidiaries' specified tax

9    items."  So we've already seen the fact that the definition

10   of collateral includes after-acquired shares in new

11   subsidiaries.

12        So you've got the entire reorganized TCEH itself

13   being collateral, as these creditors has defined it in terms

14   of how they relate to each other.  And so I would submit

15   once you accept the entirety of the reorganized TCEH is

16   collateral, because the TRA distribution are essentially

17   rights coming out of the reorganized TCEH, it falls within

18   the definition of value received as a consequence of the

19   possession of any collateral.  I think that's how we get to

20   the TRA distribution proceeds.

21        THE COURT:  All right.  Thank you, Mr. Kim.

22        MR. KIM:  Sorry, as I was talking, got do excited

23   about these provisions I took them out of my binder, so

24   we're trying to reorganize them a little bit.

25        THE COURT:  Do you need a -- should we take a

1    recess, or are we ready to go?

2           MR. SAUTER:  Your Honor, just one second.  I think

3    we're ready.

4           THE COURT:  All right.

5           MR. KIM:  I think we're ready, Your Honor.

6           THE COURT:  Okay.

7           MR. SAUTER:  Good morning, Your Honor.  My name is

8    Ben Sauter.  I want to address the third aspect of Section

9    4.1 that's in dispute, and specifically if there was an

10   exercise of remedies by the first lien collateral agent.

11   There had been a briefing back and forth about essentially

12   philosophical questions of whether the collateral agent's

13   participation in the plan support agreement is sufficient to

14   constitute an exercise of remedies, whether the acceptance

15   of collateral constitutes an exercise of remedies, whether

16   its participation in negotiating and accepting the adequate

17   protection payments and the cash collateral order constitute

18   and exercise of remedy, about whether those exercises of

19   remedies were supinely connected to the monthly payments and

20   the distributions, whether they were a direct cause of the

21   distributions, whether they were a sole cause or a proximate

22   cause.  And I submit, Your Honor, it's actually not

23   necessary for the Court to wade into that debate, because

24   when the collateral agent filed a proof of claim in these

25   bankruptcy proceedings, that in itself was a sufficient

1    exercise of remedies to trigger Section 4.1.

2            And I want to unpack that.  And I want to do it in

3    a three-step process.  So first I want to draw the Court's

4    attention to two provisions in the Security documents.  And

5    I'm going to do that because 4.1 itself refers to the

6    exercise of remedies under the security documents.  Then I'm

7    going to look at the proof of claim that was filed, because

8    it invokes those very provisions, those remedy provisions of

9    the securities documents.  And finally, I want to explain

10   why the filing of a proof of claim in bankruptcy is an

11   exercise of remedy.

12           So first, Your Honor, is Section 3.1 of the inter-

13   creditor agreement.  Now, putting up here Section 3.1(e).

14   And it's a long provision.  I'll give the Court time to read

15   it if you need, but by way of preview, what it says is after

16   an event of default, the collateral agent will receive

17   notice of that event of default.  It'll notify the majority

18   that there's been a default, and it will await instructions.

19   And if it doesn't receive an instruction, this is what

20   happens:  subsequent to the collateral agent receiving

21   written notice that an event of default has occurred, unless

22   it has been directed to the contrary by the required secured

23   parties, the collateral agent in any event, may take all

24   lawful and commercially-reasonable actions permitted under

25   the security documents that it may deem necessary or

1    advisable in this reasonable judgment to protect or preserve

2    its interest in the collateral, and interest, rights, powers

3    and remedies granted or available to the collateral agent

4    under, pursuant, or in connection with the security

5    documents.

6         It's very important for two reasons:  first, it

7    refused the notion put forward by the intervenors that a

8    direction is necessary before the collateral agent can

9    exercise remedies.  This paragraph right here contemplates a

10   situation where a direction expressly is not issued, and a

11   collateral agent may, in its discretion, proceed to enforce

12   its remedies.  It's also important because it is not limited

13   to an enforcement action.  It specifically talks about all

14   of its interests, rights, powers, and remedies under the

15   security documents.  This is 3.1(e), Your Honor.

16        3.1(a), in the board creditor agreement, makes

17   almost the exact same point, and I want to highlight that

18   language as well for Your Honor.  Such exercise enforcement

19   shall include the rights of the collateral agent to sell or

20   otherwise dispose of collateral upon foreclosure, okay, to

21   incur reasonable expenses in connection with such

22   (indiscernible) as sale or disposition, and to exercise all

23   the rights and remedies of a secured creditor, under the UCC

24   and the security documents, and to the secured creditor,

25   under the Bankruptcy Code and all other applicable law.

1           Okay, so that first clause of that paragraph again

2    makes clear what 3.1(e) makes clear, which is that the

3    remedies available to the collateral agent are not limited

4    to enforcement proceedings.  They include all of the

5    remedies.  They are contemplated by the security documents

6    and the bankruptcy code.  And then the paragraph goes on and

7    says unless and until the collateral agent shall have

8    received a direction, the collateral agent may take such

9    action, or refrain from taking such action in order to

10   preserve or protect its liens on and the value of the

11   collateral.  And so again you have a situation that

12   contemplates the possibility of a direction, but

13   specifically says that a direction is not required.

14           Now I want to direct Your Honor to the pledge

15   agreement, which makes a very similar point.  And I won't

16   put it up on the screen, but Section 12 of the pledge

17   agreement makes the same points that I've just been saying.

18   It says that in addition to other rights and remedies

19   provided for herein or otherwise available to it, and then

20   it goes on to discuss some procedures for UCC remedies.  But

21   it specifically -- here, I'll display it, Your Honor.  The

22   pledge agreement, by the way, is another security document,

23   as that term is used in the ICA, and it says -- the

24   section's entitled "Remedies", by the way.  And it says the

25   collateral agent may exercise, in respect of the collateral,

1    in addition to other rights and remedies provided for

2    herein, or otherwise available to it.  All the rights and

3    remedies of a secured party upon default under the UCC.  So

4    on its face, it contemplates, again, that the collateral

5    agent will be exercising remedies that are not limited to

6    the UCC for closure actions.  And nowhere in this paragraph

7    is there any requirement that a direction be issued.  And

8    again, I highlight these provisions, Your Honor, because

9    they're the provisions in the security documents that

10   address what remedies can be exercised by the collateral

11   agent.

12           Now I want to turn to the actual proof of claim

13   that was filed by the collateral agent in this case, because

14   it did so pursuant to the same provisions that we just

15   discussed.  Here's what the collateral agent said when it

16   filed its proof of claim.  Collateral agent is authorized to

17   file this proof of claim, pursuant to a variety of security

18   documents and provisions, two of which include 3.1 of the

19   ICA, which we just discussed, as well as Section 12 of the

20   pledge agreement.  So the collateral agent itself though

21   that it was invoking its rights and remedies under those

22   sections that we just talked about when it filed its proof

23   of claim in these proceedings.

24           So just to tie up the last loose end, in

25   submitting a proof of claim in a bankruptcy proceeding, that

1    itself constitutes an exercise of remedies.  The black

2    letter law, black letter definition of a remedy, Your Honor,

3    is a means of enforcing a right, or preventing or righting a

4    wrong.  It's in Black's Law Dictionary.  You don't have to

5    take my word for it.  J.  Aron and Morgan Stanley in their

6    brief adopt this definition in Black's Law Dictionary.

7            And that language, a means of enforcing a right is

8    very important, because that's exactly what filing a proof

9    of claim in a bankruptcy proceeding does.  Bankruptcy Rule

10   3001 defines a proof of claim as a written statement that

11   sets forth the creditors claim.  Okay, you can term a claim

12   as a defined term, in Section 101 of the bankruptcy code, as

13   a right to payment, whether or not such right it reduced to

14   a judgment, liquidated, fixed, contingent, matured,

15   unmatured, et cetera.  So the act of filing a proof of claim

16   is in fact the means for a creditor to assert its right to

17   payment in a bankruptcy proceeding.  That's what a remedy

18   is.  I'll point out, Your Honor, in Section 502 of the code,

19   a claim is deemed allowed until it's objected to.

20           So just to circle back, the security documents

21   authorize the collateral agent to act on its own, and to

22   exercise its remedies under the security documents.  The

23   collateral agent in fact did that, specifically, when it

24   filed its proof of claim.  And a proof of claim fits the

25   definition of a remedy in the bankruptcy proceeding.  I just

1    want to, before I close, Your Honor, address why the monthly

2    payments also constitute an exercise of remedy, and to do

3    that, I want to turn to the cash collateral order.  The cash

4    collateral order, of course, is the document that authorized

5    the monthly payments to be made.

6              And here's what was recognized in that word.  The

7    first lien collateral agent, in accordance with the first

8    lien documents, including at the direction of the required

9    parties, pursuant to Section 6.1 and 3.1 of the first lien

10   inter-creditor agreement, has consented to terms of the

11   adequate procreation provided for in this final order.

12   Section 3.1 is the same provision we just went through, that

13   authorizes the collateral agent exercise remedies, and by

14   the way, 6.1 is a provision in the ICA that says if the

15   collateral agent wants let the Debtors use cash collateral,

16   the individual secured parties can't object to that, as long

17   as certain conditions are met.  And that makes sense, Your

18   Honor, as does the rest of what I've said, because it's the

19   collateral agent who has the means, who has the right to the

20   collateral, and therefore is the one to set to exercise the

21   remedies with respect to that collateral, not the individual

22   secured parties.  And I want to turn finally, Your Honor, to

23   one more page --

24              THE COURT:  I'm sorry, say that last bit again

25   please.

1           MR. SAUTER:  That the collateral agent is

2    exercising remedies, with respect to the collateral, makes

3    sense, Your Honor, because under the security documents, it

4    is the collateral agent who has the liens on the property,

5    and to whom the collateral has been assigned.  The

6    collateral is not owned by the individual secured parties.

7    It goes to the collateral agent.  So in exercising a remedy

8    with respect to that, the collateral agent is an actual

9    party to make that happen.

10           And that's exactly what those provisions in the

11   collateral, in the inter-creditor agreement and the pledge

12   agreement made clear.  Now, majority, if they do it

13   permissibly, can issue an instruction to the collateral

14   agent about how to proceed.  But it's the collateral agent

15   that proceeds, and that exercises those remedies.  And the

16   beginning of that process, Your Honor, of exercising that

17   remedy in a bankruptcy proceeding is filing a claim.  Okay.

18   Your Honor, this is the final point I want to make, Your

19   Honor, about the monthly payments.

20           THE COURT:  Just a second.  Making a note.  Go

21   ahead, Your Honor.

22           MR. SAUTER:  This is a provision in the cash

23   collateral order that describes the first lien inter-

24   creditor agreement, and it says the first lien inter-

25   creditor agreement governs, among other things, the rights

1   and remedies, the holders of the first lien debt, with

2   respect to use of the cash collateral and adequate

3   protection.  So the notion that the first lien collateral

4   agent and the ICA don't govern the rights and remedies, and

5   that adequate protection is not a remedy in the bankruptcy

6   code is inconsistent with this description of the ICA.  It's

7   inconsistent with the terms of the cash collateral order

8   that recognized that the adequate protection was pursued,

9   pursuant to Section 3.1, which allows the collateral agent

10  to pursue remedies under the security documents and under

11  the Bankruptcy Code.  And Your Honor, unless you have

12  questions, I would cede the time for rebuttal, at this

13  point.

