```
 1    UNITED STATES BANKRUPTCY COURT
 2    DISTRICT OF DELAWARE
 3
 4    In re:                          :
                                      :    Chapter 11
 5    ENERGY FUTURE HOLDINGS CORP.,   :
      et. al.,                        :    Case No. 14-10979
 6                                    :
                Debtors.             :    (Joint Administration
 7    _____:    Requested)
                                      :
 8    ENERGY FUTURE HOLDINGS CORP.,   :
                                      :
 9             Plaintiff,            :
                                      :
10       v.                          :    Adv. Pro. No. 15-51386
                                      :
11    TEXAS TRANSMISSION INVESTMENT   :
      LLC,                            :
12                                    :
                                      :
13             Defendant.            :
      _____:
14                                    :
      OVATION ACQUISITION I, LLC and  :
15    OVATION ACQUISITION II, LLC,    :
                                      :
16             Intervenor Plaintiffs,:
                                      :
17    v.                              :
                                      :
18    TEXAS TRANSMISSION INVESTMENT   :
      LLC,                            :
19             Defendant.            :
      _____:
20
21
22                         United States Bankruptcy Court
23                         824 North Market Street
24                         Wilmington, Delaware 19801
25
```

1                                    March 21, 2016

2                                    12:40 PM - 4:11 PM

3

4    B E F O R E :

5    HON CHRISTOPHER S. SONTCHI

6    U.S. BANKRUPTCY JUDGE

7

8    ECRO OPERATOR:   LESLIE MURIN

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   HEARING re Texas Transmission Investments LLC's Motion for

2   Determination that the Court Lacks Authority to Enter a

3   Final Judgment or Order in this Proceeding [Adv. D.I. 67;

4   filed January 15, 2016] (the "Motion for Determination")

5

6   HEARING re Plaintiffs' Joint Motion for Summary Judgment

7   [Adv. D.I. 110; filed February 13, 2016] (the "Motion for

8   Summary Judgment")

9

10   HEARING re Texas Transmission Investments LLC's Motion for

11   Summary Judgment [Adv. D.I. 112; filed February 13, 2016]

12   (the "Cross-Motion for Summary Judgment")

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1   A P P E A R A N C E S :

2

3   FOX ROTHSCHILD LLP

4        Attorneys for Ad Hoc Group of TCEH Lienholders

5

6   BY:  L. JOHN BIRD

7

8   WHITE & CASE LLP

9        Attorneys for TCEH Ad Hoc Group of Unsecured

10  Noteholders

11

12  BY:  GREGORY STARNER

13       THOMAS LAURIA

14

15  BAKER BOTTS LLP

16       Attorneys for Ovation

17

18  BY:  VAN H. BECKWITH

19       TOM O'BRIEN

20

21  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

22       Attorneys for TTI

23

24  BY:  GEORGE ZIMMERMAN

25       MARK MCDERMOTT

1

2   KIRKLAND & ELLIS LLP

3        Attorneys for EFH

4

5   BY:  MARK MCKANE

6        WARREN HASKEL

7

8   RICHARDS, LAYTON & FINGER, P.A.

9        Attorneys for EFH

10

11  BY:  DANIEL J. DEFRANCESCHI

12       JASON M. MADRON

13

14  POLSINELLI

15       Attorneys for TCEH Committee

16

17  BY:  JUSTIN EDELSON

18

19  MCELROY, DEUTSCH, MULVANEY & CARPENTER LLP

20       Attorneys for TCEH COMMITTEE

21

22  BY:  DAVID P. PRIMACK

23

24

25

```
 1   ALSO PRESENT TELEPHONICALLY:

 2   JACOB A. ALDERSTEIN

 3   ARLENE R. ALVES

 4   ASHLEY F. BARTRAM

 5   PEG A. BRICKLEY

 6   MARK A. CODY

 7   STACEY DORÉ

 8   MARK A FINK

 9   JOSEPH A. FLORCZAK

10   BRIAN GUINEY

11   PATRICK HOLOHAN

12   HAROLD KAPLAN

13   DANIEL A. LOWENTHAL

14   TINA MOSS

15   JUSTIN SOWA

16   RICHARD A. STIEGLITZ

17   ANNA TERTERYAN

18   ANGELO THALASSINOS

19   ANDY WRIGHT

20   FOTEINI TELONI

21   HAL F. MORRIS

22   JOSHUA H. APFEL

23   NATHAN CHRISTENSEN

24   JAMIE L. EDMONSON

25   JONATHAN D. MARSHALL
```

1   LUCKEY MCDOWELL

2   BRETT H. MILLER

3   GEOFFREY NEWTON

4   ERIN SMITH

5   SARA N. TAYLOR

6   AMER TIWANA

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              CLERK:  All rise.

3              THE COURT:  Please be seated.  Oh you've got the

4     gang back together.  It's been a while since we drew this

5     kind of crowd, Mr. McKane.

6              MR. MCKANE:  And it's nice to see you, too, Judge

7     Sontchi.  Your Honor, we're here on I believe two motions

8     today -- well, three motions.  They're the dual motions for

9     summary judgment as in the TTI adversary proceeding, as well

10    as the TTI motion that I think we colloquially refer to as

11    the core, non-core dispute.

12              It's the Debtor's recommendation that we engage on

13    the substantive issue first, address the summary judgments,

14    arguments, and then turn to core, non-core, as I think has a

15    much more refined dispute.

16              THE COURT:  I think that makes sense.

17              MR. MCKANE:  All right.  Your Honor, with that, we

18    have -- the Debtors have prepared a PowerPoint presentation

19    to help guide the discussion, and we've provided copies of

20    that, as well as the entire Investor Rights Agreement, which

21    was Exhibit 7, to the Debtor's presentation to the Court and

22    your staff.

23              THE COURT:  Okay.

24              MR. MCKANE:  We've also provided copies to

25    opposing counsel and have additional copies to the extent

1    others would like them.  Your Honor, we've provided hard

2    copies because there are some static portions of the

3    presentation, but there are also some more live portions,

4    our animated slides as well.  With your permission, may I

5    proceed?

6              THE COURT:  Yes, of course.

7              MR. MCKANE:  All right.  Your Honor, we're here on

8    EFH's breach of contract claim.  We believe the undisputed

9    facts established each of the elements of the claim.  It is

10   undisputed that the Investor Rights Agreement, the IRA, is a

11   valid contract.

12             EFH contends it has fulfilled all of its

13   obligations under that agreement, and that TTI has breached

14   in two independent, but related ways.  First, TTI has

15   refused to sell its Oncor membership to OV1, and TTI has

16   refused to cooperate in good faith with the IPO conversion.

17             EFH has been damaged, and has -- and is pursuant

18   to specific performance here, with this ruling, in relief,

19   at least partial relief, for that damage.  Your Honor,

20   briefly, there are obviously well established standards to

21   guide your inquiry.

22             The key, from our perspective, is when you look at

23   the parties' respective interpretations of the agreement we

24   believe that only one, and obviously the Debtor's view, can

25   properly give meaning to all of the terms, when read

1     together as a whole.  And a comprehensive reading of the

2     contract is what's necessary here to make sense of it as a

3     whole.

4            And importantly, in evaluating whether the

5     agreement is ambiguous, the guidance from the appellate

6     courts is the courts examined the entire contract and

7     considered the relationship of the parties and the

8     circumstances under which it was executed, even before

9     getting to whether it's ambiguous or not.

10            As part of them making that decision, you need to

11    look at the context of which this contract was put together,

12    and that's why our first step will be to look at that

13    context.  Then, return turn to the language, and then

14    evaluate the extrinsic evidence.  And importantly here, Your

15    Honor, the TTI reading is a narrow reading.

16            THE COURT:  It seems odd, though, doesn't it, that

17    in order to decide whether I need extrinsic evidence, I have

18    to consider extrinsic evidence?

19            MR. MCKANE:  Well, it's not extrinsic evidence in

20    that we're not getting into the parol evidence of the

21    negotiations or we're not getting into kind of whether

22    courses are dealing -- it's stepping back and evaluating the

23    relationship of the parties to evaluate whether it's

24    ambiguous.  I think that's what the New York Court of

25    Appeals was trying to say.

1          Your Honor, we win both ways.  You look at this,

2     four corners of this agreement, and I will walk you through

3     how we win.  But if you do, examine this, you know, in --

4     with parol evidence, if you do look at the context as a

5     whole, we win, we, you know, reaffirmed in your conviction

6     that we're right here.  So I'll take it both ways.  And Your

7     Honor, we are very confident in your ability to separate out

8     anything that's parol or extrinsic, versus the four corners

9     of the agreement.

10          Looking at the context of the IRA, putting this in

11     relation with the parties, when the IRA was executed in

12     2008, THU had already created the E side of the capital

13     structure.  You may recall from last winter, in the

14     confirmation proceedings, that a Project JOULE, which was

15     the dividending out of Oncor from the T side of the capital

16     structure to create the E side of the capital structure.

17          That Project JOULE, that was the first step to

18     Project JOULE.  Project JOULE was an evaluation of what are

19     we going to do?  Could we sell off Oncor?  And it was known

20     before the IPO, that Oncor Holding was in a negative tax

21     position and there'd be significant tax consequences of a

22     direct sale.  That was a known fact to the team.

23          That was one of the reasons why TXU looked for

24     years at doing some type of tax free transaction with Oncor.

25     Ultimately, they were approached by the private equity

1    sponsors, TPG, KKR and Goldman Sachs, and they acquired TXU

2    and the LBO.

3          At the time of that transaction's closing, EFH

4    knew the sponsors may want to sell EFH as a whole, or in

5    parts, or do an IPO.  That was all known and established,

6    and EFH enacted the ring-fence around Oncor and Oncor

7    Holdings as part of the end of that transaction.

8          All of that was done before we turned to the

9    Investor Rights Agreement.  And it was the sale of the

10   minority interest to TTI that was the last piece of the

11   ring-fence.  Before TTI came to the transaction, there had

12   been prior negotiations with GE.  And there's a draft

13   agreement developed before the GE transaction fell through.

14         All of that was done.  There was a draft agreement

15   with draft drag rights, draft tag rights.  That was done and

16   provided before TTI comes forward.  And what they want you

17   to believe, what TTI advocates here is that with that

18   context, EFH knowingly agreed to a transaction in which the

19   only way they could drag out the minority investor would be

20   through a direct sale of Oncor Holdings that would trigger

21   the tax that they had spent years trying to avoid.

22         That is what they're advocating here and that

23   makes absolutely no sense.  There's no way that happened.

24   And let's walk through the agreement and I'll show you why

25   that's the case.  Before we do, Your Honor, I wanted to

1    remind you of one thing.  We've been here before.  Mr. Shore

2    stood here in December.  You have been through 250 pages of

3    briefing at this point.

4          There have been nine separate briefs filed between

5    the motion to dismiss and the summary judgment.  And at the

6    time that you evaluated this transaction in mid to late

7    December, you noted on December 18th that you thought the

8    TTI argument rested on a narrow interpretation of the

9    contract, based on specific provisions that ignored

10   difficulties that arise, if not ambiguities, difficult

11   issues that arise in interpreting that agreement as a whole.

12         And what we're here today to tell you, and what

13   you've already gleaned from the briefs, is the TTI argument

14   has not expanded.  It has not changed.  But what we have now

15   is a full reading of the contract, and the benefit of 10

16   expedited depositions and some expedited discovery so that

17   we can give some gloss, if you think it's necessary to that

18   interpretation.

19         Let's turn to the drag rights, first.  We think we

20   can address this in four steps.  TTI refuses to participate

21   in the sale.  There are four steps to get to why Your Honor

22   should compel them to participate and sell their assets.

23         We'll take it step one.  EFH has received from

24   OV1, a qualifying offer, both to sell -- both to acquire the

25   LLC units and the IPO units.  I'll walk you through both.

1    Second, the transaction will result in a change of control.

2    And the change of control is important, and I think as we've

3    noted in the past, for two reasons, right?  It's important

4    for the drag rights.  It's step two in evaluating the drag

5    rights.

6            But it's also important that a change of control

7    ruling by Your Honor impacts the rights that they're -- that

8    TTI's entitled to, to the extent that they stay in and

9    participate in the IPO conversion.  And that is a dispute

10   between the parties.

11           And therefore, Your Honor's focus on the change of

12   control, and we'll walk you through it line by line, is

13   important for two aspects of this transaction.  Okay?

14           THE COURT:  Okay.

15           MR. MCKANE:  Step three, OV1's offer provides TTI

16   with the same form and per share amount of consideration as

17   would pay to EFH.  We'll show you that.  And step four,

18   OV1's offer satisfies the IRR requirements.  Frankly, and

19   then, we think the extrinsic evidence just reaffirms all

20   that.

21           Let's start with the drag rights.  This is the key

22   language from Section 3.3(a) of the agreement.  And the

23   structure of the drag rights, the way the section is phrased

24   is important.  It's an if/then structure.  If the parent,

25   and the parent here is TEF, TEF is the investment vehicle of

1   the sponsors.  It's the -- it's the entity is directly above

2   EFH.

3            THE COURT:  Right.

4            MR. MCKANE:  If the parent, EFH or its subs,

5   receives an offer to purchase, and the key line then is,

6   held directly or indirectly by such entities, and that

7   transaction would result in a change of control, then EFH

8   may deliver a written notice to all members other than the

9   initial number requiring them to sell, or otherwise transfer

10  their drag units.

11           It's that if/then structure that's important.

12  It's the third party action that's important.  It's the fact

13  that it's held directly or indirectly.  All of that is --

14  are key indicators of why the transaction that we're putting

15  forward, why the offer that we put forward satisfies Section

16  3.3(a)(1) of the drag rights.  Step one.

17           OV1's offer to purchase Oncor was a qualifying

18  offer to purchase both the IPO units and the LLC units.

19  Let's take the IPO units first.  This is Exhibit 16, your

20  offer letter, which specifically identify, in Exhibit 16,

21  and would highlight this language from Page Two, how we get

22  there.

23           It's an offer for both, and as we go through the

24  highlighted language, why is it an IPO offer?  It's an offer

25  to purchase substantially all of the IPO units in the IPO

1    corporation through the purchase two steps -- the purchase

2    by the investors of equity interests in the IPO corporation,

3    step one.  And two, the cancellation and retirement of all

4    the existing equity interests in EFH.

5            Simply put, this offer contemplates a purchase in

6    two steps.  Investors acquire the equity interest in the

7    IPO.  The equity interests of the parent, the sponsors'

8    interests are canceled.  They merge.  EFH is the predecessor

9    of the successor entity, which is the merger of EFH and OV1.

10   And it's that corporation that goes forward.

11           That is why the offer that came in is an offer to

12   acquire IPO units.  Not surprising that this offer comes in

13   at this time.  Drag rights have a requirement for at least

14   20 days.  But at the start of transaction, that for multiple

15   steps will ultimately result in IPO units being created.

16           The offer comes in and through the two steps of

17   the cancellation of the old equity and the merger with the

18   new issue, with the new entity, OV1, that does the IPO

19   issuance, that's how the acquisition of the LL units occurs.

20           THE COURT:  Doesn't that -- can't you read the

21   contract to sort of see that that's sort of out of sequence,

22   that the issuance of the IPO units really needs to proceed

23   the merger or be part of the merger, as opposed to being the

24   tail?

25           MR. MCKANE:  Yeah, Your Honor, I actually think if

1    you look at it this way, there -- the agreement -- we

2    believe the IRA agreement provides for flexibility in that

3    sequencing, right?  That we have the ability and -- for --

4    and you'll see it was important for EFH to have the ability

5    to have the flexibility to structure this transaction in a

6    way that maximized our ability to engage in the transaction

7    in that way.  And therefore, we see nothing in the IRA that

8    prohibits the seemlessling that we put forward.

9            And then there's -- you know, this will go to

10   another issue that you'll hear, and I'll address later in

11   the presentation and also I expect to hear from TTI, which

12   is you can't compel us to participate in an IPO coordination

13   and then drag us out beforehand.

14           And Your Honor, there's nothing in the agreement

15   that says that that sequencing can't happen as well.  And I

16   think if you step back, it's not surprising at times that an

17   IPO process can take a while.  Right?  You can start an IPO

18   process, right, and the duty to cooperate kicks in with the

19   start of that process.

20           And then, elect to do a drag before the IPO

21   closes.  You can do that.  You can actually do two

22   transactions.  You could do an IPO.  You can start with an

23   IPO process.  You can drag out, cloak that transaction and

24   then do the IPO later.  It doesn't have to be at the same

25   time.

1          Here, they are at the same time.  But we view the

2     IRA as providing us the maximum flexibility to sequence

3     those transactions in a way that enables us to maximize

4     overall value and minimize taxes.

5          Your Honor, I've started with the IPO units, in

6     part because the vast majority of the tussle about purchase

7     doesn't involve them.  Right?  If you conclude that this is

8     a qualifying offer to acquire the IPO units, you go straight

9     to step two.  We're done with step one.

10          But if you -- we also independently separately

11     made an offer to acquire the LLC units.  And that's where

12     this debate comes in about, do we have a direct or an

13     indirect purchase?  I think it's more easy to understand.

14     The -- there's an offer to acquire these units.

15          The LLC units are right here right now.  I

16     understand that better.  So let me walk you through how this

17     purchase -- this offer to purchase is a qualifying offer.

18     But I wanted to note that there's -- it's independent.  We -

19     - you know, we (indiscernible) way.

20          THE COURT:  All right.

21          MR. MCKANE:  So ultimately, the core of the TTI

22     argument, which I think we've -- is best encapsulated on

23     Page Eight of their Opposition Brief, is that a transaction

24     up the chain from Oncor Holdings is not a purchase of the

25     LLC units.  That's their encapsulation of it.

1           And their point is essentially that somehow

2    transfer should be written into 3.3(a)(1), so as to enable

3    this transaction to occur.  We do not believe you need

4    transfer in any way.  And actually, transfer doesn't fit in

5    3.3(a)(1) because the ability to do this acquisitions

6    already written in there, because the language of the

7    ability to -- it's an offer to purchase that comes in from a

8    third party for assets held directly or indirectly.

9           And it's that held indirectly that enables us to

10   do an offer that comes at the EFH level.  That's why it's

11   referred to as an EFH sale proposal.  Transfer, which we see

12   in Section 2 mainly, and I'll show you, it's in Section 3,

13   and I'll get there in a minute, but transfers primarily in

14   Section 3.2.  That's the tag sections.

15          That doesn't broaden the scope of tag versus drag,

16   because transfer, if you look at the definition, the IRA

17   definition, which is on Page 14, and on the screen, transfer

18   is -- speaks of a type of disposition.  Transfer is an act

19   that EFH can do on its own, whereas a purchase is something

20   that comes in from the outside, from a third party.

21          While TTI would argue, you must add or transfer to

22   establish the vertical drag, that doesn't fit with the

23   context of 3.3(a)(1).  If 3.3(a)(1) says, "If parent EFH or

24   its subsidiaries receives and offer," right, you wouldn't

25   receive an offer to transfer.  A transfer is something that

1    EFH can do on its own.  A transfer does not equal indirect

2    purchase.

3              The key difference between transfer and purchase

4    is that a transfer can only be done by EFH, an affiliate of

5    EFH, or Oncor Holdings.  A third party in and of itself

6    cannot effectuate a transfer.  I have -- it is that -- and

7    that's why this transfer concept is inconsistent with

8    3.3(a)'s offer to purchase structure.  Excuse me.

9              Now the way to look at this is you have to compare

10   3.3(a) with Sections in 3.2 to kind of reaffirm that we're

11   right here.  That's what we've done.  And we look at 3.3(a)

12   and it -- to reaffirm that transfer is what's tied to EFH

13   actions versus Oncor -- or actions from third parties.

