**EXHIBIT B**

KeyCite Red Flag - Severe Negative Treatment
**Judgment Affirmed in Part, Reversed in Part by** FPL Energy, LLC v. TXU Portfolio Management Co., L.P., Tex., March 21, 2014

328 S.W.3d 580
Court of Appeals of Texas,
Dallas.

TXU PORTFOLIO MANAGEMENT
COMPANY, L.P. n/k/a Luminant Energy
Company, L.L.C., Appellant/Cross–Appellee,
v.
FPL ENERGY, LLC, FPL Energy Pecos Wind I,
L.P., FPL Energy Pecos Wind II, L.P., Indian Mesa
Wind Farm, L.P., Appellees/Cross–Appellants.

No. 05–08–01584–CV.
|
July 27, 2010.
|
Rehearing Overruled Jan. 14, 2011.

**Synopsis**
**Background:** Electrical wholesaler brought contract action against electrical generation facilities, seeking liquidated damages for facilities' alleged failure to deliver energy to wholesaler. Facilities filed counterclaims, alleging that wholesaler breached contract by failing to ensure electricity transmission capacity. Following jury trial, the 116th Judicial District Court, Dallas County, Bruce Priddy, J., entered declaratory judgment for wholesaler and take-nothing judgments for each party on damages claims. Wholesaler and facilities appealed.

**Holdings:** The Court of Appeals, Morris, J., held that:

[1] wholesaler was not required by contract to provide adequate electricity transmission capacity, and

[2] liquidated damages provision was enforceable against facilities.

Reversed and rendered in part, reversed and remanded in part.

West Headnotes (13)

[1]  **Electricity**
     Contracts for supply in general

Electrical wholesaler did not have obligation, under provision of electricity purchase agreement with electrical generation facilities, which required wholesaler to provide "all services including without limitation transmission services necessary [for facilities] to deliver net energy [to wholesaler] from renewable resource facility," to also provide adequate electricity transmission capacity; nothing in contract indicated that transmission services would include transmission capacity.

Cases that cite this headnote

[2]  **Appeal and Error**
     Cases Triable in Appellate Court
     **Contracts**
     Ambiguity in general

The construction of an unambiguous contract is a question of law that the Court of Appeals reviews de novo.

Cases that cite this headnote

[3]  **Contracts**
     Application to Contracts in General
     **Contracts**
     Language of Instrument

When an agreement is unambiguous, the Court of Appeals utilizes pertinent rules of contract construction, applies the plain meaning of the language used, and enforces the contract as written.

Cases that cite this headnote

[4]  **Contracts**
     Language of contract

The Court of Appeals' primary objective in interpreting a contract is to determine the true

intentions of the parties as expressed in the writing.

Cases that cite this headnote

[5]  Contracts
     Construing whole contract together
     Evidence
     Grounds for admission of extrinsic evidence

To determine the parties' intent when interpreting a contract, the Court of Appeals examines the agreement as a whole, careful to give effect to all provisions so that none are rendered meaningless; the Court does not consider extraneous evidence of the parties' intent when construing an unambiguous contract.

Cases that cite this headnote

[6]  Contracts
     Extrinsic circumstances

Evidence of circumstances surrounding the contract's execution may be considered when interpreting a contract.

Cases that cite this headnote

[7]  Damages
     Certainty as to Amount of Actual Damage
     Damages
     Proportion of Sum Stipulated to Actual Debt or Damage

Liquidated damages provision of electricity sale contract between electricity wholesaler and electrical generation facilities, which required facilities to pay wholesaler $50 for each renewable energy credit short of annual minimum requirement, was enforceable in wholesaler's contract claim against facilities; harm to wholesaler would be difficult or incapable of estimation, amount was reasonable forecast of just compensation, and liquidated damages were lower than forecasted actual damages for facilities' breach of contract.

Cases that cite this headnote

[8]  Damages
     Nature as compensation for actual damage

A valid liquidated damage provision estimates in advance the just compensation to a party accruing from the failure to perform certain contractual obligations.

Cases that cite this headnote

[9]  Damages
     Questions for jury

In general, the issue of whether a contractual provision is an enforceable liquidated damages clause or an unenforceable penalty is a question of law for the court; in making this determination, the court examines whether the harm caused by the prospective breach of the contract is incapable or difficult of estimation and whether the amount of liquidated damages is a reasonable forecast of just compensation.

