# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.* | ) ) ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

## AFFIDAVIT OF WILLIAM JEFFERY HERBERT

BEFORE ME, the undersigned authority, on this day personally appeared **William Jeffery Herbert**, and after being duly sworn, stated:

1. My name is William Jeffery Herbert. I am over the age of 18, and fully competent to make this affidavit, and the facts cited herein are within my personal knowledge and are true and correct.

2. On or about September 12, 2014, I filed a Proof of Claim in the Energy Future Holdings Corp. bankruptcy proceeding (Case No. 14-10979) for violations of Title VII of the Civil Rights Act of 1964. I was discriminated against based upon my race, age, gender/sex and for retaliation for asserting a claim.

3. I began working for Energy Future Holdings Corp. as a Diversity Advisor contractor on or around April 2001. On or around September 2005, I was hired by the company as the Diversity Manager. On or about July 2011, I was promoted to Diversity Programs and Employee Relations Manager. As part of my duties as Employee Relations Manager, I was tasked with conducting investigations of alleged employee misconduct for Energy Future Holdings Corp.

4. My investigations often involved Luminant employees who belonged to the International Brotherhood of Electrical Workers (IBEW) Local 2337. The Business Manager of IBEW Local 2337 was Randall Pierce, a white male. Mr. Pierce did not like the fact that an African American/Black was investigating his union members.

5. In the spring of 2013, Mr. Pierce began to file National Labor Relations Board (NLRB) charges and company grievance charges against me. At least three charges were filed by Mr. Pierce against me during the period of April 2013 through December 2013. Generally, the substance of these charges centered around my "tone and attitude" during investigations.

6. Energy Future Holdings Corp. launched internal investigations into each charge and found no wrongdoing by me. The grievances were dismissed. During that same period of time, I conducted multiple investigations at non-IBEW Local 2337 worksites and received no complaints, grievances, or charges stemming from those investigations. Mr. Pierce had no connection to or involvement with those non-IBEW Local 2337 investigations.

7. Energy Future Holdings Corp. took no action to remedy the filing of Mr. Pierce's frivolous and meritless charges against me. Instead, the company entered into an agreement with Mr. Pierce that specifically dealt with his racially-motivated animus toward me. The agreement provided that when I was to have any form of on-site contact with any IBEW Local 2337 employees, the company would notify Mr. Pierce ahead of time to give him the opportunity to attend the meeting or send a union designee of his choice to the meeting. This was in addition to the customary union steward representation. Under this agreement, Energy Future Holding Corp.'s Human Resources department would contact Mr. Pierce fifteen minutes prior to my arrival, and I was required to wait fifteen minutes prior to beginning any meeting with an employee to allow for Mr. Pierce to have time to respond to the contact.

8. I complained to my supervisors, including Annette Underwood, about this agreement on several occasions, citing the unfairness with which it treated me and the employees. This agreement humiliated me as it was directed specifically at me. This policy was tailor-made to appease and acquiesce to the racially-motivated animus that Mr. Pierce had toward me.

9. Due to confusion with the company oral notification process, on January 28, 2014, I allegedly missed a meeting with an on-site employee who was a member of IBEW Local 2337. This was a potential meeting with a different employee which had not actually been scheduled, the onsite representative had attempted to schedule after I arrived at the site for the scheduled meeting, and for which, my direct supervisor, Ms. Underwood had already instructed me to follow through with my scheduled meeting, stating she would work to schedule the other meeting for a later date. Thus, I had not actually missed a scheduled meeting. Ms. Underwood, also advised me that Mr. Pierce contacted the company and informed them that the union would be filing an NLRB charge against me for not attending the meeting. This is the same Mr. Pierce who had previously filed unfounded grievances against me because he did not like the fact that the investigator was black. It should be noted that in the information contained within the Proof of Claim I filed, I stated in my timeline detail that I advised Bill Mersino to tell the employee "I forgot about the meeting and offer my apologies." I did tell Mr. Mersino to tell the employee that because it would not have been appropriate to explain the notification process that Ms. Underwood and Energy Future Holding Corp. had agreed to with Mr. Pierce nor was I going to blame my supervisor.

