Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4    In re:                          :

                                     :    Chapter 11

5    ENERGY FUTURE HOLDINGS CORP.    :

                                     :    Case No. 14-10979-CSS

6                                    :

             Debtors.               :    (Joint Administration

7    _____   :    Requested)

                                     :

8                                    :

     MARATHON ASSET MANAGEMENT, LP  :

9           Plaintiff,              :

                                     :

10      v.                          :    Adv. Proc. No. 1-15-51917

                                     :

11   WILMINGTON TRUST, N.A. AS       :

     FIRST LIEN AGENT               :

12                                   :

                                     :

13           Defendants.            :

     _____:

14

15                         United States Bankruptcy Court

16                         824 North Market Street

17                         Wilmington, Delaware

18                         April 6, 2016

19                         2:15 PM - 3:15 PM

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTCHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO OPERATOR:  LESLIE MURIN

1    HEARING re Oral Argument

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 3

```
 1   A P P E A R A N C E S :

 2

 3   ROSS, ARONSTAM & MORITZ LLP

 4        Attorney for Apollo, et al

 5

 6   BY:  NICHOLAS MOZAL

 7

 8   O'MELVENY & MEYERS LLP

 9        Attorney for Apollo, et al

10

11   BY:  PETER FRIEDMAN

12        DANIEL SHAMAH

13        ANDREW SURKIN

14

15   WILMER CUTLER PICKERING HALE

16        Attorneys FOR Texas Competitive Electric

17        Holdings

18

19   BY:  GEORGE W. SHUSTER, JR

20

21   KLEHR HARRISON HARVEY BRANZBURG LLP

22        Attorneys for UMB Bank, NA. Indentured Trustee

23

24   BY:  RAY LIMISH

25
```

1   MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

2        Attorney for TCEH Debtors

3

4   BY:  DAVID PRIMACK

5

6   LANDIS RATH & COBB

7        Attorneys for Marathon, et al

8

9   BY:  MATTHEW MCGUIRE

10

11  WILMERHALE

12       Attorneys for Marathon, et al

13

14  BY:  GEORGE SHUYLER

15       BENJAMIN LOVELACE

16

17  BLANK ROME LLP

18       Attorneys for Wilmington Trust Company as

19       First Lien Administrative Agent and

20       Collateral Agent

21

22  BY:  MICHAEL DEBAECKE

23

24

25

```
 1   SEWARD & KISSEL LLP
 2        Attorneys for Wilmington Trust Company as
 3        First Lien Administrative Agent and
 4        Collateral Agent
 5
 6   BY:  MARK KOTWICK
 7
 8   APPEARING TELEPHONICALLY:
 9   KENT COLLIER
10   JUSTIN K. EDELSON
11   JAMIE L. EDMONSON
12   CATHERINE EISENHUT
13   BRIAN GUINEY
14   MARIA CHUTCHIAN
15   JASON M. MADRON
16   ELIZABETH RASSKAVOZA
17   STEPHEN R. SCHWARTZ
18   ANDREW M. THAU
19   MICHAEL TURKEL
20   MATTHEW UNDERWOOD
21   KELLIE FISHER
22   RICHARD PEDONE
23   EMILY A. BUSSIGEL
24   CHRISTOPHER L. CARTER
25   THOMAS CURTIN
```

1    THOMAS ROSS HOOPER

2    STUART KOVENSKY

3    DANIEL HARRIS

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  P R O C E E D I N G S

 2            CLERK:  All rise.

 3            THE COURT:  Please be seated.

 4            MR. MOZAL:  Good afternoon, Your Honor.

 5            THE COURT:  Good afternoon.

 6            MR. MOZAL:  Nick Mozal of Ross Aronstam & Moritz.

 7   With me are Peter Friedman, Daniel Shamah, Andrew Sorkin

 8   from O'Melveny & Myers, and together we represent Defendants

 9   -- the lender Defendants.  We're here today on our motion to

10   dismiss the complaint, and with the Court's permission, Mr.

11   Friedman will be arguing our motion.

12            THE COURT:  Okay.

13            MR. FRIEDMAN:  Good afternoon, Your Honor.  Peter

14   Friedman from O'Melveny & Myers on behalf of the Lender

15   Defendants.  Your Honor, may I approach with a binder of

16   just certain provisions of the credit agreement that I wish

17   to discuss, in particular the intercreditor agreement.  I've

18   given a copy to Mr. Schuster, counsel for Plaintiffs as well

19   as counsel for Wilmington Trust.

20            THE COURT:  Yes.

21            MR. FRIEDMAN:  Thank you, I --

22            THE COURT:  If you have a copy for Ms. Werkheiser,

23   please.

