1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4    In re:                          :

                                     :    Chapter 11

5                                    :

     ENERGY FUTURE HOLDINGS CORP., :    Case No. 14-10979 (CSS)

6    et al.,                         :

                                     :

7         Debtors.                   :    (Jointly Administered)

                                     :

8    _____:

9

10

11

12

13                              United States Bankruptcy Court

14                              824 North Market Street

15                              Wilmington, Delaware

16                              April 28, 2016

17                              3:00 PM - 3:20 PM

18

19

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTCHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO OPERATOR:  LESLIE MURIN

1    HEARING re Telephonic Status Hearing

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
 1    A P P E A R A N C E S :

 2

 3    KIRKLAND & ELLIS, LLP.

 4          Attorneys for Debtor, Energy Future Holdings

 5

 6    BY:   MARC KIESELSTEIN (TELEPHONICALLY)

 7

 8    WHITE & CASE, LLP

 9          Attorneys for the Creditor, Ad Hoc Committee TCEH

10          Unsecured Noteholders

11

12    BY:   THOMAS LAURIA (TELEPHONICALLY)

13

14    PAUL WEISS RIFKIND WHARTON & GARRISON

15          Attorneys for Interested Party, Steering Committee of

16          TCEH Lenders

17

18    BY:   ALAN KORNBERG

19

20    ALSO PRESENT TELEPHONICALLY:

21

22    JOSHUA H. APFEL

23    DEREK C. ABBOTT

24    JACOB A. ADLERSTEIN

25    KEVIN O'NEILL
```

1    MONICA S. BLACKER

2    SCOTT L. ALBERINO

3    CATHERINE EISENHUT

4    JOANNA S. NEWDECK

5    ASHLEY F. BARTRAM

6    HAL F. MORRIS

7    RACHEL R. OBALDO

8    PEG A. BRICKLEY

9    MATTHEW BROD

10   CHRISTOPHER HAHM

11   MARK A. CODY

12   HOWARD A. COHEN

13   MICHAEL D. DEBAECKE

14   DANIEL DEFRANCESCHI

15   JASON M. MADRON

16   GREGORY T. DONILON

17   STACY DORE

18   JUSTIN K. EDELSON

19   CHRISTOPHER A. WARD

20   JAMIE L. EDMONSON

21   CAROL W. LEVY

22   JEFFREY S. SABIN

23   BENJAMIN D. FEDER

24   JEFFREY R. FINE

25   GIANCARLO FINIZIO

1    MARK A. FINK

2    MARK FLANNAGAN

3    DAVID M. FOURNIER

4    SIMON FRASER

5    JULIA FROST-DAVIES

6    AMY KYLE

7    RICHARD GITLIN

8    BRADY C. WILLIAMSON

9    BRIAN GLUECKSTEIN

10   TODD M. GOREN

11   ERICA RICHARDS

12   ISLEY M. GOSTIN

13   JENNIFER GUERARD

14   STEVEN ZUCCHET

15   KURT GWYNNE

16   THOMAS HALS

17   MARK W. HANCOCK

18   MARK F. HEBBELN

19   HAROLD KAPLAN

20   DANIEL H. HOGAN

21   JEREMY HOLLEMBEAK

22   CHAD J. HUSNICK

23   NATASHA HWANGPO

24   MARK E. MCKANE

25   EDWARD SASSOWER

1    APARNA YENAMANDRA

2    DAVID M. KLAUDER

3    VINCENT LAZAR

4    RAYMOND LEMISCH

5    CATHERINE LOTEMPIO

6    DANIEL A. LOWENTHAL

7    JONATHAN D. MARSHALL

8    LUCKEY MCDOWELL

9    R. STEPHEN MCNEILL

10   STEPHEN MILLER

11   PAULINE K. MORGAN

12   TINA MOSS

13   RICHARD PEDONE

14   ERIK SCHNEIDER

15   RACHAEL RINGER

16   MATTHEW M. ROOSE

17   JEFF ROSENBAUM

18   RICHARD SCHEPACARTER

19   JEFFREY M. SCHLERF

20   NED S. SCHODEK

21   STEVEN R. SCHWARTZ

22   J. CHRISTOPHER SHORE

23   TAMARA VAN HEEL

24   ANGELO THALASSINOS

25   ANDREW M. THAU

1    MARK K. THOMAS

2    PETER YOUNG

3    AMER TIWANA

4    CARL TULLSON

5    MATTHEW UNDERWOOD

6    JEFFREY WEISS

7    SETH GOLDMAN

8    THOMAS WALPER

9    EMILY A. BUSSIGEL

10   DAVID P. PRIMACK

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 8

1                    P R O C E E D I N G S

2            THE COURT:  This is Judge Sontchi.  I hope you can

3    hear my okay.  I am participating remotely as well, not in

4    the Courtroom, but I'll tell you what I'll know and then

5    I'll turn it over to the Debtors.  I know the Debtors asked

6    for a status conference to report developments and that's

7    the limit of my knowledge, so why don't I turn it over to

8    Debtor's counsel to take the lead?

9            MR. KIESELSTEIN:  Good afternoon, Your Honor.

10   Marc Kieselstein of Kirkland & Ellis on behalf of the

11   Debtors.

12            Your Honor, indeed their have been material

13   developments on the proposed transaction that was

14   contemplated by the confirmed plan, and I think all parties

15   agree, it's appropriate to bring those to the Court's

16   attention and talk about next steps.  And others will no

17   doubt have their own perspective, but let's start with the

18   Debtors.

19            Your Honor, as the Court knows, the PUC in Austin