14          THE COURT:  I'm not remembering, so you'll have to

15  excuse me, because there was a lot to read, but are there

16  cases that you can point to that explicitly hold that the

17  filing of a proof of claim is an exercise of a remedy by a

18  creditor?

19          MR. SAUTER:  Your Honor, I don't have a citation

20  for you, but as hopefully was clear from my presentation,

21  filing a proof of claim does first the black letter law

22  meaning of that term, and it's a term that the other side

23  has adopted.  So I don't think it's a term that's in

24  dispute, or a meaning of remedy that's in dispute, Your

25  Honor.

1          THE COURT:  Okay, so the dispute isn't necessarily

2   with this idea that the filing of the proof of claim is a

3   remedy.  It's more along the idea that there was no

4   direction, so there was no ability to exercise

5   (indiscernible).

6          MR. SAUTER:  That's my read of the briefs, Your

7   Honor.  And frankly, I don't recall a specific statement in

8   the briefs that filing a proof of claim is not an exercise

9   of a remedy.  Most of their briefing on the subject is that

10  a direction is somehow required.  And clearly that's not the

11  case in the provisions that we just looked at.

12         THE COURT:  Thank you.  Anything further from DTC?

13         MR. KIM:  No, Your Honor.  We'll reserve the rest

14  of our time for rebuttal, but I promise we will not

15  necessarily have to use all of it.  We'll just do what's

16  useful.

17         THE COURT:  That's fine.  All right, we'll take a

18  short recess, and then I'll hear from the defendants and the

19  intervenors, et cetera.

20         (Recess)

21         THE COURT:  Please be seated.  Okie doke.

22         MR. MOLONEY:  Good morning, Your Honor.  Can I

23  approach the bench?  I have a little book.  Old-style.

24         THE COURT:  All right, please approach.

25         MR. MOLONEY:  Thank you, Your Honor.

1            THE COURT:  Thank you.  Do you have a separate

2    copy for Ms. Werkheiser?

3            MR. MOLONEY:  I do.

4            THE COURT:  Go ahead.

5            MR. MOLONEY:  So Tom Maloney, on behalf of J.

6    Aron.  And I'm going to start by telling you how we'd like

7    to divide up our time on defense side, Your Honor.

8            THE COURT:  Okie doke.

9            MR. MOLONEY:  As you know, J.  Aron, who I

10   represent, and Morgan Stanley filed one brief, combined, and

11   we made essentially two arguments.  The first argument is

12   the due and payable argument, which we'll discuss -- you

13   started talking about this morning.  I'm going to handle

14   that argument.  The second argument is while we're not

15   putting aside the issue of what the collateral agreement

16   means, does it even apply here?  Because there's been no

17   enforcement action, and because this is not collateral.

18   People have received -- my colleague Mark Ellenberg is going

19   to handle that argument.  And then Titan, which is another

20   secured lender, which also field a brief and motion, has

21   made some additional arguments, which they're going to deal

22   with in clean-up.  So that'll be the lineup, Your Honor.

23            THE COURT:  Okay.

24            MR. MOLONEY:  And basically, the binder I handed

25   you has -- it's not quite as imposing, but looks -- because

1   we included the entire collateral, agency, and inter-

2   creditor agreement in the first tab, and I think that's

3   important, and I think that's going to be the major

4   difference between the two presentations you're going to

5   hear this morning.  Because in the first presentation you

6   saw a few excerpts from that put up on the screen, but you

7   didn't get really a coherent picture of the agreement.

8   We're not arguing for anything philosophical.  We're not

9   arguing for any abstract resolution.  This is really a hunt

10  and peck exercise, where we'll point you to the provisions

11  that answer this case.  And it's quite clear, this agreement

12  read as a whole works very well.  It was carefully drafted,

13  and all the answers are in this agreement, in order to

14  resolve the issue, which I'm going to address.

15          So let me begin by putting this dispute in some

16  context.  And looking at your book, Your Honor, if we go to

17  Tab 9, and we go to Page 87, you see that this is language

18  from the confirmed plan in this case.  And as it simply

19  provides, it makes it explicitly clear that there's no

20  interest accruing on or after the petition date, on any of

21  the claims it issued here.  And some of the case law that

22  has been cited about, if there's been no discharge interest

23  could accrue, if you have extra collateral, interest will

24  accrue, if the Debtor is solvent, interest will accrue.

25  None of that happened, unfortunately.  We didn't have extra

1      collateral, the Debtor was not solvent, and there's been a

2      discharge.  So interest is not occurring.

3           So when they talk about reallocating in their

4      brief about the post-petition interest allocation method,

5      we're not really talking about allocating interest.  There's

6      no interest to be allocated.  And that's made clear if you

7      look at Tab 10 in the brief, in the binder, which is the

8      disclosure statement, in this case, which indicates what has

9      been paid to this class of creditors, Page 22.  They've

10     received 59.4 percent of the principal amount of their debt.

11     So basically, people got a little bit less than 60 percent

12     of the principal amount of the debt, the parties who are

13     before you, and what we're talking about an effort for one

14     group of creators to get a higher principal recovery than

15     another.  That's the economic impact of this case.  There's

16     no question about interest.  That's the economic impact.  So

17     I think that's contextually important.

18          I think it's also important to say, just to get

19     this out of the way, that everybody in their case, every

20     single secured creditor, we did, so did the plaintiffs, file

21     a proof of claim at the beginning which said, "We want to

22     get post-petition interest, too."  And if things had been

23     better, maybe if gas had gone way up in price, that may have

24     happened.  Unfortunately, we're here.  That didn't happen.

25     And we think the guiding principle in this case is not that

1   you ignore what actually happened, not that you ignored it

2   as a bankruptcy, not that you ignored real-world.  The

3   guiding principle is you look at the agreements, and you

4   deal with the facts as they are, including the actual

5   obligations owed by parties, owed by the Debtor, and

6   potentially owed by cumulative lien creditors.  If you look

7   at the world in that light, this agreement works perfectly

8   fine, and that's what the agreement requires.

9           So I think we both agree that we need to start at

10  Section 4, but there were more provisions in Section 4 that

11  were put up on the screen for you.  There's a critical

12  provision which they completely ignored, which we'll look

13  at.  So if we look at Page 19, of Tab 1, they began by

14  talking about the language regardless of any insolvency or

15  liquidation proceeding.

16          THE COURT:  Hang on, one sec.  Hang on, hang on,

17  hang on.

18          MR. MOLONEY:  I'm sorry, Your Honor.  All right,

19  Tab 1, Page 19.

20          THE COURT:  This is the weirdest paper.

21          MR. MOLONEY:  Sorry.

22          THE COURT:  All right, there we go.

23          MR. MOLONEY:  And we highlighted, we tried to

24  highlight the language, at least to make up for the weird

25  paper, which is Page 19, highlighted language, Tab 1.  They

1    focused on the language "regardless of any insolvency or

2    liquidation proceeding," which has been commenced.  But what

3    happens regardless of any insolvency or liquidation

4    proceeding?  If the collateral agent actually exercises

5    remedies, under the security documents, what he gets shall

6    be applied in the following order.  So all we're saying is

7    that whether or not this is a bankruptcy, if the collateral

8    agent exercises remedies, this is what he should do.  It

9    doesn't say forget about the fact that there's a bankruptcy.

10   That's insane, and that's -- there are provisions in the

11   agreement that make that perfectly clear.  The provision

12   they even pointed you to, 6.1.  6.1 clearly changes the

13   rights of people in the event of a bankruptcy.

14          So if there's a bankruptcy, the collateral agent

15   can consent to adequate protection, and says that you're not

16   allowed to object to it, as long as it provides for

17   materially equal treatment to all secure parties.  Sets up a

18   different standards.  It doesn't say, "As long as it

19   complies with the 4.1 waterfall.  It says as long as it's

20   materially equal treatment of all secured parties, and

21   that's on Page 28, Your Honor, of the agreement,

22   highlighted.

23          THE COURT:  All right.

24          MR. MOLONEY:  And then there are other provisions

25   on 6 (indiscernible) all the impacts of bankruptcy, so to

1    say this agreement was drafted under a guiding principle of

2    ignoring bankruptcy is just not to read the agreement.  And

3    it means the words regardless of, which you can't possibly

4    give to those words without doing damage to the English

5    language.  And going back to 4.1 again, they would like to

6    jump immediately to the third section, which is what they

7    did on the screen, going back to Page 19 again.  They would

8    like to jump immediately to third.  But this is not self-

9    executing.  The collateral agent does not know what they're

10   supposed to pay people, right?  The collateral agent's going

11   to need some information about what the individual claims

12   are, especially if he was going to file their theory about

13   giving interest and attorneys' fees, and everything else

14   picked up by secured obligations.

15          So that the provision that's really critical is

16   Section 4.3, which they did not show you, which is on Page

17   20.  And if we look at Section 4.3 on Page 20, and we look

18   like 4.3(b), and this actually answers the entire case.

19   This can be over when we finish reading this provision, Your

20   Honor, which is that the provision says, after beginning

21   without -- that with basically 10 days after you -- the

22   collateral agent gives people notice that he's gotten

23   collateral and he gets to distribute it.  What do they have

24   to do?  The secured debt represented, i.e., the trustee for

25   their bonds.  The person who represents us has got to

1   provide a written certification.  What do they have to

2   certify?  The aggregate amount of the secured obligations,

3   debt outstanding, owed by the borrower.  So in terms of your

4   question, it's owed by the Debtor, or any nother loan party

5   to the secured parties.  You have to be certified as

6   presently due and owing.

7           So this is the information that goes into the

8   formula.  They have to say, "How much am I owed by the

9   Debtor, presently due and owing?"  And that amount,

10  unfortunately, did not include post-petition interest, will

11  not include post-petition interest, and cannot include post-

12  petition interest in this case.  So that calculation is

13  actually done at the time of the distribution.  We're not

14  arguing it had to be done when this case was first filed.

15  But right then, whenever we get the plan distribution, that

16  calculation says there's no post-petition interest, and it's

17  dispositive of this case, and it's logical, because with

18  their argument for us, a very asymmetric distribution

19  formula.  They're saying you get money in, you get

20  collateral in based on a claim which does not include post-

21  petition interest, so it doesn't include collateral on

22  account of post-petition interest, but you distribute it as

23  if you had it.  And that's what skewers the results in a

24  weird economic way.

25          THE COURT:  Can I ask you, because we've sort of

1    talked around it, and the briefing doesn't talk about it.

2    What is the actual nut we're talking about here?  How much

3    money is at stake?  Or does that mean I'm going to have to

4    talk to Wilmington Trust?

5              MR. MOLONEY:  It's complicated, Your Honor, but it

6    could be up to $90 million, in a worst-case scenario.  It

7    could be a lot less, depending on a million assumptions, but

8    it's not $2 million.

9              THE COURT:  Good, because that's probably what the

10   briefing cost.

11             MR. MOLONEY:  Exactly, Your Honor.  We think

12   that's very, very high, high end, but --

13             THE COURT:  I was just -- it doesn't matter if

14   it's two dollars, I still have to make a decision.  I was

15   just curious, frankly.