14             You look at 3.3(a), if a parent -- if this comes

15   in from the outside, this offer to purchase, that's the top

16   of 3.3(a)(1), right?  But there is transfer language in

17   3.3(a)(1) on the bottom.  And that's what we have on Slide

18   18 and on the screen.

19             And that's this if/then structure.  If the parent,

20   EFH or its subsidiaries receives this offer to purchase,

21   this offer to acquire that comes in from the outside, then

22   you look to what actions EFH can take.  That's the bottom,

23   the second half of that section, then EFH may deliver a

24   notice to all members, requiring them to sell or otherwise

25   transfer their drag units.

1            Transfer is used with EFH-directed actions.  The

2     offer to purchase the -- is coming in from the third party

3     on the outside.  That's how we feel confident that you don't

4     need transfer in the language of 3.3(a)(1), and that the

5     language of purchase of something that's held directly or

6     indirectly enable -- which is what is the definition of an

7     in-EFH sale proposal -- is what enables this to be a

8     qualifying offer.

9            But there are other sections of the agreement that

10    give us confidence that our interpretation is right.  You go

11    back to 3.3, 2.2 of the tag rights, and you look

12    specifically at (h), right?  And, in (h), you see, in 3.2,

13    again, in the event that EFH or any of its subsidiaries

14    proposes to transfer -- again, EFH taking action to move or

15    dispose of assets -- then you can take certain actions.

16    What's the carve-out?  The carve-out is other than sub-y in

17    a transaction pursuant to 3.3.

18            If the whole kind of, like, crux of the TTI

19    argument, as it relates to this first step, is that you

20    can't do a vertical transaction to have a drag right, that

21    it can only happen at the Oncor level, if that were right,

22    then you wouldn't have carved out all of Section 3.3.  You

23    wouldn't need to.  You would have written it in much more

24    narrow, and just carved out one aspect of 3.3, Section 3.3

25    out.  The fact that the entire Section 3.3 was carved out of

1   3.2 -- 3.2(h) is further confirmation that the intent of the

2   party was to enable an indirect purchase of something that

3   was held, held indirectly, through 3.3(a)(1).

4           All right.  We also think that just 3.3(f) as a

5   whole supports our position.  That's the appraisal rights

6   section.  And that further contemplates that, in the -- if

7   the required sale is conditional by a sale of other aspect -

8   - other assets of the parent or the subsidiaries, then you

9   will have appraisal rights.  And this further reaffirms that

10  a vertical transaction could occur and would occur.  There

11  is no -- they didn't get into here a narrowing of this to

12  just a direct sale, which we think is 3.3(a)(2).

13          And they could have, if they wanted to be more --

14  if that was the whole goal.  If the agreement was limited in

15  the way that TTI would read it, frankly, 3.3(a)(1) would not

16  be there.  It would be read out of the agreement under their

17  interpretation.  And it, we believe, would lead to the

18  absurd result of requiring the one transaction, a direct

19  sale of Oncor Holdings, that was known at the time to

20  trigger taxes.

21          So, the last piece of the puzzle, in terms of

22  looking at the provision as a whole to reaffirm that an EFH

23  sale proposal enables this type of vertical transaction, is

24  the Change of control section.  And the Change of control

25  definition is broad.  And if you look at it, you have a sale

1    of all the assets of the company. That's sub-I. And then you

2    have sub-2(i) in the whole, merger, recapitalization, or

3    other sale of the company, or the IPO corporation, or, as

4    the case may be, related entity or any other of its

5    affiliates.

6           If you weren't able to do a vertical transaction

7    to take out the drag, there would be no need for 2(i) in the

8    whole.  The primary purpose for Change of control -- primary

9    purpose for Change of controls -- is that -- the condition

10   to the drag, except, too, in the drag analysis.  Change of

11   control is irrelevant to the tag.  There's nothing -- you

12   could -- their tag rights are not impacted in any way

13   through Change of control.  And if you worked through the

14   agreement like we did in the briefs, you may see an

15   ancillary reference here or there in Change of control.

16   But, in the empowering sections, it is a drag provision.  It

17   is a condition to the drag.

18           And that's why the fact that Change of control was

19   written so broadly, and is primarily a piece of the drag, it

20   reaffirms that a vertical transaction to acquire the LLC

21   interest was envisioned:  a merger, a recapitalization, or

22   another sale -- and not just the company, of a related

23   entity or any of its affiliates.  That's as broad as you can

24   get.

25           So, based on that language, based on the language

1    of the whole, looking at all of 3.3 and the definitions and

2    3.2, we believe it's -- there is no doubt that the only

3    commercially reasonable interpretation, the one that EFH and

4    the plaintiffs have put forward, is that a qualifying offer

5    has been made to acquire the LLC units.  But if you looked

6    to the extrinsic evidence, you would have no doubt.  So,

7    let's go there next.  All right.

8           So, discovery since the motion to dismiss stage

9    has just built this out, you know, in a very compelling way,

10   Your Honor.  The EFH negotiators were unequivocal.  And they

11   were -- and both -- two of them testified, both Mr. Horton

12   and Mr. Wilkes.  Mr. Wilkes is no longer with EFH; as you

13   know, Mr. Horton is with EFH.

14          EFH sought maximum flexibility on the ability to

15   execute this transaction.  Mr. Horton, on Page -- on Slide

16   23, in response to the question, "What exactly did you tell

17   representatives of the Borealis and GIC about your

18   understanding of the drag flexibility?" Mr. Horton went on

19   at length, as is his nature.

20          And he said, "We don't know if we're going to do

21   just a spinoff of EFIH or an IPO of EFIH.  We don't know if

22   we're going to do a sale of Oncor Electric Delivery

23   Holdings."  We needed broad parameters because the strategic

24   outcomes we didn't know at that point in time.  And we all

25   looked at each other in the eye and said, "We understand.

1    So, we got to have some concessions and some agreement

2    here."  That was the baseline of the negotiations.  And, as

3    Your Honor knows, Borealis and GIC are the two investors

4    that used TTI as their investment vehicle.

5            This mindset, this -- of the EFH negotiators, this

6    isn't just their 2016 recollections.  This is memorialized

7    in the January 2008 bid instructions letter, right?  So, you

8    have that contemporaneous record.  And it's mutually

9    reinforcing.  Mr. Wilkes gave similar testimony in his

10   deposition.  This is on the next slide.

11           In response to the question, "When you say broad

12   and flexible, what was your intent as expressed to TTI?" and

13   in response, Mr. Wilkes testified, "We were very sensitive

14   to doing a transaction that would trigger the tax gain.  We

15   couldn't dream of every currently available tax-free

16   transaction, nor any future tax-free transaction that may

17   come about.  So, we were trying to make certain we could do

18   this transaction in a tax-efficient way in the future."

19   There you go.

20           Now, the TTI negotiators, they were asked, right?

21   Mr. Scott Baldwin was asked whether he recalls limiting the

22   scope of the drag right.  And he said, specifically, "Was

23   there ever a time that GIC and Borealis made changes to 3.3

24   to limit EFH's ability to dispose or transfer of its

25   indirect ownership in Oncor?" He was not aware.  He was not

1    aware of an effort to limit the drag.

2            But it went further.  Mr. Baldwin was also asked,

3    "So, if EFH received an offer to purchase the company, above

4    Oncor, that holds the LLC units, would that be a proper

5    trigger?"  And he says, in his mind, no.  So, he's laying

6    out his interpretation that the vertical doesn't work.

7            And properly, good follow-up, "Did you express

8    that?  Did you express to EFH at the time that you signed

9    this, did you tell them what you thought that meant?"  Mr.

10   Baldwin didn't recall.  And, when pressed further, "You

11   don't remember saying that?  Do you?"  "That's correct."

12   "Look, do you recall saying, 'Look, you got to sell your LLC

13   units; you cannot sell the company that holds the LLC

14   units'?  You never said that, did you?"  Mr. Baldwin:  "I

15   don't recall."

16           Your Honor, the law in New York is plain on this.

17   Right?  You have to express your intent if you have a -- you

18   know, subjective, unexpressed intent of a negotiator is

19   irrelevant.  It has to go across the table in the

20   negotiations.  It is a well-established principle of New

21   York law on that issue that un-communicated, subjective

22   intent can just be set aside.

23           And, Your Honor, TTI has not identified any

24   evidence of expressed intent at the negotiation table that

25   somehow you couldn't do a vertical drag; you had to take out

1    Oncor Holdings in a taxable way.

2              But, Your Honor, this isn't a situation where it's

3    just the EFH negotiators on one side.  And, Your Honor, you

4    know, it goes further than that.  When you look at the

5    evidence, and you have -- of what the edits were -- and

6    we'll go through that just in a minute -- they didn't even

7    mark up 3.3(a) at all.  They didn't mark up the drag rights.

8              So, what you have is a situation, Your Honor,

9    where you've got EFH testimony of the negotiators on one

10   side, and you've got silence on recall on the negotiators

11   from TTI and the other side.  So, we went further.  And we

12   looked through and said, "What do the contemporaneous

13   records say?  Do -- how are we confident that the EFH intent

14   was communicated through, beyond just the 2016 testimony?"

15   And we have that, Your Honor, on Slide 28.

16             Your Honor, GIC and Borealis, these are

17   sophisticated players.  Right?  GIC is a part of the

18   Singapore Sovereign Wealth Fund, a $100 billion sovereign

19   wealth fund.  And when you look through the contemporaneous

20   evidence, Your Honor, I was trying to figure out what --

21   let's -- how strong is this evidence?  Is this a stray

22   email?

23             Your Honor, nothing gets stronger than the minutes

24   of the investment decision, right, of the risk committee,

25   the investment committee, the go-or-no-go vote on the

1    transaction.  And we have it from Borealis and GIC.  We've

2    got the minutes from one.  We've got the memo from the

3    other.  And both the minutes and the memorandum are mutually

4    reinforcing that they understood that a vertical transaction

5    would occur.  Right?  Don't just take my word for it; don't

6    take Mr. Horton or Mr. Wilkes.  We have it in the

7    contemporaneous records.  I want to walk through these, you

8    know, a little bit.

9           The first call-out, Exhibit 2 of the Plaintiff's

10   Exhibits, are the minutes of the GIC Investment Committee

11   from April 2008.  The person identified as NKFZ is a senior

12   executive, the head of the risk team.  And that's the start-

13   up.  He enquires whether GIC would be stuck with Oncor if

14   the sponsors chose to exit by listing just the holding

15   company, EFH, right?  Listing the holding company, they're

16   going to do it.  If they do an IPO of EFH, is GIC stuck?

17   Right?

18           SB -- that's Stuart Baldwin; that's the person --

19   the negotiator who testified, he answered that the tag and

20   the drag rights apply to transfers of interest in Oncor and

21   EFH.  So, GIC could also exit at that time.  And a structure

22   had been put in place to facilitate that.  Right?

23           So, the issue is, like, while the sponsors can IPO

24   the -- all of EFH, they may do it somewhere else.  But if

25   they do it at the parent, right, the drag rights are there.

1    And, Your Honor, that's important, because that's the

2    vertical transaction.  That's what we have here.

3           Then you have -- then, further down in the

4    minutes, PSI -- that's the president of the committee,

5    right? -- added that, for transparency, two IPOs might be

6    better, right?  But it was clarified that, even if the

7    sponsors choose to list the whole of EFH, they'd be okay.

8    And that's what we have.  We have a vertical transaction at

9    the EFH level that was thought out in detail and reaffirmed

10   by Mr. Baldwin in his deposition, right?  In Pages 25-26, he

11   was walked through these minutes line-by-line and reaffirmed

12   again that that was the exchange.

13          Later, later we get an insertion that this is a

14   typo, that these are not official, scrubbed minutes that,

15   you know, people review.  That's -- I don't think that's

16   credible.  We think these minutes are compelling evidence.

17          And, Your Honor, it'd be one thing if that typo

18   just existed in the minutes on the GIC side.  But the

19   Borealis investment memorandum, right, their partner in the

20   deal, has a similar concept built into their investment

21   thesis.  There, Borealis, you know, in their memo from April

22   7th, which is Exhibit 3 to our motion, says EFH will also

23   have drag rights such that it can require the consortium to

24   sell its Oncor interest to a third party that is acquiring

25   EFH's interest."  Not Oncor Holdings' interest, EFH's

1    interest.  That reaffirms that we have flexibility to

2    structure this transaction up and down the chain.

3              Again, Your Honor, we think the minutes and the

4    memorandum are strong.  But it's not just that.  Exhibit 8

5    is the April 2008 final bid, where the TTI team sends their

6    proposal back to EFH.  And there's a cover note, where they

7    say, "We're on board with the drag rights, subject to

8    working out appropriate price protections."  Appropriate

9    price protections is the IRR hurdle we'll get to in a

10   minute.  That's what they were focused on.

11             They say it in the cover, and then they say it in

12   the back of the proposal, because they spell out, "Here are

13   the major changes."  There's a chart that spells out the

14   major changes.  And we've, you know, highlighted the major,

15   you know, changes here on Page -- Slide 29.

16             In the drag section, right, recognizing the need

17   for appropriate price protection, that's in a footnote, and

18   it's in the cover letter.  What's silent here?  There's

19   nothing in the drag section that talks about the need for

20   being linked to Oncor Holdings, that the transaction can

21   only happen at the Oncor Holdings level.  There's no changes

22   or rewrites.  These were drag rights negotiated previously

23   with GE that, when these guys step into the deal, when GE

24   took a step back, no changes to the drag rights.

25             Now, in the reply, TTI took the position, you

1    know, that, "Whoa, while we didn't -- maybe -- you know, we

2    expanded the tag.  We expanded 3.2 and the tag to cover

3    transfer.  That means tag's -- transfer's broader."  Your

4    Honor, that doesn't hold water.  When you look at the early

5    drafts of -- you know, the draft that was sent to TTI, the

6    transfer contact -- transfer concept, excuse me, is already

7    in the tag.

8            Section 3.2(a) is the definition of the tag

9    rights.  Right?  That's the -- just like 3.3(a) lays out

10   what your drag rights are, 3.2(a) lays out what the tag

11   rights are.  And the concept of sale or transfer is built

12   into that concept already.

13           The edit that they are referring to in their reply

14   down below, which is in Section 3, is cleanup.  It's just

15   carrying the already built-in transfer concept that's in 3.2

16   across to Section 3.3.  Right?

17           And this notion that somehow they made some

18   material change in the tag rights?  You go back to their

19   offer to us with the chart in the back that says, "Here are

20   the material changes"?  There are no material changes in

21   that chart in 3.2 as it relates to transfer.  There's

22   nothing in there about that.  It's silent.

23           So, what came in in the reply brief was this

24   notion that somehow TTI expanded the tag rights through the

25   introduction of the concept of the transfer, and therefore

1    that's why transfer has to be broader and purchase couldn't

2    be an indirect transfer; that's out the window.  The

3    contemporaneous record does not establish that at all.  In

4    fact, it establishes the opposite.

5            And, Your Honor, it's not surprising that the TTI

6    negotiators weren't fixated on the drag rights on a vertical

7    drag.  That was our issue.  We were going to eat the taxes.

8    We were going to have the problem.  We were going to suffer

9    on this if we couldn't do it the way we wanted to do it.

10   That was the EFH side of the table.

11           What was TTI focused on?  Rational price

12   protection.  That's what they wanted.  And that's what the

13   evidence shows, right?  TTI negotiated post-tax IRR Hurdles

14   as their back-end protection.  Right?  And the phrase is,

15   "Deal-breaker."  Scot -- Mr. Baldwin was asked, in his

16   deposition, "This was the deal-breaker for you.  You wanted

17   to have an IRR hurdle along with drag rights as a deal-

18   breaker, didn't you?"  "We did," the answer.

19           And, Your Honor, step back for a second.  That

20   makes sense.  They're worried -- like, if I'm going to give

21   up a tag, if I'm not going to have the ability to control

22   when I come out of this transaction, at a minimum I want to

23   know what my IRR is going to be.  And that is the key

24   negotiation.  That's what the evidence shows.

25           And, Your Honor, in the reply, and I -- a little

1    bit in the opposition as well, you got this notion that

2    somehow we were being either inconsistent or unfair, that

3    somehow EFH was focused on taxes, but somehow we are doing a

4    transaction that would cause them taxes, and that somehow we

5    -- they were in a taxable situation, but we weren't.  They

6    took care of that, too.  They took care of the taxes issue

7    as they negotiated the price protection.

8           TTI negotiated a post-tax IRR hurdle as a back-end

9    protection, not (indiscernible) to Oncor Holdings.  That's

10   Slide 32.  And in particular, you got to work two sections

11   of the agreement to get here.  If you look at the IRR

12   hurdle, that's the find in 3.3(d).  Now, that's the first

13   call-out.

14           And there, in the underlined portion, we're

15   talking about no less than 10 percent.  Well, all right, how

16   do I give meaning to that 10 percent?  Well, then I got to

17   look at the definitions of the IRR.  So I go to the

18   definitions section, and that's the lower box.

19           "In determining the IRR, the following shall

20   apply:  B, all proceeds to be received by such person in the

21   required sale shall be based on the amount received after

22   application of any U.S. federal, state, or local taxation."

23   They built in their taxable versus non-taxable sale by

24   saying, "You make me whole; I get 10 percent post-tax."  And

25   that makes sense.  Now --

1          THE COURT:  Where do I sign up for that return, by

2     the way?

3          MR. MCKANE:  Well, that's the whole reason we're

4     here, Your Honor.  I mean, like, let's step back.  Right?

5     They sign up this deal in '08.  Right?  They're getting

6     post-tax 10 percent a year?  Their whole motivation as

7     economic actors is to stay in this transaction for as long

8     as possible.  They're forcing us to (indiscernible) proof.

9     We've proven it up in the agreement.  We've proven it up in

10    the discovery.

11          That's why we're -- I mean, I understand.  It's an

12    economic world.  But that's why they're fighting us.

13    There's no doubt that these are above-market returns again

14    and again and again.

15          Now, Your Honor, going back to the negotiators'

16    testimony, the lack of recollection cannot create a disputed

17    issue.  Right?  We got a lot of, "I don't recalls."  The law

18    is clear on this.  You can't avoid summary judgment by an,

19    "I don't recall."

20          And I bring that up, not just because of the

21    testimony that came out in the depositions, but because of

22    what came after.  And, Your Honor, here we've got the

23    Zucchert declaration.  And here what happened, Your Honor,

24    is, after the depositions are done, as part of the briefing,

25    we get that kind of classic post-deposition declaration that

1    comes in, right?  You know, litigators look for it; "Okay,

2    are they going to change what they said in their testimony?

3    How is this going to happen?"  We know how Courts feel about

4    those things.

5           And so, we're expecting there to be changed

6    testimony.  And we don't get changed testimony.  We get

7    more, "I don't recalls."  Slide 34, "I have no recollection

8    of Mr. Horton saying that."  And, "I have no recollection of

9    anyone else, you know, raising this issue about an upstairs

10   transaction."  I thought, at a minimum, if you're going to

11   go through the effort of lobbing in a post-deposition

12   declaration, you're going to change your testimony.  It's

13   just more of the same.  "I don't recall that."

14          But the real zinger was, "I don't recall that, but

15   I think I would've."  And I don't know how you can possibly

16   do the mental gymnastics to get there.  But, importantly,

17   you don't have to kind of try to put yourself in Mr.

18   Zucchert's head, because self-serving, equivocal assertions

19   do not create disputed issues.  And the District of Delaware

20   has granted summary judgment repeatedly when overwhelming

21   evidence is on one side and all we have on the other side is

22   someone saying words to the effect of, "I don't recall, but

23   I think I -- that if -- I would if that had happened."

24          And, Your Honor, you've got a situation here

25   where, when confronted with the contemporaneous record,

1    confronted with the documents in the deposition, the

2    witnesses don't recall.  But then, later, after the ability

3    to contest that through cross-examination, we get the

4    declaration.  That type of declaration can be set aside.