3 Cases that cite this headnote

[10] Damages
     Certainty as to Amount of Actual Damage
     Damages
     Proportion of Sum Stipulated to Actual Debt or Damage

The evidence concerning the difficulty of estimation and the reasonableness of the damages forecast, for purpose of determining the validity and enforceability of a liquidated damages clause in a contract, must be viewed as of the time the contract was executed.

Cases that cite this headnote

[11] Damages
     Liquidated damages and penalties

The party asserting that a liquidated damages provision in a contract is an unenforceable penalty has the burden of proof.

2 Cases that cite this headnote

[12] **Appeal and Error**

Rendering Final Judgment

Where the parties file cross-motions for summary judgment, the Court of Appeals may reverse and render the judgment that the trial court should have rendered.

Cases that cite this headnote

[13] **Damages**

Proportion of Sum Stipulated to Actual Debt or Damage

If the liquidated damages are proven to be disproportionate to the actual damages, the liquidated damages can be declared a penalty and recovery limited to actual damages.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*581** James W. Walker, Walker Sewell, LLP, Dallas, TX, for Appellant/Cross–Appellee.

Jeffrey M. Tillotson, Lynn, Tillotson, & Pinker, L.L.P., Dallas, for Appellees/Cross–Appellants.

Before Justices MORRIS, FITZGERALD, and FRANCIS.

**OPINION**

Opinion By Justice MORRIS.

This appeal arises out of a contractual dispute between an electricity wholesaler and three wind-powered electrical generation facilities. TXU Portfolio Management Company, L.P. n/k/a Luminant Energy Company, L.L.C. filed a lawsuit against FPL Energy, LLC, FPL Energy Pecos Wind I, L.P., FPL Energy Pecos Wind II, L.P., and Indian Mesa Wind Farm, L.P. (collectively the Wind Farms). It sought to recover liquidated damages after the Wind Farms failed to deliver the minimum annual quantities of wind-generated electric energy and renewable energy credits due under three purchase and sale agreements. The Wind Farms counterclaimed. They claimed TXUPM materially breached the contracts by failing to ensure enough **\*582** transmission capacity to allow them to generate all of the electricity that atmospheric conditions would permit. In addition to damages, the Wind Farms and TXUPM both sought declaratory relief with respect to the others' obligations under certain contractual provisions.

After several partial summary judgment rulings and a jury trial on the remaining issues, the trial court rendered a final judgment that both TXUPM and the Wind Farms take nothing by their damage claims. The final judgment also included a declaratory judgment in favor of the Wind Farms. On appeal, TXUPM challenges the trial court's take-nothing judgment on its breach of contract claim, the adverse declaratory judgment rulings, the trial court's denial of its requested trial amendment, and the admission of certain testimony by an opposing expert witness. The Wind Farms filed a cross-appeal contesting the take-nothing judgment on their breach of contract claim and several of the trial court's evidentiary rulings. For the reasons that follow, we affirm that part of the trial court's judgment ordering the Wind Farms to take nothing on their claims for damages. We reverse and render judgment in favor of TXUPM on the construction of section 2.03 of the contracts and the enforceability of the liquidated damage clause. We reverse the remainder of the trial court's judgment and remand the cause to the trial court for further proceedings.

I.

There are three basic components of the electric industry in Texas: power generation, power transmission, and power distribution. *See Pub. Util. Com'n v. City Public Serv. Bd.,* 53 S.W.3d 310, 312 (Tex.2001). Generally, the transmission of electric energy is accomplished through an interconnected network of transmission systems and infrastructure owned and operated by various transmission service providers. This network forms a single grid managed by the Electric Reliability Council of Texas (ERCOT).[1] Every generating facility enters into an interconnection agreement with the transmission service provider that owns the lines to which the generating facility connects. When electricity is produced by a generating facility, it is transmitted to a point of interconnection with the ERCOT grid. From there, it is distributed along the high voltage transmission lines and lower voltage distribution lines to end users who purchase it from retail electric providers.

[1] ERCOT serves most of Texas, although there are two other regional power grids that serve parts of the state. *See Pub. Util. Com'n,* 53 S.W.3d at 312.