10. On January 30, 2014, Ms. Underwood stated to me in her office, "I'm sick of this shit." When I attempted to discuss the circumstances for the missed meeting, Ms. Underwood replied, "Nigger, you didn't forget, you refused to follow my directions to call the union." When I asked for clarification, Ms. Underwood responded, "You heard me. I'll make sure they fire your black ass. I'm sick of this shit."

11. Energy Future Holdings Corp. has a "Flextime & Telework" program, which allows telecommuting and flexible schedule privileges to eligible employees. Supervisors must initiate the arrangement. For telecommuting purposes, the employee and his supervisor come to an agreement regarding the particular day of the week in which the employee will customarily work offsite. I had been telecommuting under prior supervisors for more than seven (7) years. On March 18, 2013, I was granted continued telecommuting privileges, which permitted me to work from home on Mondays. Ms. Underwood approved and signed off on this arrangement. A copy of this policy and the approval of my telecommuting and flextime schedule is attached as Exhibit "A."

12. On Monday, February 3, 2014, six days after the incident in which Ms. Underwood used racial slurs towards me, I was working from home as permitted under my pre-approved telecommuting schedule. I was assisting my elderly, diabetic mother before she left my house that morning. Ms. Underwood had sent an email over the weekend that I saw and opened on Monday morning. I had not seen Ms. Underwood's email until Monday morning. In this email, she demanded that I come in to work that day (Monday). When I responded that morning, she made it clear that it was mandatory that I come in to work that day. She asked me if I was going to request PTO, which I did and she then denied my request. Since Ms. Underwood denied my PTO request, to comply with this directive, I had to wait until my mother had administered her insulin injections and communicated that she felt alert enough to drive. I then escorted her to the highway to ensure that she could safely make the journey home driving by herself. I then went into the office and began working on site. I arrived at work around noon.

13. I was later called into a meeting by Ms. Underwood in the presence of a human resources manager. Ms. Underwood informed me that I was being suspended for failing to follow a supervisor directive in not reporting to work. At that same meeting, I was also informed that the union notification agreement process was being reviewed for changes. I remained off work pending further communication from Ms. Underwood.

14. Four days later, on February 7, 2014, I was again summoned in to work by Ms. Underwood. In the presence of a human resources manager, Ms. Underwood informed me that I was being terminated for insubordination for failing to follow a supervisor directive in not reporting to work on February 3, 2014.

15. However, I was following company protocol on February 3, 2014. The reason I was not at work is that I was working from home, which I was permitted to do per the Flextime & Telework agreement that Ms. Underwood signed off on. Further, during my time with Energy Future Holdings Corp., I have knowledge of similarly situated white males (e.g.-K. Hines) who failed to report to work or violated company directives and did not get fired like I did. Their punishments were must less severe. These occurrences took place before my termination.

16. Prior to my firing, every grievance against me was filed by Mr. Pierce. Energy Future Holdings Corp. determined that each and every one of these grievances was unfounded. Also, in my approximate thirteen (13) years with Energy Future Holdings Corp. I had never received any type of discipline for any reason. It was only until this event in which Ms. Underwood used racially motivated language towards me and which Mr. Pierce attempted to get me fired, that I was fired.

17. The document attached to my Proof of Claim entitled "Equal Employment Opportunity Commission Intake Questionnaire – Additional Information Pages" was prepared by me and contained factual information that is accurate as it sets forth a detailed timeline that occurred in January and early February 2014.

Further affiant saith not.

Signed this 7TH day of April, 2016.

_____
WILLIAM JEFFERY HERBERT

SUBSCRIBED AND SWORN TO before me on the 7th day of April, 2016, to certify which witness my hand and official seal of office.