24            MR. FRIEDMAN:  Yes, Your Honor.

25            THE COURT:  Thank you.
```

1          MR. FRIEDMAN:  Your Honor, the complaint fails for

2     two primary reasons.  The first is that §401 of the

3     intercreditor agreement does not apply to this dispute, and

4     if §4.1 of the intercreditor agreement does not apply,

5     Plaintiffs cannot claim any right to elevated priority

6     because §2.1 of the intercreditor agreement makes all

7     parties -- loan parties pari passu with each other.  As this

8     Court has already held last month, there has been no

9     exercise of remedies with respect to the collateral.  That

10    is the same -- this is the same collateral agent under the

11    same plan that filed the same proof of claim, under the same

12    intercreditor agreement, same Creditor documents.  That's as

13    true here with respect to the deposit LC collateral as it

14    was with respect to plan distributions in the Wilmington

15    Trust case.

16          Moreover, the complaint doesn't even allege that

17    deposit LC collateral is being distributed to Creditors

18    under the plan and finally, as we argued in our motion to

19    dismiss, there is no argument that there is collateral going

20    through the collateral agent, specifically under the

21    Delaware Trust decision.

22          Because §4.1 of the intercreditor agreement does

23    not apply, the complaint has to fail.  It's the only section

24    of the intercreditor agreement, the complaint asserts, gives

25    special rights to deposit LC collateral.  In any event, you

1    can't look outside of §4.1 of the intercreditor agreement to

2    manufacture a scenario under which deposit LC lenders get a

3    superior right in the deposit LC collateral because of §2.1.

4            Second, if, for some reason, 4.1 applies, the loan

5    documents made clear that the only provision that could give

6    rise to Plaintiff's alleged priority rights to deposit LC

7    collateral is the fourth priority, §4.1(b), which speaks to

8    deposit LC obligations.  Those exist only for the benefit of

9    deposit LC issuers, not deposit LC lenders like Plaintiffs.

10   The documents are clear from their structure, their purpose

11   and the relevant contractual definitions.  We don't need to

12   rely on anything extrinsic to prevail on this motion to

13   dismiss.  It's the intercreditor agreement and the credit

14   agreement, both of which are foundational documents to

15   Plaintiff's complaint.

16           So, as I mentioned, the first issue is the

17   intercreditor agreement's waterfall not applying.  As Tab 1

18   of the binder I gave you focuses on, there is the predicate

19   in this case, just as there was in the prior case, that §4.1

20   applies if one of four conditions exist -- I'm sorry, if all

21   four conditions exist: there has to be collateral

22   distributed to holders of TCEH first lien claims, the

23   collateral or proceeds have to be received by the collateral

24   agent, they have to be distributed on account of a sale or

25   disposition of collateral or collection on the collateral,

1    and the disposition has to have resulted from the exercise

2    of remedies.  The Court's already reached its conclusion on

3    remedies in Delaware Trust, and as I mentioned, there's

4    nothing different about what happened here.

5          In addition, there has been no distribution to the

6    collateral agent.  What the plan says, the plan that binds

7    everybody, Marathon, the other Plaintiffs, all deposit LC

8    lenders, is the only way there would be a distribution

9    through a collateral agent is if this Court held the

10   collateral is being distributed under -- in the Delaware

11   Trust decision.  That's §6(d)4 of the plan.  That didn't

12   occur, that's binding here.  Therefore, §4.1 cannot apply,

13   and that -- and because of that, we get to the other

14   provision to the intercreditor which govern.  Those

15   governing provisions say that we're pari passu with -- the

16   Defendants are pari passu with Plaintiffs, and therefore,

17   collateral has to be distributed equally.

18          Plaintiffs try to shoehorn around that by saying -

19   - or to do an end run around that by saying, look, we're

20   actually relying on §3.9 of the credit agreement for our

21   priority.  First of all, to the extent §3.9 is inconsistent

22   with §2.1 of the intercreditor agreement, because of §9 of

23   the intercreditor agreement, the intercreditor agreement has

24   to control.

25          Second of all, §3.9 does not actually give

1    Plaintiffs any kind of priority, as I'll discuss when we

2    think about how to -- what the right way to interpret

3    §4.1(b) and the definition of deposit LC obligations is.

4    So, for those reasons, it -- so, and I should point out,

5    Your Honor, that what the complaint says, if you read it

6    carefully, under Paragraph 60, is the only source of their

7    alleged priority is 4.1(b).  Now, in their opposition brief

8    to our motion to dismiss, they also argue 3.9.  Now, a

9    motion to dismiss tests the sufficiency of a complaint, not

10   an opposition brief.  I guess theoretically, you could let

11   them re-plead but because 3.9 doesn't give them anything, it

12   would be futile to let them re-plead, and that's why the

13   motion should be dismissed with prejudice.

14          But I want to address why, even if the waterfall

15   applies, Plaintiffs still lose.  Specifically, the waterfall

16   does not give deposit LC facility lenders any priority

17   rights in the deposit LC collateral.  It gives priority only

18   to deposit LC issuers.  But before I get into the textural

19   analysis of the documents, and the intercreditor agreement

20   and the credit agreement itself, I want to take a step back

21   and just explain exactly what Plaintiff's position is with

22   respect to the money they lent and how §4.1(b) and the

23   definition of deposit LC obligations purportedly impacts

24   everybody's rights because it's really radical.

25          I think, if you accept Plaintiff's position at

1    face value, if TCEH had taken their money and put it into

2    the deposit LC account, in a segregated account, but never

3    issued a single deposit letter of credit and then defaulted,

4    upon default, any cash would be divided completely pro rata

5    between deposit LC lenders and every other lender.  I don't

6    think that's in dispute, so in that case, let's say that was

7    the only collateral available because, like, a Martian came

8    down and destroyed every other bit of collateral that

9    belongs to TCEH, every and anybody else would swamp them

10   something like 20 to 1 if you look at the parties who are

11   pari passu with them.  I don't think they dispute that.

12           Alter -- secondary -- and second ideas, let's say

13   the Plaintiff's view is that if every letter of credit

14   issuer -- every letter of credit that had ever been issued

15   was fully drawn down right now, right, we're at the time of

16   the bankruptcy, the Plaintiffs and Defendants would be,

17   again, exactly pari passu with respect to any amounts that

18   have not been subject to every -- every -- the issuance of a

19   letter of credit had not been ever fallen under the aegis of

20   a deposit LC obligation.  Again, everybody pari passu,

21   potentially, they'd be massively swamped.

22           The Plaintiffs also assert that if TCEH had

23   issued, let's say $100 million dollars of letters of credit

24   and $30 million dollars of those letters of credit were

25   never drawn on, that they as lenders who, under no other

1    circumstances have priority rights to any of the deposit LC

2    collateral, would all of a sudden have a priority right to

3    the remaining money, the remaining $30 million dollars, to

4    the exclusion of everybody else who they are pari passu

5    with.  Of course, that doesn't make sense from a practical

6    level.  Neither the Plaintiffs nor the Defendants have any

7    control over whether TCEH issues of letters of credit,

8    whether the letters of credit are drawn on.  It has no

9    relationship to their credit risk.  It just is a -- an

10   outcome that fundamentally doesn't make sense.  Now, we

11   don't have to rely on the fact that it doesn't make sense to

12   grant our motion, but I think it's really important to keep

13   in mind how little sense that argument and that construction

14   of these documents makes.

15          So, if you look at Slide 2, or Tab 2, we get to