20   has to approve the application to convert Oncor into a REIT,

21   and there has been a great deal of administrative process

22   over the last six months or so, and lots of folks, on this

23   call and off, including the commission and the staff, have

24   worked very hard in the best of good faith to shepherd the

25   application through the regular party gauntlet.

1          Ultimately, the PUC gave its approval in a March

2     24th order, but there were conditions, including ones which

3     injected uncertainty as to how much of the economic benefit,

4     if any, of the restructure could be retained by the owners,

5     and not have two rate payers.

6          That, along with reservations expressed by the IRS

7     and downward pressure on REIT valuations generally, calls

8     into question whether the investor group would actually fund

9     the very large equity check necessary to consummate the

10    transaction.

11         And there's been, obviously, a great deal of

12    speculation all along about whether this deal would close,

13    and that has only intensified over the last 30 days while

14    the investor group appropriately considered its options,

15    including further motion practice before the PUC.

16         I think we now know, Your Honor, and report to the

17    Court, that we've been told that the investor group is not

18    going to fund, and instead wished to receive the $550

19    million dollars of consideration required to be paid out of

20    the TCEH First Lien collateral as quickly as possible.  As

21    Your Honor will recall, that is a term, a required term, to

22    be in any alternative plan structure.

23         And Your Honor, obviously, this is not the outcome

24    anyone wished for or hoped for, and it's certainly not an

25    occasion for casting of aspersions or pointing fingers.  It

1    is, of course, however, an outcome we very much prepared for

2    and planned for.

3                Now, it is our intention to very quickly pivot to

4    an alternative restructuring, and exactly how that pivot

5    will occur is a technical matter, it's still something under

6    discussion.

7                Now, Your Honor may recall that the plan support

8    agreement specifically permitted the Debtors to engage in

9    negotiations around an alternative restructuring, but under

10   the cover of confidentiality, and I can report that the

11   interested directors and their advisors, along with the CROs

12   of Kirkland and Evercore have been engaged in this sort of

13   contingency planning for some time, using the same sort of

14   deliberate process that supported the previous settlement of

15   the legacy litigation and the intercompany claims.

16                But we have shared an alternative plan structure

17   term sheet with a number of stakeholders, and of course, it

18   provides for all the required plan terms, including the

19   payment of the $550 million dollars.

20                Now, whatever the mechanic to pivot to an

21   alternative transaction, we want to do that quickly, and we

22   expect to file a plan for all of the estates in short order,

23   along with a scheduling motion to streamline the rest of the

24   case.  That's the Debtor's report, Your Honor, and happy to

25   entertain any questions you might have.

1          THE COURT:  Okay.  You -- I know you're using, and

2    I'm sure carefully, adverbs like "quickly," "it's in the

3    works," and whatnot.  What kind of timeframe you're talking

4    about, when you say scheduling motion, what exactly do you

5    mean?

6          MR. KIESELSTEIN:  So, Your Honor, you may recall

7    one of the negotiated items that came out of the plan

8    support agreement was a streamlined process to get from the

9    filing of an alternative plan to a confirmation hearing

10   within 90 days, and so the scheduling motion would simply be

11   a way to explicate that in a brand new fashion and put that

12   before the Court, so we have a schedule that's workable.

13         And Your Honor will also recall, that per the

14   settlement agreement, while this would never be qualified as

15   a simple confirmation hearing, it certainly would lack a lot

16   of the elements from the time around because of what was

17   settled permanently through the settlement agreement.  The

18   intercompany claims, the legacy liability management, the

19   LBO, et cetera.

20         So, the scheduling motion would be meant to

21   implement in our reasonable, rational way, the timing that