16             MR. MOLONEY:  It's enough money that, depending on

17   certain assumptions, and a million assumptions -- if we

18   dealt with that road, the litigation on that issue would

19   make this litigation seem simple, I can assure you that.

20             THE COURT:  Good reason to enter summary judgment,

21   then.

22             MR. MOLONEY:  So hopefully we don't go down that

23   road.  So there's a commercial argument to it.  So if you

24   take that understanding, now go back and look at the third

25   provision.  The reading Your Honor originally gave to it is

1    precisely right.  The language -- what this is saying is,

2    when it says due and payable, it's referring back to due and

3    payable by the Debtor.  The words due and -- what they would

4    like it to read is take out all those words.  You don't need

5    to say, if it's just third or pro rata basis in payment of

6    the secured oblations.  You wouldn't need to say they were

7    payable with respect to.  You would just say the secured

8    obligations.  You would be -- they didn't put in the words

9    due and payable there again, just at a surplus.  Those words

10   reinforce the concept in which 4.3(b) establishes, that it's

11   only obligation that's due and payable that fits in there.

12          Now, plaintiffs, I think, in their briefing, and I

13   think they kind of ran away from the lifeline Your Honor

14   threw them, which was that maybe it doesn't apply with their

15   bankruptcy, because I don't think they understood that

16   argument was untenable.  They said that it's really, it's

17   due and payable under the financing documents, whatever that

18   meant.  Because as we look, the 4.3, it's not due and

19   payable under the financing documents, it's due and payable

20   from the Debtor.  And if you say it's due and payable under

21   the financing documents, what you're really saying, it's due

22   and payable from the other creditors.  Because effectively,

23   it's got to come from somebody.  So if it's not coming from

24   the Debtor, it's effectively coming from the other

25   creditors.  And the reason why they don't want to say that

1    is there's a million provisions in the agreement that say,

2    "That's not supposed to happen."

3              And specifically, Your Honor, I would turn your

4    attention to Section 2.1, on Page 15, which is, this is

5    supposed to be a (indiscernible) lien.  And it says that no

6    secured parties, even, is held to a preference over other

7    secured party, other than 4.1, but 4.1 is referring to this

8    priority waterfall, for a second, third -- quite clear,

9    that's the preference 4.1's specifying.  There is similar

10   language that appears on Page 27, in section 5.6, which

11   talks about the fact that -- to put it in context, this

12   agreement was originally negotiated without the plaintiffs

13   being parties to it.  They came down the road a couple of

14   years after this plan was negotiated in 2007 by J.  Aron,

15   and by the initial lenders, because when they did the

16   initial financing here, they needed to have interest rate

17   swaps, and so you had a set of lenders who are also

18   providing interest rate swaps, and they had to decide how to

19   share the collateral.

20              And they understood that there'd be more people

21   down the road, and they would help to build in a possibility

22   for more people to come down the road.  But they said the

23   people down the road, in order for more debt to come on,

24   they have to be treated in the same manner as the unsecured

25   parties under the agreement, and it has to be equal and

1    ratable debt.  And that's what 5.6 says, it has to be

2    secured by first lien equally and ratably, rolled

3    previously, existing in future debt, and they have to be

4    treated in the same manner.  So they tried to draft to avoid

5    the litigation we had here.  They didn't anticipate the kind

6    of clever argument they were going to make about interest

7    rates, but they tried to draft to deal with this problem, so

8    look, everybody's going to treated equal.  No one's going to

9    get a leg up, if you come in later on.

10           So what about the provisions he cites?  He cites

11   three:  8.3, if you look at 8.3, that's on Page 35, and says

12   the agreement has to remain in full force and effect.  Well,

13   we're not going to go far with that.  We agree with that.

14   What does that have to do with the dispute, when you look at

15   that provision?  It doesn't help them a jot.  If you look at

16   9.2, and the same thing, full force and effect, we agree

17   completely.  And in the brief, they cite the 9.17, which

18   says that basically nothing in this agreement prevents an

19   absolute obligation paid when they're due and payable,

20   according to their terms.  Well, this agreement is not the

21   problem, Your Honor.  The problem is the Debtor doesn't have

22   the money, and the bankruptcy code says doesn't have to pay.

23   So we have no problem with these kind of boilerplate

24   provisions, but they bear no relevance to the resolution of

25   this case.

1            So what is the provision that they hang their hat

2      the most on, is these two definitions, and I think we should

3      look at those, on Pages 11, post-petition interest, and also

4      on Page 13 to 14, secured obligation.  Now, why did they

5      include those?  Because I think that's the only question we

6      really need to answer, to kind of finish with all our

7      arguments here.  And I think they key -- at least one key is

8      after the word post-petition interest, you see the word

9      "any"?  And the same word gets repeated in the definition of

10     secured obligations, "any".  And that's because there is a

11     circumstance where interest does accrue, even though it's

12     not against the Debtor.  But it's not -- Your Honor asked

13     the right question, who is it against?  It's against the

14     second lien holders.  And when you have a potential claim

15     against second lien holders, then you want to be able to

16     assert these rights against the second lien holder.  And

17     that, in fact, is what they did, what they did here.

18            Uh, and, and we, we cite sources in our brief

19     including the report EDA had done by the first lien, second

20     lien holders taskforce that says this is a typical

21     provision, and a typical definition when you're trying to

22     define rights between a senior lender, and a junior lender,

23     and it's negotiated, about how much are they going to

24     actually permit you.  If you haven't actually perfected your

25     security interest, are you still (indiscernible) ahead of

1    them?  If they have a perfected security interest -- so this

2    was drafted most favorably to the first lien holder, because

3    we were the only ones drafting it.

4           And they say that's fanciful, the second lien

5    holders will actually show up, will actually adopt terms, as

6    we'll see, that fit right into this agreement.  Couldn't

7    have been fought about in 2007.  Well, that actually is not

8    true.  If you go back to the documents that were around in

9    2007, and there are a number of them, and I would start,

10   Your Honor, with Tab 6.  You'll see, that was a credit

11   agreement that was entered into in 2007 by everyone, and the

12   swap agreements were basically designed just to hedge the

13   debt under the credit agreement.  And you look at the

14   highlighted Page 129 and 134 --

15          THE COURT:  Well, let me ask you.  If I start to

16   look at the credit agreement, am I looking at extrinsic

17   evidences?

18          MR. MOLONEY:  No, Your Honor.  The credit

19   agreement, I think these are all part of the operative

20   documents here.  And we're only arguing them for, just to

21   put in commercial context, they've argued that this is an

22   absurd result.  And I think we can show that if you look at

23   the commercial context, that this all fits together into one

24   very clear, understandable commercial package, which doesn't

25   -- which mandates the result we're advocating here.  The

1    difference, Your Honor --

2              THE COURT:  So I can't read the inter-creditor

3    agreement in and of itself without looking at the credit

4    agreement.  And they sort of acknowledge this as well,

5    because they also have me look at the pledge agreement, they

6    have me look at the security agreement.

7              MR. MOLONEY:  Yes, I think you have to see, oh, it

8    fits into a -- it's an inter-creditor agreement talking

9    about rights under other agreements, and I think I

10   understand it, it's fair for you to look at those other

11   agreements.  And because they're operative documents, we're

12   not looking at them for the truth of everything, it's no

13   hearsay problem, right?  We're just looking at them to see

14   what they say.  And if you look at 129 -- I mean,

15   (indiscernible) from 129 and 134.

16             THE COURT:  Well, it's not a hearsay problem, it's

17   a parole evidence problem.

18             MR. MOLONEY:  Right, parole evidence, issue,

19   right.  But it's also --

20             THE COURT:  Possibly.

21             MR. MOLONEY:  I think since it's part of the

22   overall (indiscernible) cited authority in our reply brief

23   for this, part of the overall operating documents, you can

24   get it..  but if you look at 129 and 134, you saw that even

25   back then they were thinking about the possibility of junior

1    debt very exclusively.  And frankly, you can even find it in

2    the inter-creditor agreement.  But it's clear, even in the

3    original inter-creditor agreement.  If you look at 9.3(c),

4    this is a provision that existed in 2007, and the line

5    (indiscernible) we highlighted in 9.3(c) basically permitted

6    the -- even from the very beginning, the collateral agent

7    was authorized basically to agree, to enter into agreements

8    with junior creditors, as long as we have priority.

9              So from the very first time they draft this

10   agreement, in 9.3(c), they contemplated this.  And of

11   course, they much more explicitly contemplated it when they

12   did the restatement, which is an agreement that they signed

13   onto.  The agreement they signed onto, which is Exhibit 1

14   under the exception agreement, which is Tab 3, that

15   specifically says -- I mean, we're only here doing

16   (indiscernible) because they say that they don't want to be

17   bound by the agreement they actually signed, which is 7.9.

18   If you look at the agreement they actually signed, on Page

19   33 --

20              THE COURT:  Which Tab are you on?

21              MR. MOLONEY:  I'm on Tab 1, the actual operating

22   agreement of this case.

23              THE COURT:  Okay.

24              MR. MOLONEY:  If you look at Page 33, 7.9 --

25              THE COURT:  Okay.

1            MR. MOLONEY:  So the agreement they signed onto,

2     they knew at that time there was a possibility -- it's not

3     fanciful, but that this is the widest language, was drafted

4     this way, it's the traditional way to draft the language,

5     these agreements.  And in fact, Your Honor, if you look at

6     Tab 5, lo and behold there is a second lien inter-creditor

7     agreement, and that second lien inter-creditor agreement

8     exactly mirrors an amendment that occurred, which appears in

9     Tab -- my inter-creditor agreement.

10            THE COURT:  Frankly now, I think you are in

11     extrinsic evidence.

12            MR. MOLONEY:  Yeah, I don't want to get too deep

13     into it.  But I, I think there's one piece of language in

14     this that I think is relevant, Your Honor, if we look at the

15     actual credit agreement, and I'm going to take you back

16     between that actual, in Tab 5, and you look at Page 4.

17            THE COURT:  Yes.

18            MR. MOLONEY:  And you look at the definition of

19     discharge of senior obligations.  And it explicitly refers

20     to the senior inter-creditor agreement, so it's clear that

21     these two agreements were supposed to work in tandem.

22            THE COURT:  Well, okay.

23            MR. MOLONEY:  I mean, it's not a secret.  And if

24     you go back to discharge of senior indebtedness, in the

25     senior agreement, it basically has the language about due

1    and payable, but it says, "due and payable or otherwise

2    accrued."  That's on Page 6, in Tab 1.  So the concept of

3    discharge of secured obligations is due and payable or

4    otherwise accrued, and so what happens is under the

5    agreement in Tab 5, all of the obligations, senior

6    obligations have to be paid, because there's been no

7    discharged of senior secured oblations, before they can keep

8    any collateral.  And that's the explanation for the

9    definitions.  If for that, this is really a quite simple

10   case.  And I think at this point I'd just like to kind of

11   talk about what the commercial reality, and what they knew

12   before they entered into this agreement, because I think

13   Your Honor can take that into account as well.

14            THE COURT:  How can that be?  I'm interpreting a

15   contract.  How am I going to -- you're asking me to look at

16   what they knew at the time they entered into commercial

17   context.  That's all extrinsic evidence.