5            Now, Your Honor, you know, litigator's tool chest,

6    right?  If I'm in the TTI position, I understand their

7    perspective.  Right?  I've got a transaction -- I've got an

8    agreement that not really is ambiguous, but we acknowledge

9    it's not perfect.  They don't have contemporaneous witnesses

10   on their side that recall that can be helpful.  They don't

11   have contemporaneous documents that can help them, that

12   advance their position.  And so, what do you do?

13           So, you hire an expert.  And that's what they did.

14   Right?  They hired Robert Reilly.  He's a valuation

15   professional.  He has testified -- well, to give you some

16   sense of what he does for a living, he's been deposed 200

17   times.  And so, Mr. Reilly's brought in, and he's going to

18   provide custom and usage testimony.

19           And, Your Honor, common industry practice, custom

20   and usage, Your Honor, when there's no claim that there is -

21   - was boilerplate, that this is a term of art, a standard

22   term that's used the same way across the industry, you can

23   just set that aside.  Case law says absolutely not.  There's

24   a role and a place for custom and usage, but it's

25   boilerplate language, not heavily negotiated terms like the

1   drag rights or the tag rights.  Those are different and

2   unique.

3              And -- you know, and that's something that is

4   contested to the parties, and they were contested in this

5   negotiation and that's (indiscernible), right?  This

6   mattered to TTI.  They tweaked the drag to add the price

7   protections.  Right?  They knew what they wanted to.  This

8   is not a standard term that carries across from deal to

9   deal.

10             And we need to look no further than Mr. Reilly's

11  own testimony to reaffirm that.  Right?  He acknowledged the

12  words vary.  I love this phrase.  "This is not a Xerox-type

13  deal."  A Xerox type of deal is a carbon-copied provision

14  that carries through from agreement to agreement.  That's

15  what custom and usage is for.  That's maybe where it might

16  be relevant.

17             And here, he hasn't even looked.  He says, in --

18  you know -- in his deposition, "I haven't even tried to look

19  for industry standard language on this issue."  Why?

20  Because a drag, right, isn't something where you would have

21  industry standard.  And this isn't industry standard,

22  because we've -- not because there is one, but because we

23  know it was negotiated between the parties.

24             So, in that type of circumstance, when you have a

25  negotiated term like this, custom and usage is irrelevant.

1    And that's what the case law says.  And that's why we

2    believe you can set Mr. Reilly's testimony aside.

3           So, when you look at all the extrinsic evidence on

4    this important issue of can -- is a vertical transaction of

5    this type sufficient to be a qualifying offer to purchase

6    the LLC units, we believe that the extrinsic evidence

7    reaffirms everything that we already saw in the agreement

8    itself, which is, yes, this is a qualifying offer.

9           Now let's turn to the Change of control.  All

10   right.  Now, so, Change of control comes in two steps, but

11   let's step back for a second.  TTI is telling us, and you,

12   that a transaction in which KKR, TPG, and Goldman Sachs are

13   taken out through their investment vehicle, TEF, and a whole

14   new investor group, right, through the backstop rights

15   parties and the Youngs and the Hunts come in, that that

16   transaction is not a Change of control.

17          This is what they're trying to show.  Old control

18   group goes out, and here's our classic structure of EFH, new

19   control group comes in.  Right?  That transaction, without

20   even looking at the agreement, you say, "That's a Change of

21   control."  Right?

22          Now, you then stop and say to yourself, "All

23   right, I understand the practical meaning of Change of

24   control. Is there something tricky or nuanced?  Is there

25   some gotcha in the definition of Change of control that

1    would prevent what I think in my own mind, as a practicing

2    lawyer, would be a Change of control, would be different?

3    And there isn't.  But we're going to walk through each of

4    the steps.  Here we go.

5              To get there, you got to work the definitions,

6    just like the entire agreement.  Step one:  drag rights,

7    section 3.3(a)(1) lays out that, if I get the offer such

8    that the transaction would be a Change of control,

9    capitalized defined term, then I can take the steps.

10             So, I look at the definition of Change of control.

11   Okay.  Got that.  Saw that earlier, that we have sub-2(i) in

12   the whole with a really broad definition of what Change of

13   control would be.  Got some defined terms there, Related

14   Entity and Affiliates, so you got to work those definitions

15   as well.  All right, Related Entity is an initial member,

16   okay, and then Affiliate is very broad, classic definition

17   of affiliate consistent with what you'd expect.

18             Now, that's the structure.  Knowing what the

19   definition of affiliate and related entity are, looking at

20   sub-2 in the whole, we now have to take this transaction in

21   its form, in total, and apply it to this definition.

22             TTI would like to say, "No, Change of control at

23   Oncor or at OV1."  Right?  They want to insert an additional

24   layer of -- you know, onto the agreement.  That's not in the

25   definition.  We satisfy the definition, which is what we're

1   required to do under the contract.

2            So, we can do this three ways.  Right?  The

3   transaction satisfies the Change of control three ways, and

4   I'll show you all three.  First, focusing on EFH, the EFH

5   merger with OV1, right, to do that, Your Honor, you have to

6   have your Change of control definition, right?  You have it

7   -- it's the same definition two times, on this slide.  And

8   then you have to start replacing definitions with entities

9   to work through it.

10            On the top, right, what do we have?  Change of

11   control means a merger, because we're talking about the EFH

12   merger with OV1, okay?  And it says "by," and there's a

13   series of folks, and we'll use the last one, "Affiliates,"

14   okay?  That's the last of the series.  I can replace

15   "Affiliates" with EFH; EFH is an affiliate.

16            "To a person or group of persons" -- well, OV1 is

17   a person.  Right?  That's the merger.  So, I've got an

18   Affiliate.  So, I've got a merger of an affiliate with a

19   person, EFH and OV1, that results in a person or a group of

20   persons -- well, here we can use OV1 again, right? -- owning

21   more of the equity interest of, what, company lots, Oncor,

22   put that in there.

23            And I have more of Oncor than what?  Than a

24   Related Entity and its Affiliates.  Okay, so I'm evaluating

25   whether OV1 owns more of the equity interest of Oncor than

Page 41

```
1    Related Entity -- that's Oncor Holdings -- and its

2    Affiliates.  Affiliates, again, is broad.  I can use any of

3    the affiliates.  We'll use TEF.

4              THE COURT:  Does it matter, when tracing through

5    that, that it doesn't say owning more of the indirect equity

6    interests of the company?  Because the equity interests of

7    the company --

8              MR. MCKANE:  Right.

9              THE COURT:  Is Oncor Electric Delivery Holdings

10   Company, LLC.

11             MR. MCKANE:  Right.  Right.  And we don't think

12   so.  We absolutely -- when we worked through this agreement,

13   and you look at, like, the Change of control definition,

14   which is embedded in 3.3(a)(1), which talks -- which then

15   goes to direct or indirect, and you have to give effect of

16   the entire agreement --

17             THE COURT:  Mm hmm.

18             MR. MCKANE:  Right?  We think that equity interest

19   is empowering us to do this transaction at multiple levels.

20   And the key for us, Your Honor, is, every time TTI works

21   through this definition, they always stop before that "and"

22   at the end.  When they always evaluate it, they say, "than

23   the Related Entity."  And what they forget is the Related

24   Entity and its Affiliates, and that's Affiliates, TEF.  So,

25   when you work through it as a whole, and you apply the whole
```

1    balance on the one side to the other, it works.

2            And, Your Honor, it works multiple ways.

3    Focusing, again, on the merger, if, instead of using OV1,

4    you know, in the comparison that results in, you can use a

5    group of persons, that doesn't have to be OV1.  A group of

6    persons is the investors.  And the investors own more of the

7    equity interest than Oncor Holdings and TEF.  So, you could

8    replace -- the -- using the same definitions, you could do

9    it that way as well and satisfy the agreement, just working

10   through each of the definitions as it stands.

11           All right, that's just the merger version, or the

12   merger part of the transaction.  You can also do it focusing

13   on EFH's indirect sale of the LLC units.  And to do it that

14   way, you basically -- you're looking at a sale -- right, so

15   we're focusing on the highlighted language of the sale on

16   Page 42A.  And instead of looking at the merger, we're going

17   to focus on the sale.

18           And, as Affiliates, we're going to do a sale by

19   EFH to -- and so, it's a sale by EFH to a person or a group

20   of persons; here we can do the group of persons as a sale to

21   the investors.  That results in, again, a person or group of

22   persons; here we can use the investors owning the equity

23   interests of Oncor more than Oncor Holdings and, again, TEF.

24           So, working through the definitions again, you get

25   the result in 42B.  Again, each step along the way, it's the

1    flexibility provided by persons or a group of persons

2    combined with the fact of -- how -- the breadth of

3    Affiliates that enables us to get confident that we satisfy

4    the Change of control provisions.

5           Step 3, Your Honor.  All right.  TTI will receive

6    the same consideration.  All right.  3.3(d) lays out that

7    each of the members shall receive the same type of

8    consideration, okay, at the same time as the drag units,

9    right?  If you step back and say to yourself, "What is the

10   purpose of 3.3(d)?" 3.3(d) is the no-sweetheart-deal

11   provision.  Right?  This is the provision that basically

12   ensures that, somehow, we've structured the transaction in a

13   way that it's advantageous to the insiders but doesn't give

14   TTI what they're entitled to.  Right?

15          That's the -- I think, practically, if you were

16   reading this transaction and trying to figure out how it

17   fits into the whole of the drag, that's the purpose of this

18   deal.  And so the question then becomes: are they getting

19   what they're supposed to get?  Right?  Same type and amount

20   of consideration at the same time on a per-drag-unit basis.

21          Okay.  Let's go through it.  All right?  The offer

22   letter spells it out, Section -- this is Exhibit 16, Page 2.

23   "The form of the consideration paid to the holders of LLC

24   units will be cash, and the amount of consideration will be

25   at least equal to the amount of the purchase price of the

1    LLC units held by TTI."  That is required under 3.3.  And

2    they say, "We're going to hit 3.3.  We know it's -- we are

3    going to comply the agreement."

4              The real jump ball here, Your Honor?  What's the

5    dispute here?  It's about "member," right? And is -- really,

6    is EFH a member under the IRA?  All right.  Okay.

7              You have to work this in steps.  You start with

8    one principle that's established in -- it's that the IRA

9    trumps the LLC agreement.  That's an express provision of

10   the agreement.  It's in the second section.

11             You then have to start with:  is EFH a member?

12   You need to look no further than the preamble.  Right?

13   Oxford comma or not, any realistic, reasonable reading of

14   the preamble says, right, EFH -- "Energy Future Holdings,

15   comma, a Texas Corporation, EFH, in the list of parties,

16   collectively with the initial member and the minority

17   member, the members."  EFH is a member.  Right?

18             Now, in our dueling replies, TTI is like, "Well,

19   there are times when it says, "The members and EFH."  And we

20   came forward and said, "Well, there are times when it says,

21   'the members including EFH.'"  Right?  We acknowledge it's

22   not a perfect agreement.  But to give any commercially

23   reasonable interpretation of this agreement, it is -- you

24   cannot dispute that EFH is a member of this agreement.

25             It doesn't have to be a member in the LLC; this is

1    for the investor rights agreement.  EFH is enforcing this

2    agreement.  We're enforcing our rights.  We are a member for

3    this purpose, to enforce this agreement.  So, that's the

4    first hurdle you got to get over.  I think we've done that.

5           The second:  each of the members.  Right?  You go

6    back to 3.3(d); it says, "each of the members."  And here,

7    Your Honor, from our side of the -- this is the worst

8    example, we think, of the form over substance, the -- where

9    you get the hypertechnical reading from TTI, where they're

10   saying, "Well, 'each of the members' has to mean every one

11   of the members gets the same amount."

12          And if you were to do an EFH sale transaction, you

13   would say to yourself, "Well, wait a minute.  That means

14   that drag would never happen.  If EFH is a member, and Oncor

15   Holdings is a member, no one in their right mind is going to

16   double-pay."  Right?  That is the definition of an absurd,

17   commercially unreasonable result.

18          So, if EFH is a member, and the EFH is -- and you

19   receive the EFH sale proposal coming in, right, the monies

20   paid to that member -- and we -- and therefore, 3.3(d) is

21   satisfied by ensuring they get the same amount at the same

22   time, right?  It does not make economic sense for there to

23   be any other interpretation.

24          THE COURT:  I'm not sure I got that point.

25          MR. MCKANE:  Sure.

1            THE COURT:  Can you --

2            MR. MCKANE:  Let me just try to do it again,

3    right?  Let's -- I'll go back to 3.3(d).  Right?  Right.

4    TTI's argument here is basically as follows, right?  You

5    know, in D(i) in the whole, each of the members shall

6    receive the same type and amount of consideration, right?

7    Okay?  And there's -- and so, their message is, as I

8    understand it, "Well, if EFH is a member, and Oncor Holdings

9    is a member, right, right, and TTI is a member, right, then

10   they all should get equal amounts."  Right?

11           From the EFH perspective, are they really

12   suggesting that you have to pay at EFH and then pay a

13   proportionate amount again at Oncor Holdings?  That can't be

14   right.  What they say to us in response is, "No, no, no,

15   EFH.  You are reading into the agreement each of the

16   members" -- and here's the language that they say we are

17   bringing in -- "participating in the transaction," and that

18   somehow we're inserting language in the agreement by making

19   the payment at EFH and then giving a proportionate amount

20   down to TTI.

21           We're not reading language in.  We are giving

22   meaning to the agreement as a whole, right, by saying that,

23   if the purpose of 3.3(d) is essentially a no-sweetheart-deal

24   provision, make certain I get my proportionate share, and

25   we're allowed to do a vertical transaction, which we think

1     we've established in 3.3(a)(1), to -- and you look at the

2     3.3 as a whole, to give meaning to that whole, you know,

3     trying to do that whole section, I can make the payment at

4     EFH, right, right, for the EFH stack, I can make my payment

5     to TTI, and we're good.

6          Their version is I got to make a payment at EFH,

7     and somehow I've got to convince buyers that overpay to make

8     a payment down at Oncor, if -- you know -- sorry, at Oncor

9     Holdings, and then at TTI.  That doesn't work.  There's no

10    economic manner in that would ever work.  And, in many ways,

11    it's the worst kind of gotcha, because what does it do?  It

12    enables them to stay in the deal, because, if -- you know,

13    if we had to do that, then no one would -- we'd never be

14    able to drag them out.

15         So, that -- those are the problems we have with

16    their interpretation of "same form and amount."  The -- so,

17    that's two aspects of it.  So, same form, same amount, and

18    then same time.  Same time is easy.  And that's Slide 47.

19         The drag is going to occur on the same day as the

20    closing of the IPO provision.  We're going to take it out,

21    right?  And this is the -- we have to have this principle in

22    the law.  You have to have a principle that events that

23    occur on the same day, for the -- for -- as a matter of law,

24    will be deemed to have happened at the same time.  You can't

25    do complicated commercial transactions that, for cash

1   purposes and other reasons, require minute sequencing of

2   events that occur on the same day for a transaction to

3   close, and to suggest in any way that doesn't happen at the

4   same time.  Right?  So, we've satisfied "same time" as well.

5            All right.  Step 4: the OV1 offer satisfies the

6   IRR hurdle.  All right?  This one, actually, we think is

7   easy.  We agree on the methodology.  It's -- we -- it's easy

8   to agree when OV1 is willing to use the TTI methodology.

9   That's great.  So, we have essentially a formula for

10  interpreting the -- for applying this provision of the

11  agreement, right?

12           What do we hear in response, "You can't grant

13  summary judgment now, Your Honor.  You can't because -- we

14  don't know.  There might be a tweak in the purchase price.

15  It might change between now and then."  And, Your Honor,

16  this is where, frankly, the case law is actually very

17  helpful for us, right?

18           Final determination of a purchase price is no bar

19  to summary judgment, because what -- you're ordering

20  specific performance.  And in performing -- in ordering

21  specific performance in a deal like this, you're basically

22  conveying to us, "I'll allow you -- I'll give you the drag.

23  I'll enable you to pull them out.  But I can put conditions

24  on my ability to -- your ability to enforce this order.  And

25  those are condition that are -- that can be spelled out,

1    very easily spelled out."  Right?  And you may condition the

2    enforcement of your order on reaffirming that we satisfy the

3    IRR hurdle. It's simple as that.

4           Right?  We've got a formula.  It's locked down.

5    Right?  You know, when -- you know, so, at the day of close,

6    we just have to reaffirm that we've hit the number, we hit

7    the bid.  And with that, you can enter in an order today.

8           Let's turn to the refusal to cooperate.  Slide 51

9    kind of encapsulates the points.  TTI has refused to

10   cooperate with the development and implementation -- that's

11   from the language of the agreement -- of an IPO conversion

12   that's already in progress.  3.7 doesn't limit an IPO

13   conversion to one in which TTI receives the IPO shares; an

14   IPO conversion's broader than that.  And the amended IPO

15   conversion plan allows TTI to convert its -- convert into --

16   its LLC units into IPO units, if the LLC units are not

17   dragged out first.  We take that issue off the table.

18          So, then it comes down to, you know, do we have an

19   IPO conversion?  And we believe EFH, not the board, may

20   determine how -- the development and implementation of that

21   conversion.  Let me walk through that in steps.  All right?

22          Step 1:  what does the agreement say?  Right?

23   Section 3.7 of the IRA says EFH may develop and implement an

24   IPO conversion, and each member shall cooperate and respect

25   the (indiscernible).  That is the first sentence out of the

1    box.

2            Now, like everything else in this agreement, we've

3    got a defined term.  Defined term, we have to look to the

4    defined term in the IPO conversion section.  And that spells

5    out what an IPO conversion is.  And then it says, "In

6    connection therewith, the company and each member agree to

7    cooperate with the other members in good faith to effectuate

8    the IPO Conversion, including giving any consents required

9    to effect the IPO conversion pursuant to the LLC agreement."

10   That's what we're trying to do.

11           EFH has developed and is implementing it.  They

12   have a duty to cooperate.  The duty to cooperate is built

13   into 3.7.  That's what we're trying to enforce.

14           Now, their argument arises out of Sentence 2 of

15   the agreement.  "The Oncor board is not required to take" --

16   that's our version.  They're not required to take steps to

17   initiate the IPO conversion.  What does Sentence 2 say?

18   Sentence 2 says -- this is after we had the empowering, "EFH

19   may do this."

20           Sentence 2 says, "In connection therewith, the

21   board may, at the request of EFH, take any and all actions

22   to create and implement an IPO Conversion," and then it lays

23   out, "including," key word -- and I think Your Honor noted

24   it in the motion to dismiss hearing.  And then it gives a

25   series of things that could be included in an IPO

1    conversion.  Right?

2              How do you give meaning to the first sentence and

3    the second sentence?  We think it's as follows, Your Honor.

4    EFH can develop the IPO conversion.  Then, you have the

5    board, the Oncor board.  They may have to do things to

6    effectuate that IPO conversion.  LLC agreement doesn't get

7    into the IPO conversion, you know, in any way like this.

8              So, how is the Oncor board empowered to take acts,

9    any discretionary acts?  It needs an empowering or an

10   enabling provision.  And that's what Sentence 2 is.  When

11   you look at it together, EFH develops and implements, and

12   then, in connection with what was just developed by EFH, the

13   board may, at the -- and "the board" being the board of

14   Oncor -- at the request of EFH, right, "We want you to do

15   this; we as your parent, even with the ring fence, we're

16   asking you to do this, you know, take all these actions, and

17   then here's what the series is for the IPO conversion."