FPL Energy Pecos Wind I, FPL Energy Pecos Wind II, and Indian Mesa Wind Farm are wind-powered electrical generation facilities located in the McCamey area of West Texas.[2] Each facility executed a contract agreeing to sell to TXU Electric Company, a retail electric provider, annual minimum quantities of renewable energy credits along with the wind-generated electric energy that produced those credits.[3] At TXU Electric's option, the term of the contracts could be extended through December 2019. TXUPM is the assignee of TXU Electric's interest in the three contracts. TXUPM sued the Wind Farms for liquidated damages in the form of deficiency **\*583** payments under the agreements after the Wind Farms failed to deliver the contractually-required annual minimum quantities of "renewable energy" beginning in 2002.[4] The Wind Farms countered that during the years relevant to this dispute, the McCamey area suffered from chronic transmission congestion because the transmission service providers serving the area failed to timely start and complete needed construction and upgrades of the transmission lines and facilities in and around the McCamey area.[5] This lack of transmission capacity in the McCamey area, in turn, resulted in ERCOT curtailment instructions to the Wind Farms for various periods.[6]

[2]   FPL Energy, LLC constructed Pecos Wind I and Pecos Wind II. It acquired the Indian Mesa Wind Farm in 2002.

[3]   A renewable energy credit is a tradable instrument representing the generation attributes of one megawatt-hour of electricity from a renewable energy resource, such as a wind-powered generation facility. *See* 16 TEX. ADMIN. CODE § 25.5(108).

[4]   "Renewable energy" is defined in the agreements as the combination of renewable energy credits and the contractually-defined "Net Energy" produced by the wind-powered generation facilities.

[5]   At times, the total amount of electric energy to be transmitted onto the ERCOT grid from the various generating facilities in a particular area may reach high volumes such that the transmission lines in a particular area cannot accommodate all of the electric energy capable of being generated. In such circumstances, ERCOT instructs certain facilities to limit or curtail their generation of electric energy for periods of time to reduce transmission congestion.

[6]   Once generated, electric energy cannot be stored and must be immediately transmitted to its destination. *FPL Energy Upton Wind I, L.P. v. City of Austin,* 240 S.W.3d 456, 458 n. 2 (Tex.App.-Amarillo 2007, no pet.). Thus, ERCOT curtailment instructions effectively limit energy generation rather than energy transmission. *Id.*

The Wind Farms claimed the curtailment instructions prevented them from generating all of the energy that they were capable of producing and resulted in their failure to meet the minimum annual quantities required under the contracts. They further contended that TXUPM was required to ensure adequate transmission capacity as part of its contractual obligation to provide transmission services under section 2.03 of the contracts.[7] The Wind Farms argued TXUPM's failure to do so was a material breach that not only excused their failure to deliver the annual minimum quantities but also entitled them to damages. TXUPM disputed the Wind Farms' interpretation of section 2.03, arguing it had no obligation to ensure adequate transmission capacity under the plain language of the contracts.

[7]   Implicit in the Wind Farms' contention is that, had TXUPM provided adequate transmission capacity in the McCamey area for the energy the Wind Farms were capable of producing, the transmission congestion would not have existed and ERCOT would not have issued curtailment instructions limiting the Wind Farms' generation of electricity.

The parties filed cross-motions for partial summary judgment with respect to the proper construction of section 2.03. The trial court granted the Wind Farms' motion, declaring section 2.03 unambiguously required TXUPM to provide transmission capacity as part of its obligation to provide all services necessary to transmit energy from the Wind Farms to TXUPM's customers.[8] Both parties then moved for a partial summary judgment with respect to the liquidated damage provision in the agreements. The Wind Farms argued that the $50 deficiency rate used to calculate the deficiency payments was void as an unenforceable penalty. TXUPM, on the other hand, argued that the deficiency rate was a valid measure of liquidated damages under which it was entitled to $25,948,250 for the Wind Farms' failure to provide the minimum annual amounts of renewable energy from 2003 through **\*584** 2005.[9] The trial court ruled the liquidated damage provision in the contracts was an unenforceable penalty and precluded TXUPM from presenting evidence of liquidated damages at trial.[10]

[8]   Although the trial court did not explicitly deny TXUPM's motion, its denial is implicit in the granting of the Wind Farms' motion.

[9] This amount does not include the deficiencies for 2002 because, before filing its lawsuit, TXUPM had applied funds from the Wind Farms' contractually required letters of credit to satisfy the deficiency payments for 2002.

[10] The trial court rendered an oral ruling on these summary judgment motions on May 24, 2007, during a hearing on pretrial motions.

At trial, the Wind Farms did not dispute their failure to provide the minimum annual quantities of renewable energy as alleged by TXUPM. Accordingly, the issues before the jury were limited to: (1) whether TXUPM materially breached section 2.03 of the contracts; (2) which party breached the contracts first; (3) the amount of damages to which each party was entitled, if any; (4) whether TXUPM "covered" for the Wind Farms' annual deficiencies; and (5) whether TXUPM breached a fiduciary duty to Pecos Wind I and Pecos Wind II. [11] The jury awarded TXUPM $8.9 million in actual damages on its breach of contract claim. The jury found, however, that TXUPM had covered for the Wind Farms' annual deficiencies. The jury also determined that, although TXUPM had breached its obligations under section 2.03 of the contracts, its breach was not material. Consequently, the jury awarded no damages to the Wind Farms on their breach of contract counterclaim. The jury rejected Pecos Wind I and Pecos Wind II's breach of fiduciary duty claim against TXUPM, finding that TXUPM was not their agent for the purposes of scheduling electricity from these facilities.