_____
Notary Public in and for the State of Texas

Laney Van Antwerp
Notary Public
STATE OF TEXAS
My Commission
Expires 01/07/2019
ID# 13006887-0

**Subject: Flextime & Telework (for HR Shared Services)**
**Version: 1**
**Date Created: 01/16/2013**

**Purpose:** In order to facilitate arrangements under which employees may keep a flexible work schedule around "Core Hours" and/or telecommute as part of their work schedule, EFH HR Shared Services has adopted the following guidelines and procedure.

**Scope:** These guidelines apply to the EFH HR Shared Services department.

**Guidelines:** Energy Future Holdings considers flextime and telecommuting to be viable alternative work arrangements in cases where jobs and individual characteristics are suited to such an arrangement.

In general, both flextime and telecommuting are privileges which may be granted under appropriate circumstances to eligible employees whose job responsibilities are suited to such arrangements, and each request for flextime and/or telecommuting will be decided on an individual basis under the guidelines set forth within this document. The arrangement must be in the best interests of the company. The business needs of the company are the first consideration in determining whether or not a flextime and/or telecommuting request will be authorized. Authorizations are made by the VP of HR Shared Services.

Flextime and telecommuting is not an entitlement; it is not a company-wide benefit; and it, in no way, changes the at-will terms and conditions of employment with Energy Future Holdings.

**Definitions**
**Core Hours:** Core Hours are considered 8a-5p, Monday through Friday, except recognized company holidays. All departments within EFH HR Shared Services must be staffed during Core Hours. Further, all EFH HR Services employee work schedules shall be comprised of at least 80% Core Hours.

**Flextime:** Flextime is a formal, voluntary work arrangement between the company and an employee. It is a work arrangement that grants an employee latitude in choosing particular work hours around and during "Core Hours". All flextime arrangements are made on a case-by case basis, focusing on the business needs of the company first.

Note: Compressed Workweeks are not applicable to the aforementioned Flextime.

**Telecommuting** (or "Telework"): Telecommuting is a formal, voluntary work arrangement between the company and an employee. It is a work arrangement that grants an employee latitude in choosing a particular day of the work week in which work can be performed offsite, such as at a home office, during "Core Hours". All telecommuting arrangements are made on a case-by case basis, focusing on the business needs of the company first.

Note: Informal arrangements are not the focus of this document.[D1][AL2]

**Telecommuting Office:** A specific and appropriate work environment space designated for performing the duties assigned by the company, whether at an employee's home or another recognized and approved off-site location. The Telecommuting Office area must be adequate to efficiently perform job requirements and safely accommodate equipment used to perform the job. Telecommuting employees



EXHIBIT "A"
(page 1 of 6)

are expected to provide appropriate office furniture and equipment. Energy Future Holdings is not responsible for insuring, maintaining or repairing personal equipment used, if and when use is approved by the company, to perform job duties. Energy Future Holdings is not responsible for any costs associated with initial setup of a Telecommuting Office or for modifications to the Telecommuting Office Work Area.

**Company-Owned Equipment/Supplies:** In general, the company may provide equipment, such as a computer, to be used exclusively in the performance of job responsibilities. Although placed in an off-site location during a telecommuting arrangement, any such equipment or supplies remain the property of Energy Future Holdings and access to or use of such equipment or supplies should be limited to performance of telecommuting responsibilities.

**Proprietary Information:** The telecommuting employee is expected to ensure the protection of all company confidential and/or proprietary information accessible from the Telecommuting Office. Steps include, but are not limited to, use of locked file cabinets, disk boxes and desks, regular password maintenance and any other steps appropriate for the job and the environment. The telecommuting employee is expected to check with the supervisor before transferring any confidential and/or proprietary data to the off-site location.

<u>**Procedures**</u>
1. The supervisor will initiate[D3][AL4] flextime and/or telecommuting as a possible work arrangement.

2. Generally, employees approved for formal, voluntary flextime and/or telecommuting arrangements must have been employed by Energy Future Holdings for a minimum of ~~180~~[D5][AL6]90 days of continuous, regular employment and must have exhibited solid performance, in accordance with the company's performance management process. Voluntary flextime and telecommuting arrangements are subject to a trial basis for the first 90 days, and may be discontinued at any time, at the sole discretion of Energy Future Holdings or the affected employee.