16   §4.1(b), and I think the introduction, with respect to

17   deposit LC collateral is a really important predicate to

18   interpreting 4.1(b).  What is deposit LC collateral, why

19   does it exist and what is its connection with deposit LC

20   obligations?  Deposit LC collateral is cash that sits in the

21   deposit LC loan collateral account, to be very specifically

22   -- very specific, it was originally about a $1.25 billion

23   dollars in cash deposited into certain bank accounts at the

24   closing of the TCEH first lien credit facility, and the

25   deposit LC loan collateral consisted of the proceeds of the

1    loan extended by Plaintiffs and other lenders similarly

2    situated to them.  As a contractual term, what they have are

3    called deposit LC loans.

4          If you look at Tab 3, we have the first clue as to

5    what this is supposed to mean: "Deposit LC loan collateral

6    account shall mean one or more cash collateral accounts or

7    securities accounts established pursuant to and subject to

8    the terms of §3.9 of the credit agreement, for the purpose

9    of cash collateralizing the deposit LC obligations in

10   respect of deposit LC letters of credit."  So, we don't have

11   to guess why it's there.  We don't have to go ask anybody

12   else why that money was put in there.  It actually says it

13   in the document.  The definition of deposit LC loan

14   collateral account, which contains the very collateral being

15   distributed under 4.1(b) tells us it's there to

16   collateralize the deposit LC obligations and those deposit

17   LC obligations are expressly linked to deposit letters of

18   credit, not deposit LC loans.

19         The credit agreement doesn't just say it once.  It

20   explicitly states in the recital to section -- the recital

21   section, which appear at Slide 4 -- or Tab 4: "The proceeds

22   of the deposit LC loans shall be deposited into the deposit

23   LC loan collateral account for the purpose of cash

24   collateralizing the borrower's obligations to the deposit

25   letter of credit issuer in respect of the deposit letters

1    of," Creditor -- "deposit letters of credit."  Again, no

2    mystery about what it's there for.

3              And then I think, Your Honor, when you turn to

4    3.5, the point is made even more clearly.  First, at the

5    beginning of the section deposit letters of credit -- on the

6    borrowing date, the borrower -- on the closing date, the

7    borrower established the deposit LC loan collateral account

8    for the purpose of cash collateralizing the borrower's

9    obligations to the deposit letter of credit issuer in

10   respect to the deposit letters of credit.  This is Tab 5,

11   Your Honor.

12             And then going down further: "The borrower hereby

13   grants to the collateral agent, for the benefit of all

14   deposit letter of credit issuers, a security interest in the

15   deposit LC loan collateral accounts and all cash and

16   balances therein and all proceeds of the foregoing as

17   security for the deposit LC obligations."

18             Again, repeating below: "Amounts of deposit in any

19   of the other deposit LC loan collateral account shall be

20   applied first to repay the corresponding deposit LC

21   obligations," which we know from above, depo -- this lien is

22   granted, this first lien is granted, for the benefit of

23   deposit letter of credit issuers as security for the deposit

24   LC obligations.  Nobody else gets that benefit.  In fact,

25   when you go down to the third -- or you get second, "to

1    repay deposit LC obligations in respect of all other deposit

2    letters of credit and then to repay all other obligations."

3    "All other obligations" is what our clients hold and what

4    Plaintiffs hold.

5              So, I want to highlight three specific sections of

6    3.9 of the credit agreement.  First, it draws a direct

7    linkage between what's in the deposit LC loan collateral

8    accounts, the deposit LC issuers and the deposit LC

9    obligations.  The clear way to read §3.9 is that that

10   account, "the account holding deposit LC collateral and all

11   cash in it exists for the benefit of deposit LC issuers to

12   pay the deposit LC obligations."  Again, where we have that

13   specific language, no reference to deposit LC loans getting

14   that priority.

15             Second, 3.9 reinforces the linkage by creating a

16   mechanism for how the collateral is protected for the

17   benefit of the deposit LC issuer above other parties.  They

18   have a senior right.  So, what are these deposit LC

19   obligations that are so closely tied to deposit LC issuers

20   who have this priority lien in a collateral account?

21             Well, if you look at Tab 6, we have the first

22   component of the -- we have a definition.  It means: "as the

23   ending date of determination, the stated amount of all

24   outstanding deposit letters of credit plus the aggregate

25   principal amount of unpaid drawings under all deposit

1    letters of credit."  And then if you look at the next tab,

2    Tab 7, it discussed what stated amount is.  "Stated amount

3    of any letter of credit shall mean the maximum amount from

4    time to time available to be drawn thereunder, determined

5    without regard to whether any conditions to drawing could

6    then be met."  This is actually critical.  The fact that

7    these are contingent, future obligations, meaning that, when

8    we get to the waterfall, these are not obligations that

9    necessarily have to be paid immediately, but they are

10   obligations which could remain outstanding in the future and

11   which the collateral agent, to the extent 4.1(b) applies,

12   may have to make a payment for in the future, prior to

13   getting to the fifth priority.

14            So, I think put another way, deposit LC

15   obligations are the face amount of all deposit LCs

16   outstanding plus amounts on letters of credit that have been

17   drawn but not repaid.  That's what this senior lien in 3.9

18   exists for, and that's granted to the collateral Trustee for

19   the benefit of deposit LC issuers under 3.9 of the credit

20   agreement.  3.9 also gives this junior priority to all other

21   obligations, which, as I mentioned, is what Plaintiffs hold

22   and Defendants hold together.

23            Against that backdrop, which explains 3.9 and the

24   whereas clauses and the definitions I discussed, the inter-

25   relationship between deposit LC collateral, the deposit LC

1    obligations and the deposit LC issuers, the waterfall in

2    §4.1 contemplates, becomes, I wouldn't say easy to

3    understand, but easier to understand.

4          I don't think as much -- and the waterfall, I

5    think, appears, as we mentioned, back in the second tab, and

6    I don't think there's much dispute as to what the first

7    priority does.  It provides for re -- for payment of fees

8    and obligations due to the issuer at the time the waterfall

9    is applied, other than unpaid drawings, which are amounts

10   where the letter of credit has been drawn on and TCEH hasn't

11   reimbursed yet.

12         The second priority insures that the issuer gets

13   reimbursed for the unpaid drawings.  The third priority

14   works in conjunction with the first to ensure that parties

15   who basically -- secured parties who acted as if they were

16   deposit LC issuers by advancing fees get repaid.

17         So then you get to the fourth priority.  What the

18   fourth priority does is say that whatever deposit LC

19   obligations are left over, after the first three, which are

20   amounts then due and payable or due to the letter -- deposit

21   letter of credit issuer, due to the deposit letter of credit

22   issuer, to -- you know, that need to be repaid to secured

23   parties which already advanced of paid fees.

24         The fourth priority picks up amounts, which could

25   potentially have to be repaid in the future, which are

1    remaining deposit LC obligations, in particular, it's the

2    stated amount, it is -- which is a component of deposit LC

3    obligations addressed nowhere else in §4.1(b).  Now,

4    Plaintiff sort of emphasized that by the time we reach this

5    priority, all the amounts that would be then due and owing

6    to the issuers would have already been paid, so there's

7    nothing to worry about, that they should just be able to

8    sort of swoop in and sort of be the beneficiary of any

9    remaining deposit LC obligations.  But that -- I think the