22   we had previously talked about for an alternative plan.

23         In terms of timing of the filing of a plan, that

24   could happen in very short order, that could happen in the

25   next few days, or certainly, likely, within the next few

1    days, perhaps a little longer, but that's certainly what we

2    are contemplating, and what we've talked to stakeholders

3    about as well.

4         MR. LAURIA:  Your Honor, this is Tom Lauria --

5    this is Tom Lauria of White & Case on behalf of the ad hoc

6    group of unsecured creditors on the T-side.  Whenever

7    appropriate, I would like to add a few remarks.

8         THE COURT:  Yes, of course.  If you'll just give

9    me a minute, I want to check one thing and then I'll turn it

10   over to you.  Okay, Mr. Lauria, go ahead.

11        MR. LAURIA:  Good afternoon, Your Honor, thank

12   you.  While I agree with a number of the comments of

13   Debtor's counsel, I think there are a couple of

14   clarifications that are required.

15        Number one, at this point, the plan support

16   agreement remains in full force and effect, and has not been

17   terminated by anybody, including my clients, the T first or

18   the Debtors, for that matter.  And nor have we abandoned the

19   notion that a transaction could be consummated under the

20   existing plan.

21        We have had discussions with various parties about

22   how to try to get there.  I can't provide the Court with any

23   assurance that we will get there, but those discussions are

24   ongoing, including with the Debtors, and you know,

25   nonetheless, at this point, it would appear that the parties

1   will take the position that on April 30th, they have the

2   right to terminate, if that's what they determine is the

3   right thing to do, but to my knowledge, nobody has that

4   right at this time, nobody's purported to exercise it.

5          We have filed a request for re-hearing with the

6   PUC and that is scheduled for -- it's first open to

7   discussion on the record on May 4th, next week.

8          We do not expect a ruling on the substance of the

9   request for re-hearing, but we do expect to gain some

10  insight as to where the PUC is going with respect to the

11  request, and are hopeful that there may be some guides there

12  that will assist the parties in trying to -- their path

13  forward.

14         I think the thing that I would want to make clear

15  is that, in which we agree with the Debtors, is that we are

16  all working to try to find the most efficient path to the

17  finish line, here.

18         That could be through separate plans for the T-

19  side and the E-side, or it could be through a modification

20  of the existing deal, or a transaction that is similar to

21  the existing deal, but included modifications that are

22  agreed to by stakeholders on all sides.

23         So, all options are being pursued.  The one thing

24  that we do want to be clear on is that the T unsecured

25  creditor group and -- (indiscernible) investor group is not

1   going to do anything to compromise the entitlement of

2   unsecured creditors on the T-side to the $550 million-dollar

3   payment.  It was negotiated for and provided for in the

4   settlement agreement, in the even that the existing

5   transaction cannot be consummated.

6           THE COURT:  Okay. I think I understand your

7   position.

8           MR. KORNBERG:  Your Honor, it's Alan Kornberg at

9   Paul Weiss.  Can I be heard on behalf of the TCEH First Lien

10  Creditors?

11          THE COURT:  Yes.

12          MR. KORNBERG:  We agree with the Debtor that an

13  alternative restructuring was not a hoped for outcome, but I

14  think realistically, that is where we find ourselves,

15  despite a lot of hard work by many parties, including Mr.

16  Lauria and his clients.

17          We do not believe that the conditions to a free

18  extension of the plan support period beyond April 30 have

19  been met, and we also understand that the investor group

20  will not pay for an extension, which is a right that they

21  have under the plan support agreement.

22          So, we also agree with the Debtors that we have to

23  pivot swiftly to an alternative plan, and as Your Honor will

24  recall and as parties have mentioned, the right to do so was

25  bargained and paid for by the TCEH First Lien Creditors to

1    the tune of $550 million dollars.

2            Fortunately, Mr. Kieselstein mentioned, we're not

3    starting from scratch.  An alternative plan will incorporate