18            MR. MOLONEY:  Well, the offering memorandum is

19   often considered part of the contract.

20            THE COURT:  Okay, fair enough.

21            MR. MOLONEY:  And the offering memorandum here is

22   in Tab 2, and that's the only document I'm going to refer

23   to, and then I'm going to be finished, Your Honor.

24            THE COURT:  Okay.

25            MR. MOLONEY:  If you look at the offering

1    memorandum in Tab 2, and we've highlighted on the first page

2    that they were told they were going to be equal and ratable

3    with the other creditors.  And if we go ahead to Page 9,

4    which is the next highlighted page, the back of Page 2 in

5    your book, it says it's going to be secured on a first

6    priority basis by a lien equal and ratable with the debt.

7    And then if you look on Page 23, I think this is where it

8    gets quite critical, Your Honor, because it says the toll,

9    the notes and guarantees will be secured on a first priority

10   basis, only to the extent of the value of the assets that

11   had been granted in the security of the notes, and the

12   guarantee of the notes, and there may be insufficient

13   proceeds to satisfy amounts (indiscernible) the notes, so

14   they were warned that the collateral was going to be

15   limited, as I claim it is, by the facts on the ground, with

16   the way things really happened.

17           And then similarly on the next page, Page 24, it

18   says what happens if the amount of collateral is not enough?

19   Then they say interest may cease to accrue to notes

20   thereafter, so they knew that they weren't going to be get -

21   - they didn't say, "But we'll still, interest will continue

22   to accrue."  But you're collected from, under the financing

23   documents, they say interest may cease to accrue.  And in

24   fact, they become even more explicit on this point on Page

25   55, where they say the bankruptcy code permits only the

1  payment and/or accrual of post-petition interest, cost of

2  attorneys' fees, to a secured creditors during a Debtor's

3  bankruptcy case, to the extent that the value of the

4  collateral is determined by the Bankruptcy Court to exceed

5  the aggregate outstanding principal amount and the maturity

6  of the obligations secured by the collateral, including any

7  obligations secured on a priority basis.

8           And I think I can stop there by saying rather,

9  that they basically knew that if what happened in this case

10  happened, the agreements that they were going to enter into,

11  which is the extension agreement, which is Tab 3, was

12  entered into basically, and that is the agreement by which

13  they are now party to this agreement, was entered into on

14  April 19, 2011.  The offering memorandum is dated on April

15  14, 2011.  So the offering memorandum was five days before

16  they signed the extension agreement.  They knew what this

17  agreement provided.  They knew they did not have any of the

18  rights that they're claiming here.  The windfall that is

19  being sought here is not by our clients.  The windfall is

20  being sought by a group of creditors who fully understood

21  what they were seeking.  And the final point I want to make,

22  Your Honor, is the one area we do agree with them, is they

23  say they're not trying to subordinate us.  We agree.  And

24  they say that they don't have any rights against us, we

25  don't have any rights against them.  We agree.  But if

1    that's the case, how is it possibly equitable for them to

2    get the additional money at our expense?  Thank you, Your

3    Honor.

4             THE COURT:  Okay, thank you.  Mr. Ellenberg?

5             MR. ELLENBERG:  If the Court please, Mark

6    Ellenberg, Cadawalader, Wickersham & Taft on behalf of

7    Morgan Stanley.  Your Honor, as Mr. Maloney indicated, my

8    argument is going to focus on the introductory paragraph of

9    Section 4.1, and that paragraph sits at a four-pronged test

10   for the applicability of the waterfall, which was discussed

11   by Mr. Maloney.  If any one of those four prongs is not met,

12   then the waterfall does not apply.  Number one, that means

13   we prevail on that basis alone.  And I emphasis if any one

14   of the four is not present, we prevail.  And it also means

15   that you don't actually have to get to the waterfall

16   argument and the proper construction of the third priority

17   versus the fourth priority.

18             DTC argued as if the introductory paragraph says,

19   "Any time there is a payment on account of the secured

20   obligations, it will be distributed as follows."  That's not

21   what it says.  It is instead a very limited-purpose

22   provision for a very discreet and tightly-described set of

23   facts and circumstances, and moreover it is a set of fact

24   and circumstances that does not fit it.  Not a single prong

25   of the test is met.

1            The first prong is that -- well, the four prongs

2    are that first, there has to exist collateral or the

3    proceeds of collateral to be distributed to the secured

4    creditors.  Second, the collateral agent has to be in

5    possession of the collateral or the proceeds.  Third, the

6    collateral or the proceeds have to have resulted from a

7    sale, other disposition of or collection on the collateral.

8    Fourth, the sale, disposition, or collection had to have

9    resulted from the exercise of remedies under the security

10   documents, by the collateral agent.  Again, each one of

11   those prongs has to be met.  So let's look at the first one,

12   which is that distributions are not collateral --

13            THE COURT:  Can I interrupt you for a moment?

14            MR. ELLENBERG:  Sure.

15            THE COURT:  Because this goes to your issue that

16   Section 4.1 is very narrow, and applied in a set of

17   circumstances.

18            MR. ELLENBERG:  Yes.

19            THE COURT:  How does the document deal with the

20   distribution of value, to borrow the term that's been used

21   by DTC, if 4.1 is not applicable?

22            MR. ELLENBERG:  It doesn't.

23            THE COURT:  Okay, so it gets dealt simply though

24   the credit agreement.

25            MR. ELLENBERG:  No, it's dealt with through the

1    bankruptcy code.

2              THE COURT:  Okay, so the value gets distributed to

3    the collateral agent, or to the creditors, pursuant to the

4    bankruptcy code, and the documents have no effect, one way

5    or the other?

6              MR. ELLENBERG:  This inter-creditor agreement has

7    no effect.

8              THE COURT:  Has no effect, right.

9              MR. ELLENBERG:  Specifically, 4.1 has no effect.

10             THE COURT:  Right.

11             MR. ELLENBERG:  Your Honor, distributions are

12   being made, not to the collateral agent, but to the

13   creditors.

14             THE COURT:  Okay.

15             MR. ELLENBERG:  Okay.  And those distributions are

16   being made pursuant to a plan that was confirmed by this

17   Court with specific respect to our class.  Even though

18   Morgan Stanley voted against the plan, the class accepted

19   its treatment under the plan, so that was the basis for

20   confirming it as to our class.

21             THE COURT:  Okay.

22             MR. ELLENBERG:  And the distributions flow from

23   the fact that there is a confirmed plan, governed by the

24   Bankruptcy Code, and by its own terms, that is supreme

25   federal law.  It overrides the inter-creditor agreement.

1          THE COURT:  Okay.

2          MR. ELLENBERG:  Okay.  So let's look at fact, and

3    let's just make clear -- I was going to get to this later,

4    but I think this is a good segue into it.  The fact that

5    they filed a proof of claim, that the collateral agent filed

6    a proof of claim has absolutely nothing to do with the

7    distributions that are being made under this plan.  If the

8    collateral agent had never hired counsel, had never appeared

9    in this case, had never filed a proof of claim, nothing

10   would be different.

11         We're getting distributions on the proof of claim

12   that we filed, as is everyone else at this table, and every

13   other first lien creditor.  Their proof of claim is not

14   going to be allowed.  They didn't get the vote, and they're

15   not going to get a distribution on it.  Nothing happening

16   under this plan has anything to do with the fact that they

17   filed the proof of claim, nor does it have anything to do

18   with any other act that they took, or did not take.  It

19   simply has nothing to do with it.

20         4.1, by contrast, is focused entirely on action

21   taken by the collateral agent which produces proceeds in its

22   hands.  That's when it applies.  If they had gotten relief

23   from the stay, and had a stay law foreclosure on the assets,

24   okay, then you're into 4.1, and then you have to determine

25   what the third priority and the fourth priority means.  That

1   didn't happen.  Something completely different, separate,

2   and apart happened here, which was that a plan was

3   confirmed, and distributions have been made under the plan

4   pursuant to the bankruptcy code.  This agreement should be

5   completely irrelevant to anything that has to do with those

6   distributions.

7           So let's talk about number one, that the

8   distributions are not collateral or the proceeds of

9   collateral.  And let's talk about what's being distrusted.

10  First, 100 percent of the reorganized TCEH common stock.

11  Reorganized TCEH is a new entity.  Did not exist prior to

12  the commencement of this case.  The stock obviously did not

13  exist, prior to the commencement of this case.  In addition,

14  we're getting cash, largely from the proceeds of new

15  financing by the reorganized TCEH, and the sale of preferred

16  stock.  Again, none of that existed, prior to the

17  commencement of this case.

18          We're getting the rights to purchase $700 million

19  of new EFH common stock, in addition to the common stock

20  being distributed to us under our rights off.  That, by the

21  way, under the plan, never goes to the collateral agent,

22  under any circumstances.  We're getting assigned C5 rights,

23  if unsecured creditors fail to exercise their rights, they

24  come to us.  And finally, we're getting rights to receive

25  payments under the tax receivable agreement.  Yet none of

1    these things existed, prior to this case commencing.  None

2    of these things were collateral.  We don't have a lien on

3    any of them.  Never did, never will.

4            Mr. Kim said that this is just like a foreclosure.

5    No, this is nothing like a foreclosure.  In a foreclosure,

6    you wouldn't get this kind of value, you wouldn't get this

7    kind of property out of a foreclosure.  Nor would you have

8    the procedure that was adopted here, where there was a plan

9    through which the Debtor was the architect of its own

10   corporate reorganization.  If there was a foreclosure, you

11   would seize the assets, and you would put them up for sale,

12   or you would get a deed in lieu.  Either way, you're getting

13   the assets, then you dispose of them, you get cash.  You

14   don't get stock, you don't get a rights offering.  You don't

15   have tax-contingent, tax-receivable payments.

16           Moreover, that sale would be run by the collateral

17   agent, on behalf of the lien holders.  Okay, that didn't

18   happen here.  the Debtor controlled this entire process.

19   Finally, if there was a foreclosure, you'd have a deficiency

20   claim.  Well, there's no deficiency claim here.  All the

21   liens and claims are being extinguished, and discharged.

22   This is nothing at all like a foreclosure.  A foreclosure is

23   a remedy, under the security agreements.  What's happening

24   in this case is something completely different, being

25   imposed on us under the federal bankruptcy code, which is

1    fine.  That's what the bankruptcy code is for.  But it's not

2    happening under the security agreement, and it's not

3    happening under this inter-creditor agreement.

4           Now, DTC's primary argument -- and this is set

5    forth in its reply brief at Pages 23 and 24, is that what

6    we've gotten are proceeds, proceeds of the collateral.  And

7    their argument is based on the definition of proceeds in the

8    security agreements, which happened to include the proceeds

9    of sales.  Nothing very surprising about that.  By the way,

10   he said it goes beyond the definition of the UCC.  Actually,

11   it pretty closely tracks the definition in the UCC.  And

12   then it's based on the further assertion that the collateral

13   has been sold.

14          There are two major problems with this.  The first

15   is that there hasn't been a sale.  If you want to see a

16   sale, look at the Oncor side of the case.  At Oncor, there's

17   a sale.  There's a real third-party buyer.  Not an

18   affiliate, not a successor.  You're not equitizing

19   creditors.  The assets are being sold.  That's a sale.