18             That's how you -- that's how we read those as a

19   whole.  We think that's the only commercially reasonable way

20   to read them as a whole.

21             What TTI says in response is, "No, no.  Until the

22   Oncor board takes those steps, you've got nothing.  There is

23   no IPO conversion."  And that doesn't give justice to the

24   first sentence, and it also doesn't give justice to the fact

25   that this is not a defined set that is confined.  You have

1   an "including" in there.  And I think, when you give meaning

2   to all the language, you -- that's how you get to the fact

3   that EFH starts the process, Oncor board is empowered to

4   move forward thereafter, and here's the -- here are the

5   types of things that you can do.

6           All right.  So, that's -- so, now we believe we

7   are in the middle of an IPO conversion process.  Right?

8   Okay.  The response from TTI is, "Oh, I don't have to

9   cooperate, right, because you're not giving me shares.

10  Right?  And I'm entitled to get those shares."  But we don't

11  -- first of all, we don't think that that's a limiting

12  principle in the agreement.  We don't see that.

13          But nonetheless, they have received the

14  alternative Oncor LLC agreement.  And I actually -- I mean,

15  I have it here, right?  It's Exhibit 46.  Right?  And it

16  lays out, in detail, how TTI would receive shares.  If

17  you're not dragged out beforehand, you can -- you get the

18  shares.  Right?  If you're not dragged out, you get shares.

19          And that -- it's unsatisfying to them in some

20  ways, right?  And so, why?  It's because, on 54, TTI will

21  receive the IPO units; great, they're still in the deal.

22  And all of its remaining rights after the Change of control,

23  and that's what they hate.

24          Unfortunately, that's the way the agreement is

25  written.  When there's a Change of control, TTI loses some

1     of its rights.  That's not here or there.  That's just how

2     it's written.  And -- but they're not able now to refuse to

3     cooperate with an IPO conversion process when they agreed at

4     the time of the signing that, if there's an IPO conversion

5     process that includes a Change of control, they lose some of

6     their rights.  That's ultimately the bargain they struck.

7              Now, the -- now we're back down to the timing

8     issue, right?  And it goes back to the conversation we just

9     had about, "Is timing the same day, you know, sufficient?"

10    Well, we believe there is.  And it goes to the point you

11    made, I think, in the first quarter of the argument, where

12    you said, "Well, you know, can you do both?"

13             We've looked at the agreement; we looked at it,

14    you know, 18 different ways, between the team.  There's

15    nothing in the agreement that doesn't say that I can't start

16    an IPO conversion process and have a drag before the IPO

17    conversion process closes. And so, we believe the -- that

18    TTI can be dragged out right there, you know, in that day,

19    you know, before the IPO conversion process closes.

20             And if you think about it otherwise, it would be

21    really -- it could get really perverse.  You could have a

22    process where you kick off an IPO, right, you then elect --

23    you -- maybe you get feedback from the marketplace, you

24    know, that, no, no, that, you know, it's better to sell the

25    whole thing.  You do a drag.  The drag happens.  It's over.

1    And then you go months later to the IPO conversion process;

2    could TTI, a previously dragged-out minority member, come in

3    and say, "No, I get IPO shares"?

4              That can't be right, right?  But that's the

5    logical extreme that you could take their argument to.  And

6    there's no limiting principle in the agreement that we've

7    seen.

8              All right.  And now, let's go to the refusal to

9    cooperate.  You know, Your Honor, I don't think these facts

10   are very complicated, although they're controversial.

11   They've refused to engage, right?  They abstained from

12   voting at the board level with the Oncor letter agreement.

13   Okay, fine.  Why does that matter?  They're going to say

14   that we didn't get the demand letter at that point in time.

15             Well, we bring it up because it just shows their

16   mindset.  They want nothing to do with this IPO.  They want

17   nothing to do with this.  They want to do nothing.  So, you

18   -- at the board, they abstained, right?  They admit through

19   the depositions they've taken no steps, because they don't

20   think they have to, because they don't think a valid IPO

21   conversion is going on; that's in the depositions -- right?

22   The Zucchert deposition says they've done nothing; we've

23   abstained.  Right?  And so, they -- and they've refused.

24             What's the rub here, Your Honor, really is the

25   problem, is not just that -- not only that they've refused.

1    They have taken affirmative steps to scuttle the deal.  TTI

2    has long sought to increase its stake in Oncor.  That's what

3    discovery has shown, that they've looked for different ways,

4    you know, for them to possibly get controlling position

5    here, to expand their position, right?  They evaluated that,

6    and Mr. Evanden testified on that, in Slide 58.

7              But it's more than that, Your Honor.  It's not

8    just expanding it.  They have been teaming with NextEra and

9    working with them on a competing proposal.  And that's Slide

10   59.  As late as October, TTI discussed with NextEra the

11   possibility of purchasing Oncor, right?  This is -- these

12   are meetings with the participants of the Oncor board who

13   are at Borealis and GIC with the leader of the deal team at

14   NextEra.

15             This happens, you know -- and, Your Honor, you

16   remember this, right?  We had a motion to -- there was a

17   discovery motion about all this.  Right?  You know, and what

18   we hear is this isn't ongoing.  But the timing here is

19   telling.  And Your Honor has seen some of the NextEra

20   actions, but -- and I think this was referenced, you know,

21   at the confirmation trial as well; NextEra has a Texas sub

22   called Gexa Energy.

23             So, what we have here is a series of events that

24   absolutely reaffirm what we're asking for, an order that

25   they coordinate -- that -- sorry, that they cooperate.

1    Excuse me.  You've got meetings between senior people at GIC

2    and Borealis and NextEra in October, mid-October, right,

3    where they talk about how we can -- how to -- they were --

4    NextEra is asking them, "Tell me how you want the deal

5    structured.  Tell me what rights you want in so I can make

6    it most attractive to you so I can keep you on my team."

7              Then, November, NextEra files what arguably -- you

8    remember this -- arguably is a competing plan on the docket,

9    right?  That you --

10             THE COURT:  You can get rid of the adverb.

11             MR. MCKANE:  All right, yes, thank you, Your

12   Honor.  And that was struck.  And Mr. Shore, on behalf of

13   his clients, preserved all of his rights.  Right?  So, they

14   do that in this Court.

15             Then, December 7th, Gexa, the NextEra sub, submits

16   testimony in the PCT regarding the risks associated with the

17   restructuring and the problems therewith.  Then, late

18   January, NextEra, through its sub, submits testimony

19   opposing the transaction.  Like, TTI is looking to stay in

20   this deal; they're looking to do it with NextEra; NextEra is

21   doing everything it can to scuttle this deal and to convince

22   the PCT to help it scuttle the deal.

23             That's not consistent with the duty to cooperate.

24   And I know the protestations that we will hear are, "This is

25   a backup; this is just a backup bid.  This just, you know --

1    this is like a Plan B type scenario."  Your Honor, you've

2    seen too many transactions to be able -- you just evaluate -

3    - look at the timeline.  Evaluate the timeline, and it's

4    clear that we are -- what are we asking for?  We're asking

5    for an order, you know, directing them to cooperate with

6    this deal.  All right?

7             So, specifically, what are we asking for?  We

8    spelled out this in an order.  Step 1: TTI has to refrain

9    from taking any steps to acquire an additional stake in

10   Oncor, including collaborating with NextEra.  No more,

11   right?  You're with us or you're with them.  And our

12   agreement says you're with us.

13            Step 2: when the time comes, sell the membership

14   interest.  Right?  3: vote, if a vote is required, you know,

15   for its Oncor LLC units in favor of a sale of Oncor to OV1.

16   Next one:  direct your board members, direct your Oncor

17   board members to engage.  That's essentially what we're

18   trying to say in 4.  5 is enter any agreements relating to

19   the sale, and agree to make, you know, OE-1a reps that you

20   need to make.  And then cooperate, right?  Give us the broad

21   blanket.  Comply with your agreement, cooperate.

22            And, Your Honor, with that, if you don't have any

23   questions, I think that's all we have for our opening

24   position.

25            THE COURT:  Thank you, Mr. McKane.  Ovation wish

1    to be heard?  All right.

2                MR. BECKWITH:  Your Honor, Van Beckwith on behalf

3    of Ovation.  If it pleases the Court, we will just hold for

4    any rebuttal.

5                THE COURT:  Okay.  Very good.

6                MR. BECKWITH:  Thank you, Your Honor.

7                THE COURT:  All right.  Let's take a short recess,

8    Mr. Zimmerman, and then I'll hear from you.

9                MR. ZIMMERMAN:  Thank you.

10        (Recess)

11               CLERK:  All rise.

12               THE COURT:  Please be seated.  Excuse me.  Go

13   ahead.

14               MR. ZIMMERMAN:  Good afternoon, Judge.  If I may,

15   I'd like to take this in three stages.  First, I'd like to

16   focus on the operative language in the drag.

17               Second, I'd like to address the concerns you

18   raised at the motion to dismiss to make sure that we read

19   the drag language in the context of the contract as a whole,

20   because everybody agrees, you have to read a contract as a

21   whole.

22               And then thirdly, I'd like to spend a small amount

23   of time on the extrinsic evidence, which we don't think we

24   need to look at, but we'll address it just in case.

25               And let me just preface it, since there are cross-

1    motions, our opposition to their motion for summary

2    judgment, to a large degree, is just the flipside of our

3    legal arguments on our motion for summary judgment.  So what

4    I'd like to do to save time is go through -- the law is

5    equally applicable to both my motion and their motion, and

6    the extrinsic evidence would really be, I guess, in

7    connection with our opposition to their motion.

8            And then all I'll have to do is save some rebuttal

9    time if I need to, but I don't know want to have to argue

10   this twice.

11           So, I understand we've given you a binder, if you

12   have it?

13           THE COURT:  Yes.

14           MR. ZIMMERMAN:  Good.  You may know by now that

15   Section 33, which is at Tab 1, 33(a), that's the drag

16   language, and it is triggered, unequivocally, by an offer to

17   purchase either LLC units or IPO units.  And it's an offer

18   to purchase those either to Oncor Holdings, who directly

19   owns those units, or to EFH, which holds it, quote,

20   "directly or indirectly."

21           Now, with respect to IPO, and they say -- and

22   obviously, that offer to purchase has to trigger a change of

23   control and all the other stuff, which I'll get to in a

24   moment.  They say, well, EFH received an offer to purchase,

25   quote, "LLC units or IPO units."  There are no IPO units.

1     They don't exist.  The IPO units are going to be the equity,

2     as you correctly pointed out, in the IPO corporation OV1.

3     EFH doesn't have IPO units, and the testimony is undisputed

4     that they will never own IPO units.  So, they haven't

5     received an offer to purchase IPO units.

6              What they have received, and incidentally, the

7     maker of the offer is OV1.  That's the acquisition entity,

8     that's what they've defined as the IPO corporation.

9     Obviously, OV1 isn't buying IPO units.  They're not buying

10    their own units.  It's the investors who are buying the

11    units.

12             So, since OV1 sent a letter, they're not offering

13    to buy IPO units.  EFH doesn't own and never will own IPO

14    units.  So, that doesn't work.  So we're left with, has

15    there been an offer to purchase the LLC units own directly -

16    - held directly and indirectly by EFH, that results in a

17    change of control?

18             I know that Oncor Holdings owns 80 percent of the

19    LLC units and is not going to sell them.  They hold them

20    directly.  So, let's assume, for the moment, EFH holds them

21    indirectly, because EFH owns 100 percent of Oncor Holdings.

22    Now, Oncor Holdings isn't selling the LLC units.  They will

23    never be purchasing Oncor Holdings.

24             So that begs the question, if the owner of the

25    units isn't selling them, how can anybody be buying them,

1    whether they're directly held or not.  It doesn't say

2    "indirectly purchase," it says, "an offer to purchase LLC

3    units held directly or indirectly."  The holder of those

4    units is never going to sell them, so how could they be --

5    how could there be an offer to purchase them?

6              Here's what they say.  They focus on the

7    "indirectly held by EFH," and if you look at the corporate

8    chart, which is the first tab, and you've undoubtedly

9    memorized this by now, they say, this is the first answer.

10   Well, EFH owns 100 percent of EFIH.  EFIH owns 100 percent

11   of Oncor Holdings, so theref -- and Oncor Holdings owns the

12   Oncor LLC units, so therefore, there's an offer to purchase

13   EFH's LLC units they hold indirectly because there's an

14   offer to purchase EFH's stock, 100 percent of EFH from the

15   parents.

16             There's two problems with that.  First of all, it

17   is, and we cite this, and there's really no response, it is

18   fundamental corporate law 101 that when you buy the equity

19   of a company, you do not buy the underlying assets.  That's

20   Delaware law, it's New York law, it's everybody's law, and

21   the prominent case we cite for that is the Advanced Video

22   Technology case from the Southern District of New York,

23   which I'll get to in a minute, because it's really very

24   interesting.  It was by Judge McMahon, and it said, quote:

25   "Effigy did not acquire any of the target's assets simply by

1      purchasing 100 percent of its stock."  That is a well-

2      settled proposition of corporate law.

3              So, they say -- they have two answers.  First they

4      say, well, it doesn't matter what the law is, it matters

5      what the parties intended.  Well, there's two issues with

6      that.

7              Number one, the existing law is incorporated as a

8      matter of law into a contract unless you have very specific

9      language that says we're not using established law.

10              Second, that argument that we really intended,

11      that the acquisition of the stock was in fact the

12      acquisition of the -- the underlying assets notwithstanding

13      the law, that exact argument was made in the Advanced Video

14      techniques case -- Technologies case.  The issue in that

15      case was patent infringement case.  The issue is whether the

16      Plaintiff owned the patent, the asset, because if you don't,

17      you can't sue.

18              And the argument was, we own the asset because we

19      acquired 100 percent of the stock of the company that owns

20      it.  And the Judge said, well, that doesn't work because

21      corporate law said buying stock doesn't by the assets.  They

22      said no, but -- and there was undisputed testimony.  We

23      intended, when we did that transaction, we intended that the

24      patent go with the stock to give you the stock as well -- to

25      give you the patent as well, and the Judge said, that may

1    have been your -- and there was no dispute, that was their

2    mutual intent.  Judge said, that may have been your intent,

3    but there is a way to effectuate that intent.

4              The way to do it is, when you buy the stock,

5    because the stock itself doesn't bring along the assets, you

6    assign the asset as well.  You assign the patent as part of

7    the transaction.  Which is exactly what we say here.

8              If you want to purchase, to trigger the drag, the

9    LLC units held indirectly by EFH by acquiring its stock, you

10   can do that, but you have to, as part of that transaction,

11   have Oncor Holdings assign those LLC units to EFH.  That's

12   exactly what that case is, which obviously is not happening

13   here.

14             THE COURT:  Doesn't that give rise to the tax

15   issue?

16             MR. ZIMMERMAN:  I'll get to that, because the

17   answer to that, then tax, interesting, yes it does,

18   depending on how you structure it.  There is, in fact, a

19   tax-efficient way to drag through an IPO that is tax-

20   efficient, and if you indulge me, I'll get to that in about

21   three minutes.

22             THE COURT:  Okay.

23             MR. ZIMMERMAN:  Thank you.  Second point, again,

24   reading the contract as a whole, you look at the tag

25   provision, which is Section 3.2, which is the immediately

1    preceding section, obviously, of 3.3.  I was a math major.

2    If you look at -- if you look at -- that's in -- that's at,

3    I guess, the second tab in our book.

4              Now, first point, the whole debate about whether

5    Section 3.3, the drag, contemplates an upstairs equity

6    transaction, we say it doesn't, they say it does.  One thing

7    nobody denies is if you look at 3.2(h) -- pardon me, it's

8    the next tab.  3.2(h), when the parties wanted to trigger a

9    right by the acquisition of upstairs equity, they said it in

10   unequivocally plain language.  3.2(h) says: "in the event

11   that EFH or any of its subsidiaries proposes to transfer LLC

12   units," transfer, "or IPO units, as the case may be,

13   indirectly through a transfer of equity interests in a

14   subsidiary of EFH, the sole or principal asset of which is

15   such LLC units or IPO units."

16             So, and I'll get to the rest of it in a minute,

17   that is when you wanted to describe an upstairs equity

18   transaction, that's exactly how you describe it.  So that

19   they -- and that language, obviously, is nowhere to be found

20   in the drag provision Section 3.3.

21             They say, well, we can get there.  Forget the

22   plain reading for a second, because just focus on what we

23   really wanted.  They get there two ways.

24             The first way they get there is to say, well,

25   indirectly, the drag says I can buy EFH's stock held

1    indirectly.  So that's an upstairs equity transaction,

2    obviously, they're saying.  For that to work, you have to

3    find that the word "indirectly" in 3.3(a) has the precise

4    same meaning as, quote, "proposes to transfer LLC units or

5    IPO units, as the case may be, indirectly through a transfer

6    of equity interests in a subsidiary of EFH, the sole or

7    principal asset of which is such LLC units or IPO units."

8    They want you to say -- that three lines is what

9    "indirectly" means, same thing.  It's exactly the same

10   things.  That violates every known rule of contract

11   construction.

12          We cited the case, the Supreme Court case, and the

13   interesting thing about what the law is, when you have a

14   contract that uses different phrases, and it's actually

15   interesting because in most of the cases when they discuss

16   that, the different phrases are in proximate clauses, just

17   like this one.  They said, when you use different language

18   and different phrases, that means they have different

19   meanings, and the interesting thing is the reason for that

20   principle is precisely what you were concerned about at the

21   motion to dismiss.

22          It's precisely because you read one provision in

23   the context of the entire contract.  You don't focus just on

24   one.  You don't see "indirectly" means those three lines.

25   You look at the whole contract, and when the parties wanted

1    to define a right that's triggered by an upstairs equity

2    transaction, they knew exactly how to do it, and it wasn't,

3    I quote, "indirectly."

4            Their second answer, well, an offer to purchase in

5    the drag, it's -- really means an offer to purchase or

6    transfer.  And I heard counsel say that we were the ones who

7    are suggesting you have to put in the word "transfer."  No,

8    we're not -- we don't want to change anything.

9            Their argument is, well, offer to purchase, it's

10   the same thing as offer to purchase and transfer because if

11   you look at, all over the contract, the word "transfer,"

12   which is defined, is broader than purchase, it's all over

13   the contract, including at the bottom of 3.3 but it's not at

14   the top of 3.3.

15           The drag part of 3.3 is the first two lines.

16   That's an offer to purchase.  And again, this is a fortiori

17   of what I just said.  If the different language is in the

18   same provision, at the bottom, not at the trigger, by

19   definition, unless they say it was a mistake, which has

20   never been raised and it's not a mistake, by definition,

21   "purchase" is not the same as "purchase or transfer."

22           One more point.  We saw before -- it's undisputed

23   that when the tag-along was the tag-along, which does say,

24   by the way, it's triggered by not an offer to sell, an offer

25   to sell or transfer, and we had put in the fact that during

Page 67

1    the negotiations, TTI inserted "or transfer" a whole number

2    of times, I forget how many times, within their tag section.

3    They say, well, you put it in at the bottom but it really

4    didn't -- it doesn't broaden in any way, anything.  It

5    doesn't broaden the concept of sell.  It's basically

6    meaningless.

7              They testify, both Mr. Wilkes and Mr. Horton,

8    testimony that they understood, during the negotiations,

9    when TTI put in the word or words "or transfer" whatever

10   number of times they did in the tag section, it was because

11   they intended to broaden what it meant to sale.  That's --

12   Wilkes at Page 241 in his deposition, which is Tab 12 in our

13   book, which you can look at, at your convenience.