[11] "Cover" is the purchase of goods in substitution of those due from a defaulting seller. *See* TEX. BUS. & COM.CODE ANN. § 2.712 (Vernon 1994).

Based on the jury's finding of cover, the trial court disregarded the jury's actual damage award to TXUPM and rendered judgment that TXUPM take nothing on its breach of contract claim. [12] The trial court also rendered a take-nothing judgment on the Wind Farms' breach of contract claim and the breach of fiduciary duty claim in accordance with the jury's verdict. The final judgment incorporated the trial court's previous summary judgment rulings declaring (1) section 2.03 of the contracts unambiguously required TXUPM to provide all services necessary to transmit electricity from the Wind Farms to TXUPM's customers and included the obligation to provide transmission capacity; (2) the contracts' liquidated damage clause was void under section 2.718(a) of the Texas Business and Commerce Code as an unenforceable penalty; and (3) TXUPM was obligated to return $3.075 million it received as beneficiary of the Wind Farms' letters of credit. [13] This appeal and cross-appeal ensued.

[12] The trial court reasoned that TXUPM's failure to submit any evidence of its cover damages precluded any recovery in light of the jury's finding.

[13] The trial court also denied both parties' requests for attorney's fees but awarded costs to the Wind Farms as the prevailing party.

II.

[1] In its first issue, TXUPM challenges the trial court's construction of section 2.03 found in each of the contracts. TXUPM argues that the trial court's construction requiring it to provide transmission capacity under section 2.03 ignores the plain meaning of the section by adding obligations that are not included in the provision, effectively deleting the defined term "Net Energy" from the contracts, **\*585** and conflicting with other provisions of the agreements. We agree.

[2] [3] [4] [5] [6] The construction of an unambiguous contract is a question of law that we review de novo. *MCI Tel. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 650–51 (Tex.1999). When an agreement is unambiguous, we utilize pertinent rules of contract construction, apply the plain meaning of the language used, and enforce the contract as written. *See Vincent v. Bank of Am., N.A.,* 109 S.W.3d 856, 867 (Tex.App.-Dallas 2003, pet. denied). Our primary objective is to determine the true intentions of the parties as expressed in the writing. *See Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). To determine the parties' intent, we examine the agreement as a whole, careful to give effect to all provisions so that none are rendered meaningless. *Id.* We do not consider extraneous evidence of the parties' intent when construing an unambiguous contract. *See Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995). But evidence of circumstances surrounding the contract's execution may be considered. *See Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 731–32 (Tex.1982).

The contracts before us govern the Wind Farms' production and delivery of "Net Energy," which is defined as "the amount of electric energy in [megawatt-hours] produced by [the Wind Farms] and delivered to the Connecting Entity ... as metered by the Metering Equipment." "Connecting Entity" is defined in the contracts as the entity that owns any transmission or distribution system to which the Wind Farms

are interconnected. [14] The contracts further provide that the "Delivery Point" is the interconnection between each wind farm and its respective Connecting Entity. [15] Moreover, the contracts place the burden on the Wind Farms, at their own expense, to make all arrangements necessary to interconnect with the Connecting Entity. [16]

[14]  The connecting entity is necessarily a transmission service provider because it is defined as an entity that owns a transmission or distribution system.

[15]  This is where the electricity enters the ERCOT grid.

[16]  The contracts specifically provide that if the Connecting Entity is TXU Electric, a separate agreement is required to address interconnection issues.

Identical language for section 2.03 is set forth in each contract. It provides as follows:

Section 2.03 Transmission

(a) TXU Electric shall provide, by purchasing or arranging for, all services, including without limitation Transmission Services, Ancillary Services, any control area services, line losses except for line losses on Seller's side of the Delivery Point, and transaction fees, necessary to deliver Net Energy to TXU Electric's load from the Renewable Resource Facility throughout the Contract Term ("Required Transmission Services"). During the entire Production Term, Seller is responsible for line losses on Seller's side of Delivery Point.