3. Energy Future Holdings has determined the required equipment needs for a telecommuting arrangement. These include: a Company-issued laptop with VPN and internet access. The telecommuting employee must use VPN when working from the Telecommuting Office. Equipment supplied by the company will be maintained and/or repaired by the company at its corporate headquarters, if and when the need arises. If at any time the employee does not have the required equipment during a telecommuting arrangement, the employee must physically report to 1601 Bryan St., Dallas, TX 75201 to complete job duties and responsibilities.

4. Equipment supplied by the company is to be used for business purposes only. The telecommuting employee must sign an inventory listing all company-provided property and agree to take appropriate action to protect the items from damage or theft. [D7][AL8]Energy Future Holdings accepts no responsibility for damage or repairs to employee-owned equipment. Energy Future Holdings reserves the right to make determinations as to appropriate equipment and is subject to change at any time at the sole discretion of the company.

5. Consistent with the company's expectations of information and asset security for employees working at company locations, telecommuting employees will be expected to adhere to the policies and procedures outlined in the "Information Security" section of the Policy Manual.



EXHIBIT "A"
(page 2 of 6)

6. Injuries sustained by the telecommuting employee while at their Telecommuting Office and in conjunction with their regular work duties are normally covered by the company's workers' compensation policy. Telecommuting employees are responsible for notifying the company of such injuries to their supervisor and Human Resources immediately, and in writing, any injuries related to work done for the company and incurred at the location listed on the telecommuting employee's Flextime and Telecommuting Assignment Form. Any accidents or injuries incurred while commuting to and from the Telecommuting Office and/or company offices or other job-related sites, are not the responsibilities of Energy Future Holdings.

7. The telecommuting employee is liable for any injuries sustained by non-employee visitors to their Telecommuting Office.

8. The flextime employee and his/her supervisor will agree on the alternative work schedule that the flextime employee will customarily maintain. The alternative schedule must adhere to the "Core Hours" requirements and must be documented in the Flextime & Telecommuting Assignment Form (Addendum A). Requests that overlap with regularly scheduled face-to-face meetings will not be authorized.

9. The telecommuting employee and his/her supervisor will agree on the one day of telecommuting allowed each week that the telework employee will customarily maintain, the manner and frequency of communication, and the equipment needed; all of which will be documented in the Flextime & Telecommuting Assignment Form (Addendum A). The telecommuting employee agrees to be accessible by phone or online within a reasonable time period during the agreed upon work schedule. Requests that overlap with regularly scheduled face-to-face meetings will not be authorized.

10. Flextime and telecommuting employees who are not exempt from the overtime requirements of the Fair Labor Standards Act will be required to record all hours worked in a manner designated by the company. Hours worked in excess of those specified per day and per work week, will require the advance approval of the supervisor. Failure to comply with this requirement may result in the immediate cessation of the Flextime & Telecommuting arrangement and/or other disciplinary action, up to and including termination of employment.

11. If the employee and supervisor agree on terms and conditions, and if approved by the VP of HR Shared Services, via the Flextime & Telecommuting Assignment Form, a 90 day trial period will commence.[D9][AL10]

12. The Flextime & Telecommuting Assignment Form is to be completed and approved prior to the flextime and/or telecommuting start date and kept with the immediate supervisor.

13. Evaluation of the flextime and/or telecommuting employee's performance during the trial period will include regularly scheduled interaction by phone, e-mail and/or face-to-face meetings between the employee and the supervisor, to discuss work progress and problems. At the conclusion of the trial period, the employee and supervisor will each complete an evaluation of the arrangement and make recommendations for continuance and/or modifications. Continuance will be documented in the Flextime & Telecommuting Assignment Form upon completion of the 90 day evaluation. Modifications will be documented in a new Flextime & Telecommuting Assignment Form (Addendum A). Evaluation of the telecommuting employee's performance beyond the trial period



EXHIBIT "A"
(Page 3 of 6)

will be consistent with that received by employees working at company locations in both content and frequency, but will focus on work output and completion of objectives rather than time-based performance, however, evaluation of non-exempt telecommuting employees will also include time review.