10   reason that doesn't make sense is that, precisely because

11   the deposit -- the definition of deposit LC obligations

12   contemplates amounts which could have to be paid in the

13   future that 4.1 basically says to the collateral agent, you

14   hold the money and make a decision in the future, as you're

15   actually required to under the preamble to that section, the

16   preamble which says: "The collateral agent shall apply

17   amounts in the following order as promptly as reasonably

18   practical after the receipt thereof, provided such amounts

19   shall not be so applied until such time as the amount of the

20   secured obligation has been determined in accordance with

21   the terms thereof."  So it's expressly saying to the

22   collateral agent, in some instances, you may not have to

23   make payments until you can determine the amount of the

24   secured obligation.  If the stated amount becomes the

25   secured obligation, then you pay it, and you pay it to the

1     person who has credit exposure under it, and that's the

2     deposit letter of credit issuer.

3              And there are certainly scenarios where a deposit

4     letter of credit could remain outstanding after 4.1 became

5     applicable.  One could have to get drawn, and under

6     Plaintiff's scenario, there would be either no or there

7     might be substantially less collateral for the deposit LC

8     issuer to look at to recover, and that's not consistent with

9     §3.9 of the right way to read this agreement.  So I think,

10    taken together with what we know about why the deposit LC

11    collateral exists, the definition of deposit LC obligations

12    clearly means that amounts that the deposit -- I'm sorry, it

13    clearly means the deposit LC obligations applies to issuers.

14             I think there are other provisions in the credit

15    agreement that confirm the deposit LC obligations is just

16    simply can't be interpreted to read -- or can't be read as

17    including deposit LC loans.  I think particularly if you

18    look at -- we put in our binder as Tab 8: "Deposit LC loans

19    is 2014 deposit LC loans, incremental deposit LC loan, a

20    2017 deposit LC loan, or an extended deposit LC loan, as

21    applicable."  I guess the -- three more definitions go by,

22    you get to the next definition, and the term deposit LC loan

23    appears nowhere in the definition of deposit LC obligations.

24    It's just not in there.  You can't make it fit in there.

25             Furthermore, it's not incorporated by reference.

1    You can't make the term deposit LC obligation sort of a

2    portmanteau of the words deposit LC and obligation, which is

3    defined elsewhere, because there is a fixed, precise meaning

4    as to what deposit LC obligation is.  It's the stated amount

5    of deposit letters of credit plus the aggregate principal

6    amount of unpaid drawings under the deposit letters of

7    credit.  It's not general obligations that relate to deposit

8    LCs.  There's just no way to read it that way, which is, I

9    believe, the crux of Plaintiff's argument.

10          Now, Your Honor, there are several other points I

11   think that are worth pointing out as to why Plaintiffs are

12   not entitled to any kind of priority.  If you compare and

13   contrast the definition of revolving LC credit obligations,

14   which specifically references revolving LC borrowings,

15   therefore showing that there was a specific way when

16   revolving credit obligations wanted to encompass borrowings,

17   the parties knew how to do it, it doesn't exist here.  You

18   can see what the -- what deposit LC obligations means.  And

19   I understand that revolving LCs are structurally different

20   than deposit LCs, but it shows the parties knew how to put

21   that in very specifically, the borrower specifically in when

22   they wanted the borrowings in, and specifically when they

23   wanted to, and didn't here.

24          §2.14 of the credit agreement provides that

25   deposit LC loans are pari passu to term loans.  It would be,

1    I think -- and makes no exception for -- with respect to

2    deposit LC.  §5.2 of the credit agreement conflicts with

3    their argument.  It permits TCEH to repay deposit LC loans

4    with amounts on the deposit in the deposit LC collateral

5    account only and to the extent that the account balance

6    exceeds the amount of outstanding deposit letters of credit.

7    I think -- so -- so another way, the amount of deposit LC

8    obligations at any time.  Essentially, what this provision

9    is saying is that the only amounts in the account that can

10   be used to repay the deposit LC loans are amounts not needed

11   to cover deposit LC obligations.

12           This is -- so -- and that amount, incidentally,

13   the amounts not needed, is precisely the stuff Plaintiffs

14   don't claim they have a priority interest, but that's the

15   only stuff they're allowed to -- under the credit agreement,

16   can repay their loans.

17           Your Honor, I'm not sure if you have any questions

18   but I -- I -- you know, in that event, I think my -- my

19   brains are telling me that I've missed nothing, so I'm going

20   to sit down.  Thank you, Your Honor.

21           THE COURT:  Thank you.

22           MR. SHUSTER:  Your Honor, George Shuster of Wilmer

23   Cutler Pickering Hale and Door on behalf of the Plaintiffs

24   in this action, whom we call Marathon and Polygon.  I have a

25   binder, Your Honor, of the documents that were attached to

1   what we call the (indiscernible) declaration submitted by

2   the Defendants, which include the credit agreement, the

3   intercreditor agreement and so forth, that I'll be referring

4   to by page number.  If I may, I could approach the bench and

5   provide a copy to the Court.

6           THE COURT:  Yes, please.  Thank you, yeah, a copy

7   to Ms. Werkheiser.

8           MR. SHUSTER:  Your Honor, just as a matter of

9   housekeeping, when I refer to the documents in this binder,

10  I'll refer to them by tab letter and then at the top of the

11  documents are the PACER page numbers, page such-and-such out

12  of such-and-such, and I'll be referring to those pages to

13  get you to the right section of the document to which I'll

14  also be referring.

15          THE COURT:  All right.

16          MR. SHUSTER:  Your Honor, I want to get into the

17  language of these documents because at the end of the day,

18  that is the core of what we'd like to discuss at today's

19  hearing, but I do want to cover three things before we get

20  there.  I want to say a little bit more about who the

21  Plaintiffs are in this action and how we got to this spot,

22  what is the procedural context that we find ourselves in,

23  and how this action relates to the -- what we call the

24  Delaware Trust action, the action in which the Court

25  rendered a decision several weeks ago.

1          So first, who are the Plaintiffs and how did we

2     get here?  The Plaintiffs, Marathon and Polygon, represent

3     about $250 million dollars out of the $1.25 billion-dollar

4     deposit letter of credit subfacility, which is a part of the

5     larger $24.5 billion-dollar TCEH first lien credit

6     agreement.  What is the deposit LC subfacility?  It's a

7     specific type of letter of credit subfacility where the

8     loans are advanced at the outset with the credit agreement

9     is originated, and those cash proceeds of the loans are set

10    aside, they are deposited into a segregated cash collateral

11    account.

12          For this facility in particular, that means that

13    in October of 2007, the predecessors in interest to Marathon

14    and Polygon, all of the deposit LC lenders, which was a

15    separate group of lenders, advanced $1.25 billion dollars

16    and those dollars, that $1.25 billion, was required to be

17    put into this particular deposit LC loan collateral account

18    that we're discussing today.

19          Against that $1.25 billion-dollar cash collateral

20    account, letters of credit could be issued by the deposit

21    letter of credit issuer, but the letters of credit to be

22    issued would never exceed the $1.25 billion dollars, it

23    could only be at or less than that amount, and it was always

24    contemplated that there could be extra funds beyond what was

25    required to repay the deposit letter of credit issuer for

1    draws on the letters of credit that were issued.

2              There was always a complete separateness between

3    the $1.25 billion-dollar deposit letter of credit sub-