4    the benefits of the durable settlements that Your Honor

5    previously approved.  We are carefully considering the

6    Debtors' alternative plan structure.

7            From the standpoint of the First Lien Creditors,

8    the alternative has to provide for, among other things,

9    certainty in terms of both timing and execution.  Those are

10   critical objectives of -- to our clients.

11           Our greatest fear is that the T-side will be

12   forced to endure further delay, which would not be in the

13   interests of our clients or Mr. Lauria's, not because the T-

14   side issues, of which I don't think there are any

15   substantial ones remaining, but because of the lack of

16   consensus on the E-side.

17           And that delay, delay in T-side emergence from

18   Chapter 11 because of E-side's lack of agreement, would be a

19   terrible result, given the massive loss in value which our

20   collateral has suffered, and our inability to take control

21   of the company as promised under the plan, and take the

22   actions necessary to restore it to competitiveness and

23   profitability in a changing landscape in the energy market.

24           So therefore, from the position of the First Lien

25   Creditors on the T-side, for us to support an alternative

1    restructuring, it must provide for the possibility of

2    delinkage of the T silo from the E silo for plan

3    confirmation and consummation purposes, if we cannot adhere

4    to an agreed-upon calendar, which we are waiting for the

5    Debtors to propose.

6         We hope that that timeline will be acceptable, and

7    we also hope that, if it gets dragged out because of events

8    on the E-side, that we have an effective way to eject

9    ourselves from that situation.  And if we can't reach

10   agreement on those mechanisms and such a timeline, the

11   alternative would be for the First Lien Creditors to file a

12   separate plan for TCEH so that we don't have to contend with

13   E-side issues and problems.

14        THE COURT:  Thank you.  Anyone else wish to be

15   heard?

16        MR. KIESELSTEIN:  Your Honor, Marc Kieselstein

17   again.

18        Just one point of clarification, if I may, and I

19   just wanted to be clear, that the alternative plan structure

20   that is under contemplation would not preclude pursuit of

21   the REIT and continued pursuit of the REIT application.

22        And again, that's some of the, sort of, mechanics

23   that are under discussion, but it -- while these investors

24   may have made a decision on -- a rational decision, from

25   their perspective, not to fund the REIT transaction, there

1    may be other folks in the capital structure who may want to

2    pursue that still, and our alternative plan structure would

3    accommodate that.

4              MR. LAURIA:  Your Honor, Tom Lauria again.  I just

5    have to confirm again, no formal decision has been made

6    regarding funding the plan.  That's something that the

7    investor group has to do by formal action, and to the extent

8    that statements are being made on the record that such a

9    decision has been made, I just want to correct the record.

10   It has not been made, and --

11             THE COURT:  Well, that -- what's the --

12             MR. LAURIA:  -- we're continuing to work --

13   (indiscernible) too.

14             THE COURT:  Yeah, well, what's the disconnect

15   here?  Mr. Kieselstein's making statements to me that this

16   decision's already been made and you're making statements to

17   me that the decision hasn't already been made, so how --

18   what -- I'm confused.

19             MR. LAURIA:  I think Mr. Kieselstein has

20   improperly been reporting, you know, privileged settlement

21   discussions that people have been having, and that's all I

22   can say on that.

23             What I do know is that the group has not met and

24   has not resolved anything on this topic.  There's been,

25   obviously, extensive discussions and people are acting in a

1    very prudent and careful way to make sure that they're

2    protecting their rights, but there has been no action that

3    has been taken among the investor group to withdraw from the

4    transaction or to terminate the transaction.  And that is a

5    fact.

6            MR. KIESELSTEIN:  Your Honor, I don't really feel

7    like a protracted debate with Mr. Lauria would be

8    constructive here.

9            I would say that I don't think I said that there