20   What's happening on the TCEH side of the case is not a sale.

21   The Debtor, as the bankruptcy code provides, is doing an

22   internal reorganization.  It's changing around the corporate

23   shells.  But at the end of the day, all that's happening is

24   that creditors are getting equitized.  Just like Momentum,

25   actually, creditors are getting equitized.  That's what this

1      plan is doing, because they're the fulcrum, in this case.

2              Moreover, the second big problem with the approach

3      taken by DTC is that they're conflating the "consideration

4      for the sale received by the Debtor" with the distributions

5      to the creditors.  The distributions to the creditors are

6      separate from the consideration received by the Debtor, from

7      the successor Debtor.  The distributions are an account of

8      their claims.  This is the precise question that Judge Drain

9      addressed in Momentive.  Case is at 518 Bankruptcy 740.

10     What happened there, Your Honor, and I know you're already

11     familiar with, but the senior creditors in that case were

12     the plaintiffs.  They sued the junior creditors, the

13     defendants, under a turnover provision.  They asserted that

14     because they had not been paid in full, and because the

15     junior creditors were getting equity under the plan in

16     exchange for their claims, just like what's happening here,

17     that that equity had to be turned over to the senior

18     creditors.

19              And that argument depended entirely on the legal

20     conclusion that the common stock being distributed to the

21     defendants under the Momentive Plan represented the

22     collateral, or really the proceeds of collateral, that was

23     the argument.  Judge Drain rejected this, and I'm going to

24     read a full paragraph from the opinion, Your Honor, because

25     it's the only case directly on point.  It is foursquare, and

1     it directly refutes the arguments being made by DTC.

2           Judge Drain says, "As a matter of law, however, I

3     conclude that the new stock to be distributed to the

4     defendants under the plan is not proceeds of the common

5     collateral, for purposes of the New York UCC Section 9, or

6     for that matter, any other definition of collateral

7     proceeds.  From the perspective of the Debtors, that stock

8     is not something that any currently secured parties'

9     existing lien would attach to, even under the expansive

10    defection of proceeds in Section 9 of the UCC, because the

11    new common stock comprises proceeds of the defendant's liens

12    and claims, not the proceeds of the Debtor's assets that

13    constitute the common collateral.

14           It is being received, therefore, on account of or

15    based on rights arising out of the defendant's liens and

16    claims, not on account of common collateral.  A party with a

17    lien on the defendant's rights against the Debtors could

18    assert that lien against the new common stock to be issued

19    under the plan, as the proceeds of its collateral.  A

20    creditor such as the plaintiffs, with a lien on the Debtor's

21    assets could not, however, assert a lien against that stock,

22    because the Debtor's assets, the common collateral, have not

23    been distributed, dispersed, or otherwise affected by the

24    disbursement of the new stock.  The common collateral

25    remains instead unaffected.  The defendant's lien will

1    change.  It, along with defendants of secured claims, will

2    be released under the plan in exchange for a new common

3    stock.  However, the property constituting the common

4    collateral will not change, therefore the new stock is not

5    proceeds of the common collateral."

6              That's exactly our case, Your Honor.  The assets

7    are not being distributed, they're not going anywhere.

8    They're staying with the reorganized Debtor.  And the liens

9    of the junior creditors here were in fact being released and

10   exchanged for that distribution, just like is happening

11   here.

12             DTC tries to distinguish Momentive on the ground

13   that the liens of Momentive were retained, whereas here all

14   liens are being released.  And this is at Page 26 to 27 of

15   the reply brief.  This is wrong.  As the excerpt I just read

16   clearly showed, the junior creditors' liens weren't in fact

17   being released.  It is true that in Momentive, the senior

18   creditors' liens were not being released.  But that played

19   absolutely no role in Judge Drain's decision.  I just read

20   his holding to you, and the rationale for that one.  He goes

21   on to discuss that the senior creditors' lien was not being

22   released, but that was not the basis for his holding.  I

23   read you his holding.

24             So Your Honor, because the distributions here are

25   neither collateral or the proceeds of collateral, Section

1    4.1 does not apply.  The case ends right there.  If we need

2    to go on, then we're at Prong 2.  Prong 2 requires that the

3    collateral and the proceeds be in the hand of collateral

4    agent.  The distributions, Your Honor, are to the creditors.

5    And the original plan, of course, just said that.

6    Distributions will be made to the creditors.  Because after

7    all, the distributions are being made on account of the

8    creditors' proofs of claim, not on account of the collateral

9    agent's proof of claim.  In a circular contrivance, prompted

10   I assume by threats of a confirmation objection, the plan

11   now says that, "Well, if the Court decides that these

12   distributions are collateral, then we'll distribute it to

13   the collateral agent."  Well, that's not good enough, Your

14   Honor.  Okay, that's just artificial.

15           The problem with DTC's entire approach here is

16   that it's viewing 4.1 as an acrostic.  It's trying to take

17   each individual prong, view it in isolation, and make some

18   technical argument about how they've satisfied, the most

19   preposterous one we haven't gotten to yet, which is that

20   they've actually exercised remedies.  And what they never do

21   is look at is as a coherent hold, and try to have the

22   provision make sense.  Your Honor is worried about going

23   outside the document, but let's just stay within this

24   paragraph.  Let's read all these prongs together, and let

25   them make sense, as a coherent whole.  Obviously, what this

1    provision is supposed to apply to is a situation where the

2    collateral agent has conducted a foreclosure proceeding, and

3    therefore it has assets on its ends to distribute.  Hey,

4    that's not happening here.  has not happened, never will

5    happen.

6              Prong 3, the collaterals of proceeds resulted from

7    a sale, other disposition of, or collection on the

8    collateral.  I've discussed that, Your Honor.  There has not

9    been a sale here.  There has not been a disposition, period.

10   Finally, Your Honor, that the collateral of proceeds

11   resulted from an exercise of remedies under the security

12   documents of (indiscernible).  There were no remedies

13   exercised here.  The automatic stay came into effect on the

14   petition date, was then replaced by the discharge

15   injunction.  The collateral agent was not able to exercise

16   any contractual remedy as a matter of law, and he certainly

17   has not.

18             What does the argument of DTC boil down to?  This

19   is Page 13 through 17 of the reply brief.  First, they try

20   to bootstrap Section 3.1(a) of the inter-creditor agreement,

21   far beyond what it says, okay?  They call it a remedy

22   provision.  It's not a remedy provision.  It's called an

23   enforcement of lien provision.  The word "remedy" doesn't

24   appear again.  And it's really an authority provision.

25   Remedies are addressed in Section 5 of the security

```
1    agreement.  That's where remedies are.  They're not in

2    Section 3.1.  Section 3.1 is only about authority, and what

3    it makes clear is that the collateral agent really has no

4    authority.  The collateral agent only does what it's told to

5    do by the appropriate number of creditors.  Now --

6              THE COURT:  Well, he argues, at least in this

7    context, he says there's a default there, which is they have

8    certain authority if they don't receive instruction.

9              MR. ELLENBERG:  No, Your Honor, that's not what it

10   says.  First of all, the default is that they have to get

11   instruction.  There's a very narrow exception to that, which

12   is back in the absence of instruction, including contrary

13   instruction, looking at 3.1(a), they can take action deemed

14   desirable to create, prove, preserve, or protect the liens.

15   Okay, create, prove, preserve, or protect.  Not do anything

16   that they want to do.  It's very limited.  Similarly, if we

17   look at (e), 3.1(e), they can act to protect or preserve its

18   interest in the collateral.  Okay, but the plan, Your Honor,

19   released the liens.  That's no protecting, preserving,

20   creating, proving.

21             Okay, nothing they did has anything to do with

22   what's happening under this plan, and they were not

23   authorized to do that.  In fact, Your Honor, in order to

24   release liens, they would have needed the consent of 100

25   percent, 100 percent of the predators.  That's not even a
```

1   majority provision, or a two-thirds provision.  You need 100

2   percent consent to release liens.  They never got that

3   consent.  Certainly didn't get it from us.  Pretty sure they

4   didn't get it from anyone at this table.  They had no

5   authority to take any action that resulted in the release of

6   liens, but that's why the distributions are coming to us,

7   because the liens are being released.  They could not

8   possibly have had anything to do with that.

9           Now, based on 3.1 supposedly being a remedy

10  provision, they say, "Well, in order to protect the rights

11  of the creditors, we filed a proof of claim."  Well, first

12  of all, Your Honor, it wasn't specifically authorized.  It

13  was redundant.  It wasn't even necessary, because actually

14  the DIP order said they didn't have to file one.  And in any

15  event, the filing of a proof of claim is not a remedy.  Your

16  Honor asked exactly the right question, which is, "Has any

17  case ever sent it to remedy?"  The answer's no, no case has

18  ever set it to remedy, but Momentive pretty much says that

19  it's not.

20          Because in Momentive, another argument being made

21  by the senior creditors was that the execution of a plan

22  support agreement by the subordinated creditors was an

23  exercise of remedies.  Then Judge Drain says, "No, they're

24  just exercising a right available to every predator under

25  the bankruptcy code.  That's not the exercise of a remedy."

1    Well, the filing of proof of claim is the same thing.  It's

2    a right available to every creditor under the bankruptcy

3    code.  Cannot possibly be a remedy, and even the suggestion

4    that it's a remedy is somewhat astonishing to me.

5            Your Honor, they also say that their consent to

6    the plan support agreement was the filing of a remedy.

7    Momentive directly addresses that.  They rely on the

8    Chrysler case, which had to do with a 363 sale, and whether

9    the collateral agent was sent to the sale on behalf of the

10   lien holders.  Again, that's just an authority case.  It's

11   not a remedy case.  The Court in Chrysler never addressed

12   whether that was the exercise of remedies.  So I think Your

13   Honor, it's clear that they haven't satisfied a single one

14   of the prongs of Section 4.1, and having failed to do that,

15   the waterfall on which their entire case depends never comes

16   into play.  Just one final point, Your Honor.  Counsel said

17   that we want to ignore that there are different rates of

18   interest.  That's not true.  We take them into account.  We

19   just stop them on the petition date.  Thank you.

20           THE COURT:  You're welcome.

21           MR. ROMANELLO:  Good afternoon, Your Honor.

22   Salvatore Romanello, from the law firm of Weil, Gotshal &

23   Manges, on behalf of intervenor Titan Investing Holding

24   Limited Partnership.  I have with me my partner Ronit

25   Berkovich.  Also, we have our co-counsel, Bradley Aronstam,

1    from the firm of Ross, Aronstam & Moritz.

2            Now, Your Honor, I'm going to address three

3    points.  First is that the rule of explicitness applies

4    here.  Second, even if the Court were to determine that the

5    rule doesn't literally apply, it still must be considered,

6    given that the Court must review the contract from the

7    perceptive of one who's cognizant of the customs and usages

8    in the relevant industry.  The third argument, Your Honor,

9    is that with respect to the plan distribution challenge made

10   by the plaintiff, those claims have been released under the

11   cash collateral order, as they failed to challenge the

12   claims and liens prior to the challenge determination

13   period.  Now, Your Honor, we don't need to get to those

14   points because we think we win on the due and payable

15   argument.  We win on the arguments made by Mr. Ellenberg.