14             So, as a textual matter, under the rules of

15   construction, respectfully, you cannot come to the

16   conclusion that either indirect -- that "indirectly" means

17   the same thing as an upstairs equity transaction as

18   specifically articulated in the drag section.  You just

19   cannot come to that conclusion, and you cannot come to the

20   conclusion or insert in the drag section, to trigger it by

21   an offer to purchase or transfer, because that's not what it

22   says, and Courts don't insert terms into a contract.

23             So, how do we deal with the tag point?  And I said

24   before that the first attempt was to seize on one word,

25   "indirectly."  We don't think that works, for the reasons I

1    just said.  So now they say, okay, let me seize on two

2    words, maybe that'll double my chances.

3          So we go to 3.2(h), which is the fatal language

4    for them, because what -- again, they knew how to trigger a

5    tag with the upstairs equity, and they point out that the

6    tag is triggered when EFH or its any -- proposes to transfer

7    LLC units as the case may be, indirectly through a transfer

8    of equity interests in a subsidiary of EFH, the sole and

9    principal asset of which is LLC units, parentheses, other

10   than, blah, blah, blah, "in a transaction pursuant to

11   Section 3.3," which is the drag.  And they say, aha.  Other

12   than TTI's reading that out of the contract because they --

13   what it must mean, other than 3.3 is, well, 3.3 already

14   includes an upstairs equity transaction as a trigger, that's

15   why we exclude it from the tag.

16          Well, there's two problems with that.  First of

17   all, there are clearly, nobody can dispute, that 3.3, at a

18   minimum, addresses direct transactions at the same level,

19   not upstairs equity, because 3.2 -- there's two ways to

20   trigger the drag: an offer to EFH or an offer to Oncor

21   Holdings.  Oncor Holdings is in the same level we are.

22   Oncor Holdings directly owns the LLC units.  That's clearly

23   not a vertical transaction.  Now, they don't want to do

24   that, but that's clearly not a vertical transaction.

25          Second, "other than" refers to, among other

1    things, Section 3.3(f) of the drag contemplates a two-

2    pronged transaction.  One, a direct purchase of LLC units

3    coupled with a purchase of other material assets from the

4    equity owners -- or, from the parent.  That combined

5    transaction moots the tag-along.  Why?  Not because of the

6    other transactions, because the first step, not because the

7    parent is selling upstairs, because the first step of that

8    is the direct acquisition of the LLC units.  That triggers a

9    drag.  So, when you couple that with another transaction

10   that involves other assets, you don't need to send a tag

11   notice to TTI because the purchase of the LLC units would

12   have already triggered the drag.

13          That's why, other than our reading of it makes

14   absolutely perfect sense when you combine the two provisions

15   together, the 3.2 and 3.3 together, it works seamlessly.

16          Our point, which is actually maybe more to the

17   point, whenever you do these things, I like to step back and

18   say, what are we talking about that doesn't make sense?  So

19   let me posit it this way.  If it was so fundamental to them

20   that an upstairs equity transaction be clearly contemplated

21   and within 3.3(a), if you were drafting this contract,

22   Judge, wouldn't you just put the language in 3.3(a)?  You

23   know how to do it, you just did it in the tag, 3.2(h).

24          Why would you codify that critical component in

25   3.3 by referencing a parenthetical, the other than carved

1    out parenthetical in a different section of the contract and

2    say, huh, obviously, we meant an upstairs transaction in

3    3.3?  No, the way you would do it is you'd pick up your pen

4    and you'd put the same language in 3.3.  That's how you

5    draft contracts if that in fact was what 3.3 was supposed to

6    be triggered by.

7             Next point, and this is one of the arguments they

8    make, another argument why they say our plain reading of

9    "offer to purchase" is inconsistent with some other

10   provisions of the contract.

11            They say, well, the offer to purchase reading

12   renders the following provision meaningless.  The offer to

13   purchase can be made to EFH, or Oncor Holdings.  An offer to

14   purchase to EFH makes no sense if it requires an actual

15   purchase of LLC units because EFH doesn't own any LLC units

16   or IPO units, and that's true, but it still makes sense, and

17   here's why, and it's perfectly consistent with the

18   "indirectly" and it's perfectly consistent with what I

19   described in the Southern District case with the patent.

20            If you were to buy the units held indirectly by

21   EFH, you can send an offer to purchase to EFH.  They can

22   then cause Oncor Holdings to upstream the LLC units, assign

23   them, or they can cause Oncor Holdings to sell the LLC units

24   to the buyer.  So it's perfectly appropriate for EFH to get

25   that kind of offer.  It doesn't -- our reading in no way

1     renders that meaningless.  Full stop.

2          Let me now turn to the second -- the other awkward

3     provision that everybody's been talking about.  There are

4     three provisions that, the interplay of which, we say favors

5     us, they say favors them.  You've got the drag, 3.3, which

6     we just went over, the tag 3.2 and 3.2(h) which we just went

7     over, and 3.7, the IPO conversion.  And if we may, that's in

8     (indiscernible) Section 3.7(a), there's a tab in your

9     binder.

10          THE COURT:  Mm.

11          MR. ZIMMERMAN:  And here's what it says, and you

12    heard, again, that there's an ongoing IPO conversion.  Now,

13    when they went through their PowerPoint, they kind of e-

14    lighted over what we think is a fairly important point.  The

15    definition of IPO conversion is in the middle of that page,

16    and it follows all of the actions, or any of the actions,

17    that the Oncor board may take.  That's the definition of IPO

18    conversion.

19          Now, you heard a lot about, well, they don't have

20    to -- Oncor board doesn't have to do anything.  Maybe, maybe

21    not, I don't know.  I don't know why he would request the

22    Oncor board to do things if they don't have to do them, but

23    putting that aside, it doesn't matter whether they have to

24    do it or not.  The definition of IPO conversion is steps

25    taken by Oncor Holdings, and we know, it's in the record,

1    that Oncor Holdings, Oncor's -- strike that, Oncor's board

2    is not going to take any steps until the PUC decides.

3         So, the definition of IPO conversion is steps

4    taken by the Oncor board -- I may have misspoken when I say

5    Oncor Holdings, pardon me, it was Oncor board.  Oncor board

6    hasn't taken any steps, there's no IPO conversion.  But

7    let's assume -- say that's number one.

8         Number two, in connection with any IPO conversion,

9    each member must ensure that each member receives shares of

10   common stock or other equity securities, or the right to

11   receive shares of common stock or other equity securities,

12   and other rights in connection with such IPO conversion,

13   substantially equivalent to, and in exchange for, its

14   economic interest, governance, priority and other rights and

15   privileges as such member had with respect to its Oncor LLC

16   units prior to such IPO conversion.

17        Now, the main negotiator for EFH, Mr. Horton, was

18   asked, has TTI been invited to participate in IPO, "Not that

19   I'm aware of, no."  OV1's lead negotiator confirmed that.

20        The response is, well, okay, we sent this

21   alternative LLC agreement, which now gives TTI, in case they

22   can't drag us, it gives TTI those IPO units.  It's

23   interesting.  That -- because I heard at the beginning you

24   need to look at everything in context.  Whether it's

25   directly germane or not, it's nevertheless interesting, that

1    alternative proposal was sent to us after we served our

2    request for admission that TTI was not going to get any IPO

3    units.  So they gave us that alternative, which that --

4    that's fine.  The problem is, that doesn't work because the

5    LLC -- the IPO units that we converted to have to have,

6    among other things, the same governance rights that TTI has

7    now, before the transaction, with respect to its LLC units.

8            And there were, among other rights that are taken

9    away by their alternative proposal, is the right of TTI's

10   directors, requires their consent, to any dividends that

11   TTI's directors may want to prevent if they conclude, in

12   their business judgment, that that kind of dividend would

13   prevent the company going forward from satisfying its

14   obligations.

15           And it also takes away the right to transfer -- to

16   -- the right to consent to transfers of assets within the

17   REIT group.  Now, so they're not getting the units we're

18   supposed to get.

19           Now, they say, well, that's okay.  We can take

20   away those rights because of this change of control, which

21   I'll get to in a minute, because we don't think there is a

22   change of control.

23           I want to now get to, because it directly relates

24   to 3.7, the question you started with.  Are we saying, does

25   our reading lead necessarily to the conclusion that the only

1    way they could drag TTI is by direct purchase of LLC units

2    in TTI and Oncor Holdings so as to trigger this -- so as to

3    result in a non-tax-efficient transaction, because you heard

4    forever that it was very important for them to preserve the

5    flexibility to have the tax-efficient exit.  And the answer

6    is no, it doesn't.  There is a way to do a tax-efficient

7    exit through an IPO.

8            And it's interesting, let me just go back, before

9    I get there.  Section 3.7, which is the IPO conversion, it's

10   not as if an IPO or an IPO conversion, quote, "triggers the

11   drag."  3.7 has nothing to do with the drag.  It doesn't

12   trigger the drag, it doesn't have any drag language.  It

13   contemplated EFH's stated desire to have a tax -- to maybe

14   go public and exit at an upstairs equity transaction.  It

15   doesn't mean it triggers the drag.  It's the vehicle by

16   which it can do that.  The question of whether that vehicle,

17   the IPO, triggers the drag, depends on how you structure it.

18   Can you structure it in a way to acquire the LLC units the

19   way we say it should be, in a tax-efficient transaction?

20   Yes.

21           And we cited, in our reply brief, let me just

22   briefly say it.  If you look at the last -- I believe it's

23   the last tab in your -- yes, the book, we just excerpt the -

24   - because it's a really thick book.  Quote, "Structuring

25   Venture Capital, Private Equity And Entrepreneurial

1    Transactions."

2              THE COURT:  What tab?

3              MR. ZIMMERMAN:  Hm?

4              THE COURT:  Where are you?

5              MR. ZIMMERMAN:  Oh, the last exhibit in your

6    binder.

7              THE COURT:  Fourteen?

8              MR. ZIMMERMAN:  Yes -- is there one after -- oh,

9    does he not have it?  The one after it, it says, "Levin

10   Treatise Excerpt," do you have that?

11             THE COURT:  Oh, yes.  Okay.

12             MR. ZIMMERMAN:  Okay.

13             THE COURT:  I have that.

14             MR. ZIMMERMAN:  All right.  That book has a

15   section in it, which we've copied it on the next page.  It's

16   called a "Up-C Structure," and it specifically talks about,

17   the scenario when you have an LLC that later desires to go

18   public.  And the traditional way you would do that is to

19   incorporate the LLC, but that's not a tax-efficient way to

20   do it.  So they say you have an "Up-C structure."  As an

21   alternative to simply incorporating the partnership or LLC,

22   "in anticipation of an IPO, the parties may utilize an Up-C

23   structure to raise funds in the public markets in a manner

24   that generally produces more favorable tax consequences and

25   also enables the entity to continue conducting its business

1    as a partnership (or LLC)," and the chart on the next page

2    shows you how to do that tax-efficient transaction, and it's

3    not at all that different from what they've done here.

4    Here's the only difference.

5            The IPO corp, which here would be OV1, is going to

6    do a public offering to raise funds.  The current

7    transaction contemplates that they use that funds to pay off

8    the E-side Creditors 100 cents to the dollar, full stop.

9    What this says, if you do an Up-C structure, if you use the

10   proceeds that you raise, if you raise sufficient proceeds,

11   to -- you can then buy, with those proceeds, you buy the LLC

12   units from Oncor Holdings and TTI.  You've now acquired

13   them.  It's tax-efficient, and when you do it that way, when

14   you're buying Oncor Holdings LLC units, that's -- that is a

15   change of control because the ownership of Oncor equity

16   today, the LLC units, Oncor Holdings owns 80 percent.

17           Their transaction would -- Oncor Holdings would

18   still own 80 percent, so there's no change of control at the

19   Oncor level.  This way, you buy both sets of units, tax-

20   efficient, and you trigger the -- you trigger the drag.  So

21   --

22           THE COURT:  And then how do you pay off the

23   Creditors?

24           MR. ZIMMERMAN:  That's the -- ah.  That's the

25   function -- that is purely a function of how much you're

1    able to raise.  Now, when you planned this transaction and

2    you planned your tax-efficient exit, which by the way, they

3    have a tax-efficient exit even without dragging us because

4    it's a tax -- it's tax-efficient right now.  They don't have

5    to drag us to make it tax-efficient.

6              They understood, because actually, counsel wrote

7    the book, they understood you can do it with the way I said.

8    It may be, in the intervening eight years, that either the

9    company or the markets have changed or economically, you may

10   not be enough -- you may not be able, in today's market, to

11   raise enough of the -- in the public offering.  That's a

12   function of the market.  That's a function of timing.

13   That's not a function of a restriction in the contract that

14   prevents you from doing it.  And in fact, in their offering

15   materials and in their registration statement, they even

16   say, now in their alternative proposal, that if TTI is not

17   dragged, they're going to raise less funds in the public

18   offering.  So they understand that.

19             I don't know what the economics are of doing the

20   right way to get a tax-effective deal, but there is a right

21   away, and it existed back then, and that's what they --

22   that's what they bargained for, the fact that the market,

23   and I don't know this, if the markets turned against them so

24   you can't raise enough money, that's the market.  We're not

25   an insurer here, that's the market.  That's not the

1    contract.

2          So, last point.  Because it's worse than that.

3    We've heard about their concern for a tax-efficient

4    transaction.  TTI had that same concern, and that's

5    admitted, and they understood that, because in the

6    negotiations, and in their deposition, Mr. Wilkes and Horton

7    both understood that both sides had tax issues which was

8    very important to them.  And they say, we'll we took care of

9    TTI's tax problem.  We have a 10 percent IRR on an after-tax

10   basis.  Well, that's one of the ways they dealt with it, but

11   there are other ways that TTI specifically bargained for to

12   take care of the tax problem, and one of them is in 3.7(d)

13   is in David, which is also a tab in the book.

14          In any IPO conversion, as I said before, TTI has

15   the right, and in fact, the members have to, quote, "ensure"

16   that TTI convert -- be given the opportunity to convert its

17   LLC units into IPO units.  But TTI bargained for and

18   received an option, which is in 3.7(d)2.  They could either,

19   in the context of an IPO conversion, which they say is

20   ongoing, they can either transfer their LLC units for IPO

21   units or, alternatively, 3.7(d)2, they can have their --

22   TTI's parent, TTHC convert TTHC equity into IPO units, and

23   the reason they did that is because TTHC, and if it gets

24   dragged in the proper structure, they don't have the tax

25   problem -- TTI does.  There's a -- Section 892 of the code,

1    that renders that transaction tax-efficient from TTI's

2    perspective.

3            So, both sides had a tax concern.  Both sides

4    reserved and negotiated the right to do a tax-efficient

5    deal.  What they want you to do is the following.

6            They get their tax-efficient deal, they don't

7    comply with 3.7(d), they don't give us the option.  They

8    don't comply with giving us LLC units with equal governance

9    rights.  They stick us with a multi-hundred-billion-dollar

10   tax liability, and that's fair.  And they want you to get

11   there not with a paying in with the contract, but by saying

12   "directly" equals the same things as the three lines in

13   3.2(h), by saying "indirectly," even though corporate law

14   specifically says purchase of equity is not the purchase of

15   assets, well, we don't care what the law says because we

16   meant something different.  They want you to do all of that

17   to get their tax-efficient and stick us with the bill, when

18   our way allows both sides to get their tax-efficiency.

19           THE COURT:  I'm -- now I'm confused.  Stick you

20   with what bill?  I missed your point there.  Stick you with

21   what bill?

22           MR. ZIMMERMAN:  Oh, oh.  If you -- the way their

23   alternative proposal is now, they said, well, you're going

24   to get the IPO units, convert TTI -- if TTI gets dragged

25   right now, they want us to convert the LLC units, sell them,

1    and take the $2.3 billion-dollar purchase.  That's a roughly

2    $300 million-dollar tax burden on TTI.

3            THE COURT:  Mm hmm.

4            MR. ZIMMERMAN:  TTI can avoid that.  The way they

5    can avoid it so they have no taxes is that option I just

6    talked about, TTHC converts its equity --

7            THE COURT:  Well, isn't it the same if they pay

8    you X and you avoid a liability or if they pay you X plus Y

9    where Y is the liability and you pay the liability?

10           MR. ZIMMERMAN:  No, here's why.  The answer as a

11   mathematical exercise, yes, but if you look at how the

12   purchase price is determined, it's as if, if we do the

13   option, it says as if TTI's units are going to be purchased.

14   So, even though TTHC doesn't pay the taxes, the 10 percent

15   IIR -- IRR, yes, is, even if -- and it specifically says, if

16   TTI had assigned its LLC units to a permitted transferee, to

17   you, and you don't have a tax issue, and then they want to

18   drag, the IRR is measured not by your scenario, not by your

19   tax problem -- scenario, by TTI's.  So, even though you

20   don't pay taxes and you would -- either way, you would net -

21   - they don't have to pay as much because you're not going to

22   pay taxes, that's not the -- that's not the triggering

23   price.  The price is as if TTI transferred its units.

24           So, the answer to your question is that the

25   contract does not say, that the contract has the same price

1    as if TTI would have kept its LLC units and exercised their

2    first option.

3              Let me get to -- pardon me.  Everybody agrees that

4    if you exercise the drag, quote, "each member -- each of the

5    members have to receive the same tag and amount of

6    consideration."  We have a debate about whether EFH is a

7    member, which I'll get to in a moment.  Nobody debates that

8    Oncor Holdings is a member.  They're not getting any

9    consideration, for good reason.  They're not selling

10   anything, they're not selling the units.  They say, well,

11   what that obviously really must mean is each of the members

12   -- each of the selling members, once again, that's now what

13   it says, and there's a reason why it's not what it says

14   because the testimony was, whether you credit it or not, and

15   they obviously won't, but the understanding on TTI's side

16   was, I'm at the same level of Oncor Holdings.  That's my

17   partner.  You go, I go, you stay, I stay.  And that's

18   perfectly consistent, because if each of the members have to

19   get the same consideration, Oncor Holdings isn't getting

20   any.

21             Change of control.  You heard this morning -- let

22   me just set the stage.  In order for the drag to trigger,

23   the trigger to drag under any scenario, whether you buy the

24   LLC units, whether you do an Up-C corporation, one of the

25   elements is that there has to be change of control.

1           They said -- I heard them say before, well, TTI

2    takes the position that the change of control has to occur

3    at the Oncor level.  No.  That's their position.  In their

4    moving summary judgment papers, they said there's going to

5    be a change of control because then investors, the new

6    investors, "will directly own more of the equity interests

7    in OV1 and indirectly own more of the equity interests in

8    Oncor than any other person or entity, close quote.  That's

9    Page 28 of their moving brief.  That's demonstrably wrong.

10   Nobody's going to own, under their deal as currently

11   structured, nobody's going to own more of the equity of

12   Oncor than Oncor Holdings.  So that's demonstrably wrong.

13   So that wasn't our theory.  That's the way we read it, it

14   happens to be correct, but at least at one point in life,

15   everybody agreed on that.

16           Now they say, well, that's wrong.  It's -- let's

17   look at OV1, because there's only two possibilities, right?

18   I mean, and think about it for a second.  This whole LLC

19   agreement, what is it about?  It's the company, which is

20   Oncor.  So when you have conceptually that something is

21   going to be triggered by a change of control, isn't it

22   obvious you're talking about a change of control of the

23   company?  That's what the whole agreement's about.  Of

24   course, it is.  It's silly talk.  Of course it is.  Talk

25   about litigator's litigation toolbox?  Come on, of course

1   it's Oncor.  That's the company.  That's how it's defined.