(b) "Transmission Service" is a service that allows a transmission service customer to use the transmission and distribution facilities of other electric and municipally owned utilities to efficiently and economically utilize generation resources to reliably serve its loads and to deliver energy to another transmission customer.

**\*586** (c) "Ancillary Service" is a service necessary to support the transmission of energy from resources to loads while maintaining reliable operation of transmission service providers' transmission systems in accordance with good utility practice.

The Wind Farms contend section 2.03 is a very broad provision that implicitly required TXUPM to ensure that the McCamey area had sufficient transmission capacity to enable them to produce as much electricity as atmospheric conditions would permit and to take whatever steps necessary to prevent area transmission congestion and the resulting ERCOT generation curtailments. The Wind Farms argue that because they cannot transmit energy anywhere, including to the delivery point, unless there is adequate transmission capacity already available to transmit that energy to TXU Electric's load, the contracts must necessarily require TXUPM to provide the conditions that allow them to generate energy in the first place by ensuring adequate transmission capacity.

The Wind Farms assert the language requiring that TXUPM provide "*all services* ... including *without limitation* Transmission Services, ... necessary to deliver Net Energy to TXU Electric's load *from* the Renewable Resource Facility" is consistent with their interpretation (italics in the Wind Farms' appellate brief). They further assert their construction of the agreement is bolstered by the contracts' definition of "Transmission Service" in subsection (b) as a service that allows a transmission service customer to deliver energy to another transmission customer. There are several problems with the Wind Farms' construction.

First, as noted above, ERCOT curtailments address energy generation rather than energy transmission and there is nothing in the parties' agreements requiring TXUPM to ensure the Wind Farms would be able to generate electricity or that the Wind Farms would be excused from deficiency payments resulting from any ERCOT curtailment orders. Instead, the plain language of section 2.03 clearly limits TXUPM's transmission service obligations to those necessary to deliver "Net Energy" (energy generated and delivered to the delivery point) to TXUPM's customers. Although the Wind Farms contend TXUPM's obligation to provide transmission services begins at the generating facilities and not at the delivery point, this construction is contrary to the plain wording of the contract limiting the transmission services obligation to "Net Energy." The contracts specifically define "Net Energy" as that amount of electric energy produced and delivered to the Connecting Entity.

The Wind Farms also point out the definition of "Transmission Service," which uses the term "energy" instead of "Net Energy." They contend this definition suggests that TXUPM's transmission obligation extends to more than just the energy transmitted to the delivery point. We are not persuaded. A general definition describing the nature of a transmission service cannot be used to supplant TXUPM's precise transmission service obligation for "Net

Energy." See *Maxus Exploration v. Moran Bros., Inc.,* 773 S.W.2d 358, 363 (Tex.App.-Dallas 1989), *aff'd,* 817 S.W.2d 50 (Tex.1991) (specific contract language controls over general terms).

Secondly, there is nothing in the contracts that directly or indirectly includes transmission capacity as a transmission service. Recognizing this important fact, the Wind Farms contend that because the contracts provide no limitation with respect to "all services" in section 2.03(a), it **\*587** necessarily includes transmission capacity because they cannot transmit energy if there is insufficient transmission capacity. As further support for their construction, the Wind Farms rely on a regulation promulgated by the Public Utility Commission of Texas (PUC) defining "transmission service" to include "construction or enlargement of facilities" and "transmission over distribution facilities." See 16 TEX. ADMIN. CODE § 25.5(141). This definition, however, is not part of, nor is it referenced in, the contracts before us. Because the contracts specifically define "transmission service," we will not use a regulatory definition to alter the contracts' specific definition of "transmission service."

Additionally, as noted by TXUPM, section 2.02 of the contracts obligates the Wind Farms to interconnect with the ERCOT grid by making all arrangements with the transmission service provider that owns any transmission or distribution system with which the Wind Farms interconnect. As stated in the PUC substantive rules, the interconnection process is not limited to the construction of facilities necessary for a generating facility to connect to the grid but also involves the transmission service provider's construction of system upgrades necessary to accommodate the energy anticipated to be generated by the new facility. See 16 TEX. ADMIN. CODE § 25.195.

Finally, we find it significant that the one time "transmission capacity" is specifically mentioned in the contracts, it is used as an example in defining an "uncontrollable force." Under section 6.02, a party is excused from performing its obligations under the agreement due to an uncontrollable force if certain criteria are met. We agree with TXUPM's position that if it were responsible for ensuring adequate transmission capacity or availability under section 2.03, then allowing it to avoid any contractual liability on this basis makes no sense.