14. Telecommuting is not designed to be a replacement for appropriate dependent care. Although an individual employee's schedule may occasionally be modified to accommodate childcare needs, the focus of the arrangement must remain on job performance and meeting business demands. Prospective telecommuting employees are encouraged to discuss expectations of telecommuting with family members prior to entering into a trial period.

15. Employees entering into a telecommuting arrangement may be required to forfeit use of a personal office or workstation in favor of a shared arrangement to maximize the company's facilities space.
    [D11][AL12]

16. The availability of flextime and/or telecommuting as a flexible work arrangement for employees of Energy Future Holdings may be discontinued at any time at the sole discretion of the company. If the company determines that it is in the best interest of the company, clients or employees to work in a company location on a more traditional schedule, the arrangement may be discontinued. Every effort will be made to provide advanced notice of such a change to accommodate commuting, childcare and other issues that may arise from such a change. There may be instances, however, where no notice is possible.

17. There may be times when it is necessary for the flextime and/or telecommuting employee to work at an assigned company location or report to the corporate office during times when the employee would normally be off of work and/or scheduled to work at a Telecommuting Office. In such circumstances, the employee is expected to adjust his/her schedule according to a schedule acceptable to the supervisor.



EXHIBIT "A"
(Page 4 of 6)

**Flextime & Telecommuting Assignment Form**

**Employee Name:** _____Jeff Herbert_____

**Job Title:** _____Employee Relations & Programs Manager_____

**Manager Name:** _____Annette Underwood_____

**Check One:**   ☐ Flextime    ☐ Telecommuting    ☒ Flextime & Telecommuting

Effective _____3-18-2013_____, you are authorized to work an alternative, flexible work schedule. This form and the departmental guidelines describe the terms and conditions of the arrangement.

Effective _____3-18-2013_____, you are authorized to perform your job responsibilities as a telecommuter working from a Telecommuting Office. This form and the departmental guidelines describe the terms and conditions of the arrangement.

**Telecommuting Office Address:** _____221 Sandy Creek Place, Desoto, TX, 75115_____

Is this the Employee's residence? ☒ Yes    ☐ No

**Authorized scheduled work hours:**
From _____ am / pm To _____ am / pm

**Authorized scheduled work day at the Telecommuting Office:**
☒ Monday ☐ Tuesday ☐ Wednesday ☐ Thursday ☐ Friday

**Company Issued Property** (Loaned to Employee):

| # | Description, Model/Serial Number | Condition | Initial |
|---|---|---|---|
| 1 | Dell Laptop: EFH 00013424 | Good | |
| 1 | Apple iPhone (903) 391-1955 | Good | |

**Other Terms and Conditions of flextime and/or telecommuting assignment, if any:**



EXHIBIT "A"
(Page 5 of 6)

This assignment form does not constitute a contract of employment, and should not be interpreted as creating a contract of employment, either expressed or implied. The employment relationship between the Company and the Employee is one of "employment at will", and may be terminated by either party, at any time.

**Employee Agreement:**
I have read the contents of this assignment form and the departmental guidelines. I agree to abide by all of the requirements of the form and the guidelines.

_—William T. Herbert   3-5-2013_
**Employee Signature**                                                      **Date**

**Company Approvals:**
The above named Employee has met all of the terms and conditions of the departmental guidelines and approval is granted for the Employee to participate in accordance with the Flextime & Telecommuting Assignment Form and the departmental guidelines.

_____
**Manager/Supervisor**                                                    **Date**

_____
**Authorized Approver**                                                   **Date**

*************************************************************************
**Evaluation of Trial** (to be completed by immediate supervisor 90 day after effective date)
Date & Notes:



EXHIBIT "A"
(Page 6 of 6)