4    facility and the rest of the sub-facility.  This is not a

5    facility where $1.25 billion dollars was taken out of all

6    proceeds that were funded by all lenders and put aside.

7    There is that type of facility.  This is a specific type of

8    deposit LC facility where the amount was taken from specific

9    lenders and put into that account.

10             I also wanted to say a few things about the

11   Plaintiff's participation in this case.  This is not a new

12   issue that has arisen late in the bankruptcy proceedings.

13   It was extant prior to the TCEH bankruptcy filing, Marathon

14   was involved in these cases at the outset to reserve its

15   rights in the DIP financing order, in the cash collateral

16   order, and file a lawsuit in the course of the Chapter 11

17   cases in New York State Court when it felt that there was a

18   plan to compromise the rights of the deposit LC lenders.

19             When the plan that was proposed actually did

20   purport to compromise those rights, Marathon objected and

21   the resolution of that objection was a carve-out of the

22   rights of the lenders against one another in this lawsuit,

23   from the plan.

24             So, where are we today?  Marathon has, by

25   agreement in withdrawing its objection to the plan and

1    getting that carve-out, filed a lawsuit in this Court.  The

2    lenders have moved to dismiss, and we're here on that motion

3    to dismiss today.

4           And what the Court needs to decide today is

5    whether the Defendants have met their burden to show that

6    the Plaintiffs have not presented a plausible claim for

7    relief, and in our view, we clearly have.  These are

8    complicated documents.  They are intertwined among each

9    other, and the provisions of the documents are not clear,

10   and we'll proceed in a minute to say exactly why they're not

11   clear, but in our view, this is not a case where you have

12   two parties convinced that they have the right reading of

13   the documents, that they are clear and unambiguous in one

14   way or another.  This is a case where the Plaintiffs admit

15   that these documents are not clear and they are ambiguous,

16   and they require additional evidence in order to determine

17   their true meaning.

18          So, the third thing I wanted to cover initially,

19   Your Honor, is how this action relates to the Delaware Trust

20   action.  Respectfully, the Plaintiffs disagree with the

21   Court's determination in the Delaware Trust action, but

22   we're not here to re-argue any of the points in that action

23   at all.

24          We are here to explain why we think this action is

25   quite different than that one.  And the first reason is that

1    there is a fundamental background difference in these two

2    actions.  In the Delaware Trust action, there was a dispute

3    over how adequate protection payments, a function of the

4    bankruptcy case, would be shared as a general matter among

5    all credit agreement lenders and all noteholders in a first

6    lien position at TCEH.  Here, we're talking about whether

7    specific dollars that were funded by specific lenders should

8    be returned to those lenders or not, on a priority basis.

9    That is a distinction.

10            Second, the Delaware Trust action did focus solely

11   on §4.1 of the applicable intercreditor agreement, that is

12   very similar language to the language that we have before us

13   today.  However, the priority rights of the deposit LC

14   lenders, because they were paramount and so important to

15   this facility as a whole, are expressed in other provisions

16   of these documents, as you've heard to an extent, but only

17   to an extent, from the Defendants in their argument.  Even

18   if §4.1 of the intercreditor agreement falls away

19   completely, the priority rights of the deposit LC lenders in

20   this case, survive.

21            And lastly, the Delaware Trust action really

22   determined that distributions under this specific, confirmed

23   but not yet effective, plan in this case, do not trigger

24   §4.1 of the intercreditor agreement and that waterfall.  The

25   rights of the Plaintiffs in this case, Your Honor, are

1    independent of the plan.  We objected to the plan, we carved

2    them out from the plan, and whether this plan is confirmed -

3    - whether this confirmed plan goes effective, whether some

4    other plan gets proposed that we might have to object to

5    separately, or whether no plan ultimately goes effective,

6    the rights that we have as a priority against the other

7    lenders still exist.

8              So now, Your Honor, I wanted to turn to the true

9    substance of core of the argument, the language of the

10   documents that express our priority right.  So first, a few

11   things on which I think the Plaintiffs and Defendants agree

12   in this case, that again, 100 percent of the deposit LC

13   lenders' advances went into this deposit LC loan collateral

14   account, and that there are specific priority rules for how

15   the money in that account is distributed.  No one disputes,

16   and you've heard from the Defendant lenders here, that there

17   is a priority to that money.  They say that priority is only

18   for the benefit of one party, the deposit letter of credit

19   issuer.  We say that priority is also for our clients, the

20   deposit LC lenders.  But this is not a case where it's a

21   question of priority or not, it's a question of to whom the

22   priority is owing, and that is the core issue on which these

23   documents are quite unclear, and in fact, legally ambiguous.

24   The question is, who gets paid?

25              And where I'd like to start, Your Honor, to answer

1    that question is §3.9 of the credit agreement, so this is

2    Tab A of the binder, Page 159 of 278.  You've already seen

3    portions of this language in the Defendant's presentation,

4    Your Honor, but I'd like to focus on more of the language.

5    If we look on Page 159 of 278, and you go down, one, two,

6    three, four, five, six, seven, eight, nine lines towards the

7    right margin, there's a sentence that begins the borrower

8    hereby, brackets.

9              THE COURT:  Mm hmm.

10             MR. SHUSTER:  This sentence does two things, Your

11   Honor.  The first part of this sentence before the proviso

12   is a lien grant clause.  After the proviso, you get into a

13   payment priority clause, and I'd like to explain those

14   different parts of this language in turn.

15             The first part, the lien grant, is actually a two-

16   part lien grant.  It says that the borrower hereby grants to

17   the collateral agent, for the benefit of the deposit letter

18   of credit issuers, a security interest in the deposit LC

19   loan collateral accounts and all cash and balances therein

20   and proceeds of the foregoing as security for the deposit LC

21   obligations.  No one disputes that.  No one disputes that

22   the deposit LC issuer is, in fact, a beneficiary of the

23   deposit LC obligations.  The question is, who else is?

24             Well, how do you answer that question?  The

25   language proceeds.  "And in addition, grants a security

1   interest therein for the benefit of the secured parties,"

2   which includes the deposit LC lenders, "as collateral

3   security for the obligations," which includes the deposit LC

4   obligations.  It's not as specific as it could be, but the

5   broad term "obligations" encompasses the deposit LC

6   obligations and the broad term "secured parties" encompasses

7   the deposit LC lenders.  There would be no need to use the

8   term "the obligations" as broad as it is there if the

9   deposit LC lenders did not -- if the deposit LC obligations

10   were not included within it.

11          And how do you know that's how this document is

12   speaking?  How do you know that's the lexicon of this

13   document?  You look to the language after the proviso.

14   After the proviso, and we'll look at Clause Y because it's a

15   little bit easier to read, it says: "Amounts on deposit in

16   any other deposit LC loan collateral account shall be

17   applied first to repay the corresponding deposit LC

18   obligations, second to repay the deposit LC obligations in

19   respect of all other deposit letters of credit, and then to

20   repay all other obligations," meaning obligations other than

21   deposit LC obligations.  That's a distinction between the

22   way it's drafted above where the lien is granted for all