10   has been formal piece of paper delivered to that effect, but

11   from a variety of sources and a variety of conversations,

12   it's been made to us, rather crystal clear, and that's what

13   we're noting.

14           If they change their view or if I misinterpreted

15   their view, I'm sure they will let me know soon enough, but

16   that's where things stand from any number of sources, which

17   aren't privileged, in my view.

18           MR. LAURIA:  The OV1 documents have mechanisms for

19   the group to act, and the merger agreement and the plan and

20   the PSA provide for mechanics for the parties to communicate

21   with each other on a formal basis, and I can assure you that

22   OV1 has not acted, and I can assure that no communication of

23   any termination or withdrawal or anything else has occurred

24   to this point.

25           THE COURT:  So, what happens on April 30th, then?

1            MR. LAURIA:  Well, Your Honor, my understanding is

2     that if parties take the position, and I -- at least the

3     First Liens have taken the position in formal correspondence

4     to us, that the approval that we've obtained from the PUC is

5     not sufficient to permit a closing of the transaction.

6            Then, there is not an automatic extension to June

7     30th, and so, as of April 30th, parties to the plan support

8     agreement in particular the T Firsts, the Debtors and the

9     investor group, would have the right to deliver notice to

10    the others of their determination to terminate their plans

11    for obligations.  And as a consequence of that, if that were

12    to happen, the plan would become unactionable, and the

13    merger agreement would terminate.

14            That -- none of that has happened yet, and you

15    know, I think people will do whatever they do when the time

16    comes.   But it's certainly all under discussion between and

17    among the parties and internally with our group, and

18    apparently with the T Firsts and the Debtor as well.

19            THE COURT:  Okay, that's helpful.  All right.  I

20    think I understand the dynamic.  Mr. Kieselstein, what do

21    you want from me, in the near future and in the far future?

22            MR. KIESELSTEIN:  Your Honor, there's nothing --

23    this was meant to update and hopefully not confuse Your

24    Honor, and we would expect that there will be pleadings

25    files on the docket in the next few days, including a

1    request for relief in terms of setting the schedule on an

2    alternative plan.

3            And so, it would be not -- I don't think

4    appropriate for me to preview what I'm going to ask you for.

5    I think the motion will lay out the schedule for the next

6    set of hearings to move the process along, and that will be

7    coming shortly.

8            THE COURT:  All right.  Who of you -- well, never

9    mind.  Okay.  Well, all right, I'm not going to make any

10   comment.  Does anybody else wish to be heard?  Okay, I don't

11   hear anybody.  I won't thank you for the update, but I will

12   -- I'll thank you for the update, maybe I don't appreciate

13   the update, but it is what it is, and hopefully, things will

14   move forward in a positive direction.  As always, I'm the

15   most ignorant guy on the call.  I purposefully don't follow

16   these things, so, you know, this is -- other than on the

17   broad strokes, it's surprised me, so I'm still trying to

18   digest it.

19           But thank you very much, and I'll await

20   communication from the Debtor's counsel or anyone else about

21   any requests for relief going forward and scheduling and

22   that sort of thing.  So, if you just work through the normal

23   channels and keep me informed, and if there's some sort of

24   change that -- warranting a further update, we'll just

25   (indiscernible).  Okay?

1          MR. KIESELSTEIN:  Very good, Your Honor, thank you

2   for your time.

3          THE COURT:  You're welcome.

4          MR. LAURIA:  Thank you.

5

6                        * * * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 22

1              C E R T I F I C A T I O N

2

3     I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6     Sonya                 Digitally signed by Sonya Ledanski
                            Hyde
                            DN: cn=Sonya Ledanski Hyde, o, ou,
      Ledanski Hyde         email=digital1@veritext.com, c=US
7                           Date: 2016.04.29 12:59:56 -04'00'

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  April 29, 2016