16   But it still provides context, in terms of the rule of

17   explicitness.

18            THE COURT:  But don't you lose on this argument

19   because they're not subordinating your claims?

20            MR. ROMANELLO:  No, Your Honor, for several

21   reasons.  One, we do believe it's a subordination, okay.

22   The code requires equal treatment, and what they're doing

23   here is on account of post-petition interest, they're taking

24   distributions away from us that would otherwise accrue to

25   the other first lien creditors.  Beyond that, Your Honor, if

1    you look at the reason why the rule of explicitness exists,

2    and that rationale is set forth by the New York Court of

3    Appeals in In Re Southeast Banking.  That rationale applies

4    equally here.

5              The Court there says, and I'm quoting, it says

6    that this rule recognizes that post-petition delay,

7    distortion by a Debtor results by operation of law and

8    prevents creditors from profiting or suffering a loss in

9    relation to each other because of the delay.  That's with

10   respect to the accrual of post-petition interest, and why it

11   stops at the petition date.  Case goes on to say, the rule

12   of explicitness evolved as an equitable principle, contract

13   instruction of federal common law, to rectify the perceived

14   inequity that results when pursuant to a subordination

15   agreement, a junior creditors' potential distributions go

16   first to satisfy post-petition interest of a senior

17   creditor.  That perceived inequity exists here, and that's

18   why the rule should apply either way, Your Honor.

19             They're trying to reduce amounts that would

20   otherwise go to the other first lien creditors on account of

21   post-petition interest.  In order to do so, if the rule

22   applies, Your Honor, the agreement must be clear,

23   unequivocal, unambiguous.  This integrator agreement, for

24   the purposes that they're trying to undertake, doesn't meet

25   that standard.  And for all the reasons Mr. Moloney

1    discussed and Mr. Ellenberg discussed, they could have taken

2    out the due and payable qualifier.  It could have said "all

3    plan distributions will be subject to Section 4.1, all

4    adequate protection payments will be subject to Section 4.1"

5    This agreement doesn't say that.  And Your Honor, if there

6    is any -- if the rule applies, and the Court believes,

7    "Well, I see either interpretation is possible."  Well, if

8    the rule applies, they have to lose.

9            Second, Your Honor, my second point is that even

10   if the Court were to conclude that it doesn't literally

11   apply here, the Court must assess and look at this contract

12   from the perspective of -- and it's in the intervenor

13   briefs, this standard in the brief submitted by the

14   plaintiff.  It must look at the agreement from the

15   perceptive of "one who is cognizant of the customs,

16   practices, usages, and terminology as general understood in

17   a particular trade or business."  It's a very important

18   standard here, because given a drafter of an inter-creditor

19   agreement, applying New York law, would be well aware of the

20   rule of explicitness.  How do we know that?  That's what the

21   New York Court of Appeals told us in In Re Southeast

22   Banking.

23           Again, another quote from that case.  "Parties to

24   subordination agreements undoubtedly relied on the rule.

25   Their lawyers would have been quite remiss had they not.

1    Since recent case law, as well as lien authority of many

2    commentators have consistently recognized the continued

3    vitality of the rule."  So if you really wanted to change

4    the way distributions are accounted for because of post-

5    petition interest, the person drafting this agreement would

6    be well aware of rule and whether it might or might not

7    apply.  Well, you know what they would do?  They would do

8    what happened in the second lean inter-creditor agreement.

9    They would expressly set forth the subordination, they would

10   expressly set forth the turnover provisions.  That didn't

11   happen here.  Now, Your Honor, the third point we made.

12   Even if the first lien indentured trustee could somehow

13   overcome the due and payable arguments, the fact that there

14   was never an exercise of remedies, if they could overcome

15   the fact that the rule of explicitness should apply, with

16   respect to the plan distributions, they've really waived

17   their ability to challenge the claims and liens of the other

18   first lien holders.

19          They failed to file a timely application,

20   challenging the reduction that they seek in the claims filed

21   by the other first lien creditors.  Cash collateral order,

22   Paragraph 15 provides that upon the expiration of the

23   challenge period determination date, any and all challenges

24   to the Debtor's stipulations and admissions, including

25   challenges to the extent and priority of the first lien

1    creditors' liens were "deemed to be forever waived or at

2    least (indiscernible)."  And the prepetition first lien

3    obligations that were quoted here, Your Honor, "shall

4    constitute allowed claims, not subject to counterclaim,

5    setoff, recoupment, reduction, subordination,

6    characterization, subordination, or avoidance."

7            This is a reduction.  They're looking to reduce

8    our claim, and for that reduction to go towards their

9    redistribution.  Your Honor, there was no such challenge

10   made prior to the challenge determination period ending, and

11   even if they could get over all the other hurdles that we've

12   talked about, because that challenge wasn't made, they've

13   released their claims, with respect to the plan

14   distributions.  If you have any questions, Your Honor, happy

15   to take them.

16           THE COURT:  Nope.

17           MR. ROMANELLO:  Reply?

18           MR. KIM:  Your Honor, may we just have a short

19   break before --

20           THE COURT:  Yes, of course.  Yeah, we'll take five

21   minutes or so.

22           (Recess)

23           THE COURT:  Please be seated.  Go ahead.

24           MR. KIM:  Thank you, Your Honor.  I promise we'll

25   try to do this in 20 minutes or less, since as Your Honor

1    pointed out, the briefings appear expensive, and the longer

2    I talk, the smaller the pie is to be divided up, so try and

3    do this efficiently.  I was going to address, Your Honor,

4    number one, the discussion about the phrase "due and

5    payable" specifically as it relates to the point about

6    Section 4.3, and what the means, and why it's in there.

7    Number two, I was just going to briefly touch on adequate

8    protection payments, because while it was not part of the

9    discussion so far, I think while I was talking about plan

10   distributions, I didn't specifically address that point.

11          And then number three, I was going to talk partly

12   about why the value that's coming out falls within the

13   remedy bucket, and then my colleague Ben Sauter was going to

14   list for Your Honor the various things that the collateral

15   agent has done, and also has refrained from doing, all of

16   which fall within the revenue bucket.  So those are the

17   three issues I was going to address.  If there were other

18   issues or questions that Your Honor believes should be added

19   to the list, certainly I'll put that first, or you can add

20   it as I go along.

21          THE COURT:  Why don't you go ahead.

22          MR. KIM:  So I think first Your Honor, on the

23   discussion about due and payable.  Should this phrase be

24   construed in 4.1 to mean due and payable by the Debtor, and

25   allowable and allowed in the bankruptcy?  Or should it

1    simply be construed as due and payable to the creditors by

2    somebody, Debtor, guarantors, or otherwise, under the

3    financing documents, regardless of whether it's allowed or

4    allowable in the bankruptcy?  And Your Honor, I would submit

5    the second construction, which is what we are advancing, is

6    the only one that actually squares with the explicitly

7    language of the agreement.

8              So putting up (indiscernible) again, the

9    definition of secured obligation, which forms the basis for

10   how the collateral agent is supposed to distribute, it is

11   quite clear and expansive about the notion that the amounts

12   that are due, that matured and are payable are those that

13   are payable under the financing documents, and that whatever

14   the bankruptcy laws provide for as to whether the Debtor

15   literally has to pay it or not is actually excluded, for

16   purposes of calculating different interest rates.  So here,

17   in the very definition of secured obligations, again, the

18   basis for calculation, it talks about interest and fees that

19   occur after the commencement of any bankruptcy or

20   insolvency, regardless of whether such interest or fees are

21   allowed claims in such proceeding.

22             And then it says, "Without limiting the foregoing,

23   the secured oblations include all principal, inert, charges,

24   expenses," blah, blah, blah, basically any value payable by

25   any loan party under any loan document, and all obligations

1    of every nature outstanding under any additional obligation,

2    whether fixed or contingent, matured, unmatured, in each

3    case allowed -- sorry.  My 14 has been stolen,

4    (indiscernible).  Allowed, allowable in an insolvency

5    proceeding, and shall include, without limitation, interest

6    accruing at the applicable rate provided in the applicable

7    financing document.

8              So here we're talking about all the obligations

9    owed in the loan documents, and the financing document, and

10   it explicitly talks about it not mattering whether it's

11   allowed or allowable in the bankruptcy, and in fact, the

12   same points are made in 4.3, the very provision that the

13   defendants insist ends up negating the very definition of

14   secured oblation.  4.3(b) of course talks simply about a

15   certification procedure where all the people, all of the

16   creditors who are owed money are supposed to submit a

17   document to the collateral agent saying, "This is the money

18   I believe I'm owed, by in this case the Debtor, or by the

19   borrower," but even here, the way that these certifications

20   are supposed to be calculated talks about any -- the

21   aggregate amount of secured oblations, then outstanding,

22   owed by the borrower or any other loan party under the

23   applicable financing documents.

24             So here, the certification process is explicitly

25   saying each creditor is supposed to say "This is how much

1    I'm owed, under the financing documents."  And the only way

2    to square these provisions with the other explicit

3    provisions that say it doesn't matter whether it's allowed

4    or allowable in the bankruptcy, is I would submit, to

5    construe 4.1, which is the only payment provision.  It's

6    supposed to apply whether there's a bankruptcy or not, to

7    mean that anything that's owed, due and payable, under the

8    financing documents, even if, as a matter of bankruptcy law,

9    the Bankruptcy Court has said the Debtor doesn't have to

10   pay, for purposes of everybody telling the collateral agent

11   how much they believe they're owed under the financing

12   documents, i.e.  preserving their different rates of

13   interest, the agreement makes explicit that that is what's

14   supposed to happen.  It's due and payable under the

15   financing documents, whether it's actually collectible from

16   the Debtor as a matter of bankruptcy law.

17          Now, I think we all agree that this could have

18   been drafted more simply, but what we can also all agree is

19   that there is explicit language about the fact that even

20   interest that is not allowed is supposed to be taken into

21   consideration, and there's really no reading of due and

22   payable advanced by the defense that would square with that

23   language.  And in effect, the reading advanced by the

24   defense turns "due and payable" into the phrase "allowed",

25   which is precisely the opposite of what the documents

1   actually say.  So I think unless Your Honor has questions

2   about 4.3, I was going to move onto the other two points.

3          So on the adequate protection payments, at least

4   some of the briefings talk about how whether adequate

5   protection payments are a transmutation of collateral or

6   not.  It really is beside the point, because as Your Honor

7   saw in the definition of proceeds into the security

8   agreement, any payments received as a result of an

9   involuntary conversion of collateral, it still falls into

10  the very broad definition of proceeds.  So the definition of

11  proceeds that the parties agreed to is not required the

12  money literally to be the collateral itself converted to

13  something else.  It actually also includes that any money

14  you get after collateral is involuntarily converted.

15  Finally, I think in terms of the remedy about which a lot

16  has been said --

17          THE COURT:  I'm not sure I'm following that

18  argument.  Maybe you can unpack that a little bit, because

19  adequate protection payments I would say aren't proceeds of

20  collateral, perhaps, because it's designed to preserve

21  collateral, not actually give you anything out of the

22  collateral.  So where would preservation of collateral fit

23  into the definition of proceeds?