2            So they say, well, OV1, let's try that one.

3   There's a change of control of OV1.  No.  And in fact, the

4   testimony in this from them is undisputed.  The owners of

5   OV1 today own 100 percent -- the investors own 100 percent

6   of OV1.  After the deal, they're going to own eighty --

7   strike -- 98 percent of OV1.  So there's no change of

8   control.

9            So, with all due respect, it's got to be A or B.

10  There is no C here.  It's either change of control of Oncor

11  or a change of control of OV1.  It's neither.  Full stop.

12  There is no change of control.

13           And, if you look at -- if you want to ignore

14  common sense, which of course you can't when you have a

15  contract, but if you want to, then let's look at the

16  definition of "change of control," which is, again, in this

17  binder.  And it's -- "change of control means," blah, blah,

18  or subheading 2, "a merger or recapitalization or other sale

19  by the company or the IPO corporation, as the case may be,

20  or related entity or any of its affiliates, to a person that

21  results in any person or group of persons acting in concert,

22  own more of the equity interests of the company," that's

23  Oncor, (or any resulting entity after a merger) than a

24  relative related entity."  Isn't it painfully obvious that

25  the parenthesis, "any resulting entity of a merger" means

1    any resulting entity of a merger of the company, Oncor?

2    It's the immediately preceding word.  So it's all about

3    Oncor.  That's what this whole deal is about.

4            One more point.  They have to own more than a

5    related entity.  The definition of a related entity means

6    that initial member, that's Oncor Holdings, or any of its

7    affiliates, current or future, that directly holds a

8    membership interest in the company, that's Oncor, or the IPO

9    corporation.  Oncor Holdings, or any of its affiliates, are

10   never going to hold -- directly hold any membership interest

11   in the IPO corporation.  So that related entity argument

12   doesn't work either.  So there is no change in control.

13           They say, well, if you look at the drag --

14           THE COURT:  Look, I know we're interpreting a

15   contract --

16           MR. ZIMMERMAN:  Yes.

17           THE COURT:  -- and I know we have to follow what

18   the contract says, but only a lawyer could argue there's no

19   change of control in this transaction.

20           MR. ZIMMERMAN:  At what -- which -- what level?

21           THE COURT:  Well, let's look at the company.  The

22   equity is out.

23           MR. ZIMMERMAN:  The company is Oncor.

24           THE COURT:  No, the company is EFH.

25           MR. ZIMMERMAN:  Yes.

```
 1            THE COURT:  There's a huge change of control of
 2    EFH.  The equity sponsors are gone.
 3            MR. ZIMMERMAN:  The defin --
 4            THE COURT:  The new investors are going to own
 5    this company.  Period.
 6            MR. ZIMMERMAN:  Let's go back.
 7            THE COURT:  No, no, no, I -- you're going to want
 8    to talk to me about technicalities.  I'm talking about
 9    practical.
10            MR. ZIMMERMAN:  Oh, no, no.  I'm just talking
11    about one thing --
12            THE COURT:  There's a change of control of this
13    Debtor.
14            MR. ZIMMERMAN:  The definition of change -- the
15    definition of "company" is Oncor, not EFH.
16            THE COURT:  You don't disagree with me that the
17    old equity of EFH will no longer have an indirect ownership
18    interest in Oncor?
19            MR. ZIMMERMAN:  I'm -- I'm not -- I'm not --
20            THE COURT:  You don't disagree with me that the
21    investors at OV1 will have an indirect, controlling interest
22    in Oncor?
23            MR. ZIMMERMAN:  Yes.
24            THE COURT:  Okay.  I understand the technical
25    arguments you're making, but let's get back to the
```

1    fundamentals.  That's what's happening.

2              MR. ZIMMERMAN:  But -- yes, but --

3              THE COURT:  And you don't dispute with me that

4    you're getting your IRR.  The minute you do dispute with me,

5    whether you're getting your IRR --

6              MR. ZIMMERMAN:  Absolutely.  No, but -- but --

7    here's what I don't dispute --

8              THE COURT:  So, what is it that you're not getting

9    that you bargained for?

10             MR. ZIMMERMAN:  We're not getting three things.

11   We're not getting the right to participate under 3.7 in the

12   IPO by exchanging, at the parent level, their equity.  We're

13   not getting -- or if TTI does it, we're not getting the LLC

14   units with the same governance rights.  We're not getting

15   the opportunity -- and we're not -- that's what it is.

16   We're not getting the opportunity to participate in the IPO,

17   which then would allow us, after we're dragged properly, to

18   get the non-taxable exit scenario that we bargained for,

19   just like they get the non-taxable scenario they bargained

20   for.

21             THE COURT:  Mm hmm.

22             MR. ZIMMERMAN:  That's what we bargained for and

23   that's -- we're not getting any of that.

24             I'll be very short on the -- whether EFH is a

25   member, because I think -- I think I agree with what was

1    said this morning.  What was said this morning is what EFH -

2    - if EFH were a member, it leads to an absurd result,

3    because each member has to get the same consideration.  Why

4    would anybody pay Oncor Holdings and EFH?  Why would you pay

5    twice to get the LLC units?  I couldn't agree more.

6            That's why EFH can't be a member because if they

7    are a member, it leads to that absurd result.  So their

8    argument actually is dead right.  So EFH is not a member.

9    Plus for all other reasons we said in our brief that we

10   don't have to reiterate, but that simple truth, that each

11   member has to get the same consideration, if EFH is a

12   member, then the buyer has to pay EFH for the units, and

13   Oncor holdings.  That can't be right.  They said it, and we

14   agree with that, so it makes no commercial sense for EFH to

15   be considered a member.

16           Failure to cooperate, and I'll be very brief on

17   this.  As I said before, the duty to cooperate exists if

18   there's an IPO conversion.  IPO conversion is defined as

19   steps taken by the Oncor board, they haven't taken any, so

20   there's no IPO conversion, no duty to cooperate.

21           They said there were defining actions with failure

22   to cooperate.  They said in their papers, we made statements

23   to PUC about our commitment to remain invested in Oncor.

24   That last conversations with PUC was before they even

25   entered into the merger agreement, so there couldn't have

1    been a duty to cooperate.  There was no merger agreement.

2           They -- you heard this morning, they actually met

3    and conversed with NextEra on, I think, October 15, and that

4    was the subject of your order to have a second deposition,

5    and that's true.  But the deposition, which is undisputed,

6    at that October 15th -- that's the only meeting with

7    NextEra, post-receipt of the offer to purchase.

8           What TTI's representative told NextEra is, quote,

9    "We do not support putting forward any competing proposal at

10   this time."  That's the Evington second deposition you

11   ordered at Pages 97 to 98, in Tab 13.

12          And the last point, TTI abstained from a vote at

13   the Oncor board in connection with the Oncor letter

14   agreement.  That was more than a week before the duty to

15   cooperate was triggered, and a month before they submitted a

16   proposed IPO conversion plan, so that doesn't -- and in any

17   event, the Oncor board passed that resolution, so there's no

18   downtime.

19          Last one, let me briefly talk about the extrinsic

20   evidence.  And again, we agree with their underlying premise

21   that you don't need to look at the extrinsic evidence, but

22   in the event you do:

23          The original term sheet, and this all goes to the

24   understanding of the parties.  The original term sheet,

25   which is in your binder, it's -- hey, guys which is it?

```
 1              MAN:   Tab 2.

 2              MR. ZIMMERMAN:   Tab 2, thanks.  There's the

 3     indicative bid instructions that were sent to TTI, and if

 4     you look at -- and it's if you look at Page 11, it certainly

 5     talks about tag and drag but the -- in the highlighted

 6     portion, it talks about exchange rights, and it was

 7     contemplated from day one, that in the event of an IPO, that

 8     they would -- TTI would be able to exchange into that IPO

 9     and participate.  And that was confirmed in the contract in

10     Section 3.7, which I read before.

11              Second, on the parties' intent, and you heard some

12     testimony about the custom and usage affidavit, here's the

13     only reason we put it in.  They were asked, then -- during -

14     - in the depositions, we asked EFH whether they understood

15     that Borealis and GIC wanted a broad tag and as narrow drag

16     as possible.  And the testimony from Mr. Horton was, I don't

17     know -- Page 94, "I don't know if they wanted most narrow.

18     I know they are sophisticated buyers, and I know they do a

19     lot of deals.  I know they know what is customary in the

20     market."  So, they knew that GIC and Borealis knew what was

21     customary in the market in these kinds of deals and in drags

22     and tags.

23              And so, knowing that, the custom in the market is,

24     that tags and drags are typically at the horizontal level.

25     If you want it at the vertical level, upstairs equity, you
```

1    have to have very clear language explaining that.  Now, it's

2    true, he said there is no magic language.  That's -- we

3    agree with that, but the fact is, they already know what

4    that language is because we -- because we went through it

5    before.  It's the difference in the tag 3.2 is the language

6    you would use if you wanted to get out of the custom and

7    usage.  That was the only relevance of that testimony

8    because they knew our people understood what the custom and

9    usage is because they do these deals all the time.

10             Their GIC committee notes, which they cited, that

11   the tag and drag rights applied to transfers of interest,

12   including at the EFH level.  What those notes say, which is

13   also in the binder, Tab 4, I believe, it's on the second

14   page, and it's the committee meeting at GIC and there's a

15   name that I can't pronounce inquired if GIG would be stuck

16   with Oncor if the sponsors choose to exit by listing just

17   the holding company, EFH.  Asked E. Stewart Baldwin of the

18   deponent, answered that the tag and drag rights applied to

19   transfers of interest in Oncor and EFH, so GIG could also

20   exit at this time, and a structure has been put in place to

21   facilitate this.  That structure was both in the letter --

22   in the bid instructions section I showed you, the ability to

23   participate in the IPO, and 3.7, which is the same thing,

24   the ability to participate in the IPO, by converting it to

25   IPO units.

1            In addition, as far as Mr. Baldwin goes, they say

2     there's no contemporaneous evidence that ever -- he now says

3     that his understanding was they would be able to participate

4     in the IPO, but there's no contemporaneous evidence of that

5     in the record, nor contemporaneous notes, which he took

6     during his early 2008 discussions with the sponsors of EFH,

7     and those notes are in the binder as well.  That's Tab 3,

8     and the page we highlighted, it's a little hard to read but

9     his handwriting isn't great, it says, Up REIT, umbrella

10    partnership REIT, can IPO a vehicle that owns a stake in LLC

11    and with right to switch into that added structure,

12    "swapping right," close quote.  That's the same thing we've

13    been talking about, the right to participate in the IPO, and

14    that's contemporaneous evidence.

15            As far as the ten percent IRR, whether -- whatever

16    the price is, at the end of the day, the one thing -- we

17    don't disagree with one thing.  If it turns out at the end

18    of the day, your ruling is such that it's triggered and you

19    -- we an then figure out and you'll figure out what the ten

20    percent IRR is and you would order that, that's off the

21    table.  That's obviously -- that's completely legitimate.

22    If they hit the ten percent IRR, they hit the ten percent

23    IRR.

24            Last point.  When you try to exercise a drag, the

25    law's pretty clear, and we cite the Halpin against Smith

1    case by Vice Chancellor Glasscock in Delaware, you have to

2    literally comply with the trigger.  And in that case, it's

3    interesting.  There was a provision that said if the company

4    proposes to enter into a merger, or an acquisition, they can

5    drag the vote.  They can force the minority shareholder to

6    vote for the deal by giving you notice and that's it.

7           Well, they did a merger, they didn't need the vote

8    because they got 90 percent of the people -- shareholders to

9    agree to it, so they did it by written consent.  And then

10   they said, okay, we want to trigger the vote because when

11   you -- when they triggered the drag, it eliminates the

12   appraisal right.  And the Court said, no.  Maybe the vote

13   was in the bag anyway, but you structured this in a way --

14   had -- you gave them notice after the deal was done.  Had

15   you given them notice be -- and that's not the drag.  The

16   drag says it has to be notice of a proposed transaction.

17          So, the fact that you may have had the right to

18   drag them, but you didn't do it the right way, and it may be

19   meaningless, but they have the right to have notice of a

20   vote before the transaction.  You didn't do it, and

21   therefore, drag isn't triggered, they have the right of

22   appraisal.  So, newer reading of the contract for purposes

23   of triggering drag is what Delaware law mandates.

24          With that, Judge, unless you have any questions,

25   I'd like to just reserve a rebuttal opportunity.

1              MR. MCKANE:  For the record, Your Honor, Mark

2      McKane of Kirkland & Ellis on behalf of the Debtors.

3              I'm going to be brief, but there are a couple

4      things I just wanted to respond to, both from Mr. Zimmerman,

5      but first, Your Honor, you asked me a question about the

6      direct equity, you know, and in regard to the change of

7      control, and candidly, I don't think I did a very good job

8      of explaining it.  So, the best way that I think I can do it

9      is if you went back to the slides 41(a) and B.

10             And I apologize, I've misplaced my clicker, so we

11      have to do it the old way.

12             I laid out, on the top page, 41(a), you know,

13      focusing on EFH's merger with OV1, and I laid out the

14      definition, and then I applied it in two different ways in

15      41(b), and I had a top version where we used the -- you

16      know, one way to do it, and we did a bottom way, using the

17      definitions, and when you were asking about owning more than

18      the equity interest of the company, and you were -- your

19      concern was, did that have to be the direct equity of the

20      company, the key provision in the way we give meaning to the

21      merger of EFH with OV1 is that embedded parenthetical that

22      follows, "(or any resulting entity after the merger)".  And

23      so, when you -- instead of going and evaluating the equity

24      interest of the company, if you were to evaluate the equity

25      interest of the resulting entity after the merger, you can

1   give -- that's how you give alternative meaning to the

2   change of control.  That is what we did in the lower of the

3   two applications.

4           And so, whether -- you know, we think dire --

5   equity interest is broad enough to mean equity interest

6   direct or indirect, based on the overall meaning of 3.3, but

7   if you wanted to say direct equity interest, it would read

8   as follows, using the actual names of the entities instead

9   of the definitions.  It would be: A change of control is a

10  merger, sub 2(i), by, instead of the company or the IPO or

11  related entity, you could use EFH, it's a merger by EFH to

12  OV1 that results in the group, the investors, owning more of

13  the equity interests of OV1 than Oncor Holdings and TEF.

14  That absolutely conforms with the definition of the change

15  of control, and absolutely conforms with this transaction.

16          So, you know, there should be no question in your

17  mind that the, what we all know is true, this is the change

18  of control, is -- the meaning -- we can give meaning to that

19  through the IRA, through the change of control definition in

20  41(a) and at a minimum, the 41(b) definition.

21          THE COURT:  All right.  Having said that, stick

22  with me here --

23          MR. MCKANE:  Yeah.

24          THE COURT:  -- because either -- even under that

25  reading, it then says, all right so OV1 is -- we're -- any

1    resulting entity after a merger, OV1 --

2              MR. MCKANE:  Correct.

3              THE COURT:  -- then the relevant, related entity -

4    -

5              MR. MCKANE:  Right.

6              THE COURT:  -- and its affiliates --

7              MR. MCKANE:  Right.

8              THE COURT:  -- and for relevant related entity,

9    you have Oncor Holdings --

10             MR. MCKANE:  Correct.

11             THE COURT:  -- but is Oncor Holdings a related

12   entity as it's defined?

13             MR. MCKANE:  It is and if you go -- and using the

14   hard copy, if you go forward one page, 41 -- slide 40, and

15   you look at the definition of related entity that we have

16   there at the bottom of the page, related entity means the

17   initial member or any of its current affiliates of the

18   initial member -- initial members, Oncor Holdings.

19             THE COURT:  Okay.

20             MR. MCKANE:  And I apologize for not being more

21   precise the first time around.  All right.  Your Honor,

22   again I think it's helpful to step back and when you step

23   back, what do we have here, we do have a confirmed plan that

24   provides for a conversion into a REIT where there's an IPO

25   and that is an IPO corporation, that's OV1, where there's

1    going to be an issuing of IPO shares.  EFH is going to

2    discharge its old equity and through the merger of the

3    raising of equity from OV1 and the merger of that company

4    with EFH, pay all of its creditors in full and either pay

5    the amount directly owed for the acquisition of the LLC

6    interests or satisfy the granting of IPO interest consistent

7    with what happens after a change of control.

8              That's what this transaction does and that's how I

9    think we've satisfied the drag rights in both respects --

10   either through an acquisition of the LLC units or the IPO

11   units.

12             The fact that the IPO interest doesn't exist now,

13   that's not surprising.  As Mr. Zimmerman just described at

14   the end of his argument, you have to give notice in advance.

15   This agreement says no later than 10 -- than 20 days.

16             We have two components of our transaction and, you

17   know, we are going to be creating the IPO units as part of

18   our overall efforts to raise the money, to pay off the

19   creditors and discharge the old equity and then merge the

20   companies.  That's the transaction in a nutshell.

21             Your Honor, if I understand Mr. Zimmerman's

22   argument, you know, he really wanted to through and say

23   look, the best thing you have, EFH, the best argument you've

24   got is 32H and that somehow that kind of gives meaning and

25   that's a weird -- that's a crazy way to run a railroad.

1    Right, if you wanted a drag right, you don't do it through

2    an exception in the tag right, you do it in the drag rights

3    section.

4              Well, and that all presupposes his opening

5    argument, which is that we didn't do it in 33A1 and we

6    believe we did. 33A1, to give the proper -- the commercially

7    reasonable meaning of 33A1 is a triggering element where the

8    offer comes in at EFH and that's what we have.

9              So much of Mr. Zimmerman's argument is focused on

10   the notion that somehow, you know, the difference from

11   transfer and purchase cannot be explained and I think in our

12   opening presentation we walked through how a third-party

13   can't give an offer to transfer, right?  A transfer is an

14   act that EFH makes and therefore an offer comes in, it's an

15   offer to acquire from the outside, the third-party, that is

16   the triggering step of the if/and structure of the drag

17   rights.

18             The drag rights are laid out in 33(a_ just like

19   the tag rights are laid out in 33 -- sorry, 32(h).  What Mr.

20   Zimmerman now highlights in 32(h) it's just a mechanism for

21   a particular type of tag, not the scope of the drag.  It's

22   just a mechanism by which you can do a certain type of tag.

23             But what he never really gets passed is, you know,

24   if Mr. Zimmerman really wants to focus on 32(h) and want to

25   give all this center there, what he says is well, even that

1    doesn't help us because the only way that would work in his

2    mind, you know, is through the appraisals rights in 33(f).

3    And our rejoinder is if there was supposed to be a carve out

4    in 32(h) for the appraisal rights, would be this vertical

5    structure, it would say other than 33(f).  It doesn't, it

6    says 33, which reaffirms the broader interpretation of the

7    drag that we understood it to be.

8              Now, one thing that I, you know, I think Mr.

9    Zimmerman doesn't appreciate is he says well, wait, it's not

10   absolute.  You know, 33(a)(1), this offer to purchase that

11   comes into EFH, it's not absurd because well heck, EFH

12   wholly owns Oncor Holdings, they can just move it.

13             Those of us who live with the case, we are very

14   aware of that ring-fence.  You have heard time immemorial

15   there is very little that EFH can do, we removed governance

16   practically, with regards to Oncor Holdings, because it's

17   inside the ring-fence.

18             I can't just -- EFH just can't get an offer to

19   come in and move it and the ring-fence existed before the

20   IRA was executed.  It was a known entity.  So this notion

21   that somehow we wrote in 33(a)(1) because EFH thought it

22   might have to move Oncor Holdings around is inconsistent

23   with the context in which the IRA was created.

24             With regard to the IPO conversion, you know, Mr.

25   Zimmerman wants to focus on well, there's no IPO conversion

1    because you've got to look at all the sections that, you

2    know, it's a defined term in section -- in a sense too and

3    we agree it's a defined term.