Having reviewed the agreements as a whole, we conclude there is nothing in the language used that supports the trial court's construction that within TXUPM's explicit obligation to provide transmission services for "Net Energy" under section 2.03 was an additional obligation to provide adequate transmission capacity. Such a construction ignores the plain wording of the contracts and cannot be harmonized with other sections of the agreements. As such, the trial court erred in its construction of section 2.03.

III.

[7] It is undisputed that the Wind Farms failed to deliver the contractually-required annual minimum amounts of renewable energy. Because we have rejected the construction of section 2.03 upon which the Wind Farms' affirmative defense and breach of contract claim was based, the only issue remaining with respect to TXUPM's breach of contract claim is damages. We therefore begin with the question of the validity of the contracts' liquidated damage provisions. The Wind Farms specifically raised the affirmative defense of unenforceable penalty. TXUPM asserts the trial court erred in declaring the provision an unenforceable penalty because the Wind Farms did not meet their burden of proof.

[8] [9] [10] [11] [12] A valid liquidated damage provision estimates in advance the just compensation to a party accruing from the failure to perform certain contractual obligations. See *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 664 (Tex.2005); *Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484, 486 (1952). In general, the issue of whether a contractual provision is an enforceable liquidated damage clause or an unenforceable penalty is a question of law **\*588** for the court. See *Phillips v. Phillips,* 820 S.W.2d 785, 788 (Tex.1991). In making this determination, we examine whether the harm caused by the prospective breach of the contract is incapable or difficult of estimation and whether the amount of liquidated damages is a reasonable forecast of just compensation. *Id.; Baker v. Int'l Record Syndicate, Inc.,* 812 S.W.2d 53, 55 (Tex.App.-Dallas 1991, no writ). The evidence concerning the difficulty of estimation and the reasonableness of the damages forecast must be viewed as of the time the contract was executed. *Baker,* 812 S.W.2d at 55. The party asserting that the provision is an unenforceable penalty has the burden of proof. See *Fluid Concepts, Inc. v. DA Apartments Ltd., P'ship,* 159 S.W.3d 226, 230–31 (Tex.App.-Dallas 2005, no pet.). Where, as here, the parties have filed cross-motions for summary judgment, we may reverse and render the judgment that the trial court should have rendered.

See *CU Lloyd's of Tex. v. Feldman,* 977 S.W.2d 568, 568 (Tex.1998) (per curiam).

In their motion for summary judgment, the Wind Farms asserted the provision requiring them to pay TXUPM $50 for each renewable energy credit short of their annual minimum requirement was an unenforceable penalty because (1) TXUPM's actual damages would be easy to calculate based on publicly available information at the time of any alleged breach, (2) the $50 figure was based on the $50 PUC penalty amount and, therefore, on its face, an unreasonable forecast of actual damages, and (3) the amount of liquidated damages sought by TXUPM is disproportionate to its actual damages.

The contracts provide that in the event of a "Net Deficiency" for a particular year, the Wind Farms were to make "Deficiency Payments" equal to the product of the difference between the "Net Deficiency" and the megawatt-hours of transferred renewable energy credits, times the "Deficiency Rate."[17] The initial "Deficiency Rate" in the contracts is "$50 per MWh, based upon the $50 per MWh number in PUC Substantive Rule § 25.173."[18] The contracts also specifically provide deficiency payments are "... intended to be liquidated damages and not a penalty." Under this provision, TXUPM asserts it is entitled to $29,023,250 in liquidated damages for the Wind Farms' total net deficiencies of 580,465 megawatt-hours from 2002 through 2005.[19] This figure is obtained by calculating the difference between the minimum annual quantities of renewable energy due for the years in question and the actual amount of renewable energy credits the Wind Farms provided and multiplying that difference by $50.

[17] In the event of a net deficiency, the contracts permitted the Wind Farms to transfer to TXUPM renewable energy credits not produced by the Wind Farms to partially offset the net deficiency.

[18] The contracts further provided that the $50 deficiency rate would be adjusted automatically to reflect any amended rate in section 25.173.

[19] After TXUPM applied the letter of credit proceeds to the deficiency payments due, the amount due was reduced to $25,948,250, which we previously recited in part I.

We first address whether TXUPM's damages from the Wind Farms' failure to provide the minimum annual quantities of renewable energy were difficult or incapable of estimation. The Wind Farms assert that TXUPM could readily ascertain its damages from a future breach by simply multiplying the number of megawatt-hours or renewable energy credits they were short by the market price of a credit at the time of the breach. Although it is undisputed that the value of a renewable energy ***589** credit was not known at the time of contracting, the Wind Farms argue that the market price would be ascertainable at the time of the breach. But the Wind Farms provided no evidence that, at the time the parties executed the contracts, TXUPM would be able to easily estimate the harm from the Wind Farms' failure to deliver the annual minimum quantities of renewable energy (which included not only renewable energy credits but also megawatt-hours of wind-powered energy).