23   obligations to all secured parties, as distinct from, again,

24   the very start of this clause, which grants a lien to the

25   deposit letter of credit issuer, specifically for what the

1    deposit LC issuer is owed alone, the deposit LC obligations.

2             It's difficult to read this, but that's the only

3    conclusion you can get to from the words that are on the

4    page.

5             How else do we know, though, that deposit LC

6    obligations are for the benefit of the deposit LC lenders?

7    You can look at the bottom of the same page, Your Honor.

8    There's a sentence that starts, "in addition."  This is four

9    lines up from the bottom of Page 278, to the right margin,

10   "in addition."  "In addition, the collateral agent hereby

11   agrees to instruct the depository bank to release and pay to

12   the borrower amounts, if any, remaining on deposit in the

13   deposit LC loan collateral accounts after the termination or

14   cancellation of all deposit letters of credit and the

15   repayment in full of all outstanding deposit LC loans and

16   deposit LC obligations."

17            It's saying you can release the money in this

18   account that we've been talking about to the borrower, after

19   you pay the deposit LC loans and the deposit LC obligations.

20   It doesn't say after you repay all obligations.  How could

21   you be releasing money from this account after paying the

22   deposit LC lenders and the deposit letter of credit issuer,

23   but before paying other lenders, if the deposit LC lenders

24   did not have a priority over those other lenders?

25            I now want to turn, Your Honor, to §4.1(b) of the

1   intercreditor agreement, so this is Tab B in the binder,

2   Page 23 of 60.  This is another provision of these

3   documents, Your Honor, where unfortunately, we have a

4   payment instruction without a payee.  I think you've heard a

5   perfectly rational explanation from Defendant's counsel of

6   how the first three levels of this waterfall work, and we

7   agree with that.  Those three levels of the waterfall are

8   intended to pay amounts to the deposit letter of credit

9   issuer or someone standing in the shoes of the deposit

10  letter of credit issuer, and we know that because it says

11  it.

12          The first one says: "the payment of all amounts

13  due to the deposit letter of credit issuer."  The second

14  one: "the payment of all amounts due to the deposit letter

15  of credit issuer."  The third one: "to any secured party

16  which has theretofore advanced or paid any fees to the

17  deposit letter of credit issuer."  You get to the fourth

18  level of the waterfall and there is no payee listed.  This

19  we think is a core ambiguity in the document.  Unless

20  there's some other provision of this document that very

21  clearly says to whom deposit LC obligations must be paid,

22  and we don't think there is, this fourth provision of the

23  waterfall is ambiguous.

24          And I want to say that we're reading §4.1(b) of

25  this agreement right now, even recognizing this Court's

1   decision in the Delaware Trust action because even if the

2   Court is correct in the Delaware Trust action that 4.1(b)

3   does not apply in some circumstances, or maybe even in these

4   circumstances, you can still look at this provision to

5   interpret the provisions of 3.9 that we've just gone

6   through, to try to understand what these documents mean.

7           So, where's another clue, though, that says who

8   should be paid the deposit LC obligations, who has the

9   benefit of them?  Let's look on the same page, just above

10  §4.1, which actually, the sentence begins on the prior page,

11  22 of 60.  It says: "With respect to the deposit loan

12  collateral, references in this agreement to required secure

13  parties shall be deemed references to the required deposit

14  LC loan lenders until proceeds from the deposit LC loan

15  collateral have been applied pursuant to §4.1(b) to

16  satisfaction of all priorities except last."  This provision

17  says that if you're looking to, who are the required deposit

18  LC loan lenders, which means, who is allowed to amend

19  §4.1(b)?  Who is allowed to amend the priority provisions of

20  this agreement?  It says you have to have the deposit LC

21  loan lenders agree, or at least more than a majority of

22  them, to amend everything except for last.  First, second,

23  third and fourth.

24          Fourth, the provision that doesn't have a payee,

25  but it says it's about the payment of deposit LC

1    obligations, it's the deposit LC loan lenders who have the

2    control over the amendment of that provision.  Why would you

3    give them the right to amend that provision?  Why would you

4    require their consent to amend that provision if there

5    weren't a beneficiary under that provision?  It makes no

6    sense.  The reason is, they funded this account.  That

7    account is full of their money, and if you're going to take

8    away their right to get it back, they need to consent.

9             I want to turn briefly, Your Honor, to Tab C, Page

10   18 of 52.  This is §5.4 of the security agreement.  Your

11   Honor, this is one of those provisions that now starts to

12   step a little bit further away from the core priority

13   provisions that we're talking about, §3.9 of the credit

14   agreement and §4.1(b) of the intercreditor agreement and I

15   would submit that, sort of, the further you go in these

16   documents away from the core provisions, the less

17   credibility you really have to say that these provisions

18   truly inform what is going on with respect to the deposit LC

19   obligations and the priority that my Plaintiffs are

20   claiming.

21            But, that said, this provision says: "The

22   collateral agent shall apply the proceeds of any collection

23   or sale of the collateral as well as any collateral

24   consisting of cash," which would be cash in the deposit LC

25   loan collateral account, "at any time after receipt in the

1    order specified in §4.1 of the intercreditor agreement."

2              We would submit, Your Honor, that when you read

3    across the words that don't apply in this section,

4    effectively it says: "The collateral agent shall apply...any

5    collateral consisting of cash...in the order specified in

6    §4.1 of the intercreditor agreement," period.  We would say

7    that this is yet another reason why the Delaware Trust

8    action is distinguishable, that this requires payment in the

9    order of §4.1 without regard to the preamble in §4.1, but in

10   any event, this is just, in our view, a clue, not one of the

11   core priority provisions on which our rights depend.

12             So, Your Honor, I want to turn back to the

13   definition of deposit LC obligations for a moment.  Because

14   this is, the Defendant's counsel is correct, the core

15   provision on which many of the issues here depends.  Deposit

16   LC obligations is a defined term that is effectively a

17   mathematical formula.  It produces a dollar amount.  Just

18   like §4.1 doesn't say to whom the deposit LC obligations are

19   payable, just like §3.9 of the credit agreement does not say

20   to whom the deposit LC obligations are payable, the

21   definition itself doesn't provide any payee for these

22   obligations either.  It says that it's an amount that's

23   equal to the stated amount of letters of credit outstanding,

24   and the amount of unpaid drawings.  That is a dollar amount.

25             Defendants have raised various hypothetical

1    scenarios, including ones involving Martians, where the

2    deposit LC obligations number would be zero.  There are

3    those hypothetical scenarios.  We think they are

4    commercially unreasonable and therefore should not be a

5    basis for interpreting these documents.  For example, the

6    idea that the lenders would enter into a deposit LC facility

7    and TCEH would borrow money that could only be used to back

8    LCs but then TCEH would never issue any LCs, that seems a

9    very unlikely scenario and not a commercially reasonable

10   one.

11          But in any event, it is not a stretch to say that

12   the deposit LC lenders are those who are owed the deposit LC

13   obligations.  The way this documents worked -- these

14   documents work, is you have definitions of types of loans,

15   including the capital L Loans term of which the deposit LC

16   loans are a part, and then you have definitions of

17   Obligations with a big O, and Secured Obligations, with a