24          MR. KIM:  Sure.  I'll just give the defection of

25  proceeds --

1          THE COURT:  Yes, of course.

2          MR. KIM:  One more time, because it actually

3     includes a whole bunch of different things.  Here, can you

4     just give me (indiscernible).  So proceeds, at least in the

5     way that these parties use the word, with a big P, means any

6     consideration received, and it includes other disposition of

7     any asset that constitutes collateral, any value received as

8     a consequence of the possession of any collateral, and any

9     payment received from any other person as a result of, and

10    includes involuntary conversion of whatever nature of any

11    asset or property that constitutes collateral in here.

12    Obviously, the conversion meaning away from the creditors'

13    control over the collateral, and shall include all cash and

14    negotiable instruments received by or held on behalf of the

15    collateral agent.

16          THE COURT:  Now, the collateral agent didn't

17    receive the adequate protection payments.

18          MR. KIM:  That's correct, Your Honor.  I think

19    what happened there was the collateral agent, along with the

20    other parties, acceded to an arrangement where literally the

21    wire transfer would bypass the collateral agent for

22    basically the purposes laid out in the cash collateral

23    order, which is that it was just going to take a step.  The

24    order doesn't literally say that, but the order does make

25    clear that the collateral agent is acceding to the fact that

1   it's actually going to the ultimate party that's supposed to

2   receive it.  So I think Your Honor, for the adequate

3   protection payments, unless Your Honor has any other

4   questions, I'll move on to the final point.

5            THE COURT:  Go ahead, that's fine.

6            MR. KIM:  Okay.  Now, in terms of the remedy,

7   before my colleague Ben Sauter runs through the various

8   things that the collateral agent has done, and also refrain

9   from doing, I think it's important to review, obviously, the

10  fact that as Your Honor pointed out, 4.1 is the only cannon

11  provision, and the collateral agent is the only one

12  empowered to do various things to try to realize value on

13  the collateral, or to protect it, or to basically get the

14  creditors their money.  And when you look at it in that --

15  it's not even context, it's literally just what the

16  agreement says -- I think it brings into focus that because

17  you have an inter-creditor agreement that in several places

18  explicitly talks about the collateral agent distributing

19  money it receives even after there is a bankruptcy.  The

20  definition of secured obligation makes clear that that is

21  what the parties, one of the scenarios the parties are

22  explicitly talking about, the collateral agent receiving

23  money in bankruptcy.

24            It really, I would say, it simply is inconsistent

25  with the explicit language to say that the only way the

1    inter-creditor agreement applies is if there is a

2    foreclosure, and that the typical things that would happen

3    in the bankruptcy, for example, a reorganization and

4    distributions according to a plan, would fall completely

5    outside of the inter-creditor agreement altogether, and that

6    the collateral agent would literally have to go and do an

7    enforcement, somehow which would very often not happen in

8    bankruptcy, for it to constitute value that's received, and

9    distribute it according to the 4.1.  I think the agreements

10   explicitly in several points, as I have shown you,

11   contemplate there being a bankruptcy, and a collateral agent

12   still distributing value.

13          And as my colleague will point out, this whole

14   debate about whether a proof of claim is a remedy, as that

15   word should be defined, is I would say not a very important

16   issue.  The reason it's not an important issue is that when

17   the inter-creditor agreement and the associate agreements

18   are laying out the various things the collateral agent can

19   do to either have a remedy event or exercise its remedies,

20   it is, as you would imagine, appropriate contemplating that

21   as the sole agent that can do anything with respect to the

22   collateral, and to realize value for the creditors, it has

23   the flexibility to do a variety of things.

24          It is not required simply to try to sue, and do a

25   foreclosure, including refraining from doing various things,

1    to try to maximize the returns for all creditors.  And I

2    think it would be helpful to the Court -- we had not, I

3    think just awaited debate, we ended up focusing simply on

4    the proof of claim point, to hear at least a few of the

5    provisions that explicitly lay out the fact that the

6    collateral agent refraining from doing various things, and

7    doing various thigs still constitute a remedy or remedy

8    event, as far as the agreements are concerned.  So I'll turn

9    to over to my colleague to walk through some of those

10   provisions.

11            MR. SAUTER:  Thank you, Your Honor.  Ben Sauter.

12   I want to address the argument made by the intervenors that

13   the collateral agent's filing of a proof of claim simply

14   doesn't matter.  When they make that argument, first of all,

15   they're living in a counter-factual world.  There's no basis

16   to say that it wouldn't matter, and in fact, the collateral

17   agent proceeded to engage in numerous acts throughout the

18   bankruptcy proceedings to vindicate the rights and the

19   remedies that were asserted in that claim.

20            And for example, as we've already talked about,

21   they negotiated and signed onto, and accepted the cash

22   collateral order, and agreed to the adequate protection

23   package that was allowed.  It filed objections to standing

24   motions that were submitted by unsecured creditors'

25   committees.  It signed onto the PSA that ultimately allowed

1    the plan to go forward.  And it will, in fact, under the

2    plan, receive the distributions of collateral.  So all of

3    these are remedies under bankruptcy law.  And I want to

4    show, Your Honor, two provisions from the ICA.  One, and

5    this is discussed at length in our briefing, is Section

6    3.1(a), which we've already discussed today, but I just want

7    to --

8              THE COURT:  But that's not a remedies provision.

9    That's an enforcement of liens provision.

10             MR. SAUTER:  Well, I believe it is a remedies

11   provision, because it refers specifically to remedies in

12   here, Your Honor, and one of the remedies it refers to is

13   remedies under the bankruptcy code.  The ICA contemplates

14   that remedies can be exercised under the bankruptcy code.

15   And I'm going to show another provision, Your Honor, where

16   that's made clear as well.  That's Section 4.2 of the ICA.

17   And it defines a term, Your Honor.  It defines a term called

18   "remedy event".  There are two clauses in here.  The first

19   one says, okay, limitation of payment post-default, after

20   the commencement of any insolvency or liquidation

21   proceeding, in respect of any loan party.  That's a

22   bankruptcy proceeding.

23             You skip down here, in the case of either Clause A

24   or Clause B, a remedy event -- a remedy event is defined as

25   a filing of a bankruptcy proceeding.  The collateral agent's

1    pursuit of relief in claims in that bankruptcy proceeding

2    constitutes the exercise of a remedy.  Now, in fact, the

3    collateral agent doesn't even need to exercise all these

4    affirmative remedies it has, and I just laid out the ways in

5    which it's vindicated these rights throughout this

6    bankruptcy proceeding.  But it doesn't even need to, Your

7    Honor.  3.1(c) says, "in exercising rights and remedies,

8    with respect to the collateral, after the occurrence of an

9    event of default," and then it lists of some examples of

10   what those one would be, and one of them was the exercise or

11   forbearance and exercise of all rights and remedies in

12   respect of the collateral.  So after it files its proof of

13   claim, it can sit back and it can receive --

14           THE COURT:  So anything that happens after the

15   filing of the bankruptcy is the exercise of a remedy, under

16   4.1?

17           MR. SAUTER:  Well, one example -- so, right.

18           THE COURT:  So anything -- answer the question.

19           MR. SAUTER:  Anything that happens after the

20   filing of the proof of claim.

21           THE COURT:  After the filing of the bankruptcy, I

22   said.  So you're going to say proof of claim?

23           MR. SAUTER:  The filing of bankruptcy is defined

24   as a remedy event.

25           THE COURT:  Right.

1          MR. SAUTER:  When the collateral agent takes

2     actions in connection to that remedy event to pursue payment

3     on its claim, which asserted on behalf of all of the first

4     lien secured creditors, that is the exercise of a remedy.

5     There's a problem with the intervenor's interpretation.

6     It's not intended to be this metaphysically difficult

7     provision to invoke.  It's the only way that collateral gets

8     allocated under the first lien inter-creditor agreement.

9     And when that occurs in bankruptcy, clearly remedies in

10    bankruptcy are contemplated by the ICA.  And the way that

11    that happens is for the first lien collateral agent to file

12    proof of claim, and get the money that comes out of the

13    bankruptcy.  And it could happen in various ways.  And in

14    this way, it's going to happen, the money's going to be paid

15    to it.

16          Your Honor, right here, 3.1 CIV, in the list of

17    remedies that it contemplates is the acceptance of

18    collateral in full or partial satisfaction of the secured

19    obligation.  It's entirely consistent with the first lien

20    collateral agent's participation in these bankruptcy

21    proceedings, the definition of a remedy event, the actions

22    it took throughout these bankruptcy proceedings to ensure

23    that its claim was paid.

24          THE COURT:  But the DTC, the collateral agent

25    never accepted the collateral.

1          MR. SAUTER:  It will, under the plan, accept the

2     collateral.

3          THE COURT:  How?  I don't understand.

4          MR. SAUTER:  Because that is in the plan.  Your

5     Honor, the plan says that if Your Honor finds it's

6     collateral, it goes to the collateral agent.  That's part of

7     the plan.

8          THE COURT:  Well, but only if I find it's

9     collateral that you received.  I don't -- oh, okay, so your

10    argument is that if I find it's collateral, then under the

11    operation of the plan, you will have been deemed to receive

12    the collateral.

13         MR. SAUTER:  Not deemed, we will.  But even so,

14    that's all true.  Okay, if it's found to be collateral, the

15    plan literally says it goes to the first lien collateral

16    agent.  That's all true.  I don't even think that provision

17    needs to be in there.  The default under this plan is,

18    distributions coming out of bankruptcy would go to the

19    collateral agent.  There was a fight about this at one time,

20    because the other side was trying to basically resolve this

21    in their favor by once again, as they did in the adequate

22    protection context, wrap the payments around the first lien

23    collateral agent.  And that's why this provision ultimately

24    was there.  It didn't need to be in there.  It would have

25    gone to collateral agent, regardless.  But in any event,

1    under the plan, collateral will go to the collateral agent.

2              THE COURT:  Mm-hmm, okay.

3              MR. SAUTER:  Which constitutes a remedy here,

4    under Section C4, it's consistent with the definition of a

5    remedy event, and it's consistent with the fact, there

6    doesn't even need to be this series of affirmative acts.

7    There was a proof of a claim, there was a participating in

8    these bankruptcy proceedings, in the remedy event, and

9    money's being paid out to the collateral agent.  That's all

10   that's required, Your Honor.  It's not this philosophical

11   determination of causation.

12             This is the only way that this amount of money

13   gets distributed to first lien creditors.  It's the only

14   instruction there is about how this money should be

15   allocated among creditors.  If what they were looking for

16   was a free-for-all, and a fight over how collateral would be

17   allocated, there'd be no need for Section 4.1, there'd be no

18   need for the ICA.  It's not a narrow, difficult-to-invoke

19   provision, Your Honor.  It's the only way, it's the entire

20   reason that the ICA and Section 4.1 exist.  That's all I

21   have, Your Honor.  I'm happy to answer any further

22   questions.

23             THE COURT:  Thank you.  I don't have any further

24   questions.

25             MR. KIM:  I'll just wrap up, Your Honor, just for

1    a couple minutes.

2              THE COURT:  Actually I'm going to jump -- Mr.

3    Ellenberg, can you address that last argument?  And then

4    I'll, Mr. Kim, then I'll give you back the podium.  While

5    it's fresh in my mind.