4          But it doesn't make sense that you must have all

5    those acts consummated before you actually have an IPO

6    conversion.  That doesn't work for multiple reasons.  One,

7    the definition of an IPO conversion that's laid out in

8    Section 37(a) is an including structure.  Right, you know

9    them multiple times.  And when you look at what's laid out

10   in the IPO conversion, you know, the IPO conversion, it

11   identifies a serious of presteps that you may take or you

12   may not take depending on what you're going to do with your

13   IPO and some of them just don't work.

14          I mean, if you look at -- I'll give you an

15   example, number four.  If you look at 37(a) and you look at

16   number four, it says transferring or domesticating or

17   otherwise moving the company to another jurisdiction.  We're

18   not doing that.

19          So, how could we have an IPO -- So we would have

20   to take all the steps, these are necessary steps to take

21   before you get an IPO conversion?  That doesn't work.

22   That's inconsistent with the including structure as well

23          I think, again, step back, being realistic and

24   practical, an IPO conversion is a process that we set up as

25   EFH.  We develop it.  The Oncor board may implement it and

1   any necessary preconditions, but once we send that IPO

2   conversion over and it qualifies, and this was, that process

3   starts.

4              THE COURT:  Let me interrupt you for a minute.

5              MR. MCKANE:  Sure.

6              THE COURT:  I asked Mr. Zimmerman, you know, what

7   is it that TTI bargained for that they're not getting.

8              MR. MCKANE:  Yeah.

9              THE COURT:  And he said three things and then he -

10  - maybe I misunderstood him, but he basically said three

11  times the right to participate in the topic going forward.

12             MR. MCKANE:  Right.

13             THE COURT:  Why isn't -- why is it that they don't

14  have this right to participate?  You know, why is it that

15  you're not -- depriving them of that bargain?

16             MR. MCKANE:  There's really -- this is the timing

17  issue.

18             THE COURT:  Okay.

19             MR. MCKANE:  This is the can I have a drag that

20  closes before, you know, days, moments, seconds before the

21  IPO conversion, right?  If we do an -- if we don't drag, if

22  you're still a member, right, you're not the initial member,

23  but if you're still a member at the time of the IPO

24  conversion --

25             THE COURT:  You get 20 percent.

1          MR. MCKANE:  -- you get your post-change of

2    control rights, right?  That's another -- that's a sub issue

3    where, you know, TTI doesn't like it, but in our proposal,

4    right, and we did it initially and then we modified it,

5    amended it -- in our proposal we say, you know what, if

6    you're still here you're right, you get your participation

7    rights and that's what we've offered them.  That's why as

8    exhibits I think 64, I held it up, it's the alternative LLC

9    agreement and that provides those rights.  So we're not

10   depriving them.  We're not.

11          Right, he doesn't like the fact that there's a

12   change of control and therefore he doesn't have as many

13   control rights under that agreement as before, but that's,

14   you know, that's an issue that he lost when he -- if you

15   rule that there's a change of control.

16          The other aspect of this, Your Honor, is frankly

17   you've got -- I think there's kind of a sub (indiscernible)

18   of well, what do you want me to do?  I'm not -- had no duty

19   to cooperate yet, I'm not cooperating.  Right?  One of the

20   reasons why we need him to cooperate is we need them to

21   comment on documents like that.  Like we have a whole slew

22   of corporate documents that we're getting no comments on,

23   right, as we try to move forward an IPO conversion and

24   that's the kind of thing that you would expect, you know,

25   when we are trying to implement an IPO we need done.  That's

1       why the duty to cooperate is so important.

2               Just a couple other points, Your Honor.

3               THE COURT:  I'm sorry, can you address -- I must

4       say, I struggled to follow it, but the argument that there

5       is tax consequences for TTI or TTI's members that aren't

6       being taken care of in the IRR?

7               MR. MCKANE:  This is a head scratcher, Your Honor.

8       This is hard, right, because I mean I struggle with this as

9       well.

10              As I understand what he's trying to say, right,

11      you know, it would be better for him if we took him out a

12      different way.  You know, we took him out at a different

13      level, okay?  The IRR's drag rights basically say I have to

14      hit the IRR of a post-tax 10 percent.  That may have

15      consequences at TTHC or Borealis or a GIC, but I hit my bid.

16              The way we understand what the TTI position is, is

17      I have to make it -- it's not really post-tax 10, I need it

18      post-tax 20 or post-tax 25 because by hitting the IRR and

19      taking me out at TTI there's a consequence downstream and I

20      can't control for that.  I didn't structure their

21      transaction.  They agreed to be taken out if I satisfy the

22      drag rights and I satisfy the 10 percent hurdle, basically

23      as we understand their argument, is now falling down to the

24      10 percent is not enough because it's not -- because there's

25      an embedded tax consequence once the money flows past TTI to

1    TTHC as it tries to get to the ultimate holders.

2            And Your Honor --

3            THE COURT:  All right, I'm going to back up again,

4    I'm sorry to keep interrupting you.

5            MR. MCKANE:  No, please.

6            THE COURT:  Because I don't think I understood

7    your answer to the previous question about what it is that -

8    - what's your answer to this argument that you're depriving

9    them with regard to the IPO.  So maybe you could say it

10   again.

11           MR. MCKANE:  Sure.

12           THE COURT:  And I apologize.  I'm doing my best.

13           MR. MCKANE:  I admit, I have the benefit of having

14   others here who may be able to do it better than I and so

15   before I defer to them I'll take another crack at it.

16           THE COURT:  Right.

17           MR. MCKANE:  Right?  What I understand Mr.

18   Zimmerman's argument to be is if you start an IPO conversion

19   process, I have a right to elect an alternative that may

20   benefit me when I take my IPO shares, right?  And I'm -- and

21   we are depriving him of the ability to make that exercise

22   because in the mid-stre -- you know, before we get to the

23   IPO shares, they're going to be gone.

24           THE COURT:  They're going to drag them, right.

25           MR. MCKANE:  They're gone, right?  We've given --

1    we've satisfied them another way.  We view it as

2    satisfaction.  They view that as being deprived, right?

3              So, their view is once I start an IPO process, you

4    can't drag me out.  Right, I have to go down the path and

5    you have to finish the IPO and, Your Honor, we just don't

6    see that in the contract anywhere.

7              THE COURT:  Okay.

8              MR. MCKANE:  If we don't drag him, we agree, he

9    gets his rights and those rights are, as we spell out in

10   that alternative LLC agreement.  And so the fact is on the

11   day of closing, right, we will take the proceeds of the IPO,

12   drag them out, then -- and then, you know, finish the

13   transaction and therefore he won't get those IPO shares

14   because he'll no longer be a member at that time.

15             THE COURT:  All right, I understand now.  Okay.

16             MR. MCKANE:  Your Honor, I think I have maybe one

17   other point and it goes to this notion -- well, there's two.

18   One, we've got some pretty arcane IPO structures being

19   proposed and trotted out a treatise from Jack Levine to

20   explain how it could be done.  I know my limits and what I

21   am told is, doesn't work.  It doesn't work for us, but more

22   importantly, that's not what we bargained for.  We didn't

23   bargain for a narrow sliver by which we could only do it one

24   of a thousand different ways and I think if you -- and this

25   is when you do go back, if necessary, go back to the

1    extrinsic evidence of what the negotiators said and frankly,

2    an exhibit that I thought is very compelling is Exhibit 2 of

3    Mr. Zimmerman's book.  This is the indicative bid

4    instructions.

5              Exhibit 2 is after all the labeled sections and if

6    you go to Bates 1971, page nine of 11, this is EFH

7    communicating out post-GE negotiations what do we want in

8    terms of our drag rights?  What are we telling the world

9    what our expectations are of our ability to do a drag?  And

10   it says, you know, prior to the date if EFH Corp. or a

11   transaction party proposes to sell equity interest in a

12   single transaction and then it goes down that EFH Corp. or

13   selling transacting party has a plug hole will be permitted

14   to drag equity investor in the same proportion as the

15   proposed sale by EFH Corp.  Right?

16             So, if you're, you know, setting aside arcane

17   treatise structures, there's no doubt that we want it and

18   what we got because they didn't change the drag 33(a).  We

19   wanted the ability of EFH Corp. to take them out.

20             And, Your Honor, with that I think I'll cede the

21   rest of my time to Mr. Morey.

22             MR. BECKWITH:  Your Honor, briefly, my name is Van

23   Beckwith for Ovation.  I think Mr. Morey and I want to have

24   a few words, very, very few words because you've been very

25   patient and we ceded most of our argument to Mr. McKane to

1    make it work as simply and efficiently for the Court.

2            But it really does all boil down to TTI wanting to

3    participate and this IPO corporation wishing they could

4    participate.  They either want a say in Oncor because they

5    love that 10 percent IRR hurdle and they love the tax

6    efficiency of it or they want to participate in the IPO.

7            And as we've explained in our briefs, TTI never

8    was guaranteed that right.  They never bargained for it.

9    They were never guaranteed that right.  They were never

10   entitled to an IPO uplift.

11           The IRA envisions a possible drag.  That drag can

12   be with or without an IPO and maybe that's why we are partly

13   lost in the briefing at times by TTI and that drag can be

14   separate and apart from that IPO.  It always can be separate

15   and apart from the IPO and it can be through this purchase

16   of these LLC units.

17           Imagine with me if there was no simultaneous IPO

18   here at all and instead there was an offer that was received

19   to purchase EFH's indirectly held LLC units.  TTI would have

20   no argument whatsoever.  All they would be able to do is say

21   was the IRR met?  We've heard that now conceded, and then

22   they would be dragged out.

23           Second, in the event that there is a simultaneous

24   IPO and drag, they have conversion rights, but then they can

25   be still immediately dragged.  And finally, their only

1    bargained for price protection was to receive the equivalent

2    post -- I'm sorry, per share value to EFH.  They're getting

3    that.  They're getting cash.

4            You properly asked what do they not receiving?

5    Well, they're actually and were they entitled to participate

6    in this IPO?  Well, they're actually receiving cash.  I

7    probably take a little bit of offense because I did take the

8    depositions and I heard in Mr. Zimmerman's argument, and I

9    know I shouldn't take offense because I'm a trial lawyer,

10   but he said that's what they bargained for and he was

11   referring to that's all they cared about.  That's what they

12   bargained for he said was this uplift, this ability to be

13   dragged above and they cite to this new treatise in their

14   reply brief.

15           Well, I took 1134 pages of deposition testimony

16   along with my partner Tom O'Brien and what we learned in

17   those 1134 pages of deposition we were very careful.  We had

18   New York law.  We knew exactly what they needed to say to be

19   able to introduce extrinsic evidence.  I asked the

20   witnesses, "Do you remember?  Can you tell me any quotes?

21   Were you there?  Where was the meeting?"  I don't recall.  I

22   do not recall.  I cannot remember.

23           Well, what about the language?  I don't see any

24   changes to Section 3.3(a).  Did you make any changes?  No, I

25   don't think we did.  Mr. Baldwin, Mr. Zucchert, Mr. Evanden.

1    We then reviewed the documents in spades and we saw from the

2    very first 3.3(a) to the very end 3.3(a), only one major

3    change and that was the IRR hurdle post-tax.

4           They wanted to make sure that they got their 10

5    percent post-tax over these last eight years, this 80

6    percent year over year return.  That's what they wanted.

7    And if they got that, then they are subject to be dragged

8    and that is what Ovation is asking for.

9           Their documents' deal breaker, it was not my term,

10   it's certainly a term I'm familiar with, it's a term that

11   was written by them in their documents.  And they also

12   coined it as your documents, meaning EFH's documents, our

13   price, meaning TTI.  That's in the record before Your Honor.

14          So, we showed them the IRR.  A tax efficient 10

15   percent return is what they would looking for, it's what

16   they get.  And the reason I guess I struggle with the phrase

17   that's what they bargained for is because I actually took

18   Mr. Baldwin's deposition and I was looking at these minutes

19   and to put those minutes in context they are written to the

20   president of the company in Singapore.  They are written to

21   the vice president, these members of this risk committee,

22   Mr. Ng and Mr. Te and Mr. Ng was asking the very question

23   that's being presented to this Court.

24          He was asking -- he inquired if we would be stuck

25   with Oncor if the sponsors chose to exit by listing just the

1    holding company EFH.  He was worried.  He didn't want to be

2    stuck with Oncor if there was a transaction above them, this

3    uplift transaction, this transaction -- this vertical

4    transaction.

5            And I asked Mr. Baldwin, and because the minutes

6    reflect this and then he ran from the minutes.  That's all

7    he could do.  That was all he was left with.  He said that

8    the sponsors might IPO the holding company EFH.  So I asked

9    him, I pushed on him, I said so at least your state of mind

10   right then right there April 4, 2008, sir, was that one

11   possibility was that the sponsors might be able to IPO the

12   holding company EFH.  Correct?  That's what I said, yes.  I

13   would have said yeah.

14           Question: EFH sits above Oncor in the corporate

15   structure, doesn't it?  Answer: It does.  Question: EFH has

16   an indirect interest in Oncor, does it not?  It does.  An

17   IPO of EFH would not be a direct IPO of Oncor, would it?  It

18   would not.

19           And you know why I was asking those questions.  I

20   was asking him because it comes directly from 3.3(a)i.  So,

21   Your Honor, on behalf of Ovation we do ask that you would

22   grant Summary Judgment.  I believe Mr. Lauria has a few

23   comments he might want to make.

24           THE COURT:  All right.  Mr. Lauria?

25           MR. LAURIA:  Good afternoon, Your Honor.  Tom

1    Lauria with White & Case also for OV1.

2            To be or not to be, that is the question.  Whether

3    'this nobler in the mind to suffer the slings and arrows of

4    outrageous fortune or take arms against a sea of troubles

5    and by opposing end them.

6            Now, as much as I would like to recite the whole

7    soliloquy right here on the record just to prove to Mr.

8    Shore in abstention that I can, I will not do that.

9            The fact of the matter is everybody understands

10   that that soliloquy, no matter how complex and how many

11   words are used about one simple idea, should he kill himself

12   or should he live.

13           Same is true with this contract.  It's got a lot

14   of words, it's very complicated, but it boils down to one

15   issue -- when can TTI be taken out?  When can TTI demand to

16   be taken out?  And it all comes down, I think as the Court

17   identified in its comments, to the issue of change of

18   control.

19           This was an economic negotiation between financial

20   parties.  There are no strategic owners of Oncor in this

21   dispute.  Let's not forget TTI is owned by two entities --

22   GIC and Borealis.  GIC is the investment arm for Singapore

23   and Borealis as I understand it does the same thing for

24   Canadian Pension.

25           Owning a partial interest in Oncor is not part of

1    a strategic plan for them to own and operate a business

2    enterprise.  The same is true for KKR, TPG and Goldman

3    Sachs.  They were financial investors in this business.

4    What they all negotiated for was how they can split up when

5    and if the time comes and it all tilts on change of control.

6           What did TTI negotiate for?  I think the record's

7    clear.  I think my colleagues have made the point.  It's a

8    10 percent after tax return.  A 10 percent after tax return.

9    That is a high hurdle.  It's great for Canada and Singapore.

10           What did TPG, Goldman Sachs and KKR negotiate for?

11   They negotiated for the ability to get out of this

12   investment without having to incur a massive, multi-billion

13   dollar tax liability to do so.

14           Now, we've been told by counsel at the podium that

15   there's another way to do it.  I don't know if there's

16   another way to do it.  I don't think there's any compelling

17   or credible evidence in the record that there's another way

18   to do it.

19           What I do know, what I do know is that teams of

20   lawyers study how to execute this transaction and if there

21   was a way to get to the exercising the drag right without

22   this litigation, we would have found it.

23           We discussed with TTI and its advisors numerous

24   different ways to get out and they said no, no, no, no, no.

25   So, we came up with the structure that's on the table.

1    Whether or not there's another way to do it, whether or not

2    it could have avoided the taxes I don't know.  But I can

3    tell you people looked high and low, qualified people, and

4    they didn't find it.

5            So what's TTI really saying?  They're saying the

6    only way you can drag us is if you break up Oncor Holdings

7    from Oncor.  Now we know that doing that results in a

8    massive tax liability.  So I think what TTI is really saying

9    is we've now decided after the fact, because we have a

10   complex agreement, that we don't want just a 10 percent IRR

11   until you drag us, we want it in perpetuity.  We don't ever

12   want to be able to be taken out of this transaction.  I

13   think that's really what they're saying here and that's not

14   what the agreement says.

15           There is a change of control occurring here.  I

16   don't think it's within dispute.  The fact of the matter is

17   the people who control Oncor today when this transaction

18   consummates will not control Oncor.  And there's a reason

19   that the language works the way Mr. McKane described it in

20   slide 42b, the second formulation, because we all know that

21   at the end of the day change of control is at the top.

22           Change of control may or may not occur at any

23   intermediate level.  What they've got to do is look up

24   through all the entities and look at the top.  Who's

25   electing the board?  And the people who elect the board

1    today are not going to be the people who elect the board

2    after this transaction closes.

3            So what's missing from TTI's argument?  They

4    haven't been able to point to any benefit or business

5    purpose to forcing a separation of Oncor from Oncor

6    Holdings.  What they say is today well, we'd like to be able

7    to participate in the IPO.  But the fact of the matter is

8    the consideration being paid to EFH in this transaction is

9    cash and that's what they get if they're dragged -- cash.

10           They are not entitled to different consideration

11   than what EFH gets.  They're entitled to cash if we drag

12   them.

13           So, Your Honor, I know there's a lot here.  There

14   have been a lot of words said in all the briefs.  The

15   contract is a complex contract, but the bottom line, I think

16   it's a simple principle, is there a change of control.  Are

17   they getting the right consideration, and if so then we have

18   the right to drag.  Thank you.

19           THE COURT:  Thank you, Mr. Lauria.  Mr. Zimmerman?

20           MR. ZIMMERMAN:  Judge, can we have a two minute --

21   ?

22           THE COURT:  Yes, we'll take a short recess.

23        (Recess)

24           THE COURT:  Please be seated.

25           MR. ZIMMERMAN:  Thank you for the recess, Your

1    Honor.

2             THE COURT:  You're welcome.

3             MR. ZIMMERMAN:  Just a few points, and I will sit

4    down.  First of all, it is not the case -- I tried to be

5    clear before, so let me just make it clear.  This is not a

6    situation where TTI "wants to stay in forever".  There's a

7    way to drag us.  And in fact, I believe MR. Shore said if

8    there's an IPO, as quickly as it goes, may get converted,

9    then get dragged.  You can do that.  We're not saying we

10   have to stay in forever.  You convert us, the way I talked

11   about before, under the option of 37D, and then you can drag

12   us, if you've met the other requirements.

13            So this is not -- would we like to stay forever?

14   Doesn't matter.  We are telling you, that's not our

15   litigation motion.  You absolutely can drag us if we're

16   converted first, and all the other steps in that.  Second,

17   at the risk of you beating me up, because I know you don't

18   want me to do -- I just want to touch the change of control

19   one more time.

20            THE COURT:  No, no, that's fine.

21            MR. ZIMMERMAN:  All right.  Here's what I just

22   heard.  There's obviously going to be change of control,

23   because the people who control Oncor today, the equity on

24   top, KKR and TPG, will not control Oncor after the

25   transaction.  Well, now we're back to Oncor being the

1    relevant company to look at.  So, but here's the issue.

2    Those equity holders do not control Oncor today.  That's the

3    whole point of the ring fence.  They can't.  Oncor has an

4    independent board, a majority of independent directors.

5    Oncor Holdings picks the directors.  Oncor Holdings controls

6    Oncor.  That's the ring-fence, precisely to avoid the people

7    on top from controlling Oncor.  And that's going to stay.