In 2000, the year the contracts were executed, the Wind Farms were not yet operational, the production term was not scheduled to begin until over a year later, the annual quantity requirement did not take effect until 2002, the renewable energy credit trading program had not yet been implemented, and there was no existing market for such credits. In fact, it was unclear whether credits would be readily available from other sources in the event of the Wind Farms' breach to ensure TXUPM had sufficient renewable energy credits to comply with the State's renewable energy mandate. When viewed from the time of the contracts' execution, we conclude the harm to TXUPM from the Wind Farms' failure to meet the minimum annual quantities specified in contracts with a possible term of twenty years would be difficult or incapable of estimation. See *Murphy v. Cintas Corp.,* 923 S.W.2d 663, 666 (Tex.App.-Tyler 1996, writ denied).

We next consider whether the liquidated damages amount is a reasonable forecast of just compensation. The Wind Farms argue that because the contracts simply adopted the PUC $50 penalty rate as the deficiency rate, the liquidated damage clause, on its face, is not a reasonable forecast of TXUPM's anticipated damages as a matter of law. TXUPM counters that the summary judgment evidence supports its contention that the $50 deficiency rate bore a relationship to the actual damages it might suffer as a result of the breach. It asserts that the Wind Farms' breach of the annual minimum quantities could potentially expose TXUPM to the PUC penalty. It also contends that the PUC $50 penalty approximated the value of the actual cost of one megawatt-hour of renewable energy. In fact, TXUPM presented summary judgment evidence that the Wind Farms submitted claims to ERCOT for losses incurred by the curtailments valuing one megawatt-hour of renewable energy and a renewable energy credit from $49.31 in January 2003 to $63.07 in May of 2003. Given this evidence, we

conclude the Wind Farms failed to establish that the $50 deficiency rate was an unreasonable estimate of TXUPM's actual damages. In reaching this conclusion, we necessarily reject the Wind Farms' contention that public comments unrelated to the contracts that TXU Electric made objecting to the PUC penalty rate as too high proves their contention that the $50 deficiency rate set forth in the liquidated damage clause was a penalty.

 [13]   The Wind Farms also argue the amount of liquidated damages was disproportionate to TXUPM's actual damages. If the liquidated damages are proven to be disproportionate to the actual damages, the liquidated damages can be declared a penalty and recovery limited to actual damages. See *Baker,* 812 S.W.2d at 55. As the party asserting this defense, however, the Wind Farms must prove the amount of TXUPM's actual damages to show the liquidated damages amount was not an approximation of the actual loss. *Id.* The only summary judgment evidence the Wind Farms offered in this regard was historical credit pricing information from August 22, 2002 through August 18, 2006 indicating the market value of a single renewable energy credit ranged from $4 to **\*590** $16 during the relevant time period. They presented no evidence about the value of the wind energy that the Wind Farms failed to deliver. TXUPM, on the other hand, presented actual damage models for the Pecos I and Pecos II Wind Farms demonstrating its actual damages ranged from 73 to 79 percent of the aggregate liquidated damages. These models also showed that, for some years, liquidated damages were actually lower than TXUPM's actual damages.

The Wind Farms also rely on the jury's award of $8.9 million in actual damages to TXUPM to support their contention that the liquidated damages were disproportionate to TXUPM's actual damages. Obviously, the jury award was not made at the time of the summary judgment hearing. It appears, moreover, that the jury award was based on testimony from the Wind Farms' damages expert who indicated that TXUPM damages were $8.9 million. This $8.9 million figure did not include any damages for annual deficiencies caused by ERCOT curtailments. In contrast, the liquidated damages sought by TXUPM, which it presented in the summary judgment evidence, included the entirety of the calculated annual deficiencies, including those allegedly caused by ERCOT curtailments. Because the Wind Farms failed to meet their burden on the affirmative defense of penalty, we conclude the trial court erred in granting the Wind Farms' summary judgment and declaring the liquidated damage provision unenforceable. Moreover, because the summary judgment evidence before the trial court established that, at the time of the contract's execution, the harm from a prospective breach was difficult of estimation and the amount of liquidated damages was a reasonable forecast of just compensation, we conclude as a matter of law that the liquidated damage clause was enforceable.

IV.