18   big S and a big O, and those defined term Obligations and

19   Secured Obligations include the deposit LC obligations just

20   like the big L defined term Loans includes the deposit LC

21   loans.  There's nothing unusual about that.  It works in a

22   natural language understanding, and it works in the lexicon

23   of these documents.

24          It also works in the way that §4.1(b) is drafted

25   and the way that that waterfall has to be understood.  The

1   Defendants have pointed, and we'll go back to §4.1, briefly,

2   of the intercreditor agreement, Your Honor, again, this is

3   Tab B of the binder, Page 23 of 60.  Defense counsel has

4   focused on the idea, in the preamble, in the proviso, it

5   says: "provided that such amounts shall not be applied until

6   such time as the amount of the secured obligations has been

7   determined in accordance with the terms of this agreement

8   and the other financing documents."

9          That is crucial because defense counsel is saying

10  this doesn't make sense because there might be these

11  contingent obligations when you get into the fourth level of

12  the waterfall that someone should be holding on reserve,

13  even though the documents don't talk about reserve, or

14  somehow otherwise paying to the deposit letter of credit

15  issuer to be held until it figures out whether it needs them

16  and then maybe they'll pay them back to the borrower or to

17  someone else, even though the documents don't provide a

18  mechanic for those reserves.

19         But the fact is, this waterfall only applies after

20  you determine the amount of the obligations.  So, if the

21  deposit letter of credit issuers owed something, it gets

22  paid in the first levels of the waterfall.  Then you pay the

23  deposit letter of credit lenders, and then you take any

24  extra money and pay all the other lenders ratably.  That's

25  how the provision works.  The language is in the document to

1    create that mechanic.

2            Your Honor, I'm going to finish up by mentioning a

3    few miscellaneous points, mostly because the Defendants have

4    raised them.  §5.2(d) of the credit agreement, this is the

5    one that you were told means that the borrower can use the

6    money in the deposit LC loan collateral account to pay the

7    deposit LC lenders, so long as there's enough money left to

8    also protect the deposit LC issuer.

9            I think that point favors us strongly.  That

10   provision doesn't say that the borrower can use the money in

11   this segregated account to pay any lenders that it wants.

12   It can use the money to pay the deposit LC lenders, the ones

13   who loaned this money and put it into that account in the

14   first place.  That's in a non-default scenario, the borrower

15   has the right to take the money out of the account and

16   prepay the deposit LC loans.  That sure sounds like that

17   money is being used in a sort of priority for the deposit LC

18   lenders in a non-default world.

19           In the default world, we have the other provisions

20   that say that the priority exists by way of distribution.

21   Again, both in §3.9 of the credit agreement and in 4.1(b) of

22   the intercreditor agreement.

23           The last point I'll make, Your Honor, is that the

24   defense counsel has relied on §2.1 of the intercreditor

25   agreement, which was a generic pari passu lien priority

1   language.  We think that, when you look at that provision,

2   when you line it up against all the other provisions that

3   we've spoken about here, it's clear that that is a more

4   general provision that doesn't speak to the deposit LC loan

5   collateral account in particular.  It expressly is modified

6   by §4.1 of the credit agreement, which we think expressly

7   grants us the priority that we're speaking to.  It only

8   speaks to lien priority, and it conflicts with the

9   statements of lien and payment priority elsewhere.

10          And finally, if we're talking about commercially

11  unreasonable results here, that provision, §2.1 of the

12  intercreditor agreement says that all secured parties have

13  ratable rights.  Well, one of the secured parties is the

14  deposit letter of credit issuer, so that can't literally be

15  true in all instances because everyone here agrees that the

16  deposit LC issuer has to get paid first.  So you can't force

17  that provision to do more than it does, which is state a

18  general lien priority which is modified by the other, more

19  specific provisions of these documents.

20          And with that, Your Honor, I think I'll rest and

21  reserve time to rebut anything further said by the defense

22  counsel.

23          THE COURT:  All right, thank you.

24          MR. SHUSTER:  Thank you.

25          MR. FRIEDMAN:  Good afternoon, Your Honor, Peter

1    Friedman from O'Melveny & Myers.

2           I think the first point that I wanted to make

3    deals with §3.9 of the language that Plaintiff's counsel

4    talked about.  Plaintiff's counsel said, look, there's

5    deposit LC obligations but there's also other obligations

6    which are entitled to a priority, or at least entitled to a

7    lien, and that's true, but let's be clear.  Deposit LC

8    obligations are secured for the benefit of deposit letter of

9    credit issuers.

10          Who is entitled to the remaining priority?

11   Secured parties.  Secured parties are not just Marathon and

12   the other Plaintiffs.  If you look at the definition of

13   secured parties, secured parties is everyone, including our

14   client, and obligations are obligations owed to everyone.

15          Now, Plaintiff also referred to the last sentence

16   of §3.9.  The first thing that section -- the last sentence

17   makes extremely clear is the deposit LC loans are different

18   than deposit LC obligations.

19          We know that because it says deposit LC loans and

20   deposit LC obligations.  They're not the same thing.  In

21   fact, if they're right, and §4.1(b) applies, 4.1(b) doesn't

22   say anything about deposit LC loans.  It only says something

23   about deposit LC obligations.

24          On top of that, §3.9, as Plaintiff's counsel

25   pointed out, is not necessarily applies in the context of a

1    default, it just says if they choose -- if the Plaintiff

2    chooses -- I'm sorry, if the borrower chooses to make a

3    repayment, then it'll be done in certain ways.  Here, we

4    have a default where that -- the borrower is not going to

5    have the ability to simply just make a repayment of one

6    loan, as opposed to others.

7            Plaintiff mentioned, I think for the first time

8    here, I don't think it was mentioned in their papers, but in

9    any event, the language about required secured lenders.  So,

10   first of all, required secured lenders with respect to the

11   deposit LC collateral appears nowhere in the waterfall.

12           It doesn't appear anywhere, again, giving them a

13   priority of payment right, and I think the best way to

14   understand that provision is, the deposit LC lenders have a

15   right to prevent deposit LC collateral from being taken out

16   from deposit LC issuers, so the deposit LC issuers can't

17   turn around and say, wait a second, where's the money that's

18   supposed to repay me?  It's gone, and then turn around and

19   look to the people who made the loan in the first instance.

20           So, I think that's the natural reading of what

21   that does.  You can't amend the priorities to say the people

22   who have future rights, because that's what's so important,

23   Plaintiff's reading of 4.1(b) and deposit LC obligations

24   completely leaves out the stated amount component, and

25   what's the -- deposit LC obligations.  What's the stated

1   amount?  Stated amounts are amounts which may be due from

2   time to time, irrespective of whether they're right at the

3   moment.  Now, I think that -- so it's -- I think in order to

4   protect them from having their collateral taken away and

5   turning around and suing people like Plaintiffs who

6   originally supposed to have funded the loans.

7            Your Honor, there is no possibility of the

8   collateral agent, you know, at the termination of any

9   outstanding deposit LC letter is giving money to the

10  borrower because what happens after §4.1(b) for deposit LC

11  obligations is satisfied.

12           Well, you look to the next provision of the

13  waterfall, and then you give the money to everybody.  If

14  there are -- if the stated amount -- if there never is a