6              MR. ELLENBERG:  Sure, Your Honor.  The

7    distributions normally would go to the person who filed the

8    proof of claim on which the distribution is being made.

9    That would be us.  That would be Morgan Stanley, that would

10   be J.  Aron, that would be Titan.  That would be all of the

11   first lien creditors who filed their own proof of claims.

12   In the ordinary course, the distributions would not go to

13   the trustee.  And there is no hole that has to be filled.

14   If the inter-creditor agreement did not exist, there

15   wouldn't be a free-for-all.  There would be the normal rule

16   of bankruptcy, which is that allowed secured claims get

17   their pro rata share of the distributions for that class.

18   There's no hold, there's no problem, there's no free-for-

19   all.  It's completely solved by the plan on the bankruptcy

20   code.

21             THE COURT:  Okay, thank you.  Mr. Kim?

22             MR. KIM:  Yes, Your Honor.  I think one point I

23   mentioned, which I think Mr. Sauter had no covered in

24   detail, is again with respect to rights and remedies, Your

25   Honor, I think the Court really has a choice to make, which

1    is determining, does this inter-creditor agreement

2    contemplate that the only circumstance under which the

3    inter-creditor agreement essentially applies is if literally

4    the collateral agent enforces, does a foreclosure, and it

5    distributes the collateral.  Or does it also include a

6    circumstance where there is a bankruptcy, and value paid out

7    to these creditors, pursuant to the bankruptcy?

8              And the two points I would make there, Your Honor,

9    is you know because of the definition of secured oblations,

10   the definition of post-petition interest, and the other

11   provisions I cited, that the inter-creditor agreement

12   explicitly provides that it applies in the event of a

13   bankruptcy, in the same manner.  So you don't have to guess

14   as to whether this agreement was intended to apply to a

15   bankruptcy, because it just says that to you in plain

16   English.

17             And then once you accept that premise, that these

18   creditors entered into an agreement that applies in

19   bankruptcy, then it's reasonably for the Court to ask,

20   "Well, did they set up a system where if the money, if the

21   value from a bankruptcy gets distributed through some

22   enforcement action that's permitted because of a lifting of

23   the stay, then the differing interest rates are respected,

24   and it falls within the ICA.  But if it gets distributed

25   pursuant to a reorganization, and a plan, then it falls

1    outside of the ICA.  Is that really what this agreement is

2    saying?

3              And I would submit that that is completely

4    unreasonable construction that is at odds with the plain

5    language of the agreement.  In talking about rights and

6    remedies, and I submit, Your Honor, it would have made, I

7    think everyone's job easier if instead of just using the

8    phrase "rights and remedies" they expanded upon it even more

9    to make clear what they actually put into the subsections,

10   but at least somebody did write it into the subsections when

11   it talks about rights and remedies.  And one of the

12   subsections talks about in exercising rights and remedies

13   with respect to the collateral, after the occurrence of an

14   event in default, it includes the forbearance from exercise

15   of all rights and remedies.  So rights and remedies includes

16   the decision by the collateral agent, in the best interest

17   of the creditors, to forebear from exercising rights and

18   remedies.  And I think that makes sense, because I agree,

19   Your Honor --

20             THE COURT:  That's going to make my head spin.

21   Any non-lawyer would look at you and say, "What?"

22             MR. KIM:  I think any non-lawyer listening to this

23   entire debate would have said "What?"  and walked out about

24   four hours ago.  But I think as in-artfully as that is

25   drafted, I think it makes sense that an agreement intended

1   to apply in bankruptcy, and intended to apply after in event

2   of default, an agreement that clearly imbues the collateral

3   agent with the sole power to realize value for the

4   creditors, includes within the definition of the rights and

5   remedies the collateral agent is allowed to recognize, the

6   decision in the best interest of the creditors to not do

7   something.

8           Otherwise, the notion that this agreement would

9   only apply if the collateral agent, once there's a

10  bankruptcy, would just robotically try to get permission to

11  do an enforcement action, and a foreclosure, even if that

12  resulted in lower value for the creditors, is completely at

13  odds, I submit, with this language about forbearance.  So

14  whether one characterizes what happened as a series of

15  attempted remedy actions that resulted in a payout, or

16  whether one characterizes it as a mixture of affirmative

17  steps, and forbearance from other steps, Your Honor, I would

18  say it all falls within the explicit language of 3.1(c).

19          THE COURT:  Okay.  Thank you.

20          MR. KIM:  Thank you very much.

21          MR. MOLONEY:  Your Honor, I'll be extraordinarily

22  brief, I think, unless you have questions.  But I'd like you

23  -- do you still have the book in front of you I gave you a

24  moment ago?

25          THE COURT:  Yes.

1              MR. MOLONEY:  IF we look at Tab 1 --

2              THE COURT:  Yes.

3              MR. MOLONEY:  And if we look at 4.3(b).

4              THE COURT:  Mm-hmm.

5              MR. MOLONEY:  And you have part if it read to you,

6     but they stopped short of actually the relevant section.

7     The language, the written certification is the aggregate

8     amount of the secured obligations then outstanding, owed by

9     the borrower, or any other loan parties to the secured

10    parties, represented by such secured Debtor representative

11    under the applicable financing documents, to be certified as

12    presently due and owing.  So the amount that was presently

13    due and owing is the amount you certify.  And there, if you

14    read down to the last sentence, unless otherwise directed by

15    a Court of competent jurisdiction, or each secured debt

16    representative, the collateral agent shall use the

17    information provided for in such notice as the basis of

18    applying such monies in accordance with Section 4.1 about

19    it.

20              So you're supposed to find out the money owed by

21    the borrowers or loan party.  The borrowers and the loan

22    party, if you look at the definition of the loan party,

23    which appears on Page 8 of this agreement, it means the

24    borrower, (indiscernible) holding and each subsidiary

25    guarantor, they are the Debtors.  The Debtors are the

1   parties being referred to.  The amount presently due and

2   owing from the Debtors is zero.  So the amount that you --

3   on account of post-petition interest.  Therefore, the amount

4   of post-petition interest that goes into this formula quite

5   clearly is zero.

6           THE COURT:  So how do you then reconcile that with

7   all this language that says allowed versus not allowed isn't

8   important, post-petition?

9           MR. MOLONEY:  Exactly.  Yeah, the definition of

10  secured obligation is broader, and it picks up that

11  language.  But the 4.3(c) waterfall that we're dealing with,

12  right?

13          THE COURT:  Right.

14          MR. MOLONEY:  That modifies that broader

15  definition by due and payable.  So they had a broader

16  definition, and then they said, for the purpose of this

17  waterfall, we're modifying that definition, and saying only

18  the amount that's due and payable.  And there's where it's

19  complete different.  Why do they have in the definition that

20  other possibility of a broader claim?  Because in Category 4

21  of the waterfall, there is a possibility you could

22  distribute that money that is not due and payable from the

23  Debtor if you obtained it under the inter-creditor

24  agreement.  And that didn't happen in this case, so we don't

25  have to deal with how exactly Paragraph 4 works.

```
 1              But that's Paragraph 4, which then says, no
 2   meaning whatsoever, the fourth waterfall, that provision
 3   clearly deals with the balance of any, after all the secured
 4   obligations, those due and payable, right, have been
 5   (indiscernible) feasibly paid.  And the words under
 6   applicable law, we're not saying you look to applicable law.
 7   Applicable law will tell you where we're after -- you've
 8   gotten the money, you give it back to the Debtor, or you do
 9   it back to the second lien holders, because now it's their
10   turn to get it.  That's what the applicable law is doing.
11   It's just telling you after you've satisfied the secured
12   oblations.
13              Now, if for some reason there had been junior
14   creditors who somehow got collateral in this case, we don't
15   think they did, and they turned it over to us, and it was
16   enough to pay all the post-petition interest, they would
17   have gotten all their post-petition interest on a pro rata
18   basis in the last waterfall.  That didn't happen.  Now, if
19   they had given us a little bit about of money, you could
20   come up with a million permutations.  The basic principle of
21   this provision is that you basically distribute it out on
22   the same basis it comes on, and that's what the collateral
23   agent would have done.  So that operates quite clearly.
24              The Section 3.1 provision which you looked at,
25   take a look at that for a second.  Because again, we're
```

1    playing games here.  We're not reading the entire provision.

2    And if we look at 3.1, it really isn't that complicated, and

3    it doesn't lead you to the absurd result of an exercise of

4    remedies as doing nothing.  If you read 3.1(c), which is on

5    Page 17, you have to read the language -- we highlighted it.

6    It's the exercise of the remedies at the direction of the

7    required secure parties.  So all that's being said

8    underneath only came about if there's a direction by the

9    required secured parties.  That didn't happen in this case.

10   So this provision's completely irrelevant.

11          If they got a direction from the required secured

12   parties, and the collateral agent for it was really crazy,

13   he didn't have to follow it.  That's what this is saying.

14   It's not saying that's an exercise of remedies.  It's not

15   doing this metaphysical impossibility of saying, "When you

16   do nothing, you exercise remedies."  I don't exercise, I

17   just go to bed and go to sleep, because I refrain from

18   exercising.  They did not exercise any remedies in this

19   case, Your Honor.

20          THE COURT:  If that were only the case.

21          MR. MOLONEY:  It'd be nice.  And I think that the

22   agreement is totally clear, instead it would be a complete

23   nightmare, and nobody would ever contemplate doing what he

24   says he's doing, because as Your Honor pointed out, that

25   little provision picks up all kinds of weird stuff, mature,

1   all kinds of secured obligations.  If you have to figure out

2   what all the words meant, if you had to even compute what

3   the swap pictures was worth here, it would cost the funds

4   (indiscernible).  That's going on at Lehmann.  They're

5   litigating that for a year, about the amount of swap

6   interest, where (indiscernible) claim 22 to 25 percent.  So

7   at the end of the day, they're going to owe us $90 million.

8   But I don't think -- they didn't intend that.  This was a

9   simple agreement.  If you read the words of the agreement, I

10  think you get the right answer.  Thank you, Your Honor.

11            THE COURT:  You're welcome.  Anything further?

12  Mr. Ellenberg, anything further?

13            MR. ELLENBERG:  No, Your Honor.  Thank you.

14            THE COURT:  Okay, very good.  Sir?

15            MR. SAUTER:  No, Your Honor.  Thank you.

16            THE COURT:  All right.  Thank you very much what's

17  been an excellent argument, very interesting, and then I'm

18  sure it'll come to nobody's surprise that the Court's going

19  to take the matter under advisement, and I'll issue a

20  decision as soon as I can.  I think you really don't care

21  about my schedule, but I do, and as you probably are aware,

22  I have a lot of matters pending in connection with EFH, but

23  I am very much aware of the fact that we may be moving

24  towards an effective date.  So I'll make every effort to

25  make the decision as soon as I can.  I have nothing further.

1    Thank you, we're adjourned.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3     I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6     Sonya                    Digitally signed by Sonya Ledanski
                               Hyde
                               DN: cn=Sonya Ledanski Hyde, o, ou,
      Ledanski Hyde            email=digital1@veritext.com, c=US
7                              Date: 2016.03.07 16:31:36 -05'00'

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  March 7, 2016