8    The ring-fence doesn't disappear.

9            And that goes to the final point:  that being the

10   case, that being the entire purpose of getting TTI to begin

11   with, because of the ring fence, why would a change of

12   control at the top level strip Oncor's members of their

13   rights in Oncor?  That makes no sense.  Again, you have the

14   ring fence.  And in fact, there's a provision in Section 3-3

15   that says if you otherwise have a change of control, but for

16   whatever reason you can't hit the IRR hurdle, our rights

17   change.  Our rights chance because of Schedule D, D-I-R-E,

18   that lists about 20 to 30 rights we have.  That's if there's

19   a change of control at our level, but they can't get the

20   IRR.  We still get those rights, some rights, 20 rights,

21   which we're not getting now.

22           Again, if that's the case, why would a change of

23   control up above the ring fence, which is where we didn't

24   invest to begin with have the effect of stripping our

25   rights?  Doesn't make any sense.  Bottom line is, we're not

1    seeking to stay in forever.  We're a drag you can drag.  We

2    get converted, we get that option that I talked about, and

3    then you can drag us.  Thank you.

4              THE COURT:  You're welcome.  Any final words on

5    this motion?  All right.

6              MR. MCKANE:  No, Your Honor.

7              THE COURT:  Okay.  Let's turn to the core and non-

8    core motion, and that's Mr. Zimmerman's motion.

9              MR. ZIMMERMAN:  If I may, because I'm going to

10   pass out, my partner Mark McDermott, his admission pro hoc

11   is pending before the Court, he's going to handle this.

12             THE COURT:  Okay.  Very good, thank you.  And

13   don't pass out, we don't like that.  MR. McDermott?

14             MR. MCDERMOTT:  For the record, Mark McDermott, on

15   behalf of TTI.  Your Honor, I understand that at a

16   scheduling conference a few weeks ago you'd advised the

17   parties that you had already read these papers and didn't

18   need really extended argument on it.  In light of that, and

19   given the hour of the day, I'm going to keep my comments

20   very brief, and in particular I'm not going to talk about

21   all the cases that the parties cited.  If Your Honor has any

22   questions about those, be happy to answer them, and I'll

23   reserve, if EFH or Ovation wants to talk about those, to

24   address them.

25             I think that in a very brief nutshell, the

1    disposition of this motion comes down to four facts that are

2    not disputed.  We have two complaints that have been filed

3    here, one by Debtor, one by Ovation.  Those complaints are

4    basically identical.  Each contains a single claim, one for

5    breach of contract, and a specific performance.  That's

6    Point 1.  Point 2, neither complaint asserts any right or

7    cause of action under the bankruptcy code.  They're based

8    solely on New York Contract Law.  Number 3, my client is not

9    a creditor in this case.  We have not filed a proof of claim

10   here.  And finally, Number 4, this whole dispute was

11   referenced in the plan that Your Honor confirmed a few

12   months ago as "the minority buyout", and this is what the

13   plan says about the minority buyout on Page 70.

14   "Implementation and/or consummation of the minority buyout

15   shall not be a condition of confirmation or consummation."

16           Let's just put off to one side for a second

17   whether statutorily this breach of contract claim can be

18   considered core.  I'll address that in just a second.  But

19   what really matters was this is a breach of contract action,

20   and in only six briefs that were filed here, there is not

21   one single cite to the bankruptcy code, or a bankruptcy

22   case, for subject to the point of bankruptcy law.  And I

23   think, as Your Honor recognized in Delta Financial, quoting

24   Judge Walsh, quoting Northern Pipeline, at its root, this

25   proceeding is a plain breach of contract claim governed by

1   state law.

2          Pre-petition state law contract claims are

3   precisely the type of claim that the Supreme Court could not

4   be decided by non-Article 3 judges in Northern Pipeline.  I

5   think that the analysis actually could end right there, but

6   in addition to that, the plaintiffs can't even establish the

7   antecedent requirements that their complaints in fact,

8   raised core matters.  And as Your Honor knows, the Third

9   Circuit set out, I guess a two-part test on whether or not

10  something's core.  You either look at the list of the items

11  in Section 157, Title 28.  And then on top of that, the

12  proceeding has to involve a substantive right, created by

13  the code, or could arise only in Chapter 11, regardless of

14  the particular factual circumstances.

15         I'm very aware of Your Honor's fairly extensive

16  writings on these subjects, and that you've said that it's

17  possible that Stern may have overruled that second test

18  there, but at least at a minimum it's actually helpful

19  guidance, figuring out if something might be core that

20  doesn't otherwise list it in the statute.  I don't care

21  which way you want to look at that.  I don't know that it

22  matters here, because I can't see how there is any way to

23  interpret this breach of contract claim as one involving a

24  substantive right created by the code, or that this drag

25  action could literally have arisen only in bankruptcy.

1           But beyond that, the plaintiffs point to only

2    three of the statutory core actions that could possibly be

3    implicated here, and two of them are the catch-all

4    categories -- Sub A, matters concerning administration of

5    the estate, and Sub O, other proceedings affecting

6    adjustment of the Debtor-creditor relationships.  The Courts

7    have said that those catch-all categories are actually

8    supposed to be interpreted fairly narrowly.  If you had a

9    breach of contract action within their scope, respectfully,

10   I think that's not interpreting that narrowly.

11          And in fact, the Third Circuit spoke directly to

12   this in Beard v. Brownstein, which both sides cite in the

13   papers, and the Court said, "in the Ninth Circuit, estate

14   law contract claims, which do not fall within the specific

15   categories of Court proceedings are non-core, even if they

16   arguably fall within the two catch-all provisions, for to

17   hold otherwise would allow the Bankruptcy Court to enter

18   final judgments that this Court has held unconstitutional."

19   And the Third Circuit said something to a similar effect,

20   nearly identically in the In Re Meyertech court case, which,

21   again, was also cited by all parties in their papers.

22          That leaves only one other statutory head that

23   they cite in their papers, Subsection B regarding allowance

24   or disallowance of claims against the estate.  As I said, we

25   haven't filed a proof of claim here.  We haven't filed any

1    kind of counter-claim back against them.  The only thing

2    they point to was they had a boilerplate, with all due

3    respect.  And I believe in our answer about attorneys' fees,

4    but what they cite in support of their argument, that that's

5    somehow enough to create core jurisdiction, our case is

6    dealing with Bankruptcy Court jurisdiction over fee

7    applications.  And with all due respect, we're a very long

8    ways from fee applications here.  And what's more, the Third

9    Circuit in (indiscernible) also made clear that a non-core

10   claim by an estate isn't made core, even if the defendant

11   files a counter-claim that is core.

12          Last point I'll make, and then I'll be quite for

13   the day, hopefully.  They seem to suggest, without really

14   citing anything, or developing the argument, that maybe we

15   somehow implied they consented to enter a final order.  I'm

16   not really sure, but what I will say is this:  we were

17   consistent, from the get-go, in preserving our rights on

18   this score, in accordance with Rule 7012, we could say in

19   our answer that we didn't consent to enter a final judgment.

20          We said the same thing in a motion to dismiss, and

21   I believe we filed this motion mid-January.  It was two or

22   three weeks after the Court heard argument on the motion to

23   dismiss.  So I don't see how on this record, it can fairly

24   be said that we somehow consented, certainly not as

25   contemplated by the Supreme Court's decision in Wellness.

1   So unless the Court has any questions about anything else,

2   or any of the decisions that were cited in the papers, I'll

3   sit down for now.

4           THE COURT:  No, I don't have any questions.

5           MR. MCDERMOTT:  Thank you, Your Honor.

6           THE COURT:  Mr. McKane?

7           MR. MCKANE:  Back again, Your Honor.  And while

8   there's a healthy pool for me to quote Shakespeare, I am not

9   going to go there.  Your Honor, we can lay out our argument

10  here.  I understand where you are, now that you've thought

11  about these issues at length.

12          This is not a run-of-the-mill breach of contract

13  case.  The IPO conversion is a condition of the merger

14  agreement and the plan.  That's Section 7.2(j) of the merger

15  agreement.  And EFH has an obligation to bring the

16  enforcement action as part of the merger agreement as well.

17          And again, it's one of those -- let's step back

18  for a second.  A key economic condition of the plan is

19  knowing what we have to do with the rights offering.  We

20  need to know whether we have the right to drag, is critical

21  to the plan, directly impacts the rights offering --

22          THE COURT:  Well, it affects -- it's not a

23  condition to the plan.  But it affects the likelihood of

24  consummation.  Is that a way to put it?

25          MR. MCKANE:  I think that's absolutely accurate.

1            THE COURT:  All right.  Is that enough?

2            MR. MCKANE:  And that's the great debate.  And let

3    me just, cards on the table, Your Honor.  We know this is a

4    very close question, and we know that there is a couple

5    cases that talk about inextricably intertwined may be

6    enough, and may not.  And we know where this would fall,

7    that this would be we essentially we are enforcing a

8    property right that we have, as EFH, based on a contract,

9    right?  Then is that enough, when that is built into the

10   plan at this level?  Ultimately, that's where our argument

11   falls down to, with a couple caveats I want to flag.  And we

12   recognize, it's a very close call.

13           So let me just flag some things for Your Honor,

14   for your own consideration.  We can appreciate how you could

15   come out and conclude that the better course may be a report

16   of recommendation.  And all we would ask is if you were to

17   go down that path, that we note two things -- one, that

18   there can never be claims against the Debtors brought by

19   TTI.

20           They had an opportunity here to bring counter-

21   claims, right?  They answered, they elected not to bring

22   counterclaims.  Those are waived, that is gone.  If they

23   have claims against us, we had a bar date, they put a

24   reservation of rights, they said they were going to do an

25   appraisal and then backed away.  They have had every

1   opportunity to have come and laid out these claims, and the

2   one thing that we think is just inappropriate would be any

3   effort to game the Court to get a ruling on non-core here,

4   and then come back in and say, "You know what?  We have

5   damages claims for what you put us through," with regards to

6   an IPO conversion, or a drag, or any other aspect of these

7   proceedings.  That, to us, is improper.

8            So our view would be, to the extent that we were

9   going to go non-core, and they're inviting you to go non-

10  core by holding their powder in a way that we think is

11  inconsistent with the bankruptcy rules and the rules of

12  civil procedure, we think that those claims have to be

13  waived.  We think that's an invitation for judicial -- that

14  issue is usually stopped from doing so.  That's issue number

15  one, no claims against the Debtor going forward.

16           The other, Your Honor, I think that's a request --

17  schedule has always been important to EFH.  Through the

18  course of the entire bankruptcy proceeding, and as we

19  discussed at the scheduling conference, all indications are,

20  even from today's proposed order from the PUCT that they're

21  going to approve the transaction.  And with that, the

22  parties get up until June 30th to close that transaction.

23  And that's preciously little time.  And so to the extent

24  that Your Honor elects to go down the report and

25  recommendation route, we recognize that the District Court

1    does not have the familiarity with the case, generally, or

2    the value of time here.

3           And so we've simply asked that that be noted in

4    some manner, because I think what we've seen is that TTI's

5    goal here to stay in.  They want to stay in for as long as

6    possible, they've got those above-market returns, that's

7    what they want, and to the extent that Your Honor concludes

8    that this is a non-core matter for which I'm going to issue

9    a report and recommendation on the summary judgment, and

10   have the District Court enter the final order, we understand

11   the challenge that we're presenting, with regards to this

12   contract being so close to the plan, and we simply ask that

13   Your Honor note the need for speed to the District Court.

14   Thank you, Your Honor.

15           THE COURT:  Ovation?

16           MR. LAURIA:  Your Honor, Tom Lauria, with White &

17   Case, for Ovation.  Just to further respond to the question

18   the Court asked, I think it's fair to say that we could

19   disclose around the uncertainty of the outcome in the rights

20   offering in a way that would allow us to go forward with the

21   rights offering.

22           The problem that we face, though, is the ability

23   of the creditors' to exercise the rights.  Those rights are

24   a substantial component of value that the TCEH unsecured

25   creditors are receiving.  And to make that investment

1    decision, and remember, we're talking about over $6 billion

2    being raised in the rights offering.  I think it's by far

3    the largest rights offering ever done in connection with a

4    bankruptcy case.

5              People are going to say they need to know the

6    capital structure that they're investing into.  And this is

7    a big piece of that capital structure that will either be

8    reflected with debt and equity, or not.  And so although

9    it's not such that we can't go forward, the ability to kind

10   of get to the finish line, and for creditors to actually

11   make an investment decision is going to be impacted by

12   knowing the answer to this question.  And we've got to get

13   across that finish line, we think, by June 30th.  So time is

14   really the critical thing here.  So whether it's a core

15   resolution or non-core, the key thing for the deal is the

16   need for speed.

17             THE COURT:  I understand.  Thank you.

18             MR. ZIMMERMAN:  One moment, Your Honor?

19             THE COURT:  Yes.  Well, actually, I'm going to ask

20   you a question.  I'd like you respond to what Mr. Lauria

21   said, which in effect is, while it might not be -- and this

22   is my question -- while it might not be specific condition

23   to closing, it's clearly a significant issue with regard to

24   the ability to consummate the transaction.  Why isn't that

25   enough to make this a constitutionally core proceeding?

1          MR. MCDERMOTT:  Well, actually I didn't hear that

2     it might interfere with consummation.  I heard that they're

3     prepared to go forward.  The plan specifically divorced this

4     litigation from that rights offering.

5          THE COURT:  Well, I'm asking you, okay, to assume

6     that it affects consummation.  The ability -- it creates a

7     risk factor for consummation.

8          MR. MCDERMOTT:  I don't think that that's enough,

9     Your Honor.

10          THE COURT:  Okay, why?

11          MR. MCDERMOTT:  I have worked on any number of

12     cases where there are a lot of what-ifs that have to happen

13     after the fact that you disclose around.  I've also worked

14     on rights offerings where there are a lot of different

15     alternatives.  Is it complicated?  Yeah, it's complicated.

16     Those actually go a little bit under the rubric of what I

17     think of what the Court have sometimes called how you

18     augment the estate.  It may make a difference in how much is

19     raised, or what comes in.  And I appreciate where they're

20     coming from, commercially.  It's just not enough,

21     constitutionally.

22          THE COURT:  Okay.

23          MR. MCDERMOTT:  Thank you, Your Honor.

24          THE COURT:  You're welcome.  Anything else?  All

25     right.  I have a question, Mr. McKane, or maybe this goes to

1    Ovation.  I read the hundreds of pages of briefing, and one

2    thing that was a little hard for me to distill from the

3    briefing, and it came out in argument today more clearly

4    than I had understood it in my reading, is actually how this

5    transaction is going to work.

6              So I'm wondering whether you would be able to

7    submit a supplemental statement -- five, ten pages, plain

8    English, that actually lays out for me -- because I went

9    back to the disclosure statement.  I don't know who signed

10   that order approving that disclosure statement, but that

11   clown needs to rethink what he's doing.  So I couldn't get

12   it out of the disclosure statement that describes what

13   entities are doing what, in one sequence, so that I have an

14   opportunity to understand.  Mr. Zimmerman, if you get that

15   and you have something to say about it, you can respond.

16             MR. ZIMMERMAN:  Thank you.

17             THE COURT:  Okay.  I'm not going to give you a

18   timeline on that.  Well, why don't I give you a timeline on

19   that?  If you can get that to me by, say the -- well, we

20   were going to get oh -- oh, we were going to talk about

21   that, that's right.  We were going to talk about getting

22   together next week on the phone.  If you can get that to me

23   by Friday the 25th?

24             MR. ZIMMERMAN:  We can do that.

25             THE COURT:  And Mr. Zimmerman, if you could me any

1    response by the 30th?

2              MR. ZIMMERMAN:  Yes.

3              THE COURT:  Okay.  That would be very helpful, for

4    my purposes.

5              MR. ZIMMERMAN:  Your Honor, as regards to the

6    disclosure statement, we blame Mr. Husnick.

7              THE COURT:  Always, always Mr. Husnick.  All

8    right.  So okay, so that sort of takes care of business in

9    connection with summary judgment.  There were sort of two

10   open issues -- that also takes care of the core, non-core

11   issues.

12             So there were two open issues, one that sort of

13   got raised on the phone about trial -- and I know we're

14   getting ahead of ourselves a little bit here, but there was

15   some inquiry about doing written directs.  Have you had a

16   discussion about that?  That was a discussion that somebody

17   had with my clerk.

18             MR. MCKANE:  Your Honor, we have not conferred to

19   my knowledge on that issue.  And I think if you think back

20   to an earlier conversation, a scheduling conference we had,

21   we had discussed having a scheduling conference with Your

22   Honor, with regards to any trial within 72 hours after you

23   issue rulings related to summary judgment, so that the

24   parties could kind of evaluate what, if anything, would be

25   left.

1           THE COURT:  Okay, we'll do it then, at that point.

2    I'm not opposed to that, as long as with confirmation, as

3    long as I have enough time ahead of time to -- I don't need

4    a ton, but as long as I have a couple days ahead of time to

5    read the directs, so that I am able to participate, or

6    understand what's going on for cross, that would be the only

7    issue I would have.  But we'll re-discuss that after summary

8    judgment.  Fill me in -- so this may be more for Mr. Lauria,

9    but fill me in on, because I've forgotten where we are on

10   the timeline with the PUCT, if you would.

11           MR. MCKANE:  I'll let Mr. Lauria speak to that.

12           THE COURT:  Okay.  So you got some indication from

13   them today, is that correct?

14           MR. LAURIA:  A draft order was filed during

15   argument this afternoon, and I understand about 10 minutes

16   ago, the hearing got underway with the three commissioners

17   discussing their views with respect to the draft order.  The

18   draft order is an order of approval.  It lays out some

19   conditions.

20           We're trying to figure out what they mean that

21   this point, but it'd be premature to comment.  And as I

22   understand it, the commissioners may well not agree on the

23   language at this point in the order, as well.  So I think

24   the target with the PUC is to try to get something done by

25   the 24th, when they have another session.  And failing that,

1    statutorily, and absent some other development, they have to

2    give us a ruling by the 27th.  And so at this point, we seem

3    to be on schedule, and headed towards an approval.

4              THE COURT:  Okay.  Again, can we schedule a

5    teleconference for the 28th to touch base in connection with

6    whether -- for a further update, as it might affect

7    scheduling, going forward?

8              MR. LAURIA:  Sure, sure.

9              THE COURT:  Would that work for everybody?  Is

10   everybody on the East Coast?  Yeah?  Can we do 9:00 AM.  I

11   know it's a little -- you're in Central Time, right, Mr.

12   McKane?

13             MR. MCKANE:  I can make it work, Your Honor?  It's

14   fine.

15             THE COURT:  Okay, all right.  Can we do 9:00 AM.

16   I have a 10:00, I'm not sure how long it's going to go.

17   We'll just have a -- it'll be on the record, telephone

18   conference, basically a status update on what's going on in

19   Texas, for 9:00 AM on the 28th.  Terrific.

20             All right, it was rather obvious, I think, for my

21   question about supplemental briefing, I'm going to take the

22   matter under advisement, both on the core, non-core, as well

23   as the summary judgment motions, and I will issue a decision

24   no later than sometime the week of April 4th, unless events

25   overtake us in some way.  So just keep me informed.  All

1    right?   Thank you very much.   Thank you for your time.

2    We're adjourned.

3                              *  *  *  *  *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 132

1                    C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5
     Sonya Ledanski     Digitally signed by Sonya Ledanski Hyde
                        DN: cn=Sonya Ledanski Hyde, o=Veritext,
6    Hyde               ou, email=digital@veritext.com, c=US
                        Date: 2016.03.22 11:06:52 -04'00'
7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  March 21, 2016