In its appellate brief, TXUPM requests, among other things, that either we render judgment or remand to the trial court with instructions to render judgment for $36,733,700 in liquidated damages. This amount appears to include liquidated damages for the Wind Farms' annual deficiencies occurring in 2006.[20] The summary judgment evidence before the trial court, however, did not include any information on the alleged 2006 deficiencies.[21] In fact, at the time of the summary judgment hearing, TXUPM's live pleading only sought liquidated damages or actual damages for deficiencies occurring in 2003 and 2004.[22] During trial, TXUPM sought leave of court to file a fifth amended petition including liquidated damages, or alternatively actual damages, for annual deficiencies in 2005 and 2006. After a hearing on the motion, the trial court denied the motion as it related to the 2006 annual deficiencies. Counsel for TXUPM then stated he was going to file a new lawsuit that day for the 2006 deficiencies and requested a **\*591** ruling from the court that TXUPM was "expressly forbidden from seeking this so [the Wind Farms] don't come up with some other argument that says, well, you had this other lawsuit and you should have brought in all of your claims in that lawsuit. So can we get the declaration that we are not allowed to bring these claims in this lawsuit." There is no indication that the trial court made such a ruling. Four days after the trial court's ruling on its motion to amend, however, TXUPM filed a sixth amended petition without objection omitting any reference to the 2006 annual deficiencies contained in its fifth amended petition and sought recovery only for annual deficiencies occurring in 2003 through 2005.

---

[20]  The amount requested also does not credit TXUPM with the $3,075,000 it received from the Wind Farms' letters of credit.

[21]  TXUPM's summary judgment evidence includes a report from TXUPM's contract manager setting forth the Wind Farms' annual deficiencies for 2002 through 2005 and calculating the resulting liquidated damages due after

allowing for application of the proceeds from the Wind Farms' letters of credit. The only record citation in TXUPM's appellate brief with respect to the 2006 annual deficiencies is its own sixth amended response to defendant's requests for disclosure that is attached to its motion for trial amendment.

22  TXUPM's fourth amended petition noted the annual deficiencies for 2002 had been satisfied by applying the funds it had received from the Wind Farms' letters of credit.

On appeal, TXUPM has challenged the trial court's ruling denying its trial amendment to the extent it sought recovery for the 2006 annual deficiencies. In light of counsel's statement immediately following the trial court's ruling on its trial amendment and TXUPM's later filing of a sixth amended petition removing any reference to the 2006 deficiencies, we conclude that in this case TXUPM abandoned the claim for 2006 damages. An amended pleading supercedes and supplants all previous pleadings. *See* TEX.R. CIV. P. 65; *Radelow–Gittens Real Prop. Mgmt. v. Pamex Foods,* 735 S.W.2d 558, 559 (Tex.App.-Dallas 1987, writ refused, n.r.e.). We have found nothing in the record before us indicating the trial court required TXUPM to file a sixth amended petition omitting the 2006 deficiencies. Because TXUPM abandoned its claim for damages based on the 2006 annual deficiencies after the trial court denied its trial amendment requesting these damages, it cannot now challenge that ruling in this appeal.

TXUPM also challenges that portion of the trial court's judgment ordering it to return the $3,075,000 received from the Wind Farms' letters of credit based on their alleged breach of the contract. This ruling was apparently based on the trial court's determination that TXUPM take nothing on its breach of contract claims against the Wind Farms. Because we have determined that TXUPM is entitled to liquidated damages on its breach of contract claims against the Wind Farms, we will reverse that portion of the trial court's declaratory judgment as well.

V.

Having concluded the trial court erred with respect to its construction of section 2.03 and its declaration about the enforceability of the liquidated damage provision, we need not address TXUPM's issues on appeal involving cover and the admissibility of the testimony from the Wind Farms' curtailment expert. Our resolution of these issues also makes it unnecessary to address the complaints raised in the Wind Farms' cross-appeal because all of their issues depend on our affirming the trial court's construction of section 2.03 and its declaration that the liquidated damages provision is an unenforceable penalty.

We affirm that part of the trial court's judgment ordering the Wind Farms take nothing on their claims for damages. We reverse and render judgment declaring that (1) section 2.03 of the contracts does not require TXUPM to provide transmission capacity as part of its obligation to provide all services necessary to deliver Net Energy to its customers from the Wind Farms and (2) the contracts' liquidated damage provision is an enforceable liquidated damage clause. We reverse the remainder of the trial court's judgment and remand the cause to the trial court for further proceedings.

**All Citations**

328 S.W.3d 580