15  stated amount that matures into a real obligation, you don't

16  give the money back to the borrower.  You give it to both of

17  our clients and everybody else similarly situated because

18  they hold obligations.

19           There's no prospect of a collateral agent,

20  hopefully, going rogue and giving the money back to the

21  borrower.  That's not contemplated by the agreement.

22           What is contemplated is the borrower -- is -- if

23  4.1 applies, and there's a -- some sort of distribution to

24  the collateral agent, the collateral agent, determining

25  whether there is a secured obligation with respect to stated

1    amounts and when that ripens, if it ripens, making a payment

2    on it, and if it never ripens, again, the money goes down

3    the fourth -- the fifth priority.

4           I think §5.4, which Plaintiff's counsel mentioned,

5    of the collateral security agreement, does not -- clearly

6    doesn't apply here because what are we talking about?  We're

7    talking about a situation where the collateral agent is

8    apply proceeds, which is, as this Court has already

9    determined, not what's going on here.

10          I think the only other point I wanted to make,

11   Your Honor, is that 4.1(b), it actually doesn't say that

12   with respect to deposit LC collateral on the first issue,

13   that it's payment to the deposit letter of credit issuers.

14   It's to payment of all amounts due to the deposit letter of

15   credit issuers.  Again, there's a ripe due amount.

16          Next, it's payment due to the deposit letters of

17   credit.  Third, it's amounts which have already been

18   advanced.  So, the reason the fourth issue, the fourth

19   priority doesn't say anything about who it's to, first of

20   all, we already know who it's to, based on 3.9, who has a

21   security interest for the deposit LC obligations.

22          And in addition, there is no amount necessarily

23   then due, so it doesn't -- it purposely wouldn't track the

24   first three priorities, which again, also don't say to who

25   the -- whom the amount is paid, it just says on account of

1    what is being paid.  That's the easy way to understand what

2    §4.1(b) the fourth means and why there's this discrepancy.

3            Look, I understand the documents are complicated.

4    Plaintiff's counsel is right, they are not the easiest or

5    most pleasant things to read through, but a lack of ease or

6    pleasantness about reading them doesn't create ambiguity.

7    They are unambiguous and they clearly don't grant Plaintiff

8    any kind of priority that can be recognized, as asserted in

9    their complaint, and for that reason, we ask that the

10   complaint be dismissed with prejudice.  Thank you, Your

11   Honor.

12            THE COURT:  Thank you.

13            MR. SHUSTER:  If I may, Your Honor, just a couple

14   of points by way of conclusion?

15            THE COURT:  Mm hmm.  Go ahead.

16            MR. SHUSTER:  So, going back to this language at

17   the end of §3.1(e), which is just before §4 in the

18   intercreditor agreement, defense counsel has said that that

19   provision is not referenced in the 4.1(b) waterfall, nor

20   does the 4.1(b) waterfall reference the term "required

21   deposit LC loan lenders."

22            I don't fully understand that point, frankly,

23   because it is that sentence that references the 4.1(b)

24   waterfall, it's in the opposite direction, and it expressly

25   says that the required deposit LC loan lenders are required

1    to amend the priorities one through four of that waterfall,

2    all the priorities except for the last.

3              The second point, Your Honor, is that -- and this

4    is more by way of summary than anything else, it's our view,

5    and I want to be very clear about this, that the Delaware

6    Trust action cannot be used to dispose of this action.  4.1

7    is not the only provision that we're relying on here.  We

8    have other priority rights in these documents.

9              Second, the plan can't be used to eviscerate our

10   rights in this action.  We've agreed on a carve-out from the

11   plan for the express purpose of conducting this litigation.

12   You can't say that the plan distributions or anything in the

13   plan overrides our rights, because the plan itself says that

14   nothing in the plan shall impair our rights in this action.

15   That's what the plan says.

16             And finally, Your Honor, this is a situation where

17   you have a payment provision in a document, but you don't

18   have a named payee.  No one has given you today an express

19   payee of the deposit LC obligations in §3.9, in §4.1(b),

20   anywhere.

21             Both sides have told you that there are all sorts

22   of scenarios under these documents that make no sense

23   whatsoever when you try to put the various pieces together.

24   What that tells me is that these documents are ambiguous.

25   You need other information in order to come to the right

1    answer on these documents.

2           I know that the Court would like, and to some

3    degree, the parties would like, a clear answer to this

4    question but some questions defy a clear answer, and when

5    you have no payee and unreasonable, strange scenarios that

6    happen if you try to put all of these provisions of the

7    documents together and create a clear answer, I think you

8    have to say that the documents are ambiguous.

9           We think when you line up all of the arrows here,

10   many more of them point in the direction of the Plaintiffs

11   than in the direction of the Defendant's position, but that

12   doesn't mean that we think that the documents are

13   unambiguous and that it's easy to jump to that conclusion.

14          We think it would be very helpful to compare this

15   facility to other comparable market facilities.  We think it

16   would be very helpful to hear about the independent credit

17   decisions that the lenders made in investing here.

18          Why would you invest in a separate, segregated

19   deposit LC loan facility if it had identical rights,

20   identical interest?  You wouldn't.  You would invest in it

21   if you felt that it had a higher priority right, but maybe

22   because it was a smaller facility, it had lower liquidity.

23   You couldn't move it around in the marketplace as much, and

24   you made a trade-off.  That would be evidence, if presented,

25   that would help to understand what these documents mean.

1           And finally, if we had to, Your Honor, we would go

2    to the intent of the drafters and get evidence on that.  But

3    you can't do it from the paper that's before you.  It's a

4    big binder, but it just doesn't have the answer to this

5    specific question.  Thank you, Your Honor.

6           THE COURT:  Thank you.  Yes, last word.

7           MR. FRIEDMAN:  Yeah, thank you.  Your Honor,

8    first, this is Peter Friedman again.  I should clarify that

9    what I said is the word deposit LC loans doesn't appear in

10   §4.1, but deposit LC obligations does.

11          THE COURT:  Yes.

12          MR. FRIEDMAN:  That's what my reference was.  And

13   the second is, we should just be really clear.  Plaintiffs

14   have a pari passu lien not just on deposit LC collateral.

15   You get everything.  So, to the extent that there's some

16   misapprehension that Plaintiffs are only looking to one

17   source of collateral, that's just not accurate.  Thank you,

18   Your Honor.

19          THE COURT:  You're welcome.  All right, well,

20   thank you very much for your argument.  The Court is going

21   to take the matter under advisement and issue a written

22   decision I think fairly soon, but I make no promises on how

23   quickly you'll get something, but you'll get something as

24   soon as -- as soon as reasonably able to provide it to you,

25   all right?  Thank you very much, we're adjourned.

1          MR. FRIEDMAN:   Thank you, Your Honor.

2          MR. SHUSTER:   Thank you, Your Honor.

3

4                              *  *  *  *  *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 49

1            C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

Sonya                    Digitally signed by Sonya Ledanski Hyde
6                                       DN: cn=Sonya Ledanski Hyde,
                                        o=Veritext, ou,
Ledanski Hyde            email=digital@veritext.com, c=US
7                                       Date: 2016.04.12 09:51:08 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  April 7, 2016